IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA
CHARLESTON DIVISION

| | |
|---|---|
| B.P.J., by her next friend and mother, HEATHER JACKSON,<br><br>                        *Plaintiff*,<br><br>     v.<br><br>WEST VIRGINIA STATE BOARD OF EDUCATION, HARRISON COUNTY BOARD OF EDUCATION, WEST VIRGINIA SECONDARY SCHOOL ACTIVITIES COMMISSION, W. CLAYTON BURCH in his official capacity as State Superintendent, and DORA STUTLER in her official capacity as Harrison County Superintendent,<br><br>                        *Defendants*. | Civil Action No.  2:21-cv-00316<br><br>Hon.<br><br>**COMPLAINT** |

## INTRODUCTION

1.     B.P.J. is an 11-year-old girl who will start middle school this fall.  While in elementary school, B.P.J. participated on a cheerleading team, where she enjoyed the camaraderie of practicing, playing, and competing alongside a team comprised entirely of girls.  This fall, B.P.J. wants to continue playing sports in middle school by participating on the girls' cross-country and track teams.  B.P.J. comes from a family of runners, and she is excited for her chance to try out and compete.

2.     But without this Court's intervention, B.P.J. will be denied that opportunity simply because she is transgender.  As part of a wave of similar legislation introduced across the country, West Virginia passed a new law in April 2021 that categorically bans B.P.J. and all other girls who are transgender in West Virginia from participating in school sports consistent with their

gender identity.  The new statute, which was passed by the legislature as H.B. 3293, is codified at W. Va. Code § 18-2-25d ("H.B. 3293").[1]

3.      H.B. 3293 was prompted by unfounded stereotypes, false scientific claims, and baseless fear and misunderstanding of girls who are transgender.  Proponents of H.B. 3293 made clear that its purpose is to exclude what they referred to as "transgenders"[2] from girls' sports teams. Yet, as H.B. 3293's sponsors and the Governor have acknowledged, there is no evidence of any "problem" caused by girls who are transgender participating on sports teams in West Virginia.

4.      By barring B.P.J. and other girls who are transgender from participating in school athletics, H.B. 3293 discriminates on the basis of sex and transgender status in violation of the United States Constitution and Title IX of the Education Amendments of 1972, 20 U.S.C. § 1681, *et seq.* ("Title IX").  If allowed to go into effect, H.B. 3293 will cause severe and entirely unnecessary harms and distress to B.P.J. and other girls who are transgender—an already vulnerable group of people subject to a history of discrimination that continues to this day.

5.      B.P.J. seeks declaratory and injunctive relief from this Court to allow her to experience the benefits of athletic participation consistent with her gender identity and without being singled out from other girls for different treatment simply because she is transgender.

## PARTIES

**Plaintiff**

6.      B.P.J. is an 11-year-old girl who lives in Harrison County, West Virginia.  She will attend Bridgeport Middle School in the fall and intends to try out for the girls' cross-country and track teams.  Team practices leading to the Bridgeport Middle School cross-country team tryouts

---

[1] The enacted version of H.B. 3293 is attached as Exhibit A to the Declaration of Loree Stark ("Stark Declaration") that is filed contemporaneously with this Complaint.
[2] *See* Stark Declaration, Exhibit E (April 8, 2021 West Virginia Senate Hearing).

for the 2021-2022 school year are expected to begin in July 2021.  She brings this suit through her next friend and mother, Heather Jackson.

**Defendants**

7.     Defendant West Virginia State Board of Education ("State Board of Education"), located in Kanawha County, supervises the public-school system and is responsible for implementing education policies and programs in West Virginia.  W. Va. Const. art. XII, § 2; W. Va. Code § 18-2-5.  The State Board of Education's supervisory role includes extracurricular activities such as interscholastic athletics.  W. Va. Code § 18-2-25.  The State Board of Education is authorized to delegate its power to control, supervise, and regulate interscholastic athletics to county boards or the West Virginia Secondary School Activities Commission.  *Id.*

8.     Defendant West Virginia Secondary School Activities Commission ("School Activities Commission"), located in Wood County, controls, supervises, and regulates interscholastic athletics for secondary schools pursuant to the State Board of Education's power under West Virginia Code § 18-2-25.  Such powers may be limited and supervised by the State Board of Education.  *Id*.

