# EXHIBIT A

RIN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA
CHARLESTON DIVISION

| | |
|---|---|
| B.P.J., by her next friend and mother, HEATHER JACKSON,<br><br>*Plaintiff*,<br><br>v.<br><br>WEST VIRGINIA STATE BOARD OF EDUCATION, HARRISON COUNTY BOARD OF EDUCATION, WEST VIRGINIA SECONDARY SCHOOL ACTIVITIES COMMISSION, W. CLAYTON BURCH in his official capacity as State Superintendent, and DORA STUTLER in her official capacity as Harrison County Superintendent,<br><br>*Defendants*. | Civil Action No.  2:21-cv-00316<br><br>Hon.<br><br>**MEMORANDUM IN SUPPORT OF PLAINTIFF'S MOTION FOR PRELIMINARY INJUNCTION** |

## <u>TABLE OF CONTENTS</u>

**Page**

INTRODUCTION .................................................................................................... 1

STATEMENT OF FACTS ...................................................................................... 3

    I.    Gender Identity and B.P.J.'s Transition. .................................................... 3

    II.    Participation of B.P.J. and Other Transgender Youth in Sports. .......................... 5

    III.    H.B. 3293's Categorical Ban of Girls Who Are Transgender from Sports. .......... 7

    IV.    Need for Preliminary Injunctive Relief. ................................................... 10

ARGUMENT ....................................................................................................... 10

    I.    Preliminary Injunction Standard. ............................................................ 10

    II.    B.P.J. Is Likely to Succeed on Her Title IX Claim. ................................. 11

        A.    H.B. 3293 Excludes B.P.J. from a Federally Funded Education Program. ........................................................................ 11

        B.    H.B. 3293 Excludes B.P.J. on the Basis of Sex. .................... 12

        C.    H.B. 3293 Harms B.P.J. Through Unlawful Discrimination. ................. 13

        D.    This Case Does Not Challenge Sex Separation in Sports. ...................... 16

    III.    Plaintiff Is Likely to Succeed on Her Equal Protection Claim. .......................... 16

        A.    H.B. 3293 Discriminates Against B.P.J. and Other Girls Who Are Transgender, Triggering Heightened Equal Protection Scrutiny. ............ 17

        B.    H.B. 3293 Cannot Survive Heightened Scrutiny. ................................... 19

            1.    H.B. 3293 Is Not Substantially Related to the State's Asserted Interest. ........................................................... 20

            2.    H.B. 3293 Undermines Girls' Athletic Opportunities. ............... 23

    IV.    An Injunction Is Necessary to Avoid Irreparable Harm. ...................................... 25

    V.    The Balance of Equities and the Public Interest Strongly Favor an Injunction. ................................................................................... 26

    VI.    The Bond Should Be Waived. ........................................................... 27

CONCLUSION .................................................................................................... 27

## TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Alston v. Virginia High Sch. League, Inc.*,
    144 F. Supp. 2d 526 (W.D. Va. 1999) ...............................................................11, 12

*Bd. of Trustees of Univ. of Ala. v. Garrett*,
    531 U.S. 356 (2001).................................................................................................24

*Bostock v. Clayton Cty.*,
    140 S. Ct. 1731 (2020).......................................................................................12, 13

*Centro Tepeyac v. Montgomery Cty.*,
    722 F.3d 184 (4th Cir. 2013) (en banc) ..................................................................26

*Citizens for a Responsible Curriculum v. Montgomery Cty. Pub. Sch.*,
    No. Civ.A. AW-05-1194, 2005 WL 1075634 (D. Md. May 5, 2005) ....................27

*City of Cleburne, Tex. v. Cleburne Living Ctr.*,
    473 U.S. 432 (1985).................................................................................................24

*Clark v. Arizona Interscholastic Ass'n*,
    695 F.2d 1126 (9th Cir. 1982) ................................................................................22

*Cmtys. for Equity v. Mich. High Sch. Athletic Ass'n*,
    80 F. Supp. 2d 729 (W.D. Mich. 2000) ..................................................................12

*Doe v. Wood Cty. Bd. of Educ.*,
    888 F. Supp. 2d 771 (S.D. W. Va. 2012) ................................................................25

*Grimm v. Gloucester Cty. Sch. Bd.*,
    302 F. Supp. 3d 730 (E.D. Va. 2018) .......................................................................9

*Grimm v. Gloucester Cty. Sch. Bd.*,
    822 F.3d 709 (4th Cir. 2016) ..................................................................................27

*Grimm v. Gloucester Cty Sch. Bd.*,
    972 F.3d 586 (4th Cir. 2020) .......................................................................... *passim*

*Hecox v. Little*,
    479 F. Supp. 3d 930 (D. Idaho 2020) ............................................................ *passim*

*Henry v. Greenville Airport Comm'n*,
    284 F.2d 631 (4th Cir. 1960) ..................................................................................25

## TABLE OF AUTHORITIES
### (continued)

**Page(s)**

*Hoechst Diafoil Co. v. Nan Ya Plastics Corp.*,
    174 F.3d 411 (4th Cir. 1999) ....................................................................27

*J.E.B. v. Alabama ex rel. T.B.*,
    511 U.S. 127 (1994) ........................................................................14, 27

*Lawrence v. Texas*,
    539 U.S. 558 (2003) ........................................................................14, 25

*League of Women Voters of N.C. v. North Carolina*,
    769 F.3d 224 (4th Cir. 2014) ....................................................................11

*Mayor & City Council of Baltimore v. Azar*,
    392 F. Supp. 3d 602 (D. Md. 2019) ..........................................................11

*Obergefell v. Hodges*,
    135 S. Ct. 2584 (2015) ....................................................................25, 26

*Romer v. Evans*,
    517 U.S. 620 (1996) ................................................................................24

*Ross v. Meese*,
    818 F.2d 1132 (4th Cir. 1987) ..................................................................25

*United States v. Playboy Ent. Grp., Inc.*,
    529 U.S. 803 (2000) ........................................................................22, 23

*United States v. Virginia*,
    518 U.S. 515 (1996) ................................................................17, 19, 20

*Winter v. NRDC, Inc.*,
    555 U.S. 7 (2008) ....................................................................................26

**Statutes**

W. Va. Code
    § 18-2-25d(a)(3) ............................................................................15, 22
    § 18-2-25d(a)(4) ....................................................................................18
    § 18-2-25d(a)(5) ....................................................................................20
    § 18-2-25d(b)(1) ..........................................................................1, 8, 9, 15
    § 18-2-25d(c) ............................................................................................8
    § 18-2-25d(c)(2) ..............................................................................8, 19
    § 18-2-25d(d)(1) ..............................................................................9, 19

**TABLE OF AUTHORITIES**
**(continued)**

**Page(s)**

**Other Authorities**

34 C.F.R.
    § 106.33....................................................................................................................16
    § 106.41....................................................................................................................16

ACLU, *Legislation Affecting LGBT Rights Across the Country* (last updated May
    14, 2021) .................................................................................................................7

Br. of American Academy of Pediatrics, et al., *Grimm v. Gloucester Cty. Sch. Bd.*,
    No. 19-1952, ECF 32-1 (4th. Cir.)...........................................................................5

Gillian R. Brassil, *How Some States Are Moving to Restrict Transgender Women
    in Sports*, N.Y. Times, Apr. 12, 2021 ......................................................................7

Pamela S. Karlan, Principal Deputy Assistant Att'y Gen., U.S. Dep't of Justice,
    C.R. Div., Memorandum re: Application of *Boston v. Clayton County* to Title
    IX of the Education Amendments of 1972 (Mar. 26, 2021)....................................13

Jo Yurcaba, *'State of crisis': Advocates warn of 'unprecedented' wave of anti-
    LGBTQ bills*, NBC News, April 26, 2021 11:48AM PDT .......................................7

## INTRODUCTION

B.P.J. is an 11-year-old girl who starts middle school this fall. Like many girls her age, she plans to try out for and participate on school sports so that she can practice, play, and compete as part of a team. In particular, B.P.J. wants to try out for her middle school's cross-country and track teams and continue her family's tradition of competitive running.

