IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA
CHARLESTON DIVISION

| | |
|---|---|
| B.P.J., by her next friend and mother, HEATHER JACKSON, <br><br> *Plaintiff*, <br><br> v. <br><br> WEST VIRGINIA STATE BOARD OF EDUCATION, HARRISON COUNTY BOARD OF EDUCATION, WEST VIRGINIA SECONDARY SCHOOL ACTIVITIES COMMISSION, W. CLAYTON BURCH in his official capacity as State Superintendent, and DORA STUTLER in her official capacity as Harrison County Superintendent, <br><br> *Defendants*. | Civil Action No. 2:21-cv-00316 <br><br> Hon. Joseph R. Goodwin |

**SUPPLEMENTAL DECLARATION OF KATELYN KANG**

I, Katelyn Kang, declare under penalty of perjury of the laws of the United States of America that the following is true and correct, and state:

1.      I am an attorney with the law firm Cooley LLP, counsel of record for Plaintiff B.P.J, with her next friend and mother, Heather Jackson.  The following is true of my own personal knowledge, and, if called as a witness, I would and could testify competently thereto.

2.      As set forth below, I have reviewed audio recordings and provided full transcripts of the West Virginia Legislature's testimony regarding H.B. 3293.  Each transcript is accurately described in the respective Exhibit and transcribed to the best of my ability.  Each transcript contains timestamps of testimony as available on the West Virginia Legislature's public recordings, or in the audio files provided below.  I have also provided hyperlinks where the recordings are available for review.  As of the date of this filing, each of the hyperlinks is in working order.

3.      Attached hereto as Exhibit A is a true and correct transcription of testimony heard during the West Virginia House of Delegates Education Committee Meeting on or around March 18, 2021.      A recording of the testimony is available for download at: https://liquidfiles.cooley.com/link/02OaNUdHjag73hII87u1bQ (last accessed June 7, 2021).

4.      Attached hereto as Exhibit B is a true and correct transcription of testimony heard during the West Virginia House of Delegates Judiciary Committee Meeting on or around March 18,      2021.      A      recording      of      the      testimony      is      available      at: https://liquidfiles.cooley.com/link/IBA66jDqugGj5EM04cqf2Q (last accessed June 7, 2021).

5.      Attached hereto as Exhibit C is a true and correct transcription of testimony heard during the West Virginia House of Delegates Hearing on or around March 25, 2021.  A recording of the testimony is available at:

https://www.youtube.com/watch?app=desktop&v=af_ikMx-PJU (last accessed June 7, 2021).

6.      Attached hereto as Exhibit D is a true and correct transcription of testimony heard during the first part of the West Virginia Senate Education Committee on or around April 1, 2021. A recording of the testimony is available at:

http://sg001-harmony.sliq.net/00289/Harmony/en/PowerBrowser/PowerBrowserV2/20210330/-1/50887 (last accessed June 7, 2021).

7.      Attached hereto as Exhibit E is a true and correct transcription of testimony heard during the second part of the West Virginia Senate Education Committee on or around April 1, 2021.      A      recording      of      the      testimony      is      available      at:      http://sg001-harmony.sliq.net/00289/Harmony/en/PowerBrowser/PowerBrowserV2/20210401/-1/50893  (last accessed June 7, 2021).

8.     Attached hereto as Exhibit F is a true and correct transcription of testimony heard during the West Virginia Senate Hearing on or around April 8, 2021.  A recording of the testimony is available at:

http://sg001-harmony.sliq.net/00289/Harmony/en/PowerBrowser/PowerBrowserV2/20210408/-1/50919 (accessed June 7, 2021).


I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct.


Executed on June 9, 2021                         */s/ Katelyn Kang*
                                                                Katelyn Kang, Esq.

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA
CHARLESTON DIVISION

| | |
|---|---|
| B.P.J., by her next friend and mother, HEATHER JACKSON,<br><br>                                    *Plaintiff*,<br><br>          v.<br><br>WEST VIRGINIA STATE BOARD OF EDUCATION, HARRISON COUNTY BOARD OF EDUCATION, WEST VIRGINIA SECONDARY SCHOOL ACTIVITIES COMMISSION, W. CLAYTON BURCH in his official capacity as State Superintendent, and DORA STUTLER in her official capacity as Harrison County Superintendent,<br><br>                                    *Defendants*. | Civil Action No. 2:21-cv-00316<br><br>Hon. Joseph R. Goodwin |

## CERTIFICATE OF SERVICE

I, Andrew D. Barr, do hereby certify that on this 9th day of June, 2021, I electronically filed a true and exact copy of the ***Supplemental Declaration of Katelyn Kang*** with the Clerk of Court and all parties using the CM/ECF System.

                                        */s/ Andrew D. Barr*
                                        Colorado Bar No. 49644
                                        Admitted *pro hac vice*

# EXHIBIT A

**West Virginia House of Delegates Education Committee Discussion of H.B. 3293**

**March 18, 2021**

| | | |
|---|---|---|
| Chairman Ellington: | 00:00:00 | And some of the potential witnesses today or testimony today. Um, clerk, uh, will take us out on quorum and we do have a quorum. So, uh, Vice Chair make a motion to accept the minutes from the previous meeting. |
| Vice Chair: | 00:00:16 | Uh, Mr. Chairman, I move the minutes as presented in the packet, be approved. |
| Chairman Ellington: | 00:00:23 | Uh, you heard the Vice Chair. Any, uh, questions, additions, deletions, directions? Chair here is now all in favor of accepting the minutes from the previous meeting, say aye. |
| Audience: | 00:00:32 | Aye. |
| Chairman Ellington: | 00:00:34 | Those opposed, nay. Ayes appear to have it. Ayes do have it. Minutes adopted. First on the agenda will be an originating bill. Is there any interest in the bill? |
| Counsel: | 00:00:43 | Chairman Ellington, I move the bill. |
| Chairman Ellington: | 00:00:45 | All right, Counsel. Counsel, explain the bill. |
| Counsel: | 00:00:47 | Thank you Chairman Ellington. This bill uh, mens' current code with regard to admission and, uh, participation in single-sex sports. Uh, the bill provides that the birth certificate required for admission to public school must confirm the pupil's sex at the time of birth and the birth certificate. If a birth certificate cannot be obtained, a signed physician's statement indicating the pupil's sex based solely on the pupil's unaltered internal and external reproductive anatomy must be submitted. |
| | | The sex confirmed at the time of admission shall be the pupil's sex for the purposes of participating in SSAC, single-sex interscholastic athletic events. Prior to the students' participation, uh, the SSAC must verify with the county board that each student participating in the single-sex athletics is participating according to, uh, sex listed according to, um, the county provision. And this requirement does not require, it does not apply to co, coed sports, and that's the bill, Mr. Chairman. |
| Chairman Ellington: | 00:01:51 | All right. Any questions of the bill of Counsel? Gentlemen from the, uh, was it 43rd? |
| Del. Thompson: | 00:02:00 | Yep. |

| | | |
|---|---|---|
| Chairman Ellington: | 00:02:01 | I got it right this time. |
| Del. Thompson: | 00:02:10 | Thank you Chairman Ellington. Counsel, would this, if this was adopted, would this apply to, um, all ages, middle school and high school? |
| Counsel: | 00:02:19 | Middle school and high school, not elementary. |
| Del. Thompson: | 00:02:21 | Mm-hmm (affirmative). |
| Counsel: | 00:02:21 | So secondary. |
| Del. Thompson: | 00:02:22 | Okay. Um, how would, the way this bill is written and drafted, you mentioned birth certificate, but, um, so are we going to re-have to require a birth certificate for every time a student wants to play basketball or football? |
| Counsel: | 00:02:41 | No, if you, if you look at the, um, the originating bill, I'm on page one, "Birth certificate is required upon admission to public school." So this just requires that the sex be identified at that time. And then uh, that is the sex that the county would follow, when the student is participating in sports. So know that, that that's already done at the enrollment admissions stage. |
| Del. Thompson: | 00:03:14 | Okay. And correct me if I'm wrong on this, but would this preclude any student from actually participating in a sport? |
| Counsel: | 00:03:25 | It would preclude an opposite sex person from participating in, like in, in, in the opposite sex sport. |
| Del. Thompson: | 00:03:33 | Okay. So would this, like so if a, uh, a person who was born biologically male, um, let me rephrase. A person was born biologically female, but later in life, um, they have began the transition process to identify and become a male. With this bill, and they're taking testosterone, they are taking, they're under medical care and, uh, they're transitioning. So this bill would require them to play, even if they're taking testosterone, they'd be required to play, uh, girls basketball versus boys basketball, which is what they would identify with? |
| Counsel: | 00:04:14 | Right. If I understood, if the person was born as a female, yes. That person would under this, under this bill as it is, would have to apply. |
| Del. Thompson: | 00:04:23 | Even though they're, they're transitioning take it. They might even, they, uh, you know, they appear masculine, they are taking testosterone, they would have to play female sports? |
| Counsel: | 00:04:34 | Correct. |

| Del. Thompson: | 00:04:35 | Okay. Um, have any other states adopted this? |
| Counsel: | 00:04:43 | Uh, to my knowledge, no other states have. Um, well actually, I, I think there are a couple of states that may have passed similar laws. Um, but in most cases, a lot of those are pending. Uh- |
| Del. Thompson: | 00:04:56 | Am I correct in North Carolina? Did they, did they attempt to pass something similar to this? |
| Counsel: | 00:05:05 | Just a second. |
| Del. Thompson: | 00:05:06 | I believe so. Like maybe around like 2016 or 2017, I thought. |
| Counsel: | 00:05:12 | Uh, hmm. I don't, I don't know about North Carolina. I know there are other states that have, um, introduced various types of legislation. And I don't, that doesn't mean that I think there, there definitely are other states that have looked at different sides of the issue and, um, some have addressed it in policy or have attempted to address it in the legislation. But, um, I don't know specifically about North Carolina. |
| Del. Thompson: | 00:05:37 | So currently, um, students right now who identify, um, with an opposite sex of what they were assigned at birth, they can play whatever sport that they identify with. Is that correct? |
| Counsel: | 00:05:51 | Uh, I, the way I understand it is that, a student would participate in whatever way they're identified in WVEIS. And so that would actually be up to how the county identifies the students. So- |
| Del. Thompson: | 00:06:06 | So this would— |
| Counsel: | 00:06:07 | I'm not sure, I think the answer would be, it depends on how the county identified the student in WVEIS. |
| Del. Thompson: | 00:06:11 | Okay. Um, at, at the appropriate time Chairman Ellington, I don't know who would be appropriate to maybe to really clarify that question for me and is there, maybe the SSAC or, uh, maybe someone from the State Department to kind of get a better understanding of that particular question at the appropriate time. |
| Chairman Ellington: | 00:06:31 | Will do. |
| Del. Thompson: | 00:06:31 | Um, thank you. And then, uh, Counsel is, to your knowledge, um, would this apply to, uh, would this apply only, uh, like you said, secondary school in middle school and high school. Would this have any implications to collegiate sports? |
| Counsel: | 00:06:54 | No, it would not. |

| | | |
|---|---|---|
| Del. Thompson: | 00:06:55 | Okay. Uh, no further questions at this time. I may have some later though. |
| Chairman Ellington: | 00:07:01 | All right. Gentleman from the 67th. |
| Del. Doyle: | 00:07:04 | Uh, thank you, Chairman Ellington. Uh, Counsel, to follow up on that. Um, the uh, and, and as background, um, some of us, some may be aware that this past football season Vanderbilt University had a female place kicker. Uh, she kicked in several games and is, am I correct that if we pass this bill, that would be prohibited, say for a high school football team in West Virginia, but it would be okay for a college team? |
| Counsel: | 00:07:39 | I believe that in an, I'm, maybe someone from the, um, department will be able to um, clarify this. But- |
| Del. Doyle: | 00:07:39 | Yeah, I, I- |
| Counsel: | 00:07:47 | Even under title, Title IX, if there is not a female sport that the female, that the females must be able to join a male team. |
| Del. Doyle: | 00:07:59 | So- |
| Counsel: | 00:07:59 | So I don't think that is correct. |
| Del. Doyle: | 00:08:01 | So if a high school had a female football team, uh, that person would have to kick for the female football team? |
| Counsel: | 00:08:08 | Correct. |
| Del. Doyle: | 00:08:09 | But would not be prohibited from kicking for the male football team? Uh, do you know of any high schools in West Virginia that have female football teams? |
| Counsel: | 00:08:19 | I don't. |
| Del. Doyle: | 00:08:19 | Thank you. Uh, and, and as background, what had happened here was, two of the place kickers for Vanderbilt, were injured. And the, the woman, uh, this woman was, was a first-rate soccer player and a number of the male football players went to the coach and said, "Listen, we need a kicker and she can do it." This would be prohibited for a high school in West Virginia. Is that correct if this bill passed? |
| Counsel: | 00:08:44 | I don't think so, no. Not according to Title IX. |
| Del. Doyle: | 00:08:48 | So you think Title IX might override this, uh, the, the statute? |
| Counsel: | 00:08:55 | When there is not a female sport, um, federal law- |

| | | |
|---|---|---|
| Del. Doyle: | 00:09:01 | Okay. |
| Counsel: | 00:09:01 | States that a female- |
| Del. Doyle: | 00:09:02 | Okay. |
| Counsel: | 00:09:02 | Has to be allowed to play, then becomes a coed team. And so that, that and under this bill a coed team is not [crosstalk 00:09:09]. |
| Del. Doyle: | 00:09:08 | So you're, you're . . . Yes, okay. So you are saying that federal law would trump this in that kind of a situation? |
| Counsel: | 00:09:13 | Yes. |
| Del. Doyle: | 00:09:14 | Thank you. |
| Chairman Ellington: | 00:09:16 | Further questions of Counsel, Gentleman from 16th. |
| Del. Hornbuckle: | 00:09:20 | Uh, thank you Mr. Chair. And so to piggyback off the, off the gentleman's question and the Gentleman from the 43rd. If there was a transgender male, uh, that started out life as a male, uh, one years old becomes a female and they're playing for their high school and they are competing in we'll just say, uh, swimming. And there is only a male team, will, will that individual be permitted to, to be on the, on the male team? |
| Counsel: | 00:10:00 | The individual was born male? |
| Del. Hornbuckle: | 00:10:01 | Mm-hmm (affirmative). |
| Counsel: | 00:10:01 | Yes. |
| Del. Hornbuckle: | 00:10:04 | And, and vice versa? |
| Counsel: | 00:10:07 | If there was, if there was a female? |
| Del. Hornbuckle: | 00:10:09 | Yes ma'am. |
| Counsel: | 00:10:11 | If there's not a female team, then that female would be allowed to participate on the male team. |
| Del. Hornbuckle: | 00:10:16 | So, so- |
| Counsel: | 00:10:17 | And then it would become coed. |
| Del. Hornbuckle: | 00:10:19 | Okay. So the, the, the, the, the, what the Gentleman from the 43rd said, uh, a, uh, the individual that started out as a female, uh, then became a male, was taking the hormones and all those |

Page 5 of 19

things, if there was no, uh, I guess there was only a, a female team, then they would, they would be able to be on that or a male team, I guess, any of the team they would have to be allowed, correct?

| Counsel: | 00:10:43 | Uh, I, I, I'm not, I didn't follow on- |
| Chairman Ellington: | 00:10:47 | Clarify your question. |
| Del. Hornbuckle: | 00:10:48 | The question would be, they, they would be permitted to, to participate on any team, if there was only one team. So regardless of the individual, if there was only a male team, they will be permitted to participate on a female team? |
| Counsel: | 00:11:01 | The federal law is designed to help women excel in sports. So the, the way that it works if there's not a female team, that female can participate on the male, in the male sport, which then becomes coed, but it does not go the other way around. |
| Del. Hornbuckle: | 00:11:19 | Okay. Okay. Thank you. |
| Chairman Ellington: | 00:11:26 | Gentleman from the 19th. |
| Del. Griffith: | 00:11:31 | Thank you Mr. Chairman. And I'm trying to think of scenarios here, whereby this might be um, unclear. And one is, there are many schools who have volleyball programs for girls only, would this mean that any boy who so claimed would be able to go out for the volleyball team, because there was no equivalent male team. Uh, would that be a possible scenario? |
| Counsel: | 00:12:01 | No. |
| Del. Griffith: | 00:12:03 | Why would that be? Uh. |
| Counsel: | 00:12:08 | Currently, uh, a female sports are female sports, and males are not included in that. And this bill would preclude a person who was born male, who then identi—, that person would have to continue to play as a male. |
| Del. Griffith: | 00:12:23 | Okay. |
| Counsel: | 00:12:24 | Does that answer your question? |
| Del. Griffith: | 00:12:25 | Yes. Thank you. |
| Chairman Ellington: | 00:12:27 | [inaudible 00:12:27] the gentlemen that has been challenged before, and they were told they need to start a male team if they were gonna have the male play on it. So further questions to Counsel? Lady from 51st. |

| | | |
|---|---|---|
| Del. Walker: | 00:12:38 | Thank you, Mr. Chairman. Thank you, Counsel. So I have a question, because we do have a foster care system here, and we do have trans individuals in that foster care system. And as you know and we all know, all of those documents don;t come with the student. So, if we had a trans student in a new foster home that did not have the documents, it takes even a while to get a, a doctor's visit scheduled with how we are, so with DHHR. So would the coach assume what this person's identity is, gender? |
| Counsel: | 00:13:21 | According to statute, uh, in order to be admitted in the current statute, I'm on page one, the pupil has to have either a birth certificate or an affidavit of why they don't, which I think would be the secondary case, the case in this with the foster child. Um, and then they need the signed, the, if they didn't have the birth certificate, would need the physician statement. |
| Del. Walker: | 00:13:47 | So we would not allow this child to play because we didn't have that documentation, and they may not have a, a doctor's appointment at that time? |
| Counsel: | 00:13:57 | I, in order to be admitted, that's, that's the way this bill reads. |
| Del. Walker: | 00:14:02 | So, and I'm not sure if you can answer this question for me. What do we do with children that are born with both sex organs? |
| Counsel: | 00:14:15 | I do not know. |
| Del. Walker: | 00:14:17 | At the appropriate time, Mr. Chair, if we have anyone to answer that question? |
| Chairman Ellington: | 00:14:24 | [inaudible 14:23] Any further questions Counsel? Gentleman from the 43rd. |
| Del. Thompson: | 00:14:35 | Thank you Mr. Chairman. Counsel, on page one of the bill under, uh, section two, line 10 and 11. "So a signed physician statement indicating the pupil's sex based solely on the pupil's unaltered internal and external reproductive anatomy." So if we, I'm assuming this is if that a birth certificate cannot be obtained? |
| Counsel: | 00:15:02 | Correct. |
| Del. Thompson: | 00:15:03 | So we're gonna subject the child to go to the, a doctor and essentially show them their genitalia to prove their, what genitals they have. Is that what this says? |
| Counsel: | 00:15:16 | And I'm assuming that doctors have those types of exams in a [crosstalk 00:15:21]. |

| | | |
|---|---|---|
| Del. Thompson: | 00:15:22 | Well, I'm sure, I'm sure they do for medical purposes, not just to, you know, show and tell. But, um, is that, is that what that reads that they would, they would have to show their genitals to a doctor to prove their? |
| Counsel: | 00:15:35 | I'm not a doctor. I don't know what a doctor would require. |
| Chairman Ellington: | 00:15:46 | I assume the Gentleman wants to ask the chair questions. |
| Del. Thompson: | 00:15:49 | Yeah. (laughs) |
| Chairman Ellington: | 00:15:50 | Um, there are ways to tell on exam what their gender is. |
| Del. Thompson: | 00:15:55 | Without? |
| Chairman Ellington: | 00:15:57 | Well, I mean, you do an exam, pediatricians do exams all the time. |
| Del. Thompson: | 00:16:00 | Right. |
| Chairman Ellington: | 00:16:00 | Children, and- |
| Del. Thompson: | 00:16:01 | I'm talking about like a— |
| Chairman Ellington: | 00:16:02 | Adolescents, you would do an exam and they do have a physical exams at those ages too. So yes, you would probably have to determine whether it was altered or not. |
| Del. Thompson: | 00:16:11 | By like physical— |
| Chairman Ellington: | 00:16:12 | Right. |
| Del. Thompson: | 00:16:13 | Observation? Okay. Uh, thank you Mr. Chair and Counsel. |
| Chairman Ellington: | 00:16:21 | Lady from the 30th, 41st? |
| Del. Tully: | 00:16:24 | The uh, Counsel, do you, are you aware if the WVSSAC requires a physical, sports physical for participation in sports at the secondary level in West Virginia? |
| Counsel: | 00:16:37 | I don't know if it's the SSAC or the county. Um, I'll, I'll defer to the department on that. |
| Del. Tully: | 00:16:41 | Okay. I believe it's the WVSSAC, 'cause I think it's a pretty standard form. Actually, I have it right here. And, um, it also talks about a physical exam and it talks about actually, when you do the physical exam for the G, the genital urinary system, it talks about like actually doing a physical exam for inguinal |

hernias, which are down in the groin folds for those that don't know, and also looking for bilaterally descended testicles.

So there's, those students aren't gonna be put through probably an unnecessary exam that they wouldn't already get to play sports. Would that be a correct assumption based upon this?

| Counsel: | 00:17:18 | If, if that's what it says, yes. |
| Del. Tully: | 00:17:20 | Thank you. |
| Chairman Ellington: | 00:17:22 | Gentleman from 26th? |
| Del. Evans: | 00:17:28 | Thank, thank you Mr. Chairman. Um, are there any girls in West Virginia currently playing the high school football? |
| Counsel: | 00:17:38 | I believe that the Delegate just said that there was. Maybe that was a college. I'm not sure. |
| Chairman Ellington: | 00:17:44 | [inaudible 00:17:44]. Yeah. |
| Counsel: | 00:17:44 | I, I'm not sure. |
| Del. Evans: | 00:17:46 | I believe there definitely are. I stood on the football field this year against a team that definitely had a girl on the football field. We went to Webster County at one time, Webster County had a kicker female. So, I guess it is true that girls can play male sports. |
| Counsel: | 00:18:04 | Yes. |
| Del. Evans : | 00:18:05 | But males cannot play female sports? |
| Counsel: | 00:18:09 | That's currently the way, the current law— |
| Del. Evans: | 00:18:10 | So how does this, how does this bill then affect them, or does it affect it at all? |
| Counsel: | 00:18:17 | This bill would affect those that changed their sex after birth. |
| Del. Evans: | 00:18:22 | Okay. So it has nothing to do with current sex or like, like I'm a guy, I'm not going to change that. So it would not affect me? |
| Counsel: | 00:18:30 | It would not affect you. |
| Del. Evans: | 00:18:31 | Okay, that's all I want to know. Thank you. |
| Chairman Ellington: | 00:18:34 | Further questions to Counsel? I believe by leave of the committee, we had requests from the school system. Uh, Ms. |

Sarah, would you like to come on up and . .  Ms. Stewart, you've been sworn in before. I think there was a question regarding the school system, as far as what's currently practiced. Um, Gentleman from 43rd, do you have questions and Sarah, if you would just state name and title for the people listening in on.

| | | |
|---|---|---|
| Sarah Stewart: | 00:19:05 | Sarah Stewart, West Virginia Department of Education. |
| Chairman Ellington: | 00:19:09 | Gentleman. |
| Del. Thompson: | 00:19:10 | Thank you Mr. Chairman, thank you Sarah. I appreciate you being here again. Um, So my question was, currently what is in place? This bill, it's gonna change? Uh, currently right now, if a student who was born um, biologically female, but is a, a high school student and is transitioning, identifies as a male and is transitioning taking hormones, uh, and she wants to play or he wants to play basketball. How, how is that working right now? Is that a county by county decision? Is it a school decision? Uh, is there, what, what is currently working or in place? |
| Sarah Stewart: | 00:19:49 | Let me be clear that I am a representative from the Department of Education and not a representative from the WVSSAC. |
| Del. Thompson: | 00:19:57 | Correct, I understand that. And I, I, I might have a question for them about that as well, but from your perspective from that. |
| Sarah Stewart: | 00:20:02 | I just, I wanted to make that clear and I, 'cause I don't want to speak for them. It is my understanding, that currently there is no specific rule that address, squarely addresses, transgender student participation in extracurricular activities. Um, there are Title IX considerations that do come into play with, um, coed sports.

And if there is only one sport at a, at a, um, particular school that, that we have to be mindful of Title IX and make sure those opportunities are made available. I do believe there is also a rule that if separate teams are maintained, for example a girl's basketball team and a boy's basketball team, that they, I believe there is an SSAC rule, SSAC guidance that directs that, um, that you play on the, on this, um, whatever sex, um, that the, that the students is, that does not address however, any transgender student issues. |
| Del. Thompson: | 00:21:01 | Okay. Does your department have any policy on transgender students at all or has that not been addressed? |
| Sarah Stewart: | 00:21:09 | Uh, we, um, there is currently a Fourth Circuit decision that is being appealed to the, the United States Supreme Court, dealing with, um, guidance relating to transgender students. Um, as we are in the Fourth Circuit, we are bound at least at this point, by |

|  |  | that guidance. The department has not put out any specific guidance, but it will just be mindful of, of the courts' um, direction in that regard. And should that change, we'll appropriately revise and advise the counties appropriately. |
|---|---|---|
| Del. Thompson: | 00:21:39 | If this bill is passed and we later learn, I don't know, whether the outcome of that court decision may or may not be, could this bill then potentially be in violation of that? |
| Sarah Stewart: | 00:21:47 | I don't want to speculate on what the US Supreme Court would take. |
| Del. Thompson: | 00:21:54 | Right. But not speculation, but is it a possibility that this bill would be in violation? |
| Sarah Stewart: | 00:21:59 | It, it could be. |
| Del. Thompson: | 00:22:00 | Okay. Has, has your office received, um, calls, concerns, complaints regarding anything remotely related to this about students participating in, in sports or extracurricular activities that you know, that they're . . .? |
| Sarah Stewart: | 00:22:17 | Surrounding the conversation today, no, we have not. |
| Del. Thompson: | 00:22:20 | Okay. Um, that's all I have for you Sarah. Thank you. I appreciate it. |
| Chairman Ellington: | 00:22:28 | Gentleman, from the 16th. |
| Del. Hornbuckle: | 00:22:33 | Thank you Mr. Chair. Um, and thank you for being here today. Uh, giving your legal expertise, um, would the WVSSAC have the ability, uh, uh, to set a guideline concerning transgender participation in sports on their own? |
| Sarah Stewart: | 00:22:50 | I do not want to speak for whether or not the WVSSAC— I'm not um, comfortable talking to their authorizing statute and where, where their rulemaking ability lies and ends. Potentially they could, but I think it's a better question addressed to them. |
| Del. Hornbuckle: | 00:23:04 | And are they here today? Oh, I guess not. Oh, thank you. |
| Chairman Ellington: | 00:23:11 | I have a copy of the uh, SSA, WVSSAC um, physical exam certificate, um, Delegate from the 41st asked that it be submitted as a, as an addendum. So, if anyone wants to look at it, they can afterwards. Lady from the 51st. |
| Del. Walker: | 00:23:33 | Thank you Mr. Chairman. Thank you, Sarah for being in here. So we just heard that . . . So, I have a question. When there's a transgender student that is entering K-12 public education, do |

|  |  | you require besides when that student first entered school, a birth certificate and that student is going through transition, do they need to report anything to the school system? |
|---|---|---|
| Sarah Stewart: | 00:24:00 | No. |
| Del. Walker: | 00:24:03 | Would that WVEIS, will WVEIS change the identification of the child, once they start their transition, if that child and parent wanted that to be changed? |
| Sarah Stewart: | 00:24:13 | I do not believe at the state level that we have any hard rules or regulations regarding, um, if a, a transgender student wishes to change their designation in WVEIS. Um, I believe counties perhaps have encountered this and have handled it on the local level, um, and appropriately we have not received any complaints at our office regarding that. |
| Del. Walker: | 00:24:40 | Okay. Thank you very much. |
| Chairman Ellington: | 00:24:42 | Further questions? Gentleman from the 65th? |
| Del. Clark: | 00:24:49 | Yes. I've got a current question in regards to, um, we're hearing a lot of talk about, uh, uh, a child born as a female and is transitioning to a male. |

PART 1 OF 4 ENDS [00:25:04]

| Del. Clark: | 00:25:01 | In high school, on the Board of Education, is, is it a suspendable offense for taking performance enhancing drugs? |
|---|---|---|
| Sarah Stewart: | 00:25:15 | Counties do have, um, illegal or controlled substance and illegal substance abuse policies. Um, I think it should be, I rel- I hesitate to speculate and make a broad statement. If you are taking something under the supervision of a physician, um, I, I, I'm not sure. Um, there would have to be a conversation between the county board and the parents about whether or not it was appropriate. But I'm hesitant to say that a, a student that is taking something that's prescribed by a physician could then be disciplined on the school level for that. |
| Del. Clark: | 00:25:47 | Okay. Um, I reserve my right to ask the same question later. |
| Chairman Ellington: | 00:25:52 | Okay. Further questions of, uh, Ms. Stewart? None. Thank you, Ms. Stewart. Further questions of Counsel? Other questions? Any amendments? Lady from the 51st, uh, questions or amendment? |
| Del. Walker: | 00:26:13 | Question. |

| | | |
|---|---|---|
| Chairman Ellington: | 00:26:14 | Okay. Of who? Counsel? |
| Del. Walker: | 00:26:15 | Yeah. Can we get, um- |
| Chairman Ellington: | 00:26:19 | Speak into your mic, please. I can't hear you. |
| Del. Walker: | 00:26:21 | Can we get someone from, uh, Fairness West Virginia? I have some questions for you. Thank you. |
| Chairman Ellington: | 00:26:27 | By leave of the committee. Would you state your name and title, sir? I know you've already been sworn in. |
| Andrew Schneider: | 00:26:34 | Thank you. Um, my name is Andrew Schneider, and I'm the Executive Direction of Fairness West Virginia. |
| Chairman Ellington: | 00:26:40 | All right Mr. Schneider. Lady from the 51st has a question. |
| Del. Walker: | 00:26:43 | Thank you, Chairman Ellington. Thank you, Andrew, for being here. |
| Andrew Schneider: | 00:26:45 | Thank you. |
| Del. Walker: | 00:26:46 | Can you tell me if any trans women have dominated any sporting events? |
| Andrew Schneider: | 00:26:53 | Not one athlete who has transitioned has been successful at the highest levels of sport. The lack of success is a strong indication of the fairness of permitting transgender women to compete against cisgender women. In fact, the problem with these bills is that they, they say that all bills, all boys are stronger than all girls. And that is just incorrect. |
| | | Uh, the, look at a young woman from North Carolina named Heaven Fitch, who won the high school state wrestling championship last year. I bring this story up because Heaven is a ci- is a cisgender girl, and yet she beat a bunch of cisgender boys. Young girls have many skills that are better than young boys. |
| | | What counts as an advantage may shift dramatically depending on the sport. For example, factors such as height, weight, and reaction time all affect a participant's advantage depending on the sport. |
| | | A young woman on the volleyball team may be very tall, and yet few people would consider that to be an unfair competitive advantage in her sport. Similarly, a man on the swimming team may have a naturally high hemoglobin count, enabling him to |

take in more oxygen, but he would not be barred from swimming for that reason.

