IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA
CHARLESTON DIVISION

| | | |
|---|---|---|
| B.P.J., by her next friend and mother, HEATHER JACKSON, *Plaintiff*, | ) ) | |
| | ) | |
| vs. | ) | Case No. 2:21-cv-00316 |
| | ) | |
| WEST VIRGINIA STATE BOARD OF EDUCATION, HARRISON COUNTY BOARD OF EDUCATION, WEST VIRGINIA SECONDARY SCHOOL ACTIVITIES COMMISSION, W. CLAYTON BURCH in his official capacity as State Superintendent, and DORA STUTLER in her official capacity as Harrison County Superintendent, *Defendants*. | ) ) ) ) ) ) ) ) | |

**STATEMENT OF INTEREST OF THE UNITED STATES**

The United States respectfully submits this Statement of Interest, under 28 U.S.C. § 517,[1] to advise the Court of its view that Title IX of the Education Amendments of 1972, 20 U.S.C. § 1681 *et seq.*, and the Equal Protection Clause of the Fourteenth Amendment do not permit West Virginia to categorically exclude transgender girls[2] from participating in single-sex sports restricted to girls.

---

[1] "The Solicitor General, or any officer of the Department of Justice, may be sent by the Attorney General to any State or district in the United States to attend to the interests of the United States in a suit pending in a court of the United States, or in a court of a State, or to attend to any other interest of the United States." 28 U.S.C. § 517.

[2] The term "transgender" describes a person whose gender identity differs from the person's sex assigned at birth. For example, a transgender girl is a person who identifies as a girl but whose sex assigned at birth was male. The term "cisgender" describes a person whose gender identity is the same as the person's sex assigned at birth. Given Plaintiff's age, the United States refers only to "girls" and "boys," but the analysis applies equally to women and men.

1

The United States has a significant interest in ensuring that all students, including students who are transgender, can participate in an educational environment free of unlawful discrimination and that the proper legal standards are applied to claims under Title IX and the Equal Protection Clause. The U.S. Department of Justice ("DOJ") and U.S. Department of Education enforce Title IX to protect students from sex discrimination in federally funded education programs and activities. This includes ensuring that recipients offer equal athletic opportunities to students regardless of their sex. DOJ is further charged with coordinating federal agencies' implementation and enforcement of Title IX. 28 C.F.R. Pt. 54; Exec. Order No. 12,250, 45 Fed. Reg. 72,995 (Nov. 2, 1980); 28 C.F.R. 0.51. DOJ also has authority to investigate and resolve complaints that a school board is depriving students of equal protection based on sex (and other bases). 42 U.S.C. § 2000c-6.

Under the law challenged here, West Virginia (or the "State") prohibits girls who are transgender from participating on female "[i]nterscholastic, intercollegiate, intramural, or club athletic teams or sports that are sponsored by any public secondary school or a state institution of higher education." W. Va. Code §§ 18-2-25d(c)(1)-(2) ("H.B. 3293"). The State claims that H.B. 3293 will protect athletic opportunities for girls. Neither the facts nor the law supports that assertion. To be sure, there remain significant barriers to providing full equity in athletics for female students.[3] But permitting participation by transgender girls, who make up "approximately one half of one percent" of the United States' population, is not one of them. *See Hecox v. Little*, 479 F. Supp. 3d 930, 977 (D. Idaho 2020), *appeals docketed*, Nos. 20-35813, 20-35815 (9th Cir.

---

[3] Indeed, on the day Plaintiff filed this lawsuit, the United States filed an *amicus* brief in the Sixth Circuit to clarify the standards for assessing whether a school equitably meets its students' athletic interests and abilities, regardless of sex. *See* U.S. Br. as Amicus Curiae, *Balow v. Michigan State Univ.*, No. 21-1183 (6th Cir. May 26, 2021).

Sep. 17, 2020).  The United States submits this Statement of Interest to provide its view that Plaintiff's Title IX and Equal Protection Clause challenges are likely to succeed on the merits.

## BACKGROUND

The Governor of West Virginia signed H.B. 3293 into law on April 28, 2021, and it is set to go into effect on July 8, 2021.  The law mandates that "[i]nterscholastic, intercollegiate, intramural, or club athletic teams or sports that are sponsored by any public secondary school or a state institution of higher education . . . shall be expressly designated as [male, female, or coed] based on biological sex."  W. Va. Code § 18-2-25d(c)(1).  The law defines "biological sex" as "an individual's physical form as a male or female based solely on the individual's reproductive biology and genetics at birth."  *Id.* § 18-2-25d(b)(1).  It further defines "female" to mean "an individual whose biological sex determined at birth is female," with a corresponding definition for "male."[4]  *Id.* §§ 18-2-25d(b)(2)-(3).  The law prohibits girls who are transgender from participating on girls' sports teams, stating that "[a]thletic teams or sports designated for females, women, or girls shall not be open to students of the male sex"—where "male sex" is determined by sex assigned at birth—"where selection for such teams is based upon competitive skill or the activity involved is a contact sport."  *Id.* § 18-2-25d(c)(2).  There is no parallel provision for participation on boys' sports teams.  The law also creates a private cause of action for "[a]ny student aggrieved" by a violation, allowing for injunctive relief, damages, fees, and costs against a county board of education or state institution of higher education.  *Id.* § 18-2-25d(d)(1).  The Legislature's proffered justification is that "[c]lassification of teams according to biological sex is necessary to promote equal athletic opportunities for the female sex."  *Id.* § 18-2-25d(a)(5).  Specifically, "[b]iological males would displace females to a substantial extent if permitted to compete on teams

---

[4]  The United States does not concede the accuracy of these definitions.

designated for biological females." *Id.* § 18-2-25d(a)(3).

