**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA
AT CHARLESTON**

**B.P.J., by her next friend and mother,
HEATHER JACKSON,**

    *Plaintiff*,

**vs.**

**WEST VIRGINIA STATE BOARD OF
EDUCATION, et al.,**

    *Defendants,*

    **and**

**THE STATE OF WEST VIRGINIA,**

    *Defendant-Intervenor*.

Civil Action No. 2:21-cv-00316
Hon. Joseph R. Goodwin

---

**THE STATE OF WEST VIRGINIA'S RESPONSE IN OPPOSITION
TO PLAINTIFF'S MOTION FOR PRELIMINARY INJUNCTION**

---

PATRICK MORRISEY
ATTORNEY GENERAL OF WEST
VIRGINIA

Douglas P. Buffington, II (WV Bar # 8157)
*Chief Deputy Attorney General*
Curtis R. A. Capehart (WV Bar # 9876)
*Deputy Attorney General*
Jessica A. Lee (WV Bar # 13751)
*Assistant Solicitor General*
State Capitol Complex
Building 1, Room E-26
Charleston, WV 25305-0220
Email: Curtis.R.A.Capehart@wvago.gov
Telephone: (304) 558-2021
Facsimile: (304) 558-0140

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ..........................................................................................II

INTRODUCTION ...........................................................................................................1

BACKGROUND ............................................................................................................2

ARGUMENT .................................................................................................................4

    I.    Plaintiff Is Unlikely To Succeed On The Merits. ........................................4

        A.    Plaintiff's Equal Protection Claim Is Unlikely To Succeed
            On The Merits ...................................................................................4

            1.    The State's Objective Is Important ...............................7

            2.    Section 25d Serves The State's Objective ....................7

        B.    Plaintiff's Title IX Claim Is Unlikely To Succeed On The
            Merits ..............................................................................................12

            1.    The Purposes And Achievements Of Title IX ............12

            2.    Section 25d Furthers, Not Violates, Title IX .............15

    II.    Neither The Balance Of Hardships Nor The Public Interest Favors
        An Injunction ...............................................................................................18

CONCLUSION..............................................................................................................20

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Biediger v. Quinnipiac University,*
  691 F.3d 85 (2d Cir. 2012)..................................................................................14

*Bostock v. Clayton Cty.,*
  140 S. Ct. 1731 (2020)..........................................................................14, 16, 17

*City of Cleburne v. Cleburne Living Ctr.,*
  473 U.S. 432 (1985)...............................................................................................4

*Clark v. Ariz. Interscholastic Ass'n.,*
  695 F.2d 1126 (9th Cir. 1982) ...............................................................6, 7, 9, 15

*Doe 2 v. Shanahan,*
  755 F. App'x. 19 (D.C. Cir. 2019)........................................................................5

*Frontiero v. Richardson,*
  411 U.S. 677 (1973)............................................................................................16

*Grimm v. Gloucester Cty. Sch. Bd.,*
  972 F.3d 586 (4th Cir. 2020) .................................................................................5

*McCormick v. School Dist. of Mamaroneck,*
  370 F.3d 275 (2d Cir. 2004)................................................................................15

*Morrison v. Garraghty,*
  239 F.3d 648 (4th Cir. 2001) .................................................................................5

*Neal v. Bd. of Trs. of Cal. State Univs.,*
  198 F.3d 763 (9th Cir. 1999) .........................................................................12, 14

*Nordlinger v. Hahn,*
  505 U.S. 1 (1992)..............................................................................................4, 8

*Quincy Bell & Mrs A v. Tavistock & Portman NHS Found. Trust*
  [2020].....................................................................................................................4

*Tuan Anh Nguyen v. INS,*
  533 U.S. 53 (2001)........................................................................................1, 2, 6, 9

*United States v. Virginia,*
  518 U.S. 515 (1996).......................................................................................1, 5, 6, 15

## TABLE OF AUTHORITIES
### (*continued*)

Page(s)

*Williams v. Sch. Dist. of Bethlehem*,
   998 F.2d 168 (3d Cir. 1993)................................................................13, 14, 15

*Winter v. Nat. Res. Def. Council, Inc.*,
   555 U.S. 7 (2008)................................................................................4, 19

**U.S. Const. Amendment**

U.S. Const. amend. XIV, § 1 ...............................................................................4

**Statutes**

20 U.S.C. § 1681...............................................................................................13

20 U.S.C. § 1686...............................................................................................16

W. Va. Code § 18-2-25d ...................................................................1, 2, 3, 8, 17

**Regulations**

34 C.F.R § 106.32.............................................................................................16

34 C.F.R § 106.33.............................................................................................16

34 C.F.R § 106.34.............................................................................................16

34 C.F.R § 106.40.............................................................................................16

34 C.F.R. § 106.41..................................................................................3, 13, 16

34 C.F.R § 106.43.............................................................................................16

34 C.F.R § 106.52.............................................................................................16

34 C.F.R § 106.59.............................................................................................16

34 C.F.R § 106.61.............................................................................................16

**Other Authorities**

DJ HANDELSMAN, ET AL., CIRCULATING TESTOSTERONE AS THE HORMONAL BASIS
   OF SEX DIFFERENCES IN ATHLETIC PERFORMANCE, 39 *Endocrine Reviews* 803,
   805 (2018).....................................................................................................10

## TABLE OF AUTHORITIES
(*continued*)

**Page(s)**

Joanna Harper, *Race Times For Transgender Athletes*, 6 J. of Sporting Cultures &
Identities, no. 1 (2015) .............................................................................................11

