IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA
CHARLESTON DIVISION

B.P.J., by her next friend and mother, HEATHER
JACKSON,

                          *Plaintiff*,

v.                                                    Civil Action No. 2:21-cv-00316
                                                      Hon. Joseph R. Goodwin, District Judge

WEST VIRGINIA STATE BOARD OF
EDUCATION, HARRISON COUNTY BOARD
OF EDUCATION, WEST VIRGINIA
SECONDARY SCHOOL ACTIVITIES
COMMISSION, W. CLAYTON BURCH in his
official capacity as State Superintendent, and
DORA STUTLER in her official capacity as
Harrison County Superintendent,

                          *Defendants*.

**DEFENDANT HARRISON COUNTY BOARD OF EDUCATION AND
DEFENDANT DORA STUTLER IN HER OFFICIAL CAPACITY'S
RESPONSE IN OPPOSITION TO
PLAINTIFF'S MOTION FOR PRELIMINARY INJUNCTION**

          The Harrison County Board of Education and Dora Stutler in her official capacity

as Harrison County Superintendent (collectively, "the County Board") cannot be liable to

Plaintiff because they were not responsible for and did not pass the West Virginia statute ("the

Act") at issue in this civil action.[1]  On July 8, 2021, the Act will go into effect in order to clarify

that girls' sports teams are closed to biological boys, regardless of their gender identity.  The Act

was passed by the West Virginia Legislature and signed by the State's Governor, and if it goes

into effect, it will preclude B.P.J. from joining the girls' track and cross-country teams.  The

County Board has no policy or custom that would prevent B.P.J. from joining the girls' teams

due to transgender status.  However, the County Board is required to follow the law, and so it is

tasked with enforcing the Act when (or if) it goes into effect.  Of course, if the Act does not go into effect (because, for example, the Court enjoins any of the defendants), the County Board will not enforce it, and the County Board will not prevent B.P.J. from trying out for girls' athletic teams based on transgender status.

While the County Board did not have any role in the passage of the Act, Plaintiff has asserted claims seeking equitable and monetary damages (including attorneys' fees) against it.  The County Board, however, cannot be liable to Plaintiff because its own decisions, policies, and customs are not at issue; rather, a State law is at issue.  The County Board is merely required to enforce State law, which is not a basis for liability under the Equal Protection Clause or Title IX.  Because the County Board has been sued for damages, fees, and costs, however, it finds itself in the position of having to defend a statute it had no part in forming or passing.  To that extent, the County Board observes that there is a clear legal basis for finding that the Act survives legal scrutiny under Title IX and Equal Protection review.

In the end, as demonstrated below, B.P.J. is not entitled to relief against the County Board because, at the very least, she has no likelihood of success on the merits against it.

## I. INTRODUCTION

### A.    Factual background

Plaintiff, B.P.J., is an eleven-year-old transgender girl.[2]  B.P.J. wishes to try out for the girls' cross-country (in the fall) and track (in the spring) teams at school.[3]  Earlier this year, the West Virginia Legislature passed (and the Governor subsequently signed) H.B. 3293

---

[1]      B.P.J. has also sued the West Virginia State Board of Education and W. Clayton Burch in his official capacity as State Superintendent (collectively, "the State Board") and the West Virginia Secondary School Activities Commission ("the WVSSAC").

[2]      (Compl. ¶¶ 1–2.)

[3]      (Pl.'s Mem. at 1; Compl. ¶¶ 1, 36–40.)

("the Act").[4]   The Act is scheduled to go into effect July 8, 2021, and, if it does, it will prevent B.P.J. from playing on the girls' teams beginning on August 2, 2021 (the first possible date on which B.P.J.'s school will treat B.P.J. differently from biological girls).[5]   The Act will define "male" and "female" based on "biological sex determined at birth" and will contain the following provision:

> Athletic teams or sports designated for females, women, or girls shall not be open to students of the male sex where selection for such teams is based upon competitive skill or the activity involved is a contact sport.

W. VA. CODE § 18-2-25d(b), (c)(2) (eff. July 8, 2021).[6]

As expressly set out in the Act, the Legislature's purpose was to clarify the law regarding who can play on a girls' sports team.[7]   It did so in order to recognize the inherent relevant differences between biological males and biological females in the context of physical athletic competition.[8]   Specifically, the Legislature recognized that biological boys and biological girls are not "similarly situated" in the contexts of safe physical contact and fair competitive tests of physical skill, and that—as well as or better than one's identity or any other measure—biological sex serves as the safest, fairest way to group students into teams.[9]

The typical physical differences between biological boys and biological girls are reflected in, for example, the fact that the equipment and associated requirements for boys' sports are often very different from the equipment and requirements for girls' sports, and where

---

[4]      (*See* Compl. ¶ 2.)

[5]      (*Id.* ¶ 61; DE# 36, at 5.)

[6]      (*See also* Compl. ¶ 2;  *id.* at Unnumbered Ex. thereto (Decl. of L. Stark) (DE# 1-1) at Ex. A thereto (text of enrolled H.B. 3293).)

[7]      *See* W. VA. CODE § 18-2-25d (eff. July 8, 2021).

[8]      *Id.*

[9]      *See, e.g.*, W. VA. CODE § 18-2-25d(a)(4) and (5) (eff. July 8, 2021) ("Classifications based on gender identity serve no legitimate relationship to the State of West Virginia's interest in promoting equal athletic opportunities for the female sex").

12853520

they are, they reflect that boys are generally taller, bigger, faster, and stronger than girls.  For example, the National Federation of State High School Associations' ("NFHS") *Rules Book, Track and Field and Cross Country* (2020)[10] (the rules governing track and field and cross country in West Virginia[11]) requires that the boys' discus, shot, javelin, *etc.*, are larger than the girls' discus, shot, javelin, *etc.*[12]  Boys' hurdles are taller and are more widely spaced than the girls' hurdles.  And boys' jumps are longer than the girls'.[13]  Boys have a decathlon (with ten consecutive events);  girls have a heptathlon (with seven events).[14]  Without belaboring the point, the list is extensive.

These natural trends in the physical differences between biological boys and biological girls have led to concerns about competitive fairness to, and, more importantly, the safety of, biological girls when playing with and against biological boys.  Examples from other states and levels of sports have been well-documented in the press.

**B.    Procedural history**

On May 26, 2021, B.P.J. sued the State Board, the County Board, and the WVSSAC, claiming that Defendants violated Title IX of the Educational Amendments of 1972, 20 U.S.C. §§ 1681 *et seq.* ("Title IX") (Count I) and 42 U.S.C. § 1983 by violating the Equal Protection Clause of the Fourteenth Amendment[15] ("EPC") (Count II).  B.P.J. seeks a declaratory

---

[10]    There are no 2021 rules for track and field or cross country.  *See Track and Field & Cross Country Rules Changes* (Feb. 10, 2021), *available at* https://www.nfhs.org/sports-resource-content/track-and-field-cross-country-rules-changes/ ("NOTE: Due to the cancellation of spring sports last year because of the Coronavirus, the 2020 NFHS Track and Field Rules will be used for the 2021 season.").

[11]    W. VA. CODE ST. R. § 127-3-22.1 ("Cross country rules published by the NFHS are the official rules for all interscholastic competition unless otherwise provided by Commission modification."); W. VA. CODE ST. R. § 127-3-29.1 ("Track and Field rules published by the NFHS are the official rules for all interscholastic competition unless otherwise provided by Commission modification.").

[12]    (*See generally Rules Book, Track and Field and Cross Country* (2020), available on request.)

[13]    (*Id.*)

[14]    (*Id.*)

[15]    U.S. CONST. Am. XIV.

