IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA
CHARLESTON DIVISION

B.P.J., by her next friend and mother, HEATHER
JACKSON,

*Plaintiff*,

v.

WEST VIRGINIA STATE BOARD OF
EDUCATION, HARRISON COUNTY BOARD
OF EDUCATION, WEST VIRGINIA
SECONDARY SCHOOL ACTIVITIES
COMMISSION, W. CLAYTON BURCH in his
official capacity as State Superintendent, and
DORA STUTLER in her official capacity as
Harrison County Superintendent,

*Defendants*,

and

THE STATE OF WEST VIRGINIA,

*Defendant-Intervenor*.

Civil Action No. 2:21-cv-00316

Hon. Joseph R. Goodwin

## PLAINTIFF'S CONSOLIDATED REPLY IN SUPPORT OF MOTION FOR
## <u>PRELIMINARY INJUNCTION</u>

# TABLE OF CONTENTS

**Page**

INTRODUCTION .................................................................................................. 1

ARGUMENT ....................................................................................................... 2

I.   THE ORIGINAL DEFENDANTS ARE PROPERLY SUBJECT TO
     INJUNCTIVE RELIEF ................................................................................ 2

     A.   This Court Has Jurisdiction Over B.P.J.'s Claims Against The State
          Board. ............................................................................................... 3

          1.   B.P.J. Has Standing ................................................................. 3

          2.   B.P.J.'s Claims Are Ripe. ........................................................ 4

     B.   The County Defendants And School Activities Commission Are Proper
          Defendants. ...................................................................................... 5

          1.   The County Defendants Are Subject To An Injunction ............ 5

          2.   The School Activities Commission Is Subject To An Injunction ...... 7

II.  B.P.J. IS LIKELY TO SUCCEED ON HER TITLE IX CLAIM ..................... 9

     A.   H.B. 3293 Excludes B.P.J. On The Basis Of Sex. ............................ 9

     B.   H.B. 3293 Harms B.P.J. Through Unlawful Discrimination. ............ 12

     C.   Defendants Distort *Grimm*, *Bostock*, And Federal Title IX Guidance. .............. 14

III. B.P.J. IS LIKELY TO SUCCEED ON THE MERITS OF HER EQUAL
     PROTECTION CLAIM ............................................................................. 16

     A.   H.B. 3293 Is Subject To Heightened Scrutiny ................................. 16

     B.   H.B. 3293 Is Not Substantially Related To The Legislature's Asserted
          Interest ............................................................................................ 18

          1.   The Substantial-Relationship Inquiry Focuses On Those Against
               Whom H.B. 3293 Facially Discriminates—Girls Who Are
               Transgender. ........................................................................... 19

          2.   Defendants Fail To Provide Persuasive Arguments That
               H.B. 3293's Categorical Exclusion Of Girls Who Are Transgender
               Is Substantially Related To The Asserted State Interest. .......... 20

          3.   The Attorney General Does Not Show That H.B. 3293's
               Categorical Exclusion Of Girls Who Are Transgender Is
               Substantially Related To The Asserted State Interest. .............. 22

IV.  B.P.J. WILL SUFFER IRREPARABLE HARM WITHOUT A PRELIMINARY
     INJUNCTION ........................................................................................... 26

V.   THE BALANCE OF THE EQUITIES AND PUBLIC INTEREST FAVOR B.P.J. ...... 28

CONCLUSION ................................................................................................... 30

i

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Adams v. Sch. Bd. of St. John's Cnty.*,
  968 F.3d 1286 (11th Cir. 2020) ...................................................................10, 17

*Air Evac EMS, Inc. v. Cheatham*,
  910 F.3d 751 (4th Cir. 2018) ...................................................................................3

*Alston v. Va. High Sch. League, Inc.*,
  144 F. Supp. 2d 526 (W.D. Va. 1999) ..................................................................8, 9

*Applied Partners, Inc. v. Liquasol, LLC*,
  No. 2:18-cv-00048, 2018 WL 606097 (S.D. W. Va. Jan. 29, 2018) ......................27

*Baynard v. Malone*,
  268 F.3d 228 (4th Cir. 2001) ...................................................................................7

*Bostic v. Schaefer*,
  760 F.3d 352 (4th Cir. 2014) ...................................................................................6

*Bostock v. Clayton Cty.*
  140 S. Ct. 1731 (2020) ................................................................................. *passim*

*Brentwood Acad. v. Tenn. Secondary Sch. Athletic Ass'n*,
  531 U.S. 288 (2001)...................................................................................................7

*Charter Fed. Sav. Bank v. Off. of Thrift Supervision*,
  976 F.2d 203 (4th Cir. 1992) ....................................................................................4

*City of Cleburne, Tex. v. Cleburne Living Ctr.*,
  473 U.S. 432 (1995)..................................................................................................26

*City of L.A., Calif. v. Patel*,
  576 U.S. 409 (2015)..................................................................................................20

*Clark v. Ariz. Interscholastic Ass'n*,
  695 F.2d 1126 (9th Cir. 1982) ................................................................................23

*Communities for Equity v. Mich. High Sch. Athletic Ass'n*,
  80 F. Supp. 2d 729 (W.D. Mich. 2000) ...................................................................8

*Condiff v. Hart Cnty. Sch. Dist.*,
  770 F. Supp. 2d 876 (W.D. Ky. 2011).......................................................................7

## TABLE OF AUTHORITIES
(continued)

**Page(s)**

*Duke Power Co. v. Carolina Envtl. Study Grp., Inc.*,
  438 U.S. 59 (1978)................................................................................................4

*Dziewa v. Pa. Interscholastic Athletic Ass'n, Inc.*,
  No. 08-5792, 2009 WL 113419 (E.D. Pa. Jan. 16, 2009).....................................28

*Edmo v. Idaho Dep't of Corr.*,
  358 F. Supp. 3d 1103 (D. Idaho 2018) ................................................................13

*Fitzgerald v. Barnstable Sch. Comm.*,
  555 U.S. 246 (2009)...............................................................................................6

*Franks v. Ross*,
  313 F.3d 184 (4th Cir. 2002) .................................................................................4

*Giovani Carandola, Ltd. v. Bason*,
  303 F.3d 507 (4th Cir. 2002) ...............................................................................28

*Gonzales v. O Centro Espírita Beneficente União do Vegetal*,
  546 U.S. 418 (2006).............................................................................................19

*Gregor v. W. Va. Secondary Sch. Activities Comm'n*,
  No. 2:20-cv-00654, 2020 WL 5997057 (S.D. W. Va. Oct. 9, 2020).....................27

*Grimm v. Gloucester Cnty. Sch. Bd*,
  972 F.3d 586 (4th Cir. 2020) ..................................................................... *passim*

*Hecox v. Little*,
  479 F. Supp. 3d 930 (D. Idaho 2020) .......................................................... *passim*

*Henry v. Greenville Airport Comm'n*,
  284 F.2d 631 (4th Cir. 1960) ...............................................................................26

*Israel by Israel v. W. Va. Secondary Sch. Activities Comm'n*,
  182 W. Va. 454 (1989) ...........................................................................................7

*Jones v. W. Va. State Bd. of Educ.*,
  218 W. Va. 52 (2005)...................................................................................3, 5, 7, 8

*Lawrence v. Texas*,
  539 U.S. 558 (2003).............................................................................................14

*Lexmark Int'l Inc. v. Static Control Components, Inc.*,
  572 U.S. 118 (2014)...............................................................................................3

**TABLE OF AUTHORITIES**
(continued)

Page(s)

*McGee v. Cole*,
   115 F. Supp. 3d 765 (S.D. W. Va. 2015) ....................................................................5

*Miller v. Brown*,
   462 F.3d 312 (4th Cir. 2006) ....................................................................................4

*Monell v. Dep't of Soc. Servs.*,
   436 U.S. 658 (1978) ...........................................................................................5, 6, 7

*N.C. State Conf. of NAACP v. McCrory*,
   831 F.3d 204 (4th Cir. 2016) ..................................................................................18

*Norsworthy v. Beard*,
   87 F. Supp. 3d 1164 (N.D. Cal. 2015) ...................................................................13

*Revesz ex rel. Revesz v. Pa. Interscholastic Athletic Ass'n, Inc.*,
   798 A.2d 830 (Pa. 2002) .........................................................................................28

*Robertson v. Jackson*,
   972 F.2d 529 (4th Cir. 1992) ....................................................................................3

*Ross v. Meese*,
   818 F.2d 1132 (4th Cir. 1987) ................................................................................26

*Soule by Stanescu v. Conn. Ass'n of Sch., Inc.*,
   No. 3:20-CV-00201 (RNC), 2021 WL 1617206 (D. Conn. Apr. 25, 2021)............15

*Soule v. Conn., Ass'n of Schs., Inc.*,
   No. 3:20-cv-00201, 2020 WL 6580265 (D. Conn. Aug. 21, 2020)........................29

*Tuan Anh Nguyen v. INS*,
   533 U.S. 53 (2001)...................................................................................................26

*United States v. Virginia*,
   518 U.S. 515 (1996)........................................................................................ *passim*

*Whitaker By Whitaker v. Kenosha Unified Sch. Dist. No. 1 Bd. of Educ.*,
   858 F.3d 1034 (7th Cir. 2017) ................................................................................17

*Ex parte Young*,
   209 U.S. 123 (1908)...................................................................................................5

**TABLE OF AUTHORITIES**
(continued)

**Page(s)**

**Statutes**

20 U.S.C.
§ 1681.................................................................................................................2
§ 1983.................................................................................................................6

