IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA
CHARLESTON DIVISION

B.P.J., by her next friend and mother, HEATHER
JACKSON,

                                        *Plaintiff*,

v.                                                      Civil Action No. 2:21-cv-00316
                                                        Hon. Joseph R. Goodwin, District Judge

WEST VIRGINIA STATE BOARD OF
EDUCATION, HARRISON COUNTY BOARD
OF EDUCATION, WEST VIRGINIA
SECONDARY SCHOOL ACTIVITIES
COMMISSION, W. CLAYTON BURCH in his
official capacity as State Superintendent, and
DORA STUTLER in her official capacity as
Harrison County Superintendent,

                                        *Defendants*.

**MEMORANDUM OF LAW IN SUPPORT OF DEFENDANTS
HARRISON COUNTY BOARD OF EDUCATION AND DORA STUTLER'S
<u>MOTION TO DISMISS</u>**

Dismissal of the Harrison County Board of Education and Dora Stutler in her

official capacity as Harrison County Superintendent (collectively, "the County Board") pursuant

to Fed. R. Civ. P. 12(b)(6) is appropriate because they were not responsible for and did not pass

the West Virginia statute ("the Act") at issue in this civil action, and thus they cannot be liable to

Plaintiff.  On July 8, 2021, the Act will go into effect in order to clarify that girls' sports teams are

closed to biological males, regardless of their gender identity.[1]  The Act was passed by the West

Virginia Legislature and signed by the State's Governor, and if it goes into effect, it will preclude

B.P.J. from joining the girls' track and cross-country teams.  The County Board has no policy or

---

[1] The County Board means no disrespect to B.P.J. by use of the phrase "biological boy" or "biological male" in its briefing. The County Board respects that B.P.J.'s identity is that of a girl. The Act, however, uses the phrases "biological males," "biological females," and "biological sex," and so the County Board uses these and similar phrases to discuss and address the terms of and definitions in the statute.

custom that would prevent B.P.J. from joining the girls' teams due to transgender status.  However, the County Board is required to follow the law, and so it is tasked with enforcing the Act when (or if) it goes into effect.  Of course, if the Act does not go into effect (because, for example, the Court enjoins any of the defendants), the County Board will not enforce it, and the County Board will not prevent B.P.J. from trying out for girls' athletic teams based on transgender status.  If the Act were to cause B.P.J. any actionable harm, the County Board is simply not the responsible party, and the State would be liable for any award of monetary damages, including attorneys' fees.

While the County Board did not have any role in the passage of the Act, Plaintiff has asserted claims seeking equitable and monetary damages (including costs, expenses, and attorneys' fees) against it.  The County Board thus finds itself in the position of having to defend a statute it had no part in forming or passing.  To that extent, the County Board observes that a clear legal basis exists for finding that the Act survives legal scrutiny under Title IX and Equal Protection review and thus that the County Board is not liable to Plaintiff for this additional reason.

## I. INTRODUCTION

### A.    Factual background

B.P.J. is an eleven-year-old transgender girl who wishes to try out for the girls' cross-country (in the fall) and track (in the spring) teams at school.  (Compl. ¶¶ 1–2.)  This year, the West Virginia Legislature passed (and the Governor subsequently signed) H.B. 3293 ("the Act").  (*See* Compl. ¶ 2.)  The Act is scheduled to go into effect July 8, 2021, and, if it does, it will prevent B.P.J. from participating on the girls' teams beginning on August 2, 2021.  (*Id.* ¶ 61; DE# 36, at 5.)  The Act will define "male" and "female" based on "biological sex determined at birth" and will provide that "[a]thletic teams or sports designated for females, women, or girls shall not be open to students of the male sex where selection for such teams is based upon competitive skill or the activity involved is a contact sport."  W. VA. CODE § 18-2-25d(b), (c)(2) (eff. July 8, 2021).

2

12894263

As expressly set out in the Act, the Legislature's purpose was to clarify the law regarding who can play on a girls' sports team.  *See* W. VA. CODE § 18-2-25d (eff. July 8, 2021). It did so in order to recognize the inherent relevant differences between biological males and biological females in the context of physical athletic competition.  *Id.*  The Legislature recognized that biological males and biological females are not "similarly situated" in the contexts of safe physical contact and fair competitive tests of physical skill, and that biological sex serves as the safest, fairest way to group students into teams.  *See, e.g.*, W. VA. CODE § 18-2-25d(a)(4) and (5) (eff. July 8, 2021) ("Classifications based on gender identity serve no legitimate relationship to the State of West Virginia's interest in promoting equal athletic opportunities for the female sex").

The typical physical differences between biological males and biological females are reflected in, for example, the fact that the equipment and associated requirements for boys' sports are often different from the equipment and requirements for girls' sports, and where they are, they reflect that boys are generally taller, bigger, faster, and stronger than girls.  For example, the National Federation of State High School Associations' ("NFHS") *Rules Book, Track and Field and Cross Country* (2020) ("*Rules Book*")[2] (the rules governing track and field and cross country in West Virginia) requires that the boys' discus, shot, javelin, *etc.*, are larger than the girls' discus, shot, javelin, *etc.*  (*See generally Rules Book*, available on request.) [3]   Boys' hurdles are

---

[2] There are no 2021 rules for track and field or cross country.  *See Track and Field & Cross Country Rules Changes* (Feb. 10, 2021), *available at* https://www.nfhs.org/sports-resource-content/track-and-field-cross-country-rules-changes/.

[3] W. VA. CODE ST. R. § 127-3-22.1 ("Cross country rules published by the NFHS are the official rules for all interscholastic competition unless otherwise provided by Commission modification.");  W. VA. CODE ST. R. § 127-3-29.1 ("Track and Field rules published by the NFHS are the official rules for all interscholastic competition unless otherwise provided by Commission modification.").  Thus, the Court may consider the contents of the *Rules Book* as part of this Motion to Dismiss.  If the rules are not considered to be regulations, then the Court should consider their contents as legislative facts.  "Legislative facts are established truths, facts or pronouncements that do not change from case to case but apply universally" (and are not subject to Rule 201 of the Federal Rules of Evidence).  *United States v. Gould*, 536 F.2d 216, 220 (8th Cir. 1976).  For example, "the location of South Charleston in Kanawha County and the Southern District of West Virginia may be treated as legislative fact—that is, one that is fixed and does not change

taller and are more widely spaced than girls' hurdles.  And boys' jumps are longer than the girls'. (*Id.*)  Boys have a decathlon (with ten consecutive events); girls have a heptathlon (with seven events).  (*Id.*)  Without belaboring the point, the list is extensive.

