IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA

CHARLESTON DIVISION

B. P. J., et al.,

                Plaintiffs,

v.                                          CIVIL ACTION NO.   2:21-cv-00316

WEST VIRGINIA STATE BOARD OF EDUCATION, et al.,

                Defendants.

## MEMORANDUM OPINION & ORDER

A fear of the unknown and discomfort with the unfamiliar have motivated many of the most malignant harms committed by our country's governments on their own citizens. Out of fear of those less like them, the powerful have made laws that restricted who could attend what schools, who could work certain jobs, who could marry whom, and even how people can practice their religions. Recognizing that classifying human beings in ways that officially sanction harm is antithetical to democracy, the states ratified the Fourteenth Amendment. It ensures that no state may "deny to any person within its jurisdiction the equal protection of the laws." Accordingly, the courts are most juberous of any law—state or federal—that treats groups of people differently.

The matter before me today is a motion to preliminarily enjoin a recently passed state law. Those standing in opposition to this law assert that it was enacted to incite fear and exclude certain persons rather than to address a legitimate government interest. At this point, I have been provided with scant evidence that this law addresses any problem at all, let alone an important problem. When the

government distinguishes between different groups of people, those distinctions must be supported by compelling reasons. Having determined that Plaintiff has a likelihood of success in demonstrating that this statute is unconstitutional as it applies to her and that it violates Title IX, Plaintiff's Motion for a Preliminary Injunction is **GRANTED**.

I. Plaintiff and Her Claims

B.P.J. is an eleven-year-old girl preparing to begin the sixth grade at a new school. Like many of her peers, B.P.J. intends to participate in school athletics. She hopes to join both the girls' cross country and track teams. However, B.P.J. was informed by her school that because of a new statute, she will no longer be permitted to join either team because she is a transgender girl.

For a definition of terms such as gender identity,[1] gender dysphoria,[2] cisgender,[3] etc., I refer to the meticulously researched and written opinion in *Grimm v. Gloucester County School Board*, 972 F.3d 586, 594–597 (4th Cir. 2020). I adopt the definition of transgender used in that opinion. "'Transgender' is . . . 'used as an umbrella term to describe groups of people who transcend conventional expectations of gender identity or expression.'" *Grimm*, 972 at 596 (quoting *PFLAG, PFLAG National Glossary of Terms* (July 2019), http://pflag.org/glossary).

B.P.J. writes in depth about her history—revealing publicly what are inherently private details—to educate both the court and public. B.P.J. is a transgender girl who, while assigned the sex of male at birth, knew from a young age that she is a girl. [ECF No. 64, ¶ 31]. By the third grade, B.P.J. was living as a girl at

---

[1] One's "deeply felt, inherent sense" of one's gender. *Grimm*, 927 F.3d at 594.
[2] "[A] condition that is characterized by debilitating distress and anxiety resulting from the incongruence between an individual's gender identity and birth-assigned sex." *Grimm*, 927 F.3d at 594–95.
[3] A person whose gender identity aligns with her sex-assigned-at-birth. *Grimm*, 927 F.3d at 594.

2

home but dressing as a boy at school. *Id.* B.P.J. then asked to change her name to a name commonly associated with girls and began living as a girl in both public and private. *Id.* B.P.J. also joined her elementary school's all-girl cheerleading team. *Id.* at ¶ 36. B.P.J. practiced and competed with this team without incident.

B.P.J. was diagnosed with gender dysphoria in 2019. *Id.* at ¶ 33. She began puberty-delaying treatment on June 15, 2020, to treat that condition.[4] Plaintiff avers that this treatment, which prevents endogenous puberty and therefore any physiological changes caused by increased testosterone circulation, prevents her from developing any physiological advantage over other girl athletes.[5]

B.P.J., through her mother, filed this lawsuit against the West Virginia State Board of Education, the Harrison County Board of Education, the West Virginia Secondary Schools Activities Commission ("WVSSAC"), State Superintendent W. Clayton Burch, and Harrison County Superintendent Dora Stutler. The State of West Virginia moved to intervene, and that motion was granted. Plaintiff then amended her complaint, [ECF No. 64], naming both the State and Attorney General Patrick Morrisey as defendants.

