# Exhibit 1

1              IN THE UNITED STATES DISTRICT COURT

2          FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA

3                      CHARLESTON DIVISION

4                    *  *  *  *  *  *  *  *

5    B.P.J., by her next friend and    *

6    Mother, HEATHER JACKSON,          *

7         Plaintiff                    *   Case No.

8         vs.                          *   2:21-CV-00316

9    WEST VIRGINIA STATE BOARD OF      *

10   EDUCATION, HARRISON COUNTY        *

11   BOARD OF EDUCATION, WEST          *

12   VIRGINIA SECONDARY SCHOOL         *

13   ACTIVITIES COMMISSION, W.         *

14   CLAYTON BURCH in his official     *

15   Capacity as State Superintendent,*

16   DORA STUTLER in her official      *

17   Capacity as Harrison County       *  VIDEOTAPED DEPOSITION

18   Superintendent, PATRICK MORRISEY  *        OF

19   In his official capacity as       *  WESLEY SCOTT PEPPER

20   Attorney General, and THE STATE   *  January 19, 2022

21   OF WEST VIRGINIA,                 *

22        Defendants                   *

23            Any reproduction of this transcript
              is prohibited without authorization
24                by the certifying agency.

1                    VIDEOTAPED DEPOSITION

2                            OF

3    WESLEY SCOTT PEPPER, taken on behalf of the Defendant,

4    State of West Virginia, herein, pursuant to the Rules of

5    Civil Procedure, taken before me, the undersigned,

6    Nicole Montagano, a Court Reporter and Notary Public in

7    and for the State of West Virginia, on Wednesday,

8    January 19, 2022, beginning at 10:07 a.m.

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

```
 1                    A P P E A R A N C E S

 2

 3     JOSHUA BLOCK, ESQUIRE

 4     American Civil Liberties Union Foundation

 5     125 Broad Street

 6     New York, NY  10004

 7     COUNSEL FOR PLAINTIFF

 8

 9     KATHLEEN R. HARTNETT, ESQUIRE

10     ANDREW BARR, ESQUIRE

11     JULIE VEROFF, ESQUIRE

12     ZOE HELSTROM, ESQUIRE

13     Cooley, LLP

14     3 Embarcadero Center

15     20th Floor

16     San Francisco, CA  94111-4004

17          COUNSELS FOR PLAINTIFF

18

19     SRUTI SWAMINATHAN, ESQUIRE

20     Lambda Legal

21     120 Wall Street

22     19th Floor

23     New York, NY  10005-3919

24          COUNSEL FOR PLAINTIFF
```

```
 1              A P P E A R A N C E S (cont'd)
 2    DAVID TRYON, ESQUIRE
 3    CURTIS R.A. CAPEHART, ESQUIRE
 4    State Capitol Complex
 5    Building 1, Room E-26
 6    Charleston, WV  25305
 7        COUNSEL FOR STATE OF WEST VIRGINIA
 8
 9    ROBERTA F. GREEN, ESQUIRE
10    Shuman McCuskey Slicer, PLLC
11    1411 Virginia Street East
12    Suite 200
13    Charleston, WV  25301
14        COUNSEL FOR WEST VIRGINIA SECONDARY SCHOOL
15        ACTIVITIES COMMISSION
16
17    SUSAN DENIKER, ESQUIRE
18    Steptoe & Johnson
19    400 White Oaks Boulevard
20    Bridgeport, WV  26330
21        COUNSEL FOR HARRISON COUNTY BOARD OF EDUCATION and
22        HARRISON COUNTY SUPERINTENDENT DORA STUTLER
23
24
```

```
 1              A P P E A R A N C E S (cont'd)

 2

 3   KELLY C. MORGAN, ESQUIRE

 4   KRISTEN V. HAMMOND, ESQUIRE

 5   Bailey Wyant

 6   500 Virginia Street East

 7   Suite 600

 8   Charleston, WV  25301

 9       COUNSEL FOR WEST VIRGINIA BOARD OF EDUCATION and

10       SUPERINTENDANT W. CLAYTON BURCH

11

12   TIMOTHY D. DUCAR, ESQUIRE

13   Law Office of Timothy D. Ducar

14   7430 East Butherus Drive, Suite E

15   Scottsdale, AZ  85260

16       COUNSEL FOR INTERVENOR, LAINEY ARMISTEAD

17

18   JOSHUA BROWN, ESQUIRE

19   CHRISTIANA HOLCOMB, ESQUIRE

20   RACHEL CSUTOROS, ESQUIRE

21   Alliance Defending Freedom

22   15100 North 90th Street

23   Scottsdale, AZ  85260

24       COUNSEL FOR INTERVENOR, LAINEY ARMISTEAD
```

```
1                        I N D E X

2

3   DISCUSSION AMONG PARTIES                    11 -  13

4   WITNESS: WESLEY SCOTT PEPPER

5   EXAMINATION

6       By Attorney Tryon                       13 - 124

7   DISCUSSION AMONG PARTIES                    124 - 126

8   EXAMINATION

9       By Attorney Green                       126 - 128

10  EXAMINATION

11      By Attorney Deniker                     128 - 143

12  EXAMINATION

13      By Attorney Morgan                      143 - 149

14  EXAMINATION

15      By Attorney Ducar                       149 - 179

16  DISCUSSION AMONG PARTIES                    180 - 182

17  RE-EXAMINATION

18      By Attorney Tryon                       182 - 186

19  RE-EXAMINATION

20      By Attorney Deniker                     186 - 189

21  DISCUSSION AMONG PARTIES                    189 - 190

22  CERTIFICATE                                       191

23

24
```

<u>EXHIBIT PAGE</u>

PAGE

<u>NUMBER</u>          <u>DESCRIPTION</u>                    <u>IDENTIFIED</u>

Exhibit 1     Davis Medical Records           --*

Exhibit 1R    Davis Medical Records           --*

Exhibit 2     Davis Medical Records           --*

Exhibit 3     WVU Medical Records             119*

Exhibit 4     UPMC Children's Medical

              Records                         --*

Exhibit 5     UPMC Children's Medical

              Records                         --*

Exhibit 6     UPMC Children's Medical

              Records                         --*

Exhibit 7     UPMC Children's Medical

              Records

Exhibit 8     UPMC Children's Medical

              Records                         --*

Exhibit 9     UPMC Children's Medical

              Records                         --*

Exhibit 11A Progress Notes                    --*

Exhibit 11B Progress Notes                    --*

Exhibit 11C Progress Notes                    --*

Exhibit 11D Progress Notes                    69*

```
 1                          EXHIBIT PAGE

 2

 3                                                PAGE

 4    NUMBER          DESCRIPTION              IDENTIFIED

 5    Exhibit 12   UPMC Children's Medical

 6                 Records                        --*

 7    Exhibit 13   UMPC Children's Medical

 8                 Records                        --*

 9    Exhibit 14   WVU Medical Records            73*

10    Exhibit 15   WVU Medical Records            --*

11    Exhibit 16   WVU Medical Records            --*

12    Exhibit 17   Gender Support Plan            63*

13    Exhibit 18   Preferred Name Request Form    --*

14    Exhibit 19   Gender Support Plan           132*

15    Exhibit 20   Student Information            --*

16    Exhibit 20R  Student Information            --*

17    Exhibit 21   Screening Results             --*

18    Exhibit 21R  Screening Results             --*

19    Exhibit 22   Birth Certificate             52*

20    Exhibit 22R  Birth Certificate             52*

21    Exhibit 23   Heart Walk Article            --

22    Exhibit 23R  Heart Walk Article            --

23    Exhibit 24   Photo                         --

24    Exhibit 24R  Photo                         --
```

```
1                          EXHIBIT PAGE

2

3                                              PAGE

4    NUMBER         DESCRIPTION             IDENTIFIED

5    Exhibit 25   WV Record                    --

6    Exhibit 26   Photo of Mom and BPJ         --

7    Exhibit 27   Article                      --

8    Exhibit 28   Article                      --

9    Exhibit 29   Lambda Legal Article         --

10   Exhibit 30   Declaration of Heather

11                Jackson                      --

12   Exhibit 31   Declaration of BJP           --

13   Exhibit 32   First Amended Complaint      --

14   Exhibit 33   Standards of Care            --

15   Exhibit 34   House Bill 3293              25

16

17

18

19

20

21

22

23   * CONFIDENTIAL EXHIBITS

24
```

1                        <u>OBJECTION PAGE</u>

2

3       <u>ATTORNEY</u>                                      <u>PAGE</u>

4       Hartnett 16, 19, 21, 22, 23, 24, 28, 29, 30, 31, 32, 33,

5       35, 37, 39, 40, 41, 42, 43, 44, 45, 46, 47, 51, 55, 56,

6       57, 58, 59, 60, 61, 62, 63, 64, 65, 66, 67, 70, 71, 72,

7       74, 77, 78, 79, 80, 81, 83, 87, 88, 89, 90, 91, 92, 94,

8       95, 96, 97, 98, 99, 100, 101, 102, 103, 104, 105, 106,

9       107, 108, 109, 110, 111, 112, 113, 114, 115, 118, 120,

10      122, 124, 127, 133, 134, 135, 136, 137, 138, 139, 140,

11      141, 142, 143, 144, 145, 146, 147, 148, 149, 150, 151,

12      152, 153, 154, 155, 157, 158, 159, 160, 161, 162, 163,

13      164, 165, 166, 167, 168, 169, 170, 171, 172, 175, 176,

14      177, 178, 184, 185, 186, 187, 188, 189

15

16      Tryon                                               51

17

18

19

20

21

22

23

24

```
 1                    S T I P U L A T I O N
 2     ----------------------------------------------------------
 3     (It is hereby stipulated and agreed by and between
 4     counsel for the respective parties that reading,
 5     signing, sealing, certification and filing are not
 6     waived.)
 7     ----------------------------------------------------------
 8                    VIDEOGRAPHER:  We are now on the record.
 9     My name is Jacob Stock.  I'm a Certified Legal Video
10     Specialist employed by Sargent's Court Reporting
11     Services.  The date today is January 19th, 2022, and the
12     current time reads 10:07 a.m.  This deposition is being
13     taken remotely by Zoom conference.  The caption of the
14     case is:  In the United States District Court, for the
15     Southern District of West Virginia, Charleston Division,
16     BPJ by her Next Friend and Mother, Heather Jackson, v.
17     West Virginia State Board of Education, et al., Case
18     Number 2:21-CV-00316.  The name of the witness is Wesley
19     Scott Pepper.
20                    Will the attorneys present state their
21     names and the parties they represent.
22                    ATTORNEY TRYON:  This is David Tryon.  I
23     represent the Defendant, State of West Virginia.
24                    ATTORNEY HARTNETT:  This is Kathleen
```

1   Hartnett from Cooley, LLP, and I represent the Plaintiff
2   as well as the witness.
3                  ATTORNEY GREEN:  This is Roberta Green
4   here on behalf of West Virginia Secondary School
5   Activities Commission.  I'm with Shuman, McCuskey,
6   Slicer.
7                  ATTORNEY DENIKER:  Good morning.  Susan
8   Deniker, Counsel for Defendants, Harrison County Board
9   of Education and Superintendant Dora Stutler.
10                 ATTORNEY DUCAR:  Good morning.  Timothy
11  Ducar on behalf of Intervenor, Lainey Armistead.
12                 ATTORNEY BROWN:  Joshua Brown serving as
13  local counsel for Alliance Defending Freedom on behalf
14  of Lainey Armistead.
15                 ATTORNEY MORGAN:  Kelly Morgan and
16  Kristen Hammond on behalf of the West Virginia Board of
17  Education and Superintendant Burch with Bailey and
18  Wyant.
19                 ATTORNEY SWAMINATHAN:  Sruti Swaminathan
20  on behalf of Plaintiff and witness from Lambda Legal.
21                 ATTORNEY BLOCK:  Josh Block on behalf of
22  Plaintiff.
23                 ATTORNEY BARR:  Andrew Barr from Cooley,
24  LLP, on behalf of the Plaintiff and witness.

```
 1                    ATTORNEY VEROFF:  Julie Veroff on behalf

 2    of Plaintiff.

 3                    ATTORNEY HELSTROM:  Zoe Helstrom on

 4    behalf of the Plaintiff from Cooley, LLC.

 5                    ATTORNEY HOLCOMB:  Christiana Holcomb and

 6    Rachel Csutoros on behalf of the Intervenor.

 7                    VIDEOGRAPHER:  If that is everyone, the

 8    court reporter can swear in the witness and we can

 9    begin.

10                    ATTORNEY CAPEHEART:  One other thing ---

11    my apologies, I didn't speak up earlier when Dave was

12    identifying himself.  Curtis Capeheart, also here on

13    behalf of the State of West Virginia.

14                    COURT REPORTER:  Mr. Pepper, would you

15    raise your right hand, please?

16                              ---

17                    WESLEY SCOTT PEPPER,

18    CALLED AS A WITNESS IN THE FOLLOWING PROCEEDINGS, HAVING

19    FIRST BEEN DULY SWORN, TESTIFIED AND SAID AS FOLLOWS:

20                              ---

21                    COURT REPORTER:  Thank you.

22                              ---

23                        EXAMINATION

24                              ---
```

1   BY ATTORNEY TRYON:

2      Q.    Thank you.  And just for the record right now

3   could you state your full name again?

4      A.    Wesley Scott Pepper.

5      Q.    Thank you.  So my name is David Tryon.  I

6   represent the State of West Virginia.  And first of all,

7   I just want to kind of understand, given the unusual

8   circumstances of doing this remotely, can you describe

9   the room you're in and what equipment you're using?

10     A.    It is a room in a lawyer's office and I'm here

11  by myself at a table and a semi-comfortable chair.

12     Q.    And do you have a laptop in front of you?

13     A.    Yes, yes.

14     Q.    Great.

15           And are you represented by counsel today?

16     A.    Yes, I am.

17     Q.    Can you identify for me who represents you?

18     A.    Kathleen Hartnett.

19     Q.    All right.

20     A.    I guess that's Lambda, right?

21                 ATTORNEY HARTNETT:  I'm from Cooley, but

22  --- so just to be clear, the counsel that identified

23  themselves as counsel for the Plaintiff on this

24  deposition are also representing the witness today.

BY ATTORNEY TRYON:

Q.    Thank you.

And Mr. Pepper, do you have any sort of engagement letter or representation letter with any of these attorneys?

A.    Do I?

Q.    That's my question.

A.    I didn't understand the question, sir.

Q.    Did you sign any engagement letter or representation letter retaining any of these attorneys?

A.    Not to my knowledge.  I mean, my wife and I probably did.  I don't remember.

Q.    Okay.

A.    It has been a while.

Q.    Okay.

Can you tell us for purposes of identification your location where you're currently at?

A.    I am in Buckhannon, West Virginia.

Q.    Do you know the address where you're located?

A.    I do not.

Q.    Have you ever been deposed before?

A.    Yes.

Q.    Can you tell us about when and where and what that was about?

 1     A.     I've been through a divorce.

 2     Q.     And so you were deposed in connection with that

 3 divorce?

 4     A.     Yes.

 5     Q.     How long ago was that?

 6     A.     1990.

 7     Q.     Okay.

 8            And any other depositions you've been in?

 9     A.     My oldest son had a dog bite case in Georgia.  I

10 was under a deposition for that as well.

11     Q.     When was that?

12     A.     2005, 2006.

13     Q.     Any other depositions you've been in?

14     A.     No.

15     Q.     Have you been sued before other than in

16 connection with your divorce?

17     A.     No.

18                 ATTORNEY HARTNETT:  Objection,

19 foundation.

20 BY ATTORNEY TRYON:

21     Q.     Is your wife listening to this and watching this

22 in any fashion?

23     A.     No.

24     Q.     So just a question, you've been deposed before

1   so you already have some idea of what we're doing.  But

2   a deposition is oftentimes an unusual situation because

3   it's not really any other type of communication that

4   we're typically involved in.  It's an opportunity for

5   the attorneys to ask you questions and for you to give

6   them answers.  And so I'm going to give you a few

7   instructions on how we'll handle this to try to make it

8   work out the best for everyone.

9        Would that be okay?

10   A.   Yes.

11   Q.   So first of all, we're operating in Federal

12   Court so the Federal Rules of Civil Procedure apply

13   here.  And you're going to hear objections from time to

14   time, and I just want to let you kind of give you an

15   idea of how that's handled as of the Rules.  And I'll

16   just read from what's called Federal Rule of Civil

17   Procedure C2, which says an objection at the time of the

18   examination, whether to evidence to a party's conduct,

19   the officer's qualifications, to the manner for taking

20   the deposition or any other aspect of the deposition

21   must be noted on the record but examination still

22   proceeds.  The testimony is taken subject to any

23   objection and an objection must be stated concisely in a

24   non-argumentative and non-suggestive manner.

```
 1            So in other words, if your counsel or any other
 2   lawyer objects, they can only state objection with the
 3   statement such as you've already heard foundation or
 4   something like that, and then you still need to answer
 5   the question unless your attorney instructs you to not
 6   answer the question.  So --- and I would also ask you to
 7   as we're going through this to answer verbally so that
 8   the court reporter can take this down as opposed to
 9   nodding your head or shaking your head.
10            Okay?
11      A.    Yes.
12      Q.    Thank you.
13            And if you don't understand a question, feel
14   free to ask me to clarify it, which you've already done.
15   And if you do answer, then that implies that you
16   understand the question.  So please let me know if you
17   don't understand.
18            Okay?
19      A.    Yes.
20      Q.    If you need to take a break for whatever reason,
21   please let me know and we'll arrange for that, although
22   we don't take breaks during the course of a question.
23   After you answer a question, then we can take a break.
24            And just for the record, this deposition is
```

19

1    being conducted as on Cross Examination, which for you

2    that just means that's a legal concept as to the

3    procedure.

4           Now, before we get started with our questions I

5    wanted to just let you know we understand this whole

6    situation is sensitive and we, as representing the State

7    and I'm sure others as well, we're not here to judge

8    you, your family, your child or anyone else and --- but

9    since BPJ has filed this lawsuit and we as the State

10   have an obligation to defend the statute that is being

11   challenged here, we are --- I mean, it's a serious

12   charge to challenge the validity of the statute, so we

13   have an obligation to ask questions to address that

14   issues.

15          So some of these questions, as in all

16   depositions, sometimes things are a little

17   uncomfortable, but that is the procedure that we need to

18   follow as required by the Courts.

19          Does that sound fair to you?

20              ATTORNEY HARTNETT:  Objection to the

21   description of the obligations and other --- other

22   concepts that you've stated, but I think --- just for

23   the record, we've had conversations with Counsel for the

24   Defense about the conduct of the deposition and we

1   expect it to proceed civilly and professionally, but I'm

2   not sure if you have a question for the witness.  I

3   don't think he needs to necessarily adopt your view of

4   your obligation to defend the case.

5   BY ATTORNEY TRYON:

6       Q.    Mr. Pepper, the procedure that I just described,

7   does that sound fair to you?

8       A.    Yes.  I have one request.  Can you turn your

9   volume up just a little bit so I can hear you a little

10  bit better, please?

11      Q.    I don't know if I can do that.  At your end you

12  should be able to do that.

13      A.    I've got mine at a hundred here, and it's --- it

14  just seems like it's --- I can hear you, but I'm

15  straining just a little bit.

16                ATTORNEY HARTNETT:  Can we go off the

17  record briefly?  I might have a suggestion for that.

18  I'm happy to put it on the record, too.

19                ATTORNEY TRYON:  Go ahead.  Let's go off

20  the record.

21                VIDEOGRAPHER:  We're going off the

22  record.  The current time reads 10:19 a.m.

23  OFF VIDEOTAPE

24                          ---

1   (WHEREUPON, A SHORT BREAK WAS TAKEN.)

2                              ---

3   ON VIDEOTAPE

4                    VIDEOGRAPHER:  We are back on the record.

5   The current time reads 10:20 a.m.

6   BY ATTORNEY TRYON:

7   Q.    So Mr. Pepper, in preparation for this

8   deposition did you review any documents?

9                    ATTORNEY HARTNETT:  Object to the extent

10  you --- I just would caution you, Mr. Pepper, to not

11  divulge the content of your discussions with your

12  attorneys, but you can answer the question.

13                   THE WITNESS:  Yes, I have reviewed some.

14  BY ATTORNEY TRYON:

15  Q.    Can you tell me what documents you've reviewed

16  without disclosing your discussions with your lawyers?

17  A.    I'm sorry.  I didn't quite hear you.

18  Q.    Can you tell me what documents you looked at in

19  preparation of this deposition other than discussions

20  with your lawyers?

21  A.    I can't tell you the name of them, no.

22  Q.    What were the nature of them?

23  A.    Some were documents to --- I guess for these

24  proceedings and some were doctors' recommendations.

1    Q.    Anything else?

2    A.    Nope.

3    Q.    And do you feel like you had ample time to

4  prepare for this deposition with your lawyers?

5    A.    Yes.

6    Q.    Did you have any discussions with either your

7  wife or BPJ in preparation for this deposition?

8            ATTORNEY HARTNETT:  I would just object

9  based on the marital communications privilege.  To the

10  extent that --- you know, I would direct you not to

11  answer with respect to any content of your

12  communications that were confidential with your wife.

13  But otherwise, you can answer the question.

14            THE WITNESS:  I've conferred with my

15  wife.

16  BY ATTORNEY TRYON:

17    Q.    Okay.

18            And how about your child, BPJ?

19    A.    Somewhat.

20    Q.    What discussions have you had with BPJ?

21            ATTORNEY HARTNETT:  I would just object

22  to the extent it calls for any discussions that you had

23  with BPJ with your lawyers present to the --- that would

24  be covered by the attorney/client privilege.  Otherwise,

```
 1   you can answer.
 2                    THE WITNESS:  My communication with my
 3   daughter is pretty much father to daughter like I
 4   communicate with my son, father to son, very general.
 5   BY ATTORNEY TRYON:
 6      Q.    So you're aware of this lawsuit.
 7            Right?
 8      A.    Yes.
 9      Q.    Have you read the Complaint?
10      A.    Yes.
11      Q.    Have you --- your name does not appear on here
12   but rather your wife's name.  Let me just clarify, can
13   you tell us who your wife is?
14      A.    My wife's name is Heather Denise Jackson.
15      Q.    And her name appears on the Complaint.
16            Correct?
17      A.    I believe so.
18      Q.    At the time of filing the Complaint were you
19   asked to put your name on it as well?
20                    ATTORNEY HARTNETT:  Objection to the
21   extent it calls for communications between you and your
22   lawyers, us.  But to the extent you can answer otherwise
23   --- also, to the extent it calls for any communications
24   between you and your wife, but otherwise you can answer.
```

```
 1                    THE WITNESS:  I don't recall that my name
 2    was asked to be placed on the documents, no.
 3    BY ATTORNEY TRYON:
 4       Q.    Did you consent to the filing of the lawsuit?
 5                    ATTORNEY HARTNETT:  Objection, vague.
 6    BY ATTORNEY Tryon
 7       Q.    Go ahead, you may answer.
 8       A.    Yes.
 9       Q.    When you reviewed the Complaint, did you agree
10    with everything in there or was there anything you
11    disagreed within there?
12                    ATTORNEY HARTNETT:  Objection, vague and
13    compound.
14    BY ATTORNEY TRYON:
15       Q.    Go ahead.
16       A.    I agree with --- I agree with what's in the
17    papers.
18       Q.    So the law known as HB3293, which is the law ---
19    which is the subject of this case, have you read that?
20       A.    Somewhat.
21       Q.    Okay.
22                    ATTORNEY TRYON:  I would like to ask the
23    videographer to bring that up?
24                    VIDEOGRAPHER:  Which document?
```

```
  1                    ATTORNEY TRYON:  I believe it's the last
  2   document.
  3                    VIDEOGRAPHER:  Do you have the specific
  4   number?
  5                    ATTORNEY TRYON:  Pardon me.
  6                    VIDEOGRAPHER:  Do you have the specific
  7   number?
  8                    ATTORNEY TRYON:  I apologize, Exhibit 34.
  9                    VIDEOGRAPHER:  Thank you.
 10                    ATTORNEY TRYON:  I mean, 32.  No, it's
 11   34.  I'm sorry.
 12                    VIDEOGRAPHER:  Is it 32 or 34?  I'm
 13   sorry.
 14                    ATTORNEY TRYON:  Thirty-two (32).  I beg
 15   your pardon.  Let me try it again.  It's Exhibit 34.
 16   I'm looking at two different things.
 17                    VIDEOGRAPHER:  Just give me one second to
 18   grab the right one for you.
 19                         ---
 20                    (Whereupon, Exhibit 34, House Bill 3293,
 21                     was marked for identification.)
 22                         ---
 23                    ATTORNEY TRYON:  Okay.
 24                    Can I scroll down?  How do I do that?
```

```
 1                    VIDEOGRAPHER:  Yes.
 2   BY ATTORNEY TRON:
 3      Q.    Mr. Pepper, are you able to read this?
 4      A.    It's pretty small.
 5      Q.    At the top of the screen there's a percentage.
 6   Mine says 57.9 percent.  You can increase the size on
 7   your screen.
 8                    ATTORNEY HARTNETT:  I'm sorry.  We can't
 9   do that, but it looks like the court reporter can.
10                    ATTORNEY TRYON:  I just did it.  Can you
11   see it better now?
12                    THE WITNESS:  Yes, 75 is good.
13   BY ATTORNEY TRYON:
14      Q.    Okay.  Very good.  So I want to go over a couple
15   of provisions in here.
16                    ATTORNEY HARTNETT:  David, would you be
17   able to please just scroll through the document so he
18   can see what the document is before you start reading
19   from a part of it?
20                    ATTORNEY TRYON:  Sure.
21                    VIDEOGRAPHER:  This is the videographer.
22   I just wanted to point out that basically I gave you
23   control of the --- of the documents.  So you're the only
24   one that can actually control it right now.  It's not
```

1    separate for everyone.  It's --- whatever you do, that's

2    what everyone else is going to see right now.

