# Exhibit 8

1           IN THE UNITED STATES DISTRICT COURT

2        FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA

3                *    *    *    *    *    *

4   B.P.J., by her next friend and    *

5   mother, HEATHER JACKSON,          *

6       Plaintiffs                    * Case No.

7       vs.                           * 2:21-CV-00316

8   WEST VIRGINIA STATE BOARD OF      *

9   EDUCATION, HARRISON COUNTY BOARD OF*

10  EDUCATION, WEST VIRGINIA SECONDARY *

11  SCHOOL ACTIVITIES COMMISSION, W.   *

12  CLAYTON BURCH in his official      *

13  capacity as State Superintendent,  *

14  and DORA STUTLER in her official   *

15  capacity as Harrison County        *

16  Superintendent, PATRICK MORRISEY in*

17

18              VIDEOTAPED DEPOSITION OF

19               JOSHUA SAFER, M.D.

20               March 24, 2022

21

22       Any reproduction of this transcript

23        is prohibited without authorization

24           by the certifying agency.

1   his official capacity as Attorney   *

2   General, and THE STATE OF WEST      *

3   VIRGINIA,                           *

4       Defendants                      *

5                       *   *   *   *   *   *

6

7                   VIDEOTAPED DEPOSITION OF

8                    JOSHUA SAFER, M.D.

9                     March 24, 2022

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

1                    VIDEOTAPED DEPOSITION

2                           OF

3     JOSHUA SAFER, M.D., taken on behalf of the Intervenor

4     herein, pursuant to the Rules of Civil Procedure, taken

5     before me, the undersigned, Nicole Montagano, a Court

6     Reporter and Notary Public in and for the Commonwealth

7     of Pennsylvania, taken via videoconference, on

8     Wednesday, March 24, 2022 at 9:30 a.m.

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

```
 1                    A P P E A R A N C E S

 2

 3    JOSHUA BLOCK, ESQUIRE

 4    American Civil Liberties Union Foundation

 5    125 Broad Street

 6    New York, NY  10004

 7    COUNSEL FOR PLAINTIFF

 8

 9    KATHLEEN R. HARTNETT, ESQUIRE

10    ANDREW BARR, ESQUIRE

11    JULIE VEROFF, ESQUIRE

12    ZOE HELSTROM, ESQUIRE

13    KATELYN KANG, ESQUIRE

14    Cooley, LLP

15    3 Embarcadero Center

16    20th Floor

17    San Francisco, CA  94111-4004

18        COUNSELS FOR PLAINTIFF

19

20

21

22

23

24
```

```
 1              A P P E A R A N C E S (cont'd)

 2

 3   SRUTI SWAMINATHAN, ESQUIRE

 4   Lambda Legal

 5   120 Wall Street

 6   19th Floor

 7   New York, NY  10005-3919

 8        COUNSEL FOR PLAINTIFF

 9

10   DAVID TRYON, ESQUIRE

11   State Capitol Complex

12   Building 1, Room E-26

13   Charleston, WV  25305

14        COUNSEL FOR STATE OF WEST VIRGINIA

15

16   ROBERTA F. GREEN, ESQUIRE

17   Shuman McCuskey Slicer, PLLC

18   1411 Virginia Street East

19   Suite 200

20   Charleston, WV  25301

21        COUNSEL FOR WEST VIRGINIA SECONDARY SCHOOL

22        ACTIVITIES COMMISSION

23

24
```

1                    A P P E A R A N C E S (cont'd)

2

3    SUSAN DENIKER, ESQUIRE

4    Steptoe & Johnson

5    400 White Oaks Boulevard

6    Bridgeport, WV  26330

7         COUNSEL FOR HARRISON COUNTY BOARD OF EDUCATION and

8         HARRISON COUNTY SUPERINTENDENT DORA STUTLER

9

10   KELLY C. MORGAN, ESQUIRE

11   Bailey Wyant

12   500 Virginia Street East

13   Suite 600

14   Charleston, WV  25301

15        COUNSEL FOR WEST VIRGINIA BOARD OF EDUCATION and

16        SUPERINTENDANT W. CLAYTON BURCH

17

18

19

20

21

22

23

24

```
 1                A P P E A R A N C E S (cont'd)

 2

 3   ROGER BROOKS, ESQUIRE

 4   LAURENCE WILKINSON, ESQUIRE

 5   CHRISTIANA HOLCOMB, ESQUIRE

 6   JOHNATHAN SCRUGGS, ESQUIRE

 7   Alliance Defending Freedom

 8   15100 North 90th Street

 9   Scottsdale, AZ  85260

10       COUNSEL FOR INTERVENOR, LAINEY ARMISTEAD

11

12

13

14

15

16

17

18

19

20

21

22

23

24
```

```
1                    I N D E X

2

3  DISCUSSION AMONG PARTIES                    12 - 14

4  WITNESS: JOSHUA SAFER, M.D.

5  EXAMINATION

6     By Attorney Brooks                       14 - 252

7  EXAMINATION

8     By Attorney Tryon                       253 - 288

9  DISCUSSION AMONG PARTIES                   288 - 289

10 CERTIFICATE                                      290
```

EXHIBIT PAGE

| NUMBER | IDENTIFICATION | PAGE IDENTIFIED |
|---|---|---|
| 1 | Report of Dr. Safer | 15 |
| 2 | Rebuttal Report of Dr. Safer | 15 |
| 3 | Fairness for Transgender People in Sport Article | 16 |
| 4 | Professor Handelsman Article | 43 |
| 5 | Court of Arbitration for Sport Decision | 63 |
| 6 | 5/10/21 Declartion of Dr. Safer | 75 |
| 7 | Transgender Women in a Female Category Of Sport | 99 |
| 8 | Endocrine Society Guidelines | 113 |
| 9 | Care of the Transgender Patient Article | 127 |
| 10 | Roberts, et al. Article | 133 |
| 11 | Race Times for Transgender Athletes Article | 142 |
| 12 | Joanna Harper Article | 145 |
| 13 | Dr. Roberts Article | 156 |
| 14 | Guidance With Transgender Inclusion in Domestic Sport | 161 |
| 15 | Dr. Safer Article | 183 |

1                          <u>EXHIBIT PAGE</u>

2

3                                                          <u>PAGE</u>

4     <u>NUMBER</u>    <u>IDENTIFICATION</u>                    <u>IDENTIFIED</u>

5     16        Aruna Sawaswat Article                  216

6     17        2005 Paper by Professor Heino

7               Meyer-Bahlburg                           225

8     18        Paper by Doctor Reiner                   234

9     19        Article                                  259

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

```
 1                        OBJECTION PAGE

 2

 3   ATTORNEY                                        PAGE

 4   Block     16, 17, 18, 19, 19, 20, 22, 23, 24, 24, 26, 27,

 5   28, 29, 30, 30, 31, 33, 34, 36, 36, 36, 37, 37, 38, 38,

 6   39, 41, 42, 42, 43, 43, 46, 46, 46, 47, 48, 48, 49, 50,

 7   52, 53, 54, 55, 55, 56, 57, 59, 60, 63, 65, 66, 67, 68,

 8   68, 70, 70, 72, 75, 79, 80, 81, 82, 82, 83, 83, 83, 84,

 9   84, 85, 85, 86, 86, 87, 89, 90, 91, 91, 92, 93, 93, 95.

10   95, 96, 97, 98, 101, 102, 102, 103, 103, 105, 105, 106,

11   107, 107, 108, 108, 109, 109, 110, 112, 115, 116, 118,

12   120, 123, 123, 124, 125, 126, 130, 132, 133, 134, 134,

13   136, 136, 137, 142, 144, 148, 148, 149, 150, 151, 152,

14   153, 154, 155, 156, 157, 158, 158, 160, 160, 161, 163,

15   165, 166, 167, 168, 169, 170, 170, 172, 172, 173, 173,

16   174, 174, 174, 175, 175, 176, 176, 177, 178, 180, 181,

17   183, 185, 187, 187, 188, 188, 183, 193, 195, 196, 197,

18   197, 198, 200, 200, 201, 202, 204, 205, 205, 207, 215,

19   215, 219, 222, 224, 231, 240, 244, 246, 254, 255, 255,

20   256, 257, 260, 261, 261, 262, 262, 263, 263, 264, 265,

21   268, 268, 270, 270, 271, 271, 273, 274, 275, 275, 277,

22   278, 279, 280, 280, 281, 283, 284, 285

23

24   Brooks                                         213
```

```
 1                    S T I P U L A T I O N
 2    ----------------------------------------------------------
 3    (It is hereby stipulated and agreed by and between
 4    counsel for the respective parties that reading,
 5    signing, sealing, certification and filing are not not
 6    waived.)
 7    ----------------------------------------------------------
 8                    P R O C E E D I N G S
 9    ----------------------------------------------------------
10               MR. BABWAH:  My name is Brandon Babwah.
11    I'm a notary public out of the State of New York.
12               VIDEOGRAPHER:  We are now on the record.
13    My name is Jacob Stock.  I'm a Certified Legal Video
14    Specialist employed by Sargent's Court Reporting
15    Services.  The date today is March 24th, 2022.  The
16    current time on the video monitor reads 9:17 a.m.
17    Eastern Standard Time.  This deposition is taken
18    remotely by videoconference.  The caption of this case
19    is the United States District Court for the Southern
20    District of West Virginia at Charleston, BPJ, et al.
21    versus West Virginia State of Board of Education, et
22    al., Civil Action No. 2:21-cv-00316.  The name of the
23    witness is Joshua Safer.  Will the attorneys present
24    state their names and the parties they represent?
```

1          ATTORNEY BROOKS:  Roger Brooks for the

2    Intervenor, Lainey Armistead, in the room --- in the

3    conference room with the witness.  With me is my

4    colleague, Lawrence Wilkerson.

5          ATTORNEY HOLCOMB:  Christiana Holcomb for

6    the Intervenor.

7          ATTORNEY TRYON:  This is David Tryon

8    representing the State of West Virginia.  I'm with the

9    Attorney General's Office.

10          ATTORNEY MORGAN:  This is Kelly Morgan on

11    behalf of the West Virginia Board of Education and

12    Superintendent Burch.

13          ATTORNEY DENIKER:  Good morning.  Susan

14    Deniker representing Harrison County Board of Education

15    and Superintendent Dora Stutler.

16          ATTORNEY GREEN:  Roberta Green here on

17    behalf of West Virginia Secondary School Activities

18    Commission.

19          ATTORNEY BLOCK:  For the Plaintiff in the

20    room is Josh Block from the ACLU.

21          ATTORNEY SWAMINATHAN:  And you have Sruti

22    Swaminathan from Lambda Legal.

23          ATTORNEY HARTNETT:  Good morning.  This

24    is Kathleen Hartnett from Cooley for the Plaintiff.

```
 1                    ATTORNEY BARR:  This is Andrew Barr from
 2    Coley for Plaintiff.
 3                    ATTORNEY KANG:  Good morning.  This is
 4    Katelyn Kang from Cooley for the Plaintiff.
 5                    ATTORNEY HELSTROM:  Hello.  This is Zoe
 6    Helstrom from Cooley for Plaintiff.
 7                    VIDEOGRAPHER:  And if that's everyone,
 8    may I ask the notary to swear in the witness?
 9                               ---
10                    JOSHUA SAFER, M.D.,
11    CALLED AS A WITNESS IN THE FOLLOWING PROCEEDING, AND
12    HAVING FIRST BEEN DULY SWORN BY A NOTARY PUBLIC,
13    TESTIFIED AND SAID AS FOLLOWS:
14                               ---
15                    VIDEOGRAPHER:  May I also ask the notary
16    to identify himself for the record as well?
17                    NOTARY:  My name is Brandon Babwah.
18                    VIDEOGRAPHER:  And at this time the
19    notary may be dismissed and we can begin.
20                    ATTORNEY BROOKS:  Thank you.  And thank
21    you all for making all this complicated stuff work.
22                               ---
23                    EXAMINATION
24                               ---
```

1    BY ATTORNEY BROOKS:

2       Q.    Doctor Safer, good morning.  I want to first put

3    in front of you your expert report and your rebuttal

4    report so that you have those if at any point you want

5    to refer to them.  It looks --- for convenience let's

6    mark those as Exhibit 1 and 2 for the deposition.

7                 ATTORNEY TRYON:  Roger, one moment.  I'm

8    looking at the realtime, and it's recording you as

9    Attorney Capehart.  So I don't know if that needs to be

10   corrected now.  And it's showing me as Attorney

11   Hartnett.

12                 ATTORNEY BROOKS:  She will get that fixed

13   and the record will be correct.

14                 ATTORNEY TRYON:  Okay.

15                          ---

16              (Whereupon, Exhibit 1, Report of Dr. Safer,

17              was marked for identification.)

18              (Whereupon, Exhibit 2, Rebuttal Report of

19              Dr. Safer, was marked for identification.)

20                          ---

21                 ATTORNEY BROOKS:  And at the moment I'm

22   handing copies to the witness.  And I would like to mark

23   as Safer Exhibit 3 a short article entitled Fairness for

24   Transgender People in Sport by Joshua Safer.

```
 1              ATTORNEY WILKINSON:  Tab 82.

 2                         ---

 3              (Whereupon, Exhibit 3, Fairness for

 4         Transgender People in Sports Article, was

 5         marked for identification.)

 6                         ---

 7              ATTORNEY BROOKS:  And the court reporter

 8   will hand the stamped copy to the witness; am I correct?

 9   BY ATTORNEY BROOKS:

10     Q.    And Doctor Safer, I will ask you questions if

11   you go about your expert reports but let me ask you now

12   to focus your attention on Exhibit Number 3.  Am I right

13   that this is an article that you have just very recently

14   published?

15     A.    Yes.

16     Q.    When did this come out?

17     A.    This came out within the past few weeks I think.

18     Q.    And this is not a recording of the original

19   research.  This is a two page piece simply explaining

20   current issues to the readership of this journal?

21              ATTORNEY BLOCK:  Objection to form.

22              THE WITNESS:  So this is not original

23   research, that's correct.

24              ATTORNEY BROOKS:  Thank you.
```

1    BY ATTORNEY BROOKS:

2        Q.    How would you describe the purpose of this

3    article?

4        A.    The purpose of this article is to educate

5    endocrinologists, frame the issues and also serves a bit

6    as a charge to endocrinologists in terms of work that

7    needs to be done.

8        Q.    Thank you.  If you look at the first column of

9    the first page, in the third paragraph you will see it

10   begins a possible tension exists because of the

11   observation that on average cisgender boys and men have

12   better performance outcomes in athletics than do

13   cisgender girls and women.  Do you see that language?

14       A.    I do.

15       Q.    And you are referring there to the general

16   observation that natal males have better average

17   athletic performance than natal females in a variety of

18   measures.

19           Correct?

20                ATTORNEY BLOCK:  Objection to form.

21                THE WITNESS:  So I guess I need to be

22   more specific or I can clarify.

23   BY ATTORNEY BROOKS:

24       Q.    If you would be more specific.

1    A.    So cisgender men at a certain age have better

2    sports outcomes than cisgender women.

3    Q.    But you wrote in this just published article

4    that cisgender boys and men have better performance

5    outcomes than the cisgender girls and women.

6         Correct?

7    A.    That is correct.

8    Q.    And what did you mean in that statement by your

9    reference to boys and girls?

10   A.    Boys and girls who are basically --- it depends,

11   it's context I guess.  So boys and girls who are

12   developed to that point.

13   Q.    So those --- what you had in mind are boys and

14   girls, once the puberty process begins in males in

15   particular?

16                ATTORNEY BLOCK:  Objection to form.

17                THE WITNESS:  Yes, I guess I would say

18   that what we know is what is towards the end of puberty

19   and subsequent development beyond puberty.

20   BY ATTORNEY BROOKS:

21   Q.    You say in the next sentence --- well, let me

22   just clarify, you accept as a scientific fact the

23   general observation that, on average, boys and men,

24   defining boys as you just did, have significantly

```
 1   stronger athletic performance in a variety of metrics

 2   than girls and women as you just defined girls; correct?

 3                     ATTORNEY BLOCK:  Objection to form.

 4                     THE WITNESS:  So I guess how I would say

 5   that is I accept as fact that men and boys who are

 6   appropriately developed have, yeah, have bad performance

 7   outcomes in certain sports than do cisgender women and

 8   cisgender girls again appropriately developed.

 9   BY ATTORNEY BROOKS:

10      Q.    And the next sentence reads the performance

11   difference has resulted in the establishment of female

12   only divisions for sport participation for girls and

13   women and safely compete in the live events, closed

14   quote.  Do you see that language?

15      A.    I do.

16      Q.    And there you were, am I correct, explaining the

17   relationship of your observation about male performance

18   with the existence in our society of sex-separated

19   sports.

20                Correct?

21                     ATTORNEY BLOCK:  Objection to form.

22                     THE WITNESS:  So I guess --- I would

23   think the way I would say it myself is this is a ---

24   this is the reason why we have the carve-out for the
```

```
 1    female category.
 2    BY ATTORNEY BROOKS:
 3        Q.    And one reason is to give cisgender girls and
 4    women an opportunity to, quote, reliably win events.
 5              Correct?
 6                    ATTORNEY BLOCK:  Objection.
 7                    COURT REPORTER:  I'm sorry, Counsel, I
 8    can't hear you.
 9    BY ATTORNEY BROOKS:
10        Q.    One reason, according to what you've written in
11    this article, that there have been a carve-out in a
12    separate female division is to provide girls and women
13    with opportunities to, quote, reliably win events,
14    closed quote.
15              Correct?
16        A.    So I guess the way I would say it is if we are
17    going to be really careful with the language here that
18    it would be on average to reliably win events, that is
19    --- yeah, I will leave it at that.
20        Q.    Certainly not every girl and women is going to
21    win events, as I know as a male who never won an event?
22        A.    Exactly.
23        Q.    And another reason, according to this sentence
24    that you wrote, for having a separate category for girls
```

1    and women is so that they can, quote, safely compete.

2           Correct?

3    A.    The word safely in that context is kind of ---

4    accentuates reliably.

5    Q.    And you wrote in the next sentence that, quote,

6    the female-only divisions are a major factor to

7    encourage greater participation of girls and women in

8    sports with a goal of equal participation rates.

9           Do you see that language?

10   A.    I do.

11   Q.    And can you explain to me what you understand or

12   what you were trying to explain as the relationship

13   between having a separate female category on the one

14   hand and encouraging greater participation by women and

15   girls on the other?

16   A.    Some of the goals of the people who are in sport

17   who organize sport are to get as high fractions of the

18   population to participate as can be encouraged to do so

19   for sheer health of those individuals and then of

20   everybody.  And so the purpose of the carve-out then in

21   these circumstances is to encourage girls and women to

22   participate in larger numbers than they might otherwise.

23   Q.    And do you have an opinion, do you have an

24   expert opinion as to whether the existence of separate

1    categories for female sports has in fact been a, quote,

2    major factor in encouraging greater participation by

3    women and girls in sport?

4        A.    I don't have an expert opinion.

5        Q.    You don't know whether that is objectively true

6    or not?

7                        ATTORNEY BLOCK:  Objection to form.

8                        THE WITNESS:  I don't --- right, I can't

9    state as an expert on the details of that subject,

10   that's right.

11   BY ATTORNEY BROOKS:

12       Q.    On the second column, in the --- the first full

13   sentence begins many hormone related.  Do you see that?

14       A.    Yes, I do.

15       Q.    Let me read that sentence into the record.

16   Quote, many hormone-related physical characteristics

17   acquired during puberty are not reversed if hormone

18   levels are changed later in life.  Can you tell us what

19   physical characteristics associated with typical male

20   development are in your opinion not reversed if hormone

21   levels are changed later in life?

22       A.    Again, so I don't know that I would off the top

23   of my head give an exhaustive list but a classic would

24   be height.

1    Q.    Would you --- I understand your list may not be

2    exhaustive, but let me ask you to tell us all the

3    examples as you're able to sit here thinking today of

4    physical characteristics acquired during male puberty

5    that are not reversed if hormone levels are changed

6    later in life.

7                    ATTORNEY BLOCK:  Objection to form.

8                    THE WITNESS:  I don't know that I could

9    --- I don't know that I would want to accidentally go

10   down that path and conjecture too much, but if I'm

11   expanding a bit on height and thinking about bone

12   characteristics, especially there might be modest change

13   but significant residual bone would be the biggest

14   example.  And some other elements --- I can't even say I

15   was about to say a bit proportional, but it's more

16   complicated than that, so other --- other tissues partly

17   influenced by that fact.

18   BY ATTORNEY BROOKS:

19   Q.    If we jump down to the next paragraph it begins,

20   quote, the questions arise most with transgender women

21   who began hormone treatment after puberty.  And then it

22   continues, quote, the situation includes most

23   transfeminine people because it is most common to

24   undergo endogenous puberty prior to seeking medical

1    interventions appropriate to gender identity.  Have I

2    read that correctly?

3        A.    Yes.

4        Q.    And is it consistent with your experience that

5    most natal males who seek what you refer to as gender

6    confirming treatment do so after experiencing at least

7    most of the ordinary male puberty?

8                    ATTORNEY BLOCK:  Objection to form.

9                    THE WITNESS:  Yes.  So just terminology,

10   just to be clear, so people who are recorded male at

11   birth who are looking for gender affirming is the term

12   but gender confirming is fine.  And sorry, the question

13   there?

14   BY ATTORNEY BROOKS:

15       Q.    I will ask it again.  Is it consistent with your

16   personal experience that most natal males who seek

17   gender affirming treatment present after undergoing at

18   least most of a natural male puberty?

19                   ATTORNEY BLOCK:  Same objection to

20   terminology.

21                   THE WITNESS:  Yes.  So most transgender

22   women who come seeking medical treatment have gone

23   through a typical male puberty, that is correct, right

24   now.

1    BY ATTORNEY BROOKS:

2       Q.    And in your clinic most of them have gone

3    through what you would consider to be a complete male

4    puberty process?

5       A.    I can't answer that completely because we define

6    puberty in this narrow way with the Tanner stages, but

7    then people continue to have development even beyond

8    that to a significant degree.

9       Q.    But they have experienced, in your professional

10   experience, at least the bulk of the pubertal changes?

11      A.    Yes, I mean the --- I guess --- the way I would

12   say it is, is that most of the transgender women who are

13   coming or even girls who are coming for medical

14   attention have gone through the classic Tanner stages of

15   puberty through Tanner five, which is the last one, by

16   the time they have determined that they're interested in

17   gender-affirming treatment, yes.

18      Q.    And let's go back to the very first paragraph of

19   your article in which you mention about five lines down,

20   quote, concern for possible residual athletic advantages

21   from a history of typical male puberty, closed quote.

22   Do you see that language?

23      A.    Let me find it.  Where is it?

24      Q.    It's about five lines down on the very first

1    paragraph of the article.

2        A.    Oh, the middle of the sentence, exactly.

3        Q.    And so in your opinion, it is concern for

4    possible residual athletic advantages from a history of

5    typical male puberty that drives a great deal of concern

6    about how to address inclusion of natal males who

7    experience a female gender identity in female athletics.

8            Am I correct?

9                ATTORNEY BLOCK:   Objection to form.

10                THE WITNESS:   So the concern about the

11   residual impact of testosterone during puberty for

12   transgender women who went through a typical male

13   puberty is the source of --- right, is a source of

14   tension at a medical sensitive level, yes.

15   BY ATTORNEY BROOKS:

16       Q.    And that's an issue that, for instance, you

17   engage in extensive discussions about in connection with

18   your service on the committee for the IAAF.

19            Am I correct?

20       A.    So the --- right, the conversation at World

21   Athletics now, but formerly IAAF, has dealt and I'm sure

22   will continue to deal with that which is the question of

23   to what degree are some of those characteristics, a

24   cause for relevant athletic advantage.

1    Q.    And in your opinion, concern about possible
2    residual athletic advantages resulting from a history of
3    typical male puberty is legitimate concern.
4            Right?
5                    ATTORNEY BLOCK:  Objection to form.
6                    THE WITNESS:  Right.  I don't know that
7    I'm as an expert commenting on its legitimacy.  My role
8    on the committee is talking about what is.
9    BY ATTORNEY BROOKS:
10   Q.    Do you have any expert opinion as to whether
11   concern for possible residual athletic advantages from a
12   history of typical male puberty is a legitimate concern?
13   A.    I'm sorry.  Say that again.
14   Q.    Do you have any expert opinion as to whether
15   concern for possible residual athletic advantage from a
16   history of a typical male puberty is a legitimate
17   concern?
18   A.    I don't know that I would --- again, I don't
19   know that I'm an expert on what is legitimate or not.  I
20   come into the room as the scientist talking about what
21   is true and what is not true, what do we know and what
22   do we not know.
23   Q.    So on the question then after the science has
24   been put on the table as to how to balance that with

1    other considerations of fairness, of inclusion, that is

2    not your expertise is what you are telling me?

3        A.    That is right, that is not my expertise.

4        Q.    If we go to page two, in the first column, the

5    second full paragraph begins because testosterone.  Do

6    you see that paragraph?

7        A.    I do.

8        Q.    And you discuss there World Athletic

9    requirements, that is the former IAAF I believe you just

10   testified?

11       A.    Yes.

12       Q.    And the World Athletics has adopted a

13   requirement to suppress testerone (sic) to five

14   nanomolar per liter testosterone.

15             Correct?

16       A.    World Athletics threshold is five nanomolar per

17   liter for those sports where they have a threshold.

18   That's right, yes.

19       Q.    And at least formally the International Olympic

20   Committee had a ten nanomolar threshold as part of what

21   you would call out in this paragraph.

22             Is that correct?

23             ATTORNEY BLOCK:  Objection to form.

24             THE WITNESS:  Yes.  So it was the case

1    that the International Olympic Committee Medical Group

2    was trying to form a unified approach just for purposes

3    of organization.  And at that time a ten nanomolar per

4    liter suggestion was put out.  And that is about as far

5    as it got because it then was shifted to all of the

6    individual international federations.

7    BY ATTORNEY BROOKS:

8       Q.    You say in the final sentence of that paragraph,

9    quote, such thresholds are considered to be fair to

10   transgender women because they are well above the 1.7

11   nanomolar per liter target testosterone threshold in

12   medical treatment guidelines, closed quote.

13          Do you see that language?

14      A.    Yes.

15      Q.    Am I correct that in your professional

16   understanding the 1.7 nanomolar per liter target is set

17   because that's generally believed to be at the upper

18   range of testosterone levels in normal, healthy females?

19                  ATTORNEY BLOCK:  Objection to form.

20                  THE WITNESS:  So the 1.7 nanomolar per

21   liter target is the upper level for adults cisgender

22   women.

23   BY ATTORNEY BROOKS:

24      Q.    And with that clarified, can you explain to me

```
 1    what you meant by the sentence that I just read, what
 2    the point is there?
 3        A.    The point of the sentence is to --- I guess
 4    there are a couple of considerations in terms of
 5    determining these numbers, but --- so part of the point
 6    is to identify numbers that are feasible for transgender
 7    women on their medical treatment.
 8        Q.    Is there some other point to this sentence in
 9    your understanding as it is offered?
10                  ATTORNEY BLOCK:  Objection to form.
11                  THE WITNESS:  So the sentence references
12    that piece, but there is the additional context of
13    having a number that is fair to the greater female
14    committee cisgender and transgender too.
15    BY ATTORNEY BROOKS:
16        Q.    So it's fair in your judgment to transgender
17    women because the threshold that is being set gives,
18    what should we say, plenty of buffer above what is
19    considered to be the upper range of normal female
20    testosterone levels?
21                  ATTORNEY BLOCK:  Objection to form.
22                  THE WITNESS:  Right.  So I'm not taking a
23    position on what is fair to be clear.
24    BY ATTORNEY BROOKS:
```

1      Q.     Thank you.

2      A.     But the concept of those in the room making that

3  distinction felt that this cutoff would be fair because

4  there would be, indeed, create some buffer and,

5  therefore, people who weren't perfectly at goal would

6  still be included.

7      Q.     So because this may be important, let me

8  clarify, when you wrote such thresholds are considered

9  to be fair, you were not offering a personal opinion

10  about fairness but explaining the judgment that had been

11  made by this committee about fairness?

12      A.     That's correct.

13      Q.     Thank you.  And did it cause you personally any

14  concern that the threshold --- that because the

15  threshold that was set was more than three times higher

16  than the upper bounds of testosterone concentrations in

17  normal healthy women, that that might be unfair to the

18  broader population of cisgender women?

19              ATTORNEY BLOCK:  Objection to form.

20              THE WITNESS:  So to be clear, I'm not

21  rendering an opinion as an expert on what is fair, but I

22  can interpret the considerations of people having these

23  conversations.  And so while it is true that the

24  laboratory range for testosterone for healthy cisgender

1    women has an upper limit of 1.7 nanomolar per liter,

2    there are cisgender women who, for a variety of reasons,

3    have numbers higher than that and so that and --- so

4    that is part of the consideration.

5    BY ATTORNEY BROOKS:

6        Q.    Let me take you to the two paragraphs below that

7    to the paragraph that begins the societal priorities.

8    Do you see that paragraph?

9        A.    I do.

10       Q.    The last sentence of that paragraph reads if

11   advantage from testosterone is demonstrated, does

12   society want to implement rules that may indirectly

13   coerce transgender children to begin medical regimens

14   prior to their being ready and that they might never

15   actually choose otherwise, closed quote.

16            Do you see that language?

17       A.    I do.

18       Q.    Would you explain to me the concern that you are

19   expressing there?

20       A.    If a societal goal --- and again here recognize

21   I'm not acting as an expert in this space, but I'm

22   trying to explain to my colleagues what people are

23   discussing.  And if our concern is increased

24   participation in sport by various people, then you can

1   envision a circumstance where some girls farther along

2   in puberty have a testosterone advantage that could be

3   demonstrated.  Again, not that we even have at this

4   point.  And then we would be faced with that question,

5   which is that competing goal of making those transgender

6   girls participate in sports and a recognition if they

7   are sufficiently far along in their development that

8   they may have an advantage if we demonstrate such an

9   advantage.

10      Q.    Let me see if I can break that out.  Were you

11   talking here about a concern about a hypothetical rule

12   that says to a natal male who identifies as female that

13   you may play if you have suppressed testosterone --- you

14   may play if you have taken puberty blockers at an early

15   age but you may not play if you have not taken puberty

16   blockers from an early stage?  Is that the hypothetical

17   structure that you were addressing in this sentence?

18                    ATTORNEY BLOCK:  Objection to form.

19                    THE WITNESS:  So the --- it is a

20   hypothetical and it would be that if we make a specific

21   testosterone lowering rule at a scholastic level, might

22   we run into a circumstance where we are encouraging

23   somebody to make medication who might not otherwise take

24   that medication.

```
 1   BY ATTORNEY BROOKS:

 2      Q.    And staying away from questions of fairness and

 3   speaking from what I think is a medical ethics

 4   perspective, would you think it raises ethical problems

 5   if society were to adopt a rule that permitted certain

 6   individuals to compete in female athletics if they had

 7   taken puberty blockers but did not permit them to

 8   compete with the athletic if they had not taken puberty

 9   blockers?

10                    ATTORNEY BLOCK:  Objection to form.

11                    THE WITNESS:  I think that's beyond where

12   I'm commenting as an expert witness.  Some of that

13   decision is a society decision or for other experts.

14   BY ATTORNEY BROOKS:

15      Q.    Do you consider yourself to have some expertise

16   on medical ethics?

17      A.    Not as an expert.

18      Q.    And you don't feel able --- you don't have any

19   opinion as you sit here today as to whether a policy

20   that created incentives for children to begin medical

21   regimes relating to gender transition could raise

22   medical ethical concerns?

23      A.    Not as a medical expert, that's right.

24      Q.    In the next paragraph --- and I think we said
```

1    this is just out in the last couple of weeks, this

2    publication.

3           Right?

4       A.   It's very fresh.  Number five, so yes.

5       Q.   I'm not playing memory games.  It says at the

6    top advance access publication 17 March 2022?

7       A.   Good.

8       Q.   So very recent?

9       A.   Yes.

10      Q.   And you believe you are reasonably current in

11   the science of this area?

12      A.   I am reasonably current, indeed.

13      Q.   I didn't ask if you know it all because nobody

14   knows it all, but you say at the beginning of this

15   paragraph much remains unknown scientifically.  And you

16   continue, quote, for example, at what point in puberty

17   is advantage from testosterone significant.  Is there a

18   point where such advantage would outweigh a priority to

19   outweigh all participants --- all to participate in

20   sport of some sort, closed quote.

21           Do you see that language?

22      A.   I do.

23      Q.   And actually the point in writing the second

24   sentence there --- strike that.

1          Let me just ask this in general.  Do you have

2    an opinion as to how much of a performance advantage

3    would count for those --- for natal males versus natal

4    females, how much of a performance advantage would be,

5    quote, significant?

6                    ATTORNEY BLOCK:  Objection to form.

7                    THE WITNESS:  I do not have an opinion.

8    BY ATTORNEY BROOKS:

9       Q.    And in your view, is that even a scientific

10   question?

11                   ATTORNEY BLOCK:  Objection to form.

12                   THE WITNESS:  Let me think.  No, that

13   isn't a scientific question.

14   BY ATTORNEY BROOKS:

15      Q.    And you --- and the next sentence is there a

16   point where an advantage, such an advantage would

17   outweigh a priority to motivate all to participate.  Am

18   I correct that you also don't consider that to be a

19   scientific question?

20      A.    That is correct.

21      Q.    That is a value judgment?

22                   ATTORNEY BLOCK:  Objection to form.

23                   THE WITNESS:  So it's not a scientific

24   question.  I can go a little more in --- I can expand a

1    little bit there which is to say that we have various

2    advantages and degrees of unfairness.  So what could be

3    a scientific question, if we knew the answers, would

4    include the degree of advantage for some circumstance

5    versus another circumstance where we are able to measure

6    those things.

7    BY ATTORNEY BROOKS:

8       Q.    But the question of whether an advantage on the

9    one hand outweighs a desire to be inclusive on the other

10    hand is a value question, not a scientific question?

11             ATTORNEY BLOCK:  Objection to form.

12    BY ATTORNEY BROOKS:

13       Q.    In your opinion.

14             ATTORNEY BLOCK:  Objection to form.

15             THE WITNESS:  So I guess I would just go

16    back to saying how I said it, which is the scientific

17    question in there would be to provide that degree of

18    difference and show, for example, that this would be ---

19    this is small advantages versus someone that we are

20    already do in society as big advantage and that would be

21    how --- that would be the role of the scientist.

22    BY ATTORNEY BROOKS:

23       Q.    I understand that's what you would like to say,

24    but my question for you is, in your opinion, is the next

1    step of deciding of whether that advantage which has now

2    been scientifically detailed outweighs a priority to

3    motivate all to participate is a value decision.

4                    ATTORNEY BLOCK:  Objection to form.

5                    THE WITNESS:  Yeah, I don't --- I guess I

6    can't as an expert say for certain that in all

7    circumstances that is a value to consider.

8    BY ATTORNEY BROOKS:

9        Q.    You continue among your lists of things that

10   are, quote, unknown scientifically, quote, for those who

11   have completed puberty, what duration of

12   testosterone-lowering treatment is sufficient to create

13   a level playing field in a given sport, closed quote.

14           Do you see that?

15       A.    Yes.

16       Q.    And in your view, the question of what duration

17   of testosterone lowering treatment, if any, can be

18   sufficient to create a level playing field in a given

19   sport is currently unknown scientifically?

