IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA
CHARLESTON DIVISION

B.P.J., by her next friend and mother,
HEATHER JACKSON,

                    *Plaintiff*,

v.                                  Civil Action No. 2:21-cv-00316
                                  Hon. Joseph R. Goodwin, District Judge

WEST VIRGINIA STATE BOARD OF
EDUCATION, HARRISON COUNTY BOARD
OF EDUCATION, WEST VIRGINIA
SECONDARY SCHOOL ACTIVITIES
COMMISSION, W. CLAYTON BURCH in his
official capacity as State Superintendent,
DORA STUTLER in her official capacity as
Harrison County Superintendent, PATRICK
MORRISEY in his official capacity as Attorney
General, and THE STATE OF WEST VIRGINIA,

                    *Defendants,*

and

LAINEY ARMISTEAD,

                    *Defendant-Intervenor*.

## DEFENDANTS HARRISON COUNTY BOARD OF EDUCATION AND DORA STUTLER'S MEMORANDUM OF LAW IN SUPPORT OF THEIR MOTION FOR SUMMARY JUDGMENT

14447830

Defendants Harrison County Board of Education ("HCBOE") and County Superintendent Dora Stutler ("Stutler") (collectively the "County Board"), by counsel, move the Court for summary judgment pursuant to Rule 56 of the Federal Rules of Civil Procedure. Simply stated, the HCBOE and Stutler cannot be liable because they are not the entity that caused any potential or actual injury to Plaintiff B.P.J. as they did not create, develop, propose, support or pass the West Virginia statute at issue in this civil action. Rather, the statute at issue, House Bill 3293 ("the Act"), was enacted by the West Virginia Legislature and signed by the Governor. As a result, to the extent that B.P.J. suffers any injury due to the Act, that injury will be caused by the State of West Virginia. Because B.P.J.'s injury will not be caused by any policy or rule created by the HCBOE or Stutler, B.P.J. cannot satisfy an essential element of her Title IX claim against the HCBOE or her Equal Protection Clause ("EPC") claim against Stutler.

Moreover, because the Act is a mandatory State law that affords Stutler no discretion related to enforcing the Act, and because Plaintiff is bringing a claim against Stutler in her official capacity concerning her mandatory enforcement of the Act, Stutler would be acting as a State official if she enforces the Act. As a result, any judgment against Stutler for a monetary award, including an award for attorneys' fees and costs, is the responsibility of the State of West Virginia, not the HCBOE or Stutler. Thus, to the extent B.P.J. could prove that the Act violates the EPC, any monetary award, including an award for attorneys' fees and costs, must be paid by the State. HCBOE and Stutler cannot be liable in whole or in part for monetary damages caused by the State.

Furthermore, the Act clarifies that girls' sports teams are closed to biological males, regardless of their gender identity.[1]  The County Board has no policy or custom of its own that

---

[1] The County Board means no disrespect to B.P.J. by use of the phrase "biological boy" or "biological male" in its briefing. The County Board respects that B.P.J.'s identity is that of a girl. The Act, however,

prevents B.P.J. or any other transgender female from joining the girls' teams due to transgender status. However, the County Board is required to follow the law, and so it is tasked with enforcing the Act to the extent that it goes into effect. Of course, if the Act never goes into effect as to B.P.J., the County Board will never enforce it as to her. Thus, the County Board has not caused the alleged harm to B.P.J. as set forth in her amended complaint. If the Act were to cause B.P.J. any actionable harm, the County Board is simply not the responsible party. Instead, the State would be liable for any award of monetary damages, including attorneys' fees and costs.

Finally, while the HCBOE and Stutler did not have any role in the passage of the Act, B.P.J. has asserted claims seeking equitable and monetary damages (including costs, expenses, and attorneys' fees) against them. Thus, the HCBOE and Stutler find themselves in the position of having to defend a statute they had no part in creating or passing. On that basis, a clear legal basis exists for finding that the Act survives legal scrutiny under Title IX and the EPC, and thus, the County Board is not liable to B.P.J for this additional reason.

## I. STATEMENT OF FACTS

### A.    Background regarding B.P.J.

B.P.J. is an eleven-year-old transgender girl who brought this civil action because of her wishes to try out for the girls' cross-country and track teams at school. (Am. Compl. ¶¶ 1– 2.) B.P.J. is a student in the Harrison County School system who is currently a sixth grader at Bridgeport Middle School. (*See* Heather Jackson Depo., attached to the summary judgment motion as "**Exhibit 1**," at 230, 241.) Prior to attending middle school, she attended Norwood Elementary School, which is also in the Harrison County School system. (*Id.*; B.P.J. Depo., attached to the summary judgment motion as "**Exhibit 2**," at 125.) When B.P.J. was in the third

---

uses the phrases "biological males," "biological females," and "biological sex," and so the County Board uses these and similar phrases to discuss and address the terms of and definitions in the Act.

grade, B.P.J.'s mother advised the Norwood Elementary guidance counselor that B.P.J. identified as a female and was a transgender student.  (Ex. 1, at 232-33.)  B.P.J. and her mother testified that Norwood Elementary and its employees were supportive of B.P.J. after she made the decision to transition to a transgender female.  (*Id.* at 232-36; Ex. 2, at 128-29.) Moreover, B.P.J.'s mother had no issues or concerns with B.P.J.'s treatment as a transgender student during the time that she was enrolled as a student at Norwood Elementary.  (Ex. 1, at 240.)

Additionally, B.P.J. and her mother met with Harrison County school employees on two occasions to discuss a Gender Support Plan for B.P.J.  (*Id.* at 236-39, 243.)  The purpose of the Gender Support Plan was to help accommodate any needs that B.P.J. might have as a transgender student.  (*Id.* at 239.)  They first met on August 23, 2019, to discuss the Gender Support Plan while B.P.J. was attending Norwood Elementary.  (*Id.* at 237-38.)  They met again on May 18, 2021, to discuss another Gender Support Plan to prepare for B.P.J. moving to Bridgeport Middle School.  (*Id.* at 243.)   Like before, this meeting included a discussion about accommodations for B.P.J. regarding her transition to Bridgeport Middle School. (*Id.* at 244).

B.P.J.'s mother confirmed that Bridgeport Middle School has appropriately implemented the Gender Support Plan, and that she had no issues or concerns with how school officials at Bridgeport Middle School have treated B.P.J.  (*Id.* at 264-65).  B.P.J. also confirmed that the middle school principal, her teachers and her coaches have treated her fairly and have been supportive of her.  (Ex. 2, at 131-32, 134, 141-42.)

Moreover, during the summer of 2021, B.P.J. participated in the Bridgeport Middle School's cross-country summer conditioning program.  (Ex. 1, at 258.)  During the summer session, B.P.J. was permitted to run with the girls who attended the session.  (*Id.*)  B.P.J. also was permitted to be a member of the girls' cross-country team during the fall 2021 season.  (*Id.* at 259-60.)  More recently, B.P.J. tried out for and was selected for the middle school girls' track team

this spring.

B.      **The Act.**

In 2021, the West Virginia Legislature passed (and the Governor signed) the Act, and the Court has entered a preliminary injunction enjoining Defendants from enforcing the Act as to B.P.J. (*See* Am. Compl. ¶ 2; Doc. 67.)  The Act defines "male" and "female" based on "biological sex determined at birth" and provides that "[a]thletic teams or sports designated for females, women, or girls shall not be open to students of the male sex where selection for such teams is based upon competitive skill or the activity involved is a contact sport."  W. VA. CODE § 18-2-25d(b), (c)(2) (eff. July 8, 2021).  If the Act goes into effect as to B.P.J., it will prevent her from participating on girls' school sports teams.  (Stipulation of Uncontested Facts (CM/ECF Doc. 252), at 1-2.)

The Act is a State law; it is not a policy, rule, or any other creation of the County Board.  (*See* County Board Dep., attached to the summary judgment motion as "**Exhibit 3**," at 62, 192.)  Indeed, the County Board did not devise the Act, has not voted in any way relating to policies concerning the Act, did not pass any policy, proclamation or other statement related to the Act, and has not taken any actions to implement the provisions of the Act.  (*Id.* at 38, 192; Stipulation of Uncontested Facts (CM/ECF Doc. 252), at 2.)

