# IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA
### CHARLESTON DIVISION

B. P. J., by her next friend and mother,
HEATHER JACKSON,

     **Plaintiff,**

v.

                                      CIVIL ACTION NO. 2:21-cv-00316
                                      Judge Joseph R. Goodwin

WEST VIRGINIA STATE BOARD OF
EDUCATION, HARRISON COUNTY
BOARD OF EDUCATION, WEST VIRGINIA
SECONDARY SCHOOL ACTIVITIES
COMMISSION, W. CLAYTON BURCH, in
his official Capacity as State Superintendent,
DORA STUTLER, in her official capacity as
Harrison County Superintendent, and THE
STATE OF WEST VIRGINIA,

     **Defendants.**

and LAINEY ARMISTEAD,

     **Intervenor Defendant.**

## DEFENDANT STATE OF WEST VIRGINIA'S MEMORANDUM IN SUPPORT OF <u>MOTION FOR SUMMARY JUDGMENT</u>

## TABLE OF CONTENTS

TABLE OF CONTENTS.................................................................................................................... i

TABLE OF AUTHORITIES ............................................................................................................ ii

Introduction...................................................................................................................................... 1

Background ....................................................................................................................................... 2

Legal Analysis ................................................................................................................................. 8

   A.  Legal Standard .......................................................................................................................... 8

   B.  Plaintiff's Equal Protection Claim Fails.................................................................................. 8

      1.  The State's Interests Are Important .............................................................................. 11

      2.  Section 25d Is Substantially Related To The State's Interests...................................... 13

         a.  The Save Women's Sports Act Protects Equal Athletic Opportunities for Female Athletes ............................................................................................................................ 13

         b.  The Save Women's Sports Act Protects Female Athlete's Safety ........................... 17

         c.  Plaintiff's As Applied Challenge Also Fails ............................................................ 21

   C.  Plaintiff's Title IX Claim Fails............................................................................................. 22

      1.  The Purposes And Achievements Of Title IX. ............................................................. 23

      2.  "Sex" Under Title IX Means Biological Sex................................................................. 25

      3.  Section 25d furthers, not violates, Title IX. ................................................................. 26

CONCLUSION................................................................................................................................ 28

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Auer v. Robbins*,
   519 U.S. 452 (1997)............................................................24

*Biediger v. Quinnipiac University*,
   691 F.3d 85 (2d Cir. 2012)................................................24

*Billups v. City of Charleston, S.C.*,
   961 F.3d 673 (4th Cir. 2020) ...........................................18

*Bostock v. Clayton Co, Ga.*,
   590 U.S. ___, 140 S. Ct. 1731 (2020).......................1, 6, 24, 25, 26

*City of Cleburne v. Cleburne Living Ctr.*,
   473 U.S. 432 (1985)............................................................8

*Clark v. Ariz. Interscholastic Ass'n.*,
   695 F.2d 1126 (9th Cir. 1982) .........................11, 12, 13, 17, 27

*Doe 2 v. Shanahan*,
   755 F. App'x. 19 (D.C. Cir. 2019).....................................9

*Engquist v. Oregon Dep't of Agr.*,
   553 U.S. 591 (2008)............................................................9

*Evans v. Techs. Applications & Serv. Co.*,
   80 F.3d 954 (4th Cir. 1996) ..............................................8

*Fisher v. Univ. of Texas at Austin*,
   570 U.S. 297 (2013)..........................................................10

*Frontiero v. Richardson*,
   411 U.S. 677 (1973)..........................................................25

*Gonzales v. Carhart*,
   550 U.S. 124 (2007)..........................................................21

*Grimm v. Gloucester Cnty. Sch. Bd.*,
   972 F.3d 586 (4th Cir. 2020), (Aug. 28, 2020)..............9, 27

*Grutter v. Bollinger*,
   539 U.S. 306 (2003)..........................................................10

## TABLE OF AUTHORITIES
*(continued)*

**Page(s)**

*Imaginary Images, Inc. v. Evans*,
  612 F.3d 736 (4th Cir. 2010) ..........................................................5, 7

*McCormick v. School Dist. of Mamaroneck*,
  370 F.3d 275 (2d Cir. 2004)..............................................................28

*Michael M. v. Sonoma County, Superior Court*,
  450 U.S.464 (1981).......................................................................7, 11

*Morrison v. Garraghty*,
  239 F.3d 648 (4th Cir. 2001) ...............................................................9

*N. Haven Bd. of Educ. v. Bell*,
  456 U.S. 512 (1982)............................................................................23

*Neal v. Bd. of Trs. of Cal. State Univs.*,
  198 F.3d 763 (9th Cir. 1999) ........................................................23, 24

*Nordlinger v. Hahn*,
  505 U.S. 1 (1992)..................................................................................9

*Petrie v. Ill. High Sch. Ass'n*,
  394 N.E.2d 855 (1979)........................................................................13

*Tuan Anh Nguyen v. INS*,
  533 U.S. 53 (2001)..................................................................10, 11, 16

*United States v. Staten*,
  666 F.3d 154 (4th Cir. 2011) .............................................................17

*United States v. Virginia*,
  518 U.S. 515 (1996).................................................1, 9, 10, 11, 21, 26

*Williams v. Sch. Dist. of Bethlehem*,
  998 F.2d 168 (3d Cir. 1993)..........................................................23, 24, 27

**Constitutional Provision**

U.S. Const. amend. XIV, § 1 ...................................................................8

**TABLE OF AUTHORITIES**
(*continued*)

Page(s)

**Statutes**

20 U.S.C. § 1681(a) .................................................................................................23

W. Va. Code §18-2-25d .........................1, 2, 3, 5, 6, 7, 9, 11, 12, 13, 16, 17, 21, 22, 23, 26, 27, 28


**Regulations**

34 CFR § 106.32(b)(1)...........................................................................................25

34 CFR § 106.33 ....................................................................................................25

34 CFR § 106.34 ....................................................................................................25

34 CFR § 106.40 ....................................................................................................25

34 CFR § 106.41 ..........................................................................7, 11, 12, 22, 23, 24, 25

34 CFR § 106.43 ....................................................................................................25

34 CFR § 106.52 ....................................................................................................25

34 CFR § 106.59 ....................................................................................................25

34 CFR § 106.61 ....................................................................................................25


**Rule**

Fed.R.Civ.P. 56(c) ..................................................................................................8


**Other Authorities**

*Board of Governors Updates Transgender Participation Policy*, NCAA: MEDIA
    CENTER (Jan. 19, 2022, 8:41 PM)...................................................................4

Br. of United States as Amicus Curiae, *Hecox v. Little,* No. 20-35813 (9th Cir.
    Nov. 19, 2020), ECF No. 45. ...........................................................................28

David J. Handelsman et al., *Circulating testosterone as the hormonal basis of sex
    differences in athletic performance*, 39 ENDOCRINE REVIEWS 803 (2018)............................16

**TABLE OF AUTHORITIES**
(*continued*)

**Page(s)**

Emily Bazelon, *Cross-Court Winner—Renee Richards (1934- )*, SLATE: SPORTS
    NUT (Oct. 25, 2012, 8:00 AM) ................................................................3

*Endocrine Society Issues Scientific Statement on Sex Differences in Research*,
    ENDOCRINE NEWS: INTOUCH (May 2021) ................................................6

Haley Tanne, *Who will stand up for me and other women being beaten by
    biological males like Lia Thomas?*, FOX NEWS: OPINION (Mar. 23, 2022, 2:00
    AM)............................................................................................8

INTERNATIONAL QUIDDITCH ASSOCIATION, IQA RULEBOOK 2020 7 (2020) ....................4

Letter from Norma V. Cantu, Assistant Sec'y for Civ. Rts., to Colleagues (Jan. 16,
    1996) .........................................................................................24

