IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA
CHARLESTON DIVISION

| | |
|---|---|
| B.P.J., by her next friend and mother, HEATHER JACKSON<br><br>*Plaintiff,*<br><br>   v.<br><br>WEST VIRGINIA STATE BOARD OF EDUCATION, HARRISON COUNTY BOARD OF EDUCATION, WEST VIRGINIA SECONDARY SCHOOL ACTIVITIES COMMISSION, W. CLAYTON BURCH in his official capacity as State Superintendent, DORA STUTLER in her official capacity as Harrison County Superintendent, and THE STATE OF WEST VIRGINIA<br><br>*Defendants,*<br><br>   and<br><br>LAINEY ARMISTEAD<br><br>*Defendant-Intervenor.* | Case No. 2:21-cv-00316<br><br>Hon. Joseph R. Goodwin<br><br>Oral Argument Requested |

**DEFENDANT-INTERVENOR'S MEMORANDUM IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT**

# TABLE OF CONTENTS

Table of Authorities ....................................................................................... iii

Introduction ...................................................................................................... 1

Summary Statement of Facts ........................................................................... 2

Argument .......................................................................................................... 7

    I.  The Act does not violate Equal Protection ........................................... 7

        A.  The Act draws permissible distinctions based on sex because biological sex matters in sports. ............................................... 7

        B.  The Act protects only biological females from competition against males because sex matters in sports while gender identity does not. . 10

        C.  West Virgina can constitutionally apply the Act to B.P.J. no matter B.P.J.'s physiology or gender identity or medical history. .................. 15

        D.  Because sex distinctions are valid in the sports context, *Grimm* doesn't apply. ...................................................................... 18

        E.  The Act was not passed for an invidious discriminatory purpose. ..... 19

    II.  The Act does not violate Title IX. ..................................................... 22

        A.  Title IX deals with sex, not gender identity. ....................................... 22

        B.  *Grimm* does not change Title IX's meaning........................................ 24

        C.  The Act can exclude B.P.J. from girls' sports, because B.P.J. is not similarly situated to females in the context of sports.......................... 25

        D.  Title IX sometimes requires sex-separated teams to accommodate the physiological differences between men and women............................. 26

Conclusion...................................................................................................... 27

Certificate of Service..................................................................................... 30

TABLE OF AUTHORITIES

**Cases**

*Austin v. Berryman,*
    955 F.2d 223 (4th Cir. 1992) ........................................................................ 20

*Bauer v. Lynch,*
    812 F.3d 340 (4th Cir. 2016) ........................................................................ 25

*Billups v. City of Charleston,*
    961 F.3d 673 (4th Cir. 2020) .......................................................................... 8

*Bonidy v. U.S. Postal Service,*
    790 F.3d 1121 (10th Cir. 2015) .................................................................... 17

*Bostock v. Clayton County,*
    140 S. Ct. 1731 (2020) ...................................................................... 22, 24, 25

*Bray v. Alexandria Women's Health Clinic,*
    506 U.S. 263 (1993) ........................................................................ 19, 20, 21

*Bucklew v. Precythe,*
    139 S. Ct. 1112 (2019) ................................................................................ 16

*Califano v. Boles,*
    443 U.S. 282 (1979) ...................................................................................... 7

*Califano v. Jobst,*
    434 U.S. 47 (1977) ...................................................................................... 15

*Cape v. Tennessee Secondary School Athletic Association,*
    563 F.2d 793 (6th Cir. 1977) .......................................................................... 8

*City of Cleburne, Texas v. Cleburne Living Center,*
    473 U.S. 432 (1985) .................................................................................... 21

*City of Renton v. Playtime Theatres, Inc.,*
    475 U.S. 41 (1986) ........................................................................................ 4

*Clark, By & Through Clark v. Arizona Interscholastic Association,*
    886 F.2d 1191 (9th Cir. 1989) ...................................................................... 11

*Clark, By and Through Clark v. Arizona Interscholastic Association,*
    695 F.2d 1126 (9th Cir. 1982) ............................................................. *passim*

*Craig v. Boren,*
    429 U.S. 190 (1976) .................................................................................... 11

*Doe 2 v. Shanahan,*
    917 F.3d 694 (D.C. Cir. 2019) .................................................................... 21

*Doe ex rel. Doe v. Boyertown Area School District,*
    897 F.3d 518 (3d Cir. 2018) .......................................................................... 1

*Eline v. Town of Ocean City,*
  7 F.4th 214 (4th Cir. 2021) ........................................................................ 10

*Engquist v. Oregon Department of Agriculture,*
  553 U.S. 591 (2008) ..................................................................................... 7

*Frontiero v. Richardson,*
  411 U.S. 677 (1973) ................................................................................ 1, 22

*Geduldig v. Aiello,*
  417 U.S. 484 (1974) ................................................................................... 20

*Gregor v. West Virginia Secondary School Activities Commission,*
  No. 2:20-cv-00654, 2020 WL 5997057 (S.D. W. Va. Oct. 9, 2020) ................. 25

*Grimm v. Gloucester County School Board,*
  972 F.3d 586 (4th Cir. 2020) ................................................................ *passim*

*H.B. Rowe Company v. Tippett,*
  615 F.3d 233 (4th Cir. 2010) ...................................................................... 14

*Harley v. Wilkinson,*
  988 F.3d 766 (4th Cir. 2021) ................................................................. 15, 17

*Hecox v. Little,*
  479 F. Supp. 3d 930 (D. Idaho 2020) ........................................................... 3

*Horner v. Kentucky High School Athletic Association,*
  43 F.3d 265 (6th Cir. 1994) ........................................................................ 26

*Imaginary Images, Inc. v. Evans,*
  612 F.3d 736 (4th Cir. 2010) ........................................................................ 4

*Knussman v. Maryland,*
  272 F.3d 625 (4th Cir. 2001) ...................................................................... 19

*Kolbe v. Hogan,*
  849 F.3d 114 (4th Cir. 2017) ........................................................... 10, 14, 16

*Mansourian v. Regents of University of California,*
  602 F.3d 957 (9th Cir. 2010) ...................................................................... 27

*McCormick ex rel. McCormick v. School District of Mamaroneck,*
  370 F.3d 275 (2d Cir. 2004) ....................................................................... 26

*Miami University Wrestling Club v. Miami University,*
  302 F.3d 608 (6th Cir. 2002) ...................................................................... 27

*Michael M. v. Superior Court of Sonoma County,*
  450 U.S. 464 (1981) ................................................................................. 8, 21

*Mississippi University for Women v. Hogan,*
  458 U.S. 718 (1982) ................................................................................. 8, 19

iv

*Neal v. Board of Trustees of California State Universities,*
    198 F.3d 763 (9th Cir. 1999) ............................................................................. 26

*O'Connor v. Board of Education of School District* 23,
    449 U.S. 1301 (1980) ....................................................................................... 15

*O'Connor v. Board of Education of School District No. 23,*
    645 F.2d 578 (7th Cir. 1981) ........................................................................... 16

*Personnel Administrator of Massachusetts v. Feeney,*
    442 U.S. 256 (1979) .......................................................................... 15, 19, 20, 21

*Petrie v. Illinois High School Association,*
    394 N.E.2d 855 (1979) ............................................................................... *passim*

*Plyler v. Doe,*
    457 U.S. 202 (1982) ......................................................................................... 10

*S&M Brands, Inc. v. Georgia ex rel. Carr,*
    925 F.3d 1198 (11th Cir. 2019) ....................................................................... 14

*Sandifer v. U.S. Steel Corporation,*
    571 U.S. 220 (2014) ......................................................................................... 22

*Sansotta v. Town of Nags Head,*
    724 F.3d 53 (4th Cir. 2013) ............................................................................... 7

*Tuan Anh Nguyen v. I.N.S.,*
    533 U.S. 53 (2001) .................................................................................... *passim*

*United States v. Chapman,*
    666 F.3d 220 (4th Cir. 2012) ........................................................................... 16

*United States v. Staten,*
    666 F.3d 154 (4th Cir. 2011) ..................................................................... 16, 17

*United States v. Timms,*
    664 F.3d 436 (4th Cir. 2012) ........................................................................... 15

*United States v. Virginia,*
    518 U.S. 515 (1996) ................................................................................. 1, 7, 19

*Van Der Linde Housing, Inc. v. Rivanna Solid Waste Authority,*
    507 F.3d 290 (4th Cir. 2007) ..................................................................... 10, 11

