# Exhibit 11

IN THE UNITED STATES DISTRICT COURT<br>
FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA<br>
CHARLESTON DIVISION

| | |
|---|---|
| B.P.J, by her next friend and mother, HEATHER JACKSON<br><br>*Plaintiff,*<br><br>    v.<br><br>WEST VIRGINIA STATE BOARD OF EDUCATION, HARRISON COUNTY BOARD OF EDUCATION, WEST VIRGINIA SECONDARY SCHOOL ACTIVITIES COMMISSION, W. CLAYTON BURCH in his official capacity as State Superintendent, DORA STUTLER in her official capacity as Harrison County Superintendent, and THE STATE OF WEST VIRGINIA<br><br>                *Defendants,*<br><br>    and<br><br>LAINEY ARMISTEAD,<br><br><br>                *Defendant-Intervenor.* | Case No. 2:21-cv-00316<br><br><br>Hon. Joseph R. Goodwin<br><br><br>**DEFENDANT-INTERVENOR LAINEY ARMISTEAD'S RESPONSES AND OBJECTIONS TO PLAINTIFF'S SECOND SET OF REQUESTS FOR ADMISSION** |

Pursuant to Rules 33 and 34 of the Federal Rules of Civil Procedure and the applicable Local Rules of the District West Virginia and this Court, Defendant-Intervenor Lainey Armistead provides the following answers to Plaintiff's Second Set of Requests for Admission to Defendant-Intervenor.

<u>**GENERAL OBJECTIONS**</u>

1.    Ms. Armistead objects to the following Definitions presented in Plaintiff's First Set of Requests for Admission to Defendant-Intervenor:

        **CISGENDER means a person whose gender identity aligns with the sex they were assigned at birth.**

1

Objection: Ms. Armistead objects to the definition of the term "cisgender." There is no definitive, legally recognized definition of "cisgender," Plaintiff's definition relies on the term "gender identity" which, as noted below, is not defined, and finally, Ms. Armistead denies that sex is "assigned at birth."

**GENDER IDENTITY is synonymous with the meaning used in Plaintiff's First Amended Complaint, paragraphs 19-23.**

Objection: Ms. Armistead objects to the meaning of the term "gender identity" as provided in Plaintiff's First Amended Complaint paragraphs 19-23. First, gender identity was not defined in Plaintiff's First Amended Complaint. Second, there is no definitive, legally recognized definition of "gender identity." Moreover, Ms. Armistead denies that "there is a medical consensus that there is a significant biologic component underlying gender identity" (First Am. Compl. ¶ 20) and further denies that a person's gender identity is "durable and deeply rooted" and "cannot be changed by social or medical intervention" (*Id.* ¶ 21).

**TRANSGENDER is synonymous with the meaning used in Plaintiff's First Amended Complaint, paragraph 23.**

Objection: Ms. Armistead objects to the definition of "transgender" as provided in Plaintiff's First Amended Complaint paragraph 23: "A transgender person is someone who has a gender identity that does not align with their sex assigned at birth." There is no definitive, legally recognized definition of "transgender," Plaintiff's definition relies on the term "gender identity" which, as noted above, is not defined, and finally, Ms. Armistead denies that sex is "assigned at birth."

**TRANSGENDER GIRL means a PERSON who has a female GENDER IDENTITY, and had a male sex assigned at birth.**

2

Objection: Ms. Armistead objects to the definition of "transgender girl." There is no definitive, legally recognized definition of "transgender girl," Plaintiff's definition relies on the term "gender identity" which, as noted above, is not defined, and finally, Ms. Armistead denies that sex is "assigned at birth."

**YOU, YOUR, or YOURS means Lainey Armistead as includes your agents, representatives, affiliates, attorneys, and consultants.**

Objection: Ms. Armistead objects to the definition of "you, your, or yours" to the extent it purports to require Ms. Armistead to answer on behalf of any other person or based on knowledge not in her possession. Ms. Armistead has no duty to and will not identify documents or information that are not in her possession, custody, or control (as Plaintiff's counsel similarly noted in Plaintiff's Supplemental and Amended Responses and Objections to Defendant the State of West Virginia's First Set of Interrogatories and Requests for Production, pg. 2). The responses to these Requests for Admission are made by Lainey Armistead only.

Moreover, Ms. Armistead objects to the extent this definition presumes to seek the identification of documents or communications protected by the attorney-client or the work product privilege—including those communications which include the mental impressions, conclusions, or opinions of counsel—which are not discoverable under the Federal Rules of Civil Procedure. All of Ms. Armistead's communications with her counsel of record and their agents have been in the course and scope of representing her in this litigation, and Ms. Armistead objects to any request to identify documents or communications between or among Ms. Armistead, her agents, her counsel of record, and/or their agents from June 30, 2021, to present. Ms. Armistead notes that that Plaintiff's counsel clarified in a letter to counsel for the State that Plaintiff "is not seeking the Attorney General's litigation files, but rather is seeking non-

privileged responsive documents." *See, e.g.*, Letter from Kathleen Hartnett to Curtis Capehart et al., 1 (Dec. 30, 2021). Ms. Armistead assumes the same is true for her counsel of record.

      2.     Ms. Armistead objects to the following Instruction presented in Plaintiff's Second Set of Requests for Admission to Defendant-Intervenor:

> **The response to each request shall include such information as is within**
> **YOUR custody, possession, or control, or that of YOUR attorneys,**
> **investigators, agents, employees, experts retained by YOU or YOUR**
> **attorneys, or other representatives.**

<u>Objection</u>: Ms. Armistead objects to this Instruction to the extent it purports to require Ms. Armistead to answer on behalf of any other person or based on knowledge not in her possession. Ms. Armistead has no duty to and will not identify documents or information that are not in her possession, custody, or control (as Plaintiff's counsel similarly noted in Plaintiff's Supplemental and Amended Responses and Objections to Defendant the State of West Virginia's First Set of Interrogatories and Requests for Production, pg. 2), nor will she admit or deny Requests for admissions on anyone's behalf but her own or based on anyone's knowledge but her own. The responses to these Requests for Admission are made by Lainey Armistead only.

      Moreover, Ms. Armistead objects to the extent this definition presumes to seek the identification of documents or communications protected by the attorney-client or the work product privilege—including those communications which include the mental impressions, conclusions, or opinions of counsel—which are not discoverable under the Federal Rules of Civil Procedure. All of Ms. Armistead's communications with her counsel of record and their agents have been in the course and scope of representing her in this litigation, and Ms. Armistead

objects to any request to identify documents or communications between or among Ms. Armistead, her agents, her counsel of record, and/or their agents from June 30, 2021, to present. Ms. Armistead notes that that Plaintiff's counsel clarified in a letter to counsel for the State that Plaintiff "is not seeking the Attorney General's litigation files, but rather is seeking non-privileged responsive documents." *See, e.g.*, Letter from Kathleen Hartnett to Curtis Capehart et al., 1 (Dec. 30, 2021). Ms. Armistead assumes the same is true for her counsel of record.

