# Exhibit 14

1              IN THE UNITED STATES DISTRICT COURT

2          FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA

3                     CHARLESTON DIVISION

4                   *  *  *  *  *  *  *  *

5    B.P.J., by her next friend and    *

6    Mother, HEATHER JACKSON,          *

7         Plaintiff                    *   Case No.

8         vs.                          *   2:21-CV-00316

9    WEST VIRGINIA STATE BOARD OF      *

10   EDUCATION, HARRISON COUNTY        *

11   BOARD OF EDUCATION, WEST          *

12   VIRGINIA SECONDARY SCHOOL         *

13   ACTIVITIES COMMISSION, W.         *

14   CLAYTON BURCH in his official     *

15   Capacity as State Superintendent,* VIDEOTAPED

16   DORA STUTLER in her official      * VIDEOCONFERENCE

17   Capacity as Harrison County       * DEPOSITION

18   Superintendent, PATRICK MORRISEY  *      OF

19   In his official capacity as       * HEATHER JACKSON

20   Attorney General, and THE STATE   * January 20, 2022

21   OF WEST VIRGINIA,                 *

22        Defendants                   *

23              Any reproduction of this transcript
                is prohibited without authorization
24                  by the certifying agency.

1              VIDEOTAPED VIDEOCONFERENCE DEPOSITION

2                              OF

3    HEATHER JACKSON, taken on behalf of the Defendant, State

4    of West Virginia herein, pursuant to the Rules of Civil

5    Procedure, taken before me, the undersigned, Nicole

6    Montagano, a Court Reporter and Notary Public in and for

7    the State of West Virginia, on Wednesday, January 20,

8    2022, beginning at 11:13 a.m.

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

```
1                    A P P E A R A N C E S

2

3    JOSHUA BLOCK, ESQUIRE

4    American Civil Liberties Union Foundation

5    125 Broad Street

6    New York, NY  10004

7    COUNSEL FOR PLAINTIFF

8

9    LOREE STARK, ESQUIRE

10   ACLU of West Virginia

11   P.O. Box 3952

12   Charleston, WV  25339

13       COUNSEL FOR PLAINTIFF

14

15   KATHLEEN R. HARTNETT, ESQUIRE

16   ANDREW BARR, ESQUIRE

17   JULIE VEROFF, ESQUIRE

18   ZOE HELSTROM, ESQUIRE

19   Cooley, LLP

20   3 Embarcadero Center

21   20th Floor

22   San Francisco, CA  94111-4004

23       COUNSELS FOR PLAINTIFF

24
```

```
 1              A P P E A R A N C E S (cont'd)

 2

 3   SRUTI SWAMINATHAN, ESQUIRE

 4   Lambda Legal

 5   120 Wall Street

 6   19th Floor

 7   New York, NY  10005-3919

 8        COUNSEL FOR PLAINTIFF

 9

10   DAVID TRYON, ESQUIRE

11   CURTIS R.A. CAPEHART, ESQUIRE

12   State Capitol Complex

13   Building 1, Room E-26

14   Charleston, WV  25305

15        COUNSEL FOR STATE OF WEST VIRGINIA

16

17   ROBERTA F. GREEN, ESQUIRE

18   Shuman McCuskey Slicer, PLLC

19   1411 Virginia Street East

20   Suite 200

21   Charleston, WV  25301

22        COUNSEL FOR WEST VIRGINIA SECONDARY SCHOOL

23        ACTIVITIES COMMISSION

24
```

```
1              A P P E A R A N C E S (cont'd)

2

3    SUSAN DENIKER, ESQUIRE

4    Steptoe & Johnson

5    400 White Oaks Boulevard

6    Bridgeport, WV  26330

7         COUNSEL FOR HARRISON COUNTY BOARD OF EDUCATION and

8         HARRISON COUNTY SUPERINTENDENT DORA STUTLER

9

10   KELLY C. MORGAN, ESQUIRE

11   KRISTEN V. HAMMOND, ESQUIRE

12   Bailey Wyant

13   500 Virginia Street East

14   Suite 600

15   Charleston, WV  25301

16        COUNSEL FOR WEST VIRGINIA BOARD OF EDUCATION and

17        SUPERINTENDANT W. CLAYTON BURCH

18

19   TIMOTHY D. DUCAR, ESQUIRE

20   Law Office of Timothy D. Ducar

21   7430 East Butherus Drive

22   Suite E

23   Scottsdale, AZ  85260

24        COUNSEL FOR INTERVENOR, LAINEY ARMISTEAD
```

```
 1                  A P P E A R A N C E S (cont'd)

 2

 3    JOSHUA BROWN, ESQUIRE

 4    CHRISTIANA HOLCOMB, ESQUIRE

 5    RACHEL CSUTOROS, ESQUIRE

 6    Alliance Defending Freedom

 7    15100 North 90th Street

 8    Scottsdale, AZ  85260

 9         COUNSEL FOR INTERVENOR, LAINEY ARMISTEAD

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24
```

```
1                    I N D E X

2

3   DISCUSSION AMONG PARTIES                88 -  92

4   WITNESS: HEATHER JACKSON

5   EXAMINATION

6      By Attorney Tryon                    92 -  226

7   EXAMINATION

8      By Attorney Green                   227 - 229

9   EXAMINATION

10     By Attorney Deniker                 229 - 267

11  EXAMINATION

12     By Attorney Morgan                  267 - 272

13  EXAMINATION

14     By Attorney Ducar                   273 - 285

15  RE-EXAMINATION

16     By Attorney Tryon                   285 - 287

17  DISCUSSION AMONG PARTIES              287 - 288

18  CERTIFICATE                                 289

19

20

21

22

23

24
```

```
1                          EXHIBIT PAGE

2

3                                              PAGE

4    NUMBER   DESCRIPTION                  IDENTIFIED

5    Exhibit 1    Davis Medical Records        --*

6    Exhibit 1R   Davis Medical Records        --*

7    Exhibit 2    Davis Medical Records        --*

8    Exhibit 3    WVU Medical Records          --*

9    Exhibit 4    UPMC Children's Medical

10                Records                       --*

11   Exhibit 5    UPMC Children's Medical

12                Records                       --*

13   Exhibit 6    UPMC Children's Medical

14                Records                       --*

15   Exhibit 7    UPMC Children's Medical

16                Records

17   Exhibit 8    UPMC Children's Medical

18                Records                       --*

19   Exhibit 9    UPMC Children's Medical

20                Records                       --*

21   Exhibit 11A Progress Notes                 --*

22   Exhibit 11B Progress Notes                 --*

23   Exhibit 11C Progress Notes                 --*

24   Exhibit 11D Progress Notes                 --*
```

```
 1                              EXHIBIT PAGE

 2

 3                                                    PAGE

 4      NUMBER          DESCRIPTION                IDENTIFIED

 5      Exhibit 12   UPMC Children's Medical

 6                   Records                          --*

 7      Exhibit 13   UMPC Children's Medical

 8                   Records                          --*

 9      Exhibit 14   WVU Medical Records             --*

10      Exhibit 15   WVU Medical Records             --*

11      Exhibit 16   WVU Medical Records             --*

12      Exhibit 17   Gender Support Plan             --*

13      Exhibit 18   Preferred Name Request Form     --*

14      Exhibit 19   Gender Support Plan             --*

15      Exhibit 20   Student Information             --*

16      Exhibit 20R  Student Information             --*

17      Exhibit 21   Screening Results              --*

18      Exhibit 21R  Screening Results              --*

19      Exhibit 22   Birth Certificate              --*

20      Exhibit 22R  Birth Certificate              --*

21      Exhibit 23   Heart Walk Article              --

22      Exhibit 23R  Heart Walk Article              --

23      Exhibit 24   Photo                           --

24      Exhibit 24R  Photo                           --
```

```
 1                          EXHIBIT PAGE

 2

 3                                              PAGE

 4   NUMBER          DESCRIPTION              IDENTIFIED

 5   Exhibit 25   WV Record                      --

 6   Exhibit 26   Photo of Mom and BPJ           --

 7   Exhibit 27   Article                        --

 8   Exhibit 28   Article                        --

 9   Exhibit 29   Lambda Legal Article           --

10   Exhibit 30   Declaration of Heather

11                Jackson                        --

12   Exhibit 31   Declaration of BJP             --

13   Exhibit 32   First Amended Complaint        --

14   Exhibit 33   Standards of Care              --

15   Exhibit 34   House Bill 3293                --

16

17

18

19

20

21

22

23   * CONFIDENTIAL EXHIBITS

24
```

1                          OBJECTION PAGE

2

3     ATTORNEY                                        PAGE

4     Block     98, 98, 101, 106, 106, 107, 112, 113, 113, 114,

5     115, 117, 119, 122, 122, 122, 128, 129, 131, 132, 139,

6     143, 145, 146, 148, 149, 155, 156, 160, 177, 181, 181,

7     182, 187, 188, 193, 195, 196, 200, 200, 202, 202, 204,

8     213, 213, 214, 214, 215, 217, 217, 219, 219, 219, 220,

9     220, 222, 224, 237, 239, 255, 255, 258, 258, 270, 271,

10    276, 277, 278, 279, 279, 280, 283, 287

11

12

13

14

15

16

17

18

19

20

21

22

23

24

```
 1                  S T I P U L A T I O N

 2   ----------------------------------------------------

 3   (It is hereby stipulated and agreed by and between

 4   counsel for the respective parties that reading,

 5   signing, sealing, certification and filing are not

 6   waived.)

 7   ----------------------------------------------------

 8                  P R O C E E D I N G S

 9   ----------------------------------------------------

10              ATTORNEY TRYON:  This is David Tryon on

11   behalf of the State of West Virginia conducting this

12   deposition on behalf of the State of West Virginia.  We

13   have had off the record some discussions among all the

14   counsel about some various stipulations about how to go

15   forward with the deposition and with objections, and I

16   think the best thing for me to do, since Josh, since you

17   were the one that is making the objections in this case,

18   you give your thoughts about how we can handle those

19   objections and then we can all state how we concur with

20   them.  Is that fair enough or do you want me to state

21   them?

22              ATTORNEY BLOCK:  No, I can state them.

23   And I think I'll state each type of objection.  The

24   first is that several objections have come up to
```

 1   questions that in our view seem to call for legal expert

 2   or medical opinion.  And our understanding from our

 3   discussions with Defense Counsel is that they do not

 4   intend for any of their questions to seek an answer

 5   based on legal/medical or otherwise expert opinion and

 6   they will specifically state otherwise if they are

 7   seeking a legal/expert or medical opinion.  And so based

 8   on that understanding, we will just make a standing

 9   objection to any question insofar as it calls for a

10   legal expert or medical opinion and won't be making a

11   specific objection to each question as it occurs.

12               ATTORNEY TRYON:  Agreed.  And that

13   applies to this deposition.  And to the extent that we

14   address it at other depositions, we'll address that

15   separately.

16               Right?

17               ATTORNEY BLOCK:  Yes.  So if each counsel

18   could say that they agree to this way of handling those

19   objections for purposes of this deposition.

20               ATTORNEY DENIKER:  I'm in agreement with

21   that.

22               ATTORNEY MORGAN: I am as well.

23               ATTORNEY DUCAR: I am as well.

24               ATTORNEY BLOCK:  The second set of

```
 1   objections that came up were objections to terminology
 2   regarding gender identity, being transgender, the
 3   definition of sex, gender transition, that in our view
 4   are vague and that we think can lead to confusion about
 5   what the terminology means and whether the terminology
 6   is even medically appropriate.  And so we object to any
 7   questions that could be used to imply that the language
 8   used in that question actually is medically appropriate
 9   language.  But we don't want those to unnecessarily
10   interrupt the deposition, but at the same time we think
11   it could be helpful to clarify some of the language so
12   it doesn't cause problems for any counsel down the road.
13   And so we propose that we can handle that issue by ---
14   if terminology that we think is vague and problematic
15   comes up, we will simply say objection to terminology
16   and say we have a standing objection to that terminology
17   without then reiterating objections each subsequent time
18   the terminology is used.  And so is that procedure
19   acceptable to Defense Counsel?
20              ATTORNEY TRYON:  Agreed on behalf of the
21   State of West Virginia.
22              ATTORNEY DENIKER:  I'm agreeable to that
23   as well.
24              ATTORNEY MORGAN:  I'm agreeable as well.
```

```
 1                    ATTORNEY DUCAR:  Tim Ducar on behalf of
 2   Armistead, yes.
 3                    ATTORNEY BLOCK:  And the Commission had a
 4   chance to put their statement on the record.  Roberta?
 5                    ATTORNEY GREEN:  Yes, I agree.  I'm good
 6   with that.
 7                    ATTORNEY BLOCK:  And the final issue is
 8   there are several objections on the basis that we
 9   thought it mischaracterized the witness's testimony.  We
10   of course, you know, do not want the objections to
11   impede the questioning or somehow, you know,
12   unintentionally affect how the witness responds.  We
13   discussed that, instead of saying mischaracterizes the
14   testimony, we would say objection MT and that would
15   allow us to preserve the objection without the witness
16   hearing the grounds for it.  So is that an acceptable
17   approach for all of Defense Counsel?
18                    ATTORNEY TRYON:  Yes.
19                    ATTORNEY DENIKER:  I'm also agreeable to
20   that.
21                    ATTORNEY MORGAN: I am as well.
22                    ATTORNEY GREEN:  And I agree as well.
23                    ATTORNEY DUCAR:  I agree as well.
24                    ATTORNEY BLOCK:  Terrific.  I think that
```

```
 1   resolves everything unless I missed something.
 2                   ATTORNEY TRYON:  No, I think that's
 3   right.  I think we are ready to go with the expectation
 4   that we are ready to go.  I would like to take a real
 5   quick bathroom break, to be honest.
 6                   ATTORNEY BLOCK:  That sounds good.
 7   Should we convene at 10:50?
 8                   ATTORNEY TRYON:  10:55 is fine with me.
 9                   ATTORNEY HARTNETT:  Why don't we do
10   10:55, and that will make sure we get the printed
11   copies?
12                           ---
13   (WHEREUPON, A SHORT BREAK WAS TAKEN.)
14                           ---
15                   VIDEOGRAPHER:  We are on the record.
16   The current time reads 11:13 a.m.  This is the continued
17   deposition of Heather Denise Jackson.
18                           ---
19                   HEATHER DENISE JACKSON,
20   CALLED AS A WITNESS IN THE FOLLOWING PROCEEDING, AND
21   HAVING BEEN PREVIOUSLY DULY SWORN, TESTIFIED AND SAID AS
22   FOLLOWS:
23                           ---
24                   CONTINUED EXAMINATION
```

```
 1                        ---

 2   BY ATTORNEY TRYON:

 3      Q.    Ms. Jackson, thank you for joining us again

 4   today.  And I apologize for the delay here.  We were

 5   trying to accomplish some things amongst the lawyers to

 6   streamline the process today, and sorry to keep you

 7   waiting for so long.

 8           First of all, I just want to tell you that ---

 9   two things.  First of all, you're still under oath.  So

10   everything you say today, you're still under oath just

11   as yesterday.

12           Okay?

13      A.    Yes.

14      Q.    And then we also had some discussions off the

15   record about how we're going to handle --- excuse me,

16   certain objections.  And some of them we have agreed to

17   standing depositions --- excuse me, standing objections.

18   And we will need to --- I'm sorry.  I'm seeing another

19   message.  I'm distracted.  So we will just explain that

20   to you in a moment, but one of the other counsel

21   suggested that we all ought to identify ourselves for

22   the record since we do have some different people today

23   than yesterday.  So just for the record, I'm David

24   Tryon, representing the State of West Virginia.
```

```
 1              ATTORNEY BLOCK:  I'm Joshua Block,

 2  representing the Plaintiff and the witness.  And after I

 3  finish introducing myself, I'll have co-counsel from

 4  Cooley followed by co-counsel from Lambda Legal followed

 5  by co-counsel from ACLU of Virginia identify themselves.

 6              ATTORNEY HARTNETT:  Good morning.  This

 7  is Kathleen Hartnett from Cooley for Plaintiff and the

 8  witness.

 9              ATTORNEY BARR:  Good morning.  This is

10  Andrew Barr from Cooley for Plaintiff and the witness.

11              ATTORNEY VEROFF:  Good morning.  This is

12  Julie Veroff from Cooley for BPJ and the witness.

13              ATTORNEY HELSTROM:  Good morning.  This

14  is Zoe Helstrom from Cooley for Plaintiff and the

15  witness.

16              ATTORNEY SWAMINATHAN:  Good morning.

17  This is Sruti Swaminathan for Plaintiff and the witness

18  from Lambda Legal?

19              ATTORNEY TRYON:  Roberta?

20              ATTORNEY GREEN:  Yes, Roberta Green, West

21  Virginia Secondary School Activities Commission.

22              ATTORNEY DENIKER:  Good morning,

23  everyone.  This is Susan Deniker, Counsel for Defendants

24  Harrison County Board of Education and Harrison County
```

1   Board of Education Superintendant Dora Stutler.

2                   ATTORNEY DUCAR:  Good morning.  Timothy

3   Ducar on behalf of Intervenor, Lainey Armistead.

4                   ATTORNEY HOLCOMB:  Good morning.

5   Christiana Holcomb on behalf of Intervenor.

6                   ATTORNEY CSUTOROS:  Good morning.  Rachel

7   Csutoros on behalf of Intervenor.

8                   ATTORNEY BROWN:  Joshua Brown on behalf

9   of the Intervenor.

10                  ATTORNEY MORGAN:  Kelly Morgan and Kristen

11  Hammond on behalf of the West Virginia Board of

12  Education and Superintendant Burch.

13                  ATTORNEY STARK:  Hi.  I'm Loree Stark.

14  I'm with the American Civil Liberties Union of West

15  Virginia, and I'm here on behalf of Plaintiff.

16                  ATTORNEY CAPEHART:  Curtis Capehart on

17  behalf of the State of West Virginia.

18  BY ATTORNEY TRYON:

19      Q.    Okay.

20            Ms. Jackson, I'll come back to you now.  So

21  we've have placed a number --- one of the things that we

22  wanted to do is put some hard copies in your office

23  there to facilitate going through the documents more

24  quickly.  So when I refer to a document you will be able

1    to pick it up and look at it in hard copy.  I will also

2    probably be putting it up on the screen as well.

3                    ATTORNEY TRYON:  But before we actually

4    get started with any questions, Josh, do you want to

5    state what --- you're going to use certain

6    abbreviations?

7                    ATTORNEY BLOCK:  Sure.  We put on the

8    record that there will be certain objections where I use

9    an abbreviation for it.  So if I make an objection that

10   you don't understand, that's because we stipulated that

11   we will use an abbreviation for that objection.

12                    ATTORNEY TRYON:  Okay.

13   BY ATTORNEY TRYON:

14       Q.    So let's get started.  First of all, do you have

15   any questions from yesterday, Ms. Jackson, or anything

16   you need to correct from what your testimony was

17   yesterday?

18       A.    Not off the top of my head, no.

19       Q.    Okay.

20             After your deposition yesterday, did you talk

21   to your husband or anyone else about your deposition?

22       A.    No.

23       Q.    Did you talk to your husband about his

24   deposition?

1       A.      No.

2       Q.      Okay.

3               So I want to start off talking about BPJ and

4    when BPJ was born.  These are things that seem obvious

5    to me, but I just want to make sure I understand.  When

6    BPJ was born, BPJ had male body parts.

7               Right?

8       A.      Correct.

9       Q.      And still has those male body parts.

10              Right?

11      A.      Correct.

12      Q.      And when BPJ was born you considered BPJ as a

13   male.

14              Is that true?

15      A.      Yes.

16      Q.      And at that time did you refer to BPJ as your

17   son?

18      A.      Yes.

19      Q.      And did that change at some point?

20      A.      Yes.

21      Q.      And at some point did --- what changed?

22      A.      She started presenting female characteristics

23   around the age of three.

24      Q.      And at some point you started to refer to BPJ as

```
 1  your daughter?

 2      A.    Yes.

 3      Q.    When was that?

 4      A.    I don't know of an exact date.

 5      Q.    Okay.

 6            So you said at about three years old BPJ

 7  started presenting with --- I'm sorry, how did you say

 8  it?

 9      A.    Female characteristics, mannerisms, those type

10  of things.

11      Q.    And at that point did you start referring to BPJ

12  as your daughter or was it later?

13      A.    It was probably around the age of four.

14      Q.    Does BPJ understand or recognize that BPJ was

15  born as a biological male?

16            ATTORNEY BLOCK:  Objection to

17  terminology, and I will make that a standing objection.

18            THE WITNESS:  She was born as a male with

19  a penis.

20  BY ATTORNEY TRYON:

21      Q.    And my question, though, is does --- sorry, does

22  BPJ currently recognize that BPJ was born as a

23  biological male?

24            ATTORNEY BLOCK:  Objection.  Calls for
```

1    speculation.

2                    THE WITNESS:  Yes, she knows she was born

3    as a male.

4    BY ATTORNEY TRYON:

5        Q.    Does it cause BPJ distress for someone to refer

6    to BPJ as a biological male?

7        A.    Yes.

8        Q.    Can you describe that for me a little bit, that

9    stress?

10       A.    She gets upset, she cries, she gets angry.

11       Q.    And when did that start?

12       A.    That started at an early age, around three or

13   four.

14       Q.    So at about three or four you said that BPJ

15   started to present as a female.

16             Did I get that right?

17       A.    Yes.

18       Q.    Can you tell me what specifically that means to

19   present as a female?

20       A.    From an early age she didn't want to wear male

21   clothes.  She wanted to wear my clothes as dresses.

22   When she was learning how to go to the bathroom, to

23   urinate, she didn't want to stand to urinate.  She

24   wanted to sit down to urinate.  She didn't understand

1    why she had a penis and I didn't.

2        Q.    Anything else?

3        A.    She requested at an early age for, I think it

4    was a birthday present, her own makeup kit.

5        Q.    Anything else?

6        A.    When she would pose for pictures, she would pose

7    with her leg tucked in more of a feminine stance.

8        Q.    I'm afraid I don't understand that.

9        A.    Put your hand on your hip, put your hip out a

10   little bit and cock your leg.

11       Q.    So when you're standing?

12       A.    Yeah, like when she is standing for a photo.

13       Q.    Anything else?

14       A.    Those are what comes to me off the top of my

15   head.

16       Q.    And those were all done at age three or did we

17   condense that timeframe?

18       A.    Like three to four.

19       Q.    Three to four.  And when BPJ asked why BPJ had a

20   penis, what was your explanation?

21       A.    Because she was born a boy and boys have

22   penises.

23       Q.    And what was BPJ's reaction?

24       A.    That that wasn't right.

1    Q.    Can you expound on that?

2    A.    She didn't, at that point, identify as a male,

3    so she told me I was incorrect.

4    Q.    That you were incorrect that --- that what?

5    A.    That she was a male because she had a penis.

6    Q.    And so I'm just trying to understand.  So BPJ

7    was saying that BPJ was a female in spite of having a

8    penis or that BPJ did not have a penis or what?  I

9    honestly don't understand?

10              ATTORNEY BLOCK:  Objection, compound.

11              THE WITNESS:  She's saying that she has a

12   penis, but she's not a male.

13   BY ATTORNEY TRYON:

14   Q.    That's what BPJ said at three years old?

15   A.    Well, she didn't have quite that language.  It

16   was more like I'm a girl.

17   Q.    She did know the word penis at the time?

18   A.    Yes.  We've always used correct terms for

19   genitalia.

20   Q.    And forgive me if this is insensitive, but I'm

21   just trying to understand.  Why did --- how did she no

22   that you had one and you didn't?

23   A.    Because she would follow me into the bathroom.

24   Q.    Okay.

```
 1          Did she --- did BPJ recognize that her brothers
 2  were males?
 3      A.    She recognized that we referred to them as
 4  males.
 5      Q.    Did BPJ ever ask what the difference was between
 6  BPJ and your other sons?
 7      A.    No.
 8      Q.    Let me ask you to look at Exhibit 30.
 9               ATTORNEY TRYON:  And I will ask the court
10  reporter to pull that up as well.  I lost some video
11  feed for her, for the witness.  There she is.
12               VIDEOGRAPHER:  You have her pinned?
13               ATTORNEY TRYON:  No.  There we go.  Okay.
14  I pinned Josh.  How do I unpin Josh?
15               VIDEOGRAPHER:  The same way you pinned
16  him.
17               ATTORNEY TRYON:  Okay.
18               Now I got it.  Sorry for the delay.
19  BY ATTORNEY TRYON:
20      Q.    Ms. Jackson, have you seen this document before?
21      A.    Yes.
22      Q.    Have you reviewed it before today?
23      A.    When I originally --- when I originally declared
24  it.
```

1    Q.    And on the last page, that's your signature.

2          Is that right?

3    A.    I don't have that page.

4    Q.    Okay.

5          I take it back.  So page six is the signature

6    page.  Do you have that?

