# Exhibit 18

```
 1              IN THE UNITED STATES DISTRICT COURT
 2          FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA
 3                      CHARLESTON DIVISION
 4
 5   B.P.J. by her next friend and      )
     mother, HEATHER JACKSON,           )
 6                                       )
              Plaintiff,                 )
 7                                       )
              vs.                        ) Civil Action No.
 8                                       ) 2:21-cv-00316
     WEST VIRGINIA STATE BOARD OF        )
 9   EDUCATION, HARRISON COUNTY BOARD    )
     OF EDUCATION, WEST VIRGINIA         )
10   SECONDARY SCHOOL ACTIVITIES         )
     COMMISSION, W. CLAYTON BURCH in     )
11   his official capacity as State      )
     Superintendent, DORA STUTLER in     )
12   her official capacity as            )
     Harrison County Superintendent,     )
13   and THE STATE OF WEST VIRGINIA,     )
                                         )
14            Defendants.                )
                                         )
15            and                        )
                                         )
16   LAINEY ARMISTEAD,                   )
                                         )
17            Defendant-Intervenor.      )
     _____    )
18
19          VIRTUAL VIDEOCONFERENCE VIDEO-RECORDED
20               DEPOSITION OF MICHELE BLATT
21               Monday, February 14, 2022
22   Remotely Testifying from Charleston, West Virginia
23
24    Reported By:  Hanna Kim, CLR, CSR No. 13083
25     Job No. 5079505
```

Page 1

```
 1              IN THE UNITED STATES DISTRICT COURT
 2          FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA
 3                     CHARLESTON DIVISION
 4
 5   B.P.J. by her next friend and     )
     mother, HEATHER JACKSON,          )
 6                                     )
             Plaintiff,                )
 7                                     )
             vs.                       ) Civil Action No.
 8                                     ) 2:21-cv-00316
     WEST VIRGINIA STATE BOARD OF      )
 9   EDUCATION, HARRISON COUNTY BOARD  )
     OF EDUCATION, WEST VIRGINIA       )
10   SECONDARY SCHOOL ACTIVITIES       )
     COMMISSION, W. CLAYTON BURCH in   )
11   his official capacity as State    )
     Superintendent, DORA STUTLER in   )
12   her official capacity as          )
     Harrison County Superintendent,   )
13   and THE STATE OF WEST VIRGINIA,   )
                                       )
14           Defendants.               )
                                       )
15           and                       )
                                       )
16   LAINEY ARMISTEAD,                 )
                                       )
17           Defendant-Intervenor.     )
     _____  )
18
19           Virtual videoconference video-recorded
20    deposition of MICHELE BLATT, taken pursuant to the
21    stipulations of counsel thereof, taken on behalf
22    of the Plaintiff, on Monday, February 14, 2022,
23    remotely testifying from Charleston, West
24    Virginia, before Hanna Kim, CLR, Certified
25    Shorthand Reporter, No. 13083.
```

Page 2

```
 1        REMOTE VIDEOCONFERENCE APPEARANCES OF COUNSEL:

 2

 3     For Plaintiff B.P.J.:

 4           COOLEY LLP

 5               BY:   JULIE VEROFF, ESQ.

 6               BY:   KATHLEEN HARTNETT, ESQ.

 7               BY:   ANDREW BARR, ESQ.

 8               BY:   KATELYN KANG, ESQ.

 9               BY:   ELIZABETH REINHARDT, ESQ.

10               BY:   ZOE HELSTROM, ESQ.

11               3 Embarcadero Center, 20th Floor

12               San Francisco, California 94111

13               415.693.2000

14               khartnett@cooley.com

15               -and-

16               AMERICAN CIVIL LIBERTIES UNION OF WEST

17               VIRGINIA FOUNDATION

18               BY:   LOREE STARK, ESQ.

19               BY:   NICHOLAS WARD, ESQ.

20               BY:   JOSH BLOCK, ESQ.

21               P.O. Box 3952

22             Charleston, West Virginia 25339-3952

23               914.393.4614

24               lstark@acluwv.org

25
```

Page 3

```
 1        REMOTE VIDEOCONFERENCE APPEARANCES OF COUNSEL:

 2                        (CONTINUED)

 3     For Plaintiff, B.P.J.:  (Continued)

 4              LAMBDA LEGAL

 5              BY:  SRUTI SWAMINATHAN, ESQ.

 6              BY:  AVATARA SMITH-CARRINGTON, ESQ.

 7              120 Wall Street, 19th Floor

 8              New York, New York 10005

 9              212.809.8585

10              sswaminathan@lambdalegal.org

11

12      For Defendant West Virginia Board of Education and

13     Superintendent Clayton Burch;

14              BAILEY & WYANT P.L.L.C.

15              BY:  KELLY C. MORGAN, ESQ.

16              BY:  KRISTEN V. HAMMOND, ESQ.

17              500 Virginia Street, East

18              Suite 600

19              Charleston, West Virginia 25301

20              304.720.0711

21              kmorgan@baileywyant.com

22

23

24

25

                                        Page  4
```

```
 1        REMOTE VIDEOCONFERENCE APPEARANCES OF COUNSEL:
 2                        (CONTINUED)
 3     For Defendant State of West Virginia:
 4               SPECIAL ASSISTANT TO THE ATTORNEY
 5               BY:  DAVID C. TRYON, ESQ.
 6               BY:  CURTIS CAPEHART, ESQ.
 7               State Capitol Complex
 8               112 California Avenue, Bldg. 6, Room 430
 9               Charleston, West Virginia 25305-0220
10               304.558.2021
11               david.c.tryon@WVAGO.gov
12
13      For Defendant Harrison County Board of Education
14     and Superintendent Dora Stutler:
15               STEPTOE & JOHNSON PLLC
16               BY:  SUSAN DENIKER, ESQ.
17               400 White Oaks Blvd.
18               Bridgeport, West Virginia 26330
19               304.933.8154
20               susan.deniker@steptoe-johnson.com
21
22
23
24
25
                                             Page 5
```

```
 1        REMOTE VIDEOCONFERENCE APPEARANCES OF COUNSEL:
 2                         (CONTINUED)
 3    For Defendant West Virginia Secondary School
 4    Activities Commission:
 5             SHUMAN McCUSKEY SLICER PLLC
 6             BY:  ROBERTA GREEN, ESQ.
 7             1411 Virginia Street, E., Suite 200
 8             Charleston, West Virginia 25301
 9             304.345.1400
10             rgreen@shumanlaw.com
11
12     For the Defendant-Intervenor Lainey Armistead:
13             ALLIANCE DEFENDING FREEDOM
14             BY:  HAL FRAMPTON, ESQ.
15             BY:  KATIE KELLY, ESQ.
16             BY:  TIMOTHY DUCAR, ESQ.
17             15100 N. 90th Street
18             Scottsdale, Arizona 85260
19             480.444.0020
20
21     Also Present:
22             MITCH REISBORD, Concierge
23             DAVE HALVORSON, Videographer
24
25
```

Page 6

```
 1                    INDEX OF EXAMINATION

 2

 3      WITNESS:  MICHELE BLATT

 4      EXAMINATION                              PAGE

 5            BY MS. VEROFF:                       13

 6            BY MS. GREEN:                       129

 7            BY MS. MORGAN:                      134

 8

 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

                                         Page  7
```

```
 1                    INDEX OF EXHIBITS

 2

 3   BLATT DEPOSITION EXHIBITS                    PAGE

 4   Exhibit 15    "Plaintiff's Notice of 30(b)(6)   17

 5                 Deposition"; 9 pages

 6   Exhibit 16    Printout from web page from West   46

 7                 Virginia Department of

 8                 Education's website titled "State

 9                 Board of Education"; 3 pages

10   Exhibit 17    "Defendants West Virginia State    50

11                 Board of Education and

12                 Superintendent W. Clayton Burch's

13                 Responses to Plaintiff's First

14                 Set of Requests for Production to

15                 Defendant State Board of West

16                 Virginia and W. Clayton Burch";

17                 57 pages

18   Exhibit 18    "Defendants West Virginia State    68

19                 Board of Education and

20                 Superintendent W. Clayton Burch's

21                 Responses to Plaintiff's First

22                 Set of Interrogatories to

23                 Defendants State Board of West

24                 Virginia and W. Clayton Burch";

25                 12 pages

                                            Page 8
```

```
 1            INDEX OF EXHIBITS (CONTINUED)

 2

 3     BLATT DEPOSITION EXHIBITS                      PAGE

 4   Exhibit 19    E-mail set, with top e-mail from    75

 5                 Heather Hutchens, March 15, 2021;

 6                 Bates nos.  WVSBOE 000006 through

 7                 '000009

 8   Exhibit 20    E-mail from Melissa White, dated    102

 9                 March 17, 2021, and attachment;

10                 Bates nos. WVSBOE 000002 through

11                 '000005

12   Exhibit 21    "2021 Green Book Summary of         105

13                 Public Education Bills Enacted

14                 During the 2021 Regular Session";

15                 24 pages

16   Exhibit 22    "Enrolled Bill Review Form 2021     110

17                 Regular Session"; 2 pages

18   Exhibit 23    E-mail from Sarah Stewart to        120

19                 Heather Hutchens, subject:

20                 "Fyi," dated July 1, 2021; Bates

21                 nos. WVSBOE 000001

22                          --o0o--

23

24

25
```

Veritext Legal Solutions
866 299-5127

1    Remotely Testifying from Charleston, West Virginia

2        Monday, February 14, 2022; 12:09 p.m., EST

3                   --o0o--

4           THE VIDEOGRAPHER:  Okay.  Good afternoon.

5    We are on the record at 12:09 p.m. on              12:09:56

6    February 14th, 2022.

7           This is Media Unit 1 in the video-recorded

8    deposition of Michele Blatt, in the matter of

9    B.P.J. and Heather Jackson versus West Virginia

10   State Board of Education, et al.                    12:10:15

11          It's filed in the Southern District of

12   West Virginia in -- in the Charleston Division.

13   The case number is 2:21-cv-00316.

14          This deposition is being held virtually.

15          My name is Dave Halvorson.  I'm the          12:10:31

16   videographer here from Veritext.  And I'm here with

17   the court reporter, Hanna Kim, also from Veritext.

18          Counsel, can you please all identify

19   yourselves so the witness can be sworn in.

20          MS. VEROFF:  Good morning.  This is Julie    12:10:44

21   Veroff from Cooley LLP.  I'm an attorney

22   representing Plaintiff B.P.J.

23          MS. HARTNETT:  This is Kathleen Hartnett

24   from Cooley, also for Plaintiff.

25          MR. BARR:  Andrew Barr, also from Cooley     12:11:02

                                           Page 10

1    and also for Plaintiff.

2            MS. KANG:  Katelyn Kang, also from Cooley,

3    also for Plaintiff.

4            MS. REINHARDT:  Elizabeth Reinhardt, also

5    from Cooley, also for Plaintiff.                    12:11:19

6            MS. HELSTROM:  Zoe Helstrom from Cooley

7    for Plaintiff.

8            MS. STARK:  Loree Stark with the ACLU of

9    West Virginia for Plaintiff.

10           MR. WARD:  Nicholas Ward with the ACLU of    12:11:29

11   West Virginia on behalf of Plaintiff.

12           MR. BLOCK:  Josh Block from the ACLU on

13   behalf of Plaintiff.

14           MS. SWAMINATHAN:  Sruti Swaminathan from

15   Lambda Legal on behalf of Plaintiff.                12:11:40

16           MS. SMITH-CARRINGTON:  Avatara

17   Smith-Carrington from Lambda Legal on behalf of

18   Plaintiff.

19           MS. MORGAN:  This is Kelly Morgan on

20   behalf of the West Virginia Board of Education and  12:12:01

21   Superintendent Clayton Burch, as well as Heather

22   Hutchens, as general counsel for the West Virginia

23   State Board.

24           And on Zoom as well is Kristen Hammond.

25           MR. TRYON:  This is David Tryon on behalf   12:12:19

                                                 Page 11

1    of the State of West Virginia.

2           Curtis Capehart is also on the line on

3    behalf of the State.

4           MS. DENIKER:  Susan Deniker on behalf of

5    Harrison County Board of Education and            12:12:36

6    Superintendent Dora Stutler.

7           MS. GREEN:  Roberta Green here on behalf

8    of West Virginia Secondary School Activities

9    Commission.

10          MS. FRAMPTON:  Hal Frampton from Alliance   12:12:48

11   Defending Freedom for the Defendant-Intervenor

12   Lainey Armistead.

13          Also on Zoom for the intervenor are Katie

14   Kelly and Timothy Ducar.

15          THE COURT REPORTER:  I'm going to          12:13:02

16   administer the oath to the witness.

17

18                    MICHELE BLATT,

19     having been duly administered an oath over

20   videoconference as stipulated by all counsel, was

21          examined and testified as follows:

22

23     THE VIDEOGRAPHER:  Okay.  You may proceed.

24   ///

25    ///

                                           Page 12

```
 1                    EXAMINATION

 2    BY MS. VEROFF:

 3        Q.   Good morning, Ms. Blatt.  Thank you so

 4    much for being here.

 5             Good afternoon in West Virginia.        12:13:39

 6             How are you doing today?

 7        A.   Good.  Thank you.

 8        Q.   Yep.

 9             Would you mind stating and spelling your

10    name for the record, please.                    12:13:46

11        A.   Michele Blatt.  It's M-I-C-H-E-L-E,

12    B-L-A-T-T.

13        Q.   Thank you.  And is it okay to refer to you

14    as "Ms. Blatt," or would you prefer a different

15    salutation?                                      12:14:00

16        A.   Michele's fine.

17        Q.   Michele.  Okay.  Thank you.

18             And so before we dive into questions, I

19    have just a few keeping housekeeping items to go

20    through with you.                                12:14:10

21             So the oath you've just taken today is the

22    same oath as if you were testifying in a

23    courtroom.  You must testify truthfully and not

24    leave out any important fact.

25             Is there any reason you cannot testify    12:14:19
```

Page 13

```
 1    truthfully today?

 2        A.   No.

 3        Q.   Please give verbal answers to my

 4    questions.  Nonverbal answers, like nodding or

 5    shaking your head, can't be taken down by the        12:14:28

 6    court reporter.

 7             If you don't understand a question, please

 8    just let me know, and I'd be happy to repeat it or

 9    to rephrase.

10             If you answer, I'll assume you understood.   12:14:38

11             And just to be clear, when I ask

12    questions, I'm not seeking confidential

13    communications that you had with your attorney.

14             And, lastly, to enable the court reporter

15    to take down a clean record, we should do our best    12:14:51

16    to avoid speaking at the same time.

17             So please allow me to try and finish a --

18    a question before you answer, and I'll do my very

19    best not to speak over you.

20             Does all that sound okay?                    12:15:04

21        A.   Yes.

22        Q.   Okay.  Great.

23             And just a few shorthands that I'm

24    planning to use through today's deposition.  I'm

25    going to use the shorthand "State Board" when         12:15:14
```

Page 14

```
 1    referring to the West Virginia State Board of

 2    Education.

 3            Is that okay with you?

 4        A.   Yes.

 5        Q.   I'm also going to use "H.B. 3293" when      12:15:23

 6    referring to House Bill 3293, which is codified at

 7    West Virginia Code Section 18-2-25d.

 8            Is that okay with you?

 9        A.   Yes.

10        Q.   Great.                                      12:15:36

11            And during this deposition, I'm going to

12    have a few questions that use the terms

13    "cisgender" and "transgender."

14            And so for purposes of this deposition,

15    when I say the term "cisgender," what I mean is     12:15:47

16    someone's whose gender identity matches the sex

17    they were assigned at birth.

18            Does that make sense?

19        A.   Yes.

20        Q.   Great.                                      12:15:56

21            And for purposes of this deposition, when

22    I say "transgender," I mean someone whose gender

23    identity does not match the sex they were assigned

24    at birth.

25            Does that make sense?                         12:16:07
```

Page 15

```
 1          A.   Yes.

 2          Q.   Great.

 3               And, lastly, when I say "B.P.J.," I'm

 4     referring to the Plaintiff in this case.

 5               Does that make sense?                    12:16:14

 6          A.   Yes.

 7          Q.   Great.

 8               So with all that out of the way, I want to

 9     chat a little bit about your experience with

10     depositions and preparation for today's           12:16:23

11     deposition.

12               Have you ever had your deposition taken

13     before?

14          A.   I have not.

15          Q.   And have you ever testified at trial?    12:16:31

16          A.   I have not.

17          Q.   Well, hopefully this will be an easy and

18     pain-free first deposition experience.

19               Did you bring anything to today's

20     deposition?                                        12:16:44

21          A.   I just have a copy of the House Bill 3293

22     that was codified.

23          Q.   Great.

24               And do you have any notes or annotations

25     on that copy of House Bill 3293?                   12:16:53
```

                                                      Page 16

```
 1        A.    No.

 2        Q.    And do you understand that you're here in

 3     response to a 30(b)(6) deposition notice?

 4        A.    Yes.

 5        Q.    Do you know what a 30(b)(6) deposition is?   12:17:07

 6        A.    Yes.  I just learned that Friday.

 7        Q.    Excellent.

 8              And have you had a chance to review the

 9     deposition notice?

10        A.    Yes.                                          12:17:17

11        Q.    Great.

12              And so you're familiar with a 12 topics

13     described in the notice?

14        A.    Yes.

15        Q.    Wonderful.                                    12:17:25

16              So if you'll please go into your "Marked

17     Exhibits" folder on Exhibit Share, you should see

18     Exhibit 15.

19              Please go ahead and open that exhibit, and

20     let me know when you have it open.                     12:17:37

21              MS. MORGAN:  We have it open.

22              MS. VEROFF:  Wonderful.

23              (Blatt Deposition Exhibit 15 was marked

24              electronically.)

25     BY MS. VEROFF:                                         12:17:45
```

Page 17

1        Q.   So if you'll please scroll to page, I

2    believe it's 6 -- or maybe -- I'm sorry, page 4 of

3    the PDF, you'll see "Definitions."  And if you

4    scroll to page 6, you'll see "Topics of

5    Examination."                                    12:17:58

6            Do you see that?

7        A.   Yes.

8            THE COURT REPORTER:  Counsel?

9            MS. VEROFF:  Yes.

10           THE COURT REPORTER:  I need to go off the   12:18:08

11   record for an audio issue, please.

