# Exhibit 20

IN THE UNITED STATES DISTRICT COURT

FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA

CHARLESTON DIVISION

* * * * * * * *

| | | |
|---|---|---|
| B.P.J., by her next friend and | * | |
| Mother, HEATHER JACKSON, | * | |
| Plaintiff | * | Case No. |
| vs. | * | 2:21-CV-00316 |
| WEST VIRGINIA STATE BOARD OF | * | |
| EDUCATION, HARRISON COUNTY | * | |
| BOARD OF EDUCATION, WEST | * | |
| VIRGINIA SECONDARY SCHOOL | * | |
| ACTIVITIES COMMISSION, W. | * | |
| CLAYTON BURCH in his official | * | CONFIDENTIAL |
| Capacity as State Superintendent, | * | VIDEOTAPED |
| DORA STUTLER in her official | * | VIDEOCONFERENCE |
| Capacity as Harrison County | * | DEPOSITION |
| Superintendent, PATRICK MORRISEY | * | OF |
| In his official capacity as | * | GERALD MONTANO, D.O. |
| Attorney General, and THE STATE | * | February 24, 2022 |
| OF WEST VIRGINIA, | * | |
| Defendants | * | |

Any reproduction of this transcript
is prohibited without authorization
by the certifying agency.

## Page 2

```
 1      CONFIDENTIAL VIDEOTAPED VIDEOCONFERENCE DEPOSITION
 2                          OF
 3    GERALD MONTANO, D.O., taken on behalf of the Defendant,
 4    State of West Virginia herein, pursuant to the Rules of
 5    Civil Procedure, taken before me, the undersigned, Lacey
 6    C. Scott, a Court Reporter and Notary Public in and for
 7    the State of West Virginia, on Thursday, February 24,
 8    2022, beginning at 10:06 a.m.
 9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
```

## Page 3

```
 1                    A P P E A R A N C E S
 2
 3    JOSHUA BLOCK, ESQUIRE
 4    American Civil Liberties Union Foundation
 5    125 Broad Street
 6    New York, NY  10004
 7         COUNSEL FOR PLAINTIFF
 8
 9    KATHLEEN R. HARTNETT, ESQUIRE
10    ANDREW BARR, ESQUIRE
11    ZOE HELSTROM, ESQUIRE
12    KATELYN KANG, ESQUIRE
13    Cooley, LLP
14    3 Embarcadero Center, 20th Floor
15    San Francisco, CA  94111-4004
16         COUNSELS FOR PLAINTIFF
17
18    SRUTI SWAMINATHAN, ESQUIRE
19    Lambda Legal
20    120 Wall Street, 19th Floor
21    New York, NY  10005-3919
22         COUNSEL FOR PLAINTIFF
23
24
```

## Page 4

```
 1              A P P E A R A N C E S (cont'd)
 2
 3    DAVID TRYON, ESQUIRE
 4    CURTIS R.A. CAPEHART, ESQUIRE
 5    State Capitol Complex
 6    Building 1, Room E-26
 7    Charleston, WV  25305
 8         COUNSEL FOR STATE OF WEST VIRGINIA
 9
10    ROBERTA F. GREEN, ESQUIRE
11    Shuman McCuskey Slicer, PLLC
12    1411 Virginia Street East
13    Suite 200
14    Charleston, WV  25301
15         COUNSEL FOR WEST VIRGINIA SECONDARY SCHOOL
16         ACTIVITIES COMMISSION
17
18    JEFFREY M. CROPP, ESQUIRE
19    Steptoe & Johnson
20    400 White Oaks Boulevard
21    Bridgeport, WV  26330
22         COUNSEL FOR HARRISON COUNTY BOARD OF EDUCATION and
23         HARRISON COUNTY SUPERINTENDENT DORA STUTLER
24
```

## Page 5

```
 1              A P P E A R A N C E S (cont'd)
 2
 3    KELLY C. MORGAN, ESQUIRE
 4    KRISTEN V. HAMMOND, ESQUIRE
 5    Bailey Wyant
 6    500 Virginia Street East
 7    Suite 600
 8    Charleston, WV  25301
 9         COUNSEL FOR WEST VIRGINIA BOARD OF EDUCATION and
10         SUPERINTENDANT W. CLAYTON BURCH
11
12    CHRISTIANA HOLCOMB, ESQUIRE
13    Alliance Defending Freedom
14    15100 North 90th Street
15    Scottsdale, AZ  85260
16         COUNSEL FOR INTERVENOR, LAINEY ARMISTEAD
17
18    TIMOTHY D. DUCAR, ESQUIRE
19    Law Office of Timothy D. Ducar
20    7430 East Butherus Drive, Suite E
21    Scottsdale, AZ  85260
22         COUNSEL FOR INTERVENOR, LAINEY ARMISTEAD
23
24
```

A P P E A R A N C E S (cont'd)

RONALD G. JONES, ESQUIRE
Jackson Kelly, PLLC
501 Grant Street, Suite 1010
The Union Trust Building
Pittsburgh, PA  15219
    COUNSEL FOR GERALD MONTANO, D.O.

EXHIBIT PAGE

PAGE

| NUMBER | DESCRIPTION | IDENTIFIED |
|---|---|---|
| 4 | Adolescent Medicine Evaluation | -- |
| 5 | Discharge Summary | -- |
| 6 | Outpatient Evaluations | -- |
| 7 | Outpatient Evaluations | -- |
| 8 | Adolescent Medicine Evaluation | -- |
| 9 | Progress Note | -- |
| 11A | Progress Note | -- |
| 11B | Progress Note | -- |
| 33 | Standards of Care for Health of Transexual, and Gender Nonconforming People | -- |
| 36 | Adolescent Medicine Questionnaire | -- |
| 37 | Doctor Note | -- |
| 38 | Doctor Note | -- |
| 39 | Doctor Note | -- |
| 40 | Procedure Note | -- |
| 42 | Doctor Note | -- |
| 43 | Doctor Note | -- |
| 45 | Confidential Disclosure Statement | -- |

I N D E X

DISCUSSION AMONG PARTIES        10 - 14
WITNESS: GERALD MONTANO, D.O.
EXAMINATION
   By Attorney Tryon            14 - 159
DISCUSSION AMONG PARTIES        159 - 161
CERTIFICATE                     162

OBJECTION PAGE

ATTORNEY                    PAGE
Block   18, 21, 27, 27, 35, 38, 39, 40, 41, 45, 47, 49,
58, 59, 59, 60, 62, 62, 65, 65, 68, 68, 73, 76, 76, 77,
78, 86, 94, 95, 95, 95, 97. 99, 99, 99, 108, 119, 149,
155

Jones   20, 21, 25, 27, 38, 39, 40, 41, 45, 46, 48, 49,
50, 51, 51, 53, 57, 57, 58, 59, 60, 60, 61, 62, 63, 64,
65, 66, 68, 68, 68, 72, 73, 73, 74, 76, 76, 76, 76, 77,
77, 78, 78, 85, 86, 88, 89, 89, 90, 91, 93, 94, 94, 95,
95, 95, 97, 99, 99, 109, 116, 117, 120, 120, 121, 121,
125, 126, 129, 131, 137, 141, 141, 142, 143, 146, 147,
148, 149, 151, 152, 155, 156

Page 10

S T I P U L A T I O N

----------------------------------------------------------

(It is hereby stipulated and agreed by and between
counsel for the respective parties that reading,
signing, sealing, certification and filing are not
waived.)

----------------------------------------------------------

P R O C E E D I N G S

----------------------------------------------------------

VIDEOGRAPHER:  We're now on the record.
My name is Jacob Stock.  I'm a Certified Legal Video
Specialist employed by Sargent's Court Reporting
Services.  The date today is February 24th, 2022.  The
current time reads 10:06 a.m.  This deposition is being
taken remotely by video conference.  The caption of this
case is in the the United States District Court for the
Southern District of West Virginia, Charleston Division.
BPJ by her next friend and mother, Heather Jackson,
versus West Virginia State Board of Education, et al.
Case number 2:21-CV-00316.  The name of the witness is
Gerald Montano, D.O.  Will the attorneys present state
their names and the parties they represent?
ATTORNEY TRYON:  This is David Tryon
representing the State of West Virginia.  Curtis

Page 11

Capehart, my colleague, is also on the line.
ATTORNEY BLOCK:  This is Josh Block,
representing the Plaintiff.  And I have other colleagues
on the line that will identify themselves.
ATTORNEY SWAMINATHAN:  This is Sruti
Swaminathan from Lambda Legal representing the
Plaintiff.
ATTORNEY HARTNETT:
This is Kathleen Hartnett from Cooley
representing the Plaintiff.
ATTORNEY KANG:  This is Katelyn Kang from
Cooley representing Plaintiff.
ATTORNEY JONES:  This is Ron Jones
representing Doctor Montano.
ATTORNEY CROPP:  My name is Jeffrey Cropp
of Steptoe & Johnson, representing Defendants Harrison
County Board of Education and Dora Stutler.
ATTORNEY HELSTROM:  This is Zoe Helstrom
from Cooley LLP representing the Plaintiff.
ATTORNEY DUCAR:  This is Timothy Ducar on
behalf of the intervenor.  Also on the line is my
colleague, Christiana Holcomb.  I'd like to note that I
am viewing the real time transcript and the intervenor
is not going to participate in the charges for that.

Page 12

ATTORNEY MORGAN:  This is Kelly Morgan on
behalf of the West Virginia Board of Education and
Superintendent Burch.  Also on phone is Kristen Hammond
with my office as well.  We do not need the real time or
a rough copy.
ATTORNEY GREEN:  This is Roberta Green
here on behalf of West Virginia Secondary School
Activities Commission.  We do not need the real time
feed nor do we want the rough copy of the transcript.
ATTORNEY DUCAR:  This is Tim Ducar once
again.  I didn't --- I didn't talk about the rough
draft, and we don't need that as well.
ATTORNEY BLOCK:  This is Josh Block for
Plaintiff again.  We don't need the real time either.
VIDEOGRAPHER:  And if that's everybody,
the court reporter can swear in the witness and we can
begin.
ATTORNEY BARR:  Sorry, this is Andrew
Barr for the Plaintiff.  I got kicked out of the room
and just reentered.  I'm with Cooley L.L.P.
VIDEOGRAPHER:  Okay.
---
GERALD MONTANO, D.O.,
CALLED AS A WITNESS IN THE FOLLOWING PROCEEDING, AND

Page 13

HAVING FIRST BEEN DULY SWORN, TESTIFIED AND SAID AS
FOLLOWS:
---
ATTORNEY TRYON:  Thank you.  Before we
actually get started, I was on muted --- I was mute ---
muted, so I meant to say there is a couple things we
wanted to hit right before we actually get started with
regard to how we're handling objections.  I think we can
do that with the witness present and in discussion with
Mr. Jones prior to this.  And as we have done in prior
depositions to make things smoothly, the same are the ---
what I would like to propose as far as how objections
are handled.  That the objections would be limited to
objections to form, objections to scope, specifically as
to that this doctor is not going to serve as an expert
witness and objections to terminology since we have
various terminology that each party prefers to use and
objections for privilege if the witness's counsel needs
to assert that.  Is that satisfactory to you, Mr. Block?
ATTORNEY BLOCK:  Yes, it is.
ATTORNEY TRYON:  And Mr. Jones, that's
satisfactory to you.
ATTORNEY JONES:  Yes, it is.
ATTORNEY TRYON:  And Mr. Jones, for some

Page 14

1 reason your picture is frozen for me.  That's okay, but
2 just FYI for your information.  Does anybody else have
3 any objection to that procedure?  Okay.  Then we will go
4 ahead and move forward.
5                          ---
6                    EXAMINATION
7                          ---
8 BY ATTORNEY TRYON:
9    **Q.   Mr. Montano, thank you very much for joining me**
10 **this morning.  I appreciate your time, I know your time**
11 **is valuable.  And I will try to make this as smooth and**
12 **move through this as quickly as possible.  So thank you**
13 **again?**
14    A.   You're welcome.
15    **Q.   First of all, who's there with you for the**
16 **record?**
17    A.   Ron Jones.  I'm sorry, my lawyer.
18    **Q.   And you are represented by counsel?**
19    A.   Yes.
20    **Q.   And who is that?**
21    A.   Ron Jones.
22    **Q.   Have you ever been deposed before?**
23    A.   Yes.
24    **Q.   Tell me about that.  What case was that in?**

Page 15

1    A.   It was regarding a case of whether or not to
2 allow one of my patients to proceed with
3 gender-affirming hormones because their parents
4 objected.
5    **Q.   When was that?**
6    A.   I recall 2018.
7    **Q.   And were you sued in that case?**
8    A.   No.
9    **Q.   Who was suing whom?**
10    A.   It wasn't a lawsuit, it was trying to determine
11 if this kid needed care, and I served as a witness.
12    **Q.   You served as an expert witness?**
13    A.   No, witness to that person's care.
14    **Q.   And what was the result of that?**
15    A.   The patient was allowed to get on
16 gender-affirming hormones.
17    **Q.   What hormones were those?**
18    A.   Testosterone.
19    **Q.   So that was a female who wanted to take**
20 **testosterone.**
21       **Is that right?**
22    A.   Can you repeat?
23    **Q.   Yes.**
24    A.   Can you repeat the question?

Page 16

1    **Q.   Yes, that was someone who --- a female that**
2 **wanted to take testosterone?**
3    A.   It was a --- someone who was assigned a female
4 at birth who identified as male.
5    **Q.   Have you been deposed any other times besides**
6 **that?**
7    A.   No.
8    **Q.   Have you ever been sued?**
9    A.   No.
10    **Q.   Have you ever testified at trial?**
11    A.   No.
12    **Q.   So as we go through here, just for everyone's**
13 **reference, we're in Federal Court, so the Federal Rules**
14 **of Civil Procedure apply here.  And Federal Rules of**
15 **Civil Procedure 30(c)(2) regarding objections says that**
16 **an objection at the time of examination, whether to**
17 **evidence to party's conduct or to the officer's**
18 **qualifications, to the manner of taking deposition or to**
19 **any other aspect of the deposition must be noted on the**
20 **record, but the examination still proceeds.  And we**
21 **discussed how we're going to do objections.**
22       **And Mr. Montano --- Doctor Montano, if your**
23 **counsel or any other lawyer objects, then you are still**
24 **required to answer unless instructed not to by your**

Page 17

1 lawyer.
2       **Do you understand that?**
3    A.   Yes.
4    **Q.   And I would ask you to make sure that you answer**
5 **verbally as opposed to nodding or shaking your head for**
6 **the court reporter's benefit.**
7       **Okay?**
8    A.   Yes.
9    **Q.   And if you don't understand a question, please**
10 **tell me and I will try and clarify my question.  And if**
11 **you answer the question, that indicates to me that you**
12 **do understand the question.**
13       **So do you understand that?**
14    A.   Yes.
15    **Q.   And finally, if you need a break, let me know**
16 **and we will do our best to break for you.  And the only**
17 **qualifications on that is that we can't take a break**
18 **while a question is pending.**
19       **All right?**
20    A.   Yes.
21    **Q.   So are you familiar with the subject of the**
22 **lawsuit that we're here for?**
23    A.   Yes.
24    **Q.   Are you familiar with the law that's involved,**

Page 18

1    commonly known as by some of us as Save Women's Sports
2    Act, also known as HB 3293?
3        A.   Yes.
4        Q.   Are you aware of who BPJ is?
5        A.   Yes.
6        Q.   What is your understanding of who BPJ is?
7        A.   She is the Plaintiff of that case.
8        Q.   Has BPJ been your client in the past?
9        A.   Yes.
10       Q.   Does BPJ continue to be your patient?
11       A.   No.
12       Q.   Do you know BPJ's full name?
13       A.   Yes.
14       Q.   Okay.
15            I understand there's some concern about using a
16   child's birth name in these circumstances, but can you
17   give me the full name as you understand it to be?
18            ATTORNEY BLOCK:  Objection.  Do you mean
19   --- do you want the name assigned at birth or do you
20   want the name that BPJ goes by?
21   BY ATTORNEY TRYON:
22       Q.   Give me the name that you use for BPJ?
23       A.   B█████ P█████r-J█████
24       Q.   But you're aware of the birth name.

Page 19

1        Correct?
2        A.   Yes.
3        Q.   Have you brought any documents to the deposition
4    today?
5        A.   Yes.
6        Q.   What documents have you brought?
7        A.   I brought medical records and also the
8    psychosocial assessment.
9            ATTORNEY JONES:  Just for the record,
10   this is Ron Jones, these are the records that were
11   provided.
12           ATTORNEY TRYON:  I'm sorry.  I didn't
13   hear you, Mr. Jones.
14           ATTORNEY JONES:  I'm sorry.  Can you hear
15   me now?
16           ATTORNEY TRYON:  Yes.
17           ATTORNEY JONES:  I said just for the
18   record these were the records that were provided by
19   counsel.
20           ATTORNEY TRYON:  Okay.
21           ATTORNEY JONES:  Based on the nature that
22   this is a virtual deposition.
23   BY ATTORNEY TRYON:
24       Q.   So the medical records that we have seen have

Page 20

1    your name on them and --- on many of them and some of
2    them say that you edited them or reviewed them or that
3    you were the author.  Is that a typical process?
4        A.   Yes.
5        Q.   And if it says that you were --- that you either
6    edited them or reviewed them or that you were the
7    author, is it safe to rely upon the accuracy of those
8    statements that you did so?
9        A.   Yes.
10       Q.   And when did you last review the documents that
11   you have --- let me rephrase that.  When is the last
12   time you reviewed the medical records for BPJ?
13       A.   This morning.
14       Q.   Have you gone through what you believed to be
15   all of the medical records for BPJ from your offices?
16       A.   Yes.
17       Q.   Are they correct?
18           ATTORNEY JONES:  Objection to form.  You
19   can answer.
20           THE WITNESS:  Yes.
21   BY ATTORNEY TRYON:
22       Q.   Is there anything you saw that's incorrect that
23   you need to correct before we review them.
24           ATTORNEY JONES:  Objection to form.  You

Page 21

1    can answer.
2            THE WITNESS:  Can you repeat the question
3    again?
4    BY ATTORNEY TRYON:
5        Q.   Yes.  Did you see anything in there during the
6    review that you believe is incorrect that you need to
7    correct before we review them?
8        A.   No.
9        Q.   Have you had any type of communications, whether
10   written or oral, with BPJ's lawyers?
11       A.   Yes.
12       Q.   When was the first time that you did?
13       A.   I don't recall the exact date, but I believe it
14   was early January.
15       Q.   Do you remember who you spoke with?  Let me
16   rephrase that.  What type of communication was it?
17       A.   It was a phone call.
18       Q.   Who was it with?
19       A.   Avatara Smith-Carrington.
20       Q.   And who initiated that phone call?
21       A.   Avatara or Ms. Smith Carrington.
22           ATTORNEY BLOCK:  Just objection.  Avatara
23   uses they/them pronouns.
24           THE WITNESS:  Thank you.