9.     Defendant Harrison County Board of Education ("County Board of Education") is the governing body of Harrison County's public education system, which includes Bridgeport Middle School.  W. Va. Code § 18-5-1.  The County Board of Education exercises control, supervision, and regulation over Bridgeport Middle School's interscholastic athletics unless and until it delegates such control, supervision, and regulation to the School Activities Commission. W. Va. Code § 18-5-13; W. Va. Code § 18-2-25.  On information and belief, the County Board of Education has delegated its control, supervision, and regulation of Bridgeport Middle School's interscholastic athletics to the School Activities Commission.

10.     Defendant State Superintendent W. Clayton Burch is the Chief Executive Officer of the State Board of Education.  Defendant Burch executes his official duties in Wood County. Defendant Burch oversees all public schools, county superintendents, and county boards of education in West Virginia.  W. Va. Code § 18-3-3.  He is sued in his official capacity.

11.     Defendant Superintendent Dora Stutler is the Chief Executive Officer of the County Board of Education.  Defendant Stutler executes her official duties in Harrison County.  Defendant Stutler is responsible for executing educational policies under the direction of the State Board of Education and the County Board of Education.   W. Va. Code § 18-4-10.   This includes interscholastic athletics.  She is sued in her official capacity.

## JURISDICTION AND VENUE

12.     This action arises under the United States Constitution, 42 U.S.C. § 1983, and Title IX.

13.     This Court has original jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §§ 1331 and 1343 because the matters in controversy arise under laws of the United States, including laws providing for the protection of civil rights, and because this suit seeks redress for the deprivation, under color of state law, for rights secured by the United States Constitution.

14.     Venue is proper in the Charleston Division of the Southern District of West Virginia under 28 U.S.C. § 1391(b)(1) and (2) because Defendants the State Board of Education, the School Activities Commission, and Burch reside in this Division and District and because a substantial part of the events or omissions giving rise to the claims occurred in this Division and District.

15.     This Court has the authority to enter a declaratory judgment and to provide preliminary and permanent injunctive relief pursuant to Federal Rules of Civil Procedure 57 and 65 and 28 U.S.C. §§ 2201 and 2202.

16.     This Court has personal jurisdiction over Defendants because they are domiciled in West Virginia and because West Virginia is the location of their denial of Plaintiff's rights under the United States Constitution and the laws of the United States.

## FACTUAL ALLEGATIONS

### A.     Gender Identity and Gender Dysphoria.

17.     Every individual's sex is multifaceted and comprised of many distinct biological characteristics, including, but not limited to, chromosomal makeup, hormones, internal and external reproductive organs, secondary sex characteristics, and gender identity.

18.     Everyone has a gender identity.  Although the detailed mechanisms are unknown, there is a medical consensus that there is a significant biologic component underlying gender identity.

19.     A person's gender identity is a fundamental component of their identity that is durable and deeply rooted.  It cannot be changed by social or medical intervention.

20.     When a child is born, a sex designation usually occurs at birth based on a visual assessment of the infant's external genitalia.  Most people are cisgender, meaning that their gender identity aligns with the sex they were assigned at birth.

21.     But not everyone's gender identity aligns with the sex they are assigned at birth. A transgender person is someone who has a gender identity that does not align with their sex assigned at birth.

22.     When a person experiences sustained and clinically significant distress caused by the incongruence between their gender identity and their sex-assigned at birth, they may be diagnosed with "gender dysphoria."   *See* American Psychiatric Association's Diagnostic & Statistical Manual of Mental Disorders ("DSM-V").

23.     Under the widely accepted standards of care developed by The Endocrine Society and the World Professional Association for Transgender Health, the only treatment for gender dysphoria before puberty is "social transition."   Preventing transgender youth from social transition can result in severe anxiety and depression, self-harm, and suicidality.

24.     Moreover, for transgender people of all ages (both pre- and post-puberty), being able to socially transition and live and express themselves consistent with their gender identity is critical to their health and well-being.

25.     As part of the medically necessary social transition, before transgender children reach puberty they have the option to receive puberty-delaying medical treatment.  The puberty-delaying treatment helps pre-pubertal transgender children live in alignment with their gender identity and treats the symptoms of gender dysphoria.

26.     Puberty-delaying treatment pauses endogenous puberty at whatever stage it is at when the treatment begins.  This has the impact of limiting the influence of a person's endogenous hormones on their body.  For example, a girl who is transgender who undergoes puberty-delaying treatment before her endogenous puberty begins will experience none of the impacts of testosterone that would be typical if she underwent her endogenous puberty.

27.     Because puberty-delaying treatment allows transgender youth to avoid going through their endogenous puberty, it helps mitigate gender dysphoria and prevents them from

6

experiencing permanent physical changes that would otherwise accompany their endogenous puberty.