Under West Virginia's newly enacted House Bill 3293 ("H.B. 3293"), however, B.P.J.—like all girls in West Virginia who are transgender—is categorically barred from playing school sports at the middle school, high school, and collegiate levels simply because she is transgender.[1] H.B. 3293 accomplishes this discriminatory bar by limiting membership on girls' school sports teams to girls assigned a female sex at birth based on "reproductive biology and genetics"—a test that, by definition, excludes all girls who are transgender. W. Va. Code § 18-2-25d(b)(1). The statute's "ends-driven definition[] of 'biological [sex]' . . . guarantee[s] a particular outcome:" that girls who are transgender cannot play on girls' teams and therefore cannot play sports at all. *Grimm v. Gloucester Cty Sch. Bd.*, 972 F.3d 586, 626 (4th Cir. 2020) (Wynn, J., concurring), *as amended* (Aug. 28, 2020), *cert. pending*, No. 20-1163 (determining that policies prohibiting school restroom use consistent with a student's gender identity are unconstitutional and violate Title IX).

Barring girls who are transgender from playing sports is not just an incidental effect of H.B. 3293—it is the very purpose of the law. H.B. 3293 was passed as part of a national movement to prevent girls who are transgender from participating in scholastic sports, and proponents of the bill were express that its aim is to exclude "transgenders" from playing on girls' sports teams.

---

[1] A transgender person has a gender identity that does not align with the sex they were assigned at birth. "Gender identity" is the medical term for a person's internal, innate sense of belonging to a particular sex. (Expert Declaration of Joshua D. Safer, MD, FACP, FACE ("Safer Decl.") ¶ 17.) An individual's gender identity is durable and cannot be changed by medical intervention. (*Id.* ¶ 18.) A cisgender person has a gender identity that aligns with the sex they were assigned at birth.

(Declaration of Loree Stark ("Stark Decl.") Ex. E at 2.) Moreover, the bill was passed even though its sponsors and the Governor acknowledged that there is no evidence that permitting girls who are transgender to participate on girls' sports teams in West Virginia has created any issues whatsoever. (Stark Decl. Ex. B at 1–2.; Ex. C at 1; Ex. D at 1.); Compl. ¶ 60.

Prior to H.B. 3293's enactment, West Virginia already had separate sports teams for boys and girls and did not categorically bar girls like B.P.J. from competing in school sports on girls' teams. Now, however, B.P.J. and other girls like her are singled out and prevented from participating in sports simply because they are transgender. The law also puts all female athletes at risk of being subject to sex-based challenges to their participation, in which they will have to reveal their "reproductive biology and genetics" to show entitlement to play. This unjustified discrimination on the basis of sex and transgender status deprives B.P.J. and other girls who are transgender of the meaningful experience of playing school sports available to all other kids and causes them severe and entirely unnecessary distress.

When B.P.J. learned that she cannot try out for the girls' cross-country and track teams solely because she is a girl who is transgender, she felt angry, sad, and hurt. Running on a boys' team is not a viable option for B.P.J. She is a girl. Running on a boys' team would force her to subordinate rather than affirm her identity as a girl. It would be a clear sign to her and others that the State is refusing to see her as and accept her for the girl she is. All B.P.J. wants is the chance to participate in school sports like any other kid. But H.B. 3293 singles her out from other girls by requiring that she alone has to try out for the boys' team because she is a girl who is transgender rather than a girl who is cisgender. This separate and unequal treatment is stigmatizing, painful, and humiliating, and will potentially subject B.P.J. to harassment and further discrimination.

(Declaration of Heather Jackson ("Heather Decl.") ¶¶ 26–27; Declaration of B.P.J. ("B.P.J. Decl.") ¶¶ 12, 15.)

In *Hecox v. Little*, 479 F. Supp. 3d 930, 984 (D. Idaho 2020), *appeal argued* Nos. 20-35813, 20-35815 (9th Cir. May 3, 2021), a federal court issued a preliminary injunction to prohibit Idaho from enforcing a similar discriminatory law. This Court should do the same. B.P.J. is likely to prevail on her claims that H.B. 3293 violates Title IX of the Education Amendments of 1972, 20 U.S.C. § 1681, *et seq.*, and the Equal Protection Clause. Team practices leading to cross-country tryouts are scheduled to begin in July 2021. If not preliminarily enjoined before then, H.B. 3293 will bar B.P.J. from school sports this coming school year and the resulting team sports experience to which all other student athletes have access. (B.P.J. Decl. ¶ 14.; (Expert Declaration of Mary Fry, PhD ("Fry Decl.") ¶¶ 44, 49.) This Court should preliminarily enjoin H.B. 3293 and any other law, custom, or policy that precludes B.P.J.'s participation on girls' school sports teams in West Virginia, thus preserving the status quo until B.P.J.'s claims can be vindicated.

## STATEMENT OF FACTS

### I.     Gender Identity and B.P.J.'s Transition.

Everyone has a gender identity. (Expert Declaration of Deanna Adkins, MD ("Adkins Decl.") ¶ 15.) Gender identity is durable and cannot be changed by social or medical intervention. (*Id.* ¶ 18; Safer Decl. ¶ 18.) Although the detailed mechanisms are unknown, there is a medical consensus that there is a significant biologic component underlying gender identity. (Safer Decl. ¶ 18.) Gender identity is a fundamental aspect of human identity. (*Id.* ¶ 17.)

When a child is born, a sex designation is usually made based on a visual assessment of the child's external genitalia.[2] (Adkins Decl. ¶ 37.) Most people have a gender identity that aligns with the sex they are assigned at birth, but for people who are transgender, their gender identity does not align with their sex assigned at birth. (Adkins Decl. ¶¶ 17, 38–39.) B.P.J. is a girl who is transgender, (Heather Decl. ¶ 6; B.P.J. Decl. ¶ 2), which means she is a girl who was assigned the sex of male at birth, (Adkins Decl. ¶ 14).

B.P.J. knew from a very young age that she is a girl, and her family supports her by recognizing B.P.J. as the girl she is. (Heather Decl. ¶¶ 6–10, 22; B.P.J. Decl. ¶ 5.) For transgender people of all ages, being able to live and express themselves consistent with their gender identity is critical to their health and well-being. (Adkins Decl. ¶¶ 20–22.) Preventing transgender youth from living and expressing themselves as who they are can cause severe anxiety and depression, self-harm, and suicidality. (*Id.*) When the incongruence between a person's gender identity and their assigned sex at birth results in sustained, clinically significant distress, they meet the diagnostic criteria for gender dysphoria, a serious medical condition. (Adkins Decl. ¶ 19.)

When transgender children approach puberty, it may be medically necessary to begin treatment to alleviate the symptoms of gender dysphoria and help them live in alignment with their gender identity. (Adkins Decl. ¶ 29.) Puberty-delaying treatment, for example, allows transgender youth to avoid going through endogenous puberty, thereby avoiding the permanent physical changes and heightened gender dysphoria that puberty causes for many young people who are transgender. (*Id.*) This treatment pauses endogenous puberty at whatever stage it is at when the

---

[2] "External genitalia" are only one of several sex-related characteristics. Every individual's sex is multifaceted and comprised of many distinct biological characteristics, including, but not limited to, chromosomal makeup, hormones, internal and external reproductive organs, secondary sex characteristics, and gender identity. (Safer Decl. ¶ 23; Adkins Decl. ¶ 41.)

4

treatment begins. (*Id.* ¶ 30.) Thus, a girl who is transgender who undergoes puberty-delaying treatment before puberty will experience none of the impacts of testosterone that would be typical if she underwent her endogenous puberty. (*Id.* ¶¶ 30–31.) B.P.J. has been on puberty-delaying treatment for almost one year, and she has not gone through her endogenous puberty or experienced any of the hormonal changes typical of the endogenous puberty of someone assigned male at birth. (Heather Decl. ¶ 13; B.P.J. Decl. ¶ 7.)