Some cisgender women, like Olymp- Olympic athlete Caster Semenya, naturally produce high levels of testosterone compared to other cisgender women. All bodies are different, and there is no single physical trait that determines if a student will excel in a sport.

| | | |
|---|---|---|
| Del. Walker: | 00:28:27 | Do you know if this has ever occurred in West Virginia? Have you received any calls from anyone in assistance with? |
| Andrew Schneider: | 00:28:38 | We have not. This appears to be a, a solution in search of a problem. Uh, there is no, uh, as I said before, there is no, uh, pattern or examples of, uh, transgender women dominating school sports in West Virginia. |
| Del. Walker: | 00:28:59 | Do you know how many, um, transgender persons that we have playing any sports in West Virginia, K through 12? Or secondary sports, sorry. |
| Andrew Schneider: | 00:29:11 | I, I'm not aware of, that, that data, that number. Um, and I don't know who would, or if that, that kind of statistic is even kept, um, by our secondary schools. Um, but I would imagine there's not many, and clearly it's not an issue, because we, no one has received any complaints about it. I mean, these, these bills come from national organizations that- |
| Chairman Ellington: | 00:29:39 | Um, limit to the question please. |
| Andrew Schneider: | 00:29:41 | Okay, sorry. |
| Del. Walker: | 00:29:41 | Thank you. |
| Chairman Ellington: | 00:29:42 | I, I told you beforehand, we're not going into a prepared speech. |
| Andrew Schneider: | 00:29:45 | Okay. |
| Del. Walker: | 00:29:47 | Thank you, Mr. Schneider. |
| Andrew Schneider: | 00:29:47 | Thank you. |
| Chairman Ellington: | 00:29:49 | Further questions [inaudible 00:29:50]? Gentleman from the 16th? |
| Del. Hornbuckle: | 00:29:53 | Thank you, Chairman Ellington. At the appropriate time, I'd like to ask somebody from the civil liberties group. |

| Chairman Ellington: | 00:29:59 | Any further questions for Mr. Schneider? All right. Mr. Baumwell, you, uh, have been sworn in. If you would name your name and title. |
| Eli Baumwell: | 00:30:13 | Uh, thank you, Chairman Ellington. My name is Eli Baumwell and I'm the policy director for the American Civil Liberties Union of West Virginia. |
| Chairman Ellington: | 00:30:19 | All right. Gentleman from the 16th has a question. Question? Gentleman from the, uh, 16th? |
| Del. Hornbuckle: | 00:30:29 | Thank you, Mr. Chair. Um, and thank you for being here today, sir. Uh, I got a couple of questions for you. We'll try to be brief. Uh, how will this, uh, affect the state's obligations under Title IX? |
| Eli Baumwell: | 00:30:39 | Uh, Delegate, I do believe, looking at this legislation, it does risk, um, a significant amount of federal funding under Title IX. Um, looking at federal courts, um, as I've looked at some of this legislation, Idaho was enjoined from this, and as Counsel mentioned, um, here in the Fourth Circuit, following the Bo-Bostock ruling, um, we have, we have got Fourth Circuit ruling saying that transgender individuals have to, have to be given, um, access to space based on their gender identity. That's Bo-coming from Bostock. |
| | | There's also now federal executive orders, um, following from those, those ruling in in alignment, rather, with those. Um, so we do risk violating Title IX based on these federal court rulings. |
| Del. Hornbuckle: | 00:31:25 | Uh, when you speak about violations, uh, per any civil law, are there any privacy concerns here with students? |
| Eli Baumwell: | 00:31:32 | There are potential privacy concerns. While students, um, may have to go under, undergo medical examinations to clear them for sports, um, having to disclose, um, whether it be their birth sex or any, uh, gender affirming therapy they might be undergoing is a violation of their potential, is a potentially violation of their privacy. |
| Del. Hornbuckle: | 00:31:48 | Okay. Uh, uh, legally could this have a negative impact on any other students? |
| Eli Baumwell: | 00:31:55 | This particular legislation is tailored solely to, um, athletics. Uh, looking at this particular, um, bill that just originated. Um, other, other pieces of legislation have been more broad, but this one is limited just to athletics. |

| | | |
|---|---|---|
| Del. Hornbuckle: | 00:32:11 | Uh, has there been any case law on, uh, deni- denial of participation leading to any type of, uh, mental health issues with transgender youth? |
| Eli Baumwell: | 00:32:21 | Well, absolutely. There, there's been a lot of, um, research rather. I, I shouldn't say there's case law. But there is a lot of research into, um, the, the mental health of trans youth and what can be done to protect their mental health. And being treated, um, based by their gen- gender identity and being an op- given an opportunity to, um, participate in sports and participate in social activities has certainly been linked with better, uh, mental health outcomes, both in the short and long term. |
| Del. Hornbuckle: | 00:32:53 | All right. Thank you. |
| Chairman Ellington: | 00:32:55 | Further questions for Mr. Baumwell? None? Thank you, sir. |
| Eli Baumwell: | 00:33:01 | Thank you. |
| Chairman Ellington: | 00:33:01 | Further questions of any of the other witnesses? Gentleman from the 65th, who are you? |
| Del. Clark: | 00:33:06 | Do we have anybody from the, uh, West Virginia SSAC here? |
| Chairman Ellington: | 00:33:09 | Uh, unfortunately, they are over on our Senate colleagues' side, uh, working on a bill that's over there at the moment. |
| Del. Clark: | 00:33:15 | Okay. |
| Chairman Ellington: | 00:33:17 | Further questions? Any further questions of Counsel? Chair hears none. Any amendments? None? Chair recognized Vice Chair for motion. |
| Vice Chair: | 00:33:29 | Mr. Chairman, I move that originating House Bill relating to participation in single-sex secondary school winter scholastic athletic events be reported to the floor, with the recommendation that it do pass. |
| Chairman Ellington: | 00:33:42 | Gentleman uh, moved that, uh, House Bill originating on participation in single-sex secondary school ath- interco- interscholastic athletic events be reported to the floor with a recommendation it do pass. Is there any questions or discussion? Gentleman from the 43rd. |
| Del. Thompson: | 00:34:00 | I, I have a . . . Thank you, Chairman Ellington. I have a question. Would it be possible to, uh, lay this over until we could speak to someone from the, the SSAC? To like, actually hear from how that, s- since that is their, kind of, you know, what they kind of control and govern, since that would affect them? |

| | | |
|---|---|---|
| Chairman Ellington: | 00:34:19 | Are you moving to lay it over? |
| Del. Thompson: | 00:34:21 | Yes. |
| Chairman Ellington: | 00:34:22 | If you move to lay it over, then I guess- |
| Del. Thompson: | 00:34:23 | Just one day. Or the next meeting. |
| Chairman Ellington: | 00:34:25 | Well, we don't have one day. (laughs) Um. |
| Del. Thompson: | 00:34:29 | We don't have one day? |
| Chairman Ellington: | 00:34:30 | Well, we don't have a meeting tomorrow. |
| Del. Thompson: | 00:34:32 | Oh, it's Wednesday. Thursday. |
| Chairman Ellington: | 00:34:37 | Gentleman moves that we lay this over. That takes a vote and it's non-debatable. So all in favor would say aye. |
| Del. Thompson: | 00:34:43 | Aye. |
| Chairman Ellington: | 00:34:44 | Those opposed, nay. I would say nays have a- |
| Del. Thompson: | 00:34:49 | Division? |
| Chairman Ellington: | 00:34:50 | Well, he had the s- he had the, uh, microphone, so [inaudible 00:34:53]. (laughs) |
| Del. Thompson: | 00:34:56 | Thank you. That worked. (laughs) |
| Chairman Ellington: | 00:34:58 | I could have used my microphone, too. So motion r- |
| Del. Thompson: | 00:35:02 | I did call division, though. |
| Chairman Ellington: | 00:35:03 | Motion, uh, rejected. |
| Del. Thompson: | 00:35:05 | Could I call div- I called division. |
| Chairman Ellington: | 00:35:07 | I think I had already called it, but. Well, okay, we'll call division. Is it sustained? All right, we have it sustained. The clerk will call, call the vote on that. So, if you vote yay, that means we lay it over. If you, uh, vote nay, that means it is rejected. All right.<br><br>Well, those that are in favor of the Gentleman's, uh, motion to lay it over, raise your hands. That's six. Yeah. There's six. |

All right. Those, uh, those opposed to the Gentleman's motion, raise your hands. All right, six to thirteen. All right, motion rejected.

Any further amendments? Or actually, we're on discussion. Gentleman from the, uh, 60-uh-7th?

Del. Doyle:                00:36:27          Uh, uh, thank you, Chairman Ellington. Um, I oppose the bill for, for, for two reasons. First, uh, in our questions of Counsel, uh, I think it became pretty obvious that, uh, we're on rather dangerous legal ground r- uh, relating to the feds if we pass this bill a- as it is written. So that is one.

A- also, uh, uh, the one, uh, person who testified, the gentleman from Fairness, mentioned, uh, something that I had heard before, as one of the arguments in favor of this, and that is that males are inherently stronger than females. And I, I just have a, a vignette I'd like to, uh, to go over. I've remembered this ever, ever since it happened.

When I was a, a rifle platoon leader in Vietnam, I had a guy in my platoon that weighed barely 100 pounds. He had no upper body strength whatsoever. And the rules were, we have two, what are called, uh, uh, uh, heavy machine guns there, uh, uh, uh, 7.62 machine guns, it's roughly a 30 caliber for those people who are not into metrics. And you had to carry that and 200 rounds of ammunition, and he couldn't carry it.

So, whenever it was his turn, somebody else just volunteered. I am a big time women's college basketball fan, and I'm telling you, every time I see a game, there are people out there playing that could have easily carried that machine gun and 200 rounds of ammunition.

So that's why, uh, I think is p- another part of the reason I think this is a bad bill, and I'm going vote no. Thanks.

Chairman Ellington:       00:38:06          Anyone else wish to speak? Gentleman from the 43rd?

Del. Thompson:            00:38:11          Thank you, Chairman Ellington. I also want to speak a- against this bill for a multitude of reasons. First, because, I mean, I would like to hear from the SSAC of how this would, you know, uh, impact their rules and impact and see, have a better understanding of how this would be implemented.

I'm also going speak against it for the reason, and I ask what I asked Counsel, pertaining to, if I have a daughter, and she's playing basketball, and she's on a basketball team, and with this bill, um, a person who was born female, identified as male, was taking testosterone, is transitioning, is going to be on the same

team as my daughter, outperforming her, because my daughter is not taking testosterone, this is not, this is not going to be fair to the children of West Virginia.

I under, were there, whatever side you fall on this, it's not, that's not fair. Uh, and also, I have a major problem, and as the, the Lady from the 41st mentioned about the, the sports physicals, I played basketball and baseball through middle and high school, and um, I, I had to do a physical every year, but I never once, uh, was subjected to, I guess I could've been, to the, the hernia check. So, I have a major problem with forcing children, middle school children or high school children, uh, to, for this purpose, to specifically . . . If it's for a medical reason, I totally understand it and get it, but just to par- just to prove their gender, I don't think that's right. And I don't think any of us would want our children subjected to that.

Uh, so for those reasons, I, uh, strongly, uh, do not support this bill, and I urge you all to do the same. Thank you.

| | | |
|---|---|---|
| Chairman Ellington: | 00:39:55 | Anyone else wishing to speak to the bill? Lady from the 41st. |
| Del. Tully: | 00:39:58 | I'm just want to give a point of clarification, actually, on the addendum, the thing that I provided from the WVSSAC that was the addendum. It was revised in May of 2016, so I don't know when the hernia checks, uh, first originated, but I don't . . . You probably graduated well after 2016, I would assume, sir. |
| Chairman Ellington: | 00:40:22 | Anyone else wishing to speak to the bill? All right, before us is the motion. All those in favor would say aye. Those opposed, nay. Gentleman from the 53rd? |

The Chair is undecided, so uh, let's do that again. All those in favor say aye. Those opposed, nay. (laughs) Got a loud group there. Okay. Division has been called. Yeah, I'm still undecided on that.

So, division. All those in favor, raise your hands. [inaudible 00:41:18] Those opposed, raise your hands. Fifteen, six? Fifteen to six. Motion adopted.

Next thing on the agenda is House Bill 2364. Any interest in the bill?

# EXHIBIT B

**West Virginia House of Delegates Judiciary Committee Discussion of H.B. 3293**

**March 18, 2021**

| | | |
|---|---|---|
| Chairman Capito: | 00:41 | . . . left on the agenda. The bill is 3293. We have a guest presenter with us. We're happy to have her back with the co- with the committee today. And whenever she is ready, she may proceed. |
| Counsel: | 00:56 | I thank you Mr., Mr. Chairman. This committee substitute provides that for the purposes of participating in Single Sex Secondary School Interscholastic Athletic events, under the controlled supervision and regulation of the Secondary School Acti- Activities Commission, each county school district shall confirm that the sex of the people identified, on the pupil's original birth certificate provided on his or her admission to public school is the pupil's sex at the time of birth. |
| | | If an original birth certificate was not provided or if the birth certificate provided does not indicate the pupil's sex at the time of birth, a signed physician's statement indicating the pupil's sex based solely on the pupil's unaltered, internal and external reproductive anatomy must be submitted prior to the pupil's participation in single sex secondary school interscholastic ac- ac- athletic events. Prior to the student's participation in single sex inter- secondary school interscholastic athletic events, the SSAC must verify with each county board that each student participating in Single Sex Interscholastic events is participating according to the student's sex at the time of birth. This requirement does not apply to co-educational, uh, sports. And that's a summary of the bill. |
| Chairman Capito: | 02:15 | Thank you very much, Counsel. I appreciate that presentation. Are there questions for Counsel? Are there questions? The Lady from the 4th. |
| Del. Zukoff: | 02:26 | Thank you Mr. Speaker. Do you know if there's any federal re- any federal, um, any federal courts looking at this, um, issue currently? |
| Counsel: | 02:36 | Yeah. There is a case, uh. Grimm versus, I'm not sure I'm going to pronounce the, Glo- Glo- Gloucester County School Board. It's a Fourth Circuit case. It's, it has to do with, uh, a student, uh, transgender male's right to use a male bathroom. |
| Del. Zukoff: | 03:00 | Okay. Nothing involving sports, though? |
| Counsel: | 03:06 | It, it does not, uh, does not- |
| Del. Zukoff: | 03:07 | Specifically? |

| | | |
|---|---|---|
| Counsel: | 03:08 | . . . directly a- uh, state anything about sports. |
| Del. Zukoff: | 03:11 | Okay. Have we had this come up before the Department of Education? Have we had any issues around this, this bill that, transgender students participating in sports come before the Department of Education as a concern? |
| Counsel: | 03:26 | It is my understanding that there have been no problems on the county level. |
| Del. Zukoff: | 03:26 | Okay. I checked with mine and there weren't. That's why I was just curious if you knew from a statewide perspective. |
| Counsel: | 03:28 | That's what they'd indicated to me. There had been no problems. |
| Del. Zukoff: | 03:39 | Thank you. |
| Chairman Capito: | 03:40 | Gentleman from the 37th. |
| Del. Pushkin: | 03:44 | Thank you, Mr. Chairman. Thank you, counsel. Um, and I'm sorry I missed the first part of the, of your, uh, presentation of the, uh, of the bill here. But would this preclude a female student from participating in a male sport? |
| Counsel: | 03:59 | No. |
| Del. Pushkin: | 04:00 | It would not? |
| Counsel: | 04:01 | No. Under Title IX, a female has to be allowed to participate in a sport. So, if the, for instance, there are no female football, then the female would be allowed to play in, uh, football, um. |
| Del. Pushkin: | 04:15 | All right. And that would be, I mean the only case I can, cases in West Virginia I could think of would be in sports where there aren't female sports that, that the, that the girls participate in the boys sports. That's the only time I've ever heard of it even happen, anything like this happening in West Virginia. |
| Counsel: | 04:29 | It's my understanding there have not been any issues. I, and the, the re- the executive director of the SSAC is here if anyone wants to talk to him. But I believe there are only, the only solely female sports are volleyball and softball. |
| Del. Pushkin: | 04:46 | So this only affects those two sports? |
| Counsel: | 04:46 | Well, well it would affect the single sex. So, in other words, you have single sex—you have women's basketball and, and men's basketball or- |

| | | |
|---|---|---|
| Del. Pushkin: | 04:53 | Yeah. |
| Counsel: | 04:54 | . . . and- |
| Del. Pushkin: | 04:55 | Okay. |
| Counsel: | 04:55 | . . . track- |
| Del. Pushkin: | 04:55 | I got you. I got you. |
| Counsel: | 04:56 | Two, two sets. Yeah. |
| Del. Pushkin: | 04:56 | I got you. |
| Counsel: | 04:56 | Yeah. |
| Del. Pushkin: | 04:58 | Okay, thank you. |
| Chairman Capito: | 05:00 | Further questions of Counsel? Further questions of Counsel? Chair, recognize Gentleman from the 17th. |
| Del. Lovejoy: | 05:07 | Thank you, Chairman Capito. Good afternoon, Counsel. Uh, you mentioned that Grimm case. I tried to read a little bit about it, uh, for today. So that was a Fourth Circuit case, um. |
| Counsel: | 05:07 | Mm-hmm (affirmative). |
| Del. Lovejoy: | 05:17 | The Fourth Circuit is a federal Circuit Court of Appeals. It includes the state of West Virginia, right? |
| Counsel: | 05:23 | Correct. |
| Del. Lovejoy: | 05:24 | And in that case, um, this was not a sports case but it, it dealt with the requirement to use facilities on a school ground with the sex assigned at birth. Is that fair? |
| Counsel: | 05:39 | It did. |
| Del. Lovejoy: | 05:40 | Okay. |
| Counsel: | 05:41 | Uh, the, the, uh, Grimm was born a female and wanted to us- and was transitioned to male, and wanted to use the male bathroom. |
| Del. Lovejoy: | 05:50 | So in that case, the court, the Fourth Circuit, um, found that the student's, uh, rights had been violated under Title IX, right? |
| Counsel: | 06:02 | Yes. |

| Del. Lovejoy: | 06:03 | And also, I think second, second basis was under, was it equal protection? |
|---|---|---|
| Counsel: | 06:08 | Yes. |
| Del. Lovejoy: | 06:08 | And so, what, what, you know, if we're to do something like this and we have a lawsuit come under Title IX, what are the consequences of a school board in West Virginia being found, like that case, to violate Title IX? I mean what, what's the, what are the consequences? |
| Counsel: | 06:26 | Well, uh, the schools receive federal funds. So that is, they're, they're required to follow the federal guidelines, which would include the Fourth Circuit. Um, there is also a recent executive order, um, and so the, the, the, the s- board, or the department would, is required to follow federal guidelines. So, um, I think the practical effect would be that under the Fourth Circuit case, uh, which is currently there has been a writ filed before the Supreme Court and, um, Grimm has ex- has, uh, petitioned for additional time to answer. And that is the current procedural history right now with that. Um, so in other words, you know, the, the Supreme Court may or may not take the case. If they do, then Fourth court c-, Fourth Circuit would be controlling. If they did take the case, then of course they would issue an opinion. |
| | | Um, but un- as it stands right now, the department would be bound to if a transgender person wanted to use, for instance, a transgender female wanted to use a female bathroom, they would have to allow that transgender female to use the, the female bathroom under this Fourth Circuit case. But the, the bill, the, they would have to play a different sport. |
| Del. Lovejoy: | 07:47 | So, so let me understand the posture. The Fourth Circuit Court of Appeals has rendered a decision that as it stands now, found that school's policy in, in the bathroom context as opposed to the sports context, to violate Title IX. |
| Counsel: | 08:04 | And, and they did not, um, deal with sports specifically and the, that particular person was not involved in sports. So, it did not deal with locker rooms or sports because he was not involved in sports. |
| Del. Lovejoy: | 08:14 | But the basis of that opinion was the Bostock case, is that what it's called? |
| Counsel: | 08:19 | That was one of the cases that was, yes, quoted. |
| Del. Lovejoy: | 08:22 | Bostock was not, was neither a sports nor a bathroom case, right? |

| | | |
|---|---|---|
| Counsel: | 08:25 | I haven't read that entire case. I just- |
| Del. Lovejoy: | 08:28 | But it's employment case. Yeah. |
| Counsel: | 08:29 | . . . did but, yeah. It, in a, I believe a Supreme Court case. Yes. |
| Del. Lovejoy: | 08:31 | Right. |
| Counsel: | 08:32 | Yes. |
| Del. Lovejoy: | 08:32 | Yes. And so, it's a, it's a, it's a 2020 case and it deals with employment discrimination and the Fourth Circuit applied the holdings in the employment discrimination decision of Bostock to apply to the restroom question. And so, if the Fourth Circuit were to also apply that to this situation, we could be passing a law that puts us in violation of Title IX? |
| Counsel: | 09:00 | I mean, it, it, there, there would be a, a question perhaps. I mean, it, there's a slippery, this, this is literally something that is changing every day across the United States. I mean, literally every time I'm, I go on the internet, there's something different happening. So, um, you know, who know, it's hard to say what a court is going to do. But, you know, it, it is, I think pretty safe to say that something like this would be up for, um, liti- litigation because it is being litigated- |
| Del. Lovejoy: | 09:33 | Yes. |
| Counsel: | 09:33 | . . . throughout the country daily. I mean- |
| Del. Lovejoy: | 09:35 | Yes. And we're going to have some guidance soon, won't we? |
| Counsel: | 09:35 | I'm, I- |
| Del. Lovejoy: | 09:38 | With Fourth Circuit, right? |
| Counsel: | 09:39 | Yeah. I mean, ma- uh, yeah. I guess we'll see what the Supreme Court- |
| Del. Lovejoy: | 09:44 | We have a decision from the Fourth Circuit- |
| Counsel: | 09:44 | Mm-hmm (affirmative). |
| Del. Lovejoy: | 09:46 | . . . and we're s- we're at, somebody's at the doorsteps of the United States Supreme Court saying, "We'd like you to take this up on a, on a writ of cert and that decision has not been made yet." But we will know the results of that decision by the US Supreme Court at some point in the, maybe near future, right? |

| Counsel: | 10:02 | We would, yes. |
|---|---|---|
| Del. Lovejoy: | 10:04 | Okay. Um, okay. In addition to losing federal funding if you're found to violate Title IX, um, is the successful claimant also entitled to money damages? |
| Counsel: | 10:17 | Uh, in this case, uh, I believe the way I read the case, uh, the, Grimm received $1. I mean, it was not a money case. |
| Del. Lovejoy: | 10:26 | Well, did they also receive an award of attorney's fees? |
| Counsel: | 10:28 | Attorney's fees, yes. |
| Del. Lovejoy: | 10:29 | Yes, which were more than $1. |
| Counsel: | 10:30 | I'm sure. |
| Del. Lovejoy: | 10:31 | Yeah, um. And so, if for instance, we pass a law that before the Supreme Court rules on the case up there, uh, on the writ, that also is found to violate Title IX, then we could lose our, our federal funding and be on the losing end of litigation in a fee shifting situation, right? |
| Counsel: | 10:51 | I- |
| Speaker 6: | 10:51 | One point of order, point of order, Chairman Capito. |
| Chairman Capito: | 10:55 | Gentleman will state his point of order. |
| Speaker 6: | 10:56 | Um, uh. My friend is, uh, asking Counsel, number one, to speculate and number two, to offer personal opinions. Uh, neither of which are technical in nature so, uh, I would ask the line of question be, uh, prohibited. |
| Chairman Capito: | 11:12 | [crosstalk 00:11:12] well I would just, I would just say the chair's ruling is that the, uh, the Gentleman will, will, will stick to the thrust of the bill. I think the Gentleman is asking counsel to make, uh, a legal assessment of a, of a Fourth Circuit opinion, um, and I think it's, uh, appropriate. Uh, and I think it's appropriate for her to make that distinction as Counsel, so I'll allow question to continue. |
| Del. Lovejoy: | 11:32 | Thank you Mr. Chairman. Um, and I'll try to keep it cleaner. If we pass a law that violates Title IX of the federal law, then the result of a violation is a loss of federal funding. That is a, that is a true statement of the law? |
| Counsel: | 11:47 | I don't know the particular, um, process for loss of funding. I mean, I would hope that, um, it wouldn't be, and you know, I |

|  |  | mean, I would say that there would be a process for that. I don't know. I don't think that- |
|---|---|---|
| Del. Lovejoy: | 12:00 | Can I restate as, can or may? If I say that, would that be a fair statement, that you can lose your federal funding if you pass laws that violate Title IX? |
| Counsel: | 12:11 | It's my understanding that the funding the federal government supplies is based upon the assumption that the laws that it enacts will be followed. |
| Del. Lovejoy: | 12:21 | Okay. Thank you very much. Thank you, Mr. Chairman. |
| Chairman Capito: | 12:24 | Further questions of Counsel? Gentleman from the 37th, did you have questions of Counsel? |
| Del. Pushkin: | 12:29 | At the appropriate time  I'd like to ask you now just to take leave of committee for a, a testimony from, uh [crosstalk 00:12:35]- |
| Chairman Capito | 12:34 | At the appropriate time. Chairman from the 50th for counsel. I recognize Gentleman from the 50th. |
| Del. Garcia: | 12:40 | Thank you, counsel. So, when I look at page two of, uh, let's see, what section is this, p- yeah, page two, line 26, subdivision E of section, it's on another page, 5C, um, it appears that—there's a proviso related to if somebody does not, is not able to provide a birth certificate or their birth certificate does not indicate a sex at the time of birth, correct? |
| Counsel: | 13:21 | I'm, I'm sorry. Can you rephrase that again? I see where you- |
| Del. Garcia: | 13:23 | Yeah, yeah. |
| Counsel: | 13:24 | What was your question again? I'm sorry. |
| Del. Garcia: | 13:24 | So, so that relates to—the proviso relates to a situation, um, if someone is unable to provide their original birth certificate or their birth certificate as it states here, does not indicate people's sex at the time of birth. |
| Counsel: | 13:39 | So, yeah. If you look at page one, the first paragraph, when a student is admitted to a public school, they are to provide a birth certificate. So it goes, it's referring back to that birth certificate. But if, for, for it, but there's also, if the birth certificate cannot be provided, then they have to say, have to have an affidavit proviso. So in the case that their birth certificate was not a, supplied or the, the sex was not identified, then that proviso for |

|  |  | the, uh, doctor's affidavit, I mean doctor's statement would apply. Does that answer your question? |
|---|---|---|
| Del. Garcia: | 14:14 | That do- well that doesn't and kind of continuing on further. So, if, if a birth certificate is not provided or if the birth certificate does not indicate the people's sex at the time of birth, I just want to make sure I'm understanding this correctly. So, the, the physician statement that they have to, I guess, they have to figure out about whether the person has unaltered internal and external reproductive anatomy? |
| Counsel: | 14:51 | That's what it says, yes. |
| Del. Garcia: | 14:52 | So, the, that means that anybody who can't fulfill, who can't provide their birth certificate has to undergo an examination, I would imagine some type of genital examination, by that doctor? |
| Counsel: | 15:10 | Well, all of the students are required to have a physical exam to ta- I mean, to participate in sports. |
| Del. Garcia: | 15:17 | But does that necessarily include . . . I mean, you know, again, internal and external reproductive anatomy. I, that, is that something that's normally part of a physical? |
| Counsel: | 15:33 | I don't know. |
| Del. Garcia: | 15:35 | And, and whether it's unaltered. That's, that's what this bill states. |
| Counsel: | 15:40 | That it does, yes. |
| Del. Garcia: | 15:43 | What happens if, if a student has both male and female reproductive anatomy? |
| Counsel: | 15:58 | The bill doesn't address that. |
| Del. Garcia: | 16:03 | That, and, and that's my understanding is, one or 2% of the population of the United States, that, that is, you know, that's, that happens. That's probably not a good, good question for counsel. That's, I didn't really ask a question, so I apologize. That's, that, those are, those are the questions that I have. Thank you. |
| Chairman Capito: | 16:25 | Thank you. Further questions of Counsel? Further questions? I, I had the gent- gent- excuse me, I had the Lady from the 4th followed by the Gentleman from the 13th. |
| Del. Zukoff: | 16:35 | Thank you, Mr. Chairman. Just one last question. You had mentioned when you're answering the Gentleman from the |

|  |  | 17th's question that there's an executive order currently that addresses this issue. Could you give us- |
|---|---|---|
| Counsel: | 16:48 | Oh, I'm sorry. It do- it, there's an executive order that has to do with, um, from, uh, March 8th. |
| Del. Zukoff: | 16:56 | An executive order from? |
| Counsel: | 16:58 | The President, President Biden. |
| Del. Zukoff: | 17:00 | Okay. And what does that say? |
| Counsel: | 17:04 | It is guaranteeing an educational environment free of discrimination on the basis of sex, including ori- sexual orientation and g- or gender identity. |
| Del. Zukoff: | 17:16 | Okay. Thank you. |
| Chairman Capito: | 17:19 | Gentleman from 13th. |
| Del. Zukoff: | 17:20 | I didn't know that. |
| Del. Pinson: | 17:21 | Yes, thank you Mr. Chair, thank you Counsel for your presentation of the bill that's before us. Uh, couple quick questions. I know the question was asked to you, has there been issues of this within the boundaries of our state and I believe that you answered that you weren't aware of any. I'm aware that we do have someone from the SSAC here that could either provide the same answer or their own opinion. Is that correct? |
| Counsel: | 17:51 | Yes, someone, uh, the Executive Director is here. |
| Del. Pinson: | 17:54 | Okay. I'll ask you this. In your preparation of the bill, were you able to find instances in other states where questions surrounding the legality of this same issue have been raised? |
| Counsel: | 18:15 | Yes. |
| Del. Pinson: | 18:16 | Okay. Uh, turning my attention now to the Gavin Grimm case out of Virginia, if I understood your assessment of, of that legal proceeding, the county school board, and I'm not going to try to pronounce it either, they were found to have violated Title IX based on the, the circumstances and the facts surrounding that particular case. Is that correct? |
| Counsel: | 18:53 | Yes, they were. |
| Del. Pinson: | 18:55 | And- |

| Counsel: | 18:55 | Under that case, yes. And under those circumstances, they were. |
| Del. Pinson: | 18:55 | So- |
| Counsel: | 18:58 | And equal protection. |
| Del. Pinson: | 19:00 | Thank you. And we, that case did not deal with the legality of transgender athletes at all. We're dealing with something completely separate from that. Is that correct? |
| Counsel: | 19:14 | It did not deal with sports and it said in there that, that issue was not raised because he did not play sports. |
| Del. Pinson: | 19:21 | Okay. That will be all. Thank you. Thank you, Mr. Chair. |
| Chairman Capito: | 19:23 | Further questions of Counsel. Further questions of Counsel. Uh, Counsel, question from the chair. Under, uh, I understand I think, uh, part, partially the holding in Grimm, um, that it, that, that the, the Grimm's equal protection rights were violated that he was not able to access the men's bathroom. Was, was he, is, is Grimm still able to access to women's bathroom? |
| Counsel: | 19:51 | Uh, initially they, uh, had him using the nurse's bathroom and, but there was, it was inconvenient. It sometimes made him late for classes. And so, then they fashioned a separate, um, bathroom for transgender, uh, people and, or, or they redid the stalls. I, I'm- |
| Chairman Capito: | 20:15 | Was he prohibited- |
| Counsel: | 20:15 | But they, they fashioned [crosstalk 00:20:17]- |
| Chairman Capito: | 20:17 | Was he prohibited from using the women's bathroom? |
| Counsel: | 20:18 | It, it, uh, he, this was a transgender male who was an original female. |
| Chairman Capito: | 20:18 | Right. |
| Counsel: | 20:18 | He was put- |
| Chairman Capito: | 20:24 | Right. |
| Counsel: | 20:24 | . . . prohibited from using the male bathroom. |
| Chairman Capito: | 20:26 | Right. Was he prohibited from using the female bathroom? |
| Counsel: | 20:29 | No. |

| | | |
|---|---|---|
| Chairman Capito: | 20:30 | Okay. With the holding, is he permitted to use either bathroom still? |
| Counsel: | 20:36 | Uh, it, the holding- |
| Chairman Capito: | 20:38 | If you don't have that, I understand- |
| Counsel: | 20:39 | Let, I mean my, my, well let, let me say he's in college now. So- |
| Chairman Capito: | 20:39 | Okay. |
| Counsel: | 20:43 | . . . this went on for five years. |
| Chairman Capito: | 20:44 | Okay. |
| Counsel: | 20:44 | So, um, it's, it, he's not in high school anymore but- |
| Chairman Capito: | 20:50 | Okay. |
| Counsel: | 20:50 | . . . essentially he, if the, the, he was able to use the bathroom that he identified, that- |
| Chairman Capito: | 20:56 | I understand, I understand- |
| Counsel: | 20:56 | Yeah. |
| Chairman Capito: | 20:57 | . . . the thrust of the, of the whole thing. |
| Counsel: | 20:57 | Mm-hmm (affirmative). |
| Chairman Capito: | 21:00 | I just was curious. Questions? |
| Counsel: | 21:00 | Yeah. |
| Chairman Capito: | 21:02 | The Gentleman from the 37th desires leave of the committee to call a witness. Is that witness on the screen? Oh yeah, okay. Uh. (laughing) Are, are you, uh, able to hear us? |
| Cathryn Oakley: | 21:15 | I am able to hear you. |
| Chairman Capito: | 21:17 | Okay. |
| Cathryn Oakley: | 21:17 | Are you able to hear me? |
| Chairman Capito: | 21:19 | We can hear you. Would you please introduce yourself to the committee and, uh, who you are here representing? |
| Cathryn Oakley: | 21:35 | Yes, definitely. I'm [inaudible 00:21:35]. Hold on one second. |

| | | |
|---|---|---|
| Chairman Capito: | 21:35 | Mark, go up and mute that. |
| Mark: | 21:37 | Should I mute that computer? Well, then she won't be able to hear us. |
| Chairman Capito: | 21:39 | Yes, you're right. |
| Cathryn Oakley: | 21:40 | Yeah, I can hear you. What, I'll turn my volume down while I'm introducing myself and then I'll turn it back up so I can hear you. Um, my name is Cathryn Oakley and I am the, uh, State Legislative Director and Senior Counsel at the Human Rights Campaign. Um, the Human Rights Campaign is the nation's largest organization working for equality for the LGBTQ community. Um, and I'm here on behalf of our more than three million members and supporters nationwide, including many in West Virginia, um, in opposition to the bill. And I stand ready to answer questions and, and also provide a brief statement if you allow. |
| Chairman Capito: | 22:19 | Thank you very much, Ms. Oakley. We appreciate you taking time on your Friday to be with us, as they say. So if you would, please raise your right hand. We'll swear you in. Then we'll allow questioning. Would you please raise your right hand? Do you swear to tell the truth, the whole truth and nothing but the truth? |
| Cathryn Oakley: | 22:34 | I do. |
| Chairman Capito: | 22:38 | Thank you very much. Chair recognize chairman from 37th for questions. |
| Del. Pushkin: | 22:41 | Thank you, Mr. Chairman. |
| Chairman Capito: | 22:43 | Hm? Oh. |
| Del. Pushkin: | 22:44 | Thank you, Mr. Chairman and, um, thank you for, uh, attending, uh, uh, the, uh, whatever service we're using now, uh, Ms. Oakley. Can you hear me? |
| Cathryn Oakley: | 22:53 | I can. Thank you so much for having me and, um, and to Mark for facilitating my being able to be here. |
| Del. Pushkin: | 22:59 | Okay. And, um, so you've, you, I guess you followed cases like this throughout the country, right? That's, that's part of your job at the Human Rights Campaign, is that correct? |
| Cathryn Oakley: | 23:09 | That's correct. |

| | | |
|---|---|---|
| Del. Pushkin: | 23:10 | Okay. Have you, there was asked of Counsel and, and she didn't know of anybody. Do, do you know of any cases in West Virginia? |
| Cathryn Oakley: | 23:18 | I do not know of any cases in West Virginia. |
| Del. Pushkin: | 23:21 | Okay. Um, the, the, but you have . . . Well, first of all, uh, I guess this is based on a premise that a, um, a, uh, transgender athlete would have some sort of advantage over, uh, other participants. Do you, is, I'm trying, have you heard of an actual advantage being created by transgender athletes? |
| Cathryn Oakley: | 23:46 | Yeah. Thank you for that question. That's a really important question. And I'll preface this by saying that groups like the National Women's Law Center and, uh, the Women's Sports Foundation, Women Leaders in College Sports all support inclusive polices that allow transgender athletes to participate. Um, and I, that is because, uh, to, to your excellent point, um, transgender kids, and I, you know, particularly this conversation ends focusing on transgender girls, um, transgender girls, like all girls, uh, have a variety of different bodies. They have a variety of different talents. They have a variety of different interests. |
| | | Some of them will be tall, some of them are short. Some of them are fast, some of them are slow. Some of them will have excellent hand-eye coordination. Others of them will not. Um, and so, you know, the trans pop- the trans population is, is fairly small. Uh, if you are, really only concerned with trans girls, that's then half of that number. And then of course, of those, uh, trans girls, you're, you're talking about only a few that are going to be interested in sports, um, and have, you know, sort of the combination of interest of, of physical capability, um, mental drive, work ethic to be able to excel. |
| Del. Pushkin: | 23:46 | Mm-hmm (affirmative). |
| Cathryn Oakley: | 25:00 | And I think very much to your point, the reason that we do not actually see, uh, instances of problems, uh, in, in the states, um, even though 16 states allow trans youth to participate in sports consistent with their gender identity and have done so for many years, um, there, there are in fact not issues in the states. Um, there is one, uh, case of Connecticut which we can speak about that much has been made of. |
| | | Um, I think it's really been misrepresented what's happened in Connecticut. So, I'm happy to help, uh, diffuse some of the misinformation about that. Um, but there, this is just simply not a problem, particularly in elementary and secondary schools. Um, some of the bills that we're seeing, I know not this one, uh, deal also with collegiate athletics. So, I'll also just say that the NCAA |

has had a policy for more than 10 years regulating, uh, trans, uh, participation in sports. And they also have not seen, you know, women's sports collapse as a result of, uh, people pretending to be girls in order to compete and excel.