Plaintiff B.P.J is an 11-year-old girl who is transgender. She argues that Defendants' compliance with H.B. 3293 will bar her from participating in school athletics in violation of Title IX and the Equal Protection Clause. No. 1 at 2.[5] B.P.J. participated on an all-girls cheerleading team while in elementary school, and she wants to participate in girls' athletics as she enters middle school in the 2021-22 school year. No. 2-1 at 21-22. Specifically, B.P.J. wants to try out for Bridgeport Middle School's girls' cross-country and track teams. The middle school principal informed B.P.J.'s mother that her daughter may not participate on the girls' cross-country or track teams because of H.B. 3293. No. 2-1 at 23. B.P.J. does not seek to join the boys' cross-country and track teams because she is a girl and such participation would "devastate" B.P.J., "completely erase who she is," and undermine her social transition. No. 1 at 17; No. 2-1 at 23. Even if B.P.J. wanted to participate on the boys' team, the principal said it would be "confusing" for her to join the boys' teams because she looks like and presents as a girl. No. 2-1 at 23. In reality, then, H.B. 3293 will exclude B.P.J. entirely from the cross-country and track programs at her middle school. B.P.J. has moved for a preliminary injunction, arguing that Defendants' compliance with H.B. 3293 violates Title IX and the Equal Protection Clause. She requests this Court to enjoin West Virginia from enforcing H.B. 3293 and "any other law, custom, or policy that precludes B.P.J.'s participation on girls' school sports teams in West Virginia" and allow B.P.J. to participate on girls' sports teams consistent with her gender identity. No. 19 at 8.

## ARGUMENT

On a motion for a preliminary injunction, the court reviews: (1) the movant's likelihood

---

[5] "No.__ at __" refers to the docket entry number and page number of documents filed in this case, using the Court's CM/ECF pagination.

of success on the merits; (2) the threat of irreparable harm to the movant absent an injunction; (3) the balance of hardships; and (4) the public interest.  *League of Women Voters of N.C. v. North Carolina*, 769 F.3d 224, 236 (4th Cir. 2014) (citation omitted).  The United States believes that Plaintiff will likely succeed on the merits of her Title IX and equal protection claims and does not address the other factors.

A state law that limits or denies a particular class of people's ability to participate in public, federally funded educational programs and activities solely because their gender identity does not match their sex assigned at birth violates both Title IX and the Equal Protection Clause.  H.B. 3293 does exactly this.  H.B. 3293's prohibition applies to all transgender girls in public secondary and postsecondary education—regardless of a student's specific circumstances—and to no one else.[6]

H.B. 3293 violates Title IX by effectively prohibiting, solely on the basis of sex, a certain subset of students—girls who are transgender—from participating in athletic programs offered by recipients of federal financial assistance ("recipients").  On its face, H.B. 3293 restricts girls who are transgender from participating on girls' teams.  But because forcing transgender girls to participate on boys' teams also causes discriminatory harm, H.B. 3293 affords them no opportunity to participate on single-sex sports teams at all.

H.B. 3293 also violates the Equal Protection Clause.  Discriminatory treatment against transgender people is subject to heightened scrutiny because it constitutes both discrimination based on sex and discrimination against a quasi-suspect class.  H.B. 3293 fails heightened scrutiny

---

[6] To be sure, West Virginia may not remedy the violation by extending its categorical ban to boys who are transgender.  The Supreme Court has explained that federal nondiscrimination mandates protect individuals.  By extending its discriminatory ban to boys, West Virginia would not avoid liability, but rather would double it.  *See Bostock v. Clayton Cnty.*, 140 S. Ct. 1731, 1741 (2020) ("Nor is it a defense for an employer to say it discriminates against both men and women because of sex. . . . Instead of avoiding Title VII exposure, this employer doubles it.").

analysis because West Virginia cannot demonstrate that prohibiting a handful of transgender student athletes from playing on athletic teams consistent with their gender identity is substantially related to any important government interest.  Thus, this Court should find a likelihood that Plaintiff will succeed on the merits of both her Title IX and Equal Protection Clause claims.

## I.      B.P.J. Is Likely To Prevail On Her Title IX Claim

B.P.J. is likely to prevail on her Title IX claim against Defendants.  Title IX provides that "[n]o person in the United States shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any education program or activity receiving Federal financial assistance."  20 U.S.C. § 1681(a).  Title IX's implementing regulations mandate that "[n]o person shall, on the basis of sex, be excluded from participation in, be denied the benefits of, be treated differently from another person or otherwise be discriminated against in any interscholastic, intercollegiate, club or intramural athletics offered by a recipient."  34 C.F.R. § 106.41(a); 28 C.F.R. § 54.450(a).  Although the regulations allow recipients to operate or sponsor separate teams based on sex, the regulations do not define "sex" or address how students who are transgender should be assigned to such teams.  34 C.F.R. § 106.41(b); 28 C.F.R. § 54.450(b).  The regulations do not require, or even suggest, that recipients assign students who are transgender to teams based on their sex assigned at birth, as H.B. 3293 requires.