U.S. Dep't of Educ., Office of Gen. Counsel, Memorandum for Acting
Assistant Secretary of OCR (Jan. 8. 2021) ........................................................14

U.S. Dep't of Educ., Office of C.R., OCR-00016, Clarification of
Intercollegiate Athletics Policy Guidance: The Three-Part Test
(Jan. 16 1996).............................................................................................................14

U.S. Dep't of Educ., Office of C.R., Protecting Civil Rights, Advancing
Equity (Apr. 2015) ...................................................................................................14

## INTRODUCTION

Today is the 49th anniversary of the passage of the landmark gender equality legislation Title IX.  Recognizing its importance, the West Virginia Legislature passed West Virginia Code § 18-2-25d ("Section 25d") "to promote equal athletic opportunities" for girls and women in West Virginia in light of the "inherent differences" between biological men and women. *Id*. §§ 18-2-25d(a)(5), (1). Section 25d provides for the commonsense rule that male athletes are not permitted to compete in women's sports. In passing Section 25d, the Legislature expressly relied on Justice Ginsburg's opinion for the Court in *United States v. Virginia*, in which she recognized that "[p]hysical differences between men and women . . . are enduring." 518 U.S. 515, 533 (1996). Justice Ginsburg's recognition is no less true today than when she wrote it.

Plaintiff's experts dispute those differences; but they cannot change physiology. *See* Exs. A & B. Plaintiff is a biological male who has the undisputed opportunity to try out for the boys' teams at Bridgeport Middle School.  Plaintiff, however, wants to try out for the girls' cross-country and track team because Plaintiff identifies as female. Because this would cause a biological male to unfairly compete against biological females, Section 25d bars Plaintiff from doing so. Plaintiff's claim that this violates the Constitution and Title IX are unavailing.

As to the Equal Protection claim, Plaintiff rightly concedes that the State's interest is an important one. Yet Plaintiff argues that Section 25d's prohibition on men competing in women's sports is "not substantially related" to the State's interest in promoting equal opportunity in athletics. Rather, Plaintiff contends that Section 25d's objective can be served *by different* policies. The fact that athletic opportunities could be somehow equalized through other means is of *no constitutional consequence*. *See Tuan Anh Nguyen v. INS*, 533 U.S. 53, 70 (2001) (intermediate scrutiny does not "require[] that the statute under consideration must be capable of achieving its

ultimate objective in every instance"). The equal protection analysis has never required a perfect fit between the Legislature's goal and the means used to achieve it, *see id.*, even though Section 25d fits tighly with the State's interest. This claims therefore fails.

Plaintiff's Title IX claim fares no better. To begin with, Section 25d *furthers* the goals of Title IX, as it promotes the equal opportunity for the sexes in athletics. Nor does it violate the text of the law.  Regulations interpreting the law (and relevant case law) have long recognized "sex" to refer to biological sex. But even assuming Plaintiff's preferred definition applied, the claim still fails. Although Plaintiff argues that Section 25d discriminates on the basis of sex because it targets transgender female students—that is, biological males who identify as female—the law does no such thing. Rather, it is *Plaintiff* who is asking this Court to compel the State to discriminate—to define eligibility for participation in women's sports—on the basis of gender identity. Indeed, by defining such eligibility on the basis of biological sex, Section 25d takes no account of gender identity, thus hardly discriminating "on the basis" of it.

Without a doubt, all persons should be afforded the dignity owed to them by virtue of their humanity, which is a core value underlying our civil society. However, the role of federal courts is limited to applying the law, while determinations of policy must be left to the representative branches of government. For the reasons explained below, Section 25d fully complies with both the Equal Protection Clause and Title IX, as Plaintiff fails to demonstrate a "clear showing" of a likelihood of success on a claim under either.

Plaintiff's motion for preliminary injunction should therefore be denied.

## BACKGROUND

West Virginia, after extensive legislative debate addressing all views, enacted HB 3293, now codified as West Virginia Code § 18-2-25d ("Section 25d") and effective July 8, 2021. Section

25d is straightforward. Subsection (a) contains the legislative findings, which recognizes the inherent differences between biological males and biological females and the valid justification for sex-based classifications in sports. § 18-2-25d(a). Subsection (b) contains definitions. § 18-2-25d(b). Subsection (c) contains the requirements for public school-sponsored sports. *First*, it requires designation of sports by category based on biological sex. § 18-2-25d(c)(1) (any "sports that are sponsored by any public secondary school or a state institution of higher education . . . shall be expressly designated as one of the following based on biological sex: (A) Males, men, or boys; (B) Females, women, or girls; or (C) Coed or mixed"). *Second*, it prohibits participation of biological males in sports designated for biological females. *See id.* § 18-2-25d(c)(2) ("Athletic teams or sports designated for females, women, or girls shall not be open to students of the male sex where selection for such teams is based upon competitive skill or the activity involved is a contact sport.").

Notably, the Legislature did not directly address or endorse affirmation therapy, including the use of puberty blocking drugs. Nor does the statute say anything about "transgender" boys or girls. Although not necessary to deny the motion, the State includes expert declarations opposing the science-based arguments advanced by Plaintiff. *See* Ex. A (Expert Decl. of Dr. Stephen B. Levine) (explaining the lack of consensus among professionals that "social transition"—treating an individual as if he or she were of the opposite sex for all purposes, including athletic performance—is the *only* or even most effective approach for young people who suffer from gender dysphoria); Ex. B (Expert Decl. of Dr. Gregory A. Brown) (detailing physiological differences between the sexes that affect athletic performance).; Ex. E (Expert Report of Dr. James M. Cantor, PhD) (addressing types and causes of gender dysphoria and the range of legitimate treatments therefore and possible harms from certain treatments); Ex. F (*Quincy Bell & Mrs A v.*

*Tavistock & Portman NHS Found. Trust* [2020] EWHC 3274 (Admin.)) (finding it is "highly unlikely" that children under 13 could give informed consent to use puberty blocking drugs)).