4

judgment declaring that the Act violates Title IX and the EPC, a preliminary injunction and (eventually) a permanent injunction mandating that Defendants put B.P.J. on the girls' team(s) (and to do so without B.P.J. having to post a bond), nominal damages, reasonable attorneys' fees, and unspecified relief.[16]

## II. ANALYSIS

As demonstrated below, B.P.J. is not entitled to the sought-after preliminary injunction because the County Board has not caused and never will cause any injury that B.P.J. claims has happened or will happen.  In any event, B.P.J. has not met the other requirements for issuance of a preliminary injunction.

"A plaintiff seeking a preliminary injunction must establish [1] that [the plaintiff] is likely to succeed on the merits, [2] that [the plaintiff] is likely to suffer irreparable harm in the absence of preliminary relief, [3] that the balance of equities tips in [the plaintiff's] favor, and [4] that an injunction is in the public interest."[17]  A preliminary injunction "is never awarded as of right . . . ."[18]  Rather, it "is an extraordinary remedy afforded prior to trial at the discretion of the district court that grants relief *pendente lite* of the type available after the trial."[19]

"Federal decisions have uniformly characterized the grant of interim relief as an extraordinary remedy involving the exercise of a very far-reaching power, which is to be applied 'only in [the] limited circumstances' which clearly demand it"[20]—*i.e.*, "in limited circumstances

---

[16]     (*See* Compl. at Prayer.)

[17]     *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008) (citations omitted);  *see also Real Truth About Obama, Inc. v. FEC*, 575 F.3d 342 (4th Cir. 2009) (overruling *Blackwelder Furniture Co. of Statesville v. Seilig Mfg. Co.*, 550 F.2d 189 (4th Cir. 1977)), *cert. granted, judgment vacated on other grounds and remanded*, 559 U.S. 1089 (2010), *standard reaffirmed in* 607 F.3d 355 (4th Cir. 2010).

[18]     *Munaf v. Geren*, 553 U.S. 674, 690 (2008).

[19]     575 F.3d at 345–46.

[20]     *Direx Israel, Ltd. v. Breakthrough Med. Corp.*, 952 F.2d 802, 811 (4th Cir. 1991) (citation omitted).

and then only sparingly."[21]   The Supreme Court has even called preliminary injunctions "drastic."[22] An appellate court, for example, "should be particularly 'exacting' in its use of the abuse of discretion standard when it reviews an order granting a preliminary injunction."[23] Injunctive relief thus "should not be granted unless the movant, *by a clear showing*, carries the burden of persuasion."[24]  Thus, B.P.J. "must demonstrate by 'a clear showing'"[25] that her claims are "likely to succeed on the merits at trial,"[26] which this Court has said means that B.P.J. must show that Counts I and II have "a reasonable probability of success."[27]

      **A.**      **B.P.J. is unlikely to succeed on the merits of either claim against the County Board because regardless of whether *the Act* violates Title IX or EPC, *the County Board* has not done and will not do so.**

            **1.**      **The County Board has not and will not violate B.P.J.'s Title IX rights.**[28]

Title IX provides that "[n]o person . . . shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any education program or activity receiving Federal financial assistance."[29]   Nevertheless, applicable regulations allow a recipient to "operate or sponsor separate [athletic] teams for members of each

---

[21]    *In re Microsoft Corp. Antitrust Litig.*, 333 F.3d 517, 526 (4th Cir. 2003), *abrogated on other grounds by eBay, Inc. v. MercExchange, LLC*, 547 U.S. 388 (2006).

[22]    *Weinberger v. Romero–Barcelo*, 456 U.S. 305, 311–12 (1982) ("An injunction is a drastic and extraordinary remedy, which should not be granted as a matter of course.");  *accord Monsanto Co. v. Geertson Seed Farms*, 561 U.S. 139, 165 (2010).

[23]    *Pashby v. Delia*, 709 F.3d 307, 319 (4th Cir. 2013) (citation omitted).

[24]    *Mazurek v. Armstrong*, 520 U.S. 968, 972 (1997) (quotations and citation omitted) (emphasis added in *Mazurek*);  *accord Winter*, 555 U.S. at 22 (recognizing that a preliminary injunction is "an extraordinary remedy that may only be awarded upon a clear showing that the plaintiff is entitled to such relief") (citing *Mazurek*).

[25]    *Real Truth About Obama*, 575 F.3d at 345–46.

[26]    *Id.*;  *accord Winter*, 555 U.S. at 22.

[27]    *Gregor v. W. Va. Secondary Sch. Activities Comm'n*, No. 2:20-CV-00654, 2020 WL 6292813, at *2 (S.D. W. Va. Oct. 27, 2020) (citation omitted).

[28]    B.P.J. does not bring Count I against County Superintendent Stutler, so in this section, "the County Board" does not include County Superintendent Stutler.

[29]    20 U.S.C. § 1681(a).

sex where selection for such teams is based upon competitive skill or the activity involved is a contact sport."[30]   To succeed on a Title IX claim, a plaintiff must prove "(1) that [the plaintiff] was excluded from participation in an education program 'on the basis of sex'; (2) that the educational institution was receiving federal financial assistance at the time; and (3) that improper discrimination caused [the plaintiff] harm."[31]

"[A] recipient of federal funds may be liable in damages under Title IX **only for its own misconduct**.  **The recipient itself** must 'exclude persons from participation in, . . . deny persons the benefits of, or . . . subject persons to discrimination under' its 'programs or activities' in order to be liable under Title IX."[32]   The Fourth Circuit has thus echoed that "the implied damages remedy is available only when '**the funding recipient engages in intentional conduct** that violates the clear terms of the statute.'"[33]

In *Grimm*, the Court found that the plaintiff had met the three elements of a Title IX claim where *a county school board policy* precluded the plaintiff, Grimm, a transgender male student, from using the boys' restrooms.[34]   The Court recognized that a Title IX regulation (34 C.F.R. § 106.33) permits sex-separated toilet facilities but found that unlawful discrimination nevertheless existed because *the school board itself* had relied "on *its own* discriminatory notions of what 'sex' means."[35]

In the present civil action, in contrast, the County Board is not relying (and will not rely) on its own notions of what "sex" means.  In fact, as explained above, no existing or

---

[30]      34 C.F.R. § 106.41(b).

[31]      *Grimm v. Gloucester Cty. Sch. Bd.*, 972 F.3d 586, 616 (4th Cir. 2020), *as amended* (Aug. 28, 2020) (citation omitted).

[32]      *Davis Next Friend LaShonda D. v. Monroe Cty. Bd. of Educ.*, 526 U.S. 629, 640–41 (1999) (emphasis added) (internal brackets omitted).

[33]      *Baynard v. Malone*, 268 F.3d 228, 237 (4th Cir. 2001) (emphasis added) (quoting *Davis*).

[34]      972 F.3d at 616–17, 619.

[35]      *Id.* at 618 (emphasis added) (citation omitted).

7

future policy, custom, or decision of the County Board is at issue in this civil action. Instead, the County Board is subject to complying with a mandatory state statute. It is undisputed that the County Board will have no choice but to apply the Act starting (in this case) on August 2 (assuming it is in full force and effect at that time).

The Act's wording is clearly mandatory, not merely optional, voluntary, authorizing, *etc.* It *requires* that teams and sports "***shall be*** expressly designated as one of [three choices]."[36] And in its primary provision, it *requires* that teams and sports "designated for females, women, or girls ***shall not be open*** to students of the male sex where selection for such teams is based upon competitive skill or the activity involved is a contact sport."[37] Finally, and most significantly from the County Board's perspective, the Act creates a cause of action that may be brought by "any student aggrieved by a violation of" the Act "against a county board of education" responsible for the violation.[38]

"When the municipality is acting under compulsion of state or federal law, it is the policy contained in that state or federal law, rather than anything devised or adopted by the municipality, that is responsible for the injury."[39] If B.P.J. is found to be injured by the Act, that injury will not, by definition, be caused by the County Board. This case is simply not *Grimm*, where a county board was applying a county board policy, and B.P.J. is not likely to succeed on the merits of Count I against the County Board.