W. Va. Code
§ 18-2-25d................................................................................................ *passim*
§ 127-2-3.8.........................................................................................................10

**Other Authorities**

Letter to Hon. Jim Justice from Chase Strangio & Joseph Cohen, Apr. 10, 2021,
https://www.acluwv.org/sites/default/files/field_documents/letter_to_governor_seeking_veto.
pdf .....................................................................................................................21

Lacie Pierson, *Before Gov. Justice signed four bills into law, AG Morrisey began preparing for lawsuits against them*, Charleston Gazette-Mail, May 15, 2021,
https://www.wvgazettemail.com/news/legal_affairs/before-gov-justice-signed-four-bills-into-law-ag-morrisey-began-preparing-for-lawsuits-against/article_2834f11b-ae93-5ece-97cc-bca0c0c82266.html .....................................................................................................22

Patrick Morrisey, Facebook, Apr. 11, 2021,
https://m.facebook.com/MorriseyWV/posts/3985426234849467.........................................21

School Activities Commission's Rules and Regulations Handbook,
https://www.wvssac.org/rules-and-regulations/..................................................................8

USA Rugby, *USA Rugby Response to Updated World Rugby Transgender Athlete Policy*, Oct. 9,
2021, https://www.usa.rugby/2020/10/usa-rugby-response-to-updated-world-rugby-transgender-athlete-policy/ .........................................................................................25

v

## INTRODUCTION

H.B. 3293 categorically bars B.P.J. and other girls who are transgender from playing on girls' sports teams in West Virginia.  No Defendant disputes this.[1]  Rather, every Defendant but one—Defendant-Intervenor the State of West Virginia (the "Attorney General")—disavows any responsibility for H.B. 3293 and seeks to distance themselves from it with procedural arguments. These attempts fail:  Each Defendant is properly named, and B.P.J. has standing to sue them for injunctive relief.

Regarding the merits, Defendants ignore the Fourth Circuit's controlling precedent in *Grimm v. Gloucester County School Board*, 972 F.3d 586 (4th Cir. 2020), *cert denied*, 2021 WL 2637992 (June 28, 2021), and misconstrue B.P.J.'s claim as a challenge to the existence of sex-separated sports teams.  This is incorrect.  Sex separation in school sports existed in West Virginia prior to H.B. 3293; H.B. 3293 did not change that, and B.P.J. does not challenge that.  Instead, just as Gavin Grimm successfully challenged his school board's "ends-driven definition[] of 'biological [sex]'" that excluded him from using the same restrooms as other boys, *id.* at 626 (Wynn, J., concurring), B.P.J. is challenging H.B. 3293's gerrymandered definition of biological sex that excludes her from participating on the same team as other girls.  In another case challenging an Idaho statute with a similar categorical exclusion, the court granted a preliminary injunction that prohibits the state from excluding girls who are transgender from participating on girls' sports teams.  *See Hecox v. Little*, 479 F. Supp. 3d 930 (D. Idaho 2020).[2]  Defendants have

---

[1] As permitted by this Court's Order, this Reply responds to four separate Response briefs submitted by Defendants and Defendant-Intervenor (Dkts. 47, 48, 49, 50).  Unless otherwise noted, "Defendants" refers to both the party Defendants and Defendant-Intervenor.

[2] On June 24, 2021, the Ninth Circuit remanded Idaho's appeal of *Hecox* to the District Court for further proceedings to assess potential mootness in light of one plaintiff's graduation and another plaintiff's leave of absence from school.  *See* 479 F. Supp. 3d at 980, *appeal argued* Nos. 20-

not meaningfully distinguished the reasoning or outcomes in *Grimm* or *Hecox*; nor can they.  None of the Defendants refutes B.P.J.'s showing that H.B. 3293—in purpose, text, and effect— discriminates without justification against B.P.J. and other girls who are transgender, in violation of both the Equal Protection Clause and Title IX of the Education Amendments of 1972, 20 U.S.C. § 1681, *et seq*.

It is also undisputed that, absent an injunction, B.P.J. will be prohibited from participating on the girls' cross country and track teams at her middle school (for which tryouts begin on August 2). [3]  Defendants' enforcement of H.B. 3293 will brand B.P.J. with a "scarlet 'T,'" *Grimm*, 972 F.3d at 617–18, and she will miss the irreplaceable opportunity to play sports with her peers. By contrast, no one will be harmed if this Court issues a preliminary injunction that restores the *status quo ante* and allows B.P.J. to continue playing sports with other girls.  B.P.J.'s motion for a preliminary injunction should be granted. [4]

## ARGUMENT

### I.   THE ORIGINAL DEFENDANTS ARE PROPERLY SUBJECT TO INJUNCTIVE RELIEF.

The original Defendants all assert that they cannot be held liable for enforcing H.B. 3293 based on a variety of claimed doctrines.  But Defendants cannot disavow their own responsibility to comply with Title IX and the Fourteenth Amendment.   It makes no difference whether

---

35813, 20-35815 (9th Cir. May 3, 2021), *remanded for mootness determination* (9th Cir. June 24, 2021).  The Ninth Circuit did not vacate the District Court's rulings, and thus the District Court's opinion and preliminary injunction remain in force.

[3] Defendant Harrison County Board of Education and Defendant Stutler appear to assert, without support, that B.P.J. will be able to try out for either the boys' or girls' cross country and track teams (Dkt. 50 at 24), which conflicts with their acknowledgement elsewhere that as of the August 2 tryouts, B.P.J.'s school will discriminate against B.P.J.  (*Id.* at 3.)  Based on H.B. 3293's clear mandate that girls' teams "shall not" be open to her, B.P.J. will be barred from participating on girls' teams.  W. Va. Code § 18-2-25d(c)(1)(2).

[4] Plaintiff seeks preliminary injunctive relief as applied to B.P.J.

Defendants instigated, supported, have control over, or even like H.B. 3293.  Because each Defendant has a role in implementing H.B. 3293 when it becomes effective on July 8, 2021, an injunction against each of them is necessary and appropriate to protect B.P.J.

### A.   This Court Has Jurisdiction Over B.P.J.'s Claims Against The State Board.

### 1.   B.P.J. Has Standing.

The West Virginia State Board of Education and State Superintendent Burch (collectively, the "State Board") present their objections to preliminary relief as jurisdictional, claiming a lack of both standing and ripeness.  But, as the State Board concedes, H.B. 3293 *requires* it to promulgate rules to implement the law's categorical exclusion of girls who are transgender from school sports.  *See* W. Va. Code § 18-2-25d(e); *see also Jones v. W.Va. State Bd. of Educ.*, 218 W. Va. 52, 61 (2005) (citing W. Va. § 18-2-25) (noting that it is the State Board's statutory duty to "generally supervise the schools in the state"); (Dkt. 48 ("State Opp.") at 5).  Despite this clear, mandatory role in implementing H.B. 3293, the State Board asserts that B.P.J. lacks standing to sue it because it is not charged with *enforcing* its promulgated rules against her, and thus B.P.J.'s injuries are not "fairly traceable" to its conduct.  (State Opp. at 4–6.)

The State Board is wrong.  Article III standing "requires only that the Plaintiff's injury be fairly traceable to the defendant's conduct."  *Lexmark Int'l Inc. v. Static Control Components, Inc.*, 572 U.S. 118, 134 n.6 (2014).  "The defendant's conduct need not be the last link in the causal chain" for it to be liable for B.P.J.'s injury.  *Air Evac EMS, Inc. v. Cheatham*, 910 F.3d 751, 760 (4th Cir. 2018).  H.B. 3293's requirement that the State Board promulgate rules to implement the law's categorical exclusion of girls who are transgender from school sports places the State Board directly in the causal chain of B.P.J.'s harm, providing Article III standing.  *See, e.g.*, *Robertson v. Jackson*, 972 F.2d 529, 533 (4th Cir. 1992) (finding state commissioner was properly enjoined even though local agencies directly executed statute).

The State Board also appears to argue that there can be no standing against any entity that is not listed in H.B. 3293's "cause of action" provision.  (State Opp. at 5.)  But the "cause of action" provision addresses a situation where a student claims to be "aggrieved" by the *inclusion* of a transgender girl on a girls' team.  *See* W. Va. Code § 18-2-25d(d)(1).  This provision has nothing to do with which state actors can be sued to *prevent* H.B. 3293 from being enforced.

### 2.     B.P.J.'s Claims Are Ripe.

The State Board's argument that B.P.J.'s claims are not ripe fails for the same reasons as its standing argument.  (State Opp. at 6–7.)  The constitutional component of the ripeness inquiry is coextensive with the injury-in-fact prong of standing analysis.  *See Duke Power Co. v. Carolina Envtl. Study Grp., Inc.*, 438 U.S. 59, 81 (1978); *Miller v. Brown*, 462 F.3d 312, 319 (4th Cir. 2006).  Because B.P.J. has adequately pled an injury-in-fact, her claims are ripe.

B.P.J.'s claims are also prudentially ripe.  Prudential ripeness depends on (i) "the fitness of the issues for judicial decision" and (ii) "the hardship to the parties of withholding court consideration."  *Franks v. Ross*, 313 F.3d 184, 194 (4th Cir. 2002).  "A case is fit for judicial decision when the issues are purely legal and when the action in controversy is final and not dependent on future uncertainties."  *Miller*, 462 F.3d at 319 (internal citations omitted).  "The hardship prong is measured by the immediacy of the threat and the burden imposed on the petitioners . . . under threat of enforcement of the challenged law."  *Charter Fed. Sav. Bank v. Off. of Thrift Supervision*, 976 F.2d 203, 209 (4th Cir. 1992).