These natural trends in the physical differences between biological males and biological females have led to concerns about competitive fairness to, and, more importantly, the safety of, biological females when playing with and against biological males.

**B.      Procedural history**

On May 26, 2021, B.P.J. sued West Virginia State Board of Education and W. Clayton Burch in his official capacity as State Superintendent (collectively, "the State Board"); the County Board; and the West Virginia Secondary School Activities Commission ("the WVSSAC"), claiming that Defendants violated Title IX of the Educational Amendments of 1972, 20 U.S.C. §§ 1681 *et seq.* ("Title IX") (Count I) and 42 U.S.C. § 1983 by violating the Equal Protection Clause of the Fourteenth Amendment (U.S. CONST. Am. XIV) ("EPC") (Count II). B.P.J. seeks a declaratory judgment declaring that the Act violates Title IX and the EPC, a preliminary injunction and (eventually) a permanent injunction mandating that Defendants put B.P.J. on the girls' team(s) (and to do so without B.P.J. having to post a bond), nominal damages, reasonable attorneys' fees, costs, expenses, and unspecified relief.  (*See* Compl. at Prayer.)

## II. ANALYSIS

As demonstrated below, B.P.J. cannot obtain relief against the County Board because it has not caused and never will cause any injury that B.P.J. claims has happened or will

---

from case to case[.]" *United States v. Santamaria*, No. CR 2:08-00270, 2010 WL 11520478, at *1 n.1 (S.D.W. Va. Feb. 25, 2010), *aff'd*, 418 F. App'x 197 (4th Cir. 2011) (citing *United States v. Gavegnano*, 305 F. App'x 954, 956 (4th Cir. 2009)(unpublished)).  A "district court properly may take judicial notice of legislative facts." *Gavegnano*, 305 F. App'x at 956 (4th Cir. 2009). "[C]ourts must consider the complaint in its entirety, as well as other sources courts ordinarily examine when ruling on Rule 12(b)(6) motions to dismiss, in particular, . . . matters of which a court may take judicial notice." *Tellabs, Inc. v. Makor Issues & Rts., Ltd.*, 551 U.S. 308, 322, 127 S. Ct. 2499, 2509, 168 L. Ed. 2d 179 (2007) (citation omitted).

12894263

happen and because the Act survives legal scrutiny under Title IX and the EPC.  Therefore, Plaintiff has failed to state a claim against the County Board for which relief can be granted.

### A.        Standard of Review

A Rule 12(b)(6) motion "challenges the legal sufficiency of a complaint" and provides for dismissal if the complaint fails "to state a claim upon which relief can be granted." *Francis v. Giacomelli*, 588 F.3d 186, 192 (4th Cir. 2009) (citation omitted); Fed. R. Civ. P. 12(b)(6). On a motion to dismiss, the facts alleged in the complaint are assumed to be true, but to survive a motion to dismiss, the complaint must show that the plaintiff is "entitled to relief." *Francis*, 588 F.3d at 192; Fed. R. Civ. P. 8(a)(2).

### B.        The County Board has not and will not violate B.P.J.'s Title IX rights.[4]

Title IX provides that "[n]o person . . . shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any education program or activity receiving Federal financial assistance." 20 U.S.C. § 1681(a).  Nevertheless, applicable regulations allow a recipient to "operate or sponsor separate [athletic] teams for members of each sex where selection for such teams is based upon competitive skill or the activity involved is a contact sport." 34 C.F.R. § 106.41(b).  To succeed on a Title IX claim, a plaintiff must prove "(1) that [the plaintiff] was excluded from participation in an education program 'on the basis of sex'; (2) that the educational institution was receiving federal financial assistance at the time; and (3) that improper discrimination caused [the plaintiff] harm." *Grimm v. Gloucester Cty. Sch. Bd.*, 972 F.3d 586, 616 (4th Cir. 2020), *as amended* (Aug. 28, 2020), *cert. denied sub nom. Gloucester County School Board v. Grimm, Gavin*, No. 20-1163, 2021 WL 2637992 (U.S. June 28, 2021) (citation omitted).

---

[4] B.P.J. does not bring Count I against County Superintendent Stutler, so in this section, "the County Board" does not include County Superintendent Stutler.

12894263

"[A] recipient of federal funds may be liable in damages under Title IX **only for its own misconduct**.  **The recipient itself** must 'exclude persons from participation in, . . . deny persons the benefits of, or . . . subject persons to discrimination under' its 'programs or activities' in order to be liable under Title IX."  *Davis Next Friend LaShonda D. v. Monroe Cty. Bd. of Educ.*, 526 U.S. 629, 640–41 (1999) (emphasis added) (internal brackets omitted).  The Fourth Circuit has thus echoed that "the implied damages remedy is available only when '**the funding recipient engages in intentional conduct** that violates the clear terms of the statute.'"  *Baynard v. Malone*, 268 F.3d 228, 237 (4th Cir. 2001) (emphasis added) (quoting *Davis*).

In *Grimm*, the Court found that the plaintiff had met the three elements of a Title IX claim where *a county school board policy* precluded the plaintiff, Grimm, a transgender male student, from using the boys' restrooms.  972 F.3d at 616–17, 619.  The Court recognized that a Title IX regulation (34 C.F.R. § 106.33) permits sex-separated toilet facilities but found that unlawful discrimination nevertheless existed because *the school board itself* had relied "on *its own* discriminatory notions of what 'sex' means."  *Id.* at 618 (emphasis added) (citation omitted).