In her complaint, B.P.J. alleges that Defendants Burch, Stutler, the WVSSAC, and Attorney General Morrisey deprived her of the equal protection guaranteed to her by the Fourteenth Amendment and that the State, the State Board of Education,

---

[4] "The medical treatment for gender dysphoria is to eliminate [] clinically significant distress by helping a transgender person live in alignment with their gender identity." [ECF No. 2-1, Adkins Decl., at 5]. For some transgender youth, the distress from gender dysphoria is addressed through puberty blocking treatment. *Id.* at 6. "Puberty blocking treatment allows transgender youth to avoid going through their endogenous puberty thereby avoiding the heightened gender dysphoria and permanent physical changes that puberty would cause." *Id.* The State cites to experts who question when social transition and puberty blocking treatment are appropriate for young people. *See*, [ECF No. 49, Ex. E]. But what is or should be the default treatment for transgender youth is not the question before the court.

[5] The NCAA and the International Olympic Committee, which both permit transgender women to compete as women in athletic events, require that the athletes suppress their testosterone for a certain period of time or that it be suppressed below a particular threshold.

the Harrison County Board of Education, and the WVSSAC have violated Title IX. [ECF No. 64, at 20–23]. B.P.J. seeks a declaratory judgment that Section 18-2-25d of the West Virginia Code violates Title IX and the Equal Protection Clause; an injunction preventing Defendants from enforcing the law against her; a waiver of the requirement of a surety bond for preliminary injunctive relief; nominal damages; and reasonable attorneys' fees.

The motion for a preliminary injunction that accompanies her complaint seeks relief only insofar as this law applies to her. That is, granting this motion will only prevent the State and other Defendants from enforcing Section 18-2-25d against B.P.J. Whether the law is facially unconstitutional is an issue raised in the Complaint and will be resolved at a later stage of litigation.

## II. The Law

On March 18, 2021, ten delegates in the West Virginia House of Delegates introduced House Bill 3293, strategically referred to as the "Save Women's Sports Bill." West Virginia Governor Jim Justice signed the bill into law on April 28, 2021, and it was codified as West Virginia Code, Section 18-2-25d, entitled "Clarifying participation for sports events to be based on biological sex of the athlete at birth."

The statute begins by noting that "[t]here are inherent differences between biological males and biological females, and that these differences are cause for celebration, as determined by the Supreme Court of the United States in United States v. Virginia (1996)." § 18-2-25d(a)(1). The statute then provides a series of definitions, all at issue here:

> (1) "Biological sex" means an individual's physical form as a male or female based solely on the individual's reproductive biology and genetics at birth.

4

> (2) "Female" means an individual whose biological sex determined at birth is female. As used in this section, "women" or "girls" refers to biological females.
>
> (3) "Male" means an individual whose biological sex determined at birth is male. As used in this section, "men" or "boys" refers to biological males.

§ 18-2-25d(b)(1)–(3).

Using these definitions, the gravamen of the statute requires that "[i]nterscholastic, intercollegiate, intramural, or club athletic teams or sports that are sponsored by any public secondary school or a state institution of higher education," "shall be expressly designated as one of the following based on biological sex: (A) Males, men, or boys; (B) Females, women, or girls; or (C) Coed or mixed." § 18-2-25d(c)(1). Once those teams are properly designated, the statute goes on to address who may participate on which teams. "Athletic teams or sports designated for females, women, or girls shall not be open to students of the male sex where selection for such teams is based upon competitive skill or the activity involved is a contact sport." § 18-2-25d(c)(1).

According to the statute's text, its definition of "biological sex" has nothing to do with gender identity. "Gender identity is separate and distinct from biological sex to the extent that an individual's biological sex is not determinative or indicative of the individual's gender identity. Classifications based on gender identity serve no legitimate relationship to the State of West Virginia's interest in promoting equal athletic opportunities for the female sex." § 18-2-25d(a)(4).