3                    ATTORNEY TRYON:  Thank you.

4    BY ATTORNEY TRYON:

5        Q.    So this is the bill.  You can see the front

6    page.  And then it consists of various articles.  It's

7    not very long.  It looks like it's a total of five

8    pages.

9                    ATTORNEY HARTNETT:  Thank you.

10   BY ATTORNEY TRYON:

11       Q.    So under --- on the second page it has

12   definitions.  The first definition I want to read is

13   biological sex.  It means an individual's physical form

14   as a male or a female based solely on the individual's

15   reproductive biology and genetics at birth.

16           Have I read that correctly?

17           Mr. Pepper, are you there?

18                    VIDEOGRAPHER:  Counsel, it looks like we

19   might have lost him.  I no longer see him in the list of

20   participants.

21                    ATTORNEY HARTNETT:  It looks like he just

22   rejoined.

23                    VIDEOGRAPHER:  Okay.  Give me one second

24   then.

```
 1                    THE WITNESS:  Okay.  I think we lost

 2   connection there.  Can you hear me?

 3                    ATTORNEY TRYON:  Yes, welcome back.

 4   BY ATTORNEY TRYON:

 5      Q.    I'm not sure.  Are you --- I'm not sure --- what

 6   was the last thing you heard before you lost connection?

 7      A.    You scrolled back to the top of the document and

 8   I lost you after that.  Everything seemed to freeze up

 9   on me.

10      Q.    Okay.  All right.

11              So it's a five page document.  And let me

12   scroll through again just generally what's here.  The

13   fourth page appears to be blank and then the fifth page

14   is just the signature page.  So I'm going to go to the

15   definition section here.

16              The definition of biological says means an

17   individual's physical form as a male or a female based

18   solely on the individual's reproductive biology and

19   genetics at birth.

20              Have I read that correctly?

21      A.    Yes.

22      Q.    Do you agree that that's a fair definition of

23   biological sex?

24                    ATTORNEY HARTNETT:  Objection, calls for
```

1   a legal conclusion.  Vague.

2   BY ATTORNEY TRYON:

3     Q.    Go ahead.

4     A.    I guess so, yeah.

5     Q.    And then female says means an individual's whose

6   biological sex determined at birth as female as used in

7   this section women or girls refers to biological

8   females.

9           And is that a fair definition of female?

10           ATTORNEY HARTNETT:  Objection, calls for

11   a legal conclusion, vague.

12           THE WITNESS:  Yes.

13   BY ATTORNEY TRYON:

14     Q.    And then the next definition is male, means an

15   individual's whose biological sex determined at birth is

16   male, as used in this section men or boys refers to

17   biological males.

18           Is that a fair definition of male?

19           ATTORNEY HARTNETT:  Objection, again

20   calls for a legal conclusion and is vague.

21           THE WITNESS:  I guess so.

22   BY ATTORNEY TRYON:

23     Q.    In the --- on page three it has an operative

24   provision.  Number two, it says athletic teams or sports

```
 1   designated for females, women or girls shall not be open

 2   to students of the male sex where the selection for such

 3   teams is based upon competitive skill or the activity

 4   involved is a contact sport.

 5           Do you believe that that's fair?

 6                   ATTORNEY HARTNETT:  Objection.  Calls for

 7   a legal conclusion and vague.

 8                   THE WITNESS:  Do I think it's fair?

 9   BY ATTORNEY TRYON:

10      Q.    That's my question.

11      A.    I guess.

12      Q.    Now the State claims that this bill is designed

13   to preserve women's sports.  Do you agree that that is a

14   reasonable objective for a bill?

15                   ATTORNEY HARTNETT:  Objection, foundation

16   and calls for a legal conclusion and vague.

17                   THE WITNESS:  Can you repeat the

18   question, please?  I'm not sure I understand it.

19   BY ATTORNEY TRYON:

20      Q.    Sure.  Again, this bill claims that it is

21   designed to preserve women's sports.  Irrespective of

22   whether or not it accomplishes that, I want to know

23   first of all if you think that is a reasonable objective

24   for a law, to preserve women's sports.
```

```
 1                    ATTORNEY HARTNETT:  Same objections.

 2                    THE WITNESS:  I don't know how to answer

 3   that.

 4   BY ATTORNEY TRYON:

 5       Q.    Okay.

 6             Do you know anything about Title 9?

 7       A.    Vague.

 8       Q.    Title 9 is one of the claims in the Complaints

 9   --- excuse me.  Let me rephrase that.  The Complaint

10   claims that this law violates Title 9.  Are you aware

11   that the Complaint does that?

12       A.    I do now.

13       Q.    Okay.  Fair enough.

14             One of the purposes of Title 9 is to preserve

15   and encourage women's sports.  And so my question for

16   you is do you think it is a legitimate purpose of a law

17   to try to preserve and encourage women's sports?

18                    ATTORNEY HARTNETT:  Objection, foundation

19   and calls for a legal conclusion and vague.

20                    THE WITNESS:  Once again, I'm not sure

21   how to answer that.

22   BY ATTORNEY TRYON:

23       Q.    Okay.  Fair enough.

24             Another purpose that this law is designed for,
```

```
 1    according to legislature, is to protect women's safety,

 2    especially in high school, college sports.  Would you

 3    think that is an appropriate purpose for a law?

 4                   ATTORNEY HARTNETT:  Objection,

 5    foundation, calls for a legal conclusion and vague

 6                   THE WITNESS:  I guess.  I see what you're

 7    saying, but I don't know.  I'll leave it at that.

 8    BY ATTORNEY TRYON:

 9       Q.    Okay.

10             Do you believe that this law is designed to

11    preserve women's sports?

12                   ATTORNEY HARTNETT:  Objection, calls for

13    a legal conclusion and vague.

14                   THE WITNESS:  Well, I'm no expert on

15    this, but that's what you're saying is a possibility

16    there.

17    BY ATTORNEY TRYON:

18       Q.    Okay.

19             Well, you said you had read the lawsuit before

20    it was filed, right?  Do I remember that correctly?

21       A.    Yes.

22       Q.    And that lawsuit challenges that and says that

23    it does not protect women's sports as I interpret the

24    Complaint.  Do you know anything that you see in this
```

```
 1    law that you believe does not preserve women's --- is

 2    designed to do something other than to preserve women's

 3    sports?

 4                    ATTORNEY HARTNETT:  Objection, vague,

 5    calls for speculation, calls for a legal conclusion.

 6                    THE WITNESS:  I'm not quite well versed

 7    in all this terminology, but ---.

 8    BY ATTORNEY TRYON:

 9        Q.    But what?

10        A.    I don't understand it.

11        Q.    Okay.

12        A.    I'm no expert in it.

13        Q.    I understand.  So let me back up just a little

14    bit and ask you --- you already stated your full name.

15    Can you give us your address and your phone number,

16    please?

17        A.    My home address?

18        Q.    Yes.

19        A.    My home address is 12537 Buckhannon Pike, Lost

20    Creek, West Virginia  26385.  And I'm sorry, what was

21    the other thing you wanted?

22        Q.    Your phone number.

23        A.    My cellphone number or my home phone number?

24        Q.    How about both?  And just to give you a heads
```

```
 1   up, we would not place --- we would not call you as a

 2   general rule.  We would try to contact you through your

 3   attorneys, but we would want to have this for record, if

 4   for some reason you're no longer represented by counsel.

 5       A.    Understood.  Cellphone, my cell is 770-546-5869.

 6   My home phone is 304-624-1757.

 7       Q.    Thank you.  Did you graduate from high school?

 8       A.    Yes, I did.

 9       Q.    Where did you go to high school?

10       A.    In Pennsylvania.  I graduated in 1980.

11       Q.    And after high school did you have any further

12   education?

13       A.    Yes.

14       Q.    Okay.

15             What was --- after high school what education

16   did you have?

17       A.    I went to nursing school.  I got my Associate

18   degree in Fort Pierce, Florida.  I got my Bachelor's

19   degree from Miami Shores, Florida.  And I also have a

20   doctorate degree in chiropractic I got from Marietta,

21   Georgia.

22       Q.    And when did you get your Associate's degree?

23       A.    1995.

24       Q.    And when did you get your Bachelor's degree?
```

```
1      A.     1998.

2      Q.     And finally, your Doctorate?

3      A.     2005.

4      Q.     What is your current profession?

5      A.     I am practicing as a Registered Nurse.

6      Q.     How long have you done that?

7      A.     I've been a nurse for 25, 26 years.

8      Q.     And where do you currently work?

9      A.     I currently work at John Manchin Senior

10  Healthcare Clinic in Fairmont, West Virginia.

11     Q.     And you work in the capacity of a Registered

12  Nurse.

13            Is that right?

14     A.     I'm sorry?

15     Q.     Your current capacity there is as a Registered

16  Nurse?

17                 ATTORNEY HARTNETT:  Objection, asked and

18  answered.

19                 THE WITNESS:  Yes.

20  BY ATTORNEY TRYON:

21     Q.     Have you ever worked as a chiropractor?

22     A.     Yes.

23     Q.     When was that?

24     A.     2005 through 2007.  And my last stint was part
```

1    time in 2019, I believe.

2         Q.    Did you have your own chiropractic practice or

3    did you work for somebody else?

4         A.    I worked for someone else.

5         Q.    And who was that?

6         A.    Doctor Dan and Doctor Kim Gambino.

7         Q.    How many children do you have?

8         A.    I have four.

9         Q.    So from your current marriage you have three.

10             Is that right?

11        A.    Yes.

12        Q.    And from your former marriage then you would

13   have one.

14             Is that right?

15        A.    That's correct, yes.

16        Q.    And what is the name of your ex-wife?

17        A.    My ex-wife's name is Heather Lowry.

18        Q.    When did you get married to your current wife?

19        A.    In 2001.  January 22nd to be exact.

20        Q.    So your anniversary is coming up.

21             Right?

22        A.    It's very close.

23        Q.    You don't want to forget that.

24             So let me ask you some questions about BPJ.

```
 1    And as I understand it, when BPJ was born BPJ --- whoops
 2    --- oh, you there you are.  I just lost my screen for a
 3    second.  When BPJ was born, BPJ had male body parts.
 4            Right?
 5                    ATTORNEY HARTNETT:  Objection, vague.
 6    BY ATTORNEY TRYON:
 7       Q.    You may answer.
 8       A.    Yes.
 9       Q.    Is there anything vague about that question to
10    you?
11                    ATTORNEY HARTNETT:  Objection, vague.
12    And vague as to body parts, but you can answer.
13                    THE WITNESS:  I'm not sure of the
14    definition of vague.
15    BY ATTORNEY TRYON:
16       Q.    Okay.
17            When BPJ was first born you considered BPJ as a
18    male.
19            Right?
20       A.    Yes.
21       Q.    And as your son.
22            Correct?
23       A.    Yes.
24       Q.    And now, you know, I understand BPJ had a
```

```
 1   different birth name.
 2             That's true, isn't it?
 3       A.    Yes.
 4       Q.    Now, how do you refer to BPJ now?  What name do
 5   you use for BPJ?
 6       A.    Her name is B████.
 7       Q.    Okay.
 8             And when did you change using BPJ's birth name
 9   to B████?
10       A.    When she requested it.
11       Q.    Do you remember when that was?
12       A.    Eight, nine years ago.
13       Q.    At some point you noticed something that
14   suggested that BPJ may self identify as a female rather
15   than a male?
16       A.    Can you repeat that, please?
17       Q.    Yes.  At some point did you notice something
18   that suggested that BPJ might self identify as a female
19   rather than a male?
20       A.    Yes.
21       Q.    Can you tell us, first of all, when that was,
22   the first time you noticed that, and when it was?
23       A.    Approximately eight years ago.  She liked to do
24   female things.
```

```
1      Q.     What are those that she liked to do?

2      A.     Mannerisms, dress.

3      Q.     What mannerisms?

4      A.     Talking like a female, acting like a female.

5      Q.     What do you mean talking like a female?

6      A.     Using pronouns she, her.

7      Q.     So BPJ is --- usually when you talk about

8  yourself you don't use pronouns.  Can you explain that

9  for me?

10                  ATTORNEY HARTNETT:  Objection,

11  foundation.

12                  THE WITNESS:  She preferred to be called

13  B▇▇▇ P▇▇▇ J▇▇▇, not by her birth name.

14  BY ATTORNEY TRYON:

15     Q.     Okay.

16            Do you recall when BPJ --- and just to be

17  clear, the reason I'm using the initials BPJ is because

18  that's typically the way we refer to minors in court

19  proceedings.  You're free to use whatever names you

20  prefer.  I'm not objecting to that.  But I just wanted

21  you to understand why I'm using those initials.

22            Okay?

23     A.     Yes.

24     Q.     And that is also the name that is used in the
```

```
 1   Court filing, so that's why I'm doing that.

 2          Okay?

 3     A.    Yes.

 4     Q.    So you said that at some point BPJ decided to

 5   use the name B█████.  And can you tell us how it came

 6   about that BPJ selected that name?

 7                   ATTORNEY HARTNETT:  Objection.  Calls for

 8   speculation.

 9                   THE WITNESS:  I still don't know where

10   that name came from today, where she chose that name.

11   BY ATTORNEY TRYON:

12     Q.    And when BPJ chose that name, did you

13   immediately begin using that or were you hesitant, did

14   it take you sometime before you switched over?

15                   ATTORNEY HARTNETT:  Objection, compound.

16                   THE WITNESS:  In the beginning I was

17   confused.  In the beginning I didn't understand.

18   BY ATTORNEY TRYON:

19     Q.    And so my question then is at the beginning were

20   you --- did you not change immediately or did you --- or

21   what, how did that go?

22                   ATTORNEY HARTNETT:  Objection, compound,

23   vague.

24                   THE WITNESS:  It took a little while.
```

 1    BY ATTORNEY TRYON:

 2        Q.    How long is a little while?

 3        A.    I don't remember.  That's been years ago.

 4        Q.    Did it take a couple of years for you to change

 5    what name you used?

 6        A.    No.

 7        Q.    Okay.

 8              I believe that there are other mannerisms.  You

 9    said liked to talk like a female.  What did you mean

10    that BPJ liked to talk like a female other than using

11    female pronouns?

12                    ATTORNEY HARTNETT:  Objection, asked and

13    answered.

14                    THE WITNESS:  Dressing like a female,

15    talking like a female, doing female things, things that

16    girls like to do.

17    BY ATTORNEY TRYON:

18        Q.    When you say dressing, can you describe what

19    that means?

20        A.    Wearing dresses, wearing female shoes.

21        Q.    Anything else?

22        A.    Jewelry, makeup.

23        Q.    Anything else?

24        A.    Not that I can think of right now.

1      Q.    Well, let me ask you this question, a little

2   different question.  For you what does it mean to be

3   female?

4                   ATTORNEY HARTNETT:  Objection, vague.

5                   THE WITNESS:  And I'm no expert, but

6   females at that age like to hang out with other females

7   that age.  Do the things that they like to do, play

8   dolls, play house, talk on the phone.

9   BY ATTORNEY TRYON:

10     Q.    Anything else?

11     A.    No, sir.

12     Q.    So if --- let me just see if I understand.  Are

13  you saying that if any male likes to play with dolls,

14  talk on the phone, play with other girls and to dress in

15  dresses and wear jewelry or makeup, does that mean that

16  that child is female rather than male?

17                  ATTORNEY HARTNETT:  Objection, misstates

18  his testimony.

19                  ATTORNEY TRYON:  I'm not misstating

20  anything.

21  BY ATTORNEY TRYON:

22     Q.    I'm asking, sir, if that is what you mean?

23     A.    No, I think each individual has a right to

24  choose whatever they want.

1    Q.    And if an individual has a right to choose what

2    they want, do they then just declare this is what I want

3    and identify as male or identify as female and is that

4    the determination?

5                    ATTORNEY HARTNETT:  Objection.  Vague,

6    calls for speculation, compound and to the extent it

7    calls for expert opinion.

8    BY ATTORNEY TRYON:

9       Q.    Go ahead.

10      A.    I really don't know how to answer your question.

11      Q.    Fair enough.  Let me ask it in a different way

12   to try and clarify.  Let me just ask a different

13   question.  In your mind what does it mean to be a male?

14                   ATTORNEY HARTNETT:  Objection, vague.

15                   THE WITNESS:  I'm sorry.  I missed the

16   question.

17   BY ATTORNEY TRYON:

18      Q.    Sure.  In your mind what does it mean to be

19   male?

20                   ATTORNEY HARTNETT:  Same objection.

21                   THE WITNESS:  In my mind what does it

22   mean to be male?

23   BY ATTORNEY TRYON:

24      Q.    Yes.

1      A.      To be the President of the United States, to be

2  the head of your household.

3      Q.      So the President of the United States would have

4  to be male?

5                      ATTORNEY HARTNETT:  Objection.

6                      THE WITNESS:  Not necessarily.

7                      ATTORNEY HARTNETT:  Misstates his

8  testimony.

9  BY ATTORNEY TRYON:

10     Q.      Then what do you mean by that, President of the

11 United States?  My question was what does it mean for

12 you, what does it mean to be male, and you said it would

13 be the President of the United States.

14             Can you explain that?

15     A.      Our history has shown that we've always had a

16 male dominant figure over the United States of America.

17     Q.      So maybe a little bit generically can you tell

18 me what in your mind it means to be male?

19                      ATTORNEY HARTNETT:  Objection, vague and

20 to the extent you're seeking some sort of an expert

21 opinion, but you can answer.

22                      THE WITNESS:  To be male, in my opinion,

23 to be a father, to be a brother.

24 BY ATTORNEY TRYON:

1    Q.    Does it matter what body parts you are born

2  with?

3                ATTORNEY HARTNETT:  Objection, vague and

4  to the extent it calls for an expert opinion.

5                THE WITNESS:  I don't believe that what

6  you're born with biologically has to do anything with

7  being a father or not.

8  BY ATTORNEY TRYON:

9    Q.    Can you explain what you mean by that?

10   A.    Well, I'm a male, but I'm a nurse.  Women can

11 live together and one can be male and one can be female,

12 but I'm no expert.

13   Q.    So you're --- as you said, as a nurse you

14 recognize that a child when they're born their body

15 parts determines whether they are a male or a female?

16                ATTORNEY HARTNETT:  Objection, vague,

17 calls for expert opinion, calls for a legal conclusion,

18 calls for speculation.

19 BY ATTORNEY TRYON:

20   Q.    Go ahead.

21   A.    I would guess because that's what Webster's

22 Dictionary defines male and female or whatever other

23 book that you might look at.

24   Q.    Well, your child was born as a male you said.

1    And you now --- I think you also said that you now

2    regard --- I'm not sure you said this, so let me just

3    ask the question.   Forgive me if you've already answered

4    it.   Your child was born as a male.   Do you regard your

5    child BPJ as a female now?

6        A.    That's correct.

7                    ATTORNEY HARTNETT:   Objection, vague, but

8    go ahead.

9    BY ATTORNEY TRYON:

10       Q.    What was your answer?

11       A.    I said that's correct.

12       Q.    And why?

13       A.    She is an individual.   She has the right to her

14   body.   That is her decision and I support her

15   100 percent.

16       Q.    So BPJ identifies female.   You believe that she

17   is a female?