20                   ATTORNEY BLOCK:  Objection to form.

21                   THE WITNESS:  It's unknown scientifically

22   across virtually all sports.  What duration of

23   testosterone lowering raises what degree of advantage.

24   It's just at that level.  To go to the level playing

1    field is a whole further tier.

2    BY ATTORNEY BROOKS:

3       Q.    And in your final paragraph I think you said at

4    the beginning that, in part, this was a call to the

5    field of endocrinology for needed research.  In the

6    final paragraph you say, quote, we in the endocrine

7    healthcare community have much work to do to create an

8    evidence base to help guide decision makers so the

9    choices for transgender women in sport are data driven,

10   closed quote.

11           Have I read that language correctly?

12      A.    Yes.

13      Q.    So it's your view as of 2002 that the data that

14   we have available today are insufficient to enable data

15   driven choices about transgender participation in female

16   athletics.

17           Correct?

18               ATTORNEY BLOCK:  Objection to form.

19               THE WITNESS:  I would say that in 2022 we

20   have insufficient data to --- how would I say this, we

21   have insufficient data to make rules for, let's say,

22   transgender women, mostly talking about older more

23   developed people, that would address these concerns for

24   participation.

1  <u>BY ATTORNEY BROOKS</u>:

2      Q.    Let me ask you to find your initial expert

3  report, which is Exhibit-1, and there I will ask you to

4  turn to paragraph 58.  At the beginning of paragraph 58

5  you wrote in this report executed on January 21, 2022,

6  which is two months prior to the publication date of the

7  article we just looked at --- and actually, let me pause

8  and ask you, when did you write the article that we just

9  looked at?  And the process always grinds on for a

10  little while.  When do you think you substantially

11  completed the task?

12      A.    I honestly don't remember.

13      Q.    Sorry.  The question was when do you think you

14  substantially wrote the text in the article that you

15  just looked at?

16      A.    I honestly don't remember the details.  We can

17  talk in years, so it would be 2022 and back into 2021.

18      Q.    Okay.

19            So about the same time that you were preparing

20  this expert report?

21      A.    There certainly would be some overlap.

22      Q.    You wrote in paragraph 58, quote, even if

23  evidence were eventually to show that on average

24  transgender women have some level of advantage compared

1    to average non-transgender women, closed quote.

2            Do you see that language?

3    A.    I do.

4    Q.    Now, in fact, you are aware of substantial

5    evidence that, on average, transgender women do have

6    some level of advantage compared to advantage

7    non-transgender women.

8            Correct?

9                    ATTORNEY BLOCK:  Objection to form.

10                   THE WITNESS:  No, I'm not.  So that isn't

11   my statement.

12   BY ATTORNEY BROOKS:

13   Q.    And is the question --- so you served on the

14   IAAF Committee discussing questions of testosterone

15   levels.  And in that context you did not become

16   acquainted with data showing that on average transgender

17   women have some level of advantage compared to average

18   non-transgender women?

19   A.    Not in --- so, no.  In the context of specific

20   sports, no.

21   Q.    Do you consider the question of how much

22   advantage natal males have over natal females in

23   particular sports to be within your professional

24   expertise?

1          ATTORNEY BLOCK:  Objection to form.

2          THE WITNESS:  So sorry --- so cisgender

3   men versus cisgender women, that difference at an adult

4   level, is at my expertise to know that degree of

5   difference?  Is that the question?

6   BY ATTORNEY BROOKS:

7      Q.    It is.

8      A.    No, that is not my expertise.

9      Q.    And is it within your expertise to know the

10  level of advantage enjoyed by natal males who have

11  transitioned to female gender identity over cisgender

12  women in any particular sport?

13          ATTORNEY BLOCK:  Objection to form.

14          THE WITNESS:  So in the --- so if we are

15  talking cisgender women versus transgender women, it

16  would be in my expertise to know what data we have on

17  this subject, which is different from knowing the degree

18  of difference because we don't have those data.

19  BY ATTORNEY BROOKS:

20     Q.    You say in paragraph 60, let me find this,

21  quote, there is no inherent reason why transgender women

22  physiological characteristics related to athletic

23  performance should be treated as any more of an unfair

24  advantage than the advantages that already exist among

1    different women athletes.  Do you see that language?

2       A.    I do.

3       Q.    Now, earlier you told me rather emphatically

4    that the question of fairness is outside your

5    professional expertise.

6            Correct?

7                    ATTORNEY BLOCK:  Objection to form.

8                    THE WITNESS:  It is outside my expertise.

9    BY ATTORNEY BROOKS:

10      Q.    So why did you offer here an opinion about what

11   is fair or unfair?

12                   ATTORNEY BLOCK:  Objection to form.

13                   THE WITNESS:  Right.  So I'm not

14   determining the fairness per se as an expert, but I'm

15   simply talking about the inputs where somebody who is

16   determining what is fair --- where somebody is

17   determining what is fair would consider.

18                   ATTORNEY BROOKS:  Let me mark as Safer

19   Exhibit 4 an article by Professor Handelsman entitled

20   Circulating Testosterone on a Hormonal Basis of Sex

21   Differences in Athletic Performance.

22                              ---

23                   (Whereupon, Exhibit 4, Professor Handelsman

24                    Article, was marked for identification.)

```
1                          ---

2                  ATTORNEY WILKINSON:  Tab 18.

3                  VIDEOGRAPHER:  I'm sorry, what tab is it?

4                  ATTORNEY BROOKS:  Tab 18.

5   BY ATTORNEY BROOKS:

6       Q.   And Doctor Safer, am I correct this is an

7   article that you read with some care?

8       A.   This is an article that I read with some care.

9       Q.   You cited in your expert report.

10           Correct?

11      A.   I think so.

12      Q.   I think so, too.  It's not a memory test.  I

13  retract the question.  We will come to it shortly.

14           Let me ask you to turn in --- and let me ask

15  you, do you know Professor Handelsman personally?

16      A.   I do not.

17      Q.   Have you encountered him in any other actions?

18      A.   I have.

19      Q.   Once, more than once?

20      A.   That is also a trick question for me.  For sure

21  once.

22      Q.   Okay.

23           Do you consider him to have a high reputation

24  in the field?
```

1      A.     If that question is as an expert I can't --- I

2  won't comment, but he certainly has published widely and

3  we quote him.

4      Q.     What do you mean by we in that answer?

5      A.     The rest of us in the field and I certainly

6  quote him in an expert opinion.

7      Q.     All right.

8             And this article in particular we note you

9  widely reference?

10     A.     This article is --- yeah, I think that is

11  actually a fair thing to say.  It is as widely

12  referenced as anything in a relatively small field.

13     Q.     Let me ask you to turn to the second page of

14  this article where Professor Handelsman in the first

15  full paragraph --- the second full paragraph begins

16  nevertheless.  He says, quote, fairness is an elusive

17  subjective concept with malleable boundaries that may

18  change over time as social concepts of fairness evolve.

19            Do you see that?

20     A.     I do.

21     Q.     Do you agree with that statement?

22     A.     As an expert I can't comment.

23     Q.     You don't purport to be able to give any

24  definition of fairness?

```
 1                    ATTORNEY BLOCK:  Objection to form.
 2                    THE WITNESS:  Yes, not as an expert.
 3   BY ATTORNEY BROOKS:
 4      Q.    And you don't have any opinion as to whether
 5   standards of fairness can change over time?
 6                    ATTORNEY BLOCK:  Objection to form.
 7                    THE WITNESS:  I'm aware of the
 8   conversation on the subject, of course, but if you are
 9   asking me to comment as an expert, then no.
10   BY ATTORNEY BROOKS:
11      Q.    If the actual evidence shows that the actual
12   scientific data were to show that, quote, on average
13   transgender women have, closed quote, a very large
14   advantage compared to average non-transgender women,
15   would you then have any view as to whether permitting
16   non-transgender women to compete in female categories is
17   fair?
18                    ATTORNEY BLOCK:  Objection to form.  I'm
19   sorry, what's the quotation?
20   BY ATTORNEY BROOKS:
21      Q.    If actual data were to show that on average
22   transgender women have a very large advantage compared
23   to non-transgender women, then would you have any
24   opinion as to whether it is fair to permit the
```

```
 1    transgender women to compete in the female category?
 2                    ATTORNEY BLOCK:  Objection to form.
 3                    THE WITNESS:  No, that would not change.
 4    I would simply as an expert I would talk about those
 5    degrees of difference as information.
 6    BY ATTORNEY BROOKS:
 7       Q.    But you would offer no opinion as to whether
 8    permitting the participation in the female category was
 9    or was not appropriate?
10       A.    I would not offer an expert opinion.  That's
11    right.
12       Q.    Now, you say in paragraph 60 of your expert
13    record that there is, quote, no inherent why transgender
14    women's physiological characteristics related to
15    athletic performance should be treated as any more of an
16    unfair advantage than the advantages that already exist
17    among different women athletes, close quote.  We have
18    looked at that language.
19             Correct?
20       A.    You are reading that correctly.
21       Q.    Thank you.
22       A.    Whatever the question is.
23       Q.    No question beyond that so far.  And your point
24    I take it is that for any given sport some women just
```

```
 1    have substantially more favorable physiques than others?
 2                    ATTORNEY BLOCK:  Objection to form.
 3                    THE WITNESS:  Right.  So for any given
 4    sport some women have advantages relatively to others,
 5    yes.
 6    BY ATTORNEY BROOKS:
 7       Q.    And in basketball some are simply genetically
 8    going to be substantially taller than others?
 9       A.    In basketball some are taller than others, yes.
10       Q.    I'm not speaking for you, I, at 5'8", in my
11    shoes for instance was --- am just physiologically
12    disadvantaged for basketball compared to a man who is
13    6'10"?
14                    ATTORNEY BLOCK:  Objection to form.
15                    THE WITNESS:  So as an expert I actually
16    wouldn't go there because there are other
17    characteristics in basketball per se.
18    BY ATTORNEY BROOKS:
19       Q.    That's true, although I have none of them.  But
20    is it, in your view, equally true that there is no
21    inherent reason why cisgender men's physiological
22    characteristics related to athletic performance should
23    be treated as any more of an unfair advantage for
24    competing in the women's category than the advantages
```

1    that already exist among different women athletes?

2        A.    So yeah, let's go through this more slowly a

3    second so I'm clear.

4        Q.    All I did was substitute cisgender men for

5    transgender women in that sentence.  And my question is

6    doesn't your argument as stated there apply exactly with

7    equal force to cisgender male?

8        A.    No.

9        Q.    Why is that?

10       A.    When we talk about --- when we're talking about

11   a range of characteristics among a range of people

12   versus something that might be systematically true or

13   not and so it just --- so the answer just ends up being

14   more complex.

15       Q.    Well, you have testified that most natal women

16   --- pardon me, you testified that most natal males with

17   female gender identity have undergone at least the

18   majority of male puberty before they present for gender

19   affirming treatment.

20            Correct?

21            ATTORNEY BLOCK:  Objection to form.

22            THE WITNESS:  So most cisgender women

23   when they come to medical attention have gone through a

24   significant puberty, the five Tanner stages.

BY ATTORNEY BROOKS:

Q.    And just to clarify, to use your terms, in giving that answer you said cisgender women.  That is not what you meant.

Correct?

A.    That is not what I meant, thank you. Transgender women.

Q.    And therefore, they systematically have gone through --- systematically gone through physiologic changes associated with male puberty?

ATTORNEY BLOCK:  Objection to form.

THE WITNESS:  So the --- so they --- they have gone through male puberty.  And there is something on average that may be true there, but whether that relates to an advantage in a specific sport I can't go there.

BY ATTORNEY BROOKS:

Q.    Well, the example that you gave earlier of a systematic difference resulting from male puberty that these transgender women enjoy is height, that is you mentioned that earlier.

Correct?

A.    Uh-huh (yes).

Q.    So again, let me ask, given that according to

1   your testimony and experience the substantial majority

2   of transgender women have undergone most of male

3   puberty, why is it not equally true that there is no

4   inherent reason why cisgender men's physiological

5   characteristics related to athletic performance should

6   be treated as any more of an unfair advantages than the

7   advantages that already exist among different women

8   athletes?

9       A.   So if I'm following this correctly then it's ---

10  then the answer to the question why are cisgender men

11  different than transgender women?

12      Q.   Why does this logic apply differently to the

13  cisgender men than to the transgender women?

14      A.   So let's see.  It actually doesn't.  So if you

15  have a sport where that --- where the advantage or ---

16  for the --- where a known advantage for cisgender men

17  versus cisgender women was sufficiently modest, and

18  again, I wouldn't be the judge of that, but you could

19  envision that becoming a coed sport.

20      Q.   Are you offering an opinion that either

21  government or leagues have an obligation to do an

22  individual by individual assessment as to whether a

23  particular natal male who experiences a female gender

24  identity does or does not enjoy a physiological

1    advantage in the sport they wish to play in as a result

2    of typical male development that they had gone through?

3                        ATTORNEY BLOCK:  Objection to form.

4                        THE WITNESS:  Right, I'm not offering an

5    opinion.  It was a long question.

6    BY ATTORNEY BROOKS:

7        Q.    Would you like to hear the question back?

8        A.    Sure, but I'm not offering an opinion on several

9    aspects.

10                       ATTORNEY BROOKS:  Would you read that

11   question back, please?

12                            ---

13   (COURT REPORTER READS BACK PREVIOUS QUESTION.)

14                            ---

15   BY ATTORNEY BROOKS:

16       Q.    And your answer is?

17       A.    So I'm not offering an opinion.  I should expand

18   a bit because how that question was phrased as an

19   individual by individual person and most of these rules

20   are across a group of sports.

21       Q.    And my question was about an individual person.

22       A.    Your question was an individual person, but ---.

23       Q.    Right.  Looking at your paragraph 60, again, do

24   you believe there is --- are you offering an opinion ---

1   let me start that again.  Are you able to identify for

2   me any inherent reason why a relatively weak or small or

3   slow male --- strike that.

4           You referenced in your report and also the

5   article we just looked at the IAAF regulations that

6   excluded from the female category any individual who has

7   circulating testosterone higher than five nanomolar per

8   liter.  Do you recall that?

9                       ATTORNEY BLOCK:  Objection to form.

10                      THE WITNESS:  So just to clarify, it is

11  not --- that rule for five nanomolars is not across all

12  sports.

13  BY ATTORNEY BROOKS:

14     Q.    And which sports in your recollection did that

15  apply to?

16     A.    Yeah, that's --- I don't remember off the top of

17  my head.

18     Q.    At the very least it applied to track events.

19           Correct?

20     A.    It does.  But if you start to quiz me on the

21  specific distances, I won't get that.

22     Q.    And nor will I so quiz you.  And that

23  requirement as applied to track competition was, in

24  fact, the subject of a major international arbitration,

1    as you're aware.

2            Correct?

3        A.    If we're referencing the Caster Semenya case,

4    yes.

5        Q.    Did you yourself have any participation in that

6    arbitration?

7        A.    I did not.

8        Q.    Do you know whether Doctor Handelsman had any

9    participation in that?

10                ATTORNEY BLOCK:   Objection.

11                THE WITNESS:   I don't know off the top

12   off of my head.

13   BY ATTORNEY BROOKS:

14       Q.    Have you ever read the arbitrarial decision in

15   that case?

16       A.    I'm certain I read excerpts, but that is as much

17   as I could say.

18       Q.    Okay.

19            You participated in developing on the --- a

20   member of the committee that developed the regulation

21   that you've referenced, the 7.5 nanomolar threshold?

22       A.    I was on the committee that helped determine

23   that particular threshold conceptual, yes.

24       Q.    And you're aware that in addition to individuals

```
 1   such as Caster Semenya, who suffered of a disorder of

 2   sexual development, that that rule would exclude some

 3   transgender women from female athletics that were

 4   subject to that IAAF rule.

 5            Correct?

 6                 ATTORNEY BLOCK:  Objection to the

 7   terminology.

 8                 THE WITNESS:  So I was aware that by

 9   setting a threshold that there --- and even that

10   threshold in particular, that there would be transgender

11   women who would not achieve that threshold for whatever

12   reason.

13   BY ATTORNEY BROOKS:

14      Q.    And did you nevertheless consider the regulation

15   to be reasonable?

16      A.    If you are asking me as an expert, then again I

17   can't comment.

18      Q.    Well, let me just ask you as Doctor Safer.

19      A.    Am I allowed to ---?

20                 ATTORNEY BLOCK:  Objection to form.

21   BY ATTORNEY BROOKS:

22      Q.    You are allowed.

23      A.    Okay.  So having a rule does make sense to me,

24   yes.
```

1      Q.    And you thought that that rule was reasonable?

2      A.    As with the data we have currently, yes,

3    personally.

4      Q.    And what, in your opinion, is the inherent

5    reason that advantages conferred by testosterone levels

6    far outside the normal female range should be treated as

7    any more of an unfair advantage than the advantages that

8    already exist among different women athletes?

9                    ATTORNEY BLOCK:  Objection.  I'm sorry.

10    Can you clarify as an expert or as an individual just

11    because you shifted back and forth?

12    BY ATTORNEY BROOKS:

13      Q.    First as an expert.

14      A.    So yes --- give me the question again.  I'm

15    sorry.

16      Q.    What, in your opinion, is the inherent reason

17    that advantages conferred by testosterone levels outside

18    the normal female range should be treated as any more of

19    an unfair advantage than the advantages that already

20    exist among different women athletes?

21      A.    So to clarify we --- so, okay, let me go back.

22    Let me answer in pieces I guess or ask you to say it in

23    pieces.  So what is different between typical male

24    levels of testosterone in an individual and some other

1  characteristics that are across the range of

2  characteristics of cisgender women?  Is that the

3  question?  Am I rephrasing that correctly?

4      Q.    I'm actually referencing paragraph 60 of your

5  expert report, but my question --- and let's take for

6  instance, a natal male who has press testosterone but

7  only achieved six nanomolar per liter concentration, do

8  you have that concentration, do you have that in mind?

9      A.    A transgender woman whose testosterone level is

10  six.

11      Q.    Right.  What in your opinion is the inherent

12  reason that advantages conferred by testosterone levels

13  above a threshold such as five nanomolars should be

14  treated as any more of an unfair advantage than the

15  advantages that already exist among different women

16  athletes?

17                    ATTORNEY BLOCK:  Objection to form.

18                    THE WITNESS:  So a couple of things.

19  First of all, I don't know that a testosterone level of

20  six is from a scientific perspective demonstratively

21  different than a testosterone level of five.  It's just

22  a matter of affecting it overall.  So I want to clarify

23  that.  It's not that --- that that small degree is

24  necessarily relevant.  And I can't even say that we

1    demonstrated advantage.  It's still a theoretical with

2    regard to some of those higher testosterone levels.  Let

3    me think about those for a second.  Yes, so some of the

4    logic pattern for having a threshold is in order to be

5    able to limit the entire conversation to dealing with

6    transgender women or women with --- or intersex women or

7    women who for any reason have have elevated testosterone

8    levels and not to open the door at the elite level for a

9    participation by cisgender men posing as cisgender women

10   if that makes sense.

11   BY ATTORNEY BROOKS:

12      Q.    Is there, in your judgment, any inherent reason

13   that advantages conferred by testosterone levels well

14   outside normal female ranges should be treated as any

15   more of an unfair advantage than the advantages that

16   already exist among different women athletes?

17      A.    So I have to go back to that one.  Is it my

18   opinion that male level testosterone levels ---?

19      Q.    Let me --- my question is testosterone levels

20   significantly above normal female ranges?

21      A.    Are --- then no, sorry.  It took me a little

22   while to get there, but no.

23      Q.    Because the question was complicated and the

24   answer was broken up I will ask you again, not to insult

1   you but so we have a clear record.  I think I understood

2   your answer but is there, in your opinion, any reason

3   why advantages provided by testosterone level well

4   outside normal female ranges should be treated as any

5   more of an unfair advantage than the advantages that

6   already exist among different women athletes?

7                    ATTORNEY BLOCK:  Objection to form.

8                    THE WITNESS:  And as an expert I'm not

9   rendering an opinion there, that's right.

10  BY ATTORNEY BROOKS:

11      Q.    Okay.

12            In paragraph 55 of your ---.

13                   ATTORNEY BLOCK:  Would now be a good time

14  for a break?

15                   ATTORNEY BROOKS:  Let me just ask this

16  one question and then yes.

17  BY ATTORNEY BROOKS:

18      Q.    In paragraph 55 you cite a 2015 article by

19  Joanna Harper?

20      A.    I do, yes.

21      Q.    Have you ever met Joanna Harper?

22      A.    I have.

23      Q.    And have you collaborated with Joanna Harper in

24  any way?

```
 1              ATTORNEY BLOCK:  Objection to the form.

 2              THE WITNESS:  Yeah, I don't, but I guess

 3    --- it's a complicated answer, so I need to know what

 4    you mean by that.

 5    BY ATTORNEY BROOKS:

 6       Q.    I mean it broadly.  Have you worked with her on

 7    any sorts of projects or committees?

 8       A.    Well, we were both in the working group for

 9    World Athletics that helped develop this threshold.

10       Q.    And do you consider Doctor Harper to be

11    knowledgeable in the field of sports physiology?

12       A.    I do.

13       Q.    And do you consider Doctor Harper to be

14    knowledgeable with regard to the impact of testosterone

15    suppression on athletic capabilities in male?

16       A.    So do I consider her to be knowledgeable in the

17    field?  I certainly do.  For what it's worth, she is

18    still Ms. Harper.  She's actually in the Ph.D. program

19    now.

20       Q.    Oh, okay.  I just gave her an honorary degree.

21       A.    She occupies a prominent place in the field.

22              ATTORNEY BROOKS:  Let's take that break.

23              VIDEOGRAPHER:  Going off the record.  The

24    current time is 10:25 a.m. Eastern Standard Time.
```

```
1    OFF VIDEOTAPE

2                        ---

3    (WHEREUPON, A SHORT BREAK WAS TAKEN.)

4                        ---

5    ON VIDEOTAPE

6                   VIDEOGRAPHER:  We are back on the record.

7    Current time reads 10:39 a.m. Eastern Standard Time.

8    BY ATTORNEY BROOKS:

9       Q.    Dr. Safer, let me ask you to go back to Exhibit

10   4 Professor Handelsman's article.  And if you would turn

11   in that article to page 805, the first paragraph begins

12   the strongest classification in a league sport is that

13   after puberty men 20 times more testosterone than women.

14             Do you see that language?

15      A.    I do.

16      Q.    And he discusses a number of results and ends

17   his paragraph by saying in concert --- quote, in concert

18   these render women on average unable to compete

19   effectively against men in power based or endurance

20   based sports.

21             Do you see that?

22      A.    I do.

23      Q.    And do you consider yourself qualified to

24   evaluate Professor Handelsman's assertion that women are
```

1    on average unable to compete effectively against men in

2    power based or endurance based sports?

3        A.    No.

4        Q.    Not qualified?

5        A.    Not qualified, correct.

6        Q.    Do you believe you have an understanding ---

7    well, let me ask you this.  Do you consider yourself

8    qualified to offer any opinion as to why sports have

9    been separated by sex historically?

10       A.    I guess I would say I'm aware of the history.

11       Q.    And in your understanding what is the reason

12   that sports have been separated by sex historically?

13       A.    The history is that at a certain point where

14   sufficient development has taken place there is a

15   differential in at least some sports between men and

16   women --- between cisgender men and cisgender women such

17   that in order for women to win those events reliably

18   there needs to be a carve-out.

19       Q.    And as you sit here today can you identify for

20   me any sport in which you believe that cisgender men

21   after puberty do not enjoy a significant performance

22   advantage over cisgender women?

23       A.    Yes.

24       Q.    Please do.

 1      A.    Examples include --- well, I guess I better not

 2  get too far and be the expert here, but I believe

 3  riflery and others in the category of hand/eye

 4  coordination.  I think some of the equestrian sports are

 5  examples.

 6      Q.    Okay.

 7            You are not offering any opinion, are you, that

 8  the reason for separation of sports by sex is to affirm

 9  sex specific social roles or identities?

10      A.    I'm not aware of that.  I'm not an expert on

11  those pieces, but I'm not aware personally.

12      Q.    And it is not your opinion, is it, that

13  separation of sport by sex is in general unfair?

14                  ATTORNEY BLOCK:  Objection to form.

15                  THE WITNESS:  So again, as an expert I'm

16  not commenting on fairness.

17                  ATTORNEY BROOKS:  I'm going to mark as

18  Safer Exhibit 5, a Decision in the arbitral award

19  delivered in the Court of Arbitration for Sport in

20  connection with the arbitration between Athletic South

21  Africa and the IAAF, a bulky document, unfortunately.

22                        ---

23                  (Whereupon, Exhibit 5, Court of Arbitration

24                   for Sport Decision, was marked for

```
 1              identification.)

 2                    ---

 3   BY ATTORNEY BROOKS:

 4     Q.    And Doctor Safer, now that you have --- I asked

 5   you earlier about whether you had seen the arbitration

 6   decision and I think you said you might have read

 7   excerpts of it.  Looking at it today, do you believe

 8   that you have ever seen a copy of the whole Decision?

 9     A.    I do not think I've read through the whole

10   Decision.

11     Q.    Do you think you've ever held this whole

12   document in your hand before?

13     A.    This is the first time that I held the whole

14   document.

15     Q.    I'm going to ask you about a few quotations in

16   it, not to ask your opinions about the judgment but to

17   elicit your opinions about the science.  So if you would

18   turn --- and the structure of the document is that

19   everything in it has a paragraph number which, thank

20   goodness, makes it easy to find things.  So if you would

21   turn to paragraph 556.  The first sentence of

22   paragraph 556 of this Decision reads there is no dispute

23   that ensuring fair competition in the female category of

24   elite competitive athletics is a legitimate objective
```

```
 1    for the IAAF to pursue, closed quote.  As a member of

 2    the IAAF Committee that established the policy that was

 3    challenged in this arbitration, do you agree or disagree

 4    that there is no dispute that ensuring fair competition

 5    in the female category is a legitimate objective for the

 6    IAAF to pursue?

 7                    ATTORNEY BLOCK:  Objection to form.

 8                    THE WITNESS:  As an expert I do not have

 9    an opinion.

10    BY ATTORNEY BROOKS:

11        Q.    Okay.

12              Let me ask you to turn to paragraph 456.  And

13    this arbitration, as you noted, deals with the case of

14    Caster Semenya and therefore with track events, not with

15    riflery or with equestrian events.  So I will ask your

16    reaction to that context.  In the middle of

17    paragraph 456, beginning halfway through the sixth line

18    the panel wrote, quote, suffice to say that post puberty

19    generally speaking males outperform female athletes ---

20    I'm sorry, male athletes outperform female athletes at

21    an elite level.  This difference is insurmountable,

22    closed quote.

23              Do you see that?

24        A.    I do.
```

1    Q.    And do you believe it to be true, false or

2    outside of your expertise that male athletes outperform

3    female athletes at the elite level at a difference that

4    is insurmountable?

5                    ATTORNEY BLOCK:  Objection to form.

6                    THE WITNESS:  As a blanket statement, no,

7    I would say that is not my expertise.

8    BY ATTORNEY BROOKS:

9    Q.    Let me ask you to turn to 576.  I said 576.  I

10   meant 577.  I apologize.  At the end of 577 the panel

11   has written, quote, ---.

12                   ATTORNEY BROOKS:  We just had static

13   here, so let me ask whether people outside the

14   conference room are hearing us?  If somebody could

15   unmute.

16                   ATTORNEY TRYON:  I can hear you.

17                   ATTORNEY BROOKS:  We just had some static

18   that caused me concern.

19   BY ATTORNEY BROOKS:

20   Q.    At the end of paragraph 577 the panel wrote,

21   quote, male athletes do not have to be elite to surpass

22   even the very best female athletes.  Dr. Berman pointed

23   out that in a race such as the 800 meter, a 1.6 percent

24   advantage, as calculated in BG17, was sufficient to

1  determine first place by the region of nine meters,

2  closed quote.

3           Do you see that language?

4     A.    Yes.

5     Q.    And do you consider it to be true, false or

6  outside your expertise that male athletes do not even

7  have to be elite to surpass the very best female

8  athletes?

9                     ATTORNEY BLOCK:  Objection to form.

10                    THE WITNESS:  In a --- as a blanket

11 statement it is outside my expertise.

12 BY ATTORNEY BROOKS:

13    Q.    And do you have an opinion as to whether a

14 1.6 percent advantage is a significant advantage or

15 insignificant advantage?

16    A.    I think that's too complicated as phrased for me

17 to answer.

18    Q.    That's actually one of the simpler questions

19 that I've asked today.  Let me ask it again and ask you

20 to think.  Do you have an opinion, and if you --- one

21 answer of course is I don't have an opinion or it is

22 outside of my expertise, but do you have an opinion as

23 to whether a 1.6 percent advantage in a track event is a

24 significant advantage?

1          ATTORNEY BLOCK:  Objection to form.

2          THE WITNESS:  So it depends on the event.

3    BY ATTORNEY BROOKS:

4      Q.    Why does it depend on the event?

5      A.    Well, there are events where we see --- as an

6    elite Olympic event where the runners are virtually

7    tied.  And 1.6 percent then will be significant in the

8    moment because that will be described in that field.

9    And yet there are other events where people are far more

10   spread out and there's greater --- in every element,

11   then 1.6 percent advantage becomes lost in that noise.

12     Q.    And --- well, let's take competitive high school

13   athletics, competitive high school track.  Do you have

14   an opinion as to 1.6 percent advantage in that context

15   is significant or insignificant?

16     A.    I do not have an opinion.

17     Q.    So if I understand correctly, your point in some

18   context you know that 1.6 percent is significant but

19   that in other context you don't know one way or the

20   other?

21          ATTORNEY BLOCK:  Objection to the form.

22          THE WITNESS:  Yes, I guess I would say

23   that in some context I can see that 1.6 percent is

24   significant and then in other context I can see that 1.6

1    percent does not appear to be significant.  And actually

2    even if you're asking as an expert, what even is

3    significant is outside my purview, but with that

4    understood I can still see that someone would say it one

5    way and not say it the other way.

6    BY ATTORNEY BROOKS:

7        Q.    Let me ask you to turn to paragraph 357.  And

8    first I will ask you to turn to page 88, paragraph 351,

9    just so you can see we're in a section summarizing the

10   testimony of Professor David Handelsman.  That begins at

11   paragraph 351.  And then I'm going to call your

12   attention to paragraph 357 and it puts you to the

13   statement there.

14           357 includes a number of bullet points.  The

15   third bullet point, which is on page 91, reads --- and

16   again this is --- the paragraph begins, quote, Professor

17   Handelsman went on to explain in greater detail why the

18   sex difference in circulating testosterone is the cause

19   of the difference in athletic performance between men

20   and women, and then there are bullet points.  The third

21   bullet point reads, on average, women have 50 to

22   60 percent of men's upper arm muscle cross-sectional

23   area, 65 to 70 percent of men's thigh muscle

24   cross-sectional area, 50 to 60 percent of men's limb

```
 1   strength and 60 to 80 of men's leg strength.  Do you see

 2   that language?

 3                      ATTORNEY BLOCK:  Objection to form.

 4                      THE WITNESS:  I do.

 5   BY ATTORNEY BROOKS:

 6      Q.    Do you have any knowledge as to whether those

 7   statistics are on correct as given by Dr. Handelsman?

 8      A.    I do not.

 9      Q.    And do you have any expert knowledge as to how

10   those statistics do or do not change under the influence

11   of testosterone suppression in natal males who

12   experience a female gender identity?

13                      ATTORNEY BLOCK:  Objection to

14   terminology.

15                      THE WITNESS:  So I guess the --- I have

16   no expert knowledge about these numbers, per se, but I

17   do know as an expert that when testosterone levels are

18   suppressed in transgender women and actually in

19   cisgender men, anyone, that these numbers are decreased.

20   And I can say that with confidence as an expert.

21   BY ATTORNEY BROOKS:

22      Q.    But you're not able to quantify that decrease.

23            Is that correct?

24      A.    I cannot quantify that decrease.  The data gets
```

1    murky when we start to get there.

2       Q.    Have you ever met Professor Coleman at Duke

3    University?

4       A.    Doriane Coleman?

5       Q.    Yes.

6       A.    I have.

7       Q.    And in what context have you interacted with

8    Professor Coleman?

9       A.    The --- a professional context.

10      Q.    Can you describe the context?

11      A.    We have served on some of these --- two of the

12   same committees --- committee task force, whatever you

13   call it, for World Athletics together.

14      Q.    Was she, in fact, on the committee which you

15   participated that set the five nanomolar standard for

16   the IAAF?

17      A.    I don't recall for sure but I think not.

18      Q.    Then can you identify for me the two committees

19   that you recall that you did sit on with Professor

20   Coleman?

21      A.    Subsequent to the initial group, and I don't

22   know that it's two committees, it may be the same

23   committee, they get renamed.  Things like that happen.

24   So it is --- I'm thinking forward to assisting other

1    international federations with their rule making.

2       Q.    And do you consider Professor Coleman to be

3    knowledgeable about the relative athletic capabilities

4    and records of male and female athletes?

5       A.    To me that's too vague a question.  She's a

6    lawyer.

7       Q.    Are you aware also of her athletic background as

8    a competitive athlete?

9       A.    I am.

10      Q.    And are you aware of her research and

11   publications having to do with athletic records and

12   capabilities of male and female athletes?

13                    ATTORNEY BLOCK:  Objection to form.

14                    THE WITNESS:  I'm aware of some of her

15   publications where she has co-authored, but she's not

16   usually the physiology expert in the group.

17   BY ATTORNEY BROOKS:

18      Q.    Let me ask you to turn to paragraph 393.  And if

19   you look at the page you will see that this is within

20   the tribunal summary of testimony of Professor Coleman.

21   Let me ask you since you dealt personally with the

22   professor, because I want the record to be respectful,

23   does she in general use --- prefer to be referred to as

24   Professor Lambelet-Coleman or simply Professor Coleman?

1    A.    I don't know the answer.

2    Q.    Okay.

3    A.    I prefer to her on a first name basis.

4    Q.    All right.

5          I will stick with the shorter version.  In

6  paragraph 393 the panel describing Professor Coleman's

7  submission states, quote, Professor Lambelet-Coleman's

8  report compared the lifetime best performance of three

9  elite female athletes in the 400-meter event with the

10 performance of male athletes in the same event during a

11 single year, 2017, period.  This showed not only that

12 the elite females would have lost to the best men by a

13 margin of about 12 percent but also that even at their

14 absolute best the elite females would have lost to

15 thousands of other boys and men by a much smaller

16 margin, closed quote.  Do you see that language?

17   A.    I do.

18   Q.    And do you have any reason to doubt the accuracy

19 of that summary of athletic performance statistics?

20   A.    I can't render an expert opinion there.

21   Q.    Do you as you sit here today have any reason to

22 doubt the accuracy of those statistics?

23   A.    Again, I cannot comment as an expert.  I guess

24 that's the bottom line.

1     Q.     If it is true that the most elite female

2  athletes performing at their absolute best would lose to

3  thousands of others boys and men.  It is also true,

4  would you not agree, that the very best female college

5  athletes would lose to even a larger number of

6  collegiate boys and men?

7     A.     If I'm speaking as an expert, then I'm not

8  rendering an opinion there.

9     Q.     How about as a highly educated and intelligent

10 professor?

11    A.     Simply in that context, it would be true that

12 --- that it would least be true at some level in the

13 elite levels of college.