Moreover, the County Board had no role in drafting the Act, and it provided no comments or thoughts to the Legislature regarding the Act.  (Exhibit 3, at 62.)  Furthermore, neither the County Board nor any of its agents or employees, in their official capacities, did anything officially to advocate for or support the Act or to contribute to its passage.  (*Id.* at 191-92.)  Also, prior to the Act's enactment, the County Board had no conversations with the State Board of Education or the WVSSAC about transgender students' participation in sports. (*Id.* at 65, 83.)

Even if the County Board disagrees with a policy or law of the State, the County

Board must follow the State Board of Education policy or State law. (*Id.* at 40, 44-45, 145; *see also* Def. Superintendent Dora Stutler's Resp. and Obj. to Pl.'s Second Set of Req. for Admis., attached to the summary judgment motion as "**Exhibit 4**," at 8; Def. Harrison Cty. Bd. of Educ.'s Resp. and Obj. to Pl's Second Set of Req. for Admis., attached to the summary judgment motion as "**Exhibit 5**," at 8; Stipulation of Uncontested Facts (CM/ECF Doc. 252), at 2.)  Therefore, even though the County Board did not devise the Act and has not adopted the Act as its own policy, the Act prohibits the County Board from adopting or enforcing any policy that would allow a biological male to participate on a girls' athletic team because, absent the court injunction, the County Board "would be compelled and required to enforce [the Act] because it is a mandatory State law that affords the County Board and the County Superintendent no discretion."  (Ex. 4, at 8-9, 15; Ex. 5, at 8-9.)

Indeed, because the Act is a mandatory State law, if Stutler was required to enforce the Act in her role as the County Board Superintendent, she would be acting on behalf of the State of West Virginia and would be a State Actor for purposes of 42 U.S.C. § 1983. (Ex. 4, at 15.) Thus, if the Court's preliminary injunction were not in place, the County Board could not issue any rule or take any action in conflict with the Act; with the injunction in place, however, it has been legally permissible for the County Board to take no action as it relates to the Act, and it has not enforced the Act as to any student.  (Ex. 3, at 69-70, 89-91, 192; Ex. 5, at 15.)

Additionally, the County Board has no policy of its own regarding sex separation in sports.  With regard to sports, the County Board has only two policies, neither of which is related to separation by sex.  (Ex. 3, at 56-57, 214.)  The County Board also has no policy pertaining to transgender students or transgender students' participation in sports. (*Id.* at 57, 125, 150.) Similarly, Bridgeport Middle School, which B.P.J. is currently attending, has no policy relating to gender separation in sports, and no policy regarding whether transgender students are listed as

boys or girls on sports teams' rosters.  (*Id.* at 214, 218.)  Moreover, when a student is placed on a sports team roster at Bridgeport Middle School, the athletic director puts the student on the team roster based on the gender identified by the parent or student on an information sheet that is completed by the parent or student.  (*Id.* at 213-14.)

Finally, as expressly set out in the Act, the Legislature's purpose was to clarify the law regarding who can play on a girls' sports team.  *See* W. VA. CODE § 18-2-25d.  It did so in order to recognize the inherent relevant differences between biological males and biological females in the context of physical athletic competition.  *Id.*  The Legislature recognized that biological males and biological females are not "similarly situated" in the contexts of safe physical contact and fair competitive tests of physical skill, and that biological sex serves as the safest, fairest way to group students into teams.  *See, e.g.*, W. VA. CODE § 18-2-25d(a)(4) and (5) ("Classifications based on gender identity serve no legitimate relationship to the State of West Virginia's interest in promoting equal athletic opportunities for the female sex").

The typical physical differences between biological males and biological females are reflected in, for example, the fact that the equipment and associated requirements for boys' sports are often different from the equipment and requirements for girls' sports, and where they are different, they reflect that boys are generally taller, bigger, faster, and stronger than girls.  For example, the National Federation of State High School Associations' ("NFHS") *Rules Book, Track and Field and Cross Country* (2020) ("*Rules Book*")[2] (the rules governing track and field and cross country in West Virginia) requires that the boys' discus, shot and javelin are larger than the girls' discus, shot and javelin.  (*See Rules Book*, attached to the summary judgment motion as "**Exhibit**

---

[2] There are no 2021 rules for track and field or cross country.  *See Track and Field & Cross Country Rules Changes* (Feb. 10, 2021), *available at* https://www.nfhs.org/sports-resource-content/track-and-field-cross-country-rules-changes/.

**6**," at 53, 55 and 58.)[3]  Similarly, boys' hurdles are taller and are more widely spaced than girls'

hurdles.  (*Id.* at 33.)  Additionally, boys have a decathlon (with ten consecutive events); girls have

a heptathlon (with seven events). (*Id.* at 62-63.)

Moreover, as explained in greater detail below in Section II.E., the physiological

differences between males and females that make males, in general, taller, bigger, faster, and

stronger than females, lead to legitimate concerns about competitive fairness to, and the safety of,

biological females when playing sports with and against biological males.

## II. ARGUMENT

### A.    Standard of Review.

Rule 56 of the Federal Rules of Civil Procedure provides that the "court shall grant

summary judgment if the movant shows that there is no genuine dispute as to any material fact and

the movant is entitled to judgment as a matter of law." "'Material' facts are those necessary to

establish the elements of a party's cause of action. . . . A 'genuine' dispute of material fact exists

if, in viewing the record and all reasonable inferences drawn therefrom in a light most favorable

to the non-moving party, a reasonable fact-finder could return a verdict for the non-moving party."

*Clark v. Proctor*, No. 2:20-CV-00720, 2021 WL 5411948, at *2 (S.D.W. Va. Nov. 18, 2021) (slip

copy) (citing, *inter alia*, *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)).

### B.    Because the HCBOE did not create or pass the Act, and because any injury B.P.J. suffers is not caused by any HCBOE policy, the HCBOE did not and will not violate B.P.J.'s Title IX rights.[4]

Title IX provides that "[n]o person . . . shall, on the basis of sex, be excluded from

---

[3] W. VA. CODE ST. R. § 127-3-22.1 ("Cross country rules published by the NFHS are the official rules for all interscholastic competition unless otherwise provided by Commission modification.");  W. VA. CODE ST. R. § 127-3-29.1 ("Track and Field rules published by the NFHS are the official rules for all interscholastic competition unless otherwise provided by Commission modification.").

[4] B.P.J. does not bring her Title IX claim in Count I against County Superintendent Stutler.

participation in, be denied the benefits of, or be subjected to discrimination under any education program or activity receiving Federal financial assistance." 20 U.S.C. § 1681(a). Nevertheless, applicable regulations allow a recipient to "operate or sponsor separate [athletic] teams for members of each sex where selection for such teams is based upon competitive skill or the activity involved is a contact sport." 34 C.F.R. § 106.41(b). To succeed on a Title IX claim, a plaintiff must prove "(1) that [the plaintiff] was excluded from participation in an education program 'on the basis of sex'; (2) that the educational institution was receiving federal financial assistance at the time; and (3) that improper discrimination caused [the plaintiff] harm." *Grimm v. Gloucester Cty. Sch. Bd.*, 972 F.3d 586, 616 (4th Cir. 2020), *as amended* (Aug. 28, 2020) (citation omitted), *cert. denied sub nom. Gloucester County School Board v. Grimm, Gavin*, No. 20-1163, 2021 WL 2637992 (U.S. June 28, 2021).

"[A] recipient of federal funds may be liable in damages under Title IX **only for its own misconduct**. **The recipient itself** must 'exclude persons from participation in, . . . deny persons the benefits of, or . . . subject persons to discrimination under' **its 'programs or activities'** in order to be liable under Title IX." *Davis Next Friend LaShonda D. v. Monroe Cty. Bd. of Educ.*, 526 U.S. 629, 640–41 (1999) (emphasis added) (internal brackets omitted). The Fourth Circuit has echoed that "the implied damages remedy is available only when '**the funding recipient engages in intentional conduct** that violates the clear terms of the statute.'" *Baynard v. Malone*, 268 F.3d 228, 237 (4th Cir. 2001) (emphasis added) (quoting *Davis*).