Memorandum from Reed D. Rubinstein, Principal Deputy Gen. Couns., for
    Kimberly M. Richey, Acting Assistant Sec'y of the Off. For Civ. Rts. (Jan. 8,
    2021) .........................................................................................24

Paulina Dedaj, *Penn swimmer slams school's handling of Lia Thomas saga:
    "They don't actually care about women at all"*, FOX NEWS: SPORTS (Jan. 28,
    2022, 11:10 AM)..............................................................................8

Press Release, IOC approves consensus with regard to athletes who have changed
    sex (May 18, 2004) ...........................................................................3

*Renee Richards*, DB4TENNIS, https://www.db4tennis.com/players/female/renee-
    richards....................................................................................2

REPORT TO THE PRESIDENT AND SECRETARY OF EDUCATION, UNDER SECTION
    203(B)(1) OF THE DEPARTMENT OF EDUCATION ORGANIZATION ACT, FY 13-14
    33 (2015).....................................................................................24

Statement of Interest of the United States, *Soule v. Conn Ass'n of Sch*s., 3:20-cv-
    00201 (D. Conn. Mar. 24, 2020), ECF No. 75 ...........................................28

Talia Kaplan, *"We are fighting for fairness in women's sports," says Connecticut
    student sueing over transgender policy*, FOX NEWS: SPORTS (Feb. 11, 2021,
    3:06 PM) ......................................................................................5

*Violate Title IX*, NBC CT (May 28, 2020, 12:20 PM)....................................5

## Introduction

Plaintiff B.P.J. claims that West Virginia Code §18-2-25d, sometimes referenced by its enacting legislation (H.B. 3293) and commonly known as the Save Women's Sports Act ("Section 25d"), violates both the Equal Protection Clause of the Fourteenth Amendment and Title IX.  On July 21, 2021, this Court granted an "as applied" preliminary injunction on the basis that the Court was unaware that there was a need to address this issue at this time. Memorandum Opinion & Order at 1, ECF No. 67.  The Court's injunction was limited to the Plaintiff only, but stated "[w]hether the law is facially unconstitutional is an issue raised in the Complaint and will be resolved at a later stage of litigation." Memorandum Opinion & Order at 4, ECF No. 67.  Accordingly, Defendant State of West Virginia will address both a facial challenge and the as applied challenge.

Section 25d's purpose is to, as its name indicates, preserve women's sports.  It does this by following Justice Ginsberg's observation that "[p]hysical differences between men and women . . . are enduring," *United States v. Virginia*, 518 U.S. 515, 533 (1996), and that there are "biological distinctions between male and female." *Bostock v. Clayton Co, Ga.*, 590 U.S. ___, 140 S. Ct. 1731, 1739, (2020).  The statute recognizes that these differences result in males having an athletic advantage over females and that participation by males in female-designated contact sports creates safety hazards to female athletes.  Further, the Title IX regulations explicitly anticipate athletic teams based on biological sex, not based on gender identity.  Indeed, biological bodies compete in sports; gender identities do not.

Section 25d satisfies the Equal Protection Clause and Title IX.  Accordingly, the State of West Virginia is entitled to summary judgment on both claims.

**Background**

The issue in this case is not new, and the decades-old efforts to regulate it are not based on fear or animosity.  For over forty years, sports organizations throughout the world have been examining whether biological males who identify as being female (sometimes referred to as transgirls or transwomen) should be allowed to participate on female sports teams.  And for at least ten years, schools, colleges, and other governmental bodies have been examining this issue. Those crafting the rules, regulations, and laws must consider many competing interests, including concepts of equity, the integrity of girls and women's sports, the concerns of the biological female athletes, which include performance-based fairness, preservation of women's sports and the safety of the biological women who would be competing against biological males, and the admonition, indeed the mandate, of Title IX to protect girls and women from improper discrimination.

In 1976, this topic emerged in a significant way when 41-year old Richard Raskin became Renee Richards and (after some legal action) began to compete on the women's professional tennis circuit and quickly dominated most, but not all, of the biological female competition—who were mostly half Renee's age.[1]  Years later, Richards "came to believe her past as a man provided her with advantages over her competitors[.]"  *Id.*

In 1990, the International Amateur Athletic Federation (the "IAAF," now known as World Athletics) recognized that this was no longer an isolated issue and there was a real and existing need to establish rules on whether biological men self-identifying as women may compete as females and, if so, on what conditions.  The resulting 1990 IAAF policy allowed (a) prepubescent males to participate on female teams after completing sex reassignment surgery,

---

[1] *Renee Richards*, DB4TENNIS, https://www.db4tennis.com/players/female/renee-richards (last visited Apr. 21, 2022).

and (b) males that had sex reassignment surgery after puberty be eligible to participate based on additional factors and the IAAF's discretionary "case-by-case evaluation of athletes who have undergone sex reassignment."[2]

In 2003, the International Olympic Committee (the "IOC") evaluated the IAAF policy and, in 2004, implemented its own policy allowing biological male athletes identifying as females to participate on female teams—but only as follows: (1) prepubertal males must have completed surgical sex reassignment surgery from male to female; and (2) postpubertal males must (a) have completed surgical sex reassignment surgery, including external genitalia changes and gonadectomy, (b) have obtained legal recognition of their assigned sex, and (c) shown that hormonal therapy has been administered in a verifiable manner and for a sufficient length of time to minimize gender-related advantages in sport competitions, i.e. for at least two years after gonadectomy. *Id*.[3]

Since then, at least 40 national and international athletic organizations have studied this issue and issued their own rules, which vary significantly from one another.  In 2015, U.S. Rugby recognized the serious physical risk of biological males competing against females and completely banned postpubertal biological males from competing against biological females— with no exceptions.  Other organizations—focusing on fairness in competition—severely restricted transfemale athletes from competing on female teams.  For example, the National Women's Soccer League ("NWSL") requires (among other things) (1) the transfemale player's

---

[2] Press Release, IOC approves consensus with regard to athletes who have changed sex (May 18, 2004), https://olympics.com/ioc/news/ioc-approves-consensus-with-regard-to-athletes-who-have-changed-sex-1 (explaining the background of these policies).

[3] Notably, "transgender pioneer" Renee Richards opposed the IOC 2004 policy because it is "not a level playing field" for the biological women.  Emily Bazelon, *Cross-Court Winner—Renee Richards (1934- )*, SLATE: SPORTS NUT (Oct. 25, 2012, 8:00 AM), https://slate.com/culture/2012/10/jewish-jocks-and-renee-richards-the-life-of-the-transsexual-tennis-legend.html.

total testosterone level in serum be within typical limits of women athletes (the current standard is below 10 nmol/L) for at least twelve (12) months prior to competition; (2) the athlete's total testosterone level in serum to remain in the typical range of women athletes; and (3) a final determination of fairness and reasonableness—in the NWSL's sole discretion.  Other organizations simply allow players to compete on the sports team of their gender-declared identity, switchable at any time.[4]  Finally, in 2022, the National College Athletic Association ("NCAA") abandoned the issue to individual sporting organizations.[5]

Also, for over a decade, academics have been studying the competitive advantage issues, the safety issues, and whether testosterone suppression and hormone therapy will eliminate the performance advantage.  *See generally* Ex. G, Brown Decl., and Ex. E, Carlson Decl., and bibliography of each.  While academia, the media, and advocacy organizations continued to study and debate these issues, schools and governments needed to address both the existing and anticipated impact on girls and women and their sports.