*Williams v. School District of Bethlehem,*
    998 F.2d 168 (3d Cir. 1993) ...................................................................... 15, 27

*Yellow Springs Exempted Village School District Board of Education v. Ohio*
    *High School Athletic Association,*
    647 F.2d 651 (6th Cir. 1981) ........................................................................... 24

## Statutes

20 U.S.C. § 1681 .................................................................................... 22, 23

W. Va. Code § 18-2-25d ...................................................................... *passim*

## Other Authorities

2010 NCAA Policy on Transgender Student-Athlete Participation,
   https://ncaaorg.s3.amazonaws.com/inclusion/lgbtq/INC_TransgenderStu
   dentAthleteParticipationPolicy.pdf ................................................................ 4

Chuck Culpepper, *New Zealand weightlifter Laurel Hubbard makes Olympic
   history as a transgender athlete*, Wash. Post (Aug. 2, 2021)
   https://www.washingtonpost.com/sports/olympics/2021/08/02/laurel-
   hubbard-transgender-olympics-weightlifter/ ...................................... 4

Doriane Lambelet Coleman, et al., *Re-Affirming the Value of the Sports
   Exception to Title IX's General Non-Discrimination Rule*, 27 Duke J.
   Gender L. & Pol'y 69, 81–82 (2020) ............................................ 23

International Olympic Committee, *Tokyo 2020 Swimming Women's 1500M
   Freestyle Results*, https://olympics.com/en/olympic-games/tokyo-
   2020/results/swimming/women-s-1500m-freestyle ............................ 4

International Olympic Committee, *Tokyo 2020 Swimming Women's 400M
   Individual Medley Results*, https://olympics.com/en/olympic-
   games/tokyo-2020/results/swimming/women-s-400m-individual-medley ........ 3

NCAA, *NCAA Transgender Student-Athlete Participation Policy*,
   https://www.ncaa.org/sports/2022/1/27/transgender-participation-
   policy.aspx ................................................................................ 13

*Sex,* WEBSTER'S NEW INTERNATIONAL DICTIONARY (3d ed. 1968) .............................. 22

*Transgender Track Star Stirs Controversy Competing In Alaska's Girls' State
   Meet Championships*, CBSNews.com (June 8, 2016)
   https://www.cbsnews.com/newyork/news/transgender-nattaphon-
   wangyot-alaska-track/ ................................................................ 4

World Rugby, *Transgender Women Guidelines,* https://www.world.rugby/the-
   game/player-welfare/guidelines/transgender/women ................................ 9

## Rules

Fed. R. Civ. P. 56 ................................................................................ 6

## Regulations

34 C.F.R. § 106.34 .............................................................................. 23

34 C.F.R. § 106.41 .......................................................................... 23, 26

45 C.F.R. § 86 .................................................................................... 27

### INTRODUCTION

Last month in an Atlanta swimming pool, Lia Thomas won the women's 500-yard freestyle at the NCAA Swimming and Diving Championships. Some cheered. Others booed. But one thing is not up for debate. Fifteen women were bumped down the scoreboard that day.[1] And some women didn't get to compete in the finals at all. Their hard work was sacrificed in the name of "progress."

That event encapsulates the ongoing national debate about women's sports. On one side, some policymakers have allowed males who identify as female to compete on women's sports teams. That has led to women and girls losing championship titles, medals, and the opportunity to compete in the sports they love. In contrast, West Virginia passed its Sports Act (W. Va. Code § 18-2-25d) and drew a line based on biology rather than identity, hormone levels, athletic ability, or countless other options. It did so for a simple reason. It wanted to protect the opportunities for *biological women* to compete and excel in sports. That is a valid way to achieve a valid goal. After all, the "physical differences between men and women ... are enduring: the two sexes are not fungible." *United States v. Virginia*, 518 U.S. 515, 533 (1996) (cleaned-up). And this distinction is an "immutable" one, "determined solely by the accident of birth." *Frontiero v. Richardson*, 411 U.S. 677, 686 (1973).

In fact, even Plaintiff B.P.J. agrees that sex-separate teams are valid *most of the time*. West Virginia, for example, can exclude men who identify as men from women's sports even if they are smaller, slower, weaker or have lower hormone levels than female competitors. That concession is decisive. It proves that sex-separate teams aren't based on stereotypes, prejudice, or ungrounded fears of the unknown. And it shows that laws making distinctions between the sexes don't have to be perfect in

---

[1] This brief uses the terms 'women,' 'girls,' and 'females' to refer to biological females and the terms 'men,' 'boys,' and 'males' to refer to biological males. It further uses the terms "sex," "gender," and "gender identity" as set forth in *Doe ex rel. Doe v. Boyertown Area Sch. Dist.*, 897 F.3d 518, 522 (3d Cir. 2018).

every application. Instead, laws can protect female athletes—like Intervenor Lainey Armistead—from competition against males who are *on average* bigger, faster, and stronger, regardless of athletic ability, gender identity, or hormone levels. Because biological distinctions in sports generally make sense, this Court should grant Armistead and Defendants summary judgment.

## SUMMARY STATEMENT OF FACTS

*The displacement of women and girls in sports.* Across the country, male athletes who identify as female have increasingly competed in women's sports and displaced female competitors.

For example, from 2017–2020, two male athletes in Connecticut won a combined 15 state championships in women's track and set 17 individual records. Def.-Intervenor's App. in Supp. of Mot. for Summ. J. ("App.") 37 (¶ 25); 43 (¶22). Chelsea Mitchell lost to these males on more than twenty different occasions. App. 12 (¶ 14). Alanna Smith lost to them on three different occasions. App. 36–37 (¶¶ 16–24). And Selina Soule lost to them on at least four occasions. App. 42–43 (¶¶ 18–21). For Selina, the experience was "demoralizing." App. 43 (¶ 23). Alanna "felt defeated before [she] even got set in [her] blocks." App. 36 (¶ 19). And when Chelsea's mother complained, school and state officials repeatedly told her that "girls have the right to participate, not to win." App. 29 (¶ 41).

In Hawaii, a "male athlete dominated … varsity girls' volleyball in the 2019–20 season" on the island of Maui. App. 52 (¶ 23). Female players were "nervous and intimidated," and "would often 'duck and cover' or assume a defensive position rather than prepare to respond to his spikes" because they were "afraid of getting hurt." (¶ 24) Girls competing against the male athlete "felt demoralized," and "wondered why they should even bother playing … because they knew the male athlete's team would beat them." (¶ 24). The same male athlete also competed in track, where one

female athlete said she was going to quit after the male athlete raced in her event. App. 57 (¶ 19).

Male athletes have similarly displaced females at the collegiate level. In 2018, CeCe Telfer competed on the Franklin Pierce University's women's track team after previously competing on the men's team. App. 162 (¶ 135). That year, Telfer won an NCAA championship after placing first in the women's 400-meter hurdles. App. 81. Telfer also placed fifth in the women's 100-meter hurdles. *Id.* Telfer never previously made it to a championship event while competing for the men's team. App. 162 (¶135).

June Eastwood competed for the University of Montana's men's cross country and track teams for three seasons before switching to the women's teams in 2019. App. 61 (¶ 14), 72 (¶ 15); *see also Hecox v. Little*, 479 F. Supp. 3d 930, 979 (D. Idaho 2020) (discussing proposed intervenor June Eastwood). Athletes like Madison Kenyon, Mary Marshall, and Haley Tanne, lost to Eastwood on nine different occasions combined. App. 61–62 (¶¶ 15–21), 67 (¶ 11), 73 (¶ 16). Then Eastwood won the women's mile at the 2020 Big Sky Championship meet. App. 83. For these women athletes, the experience was "deflating," "discouraging," "frustrating," and left them feeling "defeated." App. 61 (¶ 17), 62 (¶ 18), 67 (¶ 13), 73 (¶ 21). For female athlete Linnea Saltz it was "mentally exhausting to anticipate racing a male athlete with all the advantages of male puberty." App. 78 (¶ 16).

And as noted above, Lia Thomas is a male swimmer on the University of Pennsylvania women's swim team. App. 164 (¶ 137); 545–46 (212:14–214:6). Thomas recently set two Ivy League records, App. 97, 103, and became an NCAA champion in

the 500-yard freestyle, App. 110, beating two Olympic champions in the same race.[2] The NCAA simultaneously allows females who identify as male to "participate on a men's or women's team" so long as they are "not taking testosterone related to gender transition."[3] This allowed Iszac Henig, a female who identifies as male, to compete at the same NCAA championships as Lia Thomas.[4] App. 114.