Ms. Armistead objects to the extent this Instruction seeks information in the custody or control of experts retained by counsel, which has already been disclosed in accordance with the scheduling order provided in this case.

3.      Finally, Ms. Armistead objects to any other instruction or definition that imposes a burden beyond the scope of the Federal Rules of Civil Procedure, local rules, or other law.

## REQUESTS FOR ADMISSION

**REQUEST NO. 5:**

Admit that Plaintiff B.P.J. has been diagnosed with gender dysphoria.

**ANSWER:** Ms. Armistead objects to this Request because there is no definitive, legally accepted definition of "gender dysphoria" and discovery on this issue is ongoing. Moreover, she objects to this Request because this topic is the subject of expert discovery and facts about the subjective state of the mind of the opposing party are an improper basis for a Request for Admission.

Subject to these objections, Ms. Armistead states that she has no independent knowledge of B.P.J.'s gender identity, nor any means of conducting examinations or tests to determine B.P.J.'s subjective state of mind or mental distress. Ms. Armistead has made a reasonable inquiry into the information known or readily attainable by her and admits that Plaintiff and B.P.J.'s medical providers have testified that B.P.J. has been diagnosed with gender dysphoria as B.P.J.

defines that term (which, again, is objectionable as set forth above). But Ms. Armistead has no personal or independent knowledge of B.P.J.'s inner sense of self and therefore denies this Request.

**REQUEST NO. 6:**

Admit that in 2021 Plaintiff B.P.J. was a member of Bridgeport Middle School's girls' cross-country team.

**ANSWER:** Subject to Ms. Armistead's general objections, Ms. Armistead states that she has no independent knowledge of B.P.J.'s participation on Bridgeport Middle Schools' girls' cross-country team in 2021, but she made a reasonable inquiry into the information readily attainable by her and admits that Plaintiff B.P.J. has testified that B.P.J. was a member of Bridgeport Middle School's girls' cross-country team, and that Defendant Harrison County has produced documentation of the same. Ms. Armistead therefore admits this Request.

**REQUEST NO. 7:**

Admit that Plaintiff B.P.J. placed 51 out of 66 competitors in the girls' middle school cross country Mountain Hollar MS Invitational meet in 2021.

**ANSWER:** Subject to Ms. Armistead's general objections, Ms. Armistead states that she has no independent knowledge of B.P.J.'s placements in 2021 cross-country meets, but she made a reasonable inquiry into the information readily attainable by her and admits that according to Athletic.Net, the results of the Mountain Hollar MS Invitational MS Women's 3,200 Meters Junior Varsity 2021 meet show that Plaintiff B.P.J. placed 51 out of 66 competitors. However, Ms. Armistead does not know the competitors' ages, the requirements for entry, or the rules of the race.

**REQUEST NO. 8:**

Admit that Plaintiff B.P.J. placed 123 out of 150 competitors in the girls' middle school cross country Doddridge Invitational meet in 2021.

**ANSWER:** Subject to Ms. Armistead's general objections, Ms. Armistead states that she has no independent knowledge of B.P.J.'s placements in 2021 cross-country meets, but she made a reasonable inquiry into the information readily attainable by her and admits that according to Athletic.Net, the results of the Doddridge Invitational MS, Women's 3,000 Meters Middle School 2021 meet show that Plaintiff B.P.J. placed 123 out of 150 competitors. However, Ms. Armistead does not know the competitors' ages, the requirements for entry, or the rules of the race.

**REQUEST NO. 9:**

Admit that you are not aware of any complaints associated with Plaintiff B.P.J.'s membership on Bridgeport Middle School's girls' cross-country team.

**ANSWER:** Ms. Armistead objects to the term "complaints associated with" as overbroad, vague, and ambiguous because "complaints" could include the inner thoughts, off-handed comments, private conversations of anyone, or official complaints submitted through Bridgeport Middle School or another entity. "Complaints associated with" could also refer to any subject "associated" with B.P.J.'s membership on the team, including Plaintiff's language, conduct, rule-compliance, etc. Finally, it is unclear whether the complaint needs to be specifically about B.P.J.'s participation on the team, or in girls' sports generally.

Subject to these objections, Ms. Armistead states that she has no independent knowledge of any complaints concerning B.P.J.'s membership on Bridgeport Middle School's girls' cross-country team, nor can she obtain any through a reasonable inquiry into the information readily

obtainable by her. Ms. Armistead is not in direct contact with any student, family member of any student, or employee of Bridgeport Middle School, so she has no reason to be aware of any complaints associated with Plaintiff's membership. But Ms. Armistead is aware of general critiques and complaints by members of the public about B.P.J.'s participation on girls' teams impacting fairness and equality in women's sports. These statements can be found in the Twitter replies at these links: https://mobile.twitter.com/ACLU/status/1397622893832556549; https://mobile.twitter.com/WSAZnews/status/1397704112448364545. She therefore denies this Request.

**REQUEST NO. 10:**

Admit that no middle school girl was harmed as a result of B.P.J.'s participation on Bridgeport Middle School's girls' cross-country team in 2021.

**ANSWER:** Ms. Armistead objects to this Request because "harm" is ambiguous, overbroad, and vague, and Plaintiffs do not specify whether "harm" is physical, emotional, mental, or otherwise for purposes of this Request. Ms. Armistead also objects to the term "middle school girl" because it is ambiguous, overbroad, and vague as to whether Plaintiff refers to middle school girls at Bridgeport Middle School, middle school girls at Bridgeport Middle School on the girls' cross-country team, middle school girls at any or all public secondary education schools in West Virginia, or every middle school girl in the United States.

Subject to these objections, Ms. Armistead denies this Request. Middle school girls who were members of the Bridgeport Middle School girls' cross-country team and middle school girls who were members of the girls' cross-country teams at other public secondary schools in West Virginia who competed against Bridgeport Middle School in girls' cross-country were harmed when (1) they were forced to compete with/against B.P.J., a biological male; (2) they

8

were subjected to an unfair advantage because B.P.J., as a biological male, has inherent athletic advantages over biological females, including advantages in strength and speed against comparably fit, trained, and aged females; and (3) Plaintiff B.P.J. placed higher and ran faster than at least 42 middle school girls in the Mountain Hollar and Doddridge Invitationals in 2021, and regularly finished higher at meets than girls on BMS team, sometimes resulting in their scores not being counted toward the team total. Moreover, other girls may have been deterred from participating in women's sports and suffered the stigma and emotional harm of watching a male compete against and win against biological females. Finally, B.P.J.'s participation in a race pursuant to the Court's order interpreting Title IX and the Equal Protection Clause to ban the government from uniformly separating sports competitions by biological sex hurts every female athlete competing at a secondary school in West Virginia.