7    A.    I have to page five.

8    Q.    Okay.

9          I just saw you scroll past it.  Right there?

10   Q.    Yeah.  So you see that?

11   A.    Yes.

12   Q.    Is that your signature?

13   A.    It is.

14   Q.    And it was signed on 5/25/2021?

15   A.    Yes.

16   Q.    So who prepared this document?

17   A.    Well, the lawyers would have written it up and I

18   reviewed it.  They --- I told them what I told them and

19   they typed it.

20   Q.    Okay.

21         And is your --- at the time you said this is

22   true and accurate.  Do you still believe the entire

23   thing is true and accurate to the best of your knowledge

24   and belief?

1      A.     Yes.

2      Q.     Great.  Let me ask you, first of all, paragraph

3  four is I'm fiercely protective of BPJ.  What do you

4  mean by that?

5      A.     Just as any parent would be fiercely protective

6  of their child.

7      Q.     Then you say, as her mother, I want to see her

8  be able to achieve all her dreams.  Can you tell me what

9  her dreams are at this point?

10     A.     Well, in regards to this, she wanted to be able

11 to run on the cross-country team, and that is what she

12 had dreamed of.

13     Q.     Was that all you were referring to at the time

14 you signed this Declaration?

15     A.     Well, I want to see her do well in life.  I

16 mean, if she tells me she wants to go to college, I want

17 to see her achieve that.  At the age of 11 they don't

18 have a whole lot of dreams.

19     Q.     When you signed this, did BPJ express any other

20 dreams that she had --- that he or she had?

21     A.     Not that comes to mind.

22     Q.     Okay.

23            And then the next --- in paragraph six it says

24 BPJ from a very young age that she didn't want her boy

```
1    parts.  Was there anything else about that statement

2    other than what you've already told me?

3        A.    No, that's very accurate.

4        Q.    Before that it says BPJ is also transgender.

5    What does that word, transgender, mean to you, as you

6    signed this?

7        A.    She was designated at birth as a male, but she

8    is a female.

9        Q.    And hopefully I'm not repeating from yesterday,

10   but when you say she is a female that is --- can you

11   tell me why she is a female?

12       A.    She identifies as a female.

13       Q.    And just so I'm clear, that's why you say that

14   BPJ is transgender?

15       A.    Correct, she is a female.

16       Q.    Okay.

17             Next you say she never wanted to be naked for

18   bathing because she was deeply uncomfortable with and

19   did not want to see certain parts of her body.  So how

20   did she bathe?

21       A.    She bathed, but we would keep a wet washcloth

22   over her genitals.

23       Q.    What would happen when she saw her genitals?

24       A.    She would be deeply upset.
```

 1      Q.    Can you explain that to me a little bit?  I

 2   don't mean to pry, but what did that mean, that BPJ

 3   would be upset?

 4      A.    She wouldn't like seeing it.  She would be

 5   upset, she would be frustrated, visibly frustrated.

 6      Q.    Did she yell, cry, scream, say don't look at me?

 7   What happened?

 8                    ATTORNEY BLOCK:  Objection.  Compound.

 9                    THE WITNESS:  She would be deeply upset

10   in the form of she would say I don't want that.

11   BY ATTORNEY TRYON:

12      Q.    Did she just say that or did she yell, raise her

13   voice?

14      A.    She would be very stern.

15      Q.    When BPJ first was reacting this way, as you

16   described it, did you insist that BPJ was, in fact, a

17   male or did you just accept her statement that she was a

18   female?

19                    ATTORNEY BLOCK:  Objection to form.

20                    THE WITNESS:  When she told me she was a

21   female, I accepted her statement as true.

22   BY ATTORNEY TRYON:

23      Q.    From the very first time or did it take some

24   time to accept that?

```
 1      A.    No, from the first time that she told me she was

 2   a girl I believed that she believed she was a girl.

 3      Q.    And then --- but if I remember your earlier

 4   testimony, I think you said that it was a little while

 5   before you started referring to BPJ as your daughter.

 6            Is that right?

 7                 ATTORNEY BLOCK:  Objection, MT.

 8   BY ATTORNEY TRYON:

 9      Q.    Did you answer?

10      A.    Correct.

11      Q.    So let me see if I understand it.  You initially

12   --- you right away accepted her belief that she was a

13   female, but didn't actually refer to BPJ as your

14   daughter until some time later?

15      A.    It took me a while to learn the terminology.

16      Q.    How long did it take you to learn the

17   terminology?

18      A.    I don't know the answer to that, but for three

19   years --- for three years I'd been calling her my son so

20   it took a while.

21      Q.    And what terminology is that?

22      A.    To refer to her as a female.

23      Q.    And where did you learn the terminology, as

24   you've said it?
```

```
 1      A.      To refer to her as a female?

 2      Q.      Yes.

 3      A.      She told me that she is a female.

 4      Q.      Okay.

 5              Well, then I guess I'm misunderstanding,

 6  because you said it took you a while to learn the

 7  terminology.  What do you mean by that?

 8      A.      For three years I had been calling her my son,

 9  so I had to learn to call her my daughter.

10      Q.      I get it.  You didn't like --- I thought you

11  meant you had to go read some books or something.

12  You're not saying that?

13      A.      No.  I know what a daughter is.

14      Q.      Okay.  Understood.

15              And paragraph seven says, as a child BPJ also

16  presented differently from my other children, both of

17  who are boys.  Do either one of your other --- let me

18  rephrase that.  The boys that you --- you have two other

19  children who are sons.

20              Right?

21      A.      Correct.

22      Q.      Are either one of them transgender?

23      A.      No, they are not.

24      Q.      And you --- in paragraph seven you say whenever
```

1  BPJ was provided with the opportunity to pick out her

2  clothes or toys, she always went straight for the girly

3  items.  Can you tell me what those girly items --- what

4  that means?

5      A.   She would want to shop in the girls sections of

6  the stores.  She wanted dresses and lacy tutus, sparkly

7  clothes.  She wanted the girls clothes.

8      Q.   Anything else?

9      A.   Same thing with shoes.  She wanted the girls

10 shoes.

11     Q.   What toys are you referring to as girly items?

12     A.   Toys would be her dolls that she would have

13 growing up.

14     Q.   What kind of dolls?

15     A.   Plush.

16     Q.   So like girl dolls or animal dolls?  I'm not

17 sure I understand.

18     A.   Girl dolls that are plush.

19     Q.   And paragraph eight is when BPJ told us that she

20 was a girl and wants to be dressed as a girl, I was not

21 surprised because I spend so much time with her, can you

22 expound on that?

23     A.   Well, when I'm not at work, I'm with her.

24     Q.   So how much time do you spend with her?

1    A.    I am with her other than nine hours a day.

2    Q.    Paragraph nine ---.

3              ATTORNEY TRYON:  Can I ask the court

4    reporter to take control and scroll down?  Thank you.

5    BY ATTORNEY TRYON:

6    Q.    Because BPJ and I have such an open

7    communicative relationship we have --- would have

8    conversations about how she was feeling.  Can you tell

9    me about those conversations?

10   A.    Conversations in regards to how she is feeling

11   regarding she didn't want her penis, that she identified

12   as a female.

13   Q.    And then the next sentence, the last part says

14   more, she was able to clearly communicate that she knew

15   she was a girl.  What do you mean by more clearly

16   indicates?

17   A.    As she learned language skills as she grew up.

18   Q.    So what language skills --- and what language

19   changed for her to communicate that?

20   A.    As her vocabulary increased.

21   Q.    So for example, what additional words was she

22   using?

23   A.    She would use the word vagina when she learned

24   that term.  She would use the term breasts when she

1    learned that term.  She learned the term brassiere.

2        Q.    When BPJ first informed you that BPJ was a girl,

3    did you --- did this cause you any concern or stress or

4    anxiety?

5        A.    I worried about any sort of --- I don't know

6    what the word is I'm looking for --- discrimination she

7    might receive.

8        Q.    Did you at that time --- at that time had you

9    heard of the term transgender?

10       A.    Yes.

11       Q.    And in what context had you already heard the

12   term transgender?

13       A.    I'm sorry.  Could you repeat that?

14       Q.    Sure.  In what context had you heard the term

15   transgender?

16       A.    Just in referring to people as transgender.

17       Q.    Had you known anybody that was transgender

18   before BPJ told you that BPJ was a girl?

19       A.    I did not.

20       Q.    Were you surprised when BPJ announced that BPJ

21   was a girl?

22       A.    No.

23       Q.    Why is that?

24       A.    She had been presenting as a girl.

```
 1      Q.    I see.  So you expected BPJ at some point to

 2   tell you that BPJ was a girl?

 3      A.    Yes.

 4                  ATTORNEY BLOCK:  Objection, MT.

 5   BY ATTORNEY TRYON:

 6      Q.    Back in --- at the end you say you knew this was

 7   not a phase for her and that there was something

 8   different happening.  How did you know it was not a

 9   phase?

10      A.    It never went away.  It just became more

11   intense.  I had already raised two sons and realized

12   that she was a girl.  She was being raised as a

13   daughter.  She was telling me that she was a girl.

14      Q.    At what point did you conclude that it was not a

15   phase?

16      A.    I don't know a date for that.

17      Q.    Well, was it before --- I presume it was after

18   BPJ announced that BPJ was a girl.

19            Is that right?

20      A.    Yes, but I don't know the date of that either.

21      Q.    But you believe it was approximately at age

22   three?

23      A.    Three to four.

24      Q.    At some point did BPJ say that BPJ wanted
```

1  breasts?

2      A.    Yes.

3      Q.    Do you remember when that was?

4      A.    I don't remember the date.

5      Q.    Was it in the past two years or do you recall at

6  all?

7      A.    I don't recall.

8      Q.    And why did BPJ want breasts?

9      A.    Because girls have breasts.

10     Q.    Does BPJ understand at that time --- let me

11  start that over.  At that time, when BPJ said that BPJ

12  wanted breasts, did BPJ understand the purpose of

13  breasts?

14              ATTORNEY BLOCK:  Objection, calls for

15  speculation.

16              THE WITNESS:  I don't know that she knew

17  the purpose of breasts, no.

18  BY ATTORNEY TRYON:

19     Q.    Have you ever informed BPJ or had BPJ somehow

20  learned the purpose of breasts?

21              ATTORNEY BLOCK:  Objection to form.

22              THE WITNESS:  She knows she was breastfed

23  as a child, so she knows that milk comes out of them.

24  BY ATTORNEY TRYON:

1      Q.    Had you ever had any discussions with BPJ about

2  the purpose of breasts?

3      A.    No.

4      Q.    Do you know if BPJ expects that once --- if BPJ

5  has an operation to give --- to put breasts in place,

6  does BPJ expect the ability to lactate?

7                    ATTORNEY BLOCK:  Objection.  Objection to

8  form and calls for speculation.

9                    THE WITNESS:  Yeah, we've never had that

10  discussion.

11  BY ATTORNEY TRYON:

12      Q.    So you don't know?

13      A.    I would presume that she knows that it doesn't

14  work that way because she knows she can't have children.

15  She can't give birth.

16      Q.    Okay.

17                    And how do you know that?

18      A.    Because we've talked about that.

19      Q.    Tell me about that conversation.

20      A.    That she doesn't have a uterus and that's what

21  you carry a baby in, is a uterus.

22      Q.    Do you recall when you had that discussion?

23      A.    I don't know the date.

24      Q.    Was it within the past year?

1    A.    I don't know when it was.

2    Q.    Was it before or after this lawsuit was filed?

3    A.    I don't know the answer to that.

4    Q.    Did that cause distress to BPJ to know that BPJ

5    would not be able to have children?

6    A.    No.

7    Q.    Does BPJ --- let me rephrase that.  Has BPJ told

8    you that BPJ wants a vagina?

9    A.    Yes.

10   Q.    Do you remember when that was?

11   A.    I do not know the date.

12   Q.    And do you know why BPJ wants to have a vagina?

13   A.    Because she's a girl.

14   Q.    And for BPJ that's an indicator that BPJ is a

15   girl?

16   A.    She wants to be a girl.  She is a girl.  She

17   wants the genitalia to match.

18   Q.    Well, I want to ask this question again.  It's

19   important for me to understand the situation.  Has BPJ

20   thought about this in the context of sexual relations?

21   A.    No.

22           ATTORNEY BLOCK:  Objection to form and

23   calls for speculation.

24   BY ATTORNEY TRYON:

1     Q.    And how do you know that BPJ has not ---?

2     A.    We have not talked about sexual relations.

3  She's 11.

4     Q.    Fair enough.

5               ATTORNEY TRYON:  Paragraph ten, if the

6  court reporter can put the document back up on the

7  screen.

8  BY ATTORNEY TRYON:

9     Q.    By the time BPJ was in the third grade she had

10 chosen her name and was living as herself at home.  What

11 name did she choose?

12    A.    She chose the name B████.

13    Q.    Do you know why she chose the name B████?

14    A.    She said she liked the name.

15    Q.    Did she talk to you about it before choosing the

16 name?

17    A.    Nope.  She told me that that was the name she

18 was picking.

19    Q.    So paragraph ten says third grade.  How old was

20 BPJ at that time?

21    A.    I don't know how old someone is in the third

22 grade.

23    Q.    I'm asking how old BPJ was at the time that BPJ

24 went into the third grade.

1    A.    I don't know off the top of my head how old you

2  are when you enter into third grade.

3    Q.    Do you know how old BPJ was when BPJ entered

4  kindergarten?

5    A.    She was five.

6    Q.    So then in the third grade, would that make BPJ

7  eight?

8    A.    Roughly.

9    Q.    So between third grade and eighth grade in the

10  public she presented outwardly as a male?

11                ATTORNEY BLOCK:  Objection.

12                ATTORNEY TRYON:  I don't think I said

13  that right.  Let me try that again.  Apologize.

14  BY ATTORNEY TRYON:

15    Q.    Between the age of three and eight do I

16  understand correctly that she presented to the general

17  public as a male?

18    A.    At school.

19    Q.    Okay.

20         And what about outside school?

21    A.    It would depend on the function.  If it was

22  around family, she presented as a female and wore female

23  clothes.  If it was a function she didn't feel

24  comfortable in, like a funeral, she would present as she

1  would in school.

2      Q.     As a boy?

3      A.     She would wear male clothes.

4      Q.     And thank you for that clarification.  So ---

5  and then so she would dress as a boy at school and then

6  would she come home and change?

7      A.     Immediately.

8      Q.     And did BPJ --- when you say BPJ was around

9  family, do you mean just your immediate family or

10  extended family?

11      A.     Extended family.

12      Q.     And who would that extended family be just so I

13  understand your term?

14      A.     Aunts, uncles, grandparents.

15      Q.     Did anyone express a surprise at the beginning

16  that BPJ was now dressing as a boy (sic)?

17      A.     Not to me they didn't.

18      Q.     So to this day, no one outside your immediate

19  family has --- let me rephrase it.  To this day, no one

20  in your extended family has ever said why is BPJ

21  presenting as a --- or dressed as a boy when BPJ is a

22  girl?  No, let me start that all over again.

23          Let me see if I understand this.  When BPJ was

24  between the ages of three and eight when BPJ was around

1    extended family BPJ would dress as a girl.

2            Is that right?

3    A.    Correct.

4    Q.    Okay.

5            I got a little confused.  And during all that

6    time none of your extended family ever said to you or

7    anyone else that you were able to hear why is BPJ

8    wearing girl's clothing when BPJ is a boy?

9                    ATTORNEY BLOCK:  Objection to form.

10                    THE WITNESS:  Are you asking if they

11    expressed it to me?

12    BY ATTORNEY TRYON:

13    Q.    Either to you or someone you heard them say it

14    to?

15    A.    Well, when she was first introduced in female

16    clothes they asked why, and I said she is a girl.

17    Q.    And what was their reaction?

18    A.    Oh.

19    Q.    That was it?

20    A.    That is it.

21    Q.    Okay.

22            When BPJ would go to school dressed as a boy

23    prior to the third grade, did that cause BPJ any

24    distress?

1     A.     She didn't like dressing as a boy, but she was

2  worried about being made fun of at school if she dressed

3  like a girl.

4     Q.     Can you repeat your answer there?

5     A.     She didn't like dressing as a boy at school.

6     Q.     But she --?

7     A.     But she did because she was afraid that she

8  would be made fun of if she dressed as a girl at school.

9     Q.     Thank you.

10         When BPJ started wearing a dress at school did

11  BPJ get made fun of?

12     A.     No.

13     Q.     Now, when you say when BPJ came home BPJ would

14  change into girl's clothing, does that mean always a

15  dress or something else?

16     A.     Oh, it could be leggings, it could be her

17  pajamas, not necessarily always a dress.

18     Q.     That's what I'm wondering, because girls many

19  times wear pants.  So does BPJ now that BPJ is

20  identifying as a girl wear jeans or pants to school?

21     A.     She does not wear jeans.

22     Q.     Other pants?

23     A.     She wears leggings.

24     Q.     Why not jeans?

```
 1      A.    She doesn't like jeans.

 2      Q.    I want to shift gears a little bit here.  So BPJ

 3  had a different birth name than B████.

 4           Correct?

 5      A.    Correct.

 6      Q.    And does it disturb you to see or hear BPJ's

 7  birth name?

 8      A.    Disturb?  I don't understand what you mean by

 9  disturb.

10      Q.    Does it cause you any anxiety to see BPJ's birth

11  name, for example, on the Birth Certificate or other

12  places where it's been written down?

13      A.    Oh, it just seems foreign to me because she's

14  been B████for so long.

15      Q.    Does it cause distress for BPJ to see BPJ's

16  birth name?

17      A.    Yes, it does.

18      Q.    Can you describe that?  And forgive me if you've

19  already told me this yesterday, and I may have

20  forgotten, but does it --- tell me about what that

21  distress is.

22      A.    She gets angry and upset and doesn't understand

23  why her dead name is on there.

24      Q.    Where did you learn the term dead name?
```

```
 1      A.      From B█████.

 2      Q.      How did B█████ learn the term dead name?

 3                      ATTORNEY BLOCK:  Speculation.

 4                      THE WITNESS:  I don't know.

 5   BY ATTORNEY TRYON:

 6      Q.      When did B█████ start using term dead name?

 7                      ATTORNEY BLOCK:  Objection.

 8                      THE WITNESS:  I don't know the name.

 9   BY ATTORNEY TRYON:

10      Q.      Was it before or after the lawsuit was filed?

11      A.      Before.

12      Q.      More than a year before that?

13      A.      I don't know.

14      Q.      Can you give me any kind of approximation at all

15   when BPJ started using the term dead name?

16      A.      No, I cannot.

17      Q.      Well, do you know if BPJ initially heard that

18   from lawyers?

19                      ATTORNEY BLOCK:  Objection, calls for

20   speculation.

21                      THE WITNESS:   I don't know where she

22   heard it from.

23   BY ATTORNEY TRYON:

24      Q.      When is the first time you heard it?  From B█████
```

1    I think you said, is that right or not?

2       A.      B█████ told me the name --- the term dead name.

3                    ATTORNEY TRYON:  Let's go off the record

4    for just a moment.

5                    VIDEOGRAPHER:  Going off the record.  The

6    current time reads 12:01 p.m.

7    OFF VIDEOTAPE

8                    ATTORNEY TRYON:  So I'm about to get into

9    a different line of questioning.  I want to be

10   respectful about everybody's thoughts about lunch.  I'm

11   happy to keep on going for another half-hour or hour,

12   but I just want to make sure that --- I want to be

13   respectful with other people's feelings on that.  Well,

14   hearing no objection, I'm going to keep going unless

15   somebody speaks up, including you, ma'am.  If you ---

16   you're the star here.  You and the court reporter are

17   the most important people here, so if you feel the need

18   to take a break ---.

19                    THE WITNESS:  I'm okay.

20                    ATTORNEY TRYON:  Okay.

21                    ATTORNEY DUCAR:  Can we take five

22   minutes?

23                    ATTORNEY TRYON:  Yes.

24                    ATTORNEY DUCAR:  Thank you.

```
 1                          ---

 2   (WHEREUPON, A SHORT BREAK WAS TAKEN.)

 3                          ---

 4   ON VIDEOTAPE

 5              VIDEOGRAPHER:  We are back on the record.

 6   The current time reads 12:09 p.m.

 7   BY ATTORNEY TRYON:

 8      Q.    Okay.

 9              Ms. Jackson, I want to talk to you now about

10   some issues about sports.  Now, this may overlap a

11   little bit from your testimony from yesterday.  It's a

12   problem --- well, not too much.  But to the extent that

13   it does, you know, I will try and ask questions that are

14   consistent with our questions and answers from

15   yesterday.  But if you feel like I'm somehow

16   misrepresenting your testimony or anything from

17   yesterday, please let me know and I will try and be

18   respectful of your prior testimony.

19              Okay?

20      A.    Yes, sir.

21      Q.    So when did BPJ first get interested in sports?

22      A.    She was in elementary school.

23      Q.    Do you remember which grade?

24      A.    Fourth.
```

```
 1      Q.    And what was the sport she became interested in?

 2      A.    Cheerleading.

 3      Q.    What was her interest?

 4      A.    She liked to cheer.

 5      Q.    Since I haven't been a cheerleader, can you tell

 6  me what that means that she liked to cheer?

 7      A.    So she would go to the games, hers would have

 8  been football, and you cheer for your team.  You learn

 9  the routines and you learn the cheers.

10      Q.    And I believe you told me at that time she was

11  identifying as a female.

12            Is that right?

13      A.    Correct.

14      Q.    And the team that she was watching, was that a

15  school team or some other type of team?

16      A.    Bridgeport Youth Football League.

17                 COURT REPORTER:  I'm sorry, what football

18  league did you say, ma'am.

19                 THE WITNESS:  Bridgeport Youth.

20  BY ATTORNEY TRYON:

21      Q.    Is that a school-sponsored team?

22      A.    It is not sponsored by the school, it's

23  sponsored by the counties.

24      Q.    And is there a sponsor for the cheer team or was
```

```
 1   there at the time?

 2        A.    All inclusive with the football team, if that's

 3   --- I'm guessing.   I think that's what you're asking.

 4        Q.    Yes.   That answers my question.

 5              Were there any boys on that cheer team?

 6        A.    There were not.

 7        Q.    Did you attend those games with BPJ?

 8        A.    Yes.

 9        Q.    How often did you go to those games?

10        A.    Every time they had one.

11        Q.    Was that just because you were interested in

12   those football games or did one of your other children

13   play in the football game?

14        A.    One year I had a son who played on the football

15   team.   Another year I did not have a son that played on

16   the football team.

17        Q.    And you went anyway?

18        A.    Absolutely.

19        Q.    Is that because you like football or is it

20   because BPJ liked football?   Why was that?

21        A.    I like football.

22        Q.    And did BPJ express any interest in playing on

23   the football team?

24        A.    No.
```

1    Q.    But BPJ was interested in the cheer team, as I

2    recall from some things that I read, at that time just

3    interested but was not part of the team.

4          Is that right?

5    A.    Correct.

6    Q.    And as I recall from something I read, BPJ then,

7    before getting on the team, learned some of the cheers.

8          Is that right?

9    A.    Correct.

10   Q.    And was it the very next year when BPJ joined

11   the cheer team or not?

12   A.    Yes.

13   Q.    So in the fifth grade BPJ was on the cheer team?

14   A.    Correct.

15   Q.    Were there tryouts for the cheer team?

16   A.    There were not tryouts.

17   Q.    So just anybody who wanted to be on the cheer

18   team could be on the cheer team?

19   A.    Yes.  You had to present the proper

20   documentation.  You had to fill out the forms and give a

21   Birth Certificate and a physical.

22   Q.    Was that cheer team open for both boys and

23   girls?

24   A.    I don't know the answer to that.

```
 1      Q.    Did they ask you when you presented your

 2  documentation or when BPJ applied in some fashion if BPJ

 3  was a boy or a girl?

 4      A.    They did not ask me.

 5      Q.    Forgive me.  I can't find it in my notes.  At

 6  fourth grade was BPJ already dressing as a female at

 7  school?

 8      A.    Yes.

 9      Q.    Did your husband go to any of those football

10  games with you and BPJ?

11      A.    Yes.  Like which year, though?

12      Q.    The first year before BPJ was on the cheer team?

13      A.    Yes.

14      Q.    And what about the year once BPJ was on the

15  cheer team?

16      A.    When work permitted he would go.

17      Q.    Did you encourage BPJ to sign up for the cheer

18  team?

19      A.    She told me she wanted to sign up for the cheer

20  team.

21      Q.    And then did you encourage her to do so or just

22  say whatever you want to do or something like that?

23      A.    I said if she wants to cheer ---.

24                ATTORNEY BLOCK:  Objection to form.
```

```
 1                    THE WITNESS:  I said said if she wanted

 2   to cheer --- I said if she wanted to cheer, she could

 3   cheer.

 4   BY ATTORNEY TRYON:

 5       Q.    It required your parent consent I presume.

 6             Is that right?

 7       A.    Correct.

 8       Q.    Would that be just either your consent or your

 9   husband's or both?

10       A.    Either/or.

11       Q.    At that time in the third grade did BPJ express

12   any interest in any other sports?

13       A.    There are no other sports available to her.

14       Q.    Why?

15       A.    They didn't offer anything at her school.

16       Q.    You mean in that grade?

17       A.    Yeah.

18       Q.    And then after that did BPJ want to be involved

19   in any other sports?

20       A.    After that when?

21                    ATTORNEY BLOCK:  Objection, vague.

22                    ATTORNEY TRYON:  Thank you for the

23   clarification.

24   BY ATTORNEY TRYON:
```

1    Q.    After the fourth grade did ---  either in or

2  after the fourth grade did BPJ become interested in any

3  other sports?