12           THE VIDEOGRAPHER:  All right.

13           We are going off the record.  The time is

14   12:18 p.m.

15           (Off the record.)                          12:18:32

16           THE VIDEOGRAPHER:  All right.

17           We are back on the record at 12:28 p.m.

18           Go ahead.

19           MS. VEROFF:  Great.

20   BY MS. VEROFF:                                     12:28:13

21       Q.   Thank you, Ms. Blatt.

22           So we were talking about the -- the 12

23   topics in the notice of deposition.  And I'd like

24   to start with Topic 1, which is "The organization

25   and structure of the State Board, including its    12:28:24

                                                   Page 18

```
 1   employees, their positions, and the scope of their

 2   responsibilities, including the role and

 3   responsibilities of the State Superintendent."

 4           Did I read that correctly?

 5      A.   Yes.                                      12:28:37

 6      Q.   What did you do to prepare for Topic 1?

 7      A.   I've just generally thought through the

 8   process that we use and how our department and

 9   State Board is organized.

10      Q.   Did you review any documents?             12:28:53

11      A.   No.

12      Q.   And did you consult with anyone other than

13   your attorney?

14      A.   No.

15      Q.   Turning to Topic 2, "Your Policies,       12:29:04

16   Documents, and Communications concerning

17   rulemaking," did I read that correctly?

18      A.   Yes.

19      Q.   What did you do to prepare for Topic 2?

20      A.   Again, just thought through the process   12:29:18

21   that we use here at the Department of Education.

22      Q.   Did you consult any documents?

23      A.   No.

24      Q.   And did you consult any person other than

25   your attorney?                                    12:29:29
```

                                                      Page 19

```
1        A.   No.
2        Q.   Looking at Topic 3, "Your Policies,
3   Documents, and Communications Concerning Your
4   control, supervision, or authority over school
5   athletics in West Virginia," did I read that        12:29:41
6   correctly?
7        A.   Yes.
8        Q.   What did you do to prepare for Topic 3?
9        A.   Just reviewed the State Code regarding the
10  SSAC.                                                12:29:54
11       Q.   And did you review any documents?
12       A.   No.
13       Q.   I'm sorry, I couldn't hear you.  Did you
14  say "no"?
15       A.   No, just the -- the State Code that        12:30:07
16  relates to the SSAC.
17       Q.   Just the State Code.  Great.
18            And did you consult with anyone other than
19  your attorney?
20       A.   No.                                        12:30:16
21            MS. MORGAN:  Let me just state that there
22  are more than just one attorney, so attorneys for
23  the State Board and Superintendent Burch.
24  BY MS. VEROFF:
25       Q.   Did -- did you consult with any of your    12:30:30
```

Page 20

```
 1    attorneys -- or, I'm sorry, anyone other than your

 2    attorneys?

 3         A.    No.

 4         Q.    Turning to Topic 4, "Your current and/or

 5    expected role in implementing and enforcing H.B.        12:30:42

 6    3293, including any delegation of authority to or

 7    supervision over the West Virginia Secondary

 8    School Activities Commission, West Virginia county

 9    boards of education, and/or county

10    superintendents," did I read that correctly?          12:30:59

11         A.    Yes.

12         Q.    What did you do to prepare for Topic 4?

13         A.    Just reviewed House Bill 3293.

14         Q.    Did you review any other documents?

15         A.    No.                                         12:31:12

16         Q.    And did you consult with anyone other than

17    your attorneys?

18         A.    No.

19         Q.    Topic 5 is "The relationship between the

20    State Board and the West Virginia Secondary School    12:31:24

21    Activities Commission."

22              Did I read that correctly?

23         A.    Yes.

24         Q.    Did you review any -- what did you -- I'm

25    sorry.                                                 12:31:34
```

Page 21

```
 1              What did you do to prepare for Topic 5?
 2         A.   Again, just reviewed the State Code that
 3    spells out that relationship.
 4         Q.   And did you review any other documents?
 5         A.   No.                              12:31:44
 6         Q.   And did you consult with anyone other than
 7    your attorneys?
 8         A.   No.
 9         Q.   Topic 6, "Your relationship and
10    Communication with the West Virginia Legislature,   12:31:55
11    including individual legislators, legislative
12    staff, Committees, and/or Committee staff, in
13    developing legislation, including Your
14    Communication regarding and involvement in the
15    drafting, passage, and implementation of H.B.       12:32:09
16    3293.  This expressly includes all Communications
17    with the House Education Committee, including its
18    counsel Melissa White."
19              Did I read that correctly?
20         A.   Yes.                             12:32:22
21         Q.   What did you do to prepare for Topic 6?
22         A.   Just reviewed the exhibits that had been
23    submitted.
24         Q.   And did you review any other documents?
25         A.   No.                             12:32:32
```

Page 22

1          Q.    And did you consult with anyone other than

2     your attorneys?

3          A.    No.

4          Q.    Topic 7, "Your Policies, Documents, and

5     Communications Concerning the participation of          12:32:44

6     transgender students in athletics in West Virginia

7     from January 1st, 2019 to the present."

8               Did I read that correctly?

9          A.    Yes.

10         Q.    What did you do to prepare for Topic 7?       12:32:55

11         A.    There is nothing to review.  We had no

12    documents for this one.

13         Q.    And did you consult with anyone other than

14    your attorneys?

15         A.    No.                                           12:33:06

16         Q.    Topic 8, "Your Policies, Documents and

17    Communications Concerning the separation of boys

18    and girls in school-sponsored sports in West

19    Virginia prior to and following the passage of

20    H.B. 3293."                                              12:33:22

21              Did I read that correctly?

22         A.    Yes.

23         Q.    What did you do to prepare for Topic 8?

24         A.    Nothing.

25         Q.    Did you review any documents?                 12:33:32

                                                    Page 23

1       A.    No.

2       Q.    And did you consult with anyone other than

3    your attorneys?

4       A.    No.

5       Q.    Topic 9, "Your understanding Concerning        12:33:39

6    the purpose, scope, and implications of 3293.

7    This expressly includes Your understanding of

8    what, if any, governmental interests are furthered

9    by H.B. 3293." [As read]

10          Did I read that correctly?                        12:33:57

11      A.    Yes.

12      Q.    What did you do prepare for Topic 9?

13      A.    Just read the House Bill 3293 statute.

14      Q.    Did you review any other documents?

15      A.    No.                                             12:34:09

16      Q.    And did you consult with anyone other than

17   your attorneys?

18      A.    No.

19      Q.    Topic 10, "Your Policies, Documents, and

20   Communications Concerning B.P.J. and her family         12:34:24

21   from January 1st, 2019, to the present." [As read]

22          Did I read that correctly?

23      A.    Yes.

24      Q.    What did you do to prepare for Topic 10?

25      A.    We had nothing to -- to review or consider      12:34:34

                                                     Page 24

```
 1   in that.

 2        Q.   So you didn't review any documents?

 3        A.   No, other than the court case --

 4        Q.   And did you consult -- and did you consult

 5   with anyone other than your attorneys?          12:34:47

 6        A.   No.

 7        Q.   Topic 11, "Your Policies, Documents, and

 8   Communications Concerning H.B. 3293."

 9             (Interruption in audio/video.)

10             THE COURT REPORTER:  Excuse me.  There was  12:35:01

11   an interruption.  There was a cough.

12             If you could please start over.

13             MS. VEROFF:  Sure.

14   BY MS. VEROFF:

15        Q.   Topic 11, "Your Policies, Documents, and   12:35:06

16   Communications Concerning H.B. 3293.  This

17   expressly includes Your Green Book Summary of H.B.

18   3293 published in 2021, Bates stamped W -- WVSBOE

19   000035, as well as the Enrolled Bill Review Form

20   submitted in relation to H.B. 3293 Bates stamped    12:35:27

21   WVSBOE 000038."

22             Did I read that correctly?

23        A.   Yes.

24        Q.   What did you do to prepare for Topic 11?

25        A.   Just reviewed those documents.          12:35:41
```

Page 25

```
 1          Q.    And did you review any other documents
 2     besides the Green Book Summary and the Enrolled
 3     Bill Review Form?
 4          A.    No.
 5          Q.    And did you consult with anyone other than    12:35:51
 6     your attorneys?
 7          A.    No.
 8          Q.    Topic 12, the last one, "All Your
 9     discovery responses provided to date in this
10     action."                                                  12:36:03
11          Did I read that correctly?
12          A.    Yes.
13          Q.    What did you do to prepare for Topic 12?
14          A.    Just reviewed the discovery responses.
15          Q.    Did you review any other documents?         12:36:13
16          A.    No.
17          Q.    And did you consult with anyone other than
18     your attorneys?
19          A.    No.
20          Q.    Besides what we've just discussed, did you    12:36:22
21     do any other preparation for today's deposition?
22          A.    No.
23          Q.    Do you understand that you are testifying
24     today about these topics on behalf of the State
25     Board?                                                    12:36:37
```

Page 26

1        A.    Yes.

2        Q.    So, accordingly, when I ask for your

3    position on something, I'll be asking for the

4    position of the State Board, unless I specify

5    otherwise.                                        12:36:48

6              Does that make sense?

7        A.    Yes.

8        Q.    Great.

9              So even though we're largely going to be

10   discussing the -- the State Board, I do want to    12:36:57

11   talk a little bit about your personal background.

12   So for these questions, I'm asking you to speak on

13   your own behalf rather than that of the State

14   Board.

15             What is your current position?          12:37:08

16       A.    Deputy State Superintendent.

17       Q.    And what are your responsibilities as

18   Deputy State Superintendent?

19       A.    Basically to oversee the management of the

20   Department of Education and the various offices.   12:37:22

21       Q.    And can you tell me a little bit more

22   about what that involves?

23       A.    We have six main divisions here that serve

24   the different areas that are controlled by the

25   Department of Education, and so each of these      12:37:40

Page 27

1   offices I'll work with reviewing any policies that

2   they are -- are producing, work with the State

3   Board of Education to get those policies out on

4   comment, and then come back for approval,

5   oversight of the various budgets from -- in the        12:37:55

6   different offices, and the personnel issues or

7   hirings that may come up.

8       Q.   And how long have you been in this role?

9       A.   I've been in this role about a year and a

10  half.                                                  12:38:11

11      Q.   And who do you report to?

12      A.   I report to the superintendent, Clayton

13  Burch.

14      Q.   And does anyone report to you?

15      A.   Yes, the -- the six officers report to me    12:38:24

16  directly.

17      Q.   And who are the six officers?

18      A.   We have our division of CTE, and that's

19  Clinton Burch; teaching and learning, Sonia White;

20  support and accountability, Charlene Coburn;           12:38:42

21  federal programs, Melanie Parkey; our data

22  management and information systems, Tim Conzett;

23  and then our chief financial officer, Phil Uwey.

24      Q.   And did you go to college, Ms. Blatt?

25      A.   I did.                                        12:39:06

Page 28

1        Q.   Where did you go?

2        A.   Marshall University in Huntington.

3        Q.   And did you obtain a degree there?

4        A.   Yes.

5        Q.   What degree did you earn?                    12:39:15

6        A.   I have a bachelor's in K-8 multisubject

7    teaching.  And I have a master's in educational

8    leadership.  And I have a master's as a reading

9    specialist, K to adult.

10       Q.   And after you finished at Marshall          12:39:31

11   University, what was the first job that you had?

12       A.   I was a classroom teacher.

13       Q.   What school did you teach at?

14       A.   First job was Eastland Middle.

15       Q.   Got it.                                      12:39:44

16            And what county is that in?

17       A.   Wayne County.  The school no longer

18   exists, though.

19       Q.   And what --

20            MS. MORGAN:  Julie, just -- just so the      12:39:51

21   record's clear, this is beyond the scope of the --

22   the 12 topics that you have filed that you were

23   going to ask her questions about.

24            You know, I want to go ahead and allow it

25   just to, you know, try to move forward on this, but  12:40:05

Page 29

```
 1      I just want to preserve that objection.

 2             MS. VEROFF:   Thank you.

 3      BY MS. VEROFF:

 4          Q.   And after that teaching position, what was

 5      the next job that you had?                            12:40:15

 6          A.   I was a teacher for six years in Wayne

 7      County.

 8          Q.   And what grade did you teach?

 9          A.   Sixth, seventh, and eighth.

10          Q.   And after you finished those six years of    12:40:28

11      teaching, what did you do next?

12          A.   I went into administration.  I was an

13      assistant principal for three years.

14          Q.   And what school were you the assistant

15      principal at?                                         12:40:40

16          A.   Buffalo Middle School in Wayne County.

17          Q.   And after that job, what did you do next?

18          A.   I became the principal of Buffalo Middle

19      School for one year and then transferred to

20      Buffalo Elementary School for four years as the      12:40:56

21      principal.

22          Q.   And when you finished with that role as

23      the principal of the elementary school, what did

24      you do after that?

25          A.   That was at the time that I came to the      12:41:09
```

Page 30

```
 1    State Department of Education.

 2        Q.   And have you held the position of deputy

 3    superintendent the entire time you've been at the

 4    State Board of Education [verbatim]?

 5        A.   No.  I was hired as the leadership         12:41:18

 6    development coordinator, moved into an assistant

 7    director role, then a director role, then became

 8    an assistant state superintendent over one of our

 9    divisions prior to becoming the deputy

10    superintendent.                                     12:41:34

11        Q.   That's great.

12             And are there any jobs that you've held

13    that we haven't talked about just now?

14        A.   I don't think so, other than part-time

15    college jobs.                                       12:41:48

16        Q.   Excellent.  Thank you.

17             And do you play any sports?

18        A.   I did.

19        Q.   What sports did you play?

20             MS. MORGAN:  Same objection.  Object to    12:41:58

21    the form and exceeds the scope of the topics.

22             THE WITNESS:  Basketball, track, and cross

23    country.

24    BY MS. VEROFF:

25        Q.   And do you coach any sports?               12:42:10
```

Page 31

```
 1        A.   No.

 2        Q.   Do you have any kids?

 3        A.   I do.

 4             MS. MORGAN:  I'm -- I'm going to con- --

 5   give me a continuing objection.  I don't understand   12:42:21

 6   why this would be relevant to her 30(b)(6)

 7   deposition here.

 8             MS. VEROFF:  Very happy to give you a

 9   continuing deposition [sic], and -- and we'll wrap

10   up shortly.                                            12:42:36

11   BY MS. VEROFF:

12        Q.   Do any of your kids play school sports?

13        A.   Yes.

14        Q.   What sports do they play?

15        A.   My son ran cross country and track.  My     12:42:43

16   daughter played basketball, volleyball, and ran

17   cross country and track.

18        Q.   Great.

19             And before today, did you know who B.P.J.

20   was?                                                   12:43:02

21        A.   Just in preparing for this case.

22        Q.   But outside of preparing for this case,

23   did you know who she was?

24        A.   Just from news articles.

25        Q.   And has anyone at the State Board ever had   12:43:15
```

Page 32

```
 1    direct communications with B.P.J.?

 2        A.   No.

 3        Q.   Has anyone at the State Board ever had

 4    direct communications with B.P.J.'s mother?

 5        A.   No.                                    12:43:30

 6        Q.   Has anyone at the State Board ever had

 7    direct communications with B.P.J.'s father?

 8        A.   No.

 9        Q.   And has anyone at the State Board ever had

10    direct communications with one of B.P.J.'s       12:43:43

11    siblings?

12        A.   No.

13        Q.   I want to shift to talking a little bit

14    about the state superintendent.

15             Have you ever met Superintendent Burch?   12:43:55

16        A.   Yes.

17        Q.   I would imagine so, given your role.

18             How long has Superintendent Burch been in

19    his position?

20        A.   Approximately two years.               12:44:06

21        Q.   And how is someone selected to be the

22    state superintendent?

23        A.   The state superintendent is selected by

24    the State Board of Education.

25        Q.   And is there a term limit for the       12:44:23
```

Page 33

1    superintendent?

2         A.    No.   They serve at the will and pleasure

3    of the State Board of Education.

4         Q.    And who is the superintendent employed by?

5         A.    They're employed by the State Board of       12:44:35

6    Education.

7         Q.    And is the superintendent considered a

8    State official?

9         A.    Yes.

10        Q.    What are the superintendent's              12:44:46

11   responsibilities?

12        A.    His responsibility is the general

13   oversight of the public education system,

14   including the -- the county school systems, the

15   county superintendents, and the various schools      12:45:02

16   across the state.

17        Q.    And what is the relationship between the

18   superintendent and the West Virginia Department of

19   Education?

20        A.    The -- the state superintendent hires the   12:45:15

21   staff of the Department of Education and oversees

22   their work.

23        Q.    And as far as the relationship between the

24   superintendent and the State Board, is the

25   superintendent a member of the State Board?           12:45:30

Page 34

1          A.    Yes.   An ex-officio member.

2          Q.    Does ex officio mean the superintendent

3     doesn't have a vote?

4          A.    Correct.

5          Q.    Does the superintendent have any kind of        12:45:46

6     supervision over the State Board?

7          A.    No, the superintendent serves the State

8     Board.

9          Q.    So, for example, the superintendent

10    couldn't veto a decision of the State Board?          12:45:56

11         A.    Correct.

12               MS. MORGAN:   Julie, I'm just going to

13    object on the basis, again, this exceeds the topics

14    set forth in the notice of deposition, the 12

15    topics.                                               12:46:09

16               MS. VEROFF:   Thank you.   I -- I believe

17    that these questions are responsive to Topic 1,

18    which include the role and responsibilities of

19    the -- the superintendent.   But just to -- to keep

20    going forward.                                        12:46:22

21    BY MS. VEROFF:

22         Q.    Does the superintendent oversee public

23    schools in West Virginia?