BY ATTORNEY TRYON:
1  Q.  What was discussed?
2  A.  What was discussed was that the lawyers from
3  West Virginia intended to depose me as a witness to
4  BPJ's case.
5  Q.  So what else was discussed?  Tell me about the
6  details of that conversation.
7  A.  They just summarized what was the nature of the
8  case and why they --- why the lawyers from West Virginia
9  wanted to talk to me about it.
10  Q.  What did you tell Avatara?
11  A.  I just said that, okay, what would I expect
12  next.
13  Q.  What were you told to expect?
14  A.  That they will contact me and request a
15  deposition and that's all that I recall.
16  Q.  Did they --- did ---?
17  ATTORNEY TRYON:  I'm sorry.  Josh, what
18  is the first name again.  Avatara?
19  ATTORNEY BLOCK:  Avatara.
20  ATTORNEY TRYON:  Can you spell that for
21  me?
22  ATTORNEY BLOCK:  Yes, A-V-A-T-A-R-A.
23  ATTORNEY TRYON:  Thank you.

BY ATTORNEY TRYON:
1  Q.  Did Avatara tell you what you should say in the
2  deposition?
3  A.  No.
4  Q.  Any other communications with Plaintiff's
5  attorneys?
6  A.  With --- if I can --- Sruti Swaminathan
7  regarding medical records.
8  Q.  When was that?
9  A.  As I recall, the end of January.
10  Q.  Was it a phone call or other communication?
11  A.  Phone call.
12  Q.  What happened in that phone call?
13  A.  Sruti asked about certain medical records and
14  where he can get them, and I directed her to the
15  Department that handles medical records.
16  Q.  Anything else?
17  A.  No.
18  Q.  Any other communications?
19  A.  None.
20  Q.  So only two communications with Plaintiff's
21  counsel?
22  A.  Yes.
23  Q.  Do you know a Doctor Kacie Kidd?

1  A.  Yes.
2  Q.  How do you know Doctor Kidd?
3  A.  I am one of her mentors when she was a fellow.
4  Q.  What does that mean to be a mentor?
5  A.  It means being an advisor on academic and career
6  advancement.
7  Q.  When is the last time you had any communications
8  with Doctor Kidd?
9  A.  As I recall, two weeks ago.
10  Q.  What was that communication?
11  A.  Can you rephrase the question?
12  Q.  Did you have a phone call or a written
13  communication with Doctor Kidd two weeks ago?
14  A.  Phone call.
15  Q.  And what was the subject of that phone call?
16  A.  How stressed we were about this case.
17  Q.  And who called whom?
18  A.  As I recall, she called me.
19  Q.  What else was discussed besides the fact that
20  you were both stressed about the case?
21  A.  That was all.
22  Q.  Was that before or after her deposition?
23  A.  I don't recall.
24  Q.  Did she tell you anything about her deposition?

1  A.  No.
2  Q.  Why was she stressed about this case?
3  A.  I think any physician being disposed (sic) can
4  be stressful.
5  Q.  And you said you were also stressed about this
6  case?
7  A.  Yes.
8  Q.  And why is that?
9  A.  Again, any physician who's deposed, it's always
10  a stressful experience.
11  Q.  Well, I will try to not to make this stressful
12  for you.  I'll try and do my best to give you
13  straightforward questions.  Anything else that was
14  discussed in that conversation?
15  A.  No.
16  Q.  Any other communications with Doctor Kidd in the
17  past two weeks?
18  ATTORNEY JONES:  Objection to form.
19  Regarding this matter?
20  ATTORNEY TRYON:  Yes regarding this
21  matter.
22  THE WITNESS:  None.
23  BY ATTORNEY TRYON:
24  Q.  So there's some things I want to understand that

Page 26

1  I have read during the course of this case that I think
2  you may have had some involvement with.  So do you know
3  what a ▉▉▉▉ is?
4       A.   Yes.
5       Q.   And can you tell me what that is?
6       A.   It is a form of pubertal blocker.
7       Q.   What chemical is in a ▉▉▉ implant?
8       A.   The general term would be a
9  gonadotropin-releasing hormone agonist.
10      Q.   I think I've seen the term ▉▉▉▉  What is
11 that?
12      A.   That is the generic term of the medication.
13      Q.   I understand that that's been FDA approved for
14 precocious puberty.
15           Is that right?
16      A.   Yes.
17      Q.   I have also seen that it is using it for a
18 puberty delay is an off-label use and is not FDA
19 approved.
20           Is that right?
21      A.   Can you be specific when you said not FDA
22 approved for which condition?
23      Q.   Sure.  It is my understanding it is not FDA
24 approved just for puberty delay but only for precocious

Page 27

1  puberty.
2           Is that right?
3           ATTORNEY BLOCK:  Objection to form.
4           THE WITNESS:  It is not FDA approved for
5  treating gender dysphoria.
6  BY ATTORNEY TRYON:
7       Q.   What is the significance of that?
8           ATTORNEY JONES:  Objection to form.
9           THE WITNESS:  I don't understand the
10 question.  Can you rephrase it?
11          ATTORNEY TRYON:  I'll move on.
12 BY ATTORNEY TRYON:
13      Q.   How does Histrelin work?  What does it do?
14      A.   So what it does, in simple terms, it blocks the
15 communication between the hypothalamus and the
16 pituitary.  And what that ultimately does is that it
17 stops the gonads from producing either testosterone and
18 estrogen, which are important hormones in puberty
19 development.
20      Q.   And the ▉▉▉▉ ▉▉▉▉ itself is --- well, tell
21 me what that is.
22          ATTORNEY BLOCK:  Objection to form.
23          ATTORNEY TRYON:  Go ahead.
24          THE WITNESS:  Can you rephrase the

Page 28

1  question?
2  BY ATTORNEY TRYON:
3       Q.   The actual ▉▉▉▉ is similar to a stick.
4            Is that right?
5       A.   Yes.
6       Q.   Can you describe the diameter and the length?
7       A.   It's about four centimeters.
8       Q.   Long?
9       A.   Yes.
10      Q.   Right --- okay.
11           And how thick is it?
12      A.   I estimate around five millimeters.
13      Q.   And how long does it work?
14      A.   It is FDA approved for one year, but studies
15 show that it could be extended into two.
16      Q.   And how much does it cost?
17      A.   It depends.  If it's the ▉▉▉ brand, it's
18 about $4,000.  The ▉▉▉▉ brand is $40,000.
19      Q.   Did you say 4-0 thousand?
20      A.   That is correct.
21      Q.   I have also read about a Nexplanon implant.
22 What is that?
23      A.   That is a form of birth control.
24      Q.   What chemical is used in the Nexplanon implant?

Page 29

1       A.   Etonogestrel.  And let me know if you want me to
2  spell that.
3       Q.   I've got it.  And that's FDA approved for
4  contraception.
5            Is that right?
6       A.   Yes.
7       Q.   That's not used for puberty delay, is it?
8       A.   No.
9       Q.   So let me go back and get some basic
10 information.  Give me your --- if you wouldn't mind
11 giving me your business address please?
12      A.   120 Lytton, L-Y-T, as in Timothy, T as in
13 Timothy, O-N, as in Nancy, Suite M, as in Michael, 060,
14 Pittsburgh PA, 15213.
15      Q.   What is your business number?
16      A.   Can you rephrase the question?
17      Q.   Do you have a work number?
18      A.   As in a phone number?
19      Q.   Yes.  Sorry.
20      A.   (412) 692-6356.
21      Q.   And I'm going to ask for your home number or
22 cell number, whichever is preferably, in the event that
23 for some reason you're not represented by counsel and we
24 need to get a hold of you.  That would be only if your

Page 30

1   counsel is --- if you are no longer represented would I
2   ever use this number.
3       A.   Cell phone number?
4       Q.   Yes.
5       A.   ████████
6       Q.   So on your website it shows that you are Board
7   Certified with the American Board of Pediatrics in
8   Pediatrics and Adolescent Medicine.
9           Is that accurate?
10      A.   Yes.
11      Q.   And when did you get that Board Certification?
12      A.   Can you clarify which one?
13      Q.   Oh, it's more than one?
14      A.   Yes.
15      Q.   Let's start with pediatrics.
16      A.   2013.
17      Q.   And Adolescent Medicine?
18      A.   2020.
19      Q.   What does it take to get Board Certification in
20  Pediatrics?
21      A.   You are required to go to medical school and
22  graduate and then you have to complete a three-year
23  residency in pediatrics in order to sit for the Boards.
24      Q.   Anything else?

Page 31

1       A.   Passing the exam.
2       Q.   And then for Adolescent Medicine, what do you
3   have to do for that?
4       A.   Not only do you have to go through or complete a
5   pediatric residency, you will need to complete an
6   adolescent medicine fellowship and a research project
7   during that time and then sit for the Boards and pass
8   it.
9       Q.   Is it a different set of Boards?
10      A.   Yes.
11      Q.   What is the significance of having a
12  certification in pediatrics?
13      A.   It verifies that you have the correct and
14  acceptable knowledge in your field.
15      Q.   Are there things that it enables you to do
16  professionally that otherwise you could not do?
17      A.   Technically you can practice without Board
18  Certification, but some hospitals will not allow you to
19  practice in their facility if you are not Board
20  Certified or at least Board Eligible.
21      Q.   I also read that you are the Medical Director on
22  the Gender and Sexuality Development Program at UPMC
23  Children's Hospital of Pittsburgh.
24          Is that correct?

Page 32

1       A.   Yes.
2       Q.   When did you become that --- when did you get
3   that title?
4       A.   As I recall, I believe it was 2018.
5       Q.   What do you do in that position?
6       A.   So I create a program and work with several
7   colleagues in delivering gender-affirming care and
8   oversee to make sure that is done in a correct manner.
9       Q.   When you say you create a program, can you tell
10  me what that means?
11      A.   That means create --- gathering a group of
12  professionals in mental health, in pediatrics and
13  nursing and basically discussing and creating what kind
14  of services we can provide for our patients.
15      Q.   In that position do you supervise others?
16      A.   Yes.
17      Q.   How many people do you supervise?
18      A.   Estimation currently, around nine people.
19      Q.   Do you see patients in that capacity?
20      A.   Yes.
21      Q.   And I read that you are also an Assistant
22  Professor of pediatrics at the University of Pittsburgh
23  School of Medicine.
24          Is that correct?

Page 33

1       A.   Yes.
2       Q.   When did you take that position?
3       A.   That would be in 2017.
4       Q.   What do you do in that position?
5       A.   So I'm primarily responsible for the teaching of
6   our residents and assisting in research.
7       Q.   When you say teach residents, is this in a
8   classroom setting?
9       A.   No.
10      Q.   Tell me about it then.
11      A.   So I teach residents in terms of inside the
12  clinic and supervise their care of the patients there.
13      Q.   Tell me about the clinic.
14      A.   Can you be more specific?
15      Q.   All right.  I will be.  Trying to understand
16  what --- what this clinic is, where it is, what it does,
17  how many patients it has.  Let's just start in general,
18  what does --- what's the name of the clinic?
19      A.   The Center for Adolescent and Young Adult
20  Health.
21      Q.   Where is it located?
22      A.   In the University Center at the same address as
23  where I work.
24      Q.   Are you employed by the Center for Adolescent

Page 34

1  and Young Adult Health?
2      A.  No, I'm employed by University of Pittsburgh
3  Physicians.
4      Q.  But you work at the Center for Adolescent and
5  Young Adult Health?
6      A.  Yes.
7      Q.  I'm just going to call that the clinic from now
8  on.  Does the clinic see patients there?
9      A.  Yes.
10     Q.  How many doctors see patients there?
11     A.  Counting how much ---?
12     Q.  Let me clarify my question.  How many doctors
13  are there that see patients there?
14     A.  By my estimation, around eight.
15         ATTORNEY TRYON:  So I hear somebody's
16  kids, I think.
17  BY ATTORNEY TRYON:
18     Q.  I don't know if that --- where that's at.  Is
19  that where you're at Doctor Montano?
20     A.  No.
21         ATTORNEY BLOCK:  They're mine.  Sorry.
22         ATTORNEY TRYON:  That's okay, Josh.  I
23  was wondering if they were somewhere in my office.  But
24  that's okay, Josh.  You do what you got to do.

Page 35

1  BY ATTORNEY TRYON:
2      Q.  So about how many patients come through there in
3  a week?
4      A.  I don't know.
5      Q.  Would it be 10, 20, 100?
6      A.  I don't know.  I don't keep count of that.
7      Q.  What is the funding for the clinic --- let me
8  rephrase that.  Where does the funding come from for the
9  clinic?
10         ATTORNEY BLOCK:  Objection, scope.
11         ATTORNEY TRYON:  Go ahead.  I'm just
12  trying to --- I'm just trying understand.  Let me
13  actually ask a different question.
14  BY ATTORNEY TRYON:
15     Q.  Is the clinic separate or is it part of a larger
16  organization?
17     A.  It's part of a larger organizations.
18     Q.  Which is what?
19     A.  UPMC Children's Hospital of Pittsburgh.
20     Q.  Is that the only place where you see patients,
21  at the clinic, that is?
22     A.  No.
23     Q.  Where else do you see patients?
24     A.  At the Student Health Center at University of

Page 36

1  Pittsburgh.
2      Q.  Any other place where you see patients?
3      A.  No.
4      Q.  On your website it says that you received your
5  medical degree from Kansas City University of Medicine
6  in bioscience.
7          Is that right?
8      A.  Yes.
9      Q.  And when was that?
10     A.  2010.
11     Q.  And your master's degree in clinical research
12  from the University of Pittsburgh.
13         Is that right?
14     A.  Yes.
15     Q.  And when was that?
16     A.  2016.
17     Q.  Is there a particular major or emphasis that you
18  had in your master's degree?
19     A.  Clinical research.
20     Q.  Okay.
21         And then it says that you completed a
22  pediatrics residency at Saint John Children's Hospital.
23         Is that right?
24     A.  Yes.

Page 37

1      Q.  And when did you complete that residency?
2      A.  2013.
3      Q.  And then your fellowship in adolescent medicine
4  at UPMC Children's Hospital, Pittsburgh.
5          Is that right?
6      A.  Yes.
7      Q.  What year was that?
8      A.  2016.
9      Q.  And your post-doctoral research --- sorry.  You
10  were a post-doctoral research scholar in primary care
11  research at the University of Pittsburgh.
12         Right?
13     A.  Yes.
14     Q.  When was that?
15     A.  From 2014 to 2016.
16     Q.  What does that mean to be a research scholar?
17     A.  You get training on how to conduct research
18  under supervision from a mentor.
19     Q.  On your website it says that your interests
20  include increasing healthcare access for transgender and
21  gender-diverse youth and advocating for government and
22  systems policies that protect and enhance their health
23  and wellbeing.  Is that accurate as stated on your
24  website?

Page 38

1    A.   Yes.
2    Q.   And what government policies do you advocate in
3    this context?
4    A.   Any government policies that would make any
5    transperson's environment a safe place to be.
6    Q.   Are there any specific government policies that
7    you have either advocated for or against?
8         ATTORNEY JONES:  Objection to form.
9         ATTORNEY BLOCK:  Same.
10        THE WITNESS:  Can you rephrase the
11   question?
12   BY ATTORNEY TRYON:
13   Q.   Sure.  You indicate that one of your interests
14   is advocating for government policies that protect and
15   enhance the health and wellbeing of gender-diverse youth
16   and transgender youth.  My question is have you actually
17   advocated for any particular government policies?
18   A.   For, no.
19   Q.   Against?
20   A.   Yes.
21   Q.   Did you advocate against HB 3293?
22   A.   No.
23   Q.   What government policies did you advocate
24   against?

Page 39

1    A.   I don't recall the bill number, but it was a law
2    in Pennsylvania that would prevent transgender girls
3    from playing in women's sports.
4    Q.   What did you do --- excuse me.  What did you do
5    to advocate against that law?
6         ATTORNEY BLOCK:  Objection to scope.
7         ATTORNEY JONES:  Same.
8         THE WITNESS:  Should I answer ---?
9         ATTORNEY JONES:  If you understand the
10   question.
11        THE WITNESS:  Yes, I understand the
12   question.  I testified in the Pennsylvania Assembly.
13   BY ATTORNEY TRYON:
14   Q.   When was that?
15   A.   I believe August 2021.
16   Q.   Have you been asked to be an expert witness in
17   this case?
18   A.   Yes.
19   Q.   When were you asked to be an expert witness in
20   this case?
21   A.   Around August 2021.
22   Q.   Did you agree to be an expert witness in this
23   case?
24   A.   Yes.

Page 40

1         ATTORNEY BLOCK:  Objection to form.
2    BY ATTORNEY TRYON:
3    Q.   Do you anticipate submitting an expert report in
4    this case?
5    A.   No.
6    Q.   Why not?
7         ATTORNEY JONES:  Objection to form.
8         ATTORNEY TRYON:  You can answer.
9         THE WITNESS:  I wasn't requested to.
10   BY ATTORNEY TRYON:
11   Q.   Do you anticipate testifying as an expert in
12   this case?
13   A.   No.
14   Q.   And why not?
15   A.   I wasn't asked to.
16   Q.   Have you --- so I'm trying to understand this
17   because you said you agreed to be an expert witness in
18   this case, but you don't anticipate testifying.  Has
19   that request been withdrawn?
20   A.   Just to be clear, which case are you referring
21   to?
22   Q.   Maybe we're confused.  I'm talking the BPJ case.
23   Have you been asked --- let me start over then.  Have
24   you been asked to testify --- sorry.  Have you been

Page 41

1    asked to serve as an expert witness in the BPJ case?
2         ATTORNEY BLOCK:  Objection to form.
3         ATTORNEY JONES:  Same.  You can answer.
4         THE WITNESS:  No.
5    BY ATTORNEY TRYON:
6    Q.   Thank you.  That's --- I was confused there.  I
7    apologize if I caused that confusion.
8         I presume you're licensed to practice medicine.
9    Which states would you be --- are you licensed to
10   practice in?
11   A.   Pennsylvania.
12   Q.   Any others?
13   A.   No.
14   Q.   I understand you're a member of the American
15   Academy of Pediatrics.
16        Is that correct?
17   A.   Yes.
18   Q.   And what is the American Academy of Pediatrics?
19   A.   It is a professional organization of
20   pediatricians.
21   Q.   What does it take to be a member?
22   A.   You have to be a healthcare professional that
23   deals with pediatrics and you pay a fee to be a member.
24   Q.   Why did you join?

1     A.   It will help me network with other providers and

2    it's a good learning opportunity because they also offer

3    conferences.

4     Q.   Do you do anything else in there besides attend

5    conferences and network?

6     A.   No.

7     Q.   I understand you're also a member of the Society

8    for Adolescent Health and Medicine.