**B.    B.P.J.'s Gender, Medical Treatment, and Participation in Sports.**

28.    B.P.J. is a girl who is transgender, which means she is a girl who was assigned the sex of male at birth.  A recent picture of B.P.J. is included below:



29.    B.P.J. knew from a very young age that she is a girl.  By the time she was in the third grade, B.P.J. was living as a girl at home.  At the end of the school year, she informed her mother and father that she did not want to continue going to school "dressed as a boy" and that she wanted to go by the first name B. (a name commonly associated with girls).

30.    B.P.J.'s family supported (and continues to support) B.P.J. living authentically as the girl that she is.

31.     B.P.J. was diagnosed with gender dysphoria in 2019, and she began puberty-delaying treatment on June 15, 2020.  B.P.J. had been receiving this treatment for almost one year at the time West Virginia passed H.B. 3293.

32.     B.P.J. comes from a family of runners, and she plans to try out for the girls' cross-country and track teams at Bridgeport Middle School.  The team practices leading to the girls' cross-country team tryouts are expected to begin in July 2021.

33.     At a young age, B.P.J.'s mother would run with B.P.J. through local parks, which contributed to B.P.J.'s love of running.  B.P.J. has wanted to run on a team since she was in kindergarten.  She has grown up watching her older brothers run on their school teams and her mother compete in organized races.

34.     B.P.J. also likes being on a team and playing sports with other girls.  When B.P.J. competed in cheerleading while in elementary school, she enjoyed the camaraderie of being on a team of girls with her friends and working together as a team to succeed.

35.     Now, just like any other middle school student, B.P.J. wants the chance to explore her athletic interests and try out for the teams that interest her.

**C.     Participation of B.P.J. and Other Transgender Youth in School-Sponsored Athletics.**

36.     For children and young adults, school-sponsored athletics offer a range of benefits that they continue to experience throughout life.  For example, students who participate in high school sports are more likely to finish college and more likely to be actively engaged in planning for their future.  Athletics provide an opportunity to gain confidence, to develop important social, emotional, and coping skills, and to build social connections.  By contrast, when young people are excluded from participating in youth sports, or do not feel accepted or respected, they do not have the opportunity to reap these benefits.

8

37.     Girls who are transgender are similarly situated to cisgender girls (as opposed to cisgender boys) for purposes of participating on sex-separated school athletic teams.  The only way for a girl who is transgender to experience the benefits associated with sex-separated school athletics—or to participate in school athletics at all—is for her to participate on the same teams as other girls.

38.     Girls who are transgender are also not similarly situated to cisgender boys with respect to physiological characteristics associated with athletic performance.  There is scientific consensus that sex chromosomes and genitals alone—*i.e.*, independent of circulating testosterone—do not meaningfully affect athletic performance.  Rather, any population-level performance differences between cisgender boys and cisgender girls in athletic competition are due to circulating testosterone levels that typically diverge significantly starting at puberty.

39.     Girls who are transgender and who receive puberty-delaying treatment followed by gender-affirming hormone therapy never go through their endogenous puberty and thus do not experience physiological changes caused by testosterone.  They experience a hormonal puberty typical of cisgender girls and not cisgender boys.

40.     Girls who are transgender and who *do* go through some or all of their endogenous puberty can receive gender-affirming hormone therapy that reduces their circulating testosterone levels and mitigates and often eliminates any athletic benefit from having gone through endogenous puberty.  The National Collegiate Athletic Association ("NCAA"), World Athletics, and the International Olympic Committee (the "Olympics") all allow women who are transgender to play in women's athletic events after suppressing their levels of testosterone for particular periods of time (*e.g.*, one year) and (for World Athletics or the Olympics) below a particular threshold.

### D.     H.B. 3293.

#### 1.     H.B. 3293's Introduction, Debate, Amendment, and Enactment

41.     Before H.B. 3293 was enacted, a student's eligibility to participate in athletics at the secondary school level in West Virginia was governed by rules promulgated by the School Activities Commission, the executive body with expertise governing scholastic sports.  These rules provided separate teams for boys and girls.  W. Va. Admin. Code § 127-2-3 (3.8).

42.     Prior to H.B. 3293, West Virginia had no public or formal prohibition on the participation of transgender students in school sports.

43.     On March 18, 2021, H.B. 3293 was introduced in the West Virginia House by Delegate Caleb Hanna.  H.B. 3293 was part of a concerted, nationwide effort to target transgender youth for unequal treatment with state legislation.