## II.    Participation of B.P.J. and Other Transgender Youth in Sports.

B.P.J., like other young athletes, loves participating and competing on teams. (B.P.J. Decl. ¶¶ 9–10; Heather Decl. ¶¶ 15–17.) While in elementary school, she participated on a cheerleading team with great positive impact. (B.P.J. Decl. ¶¶ 8–10; Heather Decl. ¶¶ 15–17.) And, as someone who comes from a family of runners, B.P.J. grew up running and watching her older brothers and mother run competitively and for leisure. (B.P.J. Decl. ¶ 11; Heather Decl. ¶ 20.) It is because of her and her family's love for running that B.P.J. intends to try out for the girls' cross-country and track teams at Bridgeport Middle School. (B.P.J. Decl. ¶ 11; Heather Decl. ¶ 20.)

Transgender students, like all other students, benefit from the ability to participate in school athletics. (Fry Decl. ¶¶ 45–46; B.P.J. Decl. ¶¶ 9–11; Heather Decl. ¶¶ 15–17, 20.) Participation in school sports promotes fitness and has significant lifelong benefits in academics and business. (Fry Decl. ¶¶ 45–46.) These benefits are maximized when schools promote an inclusive atmosphere encouraging students to participate, work together, and improve their own performance. (*Id.* ¶¶ 34–35.) When students are excluded from sport, they are deprived of these benefits, with detrimental effects for all student-athletes exposed to that climate of exclusion. (*Id.* ¶¶ 48–50.)

The only way for a girl who is transgender to experience these benefits in the context of sex-separated sports is for her to participate on the girls' team like other girls. (Adkins Decl. ¶ 28; Fry Decl. ¶¶ 48–49; B.P.J. Decl. ¶¶ 12–15; Heather Decl. ¶¶ 26–27.) Singling out girls who are

transgender for different treatment from all other students—who are allowed to participate on teams consistent with their gender identity—negates their gender identity and undermines their medically necessary treatment. (B.P.J. Decl. ¶¶14–15; Heather Decl. ¶ 26–27; Adkins Decl. ¶¶ 28, 36 (describing how patients "suffer and experience worse health outcomes when they are ostracized from their peers through policies that exclude them from spaces and activities that other boys and girls are able to participate in consistent with gender identity")); *see also* Br. of American Academy of Pediatrics, et al., *Grimm v. Gloucester Cty. Sch. Bd.*, No. 19-1952, ECF 32-1 (4th. Cir.).

Competing on the boys' team is not an option for B.P.J. It would not only undermine her medical treatment and the core of who she is, but it would also be humiliating because it would send a public message to B.P.J. and the entire community that B.PJ. should be treated differently from everyone else. (Adkins Decl. ¶¶ 21, 23, 28, 36; Heather Decl. ¶¶ 26–27; B.P.J. Decl. ¶¶ 12–15.) This type of singling out, when legitimized by the government, also contributes to bullying and harassment of transgender youth by their peers. *See Grimm*, 972 F.3d at 597 (discussing widespread discrimination against transgender students in schools).

Girls who are transgender are similarly situated to cisgender girls—and not cisgender boys—with respect to athletic performance. Medical consensus is that any performance differences generally observed between cisgender boys and cisgender girls in athletic competition are due to circulating testosterone levels that diverge significantly starting at puberty. (Safer Decl. ¶¶ 24–25, 48.) Those performance differences are not present in girls who are transgender who (like B.P.J.) receive puberty-delaying treatment before their endogenous puberty begins and then receive gender-affirming hormone therapy to initiate puberty consistent with their gender identity. (*Id.* ¶¶ 49–50.) Through this treatment, girls who are transgender avoid endogenous puberty

altogether and do not experience the physiological changes caused by testosterone. (*Id.*) In addition, girls who are transgender and who *do* go through endogenous puberty can receive gender-affirming hormone therapy that reduces their circulating testosterone levels and mitigates and often eliminates any athletic benefit from having gone through endogenous puberty. (*Id.* ¶¶ 51–57.)

### III. H.B. 3293's Categorical Ban of Girls Who Are Transgender from Sports.

Before H.B. 3293, West Virginia had a general policy establishing separate school sports teams for boys and girls, but no law or policy categorically prohibiting girls who are transgender from playing on girls' teams. *See* W. Va. Code R. § 127-2-3.8.[3] By introducing and passing H.B. 3293 despite no evidence of any "problem" caused by transgender student athletes, the West Virginia Legislature joined a recent wave of anti-transgender legislation spurred by a national, coordinated effort to ban transgender young women and girls from women's sports.[4] In so doing, West Virginia has become one of a few states newly barring all girls who are transgender from participating in school sports.[5]

---

[3] At the college level—which is governed by the National Collegiate Athletic Association—women athletes who are transgender were (prior to H.B. 3293) permitted to participate in women's sports after suppressing their circulating testosterone levels for one year. (Safer Decl. ¶ 39.)

[4] *See, e.g.*, Jo Yurcaba, *'State of crisis': Advocates warn of 'unprecedented' wave of anti-LGBTQ bills*, NBC News, April 26, 2021 11:48AM PDT, https://www.nbcnews.com/feature/nbc-out/state-crisis-advocates-warn-unprecedented-wave-anti-lgbtq-bills-n1265132; Gillian R. Brassil, *How Some States Are Moving to Restrict Transgender Women in Sports*, N.Y. Times, Apr. 12, 2021, https://www.nytimes.com/2021/03/11/sports/transgender-athletes-bills.html.

[5] In 2020, Idaho became the first state to adopt a categorical bar on the participation of transgender women and girls in women's and girls' sports. *Hecox*, 479 F. Supp. 3d at 944 (citing Idaho Code Ann. § 33-6201-6206). Following the recent concerted national effort to pass more such laws, as of this filing, seven states in addition to Idaho—Alabama, Arkansas, Mississippi, Montana, South Dakota, Tennessee, and West Virginia—have enacted such bans on female transgender athletes. *See* ACLU, *Legislation Affecting LGBT Rights Across the Country* (last updated May 14, 2021), https://www.aclu.org/legislation-affecting-lgbt-rights-across-country.

H.B. 3293 was passed by the West Virginia Legislature on April 9, 2021 and signed by Governor Justice on April 28. (Stark Decl. Ex. A); Compl. ¶¶ 58–59. H.B. 3293 alters West Virginia's existing rules governing sex separation in school sports by categorically barring all girls who are transgender from participating in school sports from middle school through college. H.B. 3293 also creates the risk that all girl athletes—whether cisgender or transgender—will be subjected to sex-based challenges to their participation, in which they will have to reveal their "reproductive biology and genetics" to show entitlement to play.

Specifically, H.B. 3293 requires all secondary school and college sports in West Virginia to be "expressly designated" as male, female, or co-ed "based on biological sex." W. Va. Code § 18-2-25d(c). The law defines the term "biological sex" as "an individual's physical form as male or female based solely on the individual's reproductive biology and genetics at birth."[6] *Id.* § 18-2-25d(b)(1). H.B. 3293 mandates that "[a]thletic teams or sports designated for females, women, or girls shall not be open to students of the male sex where selection for such teams is based upon competitive skill or the activity involved is a contact sport." *Id.* § 18-2-25d(c)(2).[7] There is no parallel provision for male teams.

---

[6] Verification of "reproductive biology and genetics" is not part of the routine sports physical examination required by Defendant West Virginia Secondary School Activities Commission. (Heather Decl. Ex. A.) Furthermore, examining a female student's "reproductive biology" and testing her "genetics" would serve no medical purpose and would be unethical. *See Hecox*, 479 F. Supp. 3d at 985–86 (discussing expert testimony from a pediatrician who explained that "verify[ing] a patient's sex related to their reproductive anatomy, genes or hormones" absent medical indication would not be "ethical" or "consistent with medical science" (internal quotation marks omitted)).