| | | |
|---|---|---|
| Del. Pushkin: | 26:06 | Okay. Well I, I have a couple concerns about what the real consequences that, uh, this legislation could also have and that would, again, with my next question, um, do you have any statistics on like, about mental health issues or even suicide rates among the transgender teens? |
| Cathryn Oakley: | 26:29 | Yes. Um, you know, I want to preface this by saying that, uh, for transgender teens who are able to receive, um, age appropriate, medically necessarily care, um, the numbers are quite different. And in fact, having just one supportive adult in a trans youth's life can make a tremendous difference. But yes, um, trans youths experience extremely high levels of anxiety and depression, um, and also have an extremely high rate unfortunately of suicide and suicidality. Um, particularly, as I say, when they are not, um, supported by adults in their lives. |
| | | Um, and we have also found by the way that there is, uh, there is true harm, um, even with bills that are, uh, are challenging trans identity, even when they're introduced but not passed. |
| Del. Pushkin: | 26:29 | Hm. |
| Cathryn Oakley: | 27:24 | The rhetoric around those bills can be extremely harmful to transgender youth who are hearing them at home. |
| Del. Pushkin: | 27:33 | So even though it's unlikely that, that there's going to be participation from transgender girls in sports because we haven't seen it in a whole lot of places, the bill itself could be harmful just for a group that's already extremely alienated, is what you're saying, right? |
| Cathryn Oakley: | 27:48 | That's exactly what I'm saying. It's that there's actually no harm here that's being addressed by a piece of legislation like this, but, uh, there's, there's no, there's no, uh, no purpose for it. But there is harm perpetrated by it. |
| Del. Pushkin: | 27:48 | That's what I was getting at. |
| Cathryn Oakley: | 28:01 | Um, and particularly should it pass, you know, it's targeting an extremely vulnerable group of youth uh- |
| Del. Pushkin: | 28:06 | Right. |
| Cathryn Oakley: | 28:07 | . . . who as you say, are already experiencing extreme amounts of discrimination. And I, I do think that when we hear this idea that |

Page 14 of 21

there might be boys who are pretending, um, to be transgender women in order to get an advantage, transgender girls in order to be at an advantage, um, given the amount of discrimination that transgender youth face, uh, it's, it's really, uh, extremely difficult to imagine that that's something that anybody would do.

| | | |
|---|---|---|
| Del. Pushkin: | 28:31 | All right. Just a couple more questions. Um, I'm thinking now about, uh, like cisgender girls meaning a female, assigned a female at birth, identifies as a female, a female athlete, okay, who happens to be . . . Have you heard of any instances where it's a female athlete who just happens to be maybe tall, maybe, uh, more muscular than the other girls and the opposing team, or the opposing coach or opposing parents, uh, might make, uh, an accusation that, that, uh, she's not a girl? And then because of a law like this, they would like check into her background or something. Or, or it's been, being brought up because of a law like this. Have you heard of any instances of that, like that sort of thing happening? |
| Cathryn Oakley: | 29:20 | Yeah. Well, it, so there, there's only, um, well now two laws, that are, have passed that are on the books about this. One of them was passed only last week and hasn't yet gone. Last week, I think it was signed. And it has not gone into effect. Um, the other is the, uh, is the similar law that passed in Idaho last year, the HB500. Um, that law has been enjoined. It was challenged, um, in, uh, in the Ninth Circuit and, um, is currently enjoined, suspended from going into effect. So, we haven't had any of these laws in place yet that would give rise to that kind of a, uh, situation. |
| Del. Pushkin: | 29:57 | Ah- |
| Cathryn Oakley: | 29:57 | However, certainly that would be a side effect of what these bills would do is allow for the harassment of cisgender- |
| Del. Pushkin: | 29:57 | Yeah. |
| Cathryn Oakley: | 30:06 | . . . girls who are simply bigger and stronger. And I'll say, I'm 5'10". You can't, probably can't tell over Zoom. Um, I've been 5'10" since I was in sixth grade. Uh, and I promise you that did not come with any kind of sports advantage, no matter what people might think. Um, but certainly, you know, this idea that cisgender girls might be harassed for, you know, going through puberty early or being the first ones to grow, uh, that is, that's absolutely, um, possible that, that, that this bill will enable, uh, harassment for those girls. |
| Del. Pushkin: | 30:39 | Well your answer led me to one last question. First of all, I guess two if you count this one. You're an attorney with the Human Rights Campaign, right? You're a, you're a- |

| Cathryn Oakley: | 30:39 | Yes. |
|---|---|---|
| Del. Pushkin: | 30:46 | . . . you're an attorney? And you said this law hasn't been enacted anywhere 'cause it's in court. So, is it constitutional? |
| Cathryn Oakley: | 30:53 | No. |
| Del. Pushkin: | 30:54 | Okay. Thanks. That's all the questions I have, Mr. Chairman. Thank you very much. |
| Chairman Capito: | 30:59 | Further questions from Ms. Oakley? Further questions from, for Ms. Oakley? Ms. Oakley, thank you so much for being with us today. Uh, I'm sure there's nowhere else you'd rather be on a Friday afternoon. |
| Cathryn Oakley: | 31:11 | Never. Thank you so much. I appreciate it. |
| Chairman Capito: | 31:14 | Of course. Is there further desire by or of any member of the committee to call a witness, um, either that may be in the hallway or that might, uh, come to us virtually? Does any other member of the committee desire leave of the committee? Okay. If not, are there amendments to the bill? Are there amendments to the committee substitute? If not, chair recognizes Gentleman from the 32nd to move the committee substitute. |
| Del. Haynes: | 31:45 | Thank you, Chairman Capito. [inaudible 00:31:48] recommendation that we do that. |
| Chairman Capito: | 31:47 | You have heard the Gentleman's motion. Is there discussion? Gentleman from the 17th. |
| Del. Lovejoy: | 31:52 | Thank you, Mr. Chairman. [inaudible 00:31:53] full opposition to the bill. The timing of the bill is not the best. Um, I think that we have, this is another solution in search of the problem. But even more than that, we have legal guidance on this. We have a case from the Fourth Circuit in August of 2020 which tells you a law in this very area of Title IX. That decision is currently on appeal to the US Supreme Court. I don't know when they will rule but probably before, maybe before we get home or shortly thereafter we'll know whether the granted decision stands. Now, my friends have brought up some questions about that Grimm decision, and my good friend from the 13th said, "Well it's completely separate."

And I tell you that, that it is true the Grimm case does not deal with sports, but the Grimm case deals with the same issue. You have a school board that enacts a policy that says, students are required to use this facility, um, of the gender assigned at birth, okay. Um, and the Supreme Court, or excuse me, the Fourth Circuit struck it down, said you can't do that without violating |

Title IX. So if you have a policy based on a law that says you have to use or play in the team of the gender assigned at birth, it's not that much of a leap in logic to think that the same thing would apply, especially since Grimm was based on Bostock, which is another 2020 case written by Justice Gorsuch that applied, um, uh, the Title VII of the Civil Rights Act, um, that said discrimination based on sexual orientation and gender identity in the employment context.

So, you know, if you don't think that's the way it's going to go, what's the harm in giving it a couple months to find out what the law's going to be? Save our schools from Title IX violations and, and all the stuff that, um, that comes along with it. And so, I, that's the legal ground. All right. But more than that, I want to talk about the human ground.

Um, I don't know if you know a lot of transgender youth. Um, there's a lot of misconception, there's a lot of myths, there's a lot of stories about what kind of people they are. Um, they get sometimes per- put on these labels as some kind. They're, they're trying to sneak into bathrooms or get unfair competitive advantages and kind of demonized. And we do that a lot. I submit that if you will spend some time talking to some and you p- I promise you, you have them in your district, you'll find that they're like every other kid. And maybe a little worse in the sense that they face things that none of us maybe understand.

They're not trying to get over on anything. They're trying to stay alive today. They're trying to make it through the day, uh, in a, in a world that frankly is, is a little more cruel maybe than it should be. So for me, if I have a child and, and I know several in my, in my district, that the one thing that they have that makes them feel like a part of something, like a human being with dignity and respect, is being on that team, or, or running in that practice, I'm not going to take it away from them and, and, and put them back into this, this, this category or subject them to a, what my friend talked, the, the external genitalia inspection. I'm just not going to do that. I don't think it's right. I don't think it's what we need to do for kids.

We've made it a long time being able to figure out how to play sports together and how to use bathrooms and all that. We don't need a law to tell us. Uh, but if you think we need a law, you'll have one here in, in a couple of months. So for those reasons Mr. Chairman, I, I can't support this bill and I hope that, that my friends will join me in opposition.

| | | |
|---|---|---|
| Chairman Capito: | 35:25 | Further discussion. Gentleman from the 50th. |

| | | |
|---|---|---|
| Del Garcia: | 35:34 | Thank you Mr. Chairman. I'm speaking in opposition of this bill. As somebody who's represented female, uh, women who've been sexually assaulted in prisons, I didn't come to Charleston to force unwanted invasive sexual assaults of young girls, young boys. That's what this bill does. That's what you're doing if you vote yes on this. That's what the language says. That a doctor, that, this isn't a health, this isn't an examination for the purpose of seeing whether somebody's in good health. This is somebody, a doctor looking at whether there's unaltered internal and external reproductive anatomy. |
| | | That is disgusting. This bill singles out a group of people who face a challenging world. And I also didn't come down to Charleston to push somebody over the cliff if they're getting to the point of, of thinking about whether this life is worth living. That is crap. We shouldn't be doing this. Every single human being is made in the image of God. Every single one, whether you understand it or not. Whether you agree with how somebody lives or not, that's what we're talking about here today. I cannot support this bill. |
| Chairman Capito: | 37:42 | Further discussion. Chair recognizes Lady from the 4th. |
| Del. Zukoff: | 37:47 | Thank you Mr. Chairman. I'm also going to re- I'm also going to not support this bill for several reasons, both of which are, have already been mentioned from my friend from the 17th and the 50th. But I'm going to actually come at this from the aspect of a mother and my two daughters. And I raise my children to respect people as they are, not as some preconceived notion of what society thinks they should be. Or to ever put myself in a position that I could understand internally someone's mind, how they were made in the womb, how they came out feeling, how they felt about, you know, um, that they felt that they were always a boy. |
| | | I recently, and you all can look this up, there's a gentleman this week who just pre- he, he testified in the Missouri State Capital this week on a transgender bill similar. Has a, has a, um, child that was born as a boy, always identified as a male. And they, he and his, her mother made him dress as a boy, keep his haircut as a boy, um, had issues. And he had major issues. Was sad all the time, um, asked to dress in his sister's clothes and one day she was outside playing in the front yard with her brother and he called out to them to come to dinner. And she said, "No, it's time. I want to go across the street and play. Daddy, if I come in and change my clothes, can I go?" |
| | | And he realized what he was doing to that child by trying to make them something that they were not. And from a mother's perspective, I happened to be the mother of two very good |

athletes. They're adults now. One of my daughters was a two time all-state softball pitcher and a two time all-state basketball guard when she was in high school. My other daughter was a swimmer and qualified every year for the state meets and she swam in college.

So, I can tell you my personal life for 20 years was running with those girls year-round, every sport they were in. They're, some of their best friends to this day as adults are the people that they participated in sports with. It helped them create lifelong friendships. They learned about leadership. They learned about how to get along with other people. All of the aspects that we find that sports, that we all love about sports.

And I think by taking these, taking, asking these children not to participate in the one thing that may bring them joy is just simply wrong. It's wrong for us to make that decision. This decision's going to be made for us very quickly. I think we have better things to do with our time in the West Virginia legislature than put this type of legislation forth. Thank you.

| | | |
|---|---|---|
| Chairman Capito: | 40:33 | Is there further discussion? Chair recognizes the Gentleman from the 13th. |
| Del. Pinson: | 40:39 | Thank you, Mr. Chair. I'll speak in favor of the bill that's in front of us today. Um, I don't think that maybe some of the dialog that, that has taken place over the last several minutes, several days, several weeks surrounding this topic is meant to be what it, what it has become. Uh, the bill that's in front of us today, uh, does not mean that individuals of this committee or of this body do not respect someone, do not have dignity for someone, despite whatever their gender might be. |

The bill that's in front of us today is trying to place guardrails on the very sports that, that we're talking about, and the participation of those sports. Uh, we have spoke some today about the requests for a birth certificate in order for individuals to be able to participate in these sports. It's not been uncommon for us to request birth certificates for education and sports in the past for age-specific reasons. Just in a quick Google search, one can find that, uh, there is such a thing as age subjectivity where someone perceives themselves to be much younger or much older than they actually are.

And we would agree or at least hope we would agree that guardrails would need to be in place if someone, let's say my age, would want to participate in sports based on a different age. So, what, what we're doing here, and I hope that it's not lost in the dialog, but what we're doing here is talking about placing guardrails on these sports. It's not meant to be demeaning or

disrespectful. In fact, I would argue that for the individuals who are participating in their sports based on their natural-born gender, uh, I would argue that to them, it would seem that, that we are being very respectful to their natural-born gender. Thank you, Mr. Chair.

Chairman Capito:    43:19    Chair recognizes the Gentleman from, the Gentleman from the 37th.

Del. Pushkin:    43:23    Thank you Chairman Capito. Um, as one who has age subjectivity, I think I'm a lot younger than I actually am by the way, but, um, I apologize. You know, we're here at this late hour, uh, debating a bill that I complete, I feel is completely unnecessary. One of the, you know, my friend from the 13th's talking about guardrails. I'll tell you that most roads don't have guardrails because there's not a danger there. You put guardrails up where there's an actual, real danger of someone going off the side of the road but we don't have a single case of it. We are truly creating, looking for a solution in search of a problem and the solution itself is more problematic than the perceived problem.

We heard through testimony, this is one of the most alienated groups you can think of. Teens who are struggling with their own identity at the . . . All teens are struggling with their own identity. But especially, transgender teens who are, are incredibly alienated and struggling, we're going to, their legislature is, is up, here at 4:00 on a Friday, uh, deliberating this bill that's aimed directly at them for no apparent reason 'cause we don't even have any cases of it here.

So I would not, I mean I, I definitely wouldn't assign motives. I don't know what everybody's motives are. I'm sure there are some folks who really think this is a problem. I would beg of you to do some research and see and you'll find out it hasn't been a problem. And I think that there's a lot of us here who are wondering how they're going to vote. And they don't, they know it's not really a problem but they're still kind of not sure how they're going to come down on this vote. And I would just pray that you can muster up half the courage that these kids have who we're alienating with this bill. If you could muster up half the courage they have and vote this, this bill down 'cause it's completely unnecessary.

Chairman Capito:    45:15    Is there further discussion on a motion? Is there further discussion? If not, the question before the committee is on the Gentleman from the 32nd's motion to report out the committee substitute for House Bill 3293 to the full house for the recommendation of the committee substitute do pass. All in favor, please signify by saying aye.

| | | |
|---|---|---|
| Audience: | 45:31 | Aye. |
| Chairman Capito: | 45:32 | All those opposed, please signify by saying no. |
| Audience: | 45:34 | No. |
| Chairman Capito: | 45:36 | Aye's appear to have it. |
| Audience: | 45:38 | Division. |
| Chairman Capito: | 45:39 | Division's been called. Please raise one hand if you are in favor. One hand if you are opposed. On the question of adoption, there are 16 yes's and five no's. The motion is adopted and the committee substitute for House Bill 3293 will be reported into the floor with a recommendation that it do pass. There are two subcommittees, uh, that are out there. Actually, there's three subcommittees that are out there. Um, and I believe some of those intend to perhaps meet next week. So, uh, listen for those announcements on the floor. Is there any further business to come before the committee? If not, everybody have a nice weekend. Gentleman from the 32nd. |
| Del. Haynes: | 46:33 | 9:30 |
| Chairman Capito: | 46:36 | 9:30. |
| Del. Haynes: | 46:37 | And Mr. Chairman, I move we adjourn. |
| Chairman Capito: | 46:40 | All those in favor please signify by saying aye. |
| Audience: | 46:43 | Aye. |
| Chairman Capito: | 46:43 | All oppose, no. Aye's appear to have it. |

# EXHIBIT C

## House of Delegates Discussion of H.B. 3293

## March 25, 2021

| | | |
|---|---|---|
| Clerk: | 03:02:45 | Committee substitute for House Bill 3293, relating to single-sex participation in interscholastic athletic events. |
| Speaker: | 03:02:54 | Are there objections to having the bill explained in lieu of having it read? If not, the Gentleman from the 27th, Delegate Ellington to explain the bill. |
| Del. Ellington: | 03:03:01 | Thank you, Mr. Speaker. Uh, this committee substitute provides that for the purposes of participating in single-sex secondary school interscholastic athletic events under the control, supervision, and regulation of the SSAC, that each county school district shall confirm that the sex of the pupil identified on the pupil's original birth certificate be provided upon his or her admission to public school is the pupil's sex at the time of birth. Now, if an original birth certificate was not provided or if the birth certificate provided does not indicate the pupil's sex at the time of birth, a signed physician statement indicating the pupil's sex based solely on the pupil's unaltered internal and external reproductive anatomy must be submitted prior to a pupil's participation in single-sex secondary school interscholastic athletic events. So prior to a student's participation in single-sex secondary school interscholastic athletic events, the SSAC must verify with each county board that each student participating in the single-sex interscholastic events is participating according to the student's sex at the time of birth. Now this requirement does not apply to coeducational secondary school interscholastic athletic events. In addition, this does not apply to elementary school or to higher education participation. Mr. Speaker, I urge the passage of the bill. |
| Speaker: | 03:04:41 | The question before the House is, shall the bill pass? Is there debate on the bill? The Gentleman from the 3rd, Delegate Fluharty, is recognized. |
| Del. Fluharty: | 03:04:51 | Thank you, Mr. Speaker. Will the gentleman yield? |
| Del. Ellington: | 03:04:55 | Yes, sir. |
| Del. Fluharty: | 03:04:56 | So, you know, you've heard, I'm sure you took some testimony up there in committee. Um, have you had, did |

|  |  | you have any testimony of the number of complaints that SSAC has received regarding anybody taking advantage of the single-sex sport system we currently have? |
|---|---|---|
| Del. Ellington: | 03:05:13 | Uh, not in West Virginia. |
| Del. Fluharty: | 03:05:14 | So not a single complaint received in West Virginia? |
| Del. Ellington: | 03:05:17 | Not at this point in time. |
| Del. Fluharty: | 03:05:19 | Well, was there any testimony that anticipated having complaints in the future? |
| Del. Ellington: | 03:05:23 | There have been in other states. |
| Del. Fluharty: | 03:05:25 | In other states. And how many have there been? |
| Del. Ellington: | 03:05:27 | Uh, I don't have that number in front of me. |
| Del. Fluharty: | 03:05:29 | You don't have that data. So can you tell me how many of in Ohio, for example, a neighboring state? |
| Del. Ellington: | 03:05:32 | Uh, I don't have that. No. I do know that a number of states have adopted similar, uh, rules. I think there were 27 states that- |
| Del. Fluharty: | 03:05:42 | Rules or laws? |
| Del. Ellington: | 03:05:42 | . . . were looking at, or same, the same ty- a similar type of legislation. |
| Del. Fluharty: | 03:05:46 | Okay. L- let's get to that. Um, first off, you mentioned it doesn't apply to grade schools, I believe. Correct? |
| Del. Ellington: | 03:05:53 | This bill does not look at elementary school participation. |
| Del. Fluharty: | 03:05:59 | Okay. At what grade would this be enforced? |
| Del. Ellington: | 03:06:02 | This would be secondary school. |
| Del. Fluharty: | 03:06:03 | Okay. So at what age are we talking? Is that sixth grade? |
| Del. Ellington: | 03:06:08 | That would probably be from sixth on to 12th. |
| Del. Fluharty: | 03:06:11 | Okay. So we're talking about at sixth grade, what are you, 11 years old at that, that point in time? |

| | | |
|---|---|---|
| Del. Ellington: | 03:06:17 | Thereabouts. |
| Del. Fluharty: | 03:06:18 | So thereabouts 11. This will apply to 11-year olds thereabout. |
| Del. Ellington: | 03:06:23 | If they're in secondary school. |
| Del. Fluharty: | 03:06:24 | Okay. Let's talk about how that currently works now. I pulled the, the form that's currently used for athletic participation per the SSAC, um, and individuals can be examined. And the goal of that examination, I think you would agree with me as a physician, is to find out if that person is physically fit for athletic competition. Are you familiar with how these exams work? |
| Del. Ellington: | 03:06:48 | Uh, I have performed some of them in the past. |
| Del. Fluharty: | 03:06:50 | Uh, that was my, my next question. So you've performed these exams in the past, and there's criteria for it. Includes screening of the abdomen, respiratory, cardiovascular issues. Would you agree with me, the goal of the current physical exam is to make sure the per- the individual, uh, i-is going to safely participate in sports. Right? |
| Del. Ellington: | 03:07:10 | I would agree with that. |
| Del. Fluharty: | 03:07:11 | Okay. And there is through the p- through the screening process as a physician, uh, you're checking for things to, to make sure that individual, uh, will safely participate and there's no risk in that the examination you're doing and the questions you're asking, there's a medical goal at the end of the day for each step. Correct? |
| Del. Ellington: | 03:07:31 | I would agree with that. |
| Del. Fluharty: | 03:07:32 | Okay. Um, what is the medical goal of identifying whether somebody has an un- unaltered internal or ex- external reproductive anatomy? |
| Del. Ellington: | 03:07:41 | The medical goal on this bill is just stating that if, but if they do not have their gender assigned on their birth certificate that one would have to be provided by a physician statement. |
| Del. Fluharty: | 03:07:52 | Well, but through that process, you're not discovering whether they can actually participate safely in sports. |

Page 3 of 41

|  |  | You're just discovering their anatomy, uh, their anatomy based upon whether they have unaltered internal or external reproductive anatomy. Right? |
| --- | --- | --- |
| Del. Ellington: | 03:08:08 | That's what this bill is stating. |
| Del. Fluharty: | 03:08:10 | Okay. So there's no actual medical benefit to this exam going to this next level, is there? |
| Del. Ellington: | 03:08:17 | Uh, I would disagree with that. |
| Del. Fluharty: | 03:08:18 | Okay. Why? Tell me how. |
| Del. Ellington: | 03:08:20 | Why? Because if you have an individual that may have, uh, different characteristics that makes their ability stronger or, um, physically stronger or ha- or their habitus is different, that maybe that might affect, uh, injury to other participating students in the same sport. |
| Del. Fluharty: | 03:08:40 | So you're worried about other individuals playing the sport? Of course, we're not actually worried about it because you didn't have a single reference you could cite for me as taking place. |
| Del. Ellington: | 03:08:46 | Well, that's why the single sex, uh, um, interscholastic, uh, activities are based on gender as far as if it's, uh, with girls versus boys, it's separate, as far as putting a boy that might be a lot stronger competing against a girl and injuring the girl. |
| Del. Fluharty: | 03:09:04 | How long have you been practicing medicine? |
| Del. Ellington: | 03:09:06 | I've been practicing medicine for about 30 something years. |
| Del. Fluharty: | 03:09:09 | How many exa- of these exams do you believe you've done in those 30 something years? |
| Del. Ellington: | 03:09:12 | Well, as far as physical exams for sports? |
| Del. Fluharty: | 03:09:15 | Sure. |
| Del. Ellington: | 03:09:15 | Oh, it's several years I did that, but not recently. |
| Del. Fluharty: | 03:09:18 | Okay, several years. So, through the course of your 30 some years as a doctor, have you ever had, uh, any issue |

with somebody you've examined going on and playing sports and injuring another person and coming back and, and, and you had the issue of whether you should have maybe checked their anatomy a little better?

Del. Ellington:      03:09:35      When you do a physical exam, you're checking anatomy. If you're looking at the genitalia, that's a different thing.

Del. Fluharty:      03:09:40      Okay. Well this requires, um, checking for unaltered internal anatomy. Do you do that currently?

Del. Ellington:      03:09:49      You can do that hormonally.

Del. Fluharty:      03:09:50      You can do it hormonally. Do you do it currently?

Del. Ellington:      03:09:53      I haven't had to do that for, uh, sports physicals, but I have done that for other exams.

Del. Fluharty:      03:09:58      Okay. So in your 30 some years of practicing medicine, and, and during that time providing physical examinations for sports, you've never had to check the internal organs?

Del. Ellington:      03:10:09      Not for sports physicals.

Del. Fluharty:      03:10:10      Okay. But you would under this bill, right, if there's no birth certificate?

Del. Ellington:      03:10:15      If I was the one that had to attest to the gender of the, uh, the individual.

Del. Fluharty:      03:10:19      Okay. So under current law, that's not taking place, but after we pass this today, you as a doctor would now be checking the internal organs to make sure they're unaltered?

Del. Ellington:      03:10:29      No, the- I, that's not what this bill is saying.

Del. Fluharty:      03:10:33      Well, excuse me?

Del. Ellington:      03:10:34      The bill is saying that if someone wants to prove what their gender is without their birth certificate, that they would have to have proof from a physician. That's not necessarily during the sports physical.

Del. Fluharty:      03:10:44      Well, let's talk about that proof that's required. It's not currently required under law. Okay. If there's no birth

|  |  | certificate, the proof now required is for you, the physician, to check for unaltered internal and external reproductive anatomy. |
|---|---|---|
| Del. Ellington: | 03:10:57 | Well, it's not necessarily for me. It could be for whatever physician they want. |
| Del. Fluharty: | 03:11:00 | Okay. For any physician. Okay. If we're going to get, if we're going to play games like that. |
| Del. Ellington: | 03:11:03 | I mean, they mostly have pediatricians and stuff that already know their anatomy. |
| Del. Fluharty: | 03:11:08 | The point is, the point is, Doctor, the point is under the current practice, you're not going around checking for the internal organs as far as the examination related to anything SSAC-related for sports, are you? |
| Del. Ellington: | 03:11:22 | Uh, internal organs can be checked, yes. If you think there's something cardiovascular, if- |
| Del. Fluharty: | 03:11:22 | Is it a requirement? |
| Del. Ellington: | 03:11:27 | Yes there is. If there is a cardiovascular problem, you refer them to a specialist for echos or other workup. |
| Del. Fluharty: | 03:11:33 | But it's not currently a requirement as it would be if they're not- |
| Del. Ellington: | 03:11:36 | If you feel that they're not medically competent to be able to participate, if there's injur- risk of injury to them, you refer them to something else or you deny their ability to participate. |
| Del. Fluharty: | 03:11:44 | How exactly do you check whether pupils, an 11-year-old potentially, an 11-year-old, whether they have unaltered internal reproductive anatomy? Explain that process for us. |
| Del. Ellington: | 03:11:58 | Uh, they would have exams by their provider. |
| Del. Fluharty: | 03:12:01 | O- I- I want to know what the exam's like. Tell me. |
| Del. Ellington: | 03:12:04 | I, I don't think that's in the pro view of what I'm trying to discuss here. I mean, I, I've done internal exams on people before in my practice that all vary in different ages. |

| | | |
|---|---|---|
| Del. Fluharty: | 03:12:15 | All right, thanks for- |
| Del. Ellington: | 03:12:16 | I mean, I don't- |
| Del. Fluharty: | 03:12:16 | Your time. |
| Del. Ellington: | 03:12:16 | . . . know if that's pertinent to this part for- |
| Del. Fluharty: | 03:12:18 | Thanks for your time. |
| Del. Ellington: | 03:12:19 | You're welcome. |
| Del. Fluharty: | 03:12:21 | You can have a seat too, I'm done. |
| Speaker 22: | 03:12:22 | [crosstalk 03:12:22] |
| Speaker: | 03:12:22 | The gentleman did not sustain the point of order, so the gentle- the gentleman- |
| Del. Fluharty: | 03:12:39 | Very briefly, to the- |
| Speaker: | 03:12:40 | . . . is still recognized. |
| Del. Fluharty: | 03:12:41 | Briefly to the bill, you could tell that he was uncomfortable answering the questions about the actual exam. Imagine how uncomfortable it's, it's going to be for an 11-year-old who is subjected to it. You know, we had this bill on Friday. I thought about it all weekend. Fired up over it, because, you know, I was raised in a way that, if somebody's being bullied, you have a decision you can make. You could support the bully, you could take up for the person being bullied, or you could remain silent and let it go. |
| | | I'm not going to do that today. I would urge you not to do that today, because as of right now at this legislation, we are the bully. We are the bully, against kids. 11-year-olds. Picking on kids who are already suffering enough, struggling to get by just to be themselves. And because what we do now, we govern in these extremes. People make some Facebook posts and then you, you guys run out and print a bill. |
| | | That's what we do, we govern by Facebook commentary. It's, it's sad. It doesn't make any sense. I know this is going to pass, because you're more concerned with the reelection |

campaign that you are with the real effects on children in this state. I don't get it. I mean, just read this. They have to check whether the pupil's unaltered internal and external reproductive anatomy has to be submitted before participation.

No evidence that it's an issue anywhere really, and it's certainly not an issue in West Virginia. No evidence of it. He couldn't even go through the exam process in detail because he was that uncomfortable with telling us what the details are. So, I'm voting no. It's an easy no vote for me because I'm not going to be the bully. I'm not going to allow the bully to continue to bully kids in silence. I'm just not going to do it.