This Court should reject any attempt by the State to argue that *the regulations* do not prohibit the assignment of students to teams based on sex assigned at birth, regardless of whether such a classification harms transgender students.  When assigning students to single-sex sports teams, a recipient must still comply with the *statutory* prohibition against discrimination based on sex in Title IX itself.  *See, e.g., Grimm v. Gloucester Cnty. Sch. Bd.*, 972 F.3d 586, 618 (4th Cir. 2020) ("[T]he implementing regulation cannot override the statutory prohibition against

*discrimination* on the basis of sex."), *as amended* (Aug. 28, 2020), *reh'g en banc denied*, 976 F.3d 399 (4th Cir. 2020), *petition for cert. filed*, No. 20-1163 (Feb. 19, 2021).  And the Supreme Court has recently clarified that discrimination against a person for being transgender *is* discrimination based on sex.  *See Bostock v. Clayton Cnty.*, 140 S. Ct. 1731, 1746-47 (2020); *see also Grimm*, 972 F.3d at 619.  Therefore, any interpretation of Title IX's regulations that requires gender identity discrimination would violate the statute's nondiscrimination mandate.  Because H.B. 3293 requires the Defendants to engage in precisely this type of sex discrimination that causes harm to B.P.J, the law violates Title IX.  A discriminatory state law is no defense to a Title IX violation.

A.    *H.B. 3293 Requires Recipients To Discriminate In Violation Of Title IX*

B.P.J. prevails on her Title IX claim by showing:  (1) she was excluded from an education program or activity on the basis of sex; (2) the educational institution in question is a recipient of federal financial assistance; and (3) the improper discrimination caused her harm.  *See Grimm*, 972 F.3d at 616 (citation omitted).  The United States believes she is likely to make this showing.

There is no question that the school district that B.P.J. attends is a recipient of federal funds.  Nor can there be any doubt that B.P.J. will be excluded from a recipient's education program or activity:  Bridgeport Middle School's principal told B.P.J.'s mother that B.P.J. is ineligible for the girls' cross-country and track program.  *See* No. 2-1 at 23.  That is precisely the effect of H.B. 3293.  It excludes all girls who are transgender from participating in girls' athletics in public secondary and postsecondary schools.

Any argument that B.P.J. has not been excluded because she could join the boys' team is untenable.  B.P.J. is a girl, not a boy.  She describes herself as a girl.  No. 2-1 at 31.  She lives and identifies as a girl in her daily life.  No. 2-1 at 20.  Her middle school principal acknowledged it would be "confusing" for B.P.J. to join the boys' teams given that she neither looks like, nor

7

presents herself as a boy.  No. 2-1 at 23.  As the Fourth Circuit has explained, for purposes of a discrimination analysis, B.P.J. is similarly situated to other girls.  *See Grimm*, 972 F.3d at 610, 618 ("Grimm was similarly situated to other boys, but was excluded from using the boys['] restroom facilities based on his sex-assigned-at-birth.").  Requiring her to join a boys' team would harm B.P.J. for the reasons discussed below.  In practice, Harrison County Schools' compliance with H.B. 3293 will exclude B.P.J. from all of her school's single-sex sports teams.

It is also clear that this exclusion is based on sex.  H.B. 3293 targets girls who are transgender.  In *Bostock*, the Supreme Court explained that "discrimination based on . . . transgender status necessarily entails discrimination based on sex."  *See* 140 S. Ct. at 1746-47. Following *Bostock*, the Fourth Circuit held that Title IX prohibits discrimination against students because they are transgender.  *Grimm*, 972 F.3d at 616-17; *see also Adams v. Sch. Bd. of St. Johns Cnty.*, 968 F.3d 1286, 1305 (11th Cir. 2020), *petition for reh'g en banc pending*, No. 18-13592 (11th Cir. Aug. 28, 2020).  In *Grimm*, the Fourth Circuit found that a school board policy violated Title IX because the school board:

> could not exclude Grimm from the boys['] bathrooms without referencing his 'biological gender' under the policy, which it has defined as the sex marker on his birth certificate.  Even if the Board's primary motivation in implementing or applying the policy was to exclude Grimm because he is transgender, his sex remains a but-for cause for the Board's actions.

972 F.3d at 616.  So too here.  H.B. 3293 separates students onto athletic teams by their "sex determined at birth," W. Va. Code § 18-2-25d (b)(2)-(3), and it is impossible to enforce H.B. 3293 against B.P.J. without referencing her sex assigned at birth.

Finally, H.B. 3293 causes B.P.J. discriminatory harm.  To comply with H.B. 3293, B.P.J.'s school district must exclude her from girls' sports entirely, all the way through high school.  *See Gregor v. W. Va. Secondary Sch. Activities Comm'n*, 2020 WL 6292813, at *4 (S.D. W. Va. Oct.