On May 26, 2021, Plaintiff filed a 106-paragraph complaint seeking declaratory and injunctive relief against an array of state and local officials and public entities, as well as nominal damages and attorney's fees. On June 18, 2021, the State's motion to intervene as a defendant was granted, allowing for this response.  *See* ECF No. 44.

## ARGUMENT

Plaintiffs "seeking a preliminary injunction must establish that [they are] likely to succeed on the merits, likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in [their] favor, and that an injunction is in the public interest." *Id.* at 20.  Plaintiff fails to make a "clear showing" of these factors and is thus not entitled to the "extraordinary remedy" of a preliminary injunction. *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 22 (2008).

**I.      Plaintiff Is Unlikely To Succeed On The Merits.**

**A.      Plaintiff's Equal Protection Claim Is Unlikely To Succeed On The Merits.**

The Equal Protection Clause provides that no State shall "deny to any person within its jurisdiction the equal protection of the laws." U.S. Const. amend. XIV, § 1. As long recognized by the Supreme Court, the Clause is "essentially a direction that all persons *similarly situated* should be treated alike." *City of Cleburne v. Cleburne Living Ctr.*, 473 U.S. 432, 439 (1985) (emphasis added). In this manner, the provision "simply keeps governmental decisionmakers from treating differently persons who are in all relevant respects alike." *Nordlinger v. Hahn*, 505 U.S. 1, 10 (1992). As such, plaintiffs asserting a violation of the Equal Protection Clause must "demonstrate that [they have] been treated differently from others with whom [they are] similarly situated and that the unequal treatment was the result of intentional or purposeful discrimination." *Morrison v. Garraghty*, 239 F.3d 648, 654 (4th Cir. 2001).

4

The Equal Protection Clause "does not make sex a proscribed classification." *United States v. Virginia*, 518 U.S. 515, 533 (1996).[1] Plaintiff argues that heightened scrutiny should apply because Section 25d discriminates against transgender and female athletes. Although the State disagrees, the State acknowledges that the Fourth Circuit has held that heightened scrutiny applies if a law or policy treats transgender persons in a less favorable way than it treats all others. *See Grimm v. Gloucester Cty. Sch. Bd.*, 972 F.3d 586, 610 (4th Cir. 2020), *as amended* (Aug. 28, 2020).[2]

But Section 25d is different. It does not single out and treat transgender athletes differently. Indeed, it treats all biological males *the same* and prohibits them from participating in female sports to protect athletic opportunities for biological females. Therefore, Plaintiff cannot show it discriminates against transgender athletes. *Cf. Doe 2 v. Shanahan*, 755 F. App'x. 19, 23-25 (D.C. Cir. 2019) (reversing finding that requiring military personnel to serve in their biological sex was a blanket transgender ban and acknowledging that the military had substantial arguments that the plan complied with equal protection principles).

Setting that aside, the intermediate scrutiny analysis in this context is straightforward. The government first must prove that the "classification serves important governmental objectives." *Virginia*, 518 U.S. at 524 (internal quotation marks omitted). For an objective to be "important," it cannot stem from "overbroad generalizations about the different talents, capacities, or preferences of males and females." *Id*. at 533. The objective must also be "genuine, not

---

[1] Because Section 25d survives heightened scrutiny applied to sex-based classifications, it also would survive rational basis review if the statute was viewed as not a sex-based classification.

[2] Although *Grimm* is distinguishable from this case, the State believes that *Grimm* was wrongly decided on its own terms. *See Grimm*, 972 F.3d at 627-37 (Niemeyer, J., dissenting). A petition for certiorari is pending. *See* Petition for Writ of Certiorari, *Grimm v. Gloucester Cty. Sch. Bd.*, No. 20-1163, 2021 WL 723101 (Feb. 19, 2021).

hypothesized or invented post hoc in response to litigation." *Id.* In addition to proving that its policy serves important objectives, the government must show that "the discriminatory means employed are substantially related to the achievement of those objectives." *Id.* at 524 (internal quotation marks omitted). Nonetheless, as the Supreme Court has made clear, "[t]o fail to acknowledge even our most basic biological differences . . . risks making the guarantee of equal protection superficial, and so disserving it." *Tuan Anh Nguyen v. INS*, 533 U.S. 53, 73 (2001).

Importantly, this heightened standard does not mandate that all sex-based classifications must fail; rather, as Justice Ginsburg stated for the Court, the "[p]hysical differences between men and women . . . are enduring" and render "the two sexes . . . not fungible." *Virginia*, 518 U.S. at 533 (cleaned up); *accord Nguyen*, 533 U.S. at 68. Accordingly, laws may acknowledge the physical differences between men and women, so long as such sex-based classifications do not "create or perpetuate the legal, social, and economic inferiority of women." *Virginia*, 518 U.S. at 534; *see, e.g.*, *Nguyen*, 533 U.S. 53 (upholding law requiring unmarried citizen fathers, but not mothers, to officially acknowledge relationship to foreign-born child in order to pass U.S. citizenship to such child because of biological differences between the sexes). In short, when applying this standard, "the Supreme Court is willing to take into account actual differences between the sexes, including physical ones." *Clark v. Ariz. Interscholastic Ass'n.*, 695 F.2d 1126, 1129 (9th Cir. 1982) (citing *Michael M. v. Sonoma Cty. Superior Ct.*, 450 U.S. 464, 468-69 (1981)); *see Nguyen*, 533 U.S. at 73.