---

[36]      W. VA. CODE § 18-2-25d(c)(1) (eff. July 8, 2021) (emphasis added).

[37]      W. VA. CODE § 18-2-25d(c)(2) (eff. July 8, 2021) (emphasis added).

[38]      W. VA. CODE § 18-2-25d(d)(1) (eff. July 8, 2021).

[39]      *Bethesda Lutheran Home & Servs.*, 154 F.3d at 718.

12853520

**2.      The County Board has not and will not deprive B.P.J. of equal protection.**[40]

For a reason parallel to the one in § II.A.1, B.P.J. also cannot succeed on her EPC argument against the County Board: regardless of whether the Act deprives B.P.J. of an equal protection right, *the County Board* has not done and will not do so.

A local governing body (like a county board of education) can, under limited circumstances, be liable for violating the United States Constitution;  it,

> therefore, can be sued directly under § 1983 for monetary, declaratory, or injunctive relief *where[] . . . the action that is alleged to be unconstitutional implements or executes a policy statement, ordinance, regulation, or decision officially adopted and promulgated by that body's officers*.  Moreover, although the touchstone of the § 1983 action against a government body is an allegation that official policy is responsible for a deprivation of rights protected by the Constitution, local governments, like every other § 1983 "person," by the very terms of the statute, may be sued for constitutional deprivations visited pursuant to governmental "custom" even though such a custom has not received formal approval through the body's official decisionmaking channels.

*Monell v. Dep't of Soc. Servs. of City of New York*, 436 U.S. 658, 690–91 (1978) (emphasis added) (footnote omitted).

This liability has an important and well-circumscribed limit, however:

> On the other hand, the language of § 1983, read against the background of the same legislative history, compels the conclusion that Congress did not intend [local government units] to be held liable unless action pursuant to official [local government unit] policy of some nature caused a constitutional tort.  **In particular, we conclude that a [local government unit] cannot be held liable *solely* because it employs a tortfeasor—or, in other words, a [local government unit] cannot be held liable under § 1983 on a *respondeat superior* theory.**

---

[40]      There will also be a question of standing and mootness against the County Board if the Court grants B.P.J.'s motion against a culpable defendant (*i.e.*, not the County Board) because the County Board has no policy of its own that would, the Act notwithstanding, still require it to *per se* close the girls' teams to B.P.J. There will be, therefore, no reason to retain the County Board as a party.

12853520

436 U.S. at 691 (emphasis added).[41]  Thus,

> "[Local government unit] liability under § 1983 attaches where—
> and only where—a deliberate choice to follow a course of action is
> made from among various alternatives" by [local government unit]
> policymakers. . . . Only where [policy, procedure, custom, etc.]
> reflects a "deliberate" or "conscious" choice by a [local
> government unit]—a "policy" as defined by our prior cases—can a
> [local government unit] be liable for such [policy, etc.] under
> § 1983.

489 U.S. at 389 (second alteration in original) (citation omitted).  A county board is thus only

responsible for its own policies, *etc.*, but *not* for acts that were *not* the result of a deliberate,

conscious choice to follow a course of action made from among various alternatives.  Where a

county has done nothing more than comply with a mandate imposed (by statute, for example) on

the county (by the state, for example), the county has not violated § 1983.[42]

        In *Bethesda Lutheran Homes & Servs., Inc. v. Leean*, 154 F.3d 716 (7th Cir.

1998), for example, the operator of a residential facility for the mentally ill and several current

and future residents thereof sued, *inter alia*, Jefferson County, Wisconsin, for enforcing certain

state and federal Medicaid regulations and, the plaintiffs claimed, thereby violating § 1983 (by,

*inter alia*, violating the plaintiffs' constitutional right to travel).  The district court denied the

plaintiffs' claim "on the ground that . . . a county . . . cannot be held liable under section 1983 for

acts that it did under the command of state or federal law."[43]  Judge Posner noted for the court

---

[41]    *See also id.* 436 U.S. at 691 n.5 (the same rules apply to actions against local government unit
officers, because "official-capacity suits generally represent only another way of pleading an action
against an entity of which an officer is an agent").

[42]    This inquiry is a purely objective one: "[T]he state of mind of local officials who enforce or
comply with state or federal regulations is immaterial to whether the local government is violating the
Constitution if the local officials could not act otherwise without violating state or federal law. The spirit,
the mindset, the joy or grief of local officials has no consequences for the plaintiffs if these officials have
no discretion that they could exercise in the plaintiffs' favor."  154 F.3d at 719.

[43]    154 F.3d at 718.

12853520

that insofar as the county was bound to follow the state and federal laws at issue, the district court's holding was the correct application of Seventh Circuit law.

As that court recognized, "[i]t is difficult to imagine a municipal policy more innocuous and constitutionally permissible, and whose causal connection to the alleged violation is more attenuated, than the 'policy' of enforcing state law."[44]  "If the language and standards from *Monell* are not to become a dead letter, such a 'policy' simply cannot be sufficient to ground liability against a municipality."[45]  This position "has the virtue of minimizing the occasions on which federal constitutional law, enforced through section 1983, puts local government at war with state government."[46]

---

[44]     *Surplus Store & Exch., Inc. v. City of Delphi*, 928 F.2d 788, 791–92 (7th Cir. 1991).

[45]     *Id.* (citation omitted).

[46]     *Bethesda Lutheran Home & Servs.*, 154 F.3d at 718; *see also Vives v. City of New York*, 524 F.3d 346, 356 (2d Cir. 2008) ("We have held today that a municipality cannot be held liable simply for choosing to enforce the entire Penal Law.") (footnote omitted);  *Dakota Rural Action v. Noem*, No. 19-cv-5026, 2019 WL 4546908, at *5 (D.S.D. Sept. 18, 2019) ("Applying this standard [*Monell, et al.*] in this case, Plaintiffs have failed to allege that Pennington County sheriff officials have made any choices at all regarding enforcement of the challenged laws that could cause a violation of Plaintiffs' First Amendment rights.  Plaintiffs' allegations show only that a policy choice was made by State officials."); *Elabanjo v. Bellevance*, No. 1:11-CV-349, 2012 WL 4327090, at *5 (M.D.N.C. Sept. 18, 2012) ("The enforcement of a state statute by a municipality does not qualify as a municipal policy or custom sufficient to support § 1983 liability."), *report and recommendation adopted*, No. 1:11-CV-349, 2012 WL 5864004 (M.D.N.C. Nov. 19, 2012);  *cf. Echnols v. Parker*, 909 F.2d 795, 801 (5th Cir. 1990) ("[W]hen a state statute directs the actions of an official, as here, the officer, be he state or local, is acting as a state official.");  *Doby v. DeCrescenzo*, 171 F.3d 858, 868 (3d Cir. 1999) (accepting that when a county is merely enforcing state law, without adopting any particular policy of its own, it cannot be held liable under the *Monell* line of cases").