B.P.J.'s claims against the State Board are fit for review under this standard.  H.B. 3293's legality involves a "pure[] legal question," *Miller*, 462 F.3d at 319, and H.B. 3293 will imminently prevent B.P.J. from participating on the girls' sports teams at her school.  Withholding decision would inflict unnecessary and irreparable harm on an 11-year-old girl.

**B.**     **The County Defendants And School Activities Commission Are Proper Defendants.**

Because the Harrison County Board of Education, Superintendent Stutler (collectively, the "County Defendants"), and the West Virginia Secondary School Activities Commission ("School Activities Commission" or "Commission") are statutorily responsible for H.B. 3293, they are also properly subject to an injunction.  H.B. 3293 governs the "designation of athletic teams or sports sponsored by any public secondary school."  W. Va. Code § 18-2-25d.  In West Virginia, the regulation and supervision of interscholastic athletic events at the secondary school level are delegated to "county boards of education and the West Virginia Secondary School Activities Commission . . . subject to the West Virginia State Board of Education's duty . . . to generally supervise the schools in the state."  *Jones*, 218 W. Va. at 61 (citing W. Va. § 18-2-25).

**1.**     **The County Defendants Are Subject To An Injunction.**

The County Defendants admit they have "no choice but to apply" H.B. 3293 against B.P.J. (Dkt. 50 ("County Opp.") at 8.)  Thus, they are plainly proper defendants and subject to the injunction that B.P.J. seeks.  The County Defendants distract from the issues at hand with a lengthy argument about why they are not liable for enforcing a municipal policy or custom under *Monell v. Department of Social Services*, 436 U.S. 658 (1978).  (County Opp. at 6–13.)  But the County Defendants' liability under *Monell* is not the issue before the Court.

With respect to B.P.J.'s constitutional claims, the question is whether Superintendent Stutler is properly subject to an injunction under *Ex parte Young*, 209 U.S. 123 (1908).  Although Superintendent Stutler is a local government official under *Monell*, she is also considered a *state official* for purposes of *Ex parte Young* when she enforces state law.  As Chief Judge Chambers explained in *McGee v. Cole*, "local and county officials may be considered state officials for purposes of an *Ex parte Young* suit where they are responsible for enforcing or administering state

5

law rather than local or county policies." 115 F. Supp. 3d 765, 773 (S.D. W. Va. 2015). Superintendent Stutler admits that she will be "tasked with enforcing the Act when (or if) it goes into effect." (County Opp. at 1–2.) She is thus a proper defendant for purposes of enjoining H.B. 3293. *See Bostic v. Schaefer*, 760 F.3d 352, 371 n.3 (4th Cir. 2014) (noting that municipal court clerk could be enjoined from enforcing unconstitutional state law under *Ex parte Young* when he merely had "some connection with the enforcement of the act"). Whether Superintendent Stutler could *also* be enjoined from enforcing H.B. 3293 under *Monell* is presently beside the point.

With respect to B.P.J.'s claims under Title IX, the question is whether the County Board will knowingly subject B.P.J. to discrimination on the basis of sex. The County Board does not dispute that it will enforce H.B. 3293 (County Opp. at 7–8), which will exclude B.P.J. from playing on girls' sports teams based on her sex and will cause her harm. B.P.J. can therefore seek an injunction to prevent the County Board from enforcing the statute. *See also Hecox*, 479 F. Supp. 3d at 988 (denying motion to dismiss plaintiff's Title IX claims and issuing a preliminary injunction, including against a plaintiff's school district).

The County Board argues that it cannot be held liable under *Monell* for enforcing state law. But Title IX requires intentional discrimination by a school, not a municipal policy or custom as in *Monell*. "For example, a Title IX plaintiff can establish school district liability by showing that a single school administrator with authority to take corrective action responded to harassment with deliberate indifference. A plaintiff stating a similar claim via § 1983 for violation of the Equal Protection Clause by a school district or other municipal entity must show that the harassment was the result of municipal custom, policy, or practice." *Fitzgerald v. Barnstable Sch. Comm.*, 555 U.S. 246, 257–58 (2009) (citations omitted). In short, the County Defendants' attempt to apply "the *Monell* 'policy or custom' standard to Title IX claims is incorrect and not supported by

the case law." *Condiff v. Hart Cnty. Sch. Dist.*, 770 F. Supp. 2d 876, 882 n.3 (W.D. Ky. 2011).

The County Defendants' citation to *Baynard v. Malone*, 268 F.3d 228, 238 (4th Cir. 2001), is not to the contrary. In *Baynard*, Title IX liability did not attach where a school had no "actual notice" of the ongoing discrimination; here, there is no question that the County Defendants have "actual notice" of H.B. 3293 and intend to enforce it. Indeed, B.P.J.'s school principal informed her that she would be prohibited from joining the girls' cross country team specifically because of H.B. 3293. (Dkt. 1 ("Compl.") ¶ 77.) Nothing in *Baynard* restricts Title IX to only discrimination that occurs as part of County Defendants' own municipal policy.

## 2. The School Activities Commission Is Subject To An Injunction.

Finally, the Commission—which does not oppose the relief B.P.J. seeks and offers no defense for H.B. 3293—is also a proper Defendant subject to an injunction. In seeking to evade an injunction, the Commission (Dkt. 47 ("WVSSAC Opp.") at 6) incorrectly equates a "state agency" (which the Commission is not) with a "state actor" (which the Commission is). As the West Virginia Supreme Court recognized when striking down a Commission regulation, "[e]very court that has considered the question whether associations like the [Commission] are state actors have found that these organizations are so intertwined with the state that their acts constitute state action." *Israel by Israel v. W. Va Secondary Sch. Activities Comm'n*, 182 W. Va. 454, 458 (1989); *accord Brentwood Acad. v. Tenn. Secondary Sch. Athletic Ass'n*, 531 U.S. 288, 295 (2001) (determining that a state interscholastic athletic association's actions qualify as "state action" under the Fourteenth Amendment); *Jones*, 218 W. Va. at 58 (concluding that, in suit against the Commission, "there is no question that the equal protection claim involves state action").

The Commission also claims—without case law or evidentiary support—that it is an improper defendant because it "has no role and is not envisioned as having a role in enforcing West Virginia's law at this time" and because "it is not funded by public moneys." (WVSSAC

Opp. at 1, 6.)  However, as B.P.J. established in her Motion, the Commission is the controlling authority for Bridgeport Middle School's athletic programs.  (Dkt. 19 ("PI Br.") at 11–12.)  "The Legislature established the [Commission] and gave the county boards of education the option to 'delegate . . . control, supervision and regulation of interscholastic athletic events and band activities to the [Commission.]'"  *Jones*, 218 W. Va. at 61 (quoting W. Va. Code § 18-2-25).  It is undisputed that the County Defendants have "delegate[d] . . . control, supervision and regulation" to the Commission.  *See id*.  Indeed, the Commission's Rules and Regulation Handbook lists Bridgeport Middle School as a "Member School."[5]  Moreover, the Commission acknowledges that B.P.J. will have to comply with the rules and regulations they approve in order to participate in school athletics.  (WVSSAC Opp. at 3.)  Finally, B.P.J.'s ultimate eligibility to play on the girls' sports team will be determined and enforced by the Commission; the Commission's website clearly directs the "Athletic Director or Principal" to inquire regarding any particular student's eligibility to participate in interscholastic athletics.

For all of these reasons, the Commission is subject to suit and injunction, including under Title IX, because it is undisputed that its federal-funds-receiving members (*i.e.*, Harrison County) ceded to the Commission "controlling authority" over secondary school athletics.  *See Alston v. Va. High Sch. League, Inc.*, 144 F. Supp. 2d 526, 533 (W.D. Va. 1999); *see also Communities for Equity v. Mich. High Sch. Athletic Ass'n*, 80 F. Supp. 2d 729, 735 (W.D. Mich. 2000) (holding that "any entity that exercises controlling authority over a federally funded program is subject to Title IX, regardless of whether that entity is itself a recipient of federal aid").

---

[5] School Activities Commission's Rules and Regulations Handbook, at V, https://www.wvssac.org/rules-and-regulations/.