In the present civil action, in contrast, the County Board is not relying (and will not rely) on its own notions of what "sex" means.  No existing or future policy, custom, or decision of the County Board is at issue in this civil action.  The County Board is also not responding to harassment with deliberate indifference, another basis for imposing liability, as Plaintiff pointed out.  (EC# 53, at 12 (p.6 of the brief).)  *See Fitzgerald v. Barnstable Sch. Comm.*, 555 U.S. 246, 257, 129 S. Ct. 788, 797, 172 L. Ed. 2d 582 (2009).  Instead, here, the County Board is compelled to comply with a mandatory state statute.  Undisputedly, the County Board will have no choice but to apply the Act starting (in this case) on August 2 (assuming it is effective at that time).

The Act's is clearly mandatory, not merely optional, voluntary, authorizing, *etc.*  It requires that teams and sports "***shall be*** expressly designated as one of [three choices]."  W. VA.

6

CODE § 18-2-25d(c)(1) (eff. July 8, 2021) (emphasis added).  And in its primary provision, it requires that teams and sports "designated for females, women, or girls *shall not be open* to students of the male sex where selection for such teams is based upon competitive skill or the activity involved is a contact sport."  W. VA. CODE § 18-2-25d(c)(2) (emphasis added).  Finally, the Act creates a cause of action that may be brought by "any student aggrieved by a violation of" the Act "against a county board of education" responsible for the violation.  W. VA. CODE § 18-2-25d(d)(1).

"When the municipality is acting under compulsion of state or federal law, it is the policy contained in that state or federal law, rather than anything devised or adopted by the municipality, that is responsible for the injury." *Bethesda Lutheran Homes & Servs., Inc. v. Leean*, 154 F.3d 716, 718 (7th Cir. 1998).  If B.P.J. is found to be injured by the Act, that injury will not, by definition, be caused by the County Board.  Indeed, no award against the County Board can provide the relief that Plaintiff seeks; West Virginia's Legislature passed the Act, its Governor signed it, and thus the County Board is tasked with enforcing it within Harrison County.  It is now in the Court's hands to determine whether to enjoin the Act from going into effect.

If the Act is truly unlawful and unconstitutional, as Plaintiff claims, then it should be enjoined from going into effect state-wide, not just within Harrison County.  If only the County Board were enjoined from enforcing the Act, then B.P.J. could try out for the girls' sports teams at her school, but the Act would still apparently prevent her from participating in competitions involving West Virginia schools outside of Harrison County.[5]  This case is simply not *Grimm*, where a county board was applying a county board policy.  Here, the County Board is not

---

[5]  This highlights the reason why the County Board (including the Harrison County Board of Education and Superintendent Stutler) are not proper defendants because they cannot provide the full relief that Plaintiff seeks.

responsible for any injury B.P.J. could have and cannot provide the relief she seeks, as it does not control the Act. Accordingly, Plaintiff has failed to state a claim against the County Board for which relief can be granted, and Count I should be dismissed as against the County Board.

### C. The County Board has not and will not deprive B.P.J. of equal protection.[6]

For a similar reason, B.P.J. also cannot succeed on her EPC claim against the County Board; whether or not the Act deprives B.P.J. of an equal protection right, *the County Board* has not done so and will not do so, and it cannot provide the relief that Plaintiff seeks.

A local governing body (like a county board of education) can, under limited circumstances, be liable for violating the United States Constitution; it,

> therefore, can be sued directly under § 1983 for monetary, declaratory, or injunctive relief ***where[] . . . the action that is alleged to be unconstitutional implements or executes a policy statement, ordinance, regulation, or decision officially adopted and promulgated by that body's officers***. Moreover, although the touchstone of the § 1983 action against a government body is an allegation that official policy is responsible for a deprivation of rights protected by the Constitution, local governments, . . . may be sued for constitutional deprivations visited pursuant to governmental "custom" . . . .

*Monell v. Dep't of Soc. Servs. of City of New York*, 436 U.S. 658, 690–91 (1978) (emphasis added) (footnote omitted).

This liability has an important and well-circumscribed limit, however; local government units cannot "be held liable unless action pursuant to official [local government unit] policy of some nature caused a constitutional tort"; accordingly, a local government unit cannot

---

[6] There will also be a question of standing and mootness (under Fed. R. Civ. P. 12(b)(1)) against the County Board if the Court grants B.P.J.'s motion for preliminary injunction because the County Board has no policy or custom of its own that would require it to close the girls' teams to B.P.J. based on transgender status. Moreover, if the Court grants Plaintiff's motion for a preliminary injunction, Plaintiff will have no legal basis for a Title IX or EPC claim against the County Board because it will have caused her no injury. The County Board has not prevented B.P.J. from participating on the team of her choice to date, and if the Court enters a preliminary injunction, the County Board will not prohibit her from trying out or participating based on transgender status. Thus, Plaintiff's claims against the County Board fail as a matter of law.

be liable on a *respondeat superior* theory. *Id.*, 436 U.S. at 691 (emphasis added); *see also id.* 436 U.S. at 691 n.5 (the same rules apply to actions against local government unit officers because "official-capacity suits generally represent only another way of pleading an action against an entity of which an officer is an agent"). Thus,

> **"[Local government unit] liability under § 1983 attaches where—and only where—a deliberate choice to follow a course of action is made from among various alternatives" by [local government unit] policymakers**. . . . Only where [policy, procedure, custom, etc.] reflects a "deliberate" or "conscious" choice by a [local government unit]—a "policy" as defined by our prior cases—can a [local government unit] be liable for such [policy, etc.] under § 1983.