The State asserts that the objective of the statute is to provide equal athletic opportunities for female athletes and to protect the physical safety of female athletes when competing. [ECF No. 49, at 7]. Plaintiff argues that the State's assertion is a

5

façade concealing the true objective: to exclude transgender girls and women from participating in sports.

### III. The Preliminary Injunction

The United States Supreme Court and the United States Court of Appeals for the Fourth Circuit have provided district courts with a precise analytical framework for determining whether to grant preliminary injunctive relief. First, B.P.J. must make a clear showing that she will likely succeed on the merits. Second, she must make a clear showing that she is likely to be irreparably harmed absent preliminary relief. Third, she must show that the balance of equities tips in her favor. Finally, B.P.J. must show that an injunction is in the public interest. All four requirements must be satisfied. *Winter v. Natural Resources Defense Council, Inc.*, 555 U.S. 7 (2008); *The Real Truth About Obama, Inc. v. Federal Election Commission*, 575 F.3d 342, 346–47 (4th Cir. 2009), *vacated on other grounds*, 130 S. Ct. 2371 (2010).

#### a. Likelihood of Success on the Merits

As required by *Natural Resource Defense Counsel*, I must first determine if B.P.J. has demonstrated a clear likelihood of success on the merits of either her Equal Protection Claim or her Title IX Claim. I will address each in turn.

##### i. Equal Protection Claim

The Equal Protection Clause of the Fourteenth Amendment provides that "[n]o State shall . . . deny to any person within its jurisdiction the equal protection of the laws." U.S. Const. amend. XIV, § 1. It is "essentially a direction that all persons similarly situated should be treated alike." *City of Cleburne v. Cleburne Living Ctr.*, 473 U.S. 432, 439 (1985).

The first step in an equal protection analysis is to determine what level of scrutiny I must apply to Section 18-2-25d. The answer to this question turns on what

6

classifications are created by the law. Plaintiff argues that this law discriminates against transgender girls and only transgender girls because cisgender boys, cisgender girls, and transgender boys are all unaffected by the law's central tenet: non-cisgender girls may not participate on a girls' sports team. [ECF No. 19, at 19]. The State responded that this law does not treat transgender girls differently than other groups because this law is premised on "biological sex," and it treats all "biological males" similarly by prohibiting them from participating on girls' sports teams.

Essentially, the State contends that the Equal Protection Clause is not being violated because B.P.J. is being treated the same under this law as those she is similarly situated with: "biological males" as defined by West Virginia Code § 18-2-25d(b)(3). But this is misleading. Plaintiff is not most similarly situated with cisgender boys; she is similarly situated to other girls. *Accord Grimm*, 972 F.3d at 610 ("The overwhelming thrust of everything in the record . . . is that Grimm was similarly situated to other boys"). Plaintiff has lived as a girl for years. She has competed on the all-girls cheerleading team at her school. She changed her name to a name more commonly associated with girls. And of the girls at her middle school, B.P.J. is the only girl who will be prevented from participating in school-sponsored athletics. Here, there is an inescapable conclusion that Section 18-2-25d discriminates on the basis of transgender status. *Hecox v. Little*, 479 F. Supp. 3d 930, 975 (D. Idaho 2020) ("while the physiological differences the Defendants suggest support the categorical bar on transgender women's participation in women's sports may justify the Act, they do not overcome the inescapable conclusion that the Act discriminates on the basis of transgender status"). The question then is what level of scrutiny applies to classifications based on transgender status.

The Fourth Circuit answered that question in *Grimm*. *Stare decisis* requires that I apply intermediate, or heightened, scrutiny to laws that classify people according to transgender status. *Grimm* arrived at this conclusion from two different directions. First, *Grimm* finds that discrimination against transgender people is inherently based in sex, and therefore the level of scrutiny applicable to sex discrimination applies to transgender discrimination. 972 F.3d at 607. In the alternative, *Grimm* finds that transgender people are a quasi-suspect class and therefore entitled to intermediate scrutiny of laws that treat them differently than non-transgender people. *Id.*

To survive a review under intermediate scrutiny, the government must provide an "exceedingly persuasive justification" for the classification created by a law or policy. *Mississippi Univ. For Women v. Hogan*, 458 U.S. 718, 724 (1982). At a minimum, the government must show that "the classification serves important governmental objectives and that the discriminatory means employed are substantially related to the achievement of those objectives." *Id.* A law discriminating against a quasi-suspect class "must be genuine, not hypothesized or invented *post hoc* in response to litigation. And it must not rely on overbroad generalizations about the different talents, capacities, or preferences of males and females." *United States v. Virginia*, 518 U.S. 515, 533 (1996) (citing *Weinberger v. Wiesenfeld,* 420 U.S. 636, 643, 648 (1975)).