18                    ATTORNEY HARTNETT:   Objection, vague.

19   You can answer.

20                    THE WITNESS:   That's correct.

21   BY ATTORNEY TRYON:

22       Q.    Now, looking through the medical records it's

23   unclear when BPJ first identified as a girl.   In one

24   place it said that was when BPJ was two years old.

```
 1    Another place it says that when BPJ was in second grade

 2    and another says when BPJ was three years old.  Do you

 3    know which one is accurate?

 4              ATTORNEY HARTNETT:  Objection.  You're

 5    reading from documents you're not showing him and

 6    compound and incomplete description of the record.

 7    BY ATTORNEY TRYON:

 8       Q.    You can answer if you know.

 9       A.    I believe it was around three years old.  That

10    is an estimate.  That has been many years ago.

11       Q.    Yeah.  Well, I'm asking your specific memory and

12    I'm just trying to jog your memory from what I've read.

13    So you believe it was about three years old.

14              Is that right?

15       A.    That's correct.

16              ATTORNEY HARTNETT:  David, if we could

17    take a break in the next couple of minutes, that would

18    be appreciated.

19              ATTORNEY TRYON:  Okay.

20              Let me just finish up a couple of things

21    if you don't mind.

22    BY ATTORNEY TRYON:

23       Q.    So let's take a look at Exhibits 22 and 22R.

24              ATTORNEY TRYON:  If the videographer
```

```
 1   could bring that up.

 2                ATTORNEY HARTNETT:  Actually, I would

 3   request a break before we go into --- don't put it up so

 4   we don't want him to be looking over to the break.

 5   Before we go into the exhibits I would like to take a

 6   break.

 7                ATTORNEY TRYON:  All right.

 8                How long a break do you need?

 9                ATTORNEY HARTNETT:  Let's say ten

10   minutes.

11                ATTORNEY TRYON:  Okay.

12                And if I could just alert the witness

13   that since we're in the middle of a deposition, that

14   you're not permitted to have discussions with your

15   counsel about your deposition.  Okay.  We will reconvene

16   in ten.

17                VIDEOGRAPHER:  Going off the record.  The

18   current time reads 10:59 a.m.

19   OFF VIDEOTAPE

20                          ---

21   (WHEREUPON, A SHORT BREAK WAS TAKEN.)

22                          ---

23   ON VIDEOTAPE

24                VIDEOGRAPHER:  We are back on the record.
```

```
 1    The current time reads 11:10:00 a.m.
 2                    ATTORNEY HARTNETT:  Could I just ---
 3    while we are back on the record, you had mentioned
 4    before the break, Mr. Tryon, that we should not confer
 5    with our client.  Is there a specific rule or authority
 6    in this jurisdiction that you are citing to because ---
 7    general rule as you stated.
 8                    ATTORNEY TRYON:  It's my understanding
 9    that during the course of a --- that prior to deposition
10    you may consult with your client and prepare them for
11    the deposition, but during a deposition it's just the
12    same as when you're in trial and --- your face is
13    frozen.  Can you still hear me?  Kathleen?
14                    THE WITNESS:  She's frozen on my end,
15    too.
16                    VIDEOGRAPHER:  She is frozen on this end
17    as well.
18                    ATTORNEY TRYON:  Go off the record.
19                    VIDEOGRAPHER:  Going off the record.  The
20    current time reads 11:11 a.m.
21    OFF VIDEOTAPE
22                              ---
23    (HEREUPON, A SHORT BREAK WAS TAKEN.)
24                              ---
```

```
 1   ON VIDEOTAPE
 2                   VIDEOGRAPHER:  We are back on the record.
 3   The current time is 11:13 a.m.
 4                   ATTORNEY TRYON:  Counsel, it's my
 5   understanding, to answer your question, that when you
 6   are taking a deposition it's the same as being at trial.
 7   In the middle of a trial deposition you're not permitted
 8   to counsel with your client.  You can counsel with your
 9   client in preparing them for deposition but not during
10   the deposition.  That is my understanding.
11                   ATTORNEY HARTNETT:  Yeah, I think that's
12   not our understanding.  And I believe we're probably
13   under Federal common-law, but there's at least a Supreme
14   Court of West Virginia case saying that you can confer
15   during the deposition as long as it's not for an
16   improper purpose, such as, for example, in the middle of
17   a question.  So I would appreciate if you could bring
18   some authority to our attention.  Otherwise, we would
19   like to be able to check in with our client on breaks.
20   Obviously, for no improper purpose.  But like I said we
21   did not speak to him on this break.
22                   ATTORNEY TRYON:  Okay.
23                   Well, that's the understanding that I'm
24   operating under and will continue to operate under until
```

```
 1   you can provide me some ulterior authority.

 2              ATTORNEY HARTNETT:  I actually think it's

 3   the other way around.  I'm unfamiliar with that

 4   principle.  And other than certain judges I know have

 5   idiosyncratic rules at times about that issue, but my

 6   understanding is in general you are able to consult with

 7   your client on a break.  I didn't expect this issue to

 8   arise.  I believe that the state ex rel Means v. King

 9   case from the Supreme Court of Appeals from West

10   Virginia, 1999.

11              ATTORNEY TRYON:  Okay.

12              Well, let's move on with the deposition,

13   please.

14              ATTORNEY HARTNETT:  Well, okay, but I

15   would say, just to be clear on the record here, that we

16   do intend to confer with our client, to check in with

17   him, again for no improper purpose, on breaks unless

18   directed to some contrary authority because our

19   understanding is there is no such prohibition in this

20   jurisdiction.

21              ATTORNEY TRYON:  And I object to you

22   doing that.

23              ATTORNEY HARTNETT:  I object to the

24   objection without any authority to do so.  And if you
```

1    direct me to any authority that makes that point in this

2    jurisdiction, we would obviously be happy to review it.

3    I've directed you to authority State ex rel Means.

4                    ATTORNEY TRYON:  As you well pointed out,

5    that's irrelevant because it is State authority.  We are

6    under Federal Court at the moment.  Thank you.  Let's

7    continue with the deposition, please.

8    BY ATTORNEY TRYON:

9        Q.    Mr. Pepper, during the deposition --- during the

10   break did you confer with anyone?

11       A.    No.

12       Q.    Thank you.

13                        ---

14                    (Whereupon, Exhibit 22, Birth

15                     Certificate, was marked for

16                     identification.)

17                    (Whereupon, Exhibit 22R, Birth

18                     Certificate, was marked for

19                     identification.)

20                        ---

21                    ATTORNEY TRYON:  Let me direct you to

22   Exhibits 22 and 22R.  So for Counsel's information, 22

23   and 22R are the same document.  They've been redacted in

24   different ways.  Exhibit 22 came from the school and 22R

1   came from Plaintiff's Counsel.  And in other exhibits we

2   have marked where we have gotten documents that includes

3   the --- BPJ's birth name, we have two exhibits and one

4   where we've redacted the name.  It has the R attached to

5   it.  I intend to primarily use the ones with the R

6   attached to it, but there may be circumstances where I

7   will use the other or someone else may wish to use the

8   other document.

9   BY ATTORNEY TRYON:

10      Q.   So I have a very simple questions on these two

11  documents.  This is 22.

12              ATTORNEY HARTNETT:  Just to be clear, did

13  you apply any redactions to these documents or were they

14  produced with the redactions reflected in Exhibits 22

15  and 22R?

16              ATTORNEY TRYON:  Happy to clarify.

17  Exhibit 22, I did not do anything with this document,

18  not redacted at all.  These are redactions that came

19  from --- this came from the school.  It was redacted in

20  this fashion.

21              And then let me scroll down to 22R.  This

22  is the document produced by the Plaintiff and it is

23  redacted in a different fashion.

24              ATTORNEY HARTNETT:  And just for the ---

1    I would just object to the --- any unnecessary use of

2    documents or putting documents into the record with our

3    client's birth name, which is a request that we had

4    made.  But obviously you can introduce whatever exhibit

5    you want here.  We would request that you use the

6    documents without the birth name in the interest of our

7    client's privacy and the other sensitivities we

8    discussed.  And we also just would generally hold this,

9    you know, request that the exhibits and the transcript

10   be treated as confidential until we have an opportunity

11   to review them and ensure that any exhibits that should

12   be maintained as confidential are.

13            ATTORNEY TRYON:  Yeah.  And just on that

14   point, Counsel, we have gotten the --- the court

15   reporter did sign a Confidentiality Agreement --- or

16   excuse me, Protective Order.

17            ATTORNEY HARTNETT:  Thank you very much.

18            ATTORNEY TRYON:  Yes.

19   BY ATTORNEY TRYON:

20      Q.    So Mr. Pepper, I just want to confirm, as far as

21   you know, these two documents, are these correct and

22   accurate?

23      A.    From what I can read, yes.

24      Q.    Okay.

```
 1              That says 22.  And let me show you 22R.  That's

 2    a little clearer.  Is that correct and accurate to the

 3    best of your knowledge?

 4       A.    Yes.

 5       Q.    Thank you.  I have no other questions on these

 6    two exhibits.

 7              Let me ask you about the term gender dysphoria.

 8    Mr. Pepper, when is the first time you heard that term?

 9                    ATTORNEY HARTNETT:  Objection,

10    foundation.

11                    ATTORNEY TRYON:  Well, let's lay the

12    foundation.

13    BY ATTORNEY TRYON:

14       Q.    Have you ever heard the term gender dysphoria

15    before?

16       A.    Yes, but I'm not an expert on it.

17       Q.    Right.  When is the first time you heard it?

18       A.    Months ago.

19       Q.    So sometime in the past year?

20                    ATTORNEY HARTNETT:  Objection.

21                    THE WITNESS:  I don't recall.

22    BY ATTORNEY TRYON:

23       Q.    Okay.

24              Well, when BPJ first started to use your
```

```
 1    concept, acting or speaking like a girl, at that time
 2    had you heard the term gender dysphoria?
 3                    ATTORNEY HARTNETT:  Objection, vague,
 4    mischaracterization of the testimony.
 5                    THE WITNESS:  I heard it through my wife
 6    and the doctors' notes.
 7    BY ATTORNEY TRYON:
 8       Q.    Which doctor?
 9       A.    I don't recall.
10       Q.    And tell me about when you first heard the term,
11    what was your understanding of it?
12                    ATTORNEY HARTNETT:  Objection.  I'm
13    sorry, objection, foundation.
14                    THE WITNESS:  That an individual, what
15    they're born with biologically is not what they
16    represent themselves as, in a roundabout way.
17    BY ATTORNEY TRYON:
18       Q.    So then you indicated about three years old is
19    when BPJ started identifying as a female.  Is that a
20    fair characterization of your testimony?
21       A.    Yes.
22       Q.    And at that time you still had not heard the
23    term gender dysphoria.
24             Is that true?
```

```
 1      A.    At that time, no.  Yes.

 2      Q.    So when BPJ started wanting to dress and act

 3  like a girl, did you think that it was a phase that BPJ

 4  would grow out of?

 5                  ATTORNEY HARTNETT:  Objection, vague.

 6                  THE WITNESS:  I didn't know.

 7  BY ATTORNEY TRYON:

 8      Q.    Did you think that that was a possibility?

 9                  ATTORNEY HARTNETT:  Objection, vague.

10  Calls for speculation.

11                  THE WITNESS:  Anything is possible.

12  BY ATTORNEY TRYON:

13      Q.    At that time did you expect that BPJ would grow

14  out of this phase?

15                  ATTORNEY HARTNETT:  Objection vague,

16  foundation.

17                  THE WITNESS:  I did not know.

18  BY ATTORNEY TRYON:

19      Q.    So you didn't know one way or the other.

20            Is that right?

21                  ATTORNEY HARTNETT:  Objection, asked and

22  answered?

23                  THE WITNESS:  That's correct, I didn't

24  know.
```

BY ATTORNEY TRYON:

Q.    Did you think it might be a mental health issue?

ATTORNEY HARTNETT:  Objection, vague.

THE WITNESS:  I'm no mental health expert, so I can't answer that question.

BY ATTORNEY TRYON:

Q.    Well, as a nurse have you observed people who have mental health issues?

ATTORNEY HARTNETT:  Objection, vague.

THE WITNESS:  Everyone has mental health issues in my opinion.

BY ATTORNEY TRYON:

Q.    Well, I agree with you there, but there's some people who have mental health issues that need treatment.  Did you believe when your daughter --- when your child BPJ was three years old that BPJ might need some mental health --- some assistance with mental health issues?

ATTORNEY HARTNETT:  Objection, vague.

THE WITNESS:  Maybe counseling.  I don't know about mental health.

BY ATTORNEY TRYON:

Q.    Okay.

Counseling, you thought that perhaps BPJ might

```
 1    need mental --- or excuse me, counseling when BPJ was
 2    three years old?
 3                      ATTORNEY HARTNETT:  Objection.  Vague,
 4    asked and answered.
 5                      THE WITNESS:  Sure, to help her try to
 6    sort everything out.
 7    BY ATTORNEY TRYON:
 8       Q.    And when BPJ was three years old did you or your
 9    wife get mental --- get counseling for BPJ?
10       A.    I don't know the dates that she had counseling.
11    I've only been to one session with her.  Most of the
12    time I'm at work, so ---.
13       Q.    And when was --- which session were you at with
14    BPJ?
15       A.    I believe it was last summer in Morgantown.  I
16    believe it was Doctor Bunner or therapist.  I don't know
17    if that is a doctor or therapist, but ---.
18       Q.    Did you have have discussions with BPJ --- let
19    me rephrase that.  When BPJ was three years old did you
20    have discussions with your wife about how to handle the
21    situation?
22                      ATTORNEY HARTNETT:  Objection, based on
23    the marital communications privilege.  You can answer as
24    to whether --- I guess the fact of whether you talked to
```

```
 1    your wife but not --- at any particular time but not the

 2    content of the conversation.

 3                    THE WITNESS:  Yes, I've conferred with my

 4    wife through all this with her.  We both agree on what's

 5    best for my child --- our child.

 6    BY ATTORNEY TRYON:

 7       Q.   Did you talk to anyone else either where you

 8    work or other friends about the situation with BPJ, that

 9    BPJ was identifying as a girl rather than a boy?

10                    ATTORNEY HARTNETT:  Objection, vague and

11    compound.

12                    THE WITNESS:  I spoke with one of my

13    colleagues very general but nothing specific.  And as

14    far as talking with anyone else, no, I have not talked

15    to anyone else because it's really none of their

16    concern.

17    BY ATTORNEY TRYON:

18       Q.   Who is that colleague?

19       A.   A nurse --- a nurse friend of mine.

20       Q.   Is that nurse ---?

21       A.   I can't hear you.  You're shotty.

22       Q.   Does that nurse friend have a name?

23       A.   Yes.

24                    ATTORNEY HARTNETT:  Objection, sorry
```

```
 1   argumentative.  And I guess you can answer the question

 2   and we can seek to keep it confidential, but I just

 3   object to the unnecessary questioning into other ---

 4   other individuals.

 5   BY ATTORNEY TRYON:

 6      Q.    Go ahead.

 7      A.    Her name is Missy Harrison.

 8      Q.    And is she a nurse.  I assume it's a she.  I

 9   don't know.  Is Missy Harrison a nurse?

10      A.    Yes.

11      Q.    And why did you talk to Missy Harrison about

12   BPJ?

13                ATTORNEY HARTNETT:  Objection, misstates

14   the testimony.

15   BY ATTORNEY TRYON:

16      Q.    Go ahead.

17      A.    We --- we work close together.

18      Q.    Tell me about your conversation with Missy

19   Harrison.

20      A.    I told her that my child has chosen to be a

21   female and that's what she is going to be the rest of

22   her life.

23      Q.    How old was BPJ at that time?

24      A.    Nine, ten.
```

1      Q.      Before BPJ was nine or ten did you talk to

2   anyone else about BPJ's desire to be identified as a

3   female?

4      A.      No.

5      Q.      So why not?

6                 ATTORNEY HARTNETT:  Objection.

7   Argumentative.

8   BY ATTORNEY TRYON:

9      Q.      I'm nothing arguing with you, sir.  I'm just

10   interested in the situation.

11                 ATTORNEY HARTNETT:  Objection to the

12   commentary.

13                 THE WITNESS:  I didn't feel the need to.

14   BY ATTORNEY TRYON:

15      Q.      Were you embarrassed about the situation?

16                 ATTORNEY HARTNETT:  Objection.

17   Foundation.

18                 THE WITNESS:  Maybe in the beginning.

19   BY ATTORNEY TRYON:

20      Q.      So in the beginning.  How long did that last

21   where you felt some embarrassment?

22      A.      A couple of months.

23      Q.      Let me direct your attention to Exhibit 17.

24                      ---

```
 1                     (Whereupon, Exhibit 17, Gender Support

 2                     Plan, was marked for identification.)

 3                                 ---

 4   BY ATTORNEY TRYON:

 5       Q.     So this is a document that you received from the

 6   school.  It's a Gender Support Plan that appears to me

 7   was either filled out by either the school or your wife

 8   and it has signature pages --- signatures at the end,

 9   including --- let me scroll down here.  So at the bottom

10   here it has it looks like the name B████.  Would that be

11   BPJ's signature or name?

12                     ATTORNEY HARTNETT:  Objection, compound.

13                     THE WITNESS:  Yes.

14   BY ATTORNEY TRYON:

15       Q.     And let me scroll down so you can see the

16   entirety of the exhibit here.  That goes into

17   Exhibit 18.  So let me stick with Exhibit 17 and go back

18   up to the top.  Have you ever seen this document before?

19       A.     I have not.

20       Q.     Are you aware that a document was filled out at

21   the school called a Gender Support Plan?

22       A.     I'm not aware of it.

23       Q.     Okay.

24              So in the very first part here you can see it
```

```
 1    has this language that says mom very supportive, dad has
 2    struggled but coming around.  Seeking outside help
 3    through church and paternal side of family's
 4    help/support.  Does that accurately represent the
 5    situation for you in 2019, the date of this document?
 6        A.   I have no idea who wrote that.  And no, that's
 7    not my --- that's not my recollection of what was going
 8    on.
 9        Q.   Okay.
10             It says dad has struggled.  Do you know what
11    that is referring to?
12        A.   I do not.
13        Q.   It also says seeking outside help through
14    church.  Do you know what that's referring to?
15        A.   I do not.
16        Q.   Did you have any counseling through your church
17    about this situation?
18                  ATTORNEY HARTNETT:  Objection, vague.
19    Foundation.
20                  THE WITNESS:  Like I said, I have not
21    seen this document and I don't know what it represents.
22    BY ATTORNEY TRYON:
23        Q.   Okay.
24             And my question is specifically did you have
```

```
 1   any counseling through your church about BPJ's
 2   situation?
 3                  ATTORNEY HARTNETT:  Objection, vague and
 4   foundation.
 5                  THE WITNESS:  Not to my knowledge.
 6   BY ATTORNEY TRYON:
 7      Q.   Well, that answer puzzles me because if you had
 8   counseling, you would certainly know about it.  So why
 9   did you qualify that not to your knowledge?
10                  ATTORNEY HARTNETT:  Objection.
11   Argumentative.
12                  THE WITNESS:  I'm not always present with
13   every last detail that has been conducted with my
14   daughter.  My wife has been the main support.
15   BY ATTORNEY TRYON:
16      Q.   Okay.
17           But you have not sought outside help from your
18   church with respect to BPJ?
19      A.   Please repeat that.  You are very shotty.
20      Q.   When you say shotty, you mean it's breaking up,
21   my voice is breaking?
22      A.   Yes, breaking up.
23      Q.   Okay.
24           I want to make sure I'm not shotty in some
```

```
 1   other way.

 2       A.    No, no.

 3       Q.    So it says seeking outside help through church.

 4   Does that refer to any kind of outside help that you

 5   were seeking through the church?

 6       A.    Not to my knowledge.

 7       Q.    Okay.

 8             Then it says and paternal side of family's

 9   help/support.  Did you seek any help from your family

10   other than your wife with respect to BPJ's situation?

11                   ATTORNEY HARTNETT:  Objection.  Vague.

12                   THE WITNESS:  All my family has been

13   supportive of B█████ decision.

14   BY ATTORNEY TRYON:

15       Q.    So who did you discuss your situation with?

16       A.    Well, I have two sisters.  They are both nurses.

17       Q.    And when did you consult with them?

18                   ATTORNEY HARTNETT:  Objection,

19   foundation.

20                   THE WITNESS:  Years ago.  I don't

21   remember the exact date.

22   BY ATTORNEY TRYON:

23       Q.    Now, on the next document B████ is comfortable

24   with others knowing her gender identity and transition.
```

```
 1   Do you know what that --- when you see that --- let me

 2   rephrase this.  You believe that, quote, B███ is

 3   comfortable with others knowing her gender identity and

 4   transition?

 5       A.    I would assume, according to what it says there

 6   on that line.

 7       Q.    In your experience, did BPJ believe that's

 8   accurate?

 9       A.    Yes.

10       Q.    And is BPJ comfortable letting people know what

11   her original name was, what her birth name was?

12               ATTORNEY HARTNETT:  Objection.  Calls for

13   speculation.

14               THE WITNESS:  She does not even discuss

15   that.  That's not even part of who she is now.

16   BY ATTORNEY TRYON:

17       Q.    What do BPJ's brothers call BPJ?

18       A.    The same, B███.

19               ATTORNEY HARTNETT:  David, if you're

20   going to ask more questions about this document that the

21   deponent has said that he has not previously seen, could

22   you please let him review the document?

23               ATTORNEY TRYON:  Yes.  I was trying to do

24   that as the parts --- you want him to see the whole
```

1    document, is that what you're asking?

2                    ATTORNEY HARTNETT:  Yes, I would like

3    you ---.

4                    ATTORNEY TRYON:  I can do that.

5                    ATTORNEY HARTNETT:  This provider doesn't

6    appear to have a separate exhibit function, but if you

7    would be able to or someone could page down and he can

8    review the entire document before you ask more

9    questions, I would appreciate it.

10                    ATTORNEY TRYON:  That's a fair request.

11   I'm not sure if I have any more questions.  Let me take

12   a look here.

13   BY ATTORNEY TRYON:

14      Q.    I have no other questions on this particular

15   document.  Would you like to see any more of it, Mr.

16   Pepper?

17      A.    No, sir.

18      Q.    Okay.

19            Let me direct you next to 11C.

20                    VIDEOGRAPHER:  Did you say 9C?

21                    ATTORNEY TRYON:  No, 11C.

22                    VIDEOGRAPHER:  Okay.  Thank you.

23                    ATTORNEY TRYON:  I'm sorry.  This might

24   be the wrong one.  11D is what I'm looking for.  Okay.

```
 1    So this is 11D, right.  Can you give me control?

 2                          ---

 3                   (Whereupon, Exhibit 11D, Progress Notes,

 4                   was marked for identification.)

 5                          ---

 6    BY ATTORNEY TRYON:

 7        Q.    Okay.

 8              So this is three pages long.  So take your time

 9    and look through this, if you would like.  I just have a

10    couple of questions about this.  My first question is

11    going to be if you've ever seen this before?

12        A.    I've not seen this before, no.

13        Q.    Okay.

14              Well, per your attorney's request, this is

15    page one.  Let me know if you feel comfortable moving on

16    to page two.  You don't need to read all of it.  You can

17    if you'd like.

18        A.    Okay.

19        Q.    Okay.

20              This is page two.

21        A.    Okay.

22        Q.    And then here is the third page of that exhibit,

23    which is actually a different document, but it's part of

24    this exhibit.
```

1    A.    Okay.

2    Q.    All right.

3          And down further that is the end of that

4    document and goes to document 12.  So in this paragraph

5    here it says B███ --- with stopping puberty.  She wants

6    to know when she can start hormone therapy.  So let me

7    first follow up.  Did BPJ ever discuss with you about

8    stopping puberty?

9    A.    No.

10   Q.    All right.

11         And then wants to know about hormone therapy.

12   Was that discussed with you by anyone?

13              ATTORNEY HARTNETT:  Objection, vague?

14              THE WITNESS:  It was briefly discussed

15   with my wife.

16   BY ATTORNEY TRYON:

17   Q.    Did you discuss that --- with your wife?

18   A.    Just my wife.

19              COURT REPORTER:  I'm sorry, Counsel.  I

20   didn't get that question.  It cut out.

21              ATTORNEY TRYON:  I said that --- I asked

22   if he discussed that with any caregivers or just his

23   wife.

24              THE WITNESS:  My answer was just my wife.

1  BY ATTORNEY TRYON:

2     Q.    Right.  And then it says wants to get breasts

3  and get rid of her penis.  Was --- did anybody discuss

4  that with you?

5               ATTORNEY HARTNETT:  Objection, vague.

6               THE WITNESS:  No.

7  BY ATTORNEY TRYON:

8     Q.    Do you have any concerns about that?

9               ATTORNEY HARTNETT:  Objection, vague.

10               THE WITNESS:  I have no concerns.

11  BY ATTORNEY TRYON:

12     Q.    Do you know anything about the process of

13  removing a penis?

14               ATTORNEY HARTNETT:  Objection, vague.

15               THE WITNESS:  I do not.

16  BY ATTORNEY TRYON:

17     Q.    It next says she is experiencing dysphoria with

18  leg hair growth.  ████████████████████████████

19  ████████████████████████  ████████████████████

20  ██████████████████████  █████████████████

21  ████████████████

22    ███   ████

23    ███ ███████████████████████████████████

24  ███

1    ███████     ████████████     ██████████     ███████████

2    ████████████

3    BY ATTORNEY TRYON:

4        Q.    Well, let me try it again.  Is it your testimony

5    --- have you ever said man up?

6        A.    No.

7        Q.    Any idea why this might be reported in this

8    document?

9                    ATTORNEY HARTNETT:  Objection, calls for

10   speculation.

11                   THE WITNESS:  I have no idea.  I was not

12   present at the appointment.

13   BY ATTORNEY TRYON:

14       Q.    Okay.

15             Next it says mom has a transgender psychologist

16   in mind, but their office has been closed.  Do you know

17   who that transgender psychologist is or was?

18                   ATTORNEY HARTNETT:  Just for the record,

19   you're moving to the next paragraph?