14    Q.     And the very best female high school athletes

15 would lose to an even larger number of high school boys.

16          Correct?

17    A.     So now I can render a little bit of an expert

18 comment, which is that as you move down that line, the

19 degree of difference falls because the degree of

20 testosterone impact on body is evolving across those

21 ages.

22    Q.     If it's true that the world fastest female

23 athletes would lose to thousands of boys and men then it

24 is inevitably true, is it not, Doctor Safer, to say that

```
 1    the very best female high school athletes would lose to
 2    even larger numbers of high school boys?
 3                    ATTORNEY BLOCK:  Objection to form.
 4                    THE WITNESS:  So the --- it is the coils
 5    here.  So it would be larger numbers of cisgender men in
 6    general, including people who are older than they are,
 7    but I'm not sure where that would be going.
 8    BY ATTORNEY BROOKS:
 9        Q.    Let me take you back to your expert report,
10    Exhibit 1, and take you to paragraph 48.  Actually, let
11    me have the Declaration, which is Tab 50.
12                    ATTORNEY BROOKS:  Let me mark as Safer
13    Exhibit 6 a Declaration of Dr. Safer executed in
14    May 10th, 2021.
15                          ---
16                    (Whereupon, Exhibit 6, 5/10/21 Declaration
17                    of Dr. Safer, was marked for
18                    identification.)
19                          ---
20    BY ATTORNEY BROOKS:
21        Q.    And I apologize, it's paragraph 50.  Dr. Safer,
22    did you, in fact, prepare and execute this Declaration
23    in the time leading up to May 26, 2021?
24        A.    Yes.
```

1    Q.    And you state in paragraph 48 that, quote, age,

2  grade competitive sports records show minimal or no

3  difference in athletic performance between

4  non-transgender boys and non-transgender girls before

5  puberty, and you cite Handelsman, the article that we

6  have been looking at.

7          Correct?

8    A.    Yes.

9    Q.    And what research did you do to arrive at the

10  conclusion that age grade competitive sports records

11  show minimal or no difference in athletic performance

12  between non-transgender boys and non-transgender girls?

13    A.    Is the question of original research on my part?

14    Q.    No, what steps did you take to arrive at that

15  conclusion?

16    A.    Reading relevant literature.

17    Q.    You cited only Professor Handelman's 2018

18  article.  Did you read other literature that gave you

19  comfort that is a true statement?

20    A.    I have read other literature, but I would

21  suggest that Doctor Handelsman gave --- Doctor

22  Handelsman's paper is the best summary of the point.

23    Q.    And again, in making this statement, what did

24  you consider to be a minimal difference?

1    A.    When I'm thinking about this as a scientist it

2    is a difference where I'm not sure if it is true or

3    whether it is significant when defining the word

4    minimum.

5    Q.    You just defined minimal by using the work

6    significant.  You force me to ask you what do you mean

7    by significant?

8    A.    Sorry.  So as a scientist --- well, there are

9    two definitions of significant.  So the one is that it

10    is relevant for those --- for decision makers.  And that

11    actually gets outside of my expertise.  And then we do

12    use it as a term of art in science as well.

13    Q.    You meant statistically significant?

14    A.    The second would be statistically significant,

15    that's right.

16    Q.    Dr. Safer, you deleted that sentence from your

17    expert report.

18    Is that correct?

19    A.    I have to look.

20    Q.    I don't mean it to be a trick question.  Let me

21    ask you this.  Do you recall removing that sentence as

22    you revised your Declaration to create your expert

23    report?

24    A.    No.

1    Q.    All right.

2    A.    I don't recall.

3    Q.    We will just move on to the science and not ask

4  you deleted the question.  Let me take you to paragraph

5  44 of your expert report, Exhibit 1.  And just to be

6  sure, you are on the expert report now and not the

7  Declaration?  They are so similar that it is easy to get

8  confused.

9    A.    Yes.

10    Q.    Paragraph 44 you say in the second sentence,

11  increased testosterone begins to affect athletic

12  performance at the beginning of puberty, but those

13  effects continue to increase each year of puberty until

14  about 18, with the full impact of puberty resulting from

15  the cumulative effect of each year.  Do you see that

16  language?

17    A.    I do.

18    Q.    And just to clarify, in making this statement

19  what do you refer to as, quote, the beginning of

20  puberty?  And we're talking about male typical puberty

21  in this discussion so as to clarify.  So what do you

22  have in mind as the beginning of male puberty?

23    A.    So the answer is complex.  The typical male

24  puberty is defined as beginning with what we label as

```
 1    Tanner 2.  And in terms of when you would see impact on

 2    athletic performance, per se, is not well established.

 3        Q.    And now stretching that in both directions, on

 4    the one hand Tanner Stage 2, if I'm correct, is

 5    essentially defined as certain first observable physical

 6    changes in a boy's body.

 7              Right?

 8        A.    Tanner 2 is specifically defined as specific

 9    observable changes in a person's body, yes.

10        Q.    And therefore, testosterone levels have begun to

11    increase even before the first observable changes that

12    result.

13              Correct?

14        A.    The way it's understood in medicine is it is

15    reflective of existing reality.  So it is not

16    necessarily --- you know, only in the absolute.

17        Q.    Well, as a medical doctor, you would agree with

18    me or would you not that testosterone levels must

19    increase in the body before observable changes in the

20    body caused by testosterone can be --- can come about?

21                        ATTORNEY BLOCK:  Objection to the form.

22                        THE WITNESS:  So it must be the case that

23    the testosterone levels would have to rise prior to

24    their having a noticeable effect, that is true.
```

1    BY ATTORNEY BROOKS:

2      Q.    Cause has to precede effect?

3      A.    Cause in this case has to precede effect,

4    exactly.  But I caution that it is not clear that that's

5    something that we could parse out medically in a given

6    person in a reasonable way.  That is I don't know that I

7    could do a blood test and catch it as it were.

8      Q.    Okay.

9            Can you explain to me what you were referring

10   to when you mentioned the cumulative effect of pubertal

11   changes at the end of that sentence?

12     A.    Where are we now?

13     Q.    We are in the second sentence of paragraph 44 of

14   Exhibit-1.  And you say at the end with a full impact of

15   puberty resulting from the cumulative effect of each

16   year, and if you would explain for the Court what you

17   meant by cumulative effect that would be helpful.

18                    ATTORNEY BLOCK:  Objection to form.

19                    THE WITNESS:  So the testosterone has

20   impact on certain tissues, and then it continues to have

21   impact on tissues.  And I don't know that I have any

22   greater explanation for the right cumulative impact.

23   BY ATTORNEY BROOKS:

24     Q.    So your point is that by the age of 18 whatever

```
 1   advantages in athletic performance a particular male has
 2   is due to body changes that have happened each year
 3   since puberty began, not due simply to the testosterone
 4   level of that individual at age 18?
 5                   ATTORNEY BLOCK:  Objection to form.
 6                   THE WITNESS:  The meaning isn't as --- I
 7   guess I would be careful about overstating it, so there
 8   can --- there might be some impact earlier and then
 9   there might be additional impact over time, but --- and
10   so in the absolute it would be true to say that all of
11   the effect doesn't occur at Tanner 5, which is the
12   defined end.
13   BY ATTORNEY BROOKS:
14       Q.    Okay.
15             The cumulative physiological changes that you
16   are referring to here result from a multi-year history
17   of male typical levels of testosterone by age 18.
18             Correct?
19       A.    Yes.  Well, even that is --- there's complexity
20   but yes.
21       Q.    You say --- sorry, we are jumping back and
22   forth.
23       A.    Actually, just continuing a little bit further,
24   it's also about age 18 is not a trivial word.
```

 1     Q.     Understood.  And I simply used that as a

 2  representative end marker and for some individuals it

 3  would be earlier and for some individuals it would be

 4  later.

 5          Correct?

 6     A.     That's right, even with the college athletes.

 7     Q.     You state at the beginning of paragraph 44 that,

 8  quote, the concerns that animated the World Athletics

 9  and prior IOC policies are even more attenuated for

10  students in the middle of high school where athletes

11  typically range from 11 to 18.

12          Do you see that?

13     A.     I do.  Was this paragraph 44?

14     Q.     It is.  And by attenuated you mean the same in

15  nature but smaller in scale.

16          Correct?

17              ATTORNEY BLOCK:  Objection to form.

18              THE WITNESS:  Yeah, I can't even say that

19  so --- yeah, I can't ---.

20  BY ATTORNEY BROOKS:

21     Q.     Isn't that what attenuated means?

22              ATTORNEY BLOCK:  Objection to form.

23              THE WITNESS:  Attenuated is both in scale

24  and type in this case.

```
 1    BY ATTORNEY BROOKS:

 2       Q.    All right.

 3             You are not here or anywhere denying that the

 4    same type of concern, that is physiological advantages,

 5    exist at for instance age 15?

 6                    ATTORNEY BLOCK:  Objection to form.

 7                    THE WITNESS:  So sorry, say that again.

 8    BY ATTORNEY BROOKS:

 9       Q.    You are not in this paragraph or anywhere

10    offering an opinion that the same type of concerns, that

11    is physiologic or in performance advantages, exist to

12    some degree at, for instance, age 15?

13                    ATTORNEY BLOCK:  Objection to form.

14                    THE WITNESS:  I'm not offering an opinion

15    there, that's right.

16    BY ATTORNEY BROOKS:

17       Q.    And the same is true at age 13?

18                    ATTORNEY BLOCK:  Objection to form.

19                    THE WITNESS:  I'm not --- so I guess as

20    we --- as you move along to the continuum, then ---.

21    BY ATTORNEY BROOKS:

22       Q.    It gets more attenuated?

23       A.    The opinion --- right, the opinion shifts

24    because it depends on context.
```

1    Q.    In paragraph 49 of your expert report you write

2    in the third full sentence, quote, West Virginia

3    categorically prevents girls who are transgender from

4    participating on girls teams regardless of whether they

5    are prepubertal, receiving puberty blockers, or

6    receiving gender-affirming hormone therapy, closed

7    quoted.  Do you see that?

8    A.    I do.

9    Q.    What in your opinion is the significance of that

10   statement?  What is your point?

11               ATTORNEY BLOCK:  Objection.  Could you

12   just give him some time to read the context?

13   BY ATTORNEY BROOKS:

14   Q.    Yes.

15   A.    So I guess I maybe make the --- help me with

16   where you're going with that question.  I'm --- the rule

17   as written includes all transgender girls.

18   Q.    Are you --- did you mean to suggest that medical

19   science would dictate that the West Virginia law should

20   make an exception for natal males who have

21   suppressed puberty?

22               ATTORNEY BLOCK:  Object to form.

23               THE WITNESS:  The context for the --- the

24   context of different transgender girls with different

1  degrees of treatment and different stages of puberty are

2  different.  I guess that's as much I would say.  I'm not

3  expressing an opinion about what the --- I'm serving

4  here just as a scientist in terms of what the --- what

5  the --- what we know about athleticism.

6  BY ATTORNEY BROOKS:

7     Q.    You are not offering an opinion that either

8  science or reasonableness requires that West Virginia's

9  laws make an exception for natal males who have

10  suppressed puberty?

11                ATTORNEY BLOCK:  Objection to form.

12                THE WITNESS:  I'm not offering an opinion

13  that that would be --- that would be a logical law for

14  transgender girls in that circumstance.

15  BY ATTORNEY BROOKS:

16     Q.    And in the article that we began today looking

17  at you expressed concern about policies that would

18  create incentives for children to begin puberty

19  blockers, would you not?

20                ATTORNEY BLOCK:  Objection to form.

21                THE WITNESS:  So earlier in my --- I

22  reference that as a concern.  I want to be clear that as

23  an expert I'm not suggesting that --- I'm not suggesting

24  an expert opinion that these needs to be concerns.  I'm

1    raising the issues that we are considering.

2    BY ATTORNEY BROOKS:

3        Q.    Well, what you wrote to educate your colleagues

4    as an endocrinologist, you, Professor Safer, raise that

5    as a concern?

6                    ATTORNEY BLOCK:  Objection to form.

7                    THE WITNESS:  To be clear, I raised it as

8    a concern of the community.  I did not take an opinion

9    in that article that it was a concern that I was

10   offering as an expert.

11   BY ATTORNEY BROOKS:

12       Q.    Well, let me ask you as a medical doctor sitting

13   here today, an endocrinologist, it would cause you

14   concern, would it not, that policies are adopted that

15   created incentives for children to start puberty

16   blockers when they might otherwise not choose to do so?

17                   ATTORNEY BLOCK:  Objection to form and to

18   scope.

19                   THE WITNESS:  It's too broad of a

20   question as you're asking it because there is certainly

21   --- in medicine it is certainly the case that we fear

22   coercing people to certain treatments and certain

23   circumstances but they are certainly alternate examples

24   where we very much coerce people to have certain medical

1   interventions.  And so as an expert I have no opinion,

2   as we said already.  And simply as somebody trying to be

3   logical and thoughtful I can come up with examples in

4   both certain circumstances.

5   BY ATTORNEY BROOKS:

6      Q.    I'm going to ask you to take Exhibit-6 --- no,

7   Exhibit 4, the Handelsman article if you would.

8      A.    Yes.

9             ATTORNEY TRYON:  Roger, would you speak

10  up a little more, please?  And Josh, when you shuffle

11  your papers, it really garbles the testimony.  If you'd

12  be a little more careful about that, I'd appreciate it.

13            ATTORNEY BLOCK:  Sorry.

14            ATTORNEY BROOKS:  It's a crowded table

15  and we have papers bumping up against the mic.  So just

16  call out if we do that wrong.

17  BY ATTORNEY BROOKS:

18     Q.    So Dr. Safer, you pointed to the Handelsman

19  article as the best source on the proposition --- on the

20  question to what extent if any natal male has

21  physiological or I should say athletic performance

22  advantages over natal females before puberty.

23            Correct?

24            ATTORNEY BLOCK:  Objection to

```
 1   terminology?
 2                    THE WITNESS:   And if I said the word best
 3   maybe that's not the best way of saying it, but it's a
 4   very clean, well-written summary of the circumstance.
 5   BY ATTORNEY BROOKS:
 6      Q.    At any rate, it's the one that you chose to
 7   cite?
 8      A.    And it is the one that I chose to cite.
 9      Q.    I'm going to give you a three by five card to
10   help read a chart that doesn't have grid lines on it so
11   you have a straight edge.   And I want to take you in
12   Handelsman's 2018 article, Exhibit 4, to page 813 and
13   figure one.   And you've familiar with this figure and
14   these curves, are you not?
15      A.    I am, yes.
16      Q.    When you studied this article carefully this is
17   part of what you studied.
18            Right?
19      A.    It is.
20      Q.    And these charts show percentage performance
21   advantage of males over females and just to simplify
22   terminology I believe there's nothing in here about
23   dealing with transgender individuals in these charts.
24   So with your permission I'll simply use male and female
```

```
 1    to be the dare I say simple biological designations as

 2    we had previous discussions.  Is that acceptable?

 3         A.    I think so.

 4         Q.    If it's something that comes up ---.

 5         A.    I will mention it, yes.

 6         Q.    I don't think it will in this discussion.  First

 7    of all, would you agree with me that, generally

 8    speaking, junior high contemplates grades 7 through 9

 9    and commonly ages in the range of 12 to 15?

10                    ATTORNEY BLOCK:  Objection to form.

11                    THE WITNESS:  Junior high is grades 7

12    through 9.  It used to be.  Now there is Middle School.

13    BY ATTORNEY BROOKS:

14         Q.    I know?

15         A.    Exactly.

16         Q.    Let's just work with you and I are of general

17    age.  So Junior High is 7 to 9?

18         A.    Okay.

19         Q.    And in your general understanding, this is

20    layman's stuff, not expert stuff, that is ages 12 to

21    15-ish?

22         A.    Let's see, seven --- let me think about this.

23    Right, 15 at about the max, right, because there is

24    about 14.
```

 1    Q.    And high school is 14, 15 through age 18-ish.

 2  Some people graduate at age 17?

 3    A.    Yes.  As a non-expert I would believe, yes.

 4    Q.    All right.

 5          And this chart charts the percentage advantage

 6  enjoyed --- on average enjoyed by males over females in

 7  three different events at over --- on a year by year

 8  basis from ages 10 up to 19.

 9          Am I describing it correctly?

10              ATTORNEY BLOCK:  Objection to form.  Just

11  for the record, it's percentage differences, not

12  percentage advantages.

13  BY ATTORNEY BROOKS:

14    Q.    Correct, it says --- it says gender difference

15  percentage to read the Y axis.

16    A.    Clear, yes.

17    Q.    Okay.

18          So let's look at running and you have your

19  straight edge if it is helpful to you.  At age 12, what,

20  according to Dr. Handelsman, is the gender difference in

21  running performance?

22    A.    So in this paper there is a range.  But just to

23  help you get to your point faster I guess we can --- it

24  is about five percent of tab over.

1    Q.   And for reasons best known to Professor

2  Handelsman, his arrow bars extend only upwards, correct,

3  in this chart?

4    A.   Right.  I will have to attribute that to

5  cleanliness of the figure.

6    Q.   Or if he has chosen to fit his curve to the

7  bottom end of this error range possibly?

8               ATTORNEY BLOCK:  Objection to form.

9               THE WITNESS:  Yeah, I can't comment

10  there, but that wouldn't be usual.

11  BY ATTORNEY BROOKS:

12    Q.   That would not be usual, I agree.  And what

13  advantage --- what gender difference between male and

14  female does Professor Handelsman report at age ten

15  approximately?

16    A.   At age ten in the particular figure that we are

17  referencing it is --- the average is --- well, actually,

18  so here it ranges from about two percent because that is

19  probably how the air bars are meant to be up to just a

20  little north to three percent.

21    Q.   And going back to age 12, do you consider a five

22  percent difference between male and female performance

23  to be minimal?

24               ATTORNEY BLOCK:  Objection to form.

1               THE WITNESS:  So the problem here with

2  going right to this figure is it's including a range of

3  inputs, and so this is --- so these are what are called

4  cross-sectional studies, and so the --- if your question

5  is just in the narrow point of this five percent

6  minimal, well, even there I don't know that I can

7  comment because it depends on how broad the variation is

8  among the group.

9  BY ATTORNEY BROOKS:

10    Q.    And what gender difference did Dr. Handelsman

11  report in running at age 15?

12    A.    At age 15, a range that is hovering about 9 to

13  10 percent.

14    Q.    And by age 15, according to his sample, the

15  gender difference is approached --- begins to level off.

16  In other words, it has --- most of the gender difference

17  has been achieved at age 15.

18        Correct?

19            ATTORNEY BLOCK:  Objection to form.

20            THE WITNESS:  Among this data in this

21  study set, yes, I will agree with you it does level off.

22  BY ATTORNEY BROOKS:

23    Q.    So let me ask you this.  Do you have an

24  understanding of the physiological basis of what you

1    described as a two to three percent male advantage at

2    age ten in running?

3                    ATTORNEY BLOCK:  Objection to form.

4    BY ATTORNEY BROOKS:

5        Q.    If any?

6        A.    So speaking as an expert, there's no --- there

7    is no physiological --- there is no expectation of a

8    physiological explanation.  And there is awareness of

9    other confounders in terms of experience, exposure to

10   sport and things like that.

11       Q.    Let me ask you to look at jumping, at age ten.

12   And this is --- at age ten what performance of gender

13   difference advantage did Dr. Handelsman report for boys

14   in jumping?

15       A.    So at age ten it would go on --- so at age ten

16   then the range ---.

17       Q.    This by the way tells us that he cannot be

18   inclined in arrow bar --- a symmetrical arrow bar below.

19             Correct?

20                    ATTORNEY BLOCK:  Objection to form.

21                    THE WITNESS:  So he can't.  In fact, the

22   range that he's showing there goes from an advantage for

23   girls --- that is it goes below to an advantage --- for

24   boys.  The range is included and it just --- for both

1  sexes.

2  BY ATTORNEY BROOKS:

3      Q.    So what is the average advantage that he reports

4  at age ten for boys?

5      A.    So in this dataset the average is about a six

6  percent average for boys, but it is important to

7  understand the data.  And the data that --- the point

8  being that if we were to repeat the study you would

9  anticipate that that average would fall across those

10  entire --- the entire range shown so that in a different

11  day it might show a bigger advantage for boys, but a

12  different day it might also show an advantage for girls

13  about higher.

14      Q.    Are you aware of any dataset that shows a

15  smaller advantage in jumping for girls at age ten?

16      A.    Off the top of my head I cannot guide --- lead

17  you to a dataset.

18      Q.    At age 12 what advantage in jumping --- well,

19  let me start over.  At age 12 what advantage in jumping

20  does Dr. Handelsman report for boys?

21      A.    So in this dataset at age 12 he shows the

22  advantage --- the average advantage to be of the less

23  than the average advantage for age ten, but this exactly

24  points to the caution that I was referencing, which is

```
 1    that the range of possibilities that you might

 2    anticipate based on this particular dataset at age 12

 3    has a range of four to six percent advantage for boys.

 4         Q.    The arrow bar has tightened up a lot?

 5         A.    The arrow bar in that age range is tighter.

 6         Q.    And do you consider a six percent advantage to

 7    be minimal?

 8                   ATTORNEY BLOCK:  Objection to form.

 9                   THE WITNESS:  As an expert I can't answer

10    that because it depends on context on the heterogeneity

11    of all these events.

12    BY ATTORNEY BROOKS:

13         Q.    And at age 15 what average advantage in jumping

14    did Dr. Handelsman report for boys?

15         A.    For age 15 he has a range or the average sits at

16    15 percent and the range runs from about 14 percent to

17    maybe 17 percent.

18         Q.    Is there any context in your opinion, any

19    athletic endeavor that involves jumping in which a 15

20    percent advantage is in your view minimal?

21                   ATTORNEY BLOCK:  Objection to form.

22                   THE WITNESS:  Yes, I think as an expert I

23    can't answer that.  If you're thinking at the scholastic

24    level where there is a wide range of --- where there's a
```

1  quite wide range of heterogeneity in development, body

2  type, et cetera, I certainly could envision a situation,

3  yes.

4  BY ATTORNEY BROOKS:

5     Q.    Dr. Safer, in your Declaration filed in May you

6  stated that before puberty athletic advantage by boys

7  was minimal.  Do you recall that language?

8     A.    The way I would say it is the difference between

9  boys and girls before puberty is minimal or

10  non-existent.  I don't know if I could be wiser than

11  that.

12     Q.    All right.  But now you are telling me when I

13  asked you questions about minimal that you as an expert

14  are not able to define minimal.  How do you reconcile

15  those two?

16                ATTORNEY BLOCK:  Objection to form.

17                THE WITNESS:  So the definition of

18  minimal is in context.  And so as we discussed it was

19  not a significant difference using both those

20  definitions that we already used were no different at

21  all.

22  BY ATTORNEY BROOKS:

23     Q.    Your statement in your Declaration simply

24  asserted categorically in almost no context that the

difference in athletic capability of boys to girls were

both minimal.  My question for you is using whatever

definition you had in mind when you wrote that do you

consider a --- I will look at jumping, a five percent

difference in capability to be minimum?

ATTORNEY BLOCK:  Objection to form and

characterization of the report.

THE WITNESS:  So it's a context.  So in

the report the reference is to prepubertal children.

And there it is easier to be more categorical.  Where

now we're moving into an area where there is --- where

things are more complex and so it is a harder context to

make that statement.

BY ATTORNEY BROOKS:

Q.    That is a sample of ten-year old boys includes

some who are no longer prepubertal.

Correct?

A.    No.  I'm saying it more the other way, which is

a sample of ten-year-old boys would overwhelmingly be

prepubertal but a sample of 15-year-old boys would have

more of a range and have more heterogeneity.  And

there's more to it even than that, which is the

definition of minimal also includes the context of the

entire population who participated in the sport.

1    Q.    So focusing on ten-year-old boys and jumping you

2    said at age ten the large majority of boys are,

3    according to your definition, prepubertal.  Referring

4    back to Declaration and the meaning that you ascribed to

5    the word minimal there, in your view, is a six-percent

6    difference in capability minimal or not minimal?

7                    ATTORNEY BLOCK:  Objection to form and to

8    talking about his Declaration without it being in front

9    of him.

10                    ATTORNEY BROOKS:  He has it in front of

11   him and we already looked at the language.

12   BY ATTORNEY BROOKS:

13   Q.    You may answer.

14   A.    So the graph that we are looking at includes

15   arrow bars that include the possibility that boys would

16   have --- that the girls would have a superior outcome,

17   and so the answer then becomes, yes.  Where the data are

18   either small or are suspect or not significant, then all

19   of that collectively certainly is --- would be included

20   as minimal to non-existent.

21                    ATTORNEY BROOKS:  Let me mark as Exhibit

22   Safer 7 a paper by Emma Colton and Tommy Lundsburg

23   entitled Transgender Women in a Female Category of

24   Sport, from 2021, previously marked as Exhibit 13 at Dr.

1    Adkins's deposition.

2                              ---

3            (Whereupon, Exhibit 7, Transgender Women In

4            a Female Category of Sport, was marked for

5            identification.)

6                              ---

7    <u>BY ATTORNEY BROOKS:</u>

8       Q.    And first, Professor Safer, let me ask whether

9    you're familiar with this paper published last year?

10      A.    I am familiar.

11      Q.    And have you interacted professionally with

12   either Dr. Colton or --- and I don't know his degree,

13   Mr. Lundsburg in any context?

14      A.    Here I don't remember.

15      Q.    Okay.

16            Do you believe that you became aware of this

17   paper soon after it was published?

18      A.    I don't know if I can answer that cleanly

19   either, but I certainly have became aware of it

20   somewhere between then and now.

21      Q.    And have you read it with some care?

22      A.    I have read it with some care, yes.

23      Q.    Let me ask you --- well, let me ask you this

24   first.  Would you describe this paper as reporting

1    original research or as more of a literature review

2    paper?

3         A.    I don't recall them reporting on their original

4    research, but I would have to look.  It's mostly a

5    review paper.

6         Q.    That is also my impression.  I just didn't want

7    to create a different impression.  Let me ask you to

8    turn to page 201, and there in the first column

9    beginning six lines down there is a sentence that begins

10   an extensive review.  Let me ask you to find that.

11        A.    I have it.

12        Q.    And that --- I'll read it into the record.

13   Quote, an extensive review of fitness data from over

14   85,000 Australian children age 9 to 17 years old showed

15   that compared with nine-year-old females, nine-year-old

16   males were faster over short sprints, 9.8 percent, and

17   one mile, 16.6 percent, could jump 9.5 percent farther

18   from a standing start, which tested explosive power,

19   could complete 33 more push-ups in 30 seconds and have

20   13.8 percent stronger grip.  Male advantage of a similar

21   magnitude was detected in a group study of children

22   where compared to a six-year old females six-year old

23   males competed 16.6 percent more shuttle runs in a given

24   time and could jump 9.7 percent further from a standing

1  position.  Do you see that language?

2      A.    I do.

3      Q.    And on the Australian study, if you follow the

4  footnote you will see that it references a study by

5  Kaitlin Thompkinson.  That's footnote 22.  And my first

6  question is have you read the reference study by Kaitlin

7  Thompkinson?

8      A.    I don't recall.  I'm guessing yes.

9      Q.    All right.  All right.

10         Do you have any reason to doubt the accuracy of

11  this summary of the findings of Kaitlin Thompkinson

12  based on data from over 85,000 Australian children?

13                     ATTORNEY BLOCK:  Objection to form.

14                     THE WITNESS:  I think the important thing

15  to recognize when you look at these sorts of data are

16  recognizing the multiple inputs.  So the larger these

17  groups --- these cross-sectional studies get the more

18  confounded they get by access and other social

19  explanations why there are boys participating in sports

20  to a greater degree.

21  BY ATTORNEY BROOKS:

22      Q.    So putting aside causation, which might be

23  physiological and might be cultural, as you said there

24  could be various causes, do you have any reason to doubt

```
 1   the accuracy of the findings of performance advantage
 2   summarized here in the passage that I've just read?
 3                    ATTORNEY BLOCK:  Objection to form and
 4   terminology.
 5                    THE WITNESS:  Putting aside causation, I
 6   have no --- I can't offer an expert opinion I guess if
 7   that's the bottom line.  But if you're asking me just as
 8   an individual, I'm not expecting that they're
 9   fabricating that data.  I am not expecting that.
10   BY ATTORNEY BROOKS:
11     Q.    And you agree that advantages on a scale of 9
12   percent, 16 percent could provide a significant
13   advantage in athletic competition, do you not?
14                    ATTORNEY BLOCK:  Objection to
15   terminology.
16                    THE WITNESS:  So say that question again.
17   BY ATTORNEY BROOKS:
18     Q.    You agree that advantages on the scale of
19   9.8 percent or 16.6 percent would provide a large
20   advantage in athletic competition, do you not?
21                    ATTORNEY BLOCK:  Same objection to
22   terminology.
23                    THE WITNESS:  In elite athletic
24   competition, yes.
```

BY ATTORNEY BROOKS:

Q.    Did you play any sport in high school?

A.    At a sophisticated level I did not.

Q.    Your general knowledge permits you to say, does it not, that at the high school level also a 9.8 percent or a 16.6 percent advantage is a very large advantage?

                ATTORNEY BLOCK:  Objection to form and terminology?

                THE WITNESS:  So there it gets more diffuse, therefore, and I can't answer as an expert.

BY ATTORNEY BROOKS:

Q.    Can you answer as an informed adult citizen?

                ATTORNEY BLOCK:  Same objection.

                THE WITNESS:  So as an expert for sure not.  As an informed adult, it falls back to the same situation.  When there is a wide range of athletes in a certain context, then it is going to seem less relevant. And obviously with the example I gave before with an elite circumstance where that --- it describes the entire field is more significant.

BY ATTORNEY BROOKS:

Q.    Let me ask you to find your rebuttal report.

A.    And actually --- do others need a break?

Q.    Any time --- your concentration is most

1    important.  So if you need a break, we'll take a break.

2      A.    So I'm good.

3            ATTORNEY BROOKS:  Well, obviously, if

4    anybody wants a break, we can take a break.

5            ATTORNEY BLOCK:  Do you need a break?

6            ATTORNEY SWAMINATHAN:  No.

7            ATTORNEY BLOCK:  We are good.

8            THE WITNESS:  So my rebuttal.

9    BY ATTORNEY BROOKS:

10     Q.    Your rebuttal, which is Exhibit 2, so it's

11   probably at the bottom.  And in that I'm going to draw

12   your attention to paragraph 11.  And there you wrote

13   there is also no basis to confidently predict the

14   patterns about the athletic performance of prepubertal

15   cisgender boys will be the same for prepubertal

16   transgender girls, closed quote.  Do you see that?

17     A.    I do.

18     Q.    And let me attempt to see if I understand the

19   point of this paragraph.  And indeed, if you would like

20   to read the whole paragraph you should.  But my

21   understanding of the point is that you're saying that

22   even if prepubertal boys have some performance, some

23   statistically significant performance advantage over

24   prepubertal girls, that you are not confident that the

1  athletic performance capabilities of natal males who

2  identify as females before puberty will be the same as

3  those of natal males who identified as male before

4  puberty?

5              ATTORNEY BLOCK:  Objection to the

6  terminology.

7              THE WITNESS:  So to the extent --- so

8  were differences to be determined between cisgender boys

9  and cisgender girls, it is correct to say that that

10  won't conclusively demonstrate that the same applies for

11  transgender girls.  That's right.

12  BY ATTORNEY BROOKS:

13     Q.    Now, elsewhere in your writings you have said

14  that it is well known that the majority of prepubertal

15  children who experience gender dysphoria do not persist

16  in that dysphoria into pubertal adolescence.

17         Correct?

18              ATTORNEY BLOCK:  Objection.

19              THE WITNESS:  No.

20  BY ATTORNEY BROOKS:

21     Q.    Not correct?

22     A.    Not correct.

23     Q.    Then we will come back to that.  In this

24  paragraph 11, you speculate a little farther down that,

```
 1   quote, the experience of transgender girls might be more

 2   similar to the experience of cisgender girls?

 3                    ATTORNEY BLOCK:  Objection to the

 4   characterization and speculative.

 5   BY ATTORNEY BROOKS:

 6      Q.    Well, by using the word might you meant to

 7   indicate, did you not, Dr. Safer, this is a hypothesis,

 8   this is not a documented fact?

 9      A.    That if the question is do I know that the

10   experience of transgender girls is definitely in this

11   circumstance the same as cisgender girls, that's right,

12   I don't know that.  It only might be true.

13      Q.    And towards the end, in the last line, you refer

14   to potential biological underpinnings of gender

15   identity.  Again, the word potential signaling that no

16   such specific underpinnings have yet been identified.

17            Correct?

18      A.    Say that question again.

19      Q.    In the last line, your reference to, quote,

20   potential biological underpinnings of gender identify,

21   by the word potential you are indicating that no

22   specific biological underpinning has yet been

23   identified.

24            Correct?
```

1          ATTORNEY BLOCK:  Objection to form.

2          THE WITNESS:  So it's --- so no,

3    potential in this context does reference that most of

4    this biology is unknown, so that part is true, but it

5    doesn't mean that there is nothing known.

6    BY ATTORNEY BROOKS:

7    Q.    You do not propose to offer any opinion that

8    natal males --- let me strike that and start again.

9          You do not propose to offer any opinion, do

10   you, that prior to puberty natal males who identify as

11   female are less athletic capable on average than natal

12   males who identify as male?

13          ATTORNEY BLOCK:  Objection to form.

14          THE WITNESS:  I'm not offering an opinion

15   with regard to cisgender --- excuse me --- cisgender

16   boys versus transgender girls and their athleticism when

17   they are prepubertal.  If that's what you are asking,

18   then yes, I'm not offering an opinion between those two

19   groups.  I'm simply raising the possibility that

20   something like biology associated with transgender could

21   have influence into it.

22   BY ATTORNEY BROOKS:

23   Q.    Let me ask you to turn to paragraph 22 of your

24   rebuttal report.  And there you write Doctor Brown also

1  refers to widely publicized anecdotes about isolated

2  cases of transgender girls and women state championships

3  in high school sports or NCAA championships in college.

4  Do you see that?

5       A.    I do.

6       Q.    And you go on to write but transgender athletes

7  of women have been competing in NCAA and secondary

8  school athletics for many years at this point, closed

9  quote.  Do you see that language?

10      A.    I do.

11      Q.    Let me ask you to name all instances of male

12  males known to you who have competed in women's division

13  varsity athletics in any athletic endeavor for any NCAA

14  member school?

15                  ATTORNEY BLOCK:  Objection to form and

16  scope.

17                  THE WITNESS:  Right, so I certainly can't

18  do that usefully off the top of my head, name

19  transgender women and all these context in such an

20  exhaustive way like that.

21  BY ATTORNEY BROOKS:

22      Q.    Well, I asked you accused Doctor Brown of citing

23  isolated cases.  Do you have any basis to assert that he

24  has done anything other than cite all cases in which

1    natal males have competed in NCAA athletics in the

2    female category?

3         A.    So the --- if our focus is on the word isolated

4    then per se they are all --- these are all isolated

5    cases.   These aren't systematic analyses of any cohort

6    of people.

7         Q.    You are not accusing Doctor Brown of picking and

8    choosing?

9                    ATTORNEY BLOCK:  Objection to form.

10                   THE WITNESS:  So let me think about that.

11   By simply choosing individual cases that are in the

12   press then it is by its nature picking and choosing.