In *Grimm*, the Court found that the plaintiff had met the three elements of a Title IX claim where **a county school board policy** precluded the plaintiff, Grimm, a transgender male student, from using the boys' restrooms. 972 F.3d at 616–17, 619. The Court recognized that a Title IX regulation (34 C.F.R. § 106.33) permits sex-separated toilet facilities but found that unlawful discrimination nevertheless existed because **the school board itself** had relied "**on its**

**own discriminatory notions** of what 'sex' means." *Id.* at 618 (emphasis added) (citation omitted).

Here, on the other hand, it is undisputed that no County Board policy is at issue. The undisputed evidence is that the County Board had no role in drafting the Act; it provided no comments or thoughts to the Legislature about the Act; it did not advocate for or support the Act; it has enacted no policy related to the Act; it has no policy of its own regarding sex separation in sports; and it has no policy pertaining to transgender students or their participation in sports. (Ex. 3, at 38, 56-57, 62, 125, 150, 191-92.)  Indeed, the Principal for Bridgeport Middle School testified that when a student is placed on a sports team roster at Bridgeport Middle School, the athletic director puts the student on the team roster based on the gender identified by the parent or student on an information sheet that is completed by the parent or student.  (*Id.* at 213-14.)  Thus, unlike in *Grimm*, where the school board relied on its own county school board policy, there is no County Board policy, custom or practice that B.P.J. can cite to or rely upon to show that her alleged injury will be caused by an intentional act of the HCBOE.

Moreover, the Act is clearly a State law and is clearly mandatory, not merely optional or voluntary.  It requires that teams and sports "***shall be*** expressly designated as one of [three choices]."  W. VA. CODE § 18-2-25d(c)(1) (emphasis added).  In its primary provision, it requires that teams and sports "designated for females, women, or girls ***shall not be open*** to students of the male sex where selection for such teams is based upon competitive skill or the activity involved is a contact sport."  W. VA. CODE § 18-2-25d(c)(2) (emphasis added).  Finally, the Act creates a cause of action that may be brought by "any student aggrieved by a violation of" the Act "against a county board of education" responsible for the violation.  W. VA. CODE § 18-2-25d(d)(1).

"When the municipality is acting under compulsion of state or federal law, **it is the policy contained in that state or federal law**, rather than anything devised or adopted by the

municipality, **that is responsible for the injury**." *Bethesda Lutheran Homes & Servs., Inc. v. Leean*, 154 F.3d 716, 718 (7th Cir. 1998) (emphasis added). Thus, any injury that B.P.J. could sustain due to the Act would not, by definition, be caused by the HCBOE.

If the Act is truly unlawful and unconstitutional, as B.P.J. claims, then it should be permanently enjoined from going into effect state-wide, not just within Harrison County. If only the HCBOE were enjoined from enforcing the Act, then B.P.J. could try out for and participate on the girls' sports teams at her school, but the Act would still apparently prevent her from participating in competitions involving West Virginia schools outside of Harrison County. This highlights the reason why the HCBOE (and Stutler) are not proper defendants and are entitled to summary judgment: they cannot provide the full relief that Plaintiff seeks. This case is simply not *Grimm*, where a county board was applying a county board policy.

Here, the HCBOE is not responsible for any injury B.P.J. could suffer, and it cannot provide the relief she seeks, as it does not control the Act. As a result, the HCBOE has not and never will cause any injury to B.P.J. Thus, B.P.J. cannot prove an essential element of her Title IX claim against the HCBOE, and the HCBOE is entitled to summary judgment on Count I.

C.  **Because Stutler did not create or pass the Act, and because any injury B.P.J. suffers is not caused by any policy created by the HCBOE or by Stutler, Stutler has not and will not deprive B.P.J. of equal protection.**[5]

A local governing body (like a county board of education) can, under limited circumstances, be liable for violating the United States Constitution; it,

> therefore, can be sued directly under § 1983 for monetary, declaratory, or injunctive relief ***where[] . . . the action that is alleged to be unconstitutional implements or executes a policy statement, ordinance, regulation, or decision officially adopted and promulgated by that body's officers***. Moreover, although the touchstone of the § 1983 action against a government body is an allegation that official policy is responsible for a deprivation of

---

[5] Count II, Plaintiff's EPC claim, is not brought against the HCBOE.

> rights protected by the Constitution, local governments, . . . may be sued for constitutional deprivations visited pursuant to governmental "custom" . . . .

*Monell v. Dep't of Soc. Servs. of City of New York*, 436 U.S. 658, 690–91 (1978) (emphasis added) (footnote omitted).

This liability has an important and well-circumscribed limit, however; local government units cannot "be held liable unless action pursuant to official [local government unit] policy of some nature caused a constitutional tort"; accordingly, a local government unit cannot be liable on a *respondeat superior* theory. *Id.*, 436 U.S. at 691 (emphasis added); *see also id.* 436 U.S. at 691 n.5 (the same rules apply to actions against local government unit officers because "official-capacity suits generally represent only another way of pleading an action against an entity of which an officer is an agent"). Here, B.P.J. has brought her EPC claim against Stutler in her official capacity as County Superintendent of the HCBOE.

Thus, the "first inquiry in any case alleging municipal liability under § 1983 is the question whether there is a direct causal link between a municipal policy or custom and the alleged constitutional deprivation." *City of Canton, Ohio v. Harris*, 489 U.S. 378, 385, 109 S. Ct. 1197, 1203, 103 L. Ed. 2d 412 (1989).

> *"[Local government unit] liability under § 1983 attaches where— and only where—a deliberate choice to follow a course of action is made from among various alternatives" by [local government unit] policymakers*. . . . Only where [a policy, procedure, custom, etc.] reflects a "deliberate" or "conscious" choice by a [local government unit]—a "policy" as defined by our prior cases—can a [local government unit] be liable for such [policy, etc.] under § 1983.

*Id.*, 489 U.S. at 389, 109 S. Ct. at 1205 (emphasis added; second alteration in original) (citation omitted). A county board and its superintendent are thus responsible only for the county board's own policies, *etc.*, and they cannot be liable for acts that were not the result of a deliberate,

conscious choice to follow a course of action made from among various alternatives.

This Court recently recognized this important point, stating that liability under § 1983 "attaches 'only where the municipality itself causes the constitutional violation at issue.'" *Barker v. Gaylor*, No. 2:20-CV-00357, 2021 WL 3354161, at *9 (S.D.W. Va. Aug. 2, 2021) (slip copy) (quoting *Harris*, 489 U.S. at 385). Where a county has done nothing more than comply with a mandate imposed (by statute, for example) on the county (by the state, for example), the county and the county official have not violated § 1983.[6]

As this Court stated in *Barker*,

> [a] plaintiff may demonstrate the existence of an official [municipal] policy in three ways: (1) a written ordinance or regulation; (2) certain affirmative decisions of policymaking officials; or (3) in certain omissions made by policymaking officials that "manifest deliberate indifference to the rights of citizens." *Carter v. Morris*, 164 F.3d 215, 218 (4th Cir. 1999). "Locating a 'policy' ensures that a municipality is held liable only for those deprivations resulting from the decisions of its duly constituted legislative body or of those officials whose acts may fairly be said to be those of the municipality." *Bd. of Comm'rs of Bryan Cty. v. Brown*, 520 U.S. 397, 403-04, 117 S. Ct. 1382, 137 L. Ed. 2d 626 (1997).

*Barker*, 2021 WL 3354161, at *9 (S.D.W. Va. Aug. 2, 2021).

For example, in *Bethesda Lutheran Homes & Servs., Inc.*, the operator of a residential facility for the mentally ill and several current and future residents sued Jefferson County, Wisconsin, for enforcing certain state and federal Medicaid regulations. The district court denied the plaintiffs' claim "on the ground that . . . a county . . . cannot be held liable under section 1983 for acts that it did under the command of state or federal law." *Id.* at 718. Judge Posner

---

[6] This inquiry is a purely objective one: "[T]he state of mind of local officials who enforce or comply with state or federal regulations is immaterial to whether the local government is violating the Constitution if the local officials could not act otherwise without violating state or federal law. The spirit, the mindset, the joy or grief of local officials has no consequences for the plaintiffs if these officials have no discretion that they could exercise in the plaintiffs' favor." *Bethesda Lutheran Homes and Services, Inc. v. Leean*, 154 F.3d 716, 718 (7th Cir. 1998).

noted for the Seventh Circuit that insofar as the county was bound to follow the state and federal laws at issue, the district court's holding was the correct application of the law.