West Virginia sports organizations have been dealing with these issues since at least 2015, when Defendant West Virginia Secondary Schools Activities Commission ("SSAC") formulated an internal board policy anticipating this emerging issue.  Ex. A, Dolan Dep. at pp. 117-119; 121-126; and Ex. 6 thereto.  The board policy would give SSAC the authority to decide a transgender athlete's eligibility based on the student's "threat to competitive equity or the safety of teammates or opposing players."  *Id*.  Since then, SSAC had a male volleyball player inquire about participating as an identified female and another athlete (who was possibly gender-

---

[4] *See e.g.* International Quidditch Association, IQA Rulebook 2020 7 (2020), https://iqasport.cdn.prismic.io/iqasport/86da705a-b6b3-4a1f-8f49-e1d5097ba4c2_Rulebook-20.pdf.
[5] *Board of Governors Updates Transgender Participation Policy*, NCAA: Media Center (Jan. 19, 2022, 8:41 PM), https://www.ncaa.org/news/2022/1/19/media-center-board-of-governors-updates-transgender-participation-policy.aspx.

fluid) inquire about moving back and forth between male and female sports teams.  Dolan Dep. at pp. 120-121.  Indeed, the issue regarding the Plaintiff's participation in female sports was initially raised in the Harrison County School District in 2019 when the school, B.P.J., and B.P.J.'s mother met and completed a Gender Support Plan, which specifically asked in which extracurricular sports B.P.J. wanted to participate.  Ex. B., Jackson Dep. at pp. 143-144, 237-251, and Ex. 17 thereto.  The issue came up again in B.P.J.'s 2021 Gender Support Plan in which B.P.J. expressed interest in cross country sports.  *Id.* at Ex. 19 thereto.

This long-standing issue regained the national spotlight in 2019 when biological male Terry Miller, identifying as a female, beat a biological female in girls track in Connecticut.[6]  Three biological females then sued claiming a violation of Title IX.[7]

In recognition of these increasingly apparent issues, West Virginia began to grapple with this sensitive issue to try to find a fair solution at the highest level.  *See Imaginary Images, Inc. v. Evans*, 612 F.3d 736, 742 (4th Cir. 2010) (the State "may also rely on the experiences of other jurisdictions and on findings expressed in other cases).  H.B. 3293 (commonly called the "Save Women's Sports Act") was debated extensively and amended several times to try to accommodate all relevant concerns before being passed and codified at West Virginia Code 18-2-25d.  Reflecting the Legislature's struggles to adopt the right solution to such a sensitive, controversial issue, even Plaintiff's rebuttal expert Dr. Janssen agreed that he did not know the "best way for states to address a complex issue such as this."  Ex. C, Janssen Dep. at p. 338: 3-5.

---

[6] *See* Pat Eaton-Robb, *Connecticut Transgender Policy Found to Violate Title IX*, NBC CT (May 28, 2020, 12:20 PM), https://www.nbcconnecticut.com/news/local/connecticut-transgender-policy-found-to-violate-title-ix/2278511/.
[7] Talia Kaplan, *"We are fighting for fairness in women's sports," says Connecticut student sueing over transgender policy*, Fox News: Sports (Feb. 11, 2021, 3:06 PM), https://www.foxnews.com/sports/fairness-womens-sports-student-suing-transgender-athlete-policy.

The Legislature found that, while "[t]here are inherent differences between biological males and biological females, and that these differences are cause for celebration . . . . [they] are not a valid justification for sex-based classifications that make overbroad generalizations or perpetuate the legal, social, and economic inferiority of either sex." Section 25d(a)(2).  In this matter, Plaintiff has denigrated as unscientific the statute's use of the term "sex" and its classification of "biological sex," defining it as "an individual's physical form as a male or female based solely on the individual's reproductive biology and genetics at birth" (Section 25d(b)(1)).  However, this classification is very similar to the one used by the American Psychiatric Association defining "sex" as the "[b]iological indication of male and female (understood in the context of reproductive capacity), such as sex chromosomes, gonads, sex hormones, and nonambiguous internal and external genitalia."  AMERICAN PSYCHIATRIC ASSOCIATION, DIAGNOSTIC AND STATISTICAL MANUAL OF MENTAL DISORDERS (DSM-5) 829 (5th ed. 2013).  The Endocrine Society similarly explains:  "Biological sex is often confused with gender in our society. The two sexes are differentiated as females, who have ovaries and produce eggs, and males, who have testes and produce sperm."[8]    Finally, the Supreme Court uses the term "sex" to mean "biological distinctions between male and female."  *Bostock*, 590 U.S. at ___, 140 S. Ct. at 1739; *see also* Ex. D, Adkins Dep. at p. 74 (sex is a "biological concept").

The Legislature avoided making inappropriate generalizations and drafted the law narrowly to protect legitimate governmental interests.  The Legislature explained that "these inherent differences [between biological males and biological females] are a valid justification for sex-based classifications when they realistically reflect the fact that the sexes are not

---

[8] *Endocrine Society Issues Scientific Statement on Sex Differences in Research*, ENDOCRINE NEWS: INTOUCH (May 2021), https://endocrinenews.endocrine.org/endocrine-society-issues-scientific-statement-on-sex-differences-in-research/ (last visited Apr. 21, 2022).

similarly situated in certain circumstances," citing *Michael M. v. Sonoma County, Superior Court*, 450 U.S.464 (1981).  W. Va. Code 18-2-25d(a)(2).  Akin to the Endocrine Society's statement referenced above, Section 25d further recognized that:

> gender identity is separate and distinct from biological sex to the extent that an individual's biological sex is not determinative or indicative of the individual's gender identity. Classifications based on gender identity serve no legitimate relationship to the State of West Virginia's interest in promoting equal athletic opportunities for the female sex.

*Id.* at (a)(4).  Finally, the Legislature recognized that "[i]n the context of sports involving *competitive skill or contact*, biological males and biological females are not in fact similarly situated." *Id.* at (a)(3) (emphasis added).  These legislative findings, even in the context of the equal protection analysis, are "entitled to great deference".  *Michael M.* at 470; *see also Imaginary Images, Inc.*, 612 F.3d at 742 (legislature's "policy expertise is entitled to "deference[.]"

The operative provision provides:  "Athletic teams or sports designated for females, women, or girls shall not be open to students of the male sex where selection for such teams is based upon competitive skill or the activity involved is a contact sport."   Section 25d(c)(2). This reflects 34 CFR § 106.41(b), which explicitly allows entities subject to Title IX to "operate or sponsor separate teams for members of each sex where selection for such teams is based upon *competitive skill* or the activity involved is *a contact sport*." (emphasis added).

While the Save Women's Sports Act does not recite the multitude of studies and thousands of data points supporting these well-recognized interests, those studies and data points show that there was—and continues to be—a compelling governmental interest, and that the law satisfies both a rational basis test and a heightened scrutiny test.

After Section 25d's enactment, this issue again regained national attention when the University of Pennsylvania allowed Lia Thomas, a biological male swimmer now identifying as

female after competing for years as a male, to compete on its female swim team.  Biological young women objected in strong terms regarding fair competition and the personal impact of these events, saying: "They're just proving, once again, that they don't actually care about their women athletes[.]"; "They say that they care and that they're here for our emotions, but why do we have to be gracious losers? . . . Who are you to tell me that I shouldn't want to win because I do want to win.  I'm swimming.  I'm dedicating more than 20 hours a week to the sport."; and "Obviously, I want to win.  You can't just tell me I should be happy with second place.  I'm not."[9]  Other biological girls also expressed their fairness concerns over this issue.[10]  The need for fairness to biological females cannot be waved away.  States and schools are duty-bound to provide fair and equal athletic opportunities and safe sports for female athletes.

## <u>Legal Analysis</u>

### A.  <u>Legal Standard</u>

The State of West Virginia is entitled to summary judgment because "there is no genuine issue as to any material fact and the moving party is entitled to a judgment as a matter of law." *Evans v. Techs. Applications & Serv. Co.*, 80 F.3d 954, 958 (4th Cir. 1996) (citing Fed.R.Civ.P. 56(c)).