There have been similar stories of males displacing females across the country and even the entire world.[5] And the West Virginia legislature can "rely on the experiences of other jurisdictions" to craft its own legislation. *Imaginary Images, Inc. v. Evans*, 612 F.3d 736, 742 (4th Cir. 2010); *see also City of Renton v. Playtime*

---

[2] Both Emma Weyant and Erica Sullivan won individual medals in the Tokyo 2020 Olympic games. *See* International Olympic Committee, *Tokyo 2020 Swimming Women's 400M Individual Medley Results*, https://olympics.com/en/olympic-games/tokyo-2020/results/swimming/women-s-400m-individual-medley (last visited April 18, 2022; *Tokyo 2020 Swimming Women's 1500M Freestyle Results*, https://olympics.com/en/olympic-games/tokyo-2020/results/swimming/women-s-1500m-freestyle (last visited April 18, 2022).

[3] 2010 NCAA Policy on Transgender Student-Athlete Participation, https://ncaaorg.s3.amazonaws.com/inclusion/lgbtq/INC_TransgenderStudentAthlete ParticipationPolicy.pdf [permalink: https://perma.cc/J5WY-7A67].

[4] *See* Tigerlily Hopson & Toia Conde Rodrigues da Cunha, *Swimming & Diving: 'It Feels Like Flying:' Iszac Henig '23 soars on women's swim team*, Yale News (Feb. 3, 2022) https://yaledailynews.com/blog/2022/02/03/swimming-diving-it-feels-like-flying-iszac-henig-23-soars-on-womens-swim-team/ [permalink: https://perma.cc/P56V-P6B2].

[5] *See, e.g.*, App. 131 (¶ 20); Chuck Culpepper, *New Zealand weightlifter Laurel Hubbard makes Olympic history as a transgender athlete*, Wash. Post (Aug. 2, 2021) https://www.washingtonpost.com/sports/olympics/2021/08/02/laurel-hubbard-transgender-olympics-weightlifter/ [permalink: https://perma.cc/TN82-B2LX]; *Transgender Track Star Stirs Controversy Competing In Alaska's Girls' State Meet Championships*, CBSNews.com (June 8, 2016) https://www.cbsnews.com/newyork/news/transgender-nattaphon-wangyot-alaska-track/ [permalink: https://perma.cc/M8KR-EHBG].

*Theatres, Inc.*, 475 U.S. 41, 51–52 (1986) (locality could "rely on the experiences of … other cities … in enacting its adult theater zoning ordinance").

*The West Virginia Secondary School Activities Commission proposes a policy to promote fairness in sports.* Before 2016, West Virginia officials attended national athletic meets and learned that males competing in women's sports "was an issue." App. 1097 (118:18–20). In response, officials formulated a policy "to protect athletes from harm or unfairness because of physical abilities." App. 1096 (117:12–14). That policy, which was never adopted as a rule, required schools to evaluate athletes case-by-case to decide whether they could participate on girls' teams. App. 1098 (122:4–124:19).

Some male students have also asked to participate on girls' teams in West Virginia. One boy asked to play on a girls' volleyball team, and when the school said it was for girls only, he responded: "[t]hen … I'll be a girl." App. 1097 (120:20–23). Another student who wanted to participate in sports "one day … identified as a girl, next day a boy, and back and forth." *Id.* (121:3–6)

*West Virginia passes the Sports Act and B.P.J. sues.* In 2021, West Virginia passed HB 3293 which requires public schools to designate sports teams "based on biological sex," defined as an "individual's physical form as a male or female based solely on the individual's reproductive biology and genetics at birth." § 18-2-25d(b)(1), (c)(1). It also requires that teams "designated for females, women, or girls shall not be open to students of the male sex where selection for such teams is based upon competitive skill or the activity involved is a contact sport." *Id.* at (c)(2).

Shortly before the Act became effective, B.P.J. sued. B.P.J. is an 11-year-old biological male who identifies as a girl. First Am. Compl. ¶¶ 1–2 ("Compl.") (Doc. 64); App. 1440–41 (B.P.J. admitting B.P.J. has "XY chromosomes" and "internal and external reproductive organs … typical of the male sex"). In July, this Court issued a preliminary injunction against enforcing HB 3293 against B.P.J., who then competed

on the Bridgeport middle school's cross-country team as a sixth grader this past fall. At one invitational, B.P.J. placed "51 out of 66 competitors," beating two Bridgeport teammates. App. 1512.[6] B.P.J. placed "123 out of 150 competitors" at another meet, beating three Bridgeport teammates. App. 1513.[7] B.P.J. beat older competitors who were two grades above B.P.J. at both of these events, and B.P.J. beat competitors at other invitationals too. App. 1542–43.[8]

*Lainey Armistead intervenes.* Lainey Armistead is a 22-year-old soccer player at West Virginia State University who intervened in this case in late 2021. App. 1 (¶¶ 1–2) Soccer is her "passion and life-defining pursuit," and she has won state and national championships since she was nine years old. (¶¶ 2, 6).

Armistead "know[s] from experience in friendly competitions against men that facing a male in a soccer game changes the entire dynamics on the field and poses not just fairness but safety concerns, as well." (¶ 38). For example, during pick-up soccer games she has witnessed that men "compete at a faster pace," "kick the ball harder," and "have physical frames that are generally larger." (¶ 31). If she had to seriously compete against male athletes, she "would be more worried about being injured by a male than a female competitor in a game in which players are trying their hardest to win." (¶ 32). She also wants women to have real opportunities to win, and "fear[s] that girls in the future might consider not playing at all if they feel they cannot win against a physically superior male." (¶ 46).

---

[6] Meet results available under "Regular Season Results" at: http://runwv.com/CC21/CCIndex.html (Mountain Holler Invitational, Sept. 2, 2021).

[7] *Id.* (Doddridge Invitational – MS Girls, Sept. 16, 2021).

[8] *Id.* (Braxton Invitational – MS Girls, Sept. 25, 2021)

ARGUMENT

Armistead deserves summary judgment because B.P.J.'s claims fail "as a matter of law" and there is "no genuine dispute as to any material fact." Fed. R. Civ. P. 56(a). The Sports Act does not violate (I) Equal Protection or (II) Title IX.

## I.   The Act does not violate Equal Protection

"An equal protection claim involves two basic analytical steps." *Sansotta v. Town of Nags Head*, 724 F.3d 533, 542 (4th Cir. 2013). First, the plaintiff must show that the state treated similarly situated persons differently because of an invidious discriminatory purpose. *Id.* If "a plaintiff has met this burden, then the court proceeds to determine whether the disparity in treatment can be justified under the requisite level of scrutiny." *Id.* (citations omitted)

The Act does not violate Equal Protection: (A) it draws lawful distinctions based on sex because sex matters in sports while (B) gender identity does not. So the Act legitimately protects biological females from competition against males; (C) the Act can be applied to B.P.J., regardless of B.P.J.'s physiology or gender identity; and (D) the Act does not invidiously discriminate based on gender identity.

### A.   The Act draws permissible distinctions based on sex because biological sex matters in sports.

"The core concern of the Equal Protection Clause [is] as a shield against arbitrary classifications." *Engquist v. Or. Dep't of Agric.*, 553 U.S. 591, 598 (2008). "The proper classification for purposes of equal protection analysis … must begin with the statutory classification itself." *Califano v. Boles*, 443 U.S. 282, 293–94 (1979).

Here, the Act facially draws a biology-based distinction by requiring schools to separate sports teams "based on biological sex." W. Va. Code § 18-2-25d. Teams for females "shall not be open to students of the male sex where selection for such teams is based upon competitive skill or the activity involved is a contact sport." *Id.* at (c)(2). But teams for males may be open to anyone. *Id.* at (c)(3).

7

Equal Protection does not make sex "a proscribed classification." *United States v. Virginia*, 518 U.S. 515, 533 (1996). "A community made up exclusively of one sex is different from a community composed of both." *Id.* (cleaned up). And West Virginia need only show "that the classification serves important governmental objectives" and that the "means employed are substantially related to the achievement of those objectives" to show that the classification is valid. *Miss. Univ. for Women v. Hogan*, 458 U.S. 718, 724 (1982) (internal quotation marks omitted).