**REQUEST NO. 11:**

Admit that no middle school girl was injured as a result of Plaintiff B.P.J.'s participation on Bridgeport Middle School's girls' cross-country team in 2021.

**ANSWER:** Ms. Armistead objects to this Request because "injured" is ambiguous, overbroad, and vague and Plaintiffs do not specify whether "injured" refers to physical, emotional, mental, or another form of injury for purposes of this Request. Ms. Armistead also objects to the term "middle school girl" because it is ambiguous, overbroad, and vague as to whether Plaintiff refers to middle school girls at Bridgeport Middle School, middle school girls at Bridgeport Middle School on the girls' cross-country team, middle school girls at public secondary education schools in West Virginia, or every middle school girl in the United States.

Subject to these objections, Ms. Armistead denies this Request. Middle school girls who were members of the Bridgeport Middle School girls' cross-country team and middle school

girls who were members of the girls' cross-country teams at other public secondary schools in West Virginia who competed against Bridgeport Middle School were injured when (1) they were forced to compete with/against B.P.J., a biological male; (2) they were subjected to an unfair advantage because B.P.J., as a biological male, has inherent athletic advantages over biological females, including advantages in strength and speed against comparably fit, trained, and aged females; and (3) Plaintiff B.P.J. placed higher and ran faster than at least 42 middle school biological girls in the Mountain Hollar and Doddridge Invitationals in 2021, and regularly finished higher at meets than girls on the BMS team, sometimes resulting in their scores not being counted toward the team total.

**REQUEST NO. 12:**

      Admit that no Bridgeport Middle School girl student was prohibited from joining Bridgeport Middle School's girls' cross-country team in 2021.

**ANSWER:** Ms. Armistead objects to this Request because it is ambiguous, vague, and overbroad. Defendants' production and testimony demonstrate that Bridgeport Middle school girl students could have been prohibited from joining the Bridgeport Middle School's girl's cross-country team in 2021 for a myriad of reasons relating to, but not limited to, eligibility, grades, and residency. Moreover, the Request does not specify who prohibited the participation—parents, guardians, coaches, school administrators—or whether the prohibition was legal or factual.

      Subject to this objection, Ms. Armistead states that she has no independent knowledge of Bridgeport Middle School's girls' cross country team's selection process or criteria for membership in 2021, or Bridgeport Middle School's reasoning or decision-making for membership requirements on the girls' cross-country team in 2021, or the reasons why students

did or did not join the team, even after making a reasonable inquiry into the information readily

attainable by her. Ms. Armistead admits only that B.P.J. has testified that every person who tried

out for the Bridgeport Middle School's girls' cross-country team in 2021 made the team. She

denies the rest of this Request.

**REQUEST NO. 13:**

> Admit that Bridgeport Middle School's girls' cross-country team did not turn anyone
>
> away from participating due to lack of space on the roster in 2021.

**ANSWER:**  Ms. Armistead objects to this Request because it is ambiguous and vague. It is not

clear who constitutes the "team" referenced in this Request—the Bridgeport Middle School

cross-country coaches, school officials, or student atheltes.

> Subject to Ms. Armistead's general objections, Ms. Armistead states that she has no

independent knowledge of Bridgeport Middle School's girls' cross country team's selection in

2021, even after making a reasonable inquiry into the information readily attainable by her. Ms.

Armistead admits only that B.P.J. has testified that every person who tried out for the Bridgeport

Middle School's girls' cross-country team in 2021 made the team. She denies the rest of this

Request.

**REQUEST NO. 14:**

> Admit that Plaintiff B.P.J. does not have an unfair athletic advantage over other girls
>
> participating on the Bridgeport Middle School girls' cross-country team.

**ANSWER:** Ms. Armistead objects to this Request because "unfair athletic advantage" is

overbroad, vague, and ambiguous as it is unclear what kinds of unfair athletic advantages that

Plaintiff might be referring to. It is also unclear whether "other girls" refers to each and every

girl on Bridgeport Middle School's cross-country team, a similarly aged girl, or those girls in the

11

same grade as B.P.J. Moreover, she objects to this Request because this topic is the subject of expert discovery.

Subject to these objections, Ms. Armistead states that she has no independent knowledge of B.P.J.'s day-to-day performances in cross-country but has made a reasonable inquiry into the information readily attainable by her. Ms. Armistead denies this Request because B.P.J., as a biological male, has inherent athletic advantages over comparably fit, trained, and aged biological females, including in strength and speed. Ms. Armistead also notes that, according to documents produced by Defendant Harrison County Board of Education, Plaintiff B.P.J. placed higher than other members of the Bridgeport Middle School girls' cross-country team, and regularly finished higher at meets than girls on the BMS girls' cross-country team, sometimes resulting in those girls' scores not being counted toward the team total.

**REQUEST NO. 15:**

Admit that Plaintiff B.P.J. does not have an unfair athletic advantage over girls competing against the Bridgeport Middle School girls' cross-country team.

**ANSWER:** Ms. Armistead objects to this Request because "unfair athletic advantage" is overbroad, vague, and ambiguous as it is unclear what kinds of unfair athletic advantages that Plaintiffs might be referring to. Moreover, she objects to this Request because this topic is the subject of expert discovery and facts about the subjective state of the mind of the opposing party are an improper basis for a Request for Admission.

Subject to these objections, Ms. Armistead states that she has no independent knowledge of B.P.J.'s day-to-day performances in cross-country but has made a reasonable inquiry into the information readily attainable by her. Ms. Armistead denies this Request because B.P.J., as a biological male, has inherent athletic advantages over comparably fit, trained, and aged

biological females, including in strength and speed. Ms. Armistead also notes that, according to documents produced by Defendant Harrison County Board of Education, Plaintiff B.P.J. placed higher than other members of the Bridgeport Middle School girls' cross-country team, and regularly finished higher at meets than girls on the BMS girls' cross-country team, sometimes resulting in those girls' scores not being counted toward the team total.

**REQUEST NO. 16:**

Admit that cross-country is a sport that requires "competitive skill" as that phrase is used in H.B. 3293 (codified at Code of West Virginia §18-2-25d(c)(2)).

**ANSWER:** Ms. Armistead admits that cross-country is a sport that requires "competitive skill" as that phrase is used in H.B. 3293 (codified at Code of West Virginia §18-2-25d(c)(2)).

**REQUEST NO. 17:**

Admit that cross-country is a sport that requires "competitive skill" as that phrase is used in 34 C.F.R.§ 106.41(b).

**ANSWER:** Ms. Armistead admits that cross-country is a sport that requires "competitive skill" as that phrase is used in 34 C.F.R.§ 106.41(b).

**REQUEST NO. 18:**

Admit that cross-country is not a "contact sport" as that phrase is used in H.B. 3293 (codified at Code of West Virginia §18-2-25d(c)(2)).