4    A.    She wanted to run, but there was no running

5  sport available to her at her age.

6    Q.    Okay.

7          About what grade or age was that when BPJ was

8  interested?

9    A.    In the --- let's see, that would have been the

10  fifth grade.

11    Q.    The fifth grade?

12    A.    The fifth grade, she's interested in running.

13    Q.    So going into the fifth grade or while she was

14  in the fifth grade?

15    A.    I'm not sure of the date.

16    Q.    Okay.

17          But initially there was no track team --- I'm

18  sorry, you said cross-country.

19          Right?

20    A.    Right.  Correct.

21    Q.    So at that point there was no cross-country

22  available for BPJ because of BPJ's age?

23    A.    Correct.

24    Q.    Were there other track sports that BPJ was

 1    interested in?

 2        A.    Just running.

 3        Q.    Right.  So running encompasses --- and I'm no

 4    expert on track, but I thought that track included

 5    cross-country and other running events.

 6              Is that right or wrong?

 7        A.    Track can do running and other field events.

 8        Q.    So was it just cross-country that BPJ was

 9    interested in or other running events?

10        A.    That's what we were focusing on at the time

11    because that's what she knew.

12        Q.    Why did she know --- when you say that you are

13    talking about cross-country?

14        A.    Cross-country, yes.

15        Q.    And why was that what she knew?

16        A.    Because her --- her siblings ran cross-country.

17        Q.    So was BPJ interested in any kind of

18    cross-country or specific cross-country events?

19                    ATTORNEY BLOCK:  Objection, vague.

20                    THE WITNESS:  Yeah, I don't understand

21    the question.  Cross-country is cross-country.

22    BY ATTORNEY TRYON:

23        Q.    Okay.

24              So some places have --- I don't know this.  I

 1    will ask this.  As far as I know, there is boys

 2    cross-country and girls cross-country.  And I presume

 3    there may also be coed cross-country teams.

 4          Do you know about that?

 5                    ATTORNEY BLOCK:  Objection to form.

 6                    THE WITNESS:  The only one that was

 7    available was in the sixth grade, and it was a boys

 8    cross-country and a girls cross-country.

 9    BY ATTORNEY TRYON:

10       Q.    And as I understand it, BPJ prefers to try out

11    for the girls cross-country team.

12          Right?

13       A.    Yes, because she's a girl.

14       Q.    Okay.

15          I just want to establish first that is what she

16    wanted, she wanted to try out for the girls

17    cross-country team.

18          Right?

19       A.    Yes.

20       Q.    And did she ever say I don't want to try out for

21    the boys cross-country team?

22       A.    Correct.

23       Q.    And she said that because I'm a girl, I want to

24    be on the girls cross-country team or words to that

1    effect?

2        A.     She said she wanted to run with the girls on the

3    girls cross-country team.

4        Q.     Did she have any friends who were girls that

5    were on the team already?

6        A.     She knew of some people that were not in her

7    grade that were in cross-country that were friends with

8    her brother.

9        Q.     And those were girls or boys?

10       A.     Girls.

11       Q.     Did she know any boys that were on the boys

12   cross-country team?

13       A.     Her siblings.

14       Q.     Great.  Anybody else of her age group?

15       A.     Not that I know of.

16       Q.     From what I've read, I gather that the tryouts

17   for the girls cross-country team are competitive.

18            Is that your understanding?

19       A.     Correct.

20       Q.     And then once you get on the cross-country team,

21   are the races themselves competitive?

22       A.     Correct.

23       Q.     And did BPJ want to be competitive or just only

24   participate and she didn't care if she won?

```
 1      A.    Oh no, she --- she was competitive.

 2      Q.    So she wanted to win?

 3      A.    Yeah.

 4      Q.    And did she work hard at it?

 5      A.    She trained every day.

 6      Q.    And how did she do?

 7      A.    She ran cross-country.

 8      Q.    Okay.

 9            How did she do compared to others?

10      A.    She never finished first.  She never finished

11 second.

12      Q.    She wanted to finish first or second, though, I

13 take it?

14      A.    Every kid wants to.

15      Q.    I'm sorry?

16      A.    Every kid wants to finish first.

17      Q.    Including her, right?

18      A.    Yes.

19      Q.    Do the boys and girls cross-country teams ever

20 compete against each other?

21      A.    There are races where they call them one and

22 done, where everybody runs together.  And there are

23 races where they are separated out.  It just depends on

24 the format of the host school.
```

```
 1      Q.     So the ones --- they call them won and done.

 2             Is that right?

 3      A.     Yes.

 4      Q.     That means everybody runs together, all the boys

 5   and all the girls?

 6      A.     Correct.

 7      Q.     Have you ever observed any of those?

 8      A.     I believe there was one last year.

 9      Q.     Did you go do that?

10      A.     Yeah.

11      Q.     And did BPJ participate in that?

12      A.     Yes.

13      Q.     How did BPJ do?

14      A.     She didn't finish last.

15      Q.     Okay.

16             Did BPJ finish ahead of any of the boys?

17      A.     Yes.

18      Q.     And did --- how many boys was she faster than?

19      A.     I don't know the answer to that.

20      Q.     Do you know how many kids were in that

21   particular race?

22      A.     No, I don't.

23      Q.     Do you remember what the name of that event was?

24      A.     No, I don't.
```

1    Q.    Do you remember where it was or what school it

2  was at?

3    A.    No, I don't.

4    Q.    Okay.

5         When BPJ --- let me back up.  BPJ, she made the

6  team obviously.

7         Right?

8    A.    Correct.

9    Q.    Were any of the other people who tried out for

10  it, did they not get on the team?

11    A.    I don't know the answer to that.  I don't know

12  --- I'm not privy to that information, as to who tried

13  out and who made it.

14    Q.    Well, I'm going to ask you this question.  I

15  think based on our discussions yesterday I think I know

16  the answer, but I'm going to ask it anyway just to make

17  sure I understand, but do you think that boys on the

18  boys cross-country team should be allowed to compete

19  against the girls on the girls cross-country team?

20    A.    If they identify as female?  Is that what you're

21  asking, if they identify as female?

22    Q.    Well, let's start with that.  If they identify

23  as female, should they be allowed to compete against the

24  girls on the girls cross-country team?

1     A.     Anybody who identifies as female should be able

2  to run on the girls cross-country team.

3     Q.     And as to boys who do not identify as girls,

4  should they be allowed to run on the girls

5  cross-country?

6     A.     It is not permitted at the school that she's at.

7     Q.     And do you have an opinion if they should be

8  allowed to?

9     A.     If there's a boys team, that they're running on

10 the boys team if they don't identify as female.

11    Q.     So you don't think they should be allowed to run

12 on the girls team unless they identify as a girl.

13         Is that right?

14    A.     I believe that anybody who identifies as female

15 should be able to run on the female's cross-country team

16 or track team or ---.

17    Q.     Right.  But my question is if a boy, not

18 identifying as a girl, just wants to compete against the

19 girls on the cross-country team for girls, do you think

20 that should be allowed or not?

21    A.     Is there a boys team available?

22    Q.     Yes.

23    A.     Then I would think they would run on the boys

24 team.

1    Q.    What if they just want --- what if they just

2    wanted to run on the girls team instead without

3    identifying as a girl, do you think that person should

4    be allowed to?

5    A.    I don't know that I understand the question.

6    Q.    Okay.

7          We'll move on.

8                ATTORNEY TRYON:  Let me just take a break

9    here and determine if I can skip some of my questions

10   here to speed things up.  Give me just a moment.

11               VIDEOGRAPHER:  Do we want to go off the

12   record or just stay on?

13               ATTORNEY BLOCK:  Let's go off the record.

14               ATTORNEY TRYON:  Just a minute.  I will

15   be right back.  Just a minute.

16               ATTORNEY BLOCK:  So we're off the record.

17               VIDEOGRAPHER:  Yeah, we're off the record

18   at 12:29 p.m.

19   OFF VIDEOTAPE

20                           ---

21   (WHEREUPON, A SHORT BREAK WAS TAKEN.)

22                           ---

23   ON VIDEOTAPE

24               VIDEOGRAPHER:  We are back on the record.

1    The current time reads 12:33 p.m.

2                ATTORNEY TRYON:  Thank you.

3    BY ATTORNEY TRYON:

4       Q.    Just to clarify one thing that we were

5    discussing and you used term identify as a female.  Can

6    you tell me what you understand that means, to identify

7    as a female?

8       A.    Choose to live your life as a female because you

9    are a female.

10      Q.    So we were talking about boys and girls

11   cross-country teams and other running events.  And

12   yesterday we talked about if you were aware of any

13   statistics on how fast boys and girls can run.  I want

14   to ask you would it surprise you to know that there are

15   statistics that show on average 11-year-old biological

16   boys are about 20 percent faster than 11-yearold

17   biological girls in the one-mile run.

18                ATTORNEY BLOCK:  Objection to form and

19   terminology.  And I will make the terminology a standing

20   objection.

21                THE WITNESS:  I don't know that I'm

22   surprised.  I don't know that I'm not surprised.

23   BY ATTORNEY TRYON:

24      Q.    In the context of cross-country, does BPJ take

```
 1   showers or change clothing at school?
 2       A.    She changes into her uniform at school.
 3       Q.    Does she use the locker room to do that?
 4       A.    She uses a private bathroom by the counselor's
 5   office to do that.
 6       Q.    Who may use that private bathroom?
 7       A.    I don't know who beside her uses that bathroom.
 8       Q.    Is it just a unisex bathroom or what?
 9       A.    Again, I don't know who all uses it to be boys
10   or girls or both.  I don't know.
11       Q.    Have you been in it?
12       A.    I've seen it.
13       Q.    Okay.
14             And so can you describe it for me?  Does it
15   just have one toilet in there and a sink or more than
16   that?
17       A.    Yes, just one.
18       Q.    So one person can go in there, shut the door,
19   lock it and use the facilities.
20             Is that right?
21       A.    Correct.
22       Q.    And is BPJ satisfied with that arrangement?
23       A.    She doesn't mind it.  She would rather use the
24   female facilities, but she doesn't mind it.  She says it
```

```
 1   has the good toilet paper.

 2       Q.    Well, that's a good reason to use it.  Is there

 3   a reason that BPJ does not use the female facilities?

 4       A.    She was told at the school that that was the

 5   bathroom that she is supposed to use.

 6       Q.    Have you objected to that arrangement?

 7       A.    I have not.

 8                   ATTORNEY TRYON:  Okay.

 9                   It's 12:37.  I would propose to change

10   topics and move forward unless you people want to take

11   lunch now.  If I keep going forward, I would probably on

12   this next topic go until past 1:00.  So we can either go

13   for another half hour or so or we can take a break now.

14   Whatever you prefer.  Ma'am, what is your preference?

15                   THE WITNESS:  I'm fine to go another half

16   hour.

17                   ATTORNEY TRYON:  And Josh, are you okay

18   with that.

19                   ATTORNEY BLOCK:  I prefer to keep going,

20   yes.

21                   ATTORNEY TRYON:  Very good.

22   BY ATTORNEY TRYON:

23       Q.    When you first --- let me back up and ask a

24   different question.  Are you familiar with the term
```

1    gender dysphoria?

2        A.    Yes.

3        Q.    When did you first become aware of that term?

4        A.    When my daughter was diagnosed with gender

5    dysphoria.

6        Q.    So when BPJ was approximately three or four and

7    said I am a girl, you were not aware of that term.

8              Is that correct?

9        A.    No.   When she first told me that she was a girl,

10   I was not aware of that.

11       Q.    And how did your husband react when BPJ said

12   that BPJ was a girl, not a boy?

13       A.    How did he react to me?

14       Q.    To the announcement, whether it came from you or

15   from BPJ?

16       A.    Concerned.

17       Q.    Did he learn about it at approximately the same

18   time that you did?

19       A.    Yeah.

20       Q.    When you say concerned, can you explain that a

21   little better?

22       A.    Concerned about any sort of discrimination that

23   she may have later in life.

24       Q.    Was he at all distressed to learn that the child

```
 1   who he believed to be his son was now claiming to be a

 2   daughter?

 3                   ATTORNEY BLOCK:  Objection to the form

 4   and argumentative.

 5                   THE WITNESS:  I don't know if he was

 6   upset.

 7                   ATTORNEY TRYON:  Can you look at

 8   Exhibit 17 with me, please?

 9   BY ATTORNEY TRYON:

10     Q.    Let me know when you have that in front of you.

11     A.    I do.

12     Q.    This is fairly a short document so take a look

13   through there and let me know when you are able to

14   familiarize yourself with it.

15                   ATTORNEY TRYON:  If counsel would like us

16   to scroll through that, let me know and we'll have the

17   court reporter do that.

18                   ATTORNEY BLOCK:  I'm fine without the

19   scrolling.

20   BY ATTORNEY TRYON:

21     Q.    Have you seen this document before?

22     A.    Yes.

23     Q.    When did you first see this?

24     A.    When we filled it out.
```

1    Q.    Is this your handwriting?

2    A.    No, that's not my handwriting.

3    Q.    Do you know whose handwriting that is?

4    A.    The person that filled it out.

5    Q.    Okay.

6          Is that somebody at the school?

7    A.    Yes.

8    Q.    And just for the record, this a Gender Support

9    Plan dated 8/23/19.  So were you in the meeting where

10   this was filled out?

11   A.    Yes.

12   Q.    And there was some sort of meeting?

13   A.    Yes, it was individuals in a room with paper.

14   Q.    And on the last page it shows what appears to be

15   a signature of B████.  Would that be BPJ?

16   A.    Yes.

17   Q.    And at the time that this was filled out on

18   August 23, 2019, you reviewed it at that time?

19   A.    Was I what at that time?

20   Q.    Did you --- did you fill --- I'm sorry, did you

21   review it at that time?

22   A.    Yes, yes.

23   Q.    And did BPJ review it at that time?

24   A.    She didn't review the document.  She was in the

1    meeting.

2        Q.    Is there a reason that she did not review it?

3        A.    No reason.

4        Q.    In the first paragraph, under where it says

5    parent/guardian involvement ---

6        A.    Correct.

7        Q.    --- the language there says mom very supportive,

8    dad has struggled but coming around, seeking outside

9    help through church and parental side of families

10   help/support?

11                   ATTORNEY BLOCK:  Objection.  You misread

12   the document.

13                   ATTORNEY TRYON:  Oh, I'm sorry.  What did

14   I miss.

15                   ATTORNEY BLOCK:  Paternal instead of

16   parental.

17   BY ATTORNEY TRYON:

18       Q.    Ma'am, can you help me out here?  To me it looks

19   like it says paternal?

20                   ATTORNEY BLOCK:  Yeah.  I think you said

21   parental unless I misheard.

22                   ATTORNEY TRYON:  Oh, okay.

23   BY ATTORNEY TRYON:

24       Q.    So my question then is when it says dad

1    struggled, what's that referring to?

2        A.    He was concerned, but on page three it says

3    parents are supportive.

4        Q.    I understand.  We can get to page three in a

5    minute, but when it says dad had struggled, does that

6    mean that he was uncomfortable with what I'll

7    characterize as the changing of BPJ's gender?

8        A.    He was ---.

9                    ATTORNEY BLOCK:  Objection to form.

10                   THE WITNESS:  He was worried about any

11   sort of discrimination.

12   BY ATTORNEY TRYON:

13       Q.    And then but coming around, what does but coming

14   around mean?

15       A.    I don't know.

16       Q.    Well, you gave the information --- let me strike

17   that.

18             Who gave the information to the person filling

19   this out?

20       A.    I don't know if she paraphrased or what, but it

21   doesn't look like it's a quote.

22       Q.    Who gave the information to the person filling

23   this out?

24       A.    She would have been questioning me.

1    Q.    Not BPJ?

2    A.    BPJ was in the meeting, but I don't believe she

3    was questioned directly in regards to that.

4    Q.    The next part says seeking outside help through

5    church.  What outside help was dad seeking through

6    church?

7    A.    Talking to the minister.

8    Q.    About what?

9    A.    Trying to reconcile religion and his daughter.

10    Q.    And what reconciliation was that?

11    A.    I don't know.  I wasn't privy to those

12    conversations.

13    Q.    Did you tell the person filling out this form

14    that dad was seeking outside help through the church?

15    A.    Yes.

16    Q.    Which church is that, by the way?

17    A.    He goes to a different church than me.

18    Q.    Do you know what denomination?

19    A.    It's the --- it's the Church of God, whatever

20    denomination that is.

21    Q.    And you don't go to that church?

22    A.    I don't go to that church.

23    Q.    But he told you that he was seeking help from

24    the church?

```
 1              ATTORNEY BLOCK:  Objection.  Objection

 2    marital communication, privileged.

 3    BY ATTORNEY TRYON:

 4       Q.    Well, don't tell me the exact --- just tell me

 5    in general if that was the purpose of seeking help.

 6       A.    He was trying to reconcile religion versus his

 7    daughter.

 8       Q.    Do you know what that religion believes with

 9    respect to this issue?

10       A.    No, I don't go to that church.

11       Q.    And then it says and paternal side of family's

12    help/support.  Can you explain what you meant when you

13    conveyed that information ---?

14       A.    They are also members of that church.

15       Q.    Down further at the bottom of that page it says

16    B████  is comfortable with others knowing her gender

17    identity and transition.  Can you explain to me what was

18    --- well, let me back up.  Does that accurately

19    represent what you told the person filling out this

20    form?

21       A.    Yes.

22       Q.    Can you explain to me a little more about what

23    that means that she's --- that B████  is comfortable with

24    others knowing her gender identity and transition?
```

1    A.    Just that --- it's just that.  She is

2    comfortable with others knowing.  She'll talk to you

3    about it if you want to.

4    Q.    So she's comfortable talking about the

5    transition from being a boy to a girl?

6                    ATTORNEY BLOCK:  Objection to

7    terminology.  I'll make that a standing objection.

8                    THE WITNESS:  She's comfortable with

9    explaining her transgender identity.

10   BY ATTORNEY TRYON:

11   Q.    Does that include explaining that I was once a

12   boy and now I'm a girl, however --- you know, I'm not

13   trying to put it in --- those words in anybody's mouth.

14   That's the concept I'm trying to understand.

15   A.    I've never witnessed a conversation where that

16   was said.

17   Q.    Okay.

18        Then how do you know what BPJ was comfortable

19   with?

20   A.    Because I've witnessed her talking to people

21   about her transgender identity.

22   Q.    Great.  And so what have you observed her

23   saying?

24   A.    That she is transgender and that she is living

```
 1   life as a female.

 2       Q.    Anything beyond that?

 3       A.    I would have to have a specific question.

 4       Q.    Anything else you can remember right now?

 5       A.    No.

 6       Q.    On the next page ---.

 7                   ATTORNEY TRYON:  And Counsel, if you need

 8   me to bring up the page, please say so.  Oh, great, it's

 9   being brought up.  Okay.

10   BY ATTORNEY TRYON:

11       Q.    Gender will be male, do you see that part down

12   almost at the bottom?

13       A.    Oh, yeah, I see that.

14       Q.    But B████ will be in parentheses next to birth

15   name.  So why would the gender be male?

16       A.    I think it has to do with the WEVAS System.

17       Q.    Can you explain that?

18       A.    No, I don't understand WEVAS at all.

19       Q.    Okay.

20             When this was filled out, you can see on that

21   page, for example, what name and gender marker are

22   listed on the student's identity documents, and there is

23   what we call a redaction, a black mark.

24       A.    Okay.
```

1     Q.     That covers up some information.  Would that

2   information have been BPJ's birth name?

3     A.     Yes.

4     Q.     So remind me, did BPJ read this document before

5   she --- before BPJ signed it?

6     A.     She was in the meeting, but she didn't read it

7   line for line, no.

8     Q.     Okay.

9            But did sign it?

10    A.     Yes.  We were to sign it that we were present.

11    Q.     On the page marked at the lower right-hand

12   corner BPJ 010, I think it's the fourth page --- yeah,

13   it says page four at the top.  See at the bottom it says

14   received training, that part there?

15    A.     Oh, okay.

16    Q.     It says Norwood staff received training on

17   tolerance and cultural diversity and LGBTQ --- I think

18   that's plus IA on 8/21.

19            Do you see that?

20    A.     Yes, I do see that.

21    Q.     Do you know what that's referring to?

22    A.     No, I don't.

23    Q.     Have you ever been provided with any further

24   information on what tolerance or cultural diversity or

1    similar training that is given to the staff?

2        A.    No.

3        Q.    Next it says and provided protocol and multiple

4    resources --- multiple resource sources.  Was that

5    meaning that you were provided with that information or

6    that was information that was provided to the Norwood

7    staff?

8        A.    To the Norwood staff.

9        Q.    Were you provided any resource sources at the

10   time that this was filled out?

11       A.    No.

12       Q.    Going back up to the first page where we talk

13   about your husband seeking outside help through the

14   church, did his views or feelings change in any way

15   after seeking that --- after getting help through the

16   church?

17       A.    He has reconciled his religion with his

18   transgender daughter.

19       Q.    Did he explain to you how?

20       A.    No.

21       Q.    Let me ask you to look at Exhibit 11C.  In fact,

22   ma'am, if you could grab 11A, B, C and E.  And I

23   apologize let me look at 11D first, D as in David.  So

24   take a look at this, and I'll ask you a few questions

1  about it.

2      A.    Go ahead.

3      Q.    Okay.

4            And for the record, Exhibit 11D, at the top is

5  --- has the name of Andrew James Spurr, M.D., and it

6  says progress notes and it says encounter date, December

7  16, 2020.  Do you see that at the top, ma'am?

8      A.    Yes.

9      Q.    I want to make sure we are looking at the same

10 thing together.  And it says history obtained from

11 mother --- well, let me back up.  First of all, have you

12 ever seen this document before?

13     A.    No.

14     Q.    Do you remember --- it says on here, history

15 obtained from mother.  B███ was not present for this

16 tele-medicine visit.

17           Do you see that?

18     A.    Yes.

19     Q.    Do you remember this --- that you had --- were

20 involved in this tele-medicine visit, as it says?

21     A.    Yes.

22     Q.    And I want to direct you to the next paragraph

23 that says B███ is very happy with stopping puberty.  Is

24 that something that you reported to the doctor?

1       A.      Yes.

2       Q.      And it was directed to the doctor not, someone

3   else?

4       A.      To Andrew James Spurr.

5       Q.      Right.  How did you come to speak with Andrew

6   James Spurr?  How did you find him as a doctor?

7       A.      He was on --- he was just on that call as a

8   resident.  I don't know how he got assigned to us.  It's

9   the one and only time he was ever assigned to us.  I

10  don't know if Dr. Montano was out or what.

11      Q.      So Dr. Spurr is in Dr. Montano's office?

12      A.      I would presume so, yes.

13      Q.      It says she, referring to B███, wants to know

14  when she can start hormone therapy.  Were you told

15  anything in response to that?

16      A.      I was not told anything in response to that.

17      Q.      Next it says wants to get breasts and get rid of

18  her penis.  You reported that to the doctor?

19      A.      Correct.

20      Q.      And did he have any response to that?

21      A.      No.

22      Q.      You next said she is experiencing dysphoria ---

23  strike that.

24              The document says she is experiencing dysphoria

```
 1   with leg growth hair.  Did you use that terminology with

 2   the doctor?

 3                 ATTORNEY BLOCK:  Objection, misread the

 4   text.

 5   BY ATTORNEY TRYON:

 6      Q.    Let me try again, she is experiencing dysphoria

 7   ██████████████████████.  Did you use the term dysphoria

 8   when speaking to the doctor?

 9      A.    He used the term dysphoria.

10      Q.    And what terminology did you use when you spoke

11   to the doctor?

12   ██    ████████████████████████████████████████████████

13   ██████████████

14   ██    ████████████████████████████████████████████████

15      A.    Correct.

16   ██    █████████████████████████████████████████████████

17   █████████████████    And did you, in fact, tell the doctor

18   that?

19      A.    Yes.

20      Q.    And when --- so this is --- the encounter date

21   is December 16, 2020.  ████████████████████████████████

22   █████████████████████████████

23      A.    I don't know the date that he said it.  The date

24   --- the encounter date is just the date of the
```

1    appointment.