24         A.    Yes.   He has the general oversight.

25         Q.    And what does that general oversight        12:46:30

                                                     Page 35

```
 1    involve?
 2         A.   The superintendent ensures that the -- the
 3    public school system is implementing, like, the
 4    policies that are set forth by the State Board of
 5    Education and over- -- and oversees the general        12:46:47
 6    operations of the -- of the school systems.
 7         Q.   And does that oversight of the school
 8    system include Bridgeport Middle School?
 9         A.   The -- the superintendent would, you know,
10    oversee all the county systems and schools, but        12:47:04
11    works more directly with our county boards of
12    education.
13         Q.   And can you tell me a little bit more
14    about how the superintendent works with the county
15    boards of education?                                   12:47:16
16         A.   Basically, through the staff that he
17    hires, the various programs -- or federal programs
18    that we have, our school improvement leadership,
19    the various services that we provide, and the
20    supports to the school systems.                        12:47:33
21         Q.   And does the superintendent have any
22    relationship with the county superintendents?
23         A.   He has a working relationship with all 55
24    of our county superintendents.
25         Q.   And what is the nature of that working       12:47:49
```

Page 36

1    relationship?

2        A.   Just a matter of they -- you know, we put

3    out information here regularly to our

4    superintendents to provide guidance and -- and

5    support.  They will reach out to the                  12:48:03

6    superintendent or to staff here for technical

7    assistance.

8        Q.   And does the superintendent oversee the

9    West Virginia Secondary School Activities

10   Commission?                                           12:48:20

11       A.   No.

12       Q.   Is there any relationship between the

13   superintendent and the West Virginia Secondary

14   Schools [verbatim] Activities Commission?

15       A.   Not really a relationship.  I mean, you      12:48:27

16   know, the paths cross with the State Board, but...

17       Q.   Is the superintendent required to follow

18   State law?

19       A.   Yes.

20       Q.   Is the superintendent required to follow     12:48:44

21   H.B. 3293?

22       A.   Once it was codified, then yes.

23       Q.   Are you familiar with the West Virginia

24   Education Information System?

25       A.   Yes.                                         12:48:58

                                                    Page 37

1     Q.    We've heard it abbreviated as WVEIS.

2           Is that a -- a term you're familiar with?

3     A.    Yes.

4     Q.    And can you tell me, what is WVEIS?

5     A.    WVEIS is a statewide edu -- student          12:49:12

6     information system that we maintain here at the

7     State level and the counties input their data

8     into.

9     Q.    And so, does the superintendent have any

10    control over WVEIS?                                12:49:26

11    A.    The superintendent probably does not even

12    have access to individual records in WVEIS.

13    Q.    Does the superintendent have any

14    involvement with deciding what kinds of records

15    are collected in WVEIS?                            12:49:40

16    A.    Only if something comes forth in a policy

17    would he be aware of any changes or things that

18    are made.

19    Q.    Got it.

20          And can you tell me about the relationship   12:49:52

21    between the State Board and the West Virginia

22    Department of Education?

23    A.    Well, the State Board hires the

24    superintendent who oversees the staff at the

25    Department of Education.                           12:50:08

Page 38

```
 1              And so, we all have a working relationship

 2      as we work to implement and -- revise and

 3      implement policies.

 4         Q.   So would it be correct to think of the

 5      State Board as part of the Department of            12:50:21

 6      Education, or how -- how would you describe kind

 7      of how the two entities are situated together?

 8         A.   No, the -- the -- the State Board is a

 9      separate entity that supervises the state

10      superintendent and so, then ultimately, the        12:50:36

11      Department of Education.

12         Q.   I see.

13              And is the Department of Education a

14      government entity?

15         A.   Yes.                                        12:50:47

16         Q.   And is the State Board also a government

17      entity?

18         A.   Yes.

19         Q.   Does the State Board receive any federal

20      funding?                                            12:50:57

21         A.   The -- the Department of Education

22      receives funding.

23         Q.   Do you know what kind of federal funding

24      the Department of Education receives?

25         A.   We receive all of the Elementary and       12:51:09
```

Page 39

```
 1      Secondary Education Act Title programs, the IDEA

 2      funding for special education, and -- and Perkins

 3      funding, which goes with our CTE programs.

 4          Q.   Do you know how many people are employed

 5      at the Department of Education?                    12:51:30

 6          A.   Approximately 234.

 7          Q.   And so, the State Board has members; is

 8      that right?

 9          A.   Yes.

10          Q.   How many members are there on the State   12:51:41

11      Board?

12          A.   There are nine members.

13          Q.   And how many of those nine members are

14      ex-officio members?

15          A.   Two.                                       12:51:54

16          Q.   Two.

17          A.   Including nine members --

18          Q.   And how are --

19          A.   -- plus two ex-officio members.

20          Q.   So just to confirm, there are 11 members  12:52:06

21      of the State Board in total?

22          A.   Yes.

23          Q.   And how are the members selected?

24          A.   The members are appointed by the governor.

25          Q.   And is that the case for all 11 members?  12:52:17
```

Page 40

1      A.    No, just the -- the nine State Board

2   members.

3      Q.    And besides the superintendent, who is the

4   other ex-officio member?

5      A.    Chancellor Sarah Tucker that's over our      12:52:32

6   Higher Education Policy Commission and our career

7   and technical council.

8      Q.    And how often do the members of the State

9   Board meet?

10     A.    They meet monthly.                           12:52:45

11     Q.    And how does the State Board make

12   decisions?

13     A.    The State Board makes decisions based on

14   policies that have been -- that are presented to

15   them, that have been placed on comment and -- and   12:52:59

16   reviewed.

17     Q.    And, for example do they use a -- a

18   majority-vote system to make a decision?

19     A.    Yes.

20     Q.    They do.                                     12:53:12

21           And does anyone have veto authority over a

22   decision made by the State Board?

23     A.    No.

24     Q.    And is the State Board's decision subject

25   to approval of any other body?                       12:53:23

                                                    Page 41

```
 1        A.    No.

 2        Q.    And what would you say are the

 3   responsibilities of the State Board?

 4        A.    I'm sorry.  Could you repeat.

 5        Q.    Of course.                              12:53:37

 6              What are the responsibilities of the State

 7   Board?

 8        A.    The -- the State Board is charged with the

 9   general oversight of our system of free schools in

10   the state of West Virginia.                        12:53:50

11        Q.    And what does the board try to accomplish

12   when it has its monthly meetings?

13        A.    Mon- -- monthly, they will either be

14   reviewing a policy that may have been on comment

15   or they may be hearing about a policy on that is    12:54:02

16   going out on comment or has come back in order to

17   be approved.

18              They start each of their meetings with the

19   focus on the strategic plan that they have in

20   place, and usually a presentation from department   12:54:17

21   staff on a certain topic.  And that, along with --

22   as well as having delegations from the community.

23        Q.    And so, to talk a little bit more about

24   the educational policies piece, what does it mean

25   in practice for the State Board to try to           12:54:33
```

Page 42

1    determine educational policies?

2        A.   I mean, basically, the State Board

3    oversees the various pieces of -- of the

4    department.  Many of our policies are tied to

5    either federal requirements or state legislation,    12:54:51

6    and that's how many of our policies come into play

7    so that the board will review and consider.

8        Q.   And does the State Board have any

9    involvement in establishing rules?

10       A.   Yes.  The State Board will establish the    12:55:09

11   rules for West Virginia Board of Education rules.

12       Q.   And does the State Board have any other

13   responsibilities besides the ones that you just

14   talked about --

15            (Interruption in audio/video.)            12:55:26

16            THE COURT REPORTER:  Excuse me.  I didn't

17   hear the rest of the -- part of the question.  If

18   you can please repeat.

19            MS. VEROFF:  Of course.

20   BY MS. VEROFF:                                     12:55:32

21       Q.   I was asking, does the State Board have

22   any other responsibilities beside the ones we just

23   talked about?

24       A.   No.  Just to enact and implement policy

25   and oversight of the -- our supervision of          12:55:42

                                              Page 43

```
 1    the State -- in the --

 2            (Interruption in audio/video.)

 3            THE COURT REPORTER:  "Our supervision of

 4    the"?

 5            Could you please repeat.  There was an      12:55:54

 6    audio interruption.

 7            THE WITNESS:  They enact and implement

 8    policy and have oversight of the -- or supervision

 9    rights of the -- over the state superintendent

10    [verbatim].                                         12:56:06

11    BY MS. VEROFF:

12        Q.   And does the State Board have to comply

13    with federal law?

14        A.   Yes.

15        Q.   Does the State Board have to comply with   12:56:11

16    Title IX?

17        A.   Yes.

18        Q.   And does the Department of Education have

19    to comply with Title IX?

20        A.   Yes.                                       12:56:23

21        Q.   Does the State Board have to comply with

22    state law?

23        A.   Yes.

24        Q.   Does the State Board have to comply with

25    H.B. 3293?                                          12:56:32
```

Page 44

```
 1            MS. MORGAN:  Julie, this -- I'm going to

 2    object to form.  It -- this also calls for a legal

 3    conclusion as well as these other questions.

 4            But you can go ahead and answer.

 5            THE WITNESS:  Yes, once it was codified      12:56:45

 6    and became state law.

 7    BY MS. VEROFF:

 8       Q.   Does the State Board discuss state laws

 9    regarding education at its meetings?

10       A.   As they relate to policies, they do.        12:56:56

11       Q.   Has the State Board ever discussed H.B.

12    3293 at one of its meetings?

13       A.   No.

14       Q.   And is that unusual for the State Board

15    not to discuss a law concerning education that's     12:57:15

16    now been codified?

17       A.   No.

18       Q.   Do you know whether the State Board has a

19    missions statement?

20       A.   They do.                                     12:57:28

21       Q.   And do you know what it is?

22       A.   I should.

23            Something to the effect of becoming

24    lifelong learners with education and community

25    and the -- and the workforce.                        12:57:45
```

Page 45

```
 1         Q.   I'm going to go ahead and introduce

 2   another exhibit.  I'll let you know when it's

 3   available in your marked folder [verbatim].

 4           (Blatt Deposition Exhibit 16 was marked

 5           electronically.)                        12:58:15

 6   BY MS. VEROFF:

 7         Q.   Okay.  If you refresh your Marked Exhibits

 8   folder, you should be able to see Exhibit 16.

 9   Just let me know when you can see it.

10         A.   Yes.  I can see it.                   12:58:24

11         Q.   Great.

12           And do you recognize this document?

13         A.   Yes, that's our website.

14         Q.   Great.

15           Well, I'll represent that Exhibit 16 is a  12:58:35

16   web page from the West Virginia Department of

17   Education's website titled "State Board of

18   Education."  You see the URL in the bottom left

19   corner.  And if you scroll to the second page

20   under "Mission," it says, "The West Virginia Board  12:58:49

21   of Education and State Superintendent --

22           THE COURT REPORTER:  Excuse me.  Counsel,

23   if you could if you're reading, please.  Thank you.

24           MS. VEROFF:  Yes, of course.

25   BY MS. VEROFF:                                    12:59:02
```

Page 46

```
 1        Q.    "The West Virginia Board of Education and

 2   State Superintendent of Schools work in concert to

 3   establish policies and procedures to assure

 4   implementation of West Virginia's Public Education

 5   goals and to ensure the general supervision,          12:59:13

 6   oversight and monitoring of a thorough, efficient

 7   and effective system of free public schools."

 8            Did I read that correctly?

 9        A.    Yes.

10        Q.    Is that an accurate statement of the State  12:59:25

11   Board's mission?

12        A.    Yes.

13        Q.    I'd like to talk a little bit more about

14   how the State Board generally supervises public

15   schools in West Virginia.                              12:59:40

16            Can you tell me a little about what that

17   general supervision involves?

18        A.    Well, the State Board of Education has

19   a -- of course, as we -- we've said before,

20   directly supervises the superintendent.  The          12:59:52

21   superintendent then has an office of

22   accountability.  And that -- that group is charged

23   with ensuring that our county school systems are

24   implementing the policies or procedures, adhering

25   to the financial audits, the various federal          13:00:07
```

Page 47

```
 1    requirements.  And so they receive a report
 2    annually on the county school systems.
 3         Q.    And are there any other ways in which the
 4    State Board monitors public schools in West
 5    Virginia?                                         13:00:23
 6         A.    No.
 7         Q.    And are there any other forms of oversight
 8    that the State Board engages in with regards to
 9    public schools in West Virginia?
10         A.    No.                                    13:00:35
11         Q.    We talked a little bit previously about
12    the West Virginia Secondary School Activities
13    Commission.
14              Are you familiar with the West Virginia
15    Secondary School Activities Commission?           13:00:53
16         A.    Yes.
17         Q.    Can you tell me what it is?
18         A.    It is the -- a -- association charged with
19    oversight of all of the secondary schools'
20    athletic events.                                  13:01:05
21         Q.    And does the Department of Education have
22    any relationship with the West Virginia Secondary
23    School Activities Commission?
24         A.    Our only involvement with them is when
25    they submit a rule to be approved or submitted to  13:01:17
```

Page 48

```
 1     the State Board.

 2         Q.   And when the Secondary School Activities

 3     Commission submits a rule, can you talk me through

 4     what that approval process involves?

 5         A.   They will present to the State Board of     13:01:33

 6     Education.  The State Board then has the authority

 7     to accept the rule and put it out on a public

 8     30-day comment.  And then after the comment

 9     period, then they can either approve or reject the

10     rule.                                                13:01:50

11         Q.   And what criteria does the State Board use

12     in deciding whether to approve or reject a rule?

13         A.   I think the State Board relies on the

14     staff of the Department of Education to provide

15     them with -- with guidance as to the legality of    13:02:03

16     the rule, if it's based on federal, if it based on

17     state statute, and then will also review the

18     comments from the -- that come in on the policy.

19         Q.   Has the State Board ever not approved a

20     rule submitted by the commission?                   13:02:23

21         A.   Not to my knowledge, but I've not been

22     here forever.

23         Q.   And can the West Virginia Secondary School

24     Activities Commission issue a rule that conflicts

25     with a rule issued by the State Board?               13:02:39
```

Page 49

 1        A.    I'm aware that they do have their -- their

 2   rules and regulations guidance document that they

 3   use, but I don't think there's anything in

 4   conflict with the State Board of Education.

 5        Q.    And does the commission have to comply        13:02:54

 6   with the rules issued by the State Board?

 7        A.    Yes.

 8        Q.    So I'm going to introduce a new exhibit

 9   now.  I'll let you know when it's available in the

10   marked folder [verbatim].                               13:03:10

11            (Blatt Deposition Exhibit 17 was marked

12             electronically.)

13   BY MS. VEROFF:

14        Q.    So if you refresh your Marked Exhibits

15   folder, you should now be able to see Exhibit 17.       13:03:42

16   Just let me know when you can see that.

17        A.    Yes, we can see that.

18        Q.    So I'll represent that this is a discovery

19   response produced by your counsel to plaintiff's

20   counsel.                                                 13:03:55

21            Do you recognize this document?

22        A.    Yes.

23        Q.    So please scroll to page 5 of the PDF, and

24   just let me know when you're there.

25        A.    Okay.  We are there.                         13:04:08

                                                     Page 50

1     Q.   Great.

2        So I want to direct your attention to

3  "REQUEST NO. 5," which is towards the bottom of

4  the page.

5        And it reads, "REQUEST NO. 5:  All       13:04:19

6  DOCUMENTS and POLICIES CONCERNING YOUR delegation

7  of authority over secondary school athletics to

8  the West Virginia Secondary School Activities

9  Commission."

10       The response states, "These Defendants do  13:04:30

11  not have any non-privileged documents which are

12  responsive to this request other than those which

13  are publicly available, including W.Va. Code

14  Section 18-2-25 which was approved by WVBE, and

15  WVSSAC rules including but not limited to 127CSR2  13:04:48

16  which states, "'4.1.  The WVSSAC shall be

17  composed' --

18       THE COURT REPORTER:  Please slow down.

19  BY MS. VEROFF:

20     Q.  -- 'of principals or designee' --     13:04:57

21       MS. VEROFF:  I'm sorry.

22  BY MS. VEROFF:

23     Q.  -- 'of those public or private secondary

24  schools which have certified in writing to the

25  State Superintendent of Schools of West Virginia  13:05:07

Page 51

```
 1    (State Superintendent) that they have elected to

 2    delegate the control, supervision, and regulation

 3    of their interscholastic athletic and band

 4    activities.'"

 5          That was a lot.                          13:05:20

 6          Did I read that correctly?

 7    A.    Yes.

 8    Q.    Excellent.

 9          Are you familiar with 127CSR2?

10    A.    Yes.                                     13:05:29

11    Q.    And is what I read a correct statement of

12    127CSR2?

13          MS. MORGAN:  Objection as to form.

14          THE WITNESS:  I do believe so, as that was

15    one of the documents, part of the re- -- when I   13:05:43

16    reviewed this, that the counsels provided.

17    BY MS. VEROFF:

18    Q.    And so, to confirm I understand the

19    meaning, is it correct that principals are

20    required to submit a written certification to the  13:05:54

21    superintendent for their school to be able to be a

22    member of the West Virginia Secondary School

23    Activities Commission?

24          MS. MORGAN:  Object to form.

25          THE WITNESS:  Yes, according to 4.1.   13:06:07
```

Page 52

```
 1    BY MS. VEROFF:

 2         Q.   And why does that requirement exist?

 3         A.   I do not have that --

 4              MS. MORGAN:  Object -- object to the form

 5    of the question.  Calls for speculation, legal          13:06:16

 6    conclusion.

 7    BY MS. VEROFF:

 8         Q.   If a secondary school doesn't submit a

 9    certification to the state superintendent, are

10    they not allowed to be part of the West Virginia        13:06:31

11    Secondary School Activities Commission?

12              MS. MORGAN:  Objection.

13              THE WITNESS:  According to 4.1 that's

14    listed there, yes.

15    BY MS. VEROFF:                                           13:06:40

16         Q.   And do you know whether the principal of

17    Bridgeport Middle School has submitted this

18    certification to the state superintendent?

19         A.   I do not.

20         Q.   Does the State Board have any involvement      13:06:51

21    with the West Virginia Education Information

22    System, WVEIS?

23         A.   Just in the -- the fact that it's in one

24    of the policies and they're aware of that and at

25    times are given reports.                                 13:07:08
```

Page 53

1       Q.   And does the State Board have any control

2    over the kind of data that's collected in WVEIS?

3            MS. MORGAN:  Asked and answered.

4            THE WITNESS:  Yes, as they would say, we

5    have a -- there is a policy that oversees the type    13:07:25

6    of data that is collected.