9       Is that right?

10    A.   Yes.

11    Q.   What is that?

12    A.   That is another professional organization and

13   they specialize or focus on the adolescents' and young

14   adults' health.

15    Q.   How is it different from the American Academy of

16   Pediatrics?

17    A.   Their focus.  So in the AAP, the American

18   Academy of Pediatrics, they look at all pediatrics,

19   which include the age of 18, but in Society of

20   Adolescent Health and Medicine it could be anywhere

21   between 9 to 26-year-olds.  So they have different laps

22   or different scopes.

23    Q.   What does it take to be a member of that?

24    A.   You have to be some sort of professional or

1    someone who has interest in adolescent and young adult

2    health and pay a membership fee.

3     Q.   You said professional.  So that would include

4    any kind of professional or just medical professionals?

5     A.   It could be any serving professionals like

6    therapists or nurses.

7     Q.   Why did you join that one?

8     A.   Again, for networking opportunities, learning

9    opportunities, and camaraderie.

10    Q.   You are the Treasurer/Secretary for the Ohio

11   Valley Society of Adolescent Medicine.  What is that?

12    A.   So that is a regional organization that is

13   focusing on the health of adolescent and young adult

14   health, but this time within the areas of southwestern

15   Pennsylvania, eastern Ohio, West Virginia and Kentucky,

16   basically the Ohio Valley area.

17    Q.   Are you a member of WPATH?

18    A.   No.

19    Q.   Why not?

20    A.   I have not had the chance to join.

21    Q.   Are you a member of any other organizations?

22    A.   That's about it.

23    Q.   Where do you currently work?

24    A.   At the Center for Adolescent Youth and Health.

1     Q.   Which is the clinic.

2       Right?

3     A.   Yes.

4     Q.   Where else do you work?

5     A.   The student health center at University of

6    Pittsburgh.

7     Q.   And where else?

8     A.   That's all.

9     Q.   So you are an assistant professor at the

10   University of Pittsburgh.  Do you not work there?

11    A.   I will make a correction.  I do work at the

12   University of Pittsburgh as well.

13    Q.   Any place else?

14    A.   That's all.

15    Q.   Okay.

16       And so you are currently a treating physician.

17    Right?

18    A.   Yes.

19    Q.   Tell me about the areas of your medical

20   practice.

21    A.   Can you rephrase the question?

22    Q.   Sure.  I mean, I can kind of infer that you ---

23   your medical practice is for adolescents and youth and

24   children.  Would that much be accurate?

1     A.   Yes.

2     Q.   Is it beyond that?  Do you treat or diagnose

3    adults?

4     A.   I treat young adults.

5     Q.   So what age group or age range of people do you

6    treat?

7     A.   Anywhere between 9 to up to 26 years old.

8     Q.   What types of medical issues or problems

9    diseases, disorders, do you see the most?

10       ATTORNEY BLOCK:  Objection to form.

11       ATTORNEY JONES:  Same.

12       THE WITNESS:  Can you rephrase the

13   question?

14   BY ATTORNEY TRYON:

15    Q.   I'm trying to understand the scope of your

16   practice.  Is it just --- is it anything that 9 to

17   26-year-olds encounter or do you limit your practice?

18    A.   I don't limit my practice, so yes, I see many of

19   the medical issues for anyone between 9 to 26 years old.

20    Q.   So do you treat people for cold, flu, ear

21   infections, those types of things?

22    A.   Yes.

23    Q.   And mental health issues?

24    A.   Yes.

Page 46

1    Q.   Would that include bipolar issues?
2    A.   No.
3    Q.   How about chronic depression?
4    A.   Yes.
5    Q.   How about things like bulimia?
6    A.   Yes.
7    Q.   Borderline personality disorder?
8    A.   Yes.
9    Q.   Urinary tract infection?
10   A.   Yes.
11   Q.   Gender dysphoria?
12   A.   Yes.
13   Q.   How much of your time is spent on --- as a
14   treating physician versus other parts of your
15   professional work?
16   A.   I would say about 80 percent.
17   Q.   And that 80 percent, would that include
18   supervising other doctors or is that separate?
19   A.   It includes supervising other doctors.
20   Q.   When patients come to you they sometimes
21   probably already have a self diagnosis or what they
22   think they have.
23        Is that right?
24        ATTORNEY JONES:  Objection to form.

Page 47

1         THE WITNESS:  Can you rephrase the
2    question? I don't understand.
3    BY ATTORNEY TRYON:
4    Q.   Sure.  When patients come to you they I presume
5    describe their symptoms.
6         Right?
7    A.   Yes.
8    Q.   And when they do that they tell you I think I
9    have X, Y, Z ---
10        ATTORNEY BLOCK:  Objection to form.
11   BY ATTORNEY TRYON:
12   Q.   --- illness or problem?
13        ATTORNEY BLOCK:  Objection to form.
14        THE WITNESS:  Can you rephrase that
15   question? I don't understand.
16   BY ATTORNEY TRYON:
17   Q.   Sometimes when I go to my doctor I say I'm
18   experiencing these symptoms and I think this is what it
19   is.  I think I've got a cold or I think I have got --- I
20   don't know Parkinson's disease or something.  And then
21   the doctor will either say yes, no, maybe, need to run
22   more tests.  Tell me about when patients come to you.
23   Do they just give you their symptoms and say what's
24   wrong with me or do they sometimes say I think this is

Page 48

1    what's wrong with me, am I right or am I wrong?
2    A.   It would be the former.  They would tell me what
3    they are experiencing and then I ask additional
4    questions and make further assessments and
5    recommendations based on what I see in the history and
6    the physical exam.
7    Q.   So for example, if they come to you and say I
8    think I have --- nobody comes to you and says I think I
9    have the flu?
10        ATTORNEY JONES:  Objection to form.
11        THE WITNESS:  Can you rephrase that
12   question?
13   BY ATTORNEY TRYON:
14   Q.   Has anyone come to you and say --- and said I
15   think I have chronic depression?
16   A.   Yes.
17   Q.   Do you take that at face value or do you ask
18   further questions?
19   A.   I ask further questions.
20   Q.   So that's what I'm referring to as a self
21   diagnosis.  Someone comes to you and says I think I have
22   chronic depression.  Can you tell me how often people
23   come in to you, youth come in to you with a self
24   diagnosis?

Page 49

1         ATTORNEY BLOCK:  Objection to form.
2         ATTORNEY JONES:  Objection to form.
3         THE WITNESS:  I don't know what
4    percentages that would be.
5    BY ATTORNEY TRYON:
6    Q.   You indicated you are involved in diagnosing and
7    treating what is typically known as gender dysphoria.
8         Is that right?
9    A.   Yes.
10   Q.   What percentage of your practice involves that
11   type of medical issue?
12   A.   By my estimation, around 70 to 80 percent.
13   Q.   And how often do these types of patients come to
14   you with a self diagnosis saying I think I have gender
15   dysphoria?
16   A.   I don't know that number.
17   Q.   Does it happen?
18   A.   Yes.
19   Q.   Would you estimate it's more than ten percent?
20   A.   I don't know.
21   Q.   But you recall that some have done that.
22        Right?
23   A.   Yes.
24   Q.   And of those that do self diagnose with gender

Page 50

1    dysphoria, have you ever come up with a different
2    diagnosis for them?
3        A.   Yes.
4        Q.   What are some alternative diagnoses that you
5    have given?
6        A.   Eating disorders.
7        Q.   Anything else?
8        A.   That's as I recall.
9        Q.   How many times has that happened?
10       A.   I don't know the percentages.
11       Q.   As far as is it 1, 2, 20, not in percentage but
12   absolute numbers?
13       A.   That I do not know.
14       Q.   Could it be just one?
15       A.   That I don't know.
16       Q.   So when you mention eating disorders, were you
17   thinking of a particular case?
18            ATTORNEY JONES:  Objection to scope.
19            THE WITNESS:  I don't understand the
20   question.
21   BY ATTORNEY TRYON:
22       Q.   Well, I asked you of those that self diagnose
23   with gender dysphoria issues, have you ever come up with
24   a different diagnosis.  You said yes.  And I asked you

Page 51

1    what and you said eating disorders.  So I'm asking you
2    was that a specific patient you recall?
3        A.   No.
4        Q.   Do you remember any specific patients where
5    you've given them a different diagnosis?
6        A.   Yes.
7        Q.   How many?
8        A.   That number I don't know off the top of my head.
9        Q.   Well, you're thinking of one person at least.
10   Was it more than one?
11            ATTORNEY JONES:  Objection.  Asked and
12   answered.
13   BY ATTORNEY TRYON:
14       Q.   Go ahead.
15       A.   Can you repeat the question?
16       Q.   I said you were thinking of one person at least.
17   Do you recall more than one?
18       A.   Yes.
19            ATTORNEY JONES:  Same objection.
20   BY ATTORNEY TRYON:
21       Q.   Do you recall more than five?
22       A.   No.
23       Q.   Let me ask about the --- let me start that over.
24   Let me ask you about the intake process for new

Page 52

1    patients.  How does that happen?  Does a new patient
2    call in or is a new patient referred to you?
3        A.   It's a combination of both.
4        Q.   When that happens and they --- who gathers
5    information on this person --- on this patient first?
6    Would that be you or a secretary or a nurse?
7        A.   Initially it would be the schedulers to get
8    their basic information.  That would be the first point
9    of contact.
10       Q.   And does the scheduler then set up something in
11   a system with the patient's name and information?
12       A.   Yes.
13       Q.   What is that system?
14       A.   Can you clarify the question?
15       Q.   Sure.  Is there a particular software that is
16   used?
17       A.   Yes.
18       Q.   What is that?
19       A.   Epic, currently.
20       Q.   How long has it been Epic?
21       A.   For our clinic, since 2020.  February of 2020.
22       Q.   Before 2020 what was it?
23       A.   Cerner.
24       Q.   Sorry?

Page 53

1        A.   Cerner, C-E-R-N-E-R.
2        Q.   Now, you said you see patients outside the
3    clinic.
4        Right?
5        A.   Yes.
6        Q.   Sorry.  Where is that again?
7        A.   The University of Pittsburgh Student Health
8    Center.
9        Q.   Does that use the same system?
10       A.   No.
11       Q.   What system does that use?
12            ATTORNEY JONES:  Objection, scope.
13            ATTORNEY TRYON:  Let me back up.
14   BY ATTORNEY TRYON:
15       Q.   Let me ask you this question because ultimately
16   I just want to focus on BPJ.  So BPJ came to see you at
17   the clinic or at the University of Pittsburgh?
18       A.   At the clinic.
19       Q.   So at the clinic, if I understand correctly, the
20   scheduler will set up the initial record.
21       Is that right?
22       A.   Yes.
23       Q.   And then when the patient comes in will there be
24   additional information sought from the patient?

Page 54

1   A.  The social worker usually calls the patient
2   beforehand to get a sense of what that patient's needs
3   are.
4       Q.  And then what happens?
5       A.  And then the social work team provides me with
6   that information on the electronic medical records that
7   would help me put things into context.
8       Q.  So the social worker calls the patient and
9   inputs --- talks to the patient and inputs information
10  into the system.
11          Is that right?
12      A.  Yes.
13      Q.  At some point the patient comes into the clinic.
14          Right?
15      A.  Yes.
16      Q.  I suppose especially during COVID that sometimes
17  these things are handled remotely.  Did that happen
18  during the COVID period?
19      A.  Yes.
20      Q.  Now, does a nurse meet with the patient before
21  you do or are you the first contact?
22      A.  The medical assistant --- let me back up.  I
23  apologize.  It's the schedulers that first meet the
24  patients when they register and they check in the

Page 55

1   clinic.
2       Q.  And then what happens?
3       A.  Then the medical assistant comes out and take
4   the patient's vitals and a short history of their
5   complaints and their medications.
6       Q.  When you say medical assistant, can you tell me
7   what that means?
8       A.  That would be a professional who helps take
9   vitals and rooms the patient.
10      Q.  Is that --- would a nurse be a medical
11  assistant?
12      A.  Sometimes.
13      Q.  Other than nurses, who would be medical
14  assistants?
15      A.  Anyone with a certification in medical
16  assistance.
17      Q.  So is the term medical assistant an actual
18  title?
19      A.  Yes.
20      Q.  If there are other --- if there are prior
21  medical providers, would the medical assistant or the
22  scheduler get those records or get any records from
23  prior medical providers before you see the patient?
24      A.  Yes.

Page 56

1       Q.  How would that process happen?
2       A.  Typically, the patient would request to forward
3   the medical records to our office.
4       Q.  Now, I just want to make sure I understand one
5   thing about the systems that are being used.  Before
6   February 2020, the Cerner system was used.  And then
7   when you --- when the clinic started using Epic, were
8   all of the records transferred from Cerner into Epic?
9       A.  Not all.
10      Q.  Which ones were not?
11      A.  Typically, it would be phone conversations.
12  Those are not usually transferred over.
13      Q.  So the clinic's use of Epic, is that tied into
14  other medical providers besides just the clinic?
15      A.  I don't understand the question.
16      Q.  Sure.  Epic has an ability to, as I understand
17  it, to tie systems together from various hospitals or
18  other medical providers, whether it's individual doctors
19  or clinics.  Are you aware of that capability of Epic?
20      A.  Yes.
21      Q.  And so my question is with respect to the
22  clinics' use of Epic, is it tied into any other medical
23  providers or hospitals or systems besides just the
24  clinics?

Page 57

1       A.  They have something called Care Everywhere and
2   so that allows them to gain or obtain records from other
3   facilities.
4       Q.  And do you know what the clinic is tied into,
5   what other facilities through Care Everywhere?
6       A.  Can you rephrase that question?  I don't
7   understand.
8       Q.  Sure.  So in the Epic system at the clinic, can
9   you access records from say the West Virginia ---
10  University of West Virginia Medicine?
11      A.  Sometimes.
12      Q.  Why only sometimes?
13      A.  Not everyone shares their records.  So it is not
14  always consistent.
15          ATTORNEY JONES:  Objection.  I think
16  we're getting off track, off scope.  So objection to the
17  scope.
18  BY ATTORNEY TRYON:
19      Q.  What information do you need to make a diagnosis
20  of a problem?
21          ATTORNEY JONES:  Objection.
22  BY ATTORNEY TRYON:
23      Q.  Let me be more specific.  What are objective
24  symptoms?

1    ATTORNEY JONES:  Objection to form.
2    ATTORNEY BLOCK:  Objection to form.
3    THE WITNESS:  Can you rephrase the
4  question?
5  BY ATTORNEY TRYON:
6    Q.   When I say an objective symptom, do you know
7  what that means?
8    A.   It doesn't make sense, the term objective
9  symptom.
10    Q.   Do you know what a subjective symptom is?
11    A.   Yes.
12    Q.   What's a subjective symptom?
13    A.   Basically a symptom that the patient reports.
14    Q.   Is there any way to measure subjective symptoms?
15    A.   It depends.
16    Q.   On what?
17    A.   The type of symptom.
18    Q.   Can you tell me of a symptom that you can
19  measure, a subjective symptom that you can measure?
20    A.   Depression.
21    Q.   How do you measure depression?
22    A.   We --- in our practice we do what we call a
23  Patient Health Questionnaire.  It's a series of
24  questions that describes or measures the severity of

1  depression.
2    Q.   But isn't that still asking the patient
3  subjectively the patient's subjective feelings?
4    A.   Yes.
5    Q.   Would an objective symptom be something you
6  could observe externally such as a broken arm through an
7  x-ray?
8    ATTORNEY BLOCK:  Objection to form.
9    THE WITNESS:  Yes.
10  BY ATTORNEY TRYON:
11    Q.   What's --- is the intake process for someone
12  coming to you with gender dysphoria issues different
13  than a person coming to you for other types of medical
14  issues?
15    ATTORNEY JONES:  Objection to
16  terminology.
17    ATTORNEY BLOCK:  Same.
18    THE WITNESS:  Can you rephrase the
19  question?
20  BY ATTORNEY TRYON:
21    Q.   So you've indicated that you treat patients for
22  a lot of different things, and I'm just interested if
23  there is a different intake process for someone with
24  gender dysphoria as opposed to any other types of

1  issues?
2    ATTORNEY JONES:  Same objections.
3    THE WITNESS:  Is there a different way
4  you can ask that question?
5  BY ATTORNEY TRYON:
6    Q.   When someone calls to you, speak to the
7  scheduler and they have gender dysphoria issues, what do
8  they typically tell the scheduler?
9    ATTORNEY BLOCK:  Objection to form.
10    ATTORNEY JONES:  Same.
11    THE WITNESS:  Is there another way you
12  could phrase that question?
13  BY ATTORNEY TRYON:
14    Q.   Tell me about the term gender dysphoria.  What
15  does that mean to you?
16    A.   That is a distressing feeling an individual has
17  when their gender identity does not match their physical
18  body.
19    Q.   How do you typically get patients that have
20  issues with gender identity?
21    A.   There are two ways.  You may have another
22  provider refer that patient to me or they come to my
23  clinic on their own volition.
24    Q.   When they come to your clinic on their own

1  volition, do you know what they say to the scheduler?
2    A.   In our typical practice, they would basically
3  say they have gender issues.
4    Q.   Does the scheduler handle people who say they
5  have gender issues any differently than any other types
6  of medical issues?
7    ATTORNEY JONES:  Objection to form.  If
8  you understand, you can answer.
9    THE WITNESS:  No, they don't treat them
10  any differently.
11  BY ATTORNEY TRYON:
12    Q.   Are you familiar with the term gender
13  nonconformity?
14    A.   Yes.
15    Q.   And how do you describe gender nonconformity?
16    A.   That is when someone's mannerisms and behaviors
17  do not conform to what a society's view of gender.
18    Q.   Do you have patients come to you who only have
19  gender nonconformity but not gender dysphoria?
20    A.   Yes.
21    Q.   How do you distinguish between those?
22    A.   You talk to the patient.
23    Q.   You talk to the patient and how do you make a
24  determination which it is?