44.     The operative language of H.B. 3293 as introduced would have required students to provide copies of their birth certificates reflecting their "sex at time of birth" in order to be admitted to public school at any level in West Virginia.  *See* W. Va. Leg. Originating H.B. 3293 (Mar. 16, 2021) § 18-2-5c.[3]  If a student were unable to provide a birth certificate that reflected their "sex at time of birth," the student would have been required to submit an affidavit as well as "[a] signed physician's statement indicating the pupil's sex based solely on the pupil's unaltered internal and external reproductive anatomy."  *Id.* § 18-2-5c(a)(2).

45.     The introduced version of H.B. 3293 further provided that, for purposes of participating in athletics at the secondary level, "[t]he sex identified in subsection (a) above shall be the pupil's sex for the purposes of participating in single-sex secondary school interscholastic

---

[3]   The introduced version of H.B. 3293 is available on the legislature's website: https://www.wvlegislature.gov/Bill_Status/bills_text.cfm?billdoc=HB3293%20ORG.htm&yr=2021&sess type=RS&i=3293.

athletic events under the control, supervision, and regulation of the West Virginia Secondary Schools Activities Commission." *Id.* § 18-2-5c(e).

46.     The introduced version of H.B. 3293 also would have required the School Activities Commission to "verify with each county board that each student participating in single-sex interscholastic events [at the secondary level] is participating according to the student's sex at the time of the student's birth." *Id.* § 18-2-25(f).

47.     On March 18, 2021, the West Virginia House Education Committee held a hearing on H.B. 3293.  From the outset, proponents of H.B. 3293 made clear that H.B. 3293 was targeted at, and intended only to affect, girls who are transgender.  When asked how H.B. 3293 would change the status quo in West Virginia—which already had sex separation in sports—counsel for H.B. 3293 replied that the bill "would affect those that changed their sex after birth" and further explained that H.B. 3293 "would not affect" a man who was assigned a male sex at birth.[4]

48.     During the hearing, Sarah Stewart from the West Virginia Department of Education testified that her office had never received any calls or complaints about transgender students participating in athletics.  Another witness testified that there had been no instances of girls who are transgender "dominating" sports in West Virginia.  In fact, during the hearing, there was no evidence provided that any girl who is transgender had ever played on a girls' athletic team in West Virginia.

49.     H.B. 3293 passed out of the Education Committee and was heard by the Judiciary Committee on March 18, 2021.  The Judiciary Committee amended H.B. 3293 to state that, for purposes of participating in athletics at the secondary level, if a birth certificate were not provided

---

[4] *See* Stark Declaration, Exhibit B (March 18, 2021 West Virginia House of Delegates Education Committee).

or did not indicate a student's sex assigned at birth, then a "signed physician's statement indicating the pupil's sex based solely on the pupil's unaltered internal and external reproductive anatomy must be submitted." *See* W. Va. Leg. Amended H.B. 3293 (Mar. 18, 2021) § 18-2-5c.[5]

50.     As with the first hearing, testimony in the Judiciary Committee focused on students who are transgender.  Opponents of H.B. 3293 again drew attention to the fact that there had been no issues regarding transgender students participating in sports in West Virginia.  As one witness relayed:  while there is "no harm" being addressed by H.B. 3293, "there is harm perpetrated by it." [6]   Nevertheless, H.B. 3293 passed out of the Judiciary Committee, as amended, on March 18, 2021.

51.     On March 23, 2021, the West Virginia Delegates debated H.B. 3293 on the House floor.  When asked at this hearing about the number of complaints that the School Activities Commission had received regarding transgender athletes in West Virginia, Delegate Joe Ellington ("Del. Ellington"), a sponsor of H.B. 3293, admitted that he did not know of any complaints in West Virginia.

52.     Again, during the House floor debate, the sponsors of H.B. 3293 made clear that H.B. 3293 is targeted at, and is intended to exclude, girls who are transgender.  Delegate Margitta Mazzochi, a co-sponsor of H.B. 3293, suggested that she did not "want all this mixing and matching" of "transgender children" with non-transgender children in "locker rooms." Likewise, when closing the debate, Del. Ellington described the "issue" solved by H.B. 3293 as

---

[5]    The Education Committee's amendment to H.B. 3293 is available here: https://www.wvlegislature.gov/Bill_Text_HTML/2021_SESSIONS/RS/bills/HB3293%20SUB.pdf.
[6] *See* Stark Declaration, Exhibit C (March 18, 2021 West Virginia House of Delegates Judiciary Committee).