[7] H.B. 3293 does not define "competitive skill" or "contact sport" and it is not clear whether any school sports teams select their members based on anything other than "competitive skill." The cross-country and track teams B.P.J. seeks to join presumably select their members based on competitive skill, as she must try out for them. (Heather Decl. ¶ 19; B.P.J. Decl. ¶ 11.) Indeed, according to the Principal of Bridgeport Middle School (B.P.J.'s school as of fall 2021), the cross-

As an enforcement mechanism, H.B. 3293 provides that "[a]ny student aggrieved by a violation" of the law "may bring an action against a county board of education or state institution of higher education alleged to be responsible for the alleged violation," and "may seek injunctive relief and actual damages, as well as reasonable attorney's fee[s] and court costs." W. Va. Code § 18-2-25d(d)(1). The law does not specify how disputes regarding a student athlete's sex are to be resolved, but it delegates the power to promulgate rules governing the implementation of H.B. 3293, including its enforcement mechanism, to the State Board of Education.

H.B. 3293 employs a definition of "biological sex" that, by design and effect, targets and categorically excludes B.P.J. and all other girls who are transgender from playing sports at the middle school, high school, and collegiate levels. H.B. 3293 divides individuals into two categories, "biological males" and "biological females," based on their "reproductive biology and genetics at birth." W. Va. Code § 18-2-25d(b)(1). By using only those two criteria to define what the law calls "biological sex," H.B. 3293 ignores that "[a] person's sex encompasses the sum of several different biological attributes, including sex chromosomes, certain genes, gonads, sex hormone levels, internal and external genitalia, other secondary sex characteristics, and gender identity," and that all of these attributes are not "always aligned in the same direction." (Safer Decl. ¶ 23); *see also Grimm v. Gloucester Cty. Sch. Bd.*, 302 F. Supp. 3d 730, 743 (E.D. Va. 2018) ("[T]he terms 'biological male or female' should be avoided because not all individuals have physical attributes that align perfectly with biological maleness or femaleness, such as individuals with XY chromosomes who may have female-appearing genitalia.").

---

country and track teams are governed by H.B. 3293 and B.P.J. is thus prohibited from participating on the girls' teams for those sports.  (Heather Decl. ¶ 23.)

Furthermore, H.B. 3293 *precludes* consideration of the only sex-related characteristic with any documented relationship to athletic ability: circulating testosterone. (Safer Decl. ¶¶ 25, 48.) Under H.B. 3293, even girls like B.P.J.—who receive puberty-delaying treatment and never go through endogenous puberty and thus never are exposed to the levels of testosterone associated with a typical male puberty (*id.* ¶ 49)—are prohibited from participating on girls' sports teams.

The sponsors of H.B. 3293 and the accompanying legislative debate made plain that the entire purpose of H.B. 3293 was to prevent girls who are transgender from playing on girls' sports teams. During a hearing on H.B. 3293 by the West Virginia House Education Committee, counsel for H.B. 3293 explained that the bill only "would affect those that changed their sex after birth." (Stark Decl. Ex. B at 1.) A senator who supported the bill was equally candid, stating that "the bill" is "about transgenders." (*Id.* Ex. E at 2.) The bill's sponsors also acknowledged that they were not aware of a single instance of a transgender athlete having ever competed on a secondary school or higher education sports team in West Virginia, let alone any "problem" from such participation. (Stark Decl. Ex. B at 1–2; Ex. C at 1; Ex. D at 1.) Indeed, after signing the bill, Governor Justice admitted that he could not identify even "one example of a transgender child trying to get an unfair advantage." Compl. ¶ 60.

## IV.    Need for Preliminary Injunctive Relief.

Team practices leading to tryouts for Bridgeport Middle School's girls' cross-country team for the 2021-2022 school year are expected to begin in July 2021. (Heather Decl. ¶ 19.) Absent a preliminary injunction, B.P.J. will be unable to participate in school sports this coming school year.

## ARGUMENT

## I.    Preliminary Injunction Standard.

A preliminary injunction is warranted where a plaintiff (1) is likely to succeed on the merits, (2) is likely to suffer irreparable harm in the absence of preliminary relief, (3) can show that the

balance of hardships weighs in her favor, and (4) can show that the injunction is in the public interest. *League of Women Voters of N.C. v. North Carolina*, 769 F.3d 224, 236 (4th Cir. 2014). "When a preliminary injunction is sought against the government, . . . the last two factors merge." *Mayor & City Council of Baltimore v. Azar*, 392 F. Supp. 3d 602, 619 (D. Md. 2019).

## II.      B.P.J. Is Likely to Succeed on Her Title IX Claim.

To prevail on her Title IX claim regarding H.B. 3293, B.P.J. must establish (1) that she was excluded from participation in an education program offered by an educational institution that received federal financial assistance; (2) that the discrimination occurred "on the basis of sex"; and (3) that the discrimination caused her harm. *See Grimm*, 972 F.3d at 616 (citing *Preston v. Com. of Va. ex rel. New River Cmty. Coll.*, 31 F.3d 203, 206 (4th Cir. 1994)). Binding Fourth Circuit precedent makes clear that B.P.J. is likely to succeed on establishing all these requirements.

### A.      H.B. 3293 Excludes B.P.J. from a Federally Funded Education Program.

It is settled that school-sponsored athletics in West Virginia are education programs that receive federal funding. *See, e.g.*, *Alston v. Virginia High Sch. League, Inc.*, 144 F. Supp. 2d 526, 527 (W.D. Va. 1999) (applying Title IX analysis to athletics program). Defendants the West Virginia State Board of Education ("State Board of Education") and the Harrison County Board of Education ("County Board of Education") are both federally funded institutions. Compl. ¶ 86.

Similarly, the West Virginia Secondary School Activities Commission ("School Activities Commission"), which is the controlling authority for secondary school athletics in West Virginia, receives federal financial assistance. Compl. ¶ 87. Secondary school athletics are of a "unique nature" that require cooperation and a common administration between the various federal-funds-receiving members. *Alston*, 144 F. Supp. 2d at 532. As a result, the State and County Boards of

11

Education, both of which receive federal funds, ceded controlling authority over secondary school athletics to the School Activities Commission. Compl. ¶¶ 89–90. The School Activities Commission is thus a controlling authority over a federally funded program and is subject to Title IX. *See Alston*, 144 F. Supp. 2d at 533; *see also Cmtys. for Equity v. Mich. High Sch. Athletic Ass'n*, 80 F. Supp. 2d 729, 735 (W.D. Mich. 2000) (holding that "any entity that exercises controlling authority over a federally funded program is subject to Title IX, regardless of whether that entity is itself a recipient of federal aid").

### B.     H.B. 3293 Excludes B.P.J. on the Basis of Sex.

The Fourth Circuit's decision in *Grimm* makes clear that B.P.J.'s exclusion from sports by H.B. 3293 is sex-based discrimination.

Gavin Grimm was a transgender high school boy who used the boys' restrooms at school until the Gloucester County School Board passed a policy barring students from using restrooms inconsistent with their "biological gender." The Fourth Circuit had "little difficulty holding that a bathroom policy precluding Grimm from using the boys['] restrooms discriminated against him 'on the basis of sex'" because "it is impossible to discriminate against a person for being . . . transgender without discriminating against that individual based on sex." *Grimm*, 972 F.3d at 616 (quoting *Bostock v. Clayton Cty.*, 140 S. Ct. 1731, 1741 (2020)). Indeed, "the Board could not exclude Grimm from the boys['] bathrooms without referencing his 'biological gender'" under the policy. *Id*. Thus, "[e]ven if the Board's primary motivation in implementing or applying the policy was to exclude Grimm because he is transgender, his sex remains a but-for cause for the Board's actions." *Id.*

The Fourth Circuit's reasoning in *Grimm* applies with equal force here. As in *Grimm*, by enforcing H.B. 3293 and excluding B.P.J. from participating on girls' sports teams because she is transgender, Defendants are acting "on the basis of sex" under Title IX. *See Grimm*, 972 F.3d at

12

616; *see also Bostock*, 140 S. Ct. at 1741; Pamela S. Karlan, Principal Deputy Assistant Att'y Gen., U.S. Dep't of Justice, C.R. Div., Memorandum re: Application of *Boston v. Clayton County* to Title IX of the Education Amendments of 1972 (Mar. 26, 2021), *available at* https://www.justice.gov/crt/page/file/1383026/download. Governmental officials enforcing H.B. 3293 cannot apply the statute to exclude B.P.J. without referencing her "biological sex" under the statute. *See Grimm*, 972 F.3d at 616. Although the legislative history makes clear that the "primary motivation" of West Virginia legislators was to target people they referred to as "transgenders," (Stark Decl. Ex. E at 2), B.P.J.'s "sex remains a but-for cause" of her exclusion. *Grimm*, 972 F.3d at 616.