It's absurd, and I think that's how West Virginians were raised to take up for kids who are being bullied. This does the exact opposite. I'm voting no.

| Speaker: | 03:15:05 | The gentleman from the 10th [inaudible 03:15:07]Conley is recognized. |
| Del. Conley: | 03:15:11 | Thank you Mr. Speaker, may I speak to the bill? |
| Speaker: | 03:15:14 | Yes, gentleman is recognized. |
| Del. Conley: | 03:15:18 | Uh, I appreciate the, uh, the law that's been presented here, the bill that's been presented here I should say. Um, and it's a, a verification of a law that's already on the books. And, uh, let me just, uh, if you may bear with me, read from that book and read from, to you that law. It's, uh, King James' version, Genesis, chapter one. Starting with verse 26. And God said, "Let us make man in our image after our likeness, and let them have dominion over the fish of the sea, and over the fowl of the air, and over the cattle, and over all of the Earth, and over every creeping thing that creepeth upon the Earth." So God created man in his own image, in the image of God, created him male and female- |
| Speaker: | 03:16:08 | That point of order is raised. That point of order is raised. Gentleman will state the point. |
| Del. Fluharty: | 03:16:12 | Talk about the bill please. |
| Del. Conley: | 03:16:12 | I'm sorry? |

Page 8 of 41

| | | |
|---|---|---|
| Del. Fluharty: | 03:16:13 | That's not related to the bill. That's not related to the bill. His- |
| Speaker 25: | 03:16:17 | [inaudible 03:16:17] |
| Del. Fluharty: | 03:16:18 | Well- |
| Speaker: | 03:16:18 | Let's, let's- |
| Del. Fluharty: | 03:16:20 | He's not there now. |
| Speaker: | 03:16:20 | Let's go ahead and get to it. Gentle- |
| Speaker 25: | 03:16:22 | [inaudible 03:16:22] |
| Del. Conley: | 03:16:24 | . . . is, God created a man and a woman. To believe that there is a man that thinks they should be a woman or a woman that thinks they should be a man, is saying that my God made a mistake. And I've got news for all of you, my God does not make a mistake. So the bottom line is, if you're born a boy, a male, you're a male until you die. If you're born a female, you're a female until you die. So it's only fair that if you're born a male, you compete in male sports. If you're born a female, it's only fair that you compete in a female sport. |
| | | So therefor, I absolutely support this bill 100%. And I would certainly urge everybody else in here to do the same. |
| Speaker: | 03:17:12 | The gentleman from the 16th, Delegate Hornbuckle is recognized. |
| Del. Hornbuckle: | 03:17:16 | Uh, thank you Mr. Speaker. Would the chairman of education please yield? |
| Del. Ellington: | 03:17:21 | Yes sir. |
| Del. Hornbuckle: | 03:17:22 | Uh, thank you sir. Um, in regards to football, uh, whether it be middle school or high school. Uh, if there is not a girls' team, uh, are girls permitted to play on the football team? |
| Del. Ellington: | 03:17:33 | Under Title IX they are allowed to, but there are inherent risks to injury and they accept those risks. |
| Del. Hornbuckle: | 03:17:39 | But they are allowed to play? |

| | | |
|---|---|---|
| Del. Ellington: | 03:17:41 | Yes they are. |
| Del. Hornbuckle: | 03:17:42 | Thank you sir. |
| Speaker: | 03:17:47 | The gentleman from the 50th, [inaudible 03:17:50] Garcia is recognized. |
| Del. Garcia: | 03:17:52 | Thank you Mr. Speaker. Each of us, when we put our name on the ballot, first question we were asked is, why do you want to go to Charleston? I didn't come to Charleston to create problems where they don't exist. We've heard that there's no complaints about this in the state of West Virginia, about this issue about some type of advantage, competitive advantage that, that, that individuals, that kids are making this decision just so they can do better at sports. That's not happening. But we are creating a problem. And I, I've talked to a lot of people, and, uh, last week, um, was, was talking to somebody about infrastructure and they said, "Infrastructure, who cares? How can I stay in a state like West Virginia when you pass bills like this? When you take up bills like this? How can we get our young people to stay, and how can we ever attract somebody to our state?" |

You know, I also, I didn't come to Charleston to legalize or legitimize unwanted childhood sexual assault. That is what this is. That's absolutely what this is, along with a psychological attack, an emotional attack on some of our most vulnerable people in the state of West Virginia.

And the gentleman from the third said, "Unaltered internal and external reproductive anatomy." That type of examination, that's what we're talking about. That's what, you know, relating to single sex participa- no, no, no. Relating to legalizing a form of childhood assault. That's what we're doing. That's what this bill does.

That should make you uncomfortable. That should make you angry. I know it makes me angry, because these are, these are children. These are children. They live in a harsh world, a cruel world. You know, one in three transgender kids attempt to commit suicide. Did you know that? That was from a letter that we received from the American Academy of Pediatrics, that you have on your desk.

So, I did not come to Charleston to take any action that would make it more likely that anybody who is considering

whether or not this life is worth living anymore, to push them over the edge. I got, um, an email last Friday after we had our judiciary committee meeting, from somebody who works with a number of LGBTQ+ young people. And she was talking about how it had been a struggle to engage them in this legislative session.

And she said in her email, she said, "They care about this bill, but I have not dared to suggest they follow any of the video or audio discussions, out of fear for what they might hear their own representatives say about them." Kind of like what we just heard from the gentleman from the 10th. I mean, do you know that, you know, 2%, 2% of people actually have both reproductive organs.

So, I don't expect that I'm going to change anybody's mind in here, but I do have the opportunity to speak to those children that are listening. And I would just say this, every, every child is a beautiful creature of God. And yes, created in God's image, and beautiful exactly, exactly as they are, regardless of what anybody thinks that they should be like. Regardless of what, whether anybody understands. That doesn't matter. That doesn't matter.

I came to Charleston to do good. I came to Charleston to solve problems. I came to Charleston to protect others. I came to Charleston to speak out against what I see is wrong. And if that means that I don't get to come back to Charleston, then so be it. [inaudible 03:22:56]

| | | |
|---|---|---|
| Speaker: | 03:23:00 | Gentlelady from the 51st, Delegate Walker. |
| Del. Walker: | 03:23:04 | Thank you Mr. p- Speaker Pro-Tem. Will the chairman of education please yield? |
| Speaker 23: | 03:23:11 | Gentleman yields. |
| Del. Ellington: | 03:23:13 | Yes ma'am. |
| Del. Walker: | 03:23:14 | Thank you Mr. Chairman. Can you tell me how many elementary students we have that are transgender in this state? |
| Del. Ellington: | 03:23:29 | I can't tell you how many in this state. I can give you general numbers that I have on transgender. |

| Del. Walker: | 03:23:36 | No, that's okay sir. I, I just wanted in this state. Thank you. Do you know how many secondary transgender students- |
| Del. Ellington: | 03:23:45 | I do not, I do not have a breakdown on that. I just have .7% of U.S. teenagers- |
| Del. Walker: | 03:23:49 | That's, that's fine. |
| Del. Ellington: | 03:23:50 | Are transgender teens. |
| Del. Walker: | 03:23:51 | I appreciate you. I don't mean to cut you off. Just bear with me as I bear with you. So we, so do you know how many students that this bill would affect, if you can't tell me those numbers? |
| Del. Ellington: | 03:24:04 | I don't, and I don't think you can either. |
| Del. Walker: | 03:24:05 | In, in West Virginia. Okay. |
| Speaker 23: | 03:24:08 | Gentleman may state his point of order. |
| Speaker 24: | 03:24:12 | The, uh, chair of, uh, education has yielded the questions. Uh, uh, I think he should have an opportunity to, uh, answer the questions before, uh, proceeding to the next question. Thank you. |
| Speaker 23: | 03:24:22 | Gentleman's point is well taken to the lady. If you ask a question, please allow the gentleman to answer. |
| Del. Walker: | 03:24:27 | Thank you. Mr. Chairman, no disrespect at all, but if I'm asking for a certain state, could you just say you don't know and we can proceed? Cause I have a list of questions, thank you. Is there any other medical injury or diagnosis that can occur with someone that may cause for an internal or external, um, genitalia to be altered, besides if they choose to be, you know, besides going through the transgender surgeries? |
| Del. Ellington: | 03:25:09 | If you're saying that they choose gender- |
| Del. Walker: | 03:25:10 | No, if they- |
| Del. Ellington: | 03:25:10 | Corrective surgery, then- |
| Del. Walker: | 03:25:12 | Are there any other medical diagnosis that may cause external or internal body organs to be changed? |

| | | |
|---|---|---|
| Del. Ellington: | 03:25:20 | Not to be changed, but to be ambiguous, then there- |
| Del. Walker: | 03:25:20 | Okay. |
| Del. Ellington: | 03:25:23 | There are genetic disorders, yes. |
| Del. Walker: | 03:25:25 | So there are genetic disorders? |
| Del. Ellington: | 03:25:27 | Yes. |
| Del. Walker: | 03:25:30 | So, if someone was doing this examination, that would need to, it could be an assumption that maybe this was a procedure? |
| Del. Ellington: | 03:25:43 | No. If, uh, at birth, if there was ambiguous genitalia they would do a karyotype to determine what their, uh, what their gender is or if there was some other genetic issues such as Turner's or Klinefelter syndromes, for example. |
| Del. Walker: | 03:26:00 | Can you give us some examples of altered internal or external reproductive? |
| Del. Ellington: | 03:26:07 | Well, altered would be if they're on medications as far as internal. External would be corrective surgeries. |
| Del. Walker: | 03:26:15 | So, when you speak about corrective surgeries, so maybe, um, breast removal if that person had cancer? |
| Del. Ellington: | 03:26:21 | Well someone would've ha- if they had that then yes, but there would be a provider that could attest to that surgery. |
| Del. Walker: | 03:26:27 | Thank you Mr Chairman. Can I speak to the bill Speaker Pro-Tem? |
| Speaker: | 03:26:31 | Gentlelady may proceed. |
| Del. Walker: | 03:26:32 | Thank you. I appreciate it. Colleagues. We just debated. Freedom. [inaudible 03:26:49] Same difference. I'm not the parent. I don't have a child who is transgender. And not all of us practice the same religion. And we need to be mindful of that while we share our truths, respectfully. But what is so disheartening about this bill is that a child can play a sport until they get to secondary education, where their classmates may not see their differences at all. Where that child may not have been bullied before, we're opening up an opportunity. |

This flag sits on my desk for all the children and adults who are thankful to be alive, and for those who have died. Transgender people, especially transgender black people, are killed at high numbers. If we're going to talk about the rules and the respect and the good book, let's think about those individuals. If we're going to pass judgment, and this is your truth and this is your conviction, what are we saying to the children? This is not about adults. These, this is about children. Those numbers couldn't be answered but I have them. 1.0% of West Virginians at age 13 to 17-years-old identify as transgender. 1%. That's 1% that we're not going to allow in team sports, where we build team leadership and we build a bond. And we build athleticism, and we tell them right here, at secondary education, "You don't matter. You're not good enough."

Once again, I have to go back to when I went through my first year of being here. Cause we had a lot of truths today, and it shakes my soul. You called them butch, you called them the F word. You called them creatures, you called them a disgrace of God. You called them demons, you called them the devil. Well guess what I call them? Love.

I call them children. I call them future leaders. I call them trendsetters. I call them change makers. I call them to lead. I call them to use their voices. I call them to speak their pain. And I sit, uncomfortable in those moments, so they can have their own movement. Who is this bill helping, and who is it hurting? West Virginia, a place to live, work, raise a family if you choose, only if you're not transgender. Thank you, Mr. Speaker Pro-Tem.

| | | |
|---|---|---|
| Speaker: | 03:31:33 | Gentleman from the 43rd, Delegate Thompson. |
| Del. Thompson: | 03:31:39 | Thank you Mr. Speaker. Would the chair of education yield for a couple of questions? |
| Speaker: | 03:31:44 | Gentleman yields. |
| Del. Ellington: | 03:31:45 | Yes sir. |
| Del. Thompson: | 03:31:46 | Thank you Mr. Chairman. Um, so, you are a, an OBGYN by practice, correct? |
| Del. Ellington: | 03:31:53 | Yes sir. |

| | | |
|---|---|---|
| Del. Thompson: | 03:31:54 | So, can you tell me, um, after conception, when do sex organs develop on a fetus? When do they start developing? |
| Del. Ellington: | 03:32:03 | The, the start, immediately, as far as the genetics. |
| Del. Thompson: | 03:32:06 | Okay. So within like, seven to 12 weeks, they're, they should be really kind of, uh, mostly somewhat formed, to an extent? |
| Del. Ellington: | 03:32:13 | Uh, seven to 12 weeks, the genetics is there, and different features over the course of their normal 40-week gestation develop. |
| Del. Thompson: | 03:32:22 | Okay. When do, when does the, the brain start really developing and the, the higher function level of the brain start developing? |
| Del. Ellington: | 03:32:30 | As they get much older when they're out. |
| Del. Thompson: | 03:32:32 | Okay. Um so would it be- |
| Del. Ellington: | 03:32:36 | [inaudible 03:32:36] |
| Del. Thompson: | 03:32:36 | Correct to say that your sex organs are developing before your brain? Uh, higher function levels of your brain? |
| Del. Ellington: | 03:32:42 | Well, sex organs develop more during puberty. |
| Del. Thompson: | 03:32:45 | Okay, yes, true, but like, I'm talking about solely in utero. Like, whenever they're- |
| Del. Ellington: | 03:32:49 | E- you're talking about external characteristics? |
| Del. Thompson: | 03:32:52 | Yes. |
| Del. Ellington: | 03:32:53 | Well, there are external characteristics at birth, so they develop in utero. |
| Del. Thompson: | 03:32:57 | Okay. |
| Del. Ellington: | 03:32:57 | But the secondary sex characteristics develop during puberty. |
| Del. Thompson: | 03:33:01 | Okay. Um, then, I have a couple questions too. Uh, was the WVSSAC contacted about any of this? Because I know in |

|  |  | committee we didn't have a rep, because I did have some questions for him but I, we never- |
|---|---|---|
| Del. Ellington: | 03:33:16 | Yes, they, they were contacted, and as was stated during the committee meeting when you asked about that, they were over on our senate colleague's side. But yes, they were contacted and they responded that they abide by Title IX, uh, regulations, uh, for the school system. |
| Del. Thompson: | 03:33:33 | Uh, but I also wanted to ask them, and I don't know maybe if you heard, ha- have they heard of any complaints across the state of anyone qu- you know, uh, saying that this is a major problem they're facing in their schools? This is something that's really happening and it's just causing a big problem? |
| Del. Ellington: | 03:33:47 | No, they, you'd have to ask them more specifically, but no, they did not point that out to us. |
| Del. Thompson: | 03:33:52 | Okay. Um, and in the bill it says that, uh, it's based on a, your birth certificate. Um, who cont- who, who authorizes birth certificates? Is it, it's the state you were born in, right? So if you're born in West Virginia, West Virginia basically, you know, has authority over your birth certificates. If you're born in Ohio, Ohio, the county or city which you're born, they'll have the control of your birth certificate, correct? |
| Del. Ellington: | 03:34:16 | Birth certificate's filled out at the time of birth, and it's authorized at the hospital or facility where that happens. |
| Del. Thompson: | 03:34:21 | Okay. |
| Del. Ellington: | 03:34:22 | By the provider that delivered the person. |
| Del. Thompson: | 03:34:24 | So, in, in West Virginia, if a person would change their birth certificate to have their name altered to their new chosen name or, and their gender through a court order, a court decision, um, despite the fact that that has been changed, they would still have to play on the sport of their birth ass- that they were assigned at, at . . . or their, their gender assigned at birth. Is that correct? |
| Del. Ellington: | 03:34:51 | They would have to, uh . . . with this bill, they would have to abide by what their gender was at birth. |

| Del. Thompson: | 03:34:58 | Even if their birth certificate has been changed to reflect their new- |
| Del. Ellington: | 03:35:00 | Well, well apparently West Virginia does not allow birth certificates to be amended on the basis of sex alone. |
| Del. Thompson: | 03:35:09 | Are you 100% sure on that? |
| Del. Ellington: | 03:35:11 | Uh, that's what counsel has here. They have a West Virginia Supreme Court ruling on July 18th, 2020, ruled, uh, that the code section in 16525, which allows a birth cert- birth certificate to be amended does not authorize the sex on the birth certificate to be changed. |
| Del. Thompson: | 03:35:31 | So even a court order, you're saying, would not allow the birth certificate to be changed? |
| Del. Ellington: | 03:35:35 | Well a court order can change that, but not by West Virginia code for the original birth certificate. |
| Del. Thompson: | 03:35:41 | Okay. Um, I have no further questions but to speak on the bill now. |
| Speaker: | 03:35:47 | Gentleman may proceed. |
| Del. Thompson: | 03:35:49 | So, here we are again. We, uh . . . Here in Charleston we've had a lot of, you know, we have bills that all affect dif- us differently. Some of us are, you know, doctors, some of us are teachers, some of us are insurance salesmen. Some of us, we come from different industries, and we deal with different bills that affect those industries. But, but, a few of us, well the vast majority of us actually have never had to have bills that address who you are as a person, who you love, how you identify. I have for the past three years. I haven't had that privilege.

As my friend mentioned, West Virginia has 1%. That's the highest rate of transgender students in this n- in this country. And then you look at the demographics. I love demographics, I start looking at that stuff and analyzing it. And I look at it, and you start seeing that number, that percentage drop off significantly when they turn 18. Why? Why, is because they move away. Because we make, we enshrine transphobic language into laws. |

They're not respected. They want to go somewhere where they feel safe, welcomed, loved, just left alone to live their lives. Now I, I'm personally appalled and disgusted that a little girl could potentially have to show a stranger her genitalia to, to prove what sex organs she has. Would you feel comfortable with your daughter, whether they are transgender or not, be subjected to that? Cause I wouldn't. It's disgusting.

We heard some other testimony too, of, you know, uh, this is about, you know, fairness, you know, to ensure that, you know, uh, there's no, uh, people assigned male at birth are playing in female sports and they have a better advantage. They're going to be stronger, just because they're born a male. I don't believe that. This isn't about that. This isn't about fairness. This isn't about health. This isn't about safety.

This is about putting those most at risk students, those most at risk kids who are already dealing with something so traumatizing, and telling them, "You can't play this sport." I, I, I know how this is going to go too, but to, to be honest I didn't come to Charleston. When I was campaigning I didn't come here, I didn't ask peop- people weren't asking me, "Hey Cody, please put some, uh, bills on the, the, in the law that, you know, are going to restrict, you know, rights for the LGBTQ+ movement. Please, that's what I really want."

They were asking, "Hey Cody, bring us some jobs. We need some jobs, some good careers. Let's fix our roads. Let's build our roads. Let's finish corridor H and Coalfields Expressway. Let's fix our healthcare, let's fix PEIA." Not one person ha- has ever asked me for legislation e- e- even similar to this. But, here we are. With that being said, I urge rejection to this bill. Thank you, Mr. Speaker.

| | | |
|---|---|---|
| Speaker: | 03:40:07 | Gentleman from 36th, Delegate Pritt. |
| Del. Pritt: | 03:40:13 | Thank you Mr. Speaker. Would the chair of education ye- yield once again please. |
| Speaker: | 03:40:17 | Gentleman yields. |
| Del. Ellington: | 03:40:18 | Yes sir. |

| Del. Pritt: | 03:40:20 | Just have a few questions for you. Now, with regards to the part about an examination being performed, it only applies if an original birth certificate was not provided or, if the birth certificate provided was, does not indicate the pupil's sex at the time of birth. Is that right? |
|---|---|---|
| Del. Ellington: | 03:40:42 | That is what is in the bill. |
| Del. Pritt: | 03:40:43 | And, um, to the best of your knowledge, are secondary school interscholastic athletics voluntary? |
| Del. Ellington: | 03:40:51 | Yes they are. |
| Del. Pritt: | 03:40:52 | They are voluntary, right? |
| Del. Ellington: | 03:40:53 | Yes. |
| Del. Pritt: | 03:40:56 | Okay. And so, based on this, we're not requiring that every single student undergo an examination like this, right? |
| Del. Ellington: | 03:41:04 | No, the, they just give the . . . they have to present their bir- current code pr- they have to present their cu- their birth certificate when they go enter the school system. |
| Del. Pritt: | 03:41:14 | Okay. |
| Del. Ellington: | 03:41:14 | And typically, you'll have the gender on that at the time of birth, so that's usually not an issue. Now, if they come in and they don't have a birth certificate, if they want to par- uh, participate in interscholastic sports, then they have to give evidence of what their gender was at the time of birth. And that would be from their provider that has probably seen them many times before. |
| Del. Pritt: | 03:41:39 | So it's fair to say that this provision would only apply in a very, very, very limited number of situations, and if it does apply, it, the examination would be voluntary? |
| Del. Ellington: | 03:41:51 | Correct. |
| Del. Pritt: | 03:41:52 | Okay. No further questions. Thank you, Mr. Speaker. |
| Speaker: | 03:41:57 | Gentlelady from the 35th, Delegate Young. |
| Del. Young: | 03:42:02 | Thank you, Mr. Speaker. Will the chair of education continue to yield? |

| Del. Ellington: | 03:42:06 | Yes, ma'am. |
|---|---|---|
| Del. Young: | 03:42:06 | Thank you. I've got a couple, I'm going to jump around a little bit. Um, okay, so this was a, an originating bill in education? |
| Del. Ellington: | 03:42:14 | Yes it was. |
| Del. Young: | 03:42:15 | Okay, was there a stakeholders' meeting for the, for the purpose of the bill. |
| Del. Ellington: | 03:42:19 | Um, there are stakeholders I guess, uh, citizens of West Virginia. |
| Del. Young: | 03:42:25 | But you didn't have any meetings with like, the SSAC or any sort of transgender groups? |
| Del. Ellington: | 03:42:32 | I didn't. |
| Del. Young: | 03:42:33 | Okay. Um, and did this bill go through the health committee? Cause it seems like a lot about health. |
| Del. Ellington: | 03:42:40 | No, it didn't go through health. It was originated in, uh, in education. |
| Del. Young: | 03:42:45 | Was there a second reference? |
| Del. Ellington: | 03:42:46 | No. |
| Del. Young: | 03:42:47 | Okay. And, um . . . Oh- it went |
| Del. Ellington: | 03:42:51 | [crosstalk 03:42:51] Let me correct myself. No, it went to judiciary. |
| Del. Young: | 03:42:54 | Okay, thank you. |
| Del. Ellington: | 03:42:54 | Second reference. |
| Del. Young: | 03:42:54 | And- |
| Del. Ellington: | 03:42:54 | My apology. |
| Del. Young: | 03:42:57 | No problem. Um, I'm not on either of those committees, so some of this has probably already been asked by people in those committees. Um, would you agree that this bill is about participation and eligibility? |

| Del. Ellington: | 03:43:09 | Yes. |
| Del. Young: | 03:43:10 | So why is it not in a rule? |
| Del. Ellington: | 03:43:14 | We haven't developed the rule yet. |
| Del. Young: | 03:43:16 | So is this for a rule or is this- |
| Del. Ellington: | 03:43:18 | Yeah, they're, they're, they're all rules as far as participation in sports already. This is, this would, this bill would be amending that. |
| Del. Young: | 03:43:27 | How would this amend the rule? |
| Del. Ellington: | 03:43:29 | It would state that you have to be in the gender that you were assigned at birth to participate in a single-sex interscholastic sport. |
| Del. Young: | 03:43:36 | But isn't this code? |
| Del. Ellington: | 03:43:37 | In the secondary schools. |
| Del. Young: | 03:43:39 | I mean, we're changing code, not the rule. |
| Del. Ellington: | 03:43:41 | Yeah, but the SSAC would have their rules for that, yeah. |
| Del. Young: | 03:43:46 | Okay, and, um, within the rules, so are you familiar with, uh, 127CSR2, which is the eligibility rule? |
| Del. Ellington: | 03:43:53 | I don't have it in front of me but I'll take your word on what you have on it. |
| Del. Young: | 03:43:57 | Okay, and it says, when the rule . . . um, there will be a waiver granted when the rule causes extreme and undue hardship upon the student, so would there be a waiver if this would cause an undue hardship- |

PART 7 OF 9 ENDS [03:44:04]

| Del. Ellington: | 03:44:08 | Yes. |
| Del. Young: | 03:44:08 | . . . On anybody? |
| Del. Ellington: | 03:44:09 | That's what the school system has. That's what they will probably abide by. |

| Del. Young: | 03:44:12 | Good to hear. Um, okay. And also, I'm wondering what sports this applies to because like my friend from the 16th asked, there are some sports and that's in this rule too, that are everybody. |
|---|---|---|
| Del. Ellington: | 03:44:27 | This is a single-sex sports, it co-educ- co-educational sports are exempted from it. |
| Del. Young: | 03:44:34 | Okay. Um, I mean, what if the, what if the sports aren't co-educational? The rule says that if they're not like, uh, like if one school only has a sport for boys, then girls are allowed to play, so is that considered co-ed then? Like football or wrestling? |
| Del. Ellington: | 03:44:51 | Well, if, uh, if a female participated on the boys team, then I guess it makes it co-ed, but that's what Title IX requires that if there was no female team, then they are allowed to play on the male team. |
| Del. Young: | 03:45:04 | Okay. And how- |
| Del. Ellington: | 03:45:04 | It's not necessarily true the other way around. |
| Del. Young: | 03:45:07 | Okay. Would this affect that at all? |
| Del. Ellington: | 03:45:11 | No. It just says whatever gender they've designated as they get to play on that team. So it doesn't prohibit them from participating on a team. |
| Del. Young: | 03:45:11 | Okay. |
| Del. Ellington: | 03:45:18 | If it's a co-educational team, they could play on anything. |
| Del. Young: | 03:45:21 | Okay. Um, and so back to the birth certificate stuff that you and my friend over here were just chatting about. You said it's just, it's just an original birth certificate that has to be provided? |
| Del. Ellington: | 03:45:35 | Birth certificate at birth. Yeah. Your original birth certificate at birth is what this mandates. |
| Del. Young: | 03:45:39 | Do we let, um, kids participate in sports if they've changed their name on their birth certificate, maybe if they've been adopted or just change their name for whatever reason? |
| Del. Ellington: | 03:45:49 | I'm sure they do. |

| | | |
|---|---|---|
| Del. Young: | 03:45:50 | So that's allowed, we're just worried about their genitals. |
| Del. Ellington: | 03:45:56 | It's allowed as far as I, if they change their name or other conditions, just this bill is just staying that it's by the gender that was assigned to them at birth. |
| Del. Young: | 03:46:06 | Okay. And, um, I, it seems like if you don't have your birth certificate, which is in the bill but unchanged, you can get an affidavit, um, explaining the ineligibility. So there are students that go into the school system without a birth certificate. Right? |
| Del. Ellington: | 03:46:24 | Um, I'm sure there are. |
| Del. Young: | 03:46:25 | Okay. So they would not necessarily have that on hand. Um, and it sounds like that this is going to apply to anybody who doesn't have their birth certificate on hand. That so anybody who maybe filled out that affidavit or lost their birth certificate throughout time? |
| Del. Ellington: | 03:46:41 | If they wanted to participate in single-sex athletics. |
| Del. Young: | 03:46:45 | Okay. So like lots of foster kids might not have that kind of stuff. Right? |
| Del. Ellington: | 03:46:48 | Right. |
| Del. Young: | 03:46:48 | So anybody, anybody who doesn't have their birth certificate is going to have to get a genital check to play sports, single-sex sports? |
| Del. Ellington: | 03:46:56 | They would have to have with their provider attest to what their gender was. |
| Del. Young: | 03:47:02 | Okay. And, um, I'm really confused how this bill fits in with the WSSAC, uh, beliefs and objectives that are on their website. |
| Del. Ellington: | 03:47:16 | Their objectives I believe, is to have, uh, provide sports or activities for the students in a safe manner. |
| Del. Young: | 03:47:24 | Yeah. It says, "The commission seeks to present proper ideals of sportsmanship so that coaches, players, authorities, officials, and spectators may combine to any activity enjoyable and productive of physical and social |

benefits to both sides involved in the contest, with partisanship and prejudice eliminated as far as possible." I-

| | | |
|---|---|---|
| Del. Ellington: | 03:47:45 | You have it there. I, I'll take your word on that. Don't disagree. |
| Del. Young: | 03:47:48 | Okay. Thank you. Permission to speak to the bill. |
| Speaker: | 03:47:52 | Lady may proceed. |
| Del. Young: | 03:47:53 | Thank you so much, Mr. Speaker. Um, I think that this bill is all about partisanship and prejudice. We're not eliminating it. We're putting more in, I think it's full of bigotry, and I don't support it. Thank you. |
| Speaker: | 03:48:07 | Gentleman from the 47th, Delegate Phillips. |
| Del. Phillips: | 03:48:12 | Thank you Mr. Speaker. Um, like most issues we have in here, this engenders a lot of emotion on both sides. And I get a little emotional about this. Uh, last night, a young lady that I love very much had a breakout game in girls basketball and scored 19 points. And I've watched her work to earn her spot on that team, and work to earn her playing time on the court. And I, I know what she puts into it. She, uh, is going to the gym every day. She's out running in the rain and the cold and the heat. And it means a lot to her. And, uh, so I was feeling very proud last night. |

And, uh, then I got to thinking about this bill and I, uh, sat down and did a little research and came up with, uh, the 100-meter dash women's world record holder is Florence Griffith Joyner, the United States. She set that in 1988, um, at a time of 10.49 seconds, that was eclipsed in 1989 by James Jett in 10.34 seconds. She also set the 200-meter record in 1988 at the Summer Olympics, and I'm old enough to remember that, um, her time on that was a 21.34. That was eclipsed in 2013 by Dante Price at time of 21.10.

The current world record holder in the High Jump is Stefka Kostadinova, probably mangled that, of Bulgaria, and her record set in 1987 is six foot, 10 and a quarter inches. The longest held record in the event. It was beat, beaten in, uh, 1998 by Nathan Fields with a seven foot three inches. And finally, the current female record holder in the mile is Stefan Hassan, who in, uh, July of 2019 set a new record at, uh, four, uh, four minutes, 12.33 seconds. That record was

beaten or was surpassed in 2011. And it was a time of four minutes, 8.8 seconds in the 1600 meter by, uh, Jacob Bertram.

And as we think about this, instead of feeling about it, we need to realize that there are innate physiological advantages for males. And that's why we have unisex sports, we have girls playing basketball and boys playing basketball instead of together, because it's not a fair competitive floor. And, uh, then I come in here today and we find this paper on our desk part of which says the vast majority of the people this law will harm are school kids who just want to play on a sports team. And I absolutely agree with that. That's 100% true. But it's going to harm all the kids playing on that sports team.

Um, it finishes up, it tries to address a problem that does not threaten anyone. And I don't agree with that because it does threaten the kids that, like the young lady I love so much, work incredibly hard to get their spot on the team, to get their playing time on the court. And for many of them to get a college scholarship and further their education. And we are seeing cases around the country of girls records being decimated by biological males who come in and, and wipe the rec- record books clean, and totally dominate competition.

And I know we've had, uh, some alternate feelings on that, but as long as we're thinking about this instead of feeling, I'll go back to all those records I read off. Those are women's current world records, the fastest woman in the world in three different sports and put her in the high jump. The records that I listed off that beat them, weren't Olympians. They weren't professional athletes. Those were the boys high school records in West Virginia. So if you think it's fair competition, you need to go back and tell that little girl that I love, why she's got to compete against a biological male. I'll be voting for the bill. Thank you.

| Speaker: | 03:52:17 | Gentleman from the 16th, Delegate Hornbuckle. |
| Del. Hornbuckle: | 03:52:22 | Um, thank you, Mr. Speaker Pro-Tem. Ladies and gentlemen, there's a lot going on here today, there's a lot being said. And I personally, I really relate to the message and the great words by the Gentlemen from the 50th and the third. Now I know there's also some people in this body |

that relate to the words of the gentlemen from the 47th and the 10th. But on this issue, I'm going to urge all of you, all of us, no matter what side you're on, to put the emotions on the table and to embody who all of us are, which are lawmakers.

We're lawmakers. Now, I want to share with this body that in the summer of 2020, Trump appointee Justice Gorsuch wrote the Bostock opinion. And in that Bostock opinion, talks about discrimination based on gender identity violates federal law in regards to employment. Well, with that, the Fourth Circuit, which we here in West Virginia are included in, they applied that to Virginia's bathroom bill, which was struck down.

So I would invite this body to understand that there is precedent here and upon passage of this bill potentially, it's not going to cut the muster. We're looking for a problem yet again. I would also implore our body about the good back and forth between myself and the chairman of education and also the gentlelady from the 35th. And speaking about Title IX issues. And if there is a football team and there isn't a girls football team, could the girl play on it? And she could. Then the chairman also said that, uh, that young lady would also assume the inherent risks that come with that.

And then that could also go either way. Now, in this case here, if we were to have a transgender child in this state, and they were denied the right to participate again, we're asking for a lawsuit. We're asking for extended litigation. Now that might not seem like much on the surface, but what we're going at here is we're going to hurt all the children involved. Understand we're going to hurt all the children involved, not just the LGBTQ+ community youth. Again, I want to stress the word youth, but the ones who are not a part of that community.