27, 2020) (citations omitted) (acknowledging a person may be irreparably harmed if they cannot participate in a sport at all); No. 2-1 at 60 ("[I]t can be extremely harmful for transgender youth to be excluded from the team consistent with their gender identity.").[7]  B.P.J., unlike her cisgender peers, would miss the many benefits of interscholastic athletics, including skill-building, exercise, motivation, social ties, and increased confidence.  No. 2-1 at 46-47.  As many courts have recognized, this type of exclusion would cause a student like B.P.J. to experience stigma, isolation, and dignitary harm.  *See Grimm*, 972 F.3d at 597-601, 617-18 (bathroom policy made plaintiff feel "alienat[ed]" and "humiliate[ed]"); *Adams*, 968 F.3d at 1307 (bathroom policy made plaintiff feel "sorely 'alienated' and 'different' from other students because he is transgender"); *Whitaker By Whitaker v. Kenosha Unified Sch. Dist. No. 1 Bd. of Educ.*, 858 F.3d 1034, 1045-47 (7th Cir. 2017) (exclusion from boys' restroom "stigmatized" transgender boy, causing him "significant psychological distress" including "depression and anxiety"), *cert. dismissed*, 138 S. Ct. 1260 (2018); *Dodds v. Dep't of Educ.,* 845 F.3d 217, 221-222 (6th Cir. 2016) (finding that exclusion from the girls' restrooms "had substantial and immediate adverse effects" on plaintiff's "daily life," "health," and "well-being").[8]

Requiring that B.P.J. participate on a boys' team would likewise cause her real and lasting harm.  Joining the boys' team would contravene B.P.J.'s medically-supervised social transition.  No. 2-1 at 20-21, 60.  It would "erase who she is" and "devastate her," causing mental and

---

[7]  If she attends a public college in West Virginia, B.P.J. also will be banned from women's intercollegiate sports.

[8]  Conversely, the mere presence of transgender students in sex-segregated spaces that align with their gender identity does not violate cisgender students' Title IX rights.  *See Doe by & through Doe v. Boyertown Area Sch. Dist.*, 897 F.3d 518, 534 (3d Cir. 2018) (restrooms and locker rooms), *cert. denied*, 139 S. Ct. 2636 (2019); *Parents for Privacy v. Barr*, 949 F.3d 1210, 1228-29 (9th Cir. 2020), *cert. denied*, 141 S. Ct. 894 (2020) (restrooms, locker rooms, and showers).

emotional distress.  No. 2-1 at 23, 32-33.  Forcing her to run on the boys' team would "constitute harm under Title IX, as it 'invites more scrutiny and attention' from other students, 'very publicly branding all transgender students with a scarlet 'T'.'"  *Grimm*, 972 F.3d at 617-18 (quoting *Doe by & through Doe v. Boyertown Area Sch. Dist.*, 897 F.3d 518, 530 (3d Cir. 2018) (brackets omitted), *cert. denied*, 139 S. Ct. 2636 (2019)).  Being on a boys' team would make B.P.J. vulnerable to invasive questions, gossip, and ridicule for participating on the "wrong" team.  This "emotional and dignitary" harm is "legally cognizable under Title IX."  *See id.* at 618 (citing *Adams*, 968 F.3d at 1306-07, 1310-11).  On these facts, the United States believes B.P.J. is likely to prevail on the merits of her Title IX claim.

B.      *Title IX Itself Provides Sufficient Protection Against H.B. 3293's Concern That Boys Will Displace Girls In Athletics*

In addition to requiring recipients to discriminate based on sex, the West Virginia Legislature's justification for H.B. 3293 ignores Title IX's existing protections in the athletics context.  The State seeks to justify the law on the theory that "[i]n the context of sports involving competitive skill or contact, biological males and biological females are not in fact similarly situated.  Biological males would displace females to a substantial extent if permitted to compete on teams designated for biological females."  W. Va. Code § 18-2-25d(a)(3).[9]  As an initial matter, there are no facts to suggest that, in this case, allowing B.P.J. to participate in girls' sports will substantially displace other girls, or that any cisgender boy seeks a spot on a girls' team.  An overview of Title IX's regulations, which can be credited with creating hundreds of thousands of athletic opportunities for girls, demonstrates why H.B. 3293 is unnecessary.

---

[9]  H.B. 3293's definition of "biological males" wrongly conflates two distinct groups, cisgender boys and transgender girls.  The legislature's conflation of these groups is inappropriate given the Fourth Circuit's analysis of similarly situated students in *Grimm*.  972 F.3d at 610, 618 (finding that the plaintiff, a transgender boy, was "similarly situated to other boys").

Since 1975, Title IX's implementing regulations have required recipients to provide equal athletic opportunities for their students regardless of sex. 45 C.F.R. § 86.41(c) (subsequently codified at 34 C.F.R. § 106.41(a) and 28 C.F.R. § 54.450(a)). The regulations recognized that in order to expand opportunities for girls, as the underrepresented sex, recipients could offer sex-segregated sports teams. 45 C.F.R. § 86.41(b) (subsequently codified at 34 C.F.R. § 106.41(b); 28 C.F.R. § 540(b). B.P.J. does not challenge her school's ability to offer separate boys' and girls' sports teams. She simply challenges how her school and her state intend to assign her, as a transgender girl, to a single-sex team.