Section 25d easily satisifies intermediate scrutiny. It serves the important objection of providing equal athletic opportunities, including as to biological females. The law also fits tightly

with that interest. By precluding biological males from competing on teams designated for biological females, Section 25d directly protects this interest.[3]

### 1.      The State's Objective Is Important.

The State's objective, as codified by the Legislature in Section 25d(a)—to provide equal athletic opportunities—is important. It is also conceded by Plaintiff here. *See* ECF No. 19 at 20. And for good reason: It is well-established that "[t]here is no question" that "redressing past discrimination against women in athletics and promoting equality of athletic opportunity between the sexes" is "a legitimate and important governmental interest" justifying rules excluding males from female sports. *Clark*, 695 F.2d at 1131. Excluding males from female sports to "promote sex equality" and promote fair opportunities for female athletes is precisely what Section 25d does.[4]

### 2.      Section 25d Serves The State's Objective.

Plaintiff takes issue with the second prong of the intermediate scrutiny test, contending that Section 25d is not substantially related to the important goal of ensuring equal opportunities for females in sports. Yet, despite its expert declarations, Plaintiff's argument cannot overcome the well-established physiological fact recognized by numerous courts and recently confirmed by the U.S. Department of Education's Office of Civil Rights ("OCR"): Allowing biological males to compete in female sports is unfair to biological females due to males' inherent physical advantages. Ex. D; Ex. B; *e.g., Clark*, 695 F.2d at 1131 (noting that rule excluding boys from girls' team "is simply recognizing the physiological fact that males would have an undue advantage competing against women," and would diminish opportunities for females). Section 25d's

---

[3] The law does not have an overly broad sweep. For example, it does not prohibit biological females from joining teams of biological males.

[4] While protection of female sports is the central purpose for Section 25d, it also protects female athletes' safety. Ex. G. (Decl. of Dr. Chad T. Carlson, M.D., FACSM) (documenting safety reasons for sex-segregated sports); Ex. H (World Rugby, *Transgender Guidelines*) (explaining that biological women's safety is endangered if transgender women participate in women's rugby).

legislative findings specifically cite this physiological fact and governing case law recognizing it. W. Va. Code §§ 18-2-25d(a)(1)-(5). Indeed, at least one study found that even nine-year-old males are 9.8% faster than females in short sprint races and 16.6% faster in one mile races. Ex. I, at 3 & n.22. To protect biological female athletes' opportunities in light of biological males' inherent physical advantage, Section 25d provides that female sports "shall not be open to students of the male sex." *Id*. § 18-2-25d(c)(2). Just as the rule in *Clark* excluding boys from the girls' volleyball team was substantially related to the important objective of preserving equal opportunities for females to participate in sports, so too is Section 25d.

It is thus plain that a public school may lawfully prohibit, consistent with the Constitution, males from participating in women's sports in order to protect equal opportunity concerns that arise from the physiological differences between the two sexes. In light of this rationale, Plaintiff cannot claim discrimination when denied access to the female sports teams because Plaintiff is not, in fact, similarly situated to the biologically female students who play on those teams. While Plaintiff no doubt identifies as female and has taken steps to chemically alter Plaintiff's adolescent body, Plaintiff will always remain biologically different from females. Because such physiological differences are at the root of why sports teams are generally separated on the basis of sex, by adopting a policy pursuant to which Plaintiff is not permitted to join a women's sports team, the State did not "treat[ ] differently persons who are in all *relevant* respects alike," *Nordlinger*, 505 U.S. at 10 (emphasis added), and therefore did not violate the Equal Protection Clause. And there is no claim or evidence in the record that Plaintiff was treated differently from any other transgender student.

Plaintiff cannot validly challenge these conclusions. Instead, Plaintiff argues that Section 25d's objective can be served by *different rules*. Specifically, Plaintiff argues that athletic

opportunities for females *could* be adequately protected by requiring transgender male-to-female athletes to undergo a year or more of chemical hormone therapy, such that "puberty blockers" would eliminate biological males' athletic advantages, thus freeing so-treated biological males to compete against women "fairly."

As the Supreme Court has made clear in applying intermediate scrutiny, the fact that athletic opportunities could be somehow equalized through other means is of no constitutional consequence. *Nguyen*, 533 U.S. at 70 (intermediate scrutiny does not "require[] that the statute under consideration must be capable of achieving its ultimate objective *in every instance*" (emphasis added)). Put another way, "even wiser alternatives than the one chosen does not serve to invalidate the policy [of excluding males from female sports] since it is substantially related to the goal" of providing fair and equal opportunities for females to participate in athletics. *Clark*, 695 F.2d at 1132. Demanding that the statute satisfy its interest of equal opportunity as to each plaintiff who brings an as-applied challenge, like Plaintiff here, would disregard intermediate scrutiny by demanding a perfect fit between the sex-based classification and the government interest at issue. And it would be directly counter to Supreme Court instructions. This is fatal to Plaintiff's claim.