In cases where the court found local government liability, it has generally been because the local government unit's conduct was not mandated, but merely allowed (or unrelated) to state or federal law. *See Cooper v. Dillon*, 403 F.3d 1208, 1221–22 (11th Cir. 2005) (police officer's enforcement of state criminal law with no allegation that state law also made it mandatory for him to have done so);  *Garner v. Memphis Police Dept.*, 8 F.3d 358, 364 (6th Cir. 1993) (finding local government unit subject to § 1983 but only because although state statute ostensibly authorized police officer to use what could be excessive force, it had not prevented city from enacting more restrictive and thereby constitutional use-of-force policy); *Evers v. Custer Cty.*, 745 F.2d 1196, 1201 (9th Cir. 1984);  *Humphries v. Los Angeles Cty.*, No. SACV03697JVSMANX, 2012 WL 13014632, at *3 (C.D. Cal. Oct. 17, 2012) ("A municipality cannot be held liable under Monell merely for enforcing a state law.  But where the municipality makes a deliberate choice from among various alternatives to adopt a particular policy, the municipality can be held liable.").  Although *Evers* is occasionally cited as a "*but see*" for the majority position, where the local government

In 1993, the Fourth Circuit looked to the mandatory-voluntary distinction. In *Bockes v. Fields*, 999 F.2d 788 (4th Cir. 1993), Grayson County, Virginia, shared in the implementation of the Commonwealth of Virginia's social services programs. The county had discharged an employee of the Grayson County Board of Social Services in compliance with mandatory Commonwealth board employment rules, "which the local boards must follow."[47] Reversing the district court's refusal to dismiss the County Board, the Fourth Circuit said, "Such bounded, state-conferred discretion is not the 'policymaking authority' for which a county may be held responsible under § 1983."[48]

A month ago, in *Bruce & Tanya & Assocs., Inc. v. Bd. of Supervisors of Fairfax Cty., Va.*, No. 19-1151, 2021 WL 1854750 (4th Cir. May 10, 2021) (unpublished), the Fourth Circuit addressed a case arising from regulation of outdoor advertising in Virginia. The relevant state statute (Sections 1224 and 1225) did not, however, mandate that local governments enforce it.[49] Nevertheless, "Virginia's Commissioner of Highways signed a cooperative agreement with the Fairfax County Board of Supervisors authorizing the latter to enforce Section 1224."[50] Subsequently, the County began aggressively enforcing the Commonwealth's sign statute against the plaintiff ("BTA"), and BTA sued, *inter alia*, the County. The County argued that it was not liable under § 1983 because it was just enforcing a state law.

Noting that "[t]he majority of our sister circuits to consider the question have suggested that a local government can be subjected to *Monell* liability if it makes an independent

---

unit is doing nothing but following state-mandated law, district courts applying *Evers* have not hesitated to dismiss § 1983 claims against them. *See, e.g.*, *Humphries*, 2012 WL 13014632, at *3.

[47]     999 F.2d at 791.

[48]     *Id.*

[49]     2021 WL 1854750, at *9.

[50]     2021 WL 1854750, at *2.

12853520

choice to enforce or follow parameters set by state law, rather than being obliged to do so,"[51] the Court continued following *Bockes* (and *Vives*, *et al.*).[52] The Court found that the County could be liable for enforcing Section 1224 "because it consciously chose to enforce that particular state statute" but that it could not be liable for harms caused by a section of the statute it did not adopt as its own policy.[53] The Court explained, "[a]lthough the County can be liable for enforcing a state regulation it has voluntarily adopted as its own, it cannot be held liable for state statutes it has not consciously adopted into its own policy."[54]

As with Count I, B.P.J. has no likelihood of success on the merits with Count II because it is beyond debate the County Board has no choice but to comply with the Act. The Act creates a cause of action against county boards of education for "[a]ny student aggrieved by a violation of" the Act for injunctive relief, actual damages, attorney's fees, and court costs, and thus the County Board is required to enforce it.[55]

**B.      B.P.J. is unlikely to succeed on the merits of either claim because, applying the correct standard, the Act does not violate Title IX or the EPC.**

As demonstrated above, the County Board is not the entity that might ever *cause* any purported violation of Title IX or the EPC, an independently adequate reason to deny B.P.J.'s motion. The County Board had no part in developing, shaping, or passing the Act, and it has no policy or custom that would *per se* prevent B.P.J. from joining girls' teams based on transgender status. The County Board has no policy or custom directing or providing that transgender girls should be excluded from school athletics. If the Court enters the preliminary injunction requested against any of the defendants and thus keeps the Act from becoming

---

[51]     *Id.*, at *8 (footnote and citations omitted).
[52]     2021 WL 1854750, at *8.
[53]     2021 WL 1854750, at *9-10.
[54]     2021 WL 1854750, at *10.
[55]     W. VA. CODE § 18-2-25d(d)(1) (eff. July 8, 2021).

effective, the County Board will not enforce the Act.  However, the County Board has been sued for damages, fees, and costs over the Act, and it thus finds itself in the position of defending the Act.  To that extent, the Board observes in the following sections that a legal foundation clearly exists for finding that the Act is lawful under Title IX and that the Act does not violate the EPC.

### 1.  Title IX permits sex-separated sports to promote sex equality.

Regulations under Title IX permit a recipient to "operate or sponsor separate [athletic] teams for members of each sex where selection for such teams is based upon competitive skill or the activity involved is a contact sport."[56]  The regulations also require recipients to "provide equal athletic opportunity for members of both sexes," including by considering whether the "levels of competition effectively accommodate the interests and abilities of members of both sexes."[57]  Courts have recognized that provisions such as those contained in the Title IX regulations are important to promote sex equality.[58]

Importantly, the analysis in *Grimm* is not applicable or dispositive here because the *Grimm* Court did not address athletics.  Whereas transgender students may use restrooms corresponding with their gender identity without imposing the dangers of decreased

---

[56]     34 C.F.R. § 106.41(b).

[57]     34 C.F.R. § 106.41(c).

[58]     *See, e.g.*, *Cohen v. Brown Univ.*, 991 F.2d 888, 897 (1st Cir. 1993) ("Equal opportunity to participate lies at the core of Title IX's purpose."); *Clark, By and Through Clark v. Arizona Interscholastic Ass'n*, 695 F.2d 1126, 1130 (9th Cir. 1982) (noting that cases have upheld boys' exclusion from girls' teams as "a legitimate means of providing athletic opportunities for girls" due to innate physical differences between the sexes); *O'Connor v. Bd. of Ed. of Sch. Dist. No. 23*, 645 F.2d 578, 582 (7th Cir. 1981) ("Title IX aims to provide equal opportunity in educational programs" and permits "separate-sex teams and . . . exclusion of girls from" certain boys' teams); *Lafler v. Athletic Bd. of Control*, 536 F. Supp. 104, 106 (W.D. Mich. 1982) ("Although many courts have recognized a woman's right to an equal opportunity to participate in sports, . . . courts have also recognized that such equal opportunity may be provided through separate teams or competitions for men and women. . . . The regulations promulgated under Title IX . . . specifically permit the establishment of separate male and female teams in contact sports. The United States Congress, in calling for the provision of 'equal opportunity to amateur athletes ... to participate ... without discrimination on the basis of ... sex ...' in the Amateur Sports Act, 36 U.S.C. s 391(b)(6), anticipated that such equal opportunity would sometimes be provided through the use of separate programs for men and women. . . .") (citations omitted).

14

opportunities for, and compromised safety of, cisgender females, these concerns are present regarding athletic participation, as discussed in more detail in the sections that follow.

It is these concerns that make the Act lawful under Title IX, which permits sex-separated teams and promotes sex equality, because sex-related physical differences make a difference in contact sports and on teams involving competitive skill. That is, competing with boys may cause girls to lose out on opportunities, for example, opportunities to start on or even play for a team and opportunities for scholarships. And competing against boys in contact sports may cause girls to suffer more physical injuries.

In sum, sex-separated sports are lawful, and the Act defines "male" and "female" in a way intended to promote the goal of sex equality in athletics, in compliance with Title IX.

### 2.    The EPC requires only that the Act be substantially related to an important government purpose.

"The Equal Protection Clause of the Fourteenth Amendment provides that '[n]o State shall . . . deny to any person within its jurisdiction the equal protection of the laws. It is 'essentially a direction that all persons similarly situated should be treated alike.'"[59] Courts must, however, also recognize "the practical necessity that most legislation classifies for one purpose or another, with resulting disadvantage to various groups or persons."[60] The threshold question in a court's analysis of an EPC claim, therefore, must be whether the plaintiff has adduced evidence that the challenged government action fails to treat alike all persons similarly situated. If it does not, then the EPC claim fails under any scrutiny.