## II.    B.P.J. Is Likely To Succeed On Her Title IX Claim.

B.P.J. is likely to succeed on her Title IX claim.  B.P.J. has established that, due to H.B. 3293, (1) she will be excluded from participation in an education program offered by an educational institution that receives federal financial assistance; (2) the discrimination occurred "on the basis of sex"; and (3) the discrimination caused her harm.  *See Grimm*, 972 F.3d at 616. Defendants have failed to adduce anything to the contrary and, instead, largely sidestep B.P.J.'s arguments and ignore binding precedent from the Fourth Circuit.[6]

### A.    H.B. 3293 Excludes B.P.J. On The Basis Of Sex.

As explained in her opening brief, both the Supreme Court and the Fourth Circuit have already stated that discrimination based on transgender status is discrimination "on the basis of sex": "[I]t is impossible to discriminate against a person for being . . . transgender without discriminating against that individual based on sex."  *Grimm*, 972 F.3d at 616 (finding Title IX violation); *Bostock v. Clayton Cty.*, 140 S. Ct. 1731, 1741 (2020) (finding Title VII violation). B.P.J. has thus shown that she will be discriminated against based on her sex.  Indeed, Defendants "could not exclude [B.P.J.] from the [girls' team] without referencing" her "biological sex" as defined in H.B. 3293.  *Grimm*, 972 F. 3d at 616.  Therefore, "[e]ven if the Board's primary motivation in implementing or applying the policy was to exclude [B.P.J.] because [s]he is transgender, h[er] sex remains a but-for cause for the [State's] actions."  *Id.*

Echoing unsuccessful arguments made in *Grimm*, Defendants assert that B.P.J. is effectively challenging the existence of sex-separated sports.  To the contrary, B.P.J. "does not

---

[6] Other than the Commission, no Defendant disputes that B.P.J. has shown exclusion from a federally funded education program.  Because the County Defendants have delegated control of school athletics to the School Activities Commission (*see supra at* I(B)(2)), the Commission has controlling authority over federally funded school athletics and thus is subject to Title IX.  *See, e.g.*, *Alston*, 144 F. Supp. 2d at 532–33.

challenge sex-separated [teams]; [she] challenges the [statute's] discriminatory exclusion of [herself] from the sex-separated [team] matching [her] gender identity." *Grimm*, 972 F.3d at 618; *accord Adams v. Sch. Bd. of St. John's Cnty.*, 968 F.3d 1286, 1307–09 (11th Cir. 2020) (holding that plaintiff was not challenging sex-separated restrooms, but "simply seeking access to the boys' restroom as a transgender boy"). "[S]eparate but equal [sports teams] in schools on a male/female basis . . . says nothing about what happened in [H.B. 3293]:  separation of transgender students from their cisgender counterparts through a policy that ensures that transgender students may [participate in] neither male nor female [teams] due to the incongruence between their gender identity and their sex-assigned-at-birth." *See Grimm*, 972 F.3d at 625 (Wynn, J., concurring).

H.B. 3293 did not—as Defendants claim—merely codify sex separation in sports.  (Dkt. 49 ("AG Opp.") at 1; *see* County Opp. at 3, 14.)[7]  West Virginia already had a long-standing and unchallenged policy of establishing separate school sports teams for boys and girls, as well as no law or policy categorically prohibiting girls who are transgender from playing on girls' teams.  *See* W. Va. Code R. § 127-2-3.8; (Dkt. 42 ("U.S. SOI") at 6).  When compared to the status quo, it is clear that the only function of H.B. 3293 is to exclude girls who are transgender from participating on girls' teams.  The sponsor for H.B. 3293 confirmed as much when explaining that H.B. 3293

---

[7] The Attorney General's false claim that H.B. 3293 pertains only to sex separation in sport— irrespective of gender identity—is belied by the text, purpose, and effect of the law and by the exhibits attached to the Attorney General's opposition, all of which concern the participation of *girls who are transgender* in girls' sports and none of which speak to either sex separation generally or to West Virginia specifically.  (*See* AG Opp. Ex. A (prepared for case in Washington); Ex. B (prepared for case in Idaho); Ex. C (prepared for case in Idaho); Ex. D (concerning Connecticut); Ex. E (prepared for case in Kentucky); Ex. F (concerning United Kingdom); Ex. G (copy of academic paper); Ex. H (World Rugby policy concerning inclusion in a contact sport for post-pubertal women); and Ex. I (copy of academic paper).)  These exhibits further confirm what the Attorney General refuses to acknowledge but is clear from the statute itself, the legislative debate, and the universal reporting about H.B. 3293:  It is a law intended to stop so-called "transgenders" from playing school sports, not to codify sex separation.  (*See* Compl. ¶ 56.)

only "would affect those that changed their sex after birth." (Dkt. 1-1 ("Stark Decl.") Ex. B at 1); *cf. Hecox*, 479 F. Supp. 3d at 982 ("[W]hile general sex separation on athletic teams for men and women may promote sex equality and provide athletic opportunities for females, that separation preexisted the Act and has long been the status quo in Idaho.").[8]

Defendants are also wrong that the Legislature "relied on the commonly accepted definition of the word 'sex' as referring to the physiological differences between biological males and females" when drafting H.B. 3293. (AG Opp. at 17.) The physiological differences encompassed in the term "sex" include hormones and accompanying secondary-sex characteristics. *See Grimm*, 972 F.3d at 621 (Wynn, J., concurring); (Dkt. 2-1, Declaration of Joshua Safer ("Safer Decl.") ¶ 23). But West Virginia ignored any "physiological differences" that are actually relevant to athletic competition and designed an intentionally discriminatory definition limited to "reproductive biology and genetics at birth" in order to exclude *only* girls who are transgender. *See* W. Va. Code § 18-2-25d(b)(1).

Defendants next argue that H.B. 3293 complies with Title IX because "sex-related physical differences make a difference in contact sports and on teams involving competitive skill," (County Opp. at 15), and Defendants assert that if B.P.J. was permitted to join the Bridgeport Middle School cross country team, "athletic opportunities for women would be diminished," (AG Opp. at 15). This is a *non sequitur*. B.P.J. offered expert testimony demonstrating that she—an 11-year-old girl who has received puberty blockers before endogenous puberty—has no physiological advantage over her peers. (Safer Decl. ¶¶ 24–25, 48; Supplemental Declaration of Joshua Safer

---

[8] West Virginia's offensive assertion that B.P.J. is seeking recognition for "at least four 'genders' or 'gender identities'" under Title IX (AG Opp. at 16), reveals "its own bias" and "misconceptions." *Grimm*, 972 F.3d at 610. B.P.J. is a girl and only seeks the protection of Title IX afforded all girls who seek to participate in federally funded school athletics.

("Supp. Safer Decl.") ¶ 9.)  Moreover, Defendants have been unable to identify any other girl who is transgender who has sought to participate on girls' sports teams, making it obvious that B.P.J.'s desire to be included would not "diminish" opportunities for other girls to run on the middle school's team.  *Cf. Hecox*, 479 F. Supp. 3d at 977 ("[L]ess than one percent of the population is transgender").

### B.      H.B. 3293 Harms B.P.J. Through Unlawful Discrimination.

B.P.J. has also established that she will be harmed by H.B. 3293's unlawful discrimination. As explained in *Grimm*, "[i]n the Title IX context, discrimination mean[s] treating that individual worse than others who are similarly situated."  *Id.* at 618 (quoting *Bostock*, 140 S. Ct. at 1740). As a girl who is transgender, B.P.J. is similarly situated to other girls, but she alone is prohibited from trying out for the girls' cross country team.  *See id.* ("Grimm was treated worse than students with whom he was similarly situated because he alone could not use the restroom corresponding with his gender.  Unlike the other boys, he had to use either the girls['] restroom or a single-stall option.  In that sense, he was treated worse than similarly situated students.").

Again echoing the same arguments that *Grimm* rejected, Defendants claim that H.B. 3293 "treat[s] similarly situated people the same" because B.P.J. is (in their words) a "biological boy." (AG Opp. at 16–18.)  But for all relevant purposes, B.P.J. is similarly situated to other girls, not to cisgender boys, and preventing her from playing on the girls' team violates Title IX.

*First*, B.P.J. is similarly situated to other girls for purposes of benefitting from the camaraderie, competition, and friendship associated with playing on her school's athletic team. B.P.J. is a girl.  She lives and expresses herself as a girl, and it is critical to her health and well-being for her to do so.  (Dkt. 2-1 ("Adkins Decl.") ¶¶ 21, 23, 28, 36; Dkt. 2-1 ("Heather Decl.") ¶¶ 26–27; Dkt. 2-1 ("B.P.J. Decl.") ¶¶ 12–15.)  Even the Principal of Bridgeport Middle School recognized that "because B.P.J. looks and presents like a female, it would be confusing for the

girls' cross country coach if she saw one of the girls walking over to the boys' side while the teams were practicing." (Heather Decl. ¶ 24.) A choice to compete on a boys' team "is no choice at all because" it "completely misses the reality of what it means to be a transgender [girl]." *Grimm*, 972 F.3d at 624 (Wynn, J., concurring). Not only would this undermine B.P.J.'s medical treatment and the core of who she is, but it would also humiliate her because it would send a public message to herself and the entire community that B.P.J. should be treated differently from everyone else. (Adkins Decl. ¶¶ 21, 23, 28, 36; Heather Decl. ¶¶ 26–27; B.P.J. Decl. ¶¶ 12–15.)[9]

*Second*, B.P.J. is similarly situated to other girls for purposes of the physiological characteristics relevant to athletic performance. B.P.J. receives puberty-delaying treatment. As a result, she has not undergone endogenous puberty and has not experienced physiological changes caused by testosterone. (Safer Decl. ¶¶ 49–50.) It has long been recognized that B.P.J. and other girls who are transgender who do not go through endogenous puberty—like women with complete androgen insensitivity—do not have any athletic advantage simply by having XY chromosomes. (*Id.* ¶ 49); *see Hecox*, 479 F. Supp. 3d at 980.[10] Moreover, even if B.P.J. had experienced endogenous puberty—which she has not—she would still be similarly situated to cisgender girls if she received gender-affirming hormones to suppress circulating testosterone. *See Hecox*,

---

[9] The Attorney General attempts to question the importance of B.P.J.'s social transition by re-using a declaration submitted in another case by Dr. Stephen Levine. (AG Opp. at 3.) Courts have repeatedly recognized that Dr. Levine is "an outlier in the field of gender dysphoria" and have placed "virtually no weight" on his opinions. *Edmo v. Idaho Dep't of Corr.*, 358 F. Supp. 3d 1103, 1125–26 (D. Idaho 2018) (vacated in part on other grounds in *Edmo v. Corizon*, 935 F.3d 757 (9th Cir. 2019)); *see also Norsworthy v. Beard*, 87 F. Supp. 3d 1164, 1188–89 (N.D. Cal. 2015) (noting Dr. Levine's opinion overwhelmingly relied on generalizations about gender dysphoria, contained illogical inferences, and admittedly included references to a fabricated anecdote). For this reason, the district court in *Hecox* refused to afford Dr. Levine's opinion any weight at the preliminary injunction stage. *See Hecox*, 479 F. Supp. 3d at 977 n.33.