*City of Canton, Ohio v. Harris*, 489 U.S. 378, 389, 109 S. Ct. 1197, 1205, 103 L. Ed. 2d 412 (1989) (emphasis added; second alteration in original) (citation omitted). A county board is thus responsible only for its own policies, *etc.*, and it cannot be liable for acts that were not the result of a deliberate, conscious choice to follow a course of action made from among various alternatives. Where a county has done nothing more than comply with a mandate imposed (by statute, for example) on the county (by the state, for example), the county has not violated § 1983.[7]

In *Bethesda Lutheran Homes & Servs., Inc.*, 154 F.3d, for example, the operator of a residential facility for the mentally ill and several current and future residents thereof sued, *inter alia*, Jefferson County, Wisconsin, for enforcing certain state and federal Medicaid regulations and, the plaintiffs claimed, thereby violating § 1983. The district court denied the plaintiffs' claim "on the ground that . . . a county . . . cannot be held liable under section 1983 for acts that it did under the command of state or federal law." 154 F.3d at 718. Judge Posner noted for the court

---

[7] This inquiry is a purely objective one: "[T]he state of mind of local officials who enforce or comply with state or federal regulations is immaterial to whether the local government is violating the Constitution if the local officials could not act otherwise without violating state or federal law. The spirit, the mindset, the joy or grief of local officials has no consequences for the plaintiffs if these officials have no discretion that they could exercise in the plaintiffs' favor." 154 F.3d at 719.

12894263

that insofar as the county was bound to follow the state and federal laws at issue, the district court's holding was the correct application of Seventh Circuit law.

As the Seventh Circuit has recognized, "[i]t is difficult to imagine a municipal policy more innocuous and constitutionally permissible, and whose causal connection to the alleged violation is more attenuated, than the 'policy' of enforcing state law." *Surplus Store & Exch., Inc. v. City of Delphi*, 928 F.2d 788, 791–92 (7th Cir. 1991). "If the language and standards from *Monell* are not to become a dead letter, such a 'policy' simply cannot be sufficient to ground liability against a municipality." *Id.* (citation omitted). This position "has the virtue of minimizing the occasions on which federal constitutional law, enforced through section 1983, puts local government at war with state government." *Bethesda Lutheran Home & Servs.*, 154 F.3d at 718.[8]

In 1993, the Fourth Circuit considered the mandatory-voluntary distinction. In *Bockes v. Fields*, 999 F.2d 788 (4th Cir. 1993), Grayson County, Virginia, shared in the

---

[8] *See also Vives v. City of New York*, 524 F.3d 346, 356 (2d Cir. 2008) ("We have held today that a municipality cannot be held liable simply for choosing to enforce the entire Penal Law.") (footnote omitted); *Dakota Rural Action v. Noem*, No. 19-cv-5026, 2019 WL 4546908, at *5 (D.S.D. Sept. 18, 2019) ("Applying this standard [*Monell*, *et al.*] in this case, Plaintiffs have failed to allege that Pennington County sheriff officials have made any choices at all regarding enforcement of the challenged laws that could cause a violation of Plaintiffs' First Amendment rights. Plaintiffs' allegations show only that a policy choice was made by State officials."); *Elabanjo v. Bellevance*, No. 1:11-CV-349, 2012 WL 4327090, at *5 (M.D.N.C. Sept. 18, 2012) ("The enforcement of a state statute by a municipality does not qualify as a municipal policy or custom sufficient to support § 1983 liability."), *report and recommendation adopted*, No. 1:11-CV-349, 2012 WL 5864004 (M.D.N.C. Nov. 19, 2012); *cf. Echnols v. Parker*, 909 F.2d 795, 801 (5th Cir. 1990) ("[W]hen a state statute directs the actions of an official, as here, the officer, be he state or local, is acting as a state official."); *Doby v. DeCrescenzo*, 171 F.3d 858, 868 (3d Cir. 1999) (accepting that "when a county is merely enforcing state law, without adopting any particular policy of its own, it cannot be held liable under the *Monell* line of cases").

In cases where a court found local government liability, it has generally been because the local government unit's conduct was not mandated, but merely allowed (or unrelated) to state or federal law. *See Cooper v. Dillon*, 403 F.3d 1208, 1221–22 (11th Cir. 2005) (police officer's enforcement of state criminal law with no allegation that state law also made it mandatory for him to have done so); *Evers v. Custer Cty.*, 745 F.2d 1196, 1201 (9th Cir. 1984); *Humphries v. Los Angeles Cty.*, No. SACV03697JVSMANX, 2012 WL 13014632, at *3 (C.D. Cal. Oct. 17, 2012) ("A municipality cannot be held liable under Monell merely for enforcing a state law. But where the municipality makes a deliberate choice from among various alternatives to adopt a particular policy, the municipality can be held liable."). Where the local government unit is doing nothing but following state-mandated law, district courts applying *Evers* have not hesitated to dismiss § 1983 claims against them. *See, e.g.*, *Humphries*, 2012 WL 13014632, at *3.

10

12894263

implementation of the Commonwealth of Virginia's social services programs.  The county had discharged an employee of the Grayson County Board of Social Services in compliance with mandatory Commonwealth board employment rules, "which the local boards must follow."  999 F.2d at 791.  Reversing the district court's refusal to dismiss the County Board, the Fourth Circuit said, "Such bounded, state-conferred discretion is not the 'policymaking authority' for which a county may be held responsible under § 1983."  *Id.*

Very recently, in *Bruce & Tanya & Assocs., Inc. v. Bd. of Supervisors of Fairfax Cty., Va.*, No. 19-1151, 2021 WL 1854750 (4th Cir. May 10, 2021) (unpublished), the Fourth Circuit addressed a case arising from regulation of outdoor advertising in Virginia.  The relevant state statute (Sections 1224 and 1225) did not mandate that local governments enforce it.  2021 WL 1854750, at *9.  Nevertheless, "Virginia's Commissioner of Highways signed a cooperative agreement with the Fairfax County Board of Supervisors authorizing the latter to enforce Section 1224."  2021 WL 1854750, at *2.  Subsequently, the county began aggressively enforcing the Commonwealth's sign statute against the plaintiff ("BTA"), and BTA sued, *inter alia*, the county. The county argued that it was not liable under § 1983 because it was just enforcing a state law.