"Under intermediate scrutiny, the government bears the burden of establishing a reasonable fit between the challenged statute and a substantial governmental objective." *United States v. Chapman*, 666 F.3d 220, 226 (4th Cir. 2012) (citing *United States v. Chester,* 628 F.3d 673, 683 (4th Cir. 2010)). The party defending the statute must "present[] sufficient probative evidence in support of its stated rationale for

8

enacting a gender preference, i.e., . . . the evidence [must be] sufficient to show that the preference rests on evidence-informed analysis rather than on stereotypical generalizations." *H.B. Rowe Co. v. Tippett*, 615 F.3d 233, 242 (4th Cir. 2010) (quoting *Eng'g Contractors Ass'n of S. Fla. v. Metropolitan Dade Cnty.*, 122 F.3d 895, 910 (11th Cir. 1997)); *Concrete Works of Colorado, Inc. v. City and Cnty. of Denver*, 321 F.3d 950, 959 (10th Cir. 2003) ("[T]he gender-based measures . . . [must be] based on 'reasoned analysis rather than [on] the mechanical application of traditional, often inaccurate, assumptions.'" (quoting *Mississippi Univ. for Women*, 458 U.S. at 726)).

In this preliminary matter, my inquiry is constrained to whether this statute is unconstitutional *as applied* to B.P.J. An as-applied challenge is "based on a developed factual record and the application of a statute to a specific person[.]" *Educational Media Co. at Va. Tech, Inc. v. Insley*, 731 F.3d 291, 298 n.5 (4th Cir. 2013) (quoting *Richmond Med. Ctr. for Women v. Herring*, 570 F.3d 165, 172 (4th Cir. 2009) (en banc)). "It is axiomatic that a 'statute may be invalid as applied to one state of facts and yet valid as applied to another.'" *Ayotte v. Planned Parenthood of Northern New England*, 546 U.S. 320, 328 (2006) (quoting *Dahnke-Walker Milling Co. v. Bondurant*, 257 U.S. 282, 289 (1921)).

Here, the State's proffered objective for the statute is to provide equal athletic opportunities for female athletes and to protect female athletes while they participate in athletics. [ECF No. 49, at 7]. B.P.J. argues that I should reject this offered objective and instead find that the State's true objective is to exclude transgender women and girls from participating in state-sponsored athletics. While I need not do so, *Virginia*, 518 U.S. at 536, I will proceed as if the State's offered objective is genuine. Regardless, I find that this statute as applied to B.P.J. is not substantially related to providing equal athletic opportunities for girls.

9

As described at length in her memorandum in support of her motion for a preliminary injunction, B.P.J. has been living publicly as a girl for over a year at this point. As part of treating her gender dysphoria, B.P.J. has been on puberty delaying drugs for over a year. As a result, B.P.J. has not undergone and will not undergo endogenous puberty, the process that most young boys undergo that creates the physical advantages warned about by the State.

B.P.J. has provided evidence that any physical advantages that men and boys enjoy are derived from higher concentrations of circulating testosterone. This is supported by both the NCAA policy[6] and the International Olympic Committee's policy[7] that permit transgender women to compete on teams that align with their gender identity so long as those athletes receive testosterone suppressing treatment. According to B.P.J.'s experts, "there is a medical consensus that the difference in testosterone is generally the primary known driver of differences in athletic performance between elite male athletes and elite female athletes." [ECF No. 2-1, Safer Decl., at 6–7].