20                   ATTORNEY TRYON:  Yes

21                   THE WITNESS:  No, I do not know.

22   BY ATTORNEY TRYON:

23       Q.    Is there currently a transgender --- strike

24   that.

```
 1              Is there currently a psychologist that is
 2   meeting with or treating BPJ?
 3                   ATTORNEY HARTNETT:  Objection.  Compound,
 4   vague.
 5                   THE WITNESS:  I believe her psychologist
 6   is Bunner.  That's my understanding.  I could be wrong.
 7   You're breaking up again.
 8   BY ATTORNEY TRYON:
 9     Q.    Sorry.  Do you know if Bunner is a psychologist?
10     A.    I believe so.  I'm not a hundred percent.
11                            ---
12                   (Whereupon, Exhibit 14, WVU Medical
13                    Records, was marked for identification.)
14                            ---
15   BY ATTORNEY TRYON:
16     Q.    Let me direct you next to Exhibit 14, which I
17   might be able to scroll down to.  Let me try and move
18   some things around here so I can do this better.  There
19   we go.  Here is 14.  There is a lot of documents
20   contained within this Exhibit 14, so rather than
21   scrolling through all of it right now, just take one
22   document at a time.  And so this first page here is a
23   stand-alone document.  Can you read it all right?
24     A.    Can you increase it to 100 percent, please?
```

```
1    Q.    Yes.

2    A.    Thank you.   That's better.

3              ATTORNEY HARTNETT:  I would object to the

4    characterization of the document.  This appears to be a

5    15 --- let's see here, 17-page document with pagination

6    on the bottom and this is page 2 of a 17-page document.

7              ATTORNEY TRYON:  Well, let's see here.

8              ATTORNEY HARTNETT:  This appears to be a

9    medical record from a particular visit date.

10             ATTORNEY TRYON:  Yeah, thank you for your

11   clarification on that, but I think these are separate

12   entries.

13             ATTORNEY HARTNETT:  No.  I would just

14   direct your attention to --- it's like a progress note,

15   so it begins on the first page that you have here, which

16   is page two of the document.  And then it goes on to say

17   progress note continued at least through page eight.

18             ATTORNEY TRYON:  Okay.

19             ATTORNEY HARTNETT:  And then the office

20   note appears to continue, although it is a separate part

21   of the record from the progress note.  It's the

22   documents portion for the remainder of the document.  So

23   it's all the office visit note and then there is a

24   progress note and a document portion.
```

```
 1              ATTORNEY TRYON:  Okay.

 2              ATTORNEY HARTNETT:  I don't need to argue

 3   it.  I mean, it would be helpful --- I mean, you can ask

 4   the witness whatever you'd like about the familiarity of

 5   the document, but I would appreciate him having the

 6   chance to review the document before you ask questions

 7   about it.

 8   BY ATTORNEY TRYON:

 9      Q.    Well, let me ask you, first of all, have you

10   ever seen this document before?

11      A.    No, I have not.

12              COURT REPORTER:  Excuse me, Counsel.  Can

13   you make it bigger than 100 percent?  I can't read it

14   very well.

15              ATTORNEY TRYON:  How's that?

16   BY ATTORNEY TRYON:

17      Q.    Mr. Pepper, can you read it all right?

18      A.    Yes.

19      Q.    I don't have any questions for you on this page.

20      A.    You say you do have questions?

21      Q.    I do not.  Let me know when you're ready for the

22   next page.

23              ATTORNEY HARTNETT:  Yes, I would just ---

24   I think what might be help for you or someone to page
```

1    through the full document.  Obviously, for him to read

2    it at whatever pace he wants.  I'm assuming he's not

3    going to --- he can read everything word for word, but

4    it would be helpful for him to see what this document is

5    in full before you start asking questions about it.

6              ATTORNEY TRYON:  Okay.  We'll do that.

7    BY ATTORNEY TRYON:

8        Q.    Is that okay with you, Mr. Pepper?

9        A.    Yes.

10       Q.    So here is page --- here's the next page.  Tell

11   me if you want me to stop at any particular place.  And

12   when I go back and ask you a question, then you'll have

13   plenty of time to read that.  Or if you want to look at

14   more portions of it before you answer the question, just

15   let me know.

16       A.    Okay.

17       Q.    Sorry?

18             VIDEOGRAPHER:  I believe he got

19   disconnected again.  I don't see him in the video feed.

20             THE WITNESS:  Yes.  I --- I stated

21   earlier it looks like everybody else was frozen, but the

22   page before this one, I didn't get a real good chance to

23   review it.

24   BY ATTORNEY TRYON:



1    Q.    Okay.

2          Let me back up again.  A lot in this one, so it

3    is --- okay.  Let me see if I can scroll back up at the

4    top of the Complaint.  Okay.  So here is the beginning

5    of that document.  ████████████████████████████

6    ████████████████    ████████████████████████

7    ███████████████████████████████    Do you

8    know what that is referring to, Mr. Pepper?

9    A.    I do not.  I was not at that meeting.

10   Q.    Do you believe you've ever used gender as a

11   weapon?

12               ATTORNEY HARTNETT:  Objection.  Vague.

13               THE WITNESS:  Maybe in the beginning.

14   BY ATTORNEY TRYON:

15   Q.    How so?

16   A.    I would call B███ by her birth name.

17   ██    ████████████████████████████████████████

18   ████████████████████████████████████

19   █████████    ████████████████████████████████

20   ██████████  B████████████████

21                ████████████████    ██████    ██████

22                ████████████  .  ████████████

23   ██████████████

24      ██    ██████████████████████    ██████████

1  ████████████████████████████████████████████████

2  B████████████████████████████████████████████

3  ████████████████████        Do you know who that would be?

4                    ATTORNEY HARTNETT:  Objection.

5  Foundation.

6                    THE WITNESS:  No, I don't know.  Once

7  again, I was not at the visit.

8  BY ATTORNEY TRYON:

9     Q.   I understand, but do you know what a gender

10 affirming therapist is?

11                   ATTORNEY HARTNETT:  Objection.  Vague.

12                   THE WITNESS:  No, I do not.

13 BY ATTORNEY TRYON:

14    Q.   Do you know what a gender therapist is?

15                   ATTORNEY HARTNETT:  Objection.  Vague.

16                   THE WITNESS:  No, I do not.

17 BY ATTORNEY TRYON:

18    Q.   Okay.

19         For some reason I can't see you, sir.  Is your

20 camera on?

21    A.   My camera?

22    Q.   Yes.  There you are.  Now I got you, okay.

23 Thank you.

24                   VIDEOGRAPHER:  Counsel, to avoid that

```
 1   problem in the future, you would probably want to pin

 2   the witness and then it would always show him instead of

 3   the active speakers.

 4                    ATTORNEY TRYON:   Okay.

 5   BY ATTORNEY TRYON:

 6      Q.    Have you had any counseling, sir, with any

 7   therapist with respect to this situation?

 8                    ATTORNEY HARTNETT:  Objection.  Vague.

 9                    THE WITNESS:  No, sir.  I'm working all

10   the time.

11   BY ATTORNEY TRYON:

12      Q.    Okay.

13            So BPJ, as I understand it, does have a

14   therapist.

15            Is that right?

16      A.    Yes.

17      Q.    Do you know how that therapist --- how either

18   you or your wife or your child found that therapist?

19                    ATTORNEY HARTNETT:  Objection.  Compound.

20                    THE WITNESS:  I'm sure my wife found that

21   therapist.  How?  I don't know.  You would have to ask

22   her.

23   BY ATTORNEY TRYON:

24      Q.    Okay.
```

```
 1              Did you interview that therapist before BPJ

 2   started meeting with the therapist?

 3       A.    Personally, no.

 4       Q.    When you say personally, is there some other way

 5   that you did?

 6       A.    Telephone.

 7       Q.    Okay.

 8              And which therapist did you talk to?

 9       A.    I did not talk to any therapist before she went.

10       Q.    What therapist did you talk to by phone?

11       A.    Oh, that was just a general statement.  I wasn't

12   saying --- you know, other than personally, you can talk

13   to them by phone.  But I hadn't talked to any therapist

14   prior to her going to therapy.  I had just conferred

15   with my wife.

16       Q.    Have you since talked to any therapist?

17       A.    I took B███ to one therapy in Morgantown to see

18   Dr. Bunner and that was --- briefly spoke with a

19   therapist before and after her session.

20       Q.    Okay.

21              What happened during that session?

22              ATTORNEY HARTNETT:  Objection.  Calls for

23   speculation.

24   BY ATTORNEY TRYON:
```

1    Q.    Go ahead.  Are you still there?  Mr. Pepper?

2               VIDEOGRAPHER:  He appears to be frozen I

3 think.  And there he disconnected, so hopefully he will

4 be reconnecting.

5               ATTORNEY HARTNETT:  The witness is here.

6 BY ATTORNEY TRYON:

7    Q.    Okay.

8        Mr. Pepper, can you hear me now?

9    A.    Yes.

10    Q.    Okay.

11        So my question is what discussions --- my

12 question was, what happened in that session where you

13 attended with the therapist?

14               ATTORNEY HARTNETT:  Objection.  Misstates

15 the record.

16 BY ATTORNEY TRYON:

17    Q.    Okay.

18        Let me back up and make sure I understand.  You

19 were in that session with the therapist with your ---

20 with BPJ.

21        Is that correct?

22    A.    One, yes.

23    Q.    And what happened during that session?

24               ATTORNEY HARTNETT:  Objection.  Vague.

1   ███████████████. ████████████████████

2   <u>BY ATTORNEY TRYON:</u>

3        Q.    Can you elaborate, please?

4    ██ ██████████████████████████████████████

5   ███████████████████████████████████

6        Q.    And what was --- did you answer that question or

7   did BPJ answer those questions?

8        A.    We both spoke on it briefly before the session.

9        Q.    Before the session?

10       A.    Yes.

11       Q.    When you say both, you mean you and BPJ spoke

12   together?  Is that what you are saying?

13       A.    We were speaking with the therapist and he kind

14   of like was going through laying down guidelines, you

15   know, what they're going to be talking about and things

16   that --- you know, that I wasn't going to be privy to

17   but we could talk about how the session went and what is

18   going to be talked about during that session.  So he was

19   kind of laying down guidelines for me because I had

20   never been there before and he was introducing himself

21   and just giving a general rundown.

22       Q.    And then there was a session where only BPJ and

23   the therapist were present.

24            Is that right?

```
1      A.     Yes, that is correct.

2      Q.     And as far as acceptance, are people accepting

3  of BPJ's situation?

4             ATTORNEY HARTNETT:  Objection.  Vague,

5  calls for speculation.

6  BY ATTORNEY TRYON:

7      Q.     It is a general question.  If you can answer

8  generally.

9      A.     I would say generally, yes.

10     Q.     Are there those that are not accepting of BPJ's

11 situation?

12     A.     Not to my knowledge.

13            Any chance we could request five minutes to go

14 to the restroom?

15            ATTORNEY TRYON:  Yeah.  So what we could

16 do, actually, it is after 12 o'clock now.  I don't know

17 what people feel about --- let's go off the record if we

18 may.

19            VIDEOGRAPHER:  Going off the record ---.

20            ATTORNEY HARTNETT:  Sorry.  Can we stay

21 on the record for one ---?

22            VIDEOGRAPHER:  Yes, sorry.

23            ATTORNEY HARTNETT:  I just wanted to

24 direct Counsel's attention to the --- I think it's the
```

1    Page Act, the Under Armour case in the Northern District

2    of West Virginia.  That's from November of 2020.  And it

3    is Judge Alloy, I believe, making clear that we are able

4    to confer with our client on breaks of depositions even

5    if it's --- so long as it's not an improper purpose,

6    which, as I stated, it would not be.  So our intent is

7    to check in with our client on a break, particularly if

8    there's a more extended one.  And I think if you have

9    some contrary authority that disallows that, we would

10   appreciate you bringing it to our attention promptly.

11              ATTORNEY TRYON:  Counsel, what do you

12   consider to be a proper purpose?

13              ATTORNEY HARTNETT:  Checking in with how

14   he's feeling, is he comfortable.  Obviously, we're not

15   going to coach him on any answer to any question, but we

16   can talk to him about potential Redirect.  Those are all

17   appropriate topics for a deposition.  We will not be

18   sharing any of the exhibits that you forwarded as a

19   courtesy with him before --- use them or don't use them

20   in a deposition.

21              ATTORNEY TRYON:  And so you would agree

22   that you're not going to coach him on how to answer

23   questions?  Is that your statement?

24              ATTORNEY HARTNETT:  I would never coach

```
1    my witness on how to answer a question.  He's been

2    coached, if anything, to tell the truth.  And what I'm

3    telling you is out of courtesy we will not review any of

4    the exhibits with him that you sent ahead of time before

5    the deposition.  And that it is our right, I believe,

6    under the Rules and under the precedent from this

7    jurisdiction to speak with our client.  And as the case

8    sets forth, that it actually helps to advance the truth

9    seeking function here to make sure that our client is

10   comfortable, understands the questions and is able to

11   function properly in the deposition today.

12                  ATTORNEY TRYON:  Okay.

13                  So let's go off the record for a second

14   and then we will come back on and reconfer.

15                  VIDEOGRAPHER:  Going off the record.  The

16   current time is 12:09 p.m.

17   OFF VIDEOTAPE

18                          ---

19   (WHEREUPON, AN OFF RECORD DISCUSSION WAS HELD.)

20                          ---

21   ON VIDEOTAPE

22                  VIDEOGRAPHER:  Back on the record.  The

23   current time reads 12:12 p.m.

24                  ATTORNEY TRYON:  Okay.
```

 1                    We're going to take a five-minute break

 2     now and then in about an hour we're going to take a

 3     lunch break for about a half hour after that.  And so we

 4     will reconvene in ten minutes, which would be 12:22.

 5                    ATTORNEY MORGAN: This doesn't have to do

 6     with that, but since we're off the record here ---.

 7                    VIDEOGRAPHER:  We are on the record.

 8                    ATTORNEY MORGAN:  Okay.

 9                    I will wait until we are off.

10     OFF VIDEOTAPE

11                         ---

12     (WHEREUPON, AN OFF RECORD DISCUSSION WAS HELD.)

13                         ---

14                    VIDEOGRAPHER:  Is everyone ready to go

15     off the record?

16                    ATTORNEY HARTNETT:  I would just we had

17     no further discussion about the issue of talking to our

18     client while we were off the record, but we stand by

19     what we said on the record.

20                    VIDEOGRAPHER: Okay.

21                    Going off the record.  The current time

22     reads 12:12 p.m.

23                         ---

24     (WHEREUPON, A SHORT BREAK WAS TAKEN.)

```
 1                          ---
 2    ON VIDEOTAPE
 3              VIDEOGRAPHER:  Back on the record.  The
 4    current time reads 12:26 p.m.
 5    BY ATTORNEY TRYON:
 6       Q.    Okay.
 7             Mr. Pepper, I had a question, a few more
 8    questions about counseling and therapy.  ███████
 9    ███████████████████████████████████████████████
10    ███████████████████████████████████     Does that
11    comport with your memory?
12              ATTORNEY HARTNETT:  Objection to the
13    characterization of records that you're not showing the
14    witness.
15    BY ATTORNEY TRYON:
16       Q.    Go ahead, sir.
17       A.    I have no recollection of it.
18       Q.    So do you know when the first therapist
19    appointment was?
20       A.    No, I don't.
21       Q.    Do you have any documents that would show that?
22       A.    I do not.
23              ATTORNEY HARTNETT:  Objection.  Vague.
24    BY ATTORNEY TRYON:
```

```
 1        Q.     Did you answer?

 2        A.     I said I do not.  I do not.

 3        Q.     Have you kept any records in your personal files

 4   about any therapy or any visits with therapists for BPJ?

 5                    ATTORNEY HARTNETT:  Objection.  Vague,

 6   compound.

 7                    THE WITNESS:  My wife takes care of all

 8   that.

 9   BY ATTORNEY TRYON:

10        Q.     So would that be a no?

11        A.     Yes.

12        Q.     Do you know if your wife has --- with respect to

13   BPJ?

14        A.     Yes, she takes care of all of the records.

15        Q.     Now, it's also my understanding that BPJ

16   received a ███████████████    Do you know what a

17   ████████████████is?

18        A.     I do not.

19        Q.     Do you know --- are you aware that BPJ received

20   a ████████████████

21        A.     Yes.

22        Q.     From what I read, ████████████████████████

23   ████████████    Is that consistent with your memory?

24                    ATTORNEY HARTNETT:  Objection to the
```

1    description of documents that you're not showing the

2    witness.

3    BY ATTORNEY TRYON:

4        Q.    I didn't say anything about documents.  I said

5    that's my understanding.  So what is your understanding,

6    sir?

7                      ATTORNEY HARTNETT:  You said about from

8    the documents you reviewed.  But it doesn't matter.  I'm

9    just objecting to the extent you're characterizing

10   documents that are not before the witness.

11                      THE WITNESS:  I don't remember.

12   BY ATTORNEY TRYON:

13       Q.    Fair enough.

14             Did you specifically consent to the

15   implantation of the ███████████

16       A.    Through my wife.

17       Q.    Did anybody tell you what the ██████████ does?

18       A.    I believe it stops puberty.

19       Q.    Were you okay with that?

20       A.    Yes.

21                      ATTORNEY HARTNETT:  Objection.

22   BY ATTORNEY TRYON:

23       Q.    So BPJ at some point became interested in

24   sparts.

```
 1              Is that right?

 2     A.    Yes.

 3     Q.    Do you remember when that was?

 4     A.    The exact date, no.

 5     Q.    More or less?

 6     A.    Years ago.

 7                ATTORNEY HARTNETT:  Objection.

 8  BY ATTORNEY TRYON:

 9     Q.    And what sports did BPJ initially become

10  interested in?

11     A.    Cheerleading.

12     Q.    Anything else?

13     A.    Cross-country.

14     Q.    Anything else?

15     A.    Not to my knowledge.

16     Q.    Do you remember when BPJ first became interested

17  in cheerleading?

18     A.    Many years ago.

19     Q.    Okay.

20           So that was before BPJ actually went onto the

21  cheerleading team?

22     A.    That's correct.

23     Q.    Do you remember what year it was that BPJ joined

24  the cheerleading team?
```

1      A.     I do not.

2      Q.     And do you remember when BPJ first got

3   interested in cross-country?

4      A.     I would answer years ago, but I'm not sure of

5   the exact date.

6      Q.     When did BPJ first start to participate in

7   cross-country in school?

8      A.     Years ago.  Like I said, I don't remember the

9   exact date.

10      Q.     So you don't know when the first time that BPJ

11   was on the cross-country team?

12      A.     No, sir, I don't.

13      Q.     Do you know if ---?

14              COURT REPORTER:  I'm sorry.  I didn't get

15   that question.

16   BY ATTORNEY TRYON:

17      Q.     I said do you ever go to BPJ's cross-country

18   events?

19      A.     Whenever I'm not working I try to, yes.

20      Q.     How many of those events did you attend?

21              ATTORNEY HARTNETT:  Objection.  Vague.

22              THE WITNESS:  Half a dozen.

23   BY ATTORNEY TRYON:

24      Q.     Do you know when BPJ tried out for

1    cross-country?

2                        ATTORNEY HARTNETT:  Objection.  Vague.

3                        THE WITNESS:  Three, four --- three to

4    four years ago.  I'm not real certain on that.

5    BY ATTORNEY TRYON:

6      Q.    So it's your belief that three or four years ago

7    BPJ tried out for cross-country?  Is that your

8    testimony?

9                        ATTORNEY HARTNETT:  Objection.

10   Argumentative.  Asked and answered.

11                       THE WITNESS:  Yes.

12   BY ATTORNEY TRYON:

13     Q.    And when is the first event that you went to

14   where BPJ was on the cross-country team?

15     A.    I don't remember.

16     Q.    What grade was BPJ in when BPJ participated on a

17   cross-country team?

18                       ATTORNEY HARTNETT:  Could you please

19   repeat that?  I'm sorry, I didn't hear the beginning of

20   the question.

21                       ATTORNEY TRYON:  Can the court reporter

22   read that back, please?

23                       COURT REPORTER:  And when is the first

24   event that you ---?

1          ATTORNEY HARTNETT:  You're on mute.

2                    ---

3    (WHEREUPON, COURT REPORTER READS BACK PREVIOUS

4    QUESTION.)

5                    ---

6          THE WITNESS:  I don't remember.  Fifth

7    grade, sixth grade.  That's my guess.

8    BY ATTORNEY TRYON:

9      Q.    And did BPJ participate in a cross-country team

10   this year?

11     A.    Yes.

12     Q.    What grade is BPJ in this year?

13     A.    6th or 7th.  I don't remember.

14     Q.    Okay.

15           Do you know why BPJ chose to be on the

16   cross-country team?

17     A.    Do I know?

18     Q.    That's my question.

19     A.    No, I do not.

20     Q.    Did you ever discuss that with BPJ?

21     A.    Well, she comes from a family of runners.  I

22   mean, my wife and I are runners and ---.

23     Q.    And what did BPJ tell you about BPJ's desire to

24   run on a cross-country team?

1    A.    Well, it's you against yourself and that's ---

2   she doesn't have --- I mean, you have coaches but you

3   just go do the best you can.

4    Q.    Did BPJ want to compete against other runners?

5    A.    Did she want to?

6    Q.    Yes.

7    A.    As far as I know, yes.

8    Q.    Was it important for BPJ to try and win in

9   cross-country?

10              ATTORNEY HARTNETT:  Objection.  Calls for

11  speculation.

12              THE WITNESS:  Of course.  Everybody wants

13  to win, but I mean ---.

14  BY ATTORNEY TRYON:

15    Q.    Okay.

16              Are there coed cross-country teams?

17              ATTORNEY HARTNETT:  Objection.  Vague,

18  calls for speculation.

19              THE WITNESS:  Not to my knowledge.

20  BY ATTORNEY TRYON:

21    Q.    What school does BPJ go to?

22    A.    Let's see.  I just --- slate went blank.  Give

23  me a second here.  You'll have to give me a minute

24  because my mind just went blank.  It's in Harrison

```
 1  County.  I'm not sure what the name of the school is.

 2  It's the junior high, the middle school.

 3      Q.    Do you know if the middle school has a boys

 4  track cross-country team?

 5      A.    Yes.

 6      Q.    And which team did BPJ want to try out for?

 7      A.    Well, she's a girl, so she's going to be on the

 8  girls team.

 9      Q.    Well, that wasn't my question.  My question is,

10  which team did BPJ want to try out for?

11                  ATTORNEY HARTNETT:  Objection.  Asked and

12  answered.

13                  THE WITNESS:  The girls team.

14  BY ATTORNEY TRYON:

15      Q.    Thank you.

16            If there had been a coed team, would BPJ prefer

17  to be on that?

18                  ATTORNEY HARTNETT:  Objection, calls for

19  speculation.

20                  THE WITNESS:  You would have to ask her.

21  I don't know the answer to that.

22  BY ATTORNEY TRYON:

23      Q.    Are try-outs for the girls cross-country team

24  competitive?
```

 1              ATTORNEY HARTNETT:  Objection, vague,

 2    calls for speculation, to the extent it's calling for a

 3    legal conclusion.

 4              THE WITNESS:  Yes, all sports is

 5    competitive.

 6    BY ATTORNEY TRYON:

 7    Q.    What do you know about --- tell me what you know

 8    about cross-country.  I'm not a cross-country runner, so

 9    I don't know much about it.  Can you help me out here?

10              ATTORNEY HARTNETT:  Objection.  Vague,

11    calls for a narrative.

12              THE WITNESS:  I have not run

13    cross-country, but you're basically running over hill

14    and dale, up and down, doesn't matter what the weather

15    is, mud, you're going and you got to be in really good

16    shape.

17    BY ATTORNEY TRYON:

18    Q.    Anyone else in your family --- let me rephrase

19    that.  Has anyone else in your family run cross-country,

20    your wife or your other kids?

21    A.    My wife has not that I know of.  My oldest two

22    have.

23    Q.    And are there specific tryouts for the

24    cross-country team?

1          A.     Yes.

2          Q.     Are there some that do not make it onto the

3     team?

4                      ATTORNEY HARTNETT:  Objection.  Vague,

5     calls for speculation.

6                      THE WITNESS:  Well, if they've only got

7     so many spots, then only the kids that make it, make it.

8     BY ATTORNEY TRYON:

9          Q.     Do you know how many classes there are in the

10    middle school where BPJ attends?

11         A.     I do not.

12         Q.     Do you know if she made the team for this year?

13         A.     She did because she went to practice.  If you

14    miss so many practices you're not going to be accepted

15    on the team.  You have to attend practices.