13   BY ATTORNEY BROOKS:

14        Q.    What do you mean by that?

15        A.    Well, these are simply individual cases that

16   have --- that have come to public attention, and so I

17   --- so --- and that's the basis of my statement as

18   opposed to some exhaustive attempt to identify

19   transgender people in a systematic fashion.

20        Q.    As you sit here today, Dr. Safer, are you aware

21   of a single case not mentioned by Doctor Brown in his

22   report of a natal male who has competed in NCAA

23   athletics in the women's category?

24                   ATTORNEY BLOCK:  Objection to form.

1          THE WITNESS:  Can I name somebody off the

2    top of my head?  I cannot.

3    BY ATTORNEY BROOKS:

4       Q.    Do you have any concrete --- leaving aside

5    whether you remember a precise name, do you have any

6    factual basis to know that Doctor Brown has omitted any

7    case of a natal male who has competed in the female

8    division of NCAA athletics?

9              ATTORNEY BLOCK:  Objection to form.

10             THE WITNESS:  So I guess if the question

11   is what can I do off the top of my head, then I cannot.

12   BY ATTORNEY BROOKS:

13      Q.    Off the top of your head, you recall the case of

14   June Eastwood, do you not?

15      A.    You have to remind me what that is.

16      Q.    A runner in Montana?

17      A.    I actually would need to be reminded of those

18   details.

19      Q.    All right.  Certainly you recall Lia Thomas

20   because none of us can mis Lia Thomas these days?

21      A.    Lia Thomas is still in the news.

22      Q.    Do you recall the case of CeCe Telfer?

23      A.    Names are not my strength.

24      Q.    All right.  No more on that.

1          You say at the end of this paragraph, quote,

2    the occasional championship that has been widely

3    publicized do not come close to constituting the rates

4    one would expect if they, that is transgender athletes,

5    wanted rates that are proportional to their overall

6    percentage of the population, which is approximately one

7    percent.  Do you see that language?

8         A.    I do.

9         Q.    Do you have any knowledge as to what --- first

10   of all, let me ask, what is your basis for believing

11   that the current student population in college and high

12   school level is approximately one percent transgender?

13        A.    The statistic for the percentage of the

14   population who are transgender comes from surveys.

15        Q.    And do you have any knowledge at all as to what

16   percentage of varsity athletes in America today at the

17   NCAA --- among NCAA member schools in the women's

18   division are transgender?

19        A.    If the question is that a survey in that

20   population, I'm not aware of a survey that's been done.

21        Q.    So you don't know whether the number of

22   victories of championships that have been taken in the

23   women's division by transgender competitors is higher or

24   lower than the percentage of athletes in those divisions

```
 1   who are transgender?
 2               ATTORNEY BLOCK:  Objection to form.
 3               THE WITNESS:  That is correct.  I do not
 4   know the percentage that --- what we know is the
 5   percentage of transgender people and then we know the
 6   percentage of identified athletes winning competitions.
 7   And even then we don't know that absolutely.  We only
 8   know the ones that are publicized.  But, right, in the
 9   in between, we don't have statistics.  That's right.
10               ATTORNEY BROOKS:  Counsel, I'm going to
11   suggest --- in my experience, if we break for lunch at
12   noon, it makes it a little long afternoon.  So I would
13   suggest that we take a short break now and then keep
14   going until like 12:45 or something.  It's seven hours
15   on the clock and I'm here just to tell you that the
16   afternoon gets long.  So unless you are starving I'd
17   recommend ---?
18               THE WITNESS:  No, I think that's a great
19   idea.
20               ATTORNEY BROOKS:  Take a short break now.
21               THE WITNESS:  So you don't know who is on
22   the phone so give them a break.
23               ATTORNEY BROOKS:  Let's go off the
24   record.
```

1          VIDEOGRAPHER:  Going off the record.  The

2   current time reads 12:01:00 p.m. Eastern Standard Time.

3   OFF VIDEOTAPE

4                            ---

5   (WHEREUPON, A SHORT BREAK WAS TAKEN.)

6                            ---

7   ON VIDEOTAPE

8          VIDEOGRAPHER:  Back on the record.

9   Current time reads 12:14 p.m. Eastern Standard Time.

10          ATTORNEY BROOKS:  Let me mark as Safer

11   Exhibit 8 the Endocrine --- Treatment of Gender

12   Dysphoric Gender Incongruent Persons, an Endocrine

13   Society Clinical Practice Guidelines from 2017

14   previously marked as Adkins Exhibit 4.

15          ATTORNEY WILKINSON:  Tab 5.

16                            ---

17          (Whereupon, Exhibit 8, Endocrine Society

18          Guidelines, was marked for identification.)

19                            ---

20   BY ATTORNEY BROOKS:

21     Q.    And Doctor Safer, am I correct you served the

22   committee that created this revised version of the

23   Endocrine Society's Guidelines?

24     A.    Yes.

1    Q.    And is it reasonable for me to assume therefore

2 that you are familiar with it in some detail?

3    A.    I am familiar with it in some detail.

4    Q.    They also pertain to your practice?

5          Am I correct.

6    A.    And they do pertain to my practice, yes.

7    Q.    Let me ask you to turn in Exhibit-5 to Page 3879

8 --- Exhibit 8, 3879.  And there I will call your

9 attention to the specific recommendation that's numbered

10 1.4.  And it says there we recommend against puberty

11 blocking and gender-affirming hormone treatment in

12 prepubertal children with GD/gender incongruence.

13          Do you see that?

14    A.    I do.

15    Q.    And then there is a section headed evidence,

16 right?

17    A.    Yes.

18    Q.    And the first statement in the sentence that is

19 --- in the section headed evidence is, quote, in most

20 children diagnosed with GD/gender incongruence it did

21 not persist into adolescence, closed quote.

22          Do you see that?

23    A.    I do.

24    Q.    Do you believe that to be a false statement?

1    A.    I wouldn't --- I guess it depends on context

2    here too.  So as of when this was written, the

3    literature being referenced had a broader diagnosis for

4    gender dysphoria and gender incongruence or really

5    gender dysphoria is the label that was being used and

6    still is.  Gender incongruence is where we are headed.

7    And so with that broader definition, that included

8    gender expansive children who were not necessarily

9    transgender.

10    Q.    The statement is I think fairly specific.  And

11    as you are aware, the discussion cites various

12    references, but the introductory sentence states in most

13    children diagnosed with GD a gender dysphoria or gender

14    incongruence did not persist into adolescence.  Do you

15    believe to be a true statement or false statement?

16                    ATTORNEY BLOCK:  Objection to form.

17                    THE WITNESS:  The problem is I can't

18    answer that quite that cleanly.  The statement

19    references a circumstance that I just referenced where

20    children receiving that label have to --- for the most

21    part were not transgender.  The only caution I want to

22    make is that as we grow more refined in our

23    understanding of gender identity and also in our

24    labeling, that we are more specific in identifying

1    transgender kids with these sorts of labels.

2    BY ATTORNEY BROOKS:

3        Q.    Well, recommendation 1.4 says we recommend

4    against puberty blocking and a gender hormone treatment

5    in prepubertal children with gender dysphoria or gender

6    incongruence.  Do you have an understanding of why these

7    Endocrine Society guidelines of which you're a co-author

8    recommended against puberty blocking in prepubertal

9    children?

10       A.    Yes.

11       Q.    Why?

12       A.    They have no impact.

13       Q.    Can you point me to anywhere in the evidence

14   discussion that suggests that is the reason for this

15   recommendation?

16       A.    I don't know.  Let me look.

17       Q.    The evidence discussion is just two paragraphs.

18                   ATTORNEY BLOCK:  I just want to object to

19   the extent you're limiting his review to the evidence

20   section.

21   BY ATTORNEY BROOKS:

22       Q.    My question pertains to the evidence section.

23       A.    So those two paragraphs are both primarily

24   referencing 1.3 and not 1.4.

1    Q.    Well, let me ask you to turn to page 3881.  And

2  at the top of that first column on 3881 it reads we,

3  therefore, advise starting suppression in early puberty

4  to prevent irreversible development of undesirable

5  secondary sex characteristics.  However, comma,

6  adolescents with gender dysphoria, slash, gender

7  incongruence should experience the first changes of

8  their endogenous puberty because their emotional

9  reaction to these first physical changes has diagnostic

10  value in establishing the persistence of gender

11  dysphoria/gender incongruence.

12         Do you see that language?

13    A.    I do.

14    Q.    And as a scientist and practitioner do you agree

15  with that statement?

16    A.    I would say that the validity of that statement

17  is in evolution.

18    Q.    In your practice, over time --- well, let me ask

19  you this.  When this was drafted did you raise an

20  objection to the proposition that the child's emotional

21  reaction to the first physical changes of puberty had

22  important diagnostic value?

23    A.    I cannot recall our specific conversations, but

24  if you're asking if my view has shifted since let's say

1    2015, 2016, 2017, no, the recognition that there is an

2    evolution was already part of my opinion.

3        Q.     What do you mean the recognition that there is

4    an evolution about?

5        A.     So the evolution is that whether there is a need

6    to start puberty as a diagnostic --- as a necessary

7    diagnostic circumstance.

8        Q.     In your practice today do you prescribe puberty

9    blockers prior to Tanner Stage 2?

10       A.     I --- so two things.  My practice is with

11   adults.  And although I will see older kids because I

12   don't have a hard threshold of age 18, but I don't

13   prescribe puberty blockers because I don't --- my

14   practice does not include those age children.  But two,

15   it is still the guidance and so the pediatricians who

16   are part of my program do not prescribe puberty blockers

17   prior to Tanner 2 for the reason I stated initially.

18       Q.     And according to these guidelines, by the time

19   you reach Tanner Stage 2 there have been sufficient

20   first pubertal --- stages of pubertal development to

21   give a chance to observe the child's reaction to

22   pubertal changes for diagnostic purposes.

23              Correct?

24              ATTORNEY BLOCK:  Objection to form.

1          THE WITNESS:  So the --- so I guess there

2    are kind of two pieces.  The sentence is --- that

3    sentence is written, but that is the sentence that I'm

4    suggesting is an opinion that is in evolution, like I'm

5    saying, to whether that need really exists or not.  The

6    reason why we still don't prescribe puberty blockers

7    before Tanner 2 is that there is no point, there is no

8    preventive element to puberty blockers and so there is

9    no point to give them before puberty begins and there is

10   no way to know that until there is an observable

11   objective finding.

12       Q.    Has your own practice ever involved to a

13   significant extent treating prepubertal or early

14   pubertal stage children for gender dysphoria or gender

15   incongruence incongruence?

16       A.    Have I personally cared for prepubertal children

17   who are transgender or otherwise?  Actually, in the

18   subjects, no.

19       Q.    And do physicians who do treat prepubertal

20   children report to you in connection with your position

21   at the clinic or the Mount Sinai Medical Hospital?

22       A.    Yes.

23       Q.    And do you know whether your clinic makes use of

24   children's emotional reactions to the first physical

1    changes of puberty as part of their process of

2    determining whether transgender hormonal therapies of

3    any sort are appropriate for that child?

4        A.    Yeah, I can't give you give you an answer.  I

5    would actually have to go survey my psychologists.

6        Q.    Let me direct you to paragraph 17 of your

7    rebuttal report.  And there you say in the second

8    sentence under current standards of care transgender

9    adolescents are eligible to receive puberty blockers

10   when they reach Tanner 2, not Tanner 3, which is early

11   enough to prevent endogenous puberty from taking place,

12   closed quote.

13           Do you see that?

14       A.    I do.

15       Q.    Now, just for context, you testified previously

16   that the large majority of minors I'll say who present

17   with gender incongruence or gender dysphoria are, in

18   fact, considerably older and have gone through at least

19   most of the Tanner stages.

20           Correct?

21               ATTORNEY BLOCK:  Objection to

22   characterization.

23               THE WITNESS:  Most of the people we are

24   seeing in clinical practice are coming to us at later

1    stages of development, yes.

2    BY ATTORNEY BROOKS:

3    Q.    And so when we talk about prepubertal children,

4    we're talking about a small minority of the patients

5    coming in to ---?

6    A.    I can't define small, but it is the minority,

7    that's correct.

8    Q.    And do you believe that what your clinic is

9    seeing in that regard is typical of what's being seen

10   across the country these days?

11   A.    So if I'm sitting here as an expert, I don't

12   have an expert survey to point to, to give you an answer

13   there.

14   Q.    But you read the literature and you talk to

15   colleagues at other institutions.

16         Am I correct?

17   A.    I certainly both read the literature and talk to

18   colleagues.

19   Q.    And is it your current belief that what you are

20   seeing in terms of the breakdown of patient population

21   is similar to or quite different from what other major

22   gender clinics are experiencing?

23   A.    So kind of separating, I'm living in my expert

24   role, I really want to point to data where I have any

1    confidence at all, and I have none.  If you are asking

2    me in a more informal way among our conversations, then

3    I can answer that our experience seems similar to

4    others' experience.

5        Q.    All right.

6             So in talking about prepubertal children ---

7    well, strike that.  We've been through that.

8        In your rebuttal report when you said beginning

9    puberty blockers at Tanner stage 2 is early enough to

10   prevent endogenous puberty from taking place, let me ask

11   you, in consideration, do you believe it is accurate as

12   stated?

13       A.    So Tanner 2 early enough to prevent endogenous

14   puberty from taking place, yes, that is accurate.

15       Q.    You would agree with me, would you not, that the

16   endocrine guidelines of which you are a co-author

17   recommend to treat beginning puberty blockers at Tanner

18   Stage 2?

19       A.    So to clarify, under the cited guidelines what

20   they say the recommendation is do not use puberty

21   blockers prior to puberty beginning, prior to Tanner 2.

22       Q.    Let me direct you to recommendation 2.2 on

23   page 3880.  Recommendation 2.2 reads we suggest the

24   clinicians begin pubertal hormone suppression after

```
 1    girls and boys first exhibit physical changes of

 2    puberty.

 3              Do you see that?

 4        A.    I do.

 5        Q.    And then it says, paren, Tanner stages G2/B2

 6    which is to say the girls Tanner 2 or boys Tanner 2,

 7    correct?

 8        A.    That is what that means, yes.

 9        Q.    So the official recommendation from the

10    Endocrine Society is begin at or after Tanner Stage 2,

11    right?

12                    ATTORNEY BLOCK:  Objection to form.

13                    THE WITNESS:  That is a correct.

14    BY ATTORNEY BROOKS:

15        Q.    And it says that Tanner Stage 2 is defined as

16    girls and boys first exhibiting physical changes of

17    puberty.

18          Correct?

19                    ATTORNEY BLOCK:  Objection to form.

20                    THE WITNESS:  The definition of Tanner 2,

21    is where there is any objective evidence when puberty

22    has begun.

23    BY ATTORNEY BROOKS:

24        Q.    So in fact, beginning puberty blockers at Tanner
```

```
 1    Stage 2 does not categorically prevent endogenous

 2    puberty from taking place but instead prevents a

 3    substantial portion of endogenous puberty from taking

 4    place.

 5              Correct?

 6                      ATTORNEY BLOCK:  Objection to form.

 7                      THE WITNESS:  So let me ---.

 8    BY ATTORNEY BROOKS:

 9        Q.    It is in paragraph 17.

10        A.    So the --- I guess the way this is understood is

11    --- I guess it depends on how extreme you want to take

12    things.  It is back to our original conversation of that

13    cause has to take place before effect.  So it's parsing

14    it to that degree.

15              In a biological context it really is the case

16    that we need some objective evidence before we begin

17    things so that we don't make the mistake of using a

18    medication prior to its having any impact.  And then

19    it's also true that some of the hormone mediated changes

20    that we see do actually regress to that prepubertal

21    state when we --- when you use puberty blockers at

22    Tanner 2.  So the statement as written --- as I wrote it

23    is accurate in the way we think of these things in

24    biology.
```

1    Q.    Although the guidelines specifically state that

2  adolescents should --- before puberty blockers, quote,

3  should experience the first changes of their endogenous,

4  spontaneous puberty.  And the recommendation calls for

5  beginning puberty blockers, quote, after girls and boys

6  first exhibit physical changes at puberty, paren, Tanner

7  stages 2, closed paren.  I'm not misreading anything, am

8  I?

9               ATTORNEY BLOCK:  Objection to just

10  reading an excerpt.

11               THE WITNESS:  Right.  I don't know --- I

12  don't know if those were are all direct quotes or not so

13  I won't comment on whether you're misreading or not, but

14  the first statement that you reference, as I've said, is

15  one where there is an evolving understanding of its

16  veracity or its applicability.

17               The statement 2.2 is simply using

18  alternate phrasing for saying Tanner 2, that is we need

19  to have objective evidence that puberty is genuinely

20  beginning.  The focus and the purpose of these

21  statements is to avoid people using puberty blockers on

22  non-pubertal kids.

23  BY ATTORNEY BROOKS:

24    Q.    Well, you would agree with me, would you not,

1    that if one administer puberty blockers in accordance

2    with Endocrine Society guidelines, then some stages of

3    endogenous male puberty will have occurred in natal male

4    patients?

5              ATTORNEY BLOCK:  Objection the form.

6              THE WITNESS:  So when we are ---

7    specifically we're referencing transgender girls here.

8    And although pre-pubertis gender boys, when we see

9    Tanner 2, then some --- some degree of development has

10   taken place.  That part is true.  So in the absolute

11   sense, then yes.  But in a biological sense, like I said

12   already, the --- some interesting reality is that some

13   of that does regress.

14   BY ATTORNEY BROOKS:

15      Q.    By the way, you, yourself, do not have any

16   knowledge as to what developments of endogenous male

17   puberty BPJ underwent prior to initiating puberty

18   blockers, do you?

19      A.    I have had no physical contact with BPJ.

20      Q.    Nor have you studied BPJ's chart sufficiently to

21   be feel that you know the answer to that question?

22      A.    Right, I'm not expressing any opinion to the

23   specific medical terms, that's right.

24      Q.    Have you, yourself, ever supervised any

```
 1    research, clinical research, concerning treatment of

 2    prepubertal children for gender dysphoria or gender

 3    incongruence?

 4        A.    Have I supervised research on treatment of

 5    prepubertal transgender girls?  Let me think about that.

 6    Nothing is coming to mind, but our program does do

 7    research across an age span.

 8        Q.    Well, some of your colleagues might have done

 9    such research, but my question is whether you have been

10    personally supervised or involved in such research?

11        A.    I'm pretty involved actually, especially in our

12    research program, but I'm having a difficult time coming

13    up with an example.

14        Q.    All right.

15              I just want to make sure I know about it if it

16    exists.

17        A.    Yes.

18              ATTORNEY BROOKS:  Let me mark as Safer

19    Exhibit 9 an article entitled --- an article or a

20    chapter or something entitled Care of the Transgender

21    Patient dated 2019 by Dr. Safer and by Doctor Vin

22    Tangpricha.

23                            ---

24              (Whereupon, Exhibit 9, Care of the
```

```
 1              Transgender Patient Article, was marked

 2              for identification.)

 3                        ---

 4   BY ATTORNEY BROOKS:

 5      Q.    Am I correct that this is --- well, you tell me,

 6   is this an article or book chapter?  How would you

 7   describe this document?

 8      A.    This is a review article from the Annals of

 9   Internal Medicine.

10      Q.    And by review you mean it's not reporting on

11   original research but rather summarizing the state of

12   knowledge in a particular area?

13      A.    That is correct.

14      Q.    Okay.

15              And the pages may have ITC and a number, but

16   I'll just refer to the number if I may.  On page three,

17   column two, is a statement that I think is just

18   repeating what you told me, that is most --- quote, most

19   transgender persons present to clinicians in late

20   adolescence or adulthood, closed quote.  That is

21   consistent with what you testified earlier.

22              Correct?

23      A.    That is, yes.

24      Q.    And if you turn then to page five, column two,
```

1    you write in the first full sentence in column two,

2    prior effects of androgens on the skeleton height and

3    size and shape of the hands, feet, jaw and pelvis and

4    voice, including visibly --- visible laryngeal

5    prominence, will not be altered if treatment is

6    initiated after puberty.

7              Do you see that language?

8         A.   I do.

9         Q.   And is it consistent with your understanding

10   that at this stage also changes to the size of the heart

11   and the lungs will not be altered if testosterone is

12   commenced after the initiation of puberty?

13        A.   Not quite.

14        Q.   Explain that to me, please.

15        A.   So transgender women, if they have gone through

16   a typical male puberty, are going to remain larger, but

17   the testosterone has action on certain tissues, so

18   specifically muscle, and that --- when those

19   testosterone levels shrink, then that muscle shrinks and

20   the heart muscle is --- well, the heart is a muscle, so

21   it will be --- there will be an impact from body size,

22   but there will also be impact from the lower level of

23   testosterone.  So it will be kind of a mix of those two.

24        Q.   The heart is a muscle but it has in it cavities

1  of a certain size in which blood flows, out of which

2  blood is pumped, correct?  Do you have any knowledge,

3  are you aware or any literature that documents that

4  testosterone suppression reduces the heart's pumping

5  capacity?

6                    ATTORNEY BLOCK:  Objection to form.

7                    THE WITNESS:  So the --- so there is a

8  gap there of transgender research --- so no, that is

9  something that's not been studied.

10 BY ATTORNEY BROOKS:

11    Q.    And the lungs are not muscle tissue.  Are you

12 aware of any science that indicates or even suggests to

13 you as an expert that an individual who has gone through

14 typical male puberty, that individual's lungs reduce in

15 size if testosterone is suppressed?

16    A.    So the answer with regard to lungs is going to

17 have some of those same inputs as heart or other tissues

18 actually where overall size of the individual is not ---

19 well, certainly height at least is not decreasing, and

20 so this person is larger.  And so lung size matches that

21 to some degree.  And testosterone has some impact on

22 surrounding muscle.  And so to the degree that that

23 shrinks there might be lung shrinking too.  And so you

24 hear that --- that is going to be a complex answer.  And

1  in terms of interpreting it even, you then would also

2  have to interpret it in the context of the size of the

3  body if you want to consider function, and none of this

4  has been studied.

5      Q.    Certainly you don't believe, do you, that an

6  individual who has been --- let me start that again.  It

7  is not your opinion, is it, that testosterone

8  suppression by an individual who has been through a

9  typical male puberty reduces that individuals VO2 mass

10  to typical female levels?

11      A.    So the more we get into some of the subtler

12  physiology, I will take a step back and give you an

13  expert opinion, but I will --- in addition to that point

14  out that we don't even have studies on this.  We're just

15  at a stage of beginning to look at that sort f thing.

16                 ATTORNEY BLOCK:  Roger, are you able to

17  speak up a little?

18                 ATTORNEY BROOKS:  I will try.

19  BY ATTORNEY BROOKS:

20      Q.    You state that in paragraph 55 of your expert

21  report, Exhibit 1?

22      A.    So paragraph 55.

23      Q.    Fifty-five (55).  You state that there are,

24  quote, only two studies examining the effect of

1    gender-affirming hormone therapy on athletic

2    performance, closed quote.  Do you see that?

3        A.    Yes.

4        Q.    You are aware, are you not, that there are a

5    substantially larger number of studies that examine the

6    effect of testosterone suppression on strength or muscle

7    mass in natal males?

8                      ATTORNEY BLOCK:  Objection to form.

9                      THE WITNESS:  There are --- there are a

10   handful of studies on the impact of testosterone

11   lowering treatment on transgender women on some tissues,

12   yes.

13   BY ATTORNEY BROOKS:

14       Q.    Well --- and not to get carried away with the

15   terminology, there are also studies that relate to

16   application of testosterone suppression to males who

17   don't identify as transgender, are there not?

18       A.    To cisgender men in addition to transgender

19   women there are some studies --- yes, there are actually

20   some modest studies, yes, on cisgender men.

21       Q.    And have you now taken some care to review

22   yourself all the peer-reviewed studies of that type that

23   were cited in Doctor Brown's report?

24       A.    I have looked at papers that were cited by

1    Doctor Brown.  The moment we use the word all I

2    hesitate, but certainly I've read through the papers

3    that were cited.

4                    ATTORNEY BROOKS:  Well, let's start with

5    one you referenced, article by Roberts, et al., from

6    2020, which I will mark as Exhibit --- Safer Exhibit-10.

7                    COURT REPORTER:  10.

8                    ATTORNEY WILKINSON:  10, Tab 60.

9                             ---

10                   (Whereupon, Exhibit 10, Roberts, et al,

11                   Articles, was marked for

12                   identification.)

13   BY ATTORNEY BROOKS:

14     Q.    And in fact, this is one of only very few

15   articles that you cite in your expert report start to

16   finish.

17           Correct?

18                   ATTORNEY BLOCK:  Objection to form.

19                   THE WITNESS:  So this paper is referenced

20   to an expert report.

21   BY ATTORNEY BROOKS:

22     Q.    Let me direct you to the last page of your

23   expert report where there is a bibliography.  And other

24   than citing to your own writings as the entire basis of

1    your opinions you cited only six articles.

2              Correct?

3                    ATTORNEY BLOCK:  Objection to

4    characterization about its entire cases for his

5    opinions.

6                    THE WITNESS:  So the paper specifically

7    referenced two reviews and six papers but recognized

8    that some of these papers specifically are summaries of

9    the topic.

10   BY ATTORNEY BROOKS:

11     Q.    You have studied the Roberts 2020 article with

12   some care.

13              Is that correct?

14     A.    I have indeed, yes.

15     Q.    And so far as you know it is the only

16   longitudinal study of the impact of testosterone

17   suppression in natal males and actual athletic

18   performance and in this case running.

19              Correct?

20                    ATTORNEY BLOCK:  Objection to form.

21                    THE WITNESS:  So the Roberts study and

22   the Harper study are both studies of transgender women

23   with at least two time points.

24   BY ATTORNEY BROOKS:

1    Q.    The Harper study is strictly retrospective, it

2    is not a prospective, longitudinal study?

3    A.    The Harper study is --- that's a good question.

4    I actually don't know if it is --- it's probably mixed,

5    honestly.

6    Q.    Well, we can look at it, but it is not mixed.

7    It is a one-time survey.

8    A.    Well, to be clear, the way we phrase these

9    things sometimes are --- I'm trying to be --- are

10   according to certain conventions academically, so that

11   sometimes it will be framed that way because from an

12   academic perspective we'll use that context, but I think

13   some of the data was actually collected in both

14   collections.

15   Q.    The Roberts study you understand to be a

16   prospective, longitudinal study, do you not?

17   A.    Well, actually, you are testing me on that.  Did

18   they set out at the beginning to do it or did they go

19   back and look?  I'd have to see.

20   Q.    Well, based on the method, I think the answer is

21   they went back and looked because it begins we reviewed?

22   A.    Yes.

23   Q.    Do you --- is it your opinion that amongst the

24   available data, the Roberts study is --- on the impact

1    of testosterone on athletic performance is some of the

2    strongest data that we have available?

3                      ATTORNEY BLOCK:  Objection to form.

4                      THE WITNESS:  It is my opinion that the

5    Roberts and Harper studies are the only two studies that

6    we have available.

7    BY ATTORNEY BROOKS:

8       Q.    Is it your opinion as an expert, is it not, that

9    the structure of the Roberts study renders it --- and

10   the source of its data renders it far more reliable than

11   the Harper 2015 study?

12                     ATTORNEY BLOCK:  Objection to form.

13                     THE WITNESS:  I would not overstate that,

14   so no.  If I'm being --- if I'm being professorial and

15   saying this is how to organize something, then in that

16   context I might say that, but in terms of simply

17   believability of data, I got two modest papers that are

18   the sum of the world literature on the subject.

19   BY ATTORNEY BROOKS:

20      Q.    You say in paragraph 56 of your report that

21   Roberts found, quote, after two years of

22   gender-affirming hormone therapy transgender women

23   completed the 1.5 mile run 12 percent faster on average

24   than non-transgender women, closed quote.  Do you see

```
 1    that?
 2                    ATTORNEY BLOCK:  I think he needs some
 3    time to get ---.
 4                    THE WITNESS:  Yeah, to actually find
 5    the ---.
 6    BY ATTORNEY BROOKS:
 7       Q.    Paragraph 56.  And I will refer you to the third
 8    sentence.
 9       A.    All right.
10             Sorry say that again.
11       Q.    I'm simply calling your attention to the place
12    where you wrote at the Roberts report that after two
13    years of a gender-affirming hormone therapy transgender
14    women completed the 1.5 mile run 12 percent faster on
15    average than non-transgender women.
16       A.    Yes.
17       Q.    And two years, not a trick question here, twice
18    as long as the one year testosterone suppression
19    requirement that led to the NCAA rule.
20             Correct?
21       A.    Two years is twice one year, yes.
22       Q.    And you would agree with me that a 12 percent
23    faster in women's time is a substantial advantage?
24                    ATTORNEY BLOCK:  Objection to form.
```

1          THE WITNESS:  So this is a bit --- this

2    is a bit of the same conversation.  I guess I can't say

3    that in a blanket way.  It depends on context.

4    BY ATTORNEY BROOKS:

5       Q.    The context here is that that these are all Air

6    Force members, do you recall?

7       A.    I believe they are all Air Force members, yes.

8       Q.    All subject to Air Force physical fitness

9    requirements.  So we are not talking about couch

10   potatoes?

11      A.    I'm not rendering an opinion there as an expert.

12      Q.    Generally you would accept that this is a

13   relatively fit population?

14      A.    I can't even render an opinion there as an

15   expert.

16      Q.    Do you have some unhealthy relative who's a

17   member of the armed forces?

18      A.    I was in the National Guard, so I do have some

19   insight.

20      Q.    Okay.

21            You would agree, would you not, that running

22   speed and endurance, per se, are relevant to quite a

23   number of sports?

24      A.    Running speed and endurance are relevant to many

1   sports.  I'm certain that is true.  I'm not ---

2       Q.    Well ---.

3       A.    --- an expert again.

4       Q.    I'm no sports fan, but we've all seen enough

5   sports to know there's a lot of running involved not

6   just in track but in basketball, soccer, lacrosse and

7   field hockey.

8             Correct?

9       A.    I have observed that, yes.  But again, I'm not

10  rendering an expert opinion there, but yes.

11      Q.    And on page six of this paper ---.

12      A.    This is Roberts.

13      Q.    Yes, Roberts and Exhibit 10.  Roberts and his

14  co-authors summarize in their conclusion by stating,

15  quote, in this study we confirm that the use of  gender

16  affirming hormones are associated with changes in

17  athletic performance and demonstrated that the

18  pretreatment differences between a transgender and a

19  cisgender woman persist beyond the 12-month time

20  currently --- requirement currently being proposed for

21  athletic competition by the World Athletics and the IOC.

22  Do you see that?

23      A.    This is the conclusion section?

24      Q.    It is.

1    A.    Yes, I see that.

2    Q.    And you don't have any expert opinions that the

3    findings of Roberts are inaccurate or unreliable, do

4    you?

5    A.    So the --- this is again a question of context.

6    So I have no reason to suspect that these data are

7    suspect.  The only question then is what we conclude

8    when you do a study of --- for the transgender women I

9    think we are talking about 29 people, which I certainly

10   like a lot better than simply pointing to a random

11   individual, but I recognize as also simply 29

12   individuals in a certain circumstance that might or

13   might not be replicated as we do this again and increase

14   the numbers of people that we evaluate.

15   Q.    You don't propose to offer any expert opinion

16   that the findings of Roberts as reported in this paper

17   of 2020 are inaccurate?

18   A.    So, I guess the way I said it is how I said it

19   already, which is I'm not doubting Roberts' data, but I

20   wouldn't then over generalize to say that I know that

21   these would be the findings we would see in every

22   similar circumstance.

23   Q.    And are you aware that one common track event or

24   cross-country event, I can never keep them straight, is

1  the 1600 meter, which is about a mile?

2      A.     Actually, that is not my expertise.  I believe

3  you.

4      Q.     Are you aware that the 3,000 meter, a 1.8 mile

5  distance, is a standard event?

6      A.     If you are meaning to quiz me on the standard

7  lengths these days and meters and all of that, no.

8                ATTORNEY BROOKS:  Well, I can't complete

9  my next document in two minutes, we if we want to break

10 at 1:00 now or I can do one more document.

11               ATTORNEY BLOCK:  I'm fine continuing if

12 you are.

13               THE WITNESS:  My bias is to push.

14               ATTORNEY BROOKS:  Folks online, we're

15 going to continue a little bit farther.

16 BY ATTORNEY BROOKS:

17     Q.     You cited a paper by Harper from 2015.  And that

18 paper also I take it you studied with some detail?

19     A.     Yes.

20     Q.     And how many individuals did Harper have in that

21 study?

22     A.     I --- do we have her ---?

23     Q.     Everything that you mention I have.

24               ATTORNEY BROOKS:  Let me mark as Safer

```
 1   Exhibit 11 ---
 2                   ATTORNEY WILKINSON:  Yes.
 3                   ATTORNEY BROOKS:  --- Harper's --- Harper
 4   et al. or just Harper, article Race Times for
 5   Transgender Athletes from 2015.
 6                   ATTORNEY WILKINSON:  Tab 61.
 7                           ---
 8             (Whereupon, Exhibit 11, Race Times for
 9             Transgender Athletes Article, was marked for
10             identification.)
11                           ---
12                   THE WITNESS:  Thank you.
13   BY ATTORNEY BROOKS:
14     Q.    You say you have worked with Joanna Harper, you
15   are aware that Dr. Harper is both an athlete and
16   transgender?
17                   ATTORNEY BLOCK:  Objection to form.
18                   THE WITNESS:  I am aware.  I am aware
19   that she is an athlete, and I'm aware that she is
20   transgender.
21   BY ATTORNEY BROOKS:
22     Q.    Did you have after studying the paper end up
23   with an understanding of how many participants there
24   were?
```

1        A.      There were eight participants.  I'm looking at

2    Table 5.

3        Q.      Did you have an understanding of how those

4    participants were recruited?

5        A.      I do have some understanding of that, yes.

6        Q.      How is that?

7        A.      The --- how would I characterize this?  It's

8    somewhat ad hoc in the sense that Ms. Harper is in the

9    category of these other participants, and so she was

10   able to identify others that met the criteria of being

11   both transgender and being sufficiently intense in their

12   middle distance running that they had race times that

13   they could identify that would allow for the --- for

14   these determinations of age based --- I don't know all

15   the terminology here, but their age-based grade

16   proportional to others in that same sex category.

17       Q.      And it is consistent with your understanding, is

18   it not, that all of the information in this study about

19   what hormonal treatment these individuals had undergone

20   was self reported?

21       A.      This is --- the entire study is self report,

22   that is she didn't have --- Ms. Harper did not have

23   access to people's individual records independently.

24       Q.      So there was no independent confirmation of how

1    long that they had suppressed testosterone.

2          Correct?

3     A.    There was no independent confirmation beyond Ms.

4    Harper and her dealing with other subjects directly.

5     Q.    Well, in your view as a scientist, that's not

6    independent confirmation, is it?

7                    ATTORNEY BLOCK:  Objection to form.

8                    THE WITNESS:  So I'm not expressing an

9    opinion there because in a science --- you know, in a

10   scientific paper we would have --- we would have peer

11   review, but we don't --- that just --- ends up being a

12   little bit of a fuzzy realty.

13   BY ATTORNEY BROOKS:

14    Q.    There is no information in this paper about what

15   testosterone levels were achieved by any of these

16   individuals as a result of suppression, is there?