As the Seventh Circuit has recognized, "[i]t is difficult to imagine a municipal policy more innocuous and constitutionally permissible, and whose causal connection to the alleged violation is more attenuated, than the 'policy' of enforcing state law." *Surplus Store & Exch., Inc. v. City of Delphi*, 928 F.2d 788, 791–92 (7th Cir. 1991). "If the language and standards from *Monell* are not to become a dead letter, such a 'policy' simply cannot be sufficient to ground liability against a municipality." *Id.* (citation omitted). This position "has the virtue of minimizing the occasions on which federal constitutional law, enforced through section 1983, puts local government at war with state government." *Bethesda Lutheran Home & Servs.*, 154 F.3d at 718.[7]

In 1993, the Fourth Circuit considered the mandatory-voluntary distinction. In *Bockes v. Fields*, 999 F.2d 788 (4th Cir. 1993), Grayson County, Virginia, shared in the implementation of the Commonwealth of Virginia's social services programs. The county had

---

[7] *See also Vives v. City of New York*, 524 F.3d 346, 356 (2d Cir. 2008) ("We have held today that a municipality cannot be held liable simply for choosing to enforce the entire Penal Law.") (footnote omitted); *Dakota Rural Action v. Noem*, No. 19-cv-5026, 2019 WL 4546908, at *5 (D.S.D. Sept. 18, 2019) ("Applying this standard [*Monell*, *et al.*] in this case, Plaintiffs have failed to allege that Pennington County sheriff officials have made any choices at all regarding enforcement of the challenged laws that could cause a violation of Plaintiffs' First Amendment rights.  Plaintiffs' allegations show only that a policy choice was made by State officials."); *Elabanjo v. Bellevance*, No. 1:11-CV-349, 2012 WL 4327090, at *5 (M.D.N.C. Sept. 18, 2012) ("The enforcement of a state statute by a municipality does not qualify as a municipal policy or custom sufficient to support § 1983 liability."), *report and recommendation adopted*, No. 1:11-CV-349, 2012 WL 5864004 (M.D.N.C. Nov. 19, 2012); *cf. Echnols v. Parker*, 909 F.2d 795, 801 (5th Cir. 1990) ("[W]hen a state statute directs the actions of an official, as here, the officer, be he state or local, is acting as a state official."); *Doby v. DeCrescenzo*, 171 F.3d 858, 868 (3d Cir. 1999) (accepting that "when a county is merely enforcing state law, without adopting any particular policy of its own, it cannot be held liable under the *Monell* line of cases"); *Humphries v. Los Angeles Cty.*, No. SACV03697JVSMANX, 2012 WL 13014632, at *3 (C.D. Cal. Oct. 17, 2012) ("A municipality cannot be held liable under *Monell* merely for enforcing a state law. . . . But where the municipality makes a deliberate choice from among various alternatives to adopt a particular policy, the municipality can be held liable." (citations omitted).

In cases where a court found local government liability, it has generally been because the local government unit's conduct was not mandated, but merely allowed by (or unrelated to) state or federal law. *See, e.g.*, *Cooper v. Dillon*, 403 F.3d 1208, 1221–22 (11th Cir. 2005) (police officer's enforcement of state criminal law with no allegation that state law also made it mandatory for him to have done so).

discharged an employee of the Grayson County Board of Social Services in compliance with mandatory Commonwealth board employment rules, "which the local boards must follow." *Id.* at 791.  Reversing the district court's refusal to dismiss the county board, the Fourth Circuit said, "Such bounded, state-conferred discretion is not the 'policymaking authority' for which a county may be held responsible under § 1983." *Id.*

Recently, in *Bruce & Tanya & Assocs., Inc. v. Bd. of Supervisors of Fairfax Cty., Virginia*, 854 F. App'x 521 (4th Cir. 2021) (unpublished), the Fourth Circuit addressed a case arising from regulation of outdoor advertising in Virginia.  The relevant state statute (Sections 1224 and 1225) did not mandate that local governments enforce it.  *Id.* at 531. Nevertheless, "Virginia's Commissioner of Highways signed a cooperative agreement with the Fairfax County Board of Supervisors authorizing the latter to enforce Section 1224." *Id.* at 522.  Subsequently, the county began aggressively enforcing the Commonwealth's sign statute against the plaintiff ("BTA"), and BTA sued the county.  The county argued that it was not liable under § 1983 because it was just enforcing a state law.

Noting that "[t]he majority of our sister circuits to consider the question have suggested that a local government can be subjected to *Monell* liability if it makes an independent choice to enforce or follow parameters set by state law, rather than being obliged to do so," the Court continued following *Bockes* (and *Vives*, *et al.*).  *Id.* at 530.  The Court found that the county could be liable for enforcing Section 1224 "because it consciously chose to enforce" it, but the county could not be liable for harms caused by a section of the statute it did not adopt as its own policy. *Id.* at 531-32.  "Although the County can be liable for enforcing a state regulation it has **voluntarily** adopted as its own, it cannot be held liable for state statutes it has not consciously adopted into its own policy."  *Id.* at 532 (emphasis added).

Here, Stutler is entitled to summary judgment on Count II because it is undisputed that she and the HCBOE did not contribute to the passage of the Act and have not consciously adopted the Act into the County Board's own policy.  As noted above, the County Board has no policy of its own related to the Act, to sex separation in sports, or to transgender students' participation in sports.  Therefore, B.P.J. cannot establish liability for her EPC claim because she cannot prove that the alleged unconstitutional conduct arose from "a policy statement, ordinance, regulation, or decision officially adopted and promulgated by" the HCBOE's officers or Stutler. *Monell*, 436 U.S. at 690.

Rather, to the extent there is any constitutional violation, it would only arise because the State of West Virginia has enacted a mandatory law which Stutler and the HCBOE would be required to enforce and follow.  For instance, the Act requires that girls' teams "shall not be open to students of the male sex where selection for such teams is based upon competitive skill or the activity involved is a contact sport," and it creates a cause of action against county boards of education for "[a]ny student aggrieved by a violation of" the Act.   W. VA. CODE § 18-2-25d(c)(2), (d)(1).  As noted above, a county entity or county official cannot be liable for merely enforcing a mandatory State law, especially when the county does not adopt any policy of its own.  *Doby*, 171 F.3d at 868; *Humphries*, 2012 WL 13014632, at *3; *Elabanjo*, No. 1:11-CV-349, 2012 WL 4327090, at *5.

Therefore, because the Act is a mandatory State law that Stutler and the HCBOE have no discretion but to follow, and because there is undisputed evidence that the HCBOE and Stutler have no policy adopting the Act or any other similar policy or custom of their own, B.P.J. cannot prove that Stutler should be held liable for violating the EPC.  Any alleged conduct by

Stutler would solely be related to enforcing a mandatory State law.[8]  Thus, Stutler is entitled to summary judgment on Count II.

**D.      Superintendent Stutler is acting as a State – not a County – official if she enforces the Act, and any award assessed against her is the responsibility of the State, not the HCBOE.**

"Under the doctrine of *Ex parte Young,* a plaintiff may challenge the constitutionality of a state law . . . by bringing suit against an official, in her official capacity, for enforcing or administering that law or rule. . . . If the plaintiff succeeds, any judgment against the official in her official capacity," including an award of attorneys' fees, "'imposes liability on the entity that [s]he represents.'" *McGee v. Cole*, 115 F. Supp. 3d 765, 772 (S.D.W. Va. 2015) (alteration in *McGee*) (citing, *inter alia*, *Ex parte Young,* 209 U.S. 123, 155–56 (1908)). Importantly, county officials are considered to be "state officials for purposes of an *Ex parte Young* suit where they are responsible for enforcing or administering state law rather than local or county policies." *Id.* at 773.  For example, when "same-sex couples challenged Virginia's same-sex marriage ban" by suing a ***city*** clerk who had denied one of the couples a marriage license, the "U.S. Court of Appeals for the Fourth Circuit held that the clerk was a proper defendant ***through which to sue the state of Virginia*** under *Ex parte Young* because he was responsible for enforcing Virginia's same-sex marriage ban." *Id.* (emphasis added) (citing *Bostic v. Schaefer*, 760 F.3d 352 (4th Cir. 2014)).

The U.S. District Court for the Southern District of West Virginia's decision in *McGee* is directly on point with the situation in this case.  In *McGee*, which involved determining which party was responsible for paying attorneys' fees when *county clerks* enforced a West

---

[8] Notably, in her earlier briefing, B.P.J. did not counter the County Board's argument that Stutler is not liable under the EPC pursuant to *Monell*, except to argue that she may be subject to an injunction under *Ex parte Young*.  (Doc. 53, at 11-13 (pp. 5-7 of the brief).)