### B.  <u>Plaintiff's Equal Protection Claim Fails.</u>

No State shall "deny to any person within its jurisdiction the equal protection of the laws." U.S. Const. amend. XIV, § 1. As long recognized by the Supreme Court, the Equal Protection Clause is "essentially a direction that all persons *similarly situated* should be treated alike." *City*

---

[9] Paulina Dedaj, *Penn swimmer slams school's handling of Lia Thomas saga: "They don't actually care about women at all"*, Fox News: Sports (Jan. 28, 2022, 11:10 AM), https://www.foxnews.com/sports/lia-thomas-penn-swimming-teammate-interview.
[10] *See* Haley Tanne, *Who will stand up for me and other women being beaten by biological males like Lia Thomas?*, Fox News: Opinion (Mar. 23, 2022, 2:00 AM), https://www.foxnews.com/opinion/women-sports-biological-males-lia-thomas.

*of Cleburne v. Cleburne Living Ctr.*, 473 U.S. 432, 439 (1985) (emphasis added). In this manner, the provision "simply keeps governmental decisionmakers from treating differently persons who are in *all* relevant respects alike." *Nordlinger v. Hahn*, 505 U.S. 1, 10 (1992) (emphasis added).  It is "a shield against arbitrary classifications." *Engquist v. Oregon Dep't of Agr.*, 553 U.S. 591, 598 (2008).  As such, a plaintiff asserting a violation of the Equal Protection Clause must "demonstrate that he has been treated differently from others with whom he is similarly situated and that the unequal treatment was the result of intentional or purposeful discrimination." *Morrison v. Garraghty*, 239 F.3d 648, 654 (4th Cir. 2001).  Further, the Equal Protection Clause "does not make sex a proscribed classification." *Virginia*, 518 at 533.

Plaintiff has argued that heightened scrutiny should apply because Section 25d discriminates against biological males who identify as females, commonly known as transgender females or transfemales. Although the State disagrees, the State acknowledges that the Fourth Circuit has held that heightened scrutiny applies if a law or policy allegedly treats transgender persons in a less favorable way than it treats all others. *See Grimm v. Gloucester Cnty. Sch. Bd.*, 972 F.3d 586, 610 (4th Cir. 2020), *as amended* (Aug. 28, 2020). ), *cert. denied*, 141 S. Ct. 2878, (2021)[11]

But Section 25d  treats all biological males *the same*, whether they identify as females *or* males.  It prohibits *all* biological males from participating in female sports.  It also treats all biological females the same regardless of how they identify.  Therefore, it does not discriminate against transgender athletes. *See Doe 2 v. Shanahan*, 755 F. App'x. 19, 23-25 (D.C. Cir. 2019) (reversing finding that requiring military personnel to serve in their biological sex was a blanket

---

[11] Although *Grimm* is distinguishable from this case, the State believes that *Grimm* was wrongly decided on its own terms and reserves the right to challenge any heightened scrutiny standard on appeal. *See Grimm*, 972 F.3d at 627-37 (Niemeyer, J., dissenting).

transgender ban and acknowledging that the military had substantial arguments that the plan complied with equal protection principles).

Assuming the Court does apply heightened scrutiny, there is no question that strict scrutiny does *not* apply. Examining that standard shows what the law *need not* satisfy. Under strict scrutiny "classifications are constitutional only if they are narrowly tailored to further compelling governmental interests." *Fisher v. Univ. of Texas at Austin*, 570 U.S. 297, 310 (2013) (citing *Grutter v. Bollinger*, 539 U.S. 306, (2003)). However, even under strict scrutiny, no cases have ever suggested that a challenged statute must be perfectly tailored to fit every person that it might affect.

By contrast, intermediate scrutiny requires first that the "classification serves important governmental objectives." *Virginia*, 518 U.S. at 524 (internal quotation marks omitted). For an objective to be "important," it cannot stem from "overbroad generalizations about the different talents, capacities, or preferences of males and females." *Id*. at 533. The objective must also be "genuine." *Id*.

Second, the government must show that "the discriminatory means employed are substantially related to the achievement of those objectives." *Id*. at 524 (internal quotation marks omitted). Notably, neither element of the test requires a realized "problem"; it is always appropriate for legislatures to address issues that, as here, have been around for years or decades.

Importantly, this heightened standard does not mandate that all sex-based classifications must fail; rather, the "[p]hysical differences between men and women . . . are enduring" and render "the two sexes . . . not fungible." *Virginia*, 518 U.S. at 533 (cleaned up); *accord Tuan Anh Nguyen v. INS*, 533 U.S. 53, 68 (2001). Indeed, "[t]o fail to acknowledge even our most basic biological differences . . . risks making the guarantee of equal protection superficial, and so disserving it."

10

*Nguyen*, 533 U.S. at 73.   Accordingly, laws may (and should) acknowledge the physical differences between men and women, so long as such sex-based classifications do not "create or perpetuate the legal, social, and economic inferiority of women." *Virginia*, 518 U.S. at 534; *see, e.g.*, *Nguyen*, 533 U.S. 53 (upholding law requiring unmarried citizen fathers, but not mothers, to officially acknowledge relationship to foreign-born child in order to pass U.S. citizenship to such child because of biological differences between the sexes). In short, when applying this standard, the Supreme Court takes "into account actual differences between the sexes, including physical ones." *Clark v. Ariz. Interscholastic Ass'n.*, 695 F.2d 1126, 1129 (9th Cir. 1982) (citing *Michael M. v. Sonoma Cty. Superior Ct.*, 450 U.S. 464, 468-69 (1981)); *see Nguyen*, 533 U.S. at 73.

Section 25d satisifies intermediate scrutiny. It serves the important governmental objectives long recognized by many international athletic organizations, the SSAC, and Title IX (*see* 34 CFR § 106.41)—namely providing equal athletic opportunities to biological females and protecting the safety of biological female athletes.  By precluding all biological males—regardless of their gender identity—from competing on teams designated for biological females, Section 25d directly protects these interests.[12]

### 1.   The State's Interests Are Important.

The State's objectives have long been recognized by sports organizations, academic papers, experts, the federal government, and courts.  First, Plaintiff has conceded that the first interest—to provide equal athletic opportunities—is important.  Memorandum of Law at 20, ECF No. 19. It is well-established that "[t]here is no question" that "redressing past discrimination against women in athletics and promoting equality of athletic opportunity between the sexes" is "a legitimate and important governmental interest" justifying rules excluding males from female

---

[12] The law does not have an overly broad sweep. For example, it does not prohibit biological females from joining teams of biological males because that is not necessary to meet the governmental objectives.

sports. *Clark*, 695 F.2d at 1131.  Excluding males from female sports to "promote sex equality" and promote fair opportunities for female athletes is precisely what Section 25d does.  The federal government further recognized the governmental interest in 1972 by authorizing girls-only teams in its Title IX regulations.  *See* 34 CFR § 106.41(b).  West Virginia followed the federal government's long-standing view, stating: "[c]lassification of teams according to biological sex is necessary to promote equal athletic opportunities for the female sex."  W. Va. Code §18-2-25d(a)(5).

Federal regulations also recognize the govenmental interest in safety for female athletes by authorizing female-designated teams for "contact sports" including "boxing, wrestling, rugby, ice hockey, football, basketball and other sports the purpose or major activity of which involves bodily contact."  34 CFR § 106.41(b).  The SSAC's 2015 board policy also recognized the importance of "the safety of teammates or opposing players" in the context of separate female athletic teams.  *See* Dolan Dep. at 6.  And these are not "overbroad generalizations" regarding the female sex, but rather reflect "inherent differences" which "realistically reflect the fact that the sexes are not similarly situated" in the context of contact sports.  *See* W. Va. Code §18-2-25d(a)(2).