The state can do so here. The Supreme Court "has consistently upheld statutes where the gender classification is not invidious, but rather realistically reflects the fact that the sexes are not similarly situated in certain circumstances." *Michael M. v. Superior Ct. of Sonoma Cnty.*, 450 U.S. 464, 469 (1981) (plurality opinion). For example, laws may penalize just males for having sex with underage females because of the risks of pregnancy. *Id.* at 471–73. And laws can impose "a different set of rules" to prove biological parenthood "with respect to fathers and mothers," because of "the unique relationship of the mother to the event of birth." *Tuan Anh Nguyen v. I.N.S.*, 533 U.S. 53, 63–64 (2001).

In the context of sports too, "[t]he difference between men and women … is a real one." *Id.* at 73. "[D]ue to average physiological differences, males would displace females to a substantial extent if they were allowed to compete" for the same teams. *Clark, By and Through Clark v. Ariz. Interscholastic Ass'n* (*Clark I*)*, 695 F.2d 1126, 1131 (9th Cir. 1982). Indeed, "the great bulk of the females would quickly be eliminated from participation and denied any meaningful opportunity for athletic involvement," without distinct teams. *Cape v. Tenn. Secondary Sch. Athletic Ass'n*, 563 F.2d 793, 795 (6th Cir. 1977). "[C]ommon sense and the holdings of prior cases [are] sufficient to establish" the government's interest in protecting athletic opportunities for biological females, and "it is obvious" that prohibiting males from

8

participating on women's teams furthers that interest. *Billups v. City of Charleston*, 961 F.3d 673, 685 (4th Cir. 2020).

These differences also matter for safety. For example, "[m]ales are, on average, larger and heavier" than women, so "males bring more kinetic energy into collisions ... creating heightened injury risk for impacted females." App. 252 (¶ 88). That's why World Rugby recently issued guidelines excluding biological males from women's rugby because of the injury risk to females.[9] "[I]f men and women were to consistently participate together in competitive contact sports, there would be higher rates of injury in women." App. 225 (¶ 42).

B.P.J. doesn't dispute that it's acceptable for males and females to compete separately, or that West Virginia can validly prohibit men who identify as men from women's teams. In fact, B.P.J. believes that the "only way" for girls to "experience the benefits associated with sex-separated school athletics—or to participate in school athletics at all—is ... to participate on the same teams as other girls." Compl. ¶ 39. This concession proves that West Virginia's law is constitutional in many applications and therefore facially valid. It also proves the Act doesn't discriminate based on "sex stereotypes" or "for gender non-conformity." *Grimm v. Gloucester Cnty. Sch. Bd.*, 972 F.3d 586, 608 (4th Cir. 2020), *as amended* (Aug. 28, 2020). Everyone agrees that men and adolescent boys have physiological advantages "in almost all athletic events" over women and adolescent girls who are "equally aged, gifted, and trained." App. 124; *see also* App. 619 (19:4–8)[10]. So sex-separated teams are "based on the[se] innate physical

---

[9] World Rugby, *Transgender Women Guidelines,* https://www.world.rugby/the-game/player-welfare/guidelines/transgender/women [permalink: https://perma.cc/HP6H-6NCV].

[10] *See also* App. 1535 for clarification that Dr. Safer's statement should read: "I accept as fact that men and boys who are appropriately developed have . . . ***better*** performance outcomes in certain sports than do cisgender women and cisgender girls again appropriately developed." (emphasis added).

differences between the sexes, rather than on generalizations that are 'archaic' or attitudes of romantic paternalism." *Clark I*, 695 F.2d at 1130 (cleaned up) (quoting *Petrie v. Ill. High Sch. Ass'n*, 394 N.E.2d 855, 862 (1979)).

Far from being the exception, West Virginia's law is part of a "long-standing tradition in sports of setting up classifications whereby persons having objectively measured characteristics likely to make them more proficient are eliminated from certain classes of competition." *Petrie*, 394 N.E.2d at 861. Heavyweight boxers or wrestlers can't compete in lighter weight classes, and high school seniors can't compete on teams reserved for freshman. *See id.* "There is no stigma attached to a person eliminated by this system from competing in a class in which that person *might* have undue advantage." *Id.* at 861–62 (emphasis added).

### B. The Act protects only biological females from competition against males because sex matters in sports while gender identity does not.

Although B.P.J. alleges that B.P.J. and other "[g]irls who are transgender are similarly situated to cisgender girls … for purposes of participating on sex-separated school athletic teams," (Compl. ¶ 39), this assertion does not change biological fact. Gender identity alone doesn't make B.P.J. similar to female athletes.

To be similarly situated under the Equal Protection Clause, a person must be "similar in all aspects relevant to attaining the legitimate objectives of legislation." *Van Der Linde Hous., Inc. v. Rivanna Solid Waste Auth.*, 507 F.3d 290, 293 (4th Cir. 2007). "[W]hat is different and what is the same" depends on "the nature of the problem." *Plyler v. Doe*, 457 U.S. 202, 216 (1982) (cleaned up). So "retired Maryland law enforcement officers are not similarly situated to the general public" when it comes to firearm restrictions that aim to promote public safety. *Kolbe v. Hogan*, 849 F.3d 114, 147 (4th Cir. 2017). And women aren't similarly situated to men with respect to nudity ordinances that aim to protect "public sensibilities." *Eline v. Town of Ocean City*, 7 F.4th 214, 224 (4th Cir. 2021).

10

West Virginia's objective was to promote "equal athletic opportunities for the female sex." § 18-2-25(d)(a)(5). So instead of classifying athletes according to their hormone levels, gender identity, or athletic ability, the state drew a simple line based on biology to ensure males could not displace females in sports involving competitive skill or contact. *Id.*

As already explained, "[t]here is no question" that promoting equal athletic opportunities for women "is a legitimate and important governmental interest." *Clark I*, 695 F.2d at 1131. And "there is no question that the Supreme Court allows for the[] average real differences between the sexes to be recognized or that they allow gender"—meaning sex—"to be used as a proxy in this sense *if it is an accurate proxy.*" *Id.* (emphasis added).

This means B.P.J. can't be similarly situated to females "in all aspects relevant to attaining the legitimate objectives of" the Act because B.P.J. is a biological male. *Van Der Linde*, 507 F.3d at 293. If B.P.J. or any other male were allowed to displace even "one [female] player … the goal of equal participation by females in interscholastic athletics is set back, not advanced." *Clark, By & Through Clark v. Ariz. Interscholastic Ass'n (Clark II)*, 886 F.2d 1191, 1193 (9th Cir. 1989).

B.P.J. simply "misconceives the nature of … the governmental interest at issue." *Nguyen*, 533 U.S. at 69. Instead of protecting fair competition for women according to biology, B.P.J. demands that the state promote fair competition according to gender identity.

But remember, sex can "be used as a proxy" for athletic ability and performance, "*if* it is an accurate proxy" for the "average real differences between the sexes." *Clark I*, 695 F.2d at 1131 (emphasis added); *see Craig v. Boren*, 429 U.S. 190, 204 (1976) (sex classification valid if "sex represents a legitimate, accurate proxy" for permissible objective). Sex "is a biological concept," which affects physiology. App. 772 (74:13–14); *see also* App. 126 ("every system in the body is influenced by sex"). But

11

gender identity is the "'deeply felt, inherent sense' of one's gender," Mem. Op. & Order 2 n.1 ("Order") (Doc. 67), which does not affect physiology. So sex influences how blood vessels contract, but gender identity does not. App. 776 (91:11-15). And sex influences post-puberty levels of circulating testosterone, but gender identity does not. "[G]ender identity itself is not a useful indicator of athletic performance." App. 656 (167:24–168:1).

That means a pure gender-identity classification doesn't work in sports. "[H]ow people understand, experience it, and express it can change over time," App. 917 (49:22–23), like the high school male who "one day … identifie[s] as a girl, next day a boy, and back and forth." App. 1097 (121:3–5); *see also* App. 777 (95:3–4, 19–24) (discussing Endocrine Society Guidelines reporting individuals who "experienc[e] a continuous and rapid involuntary alternation between a male and female identity"). This student's gender identity might change, but absent medical intervention his physiology won't change.[11] B.P.J. agrees: most high school males—even those who identify as female—will have higher levels of circulating testosterone than an average girl. App. 1478; 1481–1482. That testosterone gives males a significant athletic advantage over females. App. 124, 158; *see also* App. 619 (19:4–8).