**ANSWER:** Ms. Armistead admits that cross-country is not a "contact sport" as that phrase is used in H.B. 3293 (codified at Code of West Virginia §18-2-25d(c)(2)).

**REQUEST NO. 19:**

Admit that cross-country is not a "contact sport" as that phrase is used in 34 C.F.R.§ 106.41(b).

13

**ANSWER:** Ms. Armistead admits that cross-country is not a "contact sport" as that phrase is used in 34 C.F.R.§ 106.41(b).

**REQUEST NO. 20:**

> Admit that, but for the injunction issued in this case (Dkt. 67), Plaintiff B.P.J. would not have been permitted to be a member of Bridgeport Middle School's girls' cross-country team in 2021 because of H.B. 3293 (codified at Code of West Virginia §18-2-25d(c)(2)).

**ANSWER:** Ms. Armistead objects to the extent this Request asks her to provide a legal conclusion about H.B. 3293. Ms. Armistead further objects to the extent this Request asks her to speculate how the Bridgeport Middle School's girls' cross-country team coach or Bridgeport Middle School administrators and athletics authorities, or other state officials, would interpret or apply H.B. 3293 to Plaintiff B.P.J.

Subject to these objections, Ms. Armistead admits that based on her personal reading and understanding of H.B. 3293, and the fact the Plaintiff has admitted that B.P.J. is biologically male, the law would not permit Plaintiff B.P.J. to be a member of Bridgeport Middle School's girls' cross-country team in 2021. But Ms. Armistead lacks personal knowledge of how the coaches, school administrators, or athletic authorities at Bridgeport Middle School, or other state officials, would interpret or apply H.B. 3293 to B.P.J. absent the preliminary injunction issued in this case, and thus denies this Request.

**REQUEST NO. 21:**

> Admit that, but for the injunction issued in this case (Dkt. 67), Plaintiff B.P.J. would not be permitted to be a member of any girls' athletic team offered at Bridgeport Middle School because of H.B. 3293 (codified at Code of West Virginia §18-2-25d(c)(2)).

14

**ANSWER:** Ms. Armistead objects to the extent this Request asks her to provide a legal conclusion about H.B. 3293. Ms. Armistead further objects to the extent this Request asks her to speculate how the Bridgeport Middle School's girls' athletic teams' coaches, school administrators, or athletics authorities would interpret or apply H.B. 3293 to Plaintiff B.P.J. absent the preliminary injunction issued in this case.

Subject to these objections, Ms. Armistead admits that based on her personal reading and understanding of H.B. 3293, and the fact the Plaintiff has admitted that B.P.J. is biologically male, the law would not permit Plaintiff B.P.J. to be a member of any Bridgeport Middle School's girls' athletic teams in 2021 because of H.B. 3293. But Ms. Armistead lacks personal knowledge of how the coaches, school administrators, or athletic authorities at Bridgeport Middle School would interpret or apply H.B. 3293 to B.P.J. absent the preliminary injunction issued in this case, and thus denies this Request.

**REQUEST NO. 22:**

Admit that H.B. 3293 prohibits Plaintiff B.P.J. from participating on girls' athletic teams at all public secondary schools located in West Virginia.

**ANSWER:** Ms. Armistead objects to the extent this Request asks her to provide a legal conclusion about H.B. 3293. Ms. Armistead further objects to the extent this Request asks her to speculate how coaches, school administrators, or athletic authorities at all public secondary schools located in West Virginia would interpret or apply H.B. 3293 to Plaintiff B.P.J. regarding participation on girls' sports teams, absent the preliminary injunction issued in this case.

Subject to these objections, Ms. Armistead admits that based on her personal understanding of H.B. 3293, the law would not permit Plaintiff B.P.J. to compete on an athletic team designated for girls at a public secondary school in West Virginia. But Ms. Armistead lacks

15

personal knowledge and independent knowledge of how the coaches or school administrators at any/all public secondary schools in West Virginia, or other state officials, would interpret or apply H.B. 3293 to B.P.J. absent the preliminary injunction issued in this case, and thus denies this Request.

**REQUEST NO. 23:**

Admit that the State Board of Education and the State Superintendent must comply with H.B. 3293 unless enjoined from doing so by a court.

**ANSWER:** Ms. Armistead objects to this Request because "must comply with" is vague and does not indicate what type of legal obligation or necessity is imposed. Ms. Armistead will interpret this Request to mean the State Board and Superintendent have a legal obligation to follow H.B. 3293. Ms. Armistead further objects to the extent this Request asks her to provide a legal conclusion about H.B. 3293. Ms. Armistead also objects to the extent this Request asks her to speculate how the State Board of Education and the State Superintendent would comply with H.B. 3293 absent the preliminary injunction issued in this case.

Subject to these objections, Ms. Armistead admits that state officials generally have a legal duty to comply with state laws that apply to them, including HB 3293, but she lacks personal knowledge of all the specific legal duties and obligations on State Board of Education and the State Superintendent and how these particular entities interpret the laws and regulations imposing these duties, and thus denies this Request.

**REQUEST NO. 24:**

Admit that H.B. 3293 prohibits the State Board of Education and the State Superintendent from adopting or enforcing a policy that would allow B.P.J. to participate on girls' athletic teams at Bridgeport Middle School.

**ANSWER:** Ms. Armistead objects to the extent this Request asks her to provide a legal conclusion about H.B. 3293. Ms. Armistead further objects to the extent this Request asks her to speculate how the State Board of Education and the State Superintendent would adopt or enforce a policy that would allow B.P.J. to participate on girls' athletic teams at Bridgeport Middle School in accordance with H.B. 3293.

Subject to these objections, Ms. Armistead admits that H.B. 3293 prohibits males, including B.P.J., from competing on girls' teams at secondary schools in West Virginia, but lacks personal knowledge of how the law is enforced or the specific legal duties imposed on the State Board of Education and the State Superintendent and therefore denies this Request.

**REQUEST NO. 25:**

Admit that the Harrison County Board of Education and the Harrison County School Superintendent must comply with H.B. 3293 unless enjoined from doing so by a court.

**ANSWER:** Ms. Armistead objects to this Request because "must comply with" is vague and does not indicate what type of legal obligation is or necessity is imposed. Ms. Armistead will interpret this Request to mean the Harrison County Board of Education and School Superintendent have a legal obligation to follow H.B. 3293. Ms. Armistead objects to the extent this Request asks her to provide a legal conclusion about H.B. 3293. Ms. Armistead further objects to the extent this Request asks her to speculate how the Harrison County Board of Education and the Harrison County School Superintendent would comply with H.B. 3293 absent the preliminary injunction issued in this case.

Subject to these objections, Ms. Armistead admits that county officials generally have a legal duty to comply with state laws that apply to them, including HB 3293, but she lacks personal knowledge of all the specific legal duties and obligations on Harrison County Board of

17

Education and School Superintendent and how these particular entities interpret the laws and regulations imposing these duties, and thus denies this Request.