2    ▮        ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

3    ▮▮▮▮

4    A.    I'm guessing yes.

5    Q.    And he said that to BPJ?

6    A.    Correct.

7    Q.    Why did he say that?

8    A.    I don't know.

9    Q.    Did you observe it?

10   A.    I observed the aftereffects.

11   Q.    So you didn't actually hear him say that?

12   A.    No, she came and reported it to me.

13   Q.    She being BPJ?

14   A.    Correct.

15   Q.    What did BPJ say about it?

16   A.    She was crying and was upset.

17   ▮        ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

18   A.    According to her.

19   Q.    What did that mean to BPJ?

20             ATTORNEY BLOCK:  Objection.  Calls for

21   speculation.

22             THE WITNESS:  I just know that it upset

23   her, that she was crying and was upset.

24   BY ATTORNEY TRYON:

1     ███  ████████████████████████████████████

2  ██████████████████████████████████████

3  █████████████

4     A.    I don't know what they were doing outside.  I

5  know they were outside because she came inside.

6     Q.    Has your husband ever said that to BPJ before

7  that, to your knowledge?

8     A.    To my knowledge, no.

9     Q.    Did BPJ say he said this to me before, or this

10 is the first time, or any other discussion about it?

11    A.    No other discussion about it.

12    Q.    This just seems odd to me, so maybe I'll just

13 ask the question.  ████████████████████████████

14 ████████████████████

15    A.    Yeah.

16    Q.    Why would that be reported?

17    A.    ██████████████████████████████████████

18 ████████████████████    My guess is he didn't read the case

19 file.

20    Q.    Okay.  Okay.

21       ██████████████████████████████████████

22 ██████████████████████████████████████

23 Who's that transgender psychologist?

24    A.    There was one locally, but he left after ---

```
 1   during the COVID session and I never did get to see him.

 2       Q.    Who was that?

 3       A.    I don't know what his name was.

 4       Q.    And has --- have you ever found a transgender

 5   psychologist?

 6       A.    We have found a psychologist that specializes in

 7   transgender care.

 8       Q.    Who is that?

 9       A.    Doctor Matthew Bunner.

10       Q.    When is the first time that you saw Doctor

11   Matthew Bunner?

12       A.    I don't know.  It would be in the medical

13   records, but I don't know the date off the top of my

14   head.

15       Q.    All right.

16             Well, then we will find it in the medical

17   records in a bit.  Was there a reason that B███ was not

18   present for this tele-medicine visit?

19       A.    I was out of town.  My dad died.

20       Q.    Sorry about that, by the way.

21             So prior to this appointment you had not ---

22   let me rephrase that.  Prior to this appointment --- or

23   this encounter on December 16, 2020, BPJ had not yet met

24   with a psychiatrist or a psychologist.
```

1          Is that right?

2     A.     Yeah, correct.

3     Q.     And is Doctor Matthew Bunner, is he a

4 psychiatrist or psychologist?

5     A.     I'm not sure of his credentials.

6     Q.     Prior to this data, ████████████████████

7 ████████████████████████████     Do you believe that

8 to be accurate date, more or less?

9     A.     That's accurate.

10    Q.     Do you know what a ████████████ is?

11    A.     Yes, it's a hormone blocker.

12    Q.     Can you describe for the record how that's

13 implanted?

14    A.     The skin is separated from the tissue below it

15 and it's slid in underneath the skin and secured with a

16 suture.

17    Q.     And where on the body?

18    A.     Where is hers?

19    Q.     Yes.

20    ██    ████████████████████████████████████████

21 ████████████████

22    Q.     Well, I don't know where ████████████, but

23 it gives me a good idea.  Thank you.

24          And then how long is that supposed to last?  Do

```
 1   you need to replace it at some point?

 2       A.    It will have to be replaced at some point.

 3       Q.    Do you know how long?

 4       A.    It depends on her labs.

 5       Q.    Were you given a general time period for whether

 6   it's a year, two years, six months?

 7   ███        █████████████████████████████████████████████

 8   ███████████████████████████

 9       Q.    So from what I understand from what you told me,

10   then ████████████████████  before BPJ met with a

11   psychologist or psychiatrist.

12             Is that right?

13       A.    Correct.

14       Q.    Is there a reason you didn't wait to talk to a

15   psychologist or psychiatrist before doing this ---

16   taking this action?

17       A.    We couldn't get in anywhere because of COVID.

18       Q.    Is that the only reason?

19       A.    Yes.

20       Q.    Did you feel it was important to actually have

21   BPJ meet with a psychiatrist or psychologist before

22   taking this action?

23             ATTORNEY BLOCK:  Objection to form.

24       ████████████████.  ███████████████████████████
```

```
 1  ███████████████████████████████████████████████████████
 2  BY ATTORNEY TRYON:
 3     Q.    Are you familiar with the Tanner stages?
 4     A.    With what?  I'm sorry.
 5     Q.    The Tanner stages, T-A-N-N-E-R?
 6     A.    I'm not sure.
 7     Q.    Can you look at Exhibit 11A, please?
 8     A.    11A.  Oh, yeah.
 9     Q.    Okay.
10           Take a look at that document and let me know
11  when you're ready.  I just have a question or two.
12     A.    Okay.
13     Q.    All right.
14                  ███████████████████████████████████████
15  ██████████████████████████████████████████████████████
16  ██████████████████████████████████ She has been followed up
17  for gender dysphoria with desire to start hormone
18  blockers, ███████████████████████████████████ Does
19  that refresh your recollection what the Tanner stage one
20  means?
21     A.    Yes.
22     Q.    What's your understanding of that?
23     A.    They take --- it almost looks like a beaded
24  necklace, but it's different size representation of
```

```
 1   testicular formation and they compare it to her testes

 2   in order to see what stage they are.

 3       Q.    What's the purpose of that?

 4       A.    To measure the testes.

 5       Q.    And is --- why do that?

 6       A.    Because it's a sign of puberty.

 7       Q.    And is there a particular Tanner stage that you

 8   need to be at in order to get the hormone blocker?

 9       A.    I do not know the answer to that.  I'm not sure

10   which stage you must be at.

11       Q.    Is that indicative --- do they use that in some

12   fashion to determine when you insert a --- or start

13   using the hormone blockers?

14       A.    They use it as a sign for puberty.

15       Q.    And does puberty have something to do with when

16   you --- well, let me just ask it this way.  As I

17   understand it, before --- the doctors do not want to use

18   hormone blockers until you start into puberty Tanner

19   Stage 2?

20       A.    Okay.

21       Q.    Do you have any information on --- do you

22   believe that is accurate or not?

23       A.    I don't know.

24       Q.    Okay.
```

```
 1              When you --- let me rephrase that.  Did both

 2   you and BPJ meet with the doctor, a doctor to discuss

 3   the pros and cons or any side effects of using hormone

 4   blockers?

 5       A.    Yes.

 6       Q.    So would that have been just you or would BPJ

 7   have been involved as well?

 8       A.    B███    would have been involved as well.

 9       Q.    How about your husband?

10       A.    He was working.  I would have to relay the

11   information after I got back from the doctor.

12       Q.    And did you relay that information to him?

13       A.    Yes.

14       Q.    Was he okay with using hormone blockers?

15       A.    We read like the package insert information.

16       Q.    Okay.

17       A.    To look at the possible side effects.

18       Q.    And what were the possible side effects,

19   according to that insert?

20       A.    Some of them off the top of my head was

21   decreased size in testes, osteoporosis.

22       Q.    Were you concerned about the side effects?

23       A.    The benefit outweighed the risk.

24       Q.    And what was the risk?  Those side effects?
```

1 A. The risk would be the side effects.

2 Q. And what was the benefit?

3 A. The benefit would be help with her transition.

4 Q. Explain what you mean by transition.

5 A. To live her life authentically, to stop the male
6 hormones.

7 Q. What would the male hormones do as you
8 understand it?

9 A. Male hormones would cause her penis size to
10 increase, her testicle size to increase, body hair to
11 start forming, Adam's apple would start forming, her
12 voice would change.

13 Q. And those are all things that you wanted to
14 avoid happening?

15 A. She wanted to avoid happening.

16 Q. How about you, did you care one way or the
17 other?

18 A. I wanted her to live her most authentic life.

19 Q. What did you mean by that, her most authentic
20 life?

21 A. I wanted her to be able to live as a female, as
22 she wished to live.

23 Q. Why does that make it her authentic life?

24 A. Because she's a girl.

1      Q.     Okay.

2             So I'm done with this exhibit.

3                    ATTORNEY TRYON:  I'm finished with

4      Exhibits 11A, B, C and D, so we can put those aside.

5      It's 1:15.  This would be a convenient place to stop if

6      we want to for lunch.  Would you like to do that, ma'am,

7      or do you want to keep going?

8                    THE WITNESS:  I need a break to use the

9      restroom.

10                   ATTORNEY TRYON:  Would you like to take a

11     half an hour for lunch?

12                   THE WITNESS:  Sure.

13                   ATTORNEY TRYON:  Okay.

14             Everybody else is good with that?

15                   ATTORNEY DENIKER:  That's fine.

16                   ATTORNEY BLOCK:  See you at 1:45.

17                   VIDEOGRAPHER: Going off the record.  The

18     current time is 1:15 p.m.

19     OFF VIDEOTAPE

20                          ---

21     (WHEREUPON, A SHORT BREAK WAS TAKEN.)

22                          ---

23     ON VIDEOTAPE

24                   VIDEOGRAPHER:  We are back on the record.

```
 1   The current time reads 1:47 p.m.
 2   BY ATTORNEY TRYON:
 3       Q.    Let's go to Exhibit 14, if you wouldn't mind,
 4   ma'am.  This Exhibit 14 is a group of medical records.
 5   Take your time and look through there and let me know
 6   when you're finished and then we'll come back to the
 7   first couple of pages for some questions.
 8                          ---
 9   (WHEREUPON, WITNESS REVIEWS DOCUMENT.)
10                          ---
11                   THE WITNESS:  I've read the first page.
12   BY ATTORNEY TRYON:
13       Q.    Are you finished?
14       A.    Yes.
15       Q.    Great.  Let me go back and first ask you a
16   question on page two of the document on the bottom that
17   says page three?
18       A.    Okay.
19   ██  ██████████████████████████████████████████████████
20   ████████████████████████████████████████████
21   █████████████████████████████████  Before I ask
22   you a question about that let me just back up.  So this
23   appears to be from an office visit with a Jean
24   Someshwar.
```

```
 1              Is that right?
 2      A.    Yes.  That's about as good as I can pronounce
 3   it.
 4      Q.    Were you in attendance at this meeting?
 5      A.    Yes.
 6      Q.    Was BPJ in attendance?
 7      A.    Yes.
 8      Q.    So then going back to my question, what I just
 9   read on the second page, where it's marked as page three
10   on the bottom.  ████████████████████████████████████
11   ██████████████████████████████████████████████  Do
12   you --- did you or BPJ say something that triggered this
13   note?
14      A.    BPJ.
15      Q.    And what did BPJ say that you believe triggered
16   this note?
17      A.    Well, it's in quotes, so I'm saying that she
18   said that.
19   ██     █████████████████████████████████████████████
20   ██████████████████████████
21      A.    Yeah.
22      Q.    What does that mean?
23      A.    I'm going to guess when they are in fights or
24   spats.
```

1   ■ ▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬

2   ▬▬▬▬

3   A.   Probably have to ask Becky that one.

4   Q.   Did she expound at all during this meeting?

5   A.   Not according to the notes.

6   Q.   I'm asking you from your memory?

7   A.   I don't remember.

8   ■ ▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬

9   ▬▬▬▬▬▬

10   A.   Yes.

11   Q.   I'm sorry?

12   A.   Yes.

13   Q.   And what does that mean?

14   A.   To me?

15   Q.   Yes.

16   A.   To me I would say that you would use it to lash

17   out at somebody.

18   ■ ▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬

19   ▬▬▬▬▬▬▬▬▬

20   ■ ▬▬▬▬▬▬▬▬ I don't know.

21   Q.   Did you observe anything like this?

22   A.   No.

23   ■ ▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬

24   ▬▬▬▬▬▬▬

1  A.  Not to me.

2  Q.  Are you aware of BPJ saying this to anyone else?

3  A.  No.

4  Q.  Back on page one, starting --- let's go back up

5 on the screen.  Let's see.  Okay, that's right.  ████

6 ████████████████████████████████████████

7 ████████████████████████████████████████

8 ████████████████████████████████████████

9 ███████████████████  How did you locate Dr. Montano in

10 Pittsburgh?

11  A.  Doctor Montano came to me through

12 recommendations from friends.

13  Q.  Excuse me, what friends?

14  A.  Friends that we know, one of which has a

15 transgender male child.

16  Q.  And who is that?

17  A.  I only know her first name.

18  Q.  Which is?

19  A.  Carolyn.

20  Q.  Does Carolyn live --- well, where does Carolyn

21 live?

22  A.  Clarksburg.

23  Q.  Just for the record, how far is Clarksburg from

24 where you live?

1       A.      Oh, maybe 30 minutes.

2       Q.      And how do you know Carolyn?

3       A.      I met her through the PFLAG Group in Morgantown.

4       Q.      So what does PFLAG stand for?

5       A.      I don't know.

6       Q.      What is the PFLAG Group?

7       A.      The group that I attend is a group of parents

8  who have transitioning children.

9       Q.      Did BPJ attend meetings with a different PFLAG

10 group?

11      A.      No.

12      Q.      At the bottom of this page, towards the bottom,

13 if you could scroll down.  Okay.  Right there.  It says

14 family was going to PFLAG meetings.  But due to COVID,

15 meetings had been virtual B███ misses seeing her PFLAG

16 friends in person.  So was B███ going to the same

17 meetings as you?

18      A.      Yes.

19      Q.      You indicated that the group you went to was for

20 parents?

21      A.      Parents with children who were transitioning.

22 So the parents would meet and the children would play.

23      Q.      So the children would play like what?

24      A.      On the playground.

 1     Q.     Okay.

 2            And they are both boys and girls?

 3     A.     Yes.

 4     Q.     That's kind of a weird question, given the

 5     context, so I'm not quite sure.  Would it include --- I

 6     guess it would be trans boys and trans girls.  Is that

 7     the proper way to say that?

 8     A.     It includes just gender boys and girls and

 9     transgender boys and girls.

10     Q.     Very good.  So in these meetings what did the

11     parents talk about?

12     A.     The issues that we might have in the community,

13     like in our churches or in finding daycare or in support

14     groups.

15     Q.     And you said something that I didn't understand.

16     You said parents with children that are transitioning,

17     which suggests they are in the process of making a

18     transition.  Is that what that means?

19     A.     Yes.

20     Q.     And so what is that process of transitioning?

21     A.     Well, with every parent and child, that's ---

22     that's up to them.

23     Q.     Can you explain in broad terms what that

24     transitioning process is?

1      A.      Identifying as your gender identity and living

2  authentically.

3      Q.      So simply, stating that you are a different

4  gender than your birth gender.  Is that all that's

5  required for that transitioning process?

6      A.      That's how it can start.

7      Q.      Okay.

8              So that's how it starts, but what happens after

9  that?

10     A.      Like I said, with every parent and child it's

11  going to be different.  With their cases, it may be

12  different than my case.

13     Q.      And with your case then, tell me about that.

14     A.      Okay.

15             Well, she presented around age three or four

16  wearing my clothes, wearing my shirts as dresses, not

17  wanting to sit to urinate.

18     Q.      So that's part of the transitioning process?

19     A.      I'm sorry?

20     Q.      You're saying that's part of the transitioning

21  process?

22     A.      That was part of B██████ transitioning process.

23     Q.      Thank you for that clarification.

24             Let's see.  Back up a little.  ████████████

1 ████████████████████████████████████████

2 ████████████████████████████████████

3 ████████████████████

4          Do you see that?

5     A.    I'm looking.

6     Q.    It's about the middle of that paragraph.

7     A.    Okay.  I see it.

8     Q.    I can point it out on the screen, but you found

9 it.

10    A.    Yeah, I found it.

11    Q.    So tell me about the process for a legal name

12 change to the extent that you know about it.

13    A.    Well, it involves a lot of documents with

14 legalese on it that's very difficult for me to weave my

15 way through.  But for the name change process, we have

16 to fill out a form, several forms.  They have to be

17 notarized, filed with the Circuit Court, then it goes

18 before a Judge, as I understand it.

19    Q.    And what have you done in that --- you or BPJ

20 have done in that process?

21    A.    We've gotten forms.  We've gotten them

22 notarized.  Wes has got to get his notarized, which he

23 is supposed to be getting done today.  And then we go up

24 to the Courthouse to submit it with $200.

1     Q.    Do you know of anything else beyond that?

2     A.    That's all I know so far.

3     Q.    So why have you waited until now to do that?

4     A.    Because it's been very hard for me to understand

5  and try to figure out what the documents are saying.

6  The first time I filled them out I filled them out

7  incorrectly.

8     Q.    How did you find out you filled them out

9  incorrectly?

10    A.    I took them up to the Circuit Court and they

11 said you did it wrong.

12    Q.    Okay.

13          And when was that?

14    A.    A couple of weeks ago.

15    Q.    So why did you wait until a few weeks ago to

16 start the name change?

17    A.    I'm been overwhelmed by the forms.

18    Q.    When did you first get the forms?

19    A.    I've had the forms for probably six months.

20    Q.    Okay.

21          So just to help me out, I'm not trying to

22 insult you or anything, but I'm just trying to

23 understand because you --- because BPJ changed BPJ's

24 name to B█████ several years ago.

```
 1           Right?
 2      A.   Correct.
 3      Q.   And so why didn't you and/or B███  move forward
 4  at that time?
 5      A.   We were deciding on middle names.
 6      Q.   Have you decided on any middle name?
 7      A.   Yes, we have.
 8      Q.   What is that?
 9      A.   It will be Maranlynn.
10      Q.   So you spent the past several years just working
11  on a middle name.
12           Is that right?
13      A.   Yes.
14      Q.   You're laughing about that.  Why?
15      A.   Because she didn't want the name Meridan and I
16  wanted the name Maridan, so we came to a compromise that
17  it is Maranlynn.  Plus the Lynn comes from her uncle and
18  she wanted to ask her uncle permission to use his middle
19  name as her middle name.
20  ███    ██████
21  ████████████████████████████████████████████████
22  █████████████████████████████████████  ███████████
23  █████████████████████████████  Can you explain
24  that to me, please?
```

1    A.    I don't know what █████████████████  mean.

2  That would be a doctor term.

3    ███    █████████████████████████████████

4  ████████████████████████████████████████████

5  What is your understanding of what that hormone therapy

6  is?

7    A.    She can either get implants or injections and

8  get hormones, female hormones, start female hormones.

9  It depends on her labs and if she goes into

10  osteoporosis.  If she goes into osteoporosis from the

11  ████████████████, she would have to start hormones

12  sooner.

13    Q.    And what would those hormones do?

14    A.    It would help her live authentically as a

15  female.

16    Q.    You need to be more specific.  Would those

17  hormones cause physical changes to BPJ's body?

18    A.    Yes.

19    Q.    What would those physical changes be?

20    A.    She could grow breasts.

21    Q.    Just to be clear, you say she could grow

22  breasts.  Would it actually trigger breast growth?

23    A.    Isn't that the same thing?

24    Q.    You said could, which is a possibility.  I'm

1    asking if that is, in fact, ---.

2        A.    I'm not a doctor.  I'm going to guess that

3    that's, you know, could be.

4        Q.    No, I just want to understand --- make sure

5    we're communicating.  And I think we are, so thank you.

6    ████████████████████████████████████████    Is that

7    what she said?

8        A.    That's her words.

9        Q.    And we talked about this a little bit before,

10   but ████████████████████, do you know what that means?

11   ██    █████████████████████████████████████████████████

12   ██████████████████

13       Q.    Do you know what age that is or what triggers

14   that?

15       A.    I don't know at what age it's legal in the State

16   of West Virginia.

17       Q.    So is that the only thing that would stop it

18   from happening sooner is just the legal age part?

19                    ATTORNEY BLOCK:  Objection to form.

20                    THE WITNESS:  And if she was medically

21   able to.  If she has reached all of the milestones that

22   she's supposed to reach, being a transgender female on

23   hormone blockers, on hormone replacement therapy.

24   BY ATTORNEY TRYON:

```
 1       Q.    Do you know how that is accomplished?

 2       A.    Well, they take the penis and they split it

 3   almost like a banana and they peel back the skin and

 4   they take all of that and they put it into a cavity

 5   inside the pelvis and create a vagina out of the

 6   erectile tissue from the penis.

 7       Q.    I guess the answer's yes.  Is she aware that

 8   that is what the procedure is?

 9       A.    Yes.

10       Q.    Was that --- who explained that to BPJ?

11       A.    I did.

12       Q.    And what was BPJ's reaction?

13       A.    Ouch.

14       Q.    That exact word?

15       A.    Yep.

16       Q.    After you explained that did BPJ still want to

17   proceed?

18       A.    Yep.

19       Q.    So I just want to go back to your discussions

20   with Carolyn I think it was who recommended Dr. Montano.

21   Do I remember that correctly?

22       A.    Yes.

23       Q.    And what exactly did Carolyn say about Dr.

24   Montano?
```

1      A.     That he specialized in transgender care.

2      Q.     Did you receive recommendations for any other

3   doctors that specialized in transgender care?

4      A.     He was the only one that we could find in the

5   area that specialized in transgender care.  He is quite

6   good.

7      Q.     When you say he is quite good, what do you mean?

8      A.     He is very good working with B█████   He talks to

9   her on her level.

10     Q.     So did you review any other doctors for

11  specializing in transgender care before settling in with

12  Dr. Montano?

13     A.     Nope.

14     Q.     And then you then decided to change doctors.

15         Is that right?

16     A.     Right.

17     Q.     And why is that?

18     A.     Doctor Kidd is practicing closer to home and

19  she's within my healthcare network.

20     Q.     Did you interview with anybody else to see if

21  you wanted to use someone else instead?

22     A.     Nope, she's the only one in my area.

23     Q.     Are you satisfied with Dr. Kidd so far?

24     A.     Yes.

```
 1      Q.    How many meetings have you and/or BPJ had with
 2  Dr. Kidd?
 3      A.    Two.  We were introduced to her in group with a
 4  bunch of --- with that Dr. Someshwar.  We were
 5  introduced in a group there and then one on one with her
 6  later on.
 7      Q.    Can you turn to --- it's marked at the bottom as
 8  page seven?  It also has what is called Bates stamp BPJ
 9  152 at the bottom.
10                  ATTORNEY TRYON:  And if the court
11  reporter would put that up.
12                  THE WITNESS:  Okay.
13  ██████████████████████
14    ████    ██████
15          ████████████████████████████████████████████
16  ██████████████████████████████████████████████████████
17  ██████████████████
18          ████████████████████
19    ████    ██████
20    ████    ████████████████████████████████████████████
21  ██████████████████████████  ██████████████████████████
22  ██████████████████████████████████████████
23  ██████████████    This was something that you reported or BPJ
24  reported?
```



1    ███   ████████████

2    ███   ███████████████████████████████

3    ████████████████

4                ███████████████  ████████████████

5    ████████████████

6    ███   █████████

7    ███   ███████████████████████████████

8    ██████████████████████████████████

9    Q.    And that was as of April of 2021?

10   A.    Yeah.

11   ███   ████████████████████████

12   ██████████████████████████████████

13   ████████████████

14         Is that a fair statement or not?

15              ATTORNEY BLOCK:  Objection to form.

16              THE WITNESS:  Not.  I wouldn't say that.

17   BY ATTORNEY TRYON:

18   Q.    Okay.

19         ████████████████████████████████

20   ████████████████

21   ███   ████████████████████

22   ███   █████████████████████████

23   ██████████████████████████████████

24   ████████   ██████████████████

1   ██   ███

2   ██   █████████████████████████████

3   ████████████████        Both you and BPJ were in this

4   particular meeting.

5              Is that right?

6   A.      Correct.

7   Q.      And do you know if this statement came from

8   something that you said or that BPJ said?

9   A.      I don't know.

10              ATTORNEY BLOCK:  Objection to the form.

11  BY ATTORNEY TRYON:

12  Q.      I'm a little confused as to this form, so it's

13  unclear to me if this is from a discussion with Mr.