7    BY MS. VEROFF:

8       Q.   And so just to make sure I understand, for

9    example, the State Board could enact a policy that

10   required a particular piece of data to be            13:07:36

11   collected, and then that data collection process

12   would be implemented in WVEIS?

13      A.   After it went through a 60-day comment

14   period, because we also have State Code that

15   references our WVEIS system and the data that is     13:07:51

16   allowed to be collected.

17      Q.   Great.

18           MS. VEROFF:  So before I move on, I know

19   that we said regarding breaks at the beginning that

20   we would go at -- up to about an hour and a half,    13:08:03

21   but I just wanted to -- to check in and see how

22   everyone was doing and see if anyone needed a break

23   sooner.

24           THE WITNESS:  We are fine.

25           THE COURT REPORTER:  I would love one.       13:08:16

                                                         Page 54

```
 1              MS. VEROFF:  Okay.  Well, let's -- I'm

 2      sorry, Hanna, was that you?

 3              THE COURT REPORTER:  Yes, please.  I would

 4      appreciate one, please, just a short break.

 5              MS. VEROFF:  Okay.  Great.  So why don't     13:08:28

 6      we go ahead -- does a -- a five-minute break work

 7      for folks?

 8              MS. MORGAN:  Yes, that's fine.

 9              MS. VEROFF:  Okay.  That would be great.

10              And, Mitch, could you send us into the       13:08:37

11      break-out rooms during the -- break?

12              THE VIDEOGRAPHER:  Yeah.  Your rooms are

13      still open, so you can join any time.  Okay --

14              MS. VEROFF:  Okay.  Great.

15              So why don't we plan to come back at --

16              THE COURT REPORTER:  Would you like to go

17      off the record?

18              THE VIDEOGRAPHER:  Should we go off the

19      record?

20              MS. VEROFF:  -- 1:15?                         13:08:56

21              THE VIDEOGRAPHER:  Anyways, we're going

22      off the record.  The time is 1:08 p.m., and this is

23      the end of Media Unit Number 1.

24              (Short recess taken.)

25              THE VIDEOGRAPHER:  Okay.  We are back on     13:18:51
```

Page 55

1    the record at 1:18 p.m., and this is beginning of

2    Media Unit Number 2.

3            Go ahead.

4            MS. VEROFF:   Thank you.

5    BY MS. VEROFF:                                    13:19:01

6        Q.   So I'd like to jump back into talking

7    about the State Board's rule-making and

8    policy-making authority and process.

9            First, can you tell me what the difference

10   is between a State Board rule and a State Board    13:19:13

11   policy?

12       A.   There's no difference between the State

13   Board policy and the State Board rule when we --

14   we actually call them policies through the Board

15   of Education; but then when they are filed with    13:19:25

16   our Secretary of State, then they're assigned a --

17   a rule number.

18       Q.   I see.

19           So just to make sure I understand, so

20   everything starts out as a policy, but it becomes  13:19:37

21   a rule when it gets filed?

22       A.   It's just referenced that way.

23   They're the -- they're the same, one and the same.

24       Q.   I see.

25           And so are there -- so there -- there are  13:19:49

                                                    Page 56

```
 1    no policies of the State Board that didn't go

 2    through the rule-making process?

 3         A.    Correct.

 4         Q.    Got it.

 5               And do you know how many rules and         13:20:02

 6    policies the State Board has issued?

 7         A.    I believe we're at 82, 83.

 8         Q.    And is the State Board ever required by

 9    state law to promulgate a rule?

10         A.    Yes.                                        13:20:21

11         Q.    And is the State Board allowed to

12    promulgate a rule that conflicts with a state law?

13         A.    No.

14               MS. MORGAN:  Ob- -- object to form.

15    BY MS. VEROFF:                                        13:20:36

16         Q.    So I'd like to know a little bit more

17    about the rule-making process.  What happens first

18    when the State Board is considering a rule?

19         A.    Well, depending on the -- kind of the

20    nexus for beginning a rule, if it's based on          13:21:37

21    something that's been told to be promulgated from

22    legislation, then it requires a look at that

23    language to begin with.

24               We usually have an internal team here that

25    will draft some language.  Any policy making          13:21:02
```

Page 57

1    always requires external stakeholders that will be

2    part of the committee as well to review.  And then

3    we will work to get a final draft of the policy

4    that then will be presented to the State Board of

5    Education for review.                      13:21:21

6          And then if -- if they are pleased with

7    that, it will go out on a 30-day comment period to

8    the entire state and then may or may not have

9    changes based on comment and then be approved the

10   following month.                           13:21:36

11       Q.   And who ultimately approves the rule?

12       A.   The State Board of Education.

13       Q.   And are there any internal policies that

14   govern the rule-drafting process?

15       A.   Not really any internal process -- or     13:21:51

16   policies, but just some procedures that -- to --

17   to make it aligned and consistent formatting and

18   things like that.  They're mostly technical.

19       Q.   Are those procedures written down

20   anywhere?                                  13:22:08

21       A.   On the -- our policy website.  On the

22   State Board of Education -- or the State

23   Department of Education website under policies

24   there will be some forms that are used to --

25   checklists and things to verify the process.     13:22:19

Page 58

```
 1        Q.    And so from start to finish, how long does

 2    the whole rule-making process typically take?

 3        A.    It really depends on the content and the

 4    length of the policy.  I mean, we have some

 5    policies that are two or three pages, and we have       13:22:37

 6    some that are a hundred and 50 pages, so it really

 7    just depends.

 8        Q.    Do you ever issue interim rules without

 9    going through the public comment period?

10        A.    At times there may be like an emergency       13:22:53

11    rule that will be enacted and it -- while -- while

12    it's on comment.

13        Q.    And what would be the reason to have an

14    emergency rule?

15        A.    It's normally something that is required      13:23:08

16    by the State Legislature.

17        Q.    And are there any examples of emergency

18    rules that you can think of?

19        A.    I can't think of any.

20        Q.    Is there a specific person at the State       13:23:22

21    Board who has responsibilities for drafting a

22    rule?

23        A.    No.  The drafting would come from whoever

24    the content experts were in the -- the area of the

25    policy.                                                 13:23:38
```

Page 59

```
 1        Q.   And does the State Board ever monitor

 2    compliance with its rules?

 3             MS. MORGAN:  Object to form.

 4             THE WITNESS:  They would monitor through

 5    the process that I described earlier with our          13:23:51

 6    accountability office.

 7    BY MS. VEROFF:

 8        Q.   And does the State Board ever enforce

 9    compliance with its rules?

10             MS. MORGAN:  Are you talking a specific        13:24:03

11    rule?

12    BY MS. VEROFF:

13        Q.   Let -- let me rephrase.

14             As a -- as a general matter, does the

15    State Board have any enforcement mechanisms that       13:24:11

16    it puts into its rules?

17             MS. MORGAN:  Object to form.

18             THE WITNESS:  Our accountability office

19    has a policy that dictates the -- the oversight and

20    the way that various policies and things have to be    13:24:22

21    enforced.

22    BY MS. VEROFF:

23        Q.   And so -- so how -- kind of using that --

24    that background, how does the State Board decide

25    what the enforcement means should be for a given       13:24:35
```

Page 60

```
 1    rule?

 2            MS. MORGAN:  Object to form.

 3            THE WITNESS:  I don't think there's

 4    specific things to a given rule.  We just -- we

 5    have a policy in place that -- with the oversight    13:24:45

 6    and our accountability policy to -- with -- just to

 7    generalize how we do all of them.

 8    BY MS. VEROFF:

 9       Q.   And is there a particular person or

10    particular office of the State Board that's          13:24:59

11    responsible for enforcing compliance when a rule

12    requires -- well, sorry, when a rule contemplates

13    enforcement?

14       A.   Again, our accountability and support

15    office oversees all of that work.                    13:25:11

16       Q.   Has the County Board of Education ever

17    violated a State Board rule?

18            MS. MORGAN:  Object to form.

19            THE WITNESS:  I'm sure there's been at

20    some time.                                           13:25:29

21    BY MS. VEROFF:

22       Q.   And what happens if a rule is violated?

23       A.   Basically -- I mean, it depends on -- you

24    know, we have -- we have rules or policies that --

25    oversight of financial things, as well as our        13:25:41
```

Page 61

1      curriculum and instruction policies.  And so it

2      would really -- it really varies depending on

3      what -- which policy might have been, you know,

4      not followed.

5          Q.   And is there any kind of appeals process      13:25:58

6      if there's thought to be a violation?

7          A.   Are you referencing for the county?

8          Q.   Yes.

9          A.   Yeah.  Yeah, as part of the -- our

10     accountability policies and that office, part of      13:26:17

11     the work that they do is to provide -- you know,

12     provide information and reviews and then meet with

13     the counties and allow them to explain or correct

14     findings.  We'll do noncompliances and findings,

15     and then they have the opportunity to correct       13:26:34

16     those and respond.

17         Q.   Okay.  And has the West Virginia Secondary

18     School Activities Commission ever violated a State

19     Board rule?

20         A.   Not to my knowledge, but...              13:26:45

21         Q.   Has an individual school ever violated a

22     State Board rule?

23         A.   I mean, I'm sure when you look at the

24     breadth and the depth of our rules, that there's

25     something in there that has occurred.            13:27:02

Page 62

1    Q.   Has a student ever violated a State Board

2    rule?

3    A.   Yes.

4    Q.   And has a -- a coach for a school sports

5    team ever violated a State Board rule?          13:27:12

6    A.   I mean, again, just when you look at the

7    80-some policies, I'm sure there is something in

8    one of those that at some point has occurred.

9    Q.   And is the oversight practice that you

10   described for the county the same process that    13:27:26

11   would apply to any entity, or are the processes

12   different?

13   A.   I'm not sure which other entity you would

14   be referring to.

15   Q.   Oh, I'm sorry.  For example, a school or    13:27:38

16   an individual student.

17   A.   You know, our oversight is mainly at

18   the -- at the county level.  And then the counties

19   have oversight of their schools and are to enforce

20   the -- the rules and policies with their schools   13:27:53

21   and then the school of course with the student.

22   Q.   I see.  So --

23        (Interruption in audio/video.)

24        THE COURT REPORTER:  I'm sorry.  "With the

25   student"?  Excuse me, there was a little cough, and   13:28:08

Page 63

1    I didn't hear the end.

2           "And then the school of course with the

3    student"?

4           THE WITNESS:  Yes.

5    BY MS. VEROFF:                                    13:28:10

6       Q.   So if, for example, a -- a student

7    violated a State Board rule, can you walk me

8    through what the process then would be?

9       A.   If a student violated a rule, then it

10   would be addressed at the -- at the school level.   13:28:23

11      Q.   You mentioned earlier that there are

12   content experts for different state laws; is that

13   correct?

14      A.   Yes.

15      Q.   Is there a content expert for H.B. 3293?   13:28:39

16      A.   No.  We have -- no.

17      Q.   And why hasn't there been a content expert

18   chosen for H.B. 3293?

19           MS. MORGAN:  Object to form.

20           THE WITNESS:  Well, when I reference       13:29:01

21   "content expert" in reference to who writes the

22   policies, mainly I'm referring to like our

23   curriculum instruction policy.  So we have a

24   math -- someone with a math background that will

25   work on that.                                     13:29:13

Page 64

```
 1              And then we have other -- we have

 2    leadership, people that have been in administration

 3    that have been principals and assistant principals,

 4    so they may oversee some of the ones that are of

 5    the broader spectrum.                          13:29:26

 6    BY MS. VEROFF:

 7         Q.    Does the State Board ever promulgate a

 8    rule in conjunction with another entity?

 9         A.    Not to my knowledge.

10         Q.    So, for example, has the State Board ever   13:29:37

11    promulgated a rule in conjunction with a West

12    Virginia Secondary School Activities Commission?

13         A.    Not in conjunction with.  They -- they

14    submit their rules from their organization, and

15    then they're reviewed by the State Board.       13:29:52

16         Q.    Got it.

17              So I want to ask now a couple questions

18    about the State Board and school sports.  And when

19    I refer to "state sports," [verbatim] what I mean

20    is athletics offered by public secondary schools    13:30:07

21    in West Virginia; so, for example, the

22    cross-country team at Bridgeport Middle School.

23              Does the Department of Education have any

24    role with respect to school sports in West

25    Virginia?                                      13:30:22
```

Page 65

1          A.    The Department of Education or the -- the

2     Board of Education?

3          Q.    I'll ask about them separately.  So,

4     first, the Department of Education.

5          A.    Okay.  The -- no.                        13:30:29

6          Q.    And does the State Board have any role

7     with respect to school sports in West Virginia?

8          A.    Just in the approval of the rules that the

9     secondary school's association -- the SSAC

10    presents to them.                                   13:30:45

11         Q.    Does the State Board currently have any

12    roles pertaining to school sports?

13         A.    Only one.  It's in relation to the 2.0 GPA

14    for eligibility.

15         Q.    So can you tell me a little bit more about  13:30:58

16    what that rule involves?

17         A.    Just that students are required to

18    maintain a 2.0 in order to participate in a sport.

19         Q.    And are there any other rules that the

20    State Board has regarding school sports?            13:31:12

21         A.    No.

22         Q.    Does the State Board monitor participation

23    in school sports?

24         A.    No.

25         Q.    Does the State Board have any rules        13:31:24

Page 66

```
 1      regarding students who are transgender?

 2          A.   No.

 3          Q.   Has the State Board ever received any

 4      complaints regarding students who are transgender

 5      participating in school sports?                    13:31:41

 6          A.   No.

 7          Q.   Has the superintendent ever received any

 8      complaints regarding students who are transgender

 9      participating in school sports?

10          A.   No.                                        13:31:56

11          Q.   So I want to shift back to talking more

12      specifically about H.B. 3293.  Are you familiar

13      with H.B. 3293?

14          A.   Yes.

15          Q.   Does H.B. 3293 require the State Board to  13:32:09

16      promulgate rules to implement H.B. 3293?

17          A.   Yes.

18          Q.   And has the State Board chosen an employee

19      to be the person responsible for promulgating the

20      rules to implement H.B. 3293?                       13:32:26

21          A.   No.

22          Q.   I'd like to introduce a new exhibit now.

23      I'll let you know when it's available in your

24      "Marked Exhibits" folder.

25               (Blatt Deposition Exhibit 18 was marked    13:32:43
```

Page 67

```
 1              electronically.)

 2          MS. VEROFF:  I just introduced Exhibit 18.

 3     BY MS. VEROFF:

 4      Q.   If you refresh your "Marked Exhibits"

 5     folder, you should be able to see it.  Please just    13:33:17

 6     let me know when you have it up.

 7      A.   It's up.

 8      Q.   Do you recognize this document?

 9      A.   Yes.

10      Q.   Great.                                          13:33:21

11          I'll represent that this is a discovery

12     response produced by your counsel to Plaintiff's

13     counsel and ask you to turn to page 6.

14          Just let me know when you're there.

15      A.   Okay.  We are there.                            13:33:42

16      Q.   If you look in the middle of the page,

17     you'll see Interrogatory Number 6, which says,

18     "Identify all PERSONS responsible for promulgating

19     rules to implement H.B. 3293."

20          And the answer states, "Heather Hutchens,       13:33:58

21     General Counsel for WVBE is responsible for

22     promulgating rules to implement H.B. 3293."

23          Did I read that correctly?

24      A.   Yes.

25      Q.   And can you tell me, what does WVBE stand       13:34:13
```

Page 68

```
 1   for?
 2        A.    The West Virginia Board of Education.
 3        Q.    And is it accurate that Heather Hutchens
 4   is responsible for promulgating rules to implement
 5   H.B. 3293?                                        13:34:30
 6        A.    Heather Hutchens is -- does promulgate --
 7   or works with all of the rules and policies that
 8   are presented to the board.  So accord- -- because
 9   she --
10        Q.    Got it.                                13:34:40
11        A.    -- you know, she would -- she would lead
12   that along with some other people within the
13   department, too, to craft a policy.
14        Q.    And so just to confirm I understand, so
15   Heather Hutchens works on all rules that are       13:34:49
16   issued by the State Board?
17        A.    Yes.
18        Q.    And has anyone else who will be working on
19   implementing H.B. 3293 rules been chosen?
20        A.    Not to my knowledge.  The statute actually 13:35:02
21   came into effect after a lawsuit was filed.  So,
22   therefore, we chose to wait and see the outcome
23   as -- as opposed to spending the time developing a
24   rule that may or may not be changed based on court
25   action.                                           13:35:22
```

Page 69

```
 1        Q.   And so have there been any discussions at
 2   the State Board about what rules implementing H.B.
 3   3293 will be?
 4           MS. MORGAN:  Object to form and also to
 5   the extent that this requests communications with    13:35:38
 6   counsel.
 7           THE WITNESS:  Could you repeat the
 8   question?
 9   BY MS. VEROFF:
10        Q.   Sure.                                        13:35:49
11           And so I'm not asking you to disclose any
12   privileged communications you've had with your
13   attorneys.
14           Have there been any discussions at the
15   State Board about what the rules implementing H.B.    13:35:59
16   3293 will be?
17        A.   No, other than just the simple what we
18   read in State Code.
19        Q.   I'm sorry, I couldn't understand the last
20   sentence.  Would you mind repeating it?               13:36:12
21        A.   I said just looking at what is required in
22   State Code.
23        Q.   So there have been discussions at the
24   State Board about what H.B. 3293 requires?  Did I
25   understand correctly?                                 13:36:26
```

Page 70

1      A.   No, not -- not with the State Board.

2      Q.   And -- and so who has had those

3  discussions?

4      A.   And I may have misspoke when you said

5  "discussions."  But just stating that we would        13:36:36

6  look at the language and the policy would

7  replicate what is in State Code.

8      Q.   I see.

9           So there have been any discussions at the

10  State Board regarding H.B. 3293?                      13:36:45

11      A.   No.

12      Q.   And have there been any actions taken at

13  the State Board to prepare to promulgate rules

14  implementing H.B. 3293?

15      A.   No.  Again, we had not got to that prior     13:37:01

16  to the lawsuit.