Page 62

1    A.   Typically, for example, if a patient wears
2 skirts and they say, well, I still identify as the sex
3 assigned at birth, so in this case male, then that would
4 be more gender nonconforming.
5    Q.   So the distinction is if they say they identify
6 as male or female, that's the distinction?
7         ATTORNEY BLOCK:  Objection to form.
8         ATTORNEY JONES:  Objection.
9         THE WITNESS:  Is there another way you
10 can ask that question?
11 BY ATTORNEY TRYON:
12    Q.   So a male --- in your hypothetical, a male comes
13 in and says I have got a --- I am wearing a skirt, but I
14 still identify as a male.  Then that person would have
15 gender nonconformity.
16         Is that right?
17    A.   Yes.
18    Q.   But if that same person said I identify as a
19 female, then that person would have gender dysphoria.
20         Is that right?
21         ATTORNEY BLOCK:  Objection to form.
22         THE WITNESS:  Can you rephrase that
23 question?
24 BY ATTORNEY TRYON:

Page 63

1    Q.   In what you just told me, if a patient comes in
2 who is a male wearing a skirt and says I identify as a
3 male, that person you said would have gender
4 nonconformity.  But if that person instead says I
5 identify as a female, then would that mean that person
6 has gender dysphoria?
7         ATTORNEY JONES:  Objection to form.
8         THE WITNESS:  Not always, because that's
9 not how we determine that.
10 BY ATTORNEY TRYON:
11    Q.   Okay.
12         So how do you determine that?
13    A.   Which one?  Can you be specific?
14    Q.   The child or person comes in, is a male wearing
15 a skirt, says I identify as a female.  How would you
16 determine if that person has gender dysphoria or gender
17 nonconformity?
18    A.   We do an assessment when we ask the patient some
19 questions about their behaviors.  And they would have
20 their parents, too, so we would also interview the
21 parents, to get a sense of this person's behavior.  And
22 then, based on what the patient tells us and our
23 objective findings, then we make the determination if
24 this person may be suffering from gender dysphoria or

Page 64

1 this person is just gender nonconforming.
2    Q.   Do you have a list of questions?
3    A.   Yes.
4    Q.   Is that list of questions on the Epic system?
5    A.   Yes.
6    Q.   Is it a form that you give to the patient?
7         ATTORNEY JONES:  Objection to form.
8         THE WITNESS:  I understand the question.
9 No, we don't give that form to the patient.
10 BY ATTORNEY TRYON:
11    Q.   Are there any qualifications for a medical
12 professional to give a diagnosis of gender dysphoria?
13    A.   Can you be --- can you rephrase that question?
14 I don't understand.
15    Q.   Sure.  Can just any doctor give a diagnosis of
16 gender dysphoria or do they have to have some other
17 qualifications?
18    A.   What do you mean by qualifications?
19    Q.   Professional qualifications.
20    A.   To answer that question, there isn't a
21 certification or degree or anything of that sort for
22 qualifications.  But in terms of training and the
23 ability to do so, there are some recommendations that
24 they should have to make that diagnosis.

Page 65

1    Q.   Who gives those recommendation?
2    A.   WPATH and the Endocrine Society.
3    Q.   What is the purpose of getting a diagnosis of
4 gender dysphoria?
5         ATTORNEY JONES:  Objection to form.
6         THE WITNESS:  Is there a different way
7 you could ask that question?
8 BY ATTORNEY TRYON:
9    Q.   Sure.  Is it necessary for some purpose that a
10 person receive a diagnosis of gender dysphoria?
11         ATTORNEY BLOCK:  Objection to form.
12         THE WITNESS:  Is there a different way
13 you can ask that question?
14 BY ATTORNEY TRYON:
15    Q.   Let me give you an example.  Before I had my
16 appendix taken out, the doctor needs to do a diagnosis
17 that says that I need to get my appendix taken out.  So
18 that diagnosis of a problem with my appendix, whatever
19 it is, is necessary for the operation.  Is there any
20 need for a diagnosis of gender dysphoria or is it just
21 something that people come to understand what's wrong
22 with them, not wrong, but what's different about them?
23         ATTORNEY BLOCK:  Objection to form.
24         ATTORNEY TRYON:  That's not even the

Page 66

1  right way to say it.
2  BY ATTORNEY TRYON:
3      Q.   That there's something about them that they are
4  trying to understand, is that the only purpose of a
5  diagnosis of gender dysphoria?
6          ATTORNEY JONES:  Objection to form.
7          THE WITNESS:  I understand the question.
8  It is actually both.  Some people are looking to
9  understand what's going on and at the same time in order
10  to receive any treatment in the healthcare system they
11  need a diagnosis.
12  BY ATTORNEY TRYON:
13      Q.   How many of your patients --- let me try and
14  establish the right terminology from your perspective.
15  As far as gender dysphoria, is it considered a medical
16  condition?
17      A.   No.
18      Q.   What is it considered?
19      A.   It's a mental health condition.
20      Q.   I'm sorry.  You said it's a mental health
21  condition?
22      A.   Yes.
23      Q.   The patients that you see with gender dysphoria,
24  how often is it that they've already been diagnosed with

Page 67

1  gender dysphoria versus a first-time approach to you
2  asking you about the --- this condition?
3      A.   I don't know the exact numbers off the top of my
4  head.
5      Q.   Can you give me an approximation?
6      A.   That, I don't know.
7      Q.   Are you familiar with the concept of watchful
8  waiting?
9      A.   Yes.
10      Q.   Have you ever told any of your patients about
11  watchful waiting?
12      A.   No.
13      Q.   So you never recommended that to anyone?  Is
14  that a true statement?
15      A.   Yes.
16      Q.   What do you know about the concept of watchful
17  waiting?
18      A.   It's a concept in which you do not do any
19  interventions for the child to see how the gender
20  dysphoria may worsen or improve without it.
21      Q.   What's your under --- basis of your
22  understanding of the concept of watchful waiting?
23      A.   I don't understand the question.
24      Q.   Where have you learned your information about

Page 68

1  watchful waiting?
2      A.   I learned it in --- when I read about the
3  guidelines or when I talk to my colleagues or in
4  professional conferences because this is something that
5  is discussed amongst us.
6      Q.   Any particular papers you've read on it?
7      A.   That, I don't recall which particular papers.
8      Q.   Did you read the original Dutch study?
9          ATTORNEY BLOCK:  Objection to scope.
10          ATTORNEY JONES:  Objection to scope.
11  BY ATTORNEY TRYON:
12      Q.   Did you read the original Dutch study?
13          ATTORNEY BLOCK:  Objection to form.
14          ATTORNEY JONES:  Objection to form.  Go
15  ahead.
16          THE WITNESS:  I'm aware of the Dutch
17  study.
18  BY ATTORNEY TRYON:
19      Q.   Did you read it?
20          ATTORNEY JONES:  Same objections.
21          THE WITNESS:  Is there any way you could
22  ask that question differently?
23  BY ATTORNEY TRYON:
24      Q.   You said you were aware of the Dutch study.  I'm

Page 69

1  asking if you read it?
2      A.   That I don't recall the exact details.
3      Q.   So you don't recall reading it?
4      A.   Correct.
5      Q.   When you give the diagnosis of gender dysphoria,
6  you said sometimes that's necessary for treatment.  What
7  treatment would that be necessary for?
8      A.   Can you rephrase the question?
9      Q.   Are there treatments which require a diagnosis
10  of gender dysphoria?
11      A.   Yes.
12      Q.   What are those treatments?
13      A.   That would include puberty blockers,
14  gender-affirming hormones and surgeries and even mental
15  health treatments.
16      Q.   Are you familiar with the WPATH standards of
17  care?
18      A.   Yes.
19          ATTORNEY TRYON:  Jacob, can you bring up
20  --- actually, no, I think I can do this.
21          ATTORNEY BLOCK:  David, it has been about
22  an hour and a half.  I just wanted to see if anyone
23  needs a break.
24          ATTORNEY TRYON:  Yeah, if we want to take

Page 70

1    a break we can take a break now.  Or keep on going,
2    whatever you prefer.
3           THE WITNESS:  I could take a break.
4           ATTORNEY TRYON:  And I'll be going past
5    lunchtime.  I'm probably halfway through.  So we can
6    consider whether or not we want to take lunch or keep
7    going all the way through.  But we can talk about that
8    later.  Why don't we take a five-minute break right now?
9           THE WITNESS:  Thank you.
10          VIDEOGRAPHER:  Going off the record.
11   Current time reads 11:37 a.m.
12   OFF VIDEOTAPE
13           ---
14   (WHEREUPON, A SHORT BREAK WAS TAKEN.)
15           ---
16   ON VIDEOTAPE
17          VIDEOGRAPHER:  Back on the record.
18   Current time reads 11:45 a.m.
19          ATTORNEY TRYON:  Okay.
20          I'm going to try and share Exhibit 33
21   here.  Jacob, do I just click on sharing or open?
22          VIDEOGRAPHER:  Right.
23          ATTORNEY JONES:
24          Is this the --- for clarification, is

Page 71

1    this the documents that you just sent to me?
2           ATTORNEY TRYON:  These are documents ---
3    this is document from before.  It's the standards of
4    care for WPATH.
5           ATTORNEY JONES:  Okay.
6           VIDEOGRAPHER:  You will hit open and then
7    that opens it for you.  And then you'll hit start and
8    that shares it with everyone.
9           ATTORNEY TRYON:  Okay.
10          So I hit start.  Do people see standards
11   of care?
12          THE WITNESS:  Yes.
13   BY ATTORNEY TRYON:
14      Q.   Great.  You're familiar with WPATH's Standards
15   of Care.
16          Right?
17      A.   Yes.
18      Q.   And the most recent version is the 7th version.
19          Is that right?
20      A.   Yes.
21      Q.   So you can see at the top up here --- and you
22   can zoom in on your own, I believe, if it's too small.
23   It says 7th version Standards --- under Standards of
24   Care.

Page 72

1           Do you see that?
2       A.   Yes.
3       Q.   So I would like to go to page 11.  No, that's
4    not the right page.  Sorry.
5           ATTORNEY JONES:  I'm just going to object
6    to the scope.  Just making a standing objection.
7           ATTORNEY TRYON:  Okay.
8           This is the page I want to ---.
9    BY ATTORNEY TRYON:
10      Q.   So take a look at page 11 there.  And this is
11   directly relevant to this situation, and ask you a
12   question about the first two paragraphs.
13      A.   I have read it.
14      Q.   Let me know when you are ready to discuss those.
15      A.   I'm ready.
16      Q.   Okay.
17          So in the first paragraph under the title
18   differences between children and adolescents with gender
19   dysphoria it says that gender dysphoria during childhood
20   does not inevitably continue into adulthood rather in
21   follow-up studies of prepubertal children, mainly boys,
22   who were referred to clinics for assessment of gender
23   dysphoria, the dysphoria persisted into adulthood were
24   only 6 to 23 percent of children.  Boys in these studies

Page 73

1    more likely to identify as gay in adulthood than as
2    transgender.  My question is do you ever disclose this
3    information to your patients?
4           ATTORNEY JONES:  Objection to form.
5           THE WITNESS:  Is there a different way
6    you could ask that question?
7    BY ATTORNEY TRYON:
8       Q.   Pardon me?
9       A.   Is there a different way you can ask that
10   question, meaning --- what I mean is that specific
11   information or the fact that not every one ends up being
12   trans?
13      Q.   Do you disclose to any of your patients that
14   prepubertal children with gender dysphoria that
15   statistically it only persists into adulthood for only 6
16   to 23 percent of children?
17          ATTORNEY BLOCK:  Objection to form.
18          ATTORNEY JONES:  Objection to form.
19          THE WITNESS:  To answer your question, I
20   don't cite those statistics.  I just say that it is a
21   possibility.
22   BY ATTORNEY TRYON:
23      Q.   So you tell your patients that is a possibility
24   that gender dysphoria may not persist into adulthood.

Page 74

1    **Is that a fair statement?**
2    A.   Yes.
3    **Q.   Do you tell all of your patients that?**
4    A.   Yes.
5    **Q.   Do you give them any percentages at all?**
6    A.   No.
7    **Q.   Do you just say it is a possibility?**
8    A.   Yes.
9        ATTORNEY JONES:  Objection to form.
10   BY ATTORNEY TRYON:
11   **Q.   Do any of your --- okay.**
12   **Are there standards that you use --- we're done**
13   **with that exhibit for now.  Are there standards that you**
14   **use for diagnosing gender dysphoria?**
15   A.   By standards, do you mean guidelines?
16   **Q.   Yes.**
17   A.   Yes.
18   **Q.   What's the source of those guidelines?**
19   A.   And by guidelines do you mean like position
20   papers or which organizations?
21   **Q.   Yes.**
22   A.   I use several, including WPATH, the Endocrine
23   Society and the University of California, San Francisco
24   Guidelines.

Page 75

1    **Q.   Do you use DSM-V?**
2    A.   Yes.
3    **Q.   Now, I have not heard of the University of**
4    **California, San Francisco Guidelines.  What are those?**
5    A.   They are a set of guidelines on how to work and
6    manage people with gender dysphoria.
7    **Q.   Are those different from DSM-V as far as**
8    **diagnosing gender dysphoria?**
9    A.   No DSM-V focuses on criteria for diagnosis where
10   UCSF focuses more on medical management.
11   **Q.   Is there anything different between DSM-V and**
12   **WPATH?**
13   A.   None to my knowledge.
14   **Q.   Is there any difference between the DSM-V**
15   **Guidelines and the Endocrine Society Guidelines?**
16   A.   None to my knowledge.
17   **Q.   Who came up with standards for DSM-V?**
18   A.   From an organizational perspective, it would be
19   American ---.
20   **Q.   I'm afraid I didn't hear you.**
21   A.   It would be the American Psychological
22   Association who writes the DSM-V.
23   **Q.   And is there a particular group within the**
24   **American Psychological Association that writes the**

Page 76

1    **standards?**
2        ATTORNEY JONES:  Objection to scope.
3        THE WITNESS:  There is.  I just don't
4    know the exact name of that group.
5    BY ATTORNEY TRYON:
6    **Q.   Fair enough.  Do you know if there is an**
7    **approval process for those standards?**
8        ATTORNEY BLOCK:  Objection to scope.
9        ATTORNEY JONES:  Objection to scope.
10       THE WITNESS:  From my knowledge, yes,
11   there's an approval process.
12   BY ATTORNEY TRYON:
13   **Q.   Are there disputes about those standards?**
14       ATTORNEY JONES:  Objection to scope.
15       ATTORNEY BLOCK:  Objection to scope.
16       ATTORNEY JONES:  And objection to form.
17   BY ATTORNEY TRYON:
18   **Q.   Are you aware of any disputes as to those**
19   **standards?**
20       ATTORNEY JONES:  Objection to scope and
21   objection to form.
22       THE WITNESS:  By dispute, do you mean
23   some mild disagreement in how this is done or like a
24   rift?

Page 77

1    BY ATTORNEY TRYON:
2    **Q.   Well, let's start with a rift.  Are you aware of**
3    **any rifts in the medical community which dispute the**
4    **methodology of DSM-V for diagnosing gender dysphoria?**
5        ATTORNEY BLOCK:  Objection to the scope.
6    This is a lay witness.
7        ATTORNEY JONES:  He's not an expert in
8    this.  He's made that perfectly clear.  I'm going to
9    instruct him not to answer.  We're getting into expert
10   testimony.
11       ATTORNEY TRYON:  Well, no it's not expert
12   testimony, but maybe I'll lay a foundation a little bit
13   differently for you.
14   BY ATTORNEY TRYON:
15   **Q.   So you use DSM-V.  Are there other standards out**
16   **there that you could use that disagree with DSM-V?**
17       ATTORNEY JONES:  Objection to form.
18       THE WITNESS:  There isn't any other set
19   of criteria that would oppose DSM-V, if that's the word
20   you use.
21   BY ATTORNEY TRYON:
22   **Q.   It is different for adults and adolescents and**
23   **children in DSM-V.**
24   **Right?**

Page 78

1    ATTORNEY BLOCK: Objection to form.
2    ATTORNEY JONES: Objection to form.
3    THE WITNESS: Can you rephrase the
4  question?
5  BY ATTORNEY TRYON:
6    Q.  The standards for diagnosing gender dysphoria is
7  different for adults and adolescents and children under
8  DSM-V.
9    Right?
10    A.  Yes.
11    Q.  Are you ---?
12    ATTORNEY JONES:  Again, I think that
13  we're getting off track here.  And I hate to make this
14  speaking objection, but you're asking him differences in
15  standards of care and he's here to talk about the care
16  and the treatment of BPJ.  I think you can ask him about
17  his care and treatment of BPJ, but I think you're
18  getting off track with the scope.
19    ATTORNEY TRYON:  Yeah.  And just to be
20  clear, we're establishing what sort of the baseline,
21  which I think is totally appropriate here.  I'm going to
22  keep on moving on.
23    ATTORNEY JONES:  Well, I think --- I
24  think you can ask him what he used for his baseline.

Page 79

1    ATTORNEY TRYON:  I think I have just done
2  that, but keep on moving.
3    ATTORNEY JONES:  I'll keep on objecting.
4    ATTORNEY TRYON:  Okay.
5  BY ATTORNEY TRYON:
6    Q.  So let's talk about BPJ.  Do you have any
7  personal relationship with BPJ or BPJ's family?
8    A.  Personal relationship?  No.
9    Q.  And how did the professional relationship with
10  BPJ or BPJ's family start?
11    A.  They made an appointment to see me at the
12  clinic.
13    Q.  Do you remember when that was?
14    A.  July 15th, 2019.
15    Q.  Was that when they made the appointment or when
16  the appointment actually was?
17    A.  That's the actual date of the appointment.
18    Q.  Do you know how that appointment was made,
19  whether it was through a referral or just a direct phone
20  call or something else?
21    A.  It was a self referral --- I correct myself.
22    Q.  I'm sorry.  There's some interference.  I
23  couldn't hear you.
24    A.  I recall that a pediatrician referred them.

Page 80

1    Q.  What pediatrician referred them?
2    A.  I don't recall the name of the pediatrician.
3    Q.  Do you remember that first visit?
4    A.  Yes.
5    Q.  Tell me about that.
6    A.  Can you be more specific?
7    Q.  Do you remember when you first saw them, their
8  appearances?
9    A.  Yes.
10    Q.  Who was there?
11    A.  B█████ --- BPJ and her mother.
12    Q.  Did someone see them on that --- let me back up.
13  You saw them at the clinic.
14    Is that right?
15    A.  Yes.
16    Q.  Did someone at the clinic see them before you
17  did?
18    A.  No.
19    Q.  Not even the scheduler?
20    A.  I correct myself.  So if you meant like another
21  professional than me, no.  But if yes, they did --- the MA
22  as part of the check-in process.
23    Q.  As part of the check-in process would another
24  medical professional have then taken BPJ's vitals and

Page 81

1  other information?
2    A.  Yes.
3    Q.  Before you met BPJ and the mother --- the mother
4  is Heather Jackson.
5    Is that right?
6    A.  Yes.
7    Q.  And before you met with them did you have any
8  written materials to look at before you actually met
9  with them in person?
10    A.  By written materials do you mean like previous
11  medical records.
12    Q.  Either previous medical records or any
13  information that had been typed into the system by
14  anyone else?
15    A.  I have reviewed those ---.
16    Q.  I'm sorry.  You're breaking up.  I can't hear
17  you.
18    ---
19  (WHEREUPON, AN OFF RECORD DISCUSSION WAS HELD.)
20    ---
21  BY ATTORNEY TRYON:
22    Q.  Let's go back.
23    A.  Can you remind me what was the last question?
24    Q.  I'm thinking here.  Before you --- let me ask a

Page 82

1  different question. So you actually met with them in
2  person as opposed to a televisit.
3       Right?
4  A. Yes.
5  Q. And before you actually met with them, did you
6  review anything --- any --- either medical records or
7  anything that any of your assistants or staff had typed
8  into the system?
9  A. Yes.
10 Q. What did you review?
11 A. One of the things I reviewed was the social work
12 note that, as I had told earlier, usually calls the
13 patient before we see them.
14 Q. Do you remember what was in those social worker
15 notes?
16 A. Basically for that note they said they tried
17 contacting that patient and they didn't pick up.
18 Q. Anything else that you reviewed that was in
19 writing?
20 A. Just the patient's vitals and the reason why
21 they're here.
22 Q. So tell me about that visit. When you first met
23 with them, did Heather Jackson speak first or did BPJ
24 speak first?