being "two transgender girls" who "were allowed to compete in state track and field meets in Connecticut."[7]

53.     During the House floor debate, opponents of H.B. 3293 emphasized that H.B. 3293 was simply "creat[ing] problems where they don't exist."  Others emphasized the negative impact that H.B. 3293 would have on West Virginia's transgender population:  as one Delegate put it, "West Virginia, a place to live, work, raise a family if you choose, only if you're not transgender."[8]

54.     H.B. 3293 was passed out of the House without further amendment on March 25, 2021.

55.     On April 1, 2021, H.B. 3293 was heard in the Senate Education Committee.  The Education Committee amended the House version of the bill, including to make it a new section of the Code (§ 18-2-25d).  The Senate Education Committee's amendment removed the birth certificate provisions and defined "[b]iological sex" as "an individual's physical form as a male or female based solely on the individual's reproductive biology and genetics at birth."  § 18-2-25d(b)(1).  The Senate Education Committee added a cause of action provision allowing "any student" "aggrieved" by a violation of H.B. 3293 to sue the respective county board of education. *Id.* at (d).  In addition, whereas previous iterations of H.B. 3293 had encompassed only secondary school athletics, the Senate Education Committee expanded the breadth of H.B. 3293's scope to encompass collegiate athletics as well.  *Id.* at (c)(1).  This amended version of H.B. 3293 was passed out of the Senate Education Committee to the full Senate.

56.     The Senate debated H.B. 3293 on April 8, 2021.  During the debate, proponents of H.B. 3293 again made clear that H.B. 3293 was targeted towards and intended to affect only

---

[7] *See* Stark Declaration, Exhibit D (March 25, 2021 West Virginia House of Delegates).
[8] *See* Stark Declaration, Exhibit D (March 25, 2021 West Virginia House of Delegates).

transgender youth.  One senator who supported H.B. 3293 explicitly noted that "the bill" is "about transgenders."  Another senator quoted from a letter which described the "trans movement" as "an attack upon womanhood."[9]

57.     Opponents of H.B. 3293 noted that multiple groups of medical professionals, including the West Virginia Chapter of the American Academy of Pediatrics, opposed H.B. 3293, calling attention to statistics on suicide and self-harm among transgender youth.

58.     H.B. 3293, as amended by the Senate Education Committee, passed the Senate floor on April 9, 2021.

59.     On April 28, 2021, Governor Justice signed H.B. 3293 into law.

60.     In an interview on April 30, Governor Justice was asked if he could provide "one example of a transgender child trying to get an unfair advantage."  In response, Governor Justice replied: "No, I can't really tell you one."[10]  He further indicated that the issue purportedly addressed by H.B. 3293 was not a priority for him, stating, "I didn't make it a priority.  It wasn't my bill. . . . This is not like it's a big priority to me. . . . I think we only have 12 kids maybe in our state that are transgender-type kids.  I mean, for crying out loud . . . I sign hundreds of bills, hundreds of bills.  This is not a priority to me."

### 2.     H.B. 3293 As Enacted

61.     H.B. 3293 becomes effective on July 8, 2021.

62.     H.B. 3293 as enacted categorically excludes participation in school sports in West Virginia at the middle school, high school, and collegiate level by all girls who are transgender.  §§ 18-2-25d(a)-(c).

---

[9] *See* Stark Declaration, Exhibit E (April 8, 2021 West Virginia Senate Hearing).
[10] https://twitter.com/MSNBC/status/1388132937707802629.

63.     It does so notwithstanding the statute's purported finding that "Classifications based on gender identity serve no legitimate relationship to the State of West Virginia's interest in promoting equal athletic opportunities for the female sex."  § 18-2-25d(a)(4).

64.     Specifically, H.B. 3293 requires that all "[i]nterscholastic, intercollegiate, intramural, or club athletic teams or sports that are sponsored by any public secondary school or a state institution of higher education, including a state institution that is a member of the National Collegiate Athletic Association (NCAA)" are "expressly designated" as either "males," "females," or "co-ed" based solely on a student's "biological sex."  §§ 18-2-25d(b), (c).

65.     H.B. 3293 further provides that "[a]thletic teams or sports designated for females, women, or girls shall not be open to students of the male sex where selection for such teams is based upon competitive skill or the activity involved is a contact sport."  *Id.* at (c)(2).  There is no parallel provision for boys' teams.