### C. H.B. 3293 Harms B.P.J. Through Unlawful Discrimination.

*Grimm* also makes clear that H.B. 3293 harms B.P.J. through unlawful discrimination.

As the Fourth Circuit explained in *Grimm*, "[i]n the Title IX context, discrimination mean[s] treating that individual worse than others who are similarly situated." *Id.* at 618 (quoting *Bostock*, 140 S. Ct. at 1740). "Grimm was treated worse than students with whom he was similarly situated because he alone could not use the restroom corresponding with his gender. Unlike the other boys, he had to use either the girls['] restroom or a single-stall option. In that sense, he was treated worse than similarly situated students." *Id.* Thus, the School Board's bathroom policy constituted unlawful discrimination. The Fourth Circuit also had "no difficulty holding that Grimm was harmed" as a result of this discrimination because being excluded from the same restrooms as other boys made Grimm feel "stigmatized and isolated" and "invite[d] more scrutiny and attention from other students, very publicly branding all transgender students with a scarlet 'T'." 972 F.3d at 617–18 (internal quotation marks and alterations omitted).

Likewise here, H.B. 3293 unlawfully discriminates against B.P.J. and causes her harm. As in *Grimm*, by enforcing H.B. 3293 and excluding B.P.J. from participating on the same team as

13

other girls, Defendants "treat[] her worse than similarly situated students." 972 F.3d at 618. All students other than girls who are transgender like B.P.J. are allowed to participate in school sports consistent with their gender. H.B. 3293 singles out B.P.J. from other girls by requiring that she—but no other girl—try out for the boys' team because she is a girl who is transgender rather than a girl who is cisgender.

And as in *Grimm,* that exclusion "very publicly brand[s]" B.P.J. and "all transgender students with a scarlet 'T'"—stigmatizing transgender students and marking them, publicly, as different from their peers. *Id.* at 617–18 (internal quotation marks and alterations omitted); *cf. J.E.B. v. Alabama ex rel. T.B.*, 511 U.S. 127, 142 (1994) (explaining that when a juror is excluded based on sex "[t]he message it sends to all those in the courtroom, and all those who may later learn of the discriminatory act, is that certain individuals, for no reason other than gender, are presumed unqualified"). Indeed, the Principal at B.P.J.'s middle school has told B.P.J.'s mother that the cross-country coaches will need to be informed that B.P.J. is transgender. (Heather Decl. ¶ 24 (relating school principal's explanation that such disclosure is necessary "because B.P.J. looks and presents like a female, and it would be confusing for the girls' cross-country coach if she saw one of the girls walking over to the boys' side while the teams were practicing").)

The separate and unequal treatment to which H.B. 3293 subjects B.P.J. is stigmatizing, isolating, and hurtful, (B.P.J. Decl. ¶¶ 12, 15; Heather Decl. ¶ 27), and "is an invitation to subject" B.P.J. and other girls who are transgender to further "discrimination both in the public and in the private spheres." *Lawrence v. Texas*, 539 U.S. 558, 575 (2003). Furthermore, if H.B. 3293 is in effect for the 2021-2022 school year, B.P.J. will not be able to participate in school sports at all, depriving her of the team bonding and camaraderie to which all other student athletes have access.

14

The legislative findings in H.B. 3293 assert that excluding girls who are transgender from girls' sports teams is not discriminatory because "biological males and biological females are not in fact similarly situated" for purposes of sex-separated athletic teams. W. Va. Code § 18-2-25d(a)(3). But B.P.J. is not a cisgender boy. She is a girl. She lives and expresses herself as a girl, and it is critical to her health and well-being for her to do so. (Adkins Decl. ¶¶ 21, 23, 28, 36; Heather Decl. ¶¶ 26–27; B.P.J. Decl. ¶¶ 12–15.) And like other girls, in order to experience the educational and social benefits that are reaped from participating on sports teams, B.P.J. must be allowed to participate on girls' teams. *See Grimm*, 972 F.3d at 624 (Wynn, J., concurring) (requiring students to choose between using the restroom associated with their physiology or a private, single-stall restroom "is no choice at all because" the policy "completely misses the reality of what it means to be a transgender [girl]").

Moreover, to the extent that cisgender boys and cisgender girls are differently situated for purposes of athletic competition, it is not because of the factors set forth in H.B. 3293—"reproductive biology and genetics at birth." W. Va. Code § 18-2-25d(b)(1). Rather, circulating testosterone—a factor ignored by H.B. 3293—is the only sex-related characteristic with any documented relationship to athletic ability. (Safer Decl. ¶¶ 25, 48.) Girls who are transgender and who—like B.P.J.—receive puberty-delaying treatment followed by gender-affirming hormone therapy, avoid endogenous puberty altogether and thus do not experience physiological changes caused by testosterone. (*Id.* ¶ 49–50.) And girls who are transgender and who *do* go through their endogenous puberty can receive gender-affirming hormone therapy that reduces their circulating testosterone levels and mitigates and often eliminates any athletic benefit from having gone through endogenous puberty. (*Id.* ¶¶ 51–57.) Thus, for purposes of athletic competition, B.P.J. is similarly situated to cisgender girls in all relevant respects.

15

### D.     This Case Does Not Challenge Sex Separation in Sports.

Finally, as in *Grimm*, Defendants' discrimination against B.P.J. is not authorized by the Title IX regulation allowing schools to provide "separate teams for members of each sex where selection for such teams is based upon competitive skill or the activity involved is a contact sport." 34 C.F.R. § 106.41. B.P.J. "does not challenge sex-separated [teams]; [she] challenges the [State's] discriminatory exclusion of [her] from the sex-separated [team] matching [her] gender identity." *Grimm*, 972 F.3d at 618. "And the implementing regulation cannot override the statutory prohibition against discrimination on the basis of sex." *Id.* "All [the regulation] suggests is that the act of creating sex-separated [teams] in and of itself is not discriminatory—not that, in applying [athletic] policies to students like [B.P.J.], the [State] may rely on its own discriminatory notions of what 'sex' means." *Id.* Indeed, the legislative hearings indicate that H.B. 3293's definition of "biological sex" was crafted for the very purpose of excluding girls who are transgender from participation in sports. (*See* Stark Decl. Ex. B at 1–2; Ex. C at 1; Ex. D at 1, 3; Ex. E at 2, 3.)

In sum, as in *Grimm*, B.P.J. is likely to succeed on her Title IX claim.

### III.     Plaintiff Is Likely to Succeed on Her Equal Protection Claim.

B.P.J. is similarly likely to succeed on her claim that H.B. 3293 violates the Equal Protection Clause. H.B. 3293 establishes criteria for participation in school sports that categorically bar girls who are transgender from participating. Laws like H.B. 3293, which force people into sex-specific spaces based on their sex assigned at birth rather than their gender identity, constitute discrimination based on sex and transgender status. *Grimm*, 972 F.3d at 608–10. Such discrimination must withstand heightened equal protection scrutiny to be constitutional. *Id.* at 607. H.B. 3293 cannot meet this "exacting" test (or any form of scrutiny). *United States v. Virginia*, 518 U.S. 515, 555 (1996) (hereinafter "*VMI*"); *see Hecox*, 479 F. Supp. 3d at 984 (holding that

plaintiff was likely to succeed on an equal protection challenge to Idaho's law banning girls who are transgender from girls' sports).