'Cause there could be potential suspensions of the season, Championships could be vacated, again, ongoing litigation. It could really hurt all of our youth. So I think we need to slow down here and understand, regardless of how you feel personally about this situation. Legally, we're asking for a battle and we're no longer going to be lawmakers, we're going to be law breakers. So I would urge you all to take your time and vote this bill down. Thank you.

| | | |
|---|---|---|
| Speaker: | 03:55:28 | Gentlelady from the fourth, Delegate Zukoff. |
| Del. Zukoff: | 03:55:39 | Maybe I should take that as a sign I'm not supposed to speak, but, um, I'm not going to. [inaudible 03:55:44], um, chair of education can you yield for a few questions. |
| Del. Ellington: | 03:55:52 | Yes, ma'am. |
| Del. Zukoff: | 03:55:53 | We haven't had this issue come up in West Virginia, but if it did come up prior to this law being enacted, how would it be handled? |
| Del. Ellington: | 03:56:05 | Probably by what we're doing now? |
| Del. Zukoff: | 03:56:08 | What? They wouldn't make a child sit out. I'm, I'm anticipating that they wouldn't make a child sit out until we met next year. |
| Del. Ellington: | 03:56:16 | [inaudible 03:56:16]. |
| Del. Zukoff: | 03:56:16 | Who would come up, who would make that decision now, if this came up without the bill that we have before us. |
| Del. Ellington: | 03:56:23 | It would probably just be made on an individual basis by the school. |
| Del. Zukoff: | 03:56:25 | Okay. Um, and you mentioned earlier that there are some children who are born with both sex org- both hormones in both sex organs at birth. It's a very small- |
| Del. Ellington: | 03:56:36 | Uh, I said ambig- I said ambiguous, yeah. |
| Del. Zukoff: | 03:56:38 | Right. And very small group. What would happen? How would, how does that work about, um, determining the gender at birth and on the birth certificate? |
| Del. Ellington: | 03:56:47 | You, uh, you get, you could get their karyotype, which is their genetics. |
| Del. Zukoff: | 03:56:51 | Okay. |
| Del. Ellington: | 03:56:51 | And then you would assign a birth based on what they were at that time on the birth certificate. |
| Del. Zukoff: | 03:56:57 | Okay. And you said that, um, sex organs continue to flourish at puberty. What if that changed? |

| Del. Ellington: | 03:57:05 | That's second, that's secondary sex characteristics at puberty. |
|---|---|---|

| Del. Zukoff: | 03:57:07 | Okay. All right. Thank you. I just wanted to understand this is, this is all new to me. Um, like many of you on this floor, when I first saw this bill, I have to tell you that I was thinking that, "Man, it wouldn't be fair for girls to have to participate against boys." And then I did my research, as you all know that I love to do. Um, I want you to know that, uh, we heard during committee that the West Virginia Department of Education and the SSAC has not, have not received one issue, not one concern about this, this, this matter. |

I called my local school district and I asked them, do we have many transgendered students? Because like many of you, I simply have never had other than one person who's a city council man who I dear. . . city council lady that who I dearly love in the city of Wheeling, who is a transgender person. I've never had contact with a chan- transgender person before. I had to educate myself about that. Now my children and my, my niece, who's a sophomore at WVU, had a lot to tell me because they accept those children for who they are. We talked about the bills and this about the bills in this, um, that we don't have, that this has really, I think, a solution looking for a problem.

One of many of the bills we've had this year. 16 states provide allowing transgender students to participate in high school sports without requiring medical proof. 10 states provide no guidance at all and allow schools to set their own requirements. We used to be all about local control in this building. That's changed. We have three states, Indiana, Kentucky, and Louisiana, that required general, gender confirmation surgery before they're allowed to play sports. And the rest of the States are all contemplating what to do about this. So at this point, we know what other states have done. We have that we have those, those options.

Um, so again, this has a s- a solution looking for a pro- a solution bill looking for a problem. Now I'm going to take my legislative hat off for a minute. I want to talk to you as a mother, a mother of two daughters. Two daughters who were exceptional athletes, like my friend talked about being his daughter's basketball. My oldest daughter was all state and two sports for two years. She was an outstanding

basketball point guard and an outstanding pitcher in softball. We traveled all around the country watching her play. I spent 25, 20, 20, 25 years of my life following my girls around to sport events. My youngest daughter is a swimmer. Made states every year.

Her freshman year through, through her senior year. And she swam collegiately. So when I talk about girls sports it's something I know a little bit about. And I can tell you that my daughter's participation in sports were because they loved it. With every essence of their being, they loved competing. They loved being on a team. They loved the camaraderie. They learned to cheer for each other. They really put their heart and soul into it because that's what they loved. And we're going to in this state allow transgendered students to participate in sports, and I don't know about you guys—we start Kitty kick and soccer at my area at three years old. We start tee-ball at three years old. We're pretty sports-oriented in the Northern panhandle.

So these children are participating by how they identify until they get to middle school. So the students that they, the children that are their friends, the children that they'd been playing with have been playing with them their entire life if they're really into sports, right? And then we're going to tell these transgender students who love to play sports, just like all of our children do, that you can no longer participate if you want to continue to play with your friends. Is that really the goal? Is that what we want to do as a legislature? Because I can tell you as a mother, I find that very difficult. And for those very reasons, I'll be voting against this bill. And I would urge you to search your soul and do the same. Thank you.

| Speaker: | 04:01:44 | Gentlelady from the 24th, Delegate Mazzocchi. |

| Del. Mazzocchi: | 04:01:48 | Thank you Speaker of Pro-Tem. This is not about freedom. This is about protection. To protect our little girls that are in school. I don't mind everybody playing together in a league. If there is the parents there and everybody, the parents can take, can take care of their children, can watch them. That is all beautiful. But in school at that age when they start at what? 11 or 12, 13, they are at a very important age. And they feel very, as a girl, they feel very conscious about their bodies. Not to say that those transgender children are not, but to be honest, I don't want all this |

mixing and matching and whatever in our, um, in these locker rooms, I'm sorry.

The, there is no adult there to supervise. I don't want all this, this, this, whatever you're saying there. You're making a big problem out of nothing. I am sorry. This is not . . . we have boys and we have girls and we have some that are somewhere in between, and it's a very small minority. And why are we making this a big, huge deal? It is not a big, huge deal that everybody can play in a league. If you have ever played soccer, and I'm telling you, we have our, my family brought soccer into Logan County and my little girl played with the boys and played against the boys.

And we had one Sunday where the mamas played against the kids. And I'm telling you I wanted to play, and I did, because I did when Marco was small. All the mamas played with against the five-year old boys, and we mamas could only win because we had a 14-year-old boy getting in our team. But when Mara was, was, was 12 and 13, and she is playing against the boys, those boys are too big, too powerful, because they knocked me off. I was out, okay? But I wanted to play. But our children in our school had, they have no, no say so. I don't want him to be exposed to something that should not even be here. So I support this bill and I want to end this discussion because it's sickening.

I'm sorry. Everybody is a human being, but don't bring it up that ev- that we are calling your names. No one would call a name, someone a name. And I appreciate all your effort. And I want you to support this because we need to protect our little girls.

| | | |
|---|---|---|
| Speaker: | 04:05:01 | Gentleman from the 36th, Delegate Barach. |
| Del. Barach: | 04:05:06 | All right. Thank you very much, Mr. Speaker. Uh, will the chairman of the education committee yield for a couple of questions? |
| Speaker: | 04:05:13 | Gentleman, yield? |
| Del. Ellington: | 04:05:14 | Yes, sir. |
| Del. Barach: | 04:05:15 | Thank you so much doctor. I didn't mean to make you get up again. |

| Del. Ellington: | 04:05:19 | All good. I need the exercise. |
|---|---|---|
| Del. Barach: | 04:05:21 | We've had a lot of questions about this. I might've missed this one, but I'm just trying to figure out why this is such a big deal right now. Why, why do we need this bill? |
| Del. Ellington: | 04:05:29 | You're asking me that? |
| Del. Barach: | 04:05:31 | Yes. |
| Del. Ellington: | 04:05:31 | I was probably going to say it in the closing statement, but, uh, there have been instances throughout the country where this has been an issue as unfair competitive advantage. And this is something that is brought up in 27 other states, uh, that have done that. And also in the U.S. Congress, there are bills related to this same, same, uh, topic. |
| Del. Barach: | 04:05:52 | But 12 states, uh, do allow it. Is that not correct? |
| Del. Ellington: | 04:05:56 | That's their freedom to do so. |
| Del. Barach: | 04:05:57 | And the NC2A, the International Olympic Committee also allow this. Oh, that's pretty heavy, uh, those are pretty heavy hitters with sports. |
| Del. Ellington: | 04:06:04 | That's beyond the purview of this bill. |
| Del. Barach: | 04:06:06 | Yes. But I'm just saying that, that, if, if they feel that it's okay, uh, that that should be something that we could use for a guideline, I would think. And, um, uh, so this, this isn't about, I think what people are afraid of this, isn't about some boy saying, "Hey, guess what? I want to win a trophy. I'm going to put on a girl's jersey and say, I feel like a girl today and I am going to race against these people." When you're talking about transgender, we're talking about people that are, from what I understand, uh, to participate in a sport like that, you have to be going through the transition process, is not, that not correct? |
| Del. Ellington: | 04:06:42 | I don't think this says that. I think it was just, if they identify as transgender, they're going to want to play on whatever team they want to do. |
| Del. Barach: | 04:06:49 | From what I understand, you have to be going through the process and that involves quite a bit of, uh, medical change. Doesn't it? |

| | | |
|---|---|---|
| Del. Ellington: | 04:06:55 | This does not say that. |
| Del. Barach: | 04:06:56 | But that's, I think what we're, we're dealing with though, isn't it? |
| Del. Ellington: | 04:06:59 | That's what some people are bringing up. |
| Del. Barach: | 04:07:00 | Okay. All right. All right. Well, thank you very much. All right. And I'm just going to go down in, on the record as saying, I think this is a bill based on, on, on not what, what people, what we need. This is based on judging people that are different than the rest of us. And I think we should look out for those people. I'm going to be voting no against this measure. And I hope you'll all, uh, follow suit with me. Thank you very much. |
| Speaker: | 04:07:24 | Gentleman from 39th, Delegate Ferrell. |
| Del. Ferrell: | 04:07:30 | Thank you, Mr. Speaker. The chairman of education, please yield. |
| Speaker: | 04:07:36 | Gentleman, yield. |
| Del. Ellington: | 04:07:37 | Yes, sir. |
| Del. Ferrell: | 04:07:39 | I know you had to address a lot of questions this afternoon. Sorry to have to add one more here at least. But what would you say the spirit of this bill is? |
| Del. Ellington: | 04:07:48 | Spirit I would say is fair competition and safety for all the students. |
| Del. Ferrell: | 04:07:52 | Exactly. Only I would have said safety and then fair competition. Because the number one issue I think comes back to safety. |
| Del. Ellington: | 04:08:00 | Right, I wasn't putting in a particular order. |
| Del. Ferrell: | 04:08:02 | Uh, second question is to follow up question. My colleagues from across the aisle made several, uh, I asked several questions about comparison to sports where girls were allowed to play football, or I actually, my first year teaching, uh, teaching and coaching, I had a girl play on the baseball team 'cause we didn't have a softball team at Dunbar High School and she played over there. But actually those are, would you say those are just exceptional |

situations where a girl is playing up in competition. It's not a situation where I coached girls volleyball and a boy would come down and play on the girls volleyball team, correct?

Del. Ellington:     04:08:39     Title IX does not allow that to happen.

Del. Ferrell:     04:08:41     Right. The, the SSAC has rules against that. Correct?

Del. Ellington:     04:08:44     And SSAC follows Title IX regulations.

Del. Ferrell:     04:08:49     All right. Thank you. Thank you very much. Can I speak to the bill please? After 30 years in education, most of that coaching high school sports, middle school sports, covering all high school sports with my sports media network, having a daughter and a son both participating in sports, I think I know a little bit about sports and the involvement of it, and especially the differences between girls and boys sports. So I coached high school volleyball here in Kanawha Valley. The teams that . . . the net on a volleyball court for the girls is seven foot, four inches and a quarter. This is the same for the guys? No. It's eight foot.

It's my colleague, my colleague over here at Harrison County, she's enjoying this lunch, uh, coaches girls basketball up at Lincoln County or Lincoln High School. They use a smaller basketball because her hands are smaller. And we could go on and on about the differences that are already in place in order to try to, uh, address some sense of fairness. But more importantly, a lot of times just to, just as we said with volleyball, they don't allow the boys to come over and play down in, into the girls level because in a lot of cases, it could even be dangerous. Especially at the net and the swing and the velocity of the ball as it travels, it would be dangerous against the girls.

So, you know, first thing, it's a safety issue. And then second would be fairness issue that [inaudible]. So the spirit of this all, if we look at today is a really, you know, what are we trying to do here? Are we trying to be unfair to a small group of the population? It doesn't matter how small the group it is. You know, we don't want to be unfair to any group. But when we look at the overall population of what we have and, and the group of kids that we're dealing with, we just want to be fair.

We just want to be fair and we're just following guidelines put in place for, for some time. I have a daughter as I mentioned, she's running track this year for Sissonville High School. She's 103 pounds soaking wet. And I just wonder you know, and not that we've had a case here in West Virginia, but would anybody want 185 pound that identifies as transgender to compete against her in the 200? I don't think so. I don't think we would think that's fair. Has anybody spoken up for her today? I don't think so. I haven't heard it.

It's just, (laughs) it's almost like we're upside down. And I think that's what my constituents, when they reach out to me about this bill and about what they see going on in the other states, and I think we mentioned there's 27, maybe other states that are looking into the same matter. We're looking, we're looking at this backwards sometimes as we do a lot of things. And I think people are just fed up and were upset and we might, and hopefully we'll never have a case of this. I hope it's never a situation. I don't think anybody in this body hopes that it's ever a situation.

But we're just getting out in front of it. And I know my time, I spend a little bit time too, when I was, uh, teaching as summers as a lifeguard. One of the things we always did and we worked on was making sure we, you know, we prevented things before they happened. You get out ahead of it. And I know as a physician over there, doctor, you, you know, your, your practice is about preventing the problem instead of, you know, trying to treat it after the fact.

And I think that's all this bill is trying to do, is get out of front, address it. Hey, West Virginia just wants to be fair. We're not trying to discriminate against anybody, but we certainly don't want to hurt 103 pound freshman girl, trying to run track at a high school against a senior who weighs 185 pounds. So I'll be voting yes on this, on this bill. And I would urge you all to join me.

| | | |
|---|---|---|
| Speaker: | 04:12:35 | Gentleman from the 37th, Delegate Pushkin. |
| Del. Pushkin: | 04:12:40 | Thank you, Mr. Speaker. Would, uh, my colleague from the 39th, please yield? |
| Speaker: | 04:12:46 | Gentleman yields. |

| | | |
|---|---|---|
| Del. Pushkin: | 04:12:48 | Thank you, sir. So you coach, uh, you're a high school coach? |
| Del. Ferrell: | 04:12:53 | I have been. Yes. |
| Del. Pushkin: | 04:12:54 | You have been. You coach girls sports? |
| Del. Ferrell: | 04:12:56 | Yes I have. |
| Del. Pushkin: | 04:12:57 | Have you ever had a transgender student go out for any of your sports teams? |
| Del. Ferrell: | 04:13:02 | Not to my knowledge. |
| Del. Pushkin: | 04:13:03 | Okay. You never had someone who was male at birth and then identifies as a female try to go out for one of your sports teams in order to gain some unfair advantage over the girls? You ever seen that, sir? |
| Del. Ferrell: | 04:13:13 | Not to my knowledge. |
| Del. Pushkin: | 04:13:14 | Thank you for yielding. That's all the questions that I have for you. Mr. Speaker, if I may address this. Um, my, my friend, my new friend from Logan's right. You know, we're making a big deal out of nothing because guess what? It hasn't happened. Even though West Virginia has the highest percentage of transgender youth, uh, possibly the most, you know, alienated, uh, folks in our, in our, in our state who we're going to further alienate today with this, with this debate, even though we had the highest percentage of these kids, none of them are going out for sports teams. |
| | | There aren't boys out there that are going to pretend to be transgender in order to get, uh, an advance, unfair advantage and excel in a, in a, in a girl sport. It's simply not happening. You know, if you truly believe it is, I suggest you do, uh, you know, a little more research than my friend from the 47th when you're, when you're looking up sports records and see it's not happening here. So the spirit of this bill is not about protection, it's definitely not about fairness. |
| | | What it's about is manufacturing some phony outrage that you can put on postcards in a couple of years and say, act like he did something for somebody. But you didn't do |

anything for anybody. What you did was you hurt kids, the most alienated kids in our schools. That's who you hurt with this debate. And that's why I'm angry about it. See, it's, it it's, it is a solution in search of a problem. However, the solution we're talking about is more problematic than the perceived problem that you're making up. And that's the problem I have with this bill.

So let's talk about a binary decision that we're getting ready to make. You can either press green or you can press red. You get two choices on this bill. And I imagine that there's two different types of green votes today. There are those of you who really believe that this is an issue, and we've got to protect these girls from this perceived threat that's not happening. There are those of you who believe that it's a, this is a real issue. For those of you that are going to vote green, because you really think it's a problem, you know, I pray for you to find wisdom and to someday realize that this isn't an issue.

Now, but those of you, and I think you might be in the majority, those of you who know this isn't an issue, but you're going to do it out of political expediency. For those of you who know that it's probably, it's more problematic, uh, for a girl who might be a little bit tall, maybe a little bit muscular, who's good at sports and in the opposing parents and coaches are going to make an issue because of this debate we had today and alienate that poor little girl. For those of you who know that's the bigger problem you're creating here, but you're going to vote anyway because of political expediency, even though you know it's not really happening here.

PART 8 OF 9 ENDS [04:16:04]

| | | |
|---|---|---|
| Del. Pushkin: | 04:16:00 | Anyway, because of political expediency, even though you know it's not really happening here, I'm going to pray for you that you find half the courage of these children who you're alienating today, and you vote red and vote this mean-spirited bill down. |
| Speaker: | 04:16:20 | Gentleman from the 46th, Delegate Burkhammer. |
| Del. Burkhammer: | 04:16:25 | Thank you, Mr. Uh, Speaker Pro-Tem. And uh, I'd like the opportunity to speak to this, because e- every bill that we |

take up, we have to ask ourself a question, is, is, who does it hurt? Who does it help?

And so it's been pointed out who we think this bill is going to hurt. And, uh, I'd like to thank my colleagues here that have brought up who that it's going to help. That's women. That's, that's my daughter, that, that is an athlete as well. And, and we can say, well, they don't need any help, that, that there's not an actual gap in, in gender. So as I watched Sports Center this morning, uh, yesterday was Equal Pay Day. And, uh, the U.S. soccer team, Megan Rapinoe, I think was her name, was at the White House, trying to close that gap, trying to continue to stand up for women.

You know, women didn't even have the right to vote until 1920. It's been 100 years ago, women couldn't even vote in our country. It wasn't until 1972 that Title IX was passed. And we've came so far in our country closing that gap. Our colleague from the 35th, before session started, talked about the women in this body right here.

I am proud that we've got a majority leader and an assistant majority leader woman. I'm proud of all the women that are in this body. And can you imagine in a time when that wasn't even capable? Because I can't.

And so today, I rise in support of all of the women here, of all of the little girls playing sports across this land. I stand for them. I stand for women. I support this bill. Thank you.

| | | |
|---|---|---|
| Speaker: | 04:18:29 | Are there those seeking further recognition before I recognize the Gentleman from the 27th to close debate? If not, Gentleman from the 27th to close the debate. Oh, excuse me. Gentlelady from the 51st. |
| Del. Fleischauer: | 04:18:43 | Thank you, Mr. Speaker. My daughter is different. My daughter played sports. My daughter is beautiful. My daughter's intelligent, and she has left this state. And it's this kind of bill that will ensure that she will never come back. Please don't pass this bill. You are demonizing little children, and you're demonizing my baby. Don't do this! |
| Speaker: | 04:19:24 | Are there those seeking further recognition? If not, Gentleman from 27th close the debate. |

| | | |
|---|---|---|
| Del. Ellington: | <u>04:19:33</u> | Thank you, Mr. Speaker. This issue came to the surface in the United States regarding tra- transgender a few years ago, when two transgender girls were allowed to compete in state track and field meets in Connecticut. They won a combined 15 girls' state indoor and outdoor championship races from 2017 to '19. That's one of the things that started national debate. As I mentioned, there are 27 states that have put in legislation regarding this. And yes, there are 17 states and, uh, District of Columbia that require inclusion. However, there are six states that have no policy regarding gender identity, or sports, regarding sports whatsoever, and we're one of those. |

Now, as was stated before, Title IX does allow girls to have, to be able to participate in sports. They wanted to have some equality. If there is not a girls' team and in school, then they would be allowed to participate on boys' team. As I mentioned, the contrary was not always the case, because there were more boys' teams typically than girls' teams.

Now of course, we talked about the inherent risks of that. And someone accepts the risk when they participate in sports, any sport, but the key is to try to make it as safe as possible. But also to make it fair as possible.

So when we looked at this bill, we were looking at what was happening in our secondary, in our K-12 and higher ed. This bill was targeted mainly toward our secondary school age children. Children under that age typically play sports together. Most of you have, maybe had kids and played so-had them play soccer on co-ed teams. Not an issue. Most of those kids are about the same size, same physique, not a big problem. However, when they reach puberty, that's when things change.

Now you can look at internal and external characteristics, but there are differences. We're not trying to be unequal according to the law. We're just trying to say that there are differences. The ability to play sports is still there, it's just a matter of what team they play on.

So this was targeted toward secondary school. That's where there were big differences. Anyone that's seen kids from middle school to high school, is a big variety in how, to what their habitus is. Some are tall, some are short, some

are heavy, some are thin, some have different abilities. Well, that's where they compete.

Once they get out of high school, on the college level, the NCAA has different rules. It also includes that they also if they are gender, trigen- transgender female, they have to have hormone levels taken for a year before they're able to participate. So there are regulations in that. We wanted to stay away from that we were just dealing with secondary school. That's where the differences in the safety was. SSAC didn't have a big issue about it. They said, "We follow Title IX, we'll do what you tell us."

That's pretty much what we were told. They were hand's distance, staying away. So we looked at what is the gender, the birth certificate is something that they have to use to enter school. That would be their birth gender. If they did not present that, then they would have to have a certi- some certification from their physician saying what gender they were at birth. Doesn't mean they're going to be sexually assaulted, as some people are claiming. Mostly pedatri- pediatricians see these people. I've seen younger girls, I've seen younger boys when I was in training. Most of them aren't a big problem. Most of us gentlemen here have been through exams, especially of the genitalia when we did sports physicals. Anyone who's done hernia exams had to do that. There was not a problem there. And I didn't see any big outcry on that.

If someone had, was it to say a transgender female that had corrective surgery, obviously, someone performed that surgery, and could attest to what the gender was of that person. And you don't even need a physical exam to do that. You can do just the karyotype. There are a number of ways. Blood work, buccal smear, whatever, tells what their gender is. Very easy, non in- relatively non-invasive. So that's not a big issue. All these things that were proposed, that we're going to be torturing these kids and everything. That's not a big problem. It shouldn't be happening.

But we do want to make sure they're in the right part. We don't want to have an unfair advantage. I saw on the news the other day, they were showing, I think it was in Indiana, a girls' basketball team with a transgender girl that was about six foot six, taller than me, playing against all these young girls that were about a foot and a half shorter. I

mean, that is not a very fair advantage. So what this is trying to do is prevent problems coming here.

We have a policy in place. It says these kids can still play if they choose to. Now, if they don't want to participate in interscholastic sports, they don't have to have anything else further done to them. That's strictly voluntary. It's just giving a more fair advantage to them.

It also has nothing to do with locker rooms. It has nothing, you know, when they mentioned Fourth Circuit Court, all that had to do with bathrooms. That was an opinion on bathrooms. Supreme Court hasn't decided anything about locker rooms or sports. That has nothing to do with this bill. Doesn't apply. Maybe it will. As I mentioned, there's legislation in the U.S. Congress, both the House and the Senate, dealing with the same problem.

But until something like that supersedes what we do, it's up to us to decide where we want to go with it. So for the safety, the enjoyment of our kids, and also, I would also say, the emotional status of our students, it goes both ways. Kids that denied the prop, the ability to obtain a scholarship to college, or to be able to participate in an, in a state event or a national event because, uh, maybe some unfair competitive advantage from previous things. Those kids suffer too. So it's not just one sided, and there's a, we're not trying to descrim- we're just saying, if that's what your gender is, that's what your ability would probably be more appropriate for. That's what this bill tends to. So Mr. Speaker, I would recommend passage of this bill.

| | | |
|---|---|---|
| Speaker: | 04:26:27 | The question before the House is shall the bill pass. Those in favor of pass the bill will vote aye. Those opposed will vote no. The clerk will prepare the machine. |

Has every member voted? Gentleman of the 58th, your vote's not registered. [inaudible 04:27:04] Gentleman wishes to be recorded as having voted in the affirmative.

Clerk will please close the machine and ascertain the result on that question. There were 78 ayes, 20 nays, and two members absent who are not voting. The majority of members having voted in the affirmative, the chair declares the bill passed. The clerk will please report the title.

| Clerk: | 04:27:25 | Committee substitute [inaudible 04:27:28] 3293, relating to single-sex participation in interscholastic athletic events. |
| Speaker: | 04:27:34 | Are there amendments to the title? If not, the title as read by the clerk will be and remains the title of the bill. For what purpose does Gentleman from the 46th seek recognition? |
| Del. Burkhammer: | 04:27:43 | Thank you, Mr. Speaker. I move that this bill be effective from passage. |
| Speaker: | 04:27:50 | Let's finish the title amendment first. If there are no, if, if, are there amendments to the title? If not the title as read by the clerk will be and remain the title of the bill. |

The Gentleman from the 46th, Delegate Burkhammer, moves that the bill be made effective from passage. The question before the House is the motion that the bill be made effective from passage. Those in favor of the motion will vote aye, those opposed will vote no. The clerk will prepare the machine.

Has every member voted? If so, the clerk will close the machine and ascertain the result on that question. There were 79 ayes, 19 nays, and two members absent and not voting. Two thirds of members having voted in the affirmative, the chair declares the bill effective from passage. The clerk will please report the action of the House to the Senate. Next bill on third reading.

# EXHIBIT D

**West Virginia Senate Education Committee Discussion of H.B. 3293**

**April 1, 2021**

| | | |
|---|---|---|
| Counsel: | 05:42 | Thank you Madam Chair. Um, House Bill 3293 as passed by the house requires each county school district to confirm that the sex on the birth certificate of every student participating in an SSAC event is a student's sex at the time of birth. If there is no original birth certificate, the student must provide a signed physician statement, and requires the SSAC to check for the county boards that every student is competing according to biological sex. The proposed committee amendment strikes out everything after the enacting clause and provides that the following be added to a new section, Section 18-2-25d. And, um, it adds legislative findings regarding the state's important government interest in ensuring equal athletic opportunity for biological females. Um, it provides definitions for biological sex, female and male. It requires all public secondary schools and public schools of higher education to designate teams according to biological sex using the male, men or boys, female, women or girls, and co-ed classifications, and, um, provides a cause of action for individuals and schools aggrieved and harmed by a violation of this section. |
| Chairwoman Rucker: | 06:57 | Thank you Counsel. Are there questions for Counsel? Senator from Harrison. |
| Senator Romano: | 07:06 | Madam Chair- |
| Chairwoman Rucker: | 07:06 | Yeah. |
| Senator Romano: | 07:07 | . . . um, who is available to speak on this issue today? |
| Chairwoman Rucker: | 07:11 | So we have four, um, speakers that have volunteered to speak on this issue, um, at the appropriate time we can call them forward. Do you have any questions for Counsel? |
| Senator Romano: | 07:23 | Well, I, I wanted to know the names. It will, it will affect my questions. Counsel, so if they can give the names and who they represent. |
| Chairwoman Rucker: | 07:29 | We have Dr. Gilbert Goliath. We have Sissy Costner Boone. We have Chase Strangio, and we have Sydney Mc- |

|  |  | McEl- McElroy. I, I am sorry if I mispronounced anybody's name. Sorry. |
|---|---|---|
| Senator Romano: | 07:42 | So at least we are doing it in committee, do, do you know who they rep- |
| Chairwoman Rucker: | 07:44 | And I also see Sarah Stewart up there. |
| Senator Romano: | 07:47 | Do, do you know who they represent? |
| Chairwoman Rucker: | 07:49 | Um, I don't have all of that with me. I know, um, one of these individuals is a pediatrician. We have someone who's a deputy director for transgender science with the ACLU. Um, I believe someone is from Marshall, and I think, uh, we have a parent. |
| Senator Romano: | 08:07 | Okay. Cou- I do have some questions for Counsel. Thank you. |
| Chairwoman Rucker: | 08:09 | Okay. Uh, Senator Romano is recognized for questions to Counsel. |
| Senator Romano: | 08:13 | Counsel, I'm, I'm a little concerned about the difference between the original bills that came over from the House and the committee strike and insert or amendment, whatever we're calling it. The, the, the bill from the House as I read it requires that the board of education confirm the biological sex of the student prior to allowing them to participate in, in sports, correct? |
| Counsel: | 08:35 | Yes. |
| Senator Romano: | 08:36 | And it did not allow a parent or another school to challenge the biological sex of the student had, that had been so, um, um, so approved by the school board. In other words, there wasn't an outside challenge that students, uh, um, biological sex, is that correct? |
| Counsel: | 09:01 | No, not in that bill. |
| Senator Romano: | 09:03 | In the House bill. But now the, the, the amendment is, I think it's called on this—is it a strike and insert or amendment? |
| Counsel: | 09:13 | Both. |

| | | |
|---|---|---|
| Senator Romano: | 09:14 | Same thing? |
| Counsel: | 09:14 | There's a strike and insert. |
| Senator Romano: | 09:14 | Okay. |
| Counsel: | 09:14 | Strike and insert amendment. |
| Senator Romano: | 09:16 | It replaces everything, I just want to be sure. |
| Counsel: | 09:18 | Yes. |
| Senator Romano: | 09:18 | The strike and insert allows, uh, anybody to challenge the biological sex of a student playing sports in our secondary school system. |
| Counsel: | 09:31 | Um, I don't think that the language allows anybody, um, line 54 says, any individual aggrieved by a violation of this section may bring an action against the county board of education. So I think the purpose here is if there's, um, a biological female that has, you know, lost the state championship to a biological male, that is the kind of person that could bring, um, an action. |
| Senator Romano: | 09:56 | Sure. But that's going to be anybody. Take it from a lawyer, anybody can be aggrieved. And I mean, I can state an, I can state an, an aggrievement sitting here. I'm just, I'm just saying anybody can be aggrieved. It really opens it up though to individuals, correct? |
| Counsel: | 10:10 | Y- you still would have the standing requirement and you would still have to show harm, um, you would still have to show that it's your particular interest, um, that is being protected by this bill. |
| Senator Romano: | 10:21 | Sure. That case is already in court though. It's already going to be a matter of public record, it's already going to be in front of the public, isn't it in order for those issues to be decided? |
| Counsel: | 10:30 | Yes. |
| Senator Romano: | 10:31 | Okay. That's my issue with the, the whole thing, and, and I'm sure I'm going to have a chance to get into it here in a second, but, uh, um, so why the differences, do you have, do you have any idea what the change, what motivated the |

Page 3 of 23

|               |       | change? Let me ask you this, are we aware of any transgender student playing sports on a team that is opposite their biological birth? |
|---------------|-------|-----|
| Counsel:      | 10:54 | No, I'm not aware. |
| Senator Romano: | 10:55 | Okay. Do, do you know why the change in the bill from the House bill, 'cause it really risks the bill going back. I mean, we could not get any bill if we allow this change, right? |
| Counsel:      | 11:05 | I, I think there was some concern on the burden that you're imposing on these county boards to have to check every single athlete that wants to participate. Um, and- |
| Senator Romano: | 11:17 | Go ahead. I'm sorry. I didn't mean to interrupt. |
| Counsel:      | 11:17 | Sorry. Um, and also not every student is going to have access to a birth certificate. So here you are asking the student to establish their sex based on birth certificate, um, and there are lots of situations in which a student doesn't have a birth certificate, and if they don't have onem that bill requires them to then go to a doctor and subject themselves to, um, a physical examination. |
| Senator Romano: | 11:44 | Well, every child, every student is subject, and correct me if I'm wrong, I'm asking you the question. Isn't every child subject to a physical examination before they can play sports in, in our secondary school system? |
| Counsel:      | 11:55 | Yes. But an examination for this purpose would likely exceed the scope of a typical examination. Um, because it- |
| Senator Romano: | 12:01 | What makes you say, what do you base that on? |
| Counsel:      | 12:03 | Based on the original language in the bill which asks to check basically, make the decision based on the, the students, you know, reproductive systems and genitalia. |
| Senator Romano: | 12:14 | No, no. I'm asking you, what, what makes you think that the physical e-exam would be any more invasive? You ever heard of, and I'm just asking you, is that from personal experience, or do you have something that tells you that it's more invasive 'cause I've had them, I've played sports, and trust me, they knew what gender I was when I left that doctor's office. I'm, I'm just wondering if you got some information that I don't. |

| | | |
|---|---|---|
| Counsel: | 12:34 | Well, I don't want to speak on the experience in West Virginia. I do know what my personal experience has been as an athlete in another state, and I just don't know if that would be- |
| Senator Romano: | 12:34 | Sure. |
| Counsel: | 12:34 | . . . relevant. |
| Senator Romano: | 12:45 | Sure. Okay. But in this state, I mean, at least as far as I know, and I'd be interested to see if any of our speakers can speak to it. You know, I, I would, I would almost presume that the physical exam that you're required to undergo would confirm whether you were a male or female, but I, I could be wrong. But, uh, thank you counsel, good job. I'll at the appropriate time, uh, Madam Chair. |
| Chairwoman Rucker: | 13:07 | Uh, sure. At the appropriate time. Are there any other questions to Counsel? It looks like the appropriate time is now. Senator, um, from Harrison, uh, do you have someone you'd like to s- call forward? |
| Senator Romano: | 13:25 | You know, based on, on your- |
| Chairwoman Rucker: | 13:26 | List? |
| Senator Romano: | 13:27 | . . . sheet, I really don't have anybody. I, I would ask anybody that could speak to, um, whether or not, uh, there was sufficient, um, examination that the school board, that if somebody did not have a birth certificate so reflecting their gender, that through the routine examination of every athlete would be able to cover that. Is there anybody that's- |
| Chairwoman Rucker: | 13:50 | Mm-hmm (affirmative). |
| Senator Romano: | 13:51 | . . . willing to speak to that issue? |
| Chairwoman Rucker: | 13:51 | Pretty specific question there. (laughs) |
| Senator Romano: | 13:51 | What's that? |
| Chairwoman Rucker: | 13:55 | Pretty specific question there. |
| Senator Romano: | 13:57 | Well, it's, it's my pretty specific concern. |

| | | |
|---|---|---|
| Chairwoman Rucker: | 13:59 | Um, I, I know, um, we have some, oh, a couple of volunteers. Okay. Um, sorry, I do not know your names. Um, is one of you a doctor? Okay. Could you please unmute yourself? |
| Dr. Sydney McElroy: | 14:17 | I am a family doctor. |
| Chairwoman Rucker: | 14:19 | Oh, okay. Um, well, so may, can you, we'll start with you ma'am, what is your name? |
| Dr. Sydney McElroy: | 14:28 | Hi, I'm Dr. Sydney McElroy. I'm a family physician with Marshall Health in Huntington. |
| Chairwoman Rucker: | 14:34 | Okay, thank you. |
| Dr. Sydney McElroy: | 14:34 | And- |
| Chairwoman Rucker: | 14:34 | Thank you for- |
| Dr. Sydney McElroy: | 14:34 | Yes. |
| Chairwoman Rucker: | 14:37 | . . . identifying yourself. Um, do you mind raising your right hand? We swear in all of our testimonies here. |
| Dr. Sydney McElroy: | 14:42 | Sure. |
| Chairwoman Rucker: | 14:42 | Please raise your right hand. Do you promise to tell the truth, the whole truth and nothing but the truth so help you God? |
| Dr. Sydney McElroy: | 14:48 | I do. |
| Chairwoman Rucker: | 14:49 | Thank you so much for joining us. Um, Senator from Harrison. |
| Senator Romano: | 14:53 | Thank you. Thank you Doctor for volunteering here. And, and Doctor, what, what I'm trying to determine, I don't know if, if you probably haven't had a chance to see these two bills we're discussing. One bill places, and I'm going to use the word burden, the burden on the school system to confirm the biological gender of the child, either through a birth certificate, and again, the other way that I always thought was relevant was the routine physical exam that every athlete's given before they participate. And the second bill, which essentially allows anybody to challenge |

Page 6 of 23

the biological gender of a child playing sports. I, I wondered if, can you speak to that?