The regulations further require that a recipient's "selection of sports and levels of competition effectively accommodate the interests and abilities of members of both sexes." 34 C.F.R. § 106.41(c); 28 C.F.R. § 54.450(c). The regulation ensures that recipients provide athletic participation opportunities that effectively accommodate the interests and abilities of each sex, and protects against boys usurping girls' athletic participation opportunities. *See Ollier v. Sweetwater Union High Sch. Dist.*, 768 F.3d 843, 856-57 (9th Cir. 2014). It does not preclude recipients from treating transgender students consistent with their gender identity. Nor can it. *See Grimm*, 972 F.3d at 618 ("[T]he implementing regulation cannot override the statutory prohibition against *discrimination* on the basis of sex."). And as a factual matter, there is no discernible risk that transgender girls will somehow "displace" cisgender girls "to a substantial extent." W. Va. Code § 18-2-25d(a)(3); *see also Hecox*, 479 F. Supp. 3d at 977 ("It is inapposite to compare the potential displacement allowing approximately half of the population (cisgender men) to compete with cisgender women, with any potential displacement one half of one percent of the population (transgender women) could cause cisgender women.").

Moreover, under Title IX, recipients may both permit transgender girls to participate on girls' athletic teams *and* exclude cisgender boys from the girls' teams.  B.P.J. is a girl.  She has participated on an all-girls community cheerleading team for the last two years.  No. 2-1 at 21.  Her middle school principal acknowledged that it would be confusing to identify her any other way.  No. 2-1 at 23.  Consistent with Fourth Circuit precedent, B.P.J. is similarly situated to other girls.  *See Grimm*, 972 F.3d at 610.  An analogous claim by a cisgender boy to play on a girls' team rather than the corresponding boys' team would fail because:  (1) he lives and presents as a boy and therefore is not similarly situated to girls for purposes of permissibly sex-segregated activities; and (2) he experiences no cognizable "emotional and dignitary harm" from being excluded from the girls' team.  *Id.* at 618 (citing *Adams*, 968 F.3d at 1306-07, 1310-11).

At its core, Title IX is about ensuring equal educational opportunities to all students regardless of their sex.  Despite its claim of "promot[ing] equal athletic opportunities" for girls, W. Va. Code § 18-2-25d(a)(5), H.B. 3293 does the opposite.  It targets a vulnerable and historically marginalized subset of girls and prohibits them from participating in athletics.  It bars girls who are transgender from teams that are consistent with their gender identity—and effectively bars them from all single-sex sports teams at the secondary and postsecondary levels—without regard to any individual's specific circumstances and without any facts to suggest that there is a "problem" that requires solving in the first place.  H.B. 3293 does so despite the fact that Title IX already protects equal athletic opportunities for all students and H.B. 3293 does so in violation of Title IX's mandate to offer educational opportunities free of sex discrimination.

## II.     H.B. 3293 Cannot Survive Heightened Scrutiny Under The Equal Protection Clause

B.P.J. is also likely to succeed on the merits of her equal protection claim because H.B. 3293 discriminates based on sex and transgender status.  The Equal Protection Clause

prevents states from discriminating against individuals on the basis of sex and against people who are transgender absent an "exceedingly persuasive" justification. *Grimm*, 972 F.3d at 610-13. The State cannot demonstrate such a justification.

> A.    *H.B. 3293 Is Subject To Heightened Scrutiny*

To determine whether a statute or policy warrants heightened scrutiny under the Equal Protection Clause, a court asks whether the classification at issue jeopardizes the exercise of a fundamental right or categorizes based on an inherently suspect characteristic. *Nordlinger v. Hahn*, 505 U.S. 1, 10 (1992) (citations omitted). Heightened scrutiny applies here for two separate reasons: H.B. 3293 discriminates based on sex and H.B. 3293 discriminates based on transgender status.

The Supreme Court has long held that classifications based on sex warrant heightened scrutiny. *See, e.g.*, *United States v. Virginia*, 518 U.S. 515, 533 (1996) (*VMI*) (citing *Miss. Univ. for Women v. Hogan*, 458 U.S. 718 (1982)). H.B. 3293 singles out girls who are transgender, including B.P.J., for different treatment based on the sex they were assigned at birth. W. Va. Code § 18-2-25d(b)(1). The Fourth Circuit's controlling precedent holds that excluding transgender students from sex-segregated spaces that align with their gender identity is discrimination based on sex under the Equal Protection Clause. *Grimm*, 972 F.3d at 607-10. Other circuits agree. *See Adams*, 968 F.3d at 1296; *Whitaker By Whitaker*, 858 F.3d at 1051. Just as in *Grimm*, H.B. 3293 discriminates on the basis of sex: it treats B.P.J. differently from all other students with the same gender identity based solely on her sex assigned at birth. 972 F.3d at 608 (school district policy limiting bathroom access to "corresponding biological genders" or sex listed on birth certificate "creates sex-based classifications").