Ignoring *Nguyen*, Plaintiff argues that athletic opportunities for biological females *could* be adequately protected by requiring transgender male-to-female athletes to undergo one year of hormone therapy. Plaintiff argues that current circulating testosterone is the "only" thing that gives males a competitive advantage. ECF No. 19 at 6, 10 ("[t]he only sex-related characteristic with any documented relationship to athletic ability [is] circulating testosterone") (citing Safer Decl.).[5]

---

[5] Plaintiff argues that Section 25d is not substantially related to the State's interest because puberty blockers can eliminate biological males' athletic advantages. This argument is without merit. Even if this argument were relevant, it is based on the false premise that prepubertal boys have no athletic

Even if Plaintiff's premises were legally relevant, they are false. Indeed, the very source that Plaintiff's expert, Dr. Safer, relies on *refutes* this argument:

> The striking male postpubertal increase in circulating testosterone provides a *major, ongoing, cumulative, and durable physical advantage* in sporting contests by creating larger and stronger bones, greater muscle mass and strength, and higher circulating hemoglobin as well as possible psychological (behavioral) differences. In concert, these render women, on average, unable to compete effectively against men in power-based or endurance-based sports.

DJ HANDELSMAN, ET AL., CIRCULATING TESTOSTERONE AS THE HORMONAL BASIS OF SEX DIFFERENCES IN ATHLETIC PERFORMANCE, 39 *Endocrine Reviews* 803, 805 (2018), https://academic.oup.com/edrv/article/39/5/803/5052770 ("Handelsman Paper") (cited in Shafer Decl., ECF No. 2-1, ¶ 25) (emphasis added).

This "major, ongoing, cumulative, and durable physical advantage" that Plaintiff's own expert validates is a problem Section 25d aims to address—and does so directly and constitutionally. And as the authors of the Handelsman Paper note, males' larger and stronger bones generally result in males having a height advantage over females, which provides an obvious physical advantage in many sports; "greater leverage for muscular limb power exerted in jumping, throwing, or other explosive power activities"; and greater bone density, helping them to avoid stress fractures. Handelsman Paper, at 818-19. The hormone therapy Plaintiff touts does not change this. Moreover, other scientific studies confirm that hormone therapy *does not* eliminate the physical advantages males enjoy over females. *See* Ex. B ¶ 11.c. (administration of testosterone suppressing drugs "does not eliminate the performance advantage of men or adolescent boys over

---

advantages over girls. In fact, studies have shown that boys have athletic advantages over girls that manifest themselves as early as six years of age. Ex. B ¶ 23 (Expert Decl. of Dr. Gregory A. Brown) ("a number of studies indicate that males' athletic advantages over females begin before puberty, and may be apparent as early as six years of age"); *id.* ¶¶ 65–68 (discussing relevant studies comparing boys' and girls' athletic abilities).

women or adolescent girls in almost all athletic contests"); *see also id.* ¶¶ 127-53 (and cited authorities and data); Ex. I (Hilton & Lundberg Sports Medicine Article regarding testosterone suppression and performance advantage).

Plaintiffs' expert, Dr. Safer, is an endocrinologist—not an expert in athletic performance. ECF No. 2-1, ¶¶ 5-13. His opinion about hormone therapy's effect on athletic performance is based not on his expertise studying athletic performance, but in reliance on one article, whose reliability is questionable. This article compares performances of eight transgender women before and after testosterone therapy. *Id.* ¶ 55 (citing Joanna Harper, *Race Times For Transgender Athletes*, 6 J. of Sporting Cultures & Identities, no. 1 at 1-9 (2015) ("Harper Article")). The Harper Article contains shortcomings and limitations "rendering the data and conclusions to be of little to no scientific validity" in proving the overall efficacy of testosterone therapy's ability to eliminate performance advantages. Ex. B ¶ 154-61 (discussing the flaws of the Harper Article).

In contrast to Dr. Safer, Dr. Gregory Brown is an expert in sports science and professor of exercise science at the University of Nebraska. Ex. B, ¶ 1. His thorough opinion, supported by scientific studies and data, is that biological male physiology—not merely currently circulating testosterone—is why males have a decided advantage over females in athletic contests. *Id.* ¶ 11.b; *see also id.* ¶¶ 77-125 (relying on numerous authorities to describe physiological differences between the sexes). Due to males' physiological differences from women, the administration of androgen inhibitors (i.e., drugs designed to reduce circulating testosterone levels) to male-to-female transgender persons *does not* eliminate their performance advantages. *See id.* ¶¶ 11.c. ¶¶ 127-53. Plaintiff's suggestion that limited hormone therapy is enough to equal the playing field between males and females does not stand up to scientific scrutiny much less the demanding preliminary injunction standard.

In an effort to promote Plaintiff's narrative that Section 25d was the product of animus toward transgender persons and was based on unfounded stereotypes, Plaintiff argues that there is no need to protect athletic opportunities for biological females by excluding biological males from their sports.[6] Rather, as the OCR determined, allowing male-to-female transgender athletes to compete in female sports "place[s] female student athletes in athletic events against male student-athletes, resulting in competitive disadvantages for female student-athletes," denying female student-athletes "the opportunity to compete in events that [are] exclusively female," and denying "female student-athletes athletic opportunities that [are] provided to male student-athletes." Ex. D at 4. Through Section 25d, the Legislature has provided a reasonable, legally permissible means to prevent these wrongs from occurring.  Thus Plaintiff fails to show unconstitutional different treatment under the Equal Protection Clause.