---

[59]    *Grimm*, 972 F.3d at 606 (quoting *City of Cleburne v. Cleburne Living Ctr.*, 473 U.S. 432, 439 (1985)). It is unclear whether B.P.J. makes a facial or as-applied challenge to the Act. Because B.P.J. attacks the very structure of the Act categorically, the County Board infers that the attack is a facial one. *Cf. United States v. Salerno*, 481 U.S. 739, 745 (1987) ("A facial challenge to a legislative Act is, of course, the most difficult challenge to mount successfully, since the challenger must establish that no set of circumstances exists under which the Act would be valid.").

[60]    *Romer v. Evans*, 517 U.S. 620, 631 (1996).

12853520

If it does, then the government must show: (1) the government's action has a purpose, and (2) that action (*i.e.*, the chosen means to the chosen end) is sufficiently tailored to the purpose. Based on the type of classification at issue, the test is refined to qualify "*how important*" the government's purpose must be, and "*how closely* related" the challenged means must be to accomplishing that purpose.[61]

EPC challenges based on sex, as here, are subject to intermediate scrutiny.[62] Under intermediate scrutiny, "how important" is only "important," and "how closely related" is only "substantially related."[63]   "[L]egislatures are presumed to have acted within their constitutional power despite the fact that, in practice, their laws result in some inequality."[64]

### 3.   The Act works no unequal treatment of students who are materially similarly situated.

A plaintiff must first show "governmental treatment dissimilar to that received by others similarly situated."[65]  It is thus critical to first ascertain how the person who alleges to have been treated differently is "situated" relative to the classification at hand in order to determine whether that person is "similarly situated" to others being classified. For the purposes of the EPC, "similarly situated" means "persons who are in *all **relevant** respects* alike."[66]  Here,

---

[61]     *Cf. United States v. Virginia*, 518 U.S. 515, 533 (1996).

[62]     *See H.B. Rowe Co. v. Tippett*, 615 F.3d 233, 242 (4th Cir. 2010);  *see also Billups v. City of Charleston, S.C.*, 961 F.3d 673, 680 (4th Cir. 2020) (describing intermediate scrutiny as "more lenient" than strict scrutiny);  *Hamilton's Bogarts, Inc. v. Michigan*, 501 F.3d 644, 653 (6th Cir. 2007) (saying that "the lesser standard of intermediate scrutiny . . . would not be a difficult one to meet").

[63]     *Virginia*, 518 U.S. at 524.   Justice Ginsburg's use of the term "exceedingly persuasive justification," *id.*, did not change the jurisprudence in this area; she merely used a different term for the same concept.  *See, e.g., Cohen v. Brown Univ.*, 101 F.3d 155, 183–84 (1st Cir. 1996) ("Under intermediate scrutiny, the burden of demonstrating an exceedingly persuasive justification for a government-imposed, gender-conscious classification is met by showing that the classification serves important governmental objectives, and that the means employed are substantially related to the achievement of those objectives.").

[64]     *Nordlinger v. Hahn*, 505 U.S. 1, 10 (1992) (quotations omitted) (quoting *McGowan v. Maryland*, 366 U.S. 420, 425–26 (1961)).

[65]     *Republican Party of N.C. v. Martin*, 980 F.2d 943, 953 (4th Cir. 1992).

[66]     505 U.S. at 10 (emphasis added);  *accord Veney v. Wyche*, 293 F.3d 726, 730 (4th Cir. 2002).

the "relevant respects" are the students' physical attributes related to whether having them compete with or against a class of other students might result in competitive unfairness to either class or might result in either class being injured.

B.P.J.'s motion is entirely predicated on a faulty formulation of whether students are similarly situated relevant to the Act's ends and means.  For example, B.P.J. argues that the Act treats only transgender girls differently, alleging "that H.B. 3293 was specifically designed to exclude girls who are transgender—*and only girls who are transgender*—from participating on girls' sports teams."[67]  B.P.J. also asserts that "H.B. 3293 . . . discriminates against girls as compared to boys."[68] But, in fact, *only and all biological boys* are prevented from doing anything under the Act (regardless of their gender identity).

B.P.J. asserts that "[t]he legislative findings in H.B. 3293 assert that excluding girls who are transgender from girls' sports teams is not discriminatory because 'biological males and biological females are not in fact similarly situated' for purposes of sex-separated athletic teams."[69]  But, B.P.J.'s argument goes, this finding is irrelevant because "B.P.J. is not a cisgender boy."[70]  This is a *non sequitur*, though;  the Act closes biological girls' teams to all biological boys, *regardless of their gender identity*, because it is not gender identity that causes the problems that the Act sets out to prevent.   Instead, biological sex is the trait far more substantially related to the Act's goals.

The Act expressly and unambiguously excludes ***all biological boys*** from girls' teams, ***regardless of their gender identity***—*i.e.*, both biological boys who identify as girls *and biological boys who identify as boys*.  The material "situation" of such students is that by virtue

---

[67]    (Pl.'s Mem. at 18 (emphasis added).)
[68]    (*Id.* at 19 (footnote omitted).)
[69]    (*Id.* at 15.)
[70]    (*Id.*)

12853520

of *being* biological boys—*not* by virtue of their gender identity—allowing them to play on girls' teams with biological girls will be physically unfair and dangerous to biological girls.

### 4. Student safety and fair competition are important governmental interests.

The Act's goals are to prevent the physical differences between biological boys, regardless of their gender identity, and biological girls from causing a competitive disadvantage to or—worse—injury to biological girls who may otherwise compete with or against biological boys, regardless of their gender identity.  B.P.J. does not challenge the importance of those goals.

It is critical to bear in mind that the Act need not have unachievable perfect goals (as is never the scrutiny) or even achievable "compelling" interests (as is the case with strict scrutiny).  It need only have "important" goals.[71]  Applying the correct scrutiny, it is clear that safety and fairness to girls are important governmental purposes.[72]

### 5. Closing girls' sports teams to biological boys is substantially related to accomplishing safety and fairness to biological girls.

#### a) Biological sex is substantially related to the Act's goals because biological boys are, on average, bigger, stronger, and faster than biological girls.

As detailed above,[73] regardless of their gender identity, biological boys are, on average, bigger, stronger, and faster than biological girls.[74]  This inexorably leads to the fact that

---

[71]     *See also Mazurek v. Armstrong*, 520 U.S. 968, 972 (1997) (courts must not "not assume unconstitutional legislative intent even when statutes produce harmful results").

[72]     *See, e.g.*, *Virginia*, 518 U.S. at 533 ("The heightened review standard our precedent establishes does not make sex a proscribed classification.  Supposed 'inherent differences' are no longer accepted as a ground for race or national origin classifications.  Physical differences between men and women, however, are enduring: '[T]he two sexes are not fungible;  a community made up exclusively of one [sex] is different from a community composed of both.'") (citations omitted);  *id.* at 540 (noting that it was "uncontested that women's admission [to a then all-male military college] would require accommodations, primarily in arranging housing assignments *and physical training programs for female cadets*").

[73]     (*See* § I.A.)

[74]     *See, e.g.*, *Clark, By & Through Clark v. Ariz. Interscholastic Ass'n*, 695 F.2d 1126, 1129–31 (9th Cir. 1982) ("The record makes clear that due to average physiological differences, males would displace

biological girls who play against and with biological boys, regardless of their gender identity, will more likely face unfairness and danger than if they played only against and with other biological girls in contact sports and sports involving competitive skill.

It is undoubtedly true that not every biological boy is larger, stronger, and faster than every biological girl. Thus, it would not be true to say that the presence of any given biological boy on a team with any given biological girl will necessarily and certainly result in an unfair physical competitive disadvantage or heightened risk of physical injury to the biological girl. But that fact does not matter here. Under intermediate scrutiny, the challenged classification need not be unrealistically perfectly related to the government's goals, or even an achievably "narrowly tailored" means (as is the case with classifications subject to strict scrutiny). Instead, the Act only need to be "substantially" related to its goals.