[10] The Attorney General attempts to dispute this scientific consensus with a recycled expert declaration from Dr. Gregory Brown. The problems inherent in Dr. Brown's study are discussed *infra* at III(B)(3).

479 F. Supp. 3d. at 981–83 (finding that plaintiff, a woman who is transgender who underwent endogenous puberty before beginning hormone replacement therapy, is similarly situated to cisgender girls for purposes of school-sponsored athletic competition).

When compared to her similarly situated peers, H.B. 3293 treats B.P.J. differently and worse.  By singling her out from other girls and preventing B.P.J. from participating on school sports teams consistent with her gender identity, H.B. 3293 effectively excludes B.P.J. from participating in *any* school sports team.  *See Grimm*, 972 F.3d at 624 (Wynn, J. concurring) (finding that the supposed "choice" for a transgender boy to use girls' restrooms instead of the boys' restrooms matching his gender identity "is no choice at all").

B.P.J. is harmed by this discrimination.  (*See* PI Br. at 4–5.)  Not only is she "stigmatized and isolated" by H.B. 3293's exclusionary policy, *Grimm*, 972 F.3d at 617 (finding "stigma of being forced to use a separate restroom" to be a harm), the state-sponsored discrimination serves as "an invitation to subject" B.P.J. and other girls who are transgender to further "discrimination both in the public and in the private spheres," *Lawrence v. Texas*, 539 U.S. 558, 575 (2003).

### C.   Defendants Distort *Grimm*, *Bostock*, And Federal Title IX Guidance.

For all the reasons discussed above, B.P.J. has established a likelihood of succeeding on her Title IX claim.  Defendants' remaining Title IX arguments amount to unsuccessful efforts to escape the plain effect of binding caselaw.

*First*, Defendants argue that allowing B.P.J. to participate on the girls' team "certainly is not consistent with the text of Title IX and its regulations."  (AG Opp. at 15–16.)  The Fourth Circuit already rejected this argument in *Grimm*:  "All [the regulation] suggests is that the act of creating sex-separated [teams] in and of itself is not discriminatory—not that, in applying [athletic] policies to students like [B.P.J.], the [State] may rely on its own discriminatory notions of what 'sex' means."  972 F.3d at 618.

*Second*, Defendants confusingly argue that the Supreme Court's decision in *Bostock* "specifically condone[s]" the definition of "biological sex" used in H.B. 3293.  (AG Opp. at 17.) But *Bostock* did not endorse a particular definition of "sex" or "biological sex."  Indeed, the Court declined to resolve whether the term "sex" in Title VII "captur[ed] more than anatomy and reach[ed] at least some norms concerning gender identity and sexual orientation" because the outcome would be the same under any definition of the term.  *Bostock*, 140 S. Ct. at 1739. Proceeding on the assumption that "sex" referred to "biological sex," the Court described "biological sex" as referring in general to "biological distinctions between male and female."  *Id.* By contrast, H.B. 3293 adopts a gerrymandered definition of "biological sex" as "reproductive anatomy and genetics at birth" and excludes any "biological distinctions" that are actually relevant to athletic performance.

*Finally*, and perplexingly, Defendants assert that the United States' Statement of Interest conflicts with the federal government's "long-held" views.  (AG Opp. at 18 n.11.)  To the contrary, between 2014 and 2016, the Department of Education and Department of Justice issued several guidance documents stating that transgender students should be allowed to participate on sports teams consistent with their identity.  *See Soule by Stanescu v. Conn. Ass'n of Sch., Inc.*, No. 3:20-CV-00201 (RNC), 2021 WL 1617206, at *9 (D. Conn. Apr. 25, 2021) (summarizing history of guidance documents regarding participation of transgender students in athletics).  Those documents were withdrawn under the Trump administration and replaced with the documents cited by Defendants.  (State Opp. at Exs. 1–3.)  But the Trump administration documents have now been withdrawn and according to the federal government "should not be relied upon in this *or any other matter*."  (State Opp. Ex. 3, at 3 (emphasis added).)  The Department of Justice and Department of Education have made their official position on H.B. 3293 eminently clear:  "The United States

respectfully submits this Statement of Interest . . . to advise the Court of its view that Title IX . . . and the Equal Protection Clause . . . do not permit West Virginia to categorically exclude transgender girls from participating in single-sex sports restricted to girls."  (U.S. SOI at 1.)

As demonstrated and notwithstanding any of the arguments proffered by Defendants, B.P.J. is not challenging sex separation in sports.  B.P.J. wants to be treated like every other girl and have the opportunity to play on her school's teams.  By preventing her from doing so, H.B. 3293 discriminates against B.P.J. "on the basis of sex" under Title IX.

## III.   B.P.J. IS LIKELY TO SUCCEED ON THE MERITS OF HER EQUAL PROTECTION CLAIM.

Defendants also have done nothing to rebut B.P.J.'s clear showing that she is likely to succeed on the merits of her claim that H.B. 3293 violates the Equal Protection Clause.  H.B. 3293 is subject to heightened scrutiny and Defendants have not—and cannot—meet their "demanding" burden of demonstrating an "exceedingly persuasive" justification for this discrimination.  *United States v. Virginia (VMI)*, 518 U.S. 515, 533 (1996).

### A.   H.B. 3293 Is Subject To Heightened Scrutiny.

As multiple Defendants acknowledge, controlling Fourth Circuit precedent provides that laws that discriminate based on transgender status and sex must be tested under heightened scrutiny.  *See Grimm*, 972 F.3d at 607–10; (*see* AG Opp. at 5; State Opp. at 8).

The State Board and County Defendants concede that H.B. 3293 triggers heightened scrutiny.  (*See* State Opp. at 8 (acknowledging that *Grimm* requires that H.B. 3293 "be analyzed under heightened scrutiny"); County Opp. at 16 ("EPC challenges based on sex, as here, are subject to intermediate scrutiny.").)  The Attorney General, however, resists this conclusion.  The Attorney General maintains that H.B. 3293 does not discriminate based on transgender status, but instead "treats all biological males *the same* and prohibits them from participating in female sports."

(AG Opp. at 5.)[11]  Yet the Attorney General's (and County Defendants') insistence on referring to girls who are transgender as "biological males"—in addition to being injurious and disrespectful—cannot mask H.B. 3293's discriminatory design and operation.  *See Bostock*, 140 S. Ct. at 1744 ("[I]t's irrelevant what an employer might call its discriminatory practice, how others might label it, or what else might motivate it.").

For all the same reasons that B.P.J. is similarly situated to other girls for purposes of her Title IX claim, she is also similarly situated to other girls for purposes of the Equal Protection Clause.  Indeed, *Grimm* considered and rejected exactly the argument the Attorney General presses here—*i.e.*, that the Court should "compare [B.P.J.'s] treatment under the policy to the treatment of students [Defendants] would consider to be 'biological' [boys]."  972 F.3d at 609–10.  *Grimm* makes clear that laws that force students into sex-specific spaces based on their sex assigned at birth rather than their gender identity constitute discrimination based on sex and transgender status. *Id*. at 608–10; *see also Adams*, 968 F.3d at 1296; *Whitaker By Whitaker v. Kenosha Unified Sch. Dist. No. 1 Bd. of Educ.*, 858 F.3d 1034, 1051 (7th Cir. 2017) (abrogated on other grounds).  That holding controls here and requires application of heightened scrutiny.[12]

---

[11] Although, as noted, the County Defendants concede that H.B. 3293 receives heightened scrutiny as a sex-based classification, they also argue that H.B. 3293 treats "all biological boys" the same. (County Opp. at 17 (emphasis omitted).)  The State Board likewise asserts that "Plaintiff was not treated differently than someone *similarly situated* as her."  (State Opp. at 8.)

[12] As the Fourth Circuit explained, framing the classification as one between "biological boys" and "biological girls" reveals Defendants' "own bias"—namely, their "belie[f] that [B.P.J.'s] gender identity is a choice," and their decision to "privilege[] sex-assigned-at-birth over [B.P.J.'s] medically confirmed, persistent and consistent gender identity."  *Grimm*, 972 F.3d at 610.  In *Grimm*, "[t]he overwhelming thrust of everything in the record" was "that Grimm was similarly situated to other boys, but was excluded from using the boys restroom facilities based on his sex-assigned at birth."  *Id.*  So too here.  B.P.J. lives as a girl.  (*See* PI Br. at 4, 6; Heather Decl. ¶¶ 8, 9–10, 26); *supra* at II(B).  "Adopting [Defendants'] framing of [B.P.J.'s] equal protection claim here would only vindicate [Defendants'] own misconceptions" and would "fail to meaningfully reckon with what it means for [B.P.J.] to be a transgender [girl]."  *Grimm*, 972 F.3d at 610 & n.10 (internal quotation marks omitted).