Noting that "[t]he majority of our sister circuits to consider the question have suggested that a local government can be subjected to *Monell* liability if it makes an independent choice to enforce or follow parameters set by state law, rather than being obliged to do so," the Court continued following *Bockes* (and *Vives*, *et al.*).  2021 WL 1854750, at *8.  The Court found that the county could be liable for enforcing Section 1224 "because it consciously chose to enforce" it, but the county could not be liable for harms caused by a section of the statute it did not adopt as its own policy.  2021 WL 1854750, at *9-10.  "Although the County can be liable for enforcing a state regulation it has voluntarily adopted as its own, it cannot be held liable for state statutes it has not consciously adopted into its own policy."  2021 WL 1854750, at *10.

11

12894263

Here, Count II states no claim on which relief can be granted because it is beyond debate that the County Board has no choice but to comply with the Act.  The Act requires that girls' teams "shall not be open to students of the male sex where selection for such teams is based upon competitive skill or the activity involved is a contact sport," and it creates a cause of action against county boards of education for "[a]ny student aggrieved by a violation of" the Act W. VA. CODE § 18-2-25d(c)(2), (d)(1) (eff. July 8, 2021).  Thus, the County Board must enforce the Act. Notably, in Plaintiff's Consolidated Reply in Support of Motion for Preliminary Injunction, Plaintiff does not counter the County Board's argument that it is not liable under the EPC pursuant to *Monell*, except to argue that Superintendent Stutler may be subject to an injunction under *Ex parte Young*.  (DE# 53, at 11-13 (pp. 5-7 of the brief).)  Thus, Count II should be dismissed as against the County Board at least to the extent that it seeks damages, expenses, fees, and costs.

**D.** **Superintendent Stutler is acting as a State – not a County – official in enforcing the Act, and any award assessed against her is the responsibility of the State, not the Harrison County Board of Education.**

"Under the doctrine of *Ex parte Young,* a plaintiff may challenge the constitutionality of a state law . . . by bringing suit against an official, in her official capacity, for enforcing or administering that law or rule. . . . If the plaintiff succeeds, any judgment against the official in her official capacity," including an award of attorneys' fees, "'imposes liability on the entity that [s]he represents.'" *McGee v. Cole*, 115 F. Supp. 3d 765, 772 (S.D.W. Va. 2015) (alteration in *McGee*) (citing, *inter alia*, *Ex parte Young,* 209 U.S. 123, 155–56, 28 S. Ct. 441, 52 L. Ed. 714 (1908)).  Importantly, county officials are considered to be "state officials for purposes of an *Ex parte Young* suit where they are responsible for enforcing or administering state law rather than local or county policies." *Id.*, 115 F. Supp. 3d at 773.  For example, where "same-sex couples challenged Virginia's same-sex marriage ban" by suing a city clerk who had denied one of the couples a marriage license, the "U.S. Court of Appeals for the Fourth Circuit held that the clerk

12

was a proper defendant ***through which to sue the state of Virginia*** under *Ex parte Young* because he was responsible for enforcing Virginia's same-sex marriage ban." *Id.* (emphasis added; citing *Bostic v. Schaefer*, 760 F.3d 352 (4th Cir. 2014)).

The U.S. District Court for the Southern District of West Virginia, in *McGee*, therefore engaged in the following analysis regarding the party responsible for paying plaintiffs' attorneys' fees assessed against *county* clerks, rejecting the State's argument that it was immune from attorneys' fees under the Eleventh Amendment:

> The Court agrees with Defendant Clerks. Sections 48–2–104 and 48–2–401 of the West Virginia Code were state laws prohibiting same-sex marriage. Each Plaintiff couple attempted to obtain a marriage license, and each was denied by one of the defendants pursuant to these state laws. . . . The State has not provided, and the Court has not found, any evidence that Defendant Clerks were administering county rules or policies rather than state law. Moreover, the clerks had no discretion to disregard state law and issue marriage licenses to the plaintiffs. . . . It is clear that Defendant Clerks were required by state law to deny marriage licenses to the plaintiffs and administered state law when they did so. The clerks were thus acting as state agents, rather than county officials, at the time of Plaintiffs' injuries. Accordingly, they are considered state officials for the purposes of this *Ex parte Young* suit. *See Bostic,* 760 F.3d at 371 n. 2; *Brotherton [v. Cleveland],* 173 F.3d [552] at 566 [(6th Cir. 1999)].
>
> Furthermore, although not named as a defendant in this case, the State was clearly the intended target of this litigation. *See Hutto [v. Finney],* 437 U.S. [678] at 700, 98 S.Ct. 2565 [(1978)] ("[S]uits brought against individual officers for injunctive relief are for all practical purposes suits against the State itself."). Not only did the Court grant an injunction preventing the clerks from administering the same-sex marriage ban, it declared two of the State's laws unconstitutional. This declaration is part and parcel of the total relief obtained and shows that the State, not the clerks, is responsible for the legislation that violated Plaintiffs' civil rights. For the foregoing reasons, the attorneys' fees assessed against Defendant Clerks will be the responsibility of the State of West Virginia.

12894263

*McGee*, 115 F. Supp. 3d at 778–79.  *See also Brotherton v. Cleveland*, 173 F.3d 552, 566 (6th Cir. 1999) ("Where county officials are sued simply for complying with state mandates that afford no discretion, they act as an arm of the State." (citing cases from the Fifth and Seventh Circuits)).

   The *McGee* Court found that the clerks themselves and the counties for which they worked were *not* jointly and severally liable for attorneys' fees because the clerks were sued in their official capacities, and they represented only the State at the time of the plaintiffs' injury.  *Id.*, 115 F. Supp. 3d at 777 n.3.