The Defendant cites to an expert who asserts that for transgender athletes who have undergone endogenous puberty, later suppression of testosterone does not eradicate all competitive advantage. [ECF No. 49, Ex. G]. Like Judge Nye in the District of Idaho, I find this opinion unpersuasive. *See Hecox v. Little*, 479 F. Supp. 3d 930, 980 (D. Idaho 2020). While that argument may be relevant to a facial challenge of the statute, it is irrelevant to this as-applied analysis. B.P.J. has not undergone endogenous puberty and will not so long as she remains on her prescribed

---

[6] *NCAA Inclusion of Transgender Student-Athletes*, NCAA (Aug. 2011), https://www.ncaa.org/sites/default/files/Transgender_Handbook_2011_Final.pdf
[7] *IOC Consensus Meeting on Sex Reassignment and Hyperandrogenism*, Int'l Olympic Comm. (Nov. 2015), https://stillmed.olympic.org/Documents/Commissions_PDFfiles/Medical_commission/2015-11_ioc_consensus_meeting_on_sex_reassignment_and_hyperandrogenism-en.pdf.

puberty blocking drugs. At this preliminary stage, B.P.J. has shown that she will not have any inherent physical advantage over the girls she would compete against on the girls' cross country and track teams.

Further, permitting B.P.J. to participate on the girls' teams would not take away athletic opportunities from other girls. Transgender people make up a small percentage of the population: 0.6% of the adult population generally, and 0.7% of thirteen- to seventeen-year-olds. Herman, Flores, Brown, et al., *Age of Individuals Who Identify as Transgender in the United States*, The Williams Institute (Jan. 2017), http://williamsinstitute.law.ucla.edu/wp-content/uploads/Age-Trans-Individuals-Jan-2017.pdf. The number of transgender people who wish to participate in school-sponsored athletics is even smaller. Insofar as I am aware, B.P.J. is the only transgender student at her school interested in school-sponsored athletics. Therefore, I cannot find that permitting B.P.J. to participate on the girls' cross country and track teams would significantly, if at all, prevent other girl athletes from participating.

Finally, as applied to B.P.J., this law cannot possibly protect the physical safety of other girl athletes. Cross country and track are not contact sports. The physical ability of one athlete does not put another in danger in the way it might in another sport like football or hockey.

As applied to B.P.J., Section 18-2-25d is not substantially related to protecting girls' opportunities in athletics or their physical safety when participating in athletics. I find that B.P.J. is likely to succeed on the merits of her equal protection claim.

### ii. Title IX

Success on her Title IX claim would require B.P.J. to show "(1) that [she] was excluded from participation in an education program 'on the basis of sex'; (2) that the

educational institution was receiving federal financial assistance at the time; and (3) that improper discrimination caused [her] harm." *Grimm*, 972 F.3d at 616 (citing *Preston v. Va. ex rel. New River Cmty. Coll.*, 31 F.3d 203, 206 (4th Cir. 1994)). There is no question that Defendants named in this case received federal funding or that the athletic programs run by Harrison County are part of an education program. Recognizing this, what remains to be determined is whether B.P.J has demonstrated that she will likely succeed in proving that she is being excluded on the basis of sex and that she was harmed by unlawful discrimination.

That B.P.J. is being excluded from school athletics on the basis of her sex is clear. Like the Fourth Circuit's decision in *Grimm*, I "have little difficulty holding" that Section 18-2-25d discriminates against her "on the basis of sex." *Grimm*, 972 F.3d at 616; *accord Bostock v. Clayton County*, 140 S. Ct. 1731, 1741 (2020) (holding that discrimination against a person for being transgender is discrimination "on the basis of sex" under Title VII). The law could not exclude B.P.J. from a girls' athletics team without referencing her "biological sex" as defined in the statute. Her sex "remains a but-for cause" of her exclusion under the law. *Grimm*, 972 F.3d at 616.

Again, as in *Grimm*, I also have little difficulty finding that B.P.J. is harmed by this law. All other students in West Virginia secondary schools—cisgender girls, cisgender boys, transgender boys, and students falling outside of any of these definitions trying to play on the boys' teams—are permitted to play on sports teams that best fit their gender identity. Under this law, B.P.J. would be the only girl at her school, as far as I am aware, that is forbidden from playing on a girls' team and must join the boys' team. Like the discriminatory policy in *Grimm*, this law both stigmatizes and isolates B.P.J.