16         Q.     And did she participate in the actual races

17    besides practices?

18         A.     I'm sorry.  Say that again, please.

19         Q.     Did she participate in any cross-country races

20    besides just practices?

21         A.     Yes.

22         Q.     Were there some people that were not --- did not

23    make it onto the team that you are aware of?

24         A.     No, I didn't pay that close attention.

1      Q.    Fair enough.  Well, you're aware, though, that

2  there is a boys track team --- excuse me, a boys

3  cross-country team at the middle school.

4           Is that right?

5                ATTORNEY HARTNETT:  Objection.  Asked and

6  answered.

7                THE WITNESS:  Yes.

8  BY ATTORNEY TRYON:

9      Q.    Are the boys who participate on the

10  cross-country --- the boys cross-country team allowed to

11  compete against the girls on the girls cross-country

12  team?

13                ATTORNEY HARTNETT:  Objection.  Vague, to

14  the extent it calls for a legal conclusion, calls for

15  speculation.

16                THE WITNESS:  That I'm not --- I'm not

17  aware of.

18  BY ATTORNEY TRYON:

19      Q.    Okay.

20           Do you think that boys on the boys track team

21  should be allowed to compete against girls on the girls

22  track teams?  By track I mean including cross-country.

23                ATTORNEY HARTNETT:  Objection.  Vague and

24  to the extent it calls for an expert or legal opinion.

1           THE WITNESS:  Yeah, I'm not an expert it.

2    BY ATTORNEY TRYON:

3        Q.    I'm asking for your opinion, sir.

4           ATTORNEY HARTNETT:  Same objections.

5           THE WITNESS:  Well, my opinion is she's

6    under --- she's under hormone blockers, so I believe

7    that she does not have the advantage that a person that

8    is a male --- doesn't have the same advantage.

9    BY ATTORNEY TRYON:

10       Q.    Yeah.  So my question though --- I appreciate

11   that answer, but my question is specifically do you

12   personally think that boys on the boys track team or

13   cross-country team should be allowed to compete against

14   the girls on the girls track or cross-country team?

15           ATTORNEY HARTNETT:  Same objection.

16           THE WITNESS:  Well, that's the rules.

17   BY ATTORNEY TRYON:

18       Q.    I'm sorry, what's the rules?

19       A.    That males run with males and females run with

20   females.

21       Q.    Do you think that boys --- that males should be

22   allowed to run with females?

23           ATTORNEY HARTNETT:  Objection.  Same

24   objections and asked and answered.

1                    THE WITNESS:  I'm not sure how to answer

2    that.

3    BY ATTORNEY TRYON:

4       Q.    Well, you just said that's the rules.

5       A.    Uh-huh (yes).

6       Q.    So I'm asking you, do you think it's fair --- it

7    would be fair for boys on the boys --- or strike that.

8            Let's use your wording.  Do you think it would be

9    fair for males to compete on the females' cross-country

10   team?

11                   ATTORNEY HARTNETT:  Same objections as

12   before and calls for speculation.

13                   THE WITNESS:  I don't know how to answer

14   that.

15   BY ATTORNEY TRYON:

16      Q.    Do you think in general that boys can run faster

17   than girls?

18                   ATTORNEY HARTNETT:  Objection.  Vague.

19   Calls for speculation and to the extent it calls for a

20   legal or expert opinion.

21                   THE WITNESS:  Boys have more muscle mass,

22   but girls can be thinner.  Some of the top elite

23   athletes are like skeletons.  So I don't know what the

24   real answer is.

1    BY ATTORNEY TRYON:

2       Q.    So you don't know if boys can run faster than

3    girls as a general matter.  Is that what you are saying?

4       A.    True.

5       Q.    At any age would that --- so you don't know

6    about any age?

7       A.    I would think it would have to depend on the

8    conditioning, the training, the will, the desire.

9       Q.    What about on average, have you ever looked at

10   any statistical --- let me start that over.  Have you

11   ever looked at any statistical information about whether

12   or not boys are faster than girls?

13                  ATTORNEY HARTNETT:  Objection.  Vague.

14                  THE WITNESS:  No, I have not.

15   BY ATTORNEY TRYON:

16      Q.    And you said that you believe that since BPJ is

17   on puberty blockers, that BPJ does not have any

18   advantage over girls?  Did I say your --- was that

19   accurate, what you said?

20                  ATTORNEY HARTNETT:  Objection.  Vague.

21                  THE WITNESS:  I guess so.

22   BY ATTORNEY TRYON:

23      Q.    Would it surprise you to know that statistically

24   an average 11-year-old biological boy is about

```
 1   20 percent faster than an 11-year-old biological girl in

 2   the mile run?

 3                   ATTORNEY HARTNETT:  Objection.  Vague,

 4   lack of foundation.

 5                   THE WITNESS:  I have no knowledge of it.

 6   BY ATTORNEY TRYON:

 7     Q.    Would it surprise you if there were statistics

 8   that said that?

 9                   ATTORNEY HARTNETT:  Objection, asked and

10   answered.  Vague and lack of foundation.

11                   THE WITNESS:  That depends on --- in my

12   opinion, it depends on the training.

13   BY ATTORNEY TRYON:

14     Q.    And what do you base that on?

15     A.    Well, you're not going to make it to the next

16   level if you don't train every day, like any sports.

17     Q.    So if boys or an athlete --- let's just say the

18   top level boys and the top level girls, do you think

19   that boys should be able to switch over and compete

20   against girls in the mile run or cross-country?

21                   ATTORNEY HARTNETT:  Objection.  Vague,

22   compound, calls for speculation and to the extent it

23   calls for a legal or an expert opinion.

24                   THE WITNESS:  Can you rephrase that?  I'm
```

1  not sure I understand.

2  BY ATTORNEY TRYON:

3      Q.    Sure.

4              ATTORNEY TRYON:  And Counsel, if you'd

5  like, I can just give you a standing objection to all of

6  my questions on this subject.  Would you like to do

7  that?

8              ATTORNEY HARTNETT:  No.  There are

9  different objections depending on the question.

10  BY ATTORNEY TRYON:

11     Q.    Let me move to another question.  Do you think

12  that any boy who wants to play on a girl's team such as

13  cross-country should be allowed to do so?

14             ATTORNEY HARTNETT:  Objection.  Asked and

15  answered, vague, argumentative.

16             THE WITNESS:  I think it would have to be

17  based on an individual --- individual case.  I don't

18  think you can blanket a general race with a general

19  question.

20  BY ATTORNEY TRYON:

21     Q.    So what do you think the criteria should be?

22             ATTORNEY HARTNETT:  Objection.  Vague,

23  calls for speculation and expert or legal opinion.

24             THE WITNESS:  I'm no expert, so I don't

1   --- I couldn't say.

2   BY ATTORNEY TRYON:

3       Q.   But you did express an opinion that's an

4   individual to individual case by case.  So I'm just

5   asking you, in your opinion, what the basis should be.

6                   ATTORNEY HARTNETT:  Objection, vague,

7   calls for speculation, expert or legal opinion.

8                   THE WITNESS:  I'm not an expert.  I don't

9   --- I don't think I can answer that.

10  BY ATTORNEY TRYON:

11      Q.   So would you object to if one of the boys on the

12  boys cross-country team suddenly switched over and

13  started racing against BPJ?

14                  ATTORNEY HARTNETT:  Objection, calls for

15  speculation, vague, to the extent it calls for legal or

16  expert opinion.

17                  THE WITNESS:  Would have to be considered

18  on a case-by-case scenario.  I mean, I don't know what

19  the scenario is.  I don't know ---.

20  BY ATTORNEY TRYON:

21      Q.   So if a boy that was on the cross-country team

22  last year wanted to switchover and participate in a

23  cross-country team this year and compete against BPJ,

24  would you have any objection to that?

1              ATTORNEY HARTNETT:  Objection.  Asked and

2   answered and the same objections that I had previously

3   and vague.

4              THE WITNESS:  And I would answer no.

5   BY ATTORNEY TRYON:

6      Q.    You have no objections?

7      A.    I have no objections.

8      Q.    So if a boy wanted to do that, they would not

9   need to even identify as being a female, it would just

10  be okay with you?

11             ATTORNEY HARTNETT:  Objection,

12  argumentative.  Calls for speculation.

13             THE WITNESS:  Like I say, it would have

14  to be a case-by-case scenario.  I can only answer for my

15  family and myself.  I can't answer for anyone else.

16  BY ATTORNEY TRYON:

17     Q.    So right now, after cross-country, do the kids

18  use any locker rooms?

19             ATTORNEY HARTNETT:  Objection.  Vague,

20  calls for speculation.

21             THE WITNESS:  She gets dressed before and

22  after.  She does not use a locker room.

23  BY ATTORNEY TRYON:

24     Q.    Are you referring to BPJ?

1      A.    Yes.

2      Q.    Is there a reason that BPJ doesn't use a locker

3   room?

4                 ATTORNEY HARTNETT:  Objection.  Calls for

5   speculation.

6                 THE WITNESS:  People don't agree with it.

7   BY ATTORNEY TRYON:

8      Q.    I'm sorry.  They don't agree --- people don't

9   agree with what?

10     A.    With her using the female facilities, so she has

11  her own --- like in school, she has her own separate

12  bathroom she uses.

13     Q.    I'm sorry to interrupt you.  Go ahead.

14     A.    That's all right.

15     Q.    What people disagree with it?

16     A.    Well, certain people in society that just don't

17  have the same views.

18     Q.    Do you know of any of those people?

19     A.    Not personally, no.  I only hear of them.

20     Q.    And do you think BPJ should use the girls locker

21  room?

22                ATTORNEY HARTNETT:  Objection.  Vague, to

23  the extent that you are calling for a legal or expert

24  opinion.

1                      THE WITNESS:  Do I feel she needs to use

2  the female facilities?

3  BY ATTORNEY TRYON:

4    Q.   Well, my word was do you think that BPJ should

5  use the female facilities?

6                  ATTORNEY HARTNETT:  Same objections.

7                  THE WITNESS:  No, because they are

8  uncomfortable and that is why she has her own facilities

9  that she uses.

10  BY ATTORNEY TRYON:

11    Q.   Okay.

12        So other people are uncomfortable or because

13  BPJ is uncomfortable or both?

14                  ATTORNEY HARTNETT:  Objection.  Vague,

15  compound.

16                  THE WITNESS:  BPJ is not uncomfortable.

17  She is very independent and she knows what she wants.

18  She does not --- I think it's society just is not

19  accepting of it.

20  BY ATTORNEY TRYON:

21    Q.   So right now BPJ would be comfortable using a

22  women's locker room after cross-country.

23        Is that right?

24    A.   I ---.

1                ATTORNEY HARTNETT:  Objection.  Sorry

2    just objection.  Vague.

3                THE WITNESS:  I don't know.  You would

4    have to ask her.

5    BY ATTORNEY TRYON:

6        Q.    Fair enough.

7              Has she ever said anything to you about it?

8                ATTORNEY HARTNETT:  Objection.  Vague.

9                THE WITNESS:  I'm sorry?

10   BY ATTORNEY TRYON:

11       Q.    Has BPJ ever said anything to you about that

12   issue?

13                ATTORNEY HARTNETT:  Same objection.

14                THE WITNESS:  No, we --- the only issue

15   was in school and they gave her a separate bathroom to

16   use.

17   BY ATTORNEY TRYON:

18       Q.    And that was okay with you?

19                ATTORNEY HARTNETT:  Objection.  Vague,

20   asked and answered.

21                THE WITNESS:  Yes, because it made her

22   comfortable.

23   BY ATTORNEY TRYON:

24       Q.    Can you repeat your answer?

```
 1      A.    My answer was yes, it's okay with me.  I said if

 2  she is comfortable with it, I'm comfortable with it.

 3      Q.    Okay.

 4            And you said that she is comfortable with that.

 5            Is that right?

 6      A.    Yes.

 7      Q.    And did she tell you that or did you just

 8  ascertain that from her conduct?

 9                  ATTORNEY HARTNETT:  Objection.  Compound.

10                  THE WITNESS:  I don't know.  You would

11  have to ask her.

12  BY ATTORNEY TRYON:

13      Q.    Okay.

14            Do you know if --- so BPJ is familiar with the

15  term gender dysphoria.

16            Right?

17                  ATTORNEY HARTNETT:  Objection.  Calls for

18  speculation.

19  BY ATTORNEY TRYON:

20      Q.    Let me back up.  Have you heard BPJ use the term

21  gender dysphoria?

22      A.    I have not.

23      Q.    Have you ever heard your wife use the term

24  gender dysphoria?
```

1    A.    Yes, we have talked about it.

2    Q.    Okay.

3          But you have not heard BPJ --- well, you

4    already answered that.  Never mind.

5          Do you know how your wife first learned the

6    term gender dysphoria?

7    A.    No, I don't.

8    Q.    Do you know anything about when the term gender

9    dysphoria was first discussed with any doctor?

10                  ATTORNEY HARTNETT:  Objection.  Vague.

11                  THE WITNESS:  No, I --- the only visit

12   that I was at was a therapist.  I wasn't at any doctors'

13   visit, so I don't know what transpired during those

14   visits.

15   BY ATTORNEY TRYON:

16   Q.    As far as you know, was there ever a

17   professional diagnosis of gender dysphoria for BPJ?

18   A.    Can you repeat the question, please?

19   Q.    As far as you know, was there ever a

20   professional diagnosis of gender dysphoria for BPJ?

21   A.    I believe so, yes.

22   Q.    Do you know when that was?

23   A.    No, I don't know the exact date.

24   Q.    Do you know who made that diagnosis?

```
 1      A.    I believe it was the doctor from Pittsburgh,

 2  UPMC.

 3      Q.    Do you remember who that is?

 4      A.    At the moment, right now, I couldn't tell you.

 5  If you said the name, I would say, yeah, that's him.

 6      Q.    Would it be Dr. Montano?

 7      A.    Yup.

 8      Q.    Do you know how he made that diagnosis?

 9              ATTORNEY HARTNETT:  Objection.  Vague,

10  also speculation.

11              THE WITNESS:  He is the doctor.  I guess

12  you would have to ask him.

13  BY ATTORNEY TRYON:

14      Q.    Well, fair enough.  On the other hand, do you

15  have any information on how he made that diagnosis?

16      A.    No.  I was not there.

17      Q.    Have you ever talked to Dr. Montano about that

18  diagnosis?

19      A.    I've never spoken with Dr. Montano.

20      Q.    Are you aware of what the treatment is for

21  gender dysphoria?

22      A.    Yes.

23              ATTORNEY HARTNETT:  Objection.

24  BY ATTORNEY TRYON:
```

1      Q.     And how are you aware of it, of the possible

2   treatments?

3      A.     Conferring with my wife.

4      Q.     And so is the extent of your knowledge on how to

5   treat gender dysphoria, is that all based on what your

6   wife has told you?

7      A.     I guess, yes.

8      Q.     Have you done any investigation on that?

9      A.     I haven't had time to.

10      Q.     So the answer would be, no, you have not done

11   any independent investigation of that?

12                ATTORNEY HARTNETT:  Objection.  Asked and

13   answered.

14                THE WITNESS:  No, just speaking with my

15   wife, who is well educated.

16   BY ATTORNEY TRYON:

17      Q.     Fair enough.

18           Now, you said you are always working.  Tell me

19   what that means when you say you are too busy for all

20   these things because you're always working.

21                ATTORNEY HARTNETT:  Objection.

22   Mischaracterizes his testimony.

23                THE WITNESS:  Well, I work 12-hour shifts

24   and sometimes it's three days a week, sometimes it's

```
 1   four, sometimes it's five.
 2   BY ATTORNEY TRYON:
 3      Q.    Were you told that there are multiple possible
 4   treatments for gender dysphoria?
 5                    ATTORNEY HARTNETT:  Objection.
 6   Foundation.
 7                    THE WITNESS:  No.
 8   BY ATTORNEY TRYON:
 9      Q.    And so as far as you know, what is the treatment
10   --- let me start that over again.  Is it your
11   understanding there is only one possible treatment for
12   gender dysphoria?
13                    ATTORNEY HARTNETT:  Objection.  Vague.
14                    THE WITNESS:  That's not my field of
15   expertise.  I don't know.
16   BY ATTORNEY TRYON:
17      Q.    I'm asking you if you understand.
18      A.    Do I understand?
19      Q.    Let me try this a different way.  Do you
20   understand if there are treatments for gender dysphoria?
21      A.    Yes.
22      Q.    And what are those treatments, as you understand
23   it?
24                    ATTORNEY HARTNETT:  Objection.  Vague.
```

1          THE WITNESS:  Counseling, medication,

2    therapy, different therapies.

3    BY ATTORNEY TRYON:

4      Q.    Do you know what kind of therapy?

5      A.    No, I don't.

6      Q.    Have you ever been told that something called

7    watchful waiting and waiting to see if a child desists

8    from gender dysphoria?

9          ATTORNEY HARTNETT:  Objection, vague,

10   lack of foundation.

11         THE WITNESS:  I'm not familiar with it.

12   BY ATTORNEY TRYON:

13     Q.    So is this the first time that you are hearing

14   of that concept?

15         ATTORNEY HARTNETT:  Objection.  Vague,

16   lack of foundation.

17         THE WITNESS:  Yes.

18   BY ATTORNEY TRYON:

19     Q.    Dr. Montano said --- did a full assessment of

20   BPJ.  And as I would understand it, when you do an

21   assessment you also do a written assessment.  And so my

22   question for you is have you ever seen an assessment,

23   something you would call an assessment of BPJ with

24   respect to her gender --- with respect to BPJ's gender

```
 1  dysphoria?
 2                  ATTORNEY HARTNETT:  Objection.  Vague and
 3  foundation to the preamble to the question.
 4                  THE WITNESS:  I saw the papers that you
 5  had on the screen.  But other than that, no.
 6  BY ATTORNEY TRYON:
 7      Q.    Have you ever heard of the WPATH standards?
 8      A.    I'm sorry.  Repeat that.
 9      Q.    Have you ever heard of the WPATH standards.
10  WPATH is an organization and they have certain standards
11  that they go by for gender dysphoria, for example.
12      A.    No, sir, I've never heard of it.
13      Q.    You mentioned that you --- strike that.
14            You mentioned that BPJ went up to Pittsburgh to
15  see Dr. Montano.
16            Is that right?
17      A.    Yes, according to my wife.
18      Q.    Okay.
19            Do you know why your wife took BPJ to
20  Pittsburgh as opposed to someplace in West Virginia?
21      A.    No, I don't.
22                  ATTORNEY TRYON:  This would be a
23  convenient time to go to lunch.  And I don't think I
24  will be as long with this witness as I anticipated.
```

1   Let's go off the record for just a moment.

2               VIDEOGRAPHER:  Going off the record.  The

3   current time is 1:03:00 p.m.

4   OFF VIDEOTAPE

5                              ---

6   (WHEREUPON, AN OFF RECORD DISCUSSION WAS HELD.)

7                              ---

8   ON VIDEOTAPE

9               VIDEOGRAPHER:  Back on the record at

10  1:04:00 p.m.

11              ATTORNEY TRYON:  So let's take a half an

12  hour approximately to go to lunch and come back at about

13  1:35.  And just pursuant to our prior discussion with

14  Counsel, Mr. Pepper, I agree you are permitted to talk

15  to your Counsel, but I would want to be clear what I'm

16  agreeing to is that things unrelated to your testimony

17  today are appropriate, but as far as them discussing any

18  questions about --- discussing any questions that I have

19  or may have, that it is my belief that that would be

20  improper and I would object to that.  Otherwise, I have

21  no objection to you talking to your counsel about just

22  general issues.

23              ATTORNEY HARTNETT:  And I would just,

24  again, direct counsel to the Pajak v. Under Armour case,

1   which I sketches out a different framework of what's

2   appropriate.  And as I made clear before and will

3   continue to make clear, we are not going to coach the

4   witness on any topic nor are we going to reveal the

5   contents of any of the exhibits that you provided before

6   the deposition because we --- we'll let you use those as

7   you use them, but I am allowed to confer with my client

8   about substance, including potentially a Redirect

9   Examination if one is necessary.

10                  ATTORNEY TRYON:  Can you give me a

11  citation on that, please?

12                  ATTORNEY HARTNETT:  Yeah.  It's Pajak v.

13  Under Armour.  I have a Westlaw cite, which is 2020

14  Westlaw 6803844.  And it's from the Northern District of

15  West Virginia.  It's the Civil Action No. 119-CV-160.

16                  ATTORNEY TRYON:  Do you have a page

17  number?

18                  ATTORNEY HARTNETT:  It is a four-page

19  Westlaw Decision.

20                  ATTORNEY TRYON:  Okay.  All right.

21                  ATTORNEY HARTNETT:  But just to be very

22  clear, I mean, right now I think we are all going to

23  take lunch and we're not having a discussion.  We are

24  not discussing substance right now, but feel free to

1    read that Decision and we can regroup further as

2    needed.

3                    ATTORNEY TRYON:   Thank you.   Okay.   We

4    can go off the record now.   See you back in a half an

5    hour.

6                    ATTORNEY HARTNETT:   Thank you.

7                    VIDEOGRAPHER:   Going off the record.   The

8    current time reads 1:06:00 p.m.

9    OFF VIDEOTAPE

10                          ---

11   (WHEREUPON, A SHORT BREAK WAS TAKEN.)

12                          ---

13   ON VIDEOTAPE

14                    VIDEOGRAPHER:   We are back on the record.

15   The current time reads 1:44 p.m.

16   BY ATTORNEY TRYON:

17      Q.    Mr. Pepper, let me try and bring you back up

18   here.   So at lunchtime did you have an opportunity to

19   talk to your counsel at all?

20      A.    Yes.

21      Q.    Any discussion about the documents or about your

22   testimony?

23      A.    No.

24                    ATTORNEY HARTNETT:   Objection.   Okay.

```
1    Objection to the extent the authority I sent you,
2    including the EBA Model Rules that are cited therein,
3    say that our conversations are protected by
4    attorney/client privilege.
5                    ATTORNEY TRYON:  Okay.
6    BY ATTORNEY TRYON:
7        Q.    Let me turn your attention to Exhibit 3.
8                         ---
9                    (Whereupon, Exhibit 3, WVU Medical
10                   Records, was marked for identification.)
11                        ---
12   BY ATTORNEY TRYON:
13       Q.    Okay.
14             This is Exhibit 3.  This is a document, a
15   medical record of Bridgeport Pediatrics.  I will just go
16   through it very quickly, Mr. Pepper, so you can see what
17   it is.
18       A.    Uh-huh (yes).
19                    ATTORNEY HARTNETT:  It looks like this is
20   a ten-page medical record.
21                    ATTORNEY TRYON:  Right.  I am just seeing
22   if there are other pages, so I will scroll down.  Okay.
23   It goes up through there.
24   BY ATTORNEY TRYON:
```

1      Q.    If there is any page you want to look at before

2  I ask you questions, let me know, Mr. Pepper.

3      A.    Okay.

4      Q.    I'm trying to go back up to the top now.  I went

5  too far.  Sorry.  It's something around here --- the

6  screen --- so we can see it better.  Here we go.  Okay.

7  So this is a visit to --- of BPJ to Bridgeport

8  Pediatrics.  ███████████████████████████████████████

9  ████████████████████████████████████████████████████████

10 ██████████████████████████████████████████████████  I

11 presume that this was a visit that you were in

12 attendance at.

13          Is that correct?

14              ATTORNEY HARTNETT:  Objection to the

15 foundation of the birth name still being used.

16              THE WITNESS:  I guess so.  I'm her

17 father.

18 BY ATTORNEY TRYON:

19     Q.    Okay.

20          And do you remember this visit?

21     A.    Vaguely.  It's been three years ago.

22     Q.    Right.  It was 2018.

23          Do you remember the purpose of the visit?

24 ███  ████████████████████████████████████████████

1     ███████████████████████

2     Q.    Okay.

3          Any other --- do you remember anything else

4  about it?