17    A.    I don't know.  Let's --- I can look through that

18   a little bit because does she reference how many of them

19   have had surgery and such?  It has been quite a while,

20   you know.  So notably, there is some independent

21   confirmation of some of the data because some of this

22   was posted.

23    Q.    Wait.  Let me just be clear.  Some of the times

24   were verified independently.

```
 1          Correct?

 2     A.    That's correct.

 3     Q.    Nothing about the hormonal treatment?

 4     A.    Right.

 5                ATTORNEY BLOCK:  Do you want to give him

 6   a chance to review it?

 7   BY ATTORNEY BROOKS:

 8     Q.    Doctor Safer, let me just withdraw that question

 9   and ask you another question.

10     A.    Yeah, go ahead.

11     Q.    Do you know whether Doctor Harper stands behind

12   the conclusions of her 2015 paper today?

13     A.    If you ask me do I know it, that's too strong a

14   statement.

15                ATTORNEY BROOKS:  Let me mark as Safer

16   Exhibit 12 an article by Joanna Harper and others from

17   2021 entitled How Does Hormone Transition in Transgender

18   Women Change Body Composition, Muscle Strength and

19   Hemoglobin.

20                ATTORNEY WILKINSON:  Tab 21.

21                      ---

22                (Whereupon, Exhibit 12, Joanna Harper

23                Article, was marked for identification.)

24                      ---
```

1    BY ATTORNEY BROOKS:

2        Q.    Dr. Safer, have we put that in front of you?

3    Yes, we have.  Are you familiar with this article?

4        A.    I am.

5        Q.    And have you read it, reviewed it recently?

6        A.    I have reviewed it relatively recently.

7        Q.    And do you understand, and I didn't completely

8    read the title.  The second sentence of the title says

9    Systematic Review with the Focus on Implications for

10   Sport Participation.

11           Do you see that?

12       A.    I do.

13       Q.    Can you tell me why when you cited Harper's 2015

14   paper that you just referred to as older science you

15   didn't cite Harper's 2021 publication?

16       A.    So to be clear, I didn't use the older science.

17   I simply referenced Harper's paper as one of the only

18   two papers on the subject.  And your question?

19       Q.    Why didn't you cite Harper's 2021 paper on the

20   topic?

21       A.    So this paper is more in the category of the

22   papers looking at impact on tissues of which there are

23   several papers as opposed to actually investigating a

24   specific activity, a person's activity.  And does this

1  have primary data in it?

2     Q.    Well, let me take you to page eight.

3     A.    Yeah, I don't even think this has a final data

4  in it.

5     Q.    Describing the Roberts study, Harper here on

6  page eight, column one, about halfway down, summarizes

7  as follows:  Quote, trans women ran significantly faster

8  during the 1.5 mile fitness test than ciswomen.  These

9  observations in trained transgender individuals are

10  consistent with the finding of the current review in

11  untrained individuals whereby 30 months of gender

12  affirming hormone therapy maybe sufficient to attenuate

13  some but all influencing factors associated with

14  muscular endurance and performance, closed quote.

15        Do you see that?

16     A.    Yes.  This is the end of the paragraph there?

17     Q.    Yes.

18     A.    We're starting with these observations, yes, I

19  see that.

20     Q.    And do you propose to offer any expert opinion

21  inconsistent with Joanna Harper's summary of the data

22  here suggesting that 30 months of gender affirming

23  hormone therapy may be sufficient to attenuate some but

24  not all influencing factors associated with muscular

endurance and performance?

     A.    The statement here is too broad, so it's simply

raising questions.

     Q.    Well, Joanna Harper says here that the findings

of her current review were that 30 months of gender

affirming hormone therapy may be sufficient to attenuate

some but not all influencing factors associated with

muscular endurance and performance?

                    ATTORNEY BLOCK:  Objection to leaving out

words of what you quoted.

BY ATTORNEY BROOKS:

     Q.    And my question for you is do you intend to

offer an expert opinion that you believe is inconsistent

with that statement?

                    ATTORNEY BLOCK:  Same objection.  It's

misquoting the document.

                    THE WITNESS:  So the operative or

inoperative word here is may be sufficient, and so when

we're --- these are research questions as we try to

understand physiology and the relevance of certain

testosterone levels at certain endpoints and then not

just endpoints as surrogates, which is what most of the

papers to date still are, but endpoints in actual

athleticism and athletic competition.  And so that's all

1    this is doing is putting out some questions or some

2    potential thoughts.

3    BY ATTORNEY BROOKS:

4        Q.    Let me ask you to turn to page one and column

5    one.

6        A.    Of this same paper?

7        Q.    Of the same paper.  In the conclusion of the

8    abstract the last sentence reads, quote, these findings

9    suggest the strength may be well be preserved in trans

10   women during the first three years of hormone therapy,

11   closed quote.

12           Do you see that?

13       A.    I do.

14       Q.    And having reviewed whatever literature you have

15   reviewed to date do you share Doctor Harper's

16   understanding that strength may well be preserved in

17   trans women during the first three years of hormone

18   therapy?

19               ATTORNEY BLOCK:  Objection to misquoting

20   the document.

21               THE WITNESS:  So I can't comment on Ms.

22   Harper's understanding, but if you're asking is that ---

23   you know, is the question a question, so the question is

24   a question.  These findings suggest that strength may

1    and again an operative word is may.

2    BY ATTORNEY BROOKS:

3        Q.    Yes.

4        A.    And these are as I, a scientist, and she is a

5    scientist too, we are turning the earth, as it were, of

6    what we know looking for what questions we might want to

7    study and how we might want to frame studies going

8    forward.

9        Q.    Let me take you back to page eight, if I may.

10   And the penultimate sentence of this paper at the bottom

11   of the first column of paragraph of page eight reads,

12   quote --- well, let me read --- yeah, I will just read

13   that, quote, whether transgender and cisgender women can

14   engage in meaningful sport even after gender affirming

15   hormone therapy is a highly debated question, closed

16   quote.

17             Do you see that language?

18       A.    I do.

19       Q.    You'll agree that up to the present that is a

20   highly debated question?

21                  ATTORNEY BLOCK:  Objection to form.

22                  THE WITNESS:  There's context there too.

23   So this is referencing a league sport and it's --- as

24   well there are a range of potential sports, and so the

1    question and the degree to which it is highly debated

2    even I'm not going to render an official opinion there.

3    So the --- whether transgender and cisgender women can

4    engage in meaningful sport depends on what sport we're

5    talking about, what treatment we're talking about, age

6    group, whether elite versus more of an intermural

7    setting.  And so it's just a relatively simple statement

8    and to summarize a paper I guess.

9    BY ATTORNEY BROOKS:

10       Q.    You agree that this --- that is the question of

11   whether transgender and cisgender women can engage in

12   meaningful sport even after gender affirming hormone

13   therapy is one on which reasonable scientists can

14   disagree and today are disagreeing?

15                   ATTORNEY BLOCK:  Objection to form.

16                   THE WITNESS:  So going back --- so is

17   your --- so are you asking me --- I guess help me

18   reframe what the question is there because there are a

19   bunch of things packed into that sentence actually.  And

20   you heard me try to unpack them both.

21   BY ATTORNEY BROOKS:

22       Q.    That may be a complex question, as debated

23   questions often are, but my question is do you agree

24   that the question of whether transgender and cisgender

1 women can engage in meaningful sport even after gender

2 affirming hormone therapy is one on which reasonable

3 scientists can differ and are differing today given the

4 possibility of data?

5           ATTORNEY BLOCK:  Objection to form for

6 the same reasons.

7           THE WITNESS:  So I'm sitting here as a

8 scientist talking about differences in athleticism and

9 such and whether --- and so moving onto meaningful sport

10 goes beyond my expertise.  I'm only putting data

11 together in a --- that's my lane on this subject.

12           ATTORNEY BROOKS:  Okay.

13           Let's break for lunch.

14           ATTORNEY BLOCK:  Let's go off the record,

15 so 2:15.

16           ATTORNEY BROOKS:  2:15?  Any dissent?  No

17 dissent.

18           VIDEOGRAPHER:  Going off the record.  The

19 current time is 1:16 p.m. Eastern Standard Time.

20 OFF VIDEOTAPE

21           ---

22 (WHEREUPON, A SHORT BREAK WAS TAKEN.)

23           ---

24 ON VIDEOTAPE

1          VIDEOGRAPHER:  Back on the record.  The

2     current time is 2:18 p.m. Eastern Standard Time.

3     BY ATTORNEY BROOKS:

4       Q.    Good afternoon, Dr. Safer.  Take you back into

5     context, I'm going to ask you to find your expert

6     report, Exhibit-1, and find paragraph 25, which we have

7     looked at before.  And there in the third sentence it

8     reads based on current research comparing

9     non-transgender boys and men with non-transgender girls

10    and women before, during and after puberty the primary

11    known biological driver of these average group

12    differences is testosterone starting at puberty, and not

13    reproductive biology or genetics, period, closed quote.

14          Do you see that language?

15      A.    Yes.

16      Q.    And your one cite for that is the endocrine that

17    we've already looked at already.

18          Right?

19               ATTORNEY BLOCK:  Objection to the form.

20               THE WITNESS:  So the citation in that

21    paragraph is the Handelsman, yes.

22    BY ATTORNEY BROOKS:

23      Q.    And do you recall our earlier discussion about

24    how the effects of testosterone are cumulative over time

1    rather than depending solely on the testosterone level

2    of an individual at a particular time, right?  Do you

3    recall that discussion?

4        A.    So the impact --- excuse me, the impact of

5    testosterone is cumulative.  It depends what impacts

6    we're talking about.  So there are impacts that are

7    cumulative, like height, and there are impacts that

8    really do reflect that point in time.

9        Q.    Now, at the moment let me ask just based on your

10   recollection.  The Handelsman article is Exhibit-4.  Do

11   you have that?  And I will ask you to find it in your

12   pile.  I should have neated up your pile of exhibits

13   while you were out.  That looks like it.

14       A.    Got it, yes.

15       Q.    The Handelsman article, as far as you recall,

16   does not contain any data or conclusions concerning the

17   effects of testosterone after the beginning of male

18   puberty, does it?

19                    ATTORNEY BLOCK:  Objection to form.

20                    THE WITNESS:  Honestly, I would have to

21   go look carefully.

22   BY ATTORNEY BROOKS:

23       Q.    Then I won't take time to do that.

24       A.    Okay.

1      Q.     It does or it doesn't.  We will deal with that.

2      A.     Yes.

3      Q.     Do you know whether any other writing Professor

4  Handelsman has expressed any view as to whether

5  testosterone suppression after male puberty eliminates

6  sex-based physical advantages sufficiently to maintain

7  fairness in sports for women?

8                    ATTORNEY BLOCK:  Objection to the form.

9                    THE WITNESS:  So first of all, putting it

10 altogether that way isn't necessarily how I would say it

11 or how I would expect it to be said.  It would be

12 testosterone suppression and whatever the scientific

13 finding at the moment would be.  So we already know that

14 the data that relate to athleticism are just the Roberts

15 paper and the Harper paper, so I guess that is as much

16 as I can say in that particular context.  And in terms

17 of --- so yes, I think that it wouldn't be --- I forgot

18 already how you phrased that.

19 BY ATTORNEY BROOKS:

20     Q.     Let me just ask again.

21     A.     Yes.

22     Q.     So the first question is not a hard one.

23     A.     Okay.

24     Q.     Do you know whether Professor Handelsman has

```
 1   himself in his publication expressed any view whether

 2   testosterone suppression after male puberty eliminates

 3   sex-based physical advantages sufficiently to maintain

 4   fairness in sports for women?

 5                   ATTORNEY BLOCK:  Objection to form.

 6                   THE WITNESS:  So I don't know if he has

 7   written something covering all those bases that you just

 8   described, how you described it.

 9                   ATTORNEY BROOKS:  All right.  Let's look

10   at treatment variable.  Let me mark as Exhibit 13 a

11   short article by Dr. Roberts with a subsequent comment

12   by David Handelsman.

13                   ATTORNEY WILKINSON:  Tab 62.

14                   ATTORNEY BROOKS:  And unfortunately, the

15   words were a little clipped on this.  We will see how we

16   do.

17                            ---

18        (Whereupon, Exhibit 13, Dr. Roberts Article, was

19        marked for identification.)

20                            ---

21                   ATTORNEY BLOCK:  Thanks.

22   BY ATTORNEY BROOKS:

23        Q.    And I think a fair description of what we have

24   here is a relatively popular press type piece by Dr.
```

1   Roberts first.  And this document is dated December 16,

2   2020.

3                    ATTORNEY BLOCK:  Objection.  Does it say

4   where it was published?

5                    ATTORNEY BROOKS:  No, it doesn't say on

6   its face where it was published.  And as we sit here

7   right now I don't recall, though actually looking at it

8   I do recall that Kilio is an online publication of some

9   sort, and I've seen the brand came from the Kilio

10  website.

11  BY ATTORNEY BROOKS:

12     Q.    At any rate, I see the date, I see the title.

13  It purports to be an article by Professor Roberts.  I

14  just want to be clear in my description it does not ---

15  it does not have the appearance of a separate peer

16  review article since the summary taken off of the

17  article that we've already looked at.  And then at the

18  end of it is a two-paragraph prospective on this offered

19  by Dr. Handelsman.

20          Do you see that?

21     A.    I do.

22     Q.    And he begins by making clear that he is

23  commenting on this study, that is Roberts study that is

24  discussed above.  He is not introducing new science,

1  correct, is that consistent with your understanding?

2           ATTORNEY BLOCK:  Objection.  Give him a

3  chance to read it.

4           THE WITNESS:  So that, yes, my

5  understanding, too, is that there is not new data here,

6  mostly a commentary within the context some of our

7  existing knowledge on the Roberts study.

8  BY ATTORNEY BROOKS:

9    Q.    And in his comment to Dr. Handelsman states in

10 the second paragraph, as of 2020, quote, a major

11 question remains whether gender affirming hormone

12 treatment overcomes sex-based physical advantages

13 sufficiently to maintain fairness so that an exception

14 can be made for trans women, paren, natal males, closed

15 paren, treated with estrogen.

16           Do you see that language?

17   A.    I do.

18           ATTORNEY BLOCK:  Objection.  I believe

19 that is what it says, but I just want to note for the

20 record that there is text cut off on the left.

21           ATTORNEY BROOKS:  There is.  And I'll get

22 better copies.  I'm looking at a copy that's not cut off

23 I will represent.

24 BY ATTORNEY BROOKS:

1    Q.    And do you have an expert opinion as to ---

2    well, do you propose to offer any opinion disagreeing

3    with Professor Handelsman that as of 2020 it remained a

4    major question whether gender affirming hormone

5    treatment to overcome sex-based physical advantages

6    sufficiently to maintain fairness so that an exception

7    could be made for trans women treated with estrogen?

8    A.    So to me that's too broad a question if you're

9    asking me to render an expert opinion about his opinion.

10   Q.    I'm asking whether you propose to offer an

11   expert opinion inconsistent with his view that remains a

12   major question as of 2020.

13   A.    It's --- I might --- well, I would at least

14   phrase things differently in there --- we might have to

15   go through pieces of it because certainly where we lack

16   data I think we would agree, but in terms of those

17   statements that then go on to editorialize, I don't know

18   that we necessarily agree in how we would frame that.

19   Q.    A little farther down, maybe two sentences down

20   it reads, quote, by contrast, trans women treated with

21   estrogens after completing male puberty experienced only

22   minimal declines in physical performance over 12 months,

23   substantially surpassing average female performance for

24   up to eight years, closed quote.  Do you agree or

```
 1   disagree with Professor Handelsman summary of the

 2   findings of Roberts?

 3                    ATTORNEY BLOCK:  Objection to form.  I'm

 4   just not sure it's all based on Roberts?

 5                    THE WITNESS:  It is not clear to me that

 6   it's --- that it is based on Roberts for what it's

 7   worth.  It's also somewhat simplistically written.  And

 8   an example is we don't --- the contention with regard to

 9   athletic outcomes relates more to testosterone, and so

10   saying transgender women treated with estrogens wouldn't

11   be precisely how I would frame that either.

12   BY ATTORNEY BROOKS:

13      Q.    He concludes --- Professor Handelsman concludes

14   by stating supporting federations should incorporate

15   these findings in the strategies for including trans

16   women in elite female competitions while maintaining

17   fairness and safety for other women.  Dr. Safer, do you

18   agree that maintaining safety for cisgender women is a

19   legitimate and indeed important concern?

20                    ATTORNEY BLOCK:  Objection to form.

21                    THE WITNESS:  As an expert I'm not going

22   to give an opinion.

23   BY ATTORNEY BROOKS:

24      Q.    As Doctor Safer do you agree that ensuring
```

```
 1   safety for cisgender women and girls is a legitimate

 2   concern?

 3                   ATTORNEY BLOCK:  Objection to form.

 4                   THE WITNESS:  So if I'm simply speaking

 5   not as an expert, just as an educated person in the

 6   field, then it is true that safety is important, but I'm

 7   not clear that --- I don't know that in most of these

 8   athletic activities it's actually a concern.

 9                   ATTORNEY BROOKS:  Let me mark as Safer

10   Exhibit 14 a document entitled Guidance with Transgender

11   Inclusion in Domestic Sport with symbols of a number of

12   UK sport governing bodies across the front and a

13   statement published September 2021.

14                   ATTORNEY WILKINSON:  Tab 22.

15                           ---

16           (Whereupon, Exhibit 14, Guidance with

17            Transgender Inclusion in Domestic Sport,

18            marked for identification.)

19                           ---

20                   THE WITNESS:  Thank you.

21   BY ATTORNEY BROOKS:

22     Q.   And my first question for you, Dr. Safer, is

23   whether you have seen this document before?

24     A.   I have seen this document before.
```

1      Q.     And were you aware of it prior to its reference

2   in this litigation?

3      A.     I don't know that I was.

4      Q.     And are you familiar with the role of the

5   supporting body mentioned on the front page in

6   governance of sport within the United Kingdom?

7      A.     By looking at all their logos, I cannot say that

8   I know them all, no.

9      Q.     And do you have any knowledge as to whether

10  these are official government charted --- chartered

11  sporting governing bodies?

12     A.     I do not have that knowledge.

13     Q.     Have you now studied this document with some

14  care?

15     A.     I would say that I have only looked at this

16  document superficially.  I'm certainly happy to look

17  through it.

18     Q.     I will ask you just about a couple of passages.

19  Let me ask you to turn to page three of the document.

20  And towards the very bottom and the next to the last

21  paragraph this --- five organizations states, quote, our

22  work exploring the latest research, evidence and studies

23  made clear that there are retained differences in

24  strength, stamina and physique between the average women

```
 1    compared with the average transgender women for

 2    nonbinary person registered male at birth with or

 3    without testosterone suppression.

 4           Do you see that language?

 5    A.    I do.

 6    Q.    And do you disagree with the conclusion of these

 7    UK sporting bodies that the latest research, evidence

 8    and studies now make clear that there are retained

 9    differences in strength, stamina and physique in

10    nonbinary --- in transgender women or nonbinary persons

11    registered male at birth with or without testosterone?

12                 ATTORNEY BLOCK:  Objection to referring

13    to this as something written by the governing bodies as

14    opposed to the quality council that makes

15    recommendations to the governing bodies.

16                 THE WITNESS:  To the statement written by

17    whoever actually wrote it that evidence and studies on

18    the subject of transgender people make clear anything, I

19    disagree.

20    BY ATTORNEY BROOKS:

21    Q.    Let me ask you to turn to page six, under the

22    heading question review is recommending it states,

23    quote, as a result of what the review found the guidance

24    concludes that the inclusion of transgender people into
```

1   female sport cannot be balanced regarding transgender

2   inclusion, fairness and safety in gender affected sport

3   where there is meaningful competition, period, closed

4   quote.

5        Do you see that?

6   A.   I do.

7   Q.   And do you disagree with that conclusion of this

8   organization or these organizations?

9   A.   So I really --- as we discussed earlier, I'm not

10  going to express as an expert --- I don't think I'd be

11  able to express as an expert fairness and so I can't

12  comment any further.

13  Q.   Let me ask you to turn to page nine in your

14  expert report, paragraph 49.

15  A.   Okay.  Paragraph 49.

16  Q.   At the end of paragraph 49 you state, quote, a

17  person's genetic makeup and internal and external

18  reproductive anatomy are not useful indicators of

19  athletic performance and have not been used in elite

20  competition for decades.  In making that statement when

21  you refer to a person's genetic makeup were you

22  referring to the question of whether they had XX or XY

23  chromosomes?

24  A.   So when I'm making the statement genetic makeup

1    I'm heavily referencing chromosomes.  So I guess I would

2    say that is mostly correct with some --- with perhaps

3    some known genes, but mostly chromosomes.

4        Q.    You would agree, would you not, that respected

5    voices in the field take the view that genetic sex it is

6    at least an important determinant of athletic

7    performance, do you not?

8                    ATTORNEY BLOCK:  Objection to form.

9                    THE WITNESS:  So that I'm supposed to

10   comment that there are people in the field who say that?

11   I guess what I would say is the consensus right now

12   among medical people advising elite athletic

13   organizations would be to move away from using that as a

14   surrogate.  In the past it was.  There were chromosome

15   tests and the problem is that people have --- there is

16   quite a bit of variety in biology and of course the

17   moment you make a rule you see the exceptions.

18   BY ATTORNEY BROOKS:

19       Q.    The exceptions.

20       A.    And so I would say that as an expert I can't

21   comment in terms of, you know, some study of everybody's

22   opinion or some survey.  But as somebody who has been on

23   these committees I've observed that that was discarded.

24       Q.    So if you put alongside individuals who suffer

1  from any condition that has been identified as a

2  disorder of sexual development, am I correct that you

3  consider yourself to have expertise in what constitutes

4  a disorder of sexual development?

5      A.   I have some expertise.  And the terminology is

6  actually differences of sexual development or sexual

7  differentiation or intersex are the terms that are more

8  popularly used.

9      Q.   You would agree with me, would you not, that

10  many respective sources up to the present would continue

11  to refer to disorders of sexual development?

12              ATTORNEY BLOCK:  Objection to form.

13              THE WITNESS:  So there --- what I would

14  say there is that --- the newer terminology has not ---

15  has not yet permeated because there have not been

16  revisions to all the documents that have been created.

17  BY ATTORNEY BROOKS:

18      Q.   How about if we say DSD?

19      A.   DSD is a reasonably safe or DSD intersex is what

20  some people do, yes.

21      Q.   Well, not all DSDs would be considered intersex

22  conditions.

23           Correct?

24      A.   You are right that some people try to parse

1    those two terms even.  And there is --- but I think

2    those kinds of distinctions might be on the scope of

3    what we are discussing.

4        Q.    Probably so.  If we put on side individuals who

5    suffer from anything that is characterized in the field

6    as a DSD you would agree, would you not, that genetic

7    makeup and specifically whether the individual possesses

8    XX or XY chromosomes is a statistically meaningful

9    indicator of athletic performance?

10                   ATTORNEY BLOCK:  Objection to form.

11                   THE WITNESS:  So no, and the --- it's ---

12   I guess it depends what you mean is what it comes down

13   to.  So if you are --- if you are simply saying, well, a

14   certain fraction of people of these chromosomes are

15   going to be --- have this other characteristic, then

16   maybe there are those kinds of associations.  But if you

17   are going to say that it's connected to the point where

18   you could actually use one of those let's say observing

19   a chromosome as an actual determination for a given

20   individual, then I would say no.

21   BY ATTORNEY BROOKS:

22       Q.    Is it your opinion that a gender identity itself

23   is a --- or useful indicator of athletic performance?

24       A.    It is my opinion that gender identity itself is

1    not a useful indicator of athletic performance.

2      Q.    You say at paragraph 44 of your report --- I

3    will save that.  I think that is a new Declaration and

4    we will not take time to do that.

5            Let me ask you to look at paragraph 24 of your

6    rebuttal report.  You say in paragraph 24 that none of

7    Doctor Carlson's arguments support HB-3293 categorical

8    ban of all girls who are transgender from all girls

9    sports teams.

10           Do you see that?

11     A.    I do.

12     Q.    And I should continue.  I'm sorry.  Doctor

13   Carlson's safety argument relates solely to contact and

14   collision sports and the physical characteristics

15   developed during puberty, period.  By referring to a

16   categorical ban let me ask this.  Do you agree that

17   safety considerations could justify or may justify

18   excluding natal males who experienced all or significant

19   part of male typical pubertal development from

20   participating in female division of contact or collision

21   sports such as basketball and soccer?

22               ATTORNEY BLOCK:  Objection to form.

23               THE WITNESS:  So if the question is would

24   I anticipate as an expert that there would be a safety

1   explanation for banning transgender women from the

2   female category, then I would --- I wouldn't --- I

3   certainly --- let me think about which way to phrase it.

4   I would have a hard time coming up with an example where

5   I would use being transgender as a safety criterion as

6   opposed to body habitus size or some other more

7   objective criterion.

8   BY ATTORNEY BROOKS:

9       Q.    Well, and I didn't say anything about gender

10  status.  Let me ask again.  Would you agree that safety

11  considerations could justify excluding natal males who

12  have experienced all or a significant part of male

13  typical pubertal development from participating in

14  female division contact and collision sports such as

15  basketball or soccer?

16              ATTORNEY BLOCK:  Objection to form.

17              THE WITNESS:  So you're saying that even

18  if we otherwise decided that it would be okay for

19  cisgender males to play with cisgender females, would I

20  envision there being a safety reason to ban those

21  cisgender males?

22  BY ATTORNEY BROOKS:

23      Q.    All I asked had nothing to do with gender

24  identity.  Do you agree that the introduction onto the

1    field or the court in or have been spoken of its contact

2    or collision sports in the female division of natal

3    males who have gone through all or a significant part of

4    male typical pubertal development could raise legitimate

5    concerns about safety for the natal females?

6                ATTORNEY BLOCK:  Same objections as the

7    previous two questions.

8                THE WITNESS:  So any person who's gone

9    through a male puberty would that, per se, make me

10   invoke a safety concern, if that's the question ---.

11   BY ATTORNEY BROOKS:

12     Q.    Could that in your mind raise the given safety

13   concerns?

14     A.    So I would not --- the word legitimate I'm not

15   addressing, but I'm not aware of that in and of itself

16   being a safety concern.

17     Q.    You state in paragraph 22 of your rebuttal

18   report that, quote, transgender athletes and women have

19   been competing in NCAA and secondary school athletics

20   for many years at this point.  Let me ask you if you are

21   aware of any instance in which natal males have competed

22   in the female category in any contact or collision sport

23   in either the NCAA or high school division?

24                ATTORNEY BLOCK:  Objection to form.

1          THE WITNESS:  So can I identify

2   transgender girls or women specifically and specific

3   instances of participation?  I cannot.

4   BY ATTORNEY BROOKS:

5     Q.    What was your basis for asserting that such

6   athletes have been competing in the NCAA and secondary

7   school athletics for many years?

8               ATTORNEY BLOCK:  I'm sorry.  Is the

9   question about collision sports?  Because you are

10  quoting something that is not about collision sports.

11              ATTORNEY BROOKS:  Let me break that out.

12  Thank you.

13  BY ATTORNEY BROOKS:

14    Q.    Do you have a view as to whether --- I shouldn't

15  say a view.  Do you have any information as to whether

16  transgender athletes have been competing in the women's

17  division of NCAA or secondary school athletics in any

18  contact or collision sports for many years?

19    A.    That information on the validity is that they

20  have had access because there has not been a ban.

21    Q.    But whether they have done so you do not have

22  any information?

23    A.    But I cannot point to specific instances,

24  exactly.

1    Q.    I apologize if I asked something early in the

2  morning, but it's faster than trying to dig back into

3  the transcript.  Do you have any opinion as to whether

4  it is reasonable to exclude a natal male with a male

5  gender identity from a high school girls basketball

6  team?

7                      ATTORNEY BLOCK:  Objection to form.

8                      THE WITNESS:  So ask that again a little

9  bit slower.

10  BY ATTORNEY BROOKS:

11    Q.    Do you have have any opinion as to whether it is

12  reasonable to exclude a natal male with a male gender

13  identity from participation in a girls high school

14  basketball team?

15                      ATTORNEY BLOCK:  Objection.

16                      THE WITNESS:  I do not have an expert

17  opinion on that subject.

18  BY ATTORNEY BROOKS:

19    Q.    Do you have a personal view?

20    A.    I don't know that I --- there it would get more

21  complicated depending on context.

22    Q.    You don't have a simple yes or no personal view

23  on that question?

24    A.    I don't.

1      Q.    And do you have a view whether it is reasonable

2   to exclude a natal male with a female gender identity

3   from participation in a high school girls basketball

4   team?

5                    ATTORNEY BLOCK:  Objection to form.

6                    THE WITNESS:  So do I have a view on

7   participation of a cisgender girl in the girls category?

8   Sorry.  Say it again.

9   BY ATTORNEY BROOKS:

10     Q.    I said do you have a view on whether it is

11  reasonable to exclude a natal male with a female gender

12  identity from participation in the high school girls

13  basketball team?

14                   ATTORNEY BLOCK:  Objection to form.

15                   THE WITNESS:  So that is a transgender

16  girl, got it.  So --- and the question is do I have a

17  view on --- I apologize.  Go back.

18  BY ATTORNEY BROOKS:

19     Q.    I can do it again.

20     A.    Yes, do it again.  Sorry.

21     Q.    Do you have a view as to whether it is

22  reasonable to exclude a natal male with a transgender

23  identity from participation in the girls high school

24  basketball team?

```
 1                    ATTORNEY BLOCK:  Objection to form.

 2                    THE WITNESS:  And it is do I have a view

 3    on excluding --- as an expert am I opining on that?  I'm

 4    not.  I'm opining as a scientist on what the data are.

 5    BY ATTORNEY BROOKS:

 6      Q.    Do you consider a policy that excludes natal

 7    males with a male gender identity from the girls

 8    basketball team to be, quote, discriminatory?

 9                    ATTORNEY BLOCK:  Objection to form and

10    scope.

11                    THE WITNESS:  So as an expert I'm not

12    taking a position on excluding cisgender males from the

13    female category, if I answered that correctly.

14    BY ATTORNEY BROOKS:

15      Q.    My question was simply do you consider such a

16    policy to be a discriminatory policy?

17                    ATTORNEY BLOCK:  Objection to form and

18    scope.

19                    THE WITNESS:  So are you asking me as an

20    expert to define discrimination?

21    BY ATTORNEY BROOKS:

22      Q.    I will direct you to paragraph 27 of your

23    rebuttal report.  And there you wrote Doctor Carlson has

24    not offered cogent explanation for why alleged safety
```

```
 1  concerns based on average differences in size and
 2  strength should be addressed within an across the board
 3  exclusion of transgender women as opposed to tailored
 4  nondiscriminatory policies.
 5          Do you see that?
 6      A.   I do.
 7      Q.   So understanding discriminatory, however you did
 8  understand it when you wrote that, do you consider a
 9  policy that prohibits natal males with a male gender
10  identity from participating on the girls basketball team
11  to be a discriminatory policy?
12              ATTORNEY BLOCK:  Same objections.
13              THE WITNESS:  Right.  So I'm not defining
14  --- I'm not defining discriminatory here.  I'm ---
15  right.  So if you are asking as an expert to define
16  discriminatory, that I can't do.
17  BY ATTORNEY BROOKS:
18      Q.   Well, if you don't know what discriminatory
19  means, what do you mean when you referred to a tailored
20  nondiscriminatory policy?
21              ATTORNEY BLOCK:  Objection to form.
22              THE WITNESS:  I guess I have to circle
23  back initially to --- I mean we can do that for any word
24  here, right, where I could have like my own personal
```

1   definition or am I acting as an expert to define these

2   words, and I think we are kind of in that situation.

3   BY ATTORNEY BROOKS:

4      Q.    But I'm asking you about your expert reports in

5   the litigation.  You must have meant something.  What

6   did you mean by nondiscriminatory when you submitted

7   this expert report?

8                   ATTORNEY BLOCK:  Objection to form.

9                   THE WITNESS:  So when I'm using the word

10  nondiscriminatory I am using it to mean something that

11  isn't using some other indicator --- well, I'm really

12  just using it in the broadest sense to something that is

13  including people.

14  BY ATTORNEY BROOKS:

15     Q.    Using it in the broadest sense, discriminating

16  between one category and another is --- could be a good

17  thing or a bad thing.

18             Correct?

19                   ATTORNEY BLOCK:  Objection to form.

20                   THE WITNESS:  As an expert I --- that is

21  way outside my scope.  But simply as an English speaker,

22  yes, discrimination could be good or it can be bad, yes.

23  BY ATTORNEY BROOKS:

24     Q.    And for instance, if you are --- well, you said

1    you don't prescribe to minors, so --- but if you are

2    dealing with a 19-year-old who says and you concluded I

3    need gender affirming hormone, and I will use the term

4    you prefer, if that individual's hormones and biology

5    are female then gender affirming hormones are going to

6    consist, among other things, perhaps of administering

7    testosterone.

8              Correct?

9    A.    Yes, typically we would have have ---.

10   Q.    And if that individual's biology and hormones

11   endogenous were male, then the gender affirming hormones

12   would include among other things estrogen or estrogen

13   analog.

14             Correct?

15             ATTORNEY BLOCK:  Objection to form.

16             THE WITNESS:  If that person had

17   typically --- typically a male hormone profile, right,

18   to move toward a more feminine profile that typically

19   would include estrogens or some other agents that were

20   other than testosterone, yes.

21   BY ATTORNEY BROOKS:

22   Q.    So speaking scientifically and not in civil

23   rights terms, if I may, you as a scientist, as you

24   decide which regimen of hormones to administer to this

1    individual have to discriminate between those who are

2    endogenously male and those who are endogenously female

3    in deciding which regimen you prescribe.

4            Correct?

5                    ATTORNEY BLOCK:  Objection to the form.

6                    THE WITNESS:  We have to make a decision.

7    And so if you are trying to get me to say that

8    discrimination can be defined as making decisions, I'm

9    with you and yes.

10   BY ATTORNEY BROOKS:

11       Q.    Okay.

12            Let me just run down a few items to make sure.

13   You have not personally engaged in any research

14   regarding sports physiology, have you?

15       A.    I'm trying to think it there's anything.  I

16   don't believe I have.

17       Q.    You yourself haven't personally engaged in any

18   research or published any papers --- that's a compound

19   question.  You, yourself, haven't engaged in any

20   research relating to sports medicine or sports injuries,

21   have you?

22       A.    I have not engaged in any research with regard

23   to sports injuries.  And the answer to the first part of

24   that gets a little muddled because some of the papers

1   that I have written about physiology and transgender

2   people could apply to sports medicine.

3        Q.    Have you, yourself, ever participated in

4   devising any athletic training regimes for individuals

5   of either sex?

6        A.    I've not been involved in devising any training

7   regimes.

8        Q.    Have you done any research with related to male

9   physiology --- I'm sorry, male physiological advantages

10  relevant to athletics before, during or after puberty?

11       A.    So there I have --- none of the research that I

12  have done to date has been specifically loopholed as ---

13  well, I can't even say that.  So research that I have

14  done with regard to observing physiology among my

15  subjects can be applicable to sports medicine in some

16  context.

17       Q.    On what publications, if any, of yours do you

18  believe relate to male physiological advantages in

19  athletics before, during or after puberty?