Virginia state law, the District Court stated:

> The Court agrees with Defendant Clerks. Sections 48–2–104 and
> 48–2–401 of the West Virginia Code were state laws prohibiting
> same-sex marriage. Each Plaintiff couple attempted to obtain a
> marriage license, and each was denied by one of the defendants
> pursuant to these state laws. . . . The State has not provided, and the
> Court has not found, any evidence that Defendant Clerks were
> administering county rules or policies rather than state law.
> Moreover, the clerks had no discretion to disregard state law and
> issue marriage licenses to the plaintiffs. . . . It is clear that Defendant
> Clerks were required by state law to deny marriage licenses to the
> plaintiffs and administered state law when they did so. The clerks
> were thus acting as state agents, rather than county officials, at the
> time of Plaintiffs' injuries. Accordingly, they are considered state
> officials for the purposes of this *Ex parte Young* suit. *See Bostic,* 760
> F.3d at 371 n. 2; *Brotherton [v. Cleveland],* 173 F.3d [552] at 566
> [(6th Cir. 1999)].
>
> Furthermore, although not named as a defendant in this case, the
> State was clearly the intended target of this litigation. *See Hutto [v.
> Finney],* 437 U.S. [678] at 700, 98 S.Ct. 2565 [(1978)] ("[S]uits
> brought against individual officers for injunctive relief for all
> practical purposes suits against the State itself."). Not only did the
> Court grant an injunction preventing the clerks from administering
> the same-sex marriage ban, it declared two of the State's laws
> unconstitutional. This declaration is part and parcel of the total relief
> obtained and **shows that the State, not the clerks, is responsible
> for the legislation that violated Plaintiffs' civil rights.** For the
> foregoing reasons, the **attorneys' fees assessed against Defendant
> Clerks will be the responsibility of the State of West Virginia**.

*McGee*, 115 F. Supp. 3d at 778–79 (emphasis added); s*ee also Brotherton v. Cleveland*, 173 F.3d

552, 566 (6th Cir. 1999) ("Where county officials are sued simply for complying with state

mandates that afford no discretion, they act as an arm of the State.") (citations omitted).

The *McGee* Court found that the clerks themselves and the counties for which they

worked were *not* jointly and severally liable for attorneys' fees, because the clerks were sued in

their official capacities, and they represented only the State at the time of the plaintiffs' injury. *Id.*,

115 F. Supp. 3d at 777 n.3.

Just as in *McGee*, here, the State is clearly the intended target of the litigation;

indeed, the State is a defendant to this civil action. Stutler and the HCBOE have been named defendants in this civil action only because they must enforce State law – not because of any policy or custom of their own.  Any civil rights violation the Act could cause B.P.J. is a result of the State's legislation; whether or not they agree with it, the County Board is compelled to enforce State law to the extent that it goes into effect.

        As a result, in enforcing the Act, Stutler would be acting as a State agent, and would be considered a State official rather than a county official.  Thus, if the Court determines that Stutler, who was sued only in her official capacity, should be retained as a defendant to Count II pursuant to *Ex parte Young* for injunction purposes, then any damages, costs, expenses, and/or fees assessed against her must be paid by the State, which is the only government entity that she would represent if she is ever required to enforce the State's Act.

        In summary, there is no reason or basis in law to retain the HCBOE as a defendant because, as noted above, the HCBOE is entitled to summary judgment on Count I, and it is not named as a defendant to Count II.  Moreover, if a monetary award, including but not limited to attorneys' fees and costs, is assessed against Stutler on Count II, that award must be paid by the State, not by the County Board or Stutler, as a matter of law and undisputed fact. Therefore, both Stutler and the HCBOE are entitled to summary judgment with regard to B.P.J.'s claims for any monetary award.  At most, Stutler may be retained as a defendant to Count II for injunction purposes only.

| E. | **B.P.J.'s claims against the County Board should be dismissed on the additional basis that the Act does not violate Title IX or the EPC.** |
|---|---|

        As demonstrated above, the County Board is not the entity that *caused* any purported violation of Title IX or the EPC, an independently adequate reason to grant summary judgment to the County Board.  The County Board undisputedly had no part in creating,

developing, shaping, or passing the Act, and it undisputedly has no policy or custom of its own that prevents B.P.J. from joining girls' teams based on transgender status.  However, because the County Board has been sued for damages, fees, and costs over the Act, the County Board finds itself in the position of defending the Act, even though it did not create, support, or pass the Act. As set forth in the following sections, a legal foundation clearly exists for finding that the Act is lawful under Title IX and that the Act does not violate the EPC.

### 1.  Title IX permits sex-separated sports to promote sex equality.

B.P.J. can succeed on her Title IX claim only if she was excluded from participating in an education program due to sex, and "improper discrimination caused [her] harm."  *Grimm*, 972 F.3d at 616.  Regulations under Title IX, however, permit a recipient to "operate or sponsor separate [athletic] teams for members of each sex where selection for such teams is based upon competitive skill or the activity involved is a contact sport."  34 C.F.R. § 106.41(b).  The regulations also require recipients to "provide equal athletic opportunity for members of both sexes," including by considering whether the "levels of competition effectively accommodate the interests and abilities of members of both sexes." 34 C.F.R. § 106.41(c).  Provisions such as those contained in the Title IX regulations are important to promote sex equality.[9]

---

[9] *See, e.g.*, *Cohen v. Brown Univ.*, 991 F.2d 888, 897 (1st Cir. 1993) ("Equal opportunity to participate lies at the core of Title IX's purpose."); *Clark, By and Through Clark v. Arizona Interscholastic Ass'n*, 695 F.2d 1126, 1130 (9th Cir. 1982) (noting that cases have upheld boys' exclusion from girls' teams as "a legitimate means of providing athletic opportunities for girls" due to innate physical differences between the sexes); *O'Connor v. Bd. of Ed. of Sch. Dist. No. 23*, 645 F.2d 578, 582 (7th Cir. 1981) ("Title IX aims to provide equal opportunity in educational programs" and permits "separate-sex teams and . . . exclusion of girls from" certain boys' teams); *Lafler v. Athletic Bd. of Control*, 536 F. Supp. 104, 106 (W.D. Mich. 1982) ("Although many courts have recognized a woman's right to an equal opportunity to participate in sports, . . . courts have also recognized that such equal opportunity may be provided through separate teams or competitions for men and women. . . . The regulations promulgated under Title IX . . . specifically permit the establishment of separate male and female teams in contact sports. The United States Congress, in calling for the provision of 'equal opportunity to amateur athletes ... to participate ... without discrimination on the basis of ... sex ...' in the Amateur Sports Act, 36 U.S.C. s 391(b)(6), anticipated that such equal opportunity would sometimes be provided through the use of separate programs for men and women. . . .") (citations omitted).

Importantly, the analysis in *Grimm* is not dispositive here because the *Grimm* Court did not address athletics.  Whereas transgender students may use restrooms corresponding with their gender identity without imposing the dangers of decreased opportunities for, and compromised safety of, cisgender females, these concerns are present regarding athletic participation.  It is these concerns that make the Act lawful under Title IX, which permits sex-separated teams and promotes sex equality, because sex-related physical differences make a difference in contact sports and on teams involving competitive skill.

As stated by expert witness, Gregory A. Brown, Ph.D., FACSM, in his report:

> [M]en, adolescent boys, and prepubertal male children perform better in almost all sports than women, adolescent girls, and prepubertal female children because of their inherent physiological advantages.  In general, men, adolescent boys, and prepubertal male children, can run faster, output more muscular power, jump higher, and possess greater muscular endurance than women, adolescent girls, and prepubertal female children.  These advantages become greater during and after male puberty, but they exist before puberty.

(*See* Excerpts from Expert Report of Dr. Brown, p. 4, attached to the summary judgment motion as "**Exhibit 7**.")  Moreover, citing to several sources, Dr. Brown found "in the literature a widespread consensus that the large performance and physiological advantages possessed by males – rather than social considerations or considerations of identity – are precisely the *reason* that most athletic competitions are separated by sex, with women treated as a 'protected class.'"  (*Id.* at 8-10) *(emphasis supplied.)*

According to several of the sources cited by Dr. Brown, "'[t]he main justification [for sex separation in sports] is to allow women a chance to win, as women have major disadvantages against men who are, on average, taller, stronger, and faster and have greater endurance due to their larger, stronger, muscles and bones as well as a higher circulating hemoglobin level.'"  (*Id.* at 8) (quoting Handelsman, D.J., *et al.*, *Circulating Testosterone as the*

*Hormonal Basis of Sex Differences in Athletic Performance*. Endocrine Reviews 39(5):803-829, 803 (Oct 2018).)  Moreover, "'[w]e have separate sex sport and eligibility criteria based on biological sex because this is the only way we can assure that female athletes have the same opportunities as male athletes not only to participate but to win in competitive sport.'" (*Id.* at 9) (quoting Women's Sports Policy Working Group, Briefing Book: A Request to Congress and the Administration to Preserve Girls' and Women's Sport and Accommodate Transgender Athletes, at 20 (2021).)