Dr. Chad Carlson, MD, FACSM, is the only expert in this case to have examined this safety issue.  He concluded that "[t]he science of sex-specific differences in physiology, intersecting with the physics of sports injury, leaves little doubt that participation by biological males in these types of girls' or women's sports, based on gender identity, creates significant additional risk of injury for the biologically female participants competing alongside these transgender athletes." Carlson Decl. at p. 2.  Further, the only international athletic organizations that examined this specific issue concur with Dr. Carlson's conclusions.  In 2020, World Rugby concluded that "there is currently no basis with which safety and fairness can be assured to

12

biologically female rugby players should they encounter contact situations with players whose biological male advantages persist to a large degree," and that, after puberty, "the lowering of testosterone removes only a small proportion of the documented biological differences." *Id*. Likewise, the UK Sports Council concluded, "[t]here are significant differences between the sexes which render direct competition between males and females . . . unsafe in sports which allow physical contact and collisions." *Id.* at 3. (citing UK Sports Councils' Equality Group Literature Review 2021 at 1.)"

### 2. Section 25d Is Substantially Related To The State's Interests.

Section 25d protects the State's important interests based on the well-known "innate physical differences between the sexes, rather than on generalizations that are 'archaic' or attitudes of romantic paternalism." *Clark I*, 695 F.2d at 1130 (cleaned up) (quoting *Petrie v. Ill. High Sch. Ass'n*, 394 N.E.2d 855, 862 (1979)).

### a. The Save Women's Sports Act Protects Equal Athletic Opportunities for Female Athletes.

Section 25d is designed to be, and is, substantially related to the important goal of ensuring equal opportunities for females in sports. As expressed by one of Plaintiff's experts, "gender identity itself is not a useful indicator of athletic performance." Ex. F, Safer Dep. 167:22-24 to 168:1. This is because the record shows that males notably outperform females in competitive sports such as track and field and other non-contact sports. It is an established physiological fact recognized by numerous courts, shown by performance data, and explained by well-known researchers. *See, e.g., Clark*, 695 F.2d at 1131 (noting that rule excluding boys from girls' team "is simply recognizing the physiological fact that males would have an undue advantage competing against women," and would diminish opportunities for females) and W. Va. Resp. at Ex. I, ECF

13

No. 49.  Allowing biological males to compete in female sports is unfair to biological females due to males' inherent physical advantages.

At virtually all levels of competition, "men, adolescent boys or male children, have an advantage over equally aged, gifted and trained women, adolescent girls or female children in almost all athletic events[.]"  Brown Decl. at 4. And the advantages are not subtle—numerous large studies bear this out.

The advantage starts well before puberty.  Males have an initial testosterone boost after birth.  At 0-5 months, males' testosterone levels exceed female levels by as much as 500 percent (Brown Decl. at ¶68), after which it levels off until puberty.  Indeed, "[r]esearch shows that sex-based discrepancies in lean muscle mass begin to be established from infancy, and persist through childhood to adolescence."  Carlson Decl. at ¶49 (citing studies).

Actual data from extensive international studies show that prepubertal biological boys consistently outperform girls in jumping, running, and upper body strength events, sometimes in drastic fashion.  Brown Decl. at ¶¶ 71-109.  In track and field events, the advantage of 11-year-old males ranges between 3.1% in short races (a winning advantage) to as much as 20.9% in the one mile run and 45% in 20 meter shuttle run (measured in stages). *See* Ex. H-1 (charting 12 studies, cumulatively involving tens of thousands of children).  Furthermore, the advantage starts as early as six years old.  Another study showed that, in the 20 meter shuttle run (laps completed), the advantage for average kids (i.e., in the 50th percentile) ranged from 16.7% for six-year-olds to 38.5% for eleven-year-olds.  Brown Decl. at ¶78; *see also* Tambalis 2015 study cited in Brown Decl. at ¶76 and Ex. H-4 (showing 12-38% advantage in shuttle run, depending on age).  Another broad-based study showed that, in the one-mile run (1.6 km), the male advantage in the 50th percentile ranged from 14.3% for nine-year-olds to 14.7% for eleven-year-olds.  Brown Decl. at

¶83. For 12 through 17 year-olds, the percentages went from 15.7% to 27.5%. *Id* at ¶83. U.S. data from Athletic.net show similar advantages; nationally, average males have an advantage in the one-mile run of 4.5% at age 6, 17.3% at age 11, and 31.8% at age 17. *See Id.* at ¶103 and App. 1 thereto.

Actual data for West Virginia middle schoolers (like the Plaintiff) further shows that 6th grade (approximately 11 years old) West Virginia boys (top ten finishers) bested girls by an average of 11.5% in the one mile run and 8.1% in the two mile run. *Id*. at ¶104 (pp. 34-35) and Ex. H-2 hereto. Nationally, the numbers for similar-aged children are even higher. *Id*. at Appx.1. In B.P.J.'s preferred sport of cross country, nationally 6th grade males outperformed females by 5.8%. *Id*. at Appx. 1, k. In fact, across nearly all sports with available data, six to eleven year old prepubescent boys outperform the same age girls by significant margins. Brown Decl. at ¶¶71-109. After puberty the advantage is even more drastic. Brown Decl. at ¶¶110-118 and Appx. 1 thereto. For example, in the one-mile run, average 17-year-old males outperform average 17-year-old females by 31.8%. *Id.*, Appx. At p.(i).

The evidence is overwhelming: Biological males have an athletic advantage over biological females. Plaintiff's experts have claimed that this can be eliminated via puberty blockers and hormone treatments. But there is no performance data to support this assertion. In fact, the opposite is true.

Testosterone suppression may reduce male advantages, but the existing studies "report that testosterone suppression for a full year (and in some cases much longer) does not come close to eliminating male advantages in strength (hand grip, leg strength, and arm strength) or running speed." Brown Decl. at ¶122; *see generally id*. at ¶¶122-174. One longitudinal study showed that two years of testosterone suppression slightly reduced the male advantage in a 1.5 mile run from

21% to 12%.  *Id.* at ¶134 and Ex. H-3 (chart).  But a 12% advantage remains a massive performance advantage.

Even Plaintiff's expert, Dr. Safer, relies on a source, which confirms that reducing circulating testosterone does not eliminate the male athletic advantage:

> The striking male postpubertal increase in circulating testosterone provides a *major, ongoing, cumulative, and durable physical advantage* in sporting contests by creating larger and stronger bones, greater muscle mass and strength, and higher circulating hemoglobin as well as possible psychological (behavioral) differences. In concert, these render women, on average, unable to compete effectively against men in power-based or endurance-based sports.

David J. Handelsman et al., *Circulating testosterone as the hormonal basis of sex differences in athletic performance*, 39 ENDOCRINE REVIEWS 803, 805 (2018), *available at* https://bit.ly/37w4v2i ("Handelsman Paper"). (cited in Shafer Decl. at ¶ 25, Motion, ECF No. 2-1) (emphasis added).

Finally, while anecdotes are not as conclusive as studies, they are illustrative.  In 2016 and 2017, NCAA athlete Cece Tefler competed as a male in several track events and was ranked 200th and 390th, respectively.  After one year of testosterone suppression, Cece Tefler competed as a female and dominated when competing in an event.  The fact that Tefler's race times as a female were nearly identical to those when competing as a male, Brown Decl. at ¶¶135-137, bears out the scientific data regarding the advantage of males.

Even assuming, contra-factually, that testosterone suppression could *eliminate* the male advantages, Section 25d would still meet the "substantial relationship" element of the Equal Protection Clause test.  As the Supreme Court has made clear in applying intermediate scrutiny, the fact that athletic opportunities might be equalized through other means or by other measures is of no constitutional consequence. *Nguyen*, 533 U.S. at 70. Put another way, the existence of even "wiser alternatives than the one chosen does not serve to invalidate the policy [of excluding males from female sports] since it is substantially related to the goal" of providing fair and equal

opportunities for females to participate in athletics. *Clark*, 695 F.2d at 1132. Demanding that the statute provide an exact solution as to every plaintiff that brings an as-applied challenge would effectively disregard intermediate scrutiny by improperly demanding a perfect fit between the sex-based classification and the government interest at issue. Intermediate scrutiny requires that the "fit between the challenged regulation and the asserted objective be reasonable, *not perfect*." *United States v. Staten*, 666 F.3d 154, 162 (4th Cir. 2011) (emphasis added).