But B.P.J.'s theory allows males who identify as female to compete in women's sports with no medical intervention, forcing female athletes to compete against males that everyone agrees are, on average, bigger, faster, and stronger. *See* App. 1498 (conceding that males similar in age to B.P.J who identify as female but do not undergo medical intervention "may not have the same sex-related physiological characteristics associated with athletic performance relevant to running track or cross-country as B.P.J."). In fact, as B.P.J.'s experts concede, B.P.J.'s logic would allow males who identify as male to participate in female sports too. *See* App. 627

_____

[11] And literature reveals that medical interventions like hormone suppression can never fully eliminate men's physiological advantages over women. App. 159–176.

(51:18–19) (conceding that this logic suggests women's leagues that admit males who identify as female could become co-ed). B.P.J. may believe that competing against males is a sacrifice women should endure. But "[a]s common sense would advise against this, neither does the Constitution demand it." *Clark I*, 695 F.2d at 1132. Even the International Olympic Committee ("IOC") and the NCAA do not allow *all* males who identify as female to compete on women's teams.[12] Compl. ¶ 42. That just underscores what everyone knows. Women's sports cannot be separated based on gender-identity alone.

Indeed, if "[t]here are more genders than we understand, can conceptualize or can count," as B.P.J.'s doctor and experts assert, B.P.J never explains how schools can practically separate sports teams based on gender identity. App. 1204 (63:14–15); App. 1205 (64:2–4) ("I could probably list more than 27 [genders] myself."); *see also* App. 317 (¶ 102) (noting one study identified 72 genders). If gender identity "moves … along the spectrum," App. 810 (226:23–24), binary classifications are impossible. What about children experiencing gender dysphoria, whose gender identity "changes in the large majority of cases"?[13] App. 400 (¶ 27). Can they participate on the boys' team one day, switch to the girls' team the next day, and then "back and forth"? App. 1097 (121:3–5). Or what about females who identify as male without medical

---

[12] Even with the NCAA's prescribed regimen of testosterone suppression, Lia Thomas still managed to beat two Olympic champions in a single race. Since this Court ruled on Plaintiff's preliminary injunction though, both the NCAA and the IOC organizations have abandoned their previous policies for a "sport-by-sport approach" that will become effective later this year. *NCAA Transgender Student-Athlete Participation Policy*, https://www.ncaa.org/sports/2022/1/27/transgender-participation-policy.aspx [permalink: https://perma.cc/AV9C-EE4X] (last visited April 21, 2022).

[13] B.P.J.'s experts assert that a person's gender identity is durable, but "how people understand, experience it and express it can change over time." App. 917 (49:21–23); *see also* App. 794 (163:7–164:12). This is a difference without significance. Both parties agree that a person's *asserted* gender identity can change.

intervention? Athletes like Iszac Henig continue to compete in women's sports. But a pure gender-identity classification would force Henig to compete in the men's category.

As these examples show, B.P.J.'s theory isn't rationally tied to promoting fairness. Making distinctions based on biology *is* rational, however, given the average physiological differences between men and women.

And even if "specific athletic opportunities could be equalized more fully in a number of ways," that doesn't invalidate West Virginia's chosen method here. *Clark I*, 695 F.2d at 1131. Perhaps "participation could be limited on the basis of specific physical characteristics other than sex." *Id.* Perhaps participation by males "could be allowed but only in limited numbers." *Id.* Or perhaps the state could enact an affirmative-action program to achieve "gender participation goals." *H.B. Rowe Co. v. Tippett*, 615 F.3d 233, 256 (4th Cir. 2010). "Instead, [West Virginia] enacted an easily administered scheme to promote the different but still substantial interest of ensuring" men could not displace women in competitive or contact sports. *Nguyen*, 533 U.S. at 69. And it's acceptable that "the alternative chosen may not maximize equality, and may represent trade-offs between equality and practicality." *Clark I*, 695 F.2d at 1131–32; *Nguyen*, 533 U.S. at 69 (same); *see also Petrie*, 394 N.E.2d at 862 (classification based on physical parity "would be too difficult to devise").

Because male athletes who identify as female are not similarly situated to biological females in athletics, B.P.J.'s Equal Protection claim must fail "for lack of an initial showing that the [law] treats similarly situated persons differently." *Kolbe*, 849 F.3d at 147; *accord S&M Brands, Inc. v. Georgia ex rel. Carr*, 925 F.3d 1198, 1203 (11th Cir. 2019) ("Our threshold inquiry in an Equal Protection case is whether the plaintiff and the proposed comparator are similarly situated[.]").

14

**C.  West Virgina can constitutionally apply the Act to B.P.J. no matter B.P.J.'s physiology or gender identity or medical history.**

Because West Virginia can validly exclude males from women's sport, the state can validly apply its law to B.P.J. too. To be sure, B.P.J. objects that by suppressing endogenous testosterone levels, B.P.J. will eliminate any athletic advantages over biological females.[14] But focusing on B.P.J.'s specific characteristics "misconceives … the manner in which we examine statutes alleged to violate equal protection." *Nguyen*, 533 U.S. at 69.

"In assessing an equal protection challenge, a court is called upon only to measure the basic validity of the legislative classification." *Pers. Adm'r of Mass. v. Feeney*, 442 U.S. 256, 272 (1979). That means this Court looks at "the particular classifications being made," and whether "that classification and the different treatment set forth in the statute" substantially furthers the government's interest. *United States v. Timms*, 664 F.3d 436, 447–48 (4th Cir. 2012); *accord Williams v. Sch. Dist. of Bethlehem*, 998 F.2d 168, 179 (3d Cir. 1993) (court examines "the relationship between the classification and the government interest.").

That analysis does not turn on B.P.J.'s "individual characteristics." *Harley v. Wilkinson*, 988 F.3d 766, 769 (4th Cir. 2021). "The broad legislative classification must be judged by reference to characteristics typical of the affected classes rather than by focusing on selected, atypical examples." *Califano v. Jobst*, 434 U.S. 47, 55 (1977).

Justice Stevens applied this principle when a middle school girl sued to play on a boys' basketball team.[15] *O'Connor v. Bd. of Ed. of Sch. Dist.* 23, 449 U.S. 1301, 1306

---

[14] Armistead's experts have established that these differences are significant and can never be completely reversed through medical intervention. But Armistead need not prove this to win her summary-judgment motion.

[15] West Virginia's law says nothing about that situation since it permits girls to participate on boys' teams. *See O'Connor*, 449 U.S. at 1306 n.4 (Stevens, J., in

(1980) (Stevens, J., in chambers). The Equal Protection analysis there did not turn on her individual circumstances or "the advantages she would gain from the higher level of competition in the boys' program." *Id.* Instead, it turned on "whether it [was] permissible for the defendants to structure their athletic programs by using sex as one criterion for eligibility." *Id.* The "general rule" cannot "be unconstitutional simply because it appears arbitrary in an individual case." *Id.*; *O'Connor v. Bd. of Educ. of Sch. Dist. No. 23*, 645 F.2d 578, 581 (7th Cir. 1981) (adopting Justice Stevens' reasoning).

Cases applying intermediate scrutiny to gun restrictions prove the same point. A gun law that distinguishes between retired police officers and the public is valid, even though "individual officers might not have been properly trained on assault weapons." *Kolbe*, 849 F.3d at 147 n.18 ("[W]e must look at retired officers as a broader class."). And laws that prohibit domestic abusers from possessing firearms are also valid, though "not every person who falls within … it would misuse a firearm … if permitted to possess one." *United States v. Chapman*, 666 F.3d 220, 231 (4th Cir. 2012); *see also United States v. Staten*, 666 F.3d 154, 167 (4th Cir. 2011) (same).

The same focus should apply in this case—to the class, not the individual. The question is whether West Virginia can distinguish between females *as a class* and males *as a class*, not whether the state can distinguish between females as a class and males *like B.P.J.* Once again, B.P.J. seems to agree with the principle; B.P.J. just prefers a different classification. B.P.J. wants everyone to participate on the team that matches their gender identity alone, including male athletes with levels of circulating testosterone typical of men. But B.P.J. cannot force the state to make this judgment as a matter of constitutional requirement.