**REQUEST NO. 26:**

Admit that H.B. 3293 prohibits the Harrison County Board of Education and the Harrison County Superintendent from adopting or enforcing a policy that would allow B.P.J. to participate on girls' athletic teams at Bridgeport Middle School.

**ANSWER:** Ms. Armistead objects to the extent this Request asks her to provide a legal conclusion about H.B. 3293. Ms. Armistead further objects to the extent this Request asks her to speculate how the Harrison County Board of Education and the Harrison County Superintendent would adopt or enforce a policy that would allow B.P.J. to participate on girls' athletic teams at Bridgeport Middle School in accordance with H.B. 3293.

Subject to these objections,  Ms. Armistead admits that H.B. 3293 prohibits males, including B.P.J., from competing on girls' teams at secondary schools in West Virginia, but lacks personal knowledge of how the law is enforced or the specific legal duties imposed on the Harrison County Board of Education and School Superintendent and therefore denies this Request.

**REQUEST NO. 27:**

Admit that the West Virginia Secondary School Athletic Commission must comply with H.B. 3293 unless enjoined from doing so by a court.

**ANSWER:** Ms. Armistead objects to the extent this Request asks her to provide a legal conclusion about H.B. 3293. Ms. Armistead further objects to the extent this Request asks her to speculate how the West Virginia Secondary School Athletic Commission would comply with H.B. 3293 absent the preliminary injunction issued in this case.

18

Subject to these objections, Ms. Armistead Ms. Armistead admits that H.B. 3293 prohibits males, including B.P.J., from competing on girls' teams at secondary schools in West Virginia, but lacks personal knowledge of how the law is enforced or the specific legal duties imposed on the West Virginia Secondary School Athletic Commission and therefore denies this Request.

**REQUEST NO. 28:**

Admit that H.B. 3293 prohibits the West Virginia Secondary School Athletic Commission from adopting or enforcing a policy that would allow B.P.J. to participate on girls' athletic teams at Bridgeport Middle School.

**ANSWER:** Ms. Armistead objects to the extent this Request asks her to provide a legal conclusion about H.B. 3293. Ms. Armistead further objects to the extent this Request asks her to speculate how the West Virginia Secondary School Athletic Commission would adopt or enforce a policy that would allow B.P.J. to participate on girls' athletic teams at Bridgeport Middle School in accordance with H.B. 3293.

Subject to these objections, Ms. Armistead admits that H.B. 3293 prohibits males, including B.P.J., from competing on girls' teams at secondary schools in West Virginia, but lacks personal knowledge of how the law is enforced or the specific legal duties imposed on the West Virginia Secondary School Athletic Commission and therefore denies this Request.

**REQUEST NO. 29:**

Admit that there are no athletic teams designated as "coed or mixed," as that phrase is used in H.B. 3293 (codified at Code of West Virginia §18-2-25d(c)(1)(C)), offered at Bridgeport Middle School.

**ANSWER:** Ms. Armistead lacks personal and independent knowledge of whether Bridgeport Middle School offers any coed or mixed athletic teams. Even after conducting a reasonable

investigation, Ms. Armistead cannot find sufficient information to determine whether there are any athletic teams designated as coed or mixed at Bridgeport Middle School and notes there is conflicting evidence in the record on this point, and thus denies this Request.

**REQUEST NO. 30:**

Admit that there are no athletic teams designated as "coed or mixed," as that phrase is used in H.B. 3293 (codified at Code of West Virginia §18-2-25d(c)(1)(C)), that compete interscholastically offered at any public secondary school located in West Virginia.

**ANSWER:** Ms. Armistead objects to this Request because it is unduly burdensome to research and determine whether every public secondary school located in West Virginia offers coed or mixed athletic teams. Ms. Armistead points to West Virginia Secondary School Activities Commission's Responses to Plaintiff's First Set of Interrogatories, Response to Interrogatory No. 11, showing there are at least 277 public secondary schools who are members of the West Virginia Secondary School Activities Commission, notwithstanding any additional non-member public schools in West Virginia.

Subject to these objections, Ms. Armistead lacks personal and independent knowledge of whether any public secondary school in West Virginia offers any coed or mixed athletic teams. Even after conducting a reasonable investigation, Ms. Armistead cannot find sufficient information to determine whether there are any athletic teams designated as coed or mixed that compete interscholastically at any public secondary schools located in West Virginia, and thus denies this Request.

**REQUEST NO. 31:**

Admit that there are no cross-country teams designated as "coed or mixed," as that phrase is used in H.B. 3293 (codified at Code of West Virginia §18-2-25d(c)(1)(C)), that

compete interscholastically offered by any member school of the West Virginia

Secondary School Activities Commission.

**ANSWER:** Ms. Armistead objects to this Request because it is unduly burdensome and

overbroad to research and determine whether every member public secondary school of the West

Virginia Secondary School Activities Commission offers coed or mixed athletic teams. Ms.

Armistead points to West Virginia Secondary School Activities Commission's Responses to

Plaintiff's First Set of Interrogatories, Response to Interrogatory No. 11, showing there are at

least 277 public secondary schools who are members of the West Virginia Secondary School

Activities Commission.

Subject to these objections, Ms. Armistead lacks personal and independent knowledge of

whether any West Virginia Secondary public secondary school in West Virginia offers any coed

or mixed cross-country teams. Even after conducting a reasonable investigation, Ms. Armistead

cannot find sufficient information to determine whether there are any cross-country teams

designated as coed or mixed at any West Virginia Secondary School Activities Commission

member public secondary schools located in West Virginia that compete interscholastically, and

thus denies this Request.

**REQUEST NO. 32:**

Admit that there are no athletic leagues designated as "coed or mixed," as that phrase is

used in H.B. 3293 (codified at Code of West Virginia §18-2-25d(c)(1)(C)), that comprise

teams from more than one school supervised by the West Virginia Secondary School

Activities Commission.

**ANSWER:** Ms. Armistead objects to this Request because it is unduly burdensome to research

and determine whether every public secondary school located in West Virginia offers coed or

mixed athletic teams. Ms. Armistead points to WVSSAC's Responses to Plaintiff's First Set of

Interrogatories, Response to Interrogatory No. 11, showing there are at least 277 public secondary schools who are members of WVSSAC, notwithstanding any additional non-member public schools in West Virginia.

Subject to these objections, Ms. Armistead lacks personal and independent knowledge of whether there are any athletic leagues comprised of West Virginia Secondary public secondary schools' athletic teams that are supervised by the West Virginia Secondary School Activities Commission. Even after conducting a reasonable investigation, Ms. Armistead cannot find sufficient information to determine whether there are any athletic leagues comprised of West Virginia Secondary public secondary schools' athletic teams that are supervised by the West Virginia Secondary School Activities Commission, and thus denies this Request.