14  Bunner or with Dr. Someshwar.

15              Do you know?

16  A.      This whole note?

17  Q.      This particular paragraph anyways?

18  A.      Oh, well it would be in the same notes as the

19  whole packet from the WVU Healthcare University Town

20  Center.

21  Q.      Right.  So maybe I can ask the question a little

22  better perhaps.  When you went to this appointment on

23  April 1st, 2021, who did you meet with?

24  A.      I don't know who this note is from.  I don't

```
 1    know.  It says progress note continued.  I don't know
 2    where the first page is.
 3        Q.    Okay.
 4              The first page would be the prior page that
 5    appears to me, but let me ask you if you met on this
 6    occasion with Matthew Bunner?
 7        A.    I don't know who this meeting was with.
 8        Q.    Do you remember a meeting on --- I mean, this
 9    reports a meeting that you've just indicated to me that
10    you attended?
11        A.    Yes.
12        Q.    Okay.
13        A.    Yes.
14        Q.    Okay.
15        A.    I've been to a lot of doctors' appointments and
16    I don't know which doctor this is from.
17        Q.    Okay.
18        A.    It doesn't say.
19        Q.    Well, it has two names throughout the documents.
20    One is --- if you go to the prior page, on page six, I
21    will let the court reporter bring that up.  Towards the
22    top it says I saw and examined the patient.  I received
23    resident's note.  I agree with the findings and plan of
24    care as documented in the resident's note.  Any
```

```
 1   exceptions/additions are edited/noted.  Jean Someshwar.

 2       A.    Jean Someshwar (corrects pronunciation).

 3       Q.    Thanks.

 4       A.    So this note would be from Dr. Someshwar or

 5   however you pronounce it.

 6       Q.    But then down below it says progress notes by

 7   Bunner, Matthew, LPC?

 8       A.    Okay.

 9       Q.    So let me first ask, do you specifically

10   remember meeting with Jean Someshwar?

11       A.    I remember being in one meeting with him, yes.

12       Q.    Is Jean a man or a woman?

13       A.    I don't know how they identify as.

14       Q.    Okay.

15             But you said --- all right.  And Matthew

16   Bunner, do you know who Matthew Bunner is?

17       A.    Yes, I do.

18       Q.    In the middle of the page here it refers to

19   editor being Matthew Bunner and the author as being

20   Matthew Bunner.

21       A.    Okay.

22       Q.    So it appears --- and correct me if I'm wrong,

23   but it appears that Mr. Bunner also met with you on that

24   date?
```

```
 1        A.     Yes, there was a group of people there.

 2        Q.     Who else was there besides Mr. Bunner and Jean

 3   Someshwar?

 4        A.     I don't know.

 5        Q.     Was there others?

 6        A.     Yeah.  There was nurses.

 7        Q.     Was this all one big meeting or separate

 8   meetings?

 9        A.     It was a big group.  It was B███  and I in a

10   room with these people.

11        Q.     How many people?

12        A.     I don't remember.

13        Q.     Can you give me --- more than five?

14        A.     I don't remember.

15        Q.     At the bottom of page seven, under procedure, do

16   you see that?

17        A.     Yes.

18   ███   ██████████████████████████████████████████████

19   █████████████████████     Do you remember that procedure

20   as represented there?

21        A.     I don't remember that.

22        Q.     Then next it says provided assessment/treating

23   utilizing some or all interventions below from WPATH

24   standards of care version seven.
```

```
 1              Do you see that?

 2      A.     Yes.

 3      Q.     Do you remember that assessment being or

 4  treatment being provided to you?

 5      A.     I don't know what WPATH Standards of Care

 6  version seven is.

 7      Q.     Have you ever --- so have you ever heard that

 8  term WPATH Standards of Care?

 9      A.     No.

10      Q.     And you've never seen the document just titled

11  WPATH Standards of Care?

12      A.     No.

13      Q.     First item under there is one, directly assess

14  gender dysphoria in children and adolescents.  Was that

15  discussed with you?

16      A.     It looks like it was an assessment on their

17  part.

18      Q.     And was that assessment when they were

19  discussing it to you and BPJ?

20      A.     I presume that they made their assessment based

21  on their interview.

22      Q.     And do you know what their assessment was?

23      A.     No.

24      Q.     Do you remember what was discussed in that
```

```
 1    interview?
 2       A.    Well, if I go to the first page I can read what
 3    was discussed.  But other than that ---.
 4       Q.    You don't have any independent recollection?
 5       A.    No.
 6       Q.    If you could go to the next page marked
 7    page eight.
 8       A.    Okay.
 9       Q.    At the top it's got Item Number 4, it talks
10    about referring adolescents for additional physical
11    interventions.  And the second sentence says the
12    referral should include documentation of an assessment
13    of gender dysphoria and mental health, the adolescent's
14    eligibility for physical interventions outlined below,
15    comma, the medical health professional's role and
16    expertise and any other information pertinent to the
17    use, health and referral for specific treatments.  Are
18    you aware of any such referral?
19                    ATTORNEY BLOCK:  Objection to the form.
20                    THE WITNESS:  She already had blockers.
21    BY ATTORNEY TRYON:
22       Q.    Understood.  This is not limited to puberty
23    blockers.
24    ▮▮    ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
```

1 ████████████████████████████████████████

2 ████████████████████████

3    Q.    Right.  Do you anticipate a referral for any

4 other physical interventions?

5    A.    I don't know the answer to that.

6    Q.    Prior to getting the puberty blocker, was there

7 documentation of BPJ's --- strike that.

8          Let me start that over.  Prior to getting the

9 puberty blocker, ████████████████ was there, to your

10 knowledge, an assessment of gender dysphoria and mental

11 health of BPJ?

12    A.    The assessment was made by Dr. Montano.

13    Q.    Do you know what documentation there is for that

14 assessment?

15    A.    No, I don't.

16    Q.    Earlier in this deposition I asked you if you

17 have documentation, and you said you have documents.

18 What documents do you have relative to BPJ's gender

19 dysphoria?

20                    ATTORNEY BLOCK:  Objection, MT.

21                    THE WITNESS:   I have copies of her

22 Gender Care Plans given to me by the schools.  Is that

23 what you mean?

24 BY ATTORNEY TRYON:

1    Q.    I'm just asking a broad question to see what

2  documents you have.

3    A.    Oh, off the top of my head, I don't have them

4  with me.

5    Q.    Okay.

6          And off the top of your head you mentioned the

7  plan assessments from the schools.  Anything else?

8    A.    I have --- I have the Gender Care Assessment ---

9  or Gender Care Plans from Norwood and I got one from

10  Bridgeport.  I have those.  And I have some copies of

11  partial of her records from UPMC that I gave to Dr. Kidd

12  at WVU.

13    Q.    Have you shared those documents with your

14  counsel?

15    A.    They're here.

16    Q.    Okay.

17          So the documents --- when you say here you mean

18  in the conference room there?

19    A.    Yes, they're with your exhibits.

20    Q.    Okay.

21          Any other documents that are not with the

22  exhibits that you've seen so far that you think you have

23  in your possession?

24    A.    No, I don't have anything other than what I

```
1   said.

2       Q.    If you go to what's now page nine.

3       A.    Okay.

4   ██  ████████████████████████████████████████████

5   ████████████████████████████████

6       A.    Yes.

7       Q.    Is that what that represents, ███████████?

8       A.    ████████████████████████████████    It's

9   definitely not mine.

10  ██  ████████████████████████████████████████████

11  ████████████████████

12            Right?

13      A.    Correct.

14      Q.    And this is measured --- do you see down below,

15  at the bottom of that little chart, it says for boys?

16      A.    Where does it say that at?

17      Q.    So I'll just point with the cursor.  It's kind

18  of hard to see on the screen, but right here.  On the

19  hard copy that I have it's a little clearer?

20      A.    I don't see the cursor moving on my screen.  Oh,

21  now I do.

22            VIDEOGRAPHER:  To move the cursor on your

23  screen you have to click first and then you can move it.

24            ATTORNEY TRYON:  Oh.
```

1                <u>VIDEOGRAPHER</u>:  There you go.

2                <u>THE WITNESS</u>:  If you say that's what it

3  says then I can't read that, but ---.

4  <u>BY ATTORNEY TRYON</u>:

5     Q.    Okay?

6     A.    And I have it in this copy, too, and I can't

7  read it there either.

8     Q.    Yeah.  You know, I understand because I have a

9  copy under which is probably a copy and you have a ---.

10     A.    A copy of a copy.

11     Q.    But it does say --- in mine it says --- I can't

12  read all of it.  ██████████████████████

13  ████████████████████████████████████████████

14  ████████████████    ██████████████████    ████████

15  ████████████████████████████████████████████

16  ████    ████████████████████████████████████

17  ██████████████████

18     A.    You would have to ask them.

19     Q.    That was never discussed with you, I take it?

20     A.    No.

21     Q.    I will just note for the record on BP --- within

22  this document there is on Bates stamp BPJ 162 --- you

23  don't need to look at it, but there are some markings on

24  that page that says Dr. Brunner/Dr. Someshwar, and it

1   says 2021.  I belive those are handwritten notes.  Those

2   were not on the original.  Those are my notes only.  My

3   apologies.  Those should have been taken off before this

4   started.

5                    VIDEOGRAPHER:  I'm sorry.  Did you want

6   me to scroll to that one?

7                    ATTORNEY TRYON:  No, unless somebody else

8   wants to see it.  But that's just for the record, so if

9   people see that in the future, they can say --- they can

10  understand what that is.

11                   VIDEOGRAPHER:  Okay.

12  BY ATTORNEY TRYON:

13     Q.    Let me go back to Exhibit 1.  If you could take

14  a quick look through here.  I don't have any specific

15  questions.  I just have a general question.  If you want

16  to take a look through there.

17     A.    Okay.

18     Q.    So these documents came from the local Board of

19  Education as part of this discovery process.  I think

20  that's right.  Yes.  And I apologize, West Virginia 1-R

21  you have got to look at.

22     A.    Let me grab that.

23                   ATTORNEY BLOCK:  Do you have a Bates

24  number for that?

1                    ATTORNEY TRYON:   HBCBOE 00075.

2                    ATTORNEY BLOCK:   Thank you.

3    BY ATTORNEY TRYON:

4        Q.    So my question on this, first of all, is so

5    these are medical records from the Davis Medical Center.

6    The date of the visit appears to be May 13, 2014.  And I

7    believe I saw something in here that indicated that

8    these were given to the school in 2016.  And I was

9    interested to know if you recall why these were

10   submitted to the school at that time?

11                   ATTORNEY BLOCK:   Objection.  Foundation.

12                   THE WITNESS:   The school requires their

13   vaccination records and their oral evaluations.

14   BY ATTORNEY TRYON:

15       Q.    What do you mean by oral evaluations?

16       A.    Their dentist.

17       Q.    Oh, okay.  So this has more information than

18   just the vaccinations.  Were you just being

19   overinclusive when you sent this to them?

20       A.    I just gave them the well child visit.

21       Q.    Okay.

22             If you could turn to Exhibit 3, please.  Do you

23   know --- never mind.  We don't need Exhibit 3.  Exhibit

24   4?

```
 1       A.      Exhibit 4.  Okay.

 2       Q.      Take a look through there and then I will have a

 3  few questions.

 4       A.      Okay.

 5       Q.      At the top it says that it's from UPMC

 6  Children's Hospital of Pittsburgh and it says adolescent

 7  medicine evaluation.  And the child listed is P█████

 8  J██████.  The first name is blocked out.  It references

 9  male, age nine years old.  And then down below it has a

10  date of July 15, 2019.  Do you see that?  No, it's at

11  the top of that page.

12       A.      Oh.

13       Q.      Right at the very top of the page.

14       A.      Oh, I see it, next to Montano's name.  Okay.

15       Q.      Yes.  Do you remember having a visit on or about

16  that date?

17       A.      I don't remember it, but I'm sure there was.

18       Q.      And that was with Dr. Montano or --- yeah, Dr.

19  Montano?

20       A.      Yes.

21       Q.      Without referencing the notes here specifically,

22  do you remember what was discussed at this visit?

23       A.      I don't remember what was discussed at this

24  visit.
```

```
 1        Q.     Do you remember the purpose of it?

 2        A.     I'm guessing just continued care plan.

 3        Q.     Do you remember --- tell me from what you know

 4   who Dr. Montano is.

 5        A.     Doctor Gerald Montano.  He specializes in gender

 6   dysphoria, in transitional care patients.

 7        Q.     And it appears to me from my review of the

 8   records, please correct me if I'm wrong, that this is

 9   the first time when there was a diagnosis of gender

10   dysphoria by a medical professional?

11                    ATTORNEY BLOCK:  Objection to form.

12   BY ATTORNEY TRYON:

13        Q.     Is that in your memory or not?

14        A.     I don't know.

15   ██      ██████████████████████████████████████

16   ██████████    ████████████████████████████████████

17   █████████  █████████████████████████   ████████████████

18   ████████████

19        A.     No.

20        Q.     So it says B████, legal name P████  J██████, is

21   a nine-year-old transgender female coming to the clinic

22   for gender dysphoria.  So does that suggest that's the

23   purpose of this visit.

24               Is that right?
```

1    A.    Okay.

2                   ATTORNEY BLOCK:  Objection.

3    BY ATTORNEY TRYON:

4    Q.    Is that consistent with your memory?

5    A.    I'm just going by what the notes say, and the

6    notes say that we're there for gender dysphoria.

7    Q.    Okay.

8    ██████████████████████████████████

9    ████████████████████████████████████████

10   ██████  ████████████████████████████

11   ████████████████████████████████████████

12   ██████████████████████████████████████

13   ████████████████████████████

14         Do you see all that?

15   A.    Yes.

16   Q.    And do you remember reporting this information

17   to Dr. Montano or that BPJ reported this information to

18   Dr. Montano on or about July 15, 2019?

19   ██   ████████████████████████████

20   ████████████████████████████████████████

21   Q.    Okay.

22         And just to be clear, BPJ was in attendance for

23   this meeting as well?

24   A.    Yes.



1

2

3

4

5

6

7

8

9      Q.     So you don't know what that means then?

10     A.     I would presume it meant

11

12

13     Q.     Now, on the third page, which is labeled BPJ 036

14  in the lower right hand corner, do you have that?

15     A.     Under social history?

16     Q.     Yes.

17     A.     Yes.

18

19

20

21

22

23

24

1   was?

2       A.      No, I don't.

3       Q.      Do you know how it was conducted?

4       A.      No, I don't.

5       Q.      Do you know of any documentation for it?

6       A.      No, I don't.

7       Q.      Other than what is here before us?

8       A.      Unless it's in one of these exhibits, I don't

9   know.

10      Q.      Okay.

11              Dr. Montano, did he diagnose BPJ with gender

12  dysphoria?

13      A.      Yes.

14      Q.      Do you know the basis of his diagnosis?

15      A.      No.  I presume that went with his medical

16  training to diagnose.

17      Q.      Right.  Do you know what factors or anything

18  else that he used to make that diagnosis?

19      A.      That would be a question for him.

20      Q.      It will be a question for him, but I'm asking

21  you if you know.

22      A.      I don't know.  I'm not a doctor.

23      Q.      So if you go to page four --- let me know when

24  you are there?

1    A.    Okay.

2    Q.    At the bottom, where it says history suggests

3 that B█████ suggests --- excuse me, history suggests that

4 B█████ suffers from gender dysphoria.

5        Have you seen that note before today?

6    A.    No.

7    Q.    And then it says the World Professional

8 Association for Transgender Health.  Are you familiar

9 with that organization?

10    A.    No, sir.

11    Q.    Have you ever heard of that organization before

12 today?

13    A.    No, sir.

14 ██ ███████████████████████████████████████████████

15 ███████████████████████████████████████████████████

16 ███████████████████████████████████████████████████

17 ███████████████████████████████████

18 ████████████████ Do you remember Dr. Montano discussing

19 that with you?

20    A.    Yes.

21    Q.    What else do you remember about what he

22 discussed with you?

23    A.    Just informed --- that just falls under informed

24 consent.  Just --- he just told us the benefits and the

```
 1   risks.

 2      Q.    And if I recall correctly, you then discussed

 3   these risks with your husband.

 4            Is that right?

 5      A.    Correct.

 6                ATTORNEY BLOCK:  Objection, MT, vague.

 7   BY ATTORNEY TRYON:

 8      Q.    And both --- so B███, you and your husband are

 9   all comfortable with the risks for infertility?

10      A.    Yes.

11      Q.    Has B███ ever expressed an interest in having

12   children?

13      A.    It has not really come up.  I mean, she gets mad

14   at her brother, she says stuff like I'm never having

15   children.

16      Q.    Sorry for laughing, but that is kind of funny.

17      A.    Just in --- just in situations like that.

18      Q.    Yeah.  Yeah.  Were you advised --- let me

19   rephrase that.  Did Dr. Montano advise you that the

20   majority of pre-pubescent children with gender dysphoria

21   desist from gender dysphoria if given affirmation

22   therapy?

23                ATTORNEY BLOCK:  Objection.

24   BY ATTORNEY TRYON:
```

 Q. Sorry. Let me just start that all over again. In fact, you can strike that all.

Let me ask you to take a look at Exhibit 33, please.

A. Thirty-three (33)?

Q. Correct.

A. Okay. I have it.

Q. Ma'am, I will represent to you that this is an excerpt from the Standards of Care of the World Professional Association for Transgender Health. It goes through page 21. And this is the seventh version. And I have a few questions about it. You can either read the entire thing right now or you can just wait for me to ask you a question and then if you want to read other parts of it as well, you can do that.

A. I've never seen this before.

Q. Okay.

So Dr. Montano, as I mentioned earlier in the document that we were looking at before, references the Standards of Care for the World Professional Association of Transgender Health.

Do you recall that?

A. I remember it was mentioned in that other document.

```
1      Q.     Right.

2                    ATTORNEY BLOCK:  Objection to form.

3  BY ATTORNEY TRYON:

4      Q.     Let me ask you to turn to page five.

5      A.     I don't see page numbers.

6      Q.     At the very bottom right it has page numbers.

7  It looks like they may not have printed very well.  At

8  the top it says gender non-conformity is not the same as

9  gender dysphoria.

10      A.     The difference between gender non-conformity and

11  gender dysphoria?

12      Q.     At the top it says gender non-conformity is not

13  the same.  Yes.  Right.  On page four it says the

14  difference between gender non-conformity and gender

15  dysphoria and then I have a question for you on page

16  five, at the top of page five.  Take a look at that

17  paragraph and then I have a question about it.  And then

18  if you want to --- before you answer my question, if you

19  want to look at more you can, but I don't think you will

20  need to.

21      A.     The one that says gender nonconformity refers to

22  the extent, that paragraph?

23      Q.     That paragraph.

24                    ATTORNEY BLOCK:  And while she's looking
```

```
 1    at this document, I will just refer back to our standing

 2    objections.

 3                    ATTORNEY TRYON:   Thank you.

 4                    THE WITNESS:   Okay.

 5    BY ATTORNEY TRYON:

 6       Q.    So my question is did Dr. Montano explain to you

 7    the difference between gender nonconformity and gender

 8    dysphoria?

 9       A.    No.

10       Q.    Having read that, do you think it would have

11    been useful for him to explain that to you?

12       A.    No.

13       Q.    If you could turn to page 11, please?

14       A.    I have no page numbers.

15       Q.    Well, keep scrolling down on the screen.  Do you

16    see --- they're not as faint on the copy that is on the

17    screen, but at the lower right-hand corner it says

18    page 11.  So if you count in it would be about 13 pages,

19    but it says differences between children and adolescents

20    with gender dysphoria.  That's the topic near the top of

21    the page.

22       A.    Okay.

23             I found the page.

24       Q.    Okay.
```

1    I'm just going to read the first --- the

2  sentence that I'm interested in, couple of sentences.

3  And then I'm going to ask you a question.  And if you

4  would like to read more of them --- of this before

5  answering you may.  But it says an important difference

6  between gender dysphoric children and adolescents is in

7  the proportion for whom dysphoria persists into

8  childhood --- excuse me, into adulthood.  Gender

9  dysphoria during childhood does not inevitably continue

10 into adulthood.  Rather follow-up studies of pre-pubetal

11 children, mainly boys, who were referred to clinics for

12 assessment of gender dysphoria, the dysphoria persisted

13 into adulthood for only 6 to 23 percent of children.

14 And my question is did Dr. Montano explain that to you?

15    A.    No.

16         ATTORNEY BLOCK:  Objection to form.

17 First, there's a footnote in that paragraph that I think

18 is illegible on the piece of paper.  And second, you

19 didn't read the entire paragraph.

20         ATTORNEY TRYON:  I'll read the footnotes

21 that's not illegible because it's legible on my copy.

22 My apologies for that.

23 BY ATTORNEY TRYON:

24    Q.    It says gender nonconforming behaviors in

```
1    children may continue into adulthood but such behaviors
2    are not necessarily indicative of gender dysphoria and a
3    need for treatment.  As described in Section 3, gender
4    dysphoria is not synonymous in gender expression.  So
5    when you're finished with your review, let me know.  I'm
6    just interested if Dr. Montano did explain that to you.
7        A.    I don't remember.
8        Q.    Would that have been helpful for you to have
9    that information?
10       A.    No.
11                    ATTORNEY TRYON:  Off the record for just
12   one moment, please.
13                    VIDEOGRAPHER:  Going off the record.  The
14   current time reads 2:52 p.m.
15   OFF VIDEOTAPE
16                         ---
17   (WHEREUPON, AN OFF RECORD DISCUSSION WAS HELD.)
18                         ---
19   ON VIDEOTAPE
20                    VIDEOGRAPHER:  Back on the record.  The
21   current time reads 2:53 p.m.
22                    THE WITNESS:  Yes.  And I can't see that
23   footnote either on my copies.
24   BY ATTORNEY TRYON:
```

1    Q.    Yes, my apologies.  I don't know why that didn't

2    come through on the photocopy, but we'll try and remedy

3    that.  Okay.  I'm finished with that exhibit.

4          At what point did you start considering suing

5    the State to have this law declared unconstitutional?

6    A.    When I realized that it was going to affect my

7    child.

8    Q.    And was that before or after the law was

9    actually passed?

10   A.    It was after it was signed by the Governor.

11   Q.    And how did you come to be aware of it?

12   A.    Be aware of the law?

13   Q.    Yes.

14   A.    That it was in consideration or that it was

15   signed?

16   Q.    Well, let's start with consideration.  When did

17   you first become aware that it was under consideration?

18   A.    I don't know the date.  I remember seeing it on

19   the news, that it was under consideration.

20   Q.    And at that time were you aware that it could

21   affect your child?

22   A.    I was alarmed.

23   Q.    Did you contact any legislators about it?

24   A.    Yes.

```
 1      Q.     Who did you contact?

 2      A.     Romano and Patrick.  I can't remember his last

 3   name.

 4      Q.     Are they --- do you remember which house they're

 5   in?

 6      A.     No, I don't.

 7      Q.     And how did you contact them?

 8      A.     Via email.

 9      Q.     Do you remember the contents of the emails?

10      A.     Asking them to vote against it.

11      Q.     Did they vote against it?

12      A.     I don't know.

13      Q.     Do you have a copy of that email?

14      A.     I have no idea.

15      Q.     Was it the same email to each one of them?

16      A.     Yes.

17      Q.     And you sent it from your computer?

18      A.     Yeah.

19      Q.     Would it still be on your computer?

20      A.     I don't think so.  I don't know.

21      Q.     Why do you think so?  You said you don't think

22   so.  Why would it not be?

23      A.     Because at that point I didn't keep emails.

24      Q.     Can you look on your computer and see if you
```

1   still have, them please?  Obviously not right now.

2       A.    Okay.

3                   ATTORNEY TRYON:  And then if so, we would

4   request copies of those from counsel.  And we can make a

5   formal request or we can just have this be the formal

6   request if you prefer?

7                   ATTORNEY BLOCK:  I prefer this to be the

8   formal request.  We will follow up with you.

9                   ATTORNEY TRYON:  Thank you.

10  BY ATTORNEY TRYON:

11      Q.    Did you ever receive a response from either one

12  of those legislators?

13      A.    No.

14      Q.    Did that bother you?

15      A.    Yes.

16      Q.    Did you do any kind of follow-up?

17      A.    No.

18      Q.    Did you contact any other public officials about

19  that piece of legislation?

20      A.    I called the Governor's Office and asked them

21  not to sign it.

22      Q.    Did you get to talk to the Governor?

23      A.    No.

24      Q.    Do you know who you talked to?

1      A.      A voicemail.

2      Q.      Did you ever hear back?

3      A.      No.

4      Q.      He never saw this?

5      A.      No.

6      Q.      And then once you saw that the law was actually

7  passed, did you do anything else?

8      A.      I contacted the ACLU and asked if they were

9  going to fight against this law.

10     Q.      And how did you contact them?

11     A.      By phone.

12     Q.      Was that your first contact with the ACLU?

13     A.      Correct.

14     Q.      About anything at all?

15     A.      Yep.

16     Q.      And why did you think to call the ACLU?

17     A.      Because they fight for civil liberties.

18     Q.      So you just had that background knowledge about

19  the ACLU, you thought I will call the ACLU or was there

20  anything else that triggered your ---?

21     A.      I felt like my daughter's --- I felt like my

22  daughter's civil liberties were being violated.

23     Q.      And that was after the law was passed?

24     A.      Correct.

1      Q.    On the Complaint it has your name as next friend

2  and mother of BPJ.

3            Do you recall that?

4      A.    Yes.

5      Q.    And do you know why your name is on there?

6      A.    Because I'm the next friend and mother of BPJ.

7      Q.    Do you know why that is legally --- what the

8  legal impetus behind that is?