17      Q.   Okay.  And so just to confirm, is it your

18  testimony that the State Board hasn't taken any

19  action to promulgate rules implementing H.B. 3293

20  because this lawsuit was filed?                       13:37:17

21      A.   Well, it's just the time frames and

22  because of the lawsuit, there -- we had not

23  had time --

24      Q.   And --

25           (Simultaneous speaking.)                     13:37:26

                                              Page 71

```
 1              (Interruption in audio/video.)

 2       A.   There was not the -- there was not time

 3  prior to the lawsuit to start working on the rules

 4  when the session ended and the rule became

 5  effective.                                    13:37:34

 6       Q.   So if this lawsuit had not been filed,

 7  would the State Board have begun preparing to

 8  implement rules to implement H.B. 3293?

 9            MS. MORGAN:  Objection as to form.  It

10  also calls for speculation.                   13:37:46

11            You can answer the best that you can.

12            THE WITNESS:  Most likely, yes, we -- we

13  would have.

14  BY MS. VEROFF:

15       Q.   And would any rules the State Board issues  13:37:55

16  pursuant to H.B. 3293 have to be consistent with

17  H.B. 3293?

18       A.   Yes.

19       Q.   And so put another way, just to make sure

20  I understand, could the State Board issue rules in    13:38:10

21  conflict with H.B. 3293?

22       A.   No.

23       Q.   Under any rules that the State Board

24  issues to implement H.B. 3293, will cisgender

25  girls be able to participate girls sports team?       13:38:29
```

Page 72

1        A.   Yes, according to my understanding of

2    the -- the statute.

3        Q.   And under any rules that the State Board

4    issues to implement H.B. 3293, will transgender

5    girls be able to participate on girls sports        13:38:47

6    teams?

7        A.   Not from my understanding of the statute.

8             MS. MORGAN:  And let me just place my

9    objection as to form.  I didn't want to interrupt

10   her answer, but object to form.                      13:38:58

11   BY MS. VEROFF:

12       Q.   Must the West Virginia Secondary School

13   Activities Commission comply with any rule that

14   the State Board issues to implement H.B. 3293?

15            MS. GREEN:  Object to the form.            13:39:10

16            MS. MORGAN:  Same objection.

17            THE COURT REPORTER:  Excuse me.  One

18   second.

19            Who objected to form?  I did not get the

20   speaker, please.                                    13:39:20

21            MS. GREEN:  This is Roberta Green here on

22   behalf of WVSSAC, and I object to the form.

23            MS. MORGAN:  And Kelly Morgan, I also

24   objected to form as well.

25   BY MS. VEROFF:                                      13:39:42

                                             Page 73

1       Q.   You can answer the question.  Please let

2    me know if you need me to repeat it.

3       A.   Yes, please.  Yes, please repeat I mean.

4       Q.   Does the West Virginia Secondary School

5    Activities Commission have to comply with any rule      13:39:54

6    that the State Board promulgates to implement H.B.

7    3293?

8       A.   Yes.

9       Q.   And does the Harrison County Board of

10   Education have to comply with any rule that the         13:40:05

11   State Board issues to implement H.B. 3293?

12      A.   Yes.

13           MS. DENIKER:  This is Susan Deniker.

14   Objection to the form.

15   BY MS. VEROFF:                                          13:40:18

16      Q.   You can go ahead and answer.

17      A.   Yes.

18      Q.   And does the Harrison County

19   Superintendent have to comply with any rule that

20   the State Board promulgates to implement H.B.           13:40:31

21   3293?

22           MS. DENIKER:  This is Susan Deniker.

23   Objection to the form.

24           THE WITNESS:  Yes.

25   BY MS. VEROFF:                                          13:40:41

Page 74

1       Q.   And does Bridgeport Middle School have to

2    comply with any rule that the State Board

3    promulgates to implement H.B. 3293?

4            MS. DENIKER:   This is Susan Deniker.   Same

5    objection.                                    13:40:57

6            THE WITNESS:   Yes.

7    BY MS. VEROFF:

8       Q.   I'm going to introduce a new exhibit now.

9    I'll let you know when it's available in your

10   "Marked Exhibits" folder.                      13:41:05

11           (Blatt Deposition Exhibit 19 was marked

12           electronically.)

13   BY MS. VEROFF:

14      Q.   I've now introduced Exhibit 19.   If you

15   refresh your "Marked Exhibits" folder, you should   13:41:26

16   be able to view it.   Please just let me know when

17   you have it up.

18      A.   Yes, it's up.

19      Q.   And do you recognize this document?

20      A.   Yes.                                    13:41:40

21      Q.   I'll represent that these are documents

22   produced to plaintiff's counsel by your counsel as

23   part of your discovery production.

24           And I'm going to ask you to scroll to page

25   3 of this document.   In the bottom left corner,   13:41:51

Page 75

```
 1    you should see that it's Bates stamped WVSBOE

 2    '00008.

 3          Do you see that?

 4      A.   Yes.

 5      Q.   And at the bottom of the -- the -- sorry.     13:42:05

 6          At the bottom of page 3, you'll see an

 7    e-mail from Melissa White sent on Thursday,

 8    March 11, 2021, to Bernie Dolan with the subject

 9    line "Transgender participation in secondary

10    schools bill."                                       13:42:22

11          Do you see that?

12      A.   Yes.

13      Q.   And do you recognize this e-mail?

14      A.   Yes, from my review of the documents.

15      Q.   Who is Melissa White?                         13:42:31

16      A.   Melissa White is the counsel for house

17    education.

18      Q.   And who is Bernie Dolan?

19      A.   Bernie Dolan is the executive director of

20    the SSAC.                                            13:42:50

21      Q.   So The e-mail reads, "Bernie, Attached is

22    a draft of an originating bill regarding

23    transgender participation in sports.  I kept it

24    short.  There are obviously certain things that

25    would need to be handled in a rule, unless you       13:42:59
```

```
 1     have language that you would like to see in the

 2     bill.  Please let me know your thoughts and if

 3     there are unintended consequences.  The Chairman

 4     does not want to keep girls from participating in

 5     boys sports when there are not girls teams.        13:43:13

 6     Thanks, Melissa."

 7             Did I read that correctly?

 8         A.   Yes.

 9         Q.   Do you know if Bernie Dolan responded to

10     this e-mail?                                       13:43:35

11             (Simultaneous speaking.)

12             (Interruption in audio/video.)

13             MS. MORGAN:  I'll just object to form.

14             MS. GREEN:  Same objection.

15             THE COURT REPORTER:  Excuse me.  Could

16     please repeat the --

17     BY MS. VEROFF:

18         A.   Did Bernie Dolan --

19             THE COURT REPORTER:  Excuse me.  Could you

20     please repeat your objections.

21             MS. MORGAN:  Object to form.

22             MS. GREEN:  This is Roberta Green on

23     behalf of SS- -- deputy SSAC.  I object to form.

24     BY MS. VEROFF:

25         Q.   Did Bernie Dolan otherwise discuss H.B.    13:43:49
```

Page 77

```
 1    3293 with Melissa White?

 2            MS. GREEN:  Object to the -- this is

 3    Roberta Green on behalf of SSAC.  I object to the

 4    form.

 5            MS. MORGAN:  Object to form as well.      13:44:04

 6            MS. VEROFF:  And moving forward, we can

 7    assume that an objection for one is an objection

 8    for all.

 9            MS. MORGAN:  Well, I have --

10            MS. GREEN:  Well, I appreciate that,      13:44:10

11    actually.  But I represent a different defendant,

12    and I would like to enter my objections myself.

13    Thank you.

14            MS. MORGAN:  Yeah, I be- -- I agree with

15    Roberta.  I do not believe that is appropriate    13:44:19

16    protocol.  Objections should be placed by each

17    defendant.

18    BY MS. VEROFF:

19        Q.   You can go ahead and answer.  Please let

20    me know if you need me to repeat the question.    13:44:35

21        A.   Yes, please repeat.

22        Q.   Did Bernie Dolan otherwise discuss H.B.

23    3293 with MW?

24            MS. MORGAN:  Object to form and also calls

25    for speculation.                                  13:44:45
```

Page 78

```
 1              MS. GREEN:  I'll object to the form --

 2              MS. VEROFF:  I'm just re- --

 3              MS. GREEN:  -- foundation.  Scope and --

 4     way outside the scope for this witness.

 5              But, you know, not my witness.          13:44:54

 6              MS. VEROFF:  Thank you.  This is the same

 7     question that I asked previously that you already

 8     objected to, and I was just repeating it for the

 9     witness's convenience.

10              THE WITNESS:  I have no idea.            13:45:08

11     BY MS. VEROFF:

12        Q.  And do you know -- and I'm asking you on

13     behalf of the State Board -- know what things

14     Melissa White thought needed to be handled in a

15     rule?                                            13:45:19

16              MS. MORGAN:  Object to form.  Also calls

17     for speculation.  Outside of the scope of these

18     topics.

19              THE WITNESS:  I do not --

20              MS. GREEN:  And this is Roberta Green on   13:45:24

21     behalf of SSAC.  I object to the form.

22              THE WITNESS:  I do not.

23     BY MS. VEROFF:

24        Q.  Does the State Board agree that certain

25     aspects of H.B. 3293 need to be handled in a rule?  13:45:35
```

Page 79

```
 1              MS. MORGAN:  Object to form.

 2              THE WITNESS:  I mean, the -- the State

 3       Board has not had that discussion, as they have not

 4       started to promulgate a rule.

 5       BY MS. VEROFF:                                13:45:54

 6          Q.   And just to confirm, aside from

 7       rule-making, has the State Board taken any other

 8       action to contemplate the implementation of H.B.

 9       3293?

10              MS. MORGAN:  Object to form.           13:46:10

11              THE WITNESS:  No, not to my knowledge.

12       BY MS. VEROFF:

13          Q.   I'd like now to ask you about some of the

14       people who are listed on the State Board's initial

15       disclosures.                                  13:46:21

16              Let's start with Sarah Stewart.

17              Do you know who Sarah Stewart?

18          A.   Sarah Stewart was our previous legislative

19       liaison attorney that worked with -- at the

20       Department of Education.                      13:46:34

21          Q.   And do you say "previous" because she no

22       longer works at the Department of Education?

23          A.   Correct.

24          Q.   And when did she leave that role?

25              MS. MORGAN:  Object to form.           13:46:43
```

                                                    Page 80

```
 1              Julie, this is beyond the -- the 12 topics

 2      set forth in this -- on this notice.

 3              THE WITNESS:  I don't remember the exact

 4      date.  It's been within the last year.

 5      BY MS. VEROFF:                                    13:46:58

 6         Q.   And did Sarah Stewart have any involvement

 7      with H.B. 3293 when it was pending before the

 8      legislature?

 9              MS. MORGAN:  Same objection.

10              THE WITNESS:  Other than just her -- her    13:47:08

11      role as the legislative liaison working with the --

12      with the different committees.

13      BY MS. VEROFF:

14         Q.   And did Sarah Stewart have any involvement

15      with H.B. 3293 after it was passed?                13:47:21

16              MS. MORGAN:  Object to form.  Beyond the

17      scope.  Calls for speculation.

18              She's a 30(b)(6) witness.  You're not --

19      she -- she's not going to know personal factual

20      information held by Sarah Stewart.                 13:47:36

21              THE WITNESS:  I don't know.

22      BY MS. VEROFF:

23         Q.   I'm going to ask now about Heather

24      Hutchens, who's listed in the initial disclosures.

25              Do you know who Heather Hutchens is?        13:47:50
```

                                                     Page 81

```
 1        A.   I do.

 2        Q.   And what is her position?

 3        A.   She's general counsel for the Department

 4    of Education --

 5        Q.   And what --                              13:47:57

 6             (Simultaneous speaking.)

 7             (Interruption in audio/video.)

 8        A.   Sorry.

 9        Q.   I'm sorry to interrupt.  No, no, that was

10    my fault.                                         13:48:02

11             What does the general counsel role entail?

12             MS. MORGAN:  Object to form.

13             THE WITNESS:  General counsel oversees all

14    the policies, regulations, the management of the --

15    the personnel for the State Board and for the     13:48:17

16    Department of Education.

17    BY MS. VEROFF:

18        Q.   And did Heather Hutchens have any

19    involvement with H.B. 3293 when it was pending

20    before the legislature?                           13:48:31

21             MS. MORGAN:  Object to form.

22             THE WITNESS:  Only what I've seen in

23    the -- the documents that were submitted.

24    BY MS. VEROFF:

25        Q.   And has Heather Hutchens have any         13:48:40
```

Page 82

```
 1    involvement with H.B. 3293 since it was passed?

 2            MS. MORGAN:  Same objection.

 3            THE WITNESS:  Not to my knowledge.

 4    BY MS. VEROFF:

 5        Q.   I'd like to next ask about Mary Catherine     13:48:51

 6    Tuckwiller.

 7            Do you know who Mary Catherine Tuckwiller

 8    is?

 9        A.   I do.

10        Q.   And what is her position?                     13:49:01

11            MS. MORGAN:  I'm going to go ahead and

12    place a standing objection.

13            Again, these are beyond the scope of these

14    12 topics.  So object to form, and I will just

15    continue my objections here.                           13:49:11

16            Go ahead.

17            THE WITNESS:  Mary Catherine Tuckwiller

18    was a staff attorney that formerly worked at the

19    Department of Education.

20    BY MS. VEROFF:                                         13:49:24

21        Q.   And what did her job as a staff attorney

22    entail?

23        A.   She worked directly for the general

24    counsel.

25        Q.   And did she have any involvement with H.B.    13:49:30
```

Page 83

1    3293 when it was pending before the legislature?

2         A.   I don't know other than what I've seen

3    in -- in the documents that were submitted.

4         Q.   And I'd like next ask about Stephanie

5    Abraham.                                          13:49:43

6              Do you know who Stephanie Abraham is?

7         A.   I do.

8         Q.   And what is her job?

9         A.   She's also a staff attorney that works

10   under our general counsel.                        13:50:01

11        Q.   And what does that job entail?

12        A.   Just -- she's assigned topics and -- and

13   cases and things from the general counsel.

14        Q.   And did she have any involvement with H.B.

15   3293 when it was pending before the legislature?   13:50:17

16        A.   Not to my knowledge.

17        Q.   And I'd like to also ask about Jonah

18   Adkins.

19             Do you know who Jonah Adkins is?

20        A.   I do.                                   13:50:29

21        Q.   And what is his position?

22        A.   His current position is a coordinator in

23   our accountability office.

24        Q.   And did he have any involvement with H.B.

25   3293 when it was pending before the legislature?   13:50:41

Page 84

```
1        A.    Not that I'm aware of.

2        Q.    Great.  Thank you.

3              MS. VEROFF:  And just to respond to the

4    objections, I just want to alert and point --

5    direct counsel to Topic 12, which is all discovery      13:50:53

6    responses in this action, which the witness has

7    said that she reviewed and those, of course,

8    include the initial disclosures listing all the

9    people that I just asked about.

10             MS. MORGAN:  Yes, Julie.  Yes, but           13:51:04

11   discovery are not all-encompassing as all pleadings

12   filed in a case.  You're talking about initial

13   disclosures.

14             Discovery responses, and as you've gone

15   through, have already been responses to             13:51:18

16   interrogatories request for production of

17   documents, request for admissions.  Again, my

18   objection stands.

19             MS. VEROFF:  Thank you.

20             I think it's probably a good time to take   13:51:28

21   a quick break.  So maybe we can go off the record.

22             MS. MORGAN:  We haven't quite been an hour

23   yet.  Can we not continue through?

24             MS. VEROFF:  I've heard a request from

25   co-counsel to take a -- a quick break.  So if we     13:51:42
```

Page 85

```
 1    would just take five minutes as a courtesy to

 2    co-counsel, I think that would be great.

 3            THE VIDEOGRAPHER:  Okay.  We're going off

 4    the record.  The time is 1:51 p.m., and this is the

 5    end of Media Unit Number 2.                    13:51:53

 6            (Short recess taken.)

 7            THE VIDEOGRAPHER:  We are back on the

 8    record at 2:03 p.m., and this is the beginning of

 9    Media Unit Number 3.

10            Go ahead.                              14:04:10

11            MS. VEROFF:  Thank you so much.

12            I just want to preserve a -- a few things

13    for the record.  Just to note that plaintiff's

14    counsel had offered earlier in the deposition that

15    an objection for one could be an objection for all  14:04:20

16    to expedite things, and the defendants' counsel

17    prefers not to proceed that way.

18            There also have been certain objections

19    about questions beyond the scope.  And I wanted to

20    note for the record that the questions regarding    14:04:34

21    Superintendent Burch are encompassed within Topic

22    1.  And questions regarding the contents of initial

23    disclosures are encompassed in Topic 12.  And

24    questions regarding communications and discussions

25    concerning H.B. 3293 are encompassed in various     14:04:49
```

Page 86

1    topics in the deposition notice.

2    BY MS. VEROFF:

3        Q.   So picking back up where we left off,

4    Ms. Blatt -- -

5            MS. MORGAN:  Oh, I would like to respond    14:04:57

6    here, Julie, before you proceed.  I'm not going to

7    actually respond to each of your summarizations, as

8    they are not appropriate.

9            All my objections are -- were accurately

10   stated on the record and will stand.  And those can    14:05:09

11   be addressed with the Court at a future date.

12           MR. TRYON:  This is David Tryon.  I must

13   comment.

14           Julie, you indicated that there was a

15   stipulation that an objection by one is an    14:05:24

16   objection for all.  I do not recall hearing that.

17   I will not -- I'm not sure if that's an accurate

18   statement of the law or not.  But I do not remember

19   hearing that.  The record will show whatever it

20   was.  Thank you.    14:05:37

21           MS. GREEN:  This is Roberta Green on

22   behalf of SSAC, and I also would like to make my

23   own objections.  I may have said that already on

24   the record.  But also my objections made up to this

25   point and those going forward will stand as well.    14:05:54

Page 87

1     Thank you.

2              MS. VEROFF:  Thank you so much.

3     BY MS. VEROFF:

4         Q.   So, let's dive back in, Ms. Blatt.

5              Prior to H.B. 3293's passage, did anyone      14:06:04

6     at the State Board have any communications about

7     H.B. 3293 with legislators?

8         A.   On what I've seen in the documents that

9     were submitted with our legislative liaison.

10        Q.   And do you know about any communications      14:06:22

11    beyond what's captured in the discovery production

12    that you've seen?