Page 83

1  A. I believe that BPJ spoke first.
2  Q. What did BPJ tell you?
3  A. As I recall, she was --- she told me that she
4  was concerned about going into puberty.
5  Q. Anything else that you can recall as you sit
6  here?
7  A. That's the initial thing I recall.
8  Q. How about Heather Jackson, do you remember
9  anything that she said?
10 A. Not without looking at my notes.
11 Q. Fair enough. Do you remember anything that you
12 told them?
13 A. Yes.
14 Q. What did you tell them?
15 A. I counseled them about all --- you know, what
16 would the visit look like and what kind of options are
17 available and how we could help them. That's part of my
18 custom and practice.
19 Q. At that time did you ask questions in order to
20 determine if BPJ should be diagnosed with gender
21 dysphoria?
22 A. Yes.
23 Q. Did BPJ tell you that BPJ had gender dysphoria?
24 A. No.

Page 84

1  Q. Did Heather tell you that?
2  A. No.
3  Q. At that time did you do a psychodiagnostic
4  assessment of BPJ?
5  A. I did a psychosocial evaluation.
6  Q. Is that different than a psychodiagnostic
7  assessment?
8  A. Yes.
9  Q. How is that different?
10 A. Because I am asking more questions about the
11 context of that patient and it's not necessarily to make
12 a diagnosis.
13 Q. Did you do a psychiatric assessment?
14 A. Can you clarify? What do you mean by
15 psychiatric assessment?
16 Q. Yes, I can. Let me go back to Exhibit 33. Do
17 you see that on your screen?
18 A. No.
19     VIDEOGRAPHER: Attorney Tryon, did you
20 hit the start button? There you go.
21 BY ATTORNEY TRYON:
22 Q. Let me know when you see that.
23 A. I see --- there we go.
24 Q. Okay.

Page 85

1  I want to go to page 15. Okay. This is in the
2  WPATH Standards of Care, page 15, item two. It says
3  assessment of gender dysphoria and mental health should
4  explore the nature and characteristics of a child's or
5  adolescent's gender identity. A psychodiagnostic and
6  psychiatric assessment covering the areas of emotional
7  functioning, peer and other social relationships and
8  intellectual functioning, slash, school of achievement
9  should be performed. Did you do either --- did you do
10 that psychiatric assessment as described here?
11 A. Yes.
12 Q. What did that entail?
13 A. So in adolescent medicine you ask questions
14 about that person's school life and how they are doing
15 in their grades. You screen for any depression. You
16 ask about their eating behaviors. You ask about any
17 substance use and potential for violence in the home,
18 any concerns about their sexual orientation or gender
19 identity and smoking habits and the relationships or at
20 least observe the relationships between their family
21 members.
22 Q. Is that what you consider a psychiatric
23 assessment?
24     ATTORNEY JONES: Objection to form.

Page 86

1    THE WITNESS:  I understand the question.
2    By defined at the WPATH the psychiatric assessment, if
3    they describe the emotional functioning, peer and social
4    relationships and school achievements, then yes, I did
5    something like that.
6    BY ATTORNEY TRYON:
7    **Q.    But you indicated I think that a**
8    **psychodiagnostic assessment is different.**
9        **Is that right?**
10       ATTORNEY BLOCK:  Objection to form.
11       ATTORNEY JONES:  Objection to form.
12   BY ATTORNEY TRYON:
13   **Q.    You can answer.**
14   A.    From what I understand when you first asked the
15   question, but if reading that and say that a
16   psychodiagnostic and psychiatric assessment includes
17   those things that I ask, then that would be a
18   psychodiagnostic exam.
19   **Q.    And how did you document your assessment?**
20   A.    There's a form that the patient filled out and I
21   verified.
22   **Q.    I'm trying to post Exhibit 36.  Let me know when**
23   **you see that.**
24   A.    I can see it.

Page 87

1    **Q.    Is this the form that you are referring to?**
2    A.    Yes.
3    **Q.    Did --- do you know who filled this out?**
4    A.    BPJ did.
5    **Q.    Did BPJ fill this out in your presence?**
6    A.    I don't recall.
7    **Q.    What is the source of this form?**
8    A.    By source do you mean like who created the form
9    or ---?
10   **Q.    Created this form?**
11   A.    The American Medical Association.
12   **Q.    Let me ask you, up in the upper right-hand**
13   **corner here --- just to make sure I understand some of**
14   **the things on this --- it shows DOS 7/15/2019.  That**
15   **means the date of service.**
16       **Is that right?**
17   A.    Yes.
18   **Q.    And this was the first visit you had with BPJ**
19   **and Heather Jackson?**
20   A.    Yes.
21   **Q.    And then I see in that same area, Epic FIN, and**
22   **then number.  What is that?**
23   A.    That is the financial information number.  It
24   helps with billing.

Page 88

1    **Q.    Down lower, under what would you like to talk**
2    **about today and it says other, explain AFAB, do you see**
3    **that?**
4    A.    Yes.
5    **Q.    What does AFAB mean?**
6    A.    The acronym I'm familiar with is assigned female
7    at birth.
8    **Q.    Under self it says --- the third question there,**
9    **if you could change one thing about your life or**
10   **yourself would it be --- it says to be a girl, which is**
11   **--- I presume BPJ wrote that.**
12       **Is that right?**
13   A.    Yes.
14   **Q.    Did you explore why BPJ wanted to be a girl?**
15   A.    Can you clarify?  What do you mean by exploring?
16   **Q.    Did you ask BPJ why BPJ would like to be a girl?**
17       ATTORNEY JONES:  Objection to form and
18   terminology.
19       THE WITNESS:  In my practice I don't ask
20   the reasons someone wants to be a girl.  What I ask is
21   what are the features or what are the behaviors that
22   would be consistent in saying that I am a girl or that
23   patient is a girl.
24   BY ATTORNEY TRYON:

Page 89

1    **Q.    And did you ask BPJ that?**
2    A.    Yes.
3    **Q.    What did BPJ tell you?**
4    A.    That she was afraid of going through puberty
5    because she does not want to be a boy, that she dresses
6    as a girl, that she doesn't like her own body, that she
7    prefers people use she/her pronouns and use the name
8    B███, that, as I said, she dresses in a way that is
9    consistent with being a girl, like the clothing, the
10   hairstyle, and that she identifies as a girl.
11   **Q.    And why did BPJ --- why was BPJ afraid of being**
12   **a boy?**
13       ATTORNEY JONES:  Objection to form.
14       ATTORNEY BLOCK:  Object to form.
15       THE WITNESS:  I can answer that question.
16   Because she didn't identify as a boy.
17   BY ATTORNEY TRYON:
18   **Q.    What was --- what was BPJ afraid of?**
19       ATTORNEY JONES:  Objection to form.
20   Asked and answered.
21       THE WITNESS:  Can you repeat that
22   question?
23   BY ATTORNEY TRYON:
24   **Q.    You said she was afraid of going through puberty**



Page 90

1  because she does not want to be a boy.  Why was she
2  afraid of going through puberty?
3      A.  ████████████████████████████████████
   ████████████████████████████████████
   ████████████████████████████████████
   ████████████████████████████████████
   ████████████████████████████████████
   ████████████████████████████████████
   ████████████████████████████████████
   ████████████████████████████████████
12  BY ATTORNEY TRYON:
13      Q.  Is that a word that you would use or a word that
14  BPJ actually used?
15      A.  That is from my own observation.
16      Q.  ████████████████████████████████████
   ████████████████████████████████████
   ████████████████████████████████████
   ████████████████████████████████████
22      Q.  Did BPJ --- strike that.
23          Did you ask BPJ what it means in BPJ's mind to
24  be a girl?

Page 91

1          ATTORNEY JONES:  Form.
2          THE WITNESS:  Is there a different way
3  you can ask that question?
4  BY ATTORNEY TRYON:
5      Q.  In the form it says if you could change one
6  thing about your life or yourself would it be, BPJ wrote
7  to be a girl.  Did you ask BPJ what it meant to be a
8  girl?
9      A.  If you mean from an existential point, no.
10     Q.  Did you ask anything else --- you may have
11  already answered part of this.  I apologize if I'm ---
12  if I'm asking the same thing.  Did you ask BPJ --- let
13  me --- and forgive me if I'm asking you to repeat
14  yourself.  Did you ask BPJ what characteristics of being
15  a girl that BPJ wanted?
16     A.  I may have to look at my notes to refresh my
17  memory.
18     Q.  What notes are those?
19     A.  The medical records on the day I saw her.
20     Q.  I see.  Okay.  We'll get to those in a bit then.
21  Do you have any handwritten notes from your visit with
22  BPJ and Heather Jackson that day?
23     A.  No.
24     Q.  So the only notes would be what are in the

Page 92

1  system.
2          Right?
3      A.  Yes.
4      Q.  Let's go to the second page here.  Do you see
5  under development there's some questions there?
6      A.  Yes.
7      Q.  Did you discuss issues under this category with
8  BPJ?
9      A.  Yes.
10     Q.  Tell me about those discussions.
11     A.  So the two main questions I ask that is custom
12  and part of my practice is if you --- what parts of your
13  body do you feel most uncomfortable with.  And then if
14  there are anything you would change to make your body
15  fit with who --- with that person's or patient's gender
16  identity.
17     Q.  And what was BPJ's response?
18     A.  ████████████████████████████████████
   ████████████████████████████████████
21     Q.  The next --- well, I don't know how to
22  characterize this, but it says I am romantically or
23  sexually attracted to boys, ████████████████.  Did
24  you ask BPJ about that?

Page 93

1      A.  No, I didn't expand upon that.
2      Q.  ████████████████████████████████████
   ████████████████████████████████████
   ████████████████████████████████████
   ████████████████████████████████████
6  BY ATTORNEY TRYON:
7      Q.  ████████████████████████████████████
   ████████████████████████████████████
   ████████████████████████████████████
   ████████████████████████████████████
   ████████████████████████████████████
   ████████████████████████████████████
14     Q.  Why do you ask that?
15     A.  It provides me a level of that patient's mental
16  health.
17     Q.  Ultimately, did you, in fact, diagnose BPJ with
18  gender dysphoria or not?
19     A.  Yes, I diagnosed her with gender dysphoria.
20     Q.  Has anyone else previously or after, to your
21  knowledge, diagnosed BPJ with gender dysphoria?
22     A.  Do you mean as in like a second opinion?
23     Q.  I don't know if I would call it second opinion
24  or not.  I want to know if you know of anyone else

1    that's actually made a formal diagnosis of gender
2    dysphoria for BPJ?
3        A.   That I do not know.
4        Q.   I have been told that there's something called
5    --- that gender identity is fluid.
6        Is that right?
7            ATTORNEY BLOCK:  Objection to form.
8            ATTORNEY JONES:  Form and terminology.
9            ATTORNEY TRYON:  Let me back up.
10   BY ATTORNEY TRYON:
11       Q.   What does the term gender identity mean?
12       A.   Gender identity is an immutable characteristic
13   of someone's feeling of either being a woman or a man or
14   something in between or another gender, which could be a
15   combination of bio, psychosocial, societal expectations
16   and their own sense of what their gender identity is.
17       Q.   Can gender identity be fluid?
18           ATTORNEY JONES:  Objection to form.
19           THE WITNESS:  It cannot be fluid.  It is
20   immutable.
21   BY ATTORNEY TRYON:
22       Q.   So if another medical professional said that
23   gender identity is fluid, that person would be wrong in
24   your estimation?

1            ATTORNEY JONES:  Objection to scope.
2    He's not here as an expert.
3    BY ATTORNEY TRYON:
4        Q.   You can answer.
5        A.   I would say they're using --- that would be
6    incorrect definition of what gender identity is.
7        Q.   I've also been told that gender identity
8    evolves.  Are you saying --- is that right or wrong?
9            ATTORNEY BLOCK:  Objection to the form.
10   BY ATTORNEY TRYON:
11       Q.   Or that it can evolve.  Would that be right or
12   wrong.
13           ATTORNEY BLOCK:  Objection to form.
14           ATTORNEY JONES:  And scope.
15           THE WITNESS:  Can you clarify what do you
16   mean by evolve?
17   BY ATTORNEY TRYON:
18       Q.   Change over time.
19       A.   No.
20       Q.   Have you ever --- is gender identity something
21   that is observable externally or only what some person
22   feels?
23           ATTORNEY BLOCK:  Objection to form.
24           ATTORNEY JONES:  Form.  You can answer.

1            THE WITNESS:  That is something that a
2    person only knows.
3            ATTORNEY TRYON:  Jacob, I'm trying to
4    find the documents used previously.  Trying to find
5    Exhibit 4.
6            VIDEOGRAPHER:  Give me one moment here.
7    That would be --- 4 would be in the one marked 1 through
8    9.  Correct?
9            ATTORNEY TRYON:  Correct.
10           VIDEOGRAPHER:  Okay.
11           It should be shared with you.  You might
12   see it in a folder labeled shared with you.
13           ATTORNEY TRYON:  Shared with group.
14   There we go.  Okay.
15           Jacob, is there a way to get through here
16   without clicking the arrow button so I can get through
17   faster?
18           VIDEOGRAPHER:  You can highlight the
19   number and type in, you know, whatever number page you
20   want to go to.
21           ATTORNEY TRYON:  Thank you.
22           Okay.  This is Exhibit 4.
23   BY ATTORNEY TRYON:
24       Q.   Can you see that, Doctor Montano?

1        A.   I cannot see it.
2        Q.   Oh, let me know when you see it.
3        A.   It's loading.  Sorry.
4        Q.   That's okay.
5        A.   I see it.
6        Q.   Do you recognize this document?
7        A.   Yes.
8        Q.   What is it?
9        A.   That is the physical documentation when I first
10   saw BPJ.
11       Q.   How is this form filled out?  Do you see this
12   form just like this on the system and you type in your
13   information or is this just a separate internal form
14   that then populates this?
15       A.   It's the template within the electronic medical
16   record.
17       Q.   Are you saying this is the actual template or
18   there is a template that you --- on the system that you
19   type into which then populates this form?
20           ATTORNEY BLOCK:  Objection to form.
21           ATTORNEY JONES:  Objection to form.
22           THE WITNESS:  Is there --- can you
23   rephrase that question?
24   BY ATTORNEY TRYON:

Page 98

1    Q.   Yeah.  I'm just trying to understand.  When you
2  --- when --- you don't fill things out in paper, right?
3  You do it right on the computer.
4       Is that correct?
5    A.   Yes.
6    Q.   And when you pull up --- go to enter information
7  on the computer, does the document look like this
8  Exhibit 4?
9    A.   Yes, it's like a pre-form template that I use.
10   Q.   And what's the source of the template?  Is it
11 something that you developed or that UPMC developed or
12 something that Epic developed or something else?
13   A.   It's a template I developed.
14   Q.   Is this form in the Epic system now?
15   A.   Yes.
16   Q.   And more than form.  I guess I should say ---
17 rephrase that.  Is this actual document in the Epic
18 system?
19   A.   Are you referring to WV 4?
20   Q.   Yes.
21   A.   Yes.  It's in the electronic medical record
22 system.
23   Q.   At the top here it has got the designation of
24 male.

Page 99

1       Do you see that?
2    A.   Yes.
3    Q.   Why does it say male?
4    A.   Because that is the legal sex of the patient.
5    Q.   Is there any other reason that the designation
6  of male should be in here?
7       ATTORNEY BLOCK:  Objection to form.
8       ATTORNEY JONES:  Objection to form.
9       THE WITNESS:  From my custom and
10 practice, it's important to know what organs that person
11 has.  So it's a good thing to know.
12 BY ATTORNEY TRYON:
13   Q.   Does that mean that BPJ is a biological male?
14      ATTORNEY BLOCK:  Objection to form.
15      ATTORNEY JONES:  Objection to form.
16      THE WITNESS:  The way I would describe it
17 is that B███ or BPJ was assigned male at birth.
18 BY ATTORNEY TRYON:
19   Q.   Does the term biological male have a meaning?
20      ATTORNEY BLOCK:  Objection to form.
21      THE WITNESS:  To answer your question, it
22 is a very misleading and to some people offensive
23 meaning.
24 BY ATTORNEY TRYON:

Page 100

1    Q.   Is it offensive to you?
2    A.   No.
3    Q.   In what way is it misleading?
4    A.   Because it disqualifies someone's gender
5  identity when you describe them as biologically male.
6    Q.   Does the term --- how does the term male as used
7  in this document differ from the term biological male?
8    A.   Going back to my assigned male at birth, this is
9  what that patient was assigned at birth typically based
10 on what the doctors see in their genitalia.
11   Q.   Now, ████████████████
12 ██  ██████████████████████
13 ██  ██████ ████████████████████
14 ██  ████████████████
15 ██  █████████████████
16   Q.   Under desire or secondary sex characteristics of
17 other gender, slash, to be other gender, in that part of
18 this form can you tell me what part of the template and
19 what items you actually inputted?
20   A.   So the heading desire to get rid of secondary
21 sex characteristics and then the expectations for
22 today's visit and then hopes for hormone therapy, those
23 are part of the template.  And then the words afterwards
24 are something that I input based on the patient

Page 101

1  response.
2    Q.   And the words desire for secondary sex
3  characteristic of other gender, slash, to be other
4  gender, that's part of the template?
5    A.   Yes.
6    Q.   And then severity of wanting to be another
7  gender is based on the following, that's part of the
8  template?
9    A.   Yes.
10   Q.   And then there's four items underneath that,
11 hairstyle, clothing, shoes and name.  Are those part of
12 the template?
13   A.   Yes.
14   Q.   And the Y after each one of those, is that
15 something that you inputted into the system?
16   A.   Yes.
17   Q.   I presume Y stands for yes.
18      Correct?
19   A.   Yes.  Yes.
20   Q.   So are you the one that created the template
21 that listed hairstyle, clothing, shoes and name.
22      Is that right?
23   A.   Yes.
24   Q.   Why did you choose those particular four

Page 102

1 categories?
2    A.   That was based on my training on what questions
3 would be high yield and also based on my understanding
4 of the criteria for gender dysphoria.
5    Q.   So you just limited it to four there, not ---
6 why didn't you have more characteristics?
7    A.   I felt that those would be sufficient enough to
8 indicate someone's desire to be of the other gender.
9    Q.   When it says been expressing herself as female,
10 that's template?
11    A.   No, that actually was something I inputted
12 myself.
13    Q.   Okay.
14        So including the one year?  That question is
15 not entirely clear.  Let me try again.  So it says been
16 expressing herself as female, colon, one year.  That
17 entire phrase is something you inputted separately, not
18 part of the template?
19    A.   I'm sorry.  I had a recording phrase.  I don't
20 know if you said template.
21    Q.   The language, it says been expressing herself as
22 female.  Is that language part of the template or
23 something you typed in?
24    A.   That is something I typed in.