66.     H.B. 3293 defines "[b]iological sex" as "an individual's physical form as a male or female ***based solely on the individual's reproductive biology and genetics at birth***."  *Id.* at (b)(1) (emphasis added).  Girls who are transgender necessarily cannot show that they are girls under this definition.

67.     H.B. 3293 also provides a cause of action for "[a]ny student" "aggrieved" by a violation of H.B. 3293 to sue for "injunctive relief and actual damages, as well as reasonable attorney's fee and court costs."  *Id.* at (d).

68.     H.B. 3293 does not define (or set any limits on) what a "violation" under H.B. 3293 may be and delegates authority to other bodies to establish rules and regulations.

69.     H.B. 3293 thus exposes female athletes to the risk of having to subject themselves to sex-based challenges in order to participate on a school-sponsored girls' athletic team.  The

medical history form that the School Activities Commission requires students wishing to participate in school athletics to complete does not refer to sex or gender, or require students to report their reproductive biology or genetics. As a result, girls whose sex is disputed will be unable to rely on their regular sports exam to make the appropriate showing of "biological sex" under H.B. 3293 and thus may be subject to embarrassing, invasive, and/or costly exams to be allowed to play on the girls' team. There is no parallel burden placed on boys.

### 3. H.B. 3293 Excludes Girls Who Are Transgender Based on Their Transgender Status—Not Based on Purported Athletic Advantages

70. H.B. 3293 excludes girls who are transgender from girls' sports teams based on their transgender status, not on any feature tied to a purported physiological athletic advantage.

71. Specifically, H.B. 3293 requires that athletic teams be separated based solely on genetics and reproductive anatomy at birth. W. Va. Code § 18-2-25d(b)(1). H.B. 3293 precludes consideration of circulating testosterone in determining "biological sex"—the only sex-related characteristic with any documented relationship to athletic ability.

72. H.B. 3293 thus categorically bars *any* girl who is transgender from participating in girls' sports without considering factors that have any correlation with athletic ability. Under H.B. 3293, even girls like B.P.J., who receive puberty-delaying treatment and never go through endogenous puberty, are prohibited from participating on girls' sports teams.

73. By contrast, H.B. 3293 would allow a boy who is transgender to play on the girls' sports team, even if the boy had received hormone replacement therapy, including exogenous testosterone as part of his treatment for gender dysphoria.

### E.    H.B. 3293 Harms B.P.J. and Other Girls Who Are Transgender.

74.    B.P.J. was angry and sad when she learned about H.B. 3293 and how it would impact her.  Although B.P.J. is a girl, under H.B. 3293's definition of "biological sex," B.P.J. will be excluded from joining a girls' sports team at school.  W. Va. Code 18-2-25d(b)(1).

75.    If H.B. 3293 is in effect at the start of the Fall 2021 athletic season, B.P.J. will not be able to participate in any activity involving "competitive skill."

76.    Upon information and belief, cross-country running, track, and presumably any other school-sponsored sport of interest to B.P.J. fit that descriptor.

77.    Indeed, on May 18, 2021, the Principal of Bridgeport Middle School—the school that B.P.J. will attend in fall 2021—informed B.P.J.'s mother that B.P.J. will not be permitted to join the girls' cross-country or track teams due to H.B. 3293.  The Principal further stated that if B.P.J. attempted to participate on the boys' team, it would be "confusing" for the cross-country coaches because B.P.J. looks and presents as female, like any other girl.  The Principal said he thus would have to inform the coaches for both the girls' and boys' cross-country teams that B.P.J. is transgender.

78.    The reality is that B.P.J. cannot—and does not want to—participate on the boys' team because she is a girl, not a cisgender boy.  Doing so would be embarrassing and would undermine her medical treatment for gender dysphoria, which includes living and expressing herself as a girl in all aspects of her life.  Forcing her onto a boys' team would undermine this core part of her identity and medical care.

79.    Barring B.P.J. from participating in school sports prevents her from experiencing the motivation, challenge, camaraderie, and joy that sport has brought her in the past, as well as opportunity to be teammates with other girls participating in athletics.

80.     West Virginia's attempt to force B.P.J. to compete on the boys' team also is a clear sign to her and others that West Virginia does not see or accept her as the girl that she is.

81.     Excluding girls who are transgender from participating in athletics alongside their female peers increases shame and stigma and contributes to negative physical and emotional health outcomes for the girls who are transgender who are excluded.

82.     H.B. 3293 also limits (or eliminates) the benefits of athletics for *all* girls. Exclusionary policies such as that embodied in H.B. 3293 discourage, rather than encourage, participation in athletics.