Where, as here, the ultimate burden to justify H.B. 3293 under the Equal Protection Clause "rests entirely on the State," *VMI*, 518 U.S. at 533, the burden to show a likelihood of success on that claim shifts to Defendants at the preliminary injunction stage as well. *See Gonzales v. O Centro Espírita Beneficente União do Vegetal*, 546 U.S. 418, 429 (2006) ("[T]he burdens at the preliminary injunction stage track the burdens at trial.").

### A.  H.B. 3293 Discriminates Against B.P.J. and Other Girls Who Are Transgender, Triggering Heightened Equal Protection Scrutiny.

On its face, H.B. 3293 targets B.P.J. and other girls who are transgender for discriminatory treatment. Prior to the enactment of H.B. 3293, sex separation in sports already existed in West Virginia as a matter of regulation and longstanding (and unchallenged) practice. And no existing state law prohibited girls who are transgender from participating on girls' teams in school sports. H.B. 3293 is a sweeping change to that landscape. By its plain text, purpose, and effect, H.B. 3293 singles out girls who are transgender through a definition of "biological sex" that categorically excludes them from participating in school sports based on both their transgender status and sex.

As explained above, the statute's requirement that "biological sex" be established based only on "reproductive biology and genetics at birth" categorically excludes girls who are transgender from qualifying as girls. *See supra* Statement of Facts III. The legislative findings for H.B. 3293 also reject the notion of allowing students to play on sports teams consistent with their "gender identity," asserting that "gender identity is separate and distinct from biological sex" and that "[c]lassifications based on gender identity serve no legitimate relationship to the State of West Virginia's interest in promoting equal athletic opportunities for the female sex." W. Va. Code § 18-

2-25d(a)(4).[8] H.B. 3293 thus establishes an "ends-driven definition[] of 'biological [sex]'" to "guarantee[] a particular outcome:" that girls who are transgender cannot play on the girls' team—the team consistent with their gender identity—and therefore cannot play sports at all. *Grimm*, 972 F.3d at 626 (Wynn, J., concurring); *see also id.* at 620 (Wynn, J., concurring) ("[T]he [law's] use of 'biological [sex]' to classify students has the effect of shunting individuals like [B.P.J.]—who *may not* [participate on the girls' team] because of their 'biological [sex],' and who *cannot* [participate on the boys' team] because of their gender identity'—[out of school athletics] altogether").

The legislative history confirms what is plain from the face of the bill: that H.B. 3293 was specifically designed to exclude girls who are transgender—and only girls who are transgender—from participating on girls' sports teams. When asked how the bill would change the status quo (which already precluded boys from playing on girls' teams), counsel for the bill replied that the "bill would affect those that changed their sex after birth" and "would not affect" a boy who identifies as a boy. (Stark Decl. Ex. B at 1.) Later, a co-sponsor of the bill stated that she did not "want all this mixing and matching" of transgender students with non-transgender students in "locker rooms." (*Id.* Ex. D at 3.) Another delegate described the "issue" that H.B. 3923 was designed to address as "two transgender girls" who "were allowed to complete in state track and field meetings in Connecticut." (*Id.*) During the debate in the Senate, one senator expressly noted

---

[8] The Legislature made this "finding" even though H.B. 3293 is *in fact* a prohibited anti-transgender classification because it conditions participation on a girls' sports team with having a gender identity consistent with sex assigned at birth. The Legislature's own recognition that "gender identity"-based classifications have "no legitimate relationship" to the State's asserted interest only underscores why H.B. 3293's exclusion of girls who are transgender (but not other girls) cannot stand.

that "the bill" is "about transgenders," and another favorably shared a constituent letter stating that the "trans movement is an attack upon womanhood." (*Id.* Ex. E at 3.)

Discrimination against transgender people is subject to heightened scrutiny under the Equal Protection Clause because it rests on "sex-based classifications and because transgender people constitute at least a quasi-suspect class." *Grimm*, 972 F.3d at 607; *see id.* at 608 (explaining that laws discriminating against transgender people with respect to using facilities consistent with their gender identity discriminate based on sex because such policies "necessarily rest[] on a sex classification" and "punish transgender persons for gender non-conformity, thereby relying on sex stereotypes" (internal quotation marks omitted; collecting cases from other circuits)). H.B. 3293 also is subject to heightened scrutiny because it discriminates against girls as compared to boys.[9]

### B. H.B. 3293 Cannot Survive Heightened Scrutiny.

To survive heightened scrutiny, the government "must show at least that the [challenged] classification serves important governmental objectives and that the discriminatory means employed are substantially related to the achievement of those objectives." *VMI*, 518 U.S. at 516 (internal quotation marks omitted). The law cannot "rely on overbroad generalizations about the different talents, capacities, or preferences of males and females." *Id.* at 533.

---

[9] The law provides that "[a]thletic teams or sports designated for females, women, or girls shall not be open to students of the male sex . . .." W. Va. Code § 18-2-25d(c)(2). There is no parallel provision for teams and sports designated for male students. Only girls are therefore vulnerable to the challenge that they do not satisfy the law's definition of female "biological sex." Boys, by contrast, face no risk of being the focus of an action brought against a county board of education or state institution of higher education by a student allegedly aggrieved by a violation of the law. *Id.* § 18-2-25d(d)(1). The law triggers heightened scrutiny on this basis as well. *See VMI*, 518 U.S. at 555 ("[A]ll gender-based classifications today warrant heightened scrutiny." (internal quotation marks omitted)).

1.      **H.B. 3293 Is Not Substantially Related to the State's Asserted Interest.**

The sole justification offered for H.B. 3293 is "promot[ing] equal athletic opportunities for the female sex." W. Va. Code § 18-2-25d(a)(5). But that is not what H.B. 3293 does. Sex separation in sports preexisted H.B. 3293. What H.B. 3293 does is exclude girls who are transgender from sports. The permissibility of providing "separate but equal [athletic teams] in schools on a male/female basis . . . says nothing about what happened in this case: separation of transgender students from their cisgender counterparts through a policy that ensures that transgender students may [participate in] neither male nor female [teams] due to the incongruence between their gender identity and their sex-assigned-at-birth." *Grimm*, 972 F.3d at 625 (Wynn, J., concurring).

Although providing equal athletic opportunities is an important governmental interest, "the discriminatory means employed" through H.B. 3293's deliberately exclusionary definition of "biological sex" is not substantially related to that interest. *VMI*, 518 U.S. at 553 (internal quotation marks omitted). As noted above in connection with B.P.J.'s Title IX claim, the only sex-related characteristic with any documented relationship to athletic ability is circulating testosterone. (Safer Decl. ¶¶ 25, 48.) But H.B. 3293 does not permit any consideration of circulating testosterone. Instead, it hinges athletic participation on sex chromosomes and reproductive anatomy. Yet the scientific consensus is that those two factors do not on their own affect athletic performance. (*Id.* ¶¶ 41, 43.) "That the Act essentially bars consideration of circulating testosterone illustrates the Legislature appeared less concerned with ensuring equality in athletics than it was with ensuring exclusion of transgender women athletes." *Hecox*, 479 F. Supp. 3d at 984.

Moreover, when it comes to circulating testosterone, girls who are transgender and who receive puberty-delaying treatment prior to their endogenous puberty, followed by gender-affirming hormone therapy, never go through their endogenous puberty and thus experience none

of the physiological changes caused by an influx of testosterone. (Adkins Decl. ¶¶ 30–31; Safer Decl. ¶¶ 47–49.) B.P.J., for instance, is receiving puberty-delaying treatment and has not undergone puberty typical of people assigned male at birth. (Heather Decl. ¶ 13; B.P.J. Decl. ¶ 7.) For purposes of biological sex characteristics that impact athletic performance, B.P.J. is similarly situated to her cisgender female friends and teammates.