Dr. Sydney McElroy: 15:34   Sure. I, I have done hundreds of sports physicals in my career as a family physician, and I can tell you that while I'm imagining what you referenced earlier in a pre-participation sports physical, um, that you went through being a, sort of an examination of your genitalia. I, I, that was probably a check for an inguinal hernia, which has been part of sports physicals for some time, although more recent evidence has actually called into question if we even need to do that. But if we're talking about a cisgendered female or the, a patient that has a vagina, uh, a labia, we would not examine that as part of a pre-participation sports physical, that's not part of the routine examination. Um, and the original language of the bill that I found very concerning that it did not just say external reproductive anatomy, it said internal and external reproductive anatomy.

In order to prove internal reproductive anatomy for someone with a uterus and ovaries, we would have to at the very least place the patient in the lithotomy position, which is when we have them in stirrups, you've probably seen that, if someone's giving birth in a movie or something. Place her in stirrups and do a speculum exam, so use a, a device to widen the vaginal canal and see the bottom of the uterus, the cervix. And if you couldn't do that, then the next option would be some sort of radiological exam, whether that be a trans vaginal ultrasound where we insert a probe into the vagina or a CAT scan or an MRI which would expose them to radiation. So no, that, it would not be part of a standard pre-participation sports physical, or I should say, frankly, any physical exam that a child would undergo as part, I mean, young girls do not have pelvic exams done just so we can look for a uterus, that would be malpractice if we did that.

Senator Romano: 17:29   I can't-

Dr. Sydney McElroy: 17:29   This would not be a standard exam.

Senator Romano: 17:31   I can't imagine it would have to go that in depth, but that's, me, believe me, I'm trying to, what, what I want to avoid is, I mean, tell me this, and, and you're family physician.

Page 7 of 23

Dr. Sydney McElroy: 17:31         Yes.

Senator Romano:    17:40        What psychological effect do you think it would have on a young teenage boy or a young teenage girl to get singled out publicly as somebody who was, you know, playing a sport for which they're, um, they've crossed over from a gender perspective. I mean, what, can you tell me as a physician, what, what effect do you think that would have on them psychologically to have that kind of, of scrutiny placed upon them in their school and in their community?

Dr. Sydney McElroy: 18:09         Well, I think that if, if, are you referencing the psychological effect of a transgender athlete being harassed or, or called out by members of the community?

Senator Romano:    18:19        You know, you know, actually I'm not.

Dr. Sydney McElroy: 18:21         Is that what you're asking me?

Senator Romano:    18:22        I'm, I'm thinking back through my school years, and I'm thinking back to, uh, girls that might've been, um, you know, um, you know, built more masculine in nature than, than other girls and, and they were good athletes. And, and, you know, I'm, I'm wondering, and they're females. I mean, there was, at least when I grew up, there was never any doubt they were females, but I'm wondering what would happen if, if they were challenged because somebody felt aggrieved. You know, I w- I wonder if their-

Dr. Sydney McElroy: 18:50         Sure.

Senator Romano:    18:51        . . . if their gender was challenged, what effect do you think that would have on them psychologically?

Dr. Sydney McElroy: 18:55         Uh, I, I think, I think that what you're referencing is exactly a lot of the problem with this. I think that there are so many variations in body type and size and all of those things, especially throughout the middle school, high school years, that to unnecessarily call attention to those differences, whether the student is transgender or cisgender as in the example your giving, would absolutely be embarrassing, uh, humiliating, would put that student through a, a terrible time. I mean, yes, that could be psychologically, and, and especially when you're talking about transgender students, these are kids that already 50% of them are going to

attempt suicide in their life. So they're already under undue stress and pressure.

Um, you know, they're six times more likely to have anxiety and depression. They are 84% of them are, are, you know, afraid of attending school because they feel unsafe there. So, yeah, I think that that's the whole problem is we're trying to define something, um, that could cause great harm instead of just allowing for natural differences between kids to let them all play, let them enjoy the benefits of sports. I think what you're speaking to is the, the problem with the bill in either form-

| Senator Romano: | 20:06 | And, and just to be clear- |
| Dr. Sydney McElroy: | 20:06 | . . . it's damaging. |
| Senator Romano: | 20:07 | I'm sorry. Go ahead doctor. |
| Dr. Sydney McElroy: | 20:09 | It, it could be damaging to children either way. It could be absolutely psychologically damaging to children. |
| Senator Romano: | 20:14 | And, and we're talking to, I mean, I'm not even getting to the transgender kids who already have tremendous psychological issues they're dealing with. I'm just talking about, you know, a young girl who, who maybe grew up a little faster than everybody else, maybe she's a little bigger than everybody else. I went to school with them. They were, you know, a couple of females in my classes I was afraid of, but, but they were females. But it would have been nothing to challenge their sexual, their gender, you know, if I wanted to, to challenge them because they were, you know, the star of the basketball team, or they were the, you know, the, the star of the soccer team, it would be nothing, and, and that would be devastating to a child that wasn't even having trans- transgender issues, that would just be a regular child, right? |
| Dr. Sydney McElroy: | 20:55 | Yes. Yes. I agree. |
| Senator Romano: | 20:56 | Well, let me see if anybody else has any other questions for you doctor. Thank you for coming on today. |
| Dr. Sydney McElroy: | 21:01 | Oh, no problem. Thank you. |

Chairwoman Rucker:   21:03        Thank you. Are there any other questions for our guest? It looks like not. Thank you so much for volunteering to come on today. And I know there was, uh, another light on, I believe, it, um, sir, could you identify yourself before the committee? Yes, sir. We, we can't hear you. Can you unmute yourself? Hmm. Sorry. We still hear no sound. Okay, let me look. Um, I, I don't know whether that was, um, Dr. Gilbert Goliath. I'm sorry, there is no sound at all. Yes, um, I, sir, we can't hear you. I don't know if you could try to work out your issue and we'll try to recognize you in a couple of minutes. Thank you.

Dr. Gilbert Goliath:   22:18        Okay.

Chairwoman Rucker:   22:18        Oh, there you are.

Dr. Gilbert Goliath:   22:20        Uh, you got me?

Chairwoman Rucker:   22:21        We can hear you now.

Dr. Gilbert Goliath:   22:23        Okay, great. Yeah, no, I concur with what Dr. McElroy said, uh, the psychological issues.

Chairwoman Rucker:   22:29        Sir, sir, hold on.

Dr. Gilbert Goliath:   22:30        Oh, I'm sorry.

Chairwoman Rucker:   22:31        Please identify yourself for the committee.

Dr. Gilbert Goliath:   22:33        Oh, my, my name is Gilbert Goliath. I'm a pediatrician.

Chairwoman Rucker:   22:37        Okay. Thank you. Would you please raise your right hand? Do you promise to tell the truth, the whole truth and nothing but the truth so help you God?

Dr. Gilbert Goliath:   22:45        Yes, I do.

Chairwoman Rucker:   22:46        Thank you so much. So now you may please go ahead and give us your thoughts.

Dr. Gilbert Goliath:   22:50        Okay. Sorry about that. So yes, I concur with what Dr. McElroy said about the psychological issues that these, uh, young people would go through if they were in a situation where the gender was questioned. And back to as far as the physical exam is, she was exactly right about, we don't do an intensive physical exam during this pre- uh, sports

participation, because with the males it's very easy to determine the sex, but a little bit more difficult for female, which we don't look at that part of the body, to the genitalia of the female, we look at the external vagina, but that's about the extent of it. So, as she also mentioned about having radiological studies that would need to be performed to prove the gender identity of that young person, uh, that's involved in this, if they plan on participating in a sport.

| | | |
|---|---|---|
| Chairwoman Rucker: | 23:43 | Okay. Thank you. Um, I believe that the Senator from Harrison might want to ask you a few questions if that's okay. Senator- |
| Dr. Gilbert Goliath: | 23:43 | Sure. |
| Chairwoman Rucker: | 23:51 | . . . Senator from Harrison. |
| Senator Romano: | 23:53 | Thank you. Thank you Madam Chair. Um, and I'm sorry, could you identify yourself for me again? I apologize. |
| Dr. Gilbert Goliath: | 23:58 | Uh, Dr. Gilbert Goliath, pediatrician. |
| Senator Romano: | 24:01 | Uh, thank you doctor, and thank you for being here. Where, where are you located? |
| Dr. Gilbert Goliath: | 24:05 | In Char- South Charleston, West Virginia. |
| Senator Romano: | 24:07 | Okay. My, my sister-in-law's a pediatrician, so I know you guys all hang together, but, uh, um, I, I'm really concerned, and, and I want you to speak to this, there's two bills before us. The one that came over from the House, which simply says that the board of education will, you know, confirm the gender through a birth certificate, and if there's not a birth certificate, take other steps necessary. The one that we're considering that we call a, uh, committee substitute or a strike and insert, um, allows anybody to challenge the gender of a student who's, uh, playing in a single-sex sport. |

In other words, if you're a girls basketball team and you got somebody on that team that's doing really well, but they, you know, might be, you know, reasonably questioned, anybody could bring a suit and challenge the gender of that child. Can, as a pediatrician, can, can you speak to what we're doing to our children by, um, allowing them to be subject to such a challenge, uh, really from, you know,

supposedly anybody it's aggrieved, which really means anybody could bring that type of action to try to challenge that child's gender. What would that do to that child's, um, psychological wellbeing?

Dr. Gilbert Goliath:   25:22   It can be psychologically devastating, uh, and that leads into many of the aspects, uh, leading with depression, anxiety, and just other mental health issues, because it's, being in this state, it's a small community and everyone knows everything, and that can lead to the, uh, young person being ostracized not only from community, but even family members. So I think it takes a heavy, psychological toll on the individual that has gone through the situation.

Senator Romano:   25:52   And, and would children subjected to that kind of, uh, scrutiny and distress, would, would they be, uh, more likely to have psychological issues and, and, you know, possibly leading to, you know, uh, um, depression and other, you know, psychological maladies, maybe even suicide?

Dr. Gilbert Goliath:   26:11   Oh, of course, even kids who are not participating in sports, if they have their gender identity questioned, that itself without even being in part, in the sports, it, it hampers a child's psychological, uh, whole, uh, approach.

Senator Romano:   26:25   And, and, and doctor, if we had, if we had a choice, I, I hate, you know, one of these bill is going to pass. You know, I don't, unfortunately, I, I don't have the, the power to, to, we've never had a case of, I think a, a, the wrong gender playing the wrong sport, but we're going to pass this bill today, I think. Um, but if, if you had a choice between a bill where it was left to the, to the schools to confirm the gender of a child playing in a single, uh, gender sport, or you allow the public at large to be able to challenge the gender of a child, uh, which one would you choose?

Dr. Gilbert Goliath:   27:03   Well, the one thing is that you would have to want to anatomically identify the gender of the child to make the correct decision. So that's hard to, if, how would the general public be able to do that as opposed to the school, but either, with either one you would still need some type of examination-

Senator Romano:   27:19   The schools are going to look to-

| | | |
|---|---|---|
| Dr. Gilbert Goliath: | 27:21 | [inaudible 00:27:21] |
| Senator Romano: | 27:21 | Yeah. The schools are going to look to birth certificates, and it really doesn't say what happens if there's any doubt beyond that. But the, the other bill allows the public to challenge it if they're aggrieved in any way by the, the child who they suspect is not of the correct gender. |
| Dr. Gilbert Goliath: | 27:37 | Then you would have to go with the birth certificate at the present time. |
| Senator Romano: | 27:41 | Yeah. And, and that's what the first bill does with the school, but the second one allows a, a court suit to be filed, a public court suit that would name the child, I presume, so. |
| Dr. Gilbert Goliath: | 27:41 | Right. |
| Senator Romano: | 27:50 | So all right doctor. Well, thank you. |
| Dr. Gilbert Goliath: | 27:55 | All right. You're welcome. |
| Chairwoman Rucker: | 28:00 | Thank you. Um, the Senator from Boone. |
| Senator Stollings: | 28:01 | Thank you Madam Chairman. Uh, Dr. Goliath, uh, we've shared a lot of patients over the years, uh, it's, it's good to see you. (laughs) |
| Dr. Gilbert Goliath: | 28:08 | Good to see you. |
| Senator Stollings: | 28:10 | Uh, again, we've talked about the mental health, and then in some cases also there's hormonal regulation in some of these, uh, children. These hormonal regulations are not necessarily safe, is that correct or? |
| Dr. Gilbert Goliath: | 28:27 | Yes, that's right. |
| Senator Stollings: | 28:29 | Do you, are you aware of just how big an issue this is in West Virginia, uh? |
| Dr. Gilbert Goliath: | 28:36 | I have personally not had any patients myself that have undergone through this situation, but I have been reading a lot about, in other places that they've been dealing with this. |
| Senator Stollings: | 28:51 | And again, are you, are you, do you think you're, and the, uh, other physician, do you think you are in a, uh, in the |

|  |  | majority or the minority of the way, uh, healthcare providers, uh, think about this issue? |
|---|---|---|
| Dr. Gilbert Goliath: | 29:06 | I would tend to believe I'm in the majority. |
| Senator Stollings: | 29:10 | Yeah. And do you know of any, any associations that have come out either for or against this as far as a medical, uh, associations? |
| Dr. Gilbert Goliath: | 29:21 | Well, as far as guidelines, of course, American Academy of Pediatrics they said we should support transgender individuals in all aspects of, uh, medical health and wellbeing, even in the area of sports. Uh, but that's not a guideline, that's just their opinion. Uh, I know personally people in both sides that feel that male is male when it comes to interacting with females because of the, just the difference in the body characteristics, the, uh, metabolism, the bone structure and the body mass. So that makes the difference regardless of what the transgender person feels they are. |
| Senator Stollings: | 30:00 | Okay. Thank you. Thank you, Madam Chairman. |
| Chairwoman Rucker: | 30:03 | Thank you Senator. Um, senior Senator from the floor. |
| Senator Tarr: | 30:06 | Thank you Madam Chair. Uh, can I have a question to counsel please? |
| Chairwoman Rucker: | 30:10 | Okay. Um, one second. Are there any other questions for Dr. Goliath? Thank you. Um, okay. Thank you so much doctor, we really appreciate you being available for the committee. |
| Dr. Gilbert Goliath: | 30:25 | Thank you. |
| Chairwoman Rucker: | 30:29 | Go ahead senior Senator from the floor. |
| Senator Tarr: | 30:31 | Thank you Madam Chair. Counsel, in the section that lands on cause of action I think that some of the, that, uh, senators having con- some concern over the physicians. There's two parts to that, um, one says any individual, and then after that, number two, it's line 58, it says, any school that suffers any direct or indirect harm as a result of violation of this section. And so if, um, would you anticipate that if, if any individual I can see where if, if somebody is, um, uh, an aggrieved parent and they're |

pushing because their child lost and maybe it's by, you know, a millisecond on a race, as opposed to somebody's lap somebody, you know, that's just has, obviously, obvious physical differences.

Um, and then on the second part it says, any school that suffers. So any school I imagine would be a much more tempered approach because I can't see a school that would want to risk harming any child, whereas an angry parent I could see possibly just, I used to coach, uh, tee-ball and little league baseball and that kind of stuff. So I know there's parents that will rip your head off, or call a strike wrong. Um, the, what my question is, is that on the, any individual piece of that, is there a way that, that we can change that to protect the child for one, or does the, any school part, uh, protect that child enough from, from having an accusation that would be false and just, um, something that is, um, adversarial?

| Counsel: | 32:09 | I think maybe for the, any individual, you could probably use language that specifies that it is a student athlete, um, that was directly impacted. Um, I don't know if just relying on schools, um, would be sufficient. |
| Senator Tarr: | 32:31 | So my concern is not, and I think I know where the conversations going about, you know, if, if we're going to take out, um, a cause of action piece. But my concern is, you know, I've, I've got to read a few emails of some of the females where states that do have this problem now going on, where we have males that are participating in female sports, and there's some real harm and real reason to be aggrieved by these individuals. And so taking out the, I assume this is the teeth of the bill, it's the only place I see any teeth. So if we, if, if that is, that whole section were to be removed, is there anything that other than just saying, hey, we hope you don't do this, that this bill accomplishes? |
| Counsel: | 33:12 | It would basically leave it as status quo if you don't provide a, a cause of action. |
| Senator Tarr: | 33:17 | Okay. Thank you. |
| Chairwoman Rucker: | 33:21 | Thank you Senator. Um, Senator from Wetzel do you have questions for counsel? |

| | | |
|---|---|---|
| Senator Clements: | 33:25 | No. Uh, I think I've just basically got it answered, but it says any individual aggrieved, does that, would that prevent or allow just any fan in the stands to file an action? |
| Counsel: | 33:41 | My interpretation would be that it's an individual that's directly aggrieved by a violation, and directly meaning that, it is your interest that this bill intends to protect, and here it's clear that the interest is biological females. |
| Senator Clements: | 33:57 | Well, I'm aggrieved 'cause my team lost. |
| Counsel: | 34:01 | Well, then you might fall under the school, um, provision. |
| Senator Clements: | 34:06 | Okay. That's, I'm just curious, it's not doesn't open it up to just anybody to come in then and file some type of action? |
| Counsel: | 34:13 | No. |
| Senator Clements: | 34:13 | Okay. Thank you. |
| Chairwoman Rucker: | 34:17 | Thank you. Um, Senator Romano, questions for counsel? |
| Senator Clements: | 34:23 | Madam Chair. Counsel, did, did we look at the WVSSAC's policy with regard to challenges such as we're contemplating in this bill? |
| Counsel: | 34:34 | I did talk to someone from WVSSAC and- |
| Senator Clements: | 34:38 | But did you look at the policy? |
| Counsel: | 34:39 | Yes. |
| Senator Clements: | 34:39 | Okay. |
| Counsel: | 34:41 | So the policy is basically just, you wait until there is a, an issue, from my understanding when also talking to the WVSSAC about their policy. |
| Senator Clements: | 34:52 | Well, to me this policy achieves what I think we were looking for, um, you know, that the school makes a determination of the high school student's eligibility including gender, and then it says, any member school may appeal the eligibility of a changed gender student on the grounds of a student's participation in interscholastic athletics would adversely affect competitive equity or safety of teammates or opposing players, such an appeals |

heard by the WVSSAC board of directors, which is principals.

The identity of the student shall remain confidential in all discussions, documentation shall remain confidential. And the, and, and then it goes on with some other factors to be considered. I mean, it's, it's more of an equity determination, and maybe that's not what the intent of this bill is, but I think those first two paragraphs, you know, if, if we insist on having this, uh, this, um, comp sub or strike and insert that, you know, we, we allow this to remain in the schools and remain confidential, that would at least protect children from, from unwarranted accusations that are going to destroy their lives. It, was that considered at all by the, by the committee in, in creating this sub committee substitute?

| Counsel: | 36:06 | Yes. And I think that's actually kind of why this bill changed from the first bill, because it seemed more likely that a student would be subjected to an invasive physical examination just because there might be more students who don't have birth certificates or students from c- you know, from other states coming in that don't have a birth certificate. Um, it just seemed more likely that a student would have to end up going to a doctor just to get clearance to play a sport. |

| Senator Clements: | 36:37 | Well, but, but- |

| Counsel: | 36:38 | This allows everyone- |

| Senator Clements: | 36:39 | . . . if we- |

| Counsel: | 36:40 | . . . to compete right now, and basically in a way affirms the WVSSAC policy, um, and doesn't really, uh, change the status quo, except that it expressly provides a, a cause of action for [crosstalk 00:36:54] |

| Senator Clements: | 36:55 | Let me ask you a question. I'm just asking you individually, and you don't have to answer if you're uncomfortable. But what would you rather do to be one of a class that because you don't have a birth certificate that you get a physical examination like every other kid does, or because somebody singled you out because they saw you play a great game last week and your hair's a little shorter, your shoulders are a little broadened, they accuse you of |

|  |  | being a, a boy, and therefore you're publicly exposed as, you know, someone whose gender is being challenged publicly. What would you prefer? |
|---|---|---|
| Counsel: | 37:27 | I don't think my preference is relevant. (laughs) |
| Senator Clements: | 37:29 | Well, that's a good an- I guess that's a palsy question, but I mean, you know, I, I mean, I just, I just see it to be vastly different in, in a public exposure, a public outing of, of somebody who, who's probably a girl and is going to get, you know, just, I'm really shocked that we want to do this. I really am. Thank you. |
| Chairwoman Rucker: | 37:53 | Um, Senator from Mason. |
| Senator Grady: | 37:58 | Um, so I'm listening to my, um, colleague from Harrison. Um, I have some of the same concerns when it comes to that, is the, the, the last thing we want to do is to, um, embarrass or single out, you know, a young lady. Um, and, and so, you know, looking at the cause of action, my question just is, if we take out where it says any individual aggrieved by a violation, um, what if it was, if the school, so we're talking about SSAC, we're talking about NCAA, we're talking about playing for a school. So the school that that student plays for, if they could, um, you know, if they could seek, let's see, if they would allege a violation, um, with another school board. |
| Counsel: | 38:46 | Mm-hmm (affirmative). |
| Senator Grady: | 38:46 | In your legal opinion, would that keep it more discreet and more not public, meaning, it wouldn't release the name of the, the individual athlete and it would just be between school boards, um, because that's the main concern is not releasing the name of these students. Um, and, you know, would that take care of that problem if, if it was from school to school or, in your opinion? |
| Counsel: | 39:14 | I think it would definitely address that problem a little bit or mitigate that issue. Um, I don't know if there's any other lawyers in the room, but I'm not sure if necessarily a, an underage child needs to have their name on a lawsuit. Um, I don't know if they can be identified as Jane Doe in a lawsuit instead of their name. That might be relevant. Um. |

| Senator Grady: | 39:41 | Okay. Um, so, uh, I'll see if anybody else has any other questions and I'll think on this for a few. Thank you so much. |

| Chairwoman Rucker: | 39:50 | Thank you. Senator, uh, from Brooke. Sorry. Um, you guys have switched seats. Senator from Morgan. |

| Senator Trump: | 40:01 | Thank you Madam Chairman. I, I can weigh in a little bit on this because I know that when, uh, it's probably about the last 20 or 25 years, uh, our Supreme Court has adopted a practice of whenever a case involves, uh, a minor child as a party, uh, and in cases where even, uh, the parties are the adults, but it relates to a private matter involving minor children, they've adopted a practice of using first and last initials to identify the litigants. So you see cases like, uh, AB versus JM, uh, reported all the time. Those are sort of how they report divorce cases now, and the appeals, the appeal decisions in cases where children are removed in a, an abuse or neglect situation from their parents' home, the cases are in re, the children of, you know, AB and JM and that sort of thing. |

| Chairwoman Rucker: | 41:06 | Thank you very much, um, appreciate that. Um, Senator from Brooke. |

| Senator Weld: | 41:11 | Madam Chair, uh, Counsel, I'm going to go to subsection D. So, saying that a government entity, any licensing or accredited, accrediting organization, or any athletic association or organization shall not entertain a complaint, open an investigation, or take other adverse action against the county board of education for maintaining separate athletics. This is, uh, we might have, I think there's an issue in drafting here, and I'll, I'll walk you through it. |

| Counsel: | 41:48 | Okay. |

| Senator Weld: | 41:49 | So first being that, if you go up to page two and c(1), this includes higher education, so the NCAA, NAIA, and JCAA. You come down to, now let's go back to sub D on line 51 it says, "or take any other adverse action against the county board of education." So was that, was that subsection meant to only pertain to junior high and, and, and, uh, high schools? |

| Counsel: | 42:42 | No, I don't believe so. I think because we are dealing with a situation which we're asking both secondary public |

|  |  | schools and, uh, public higher education to comply with this, I think you would want to be able to protect public higher education from, um, any complaints for complying with this law. |
|---|---|---|
| Senator Weld: | 43:01 | So, so if we, even if, if that were changed then to reflect in addition to the county board of education to, and I don't know what proper term we would use. But, so if, if we're, if, if, if middle school and, and high school is, uh, you know, the, the athletic association or conference overseeing them is, how do we have, how would we have jurisdiction over telling the NCAA that they can't open an investigation, or that they can't take adverse action against a, a school? |
| Counsel: | 43:53 | I, I think because we're dealing specifically with a state law that applies to state institutions. |
| Senator Weld: | 44:01 | But do we have any jurisdiction at all to tell the NCAA you can't open an investigation against a school, or take any adverse action against a school? I mean, what, what jurisdiction would we have a- a- against them that they can't, that they can't open an investigation per se? And I see that, you know, on the state level, if, if, if it's a high school in West Virginia, we have the WVSSAC, or, I mean, it's, it's a different scenario, but. . . |
| Counsel: | 44:46 | It is a bit ambiguous, and so now I'm thinking whether this is meant to protect, protect against, you know, another government agency, or, um, anything that is related to the government from bringing an action against a school for doing this, and not necessarily a wholly private organization that's unrelated to government activity. |
| Senator Weld: | 45:21 | Okay. Thank you. Thank you, Madam Chair. |
| Chairwoman Rucker: | 45:25 | Thank you. Um, senior Senator from 4th. |
| Senator Tarr: | 45:28 | Thank you Madam Chair. Counsel. Um, on line 59 on the bill, and this is just, 'cause, uh, maybe this is a legal term, um, just like to have it explained. "Private cause of action," does, is private cause of action a, a certain type of cause of action, or is that just saying that the names are kept out, what does it mean by private? |

| | | |
|---|---|---|
| Counsel: | 45:47 | It means that you as the citizen have, you have the right, this bill is creating a right for you, um, to, um, what's the word? Pursue a civil remedy, I suppose. |
| Senator Tarr: | 46:06 | Okay. So it just indicates a citizen? |
| Counsel: | 46:10 | Yeah. |
| Senator Tarr: | 46:10 | 'Cause that one's under school. I'm just curious, or is it, or is it that it's keeping stuff confidential? That's what I'm trying to just determine between. |
| Counsel: | 46:28 | Hmm. |
| Senator Tarr: | 46:29 | It's, it's not a confidentiality thing? |
| Counsel: | 46:30 | No, it's not. |
| Senator Tarr: | 46:31 | Okay. That's what I wanted to know. Okay. That's what, that's, that's, that's, that clarifies it enough for me. Thank you. |
| Chairwoman Rucker: | 46:37 | Thank you Senator. Um, Senator from Wood. |
| Senator Wood: | 46:40 | Thank you Madam Chairman. Counsel, uh, I'm sure you did a lot of research of schools where, uh, or at least some research, schools where you have males on, on girls teams, would you have, you have read about a lot of that, seen a lot of that, you have fair amount of knowledge. So at halftime when these girls go into the locker rooms and you have boys on the girls teams, do the, do the boys generally go with them, or do they go into a male locker room? |
| Counsel: | 47:13 | I'm not necessarily sure about, I'm just not really sure about that situation, um, just because this talks about a distinction and, you know, on the playing field and not in the locker rooms. |
| Senator Wood: | 47:25 | Did you read of any situations where the males went into the bathroom with the girls, the locker room with the girls? |
| Counsel: | 47:34 | Well, there is a Fourth Circuit case that would be binding on this jurisdiction where it wasn't in a sports situation, but a biological female transitioning to male, so he identifies as male, um, with, wanted to use the males restroom, and basically the county board told him not to, um, and the |

court struck that down because they said that gender identity was not substantially related to your interest in protecting students' privacy. Um, but in the sports context, it's different because biological sex is substantially related to athletic outcomes and, um, and competitive sports and, um, contact sports.

| Senator Wood: | 48:21 | Okay. 'Cause I have shared my memory, uh, just recently seeing a grown man on a girls basketball team. I don't know, he's 50, who identifies as a female sitting in the locker room with these girls, this bill would prevent something like that, right? I mean, if you have no males allowed onto a, a female team, they obviously logically couldn't go- |
| Counsel: | 48:48 | Well- |
| Senator Wood: | 48:48 | . . . into the locker room if they're not on a team, right? |
| Counsel | 48:51 | I see what you're saying, but this bill just speaks not to the privacy issues and entering different lockers- |
| Senator Wood: | 48:57 | But by- |
| Counsel: | 48:58 | . . . but just competing on the field. |
| Senator Wood: | 48:59 | Right. |
| Counsel: | 49:00 | Um, and I don't think that we could even speak to the bathroom situation because that is completely different as the Fourth Circuit determined. |
| Senator Wood: | 49:08 | But if no boys are on the girls team, obviously they couldn't go into the girl's locker room, am I right? |
| Counsel: | 49:14 | If a biological male, um, identified as female and wanted to go into a female bathroom, under the Fourth Circuit, you could, that, that has to be allowed if there's no, um, if that distinction doesn't serve any privacy interest. In other words, if that as- if that individual could still go into the bathroom and privacy would be maintained because there are stalls in there, because there's barriers between the urinals, um, and that's a completely different situation from competition on the field. |
| Senator Wood: | 49:48 | Right. Okay. Thank you. Thank you Madam Chair. |

Chairwoman Rucker: 49:52      Thank you. We are approaching, um, the end of our allotted time. So at this time I'm going to, um, consider a motion by the Vice Chair to recess and for us to come back 10 minutes after Health Committee tonight. Um, thank you all. And our guests who are on virtually, if you want to come back, um, we will send you another Team invite. Uh, Senator from Raleigh.

Vice Chair: 50:20      Thank you Madam Chair. I move that we recess until 10 minutes after the Health Committee.

Chairwoman Rucker: 50:29      Okay. It just went blank. Um, so the motion is to recess until, um, 10 minutes after floor session and, um, the committees and after Health. All those in favor say, aye.

Speakers: 50:42      Aye.

Chairwoman Rucker: 50:44      All those opposed say, no.

Speakers: 50:45      No.

Chairwoman Rucker: 50:45      In the opinion of the chair, the ayes have it. Thank you. (silence)

# EXHIBIT E

**West Virginia Senate Education Committee Discussion of H.B. 3293, pt. 2**

**April 1, 2021**

| | | |
|---|---|---|
| Chairwoman Rucker: | 00:10 | (silence). |
| | | Committee on Senate Education will come to order. We will return to the order of business, which was discussion of, um, House Bill 3293, the proposed, um, strike and insert amendment. |
| | | Counsel, will you please explain changes that have been made, um, since we last met. |
| Counsel: | 00:32 | Yes, so we have a new proposed strike and insert amendment and it's basically, it's very similar to the last one except that it removes protection for educational institutions against adverse action, um, it adds clarifying language to the cause of action provision, um, and addresses privacy concerns, um, and then it also requires the promulgation of rules pursuant to this section. |
| Chairwoman Rucker: | 01:05 | Thank you, counsel. Are there any questions? Is there discussion? Amendments? |
| | | I will recognize the Vice Chair Roberts for a motion. |
| Vice Chair Roberts: | 01:26 | Madam Chair, I move adoption of the amendment explained by counsel. |
| Chairwoman Rucker: | 01:31 | The question is to agree on the language on the amendment as explained by counsel. All those in favor say aye. |
| Multiple: | 01:39 | Aye. |
| Chairwoman Rucker: | 01:40 | All those opposed say no. |
| | | In the opinion of the chair, the ayes have it. I declare the motion adopted. I will recognize the Vice Chair Roberts for another motion. |
| Vice Chair Roberts: | 01:50 | Chairwoman Rucker, I move that the committee substitute for House Bill 3293 be reported to the full Senate with the recommendation that it be passed as amended. |

Chairwoman Rucker:  02:02          The question is on the motion that the committee substitute for House Bill 3293 as amended be reported to the full Senate with the recommendation that it be passed. All those in favor say aye.