Fourth Circuit precedent also requires heightened scrutiny here because people who are

transgender are a quasi-suspect class. *Grimm,* 972 F.3d at 611–13.  The Fourth Circuit observed, "one would be hard-pressed to identify a class of people more discriminated against historically or otherwise more deserving of the application of heightened scrutiny when singled out for adverse treatment." *Id.* at 610-11 (citation omitted).  It does not matter that H.B. 3293 categorizes teams without explicitly referencing "transgender students":  by categorizing teams based on that law's definition of "biological sex," girls who are transgender are the only group who cannot compete on sports teams that align with their gender identity.  W. Va. Code § 18-2-25d(b).  Because H.B. 3293 discriminates against a quasi-suspect class—girls who are transgender—this Court must apply heightened scrutiny.  *Grimm,* 972 F.3d at 610.

  B. *H.B. 3293 Is Not Substantially Related To Achieving The State's Articulated Governmental Interest*

  H.B. 3293 cannot survive the rigorous analysis that heightened scrutiny demands.  To survive heightened scrutiny, the state must show the law "serves important governmental objectives" and the "discriminatory means employed are substantially related to the achievement of those objectives." *See VMI*, 518 U.S. at 533 (quoting *Miss. Univ. for Women*, 458 U.S. at 724) (internal quotation marks omitted).  "The burden of justification is demanding" and the justification must be "'exceedingly persuasive.'" *Id.* (quoting *Miss. Univ. for Women,* 458 U.S. at 724).  The inquiry provides enhanced protection in circumstances where there is a greater danger that the legal classification results from either impermissible prejudice or stereotypes, *see, e.g.*, *Grimm*, 972 F.3d at 614–15, or "a bare . . . desire to harm a politically unpopular group," *United States Dep't of Agric. v. Moreno*, 413 U.S. 528, 534 (1973).

  Moreover, when evaluating an articulated governmental interest, the "justification must be genuine, not hypothesized" and "must not rely on overbroad generalizations." *VMI*, 518 U.S. at 533; *see also Grimm*, 972 F.3d at 615 (holding that policy restricting access to restroom by

14

"biological sex" is "marked by misconception and prejudice" against transgender plaintiff) (citation omitted); *Adams*, 968 F.3d at 1297 (finding no substantial relationship between defendants' articulated justification and restroom policy where the concerns were hypothesized and treated transgender plaintiff unfavorably "simply because he defies gender stereotypes"). A classification does not withstand heightened scrutiny when "the alleged objective" differs from the "actual purpose" underlying the classification. *Miss. Univ. for Women,* 458 U.S. at 730.

The State proffers "promoting equal athletic opportunities for the female sex" as its governmental interest. W. Va. Code § 18-2-25d(a)(4). There is no doubt that promoting equal athletic opportunities is an important governmental interest. *See Equity in Athletics, Inc. v. Dep't of Educ.*, 639 F.3d 91, 104 (4th Cir. 2011) (citing *Kelley v. Bd. of Tr., Univ. of Ill.*, 35 F.3d 265, 272 (7th Cir. 1994)). The State contends this law is necessary to "promote equal athletic opportunities for the female sex" because "[i]n the context of sports involving competitive skill or contact, biological males and biological females are not . . . similarly situated" and "[b]iological males would displace females to a substantial extent if permitted to compete on teams designated for biological females." W. Va. Code § 18-2-25d(a)(3)-(5). But as explained above, Title IX already ensures that cisgender boys will not "displace [girls] to a substantial extent" and the State does not claim that cisgender boys have sought to do so. The truth is H.B. 3293 targets transgender girls. This Court should reject the State's proffered explanation as factually inaccurate, based on biases, and employing overbroad generalizations about transgender girls. Further casting doubt on the State's justification, H.B. 3293 hinders equal athletic opportunities for girls by creating an additional hurdle for participation.

First, the State's justification lacks a factual basis. H.B. 3293's text and legislative record make clear that the law was calculated to exclude girls who are transgender from girls' athletic

teams.  The State already allows schools to have "separate teams for members of each sex," and under existing state law, cisgender boys cannot join a girls' team except in limited circumstances. W. Va. Code R.  § 127-2-3.8.[10]  When asked how H.B. 3293 would change this status quo, counsel for the bill explained that it "would affect those that changed their sex after birth."  No. 1-1 at 14. Other delegates, including bill sponsors, also made clear that the bill's focus was on transgender girls.  No. 1-1 at 21, 25.  So, when the State says, "biological males would displace females" in athletics, W. Va. Code § 18-2-25d(a)(3), and defines students by their sex assigned at birth, *id.* § 18-2-25d(b)(1), the State's objective is clear: to define transgender girls as "boys" and then to prevent them from participating on girls' athletics teams.  *See VMI*, 518 U.S. at 535-36 ("[B]enign justifications proffered in defense of categorical exclusions will not be accepted automatically; a tenable justification must describe actual state purposes, not rationalizations for actions in fact differently grounded." (internal quotation marks and citation omitted)).