### B.     Plaintiff's Title IX Claim Is Unlikely To Succeed On The Merits.

Plaintiff also fails to appreciate Title IX *requires* some different treatment between the biological sexes. So not only does Section 25d *not* violate Title IX, the law strengthens the goals of Title IX in West Virginia. Thus Plaintiff has not made a clear showing of a likelihood of success on the merits on the Title IX challenge to Section 25d.

### 1.     The Purposes And Achievements Of Title IX.

Title IX was designed to eliminate significant "discrimination against women in education." *Neal v. Bd. of Trs. of Cal. State Univs.*, 198 F.3d 763, 766 (9th Cir. 1999) (citing *N. Haven Bd. of Educ. v. Bell*, 456 U.S. 512, 523-24 & n.13 (1982)). It mandates that no person "shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to

---

[6] This Court should reject Plaintiff's attempt to impute to the State an illegal bias or animus. In doing so, Plaintiff fails to appreciate that it is permissible for schools to provide single-sex sports teams. Thus, it was not animus or illegal bias for the State to conclude that, in establishing sports teams separated by biological sex, the student's biological sex was relevant.

discrimination under any education program or activity receiving Federal financial assistance." 20 U.S.C. § 1681(a).

While Title IX does not mention athletics specifically, it applies as rigorously to athletic programs of schools as to academic programs. 34 C.F.R. § 106.41(a). In 1975, at Congress' express direction, the executive branch promulgated implementing regulations for Title IX, which made explicit Title IX's application to school athletic programs. 34 C.F.R. § 106.41. Section (a) declares that "[n]o person shall, on the basis of sex, be excluded from participation in, be denied the benefits of, be treated differently from another person or otherwise be discriminated against in any interscholastic, intercollegiate, club or intramural athletics offered by a recipient, and no recipient shall provide any such athletics separately on such basis." 34 C.F.R. § 106.41(a). Like the text of Title IX itself, the regulation is sex-neutral on its face, but "it would require blinders to ignore that the motivation for the promulgation of the regulation" was to increase opportunities for girls. *Williams v. Sch. Dist. of Bethlehem*, 998 F.2d 168, 175 (3d Cir. 1993).

The regulation authorizes "separate teams for members of each sex where selection for such teams is based upon competitive skill or the activity involved is a contact sport," which is provided "nowithstanding" the requirements of subsection (a). 34 C.F.R. § 106.41(b). And § 106.41(c) requires that all subject entities "shall provide equal athletic opportunity for members of both sexes." The factors to consider in determining whether equal opportunities are available include whether the program provides "levels of competition" that "effectively accommodate the . . . abilities of members of *both* sexes," and whether the program provides equal opportunities for public recognition or "publicity" to *both* sexes. *Id*. §§ 106.41(c)(1), (10) (emphases added).

Title IX does not require that all athletic teams and competitions be co-ed. In many sports, Title IX's goal of non-discrimination could not be achieved with sex-blind programs. Thus Title

IX is different from the civil rights statutes that are concerned with race, such as Title VI and VII and the court cases interpreting those statutes. Indeed, the U.S. Department of Education's Office of Civil Rights in a 1996 "Dear Colleague" letter accompanying a formal "Clarification of Intercollegiate Athletics Policy Guidance: The Three-Part Test" (the "1996 Clarification"), noted that Title IX is "unique" in this respect and in "contrast" to Title VI, which would prohibit without exception "separate athletic programs on the basis of race or national origin."[7] Indeed, the Supreme Court recently recognized that Title IX is different than Title VII. *Bostock v. Clayton Cty.*, 140 S. Ct. 1731, 1753 (2020).[8]

Before the enactment of Title IX in 1972, schools often emphasized boys' athletic programs "to the exclusion of girls' athletic programs," *Williams*, 998 F.2d at 175, and vastly fewer girls participated in competitive interscholastic athletics than boys. Title IX has been strikingly successful in changing this. "For example, between 1972 and 2011, girls' participation in high school athletics increased from approximately 250,000 to 3.25 million students."[9] Title IX is regularly given substantial credit for this sea change. *E.g., Neal*, 198 F.3d at 773.

As the historical agency interpretations, implementing regulations, and controlling case law establish, the term "sex" in this context can only reasonably be understood to mean biological

[7] U.S. DEP'T OF EDUC., OFFICE OF C.R., OCR-00016, CLARIFICATION OF INTERCOLLEGIATE ATHLETICS POLICY GUIDANCE: THE THREE-PART TEST (Jan. 16 1996), *available at* https://www2.ed.gov/about/offices/list/ocr/docs/clarific.html. The Second Circuit has found the 1996 Clarification is "entitled to substantial deference under *Auer v. Robbins*, [519 U.S. 452, 461 (1997)]." *Biediger v. Quinnipiac Univ.*, 691 F.3d 85, 97 (2d Cir. 2012) (citation omitted).
[8] *See also* U.S. DEP'T OF EDUC., OFFICE OF GEN. COUNSEL, MEMORANDUM FOR KIMBERLY M. RICHEY ACTING ASSISTANT SECRETARY OF THE OFFICE FOR CIVIL RIGHTS (Jan. 8. 2021), https://www2.ed.gov/about/offices/list/ocr/correspondence/other/ogc-memorandum-01082021.pdf?utm_content=&utm_medium=email&utm_name=&utmsource=govdelivery&utm_term=.
[9] U.S. DEP'T OF EDUC., OFFICE OF C.R., PROTECTING CIVIL RIGHTS, ADVANCING EQUITY 33 (Apr. 2015), https://www2.ed.gov/about/reports/annual/ocr/report-to-president-and-secretary-of-education-2013-14.pdf.