Applying this correct scrutiny, courts routinely accept that a classification that relies on some degree of generality can still be "substantially" related to its end.[75] Thus,

---

females to a substantial extent if they were allowed to compete for positions on the volleyball team. Thus, athletic opportunities for women would be diminished. As discussed above, there is no question that the Supreme Court allows for these average real differences between the sexes to be recognized or that they allow gender to be used as a proxy in this sense if it is an accurate proxy.") (catalogue of cases omitted); *O'Conner v. Board of Education*, 645 F.2d 578 (7th Cir.) (discussing other cases excluding based on a student's sex and saying that "the exclusion was a legitimate means of providing athletic opportunities for girls," noting "that the classification of teams based on sex was based on the innate physical differences between the sexes, [rather than on] generalizations that are archaic [or attitudes of] romantic paternalism," acknowledging "that the sexual classification could be avoided by classifying directly on the basis of physical differences such as height or weight, but concluded that such classifications would be too difficult to devise, primarily because of strength differentials between the sexes," noting that "[h]andicapping competitions . . . would be difficult and contrary to the interest of achieving the best competition possible," noting that "multi-tiered teams . . . were [would be] too expensive to impose on the schools," and concluding "that sex was the only feasible classification to promote the legitimate and substantial state interest of providing for interscholastic athletic opportunities for girls") (scattered alterations in original) (quotations, citations, and parallel citations omitted), *cert. denied*, 454 U.S. 1084 (1981).

[75] A blanket rule limiting selective service registration to men, for example, thus satisfied intermediate scrutiny even "assuming that a small number of women could be drafted for noncombat roles" because "Congress simply did not consider it worth the added burdens of including women in draft and registration plans." *Rostker v. Goldberg*, 453 U.S. 57, 81 (1981). And a social security rule

classification based on average differences can easily withstand intermediate scrutiny.[76]  As a result, it is of inadequate constitutional significance that any one particular student—including B.P.J.[77]—might not have yet gone through puberty and thus not yet gained all or even any of the differences in physical characteristics that medical intervention either can or cannot equalize.  A perfect, or even best possible, fit between a government's chosen means (*i.e.*, the classification) and its important goals is not what *intermediate* scrutiny demands.  Intermediate scrutiny tolerates such imperfections in classifications.

> **b)** **B.P.J.'s assertion that blood testosterone level is a way to sort student athletes into who should be on the girls' teams and who should be on the boys' teams changes nothing.**

The foundation of B.P.J.'s argument against the Act is that participation on girls' sports teams should be determined not based on biological sex at birth but on circulating testosterone levels.  B.P.J. provides voluminous opinions from her proffered expert asserting that lowering testosterone will level the playing field between biological boys and biological girls.  Thus, the argument goes, drawing the line based on circulating testosterone levels is the only acceptable way to achieve the safety of and fairness to both biological girls and transgender girls.

First, the possibility that testosterone levels are *a* way to accomplish the Act's goals does not, under intermediate scrutiny, necessarily mean that testosterone levels are *the only* constitutionally permissible way to do so:  "The existence of [] alternatives shows only that the

---

advantageous to women satisfied such scrutiny because "women *on the average* received lower retirement benefits than men."  *Califano v. Webster*, 430 U.S. 313, 318 n.5 (1977).

[76]     *See, e.g.*, *Clark*, 695 F.2d at 1127 ("According to the stipulated facts there seems to be no question, then, that boys **will on average** be potentially better volleyball players than girls.") (emphasis added); *id.* at 1131 ("The record makes clear that **due to average physiological differences**, males would displace females to a substantial extent if they were allowed to compete for positions on the volleyball team.  Thus, athletic opportunities for women would be diminished.  As discussed above, there is no question that **the Supreme Court allows for these average real differences between the sexes** to be recognized or that they allow gender to be used as a proxy in this sense if it is an accurate proxy.") (emphasis added).

[77]     (*See* Pl.'s Mem. at 20.)

12853520

exclusion of boys is not *necessary* to achieve the desired goal. It does not mean that the required

substantial relationship does not exist."[78]  That is:

> the alternative chosen may not maximize equality, and may
> represent trade-offs between equality and practicality. But since
> absolute necessity is not the standard, and absolute equality of
> opportunity in every sport is not the mandate, even the existence of
> wiser alternatives than the one chosen does not serve to invalidate
> the policy here since it is substantially related to the goal. That is
> all the standard demands. While equality in specific sports is a
> worthwhile ideal, it should not be purchased at the expense of
> ultimate equality of opportunity to participate in sports. As
> common sense would advise against this, neither does the
> Constitution demand it.

695 F.2d at 1131–32 (citation omitted).

Second, awarding relief—even preliminary relief—on an issue as difficult and

consequential at this phase of a civil action where the defendants have not had any meaningful

opportunity to research important and complex issues would be premature.[79]  Cases rarely come

along as important as this one. The issues will be enormously complex. They will undoubtedly

spawn far-reaching sociopolitical debate and require extensive scientific study. The results in

---

[78]     *Clark*, 695 F.2d at 1131.

[79]     Even discounting the other civil actions they have brought, it is clear from, if nothing else, the
sheer volume of B.P.J.'s assertions in this regard that B.P.J.'s counsel has had an enormous head start.
On the other hand, because of the cramped timing of B.P.J.'s motion, the County Board is forced to rely
on anecdotal evidence. And one would have to work hard to avoid even the press reports that the science
on the relationship between testosterone levels and the promotion of fairness and safety is debated. *See,
e.g.*, Dan Avery, *Trans women retain athletic edge after a year of hormone therapy, study finds*, NBC
News (Jan. 5, 2021), *available at* https://www.nbcnews.com/feature/nbc-out/trans-women-retain-athletic-
edge-after-year-hormone-therapy-study-n1252764;  Timothy A. Robert, *et al.*, *Effect of gender affirming
hormones on athletic performance in transwomen and transmen: implications for sporting organisations
and legislators*, BRIT. J. OF SPORTS MED. (vol. 55, issue 11), *abstract available at*
https://bjsm.bmj.com/content/55/11/577.full;  *Trans Athletes Are Posting Victories and Shaking Up
Sports*, WIRED (Oct. 29, 2019), *available at* https://www.wired.com/story/the-glorious-victories-of-
trans-athletes-are-shaking-up-sports/;  Anita Y. Milanovich, Opinion, *Transgender athletes deserve
compassion, but not the right to transform women's sports*, USA Today (Sep. 27, 2019), *available at*
https://www.usatoday.com/story/opinion/voices/2019/09/27/transgender-athletes-supreme-court-sex-
equality-column/2421776001/;  Ross Tucker, Ph.D., *On Transgender athletes and performance
advantage* (with linked sources), *available at* https://sportsscientists.com/2019/03/on-transgender-
athletes-and-performance-advantages/.  The County Board reserves argument on these issues if it
becomes necessary to later address them.

12853520

this case, one of the watershed cases on the issue, will affect (even if not in a legally mandatory way) what governments in other states—unrepresented here—are allowed to do and what liability they will be exposed to.  Granting relief, even preliminary relief, under these circumstances would be inappropriate.[80]

### C.    B.P.J. is unlikely to suffer irreparable harm in the absence of preliminary relief.

B.P.J. is unlikely to suffer irreparable harm in the absence of preliminary relief against the County Board.  First, even if, as B.P.J. suggests, irreparable harm must be presumed where the defendant violates the plaintiff's constitutional rights,[81] as shown *supra*, the County Board has not violated B.P.J.'s constitutional rights, because the County Board has done nothing that (not-yet-effective but soon fully enforceable) state law will not compel it to do under threat of punishment, including another lawsuit.  Thus, no presumption attaches.[82]

Second, *Ross* does not bear the weight that B.P.J. needs the Court to place on it.  In *Ross*, the Fourth Circuit said that "the denial of a constitutional right, if denial is established, constitutes irreparable harm for purposes of equitable jurisdiction."[83]  But this is not an iron-clad statement.  More recently, the Fourth Circuit held that an injunction was not appropriate where, absent an injunction, a for-profit methadone clinic would be forced to move its location due to an

---

[80]      *See, e.g.*, *Applied Partners, Inc. v. Liquasol, LLC*, No. 2:18-CV-00048, 2018 WL 606097, at *1 (S.D. W. Va. Jan. 29, 2018) ("[G]ranting a preliminary injunction requires that a district court, acting on an incomplete record, order a party to act, or refrain from acting, in a certain way.  The danger of a mistake in this setting is substantial.") (quotations and citation omitted);  *cf. Wetzel v. Edwards*, 635 F.2d 283, 286–87 (4th Cir. 1980) ("Furthermore, a preliminary injunction may not be availed of to secure a piecemeal trial. . . .  Generally, the proper administration of justice necessitates that the appellate court have the case completely before it in rendering a decision thereon.").