Moreover, Defendants' argument that H.B. 3293 is not targeted at girls who are transgender based on their transgender status is belied by the legislative history. Despite Defendants' attempts to obfuscate, the Legislature's purpose in enacting H.B. 3293 is not subject to serious debate. During the legislative hearings, proponents of H.B. 3293 were express that the law's aim is to exclude "transgenders" from playing on girls' sports teams. (Stark Decl. Ex. E at 2.) Similarly, counsel for H.B. 3293 explained that H.B. 3293 only "would affect those that changed their sex after birth." (Stark Decl. Ex. B at 1.) And the Governor himself acknowledged that H.B. 3293 only addressed the issue of girls who are transgender playing on girls' teams. (Compl. ¶ 60 & n.10.) Accordingly, a House Delegate who opposed H.B. 3293 stated during the legislative hearings that H.B. 3293 made West Virginia "a place to live, work, raise a family if you choose, only if you're not transgender." (Stark Decl. Ex. D at 2.) The Department of Justice's Statement of Interest further highlights the admitted anti-transgender sentiment motivating many of the proponents of H.B. 3293. (U.S. SOI at 18.) Given this legislative record, the carefully crafted statutory definitions to exclude girls who are transgender, and the fact that sex separation in sport in West Virginia preexisted H.B. 3293, it could not be clearer that H.B. 3293 was enacted to prevent girls who are transgender from playing on girls' teams. And that is precisely what it does. *Cf. N.C. State Conf. of NAACP v. McCrory*, 831 F.3d 204, 214 (4th Cir. 2016) (striking down voting previsions that were crafted "with almost surgical precision" to target Black voters).

**B.    H.B. 3293 Is Not Substantially Related To The Legislature's Asserted Interest.**

To satisfy heightened scrutiny, Defendants must show that H.B. 3293 "serves important governmental objectives" and that its discriminatory classification is "substantially related to the achievement of those objectives." *VMI*, 518 U.S. at 524, 533 (citation omitted). The justification for the discriminatory means chosen must be "exceedingly persuasive," and "must not rely on overbroad generalizations about the different talents, capacities, or preferences of males and

18

females." *Id.* at 533.  Defendants' burden of persuasion applies even at the preliminary injunction stage.  *See Gonzales v. O Centro Espírita Beneficente União do Vegetal*, 546 U.S. 418, 429 (2006).

This "demanding" burden "rests entirely on the State," *VMI*, 518 U.S. at 533, and Defendants come nowhere close to satisfying it.  Defendants' briefs misunderstand B.P.J.'s argument and the basic analytic framework for equal protection claims; fail to offer any persuasive argument or credible evidence that categorically excluding girls who are transgender from school sports will promote athletic opportunities for girls; and largely ignore the specifics of this case. The asserted justifications for H.B. 3293 are so disconnected from the statute's operation in practice that the only conceivable purpose served by the law is "an invalid interest of excluding transgender women and girls from women's sports entirely."  *Hecox*, 479 F. Supp. 3d at 984–85.

> **1.    The Substantial-Relationship Inquiry Focuses On Those Against Whom H.B. 3293 Facially Discriminates—Girls Who Are Transgender.**

At the outset, the State Board mistakenly suggests that B.P.J. takes no issue with H.B. 3293's definitions of "biological sex," "female," and "male," and is instead concerned only with "the *effect* of these otherwise valid definitions."  (State Opp. at 11.)  That is wrong.  Defining and categorizing boys and girls based solely on their "reproductive biology and genetics at birth," W. Va. Code § 18-2-25d(b)(1), is not "objective" or "factually []accurate," as the State Board claims.  (State Opp. at 11.)  H.B. 3293 uses an "ends-driven definition[] of 'biological [sex]'" to "guarantee a particular outcome":  The categorical exclusion of girls who are transgender from girls' teams, and therefore from school sports altogether.  (PI Br. at 17–18 (quoting *Grimm*, 972 F.3d at 626 (Wynn, J. concurring); *see also* U.S. SOI at 16 ("So, when the State . . . defines students by their sex assigned at birth, . . . the State's objective is clear:  to define transgender girls as 'boys' and then to prevent them from participating on girls' athletic teams.").)  H.B. 3293 thus is discriminatory on its face, not just in its effect.

19

The State Board further suggests that H.B. 3293 is substantially related to promoting equal athletic opportunities for girls because "less than 1% of the United States population" is transgender, and the law therefore "has no discriminatory effect in over 99% of the cases." (State Opp. at 12.)   But in assessing the constitutionality of H.B. 3293, "[t]he proper focus of the constitutional inquiry is the group for whom the law is a restriction, not the group for whom the law is irrelevant." *City of L.A., Calif. v. Patel*, 576 U.S. 409, 418 (2015).   The State Board ignores this rule, as well as the fact that H.B. 3293 is targeted at girls who are transgender, not all students. Sex separation in sports already existed in West Virginia as a matter of regulation and longstanding practice prior to H.B. 3293.   The change worked by H.B. 3293's operative provision is to restrict girls who are transgender from playing on girls' teams.   No other group is prohibited from playing on the sports team consistent with their gender identity.   The question thus is whether excluding girls who are transgender from girls' sports teams is substantially related to promoting athletic opportunities for girls.   The answer is no.

> **2.    Defendants Fail To Provide Persuasive Arguments That H.B. 3293's Categorical Exclusion Of Girls Who Are Transgender Is Substantially Related To The Asserted State Interest.**

Of those Defendants B.P.J. named in her Complaint, only the County Defendants make any effort to argue that categorically prohibiting transgender girls from playing on girls' sports teams based on their "reproductive biology and genetics at birth" is substantially related to the State's asserted interest.   That effort is half-hearted at best, and hardly provides an "exceedingly persuasive" justification for H.B. 3293's discrimination.   *VMI*, 518 U.S. at 533.   Although the County Defendants assert that "biological boys are, on average, bigger, stronger, and faster than girls"—a proposition for which they cite the fact that in high school track and field events, boys use a larger discus, shot, and javelin and taller hurdles than girls—they do not submit evidence that those differences in performance are attributable to sex chromosomes and reproductive

20

anatomy, which are the only criteria on which H.B. 3293 conditions athletic participation.  (County Opp. at 4, 18; *see* PI Br. at 20.)  Instead, they offer only the breezy assertion that there are "press reports that the science on the relationship between testosterone levels and the promotion of fairness and safety is debated," and say they are "reserv[ing] argument on these issues if it becomes necessary to later address them."  (County Opp. at 21 n.79.)

The County Defendants attribute their "rel[iance] on anecdotal evidence" to "the cramped timing of B.P.J.'s motion" and a supposed "enormous head start" by B.P.J.'s counsel, and urge the Court to deny B.P.J.'s request for a preliminary injunction because "defendants have not had any meaningful opportunity to research important and complex issues."  (*Id*. at 21 & n.79.)  To begin with, any evidence supporting H.B. 3293 should have been amassed and supplied by the Legislature *before* enacting H.B. 3293, not *after* it, and the lack of any such evidence is telling. *Cf. VMI*, 518 U.S. at 533 (finding that justifications for statute "must be genuine, not hypothesized or invented *post hoc* in response to litigation"); *see infra* n.15.  Moreover, not only have Defendants had more time to respond to B.P.J.'s motion than is ordinarily afforded under the rules, which govern "complex and simple matters" alike, but B.P.J.'s counsel publicly gave notice that they would challenge H.B. 3293 were it to pass.[13]  Likewise, the Attorney General announced in early April 2021 that it anticipated a lawsuit against H.B. 3293 and would soon begin working on its defense.[14]

---

[13] *See* Letter to Hon. Jim Justice from Chase Strangio & Joseph Cohen 3–4, Apr. 10, 2021, https://www.acluwv.org/sites/default/files/field_documents/letter_to_governor_seeking_veto.pdf ("[I]f passed, this bill will be challenged in court and will not pass scrutiny. . . . It is our hope that you veto this bill before anyone has to resort to litigation over the matter.").

[14] *See* Patrick Morrisey, Facebook, Apr. 11, 2021, https://m.facebook.com/MorriseyWV/posts/3985426234849467 ("In the upcoming days, after the Governor makes decisions about whether to sign certain pieces of legislation into law or veto them, we will begin getting ready for litigation in defense of new state laws.  We anticipate we may be

In short, the fact that any Defendant failed to come up with a persuasive argument that H.B. 3293 satisfies heightened scrutiny on the preliminary injunction timeline is hardly a reason for the Court to deny B.P.J.'s motion.  If anything, it is further evidence of the law's infirmity.

### 3. The Attorney General Does Not Show That H.B. 3293's Categorical Exclusion Of Girls Who Are Transgender Is Substantially Related To The Asserted State Interest.

Whereas the original Defendants are reluctant to defend H.B. 3293's sweeping categorical exclusion, the Attorney General offers a full-throated endorsement, arguing that H.B. 3293 is necessary to ensure that girls who are transgender do not significantly displace girls who are cisgender from sports teams.  But the Attorney General does not show—as it must for the law to survive heightened scrutiny—that "reproductive biology and genetics at birth" are so connected to athletic performance that categorically barring girls who are transgender from girls' sports is substantially related to addressing those alleged concerns.[15]

---

needed to defend . . . [t]he Save Women's Sports Bill . . . .  We will review [this] bill[]/law[] in order to prepare defenses for legal challenges against [it.]"); Lacie Pierson, *Before Gov. Justice signed four bills into law, AG Morrisey began preparing for lawsuits against them*, Charleston Gazette-Mail, May 15, 2021, https://www.wvgazettemail.com/news/legal_affairs/before-gov-justice-signed-four-bills-into-law-ag-morrisey-began-preparing-for-lawsuits-against/article_2834f11b-ae93-5ece-97cc-bca0c0c82266.html (discussing the AG's April 11 Facebook post and noting that the AG's office released a request for proposals in late April 2021 seeking legal counsel to help defend legislation in the months ahead).