   Just as in *McGee*, here, the State is clearly the intended target of the litigation. Superintendent Stutler and the Harrison County Board of Education have been named defendants in this civil action only because they must enforce state law – not because of any policy or custom of their own.  Any civil rights violation the Act could cause B.P.J. is a result of the State's legislation.  Thus, if Superintendent Stutler, who was sued only in her official capacity, is retained as a defendant to Count II pursuant to *Ex parte Young* for injunction purposes, then any damages, costs, expenses, and/or fees assessed against her must be paid by the State, the government entity that she represents when/if she enforces the State's Act.  There is no reason to retain the Harrison County Board of Education as a defendant.[9]  Therefore, Harrison County Board of Education is entitled to the dismissal of Counts I and II against it, and if a monetary award, including but not

---

[9] Even if Superintendent Stutler were acting as the agent of the Harrison County Board of Education in enforcing the Act (which she is not), the latter would not need to be retained as a defendant in order to hold it liable for an award of damages assessed against Stutler. *See McGee*, 115 F. Supp. 3d at 773 (S.D.W. Va. 2015) ("If the Court instead finds that the [county] clerks were sued for administering a county rule or policy, they would properly be considered agents of their respective counties, not of the State. In that case, it is the counties and not the State that would be liable for the judgment and any attorneys' fees assessed against the clerks.") *See also Will v. Michigan Dep't of State Police*, 491 U.S. 58, 71, 109 S. Ct. 2304, 2312, 105 L. Ed. 2d 45 (1989) ("a suit against a state official in his or her official capacity is not a suit against the official but rather is a suit against the official's office").

12894263

limited to attorneys' fees, is assessed against Superintendent Stutler, that award must be paid by the State, not by the County Board.

> **E.    B.P.J.'s claims against the County Board should be dismissed on the additional basis that the Act does not violate Title IX or the EPC.**

As demonstrated above, the County Board is not the entity that might ever *cause* any purported violation of Title IX or the EPC, an independently adequate reason to dismiss Plaintiff's claims against the County Board.  The County Board had no part in developing, shaping, or passing the Act, and it has no policy or custom that would prevent B.P.J. from joining girls' teams based on transgender status.  The County Board has no policy or custom directing or providing that transgender girls should be excluded from girls' sports teams.  If the Court enters the preliminary injunction requested against any of the defendants and thus keeps the Act from becoming effective, the County Board will not enforce it.  However, the County Board has been sued for damages, fees, and costs over the Act, and it thus finds itself in the position of defending the Act.  To that extent, the Board observes in the following sections that a legal foundation clearly exists for finding that the Act is lawful under Title IX and that the Act does not violate the EPC.

> **1.    Title IX permits sex-separated sports to promote sex equality.**

Regulations under Title IX permit a recipient to "operate or sponsor separate [athletic] teams for members of each sex where selection for such teams is based upon competitive skill or the activity involved is a contact sport."  34 C.F.R. § 106.41(b).  The regulations also require recipients to "provide equal athletic opportunity for members of both sexes," including by considering whether the "levels of competition effectively accommodate the interests and abilities

12894263

of members of both sexes."  34 C.F.R. § 106.41(c).  Courts have recognized that provisions such as those contained in the Title IX regulations are important to promote sex equality.[10]

Importantly, the analysis in *Grimm* is not applicable or dispositive here because the *Grimm* Court did not address athletics.  Whereas transgender students may use restrooms corresponding with their gender identity without imposing the dangers of decreased opportunities for, and compromised safety of, cisgender females, these concerns are present regarding athletic participation.  It is these concerns – which were not present in *Grimm* – that make the Act lawful under Title IX, which permits sex-separated teams and promotes sex equality, because sex-related physical differences make a difference in contact sports and on teams involving competitive skill. That is, competing with biological males may cause girls to lose out on opportunities, for example, opportunities to start on or even play for a team and opportunities for scholarships.  And competing against biological males in contact sports may cause girls to suffer more physical injuries.

In sum, sex-separated sports are lawful, and the Act defines "male" and "female" in a way intended to promote the goal of sex equality in athletics, in compliance with Title IX. Count I thus fails to state a claim upon which relief can be granted, and it should be dismissed.

---

[10] *See, e.g.*, *Cohen v. Brown Univ.*, 991 F.2d 888, 897 (1st Cir. 1993) ("Equal opportunity to participate lies at the core of Title IX's purpose."); *Clark, By and Through Clark v. Arizona Interscholastic Ass'n*, 695 F.2d 1126, 1130 (9th Cir. 1982) (noting that cases have upheld boys' exclusion from girls' teams as "a legitimate means of providing athletic opportunities for girls" due to innate physical differences between the sexes); *O'Connor v. Bd. of Ed. of Sch. Dist. No. 23*, 645 F.2d 578, 582 (7th Cir. 1981) ("Title IX aims to provide equal opportunity in educational programs" and permits "separate-sex teams and . . . exclusion of girls from" certain boys' teams); *Lafler v. Athletic Bd. of Control*, 536 F. Supp. 104, 106 (W.D. Mich. 1982) ("Although many courts have recognized a woman's right to an equal opportunity to participate in sports, . . . courts have also recognized that such equal opportunity may be provided through separate teams or competitions for men and women. . . . The regulations promulgated under Title IX . . . specifically permit the establishment of separate male and female teams in contact sports. The United States Congress, in calling for the provision of 'equal opportunity to amateur athletes ... to participate ... without discrimination on the basis of ... sex ...' in the Amateur Sports Act, 36 U.S.C. s 391(b)(6), anticipated that such equal opportunity would sometimes be provided through the use of separate programs for men and women. . . .") (citations omitted).

12894263

**2.      The Act is substantially related to an important government purpose and thus survives scrutiny under the EPC.[11]**

"The Equal Protection Clause of the Fourteenth Amendment provides that '[n]o State shall . . . deny to any person within its jurisdiction the equal protection of the laws.  It is 'essentially a direction that all persons similarly situated should be treated alike.'"  *Grimm*, 972 F.3d at 606 (quoting *City of Cleburne v. Cleburne Living Ctr.*, 473 U.S. 432, 4fgr39 (1985)).  EPC challenges based on sex, as here, are subject to intermediate scrutiny.  *See H.B. Rowe Co. v. Tippett*, 615 F.3d 233, 242 (4th Cir. 2010).   Under intermediate scrutiny, the challenged classification must serve an important government purpose, and the means employed must be substantially related to that purpose.  *United States v. Virginia*, 518 U.S. 515, 524, 532-33 (1996). "'[L]egislatures are presumed to have acted within their constitutional power despite the fact that, in practice, their laws result in some inequality.'"  *Nordlinger v. Hahn*, 505 U.S. 1, 10 (1992) (quoting *McGowan v. Maryland,* 366 U.S. 420, 425–26 (1961)).