12

The final question is whether the law unlawfully discriminates against B.P.J. In the Title IX context, discrimination "mean[s] treating that individual worse than others who are similarly situated." *Grimm*, 972 F.3d at 618 (quoting *Bostock*, 140 S. Ct. at 1740). Here, as I have stated above, B.P.J. will be treated worse than girls with whom she is similarly situated because she alone cannot join the team corresponding to her gender identity. Considering all of this, I find that B.P.J. has demonstrated a likelihood of success on the merits for her Title IX claim.

### b. Irreparable Harm

When a party has shown a likelihood of a constitutional violation, the party has shown an irreparable harm. *Henry v. Greenville Airport Comm'n*, 284 F.2d 631, 633 (4th Cir. 1960). Forcing a girl to compete on the boys' team when there is a girls' team available would cause her unnecessary distress and stigma. In addition to the harm to B.P.J., requiring her to compete on the boys' team would also be confusing to coaches and teammates. And not only would B.P.J. be excluded from girls' sports completely; she would be excluded because of who she is: a transgender girl. Having found above that her exclusion is likely to be in violation of the Equal Protection Clause and Title IX, I find that B.P.J. has demonstrated that she will be irreparably harmed if this law were to take full effect.

### c. Balance of Equities and the Public Interest

Where, as here, the government is a party, the "balance of the equities" and "public interest" prongs of the preliminary injunction test merge. *Nken v. Holder*, 556 U.S. 418, 435 (2009). In evaluating the balance of the equities, courts "must balance the competing claims of injury and must consider the effect on each party of the granting or withholding of the requested relief." *Winter*, 555 U.S. at 24. It is always

13

in the public interest to uphold constitutional rights. *Centro Tepeyac v. Montgomery Cnty.*, 722 F.3d 184, 191 (4th Cir. 2013).

It is clearly in the public interest to uphold B.P.J.'s constitutional right to not be treated any differently than her similarly situated peers because any harm to B.P.J.'s personal rights is a harm to the share of American rights that we all hold collectively. The right not to be discriminated against by the government belongs to all of us in equal measure. It is that communal and shared ownership of freedom that makes up the American ideal. The American ideal is one "that never has been yet— And yet must be—the land where *every* man is free." *Let America be America Again, Langston Hughes.*

Plaintiff B.P.J.'s Motion for a Preliminary Injunction is **GRANTED**.

## IV. Bond Requirement

Plaintiff also seeks to waive the bond required by Federal Rule of Civil Procedure 65(c). "Where the district court determines that the risk of harm [to the enjoined party] is remote, or that the circumstances otherwise warrant it, the court may fix the amount of the bond accordingly. In some circumstances, a nominal bond may suffice." *Hoecst Diafoil Co. v. Nan Ya Plastics Corp.*, 174 F.3d 411, 421 n.3 (4th Cir. 1999). This bond can even be waived entirely when the defendant would not suffer any harm from the injunction. *Citizens for a Responsible Curriculum v. Montgomery Cnty. Pub. Sch.*, No. Civ. A. AW-05-1994, 2005 WL 1075634, at *12 (D. Md. May 5, 2005). I find that a bond is unnecessary and waive its requirement in this case.

## V. Conclusion

For the reasons stated above, Plaintiff's Motion for a Preliminary Injunction [ECF No. 2] is **GRANTED**. While this case is pending, Defendants are enjoined from

enforcing Section 18-2-25d against B.P.J. She will be permitted to sign up for and participate in school athletics in the same way as her girl classmates.

The court **DIRECTS** the Clerk to send a copy of this Order to counsel of record and any unrepresented party. The court further **DIRECTS** the Clerk to post a copy of this published opinion on the court's website, www.wvsd.uscourts.gov.

ENTER: July 21, 2021

_____
JOSEPH R. GOODWIN
UNITED STATES DISTRICT JUDGE

15