5     A.    No, I don't.

6     Q.    Let me ask you specifically, do you remember any

7  discussion about BPJ's self identification as a female?

8     A.    Repeat that again.  I'm not sure I understand

9  what you meant.

10     Q.    Sure.  When you visited --- so the doctor here

11  is Bradley Mitchell.

12          Do you remember him?

13     A.    Yes.

14     Q.    And do you remember in your discussion with Dr.

15  Mitchell if there was any discussion about BPJ's self

16  identification as a female?

17     A.    I don't remember.  That's been three years ago.

18  I don't remember that.

19     Q.    Do you remember if BPJ was dressed as a female

20  that day?

21     A.    No, I don't remember.

22     Q.    Do you know if when you introduced BPJ to the

23  doctor what name he used on that day?

24     A.    I'm having trouble hearing you.  Say it again,

```
 1   please.
 2       Q.    Sure.  I'll try again.  Do you remember what
 3   name was used when you introduced BPJ to the doctor that
 4   day, what first name?
 5       A.    I don't.  No, sir, I don't.
 6       Q.    So you don't remember one way or the other if it
 7   was BPJ's birth name or the name B███, is that a fair
 8   statement?
 9       A.    Yes, I don't recall.
10       Q.    Do you remember any diagnosis or anything else
11   from that visit?
12       A.    No, I do not.
13       Q.    Since it was a well care visit, according to
14   what this has, is there any reason why you would not
15   have brought up to the doctor any concerns you might
16   have about BPJ's identifying as a female and any
17   problems that BPJ was having related to that?
18                ATTORNEY HARTNETT:  Objection.  Vague.
19   Calls for speculation.
20                THE WITNESS:  I don't recall.  It's been
21   too long.  Too much has transpired.
22   BY ATTORNEY TRYON:
23       Q.    Let me go over some doctors' names and see if
24   you recognize them.  Amanda Pennington?
```

```
 1      A.    Sounds familiar, but I don't --- I don't

 2  remember where she was located.

 3      Q.    Okay.

 4            How about Dr. Montano?

 5      A.    Montano is in Pittsburgh.

 6      Q.    Dr. Semashwar?

 7      A.    I don't have a clue.

 8      Q.    Mr. Bunner?

 9      A.    Morgantown.

10      Q.    And who is Mr. Bunner?

11      A.    I believe a therapist.

12      Q.    And refresh my memory, have you had some

13  discussions with Mr. Bunner?

14      A.    Very vague before and after her session, the

15  session that I was at.

16      Q.    Doctor Bhutt, B-H-U-T-T?

17      A.    Uh-uh (no).  No, I don't.

18      Q.    Dr. Kidd?

19      A.    Spell it?

20      Q.    K-I-D-D.

21      A.    No, I don't.

22      Q.    Any other doctors that have treated BPJ that you

23  are aware of?

24      A.    No, sir, not to my knowledge.
```

1          ATTORNEY TRYON:  Okay.

2               That may be all the questions that I have

3    at this time.  Let me just go off screen for just a

4    moment.  You can take down the exhibit.  So at this time

5    I have no other questions.

6               And so I have one concern that I would

7    want to express on the record is that we are still going

8    through ongoing document and other discovery, and so to

9    the extent there's additional information or discovery

10   presented by Plaintiff, then we might need to reconvene

11   this deposition.  I think it's unlikely, but I would

12   reserve the right to continue the deposition at a future

13   date in that situation.

14          ATTORNEY HARTNETT:  And we would object

15   to that.  We believe that --- I mean, we're not at the

16   end of the deposition because we have other potential

17   questioners, but there is no other basis for holding

18   open the deposition.

19          ATTORNEY TRYON:  I would expect that you

20   would object.  But that's our position, so --- that's

21   all I have for this witness at this time.

22          ATTORNEY HARTNETT:  Sorry.  Is there

23   something specific that you object to not having in your

24   possession right now that you need to question this

1    witness?

2                    ATTORNEY TRYON:  I noticed that --- one

3    moment.  You have indicated in responding to

4    interrogatories from Lainey Armistead that you intend to

5    supplement responses to the Defendant's State of West

6    Virginia First Set of Discovery Requests.  So depending

7    on what's in there, that may be something that we may

8    need to reconvene with this witness.  And similarly, to

9    the extent that it turns out there's more doctors'

10   records that turn up, then we might need to reconvene

11   with this witness.

12                   ATTORNEY HARTNETT:  Sorry, what --- I

13   think we're supplementing the Armistead to simply

14   respond to what we've already produced to you.  As we've

15   conveyed to you, we've already sought and produced all

16   the medical records.  Yesterday you, I believe, sent a

17   follow-up email or your colleague asking some additional

18   questions, none of which indicated they were necessary

19   to resolve before today's deposition.  I think the

20   testimony today makes clear that any additional medical

21   records are not something that would require holding

22   this deposition open, and so just on the record I object

23   to any notion of holding this deposition open.  Now

24   would be the time to ask questions.

1          ATTORNEY TRYON:  I hear you.

2          ATTORNEY HARTNETT:  Okay.

3          I believe there will be additional

4    questioners now?

5          ATTORNEY TRYON:  Yes.  You might be

6    muted.

7          ATTORNEY GREEN:  I'll go ahead and go

8    next.

9                    ---

10                EXAMINATION

11                    ---

12   BY ATTORNEY GREEN:

13       Q.    Mr. Pepper, my name is Roberta Green.  And we

14   met --- or you heard us all kind of introduce ourselves

15   at the beginning of this process.  I'm an attorney here

16   on behalf of West Virginia Secondary School Activities

17   Commission, which is also WVSSAC.  Do you know that

18   entity?

19       A.    No.

20       Q.    All right.

21       I just have a few questions for you.

22       A.    Okay.

23       Q.    I appreciate your willingness to respond.  Do

24   you recall when you first learned about House Bill 3293?

```
 1      A.     A couple of years back my wife was talking about
 2    it.  Like I said, I can't give you the exact date.
 3      Q.     And do you recall whether at any time prior to
 4    hearing about the House bill from your wife, any time
 5    prior to that, you notified WVSSAC of BPJ's interest in
 6    cross-country?
 7      A.     I didn't personally, no.
 8      Q.     Do you recall whether at any time prior to
 9    filing the lawsuit or your family filed the lawsuit you
10    notified WVSSAC of BPJ's interest in running
11    cross-country?
12      A.     I did not.
13      Q.     All right.
14             And do you recall whether any time prior to
15    today, this moment, you notified WVSSAC of BPJ's
16    interest in cross-country?
17                    ATTORNEY HARTNETT:  Objection to
18    foundation.
19                    THE WITNESS:  My wife would have that
20    information.  I don't --- I don't know that information.
21    I don't have that information.
22    BY ATTORNEY GREEN:
23      Q.     All right.
24             And I was asking whether you personally had it.
```

```
 1   Have you personally had any communications with WVSSAC?

 2        A.    No.

 3                  ATTORNEY GREEN:  I don't have any other

 4   questions.  I appreciate your time.

 5                  THE WITNESS:  Thank you.

 6                  ATTORNEY GREEN:  Thank you.

 7                       ---

 8                  EXAMINATION

 9                       ---

10   BY ATTORNEY DENIKER:

11        Q.    Mr. Pepper, my name is Susan Deniker.  I am

12   counsel for the Harrison County Board of Education and

13   the Harrison County Board of Education's Superintendant

14   Dora Stutler.  Thank you for your time today.  We

15   appreciate it.  I have a few questions for you.  Have

16   you been involved in any meetings with any officials,

17   any employees of Harrison County Board of Education

18   relating to BPJ's gender identity and any accommodation

19   of her gender identity in the school system?

20        A.    I have not.

21        Q.    Okay.

22              Have you had a conversation with any employee

23   of the Harrison County Board of Education at anytime

24   with regard to your daughter's gender identity?
```

```
 1      A.    No.

 2      Q.    Have you had any communications with anybody

 3  employed by the Harrison County Board of Education

 4  regarding BPJ's participation in school sports?

 5      A.    No.

 6      Q.    I'm going to ask the court reporter to show you

 7  one of the State's documents.  I'll start with West

 8  Virginia Exhibit 17.  Mr. Pepper I believe that you saw

 9  this document earlier.  And we will get it pulled up,

10  but I will represent to you that it is the Gender

11  Support Plan that was done for BPJ through the school

12  system.

13                  ATTORNEY DENIKER:  And I'm going to ask

14  the videographer quickly, am I able to scroll down so

15  that the witness can see this document in its entirety?

16                  VIDEOGRAPHER:  Yes.  I passed you

17  controls.  All you really have to do is click and there

18  you go.

19  BY ATTORNEY DENIKER

20      Q.    Mr. Pepper, I would be glad to scroll through

21  this entire document, but I want to confirm whether you

22  were at this meeting and whether you've seen this

23  document before.  So I will scroll through it, but those

24  are the questions that I'm going to be asking you.
```

```
 1            You'll see that this document, Mr. Pepper, on
 2    the top right-hand side it says today's date,
 3    August 23rd, 2019.
 4            Do you see that?
 5    A.    Yes.
 6    Q.    We are at the signature page of this document,
 7    which is Bates numbered BPJ 011.  Is your signature on
 8    this document?
 9    A.    No.
10    Q.    Were you in attendance for this meeting?
11    A.    No.
12    Q.    Have you ever seen this Gender Support Plan,
13    which is dated August 23rd, 2019?
14    A.    The lawyer before you had it up.
15    Q.    And prior before seeing that today during your
16    deposition, have you seen this Gender Support Plan dated
17    August 23rd, 2019?
18    A.    I can't say I have and I can't say that I
19    haven't.  I don't recall.  I may have seen it briefly,
20    but I don't --- I don't recall.
21    Q.    Would you --- do you know whether you would have
22    seen this document at the time that it was created?
23    A.    That I'm not sure of.  Maybe after.  Maybe
24    after, you know, it was all --- yes.  I guess your
```

1    answer is yes.

2        Q.    That you think that you likely saw it at the

3    time that the document was executed?

4        A.    Yes, it's possible.

5        Q.    Okay.

6              And I realize you don't recall whether or not

7    you've seen it, but sitting here today, do you recall

8    any concerns that you had with regard to this document?

9        A.    No.

10       Q.    And based upon your earlier testimony, is it

11   fair to say that you didn't reach out to anybody at

12   Norwood Elementary School or with the Harrison County

13   schools to address any concerns you had with regard to

14   the Gender Support Plan created for BPJ?

15       A.    No, I didn't, but I'm sure my wife did.

16       Q.    Do you know what steps specifically that she

17   took?

18       A.    No, I don't.  You'll have to ask her that.

19       Q.    Do you know whether or not she was in agreement

20   with this Gender Support Plan dated August 23rd, 2019?

21       A.    I would say by her signature that she was.

22       Q.    I'm going to scroll down because the next

23   document I want to show you is marked as West Virginia

24   Exhibit 19.

```
1                            ---
2              (Whereupon, Exhibit 19, Gender Support
3              Plan, was marked for identification.)
4                            ---
5    BY ATTORNEY DENIKER:
6       Q.    And Mr. Pepper, I'm going to ask the same
7    questions for you.  You'll see that this document says
8    --- is also a Gender Support Plan.  The date of this is
9    May 18th, 2021?
10            Do you see that?
11      A.    Yes.
12      Q.    Okay.
13            And I'll scroll through this document so that
14   you can see it as well.  And Mr. Pepper, if we look at
15   the signature page of this document, and we are on Bates
16   number document BPJ 006, is your signature on this
17   document?
18      A.    No, ma'am.
19      Q.    Did you attend this meeting?
20      A.    No, ma'am.
21      Q.    Do you recall whether or not you have seen this
22   Gender Support Plan dated May 18th, 2021?
23      A.    I can't say that I have.
24      Q.    Sitting here today, are you aware of any
```

1   concerns that you had with regard to the Gender Support

2   Plans that were agreed upon between your wife and BPJ in

3   the school system?

4        A.    No.

5        Q.    And again, did you reach out to anybody in

6   Harrison County schools, including anybody at Bridgeport

7   Middle School, to address any questions or concerns you

8   had about the Gender Support Plan?

9        A.    I did not.

10       Q.    Your daughter, I understand, is in the 6th grade

11  at Bridgeport Middle School.

12             Is that correct, Mr. Pepper?

13       A.    Yes, I believe so.  I believe that's the first

14  year that they attend there, the 6th grade.

15       Q.    And before that she attended Norwood Elementary

16  School.

17             Is that correct?

18       A.    Yes.

19       Q.    Did BPJ have a good experience at Norwood

20  Elementary School?

21                  ATTORNEY HARTNETT:  Objection, vague.

22                  THE WITNESS:  As far as I know.

23  BY ATTORNEY DENIKER:

24       Q.    Was it your understanding that --- I know you

```
 1   were not part of these communications, but that your
 2   wife and BPJ had communications with Norwood Elementary
 3   School to discuss BPJ's gender identification?
 4        A.    Yes, my wife took care of that.
 5        Q.    And was it your understanding that the Board of
 6   Education and the folks at Norwood Elementary School
 7   satisfactorily addressed and accommodated your
 8   daughter's needs there?
 9                   ATTORNEY HARTNETT:  Objection.  Vague.
10                   THE WITNESS:  As far as I know, but like
11   I said, my wife took care of all of that.  She has all
12   of the specifics, if you will.
13   BY ATTORNEY DENIKER:
14        Q.    Did you personally have any concerns with regard
15   to how BPJ was treated as a result of her gender
16   identity while she was a student at Norwood Elementary
17   School?
18        A.    No, my wife took care of all of that.
19        Q.    And I'm going to ask you the same thing about
20   the limited time that she's been at Bridgeport Middle
21   School.  Sitting here today, do you have any concerns
22   with how the employees of the Harrison County Board of
23   Education and the folks at Bridgeport Middle School have
24   addressed your daughter and handled her needs as a
```

```
 1   student based upon her gender identification?

 2              ATTORNEY HARTNETT:  Objection.  Vague and

 3   compound, but you can answer.

 4              THE WITNESS:  No, I have no problems.

 5   BY ATTORNEY DENIKER:

 6     Q.    I know that you said that you haven't been part

 7   of any communications with any Harrison County school

 8   officials with regard to your daughter's participation

 9   in school sports.  It's my understanding that BPJ did

10   participate in the girls cross-country team this year in

11   6th grade.

12              Is that right, Mr. Pepper?

13     A.    Yes.

14     Q.    And was that a positive experience for her this

15   year?

16     A.    Yes.

17     Q.    And I know earlier you testified that BPJ had

18   previously participated in cheerleading.  It's my

19   understanding that that cheerleading was not a school

20   affiliated activity or sport.

21              Is that accurate, Mr. Pepper?

22     A.    That I don't know.

23     Q.    It's also my understanding that BPJ would not

24   have had an opportunity to engage in school sports until
```

```
 1   she would have gotten to middle school this year.

 2           Is that consistent with your understanding?

 3                   ATTORNEY HARTNETT:  Objection.  Vague.

 4   Calls for speculation.

 5                   THE WITNESS:  I'm not aware of it.

 6   BY ATTORNEY DENIKER:

 7   Q.    Other than running for the Bridgeport Middle

 8   School girls cross-country team this fall, has your

 9   daughter participated in any other school athletic

10   activities?

11   A.    No.

12   Q.    Mr. Pepper, are you aware of any Harrison County

13   Board of Education rule or policy that would have

14   prohibited your daughter from participating in girls

15   sports?

16   A.    I believe so, I don't --- I can't quote the

17   rule, but yes.

18   Q.    It's my understanding, Mr. Pepper, that your

19   daughter's litigation is challenging House Bill 3293,

20   which has been talked a little bit about today in your

21   deposition.  Is that consistent with your understanding

22   of the litigation?

23   A.    Yes.

24   Q.    And is it your understanding that that is a
```

1    state law that was passed by the West Virginia

2    legislature?

3        A.    I know now.

4        Q.    Did you know that before today's deposition, Mr.

5    Pepper?

6        A.    Yes.

7        Q.    Are you --- and so I want to go back to my other

8    question and that is are you aware of any Harrison

9    County Board of Education policy or rule that would have

10   limited your --- would have limited BPJ's ability to

11   participate in girls sports through the school system?

12              ATTORNEY HARTNETT:  Objection.  Vague and

13   to the extent it calls for a legal conclusion.

14              THE WITNESS:  Due to her biological

15   birth, yes.

16   BY ATTORNEY DENIKER:

17       Q.    And what policy or rule of the Harrison County

18   Board of Education is that, Mr. Pepper?

19       A.    That I don't know, but I know it's out there.

20       Q.    And who told you that that was  out there?

21       A.    My wife did.

22       Q.    And did she tell you what the nature of that

23   policy was?

24              ATTORNEY HARTNETT:  Objection to the

 1  extent it's calling for confidential marital

 2  communications.

 3  BY ATTORNEY DENIKER:

 4      Q.    Well, Mr. Pepper, I'm aware of the state law

 5  that we're talking about today and that I believe is

 6  being challenged through the litigation that has been

 7  brought by BPJ.  And what I want to know is, is there

 8  anything that the Harrison County Board of Education did

 9  as a separate body to pass a policy or a rule that would

10  have addressed participation in school sports by

11  transgendered student athletes?

12              ATTORNEY HARTNETT:  Objection, vague to

13  the extent it calls for a legal conclusion and calls for

14  speculation.

15              THE WITNESS:  Can you rephrase it?  I'm

16  not sure I understand the gist of it.

17  BY ATTORNEY DENIKER:

18      Q.    Sure.  And I'm not trying to trick you.

19              ATTORNEY DENIKER:  And Kathleen, I will

20  give you a continuing objection to the question.

21  BY ATTORNEY DENIKER:

22      Q.    I'm just trying to see if you are aware of the

23  specific policy or rule that was passed by the Harrison

24  County Board of Education, not the West Virginia State

1  Legislature, not any other entity, but was passed by the

2  Harrison County Board of Education that relates to the

3  participation of transgender students in school

4  athletics.

5                    ATTORNEY HARTNETT:  Same objections.

6                    THE WITNESS:  And I don't know the answer

7  to that.

8  BY ATTORNEY DENIKER:

9      Q.    Have you ever had any communications --- well,

10 let me strike that and ask you this question.

11                   Have you ever met Superintendant Dora Stutler?

12     A.    Maybe once or twice.  I can't recall.

13     Q.    Have you ever had any conversations with Dora

14 Stutler about BPJ's participation in school sports?

15     A.    I don't recall.

16     Q.    Have you ever had any communications with

17 Superintendent Stutler about BPJ's gender identity?

18     A.    That I don't recall either.  There's been so

19 many people out there.  I don't --- I can't remember.  I

20 can't recall.

21     Q.    Let's talk about Principal Mazza for a minute,

22 Dave Mazza, who is the principal of Bridgeport Middle

23 School.  Have you had any communications with Mr. Mazza

24 directly about BPJ's participation in school sports?

1    A.    No.

2    Q.    Have you had any communications with Mr. Mazza

3  about BPJ's gender identity and any issues that may

4  relate to her gender identity?

5    A.    No.

6    Q.    Did you have any communications with the coaches

7  of the Bridgeport Middle School cross-country team about

8  BJP's participation on the girls cross-country team?

9    A.    I did not, no.

10    Q.    Did you have any interactions at all with the

11  coaches of the girls cross-country team during

12  cross-country season this year?

13    A.    Just to say hi and, you know, hey, how is

14  everything going.  But other than that, no, no

15  specifics.

16    Q.    Did you have any concerns with how BPJ was

17  treated by the cross-country coaches this last

18  cross-country season?

19                ATTORNEY HARTNETT:  Objection.  Vague.

20                THE WITNESS:  I did not.

21  BY ATTORNEY DENIKER:

22    Q.    Did BPJ express any concerns to you about her

23  treatment by the cross-country coaches at the Bridgeport

24  Middle School?

1         <u>ATTORNEY HARTNETT</u>:  Objection, vague.

2         <u>THE WITNESS</u>:  Not to my knowledge.

3  <u>BY ATTORNEY DENIKER</u>:

4     Q.    Mr. Pepper, did you have any involvement with

5  any members of the West Virginia Legislature with regard

6  to the passage of House Bill 3293?

7     A.    No.  I don't understand the --- I don't know

8  what you're saying.

9     Q.    Well, thank you for telling me that.  And I

10  should have started my questioning by telling you to do

11  just that.  If I ask you something that you don't

12  understand or you don't hear my question.  Please ask

13  me, and I will be glad to rephrase or repeat my

14  question.  So thank you, Mr. Pepper, for doing that.

15         Let me ask you maybe the question --- maybe we

16  can break it down a little bit.  Did you communicate in

17  any way with any members of the West Virginia

18  Legislature when House Bill 3293 was being considered?

19     A.    I don't know how to answer that.  I don't know

20  what to say.

21     Q.    Did you write any letters to any members of the

22  West Virginia Legislature saying that you oppose House

23  Bill 3293?

24     A.    I didn't.

1     Q.     Did you contact --- did you call or visit the

2  offices of any member of the West Virginia Legislature

3  to state your opposition to House Bill 3293?

4     A.     No, I did not.

5     Q.     Did you communicate with anybody in the West

6  Virginia Legislature in any manner with regard to House

7  Bill 3293?

8     A.     No.

9     Q.     Did you contact Governor Justice or anyone in

10  the Governor's Office with regard to House Bill 3293?

11     A.     No.  My wife took care of all of that.

12     Q.     Mr. Pepper, sitting here today, do you

13  personally have any concerns with regard to how BPJ has

14  been treated by employees of Harrison County Board of

15  Education?

16              ATTORNEY HARTNETT:  Objection.  Vague and

17  to the extent that it calls for a legal conclusion.

18              THE WITNESS:  Say it again.  I'm sorry.

19  BY ATTORNEY DENIKER:

20     Q.     Sure.  Sitting here today, do you personally

21  have any concerns with regard to how BPJ has been

22  treated by any employee of the Harrison County Board of

23  Education?

24              ATTORNEY HARTNETT:  Same objection.

1          THE WITNESS:  No, I don't.

2          ATTORNEY DENIKER:  Mr. Pepper, I don't

3     have any further questions for you at this time.  Thank

4     you.

5          THE WITNESS:  Thank you.

6                           ---

7                       EXAMINATION

8                           ---

9     BY ATTORNEY MORGAN:

10    Q.    Good afternoon.  Mr. Pepper, my name is Kelly

11    Morgan.  I represent the West Virginia Board of

12    Education and Superintendent Burch in this matter.

13    Please, same as Susan had mentioned to you, if you don't

14    understand my question, please let me know.  Otherwise,

15    I'm going to presume that you understood my question if

16    you answer my question.

17          Is that fair?

18    A.    Yes.

19    Q.    All right.

20          I just have just a few questions here.  I don't

21    anticipate being very long here.  But let me ask you

22    this.  So the West Virginia Board of Education, are you

23    aware who makes up the West Virginia Board of Education?

24          ATTORNEY HARTNETT:  Objection.  Vague.

1              THE WITNESS:  No, I don't.

2    BY ATTORNEY MORGAN:

3        Q.    Do you know --- when I say the West Virginia

4    Board of Education, do you know what that entity is?

5        A.    No.

6        Q.    Do you have any understanding that the West

7    Virginia Board of Education is over the county Boards of

8    Education?

9                  ATTORNEY HARTNETT:  Objection to the

10   extent it calls for a legal conclusion.

11                 THE WITNESS:  I don't have knowledge of

12   it, no.

13   BY ATTORNEY MORGAN:

14       Q.    Have you had any discussions with anyone from

15   the West Virginia Board of Education at anytime?

16       A.    No.

17       Q.    Have you ever personally contacted the West

18   Virginia Board of Education about BPJ?

19       A.    I have not, no.

20       Q.    Have you ever met Superintendant Burch?

21       A.    I can't recall, no.

22       Q.    Do you believe you have ever had any discussions

23   with him?

24       A.    No.

1    Q.    Did you ever try to contact his office for any

2    reason?