20       A.    Well, just off the top of my head, without

21  looking at it exhaustively, I have a paper on

22  hematocrit, which is the oxygen-carrying cells in

23  people.  In transgender people I have a paper on

24  testosterone levels with different treatments.  So those

1    can have --- those actually can have a sports context.

2        Q.     Have you done any research on the impact of

3    testosterone suppression on athletic performance or any

4    measurement of strength?

5        A.     So the second piece of that is I have not done

6    any research that specifically used strength as an

7    endpoint in my own studies.  To the second piece of

8    those --- I forgot what ---.

9        Q.     Athletic performance?

10       A.     Athletic performance, there it gets a muddled

11   thing.  The research that I have done can be applicable

12   in that context.

13       Q.     Well, that is if your endpoint is hematocrit

14   count, to use the right term, you're saying that might

15   have implications for athletic performance?  Is that

16   your point?

17       A.     That is correct, yes.

18       Q.     But you have not done any research in which any

19   measurement of athletic performance is an endpoint?

20                    ATTORNEY BLOCK:  Objection to form.

21                    THE WITNESS:  Again, I have to think

22   about how to say that because some of the --- part of

23   the problem is that papers that we're looking at include

24   quite a bit of literature on components that may be

```
1   applicable --- that may be applicable in sports
2   medicine, whether it is muscle strength and muscle size
3   or blood cell counts and such.  And so that more
4   expansively than my research is in that category.
5   Whereas, if I'm trying to be focused and narrow, then
6   I've got those two studies, the one by Roberts and the
7   one by Harper.  And my papers are not those.
8   BY ATTORNEY BROOKS:
9      Q.    You don't have any information about numbers of
10  children in West Virginia who suffer from any DSD, do
11  you?
12     A.    No, as --- I guess I have to say no there in
13  terms of actual surveys of kids in West Virginia, I know
14  some brought statistics.  West Virginia is big enough
15  that you would predict that the statistics would
16  generally apply, but that is as smart as I could get on
17  the subject.
18     Q.    And you are --- I think you effectively answered
19  this, but to be clear for the record you are not opining
20  that BPJ suffers from any DSD?
21                  ATTORNEY BLOCK:  Objection to the form.
22                  THE WITNESS:  So the --- here too we get
23  into --- into an evolving area of definitions where you
24  could envision if some of the specific genetics that are
```

1  associated with being transgender became identified,

2  would we in the medical world start to label those

3  instances as DSD?  It's possible.  So that is just ---.

4  BY ATTORNEY BROOKS:

5     Q.  Thus far no such indicators have been

6  identified.

7        Correct?

8     A.  I can't even --- I can't even say that

9  definitively.  It is an area of active conversation in

10  terms of --- in terms of boarder setting in the medical

11  community right now.

12     Q.  However, I think my question is easier.  You're

13  not offering an opinion --- any opinion that BPJ suffers

14  from any DSD, are you?

15     A.  So I don't have --- so to be clear first I don't

16  know the --- BPJ's specific medical condition.  I wasn't

17  brought in to evaluate that and I have not.  So I can't

18  actually render an opinion on any of the medical story

19  there.

20     Q.  And you don't know whether any child or typical

21  XY chromosome --- pardon me, you don't know whether any

22  child with XY chromosomes who suffers from a DSD has

23  ever sought to compete in female athletics in West

24  Virginia up until the present?

1          ATTORNEY BLOCK:  Objection to the form.

2          THE WITNESS:  So the question is do I

3    know of an instance of a specific individual with XY

4    chromosomes and a DSD connected to that who has

5    specifically participated in sports in West Virginia?

6    BY ATTORNEY BROOKS:

7      Q.    Who has sought to participate in female

8    athletics in West Virginia?

9      A.    Right, so who has sought to participate in

10   female sports in West Virginia.  I cannot give you a

11   specific instance, that is true.  I can say, though,

12   knowing the percentage of people who have DSDs and the

13   size of the State of West Virginia that you would

14   predict it would be true, but that would be again as

15   smart as I could be on one subject.

16          ATTORNEY BROOKS:  Let me mark as Safer

17   Exhibit 15 what was previously designated as Tab 53, an

18   article by Dr. Safer and others entitled the Mount Sinai

19   Patient Center Preoperative Criteria Meant to Optimize

20   Outcomes are Less of a Barrier to Care than WPATH SOC 7

21   Criteria Before Transgender Specific Surgery.  And yes,

22   that is a mouthful.

23                          ---

24          (Whereupon, Exhibit 15, Dr. Safer Article,

```
 1              was marked for identification.)

 2                        ---

 3   BY ATTORNEY BROOKS:

 4     Q.    Now, Dr. Safer, to be fair, I see that you are

 5   the last listed author on a fairly lengthy list of

 6   authors.  And maybe that does and maybe that doesn't

 7   have significance in terms of how in depth your

 8   involvement in this paper was.  Let me ask.  Was this a

 9   paper of which you had some significant input?

10     A.    I had significant input.  I can tell you that in

11   the medical and scientific community the first author

12   typically did the work and the last author is the senior

13   author and supervisor.  And the middle authors are

14   actually the ones where you ---.

15     Q.    Okay.

16           I was aware of the significance of the first.

17   I was not aware of the significance of the last.  Okay.

18   That is helpful.  All of the authors here, if I'm

19   correct, are colleagues within the Mount Sinai Clinic or

20   division that you supervise.

21           Am I correct?

22     A.    All of the authors were in those positions at

23   some point, which is how we came together to write the

24   paper.
```

1  Q. And the paper I should say for the record is

2 dated 2020.  And let me see if I correctly understood

3 what the paper is about.  If we --- in this paper you

4 compare the eligibility of patients who are seeking

5 vaginoplasty under the WPATH Standard of Care 7 criteria

6 versus the criteria actually used by your clinic.

7   Am I correct?

8 A. Yes.

9  Q. And just so we're clear, vaginoplasty is a

10 surgery that is only done on biological male, natal male

11 individuals.

12   Correct?

13    ATTORNEY BLOCK:  Objection to form.

14    THE WITNESS:  So a vaginal plasty is the

15 genital reconstruction surgery to create a vagina in a

16 person.  When we are using it as a gender affirming

17 surgery, then we are using it on people who have what

18 would be considered typically male anatomy in that

19 circumstance but the surgery could also be used on

20 somebody with typically female anatomy requiring

21 construction for whatever their circumstance may be.

22 BY ATTORNEY BROOKS:

23  Q. That said, the subjects discussed in this paper

24 are all individuals who are seeking the surgery for

1  gender affirming purposes rather than, for instance,

2  because of a severe DSD.

3         Correct?

4    A.   The people in this circumstance are all people

5  seeking the surgery for gender affirming purposes and

6  not those for DSD or for other purposes, reconstruction

7  of vaginas for accidents and cancers.  I mean there is

8  quite a range.

9    Q.   And the result as summarized in the abstract is

10 that of 139 patients who were identified as subjects of

11 this study, 63 qualified for surgery immediately based

12 on the Mount Sinai criteria.

13        Correct?

14   A.   Yes.

15   Q.   Whereas only 21 of those would have qualified

16 based on the criteria set out in the WPATH Standard of

17 Care Version 7?

18   A.   Yes.

19   Q.   Three times as many individuals qualified for

20 immediate surgery under the standard used by your clinic

21 as opposed to the standards set out in the WPATH

22 Standard of Care?

23   A.   That's correct.

24   Q.   When did your clinic begin approving surgery for

```
 1   patients who are not eligible under the WPATH Standard
 2   of Care?
 3                    ATTORNEY BLOCK:  Objection to form.
 4                    THE WITNESS:  Yeah, so to be clear, the
 5   patients in our program qualify by both criteria.  The
 6   paper is simply pointing out that our process is more
 7   efficient and patient friendly, but it's not to say that
 8   we were not informed by WPATH criteria also.  And I
 9   think I need to expand even a little bit further.  Part
10   of the point of the paper is that it includes --- it
11   includes efforts to know benefit to the patient that end
12   up being time consuming and therefore are a waste of
13   energy in contrast to our approach, which is actually
14   more conservative than WPATH's approach.  We actually
15   look at more things but we do so in a more efficient
16   fashion and that is actually the point of the paper.
17   BY ATTORNEY BROOKS:
18      Q.    Well, let me clarify one thing you just said.
19   According to this paper, it is not the case, is it, that
20   every patient for whom your clinic approved surgery was
21   at that time qualified according to the WPATH criteria?
22                    ATTORNEY BLOCK:  Objection to form.
23                    THE WITNESS:  Wait.  Say it again.  Could
24   you repeat that?
```

1   BY ATTORNEY BROOKS:

2     Q.    It is not the case, is it, that every patient

3   who was qualified for surgery by your clinic had been

4   demonstrated to satisfy the WPATH criteria for

5   eligibility?

6     A.    It is --- so there were --- the patients just as

7   stated who qualified by our criteria but not by WPATH

8   criteria, there is such a group that existed, exactly,

9   yes.

10    Q.    Okay.

11          And specifically, according to your criteria,

12  three times as many patients are eligible according to

13  WPATH criteria?

14              ATTORNEY BLOCK:  Objection to form.

15              THE WITNESS:  It's not so much the three

16  times.  It is the pace.  Some of this relates to pace

17  and efficiency.

18  BY ATTORNEY BROOKS:

19    Q.    Dr. Safer, your clinic, according to this paper,

20  approved for surgery 42 patients who were at that time

21  not eligible according to WPATH criteria.

22          Correct?

23              ATTORNEY BLOCK:  Objection to form.

24              THE WITNESS:  No.  So the reality is we

1    still live in the universe that everybody else lives in,

2    so we are --- so this paper proposes a more appropriate

3    and a more patient appropriate model, but it is not the

4    case that we actually sent people to surgery who would

5    not be approved by WPATH.

6    BY ATTORNEY BROOKS:

7        Q.    Well, were you personally involved in developing

8    and approving Mount Sinai's criteria?

9        A.    Let me look at the role here.  Yes, I definitely

10   had a role in developing our criteria.

11       Q.    Let me ask you to look at page 168, column one,

12   call your attention quite a bit to table one.  And if I

13   understand correctly, table one is designed to help us

14   compare and contrast what is required by the WPATH

15   criteria for surgical readiness versus the Mount Sinai

16   criteria for surgical readiness.

17            Correct?

18       A.    That is correct, yes.

19       Q.    And the WPATH requires a letter of support from

20   the patient's hormone provider confirming the hormone

21   regimen and the length of time of hormone therapy.

22            Correct?

23       A.    That is how it is written, yes.

24       Q.    And farther down, under mental health it says

1    that it requires two letters of support from mental

2    health providers?

3         A.    It does, yes.

4         Q.    And it gives on page 157 a definition who is a

5    qualified mental health professional down towards the

6    bottom of the second column.  I'm going to ask you to

7    find that language if you could?

8         A.    Uh-huh (yes), yes.

9         Q.    You say, many define licensed mental health

10   providers having one or more of the following

11   credentials, the LCSW, Licensed Clinical Social Worker.

12           Is that right?

13        A.    LCSW is Licensed Clinical Social Worker, yes.

14        Q.    And MD, DO that is a medical doctor, a doctor of

15   --- what does the O stand for?

16        A.    Osteopathy.

17        Q.    There we go.  A psychiatrist, a Ph.D., yes, that

18   was surprising to me.  Surely not just any Ph.D.?

19        A.    Right, that's referring to a Ph.D. clinical

20   psychologist.

21        Q.    Okay.

22           Or any Master's level for above counseling

23   degrees.  But then you go on to say that in your

24   evaluation based on SOC-7 criteria.  That's the WPATH

    1    criteria?

    2        A.    That's the WPATH criteria, yes.

    3        Q.    We included the above degrees with the following

    4    exclusions, mental health providers with lower than

    5    Master's level training and unlicensed mental health

    6    providers of any type, NPs and PAs without mental health

    7    credentials, physicians who are not psychiatrists or

    8    mental health providers who are still in training.  Do

    9    you see that language?

   10        A.    I do.

   11        Q.    So under the definition used in your clinic you,

   12    yourself, do not qualify as a mental health

   13    professional.

   14              Correct?

   15        A.    That is correct.

   16        Q.    So at no point have you relied on your own

   17    opinion for any mental health evaluation for

   18    eligibility?

   19        A.    That's correct.

   20        Q.    Okay.

   21              I just wanted to understand that clearly.  So

   22    back to mental health data.  In says in the WPATH column

   23    that two letters of support from mental health providers

   24    are required.  In this paper you state on the next page,

1    but I will quote it the most significant of the Mount

2    Sinai criteria is the removal of the requirement of two

3    independent psychiatric evaluations.  And that is in

4    column two of page 169, at the end of the first full

5    paragraph.  The first full paragraph, column two, the

6    final sentence.

7         A.    I'm in which column?  Sorry.

8         Q.    Column two.

9         A.    Oh, column two.  Sorry.

10        Q.    The first full paragraph, final sentence.

11        A.    The most significant deletion from the Mount

12   Sinai criteria is the removal of --- yes, I see that.

13        Q.    And you stated at the top of column one on the

14   same page that, quote, finding two mental health

15   providers to do independent evaluations is

16   time-consuming, expensive and difficult.

17              Right?

18        A.    Just trying to find that exact wording.  Yes.

19        Q.    So in your own clinic's practice, while WPATH

20   calls for two letters from independent mental health

21   providers, you concluded that because it was hard to get

22   two independent evaluations your clinic would simply

23   dispense with the requirement of any independent mental

24   health review.

1        Correct?

2                ATTORNEY BLOCK:  Objection to form.

3                THE WITNESS:  No, that is not quite

4   correct.  Part of the difference for our operation is

5   that we have --- we have expertise in-house and we have

6   --- if you notice, looking at the table, a longer list

7   of requirements actually than WPATH does, which includes

8   a social work component.  And that actually is the ---

9   that's the source of actually yet a second pair of eyes,

10  as it were.  And so it is not the case that we are ---

11  that we're providing less of a screen, we are actually

12  providing more of a screen.  It's just that we are

13  operating in a more efficient manner for the patient.

14  BY ATTORNEY BROOKS:

15     Q.    Let's flip back to column one.  A few more lines

16  down it says for our analysis patients who otherwise met

17  WPATH SOC 7 criteria received one letter of support from

18  the CTMS mental health provider.  Right?  You would

19  agree with me, would you not, that the only letter of

20  support for a mental health provider required by your

21  protocols is from a mental health provider within your

22  employment?

23                ATTORNEY BLOCK:  Objection to not reading

24  the complete sentence.

```
 1            THE WITNESS:  So yes.  So maybe let me

 2   just --- show me the wording again.

 3   BY ATTORNEY BROOKS:

 4     Q.    Yes.  For our analysis --- and I'm beginning at

 5   perhaps eight lines down.

 6     A.    Our analysis, yes.

 7     Q.    Patients who otherwise met WPATH SOC 7 criteria

 8   received one letter of support from the CTMS mental

 9   health provider doing the assessment, period, closed

10   quoted.

11            Do you see that?

12     A.    I do, yes.

13     Q.    As the term is generally understood in your

14   field, a CTMS mental health provider is not independent

15   --- let me use the correct terminology, is not an

16   independent mental health provider?

17     A.    So in a clinic setting I don't know that the

18   word independent actually has the same meaning as in

19   some other context.  So even a WPATH requirement isn't

20   necessarily that it would be an unaffiliated person or I

21   don't know what you were thinking independent might mean

22   here, so I don't want to put words in your mouth or

23   conjecture too much.  But when we say independent we

24   just mean two different people.
```

1    Q.    But in fact, the letter of support from the CTMS

2   mental health provider that you refer to in this

3   paragraph at the top of column one of page 169 actually

4   plays no role in your determination as to whether this

5   patient is eligible for surgery.

6         Correct?

7              ATTORNEY BLOCK:  Objection to form.

8              THE WITNESS:  So yes.  I'm confused by

9   the question.

10   BY ATTORNEY BROOKS:

11    Q.    I'm confused by the text.  The final paragraph

12   --- sentence in that paragraph reads these letters of

13   support were used to satisfy third payor requirements to

14   cover surgery and were not part of the CTMS assessment?

15    A.    Oh, yeah, that's a good point.  The literal

16   letter is because we are all in-house the opinion of the

17   person is, of course, important and so the screen takes

18   place.  But the need to create --- the bureaucratic of

19   creating a specific letter is one of the burdens that we

20   are suggesting could be removed.

21    Q.    In table one, let me find this.  Under mental

22   health WPATH SOC-7 requires, quote, persistent, well

23   documented gender dysphoria.

24         Do you see that?

 1      A.     I do.

 2      Q.     And you understand well documented gender

 3 dysphoria to be referring to a general diagnosis under

 4 the DSM-V criteria?

 5      A.     So for WPATH's purposes I think they are

 6 specifically referring to the DSM diagnosis.

 7      Q.     In your clinic you are willing to approve for

 8 this --- I'm not sure how to actually say the word

 9 vaginoplasty surgery, individuals who do not suffer from

10 persistent well documented gender dysphoria.

11           Correct?

12                ATTORNEY BLOCK:  Objection to the form.

13                THE WITNESS:  So if you look, the list of

14 the criteria for Mount Sinai, then the phrasing is a

15 confirmation that this person --- for all intents and

16 purposes, that this person is transgender and with the

17 language and evolution we use that word gender dysphoria

18 and we also use the new word that will replace gender

19 dysphoria, gender incongruence, as the terms I

20 referenced before, transgender.

21 BY ATTORNEY BROOKS:

22      Q.     And the effect of that is you do not require a

23 diagnosis of gender dysphoria under the terms of DSM-V.

24           Correct?

```
 1              ATTORNEY BLOCK:  Objection to form.

 2              THE WITNESS:  So the --- yeah, if we had

 3  our druthers, which is I think you are asking, and we

 4  did not --- and we weren't simply satisfying a third

 5  party payor, would we insist on that formal DSM-V

 6  criteria for a person we otherwise know to be

 7  transgender?  We would not.

 8  BY ATTORNEY BROOKS:

 9     Q.    And in fact, you do not.

10           Correct?

11              ATTORNEY BLOCK:  Objection to form.

12              THE WITNESS:  Well, as a practical

13  matter, like I said, we live in a universe where we end

14  up doing both what we suggest is the necessary approach

15  and we end up, because we still live in the universe

16  that we live in, satisfying the other approach even

17  though we're suggesting that it's cumbersome.

18  BY ATTORNEY BROOKS:

19     Q.    Dr. Safer, you testified earlier that, in fact,

20  in 42 patients your clinic determined they were surgery

21  eligible even though they did not satisfy the SOC

22  criteria listed in column one of table one?

23     A.    Right.  So they are not --- so they would be ---

24  they theoretically would be eligible without having
```

1  satisfied the --- some of those specific WPATH criteria

2  that we discussed.  But in practice nobody went to

3  surgery without covering both sets of criteria.

4      Q.    Isn't the precise results reported by this paper

5  that 42 patients were deemed surgery approved who did

6  not qualify under WPATH criteria?

7      A.    But I guess the bottom line of the paper is that

8  if we followed our --- our rules alone, we would

9  actually cover more details and be more conservative in

10  our approach if a longer list of criteria and we would

11  do so more quickly.  That's all the paper says.  It

12  doesn't say that we have --- that we have actively

13  defied the existing universe and sent people to surgery

14  without covering the criteria that are generally being

15  used by doctors.

16      Q.    And by the way, the surgery we're talking about,

17  vaginoplasty, in the context where it is being used for

18  gender affirming purposes, invariably includes

19  castrating the individual.

20          Correct?

21              ATTORNEY BLOCK:  Objection to form and

22  foundation.

23              THE WITNESS:  So a vaginoplasty is a

24  genital reconstruction surgery, which in this context is

 1    taking the existing typically --- typical male genitalia

 2    and reconfiguring it into typically female genitalia.

 3    And in that --- in the procedure the testes are removed.

 4    BY ATTORNEY BROOKS:

 5        Q.    They're not reconfigured?

 6        A.    They are not reconfigured.

 7        Q.    Let me ask you 169, column one, it says about

 8    two-thirds of the way down, at the end of the paragraph

 9    that begins medical requirements for the Mount Sinai

10    CTMS?  I want to direct your opinion --- your attention

11    to the final sentence.

12        A.    So which paragraph, column one.

13        Q.    Column one, the paragraph that begins halfway

14    down, medical requirements?

15        A.    Yes.

16        Q.    Now, let's jump to the end.  The Mount Sinai

17    criteria also removed the 12-month continuous hormone

18    therapy requirement for the vaginoplasty which

19    complicates matters for people who have received hormone

20    therapy from non-medical providers.

21              Do you see that language?

22        A.    I do.

23        Q.    Explain to me the reference for people who have

24    received hormone therapy from non-medical providers?

1     A.    Well, it is the circumstance that some people

2   more so outside of New York, some transgender people

3   still do not have access to care for --- to gender

4   affirming care and do get some of their treatment by

5   alternative means.  And if there is an insistence on a

6   documented 12-month continuous hormone therapy

7   requirement, then those people might not be able to be

8   approved for surgery.

9     Q.    I need to ask you to clarify what you mean by

10  obtaining by alternate means?

11    A.    We have people getting hormones from internet

12  providers.  We have people inappropriate --- well, I

13  apologize, I don't want to make a value judgment there,

14  but we have people getting hormones from friends or

15  connections of theirs, things outside the system.

16    Q.    So you have some people come to you who have

17  effectively self-diagnosed and self-prescribed ---

18                  ATTORNEY BLOCK:  Objection.

19  BY ATTORNEY BROOKS:

20    Q.    --- hormone therapies?

21                  ATTORNEY BLOCK:  Objection to form.

22                  THE WITNESS:  So when we are seeing

23  people for surgeries, then it is no longer a matter of

24  self-diagnosis because we see them ourselves with our

```
 1   internal team.  But there are people who have

 2   self-prescribed their hormones or obtained them by

 3   nonconventional means, that part, yes.

 4   BY ATTORNEY BROOKS:

 5       Q.    And when people come in who have obtained

 6   hormones by nonconventional means and taken them without

 7   prescription necessarily, you chose to remove the

 8   requirement for 12 months properly prescribed continuous

 9   hormone therapy rather than insisting that the patients

10   undergo control of hormone therapy for 12 months before

11   you operate on them?

12               ATTORNEY BLOCK:  Objection to form.

13               THE WITNESS:  So to clarify, again, these

14   are --- we are proposing that this would be the

15   protocol.  In practice, we have not been able to do

16   this, that is we have had to do both.  But in our

17   experience, as a program we don't see any benefit to a

18   supervised --- a supervised regimen, that is we are not

19   --- I'll just leave it there.

20   BY ATTORNEY BROOKS:

21       Q.    WPATH in table one requires that all psychiatric

22   symptoms be, quote, well controlled.

23            Correct?

24       A.    They use that language, yes.
```

1    Q.    And the language under the CTMS column is rather

2    different.   Among other things it says no suicide

3    attempt in the last six months.   Do you see that?

4    A.    Let me find it.   We're in the table, right?

5    Q.    We are in the mental health section under CTMS

6    column?

7    A.    Yes.

8    Q.    No suicide attempt in the last six months.   But

9    if the patient tried to commit suicide seven months ago,

10   that's okay?

11                   ATTORNEY BLOCK:   Objection to form.

12                   THE WITNESS:   So the point here and the

13   distinction is that the WPATH criteria are too vague,

14   and so what you are observing with the Mount Sinai

15   criteria is they're much more granular.   And rather than

16   leaving something to some subjective interpretation we

17   define some of the specifics to make it clearer on what

18   the guidelines should be.

19   BY ATTORNEY BROOKS:

20   Q.    You refer here in your guideline to no suicide

21   attempt in the last six months.   If a patient has

22   entertained suicidal thoughts but made no attempt in the

23   last six months, did that patient potentially satisfy

24   the Mount Sinai criteria?

1      A.    So that kind of decision would be at the

2   discretion of the reviewing mental health professional,

3   the psychiatrist or the psychologist, and so you can

4   certainly envision different circumstances.  So even

5   going back to your example of seven months, you could

6   envision that something like that might be considered,

7   depending upon the person, too unstable even though they

8   technically met criteria.  This isn't just a check box.

9   It is more a guideline.  And similarly, to your point

10  about a suicidal ideation, there are different tiers of

11  them.  And I won't claim to be an expert on the

12  specifics there, but my mental health professionals are

13  more concerned about some of those than others.

14                  ATTORNEY BROOKS:  Take a break.

15                  VIDEOGRAPHER:  The current time reads

16  3:35 p.m. Eastern Standard Time.

17  OFF VIDEOTAPE

18                          - - -

19  (WHEREUPON, A SHORT BREAK WAS TAKEN.)

20                          - - -

21  ON VIDEOTAPE

22                  VIDEOGRAPHER:  We are back on the record.

23  The current time is 3:55 p.m. Eastern Standard Time.

24  BY ATTORNEY BROOKS:

1    Q.    Dr. Safer, you testified earlier, and I think

2   I'm using the word that you used that if your clinic had

3   its druthers they would be following or making decisions

4   strictly based on the criteria that are laid out in this

5   paper, Exhibit 15, under the heading of Mount Sinai

6   CTMS.

7          Correct?

8    A.    Yes.

9    Q.    And can I infer from that that you, yourself,

10   don't view the WPATH SOC-7 as setting out scientifically

11   established best practices but rather recommendations on

12   which you use different?

13                 ATTORNEY BLOCK:  Objection to form.

14                 THE WITNESS:  No, I would not say that.

15   So SOC-7 sets out the guidelines as things were

16   understood in 2011 and 2012, and we have learned ---

17   we've learned and things have evolved since then in

18   terms of the care of transgender people.

19   BY ATTORNEY BROOKS:

20    Q.    Did you have any participation in the

21   development of the SOC-7 guidelines?

22    A.    I had very minimal participation.  I helped

23   review some articles that informed those guidelines.

24    Q.    Those guidelines --- did you have any

1    familiarity with the process of how they were being

2    drafted?

3        A.    I'm trying to think if I can say things

4    usefully.   I was not close enough to the process that we

5    would want --- that I would want to start commenting on.

6        Q.    Do you know whether they addressed issues on

7    which opinions within the drafting committee differed?

8        A.    I can't comment on SOC-7.  We are literally

9    writing SOC-8 now.

10       Q.    And on that are there issues that the SOC-8 is

11   addressing on which opinions significantly differ?

12       A.    Yes.

13       Q.    So it's not that every aspect of the guidelines

14   are unanimously agreed by every member?

15                   ATTORNEY BLOCK:  Objection to form.

16                   THE WITNESS:  So with medical guidelines

17   in general there isn't --- that unanimity wouldn't be a

18   thing.  They're referred to as consensus documents

19   rather than unanimous documents.

20   BY ATTORNEY BROOKS:

21       Q.    And what that tells us is that there is --- that

22   reasonable people differ on at least some aspects of

23   what is set forth in the document?

24                   ATTORNEY BLOCK:  Objection to form.

```
 1              THE WITNESS:  In all guidelines,

 2    including these, members of the committee even differ in

 3    terms of how things are framed and when consensus is

 4    obtained, but not unanimity.

 5    BY ATTORNEY BROOKS:

 6         Q.    How many gender performing surgeries or gender

 7    affirming surgeries were performed in your clinic in

 8    2021?

 9         A.     In 2021, all --- there were, according to the

10    New York Times, about 9,000 total surgeries performed at

11    Mount Sinai hospitals, including everything we do.  So

12    that wouldn't just be vaginoplasty.  That would include

13    chest reconstruction surgeries, revisions of older

14    surgeries, et cetera.

15         Q.    Well, you quote the New York Times.  Where did

16    they get the information?

17         A.    I suppose the sources is us.

18         Q.    You believe that number to be approximately

19    accurate?

20         A.    I think that's right.

21         Q.    I don't trust the New York Times, but you have a

22    pass.  And now 2021 may or may not have been affected by

23    COVID in terms of patients presenting and wanting

24    surgery.  Has there been a clear trend in numbers of
```

```
 1   surgeries performed by your clinic over the last five
 2   years?
 3                   ATTORNEY BLOCK:  Objection to form.
 4                   THE WITNESS:  So there is definitely an
 5   increase in the number of surgeries at Mount Sinai over
 6   the past five years.  Unfortunately, expectation is the
 7   challenge.  We opened the program in 2016, so roughly
 8   those five years.  And certainly the first few years
 9   were quieter as the reputation grew.  In 2020, numbers
10   were down because we had to divert resources to taking
11   care of people with COVID.  Our group, including myself,
12   literally dropped what we were doing for a period of
13   time to go become COVID hospital employees, and so there
14   was a dip there in 2021 as a little bit of a rebound
15   element to it.
16   BY ATTORNEY BROOKS:
17      Q.    Are you able to give me any average total
18   receipts of your clinic or the hospital as a whole and
19   associated physicians from gender affirming surgeries
20   performed within 2021?
21      A.    I'm sorry, say that again.
22      Q.    Let me just ask this again.  Do you have any
23   knowledge as the total --- as to the total receipts of
24   your clinic or the wider hospital and physicians
```

1    involved as a result of gender affirming surgeries

2    performed by your clinic in the last year?

3        A.    So do I know some of the financial elements?

4        Q.    Correct.

5        A.    So I do know some of the financial elements, but

6    nothing that the hospital would allow me to share.

7        Q.    Your counsel can designate it as confidential

8    later on, so it doesn't become public, but you are

9    obliged to answer the question.

10              ATTORNEY BLOCK:  I'm not ---.

11   BY ATTORNEY BROOKS:

12       Q.    I'm entitled to understand your financial

13   interest in the area of your testimony.

14              ATTORNEY BLOCK:  We are not representing

15   him in the context of any legal dispute with Mount

16   Sinai.

17              ATTORNEY BROOKS:  I am entitled to

18   understand the expert's financial interest.  And I

19   suggest to you, Counsel, that you'd rather have me

20   questions asked here where you can designate it as

21   confidential than at trial in a public courtroom.

22              ATTORNEY BLOCK:  It's not up to me.

23              ATTORNEY BROOKS:  You can confer if you

24   want, because that would be the alternative.  If you

1   want to step out and confer with your witness, you

2   should do so.

3                    ATTORNEY BLOCK:  It's not up to me to say

4   what he can and can't say in contravention with an

5   agreement with his employer, and so I think if you want

6   to like obtain like a Protective Order, you know, with

7   him.

8                    ATTORNEY BROOKS:  We have a Protective

9   Order in place, Counsel.

10                    ATTORNEY BLOCK:  I know, I'm not

11   representing him in that capacity, though.  So if you

12   want to interface with his attorney through Mount Sinai

13   then you can, but I don't have an attorney/client

14   relationship with him for purposes of any employment

15   disputes.

16                    ATTORNEY BROOKS:  Are you instructing the

17   witness not to answer?

18                    ATTORNEY BLOCK:  No, I'm not.

19                    ATTORNEY BROOKS:  Are you refusing to

20   answer?

21                    THE WITNESS:  I wouldn't be able to

22   answer without including the hospital lawyers.

23   BY ATTORNEY BROOKS:

24      Q.    Can you tell me ---?

```
 1              ATTORNEY TRYON:  This is Dave Tryon.  I'm

 2  sorry ---.

 3              ATTORNEY BROOKS:  Go ahead.

 4              ATTORNEY TRYON:  May I just also say that

 5  I think if the witness is not willing to disclose his

 6  financial interest here, that that would be grounds to

 7  disqualify him as a witness, which on behalf of the

 8  state I would likely pursue.  So I would respectfully

 9  request that he answer the question.

10              ATTORNEY BLOCK:  Dave, on what basis is

11  that grounds to --- he has disclosed everything required

12  by the rules.  You're asking for --- he has no financial

13  interest in this litigation.

14              ATTORNEY BROOKS:  We don't need to argue

15  the motion right now.  The motion seems likely, the

16  motion will be briefed, but we don't --- we got no Judge

17  here, we're not going to be deciding ---.

18              ATTORNEY BLOCK:  If you want to file a

19  subpoena as a third-party subpoena for that information

20  with a Court Order, than you're free to do so.  He is

21  appearing here as an expert witness on his expert

22  testimony.  So you have plenty of discovery tools to

23  obtain that information.  And we're not his counsel for

24  that.
```

1          ATTORNEY BROOKS:  I do have discovery

2    tools, including asking him questions at this

3    deposition.  I've attempted to do so.  You have not

4    instructed him not to answer.  The witness has refused

5    to answer.  The record is clear.

6    BY ATTORNEY BROOKS:

7        Q.    Let me ask you about personally.  Does your own

8    income or any bonus you receive depend on any part of

9    the overall revenues of your plan?

10       A.    It does not.

11       Q.    And does your personal income consist strictly

12   of a salary or also a salary plus fees associated with

13   surgeries performed?

14       A.    Exclusively a salary.

15       Q.    And your income depends in no way on how many

16   surgeries, you yourself perform?

17       A.    That --- well, I don't perform surgeries I'm not

18   an endocrinologist.

19       Q.    Pardon me.

20       A.    But that's right, it's not revenue based.

21       Q.    It's not revenue based in any way?

22       A.    In any way.  That's right.

23       Q.    That is helpful.  Do you have any understanding

24   as to the average revenues per patient that your clinic

1   receives for patients who are seeking gender affirming

2   surgery in the clinic?

3       A.    We don't characterize it that way.  There's a

4   --- there's a wide range of reimbursements or lack of

5   reimbursements across medicine.  And gender affirming

6   care includes quite that entire range actually, from

7   mental health, which is under reimbursed, to the

8   surgeries which are --- where there's more money.

9       Q.    I've been waiting to hear the flip side of that.

10      A.    So yes, so we have that, so I don't think I

11  could give --- I wouldn't --- even were I allowed by the

12  hospital to give you the specifics, I don't know that I

13  would be able to do that on a per patient basis.

14      Q.    Can you tell me your total personal income in

15  2021 from --- in any way related to your work in

16  connection with your employment at Mount Sinai?

17      A.    So is this something that I'm answering?

18              ATTORNEY BLOCK:  I'm sorry, could you

19  restate the question?

20              THE WITNESS:  He's asking for my ---

21  you're asking for my salary?

22  BY ATTORNEY BROOKS:

23      Q.    I'm asking for your total income, in any way

24  --- in 2021 in any way associated with the clinic at

1  Mount Sinai?

2      A.    So we're running into --- so I'm simply on

3  salary, but the specifics of that are also something

4  where I would need to include the Mount Sinai lawyers,

5  because that's part of their practice, and I would have

6  to defer to them.

7      Q.    You decline to answer the question about your

8  own personal income?

9      A.    Yes.

10              ATTORNEY BROOKS:  I won't take time to

11  speak upon it, but I will object.

12  BY ATTORNEY BROOKS:

13      Q.    I read in some document that your spouse is an

14  employee of Parexel --- if I'm pronouncing that company

15  correctly.

16              Is that still the case?

17      A.    Yes.

18      Q.    And does that company derive any revenues from

19  the sales, testing, clinical trials of any

20  pharmaceutical that is used to suppress puberty or is

21  used as a cross sex hormone?

22      A.    I don't know the answer.  Parexel is a very

23  large back office organization supporting clinical

24  research with many clients.  And so you can envision

1   some connection buried in there, but I don't know

2   specifics.

3       Q.    Fair enough.

4               ATTORNEY BROOKS:  Let me have 54.

5   BY ATTORNEY BROOKS:

6       Q.    Let me ask you to turn to paragraph 18 in your

7   expert report, and there in the first sentence you write

8   although the detailed mechanisms are unknown, there is a

9   medical consensus that there is a significant biologic

10  component underlying gender identity, closed quote.