As a result, competing with biological males may cause girls to lose out on various opportunities, such as opportunities to start for a team, to play for a team, or to even make a team, as well as opportunities for scholarships and an opportunity to win.  Additionally, competing against biological males in contact sports may cause girls to suffer more physical injuries.  Because the Title IX regulations recognize, and allow for, a Title IX recipient to sponsor or operate separate athletic teams based on sex "where selection for such teams is based upon competitive skill or the activity involved is a contact sport[,]" and because the regulations require recipients to "provide equal athletic opportunity for members of both sexes," it does not violate Title IX to discriminate between males and females in the context of sports.  34 C.F.R. § 106.41(b) and (c).

Thus, sex-separated sports are lawful and permissible under Title IX.  Moreover, in compliance with Title IX, the Act in question defines "male" and "female" in a way intended to promote the goal of sex equality in athletics.  Furthermore, and using the same language used in the Title IX regulations, the Act separates sports teams based on sex "where selection for such teams is based upon competitive skill or the activity involved is a contact sport."  W. Va. Code § 18-2-25d(c)(2); 34 C.F.R. § 106.41(b).  As a result, B.P.J. cannot prove that the Act violates Title IX, and the HCBOE should be granted summary judgment for Count I.

### 2. The Act is substantially related to an important government purpose and thus survives scrutiny under the EPC.[10]

"The Equal Protection Clause of the Fourteenth Amendment provides that '[n]o State shall . . . deny to any person within its jurisdiction the equal protection of the laws.  It is 'essentially a direction that all persons similarly situated should be treated alike.'" *Grimm*, 972 F.3d at 606 (quoting *City of Cleburne v. Cleburne Living Ctr.*, 473 U.S. 432 (1985)).  EPC challenges based on sex, as here, are subject to intermediate scrutiny.  *See H.B. Rowe Co. v. Tippett*, 615 F.3d 233, 242 (4th Cir. 2010).  Under intermediate scrutiny, the challenged classification must serve an important government purpose, and the means employed must be substantially related to that purpose.  *U.S. v. Virginia*, 518 U.S. 515, 524, 532-33 (1996).  "'[L]egislatures are presumed to have acted within their constitutional power despite the fact that, in practice, their laws result in some inequality.'" *Nordlinger v. Hahn*, 505 U.S. 1, 10 (1992) (quoting *McGowan v. Maryland,* 366 U.S. 420, 425–26 (1961)).

An EPC plaintiff must first show "governmental treatment dissimilar to that received by others similarly situated." *Republican Party of N.C. v. Martin*, 980 F.2d 943, 953 (4th Cir. 1992).  For EPC purposes, "similarly situated" means "persons who are in all relevant respects alike." *Nordlinger*, 505 U.S. at 10.  Here, those "similarly situated" under the Act are biological males, regardless of gender identity, and the "relevant respects" are physical attributes relevant to competitive fairness and safety.  The Act closes biological females' teams to all biological males because biological sex, not gender identity, causes the problems that the Act seeks to prevent.

The Act's goals are to prevent the physical differences between the biological

---

[10] The County Board hereby incorporates by reference the arguments it made in "Defendant Harrison County Board of Education and Defendant Dora Stutler in her Official Capacity's Response in Opposition to Plaintiff's Motion for Preliminary Injunction" regarding why the Act survives scrutiny under the EPC. (Doc. 50, at 15-22.)  For purposes of brevity, a truncated version of those arguments is presented here.

sexes, regardless of gender identity, from causing a competitive disadvantage – or worse, an injury – to biological females. B.P.J. does not challenge the importance of those goals. Clearly, safety and fairness to females are important governmental purposes.[11]

Furthermore, the Act's means are substantially related to its important purposes. As confirmed by expert reports in this case, biological males are, on average, bigger, stronger, and faster than biological females.[12] (Ex. 7, at 10-22; Excerpts from Expert Report of Chad Carlson, M.D., FACM, pp. 24-33, attached to the summary judgment motion as "**Exhibit 8**.") For instance:

- Men have 60% to 100% greater arm strength than women and 25% to 60% greater leg strength than women. (Ex. 7, at 10-11.)

- After the completion of puberty, males have a 10% to 12% advantage in running, which is an overwhelming difference. (*Id.* at 12.) Looking at times from 2017, one source cited by Dr. Brown found that when comparing the performances in running events of boys under the age of 18 to the single best adult woman performance in the same events, over one hundred boys outperformed the single best adult female time for a majority of the events. (*Id.* at 14,

---

[11] *See, e.g.*, *Virginia*, 518 U.S. at 533 ("The heightened review standard our precedent establishes does not make sex a proscribed classification. . . . Physical differences between men and women[] . . . are enduring: '[T]he two sexes are not fungible; a community made up exclusively of one [sex] is different from a community composed of both.'") (citations omitted); *id.* at 540 (noting that it was "uncontested that women's admission [to a then all-male military college] would require accommodations, primarily in arranging housing assignments *and physical training programs for female cadets*" (emphasis added)).

[12] *See, e.g.*, *Clark, By & Through Clark v. Ariz. Interscholastic Ass'n*, 695 F.2d 1126, 1129–31 (9th Cir. 1982), which discussed other cases, including *Petrie v. Illinois High School Athletic Association,* 75 Ill. App.3d 980, 31 Ill. Dec. 653, 394 N.E.2d 855 (1979), in which the court found that exclusion of boys from girls' teams "was a legitimate means of providing athletic opportunities for girls," noted "that the classification of teams based on sex was based on the innate physical differences between the sexes, [rather than on] generalizations that are archaic . . . [or attitudes of] romantic paternalism," acknowledged "that the sexual classification could be avoided by classifying directly on the basis of physical differences such as height or weight, but concluded that such classifications would be too difficult to devise, . . . primarily because of strength differentials between the sexes," concluded that "[h]andicapping competitions . . . would be difficult and contrary to the interest of achieving the best competition possible," noted that "multi-tiered teams . . . [would be] too expensive to impose on the schools," and concluded "that sex was the only feasible classification to promote the legitimate and substantial state interest of providing for interscholastic athletic opportunities for girls." *Clark*, 695 F.2d at 1130 (internal quotations and citations omitted).

Table 1) (citing Coleman, D.L. and W. Shreve, *Comparing Athletic Performances: The Best Elite Women to Boys and Men*. https://law.duke.edu/sports/sex-sport/comparative-athletic-performance.)

- Men jump higher and farther than women.  (*Id.* at 15.)  In analyzing high school high jump numbers of males and females, researchers found that males have an 18.18% advantage. (*Id.*) (citing Higerd, G.A., *Assessing the Potential Transgender Impact on Girl Champions in American High School Track and Field*. Doctoral Dissertation United States Sports Academy, 96 (2021). https://www.proquest.com/openview/65d34c1e949899aa823beecad873afae/1?pqorigsite=gscholar&cbl=18750&diss=y.)  Similarly, the researchers found that high school males have a 24.14% performance advantage in the long jump.  (*Id.*) (citing Higerd, 97.)

- Males throw and kick farther than females. (*Id.* at 16.)  "By age 12, 'boys' throwing velocity is already between 3.5 and 4 standard deviation units higher than the girls.'" (*Id.*) (citing Thomas, J.R. and K. E. French, *Gender Differences Across Age in Motor Performance: A Meta-Analysis*. Psych. Bull. 98(2):260-282, 268 (1985).)