Thus, the actual evidence shows that the Save Women's Sports Act's requirement that only biological females may participate on female teams is based on science, and that it is substantially related to the important governmental objective of ensuring equal athletic opportunities for females.

### b. The Save Women's Sports Act Protects Female Athlete's Safety.

A second governmental interest supporting the Save Women's Sports Act is the fundamental interest in the safety of girls and women in contact sports. That interest is implicit in the Title IX sports regulations, is recognized by World Rugby and UK Sports (*see* Carlson Decl. at pp. 1-3) and, here in West Virginia, by SSAC. And it is self evident in the very nature of contact sports.

Section 25d is designed to protect female athletes from physical injuries. The biological sex classification is substantially related to that purpose, and the scientific evidence supports that classification. Dr. Chad Carlson is a medical doctor practicing in sports medicine and has extensive qualifications in this area of medicine. *See* Carlson Decl. He fully documents the science behind what is "self-evident to most people familiar with sports injuries that if men and women were to participate together in competitive contact sports, there would be higher rates of injury in women." Id. at ¶24. The West Virginia Legislature is just as familiar with this common-sense observation as anyone observing men's and women's contact sports. *See Billups*

*v. City of Charleston, S.C.,* 961 F.3d 673, 685 (4th Cir. 2020) (governments can use "common sense" to establish a governmental interest).

Athletes are often grouped together in "a pool of individuals with predictable commonalities." Carlson Decl. at ¶22. "[T]here are statistical differences between sexes when it comes to [variables related to causes of injuries] meaning that in a collision sport where skeletally mature males and females are playing against one another there is a higher statistical likelihood that injury will result when collisions occur, and in particular there is a higher likelihood that a female will suffer injury." *Id*. at ¶25. Physics can help understand and predict sports injuries. *Id* at ¶¶29-41. "[W]hat appear to be minor discrepancies in size and speed" between males and females can cause "more frequent and more severe injuries." *Id.* at ¶33. In more technical terms, the "increase in kinetic energy, and therefore imparted forces resulting from collision with larger, faster players" can be "profound." *Id.* at ¶41 (internal citation omitted). Indeed, "[i]t is an inescapable fact of the human species that males as a group are statistically larger and heavier than females." *Id.* at ¶43. They are bigger, stronger, taller, and faster. *Id*. at ¶¶44-46. They throw, punch, and kick harder. *Id*. at ¶¶47-56. These advantages translate into not only male performance advantages in contact sports, but also into increased dangers to biological females if they compete on the same teams or against one another.

Biological females are also inherently more susceptible to injury than biological males. *Id*. at ¶¶57-66. While one might think this relates only to high school and college, it in fact also applies to middle schoolers. *Id*. at ¶57. The news media and schools have often recognized the dangers of concussions in football. But female concussions in soccer, volleyball, basketball, and softball/baseball are much higher than for males. Overall, concussion rates among NCAA female collegiate athletes is "40% higher than that of males." *Id*. at 61. Given that biological

females have higher rates of concussive injury when competing against one another, "[t]he addition of biologically male athletes into women's contact sports will inevitably increase the risk of concussive injury to girls and women." *Id*. at ¶69. Since concussions can cause severe and long lasting harm, the State must be particularly vigilant of female athletes' safety.

Finally, Anterior Cruciate Ligament ("ACL") injuries are a common problem for athletes, especially in some contact sports. Female athletes are "far more vulnerable to ACL injuries" than males. *Id*. at 70, and *generally* at ¶¶70-78. The introduction of male athletes into female arenas can only increase the potential for such injuries.

Some assert that "hormonal manipulation of a male athlete can feminize the athlete enough that he is comparable with females" for these purposes (*Id*. at ¶80), but "none of the relevant transgender eligibility policies [of sports organizations]. . . requires any demonstration that it has actually achieved that effect[.]" *Id*. at ¶81. "In fact, the relevant evidence strongly indicates that no amount of testosterone suppression can eliminate male physiological advantages relevant to performance and safety". *Id*. at ¶83, and *generally* ¶¶79-97. Some sports organizations claim to level the field by requiring transwomen to have a circulating testosterone level of either 5 or 10 nmol/L. But, that is still five to ten times the typical biological females' level of 0.06 to 1.68 nmol/L. *See id*. at ¶81. In any event, "sex-based discrepancies in lean muscle mass begin to be established from infancy, and persist through childhood to adolescence." *Id*. at ¶49 (citing studies). After puberty, testosterone suppression does not "materially shrink bones so as to eliminate height, leverage, performance and weight differences[.]" *Id*. at ¶89.

Organizational data is limited but tilts in a common direction. The NCAA is apparently "not monitoring and documenting instances of transgender participation on women's teams for

purposes of injury reporting." *Id*. at ¶85.  The only organizations that actually have examined the safety of biological women in the debate over transfemale athletes in female sports have determined that it is not safe to have transfemales on female designated teams. *See id*. at ¶¶94 and 86, citing World Rugby and UK Sport.[13]

Because the participation of transgender females in contact sports is relatively new, there have not been wide scale studies of resulting injuries.  However, the reported incidents are illustrative.  For example, transfemale mixed-martial arts fighter Fallon Fox fought biological woman Tamikka Bretts and broke Tamikka's eye socket.  Tamikka, an unusually strong women in her own right, "never felt so overpowered" by any other woman.  Carlson Decl. at ¶47.

While Plaintiff's endocrinologist experts theorize that simply depressing circulating testosterone might equalize the sexes in performance, they make no claim that it will eliminate the safety risks to girls and women in contact sports.  Moreover, Plaintiff has no studies or sports medical experts that support such a claim.

In any event, governments need not await injury before acting, particularly when injury can be anticipated and prevented.  This issue has been present in sports for over four decades, but now that the number of children and youth identifying as transgender has shot up to over 100 times historical rates (Carlson Decl. at p.59), the Legislature can reasonably act now—the Constitution does not require waiting for more data or actual injuries to West Virginia student-athletes.  As Dr. Carlson—the only expert in this case knowledgeable about sports injuries—explains: "policymakers have an important and pressing duty not to wait while avoidable injuries are inflicted on girls and women, but instead to proactively establish policies governing

---

[13] While girls and women may voluntarily subject themselves to some such risk if they choose to participate in co-ed contact sports, the West Virginia Legislature reasonably concluded that participation in female-designated contact sports should not result in having to confront such risk.

participation of biological males in female athletics that give proper and scientifically-based priority to safety in sport for these girls and women. Separating participants . . . promotes the safety of female athletes by protecting them from predictable and preventable injury." *Id*. at p.59. That is exactly what West Virginia has done, using a classification that is "substantially related to the achievement of those objectives." *Virginia*, 518 U.S. 524. Accordingly, Section 25d meets the constitutional requirements under the Equal Protection Clause.

### c. Plaintiff's As Applied Challenge Also Fails.

As discussed above, on average, male athletes such as B.P.J. do have an inherent physical advantage over equally aged, gifted, and trained females. This even applies to prepubertal biological males identifying as females, such as B.P.J. Theoretical arguments that puberty blockers prevent or eliminate this advantage, or that only circulating testosterone affects athletic performance, are only theories, and there is no performance data to support those theories. The existing data (Section B.2.a.) actually show otherwise.