---

chambers) (explaining schools can require boys to compete against "talented girls without reciprocal rights").

Nor can B.P.J. avoid these principles by labeling this an as-applied challenge. "[C]lassifying a lawsuit as facial or as-applied … does not speak at all to the substantive rule of law necessary to establish a constitutional violation." *Bucklew v. Precythe*, 139 S. Ct. 1112, 1127 (2019). Under intermediate scrutiny, West Virginia need not show that the Act is "capable of achieving its ultimate objective in every instance." *Nguyen*, 533 U.S. at 70. Indeed, if the law must be perfectly tailored to B.P.J.'s circumstances, then this Court would be applying strict scrutiny, not intermediate scrutiny, and this Court would need to invalidate all sex-separated sports because girls' and boys' teams will never achieve perfect fairness or parity in competition.

So even though B.P.J. raises an as-applied challenge, the means-ends "fit needs to be reasonable; a perfect fit is not required." *Staten*, 666 F.3d at 162. And "in making this determination," the court need "not consider any individual characteristics of the person raising the as-applied challenge." *Harley*, 988 F.3d at 769 (citing *Staten*, 666 F.3d 464); *accord Bonidy v. U.S. Postal Serv.*, 790 F.3d 1121, 1127 (10th Cir. 2015) (explaining in an as-applied challenge that the post office "is not required to tailor its safety regulations to the unique circumstances of each customer").

The fact that B.P.J. concedes the validity of "sex separation in sports" proves the point and resolves this case. Some boys run slower than the average girl. App. 1442 (No. 7). Some boys have circulating testosterone levels similar to the average girl because of medical conditions or medical interventions. App. 1448–1452 (Nos. 19–23); 1464–1465 (No. 41); 1466–1467 (No. 43); 1468–69 (No. 45). But B.P.J. agrees that these boys still can't compete on the girls' cross-country team if they identify as boys. App. 1452–1458 (Nos. 24–32); 1463–1469 (Nos. 40–45). "Like all systems of classifications for competition," sex separation "is overbroad and underbroad in that it includes females who are athletically superior to many males and excludes males who are less well-endowed athletically than most females." *Petrie*, 394 N.E.2d at 862.

17

If the state can exclude males from girls' sports when those males identify as male and have similar athletic abilities as girls (group A), it must be permissible to exclude males who identify as female and have similar athletic abilities as girls too (group B). After all, both groups are similar to girls as to athletic ability. But letting group B participate in girls' sports while excluding group A would discriminate based solely on gender identity—the very thing B.P.J. complains of. In this respect, B.P.J.'s argument could be used by any male to challenge sex-based sports distinctions.

### D. Because sex distinctions are valid in the sports context, *Grimm* doesn't apply.

B.P.J.'s concessions also show why *Grimm* doesn't control this case.

According to *Grimm*, a female student who "liv[ed] fully as a boy" was most similarly situated to other boys when it came to promoting privacy in bathrooms. *Grimm*, 972 F.3d at 593. And according to *Grimm*, separating bathrooms based on biology "ignore[d] the reality of how a transgender child uses the bathroom: 'by entering a stall and closing the door.'" *Id.* at 613. *Grimm* then criticized the school because it installed privacy strips in the boys' bathroom and "could not identify any other privacy concern" by letting the plaintiff use the boys' bathroom. *Id.* at 614. So, though the school had a legitimate interest in protecting privacy, *Grimm* faulted the school for not furthering those interests through its sex-specific policy.[16] *Id.* And that made the school's "privacy argument … sheer conjecture and abstraction." *Id.* (cleaned up).

But privacy isn't at stake here. After all, men and women regularly compete together on coed leagues. Instead, displacement of females by males matters. B.P.J. already agrees that sex-separate teams are generally valid. And that separation is justified by the average physiological differences between males and females. *See*

---

[16] Plus, the school in *Grimm* admitted that its policy "relie[d] solely on transgender status." *Grimm*, 972 F.3d at 609.

*supra* § I.A. This makes biological sex relevant to promoting fairness in sports. Gender identity is not. So "privileg[ing] sex" above an athlete's "medically confirmed, persistent and consistent gender identity" makes sense *in this context*. *Grimm*, 972 F.3d at 610.

In fact, categorizing athletes based on gender identity requires officials to evaluate whether athletes dress like a girl, live their life as a girl, or have "a name commonly associated with girls," Compl. ¶ 31, factors that inherently perpetuate "archaic and stereotypic notions" about the sexes. *Miss. Univ. for Women*, 458 U.S. at 725. How else will officials verify a student's assertion about their gender identity? Even B.P.J. agrees that gender-identity classifications bear "no legitimate relationship" to promoting the state's interest in fair competition for females. *See* Memo. in Supp. of Pl.'s Mot. for. Prelim. Inj. 18 n.8 (Doc. 19) (quoting W. Va. Code § 18-2-25d). In fact, these types of "overbroad generalizations about the different talents, capacities, or preferences of males and females" are *never* valid reasons to draw distinctions. *Grimm,* 972 F.3d at 635 (quoting *Virginia*, 518 U.S. at 533). They "rest on nothing more than conventional notions about the proper station in society for males and females." *Knussman v. Maryland*, 272 F.3d 625, 636 (4th Cir. 2001).

### E.   The Act was not passed for an invidious discriminatory purpose.

Although the Act is facially valid and does not improperly discriminate based on sex, B.P.J. still argues that it discriminates against persons who identify as transgender. But for facially neutral laws, courts conduct "a twofold inquiry." *Feeney*, 442 U.S. at 274. "The first question is whether the statutory classification is indeed neutral in the sense that" it is not "overtly or covertly designed to prefer" a certain class. *Id.* at 273–74. "[T]he second question is whether the adverse effect reflects invidious … discrimination." *Id.* at 274.

The Act's sex-based classification is not a "covert" attempt to disfavor athletes based on gender identity. A law that favors veterans doesn't covertly favor men, even

if veterans are 98% male. *Id.* at 270, 274. And a law that disfavors abortion doesn't covertly discriminate against women, even though only women can procure an abortion. *Bray v. Alexandria Women's Health Clinic*, 506 U.S. 263, 271 (1993) (quoting *Geduldig v. Aiello*, 417 U.S. 484, 496 n.20 (1974)).[17] Here, the Act limits half the population: biological males. So there's a stark "lack of identity" between the Act's sex-based classification and transgender persons. *Geduldig*, 417 U.S. at 496 n.20. "Too many men are affected … to permit the inference that the statute is but a pretext" for disfavoring transgender persons. *Feeney*, 442 U.S. at 275; *see also Geduldig*, 417 U.S. at 496 n.20 (pregnancy distinction did not distinguish based on sex because "nonpregnant" category "includes members of both sexes"). A disparate impact simply isn't enough to prove invidious discrimination.

Neither is the Act "targeted at … girls who are transgender." Compl. ¶ 46. "[T]he Fourteenth Amendment guarantees equal laws, not equal results." *Feeney*, 442 U.S. at 273. So "uneven effects upon particular groups within a class are ordinarily of no constitutional concern" unless there is "a reason to infer antipathy." *Id.* at 271–72; *see also Bray*, 506 U.S. at 272–73 (regulations "disfavoring… abortion" are "not *ipso facto* sex discrimination"). And here, any disparate impact is "plausibly explained on a neutral ground." *Feeney*, 442 U.S. at 275. Sex-based distinctions necessarily overlap a person's gender identity or contradict it. So excluding males who identify as female from women's sports "is essentially an unavoidable consequence of a legislative policy that has in itself always been deemed to be legitimate." *Id.* at 279 n.25. That resolves this question because the Act treats B.P.J. no different than other males, even if (according to B.P.J.) it affects B.P.J. more than many males.

---

[17] *See also Austin v. Berryman*, 955 F.2d 223, 227 (4th Cir. 1992) (law denying unemployment benefits to persons who relocate with their spouse for work aren't gender based even though "women comprise[d] 86.8% of the injured class").

Nor should this Court assume that all transgender persons desire to play on the sports team that accords with their gender identity. "[T]he transgender community is not a monolith in which every person wants to take steps necessary to live in accord with his or her preferred gender (rather than his or her biological sex)." *Doe 2 v. Shanahan*, 917 F.3d 694, 722 (D.C. Cir. 2019) (Williams, J., concurring); *see also id.* at 701 (Wilkins, J., concurring) (same). Athletes like Iszac Henig compete at the highest levels of collegiate women sports, even though Henig identifies as male. The Act simply doesn't target males who identify as female, even if some of them desire to play on female teams.