**REQUEST NO. 33:**

Admit that there are no athletic teams designated as "coed or mixed," as that phrase is used in H.B. 3293 (codified at Code of West Virginia §18-2-25d(c)(1)(C))," that compete interscholastically offered by any public secondary school under the supervision of the West Virginia State Board of Education.

**ANSWER:** Ms. Armistead objects to this Request because it is unduly burdensome to research and determine whether every public secondary school located in West Virginia offers coed or mixed athletic teams. Ms. Armistead points to WVSSAC's Responses to Plaintiff's First Set of Interrogatories, Response to Interrogatory No. 11, showing there are at least 277 public secondary schools who are members of WVSSAC, notwithstanding any additional non-member public schools in West Virginia.

Subject to these objections, Ms. Armistead lacks personal and independent knowledge of whether any West Virginia Secondary public secondary school in West Virginia offers any coed or mixed athletic teams that compete interscholastically under the supervision of the West

Virginia State Board of Education. Even after conducting a reasonable investigation, Ms. Armistead cannot find sufficient information to determine whether any West Virginia Secondary public secondary school in West Virginia offers any coed or mixed athletic teams that compete interscholastically under the supervision of the West Virginia State Board of Education, and thus denies this Request.

**REQUEST NO. 34:**

Admit that H.B. 3293 does not prohibit a cisgender girl student at Bridgeport Middle School from joining a girls' athletic team offered at Bridgeport Middle School.

**ANSWER:** Ms. Armistead objects to the meaning of the term "cisgender". There is no definitive, legally recognized definition of "cisgender", Plaintiff's definition relies on the term "gender identity" which, as noted above, is not defined, and finally, Ms. Armistead denies that sex is "assigned at birth." Ms. Armistead further objects to the extent this Request asks her to provide a legal conclusion about H.B. 3293 and objects to the extent this Request asks her to speculate how Bridgeport Middle School would enforce H.B. 3293 regarding its girls' athletic teams.

Subject to these objections, Ms. Armistead admits only that, based on her personal understanding and reading of H.B. 3293, the law does not prohibit biological girls of appropriate age, academic standing, and eligibility, from trying out for or joining a girls' athletic team offered at Bridgeport Middle School.

**REQUEST NO. 35:**

Admit that H.B. 3293 does not prohibit a cisgender girl student at any public secondary school in West Virginia from joining a girls' athletic team offered by her public secondary school.

**ANSWER:** Ms. Armistead objects to the meaning of the term "cisgender". There is no definitive, legally recognized definition of "cisgender", Plaintiff's definition relies on the term "gender identity" which, as noted above, is not defined, and finally, Ms. Armistead denies that sex is "assigned at birth." Ms. Armistead further objects to the extent this Request asks her to provide a legal conclusion about H.B. 3293 and objects to the extent this Request asks her to speculate how any and all public secondary school in West Virginia would enforce H.B. 3293 regarding its girls' athletic teams.

Subject to these objections, Ms. Armistead only admits that based on her personal understanding and reading of H.B. 3293, the law does not prohibit biological girls of appropriate age, academic standing, and eligibility from trying out for or otherwise joining a girls' athletic team offered at any public secondary school in West Virginia.

**REQUEST NO. 36:**

Admit that H.B. 3293 prohibits a Bridgeport Middle School transgender girl student from joining a girls' athletic team offered at Bridgeport Middle School.

**ANSWER:** Ms. Armistead objects to the definition of "transgender" as provided in Plaintiff's First Amended Complaint paragraph 23: "A transgender person is someone who has a gender identity that does not align with their sex assigned at birth." There is no definitive, legally recognized definition of "transgender", Plaintiff's definition relies on the term "gender identity" which, as noted above, is not defined, and finally, Ms. Armistead denies that sex is "assigned at birth." Ms. Armistead further objects to the extent this Request asks her to provide a legal conclusion about H.B. 3293 and objects to the extent this Request asks her to speculate how Bridgeport Middle School would enforce H.B. 3293 regarding the inner sense of self of biological males seeking to join its girls' athletic teams.

Subject to these objections, Ms. Armistead admits that H.B. 3293 prohibits biological males, regardless of how they identify, from competing on a team designated for women or girls at Bridgeport Middle School. But Ms. Armistead lacks personal knowledge of how the coaches, school administrators or athletic authorities at Bridgeport Middle School, or other state officials, intend to or would interpret or apply H.B. 3293.

**REQUEST NO. 37:**

Admit that H.B. 3293 prohibits any transgender girl secondary school student located in West Virginia from joining a girls' athletic team offered by her public secondary school.

**ANSWER:** Ms. Armistead objects to the definition of "transgender" as provided in Plaintiff's First Amended Complaint paragraph 23: "A transgender person is someone who has a gender identity that does not align with their sex assigned at birth." There is no definitive, legally recognized definition of "transgender", Plaintiff's definition relies on the term "gender identity" which, as noted above, is not defined, and finally, Ms. Armistead denies that sex is "assigned at birth." Ms. Armistead further objects to the extent this Request asks her to provide a legal conclusion about H.B. 3293 and objects to the extent this Request asks her to speculate how any public secondary school in West Virginia, or other state officials, would enforce H.B. 3293 regarding the inner sense of self of biological males seeking to join girls' athletic teams.

Subject to these objections, Ms. Armistead admits that H.B. 3293 prohibits biological males, regardless of how they identify, from competing on an athletic team designated for women or girls at a public secondary school in West Virginia. But Ms. Armistead lacks personal knowledge of how the coaches, school administrators, or athletic authorities at every public secondary school in West Virginia, or state officials, intend to or would interpret or apply H.B. 3293 to biological males.

**REQUEST NO. 38:**

25

Admit that prior to the enactment of H.B. 3293, cisgender boy students at Bridgeport Middle School were prohibited from joining girls' athletic teams offered at Bridgeport Middle School.

**ANSWER:** Ms. Armistead objects to the phrase "prohibited from joining" because it is unclear whether the Request asks for whether the law forbade this or whether any male athletes wanted to join and were barred from doing so. Additionally, the term "cisgender" is vague as it has no definitive, legally recognized definition, Plaintiff's definition relies on the term "gender identity" which, as noted above, is not defined, and finally, Ms. Armistead denies that sex is "assigned at birth." Ms. Armistead further objects to the extent this Request asks her to provide a legal conclusion about H.B. 3293 and objects to the extent this Request asks her to speculate whether biological male students at Bridgeport Middle School were prohibited from joining girls' athletic teams offered at Bridgeport Middle School. Finally, this Request has no time limit and is therefore vastly overbroad. It is impossible for Ms. Armistead to know all the rules and regulations at all times prior to the passage of H.B. 3293, how officials interpreted and applied those rules, and all the reasons why and if males attempted to join a girls' team and were in fact prohibited from doing so.