9      A.    The next friend part?

10     Q.    Do you know why your name needs to be on that

11 part of the document?

12     A.    Because I'm the adult.  I'm the mom.

13     Q.    So it's your understanding simply because BPJ is

14 a minor your name needed to be on there in some

15 capacity?

16     A.    Yes.

17     Q.    Did you review the Complaint before it was

18 filed?

19     A.    I don't remember.  I reviewed documents.

20     Q.    Let's take a look at Exhibit 32, which is the

21 Complaint.

22            ATTORNEY BLOCK:  Before we do that I just

23 want to check to see if the witness needs a break at

24 all.

```
 1                    THE WITNESS:  I'm good.

 2                    ATTORNEY TRYON:  I'm nearing the end.

 3                    THE WITNESS:  Oh, yeah, this.

 4     BY ATTORNEY TRYON:

 5        Q.    Before we turn to that, let me ask you real

 6     quick, my colleague gave two names.  Would the

 7     legislators have been Patrick Martin?

 8        A.    Pat Morrisey.

 9        Q.    Okay.

10              Well, Morrisey is the Attorney General.  Is

11     there another Morrisey?  Mike Romano?

12        A.    Mike Romano, yeah.

13        Q.    Okay.

14              Having this in front of you now, do you recall

15     reviewing this before it was filed?

16        A.    Yes.

17        Q.    On page eight there is a picture of BPJ?

18        A.    Yeah.

19        Q.    Is that a picture that you supplied?

20        A.    Yes.

21        Q.    And so it appears to be to me that BPJ is

22     wearing makeup.

23              Is that right?

24        A.    Yes, for cheer competition.
```

1    Q.    And did BPJ apply that makeup or did you?

2    A.    We both did it.

3    Q.    And BPJ is wearing an Indian jersey.

4          Is that right?

5    A.    Correct.

6    Q.    Is BPJ part American Indian?

7    A.    No, she cheers for the Indians.

8    Q.    Is that the name of the local team?

9    A.    Yes.

10   Q.    Not the Cleveland Indians?

11   A.    No, not that they're known as Cleveland Indians

12   anymore.

13   Q.    I understand.

14   A.    The Cleveland Guardians.

15   Q.    I understand.  I'm from Cleveland.

16   A.    Oh, are you a Browns fan?

17   Q.    You know, I think we'll just leave that alone.

18   We can talk about it off the record.  How's that?

19         Were you asked if you agreed with everything in

20   here before it was filed?

21   A.    Yes.

22   Q.    And do you understand the legal issues?

23   A.    Which legal issues?

24   Q.    Well, it talks about on --- you know, I should

1    just clarify.  What I'm showing you is the Amended

2    Complaint.  There was a prior Complaint that was filed

3    and then there was a subsequent that was filed for

4    clarification for the record.  So on page 20 there's

5    count one?

6        A.    Yes.

7                    ATTORNEY BLOCK:  Just objection.  I'm

8    just going to refer back to our standing objections.

9                    ATTORNEY TRYON:  Okay.  I haven't asked

10   the question yet, but that's okay.

11   BY ATTORNEY TRYON:

12       Q.    Having --- did you review this count one?

13       A.    A while back.

14       Q.    And in your own mind or your own terminology

15   would you be able to explain what you understand count

16   one to ask or claim?

17       A.    Well, I'd say that she is protected under Title

18   IX.

19       Q.    What do you know about Title IX?  And if you

20   don't know anything about it, that's okay.  I'm just

21   asking for your --- what you know because your lawyers

22   are the ones that really put this aspect of it together.

23   I just want to understand your understanding.

24                   ATTORNEY BLOCK:  Objection to the form.

BY ATTORNEY TRYON:

1  BY ATTORNEY TRYON:

2      Q.    Go ahead.

3      A.    You could be denied based on your sex, meaning

4  your biological sex.

5      Q.    I didn't understand your answer.  Could you say

6  that again?

7      A.    You could be denied benefits based on your

8  biological sex, benefits afforded to you under Title IX.

9      Q.    And then Count 2, if you could take a look at

10  that and tell me what your own understanding of what

11  that is about?

12     A.    It's about the equal protection clause of the

13  14th Amendment.

14     Q.    Do you know anything about that?

15             ATTORNEY BLOCK:  Objection, vague.

16  BY ATTORNEY TRYON:

17     Q.    Do you know anything about the equal protection,

18  the claim for equal protection --- excuse me, the 14th

19  Amendment, the equal protection clause?

20     A.    It's just equal protection under the law.

21     Q.    Have you looked into what that law is at all on

22  your own?

23             ATTORNEY BLOCK:  Objection, vague.

24             THE WITNESS:  No.

1    BY ATTORNEY TRYON:

2        Q.    I didn't hear you.

3        A.    No.

4        Q.    Let me go back to the title, though.  I'm just

5    going to ask you one more question about it.  Where it

6    says BPJ, her next friend and mother, Heather Jackson,

7    is there a reason you were selected to be the next

8    friend as opposed to your husband as the next friend and

9    father?

10       A.    I'm the one that reached out for help in the

11   first place.

12       Q.    Did anyone ask if your husband wanted to be

13   named on here as also another next friend and parent?

14                   ATTORNEY BLOCK:  Just objection to the

15   extent that this calls for communications with your

16   attorneys.  I'm instructing you not to answer.

17   BY ATTORNEY TRYON:

18       Q.    Without any communication with your attorney,

19   did you have a discussion with your husband about him

20   being named on here?

21       A.    My husband and I have been hand in hand

22   throughout this whole procedure.

23       Q.    I understand.  That wasn't my question.  My

24   question was did you have any discussion with his name

```
1   appearing on here as well?

2       A.    No.

3       Q.    Let me ask you about Exhibit WV 23R.

4       A.    Okay.

5       Q.    So on the third page of this document?

6       A.    Yes.

7                   ATTORNEY TRYON:  Can the court reporter

8   put that up?

9                   VIDEOGRAPHER:  I'm looking.  I don't see

10  a 23R, I just see a 23.

11                  ATTORNEY TRYON:  Put up 23, and then it

12  should be --- if you scroll down it should be there.

13                  VIDEOGRAPHER:  So I got that article and

14  then it moves into 24.

15                  ATTORNEY TRYON:  Well, my apologies.  We

16  will use 23 for this deposition.  And as we've already

17  indicated, we will not be using this exhibit with BPJ.

18  BY ATTORNEY TRYON:

19      Q.    So on the --- so can you look at 23?

20      A.    Yes.

21      Q.    So on the --- this is an article from 2016.  And

22  in 2016 you were already referring to BPJ as B████ and

23  using the pronouns her.

24                  Right?
```

1     A.     Correct, with family.

2     Q.     So then, yes, my question is on page three, when

3  you're talking to apparently the reporter you say

4  Stratton looks forward to it.  He does this every year

5  because he says he wants to help other babies.  Why did

6  you continue to use ███████ name in public?

7                ATTORNEY BLOCK:  Objection, the document

8  looks like █████ is in brackets from the quote you

9  read.

10               ATTORNEY TRYON:  Yes.

11  BY ATTORNEY TRYON:

12     Q.     So ma'am, let's be ---.

13               ATTORNEY TRYON:  Thank you for that

14  clarification.

15  BY ATTORNEY TRYON:

16     Q.     Did you, in fact, refer to BPJ as ██████ when

17  you talked to the reporter for this article?

18     A.     Yes.

19     Q.     And why did you do that?

20     A.     Because it was public, not private.

21     Q.     And when did you go public?

22               ATTORNEY BLOCK:  Objection, vague.

23               THE WITNESS:  I don't know the date.

24  BY ATTORNEY TRYON:

```
 1      Q.      Okay.

 2              Let's take a look at 25.

 3                      VIDEOGRAPHER:  There's 23R.  It was right

 4      after 24R.

 5                      ATTORNEY TRYON:  Oh, well, my apologies.

 6      BY ATTORNEY TRYON:

 7      Q.      Do you have 25 in front of you?

 8      A.      Correct.

 9      Q.      So on the second page of that exhibit it appears

10      to have a quote from BPJ saying I just want to run.  I

11      come up from a family of runners, P██████ J██████ said in

12      a news release.  I know how hurtful a law like this is

13      to all kids like me who just want to play sports with

14      their classmates and I'm doing this for them.  Trans

15      kids deserve better, closed quote.  Now, sometimes

16      newspapers misreport things, so I'm asking you if you

17      know if that's an accurate quote?

18      A.      That is accurate.

19      Q.      Was that an oral statement that BPJ made?

20      A.      Oral.

21      Q.      And did you help her come up with that or did

22      BPJ come up with that all on BPJ's own?

23      A.      BPJ.

24      Q.      So what exactly is BPJ doing for others, for
```

```
 1   them?
 2                    ATTORNEY BLOCK:  Objection, vague,
 3   foundation.
 4                    THE WITNESS:  She wants all kids to be
 5   able to run with the teams that they identify with or
 6   play with the teams that they identify with.
 7   BY ATTORNEY TRYON:
 8      Q.    And trans kids deserve better, do you know what
 9   that meant?
10                    ATTORNEY BLOCK:  Objection, speculation.
11                    THE WITNESS:  They deserve to be treated
12   equally.
13   BY ATTORNEY TRYON:
14      Q.    On the next page, at the top of that page, the
15   second paragraph says the Complaint complains that House
16   Bill 3293 was prompted by unfounded stereotypes.  Do you
17   have an opinion on what those unfounded stereotypes are?
18      A.    Unfounded stereotypes ---.
19                    ATTORNEY BLOCK:  Just objection to
20   reading only part of the sentence.
21   BY ATTORNEY TRYON:
22      Q.    Go ahead.
23      A.    The fear that if she runs on a girls team, that
24   she's going to beat all the other girls because she was
```

1   born as a biological sex male.  That's an unfounded

2   stereotype.

3       Q.    How about false scientific claims, do you know

4   what that is?

5       A.    Same thing.

6       Q.    Do you know what baseless fear and

7   misunderstandings of girls who are transgender, do you

8   know what that refers to?

9       A.    Same thing.

10      Q.    Well, what's the fear?

11      A.    The fear that they're going to beat out all the

12  other competition and win all the awards and get all the

13  scholarships.

14      Q.    Okay.

15           And just to be clear that --- I think I

16  understood the prior testimony, you don't have any data

17  or articles or scientific claims to support this data,

18  do you?

19                    ATTORNEY BLOCK:  Objection to form.

20                    THE WITNESS:  I don't have anything.

21  BY ATTORNEY TRYON:

22      Q.    Has anything been shown to you?

23                    ATTORNEY BLOCK:  Objection to form,

24  vague.

1    BY ATTORNEY TRYON:

2        Q.    You're shaking your head no.  Is that a no?

3        A.    Shown to me in regards to ---?

4        Q.    Thank you for asking for that clarification.  Do

5    you have any --- this talks about false scientific

6    claims.  Do you have any scientific evidence to show

7    that those claims are false?

8        A.    I don't have anything to show that they're false

9    or true.

10       Q.    And you haven't seen anything, have you?

11       A.    No.

12       Q.    Okay.

13             Let me ask you to take a look at Exhibit 27.

14    And I'm going to ask you a question about the seventh

15    page in.  It's actually the last page of the article

16    itself.

17       A.    Okay.

18       Q.    All right.

19             So on that page B█████ is quoted as --- B█████

20    was devastated.  She said, quote, I felt horrible

21    because I knew then I couldn't run with the other girls.

22    So is that her quote or did somebody supply that to her?

23       A.    No, that's her.

24       Q.    And then it says B█████ immediately started

1    discussing potential lawsuit with her mom.  Can you

2    explain that to me?

3        A.    She wanted to know what we could do to fight it.

4        Q.    Did she raise that before you did or ---

5        A.    Yes.

6        Q.    --- on her own?

7        A.    Yes.  She wanted to know how we could fight it.

8        Q.    So it sounds like, and correct me if I'm wrong,

9    it sounds like the lawsuit was initially --- let me

10   rephrase that.  Was the lawsuit her idea or just the

11   idea of fighting it?

12       A.    The idea of fighting it.

13                   ATTORNEY BLOCK:  Objection to the form.

14                   THE WITNESS:  The idea of fighting it.

15   BY ATTORNEY TRYON:

16       Q.    And then how was the idea of a lawsuit, how did

17   that come to pass?

18       A.    That was the only way we could fight it.

19       Q.    Well, did you come up with that idea or did that

20   idea come after you called the ACLU?

21       A.    I asked for help.

22       Q.    In the form of a lawsuit or was that a

23   suggestion they made to you?

24       A.    No, a suggestion I made.

1      Q.      Okay.

2              Exhibit 29.

3      A.      Okay.

4      Q.      I'm going to ask you a question about the third

5   paragraph down.  That starts with the term --- with the

6   words that I just want to run.  Take your time to read

7   through this as much as you want, and I just have a

8   question about that.

9      A.      Okay.

10     Q.      So this appears to be a press release by Lambda

11  Legal.  And this appears to be a quote attributed to

12  B███.  In the third paragraph it says I just want to

13  run and the State wants to stop me from running as part

14  of a team at my school, said B███, an 11-year-old

15  middle school student.  I love running and being part of

16  a team.  And the State of West Virginia should explain

17  in court why they won't let me, closed quote.

18             You know, sometimes in the press releases like

19  this the person putting together the press release puts

20  together a quote and then attributes it to --- shows it

21  to the person to whom it's attributed and says is this

22  okay for me to say.  And other times it's something that

23  the person quoted actually said.  Can you tell me which

24  one of those it is?

1    A.    That's B███.

2              ATTORNEY BLOCK:  Objection to the form.

3    Objection to the form.

4              THE WITNESS:  That's B███.

5    BY ATTORNEY TRYON:

6    Q.    So she came up with this quote all on her own?

7    A.    Yes.

8    Q.    And so she wants the State of West Virginia to

9    explain in court why they won't let BPJ run as part of

10   the team.

11            Right?

12   A.    Yes.

13   Q.    Okay.

14            When this lawsuit was filed, did she understand

15   that she might be subject to a deposition?

16   A.    We didn't even know what a deposition was.

17   Q.    Okay.

18            So I'll ask the same question of you, although

19   I think the answer is obvious.  At the time that you

20   filed this lawsuit, did you know that you might be

21   subject to a deposition?

22   A.    I didn't even know what a deposition was.

23   Q.    So the answer would be no?

24   A.    That would be a no.

```
 1              ATTORNEY TRYON:  Let me go off the record

 2   for just a minute and see if I have any other questions.

 3              VIDEOGRAPHER:  Going off the record.  The

 4   current time reads 3:23 p.m.

 5   OFF VIDEOTAPE

 6                        ---

 7   (WHEREUPON, A SHORT BREAK WAS TAKEN.)

 8                        ---

 9   ON VIDEOTAPE

10              VIDEOGRAPHER:  We are back on the record.

11   The current time reads 3:27 p.m.

12   BY ATTORNEY TRYON:

13      Q.    I want to go back and just reconfirm something

14   about --- you said you wrote to two legislators.  And we

15   just checked to see which legislators are in your

16   district, and one is Patrick Martin and one is Mike

17   Romano.

18      A.    That's who it is.  It's Patrick Martin.

19      Q.    Okay.

20            Very good.  And then I'm interested, given

21   there's been a fair amount of publicity in this case,

22   have you received media inquiries about this case?

23      A.    The only inquiries I have had has come to me

24   through my lawyers.
```

1     Q.    Okay.

2         Do you have any --- has anyone contacted you

3  about you or BPJ being some sort of representative or

4  advocate for transgender rights?

5     A.    No.

6     Q.    And you said that you have received --- no, let

7  me rephrase that.  Have you received any press inquiries

8  about this case through your attorneys?

9     A.    The inquiries I have were the ones that you

10  brought forth as exhibits.

11     Q.    There weren't any others?

12     A.    No.

13     Q.    Well, I should represent to you there are a few

14  others that I have not shown.

15     A.    Okay.

16     Q.    So I'm not trying to trick you.  I just want to

17  --- but you don't remember any others right now?

18     A.    No, but I haven't seen all the exhibits either.

19  I don't know if you have them in here as exhibits.

20     Q.    Yeah, and that's fine.  If you don't remember

21  any others, that's all right.  There are one or two

22  more, but that's okay.

23               ATTORNEY TRYON:  I don't think I have any

24  other questions at this time, subject to any follow-up

1 after other questions and any other reservation rights

2 we might make at the end of this deposition.  Thank you

3 for your time.

4                    ATTORNEY BLOCK:  Before other counsel

5 begins, do you need a break, Heather?

6                    THE WITNESS:  I would like to use the

7 restroom.

8                    ATTORNEY BLOCK:  Okay.

9                    So let's come back at 3:35, everyone.

10                    ATTORNEY TRYON:  Okay.  Thank you.

11                    VIDEOGRAPHER:  Going off the record.  The

12 current time reads 3:29 p.m.

13 OFF VIDEOTAPE

14                              ---

15 (WHEREUPON, A BREAK WAS TAKEN.)

16                              ---

17 ON VIDEOTAPE

18                    VIDEOGRAPHER:  We are back on the record.

19 The current time reads 3:36 p.m.

20                              ---

21                         EXAMINATION

22                              ---

23 BY ATTORNEY GREEN:

24    Q.    All right.  We are back on the record.  And I've

1    just --- the State has signed off officially, and so ---

2    oh, there you are.  You just popped her into the screen.

3    It took me a minute to find her.

4            Ms. Jackson, my name is Roberta Green.  I'm an

5    attorney here on behalf of West Virginia Secondary

6    School Activities Commission, also known as WVSSAC.

7            Do you know the those initials, WVSSAC?

8    A.    Yes, I know the WVSSAC initials.  Yes.

9    Q.    Okay.  Great.  So if I refer to it then --- it

10   as WVSSAC, you'll know who I mean?

11   A.    Yes, yes.

12   Q.    That will save us ten words every time I --- so

13   I just have a few questions for you today.  If I

14   understood your testimony correctly, you learned of

15   House Bill 3293 when you heard about it on the news.

16           Is that accurate?

17   A.    Yes, that's accurate.

18   Q.    Do you recollect whether at any time prior to

19   learning of House Bill 3293 you had notified WVSSAC of

20   BPJ's interest in running on the girls cross-country

21   team?

22   A.    I did not notify them of her desire.

23   Q.    All right.

24           And at any time prior to filing the lawsuit do

```
 1    you recall whether you ever notified WVSSAC of BPJ's
 2    interest in running on the girls cross-country team?
 3         A.    I did not contact the WVSSAC in advance.
 4         Q.    All right.
 5               And do you know whether at any time, like up
 6    until today, you have contacted WVSSAC to notify them of
 7    BPJ's interest in running on the girls cross-country
 8    team?
 9         A.    I have not.
10                    ATTORNEY GREEN:  Okay.
11               I don't think I have any other questions.
12    So thank you very much.  I appreciate it.
13                              ---
14                         EXAMINATION
15                              ---
16    BY ATTORNEY DENIKER:
17         Q.    Good afternoon, Ms. Jackson.  My name is Susan
18    Deniker.  I introduced myself earlier today, but I
19    represent the Harrison County Board of Education and
20    superintendant Dora Stutler in this litigation.  Thank
21    you for your time today.  I know it's been a long day
22    and I appreciate you hanging in there with us.
23               I do have some additional questions for you.
24    If I ask you anything that you don't understand today
```

```
 1    please tell me and I'll be glad to rephrase the

 2    question.  If you don't do that I will assume that you

 3    have understood the question.

 4              Is that fair?

 5    A.    Okay.

 6    Q.    Thank you.

 7              Ms. Jackson, tell me about BPJ's education.

 8    Did she start her education in Harrison County schools?

 9    A.    Yes, she started her education in Harrison

10    County schools.

11    Q.    And did she start in pre-K or in kindergarten?

12    A.    Kindergarten.

13    Q.    Did she have any formal education before going

14    to kindergarten?  In other words, was she in a

15    pre-school program or a pre-K program anywhere before

16    starting kindergarten?

17    A.    No.

18    Q.    And did she do her entire elementary schooling

19    at Norwood Elementary?

20    A.    Yes, she did.

21    Q.    Tell me the first --- well, in general, how was

22    your experience for --- how was the experience for BPJ

23    at the Norwood Elementary School did she have a positive

24    experience at that elementary school?
```

1    A.    She had a positive experience.

2    Q.    The current Superintendent of Harrison County

3  schools is Dora Stutler.  Was she the principal at

4  Norwood during part of the time period that BPJ would

5  have been enrolled at Norwood Elementary School?

6    A.    Yes, she was.

7    Q.    So you had interactions with Ms. Stutler while

8  she was the principal at Norwood.

9          Is that true?

10   A.    Interactions, yes.

11   Q.    And were your interactions with her positive?

12   A.    I think I've received a couple phone calls from

13  her in regards to B████, that maybe she had concerns

14  over not getting a homework assignment in or that kind

15  of thing, but it was positive criticism.

16   Q.    So your interactions with Ms. Stutler when she

17  was principal at Norwood Elementary School were all

18  professional in nature?

19   A.    Yes.

20   Q.    And you didn't have any concerns with those

21  communications?

22   A.    No concerns.

23   Q.    Did your other --- did your two older children,

24  your sons, did they go through Norwood Elementary School

1    as well?

2        A.    Yes.

3        Q.    And did you have any issues or concerns when

4    they went through Norwood Elementary School?

5        A.    Correct that.  My oldest one transferred from

6    St. Mary's to Bridgeport Middle.  My second one was all

7    in Norwood.

8        Q.    Okay.

9        A.    I think his kindergarten year, there was no room

10   at Norwood and he had to go to Johnson.

11       Q.    Very good.

12             So you transferred your oldest child to St.

13   Mary's?

14       A.    From St. Mary's directly to Bridgeport Middle,

15   so I correct that.

16       Q.    So your middle --- your middle child, that child

17   did go through Norwood Elementary School?

18       A.    Yes, yes.

19       Q.    Any issues or concerns during his time at

20   Norwood Elementary School?

21       A.    No.

22       Q.    When did you first make any employees of Norwood

23   Elementary School or anybody in Harrison County schools

24   aware that BPJ identified as a female and was a

```
 1   transgender student?

 2       A.    I contacted Mr. James Thornton, who was the

 3   school counselor, but I don't know the date.

 4       Q.    Do you recall what grade BPJ was in at the time?

 5       A.    Third.

 6       Q.    And Mr. Thornton was the guidance counselor at

 7   Norwood Elementary School at that time?

 8       A.    Yes.

 9       Q.    And can you tell me at about that communication?

10   What was discussed when you contacted Mr. Thornton?

11       A.    That B███ is a transgender female and wishes to

12   be --- conduct her life as such and her pronouns were

13   she/her.

14       Q.    What was Mr. Thornton's response to that?

15       A.    He understood and was going to take it to a

16   higher power.  I'm guessing it was the principal at the

17   time.

18       Q.    Was there anything else that you can recall that

19   was part of that initial communication with Mr. Thornton

20   about BPJ's transgender status?

21       A.    That she was going to start presenting as a

22   female at school.

23       Q.    And then what was Mr. Thornton's response to

24   that?
```

1     A.     The same, that he would go ahead and handle what

2  had to be handled on his end.

3     Q.     Did you find him to be supportive of ---?

4     A.     Yes.

5     Q.     Did you say extremely?

6     A.     Extremely supportive of Becky's transition.

7     Q.     Very good.  Did Mr. Thornton, in fact, get back

8  to you after he spoke with the principal?

9     A.     I don't recall.

10     Q.     What was --- what was the next communication

11  that you recall having with the school officials with

12  regard to B███████ transition?

13     A.     I would have had contact with her teacher at

14  that time.  I can't remember her name at that time.  And

15  realizing that she was going to have questions or that

16  the students would have questions, but I can't remember

17  that teacher's name.  I apologize.

18     Q.     That's no problem.

19            Tell me about the nature of your communications

20  with --- this would have been the third grade teacher.

21            Is that correct?

22     A.     Right, right.  That she was going to start

23  presenting as a female at school.

24     Q.     And was the teacher supportive of that?

```
 1        A.     Yes.

 2        Q.     And then BPJ did start presenting as a female at

 3   school I think I heard you testify earlier.

 4               Is that correct?

 5        A.     That is correct.

 6        Q.     Were there any problems or issues with that?

 7        A.     The only thing that I know of is that the

 8   teacher did get questions as to why B████ was dressing

 9   the way she was dressing, and her answer was she's B███

10   and that's what makes her happy.

11        Q.     Were you comfortable with that response from the

12   teacher?

13        A.     Yes.

14        Q.     And so in the third grade did you have any

15   concerns with regard to how the school handled B█████

16   transition?

17        A.     No, I did not.

18        Q.     And then BPJ also would have been enrolled at

19   Norwood Elementary School in the fourth and fifth

20   grades.

21               Is that true?

22        A.     That is correct.

23        Q.     And at that point she was --- in those grades

24   she was fully transitioned ---
```

1      A.     Correct.

2      Q.     --- to being a female student.

3             Is that correct?

4      A.     Correct.

5      Q.     And did you have any issues or concerns with the

6  way school officials handled that?