13        A.   No.

14        Q.   And prior to H.B. 3293's passage, did

15    anyone at the State Board have any communications      14:06:35

16    about H.B. 3293 with legislative staff?

17        A.   The communication with Melissa White would

18    be one of their staff.

19        Q.   And was there any communications with

20    legislative staff over than Melissa White?            14:06:53

21        A.   Not that I'm aware of.

22        Q.   And prior to H.B. 3293's passage, did

23    anyone at the State Board have any communications

24    about H.B. 3293 with Governor Justice?

25        A.   Not that I'm aware of.                        14:07:12

                                                  Page 88

1      Q.   And prior to H.B. 3293's passage, did

2    anyone at the State Board have communication about

3    H.B. 3293 with any staff for Governor Justice?

4      A.   Not that I'm aware of.

5      Q.   Prior to H.B. 3293's passage, did anyone     14:07:26

6    at the State Board have any communications about

7    H.B. 3293 with Alliance Defending Freedom?

8      A.   Not to my knowledge.

9      Q.   And prior to H.B. 3293's passage, did

10   anyone at the State Board have any communications     14:07:44

11   about H.B. 3293 with any county board of

12   education?

13     A.   No, not to my knowledge.

14     Q.   And prior to H.B. 3293's passage, did

15   anyone at the State Board have any communications     14:07:58

16   about H.B. 3293 with any individual schools?

17     A.   Not to my knowledge.

18     Q.   Prior to H.B. 3293's passage, did anyone

19   at the State Board have any communications about

20   H.B. 3293 with any school principals?     14:08:14

21     A.   Not to my knowledge.

22     Q.   And prior to H.B. 3293's passage, did the

23   State Board have any communications about H.B.

24   3293 with anyone other than the groups of folks

25   we've just talked about?     14:08:31

Page 89

```
1        A.   No, not that I'm aware of.

2        Q.   And prior to H.B. 3293's passage, did

3    Superintendent Burch have any communications about

4    H.B. 3293 with any of the individuals I've just

5    asked you about?                                14:08:46

6        A.   Not that I'm aware of.

7        Q.   Was anyone at the State Board ever told by

8    a legislator what the purpose of H.B. 3293 was?

9        A.   Not that I'm aware of.

10       Q.   Was anyone at the State Board ever told by  14:09:00

11   a legislative staffer what the purpose of the H.B.

12   3293 was?

13       A.   Not that I'm aware of.

14       Q.   I'd like to ask you a few questions about

15   the State Board's interactions with the House of     14:09:14

16   Delegates Education Committee while H.B. 3293 was

17   pending.

18            Did anyone from the State Board answer

19   questions posed by the House of Delegates

20   Education Committee during meetings?                 14:09:31

21       A.   The State Board of Education does not

22   interact with the House Education Committee.  If

23   anyone would have interacted with them, it would

24   have been our legislative liaison, Sarah Stewart.

25       Q.   And so, did anyone -- so besides Sarah      14:09:40
```

Page 90

1    Stewart, did anyone else at the Department of

2    Education answer questions posed by the House of

3    Delegates Education Committee?

4        A.   I don't believe so.

5        Q.   And at which House of Delegates Education     14:09:56

6    Committee meeting did Sarah Stewart answer

7    questions?

8        A.   Are you referencing, like, a date or...

9        Q.   Yes.  Can you tell me the dates on which

10   Sarah Stewart answered questions --                  14:10:07

11       A.   No.  I'm sorry.  I can't.

12            (Interruption in audio/video.)

13            THE COURT REPORTER:  Excuse me.  If you

14   could start the question over.  There was an

15   interruption.                                        14:10:20

16   BY MS. VEROFF:

17       Q.   Sure.  I'll -- and I'll rephrase.

18            On which dates did Sarah Stewart answer

19   questions from the House of Delegates Education

20   Committee?                                           14:10:28

21       A.   I don't know the dates.

22       Q.   Did you speak with Sarah Stewart in

23   preparation for today's deposition?

24       A.   I did not.

25       Q.   And do you know who posed questions to       14:10:37

Page 91

1    Sarah Stewart at the House of Delegates Education

2    Committee meetings?

3         A.   No, I don't.

4         Q.   Do you know what questions were asked of

5    Sarah Stewart?                                      14:10:52

6         A.   No.

7         Q.   Do you know whether Sarah Stewart provided

8    her answers orally or in writing?

9         A.   I do not.

10        Q.   Do you know what answers Sarah Stewart     14:11:01

11   provided to the House of Delegates Education

12   Committee?

13        A.   I do not.

14        Q.   Did you review Sarah Stewart's testimony

15   before the House of Delegates Education Committee    14:11:16

16   for today's deposition?

17        A.   No, I have not.

18        Q.   Is it typical for staff at the Department

19   of Education to answer questions from the

20   legislature related to bills under consideration?   14:11:26

21        A.   Yes.  Usually technical ques- -- questions

22   are addressed.

23        Q.   And is Sarah Stewart usually the person

24   who provides that testimony?

25        A.   Yes, she was at the time.                  14:11:40

                                             Page 92

1          Q.    And who is the person now who would

2     provide such testimony?

3          A.    Drew McClanahan.

4          Q.    And what is their position?

5          A.    He's our legislative director now.          14:11:56

6          Q.    All right.

7                So I'd like to direct you back to one of

8     our marked exhibits.  So this is Exhibit 19.  It

9     should already be in your Marked Exhibits folder.

10               If you can just let me know when you have     14:12:11

11     it up.

12          A.    Okay.  We have it up.

13          Q.    Great.

14               And I'd like to ask you to scroll to

15     page 3 of the PDF, please.  You'll see in the          14:12:23

16     bottom left corner it's Bates-stamped WVSBOE

17     000008.

18               Do you see that page?

19          A.    Yes.

20          Q.    And in the middle of the page, there's an    14:12:38

21     e-mail from Melissa White sent on Monday,

22     March 15th, 2021, to Sarah Stewart.  The subject

23     is "FW:  Transgender participation in secondary

24     schools bill."

25               Do you see that e-mail?                      14:12:55

                                                    Page 93

```
 1        A.    I do.

 2        Q.    And I'll represent that this is a document

 3   produced to plaintiff's counsel by your counsel as

 4   part of discovery production.

 5              Do you recognize this e-mail?              14:13:04

 6        A.    Yes.

 7        Q.    Is it one that you reviewed in preparation

 8   for today's deposition?

 9        A.    Yes.

10        Q.    And the body of the e-mail says, "Sarah,    14:13:13

11   per our discussion.  Thank you, Melissa."

12              Did I read that correctly?

13        A.    Yes.

14        Q.    Do you know what "per our discussion"

15   refers to?                                            14:13:27

16        A.    I do not.

17        Q.    And did you speak to Sarah Stewart about

18   this e-mail in preparation for today's deposition?

19              MS. MORGAN:  Asked and answered.

20              THE WITNESS:  I did not.                   14:13:39

21   BY MS. VEROFF:

22        Q.    Did you speak to Melissa White in

23   preparation for today's deposition?

24        A.    No.

25        Q.    Do you know if Sarah Stewart responded to   14:13:48
```

Page 94

 1    Melissa White's e-mail?

 2        A.   I don't know.

 3        Q.   I'd like you now to turn to page 2 of

 4    Exhibit 19.  You'll see in the bottom left-hand

 5    corner that it's Bates-stamped WVSBOE 000007.          14:14:00

 6             Do you see that e- -- that page?

 7        A.   Yes.

 8        Q.   And so, at the bottom of this page is an

 9    e-mail from Sarah Stewart sent on Monday,

10    March 15th, 2021, to Heather Hutchens, Stephanie       14:14:15

11    Abraham and Mary Catherine Tuckwiller with a

12    subject line, "FW:  Transgender participation in

13    secondary schools bill."

14             Do you see that e-mail?

15        A.   I do.                                          14:14:29

16        Q.   And I'll represent that your counsel

17    provided this document to plaintiff's counsel as

18    part of discovery production.

19             The e-mail reads, "Happy Monday.  Would

20    you all care to take a look at this one and            14:14:40

21    provide feedback (preferably in writing)?  Not

22    necessarily on the substance, but modifications we

23    would suggest.  I have to leave for a funeral soon

24    and not sure when will be back this afternoon.

25    Thanks, Sarah."                                         14:14:55

                                                     Page 95

```
 1               Did I read that correctly?
 2       A.   Yes.
 3       Q.   And do you recognize this e-mail?
 4       A.   Yes.
 5       Q.   Did you review it in preparation for      14:15:01
 6   today's deposition?
 7       A.   (No response by witness.)
 8       Q.   And by "take a look at this one" --
 9            THE COURT REPORTER:  Excuse me.  I don't
10   know if there was an audio glitch, but I did not    14:15:18
11   get an answer.
12            THE WITNESS:  It was yes.
13   BY MS. VEROFF:
14       Q.   By "take a look at this one," was Sarah
15   Stewart referring to the draft of H.B. 3293?        14:15:34
16            MS. MORGAN:  Object to form.  Calls for
17   speculation.
18            THE WITNESS:  It would appear that
19   that's -- by looking at the subject line.
20   BY MS. VEROFF:                                      14:15:46
21       Q.   And do you know why Sarah Stewart asked
22   these three individuals for their feedback on H.B.
23   3293?
24            MS. MORGAN:  Objection as to form.  And
25   calls for speculation.                              14:15:58
```

                                              Page 96

```
 1              THE WITNESS:  They all are in our legal

 2      office.  They're all three attorneys.

 3      BY MS. VEROFF:

 4          Q.   And do you know why Sarah Stewart

 5      preferred to receive their feedback in writing?    14:16:11

 6              MS. MORGAN:  Same objections.

 7              THE WITNESS:  I do not.

 8      BY MS. VEROFF:

 9          Q.   Do you know who Sarah Stewart plans to

10      share any suggested modifications with?            14:16:23

11              MS. MORGAN:  Same objections.

12              THE WITNESS:  I do not.

13      BY MS. VEROFF:

14          Q.   Did any of the recipients of this e-mail

15      respond?                                           14:16:35

16          A.   Yes, I believe there was a response from

17      one of them in -- in the exhibits.  I think it may

18      have been Mary Catherine Tuckwiller.

19          Q.   And do you know if any of them suggested

20      modifications to H.B. 3293?                        14:16:55

21          A.   I do not.

22          Q.   And did you speak with Heather Hutchens

23      about this e-mail in preparing for today's

24      deposition?

25              MS. MORGAN:  Ob- -- object to form.  And   14:17:07
```

Page 97

1   you're also asking about communications between

2   Michele as -- with counsel.  That's protected by

3   the attorney-client privilege.

4           You can answer whether you actually spoke

5   to her, just not to -- as to any substance.          14:17:27

6           THE WITNESS:  Not --

7           (Interruption in audio/video.)

8           THE COURT REPORTER:  Can you please

9   repeat.

10          THE WITNESS:  I said, "Not in relation to    14:17:32

11  the e-mail."

12  BY MS. VEROFF:

13      Q.  And did you speak with Stephanie Abraham

14  about this e-mail in preparation for today's

15  deposition?                                          14:17:42

16          MS. MORGAN:  Same objection and same

17  direction.

18          THE WITNESS:  No.

19  BY MS. VEROFF:

20      Q.  And did you ask -- did you speak with Mary   14:17:48

21  Catherine Tuckwiller about this e-mail in

22  preparation for today's deposition?

23          MS. MORGAN:  Same objection.  Same

24  direction.

25          THE WITNESS:  No.                            14:17:59

Page 98

```
 1    BY MS. VEROFF:
 2        Q.   And do you know where we would find the
 3    information about whether any of these individuals
 4    suggested modifications to H.B. 3293?
 5        A.   I do not.                              14:18:10
 6        Q.   I'd like you now to look at page 1 of this
 7    exhibit, which at the bottom is Bates stamped
 8    WVSBOE 000006.
 9             Just let me know when you're on that page.
10        A.   We're there.                          14:18:30
11        Q.   Great.
12             So at the top you'll see an e-mail from
13    Heather Hutchens sent on Monday, March 15th, 2021,
14    to Mary Catherine Tuckwiller, Sarah Stewart, and
15    Stephanie Abraham.  The Subject line is "RE:       14:18:42
16    Transgender participation in secondary schools
17    bill."
18             Do you recognize this e-mail?
19        A.   Yes.
20        Q.   Did you review it in preparation for      14:18:48
21    today's deposition?
22        A.   Yes.
23        Q.   The body of the e-mail reads, "It seems
24    like much ado about nothing.  I don't think any of
25    it is necessary."                                 14:19:01
```

Page 99

1          Did I read that correctly?

2     A.   Yes.

3     Q.   And when Heather Hutchens said "It seems

4  like much ado about nothing," was she referring to

5  H.B. 3293?                                          14:19:14

6          MS. MORGAN:  Object to form.  You're --

7  again, this is a 30(b)(6) deposition.

8          You can [verbatim] --

9          (Interruption in audio/video.)

10          -- actually ask individuals about their     14:19:20

11  personal knowledge, but I will let you answer to

12  the extent that you're able to do so.

13          THE WITNESS:  Only looking at the subject

14  line, would I suspect that's what it is.

15  BY MS. VEROFF:                                      14:19:33

16     Q.   And did you discuss this e-mail with

17  Heather Hutchens in preparing for today's

18  deposition?

19          MS. MORGAN:  Object to form to the extent

20  that it is asking about her discussions with        14:19:41

21  counsel protected by the attorney-client privilege.

22          But you can testify as to whether you

23  actually spoke to her, just not as to substance.

24          THE WITNESS:  Yes.

25  BY MS. VEROFF:                                      14:19:57

                                                    Page 100

```
 1          Q.    Thank you.

 2               And -- and just to confirm, as I said at

 3       the outset, I'm not asking for any confidential

 4       communications that you've had with your counsel.

 5       I'm just asking about the nature of your                14:20:03

 6       preparation for today's deposition.

 7               So just looking for whether or not you

 8       spoke with someone.

 9               And so when Heather Hutchens writes here

10       that H.B. 3293 is, quote, "much ado about            14:20:12

11       nothing," what was her reason for concluding that

12       H.B. 3293 was "much ado about nothing"?

13               MS. MORGAN:  Object to form and

14       speculation.

15               THE WITNESS:  The only thing I would say    14:20:27

16       is that we've not had an issue in West Virginia

17       regarding transgender in sports.

18       BY MS. VEROFF:

19          Q.    Does the State Board agree that H.B. 3293

20       is much ado about nothing?                           14:20:38

21               MS. MORGAN:  Object to form.

22               THE WITNESS:  I could not answer to that

23       for the State Board.

24       BY MS. VEROFF:

25          Q.    And are you here speaking today on behalf   14:20:46
```

Page 101

 1    of the State Board?

 2          MS. MORGAN:  Asked and answered.

 3    Obviously she has been designated to testify as to

 4    the 12 topics identified in the notice.

 5          THE WITNESS:  Yes.                    14:20:57

 6    BY MS. VEROFF:

 7     Q.   But you don't know the State's position on

 8    whether the -- I'm sorry, the State Board's

 9    position on whether it would agree that H.B. 3293

10    is "much ado about nothing"?                14:21:09

11          MS. MORGAN:  Object to form.

12          THE WITNESS:  I just know that we don't

13    see an issue in West Virginia.

14    BY MS. VEROFF:

15     Q.   Okay.                                 14:21:18

16          So I'm going to introduce a new exhibit

17    now.  I'll let you know when you can expect to see

18    it in the "Marked Exhibits" folder.

19          (Blatt Deposition Exhibit 20 was marked

20           electronically.)                     14:21:40

21    BY MS. VEROFF:

22     Q.   If you'll refresh your "Marked Exhibits"

23    folder, you should now see what's marked as

24    Exhibit 20.  Please just let me know when you have

25    it up.                                      14:21:51

                                          Page 102

```
 1         A.    I'm sorry, it's up.

 2         Q.    Oh, okay.  Excellent.

 3         A.    I'm sorry, I zoned out there.

 4         Q.    No problem.

 5               So I'd like to direct you to the first      14:22:13

 6    page, which is Bates stamped in the bottom left

 7    corner WVSBOE 000002.

 8               And on this e-mail -- or, I'm sorry, on

 9    this page is an e-mail from Melissa White dated

10    Wednesday, March 17th, 2021, to Sarah Stewart.      14:22:29

11    The Subject line is "HB 3293 (single-sex sports)."

12               Do you recognize this e-mail?

13         A.    Yes.

14         Q.    Did you review it in preparation for

15    today's deposition?                                 14:22:42

16         A.    Yes.

17         Q.    And I'll represent that this document was

18    provided by your counsel to Plaintiff's counsel as

19    part of discovery production.  The body of the

20    e-mail reads, "Sarah, As we discussed, how does     14:22:52

21    this look?  Thanks, Melissa."

22               Did I read that correctly?

23         A.    Yes.

24         Q.    And do you know what "as we discussed"

25    refers to?                                          14:23:04
```

```
 1              MS. MORGAN:  Object to form.

 2              THE WITNESS:  I do not.

 3    BY MS. VEROFF:

 4        Q.   Did Sarah Stewart and Melissa White have

 5    any discussions about H.B. 3293?              14:23:13

 6              MS. MORGAN:  Object to form.

 7              THE WITNESS:  I -- I only know what I read

 8    there in the e-mail.

 9    BY MS. VEROFF:

10        Q.   And did Sarah Stewart respond to Melissa    14:23:22

11    White's e-mail?

12        A.   I'm not aware.

13        Q.   And do you know how we would find out the

14    answer to that question?

15              MS. MORGAN:  Object to form.          14:23:34

16              THE WITNESS:  I do not.

17    BY MS. VEROFF:

18        Q.   Is it common for legislative staff to

19    solicit feedback from State Board employees?

20        A.   Yes, particularly through our legislative    14:23:45

21    liaison.

22        Q.   And when the Department of Education sends

23    feedback on proposed legislation, does the

24    legislature typically take it into account?

25        A.   Most of the feedback we would provide      14:24:02
```

                                                Page 104

```
 1    would be technical in nature.  We're referencing a

 2    policy or something like that.  And that type of

 3    technical information, they will usually consider.

 4             MS. MORGAN:  Let me also place my

 5    objection as to form on the record.            14:24:14

 6    BY MS. VEROFF:

 7        Q.   And do you know if the legislatures --

 8    legislature took into account the Department of

 9    Education's feedback on H.B. 3293?

10             MS. MORGAN:  Object as to form.        14:24:25

11             THE WITNESS:  I do not.

12             MS. VEROFF:  I'm going to introduce

13    another exhibit now.  I'll let you know when it's

14    available in the marked exhibits folder.

15             (Blatt Deposition Exhibit 21 was marked  14:24:38

16             electronically.)

17    BY MS. VEROFF:

18        Q.   I've now placed what is marked as Exhibit

19    21 in the "Marked Exhibits" folder.  Please just

20    let me know when you're able to pull it up.      14:25:01

21             MS. MORGAN:  What number did you say

22    again?

23             MS. VEROFF:  It should be Exhibit 21.

24             THE WITNESS:  Yes, I see it.

25    BY MS. VEROFF:                                  14:25:19
```

Page 105

1      Q.   Great.

2           And this is Bates stamped in the bottom

3      left corner.   The first page is WVSBOE 000013.