Page 103

1    Q.   And then the one year, you typed that in?
2    A.   Yes.
3    Q.   And that was based on what BPJ and/or BPJ's mom
4 told you?
5    A.   Both of them.
6    Q.   ████████████████████████████████
  ██ ███████████████████████████████
  ██ ████████████████████████████
  ██ ██ █████████████████████
  ██ ██ ███████████████████████
  ██ ██ ██████████████████████
  ██ ██ ███████████████
16    Q.   So I don't really understand what that's saying.
17 Can you explain that?
18    A.   To be honest, I don't understand what it means
19 either.
20    Q.   On the next page, under social and psychosocial
21 habits it says no data available.  Did you type in no
22 data available?
23    A.   No.
24    Q.   And the next part says a detailed psychosocial

Page 104

1 assessment was conducted and documented confidentially
2 and relevant recommendations and health education was
3 offered to the patient and family.  Is that part of the
4 template or is that something you typed in?
5    A.   That is part of the template.
6    Q.   And was that psychosocial assessment conducted?
7    A.   Yes.
8    Q.   And how is it documented?
9    A.   It was documented through that confidential
10 Adolescent Medicine Questionnaire.
11    Q.   The two-page document that we looked at earlier?
12    A.   Yes.
13    Q.   Any other documentation on that psychosocial
14 assessment?
15    A.   No.
16    Q.   On the page we're looking at, which is page five
17 of 6, also labeled at the bottom BPJ 038, at the top
18 there's a part that says we discussed with B███ and her
19 parents/caregiver the nature, effects, benefits, et
20 cetera.
21        Do you see that paragraph?
22    A.   Yes.
23    Q.   How much of that is part of the template and how
24 much of that was actually typed in by you?

Page 105

1    A.   That was part of the template, but it's my
2 custom and practice to describe all of that when I'm
3 counseling my patients.
4    Q.   And so it says that you offered a refer to the
5 fertility services at Magee Womens Hospital.  Why did
6 you offer her a referral to the fertility services at
7 Magee Womens Hospital?
8    A.   The reason being is that if B███ were to decide
9 to get a puberty blocker, ██████████████████████
  ██ ██████████  And so I always --- it's my custom
11 and practice to always counsel my parents that that is a
12 possibility and they should consult with a fertility
13 specialist to understand what would happen if this
14 person were to go or use puberty blockers.
15    Q.   Well, will BPJ be able to produce any eggs with
16 or without puberty blockers?
17    A.   I apologize.  ███████████████████████
  ██
19    Q.   You threw me there.  One more question about
20 this form, back on the first page, page one of eight I
21 think it is.  So under history of present illness ---
22 OFF VIDEOTAPE
23    Q.   --- incongruence, it says identifies as
24 transgender instead of male.  What does it take to

1    identify as transgender?
2        A.   To stop you right there, I can't see that file.
3             VIDEOGRAPHER:  Hold on one second.  The
4    witness's video feed cut out for a second and that ended
5    up pausing the recording during your question.  The
6    reporter still heard it, though.  But let me get
7    everything sorted here real quick.
8             Okay.  We are recording again.  Doctor
9    Montano, can you see the exhibit right now?
10            THE WITNESS:  No.
11            VIDEOGRAPHER:  Mr. Tryon, could you do me
12   a favor and just hit stop and then start again?
13            ATTORNEY JONES:  Just so you know, I have
14   --- if you would like ---?
15            VIDEOGRAPHER:  The witness got cut out
16   again.
17            ATTORNEY TRYON:  I can see Mr. Jones.  I
18   cannot see the witness.
19            VIDEOGRAPHER:  Right.  The witness's feed
20   is not here.  Mr. Jones, is he losing internet
21   connection on the computer he's using?  I'm going to
22   send him a chat.
23            ATTORNEY JONES:  I apologize.  I would
24   have thought that my --- my office had the capability to

1    handle this.
2             ATTORNEY TRYON:  Are we all back together
3    again?
4             ATTORNEY JONES:  Yes.
5             VIDEOGRAPHER:  Give me one second.  Mr.
6    Tryon, you might have to do that stop and start again if
7    the witness can't see the exhibit.
8             THE WITNESS:  I can see it right now.
9             VIDEOGRAPHER:  Oh, okay.
10            ATTORNEY JONES:  And I have the document
11   that he's referring to, our copy, in front of him.
12            VIDEOGRAPHER:  Okay.  We are recording
13   and we are back on the record.
14   ON VIDEOTAPE
15   BY ATTORNEY TRYON:
16       Q.   Independent of this exhibit, did you tell BPJ or
17   Heather Jackson that there was a possibility that BPJ
18   could --- might not persist with gender dysphoria?
19       A.   It is my custom and practice to discuss that
20   with all of my patients.
21       Q.   Do you remember saying that to BPJ and Heather
22   Jackson?
23       A.   Again, it's part of my custom and practice to
24   always bring that up.

1        Q.   I understand.  Do you remember having that
2    discussion with them?
3        A.   Not the specific details, but yes.
4        Q.   Do you remember what their reaction was, the
5    response was?
6        A.   I don't remember.
7        Q.   And on the document, Exhibit 4, it says history
8    of present illness, incongruence, that much is part of
9    the form.
10            Right?
11       A.   Yes.
12       Q.   And then the next part says identifies as
13   transgender instead of --- instead of male.  Is that
14   something you typed in?
15       A.   Yes.
16       Q.   And did BPJ say that BPJ identifies as
17   transgender or something else and you just
18   re-characterized it?
19       A.   I don't recall specifically.
20       Q.   Okay.
21            What does it take for someone to identify as
22   transgender, to say I identify as transgender, or is
23   there something beyond that?
24            ATTORNEY BLOCK:  Objection to form.

1             ATTORNEY JONES:  Objection to form.
2             THE WITNESS:  The criteria for
3    incongruence is someone who states that someone
4    identifies differently from the sex assigned to them at
5    birth.
6    BY ATTORNEY TRYON:
7        Q.   Okay.
8             I'm showing you now Exhibit 5.  Do you see
9    that?
10       A.   Yes.
11       Q.   So this would have been generated through the
12   same system --- I mean this appears to have much of the
13   same information as the prior document, Exhibit 4, but
14   in a different format.  At the top it says discharge
15   summary.  So let me, first of all, ask you if you have
16   seen this document before?
17       A.   Yes.
18       Q.   And how is this different from Exhibit 4, which
19   is --- is titled Adolescent Medicine, dash, Evaluation?
20            VIDEOGRAPHER:  I have to interrupt you.
21   The witness's video cut out again.  It looks like he's
22   back.
23            THE WITNESS:  I can still see the form
24   --- oh, I'm frozen.

Page 110

BY ATTORNEY TRYON:
1   Q.   Do you see the form or not?
2   A.   I can see the form.
3   Q.   Okay.
4       Did you understand my question?
5   A.   Can you repeat the question, please?
6   Q.   Yes.  Let me fix my system here.  Okay.  How is
7   this Exhibit 5 differ from Exhibit 4?
8   A.   So the discharge summary is something that we
9   are required by the hospital to give to summarize their
10  care and the next steps for the patient.
11  Q.   Under provider plan there's three items.  That's
12  information you typed in there.
13      Correct?
14  A.   Yes.
15  Q.   And item two, I will contact Doctor Murray in
16  Morgantown, West Virginia, to determine if her clinic
17  can give pubertal blockers, did you contact Doctor
18  Murray?
19  A.   My memory is not clear.  I may have to review
20  some of the telephone notes to see if I remember or to
21  help me recall that I did speak with Doctor Murray.
22  Q.   Why were you considering contacting Doctor
23  Murray to determine if her clinic could give pubertal

Page 111

1   blockers?
2   A.   Because it would be closer to the patient.
3   Q.   Who is Doctor Murray?
4   A.   She is a physician that used to work at West
5   Virginia University Adolescent Medicine.
6   Q.   Where does Doctor Murray work now?
7   A.   Boston Children's.
8   Q.   What is Doctor Murray's first name?
9   A.   Pamela.
10  Q.   Ultimately, Doctor Murray did not give any
11  pubertal blockers to BPJ.
12      Correct?
13  A.   Yes.
14  Q.   Do you know why?
15  A.   From my recollection, she just didn't do those
16  procedures or give out those medications.
17  Q.   This is Exhibit 6.  This is also from the date
18  of service of --- I'm sorry.  Do you see that?
19  A.   Yes.
20  Q.   Are you looking at a hard copy?
21  A.   I'm looking at both.
22  Q.   Very good.  This is also from July 15, 2019 it
23  says at the top.  Do you see that?
24  A.   Yes.

Page 112

1   Q.   And this is outpatient evaluations.  It appears
2   to have much the same information again, but it's a
3   different form.  Can you explain the purpose of this
4   form?
5   A.   I believe it's just a duplication because my
6   recollection of the full form, it looks like the exact
7   same information that was on the previous exhibit.
8   Q.   Okay.
9       Let's look at the bottom here.  And I think
10  you're probably right.  The bottom, it says it was
11  printed on 5/19/2021.  So back in May this was printed.
12  Do you know why this was printed back in May of 2021?
13  A.   That I would not know.
14  Q.   Next I have got Exhibit 7.  Do you see that?
15  A.   Yes.
16  Q.   This is the same thing it appears.
17      Is that right?
18  A.   Yep.  Yes.
19  Q.   Next I'm showing you Exhibit 8.  Do you see
20  that?
21  A.   Yes.
22  Q.   And it shows an addendum typed in there.  Do you
23  see that?
24  A.   Yes.

Page 113

1   Q.   Is all of that something you typed in?
2   A.   Yes.
3   Q.   And you typed it in on October 17, 2019?
4   A.   Yes.
5   Q.   Did you see the patient on this date?
6   A.   No.
7   Q.   Who did see the patient on that date?
8   A.   Laura Lynch.
9   Q.   And who is Laura Lynch?
10  A.   She's a physician assistant at the clinic.
11  Q.   Next I'm showing you Exhibit 9.  Have you seen
12  this document before?
13  A.   Yes.
14  Q.   What is it?
15  A.   It's the progress note written by Laura Lynch on
16  October 15th, 2019, of PBJ.
17  Q.   And did you review these notes on the date of
18  service of 10/15/2019?
19  A.   It appears I reviewed these notes two days
20  afterwards.
21  Q.   Did you make any changes to Laura Lynch's ---
22  what she had put in?
23  A.   No.
24  Q.   Would that somehow be indicated if you had made

Page 114

1   any changes?
2       A.   Yes.
3       Q.   How would you notate that?  Would that be simply
4   --- would you state that on the addendum?
5       A.   I would state that on the addendum.
6       Q.   And this was just a follow-up visit.
7            Is that right?
8       A.   Yes.
9       Q.   I'm now showing you Exhibit 11A.  Do you see
10  that?
11      A.   Not yet.
12      Q.   I forgot to hit start.  Let me know when you see
13  it.
14      A.   I see it.
15      Q.   This says --- have you seen this document
16  before?
17      A.   Yes.
18      Q.   The encounter date is March 16, 2020.
19           Right?
20      A.   Yes.
21      Q.   Encounter date means the date of the visit.
22           Correct?
23      A.   Yes.
24      Q.   And who is Taylor Rives?

Page 115

1       A.   She was one of the resident trainees with me
2   that day.
3       Q.   Now, it says under history of present illness,
4   second sentence, she has been followed for gender
5   dysphoria with desire to start hormone blockers, but was
6   ███████████████ last visit.  What does that mean?
7       A.   ████████████████████████████████
8   ██████████████████████████████████████.
9       Q.   ████████████████████
10  ██  ████  ██████████████████
11  ██  ████  ████████████████████
12      A.   Generally it means first signs of puberty, which
13  is different ---.
14           VIDEOGRAPHER:  You're cutting out again,
15  Doctor Montano.
16           THE WITNESS:  Can you hear me now?
17           VIDEOGRAPHER:  Yes.
18           ATTORNEY TRYON:  Yes.
19           THE WITNESS:  Can you repeat the question
20  that you couldn't hear my answer?
21  BY ATTORNEY TRYON:
22      Q.   ███████████████████████████
23  ██  ███████████████████████████
24  ██  ████  ████████████████.

Page 116

1       Q.   Such as what?
2       A.   Depending on sex, but for those assigned male at
3   birth, it would be testicular growth.  And for those
4   assigned female at birth, it would be breast buds.
5                        ---
6   (WHEREUPON, AN OFF RECORD DISCUSSION WAS HELD.)
7                        ---
8   BY ATTORNEY TRYON:
9       Q.   Down lower it says therapist, she has not
10  started seeing a therapist yet.  However, they have a
11  therapist in her town who specializes in gender
12  dysphoria.  Mother is waiting to start therapy until
13  B████ wants to start.  Do you know who that therapist
14  was to be?
15      A.   No.
16      Q.   Is it normal to wait as long as BPJ and Heather
17  waited to start seeing a therapist?
18           ATTORNEY JONES:  Objection to form.
19           THE WITNESS:  To answer your question,
20  it's not atypical for someone to wait to see a
21  therapist.
22  BY ATTORNEY TRYON:
23      Q.   Do your patients who have gender dysphoria
24  typically meet with a therapist before meeting with you?

Page 117

1       A.   Not always.
2       Q.   But sometimes?
3       A.   Yes.
4       Q.   During your discussions with BPJ and Heather
5   Jackson, did you discuss having a therapist prior to
6   this date of 3/16/2020?
7       A.   From my recollection, yes, because of my custom
8   and practice.  But yes.
9       Q.   Why do you --- and I take it you recommend that
10  they talk to a therapist.
11           Is that true?
12           ATTORNEY JONES:  Objection to form.
13           ATTORNEY BLOCK:  Same.
14  BY ATTORNEY TRYON:
15      Q.   Go ahead.
16      A.   To answer your question, it's my custom and
17  practice to always --- to recommend seeing a therapist
18  because gender affirmation can be very difficult for the
19  patient, so it's in order to get them support that they
20  need.
21      Q.   And did you recommend that in your first visit
22  with BPJ and Heather Jackson?
23      A.   From my recollection, yes.
24      Q.   And what was their response?

Page 118

1    A.   I do not recall what their response was.
2    Q.   Did you suggest any names?
3    A.   That I don't know.
4    Q.   **Do you typically give your patients names of**
5    **therapists?**
6    A.   Yeah, my --- yes, my custom and practice is I
7    actually consult our behavioral health team and then
8    they speak with our patients to help find a therapist if
9    they need one.
10   Q.   **Next is Exhibit 11B. I'm sorry, I need to go**
11   **back to 11A for a moment. So under physical exam, do**
12   **you see that?**
13   A.   Yes.
14   Q.   **It shows a reference to BP and then also to BMI.**
15   **What is BMI?**
16   A.   BMI is a measurement of the weight in ratio to
17   someone's height.
18   Q.   **And why is that tracked?**
19   A.   Because it helps determine if --- a patient
20   might be having difficulties with obesity if it's too
21   high of a number.
22   Q.   **And BMI percentages are divided into categories**
23   **for comparison to similar populations.**
24       **Is that right?**

Page 119

1    A.   Yes.
2    Q.   **Is it important to compare people to the correct**
3    **grouping?**
4        ATTORNEY BLOCK:  Objection to form.
5        ATTORNEY TRYON:  Let me rephrase.
6    BY ATTORNEY TRYON:
7    Q.   **Go ahead.**
8    A.   No, you can rephrase the question, please.
9    Q.   **Why are they divided into categories to compare**
10   **for comparison to similar populations?**
11   A.   It helps create a normalized data to help
12   pediatricians in general to figure out if someone is
13   outside the typical range.
14   Q.   **And they're dividing it between boys and girls.**
15   **Right?**
16   A.   Yes.
17   Q.   **And this one shows that BPJ was in the** ▮
     ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
18   ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
19   **Right?**
20   A.   Yes.
21   Q.   ▮▮▮▮▮▮▮▮▮▮▮▮▮▮
     ▮▮ ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
     ▮▮ ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

Page 120

1    ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
2    ▮▮ ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
3    ▮▮ ▮▮▮▮▮▮▮▮▮▮
4    ▮▮ ▮▮▮▮
5        ATTORNEY JONES:  Objection to form.
6    BY ATTORNEY TRYON:
7    Q.   ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
8    ▮▮ ▮▮▮▮▮▮▮▮▮▮▮▮
9    ▮▮ ▮▮▮▮▮▮
10   ▮▮ ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
11   ▮▮ ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
12   ▮▮ ▮▮▮▮▮▮▮▮▮▮▮▮
13   Q.   **So in your opinion, should BPJ have been**
14   **compared on BMI with** ▮▮▮▮▮▮▮▮▮▮▮▮
15   ▮▮ ▮▮▮▮▮▮▮▮▮▮▮▮
16       ATTORNEY JONES:  Objection, scope.
17   BY ATTORNEY TRYON:
18   Q.   **Go ahead.**
19   A.   There's a debate as to which ones to be used and
20   our --- at least in my practice, if this is something
21   pertinent, I will try to do both boys and girls and make
22   a comparison.
23   Q.   **So you think for BPJ you should track BPJ on**
24   **both boy's and girl's charts?**

Page 121

1        ATTORNEY JONES:  Objection, scope.
2    BY ATTORNEY TRYON:
3    Q.   **Is that right?**
4    A.   That's what I would do.
5    Q.   **Well, this is your form. Can't you modify it to**
6    **do that?**
7        ATTORNEY JONES:  Objection, scope, asked
8    and answered.
9    BY ATTORNEY TRYON:
10   Q.   **Go ahead. You can answer.**
11       ATTORNEY JONES:  I don't want to give a
12   speaking objection.
13       ATTORNEY TRYON:  I'll give you a standing
14   objection on this.
15       THE WITNESS:  Can you repeat the
16   question?
17   BY ATTORNEY TRYON:
18   Q.   **Well, let me back up. Maybe I misunderstood**
19   **something. This form that you're --- that is being**
20   **filled out here, is this a form that you created?**
21   A.   It's a template I created, yes.
22   Q.   **So on the template, are you able to add an**
23   **additional category for BMI percentiles for girls as**
24   **well as boys?**



Page 122

1    A.   No, I cannot.
2    Q.   Why not?
3    A.   Because that's not automatically populated based
4    on the chart and what is listed as the legal sex of the
5    child.
6    Q.   ████████████████████████
     ██ ████████████████████████████████
     ██ █████████████████████████
     ██ ████████████████
     ██ ██████████████████████████████████
     ██ ██████████
14   Q.   Do you record that anywhere?
15   A.   Usually I do.
16   Q.   Where would you record that?
17   A.   I would record that somewhere near the physical
18   exam.
19   Q.   On the system in the --- in the notes that you
20   type in.
21        Is that right?
22   A.   To clarify, I would just type it in.
23   Q.   And then when it was printed out, if you had
24   done that, it would be in here.