83.     Moreover, because H.B. 3293 impacts girls and not boys, it puts all girls at risk of having their sex disputed.

### CLAIMS FOR RELIEF

### COUNT I
Violation of Title IX
20 U.S.C. § 1681, *et seq*.
Plaintiff against the State Board of Education, the County Board of Education, and the School Activities Commission

84.     Plaintiff incorporates the foregoing paragraphs as though fully set forth herein. Plaintiff brings this Count against the State Board of Education, the County Board of Education, and the School Activities Commission.

85.     Title IX provides that "[n]o person in the United States shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any education program or activity receiving Federal financial assistance."  20 U.S.C. § 1681(a).

86.     The State Board of Education and the County Board of Education are educational programs receiving federal financial assistance.

87.     The School Activities Commission receives federal financial assistance directly and/or indirectly through *inter alia* dues paid by its federal-fund-receiving members.

88.     Because secondary school athletics are of a unique nature that require cooperation and a common administration between the various federal-fund-receiving members, these federal-fund-receiving members have ceded controlling authority to the School Activities Commission over secondary school athletics.

89.     The School Activities Commission's existence and purpose is merely a consequence of the inherent need for a centralized body to manage, coordinate, schedule, or otherwise administer secondary school sports in West Virginia.  It thus is a controlling authority over a federally funded program, namely, athletic opportunities for federal-fund-receiving educational institutions in West Virginia.

90.     Under Title IX, discriminating against transgender students is discrimination "on the basis of sex."

91.     The statutory language of Title IX does not exempt athletic programs from the broad prohibition on discrimination.  The implementing regulations for Title IX permit sports teams to be separated by sex, but do not mandate such separation.

92.     Neither Title IX, nor its regulations, purport to define "sex" based on reproductive anatomy or genetics at birth.  These authorities also do not specify what constitutes separation of sex for purposes of athletic activities, should a school choose to separate certain sports teams by sex.

93.     H.B. 3293 discriminates against B.P.J. and other girls who are transgender by singling them out for different treatment from cisgender girls and—as a result—preventing them

from accessing the benefits of participation in school athletics on an equal basis as other students, in violation of their rights under Title IX.

94.     H.B. 3293 also discriminates against B.P.J. and other girls as compared to boys. H.B. 3293 places girls, but not boys, at risk of having their "biological sex" challenged and accordingly being the focus of an action contending that they do not satisfy the law's definition of female "biological sex."   As a result, H.B. 3293 prevents girls from accessing the benefits of participation in school athletics on an equal basis vis-à-vis boys in violation of their rights under Title IX.

95.     B.P.J. is irreparably harmed by Defendants' illegal conduct in violation of Title IX.

**COUNT II**
Deprivation of Equal Protection
U.S. Const. Amend. XIV
Plaintiff against All Defendants

96.     Plaintiff incorporates the foregoing paragraphs as though fully set forth herein. Plaintiff brings this Count against Defendants the State Board of Education, the County Board of Education, the School Activities Commission, State Superintendent W. Clayton Burch in his official capacity, and Harrison County Superintendent Dora Stutler in her official capacity.

97.     The Equal Protection Clause of the Fourteenth Amendment, enforceable pursuant to 42 U.S.C. § 1983, provides that no state shall "deny to any person within its jurisdiction the equal protection of the laws."  U.S. Const. amend. XIV, § 1.

98.     Defendants are all governmental actors acting under color of state law for purposes of 42 U.S.C. § 1983 and the Fourteenth Amendment.

99.     Under the Equal Protection Clause, discrimination based both on sex and transgender status is subject to heightened scrutiny and is therefore presumptively unconstitutional

absent a showing by the state that the discrimination is substantially related to an important state interest.

100.   H.B. 3293 discriminates against girls who are transgender by singling them out for different treatment from cisgender girls and—as a result—prevents them from accessing the benefits of participation in school athletics on an equal basis as other students based both on sex and transgender status.

101.   Excluding girls who are transgender form participating on girls' sports teams based solely on their "reproductive anatomy and genetics at birth" is not substantially related to any important state interest.

102.    West Virginia passed H.B. 3293 for the impermissible purpose of excluding all girls who are transgender from school athletics.  H.B. 3293's sweeping exclusion of girls who are transgender from participation in school athletics is so disconnected from H.B. 3293's purported justifications that it is impossible to credit them.

103.   H.B. 3293 is based on unfounded stereotypes, false scientific claims, and baseless fear and misunderstanding of girls who are transgender, which are insufficient to justify discriminatory treatment under any level of scrutiny.