Likewise, for girls who are transgender who *do* go through their endogenous puberty but then receive gender-affirming hormone therapy that reduces their circulating testosterone levels, this treatment mitigates and often eliminates any potential athletic benefits deriving from having gone through some or all of their endogenous puberty.[10] (Safer Decl. ¶¶ 49–52.) H.B. 3293 ignores all these realities. *See Grimm*, 972 F.3d at 623–24 (Wynn, J., concurring) ("[I]f the Board's concern were truly that individuals might be exposed to those with differing physiology, it would presumably have policies in place to address differences between pre-pubescent and post-pubescent students, as well as intersex individuals . . . . That the Board's policy does not address those circumstances further suggests that its privacy justification is a post-hoc rationalization based on mere hypotheticals.").

In addition, even if there were marginal differences in athletic performance between some girls who are transgender and some girls who are cisgender, that would still not justify West Virginia's sweeping categorical exclusion. The legislative findings assert that if girls who are transgender were allowed to participate on girls' sports teams, they "would displace females to a substantial extent if permitted to compete on teams designated for biological females." W. Va.

---

[10] The National Collegiate Athletic Association, World Athletics, and the International Olympic Committee accordingly all allow women who are transgender to play in elite women's athletic events after suppressing their levels of testosterone for particular periods of time or below particular thresholds. (Safer Decl. ¶¶ 34–35, 39.)

Code § 18-2-25d(a)(3). But West Virginia provides no reason to credit that assertion—much less an "exceedingly persuasive" one. The only support offered for the proposition that girls who are transgender will substantially displace girls who are not transgender if allowed to play on girls' teams in the findings is a citation to *Clark v. Arizona Interscholastic Association*, 695 F.2d 1126 (9th Cir. 1982). But *Clark* had nothing to do with transgender athletes or whether girls who are transgender may be categorically excluded from girls' teams. Rather, *Clark* concerned a school district policy preventing cisgender boys from playing volleyball on the girls' team in a school district that did not sponsor a boys' volleyball team but provided "overall [athletic] opportunit[ies]" to boys that were "not inferior" to those provided to girls. 695 F.2d at 1131–32. There, the parties stipulated that boys would "on average be potentially better volleyball players than girls," thus creating an "undue advantage." *Id.* at 1127, 1131. Based on those stipulated facts, the Court found that "due to average physiological differences, males would displace females to a substantial extent if they were allowed to compete for positions on the volleyball team." *Id.* at 1131.

Here, in contrast, there is no finding, record, or any showing whatsoever that allowing girls who are transgender to play on girls' teams—let alone any specific team in West Virginia—would result in cisgender girls being substantially displaced from school sports teams. "Although the ratio of males to females is roughly one to one, less than one percent of the population is transgender." *Hecox*, 479 F. Supp. 3d at 977. As the bill's sponsor and Governor Justice have acknowledged, there were no known examples of transgender athletes participating in sports—much less dominating or otherwise displacing cisgender girls—in West Virginia at the time H.B. 3293 was passed. (Stark Decl. Ex. B at 1–2; Ex. C at 1; Ex. D at 1.); Compl. ¶ 60. Indeed, when Governor Justice was asked after signing the bill whether he could give "one example of a transgender child trying to get an unfair advantage," he responded, "No, I can't really tell you one." Compl. ¶ 60; *cf.*

*United States v. Playboy Ent. Grp., Inc.*, 529 U.S. 803, 822 (2000) (explaining that under heightened scrutiny "the Government must present more than anecdote and supposition" to show that "an actual problem" exists).

### 2.     H.B. 3293 Undermines Girls' Athletic Opportunities.

Not only is H.B. 3293 not substantially related to the goal of protecting girls' opportunities in sports, but it actually undermines the benefits that girls can access by playing sports. A principal goal of school athletics (as opposed to elite athletics, which, as noted, *see supra* n.10, expressly *permit* women who are transgender to compete on women's teams) is for students to develop skills, make friends, increase physical activity, and learn valuable life lessons—which can contribute to greater success in college and throughout life. (Fry Decl. ¶¶ 45–46.) These are precisely the types of benefits B.P.J. has experienced from participating in cheerleading in the past and hopes to gain from playing on girls' teams in the future. (B.P.J. Decl. ¶¶ 9–10, 14; Heather Decl. ¶¶ 16–17, 20.)

Encouraging student-athletes to focus on improving their own performance and cooperation with teammates maximizes the benefits of athletics for all women. (Fry Decl. ¶¶ 26, 30, 47.) Where coaches create an environment in which student-athletes feel safe, valued, and respected, performance is improved and the benefits of sport are maximized. (*Id.* ¶¶ 22, 42.) Excluding students for no other reason than because they are transgender eliminates the benefits of sports for them and diminishes those benefits for all girls. (*Id.* ¶¶ 49, 50.) H.B. 3293's vague provision permitting students who feel "aggrieved" to sue for injunctive relief also creates a means that could be used to bully girls, including those perceived as less feminine, and to chill them from participating. Boy student athletes in West Virginia do not face similar threats to their ability to participate and compete on a boys' team.

\* \* \*

23

In short, the legislature's "sheer conjecture and abstraction" about the ends allegedly served by H.B. 3293 is insufficient to carry the State's demanding burden under heightened scrutiny. *Grimm*, 972 F.3d at 614 (internal quotation marks omitted). Instead of furthering an important governmental interest in equality, the plain text of the statute and its operation in practice advances only an "invalid interest of excluding transgender women and girls from women's sports entirely, regardless of their physiological characteristics." *Hecox*, 479 F. Supp. 3d at 984–85.

The pretextual nature of the State's claimed justification of advancing equality in sports is confirmed by the context surrounding H.B. 3293's enactment. The legislative history makes clear that the law was passed out of fear and disapproval of transgender women and girls and was "marked by misconception and prejudice." *Grimm*, 972 F.3d at 615 (quoting *Tuan Anh Nguyen v. INS*, 533 U.S. 53, 73 (2001)); *see supra* Argument III.A (discussing legislators' remarks about people who are transgender).

Indeed, even if heightened scrutiny did not apply, H.B. 3293 would fail under any standard of review. The statute imposes a sweeping, categorical bar on participation in virtually all sports from middle school through college, including club and intramural, for girls who are transgender. It applies to girls who are transgender regardless whether they go through endogenous puberty, the age at which they transition, the level of their circulating testosterone, or the level and sport in which they want to compete. "The breadth of the [law] is so far removed from [the] particular justifications" put forth in support of it, that it is "impossible to credit them." *Romer v. Evans*, 517 U.S. 620, 635 (1996). Under any standard of scrutiny, the Legislature's generalized fear, discomfort, or moral disapproval of a group of people is not a legitimate governmental interest for imposing unequal treatment. *See City of Cleburne, Tex. v. Cleburne Living Ctr.*, 473 U.S. 432, 448 (1985); *see also Bd. of Trustees of Univ. of Ala. v. Garrett*, 531 U.S. 356, 374 (2001) (Kennedy,

J., concurring) (explaining that irrational discrimination "rises not from malice or hostile animus alone" and "may result as well from insensitivity caused by simple want of careful, rational reflection or from some instinctive mechanism to guard against people who appear to be different in some respects from ourselves").

## IV.    An Injunction Is Necessary to Avoid Irreparable Harm.

The violation of B.P.J.'s rights under Title IX constitutes irreparable harm that cannot be compensated by monetary damages. *Doe v. Wood Cty. Bd. of Educ.*, 888 F. Supp. 2d 771, 777 (S.D. W. Va. 2012) (collecting cases). B.P.J. likewise faces irreparable harm from the violation of her rights under the Equal Protection Clause. It is well established that where constitutional rights are being violated, irreparable harm is presumed. *Ross v. Meese*, 818 F.2d 1132, 1135 (4th Cir. 1987) ("[T]he denial of a constitutional right, if denial is established, constitutes irreparable harm for purposes of equitable jurisdiction."); *see also Henry v. Greenville Airport Comm'n*, 284 F.2d 631, 633 (4th Cir. 1960) ("The District Court has no discretion to deny relief by preliminary injunction to a person who clearly establishes by undisputed evidence that he is being denied a constitutional right.").