Multiple:           02:13          Aye.

Chairwoman Rucker:  02:14          All those opposed say no.

                                   In the opinion of the chair, the ayes have it. Committee substitute for House Bill 3293 as amended will be recorded. If there is no further business to come before the committee, I will ask the Vice Chair Roberts for a motion.

Vice Chair Roberts: 02:14          I move we adjourn.

Chairwoman Rucker:  02:29          The question is on adjournment. All those in favor say aye.

Multiple:           02:33          Aye.

Chairwoman Rucker:  02:34          All those opposed say no.

                                   The ayes have it. Have a good evening.

                                   (silence).

# EXHIBIT F

### West Virginia Senate Discussion of H.B. 3293

### April 8, 2021

| | | |
|---|---|---|
| Clerk Cassis: | 01:13:45 | Engrossed Committee Substitute for House Bill 3293 relating to single-sex participation in interscholastic athletic events, third reading of the bill. |
| President Blair: | 01:13:55 | Question is on passage of the bill, Senator from Jefferson. |
| Senator Rucker: | 01:13:58 | Thank you Mr. Chairman. House Bill 3293 as amended by Senate Education provides legislative findings regarding the state's important government interest in ensuring equal athletic opportunity for biological females. It defines biological sex, female and male. It requires all public secondary schools and state institutions of higher education to designate teams according to biological sex. It prohibits biological males from competing on teams designated for biological females, where selection for such team is based upon competitive skill or the activity involved in a contact sport. Provides a cause of action for students aggrieved and harmed by violation of this section and requires the promulgation of rules. Happy to answer any questions, I urge passage. |
| President Blair: | 01:14:49 | Question is on passage of the bill, is there discussion? Senator from Harrison. |
| Senator Romano: | 01:14:55 | Thank you Mr. President, will the Senator from Jefferson yield? |
| President Blair: | 01:14:57 | Will the Senator yield? Senator yields. |
| Senator Romano: | 01:15:01 | Thank you Senator. Senator, you know, I appreciate the changes that were made to the committee's strike and insert, um, after we had some discussion, but I- I did want to kind of ask you a couple questions on what the result of that would be. An indiv- any individual and I-I think it says a student, doesn't it? A minor student or their parent 'cause the- the parent would have to the-the actual, um, challenge of a violation by somebody who may be chan- transgender, um, playing a sport. The-the challenge would come from a student, isn't that correct? I mean a student would be allowed to challenge another player as to whether they're playing in a s- a single-sex sport under the appropriate gender. |

| | | |
|---|---|---|
| Senator Rucker: | 01:16:01 | I-I don't believe that it specifies it has to be a student and I want to to point out that, um, the State Board of Education and the Higher Education Policy Commission would have to promulgate rules. There is under the cause of action, it does say that a student aggrieved by a violation of this section may bring an action, but I don't think it specifies that a challenge has to be made by a student. |
| Senator Romano: | 01:16:25 | I'm going to read it, it says any student aggrieved by a violation of this section may bring an action against a county board of education or state institution of higher education. |
| Senator Rucker: | 01:16:34 | Yes, that-that's if there's a violation, um, for not following the state code, but I- were you referring to just challenging whether or not someone was of the right biological? |
| Senator Romano: | 01:16:47 | Well let me be clear, my issue is that private individuals can bring an action. It says student, but that would have to come from a parent of a student I presume 'cause most students in secondary education are minors and they would have to have an adult on their behalf represent them. |
| Senator Rucker: | 01:17:04 | I-I assume that if they're minors that their parents would have to do it on their behalf. |
| Senator Romano: | 01:17:09 | And- and, you know, I- I- again, I appreciate the fact that you've tried to add some confidentiality to this by the student not being identified in the- in the pleading, but if- if a student would be challenged, that student would have to be notified and, you know, some action taken to determine their gender, I presume, would that be accurate? |
| Senator Rucker: | 01:17:34 | That would be accurate and that would probably be specified in the rules that are developed by the Board of Education and Higher Education Policy Commission. |
| Senator Romano: | 01:17:42 | Well, I'm- I'm sticking with secondary education now 'cause I want to ask you, what effect do you think that would have on a 14, 15, 16 year old girl that might be a tomboy, but a hell of an athlete and- and an opposing, uh, player or parent of an opposing player challenges them or somebody on the same team challenges them because she's the star of the- of the- of the club and- and they want them all, they want that person off of the club. What- what psychological effect do you think that will have on that |

child, on that poor girl or poor boy that might be a little bit, you know, not, maybe not, you know, manly enough for somebody and they challenge their- their gender.

Senator Rucker:    01:18:23    So, I want to to point out that, um, what we allow for in here is that a student who feels aggrieved by a violation can bring an action against a county board of education or a state institution, not against an individual.

Senator Romano:    01:18:37    But- but it's got to involve the individual. I mean, how-how's the county board of education going to defend itself unless it has that individual pulled out, sent to a physician or some other reputable person to determine what their gender is?

Senator Rucker:    01:18:52    Well, I'm- I'm not a lawyer, but if the State Board of Education and the Higher Education Policy Commission set rules for implementation and the county board of education or state institution does not follow those rules, then they won't be able to defend themselves. But if they're following the rules, I think they- they would be protected because they're following the rules.

Senator Romano:    01:19:13    But- but if that child is identified in any way, if that child is singled out, if nobody else knows but that child, what effect do you think that's going to have on that child's psychological wellbeing?

Senator Rucker:    01:19:25    I don't see where we're singling out any particular student and what I do see is that we're defending, um, women's sports for women, for girls, and we're giving an opportunity for our institutions to, um, have that as their policy, as we are told to do because of Title IX.

Senator Romano:    01:19:47    Well, let me ask you this, was there any evidence that there had ever been any transgender student play for the, uh, single-sex team opposite what their biological birth record indicated? Did we have one case in West Virginia that you know of?

Senator Rucker:    01:20:05    Not that I know of.

Senator Romano:    01:20:06    Okay, do- do you not see that- that what we've done here is open up the opportunity for unfair attacks against boys and girls who, if they're a girl, they may be a little too tomboyish, if they're a boy maybe they're a little too

effeminate, but- but they were opening them up for attack from people who may want to embarrass them even without justification.

Senator Rucker: 01:20:42 Thank you, um, so I just want to point out two things in response. Um, one is that the, um, court still would need to determine that there's standing that, um, for that student who is making the allegation, um, so it's not like it's an automatic process. And second of all, I just want to point out that this bill is not about transgender individuals, it is about women and girls sports and our, um, our interest in protecting sports for women and girls. And, uh, like again, I want to point out Title IX actually gives the state that responsibility.

Senator Romano: 01:21:24 Is it limited to just girls sports? I thought it applied to both sexes. Am I wrong about that? It appears to be for both sexes, Senator.

Senator Rucker: 01:21:43 Yeah.

Senator Romano: 01:21:44 Unless I'm missing something.

Senator Rucker: 01:21:45 No, I'm sorry just one second 'cause before I answer you I just want to make certain that my answer's correct.

Senator Romano: 01:21:50 That's fine and it really doesn't matter Senator, you don't need to dwell on that, but if you can find it quickly, it'll be helpful.

Senator Rucker: 01:21:57 Sure, no problem. Okay, so in page 3, lines 40 to 42, athletic teams or sports designated for females, women or girls, shall not be open to students of the male sex or selection for such team is based upon competitive skill or the activity involved as a contact sport.

Senator Romano: 01:21:57 Thank you.

Senator Rucker: 01:22:17 And currently I just want to point that, um, girls have been allowed to participate in sports for men, for boys, um, in certain circumstances and that is because they do not always have access to all of the different athletic opportunities. And that is exactly the reason for Title IX and exactly the reason for why we want to protect girls and women sports.

| Senator Romano: | 01:22:42 | Sure, sure, I do too, I- I don't- |
|---|---|---|
| Senator Rucker: | 01:22:43 | It is usually- it is usually not a problem when it comes to girls wanting to participate- participate in men's sports, but I just want to point out we're trying to protect girls and women sports. |
| Senator Romano: | 01:22:54 | And I do too and it makes it a little easier for this argument because now all we have to worry about is the poor tomgirl who grows up and, you know, might look a little boyish, do you not think she is going to be open to attack by an opposing team or a teammate for- on the ba- basis of gender? Wrongly? I mean it could be wrongly, but- but if the school board has to defend itself, do you not think they're going to have to- that- that little girl is not going to know that somebody challenged her, challenged her gender? |
| Senator Rucker: | 01:23:25 | So I- I appreciate the hypothetical situation that could occur and as someone who used to be a tomboy and had this, you know, discussion earlier with my staff, um, as the only girl and having four brothers that I grew up with, I- I was an absolute tomboy, I did not like wearing skirts believe it or not and I was very much, um, into athletics and sports. I can tell you that it is still pretty obvious if you are- |
| Senator Romano: | 01:23:54 | I'm sorry, they still what, I missed that. |
| Senator Rucker: | 01:23:55 | It is still pretty obvious if you are of the biological sex and the other issue I want to point out, it's- the way that we wrote this bill and we did it very carefully, it is only if there is, you know, a concern. One of the reasons for why, um, it is in our interest to protect women's and girls' sports is because there is a very big physical difference and advantage for biological males. Um, there's been, um, and I'm not going to be able to cite it off memory, but, you know, I was the captain of my cross-country team and I was really good. And, um, we would run together both the boys and the girls and even though I was the fastest girl on the girls' team, the slowest boy on the boys' team could still, um, beat me. |
| | | So, I mean, that's just one of many examples I could cite and there is an inherent interest that we have in the state to give girls an opportunity, to give women an opportunity. It makes a difference in their ability to get scholarships, it |

makes a difference in their developing of leadership and I will tell you that it was something that is, um, in- inherently of the interest of this state because we do believe in women and girls. There was a statistic that I saw somewhere that said that a high percentage of executives, women executives, CEOs were involved in athletics.

So it just goes to show you that having those opportunities for women and girls is very important in order for us to right the many ways in which women have been disadvantaged.

Senator Romano:     01:25:40     Well Senator, this isn't about opportunity for girls to play without interference from boys 'cause we've never had one of those cases. We've never had any boy try to play on a girls' team. The- the question is, how would you have felt when you were a tomboy growing up if somebody had challenged your gender, what would that have done to your self-esteem, what would that have done to your psychological outlook because there's nothing in this bill that says it has to be a serious concern, it just says that you have a cause of action if you've been aggrieved by a violation.

So you're going to get to file the case, you're going to get to file it in court and sure it's going to say, you know, Jane Doe versus MH, but that child for the school board to defend themself, they're going to have to have that child examined. That child's going to know that somebody challenged her gender.

Senator Rucker:     01:26:30     I don't think it's going to necessarily have to be an examination and that is one of the reasons to have rules be established. It could be as simple as a birth certificate, it could be as simple as an affidavit signed by the physician, I- I don't think we need to, you know, over complicate it and I'm certain-

Senator Romano:     01:26:46     Yeah, it may be-

Senator Rucker:     01:26:46     . . . I'm certain that the HEBC and the Board of Education will choose the simplest method.

Senator Romano:     01:26:50     It- it may be as simple as an affidavit, it may be as serious as a pelvic exam with a child's feet up in stirrups being examined by an OBGYN.

| | | |
|---|---|---|
| Senator Rucker: | 01:27:01 | Well, it's a really good thing that as the legislative body, we're going to be able to see those rules when they get developed. |
| Senator Romano: | 01:27:06 | Well, I- I- I'm concerned about it, the rules don't have anything to do with the court challenge section. It does say that the, but- but you know that WVSSAC already has rules in place to prevent boys from being on women's teams? |
| Senator Rucker: | 01:27:20 | Actually they do not. Um, what we have and I've been grateful, um, that we've had a member that's been able to get us all copies of it. So what this document is, is an internal policy for the board of directors to have in case there were to be a question so that they would have something to guide their decision-making, but it is not a rule and they have not established any rules regarding transgender. |
| Senator Romano: | 01:27:46 | You don't- you don't think an internal directive to the- to the board of directors is a rule that they're going to follow? |
| Senator Rucker: | 01:27:50 | No it's not and it has not been voted on or approved by their members. |
| Senator Romano: | 01:27:54 | Are you aware of any instance where there's been a situation where there's been a male on a female team in West Virginia? |
| Senator Rucker: | 01:28:01 | Well, I already answered that, that I- I did not know of- of any West Virginia, but I have heard in other states. |
| Senator Romano: | 01:28:07 | I'm sorry then how do we know they're not going to follow- |
| Senator Rucker: | 01:28:09 | I always want to point out. I'm sorry. |
| Senator Romano: | 01:28:10 | How do you know they're not going to follow their internal directives? |
| President Blair: | 01:28:13 | Gentleman will state his point of order. |
| Senator Trump: | 01:28:17 | Thank you Mr. President, I- I couldn't hear, uh, the answer that was being given to the question, I think the, uh, questioner had moved on to a second question, I don't think the Chairman had completed her answer. |

| | | |
|---|---|---|
| Senator Romano: | 01:28:31 | Well, I apologize ch- Mr. President, I thought she completed it. |
| President Blair: | 01:28:34 | The- the- the Gentleman's, uh, po- the- the Gentleman's point of order is well taken, questions will be asked and answers will be given. |
| Senator Romano: | 01:28:40 | I apologize Senator, I thought you had finished. Go right ahead. |
| Senator Rucker: | 01:28:43 | No problem, I just wanted to point out that one of the considerations about this internal policy, if you read it, and it was actually highlighted in the copy that we got today, you know, it makes it in this internal policy that the school, the school, the individual school, we're talking about our public schools, would have had the responsibility of dealing with this situation if it were to arise and it would definitely open them up for legal challenge. So, this is one of the reasons for why I think it's important and we did pass a bill earlier that we have some say in these rules because we certainly do not want to put our public schools in a situation where they are going to be, um, sued. And I'm sorry, you may now, if I hope that's okay and you may now ask your second, your other question. |
| Senator Romano: | 01:29:33 | I- I think we got to the second question. Let me ask you then because this includes higher education too, doesn't it? |
| Senator Rucker: | 01:29:40 | Yes it does. |
| Senator Romano: | 01:29:40 | That's our colleges and universities around the state, correct? |
| Senator Rucker: | 01:29:44 | Yes, the public, yes. |
| Senator Romano: | 01:29:46 | The NCAA has very, very, uh, detailed rules on the handling of a situation of a male- a male participating in female sports, don't they? |
| Senator Rucker: | 01:30:00 | No, actually you're- you're not correct, um, and it's something that I did talk about, um, or at least was brought up in the committee, I have their policy with me somewhere in here. Um, it is a guidance, um- |
| Senator Romano: | 01:30:15 | It is a what? |

| | | |
|---|---|---|
| Senator Rucker: | 01:30:15 | A guidance, they developed guidance for institutions who want to allow for transgender participation and it is a very, uh, they attempt to be specific and they give certain criteria if you're going to allow a transgender male to participate in women sports. But it is not a rule and it not a policy. |
| Senator Romano: | 01:30:36 | Are you aware of guidance not being followed by higher education in West Virginia? |
| Senator Rucker: | 01:30:41 | Not in West Virginia, but there are actually, um, many states that have, um, different, uh, policies and rules that are diverged from what the NCAA policy is, so it has happened before. |
| Senator Romano: | 01:30:53 | Certainly you agree that our statue isn't going to look anything like the NCAA rules or guidance, whatever you want to call them. |
| Senator Rucker: | 01:31:04 | No, it- it's not really addressing their guidance, it is actually, um, creating a protection for women's sports in the state of West Virginia and of course it is the state's authority to enforce Title IX in the state and to determine what their, um, interest is in protecting women's and girls' sports. |
| Senator Romano: | 01:31:26 | I mean I've- I've got the NCAA guidance here, it's a- it's a pretty detailed, uh, set of instructions and- and- and also includes education for our schools. And- and- and again, I'm not faulting you for trying to make sure that girls only have to play girls in single-sex sports, I'm certainly not faulting you. My overriding concern is what effect it's going to have on a 16 or 17 year old girl who may be a little tomboyish who be a heck of an athlete and who gets challenged by a parent of- of the same team or a parent of an opposing team. |
| | | And- and you're right, it may be nothing more than showing their birth certificate and then the school complies, but it's going to scar that young lady for the rest of her life. Mr. President, I just want to take a second to say I do not oppose the amendment, it's a heck of a lot better than the original bill, but I will speak in opposition to this bill at the appropriate time, thank you Mr. President. |
| President Blair: | 01:32:30 | Was there further discussion? Junior Senator from the 8th. |

| | | |
|---|---|---|
| Senator Lindsay: | 01:32:33 | Thank you Mr. President if the, uh, the Senator from Jefferson would yield. |
| President Blair: | 01:32:37 | Will the Senator from Jefferson yield? The Senator yields. |
| Senator Lindsay: | 01:32:42 | Thank you, thank you Senator, good morning. |
| Senator Rucker: | 01:32:42 | Good morning. |
| Senator Lindsay: | 01:32:45 | I just, I wasn't planning to address this until we- we took up the bill, but I was the individual who put the, uh, West Virginia, I'm going to go ahead and read it into the record. The transgender policy of the West Virginia Secondary School Activities Commission, this is what it says at the top, in the event a member school or its governing authority determines to permit transgender students to participate in inter sch- scholastic athletics, the WVSSAC has adopted the following policy to govern such participation. |
| | | I don't, that doesn't sound like just an internal document that schools can decide to follow or not or that the WVSSAC can decide to follow or not. |
| Senator Rucker: | 01:33:30 | It's not an internal document of the schools, it's an internal document of the WVSSAC Board of Directors. And we called, um, Bernie Dolan to specifically verify because we had asked in committee, someone had asked for, you know, what is the WVSSAC policy regarding transgender and we were told there wasn't any, so we specifically looked into it. So this is an internal, um, policy for the board of directors that they created in case there were to be a situation in which they want to address this participation of transgender students. |
| Senator Lindsay: | 01:34:05 | But I read that- I'm sorry, I thought you were finished. |
| Senator Rucker: | 01:34:05 | No problem. |
| Senator Lindsay: | 01:34:08 | I read that correctly, the WVSSAC has adopted this policy, right? |
| Senator Rucker: | 01:34:15 | I don't- I don't know what to tell you, Bernie Dolan says this is an internal- an internal policy for the board of directors, it is not one that has been adopted by the WVSSAC as a rule. |

| | | |
|---|---|---|
| Senator Lindsay: | 01:34:26 | Okay, what- I think we're- we're- we're playing games with language here. It does say that the WVSSAC has adopted this policy, correct? |
| Senator Rucker: | 01:34:37 | That- that is what it says on the top of here. |
| Senator Lindsay: | 01:34:39 | Okay. |
| Senator Rucker: | 01:34:39 | But above it- it says WVSSAC Board of Directors and I'm just letting you know what Mr. Dolan said. |
| Senator Lindsay: | 01:34:47 | I'm sorry? And- and as far as I know, Bernie Dolan did not testify to- to your, uh, belief as far as the significance of this policy, right? |
| Senator Rucker: | 01:34:59 | No, he did not testify. |
| Senator Lindsay: | 01:35:00 | Because we were told by the West Virginia SSAC that this is their policy and this is what they have the schools follow, so I just want to make sure the record's clear because again, we're playing with words here just to suggest to minimize the import of this policy. But regardless of what you believe this policy is or isn't, I just want to make sure I understand that number one it says the "transgender student school shall make the initial determination as to whether a student may participate in inner scholastic athletics and gender- in a gender that does not match the gender assigned to him." So the school makes that first determination, correct? |
| Senator Rucker: | 01:35:42 | According to this internal document, yes. |
| Senator Lindsay: | 01:35:45 | Sure and if there's a- if there's a conflict with, not a conflict, but if a party is upset with that determination, then it goes to the West Virginia SSAC Board of irectors on appeal, correct? |
| Senator Rucker: | 01:35:59 | I- I'm not a 100% certain, again I point out that I'm not a lawyer and I would assume that if there is a problem or a conflict that that is what would normally happen. |
| Senator Lindsay: | 01:36:10 | Well, that's what the policy says, right? |
| Senator Rucker: | 01:36:13 | Well, actually what I see here is that they would, um, give the school the authority to determine how to handle it. |

| | | |
|---|---|---|
| Senator Lindsay: | 01:36:23 | Sure. But any such appeal will be heard by the WVSSAC Board of Directors, that's what it says. |
| Senator Rucker: | 01:36:31 | If there's an appeal, yes. |
| Senator Lindsay: | 01:36:32 | Okay and then the Board of Directors decision that says in-in sub-paragraph C, "the Board's deliberations will be limited to the question of whether the transgender student represents a threat to competitive equity or the safety of teammates or opposing players". You see that? |
| Senator Rucker: | 01:36:49 | Yes. |
| Senator Lindsay: | 01:36:50 | So it takes into consideration the safety of- of players and the equity of the issue, correct? |
| Senator Rucker: | 01:36:56 | Correct. |
| Senator Lindsay: | 01:36:57 | And it's specific to every circumstance. |
| Senator Rucker: | 01:37:01 | It's very similar to what we're passing in this legislation today if it were to pass. |
| Senator Lindsay: | 01:37:04 | Well then why would we take, why would this body, if it's similar, why would this body take the decisions away from the school and the- and the West Virginia SAC- AC and the appeals process? |
| Senator Rucker: | 01:37:17 | As I pointed out before, this actually opens up the schools for legal action and it is, um, as I pointed out, not a rule, it is an internal document that they are using if the circumstances were to come up. But it is in the state's interest and obviously this is a policy decision, but it is in the state's interest to protect women and girls' sports and what this bill does would essentially be following this model of protecting women and girls' sports, um, for the future of West Virginia and for the future of our girls. |
| Senator Lindsay: | 01:37:54 | Well this policy does not o- from the West Virginia SSAC does not only protect women, it protects all students. Transgender, uh, or- or- or- or- or all- all students under the sun, not just boys, girls but transgender as well, right? |
| Senator Rucker: | 01:38:14 | Are you- okay, you're asking me if I believe it's doing that? |

| | | |
|---|---|---|
| Senator Lindsay: | 01:38:17 | This policy that's been adopted by the West Virginia SSAC? |
| Senator Rucker: | 01:38:22 | I believe that our state law would, if, again, this becomes law, it would also do the same. |
| Senator Lindsay: | 01:38:28 | Well then what's the purpose of the law then other than the political advantages potentially, but if we already have a policy in place as determined by the West Virginia Secondary School Activities, what are we doing here on this bill? |
| Senator Rucker: | 01:38:42 | A- again, I want to point out that this has not been adopted as a rule for the schools, the member schools to follow and it does not provide protection, um, for our schools. |
| Senator Lindsay: | 01:38:55 | Mr. President, may I speak to the amendment? |
| President Blair: | 01:38:59 | You can speak to the bill. |
| Senator Lindsay: | 01:39:05 | Oh, it's already been, oh, okay. Mr. President, I apologize, I thought we were on the amendment. Um, but I'll, may I ask unanimous consent to speak to the bill. |
| President Blair: | 01:39:16 | Yes. Approved. |
| Senator Lindsay: | 01:39:19 | Thank you, thank you, Mr. President. Um, ladies and gentlemen, let's clear as black and white as this page, I'm going to read it into the record again because I think it's worth noting why we don't need HB 3293. "In the event a member school or its governing authority determines to permit tra- transgender students to participate inner- interscholastic athletics, the WVSSAC has adopted the following- following policy to govern such participation." And actually- it's actually called the "WVSSAC transgender student policy." It's specific to the student that is seeking to play a sport, it's a process that seeks to make sure not just for female students, but for all students whether or not the transgender student represents a threat to competitive equity or safety of teammates or opposing players.

So we're here discussing a bill that is already solved if- if the- if the s- if the intentions are true for this bill, a problem that's already solved. I would suggest to you a problem that doesn't exist 'cause we, as a caucus, spoke to |

representatives of the West Virginia Secondary School Activities Commission and they said there wasn't a case on a high school level as far as transgender students. Then in fact if it comes up at all, it comes up in the middle school level. So we're talking fifth, sixth, seventh, and eighth grade, clearly no-one's working for a- a- a college scholarship on that level. The- if I could just share just a few things too as well in addition to that, um, you know, I've said before, like many of you, I've played sports ever since I was eight or nine years old, athletic sports, organized sports. Um, I played on good teams, bad teams, I played on teams where I was the star, I played on teams where I was a- I- I rode the bench pretty hard. One specifically was when I started playing baseball, I played junior league baseball here at Capitol Midwestern in Charleston and I was horrible. I was a horrible player, my brother and I played for Hardee's.

And we only got to play, uh, the last two innings of the game because that's the o- when you're bad, when you're not good at that pat- at- at that sport, that's what ends up happening 'cause you're- you're- you're required to play. The last game of the season, I always played right field for the la- last game of the season my coach put me on third base and I played the entire game and I couldn't catch a ball. Balls went by me all the time, I couldn't field the ball. I was so bad that the coach's wife was screaming from the bleachers to take me out of third base. That's how bad I was, honestly.

And so afterwards, obviously I went home and shed a tear or two, but then we had a, I went back to the, we had a wall in our neighborhood where I could just throw a tennis ball with a mitt because I was convinced that I would come back and play third base the next year. We actually played for an expansion team, Mario's Pizza, the next year. City Councilman Adam Noth played on the same team so we were all All-Stars.

Anyway, I started every game at third base, I completed every game at third base, I was practically an All-Star in that regard, I still couldn't hit a lick, but I was good enough to- to run the base paths. The point of this story is because sports allowed me to overcome my difference, overcome my infirmities. It challenged me for the first time in my life to show that I could overcome these barriers.

And that's a good lesson to learn. I- I like to consider myself a one, uh, uh, a great athlete, but there's no way I was ever going to be an Olympian or play in a pro sport, but that's not what sports is about, it's an outlet. It allows students to overcome challenges. That's an important lesson. Not only that, teams or the groups, if you played on teams, are usually the first groups of people that you're accepted in, that you're welcomed in, the camaraderie. That's just- that's just as important as playing the sport.

Why would we pass legislation, when there's already a policy in place that swoops down and takes that opportunity away from a student, middle school students, I add. 'Cause again, what we heard from WVSSAC was we see this is in middle school, not in high school. And let me remind the body as well because this was said in support of a measure earlier this session, the phrase "our students," remember our students, our children, they're black and white, they're rich and poor, they're abled and disabled, they're gay and straight and they're transgender. Why would we pursue a policy that separates those individuals? There's just no need for it.

PART 3 OF 5 ENDS [01:45:04]

Senator Lindsay:    01:45:02    Again, because the outlet of sports is so important to a young person's life because it allows them to overcome the challenges, because it allows them to be accepted in a group and we're talking about a specific set of students that are already having issues as- as it is. I can't imagine the pressure of a middle school student who identifies as a different gender trying to get along in their school. I'm all for women sports, but that's not what this bill is. This bill specifically says on page two, "classifications based on gender identity serve no legitimate relationship to the state of West Virginia's interest of promoting equal athletic opportunities."

So to sell it to the public, we talk about women, but what this bill does is it separates children at their weakest time and there's just no public policy and support of it, there's no benefit to it, all it does is seek to divide. And gives us, the- the public, the nation, another reason to joke about West Virginia for pursuing such a policy in the first place. Vote for our children, vote no on this bill, thank you.

| President Blair: | 01:46:22 | Further discussion. Senior Senator from the 4th. |
| Senator Tarr: | 01:46:28 | Thank you, would the Senator yield Chair Lady. |
| President Blair: | 01:46:31 | Senator from Jefferson yield, Senator yields. |
| Senator Tarr: | 01:46:34 | All right, thank you Mr. President and thank you for yielding. So, I was just going back and forth between discussion here between what's considered policies and I think rules and regulations of the SSAC. And I understand that the policy that was laid on our desk, you're saying, is the internal policy, do internal policies or rules and regulations of the SSAC govern sports in West Virginia? |
| Senator Rucker: | 01:46:59 | No. |
| Senator Tarr: | 01:47:01 | So, the- the internal policy and the reason I was looking here is that, you know, I went to SSAC's website as this came up and I was looking, I thought, well, I want to look at this policy. What I found is it says that rules and regulations, the constitution and bylaws of the WVSSAC are the rules and regulations of the commission. So, what we had before us is an internal policy and you're saying that it's not the internal policy that governs sports, but it's the rules and regulations that governs the sport. |
| Senator Rucker: | 01:47:33 | That is correct. |
| Senator Tarr: | 01:47:34 | That's correct? Okay. Um, well, what I found, just appreciating you answering my question, I'll just speak to the bill if that's okay. Mr. President, you know, I just- I just did, um, went in and looked at the constitution and rules and regulations of the WVSSAC that is current on their website here and I did a word search for transgender and it came up zero. This policy which is not what governs sports in West Virginia in- has nothing to do with the rules and regulations that govern sports in West Virginia.

Because when you look at the rules and regulations of WVSSAC, "transgender" which is mentioned in this policy, one, at least two, three, four, five and so on times is nowhere in the rules and regulations whatsoever of the WVSSAC that governs athletics. And the other thing is I think that, you know, one- the Senator that spoke here a second ago talking about having such a trouble in a sport is one of the issues we're talking about. Because you know |

what, I may not be very competitive in a male sport, but what I could do is identify as female or say that I do and go dominate in a female sport because of the physical advantage that is just naturally given to a male over a female. So and which is what this bill's about, so Mr. President I rise in support of this bill.

President Blair:          01:49:09          Further discussion, Senator from Bane. Senator from Bane.

Senator Stollings:       01:49:17          Thank you Mr. President. I'm not sure if this body is concerned about what this bill does or could do to a transgender person in West Virginia. But the West Virginia State Medical Association, the West Virginia Chapter of the American Academy of Pediatrics, the West Virginia Psychological Association and the West Virginia School Psychologist Association and the American Academy of Pediatrics on a national level are very concerned about what this would do to a transgender person, student, in West Virginia. They say many trans youth already face an uphill battle in nearly every part of their lives. 84% of transgender youth feel unsafe at school. Nearly half trans youth attempt suicide, think about that. And the trans community is increasingly the target of violence and harassment. This bill will further ostracize young transgender people from their peers. The West Virginia Chapter of the American Academy of Pediatrics opposes House Bill 3293. Their organization works toward all children and adolescents regardless of gender identity or expression.

Receiving care to promote optimal physical, mental, and social wellbeing. Any discrimination based on gender identity or expression damages the socio-emotional health of children, families, and society. Again, transgender youth in West Virginia are high at risk- higher risk of suicide than their cisgender peers and this bill will only further the discrimination transgender youth experience. They again ask us to reject this- this bill. Transgender already face higher risk of suicide and depression and again it would further harm too many of West Virginia's most vulnerable.

So whether we are concerned about the unintended consequences of this bill, the people that are specialists and people that are on the frontline clearly, clearly have an issue. So it is with that regard and the fact that I think the SSAC does cover and does have a policy, should this ever

become an issue. So we're creating legislation for a problem that doesn't exist and it does have unintended negative consequences. I urge a no-vote.

President Blair:        01:52:30        Senator from Brooke.

Senator Weld:        01:52:32        Thank you Mr. President, to stand today and explain my vote on this issue. This is, it's a difficult one, it's an odd one. It's not an issue when I first ran for the legislature in 2014, if- if you had said this was a bill that you- you'd be debating and taking up, but I- I wouldn't have even understood the concept to be honest with you, Mr. President, it's- it's a tough issue. We're talking about young kids, high school kids, and college athletes, just a tough issue.

And so I understand the concept as I've started to research it, I still don't understand the whole transgender issue, I don't, I'll fully admit, it's- it- it's just not something that I fully understand. But what I do understand, Mr. President, is the law and so I started to do some research on this issue 'cause it's just something that I didn't know about. So one of the things that I found was that recently, uh, South Dakota had a- a similar piece of legislation and their- their governor Kristi Noem who was a- a- an ardent supporter of- of the legislation before it- it came to her, had to send it back to the legislature.

And- and- the- the bill that they had pertained to higher education, to NCAA, uh, National Junior College Athletic Assassination, NAIA and so, but I- I'm going to read Kristi Noem's statement. The NCAA is a private association, that means they can do what they want to do. If South Dakota passes a law that's against their policy, they will likely take punitive action against us. That means they can pull their tournaments from the state, they could pull their home games, they can even prevent our athletes from playing in their league.

South Dakota's chances of winning a lawsuit against the NCAA are very low. Competing on the national stage means compliance with the nation governing bodies that oversee college athletics. While I certainly do not always agree with actions these sanctioned bodies take, I understand that college- collegiate athletics requires such a system, a 50-state patch work is not workable. The

NCAA's policy is that after a year of hormone suppression therapy, which is something that I do not understand Mr. President, an individual can then play the sport that they want to play and so it's a policy of inclusion after that year.

This would be a policy that at no point becomes inclusionary in the higher education levels. And so we would be against the policy of the NCAA. And- and Governor Noem was accused of catering to the NCAA when she- on that- when she took the veto action and I may likely be accused of doing the same. But I'm not, but I'm a realist and I know the law and I can understand the law.

And the last thing that I want to do Mr. President is have this negatively affect any of our college athletic teams here in the state of West Virginia. I was a college athlete myself, it's hard, it's a lot of work. It's not like high school, there's much more into it, you get one day off, you get Sundays off. And so I couldn't take any action here that would potentially put into jeopardy the hard work that our college athletes put into a season. Because the NCAA, right or wrong, could say WVU, West Liberty, Fairmont, Marshall, whomever, you're no longer in the league, you can't play in the game or we're not going to- you're not going to be a tournament host site.