Recently, an Idaho District Court found a similar law unconstitutional.  *See Hecox*, 479 F. Supp. 3d at 979.  The *Hecox* court rejected Idaho's claim that barring girls who are transgender from girls' athletic teams had any relationship to ensuring equality and opportunities for girls' athletics.  As was the case in *Hecox*, H.B. 3293's legislative record "reveals no history of transgender athletes ever competing in sports" in West Virginia and no evidence that female athletes have been displaced by transgender athletes in West Virginia.  *Id.* at 978.  The West

---

[10]  H.B. 3293's reliance on *Clark v. Ariz. Interscholastic Ass'n*, 695 F.2d 1126 (9th Cir. 1982), does not support the law's discriminatory means.  W. Va. Code § 18-2-25d(a)(3).  *Clark* did not address the participation of transgender athletes.  Instead, *Clark* upheld a school district's policy that cisgender boys could not play on a girls' volleyball team where "boys' overall opportunity is not inferior to girls'."  695 F.2d at 1131.  At issue here is a transgender girl who seeks to play on a girls' team.  *Clark* thus provides no support for the State's discriminatory purpose because, simply, transgender women "have not and could not 'displace' cisgender women in athletics 'to a substantial extent.'"  *Hecox*, 479 F. Supp. 3d. at 977 (quoting *Clark*, 695 F.3d at 1131).

Virginia Department of Education's Executive Director of Policy and Government Relations testified that the agency has received no complaints about transgender athletes. No. 1-1 at 14-15. One of the bill's sponsors, Delegate Ellington, stated that he knew of no complaints regarding transgender athletes in West Virginia, *see* No. 1-1 at 9, 19, much less that transgender girls are so numerous and skilled that they could "displace" other women and girls in sports.[11]   Instead, he pointed to "two transgender girls" who "were allowed to compete in state track and field meets in Connecticut." No. 1-1 at 21.   The existence of two runners in another state fails to provide an "exceedingly persuasive justification" for H.B. 3293's categorical bar. *See Hecox*, 479 F. Supp. 3d. at 979 (citing *VMI*, 518 U.S. at 533).   As in Idaho, the record here contains "no evidence to suggest a categorical bar against transgender female athlete's participation in sports is required in order to promote 'sex equality' or to 'protect athletic opportunities for females'" in West Virginia. *Id.* at 978-79 (citation omitted).   The State can point to no valid evidence to justify H.B. 3293.

On the contrary, the State disregarded evidence that giving girls who are transgender the same athletic opportunities that all other girls enjoy has not displaced cisgender girls.   The West Virginia Legislature had before it evidence that sixteen states successfully allow transgender students to participate in sports consistent with their gender identity.   No. 25 at 38-39, 75.   The National Collegiate Athletic Association ("NCAA") has allowed transgender students who meet certain conditions to participate in intercollegiate sports consistent with their gender identity for over ten years.   *Id.*; *see also* NCAA, *NCAA Inclusion of Transgender Student-Athletes* (2011), https://www.ncaa.org/sites/default/files/Transgender_Handbook_2011_Final.pdf.   Yet, girls and young women who are transgender have not displaced cisgender girls in those states or in college

---

[11]   The bill's co-sponsors and the Governor of West Virginia also stated that they did not know of any girls who are transgender in West Virginia who competed on girls' teams, much less who dominated or displaced cisgender girls.   No. 1 at 2, 14.

athletics.  The lack of "empirical evidence that transgender inclusion will hinder sex equality in sports or athletic opportunities" for girls shows that H.B. 3293's exclusion of transgender girls "has no relationship" to the law's objective.  *Hecox*, 479 F. Supp. 3d. at 979, 982.

Second, statements by H.B. 3293's sponsors show that a misunderstanding or fear of transgender girls, and in certain instances, outright anti-transgender bias, rather than an interest in promoting women's athletic opportunities, motivated this bill.  For example, Delegate Mazzochi said that she did not "want all this mixing and matching" of transgender and cisgender children in "locker rooms."  No. 1 at 12.  Delegate Bridges announced on Facebook he was co-sponsoring H.B. 3293, then "liked" comments to his post that advocated for physical violence against girls who are transgender, compared them to pigs, and called them by a pejorative term ("tranny").  Jordan Bridges, "Update: The bill passed out of committee." Facebook (Mar. 16, 2021), https://perma.cc/HA5C-VJ4N.[12]  He also made other anti-transgender comments, saying that "this country is going down hill [sic] fast" in response to a news article discussing transgender-inclusive business practices.    Jordan Bridges, "I swear my hand." Facebook (Oct. 23, 2019), https://perma.cc/8BHK-7V5Z.  The biases and moral disapproval articulated by the bill's sponsors are not justifiable reasons to legislate.  *See Lawrence v. Texas*, 539 U.S. 558, 577-78 (2003) (holding moral disapproval of same-sex sexual conduct was impermissible basis for legislation); *see also Palmore v. Sidoti*, 466 U.S. 429, 433 (1984) (finding in a race discrimination suit that "[t]he Constitution cannot control such prejudices but neither can it tolerate them.  Private biases may be outside the reach of the law, but the law cannot, directly or indirectly, give them effect.").[13]

---

[12]  The archived and live Facebook pages are available via the permalink.  DOJ has retained permanent copies of these Facebook pages in the event that they are modified or deleted.