14

sex—not the person's internal sense of being male or female, or their outward presentation of that internally felt sense ("gender identity"), as Plaintiff argues.

It has long been recognized in law that biological females and biological males are different in ways that are relevant to athletics because of physiological differences between males and females. *See Virginia*, 518 U.S. at 533. The Ninth Circuit, ruling against a boy's challenge to a high school policy excluding males from participating on the girls' volleyball team, affirmed that the exclusion of boys was necessary to secure equal opportunity and treatment for female athletes. *See Clark*, 695 F.2d 1126. It found it a "physiological fact" to reveal that "males would have an undue advantage competing against women," and that the evidence was clear that "due to average physiological differences, males would displace females to a substantial extent if they were allowed to compete for positions" on the women's team. *Id*. at 1131. The result would be that "athletic opportunities for women would be diminished." *Id*.; *see also Williams*, 998 F.2d at 178. Accordingly, under Title IX and its implementing regulations as currently written and interpreted—which Plaintiff *does not* challenge—schools *must* consider students' biological sex when determining whether male and female student athletes have equal opportunities to participate. *McCormick v. Sch. Dist. of Mamaroneck*, 370 F.3d 275, 287 (2d Cir. 2004).

### 2. Section 25d Furthers, Not Violates, Title IX.

With this background, nothing in Section 25d is contrary to Title IX or its implementing regulations. Plaintiff argues that the case does not challenge sex separation in sports. ECF No. 19 at 16. But that is precisely the logical implication of Plaintiff's position. Title IX uses the term "sex." The interpretive regulations use the term "sex" to mean the two biological sexes, male and female. Moreover, even the Supreme Court has consistently recognized the term to identify *only two* sexes—male and female. *Bostock*, S. Ct. at 1739 (proceeding on the assumption that at the time Title VII's passage, the term sex "referr[ed] only to biological distinctions between male and

female" and did not include "norms concerning gender identity"); *see* 34 C.F.R. § 106.41(c) (recipients "shall provide equal athletic opportunity for members of *both* sexes") (emphasis added). The ordinary meaning of "both" connotes two. Contrary to this regulation—which Plaintiff does not challenge—Plaintiff asserts at least four "genders" or "gender identities." Plaintiff's firmly held belief does not make it the law, and it certainly is not consistent with the text of Title IX and its regulations.

In fact, statutory and regulatory text and structure, contemporaneous Supreme Court authorities, and historic practices demonstrate that the ordinary public meaning of the term "sex" at the time of Title IX's enactment could only have been, as Justice Gorsuch put it, "biological distinctions between male and female." *Bostock*, S. Ct. at 1739; *see* 20 U.S.C. §§ 1681(a), 1686; *Frontiero v. Richardson*, 411 U.S. 677, 686 (1973) (plurality op.) ("[S]ex, like race and national origin, is an immutable characteristic determined solely by the accident of birth."); 34 C.F.R. §§ 106.32(b)(1), 106.33, 106.34, 106.40, 106.41, 106.43, 106.52, 106.59, 106.61. *Bostock* continued this understanding that the ordinary public meaning of the term "sex" in Title VII means biological distinctions between male and female. *Bostock*, 140 S. Ct. at 1738-39; *see also id.* at 1784-91 (Alito, J. dissenting). This is consistent with, and further supports, the long-standing and unchallenged agency construction of the term "sex" in Title IX to mean *biological* sex, male or female. In short, the physical differences between biological males and biological females and the resulting need to consider those differences for purposes of ensuring equal opportunity for "both sexes" is precisely what the exceptions for separate sports in the longstanding Title IX regulations are all about. 34 C.F.R. § 106.41.

Plaintiff's argument otherwise is unpersuasive. While Plaintiff accepts the fact that Title IX authorizes sports teams separated by sex—indeed, Plaintiff seeks to join the female teams that

are separated from male teams—the implementation of Plaintiff's position would allow Plaintiff to participate on teams contrary to the basis for the separation. Bridgeport Middle maintains sex-separated cross-country and track teams, and under Section 25d, Plaintiff would be entitled to join the boys' teams. But requiring the school to allow Plaintiff, a biological male who identifies as female, to join the female team compromises the separation of athletics as explicitly authorized by Title IX and its implementing regulations—which again, go unchallenged here.

Seeking to overcome this logical barrier, Plaintiff argues that the State applied its own "discriminatory" notions of what "sex" means. ECF No. 19 at 20. To the contrary,  the Legislature relied on the commonly accepted definition of the word "sex" as referring to the physiological differences between biological males and females, including in statute, regulations, and controlling caselaw from the Supreme Court. Any other reading would impede the purposes of Title IX because sex—not gender identity—governs physiological athletic ability.  Thus, for purposes of access to sex-separated athletics, Plaintiff's sex is male.

To be sure, Plaintiff is correct that Section 25d does make distinctions "based on sex," as Title IX actually requires in this context. Indeed, the statute uses language *specifically condoned* by the Supreme Court as recently as last year. *Compare Bostock*, 140 S. Ct. at 1751 (referring to the term "biological sex.") *with* § 18-2-25d(b)(1) ("biological sex"). The Supreme Court-approved language, therefore, treats similarly situated persons equally and is in compliance with Title IX's directives.