[81]      *See Ross v. Meese*, 818 F.2d 1132 (4th Cir. 1987).

[82]      *See, e.g.*, *Aslanturk v. Hott*, 459 F. Supp. 3d 681, 700 (E.D. Va. 2020) ("While the Fourth Circuit has indicated that 'the denial of a constitutional right' in its own right 'constitutes irreparable harm for purposes of equitable jurisdiction,' . . ., there must be some constitutional right that has been violated for such a finding."), *reconsideration denied*, No. 1:20-CV-00433, 2020 WL 5745799 (E.D. Va. June 30, 2020) (citation omitted).

[83]      818 F.2d at 1135.

22

ordinance, although a jury had already found in the clinic's favor on its substantive due process claim.[84]  The Court rejected the clinic's *Ross* argument:

> Third, relying on [*Ross*], the Clinic contends that a constitutional violation per se constitutes irreparable harm.  This contention wrenches the *Ross* holding from its context.  The plaintiff in *Ross* alleged violations of her First, Fourth, and Sixth Amendment rights arising out of a series of unlawful searches, and sought to compel the government to destroy the information that it had acquired and to enjoin the offending law enforcement agents from disseminating the information.  The harm at issue here—damage to a business's property interests—is qualitatively different, most clearly because assessing money damages in *Ross* would have been, at the very least, significantly more challenging than in this case.

355 F. App'x at 777 (citation omitted).

Similarly, the harm alleged here—a student's potential inability to, for a limited time, join a particular sex-separated school sports team—is likewise qualitatively different from that alleged in *Ross*, as shown by a Title IX case decided that the Court recently decided. *Gregor*, *supra*, involved a female student who wanted to participate on the boys', instead of the girls', soccer team at her high school.[85]  The Court noted that the plaintiff would be able to participate in at most two games if an injunction were granted, and also noted that the plaintiff had no other option "for playing soccer because she had missed any opportunity to try out for the girls' team or a private club team."[86]

The Court found that the plaintiff would not be irreparably harmed if she was not permitted to play on the boys' team:

> Courts are divided over whether not being able to participate in athletics constitutes irreparable harm.  **But most courts seem to lean toward the harm being irreparable only when the person cannot participate in the sport at all.**  *Reed v. Nebraska School*

---

[84]    *A Helping Hand, LLC v. Baltimore Cty., MD*, 355 F. App'x 773, 775 (4th Cir. 2009) (unpublished).

[85]    2020 WL 6292813, at *1.

[86]    *Id.*, at *4.

*Activities Assoc.*, 341 F. Supp. 258 (D. Neb. 1972) (finding irreparable harm when a girl would not be able to play golf at all if not permitted to play on the boys' golf team); *D.M. by Bao Xing v. Minnesota State High School League*, 917 F.3d 994, 1003 (8th Cir. 2019) (finding irreparable harm when boys would have no school dance team to compete on if not permitted to join the girls' dance team). **Other courts have found that students are not irreparably harmed even when the student is barred from competition for an entire season.**

2020 WL 6292813, at *4 (emphasis added). The United States District Court for the Eastern District of Pennsylvania likewise stated that "[t]his Court, as well as all other federal courts, have previously and consistently held that ineligibility for participation in interscholastic athletic competitions alone does not constitute irreparable harm."[87]

Here, B.P.J. faces no irreparable harm. In the absence of the sought-after preliminary injunction, B.P.J. will: (1) be able to fully participate in summer conditioning, where participants will not be treated differently based on sex, and then (2) be able to try out for either the girls' or the boys' cross-country and track teams. B.P.J. thus has no irreparable harm because Defendants will not be preventing B.P.J. from participating in cross country or track based on transgender status. B.P.J. thus has not shown (and cannot show) irreparable harm from denial of the sought-after preliminary injunction.

**D.    The balance of equities and the public interest favor denying the sought-after preliminary injunction.**

Here, "because the government's interest *is* the public interest," harm to the State should the sought-after preliminary injunction issue is, by definition, also necessarily against the

---

[87]     *Dziewa v. Penn. Interscholastic Athletic Ass'n, Inc.*, No. 08-CV-5792, 2009 WL 113419, at *7 (E.D. Pa. Jan. 16, 2009); *see also Revesz ex rel. Revesz v. Penn. Interscholastic Athletic Ass'n, Inc.*, 798 A.2d 830, 837 (Pa. Commw. Ct. 2002) (finding that "the loss of an opportunity to play interscholastic athletics for one year does not constitute irreparable harm").

12853520

public interest.[88]   And in cases involving the public interest, courts should be reluctant to issue preliminary injunctive relief, because there is nothing to repair the County Board's injuries.[89]

B.P.J. claims that not playing with biological girls will cause emotional pain, sadness, anger, distress, *etc.*,[90] and that playing with biological girls will yield "the opportunity to play sports and the associated experiences of competition, friendship, and responsibility."[91]

But this case is about more than B.P.J.  It is about the fairness to and safety of any number of biological girls who, absent the Act, may have to compete against and engage in athletic competition (including contact sports) with and against biological boys.  Biological girls may face emotional injury, physical injury, and competitive disadvantage from such a situation. Accordingly, the County Board also faces harm if a preliminary injunction is issued, as it may face suits from biological girls asserting such claims – and/or suits brought by cisgender boys who prefer to play on a girls' team like transgender girls would be able to.[92]

Given the significance of the issues in this case, it would be difficult to overstate its importance beyond the parties.  Every other school in West Virginia has been forced to be an unrepresented party to the case.  And every other school in the Nation may be affected, even if indirectly, by the result reached here, even the result of the decision to issue a preliminary

---

[88]       *Pursuing Am.'s Greatness v. Fed. Election Comm'n*, 831 F.3d 500, 511 (D.C. Cir. 2016).

[89]       *See, e.g.*, *Yakus v. United States*, 321 U.S. 414, 440–41 (1944) ("Even in suits in which only private interests are involved the award is a matter of sound judicial discretion, in the exercise of which the court balances the conveniences of the parties and possible injuries to them according as they may be affected by the granting or withholding of the injunction. . . .  But where an injunction is asked which will adversely affect a public interest for whose impairment, even temporarily, an injunction bond cannot compensate, the court may in the public interest withhold relief until a final determination of the rights of the parties, though the postponement may be burdensome to the plaintiff.").

[90]       (*See, e.g.*, Pl.'s Mem. at 2 and 26.)

[91]       (*See, e.g.*, *id.* at 26.)

[92]       The County Board has *jus tertii* standing to assert in this litigation such claims on behalf of non-party students as factors in the preliminary injunction analysis.  *See, e.g.*, *Kanawha Cty. Pub. Libr. Bd. v. Bd. of Educ. of Cty. of Kanawha*, 231 W. Va. 386, 396–97, 745 S.E.2d 424, 434–35 (2013).

12853520

injunction (because as litigators appreciate, holdings in the "likelihood of success on the merits" are frequently cited in other cases in analyzing the merits of the ultimate, permanent outcome).