[15] Although H.B. 3293 discusses the State's interest in equal athletic opportunities only in terms of the substantial displacement of female athletes, *see* W. Va. Code § 18-2-25d(a)(3)-(4), the Attorney General and County Defendants now assert that H.B. 3293 also furthers an interest in "protect[ing] female athletes' safety."  (AG Opp. at 7 n.4; *see also* County Opp. at 18 (stating that H.B. 3293's "goals" are to prevent "competitive disadvantage" and "injury to biological girls").)  The Court should reject this effort, for a justification "invented *post hoc* in response to litigation" cannot be credited.  *VMI*, 518 U.S. at 533.  But in any event, H.B. 3293 sweeps far too broadly to be substantially related to Defendants' *post hoc* safety interest.  H.B. 3293 is not limited to contact sports, but includes any sport involving "competitive skill," and thus bars girls who are transgender from sports that do not involve any contact, such as cross country.  *See* W. Va. Code § 18-2-25d(c)(2).

The Attorney General begins with the assertion that boys have "inherent physical advantages" over girls. (AG Opp. at 7.) But as B.P.J.'s brief explained, the only sex-related characteristic with any demonstrated effect on athletic ability is circulating testosterone, not sex chromosomes or anatomy at birth. (*See* PI Br. at 15, 20–21.) The Attorney General's sources are not to the contrary. (*See* AG Opp. at 7.) *Clark v. Arizona Interscholastic Association*, 695 F.2d 1126 (9th Cir. 1982), did not address the participation of transgender athletes. Instead, the case involved a cisgender boy's attempt to join a girls' volleyball team. The ruling was premised on a concern that cisgender boys (roughly 50% of the population) would displace cisgender girls, and *Clark*'s statement that "males would have an undue advantage competing against women" in high school volleyball was based on a stipulation by the parties about cisgender boys who had experienced their endogenous puberty. 695 F.2d at 1127, 1131; (*see* PI Br. at 22); *see also Hecox*, 479 F. Supp. 3d at 976. The issues driving the decision in *Clark* simply do not pertain to including girls who are transgender on girls' teams. Girls who are transgender make up less than 1% of the population, *id.* at 977, and B.P.J. is a girl who has not gone through endogenous puberty and has none of the physiological advantages ascribed to cisgender boys in *Clark*.

In arguing that girls who are transgender have an athletic advantage even when they have received puberty-blockers and gender affirming hormones, the Attorney General recycles the same expert declaration from Dr. Gregory Brown that was submitted in *Hecox*. In response, B.P.J. has submitted a supplemental declaration from Dr. Joshua Safer that is similar to a supplemental declaration the plaintiffs submitted in *Hecox*. After reviewing both sets of declarations, the *Hecox* court concluded that the evidence cited in Dr. Brown's declaration did not support his conclusions. *Hecox* explained that "[w]hile Dr. Brown maintains that hormone and testosterone suppression cannot fully eliminate physiological advantages once an individual has passed through male

puberty, the Court notes some of the studies Dr. Brown relies upon actually held the opposite." 479 F. Supp. 3d at 980. "Further, the majority of the evidence Dr. Brown cites, and most of his declaration, involve the differences between male and female athletes in general, and contain no reference to, or information about, the difference between cisgender women athletes and transgender women athletes who have suppressed their testosterone." *Id.* And one of the only studies involving transgender individuals "explicitly stated it 'is important to recognize that we only assessed proxies for athletic performance . . . it is still uncertain how the findings would translate to transgender athletes.'" *Id.* at 981 (citation omitted).

The same flaws with Dr. Brown's declaration identified by the *Hecox* court persist here. As Dr. Safer explains, none of the studies cited by Dr. Brown show that puberty-blockers and gender-affirming hormone therapy do not eliminate the performance advantage of testosterone. (*See* Supp. Safer Decl. ¶¶ 10–12.) Indeed, they did not even measure athletic performance. (*Id.* ¶ 12.) And the Handelsman study the Attorney General calls out in its brief actually *supports* the inclusion of girls who are transgender in girls' sports, as it specifically concludes that "the appropriate eligibility criterion for female athletic events should be a circulating testosterone of <5.0 nmol/L" and acknowledges that this level "would include" girls who are transgender who receive hormone therapy. DJ Handelsman et al., Circulating Testosterone as the Hormonal Basis of Sex Differences in Athletic Performance, 39 Endocrine Reviews 803, 803 (2018); (*see also* Supp. Safer Decl. ¶ 13).

Moreover, in this case there is no need to consider the issue of counteracting physiological changes caused by puberty because B.P.J. receives puberty blockers to prevent those changes from occurring and thus has never gone through endogenous puberty. (*See* PI Br. at 5.) As to the Attorney General's claim that prepubertal boys have a physiological advantage over prepubertal

girls, there is simply no support for that claim.  Dr. Brown notes that some population studies have observed a difference in athletic performance between boys and girls even before puberty. (AG Opp. at 9 n.5.)  But those population studies do not purport to identify any relevant physiological differences between prepubertal cisgender boys and prepubertal cisgender girls for purposes of athletic performance.  (Supp. Safer Decl. ¶ 9.)  Differences in performance could be explained by, among other things, greater encouragement of athleticism in boys and greater opportunities to play sports.  (*Id.*)  Further, the studies cited by Dr. Brown that actually attempt to define the cause of athletic differences between cisgender men and cisgender women all attribute those differences to circulating testosterone levels that typically diverge at puberty.  (*Id.*); *see, e.g.*, Handelsman at 820 (summarizing evidence rejecting hypothesis that physiological characteristics are driven by Y chromosome).[16]

At bottom, the Attorney General's argument is that B.P.J. is "biologically different" from cisgender girls and so can be excluded from girls' teams.  (AG Opp. at 8.)  But as discussed above in connection with B.P.J.'s Title IX claim, the relevant question for equal protection purposes is whether the differences that H.B. 3293 have made dispositive of her participation on girls' sports teams—sex chromosomes and anatomy at birth—matter to the goal the Attorney General claims West Virginia is trying to achieve.  That is, are sex chromosomes and anatomy at birth themselves substantially related to athletic performance such that allowing B.P.J. and girls who are

---

[16] Even World Rugby's policy, to which the Attorney General points (*see* AG Opp. at 7 n.4), would not bar B.P.J. from competing, as it allows women who are transgender to play if they transitioned before undergoing puberty.  (*See id.* at Ex. 8.)  Notably, USA Rugby has recently announced that it will not follow World Rugby's policy and will continue to allow women who are transgender to compete in women's rugby competitions in the United States.  *See* USA Rugby, *USA Rugby Response to Updated World Rugby Transgender Athlete Policy*, Oct. 9, 2021, https://www.usa.rugby/2020/10/usa-rugby-response-to-updated-world-rugby-transgender-athlete-policy/.

transgender to play on girls' sports teams will substantially displace girls who are cisgender? *Cf. City of Cleburne, Tex v. Cleburne Living Ctr.*, 473 U.S. 432, 448 (1995).  For the reasons set forth above and in B.P.J.'s opening brief and accompanying declarations, they are not.  Just like the similar law that remains enjoined in Idaho, H.B. 3293 "is based on overbroad generalizations without factual justification."  *Hecox*, 479 F. Supp. 3d at 982.

Finally, and tellingly, no Defendant makes any attempt to show that girls who are transgender have substantially displaced girls who are cisgender in school sports in West Virginia. Nor does any Defendant make any attempt to argue that transgender girls like B.P.J.—an 11-year-old middle schooler who lives as a girl, is on puberty-delaying treatment and has never gone through any endogenous puberty, and just wants to run on the girls' cross country team with her friends—are substantially displacing cisgender girls on school sports teams.  And no Defendant engages with the evidence that H.B. 3293 "is 'marked by misconception and prejudice'" against girls who are transgender.  *Grimm*, 972 F.3d at 615 (quoting *Tuan Anh Nguyen v. INS*, 533 U.S. 53, 73 (2001)); (*see* PI Br. at 10, 18–19; U.S. SOI at 18).

B.P.J. does not demand a "perfect fit" between H.B. 3293 and the asserted government interest.  (AG Opp. at 9.)  B.P.J. simply demands the same "exceedingly persuasive" justification and substantial relationship between means and ends that the Supreme Court has long required in heightened scrutiny equal protection cases.  *VMI*, 518 U.S. at 533.  At the end of the day, Defendants simply cannot carry that heavy burden.

## IV.    B.P.J. WILL SUFFER IRREPARABLE HARM WITHOUT A PRELIMINARY INJUNCTION.

The remaining preliminary injunction factors weigh heavily in B.P.J.'s favor.  Only the County Defendants raise any argument at all about B.P.J.'s showing of irreparable harm; all other Defendants are silent on that issue, and with good reason.  As B.P.J. explained previously, where one's constitutional rights are violated, courts in the Fourth Circuit presume irreparable harm.  *See*

*Ross v. Meese*, 818 F.2d 1132, 1135 (4th Cir. 1987); *Henry v. Greenville Airport Comm'n*, 284 F.2d 631, 633 (4th Cir. 1960).  The County Defendants claim that no presumption of irreparable harm can attach because they have not yet enforced H.B. 3293, but this is incorrect. (County Opp. at 22.)  B.P.J. has submitted "proof indicating that the harm [caused by enforcement of H.B. 3293] is certain to occur in the near future," *Applied Partners, Inc. v. Liquasol, LLC*, No. 2:18-cv-00048, 2018 WL 606097, at *2 (S.D. W. Va. Jan. 29, 2018), and County Defendants concede that the law is "soon fully enforceable."  (County Opp. at 22.)