An EPC plaintiff must first show "governmental treatment dissimilar to that received by others similarly situated."  *Republican Party of N.C. v. Martin*, 980 F.2d 943, 953 (4th Cir. 1992).  For EPC purposes, "similarly situated" means "persons who are in all relevant respects alike."  *Nordlinger*, 505 U.S. at 10.   Here, those "similarly situated" are biological males, regardless of gender identity, and the "relevant respects" are the students' physical attributes relevant to competitive fairness and safety.  Thus, the Act closes biological females' teams to all biological males because biological sex, not gender identity, causes the problems that the Act seeks to prevent.

---

[11] The County Board hereby incorporates by reference the arguments it made in "Defendant Harrison County Board of Education and Defendant Dora Stutler in her Official Capacity's Response in Opposition to Plaintiff's Motion for Preliminary Injunction" regarding why the Act survives scrutiny under the EPC. (DE# 50, at 15-22.)  For purposes of brevity, a truncated version of those arguments is presented here.

12894263

The Act's goals are to prevent the physical differences between the biological sexes, regardless of gender identity, from causing a competitive disadvantage to or—worse— injury to biological females.  B.P.J. does not challenge the importance of those goals.  Clearly, safety and fairness to girls are important governmental purposes.[12]

Furthermore, the Act's means are substantially related to its important purposes. As detailed above (*see* § I.A.), biological males are, on average, bigger, stronger, and faster than biological females.[13]  Therefore, biological females who play against and with biological males, regardless of their gender identity, will more likely face unfairness and danger than if they played only against and with other biological females in contact sports and sports involving competitive skill.  These concerns were not present in *Grimm*, which addressed restroom use – not safety and fairness concerns unique to participation in athletics, making *Grimm* non-dispositive here.

It is undoubtedly true that not every biological male is larger, stronger, and faster than every biological female.  But that fact does not matter here.  Under intermediate scrutiny, the

---

[12] *See, e.g.*, *Virginia*, 518 U.S. at 533 ("The heightened review standard our precedent establishes does not make sex a proscribed classification. . . . Physical differences between men and women[] . . . are enduring: '[T]he two sexes are not fungible;  a community made up exclusively of one [sex] is different from a community composed of both.'") (citations omitted);  *id.* at 540 (noting that it was "uncontested that women's admission [to a then all-male military college] would require accommodations, primarily in arranging housing assignments *and physical training programs for female cadets*" (emphasis added)).

[13] *See, e.g.*, *Clark, By & Through Clark v. Ariz. Interscholastic Ass'n*, 695 F.2d 1126, 1129–31 (9th Cir. 1982), which discussed other cases, including *Petrie v. Illinois High School Athletic Association,* 75 Ill. App.3d 980, 31 Ill. Dec. 653, 394 N.E.2d 855 (1979), in which the Appellate Court of Illinois found that exclusion of boys from girls' teams "was a legitimate means of providing athletic opportunities for girls," noted "that the classification of teams based on sex was based on the innate physical differences between the sexes, [rather than on] generalizations that are archaic . . . [or attitudes of] romantic paternalism," acknowledged "that the sexual classification could be avoided by classifying directly on the basis of physical differences such as height or weight, but concluded that such classifications would be too difficult to devise, . . . primarily because of strength differentials between the sexes," concluded that "[h]andicapping competitions . . . would be difficult and contrary to the interest of achieving the best competition possible," noted that "multi-tiered teams . . . [would be] too expensive to impose on the schools," and concluded "that sex was the only feasible classification to promote the legitimate and substantial state interest of providing for interscholastic athletic opportunities for girls." *Clark*, 695 F.2d at 1130 (internal quotations and citations omitted).

challenged classification need not be unrealistically perfectly related to the government's goals. Instead, the Act only needs to be "substantially" related to its goals. Applying this correct scrutiny, courts routinely accept that a classification that relies on some degree of generality can still be "substantially" related to its end.[14] Thus, classification based on average differences can easily withstand intermediate scrutiny. *See, e.g.*, *Clark*, 695 F.2d at 1131 ("The record makes clear that due to average physiological differences, males would displace females to a substantial extent if they were allowed to compete for positions on the volleyball team. . . . [T]he Supreme Court allows for these average real differences between the sexes to be recognized [and] . . . gender [may] be used as a proxy in this sense if it is an accurate proxy." (emphasis added)).

This case is about more than B.P.J. and whether she creates the risks the Act seeks to prevent. It is about the fairness to and safety of any number of biological females who, absent the Act, may have to compete against and engage in athletic competition (including contact sports) with and against biological males. It is of inadequate constitutional significance that any particular student has not yet gone through puberty and thus not yet gained all or even any of the differences in physical characteristics that medical intervention either can or cannot equalize. A perfect, or even best possible, fit between a government's chosen means (*i.e.*, the classification) and its important goals is not what *intermediate* scrutiny demands. Intermediate scrutiny tolerates such imperfections in classifications.

B.P.J. argues that participation on girls' sports teams should be determined not based on biological sex at birth but on circulating testosterone levels. However, the science on the

---

[14] A blanket rule limiting selective service registration to men, for example, thus satisfied intermediate scrutiny even "assuming that a small number of women could be drafted for noncombat roles" because "Congress simply did not consider it worth the added burdens of including women in draft and registration plans." *Rostker v. Goldberg*, 453 U.S. 57, 81 (1981). And a social security rule advantageous to women satisfied such scrutiny because "women *on the average* received lower retirement benefits than men." *Califano v. Webster*, 430 U.S. 313, 318 n.5 (1977).

12894263

relationship between testosterone levels and the promotion of fairness and safety is debated.  More importantly, the possibility that testosterone levels are *a* way to accomplish the Act's goals does not, under intermediate scrutiny, necessarily mean that testosterone levels are *the only* constitutionally permissible way to do so.  That is, "the alternative chosen may not maximize equality, and may represent trade-offs between equality and practicality.  But . . . even the existence of wiser alternatives than the one chosen does not serve to invalidate the policy here since it is substantially related to the goal."  *Clark*, 695 F.2d at 1131–32 (citation omitted).