3    A.    I did not, no.

4    Q.    Do you have any reason to believe that the West

5    Virginia Board of Education --- and I'm just asking do

6    you personally, as you sit here today, do you have any

7    reason to believe that the West Virginia Board of

8    Education or State Superintendant Burch had any

9    involvement in the passage of House Bill 3293?

10              ATTORNEY HARTNETT:  Objection, compound

11   and to the extent it calls for a legal conclusion.

12              THE WITNESS:  I can't answer that.  I

13   don't know that answer.

14   BY ATTORNEY MORGAN:

15   Q.    Well, you can't answer it.  Are you saying that

16   you don't have any reason to believe that they had any

17   involvement?

18              ATTORNEY HARTNETT:  Same objections.

19              THE WITNESS:  I don't know.  I don't know

20   the hierarchy of it all.

21   BY ATTORNEY MORGAN:

22   Q.    So then would you agree with me that, as you sit

23   here today, there's nothing you can point to, yourself

24   personally as BPJ's father, that you believe that the

1   West Virginia Board of Education or State Superintendant

2   Burch was specifically involved in with regard to this

3   House Bill 3293?

4               ATTORNEY HARTNETT:  Objection, compound,

5   vague and to the extent it calls for a legal conclusion.

6               ATTORNEY MORGAN:  And I'll give you a

7   continuing objection, but please I'd ask that you not

8   interrupt my questions to the witness.

9               ATTORNEY HARTNETT:  I'm not interrupting

10  your questions.  I'm giving question-specific

11  objections.  I have one additional objection to the

12  prior question.

13              ATTORNEY MORGAN:  Okay.

14              And I'm going to say that, honestly,

15  these objections are inappropriate.  You're only to be

16  --- there are not to be any speaking objections.  You

17  are giving direction to the witness, so I'm going to ask

18  you not to do that.

19              ATTORNEY HARTNETT:  I object to that

20  that.  I'm sorry.  That's a pretty serious charge.

21  They're not inappropriate.  Your question was compound.

22  It asked about two different entities.  Your question

23  was potentially calling for a legal conclusion.  All my

24  objections are well founded and I stated them simply.

1    I'm allowed to object to each question.  You can re-ask

2    him and I will say same objections and he can answer.

3                    ATTORNEY MORGAN:  And I will give you a

4    continuing objection.

5    BY ATTORNEY MORGAN:

6       Q.   Mr. Pepper, is there --- given that you've told

7    me that you have --- that you can't think of anything

8    here today, is that fair to say that you don't have

9    anything specific that you can point to that you believe

10   that the  West Virginia Board of Education was involved

11   in the passage of the House Bill 3293?

12                   ATTORNEY HARTNETT:  Same objections and

13   misstates his testimony.

14                   THE WITNESS:  Like I said, I don't know

15   how --- I don't know the hierarchy.  I don't know the

16   chain of command, if they were involved or not.  I

17   cannot say personally, no.

18   BY ATTORNEY MORGAN:

19      Q.   And so ---.

20      A.   I do not know.

21      Q.   I'm sorry to interrupt you.  So then there's

22   nothing that you can point to specifically.

23            Is that correct?

24                   ATTORNEY HARTNETT:  Same objections and

1   asked and answered.

2             THE WITNESS:  I can't point to anything.

3   I don't know if they created that bill or not.  That's

4   --- that's not my cup of tea, you know.  I'm not a

5   lawyer.

6   BY ATTORNEY MORGAN:

7    Q.   Do you personally have any concerns as to how

8   BPJ has been treated by the West Virginia Board of

9   Education?

10             ATTORNEY HARTNETT:  Objection.  Vague and

11   to the extent it calls for a legal conclusion.  You can

12   answer.

13             THE WITNESS:  I have --- I personally

14   don't have any problems, no.

15   BY ATTORNEY MORGAN:

16    Q.   Okay.

17         Is that the same for State Superintendant

18   Burch?

19             ATTORNEY HARTNETT:  Same objection.

20             THE WITNESS:  I have no problems with

21   him.  But like I said, I don't know if they were

22   involved with creating that law or passing that bill.  I

23   don't know.  That's --- that's beyond my realm.

24   BY ATTORNEY MORGAN:

1    Q.    And let me clarify.  My question as to State

2  Superintendant Burch was do you have any concerns about

3  how BPJ was treated by State Superintendant Burch?

4                    ATTORNEY HARTNETT:  Same objections.

5                    THE WITNESS:  I don't have anything

6  specific.

7  BY ATTORNEY MORGAN:

8    Q.    We talked a lot about today this House Bill 3293

9  and I know you were asked some questions about the

10 definitions.  Let me ask you, do you ever recall a time

11 you actually sitting down and reading the full House

12 Bill 3293?

13   A.    No.

14                   ATTORNEY MORGAN:  All right.  Thank you.

15 Those are all the questions I have for you.

16                   THE WITNESS:  Thank you.

17                         ---

18                     EXAMINATION

19                         ---

20 BY ATTORNEY DUCAR:

21   Q.    Good afternoon, Mr. Pepper.  I'm Timothy Ducar

22 and I represent Lainey Armistead.  When did BPJ start

23 showing an interest in athletics?

24   A.    I can't recall that.

1    Q.    Can you estimate?

2    A.    What athlete --- what specific entity are we

3 speaking of?

4    Q.    Any of them?

5    A.    She was interested in sports from a very young

6 age.  All my children were.

7    Q.    Can you estimate how old that was?

8    A.    Two, three, four.

9    Q.    And what was she interested in?

10    A.    Playing ball.

11    Q.    Did BPJ do anything else that evidenced her

12 interest in athletics at a very early age?

13                    ATTORNEY HARTNETT:  Objection.  Vague.

14                    THE WITNESS:  Just normal kid, likes to

15 run around like any other kid.

16 BY ATTORNEY DUCAR:

17    Q.    Did you play ball with BPJ?

18    A.    Sure.

19    Q.    What type of ball would you play with when you

20 played with BPJ, like what type of sport?

21    A.    Passing the ball, just throwing the ball.

22    Q.    And can you estimate when --- when that started?

23    A.    Well, we do that with my kids at a young age.  I

24 was very involved with my children from a young age.

1    Q.    From a young age did you encourage BPJ to

2    participate in organized sports?

3    A.    No.

4    Q.    From a young age did you encourage BPJ to

5    participate in any sports?

6    A.    No.

7    Q.    So BPJ just decided to like sports on BPJ's own.

8          Is that a fair statement?

9                ATTORNEY HARTNETT:  Objection to the

10   extent it calls for speculation.

11               ATTORNEY DUCAR:  I'm actually asking what

12   his experience is.  I'm not really asking him to

13   speculate about anything.

14               ATTORNEY HARTNETT:  You asked whether BPJ

15   decided to like sports on BPJ's own, which is asking for

16   BPJ's opinion, but you can ask the question.

17   BY ATTORNEY DUCAR:

18   Q.    Okay.

19   A.    Sure.  All my kids like sports because I like

20   sports.  They kind of follow what their mother and

21   father do.

22   Q.    And did you encourage them to participate in

23   sports, all of your children?

24               ATTORNEY HARTNETT:  Objection.

```
 1                    THE WITNESS:  If they wanted to.
 2    BY ATTORNEY DUCAR:
 3        Q.    What was the first sport BPJ competed in?
 4                    ATTORNEY HARTNETT:  Objection.  Vague.
 5                    THE WITNESS:  Cheerleading.
 6    BY ATTORNEY DUCAR:
 7        Q.    And when was that?
 8        A.    Three years ago, yeah, 2016.  Maybe five, six
 9    years ago.  I'm not sure of the exact date.
10        Q.    BPJ participated in cheerleading first.  What
11    other organized sports has BPJ participated in?
12        A.    Cross-country.
13        Q.    Anything else?
14        A.    No.
15        Q.    Has BPJ ever participated in a boys
16    cross-country team?
17        A.    No.
18        Q.    Has BPJ ever participated in a boys track and
19    field team?
20        A.    No.
21        Q.    Has BPJ ever participated in any organized
22    sports that was a boys team?
23        A.    No.
24        Q.    Who decided that BPJ was going to try out for
```

```
 1  the track team at her current school?

 2      A.    She did, of course.

 3      Q.    Did you have a hand in that?

 4                ATTORNEY HARTNETT:  Objection.  Vague.

 5                THE WITNESS:  No.  I'm sure my wife did.

 6  BY ATTORNEY DUCAR:

 7      Q.    So I guess to clarify, you did not assist BPJ in

 8  deciding to try out for the track and field team.

 9            Is that a fair statement?

10      A.    Yes.

11      Q.    We are here today because BPJ, in part, wants to

12  be a different gender than her biological birth gender.

13  How did you become aware of BPJ's interest in becoming a

14  different gender?

15                ATTORNEY HARTNETT:  Objection to the

16  preamble to your question and to the term your --- as

17  vague to the terms you're using.

18                THE WITNESS:  Through my wife and through

19  B█████

20  BY ATTORNEY DUCAR:

21      Q.    When did that first happen?

22                ATTORNEY HARTNETT:  Objection.  Vague.

23                THE WITNESS:  Years ago.

24  BY ATTORNEY DUCAR:
```

1    Q.    Can you estimate how many years ago it was that

2  either your wife or BPJ gave you an indication that BPJ

3  was interested in becoming a different gender?

4              ATTORNEY HARTNETT:  Objection.

5  Foundation and vague.

6              THE WITNESS:  Approximately seven, eight

7  years ago.

8  BY ATTORNEY DUCAR:

9    Q.    During this seven or eight years was BPJ

10  consistent in desiring to change BPJ's gender?

11              ATTORNEY HARTNETT:  Objection to the

12  foundation and the terms and their vagueness.

13              THE WITNESS:  Yes, 100 percent.

14  BY ATTORNEY DUCAR:

15    Q.    Who was the first person who talked to you about

16  BPJ's desire to change her gender?

17              ATTORNEY HARTNETT:  Objection to the

18  terminology being used as vague and lacking foundation.

19              THE WITNESS:  I would say my wife.

20  BY ATTORNEY DUCAR:

21    Q.    When was that conversation?

22    A.    It's been too many years.  I couldn't tell you.

23    Q.    Can you estimate?

24    A.    Seven, eight, I don't know.

1    Q.    That conversation was between you and your wife.

2    Is that what you testified?

3    A.    Yes.

4    Q.    Can you estimate how many times you have talked

5    to your wife about BPJ's desire to change her gender?

6              ATTORNEY HARTNETT:  Objection to the

7    terminology you're using in terms of vagueness and

8    foundation.  Also we have asserted the marital

9    communications privilege.  To the extent you're asking

10   about generalized topics or numbers of conversations,

11   that's one thing, but I've instructed the witness not to

12   divulge the specifics of confidential conversations.

13             ATTORNEY DUCAR:  And Ms. Hartnett, I

14   didn't ask him that.  And why don't you explain to me

15   what's vague about my question so ---.

16             ATTORNEY HARTNETT:  You keep saying the

17   words changed her gender.  That's not a recognized

18   concept.  That's not an appropriate terminology.  That's

19   what I find to be vague.

20             ATTORNEY DUCAR:  Do you have a different

21   suggestion on how I would explain what I'm trying to

22   explain, which is somebody who wants to change their

23   gender?

24             ATTORNEY HARTNETT:  There's various

```
1    terminology that we can --- I'm happy to discuss it off

2    the record or on the record, but transition would be ---

3    socially transitioned would be one word that you could

4    use.

5                      ATTORNEY DUCAR:  That would be great.

6    Thank you.

7                      ATTORNEY HARTNETT:  Thank you for asking.

8    BY ATTORNEY DUCAR:

9        Q.    Over the years can you estimate how many times

10   you have talked to your wife about BPJ's desire to

11   socially transition to a female?

12       A.    I can't recall.  I don't know.

13       Q.    Would you estimate it to be two, five, more,

14   less?

15       A.    Probably more.

16       Q.    Can you give me any idea?

17       A.    No.  It had been an ongoing thing.

18       Q.    When was the first time that you actually

19   remember talking to BPJ herself about her desire to

20   socially transition?

21       A.    I couldn't tell you.

22       Q.    Can you estimate?

23       A.    Seven, eight years ago.

24       Q.    Do you recall what was talked about?
```

1    A.    I do not.

2    Q.    Can you estimate how many times you have talked

3  to BPJ in the last seven or eight years with regards to

4  PBJ's desire to socially transition?

5    A.    I would say less than a handful because she

6  speaks mainly with her mom.

7    Q.    Well, how do you define less than a handful?

8    A.    Five.

9    Q.    Earlier HB 3293 was talked about when the State

10 was questioning you.  One of the provisions indicates

11 that sports teams for biological girls are not open to

12 biological males and you were asked if that was fair and

13 your answer was I guess.  Why do you think that's fair?

14         ATTORNEY HARTNETT:  Objection.  Misstates

15 his testimony and the same objections that I earlier

16 made.

17         THE WITNESS:  I'm not sure I understand.

18 I'm not sure I understand the question of what's fair.

19 BY ATTORNEY DUCAR:

20   Q.    Do you have a basic idea of what is fair, what's

21 right and wrong?

22         ATTORNEY HARTNETT:  Objection.  Compound.

23         ATTORNEY DUCAR:  I'll withdraw that

24 question.

1   BY ATTORNEY DUCAR:

2      Q.    What I'm trying to ask is you had earlier

3   testified that you thought or at least you guessed that

4   it was fair that biological males do not compete on

5   biological girls sports teams.  And I wanted to know ---

6   tell me why you think that's fair.

7                    ATTORNEY HARTNETT:  Objection, misstates

8   his testimony and the earlier objections.

9                    THE WITNESS:  Females have tried out for

10  male teams.  Football.  I don't know.

11  BY ATTORNEY DUCAR:

12     Q.    I'm talking about males on female teams.

13     A.    I'm not sure I understand the definition of

14  male.

15     Q.    Well, I guess my question is do you think it's

16  fair that a biological male can compete on a biological

17  girl's sports team?

18                    ATTORNEY HARTNETT:  Same objections and

19  asked and answered.

20  BY ATTORNEY DUCAR:

21     Q.    I believe you said that you think that it is

22  fair that they not be able to do so and I wanted to know

23  why you think that's fair.

24                    ATTORNEY HARTNETT:  Same objections.

 1                    THE WITNESS:  It's a case by case --- my

 2    opinion is it's a case-by-case decision.

 3    BY ATTORNEY DUCAR:

 4      Q.    Can you give me an example of when it would be

 5    fair for a biological male to compete on a biological

 6    female's sports team?

 7                    ATTORNEY HARTNETT:  Objection to the

 8    terminology as vague and lacking, foundation, also calls

 9    for speculation and to the extent you're calling for a

10    legal conclusion.

11                    THE WITNESS:  Well, in the case of B█████,

12    she has not gone through puberty, so I guess that would

13    be a case.

14    BY ATTORNEY DUCAR:

15      Q.    Okay.

16            Puberty.  Are there any other factors that you

17    can put your hands on or put your finger on?

18                    ATTORNEY HARTNETT:  Objection.  Sorry,

19    vague to the extent it calls for a legal or expert

20    opinion.

21                    THE WITNESS:  I'm not a medical doctor.

22    I can't answer that.  That's not my expertise.

23    BY ATTORNEY DUCAR:

24      Q.    Well, that's true.  I'm not asking for your

1   expertise or for medical expertise.  Earlier you said

2   that BPJ had female mannerisms, including like ---

3   including talking like a female.  Can you describe what

4   it means to talk like a female?

5                   ATTORNEY HARTNETT:  Objection.  I would

6   just note the prior testimony speaks for itself, but you

7   can answer if you can.

8                   THE WITNESS:  I don't know that I can.

9   BY ATTORNEY DUCAR:

10    Q.    Would it be the tone of voice?  Would it be the

11   type of words used?  Would it be actions during the

12   discussion?  Can you narrow it down at all?

13                   ATTORNEY HARTNETT:  Objection, compound,

14   calls for speculation.

15                   THE WITNESS:  I don't know how to answer

16   that.

17   BY ATTORNEY DUCAR:

18    Q.    You also said that BPJ acted like a female

19   because she did --- BPJ did things that girls like to

20   do.  What are things that girls like to do?

21                   ATTORNEY HARTNETT:  I just would object

22   to the extent that it doesn't fully capture his

23   testimony, but --- and vague.

24                   THE WITNESS:  Paint her fingernails.

1    BY ATTORNEY DUCAR:

2        Q.    Anything else?

3        A.    Put her hair up.  I mean I don't know, things of

4    that nature.

5        Q.    When was the first time she painted her

6    fingernails?

7        A.    I don't recall.

8        Q.    When was the first time BPJ put BPJ's hair up?

9        A.    I don't know.

10       Q.    Can you estimate?

11       A.    No, I can't.  I can't even estimate.  I don't

12   know.

13       Q.    Earlier you described female attire as including

14   dresses, female shoes, jewelry, makeup.  In your view,

15   can an individual be female without liking female shoes,

16   jewelry or makeup?

17               ATTORNEY HARTNETT:  I would just object

18   --- sorry, just to the extent that the record speaks for

19   itself on his full prior testimony, but you can answer.

20               THE WITNESS:  I guess so.

21   BY ATTORNEY DUCAR:

22       Q.    Earlier you testified that you considered BPJ to

23   be male when BPJ was born.  Why?

24               ATTORNEY HARTNETT:  Objection.  Misstates

```
 1   the testimony.

 2                    THE WITNESS:  Well, that is what the

 3   doctor said.

 4   BY ATTORNEY DUCAR:

 5      Q.    Is there any other reason?

 6                    ATTORNEY HARTNETT:  Same objection.

 7                    THE WITNESS:  No.

 8   BY ATTORNEY DUCAR:

 9      Q.    It didn't have anything to do with the genitalia

10   of the baby?

11                    ATTORNEY HARTNETT:  Objection.

12                    THE WITNESS:  Well, that's how they

13   determine, I guess.

14   BY ATTORNEY DUCAR:

15      Q.    Earlier you testified that being a male means

16   being President of the United States or head of your

17   household.  Does being male have anything to do with the

18   body that you're born with?

19                    ATTORNEY HARTNETT:  Objection, misstates

20   his testimony and to the extent it's seeking any expert

21   or legal opinion.

22                    THE WITNESS:  I guess.

23   BY ATTORNEY DUCAR:

24      Q.    I'm sorry.  I missed your answer?
```

```
 1      A.     I said, yes, I guess, but I'm no expert.

 2      Q.     When did BPJ start wearing girls clothing at

 3  home?

 4      A.     I couldn't give you a year.

 5      Q.     Did BPJ ask anybody prior to beginning to dress

 6  up in women's clothing?

 7              ATTORNEY HARTNETT:  Objection.  Vague.

 8  Calls for speculation.

 9              THE WITNESS:  My wife could give you a

10  better answer on that.  I don't know.

11  BY ATTORNEY DUCAR:

12      Q.     When did BPJ start presenting as a girl in other

13  ways at home?

14              ATTORNEY HARTNETT:  Objection.  Vague.

15              THE WITNESS:  Six, seven, eight years.  I

16  really don't know.

17  BY ATTORNEY DUCAR:

18      Q.     Do you know if BPJ received any encouragement to

19  do that from somebody?

20              ATTORNEY HARTNETT:  Objection, vague.

21              THE WITNESS:  No, I don't know the answer

22  to that.

23  BY ATTORNEY DUCAR:

24      Q.     Has BPJ consistently presented as a girl at home
```

1    since BPJ first began doing so?

2        A.    Yes.

3        Q.    When did BPJ start wearing girl's clothing at

4    school?

5        A.    I can't --- I couldn't tell you.  My wife could

6    tell you.

7        Q.    Did BPJ ask you about wearing girl's clothing at

8    school prior to doing so?

9        A.    No.

10       Q.    Did it surprise you that BPJ began wearing

11   women's clothing or girl's clothing in school without

12   asking you?

13                    ATTORNEY HARTNETT:  Objection.

14   Argumentative.

15                    THE WITNESS:  At first maybe, but that

16   was her choice.

17   BY ATTORNEY DUCAR:

18       Q.    Do you know if BPJ asked your wife if BPJ could

19   wear girl's clothing to school prior to doing so?

20       A.    I'm sure she did, but I don't know personally.

21       Q.    Do you know whether BPJ has ever asked people at

22   school to refer to her as a female or to use the

23   pronouns she or her?

24       A.    Yes.

```
1    Q.    Do you know who BPJ asked?

2    A.    I believe it was the principal and also the

3    counselors there.

4    Q.    Of what school?

5    A.    Norwood Elementary.

6    Q.    Anybody else?

7    A.    Not to my knowledge, no.

8    Q.    Has BPJ asked her friends at school to refer to

9    her as a female or to use pronouns she or her?

10   A.    You would have to ask her that.  I don't know.

11   Q.    When did BPJ first start presenting herself as a

12   girl at school?

13   A.    I don't know personally.  That would be a good

14   question to ask my wife.

15   Q.    After BPJ first started presenting as a girl at

16   school, has she done so consistently since then?

17   A.    I'm sorry.  Say it again, please, the question.

18   Q.    After BPJ first presented as a girl at school,

19   has she consistently done so since then?

20   A.    Yes.

21   Q.    How do you feel about BPJ's transition?

22   A.    I support her 100 percent.

23              ATTORNEY HARTNETT:  Objection.

24              THE WITNESS:  My love for her is
```

1    unconditional.

2    BY ATTORNEY DUCAR:

3        Q.    Do you think BPJ's desire to transition is

4    permanent?

5                    ATTORNEY HARTNETT:  Objection to the

6    extent that it calls for any kind of expert opinion.

7                    THE WITNESS:  I believe so, but you would

8    be better off to ask her.

9    BY ATTORNEY DUCAR:

10       Q.    Has BPJ's desire to transition caused any stress

11   for you?

12       A.    In the beginning maybe a little.

13       Q.    Has BPJ's desire to transition caused any stress

14   upon anybody else in your family?

15       A.    Not that I know of.

16       Q.    Does that also include BPJ?

17       A.    Not quite sure --- I'm not following.  Say that

18   again.  Including BPJ how?

19       Q.    Do you think BPJ's desire to transition is

20   causing BPJ anxiety?

21                    ATTORNEY HARTNETT:  Objection.  Vague,

22   calls for speculation.

23                    THE WITNESS:  It is possible, but I'm no

24   --- I'm no expert in that field.  I don't know.  I'm not

1    a doctor.

2    BY ATTORNEY DUCAR:

3        Q.    You haven't talked to BPJ about anxiety issues.

4              Correct?

5        A.    That's correct.

6        Q.    Has the publicity that has come with this

7    lawsuit caused any stressors within your family?

8                    ATTORNEY HARTNETT:  Objection, vague.

9                    THE WITNESS:  No.

10   BY ATTORNEY DUCAR:

11       Q.    Does this lawsuit cause any stressors to the

12   people within your family?

13                   ATTORNEY HARTNETT:  Same objection.

14                   THE WITNESS:  Sure.  Talking to

15   strangers all day long, absolutely.

16   BY ATTORNEY DUCAR:

17       Q.    So depositions are stressful.  You just

18   indicated this deposition is stressful.  Is this lawsuit

19   stressful on anyone in your family other than the fact

20   that everyone's deposition has to be taken?

21                   ATTORNEY HARTNETT:  Objection, misstates

22   the testimony.  Vague.

23                   THE WITNESS:  I can only answer for

24   myself.

1    BY ATTORNEY DUCAR:

2       Q.    All right.

3             Please do so.

4       A.    Well, I'm sitting in a chair for six hours.  I'm

5    used to being on my feet for 12 hours a day, so yeah,

6    this is pretty uncomfortable, unnatural for me.

7       Q.    Does this lawsuit, other than the deposition,

8    cause you any other stressors?

9                   ATTORNEY HARTNETT:  Objection.

10                  THE WITNESS:  No, and I won't let it.

11   BY ATTORNEY DUCAR:

12      Q.    Has your wife told you how she feels about BPJ's

13   desire to transition?