11          Do you see that?

12      A.    No, I might have pulled the wrong thing out.

13  Which ---?

14      Q.    It's the expert report not the rebuttal?

15      A.    Expert report.  And it's which paragraph?

16      Q.    Paragraph 18?

17      A.    Oh, sorry.

18      Q.    This is why lawyers number their paragraphs.

19      A.    That is wise.  All right.  Paragraph 18.

20      Q.    I'm just calling your attention --- and I have

21  read into the record the first sentence of that

22  paragraph.

23      A.    I see it.

24      Q.    And picking up on our earlier discussion about

1   consensus.  When you say there is a medical consensus,

2   do you mean that all experts in the field agree or do

3   you mean that in your view this is a majority opinion?

4                    ATTORNEY BLOCK:  Objection to form.

5                    THE WITNESS:  So when I guess similar to

6   when we talked about guidelines if the question is, is

7   there unanimity, then there is never unanimity, so there

8   you go.

9   BY ATTORNEY BROOKS:

10      Q.    Okay.

11      A.    I can be a little stronger, though, because the

12  mainstream medical organizations have various statements

13  in this space.  So for example, the endocrine society,

14  which is the largest international organization of

15  endocrinologists does actually have a statement where

16  the sum of the modeling for gender affirming care is

17  prefaced with statements that support this.

18      Q.    In providing the basis for your opinion that

19  there is such a consensus, you cite only two papers and

20  those only papers that you had written yourself.

21          Did you consider those papers written by

22  yourself to adequately document the existence of the

23  medical consensus?

24                    ATTORNEY BLOCK:  Objection to form.

1              THE WITNESS:  So both of the papers

2    reference reviews with larger bibliographies that

3    reference yet other papers that support the statement.

4    And when we're talking about what's informing the

5    statement, of course, is not limited to the specific

6    papers referenced, so that's part of the reason why I

7    gave that example, for example, the endocrine society's

8    formal statements on the project, which is a consensus

9    view of more people than myself, of course.

10             ATTORNEY BROOKS:  Let me mark as

11   Exhibit 16, an article by Aruna Saraswat and others

12   entitled Evidence Supporting the Biological Nature of

13   Gender Identity from 2015 of which Dr. Safer is one of

14   the co-authors.

15             ATTORNEY WILKINSON:  Tab 54.

16                       ---

17             (Whereupon, Exhibit 16, Aruna Saraswat

18             Article, was marked for identification.)

19                       ---

20   BY ATTORNEY BROOKS:

21      Q.    And Dr. Safer, is that a paper that you --- I

22   guess I see by placement --- had supervisory

23   responsibility for?

24      A.    Yes.

1    Q.    Let me --- I learned something in this

2    deposition, so that is good.

3           Let me call your attention to page two and

4    column two, and in the very bottom paragraph ---.

5                ATTORNEY BLOCK:  I'm sorry, did you mean

6    200?

7                ATTORNEY BROOKS:  I did mean 200.  I

8    apologize.  That is also the second page.

9    BY ATTORNEY BROOKS:

10   Q.    In the bottom --- first column bottom paragraph

11   it states, quote, however it is important to note that

12   most transgender individuals develop a gender identity

13   that cannot be explained by atypical sexual

14   differentiation, closed quote.

15   A.    So this is column two.

16   Q.    Column one.  If I misspoke I apologize.

17   A.    I could have misunderstood at this hour.

18   Q.    At the bottom paragraph?

19   A.    However it is important to note, I'm there, yes.

20   Q.    All right.

21          Can you explain to me what is meant by the

22   statement that most transgender individuals have a

23   gender identity that cannot be explained by atypical

24   transgender differentiation?

1    A.    So that is referencing, in this context at the

2    time that this was written, the anatomy, genitals,

3    reproductive structures.

4    Q.    And let me just --- for purposes of terminology,

5    you said at the time this was written.  This is about

6    seven years ago, six years ago?

7    A.    2015, yes.

8    Q.    And if you look at the page one, column one

9    abstract.  This paper is using the term disorders, in

10   sexual development, and that DSD.

11         Do you see that?

12   A.    I do.

13   Q.    That was a term that you were comfortable with

14   most recently?

15   A.    It was a terminology that I was using that

16   recently, yes.

17   Q.    The point here, on page 200, column one, that we

18   were just looking at is, in fact, most transgender

19   individuals do not suffer from any identifiable DSD.

20         Is that what this is saying?

21   A.    From a physically identifiable DSD, that is what

22   this is saying, yes.

23   Q.    Physically, genetically, hormonally,

24   identifiable by any physical measurement.

1          Correct?

2               ATTORNEY BLOCK:  Objection to form.

3               THE WITNESS:  So you have to be careful

4    to be not too broad, and part of the reason is the line

5    there is actually blurring.  So when I'm sitting here

6    and talking in 2022 I recognize that there is a

7    potential for some blurring in that line.  But in 2015

8    it was certainly understood to be how you're saying it.

9    BY ATTORNEY BROOKS:

10     Q.    Well, it remains true today, does it not, that

11   the overwhelming majority of transgender individuals do

12   not suffer from any identifiable atypicality

13   genetically, physically or hormonally.

14          Correct?

15     A.    Well, that's not how I would say it, because

16   gender identity is a biological phenomenon and so one

17   would predict that as we identify certain correlates or

18   even explanations, than we will have things in that

19   space.  But if we're talking about how things were

20   defined in 2015, being transgender was defined as

21   somebody where their gender identity was not aligned

22   with the rest of their biology, and there was no

23   apparent, physical variation either in terms of their

24   anatomy or their chromosomes in terms of their genitals,

1   in terms of their reproductive anatomy or in terms of

2   their chromosomes.  So that is how it was defined at the

3   time.

4      Q.   Well, today, and using identifiable to mean you,

5   Doctor safer, are able to identify it now, not

6   hypothetically in the future, it remains true that the

7   overwhelming majority of transgender individuals do not

8   suffer from any current identifiable, physical

9   chromosomal or hormonal irregularity.

10       Correct?

11      A.   I would say that right now in 2022, it would be

12   true to say that a transgender person does not have an

13   identifiable genital difference almost by definition or

14   a --- or an internal reproductive organ difference

15   almost by definition.  Chromosomal I can't say, because

16   we actually don't check.  And hormonal gets even grayer

17   than that, because it could be the case that there are

18   hormonal exposures, for example, in utero that explain

19   at, least some people as being transgender.

20      Q.   As you sit here today, you don't know of any

21   chromosomal test that can identify an individual as

22   transgender, do you?

23      A.   Is there a --- there --- as I sit here today

24   there are no tests to identify somebody who is

1    transgender.

2        Q.    And that includes genetic tests?

3        A.    There's no scan and there are no blood tests and

4    there are no genetic tests.

5        Q.    And no hormonal tests?

6        A.    That's right.  There are no hormonal tests right

7    now to identify a transgender person.

8        Q.    As you sit here today and based on your whole

9    knowledge of the field, there is no biological test from

10   some mental professionals, as they can do, but there is

11   no biological test that will tell you in advance which

12   prepubertal child who is suffering from gender dysphoria

13   would persist and which would desist as they enter

14   adolescence?

15       A.    So I would have to challenge how you're stating

16   that a little bit just so that we are cleaner in terms

17   of how we think.  So we're thinking right now in terms

18   of identifying kids who are transgender.  We use various

19   terminologies, so that --- we've have been using the

20   term gender dysphoria we're going to be shifting to more

21   gender incongruence, but we're trying to identify people

22   who are transgender and who may require intervention

23   later.

24              Recognizing further that only a subset of

1  transgender people would require a medical or surgical

2  intervention.  And so if the question is can --- is

3  there a test now in 2022 to determine in an prepubescent

4  kid who says they're transgender or people who suspect

5  may be transgender on whatever they're saying, no, there

6  is no test to know that is true or not and to know if

7  they'll think that later or not, and to know if they'll

8  want treatment or not.

9      Q.    So it is your opinion that there is consensus

10 that there is a biological basis for transgender

11 identification, but as of 2022 you don't know with any

12 confidence what that biological basis is.

13         Correct?

14         ATTORNEY BLOCK:  Objection to form.

15         THE WITNESS:  I would say that it is

16 complicated and there may even be more --- there might

17 be multiple explanations for people being transgender.

18 We see that with other biological entities like

19 diabetes, for example.  So the idea that we don't know

20 what it is, is also a little too narrow.

21 BY ATTORNEY BROOKS:

22     Q.    You don't know any one identifiable biological

23 cause with any confidence that state within a scientific

24 knowledge?

1     A.    No.  That's not quite true.  We know that ---

2    and it's not even the biology of being transgender even

3    though that is how I just framed it.  It is even one

4    step back which is the biology of gender identity.  We

5    all have gender identity, and how is that determined and

6    what is that biology.  And we know there --- and we know

7    then that some transgender people have that particular

8    biology not aligned with some of their other biology.

9          So going back to what you just asked, that we

10   don't know any mechanisms is not quite true.  That is

11   people that looks to be true that exposure to androgen,

12   male hormones in utero can have some influence on some

13   people as to their identity.

14    Q.    Well, if there is not yet any test that is

15   predictive of gender identity in a prepubescent child,

16   then as a matter of science it follows that you don't

17   actually know any causal relationship, any biological

18   basis, is that not true?

19    A.    No, that wouldn't be quite sure.  We can't test

20   for somebody deemed transgender, and we can't test

21   gender identity with a test.  But like I said, that at

22   least in some circumstances the androgen exposure in

23   utero, in a mother's womb, could be part of the

24   explanation for some people.  Maybe isn't all the

 1   explanation for some people.

 2       Q.    It could be, but no science has been done to

 3   prove that that is a fact, has it?

 4       A.    So it isn't really a hypothetical, that is we do

 5   have --- we do have data that support it, but it doesn't

 6   lead us to a test.

 7       Q.    If it is not testable, then it is a hypothesis,

 8   not a fact, isn't it, not of science.

 9             Correct?

10             ATTORNEY BLOCK:  Objection to form.

11             THE WITNESS:  No, that is using testing

12   two different ways.  So in a scientific study, then a

13   hypothesis is something that you have based on a certain

14   --- based on certain data, but then you test to see how

15   true it might be.  But when I was using the word test,

16   I'm talking about like a blood test or something that we

17   could actually do on a given individual to know their

18   circumstance with regard to their gender identity.

19   BY ATTORNEY BROOKS:

20       Q.    Let me ask you to look at the paper that I've

21   marked as Exhibit 16, Evidence Supporting the Biological

22   Nature.  Is that that which you have in front of you?

23       A.    I do, yes.

24       Q.    And on the first page you refer under the result

```
 1    that begins by discussion of a seminal study by
 2    Meyer-Bahlburg.  Do you see that?  Second column,
 3    beginning of the results section.
 4        A.    Yes.
 5        Q.    And is it your contention that the
 6    Meyer-Bahlburg study provides evidence of a biological
 7    basis for transgender identification?
 8        A.    What the Meyer-Bahlburg study does is it
 9    provides evidence of a biological basis for gender
10    identity.
11        Q.    Well, specifically the study, the Meyer-Bahlburg
12    study --- let me have that so we are not shooting in the
13    dark.  Exhibit 17 is a paper from 2005 from Professor
14    Heino Meyer-Bahlburg, entitled Gender Identity Outcome
15    in Female Raised 46, comma XY persons with penile
16    agenesis, and it continues.  It's a long document?
17                    ATTORNEY WILKINSON:  Tab 14.
18                              ---
19              (Whereupon, Exhibit 17, 2005 Paper by
20              Professor Heino Meyer-Bahlburg, was marked
21              for identification.)
22                              ---
23    BY ATTORNEY BROOKS:
24        Q.    I believe the level of questions that I will be
```

```
 1    asking, however, are the ones that you will know off the
 2    top of your head given the importance of this study in
 3    the field.  The study concerned exclusively children who
 4    are born with what's referred to as a 46 XY condition.
 5              Right?
 6      A.    Yes.
 7      Q.    And that is long recognized as a DSD?
 8      A.    No, 46 XY is the classic male chromosome
 9    pattern.
10      Q.    Yes.  Pardon me.  So these are individuals with
11    typical male pattern chromosomes?
12      A.    Yes.
13      Q.    Who, however, for some reason have had a
14    developmental disorder or defect affecting their
15    genitals?
16      A.    Who have had some sort of alteration or
17    development of their genitals, exactly.
18      Q.    And the study concerns the results of efforts to
19    raise such genetically male children as female in some
20    cases after surgical procedures to feminize them and in
21    some cases absent surgical procedures.
22              Correct?
23      A.    The study really relates to the gender identity
24    of those where there is an attempt to raise them as
```

1    females.

2    Q.    And the results, if I understand the study, were

3    mixed, that is that some of the individuals who were

4    raised as females nevertheless came to identify as male

5    and some of the individuals who were raised as females

6    came --- persisted in identifying as female.

7          Correct?

8    A.    It is not actually as clean as you're saying it.

9    So we should look at some of the specifics and we might

10   need to point out to specific sentences, but this too is

11   a survey of --- a survey of studies, to be clear, it's

12   not its own isolated study, and then there --- in none

13   of these studies were they systematic or, you know, I

14   guess I will just use the word systematic in

15   ascertaining that all of the people who were being

16   raised female and ascertaining all of the gender

17   identity of those people.  But what they are really

18   observing is that the numbers that they mention of the

19   people who they were trying to raise female who had male

20   gender identity were whatever the numbers were.  I don't

21   know if that makes sense, but you'll follow as

22   necessary.

23   Q.    If you turn to page 432 it begins under the

24   heading discussion.  It begins, quote, the main findings

1    can be summarized as follows.  One, the majority of 46

2    XY individuals with presumably normal male prenatal

3    hormonal milieu, comma, non-hormonal anatomic

4    abnormalities of the genitals, comma, and female gender

5    assignment at birth or in early childhood have not

6    changed gender to male.  Do you see that?

7        A.    I do see it.

8        Q.    And one thing, and I understand the

9    qualifications that you've just described this is not

10   recording a carefully structured study performed by

11   Doctor Meyer-Bahlburg but rather a review of case

12   histories.

13           Right?

14       A.    Exactly.

15       Q.    But his conclusion from his review of those is

16   that the majority of genetically presumably normal male

17   individuals who were raised female, and I believe it's

18   fair to summarize in most cases after feminizing genital

19   surgery, adhered to a female gender identity at least to

20   the data we have?

21       A.    Yes, so I don't know whether they actually all

22   had surgery or not.

23       Q.    They did not all have surgery.

24       A.    Right or even the larger number.  I don't know.

1    I would have to go through.

2        Q.    Fair enough.

3        A.    But the --- and it was his opinion at the time

4    he was writing this that the majority who were reared

5    female were living as female, although we don't know

6    their gender --- but now this is me stepping out, saying

7    we don't know their gender identity, nobody asked.  The

8    reason why this paper is interesting is even in the

9    circumstance where they were being so passive in how

10   they were collecting the data, such a large fraction of

11   these individuals were so clear in their male gender

12   identity that they actually identified themselves

13   against the protocols.

14       Q.    And that seemed to be evidence that --- of a

15   biologic basis of gender identity congruent with their

16   male genetics.

17             Correct?

18       A.    That --- for these people, that's right.  That

19   is with or --- with their chromosomes.

20       Q.    Right.

21       A.    Which you would predict.  If we think about ---

22   if we recognize --- if we think that by survey a half a

23   percent or even a full percent of people are transgender

24   that would mean that 99 percent of people are cisgender.

1    And so if you take a population of people with certain

2    chromosomes, 99 percent of them are going to be

3    cisgender and will have a gender identity incongruent

4    with their chromosomes.

5        Q.    The study includes no individuals who were

6    raised with a gender identity inconsistent with their

7    male chromosomes who came to identify or later perceived

8    themselves as identifying as female.

9            Correct?

10       A.    Well, we don't know that because they were ---

11   they're all XY individuals who were being raised female.

12   And somebody who had a female gender identity who is

13   transgender among them would never be identified as

14   transgender in this case.

15       Q.    So my question was a little more specific.  The

16   study simply doesn't include any individual who had male

17   chromosomes who was raised male who came to identify as

18   female?

19       A.    That's correct.  All of these people who are XY

20   chromosome people raised female.

21       Q.    And you would agree with me, would you not, the

22   study provides some evidence that external forces such

23   as feminizing surgery or how their parents treat the

24   child can have some influence on the formation of gender

1    identity?

2       A.    I can't say that because the study really

3    doesn't go there.  The study is only passive observation

4    and all --- the only thing I would say with some

5    confidence is that some fraction of these individuals

6    who are so clear in their gender identity that despite

7    nobody even looking for that sort of thing, because that

8    wasn't even a consideration when these --- when these

9    cases occurred, they --- the individuals spontaneously

10   announced to the authorities around them, parents and

11   doctors, that they were wrong, that the parents and

12   doctors were wrong.

13      Q.    And that, in your view, provides at least some

14   evidence of a genetic basis for gender identity

15   congruent with chromosomal sex?

16                  ATTORNEY BLOCK:  Objection to form.

17                  THE WITNESS:  No.  It provides some

18   evidence of a biological basis for gender identity that

19   can't be manipulated externally.

20   BY ATTORNEY BROOKS:

21      Q.    Well, considering that the study included no

22   examples of any individual who adopted a transgender

23   identity inconsistent with how they were raised, the

24   study simply can't provide any information about

 1    biologic basis of transgender identification, can it?

 2        A.    Wait.  I think say that again.

 3        Q.    The study includes no individuals who adopted a

 4    gender identity, a transgender identity apart from

 5    social transition and, therefore, can provide no

 6    information one way or the other about whether there is

 7    or is not a biologic basis for transgender

 8    identification?

 9        A.    So not quite.  So the --- because remember the

10    point is that gender identity, period, universally, has

11    a biological basis.  It's not that we --- and to be

12    clear, I don't even know that we won't find and some

13    people even wonder if we will find a gene that

14    associates a gene with transgender, per se.  But I'm not

15    even saying that.  If there's --- I'm only saying that

16    we will find let's say genes associated with gender

17    identity and not everybody will have them aligned with

18    the rest of their biology.  So I just want to preface

19    with that.

20            And in this particular review, they're taking

21    people who have XY chromosomes exclusively.  So

22    therefore, if one --- if a certain fraction of them were

23    to have female gender identity despite assuming

24    different development they would have had male --- they

1   would have had other male biology, those are the people

2   we would have categorized as transgender using current

3   definitions.  And those individuals would not have been

4   apparent in this study they were being raised female

5   anyway.

6       Q.    And my point was that, therefore, that this

7   study can't provide any information about whether there

8   is or isn't a biological basis for transgender

9   identification?

10      A.    So yes.  I guess how you are framing that is

11  where I'm pushing back.  So the point of this study is

12  as evidence of there being a biological basis of gender

13  identity period, having nothing --- not necessarily for

14  being transgender.  In fact, I don't even know if there

15  --- yeah, I don't even know if that would be the model.

16  The model would be somebody who has a certain gender

17  identity, a certain other biology, and then that

18  combination is what we are calling transgender.

19      Q.    You also referenced a paper by Doctor Reiner.

20  And let me have that.

21              ATTORNEY BROOKS:  And I will mark that as

22  Exhibit 18, 2004 Discordant Sexual in Some Genetic Males

23  With Cloacal Exstrophy Assigned to Female Sex at Birth.

24              ATTORNEY WILKINSON:  Tab 71.

```
1                            ---

2                 (Whereupon, Exhibit 18, Paper by Doctor

3                 Reiner, was marked for identification.)

4                            ---

5    BY ATTORNEY BROOKS:

6       Q.    And Dr. Safer, you are well familiar with this

7    paper.

8             Am I correct?

9       A.    I am, yes.

10      Q.    And this is the only other paper that you cite

11   for the assertion that gender identity has a biological

12   basis.

13            Am I correct?

14      A.    No, there are a range of categories of papers,

15   but these are two of my favorite papers in the first

16   category, which is the category of attempting to

17   manipulate gender identity externally.

18      Q.    Dr. Bahlburg in his paper, on page 433 of

19   Exhibit 14, in column one ---.

20      A.    Yes.  Let me get there.

21      Q.    Yes.  433, column one.

22      A.    433, column one.

23      Q.    He says about two inches off the bottom,

24   referring to the Reiner and Gearhart paper of 2004,
```

1   which I believe is this paper, he says, quote, it has

2   serious methodological flaws.  Do you agree with that

3   statement?

4       A.   Let's read what he is criticizing.  All these

5   papers have their weaknesses.  All right.  So the

6   remainder of that --- so the remainder of the paragraph

7   is --- details the complaints for Doctor Meyer-Bahlburg,

8   where his --- which I focus as a social science

9   researcher that they didn't do various assessments that

10  would make it --- that would make standard people doing

11  some of this research able to replicate some of the

12  items in the paper.  And I will --- so while Doctor

13  Meyer-Bahlburg may be frustrated and be complaining

14  about that, he is not actually attacking the veracity of

15  their results.

16      Q.   Well, the point was serious methodological flaws

17  is you are not really able to evaluate the veracity of

18  the results.

19          Correct?

20      A.   Not necessarily.

21      Q.   Do you agree with Doctor Meyer-Bahlburg's

22  evaluation that the methodology of the study reported by

23  Reiner and Gearhart suffers from serious methodological

24  flaws?

1      A.      No.

2      Q.      So let's summarize this study if I may.  I'm

3  turning to page 334.

4      A.      And extending that too, part of his frustration

5  wouldn't be my frustration because I am not looking for

6  those particular endpoints, that is for my purposes for

7  determining whether gender identity is a biological

8  basis Reiner and Gearhart's paper is actually quite

9  strong.

10     Q.      Let's look at the first page in the summary up

11  front.  It refers to this paper dealt with 16 --- under

12  methods, 16 genetic males.

13             Correct?

14     A.      Yes.

15     Q.      And these were all males who suffered from ---

16  uses the word in the second line of the background as

17  severe developmental disorders affecting their genitals.

18             Correct?

19     A.      That's how it is phrased here.  Where am I

20  seeing that?

21     Q.      The second line of the background says severe.

22     A.      Severe phallic inadequacy, yes, I see that.

23     Q.      Which is to say not --- absent or severely

24  disformed penis?

1      A.      That's what that means, yes.

2      Q.      Okay.

3              But these are individuals who are genetically

4   male, and more than that, on page 334, column two,

5   two-thirds of the way down it says the testes were

6   histologically normal in all 14 when examined?

7      A.      I'm on column two.

8      Q.      It is column two.

9      A.      I apologize.

10     Q.      You can kind of see where my finger is pointing

11   here.

12     A.      And this is under ---.

13     Q.      Under methods and the paragraph that begins

14   parents to be educated?

15     A.      Testes were histologically normal in all 14.

16   I'm there, yes.

17     Q.      So we had individuals who were genetically male

18   that had normal testes and had severe deprivation of

19   their penis or it was absent?

20     A.      Yes.

21     Q.      And what was done to these 14 subjects, looking

22   just above that, is that they were assigned a female sex

23   surgically by means of orchiectomy and construction of

24   vulva.

1          Right?

2     A.     Yes.

3     Q.     And orchiectomy is another medical term for what

4  the layman thinks of as castration?

5     A.     As removing the testes.

6     Q.     And construction of the vulvi is creating a ---

7  I'm not sure what the right term is, a pseudo vagina?

8     A.     It wouldn't be a pseudo vagina, but creating a

9  vagina.

10     Q.     It says that --- just immediately following the

11  description of the surgery 14 of these 16 --- looking

12  back at the results paragraph and the abstract, 14 of

13  these 16 were assigned female but later declared

14  themselves male despite the surgery, despite being

15  raised as female.

16          Right?

17     A.     Right, 8 of the 14 who were assigned female.

18     Q.     I'm sorry, I misread that.  Thank you.  Eight of

19  the 14 who were assigned female nevertheless declared

20  themselves male at some stage?

21     A.     That's correct.

22     Q.     And the two who had been raised as males, even

23  though they suffered the same type of phallic

24  developmental defect, remained identifying as males.

1        Correct?

2    A.    Yes.

3    Q.    There was an --- whatever assignment was made,

4  this was made to infants.  It wasn't made or based on

5  any choice or reported sense on the part of the child?

6    A.    That's exactly right, yes.

7    Q.    So several of these individuals, specifically

8  six, who were assigned female at least throughout the

9  period identified by this study adhered to a female ---

10  living out the female gender identity?

11    A.    Actually it was five because one of the children

12  refused to have contact with the surgeons when some of

13  these conversations began to take place.

14    Q.    So we know that five --- we don't know what that

15  person was thinking, feeling or identifying --- but we

16  know that five ---?

17    A.    They were angry.

18    Q.    They were angry.  Whichever that came out, I'd

19  be angry, so ---

20    A.    Yes.

21    Q.    --- so 5 of the 14 subjects who were assigned

22  female and surgically transitioned and socially

23  transitioned continued to at least physically identify

24  as female?

1    A.    As of when they wrote the paper they were still

2  identifying as female as far as I remember.  That's

3  right.

4    Q.    And it would be your position that visibly

5  identifying as female doesn't necessarily mean that they

6  were generally transgender?

7    A.    That --- we don't know that because that wasn't

8  asked.

9    Q.    Is it your view that if you had these children

10 who were surgically transitioned, socially transitioned

11 visibly identifying as female, that if you had simply

12 asked them you would have found out the undoubted truth

13 about their gender identity?

14                ATTORNEY BLOCK:  Objection to form.

15                THE WITNESS:  So it is true that as

16 people develop and assuming that there are good language

17 skills and that there aren't other developmental, mental

18 developmental reasons or other mental health reasons why

19 people would not be clear, that people are able to

20 articulate their gender identity.  Certainly adults do

21 so apparently quite reliably and older teenagers the

22 same, so depending on age.  But yes, there would be a

23 point in time when you could simply ascertain that by

24 asking.

BY ATTORNEY BROOKS:

Q.    Dr. Safer is that fundamentally a medical question or a psychology/mental health question?  The question of the reliability of a patient's self report?

A.    I don't know that I separate it that way.  I say that based on the data we slowly develop overtime of transgender people where we see that any absence of other confounding items along the lines that I said, people at a certain stage in maturity who tell you a certain thing about their gender identity are consistent in that regard.

Q.    This study, the Reiner Gearhart study, Exhibit 18, concerns --- looks at the effect of trying to raise individuals in a gender identity discordant with their chromosomal sex.

Correct?

A.    It is discorded with quite a number of things, but yes, chromosomal is one of your hard data points.

Q.    This study does not look at the question about whether and when or how any sort of intervention might encourage development of a gender identity consistent with one's genetics sex; does it?  It simply does not look at this issue?

A.    Say that again, sorry.

1    Q.    This study does not address the question of
2  whether or how or at what developmental stage
3  therapeutic interventions might encourage the
4  development of a gender identity consistent with one's
5  chromosomal sex?
6    A.    The study is --- the way I'm interpreting the
7  study is it's looking at our inability to manipulate
8  gender identity.  And it's just that.  And I'm a little
9  fuzzy on the rest of what you're asking me.
10    Q.    Well, the study looks at efforts to manipulate
11  gender identity away from chromosomal from the identity
12  normally associated with one's chromosomal sex.  In this
13  case the male sex.
14          Right?
15    A.    It does.
16    Q.    This study simply does not look at efforts to
17  manipulate gender identity towards alignment with the
18  identity normally associated with a subject's
19  chromosomal sex?
20    A.    I think I'm following you now.  So you're
21  suggesting that if we took a transgender person and
22  tried to manipulate their gender identity to align with
23  some of the rest of their biology?
24    Q.    I'm not suggesting that I'm simply saying this

```
 1    study.

 2       A.    That particular instance.  Yes.

 3                   ATTORNEY BROOKS:  15.  It is one of the

 4    previous marked ones, if that matters.  All right.

 5                   I will not show you that document.  Let

 6    me ask the court reporter how many --- how much time we

 7    have left on the clock.

 8                   COURT REPORTER:  I have 5:52, five hours

 9    and 52 minutes.

10                   ATTORNEY TRYON:  I didn't hear that.

11    Could you repeat that?

12                   ATTORNEY BROOKS:  We've got an hour and

13    eight minutes according to the clock of the court

14    reporter here, and I believe that our friend in the

15    ether is calculating separately.

16                   VIDEOGRAPHER:  Correct.  And it sounds

17    like the same.  I have to do the math.

18                   ATTORNEY BROOKS:  Okay.

19    BY ATTORNEY TRYON:

20       Q.    Are you familiar Dr. Safer with a paper recently

21    published by Lisa Littman of Brown University looking at

22    the surveying 100 teens or young adults --- actually

23    surveying a hundred individuals who report having

24    de-transitioned and gone from identifying as transgender
```

1  to identifying in a manner consistent with their genetic

2  sex?

3                    ATTORNEY BLOCK:  Objection to form.

4                    THE WITNESS:  So I'm aware of Dr. Littman

5  having written a second paper.  But I'm not facile, I

6  guess.

7  BY ATTORNEY BROOKS:

8     Q.    You haven't read that paper?

9     A.    I have not read the paper.  I probably did read

10  it, but I would not be able to be quizzed on it.

11     Q.    Then I won't quiz you on it.  I always tell

12  witnesses I don't know is the easiest way out of a line

13  of questioning.

14          Are you --- let me ask you this, does your

15  clinic have any procedure in place to track outcomes on

16  patients on whom you perform gender conforming surgery

17  long term?

18     A.    We're actually in the --- we have a couple of

19  processes, so I guess the short answers are yes and

20  we're going to be more rigorous going forward.

21     Q.    Do you have any knowledge as to how many

22  patients on whom your clinic has performed surgery have

23  after that surgery committed suicide?

24     A.    I don't off the top of my head know that.

```
 1      Q.     Do you believe that your clinic possesses

 2   reasonably complete information on that question?

 3      A.     I actually don't think our information is

 4   sufficiently complete currently, and that actually is an

 5   area where we're going to develop more vigorously,

 6   because I would actually like to know that.

 7      Q.     Do you know whether any patients on whom your

 8   clinic has performed surgery has subsequently sought to

 9   de-transition and take on or revert to, whichever way

10   you want to see it, a gender identity that's aligned

11   with their chromosomal sex?

12      A.     So it's a complicated question.  And actually I

13   just want to go back to the first part where you were

14   talking about suicide.

15             To be clear, the rigor I'm talking about is not

16   suicide focused, because I actually am not anticipating

17   that that is --- that that is happening or is happening

18   more than with being seen in a general population, but

19   for all encompassing that we do definitely need that.

20             But back to your current question ---.

21      Q.     Let me jump back to suicide for a moment.  Are

22   you aware of studies coming out of DeVry University and

23   Amsterdam suggesting that post-surgical transgender

24   populations continues to experience elevated rates of
```

1    complete suicides compared to controlled populations?

2              ATTORNEY BLOCK:  Objection to form.

3              THE WITNESS:  So I'm aware that

4    transgender people have more mental health morbidity

5    than other populations.  Once corrections are made for

6    other confounding factors I don't know that we would

7    have --- that we're very clear yet on those data

8    including ---.

9    BY ATTORNEY BROOKS:

10   Q.    When I refer to a published study coming out of

11   DeVry University of Amsterdam showing high rates of

12   suicidality in postsurgical transgender patients, you

13   believe you're familiar with that literature?

14   A.    I guess it would fall in the same category as

15   Littman's second paper.

16   Q.    Okay.

17   A.    Where I'm familiar with the fact that they're

18   doing surveys and I'm familiar with the broad outlines,

19   but could not ---

20   Q.    Okay.

21   A.    --- comment on specific studies without it being

22   in front of me.

23   Q.    And have any patients on whom your clinic has

24   performed surgery subsequently decided to de-transition

1  and assume a gender identity aligned with their

2  chromosomal sex?

3      A.    I don't --- I don't know.  There is absolutely

4  the case that there are people who stop their treatment

5  at different levels, so it has definitely been my

6  experience that I have patients who I've put on hormone

7  treatments who have stopped those hormone treatments.

8  And there are also, among our patients --- I don't know

9  if any of the patients where we performed the original

10 surgery they actually were opting for a different

11 surgery, but we definitely have patients who have come

12 to us, who had a surgery done elsewhere who were looking

13 for a degree basically what you're calling a reversal,

14 to the degree that that's possible.  So that such a

15 thing does exist.  So the point about saying that they

16 have a different gender identity, that would --- that is

17 not typically how the patients come saying it.  They

18 don't say, oh, it turns out my gender identity is not

19 that.  It's more often society is not treating me well,

20 this isn't working out.  That's the more --- that's the

21 --- that's the typical scenario.  I mean, yes, we

22 definitely have seen that circumstance.

23     Q.    Dave Tryon, who is with us remotely as Counsel

24 for West Virginia, I have promised him an hour, so I

```
 1  have to stop, even though I have so many more

 2  interesting questions.

 3                  ATTORNEY BROOKS:  So Dave, I will stop

 4  and I will turn the witness over to you.

 5                  ATTORNEY BLOCK:  Could we take a break

 6  now?

 7                  ATTORNEY BROOKS:  Of course, it is a good

 8  time for sure.

 9                  ATTORNEY BLOCK:  Thanks.  Can we go off

10  the record?

11                  VIDEOGRAPHER:  The time is 5:03 p.m.

12  Eastern Standard Time.

13  OFF VIDEOTAPE

14                          ---

15  (WHEREUPON, A SHORT BREAK WAS TAKEN.)

16                          ---

17  ON VIDEOTAPE

18                  VIDEOGRAPHER:  We are back on the record.

19  The current time reads 5:25 p.m. Eastern standard Time.

20                  ATTORNEY BLOCK:  This is Josh Block on

21  behalf of the Plaintiff.  We have conferred off the

22  record, including with counsel from Mount Sinai, and

23  Doctor Safer can answer the two questions he declined to

24  answer before provided that we mark those portions of
```

1    the deposition transcript confidential, and all counsel

2    for Defendants have agreed with that.