- Even before puberty, "[b]oys exhibit advantages in athletic performance[.]" (*Id.* at 25-36.)  Among the sources Dr. Brown cited to support his finding include the following:

  o "'[L]arge-scale data reports on children from the age of six show that young males have significant advantage in cardiovascular endurance, muscular strength, muscular endurance, speed/agility and power tests,' although they 'score lower on flexibility tests.'" (*Id.* at 28) (quoting UK Sports Councils, International Research Literature Review, 3 (2021) https://equalityinsport.org/docs/300921/Transgender%20International%20Research%20Literature%20Review%202021.pdf.)

  o "'An extensive review of fitness data from over 85,000 Australian children aged 9–17 years old showed that, compared with 9-year-old females, 9-year-old males

were faster over short sprints (9.8%) and 1 mile (16.6%), could jump 9.5% further from a standing start (a test of explosive power), could complete 33% more push-ups in 30 [seconds] and had 13.8% stronger grip.'" (*Id.* at 28) (quoting Hilton, E. N. and T.R. Lundberg, *Transgender Women in the Female Category of Sport: Perspectives on Testosterone Suppression and Performance Advantage*. Sports Medicine 51:199-214, 201 (2021).)

       o   Analyzing data from a Eurofit test performed on children in 30 European countries, and "[s]ampling the low, middle, and top decile, 9-year-old boys performed better than 9-year-old girls by between 6.5% and 9.7% in the standing broad jump; from 11.4% to 16.1% better in handgrip; and from 45.5% to 49.7% better in the 'bent-arm hang.'" (*Id.* at 28-29) (citing Tomkinson, G. *et al.*, *European Normative Values for Physical Fitness in Children and Adolescents Aged 9-17 Years: Results from 2,779,165 Eurofit Performances Representing 30 countries*. Br J Sports Med 52:1445-56 (2018).)

Based on the above, and because of the physiological differences between males and females, males at any level, in general, have an athletic advantage over females who are equally aged, gifted or trained. (*Id.* at 4.) This athletic advantage for males leads to unfairness for females when males are allowed to compete against females in sports. In prohibiting males from playing on female sports teams or competing in female sports, the Act serves the important government purpose of allowing females to play sports and compete in a fair environment.

In addition to the physiological differences creating fairness issues, those physiological differences between males and females will increase the frequency and the severity of injury to females if males are allowed to compete against females. (Ex. 8, at 9.) As Dr. Carlson concluded, "[m]ales exhibit large average advantages in size, weight, and physical capacity over females—often falling far outside female ranges. Even before puberty, males have a performance advantage over females in most athletic events." (*Id.*)

The risk of female injury is even greater when considering studies which show that females have an enhanced susceptibility to suffering an injury in sports.  To support this opinion, Dr. Carlson cited to the following studies:

- "An analysis of Finnish student athletes from 1987-1991, analyzing over 600,000 person-years of activity exposures, found, in students under fifteen years of age, higher rates of injury in girls than boys in soccer, volleyball, judo and karate."  (*Id*. at 34) (citing Kujala U.M., *et al*., *Acute Injuries in Soccer, Ice Hockey, Volleyball, Basketball, Judo, and Karate: Analysis of National Registry Data*. BMJ 311(7018):1465-68 (1995).)

- "Another epidemiological study looking specifically at injury rates in over 14,000 middle schoolers over a 20 year period showed that 'in sex-matched sports, middle school girls were more likely to sustain any injury (RR = 1.15, 95% CI = 1.1, 1.2) or a time-loss injury (RR = 1.09, 95% CI =1.0, 1.2) than middle school boys.' In analyzed both-sex sports (*i.e*., sex-separated sports that both girls and boys play, like soccer), girls sustained higher injury rates, and greater rates of time-loss injury."  (*Id*.) (citing Beachy, G. and M. Rauh, *Middle School Injuries: A 20-year (1988-2008) Multisport Evaluation*. J. Athl. Train. 49(4):493-506 (2014).)

- "Another study of over 2000 middle school students at nine schools showed that the injury rate was higher for girls' basketball than for football (39.4 v 30.7/1000 AEs), and injury rates for girls' soccer were nearly double that of boys' soccer (26.3 v. 14.7/1000 AEs)." (*Id*.) (citing Caswell, S.V., *et al*., *Epidemiology of Sports Injuries Among Middle School Students*. Brit. J. of Sports Med. 51(4):305 (2017).)

Dr. Carlson further noted that the research shows that females are more susceptible to Anterior Cruciate Ligament ("ACL") injuries and concussions.  (*Id.* at 35-45.)  With regard to ACL injuries, "[o]ne meta-analysis of 58 studies reports that female athletes have a 150% relative risk for ACL injury compared with male athletes, with other estimates suggesting as much as a

300% increased risk." (*Id.* at 42) (citing Montalvo, A.M. *et al.*, *Anterior Cruciate Ligament Injury Risk in Sport: A Systematic Review and Meta-Analysis of Injury Incidence by Sex and Sport Classification*. J. Ath. Training 54(5):472-482 (2019); Sutton, K.M. *et al.*, *Anterior Cruciate Ligament Rupture: Differences Between Males and Females*. J. Am. Acad. Orthop. Surg. 21(1):41-50 (2013).)

With regard to concussions, "[a] large retrospective study of U.S. high school athletes showed a higher rate of female concussions in soccer (79% higher), volleyball (0.6 concussions/10,000 exposures, with 485,000 reported exposures, vs. no concussions in the male cohort), basketball (31% higher), and softball/baseball (320% higher)." (*Id.* at 36) (citing Marar, M. *et al.*, *Epidemiology of Concussions Among United States High School Athletes in 20 Sports*. Am. J. Sports Med. 40(4):747-755 (*2012*).) Moreover, when females suffer a concussion, "females on average suffer materially greater cognitive impairment than males[.]" (*Id.* at 38.) For instance,

> [a] study of 2340 high school and collegiate athletes who suffered concussions determined that females had a 170% higher frequency of cognitive impairment following concussions, and that in comparison with males, female athletes had significantly greater declines in simple and complex reaction times relative to their preseason baseline levels. Moreover, the females experienced greater objective and subjective adverse effects from concussion even after adjusting for potentially protective effect of helmets used by some groups of male athletes.

(*Id.* at 39) (citing Broshek, D.K. *et al.*, *Sex Differences in Outcome Following Sports-Related Concussion*, J. Neurosurg. 102:856-63 (May 2005); Colvin, A.C. *et al.*, *The Role of Concussion History and Gender in Recovery from Soccer-Related Concussion*. Am. J. Sports Med, 37(9):1699-1704 (2009); Covassin, T. *et al.*, *The Role of Age and Sex in Symptoms, Neurocognitive Performance, and Postural Stability in Athletes after Concussion*. Am. J. Sports Med. 40(6):1303-1312 (2012).) Therefore, "when females compete against each other, they already have higher rates of concussive injury than males, across most sports. The addition of biologically male

athletes into women's contact sports will inevitably increase the risk of concussive injury to girls and women[.]"  (*Id.* at 41.)

Clearly, there is an important government purpose in protecting the safety of female athletes.  Due to recognized physiological differences between biological males and biological females, there is an increase in risk of injuries to biological females if biological males are allowed to compete against females in sports or to play on the same sports teams as females.  In prohibiting biological males from playing on female sports teams or competing in female sports, the Act advances the important government purpose of protecting the safety of female athletes.

In summary, biological females who play against and with biological males, regardless of their gender identity, will more likely face unfairness and danger than if they played only against and with other biological females in contact sports and sports involving competitive skill.  These concerns were not present in *Grimm*, which addressed restroom use – not safety and fairness concerns unique to participation in athletics, making *Grimm* non-dispositive here.

While it is undoubtedly true that not every biological male is larger, stronger, and faster than every biological female, that fact does not matter here.  Under intermediate scrutiny, the challenged classification need not be unrealistically perfectly related to the government's goals.  Instead, the Act only needs to be "substantially" related to its goals.  Applying this correct scrutiny, courts routinely accept that a classification that relies on some degree of generality can still be "substantially" related to its end.[13]  Thus, classification based on average differences can easily withstand intermediate scrutiny.  *See, e.g.*, *Clark*, 695 F.2d at 1131 ("The record makes clear that

---

[13] A blanket rule limiting selective service registration to men, for example, thus satisfied intermediate scrutiny even "assuming that a small number of women could be drafted for noncombat roles" because "Congress simply did not consider it worth the added burdens of including women in draft and registration plans."  *Rostker v. Goldberg*, 453 U.S. 57, 81 (1981).  Additionally, a social security rule advantageous to women satisfied such scrutiny because "women *on the average* received lower retirement benefits than men."  *Califano v. Webster*, 430 U.S. 313, 318 n.5 (1977).

due to average physiological differences, males would displace females to a substantial extent if they were allowed to compete for positions on the volleyball team. . . . [T]he Supreme Court allows for these average real differences between the sexes to be recognized [and] . . . gender [may] be used as a proxy in this sense if it is an accurate proxy.").