As-applied challenges to laws based on the Equal Protection Clause can succeed only if the law violates the Constitution "in discrete and well-defined instances." *Gonzales v. Carhart*, 550 U.S. 124, 167 (2007). At the preliminary injunction stage, the Court relied on Plaintiff's experts' claims that "there is a medical consensus that the difference in testosterone is generally the primary known driver of differences in athletic performance between elite male athletes and elite female athletes." Memorandum Opinion & Order at 10, ECF No. 67. But the fact that prepubescent biological boys have a significant performance advantage over prepubescent biological girls refutes this claim. *See supra* Section B.2.a. Moreover, at the preliminary injunction stage, it was anticipated that B.P.J. would not displace any biological females, thus suggesting that Section 25d need not apply to B.P.J.'s situation. In fact, the results have shown the contrary. The team roster for girls' cross country at Plaintiff's school was long enough that

21

everyone who tried out made the team, including B.P.J.  However, at cross country events, B.P.J. did beat other biological females, taking from them the placements and rankings that they otherwise would have had in those races.

B.P.J., as a biological male, had a statistically unfair advantage over the biological girls on the cross country team and at cross country events.  The fact that B.P.J. was not able to beat all the biological girls is of no moment; B.P.J. did beat, and therefore did displace, some of them. The government has a compelling interest in providing equal opportunities to all biological females and the law is substantially related to that purpose.  Accordingly, the Court should find the law passes constitutional muster on an as applied basis.

### 3.   C.  Plaintiff's Title IX Claim Fails.

Section 25d does not exclude the Plaintiff or any other biological male, whether identifying as male or female, from school athletics.  To the contrary, it simply designates on which team they shall play.  This is consistent with, and supports the purposes of, Title IX.

As discussed above, on average, male athletes do have an inherent physical advantage over equally aged, gifted, and trained females.  Plaintiff's experts' theoretical argument that only circulating testosterone affects athletic performance fail to provide any performance data to contradict the data from not only West Virginia and the United States overall, but also data from all over the planet.  That data shows that even prepubertal males have a significant athletic advantage, irrespective of circulating testosterone.  A male with a female identity does not lose that inherent advantage.  Accordingly, both prepubertal and postpubertal males who identify as females are more similarly situated to similarly aged males identifying as males than biological females.

Title IX *requires* some different treatment between the biological sexes.  *See* 34 § CFR 106.41(b).  It does not prohibit or even address different treatment based on gender identity.  So

not only does Section 25d not violate Title IX, the law strengthens the goals of Title IX in West Virginia.

### 1. The Purposes And Achievements Of Title IX.

Title IX was designed to eliminate significant "discrimination against women in education." *Neal v. Bd. of Trs. of Cal. State Univs.*, 198 F.3d 763, 766 (9th Cir. 1999) (citing *N. Haven Bd. of Educ. v. Bell*, 456 U.S. 512, 523-24 & n.13 (1982)).  It mandates that no person "shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any education program or activity receiving Federal financial assistance." 20 U.S.C. § 1681(a).

In 1975, at Congress's express direction, the executive branch promulgated implementing regulations for Title IX.  Those regulations declare that "[n]o person shall, on the basis of sex, be excluded from participation in, be denied the benefits of, be treated differently from another person or otherwise be discriminated against in any interscholastic, intercollegiate, club or intramural athletics offered by a recipient, and no recipient shall provide any such athletics separately on such basis." 34 C.F.R. § 106.41(a). Like the text of Title IX itself, the regulation is sex-neutral on its face, but "it would require blinders to ignore that the motivation for the promulgation of the regulation" was to increase opportunities for women and girls. *Williams v. Sch. Dist. of Bethlehem*, 998 F.2d 168, 175 (3d Cir. 1993).

The regulation—"notwithstanding" the requirement of 106.41(a)—then authorizes "separate teams for members of each sex where selection for such teams is based upon competitive skill or the activity involved is a contact sport." 34 C.F.R. § 106.41(b).  And § 106.41(c) requires that all subject entities "shall provide equal athletic opportunity for members of both sexes." The factors to consider in determining whether equal opportunities are available include whether the program provides "levels of competition" that "effectively accommodate the . . . abilities of

23

members of *both* sexes," and whether the program provides equal opportunities for public recognition or "publicity" to *both* sexes. *Id.*, §§ 106.41(c)(1), (10) (emphases added).

Thus, Title IX is different from the civil rights statutes that are concerned with race, such as Title VI and VII, and the decisions interpreting those statutes. Indeed, the U.S. Department of Education's Office of Civil Rights in a 1996 "Dear Colleague" letter accompanying a formal "Clarification of Intercollegiate Athletics Policy Guidance: The Three-Part Test" (the "1996 Clarification"), noted that Title IX is "unique" in this respect and in "contrast" to Title VI, which would prohibit without exception "separate athletic programs on the basis of race or national origin."[14] Indeed, the Supreme Court has also recognized that Title IX is different than Title VII. *Bostock*, 590 U.S. at ___, 140 S. Ct. at 1753.[15]

Before the enactment of Title IX in 1972, schools often emphasized boys' athletic programs "to the exclusion of girls' athletic programs," *Williams*, 998 F.2d at 175, and vastly fewer girls participated in competitive interscholastic athletics than boys. Title IX has been strikingly successful in changing this. "For example, between 1972 and 2011, girls' participation in high school athletics increased from approximately 250,000 to 3.25 million students."[16] Title IX is regularly given substantial credit for this sea change. *E.g., Neal*, 198 F.3d at 773.

---

[14] Letter from Norma V. Cantu, Assistant Sec'y for Civ. Rts., to Colleagues (Jan. 16, 1996), *available at* https://www2.ed.gov/about/offices/list/ocr/docs/clarific.html. The Second Circuit has found the 1996 Clarification is "entitled to substantial deference under *Auer v. Robbins*, [519 U.S. 452, 461 (1997)]." *Biediger v. Quinnipiac University*, 691 F.3d 85, 97 (2d Cir. 2012) (citation omitted).

[15] *See also* Memorandum from Reed D. Rubinstein, Principal Deputy Gen. Couns., for Kimberly M. Richey, Acting Assistant Sec'y of the Off. For Civ. Rts. (Jan. 8, 2021), *available at* https://www2.ed.gov/about/offices/list/ocr/correspondence/other/ogc-memorandum-01082021.pdf?utm_content=&utm_medium=email&utm_name=&utm_source=govdelivery&utm_term=.

[16] U.S. Dep't of Educ., Office of Civ. Rts., Protecting Civil Rights, Advancing Equity: Report to the President and Secretary of Education, Under Section 203(b)(1) of the Department of Education Organization Act, FY 13-14 33 (2015), *available at* https://www2.ed.gov/about/reports/annual/ocr/report-to-president-and-secretary-of-education-2013-14.pdf.

### 2. "Sex" Under Title IX Means Biological Sex.

As the historical agency interpretations, implementing regulations, and controlling case law establish, the term "sex" in this context can only reasonably be understood to mean biological sex—not the person's internal sense of being male or female, or their outward presentation of that internally felt sense (sometimes referenced as "gender identity").

Title IX uses the term "sex." The interpretive regulations use the term "sex" to mean the two biological sexes, male and female. *See e.g.* 34 C.F.R. § 106.41(c) (recipients "shall provide equal athletic opportunity for members of *both* sexes") (emphasis added). The ordinary meaning of "both" connotes two.

Even the Supreme Court has consistently recognized the term to identify *only two* sexes— male and female. *Bostock*, 590 U.S. at ___, 140 S. Ct. at 1739 (proceeding on the assumption that at the time of Title VII's passage, the term sex "referr[ed] only to biological distinctions between male and female" and did not include "norms concerning gender identity"); *see, also, Frontiero v. Richardson*, 411 U.S. 677, 686 (1973) (plurality opinion) ("[S]ex, like race and national origin, is an immutable characteristic determined solely by the accident of birth."); 34 CFR §§ 106.32(b)(1), 106.33, 106.34, 106.40, 106.41, 106.43, 106.52, 106.59, 106.61.  Contrary to the statute's and regulation's plain language—which Plaintiff does not challenge—Plaintiff asserts at least four "genders" or "gender identities." Dr. Kidd, Plaintiff's current medical doctor, asserts that there are in excess of 27 genders, perhaps as many as 100. Ex. I, Kidd Dep. at pp. 63:23- 64:4. Plaintiff's position that a student-athlete should be permitted to participate on a team consistent with the athlete's gender identity rather than biological sex creates a conundrum for schools facing this vast array of gender identities. On which team should biological male athletes identifying as nonbinary, bi-gender, agender, nongender, gray gender, etc. participate? Is it whichever team that athlete chooses at any particular time? *Bostock* continued this understanding that the ordinary public

meaning of the term "sex" in Title VII means biological distinctions between male and female. 590 U.S. at ___, 140 S. Ct. at 1738-39. This is consistent with, and further supports, the long-standing and unchallenged agency construction of the term "sex" in Title IX to mean *biological* sex, male or female.