B.P.J.'s theory also produces seismic consequences. According to B.P.J., any law in any context with a biology-based classification is unconstitutional because it will always place persons who identify as transgender in the "wrong" category. But the Supreme Court has said just the opposite and "consistently upheld statutes where the gender classification … realistically reflects the fact that the sexes are not similarly situated in certain circumstances." *Michael M.*, 450 U.S. at 469 (plurality).

"The dispositive question, then, is whether [B.P.J.] has shown that a … discriminatory purpose" animated the Act. *Feeney*, 442 U.S. at 276. At most, B.P.J. will point to legislators' statements that the Act "would affect those that changed their sex after birth" but not other males, or the Act is about "two transgender girls" who "were allowed to compete in state track and field meets in Connecticut." Compl. ¶¶ 51, 56.

But these statements reflect a desire to exclude biological males from women's sports—which has long been permitted—not "a bare … desire to harm a politically unpopular group." *City of Cleburne v. Cleburne Living Ctr.*, 473 U.S. 432, 447 (1985). Remember, "[d]iscriminatory purpose … implies more than intent as volition or intent as awareness of consequences." *Feeney*, 442 U.S. at 279 (cleaned up). B.P.J.'s theory is that *any* statement promoting a biological distinction over a gender-identity

distinctions is animated by animus. But "[w]hether one agrees or disagrees with the goal of" excluding males from women's sports, "that goal in itself … does not remotely qualify for such harsh description." *Bray*, 506 U.S. at 274. "This is not the stuff out of which … 'invidiously discriminatory animus' is created." *Id.*

## II.   The Act does not violate Title IX.

To succeed on a Title IX claim, B.P.J. must show that the Act discriminates against B.P.J. "on the basis of sex." *Grimm*, 972 F.3d at 616 (citation omitted). The Act does no such thing: (A) Title IX deals with sex, not gender identity; (B) *Grimm* does not change Title IX's meaning, (C) the Act can exclude B.P.J. from girls' sports because B.P.J. is not similarly situated to girls in this context; and (D) Title IX sometimes requires sex-separated teams in sports.

### A.   Title IX deals with sex, not gender identity.

B.P.J. does not challenge sex-separated athletics under Title IX; instead, B.P.J. asserts that Title IX requires schools to permit athletes to compete on the team that matches their gender identity. Not true.

B.P.J.'s argument depends on reading 'gender identity' into the word 'sex' under Title IX. But gender identity and "transgender status are distinct concepts from sex." *Bostock v. Clayton Cnty.*, 140 S. Ct. 1731, 1746–47 (2020). Even B.P.J.'s experts don't dispute that "gender cannot influence sex." App.773–74 (81:18–82:5). Since the word 'sex' can't fully encompass all of these terms at once, the question is *which* term Title IX uses when it prohibits discrimination "on the basis of sex." 20 U.S.C. § 1681(a).

Because "sex" is not defined in the statute, it should "be interpreted as taking [its] ordinary, contemporary, common meaning." *Sandifer v. U.S. Steel Corp.*, 571 U.S. 220, 227 (2014) (citation omitted). In 1972, the ordinary meaning of "sex" was "one of the two divisions of organic esp. human beings respectively designated male or female." *Sex,* WEBSTER'S NEW INTERNATIONAL DICTIONARY (3d ed. 1968). The Supreme

Court has similarly described "sex" as "an immutable characteristic determined solely by the accident of birth." *Frontiero*, 411 U.S. at 686.

Title IX's text reinforces this biological sense, not a "multifaceted" sense. Compl. ¶ 19. Throughout the statute, the term is used as a binary concept, encapsulating only male and female. For example, Title IX allows schools in some cases to change "from being an institution which admits only students of *one sex* to being an institution which admits students of *both sexes*." 20 U.S.C. § 1681(a)(2) (emphases added). Title IX also exempts "father-son or mother-daughter activities … but if such activities are provided for students of *one sex*, opportunities for reasonably comparable activities shall be provided for students of *the other sex*." 20 U.S.C. § 1681(a)(8) (emphases added).

If sex included concepts like a person's gender identity, many Title IX exemptions would not make sense. For example, Title IX exempts institutions "traditionally" limiting their admissions to "only students of one sex," 20 U.S.C. § 1681(a)(5); sororities and fraternities "traditionally … limited to persons of one sex," § 1681(a)(6)(B); "living facilities for the different sexes," § 1686; "separation of students by sex within physical education classes" for sports whose major activity involves bodily contact, 34 C.F.R. § 106.34(a)(1); and human sexuality classes and choirs separated by "sex," 34 C.F.R. § 106.34. If sex includes gender identity, these provisions would permit discrimination based on stereotypes of how men and women should behave and appear. *See supra* § I.D. (outlining this argument). That makes little sense. These exemptions work only if sex throughout Title IX means biological sex alone.

So too in athletics. Title IX regulations correctly allow for sex-separated teams "where selection for such teams is based upon competitive skill or the activity involved is a contact sport." 34 C.F.R. § 106.41(b)–(c). This carve out shows that sex-separated teams are about fairness and safety—justifications based on biology, not

gender identity. *See supra* § I.A–B; *see also* Doriane Lambelet Coleman, et al., *Re-Affirming the Value of the Sports Exception to Title IX's General Non-Discrimination Rule*, 27 Duke J. Gender L. & Pol'y 69, 81–82 (2020) (making this point).

B.P.J. agrees this separation is valid. So do courts based on the "average physical differences between sexes." *Yellow Springs Exempted Vill. Sch. Dist. Bd. of Educ. v. Ohio High Sch. Athletic Ass'n*, 647 F.2d 651, 657 (6th Cir. 1981). This just shows that B.P.J.'s method of dividing boys and girls is entirely unhinged from the physiological differences that justify sex-separated sports in the first place.

**B.**  ***Grimm* does not change Title IX's meaning.**

B.P.J. may argue that this Court must read Title IX to forbid gender-identity discrimination under *Grimm* and its predecessor *Bostock*, and therefore West Virginia must allow B.P.J. to compete on the girls' team. Not so.

*Grimm* simply said that gender-identity discrimination necessarily considers sex, that gender-identity discrimination constitutes sex-discrimination under Title IX, and that the school in *Grimm* made a distinction grounded in a sex stereotype. *Grimm*, 972 F.3d at 616 (citing *Bostock*, 140 S. Ct. at 1741). But as already explained, the Act here makes a biological distinction related to real physiological differences, not gender identity or sex stereotypes. *See supra* § I.A. And *Grimm* did not consider, much less conclude that *all biological* distinctions are sex stereotypes or that *all distinctions* based on sex always constitute gender-identity discrimination.

Nor can that be true. Otherwise, Title IX would forbid *any sex distinction* in sports—even excluding men who identify as men from women's team. Not even B.P.J. agrees with that. Remember, unlike separate bathrooms designed to promote privacy, separate sports teams aim to prevent displacement of females by males. The justification for Title IX is inherently rooted in biological sex. Whatever application *Grimm* has in other contexts, it cannot be applied to sports without undermining Title IX's entire purpose of promoting fairness for women.

### C. The Act can exclude B.P.J. from girls' sports, because B.P.J. is not similarly situated to females in the context of sports.

B.P.J. may argue that the Act still discriminates against B.P.J. "on the basis of sex," because the Act "could not exclude B.P.J. from a girls' athletics team without referencing her 'biological sex.'" Order 12 ("Her sex 'remains a but-for cause' of her exclusion under the law."). But the first point doesn't follow from the second.

B.P.J. is not being discriminated against or "excluded from school athletics on the basis of her sex," Order 12, because B.P.J. may still compete on the boys' team like every other male. The Act only prevents B.P.J. from participating on certain women's teams, like it does for every other male. "Even if [B.P.J.] does not wish to pursue this option," Title IX doesn't require access to one particular team when "there are other … opportunities available to her." *Gregor v. W. Va. Secondary Sch. Activities Comm'n*, No. 2:20-cv-00654, 2020 WL 5997057, at *3 (S.D.W. Va. Oct. 9, 2020). That's why this Court denied a high school girl's request for a preliminary injunction to play on the boys' soccer team—she had "other options for playing soccer like joining the girls' team … or playing with a private club…." *Id.*

To be sure, B.P.J. argues that the Act harms male athletes who identify as female because they are being treated worse than "cisgender" girls. But that's the wrong comparator. "In the Title IX context, discrimination 'means treating that individual worse than others who are similarly situated.'" *Grimm*, 972 F.3d at 618 (citing *Bostock*, 140 S. Ct. at 1740) (cleaned up). And as already explained, B.P.J. is not similarly situated to females in sports. *See supra* § I.B.