Subject to these objections, Ms. Armistead admits that Title IX has, for nearly 50 years in our country, prohibited males from competing in federally funded girls' sports where competitive skill or physical contact is involved, but she has no personal knowledge about how West Virginia officials have interpreted or intend to interpret Title IX. But more recently, some courts, administrative agencies, athletic bodies, and government officials have adopted a different understanding of Title IX, adopted a different understanding of what it means to be male and female, and therefore created confusion about who can compete in girls' sports and on what conditions they could do so. Finally, Ms. Armistead has no personal or independent

knowledge as to how officials interpreted state and federal law prior to passing H.B. 3293, and therefore denies the same.

**REQUEST NO. 39:**

Admit that prior to the enactment of H.B. 3293, a cisgender boy student at any public secondary school in West Virginia was prohibited from joining girls' athletic teams offered at his public secondary school.

**ANSWER:** Ms. Armistead objects to the phrase "prohibited from joining" because it is unclear whether the Request asks for whether the law forbade this or whether any male athletes attempted to join and were barred from doing so. Ms. Armistead also objects to the meaning of the term "cisgender". There is no definitive, legally recognized definition of "cisgender", Plaintiff's definition relies on the term "gender identity" which is not defined, and finally, Ms. Armistead denies that sex is "assigned at birth." Ms. Armistead further objects to the extent this Request asks her to provide a legal conclusion about H.B. 3293 and objects to the extent this Request asks her to speculate whether biological male students were prohibited from joining girls' athletic teams offered at any public secondary school in West Virginia. Finally, this Request has no time limit and is therefore vastly overbroad. It is impossible for Ms. Armistead to know all the rules and regulations at all times prior to the passage of H.B. 3293, how officials interpreted and applied those rules, and all the reasons why and if males attempted to join a girls' team and were in fact prohibited from doing so.

Subject to these objections, Ms. Armistead admits that Title IX has, for nearly 50 years in our country, prohibited males from competing in federally funded girls' sports where competitive skill or physical contact is involved, but she has no personal knowledge about how West Virginia officials have interpreted or intend to interpret Title IX. But more recently, some courts, administrative agencies, athletic bodies, and government officials have adopted a

different understanding of Title IX, adopted a different understanding of what it means to be male and female, and therefore created confusion about who can compete in girls' sports and on what conditions they could do so. Finally, Ms. Armistead has no personal or independent knowledge as to how officials interpreted state and federal law prior to passing H.B. 3293, and therefore denies the same.

**REQUEST NO. 40:**

Admit that prior to the enactment of H.B. 3293, you are not aware of any transgender student athlete participating on an athletic team offered by Bridgeport Middle School.

**ANSWER:** Ms. Armistead objects to the definition of "transgender" as provided in Plaintiff's First Amended Complaint paragraph 23: "A transgender person is someone who has a gender identity that does not align with their sex assigned at birth." There is no definitive, legally recognized definition of "transgender", Plaintiff's definition relies on the term "gender identity" which, as noted above, is not defined, and finally, Ms. Armistead denies that sex is "assigned at birth."

Subject to these objections, Ms. Armistead admits that prior to the enactment of H.B. 3293, she had no personal or independent knowledge of the internal sense of self of members of the athletic teams at Bridgeport Middle School and whether that internal sense has changed, nor would she have any reason to know or possess that information. After a reasonable inquiry into the knowledge and information available to her, she states that she is aware of testimony from the WVSSAC indicating that at least one other male who identified as female tried to compete in girls' sports, but she does not know where the student attended school. This could have been at Bridgeport Middle School, so Ms. Armistead denies this Request.

**REQUEST NO. 41:**

Admit that prior to the enactment of H.B. 3293, you are not aware of any transgender student athlete participating on an athletic team offered by a public secondary school in West Virginia.

**ANSWER:** Ms. Armistead objects to the definition of "transgender" as provided in Plaintiff's First Amended Complaint paragraph 23: "A transgender person is someone who has a gender identity that does not align with their sex assigned at birth." There is no definitive, legally recognized definition of "transgender", Plaintiff's definition relies on the term "gender identity" which, as noted above, is not defined, and finally, Ms. Armistead denies that sex is "assigned at birth."

Subject to these objections, Ms. Armistead admits that prior to the enactment of H.B. 3293, she had no personal or independent knowledge of the internal sense of self of members of the athletic teams at a public secondary school in West Virginia, nor would she have any reason to know or possess that information. After a reasonable inquiry into the knowledge and information available to her, Ms. Armistead states that she is aware of testimony from the WVSSAC indicating that at least one other male who identified as female tried to compete in girls' sports at a secondary school in West Virginia, but she does not know where the student attended school.

**REQUEST NO. 42:**

Admit that other than Plaintiff B.P.J., you are not aware of a transgender student athlete participating on an athletic team offered by Bridgeport Middle School.

**ANSWER:** Ms. Armistead objects to the definition of "transgender" as provided in Plaintiff's First Amended Complaint paragraph 23: "A transgender person is someone who has a gender identity that does not align with their sex assigned at birth." There is no definitive, legally recognized definition of "transgender", Plaintiff's definition relies on the term "gender identity"

29

which, as noted above, is not defined, and finally, Ms. Armistead denies that sex is "assigned at birth."

Subject to these objections, Ms. Armistead admits that other than Plaintiff B.P.J., she is currently not aware of and has no personal or independent knowledge of the current internal sense of self of members of the athletic teams at Bridgeport Middle School, nor does she have any reason to know or possess that information.

**REQUEST NO. 43:**

Admit that other than Plaintiff B.P.J., you are not aware of a transgender student athlete participating on an athletic team offered by a public secondary school in West Virginia.

**ANSWER:** Ms. Armistead objects to the definition of "transgender" as provided in Plaintiff's First Amended Complaint paragraph 23: "A transgender person is someone who has a gender identity that does not align with their sex assigned at birth." There is no definitive, legally recognized definition of "transgender", Plaintiff's definition relies on the term "gender identity" which, as noted above, is not defined, and finally, Ms. Armistead denies that sex is "assigned at birth."

Subject to these objections, Ms. Armistead admits that she is currently not aware of, and she has no personal or independent knowledge of the internal sense of self of members of the athletic team offered by a public secondary school in West Virginia, nor would she have any reason to know or possess that information.

**REQUEST NO. 44:**

Admit that students derive social benefits from participation on athletic teams offered by public secondary schools in West Virginia.

**ANSWER:** Ms. Armistead objects to the term "social benefits" as overbroad, vague, and ambiguous because it is not clear how, why, or what kind of social benefits different individuals

30

experience and Ms. Armistead has no personal or independent knowledge of the social benefits that students other than herself may or may not derive from participating on athletic teams. Moreover, she objects to this Request because this topic is the subject of expert discovery and facts about the subjective state of the mind of the opposing party are an improper basis for a Request for Admission.