7      A.     School officials handled it quite well.

8      Q.     So during BPJ's tenure as a student at Norwood

9  Elementary School did you have any concerns or issues

10  with regard to how school officials handled --- how your

11  daughter wanted to handle her transgender status and how

12  she wanted to present at school?

13      A.     They respected her transition and her

14  transgender status.  They used her correct pronouns,

15  which was she/her.

16      Q.     That was something that was important to you and

17  BPJ.

18             Is that correct?

19      A.     Correct.

20      Q.     So part of that --- my understanding is that

21  part of the communications that you would have had with

22  school officials at Norwood Elementary School included

23  completing a Gender Support Plan for BPJ.

24             Is that correct?

1      A.     That is correct.

2      Q.     And I'll ask you --- I'm going to ask you about

3   both Gender Support Plans because I know you're having

4   to grab things.  I'm going to ask you about Exhibits 17

5   and 19, if you want to pull them out.  We'll look at

6   Exhibit 17 first.

7      A.     I've got 17 in front of me.

8      Q.     Okay.  Very good.  We'll start there.  We can

9   get to 19 when we get there.

10         And you can take as much time as you want to

11   review this, but my initial question is going to be is

12   this the Gender Support Plan that was in place when BPJ

13   was at Norwood Elementary School?

14      A.     Yes, it is.

15      Q.     And you would agree with me that this document

16   is dated August 23rd, 2019?

17      A.     Correct.

18      Q.     And this was a document that the Harrison County

19   Board of Education had in place, so that there was a

20   process to discuss a combination of a student who's

21   transgender like BPJ.

22         Is that correct?

23             ATTORNEY BLOCK:  Objection to form.

24             THE WITNESS:  That's my understanding.

BY ATTORNEY DENIKER:

Q.    And in fact, did you meet with school officials from the Harrison County Board of Education to develop this Gender Support Plan to support BPJ?

A.    I met with the people that are listed on the last page of the Gender Peer Support Plan.

Q.    Was there anybody present in the meeting on August 23rd, 2019, whose name doesn't appear on the signature page on page five, which is Bates number BPJ 011?

A.    I don't know.  I know that we were all supposed to sign it to say that we were there in attendance.  So I presume everyone signed it.

Q.    In looking at this signature page, do you recall anybody being there whose name you don't see there?

A.    I don't off the top of my head, no.

Q.    Is your signature on this document?

A.    Yes, ma'am, it is.

Q.    And it looks like BPJ's signature is on this document as well.

        Is that correct?

A.    Correct, because she was in attendance.  She had to sign it.

Q.    So she was part of this meeting.

1          Is that right?

2     A.    That's correct.

3     Q.    Did you find the school officials that

4 participated in this process to be respectful of you and

5 of BPJ?

6     A.    Yes, I did.

7     Q.    And did you find that the purpose of this was to

8 help accommodate any needs that BPJ might have as a

9 transgender student?

10              ATTORNEY BLOCK:  Objection to form.

11              THE WITNESS:  That's my understanding that

12 that was the purpose of the document.

13 BY ATTORNEY DENIKER:

14    Q.    Did you --- were you in agreement with the

15 Gender Support Plan that was put into place through this

16 August 23rd, 2019 document?

17    A.    Yes, I was in agreement with it.

18    Q.    Was BPJ in agreement with it?

19    A.    Yes, as much as she understood.  Yes.

20    Q.    And did you believe that the school followed

21 through and accommodated her in accordance with this

22 Gender Support Plan while she was at the Norwood

23 Elementary School?

24    A.    They followed the Gender Support Peer Plan, yes.

```
 1      Q.    So is it fair to say that you didn't have any

 2   issues or concerns of BPJ's treatment as a transgender

 3   student during the time that she was a student at

 4   Norwood Elementary School?

 5      A.    I would say correct.

 6                 COURT REPORTER:  I'm sorry.  I'm sorry.

 7   Can you state that question one more time?  It was a

 8   little fast.

 9                 ATTORNEY DENIKER:  I will try to do that.

10   BY ATTORNEY DENIKER:

11      Q.    Is it fair to say that you did not have any

12   issues or concerns with BPJ's treatment as a transgender

13   student during the time that she was enrolled as a

14   student at Norwood Elementary School?

15      A.    We had no issues.

16      Q.    Ms. Jackson, to confirm, it is my understanding

17   that Harrison County Schools does not offer

18   school-sponsored athletics for students who are in

19   elementary school.  Is that consistent with your

20   understanding?

21      A.    That's my understanding.

22      Q.    And I heard you testify earlier that BPJ

23   participated in cheerleading, which was not a

24   school-related activity, while we was in elementary
```

1   school.

2           Is that correct?

3       A.      That was through the Bridgeport Youth Football.

4       Q.      And that's not affiliated with the Harrison

5   County Board of Education.

6           Is that correct?

7       A.      That is --- that is correct.

8       Q.      So the first time that BPJ was eligible to

9   participate in school-sponsored sports was when she went

10  to middle school for this coming academic year.

11          Is that correct?

12      A.      That is correct.

13      Q.      And BPJ, is she currently in the 6th grade?

14      A.      That is correct.

15      Q.      And is she still 11 years old?

16      A.      Yes.

17      Q.      And prior to her --- so she would have

18  transferred from Norwood Elementary School to Bridgeport

19  Middle School for the beginning of this academic year.

20          Is that correct?

21      A.      Correct.

22      Q.      And it's my understanding that Bridgeport Middle

23  School is a three-year middle school that has grades

24  six, seven and eight.

1           Is that correct?

2      A.      That is correct.

3      Q.      Your older children, your two sons, have they

4  both gone through Bridgeport Middle School?

5      A.      Yes, they have.

6      Q.      So you're familiar with the school?

7      A.      Yes.

8      Q.      And you were familiar with it before BPJ

9  enrolled there.

10          Is that correct?

11     A.      Yes.

12     Q.      And did you have --- well, strike that.

13          Now, I am going to ask you to look at Exhibit

14  Number 19, if you can find it, please.

15     A.      I got to find it.  Can they bring it up on the

16  screen rather than me finding it?

17     Q.      Yes.  And if you need to see a paper copy, I'll

18  be glad to take a break for you to be able to find it.

19     A.      That's okay.  I can look on the screen.  I'm

20  familiar with this document.

21     Q.      Great.  Would you agree with me that this

22  document we just marked as Exhibit West Virginia 19 is a

23  Gender Support Plan for BPJ, which is dated May 18th,

24  2021?

1  A. Correct.

2  Q. And was this a meeting that you would have had

3 with school officials to create another Gender Support

4 Plan for BPJ?

5  A. Correct.

6  Q. May 18th of 2021, at that time am I correct that

7 BPJ would have been finishing her 5th-grade year at

8 Norwood at that time?

9  A. Yes.

10  Q. So this meeting was done in preparation for

11 BPJ's transition to Bridgeport Middle School.

12   Is that correct?

13  A. Correct, and the meeting was held at Norwood.

14  Q. And as before, the folks that were in

15 attendance, are their signatures on page five of this

16 document, which is Bates number BPJ 006?

17  A. Yes, I presume that is everyone that was there.

18 We were all asked to sign in if we attended.

19  Q. And again, as I asked you before, is there

20 anybody who you recall being present for this meeting

21 whose name or signature doesn't appear on page five of

22 this document?

23  A. I don't think so.

24  Q. Is your signature on this document?

1    A.    Yes, it is.

2    Q.    And I also see BPJ's signature on this document.

3          Is that correct?

4    A.    Yes.

5    Q.    This included --- even though it was held at

6    Norwood Elementary School, this did include school

7    officials from Bridgeport Middle School.

8          Is that correct?

9    A.    Correct.

10    Q.    And this included a discussion about

11    accommodation for BPJ once she got to the middle school

12    for this current academic year.

13          Is that correct?

14    A.    Correct.

15    Q.    Was this meeting conducted professionally in

16    your opinion?

17    A.    Yes.

18    Q.    And were you able to discuss wishes, ideas, and

19    concerns you had about accommodations for BPJ as she was

20    starting into the middle school?

21    A.    Yes.

22    Q.    And did you feel like this was a positive

23    meeting?

24    A.    Yes.

1    Q.    Dave Mazza is somebody who's on the signature

2  page.  He's the principal at Bridgeport Middle School.

3          Is that correct?

4    A.    That is correct.

5    Q.    Did you know Mr. Mazza before you had this

6  meeting?

7    A.    Yes.

8    Q.    And again, you would have been a parent of

9  students who have been at Bridgeport Middle School.

10         Is that correct?

11   A.    That is correct.

12   Q.    Your middle child, Ms. Jackson, I'm trying to

13  figure out the ages, is he a couple of years older than

14  BPJ?

15   A.    Thirteen (13).

16   Q.    He's 13.  And what grade is he currently in?

17   A.    Eighth.

18   Q.    So you have two children currently at the middle

19  school.

20         Is that correct?

21   A.    That is correct.

22   Q.    Okay.

23         So Mr. Mazza wasn't new to you in this meeting?

24   A.    That is correct.

1    Q.    And did you have a --- prior to this meeting,

2    did you have a positive relationship with Mr. Mazza?

3    A.    That is correct.

4    Q.    He's a nice guy, isn't he?

5    A.    He is.

6    Q.    And my experience with him has been that he's

7    very student centered.  Has that been your experience as

8    it relates to your children?

9    A.    He's extremely student oriented.

10    Q.    He really cares about the students, doesn't he?

11    A.    I believe so, yes.

12    Q.    And I see that Tarra Shields was on this

13    document.  Is she the counselor at Bridgeport Middle

14    School?

15    A.    She's the principal I believe now, isn't she?

16    Q.    Is she one of the principals there?

17    A.    I think so, at Norwood.

18    Q.    At Norwood?

19    A.    At Norwood.

20    Q.    That's right.  That's right, Ms. Jackson.  So

21    she was there as the Norwood principal.

22          Is that correct?

23    A.    Correct, correct.

24    Q.    And it looks like Ms. Merrill was there and she

```
 1   is a counselor at Bridgeport Middle School.

 2           Is that correct?

 3   A.      That is correct.

 4   Q.      And how was your experience with her in this

 5   meeting?

 6   A.      Can you be more specific?

 7   Q.      Sure.  Was she professional with you?

 8   A.      Yes.

 9   Q.      And was she helpful in terms of identifying

10   appropriate accommodations for your daughter as she was

11   getting ready to transition to the middle school?

12   A.      Yes.

13   Q.      Did you feel that the Bridgeport Middle School

14   team was committed to making your daughter's transition

15   to the school as a transgender student a positive

16   experience?

17   A.      Yeah.  The only concern that was raised was the

18   concern about her participating in cross-country.

19   Q.      And I wanted to talk to you about this, Ms.

20   Jackson.  Let me ask you this.  Other than conversation

21   as it related to participation on the cross-country

22   team, did you have any concerns at all about what was

23   discussed during this meeting for the Gender Support

24   Plan on May 18th, 2021?
```

1      A.    No.

2      Q.    So during this meeting it sounds like you did

3  have a discussion with the school officials with regard

4  to BPJ's participation in athletics.

5            Is that correct?

6      A.    That is correct.

7      Q.    And in fact, that's part of this plan is to

8  discuss --- that is a topic to be discussed.

9            Is that correct?

10     A.    I'm sorry.  Can you repeat that?

11     Q.    Sure.  And I probably didn't ask it very well.

12  And let me actually ask you by looking at the document.

13  Let's look at page four of the document.  And this is

14  Bates number BPJ 005.  And Ms. Jackson, I will ask you

15  to look at the top of that document as we scroll up to

16  it.  And there's a specific section on this Gender

17  Support Plan to have a discussion about the student's

18  participation in extracurricular activities.

19            Would you agree with that?

20     A.    Yeah, there's definitely information there

21  regarding that.

22     Q.    And it specifically also addresses sports,

23  doesn't it?

24     A.    Yes, specifically is cross-country and track.

1    Q.    Okay.

2          And so I think the question on the form, it

3    says, in what extracurricular programs or activities

4    will the student be participating and then in

5    parentheses it says sports, theater, clubs, et cetera,

6    question mark.  Did I read that accurately, Ms. Jackson?

7    A.    Yes.

8    Q.    And then in handwriting under that question it

9    says cross-country and track.

10         Is that right?

11   A.    That is correct.

12   Q.    And did you fill this document out?

13   A.    No, that is Ms. Merrill's handwriting.

14   Q.    Okay.

15         And the entries that say cross-country and

16   track, did that --- where did that information come

17   from?

18   A.    From B████ and myself, that she wanted to

19   participate in cross-country and track.

20   Q.    Okay.

21         And that was noted on this form.

22         Is that correct?

23   A.    Correct.

24   Q.    And was there a discussion about BPJ's

1    participation in school sports and specifically

2    cross-country and track since BPJ expressed an interest

3    in that participation?

4       A.    Yes.  What was discussed is actually on that

5    next line, about the coaches have to be aware of the

6    transition.

7       Q.    Okay.

8            The next line says what steps will be necessary

9    for supporting the student there.  And as you noted, it

10   says coaches would need to be aware of Becky's

11   transition.  If teammates have questions, they can

12   approach the coach or administration.  Did you have any

13   concern with that?

14      A.    The only concern I had at the time was, was she

15   going to be able to run on the girls cross-country team.

16      Q.    And did you ask that question during the

17   meeting?

18      A.    It came up during the meeting.  I don't know if

19   it was in question form or in statement form.

20      Q.    Do you remember who brought it up?

21      A.    I brought it up.

22      Q.    Do you remember what you said during the

23   meeting?

24      A.    Not specifically, just that I was concerned that

1    she would be able to run on the girls cross-country

2    team.

3        Q.    And did somebody respond to that inquiry from

4    you?

5        A.    David Mazza.

6        Q.    And what did Mr. Mazza say?

7        A.    That it would all depend on how the bill was

8    going to come about, and that if she wanted to run, she

9    wouldn't be able to run on the girls cross-country

10   because of the bill.

11       Q.    And when you say the bill, are you talking about

12   House Bill 3293?

13       A.    Yeah.

14       Q.    And is that the bill that --- is it your

15   understanding that it's House Bill 3293 that your

16   current litigation seeks to overturn and address?

17       A.    Yes.

18       Q.    So were you aware as of the date of this Gender

19   Support Plan, May 18th, 2021, what the status of House

20   Bill 3293 was?

21       A.    I just knew it was in legislature.

22       Q.    And Mr. Mazza was also aware of it, it sounds

23   like from his response to you.

24             Is that your understanding?

1      A.      Yes.

2      Q.      And so was there any further discussion of BPJ's

3   ability to run on the girls team other than what you

4   have already told me?

5      A.      That was the gist of the conversation, was

6   regarding my concerns whether or not she would be able

7   to run on the girls cross-country team.

8      Q.      And so you were aware of the House Bill --- and

9   were you aware that it was a state law?

10      A.      All I knew was about the bill.

11      Q.      Okay.

12              And were you aware that that was a bill that

13   was considered and passed by the West Virginia State

14   Legislature?

15      A.      I'm not sure what year it was passed.  I know it

16   was signed by the Governor in April.

17      Q.      So you understood that the bill was signed by

18   the Governor.

19              Correct?

20      A.      Yes.

21      Q.      I'm not trying to quiz you on dates here, Ms.

22   Jackson, but were you aware that at some point the West

23   Virginia Legislature passed that bill?

24      A.      Yes.  Yes, it was passed.  Yes.

1     Q.     Would you agree with me that there is no
2   Harrison County Schools rule or policy that addresses
3   transgender student participation in sports?
4     A.     I don't know that there is or is not.
5     Q.     Has anybody ever told you that there is a
6   Harrison County policy or rule that would prohibit BPJ
7   from participating in a girls sports team?
8     A.     No one has ever told me that.
9     Q.     And the only discussion that you had with Mr.
10  Mazza with regard to BPJ's participation on a girls
11  sports team related specifically to House Bill 3293.
12            Is that correct?
13    A.     Can you repeat that question, please?
14    Q.     Sure.  The only conversation you had with Mr.
15  Mazza with regard to BPJ's ability to participate in a
16  girls sports team at Bridgeport Middle School related to
17  House Bill 3293.
18            Is that correct?
19    A.     Yes.
20    Q.     Have you had any communication with any other
21  official of Harrison County Board of Education or
22  Harrison County Schools related to BPJ's ability to
23  participate in girls sports?
24    A.     No, I have not.

1    Q.    So the only communication related to this

2  occurred with Mr. Mazza on May 18th, 2021.

3          Is that correct?

4    A.    Correct.

5    Q.    And your only discussion about a possible

6  limitation of BPJ's ability to participate in girls

7  sports related to House Bill 3293.

8          Correct?

9    A.    I'm sorry.  I thought I answered that.  Can you

10 repeat the question?  I'm confused.

11   Q.    Sure.  And your only communication then with

12 anybody in Harrison County Schools related to BPJ's

13 ability to participate on a girls sports team was with

14 Mr. Mazza.

15         Correct?

16   A.    Correct.

17   Q.    And that conversation only related to BPJ's

18 ability to run as it would have been impacted by House

19 Bill 3293.

20         Is that correct?

21   A.    The conversation was in regards to how --- if

22 she would be able to run on the girls cross-country team

23 and that would have been dictated by that House Bill.

24   Q.    Mr. Mazza didn't tell you that it would be

```
 1    dictated by anything else, did he?

 2        A.    No.

 3        Q.    And Mr. Mazza, he did not indicate to you that

 4    he wouldn't permit BPJ to participate on the girls team

 5    personally.

 6              Is that correct?

 7                   ATTORNEY BLOCK:  Objection to form.

 8                   THE WITNESS:  Yeah.  Can you repeat that

 9    question?

10    BY ATTORNEY DENIKER:

11        Q.    Sure.  Did Mr. Mazza tell you that he personally

12    had any objection to BPJ participating on a girls sports

13    team?

14        A.    He never said those words, no.

15        Q.    Okay.

16              And did anybody else in Harrison County Schools

17    affiliated with Harrison County Schools in any way tell

18    you that they wouldn't permit or had a problem with BPJ

19    participating in a girls sports team?

20                   ATTORNEY BLOCK:  Objection.  Compound

21    question.

22                   THE WITNESS:  I didn't contact --- I

23    wasn't in contact with any other individuals.

24    BY ATTORNEY DENIKER:
```

1      Q.      So you didn't have any communications with
2    anybody else about that.
3              Is that correct?
4      A.      That is correct.
5      Q.      Is there any other communication that you had
6    with anybody in Harrison County Schools about BPJ's
7    participation on a girls sports team other than what we
8    just talked about?
9      A.      No.
10     Q.      Were you otherwise comfortable --- well, strike
11    that.
12              This Gender Support Plan that is dated
13    May 18th, 2021, is that currently in effect for BPJ?
14     A.      Yes.
15     Q.      And were you in agreement with that when you
16    signed it on May 18th, 2021?
17     A.      Correct.
18     Q.      And have you had any issues or concerns or
19    problems with the implementation of this Gender Support
20    Plan during the school year?
21     A.      With the Gender Support Plan I've had no issues.
22     Q.      Did you raise any concerns with anybody within
23    the Harrison County Board of Education or Harrison
24    County Schools about your objections or disagreements

1   with House Bill 3293?

2       A.    I hadn't had any conversations with those

3   individuals.

4       Q.    And when you say I hadn't I just want to make

5   sure that sitting here today have you had any

6   discussions with anybody affiliated with Harrison County

7   Board of Education other than the communication you had

8   with Mr. Mazza about concerns or problems you had with

9   House Bill 3293?

10      A.    I have not.

11      Q.    Are you aware that there is an elected Board of

12  Education for all of the county Boards of Education in

13  West Virginia?

14      A.    Yes.

15      Q.    And are you aware that there is a specific

16  County Board --- elected County Board of Education for

17  Harrison County Schools?

18      A.    Yes.

19      Q.    Did you have any communications with anybody on

20  the elected Board of Education with regard to BPJ and

21  her ability to participate in girls sports teams?

22      A.    I've had no contact with anybody on the elected

23  board.

24      Q.    Have you had any communication with Dora Stutler

```
 1   with regard to BPJ's ability to participate in school

 2   sports?

 3       A.    No.

 4       Q.    Was BPJ permitted to participate in summer

 5   conditioning with the Bridgeport Middle School

 6   cross-country team in the summer of 2021?

 7       A.    Yes.

 8               ATTORNEY BLOCK:  Objection to form.

 9   BY ATTORNEY DENIKER:

10       Q.    And it's my understanding that the Middle School

11   cross-country team at Bridgeport Middle School does the

12   summer conditioning where they run together.

13               Is that correct?

14       A.    They --- they all condition together, but they

15   separate out into groups, if that makes sense.

16       Q.    How were those groups separated?  Do you know?

17       A.    Normally by speed in the conditioning

18   environment.

19       Q.    Are they separated by sex or gender in any way?

20       A.    Only by boys team and girls team.

21       Q.    And was BPJ permitted to run then with the girls

22   teams in the girls groups?

23       A.    Correct.

24               ATTORNEY BLOCK:  Objection to form.
```

1   BY ATTORNEY DENIKER:

2        Q.    Did you have any issues or concerns with how BPJ

3   was treated concerning conditioning?

4        A.    No.  The coaches were very respectful of her

5   pronouns and her transgender identity.

6        Q.    And was that true for the entire cross-country

7   season?

8        A.    The coaches --- yes, the coaches were very much

9   so, yes.

10       Q.    So you had --- did BPJ have a positive

11  experience participating on the girls cross-country

12  team?

13       A.    Yes.

14       Q.    And so I got a little bit ahead of myself

15  because we were talking about summer conditioning and

16  then there were tryouts for cross-country.

17             Is that correct?

18       A.    That's correct.

19       Q.    And did that take place in August of 2021?

20       A.    Yes.

21       Q.    And BPJ tried out for the girls cross-country

22  team.

23             Is that correct?

24       A.    That is correct.

```
 1        Q.     And she was permitted to do so by the middle

 2   school.

 3               Is that right?

 4        A.     That is correct.

 5        Q.     And was she selected for membership on the girls

 6   cross-country team?

 7        A.     That is correct.

 8        Q.     And I think I heard you testify earlier that she

 9   did compete through the whole season on the girls

10   cross-country team.

11               Is that right?

12        A.     That is correct.

13        Q.     And she had a good experience doing that?

14        A.     Yes, she did.

15        Q.     Good.  I'm glad to hear that.  And I had to

16   laugh when Mr. Tryon was asking you questions about

17   where she placed because it's clear to me that he has

18   never been to a middle school cross-country meet because

19   they're just --- even in high school, there are just

20   tons of kids and lots of runners, aren't there?

21        A.     There's tons of them, yes.

22        Q.     And just for the record, my kids never came in

23   first or second either, so I understand that.

24               Who were the coaches for the cross-country team
```

```
 1   this year at the Bridgeport Middle School?

 2       A.    Schoonmaker or Shumaker, I'm not sure how to

 3   pronounce her name, and I can't remember the names of

 4   the other two.

 5                 ATTORNEY BLOCK:  Sorry.  Just can you

 6   give me a five-second pause while I move to the other

 7   room.  My son is about to come home from school.

 8                 ATTORNEY DENIKER:  Absolutely.  No

 9   problem.

10                 ATTORNEY BLOCK:  Shift over.  All set.

11                 ATTORNEY DENIKER:  That was fast.

12                 ATTORNEY BLOCK:  Small apartment.

13   BY ATTORNEY DENIKER:

14       Q.    Ms. Jackson, I was asking you about the

15   Bridgeport cross-country coaches.  Are the coaches the

16   same for the girls and the boys teams?

17       A.    Yes, they are.

18       Q.    And was the head coach Danielle I think maybe

19   it's Schoonmacher?

20       A.    Yes.

21       Q.    And then you said there were two other coaches.

22   I think one of them may be Natalie McBriar?

23       A.    Yes, that is one of them.

24       Q.    Is that correct?
```

1    A.    Yes.

2    Q.    And do you who the other one was?

3    A.    I can't remember her name.

4    Q.    But your daughter would have interacted with

5    these coaches throughout the season?

6    A.    Correct.

7    Q.    And didn't have any issue or problem with them.

8          Is that correct?

9    A.    That is correct.

10   Q.    Did she have any issues or problems with other

11   students on the cross-country team?

12   A.    At one point she came home and reported that

13   somebody had told her that she's not a real girl.  I

14   asked her at that point if she reported it to the coach

15   and she said that she did.

16   Q.    And do you know whether the situation was

17   addressed by the coaches?

18   A.    I do not know.

19   Q.    Did you follow up with the coaches to discuss

20   this concern?

21   A.    I did not.

22   Q.    Did you feel that BPJ had handled it herself and

23   you were comfortable with that?

24   A.    Oh, quite well, yes.

1    Q.    And were there any issues after that with

2    students, after BPJ raised this concern with the

3    coaches?