4      And the document goes through WVSBOE 000036.

5           And I'll represent that your counsel        14:25:35

6      provided this document to Plaintiff's counsel as

7      part of discovery production.

8           Do you recognize this document?

9      A.   Yes.

10     Q.   And can you tell me what it was?           14:25:47

11     A.   It's our summary of legislation that was

12     passed in that 2021 session.

13     Q.   And -- so this is the -- the "2021 Green

14     Book."  And is this prepared every legislative

15     session?                                         14:25:59

16     A.   Yes.

17     Q.   And who prepares the summaries in the

18     Green Book?

19     A.   They're either prepared by our legislative

20     liaison, or it may be prepared by -- if we had   14:26:09

21     a -- a lead that was representing that bill.

22     Q.   And does anyone have to approve the

23     summaries that are prepared?

24     A.   We approve them through our legal office.

25     Q.   And who receives the 2021 Green Book?       14:26:22

Page 106

1      A.    We prepare it for the Department's

2    reference and then for our county superintendents.

3      Q.    And how do the county superintendents

4    access the 2021 Green Book?

5      A.    It's available electronically on our        14:26:37

6    website.

7      Q.    And for each bill listed in the Green

8    Book, is there a WVDE context?

9      A.    Yes, I believe so.

10     Q.    And does "WVDE" stand for West Virginia      14:26:55

11   Department of Education?

12     A.    Yes.

13     Q.    And what does it mean to be the Department

14   of Education contact for a bill?

15     A.    It just means that if someone has           14:27:07

16   questions regarding that bill, this is who they

17   should reach out to.

18     Q.    And how are people chosen to be the

19   Department of Education contact for a given bill?

20     A.    Just based on their background and their    14:27:18

21   experience and maybe their work with that bill as

22   it was being led through the legislation.

23     Q.    And if someone is listed as the Department

24   of Education contact, does that mean that they

25   speak on behalf of the Department of Education      14:27:34

Page 107

```
 1      when they answer questions about the bill?

 2          A.   Yes.

 3          Q.   I'd like you to turn to page 23 of

 4      Exhibit 21.  It's page 23 of the PDF.

 5               Just let me know when you're there.        14:27:49

 6          A.   Okay.  We're there.

 7          Q.   Great.

 8               So you'll see two bills listed on this

 9      page, the second of which is "House Bill 3293:

10      Relating to single-sex participation in           14:28:16

11      interscholastic athletic events."

12               Do you see that?

13          A.   Yes.

14          Q.   And who is listed as the WVDE contact for

15      House Bill 3293?                                   14:28:28

16          A.   It says "Bernie Dolan, West Virginia

17      Secondary Schools Activities Commission."

18          Q.   And why was Bernie Dolan chosen as the

19      Department of Education contact for House Bill

20      3293?                                              14:28:40

21               MS. GREEN:  Roberta Green on behalf of

22      SSAC.

23               Object to the form.

24               THE WITNESS:  He was chosen because

25      this -- he is in charge of the SSAC and the        14:28:49
```

Page 108

1    regulation and oversight of those athletic events.

2    BY MS. VEROFF:

3        Q.   And as the Department of Education contact

4    for House Bill 3293, he was speaking on behalf of

5    the Department of Education if someone contacted      14:29:04

6    him with questions?

7            MS. MORGAN:  Object to form.

8            MS. GREEN:  I'm going to object to the

9    form.

10           Roberta Green, SSAC.                           14:29:14

11           THE WITNESS:  He would be speaking in

12   reference to what was in the statute, if contacted.

13   BY MS. VEROFF:

14       Q.   And is it unusual for a non-Department of

15   Education employee to be listed as the contact for    14:29:28

16   a bill?

17           MS. MORGAN:  Object to form.

18           THE WITNESS:  I would say it is not a

19   normal practice; however, the -- our lead on that

20   bill had been Sarah Stewart.  By the time this book   14:29:43

21   was published, she had already left, so he was the

22   one that would be able to be most versed in the

23   statute.

24   BY MS. VEROFF:

25       Q.   I see.                                        14:29:53

                                               Page 109

```
 1              So if Sarah Stewart had still been at the

 2     Department of Education, she would have been

 3     listed as the contact?

 4              MS. MORGAN:  Object to form.

 5              THE WITNESS:  Most likely.              14:30:00

 6     BY MS. VEROFF:

 7        Q.   And the last sentence of the bill summary

 8     reads, "The WVBE is charged with adopting a policy

 9     to implement the provisions of the bill."

10              Did I read that correctly?              14:30:14

11        A.   Yes.

12        Q.   And do you agree that the State Board is

13     charged with adopting a policy to implement the

14     provisions of H.B. 3293?

15        A.   Yes, according to what I read in statute.  14:30:24

16        Q.   Great.

17              MS. VEROFF:  Let me introduce another

18     exhibit now.  I'll let you know when you can expect

19     it in your "Marked Exhibits" folder.

20              (Blatt Deposition Exhibit 22 was marked  14:30:52

21              electronically.)

22     BY MS. VEROFF:

23        Q.   You should now be able to see Exhibit 22

24     in your "Marked Exhibits" folder if you refresh.

25     Please just let me know when you're able to see   14:31:02
```

Page 110

1    it.

2         A.    Okay, I can see it.

3         Q.    Great.

4               And this is Bates stamped in the bottom

5    left corner WVSBOE 000037, and then the second          14:31:09

6    page is 000038.

7               I'll represent that your counsel provided

8    this document to Plaintiff's counsel as part of

9    discovery production.

10              Do you recon- -- recognize this document?    14:31:25

11        A.    Yes.

12        Q.    And what is it?

13        A.    It's our -- the abstract that we complete

14   as legislation is sent to the governor's office.

15        Q.    And did you review this document in          14:31:39

16   preparation for today's deposition?

17        A.    Yes.

18        Q.    Is the Enrolled Bill Review Form a

19   standard form that's prepared for all bills that

20   pass?                                                    14:31:52

21        A.    Yes.

22        Q.    And how did this form develop?

23              MS. MORGAN:   Object to form.

24              THE WITNESS:   I don't know.  We've used

25   the form as long as I'm aware of that I've been          14:32:04

                                                    Page 111

1    here.

2    BY MS. VEROFF:

3         Q.   Is there a law requiring use of this form?

4              MS. MORGAN:  Object to form.

5              THE WITNESS:  I'm not -- I'm not aware of     14:32:14

6    one.

7    BY MS. VEROFF:

8         Q.   And who prepared this Enrolled Bill Review

9    Form for H.B. 3293?

10        A.   Sarah Stewart, our legislative liaison,      14:32:21

11   our government affairs counsel.

12        Q.   And who receives the Enrolled Bill Review

13   Form?

14        A.   They're sent to the governor's office.

15        Q.   And who in the governor's office receives    14:32:35

16   it?

17        A.   I'm not sure if there's an exact person.

18   I mean, there's a chief of staff that has several

19   attorneys on staff.

20        Q.   And is it sent to anyone else?               14:32:51

21        A.   No, not to my knowledge.

22        Q.   And do you know what the governor's office

23   does with the form when it receives it?

24             MS. MORGAN:  Object to form.

25             THE WITNESS:  My understanding is just       14:33:02

                                            Page 112

1    that they -- they review the agency's summary of

2    the bill in determination, recommendations that

3    they would make to the governor.

4    BY MS. VEROFF:

5         Q.   And besides Sarah Stewart, who prepared        14:33:11

6    the Enrolled Bill Review Form, did anyone else at

7    the Department of Education review this Enrolled

8    Bill Form [verbatim] for H.B. 3293?

9         A.   I can't speak exactly to this bill.  But

10   the normal process is the state superintendent          14:33:32

11   would review prior to submitting.

12        Q.   And do you know if the state

13   superintendent reviewed this Enrolled Bill Form

14   [verbatim] for H.B. 3293?

15             MS. MORGAN:  Object to form.                   14:33:41

16             THE WITNESS:  I can't -- I believe so, but

17   I can't speak for definite.

18   BY MS. VEROFF:

19        Q.   And on the second page of the PDF, which

20   is Bates stamped WVSBOE 000038, there's Item            14:33:50

21   Number 14, which says, "Is a Governor's veto

22   recommended?  If yes, please explain."

23             And the answer provided is "The WVDE does

24   not support this bill."

25             Did I read that correctly?                     14:34:08

Page 113

1        A.   Yes.

2        Q.   And does WVDE stand for West Virginia

3    Department of Education here?

4        A.   Yes.

5        Q.   And is it correct that the Department of      14:34:17

6    Education did not support H.B. 3293?

7        A.   Department of Education did -- as we've

8    talked --

9             (Interruption in audio/video.)

10            THE COURT REPORTER:  Excuse me.  Could you    14:34:31

11   please start over your answer.  There was an

12   interruption in audio.

13            THE WITNESS:  The -- the Department of

14   Education did not see that we had an issue with

15   transgender in sports that would require us to take    14:34:43

16   the necessary steps and work to promulgate a rule.

17            And then also, normally a rule in relation

18   to sports would have been created by the SSAC and

19   then brought forth to the Board of Education.

20   BY MS. VEROFF:                                         14:35:04

21       Q.   And were there any other reasons besides

22   those two that the Department of Education didn't

23   support H.B. 3293?

24       A.   Not that I'm aware of.

25       Q.   And who made the decision that the            14:35:13

                                            Page 114

 1    Department of Education didn't support H.B. 3293?

 2        A.   Well, as I -- as I said a little bit

 3    earlier, I will -- you know, it's a discussion

 4    between our legislative attorney and the state

 5    superintendent.                                    14:35:29

 6        Q.   And were the reasons that the Department

 7    of Education didn't support H.B. 3293 written down

 8    anywhere?

 9        A.   Not to my knowledge.

10        Q.   And were there any memos or other         14:35:41

11    documents prepared that underlie --

12             (Interruption in audio/video.)

13             THE COURT REPORTER:  Excuse me.  Could you

14    please start over.

15             MS. VEROFF:  Of course.                   14:35:53

16    BY MS. VEROFF:

17        Q.   Were there any documents that capture

18    the -- the reasoning arising at the conclusion

19    that the Department of Education doesn't support

20    the bill?                                          14:36:02

21        A.   No, I don't believe there are any

22    documents for -- for any other bill.

23        Q.   And did the Department of Education tell

24    any legislators that it didn't support H.B. 3293?

25        A.   Not necessarily.  I mean, I don't know    14:36:19

                                              Page 115

```
 1     that there -- if there were conversations held

 2     between *Sarah* and the legislators.

 3               (Interruption in audio/video.)

 4               THE COURT REPORTER:  Excuse me.

 5               "Between Sara and"?                    14:36:36

 6               THE WITNESS:  The legislators.

 7     BY MS. VEROFF:

 8        Q.   And did the Department of Education tell

 9     any legislative staff that it didn't support H.B.

10     3293?                                            14:36:48

11        A.   I'm not aware of anything that was said.

12               MS. MORGAN:  Julie, hold up just one

13     moment.  What I'm going to do is I'm going to move

14     this speaker more in front.  That might be -- if

15     you want to move that for a second -- that might be  14:36:57

16     part of why her -- her face is looking at different

17     directions.  So it might be -- see if that's any

18     better.

19               THE WITNESS:  I'm not in the middle.

20     BY MS. VEROFF:                                   14:37:11

21        Q.   Did the Department of Justice [verbatim]

22     speak with anyone in Governor Justice -- Justice's

23     office about its decision not to support H.B.

24     3293?

25               MS. MORGAN:  Department of Justice?       14:37:23
```

Page 116

```
 1              MS. VEROFF:  I'm sorry.  In Governor --

 2    Governor Justice's office.

 3              MS. MORGAN:  The question was, did the --

 4    anyone in the Department of Justice.

 5              MS. VEROFF:  Sorry.                    14:37:34

 6    BY MS. VEROFF:

 7       Q.   Did anyone in the Department of Education

 8    speak with anyone in Governor Justice's office

 9    about the Department's decision not to support

10    H.B. 3293?                                       14:37:43

11       A.   Not that I'm aware of.

12       Q.   And did anyone at the Department of

13    Education ask Governor Justice to veto H.B. 3293?

14       A.   Not that I'm aware of, no.

15       Q.   And is the Department of Education's      14:37:58

16    current position that it doesn't support H.B.

17    3293?

18              MS. MORGAN:  Object to form.

19              THE WITNESS:  We -- the Department of

20    Education has to -- we have to follow anything once  14:38:08

21    it is codified and put in statute.

22    BY MS. VEROFF:

23       Q.   And does the State Board not support H.B.

24    3293?

25              MS. MORGAN:  Object to form.            14:38:21
```

                                        Page 117

```
 1              THE WITNESS:  Once it was codified, the
 2    State Board is charged with implementing and
 3    enforcing.
 4    BY MS. VEROFF:
 5         Q.   How frequently does the Department of        14:38:31
 6    Education decide that it doesn't support a bill?
 7         A.   I could not speak to the frequency.  We
 8    have a few different options.  You know, we --
 9    there are ought times when we say ask for a veto.
10    Specifically there are times when we say we don't     14:38:50
11    have a stance.  So I'm not sure.
12         Q.   In your tenure as deputy superintendent,
13    have you ever seen an Enrolled Bill Review Form
14    besides the one for H.B. 3293 that says that the
15    Department of Education doesn't support a bill?       14:39:01
16         A.   This would actually be my first year as --
17    in -- as deputy with a session and for -- I
18    wouldn't have access to those to review prior to
19    them being submitted.  And we haven't had any
20    legislation sent to the governor's office yet.        14:39:18
21         Q.   I see.
22              And so you weren't in this role when this
23    Enrolled Bill Review Form was passed?  Am I
24    understanding that correctly?
25         A.   I don't believe so.                         14:39:28
```

Page 118

1        Q.   Got it.

2             And I'd like now for you to look at Item

3    Number 15, so just below where we were looking,

4    which says, "Please identify whether any other

5    state agency should also provide a bill review:"      14:39:45

6    And the answer is "HEPC."

7             Did I read that correctly?

8        A.   Yes.

9        Q.   What is HEPC?

10       A.   It's our Higher Education Policy            14:39:55

11   Commission.

12       Q.   And what is the HEPC's relationship to the

13   Department of Education?

14       A.   Really the best way to describe it is like

15   a sister agency.  It oversees our colleges and        14:40:08

16   current technical centers -- or career and

17   technical -- I'm sorry, career and --

18             (Interruption in audio/video.)

19             THE COURT REPORTER:  Excuse me.

20             THE WITNESS:  I'm sorry, career and         14:40:17

21   technical community colleges.

22   BY MS. VEROFF:

23       Q.   Thank you.

24             And did anyone in the Department of

25   Education have any communication with anyone at       14:40:26

Page 119

1    HEPC about H.B. 3293?

2            MS. MORGAN:  Object to form.

3            THE WITNESS:  I'm not aware of any

4    communication.

5    BY MS. VEROFF:                                    14:40:36

6        Q.   And did the superintendent have any

7    communications with anyone at HEPC about H.B.

8    3293?

9            MS. MORGAN:  Object to form.

10           THE WITNESS:  Not that I'm aware of.     14:40:45

11   BY MS. VEROFF:

12       Q.   And why did the Department of Education

13   believe that HEPC should also provide a bill

14   review?

15       A.   Because the bill references sports at the   14:40:54

16   college level as well, and so they -- they had

17   oversight over that age of students.

18       Q.   And did HEPC actually provide a bill

19   review?

20       A.   I don't know if they did or not.        14:41:10

21           MS. VEROFF:  And now I'd like to introduce

22   another exhibit.  I'll let you know when this is

23   available to you in the Marked Exhibits folder.

24           (Blatt Deposition Exhibit 23 was marked

25           electronically.)                          14:41:43

                                        Page 120

1     BY MS. VEROFF:

2         Q.   You should now see Exhibit 23 in your

3     Marked Exhibits folder.  Just let me know when you

4     have it.

5         A.   Okay.                                   14:41:52

6         Q.   So this is Bates stamped WVSBOE 000001.

7     It's an e-mail from Sarah Stewart, dated Thursday,

8     July 1st, 2021, to Heather Hutchens.  Subject

9     line --

10             THE COURT REPORTER:  Could you slow down,

11    please, Counsel.

12             MS. VEROFF:  I'm so sorry.

13    BY MS. VEROFF:

14        Q.   It's from Sarah Stewart sent Thursday,

15    July 1st, 2021, to Heather Hutchens.  The subject   14:42:18

16    line is "fyi."

17             Do you recognize this e-mail?

18        A.   Yes.

19        Q.   And I'll represent that it was provided by

20    your counsel to plaintiff's counsel as part of     14:42:23

21    discovery production.

22             Did you review this e-mail in preparation

23    for today's deposition?

24        A.   I did.

25        Q.   And did you review the article that Sarah   14:42:34

                                                   Page 121

1    Stewart links to in the body of the e-mail?

2         A.   I did not.

3         Q.   Do you know why Sarah Stewart e-mailed

4    this article to Heather Hutchens?

5              MS. MORGAN:  Object to form.                14:42:47

6              THE WITNESS:  I don't, but I would -- you

7    know, I would assume she was just sharing

8    information on the fact that it had been

9    a MetroNews article.  It's not uncommon for

10   anything us to share education -- anything related  14:43:00

11   to education with each other.