Page 123

1        Right?
2    A.   Yes.
3    Q.   Okay.
4        And just so we're clear, I'm not trying to you,
5    know, trick you or anything, but it's not in this chart
6    for BPJ.
7        Correct?
8    A.   Yes.
9    Q.   Okay.
10       I'm now showing you Exhibit 37.  Let me know
11   when you can see that.
12   A.   Yes.
13   Q.   So this is one of the documents that we just
14   received.  So on page one it shows at the top chief
15   complaint and then it says orders.  What does that mean?
16   A.   So the heading says telephone.  So what it shows
17   is basically the conversation that was done on the
18   telephone.  And in this case it would be the reason why
19   they called.
20   Q.   Okay.
21       In the last exhibit that we looked at, Exhibit
22   11A, it showed the encounter date of 3/16, which is the
23   same date of this document.
24       Right?

Page 124

1    A.   Yes.
2    Q.   Then under clinical notes it says Quest came
3    upstairs.  Is Quest a person?
4    A.   Quest is a laboratory service.
5    Q.   It says Quest came upstairs and said they needed
6    ██████████████, since the patient is only
7    nine.  I entered the correct estradiol script.  What is
8    ███████████████████?
9    A.   ████████████████ is the measurement of
10   the female hormone, ██████  And especially for those
11   who may not produce enough, that's the one that will
12   pick up smaller levels.
13   Q.   And then at the end of the sentence it has two
14   superscript things.  One says LM.1M.  What does that
15   mean?
16   A.   Based on the attribution key, it basically said
17   who wrote that note and how did they write that note.
18   Q.   So the M says manual.  Does that mean it's typed
19   in manually?
20   A.   Yes.
21   Q.   So does that mean information to the left of
22   that superscript --- was entered manually?
23   A.   Yes.
24   Q.   Why was a script written for BPJ for ████████

Page 125

1    ████████████
2    A.   It was written because it was the part of the
3    baseline labs if we were to start this patient on
4    pubertal blockers.
5    Q.   This particular document was also from the March
6    2000 --- March 16, 2020, but this information was not in
7    the other document that we had received from that same
8    date.  Can you explain to me why there's two separate
9    systems?  It appears it's two separate systems for
10   visits on the same day.  Is that how that works?  I mean
11   can you clear it up for me?
12       ATTORNEY JONES:  Objection.  Scope.  You
13   know, he's not an IT.
14       ATTORNEY TRYON:  I understand.
15   BY ATTORNEY TRYON:
16   Q.   I'm just trying to understand what information
17   you have on this that can help me out.
18   A.   That I would not know.
19   Q.   But you are familiar with this document.
20       Right?
21   A.   Yes.
22   Q.   Did you see this back in March of 2020?
23   A.   Yes, it was sent to me.
24   Q.   Electronically?

Page 126

```
1     A.  Yes.
2     Q.  I'm looking now at the third page of this
3  exhibit, and I look down and see where it says self
4  harm?
5     A.  Yes.
6     Q.  And then it says TR.2T in the superscript.  What
7  does that mean?
8     A.  That I would not know.
9     Q.  Well, does the T --- well, TR is the person's
10 name, right, Taylor Rives or Rives (different
11 pronunciation), if you look at the top?
12        ATTORNEY JONES:  Objection, asked and
13 answered.
14        THE WITNESS:  That could mean anything,
15 so I would not be able to know what that would mean.
16 BY ATTORNEY TRYON:
17    Q.  Well, these superscripts, have you seen these
18 before?
19    A.  No.  It's not part of the medical record that I
20 have.
21    Q.  Well, now it's unclear to me when you --- are
22 you saying you haven't seen this document before.  I
23 thought you said that you had.  Can you clear that up
24 for me?
```

Page 127

```
1     A.  I have seen this document before, but I have
2  never seen it with those superscripts in it.
3     Q.  Okay.
4        So under self harm it says ███████████████
5  █
6        Is that right?
7     A.  Yes.
8     Q.  And then suicidality, what is suicidality?
9     A.  Suicidality is the desire to end one's own life.
10    Q.  ████████████████████████████████████████
11 █   ██████████████████████████████
12 █   ████████
13 █   █  █
14 █          next page.  Sorry, I don't have questions
15 on the next page.  It will be the following page.
16 There's a notation of some information that it appears
17 you entered.  It says I saw and examined the patient and
18 was present during the key portion of the E, slash, M
19 service.  Did you type that in?
20    A.  Yes.
21    Q.  And what is E, slash, M service?
22    A.  Evaluation and management.
23    Q.  Now, a couple lines down it says reviewed adol
24 med note from 10/15/2019 and at the time the patient was
```

Page 128

```
1  still at █████-█ and then it has got a superscript there.
2  It says GM.2M.  And if you look down below, it says GM.2
3  and it refers to you, your name, on 3/16/2020 at 10:58
4  a.m.  Looking at that now, does that give you an
5  indication what that superscript means?
6     A.  Based on the attribution key it means that I
7  wrote that note --- or wrote that portion of the note.
8     Q.  And what would be the portion of the note to the
9  left of the superscription.
10        Right?
11    A.  Yes.
12    Q.  ████████████████████████████████████████████
13 █   ████████████████████████████████████████
14 █   █████████████████████████████████████████
15 █   ██████████████████████████
16 █   █  █████████████████████████████
17 █   █████████████████████████████████████
18 █   ██████████████████████████████████
19 █   ██████████████████████████████████████████████
20 █   ██████
24    Q.  Not to ask the obvious, but did BPJ say why BPJ
```

Page 129

```
1  was uncomfortable?
2     A.  Same reason why she came in, it's because she
3  doesn't like her own body.
4     Q.  Did she actually say that or are you just
5  projecting --- not projecting, but is that what you
6  think --- why she was uncomfortable?
7        ATTORNEY JONES:  Objection to form.
8        THE WITNESS:  From my recollection, she
9  told me that.  That's why we have a process in which we
10 cover her face, so she doesn't have to see the
11 examination being done.
12 BY ATTORNEY TRYON:
13    Q.  What do you cover her --- BPJ's face with?
14    A.  A gown, a patient gown.
15    Q.  Okay.
16        Exhibit 11B, have you seen this document
17 before?
18    A.  I can't see it right now.
19    Q.  Oh, that's because I didn't hit the right
20 button.
21        ATTORNEY BLOCK:  David, how much --- how
22 much longer do you think you have?
23        ATTORNEY TRYON:  I'm guessing --- I think
24 within an hour.
```

Page 130

```
 1            ATTORNEY BLOCK:  It's been about two
 2   hours since our last break.  Is now a good time for
 3   another one?
 4            ATTORNEY TRYON:  It works for me if
 5   people want to do that.
 6            ATTORNEY JONES:  Do you want to take a
 7   break?
 8            THE WITNESS:  Yes.
 9            ATTORNEY JONES  And can also go off the
10   record just about timing also, just so I can get an idea
11   of, you know, how much time ---?
12            ATTORNEY TRYON:  So let's go off the
13   record.
14            VIDEOGRAPHER:  Let me take us off then.
15   Going off the record.  The current time reads 1:33 p.m.
16   OFF VIDEOTAPE
17            ---
18   (WHEREUPON, A SHORT BREAK WAS TAKEN.)
19            ---
20   ON VIDEOTAPE
21            VIDEOGRAPHER:
22            We're back on the record.  The current
23   time reads 1:44 p.m.
24   BY ATTORNEY TRYON:
```

Page 131

```
 1       Q.  Okay.
 2            Exhibit 11, do you see that?
 3       A.  Yes.
 4       Q.  And this is from the encounter date of April 13,
 5   2020.
 6            Right?
 7       A.  Yes.
 8       Q.  And you've seen this document before?
 9       A.  Yes.
10       Q.  It shows you at the top.  Does that mean you are
11   the author of this document?
12       A.  Yes.
13       Q.  And everything in here is correct as far as you
14   can tell?
15            ATTORNEY JONES:  Objection to form.
16            THE WITNESS:  I see no errors.
17   BY ATTORNEY TRYON:
18       Q.  Under it says review the labs with mom, F▆▆▆▆
     ▆▆   ▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆
     ▆▆   ▆▆▆▆▆▆▆▆▆▆▆▆
22       Q.  And you had a lab done for that --- for those?
23       A.  Yes.
24       Q.  And what does that tell you?
```

Page 132

```
 1       A.  So in this case it gives us the baseline in
 2   terms of what their original levels are.
 3       Q.  I'm sorry, original levels of those two
 4   chemicals?
 5       A.  Yes.
 6       Q.  And then testosterone, is that a separate lab
 7   test?
 8       A.  Yes.
 9       Q.  And this document does not show those levels.
10            Correct?
11       A.  Correct.
12       Q.  And the next word, estradiol, how do you
13   pronounce that?
14       A.  Estradiol.
15       Q.  Estradiol.  And that was also a test that was
16   run?
17       A.  Yes.
18       Q.  ▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆
     ▆▆   ▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆
     ▆▆   ▆▆▆▆
21       Q.  So on the next page, where it says we discussed
22   with B▆▆  and then it has that language, if I
23   understand correctly, that is basically template
24   language but you insert B▆▆  name.
```

Page 133

```
 1            Is that right?
 2       A.  Yes.
 3       Q.  But you recall that you discussed those things
 4   with BPJ and Heather Jackson?
 5       A.  Yes.
 6       Q.  So this is on April 13.  I'm going to show you
 7   another document from April 13, 2020.  Let me know when
 8   you see that.
 9       A.  I can see that.
10       Q.  It is Exhibit 38?
11       A.  Yes.
12       Q.  Again, this is from the prior document, which
13   was Exhibit 11B.  We received that some time ago.
14   Exhibit 38 we just received within the past week.  It
15   looks like --- are these --- and you may have already
16   said you don't know, but are these from different
17   systems or different parts of the same system, if you
18   know?
19       A.  That I --- that I do not know.
20       Q.  You see at the top it says visit date,
21   4/13/2020.
22            Right?
23       A.  Yes.
24       Q.  And have you seen this document before?
```

Page 134

1    A.  No --- I clarify.  I reviewed that document the
2    night before but not in my electronic medical records.
3    Q.  Okay.
4       It says under progress notes, it has your name
5    and it says you are the author.  What were you the
6    author of?
7    A.  I was the author of the progress note that I
8    wrote related to that visit on that date.
9    Q.  What do you see in this document, because I'm
10   not familiar with it, that you believe that you actually
11   input it into the system?
12   A.  Can you rephrase the question?  I do not
13   understand.
14   Q.  Sure.  There's a lot of information on here, a
15   lot of writing.  And I'm trying to understand what
16   information you would have inputted into this that
17   appears on this document.
18       ATTORNEY JONES:  And can I interject real
19   quick.  It appears, you know, yesterday, last night was
20   the first time we were made aware of these documents.
21   And after looking at these documents going to, you know,
22   we're using your Bates number WV 0031 and WV 0032 and
23   then looking at the page number of both of them, it
24   appears that a page is missing from the progress note.

Page 135

1    I do not believe that Doctor Montano can accurately, you
2    know, answer this question based on this missing page.
3       ATTORNEY TRYON:  Yeah.  I will represent
4    to you, as far as I know, this is what we got.  I don't
5    know why that page is missing.  I don't know if it was
6    not copied correctly when it was sent to us.  These are
7    the documents that we received just two days ago.  I'm
8    not sure what the missing page is.  But if we could just
9    find out what Doctor Montano knows about these two
10   particular pages, recognizing that there's a missing
11   page that nobody knows what's there.
12       THE WITNESS:  So from I tell by looking
13   through the information, it feels like it was a
14   duplicate --- there are words and information that are
15   duplicated from the progress note that I wrote on that
16   same day.
17   BY ATTORNEY TRYON:
18   Q.  Okay.
19       The reference to the ███████████
    ███ ██████████████████████, is that something
21   you would have inputted or someone else?
22   A.  That would be something I would have ordered and
23   then it would be reflected on that note.
24   Q.  When you order something, how does that actually

Page 136

1    happen?  Do you write a script on like one of the old
2    fashion pads and give it to somebody or tell somebody
3    and they inputted it into the system or do you actually
4    input it into the system like this?
5    A.  I electronically inputted it.
6    Q.  Okay.
7       Did you actually order it from the provider?
8    A.  Can you clarify that question?
9    Q.  Let me ask you a different question.  Who's
10   Samantha Richard?
11   A.  She was a medical assistant that worked in our
12   clinic at that time.
13   Q.  Okay.
14       So this ██████  ███████ kit, is that something
15   that would be stocked in the clinic or has to be ordered
16   from the manufacturer or supplier?
17   A.  It has to be ordered from the manufacturer.
18   Q.  Do you know who actually ordered it from the
19   manufacturer?
20   A.  I did.
21   Q.  You did?
22   A.  Yes.
23   Q.  So you actually --- do you do that
24   electronically or do you make a phone call?

Page 137

1    A.  I do that electronically.
2    Q.  Okay.
3       Then next on the next page of this exhibit,
4    which I recognize appears that there may be a missing
5    page in between, it refers to --- under instructions it
6    says we will first obtain a preauthorization of
7    ███████  Authorization from whom?
8    A.  It would be authorization from the patient's
9    insurance company.
10   Q.  Next I'm showing you Exhibit 39.  Let me know
11   when you see that.
12   A.  Yes.
13   Q.  And this is for --- the note is dated 5/5/2020.
14   Do you see that?
15   A.  Yes.
16   Q.  And have you seen this document before?
17   A.  I've seen the contents of that document but not
18   in that format.
19   Q.  Fair enough.  Everything in this document seems
20   correct to you?
21       ATTORNEY JONES:  Objection to form.
22   BY ATTORNEY TRYON:
23   Q.  I think you can --- anybody who has access to it
24   can scroll through it on the screen, but I think you



Page 138

1   have a hard copy of it as well.
2       Is that right?
3   A.  Yeah.  Based on the interaction, I recall that
4   happening and that is correct.
5   Q.  Who is Alexis Hammond?
6   A.  She's one of the nurses who works at our clinic.
7   Q.  Lauren Machi is also a nurse at the clinic.
8       Is that right?
9   A.  Yes.
10  Q.  Do you remember a ▮▮▮▮▮ being delivered?
11  A.  No, I did not physically saw it delivered.
12  Q.  Was it --- did you do --- well, strike that.
13      On 6/15/2020 there was ▮▮▮▮▮▮▮▮▮▮▮
14  with BPJ.
15      Is that right?
16  A.  Yes.
17  Q.  And who performed that?
18  A.  I did.
19  Q.  Who else was present at that procedure?
20  A.  If I could see the procedure note it will help
21  me remember if anyone else helped me during that
22  procedure.
23  Q.  Okay.
24      I'm showing you Exhibit 40.  Is that the

Page 139

1   procedure note that you're referring to?  This is the
2   only information that I've received for any visit on
3   6/15/2020.
4   A.  That was part of the note, but I do have a hard
5   copy here.
6   Q.  Yeah.  It's several pages long.
7   A.  Yes.
8   Q.  It goes --- Bates stamp is WV 22 through WV 26.
9   A.  Yes, I can see that.
10  Q.  Okay.
11      Is this the note you were referring to?
12  A.  Yes.
13  Q.  And have you seen the information in this
14  document before?
15  A.  Yes.
16  Q.  And it shows under procedures that you're the
17  author of this.
18      Is that right?
19  A.  Yes.
20  Q.  And then down at the bottom it says P▮▮▮▮,
21  ▮▮k, P▮▮▮-▮▮▮▮▮ d▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
22  ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
23      Do you see that?
24  A.  Yes.

Page 140

1   Q.  So ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮,
2   is it?
3   A.  Correct.
4   Q.  Did you insert a ▮▮▮▮▮ insert?
5   A.  No.
6   Q.  It says she has been counseled concerning the
7   risks, benefits and alternatives to ▮▮▮▮ and she
8   especially understands that her menstrual periods are
9   expected to become irregular and unpredictable
10  throughout the time she is using the ▮▮▮  She has
11  no contradictions to ▮▮▮▮  Her questions have been
12  answered.  She has fully reviewed the FDA approved
13  ▮▮▮▮▮▮▮▮ consent brochure, has signed the consent form
14  and wishes to proceed with the insertion today.  Did she
15  sign a ▮▮▮▮▮ consent brochure consent form?
16  A.  No.
17  Q.  But this says that she --- that BPJ did?
18      ATTORNEY BLOCK:  David, can you change
19  the view of the document so the page you're reading from
20  is up on the screen?
21      ATTORNEY TRYON:  I'm sorry.  I thought
22  everyone could see this, could go through it.  So it
23  goes from page one onto page two.
24  BY ATTORNEY TRYON:

Page 141

1   Q.  So this says that BPJ signed the consent form
2   for the ▮▮▮▮▮ insert.  Are you now saying this note
3   is wrong?
4   A.  The note is a template I was forced to use and
5   that's why I put in parentheses ▮▮▮▮▮ because it's
6   a very similar procedure.  But the way the hospital set
7   this up that was the only template I used and would not
8   let me finish the note or bill the patient's insurance
9   if I do not use that note.  So this was the best next
10  option for me to use.
11  Q.  How many ▮▮▮▮▮ insertions do you do a year?
12      ATTORNEY JONES:  Objection.
13      THE WITNESS:  That number I do not keep
14  track of.
15  BY ATTORNEY TRYON:
16  Q.  Well, it's many many.
17      Right?
18  A.  It's something I do ---.
19  Q.  I'm sorry, what?
20  A.  I do it commonly, yes.
21  Q.  And yet you don't have a template that allows
22  you to say you inserted a ▮▮▮▮▮?
23      ATTORNEY JONES:  Objection.  Don't answer
24  that.  We're not here to talk about any type of --- you

Page 142

1    know, his diagnosis is what it is and ---.
2         ATTORNEY TRYON:  No, this is --- this is
3    very relevant.
4         ATTORNEY JONES:  Well, I'm --- I'm
5    instructing him not to answer.  He spoke to you about
6    this and he spoke to you why he inserted --- or why he
7    inserted the words the way he did.  If there's any other
8    concern then, you know, that's to be taken up for --- at
9    another time, another thing.  But this case is about BPJ
10   and essentially her inability to play sports.
11        ATTORNEY TRYON:  This case is about BPJ
12   and BPJ's diagnosis and treatment, and I'm entitled to
13   ask these questions and I'm not going to debate it.
14        ATTORNEY JONES:  Okay.
15        I'm instructing him not to answer.  I
16   think this is going beyond the scope.  He explained.
17   It's asked and answered.  Keep moving.
18   BY ATTORNEY TRYON:
19        Q.  The next statement says procedure, ████
20   insert.  Do you see that?
21        ATTORNEY JONES:  Objection, form.  It
22   also says █████ insertion.
23   BY ATTORNEY TRYON:
24        Q.  Do you see where I'm reading?