104.   H.B. 3293 also discriminates against B.P.J. and other girls as compared to boys. H.B. 3293 places girls, but not boys, at risk of having their "biological sex" challenged and accordingly being the focus of an action contending that they do not satisfy the law's definition of female "biological sex."  As a result, H.B. 3293 prevents girls from accessing the benefits of participation in school athletics on an equal basis vis-à-vis boys in violation of their rights under the Equal Protection Clause.

105.     As a result, Defendants have violated the Equal Protection Clause, enforceable pursuant to 42 U.S.C. § 1983.

106.     B.P.J. is irreparably harmed by Defendants' illegal conduct in violation of the Equal Protection Clause, enforceable pursuant to 42 U.S.C. § 1983.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff respectfully requests that this Court enter an order and judgment as follows:

A.     Declaring that the provisions of and enforcement by Defendants of H.B. 3293 as discussed above violate Plaintiff's rights under Title IX;

B.     Declaring that the provisions of and enforcement by Defendants of H.B. 3293 as discussed above violate Plaintiff's rights under the Equal Protection Clause of the Fourteenth Amendment;

C.     Preliminarily and permanently enjoining Defendants, their officials, agents, employees, assigns, and all persons acting in concert or participating with them from enforcing H.B. 3293 and any other law, custom, or policy that precludes Plaintiff's participation on girls' school sports teams in West Virginia;

D.     Waiving the requirement for the posting of a bond as security for entry of temporary or preliminary injunctive relief;

E.     Awarding Plaintiff nominal damages, as well as her costs, expenses, and reasonable attorneys' fees pursuant to 42 U.S.C. § 1988 and other applicable laws; and

F.     Granting such other and further relief as the Court deems just and proper.

Dated: May 26, 2021

Respectfully submitted,

_/s/ Loree Stark_

Joshua Block*
Taylor Brown*
Chase Strangio*
AMERICAN CIVIL LIBERTIES UNION
FOUNDATION
125 Broad St.
New York, NY 10004
Phone: (212) 549-2569
jblock@aclu.org

Avatara Smith-Carrington*
LAMBDA LEGAL
3500 Oak Lawn Avenue, Suite 500
Dallas, TX 75219
Phone: (214) 219-8585
asmithcarrington@lambdalegal.org

Carl Charles*
Tara Borelli*
 LAMBDA LEGAL
730 Peachtree Street NE, Suite 640
Atlanta, GA  30308-1210
Phone: (404) 897-1880
ccharles@lambdalegal.org

Andrew Barr*
COOLEY LLP
1144 15th St., Suite 2300
Denver, CO  80202-5686
Phone: (720) 566-4000
abarr@cooley.com

Loree Stark (Bar No. 12936)
AMERICAN CIVIL LIBERTIES UNION OF WEST
VIRGINIA FOUNDATION
P.O. Box 3952
Charleston, WV 25339-3952
Phone: (914) 393-4614
lstark@acluwv.org

Kathleen Hartnett*
Julie Veroff*
COOLEY LLP
101 California Street 5th Floor
San Francisco, CA 94111-5800
Phone: (415) 693-2000
khartnett@cooley.com

Katelyn Kang*
COOLEY LLP
55 Hudson Yards
New York, NY 10001-2157
Phone: (212) 479-6000
kkang@cooley.com

Elizabeth Reinhardt*
COOLEY LLP
500 Boylston Street, 14th Floor
Boston, MA 02116-3736
Phone: (617) 937-2305
ereinhardt@cooley.com

*Statements of Visiting Attorneys
Forthcoming

Attorneys for Plaintiff

23

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA
CHARLESTON DIVISION

B.P.J., by her next friend and mother, HEATHER JACKSON,

*Plaintiff*,

v.

WEST VIRGINIA STATE BOARD OF EDUCATION, HARRISON COUNTY BOARD OF EDUCATION, WEST VIRGINIA SECONDARY SCHOOL ACTIVITIES COMMISSION, W. CLAYTON BURCH in his official capacity as State Superintendent, and DORA STUTLER in her official capacity as Harrison County Superintendent,

*Defendants*.

Civil Action No. 2:21-cv-00316

Hon.

## CERTIFICATE OF SERVICE

I, Loree Stark, do hereby certify that on this 26th day of May, 2021, I electronically filed a true and exact copy of ***Plaintiff's Complaint*** with the Clerk of Court and all parties using the CM/ECF System.

*/s/ Loree Stark*
West Virginia Bar No. 12936

24