B.P.J. "will experience [her] middle school years only once during [her] life." *Doe*, 888 F. Supp. 2d at 778. If B.P.J. is denied the opportunity to try out for and compete on the girls' sports teams, she will lose seasons of competition, camaraderie, and development with her peers that she can never get back. (B.P.J. Decl. ¶¶ 12, 14.) She will also be subject to the state's communication of its moral disapproval of her identity, which the Constitution prohibits. *See Lawrence*, 539 U.S. at 582–83; (Heather Decl. ¶ 27; B.P.J. Decl. ¶ 15.) H.B. 3293 was enacted for the very purpose of barring the perceived "threat" of girls who are transgender from participating in girls' athletics. *See supra* Argument III.A. The social, psychological, and emotional harms resulting from that

discrimination are "[d]ignitary wounds [that] cannot always be healed with the stroke of a pen." *Obergefell v. Hodges*, 135 S. Ct. 2584, 2606 (2015).

## V.    The Balance of Equities and the Public Interest Strongly Favor an Injunction.

The balances of equities and the public interest also strongly favor an injunction. In evaluating the balance of equities, courts "must balance the competing claims of injury and must consider the effect on each party of the granting or withholding of the requested relief." *Winter v. NRDC, Inc.*, 555 U.S. 7, 24 (2008) (citation omitted). B.P.J.'s harms are significant and weigh heavily in favor of injunctive relief. As explained above, H.B. 3293 will deprive B.P.J. of the opportunity to play sports and the associated experiences of competition, friendship, and responsibility. (B.P.J. Decl. ¶¶ 12, 14–15; Heather Decl. ¶ 26.) It will also cause her pain and distress. (B.P.J. Decl. ¶¶ 12, 15; Heather Decl. ¶ 27.)

Moreover, for individuals with gender dysphoria, being prevented from affirming their gender identity can result in severe anxiety, depression, self-harm, and suicidal ideation. (Adkins Decl. ¶¶ 20–21.) Indeed, the estimated prevalence of suicide attempts among people who are transgender is as high as 40%. (*Id.* ¶ 22.)

In stark contrast to the deeply personal and irreparable harms B.P.J. faces, a preliminary injunction would not harm Defendants. An injunction would merely maintain the status quo—under which girls who are transgender were not categorically excluded from school sports—while B.P.J. pursues her claims. Given that no "problems" involving the participation of transgender athletes have been reported in West Virginia, Defendants face no harm if the status quo is maintained.

Finally, it is always in the public interest to "uphold[] constitutional rights." *Centro Tepeyac v. Montgomery Cty.*, 722 F.3d 184, 191 (4th Cir. 2013) (en banc) (internal quotation marks omitted). And "[t]he public interest is certainly served by promoting compliance with Title IX."

*Doe*, 888 F. Supp. 2d at 778. "Enforcing [B.P.J.'s] right to be free from discrimination on the basis of sex in an educational institution is plainly in the public interest." *Grimm v. Gloucester Cty. Sch. Bd.*, 822 F.3d 709, 729 (4th Cir. 2016) (Davis, J., concurring), *vacated and remanded on other grounds*, 137 S. Ct. 1239 (2017); *see also J.E.B.*, 511 U.S. at 140 ("The community is harmed by the State's participation in the perpetuation of invidious group stereotypes.").

## VI. The Bond Should Be Waived.

Given the rights at stake in this case and the fact that Defendants will not suffer harm from the imposition of a preliminary injunction, the Federal Rule of Civil Procedure 65(c) bond should be waived. *See Hoechst Diafoil Co. v. Nan Ya Plastics Corp.*, 174 F.3d 411, 421 n.3 (4th Cir. 1999) ("Where the district court determines that the risk of harm [to the enjoined party] is remote, or that the circumstances otherwise warrant it, the court may fix the amount of the bond accordingly. In some circumstances, a nominal bond may suffice."); *Citizens for a Responsible Curriculum v. Montgomery Cty. Pub. Sch.*, No. Civ.A. AW-05-1194, 2005 WL 1075634, at *12 (D. Md. May 5, 2005) (waiving bond where defendant would not suffer harm). A bond is neither appropriate nor necessary in this case.

## CONCLUSION

For the reasons stated herein, Plaintiff respectfully requests that the Court grant her Motion for a Preliminary Injunction and preliminarily enjoin Defendants, as well as their officers, employees, agents, attorneys, and any person who is in active concert or participation with any Defendant or under any Defendant's supervision, direction, or control, from enforcing H.B. 3293 and any other law, custom, or policy that precludes Plaintiff's participation on girls' school sports teams in West Virginia. Plaintiff further requests that the Court waive the Rule 65 bond.

Dated: May 26, 2021

Respectfully submitted,

/s/ Loree Stark

Joshua Block*
Taylor Brown*
Chase Strangio*
AMERICAN CIVIL LIBERTIES UNION
FOUNDATION
125 Broad St.
New York, NY 10004
Phone: (212) 549-2569
jblock@aclu.org

Avatara Smith-Carrington*
LAMBDA LEGAL
3500 Oak Lawn Avenue, Suite 500
Dallas, TX 75219
Phone: (214) 219-8585
asmithcarrington@lambdalegal.org

Carl Charles*
Tara Borelli*
LAMBDA LEGAL
730 Peachtree Street NE, Suite 640
Atlanta, GA  30308-1210
Phone: (404) 897-1880
ccharles@lambdalegal.org

Katelyn Kang*
COOLEY LLP
55 Hudson Yards
New York, NY 10001-2157 Phone:
(212) 479-6000
kkang@cooley.com

Loree Stark (Bar No. 12936)
AMERICAN CIVIL LIBERTIES UNION OF WEST
VIRGINIA FOUNDATION
P.O. Box 3952
Charleston, WV 25339-3952
Phone: (914) 393-4614
lstark@acluwv.org

Kathleen Hartnett*
Julie Veroff*
COOLEY LLP
101 California Street 5th Floor
San Francisco, CA 94111-5800
Phone: (415) 693-2000
khartnett@cooley.com

Andrew Barr*
COOLEY LLP
1144 15th St., Suite 2300
Denver, CO  80202-5686
Phone: (720) 566-4000
abarr@cooley.com

Elizabeth Reinhardt*
COOLEY LLP
500 Boylston Street, 14th Floor
Boston, MA 02116-3736
Phone: (617) 937-2305
ereinhardt@cooley.com

*Statements of Visiting Attorneys
Forthcoming

Attorneys for Plaintiff

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA
CHARLESTON DIVISION

| | |
|---|---|
| B.P.J., by her next friend and mother, HEATHER JACKSON, <br><br> *Plaintiff*, <br><br> v. <br><br> WEST VIRGINIA STATE BOARD OF EDUCATION, HARRISON COUNTY BOARD OF EDUCATION, WEST VIRGINIA SECONDARY SCHOOL ACTIVITIES COMMISSION, W. CLAYTON BURCH in his official capacity as State Superintendent, and DORA STUTLER in her official capacity as Harrison County Superintendent, <br><br> *Defendants*. | Civil Action No.  2:21-cv-00316 <br><br> Hon. |

## CERTIFICATE OF SERVICE

I, Loree Stark, do hereby certify that on this 26th day of May, 2021, I electronically filed a true and exact copy of ***Memorandum in Support of Plaintiff's Motion for Preliminary Injunction*** with the Clerk of Court and all parties using the CM/ECF System. A copy of this Memorandum will also be served to the Defendants with the Complaint.

DATED this 26th day of May, 2021          */s/ Loree Stark*
                                                                          West Virginia Bar No. 12936

29