They could and I don't agree with it, but they could because they're a private entity, we have no jurisdiction over them whatsoever. We don't. And another thing Mr. President is a particular part of this bill that legally I think presents a lot of challenges, could present a lot of challenges for our colleges and universities and I'll read from the bill. "Any student aggrieved by a violation of this section may bring an action against the county board of education or state institution of higher education allegedly responsible for the alleged violation."

"The aggrieved student may seek injunctive relief and actual damages as well as reasonable attorney's fees and court costs if the student substantially prevails." So West Liberty State University, the girls' basketball team plays Notre Dame College, it's- it's in Ohio. So that team has a transgender female on it and she's complied with the NCAA's policy the year. So she comes to- to West Virginia to play West Liberty, well she can't because of the state's policy. So she has been aggrieved by this law, so does she

now have a c- a cause of action, she's an aggrieved person. She's a student who's aggrieved by this section, does she now have a cause of action against West Liberty State University?

On the other side of that, they don't play the game at all. On high school it's- it's a lot different, we've got a lot of high schools in the state of West Virginia. If- if- if Brooke High didn't play Soonbill Big Red, I'm sure they could pick up another school in- in West Virginia to play against. But we only have so many Division I colleges in the state of West Virginia, we only have so many Division II colleges in the state of West Virginia.

We're going to have to start dropping games because the policies don't align and that's my concern here Mr. President is I'm looking down the road prospectively of what could happen by the inclusion of higher education in this. And again, don't get me wrong, I don't think that- that people who have a- a distinct physical physiological advantage who are members of an opposite sex should be allowed to play sport with them. It's unfair. But by including higher education in this, we've added another layer of complexity to an issue that is already extremely complex, extremely difficult, Mr. President, this is something that I couldn't have- have ever imagined that I would deal with as a legislator. When I moved to Washington D.C. in 2003 from- from Wellsburg in Fairmont, the world was a completely different place, it's a lot different than anything I was used to.

And while that kinda prepped me for- for something like this, it really, it- it didn't to the point where I was going to have to make decisions on it. So I don't- I don't make this decision lightly because I agree with the concept, but I also take it as someone who has to look at the reality based in law and that's what's happening underneath this piece of legislation. Thank you, Mr. President.

| | | |
|---|---|---|
| President Blair: | 02:01:07 | Senator from Harrison. |
| Senator Romano: | 02:01:10 | Thank you Mr. President. You know, I- I like the Senator from Brooke struggle with this bill 'cause, you know, I don't have any desire for a 250 pound boy to be playing girls sports, but let me be clear, this isn't about men and women's and girls' locker rooms or any of that stuff, this is |

just a bill about sports. And it's not even about transgender kids from my perspective, it's about your daughter, it's about your niece, your grandniece who might be a little tomboyish and who's going to get called out because we have a provision in here giving private citizens a right to challenge their gender. Can't imagine how devastating that would be to a 14, 15- or 16-year-old girl. You know, I used to get called sissy sometimes, it- it was hard, you know, you get bullied, it's hard when- when people pick on you, imagine if it's the authority. Imagine if it's your school authority that has to bring you in, question you, question your parents, perhaps submit you to a physical examination because some jealous parent who has a kid on your team doesn't like that you get all the accolades and all the newspaper clippings.

Or an opposing team who thinks they can vie for a state championship if you're not on the girls' basketball team and wants to put a little wrench in the winds of a certain school. That's what we're going to allow here, that's what we're going to encourage people to do, we've given private individuals the opportunity to challenge the gender of our children. How reckless. You know, and I hear everybody mincing words about policies and rules and, you know, is it in place, you know why it's only a policy of the WVSSAC, 'cause we've never had one case of a boy trying to play sport, women's sports in- in our high schools.

Not one case, but yet they've gone as far as to write detailed policies on how they're going to handle it if that ever becomes an issue. I don't even want to get started into what we're doing to the outside world, my God we look as backwards as the states that have lost the All-Star games and- and all kinds of sporting and- and entertainment events because we're backwards. We look like a bunch of rednecks from West Virginia and this feeds right into it. You know, I was always proud to be from here, I always used to tell people when I lived in DC and they'd make fun of my drawl or something that, you know, no better place to live than West Virginia 'cause if you need something, your neighbors are going to help you, if you're in trouble, your friends are going to back you and it's a great place to live.

It's not getting like that anymore, we're pushing anybody different than us out, we're telling the world we don't want

you here. We only want who's left here and it gets to be fewer and fewer every year. Now I know somebody salivating in some election room right now, oh we're going to beat them to death, beat them to death with the boys and the girls bathroom advertisement if they vote against this bill. I can assure you that I will spend any amount of money in this state to make sure that everybody know that this bill's about their daughters, it's about their grandchildren, it's about their nieces, it's about them getting attacked because they may be a little tomboyish in high school.

And that that's what the outcome of this bill is going to be and that it was a bill to try to set people up in an election. We're not worried about boys playing girl sports, it's never happened here, how can we be worried about something that's never happened? How could we have a bill that is this bad, makes us look this backwards on- about something that has never happened? In a- in an issue where there's policies written and ready to be employed if it ever does come up and we have the audacity and the arrogance to tell the NCAA what we should be doing in our higher education's scholastic athletics, they're probably chuckling right now listening to this debate if they even bothered to take the time to tune in.

Mr. President, this bill isn't going to do anything to move West Virginia forward, it's going to move West Virginia directly to the back of the room, I urge a no-vote.

| | | |
|---|---|---|
| President Blair: | 02:06:13 | Senator from Marion. |
| Senator Caputo: | 02:06:16 | Thank you Mr. President, uh, I wish I could be as eloquent sometimes as my friend from Brooke and my friend from Harrison, but I had been sitting here listening to this debate and I'm sorry, I don't struggle at all with a no-vote on this, Mr. President. I struggle none. I have really come to the conclusion that this is a solution looking for a problem. I've sat here and listened to possible challenges, possible court hearings, possible production of birth certificates and gender challenges and maybe even up to and including a physical exam to determine someone's gender. |

You know, businesses and professional teams all over the country are shying away from places that have policies like we're looking at in this chamber. Now it's- it's a solution

looking for a problem, Mr. President, but you know, I think one thing we're all losing sight of here is the problem's not the kids, the problem's not the student athletes. I look around this room and there's not a whole lot of youth in here, I hope I don't offend anybody, but there is not a whole lot of youth in here.

When's the last time you sat down and talked to the young people in this state? Are you still campaigning at the McDonald's, having coffee in the mornings with our wonderful retired folks in our neighborhood or are you talking to the kids? They want a more inclusive society, my kids don't give a rat's behind what color you are, what your sexual orientation is, what you do in your personal life. The youth of today want to put that behind us, maybe that's the problem. We're the representatives here, but maybe that's problem, well maybe we're talking to the wrong people.

Maybe we're not talking to the future of West Virginia, maybe we ought to start wondering why our kids want to leave here. And maybe we ought to start admitting to ourself why nobody's coming here. We gotta be honest with each other, we talk a- a pretty big game, we talk about moving West Virginia forward and Mr. President I believe you were sincere when you said you want 400,000 people to move to West Virginia. I've known you for a long time and I believe you were sincere.

But here's a news flash, we're not going to get there by telling people if you don't look like us, if you don't love like us, if you don't think like us, you got a problem in West Virginia. I think we gotta be honest with each other, we're telling people they're not welcome here. I think that may be ought to be on the sign, not welcome to West Virginia but not welcome to West Virginia if you don't think like us because that's what the message is we're sending. You know Mr. President, Tina and I worked really hard raising our kids to treat everybody the same and not look at the differences maybe of what we do and what we look like, but to treat everybody the same but more importantly, our kids taught us to be that way.

Our kids think it's crazy that we're having this debate right now. My daughter tells me all the time, I can't believe you guys are still talking about this kind of stuff and she's right, she's absolutely right Mr. President. Mr. President I know

you don't get out on the West Wing much, at least clear out there where I'm at, but there's a sign in my office and it says all kinds welcome here. But more importantly, Mr. President, that sign lives in my heart, lives in my heart that all kinds of people are welcome in my beautiful state, I just wish that the rest of the members that I serve with would welcome people here in the same fashion. Thank you, Mr. President.

| President Blair: | 02:11:35 | Senator from Ohio. |
| --- | --- | --- |

| Senator Ihlenfeld: | 02:11:37 | Thank you Mr. President. I want to share with you all words from a very successful businessman. Quote, our purpose is changing business for good and that means using our business to make a positive impact in the lives of our employees as well as our customers. Businesses are starting to see that they have important roles to play in standing up for LGBTQ rights, especially, especially in places where those rights are being violated. This CEO went on to say that he believes making sure customer bases are as diverse and inclusive as possible will help businesses to thrive. |
| --- | --- | --- |

And I think the same thing can be said about state economies, the more inclusive we are, the more likely it is that our economy will thrive. You want to know what CEO said those words? It's a gentleman by the name of Richard Branson, Sir Richard Branson. Y'all know who he is? He's the CEO of Virgin Atlantic, Virgin Galactic, Virgin Mobile, Virgin Oceanic, Virgin Radio, and the owner and CEO of Virgin Hyperloop. You know what Virgin Hyperloop is? Think if you're from Grant and Tucker County you do. I know the man downstairs knows what Virgin Hyperloop is.

They plan to build a certification center on an 800-acre track in Grant and Tucker Counties that will bring thousands of construction jobs here and millions of dollars in economic impact to our state. Richard Branson is one of the most pro-LGBTQ CEOs in the entire world. And I point this out to you because I don't know how to reach some of you. Some and I don't want to paint too broad of a brush, but some in this room don't seem to care that this bill is cruel, that it's narrow-minded, that it's mean spirited, that it's unnecessary, that it's purely political. Maybe you do care about that part of it.

So I'll go back to a point I've tried to raise in this room this session that might resonate- might resonate and it's purely economical. And I don't like doing that because the economic reasons aren't the first, second, or third reasons why this is a bad bill, but it might resonate with some of you. By voting yes for this bill, you are willing to risk a project that WVU's Bureau of Economic and Business Research predicts will have an annual $48 million impact on our state, annually, $48 million with that Hyperloop project. You're willing to risk that, you're willing to risk that Sir Richard Branson is going to see what we do here and change his mind about building that certification center.

On top of that you're willing to risk all that the NCAA does for us to add on to what the Senator from Brooke said. Two years ago, one of the greatest sporting events that I've witnessed in West Virginia occurred in Morgan Town, the NCAA baseball regional. We were able to host it at that brand new beautiful stadium, there were record crowds. Over 4000 people which is big for a baseball game packed that stadium on the first night, they had sell-out crowds throughout that tournament. The economic impact on the Morgan Town region was in the millions of dollars.

We won't be able to host events like that anymore if we pass a bill like this. The head of the NCAA just made a statement the other day that made it very clear that states that pass bills like this are not ones where he wants to hold tournaments and we can't control what they do. At the tournament level or below. And besides the risk of losing all that I've mentioned, we risk businesses that might want to have a retreat here, that might want to open an office here, that might want to have a headquarters here.

Do you realize what a hard job you're making for Chelsea Ruby, Mitch Carmichael, Ed Gaunch, Michael Grany, you're making their job so difficult to promote tourism and economic development with bills like this. And I think some of you are probably thinking, well, the governor will just veto it so I can vote for it and then he'll take care of it. That's not how it works, number one, we don't know what the governor's going to do with this bill, gosh I hope he would veto it if it passes. But number two, we're still sending a message that this body, this Senate and also the House supports policies like this.

So, I would ask you, Mr. President, are we pro-business, are we really pro-business, are we really trying to grow this state? I'm not sure that we are when we have bills like this running, I'm surprised this bill is even running. I don't have control over what hits committees, I don't have control what hit- about what hits the floor, but you do Mr. President, you could stop bills like this if you cared enough to look the future, if you really wanted 400,000 people to come here, you could do something about it. You yourself could stop it, but you've decided to let this bill run and put it up on the board and ignore what it would do to our state if it passes.

Let me finish by saying this on a more personal note. I have a lot of friends and relatives, loved ones who have moved away from West Virginia because they're gay, because they don't feel welcome here, because they have felt ostracized and I don't blame them, I probably would do the same and that's sad to say. My loved ones who fit into that category not only are wonderful and caring people, but they're also really smart people, they've got really good jobs and they have nice houses, they drive nice cars, they make good money.

But guess what, they don't pay real estate tax in West Virginia, they don't pay sales tax in West Virginia, they don't pay income tax in West Virginia, they pay it in the state where they feel welcome, where they have felt like they needed to move, uh, where they feel love and accepted and- and part of the community. And that's part of the problem, the more people that we say are not welcome, the fewer are going to come here, the harder it's going to be to fulfill the dreams that I think we all have that, uh, the- these bold plans that we have and as I've said before I respect these bold plans, but the more we discuss and vote and pass bills like this, the harder it's going to be to get out of the- the economic slump that we find ourselves in.

And so just like my friend from Marion said, I would challenge you all when you make your vote to think about the younger generation, to think about millennials, to think about Generation Z. I think about my kids many times when I place a vote, to think about whether what we're doing would want- cause them to want to stay here and live here and work here or not. Uh, we can certainly campaign at the McDonald's, uh, with people that our age, uh, but we

need to think about those who are up and coming, 16, 18, 25, think about what's important to them and I- I would suggest that they care about inclusion very much so and I would ask all of you to consider that when you place your vote. Thank you, Mr. President.

| President Blair: | 02:19:57 | Thank you. |

PART 4 OF 5 ENDS [02:20:04]

| Senator Maroney: | 02:20:03 | Thank you Mr. President. Um, this bill has nothing to do with gay people or those that are gay, and to imply that is, I think, misleading. The bill, the bill it talks about, it's about transgenders. It's about, there's a safety issue involved here in sports. Uh, the Senator from hi- or from, uh, Brooke stood up, uh, half hour ago, and I didn't, I've never spoke to him about this bill. And basically everything he said was things I was thinking. He said it better. He did more research, but they're all, they're all along the lines of my thought process. And from, from a high school sport standpoint or, or middle school standpoint, thi- this bill makes sense. We, I think we need to step in as a state. Uh, I don't, I've heard five or six times with a solution for a problem we don't have. Well, it, it's becoming a problem. Okay. It's, it's, it's happening in other places. I, I'd prefer to have solutions proactively than reactive. I think, I think it's time we address it. It's a tough issue to address. I think we address it. Uh, the, the, the, the high school component of this bill in, in the middle school, that everything below the college level of this bill, I agree with wholeheartedly. Uh, and I don't have a problem with voting yes for that part of the bill. |

Uh, I have a big problem with, uh, with the college part of this bill. I think it's shortsighted and doesn't look into the depth of the issue, uh, as far as the, uh, potential ramifications. See, they've, they've solved their problem or, or they've, by addressing it, they've addressed the problem directly. They have a policy. It requires, the policy includes medical therapy, a year long, a hormonal suppression therapy. And for us to step in and, and, and try to dictate that when we don't have to, because they've already handled it and including that part, that's enough to make me vote no for the bill. We don't have this.

We don't have this, we don't have a case in, or, or no, no one can cite an example of this in West Virginia as of now. So therefore, maybe we can, we've got six months, eight months before we're back down here. They wouldn't get it right next time. Uh, well, this needs to be addressed at the scholastic level in my opinion. I would vote yes all day long. Uh, I think we, I think sometimes, uh, our emotions or our strong feelings on issues cloud sometimes real impact in judgment and in, in, in carrying it out a little bit too far.

I think we carried this too far further than we had to by including the colleges. Uh, you know, again, and I'm going to to close the way I started this. This bill has nothing to do with gay people or homosexuality. Uh, I have a cousin that's gay. I have, I know plenty of friends. I mean, I, there was no way at all that, that should be misinterpreted as with a vote on this bill. That was, that was misleading. Thank you.

| | | |
|---|---|---|
| President Blair: | 02:23:10 | Junior Senator from 4th. |
| Senator Grady: | 02:23:13 | Thank you, Mr. President. I'm standing here, um, with my makeup on my face and my jewelry shining, and, and I look, uh, you know, really, really girly. And I wasn't always that way. I was a tomboy that I've heard several of my colleagues talk about up until I was about 19-years-old before I ever decided that I would try makeup. And I'd like to fix my hair up and maybe wear dresses. Um, I used to, uh, play, uh, I played any sport that I could get my hands on. Uh, if you gave me a ball, I could beat almost all the boys in my class, all my friends in my neighborhood. |

Funny story, just real quick. Um, my guy friends, my, they were in my neighborhood and I went to school with would call my brother to play home and derby or something, and they would say, "Don't tell your sister, but we're going to meet at the school at three o'clock." You know, and I would drive down the road and, and see, uh, on my bicycle and see that they were there and thought, "I wasn't invited. Why wasn't I invited?" And they said, "It's because you always beat me."

You know, and that's it, but I was a tomboy and, and I, and I had a lot of friends that were tomboys, you know, and, and making that as, those insinuations of it's going to

expose, uh, make tomboys feel out of place, just different things like that, I think that's incorrect. Um, I think I'm sti- you know, now I'm, I'm looking at it as a mother of girls, a former athlete. I'm a former athlete who has state championships, national championships, world championships under my belt in different sports, and a coach of girls.

You know, and I, and I look at it and, and I've talked to girls, I've talked to girls who are high school athletes, I've talked to girls who are college athletes, and they're in support of this. You know, when we look at sports, every implement that we use in sports, from the governing rules, um, of the games to tape measures, clocks, um, the court or field dimensions, um, all those things, they're all used to define the boundaries of fair play.

The most basic and fundamental of such of those requirements is age and sex. It has been less than one generation. One generation since women won the hard fought battle of Title IX. What that means is my mom didn't have the fair, the f- the fairness that Title IX supplied. One generation. You know, Title IX was important because it created equal sports programs for women at the high school level and the college level. Mr. President, this bill is not anti-LGBTQIA. It does not discriminate. It simply ensures that our female com- competitors will continue to have those protections, and it protects the integrity of women's sports. For my girls, your girls, and all the girls in West Virginia, I fully support this bill, and I hope that you will too. Thank you.

| President Blair: | 02:26:14 | Senator from Greenbrier. |

| Senator Baldwin: | 02:26:16 | Thank you. Thank you, Mr. President. I'm not standing up to speak in hopes to change anybody's mind about their vote. Um, and I'm not standing up to speak expecting to affect the outcome of the vote at all. I'm just speaking as a coach and as a dad and as a pastor, because I got a couple things that I just feel compelled to say, and we've had a good debate here today. I appreciate that out of the body. The first thing that I just have to say, it's been said here, but it was said briefly, and I think folks need to be sure they heard this. |

As the Senator from Boone said before, half of trans kids strongly consider suicide. Half of trans kids strongly consider suicide. That's reported by Forbes magazine based on the 2020 study by the Trevor Project. 60% of trans kids physically harm their own bodies. 60% harm themselves. Half strongly consider suicide. Why? Why? Why would so many trans kids harm themselves and attempt suicide? I would echo what the Senator from Brooke said, this is not something I understand, this is not something that I have lived through, but what I understand from talking to folks who have lived through it is that it's because they don't feel like they fit in. They're bullied, relentlessly. They are not included in anything other kids are included in because they're so obviously different. A lot of people wear their shame on the inside. Trans kids don't have that luxury. They look different. They live in bodies that they often hate, and the isolation that causes leads half, one out of every two trans kids to strongly, to strongly consider suicide. The other thing that I just feel compelled to say is that I've heard people make a religious argument for this bill, and I've heard people say, "Well, God doesn't make mistakes." And I fully agree. God does not make mistakes, but we do all the time.

Every person was made in the image of God, and God didn't make a mistake when God did that. Every person is made in the image of God, and God compels us to love one another just as we've been loved. Even those who are different, I might go s- go so far as to say, especially those who are different from us. And we've just come through Holy Week, we've just come through Easter, spending a lot of time back home in our churches, talking about the way that Jesus spent his time in ministry. And you all know the stories. Jesus didn't hang out with people like us. He didn't really like people like us. He hung out with sinners and outcasts, people that the world's shamed and ridiculed.

In particular, Jesus spent a lot of time with lepers, people who looked different, and because they looked different, they were despised. They were despised so much that they were outcast. The lepers of today's society are transgendered citizens. They are mocked, they're beaten, they are ridiculed, just for being different. People have basic needs. Kids have basic needs that are amplified even further because they are kids. You've got to have support

and acceptance at base. If you don't have that support and acceptance, you're not going to be able to move forward.

You know, we read some of those stories this past Holy Week of, um, Jesus healing the lepers by restoring them to their community. He made them physically well, but what he really did for them is he allowed them to go back home and he allowed them to be accepted for who they were. Mr. President, I thank you for the time to just share some things that are on my heart. Again, not speaking trying to influence anybody. Just had some things that I needed to share, but I have to say, I not only cannot support a bill that further alienates trans kids, but I am compelled to stand on this floor, even if nobody else is listening and having their side conversations and they've already decided about this a long time ago, to stand up and say that our children deserve better.

When we debated the Tebow bill, I supported that. I stood with my colleagues from the other side of the island, supported that because it gave all, all kids an opportunity to play. I don't see how this is any different. We need to let kids be kids. Half of trans kids strongly consider suicide, half. And if this bill passes, I shudder, I shudder to think how that would impact this incredibly vulnerable segment of society. So, let's err on the side of kindness to those who are most vulnerable, let's err on the side of grace, let's err on the side of inclusion. Thank you, Mr. President.

| President Blair: | 02:32:52 | Is there further discussion before I recognize the Senator from Jefferson to close debate. Senator from Monongalia[inaudible 02:32:59]. |
| Senator Beach: | 02:32:59 | Mr. President, I move we table the bill, please. |
| President Blair: | 02:33:02 | Motion is tabled the bill. Those in favor we'll vote aye. Those who've opposed will . . . Excuse me. Those who wish to table the bill will say aye. |
| Audience: | 02:33:15 | Aye. |
| President Blair: | 02:33:16 | Those who oppose say no. |
| Audience: | 02:33:18 | No. |

President Blair:          02:33:20          The no's appear to have it. The no's do have it. The motion
                                           is rejected. Senator from Raleigh.

Senator Roberts:         02:33:31          Thank you, Mr. President. I think that the narrative shifts
                                           around from the actual bill itself. The bill is designed to
                                           protect girls in women's sports. It is not something that is
                                           designed to hurt people, it's designed to protect people. I
                                           received a couple of emails that kind of lay it out and
                                           people should understand. These are actually both from
                                           Raleigh County. The first one says, "I am a lesbian in favor
                                           of the sports bill. Dear West Virginia legislators. I am a US
                                           citizen originally from the Philippines, living in West
                                           Virginia with my wife and child. I am urging you today to
                                           vote for the sports bill and uphold one aspect of what it is
                                           to be born female.

                                           There are too many groups on both sides of the aisle, trying
                                           to politicize a subject that should be 100% science and
                                           common sense. Due to the trans movement, what it is to be
                                           a female and to be safe in this country is being erased. The
                                           entire trans movement is an attack upon woman—
                                           womanhood. I urge you to save our young women from
                                           allowing biological males into sports locker rooms, et
                                           cetera with our girls. I don't understand why we cannot
                                           create a third category for the trans to compete with each
                                           other instead of harming and taking away opportunities
                                           from females."

                                           A second email says, "Dear West Virginia legislators. My
                                           name . . . " Oh, and I shouldn't say her name, uh, but she
                                           lives in West Virginia in Raleigh County. "I am a married
                                           lesbian in the process of adopting my daughter. Please vote
                                           yes today to protect my daughter from having to compete
                                           against boys. This is a needed bill and large segments of the
                                           LGB community support the bill." She makes some other
                                           statements there, but I think you get the sentiment.

                                           And I think that the focus is not on the potential or the
                                           hypothetical of what might happen that hasn't apparently
                                           happened already in West Virginia, but the focus is upon
                                           the thousands of girls in sports at all levels in West Virginia
                                           that are at risk for injury based on the differences between
                                           the biological sexes. And that is very important that this is
                                           to protect them, it is not meant to harm others and it's the
                                           right thing to do and I support this bill. Thank you.

| President Blair: | 02:36:49 | Further discussion. Senior Senator from the 6th. |

Senator Maynard: 02:36:53 Thank you Mr. President. Voting no on this bill is a vote to disintegrate school sports as we know it. Today lines are no longer being drawn, no boundaries. They say, so it's all inclusive. But Mr. President, if this bill is not passed, it will not prepare future generations when, because of the lines will be blurred. Besides religious reasons, besides safety issues, if we sell out to the national, uh, sports associations in sanctioning bodies, uh, if that's the price we put on our, um, safety issues and what we think is right, then, uh, I think we're just selling ourselves out. Mr. President, I'll urge passage of the bill.

President Blair: 02:37:35 Is there further discussion before I recognize the Senator from Jefferson. Senior Senator from the 17th.

Senator Takubo: 02:37:43 Thank you Mr. President. I, um, uh, you know, I think we, we've, we've blurred the lines quite a bit on this one. Um, you know, at the end of the day, uh, the LGBT, everybody tries to make this about, uh, all kinds of different issues. I think it's well-known, I've always been a sponsor, uh, actually lead sponsor of the fairness bill. Uh, you know, I put a flyer on everybody's, um, desks about tonight. Uh, there's going to be a, um, a thank you to legislators at 5:30, Bible Center Church. Come have dinner, no asks.

Um, can I have church afterwards? Well, the church I go to says, "Hey, listen, everybody's broken. And, and the Bible clearly says, there's nobody without sin more than me." So, uh, I'm not getting on any moral high ground and people are trying to take this bill and turn it into that. I don't think that's it at all. Um, it, it comes down to basic, uh, science, like many comments have been made. There's a bigger body mass, you know, up to 10, 11, you know, probably, probably girls have a advantage over boys, but you know, when you get to junior high and high school, there's a reason why you have varsity and JV even amongst the boys because the body mass, uh, is larger and, and people can get hurt. There are clear advantages.

And so, um, to me, this bill is just a clear definition now. Is it a solution looking for a problem? Yes, I think it is. Do I think that any of this has really happened in West Virginia? Do we probably need any this bill for anything in West Virginia? Probably not. Um, but do I 100% firmly believe

that boys should play boy sports and girls should play? Absolutely. Now, uh, to be honest, I really have no issue with a girl playing a boys' sport because again, the body mass issue is not there.

If you've got the athletic ability for a girl to play, uh, boys baseball or, or I really wouldn't have any issue with that. But the, the fact of the matter is, you know, where the masters tournament is on, uh, you know, the top, uh, female golfer, I remember just few years ago, tried to play against the guys in the tournament got killed, and she had, she was like the number one women's golfer eight or nine years in a row. So there's a clear difference. And so that's what the bill does.

Now as a Senator, I have to look at all aspects of the bill and how it relates to my state. Um, when the college aspect got put into this, that's what gave me the heartburn because colleges, the NCAA, they already address this. They do have policies for this. And, and I think Kristi Noem, uh, is probably in the exact same boat that I am. She's 100% in agreement that, that the policy should be boys don't play girls athletics. However, NCAA is trying to do that patchwork of 50 states. They have to be compliant. I don't think that they're some crazy organization. They're having to deal with a lot of different personalities across the country with all these 50 different states, and, and they just want to run a good athletics program for the students, for the athletes, for the country.

And so as a Senator, do I look at this section of the bill and say, could that cause some major problems? I could see somebody trying to pull us out as an example and come football season for W and Marshall and all the college athletes in our state that are trying to move forward, that this could create some major hiccups again for a problem we really don't have. And so I can also see us coming back here and having to try to unwind all of this in some kind of special session or something.

So for that reason, uh, I am going to be a no vote, but I want to make it very clear that the principle of the bill I'm 100% in favor of. I just think we should have left it to the high school athletics alone if a bill was going to be ran. I certainly wouldn't have done it, but, uh, it is my duty as a senator when a bill comes up and and, and, uh, I have not been,

uh, voted by my constituents to, to take a pass, I'm expected to vote. So my vote will be read. I just want to make it clear as to the intent of why I'll be voting nay today. Thank you, Mr. President.

President Blair:  02:41:53  Is there a further discussion? Senator from Jefferson to close debate.

Senator Rucker:  02:42:00  Thank you, Mr. President. And I appreciate, um, the robust debate and everyone's expressing their opinion. This is obviously, you know, something that touches people. Um, and before I get to just a final explanation of what this bill does, I just need to, you know, respond to some of the things that were said, and I'm going to start, if that's okay, with the claims about the NCAA. So I have here before me a printout of their, um, transgender policy, and this is going to be from the very first page.

It says, "The purpose of this resource is to provide guidance to NCAA athletic programs about how to ensure transgender student athletes fair, respectful, and legal access to collegiate sports teams based on current medical and legal knowledge." It provides best practice and policy recommendations. It's a recommendation. It's giving them guidance, and further in this policy, it talks about how the science is not settled. There is ongoing research and, you know, this issue of transgender athletes is something that can change based on the science that we, um, as we do more research, as we find out more and as more of this is happening.

In terms of science, because folks really like to point out how we should follow the science, males have larger lungs and denser alveoli in the lungs enabling faster oxygen intake, uptake. They have larger hearts and per stroke pumping volume and more hemoglobin per unit of blood, and increased number of muscle fibers and increased muscle mass. And I'm not going to go through all this. They have larger bones, longer bones, increased mineral density in their bones. U.S. adult males on average are five inches taller than U.S. adult women, and I have pages of this, but I'm not going to read through all of that.

The reality is that the reason for why we're having this discussion Mr. President is because it matters. It matters. There is a difference between men, biological men and

biogo- biological women. This bill does not target transgender and it is not about prohibiting transgender. It does not affect male sports, it does not affect coed sports of which there's a lot of those. It only talks about women's sports and the history of women's sports in the United States. It's a very short one.

Historically, the NCAA had zero interest in women's sports. It wasn't until Title IX that they became interested. The first NCAA men's basketball tournament was in 1939. Do you know when the first NCAA women's basketball tournament was? Not till 1982, 10 years after Title IX was adopted, and nearly 50 years after men. The only reason for Title IX is because women deserve a chance to participate. And there were folks making that point from the side that doesn't plan to support this bill. They were making the point about how s- athletics is about overcoming challenges.

If you pair men and women together, there is a difference in how well they can compete against each other. It doesn't mean they can't do it, and they do. And we have coed sports and we have women participating in men's sports, but there is a difference. And these athletic opportunities, these opportunities to be part of a team, these opportunities to shine, they make a difference in their lives forever, and we've already mentioned it. And others have actually said the same thing. You know, you're talking about scholarships, you're talking about opportunities to get into schools, you're talking about opportunities to demonstrate leadership and cooperation and be part of a team. It is exactly that, that we are wanting to protect for our women and our girls.

This isn't against anyone. It is for, for the policy of helping our girls, helping our women have the opportunity. That is what Title IX was about and that is what the policy has been. This bill does nothing more than codify what is already well-established under federal and state common law. The biological females and biological males are not similarly situated in certain circumstances, and one of those circumstances is in sports.

One of the things I want to make sure I respond to is the discussion as to whether or not where it might be hurting our state somehow, by having this policy of protecting our

girls and our women. I must tell you that to me, if you say that you do support women, that you do support our girls, if you say that you want to give them an opportunity, and we have bills, we have bills even this year have been introduced about trying to provide an opportunity for a class that has been historically disadvantaged. Well, this is, this is one of these bills. This is one of the bills that you can support because you want to ensure continued opportunities.

We cannot direct the NCAA. We have no authority over them. We don't. This bill doesn't do that. This bill is about our state institutions, and it is actually our authority to enforce Title IX. That is our authority. We the states are supposed to enforce Title IX. The only student who could bring a cause of action are those who are aggrieved and who have standing. So in conclusion, we really have talked this a lot and we have brought in a whole bunch of different issues into it. But what the reality of this is, is that it is the best interest of the state to protect women and girls and protect the opportunity for them to participate in sports. Supporting this is simply doing that. I urge passage.

| | | |
|---|---|---|
| President Blair: | 02:49:30 | Question for the Senate is shall the bill pass, all those in favor will vote yay, those who oppose will nay. The clerk should prepare the machine. Has every member voted? Has every member voted? If so, the clerk close machine and ascertain the results. On this question, 18 yays, 15 nays, one absent, not voting. More than a majority of those present voting, having voted in the affirmative. I declare the bill passed. The clerk has a Title Nine. |
| Clerk Cassis: | 02:50:10 | Senator Rucker move to amend the title of the bill. |
| President Blair: | 02:50:13 | The questions on adoption of the title amendment, all those in favor say aye. |
| Audience: | 02:50:16 | Aye. |
| President Blair: | 02:50:17 | Those who oppose, no. The ayes appear to have it, the ayes do have it, uh, declare the title amendment adopted. The clerk will communicate the action of the Senate to the house. Senior Senator from the 17th. |
| Senator Takubo: | 02:50:29 | Thank you Mr. President, and I move the Senate stand in recess until 3:00 PM. |

| President Blair: | 02:50:32 | Senior Senator from 17 means repeat recess till 3:00 PM. All those in favor say, aye. |
| Audience: | 02:50:37 | Aye. |
| President Blair: | 02:50:38 | Those who oppose, nay. The ayes have it. We'll recess till 3:00 PM. |

PART 5 OF 5 ENDS [02:50:50]