[13]  Intermediate scrutiny is the appropriate level of review in this case.  But even under rational basis review, H.B. 3293 would fail because bare dislike of an unpopular social group is never a

Third, even if this Court were to credit the State's purported objective of wanting to protect girls' athletic opportunities, H.B. 3293's categorical exclusion of transgender girls is not "substantially related" to that objective, as the equal protection caselaw requires. *See VMI*, 518 U.S. at 533 (quoting *Miss. Univ. for Women*, 458 U.S. at 724) (internal quotation marks omitted). H.B. 3293's assumption that transgender girls, as a group, enjoy some inherent competitive advantage over their cisgender classmates ignores the facts of this case. Excluding B.P.J., who has not gone through puberty and is receiving puberty-delaying treatment, No. 2-1 at 21, 32, contributes nothing to ensuring competitive fairness. *See* No. 2-1 at 6-8. By sweeping so broadly, the State proved itself "less concerned with ensuring equality in athletics than [] with ensuring exclusion of transgender women athletes." *Hecox*, 479 F. Supp. 3d at 984.

Finally, H.B. 3293 may hinder rather than promote athletic opportunities for all girls. Though the law purports to bar only transgender girls from joining the girls' team, the practical effect is that *every* girl in West Virginia may be subject to having her eligibility for a single-sex team challenged merely because some other student claims the girl in question is not a "real" girl. This is likely to affect girls who do not adhere to sex stereotypes and who present as less stereotypically feminine. While intended to expose transgender girls, the consequences would be harmful for gender non-conforming cisgender girls as well. Indeed, two doctors testified that being the subject of such a challenge would be "psychologically devastating," "embarrassing, humiliating," "lead to the . . . person being ostracized," and increase her suicide risk. No. 25 at 97-98, 101. Thus, rather than protecting opportunities for girls, the law could reasonably chill

---

legitimate legislative motive. *See Cleburne v. Cleburne Living Ctr.,* 473 U.S. 432, 446-47 (1985)*; Moreno*, 413 U.S. at 534. The State's prohibition of transgender girls from girls' teams is not rationally related to its stated interest of protecting girls' athletic opportunities. *See Cleburne,* 473 U.S. at 446 ("The State may not rely on a classification whose relationship to an asserted goal is so attenuated as to render the distinction arbitrary or irrational.").

athletic participation by all girls who do not conform to sex stereotypes.

H.B. 3293 cannot survive heightened scrutiny.  The State cannot point to any valid evidence that allowing transgender girls to participate on girls' sports teams endangers girls' athletic opportunities.  Instead, the State legislated based on misconceptions and overbroad assumptions about transgender girls.  It is illogical for the State to believe it can protect girls' athletic opportunities by barring girls from playing sports.  The harm to B.P.J. is real and it will be lasting.  The United States believes B.P.J. will succeed on the merits of her equal protection claim.

**CONCLUSION**

Title IX and the U.S. Constitution bar Defendants from implementing the policy commanded by H.B. 3293.  That policy does nothing to further the State's purported goal of protecting athletic opportunities for girls.  At the same time, it violates the nondiscrimination mandates of Title IX and the Equal Protection Clause.

Respectfully submitted, this 17th day of June, 2021.


LISA G. JOHNSTON
Acting United States Attorney
Southern District of West Virginia


_____
FRED B. WESTFALL, JR.
W. Va. State Bar No. 3992
Assistant United States Attorney, Civil Chief
JENNIFER M. MANKINS
W. Va. State Bar No. 9959
Assistant United State Attorney
300 Virginia Street East, Room 4000
Charleston, WV 25301
Telephone: (304) 345-2200
Fax: (304) 347-5104
Fred.Westfall@usdoj.gov
Jennifer.Mankins@usdoj.gov


/s/ Emma Leheny
EMMA LEHENY
Principal Deputy General Counsel

VANESSA SANTOS
JESSICA WOLLAND
Attorneys
Office of the General Counsel
United States Department of Education


KRISTEN CLARKE
Assistant Attorney General

PAMELA S. KARLAN
Principal Deputy Assistant Attorney General
Civil Rights Division

SHAHEENA A. SIMONS
Acting Deputy Assistant Attorney General
Civil Rights Division


_____
WHITNEY M. PELLEGRINO
Acting Chief
ARIA S. VAUGHAN
MICHELLE L. TUCKER
AMANDA K. DALLO
Trial Attorneys
United States Department of Justice
Civil Rights Division
Educational Opportunities Section
950 Pennsylvania Ave., NW
4CON, 10th Floor
Washington, DC 20530
Telephone: (202) 598-9629
Aria.Vaughan@usdoj.gov
NY Bar No. 5044748


*Attorneys for the United States*

## CERTIFICATE OF SERVICE

I hereby certify that on June 17, 2021, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system, which will send notification of such filing to all attorneys of record.

Respectfully submitted,

ARIA S. VAUGHAN
Trial Attorney
Civil Rights Division
Educational Opportunities Section
950 Pennsylvania Ave., NW
4CON, 10th Floor
Washington, DC 20530
Telephone: (202) 598-9629
Aria.Vaughan@usdoj.gov
NY Bar No. 5044748