Plaintiff's pervasive reliance on the Fourth Circuit's decision in *Grimm* to assert an different interpretation of Title IX is unpersuasive. First, *Grimm* simply has no application here because it does not interpret the provisions of Title IX relating to athletics, including its implementing regulations. Those regulations are separate and different from other Title IX

provisions. Moreover, *Bostock* and other Supreme Court decisions control on this point, absent a clear direction from the Fourth Circuit, which simply does not appear in *Grimm*. Using *Grimm*'s question of whether the law treats similarly situated people the same, Plaintiff claims that Section 25d does not. But under *Bostock and the* controlling regulations, Section 25d *does* treat similarly situated people the same. As noted, Title IX athletic regulations contemplate two sexes based on *biological* sex. It does not contemplate segregating sports based on "gender identity," which can, and according to Plaintiff does, change from time to time. Athletic teams are separated into male and female athletes. The statute, the regulations, and all relevant circuit court cases consistently look at this based on *biological* sex, which is precisely what Section 25d does.

Ultimately, it is Plaintiff who asks the State to discriminate on the basis of gender identity by redefining eligibility for participation in women's sports. By defining such eligibility on the basis of (biological) sex, however, Section 25d disregards gender identity, thus hardly discriminating "on the basis" of it. There is no Title IX violation here.[10]

## II.     Neither The Balance Of Hardships Nor The Public Interest Favors An Injunction.

In evaluating Plaintiff's entitlement to a preliminary injunction, this Court "must balance the competing claims of injury and must consider the effect on each party of the granting or withholding of the requested relief. In exercising their sound discretion, courts of equity should pay particular regard for the public consequences in employing the extraordinary remedy of

---

[11] From the enactment of the Title IX women's athletics regulations until as late as January 2021, the U.S. Department of Education and the Department of Justice have repeatedly taken a position consistent with that set forth in Section 25d, both before and after *Bostock*. *See supra* notes 7 & 8; *see also* ECF No. 75, Statement of Interest of the United States, *Soule v. Conn Ass'n of Sch*s., 3:20-cv-00201 (D. Conn. Mar. 24, 2020); ECF No. 45, Br. of United States as Amicus Curiae, *Hecox v. Little,* No. 20-35813 (9th Cir. Nov. 19, 2020). Thus the United States' Statement of Interest in this case contradicts its long-held view without subjecting this new interpretation to public review and comment.

injunction." *Winter*, 555 U.S. at 24 (citations omitted). Plaintiff does not satisfy these requirements, either.

To begin with, in arguing that the equities favor an injunction, the focus is solely on Plaintiff's experience—yet this ignores the interests of *all* female athletes who will benefit from Section 25d. *See* Ex. B. Plaintiff simply asserts that an injunction "would not harm Defendants," explaining that "no 'problems'" have been "reported" in West Virginia, according to snippets of reports on statements from certain members of state government. ECF No. 19 at 26.

Plaintiff's say-so assertion that no harm will come from an injunction is wrong. On the contrary, nationwide attention has recently been given to the U.S. Department of Education Office for Civil Rights investigation and litigation in Connecticut, where opportunities for participation, advancement, victory opportunities, and public recognition have been taken from many girls as a result of the participation of just two biologically male athletes in Connecticut girls' track competitions. Ex. D, at 18-27. Chelsea Mitchell, one of the girls harmed in this way and one of the complainants to OCR, details the harms that she personally suffered in a sworn declaration. Ex. C. Those harms included being denied "four state championship titles, two All New England awards, medals, points, and publicity"—all as a result of the state athletic conference policy that grants male athletes entrance to female competitions. *Id*. ¶ 6. And when a biologically male athlete swept several female state championships and titles and was named "girls . . . athlete of the year" by the local paper, Chelsea understandably felt the injustice this implied against those who are in fact biologically female athletes. *Id*., ¶ 33. She hopes that future female athletes may be spared the "anxiety, stress, and performance losses" that she suffered due to biological male competition in female events. *Id*. ¶ 47. Chelsea's narrative shows the real harm that is both predictable and experienced when biological males compete in girls' or women's leagues based on claims of

19

gender identity. While Plaintiff ignores this, this Court should not. Indeed, it was the harms that Chelsea describes that caused OCR to conclude that "by permitting the participation of biologically male students in girls' interscholastic track in the state of Connecticut, [the Connecticut league and member schools] denied female student-athletes benefits and opportunities" including equal opportunities "to place higher in . . . events; to receive awards and other recognition; and possibly to obtain greater visibility to colleges and other benefits," and so *violated* Title IX. Ex. D, at 37.

Finally, unlike the plaintiffs in *Clark* who had no boys' volleyball team to play on, there is no dispute that Plaintiff has options to participate in school sports under Section 25d. It is undisputed Plaintiff can try out for the boys' cross-country and track teams. Thus Plaintiff does not satisfy that the balance of hardships and the public interest weighs in favor of injunctive relief.

## CONCLUSION

For these reasons, Plaintiff's motion for preliminary injunction should be denied.

**Respectfully submitted,**

**THE STATE OF WEST VIRGINIA,**

**PATRICK MORRISEY**
**ATTORNEY GENERAL OF WEST VIRGINIA**

/s/ Curtis R. A. Capehart
Douglas P. Buffington, II (WV Bar # 8157)
*Chief Deputy Attorney General*
Curtis R. A. Capehart (WV Bar # 9876)
*Deputy Attorney General*
Jessica A. Lee (WV Bar # 13751)
*Assistant Solicitor General*
State Capitol Complex
Building 1, Room E-26
Charleston, WV 25305-0220
Email: Curtis.R.A.Capehart@wvago.gov
Telephone: (304) 558-2021
Facsimile: (304) 558-0140