Finally, B.P.J. argues that:

> it is always in the public interest to "uphold[] constitutional rights."  And "[t]he public interest is certainly served by promoting compliance with Title IX."  "Enforcing [B.P.J.'s] right to be free from discrimination on the basis of sex in an educational institution is plainly in the public interest."

(Pl.'s Mem. at 26 (citations omitted) (alterations in original).)

That argument is entirely circular.  It is akin to saying "the public interest favors the plaintiff *if the plaintiff happens in the end to have been right*, because the public interest always favors the party whose side the law turns out to have been on."  Accepting this argument would render the equity balancing and public interest factors a complete nullity.  It requires assuming up front something that has not been decided yet: *i.e.*, who will win.  On the other side of the same coin, the public interest also supports *not* making an initial demand on a public school system that *is not* required by the law, so *if the County Board ultimately win*s, then the public interest will have supported denying the preliminary injunction.  Without knowing who is *going* to prevail, the importance of enforcing an underlying legal right *if the plaintiff is deprived of it* is exactly as important as *not* enforcing an alleged underlying legal right if the plaintiff is *not* deprived of any actual right.  The fact that the public interest always favors whoever *eventually* wins is simply incapable of having any bearing on the propriety of granting preliminary relief, when the eventual winner is unknown.

At any rate, as shown above, B.P.J. is not likely to succeed on the merits against the County Board because it is not responsible for the Act.  Thus, regardless of the Act's lawfulness, the County Board did not and will not harm B.P.J.  At most, it will enforce the Act as State law, if it goes into effect.  If the Act does not go into effect, the County Board will permit

B.P.J. to try out for girls' sports teams because it has no policy that prohibits B.P.J. from doing so based upon transgender status.  Therefore, no public interest weighs in favor of enjoining the County Board, which will simply enforce whatever law is in effect.

### III. CONCLUSION

B.P.J. has not shown any likelihood of success on the merits on either Count I or Count II because *the County Board* has caused neither the EPC nor the Title IX injuries that B.P.J. alleges will purportedly happen on or after August 2, 2021.  And, although the County Board did not pass the Act and has no policy or custom of its own excluding transgender girls from girls' sports teams, nevertheless, sound legal arguments support the lawfulness and constitutionality of the Act.

The County Board is keenly aware of the context of this civil action, the attention that it will undoubtedly draw, and its importance to the parties, to every other school in West Virginia, and to student athletes, their parents, and schools across the Nation.  But newsworthiness is no substitute for the value of deliberation and merit.  As demonstrated, B.P.J. has not satisfied the requirements to have the Court issue a preliminary injunction.

Accordingly, the Harrison County Board of Education and Harrison County Superintendent Dora Stutler in her official capacity respectfully request the Court to **DENY** B.P.J.'s motion for preliminary injunction as against them.

Respectfully submitted this 23rd day of June, 2021,

/s/ Susan L. Deniker
Susan L. Deniker          (WV ID #7992)
STEPTOE & JOHNSON PLLC                          400 White Oaks Boulevard
   OF COUNSEL                                   Bridgeport, WV 26330-4500
                                                (304) 933-8000

*Counsel for Defendants Harrison County Board of Education and Dora Stutler*

12853520

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA
CHARLESTON DIVISION

B.P.J., by her next friend and mother, HEATHER
JACKSON,

        *Plaintiff*,

v.
        Civil Action No. 2:21-cv-00316
        Hon. Joseph R. Goodwin, District Judge

WEST VIRGINIA STATE BOARD OF
EDUCATION, HARRISON COUNTY BOARD
OF EDUCATION, WEST VIRGINIA
SECONDARY SCHOOL ACTIVITIES
COMMISSION, W. CLAYTON BURCH in his
official capacity as State Superintendent, and
DORA STUTLER in her official capacity as
Harrison County Superintendent,

        *Defendants*.

## <u>CERTIFICATE OF SERVICE</u>

        I hereby certify that on June 23, 2021, I electronically filed a true and exact copy

of "*Defendant Harrison County Board of Education and Defendant Dora Stutler in Her*

*Official Capacity's Response in Opposition to Plaintiff's Motion for Preliminary Injunction*"

with the Clerk of the Court using the CM/ECF system, which will send notification of such filing

to the following counsel of record:

**Andrew D. Barr**
COOLEY
Suite 2300
1144 15th Street
Denver, CO 80202
    *Counsel for Plaintiff*

**Joshua A. Block**
AMERICAN CIVIL LIBERTIES UNION
Floor 18
125 Broad Street
New York, NY 10004
    *Counsel for Plaintiff*

12853520

**Tara L. Borelli**
LAMBDA LEGAL DEFENSE AND
EDUCATION FUND
Suite 640
730 Peachtree Street NE
Atlanta, GA 30308-1210
*Counsel for Plaintiff*

**Kathleen R Hartnett**
COOLEY
5th Floor
101 California Street
San Francisco, CA 94111
*Counsel for Plaintiff*

**Elizabeth Reinhardt**
COOLEY
500 Boylston Street
Boston, MA 02116
*Counsel for Plaintiff*

**Loree Beth Stark**
AMERICAN CIVIL LIBERTIES UNION OF
WEST VIRGINIA
Suite 507
405 Capitol Street
Charleston, WV 25301
914-393-4614
*Counsel for Plaintiff*

**Sruti J. Swaminathan**
LAMBDA LEGAL DEFENSE AND
EDUCATION FUND
19th Floor
120 Wall Street
New York, NY 10005
*Counsel for Plaintiff*

**Carl Solomon Charles**
LAMBDA LEGAL
Suite 640
730 Peachtree Street, NE
Atlanta, GA 30308
*Counsel for Plaintiff*

**Katelyn Kang**
COOLEY
55 Hudson Yards
New York, NY 10001
*Counsel for Plaintiff*

**Avatara Antoinette Smith-Carrington**
LAMBDA LEGAL DEFENSE AND
EDUCATION FUND
Suite 500
3500 Oak Lawn Avenue
Dallas, TX 75219
*Counsel for Plaintiff*

**Julie Veroff**
COOLEY
5th Floor
101 California Street
San Francisco, CA 94111
*Counsel for Plaintiff*

**Aria Vaughan**
DEPARTMENT OF JUSTICE
4CON, 10th Floor
950 Pennsylvania Avenue NW
Washington, DC 20530
*Counsel for Interest Party USA*

12853520

**Douglas P. Buffington, II**
WV ATTORNEY GENERAL'S OFFICE
Building 1, Room 26e
1900 Kanawha Boulevard, East
Charleston, WV 25305
*Counsel for Intervenor State of W. Va.*

**Jessica Anne Lee**
WEST VIRGINIA ATTORNEY GENERAL'S
OFFICE
Building 1, Room E-26
1900 Kanawha Boulevard, East
Charleston, WV 25305
*Counsel for Intervenor State of W. Va.*

**Jennifer M. Mankins**
U. S. ATTORNEY'S OFFICE
P. O. Box 1713
Charleston, WV 26326-1713
*Counsel for Interest Party USA*

**Roberta F. Green**
**Anthony E. Nortz**
**Kimberly M. Bandy**
SHUMAN MCCUSKEY & SLICER
P. O. Box 3953
Charleston, WV 25339
*Counsel for Defendant WVSSAC*

**Curtis R. Capehart**
WV ATTORNEY GENERAL'S OFFICE
Building 1, Room 26e
1900 Kanawha Boulevard, East
Charleston, WV 25305
*Counsel for Intervenor State of W. Va.*

**Fred B. Westfall , Jr.**
UNITED STATES ATTORNEY'S OFFICE
P. O. Box 1713
Charleston, WV 25326-1713
*Counsel for Interest Party USA*

**Kelly C. Morgan**
**Kristen Vickers Hammond**
**Michael W. Taylor**
BAILEY & WYANT
P. O. Box 3710
Charleston, WV 25337-3710
*Counsel for Defendant WVSBE*

/s/ Susan L. Deniker

12853520