Regardless, no presumption of constitutionality is necessary to support B.P.J.'s showing of irreparable harm, since the undisputed facts alone establish it.  H.B. 3293 will deprive B.P.J. of athletic opportunity at a key developmental point in her childhood, causing her to lose seasons of competition, camaraderie, and development with her peers that she will never be able to get back. (B.P.J. Decl. ¶¶ 12, 14.)

Nor is this a case like *Gregor v. West Virginia Secondary School Activities Commission*, No. 2:20-cv-00654, 2020 WL 5997057 (S.D. W. Va. Oct. 9, 2020).  The plaintiff in *Gregor* wished to participate on the boys' soccer team—*instead* of the girls' soccer team, which she agreed was available to her.  *Id.* at *2–3.  This Court noted that the "crucial difference" between the case before it and other sex discrimination in sport cases granting relief was that the plaintiff's school *did* offer her the opportunity to participate in a girls' soccer team, which indeed she had done for two years. *Id.*  *Gregor* observed that some courts had found irreparable harm where the plaintiff "cannot participate in the sport at all," and this is just such a case.  *Id.*

Unlike the plaintiff in *Gregor*, if B.P.J. cannot participate on the girls' team, she cannot participate at all.  The law of this Circuit already recognizes this principle.  *Grimm*, 972 F.3d at 624 (Wynn, J. concurring) (finding that the supposed "choice" for a transgender boy to use girls'

restrooms instead of the boys' restrooms matching his gender identity "is no choice at all"). B.P.J. is a girl. Having state law brand B.P.J. with a "scarlet T"—and stigmatize her by treating her as if she is a boy—would cause distress that is intolerable for her. (B.P.J. Decl. ¶¶ 12–15; Heather Decl. ¶¶ 26–27.) That is no option at all.[17]

## V.  THE BALANCE OF THE EQUITIES AND PUBLIC INTEREST FAVOR B.P.J.

The balance of equities and the public interest strongly favor an injunction. The grave harms that B.P.J. will suffer—social, psychological, and emotional—far outweigh the imaginary and conjectural harms the County Defendants and the Attorney General claim will be inflicted upon them if H.B. 3293 is preliminarily enjoined. In fact, Defendants demonstrate no harm from simply maintaining the status quo of the regulatory framework that always existed prior to H.B. 3293—a framework that has never categorically excluded girls who are transgender from participation, and that did not produce a single instance of harm in the legislative record. In stark contrast to the profound harms H.B. 3293 inflicts on B.P.J., Defendants are "in no way harmed by issuance of a preliminary injunction which prevents the state from enforcing restrictions likely to be found unconstitutional. If anything, the system is improved by such an injunction." *Giovani Carandola, Ltd. v. Bason*, 303 F.3d 507, 521 (4th Cir. 2002).

Although the preliminary relief B.P.J. seeks is allowing her to participate in cross country and track, Defendants offer no argument about why allowing B.P.J. to participate would affect the

---

[17] The County Defendants cite other cases involving temporary periods of ineligibility to participate in scholastic sports, but they are inapposite. (County Opp. at 24 n.87.) *See, e.g.*, *Dziewa v. Pa. Interscholastic Athletic Ass'n, Inc.*, No. 08-5792, 2009 WL 113419, at *7 (E.D. Pa. Jan. 16, 2009) (involving one-year ineligibility period where student could still attend practices and participate in freestyle wrestling tournaments); *Revesz ex rel. Revesz v. Pa. Interscholastic Athletic Ass'n, Inc.*, 798 A.2d 830, 837 (Pa. 2002) (involving one-year ineligibility period where student could still participate in intramural sports and play in recreational leagues). Neither case involved an equality injury or enduring and total exclusion. In stark contrast, H.B. 3293's prohibition of equal opportunity for B.P.J. is permanent and absolute.

balance of the equities or the public interest.  (County Opp. at 24–27.)  Instead, they make only vague insinuations that girls, writ large, "may face emotional injury, physical injury, and competitive disadvantage."  (*Id*. at 25.)  Not so.  The only evidence in the record shows that B.P.J. was accepted by her peers while participating in cheer, and that she was an integral part of her team.  (B.P.J. Decl. ¶ 9.)  The idea that allowing B.P.J. to run track or cross country would somehow "injure" other girls is baseless and inflammatory.

Defendants try to move the goalpost by suggesting that the Court must consider "*all* female athletes" as part of this analysis.  (AG Opp. at 19.)  But that is not the test.  The relief sought here concerns B.P.J. and her ability to try out for the track and cross country teams, not "all female athletes" across West Virginia let alone the Nation—although the Defendants have nothing to say about them either.  Instead, the Attorney General invokes a Connecticut case involving two transgender girls, both of whom were previously high school runners.  (*Id*. at 19.)  The Attorney General expounds at length upon the allegations raised by the cisgender girls who sought to block them from participating, (*id.*), but fails to mention that the transgender girls were repeatedly defeated by their cisgender peers.  *Soule v. Conn.*, *Ass'n of Schs., Inc.*, No. 3:20-cv-00201, 2020 WL 6580265, at * 10–11 (D. Conn. Aug. 21, 2020).  That case has nothing to do with whether the 11-year-old girl at the heart of this case can try out for cross country with her female friends and peers.

The County Defendants try to cast B.P.J.'s argument about the public interest as "circular," (County Opp. at 26), but the circularity comes instead from their own claim that because "the government's interest *is* the public interest," this factor "necessarily" weighs in favor of the government.  (*Id*. at 24.)  Under that logic, all government action is automatically self-justifying merely because the government does it.  That is not the law.  As B.P.J. explained in her motion,

the balance of equities tips sharply in her favor, and nothing in Defendants' arguments changes that.  (PI Br. at 26–27.)

## CONCLUSION

For the foregoing reasons and those in Plaintiff's opening motion, Plaintiff respectfully requests that the Motion for Preliminary Injunction be granted.

Dated: June 30, 2021

Respectfully submitted,

/s/ Loree Stark

Joshua Block*
Taylor Brown*
Chase Strangio*
AMERICAN CIVIL LIBERTIES UNION
FOUNDATION
125 Broad St.
New York, NY 10004
Phone: (212) 549-2569
jblock@aclu.org

Avatara Smith-Carrington*
LAMBDA LEGAL
3500 Oak Lawn Avenue, Suite 500
Dallas, TX 75219
Phone: (214) 219-8585
asmithcarrington@lambdalegal.org

Carl Charles*
Tara Borelli*
LAMBDA LEGAL
730 Peachtree Street NE, Suite 640
Atlanta, GA 30308-1210
Phone: (404) 897-1880
ccharles@lambdalegal.org

Sruti Swaminathan*
LAMBDA LEGAL
120 Wall Street, 19th Floor
New York, NY 10005
Phone: (212) 809-8585
sswaminathan@lambdalegal.org

Andrew Barr*
COOLEY LLP
1144 15th St. Suite 2300
Denver, CO 80202-5686
Phone: (720) 566-4000
abarr@cooley.com

Loree Stark (Bar No. 12936)
AMERICAN CIVIL LIBERTIES UNION OF WEST
VIRGINIA FOUNDATION
P.O. Box 3952
Charleston, WV 25339-3952
Phone: (914) 393-4614
lstark@acluwv.org

Kathleen Hartnett*
Julie Veroff*
COOLEY LLP
3 Embarcadero Center, 20th Floor
San Francisco, CA 94111
Phone: (415) 693-2000
khartnett@cooley.com

Katelyn Kang*
COOLEY LLP
55 Hudson Yards
New York, NY 10001-2157
Phone: (212) 479-6000
kkang@cooley.com

Elizabeth Reinhardt*
COOLEY LLP
500 Boylston Street, 14th Floor
Boston, MA 02116-3736
Phone: (617) 937-2305
ereinhardt@cooley.com

*Visiting Attorneys

Attorneys for Plaintiff

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA
CHARLESTON DIVISION

B.P.J., by her next friend and mother, HEATHER
JACKSON,

                                    *Plaintiff*,

        v.

WEST   VIRGINIA   STATE   BOARD   OF          Civil Action No. 2:21-cv-00316
EDUCATION, HARRISON COUNTY BOARD
OF   EDUCATION,   WEST   VIRGINIA            Hon. Joseph R. Goodwin
SECONDARY   SCHOOL   ACTIVITIES
COMMISSION, W. CLAYTON BURCH in his
official  capacity  as  State  Superintendent,  and
DORA STUTLER in her official capacity as
Harrison County Superintendent,

                                    *Defendants*,

        and

THE STATE OF WEST VIRGINIA,

                                    *Defendant-Intervenor*.

## CERTIFICATE OF SERVICE

I, Loree Stark, do hereby certify that on this 30th day of June, 2021, I electronically filed a

true and exact copy of ***Plaintiff's Consolidated Reply in Support of Motion for Preliminary***

***Injunction*** with the Clerk of Court and all parties using the CM/ECF System.

                                    */s/ Loree Stark*
                                    West Virginia Bar No. 12936

32