Because the Act survives intermediate scrutiny, Count II fails to state a claim upon which relief can be granted, and Count II should be dismissed.

### III. CONCLUSION

For all of the foregoing reasons, the Harrison County Board of Education and Harrison County Superintendent Dora Stutler respectfully request that the Court **GRANT** their Motion to Dismiss.  The Harrison County Board of Education should be entirely dismissed as a defendant to this civil action.  If Superintendent Stutler is retained as a defendant to Count II for purposes of an injunction, then she must be retained as an agent of the State, not of the Harrison County Board of Education, and thus any damages or other monetary award that may be assessed against her must be paid by the State.

Respectfully submitted this 2nd day of July, 2021.

/s/ Susan L. Deniker
Susan L. Deniker          (WV ID #7992)
400 White Oaks Boulevard
Bridgeport, WV 26330-4500
(304) 933-8000

STEPTOE & JOHNSON PLLC
   OF COUNSEL

*Counsel for Defendants Harrison County Board of Education and Dora Stutler*

12894263

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA
CHARLESTON DIVISION

B.P.J., by her next friend and mother, HEATHER
JACKSON,

                                    *Plaintiff*,

v.                                                          Civil Action No. 2:21-cv-00316
                                                            Hon. Joseph R. Goodwin, District Judge

WEST VIRGINIA STATE BOARD OF
EDUCATION, HARRISON COUNTY BOARD
OF EDUCATION, WEST VIRGINIA
SECONDARY SCHOOL ACTIVITIES
COMMISSION, W. CLAYTON BURCH in his
official capacity as State Superintendent, and
DORA STUTLER in her official capacity as
Harrison County Superintendent,

                                    *Defendants*.

## CERTIFICATE OF SERVICE

        I hereby certify that on July 2, 2021, I electronically filed a true and exact copy of

"***Memorandum of Law in Support of Defendants Harrison County Board of Education and***

***Dora Stutler's Motion to Dismiss***" with the Clerk of the Court using the CM/ECF system, which

will send notification of such filing to the following counsel of record:

| | |
|---|---|
| **Andrew D. Barr** | **Joshua A. Block** |
| COOLEY | AMERICAN CIVIL LIBERTIES UNION |
| Suite 2300 | Floor 18 |
| 1144 15th Street | 125 Broad Street |
| Denver, CO 80202 | New York, NY 10004 |
| *Counsel for Plaintiff* | *Counsel for Plaintiff* |

**Tara L. Borelli**
LAMBDA LEGAL DEFENSE AND
EDUCATION FUND
Suite 640
730 Peachtree Street NE
Atlanta, GA 30308-1210
*Counsel for Plaintiff*

**Carl Solomon Charles**
LAMBDA LEGAL
Suite 640
730 Peachtree Street, NE
Atlanta, GA 30308
*Counsel for Plaintiff*

**Kathleen R Hartnett**
COOLEY
5th Floor
101 California Street
San Francisco, CA 94111
*Counsel for Plaintiff*

**Katelyn Kang**
COOLEY
55 Hudson Yards
New York, NY 10001
*Counsel for Plaintiff*

**Elizabeth Reinhardt**
COOLEY
500 Boylston Street
Boston, MA 02116
*Counsel for Plaintiff*

**Avatara Antoinette Smith-Carrington**
LAMBDA LEGAL DEFENSE AND
EDUCATION FUND
Suite 500
3500 Oak Lawn Avenue
Dallas, TX 75219
*Counsel for Plaintiff*

**Loree Beth Stark**
AMERICAN CIVIL LIBERTIES UNION OF
WEST VIRGINIA
Suite 507
405 Capitol Street
Charleston, WV 25301
914-393-4614
*Counsel for Plaintiff*

**Julie Veroff**
COOLEY
5th Floor
101 California Street
San Francisco, CA 94111
*Counsel for Plaintiff*

**Sruti J. Swaminathan**
LAMBDA LEGAL DEFENSE AND
EDUCATION FUND
19th Floor
120 Wall Street
New York, NY 10005
*Counsel for Plaintiff*

**Aria Vaughan**
DEPARTMENT OF JUSTICE
4CON, 10th Floor
950 Pennsylvania Avenue NW
Washington, DC 20530
*Counsel for Interest Party USA*

12894263

**Douglas P. Buffington, II**
WV ATTORNEY GENERAL'S OFFICE
Building 1, Room 26e
1900 Kanawha Boulevard, East
Charleston, WV 25305
 *Counsel for Intervenor State of W. Va.*

**Jessica Anne Lee**
WEST VIRGINIA ATTORNEY
GENERAL'S OFFICE
Building 1, Room E-26
1900 Kanawha Boulevard, East
Charleston, WV 25305
 *Counsel for Intervenor State of W. Va.*

**Curtis R. Capehart**
WV ATTORNEY GENERAL'S OFFICE
Building 1, Room 26e
1900 Kanawha Boulevard, East
Charleston, WV 25305
 *Counsel for Intervenor State of W. Va.*

**Fred B. Westfall , Jr.**
UNITED STATES ATTORNEY'S OFFICE
P. O. Box 1713
Charleston, WV 25326-1713
 *Counsel for Interest Party USA*

**Jennifer M. Mankins**
U. S. ATTORNEY'S OFFICE
P. O. Box 1713
Charleston, WV 26326-1713
 *Counsel for Interest Party USA*

**Kelly C. Morgan**
**Kristen Vickers Hammond**
**Michael W. Taylor**
BAILEY & WYANT
P. O. Box 3710
Charleston, WV 25337-3710
 *Counsel for Defendant WVSBE*

**Roberta F. Green**
**Anthony E. Nortz**
**Kimberly M. Bandy**
SHUMAN MCCUSKEY & SLICER
P. O. Box 3953
Charleston, WV 25339
 *Counsel for Defendant WVSSAC*

      /s/ Susan L. Deniker
    _____

12894263