14                  ATTORNEY HARTNETT:  Objection.  Just back

15   to the marital communications privilege.  I would

16   instruct the witness not to discuss his confidential

17   communications with his spouse.

18                  ATTORNEY DUCAR:  Okay.

19                  I will withdraw the question.

20   BY ATTORNEY DUCAR:

21      Q.    Mr. Pepper, how does this lawsuit affect ---

22   from a stressor situation, is this causing  --- let me

23   rephrase the question.  Does this lawsuit cause your

24   wife ---?

```
1      A.    You were breaking up there.  I'm sorry, I didn't

2  hear you towards the end.

3      Q.    Does this lawsuit cause your wife any stressors?

4            ATTORNEY HARTNETT:  Objection, vague.

5  Calls for speculation.

6            THE WITNESS:  Sure, she's been stressed

7  out.

8  BY ATTORNEY DUCAR:

9      Q.    Can you give me an example of how it's stressing

10 her out?

11     A.    Well, no.  You'd have to ask her that.

12     Q.    Do you support BPJ's interest in being

13 transgender?

14     A.    Yes, 100 percent.

15     Q.    Do you encourage BPJ's interest in being

16 transgender?

17           ATTORNEY HARTNETT:  Objection.  Vague,

18 foundation.

19           THE WITNESS:  I encourage her to be

20 herself and I love her no matter what.  Like I said, my

21 love is unconditional for her.

22 BY ATTORNEY DUCAR:

23     Q.    Have you encouraged her to transition?

24     A.    If this is what makes her happy, it makes me
```

1    happy.

2        Q.    Have you encouraged BPJ to transition?

3                    ATTORNEY HARTNETT:  Objection, asked and

4    answered.

5                    ATTORNEY DUCAR:  I didn't get the answer.

6                    ATTORNEY HARTNETT:  He answered your

7    question.

8                    THE WITNESS:  She's my daughter.  I love

9    her.  It makes her happy.

10   BY ATTORNEY DUCAR:

11       Q.    Mr. Pepper, have you encouraged BPJ to

12   transition?

13                   ATTORNEY HARTNETT:  Objection.  Vague,

14   asked and answered.

15                   THE WITNESS:  I've encouraged her to be

16   herself.  I encourage her to be who she is.  And if

17   she's happy, I back her 100 percent.

18   BY ATTORNEY DUCAR:

19       Q.    So you have not encouraged her to transition.

20            Correct?

21                   ATTORNEY HARTNETT:  Objection, misstates

22   the testimony.

23                   THE WITNESS:  No, I didn't say that.

24   BY ATTORNEY DUCAR:

1    Q.    Well, it's a simple question.  I don't know why

2    I can't get a simple answer.

3                    ATTORNEY HARTNETT:  Objection.  That's

4    argumentative and he has answered your question three

5    times.

6                    THE WITNESS:  She's my daughter.  I love

7    her.  I support her.

8    BY ATTORNEY DUCAR:

9    Q.    Was transitioning BPJ's idea?

10   A.    Say that again, please.

11   Q.    Was transitioning BPJ's idea?

12                   ATTORNEY HARTNETT:  Objection.  Vague.

13                   THE WITNESS:  I can't answer for her.

14   You would have to ask her that.

15   BY ATTORNEY DUCAR:

16   Q.    Do you think it's important that team sports

17   have fair rules?

18                   ATTORNEY HARTNETT:  Objection.  Vague.

19                   THE WITNESS:  All sports has rules.

20   BY ATTORNEY DUCAR:

21   Q.    Do you think it's important that team sports

22   have fair rules?

23                   ATTORNEY HARTNETT:  Objection.  Vague.

24                   THE WITNESS:  I'm not the one who makes

1    the rules up, so ---.

2    BY ATTORNEY DUCAR:

3      Q.    Well, even though you don't make up the rules,

4    do you think it's important that they're fair?

5                      ATTORNEY HARTNETT:  Objection.  Vague,

6    asked and answered.

7                      THE WITNESS:  I mean, there's right and

8    wrong.

9    BY ATTORNEY DUCAR:

10     Q.    Well, do you think that it's important that team

11   sports have fair rules?

12                     ATTORNEY HARTNETT:  Objection, vague,

13   asked and answered.

14                     THE WITNESS:  Yeah.

15   BY ATTORNEY DUCAR:

16     Q.    Do you have any long-term treatment goals for

17   BPJ?

18                     ATTORNEY HARTNETT:  Objection, vague.

19                     THE WITNESS:  I don't.

20                     ATTORNEY HARTNETT:  I don't want to

21   interrupt your line of questioning, but we've been going

22   for about an hour and a half.  So I would like to take a

23   break shortly.

24                     ATTORNEY DUCAR:  I probably have about

1  maybe six more questions.

2              ATTORNEY HARTNETT:  I wasn't sure.  I

3  thought you might be getting there.  Wes, are you okay

4  going a little bit longer?

5              THE WITNESS:  Yeah.  I got to --- I got

6  to urinate.

7              ATTORNEY DUCAR:  If you want, we can take

8  a break and then --- I'm not sure how long these next

9  six questions are going to take.  So we can ---.

10             THE WITNESS:  I just need five minutes.

11             ATTORNEY DUCAR:  That's fine here.

12             ATTORNEY HARTNETT:  Okay.

13             THE WITNESS:  Thank you.

14             VIDEOGRAPHER:  Going off the record.  The

15  current time reads 3:01:00 p.m.

16  OFF VIDEOTAPE

17                      ---

18  (WHEREUPON, A SHORT BREAK WAS TAKEN.)

19                      ---

20  ON VIDEOTAPE

21             VIDEOGRAPHER:  We are back on the record.

22  The current time reads 3:10:00 p.m.

23  BY ATTORNEY DUCAR:

24    Q.    Mr. Pepper --- well, let's see.  I would like to

```
 1    take a look at West Virginia Exhibit 14 at this time.
 2                      ATTORNEY DUCAR:  And Mr. Court Reporter,
 3    if you don't mind scrolling through the whole thing just
 4    so we can get an idea what it says?  These are progress
 5    notes.
 6                      VIDEOGRAPHER:  You mean the whole
 7    exhibit.
 8                      Correct?
 9                      ATTORNEY DUCAR:  Well, I don't need the
10    whole exhibit.
11                      ATTORNEY HARTNETT:  I think it would be
12    helpful for the witness to refamiliarize himself just
13    with the exhibit to help move this along, but maybe by
14    showing the date of the visit that might help remind him
15    what he saw earlier.
16                      THE WITNESS:  Okay.
17    BY ATTORNEY DUCAR:
18        ██    █████
19           ████████████████████████████████████████████████
20    ████████████████████████████████████████████████████████
21    ████████████████       ██████████████████████████████████
22    ████████████████████████████████████
23    ████████████████████       Has BPJ told you that changing
24    her legal name is important to her?
```

1    A.    She has told my wife.

2    Q.    Do you have any idea of what the term gender

3 marker changes means?

4    A.    No.

5    ████       █████████████████████████████████████

6 ████████████████████████████████████████████████████

7 ██████████████████████████    I'll stop there.  Has BPJ

8 indicated any concerns with bathroom --- which bathrooms

9 she will be using?

10    A.    They have provided her a separate one.  It's

11 exclusive for her at school.

12    Q.    Has she verbalized any concerns with regards to

13 changing during gym class?

14             ATTORNEY HARTNETT:  Objection, calls for

15 speculation.

16             THE WITNESS:  Not to my knowledge.

17 BY ATTORNEY DUCAR:

18    Q.    Has BPJ expressed any concerns that her

19 preferred name and pronouns are used by the school?

20             ATTORNEY HARTNETT:  Objection, calls for

21 speculation.

22             THE WITNESS:  She wants everyone to call

23 her B████.

24 BY ATTORNEY DUCAR:

1    Q.    The record also notes above that BPJ is

2  interested in starting hormone therapy as soon as

3  medically possible.  Has BPJ talked to you about hormone

4  therapy, which I also call puberty blockers?

5                ATTORNEY HARTNETT:  I'm sorry.  Could you

6  just direct me and the witness to what part of the

7  document you're referring to?

8                ATTORNEY DUCAR:  Sure.  It's the third

9  paragraph, third sentence, where it says she is also

10  interested in starting hormone therapy as soon as

11  medically possible.

12                ATTORNEY HARTNETT:  Thank you.

13  BY ATTORNEY DUCAR:

14    Q.    So my question was, have you talked to BPJ about

15  puberty blockers?

16    A.    No.

17    Q.    Whose idea was it for BPJ to start puberty

18  blockers?

19                ATTORNEY HARTNETT:  Objection, calls for

20  speculation.

21                THE WITNESS:  That would be a question

22  for B██████  I'm not sure of the answer.

23                ATTORNEY HARTNETT:  Sorry.  I also want

24  to object to the foundation of hormone therapy being

1    equivalent to puberty blockers.

2    BY ATTORNEY DUCAR:

3        Q.    Do you understand the risks --- or let me

4    rephrase that.  What do you understand the risks of

5    puberty blockers to be?

6                    ATTORNEY HARTNETT:  Objection.

7    Foundation.

8                    THE WITNESS:  My wife and I have

9    discussed this and there are several.  And I cannot tell

10   you off the top of my head what it is, but --- and I'll

11   answer with this question --- or with this statement

12   that, you know, I love my daughter and I will --- this

13   is her choice.

14   BY ATTORNEY DUCAR:

15       Q.    So you would agree that there are long-term

16   ramifications for puberty blockers, but you just don't

17   recall them at this time?

18                    ATTORNEY HARTNETT:  Objection, foundation

19   and misstates his testimony.

20                    THE WITNESS:  Yes.

21                    ATTORNEY DUCAR:  Mr. Court Reporter, you

22   can take that document off the screen at this point.

23   Thank you.

24   BY ATTORNEY DUCAR:

1    Q.    Have you discussed the long-term ramifications

2    of taking puberty blockers with BPJ?

3    A.    No.

4    Q.    What do you understand to be the risks of cross

5    sex hormones?

6              ATTORNEY HARTNETT:  Objection.  Vague and

7    calls for speculation.

8              THE WITNESS:  Sterility.

9    BY ATTORNEY DUCAR:

10   Q.    Do you know how long one must take cross sex

11   hormones before they becomes sterile?

12             ATTORNEY HARTNETT:  Objection,

13   foundation.  Calls for speculation.

14             THE WITNESS:  I am not an expert on it.

15   I don't know.

16   BY ATTORNEY DUCAR:

17   Q.    Have you discussed the long-term ramifications

18   of taking cross sex hormones with BPJ?

19             ATTORNEY HARTNETT:  Objection, vague.

20             THE WITNESS:  No.

21   BY ATTORNEY DUCAR:

22   Q.    Do you know why --- strike that.

23         Do you know that BPJ was selected to be part of

24   the base of BPJ's cheer team pyramids?

1              THE WITNESS:  I'm not following you.

2    Please say it another way.

3    BY ATTORNEY DUCAR:

4        Q.    Are you aware of when cheerleading teams create

5    pyramids of people?

6        A.    Creating pyramids of people?

7        Q.    Like a certain number of people would be at the

8    bottom and then a certain number of people would be on

9    top of them and they would create a pyramid?

10       A.    I've seen it before, but I'm not --- I'm not

11   following you.

12       Q.    So you know what I'm talking about.

13             Correct?

14       A.    Yes.

15       Q.    Do you know that BPJ was selected to be part of

16   the base of BPJ's cheer team pyramids?

17       A.    No, I'm not aware of that.

18                ATTORNEY DUCAR:  Thank you very much, Mr.

19   Pepper.  I have no further questions at this time.

20                THE WITNESS:  Thank you.

21                ATTORNEY HARTNETT:  And the Plaintiff

22   does not have any questions.

23                ATTORNEY TRYON:  Okay.

24                This is Dave Tryon.  I do have a few

1    follow-up questions based on the line of questions that

2    were asked.

3              ATTORNEY HARTNETT:  I don't think that's

4    --- sorry, that wasn't my --- I thought your questioning

5    was done.

6              ATTORNEY DENIKER:  I also have just one

7    or two follow-up questions.

8              ATTORNEY TRYON:  I think my follow-up

9    questions are based on questions that have been asked

10   after my questions.  I've never had anybody object to me

11   doing that before.  Are you objecting to me doing that?

12             ATTORNEY HARTNETT:  I'm thinking about it

13   because I don't --- I've never had multiple Defense

14   Counsel do multiple rounds of questioning.  They usually

15   do their questioning and unless there's a Redirect they

16   don't get to do additional questioning.

17             ATTORNEY TRYON:  Well, that's different

18   from my experience, respectfully.  I've been on a lot of

19   multi-Defendants questioning and their depositions and

20   it's my experience that, you know, after new things come

21   up during other counsels' questions, that there's not an

22   issue with following up on some of those things.

23             ATTORNEY HARTNETT:  Can we go off the

24   record?  I would like to confer with my co-counsel.

```
 1                    ATTORNEY TRYON:  Yes.

 2                    VIDEOGRAPHER:  Going off the record.  The

 3  current time reads 3:20 p.m.

 4  OFF VIDEOTAPE

 5                         ---

 6  (WHEREUPON, A SHORT BREAK WAS TAKEN.)

 7                         ---

 8  ON VIDEOTAPE

 9                    VIDEOGRAPHER:  We're back on the record.

10  The current time reads 3:26 p.m.

11                    ATTORNEY HARTNETT:  Okay.

12                    We can put this on the record or off, but

13  I conferred with my co-counsel.  Like I said, this is

14  not what we were expecting in the sense that I think we

15  had discussed having Defendants go kind of in a row and

16  that when you concluded your questioning, it would be

17  concluded, and absent Redirect from the other side, in

18  my experience you don't get to continue your

19  questioning.

20                    On the other hand, we like to be

21  practical here, and so if folks have a few additional

22  questions, we're not going to --- I mean, we don't want

23  to hold this deposition open.  So I just need to know

24  how much additional questioning you're contemplating.
```

1           ATTORNEY TRYON:  Yes, Kathleen, just to

2    be clear, my understanding of the proper protocol is

3    that additional examination would be based on --- within

4    the scope of what other counsel have raised and --- so

5    that's where I would anticipate, you know, my questions

6    to be.  I don't have many, less than a dozen.

7           ATTORNEY HARTNETT:  Okay.

8           Again, we don't want to be obstructive

9    here in any way.  And to the extent that that is a

10   response to other questioning, we're happy to allow it

11   here briefly.  I just think we need to be careful to not

12   retread on things we've done or obviously do anything

13   harassing.  But thank you for explaining.

14           ATTORNEY TRYON:  Sure.

15                          ---

16                    RE-EXAMINATION

17                          ---

18   BY ATTORNEY TRYON:

19     Q.   Mr. Pepper, first of all, thank you again for

20   your time.  We appreciate the time, as we know that this

21   is --- well, it's just appreciated.  And so the term

22   social --- socially transition came up during Mr.

23   Ducar's questioning.  Is today the first time you have

24   heard that term?

1    A.    Yes.

2    Q.    Let me turn back to Exhibit 17, please.

3              ATTORNEY TRYON:  Jacob, can you bring

4    that up?  I see you're working on it.  Okay.  Great.

5    BY ATTORNEY TRYON:

6    Q.    So when I was asking you questions about this

7    document, sir, it was my understanding that you had not

8    seen this before.  But when Attorney Susan Deniker was

9    asking you about it and I have it written down what was

10   said, at one point you said --- you were asked --- Ms.

11   Deniker asked, did you see Exhibit 17 at the time it was

12   executed.  And you said yes, it's possible.  So after

13   her questioning did that refresh your recollection that,

14   in fact, you had seen Exhibit 17 before?

15   A.    I've seen so many documents that I --- it's

16   very possible.  But like I say, I can't tell you, you

17   know, for a fact.  I wouldn't take a test on it.

18   Q.    Fair enough.

19             Let me ask you then to take a quick look at

20   this first paragraph in the form that says mom is very

21   supportive.  Dad has struggled but coming around and

22   seeking outside help through church and paternal side of

23   family's help/support.  Let me just ask you to look at

24   that and think back if you, in fact, saw that language

1    on the report before today.

2              ATTORNEY HARTNETT:  Objection, asked and

3    answered.

4              THE WITNESS:  And I don't recall.  It's

5    been three years ago.

6    BY ATTORNEY TRYON:

7    Q.    Fair enough.  All I want is your --- I want to

8    make sure we have the correct testimony.

9              During the questioning by Mr. Ducar you were

10   asked if BPJ has stressed over this situation.  And I

11   don't remember exactly what the question was but asked

12   if BPJ had stress in the context of the gender dysphoria

13   or transition.  And I believe you said that BPJ had some

14   stress.

15             Is that right?

16             ATTORNEY HARTNETT:  Objection.  It

17   doesn't completely state his testimony.

18             ATTORNEY TRYON:  Right.

19             THE WITNESS:  She has stress, but it's

20   not --- it's not over it with me.  It's more over it

21   with my wife.  My wife and my daughter have the

22   communication line going.

23   BY ATTORNEY TRYON:

24   Q.    Got it.  My question is did BPJ's stress ever

1    get to the point where BPJ was suicidal?

2                    ATTORNEY HARTNETT:  Objection.

3                    THE WITNESS:  Not to my knowledge.

4    BY ATTORNEY TRYON:

5        Q.    Okay.

6              Mr. Ducar asked you a number of questions about

7    encouragement or did you encourage the transition, and

8    you didn't seem to understand that.  I just want to know

9    what do you understand the word encourage to mean?

10                   ATTORNEY HARTNETT:  Objection.  Misstates

11   his testimony and he answered the question repeatedly.

12                   THE WITNESS:  I encourage her to be

13   herself.  I encourage her to be the best that she can.

14   I encourage her to be happy.  I encourage her to love

15   herself and to love her family, because her family loves

16   her.

17   BY ATTORNEY TRYON:

18       Q.    Right.  And you made that very clear and I

19   appreciate that.  But when you say encourage, what do

20   you mean by encourage?

21       A.    Well, she makes straight As.  I encourage her to

22   be a good student.  So that's some encouragement.  She

23   gets a lot of that from her mother.  I mean, I'm no

24   dummy, but ---.

1      Q.    So then I have maybe one more question about

2 that because --- and I'm just trying to understand, did

3 you actively encourage BPJ in social transition or just

4 to socially transition to a female or were you just

5 neutral on it?

6                ATTORNEY HARTNETT:  Objection.  Compound

7 and asked and answered.

8                THE WITNESS:  I've encouraged B█████to be

9 herself.  B█████has chosen to be --- represent herself

10 as being a female, and that's who she is.  I encourage

11 her to be a female, yes, I encourage her, because that's

12 what she loves.  That's her life now.

13 BY ATTORNEY TRYON:

14     Q.    And when did you start encouraging her to do

15 that?

16     A.    Many years ago.  I've been onboard many years.

17                ATTORNEY TRYON:  I have no other

18 questions.

19                ATTORNEY HARTNETT:  Roberta, did you have

20 questions?

21                ATTORNEY GREEN:  On behalf of WVSSAC, no

22 further questions.  Thank you.

23                        ---

24                   RE-EXAMINATION

```
 1                            ---

 2   BY ATTORNEY DENIKER:

 3       Q.    Mr. Pepper, Susan Deniker.  I only have a few

 4   questions for you.  I asked you before, this is a

 5   clarifying question, if you had any communications with

 6   any employees of the Harrison County Board of Education

 7   regarding BPJ, her gender identity and her participation

 8   in school sports, and you told me that you had not.  I

 9   wanted to ask you and clarify have you had any

10   communications with anybody on the elected Harrison

11   County Board of Education regarding BPJ's gender

12   identity?

13       A.    I'm not sure who those elected members would be.

14       Q.    Is that a no then?

15       A.    Yes.  I don't even know who you're talking

16   about.

17       Q.    Okay.

18             So the Harrison County Board of Education has

19   an elected board, the citizens and the county elect, and

20   I just want to know if you raised any concerns,

21   complaints or had any communication at all with BPJ's

22   --- any accommodations for her gender identity or her

23   participation in school sports?

24             ATTORNEY HARTNETT:  Just objecting to
```

1    this questioning as not prompted by anything on the

2    other parties' questioning.  This just seems to be

3    additional questioning that could have been asked the

4    first round.  Also object to his prior testimony speaks

5    for itself, and I'm not sure the summary was entirely

6    accurate.  If this is the only question, he's free to

7    answer it, but I just don't think we should be going

8    down this road of questioning that could have been asked

9    previously.

10   BY ATTORNEY DENIKER:

11        Q.    Mr. Pepper, do you understand my question?

12        A.    No.  Would you say it again, please?

13        Q.    Sure.  And I would agree to give your counsel a

14   continuing objection because I know it gets confusing

15   when we all, you know, talk like this.  But I'm just ---

16   have you had any communications with any member of the

17   elected Harrison County Board of Education to discuss in

18   any way accommodation of your daughter's gender

19   identification, issues at school or her participation in

20   school sports?

21             ATTORNEY HARTNETT:  Objection that it's

22   beyond the scope of the other testimony and for the

23   other objections.

24             THE WITNESS:  Directly, no.  Indirectly

```
 1   through my wife, I would say yes.
 2   BY ATTORNEY DENIKER:
 3      Q.    But you personally haven't had any of those
 4   communications.
 5            Is that correct?
 6      A.    That's correct.
 7                  ATTORNEY HARTNETT:  Objection, asked and
 8   answered.
 9                  ATTORNEY DENIKER:  Thank you, Mr. Pepper.
10   I don't have any further questions.
11                  ATTORNEY MORGAN:  I don't have any
12   further questions.
13                  ATTORNEY DUCAR:  Nothing further here.
14   Thank you.
15                  ATTORNEY HARTNETT:  Okay.
16                  And we have nothing further from the
17   Plaintiff.  We would reserve, obviously, our right to
18   review.  But otherwise, we consider the deposition to
19   now be closed.
20                  VIDEOGRAPHER:  That concludes today's
21   deposition.  The current time reads 3:37 p.m.
22                  ATTORNEY TRYON:  If I could just say
23   something before we close.  First of all, thank you
24   again, Mr. Pepper.  But also, to the extent that we
```

1  receive additional information in discovery that

2  necessitates to ask more questions, we would expect to

3  do so.  But I don't anticipate that.  But again, I know

4  that Plaintiff's Counsel has already objected to that,

5  so I recognize that, but I want to make sure I preserve

6  that for the record.

7              ATTORNEY HARTNETT:  And I would reiterate

8  my objection that there has been absolutely nothing

9  identified that would require a further deposition of

10 Mr. Pepper.

11             ATTORNEY TRYON:  Thank you.

12             VIDEOGRAPHER:  That concludes the

13 deposition.  The current time reads 3:37 p.m.

14                   * * * * * * *

15     VIDEOTAPED DEPOSITION CONCLUDED AT 3:37 P.M.

16                   * * * * * * *

17

18

19

20

21

22

23

24

                                                              191

1    STATE OF WEST VIRGINIA   )

2                        CERTIFICATE

3              I, Nicole Montagano, a Notary Public in

4    and for the State of West Virginia, do hereby

5    certify:

6              That the witness whose testimony appears

7    in the foregoing deposition, was duly sworn by me

8    on said date, and that the transcribed deposition

9    of said witness is a true record of the testimony

10   given by said witness;

11             That the proceeding is herein recorded

12   fully and accurately;

13             That I am neither attorney nor counsel

14   for, nor related to any of the parties to the

15   action in which these depositions were taken, and

16   further that I am not a relative of any attorney

17   or counsel employed by the parties hereto, or

18   financially interested in this action.

19             I certify that the attached transcript

20   meets the requirements set forth within article

21   twenty-seven, chapter forty-seven of the West

22   Virginia.

23             [OFFICIAL SEAL / NOTARY PUBLIC / STATE OF WEST VIRGINIA / Nicole Montagano / Sargent's Court Reporting Service, Inc. / HUB Business Center Suites / Martinsburg WV 25401 / My Commission Expires November 26, 2026]

24                             Nicole Montagano,

25                             Court Reporter