3                    ATTORNEY BROOKS:   And this is Roger

4    Brooks, and yes, I confirm that all counsel for

5    Defendants have agreed to that.

6    CONFIDENTIAL PORTION BEGINS

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24







13  CONFIDENTIAL PORTION ENDS

```
1                              ---

2                          EXAMINATION

3                              ---

4    BY ATTORNEY TRYON:

5         Q.    Hello, Dr. Safer.  Thanks for your time today.

6    So I am David Tryon.  I represent the State of Virginia.

7    I'm appointed by the Attorney General's Office.  And I

8    wanted to start out by looking at --- asking you to take

9    a look at your Rebuttal Report.  I don't recall what

10   exhibit number that is.  If you could tell us what it is

11   marked?

12                    ATTORNEY WILKINSON:  Exhibit 2.

13                    ATTORNEY TRYON:  Exhibit 2.

14                    ATTORNEY WILKINSON:  Tab 51.

15                    THE WITNESS:  I have that in front of me.

16   BY ATTORNEY TRYON:

17        Q.    Could you take a look at paragraph six, please?

18   Do you have that in front of you?

19        A.    Yes.

20        Q.    Great.  Now, in here it says in the second or

21   maybe third sentence as reflected in the same source

22   cited by Doctor Brown dimorphous sexual characteristics

23   in men and women are produced by a combination of genes,

24   prenatal androgen exposure to sex hormones.  And I'd
```

```
 1    like to focus on that particular clause.  Can you

 2    explain what prenatal androgen exposure to sex hormones

 3    is?

 4        A.    Yes.  That references --- I guess to me it's

 5    more or less exactly what it says, which is that the

 6    developing fetus is exposed to various hormones and

 7    other factors and androgen is specifically the male ---

 8    is typically what we consider to be the male sex

 9    hormone, although everyone has some.  And then prenatal

10    just means and in utero or in the mother's womb.

11        Q.    So androgen for males is testosterone.

12              Is that right?

13        A.    Androgen in general is that category of hormones

14    that we think of as typically male, even though, like I

15    said, we all have them.  And one of the androgens is

16    testosterone.  And with adults it is the one that we are

17    talking about most of the time, of course.

18        Q.    Okay.

19              So as I understand it, your suggestion is that

20    that prenatal exposure to testosterone can have an

21    impact even after birth.

22              Is that right?

23              ATTORNEY BLOCK:  Objection to form.

24              THE WITNESS:  So all factors --- well, I
```

```
 1    don't want to overstate it, but factors that occur to

 2    which a fetus is exposed in the womb have impact on the

 3    development of that fetus, of that person when they are

 4    born, and so androgens, including testosterone, would be

 5    part of that, so yes.

 6    BY ATTORNEY TRYON:

 7       Q.   So are you aware of studies addressing the

 8    impact of prenatal exposure to testosterone as it

 9    impacts people after their birth?

10                   ATTORNEY BLOCK:  Objection to form.

11                   THE WITNESS:  I think I need you to be

12    specific about which studies.

13    BY ATTORNEY TRYON:

14       Q.   Are you aware of any study that addresses the

15    effect of prenatal testosterone upon boys after they're

16    born?

17                   ATTORNEY BLOCK:  Objection to form.

18                   THE WITNESS:  So the ---.

19    BY ATTORNEY TRYON:

20       Q.   Or men?

21       A.   So I can --- I guess --- I have to --- kind of

22    two answers.  Exposure to prenatal androgens, kind of

23    generally because it is not always, testosterone explain

24    the development of what we consider to be typically male
```

1    genitalia so that all babies born with what --- with a

2    penis and with a urethra that is the part for which you

3    urinate, that's up inside the penis and having the

4    gonads, which would typically be testes in the scrotum,

5    all of that happens in response to testosterone.

6    BY ATTORNEY TRYON:

7        Q.    And then that also triggers a question I had.

8    You had previously said in your original report a

9    person's genetic makeup and internal and external

10   reproductive anatomy are not useful indicators of

11   athletic performance and have not been used in a league

12   competition for decades.

13          My question on that is, when you say a person's

14   genetic makeup doesn't their genetic makeup trigger

15   whether or not they are going to --- a person's genetic

16   makeup will determine whether or not they're a boy or a

17   girl, and therefore if they're a boy that would trigger

18   their generation of more testosterone than a girl.

19          Is that a fair statement?

20              ATTORNEY BLOCK:  Objection to form.

21              THE WITNESS:  Yeah, no, that's --- so I

22   think I need to walk that back a little bit.  Why don't

23   we --- can we do it like piece by piece or have you

24   restate parts?

1    BY ATTORNEY TRYON:

2      Q.    I will restate it.  So when you say a person's

3    genetic makeup, what does that mean?

4      A.    Mostly in this context I'm referencing their

5    chromosomes that's the specific that in the further past

6    was actually being used to identify people which we no

7    longer do.  It's not sufficiently reliable.

8      Q.    Does the --- you have an X Y chromosome that is

9    typically considered to mean that you're a male.

10           Correct?

11     A.    The XY chromosome is typically considered to

12   mean that you're a male, correct.

13     Q.    And that would mean that you would be generating

14   more testosterone than if you have an X chromosome.

15           Right?

16               ATTORNEY BLOCK:  Objection to form.

17               THE WITNESS:  So the presence alone of

18   that XY pattern is insufficient to know with certainty

19   that you're producing more testosterone and that is part

20   of the point of I'm saying it is that biological sex is

21   more complex, and you could have the gene for the testes

22   that produce testosterone elsewhere, and then you

23   wouldn't have that pattern and you still would be

24   producing the testosterone or vice versa.

BY ATTORNEY TRYON:

Q.    Okay.

        Well, let's go back to prenatal testosterone.
So you're not --- if I understood what you're saying
before, you're not aware of any studies that show
whether or not prenatal testosterone would have --- let
me just start that over again.

        Are you aware of any studies that address
whether prenatal testosterone has impact on sporting, on
athletics in children after birth?

A.    Correct.  That would be right to say that there
are no studies of which I'm aware that can associate
prenatal testosterone with athleticism.  And I don't
know what levels we're even talking.  Like an adult
level?  What's your question there?

Q.    My next question is, have you heard of the
Journal of Sports Science and Medicine?

A.    I guess you would have to show it to me.

Q.    Okay.

        Have you ever heard the name Jim Goldby or
Jennifer Mays?

A.    No.

                ATTORNEY TRYON:  Jake, could you bring up
the Exhibit that I sent to you today, which is the

```
 1   General Sports Science and Medicine?

 2                ATTORNEY WILKINSON:  Do you see anything?

 3                THE WITNESS:  I don't see anything.  Oh,

 4   that'S too small.  Okay.  That's okay.

 5                ATTORNEY TRYON:  Okay.

 6                And this will be Exhibit --- what Exhibit

 7   are we on Jake, do you know?

 8                VIDEOGRAPHER:  This is 19.

 9                            ---

10                (Whereupon, Exhibit 19, Article, was

11                 marked for identification.)

12                            ---

13                ATTORNEY TRYON:  I'm sorry, 19?

14                VIDEOGRAPHER:  Correct.

15   BY ATTORNEY TRYON:

16      Q.    Okay.

17            I take it from your earlier answers, you

18   probably never seen it before.

19            Is that right?

20      A.    I certainly don't recall.  I don't want to state

21   definitively I've never seen it either, but it's

22   certainly not a paper that I'm going to know off the top

23   of my head.

24      Q.    Well, let me ask you to take a look at the
```

1    conclusion on page 449?

2       A.    So can we move the pictures because they're

3    blocking.

4       Q.    Can you see it?

5       A.    We're getting there.   And then is there a way to

6    move that?   Oh perfect.   Yes.

7       Q.    Okay.

8             The conclusion says, current paper provides

9    initial support from an association between prenatal

10   testosterone levels and mental toughness, optimism, goal

11   orientations, coping strategies and hostility, period.

12   Findings tentatively suggest that the mentioned

13   psychological characteristics may be partially

14   biologically predetermined.

15            Do you see that?

16      A.    I do see it, yes.

17      Q.    Do you have any reason to believe whether that's

18   true or not true?

19                 ATTORNEY BLOCK:   Objection.   I just

20   object to asking him about a conclusion when he just has

21   a little snippet of that and hasn't reviewed the

22   article.   And I'm not even sure if it has been cited in

23   the other expert reports.

24                 THE WITNESS:   I certainly can ---.

```
 1   BY ATTORNEY TRYON:

 2      Q.    Go ahead.

 3      A.    I certainly cannot say if that conclusion has

 4   any logic to it without knowing the study.

 5      Q.    Understood.  Is it possible since this

 6   particular study suggests there is an impact on adults

 7   by prenatal testosterone?  Is it that prenatal

 8   testosterone could also have a DSD explanation for why

 9   should boys at 11 years old have more athletic ability

10   than girls?

11                   ATTORNEY BLOCK:  Objection to form.

12                   THE WITNESS:  So speaking --- yeah,

13   speaking as an expert, I can't give you an expert

14   comment there without seeing their study.

15   BY ATTORNEY TRYON:

16      Q.    Okay.

17            So you just can't say one way or the other.

18            Correct?

19                   ATTORNEY BLOCK:  Objection to form.

20                   THE WITNESS:  I mostly wouldn't want to

21   comment on their study.  I will only make the

22   observation that the data of which I am aware do not

23   show differences for prepubertal children, if that was

24   part of your question.
```

BY ATTORNEY TRYON:

Q.    And so the performance data that Dr. Handelsman pointed out showing that there are some damages given before puberty, you reject those?

ATTORNEY BLOCK:  Objection to form.

THE WITNESS:  So those broad cross-sectional studies don't get at input, whether they are referencing biological explanations versus societal explanations.

BY ATTORNEY TRYON:

Q.    Okay.

Whether it's societal or biologic explanations, Handelsman still demonstrated that there is an advantage for pre-pubescent males over females in athletics.

Right?

ATTORNEY BLOCK:  Objection to form.

THE WITNESS:  No, neither Dr. Handelsman in his paper --- he doesn't actually say that.  And if you --- I think we looked previously at one of the figures where specifically the range of outcomes, if you were to repeat the study, included the girls doing better than the boys.

BY ATTORNEY TRYON:

Q.    Well, that was only one of them.  That was not

1    it.  That was one of the charts.  The other chart showed

2    that there was an advantage, right?

3                        ATTORNEY BLOCK:  Objection to form.

4                        THE WITNESS:  The other --- yeah, let me

5    think with that one.  Right.  We are not getting into

6    what the causality is, then the other charts did show

7    the boys doing better.  And again, the caveat remains

8    what is not --- what is not demonstrated there is that

9    there is --- that that is a biological thing versus

10   simply the very longstanding societal and cultural

11   environments.

12   BY ATTORNEY TRYON:

13       Q.    And you've contended that there's a biological

14   component to gender identity.

15            Correct?

16       A.    Yes.

17       Q.    Which we have not been able to identify in this

18   deposition.

19            Correct?

20                        ATTORNEY BLOCK:  Objection to form.

21                        THE WITNESS:  So it is not quite --- well

22   I actually don't know what's been identified in the

23   deposition.  The data are included in my --- in the

24   papers that I referenced that are what are convincing to

1    the medical community right now.  The detailed

2    explanations for the specific biology are not known if

3    that's where you're going.

4    BY ATTORNEY TRYON:

5    Q.   Assuming there is actually a biological

6    component, as you say, to gender identity, that says

7    nothing about whether a biological male identifying as a

8    female should, as a public policy matter, be allowed to

9    participate on a girls athletic team in high school and

10    middle school.

11        Right?

12            ATTORNEY BLOCK:  Objection to form.

13            THE WITNESS:  So the way that I would say

14    that is even if we recognize that there is a biological

15    explanation for gender identity, that does not --- well,

16    I don't know that then I can go on to make an expert

17    statement, honestly, because that gets outside my

18    purview and in terms of --- my lane is just simply to

19    say that.

20    BY ATTORNEY TRYON:

21    Q.   Got it.  Can you look at your rebuttal report

22    and look at page two?

23    A.   I have my rebuttal in front of me and I'm on

24    page two.

 1    Q.    Paragraph 4B?

 2    A.    I have that in front of me.

 3    Q.    You say --- great.  You say circulating

 4  testosterone is the primary known biological driver of

 5  average differences in athletic performance.  Do you see

 6  that?

 7    A.    I do.

 8    Q.    You say it is primary so what are the other

 9  biological drivers of average differences in athletic

10  performance?

11              ATTORNEY BLOCK:  Objection to form.

12              THE WITNESS:  So when I --- so we're

13  talking about circulating testosterone --- let me just

14  look at this.  Right.  The truth is, is that it may ---

15  that the only candidates that we have so far are

16  testosterone at puberty and testosterone in the moment.

17  BY ATTORNEY TRYON:

18    Q.    So it's --- according to you, it's testosterone

19  at puberty and circulating testosterone are the only

20  biological drivers of average differences in athletic

21  performance.

22              Is that right?

23    A.    So excuse me.  I'm actually --- so this is the

24  president of the hospital.

```
 1              ATTORNEY BLOCK:  I'm sorry.  Can we go

 2   off the record for a minute and take a break.  The

 3   president of the hospital is returning his previous

 4   call.

 5              VIDEOGRAPHER:  Going off the record.  The

 6   current time is 5:48 Eastern Standard Time.

 7   OFF VIDEOTAPE

 8                        - - -

 9   (WHEREUPON, A SHORT BREAK WAS TAKEN.)

10                        - - -

11   ON VIDEOTAPE

12              VIDEOGRAPHER:  Back on the record.  The

13   current time reads 5:54 p.m. Eastern Standard Time.

14   BY ATTORNEY TRYON:

15     Q.    My last question was according --- according to

16   you, testosterone at puberty and circulating

17   testosterone are the only biological drivers of average

18   differences in athletic performance.

19              Is that right?

20     A.    Right, they are the only ones that are known.

21     Q.    And in paragraph 4C, looking on page three ---

22   let's move over to page three, at the top of the page,

23   your statement is there is no basis to expect that

24   transgender girls who receive puberty delaying
```

```
 1    medication followed by gender affirming hormones would

 2    have an athletic advantage.  There's a comma.  But if we

 3    just put a period there, is that your opinion?

 4        A.    That is correct.  Yes, that is my opinion.

 5        Q.    Let me ask you the converse.  You say there is

 6    no basis to expect that transgender girls who receive

 7    puberty delaying medication followed by gender affirming

 8    hormones would not have an athletic advantage, period.

 9    Would you agree with that statement?

10        A.    No.

11        Q.    Do you have any --- excuse me, any performance

12    data from an actual athletic event that support your

13    opinion?

14        A.    I do not have any data from an actual athletic

15    performance study for that.  No, I do not in that

16    context, in that specific instance.

17        Q.    Let me ask you to look at your report.  Turn to

18    paragraph 45.

19        A.    So my report, paragraph 45.  All right.  I have

20    that in front of me.

21        Q.    Great.  Finally, unlike elite international

22    competition, schools and colleges often provide athletic

23    competition as part of a broader educational mission.

24    In that context, when scholastic athletics are
```

1    components of the educational process, institutions may

2    adopt policies designed to emphasize inclusion and to

3    provide the most athletic opportunities to the greatest

4    number of people.  You see that.

5         Right?

6    A.    I do.

7    Q.    So these policies you referred to are designed

8    to emphasize inclusion and to provide the most athletic

9    opportunities to the greatest number of people, what's

10   the source of that policy?  Did you come up with that or

11   did you see it someplace else?

12             ATTORNEY BLOCK:  Objection to the form.

13             THE WITNESS:  So the question is how am I

14   aware?  Yeah --- I apologize.  You can hear that I'm

15   confused on your question.

16   BY ATTORNEY TRYON:

17   Q.    I'll try and do better.  You said intuitions may

18   adopt policies designed to emphasize inclusion and to

19   provide the most athletic opportunities to embrace a

20   number of people.  And those policies that you're saying

21   there, is that a policy that you read about somewhere or

22   something you are just suggesting?  What's the source of

23   that?

24             ATTORNEY BLOCK:  Objection to form.

```
 1                    THE WITNESS:  So an operative word in
 2   this is may adopt policies, so this isn't referencing a
 3   specific policy that I would give you right this moment,
 4   if that's what you are asking.
 5   BY ATTORNEY TRYON:
 6      Q.    So right, just aside from education --- this
 7   whole paragraph is talking about education, but you're
 8   not an expert on education or teaching methodology, are
 9   you?
10      A.    I certainly am not.
11      Q.    And you don't have any degrees in education or
12   training in teaching methodology, do you?
13      A.    I do not.
14      Q.    And you have no degrees or training in pedagogy?
15      A.    I have no degree in pedagogy.  I will be careful
16   how absolutely I do not, because that's not my ---
17   that's not where I am representing myself to be an
18   expert.  I am involved in some education, but at the
19   scholastic level not, so let's just say no.
20      Q.    And you have no expertise as to whether sports
21   or how sports are used as part of educational systems.
22           Right.
23      A.    Correct.  That is not the expertise.  The how
24   and my decisions among this are not my expertise.
```

```
 1      Q.    Do you have any idea how many schools actually

 2  have sports programs?

 3                   ATTORNEY BLOCK:  Objection.  I couldn't

 4  hear the full question.  You cut out.

 5  BY ATTORNEY TRYON:

 6      Q.    Sorry.  Do you have any idea how many schools

 7  have sports programs?

 8      A.    I could not give you a number, no.

 9      Q.    Are you aware that some colleges do not have

10  athletic programs?

11      A.    I guess I'm vaguely aware.  If you're asking me

12  as an expert than I wouldn't comment on that as an

13  expert, but as a human in society I certainly am aware

14  that that is a thing.

15      Q.    Okay.

16            And do you have any idea what percentage of

17  kids are in athletic programs in schools versus those

18  that are not that are still students?

19      A.    No, I would not be your source for that data

20  point.

21      Q.    So when you are expressing this opinion in

22  paragraph 45 that's not an expert opinion there, is it?

23                   ATTORNEY BLOCK:  Objection to form.

24                   THE WITNESS:  So right, I guess it's a
```

```
 1    bit confusing here, because it's not my expert opinion

 2    that --- well, I'm certainly aware as an individual that

 3    this is a priority and when I sit on --- when I sit on

 4    committees where we discuss relative priorities, there

 5    are experts present who discuss these priorities.  But

 6    if I'm speaking to you as an expert, then I --- then I

 7    can't be the representative expert in that space.

 8    BY ATTORNEY TRYON:

 9       Q.    Right.  Well, I'm just asking, in paragraph 45,

10    given your lack of expertise and education, you are not

11    giving an expert opinion in paragraph 45.

12            Is that a correct statement?

13                    ATTORNEY BLOCK:  Objection, asked and

14    answered.

15                    THE WITNESS:  So I'm simply --- I'm

16    raising all of the issues that we know exist, but then

17    I'm not providing an expert opinion in terms of the

18    relative priorities among these circumstances that

19    exist.

20    BY ATTORNEY TRYON:

21       Q.    Let me just ask you very clearly is paragraph 45

22    an expert opinion of yours?

23                    ATTORNEY BLOCK:  Objection to form.

24                    THE WITNESS:  I don't think I'm even
```

```
 1    expressing an opinion in paragraph 45, expert or

 2    otherwise.  I'm simply stating the background situation.

 3    BY ATTORNEY TRYON:

 4        Q.    Okay.

 5              But --- okay.  I would ask you to turn to

 6    paragraph 37 of your report.

 7        A.    All right.

 8              I have that in front of me.

 9        Q.    This is talking about the International Olympics

10    Committee.  Right?  Let me move back to paragraphs 35

11    and 36.

12        A.    Yes, this is the International Olympic

13    Committee.  This relates to the International Olympic

14    Committee.

15        Q.    So this 2021 framework, do you believe that you

16    understand this framework?

17        A.    I think you'll have to ask more specific

18    questions because I might understand parts and I might

19    have questions about parts.

20        Q.    Very good.  First of all, it says the 2021

21    framework further provides that, quote, any restrictions

22    arising from eligibility criteria should be based on

23    robust and peer-reviewed research that, A, demonstrates

24    a consistent, unfair, disproportionate competitive
```

1   advantage with performance and/or an unpreventable risk

2   to the physical safety of other athletes.  You see that

3   part, right?

4        A.    I do, yes.

5        Q.    Do you understand what the word disproportionate

6   means in this context?

7        A.    To a degree.

8        Q.    Okay.

9              What do you understand it to mean when it says

10  a disproportionate competitive advantage in performance?

11       A.    The IOC is aware that there's quite a wide range

12  of advantages with different body types and different

13  biology, and so they use language like disproportionate

14  when they want to talk about something that's --- that's

15  --- that's systematically associated with one

16  circumstance in a way that they think would violate the

17  rules, whatever they might be, for a specific sport.

18       Q.    That's pretty ambiguous.  I have no idea what

19  that means.  Let me see if we can narrow it down.  Is a

20  disproportionate competitive advantage in performance

21  --- would 20 percent be a disproportionate competitive

22  advantage?

23              ATTORNEY BLOCK:  Objection to form.

24              THE WITNESS:  So that's --- I can't

```
 1   answer that, because it depends on context, and I'm not
 2   the person who wrote the specific language in that
 3   document, so that is the quote from the document.  But
 4   in terms of --- I don't --- I think we go someplace we
 5   don't want to go if we try to over define the specific
 6   word disproportionate.
 7   BY ATTORNEY TRYON:
 8      Q.    So it's just not something that you or I could
 9   look at and reach any kind of conclusion to tell them
10   what that means sitting here today.
11          Is that right?
12      A.    I think if we look at a specific sport, I think
13   that if it was limited to just the two of us we might
14   need more expertise to make a decision.
15      Q.    Well, let's say if we talked about the one mile
16   --- running one mile, is that something that we could
17   then determine what disproportionate competitive
18   advantage and performance would mean?
19                   ATTORNEY BLOCK:  Objection to form.
20                   THE WITNESS:  It would depend on context.
21   And if we're talking about at the elite level which is
22   what the IOC references and we limited --- even then if
23   we limit it just to you and to myself, we would want
24   more expertise.
```

1  BY ATTORNEY TRYON:

2     Q.    Right.  Okay.

3           So we don't know what the IOC meant by this in

4  any particular context do we?

5                    ATTORNEY BLOCK:  Objection to form.

6                    ATTORNEY TRYON:  Actually, let me redraw

7  this question.

8  BY ATTORNEY TRYON:

9     Q.    You as an expert would not be able to give me an

10  expert opinion on what disproportionate competitive

11  advantage in performance of the one mile run would be;

12  right?  You could not give me an expert opinion on that.

13           Fair statement?

14     A.    If you break the words out in that --- in that

15  fashion then it does become difficult.  If you ask me

16  what the entire statement after the letter A is

17  referencing, I can at least explain some of the thought

18  process for the IOC there.

19     Q.    Well, my question is simply, you as an expert,

20  are you able to tell me what --- able to define for me

21  what would be a consistent, unfair disproportionate

22  competitive advantage in performance in a one mile run

23  for the IOC?

24                    ATTORNEY BLOCK:  Objection to form.

1          THE WITNESS:  I, as an expert, cannot

2    give you a blanket explanation of what would

3    specifically consist of --- what would specifically meet

4    that definition.  When they wrote the statement they

5    didn't actually even have specific guidance, that is

6    simply the spirit of a guideline --- the spirit of what

7    a specific guideline should consider when that guideline

8    is made.

9    BY ATTORNEY TRYON:

10        Q.    Do you know what they meant when they said

11   unfair?

12        A.    So the --- it's kind of the same circumstance.

13   That is the purpose of this statement is to be global

14   guidance for the experts in the specific sport when they

15   might develop guidelines relevant to their specific

16   sport.  So for example, the group with expertise in that

17   one mile run that you're referencing should think in

18   this context.  That's all this is doing.

19        Q.    And some of the sporting organizations have come

20   up with some very specific rules.

21              Correct?

22        A.    Some of the sporting federations have come up

23   with specific rules, yes.

24        Q.    And as I recall, some of them require a certain

```
 1    level of circulating testosterone.
 2             Is that right?
 3       A.   Some of the sporting federations use a certain
 4    level of circulating hormone as part or all of their
 5    roles.
 6       Q.   And some of them use the level that you've
 7    mentioned that you were involved in setting, which was 5
 8    Nmol --- say it for me.  Nmol something.
 9       A.   Nmol/Ls per liter.  Yes, some of them use that
10    nmol/L per liter threshold.
11       Q.   Did they --- where did they get that 5 nmol/L
12    quantity, do you know?
13                      ATTORNEY BLOCK:  Objection to form.
14                      THE WITNESS:  So I do know where that
15    number comes from originally for World Athletics, which
16    is the first one to put that number out.  And that
17    number comes from studies of some Olympic athletes in
18    some races where there was for at least certain
19    distances a demonstrable difference between people who
20    had --- and specifically people in the female category
21    who had lower numbers of testosterone than that and
22    higher numbers of testosterone than that.
23    BY ATTORNEY TRYON:
24       Q.   You were on that committee.
```

```
 1           Right?

 2    A.    I was on the group that wrote that World

 3  Athletics policy, yes.  Not on the group that did that

 4  study.

 5    Q.    And so how did you finally come up with the

 6  number of five as opposed to four or six or three or

 7  seven?

 8    A.    The number five discriminates in terms --- in

 9  terms of there being some demonstrated advantage or

10  improved outcome is really what it was, for those with

11  higher numbers versus those with lower numbers.  That

12  was not true necessarily with a lower testosterone

13  threshold.  That is a difference was not as apparent and

14  that's really the entire logic pattern there.

15    Q.    Well, earlier you just said it could have been

16  --- you didn't think there was that much difference

17  between five and six.  That was your testimony earlier

18  as I recall.

19           Right?

20              ATTORNEY BLOCK:  Objection.

21              THE WITNESS:  As an endocrinologist I can

22  tell you that those difference --- that that's right

23  that to --- the difference between five and six would be

24  hard to demonstrate.
```

1   <u>BY ATTORNEY TRYON</u>:

2     Q.    So how did you settle on five instead of six or

3   five or six instead of four?

4     A.    So I guess the inputs are that there needed to

5   be a line so that there's ability to enforce something.

6   There needed to be a rule.  And the choice of five,

7   mostly, is what I've been saying already, which is ---

8   it's a clean number where there's at least some

9   distances, there's a demonstrable difference in outcomes

10   at that level --- above and below that level.

11     Q.    So are you saying that there is a value of

12   having a hard rule?

13                  <u>ATTORNEY BLOCK</u>:  Objection to form.

14   <u>BY ATTORNEY TRYON</u>:

15     Q.    Maybe I should say having a clean rule?

16     A.    So as an expert I'm not --- that wasn't my role

17   on the committee to determine that there needed to be a

18   rule, but that is certainly the logic pattern of the

19   committee that there ought to be a rule.  That is not my

20   expert opinion.

21     Q.    Okay.

22          But different organizations are free to come up

23   with different conclusions of about what their rules

24   ought to be.

1            Right?

2                    ATTORNEY BLOCK:  Objection to form.

3                    THE WITNESS:  So the different

4    International Athletic Federations were to make use of

5    data such as it exists to make their own rules for

6    participation in their sports.

7    BY ATTORNEY TRYON:

8       Q.    And different organizations came up with very

9    different rules.

10           Right?

11                   ATTORNEY BLOCK:  Objection to form.

12                   THE WITNESS:  So most of the

13   international federations still do not have rules,

14   actually.  And honestly, that's mostly a logistics

15   situation where some of these organizations are too

16   small to put the data together or the committees

17   together to make rules.

18   BY ATTORNEY TRYON:

19      Q.    Those that do have rules have different rules.

20           Correct?

21      A.    Those that do have rules have had different

22   conversations in the space.  I don't know that I could

23   systematically go through all of them, but there is some

24   variation, yes.

```
 1        Q.     Some require --- have a Level 5 nanomoles per

 2   liter and some still have ten.

 3               Right?

 4        A.     So I'd have to go back and look.  You would have

 5   to show me.  World Athletics has five for sure.  And

 6   that's the one where I'm most familiar because I was

 7   actually sitting in the room helping draft that.  The

 8   IOC in the past had used ten as a line, but that just

 9   sits there right now as a --- as a number someone might

10   adopt.  I actually don't know off the top of my head if

11   anybody has adopted that for their formal rules.

12        Q.     What was the scientific basis for the ten

13   nanomoles per liter?

14        A.     The logic for ten at the time is it is the

15   bottom of the male range.  That's its history.

16        Q.     Okay.

17               So it sounds to me like there is room for

18   reasonable discussion about what the appropriate rule

19   ought to be?

20               ATTORNEY BLOCK:  Objection to form.

21               THE WITNESS:  The way I would say it is

22   as different athletic organizations obtain data, they

23   might use those data to determine differences, including

24   if the --- if our best measure is testosterone,
```

1  different thresholds of testosterone.

2  BY ATTORNEY TRYON:

3      Q.    Would it be appropriate to use performance data

4  as well to make those decisions?

5      A.    The best data in my opinion are actual outcomes

6  within a given sport.

7      Q.    What do you mean by outcomes, performance?  Are

8  we saying the same thing?

9      A.    I don't know if we're saying the same thing.  So

10  the studies that I reference are the Roberts study and

11  the Harper study, where they actually look at specific

12  athletic endeavors and measure those as opposed to the

13  studies where they're simply sitting in a physiology lab

14  measuring somebody move an arm back and forth and

15  thinking that it might associate with some actual

16  athletic performance.

17      Q.    Somebody moving their arm back and forth with

18  weights, that's not athletic?

19      A.    It's --- again, it would --- right, that's ---

20  that's only --- that's what we would call a surrogate

21  endpoint where you are simply looking at something that

22  might correlate with what you want, but --- but you

23  don't know it until you test it.  It ends up being what

24  we call hypothesis generating.  That is how we would say

```
 1    it in a scientific way.
 2        Q.    And the same would hold true with the level of
 3    circulating testosterone, you would want to actually
 4    test that in real life to see how people's circulating
 5    testosterone actually translates into performance of an
 6    actual athletic contest.
 7              Right?
 8        A.    That's right.  So the data that were used to
 9    determine the five nanomole per liter cut point are
10    passively collected data.  And if somebody did a study
11    looking at that threshold and found that there was,
12    let's say, no difference, then that rule might be
13    discarded.
14        Q.    And so far, other than Roberts and Harper, if I
15    recall correctly, those are the only two that you know
16    of.
17              Right?
18              ATTORNEY BLOCK:  Objection to form.
19              THE WITNESS:  Those are the only two
20    studies that have gone that extra step and looked at an
21    actual athletic activity with an outcome that is part of
22    that athletic activity and not what I was just
23    referencing, as a surrogate endpoint.
24    BY ATTORNEY TRYON:
```

1      Q.    In those two studies did they check the
2  circulating testosterone in the individuals in these
3  studies?
4      A.    I'd have to look.  I think we did look earlier
5  today with regard to the Harper study, and I don't think
6  she's referencing testosterone levels at all.  Again,
7  I'd have to go back and look to be sure.  We were
8  talking about whether they were self-reported.  And the
9  --- with the Robert study I would have to go back and
10  look at that one, too.  I'm feeling like the answer is
11  no, but we can look there if you want.
12      Q.    Yeah, we don't need to.  I'm pretty sure that we
13  just talked about how long they had been in the therapy
14  rather than actual measurements.
15          Well, let me move on.  I know we don't have a
16  lot of time left.
17          So you said you're familiar in your expert
18  report you are familiar with HB-3293.
19          Is that right?
20              ATTORNEY BLOCK:  Objection to form.
21              THE WITNESS:  So yes, I'm somewhat
22  familiar.
23  BY ATTORNEY TRYON:
24      Q.    Have you read the whole thing?

1          A.     I don't think I've read the whole thing, no.

2          Q.     When did you first hear of HB-3293?

3          A.     I probably first heard of it when the --- when I

4     received contact from the ACLU to serve as an expert

5     witness.

6          Q.     Do you recall if that was before or after it was

7     passed?

8          A.     I don't recall.  I would have to speculate that

9     it would be after, because that would --- I mean that

10    would make sense that that is true, but I don't recall,

11    so I wouldn't be able to answer that.

12         Q.     Okay.

13                So we would refer to this as State Women's

14    Sports Law and there's other types of laws like this

15    throughout the country.

16                Are you aware of that?

17                     ATTORNEY BLOCK:  Objection to form.

18                     THE WITNESS:  So I'm aware that there are

19    attempts at legislation and some actual legislation

20    passed to block transgender athletes in various

21    permeations, including transgender women in several

22    states.  I'm aware of that, yes.

23    BY ATTORNEY TRYON:

24         Q.     Are you aware then House Bill 3293 the word

1    transgender does not appear at all?

2       A.    House Bill --- that's this one?

3       Q.    That is this one.

4       A.    I was not aware that the word transgender does

5    not appear at all.

6       Q.    Are you tracking the other bills out there that

7    are similar to House Bill 3293?

8       A.    I am not personally tracking the other bills,

9    no.

10      Q.    Can you take a look at the Handelsman report

11   that you have in front of you.  I don't recall the

12   exhibit number.

13              ATTORNEY WILKINSON:  I think Exhibit 13

14   --- oh, sorry, it's Exhibit 4, I think.

15              THE WITNESS:  I don't see.

16              ATTORNEY WILKINSON:  I can give you that.

17              THE WITNESS:  The stack got big.

18              ATTORNEY TRYON:  We can just bring it ---

19   if you can't find it we can bring it up on the screen?

20              THE WITNESS:  Okay.

21              I was given another copy, so we're good.

22   I have it in front of me.

23   BY ATTORNEY TRYON:

24      Q.    Okay.

```
 1              On the second page?

 2      A.      On the second page.

 3      Q.      Okay.

 4              Under fairness and segregation in sports.

 5              Do you see that section?

 6      A.      I do.

 7      Q.      In the third full paragraph underneath there ---

 8  oh the formatting there is a little different than the

 9  copy that I have.  Let's see.  There's a paragraph that

10  starts the terms sex and gender.  There it is.  The

11  terms sex and gender are often confused as

12  interchangeable.  Now, I want you to focus on this next

13  sentence.  Sex is an objective specific biological

14  state, a term with distinct fixed facets notably

15  genetic, chromosomal, gonadal, hormonal and phenotypic

16  including genital sex, each of which has a

17  characteristic defined binary form.  Did I read that

18  correctly?

19      A.      You read that correctly, yes.

20      Q.      Do you agree with that statement?

21      A.      I don't agree with that statement completely,

22  no.

23      Q.      What specifically do you find objectionable.

24      A.      It's missing some components of sex, including,
```

1   for example gender identity.  And the phrasing

2   characteristic defined binary form is not necessarily

3   true for each component of biological sex.

4       Q.    So you disagree with the statement in the

5   Handelsman report, is that --- did I state that fairly?

6       A.    Right.  I would characterize the statement as

7   not exhaustive.

8                 ATTORNEY TRYON:  Let me ask the court

9   reporter if I have any time.

10                 COURT REPORTER:  I have six minutes and

11   58 --- six hours and 58 minutes.

12                 ATTORNEY TRYON:  Well, I guess with my

13   last two minutes I'll just say thank you for your time

14   and I appreciate it.  And I don't have any other

15   questions.  I don't know if any of the other Defendants

16   do.  I doubt it.  But go ahead.  If they do, go ahead.

17   Kelly?

18                 ATTORNEY MORGAN:  This is Kelly Morgan.

19   I don't have any questions.  Thank you so much.

20                 ATTORNEY TRYON:  Roberta?  Susan, you're

21   next.

22                 ATTORNEY GREEN:  This is Roberta Green on

23   the behalf of the SSAC.  No questions.  Thank you.

24                 ATTORNEY DENIKER:  Dr. Safer, this is

1    Susan Deniker.  I have no questions.  Thank you for your

2    time today.

3                    ATTORNEY TRYON:  We are finished.

4                    VIDEOGRAPHER:  This concludes this

5    deposition.  The current time reads 6:31 p.m. Eastern

6    Standard Time.

7                    * * * * * * *

8         VIDEOTAPED DEPOSITION CONCLUDED AT 6:31 P.M.

9                    * * * * * * *

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

1

1   STATE OF WEST VIRGINIA  )

2                    CERTIFICATE

3        I, Nicole Montagano, a Notary Public in

4   and for the State of West Virginia, do hereby

5   certify:

6            That the witness whose testimony appears

7   in the foregoing deposition, was duly sworn by me

8   on said date, and that the transcribed deposition

9   of said witness is a true record of the testimony

10  given by said witness;

11           That the proceeding is herein recorded

12  fully and accurately;

13           That I am neither attorney nor counsel

14  for, nor related to any of the parties to the

15  action in which these depositions were taken, and

16  further that I am not a relative of any attorney

17  or counsel employed by the parties hereto, or

18  financially interested in this action.

19           I certify that the attached transcript

20  meets the requirements set forth within article

21  twenty-seven, chapter forty-seven of the West

22  Virginia.

23  

24                          Nicole Montagano,

25                           Court Reporter