Ultimately, this case is about more than B.P.J. and whether she creates the risks the Act seeks to prevent.  It is about the fairness to and safety of any number of biological females who, absent the Act, may have to compete against and engage in athletic competition (including contact sports) with and against biological males.  It is of inadequate constitutional significance that any particular student has not yet gone through puberty and thus not yet gained all or even any of the differences in physical characteristics that medical intervention either can or cannot equalize.  A perfect, or even best possible, fit between a government's chosen means (*i.e.*, the classification) and its important goals is not what *intermediate* scrutiny demands.  Intermediate scrutiny tolerates such imperfections in classifications.

B.P.J. argues that participation on girls' sports teams should be determined not based on biological sex at birth but on circulating testosterone levels.  However, the science on the relationship between testosterone levels and the promotion of fairness and safety is debated.  More importantly, the possibility that testosterone levels are *a* way to accomplish the Act's goals does not, under intermediate scrutiny, necessarily mean that testosterone levels are *the only* constitutionally permissible way to do so.  That is, "the alternative chosen may not maximize equality, and may represent trade-offs between equality and practicality.  But . . . even the existence of wiser alternatives than the one chosen does not serve to invalidate the policy here since it is substantially related to the goal."  *Clark*, 695 F.2d at 1131–32 (citation omitted).  Because the Act survives intermediate scrutiny, B.P.J. cannot prove that the Act violates the EPC.  As a result, Stutler is entitled to summary judgment on that claim.

## III. CONCLUSION

For all of the foregoing reasons, the HCBOE and Stutler respectfully request that the Court **GRANT** their Motion for Summary Judgment.  The HCBOE is entitled to summary judgment on the sole claim against it, and it should be dismissed as a defendant.  Stutler has not violated any right of B.P.J.'s, and thus, she is also entitled to summary judgment.  If Stutler is retained as a defendant to Count II for purposes of an injunction, then she must be retained as an agent of the State, not of the HCBOE, and consequently, any damages or other monetary award, including any award for attorneys' fees and costs, that may be assessed against her must be paid by the State.  Therefore, the HCBOE and Stutler are entitled to summary judgment on Counts I and II, as well as B.P.J.'s claim for monetary damages, including any award for attorneys' fees and costs, against them.

Respectfully submitted this 21st day of April, 2022.


                                                     */s/ Susan L. Deniker*_____
                                                     Susan L. Deniker          (WV ID #7992)
                                                     Jeffrey M. Cropp          (WV ID #8030)
STEPTOE & JOHNSON PLLC                               400 White Oaks Boulevard
   OF COUNSEL                                        Bridgeport, WV 26330-4500
                                                     (304) 933-8000

                                                     *Counsel for Defendants Harrison County Board*
                                                     *of Education and Dora Stutler*

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA
CHARLESTON DIVISION

B.P.J., by her next friend and mother, HEATHER
JACKSON,

*Plaintiff*,

v.                                                                   Civil Action No. 2:21-cv-00316
                                                                     Hon. Joseph R. Goodwin, District Judge

WEST VIRGINIA STATE BOARD OF
EDUCATION, HARRISON COUNTY BOARD
OF EDUCATION, WEST VIRGINIA
SECONDARY SCHOOL ACTIVITIES
COMMISSION, W. CLAYTON BURCH in his
official capacity as State Superintendent,
DORA STUTLER in her official capacity as
Harrison County Superintendent, PATRICK
MORRISEY in his official capacity as Attorney
General, and THE STATE OF WEST VIRGINIA,

*Defendants,*

and

LAINEY ARMISTEAD,

*Defendant-Intervenor*.

## **CERTIFICATE OF SERVICE**

I hereby certify that on 21st day of April, 2022, I electronically filed the foregoing

"Defendants Harrison County Board of Education and Dora Stutler's Memorandum of Law in

Support of Their Motion for Summary Judgment" with the Clerk of the Court using the CM/ECF

system, which will send notification of such filing to all counsel of record.

14447830

**Joshua A. Block, Esquire**
AMERICAN CIVIL LIBERTIES UNION
FOUNDATION
125 Broad Street 18th Floor
New York, NY 10004
*Counsel for Plaintiff*


**Loree Stark, Esquire**
**Nicholas P. Ward, Esquire**
AMERICAN CIVIL LIBERTIES UNION
OF WEST VIRGINIA
1614 Kanawha Boulevard East
Charleston, WV  25311
*Counsel for Plaintiff*

**Avatara A. Smith-Carrington, Esquire**
LAMBDA LEGAL
3500 Oak Lawn Avenue Suite 500
Dallas, TX 75219
*Counsel for Plaintiff*

**Carl Solomon Charles, Esquire**
**Tara L. Borelli, Esquire**
LAMBDA LEGAL
158 West Ponce De Leon Avenue, Suite 105
Decatur, GA 30030
*Counsel for Plaintiff*

**Sruti J. Swaminathan, Esquire**
LAMBDA LEGAL
120 Wall Street 19th Floor
New York, NY 10005
*Counsel for Plaintiff*

**Kathleen R. Hartnett, Esquire**
**Julie Veroff, Esquire**
**Zoë Helstrom, Esquire**
COOLEY LLP
3 Embarcadero Center, 20th Floor
San Francisco, CA 94111
*Counsel for Plaintiff*

**Katelyn Kang, Esquire**
**Valeria M. Pelet del Toro, Esquire**
COOLEY LLP
55 Hudson Yards
New York, NY 10001
*Counsel for Plaintiff*

**Elizabeth Reinhardt, Esquire**
COOLEY LLP
500 Boylston Street, 14th Floor
Boston, MA 02116-3736
*Counsel for Plaintiff*

**Andrew D. Barr, Esquire**
COOLEY LLP
1144 15th Street Suite 2300
Denver, CO 80202
*Counsel for Plaintiff*

**Roberta F. Green, Esquire**
**Kimberly M. Bandy, Esquire**
**Shannon M. Rogers, Esquire**
SHUMAN McCUSKEY & SLICER
PO Box 3953
Charleston, WV 25339-3953
*Counsel for Defendant WV Secondary
School Activities Commission*

14447830

**Kelly C. Morgan, Esquire**
**Kristen Vickers Hammond, Esquire**
**Michael W. Taylor, Esquire**
BAILEY & WYANT
PO Box 3710
Charleston, WV 25337-3710
*Counsel for Defendants WV State Board of Education and W. Clayton Burch*

**Brandon Steele, Esquire**
**Joshua D. Brown, Esquire**
THE LAW OFFICES OF BRANDON S. STEELE
3049 Robert C. Byrd Drive, Suite 100
Beckley, WV 25801
*Counsel for Defendant-Intervenor Lainey Armistead*

**Christina Holcomb, Esquire**
ALLIANCE DEFENDING FREEDOM
440 First Street NW, Suite 600
Washington, DC 20001
*Counsel for Defendant-Intervenor Lainey Armistead*

**Travis Barham, Esquire**
ALLIANCE DEFENDING FREEDOM
1000 Hurricane Shoals Rd NE
STE D-1100
Lawrenceville GA 30043
*Counsel for Defendant-Intervenor Lainey Armistead*

STEPTOE & JOHNSON PLLC
Of Counsel

**Douglas P. Buffington, II, Esquire**
**Curtis R. Capehart, Esquire**
**David C. Tryon, Esquire**
WV ATTORNEY GENERAL'S OFFICE
State Capitol Complex
Building 1, Room 26E
1900 Kanawha Boulevard East
Charleston, WV 25305-0220
*Counsel for Defendant The State of West Virginia*

**Jonathan Scruggs, Esquire**
**Roger G. Brooks, Esquire**
**Henry W. Frampton, IV, Esquire**
ALLIANCE DEFENDING FREEDOM
15100 N. 90th Street
Scottsdale, AZ 85260
*Counsel for Defendant-Intervenor Lainey Armistead*

**Rachel Csutoros, Esquire**
**Tyson Langhofer, Esquire**
ALLIANCE DEFENDING FREEDOM
44180 Riverside Parkway
Lansdowne, VA 20176
*Counsel for Defendant-Intervenor Lainey Armistead*

**Timothy D. Ducar, Esquire**
Law Offices of Timothy D. Ducar, PLC
7430 E. Butherus Drive, Suite E
Scottsdale, AZ 85260
*Counsel for Defendant-Intervenor Lainey Armistead*

/s/ Susan L. Deniker
Susan L. Deniker          (WV ID #7992)
Jeffrey M. Cropp          (WV ID #8030)
400 White Oaks Boulevard
Bridgeport, WV 26330-4500
(304) 933-8000

*Counsel for Defendants Harrison County Board of Education and Dora Stutler*

14447830