Thus, contrary to suggestions that the State created its own definition of "sex," the Legislature relied on the commonly accepted definition of the word "sex" as referring to the physiological differences between biological males and females, including medical definitions, statutory and regulatory meanings, and controlling caselaw from the Supreme Court. *See also* pp. 6-7, *supra*. Any other reading would impede the purposes of Title IX because sex—not gender identity—governs physiological athletic ability.

### 3. Section 25d furthers, not violates, Title IX.

With this background, nothing in Section 25d is contrary to Title IX or its implementing regulations. Plaintiff accepts that Title IX authorizes sports teams separated by sex. Because this separation exists, Plaintiff seeks to join the separate female teams. But the implementation of Plaintiff's position would allow biological males to participate on teams contrary to the very basis for the separation. Bridgeport Middle maintains sex-separated cross-country and track teams, and under Section 25d, Plaintiff would be entitled to join the boys' teams. But requiring the school to allow Plaintiff, a biological male who identifies as female, to join the female team compromises the separation of athletics as explicitly authorized by Title IX and its implementing regulations—which again, go unchallenged here.

It has long been recognized in law that biological females and biological males are different in ways that are relevant to athletics because of physiological differences between males and females. *See Virginia*, 518 U.S. at 533. The Ninth Circuit, ruling against a boy's challenge to a high school policy excluding males from participating on the girls' volleyball team, affirmed that

the exclusion of boys was necessary to secure equal opportunity and treatment for female athletes. *See Clark*, 695 F.2d 1126. It found it a "physiological fact" that "males would have an undue advantage competing against women," and that the evidence was clear that "due to average physiological differences, males would displace females to a substantial extent if they were allowed to compete for positions" on the women's team. *Id*. at 1131. The result would be that "athletic opportunities for women would be diminished." *Id*.; *see also Williams*, 998 F.2d at 178.

The holding of *Grimm*, while controlling authority as to school bathroom usage for a specific student, does not apply here. *Grimm* does not interpret Title IX or its implementing regulations as they relate to athletics. Those regulations are separate and different from other Title IX provisions. In fact, *Grimm* is explicitly "limited to how school bathroom policies implicate the rights of transgender students who 'consistently, persistently, and insistently' express a binary gender." *Grimm*, 972 F.3d at 596. Moreover, *Grimm* determined that the bathroom policy, as applied to the transmale plaintiff, was not substantially related to *the governmental interest of privacy* because plaintiff Grimm, a high school student, had "physical features commonly associated with the male sex" such as facial hair, no breasts, and a deepened voice. *Id*. at 621 (Wynn J. Concurring). While changing physical appearance may ameliorate privacy concerns in properly re-configured bathrooms (as the school district had done), the State has established that identifying as female, even if accompanied by puberty blockers or hormone treatment, does not eliminate male performance advantages or safety concerns. *See supra* Section B.

Moreover, *Bostock* and other Supreme Court decisions control on this issue, absent a clear and more specific direction from the Fourth Circuit, which simply does not appear in *Grimm*. Under *Bostock* and the controlling regulations, Section 25d *does* treat similarly situated people the same. As noted, Title IX athletic regulations contemplate two sexes based on *biological* sex. It

27

does not contemplate segregating sports based on over 27 genders (*see* Kidd Dep. at pp. 63-64) or on athletes whose "gender identity" either changes or whose understanding of gender "can change over time." *See* Janssen Dep. at pp. 46-51.   Athletic teams are separated into male and female athletes. The statute, the regulations, and all relevant circuit court decisions consistently look at this based on *biological* sex, which is precisely what Section 25d does.

Accordingly, under Title IX and its implementing regulations as currently written and interpreted—which Plaintiff *does not* challenge—schools *must* consider students' biological sex when determining whether male and female student athletes have equal opportunities to participate. *McCormick v. School Dist. of Mamaroneck*, 370 F.3d 275, 287 (2d Cir. 2004).

Ultimately, Plaintiff seeks to have the State (and most other Defendants) discriminate on the basis of gender identity, thereby redefining eligibility for participation in women's sports.  By defining such eligibility on the basis of biological sex, however, Section 25d disregards gender identity, thus not discriminating "on the basis" of it.  There is no Title IX violation here.[17]

## CONCLUSION

The State of West Virginia is entitled to summary judgement on both of Plaintiff's causes of action.

> Respectfully submitted,
>
> By counsel,
> PATRICK MORRISEY
>   *West Virginia Attorney General*
>
> /s/ *Curtis R. A. Capehart*
> Douglas P. Buffington II (WV Bar # 8157)
>   *Chief Deputy Attorney General*

---

[20] From the enactment of the Title IX women's athletics regulations until as late as January 2021, the U.S. Department of Education and the Department of Justice have repeatedly taken a position consistent with that set forth in Section 25d, both before and after *Bostock*. *See supra* notes 14 & 15; *see also* Statement of Interest of the United States, *Soule v. Conn Ass'n of Schs.*, 3:20-cv-00201 (D. Conn. Mar. 24, 2020), ECF No. 75; Br. of United States as Amicus Curiae, *Hecox v. Little,* No. 20-35813 (9th Cir. Nov. 19, 2020), ECF No. 45. Thus, the United States' Statement of Interest in this case contradicts its long-held view without subjecting this new interpretation to public review and comment.

Curtis R.A. Capehart (WV Bar # 9876)
  *Deputy Attorney General*
David C. Tryon (WV Bar #14145)
  *Deputy Solicitor General*
OFFICE OF THE WEST VIRGINIA ATTORNEY
GENERAL
State Capitol Complex
1900 Kanawha Blvd. E, Building 1, Room E-26
Charleston, WV 25305-0220
Telephone: (304) 558-2021
Facsimile: (304) 558-0140
Email:  David.C.Tryon@wvago.gov

*Counsel for Plaintiff, STATE OF WEST VIRGINIA*

DATE: April 21, 2022

**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA
CHARLESTON DIVISION**

**B. P. J., by her next friend and mother,**

**HEATHER JACKSON,**

     **Plaintiff,**

**v.**                                                  **CIVIL ACTION NO. 2:21-cv-00316**

                                                       **Judge Joseph R. Goodwin**

**WEST VIRGINIA STATE BOARD OF
EDUCATION, HARRISON COUNTY
BOARD OF EDUCATION, WEST VIRGINIA
SECONDARY SCHOOL ACTIVITIES
COMMISSION, W. CLAYTON BURCH, in
his official Capacity as State Superintendent,
DORA STUTLER, in her official capacity as
Harrison County Superintendent, and THE
STATE OF WEST VIRGINIA BOARD OF
EDUCATION, et al.,**

     **Defendants.**

**and LAINEY ARMISTEAD,**

     **Intervenor Defendant.**

## CERTIFICATE OF SERVICE

    I hereby certify that, on this 21st day of April, I electronically filed the foregoing "Defendant State of West Virginia's Motion for Summary Judgment" with the Clerk of Court and all parties using the CM/ECF System.


                                      */s/ Curtis R. A. Capehart*

                                      Curtis R. A. Capehart