*Bauer v. Lynch* illustrates the point in a similar context. 812 F.3d 340, 342 (4th Cir. 2016). There, a male applicant "flunked out of the FBI Academy after falling a single push-up short of the thirty required of male Trainees." *Id.* He sued under Title VII because "but for" his sex, his score would have been enough. *Id.* at 350. But as the Fourth Circuit pointed out, "[m]en and women simply are not physiologically the same for the purposes of physical fitness programs." *Id.* Instead, it held that physical-

fitness tests that accommodate these "innate" differences are valid as long as they impose equal burdens on men and women by "requiring the same level of physical fitness of each" *Id.* at 348, 351.

The same logic applies in athletics. Though B.P.J. identifies as a girl, B.P.J. is not similarly situated to girls because of the average physiological differences between the sexes. *See supra* § I.B. So like all biological males, the Act lets B.P.J. participate on male teams. Like all biological males, the Act forbids B.P.J. from participating on female teams. That way, females have an equal opportunity to compete. That is what Title IX is all about.

### D. Title IX sometimes requires sex-separated teams to accommodate the physiological differences between men and women.

Title IX's purpose is to provide women and girls with equal educational opportunities that have historically been denied to them. *See McCormick ex rel. McCormick v. Sch. Dist. of Mamaroneck*, 370 F.3d 275, 286 (2d Cir. 2004). In the context of athletics, "[m]ale athletes had been given an enormous head start." *Neal v. Bd. of Trs. of Cal. State Univs.*, 198 F.3d 763, 767 (9th Cir. 1999). So Title IX's implementing regulations aimed "to level the proverbial playing field," *id.* and requires that schools "shall provide equal athletic opportunity for members of both sexes." 34 C.F.R. § 106.41(c).

This sometimes requires schools to establish women-only sports to give women a fair opportunity to compete. No one seriously disputes that males would displace females if both sexes were forced to compete against one another in certain sports. *E.g. Clark I,* 695 F.2d at 1131; *Petrie*, 394 N.E.2d at 862. And schools need to accommodate women's interests "in both the selection of the sports and the levels of competition, to the extent necessary to provide equal athletic opportunity." *Horner v. Ky. High Sch. Athletic Ass'n*, 43 F.3d 265, 273 (6th Cir. 1994) (quoting Title IX of the

Education Amendments of 1972; a Policy Interpretation; Title IX and Intercollegiate Athletics, 44 Fed. Reg. 71,413 (Dec. 11, 1979) (codified at 45 C.F.R. pt. 86)).[18]

"Athletic opportunities means real opportunities, not illusory ones." *Williams*, 998 F.2d at 175 (cleaned up). So "the mere opportunity for girls to try out" for a team is not enough if they don't stand a realistic chance of making the roster because of competition from men. *Id.*[19] And the mere opportunity to participate also isn't enough if they don't have a realistic chance to win scholarships or "enjoy the thrill of victory" because the sport is dominated by men. *See Mansourian v. Regents of Univ. of Cal.*, 602 F.3d 957, 973 (9th Cir. 2010). After all, "[w]ho plays sports and doesn't want to win?" App. 513 (82:24–83:1). Equality of opportunity can't exist in sports like cross-country and track if women must compete against men.

## Conclusion

"Sex is a biological concept." App. 772 (74:13–14). It provides a clear line for separating sports teams. Yet B.P.J. wants schools to separate sports based solely on gender identity. But gender identity doesn't say anything about athletic ability. So separating sports based on gender identity doesn't promote safety or fairness—the reason we have sex separated teams in the first place. Instead, this proposal would undermine our country's valiant 50-year effort to level the playing field for biological women in sports. And this would allow male athletes like Lia Thomas to keep displacing females, removing them from the podium and sometimes even from entire playing fields. These women and their hard work should not be sacrificed or erased

---

[18] Many circuits have deferred to these policy documents in determining what violates Title IX. *See Miami Univ. Wrestling Club v. Miami Univ.*, 302 F.3d 608, 615 (6th Cir. 2002) (citing cases).

[19] "Whether the opportunity for girls to try out for a boys' team is a realistic athletic opportunity with respect to that particular sport may turn on whether there are real and significant physical differences between boys and girls in high school." *Williams*, 998 F.2d at 175.

in the name of so-called progress. This Court should therefore affirm the legitimacy of women-only sports and grant Armistead's motion for summary judgment.

Respectfully submitted this 21st day of April, 2022.

*/s/ Brandon S. Steele*

Tyson C. Langhofer, VA Bar No. 95204*
Rachel A. Csutoros, MA Bar No. 706225*
Alliance Defending Freedom
44180 Riverside Parkway
Lansdowne, VA 20176
(571) 707-2119
(571) 707-4790 Fax
tlanghofer@adflegal.org
rcsutoros@adflegal.org

Travis C. Barham, GA Bar No. 753251*
Alliance Defending Freedom
1000 Hurricane Shoals Road NE, Ste D-1100
Lawrenceville, GA 30043
(770) 339-0774
(770) 339-0774 Fax
tbarham@adflegal.org

Timothy D. Ducar, AZ Bar No. 015307*
Law Offices of Timothy D. Ducar, PLC
7430 E. Butherus Drive, Suite E
Scottsdale, AZ 85260
(480) 502-2119
(480) 452-0900 Fax
tducar@azlawyers.com

Brandon Steele, WV Bar No. 12423
Joshua D. Brown, WV Bar No. 12652
The Law Offices of Brandon S. Steele
3049 Robert C. Byrd Drive, Suite 100
Beckley, WV 25801
(304) 253-1230
(304) 255-1520 Fax
bsteelelawoffice@gmail.com
joshua_brown05@hotmail.com

Jonathan Scruggs, AZ Bar No. 030505*
Roger G. Brooks, NC Bar No. 16317*
Henry W. Frampton, IV, SC Bar No. 75314*
Alliance Defending Freedom
15100 N. 90th Street
Scottsdale, AZ 85260
(480) 444-0020
(480) 444-0028 Fax
jscruggs@adflegal.org
rbrooks@adflegal.org
hframpton@adflegal.org

Christiana Holcomb, DC Bar No. 176922*
Alliance Defending Freedom
440 First Street NW, Suite 600
Washington, DC 20001
(202) 393-8690
(202) 347-3622 Fax
cholcomb@adflegal.org

*Visiting Attorneys*
*Attorneys for Defendant-Intervenor*

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA**
**CHARLESTON DIVISION**

| | |
|---|---|
| B.P.J, by her next friend and mother, HEATHER JACKSON<br><br>*Plaintiff,*<br><br>      v.<br><br>WEST VIRGINIA STATE BOARD OF EDUCATION, HARRISON COUNTY BOARD OF EDUCATION, WEST VIRGINIA SECONDARY SCHOOL ACTIVITIES COMMISSION, W. CLAYTON BURCH in his official capacity as State Superintendent, DORA STUTLER in her official capacity as Harrison County Superintendent, and THE STATE OF WEST VIRGINIA<br><br>*Defendants,*<br><br>      v.<br><br>LAINEY ARMISTEAD<br><br>*Defendant-Intervenor.* | Case No. 2:21-cv-00316<br><br>Hon. Joseph R. Goodwin |

**CERTIFICATE OF SERVICE**

I, Brandon Steele, hereby certify that on April 21, 2022, I electronically filed a true and exact copy of ***Defendant-Intervenor's Memorandum in Support of Motion for Summary Judgment*** with the Clerk of Court and all parties using the CM/ECF system.

> */s/ Brandon S. Steele*
> Brandon Steele, WV Bar No. 12423
> The Law Offices of Brandon S. Steele
> 3049 Robert C. Byrd Drive, Suite 100
> Beckley, WV 25801
> (304) 253-1230
> (304) 255-1520 Fax
> bsteelelawoffice@gmail.com
>
> *Attorney for Defendant-Intervenor*