Subject to these objections, Ms. Armistead admits that she has personally derived social benefits as a student from playing soccer when the competition was safe and fair such as mental and physical toughness, perseverance, good sportsmanship, the value of hard work and discipline, the importance of teamwork, and leadership. Ms. Armistead further admits that she has observed other fellow athletes similarly benefiting from participation on athletic teams and believes that students generally benefit from participation when the competition is safe and fair. But Ms. Armistead never participated in sports in secondary schools in West Virginia and therefore cannot speak to the personal experience of every student.

**REQUEST NO. 45:**

Admit that students derive psychological benefits from participation on athletic teams offered by public secondary schools in West Virginia.

**ANSWER:** Ms. Armistead objects to the term "psychological benefits" as overbroad, vague, and ambiguous because it is not clear how, why, or what kind of psychological benefits different students may or may not experience from participating on athletic teams offered by public secondary schools in West Virginia. And Ms. Armistead has no personal or independent knowledge of the psychological benefits that students other than herself may or may not derive from participating on athletic teams. Moreover, she objects to this Request because this topic is the subject of expert discovery and facts about the subjective state of the mind of the opposing party are an improper basis for a Request for Admission.

31

Subject to these objections, Ms. Armistead admits that she has personally derived psychological benefits from playing soccer when the competition was safe and fair such as mental and physical toughness, perseverance, good sportsmanship, the value of hard work and discipline, the importance of teamwork, and leadership. Ms. Armistead further admits that she has observed fellow athletes similarly benefitting from participation on athletic teams when the competition is safe and fair. But Ms. Armistead never participated in sports in secondary schools in West Virginia and therefore cannot speak to the personal experience of every student.

**REQUEST NO. 46:**

Admit that interscholastic athletic competition benefits middle school students.

**ANSWER:** Ms. Armistead objects to the term "benefits" as overbroad, vague, and ambiguous because it is not clear how, why, or what kind of benefits different students may or may not experience from interscholastic athletic competition. And Ms. Armistead has no personal or independent knowledge of the all the benefits that middle school students may or may not derive from interscholastic athletic competition. Ms. Armistead also objects to the term "middle school students" as overbroad, vague, and ambiguous. It is not clear whether Plaintiff refers to middle school students in West Virginia, the United States of America, or the entire world. Moreover, she objects to this Request because this topic is the subject of expert discovery and facts about the subjective state of the mind of the opposing party are an improper basis for a Request for Admission.

Subject to these objections, Ms. Armistead lacks personal and independent knowledge of how and if interscholastic competition benefits each and every middle school student, but she admits that interscholastic competition—when fair and safe—generally benefits students and she has personally benefitted from such fair and safe competition.

**REQUEST NO. 47:**

32

Admit that middle school students who participate in interscholastic athletics receive benefits regardless whether they win or lose.

**ANSWER:** Ms. Armistead objects to the term "benefits" as overbroad, vague, and ambiguous because it is not clear how, why, or what kind of benefits different students may or may not receive from participating in interscholastic athletics regardless whether they win or lose, or whether the benefit is monetary, emotional, or psychological. And Ms. Armistead has no personal or independent knowledge of all the benefits that middle school students may or may not receive from participating in interscholastic athletics regardless whether they win or lose. Ms. Armistead also objects to the term "middle school students" as overbroad, vague, and ambiguous because it is not clear whether Plaintiff refers to middle school students in West Virginia, the United States of America, or the entire world. Moreover, she objects to this Request because this topic is the subject of expert discovery and facts about the subjective state of the mind of the opposing party are an improper basis for a Request for Admission.

Subject to these objections, Ms. Armistead admits that she personally benefited when she competed in safe and fair sports in middle school regardless of whether she won or lost. And based on her personal experience, she believes that competing in safe and fair sports generally benefits middle schoolers, but she cannot speak to the personal experience of every middle school interscholastic athlete.

**REQUEST NO. 48:**

Admit that student athletes who participate in interscholastic athletics receive benefits regardless whether they win or lose.

**ANSWER:** Ms. Armistead objects to the term "benefits" as overbroad, vague, and ambiguous because it is not clear how, why, or what kind of benefits different student athletes may or may not receive from participating in interscholastic athletics regardless whether they win or lose, or

33

whether the benefit is monetary, emotional, or psychological. And Ms. Armistead has no personal or independent knowledge of all the benefits that student athletes may or may not receive from participating in interscholastic athletics regardless whether they win or lose. Ms. Armistead also objects to the term "student athletes" as overbroad, vague, and ambiguous because it is not clear whether Plaintiff refers to all student athletes in West Virginia, the United States of America, or the entire world, or the age range/grade level of student athletes. "Student athletes" could include any student of any age who plays sports or considers themselves an athlete. Moreover, she objects to this Request because this topic is the subject of expert discovery and facts about the subjective state of the mind of the opposing party are an improper basis for a Request for Admission.

Subject to these objections, Ms. Armistead Ms. Armistead admits that she personally benefited when she competed in safe and fair sports as an interscholastic athlete regardless of whether she won or lost. And based on her personal experience, she believes that competing in safe and fair sports generally benefits interscholastic athletes, but she cannot speak to the personal experience of every interscholastic athlete.

Respectfully submitted this 10th day of March, 2022.

/s/ Christiana Holcomb
—————————————————
Christiana Holcomb, DC Bar No. 176922*
Alliance Defending Freedom
440 First Street NW, Suite 600
Washington, DC 20001
(202) 393-8690
(202) 347-3622 Fax
cholcomb@adflegal.org

Jonathan Scruggs, AZ Bar No. 030505*
Alliance Defending Freedom
15100 N. 90th Street
Scottsdale, AZ 85260
(480) 444-0020
(480) 444-0028 Fax
jscruggs@adflegal.org

Rachel Csutoros, MA Bar No. 706225*
Tyson Langhofer, VA Bar No. 95204*
Alliance Defending Freedom
44180 Riverside Parkway
Lansdowne, VA 20176
(571) 707-4655
(202) 347-3622 Fax
rcsutoros@adflegal.org
tlanghofer@adflegal.org

Travis Barham, GA Bar No. 753251*
Alliance Defending Freedom
1000 Hurricane Shoals Road NE
Suite D-1100
Lawrenceville, GA 30043
(770) 339-0774
(770) 339-6744 Fax
tbarham@adflegal.org

Timothy D. Ducar, AZ Bar No. 015307*
Law Offices of Timothy D. Ducar, PLC
7430 E. Butherus Drive, Suite E
Scottsdale, AZ 85260
(480) 502-2119
(480) 452-0900 Fax
tducar@azlawyers.com

Brandon Steele, WV Bar No. 12423
Joshua Brown, WV Bar No. 12652
The Law Offices of Brandon S. Steele
3049 Robert C. Byrd Drive, Suite 100
Beckley, WV 25801
(304) 253-1230
(304) 255-1520 Fax
bsteelelawoffice@gmail.com

*Visiting Attorneys

Attorneys for Intervenor