4    A.    There was not.

5    Q.    If you thought that there was a further problem

6    would you have gotten involved and either addressed it

7    with either the coaches or school officials?

8    A.    Most definitely.

9    Q.    Is it fair to say you didn't think that was

10   necessary?

11   A.    Correct.

12   Q.    That season is over now.

13         Is that correct?

14   A.    That is correct.

15   Q.    And is BPJ --- did she try out for any winter

16   sports at the middle school?

17   A.    No, she did not.

18   Q.    Does she intend to try out for any spring

19   sports?

20   A.    Yes, she does.

21   Q.    And what does she intend to try out for?

22   A.    Track.

23   Q.    And has --- have you had any communications with

24   school officials about her ability to try out for track

1    this spring?

2        A.    We have not.

3        Q.    Is it your understanding that she will be

4    permitted to try out for the girls track team?

5        A.    I don't have an understanding whether she'll be

6    permitted or not.

7        Q.    Because you have not had any discussions.

8              Is that correct?

9        A.    Correct.

10       Q.    Let me talk more candidly about BPJ's school

11   year.  And I'm sorry if I already asked you this, but at

12   the middle school she's I guess almost halfway through

13   her sixth grade year.

14             Is that correct?

15       A.    That is correct.

16       Q.    And is she having a good school year?

17       A.    She's having an excellent school year.  After

18   she learned her locker combination, everything went

19   well.

20       Q.    Right now all of us are having a flashback to

21   middle school and the trauma that was remembering your

22   locker code.  I understand that, Ms. Jackson.  And do

23   you feel that the school has appropriately implemented

24   the Gender Support Plan that you agreed upon?

1    A.    Yes.

2    Q.    And you don't have any issues or concerns with

3  how school officials have treated BPJ this school

4  year-to-date?

5    A.    No.

6    Q.    I want to follow up on a question that Mr. Tryon

7  asked about cross-country meets this fall.  You

8  mentioned that some meets --- I think you called them

9  one and done meets?

10    A.    Yes.

11    Q.    And I think you described that everybody ---

12  they have the girls teams and the boys teams all run at

13  one time.

14         Is that correct?

15    A.    Correct, correct.

16    Q.    And in those situations the boys teams are still

17  competing against the boys teams and the girls teams are

18  still competing against the girls teams.

19         Is that correct?

20    A.    Yes.  The statistics go towards the appropriate

21  team.

22    Q.    That was what I assumed was the case in those

23  meets, but I just wanted to ask you.  I haven't seen one

24  of those, but I figured they still separated the results

1   by girls teams and boys teams.

2           Right?

3   A.      Correct.

4   Q.      And in those situations BPJ would have been

5   listed on girls roster and would have been competing

6   against other girls teams.

7           Correct?

8   A.      That is correct.

9   Q.      I did notice in one of the pictures that was

10  provided through your counsel in discovery there were

11  some pictures of BPJ at various cross-country meets this

12  fall.  It looks like she was having a good time.

13          Was that correct?

14  A.      That is correct.

15  Q.      I saw the one of her in the creek, and I will

16  tell you that I have been there with my daughter and

17  what a muddy mess.  Huh?

18  A.      Yes, very much so.

19  Q.      But the middle school kids love it.  I don't

20  know if BPJ loved it, but I know that my daughter

21  thought it was great to get muddy.

22  A.      The creek crossing runs are her favorites.

23  Q.      Let me just look at my notes here, Ms. Jackson.

24  I'm almost done.

```
 1              I want to go back briefly to your

 2    communications with Mr. Mazza about House Bill 3293.

 3    Mr. Mazza did not tell you that he agreed with that

 4    bill, did he?

 5        A.    He didn't say he agreed or disagreed.

 6        Q.    And did anybody employed by Harrison County

 7    Schools or any elected official of Harrison County

 8    Schools ever tell you that they agreed with House Bill

 9    3293?

10        A.    I've had no communication with anybody in that

11    genre whether they agreed or disagreed.

12        Q.    And that would include Superintendant Stutler,

13    she also didn't tell you that she agreed with House Bill

14    3293.

15              Correct?

16        A.    Yes, there has been no communication between me

17    or her whether she agrees or disagrees.

18              ATTORNEY DENIKER:  Ms. Jackson, thank

19    you.  I don't have any further questions at this time.

20                          ---

21                      EXAMINATION

22                          ---

23    BY ATTORNEY MORGAN:

24        Q.    Ms. Jackson, my name is Kelly Morgan and I
```

1    represent the West Virginia Board of Education and

2    Superintendant Burch.  Can you hear me okay?

3        A.    Yes.

4        Q.    All right.

5              I only anticipate a few questions here, so I

6    don't anticipate going very long.  But if you don't

7    understand my question, please let me know.  Otherwise,

8    I'm going to assume that you understood my question if

9    you answer my question.

10             Is that fair?

11       A.    Okay.  Yes.

12       Q.    All right.

13             Had you ever had any discussions with anyone

14   from the West Virginia Board of Education?

15       A.    I have not.

16       Q.    And when I say the West Virginia Board of

17   Education, what does that mean to you?

18       A.    I don't know how to answer that.  That means the

19   West Virginia Board of Education.

20       Q.    Do you know what the West Virginia Board of

21   Education is?

22       A.    Yeah, the governing body of the board --- of the

23   educational system.

24       Q.    Can you describe that any more for me as to what

```
 1    your understanding is?

 2        A.      No, I cannot.

 3        Q.      Do you know like the hierarchy of how that's set

 4    up at all?

 5        A.      No.

 6        Q.      Okay.

 7                Do you know where they are in relation to say

 8    Harrison County Board of Education?

 9        A.      No.

10        Q.      Fair enough.

11        A.      Do you mean physically where they're located?

12        Q.      No, not physically?

13        A.      Oh, okay.

14        Q.      Like as who might give direction to who?

15        A.      Oh, okay.  No.

16        Q.      Or who does what or anything like that?

17        A.      No.

18        Q.      Okay.  Fair enough.

19                I just wondered.  Have you ever talked to

20    Superintendant Burch?

21        A.      No.

22        Q.      Have you ever contacted his office?

23        A.      No.

24        Q.      Are you aware of anyone in your family who has
```

```
1   contacted the West Virginia Board of Education or

2   Superintendant Burch?

3        A.   I am not aware.

4        Q.   Do you have any reason to believe that the West

5   Virginia Board of Education had any specific role or

6   involvement in the passage of House Bill 3293?

7        A.   I don't know.

8        Q.   You wouldn't know one way or another?

9        A.   Nope.

10       Q.   Okay.

11            And so if you never had any contact with the

12  West Virginia Board of Education or Superintendant

13  Burch, is it fair to say that you don't have any

14  complaints of anything that they've done in this case

15  with regard to BPJ?

16                 ATTORNEY BLOCK:   Objection to form.

17                 THE WITNESS:   Can you repeat the

18  question?

19  BY ATTORNEY MORGAN:

20       Q.   Sure.   Let me even rephrase it a different way.

21  Do you have any complaints as to anything that the West

22  Virginia Board of Education has done with regard to BPJ?

23       A.   Up to this point they have let her run on the

24  girls cross-country team, so we're happy with that.
```

```
 1        Q.     And when you say they, who are you referring to?

 2        A.     The Board of Education.  They have not ---

 3   because of the stay, they didn't tell her she couldn't

 4   run.

 5        Q.     And are you specifically referring to Harrison

 6   County Board of Education?

 7        A.     I'm referring to any Board of Education.

 8        Q.     You said earlier that you had never been

 9   contacted by anyone for BPJ to be, in essence, the

10   spokesperson for transgender rights.

11               Is that right?

12        A.     That's correct.

13        Q.     Had you ever contemplated her being a

14   spokesperson for transgender rights?

15        A.     Heavens, no.

16        Q.     You said that you had a family friend who also

17   had a transgender, I believe male.

18               Is that right?

19        A.     That's correct.

20        Q.     What discussions have you had with that friend

21   regarding transgender rights?

22               ATTORNEY BLOCK:  Objection.  Vague.

23               THE WITNESS:  Yeah, I'm not sure how to

24   answer that.  I mean ---.
```

BY ATTORNEY MORGAN:

1

2      Q.    As you sit here today, can you think of anything

3  specific about things you might do to promote

4  transgender rights?

5      A.    What we would do as individuals to promote it?

6      Q.    Yes.

7      A.    Like publicly promote it?

8      Q.    Sure.

9      A.    No.

10     Q.    Have you talked to this friend?  And I forget

11  her name.

12     A.    Carolyn.

13     Q.    Carolyn.  Have you talked to Carolyn about this

14  case?

15     A.    No.

16     Q.    Do you know whether B███ has talked to Carolyn

17  or her transgender son, if I'm using that term

18  correctly, about this case?

19     A.    She has not.

20            ATTORNEY MORGAN:  Ms. Jackson, those are

21  all the questions that I have for you.  Thank you.

22            And before someone questions, I think it

23  was Tim possibly, I may be switching to a different

24  device so just be patient if I drop off this for the

```
 1    court reporter and all other counsel.  I'll be joining

 2    on another device.  Thank you again.

 3                            ---

 4                        EXAMINATION

 5                            ---

 6    BY ATTORNEY DUCAR:

 7       Q.    Good afternoon, Ms. Jackson.  I'm Tim Ducar and

 8    I represent Lainey Armistead, an intervenor in this

 9    case.  You previously --- strike that.

10           Let's go back to this cross-country competition

11    example that we were talking about because I am

12    unfamiliar with it.  Is this one and done competition

13    everybody runs all at one time but the rankings are kept

14    track somehow?

15       A.    Correct.

16       Q.    And you said the rankings are done in what

17    manner?

18       A.    Sometimes they have chips, sometimes it's done

19    manually.

20       Q.    So it is separated by gender or sex or is it

21    separated by --- how are those separated?

22       A.    Sorry.  There's a huge echo.

23                    ATTORNEY MORGAN:  Sorry.  That may have

24    been me.  I think I fixed it.
```

```
 1                    THE WITNESS:  Okay.

 2                    I'm sorry.  Mr. Ducar, could you repeat?

 3   BY ATTORNEY DUCAR:

 4        Q.    How are the groups that are competing separated

 5   in those kinds of events?

 6        A.    I'm not sure how the logistics works.  I've

 7   never worked an event where that happens, so I'm not

 8   sure how they do it.

 9        Q.    Okay.

10              But when BPJ ran in an event like that, I guess

11   she only ran in one, would you describe her as not being

12   first, not being second, not being last, but how?

13        A.    I wouldn't know to tell you where she ranked.

14        Q.    Okay.

15              On the times that she competed against --- on

16   the girls team, she didn't end up first, second or last.

17   Was she in the front of the pack?  Was she in the back?

18   How did she end up?

19        A.    She was in the back of the pack.

20        Q.    So the second 50 percent anyway.

21              Correct?

22        A.    She was not in the top 50 percent.

23        Q.    She still enjoyed herself.

24              Right?
```

1    A.    She had a blast.

2    Q.    You previously testified that BPJ was born a

3 male.  Can you please explain what you meant when you

4 said BPJ was born a male?

5    A.    She was born as a male in that she was

6 designated male at birth because she had a penis when

7 she was born.

8    Q.    Is there any other characteristics that would

9 conclude you to say BPJ was born a male?

10   A.    No.  That is how they're identified when you

11 give birth.  They look at the genitalia and tell you

12 it's a boy or a girl.

13   Q.    You previously testified the reason BPJ is

14 female is based upon BPJ's identification as a female.

15 In your view, how does someone know what they identify

16 as?

17   A.    She knows that she's a female just like I know

18 that I'm a female and you know that you're a male.

19   Q.    So it's something somebody knows internally.

20         Correct?

21   A.    Yes.  She knows that she's a female.

22   Q.    And the way one identifies whether or not

23 they're male or female is their internal thought about

24 that.

1          Correct?

2                    ATTORNEY BLOCK:  Objection to form.

3                    THE WITNESS:  Their internal thought and

4     their outward thought.

5     BY ATTORNEY DUCAR:

6     Q.     How they act, is that what you're saying?

7     A.     How they express themselves, if they come out

8     and say that I am a female.

9     Q.     Very well.

10            You testified earlier that someone who

11    identifies as a female should be able to run on girls

12    cross-country teams.  Do you think it's true even if the

13    person was born a biological male and has not taken

14    puberty blockers?

15    A.     Yes.

16    Q.     Earlier you testified that BPJ showed female

17    characteristics at about age three.  What are female

18    characteristics that she would have --- or that BPJ

19    displayed?

20    A.     Her mannerisms, her choice of clothing, limited

21    vocabulary but able to say that she's a girl, expressing

22    concern over the fact that she had a penis.

23    Q.     I presume you supported her the entire time when

24    she was showing these characteristics?

```
 1      A.      Yes, I nurtured her.

 2      Q.      Did you ever dissuade BPJ's from these

 3  characteristics?

 4      A.      Nope.

 5      Q.      Have you ever?

 6      A.      Nope.

 7      Q.      How do you feel about BPJ's transitioning?

 8      A.      I think she's a beautiful little girl.

 9      Q.      Do you think her desire to transform is

10  permanent?

11      A.      Yes.

12      Q.      What happens if BPJ changes BPJ's mind and wants

13  to transition back?

14              ATTORNEY BLOCK:  Objection to form.

15  BY ATTORNEY DUCAR:

16      Q.      Would you support that?

17      A.      I would support her true self, however she

18  chooses live authentically.

19      Q.      So would you support de-transitioning if that is

20  what BPJ wanted to do?

21      A.      If some day she came to me and said she chose to

22  de-transition, yes, I would support her.

23      Q.      Does the fact that BPJ wants to transition or is

24  transitioning causing you any anxiety?
```

1      A.    Just worried about any sort of discrimination

2   that she may face.

3      Q.    Anything else?

4      A.    No.

5      Q.    Is it causing your husband any anxiety?

6      A.    You would have to ask him.

7      Q.    None that you're aware of?

8      A.    It seems that he's doing just fine.

9      Q.    Is it causing BPJ any anxiety?

10                ATTORNEY BLOCK:  Objection to form.

11                THE WITNESS:  If she gets misgendered,

12   she's upset.

13   BY ATTORNEY DUCAR:

14      Q.    Is there anything else about the transitioning

15   that causes her anxiety?

16      A.    No.  She's happy to transition.

17      Q.    How about this lawsuit, is this lawsuit causing

18   you anxiety?

19      A.    The whole process of it is quite overwhelming.

20      Q.    Is it causing your husband anxiety?

21      A.    You would have to ask him on that one.

22      Q.    Is it causing BPJ anxiety?

23      A.    Not that I know of.

24      Q.    Has your husband told you about how he feels

```
 1   about BPJ's desire to transition?

 2       A.    I know that he supports her.

 3       Q.    Do you have any hesitation about BPJ's interest

 4   in socially or medically transitioning?

 5       A.    Can you repeat that, please?

 6       Q.    Do you have any hesitation about BPJ's interest

 7   in socially or medically transitioning?

 8       A.    No hesitation.

 9       Q.    Have you encouraged BPJ's interest in

10   transitioning?

11       A.    I have helped ---.

12             ATTORNEY BLOCK:  Objection to form.

13             THE WITNESS:  I have helped her in her

14   desire to transition.

15   BY ATTORNEY DUCAR:

16       Q.    So that would be yes.

17             Correct?

18       A.    I helped her in her desire to transition.

19       Q.    Have you encouraged her?

20       A.    I have helped her.

21             ATTORNEY BLOCK:  Objection to the form.

22   BY ATTORNEY DUCAR:

23       Q.    So you have not encouraged BPJ?

24       A.    I wouldn't use the word encourage.
```

1      Q.    Do you think it's important that team sports

2   have fair rules?

3                    ATTORNEY BLOCK:  Objection to form.

4                    ATTORNEY DUCAR:  Excuse me.  What is

5   wrong with the form?  That's a simple question.

6                    ATTORNEY BLOCK:   I think the fair rules

7   is vague.

8                    ATTORNEY DUCAR:  Okay.  Thank you.

9   BY ATTORNEY DUCAR:

10      Q.    So I'll ask it again.  Ms. Jackson, do you think

11   it's important that team sports have fair rules?

12      A.    I think rules are necessary in society.

13      Q.    Do you think it's important that team sports

14   have fair rules?

15      A.    What constitutes fair?

16      Q.    Well, that's a good question.  Okay.  I'll move

17   on then.

18            Do you have any long-term treatment goals for

19   BPJ?

20      A.    Well, I hope she'll continue her blockers until

21   she's ready for her next step, whatever she and her

22   doctors decide that need be.

23      Q.    You're going to follow the medical advice of the

24   doctors.

```
 1            Correct?
 2       A.    Correct.
 3       Q.    Whose idea was it for BPJ to start puberty
 4   blockers?
 5       A.    She expressed her desire to start the puberty
 6   blockers.  She was concerned about her body producing
 7   male hormones.
 8       Q.    Earlier you testified that Dr. Montano talked to
 9   you about risks of puberty blockers.
10            Did you understand what he said?
11       A.    Yes.
12       Q.    Did BPJ understand what he said?
13       A.    Yes.
14       Q.    And do you understand the long-term
15   ramifications of BPJ taking puberty blockers?
16       A.    As I read the package insert.
17       Q.    What do you understand the risks to be of cross
18   sex hormones?
19       A.    I don't understand the question.
20       Q.    You talked about hormone therapy throughout this
21   deposition.
22            Correct?
23       A.    Correct.
24       Q.    What do you define as hormone therapy?
```

```
 1       A.      Well, in her particular case she will be
 2   receiving female hormones.
 3       Q.      Do you understand the risks of her taking female
 4   hormones?
 5       A.      Yes.
 6       Q.      Does B███?
 7       A.      Yes.
 8       Q.      And you understand the long-term ramifications
 9   of BPJ taking these hormones.
10           Correct?
11       A.      I know there are risks.
12       Q.      And BPJ knows those as well.
13           Right?
14       A.      There are risks, yes.
15       Q.      What are those risks?
16       A.      Possibility of increased chance of cancer.
17       Q.      Anything else?
18       A.      Non-reversible characteristics.
19       Q.      For example, what would that be?
20       A.      Decreased size in testes.
21       Q.      Anything else?
22       A.      If she would eventually want to go off the
23   hormones, a decreased size in breasts.
24       Q.      Anything else?
```

1      A.      Those are the biggies.

2      Q.      Earlier I did not hear that Dr. Montano talked

3   about the risks of testosterone.  Did Dr. Montano talk

4   to you about the risks of testosterone?

5      A.      She's not taking testosterone.

6      Q.      Did Dr. Montano ever talk to you about that?

7      A.      She won't be taking testosterone.

8      Q.      Does that mean no?

9      A.      No, because she's not taking testosterone.

10     Q.      Has any medical professional talked to you about

11  the risks of taking testosterone?

12     A.      No, because she wouldn't be taking testosterone.

13     Q.      Is BPJ eligible to compete on Bridgeport Middle

14  Schools cross-country team, girls?

15                 ATTORNEY BLOCK:  Objection to form.

16                 THE WITNESS:  She was permitted to

17  participate this past season.

18  BY ATTORNEY DUCAR:

19     Q.      Bridgeport Middle School has a boys

20  cross-country team.

21             Correct

22     A.      Correct.

23     Q.      Is BPJ eligible to compete on Bridgeport Middle

24  School's boys cross-country team?

1      A.    She would not participate.

2      Q.    Do you know if BPJ is eligible to do so?

3      A.    It was irrelevant to the conversation in regards

4   that she would refuse to try out for the boys

5   cross-country team.

6      Q.    So is it fair to say you're not sure?

7      A.    I don't know if she would be eligible.

8      Q.    I believe in your Declaration you said that

9   BPJ's running on a boys cross-country team is not an

10   option.  What did you mean by that?

11      A.    She will not be running on a boys cross-country

12   team.  She has exhibited absolutely no desire to run on

13   a boys cross-country team.

14      Q.    Are there situations where it would be not fair

15   to allow a male, a biological male, to run on a girls

16   cross-country team?

17      A.    Can you repeat the question?

18      Q.    Are there situations where it would be not fair

19   to allow a biological male to run on a girls

20   cross-country team?

21      A.    If a biological male identifies as a female they

22   should be allowed to run on a girls cross-country team

23   or play girls sports.

24      Q.    Okay.

1          But my question is, is there a situation where

2   it wouldn't be fair to allow that to happen?

3      A.    I guess I don't understand how the wording of it

4   --- it's almost like you are using a double negative.

5   I'm not understanding the question.

6      Q.    Is it --- can you think of a situation where it

7   would be unfair to allow a biological male to run on a

8   girls cross-country team?

9      A.    No, I can't think of a situation.

10             ATTORNEY DUCAR:  Thank you, Ms. Jackson.

11  I have nothing further for you.

12             ATTORNEY TRYON:  I have two follow-up

13  questions.

14                        ---

15                   RE-EXAMINATION

16                        ---

17  BY ATTORNEY TRYON:

18     Q.    You indicated that ---.

19             ATTORNEY DUCAR:  I'm sorry.  Can I

20  interrupt?

21             ATTORNEY TRYON:  Yes.

22             ATTORNEY DUCAR:  I have like three other

23  questions that I forgot about.  I'm sorry to interrupt.

24             ATTORNEY TRYON:  Okay.  Go ahead.

```
 1                    ATTORNEY DUCAR:  All right.  Do you need

 2      a break, Heather?

 3                    THE WITNESS:  I just need to get a little

 4      more water.  I'm out.

 5                    ATTORNEY DUCAR:  Okay.

 6                    I'm changing my mind.  I've already

 7      handled these questions, so I'm sorry for interrupting

 8      and now I have no further questions.

 9                    THE WITNESS:  Got it.

10      BY ATTORNEY TRYON:

11         Q.    Two quick questions.  You indicated during some

12      of the other questioning that BPJ intends to or wants to

13      run in track this next year.

14              Is that right?

15         A.    That is correct.

16         Q.    Do you know which events that BPJ wants to or

17      intends to run in this next year?

18         A.    She's interested in distance running.

19         Q.    Can you be more specific?

20         A.    The mile, two-mile.

21         Q.    Any others?

22         A.    She's not really experienced any of the other

23      events in track because this would be her first year to

24      be exposed to them.  So she hasn't really raised any
```

 1    desire because she hasn't experienced them.

 2        Q.    Okay.

 3              So what about cross-country, does BPJ want to

 4    do them again?

 5        A.    Oh, yes.

 6        Q.    Great.  Then when running in these meets, these

 7    cross-country meets, it's my understanding that BPJ was

 8    competing against both sixth, seventh and eighth

 9    graders.

10              Is that right?

11        A.    That is correct.

12        Q.    Ninth graders?

13        A.    No.

14        Q.    That's true for all cross-country that BPJ's

15    grade levels.

16              Right?

17        A.    That is correct.

18                    ATTORNEY TRYON:  Thank you.  I have no

19    further questions with the caveat in the event that we

20    need to reopen this upon delivery of additional

21    documents we would want to continue this deposition.

22    Other than that, I have no other questions.

23                    ATTORNEY BLOCK:  And Plaintiff would

24    object to any continuation of the deposition.

1           ATTORNEY GREEN:  On behalf of WVSSAC I

2    have no further questions.  Thank you, Ms. Jackson.

3           THE WITNESS:  Thank you.

4           ATTORNEY DENIKER:  I have no further

5    questions.  Thank you for your time today, Ms. Jackson.

6           THE WITNESS:  Thank you.

7           ATTORNEY MORGAN:  I have no further

8    questions.  Thank you so much.

9           THE WITNESS:  Thank you.

10          ATTORNEY DUCAR:  I have nothing further.

11   Thank you so much.

12          THE WITNESS:  Thank you.

13          ATTORNEY BLOCK:  And the witness will

14   review the transcript in accordance with the Rules.

15          VIDEOGRAPHER:  If there are no further

16   questions, then that this concludes the deposition.  The

17   time reads 4:49 p.m.

18                   * * * * * * *

19        VIDEOTAPED VIDEOCONFERENCE DEPOSITION

20              CONCLUDED AT 4:49 P.M.

21                   * * * * * * *

22

23

24

289

1    STATE OF WEST VIRGINIA   )

2                    CERTIFICATE

3         I, Nicole Montagano, a Notary Public in

4    and for the State of West Virginia, do hereby

5    certify:

6         That the witness whose testimony appears

7    in the foregoing deposition, was duly sworn by me

8    on said date, and that the transcribed deposition

9    of said witness is a true record of the testimony

10   given by said witness;

11        That the proceeding is herein recorded

12   fully and accurately;

13        That I am neither attorney nor counsel

14   for, nor related to any of the parties to the

15   action in which these depositions were taken, and

16   further that I am not a relative of any attorney

17   or counsel employed by the parties hereto, or

18   financially interested in this action.

19        I certify that the attached transcript

20   meets the requirements set forth within article

21   twenty-seven, chapter forty-seven of the West

22   Virginia.

23   

24                        Nicole Montagano,

25                        Court Reporter