12   BY MS. VEROFF:

13        Q.   And did Heather Hutchens respond to this

14   e-mail?

15             MS. MORGAN:  Heather Hutchens or Sarah     14:43:09

16   Stewart?

17   BY MS. VEROFF:

18        Q.   Did Heather Hutchens respond to the

19   e-mail?

20             MS. MORGAN:  Object to form.               14:43:16

21             THE WITNESS:  I'm not -- I don't know.

22   BY MS. VEROFF:

23        Q.   And you mentioned that Sarah Stewart has

24   left the Department of Education.

25             Do you know why she left?                  14:43:20

                                        Page 122

```
 1              MS. MORGAN:  Object to form.

 2              THE WITNESS:  She took another position --

 3     BY MS. VEROFF:

 4         Q.   And do you know where other position is?

 5              (Simultaneous speaking.)              14:43:24

 6              (Interruption in audio/video.)

 7         A.   -- or another job.

 8              THE COURT REPORTER:  Excuse me.  There was

 9     speaking over.  I didn't get the rest of the

10     answer.                                        14:43:33

11              THE WITNESS:  I said, "She took another

12     job."

13     BY MS. VEROFF:

14         Q.   And I'm sorry for interrupting.

15              Do you know where her new job is?      14:43:38

16         A.   She works with West Virginia legislature.

17         Q.   And do you know what department or

18     committee at the West Virginia legislature?

19         A.   She's counsel for the senate president.

20         Q.   And who is the senate president?        14:43:59

21         A.   Craig Blair.

22         Q.   I see.

23              And was Craig Blair the president of the

24     senate at the time that H.B. 3293 was passed?

25         A.   Yes, I believe so.                      14:44:08
```

Page 123

```
 1        Q.    Great.

 2              And -- and I'm sorry if I didn't ask this

 3     earlier.

 4              Did you speak with Superintendent Burch in

 5     preparing for today's deposition?                    14:44:19

 6        A.    No.

 7        Q.    No.

 8              I just have a few last questions, and I

 9     think we can take another break.  And this is just

10     about H.B. 3293.                                     14:44:29

11              Under H.B. 3293, can cisgender girls play

12     on girls' sports teams?

13        A.    Sorry.  Could you repeat.

14        Q.    Of course.

15              Under H.B. 3293, can cisgender girls play   14:44:45

16     on girls' sports teams?

17        A.    Yes.

18        Q.    Under H.B. 3293, can transgender girls

19     play on girls' sports teams?

20              MS. MORGAN:  Object to form.                14:45:00

21              MR. TRYON:  This -- this is David Tryon.

22              Objection as to terminology.

23              THE WITNESS:  Yes, according to

24     statute they -- or no, according to statute, they

25     cannot.                                              14:45:09
```

Page 124

```
 1    BY MS. VEROFF:

 2        Q.   Thank you.

 3             And under H.B. 3293, can B.P.J., the

 4    plaintiff in this case, play on a girls' sports

 5    team?                                          14:45:23

 6        A.   No.  According to this statute, no.

 7        Q.   And why can't she play on a girls' sports

 8    team?

 9             MS. MORGAN:  Object to form.

10             THE WITNESS:  Because the statute would   14:45:32

11    prohibit it.

12    BY MS. VEROFF:

13        Q.   If B.P.J. were a cisgender girl, could she

14    play on girls' sports teams under H.B. 3293?

15             MS. MORGAN:  Objection to form.          14:45:40

16             THE WITNESS:  According --

17             MR. TRYON:  Objection.

18             THE WITNESS:  According to what I read in

19    the statute, yes.

20    BY MS. VEROFF:                                    14:45:47

21        Q.   Does the State Board believe that H.B.

22    3293 is necessary?

23             MS. MORGAN:  Object to form.

24             THE WITNESS:  So we've not had an issue in

25    the past is what we've -- we had said from -- you   14:45:59
```

Page 125

1    know, throughout the thing, that it's not been a

2    concern in West Virginia.

3    BY MS. VEROFF:

4        Q.   And does the State Board believe that H.B.

5    3293 advances any important government interests?    14:46:10

6            MS. MORGAN:  Object to form.

7            THE WITNESS:  I'm not aware -- or I mean,

8    I -- not that we're aware of.

9    BY MS. VEROFF:

10       Q.   Is it -- so just to confirm, do you mean    14:46:20

11   that you're not aware of whether the State Board

12   thinks that any important government interests are

13   advanced, or do you mean that the State Board does

14   not believe that any important government

15   interests are advanced by H.B. 3293?                  14:46:34

16       A.   There -- the State Board --

17           MR. TRYON:  This is David Tryon.

18   Objection to calls for a legal conclusion.

19           MS. MORGAN:  Object form.

20           THE WITNESS:  The -- the -- the State      14:46:42

21   Board is not aware if there is or is not a

22   relationship for -- for that.

23   BY MS. VEROFF:

24       Q.   Great.

25           MS. VEROFF:  So I think at this time, I    14:46:51

                                              Page 126

```
 1    think I'm -- I'm close to being finished.  So I'd
 2    like to suggest that we go off the record and take
 3    a five-minute break just so I can confer with
 4    co-counsel before we wrap up.
 5            Does that sound okay to everybody?          14:47:07
 6            MS. MORGAN:  Okay.
 7            MR. TRYON:  Yes, I -- I needed some -- a
 8    break.  Thank you.
 9            THE VIDEOGRAPHER:  Okay.  We're going off
10    the record.  The time is 2:47 p.m., and this is the   14:47:15
11    end of Media Unit Number 3.
12            (Short recess taken.)
13            THE VIDEOGRAPHER:  We are back on the
14    record at 3:01 p.m., and this is the beginning of
15    Media Unit Number 4.                                15:01:42
16            Go ahead.
17            MS. VEROFF:  Thank you so much, Ms. Blatt,
18    for your time today.  I hope, as indicated, this
19    was a fairly pain-free deposition.  And I've
20    reached the end of my questioning.                 15:01:54
21            Plaintiff would like to leave today's
22    deposition open in -- in light of potential
23    inadequacy of preparation issues.  And also I
24    reserve my rights to ask questions following from
25    any questions asked by the other parties or if     15:02:08
```

Page 127

1    there are any changes in the errata.

2            But other than, I am finished, and so will

3    turn it over to counsel for other parties.

4            THE WITNESS:  Thank you.

5            MS. MORGAN:  Just for a moment, we do not    15:02:19

6    agree to leave this deposition open.  You have been

7    allowed full opportunity to ask any questions

8    pursuant to these 12 topics, and she's answered

9    them fully.

10           MS. VEROFF:  I'll just add for the record    15:02:31

11   that the witness stated at the beginning of

12   deposition when we were viewing the notice of

13   examination -- or the topics of examination, that

14   there was one topic that she did no preparation

15   for.  And the witness also admitted that she didn't  15:02:41

16   speak with any of the individuals featured in the

17   discovery responses.

18           MS. MORGAN:  I don't believe that she --

19           MS. VEROFF:  Or she --

20           MS. MORGAN:  -- actually has testified       15:02:52

21   that she didn't prepare for any topics.  May- --

22   there may not have been any documents to review to

23   prepare.  But, you know, her testimony is what it

24   is.  We're -- we're not agreeing to keep her

25   deposition -- or a deposition of a 30(b)(6)          15:03:08

Page 128

1    representative open.

2           Does anyone else have any other questions?

3                      EXAMINATION

4    BY MS. GREEN:

5       Q.   This is Roberta Green, here on behalf of      15:03:24

6    WVSSAC.  And, Ms. Blatt, I have a few questions

7    for you.  Appreciate your patience.

8           I've heard you testify to some things that

9    referenced Bernie Dolan.

10          Did you confer with Bernie Dolan today --      15:03:37

11   or prior to your deposition today?

12      A.   No.

13      Q.   So in terms of who Mr. Dolan communicated

14   with relative to the legislation, would you defer

15   to Mr. Dolan identify those persons for himself?      15:03:54

16      A.   Yes, I would.

17      Q.   And in terms in your Deposition

18   Exhibit 21, which is the Green Book, at page 23,

19   there's a summary of House Bill 3293 that

20   represents that the West Virginia Board Department    15:04:08

21   of Education contact is Bernie Dolan.

22          Do you recollect that document?

23      A.   Yes.

24      Q.   And as you sit here, do you understand

25   that Bernie Dolan is not a West Virginia             15:04:18

                                        Page 129

1    Department of Education employee?

2         A.   I do.

3         Q.   And are you aware of whether Mr. Dolan was

4    aware he was listed in the Green Book as the West

5    Virginia Department of Education contact relative      15:04:30

6    to House Bill 3293?

7         A.   I'm not aware if he was or not.

8         Q.   And in terms of any involvement Mr. Dolan

9    had in preparing the bill summary that's listed in

10   the Green Book at page 23, as you sit here, do you     15:04:44

11   know whether he had involv- -- any involvement at

12   all?

13        A.   I do not know if he did.

14        Q.   And in terms of whether Mr. Dolan --

15             (Interruption in audio/video.)              15:04:57

16             THE COURT REPORTER:  Excuse me.  Counsel,

17   there was a cough and an interruption.  If you

18   would please start over, please.

19             MS. GREEN:  Wow.  I don't know.  We --

20   well, I could try or maybe something a little         15:05:09

21   different.

22   BY MS. GREEN:

23        Q.   So I can't even -- and I don't know

24   whether I asked you whether Mr. -- you know

25   whether Mr. Dolan ever even reviewed this bill        15:05:22

                                            Page 130

1    summary that's in the Green Book at page 23.

2         A.   I don't know that if he did.

3         Q.   And I believe you testified that the State

4    Board has no official relationship with WVSSAC; is

5    that true?                                    15:05:48

6         A.   I said the relationship was in that we --

7    the State Board approves the -- the rules for the

8    SSAC.

9         Q.   And other than that, no relationship; is

10   that true?                                    15:05:58

11        A.   Yes.

12        Q.   So you would defer to WVSSAC to answer its

13   own questions relative to its internal practices

14   and how it proceeds internally; is that true?

15        A.   Yes.                                15:06:12

16        Q.   And you're not a 30(b) witness for SSAC,

17   are you?

18        A.   No, I'm not.

19        Q.   All right.

20             And in terms of whether SSAC has to comply   15:06:26

21   with State rules, is it actually that the SSAC's

22   member schools or the membership of SSAC has to

23   comply with the State rules?  Do --

24        A.   Yes, that would be -- that's how I would

25   understand.  Our schools would have to comply with   15:06:44

                                                  Page 131

```
1    the rules.
2         Q.   Okay.  Very good.
3              And in terms of the 2.0 rule, I recollect
4    you spoke to the 2.0 rule.
5              Do you recollect that testimony?        15:06:54
6         A.   Yes, that that was the only reference to
7    sports participation that's in a State Board
8    policy.
9         Q.   All right.
10             And in terms of who actually has a --    15:07:05
11             (Interruption in audio/video.)
12             THE COURT REPORTER:  Excuse me.  If you
13   would please start over.  There was an interruption
14   in audio.
15   BY MS. GREEN:                                     15:07:17
16        Q.   So in terms of who actually has authority
17   to enforce or waive the 2.0 rule, that would be
18   the State Board; wouldn't it?
19        A.   No.  That would be the authority of the --
20   enforcement of the 2.0 rule lies with the schools   15:07:35
21   and with the counties, mainly with the schools who
22   are reviewing the -- the records of the students.
23        Q.   Okay.  And very good point.  Thank you for
24   clarifying, not SSAC.
25             SSAC doesn't enforce the State Board's    15:07:49
```

Page 132

1    rules; correct?

2         MS. VEROFF:   Objection as to counsel

3    testifying.

4    BY MS. GREEN:

5         Q.   State -- State Board rule, your one rule;   15:07:59

6    is that true?

7         A.   Elig- -- eligibility is determined at the

8    school level.

9         Q.   All right.

10        And in terms of -- I think during the   15:08:07

11   pandemic, the State Board had waived or changed

12   compliance with the 2.0 rule, and that was done by

13   the State Board; wasn't it?

14        A.   Yes.

15        Q.   That's not SSAC doing that with your rule,   15:08:20

16   was it?

17        A.   No.

18        Q.   And I'm not sure whether I asked you or

19   not -- and maybe counsel will all object and tell

20   me I did.   15:08:38

21        But in terms of any sorts of

22   communications Bernie Dolan had with the

23   legislature or didn't have, any sort of e-mails

24   Bernie Dolan sent, any sort of communication, you

25   would defer to Mr. Dolan to speak for himself,   15:08:50

Page 133

1    would you not?

2        A.    Yes.

3        Q.    Thank you.  Appreciate it.

4        A.    Thank you.

5            MS. GREEN:  No further questions at this      15:08:58

6    time.  Thank you, all.

7            MR. TRYON:  Ms. Blatt, my name the David

8    Tryon.  I don't see my video coming up yet.

9    But anyways, my name is David Tryon, on behalf of

10   the State of West Virginia.  Thank you very much      15:09:12

11   for your time today.  We have no questions.  Thank

12   you.

13           THE WITNESS:  Thank you.

14           MS. GREEN:  Good afternoon, Ms. Blatt.  My

15   name is Susan Deniker.  I represent the Harrison      15:09:27

16   County Board of Education and Superintendent

17   Stutler.  Thank you for your time today.  I do not

18   have any questions.

19           THE WITNESS:  Thank you.

20           MS. MORGAN:  So I have a few clarifying        15:09:37

21   questions that I would like to ask Ms. Blatt.

22                       EXAMINATION

23   BY MS. MORGAN:

24       Q.    You were asked about the 2.0 rule, both by

25   plaintiff's counsel as well as counsel for SSAC.      15:09:48

Page 134

```
 1      And just want to clarify.

 2              That is a -- a rule that was promulgated

 3      by the West Virginia Board of Education; correct?

 4          A.   Yes.

 5          Q.   And it was -- it is to be implemented,      15:10:01

 6      enforced by who?

 7          A.   By this -- membership schools.

 8          Q.   Is that similar to what will happen in the

 9      future if a rule is promulgated by the Board of

10      Education?                                           15:10:19

11          A.   Yes.

12              MS. VEROFF:  Objection as to form.

13      BY MS. MORGAN:

14          Q.   Has the State Board of Education ever

15      discussed 3293 at a meeting -- discussed House       15:10:38

16      Bill, that it was codified, 3293, at a board

17      meeting?

18          A.   No, they have not.

19              MS. VEROFF:  Objection.  Asked and

20      answered.                                            15:10:51

21      BY MS. MORGAN:

22          Q.   Have they taken any vote or action?

23          A.   No, they have not.

24          Q.   Has the department received any complaints

25      about --                                             15:11:07
```

Page 135

```
 1            MS. VEROFF:  Object- --

 2            (Simultaneous speaking.)

 3            (Interruption in audio/video.)

 4     BY MS. MORGAN:

 5        Q.   -- stu- -- has the State Board of       15:11:12

 6     Education or the Department of Education received

 7     any complaints by any individuals about

 8     transgender athletes participating in sports?

 9        A.   No, we have not.

10        Q.   When --                                 15:11:29

11            MS. MORGAN:  Let's go off the record just

12     for a moment.

13            THE VIDEOGRAPHER:  Okay.  We're going off

14     the record.  The time is 3:11 p.m.

15            (Off the record.)                        15:12:01

16            THE VIDEOGRAPHER:  We're back on the

17     record at 3:12 p.m.

18            Go ahead.

19     BY MS. MORGAN:

20        Q.   Topic 8 states that it's about "Your     15:12:53

21     Policies, Documents and Communications Concerning

22     the separation of boys and girls in sports in West

23     Virginia prior to and following the passage of

24     H.B. 3293."  [As read]

25            Are -- are there any policies, documents  15:13:11
```

Page 136

1    or communications regarding that topic?

2         A.   No, we do not have any.

3         Q.   Did you prepare for that topic to testify

4    here today?

5         A.   Just in stating -- reviewing it, we do not    15:13:23

6    have anything that relates to that in a policy.

7         Q.   Okay.

8              MS. MORGAN:  It's all the questions I

9    have.

10             THE COURT REPORTER:  May we go off the       15:13:40

11   record, Counsel?

12             THE WITNESS:  Go off the record?

13             MS. MORGAN:  If everybody is done, I think

14   we are done here.  And she'll read.

15             THE VIDEOGRAPHER:  Okay, then.  We are off    15:13:52

16   the record at 3:13 p.m.  This ends today's test- --

17   testimony given by Michele Blatt.

18             The total number of media used was four,

19   and will be retained by Veritext Legal Solutions.

20             (Proceedings concluded, 3:13 p.m., EST, on

21   February 14, 2022.)

22

23

24

25

Veritext Legal Solutions
866 299-5127

```
 1                          JURAT

 2

 3           I, MICHELE BLATT, do hereby certify under

 4      penalty of perjury that I have read the foregoing

 5      transcript of my deposition taken remotely on the

 6      14th day of February, 2022; that I have made such

 7      corrections as appear noted herein in ink,

 8      initialed by me; that my testimony as contained

 9      herein, as corrected, is true and correct.

10

11           Dated this _____ day of _____, 2022,

12      at

13      _____.

14

15

16

17

18

19                        _____

                          MICHELE BLATT

20

21

22

23

24

25

                                          Page 138
```

CERTIFICATE OF REPORTER

1  

2          I, Hanna Kim, a Certified Shorthand

3    Reporter, do hereby certify:

4          That prior to being examined, the witness

5    in the foregoing proceedings was by me duly sworn

6    to testify to the truth, the whole truth, and

7    nothing but the truth;

8          That said proceedings were taken before me

9    at the time and place therein set forth and were taken

10   down by me in shorthand and thereafter transcribed

11   into typewriting under my direction and supervision;

12         I further certify that I am neither

13   counsel for, nor related to, any party to said

14   proceedings, not in anywise interested in the

15   outcome thereof.

16         Further, that if the foregoing pertains to

17   the original transcript of a deposition in a federal

18   case, before completion of the proceedings, review of

19   the transcript [X] was [ ] was not requested.

20         In witness whereof, I have hereunto

21   subscribed my name.

22   Dated:   3rd day of March, 2022

23  

24  

25         Hanna Kim, CLR, CSR No. 13083

                                                  Page 139