Page 143

1        A.  Yes.
2        Q.  Do you have the ability to modify the language
3    underneath where it says clinical notes?
4        A.  No, because it's a template.
5        Q.  And you cannot modify that template?
6        A.  Correct.
7        Q.  And you cannot insert your own clinical notes?
8        A.  I could ---.
9        ATTORNEY JONES:  Objection to form.
10       THE WITNESS:  Under procedure comments I
11   clarified that this is specifically for ████
12   procedure.
13   BY ATTORNEY TRYON:
14       Q.  Can you show me what you're referring to?
15       A.  In the very bottom, where it says procedure
16   comments, I said that I specifically reviewed the risk
17   for ████ procedure and including those risks and
18   that they both understand and consented.
19       Q.  Where is that consent form?
20       A.  It's in the chart.
21       ATTORNEY TRYON:  We would request that
22   consent form because we do not have it.
23   BY ATTORNEY TRYON:
24       Q.  Where it says ██████ insert information, do

Page 144

1    you see that?
2        A.  Yes.
3        Q.  It says office supplied device and then it says
4    yes.  Did the office supply that device?
5        A.  We had the device, correct.
6        Q.  And it shows the lot number.
7            Right?
8        A.  Yes.
9        Q.  What's that lot number?
10       A.  It's the identification of the ████ to know
11   which lot it came from.
12       Q.  I'm sorry?
13       A.  Continue.  I apologize.
14       Q.  So is it the actual lot number for the item
15   which was inserted?
16       A.  Yes.
17       Q.  Down further under procedure details it says
18   blank, presumably the child's name, was given post
19   insertion instructions.  She understands that ████
20   must be removed at the end of three years and may be
21   removed sooner if she wishes.  And it has your initials
22   and the superscript.  Did you enter that data?
23       A.  That was part of the template, yes.
24       Q.  No, it's not part of the data --- the template I

Page 145

1    don't think because if you look down at the bottom under
2    attribution key, it says M for manual.
3            Right?
4        A.  Yes.
5        Q.  So it says GM.1M, so that means it was manually
6    inputted.
7            Right?
8        A.  Yes.
9        Q.  And it actually shows the exact date and time
10   when you inputted that information.
11           Right?
12       A.  Yes.
13       Q.  The ██████ insert lasts for three years.
14           Right?
15       A.  Yes.
16       Q.  But the ████ insert does not.
17           Correct?
18       A.  Yes.
19       Q.  There's nothing on this entire form that has the
20   word ████ does it?
21       A.  I used the word ████ because that's the
22   generic name.
23       Q.  Let's go to the next page.  Up at the top, on
24   the right, where it says status, do you see that?

Page 146

```
 1        A.   Yes.
 2        Q.   It says deleted by Montano, Gerald, D.O., at
 3   6/15/2020, 9:33 a.m.  What does that mean?  What is that
 4   referring to?
 5        A.   That means that I deleted the note.
 6        Q.   What note did you delete?
 7        A.   The procedure note that you see in the exhibit
 8   on that current page.
 9        Q.   What did the note say that you deleted?
10        A.   The whole note was deleted.
11        Q.   Does the information --- are you saying the
12   document that I have before me was deleted?
13             ATTORNEY JONES:  Objection to form.
14             THE WITNESS:  So this page, specific
15   page, was the one I deleted, not the page before.
16   BY ATTORNEY TRYON:
17        Q.   Why did you delete this page?
18        A.   Same reason why I have difficulty with the last
19   page, because it had incorrect information and I did not
20   want to represent that.
21        Q.   Where are you able to --- but it says deleted,
22   but it's still here.
23             Right?
24        A.   Yes.
```

Page 147

```
 1        Q.   So why does it say deleted if it's still here?
 2   I'm confused.
 3             ATTORNEY JONES:  Objection to form.
 4             THE WITNESS:  That I cannot explain.
 5   BY ATTORNEY TRYON:
 6        Q.   Who else was present at this appointment?
 7        A.   Based on the note and my recollection, it was
 8   me, BPJ and mom.
 9        Q.   I'm sorry.  I couldn't hear that.
10        A.   Based on the note and my recollection, it would
11   be BPJ, me, and her mom.
12        Q.   So where it says names of all present during the
13   procedure there's three asterisks below that.  What are
14   those three asterisks for?
15        A.   That --- that means that it's a blank template,
16   fill in the blank.  The reason ---.
17        Q.   I couldn't hear that.  Sorry?
18        A.   Those three asteriskes is a fill in --- is a
19   --- is a place where you can fill in that information.
20   However, that was left blank because I deleted that
21   note.
22        Q.   So there is information below which specifically
23   says blank Pepper-Jackson.  So somebody typed in BPJ's
24   name.
```

Page 148

```
 1        Right?
 2        A.   As I can see, yes.
 3        Q.   Is that you?
 4        A.   It looks like I did.
 5        Q.   It says desires ████████ insertion.  You could
 6   have typed in right there desires ████ insertion, but
 7   you didn't.
 8        Right?
 9             ATTORNEY JONES:  Objection.  Again, if
10   you look at the top it says deleted by Gerald Montano.
11   He again explained why this was deleted.
12   BY ATTORNEY TRYON:
13        Q.   You could have typed that in if you wanted to.
14   Right?
15             COURT REPORTER:  Was there an answer?  I
16   didn't hear.  What was the answer?
17             ATTORNEY JONES:  I told him not to answer
18   that and I said next question.
19             COURT REPORTER:  Did he answer it?
20             ATTORNEY TRYON:  So you told him not to
21   answer that?
22             ATTORNEY JONES:  I did.  He explained to
23   you already why he deleted it.  If you look at this note
24   it says deleted by Gerald Montano, and he told you why
```

Page 149

```
 1   he specifically deleted that portion of the note.  I can
 2   have the court reporter read it back to you.
 3             ATTORNEY TRYON:  Well, let's go back to
 4   the prior page.  Go back to page one.  Oops, I'm on the
 5   wrong document.
 6             ATTORNEY BLOCK:  Objection.  Just, David,
 7   for the scope of this deposition, this is about his
 8   treatment of BPJ, not about their recordkeeping
 9   practices.
10             ATTORNEY TRYON:  Jacob, can you bring up
11   Exhibit 40 for me again, please?  Somehow I've lost it.
12             VIDEOGRAPHER:  Yes.
13             ATTORNEY JONES:  I join on that last
14   objection.
15             VIDEOGRAPHER:  Mr. Tryon, I need you to
16   stop sharing the one that you have.  If you could hit
17   the stop button.  Thank you.  This is what I have for
18   Exhibit 40.  Do you see that?
19             ATTORNEY TRYON:  Yes.
20   BY ATTORNEY TRYON:
21        Q.   So at the bottom there you did not delete this
22   page or the following page.
23        Is that right?
24        A.   Yes.
```

Page 150

1    Q.   And you did enter that information, B▮
2  Pepper-Jackson desires, as indicated by that superscript
3  there.
4        Right?
5    A.   Can you refer ---?
6    Q.   Where it says --- at the very bottom there is a
7  blank, a redaction, and it says Pepper --- well, B▮
8  Pepper-Jackson --- well, the deletion, desires.  You
9  inputted those words.
10       Right?
11   A.   The ▮▮▮▮ part, yes.
12   Q.   So you were able to insert ▮▮▮▮ insertion?
13   A.   Yes, they allow for comments.
14           ATTORNEY JONES:  With, all due respect,
15  if you look at the blank Pepper-Jackson it's GM.1T.  GM,
16  if you go to the attribution key on WV 0024 is Montano,
17  Gerald, and then 1T is template.  So if we're doing what
18  you said before and you're going to the left, the blank
19  Pepper-Jackson is part of the template.
20           ATTORNEY TRYON:  Okay.
21  BY ATTORNEY TRYON:
22   Q.   Help me out here.  So blank Pepper-Jackson is in
23  the template, Mr. Montano?
24   A.   Yes, that's part of the procedure note.  It

Page 151

1  automatically generates the name.
2           ATTORNEY JONES:  And again, I just object
3  to this line of questioning.  I mean ---.
4           ATTORNEY TRYON:  I'm going to move on to
5  the next exhibit.
6           ATTORNEY JONES:  Thank you.
7  BY ATTORNEY TRYON:
8    Q.   So sharing with you Exhibit 42.  Let me know
9  when you can see that.
10   A.   Yes, I see that.
11   Q.   And I'm going to go to the third page of that
12  document.  And if we look down you see the paragraph
13  that starts B▮  Oh, there's a couple places.  Under
14  history of present illness, the second paragraph, do you
15  see that?
16   A.   Yes.
17   Q.   And it says she wants to know when she can start
18  hormone therapy. ▮▮▮▮▮▮▮▮▮▮▮And so do you have an idea --- did you
19  ▮ already decide when BPJ can start hormone therapy at
20  that point?
21   A.   No.
22
23   Q.   Did you ever discuss a timeframe for that with
24  BPJ and Heather Jackson?

Page 152

1    A.   No.
2    Q.   How about a timeline for ▮▮▮▮▮▮▮
3  ▮ ▮▮ ▮▮
5    Q.   Then it said below recently her dad said ▮▮▮
6  which caused distress.  What do you remember about that
7  conversation?
8    A.   Exactly what it says there.
9    Q.   So you just remember that --- who told you that
10  dad said ▮▮▮▮, Heather or BPJ?
11   A.   Heather.
12   Q.   And that caused distress to whom?
13   A.   That caused distress to B▮
14   Q.   And did B▮ explain that?
15   A.   As you can see she wasn't present in that visit.
16  I was speaking solely to mom.  So this is from mom's
17  point of view.
18   Q.   Yeah, thank you for pointing that out.  Lastly,
19  it says she has not ▮▮▮▮▮▮▮.  Why would that be put
20  in there?
21           ATTORNEY JONES:  Real quick, I'm just
22  going to object to the --- to the form of the question.
23  You're asking him to interpret a note of his resident.
24  I mean, as a supervising physician, you know, there are

Page 153

1  some things, but you know some --- I'm just going to
2  object to the form of the question.
3  BY ATTORNEY TRYON:
4    Q.   Well, let's back up.  Did you review the
5  information in this form?
6    A.   Yes.
7    Q.   And it says she had ▮▮▮▮▮▮▮.  Did you
8  review that?
9    A.   Yes.
10   Q.   And why did you let that stay in there?
11   A.   I do not recall.
12   Q.   I mean, it's impossible for ▮▮▮▮▮▮
13  ▮ ▮▮▮▮▮▮
14  ▮ ▮▮
16   Q.   I'll show you Exhibit 43.  Have you seen this
17  document before --- oops, I need to start.  Let me know
18  when you see that.
19   A.   Yes.
20   Q.   This is from May 17, 2021.  And then the second
21  page is from 5/17/2021.  And this shows under telephone
22  encounter that your name and author is your name.  And
23  then it says, hi, scheduling team, can you please reach
24  out to this family to schedule a follow-up appointment

## Page 154

1  with me.
2      Do you see that?
3    A.  Yes.
4    Q.  Why did you want to have a follow-up
5  appointment?
6    A.  It's routine practice to have the patient return
7  every three months once they're put on the puberty
8  blocker to make sure everything is going all right.
9    Q.  And did you have that follow-up appointment?
10   A.  It did not happen.
11   Q.  Do you know why?
12   A.  That I don't know why.  They didn't make that
13  appointment.
14   Q.  Did you have --- forgive me if I don't get the
15  terminology correct.  Did you recommend or prescribe any
16  further treatment for BPJ other than the █████████
17   A.  No.
18   Q.  I'm showing you Exhibit 45.  First page is just
19  a confidential disclosure statement that came with these
20  documents when we received them.  And then the next
21  three pages are for --- well, I don't know how to
22  characterize this, but they're dated 5 --- excuse me.  I
23  can't even --- it looks like the active coverage is as
24  of 12/31/2021, so it looks like that's the date of this

## Page 155

1  document but the problem listed --- yeah, so 12/31/2021.
2  Do you recognize this document?
3    A.  It looks like a duplicate of the previous
4  document.
5    Q.  Can you look through here and tell me if
6  everything in here looks to be correct?
7      ATTORNEY JONES:  Objection to form.  What
8  --- just this page only?
9      ATTORNEY TRYON:  No, all three pages.  I
10  guess a total of --- after the first page, disclosure
11  statement, the rest of the document.
12     ATTORNEY JONES:  So just so we're clear,
13  not going by the Bates --- well, we can go by the Bates.
14  It would be WV 002 through WV ---.
15     ATTORNEY TRYON:  0004.
16     ATTORNEY BLOCK:  I'm just going to make
17  an objection to form.  A lot of this information is
18  blank.
19     THE WITNESS:  From what I'm reading in
20  the information here, this is all correct.
21  BY ATTORNEY TRYON:
22   Q.  I didn't hear you.
23   A.  From what I'm reading in the information here in
24  the exhibit they are correct.

## Page 156

1    Q.  And I recognize there's some information that
2  does not appear here and I'm just asking you to be clear
3  about the information that does appear here.  So does
4  that --- your answer remain the same?
5    A.  Yes.
6    Q.  Let me ask you one question under problem list,
7  where it says █████████.
8      Do you see that?
9    A.  Yes.
10     ATTORNEY JONES:  On WV 000 ---.
11  BY ATTORNEY TRYON:
12   Q.  Is this █████ and the answer is no?
13   A.  Yes, I see that.
14   Q.  So can you explain that to me?  Does that mean
15  that gender dysphoria is not a chronic condition or does
16  it mean something else?  I don't understand it.
17   A.  If I understand this completely, when you put in
18  the diagnosis in the chart, sometimes that would be
19  specific to that date only.  So it doesn't list that as
20  chronic.  That date is only specific to that date from
21  my understanding of how the electronic medical records
22  is listed.
23     ATTORNEY JONES:  Again, objection to this
24  line of questioning.  I'm not exactly sure if Doctor

## Page 157

1  Montano was even the person filling out this part of the
2  form.  So you're essentially asking him to interpret
3  what someone else put.
4      VIDEOGRAPHER:  Mr. Tryon, you appear to
5  be muted.  Mr. Tryon?  Can everybody hear me?
6      THE WITNESS:  I can hear you.
7      VIDEOGRAPHER:  Okay.
8      I'm going to send him a message.  Give me
9  one second.
10     ATTORNEY HARTNETT:  This is Kathleen
11  Hartnett for the Plaintiff.  Just for the record, the
12  volume is going in and out for a lot of people listening
13  to it.  So whatever is happening to him may be what's
14  been happening to us sporadically throughout the
15  deposition.
16     VIDEOGRAPHER:  Okay.
17     ATTORNEY TRYON:  I got booted.  I am
18  back.  Can you guys hear me?
19     VIDEOGRAPHER:  Yes.  I just sent you a
20  chat message.
21     ATTORNEY TRYON:  Okay.
22     VIDEOGRAPHER:  Okay.
23  BY ATTORNEY TRYON:
24   Q.  I'm sorry.  So my question that I was trying to

1  ask, Doctor Montano, have you had any conversations ---
2  communications with BPJ or Heather Jackson since May 17,
3  2021?
4      A.   Yes ---.
5      Q.   I'm sorry?
6      A.   Yes.
7      Q.   And when was that?
8      A.   From my recollection, it would be sometime in
9  December of 2021.
10     Q.   And what was that communication?
11     A.   The communication, as I recall, was that the
12 lawyers for West Virginia wanted to talk to me regarding
13 her care, and I basically told them that they would need
14 to sign a release of information for them to speak with
15 those lawyers.
16     Q.   And that was a conversation with --- with
17 Heather Jackson or BPJ?
18     A.   With Heather Jackson.
19     Q.   And anything else discussed during that
20 conversation?
21     A.   No.
22     Q.   Any other conversations other than that since
23 May 2021?
24     A.   No.

1      ATTORNEY TRYON:  Well, give me just a
2  minute.  I think I'm about finished here.  Let me take a
3  quick break and I'll be back in just a moment.
4      VIDEOGRAPHER:  Going off the record.
5  Current time is 2:34 p.m.
6  OFF VIDEOTAPE
7      ---
8  (WHEREUPON, A SHORT BREAK WAS TAKEN.)
9      ---
10     ATTORNEY TRYON:  No further questions.
11 ON VIDEOTAPE
12     VIDEOGRAPHER:  We're back on the record,
13 2:37.
14     ATTORNEY TRYON:  Okay.
15     This is David Tryon.  I'm back, and I
16 have no further questions.  Doctor Montano, thank you
17 for your time.  I appreciate it.  And we would request a
18 copy of that consent form that was discussed earlier.
19 And my question is simply do I need to do anything
20 formal to request that or will this suffice, Mr. Jones?
21     ATTORNEY JONES:  I would say just send me
22 an e-mail just so I have something hard copy.  And then
23 I'll make the request and get that for you.
24     ATTORNEY TRYON:  Great.  I doubt anybody

1  else has any questions, but ---.
2      ATTORNEY GREEN:  This is Roberta Green,
3  WVSSAC.  I have no questions.
4      ATTORNEY BLOCK:  This is Josh Block for
5  Plaintiff.  We don't have any questions, but we want to
6  make sure the transcript is marked confidential.
7      ATTORNEY CROPP:  This is Jeff Cropp for
8  Harrison County Board of Education, Dora Stutler.  We
9  don't have any questions.
10     ATTORNEY MORGAN:  This is Kelly Morgan on
11 behalf of the West Virginia Board of Education and
12 Superintendent Burch.  I don't have any questions.
13     ATTORNEY TRYON:  Tim, you're muted.
14     ATTORNEY DUCAR:  Thank you.  Timothy
15 Ducar on behalf of the intervenor.  We have no
16 questions.
17     ATTORNEY TRYON:  I think that concludes
18 today's deposition, Mr. Montano.  You have the right to
19 review this --- the transcript.  I'm sure your client
20 --- your attorney will instruct you accordingly, whether
21 or not ---
22     ATTORNEY JONES:  We'll read.
23     ATTORNEY TRYON:  --- to read or waive.
24     ATTORNEY JONES:  We will read.

1      VIDEOGRAPHER:  That concludes the
2  deposition.
3      ATTORNEY TRYON:  I guess I didn't --- we
4  would like a copy of the transcript and that only, and
5  we would like an etranscript as well.
6      ATTORNEY DUCAR:  Yes, the intervenor
7  would like a copy of the transcript as well.  No video,
8  please.
9      VIDEOGRAPHER:  That concludes the
10 deposition.  The current time is 2:40 p.m.
11     * * * * * * *
12 CONFIDENTIAL VIDEOTAPED DEPOSITION CONCLUDED
13     AT 2:40 P.M.
14     * * * * * * *
15
16
17
18
19
20
21
22
23
24