Exhibit 26

1          IN THE UNITED STATES DISTRICT COURT

2       FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA

3               *    *    *    *    *    *

4    B.P.J., by her next friend and     *

5    mother, HEATHER JACKSON,           *

6        Plaintiffs                     * Case No.

7        vs.                            * 2:21-CV-00316

8    WEST VIRGINIA STATE BOARD OF       *

9    EDUCATION, HARRISON COUNTY BOARD OF*

10   EDUCATION, WEST VIRGINIA SECONDARY *

11   SCHOOL ACTIVITIES COMMISSION, W.   *

12   CLAYTON BURCH in his official      *

13   capacity as State Superintendent,  *

14   and DORA STUTLER in her official   *

15   capacity as Harrison County        *

16   Superintendent, PATRICK MORRISEY in*

17

18              VIDEOTAPED DEPOSITION OF

19                JOSHUA SAFER, M.D.

20                 March 24, 2022

21

22       Any reproduction of this transcript

23        is prohibited without authorization

24            by the certifying agency.

1  his official capacity as Attorney  *

2  General, and THE STATE OF WEST     *

3  VIRGINIA,                          *

4      Defendants                     *

5                      *    *    *    *    *    *

6

7                  VIDEOTAPED DEPOSITION OF

8                   JOSHUA SAFER, M.D.

9                    March 24, 2022

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

```
 1                      VIDEOTAPED DEPOSITION

 2                             OF

 3     JOSHUA SAFER, M.D., taken on behalf of the Intervenor

 4     herein, pursuant to the Rules of Civil Procedure, taken

 5     before me, the undersigned, Nicole Montagano, a Court

 6     Reporter and Notary Public in and for the Commonwealth

 7     of Pennsylvania, taken via videoconference, on

 8     Wednesday, March 24, 2022 at 9:30 a.m.

 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24
```

```
 1              A P P E A R A N C E S

 2

 3    JOSHUA BLOCK, ESQUIRE

 4    American Civil Liberties Union Foundation

 5    125 Broad Street

 6    New York, NY  10004

 7    COUNSEL FOR PLAINTIFF

 8

 9    KATHLEEN R. HARTNETT, ESQUIRE

10    ANDREW BARR, ESQUIRE

11    JULIE VEROFF, ESQUIRE

12    ZOE HELSTROM, ESQUIRE

13    KATELYN KANG, ESQUIRE

14    Cooley, LLP

15    3 Embarcadero Center

16    20th Floor

17    San Francisco, CA  94111-4004

18         COUNSELS FOR PLAINTIFF

19

20

21

22

23

24
```

```
 1              A P P E A R A N C E S (cont'd)

 2

 3  SRUTI SWAMINATHAN, ESQUIRE

 4  Lambda Legal

 5  120 Wall Street

 6  19th Floor

 7  New York, NY  10005-3919

 8      COUNSEL FOR PLAINTIFF

 9

10  DAVID TRYON, ESQUIRE

11  State Capitol Complex

12  Building 1, Room E-26

13  Charleston, WV  25305

14      COUNSEL FOR STATE OF WEST VIRGINIA

15

16  ROBERTA F. GREEN, ESQUIRE

17  Shuman McCuskey Slicer, PLLC

18  1411 Virginia Street East

19  Suite 200

20  Charleston, WV  25301

21      COUNSEL FOR WEST VIRGINIA SECONDARY SCHOOL

22      ACTIVITIES COMMISSION

23

24
```

```
 1              A P P E A R A N C E S (cont'd)

 2

 3   SUSAN DENIKER, ESQUIRE

 4   Steptoe & Johnson

 5   400 White Oaks Boulevard

 6   Bridgeport, WV  26330

 7        COUNSEL FOR HARRISON COUNTY BOARD OF EDUCATION and

 8        HARRISON COUNTY SUPERINTENDENT DORA STUTLER

 9

10   KELLY C. MORGAN, ESQUIRE

11   Bailey Wyant

12   500 Virginia Street East

13   Suite 600

14   Charleston, WV  25301

15        COUNSEL FOR WEST VIRGINIA BOARD OF EDUCATION and

16        SUPERINTENDANT W. CLAYTON BURCH

17

18

19

20

21

22

23

24
```

```
1              A P P E A R A N C E S (cont'd)

2

3   ROGER BROOKS, ESQUIRE

4   LAURENCE WILKINSON, ESQUIRE

5   CHRISTIANA HOLCOMB, ESQUIRE

6   JOHNATHAN SCRUGGS, ESQUIRE

7   Alliance Defending Freedom

8   15100 North 90th Street

9   Scottsdale, AZ  85260

10       COUNSEL FOR INTERVENOR, LAINEY ARMISTEAD

11

12

13

14

15

16

17

18

19

20

21

22

23

24
```

```
1                        I N D E X

2

3   DISCUSSION AMONG PARTIES                      12 - 14

4   WITNESS: JOSHUA SAFER, M.D.

5   EXAMINATION

6      By Attorney Brooks                         14 - 252

7   EXAMINATION

8      By Attorney Tryon                         253 - 288

9   DISCUSSION AMONG PARTIES                     288 - 289

10  CERTIFICATE                                        290

11

12

13

14

15

16

17

18

19

20

21

22

23

24
```

1                          EXHIBIT PAGE

2

3                                                           PAGE

4    NUMBER    IDENTIFICATION                        IDENTIFIED

5     1     Report of Dr. Safer                         15

6     2     Rebuttal Report of Dr. Safer               15

7     3     Fairness for Transgender People in

8           Sport Article                              16

9     4     Professor Handelsman Article               43

10    5     Court of Arbitration for Sport Decision  63

11    6     5/10/21 Declartion of Dr. Safer            75

12    7     Transgender Women in a Female Category

13          Of Sport                                   99

14    8     Endocrine Society Guidelines              113

15    9     Care of the Transgender Patient Article  127

16    10    Roberts, et al. Article                   133

17    11    Race Times for Transgender

18          Athletes Article                          142

19    12    Joanna Harper Article                     145

20    13    Dr. Roberts Article                       156

21    14    Guidance With Transgender Inclusion in

22          Domestic Sport                            161

23    15    Dr. Safer Article                         183

24

<u>EXHIBIT PAGE</u>

<u>PAGE</u>

| <u>NUMBER</u> | <u>IDENTIFICATION</u> | <u>IDENTIFIED</u> |
|---|---|---|
| 16 | Aruna Sawaswat Article | 216 |
| 17 | 2005 Paper by Professor Heino | |
| | Meyer-Bahlburg | 225 |
| 18 | Paper by Doctor Reiner | 234 |
| 19 | Article | 259 |

```
 1                      OBJECTION PAGE

 2

 3    ATTORNEY                                        PAGE

 4    Block    16, 17, 18, 19, 19, 20, 22, 23, 24, 24, 26, 27,

 5    28, 29, 30, 30, 31, 33, 34, 36, 36, 36, 37, 37, 38, 38,

 6    39, 41, 42, 42, 43, 43, 46, 46, 46, 47, 48, 48, 49, 50,

 7    52, 53, 54, 55, 55, 56, 57, 59, 60, 63, 65, 66, 67, 68,

 8    68, 70, 70, 72, 75, 79, 80, 81, 82, 82, 83, 83, 83, 84,

 9    84, 85, 85, 86, 86, 87, 89, 90, 91, 91, 92, 93, 93, 95.

10    95, 96, 97, 98, 101, 102, 102, 103, 103, 105, 105, 106,

11    107, 107, 108, 108, 109, 109, 110, 112, 115, 116, 118,

12    120, 123, 123, 124, 125, 126, 130, 132, 133, 134, 134,

13    136, 136, 137, 142, 144, 148, 148, 149, 150, 151, 152,

14    153, 154, 155, 156, 157, 158, 158, 160, 160, 161, 163,

15    165, 166, 167, 168, 169, 170, 170, 172, 172, 173, 173,

16    174, 174, 174, 175, 175, 176, 176, 177, 178, 180, 181,

17    183, 185, 187, 187, 188, 188, 183, 193, 195, 196, 197,

18    197, 198, 200, 200, 201, 202, 204, 205, 205, 207, 215,

19    215, 219, 222, 224, 231, 240, 244, 246, 254, 255, 255,

20    256, 257, 260, 261, 261, 262, 262, 263, 263, 264, 265,

21    268, 268, 270, 270, 271, 271, 273, 274, 275, 275, 277,

22    278, 279, 280, 280, 281, 283, 284, 285

23

24    Brooks                                          213
```

```
 1              S T I P U L A T I O N
 2    --------------------------------------------------------
 3    (It is hereby stipulated and agreed by and between
 4    counsel for the respective parties that reading,
 5    signing, sealing, certification and filing are not not
 6    waived.)
 7    --------------------------------------------------------
 8              P R O C E E D I N G S
 9    --------------------------------------------------------
10              MR. BABWAH:  My name is Brandon Babwah.
11    I'm a notary public out of the State of New York.
12              VIDEOGRAPHER:  We are now on the record.
13    My name is Jacob Stock.  I'm a Certified Legal Video
14    Specialist employed by Sargent's Court Reporting
15    Services.  The date today is March 24th, 2022.  The
16    current time on the video monitor reads 9:17 a.m.
17    Eastern Standard Time.  This deposition is taken
18    remotely by videoconference.  The caption of this case
19    is the United States District Court for the Southern
20    District of West Virginia at Charleston, BPJ, et al.
21    versus West Virginia State of Board of Education, et
22    al., Civil Action No. 2:21-cv-00316.  The name of the
23    witness is Joshua Safer.  Will the attorneys present
24    state their names and the parties they represent?
```

1          ATTORNEY BROOKS:  Roger Brooks for the

2    Intervenor, Lainey Armistead, in the room --- in the

3    conference room with the witness.  With me is my

4    colleague, Lawrence Wilkerson.

5          ATTORNEY HOLCOMB:  Christiana Holcomb for

6    the Intervenor.

7          ATTORNEY TRYON:  This is David Tryon

8    representing the State of West Virginia.  I'm with the

9    Attorney General's Office.

10          ATTORNEY MORGAN:  This is Kelly Morgan on

11    behalf of the West Virginia Board of Education and

12    Superintendent Burch.

13          ATTORNEY DENIKER:  Good morning.  Susan

14    Deniker representing Harrison County Board of Education

15    and Superintendent Dora Stutler.

16          ATTORNEY GREEN:  Roberta Green here on

17    behalf of West Virginia Secondary School Activities

18    Commission.

19          ATTORNEY BLOCK:  For the Plaintiff in the

20    room is Josh Block from the ACLU.

21          ATTORNEY SWAMINATHAN:  And you have Sruti

22    Swaminathan from Lambda Legal.

23          ATTORNEY HARTNETT:  Good morning.  This

24    is Kathleen Hartnett from Cooley for the Plaintiff.

1          ATTORNEY BARR:  This is Andrew Barr from

2 Coley for Plaintiff.

3          ATTORNEY KANG:  Good morning.  This is

4 Katelyn Kang from Cooley for the Plaintiff.

5          ATTORNEY HELSTROM:  Hello.  This is Zoe

6 Helstrom from Cooley for Plaintiff.

7          VIDEOGRAPHER:  And if that's everyone,

8 may I ask the notary to swear in the witness?

9                ---

10          JOSHUA SAFER, M.D.,

11 CALLED AS A WITNESS IN THE FOLLOWING PROCEEDING, AND

12 HAVING FIRST BEEN DULY SWORN BY A NOTARY PUBLIC,

13 TESTIFIED AND SAID AS FOLLOWS:

14                ---

15          VIDEOGRAPHER:  May I also ask the notary

16 to identify himself for the record as well?

17          NOTARY:  My name is Brandon Babwah.

18          VIDEOGRAPHER:  And at this time the

19 notary may be dismissed and we can begin.

20          ATTORNEY BROOKS:  Thank you.  And thank

21 you all for making all this complicated stuff work.

22                ---

23          EXAMINATION

24                ---

BY ATTORNEY BROOKS:

   Q.   Doctor Safer, good morning.  I want to first put in front of you your expert report and your rebuttal report so that you have those if at any point you want to refer to them.  It looks --- for convenience let's mark those as Exhibit 1 and 2 for the deposition.

             ATTORNEY TRYON:  Roger, one moment.  I'm looking at the realtime, and it's recording you as Attorney Capehart.  So I don't know if that needs to be corrected now.  And it's showing me as Attorney Hartnett.

             ATTORNEY BROOKS:  She will get that fixed and the record will be correct.

             ATTORNEY TRYON:  Okay.

                   ---

             (Whereupon, Exhibit 1, Report of Dr. Safer, was marked for identification.)

             (Whereupon, Exhibit 2, Rebuttal Report of Dr. Safer, was marked for identification.)

                   ---

             ATTORNEY BROOKS:  And at the moment I'm handing copies to the witness.  And I would like to mark as Safer Exhibit 3 a short article entitled Fairness for Transgender People in Sport by Joshua Safer.

1      <u>ATTORNEY WILKINSON:</u>  Tab 82.

2                    ---

3           (Whereupon, Exhibit 3, Fairness for

4           Transgender People in Sports Article, was

5           marked for identification.)

6                    ---

7           <u>ATTORNEY BROOKS:</u>  And the court reporter

8    will hand the stamped copy to the witness; am I correct?

9    <u>BY ATTORNEY BROOKS:</u>

10      Q.    And Doctor Safer, I will ask you questions if

11   you go about your expert reports but let me ask you now

12   to focus your attention on Exhibit Number 3.  Am I right

13   that this is an article that you have just very recently

14   published?

15      A.    Yes.

16      Q.    When did this come out?

17      A.    This came out within the past few weeks I think.

18      Q.    And this is not a recording of the original

19   research.  This is a two page piece simply explaining

20   current issues to the readership of this journal?

21           <u>ATTORNEY BLOCK:</u>  Objection to form.

22           <u>THE WITNESS:</u>  So this is not original

23   research, that's correct.

24           <u>ATTORNEY BROOKS:</u>  Thank you.

1    BY ATTORNEY BROOKS:

2       Q.    How would you describe the purpose of this

3    article?

4       A.    The purpose of this article is to educate

5    endocrinologists, frame the issues and also serves a bit

6    as a charge to endocrinologists in terms of work that

7    needs to be done.

8       Q.    Thank you.  If you look at the first column of

9    the first page, in the third paragraph you will see it

10   begins a possible tension exists because of the

11   observation that on average cisgender boys and men have

12   better performance outcomes in athletics than do

13   cisgender girls and women.  Do you see that language?

14      A.    I do.

15      Q.    And you are referring there to the general

16   observation that natal males have better average

17   athletic performance than natal females in a variety of

18   measures.

19          Correct?

20              ATTORNEY BLOCK:  Objection to form.

21              THE WITNESS:  So I guess I need to be

22   more specific or I can clarify.

23   BY ATTORNEY BROOKS:

24      Q.    If you would be more specific.

1    A.    So cisgender men at a certain age have better

2  sports outcomes than cisgender women.

3    Q.    But you wrote in this just published article

4  that cisgender boys and men have better performance

5  outcomes than the cisgender girls and women.

6        Correct?

7    A.    That is correct.

8    Q.    And what did you mean in that statement by your

9  reference to boys and girls?

10   A.    Boys and girls who are basically --- it depends,

11  it's context I guess.  So boys and girls who are

12  developed to that point.

13   Q.    So those --- what you had in mind are boys and

14  girls, once the puberty process begins in males in

15  particular?

16              ATTORNEY BLOCK:  Objection to form.

17              THE WITNESS:  Yes, I guess I would say

18  that what we know is what is towards the end of puberty

19  and subsequent development beyond puberty.

20  BY ATTORNEY BROOKS:

21   Q.    You say in the next sentence --- well, let me

22  just clarify, you accept as a scientific fact the

23  general observation that, on average, boys and men,

24  defining boys as you just did, have significantly

```
 1   stronger athletic performance in a variety of metrics
 2   than girls and women as you just defined girls; correct?
 3                        ATTORNEY BLOCK:  Objection to form.
 4                        THE WITNESS:  So I guess how I would say
 5   that is I accept as fact that men and boys who are
 6   appropriately developed have, yeah, have bad performance
 7   outcomes in certain sports than do cisgender women and
 8   cisgender girls again appropriately developed.
 9   BY ATTORNEY BROOKS:
10      Q.    And the next sentence reads the performance
11   difference has resulted in the establishment of female
12   only divisions for sport participation for girls and
13   women and safely compete in the live events, closed
14   quote.  Do you see that language?
15      A.    I do.
16      Q.    And there you were, am I correct, explaining the
17   relationship of your observation about male performance
18   with the existence in our society of sex-separated
19   sports.
20                   Correct?
21                        ATTORNEY BLOCK:  Objection to form.
22                        THE WITNESS:  So I guess --- I would
23   think the way I would say it myself is this is a ---
24   this is the reason why we have the carve-out for the
```

 1  female category.

 2  BY ATTORNEY BROOKS:

 3      Q.    And one reason is to give cisgender girls and

 4  women an opportunity to, quote, reliably win events.

 5          Correct?

 6              ATTORNEY BLOCK:  Objection.

 7              COURT REPORTER:  I'm sorry, Counsel, I

 8  can't hear you.

 9  BY ATTORNEY BROOKS:

10      Q.    One reason, according to what you've written in

11  this article, that there have been a carve-out in a

12  separate female division is to provide girls and women

13  with opportunities to, quote, reliably win events,

14  closed quote.

15          Correct?

16      A.    So I guess the way I would say it is if we are

17  going to be really careful with the language here that

18  it would be on average to reliably win events, that is

19  --- yeah, I will leave it at that.

20      Q.    Certainly not every girl and women is going to

21  win events, as I know as a male who never won an event?

22      A.    Exactly.

23      Q.    And another reason, according to this sentence

24  that you wrote, for having a separate category for girls

1    and women is so that they can, quote, safely compete.

2         Correct?

3    A.    The word safely in that context is kind of ---

4    accentuates reliably.

5    Q.    And you wrote in the next sentence that, quote,

6    the female-only divisions are a major factor to

7    encourage greater participation of girls and women in

8    sports with a goal of equal participation rates.

9         Do you see that language?

10   A.    I do.

11   Q.    And can you explain to me what you understand or

12   what you were trying to explain as the relationship

13   between having a separate female category on the one

14   hand and encouraging greater participation by women and

15   girls on the other?

16   A.    Some of the goals of the people who are in sport

17   who organize sport are to get as high fractions of the

18   population to participate as can be encouraged to do so

19   for sheer health of those individuals and then of

20   everybody.  And so the purpose of the carve-out then in

21   these circumstances is to encourage girls and women to

22   participate in larger numbers than they might otherwise.

23   Q.    And do you have an opinion, do you have an

24   expert opinion as to whether the existence of separate

1  categories for female sports has in fact been a, quote,

2  major factor in encouraging greater participation by

3  women and girls in sport?

4      A.    I don't have an expert opinion.

5      Q.    You don't know whether that is objectively true

6  or not?

7                      ATTORNEY BLOCK:  Objection to form.

8                      THE WITNESS:  I don't --- right, I can't

9  state as an expert on the details of that subject,

10 that's right.

11 BY ATTORNEY BROOKS:

12     Q.    On the second column, in the --- the first full

13 sentence begins many hormone related.  Do you see that?

14     A.    Yes, I do.

15     Q.    Let me read that sentence into the record.

16 Quote, many hormone-related physical characteristics

17 acquired during puberty are not reversed if hormone

18 levels are changed later in life.  Can you tell us what

19 physical characteristics associated with typical male

20 development are in your opinion not reversed if hormone

21 levels are changed later in life?

22     A.    Again, so I don't know that I would off the top

23 of my head give an exhaustive list but a classic would

24 be height.

1    Q.    Would you --- I understand your list may not be

2  exhaustive, but let me ask you to tell us all the

3  examples as you're able to sit here thinking today of

4  physical characteristics acquired during male puberty

5  that are not reversed if hormone levels are changed

6  later in life.

7                    ATTORNEY BLOCK:  Objection to form.

8                    THE WITNESS:  I don't know that I could

9  --- I don't know that I would want to accidentally go

10  down that path and conjecture too much, but if I'm

11  expanding a bit on height and thinking about bone

12  characteristics, especially there might be modest change

13  but significant residual bone would be the biggest

14  example.  And some other elements --- I can't even say I

15  was about to say a bit proportional, but it's more

16  complicated than that, so other --- other tissues partly

17  influenced by that fact.

18  BY ATTORNEY BROOKS:

19    Q.    If we jump down to the next paragraph it begins,

20  quote, the questions arise most with transgender women

21  who began hormone treatment after puberty.  And then it

22  continues, quote, the situation includes most

23  transfeminine people because it is most common to

24  undergo endogenous puberty prior to seeking medical

```
1    interventions appropriate to gender identity.  Have I
2    read that correctly?
3        A.    Yes.
4        Q.    And is it consistent with your experience that
5    most natal males who seek what you refer to as gender
6    confirming treatment do so after experiencing at least
7    most of the ordinary male puberty?
8                    ATTORNEY BLOCK:  Objection to form.
9                    THE WITNESS:  Yes.  So just terminology,
10   just to be clear, so people who are recorded male at
11   birth who are looking for gender affirming is the term
12   but gender confirming is fine.  And sorry, the question
13   there?
14   BY ATTORNEY BROOKS:
15       Q.    I will ask it again.  Is it consistent with your
16   personal experience that most natal males who seek
17   gender affirming treatment present after undergoing at
18   least most of a natural male puberty?
19                   ATTORNEY BLOCK:  Same objection to
20   terminology.
21                   THE WITNESS:  Yes.  So most transgender
22   women who come seeking medical treatment have gone
23   through a typical male puberty, that is correct, right
24   now.
```

1    BY ATTORNEY BROOKS:

2        Q.    And in your clinic most of them have gone

3    through what you would consider to be a complete male

4    puberty process?

5        A.    I can't answer that completely because we define

6    puberty in this narrow way with the Tanner stages, but

7    then people continue to have development even beyond

8    that to a significant degree.

9        Q.    But they have experienced, in your professional

10   experience, at least the bulk of the pubertal changes?

11       A.    Yes, I mean the --- I guess --- the way I would

12   say it is, is that most of the transgender women who are

13   coming or even girls who are coming for medical

14   attention have gone through the classic Tanner stages of

15   puberty through Tanner five, which is the last one, by

16   the time they have determined that they're interested in

17   gender-affirming treatment, yes.

18       Q.    And let's go back to the very first paragraph of

19   your article in which you mention about five lines down,

20   quote, concern for possible residual athletic advantages

21   from a history of typical male puberty, closed quote.

22   Do you see that language?

23       A.    Let me find it.  Where is it?

24       Q.    It's about five lines down on the very first

1    paragraph of the article.

2        A.    Oh, the middle of the sentence, exactly.

3        Q.    And so in your opinion, it is concern for

4    possible residual athletic advantages from a history of

5    typical male puberty that drives a great deal of concern

6    about how to address inclusion of natal males who

7    experience a female gender identity in female athletics.

8            Am I correct?

9                ATTORNEY BLOCK:  Objection to form.

10               THE WITNESS:  So the concern about the

11   residual impact of testosterone during puberty for

12   transgender women who went through a typical male

13   puberty is the source of --- right, is a source of

14   tension at a medical sensitive level, yes.

15   BY ATTORNEY BROOKS:

16       Q.    And that's an issue that, for instance, you

17   engage in extensive discussions about in connection with

18   your service on the committee for the IAAF.

19           Am I correct?

20       A.    So the --- right, the conversation at World

21   Athletics now, but formerly IAAF, has dealt and I'm sure

22   will continue to deal with that which is the question of

23   to what degree are some of those characteristics, a

24   cause for relevant athletic advantage.

1      Q.    And in your opinion, concern about possible

2 residual athletic advantages resulting from a history of

3 typical male puberty is legitimate concern.

4           Right?

5                     ATTORNEY BLOCK:  Objection to form.

6                     THE WITNESS:  Right.  I don't know that

7 I'm as an expert commenting on its legitimacy.  My role

8 on the committee is talking about what is.

9 BY ATTORNEY BROOKS:

10     Q.    Do you have any expert opinion as to whether

11 concern for possible residual athletic advantages from a

12 history of typical male puberty is a legitimate concern?

13     A.    I'm sorry.  Say that again.

14     Q.    Do you have any expert opinion as to whether

15 concern for possible residual athletic advantage from a

16 history of a typical male puberty is a legitimate

17 concern?

18     A.    I don't know that I would --- again, I don't

19 know that I'm an expert on what is legitimate or not.  I

20 come into the room as the scientist talking about what

21 is true and what is not true, what do we know and what

22 do we not know.

23     Q.    So on the question then after the science has

24 been put on the table as to how to balance that with

```
 1    other considerations of fairness, of inclusion, that is

 2    not your expertise is what you are telling me?

 3         A.    That is right, that is not my expertise.

 4         Q.    If we go to page two, in the first column, the

 5    second full paragraph begins because testosterone.  Do

 6    you see that paragraph?

 7         A.    I do.

 8         Q.    And you discuss there World Athletic

 9    requirements, that is the former IAAF I believe you just

10    testified?

11         A.    Yes.

12         Q.    And the World Athletics has adopted a

13    requirement to suppress testerone (sic) to five

14    nanomolar per liter testosterone.

15              Correct?

16         A.    World Athletics threshold is five nanomolar per

17    liter for those sports where they have a threshold.

18    That's right, yes.

19         Q.    And at least formally the International Olympic

20    Committee had a ten nanomolar threshold as part of what

21    you would call out in this paragraph.

22              Is that correct?

23              ATTORNEY BLOCK:  Objection to form.

24              THE WITNESS:  Yes.  So it was the case
```

1    that the International Olympic Committee Medical Group

2    was trying to form a unified approach just for purposes

3    of organization.  And at that time a ten nanomolar per

4    liter suggestion was put out.  And that is about as far

5    as it got because it then was shifted to all of the

6    individual international federations.

7    BY ATTORNEY BROOKS:

8      Q.   You say in the final sentence of that paragraph,

9    quote, such thresholds are considered to be fair to

10   transgender women because they are well above the 1.7

11   nanomolar per liter target testosterone threshold in

12   medical treatment guidelines, closed quote.

13         Do you see that language?

14     A.   Yes.

15     Q.   Am I correct that in your professional

16   understanding the 1.7 nanomolar per liter target is set

17   because that's generally believed to be at the upper

18   range of testosterone levels in normal, healthy females?

19              ATTORNEY BLOCK:  Objection to form.

20              THE WITNESS:  So the 1.7 nanomolar per

21   liter target is the upper level for adults cisgender

22   women.

23   BY ATTORNEY BROOKS:

24     Q.   And with that clarified, can you explain to me

1    what you meant by the sentence that I just read, what

2    the point is there?

3        A.    The point of the sentence is to --- I guess

4    there are a couple of considerations in terms of

5    determining these numbers, but --- so part of the point

6    is to identify numbers that are feasible for transgender

7    women on their medical treatment.

8        Q.    Is there some other point to this sentence in

9    your understanding as it is offered?

10                   ATTORNEY BLOCK:  Objection to form.

11                   THE WITNESS:  So the sentence references

12   that piece, but there is the additional context of

13   having a number that is fair to the greater female

14   committee cisgender and transgender too.

15   BY ATTORNEY BROOKS:

16       Q.    So it's fair in your judgment to transgender

17   women because the threshold that is being set gives,

18   what should we say, plenty of buffer above what is

19   considered to be the upper range of normal female

20   testosterone levels?

21                   ATTORNEY BLOCK:  Objection to form.

22                   THE WITNESS:  Right.  So I'm not taking a

23   position on what is fair to be clear.

24   BY ATTORNEY BROOKS:

1          Q.      Thank you.

2          A.      But the concept of those in the room making that

3     distinction felt that this cutoff would be fair because

4     there would be, indeed, create some buffer and,

5     therefore, people who weren't perfectly at goal would

6     still be included.

7          Q.      So because this may be important, let me

8     clarify, when you wrote such thresholds are considered

9     to be fair, you were not offering a personal opinion

10    about fairness but explaining the judgment that had been

11    made by this committee about fairness?

12         A.      That's correct.

13         Q.      Thank you.  And did it cause you personally any

14    concern that the threshold --- that because the

15    threshold that was set was more than three times higher

16    than the upper bounds of testosterone concentrations in

17    normal healthy women, that that might be unfair to the

18    broader population of cisgender women?

19                      ATTORNEY BLOCK:  Objection to form.

20                      THE WITNESS:  So to be clear, I'm not

21    rendering an opinion as an expert on what is fair, but I

22    can interpret the considerations of people having these

23    conversations.  And so while it is true that the

24    laboratory range for testosterone for healthy cisgender

```
 1   women has an upper limit of 1.7 nanomolar per liter,
 2   there are cisgender women who, for a variety of reasons,
 3   have numbers higher than that and so that and --- so
 4   that is part of the consideration.
 5   BY ATTORNEY BROOKS:
 6       Q.    Let me take you to the two paragraphs below that
 7   to the paragraph that begins the societal priorities.
 8   Do you see that paragraph?
 9       A.    I do.
10       Q.    The last sentence of that paragraph reads if
11   advantage from testosterone is demonstrated, does
12   society want to implement rules that may indirectly
13   coerce transgender children to begin medical regimens
14   prior to their being ready and that they might never
15   actually choose otherwise, closed quote.
16             Do you see that language?
17       A.    I do.
18       Q.    Would you explain to me the concern that you are
19   expressing there?
20       A.    If a societal goal --- and again here recognize
21   I'm not acting as an expert in this space, but I'm
22   trying to explain to my colleagues what people are
23   discussing.  And if our concern is increased
24   participation in sport by various people, then you can
```

1    envision a circumstance where some girls farther along

2    in puberty have a testosterone advantage that could be

3    demonstrated.  Again, not that we even have at this

4    point.  And then we would be faced with that question,

5    which is that competing goal of making those transgender

6    girls participate in sports and a recognition if they

7    are sufficiently far along in their development that

8    they may have an advantage if we demonstrate such an

9    advantage.

10       Q.    Let me see if I can break that out.  Were you

11   talking here about a concern about a hypothetical rule

12   that says to a natal male who identifies as female that

13   you may play if you have suppressed testosterone --- you

14   may play if you have taken puberty blockers at an early

15   age but you may not play if you have not taken puberty

16   blockers from an early stage?  Is that the hypothetical

17   structure that you were addressing in this sentence?

18                    ATTORNEY BLOCK:  Objection to form.

19                    THE WITNESS:  So the --- it is a

20   hypothetical and it would be that if we make a specific

21   testosterone lowering rule at a scholastic level, might

22   we run into a circumstance where we are encouraging

23   somebody to make medication who might not otherwise take

24   that medication.

1    BY ATTORNEY BROOKS:

2        Q.    And staying away from questions of fairness and

3    speaking from what I think is a medical ethics

4    perspective, would you think it raises ethical problems

5    if society were to adopt a rule that permitted certain

6    individuals to compete in female athletics if they had

7    taken puberty blockers but did not permit them to

8    compete with the athletic if they had not taken puberty

9    blockers?

10                    ATTORNEY BLOCK:  Objection to form.

11                    THE WITNESS:  I think that's beyond where

12   I'm commenting as an expert witness.  Some of that

13   decision is a society decision or for other experts.

14   BY ATTORNEY BROOKS:

15       Q.    Do you consider yourself to have some expertise

16   on medical ethics?

17       A.    Not as an expert.

18       Q.    And you don't feel able --- you don't have any

19   opinion as you sit here today as to whether a policy

20   that created incentives for children to begin medical

21   regimes relating to gender transition could raise

22   medical ethical concerns?

23       A.    Not as a medical expert, that's right.

24       Q.    In the next paragraph --- and I think we said

```
 1    this is just out in the last couple of weeks, this

 2    publication.

 3            Right?

 4       A.    It's very fresh.  Number five, so yes.

 5       Q.    I'm not playing memory games.  It says at the

 6    top advance access publication 17 March 2022?

 7       A.    Good.

 8       Q.    So very recent?

 9       A.    Yes.

10       Q.    And you believe you are reasonably current in

11    the science of this area?

12       A.    I am reasonably current, indeed.

13       Q.    I didn't ask if you know it all because nobody

14    knows it all, but you say at the beginning of this

15    paragraph much remains unknown scientifically.  And you

16    continue, quote, for example, at what point in puberty

17    is advantage from testosterone significant.  Is there a

18    point where such advantage would outweigh a priority to

19    outweigh all participants --- all to participate in

20    sport of some sort, closed quote.

21            Do you see that language?

22       A.    I do.

23       Q.    And actually the point in writing the second

24    sentence there --- strike that.
```

```
 1           Let me just ask this in general.  Do you have
 2  an opinion as to how much of a performance advantage
 3  would count for those --- for natal males versus natal
 4  females, how much of a performance advantage would be,
 5  quote, significant?
 6                ATTORNEY BLOCK:  Objection to form.
 7                THE WITNESS:  I do not have an opinion.
 8  BY ATTORNEY BROOKS:
 9    Q.    And in your view, is that even a scientific
10  question?
11                ATTORNEY BLOCK:  Objection to form.
12                THE WITNESS:  Let me think.  No, that
13  isn't a scientific question.
14  BY ATTORNEY BROOKS:
15    Q.    And you --- and the next sentence is there a
16  point where an advantage, such an advantage would
17  outweigh a priority to motivate all to participate.  Am
18  I correct that you also don't consider that to be a
19  scientific question?
20    A.    That is correct.
21    Q.    That is a value judgment?
22                ATTORNEY BLOCK:  Objection to form.
23                THE WITNESS:  So it's not a scientific
24  question.  I can go a little more in --- I can expand a
```

1    little bit there which is to say that we have various

2    advantages and degrees of unfairness.  So what could be

3    a scientific question, if we knew the answers, would

4    include the degree of advantage for some circumstance

5    versus another circumstance where we are able to measure

6    those things.

7    BY ATTORNEY BROOKS:

8        Q.    But the question of whether an advantage on the

9    one hand outweighs a desire to be inclusive on the other

10   hand is a value question, not a scientific question?

11                ATTORNEY BLOCK:  Objection to form.

12   BY ATTORNEY BROOKS:

13       Q.    In your opinion.

14                ATTORNEY BLOCK:  Objection to form.

15                THE WITNESS:  So I guess I would just go

16   back to saying how I said it, which is the scientific

17   question in there would be to provide that degree of

18   difference and show, for example, that this would be ---

19   this is small advantages versus someone that we are

20   already do in society as big advantage and that would be

21   how --- that would be the role of the scientist.

22   BY ATTORNEY BROOKS:

23       Q.    I understand that's what you would like to say,

24   but my question for you is, in your opinion, is the next

1  step of deciding of whether that advantage which has now

2  been scientifically detailed outweighs a priority to

3  motivate all to participate is a value decision.

4          ATTORNEY BLOCK:  Objection to form.

5          THE WITNESS:  Yeah, I don't --- I guess I

6  can't as an expert say for certain that in all

7  circumstances that is a value to consider.

8  BY ATTORNEY BROOKS:

9    Q.    You continue among your lists of things that

10 are, quote, unknown scientifically, quote, for those who

11 have completed puberty, what duration of

12 testosterone-lowering treatment is sufficient to create

13 a level playing field in a given sport, closed quote.

14        Do you see that?

15   A.    Yes.

16   Q.    And in your view, the question of what duration

17 of testosterone lowering treatment, if any, can be

18 sufficient to create a level playing field in a given

19 sport is currently unknown scientifically?

20          ATTORNEY BLOCK:  Objection to form.

21          THE WITNESS:  It's unknown scientifically

22 across virtually all sports.  What duration of

23 testosterone lowering raises what degree of advantage.

24 It's just at that level.  To go to the level playing

```
 1   field is a whole further tier.

 2   BY ATTORNEY BROOKS:

 3      Q.    And in your final paragraph I think you said at

 4   the beginning that, in part, this was a call to the

 5   field of endocrinology for needed research.  In the

 6   final paragraph you say, quote, we in the endocrine

 7   healthcare community have much work to do to create an

 8   evidence base to help guide decision makers so the

 9   choices for transgender women in sport are data driven,

10   closed quote.

11          Have I read that language correctly?

12      A.    Yes.

13      Q.    So it's your view as of 2002 that the data that

14   we have available today are insufficient to enable data

15   driven choices about transgender participation in female

16   athletics.

17          Correct?

18              ATTORNEY BLOCK:  Objection to form.

19              THE WITNESS:  I would say that in 2022 we

20   have insufficient data to --- how would I say this, we

21   have insufficient data to make rules for, let's say,

22   transgender women, mostly talking about older more

23   developed people, that would address these concerns for

24   participation.
```

BY ATTORNEY BROOKS:

Q.    Let me ask you to find your initial expert report, which is Exhibit-1, and there I will ask you to turn to paragraph 58.  At the beginning of paragraph 58 you wrote in this report executed on January 21, 2022, which is two months prior to the publication date of the article we just looked at --- and actually, let me pause and ask you, when did you write the article that we just looked at?  And the process always grinds on for a little while.  When do you think you substantially completed the task?

A.    I honestly don't remember.

Q.    Sorry.  The question was when do you think you substantially wrote the text in the article that you just looked at?

A.    I honestly don't remember the details.  We can talk in years, so it would be 2022 and back into 2021.

Q.    Okay.

So about the same time that you were preparing this expert report?

A.    There certainly would be some overlap.

Q.    You wrote in paragraph 58, quote, even if evidence were eventually to show that on average transgender women have some level of advantage compared

1    to average non-transgender women, closed quote.

2          Do you see that language?

3    A.    I do.

4    Q.    Now, in fact, you are aware of substantial

5    evidence that, on average, transgender women do have

6    some level of advantage compared to advantage

7    non-transgender women.

8          Correct?

9                ATTORNEY BLOCK:  Objection to form.

10               THE WITNESS:  No, I'm not.  So that isn't

11   my statement.

12   BY ATTORNEY BROOKS:

13   Q.    And is the question --- so you served on the

14   IAAF Committee discussing questions of testosterone

15   levels.  And in that context you did not become

16   acquainted with data showing that on average transgender

17   women have some level of advantage compared to average

18   non-transgender women?

19   A.    Not in --- so, no.  In the context of specific

20   sports, no.

21   Q.    Do you consider the question of how much

22   advantage natal males have over natal females in

23   particular sports to be within your professional

24   expertise?

```
 1                    ATTORNEY BLOCK:  Objection to form.

 2                    THE WITNESS:  So sorry --- so cisgender

 3    men versus cisgender women, that difference at an adult

 4    level, is at my expertise to know that degree of

 5    difference?  Is that the question?

 6    BY ATTORNEY BROOKS:

 7      Q.    It is.

 8      A.    No, that is not my expertise.

 9      Q.    And is it within your expertise to know the

10    level of advantage enjoyed by natal males who have

11    transitioned to female gender identity over cisgender

12    women in any particular sport?

13                    ATTORNEY BLOCK:  Objection to form.

14                    THE WITNESS:  So in the --- so if we are

15    talking cisgender women versus transgender women, it

16    would be in my expertise to know what data we have on

17    this subject, which is different from knowing the degree

18    of difference because we don't have those data.

19    BY ATTORNEY BROOKS:

20      Q.    You say in paragraph 60, let me find this,

21    quote, there is no inherent reason why transgender women

22    physiological characteristics related to athletic

23    performance should be treated as any more of an unfair

24    advantage than the advantages that already exist among
```

```
 1   different women athletes.  Do you see that language?

 2      A.    I do.

 3      Q.    Now, earlier you told me rather emphatically

 4   that the question of fairness is outside your

 5   professional expertise.

 6           Correct?

 7                ATTORNEY BLOCK:  Objection to form.

 8                THE WITNESS:  It is outside my expertise.

 9   BY ATTORNEY BROOKS:

10      Q.    So why did you offer here an opinion about what

11   is fair or unfair?

12                ATTORNEY BLOCK:  Objection to form.

13                THE WITNESS:  Right.  So I'm not

14   determining the fairness per se as an expert, but I'm

15   simply talking about the inputs where somebody who is

16   determining what is fair --- where somebody is

17   determining what is fair would consider.

18                ATTORNEY BROOKS:  Let me mark as Safer

19   Exhibit 4 an article by Professor Handelsman entitled

20   Circulating Testosterone on a Hormonal Basis of Sex

21   Differences in Athletic Performance.

22                          ---

23                (Whereupon, Exhibit 4, Professor Handelsman

24                Article, was marked for identification.)
```

```
 1                            ---

 2                ATTORNEY WILKINSON:  Tab 18.

 3                VIDEOGRAPHER:  I'm sorry, what tab is it?

 4                ATTORNEY BROOKS:  Tab 18.

 5   BY ATTORNEY BROOKS:

 6       Q.    And Doctor Safer, am I correct this is an

 7   article that you read with some care?

 8       A.    This is an article that I read with some care.

 9       Q.    You cited in your expert report.

10             Correct?

11       A.    I think so.

12       Q.    I think so, too.  It's not a memory test.  I

13   retract the question.  We will come to it shortly.

14             Let me ask you to turn in --- and let me ask

15   you, do you know Professor Handelsman personally?

16       A.    I do not.

17       Q.    Have you encountered him in any other actions?

18       A.    I have.

19       Q.    Once, more than once?

20       A.    That is also a trick question for me.  For sure

21   once.

22       Q.    Okay.

23             Do you consider him to have a high reputation

24   in the field?
```

1    A.    If that question is as an expert I can't --- I

2    won't comment, but he certainly has published widely and

3    we quote him.

4    Q.    What do you mean by we in that answer?

5    A.    The rest of us in the field and I certainly

6    quote him in an expert opinion.

7    Q.    All right.

8         And this article in particular we note you

9    widely reference?

10    A.    This article is --- yeah, I think that is

11    actually a fair thing to say.  It is as widely

12    referenced as anything in a relatively small field.

13    Q.    Let me ask you to turn to the second page of

14    this article where Professor Handelsman in the first

15    full paragraph --- the second full paragraph begins

16    nevertheless.  He says, quote, fairness is an elusive

17    subjective concept with malleable boundaries that may

18    change over time as social concepts of fairness evolve.

19         Do you see that?

20    A.    I do.

21    Q.    Do you agree with that statement?

22    A.    As an expert I can't comment.

23    Q.    You don't purport to be able to give any

24    definition of fairness?

```
1              ATTORNEY BLOCK:  Objection to form.

2              THE WITNESS:  Yes, not as an expert.

3   BY ATTORNEY BROOKS:

4     Q.    And you don't have any opinion as to whether

5   standards of fairness can change over time?

6              ATTORNEY BLOCK:  Objection to form.

7              THE WITNESS:  I'm aware of the

8   conversation on the subject, of course, but if you are

9   asking me to comment as an expert, then no.

10  BY ATTORNEY BROOKS:

11    Q.    If the actual evidence shows that the actual

12  scientific data were to show that, quote, on average

13  transgender women have, closed quote, a very large

14  advantage compared to average non-transgender women,

15  would you then have any view as to whether permitting

16  non-transgender women to compete in female categories is

17  fair?

18              ATTORNEY BLOCK:  Objection to form.  I'm

19  sorry, what's the quotation?

20  BY ATTORNEY BROOKS:

21    Q.    If actual data were to show that on average

22  transgender women have a very large advantage compared

23  to non-transgender women, then would you have any

24  opinion as to whether it is fair to permit the
```

```
 1   transgender women to compete in the female category?

 2                    ATTORNEY BLOCK:  Objection to form.

 3                    THE WITNESS:  No, that would not change.

 4   I would simply as an expert I would talk about those

 5   degrees of difference as information.

 6   BY ATTORNEY BROOKS:

 7       Q.    But you would offer no opinion as to whether

 8   permitting the participation in the female category was

 9   or was not appropriate?

10       A.    I would not offer an expert opinion.  That's

11   right.

12       Q.    Now, you say in paragraph 60 of your expert

13   record that there is, quote, no inherent why transgender

14   women's physiological characteristics related to

15   athletic performance should be treated as any more of an

16   unfair advantage than the advantages that already exist

17   among different women athletes, close quote.  We have

18   looked at that language.

19             Correct?

20       A.    You are reading that correctly.

21       Q.    Thank you.

22       A.    Whatever the question is.

23       Q.    No question beyond that so far.  And your point

24   I take it is that for any given sport some women just
```

```
 1   have substantially more favorable physiques than others?
 2                   ATTORNEY BLOCK:  Objection to form.
 3                   THE WITNESS:  Right.  So for any given
 4   sport some women have advantages relatively to others,
 5   yes.
 6   BY ATTORNEY BROOKS:
 7       Q.    And in basketball some are simply genetically
 8   going to be substantially taller than others?
 9       A.    In basketball some are taller than others, yes.
10       Q.    I'm not speaking for you, I, at 5'8", in my
11   shoes for instance was --- am just physiologically
12   disadvantaged for basketball compared to a man who is
13   6'10"?
14                   ATTORNEY BLOCK:  Objection to form.
15                   THE WITNESS:  So as an expert I actually
16   wouldn't go there because there are other
17   characteristics in basketball per se.
18   BY ATTORNEY BROOKS:
19       Q.    That's true, although I have none of them.  But
20   is it, in your view, equally true that there is no
21   inherent reason why cisgender men's physiological
22   characteristics related to athletic performance should
23   be treated as any more of an unfair advantage for
24   competing in the women's category than the advantages
```

1    that already exist among different women athletes?

2       A.    So yeah, let's go through this more slowly a

3    second so I'm clear.

4       Q.    All I did was substitute cisgender men for

5    transgender women in that sentence.  And my question is

6    doesn't your argument as stated there apply exactly with

7    equal force to cisgender male?

8       A.    No.

9       Q.    Why is that?

10       A.    When we talk about --- when we're talking about

11    a range of characteristics among a range of people

12    versus something that might be systematically true or

13    not and so it just --- so the answer just ends up being

14    more complex.

15       Q.    Well, you have testified that most natal women

16    --- pardon me, you testified that most natal males with

17    female gender identity have undergone at least the

18    majority of male puberty before they present for gender

19    affirming treatment.

20            Correct?

21                ATTORNEY BLOCK:  Objection to form.

22                THE WITNESS:  So most cisgender women

23    when they come to medical attention have gone through a

24    significant puberty, the five Tanner stages.

1   BY ATTORNEY BROOKS:

2      Q.    And just to clarify, to use your terms, in

3   giving that answer you said cisgender women.  That is

4   not what you meant.

5           Correct?

6      A.    That is not what I meant, thank you.

7   Transgender women.

8      Q.    And therefore, they systematically have gone

9   through --- systematically gone through physiologic

10  changes associated with male puberty?

11                  ATTORNEY BLOCK:  Objection to form.

12                  THE WITNESS:  So the --- so they --- they

13  have gone through male puberty.  And there is something

14  on average that may be true there, but whether that

15  relates to an advantage in a specific sport I can't go

16  there.

17  BY ATTORNEY BROOKS:

18     Q.    Well, the example that you gave earlier of a

19  systematic difference resulting from male puberty that

20  these transgender women enjoy is height, that is you

21  mentioned that earlier.

22          Correct?

23     A.    Uh-huh (yes).

24     Q.    So again, let me ask, given that according to

```
 1    your testimony and experience the substantial majority

 2    of transgender women have undergone most of male

 3    puberty, why is it not equally true that there is no

 4    inherent reason why cisgender men's physiological

 5    characteristics related to athletic performance should

 6    be treated as any more of an unfair advantages than the

 7    advantages that already exist among different women

 8    athletes?

 9        A.    So if I'm following this correctly then it's ---

10    then the answer to the question why are cisgender men

11    different than transgender women?

12        Q.    Why does this logic apply differently to the

13    cisgender men than to the transgender women?

14        A.    So let's see.  It actually doesn't.  So if you

15    have a sport where that --- where the advantage or ---

16    for the --- where a known advantage for cisgender men

17    versus cisgender women was sufficiently modest, and

18    again, I wouldn't be the judge of that, but you could

19    envision that becoming a coed sport.

20        Q.    Are you offering an opinion that either

21    government or leagues have an obligation to do an

22    individual by individual assessment as to whether a

23    particular natal male who experiences a female gender

24    identity does or does not enjoy a physiological
```

```
 1    advantage in the sport they wish to play in as a result
 2    of typical male development that they had gone through?
 3                        ATTORNEY BLOCK:  Objection to form.
 4                        THE WITNESS:  Right, I'm not offering an
 5    opinion.  It was a long question.
 6    BY ATTORNEY BROOKS:
 7        Q.    Would you like to hear the question back?
 8        A.    Sure, but I'm not offering an opinion on several
 9    aspects.
10                        ATTORNEY BROOKS:  Would you read that
11    question back, please?
12                              ---
13    (COURT REPORTER READS BACK PREVIOUS QUESTION.)
14                              ---
15    BY ATTORNEY BROOKS:
16        Q.    And your answer is?
17        A.    So I'm not offering an opinion.  I should expand
18    a bit because how that question was phrased as an
19    individual by individual person and most of these rules
20    are across a group of sports.
21        Q.    And my question was about an individual person.
22        A.    Your question was an individual person, but ---.
23        Q.    Right.  Looking at your paragraph 60, again, do
24    you believe there is --- are you offering an opinion ---
```

```
 1   let me start that again.  Are you able to identify for

 2   me any inherent reason why a relatively weak or small or

 3   slow male --- strike that.

 4          You referenced in your report and also the

 5   article we just looked at the IAAF regulations that

 6   excluded from the female category any individual who has

 7   circulating testosterone higher than five nanomolar per

 8   liter.  Do you recall that?

 9                    ATTORNEY BLOCK:  Objection to form.

10                    THE WITNESS:  So just to clarify, it is

11   not --- that rule for five nanomolars is not across all

12   sports.

13   BY ATTORNEY BROOKS:

14      Q.    And which sports in your recollection did that

15   apply to?

16      A.    Yeah, that's --- I don't remember off the top of

17   my head.

18      Q.    At the very least it applied to track events.

19          Correct?

20      A.    It does.  But if you start to quiz me on the

21   specific distances, I won't get that.

22      Q.    And nor will I so quiz you.  And that

23   requirement as applied to track competition was, in

24   fact, the subject of a major international arbitration,
```

```
 1  as you're aware.

 2          Correct?

 3      A.    If we're referencing the Caster Semenya case,

 4  yes.

 5      Q.    Did you yourself have any participation in that

 6  arbitration?

 7      A.    I did not.

 8      Q.    Do you know whether Doctor Handelsman had any

 9  participation in that?

10              ATTORNEY BLOCK:  Objection.

11              THE WITNESS:  I don't know off the top

12  off of my head.

13  BY ATTORNEY BROOKS:

14      Q.    Have you ever read the arbitrarial decision in

15  that case?

16      A.    I'm certain I read excerpts, but that is as much

17  as I could say.

18      Q.    Okay.

19          You participated in developing on the --- a

20  member of the committee that developed the regulation

21  that you've referenced, the 7.5 nanomolar threshold?

22      A.    I was on the committee that helped determine

23  that particular threshold conceptual, yes.

24      Q.    And you're aware that in addition to individuals
```

1   such as Caster Semenya, who suffered of a disorder of

2   sexual development, that that rule would exclude some

3   transgender women from female athletics that were

4   subject to that IAAF rule.

5          Correct?

6                ATTORNEY BLOCK:  Objection to the

7   terminology.

8                THE WITNESS:  So I was aware that by

9   setting a threshold that there --- and even that

10  threshold in particular, that there would be transgender

11  women who would not achieve that threshold for whatever

12  reason.

13  BY ATTORNEY BROOKS:

14     Q.    And did you nevertheless consider the regulation

15  to be reasonable?

16     A.    If you are asking me as an expert, then again I

17  can't comment.

18     Q.    Well, let me just ask you as Doctor Safer.

19     A.    Am I allowed to ---?

20                ATTORNEY BLOCK:  Objection to form.

21  BY ATTORNEY BROOKS:

22     Q.    You are allowed.

23     A.    Okay.  So having a rule does make sense to me,

24  yes.

```
 1      Q.    And you thought that that rule was reasonable?

 2      A.    As with the data we have currently, yes,

 3   personally.

 4      Q.    And what, in your opinion, is the inherent

 5   reason that advantages conferred by testosterone levels

 6   far outside the normal female range should be treated as

 7   any more of an unfair advantage than the advantages that

 8   already exist among different women athletes?

 9                   ATTORNEY BLOCK:  Objection.  I'm sorry.

10   Can you clarify as an expert or as an individual just

11   because you shifted back and forth?

12   BY ATTORNEY BROOKS:

13      Q.    First as an expert.

14      A.    So yes --- give me the question again.  I'm

15   sorry.

16      Q.    What, in your opinion, is the inherent reason

17   that advantages conferred by testosterone levels outside

18   the normal female range should be treated as any more of

19   an unfair advantage than the advantages that already

20   exist among different women athletes?

21      A.    So to clarify we --- so, okay, let me go back.

22   Let me answer in pieces I guess or ask you to say it in

23   pieces.  So what is different between typical male

24   levels of testosterone in an individual and some other
```

1   characteristics that are across the range of

2   characteristics of cisgender women?  Is that the

3   question?  Am I rephrasing that correctly?

4       Q.    I'm actually referencing paragraph 60 of your

5   expert report, but my question --- and let's take for

6   instance, a natal male who has press testosterone but

7   only achieved six nanomolar per liter concentration, do

8   you have that concentration, do you have that in mind?

9       A.    A transgender woman whose testosterone level is

10  six.

11      Q.    Right.  What in your opinion is the inherent

12  reason that advantages conferred by testosterone levels

13  above a threshold such as five nanomolars should be

14  treated as any more of an unfair advantage than the

15  advantages that already exist among different women

16  athletes?

17                  ATTORNEY BLOCK:  Objection to form.

18                  THE WITNESS:  So a couple of things.

19  First of all, I don't know that a testosterone level of

20  six is from a scientific perspective demonstratively

21  different than a testosterone level of five.  It's just

22  a matter of affecting it overall.  So I want to clarify

23  that.  It's not that --- that that small degree is

24  necessarily relevant.  And I can't even say that we

1    demonstrated advantage.  It's still a theoretical with

2    regard to some of those higher testosterone levels.  Let

3    me think about those for a second.  Yes, so some of the

4    logic pattern for having a threshold is in order to be

5    able to limit the entire conversation to dealing with

6    transgender women or women with --- or intersex women or

7    women who for any reason have have elevated testosterone

8    levels and not to open the door at the elite level for a

9    participation by cisgender men posing as cisgender women

10   if that makes sense.

11   BY ATTORNEY BROOKS:

12       Q.    Is there, in your judgment, any inherent reason

13   that advantages conferred by testosterone levels well

14   outside normal female ranges should be treated as any

15   more of an unfair advantage than the advantages that

16   already exist among different women athletes?

17       A.    So I have to go back to that one.  Is it my

18   opinion that male level testosterone levels ---?

19       Q.    Let me --- my question is testosterone levels

20   significantly above normal female ranges?

21       A.    Are --- then no, sorry.  It took me a little

22   while to get there, but no.

23       Q.    Because the question was complicated and the

24   answer was broken up I will ask you again, not to insult

```
 1    you but so we have a clear record.  I think I understood
 2    your answer but is there, in your opinion, any reason
 3    why advantages provided by testosterone level well
 4    outside normal female ranges should be treated as any
 5    more of an unfair advantage than the advantages that
 6    already exist among different women athletes?
 7                      ATTORNEY BLOCK:  Objection to form.
 8                      THE WITNESS:  And as an expert I'm not
 9    rendering an opinion there, that's right.
10    BY ATTORNEY BROOKS:
11       Q.    Okay.
12             In paragraph 55 of your ---.
13                      ATTORNEY BLOCK:  Would now be a good time
14    for a break?
15                      ATTORNEY BROOKS:  Let me just ask this
16    one question and then yes.
17    BY ATTORNEY BROOKS:
18       Q.    In paragraph 55 you cite a 2015 article by
19    Joanna Harper?
20       A.    I do, yes.
21       Q.    Have you ever met Joanna Harper?
22       A.    I have.
23       Q.    And have you collaborated with Joanna Harper in
24    any way?
```

1           <u>ATTORNEY BLOCK:</u>  Objection to the form.

2           <u>THE WITNESS:</u>  Yeah, I don't, but I guess

3  --- it's a complicated answer, so I need to know what

4  you mean by that.

5  <u>BY ATTORNEY BROOKS:</u>

6      Q.    I mean it broadly.  Have you worked with her on

7  any sorts of projects or committees?

8      A.    Well, we were both in the working group for

9  World Athletics that helped develop this threshold.

10     Q.    And do you consider Doctor Harper to be

11 knowledgeable in the field of sports physiology?

12     A.    I do.

13     Q.    And do you consider Doctor Harper to be

14 knowledgeable with regard to the impact of testosterone

15 suppression on athletic capabilities in male?

16     A.    So do I consider her to be knowledgeable in the

17 field?  I certainly do.  For what it's worth, she is

18 still Ms. Harper.  She's actually in the Ph.D. program

19 now.

20     Q.    Oh, okay.  I just gave her an honorary degree.

21     A.    She occupies a prominent place in the field.

22          <u>ATTORNEY BROOKS:</u>  Let's take that break.

23          <u>VIDEOGRAPHER:</u>  Going off the record.  The

24 current time is 10:25 a.m. Eastern Standard Time.

```
 1   OFF VIDEOTAPE

 2                        ---

 3   (WHEREUPON, A SHORT BREAK WAS TAKEN.)

 4                        ---

 5   ON VIDEOTAPE

 6                   VIDEOGRAPHER:  We are back on the record.

 7   Current time reads 10:39 a.m. Eastern Standard Time.

 8   BY ATTORNEY BROOKS:

 9      Q.    Dr. Safer, let me ask you to go back to Exhibit

10   4 Professor Handelsman's article.  And if you would turn

11   in that article to page 805, the first paragraph begins

12   the strongest classification in a league sport is that

13   after puberty men 20 times more testosterone than women.

14           Do you see that language?

15      A.    I do.

16      Q.    And he discusses a number of results and ends

17   his paragraph by saying in concert --- quote, in concert

18   these render women on average unable to compete

19   effectively against men in power based or endurance

20   based sports.

21           Do you see that?

22      A.    I do.

23      Q.    And do you consider yourself qualified to

24   evaluate Professor Handelman's assertion that women are
```

1    on average unable to compete effectively against men in

2    power based or endurance based sports?

3        A.    No.

4        Q.    Not qualified?

5        A.    Not qualified, correct.

6        Q.    Do you believe you have an understanding ---

7    well, let me ask you this.  Do you consider yourself

8    qualified to offer any opinion as to why sports have

9    been separated by sex historically?

10       A.    I guess I would say I'm aware of the history.

11       Q.    And in your understanding what is the reason

12   that sports have been separated by sex historically?

13       A.    The history is that at a certain point where

14   sufficient development has taken place there is a

15   differential in at least some sports between men and

16   women --- between cisgender men and cisgender women such

17   that in order for women to win those events reliably

18   there needs to be a carve-out.

19       Q.    And as you sit here today can you identify for

20   me any sport in which you believe that cisgender men

21   after puberty do not enjoy a significant performance

22   advantage over cisgender women?

23       A.    Yes.

24       Q.    Please do.

1    A.    Examples include --- well, I guess I better not

2   get too far and be the expert here, but I believe

3   riflery and others in the category of hand/eye

4   coordination.  I think some of the equestrian sports are

5   examples.

6    Q.    Okay.

7         You are not offering any opinion, are you, that

8   the reason for separation of sports by sex is to affirm

9   sex specific social roles or identities?

10    A.    I'm not aware of that.  I'm not an expert on

11   those pieces, but I'm not aware personally.

12    Q.    And it is not your opinion, is it, that

13   separation of sport by sex is in general unfair?

14             ATTORNEY BLOCK:  Objection to form.

15             THE WITNESS:  So again, as an expert I'm

16   not commenting on fairness.

17             ATTORNEY BROOKS:  I'm going to mark as

18   Safer Exhibit 5, a Decision in the arbitral award

19   delivered in the Court of Arbitration for Sport in

20   connection with the arbitration between Athletic South

21   Africa and the IAAF, a bulky document, unfortunately.

22                        ---

23             (Whereupon, Exhibit 5, Court of Arbitration

24             for Sport Decision, was marked for

```
 1              identification.)

 2                    ---

 3  BY ATTORNEY BROOKS:

 4     Q.    And Doctor Safer, now that you have --- I asked

 5  you earlier about whether you had seen the arbitration

 6  decision and I think you said you might have read

 7  excerpts of it.  Looking at it today, do you believe

 8  that you have ever seen a copy of the whole Decision?

 9     A.    I do not think I've read through the whole

10  Decision.

11     Q.    Do you think you've ever held this whole

12  document in your hand before?

13     A.    This is the first time that I held the whole

14  document.

15     Q.    I'm going to ask you about a few quotations in

16  it, not to ask your opinions about the judgment but to

17  elicit your opinions about the science.  So if you would

18  turn --- and the structure of the document is that

19  everything in it has a paragraph number which, thank

20  goodness, makes it easy to find things.  So if you would

21  turn to paragraph 556.  The first sentence of

22  paragraph 556 of this Decision reads there is no dispute

23  that ensuring fair competition in the female category of

24  elite competitive athletics is a legitimate objective
```

1   for the IAAF to pursue, closed quote.  As a member of

2   the IAAF Committee that established the policy that was

3   challenged in this arbitration, do you agree or disagree

4   that there is no dispute that ensuring fair competition

5   in the female category is a legitimate objective for the

6   IAAF to pursue?

7                    ATTORNEY BLOCK:  Objection to form.

8                    THE WITNESS:  As an expert I do not have

9   an opinion.

10  BY ATTORNEY BROOKS:

11      Q.    Okay.

12            Let me ask you to turn to paragraph 456.  And

13  this arbitration, as you noted, deals with the case of

14  Caster Semenya and therefore with track events, not with

15  riflery or with equestrian events.  So I will ask your

16  reaction to that context.  In the middle of

17  paragraph 456, beginning halfway through the sixth line

18  the panel wrote, quote, suffice to say that post puberty

19  generally speaking males outperform female athletes ---

20  I'm sorry, male athletes outperform female athletes at

21  an elite level.  This difference is insurmountable,

22  closed quote.

23            Do you see that?

24      A.    I do.

1    Q.    And do you believe it to be true, false or

2   outside of your expertise that male athletes outperform

3   female athletes at the elite level at a difference that

4   is insurmountable?

5                    ATTORNEY BLOCK:  Objection to form.

6                    THE WITNESS:  As a blanket statement, no,

7   I would say that is not my expertise.

8   BY ATTORNEY BROOKS:

9    Q.    Let me ask you to turn to 576.  I said 576.  I

10  meant 577.  I apologize.  At the end of 577 the panel

11  has written, quote, ---.

12                   ATTORNEY BROOKS:  We just had static

13  here, so let me ask whether people outside the

14  conference room are hearing us?  If somebody could

15  unmute.

16                   ATTORNEY TRYON:  I can hear you.

17                   ATTORNEY BROOKS:  We just had some static

18  that caused me concern.

19  BY ATTORNEY BROOKS:

20   Q.    At the end of paragraph 577 the panel wrote,

21  quote, male athletes do not have to be elite to surpass

22  even the very best female athletes.  Dr. Berman pointed

23  out that in a race such as the 800 meter, a 1.6 percent

24  advantage, as calculated in BG17, was sufficient to

```
 1    determine first place by the region of nine meters,

 2    closed quote.

 3              Do you see that language?

 4       A.    Yes.

 5       Q.    And do you consider it to be true, false or

 6    outside your expertise that male athletes do not even

 7    have to be elite to surpass the very best female

 8    athletes?

 9                    ATTORNEY BLOCK:  Objection to form.

10                    THE WITNESS:  In a --- as a blanket

11    statement it is outside my expertise.

12    BY ATTORNEY BROOKS:

13       Q.    And do you have an opinion as to whether a

14    1.6 percent advantage is a significant advantage or

15    insignificant advantage?

16       A.    I think that's too complicated as phrased for me

17    to answer.

18       Q.    That's actually one of the simpler questions

19    that I've asked today.  Let me ask it again and ask you

20    to think.  Do you have an opinion, and if you --- one

21    answer of course is I don't have an opinion or it is

22    outside of my expertise, but do you have an opinion as

23    to whether a 1.6 percent advantage in a track event is a

24    significant advantage?
```

```
1              ATTORNEY BLOCK:  Objection to form.

2              THE WITNESS:  So it depends on the event.

3    BY ATTORNEY BROOKS:

4        Q.    Why does it depend on the event?

5        A.    Well, there are events where we see --- as an

6    elite Olympic event where the runners are virtually

7    tied.  And 1.6 percent then will be significant in the

8    moment because that will be described in that field.

9    And yet there are other events where people are far more

10   spread out and there's greater --- in every element,

11   then 1.6 percent advantage becomes lost in that noise.

12       Q.    And --- well, let's take competitive high school

13   athletics, competitive high school track.  Do you have

14   an opinion as to 1.6 percent advantage in that context

15   is significant or insignificant?

16       A.    I do not have an opinion.

17       Q.    So if I understand correctly, your point in some

18   context you know that 1.6 percent is significant but

19   that in other context you don't know one way or the

20   other?

21              ATTORNEY BLOCK:  Objection to the form.

22              THE WITNESS:  Yes, I guess I would say

23   that in some context I can see that 1.6 percent is

24   significant and then in other context I can see that 1.6
```

1  percent does not appear to be significant.  And actually

2  even if you're asking as an expert, what even is

3  significant is outside my purview, but with that

4  understood I can still see that someone would say it one

5  way and not say it the other way.

6  BY ATTORNEY BROOKS:

7     Q.    Let me ask you to turn to paragraph 357.  And

8  first I will ask you to turn to page 88, paragraph 351,

9  just so you can see we're in a section summarizing the

10  testimony of Professor David Handelsman.  That begins at

11  paragraph 351.  And then I'm going to call your

12  attention to paragraph 357 and it puts you to the

13  statement there.

14        357 includes a number of bullet points.  The

15  third bullet point, which is on page 91, reads --- and

16  again this is --- the paragraph begins, quote, Professor

17  Handelsman went on to explain in greater detail why the

18  sex difference in circulating testosterone is the cause

19  of the difference in athletic performance between men

20  and women, and then there are bullet points.  The third

21  bullet point reads, on average, women have 50 to

22  60 percent of men's upper arm muscle cross-sectional

23  area, 65 to 70 percent of men's thigh muscle

24  cross-sectional area, 50 to 60 percent of men's limb

1    strength and 60 to 80 of men's leg strength.  Do you see

2    that language?

3                        ATTORNEY BLOCK:  Objection to form.

4                        THE WITNESS:  I do.

5    BY ATTORNEY BROOKS:

6        Q.    Do you have any knowledge as to whether those

7    statistics are on correct as given by Dr. Handelsman?

8        A.    I do not.

9        Q.    And do you have any expert knowledge as to how

10   those statistics do or do not change under the influence

11   of testosterone suppression in natal males who

12   experience a female gender identity?

13                       ATTORNEY BLOCK:  Objection to

14   terminology.

15                       THE WITNESS:  So I guess the --- I have

16   no expert knowledge about these numbers, per se, but I

17   do know as an expert that when testosterone levels are

18   suppressed in transgender women and actually in

19   cisgender men, anyone, that these numbers are decreased.

20   And I can say that with confidence as an expert.

21   BY ATTORNEY BROOKS:

22       Q.    But you're not able to quantify that decrease.

23             Is that correct?

24       A.    I cannot quantify that decrease.  The data gets

1    murky when we start to get there.

2        Q.    Have you ever met Professor Coleman at Duke

3    University?

4        A.    Doriane Coleman?

5        Q.    Yes.

6        A.    I have.

7        Q.    And in what context have you interacted with

8    Professor Coleman?

9        A.    The --- a professional context.

10        Q.    Can you describe the context?

11        A.    We have served on some of these --- two of the

12    same committees --- committee task force, whatever you

13    call it, for World Athletics together.

14        Q.    Was she, in fact, on the committee which you

15    participated that set the five nanomolar standard for

16    the IAAF?

17        A.    I don't recall for sure but I think not.

18        Q.    Then can you identify for me the two committees

19    that you recall that you did sit on with Professor

20    Coleman?

21        A.    Subsequent to the initial group, and I don't

22    know that it's two committees, it may be the same

23    committee, they get renamed.  Things like that happen.

24    So it is --- I'm thinking forward to assisting other

1  international federations with their rule making.

2      Q.    And do you consider Professor Coleman to be

3  knowledgeable about the relative athletic capabilities

4  and records of male and female athletes?

5      A.    To me that's too vague a question.  She's a

6  lawyer.

7      Q.    Are you aware also of her athletic background as

8  a competitive athlete?

9      A.    I am.

10     Q.    And are you aware of her research and

11  publications having to do with athletic records and

12  capabilities of male and female athletes?

13                  ATTORNEY BLOCK:  Objection to form.

14                  THE WITNESS:  I'm aware of some of her

15  publications where she has co-authored, but she's not

16  usually the physiology expert in the group.

17  BY ATTORNEY BROOKS:

18     Q.    Let me ask you to turn to paragraph 393.  And if

19  you look at the page you will see that this is within

20  the tribunal summary of testimony of Professor Coleman.

21  Let me ask you since you dealt personally with the

22  professor, because I want the record to be respectful,

23  does she in general use --- prefer to be referred to as

24  Professor Lambelet-Coleman or simply Professor Coleman?

1      A.      I don't know the answer.

2      Q.      Okay.

3      A.      I prefer to her on a first name basis.

4      Q.      All right.

5              I will stick with the shorter version.   In

6    paragraph 393 the panel describing Professor Coleman's

7    submission states, quote, Professor Lambelet-Coleman's

8    report compared the lifetime best performance of three

9    elite female athletes in the 400-meter event with the

10   performance of male athletes in the same event during a

11   single year, 2017, period.  This showed not only that

12   the elite females would have lost to the best men by a

13   margin of about 12 percent but also that even at their

14   absolute best the elite females would have lost to

15   thousands of other boys and men by a much smaller

16   margin, closed quote.  Do you see that language?

17     A.      I do.

18     Q.      And do you have any reason to doubt the accuracy

19   of that summary of athletic performance statistics?

20     A.      I can't render an expert opinion there.

21     Q.      Do you as you sit here today have any reason to

22   doubt the accuracy of those statistics?

23     A.      Again, I cannot comment as an expert.  I guess

24   that's the bottom line.

```
 1     Q.    If it is true that the most elite female

 2  athletes performing at their absolute best would lose to

 3  thousands of others boys and men.  It is also true,

 4  would you not agree, that the very best female college

 5  athletes would lose to even a larger number of

 6  collegiate boys and men?

 7     A.    If I'm speaking as an expert, then I'm not

 8  rendering an opinion there.

 9     Q.    How about as a highly educated and intelligent

10  professor?

11     A.    Simply in that context, it would be true that

12  --- that it would least be true at some level in the

13  elite levels of college.

14     Q.    And the very best female high school athletes

15  would lose to an even larger number of high school boys.

16          Correct?

17     A.    So now I can render a little bit of an expert

18  comment, which is that as you move down that line, the

19  degree of difference falls because the degree of

20  testosterone impact on body is evolving across those

21  ages.

22     Q.    If it's true that the world fastest female

23  athletes would lose to thousands of boys and men then it

24  is inevitably true, is it not, Doctor Safer, to say that
```

```
 1    the very best female high school athletes would lose to

 2    even larger numbers of high school boys?

 3                    ATTORNEY BLOCK:  Objection to form.

 4                    THE WITNESS:  So the --- it is the coils

 5    here.  So it would be larger numbers of cisgender men in

 6    general, including people who are older than they are,

 7    but I'm not sure where that would be going.

 8    BY ATTORNEY BROOKS:

 9       Q.    Let me take you back to your expert report,

10    Exhibit 1, and take you to paragraph 48.  Actually, let

11    me have the Declaration, which is Tab 50.

12                    ATTORNEY BROOKS:  Let me mark as Safer

13    Exhibit 6 a Declaration of Dr. Safer executed in

14    May 10th, 2021.

15                          ---

16                    (Whereupon, Exhibit 6, 5/10/21 Declaration

17                    of Dr. Safer, was marked for

18                    identification.)

19                          ---

20    BY ATTORNEY BROOKS:

21       Q.    And I apologize, it's paragraph 50.  Dr. Safer,

22    did you, in fact, prepare and execute this Declaration

23    in the time leading up to May 26, 2021?

24       A.    Yes.
```

1   Q.    And you state in paragraph 48 that, quote, age,

2   grade competitive sports records show minimal or no

3   difference in athletic performance between

4   non-transgender boys and non-transgender girls before

5   puberty, and you cite Handelsman, the article that we

6   have been looking at.

7        Correct?

8   A.    Yes.

9   Q.    And what research did you do to arrive at the

10  conclusion that age grade competitive sports records

11  show minimal or no difference in athletic performance

12  between non-transgender boys and non-transgender girls?

13  A.    Is the question of original research on my part?

14  Q.    No, what steps did you take to arrive at that

15  conclusion?

16  A.    Reading relevant literature.

17  Q.    You cited only Professor Handelman's 2018

18  article.  Did you read other literature that gave you

19  comfort that is a true statement?

20  A.    I have read other literature, but I would

21  suggest that Doctor Handelsman gave --- Doctor

22  Handelsman's paper is the best summary of the point.

23  Q.    And again, in making this statement, what did

24  you consider to be a minimal difference?

1    A.    When I'm thinking about this as a scientist it

2    is a difference where I'm not sure if it is true or

3    whether it is significant when defining the word

4    minimum.

5    Q.    You just defined minimal by using the work

6    significant.  You force me to ask you what do you mean

7    by significant?

8    A.    Sorry.  So as a scientist --- well, there are

9    two definitions of significant.  So the one is that it

10   is relevant for those --- for decision makers.  And that

11   actually gets outside of my expertise.  And then we do

12   use it as a term of art in science as well.

13   Q.    You meant statistically significant?

14   A.    The second would be statistically significant,

15   that's right.

16   Q.    Dr. Safer, you deleted that sentence from your

17   expert report.

18         Is that correct?

19   A.    I have to look.

20   Q.    I don't mean it to be a trick question.  Let me

21   ask you this.  Do you recall removing that sentence as

22   you revised your Declaration to create your expert

23   report?

24   A.    No.

1    Q.    All right.

2    A.    I don't recall.

3    Q.    We will just move on to the science and not ask

4    you deleted the question.  Let me take you to paragraph

5    44 of your expert report, Exhibit 1.  And just to be

6    sure, you are on the expert report now and not the

7    Declaration?  They are so similar that it is easy to get

8    confused.

9    A.    Yes.

10   Q.    Paragraph 44 you say in the second sentence,

11   increased testosterone begins to affect athletic

12   performance at the beginning of puberty, but those

13   effects continue to increase each year of puberty until

14   about 18, with the full impact of puberty resulting from

15   the cumulative effect of each year.  Do you see that

16   language?

17   A.    I do.

18   Q.    And just to clarify, in making this statement

19   what do you refer to as, quote, the beginning of

20   puberty?  And we're talking about male typical puberty

21   in this discussion so as to clarify.  So what do you

22   have in mind as the beginning of male puberty?

23   A.    So the answer is complex.  The typical male

24   puberty is defined as beginning with what we label as

```
 1   Tanner 2.  And in terms of when you would see impact on

 2   athletic performance, per se, is not well established.

 3       Q.    And now stretching that in both directions, on

 4   the one hand Tanner Stage 2, if I'm correct, is

 5   essentially defined as certain first observable physical

 6   changes in a boy's body.

 7             Right?

 8       A.    Tanner 2 is specifically defined as specific

 9   observable changes in a person's body, yes.

10       Q.    And therefore, testosterone levels have begun to

11   increase even before the first observable changes that

12   result.

13             Correct?

14       A.    The way it's understood in medicine is it is

15   reflective of existing reality.  So it is not

16   necessarily --- you know, only in the absolute.

17       Q.    Well, as a medical doctor, you would agree with

18   me or would you not that testosterone levels must

19   increase in the body before observable changes in the

20   body caused by testosterone can be --- can come about?

21                   ATTORNEY BLOCK:  Objection to the form.

22                   THE WITNESS:  So it must be the case that

23   the testosterone levels would have to rise prior to

24   their having a noticeable effect, that is true.
```

1    BY ATTORNEY BROOKS:

2        Q.    Cause has to precede effect?

3        A.    Cause in this case has to precede effect,

4    exactly.  But I caution that it is not clear that that's

5    something that we could parse out medically in a given

6    person in a reasonable way.  That is I don't know that I

7    could do a blood test and catch it as it were.

8        Q.    Okay.

9              Can you explain to me what you were referring

10   to when you mentioned the cumulative effect of pubertal

11   changes at the end of that sentence?

12       A.    Where are we now?

13       Q.    We are in the second sentence of paragraph 44 of

14   Exhibit-1.  And you say at the end with a full impact of

15   puberty resulting from the cumulative effect of each

16   year, and if you would explain for the Court what you

17   meant by cumulative effect that would be helpful.

18                    ATTORNEY BLOCK:  Objection to form.

19                    THE WITNESS:  So the testosterone has

20   impact on certain tissues, and then it continues to have

21   impact on tissues.  And I don't know that I have any

22   greater explanation for the right cumulative impact.

23   BY ATTORNEY BROOKS:

24       Q.    So your point is that by the age of 18 whatever

1   advantages in athletic performance a particular male has

2   is due to body changes that have happened each year

3   since puberty began, not due simply to the testosterone

4   level of that individual at age 18?

5              ATTORNEY BLOCK:  Objection to form.

6              THE WITNESS:  The meaning isn't as --- I

7   guess I would be careful about overstating it, so there

8   can --- there might be some impact earlier and then

9   there might be additional impact over time, but --- and

10  so in the absolute it would be true to say that all of

11  the effect doesn't occur at Tanner 5, which is the

12  defined end.

13  BY ATTORNEY BROOKS:

14     Q.    Okay.

15           The cumulative physiological changes that you

16  are referring to here result from a multi-year history

17  of male typical levels of testosterone by age 18.

18           Correct?

19     A.    Yes.  Well, even that is --- there's complexity

20  but yes.

21     Q.    You say --- sorry, we are jumping back and

22  forth.

23     A.    Actually, just continuing a little bit further,

24  it's also about age 18 is not a trivial word.

```
 1      Q.    Understood.  And I simply used that as a

 2   representative end marker and for some individuals it

 3   would be earlier and for some individuals it would be

 4   later.

 5            Correct?

 6      A.    That's right, even with the college athletes.

 7      Q.    You state at the beginning of paragraph 44 that,

 8   quote, the concerns that animated the World Athletics

 9   and prior IOC policies are even more attenuated for

10   students in the middle of high school where athletes

11   typically range from 11 to 18.

12            Do you see that?

13      A.    I do.  Was this paragraph 44?

14      Q.    It is.  And by attenuated you mean the same in

15   nature but smaller in scale.

16            Correct?

17                 ATTORNEY BLOCK:  Objection to form.

18                 THE WITNESS:  Yeah, I can't even say that

19   so --- yeah, I can't ---.

20   BY ATTORNEY BROOKS:

21      Q.    Isn't that what attenuated means?

22                 ATTORNEY BLOCK:  Objection to form.

23                 THE WITNESS:  Attenuated is both in scale

24   and type in this case.
```

```
 1   BY ATTORNEY BROOKS:

 2      Q.    All right.

 3            You are not here or anywhere denying that the

 4   same type of concern, that is physiological advantages,

 5   exist at for instance age 15?

 6                  ATTORNEY BLOCK:  Objection to form.

 7                  THE WITNESS:  So sorry, say that again.

 8   BY ATTORNEY BROOKS:

 9      Q.    You are not in this paragraph or anywhere

10   offering an opinion that the same type of concerns, that

11   is physiologic or in performance advantages, exist to

12   some degree at, for instance, age 15?

13                  ATTORNEY BLOCK:  Objection to form.

14                  THE WITNESS:  I'm not offering an opinion

15   there, that's right.

16   BY ATTORNEY BROOKS:

17      Q.    And the same is true at age 13?

18                  ATTORNEY BLOCK:  Objection to form.

19                  THE WITNESS:  I'm not --- so I guess as

20   we --- as you move along to the continuum, then ---.

21   BY ATTORNEY BROOKS:

22      Q.    It gets more attenuated?

23      A.    The opinion --- right, the opinion shifts

24   because it depends on context.
```

```
 1      Q.     In paragraph 49 of your expert report you write

 2   in the third full sentence, quote, West Virginia

 3   categorically prevents girls who are transgender from

 4   participating on girls teams regardless of whether they

 5   are prepubertal, receiving puberty blockers, or

 6   receiving gender-affirming hormone therapy, closed

 7   quoted.  Do you see that?

 8      A.     I do.

 9      Q.     What in your opinion is the significance of that

10   statement?  What is your point?

11                ATTORNEY BLOCK:  Objection.  Could you

12   just give him some time to read the context?

13   BY ATTORNEY BROOKS:

14      Q.     Yes.

15      A.     So I guess I maybe make the --- help me with

16   where you're going with that question.  I'm --- the rule

17   as written includes all transgender girls.

18      Q.     Are you --- did you mean to suggest that medical

19   science would dictate that the West Virginia law should

20   make an exception for natal males who have

21   suppressed puberty?

22                ATTORNEY BLOCK:  Object to form.

23                THE WITNESS:  The context for the --- the

24   context of different transgender girls with different
```

1    degrees of treatment and different stages of puberty are

2    different.  I guess that's as much I would say.  I'm not

3    expressing an opinion about what the --- I'm serving

4    here just as a scientist in terms of what the --- what

5    the --- what we know about athleticism.

6    BY ATTORNEY BROOKS:

7        Q.    You are not offering an opinion that either

8    science or reasonableness requires that West Virginia's

9    laws make an exception for natal males who have

10   suppressed puberty?

11                   ATTORNEY BLOCK:  Objection to form.

12                   THE WITNESS:  I'm not offering an opinion

13   that that would be --- that would be a logical law for

14   transgender girls in that circumstance.

15   BY ATTORNEY BROOKS:

16       Q.    And in the article that we began today looking

17   at you expressed concern about policies that would

18   create incentives for children to begin puberty

19   blockers, would you not?

20                   ATTORNEY BLOCK:  Objection to form.

21                   THE WITNESS:  So earlier in my --- I

22   reference that as a concern.  I want to be clear that as

23   an expert I'm not suggesting that --- I'm not suggesting

24   an expert opinion that these needs to be concerns.  I'm

1    raising the issues that we are considering.

2    BY ATTORNEY BROOKS:

3       Q.    Well, what you wrote to educate your colleagues

4    as an endocrinologist, you, Professor Safer, raise that

5    as a concern?

6                    ATTORNEY BLOCK:  Objection to form.

7                    THE WITNESS:  To be clear, I raised it as

8    a concern of the community.  I did not take an opinion

9    in that article that it was a concern that I was

10   offering as an expert.

11   BY ATTORNEY BROOKS:

12      Q.    Well, let me ask you as a medical doctor sitting

13   here today, an endocrinologist, it would cause you

14   concern, would it not, that policies are adopted that

15   created incentives for children to start puberty

16   blockers when they might otherwise not choose to do so?

17                   ATTORNEY BLOCK:  Objection to form and to

18   scope.

19                   THE WITNESS:  It's too broad of a

20   question as you're asking it because there is certainly

21   --- in medicine it is certainly the case that we fear

22   coercing people to certain treatments and certain

23   circumstances but they are certainly alternate examples

24   where we very much coerce people to have certain medical

1    interventions.  And so as an expert I have no opinion,

2    as we said already.  And simply as somebody trying to be

3    logical and thoughtful I can come up with examples in

4    both certain circumstances.

5    BY ATTORNEY BROOKS:

6       Q.    I'm going to ask you to take Exhibit-6 --- no,

7    Exhibit 4, the Handelsman article if you would.

8       A.    Yes.

9               ATTORNEY TRYON:  Roger, would you speak

10   up a little more, please?  And Josh, when you shuffle

11   your papers, it really garbles the testimony.  If you'd

12   be a little more careful about that, I'd appreciate it.

13              ATTORNEY BLOCK:  Sorry.

14              ATTORNEY BROOKS:  It's a crowded table

15   and we have papers bumping up against the mic.  So just

16   call out if we do that wrong.

17   BY ATTORNEY BROOKS:

18      Q.    So Dr. Safer, you pointed to the Handelsman

19   article as the best source on the proposition --- on the

20   question to what extent if any natal male has

21   physiological or I should say athletic performance

22   advantages over natal females before puberty.

23              Correct?

24              ATTORNEY BLOCK:  Objection to

1    terminology?

2              THE WITNESS:   And if I said the word best

3    maybe that's not the best way of saying it, but it's a

4    very clean, well-written summary of the circumstance.

5    BY ATTORNEY BROOKS:

6       Q.    At any rate, it's the one that you chose to

7    cite?

8       A.    And it is the one that I chose to cite.

9       Q.    I'm going to give you a three by five card to

10   help read a chart that doesn't have grid lines on it so

11   you have a straight edge.  And I want to take you in

12   Handelsman's 2018 article, Exhibit 4, to page 813 and

13   figure one.  And you've familiar with this figure and

14   these curves, are you not?

15      A.    I am, yes.

16      Q.    When you studied this article carefully this is

17   part of what you studied.

18            Right?

19      A.    It is.

20      Q.    And these charts show percentage performance

21   advantage of males over females and just to simplify

22   terminology I believe there's nothing in here about

23   dealing with transgender individuals in these charts.

24   So with your permission I'll simply use male and female

```
 1    to be the dare I say simple biological designations as
 2    we had previous discussions.  Is that acceptable?
 3        A.    I think so.
 4        Q.    If it's something that comes up ---.
 5        A.    I will mention it, yes.
 6        Q.    I don't think it will in this discussion.  First
 7    of all, would you agree with me that, generally
 8    speaking, junior high contemplates grades 7 through 9
 9    and commonly ages in the range of 12 to 15?
10                   ATTORNEY BLOCK:  Objection to form.
11                   THE WITNESS:  Junior high is grades 7
12    through 9.  It used to be.  Now there is Middle School.
13    BY ATTORNEY BROOKS:
14        Q.    I know?
15        A.    Exactly.
16        Q.    Let's just work with you and I are of general
17    age.  So Junior High is 7 to 9?
18        A.    Okay.
19        Q.    And in your general understanding, this is
20    layman's stuff, not expert stuff, that is ages 12 to
21    15-ish?
22        A.    Let's see, seven --- let me think about this.
23    Right, 15 at about the max, right, because there is
24    about 14.
```

1    Q.    And high school is 14, 15 through age 18-ish.

2  Some people graduate at age 17?

3    A.    Yes.  As a non-expert I would believe, yes.

4    Q.    All right.

5         And this chart charts the percentage advantage

6  enjoyed --- on average enjoyed by males over females in

7  three different events at over --- on a year by year

8  basis from ages 10 up to 19.

9         Am I describing it correctly?

10              ATTORNEY BLOCK:  Objection to form.  Just

11  for the record, it's percentage differences, not

12  percentage advantages.

13  BY ATTORNEY BROOKS:

14    Q.    Correct, it says --- it says gender difference

15  percentage to read the Y axis.

16    A.    Clear, yes.

17    Q.    Okay.

18         So let's look at running and you have your

19  straight edge if it is helpful to you.  At age 12, what,

20  according to Dr. Handelsman, is the gender difference in

21  running performance?

22    A.    So in this paper there is a range.  But just to

23  help you get to your point faster I guess we can --- it

24  is about five percent of tab over.

1    Q.    And for reasons best known to Professor

2  Handelsman, his arrow bars extend only upwards, correct,

3  in this chart?

4    A.    Right.  I will have to attribute that to

5  cleanliness of the figure.

6    Q.    Or if he has chosen to fit his curve to the

7  bottom end of this error range possibly?

8                ATTORNEY BLOCK:  Objection to form.

9                THE WITNESS:  Yeah, I can't comment

10 there, but that wouldn't be usual.

11 BY ATTORNEY BROOKS:

12   Q.    That would not be usual, I agree.  And what

13 advantage --- what gender difference between male and

14 female does Professor Handelsman report at age ten

15 approximately?

16   A.    At age ten in the particular figure that we are

17 referencing it is --- the average is --- well, actually,

18 so here it ranges from about two percent because that is

19 probably how the air bars are meant to be up to just a

20 little north to three percent.

21   Q.    And going back to age 12, do you consider a five

22 percent difference between male and female performance

23 to be minimal?

24                ATTORNEY BLOCK:  Objection to form.

1          THE WITNESS:  So the problem here with

2   going right to this figure is it's including a range of

3   inputs, and so this is --- so these are what are called

4   cross-sectional studies, and so the --- if your question

5   is just in the narrow point of this five percent

6   minimal, well, even there I don't know that I can

7   comment because it depends on how broad the variation is

8   among the group.

9   BY ATTORNEY BROOKS:

10     Q.    And what gender difference did Dr. Handelsman

11  report in running at age 15?

12     A.    At age 15, a range that is hovering about 9 to

13  10 percent.

14     Q.    And by age 15, according to his sample, the

15  gender difference is approached --- begins to level off.

16  In other words, it has --- most of the gender difference

17  has been achieved at age 15.

18          Correct?

19              ATTORNEY BLOCK:  Objection to form.

20              THE WITNESS:  Among this data in this

21  study set, yes, I will agree with you it does level off.

22  BY ATTORNEY BROOKS:

23     Q.    So let me ask you this.  Do you have an

24  understanding of the physiological basis of what you

 1    described as a two to three percent male advantage at

 2    age ten in running?

 3                    ATTORNEY BLOCK:  Objection to form.

 4    BY ATTORNEY BROOKS:

 5        Q.    If any?

 6        A.    So speaking as an expert, there's no --- there

 7    is no physiological --- there is no expectation of a

 8    physiological explanation.  And there is awareness of

 9    other confounders in terms of experience, exposure to

10    sport and things like that.

11        Q.    Let me ask you to look at jumping, at age ten.

12    And this is --- at age ten what performance of gender

13    difference advantage did Dr. Handelsman report for boys

14    in jumping?

15        A.    So at age ten it would go on --- so at age ten

16    then the range ---.

17        Q.    This by the way tells us that he cannot be

18    inclined in arrow bar --- a symmetrical arrow bar below.

19              Correct?

20                    ATTORNEY BLOCK:  Objection to form.

21                    THE WITNESS:  So he can't.  In fact, the

22    range that he's showing there goes from an advantage for

23    girls --- that is it goes below to an advantage --- for

24    boys.  The range is included and it just --- for both

1    sexes.

2    BY ATTORNEY BROOKS:

3        Q.    So what is the average advantage that he reports

4    at age ten for boys?

5        A.    So in this dataset the average is about a six

6    percent average for boys, but it is important to

7    understand the data.  And the data that --- the point

8    being that if we were to repeat the study you would

9    anticipate that that average would fall across those

10   entire --- the entire range shown so that in a different

11   day it might show a bigger advantage for boys, but a

12   different day it might also show an advantage for girls

13   about higher.

14       Q.    Are you aware of any dataset that shows a

15   smaller advantage in jumping for girls at age ten?

16       A.    Off the top of my head I cannot guide --- lead

17   you to a dataset.

18       Q.    At age 12 what advantage in jumping --- well,

19   let me start over.  At age 12 what advantage in jumping

20   does Dr. Handelsman report for boys?

21       A.    So in this dataset at age 12 he shows the

22   advantage --- the average advantage to be of the less

23   than the average advantage for age ten, but this exactly

24   points to the caution that I was referencing, which is

1  that the range of possibilities that you might

2  anticipate based on this particular dataset at age 12

3  has a range of four to six percent advantage for boys.

4      Q.    The arrow bar has tightened up a lot?

5      A.    The arrow bar in that age range is tighter.

6      Q.    And do you consider a six percent advantage to

7  be minimal?

8              ATTORNEY BLOCK:  Objection to form.

9              THE WITNESS:  As an expert I can't answer

10  that because it depends on context on the heterogeneity

11  of all these events.

12  BY ATTORNEY BROOKS:

13      Q.    And at age 15 what average advantage in jumping

14  did Dr. Handelsman report for boys?

15      A.    For age 15 he has a range or the average sits at

16  15 percent and the range runs from about 14 percent to

17  maybe 17 percent.

18      Q.    Is there any context in your opinion, any

19  athletic endeavor that involves jumping in which a 15

20  percent advantage is in your view minimal?

21              ATTORNEY BLOCK:  Objection to form.

22              THE WITNESS:  Yes, I think as an expert I

23  can't answer that.  If you're thinking at the scholastic

24  level where there is a wide range of --- where there's a

1    quite wide range of heterogeneity in development, body

2    type, et cetera, I certainly could envision a situation,

3    yes.

4    BY ATTORNEY BROOKS:

5       Q.    Dr. Safer, in your Declaration filed in May you

6    stated that before puberty athletic advantage by boys

7    was minimal.  Do you recall that language?

8       A.    The way I would say it is the difference between

9    boys and girls before puberty is minimal or

10   non-existent.  I don't know if I could be wiser than

11   that.

12      Q.    All right.  But now you are telling me when I

13   asked you questions about minimal that you as an expert

14   are not able to define minimal.  How do you reconcile

15   those two?

16                  ATTORNEY BLOCK:  Objection to form.

17                  THE WITNESS:  So the definition of

18   minimal is in context.  And so as we discussed it was

19   not a significant difference using both those

20   definitions that we already used were no different at

21   all.

22   BY ATTORNEY BROOKS:

23      Q.    Your statement in your Declaration simply

24   asserted categorically in almost no context that the

1  difference in athletic capability of boys to girls were

2  both minimal.  My question for you is using whatever

3  definition you had in mind when you wrote that do you

4  consider a --- I will look at jumping, a five percent

5  difference in capability to be minimum?

6          ATTORNEY BLOCK:  Objection to form and

7  characterization of the report.

8          THE WITNESS:  So it's a context.  So in

9  the report the reference is to prepubertal children.

10 And there it is easier to be more categorical.  Where

11 now we're moving into an area where there is --- where

12 things are more complex and so it is a harder context to

13 make that statement.

14 BY ATTORNEY BROOKS:

15 Q.   That is a sample of ten-year old boys includes

16 some who are no longer prepubertal.

17          Correct?

18 A.   No.  I'm saying it more the other way, which is

19 a sample of ten-year-old boys would overwhelmingly be

20 prepubertal but a sample of 15-year-old boys would have

21 more of a range and have more heterogeneity.  And

22 there's more to it even than that, which is the

23 definition of minimal also includes the context of the

24 entire population who participated in the sport.

1    Q.    So focusing on ten-year-old boys and jumping you

2    said at age ten the large majority of boys are,

3    according to your definition, prepubertal.  Referring

4    back to Declaration and the meaning that you ascribed to

5    the word minimal there, in your view, is a six-percent

6    difference in capability minimal or not minimal?

7              ATTORNEY BLOCK:  Objection to form and to

8    talking about his Declaration without it being in front

9    of him.

10             ATTORNEY BROOKS:  He has it in front of

11   him and we already looked at the language.

12   BY ATTORNEY BROOKS:

13   Q.    You may answer.

14   A.    So the graph that we are looking at includes

15   arrow bars that include the possibility that boys would

16   have --- that the girls would have a superior outcome,

17   and so the answer then becomes, yes.  Where the data are

18   either small or are suspect or not significant, then all

19   of that collectively certainly is --- would be included

20   as minimal to non-existent.

21             ATTORNEY BROOKS:  Let me mark as Exhibit

22   Safer 7 a paper by Emma Colton and Tommy Lundsburg

23   entitled Transgender Women in a Female Category of

24   Sport, from 2021, previously marked as Exhibit 13 at Dr.

```
 1    Adkins's deposition.

 2                         ---

 3              (Whereupon, Exhibit 7, Transgender Women In

 4              a Female Category of Sport, was marked for

 5              identification.)

 6                         ---

 7    BY ATTORNEY BROOKS:

 8       Q.    And first, Professor Safer, let me ask whether

 9    you're familiar with this paper published last year?

10       A.    I am familiar.

11       Q.    And have you interacted professionally with

12    either Dr. Colton or --- and I don't know his degree,

13    Mr. Lundsburg in any context?

14       A.    Here I don't remember.

15       Q.    Okay.

16             Do you believe that you became aware of this

17    paper soon after it was published?

18       A.    I don't know if I can answer that cleanly

19    either, but I certainly have became aware of it

20    somewhere between then and now.

21       Q.    And have you read it with some care?

22       A.    I have read it with some care, yes.

23       Q.    Let me ask you --- well, let me ask you this

24    first.  Would you describe this paper as reporting
```

1    original research or as more of a literature review

2    paper?

3         A.    I don't recall them reporting on their original

4    research, but I would have to look.  It's mostly a

5    review paper.

6         Q.    That is also my impression.  I just didn't want

7    to create a different impression.  Let me ask you to

8    turn to page 201, and there in the first column

9    beginning six lines down there is a sentence that begins

10   an extensive review.  Let me ask you to find that.

11        A.    I have it.

12        Q.    And that --- I'll read it into the record.

13   Quote, an extensive review of fitness data from over

14   85,000 Australian children age 9 to 17 years old showed

15   that compared with nine-year-old females, nine-year-old

16   males were faster over short sprints, 9.8 percent, and

17   one mile, 16.6 percent, could jump 9.5 percent farther

18   from a standing start, which tested explosive power,

19   could complete 33 more push-ups in 30 seconds and have

20   13.8 percent stronger grip.  Male advantage of a similar

21   magnitude was detected in a group study of children

22   where compared to a six-year old females six-year old

23   males competed 16.6 percent more shuttle runs in a given

24   time and could jump 9.7 percent further from a standing

1    position.  Do you see that language?

2       A.    I do.

3       Q.    And on the Australian study, if you follow the

4    footnote you will see that it references a study by

5    Kaitlin Thompkinson.  That's footnote 22.  And my first

6    question is have you read the reference study by Kaitlin

7    Thompkinson?

8       A.    I don't recall.  I'm guessing yes.

9       Q.    All right.  All right.

10          Do you have any reason to doubt the accuracy of

11   this summary of the findings of Kaitlin Thompkinson

12   based on data from over 85,000 Australian children?

13                    ATTORNEY BLOCK:  Objection to form.

14                    THE WITNESS:  I think the important thing

15   to recognize when you look at these sorts of data are

16   recognizing the multiple inputs.  So the larger these

17   groups --- these cross-sectional studies get the more

18   confounded they get by access and other social

19   explanations why there are boys participating in sports

20   to a greater degree.

21   BY ATTORNEY BROOKS:

22      Q.    So putting aside causation, which might be

23   physiological and might be cultural, as you said there

24   could be various causes, do you have any reason to doubt

```
 1   the accuracy of the findings of performance advantage
 2   summarized here in the passage that I've just read?
 3                  ATTORNEY BLOCK:  Objection to form and
 4   terminology.
 5                  THE WITNESS:  Putting aside causation, I
 6   have no --- I can't offer an expert opinion I guess if
 7   that's the bottom line.  But if you're asking me just as
 8   an individual, I'm not expecting that they're
 9   fabricating that data.  I am not expecting that.
10   BY ATTORNEY BROOKS:
11     Q.    And you agree that advantages on a scale of 9
12   percent, 16 percent could provide a significant
13   advantage in athletic competition, do you not?
14                  ATTORNEY BLOCK:  Objection to
15   terminology.
16                  THE WITNESS:  So say that question again.
17   BY ATTORNEY BROOKS:
18     Q.    You agree that advantages on the scale of
19   9.8 percent or 16.6 percent would provide a large
20   advantage in athletic competition, do you not?
21                  ATTORNEY BLOCK:  Same objection to
22   terminology.
23                  THE WITNESS:  In elite athletic
24   competition, yes.
```

BY ATTORNEY BROOKS:

Q.    Did you play any sport in high school?

A.    At a sophisticated level I did not.

Q.    Your general knowledge permits you to say, does it not, that at the high school level also a 9.8 percent or a 16.6 percent advantage is a very large advantage?

ATTORNEY BLOCK:  Objection to form and terminology?

THE WITNESS:  So there it gets more diffuse, therefore, and I can't answer as an expert.

BY ATTORNEY BROOKS:

Q.    Can you answer as an informed adult citizen?

ATTORNEY BLOCK:  Same objection.

THE WITNESS:  So as an expert for sure not.  As an informed adult, it falls back to the same situation.  When there is a wide range of athletes in a certain context, then it is going to seem less relevant. And obviously with the example I gave before with an elite circumstance where that --- it describes the entire field is more significant.

BY ATTORNEY BROOKS:

Q.    Let me ask you to find your rebuttal report.

A.    And actually --- do others need a break?

Q.    Any time --- your concentration is most

1    important.  So if you need a break, we'll take a break.

2       A.    So I'm good.

3             ATTORNEY BROOKS:  Well, obviously, if

4    anybody wants a break, we can take a break.

5             ATTORNEY BLOCK:  Do you need a break?

6             ATTORNEY SWAMINATHAN:  No.

7             ATTORNEY BLOCK:  We are good.

8             THE WITNESS:  So my rebuttal.

9    BY ATTORNEY BROOKS:

10      Q.    Your rebuttal, which is Exhibit 2, so it's

11   probably at the bottom.  And in that I'm going to draw

12   your attention to paragraph 11.  And there you wrote

13   there is also no basis to confidently predict the

14   patterns about the athletic performance of prepubertal

15   cisgender boys will be the same for prepubertal

16   transgender girls, closed quote.  Do you see that?

17      A.    I do.

18      Q.    And let me attempt to see if I understand the

19   point of this paragraph.  And indeed, if you would like

20   to read the whole paragraph you should.  But my

21   understanding of the point is that you're saying that

22   even if prepubertal boys have some performance, some

23   statistically significant performance advantage over

24   prepubertal girls, that you are not confident that the

1  athletic performance capabilities of natal males who

2  identify as females before puberty will be the same as

3  those of natal males who identified as male before

4  puberty?

5              ATTORNEY BLOCK:  Objection to the

6  terminology.

7              THE WITNESS:  So to the extent --- so

8  were differences to be determined between cisgender boys

9  and cisgender girls, it is correct to say that that

10  won't conclusively demonstrate that the same applies for

11  transgender girls.  That's right.

12  BY ATTORNEY BROOKS:

13    Q.   Now, elsewhere in your writings you have said

14  that it is well known that the majority of prepubertal

15  children who experience gender dysphoria do not persist

16  in that dysphoria into pubertal adolescence.

17       Correct?

18             ATTORNEY BLOCK:  Objection.

19             THE WITNESS:  No.

20  BY ATTORNEY BROOKS:

21    Q.   Not correct?

22    A.   Not correct.

23    Q.   Then we will come back to that.  In this

24  paragraph 11, you speculate a little farther down that,

```
 1  quote, the experience of transgender girls might be more
 2  similar to the experience of cisgender girls?
 3                    ATTORNEY BLOCK:  Objection to the
 4  characterization and speculative.
 5  BY ATTORNEY BROOKS:
 6    Q.    Well, by using the word might you meant to
 7  indicate, did you not, Dr. Safer, this is a hypothesis,
 8  this is not a documented fact?
 9    A.    That if the question is do I know that the
10  experience of transgender girls is definitely in this
11  circumstance the same as cisgender girls, that's right,
12  I don't know that.  It only might be true.
13    Q.    And towards the end, in the last line, you refer
14  to potential biological underpinnings of gender
15  identity.  Again, the word potential signaling that no
16  such specific underpinnings have yet been identified.
17          Correct?
18    A.    Say that question again.
19    Q.    In the last line, your reference to, quote,
20  potential biological underpinnings of gender identify,
21  by the word potential you are indicating that no
22  specific biological underpinning has yet been
23  identified.
24          Correct?
```

1           ATTORNEY BLOCK:  Objection to form.

2               THE WITNESS:  So it's --- so no,

3       potential in this context does reference that most of

4       this biology is unknown, so that part is true, but it

5       doesn't mean that there is nothing known.

6       BY ATTORNEY BROOKS:

7           Q.    You do not propose to offer any opinion that

8       natal males --- let me strike that and start again.

9               You do not propose to offer any opinion, do

10      you, that prior to puberty natal males who identify as

11      female are less athletic capable on average than natal

12      males who identify as male?

13              ATTORNEY BLOCK:  Objection to form.

14              THE WITNESS:  I'm not offering an opinion

15      with regard to cisgender --- excuse me --- cisgender

16      boys versus transgender girls and their athleticism when

17      they are prepubertal.  If that's what you are asking,

18      then yes, I'm not offering an opinion between those two

19      groups.  I'm simply raising the possibility that

20      something like biology associated with transgender could

21      have influence into it.

22      BY ATTORNEY BROOKS:

23          Q.    Let me ask you to turn to paragraph 22 of your

24      rebuttal report.  And there you write Doctor Brown also

1    refers to widely publicized anecdotes about isolated

2    cases of transgender girls and women state championships

3    in high school sports or NCAA championships in college.

4    Do you see that?

5        A.    I do.

6        Q.    And you go on to write but transgender athletes

7    of women have been competing in NCAA and secondary

8    school athletics for many years at this point, closed

9    quote.  Do you see that language?

10       A.    I do.

11       Q.    Let me ask you to name all instances of male

12   males known to you who have competed in women's division

13   varsity athletics in any athletic endeavor for any NCAA

14   member school?

15                   ATTORNEY BLOCK:  Objection to form and

16   scope.

17                   THE WITNESS:  Right, so I certainly can't

18   do that usefully off the top of my head, name

19   transgender women and all these context in such an

20   exhaustive way like that.

21   BY ATTORNEY BROOKS:

22       Q.    Well, I asked you accused Doctor Brown of citing

23   isolated cases.  Do you have any basis to assert that he

24   has done anything other than cite all cases in which

1   natal males have competed in NCAA athletics in the

2   female category?

3       A.    So the --- if our focus is on the word isolated

4   then per se they are all --- these are all isolated

5   cases.   These aren't systematic analyses of any cohort

6   of people.

7       Q.    You are not accusing Doctor Brown of picking and

8   choosing?

9                   ATTORNEY BLOCK:  Objection to form.

10                  THE WITNESS:  So let me think about that.

11  By simply choosing individual cases that are in the

12  press then it is by its nature picking and choosing.

13  BY ATTORNEY BROOKS:

14      Q.    What do you mean by that?

15      A.    Well, these are simply individual cases that

16  have --- that have come to public attention, and so I

17  --- so --- and that's the basis of my statement as

18  opposed to some exhaustive attempt to identify

19  transgender people in a systematic fashion.

20      Q.    As you sit here today, Dr. Safer, are you aware

21  of a single case not mentioned by Doctor Brown in his

22  report of a natal male who has competed in NCAA

23  athletics in the women's category?

24                  ATTORNEY BLOCK:  Objection to form.

1          THE WITNESS:  Can I name somebody off the

2     top of my head?  I cannot.

3     BY ATTORNEY BROOKS:

4          Q.    Do you have any concrete --- leaving aside

5     whether you remember a precise name, do you have any

6     factual basis to know that Doctor Brown has omitted any

7     case of a natal male who has competed in the female

8     division of NCAA athletics?

9               ATTORNEY BLOCK:  Objection to form.

10              THE WITNESS:  So I guess if the question

11    is what can I do off the top of my head, then I cannot.

12    BY ATTORNEY BROOKS:

13         Q.    Off the top of your head, you recall the case of

14    June Eastwood, do you not?

15         A.    You have to remind me what that is.

16         Q.    A runner in Montana?

17         A.    I actually would need to be reminded of those

18    details.

19         Q.    All right.  Certainly you recall Lia Thomas

20    because none of us can mis Lia Thomas these days?

21         A.    Lia Thomas is still in the news.

22         Q.    Do you recall the case of CeCe Telfer?

23         A.    Names are not my strength.

24         Q.    All right.  No more on that.

```
1          You say at the end of this paragraph, quote,
2   the occasional championship that has been widely
3   publicized do not come close to constituting the rates
4   one would expect if they, that is transgender athletes,
5   wanted rates that are proportional to their overall
6   percentage of the population, which is approximately one
7   percent.  Do you see that language?
8      A.    I do.
9      Q.    Do you have any knowledge as to what --- first
10  of all, let me ask, what is your basis for believing
11  that the current student population in college and high
12  school level is approximately one percent transgender?
13     A.    The statistic for the percentage of the
14  population who are transgender comes from surveys.
15     Q.    And do you have any knowledge at all as to what
16  percentage of varsity athletes in America today at the
17  NCAA --- among NCAA member schools in the women's
18  division are transgender?
19     A.    If the question is that a survey in that
20  population, I'm not aware of a survey that's been done.
21     Q.    So you don't know whether the number of
22  victories of championships that have been taken in the
23  women's division by transgender competitors is higher or
24  lower than the percentage of athletes in those divisions
```

```
 1   who are transgender?

 2                  ATTORNEY BLOCK:  Objection to form.

 3                  THE WITNESS:  That is correct.  I do not

 4   know the percentage that --- what we know is the

 5   percentage of transgender people and then we know the

 6   percentage of identified athletes winning competitions.

 7   And even then we don't know that absolutely.  We only

 8   know the ones that are publicized.  But, right, in the

 9   in between, we don't have statistics.  That's right.

10                  ATTORNEY BROOKS:  Counsel, I'm going to

11   suggest --- in my experience, if we break for lunch at

12   noon, it makes it a little long afternoon.  So I would

13   suggest that we take a short break now and then keep

14   going until like 12:45 or something.  It's seven hours

15   on the clock and I'm here just to tell you that the

16   afternoon gets long.  So unless you are starving I'd

17   recommend ---?

18                  THE WITNESS:  No, I think that's a great

19   idea.

20                  ATTORNEY BROOKS:  Take a short break now.

21                  THE WITNESS:  So you don't know who is on

22   the phone so give them a break.

23                  ATTORNEY BROOKS:  Let's go off the

24   record.
```

```
 1                    VIDEOGRAPHER:  Going off the record.  The
 2   current time reads 12:01:00 p.m. Eastern Standard Time.
 3   OFF VIDEOTAPE
 4                           ---
 5   (WHEREUPON, A SHORT BREAK WAS TAKEN.)
 6                           ---
 7   ON VIDEOTAPE
 8                    VIDEOGRAPHER:  Back on the record.
 9   Current time reads 12:14 p.m. Eastern Standard Time.
10                    ATTORNEY BROOKS:  Let me mark as Safer
11   Exhibit 8 the Endocrine --- Treatment of Gender
12   Dysphoric Gender Incongruent Persons, an Endocrine
13   Society Clinical Practice Guidelines from 2017
14   previously marked as Adkins Exhibit 4.
15                    ATTORNEY WILKINSON:  Tab 5.
16                           ---
17            (Whereupon, Exhibit 8, Endocrine Society
18             Guidelines, was marked for identification.)
19                           ---
20   BY ATTORNEY BROOKS:
21      Q.    And Doctor Safer, am I correct you served the
22   committee that created this revised version of the
23   Endocrine Society's Guidelines?
24      A.    Yes.
```

1      Q.    And is it reasonable for me to assume therefore

2    that you are familiar with it in some detail?

3      A.    I am familiar with it in some detail.

4      Q.    They also pertain to your practice?

5            Am I correct.

6      A.    And they do pertain to my practice, yes.

7      Q.    Let me ask you to turn in Exhibit-5 to Page 3879

8    --- Exhibit 8, 3879.  And there I will call your

9    attention to the specific recommendation that's numbered

10   1.4.  And it says there we recommend against puberty

11   blocking and gender-affirming hormone treatment in

12   prepubertal children with GD/gender incongruence.

13           Do you see that?

14     A.    I do.

15     Q.    And then there is a section headed evidence,

16   right?

17     A.    Yes.

18     Q.    And the first statement in the sentence that is

19   --- in the section headed evidence is, quote, in most

20   children diagnosed with GD/gender incongruence it did

21   not persist into adolescence, closed quote.

22           Do you see that?

23     A.    I do.

24     Q.    Do you believe that to be a false statement?

1    A.    I wouldn't --- I guess it depends on context

2    here too.  So as of when this was written, the

3    literature being referenced had a broader diagnosis for

4    gender dysphoria and gender incongruence or really

5    gender dysphoria is the label that was being used and

6    still is.  Gender incongruence is where we are headed.

7    And so with that broader definition, that included

8    gender expansive children who were not necessarily

9    transgender.

10   Q.    The statement is I think fairly specific.  And

11   as you are aware, the discussion cites various

12   references, but the introductory sentence states in most

13   children diagnosed with GD a gender dysphoria or gender

14   incongruence did not persist into adolescence.  Do you

15   believe to be a true statement or false statement?

16                    ATTORNEY BLOCK:  Objection to form.

17                    THE WITNESS:  The problem is I can't

18   answer that quite that cleanly.  The statement

19   references a circumstance that I just referenced where

20   children receiving that label have to --- for the most

21   part were not transgender.  The only caution I want to

22   make is that as we grow more refined in our

23   understanding of gender identity and also in our

24   labeling, that we are more specific in identifying

1    transgender kids with these sorts of labels.

2    BY ATTORNEY BROOKS:

3        Q.    Well, recommendation 1.4 says we recommend

4    against puberty blocking and a gender hormone treatment

5    in prepubertal children with gender dysphoria or gender

6    incongruence.  Do you have an understanding of why these

7    Endocrine Society guidelines of which you're a co-author

8    recommended against puberty blocking in prepubertal

9    children?

10       A.    Yes.

11       Q.    Why?

12       A.    They have no impact.

13       Q.    Can you point me to anywhere in the evidence

14   discussion that suggests that is the reason for this

15   recommendation?

16       A.    I don't know.  Let me look.

17       Q.    The evidence discussion is just two paragraphs.

18                     ATTORNEY BLOCK:  I just want to object to

19   the extent you're limiting his review to the evidence

20   section.

21   BY ATTORNEY BROOKS:

22       Q.    My question pertains to the evidence section.

23       A.    So those two paragraphs are both primarily

24   referencing 1.3 and not 1.4.

1    Q.    Well, let me ask you to turn to page 3881.  And

2  at the top of that first column on 3881 it reads we,

3  therefore, advise starting suppression in early puberty

4  to prevent irreversible development of undesirable

5  secondary sex characteristics.  However, comma,

6  adolescents with gender dysphoria, slash, gender

7  incongruence should experience the first changes of

8  their endogenous puberty because their emotional

9  reaction to these first physical changes has diagnostic

10  value in establishing the persistence of gender

11  dysphoria/gender incongruence.

12         Do you see that language?

13    A.    I do.

14    Q.    And as a scientist and practitioner do you agree

15  with that statement?

16    A.    I would say that the validity of that statement

17  is in evolution.

18    Q.    In your practice, over time --- well, let me ask

19  you this.  When this was drafted did you raise an

20  objection to the proposition that the child's emotional

21  reaction to the first physical changes of puberty had

22  important diagnostic value?

23    A.    I cannot recall our specific conversations, but

24  if you're asking if my view has shifted since let's say

1   2015, 2016, 2017, no, the recognition that there is an

2   evolution was already part of my opinion.

3       Q.    What do you mean the recognition that there is

4   an evolution about?

5       A.    So the evolution is that whether there is a need

6   to start puberty as a diagnostic --- as a necessary

7   diagnostic circumstance.

8       Q.    In your practice today do you prescribe puberty

9   blockers prior to Tanner Stage 2?

10      A.    I --- so two things.  My practice is with

11  adults.  And although I will see older kids because I

12  don't have a hard threshold of age 18, but I don't

13  prescribe puberty blockers because I don't --- my

14  practice does not include those age children.  But two,

15  it is still the guidance and so the pediatricians who

16  are part of my program do not prescribe puberty blockers

17  prior to Tanner 2 for the reason I stated initially.

18      Q.    And according to these guidelines, by the time

19  you reach Tanner Stage 2 there have been sufficient

20  first pubertal --- stages of pubertal development to

21  give a chance to observe the child's reaction to

22  pubertal changes for diagnostic purposes.

23          Correct?

24              ATTORNEY BLOCK:  Objection to form.

1           THE WITNESS:  So the --- so I guess there

2    are kind of two pieces.  The sentence is --- that

3    sentence is written, but that is the sentence that I'm

4    suggesting is an opinion that is in evolution, like I'm

5    saying, to whether that need really exists or not.  The

6    reason why we still don't prescribe puberty blockers

7    before Tanner 2 is that there is no point, there is no

8    preventive element to puberty blockers and so there is

9    no point to give them before puberty begins and there is

10   no way to know that until there is an observable

11   objective finding.

12        Q.    Has your own practice ever involved to a

13   significant extent treating prepubertal or early

14   pubertal stage children for gender dysphoria or gender

15   incongruence incongruence?

16        A.    Have I personally cared for prepubertal children

17   who are transgender or otherwise?  Actually, in the

18   subjects, no.

19        Q.    And do physicians who do treat prepubertal

20   children report to you in connection with your position

21   at the clinic or the Mount Sinai Medical Hospital?

22        A.    Yes.

23        Q.    And do you know whether your clinic makes use of

24   children's emotional reactions to the first physical

```
 1    changes of puberty as part of their process of
 2    determining whether transgender hormonal therapies of
 3    any sort are appropriate for that child?
 4        A.    Yeah, I can't give you give you an answer.  I
 5    would actually have to go survey my psychologists.
 6        Q.    Let me direct you to paragraph 17 of your
 7    rebuttal report.  And there you say in the second
 8    sentence under current standards of care transgender
 9    adolescents are eligible to receive puberty blockers
10    when they reach Tanner 2, not Tanner 3, which is early
11    enough to prevent endogenous puberty from taking place,
12    closed quote.
13            Do you see that?
14        A.    I do.
15        Q.    Now, just for context, you testified previously
16    that the large majority of minors I'll say who present
17    with gender incongruence or gender dysphoria are, in
18    fact, considerably older and have gone through at least
19    most of the Tanner stages.
20            Correct?
21            ATTORNEY BLOCK:  Objection to
22    characterization.
23            THE WITNESS:  Most of the people we are
24    seeing in clinical practice are coming to us at later
```

1    stages of development, yes.

2    BY ATTORNEY BROOKS:

3        Q.    And so when we talk about prepubertal children,

4    we're talking about a small minority of the patients

5    coming in to ---?

6        A.    I can't define small, but it is the minority,

7    that's correct.

8        Q.    And do you believe that what your clinic is

9    seeing in that regard is typical of what's being seen

10   across the country these days?

11       A.    So if I'm sitting here as an expert, I don't

12   have an expert survey to point to, to give you an answer

13   there.

14       Q.    But you read the literature and you talk to

15   colleagues at other institutions.

16            Am I correct?

17       A.    I certainly both read the literature and talk to

18   colleagues.

19       Q.    And is it your current belief that what you are

20   seeing in terms of the breakdown of patient population

21   is similar to or quite different from what other major

22   gender clinics are experiencing?

23       A.    So kind of separating, I'm living in my expert

24   role, I really want to point to data where I have any

1    confidence at all, and I have none.  If you are asking

2    me in a more informal way among our conversations, then

3    I can answer that our experience seems similar to

4    others' experience.

5        Q.    All right.

6              So in talking about prepubertal children ---

7    well, strike that.  We've been through that.

8              In your rebuttal report when you said beginning

9    puberty blockers at Tanner stage 2 is early enough to

10   prevent endogenous puberty from taking place, let me ask

11   you, in consideration, do you believe it is accurate as

12   stated?

13       A.    So Tanner 2 early enough to prevent endogenous

14   puberty from taking place, yes, that is accurate.

15       Q.    You would agree with me, would you not, that the

16   endocrine guidelines of which you are a co-author

17   recommend to treat beginning puberty blockers at Tanner

18   Stage 2?

19       A.    So to clarify, under the cited guidelines what

20   they say the recommendation is do not use puberty

21   blockers prior to puberty beginning, prior to Tanner 2.

22       Q.    Let me direct you to recommendation 2.2 on

23   page 3880.  Recommendation 2.2 reads we suggest the

24   clinicians begin pubertal hormone suppression after

```
 1   girls and boys first exhibit physical changes of

 2   puberty.

 3            Do you see that?

 4      A.    I do.

 5      Q.    And then it says, paren, Tanner stages G2/B2

 6   which is to say the girls Tanner 2 or boys Tanner 2,

 7   correct?

 8      A.    That is what that means, yes.

 9      Q.    So the official recommendation from the

10   Endocrine Society is begin at or after Tanner Stage 2,

11   right?

12                    ATTORNEY BLOCK:  Objection to form.

13                    THE WITNESS:  That is a correct.

14   BY ATTORNEY BROOKS:

15      Q.    And it says that Tanner Stage 2 is defined as

16   girls and boys first exhibiting physical changes of

17   puberty.

18         Correct?

19                    ATTORNEY BLOCK:  Objection to form.

20                    THE WITNESS:  The definition of Tanner 2,

21   is where there is any objective evidence when puberty

22   has begun.

23   BY ATTORNEY BROOKS:

24      Q.    So in fact, beginning puberty blockers at Tanner
```

1    Stage 2 does not categorically prevent endogenous

2    puberty from taking place but instead prevents a

3    substantial portion of endogenous puberty from taking

4    place.

5            Correct?

6                    ATTORNEY BLOCK:  Objection to form.

7                    THE WITNESS:  So let me ---.

8    BY ATTORNEY BROOKS:

9        Q.    It is in paragraph 17.

10       A.    So the --- I guess the way this is understood is

11   --- I guess it depends on how extreme you want to take

12   things.  It is back to our original conversation of that

13   cause has to take place before effect.  So it's parsing

14   it to that degree.

15           In a biological context it really is the case

16   that we need some objective evidence before we begin

17   things so that we don't make the mistake of using a

18   medication prior to its having any impact.  And then

19   it's also true that some of the hormone mediated changes

20   that we see do actually regress to that prepubertal

21   state when we --- when you use puberty blockers at

22   Tanner 2.  So the statement as written --- as I wrote it

23   is accurate in the way we think of these things in

24   biology.

1     Q.    Although the guidelines specifically state that

2   adolescents should --- before puberty blockers, quote,

3   should experience the first changes of their endogenous,

4   spontaneous puberty.  And the recommendation calls for

5   beginning puberty blockers, quote, after girls and boys

6   first exhibit physical changes at puberty, paren, Tanner

7   stages 2, closed paren.  I'm not misreading anything, am

8   I?

9                 ATTORNEY BLOCK:  Objection to just

10  reading an excerpt.

11                THE WITNESS:  Right.  I don't know --- I

12  don't know if those were are all direct quotes or not so

13  I won't comment on whether you're misreading or not, but

14  the first statement that you reference, as I've said, is

15  one where there is an evolving understanding of its

16  veracity or its applicability.

17                The statement 2.2 is simply using

18  alternate phrasing for saying Tanner 2, that is we need

19  to have objective evidence that puberty is genuinely

20  beginning.  The focus and the purpose of these

21  statements is to avoid people using puberty blockers on

22  non-pubertal kids.

23  BY ATTORNEY BROOKS:

24    Q.    Well, you would agree with me, would you not,

1   that if one administer puberty blockers in accordance

2   with Endocrine Society guidelines, then some stages of

3   endogenous male puberty will have occurred in natal male

4   patients?

5                    ATTORNEY BLOCK:  Objection the form.

6                    THE WITNESS:  So when we are ---

7   specifically we're referencing transgender girls here.

8   And although pre-pubertis gender boys, when we see

9   Tanner 2, then some --- some degree of development has

10  taken place.  That part is true.  So in the absolute

11  sense, then yes.  But in a biological sense, like I said

12  already, the --- some interesting reality is that some

13  of that does regress.

14  BY ATTORNEY BROOKS:

15      Q.    By the way, you, yourself, do not have any

16  knowledge as to what developments of endogenous male

17  puberty BPJ underwent prior to initiating puberty

18  blockers, do you?

19      A.    I have had no physical contact with BPJ.

20      Q.    Nor have you studied BPJ's chart sufficiently to

21  be feel that you know the answer to that question?

22      A.    Right, I'm not expressing any opinion to the

23  specific medical terms, that's right.

24      Q.    Have you, yourself, ever supervised any

1    research, clinical research, concerning treatment of

2    prepubertal children for gender dysphoria or gender

3    incongruence?

4        A.    Have I supervised research on treatment of

5    prepubertal transgender girls?  Let me think about that.

6    Nothing is coming to mind, but our program does do

7    research across an age span.

8        Q.    Well, some of your colleagues might have done

9    such research, but my question is whether you have been

10   personally supervised or involved in such research?

11       A.    I'm pretty involved actually, especially in our

12   research program, but I'm having a difficult time coming

13   up with an example.

14       Q.    All right.

15            I just want to make sure I know about it if it

16   exists.

17       A.    Yes.

18            ATTORNEY BROOKS:  Let me mark as Safer

19   Exhibit 9 an article entitled --- an article or a

20   chapter or something entitled Care of the Transgender

21   Patient dated 2019 by Dr. Safer and by Doctor Vin

22   Tangpricha.

23                          ---

24            (Whereupon, Exhibit 9, Care of the

```
 1              Transgender Patient Article, was marked

 2              for identification.)

 3                         ---

 4   BY ATTORNEY BROOKS:

 5      Q.    Am I correct that this is --- well, you tell me,

 6   is this an article or book chapter?  How would you

 7   describe this document?

 8      A.    This is a review article from the Annals of

 9   Internal Medicine.

10      Q.    And by review you mean it's not reporting on

11   original research but rather summarizing the state of

12   knowledge in a particular area?

13      A.    That is correct.

14      Q.    Okay.

15              And the pages may have ITC and a number, but

16   I'll just refer to the number if I may.  On page three,

17   column two, is a statement that I think is just

18   repeating what you told me, that is most --- quote, most

19   transgender persons present to clinicians in late

20   adolescence or adulthood, closed quote.  That is

21   consistent with what you testified earlier.

22              Correct?

23      A.    That is, yes.

24      Q.    And if you turn then to page five, column two,
```

```
 1   you write in the first full sentence in column two,

 2   prior effects of androgens on the skeleton height and

 3   size and shape of the hands, feet, jaw and pelvis and

 4   voice, including visibly --- visible laryngeal

 5   prominence, will not be altered if treatment is

 6   initiated after puberty.

 7            Do you see that language?

 8       A.   I do.

 9       Q.   And is it consistent with your understanding

10   that at this stage also changes to the size of the heart

11   and the lungs will not be altered if testosterone is

12   commenced after the initiation of puberty?

13       A.   Not quite.

14       Q.   Explain that to me, please.

15       A.   So transgender women, if they have gone through

16   a typical male puberty, are going to remain larger, but

17   the testosterone has action on certain tissues, so

18   specifically muscle, and that --- when those

19   testosterone levels shrink, then that muscle shrinks and

20   the heart muscle is --- well, the heart is a muscle, so

21   it will be --- there will be an impact from body size,

22   but there will also be impact from the lower level of

23   testosterone.  So it will be kind of a mix of those two.

24       Q.   The heart is a muscle but it has in it cavities
```

1    of a certain size in which blood flows, out of which

2    blood is pumped, correct?  Do you have any knowledge,

3    are you aware or any literature that documents that

4    testosterone suppression reduces the heart's pumping

5    capacity?

6                    ATTORNEY BLOCK:  Objection to form.

7                    THE WITNESS:  So the --- so there is a

8    gap there of transgender research --- so no, that is

9    something that's not been studied.

10   BY ATTORNEY BROOKS:

11       Q.    And the lungs are not muscle tissue.  Are you

12   aware of any science that indicates or even suggests to

13   you as an expert that an individual who has gone through

14   typical male puberty, that individual's lungs reduce in

15   size if testosterone is suppressed?

16       A.    So the answer with regard to lungs is going to

17   have some of those same inputs as heart or other tissues

18   actually where overall size of the individual is not ---

19   well, certainly height at least is not decreasing, and

20   so this person is larger.  And so lung size matches that

21   to some degree.  And testosterone has some impact on

22   surrounding muscle.  And so to the degree that that

23   shrinks there might be lung shrinking too.  And so you

24   hear that --- that is going to be a complex answer.  And

1    in terms of interpreting it even, you then would also

2    have to interpret it in the context of the size of the

3    body if you want to consider function, and none of this

4    has been studied.

5        Q.    Certainly you don't believe, do you, that an

6    individual who has been --- let me start that again.  It

7    is not your opinion, is it, that testosterone

8    suppression by an individual who has been through a

9    typical male puberty reduces that individuals VO2 mass

10   to typical female levels?

11       A.    So the more we get into some of the subtler

12   physiology, I will take a step back and give you an

13   expert opinion, but I will --- in addition to that point

14   out that we don't even have studies on this.  We're just

15   at a stage of beginning to look at that sort f thing.

16                   ATTORNEY BLOCK:  Roger, are you able to

17   speak up a little?

18                   ATTORNEY BROOKS:  I will try.

19   BY ATTORNEY BROOKS:

20       Q.    You state that in paragraph 55 of your expert

21   report, Exhibit 1?

22       A.    So paragraph 55.

23       Q.    Fifty-five (55).  You state that there are,

24   quote, only two studies examining the effect of

1  gender-affirming hormone therapy on athletic

2  performance, closed quote.  Do you see that?

3      A.    Yes.

4      Q.    You are aware, are you not, that there are a

5  substantially larger number of studies that examine the

6  effect of testosterone suppression on strength or muscle

7  mass in natal males?

8                  ATTORNEY BLOCK:  Objection to form.

9                  THE WITNESS:  There are --- there are a

10  handful of studies on the impact of testosterone

11  lowering treatment on transgender women on some tissues,

12  yes.

13  BY ATTORNEY BROOKS:

14      Q.    Well --- and not to get carried away with the

15  terminology, there are also studies that relate to

16  application of testosterone suppression to males who

17  don't identify as transgender, are there not?

18      A.    To cisgender men in addition to transgender

19  women there are some studies --- yes, there are actually

20  some modest studies, yes, on cisgender men.

21      Q.    And have you now taken some care to review

22  yourself all the peer-reviewed studies of that type that

23  were cited in Doctor Brown's report?

24      A.    I have looked at papers that were cited by

```
 1   Doctor Brown.  The moment we use the word all I
 2   hesitate, but certainly I've read through the papers
 3   that were cited.
 4              ATTORNEY BROOKS:  Well, let's start with
 5   one you referenced, article by Roberts, et al., from
 6   2020, which I will mark as Exhibit --- Safer Exhibit-10.
 7              COURT REPORTER:  10.
 8              ATTORNEY WILKINSON:  10, Tab 60.
 9                        ---
10         (Whereupon, Exhibit 10, Roberts, et al,
11          Articles, was marked for
12          identification.)
13   BY ATTORNEY BROOKS:
14     Q.    And in fact, this is one of only very few
15   articles that you cite in your expert report start to
16   finish.
17          Correct?
18              ATTORNEY BLOCK:  Objection to form.
19              THE WITNESS:  So this paper is referenced
20   to an expert report.
21   BY ATTORNEY BROOKS:
22     Q.    Let me direct you to the last page of your
23   expert report where there is a bibliography.  And other
24   than citing to your own writings as the entire basis of
```

```
 1   your opinions you cited only six articles.

 2           Correct?

 3                   ATTORNEY BLOCK:  Objection to

 4   characterization about its entire cases for his

 5   opinions.

 6                   THE WITNESS:  So the paper specifically

 7   referenced two reviews and six papers but recognized

 8   that some of these papers specifically are summaries of

 9   the topic.

10   BY ATTORNEY BROOKS:

11     Q.    You have studied the Roberts 2020 article with

12   some care.

13           Is that correct?

14     A.    I have indeed, yes.

15     Q.    And so far as you know it is the only

16   longitudinal study of the impact of testosterone

17   suppression in natal males and actual athletic

18   performance and in this case running.

19           Correct?

20                   ATTORNEY BLOCK:  Objection to form.

21                   THE WITNESS:  So the Roberts study and

22   the Harper study are both studies of transgender women

23   with at least two time points.

24   BY ATTORNEY BROOKS:
```

1    Q.    The Harper study is strictly retrospective, it

2    is not a prospective, longitudinal study?

3    A.    The Harper study is --- that's a good question.

4    I actually don't know if it is --- it's probably mixed,

5    honestly.

6    Q.    Well, we can look at it, but it is not mixed.

7    It is a one-time survey.

8    A.    Well, to be clear, the way we phrase these

9    things sometimes are --- I'm trying to be --- are

10    according to certain conventions academically, so that

11    sometimes it will be framed that way because from an

12    academic perspective we'll use that context, but I think

13    some of the data was actually collected in both

14    collections.

15    Q.    The Roberts study you understand to be a

16    prospective, longitudinal study, do you not?

17    A.    Well, actually, you are testing me on that.  Did

18    they set out at the beginning to do it or did they go

19    back and look?  I'd have to see.

20    Q.    Well, based on the method, I think the answer is

21    they went back and looked because it begins we reviewed?

22    A.    Yes.

23    Q.    Do you --- is it your opinion that amongst the

24    available data, the Roberts study is --- on the impact

1  of testosterone on athletic performance is some of the

2  strongest data that we have available?

3              ATTORNEY BLOCK:  Objection to form.

4              THE WITNESS:  It is my opinion that the

5  Roberts and Harper studies are the only two studies that

6  we have available.

7  BY ATTORNEY BROOKS:

8     Q.    Is it your opinion as an expert, is it not, that

9  the structure of the Roberts study renders it --- and

10  the source of its data renders it far more reliable than

11  the Harper 2015 study?

12             ATTORNEY BLOCK:  Objection to form.

13             THE WITNESS:  I would not overstate that,

14  so no.  If I'm being --- if I'm being professorial and

15  saying this is how to organize something, then in that

16  context I might say that, but in terms of simply

17  believability of data, I got two modest papers that are

18  the sum of the world literature on the subject.

19  BY ATTORNEY BROOKS:

20    Q.    You say in paragraph 56 of your report that

21  Roberts found, quote, after two years of

22  gender-affirming hormone therapy transgender women

23  completed the 1.5 mile run 12 percent faster on average

24  than non-transgender women, closed quote.  Do you see

```
 1    that?
 2                   ATTORNEY BLOCK:  I think he needs some
 3    time to get ---.
 4                   THE WITNESS:  Yeah, to actually find
 5    the ---.
 6    BY ATTORNEY BROOKS:
 7       Q.    Paragraph 56.  And I will refer you to the third
 8    sentence.
 9       A.    All right.
10             Sorry say that again.
11       Q.    I'm simply calling your attention to the place
12    where you wrote at the Roberts report that after two
13    years of a gender-affirming hormone therapy transgender
14    women completed the 1.5 mile run 12 percent faster on
15    average than non-transgender women.
16       A.    Yes.
17       Q.    And two years, not a trick question here, twice
18    as long as the one year testosterone suppression
19    requirement that led to the NCAA rule.
20             Correct?
21       A.    Two years is twice one year, yes.
22       Q.    And you would agree with me that a 12 percent
23    faster in women's time is a substantial advantage?
24                   ATTORNEY BLOCK:  Objection to form.
```

```
 1              THE WITNESS:  So this is a bit --- this
 2   is a bit of the same conversation.  I guess I can't say
 3   that in a blanket way.  It depends on context.
 4   BY ATTORNEY BROOKS:
 5       Q.    The context here is that that these are all Air
 6   Force members, do you recall?
 7       A.    I believe they are all Air Force members, yes.
 8       Q.    All subject to Air Force physical fitness
 9   requirements.  So we are not talking about couch
10   potatoes?
11       A.    I'm not rendering an opinion there as an expert.
12       Q.    Generally you would accept that this is a
13   relatively fit population?
14       A.    I can't even render an opinion there as an
15   expert.
16       Q.    Do you have some unhealthy relative who's a
17   member of the armed forces?
18       A.    I was in the National Guard, so I do have some
19   insight.
20       Q.    Okay.
21             You would agree, would you not, that running
22   speed and endurance, per se, are relevant to quite a
23   number of sports?
24       A.    Running speed and endurance are relevant to many
```

1    sports.  I'm certain that is true.  I'm not ---

2       Q.    Well ---.

3       A.    --- an expert again.

4       Q.    I'm no sports fan, but we've all seen enough

5    sports to know there's a lot of running involved not

6    just in track but in basketball, soccer, lacrosse and

7    field hockey.

8             Correct?

9       A.    I have observed that, yes.  But again, I'm not

10   rendering an expert opinion there, but yes.

11      Q.    And on page six of this paper ---.

12      A.    This is Roberts.

13      Q.    Yes, Roberts and Exhibit 10.  Roberts and his

14   co-authors summarize in their conclusion by stating,

15   quote, in this study we confirm that the use of  gender

16   affirming hormones are associated with changes in

17   athletic performance and demonstrated that the

18   pretreatment differences between a transgender and a

19   cisgender woman persist beyond the 12-month time

20   currently --- requirement currently being proposed for

21   athletic competition by the World Athletics and the IOC.

22   Do you see that?

23      A.    This is the conclusion section?

24      Q.    It is.

1    A.    Yes, I see that.

2    Q.    And you don't have any expert opinions that the

3  findings of Roberts are inaccurate or unreliable, do

4  you?

5    A.    So the --- this is again a question of context.

6  So I have no reason to suspect that these data are

7  suspect.  The only question then is what we conclude

8  when you do a study of --- for the transgender women I

9  think we are talking about 29 people, which I certainly

10 like a lot better than simply pointing to a random

11 individual, but I recognize as also simply 29

12 individuals in a certain circumstance that might or

13 might not be replicated as we do this again and increase

14 the numbers of people that we evaluate.

15   Q.    You don't propose to offer any expert opinion

16 that the findings of Roberts as reported in this paper

17 of 2020 are inaccurate?

18   A.    So, I guess the way I said it is how I said it

19 already, which is I'm not doubting Roberts' data, but I

20 wouldn't then over generalize to say that I know that

21 these would be the findings we would see in every

22 similar circumstance.

23   Q.    And are you aware that one common track event or

24 cross-country event, I can never keep them straight, is

```
 1    the 1600 meter, which is about a mile?

 2        A.    Actually, that is not my expertise.  I believe

 3    you.

 4        Q.    Are you aware that the 3,000 meter, a 1.8 mile

 5    distance, is a standard event?

 6        A.    If you are meaning to quiz me on the standard

 7    lengths these days and meters and all of that, no.

 8                    ATTORNEY BROOKS:  Well, I can't complete

 9    my next document in two minutes, we if we want to break

10    at 1:00 now or I can do one more document.

11                    ATTORNEY BLOCK:  I'm fine continuing if

12    you are.

13                    THE WITNESS:  My bias is to push.

14                    ATTORNEY BROOKS:  Folks online, we're

15    going to continue a little bit farther.

16    BY ATTORNEY BROOKS:

17        Q.    You cited a paper by Harper from 2015.  And that

18    paper also I take it you studied with some detail?

19        A.    Yes.

20        Q.    And how many individuals did Harper have in that

21    study?

22        A.    I --- do we have her ---?

23        Q.    Everything that you mention I have.

24                    ATTORNEY BROOKS:  Let me mark as Safer
```

```
 1   Exhibit 11 ---
 2                    ATTORNEY WILKINSON:  Yes.
 3                    ATTORNEY BROOKS:  --- Harper's --- Harper
 4   et al. or just Harper, article Race Times for
 5   Transgender Athletes from 2015.
 6                    ATTORNEY WILKINSON:  Tab 61.
 7                         ---
 8             (Whereupon, Exhibit 11, Race Times for
 9             Transgender Athletes Article, was marked for
10             identification.)
11                         ---
12                    THE WITNESS:  Thank you.
13   BY ATTORNEY BROOKS:
14     Q.    You say you have worked with Joanna Harper, you
15   are aware that Dr. Harper is both an athlete and
16   transgender?
17                    ATTORNEY BLOCK:  Objection to form.
18                    THE WITNESS:  I am aware.  I am aware
19   that she is an athlete, and I'm aware that she is
20   transgender.
21   BY ATTORNEY BROOKS:
22     Q.    Did you have after studying the paper end up
23   with an understanding of how many participants there
24   were?
```

1    A.    There were eight participants.  I'm looking at

2    Table 5.

3    Q.    Did you have an understanding of how those

4    participants were recruited?

5    A.    I do have some understanding of that, yes.

6    Q.    How is that?

7    A.    The --- how would I characterize this?  It's

8    somewhat ad hoc in the sense that Ms. Harper is in the

9    category of these other participants, and so she was

10    able to identify others that met the criteria of being

11    both transgender and being sufficiently intense in their

12    middle distance running that they had race times that

13    they could identify that would allow for the --- for

14    these determinations of age based --- I don't know all

15    the terminology here, but their age-based grade

16    proportional to others in that same sex category.

17    Q.    And it is consistent with your understanding, is

18    it not, that all of the information in this study about

19    what hormonal treatment these individuals had undergone

20    was self reported?

21    A.    This is --- the entire study is self report,

22    that is she didn't have --- Ms. Harper did not have

23    access to people's individual records independently.

24    Q.    So there was no independent confirmation of how

1    long that they had suppressed testosterone.

2         Correct?

3    A.    There was no independent confirmation beyond Ms.

4    Harper and her dealing with other subjects directly.

5    Q.    Well, in your view as a scientist, that's not

6    independent confirmation, is it?

7                         ATTORNEY BLOCK:  Objection to form.

8                         THE WITNESS:  So I'm not expressing an

9    opinion there because in a science --- you know, in a

10   scientific paper we would have --- we would have peer

11   review, but we don't --- that just --- ends up being a

12   little bit of a fuzzy realty.

13   BY ATTORNEY BROOKS:

14   Q.    There is no information in this paper about what

15   testosterone levels were achieved by any of these

16   individuals as a result of suppression, is there?

17   A.    I don't know.  Let's --- I can look through that

18   a little bit because does she reference how many of them

19   have had surgery and such?  It has been quite a while,

20   you know.  So notably, there is some independent

21   confirmation of some of the data because some of this

22   was posted.

23   Q.    Wait.  Let me just be clear.  Some of the times

24   were verified independently.

1          Correct?

2     A.    That's correct.

3     Q.    Nothing about the hormonal treatment?

4     A.    Right.

5               ATTORNEY BLOCK:  Do you want to give him

6  a chance to review it?

7  BY ATTORNEY BROOKS:

8     Q.    Doctor Safer, let me just withdraw that question

9  and ask you another question.

10    A.    Yeah, go ahead.

11    Q.    Do you know whether Doctor Harper stands behind

12  the conclusions of her 2015 paper today?

13    A.    If you ask me do I know it, that's too strong a

14  statement.

15              ATTORNEY BROOKS:  Let me mark as Safer

16  Exhibit 12 an article by Joanna Harper and others from

17  2021 entitled How Does Hormone Transition in Transgender

18  Women Change Body Composition, Muscle Strength and

19  Hemoglobin.

20              ATTORNEY WILKINSON:  Tab 21.

21                        ---

22              (Whereupon, Exhibit 12, Joanna Harper

23              Article, was marked for identification.)

24                        ---

1    BY ATTORNEY BROOKS:

2        Q.     Dr. Safer, have we put that in front of you?

3    Yes, we have.  Are you familiar with this article?

4        A.     I am.

5        Q.     And have you read it, reviewed it recently?

6        A.     I have reviewed it relatively recently.

7        Q.     And do you understand, and I didn't completely

8    read the title.  The second sentence of the title says

9    Systematic Review with the Focus on Implications for

10   Sport Participation.

11            Do you see that?

12       A.     I do.

13       Q.     Can you tell me why when you cited Harper's 2015

14   paper that you just referred to as older science you

15   didn't cite Harper's 2021 publication?

16       A.     So to be clear, I didn't use the older science.

17   I simply referenced Harper's paper as one of the only

18   two papers on the subject.  And your question?

19       Q.     Why didn't you cite Harper's 2021 paper on the

20   topic?

21       A.     So this paper is more in the category of the

22   papers looking at impact on tissues of which there are

23   several papers as opposed to actually investigating a

24   specific activity, a person's activity.  And does this

1    have primary data in it?

2        Q.    Well, let me take you to page eight.

3        A.    Yeah, I don't even think this has a final data

4    in it.

5        Q.    Describing the Roberts study, Harper here on

6    page eight, column one, about halfway down, summarizes

7    as follows:  Quote, trans women ran significantly faster

8    during the 1.5 mile fitness test than ciswomen.  These

9    observations in trained transgender individuals are

10   consistent with the finding of the current review in

11   untrained individuals whereby 30 months of gender

12   affirming hormone therapy maybe sufficient to attenuate

13   some but all influencing factors associated with

14   muscular endurance and performance, closed quote.

15            Do you see that?

16       A.    Yes.  This is the end of the paragraph there?

17       Q.    Yes.

18       A.    We're starting with these observations, yes, I

19   see that.

20       Q.    And do you propose to offer any expert opinion

21   inconsistent with Joanna Harper's summary of the data

22   here suggesting that 30 months of gender affirming

23   hormone therapy may be sufficient to attenuate some but

24   not all influencing factors associated with muscular

1   endurance and performance?

2      A.    The statement here is too broad, so it's simply

3   raising questions.

4      Q.    Well, Joanna Harper says here that the findings

5   of her current review were that 30 months of gender

6   affirming hormone therapy may be sufficient to attenuate

7   some but not all influencing factors associated with

8   muscular endurance and performance?

9                   ATTORNEY BLOCK:  Objection to leaving out

10  words of what you quoted.

11  BY ATTORNEY BROOKS:

12     Q.    And my question for you is do you intend to

13  offer an expert opinion that you believe is inconsistent

14  with that statement?

15                  ATTORNEY BLOCK:  Same objection.  It's

16  misquoting the document.

17                  THE WITNESS:  So the operative or

18  inoperative word here is may be sufficient, and so when

19  we're --- these are research questions as we try to

20  understand physiology and the relevance of certain

21  testosterone levels at certain endpoints and then not

22  just endpoints as surrogates, which is what most of the

23  papers to date still are, but endpoints in actual

24  athleticism and athletic competition.  And so that's all

```
 1    this is doing is putting out some questions or some

 2    potential thoughts.

 3    BY ATTORNEY BROOKS:

 4        Q.    Let me ask you to turn to page one and column

 5    one.

 6        A.    Of this same paper?

 7        Q.    Of the same paper.  In the conclusion of the

 8    abstract the last sentence reads, quote, these findings

 9    suggest the strength may be well be preserved in trans

10    women during the first three years of hormone therapy,

11    closed quote.

12              Do you see that?

13        A.    I do.

14        Q.    And having reviewed whatever literature you have

15    reviewed to date do you share Doctor Harper's

16    understanding that strength may well be preserved in

17    trans women during the first three years of hormone

18    therapy?

19                   ATTORNEY BLOCK:  Objection to misquoting

20    the document.

21                   THE WITNESS:  So I can't comment on Ms.

22    Harper's understanding, but if you're asking is that ---

23    you know, is the question a question, so the question is

24    a question.  These findings suggest that strength may
```

1    and again an operative word is may.

2    BY ATTORNEY BROOKS:

3        Q.    Yes.

4        A.    And these are as I, a scientist, and she is a

5    scientist too, we are turning the earth, as it were, of

6    what we know looking for what questions we might want to

7    study and how we might want to frame studies going

8    forward.

9        Q.    Let me take you back to page eight, if I may.

10   And the penultimate sentence of this paper at the bottom

11   of the first column of paragraph of page eight reads,

12   quote --- well, let me read --- yeah, I will just read

13   that, quote, whether transgender and cisgender women can

14   engage in meaningful sport even after gender affirming

15   hormone therapy is a highly debated question, closed

16   quote.

17            Do you see that language?

18       A.    I do.

19       Q.    You'll agree that up to the present that is a

20   highly debated question?

21                  ATTORNEY BLOCK:  Objection to form.

22                  THE WITNESS:  There's context there too.

23   So this is referencing a league sport and it's --- as

24   well there are a range of potential sports, and so the

```
 1    question and the degree to which it is highly debated
 2    even I'm not going to render an official opinion there.
 3    So the --- whether transgender and cisgender women can
 4    engage in meaningful sport depends on what sport we're
 5    talking about, what treatment we're talking about, age
 6    group, whether elite versus more of an intermural
 7    setting.  And so it's just a relatively simple statement
 8    and to summarize a paper I guess.
 9    BY ATTORNEY BROOKS:
10       Q.    You agree that this --- that is the question of
11    whether transgender and cisgender women can engage in
12    meaningful sport even after gender affirming hormone
13    therapy is one on which reasonable scientists can
14    disagree and today are disagreeing?
15                    ATTORNEY BLOCK:  Objection to form.
16                    THE WITNESS:  So going back --- so is
17    your --- so are you asking me --- I guess help me
18    reframe what the question is there because there are a
19    bunch of things packed into that sentence actually.  And
20    you heard me try to unpack them both.
21    BY ATTORNEY BROOKS:
22       Q.    That may be a complex question, as debated
23    questions often are, but my question is do you agree
24    that the question of whether transgender and cisgender
```

1  women can engage in meaningful sport even after gender

2  affirming hormone therapy is one on which reasonable

3  scientists can differ and are differing today given the

4  possibility of data?

5              ATTORNEY BLOCK:  Objection to form for

6  the same reasons.

7              THE WITNESS:  So I'm sitting here as a

8  scientist talking about differences in athleticism and

9  such and whether --- and so moving onto meaningful sport

10  goes beyond my expertise.  I'm only putting data

11  together in a --- that's my lane on this subject.

12              ATTORNEY BROOKS:  Okay.

13              Let's break for lunch.

14              ATTORNEY BLOCK:  Let's go off the record,

15  so 2:15.

16              ATTORNEY BROOKS:  2:15?  Any dissent?  No

17  dissent.

18              VIDEOGRAPHER:  Going off the record.  The

19  current time is 1:16 p.m. Eastern Standard Time.

20  OFF VIDEOTAPE

21                        ---

22  (WHEREUPON, A SHORT BREAK WAS TAKEN.)

23                        ---

24  ON VIDEOTAPE

1          VIDEOGRAPHER:  Back on the record.  The

2    current time is 2:18 p.m. Eastern Standard Time.

3    BY ATTORNEY BROOKS:

4      Q.    Good afternoon, Dr. Safer.  Take you back into

5    context, I'm going to ask you to find your expert

6    report, Exhibit-1, and find paragraph 25, which we have

7    looked at before.  And there in the third sentence it

8    reads based on current research comparing

9    non-transgender boys and men with non-transgender girls

10   and women before, during and after puberty the primary

11   known biological driver of these average group

12   differences is testosterone starting at puberty, and not

13   reproductive biology or genetics, period, closed quote.

14          Do you see that language?

15     A.    Yes.

16     Q.    And your one cite for that is the endocrine that

17   we've already looked at already.

18          Right?

19              ATTORNEY BLOCK:  Objection to the form.

20              THE WITNESS:  So the citation in that

21   paragraph is the Handelsman, yes.

22   BY ATTORNEY BROOKS:

23     Q.    And do you recall our earlier discussion about

24   how the effects of testosterone are cumulative over time

1    rather than depending solely on the testosterone level

2    of an individual at a particular time, right?  Do you

3    recall that discussion?

4        A.    So the impact --- excuse me, the impact of

5    testosterone is cumulative.  It depends what impacts

6    we're talking about.  So there are impacts that are

7    cumulative, like height, and there are impacts that

8    really do reflect that point in time.

9        Q.    Now, at the moment let me ask just based on your

10   recollection.  The Handelsman article is Exhibit-4.  Do

11   you have that?  And I will ask you to find it in your

12   pile.  I should have neated up your pile of exhibits

13   while you were out.  That looks like it.

14       A.    Got it, yes.

15       Q.    The Handelsman article, as far as you recall,

16   does not contain any data or conclusions concerning the

17   effects of testosterone after the beginning of male

18   puberty, does it?

19                      ATTORNEY BLOCK:  Objection to form.

20                      THE WITNESS:  Honestly, I would have to

21   go look carefully.

22   BY ATTORNEY BROOKS:

23       Q.    Then I won't take time to do that.

24       A.    Okay.

```
 1       Q.    It does or it doesn't.  We will deal with that.

 2       A.    Yes.

 3       Q.    Do you know whether any other writing Professor

 4  Handelsman has expressed any view as to whether

 5  testosterone suppression after male puberty eliminates

 6  sex-based physical advantages sufficiently to maintain

 7  fairness in sports for women?

 8                  ATTORNEY BLOCK:  Objection to the form.

 9                  THE WITNESS:  So first of all, putting it

10  altogether that way isn't necessarily how I would say it

11  or how I would expect it to be said.  It would be

12  testosterone suppression and whatever the scientific

13  finding at the moment would be.  So we already know that

14  the data that relate to athleticism are just the Roberts

15  paper and the Harper paper, so I guess that is as much

16  as I can say in that particular context.  And in terms

17  of --- so yes, I think that it wouldn't be --- I forgot

18  already how you phrased that.

19  BY ATTORNEY BROOKS:

20       Q.    Let me just ask again.

21       A.    Yes.

22       Q.    So the first question is not a hard one.

23       A.    Okay.

24       Q.    Do you know whether Professor Handelsman has
```

```
 1   himself in his publication expressed any view whether

 2   testosterone suppression after male puberty eliminates

 3   sex-based physical advantages sufficiently to maintain

 4   fairness in sports for women?

 5                   ATTORNEY BLOCK:  Objection to form.

 6                   THE WITNESS:  So I don't know if he has

 7   written something covering all those bases that you just

 8   described, how you described it.

 9                   ATTORNEY BROOKS:  All right.  Let's look

10   at treatment variable.  Let me mark as Exhibit 13 a

11   short article by Dr. Roberts with a subsequent comment

12   by David Handelsman.

13                   ATTORNEY WILKINSON:  Tab 62.

14                   ATTORNEY BROOKS:  And unfortunately, the

15   words were a little clipped on this.  We will see how we

16   do.

17                            ---

18        (Whereupon, Exhibit 13, Dr. Roberts Article, was

19        marked for identification.)

20                            ---

21                   ATTORNEY BLOCK:  Thanks.

22   BY ATTORNEY BROOKS:

23        Q.    And I think a fair description of what we have

24   here is a relatively popular press type piece by Dr.
```

1  Roberts first.  And this document is dated December 16,

2  2020.

3                    ATTORNEY BLOCK:  Objection.  Does it say

4  where it was published?

5                    ATTORNEY BROOKS:  No, it doesn't say on

6  its face where it was published.  And as we sit here

7  right now I don't recall, though actually looking at it

8  I do recall that Kilio is an online publication of some

9  sort, and I've seen the brand came from the Kilio

10 website.

11 BY ATTORNEY BROOKS:

12   Q.   At any rate, I see the date, I see the title.

13 It purports to be an article by Professor Roberts.  I

14 just want to be clear in my description it does not ---

15 it does not have the appearance of a separate peer

16 review article since the summary taken off of the

17 article that we've already looked at.  And then at the

18 end of it is a two-paragraph prospective on this offered

19 by Dr. Handelsman.

20           Do you see that?

21   A.   I do.

22   Q.   And he begins by making clear that he is

23 commenting on this study, that is Roberts study that is

24 discussed above.  He is not introducing new science,

```
 1   correct, is that consistent with your understanding?
 2              ATTORNEY BLOCK:  Objection.  Give him a
 3   chance to read it.
 4              THE WITNESS:  So that, yes, my
 5   understanding, too, is that there is not new data here,
 6   mostly a commentary within the context some of our
 7   existing knowledge on the Roberts study.
 8   BY ATTORNEY BROOKS:
 9     Q.    And in his comment to Dr. Handelsman states in
10   the second paragraph, as of 2020, quote, a major
11   question remains whether gender affirming hormone
12   treatment overcomes sex-based physical advantages
13   sufficiently to maintain fairness so that an exception
14   can be made for trans women, paren, natal males, closed
15   paren, treated with estrogen.
16              Do you see that language?
17     A.    I do.
18              ATTORNEY BLOCK:  Objection.  I believe
19   that is what it says, but I just want to note for the
20   record that there is text cut off on the left.
21              ATTORNEY BROOKS:  There is.  And I'll get
22   better copies.  I'm looking at a copy that's not cut off
23   I will represent.
24   BY ATTORNEY BROOKS:
```

1    Q.    And do you have an expert opinion as to ---

2  well, do you propose to offer any opinion disagreeing

3  with Professor Handelsman that as of 2020 it remained a

4  major question whether gender affirming hormone

5  treatment to overcome sex-based physical advantages

6  sufficiently to maintain fairness so that an exception

7  could be made for trans women treated with estrogen?

8    A.    So to me that's too broad a question if you're

9  asking me to render an expert opinion about his opinion.

10   Q.    I'm asking whether you propose to offer an

11  expert opinion inconsistent with his view that remains a

12  major question as of 2020.

13   A.    It's --- I might --- well, I would at least

14  phrase things differently in there --- we might have to

15  go through pieces of it because certainly where we lack

16  data I think we would agree, but in terms of those

17  statements that then go on to editorialize, I don't know

18  that we necessarily agree in how we would frame that.

19   Q.    A little farther down, maybe two sentences down

20  it reads, quote, by contrast, trans women treated with

21  estrogens after completing male puberty experienced only

22  minimal declines in physical performance over 12 months,

23  substantially surpassing average female performance for

24  up to eight years, closed quote.  Do you agree or

1   disagree with Professor Handelsman summary of the

2   findings of Roberts?

3                    ATTORNEY BLOCK:  Objection to form.  I'm

4   just not sure it's all based on Roberts?

5                    THE WITNESS:  It is not clear to me that

6   it's --- that it is based on Roberts for what it's

7   worth.  It's also somewhat simplistically written.  And

8   an example is we don't --- the contention with regard to

9   athletic outcomes relates more to testosterone, and so

10  saying transgender women treated with estrogens wouldn't

11  be precisely how I would frame that either.

12  BY ATTORNEY BROOKS:

13     Q.    He concludes --- Professor Handelsman concludes

14  by stating supporting federations should incorporate

15  these findings in the strategies for including trans

16  women in elite female competitions while maintaining

17  fairness and safety for other women.  Dr. Safer, do you

18  agree that maintaining safety for cisgender women is a

19  legitimate and indeed important concern?

20                   ATTORNEY BLOCK:  Objection to form.

21                   THE WITNESS:  As an expert I'm not going

22  to give an opinion.

23  BY ATTORNEY BROOKS:

24     Q.    As Doctor Safer do you agree that ensuring

```
 1   safety for cisgender women and girls is a legitimate

 2   concern?

 3                   ATTORNEY BLOCK:  Objection to form.

 4                   THE WITNESS:  So if I'm simply speaking

 5   not as an expert, just as an educated person in the

 6   field, then it is true that safety is important, but I'm

 7   not clear that --- I don't know that in most of these

 8   athletic activities it's actually a concern.

 9                   ATTORNEY BROOKS:  Let me mark as Safer

10   Exhibit 14 a document entitled Guidance with Transgender

11   Inclusion in Domestic Sport with symbols of a number of

12   UK sport governing bodies across the front and a

13   statement published September 2021.

14                   ATTORNEY WILKINSON:  Tab 22.

15                            ---

16              (Whereupon, Exhibit 14, Guidance with

17              Transgender Inclusion in Domestic Sport,

18              marked for identification.)

19                            ---

20                   THE WITNESS:  Thank you.

21   BY ATTORNEY BROOKS:

22      Q.    And my first question for you, Dr. Safer, is

23   whether you have seen this document before?

24      A.    I have seen this document before.
```

1     Q.     And were you aware of it prior to its reference

2  in this litigation?

3     A.     I don't know that I was.

4     Q.     And are you familiar with the role of the

5  supporting body mentioned on the front page in

6  governance of sport within the United Kingdom?

7     A.     By looking at all their logos, I cannot say that

8  I know them all, no.

9     Q.     And do you have any knowledge as to whether

10  these are official government charted --- chartered

11  sporting governing bodies?

12     A.     I do not have that knowledge.

13     Q.     Have you now studied this document with some

14  care?

15     A.     I would say that I have only looked at this

16  document superficially.  I'm certainly happy to look

17  through it.

18     Q.     I will ask you just about a couple of passages.

19  Let me ask you to turn to page three of the document.

20  And towards the very bottom and the next to the last

21  paragraph this --- five organizations states, quote, our

22  work exploring the latest research, evidence and studies

23  made clear that there are retained differences in

24  strength, stamina and physique between the average women

```
 1   compared with the average transgender women for
 2   nonbinary person registered male at birth with or
 3   without testosterone suppression.
 4           Do you see that language?
 5   A.    I do.
 6   Q.    And do you disagree with the conclusion of these
 7   UK sporting bodies that the latest research, evidence
 8   and studies now make clear that there are retained
 9   differences in strength, stamina and physique in
10   nonbinary --- in transgender women or nonbinary persons
11   registered male at birth with or without testosterone?
12               ATTORNEY BLOCK:  Objection to referring
13   to this as something written by the governing bodies as
14   opposed to the quality council that makes
15   recommendations to the governing bodies.
16               THE WITNESS:  To the statement written by
17   whoever actually wrote it that evidence and studies on
18   the subject of transgender people make clear anything, I
19   disagree.
20   BY ATTORNEY BROOKS:
21   Q.    Let me ask you to turn to page six, under the
22   heading question review is recommending it states,
23   quote, as a result of what the review found the guidance
24   concludes that the inclusion of transgender people into
```

```
 1   female sport cannot be balanced regarding transgender

 2   inclusion, fairness and safety in gender affected sport

 3   where there is meaningful competition, period, closed

 4   quote.

 5           Do you see that?

 6      A.    I do.

 7      Q.    And do you disagree with that conclusion of this

 8   organization or these organizations?

 9      A.    So I really --- as we discussed earlier, I'm not

10   going to express as an expert --- I don't think I'd be

11   able to express as an expert fairness and so I can't

12   comment any further.

13      Q.    Let me ask you to turn to page nine in your

14   expert report, paragraph 49.

15      A.    Okay.  Paragraph 49.

16      Q.    At the end of paragraph 49 you state, quote, a

17   person's genetic makeup and internal and external

18   reproductive anatomy are not useful indicators of

19   athletic performance and have not been used in elite

20   competition for decades.  In making that statement when

21   you refer to a person's genetic makeup were you

22   referring to the question of whether they had XX or XY

23   chromosomes?

24      A.    So when I'm making the statement genetic makeup
```

1    I'm heavily referencing chromosomes.  So I guess I would

2    say that is mostly correct with some --- with perhaps

3    some known genes, but mostly chromosomes.

4        Q.    You would agree, would you not, that respected

5    voices in the field take the view that genetic sex it is

6    at least an important determinant of athletic

7    performance, do you not?

8                    ATTORNEY BLOCK:  Objection to form.

9                    THE WITNESS:  So that I'm supposed to

10   comment that there are people in the field who say that?

11   I guess what I would say is the consensus right now

12   among medical people advising elite athletic

13   organizations would be to move away from using that as a

14   surrogate.  In the past it was.  There were chromosome

15   tests and the problem is that people have --- there is

16   quite a bit of variety in biology and of course the

17   moment you make a rule you see the exceptions.

18   BY ATTORNEY BROOKS:

19       Q.    The exceptions.

20       A.    And so I would say that as an expert I can't

21   comment in terms of, you know, some study of everybody's

22   opinion or some survey.  But as somebody who has been on

23   these committees I've observed that that was discarded.

24       Q.    So if you put alongside individuals who suffer

1    from any condition that has been identified as a

2    disorder of sexual development, am I correct that you

3    consider yourself to have expertise in what constitutes

4    a disorder of sexual development?

5        A.    I have some expertise.  And the terminology is

6    actually differences of sexual development or sexual

7    differentiation or intersex are the terms that are more

8    popularly used.

9        Q.    You would agree with me, would you not, that

10   many respective sources up to the present would continue

11   to refer to disorders of sexual development?

12              ATTORNEY BLOCK:  Objection to form.

13              THE WITNESS:  So there --- what I would

14   say there is that --- the newer terminology has not ---

15   has not yet permeated because there have not been

16   revisions to all the documents that have been created.

17   BY ATTORNEY BROOKS:

18       Q.    How about if we say DSD?

19       A.    DSD is a reasonably safe or DSD intersex is what

20   some people do, yes.

21       Q.    Well, not all DSDs would be considered intersex

22   conditions.

23              Correct?

24       A.    You are right that some people try to parse

```
 1   those two terms even.  And there is --- but I think

 2   those kinds of distinctions might be on the scope of

 3   what we are discussing.

 4       Q.    Probably so.  If we put on side individuals who

 5   suffer from anything that is characterized in the field

 6   as a DSD you would agree, would you not, that genetic

 7   makeup and specifically whether the individual possesses

 8   XX or XY chromosomes is a statistically meaningful

 9   indicator of athletic performance?

10                   ATTORNEY BLOCK:  Objection to form.

11                   THE WITNESS:  So no, and the --- it's ---

12   I guess it depends what you mean is what it comes down

13   to.  So if you are --- if you are simply saying, well, a

14   certain fraction of people of these chromosomes are

15   going to be --- have this other characteristic, then

16   maybe there are those kinds of associations.  But if you

17   are going to say that it's connected to the point where

18   you could actually use one of those let's say observing

19   a chromosome as an actual determination for a given

20   individual, then I would say no.

21   BY ATTORNEY BROOKS:

22       Q.    Is it your opinion that a gender identity itself

23   is a --- or useful indicator of athletic performance?

24       A.    It is my opinion that gender identity itself is
```

```
 1   not a useful indicator of athletic performance.

 2      Q.    You say at paragraph 44 of your report --- I

 3   will save that.  I think that is a new Declaration and

 4   we will not take time to do that.

 5           Let me ask you to look at paragraph 24 of your

 6   rebuttal report.  You say in paragraph 24 that none of

 7   Doctor Carlson's arguments support HB-3293 categorical

 8   ban of all girls who are transgender from all girls

 9   sports teams.

10           Do you see that?

11      A.    I do.

12      Q.    And I should continue.  I'm sorry.  Doctor

13   Carlson's safety argument relates solely to contact and

14   collision sports and the physical characteristics

15   developed during puberty, period.  By referring to a

16   categorical ban let me ask this.  Do you agree that

17   safety considerations could justify or may justify

18   excluding natal males who experienced all or significant

19   part of male typical pubertal development from

20   participating in female division of contact or collision

21   sports such as basketball and soccer?

22                     ATTORNEY BLOCK:  Objection to form.

23                     THE WITNESS:  So if the question is would

24   I anticipate as an expert that there would be a safety
```

1    explanation for banning transgender women from the

2    female category, then I would --- I wouldn't --- I

3    certainly --- let me think about which way to phrase it.

4    I would have a hard time coming up with an example where

5    I would use being transgender as a safety criterion as

6    opposed to body habitus size or some other more

7    objective criterion.

8    BY ATTORNEY BROOKS:

9        Q.    Well, and I didn't say anything about gender

10   status.  Let me ask again.  Would you agree that safety

11   considerations could justify excluding natal males who

12   have experienced all or a significant part of male

13   typical pubertal development from participating in

14   female division contact and collision sports such as

15   basketball or soccer?

16               ATTORNEY BLOCK:  Objection to form.

17               THE WITNESS:  So you're saying that even

18   if we otherwise decided that it would be okay for

19   cisgender males to play with cisgender females, would I

20   envision there being a safety reason to ban those

21   cisgender males?

22   BY ATTORNEY BROOKS:

23       Q.    All I asked had nothing to do with gender

24   identity.  Do you agree that the introduction onto the

1   field or the court in or have been spoken of its contact

2   or collision sports in the female division of natal

3   males who have gone through all or a significant part of

4   male typical pubertal development could raise legitimate

5   concerns about safety for the natal females?

6               ATTORNEY BLOCK:  Same objections as the

7   previous two questions.

8               THE WITNESS:  So any person who's gone

9   through a male puberty would that, per se, make me

10  invoke a safety concern, if that's the question ---.

11  BY ATTORNEY BROOKS:

12    Q.   Could that in your mind raise the given safety

13  concerns?

14    A.   So I would not --- the word legitimate I'm not

15  addressing, but I'm not aware of that in and of itself

16  being a safety concern.

17    Q.   You state in paragraph 22 of your rebuttal

18  report that, quote, transgender athletes and women have

19  been competing in NCAA and secondary school athletics

20  for many years at this point.  Let me ask you if you are

21  aware of any instance in which natal males have competed

22  in the female category in any contact or collision sport

23  in either the NCAA or high school division?

24               ATTORNEY BLOCK:  Objection to form.

1          THE WITNESS:  So can I identify

2    transgender girls or women specifically and specific

3    instances of participation?  I cannot.

4    BY ATTORNEY BROOKS:

5        Q.    What was your basis for asserting that such

6    athletes have been competing in the NCAA and secondary

7    school athletics for many years?

8               ATTORNEY BLOCK:  I'm sorry.  Is the

9    question about collision sports?  Because you are

10   quoting something that is not about collision sports.

11              ATTORNEY BROOKS:  Let me break that out.

12   Thank you.

13   BY ATTORNEY BROOKS:

14       Q.    Do you have a view as to whether --- I shouldn't

15   say a view.  Do you have any information as to whether

16   transgender athletes have been competing in the women's

17   division of NCAA or secondary school athletics in any

18   contact or collision sports for many years?

19       A.    That information on the validity is that they

20   have had access because there has not been a ban.

21       Q.    But whether they have done so you do not have

22   any information?

23       A.    But I cannot point to specific instances,

24   exactly.

1    Q.    I apologize if I asked something early in the

2    morning, but it's faster than trying to dig back into

3    the transcript.  Do you have any opinion as to whether

4    it is reasonable to exclude a natal male with a male

5    gender identity from a high school girls basketball

6    team?

7                      ATTORNEY BLOCK:  Objection to form.

8                      THE WITNESS:  So ask that again a little

9    bit slower.

10   BY ATTORNEY BROOKS:

11   Q.    Do you have have any opinion as to whether it is

12   reasonable to exclude a natal male with a male gender

13   identity from participation in a girls high school

14   basketball team?

15                     ATTORNEY BLOCK:  Objection.

16                     THE WITNESS:  I do not have an expert

17   opinion on that subject.

18   BY ATTORNEY BROOKS:

19   Q.    Do you have a personal view?

20   A.    I don't know that I --- there it would get more

21   complicated depending on context.

22   Q.    You don't have a simple yes or no personal view

23   on that question?

24   A.    I don't.

1     Q.    And do you have a view whether it is reasonable

2  to exclude a natal male with a female gender identity

3  from participation in a high school girls basketball

4  team?

5                ATTORNEY BLOCK:  Objection to form.

6                THE WITNESS:  So do I have a view on

7  participation of a cisgender girl in the girls category?

8  Sorry.  Say it again.

9  BY ATTORNEY BROOKS:

10    Q.    I said do you have a view on whether it is

11  reasonable to exclude a natal male with a female gender

12  identity from participation in the high school girls

13  basketball team?

14               ATTORNEY BLOCK:  Objection to form.

15               THE WITNESS:  So that is a transgender

16  girl, got it.  So --- and the question is do I have a

17  view on --- I apologize.  Go back.

18  BY ATTORNEY BROOKS:

19    Q.    I can do it again.

20    A.    Yes, do it again.  Sorry.

21    Q.    Do you have a view as to whether it is

22  reasonable to exclude a natal male with a transgender

23  identity from participation in the girls high school

24  basketball team?

```
 1                    ATTORNEY BLOCK:  Objection to form.

 2                    THE WITNESS:  And it is do I have a view

 3   on excluding --- as an expert am I opining on that?  I'm

 4   not.  I'm opining as a scientist on what the data are.

 5   BY ATTORNEY BROOKS:

 6     Q.    Do you consider a policy that excludes natal

 7   males with a male gender identity from the girls

 8   basketball team to be, quote, discriminatory?

 9                    ATTORNEY BLOCK:  Objection to form and

10   scope.

11                    THE WITNESS:  So as an expert I'm not

12   taking a position on excluding cisgender males from the

13   female category, if I answered that correctly.

14   BY ATTORNEY BROOKS:

15     Q.    My question was simply do you consider such a

16   policy to be a discriminatory policy?

17                    ATTORNEY BLOCK:  Objection to form and

18   scope.

19                    THE WITNESS:  So are you asking me as an

20   expert to define discrimination?

21   BY ATTORNEY BROOKS:

22     Q.    I will direct you to paragraph 27 of your

23   rebuttal report.  And there you wrote Doctor Carlson has

24   not offered cogent explanation for why alleged safety
```

```
 1    concerns based on average differences in size and

 2    strength should be addressed within an across the board

 3    exclusion of transgender women as opposed to tailored

 4    nondiscriminatory policies.

 5            Do you see that?

 6       A.    I do.

 7       Q.    So understanding discriminatory, however you did

 8    understand it when you wrote that, do you consider a

 9    policy that prohibits natal males with a male gender

10    identity from participating on the girls basketball team

11    to be a discriminatory policy?

12                ATTORNEY BLOCK:  Same objections.

13                THE WITNESS:  Right.  So I'm not defining

14    --- I'm not defining discriminatory here.  I'm ---

15    right.  So if you are asking as an expert to define

16    discriminatory, that I can't do.

17    BY ATTORNEY BROOKS:

18       Q.    Well, if you don't know what discriminatory

19    means, what do you mean when you referred to a tailored

20    nondiscriminatory policy?

21                ATTORNEY BLOCK:  Objection to form.

22                THE WITNESS:  I guess I have to circle

23    back initially to --- I mean we can do that for any word

24    here, right, where I could have like my own personal
```

1  definition or am I acting as an expert to define these

2  words, and I think we are kind of in that situation.

3  BY ATTORNEY BROOKS:

4     Q.    But I'm asking you about your expert reports in

5  the litigation.  You must have meant something.  What

6  did you mean by nondiscriminatory when you submitted

7  this expert report?

8                    ATTORNEY BLOCK:  Objection to form.

9                    THE WITNESS:  So when I'm using the word

10  nondiscriminatory I am using it to mean something that

11  isn't using some other indicator --- well, I'm really

12  just using it in the broadest sense to something that is

13  including people.

14  BY ATTORNEY BROOKS:

15     Q.    Using it in the broadest sense, discriminating

16  between one category and another is --- could be a good

17  thing or a bad thing.

18          Correct?

19                    ATTORNEY BLOCK:  Objection to form.

20                    THE WITNESS:  As an expert I --- that is

21  way outside my scope.  But simply as an English speaker,

22  yes, discrimination could be good or it can be bad, yes.

23  BY ATTORNEY BROOKS:

24     Q.    And for instance, if you are --- well, you said

1    you don't prescribe to minors, so --- but if you are

2    dealing with a 19-year-old who says and you concluded I

3    need gender affirming hormone, and I will use the term

4    you prefer, if that individual's hormones and biology

5    are female then gender affirming hormones are going to

6    consist, among other things, perhaps of administering

7    testosterone.

8           Correct?

9    A.    Yes, typically we would have have ---.

10   Q.    And if that individual's biology and hormones

11   endogenous were male, then the gender affirming hormones

12   would include among other things estrogen or estrogen

13   analog.

14          Correct?

15              ATTORNEY BLOCK:  Objection to form.

16              THE WITNESS:  If that person had

17   typically --- typically a male hormone profile, right,

18   to move toward a more feminine profile that typically

19   would include estrogens or some other agents that were

20   other than testosterone, yes.

21   BY ATTORNEY BROOKS:

22   Q.    So speaking scientifically and not in civil

23   rights terms, if I may, you as a scientist, as you

24   decide which regimen of hormones to administer to this

```
 1    individual have to discriminate between those who are
 2    endogenously male and those who are endogenously female
 3    in deciding which regimen you prescribe.
 4              Correct?
 5                        ATTORNEY BLOCK:  Objection to the form.
 6                        THE WITNESS:  We have to make a decision.
 7    And so if you are trying to get me to say that
 8    discrimination can be defined as making decisions, I'm
 9    with you and yes.
10    BY ATTORNEY BROOKS:
11        Q.    Okay.
12              Let me just run down a few items to make sure.
13    You have not personally engaged in any research
14    regarding sports physiology, have you?
15        A.    I'm trying to think it there's anything.  I
16    don't believe I have.
17        Q.    You yourself haven't personally engaged in any
18    research or published any papers --- that's a compound
19    question.  You, yourself, haven't engaged in any
20    research relating to sports medicine or sports injuries,
21    have you?
22        A.    I have not engaged in any research with regard
23    to sports injuries.  And the answer to the first part of
24    that gets a little muddled because some of the papers
```

 1    that I have written about physiology and transgender

 2    people could apply to sports medicine.

 3         Q.    Have you, yourself, ever participated in

 4    devising any athletic training regimes for individuals

 5    of either sex?

 6         A.    I've not been involved in devising any training

 7    regimes.

 8         Q.    Have you done any research with related to male

 9    physiology --- I'm sorry, male physiological advantages

10    relevant to athletics before, during or after puberty?

11         A.    So there I have --- none of the research that I

12    have done to date has been specifically loopholed as ---

13    well, I can't even say that.  So research that I have

14    done with regard to observing physiology among my

15    subjects can be applicable to sports medicine in some

16    context.

17         Q.    On what publications, if any, of yours do you

18    believe relate to male physiological advantages in

19    athletics before, during or after puberty?

20         A.    Well, just off the top of my head, without

21    looking at it exhaustively, I have a paper on

22    hematocrit, which is the oxygen-carrying cells in

23    people.  In transgender people I have a paper on

24    testosterone levels with different treatments.  So those

```
1    can have --- those actually can have a sports context.

2        Q.    Have you done any research on the impact of

3    testosterone suppression on athletic performance or any

4    measurement of strength?

5        A.    So the second piece of that is I have not done

6    any research that specifically used strength as an

7    endpoint in my own studies.  To the second piece of

8    those --- I forgot what ---.

9        Q.    Athletic performance?

10       A.    Athletic performance, there it gets a muddled

11   thing.  The research that I have done can be applicable

12   in that context.

13       Q.    Well, that is if your endpoint is hematocrit

14   count, to use the right term, you're saying that might

15   have implications for athletic performance?  Is that

16   your point?

17       A.    That is correct, yes.

18       Q.    But you have not done any research in which any

19   measurement of athletic performance is an endpoint?

20                    ATTORNEY BLOCK:  Objection to form.

21                    THE WITNESS:  Again, I have to think

22   about how to say that because some of the --- part of

23   the problem is that papers that we're looking at include

24   quite a bit of literature on components that may be
```

```
 1   applicable --- that may be applicable in sports

 2   medicine, whether it is muscle strength and muscle size

 3   or blood cell counts and such.  And so that more

 4   expansively than my research is in that category.

 5   Whereas, if I'm trying to be focused and narrow, then

 6   I've got those two studies, the one by Roberts and the

 7   one by Harper.  And my papers are not those.

 8   BY ATTORNEY BROOKS:

 9       Q.    You don't have any information about numbers of

10   children in West Virginia who suffer from any DSD, do

11   you?

12       A.    No, as --- I guess I have to say no there in

13   terms of actual surveys of kids in West Virginia, I know

14   some brought statistics.  West Virginia is big enough

15   that you would predict that the statistics would

16   generally apply, but that is as smart as I could get on

17   the subject.

18       Q.    And you are --- I think you effectively answered

19   this, but to be clear for the record you are not opining

20   that BPJ suffers from any DSD?

21                  ATTORNEY BLOCK:  Objection to the form.

22                  THE WITNESS:  So the --- here too we get

23   into --- into an evolving area of definitions where you

24   could envision if some of the specific genetics that are
```

```
 1    associated with being transgender became identified,

 2    would we in the medical world start to label those

 3    instances as DSD?  It's possible.  So that is just ---.

 4    BY ATTORNEY BROOKS:

 5       Q.    Thus far no such indicators have been

 6    identified.

 7             Correct?

 8       A.    I can't even --- I can't even say that

 9    definitively.  It is an area of active conversation in

10    terms of --- in terms of boarder setting in the medical

11    community right now.

12       Q.    However, I think my question is easier.  You're

13    not offering an opinion --- any opinion that BPJ suffers

14    from any DSD, are you?

15       A.    So I don't have --- so to be clear first I don't

16    know the --- BPJ's specific medical condition.  I wasn't

17    brought in to evaluate that and I have not.  So I can't

18    actually render an opinion on any of the medical story

19    there.

20       Q.    And you don't know whether any child or typical

21    XY chromosome --- pardon me, you don't know whether any

22    child with XY chromosomes who suffers from a DSD has

23    ever sought to compete in female athletics in West

24    Virginia up until the present?
```

1             ATTORNEY BLOCK:  Objection to the form.

2             THE WITNESS:  So the question is do I

3     know of an instance of a specific individual with XY

4     chromosomes and a DSD connected to that who has

5     specifically participated in sports in West Virginia?

6     BY ATTORNEY BROOKS:

7        Q.    Who has sought to participate in female

8     athletics in West Virginia?

9        A.    Right, so who has sought to participate in

10    female sports in West Virginia.  I cannot give you a

11    specific instance, that is true.  I can say, though,

12    knowing the percentage of people who have DSDs and the

13    size of the State of West Virginia that you would

14    predict it would be true, but that would be again as

15    smart as I could be on one subject.

16            ATTORNEY BROOKS:  Let me mark as Safer

17    Exhibit 15 what was previously designated as Tab 53, an

18    article by Dr. Safer and others entitled the Mount Sinai

19    Patient Center Preoperative Criteria Meant to Optimize

20    Outcomes are Less of a Barrier to Care than WPATH SOC 7

21    Criteria Before Transgender Specific Surgery.  And yes,

22    that is a mouthful.

23                          ---

24            (Whereupon, Exhibit 15, Dr. Safer Article,

```
 1                was marked for identification.)

 2                          ---

 3   BY ATTORNEY BROOKS:

 4      Q.    Now, Dr. Safer, to be fair, I see that you are

 5   the last listed author on a fairly lengthy list of

 6   authors.  And maybe that does and maybe that doesn't

 7   have significance in terms of how in depth your

 8   involvement in this paper was.  Let me ask.  Was this a

 9   paper of which you had some significant input?

10      A.    I had significant input.  I can tell you that in

11   the medical and scientific community the first author

12   typically did the work and the last author is the senior

13   author and supervisor.  And the middle authors are

14   actually the ones where you ---.

15      Q.    Okay.

16            I was aware of the significance of the first.

17   I was not aware of the significance of the last.  Okay.

18   That is helpful.  All of the authors here, if I'm

19   correct, are colleagues within the Mount Sinai Clinic or

20   division that you supervise.

21            Am I correct?

22      A.    All of the authors were in those positions at

23   some point, which is how we came together to write the

24   paper.
```

1    Q.    And the paper I should say for the record is

2    dated 2020.  And let me see if I correctly understood

3    what the paper is about.  If we --- in this paper you

4    compare the eligibility of patients who are seeking

5    vaginoplasty under the WPATH Standard of Care 7 criteria

6    versus the criteria actually used by your clinic.

7          Am I correct?

8    A.    Yes.

9    Q.    And just so we're clear, vaginoplasty is a

10   surgery that is only done on biological male, natal male

11   individuals.

12         Correct?

13                ATTORNEY BLOCK:  Objection to form.

14                THE WITNESS:  So a vaginal plasty is the

15   genital reconstruction surgery to create a vagina in a

16   person.  When we are using it as a gender affirming

17   surgery, then we are using it on people who have what

18   would be considered typically male anatomy in that

19   circumstance but the surgery could also be used on

20   somebody with typically female anatomy requiring

21   construction for whatever their circumstance may be.

22   BY ATTORNEY BROOKS:

23   Q.    That said, the subjects discussed in this paper

24   are all individuals who are seeking the surgery for

 1    gender affirming purposes rather than, for instance,

 2    because of a severe DSD.

 3            Correct?

 4    A.    The people in this circumstance are all people

 5    seeking the surgery for gender affirming purposes and

 6    not those for DSD or for other purposes, reconstruction

 7    of vaginas for accidents and cancers.  I mean there is

 8    quite a range.

 9    Q.    And the result as summarized in the abstract is

10    that of 139 patients who were identified as subjects of

11    this study, 63 qualified for surgery immediately based

12    on the Mount Sinai criteria.

13            Correct?

14    A.    Yes.

15    Q.    Whereas only 21 of those would have qualified

16    based on the criteria set out in the WPATH Standard of

17    Care Version 7?

18    A.    Yes.

19    Q.    Three times as many individuals qualified for

20    immediate surgery under the standard used by your clinic

21    as opposed to the standards set out in the WPATH

22    Standard of Care?

23    A.    That's correct.

24    Q.    When did your clinic begin approving surgery for

1   patients who are not eligible under the WPATH Standard

2   of Care?

3                    ATTORNEY BLOCK:  Objection to form.

4                    THE WITNESS:  Yeah, so to be clear, the

5   patients in our program qualify by both criteria.  The

6   paper is simply pointing out that our process is more

7   efficient and patient friendly, but it's not to say that

8   we were not informed by WPATH criteria also.  And I

9   think I need to expand even a little bit further.  Part

10  of the point of the paper is that it includes --- it

11  includes efforts to know benefit to the patient that end

12  up being time consuming and therefore are a waste of

13  energy in contrast to our approach, which is actually

14  more conservative than WPATH's approach.  We actually

15  look at more things but we do so in a more efficient

16  fashion and that is actually the point of the paper.

17  BY ATTORNEY BROOKS:

18      Q.   Well, let me clarify one thing you just said.

19  According to this paper, it is not the case, is it, that

20  every patient for whom your clinic approved surgery was

21  at that time qualified according to the WPATH criteria?

22                   ATTORNEY BLOCK:  Objection to form.

23                   THE WITNESS:  Wait.  Say it again.  Could

24  you repeat that?

BY ATTORNEY BROOKS:

Q.    It is not the case, is it, that every patient who was qualified for surgery by your clinic had been demonstrated to satisfy the WPATH criteria for eligibility?

A.    It is --- so there were --- the patients just as stated who qualified by our criteria but not by WPATH criteria, there is such a group that existed, exactly, yes.

Q.    Okay.

And specifically, according to your criteria, three times as many patients are eligible according to WPATH criteria?

ATTORNEY BLOCK:  Objection to form.

THE WITNESS:  It's not so much the three times.  It is the pace.  Some of this relates to pace and efficiency.

BY ATTORNEY BROOKS:

Q.    Dr. Safer, your clinic, according to this paper, approved for surgery 42 patients who were at that time not eligible according to WPATH criteria.

Correct?

ATTORNEY BLOCK:  Objection to form.

THE WITNESS:  No.  So the reality is we

1    still live in the universe that everybody else lives in,

2    so we are --- so this paper proposes a more appropriate

3    and a more patient appropriate model, but it is not the

4    case that we actually sent people to surgery who would

5    not be approved by WPATH.

6    BY ATTORNEY BROOKS:

7        Q.    Well, were you personally involved in developing

8    and approving Mount Sinai's criteria?

9        A.    Let me look at the role here.  Yes, I definitely

10   had a role in developing our criteria.

11       Q.    Let me ask you to look at page 168, column one,

12   call your attention quite a bit to table one.  And if I

13   understand correctly, table one is designed to help us

14   compare and contrast what is required by the WPATH

15   criteria for surgical readiness versus the Mount Sinai

16   criteria for surgical readiness.

17            Correct?

18       A.    That is correct, yes.

19       Q.    And the WPATH requires a letter of support from

20   the patient's hormone provider confirming the hormone

21   regimen and the length of time of hormone therapy.

22            Correct?

23       A.    That is how it is written, yes.

24       Q.    And farther down, under mental health it says

```
 1    that it requires two letters of support from mental

 2    health providers?

 3         A.    It does, yes.

 4         Q.    And it gives on page 157 a definition who is a

 5    qualified mental health professional down towards the

 6    bottom of the second column.  I'm going to ask you to

 7    find that language if you could?

 8         A.    Uh-huh (yes), yes.

 9         Q.    You say, many define licensed mental health

10    providers having one or more of the following

11    credentials, the LCSW, Licensed Clinical Social Worker.

12              Is that right?

13         A.    LCSW is Licensed Clinical Social Worker, yes.

14         Q.    And MD, DO that is a medical doctor, a doctor of

15    --- what does the O stand for?

16         A.    Osteopathy.

17         Q.    There we go.  A psychiatrist, a Ph.D., yes, that

18    was surprising to me.  Surely not just any Ph.D.?

19         A.    Right, that's referring to a Ph.D. clinical

20    psychologist.

21         Q.    Okay.

22              Or any Master's level for above counseling

23    degrees.  But then you go on to say that in your

24    evaluation based on SOC-7 criteria.  That's the WPATH
```

```
 1    criteria?

 2        A.    That's the WPATH criteria, yes.

 3        Q.    We included the above degrees with the following

 4    exclusions, mental health providers with lower than

 5    Master's level training and unlicensed mental health

 6    providers of any type, NPs and PAs without mental health

 7    credentials, physicians who are not psychiatrists or

 8    mental health providers who are still in training.  Do

 9    you see that language?

10        A.    I do.

11        Q.    So under the definition used in your clinic you,

12    yourself, do not qualify as a mental health

13    professional.

14              Correct?

15        A.    That is correct.

16        Q.    So at no point have you relied on your own

17    opinion for any mental health evaluation for

18    eligibility?

19        A.    That's correct.

20        Q.    Okay.

21              I just wanted to understand that clearly.  So

22    back to mental health data.  In says in the WPATH column

23    that two letters of support from mental health providers

24    are required.  In this paper you state on the next page,
```

1   but I will quote it the most significant of the Mount

2   Sinai criteria is the removal of the requirement of two

3   independent psychiatric evaluations.  And that is in

4   column two of page 169, at the end of the first full

5   paragraph.  The first full paragraph, column two, the

6   final sentence.

7        A.    I'm in which column?  Sorry.

8        Q.    Column two.

9        A.    Oh, column two.  Sorry.

10       Q.    The first full paragraph, final sentence.

11       A.    The most significant deletion from the Mount

12   Sinai criteria is the removal of --- yes, I see that.

13       Q.    And you stated at the top of column one on the

14   same page that, quote, finding two mental health

15   providers to do independent evaluations is

16   time-consuming, expensive and difficult.

17            Right?

18       A.    Just trying to find that exact wording.  Yes.

19       Q.    So in your own clinic's practice, while WPATH

20   calls for two letters from independent mental health

21   providers, you concluded that because it was hard to get

22   two independent evaluations your clinic would simply

23   dispense with the requirement of any independent mental

24   health review.

1      Correct?

2           ATTORNEY BLOCK:  Objection to form.

3           THE WITNESS:  No, that is not quite

4    correct.  Part of the difference for our operation is

5    that we have --- we have expertise in-house and we have

6    --- if you notice, looking at the table, a longer list

7    of requirements actually than WPATH does, which includes

8    a social work component.  And that actually is the ---

9    that's the source of actually yet a second pair of eyes,

10   as it were.  And so it is not the case that we are ---

11   that we're providing less of a screen, we are actually

12   providing more of a screen.  It's just that we are

13   operating in a more efficient manner for the patient.

14   BY ATTORNEY BROOKS:

15        Q.    Let's flip back to column one.  A few more lines

16   down it says for our analysis patients who otherwise met

17   WPATH SOC 7 criteria received one letter of support from

18   the CTMS mental health provider.  Right?  You would

19   agree with me, would you not, that the only letter of

20   support for a mental health provider required by your

21   protocols is from a mental health provider within your

22   employment?

23           ATTORNEY BLOCK:  Objection to not reading

24   the complete sentence.

```
 1                    THE WITNESS:  So yes.  So maybe let me

 2    just --- show me the wording again.

 3    BY ATTORNEY BROOKS:

 4       Q.    Yes.  For our analysis --- and I'm beginning at

 5    perhaps eight lines down.

 6       A.    Our analysis, yes.

 7       Q.    Patients who otherwise met WPATH SOC 7 criteria

 8    received one letter of support from the CTMS mental

 9    health provider doing the assessment, period, closed

10    quoted.

11             Do you see that?

12       A.    I do, yes.

13       Q.    As the term is generally understood in your

14    field, a CTMS mental health provider is not independent

15    --- let me use the correct terminology, is not an

16    independent mental health provider?

17       A.    So in a clinic setting I don't know that the

18    word independent actually has the same meaning as in

19    some other context.  So even a WPATH requirement isn't

20    necessarily that it would be an unaffiliated person or I

21    don't know what you were thinking independent might mean

22    here, so I don't want to put words in your mouth or

23    conjecture too much.  But when we say independent we

24    just mean two different people.
```

1      Q.    But in fact, the letter of support from the CTMS

2   mental health provider that you refer to in this

3   paragraph at the top of column one of page 169 actually

4   plays no role in your determination as to whether this

5   patient is eligible for surgery.

6           Correct?

7                    ATTORNEY BLOCK:  Objection to form.

8                    THE WITNESS:  So yes.  I'm confused by

9   the question.

10  BY ATTORNEY BROOKS:

11     Q.    I'm confused by the text.  The final paragraph

12  --- sentence in that paragraph reads these letters of

13  support were used to satisfy third payor requirements to

14  cover surgery and were not part of the CTMS assessment?

15     A.    Oh, yeah, that's a good point.  The literal

16  letter is because we are all in-house the opinion of the

17  person is, of course, important and so the screen takes

18  place.  But the need to create --- the bureaucratic of

19  creating a specific letter is one of the burdens that we

20  are suggesting could be removed.

21     Q.    In table one, let me find this.  Under mental

22  health WPATH SOC-7 requires, quote, persistent, well

23  documented gender dysphoria.

24          Do you see that?

 1      A.    I do.

 2      Q.    And you understand well documented gender

 3   dysphoria to be referring to a general diagnosis under

 4   the DSM-V criteria?

 5      A.    So for WPATH's purposes I think they are

 6   specifically referring to the DSM diagnosis.

 7      Q.    In your clinic you are willing to approve for

 8   this --- I'm not sure how to actually say the word

 9   vaginoplasty surgery, individuals who do not suffer from

10   persistent well documented gender dysphoria.

11         Correct?

12            ATTORNEY BLOCK:  Objection to the form.

13            THE WITNESS:  So if you look, the list of

14   the criteria for Mount Sinai, then the phrasing is a

15   confirmation that this person --- for all intents and

16   purposes, that this person is transgender and with the

17   language and evolution we use that word gender dysphoria

18   and we also use the new word that will replace gender

19   dysphoria, gender incongruence, as the terms I

20   referenced before, transgender.

21   BY ATTORNEY BROOKS:

22      Q.    And the effect of that is you do not require a

23   diagnosis of gender dysphoria under the terms of DSM-V.

24         Correct?

```
 1              ATTORNEY BLOCK:  Objection to form.

 2              THE WITNESS:  So the --- yeah, if we had

 3  our druthers, which is I think you are asking, and we

 4  did not --- and we weren't simply satisfying a third

 5  party payor, would we insist on that formal DSM-V

 6  criteria for a person we otherwise know to be

 7  transgender?  We would not.

 8  BY ATTORNEY BROOKS:

 9      Q.    And in fact, you do not.

10            Correct?

11              ATTORNEY BLOCK:  Objection to form.

12              THE WITNESS:  Well, as a practical

13  matter, like I said, we live in a universe where we end

14  up doing both what we suggest is the necessary approach

15  and we end up, because we still live in the universe

16  that we live in, satisfying the other approach even

17  though we're suggesting that it's cumbersome.

18  BY ATTORNEY BROOKS:

19      Q.    Dr. Safer, you testified earlier that, in fact,

20  in 42 patients your clinic determined they were surgery

21  eligible even though they did not satisfy the SOC

22  criteria listed in column one of table one?

23      A.    Right.  So they are not --- so they would be ---

24  they theoretically would be eligible without having
```

1    satisfied the --- some of those specific WPATH criteria

2    that we discussed.  But in practice nobody went to

3    surgery without covering both sets of criteria.

4        Q.    Isn't the precise results reported by this paper

5    that 42 patients were deemed surgery approved who did

6    not qualify under WPATH criteria?

7        A.    But I guess the bottom line of the paper is that

8    if we followed our --- our rules alone, we would

9    actually cover more details and be more conservative in

10   our approach if a longer list of criteria and we would

11   do so more quickly.  That's all the paper says.  It

12   doesn't say that we have --- that we have actively

13   defied the existing universe and sent people to surgery

14   without covering the criteria that are generally being

15   used by doctors.

16       Q.    And by the way, the surgery we're talking about,

17   vaginoplasty, in the context where it is being used for

18   gender affirming purposes, invariably includes

19   castrating the individual.

20            Correct?

21                 ATTORNEY BLOCK:  Objection to form and

22   foundation.

23                 THE WITNESS:  So a vaginoplasty is a

24   genital reconstruction surgery, which in this context is

```
 1    taking the existing typically --- typical male genitalia

 2    and reconfiguring it into typically female genitalia.

 3    And in that --- in the procedure the testes are removed.

 4    BY ATTORNEY BROOKS:

 5        Q.    They're not reconfigured?

 6        A.    They are not reconfigured.

 7        Q.    Let me ask you 169, column one, it says about

 8    two-thirds of the way down, at the end of the paragraph

 9    that begins medical requirements for the Mount Sinai

10    CTMS?  I want to direct your opinion --- your attention

11    to the final sentence.

12        A.    So which paragraph, column one.

13        Q.    Column one, the paragraph that begins halfway

14    down, medical requirements?

15        A.    Yes.

16        Q.    Now, let's jump to the end.  The Mount Sinai

17    criteria also removed the 12-month continuous hormone

18    therapy requirement for the vaginoplasty which

19    complicates matters for people who have received hormone

20    therapy from non-medical providers.

21              Do you see that language?

22        A.    I do.

23        Q.    Explain to me the reference for people who have

24    received hormone therapy from non-medical providers?
```

1    A.    Well, it is the circumstance that some people

2   more so outside of New York, some transgender people

3   still do not have access to care for --- to gender

4   affirming care and do get some of their treatment by

5   alternative means.  And if there is an insistence on a

6   documented 12-month continuous hormone therapy

7   requirement, then those people might not be able to be

8   approved for surgery.

9    Q.    I need to ask you to clarify what you mean by

10   obtaining by alternate means?

11    A.    We have people getting hormones from internet

12   providers.  We have people inappropriate --- well, I

13   apologize, I don't want to make a value judgment there,

14   but we have people getting hormones from friends or

15   connections of theirs, things outside the system.

16    Q.    So you have some people come to you who have

17   effectively self-diagnosed and self-prescribed ---

18                    ATTORNEY BLOCK:  Objection.

19   BY ATTORNEY BROOKS:

20    Q.    --- hormone therapies?

21                    ATTORNEY BLOCK:  Objection to form.

22                    THE WITNESS:  So when we are seeing

23   people for surgeries, then it is no longer a matter of

24   self-diagnosis because we see them ourselves with our

```
1    internal team.  But there are people who have

2    self-prescribed their hormones or obtained them by

3    nonconventional means, that part, yes.

4    BY ATTORNEY BROOKS:

5        Q.    And when people come in who have obtained

6    hormones by nonconventional means and taken them without

7    prescription necessarily, you chose to remove the

8    requirement for 12 months properly prescribed continuous

9    hormone therapy rather than insisting that the patients

10   undergo control of hormone therapy for 12 months before

11   you operate on them?

12                   ATTORNEY BLOCK:  Objection to form.

13                   THE WITNESS:  So to clarify, again, these

14   are --- we are proposing that this would be the

15   protocol.  In practice, we have not been able to do

16   this, that is we have had to do both.  But in our

17   experience, as a program we don't see any benefit to a

18   supervised --- a supervised regimen, that is we are not

19   --- I'll just leave it there.

20   BY ATTORNEY BROOKS:

21       Q.    WPATH in table one requires that all psychiatric

22   symptoms be, quote, well controlled.

23             Correct?

24       A.    They use that language, yes.
```

1      Q.    And the language under the CTMS column is rather

2    different.   Among other things it says no suicide

3    attempt in the last six months.   Do you see that?

4      A.    Let me find it.   We're in the table, right?

5      Q.    We are in the mental health section under CTMS

6    column?

7      A.    Yes.

8      Q.    No suicide attempt in the last six months.   But

9    if the patient tried to commit suicide seven months ago,

10   that's okay?

11                      ATTORNEY BLOCK:   Objection to form.

12                      THE WITNESS:   So the point here and the

13   distinction is that the WPATH criteria are too vague,

14   and so what you are observing with the Mount Sinai

15   criteria is they're much more granular.   And rather than

16   leaving something to some subjective interpretation we

17   define some of the specifics to make it clearer on what

18   the guidelines should be.

19   BY ATTORNEY BROOKS:

20     Q.    You refer here in your guideline to no suicide

21   attempt in the last six months.   If a patient has

22   entertained suicidal thoughts but made no attempt in the

23   last six months, did that patient potentially satisfy

24   the Mount Sinai criteria?

1     A.    So that kind of decision would be at the

2   discretion of the reviewing mental health professional,

3   the psychiatrist or the psychologist, and so you can

4   certainly envision different circumstances.  So even

5   going back to your example of seven months, you could

6   envision that something like that might be considered,

7   depending upon the person, too unstable even though they

8   technically met criteria.  This isn't just a check box.

9   It is more a guideline.  And similarly, to your point

10  about a suicidal ideation, there are different tiers of

11  them.  And I won't claim to be an expert on the

12  specifics there, but my mental health professionals are

13  more concerned about some of those than others.

14                  ATTORNEY BROOKS:  Take a break.

15                  VIDEOGRAPHER:  The current time reads

16  3:35 p.m. Eastern Standard Time.

17  OFF VIDEOTAPE

18                          - - -

19  (WHEREUPON, A SHORT BREAK WAS TAKEN.)

20                          - - -

21  ON VIDEOTAPE

22                  VIDEOGRAPHER:  We are back on the record.

23  The current time is 3:55 p.m. Eastern Standard Time.

24  BY ATTORNEY BROOKS:

1     Q.    Dr. Safer, you testified earlier, and I think

2    I'm using the word that you used that if your clinic had

3    its druthers they would be following or making decisions

4    strictly based on the criteria that are laid out in this

5    paper, Exhibit 15, under the heading of Mount Sinai

6    CTMS.

7            Correct?

8    A.    Yes.

9    Q.    And can I infer from that that you, yourself,

10    don't view the WPATH SOC-7 as setting out scientifically

11    established best practices but rather recommendations on

12    which you use different?

13                  ATTORNEY BLOCK:  Objection to form.

14                  THE WITNESS:  No, I would not say that.

15    So SOC-7 sets out the guidelines as things were

16    understood in 2011 and 2012, and we have learned ---

17    we've learned and things have evolved since then in

18    terms of the care of transgender people.

19    BY ATTORNEY BROOKS:

20    Q.    Did you have any participation in the

21    development of the SOC-7 guidelines?

22    A.    I had very minimal participation.  I helped

23    review some articles that informed those guidelines.

24    Q.    Those guidelines --- did you have any

1  familiarity with the process of how they were being

2  drafted?

3      A.    I'm trying to think if I can say things

4  usefully.  I was not close enough to the process that we

5  would want --- that I would want to start commenting on.

6      Q.    Do you know whether they addressed issues on

7  which opinions within the drafting committee differed?

8      A.    I can't comment on SOC-7.  We are literally

9  writing SOC-8 now.

10     Q.    And on that are there issues that the SOC-8 is

11  addressing on which opinions significantly differ?

12     A.    Yes.

13     Q.    So it's not that every aspect of the guidelines

14  are unanimously agreed by every member?

15                 ATTORNEY BLOCK:  Objection to form.

16                 THE WITNESS:  So with medical guidelines

17  in general there isn't --- that unanimity wouldn't be a

18  thing.  They're referred to as consensus documents

19  rather than unanimous documents.

20  BY ATTORNEY BROOKS:

21     Q.    And what that tells us is that there is --- that

22  reasonable people differ on at least some aspects of

23  what is set forth in the document?

24                 ATTORNEY BLOCK:  Objection to form.

1          <u>THE WITNESS:</u>  In all guidelines,

2   including these, members of the committee even differ in

3   terms of how things are framed and when consensus is

4   obtained, but not unanimity.

5   <u>BY ATTORNEY BROOKS</u>:

6        Q.    How many gender performing surgeries or gender

7   affirming surgeries were performed in your clinic in

8   2021?

9        A.    In 2021, all --- there were, according to the

10  <u>New York Times</u>, about 9,000 total surgeries performed at

11  Mount Sinai hospitals, including everything we do.  So

12  that wouldn't just be vaginoplasty.  That would include

13  chest reconstruction surgeries, revisions of older

14  surgeries, et cetera.

15       Q.    Well, you quote the <u>New York Times</u>.  Where did

16  they get the information?

17       A.    I suppose the sources is us.

18       Q.    You believe that number to be approximately

19  accurate?

20       A.    I think that's right.

21       Q.    I don't trust the <u>New York Times</u>, but you have a

22  pass.  And now 2021 may or may not have been affected by

23  COVID in terms of patients presenting and wanting

24  surgery.  Has there been a clear trend in numbers of

```
 1   surgeries performed by your clinic over the last five
 2   years?
 3                    ATTORNEY BLOCK:  Objection to form.
 4                    THE WITNESS:  So there is definitely an
 5   increase in the number of surgeries at Mount Sinai over
 6   the past five years.  Unfortunately, expectation is the
 7   challenge.  We opened the program in 2016, so roughly
 8   those five years.  And certainly the first few years
 9   were quieter as the reputation grew.  In 2020, numbers
10   were down because we had to divert resources to taking
11   care of people with COVID.  Our group, including myself,
12   literally dropped what we were doing for a period of
13   time to go become COVID hospital employees, and so there
14   was a dip there in 2021 as a little bit of a rebound
15   element to it.
16   BY ATTORNEY BROOKS:
17      Q.    Are you able to give me any average total
18   receipts of your clinic or the hospital as a whole and
19   associated physicians from gender affirming surgeries
20   performed within 2021?
21      A.    I'm sorry, say that again.
22      Q.    Let me just ask this again.  Do you have any
23   knowledge as the total --- as to the total receipts of
24   your clinic or the wider hospital and physicians
```

 1   involved as a result of gender affirming surgeries

 2   performed by your clinic in the last year?

 3       A.    So do I know some of the financial elements?

 4       Q.    Correct.

 5       A.    So I do know some of the financial elements, but

 6   nothing that the hospital would allow me to share.

 7       Q.    Your counsel can designate it as confidential

 8   later on, so it doesn't become public, but you are

 9   obliged to answer the question.

10                ATTORNEY BLOCK:  I'm not ---.

11   BY ATTORNEY BROOKS:

12       Q.    I'm entitled to understand your financial

13   interest in the area of your testimony.

14                ATTORNEY BLOCK:  We are not representing

15   him in the context of any legal dispute with Mount

16   Sinai.

17                ATTORNEY BROOKS:  I am entitled to

18   understand the expert's financial interest.  And I

19   suggest to you, Counsel, that you'd rather have me

20   questions asked here where you can designate it as

21   confidential than at trial in a public courtroom.

22                ATTORNEY BLOCK:  It's not up to me.

23                ATTORNEY BROOKS:  You can confer if you

24   want, because that would be the alternative.  If you

1    want to step out and confer with your witness, you

2    should do so.

3                    ATTORNEY BLOCK:  It's not up to me to say

4    what he can and can't say in contravention with an

5    agreement with his employer, and so I think if you want

6    to like obtain like a Protective Order, you know, with

7    him.

8                    ATTORNEY BROOKS:  We have a Protective

9    Order in place, Counsel.

10                   ATTORNEY BLOCK:  I know, I'm not

11   representing him in that capacity, though.  So if you

12   want to interface with his attorney through Mount Sinai

13   then you can, but I don't have an attorney/client

14   relationship with him for purposes of any employment

15   disputes.

16                   ATTORNEY BROOKS:  Are you instructing the

17   witness not to answer?

18                   ATTORNEY BLOCK:  No, I'm not.

19                   ATTORNEY BROOKS:  Are you refusing to

20   answer?

21                   THE WITNESS:  I wouldn't be able to

22   answer without including the hospital lawyers.

23   BY ATTORNEY BROOKS:

24        Q.    Can you tell me ---?

1                    ATTORNEY TRYON:  This is Dave Tryon.  I'm

2       sorry ---.

3                    ATTORNEY BROOKS:  Go ahead.

4                    ATTORNEY TRYON:  May I just also say that

5       I think if the witness is not willing to disclose his

6       financial interest here, that that would be grounds to

7       disqualify him as a witness, which on behalf of the

8       state I would likely pursue.  So I would respectfully

9       request that he answer the question.

10                    ATTORNEY BLOCK:  Dave, on what basis is

11       that grounds to --- he has disclosed everything required

12       by the rules.  You're asking for --- he has no financial

13       interest in this litigation.

14                    ATTORNEY BROOKS:  We don't need to argue

15       the motion right now.  The motion seems likely, the

16       motion will be briefed, but we don't --- we got no Judge

17       here, we're not going to be deciding ---.

18                    ATTORNEY BLOCK:  If you want to file a

19       subpoena as a third-party subpoena for that information

20       with a Court Order, than you're free to do so.  He is

21       appearing here as an expert witness on his expert

22       testimony.  So you have plenty of discovery tools to

23       obtain that information.  And we're not his counsel for

24       that.

1          ATTORNEY BROOKS:  I do have discovery

2    tools, including asking him questions at this

3    deposition.  I've attempted to do so.  You have not

4    instructed him not to answer.  The witness has refused

5    to answer.  The record is clear.

6    BY ATTORNEY BROOKS:

7         Q.    Let me ask you about personally.  Does your own

8    income or any bonus you receive depend on any part of

9    the overall revenues of your plan?

10        A.    It does not.

11        Q.    And does your personal income consist strictly

12   of a salary or also a salary plus fees associated with

13   surgeries performed?

14        A.    Exclusively a salary.

15        Q.    And your income depends in no way on how many

16   surgeries, you yourself perform?

17        A.    That --- well, I don't perform surgeries I'm not

18   an endocrinologist.

19        Q.    Pardon me.

20        A.    But that's right, it's not revenue based.

21        Q.    It's not revenue based in any way?

22        A.    In any way.  That's right.

23        Q.    That is helpful.  Do you have any understanding

24   as to the average revenues per patient that your clinic

1    receives for patients who are seeking gender affirming

2    surgery in the clinic?

3        A.    We don't characterize it that way.  There's a

4    --- there's a wide range of reimbursements or lack of

5    reimbursements across medicine.  And gender affirming

6    care includes quite that entire range actually, from

7    mental health, which is under reimbursed, to the

8    surgeries which are --- where there's more money.

9        Q.    I've been waiting to hear the flip side of that.

10       A.    So yes, so we have that, so I don't think I

11   could give --- I wouldn't --- even were I allowed by the

12   hospital to give you the specifics, I don't know that I

13   would be able to do that on a per patient basis.

14       Q.    Can you tell me your total personal income in

15   2021 from --- in any way related to your work in

16   connection with your employment at Mount Sinai?

17       A.    So is this something that I'm answering?

18              ATTORNEY BLOCK:  I'm sorry, could you

19   restate the question?

20              THE WITNESS:  He's asking for my ---

21   you're asking for my salary?

22   BY ATTORNEY BROOKS:

23       Q.    I'm asking for your total income, in any way

24   --- in 2021 in any way associated with the clinic at

1   Mount Sinai?

2       A.    So we're running into --- so I'm simply on

3   salary, but the specifics of that are also something

4   where I would need to include the Mount Sinai lawyers,

5   because that's part of their practice, and I would have

6   to defer to them.

7       Q.    You decline to answer the question about your

8   own personal income?

9       A.    Yes.

10                 ATTORNEY BROOKS:  I won't take time to

11  speak upon it, but I will object.

12  BY ATTORNEY BROOKS:

13      Q.    I read in some document that your spouse is an

14  employee of Parexel --- if I'm pronouncing that company

15  correctly.

16             Is that still the case?

17      A.    Yes.

18      Q.    And does that company derive any revenues from

19  the sales, testing, clinical trials of any

20  pharmaceutical that is used to suppress puberty or is

21  used as a cross sex hormone?

22      A.    I don't know the answer.  Parexel is a very

23  large back office organization supporting clinical

24  research with many clients.  And so you can envision

```
 1   some connection buried in there, but I don't know
 2   specifics.
 3        Q.    Fair enough.
 4                  ATTORNEY BROOKS:  Let me have 54.
 5   BY ATTORNEY BROOKS:
 6        Q.    Let me ask you to turn to paragraph 18 in your
 7   expert report, and there in the first sentence you write
 8   although the detailed mechanisms are unknown, there is a
 9   medical consensus that there is a significant biologic
10   component underlying gender identity, closed quote.
11              Do you see that?
12        A.    No, I might have pulled the wrong thing out.
13   Which ---?
14        Q.    It's the expert report not the rebuttal?
15        A.    Expert report.  And it's which paragraph?
16        Q.    Paragraph 18?
17        A.    Oh, sorry.
18        Q.    This is why lawyers number their paragraphs.
19        A.    That is wise.  All right.  Paragraph 18.
20        Q.    I'm just calling your attention --- and I have
21   read into the record the first sentence of that
22   paragraph.
23        A.    I see it.
24        Q.    And picking up on our earlier discussion about
```

1    consensus.  When you say there is a medical consensus,

2    do you mean that all experts in the field agree or do

3    you mean that in your view this is a majority opinion?

4                    ATTORNEY BLOCK:  Objection to form.

5                    THE WITNESS:  So when I guess similar to

6    when we talked about guidelines if the question is, is

7    there unanimity, then there is never unanimity, so there

8    you go.

9    BY ATTORNEY BROOKS:

10       Q.    Okay.

11       A.    I can be a little stronger, though, because the

12   mainstream medical organizations have various statements

13   in this space.  So for example, the endocrine society,

14   which is the largest international organization of

15   endocrinologists does actually have a statement where

16   the sum of the modeling for gender affirming care is

17   prefaced with statements that support this.

18       Q.    In providing the basis for your opinion that

19   there is such a consensus, you cite only two papers and

20   those only papers that you had written yourself.

21            Did you consider those papers written by

22   yourself to adequately document the existence of the

23   medical consensus?

24                    ATTORNEY BLOCK:  Objection to form.

1                        THE WITNESS:  So both of the papers

2    reference reviews with larger bibliographies that

3    reference yet other papers that support the statement.

4    And when we're talking about what's informing the

5    statement, of course, is not limited to the specific

6    papers referenced, so that's part of the reason why I

7    gave that example, for example, the endocrine society's

8    formal statements on the project, which is a consensus

9    view of more people than myself, of course.

10                       ATTORNEY BROOKS:  Let me mark as

11   Exhibit 16, an article by Aruna Saraswat and others

12   entitled Evidence Supporting the Biological Nature of

13   Gender Identity from 2015 of which Dr. Safer is one of

14   the co-authors.

15                       ATTORNEY WILKINSON:  Tab 54.

16                               ---

17                  (Whereupon, Exhibit 16, Aruna Saraswat

18                  Article, was marked for identification.)

19                               ---

20   BY ATTORNEY BROOKS:

21      Q.    And Dr. Safer, is that a paper that you --- I

22   guess I see by placement --- had supervisory

23   responsibility for?

24      A.    Yes.

1    Q.    Let me --- I learned something in this

2    deposition, so that is good.

3          Let me call your attention to page two and

4    column two, and in the very bottom paragraph ---.

5                ATTORNEY BLOCK:  I'm sorry, did you mean

6    200?

7                ATTORNEY BROOKS:  I did mean 200.  I

8    apologize.  That is also the second page.

9    BY ATTORNEY BROOKS:

10    Q.    In the bottom --- first column bottom paragraph

11    it states, quote, however it is important to note that

12    most transgender individuals develop a gender identity

13    that cannot be explained by atypical sexual

14    differentiation, closed quote.

15    A.    So this is column two.

16    Q.    Column one.  If I misspoke I apologize.

17    A.    I could have misunderstood at this hour.

18    Q.    At the bottom paragraph?

19    A.    However it is important to note, I'm there, yes.

20    Q.    All right.

21          Can you explain to me what is meant by the

22    statement that most transgender individuals have a

23    gender identity that cannot be explained by atypical

24    transgender differentiation?

1      A.      So that is referencing, in this context at the

2   time that this was written, the anatomy, genitals,

3   reproductive structures.

4      Q.      And let me just --- for purposes of terminology,

5   you said at the time this was written.  This is about

6   seven years ago, six years ago?

7      A.      2015, yes.

8      Q.      And if you look at the page one, column one

9   abstract.  This paper is using the term disorders, in

10  sexual development, and that DSD.

11         Do you see that?

12     A.      I do.

13     Q.      That was a term that you were comfortable with

14  most recently?

15     A.      It was a terminology that I was using that

16  recently, yes.

17     Q.      The point here, on page 200, column one, that we

18  were just looking at is, in fact, most transgender

19  individuals do not suffer from any identifiable DSD.

20         Is that what this is saying?

21     A.      From a physically identifiable DSD, that is what

22  this is saying, yes.

23     Q.      Physically, genetically, hormonally,

24  identifiable by any physical measurement.

1           Correct?

2                   ATTORNEY BLOCK:  Objection to form.

3                   THE WITNESS:  So you have to be careful

4    to be not too broad, and part of the reason is the line

5    there is actually blurring.  So when I'm sitting here

6    and talking in 2022 I recognize that there is a

7    potential for some blurring in that line.  But in 2015

8    it was certainly understood to be how you're saying it.

9    BY ATTORNEY BROOKS:

10   Q.    Well, it remains true today, does it not, that

11   the overwhelming majority of transgender individuals do

12   not suffer from any identifiable atypicality

13   genetically, physically or hormonally.

14           Correct?

15   A.    Well, that's not how I would say it, because

16   gender identity is a biological phenomenon and so one

17   would predict that as we identify certain correlates or

18   even explanations, than we will have things in that

19   space.  But if we're talking about how things were

20   defined in 2015, being transgender was defined as

21   somebody where their gender identity was not aligned

22   with the rest of their biology, and there was no

23   apparent, physical variation either in terms of their

24   anatomy or their chromosomes in terms of their genitals,

1    in terms of their reproductive anatomy or in terms of

2    their chromosomes.  So that is how it was defined at the

3    time.

4        Q.    Well, today, and using identifiable to mean you,

5    Doctor safer, are able to identify it now, not

6    hypothetically in the future, it remains true that the

7    overwhelming majority of transgender individuals do not

8    suffer from any current identifiable, physical

9    chromosomal or hormonal irregularity.

10            Correct?

11       A.    I would say that right now in 2022, it would be

12   true to say that a transgender person does not have an

13   identifiable genital difference almost by definition or

14   a --- or an internal reproductive organ difference

15   almost by definition.  Chromosomal I can't say, because

16   we actually don't check.  And hormonal gets even grayer

17   than that, because it could be the case that there are

18   hormonal exposures, for example, in utero that explain

19   at, least some people as being transgender.

20       Q.    As you sit here today, you don't know of any

21   chromosomal test that can identify an individual as

22   transgender, do you?

23       A.    Is there a --- there --- as I sit here today

24   there are no tests to identify somebody who is

```
 1   transgender.

 2        Q.    And that includes genetic tests?

 3        A.    There's no scan and there are no blood tests and

 4   there are no genetic tests.

 5        Q.    And no hormonal tests?

 6        A.    That's right.  There are no hormonal tests right

 7   now to identify a transgender person.

 8        Q.    As you sit here today and based on your whole

 9   knowledge of the field, there is no biological test from

10   some mental professionals, as they can do, but there is

11   no biological test that will tell you in advance which

12   prepubertal child who is suffering from gender dysphoria

13   would persist and which would desist as they enter

14   adolescence?

15        A.    So I would have to challenge how you're stating

16   that a little bit just so that we are cleaner in terms

17   of how we think.  So we're thinking right now in terms

18   of identifying kids who are transgender.  We use various

19   terminologies, so that --- we've have been using the

20   term gender dysphoria we're going to be shifting to more

21   gender incongruence, but we're trying to identify people

22   who are transgender and who may require intervention

23   later.

24               Recognizing further that only a subset of
```

 1   transgender people would require a medical or surgical

 2   intervention.  And so if the question is can --- is

 3   there a test now in 2022 to determine in an prepubescent

 4   kid who says they're transgender or people who suspect

 5   may be transgender on whatever they're saying, no, there

 6   is no test to know that is true or not and to know if

 7   they'll think that later or not, and to know if they'll

 8   want treatment or not.

 9       Q.   So it is your opinion that there is consensus

10   that there is a biological basis for transgender

11   identification, but as of 2022 you don't know with any

12   confidence what that biological basis is.

13            Correct?

14            ATTORNEY BLOCK:  Objection to form.

15            THE WITNESS:  I would say that it is

16   complicated and there may even be more --- there might

17   be multiple explanations for people being transgender.

18   We see that with other biological entities like

19   diabetes, for example.  So the idea that we don't know

20   what it is, is also a little too narrow.

21   BY ATTORNEY BROOKS:

22       Q.   You don't know any one identifiable biological

23   cause with any confidence that state within a scientific

24   knowledge?

1      A.    No.   That's not quite true.  We know that ---

2  and it's not even the biology of being transgender even

3  though that is how I just framed it.  It is even one

4  step back which is the biology of gender identity.  We

5  all have gender identity, and how is that determined and

6  what is that biology.  And we know there --- and we know

7  then that some transgender people have that particular

8  biology not aligned with some of their other biology.

9           So going back to what you just asked, that we

10 don't know any mechanisms is not quite true.  That is

11 people that looks to be true that exposure to androgen,

12 male hormones in utero can have some influence on some

13 people as to their identity.

14     Q.    Well, if there is not yet any test that is

15 predictive of gender identity in a prepubescent child,

16 then as a matter of science it follows that you don't

17 actually know any causal relationship, any biological

18 basis, is that not true?

19     A.    No, that wouldn't be quite sure.  We can't test

20 for somebody deemed transgender, and we can't test

21 gender identity with a test.  But like I said, that at

22 least in some circumstances the androgen exposure in

23 utero, in a mother's womb, could be part of the

24 explanation for some people.  Maybe isn't all the

1    explanation for some people.

2        Q.    It could be, but no science has been done to

3    prove that that is a fact, has it?

4        A.    So it isn't really a hypothetical, that is we do

5    have --- we do have data that support it, but it doesn't

6    lead us to a test.

7        Q.    If it is not testable, then it is a hypothesis,

8    not a fact, isn't it, not of science.

9            Correct?

10           ATTORNEY BLOCK:  Objection to form.

11           THE WITNESS:  No, that is using testing

12   two different ways.  So in a scientific study, then a

13   hypothesis is something that you have based on a certain

14   --- based on certain data, but then you test to see how

15   true it might be.  But when I was using the word test,

16   I'm talking about like a blood test or something that we

17   could actually do on a given individual to know their

18   circumstance with regard to their gender identity.

19   BY ATTORNEY BROOKS:

20       Q.    Let me ask you to look at the paper that I've

21   marked as Exhibit 16, Evidence Supporting the Biological

22   Nature.  Is that that which you have in front of you?

23       A.    I do, yes.

24       Q.    And on the first page you refer under the result

```
 1    that begins by discussion of a seminal study by
 2    Meyer-Bahlburg.  Do you see that?  Second column,
 3    beginning of the results section.
 4        A.    Yes.
 5        Q.    And is it your contention that the
 6    Meyer-Bahlburg study provides evidence of a biological
 7    basis for transgender identification?
 8        A.    What the Meyer-Bahlburg study does is it
 9    provides evidence of a biological basis for gender
10    identity.
11        Q.    Well, specifically the study, the Meyer-Bahlburg
12    study --- let me have that so we are not shooting in the
13    dark.  Exhibit 17 is a paper from 2005 from Professor
14    Heino Meyer-Bahlburg, entitled Gender Identity Outcome
15    in Female Raised 46, comma XY persons with penile
16    agenesis, and it continues.  It's a long document?
17                     ATTORNEY WILKINSON:  Tab 14.
18                              ---
19              (Whereupon, Exhibit 17, 2005 Paper by
20              Professor Heino Meyer-Bahlburg, was marked
21              for identification.)
22                              ---
23    BY ATTORNEY BROOKS:
24        Q.    I believe the level of questions that I will be
```

1  asking, however, are the ones that you will know off the

2  top of your head given the importance of this study in

3  the field.  The study concerned exclusively children who

4  are born with what's referred to as a 46 XY condition.

5          Right?

6    A.    Yes.

7    Q.    And that is long recognized as a DSD?

8    A.    No, 46 XY is the classic male chromosome

9  pattern.

10   Q.    Yes.  Pardon me.  So these are individuals with

11 typical male pattern chromosomes?

12   A.    Yes.

13   Q.    Who, however, for some reason have had a

14 developmental disorder or defect affecting their

15 genitals?

16   A.    Who have had some sort of alteration or

17 development of their genitals, exactly.

18   Q.    And the study concerns the results of efforts to

19 raise such genetically male children as female in some

20 cases after surgical procedures to feminize them and in

21 some cases absent surgical procedures.

22          Correct?

23   A.    The study really relates to the gender identity

24 of those where there is an attempt to raise them as

1    females.

2       Q.    And the results, if I understand the study, were

3    mixed, that is that some of the individuals who were

4    raised as females nevertheless came to identify as male

5    and some of the individuals who were raised as females

6    came --- persisted in identifying as female.

7          Correct?

8       A.    It is not actually as clean as you're saying it.

9    So we should look at some of the specifics and we might

10   need to point out to specific sentences, but this too is

11   a survey of --- a survey of studies, to be clear, it's

12   not its own isolated study, and then there --- in none

13   of these studies were they systematic or, you know, I

14   guess I will just use the word systematic in

15   ascertaining that all of the people who were being

16   raised female and ascertaining all of the gender

17   identity of those people.  But what they are really

18   observing is that the numbers that they mention of the

19   people who they were trying to raise female who had male

20   gender identity were whatever the numbers were.  I don't

21   know if that makes sense, but you'll follow as

22   necessary.

23      Q.    If you turn to page 432 it begins under the

24   heading discussion.  It begins, quote, the main findings

```
 1    can be summarized as follows.  One, the majority of 46

 2    XY individuals with presumably normal male prenatal

 3    hormonal milieu, comma, non-hormonal anatomic

 4    abnormalities of the genitals, comma, and female gender

 5    assignment at birth or in early childhood have not

 6    changed gender to male.  Do you see that?

 7        A.    I do see it.

 8        Q.    And one thing, and I understand the

 9    qualifications that you've just described this is not

10    recording a carefully structured study performed by

11    Doctor Meyer-Bahlburg but rather a review of case

12    histories.

13              Right?

14        A.    Exactly.

15        Q.    But his conclusion from his review of those is

16    that the majority of genetically presumably normal male

17    individuals who were raised female, and I believe it's

18    fair to summarize in most cases after feminizing genital

19    surgery, adhered to a female gender identity at least to

20    the data we have?

21        A.    Yes, so I don't know whether they actually all

22    had surgery or not.

23        Q.    They did not all have surgery.

24        A.    Right or even the larger number.  I don't know.
```

1    I would have to go through.

2        Q.    Fair enough.

3        A.    But the --- and it was his opinion at the time

4    he was writing this that the majority who were reared

5    female were living as female, although we don't know

6    their gender --- but now this is me stepping out, saying

7    we don't know their gender identy, nobody asked.  The

8    reason why this paper is interesting is even in the

9    circumstance where they were being so passive in how

10   they were collecting the data, such a large fraction of

11   these individuals were so clear in their male gender

12   identity that they actually identified themselves

13   against the protocols.

14       Q.    And that seemed to be evidence that --- of a

15   biologic basis of gender identity congruent with their

16   male genetics.

17            Correct?

18       A.    That --- for these people, that's right.  That

19   is with or --- with their chromosomes.

20       Q.    Right.

21       A.    Which you would predict.  If we think about ---

22   if we recognize --- if we think that by survey a half a

23   percent or even a full percent of people are transgender

24   that would mean that 99 percent of people are cisgender.

```
 1   And so if you take a population of people with certain

 2   chromosomes, 99 percent of them are going to be

 3   cisgender and will have a gender identity incongruent

 4   with their chromosomes.

 5       Q.    The study includes no individuals who were

 6   raised with a gender identity inconsistent with their

 7   male chromosomes who came to identify or later perceived

 8   themselves as identifying as female.

 9             Correct?

10       A.    Well, we don't know that because they were ---

11   they're all XY individuals who were being raised female.

12   And somebody who had a female gender identity who is

13   transgender among them would never be identified as

14   transgender in this case.

15       Q.    So my question was a little more specific.  The

16   study simply doesn't include any individual who had male

17   chromosomes who was raised male who came to identify as

18   female?

19       A.    That's correct.  All of these people who are XY

20   chromosome people raised female.

21       Q.    And you would agree with me, would you not, the

22   study provides some evidence that external forces such

23   as feminizing surgery or how their parents treat the

24   child can have some influence on the formation of gender
```

1    identity?

2       A.    I can't say that because the study really

3    doesn't go there.  The study is only passive observation

4    and all --- the only thing I would say with some

5    confidence is that some fraction of these individuals

6    who are so clear in their gender identity that despite

7    nobody even looking for that sort of thing, because that

8    wasn't even a consideration when these --- when these

9    cases occurred, they --- the individuals spontaneously

10   announced to the authorities around them, parents and

11   doctors, that they were wrong, that the parents and

12   doctors were wrong.

13      Q.    And that, in your view, provides at least some

14   evidence of a genetic basis for gender identity

15   congruent with chromosomal sex?

16                    ATTORNEY BLOCK:  Objection to form.

17                    THE WITNESS:  No.  It provides some

18   evidence of a biological basis for gender identity that

19   can't be manipulated externally.

20   BY ATTORNEY BROOKS:

21      Q.    Well, considering that the study included no

22   examples of any individual who adopted a transgender

23   identity inconsistent with how they were raised, the

24   study simply can't provide any information about

1    biologic basis of transgender identification, can it?

2        A.    Wait.  I think say that again.

3        Q.    The study includes no individuals who adopted a

4    gender identity, a transgender identity apart from

5    social transition and, therefore, can provide no

6    information one way or the other about whether there is

7    or is not a biologic basis for transgender

8    identification?

9        A.    So not quite.  So the --- because remember the

10   point is that gender identity, period, universally, has

11   a biological basis.  It's not that we --- and to be

12   clear, I don't even know that we won't find and some

13   people even wonder if we will find a gene that

14   associates a gene with transgender, per se.  But I'm not

15   even saying that.  If there's --- I'm only saying that

16   we will find let's say genes associated with gender

17   identity and not everybody will have them aligned with

18   the rest of their biology.  So I just want to preface

19   with that.

20            And in this particular review, they're taking

21   people who have XY chromosomes exclusively.  So

22   therefore, if one --- if a certain fraction of them were

23   to have female gender identity despite assuming

24   different development they would have had male --- they

```
 1   would have had other male biology, those are the people
 2   we would have categorized as transgender using current
 3   definitions.  And those individuals would not have been
 4   apparent in this study they were being raised female
 5   anyway.
 6       Q.    And my point was that, therefore, that this
 7   study can't provide any information about whether there
 8   is or isn't a biological basis for transgender
 9   identification?
10       A.    So yes.  I guess how you are framing that is
11   where I'm pushing back.  So the point of this study is
12   as evidence of there being a biological basis of gender
13   identity period, having nothing --- not necessarily for
14   being transgender.  In fact, I don't even know if there
15   --- yeah, I don't even know if that would be the model.
16   The model would be somebody who has a certain gender
17   identity, a certain other biology, and then that
18   combination is what we are calling transgender.
19       Q.    You also referenced a paper by Doctor Reiner.
20   And let me have that.
21                 ATTORNEY BROOKS:  And I will mark that as
22   Exhibit 18, 2004 Discordant Sexual in Some Genetic Males
23   With Cloacal Exstrophy Assigned to Female Sex at Birth.
24                 ATTORNEY WILKINSON:  Tab 71.
```

```
 1                           ---

 2                (Whereupon, Exhibit 18, Paper by Doctor

 3                Reiner, was marked for identification.)

 4                           ---

 5  BY ATTORNEY BROOKS:

 6      Q.    And Dr. Safer, you are well familiar with this

 7  paper.

 8            Am I correct?

 9      A.    I am, yes.

10      Q.    And this is the only other paper that you cite

11  for the assertion that gender identity has a biological

12  basis.

13            Am I correct?

14      A.    No, there are a range of categories of papers,

15  but these are two of my favorite papers in the first

16  category, which is the category of attempting to

17  manipulate gender identity externally.

18      Q.    Dr. Bahlburg in his paper, on page 433 of

19  Exhibit 14, in column one ---.

20      A.    Yes.  Let me get there.

21      Q.    Yes.  433, column one.

22      A.    433, column one.

23      Q.    He says about two inches off the bottom,

24  referring to the Reiner and Gearhart paper of 2004,
```

1  which I believe is this paper, he says, quote, it has

2  serious methodological flaws.  Do you agree with that

3  statement?

4      A.    Let's read what he is criticizing.  All these

5  papers have their weaknesses.  All right.  So the

6  remainder of that --- so the remainder of the paragraph

7  is --- details the complaints for Doctor Meyer-Bahlburg,

8  where his --- which I focus as a social science

9  researcher that they didn't do various assessments that

10  would make it --- that would make standard people doing

11  some of this research able to replicate some of the

12  items in the paper.  And I will --- so while Doctor

13  Meyer-Bahlburg may be frustrated and be complaining

14  about that, he is not actually attacking the veracity of

15  their results.

16      Q.    Well, the point was serious methodological flaws

17  is you are not really able to evaluate the veracity of

18  the results.

19          Correct?

20      A.    Not necessarily.

21      Q.    Do you agree with Doctor Meyer-Bahlburg's

22  evaluation that the methodology of the study reported by

23  Reiner and Gearhart suffers from serious methodological

24  flaws?

1    A.    No.

2    Q.    So let's summarize this study if I may.  I'm

3    turning to page 334.

4    A.    And extending that too, part of his frustration

5    wouldn't be my frustration because I am not looking for

6    those particular endpoints, that is for my purposes for

7    determining whether gender identity is a biological

8    basis Reiner and Gearhart's paper is actually quite

9    strong.

10   Q.    Let's look at the first page in the summary up

11   front.  It refers to this paper dealt with 16 --- under

12   methods, 16 genetic males.

13         Correct?

14   A.    Yes.

15   Q.    And these were all males who suffered from ---

16   uses the word in the second line of the background as

17   severe developmental disorders affecting their genitals.

18         Correct?

19   A.    That's how it is phrased here.  Where am I

20   seeing that?

21   Q.    The second line of the background says severe.

22   A.    Severe phallic inadequacy, yes, I see that.

23   Q.    Which is to say not --- absent or severely

24   disformed penis?

1      A.      That's what that means, yes.

2      Q.      Okay.

3              But these are individuals who are genetically

4   male, and more than that, on page 334, column two,

5   two-thirds of the way down it says the testes were

6   histologically normal in all 14 when examined?

7      A.      I'm on column two.

8      Q.      It is column two.

9      A.      I apologize.

10     Q.      You can kind of see where my finger is pointing

11  here.

12     A.      And this is under ---.

13     Q.      Under methods and the paragraph that begins

14  parents to be educated?

15     A.      Testes were histologically normal in all 14.

16  I'm there, yes.

17     Q.      So we had individuals who were genetically male

18  that had normal testes and had severe deprivation of

19  their penis or it was absent?

20     A.      Yes.

21     Q.      And what was done to these 14 subjects, looking

22  just above that, is that they were assigned a female sex

23  surgically by means of orchiectomy and construction of

24  vulva.

1          Right?

2     A.    Yes.

3     Q.    And orchiectomy is another medical term for what

4 the layman thinks of as castration?

5     A.    As removing the testes.

6     Q.    And construction of the vulvi is creating a ---

7 I'm not sure what the right term is, a pseudo vagina?

8     A.    It wouldn't be a pseudo vagina, but creating a

9 vagina.

10    Q.    It says that --- just immediately following the

11 description of the surgery 14 of these 16 --- looking

12 back at the results paragraph and the abstract, 14 of

13 these 16 were assigned female but later declared

14 themselves male despite the surgery, despite being

15 raised as female.

16          Right?

17    A.    Right, 8 of the 14 who were assigned female.

18    Q.    I'm sorry, I misread that.  Thank you.  Eight of

19 the 14 who were assigned female nevertheless declared

20 themselves male at some stage?

21    A.    That's correct.

22    Q.    And the two who had been raised as males, even

23 though they suffered the same type of phallic

24 developmental defect, remained identifying as males.

 1         Correct?

 2     A.     Yes.

 3     Q.     There was an --- whatever assignment was made,

 4  this was made to infants.  It wasn't made or based on

 5  any choice or reported sense on the part of the child?

 6     A.     That's exactly right, yes.

 7     Q.     So several of these individuals, specifically

 8  six, who were assigned female at least throughout the

 9  period identified by this study adhered to a female ---

10  living out the female gender identity?

11     A.     Actually it was five because one of the children

12  refused to have contact with the surgeons when some of

13  these conversations began to take place.

14     Q.     So we know that five --- we don't know what that

15  person was thinking, feeling or identifying --- but we

16  know that five ---?

17     A.     They were angry.

18     Q.     They were angry.  Whichever that came out, I'd

19  be angry, so ---

20     A.     Yes.

21     Q.     --- so 5 of the 14 subjects who were assigned

22  female and surgically transitioned and socially

23  transitioned continued to at least physically identify

24  as female?

1    A.    As of when they wrote the paper they were still

2  identifying as female as far as I remember.  That's

3  right.

4    Q.    And it would be your position that visibly

5  identifying as female doesn't necessarily mean that they

6  were generally transgender?

7    A.    That --- we don't know that because that wasn't

8  asked.

9    Q.    Is it your view that if you had these children

10  who were surgically transitioned, socially transitioned

11  visibly identifying as female, that if you had simply

12  asked them you would have found out the undoubted truth

13  about their gender identity?

14              ATTORNEY BLOCK:  Objection to form.

15              THE WITNESS:  So it is true that as

16  people develop and assuming that there are good language

17  skills and that there aren't other developmental, mental

18  developmental reasons or other mental health reasons why

19  people would not be clear, that people are able to

20  articulate their gender identity.  Certainly adults do

21  so apparently quite reliably and older teenagers the

22  same, so depending on age.  But yes, there would be a

23  point in time when you could simply ascertain that by

24  asking.

BY ATTORNEY BROOKS:

Q.    Dr. Safer is that fundamentally a medical question or a psychology/mental health question?  The question of the reliability of a patient's self report?

A.    I don't know that I separate it that way.  I say that based on the data we slowly develop overtime of transgender people where we see that any absence of other confounding items along the lines that I said, people at a certain stage in maturity who tell you a certain thing about their gender identity are consistent in that regard.

Q.    This study, the Reiner Gearhart study, Exhibit 18, concerns --- looks at the effect of trying to raise individuals in a gender identity discordant with their chromosomal sex.

Correct?

A.    It is discorded with quite a number of things, but yes, chromosomal is one of your hard data points.

Q.    This study does not look at the question about whether and when or how any sort of intervention might encourage development of a gender identity consistent with one's genetics sex; does it?  It simply does not look at this issue?

A.    Say that again, sorry.

1    Q.    This study does not address the question of

2  whether or how or at what developmental stage

3  therapeutic interventions might encourage the

4  development of a gender identity consistent with one's

5  chromosomal sex?

6    A.    The study is --- the way I'm interpreting the

7  study is it's looking at our inability to manipulate

8  gender identity.  And it's just that.  And I'm a little

9  fuzzy on the rest of what you're asking me.

10    Q.    Well, the study looks at efforts to manipulate

11  gender identity away from chromosomal from the identity

12  normally associated with one's chromosomal sex.  In this

13  case the male sex.

14         Right?

15    A.    It does.

16    Q.    This study simply does not look at efforts to

17  manipulate gender identity towards alignment with the

18  identity normally associated with a subject's

19  chromosomal sex?

20    A.    I think I'm following you now.  So you're

21  suggesting that if we took a transgender person and

22  tried to manipulate their gender identity to align with

23  some of the rest of their biology?

24    Q.    I'm not suggesting that I'm simply saying this

1    study.

2        A.    That particular instance.  Yes.

3              ATTORNEY BROOKS:  15.  It is one of the

4    previous marked ones, if that matters.  All right.

5              I will not show you that document.  Let

6    me ask the court reporter how many --- how much time we

7    have left on the clock.

8              COURT REPORTER:  I have 5:52, five hours

9    and 52 minutes.

10             ATTORNEY TRYON:  I didn't hear that.

11   Could you repeat that?

12             ATTORNEY BROOKS:  We've got an hour and

13   eight minutes according to the clock of the court

14   reporter here, and I believe that our friend in the

15   ether is calculating separately.

16             VIDEOGRAPHER:  Correct.  And it sounds

17   like the same.  I have to do the math.

18             ATTORNEY BROOKS:  Okay.

19   BY ATTORNEY TRYON:

20       Q.    Are you familiar Dr. Safer with a paper recently

21   published by Lisa Littman of Brown University looking at

22   the surveying 100 teens or young adults --- actually

23   surveying a hundred individuals who report having

24   de-transitioned and gone from identifying as transgender

1   to identifying in a manner consistent with their genetic

2   sex?

3                    ATTORNEY BLOCK:  Objection to form.

4                    THE WITNESS:  So I'm aware of Dr. Littman

5   having written a second paper.  But I'm not facile, I

6   guess.

7   BY ATTORNEY BROOKS:

8       Q.    You haven't read that paper?

9       A.    I have not read the paper.  I probably did read

10  it, but I would not be able to be quizzed on it.

11      Q.    Then I won't quiz you on it.  I always tell

12  witnesses I don't know is the easiest way out of a line

13  of questioning.

14            Are you --- let me ask you this, does your

15  clinic have any procedure in place to track outcomes on

16  patients on whom you perform gender conforming surgery

17  long term?

18      A.    We're actually in the --- we have a couple of

19  processes, so I guess the short answers are yes and

20  we're going to be more rigorous going forward.

21      Q.    Do you have any knowledge as to how many

22  patients on whom your clinic has performed surgery have

23  after that surgery committed suicide?

24      A.    I don't off the top of my head know that.

1    Q.    Do you believe that your clinic possesses

2 reasonably complete information on that question?

3    A.    I actually don't think our information is

4 sufficiently complete currently, and that actually is an

5 area where we're going to develop more vigorously,

6 because I would actually like to know that.

7    Q.    Do you know whether any patients on whom your

8 clinic has performed surgery has subsequently sought to

9 de-transition and take on or revert to, whichever way

10 you want to see it, a gender identity that's aligned

11 with their chromosomal sex?

12    A.    So it's a complicated question.  And actually I

13 just want to go back to the first part where you were

14 talking about suicide.

15         To be clear, the rigor I'm talking about is not

16 suicide focused, because I actually am not anticipating

17 that that is --- that that is happening or is happening

18 more than with being seen in a general population, but

19 for all encompassing that we do definitely need that.

20         But back to your current question ---.

21    Q.    Let me jump back to suicide for a moment.  Are

22 you aware of studies coming out of DeVry University and

23 Amsterdam suggesting that post-surgical transgender

24 populations continues to experience elevated rates of

1    complete suicides compared to controlled populations?

2              ATTORNEY BLOCK:  Objection to form.

3              THE WITNESS:  So I'm aware that

4    transgender people have more mental health morbidity

5    than other populations.  Once corrections are made for

6    other confounding factors I don't know that we would

7    have --- that we're very clear yet on those data

8    including ---.

9    BY ATTORNEY BROOKS:

10   Q.    When I refer to a published study coming out of

11   DeVry University of Amsterdam showing high rates of

12   suicidality in postsurgical transgender patients, you

13   believe you're familiar with that literature?

14   A.    I guess it would fall in the same category as

15   Littman's second paper.

16   Q.    Okay.

17   A.    Where I'm familiar with the fact that they're

18   doing surveys and I'm familiar with the broad outlines,

19   but could not ---

20   Q.    Okay.

21   A.    --- comment on specific studies without it being

22   in front of me.

23   Q.    And have any patients on whom your clinic has

24   performed surgery subsequently decided to de-transition

1   and assume a gender identity aligned with their

2   chromosomal sex?

3       A.     I don't --- I don't know.  There is absolutely

4   the case that there are people who stop their treatment

5   at different levels, so it has definitely been my

6   experience that I have patients who I've put on hormone

7   treatments who have stopped those hormone treatments.

8   And there are also, among our patients --- I don't know

9   if any of the patients where we performed the original

10  surgery they actually were opting for a different

11  surgery, but we definitely have patients who have come

12  to us, who had a surgery done elsewhere who were looking

13  for a degree basically what you're calling a reversal,

14  to the degree that that's possible.  So that such a

15  thing does exist.  So the point about saying that they

16  have a different gender identity, that would --- that is

17  not typically how the patients come saying it.  They

18  don't say, oh, it turns out my gender identity is not

19  that.  It's more often society is not treating me well,

20  this isn't working out.  That's the more --- that's the

21  --- that's the typical scenario.  I mean, yes, we

22  definitely have seen that circumstance.

23      Q.     Dave Tryon, who is with us remotely as Counsel

24  for West Virginia, I have promised him an hour, so I

```
1   have to stop, even though I have so many more

2   interesting questions.

3                    ATTORNEY BROOKS:  So Dave, I will stop

4   and I will turn the witness over to you.

5                    ATTORNEY BLOCK:  Could we take a break

6   now?

7                    ATTORNEY BROOKS:  Of course, it is a good

8   time for sure.

9                    ATTORNEY BLOCK:  Thanks.  Can we go off

10  the record?

11                   VIDEOGRAPHER:  The time is 5:03 p.m.

12  Eastern Standard Time.

13  OFF VIDEOTAPE

14                        ---

15  (WHEREUPON, A SHORT BREAK WAS TAKEN.)

16                        ---

17  ON VIDEOTAPE

18                   VIDEOGRAPHER:  We are back on the record.

19  The current time reads 5:25 p.m. Eastern standard Time.

20                   ATTORNEY BLOCK:  This is Josh Block on

21  behalf of the Plaintiff.  We have conferred off the

22  record, including with counsel from Mount Sinai, and

23  Doctor Safer can answer the two questions he declined to

24  answer before provided that we mark those portions of
```

1  the deposition transcript confidential, and all counsel

2  for Defendants have agreed with that.

3              ATTORNEY BROOKS:  And this is Roger

4  Brooks, and yes, I confirm that all counsel for

5  Defendants have agreed to that.

6  CONFIDENTIAL PORTION BEGINS

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24







13  CONFIDENTIAL PORTION ENDS

```
 1                        ---

 2                     EXAMINATION

 3                        ---

 4   BY ATTORNEY TRYON:

 5      Q.    Hello, Dr. Safer.  Thanks for your time today.

 6   So I am David Tryon.  I represent the State of Virginia.

 7   I'm appointed by the Attorney General's Office.  And I

 8   wanted to start out by looking at --- asking you to take

 9   a look at your Rebuttal Report.  I don't recall what

10   exhibit number that is.  If you could tell us what it is

11   marked?

12                    ATTORNEY WILKINSON:  Exhibit 2.

13                    ATTORNEY TRYON:  Exhibit 2.

14                    ATTORNEY WILKINSON:  Tab 51.

15                    THE WITNESS:  I have that in front of me.

16   BY ATTORNEY TRYON:

17      Q.    Could you take a look at paragraph six, please?

18   Do you have that in front of you?

19      A.    Yes.

20      Q.    Great.  Now, in here it says in the second or

21   maybe third sentence as reflected in the same source

22   cited by Doctor Brown dimorphous sexual characteristics

23   in men and women are produced by a combination of genes,

24   prenatal androgen exposure to sex hormones.  And I'd
```

1    like to focus on that particular clause.  Can you

2    explain what prenatal androgen exposure to sex hormones

3    is?

4       A.    Yes.  That references --- I guess to me it's

5    more or less exactly what it says, which is that the

6    developing fetus is exposed to various hormones and

7    other factors and androgen is specifically the male ---

8    is typically what we consider to be the male sex

9    hormone, although everyone has some.  And then prenatal

10   just means and in utero or in the mother's womb.

11      Q.    So androgen for males is testosterone.

12            Is that right?

13      A.    Androgen in general is that category of hormones

14   that we think of as typically male, even though, like I

15   said, we all have them.  And one of the androgens is

16   testosterone.  And with adults it is the one that we are

17   talking about most of the time, of course.

18      Q.    Okay.

19            So as I understand it, your suggestion is that

20   that prenatal exposure to testosterone can have an

21   impact even after birth.

22            Is that right?

23            ATTORNEY BLOCK:  Objection to form.

24            THE WITNESS:  So all factors --- well, I

1    don't want to overstate it, but factors that occur to

2    which a fetus is exposed in the womb have impact on the

3    development of that fetus, of that person when they are

4    born, and so androgens, including testosterone, would be

5    part of that, so yes.

6    BY ATTORNEY TRYON:

7        Q.    So are you aware of studies addressing the

8    impact of prenatal exposure to testosterone as it

9    impacts people after their birth?

10                   ATTORNEY BLOCK:  Objection to form.

11                   THE WITNESS:  I think I need you to be

12   specific about which studies.

13   BY ATTORNEY TRYON:

14       Q.    Are you aware of any study that addresses the

15   effect of prenatal testosterone upon boys after they're

16   born?

17                   ATTORNEY BLOCK:  Objection to form.

18                   THE WITNESS:  So the ---.

19   BY ATTORNEY TRYON:

20       Q.    Or men?

21       A.    So I can --- I guess --- I have to --- kind of

22   two answers.  Exposure to prenatal androgens, kind of

23   generally because it is not always, testosterone explain

24   the development of what we consider to be typically male

1   genitalia so that all babies born with what --- with a

2   penis and with a urethra that is the part for which you

3   urinate, that's up inside the penis and having the

4   gonads, which would typically be testes in the scrotum,

5   all of that happens in response to testosterone.

6   BY ATTORNEY TRYON:

7       Q.    And then that also triggers a question I had.

8   You had previously said in your original report a

9   person's genetic makeup and internal and external

10  reproductive anatomy are not useful indicators of

11  athletic performance and have not been used in a league

12  competition for decades.

13          My question on that is, when you say a person's

14  genetic makeup doesn't their genetic makeup trigger

15  whether or not they are going to --- a person's genetic

16  makeup will determine whether or not they're a boy or a

17  girl, and therefore if they're a boy that would trigger

18  their generation of more testosterone than a girl.

19          Is that a fair statement?

20              ATTORNEY BLOCK:  Objection to form.

21              THE WITNESS:  Yeah, no, that's --- so I

22  think I need to walk that back a little bit.  Why don't

23  we --- can we do it like piece by piece or have you

24  restate parts?

1    BY ATTORNEY TRYON:

2       Q.    I will restate it.  So when you say a person's

3    genetic makeup, what does that mean?

4       A.    Mostly in this context I'm referencing their

5    chromosomes that's the specific that in the further past

6    was actually being used to identify people which we no

7    longer do.  It's not sufficiently reliable.

8       Q.    Does the --- you have an X Y chromosome that is

9    typically considered to mean that you're a male.

10           Correct?

11      A.    The XY chromosome is typically considered to

12   mean that you're a male, correct.

13      Q.    And that would mean that you would be generating

14   more testosterone than if you have an X chromosome.

15           Right?

16              ATTORNEY BLOCK:  Objection to form.

17              THE WITNESS:  So the presence alone of

18   that XY pattern is insufficient to know with certainty

19   that you're producing more testosterone and that is part

20   of the point of I'm saying it is that biological sex is

21   more complex, and you could have the gene for the testes

22   that produce testosterone elsewhere, and then you

23   wouldn't have that pattern and you still would be

24   producing the testosterone or vice versa.

```
 1   BY ATTORNEY TRYON:

 2      Q.    Okay.

 3            Well, let's go back to prenatal testosterone.

 4   So you're not --- if I understood what you're saying

 5   before, you're not aware of any studies that show

 6   whether or not prenatal testosterone would have --- let

 7   me just start that over again.

 8            Are you aware of any studies that address

 9   whether prenatal testosterone has impact on sporting, on

10   athletics in children after birth?

11      A.    Correct.  That would be right to say that there

12   are no studies of which I'm aware that can associate

13   prenatal testosterone with athleticism.  And I don't

14   know what levels we're even talking.  Like an adult

15   level?  What's your question there?

16      Q.    My next question is, have you heard of the

17   Journal of Sports Science and Medicine?

18      A.    I guess you would have to show it to me.

19      Q.    Okay.

20            Have you ever heard the name Jim Goldby or

21   Jennifer Mays?

22      A.    No.

23                ATTORNEY TRYON:  Jake, could you bring up

24   the Exhibit that I sent to you today, which is the
```

1   <u>General Sports Science and Medicine</u>?

2                   <u>ATTORNEY WILKINSON</u>:  Do you see anything?

3                   <u>THE WITNESS</u>:  I don't see anything.  Oh,

4   that'S too small.  Okay.  That's okay.

5                   <u>ATTORNEY TRYON</u>:  Okay.

6                   And this will be Exhibit --- what Exhibit

7   are we on Jake, do you know?

8                   <u>VIDEOGRAPHER</u>:  This is 19.

9                               ---

10                  (Whereupon, Exhibit 19, Article, was

11                   marked for identification.)

12                              ---

13                  <u>ATTORNEY TRYON</u>:  I'm sorry, 19?

14                  <u>VIDEOGRAPHER</u>:  Correct.

15  <u>BY ATTORNEY TRYON</u>:

16     Q.    Okay.

17           I take it from your earlier answers, you

18  probably never seen it before.

19           Is that right?

20     A.    I certainly don't recall.  I don't want to state

21  definitively I've never seen it either, but it's

22  certainly not a paper that I'm going to know off the top

23  of my head.

24     Q.    Well, let me ask you to take a look at the

1    conclusion on page 449?

2        A.    So can we move the pictures because they're

3    blocking.

4        Q.    Can you see it?

5        A.    We're getting there.  And then is there a way to

6    move that?  Oh perfect.  Yes.

7        Q.    Okay.

8            The conclusion says, current paper provides

9    initial support from an association between prenatal

10   testosterone levels and mental toughness, optimism, goal

11   orientations, coping strategies and hostility, period.

12   Findings tentatively suggest that the mentioned

13   psychological characteristics may be partially

14   biologically predetermined.

15           Do you see that?

16       A.    I do see it, yes.

17       Q.    Do you have any reason to believe whether that's

18   true or not true?

19               ATTORNEY BLOCK:  Objection.  I just

20   object to asking him about a conclusion when he just has

21   a little snippet of that and hasn't reviewed the

22   article.  And I'm not even sure if it has been cited in

23   the other expert reports.

24               THE WITNESS:  I certainly can ---.

1    BY ATTORNEY TRYON:

2       Q.    Go ahead.

3       A.    I certainly cannot say if that conclusion has

4    any logic to it without knowing the study.

5       Q.    Understood.  Is it possible since this

6    particular study suggests there is an impact on adults

7    by prenatal testosterone?  Is it that prenatal

8    testosterone could also have a DSD explanation for why

9    should boys at 11 years old have more athletic ability

10   than girls?

11                    ATTORNEY BLOCK:  Objection to form.

12                    THE WITNESS:  So speaking --- yeah,

13   speaking as an expert, I can't give you an expert

14   comment there without seeing their study.

15   BY ATTORNEY TRYON:

16      Q.    Okay.

17              So you just can't say one way or the other.

18              Correct?

19                    ATTORNEY BLOCK:  Objection to form.

20                    THE WITNESS:  I mostly wouldn't want to

21   comment on their study.  I will only make the

22   observation that the data of which I am aware do not

23   show differences for prepubertal children, if that was

24   part of your question.

BY ATTORNEY TRYON:

Q.    And so the performance data that Dr. Handelsman pointed out showing that there are some damages given before puberty, you reject those?

ATTORNEY BLOCK:  Objection to form.

THE WITNESS:  So those broad cross-sectional studies don't get at input, whether they are referencing biological explanations versus societal explanations.

BY ATTORNEY TRYON:

Q.    Okay.

Whether it's societal or biologic explanations, Handelsman still demonstrated that there is an advantage for pre-pubescent males over females in athletics.

Right?

ATTORNEY BLOCK:  Objection to form.

THE WITNESS:  No, neither Dr. Handelsman in his paper --- he doesn't actually say that.  And if you --- I think we looked previously at one of the figures where specifically the range of outcomes, if you were to repeat the study, included the girls doing better than the boys.

BY ATTORNEY TRYON:

Q.    Well, that was only one of them.  That was not

1   it.  That was one of the charts.  The other chart showed

2   that there was an advantage, right?

3                    ATTORNEY BLOCK:  Objection to form.

4                    THE WITNESS:  The other --- yeah, let me

5   think with that one.  Right.  We are not getting into

6   what the causality is, then the other charts did show

7   the boys doing better.  And again, the caveat remains

8   what is not --- what is not demonstrated there is that

9   there is --- that that is a biological thing versus

10  simply the very longstanding societal and cultural

11  environments.

12  BY ATTORNEY TRYON:

13    Q.    And you've contended that there's a biological

14  component to gender identity.

15          Correct?

16    A.    Yes.

17    Q.    Which we have not been able to identify in this

18  deposition.

19          Correct?

20                    ATTORNEY BLOCK:  Objection to form.

21                    THE WITNESS:  So it is not quite --- well

22  I actually don't know what's been identified in the

23  deposition.  The data are included in my --- in the

24  papers that I referenced that are what are convincing to

 1    the medical community right now.  The detailed

 2    explanations for the specific biology are not known if

 3    that's where you're going.

 4    BY ATTORNEY TRYON:

 5        Q.    Assuming there is actually a biological

 6    component, as you say, to gender identity, that says

 7    nothing about whether a biological male identifying as a

 8    female should, as a public policy matter, be allowed to

 9    participate on a girls athletic team in high school and

10    middle school.

11              Right?

12                   ATTORNEY BLOCK:  Objection to form.

13                   THE WITNESS:  So the way that I would say

14    that is even if we recognize that there is a biological

15    explanation for gender identity, that does not --- well,

16    I don't know that then I can go on to make an expert

17    statement, honestly, because that gets outside my

18    purview and in terms of --- my lane is just simply to

19    say that.

20    BY ATTORNEY TRYON:

21        Q.    Got it.  Can you look at your rebuttal report

22    and look at page two?

23        A.    I have my rebuttal in front of me and I'm on

24    page two.

```
 1      Q.    Paragraph 4B?

 2      A.    I have that in front of me.

 3      Q.    You say --- great.  You say circulating

 4  testosterone is the primary known biological driver of

 5  average differences in athletic performance.  Do you see

 6  that?

 7      A.    I do.

 8      Q.    You say it is primary so what are the other

 9  biological drivers of average differences in athletic

10  performance?

11                 ATTORNEY BLOCK:  Objection to form.

12                 THE WITNESS:  So when I --- so we're

13  talking about circulating testosterone --- let me just

14  look at this.  Right.  The truth is, is that it may ---

15  that the only candidates that we have so far are

16  testosterone at puberty and testosterone in the moment.

17  BY ATTORNEY TRYON:

18      Q.    So it's --- according to you, it's testosterone

19  at puberty and circulating testosterone are the only

20  biological drivers of average differences in athletic

21  performance.

22            Is that right?

23      A.    So excuse me.  I'm actually --- so this is the

24  president of the hospital.
```

```
 1                    ATTORNEY BLOCK:  I'm sorry.  Can we go

 2   off the record for a minute and take a break.  The

 3   president of the hospital is returning his previous

 4   call.

 5                    VIDEOGRAPHER:  Going off the record.  The

 6   current time is 5:48 Eastern Standard Time.

 7   OFF VIDEOTAPE

 8                         - - -

 9   (WHEREUPON, A SHORT BREAK WAS TAKEN.)

10                         - - -

11   ON VIDEOTAPE

12                    VIDEOGRAPHER:  Back on the record.  The

13   current time reads 5:54 p.m. Eastern Standard Time.

14   BY ATTORNEY TRYON:

15     Q.    My last question was according --- according to

16   you, testosterone at puberty and circulating

17   testosterone are the only biological drivers of average

18   differences in athletic performance.

19           Is that right?

20     A.    Right, they are the only ones that are known.

21     Q.    And in paragraph 4C, looking on page three ---

22   let's move over to page three, at the top of the page,

23   your statement is there is no basis to expect that

24   transgender girls who receive puberty delaying
```

```
 1    medication followed by gender affirming hormones would
 2    have an athletic advantage.  There's a comma.  But if we
 3    just put a period there, is that your opinion?
 4        A.    That is correct.  Yes, that is my opinion.
 5        Q.    Let me ask you the converse.  You say there is
 6    no basis to expect that transgender girls who receive
 7    puberty delaying medication followed by gender affirming
 8    hormones would not have an athletic advantage, period.
 9    Would you agree with that statement?
10        A.    No.
11        Q.    Do you have any --- excuse me, any performance
12    data from an actual athletic event that support your
13    opinion?
14        A.    I do not have any data from an actual athletic
15    performance study for that.  No, I do not in that
16    context, in that specific instance.
17        Q.    Let me ask you to look at your report.  Turn to
18    paragraph 45.
19        A.    So my report, paragraph 45.  All right.  I have
20    that in front of me.
21        Q.    Great.  Finally, unlike elite international
22    competition, schools and colleges often provide athletic
23    competition as part of a broader educational mission.
24    In that context, when scholastic athletics are
```

1    components of the educational process, institutions may

2    adopt policies designed to emphasize inclusion and to

3    provide the most athletic opportunities to the greatest

4    number of people.  You see that.

5              Right?

6       A.    I do.

7       Q.    So these policies you referred to are designed

8    to emphasize inclusion and to provide the most athletic

9    opportunities to the greatest number of people, what's

10   the source of that policy?  Did you come up with that or

11   did you see it someplace else?

12             ATTORNEY BLOCK:  Objection to the form.

13             THE WITNESS:  So the question is how am I

14   aware?  Yeah --- I apologize.  You can hear that I'm

15   confused on your question.

16   BY ATTORNEY TRYON:

17      Q.    I'll try and do better.  You said intuitions may

18   adopt policies designed to emphasize inclusion and to

19   provide the most athletic opportunities to embrace a

20   number of people.  And those policies that you're saying

21   there, is that a policy that you read about somewhere or

22   something you are just suggesting?  What's the source of

23   that?

24             ATTORNEY BLOCK:  Objection to form.

```
 1              THE WITNESS:  So an operative word in

 2   this is may adopt policies, so this isn't referencing a

 3   specific policy that I would give you right this moment,

 4   if that's what you are asking.

 5   BY ATTORNEY TRYON:

 6      Q.    So right, just aside from education --- this

 7   whole paragraph is talking about education, but you're

 8   not an expert on education or teaching methodology, are

 9   you?

10      A.    I certainly am not.

11      Q.    And you don't have any degrees in education or

12   training in teaching methodology, do you?

13      A.    I do not.

14      Q.    And you have no degrees or training in pedagogy?

15      A.    I have no degree in pedagogy.  I will be careful

16   how absolutely I do not, because that's not my ---

17   that's not where I am representing myself to be an

18   expert.  I am involved in some education, but at the

19   scholastic level not, so let's just say no.

20      Q.    And you have no expertise as to whether sports

21   or how sports are used as part of educational systems.

22            Right.

23      A.    Correct.  That is not the expertise.  The how

24   and my decisions among this are not my expertise.
```

1      Q.    Do you have any idea how many schools actually

2  have sports programs?

3                    ATTORNEY BLOCK:  Objection.  I couldn't

4  hear the full question.  You cut out.

5  BY ATTORNEY TRYON:

6      Q.    Sorry.  Do you have any idea how many schools

7  have sports programs?

8      A.    I could not give you a number, no.

9      Q.    Are you aware that some colleges do not have

10 athletic programs?

11     A.    I guess I'm vaguely aware.  If you're asking me

12 as an expert than I wouldn't comment on that as an

13 expert, but as a human in society I certainly am aware

14 that that is a thing.

15     Q.    Okay.

16           And do you have any idea what percentage of

17 kids are in athletic programs in schools versus those

18 that are not that are still students?

19     A.    No, I would not be your source for that data

20 point.

21     Q.    So when you are expressing this opinion in

22 paragraph 45 that's not an expert opinion there, is it?

23                    ATTORNEY BLOCK:  Objection to form.

24                    THE WITNESS:  So right, I guess it's a

```
 1    bit confusing here, because it's not my expert opinion

 2    that --- well, I'm certainly aware as an individual that

 3    this is a priority and when I sit on --- when I sit on

 4    committees where we discuss relative priorities, there

 5    are experts present who discuss these priorities.  But

 6    if I'm speaking to you as an expert, then I --- then I

 7    can't be the representative expert in that space.

 8    BY ATTORNEY TRYON:

 9      Q.    Right.  Well, I'm just asking, in paragraph 45,

10    given your lack of expertise and education, you are not

11    giving an expert opinion in paragraph 45.

12            Is that a correct statement?

13                 ATTORNEY BLOCK:  Objection, asked and

14    answered.

15                 THE WITNESS:  So I'm simply --- I'm

16    raising all of the issues that we know exist, but then

17    I'm not providing an expert opinion in terms of the

18    relative priorities among these circumstances that

19    exist.

20    BY ATTORNEY TRYON:

21      Q.    Let me just ask you very clearly is paragraph 45

22    an expert opinion of yours?

23                 ATTORNEY BLOCK:  Objection to form.

24                 THE WITNESS:  I don't think I'm even
```

1    expressing an opinion in paragraph 45, expert or

2    otherwise.  I'm simply stating the background situation.

3    BY ATTORNEY TRYON:

4        Q.    Okay.

5              But --- okay.  I would ask you to turn to

6    paragraph 37 of your report.

7        A.    All right.

8              I have that in front of me.

9        Q.    This is talking about the International Olympics

10   Committee.  Right?  Let me move back to paragraphs 35

11   and 36.

12       A.    Yes, this is the International Olympic

13   Committee.  This relates to the International Olympic

14   Committee.

15       Q.    So this 2021 framework, do you believe that you

16   understand this framework?

17       A.    I think you'll have to ask more specific

18   questions because I might understand parts and I might

19   have questions about parts.

20       Q.    Very good.  First of all, it says the 2021

21   framework further provides that, quote, any restrictions

22   arising from eligibility criteria should be based on

23   robust and peer-reviewed research that, A, demonstrates

24   a consistent, unfair, disproportionate competitive

1    advantage with performance and/or an unpreventable risk

2    to the physical safety of other athletes.  You see that

3    part, right?

4        A.    I do, yes.

5        Q.    Do you understand what the word disproportionate

6    means in this context?

7        A.    To a degree.

8        Q.    Okay.

9              What do you understand it to mean when it says

10   a disproportionate competitive advantage in performance?

11       A.    The IOC is aware that there's quite a wide range

12   of advantages with different body types and different

13   biology, and so they use language like disproportionate

14   when they want to talk about something that's --- that's

15   --- that's systematically associated with one

16   circumstance in a way that they think would violate the

17   rules, whatever they might be, for a specific sport.

18       Q.    That's pretty ambiguous.  I have no idea what

19   that means.  Let me see if we can narrow it down.  Is a

20   disproportionate competitive advantage in performance

21   --- would 20 percent be a disproportionate competitive

22   advantage?

23                    ATTORNEY BLOCK:  Objection to form.

24                    THE WITNESS:  So that's --- I can't

1  answer that, because it depends on context, and I'm not

2  the person who wrote the specific language in that

3  document, so that is the quote from the document.  But

4  in terms of --- I don't --- I think we go someplace we

5  don't want to go if we try to over define the specific

6  word disproportionate.

7  BY ATTORNEY TRYON:

8     Q.    So it's just not something that you or I could

9  look at and reach any kind of conclusion to tell them

10 what that means sitting here today.

11        Is that right?

12    A.    I think if we look at a specific sport, I think

13 that if it was limited to just the two of us we might

14 need more expertise to make a decision.

15    Q.    Well, let's say if we talked about the one mile

16 --- running one mile, is that something that we could

17 then determine what disproportionate competitive

18 advantage and performance would mean?

19            ATTORNEY BLOCK:  Objection to form.

20            THE WITNESS:  It would depend on context.

21 And if we're talking about at the elite level which is

22 what the IOC references and we limited --- even then if

23 we limit it just to you and to myself, we would want

24 more expertise.

BY ATTORNEY TRYON:

Q.    Right.  Okay.

So we don't know what the IOC meant by this in any particular context do we?

ATTORNEY BLOCK:  Objection to form.

ATTORNEY TRYON:  Actually, let me redraw this question.

BY ATTORNEY TRYON:

Q.    You as an expert would not be able to give me an expert opinion on what disproportionate competitive advantage in performance of the one mile run would be; right?  You could not give me an expert opinion on that.

Fair statement?

A.    If you break the words out in that --- in that fashion then it does become difficult.  If you ask me what the entire statement after the letter A is referencing, I can at least explain some of the thought process for the IOC there.

Q.    Well, my question is simply, you as an expert, are you able to tell me what --- able to define for me what would be a consistent, unfair disproportionate competitive advantage in performance in a one mile run for the IOC?

ATTORNEY BLOCK:  Objection to form.

1          THE WITNESS:   I, as an expert, cannot

2     give you a blanket explanation of what would

3     specifically consist of --- what would specifically meet

4     that definition.   When they wrote the statement they

5     didn't actually even have specific guidance, that is

6     simply the spirit of a guideline --- the spirit of what

7     a specific guideline should consider when that guideline

8     is made.

9     BY ATTORNEY TRYON:

10         Q.    Do you know what they meant when they said

11    unfair?

12         A.    So the --- it's kind of the same circumstance.

13    That is the purpose of this statement is to be global

14    guidance for the experts in the specific sport when they

15    might develop guidelines relevant to their specific

16    sport.   So for example, the group with expertise in that

17    one mile run that you're referencing should think in

18    this context.   That's all this is doing.

19         Q.    And some of the sporting organizations have come

20    up with some very specific rules.

21              Correct?

22         A.    Some of the sporting federations have come up

23    with specific rules, yes.

24         Q.    And as I recall, some of them require a certain

```
 1    level of circulating testosterone.
 2            Is that right?
 3       A.    Some of the sporting federations use a certain
 4    level of circulating hormone as part or all of their
 5    roles.
 6       Q.    And some of them use the level that you've
 7    mentioned that you were involved in setting, which was 5
 8    Nmol --- say it for me.  Nmol something.
 9       A.    Nmol/Ls per liter.  Yes, some of them use that
10    nmol/L per liter threshold.
11       Q.    Did they --- where did they get that 5 nmol/L
12    quantity, do you know?
13                   ATTORNEY BLOCK:  Objection to form.
14                   THE WITNESS:  So I do know where that
15    number comes from originally for World Athletics, which
16    is the first one to put that number out.  And that
17    number comes from studies of some Olympic athletes in
18    some races where there was for at least certain
19    distances a demonstrable difference between people who
20    had --- and specifically people in the female category
21    who had lower numbers of testosterone than that and
22    higher numbers of testosterone than that.
23    BY ATTORNEY TRYON:
24       Q.    You were on that committee.
```

1          Right?

2     A.     I was on the group that wrote that World

3     Athletics policy, yes.  Not on the group that did that

4     study.

5     Q.     And so how did you finally come up with the

6     number of five as opposed to four or six or three or

7     seven?

8     A.     The number five discriminates in terms --- in

9     terms of there being some demonstrated advantage or

10    improved outcome is really what it was, for those with

11    higher numbers versus those with lower numbers.  That

12    was not true necessarily with a lower testosterone

13    threshold.  That is a difference was not as apparent and

14    that's really the entire logic pattern there.

15    Q.     Well, earlier you just said it could have been

16    --- you didn't think there was that much difference

17    between five and six.  That was your testimony earlier

18    as I recall.

19         Right?

20              ATTORNEY BLOCK:  Objection.

21              THE WITNESS:  As an endocrinologist I can

22    tell you that those difference --- that that's right

23    that to --- the difference between five and six would be

24    hard to demonstrate.

BY ATTORNEY TRYON:

Q.    So how did you settle on five instead of six or five or six instead of four?

A.    So I guess the inputs are that there needed to be a line so that there's ability to enforce something. There needed to be a rule.  And the choice of five, mostly, is what I've been saying already, which is --- it's a clean number where there's at least some distances, there's a demonstrable difference in outcomes at that level --- above and below that level.

Q.    So are you saying that there is a value of having a hard rule?

                    ATTORNEY BLOCK:  Objection to form.

BY ATTORNEY TRYON:

Q.    Maybe I should say having a clean rule?

A.    So as an expert I'm not --- that wasn't my role on the committee to determine that there needed to be a rule, but that is certainly the logic pattern of the committee that there ought to be a rule.  That is not my expert opinion.

Q.    Okay.

      But different organizations are free to come up with different conclusions of about what their rules ought to be.

1        Right?

2                    ATTORNEY BLOCK:  Objection to form.

3                    THE WITNESS:  So the different

4   International Athletic Federations were to make use of

5   data such as it exists to make their own rules for

6   participation in their sports.

7   BY ATTORNEY TRYON:

8      Q.    And different organizations came up with very

9   different rules.

10         Right?

11                   ATTORNEY BLOCK:  Objection to form.

12                   THE WITNESS:  So most of the

13  international federations still do not have rules,

14  actually.  And honestly, that's mostly a logistics

15  situation where some of these organizations are too

16  small to put the data together or the committees

17  together to make rules.

18  BY ATTORNEY TRYON:

19     Q.    Those that do have rules have different rules.

20         Correct?

21     A.    Those that do have rules have had different

22  conversations in the space.  I don't know that I could

23  systematically go through all of them, but there is some

24  variation, yes.

1    Q.    Some require --- have a Level 5 nanomoles per

2    liter and some still have ten.

3         Right?

4    A.    So I'd have to go back and look.  You would have

5    to show me.  World Athletics has five for sure.  And

6    that's the one where I'm most familiar because I was

7    actually sitting in the room helping draft that.  The

8    IOC in the past had used ten as a line, but that just

9    sits there right now as a --- as a number someone might

10   adopt.  I actually don't know off the top of my head if

11   anybody has adopted that for their formal rules.

12   Q.    What was the scientific basis for the ten

13   nanomoles per liter?

14   A.    The logic for ten at the time is it is the

15   bottom of the male range.  That's its history.

16   Q.    Okay.

17        So it sounds to me like there is room for

18   reasonable discussion about what the appropriate rule

19   ought to be?

20             ATTORNEY BLOCK:  Objection to form.

21             THE WITNESS:  The way I would say it is

22   as different athletic organizations obtain data, they

23   might use those data to determine differences, including

24   if the --- if our best measure is testosterone,

1  different thresholds of testosterone.

2  BY ATTORNEY TRYON:

3      Q.    Would it be appropriate to use performance data

4  as well to make those decisions?

5      A.    The best data in my opinion are actual outcomes

6  within a given sport.

7      Q.    What do you mean by outcomes, performance?  Are

8  we saying the same thing?

9      A.    I don't know if we're saying the same thing.  So

10  the studies that I reference are the Roberts study and

11  the Harper study, where they actually look at specific

12  athletic endeavors and measure those as opposed to the

13  studies where they're simply sitting in a physiology lab

14  measuring somebody move an arm back and forth and

15  thinking that it might associate with some actual

16  athletic performance.

17      Q.    Somebody moving their arm back and forth with

18  weights, that's not athletic?

19      A.    It's --- again, it would --- right, that's ---

20  that's only --- that's what we would call a surrogate

21  endpoint where you are simply looking at something that

22  might correlate with what you want, but --- but you

23  don't know it until you test it.  It ends up being what

24  we call hypothesis generating.  That is how we would say

1  it in a scientific way.

2      Q.   And the same would hold true with the level of

3  circulating testosterone, you would want to actually

4  test that in real life to see how people's circulating

5  testosterone actually translates into performance of an

6  actual athletic contest.

7          Right?

8      A.   That's right.  So the data that were used to

9  determine the five nanomole per liter cut point are

10  passively collected data.  And if somebody did a study

11  looking at that threshold and found that there was,

12  let's say, no difference, then that rule might be

13  discarded.

14     Q.   And so far, other than Roberts and Harper, if I

15  recall correctly, those are the only two that you know

16  of.

17          Right?

18              ATTORNEY BLOCK:  Objection to form.

19              THE WITNESS:  Those are the only two

20  studies that have gone that extra step and looked at an

21  actual athletic activity with an outcome that is part of

22  that athletic activity and not what I was just

23  referencing, as a surrogate endpoint.

24  BY ATTORNEY TRYON:

1     Q.    In those two studies did they check the

2  circulating testosterone in the individuals in these

3  studies?

4     A.    I'd have to look.  I think we did look earlier

5  today with regard to the Harper study, and I don't think

6  she's referencing testosterone levels at all.  Again,

7  I'd have to go back and look to be sure.  We were

8  talking about whether they were self-reported.  And the

9  --- with the Robert study I would have to go back and

10  look at that one, too.  I'm feeling like the answer is

11  no, but we can look there if you want.

12     Q.    Yeah, we don't need to.  I'm pretty sure that we

13  just talked about how long they had been in the therapy

14  rather than actual measurements.

15          Well, let me move on.  I know we don't have a

16  lot of time left.

17          So you said you're familiar in your expert

18  report you are familiar with HB-3293.

19          Is that right?

20               ATTORNEY BLOCK:  Objection to form.

21               THE WITNESS:  So yes, I'm somewhat

22  familiar.

23  BY ATTORNEY TRYON:

24     Q.    Have you read the whole thing?

1     A.     I don't think I've read the whole thing, no.

2     Q.     When did you first hear of HB-3293?

3     A.     I probably first heard of it when the --- when I

4  received contact from the ACLU to serve as an expert

5  witness.

6     Q.     Do you recall if that was before or after it was

7  passed?

8     A.     I don't recall.  I would have to speculate that

9  it would be after, because that would --- I mean that

10  would make sense that that is true, but I don't recall,

11  so I wouldn't be able to answer that.

12     Q.     Okay.

13           So we would refer to this as State Women's

14  Sports Law and there's other types of laws like this

15  throughout the country.

16           Are you aware of that?

17                 ATTORNEY BLOCK:  Objection to form.

18                 THE WITNESS:  So I'm aware that there are

19  attempts at legislation and some actual legislation

20  passed to block transgender athletes in various

21  permeations, including transgender women in several

22  states.  I'm aware of that, yes.

23  BY ATTORNEY TRYON:

24     Q.     Are you aware then House Bill 3293 the word

```
 1   transgender does not appear at all?
 2      A.    House Bill --- that's this one?
 3      Q.    That is this one.
 4      A.    I was not aware that the word transgender does
 5   not appear at all.
 6      Q.    Are you tracking the other bills out there that
 7   are similar to House Bill 3293?
 8      A.    I am not personally tracking the other bills,
 9   no.
10      Q.    Can you take a look at the Handelsman report
11   that you have in front of you.  I don't recall the
12   exhibit number.
13              ATTORNEY WILKINSON:  I think Exhibit 13
14   --- oh, sorry, it's Exhibit 4, I think.
15              THE WITNESS:  I don't see.
16              ATTORNEY WILKINSON:  I can give you that.
17              THE WITNESS:  The stack got big.
18              ATTORNEY TRYON:  We can just bring it ---
19   if you can't find it we can bring it up on the screen?
20              THE WITNESS:  Okay.
21              I was given another copy, so we're good.
22   I have it in front of me.
23   BY ATTORNEY TRYON:
24      Q.    Okay.
```

1          On the second page?

2     A.    On the second page.

3     Q.    Okay.

4          Under fairness and segregation in sports.

5          Do you see that section?

6     A.    I do.

7     Q.    In the third full paragraph underneath there ---

8 oh the formatting there is a little different than the

9 copy that I have.  Let's see.  There's a paragraph that

10 starts the terms sex and gender.  There it is.  The

11 terms sex and gender are often confused as

12 interchangeable.  Now, I want you to focus on this next

13 sentence.  Sex is an objective specific biological

14 state, a term with distinct fixed facets notably

15 genetic, chromosomal, gonadal, hormonal and phenotypic

16 including genital sex, each of which has a

17 characteristic defined binary form.  Did I read that

18 correctly?

19    A.    You read that correctly, yes.

20    Q.    Do you agree with that statement?

21    A.    I don't agree with that statement completely,

22 no.

23    Q.    What specifically do you find objectionable.

24    A.    It's missing some components of sex, including,

1  for example gender identity.  And the phrasing

2  characteristic defined binary form is not necessarily

3  true for each component of biological sex.

4      Q.    So you disagree with the statement in the

5  Handelsman report, is that --- did I state that fairly?

6      A.    Right.  I would characterize the statement as

7  not exhaustive.

8              ATTORNEY TRYON:  Let me ask the court

9  reporter if I have any time.

10             COURT REPORTER:  I have six minutes and

11  58 --- six hours and 58 minutes.

12             ATTORNEY TRYON:  Well, I guess with my

13  last two minutes I'll just say thank you for your time

14  and I appreciate it.  And I don't have any other

15  questions.  I don't know if any of the other Defendants

16  do.  I doubt it.  But go ahead.  If they do, go ahead.

17  Kelly?

18             ATTORNEY MORGAN:  This is Kelly Morgan.

19  I don't have any questions.  Thank you so much.

20             ATTORNEY TRYON:  Roberta?  Susan, you're

21  next.

22             ATTORNEY GREEN:  This is Roberta Green on

23  the behalf of the SSAC.  No questions.  Thank you.

24             ATTORNEY DENIKER:  Dr. Safer, this is

289

1    Susan Deniker.  I have no questions.  Thank you for your

2    time today.

3                    ATTORNEY TRYON:  We are finished.

4                    VIDEOGRAPHER:  This concludes this

5    deposition.  The current time reads 6:31 p.m. Eastern

6    Standard Time.

7                        *  *  *  *  *  *  *

8         VIDEOTAPED DEPOSITION CONCLUDED AT 6:31 P.M.

9                        *  *  *  *  *  *  *

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

1

1    STATE OF WEST VIRGINIA  )

2                     CERTIFICATE

3              I, Nicole Montagano, a Notary Public in

4    and for the State of West Virginia, do hereby

5    certify:

6              That the witness whose testimony appears

7    in the foregoing deposition, was duly sworn by me

8    on said date, and that the transcribed deposition

9    of said witness is a true record of the testimony

10   given by said witness;

11             That the proceeding is herein recorded

12   fully and accurately;

13             That I am neither attorney nor counsel

14   for, nor related to any of the parties to the

15   action in which these depositions were taken, and

16   further that I am not a relative of any attorney

17   or counsel employed by the parties hereto, or

18   financially interested in this action.

19             I certify that the attached transcript

20   meets the requirements set forth within article

21   twenty-seven, chapter forty-seven of the West

22   Virginia.

23

24                               Nicole Montagano,

25                               Court Reporter

Exhibit

4

# Circulating Testosterone as the Hormonal Basis of Sex Differences in Athletic Performance

David J. Handelsman,[1,2] Angelica L. Hirschberg,[3,4] and Stephane Bermon[5,6]

[1]ANZAC Research Institute, University of Sydney, Concord, New South Wales 2139, Australia; [2]Department of Andrology, Concord Hospital, Sydney, New South Wales 2139, Australia; [3]Department of Women's and Children's Health, Karolinska Institutet, 171 76 Stockholm, Sweden; [4]Department of Gynecology and Reproductive Medicine, Karolinska University Hospital, 171 76 Stockholm, Sweden; [5]Laboratoire Motricité Humaine, Education, Sport, Santé, Université Côte d'Azur, 06000 Nice, France; and [6]Health and Science Department, International Association of Athletics Federations, 98000 Monaco

Downloaded from https://academic.oup.com/edrv/article/39/5/803/5052770 by guest on 25 September 2020

**ABSTRACT** Elite athletic competitions have separate male and female events due to men's physical advantages in strength, speed, and endurance so that a protected female category with objective entry criteria is required. Prior to puberty, there is no sex difference in circulating testosterone concentrations or athletic performance, but from puberty onward a clear sex difference in athletic performance emerges as circulating testosterone concentrations rise in men because testes produce 30 times more testosterone than before puberty with circulating testosterone exceeding 15-fold that of women at any age. There is a wide sex difference in circulating testosterone concentrations and a reproducible dose-response relationship between circulating testosterone and muscle mass and strength as well as circulating hemoglobin in both men and women. These dichotomies largely account for the sex differences in muscle mass and strength and circulating hemoglobin levels that result in at least an 8% to 12% ergogenic advantage in men. Suppression of elevated circulating testosterone of hyperandrogenic athletes results in negative effects on performance, which are reversed when suppression ceases. Based on the nonoverlapping, bimodal distribution of circulating testosterone concentration (measured by liquid chromatography–mass spectrometry)—and making an allowance for women with mild hyperandrogenism, notably women with polycystic ovary syndrome (who are overrepresented in elite athletics)—the appropriate eligibility criterion for female athletic events should be a circulating testosterone of <5.0 nmol/L. This would include all women other than those with untreated hyperandrogenic disorders of sexual development and noncompliant male-to-female transgender as well as testosterone-treated female-to-male transgender or androgen dopers. *(Endocrine Reviews 39: 803 – 829, 2018)*

V irtually all elite sports are segregated into male and female competitions. The main justification is to allow women a chance to win, as women have major disadvantages against men who are, on average, taller, stronger, and faster and have greater endurance due to their larger, stronger muscles and bones as well as a higher circulating hemoglobin level. Hence, elite female competition forms a protected category with entry that must be restricted by an objective eligibility criterion related, by necessity, to the relevant sex-specific physical advantages. The practical need to establish an eligibility criterion for elite female athletic competition led the International Association of Athletic Federations (IAAF) to establish a rule in 2011, endorsed by the International Olympic Committee (IOC) in 2012, for hyperandrogenic women. That

IAAF regulation stated that for athletes to be eligible to compete in female events, the athlete must be legally recognized as a female and, unless she has complete androgen insensitivity, maintain serum testosterone <10 nmol/L. That IAAF eligibility rule was challenged by an athlete to the Court for Arbitration in Sports, which ruled in 2015 that, although an eligibility criterion was justified, there was insufficient evidence of the extent of the competitive advantage enjoyed by hyperandrogenic athletes who had circulating testosterone >10 nmol/L over female athletes with circulating testosterone in the normal female range. The Court for Arbitration in Sports suspended the rule pending receipt of such evidence. In that context, the present review presents the available evidence on the hormonal basis for the sex difference

ISSN Print: 0163-769X
ISSN Online: 1945-7189
Printed: in USA
Copyright © 2018
Endocrine Society
This article has been published under the terms of the Creative Commons Attribution License (CC BY; https://creativecommons.org/licenses/by/4.0/).
Received: 28 January 2018
Accepted: 18 June 2018
First Published Online: 13 July 2018

Downloaded from https://academic.oup.com/edrv/article/39/5/803/5052770 by guest on 25 September 2020

**ESSENTIAL POINTS**

- It is widely accepted that elite athletic competitions should have separate male and female events
- The main justification is that men's physical advantages in strength, speed, and endurance mean that a protected female category, with objective entry criteria, is required
- Prior to puberty, there is no sex difference in circulating testosterone concentrations and athletic performance
- From male puberty onward, the sex difference in athletic performance emerges as circulating testosterone concentrations rise as the testes produce 30 times more testosterone than before puberty, resulting in men having 15- to 20-fold greater circulating testosterone than children or women at any age
- This wide, bimodal sex difference in circulating testosterone concentrations and the clear dose-response relationships between circulating testosterone and muscle mass and strength, as well as the hemoglobin level, largely account for the sex differences in athletic performance
- Based on the nonoverlapping, bimodal distribution of circulating testosterone concentration (measured by liquid chromatography–mass spectrometry) with 95% references ranges of 7.7 to 29.4 nmol/L in healthy men and 0 to 1.7 nmol/L in healthy premenopausal women—making an allowance for women with the mild hyperandrogenism of polycystic ovary syndrome, who are overrepresented in elite athletics—the eligibility criterion for female athletic events should be a circulating testosterone concentration of <5.0 nmol/L

in athletic performance. It concludes that the evidence justifies a revised eligibility criterion of a threshold circulating testosterone concentration of 5 nmol/L (measured by a mass spectrometry method).

## Sex, Fairness, and Segregation in Sport

If sports are defined as the organized playing of competitive games according to rules (1), fixed rules are fundamental in representing the boundaries of fair sporting competition. Rule breaking, whether by breaching eligibility or competition rules, such as use of banned drugs, illegal equipment, or match fixing, creates unfair competitive advantages that violate fair play. Cheating constitutes a fraud against not just competitors but also spectators, sponsors, the sport, and the public. In the absence of genuine fair competition, elite sports would lose their wide popular appeal and ability to captivate and inspire with the authentic attraction of genuine contest between highly trained athletes.

Nevertheless, fairness is an elusive, subjective concept with malleable boundaries that may change over time as social concepts of fairness evolve. For example, until the late 19th century when organized sports trainers emerged, training itself was considered a breach of fairness because competition was envisaged at that time as a contest based solely on natural endowments. Similarly, sports once distinguished between amateurs and professionals. The concept of fairness has deep and complex philosophical roots mainly focused on notions of distributive justice. These considerations affect sports through the universal application of antidiscrimination and human rights legislation. Less attention is given to the philosophical basis of fair competition in elite sports, where the objectives are not egalitarian but aim to discover a hierarchy of achievement derived

from a mixture of unequal natural talent and individual training effort. Excellent, insightful discussion of the legal and moral complexities of sex and fair competition in elite sports from a legal scholar and former elite female athlete is available (2).

The terms *sex* and *gender* are often confused and used as if interchangeable. *Sex* is an objective, specific biological state, a term with distinct, fixed facets, notably genetic, chromosomal, gonadal, hormonal, and phenotypic (including genital) sex, each of which has a characteristic defined binary form. Whereas all facets of biological sex are almost always aligned so that assignment of sex at birth is straightforward, rare instances in which two or more facets of biological sex conflict constitute an intersex state, now referred to as disorders (or differences) of sex development (DSDs) (3). In contrast, *gender* is a subjective, malleable, self-identified social construct that defines a person's individual gender role and orientation. Prompted by biological, personal, and societal factors, volitional expression of gender can take on virtually any form limited only by the imagination, with some individuals asserting they have not just a single natal gender but two genders, none, a distinct third gender, or gender that varies (fluidly) from time to time. Hence, whereas gender is usually consistent with biological sex as assigned at birth, in a few it can differ during life. For example, if gender were the basis for eligibility for female sports, an athlete could conceivably be eligible to compete at the same Olympics in both female and male events. These features render the unassailable personal assertion of gender identity incapable of forming a fair, consistent sex classification in elite sports.

The strongest justification for sex classification in elite sports is that after puberty men produce 20 times more testosterone than women (4–7), resulting in circulating testosterone concentrations 15-fold higher than in children or women of any age. Age-grade competitive sporting records show no sex differences prior to puberty, whereas from the age of male puberty onward there is a strong and ongoing male advantage (8). The striking male postpubertal increase in circulating testosterone provides a major, ongoing, cumulative, and durable physical advantage in sporting contests by creating larger and stronger bones, greater muscle mass and strength, and higher circulating hemoglobin as well as possible psychological (behavioral) differences. In concert, these render women, on average, unable to compete effectively against men in power-based and endurance-based sports.

Sex classification in sports therefore requires proof of eligibility to compete in the protected (female) category. This deceptively simple requirement for fairness is taken for granted by peer female competitors who regard participation by males, or athletes with physical features closely resembling males, as unfair. This makes policing of eligibility inescapable for sports, to avoid unfair male participation in female events. However, such policing inevitably intrudes into highly personal matters so that it must be achieved with respect for dignity and privacy, demanding use of the least invasive, scientifically reliable means. Unsurprisingly, this dilemma has always been highly contentious since it first entered international elite sports in the early 20th century, and it has become increasingly prominent and contentious in recent decades; nevertheless, the requirement to maintain fair play in female events will not disappear as long as separate female competitions exist. During recent decades, there has been progressively better understanding of the complex biology of genetic sex determination and the impact of pubertal sexual maturation in establishing phenotypic sexual dichotomy in physical capabilities. These sex-dichotomous physical features form the basis of, but remain quite distinct from, adult gender roles and identity. During the last century, as knowledge grew, the attempts to formalize a scientific basis for the unavoidable necessity of policing eligibility for the female category have been continually challenged. Most recently, the increasing assertion of gender self-identification as a social criterion has further challenged the hegemony of biology for determining "sports sex," Coleman's apt term (2). Allowing subjective gender self-identification to become the sole criterion of sports sex would allow for gaming and perceptions of systematic unfairness to grow. The case for women's sports being defined by sex rather than gender, including the consequences of acceding to gender-based classification, has been outlined (9) in arguing the importance of proper medical management of athletes intending to compete in female events.

Separate male and female events in sports is a dominant form of classification that is superimposed on other graduated age group and weight classifications (e.g., in weightlifting, power lifting, wrestling, boxing, rowing), which reflect differences in strength, power, and speed to ensure fairness in terms of opportunity to win and, additionally, safety in contact sports. Age and weight classifications rely on objective criteria (birth date, weigh-in weight) for eligibility, and so should sex classification. Nevertheless, some power sports dependent on explosive strength and power (e.g., throwing events, sprinting) do not segregate weight classes, whereas other sports where height is an advantage (e.g., basketball, jockeys) do not have height classifications. These sports disproportionately attract athletes with greater weight and/or power-to-weight ratio or advantageous stature, respectively. If sex classification were eliminated, such open or mixed competitions would be dominated almost exclusively by men. It therefore seems highly unlikely that sex classification would ever be discarded, despite calls on philosophical or sociological grounds to end "gender" classification in sport (10).

## Sex Difference in Circulating Testosterone Levels

### Testosterone biosynthesis, secretion, and regulation in men and women

An androgen is a hormone capable of developing and maintaining masculine characteristics in reproductive tissues (notably the genital tract, as well as in other tissues and organs associated with secondary sexual characteristics and fertility) and contributing to the anabolic status of nonreproductive body organs (11). The two dominant bioactive androgens circulating in mature mammals, including humans—testosterone and its more potent metabolite DHT—account for the development and maintenance of all androgen-dependent characteristics, and their circulating levels in men and nonpregnant women arise from steroids synthesized de novo in the testes, ovary, or adrenals (12).

The sexually undifferentiated gonads in the embryo develop into either ovaries or testes according to whether a Y chromosome (or at least the sry gene) is present. After birth and until puberty commences, circulating testosterone concentrations are essentially the same in boys and girls, other than briefly in the neonatal period of boys when higher levels prevail. The onset of male puberty, a brain-driven process triggered by a still mysterious hypothalamic or higher cerebral mechanism (13), initiates a hormonal cascade. In males, this leads to enhanced pituitary LH secretion that stimulates the 500 million Leydig cells in the testes

Downloaded from https://academic.oup.com/edrv/article/39/5/803/5052770 by guest on 25 September 2020

to secrete 3 to 10 mg (mean, 7 mg) of testosterone daily (4, 6, 7, 14, 15). This creates a very high local concentration of testosterone within the testis as well as a steep downhill concentration gradient into the bloodstream that maintains circulating testosterone levels at adult male levels, which are tightly regulated by strong negative hypothalamic feedback of circulating testosterone. In the absence of testes, these mechanisms do not function in females. In girls, serum testosterone increases during puberty (16), peaking at age 20 to 25 years before declining gradually with age (17, 18), but it remains <2 nmol/L at all ages, as determined by a reliable method (see below).

In adult women, circulating testosterone is derived from three roughly equal sources: direct secretion from the adrenal gland or the ovary and indirect extraglandular conversion (in liver, kidney, muscle, fat, skin) from testosterone precursors secreted by the adrenal and ovary. Only when circulating testosterone concentrations rise in male adolescents above the prepubertal concentrations does the virilization characteristic of men commence, progress, and endure throughout adult life, at least until old age (18). In combination, these different sources produce ~0.25 mg of testosterone daily so that throughout life women maintain circulating testosterone levels of <2 nmol/L. Circulating testosterone concentrations in women are subject to little dynamic physiological regulation. As a result, circulating testosterone concentrations in healthy premenopausal women are stable (nonfluctuating) and not subject to strong negative feedback by exogenous testosterone (as happens in men). Even the small rise (50%) at the time of the mid-cycle LH surge triggering ovulation (19) remains within the physiological range for premenopausal females.

**Male and female reference ranges for circulating testosterone**

A reliable threshold for circulating testosterone must be set using measurement by the reference method of liquid chromatography–mass spectrometry (LC-MS) rather than using one of the various available commercial testosterone immunoassays. The necessary reliance on steroid mass spectrometry for clinical applications in endocrinology, reproductive medicine, and sports medicine is widely recognized. It has been standard for decades in antidoping science (20), and the growing consensus is that it is required for high-quality clinical research and practice recognized by cognate professional societies (21, 22) and editorials in leading clinical endocrinology (23) and reproductive medicine (24) journals. The inherently limited specificity of testosterone immunoassays arises from antibody cross-reactivity with structurally related steroids (such as precursors and metabolites) other than the intended target. As a result, all steroid immunoassays, including for testosterone, display method-specific bias whereby, for example, the lower limit of a

testosterone reference range in healthy young men varies from 7.3 to 12.6 nmol/L according to the immunoassay used, so that no consensus definition of a lower limit could be obtained independent of the commercial immunoassay method used (25). Furthermore, testosterone immunoassays are optimized for circulating levels in men but display increasing inaccuracy at the lower, by an order of magnitude, circulating testosterone concentrations in women or children. In contrast to immunoassays, LC-MS–based methods are highly specific and do not depend on proprietary antibodies. Using LC-MS–based measurements, method-specific bias can be avoided and a fixed consensus lower reference limit defined (Table 1). Hence, for the precision required in sports medicine, whether for eligibility criteria or antidoping applications, testosterone in serum must be measured by LC-MS methods.

Prior to puberty, levels of circulating testosterone as determined by LC-MS are the same in boys and girls (16). They remain lower than 2 nmol/L in women of all ages. However, from the onset of male puberty the testes secrete 20 times more testosterone resulting in circulating testosterone levels that are 15 times greater in healthy young men than in age-similar women. Using LC-MS measurement, circulating testosterone in adults has a strikingly nonoverlapping bimodal distribution with wide and complete separation between men and women. Table 1 (25–36) summarizes data from appropriate reported studies using mass spectrometry–based methods to measure serum testosterone in healthy men and women. Based on a number-weighted pooling with conventional 95% two-sided confidence limits of the eight available studies using LC-MS measurements of serum testosterone, the reference range for healthy young men (18 to 40 years) is 7.7 nmol/L to 29.4 nmol/L. Similarly, summarizing the nine available studies for healthy menstruating women under 40 years, the 95% (two-sided) reference range is 0 to 1.7 nmol/L. These reference limits do not control for factors such as oral contraceptive use (35, 36), menstrual phase (19), SHBG (37, 38), overweight (39, 40), fasting and smoking (41), diet (40), and physical activity (42, 43) in women and men, all of which have small effects on circulating testosterone but without materially influencing the divergence between the nonoverlapping bimodal distribution of male and female reference ranges of circulating testosterone.

In creating a threshold for eligibility for female events it is also necessary to make allowance for women with polycystic ovary syndrome (PCOS) and nonclassical adrenal hyperplasia. PCOS is a relatively common disorder among women of reproductive ages with a prevalence of 6% to 10%, depending on the diagnostic criteria used (44), in which mild hyperandrogenism is a key clinical feature and has higher than expected prevalence among elite female athletes

Downloaded from https://academic.oup.com/edrv/article/39/5/803/5052770 by guest on 25 September 2020

Downloaded from https://academic.oup.com/edrv/article/39/5/803/5052770 by guest on 25 September 2020

**Table 1.** Serum Testosterone Measurements by LC-MS Methods in Studies of Healthy Men and Women

| Study | Sample (Age 18–40 y) | N | Lower 95% CL (nmol/L) | Upper 95% CL (nmol/L) |
|---|---|---|---|---|
| Men | | | | |
| Sikaris *et al.*, 2005 (25) | Elite, eugonadal | 124 | 10.4 | 30.1 |
| Turpeinen *et al.*, 2008 (26) | Convenience | 30 | 10.1 | 31.2 |
| Kushnir *et al.*, 2010 (27) | Convenience | 132 | 7.2 | 24.2 |
| Salameh *et al.*, 2010 (28) | Convenience | 264 | 7.1 | 39.0 |
| Neale *et al.*, 2013 (29) | Convenience | 67 | 10.6 | 31.9 |
| Kelsey *et al.*, 2014 (30) | Secondary pooled analysis | 1058 | 7.2 | 25.3 |
| Hart *et al.*, 2015 (31) | Birth cohort | 423 | 7.4 | 28.0 |
| Travison *et al.*, 2017 (32) | Pooled two cohorts | 1656 | 7.9 | 31.1 |
| Number-weighted mean | | | 7.7 | 29.4 |
| Women | | | | |
| Turpeinen *et al.*, 2008 (26) | Convenience | 32 | 0.8 | 2.8 |
| Kushnir *et al.*, 2010 (27) | Convenience | 104 | 0.3 | 2.0 |
| Salameh *et al.*, 2010 (28) | Convenience | 235 | 0.03 | 1.5 |
| Haring *et al.*, 2012 (33) | Population-based | 263 | 0.04 | 2.0 |
| Neale *et al.*, 2013 (29) | Convenience | 90 | 0 | 1.7 |
| Bui *et al.*, 2013 (34) | Convenience | 25 | 0.30 | 1.69 |
| Rothman *et al.*, 2013 (19) | Convenience | 31 | 0.4 | 0.92 |
| Bermon and Garnier, 2017 (35) | Elite athletes | 1652 | 0 | 1.62 |
| Eklund *et al.*, 2017 (36) | Elite athletes and controls | 223 | 0.26 | 1.73 |
| Number-weighted mean | | | 0.06 | 1.68 |

Abbreviation: CL, confidence limit.

(36, 45–47). Nonclassical adrenal hyperplasia is a milder and later (adult) onset variant of classical congenital adrenal hyperplasia (48) with a much higher but still rare population prevalence (1:1000 vs 1:16,000 for the classical variant) (49). Table 2 (50–64) summarizes clinical studies (n = 16, ≥40 women) reporting serum testosterone concentrations measured by LC-MS in samples from women with PCOS.

The pooled data reveal that the upper limit of serum testosterone in women with PCOS is 3.1 nmol/L (95% CI, one-sided) or 4.8 nmol/L (using a 99.99% CI, one-sided) (Table 3). Hence, a conservative threshold for circulating testosterone of 5 nmol/L measured by LC-MS would identify <1:10,000 women with PCOS as false positives, based on circulating testosterone measurement alone. Circulating testosterone higher than this threshold is likely to be due to testosterone-secreting adrenal or ovarian tumors, intersex/DSD, badly controlled or noncompliant male-to-female (M2F) transgender athletes, or testosterone doping.

### The physiological effects of testosterone depend on the circulating testosterone, not its source (endogenous or exogenous)

Testosterone, whether of a natural endogenous or manufactured exogenous source, has an identical chemical structure and biological effects, aside from minor differences in isotopic composition, which are biologically insignificant. At equivalent doses and circulating levels, exogenous testosterone exerts the same biological and clinical effects on every known androgen-responsive tissue or organ as endogenous testosterone, apart from effects on spermatogenesis, which as discussed below is only a matter of degree. Consequently, exogenous testosterone is a fully effective substitute for endogenous testosterone in therapeutic use, countering the effects of testosterone deficiency due to hypogonadism (reproductive system disorders). Any purported differences between endogenous and exogenous testosterone are due to corresponding differences in the endogenous production rate or exogenous dose. Such differences in

REVIEW

**Table 2. Summary of Serum Testosterone (nmol/L) by LC-MS in Women With PCOS From 16 Studies**

Data taken directly from paper or interpolated from other data (*e.g.*, median, quartiles, ranges, sample size) supplied as described by Wan *et al.*, 2014 (Estimating the sample mean and standard deviation from the sample size, median, range and/or interquartile range. BMC Med Res Methodol 14: 135) are shown in italics.

| Study | N | Mean | SD |
|---|---|---|---|
| Moran *et al.*, 2017 (50) | 92 | *0.24* | *0.08* |
| Münzker *et al.*, 2017 (51) | 274 | *0.93* | *0.19* |
| O'Reilly *et al.*, 2017 (52) | 114 | 0.55 | 0.19 |
| Handelsman *et al.*, 2017 (53) | 152 | 0.38 | 0.25 |
| Pasquali *et al.*, 2016 (54) | 156 | 1.17 | 0.47 |
| Yang *et al.*, 2016 (55) | 1159 | 2.2 | 1.44 |
| Tosi *et al.*, 2016 (56) | 116 | 1.33 | 0.55 |
| Daan *et al.*, 2015 (57) | 170 | *1.64* | 0.53 |
| Bui *et al.*, 2015 (58) | 44 | 0.85 | 0.3 |
| Keefe *et al.*, 2014 (59) | 52 | *1.7* | 0.97 |
| Yasmin *et al.*, 2013 (60) | 165 | 1.99 | 1.02 |
| Janse *et al.*, 2011 (61) | 200 | *1.12* | 0.47 |
| Jedel *et al.*, 2011 (62) | 72 | 0.23 | 0.08 |
| Legro *et al.*, 2010 (Mayo) (63) | 596 | 2.12 | 0.89 |
| Legro *et al.*, 2010 (Quest) (63) | 596 | *1.98* | 0.97 |
| Stener-Victorin *et al.*, 2010 (64) | 74 | 1.53 | 0.62 |
| Sum | 4032 | | |
| Number-weighted mean | | 1.69 | 0.87 |

Downloaded from https://academic.oup.com/edrv/article/39/5/803/5052770 by guest on 25 September 2020

effective exposure lead to corresponding differences in circulating testosterone levels and its effects according to the dose-response curves for testosterone.

Similar to all hormones and drugs, over their effective range of biological activity the dose-response relationship for testosterone is usually a sigmoidal curve with lower and upper plateaus joined by a monotonically rising middle region, which may be linear in the natural scale but more often log-linear (linear on the log or similar transformed scale). In the middle portion of the typical sigmoidal dose-response curve for the same increase in testosterone dose (or concentration), the response would be increased in simple proportional (*i.e.*, linear) but more often on a logarithmic scale. In contrast, at the lower and upper plateaus of dose or concentrations, changes in testosterone exposure may evoke minimal or no response on the endpoint. For example, in women of any age circulating testosterone concentrations are along the lower plateau of the dose-response curve, so that increases in circulating testosterone concentrations within that lower plateau may have minimal or no effect. In female athletes with the mild hyperandrogenism of PCOS, higher performance has been shown (47), with their muscle mass and power performance correlating with androgen levels (36).

However, beyond these effects where endogenous testosterone concentrations are in the high-normal adult female range, it is only when the increases in circulating testosterone concentrations substantially and consistently exceed those prevailing in childhood (<2 nmol/L) and among women including those with PCOS (<5 nmol/L) that the effects would replicate the effects of rising testosterone concentrations of boys in middle to late puberty (typically >8 nmol/L), that is, the masculinizing effects of increased muscle, bone, and hemoglobin characteristics of men. As shown above, the circulating testosterone of most women never reaches consistently >5 nmol/L, a level that boys must sustain for some time to exhibit the masculinizing effects of male puberty.

In addition, the effects of testosterone are modulated in a form of fine tuning by the patterns of exposure, such as whether the circulating testosterone is delivered in the unphysiological steady-state format (*e.g.*, quasi–steady-state delivery by implant or transdermal products) or by the peak-and-trough delivery of injections, as opposed to the natural state of endogenous fluctuations in serum testosterone around the average adult male levels. However, these latter pattern effects are subtle and the dominant effect remains that of dose and average testosterone

REVIEW

concentrations in blood, however they arise. Furthermore, there is evidence that the androgen sensitivity of responsive tissues differs and may be optimal at different circulating testosterone concentrations (65).

Male sexual function is maintained by endogenous testosterone at adult male circulating concentrations. These effects can be replicated by exogenous testosterone if and only if it achieves comparable circulating testosterone concentrations. For example, in a well-controlled prospective study of older men with prostate cancer (66), androgen deprivation achieving castrate levels of circulating testosterone sustained during 12 months markedly suppressed sexual desire and function, whereas those effects did not occur in age-matched men having nonhormonal treatment of prostate cancer or those without prostate cancer. In healthy younger men whose endogenous testosterone was fully suppressed, sexual function completely recovered when circulating testosterone was restored to the physiological male range by administration of exogenous testosterone (67). Similar effects were also observed in healthy, middle-aged men in whom male sexual function was fully maintained (compared with placebo) during 2 years of treatment with an exogenous androgen (DHT) despite that treatment causing sustained, complete suppression of endogenous testosterone (68). This further supports the key interpretation that the biological effects of exogenous or endogenous testosterone are the same at comparable circulating levels.

Clinically, exogenous testosterone replicates fully all effects of endogenous testosterone on every reproductive and nonreproductive organ or tissue, with the sole exception of the testis. Sperm production in the testis requires a very high concentration of testosterone (typically 100-fold greater than in the general bloodstream), which is produced in nature only by the action of the pituitary hormone LH. LH stimulates the Leydig cells in the interstitial space of the testis between seminiferous tubules to produce high intratesticular concentrations of testosterone, which are necessary and sufficient to initiate and maintain sperm production in the adjacent seminiferous tubules. This high concentration of testosterone also provides a downhill gradient to supply the rest of the body, where circulating testosterone acts on androgen-responsive tissues to produce and maintain masculine patterns of androgenization. When exogenous testosterone (or any other androgen) is administered to men, pituitary LH is suppressed by negative feedback and the sperm production halts for as long as exogenous testosterone or androgen exposure continues, after which it recovers (69). However, even the reduction in spermatogenesis and testis size when men are treated with exogenous testosterone is only a matter of degree. It is well established in rodents (70, 71) that spermatogenesis is induced by exogenous testosterone when the testosterone concentrations in the testis are high enough to replicate what occurs naturally via LH stimulation (72). However, direct replication that high-dose testosterone also initiates and maintains spermatogenesis in humans is not feasible, as these testosterone doses are 10- to 100-fold higher than could be safely given to humans. Nevertheless, confirmatory evidence in humans is available from rare cases of men with an activating mutation of the chorionic gonadotropin/LH receptor (73, 74). This mutation causes autonomous testicular testosterone secretion leading to precocious puberty arising from the premature adult male circulating testosterone concentrations that lead to complete suppression of circulating gonadotropin (LH, FSH) secretion. In this illustrative case the testis was exposed to non-physiologically high testosterone concentrations (but without any gonadotropin stimulation) that induced sperm production and allowed for natural paternity (73). This indicates that even for spermatogenesis, exogenous testosterone can replicate all biological effects of endogenous testosterone in accordance with the relevant dose-response characteristics.

The most realistic view is that increasing circulating testosterone from the childhood or female range to the adult male range will have the same physiological effects whether the source of the additional testosterone is endogenous or exogenous. This is strongly supported by well-established knowledge about the relationship of circulating testosterone concentrations

**Table 3.** Upper Confidence Limits on Serum Testosterone in Women With PCOS

| Confidence Interval | Likelihood[a] | SD[b] | One-Sided[c] | Two-Sided[c] |
|---|---|---|---|---|
| 95% | 1:20 | 1.96 | 3.13 | 3.39 |
| 99% | 1:100 | 2.35 | 3.47 | 3.73 |
| 99.9% | 1:1000 | 3.10 | 4.21 | 4.39 |
| 99.99% | 1:10,000 | 3.72 | 4.77 | 4.95 |

[a]Likelihood that a woman with PCOS would exceed that limit by chance.
[b]Number of SDs for each confidence limit.
[c]Two-sided CIs are conventional for a result that could exceed or fall below confidence limits, but here we focus only on values exceeding the upper limit, so that one-sided confidence limits are appropriate.

Downloaded from https://academic.oup.com/edrv/article/39/5/803/5052770 by guest on 25 September 2020

REVIEW

with the timing and manifestations of male puberty. The characteristic clinical features of masculinization (*e.g.*, muscle growth, increased height, increased hemoglobin, body hair distribution, voice change) appear only if and when circulating testosterone concentrations rise into the range of males at mid-puberty, which are higher than in women at any age even after the rise in circulating testosterone in female puberty. If and only if the pubertal rise in circulating testosterone fails will the males affected be clinically considered hypogonadal. Such a failure of male puberty may occur for genetic reasons (arising from mutations that inactivate any of the cascade of proteins whose activity is critical in the hypothalamus to trigger male puberty) or as a result of acquired conditions, caused by pathological disorders of the hypothalamus or pituitary or functional defects arising from severe deficits of energy or nutrition (*e.g.*, extreme overtraining, undernutrition), with the latter being comparable with hypothalamic amenorrhea or anorexia nervosa in female athletes/ballet dancers. If male puberty fails, testosterone replacement therapy is fully effective in replicating all of the distinctive masculine features apart from spermatogenesis.

### Elevated circulating testosterone concentration caused by DSDs

Rare genetic intersex conditions known as DSDs can lead to markedly increased circulating testosterone in women. When coupled with ambiguous genitalia at birth, they may appear as undervirilized males or virilized females. This can cause athletes who were raised and identify as women to have circulating testosterone levels comparable to those of men and greatly exceeding those of non-DSD (and nondoped) women, including those with PCOS. Key congenital disorders in this category are 46,XY DSDs, namely $5\alpha$ reductase deficiency (75), $17\beta$-hydroxysteroid dehydrogenase type 3 deficiency (76), and androgen insensitivity (77, 78), as well as congenital adrenal hyperplasia (79), which is a 46,XX DSD. There is evidence that the first three conditions, components of 46,XY DSDs, are 140-fold more prevalent among elite female athletes than expected in the general population (80).

Genetic $5\alpha$ reductase deficiency is due to an inactivating mutation in the $5\alpha$ reductase type II enzyme (75). This leads to a deficit of DHT during fetal life when DHT is required for converting the sex-undifferentiated embryonic and fetal tissue to the sex-differentiated masculine form external genitalia. Although genetic males (46,XY) with $5\alpha$ reductase deficiency will develop testes, they usually remain undescended and labial fusion to form a scrotum and phallic growth does not occur. Hence, at birth the external genitalia may appear feminine, leading to a female assigned natal sex. Thus, individuals with $5\alpha$ reductase deficiency may have male chromosomal sex

(46,XY), gonadal sex (testes), and hormonal sex (adult male testosterone concentrations), but such severely undervirilized genitalia that affected individuals may be raised from birth as females rather than as undervirilized males. However, from the onset of male puberty, testicular Leydig cells start producing large amounts of testosterone, and the steep rise in circulating testosterone to adult male levels (with the permissive role of $5\alpha$ reductase activity) leads to masculine virilization, including male patterns of muscle and bone growth, hemoglobin levels, and other masculine body habitus features (hair growth pattern, voice change), as well as phallic growth (80). Such changes of male puberty prompt around half affected individuals who had female sex assigned at birth and developed as girls prior to puberty to adopt a male gender identity and role at puberty (81). Sperm are formed in the testes so that, using *in vitro* fertilization, these individuals may father children (82).

$17\beta$-Hydroxysteroid dehydrogenase type 3 deficiency (76) has a natural history similar to that of $5\alpha$ reductase deficiency. This disorder is due to inactivating mutations in a steroidogenic enzyme expressed only in the testis and that is essential for testosterone formation in the fetus. In the absence of a functional enzyme, the testis makes little testosterone but instead secretes large amounts of androstenedione, the steroid immediately prior to the enzymatic block. In the circulation, the excess of androstenedione is converted to testosterone (mainly by the enzyme AKR1C3) (12). Although the circulating testosterone is then converted to circulating DHT, insufficient DHT is formed locally within the urogenital sinus to virilize genitalia at birth. This causes the same severe undervirilization of the external genitalia of genetically male individuals, leading to ambiguous genitalia at birth despite male chromosomal, gonadal, and hormonal sex. When puberty arrives, the testes start producing the adult male testosterone output. Again, this leads to marked virilization and subsequent assumption of a male gender identity by some affected individuals, conflicting with a female assigned natal sex and childhood upbringing.

Androgen insensitivity, which arises from mutation in the androgen receptor (AR), poses different but complex challenges for eligibility for female athletic events. As the AR is located on the X chromosome, genetic males (46,XY) are hemizygous, so that an inactivating mutation in the AR can be partially or fully insensitive to androgen action. Affected individuals have male internal genitalia (testes in the inguinal canal or abdomen with Wolffian ducts) and consequently adult male circulating testosterone concentrations after puberty. These nonlethal mutations have a wide spectrum of functional effects, ranging from full resistance to all androgen action in complete androgen insensitivity syndrome (CAIS) where individuals have a full female phenotype with

Downloaded from https://academic.oup.com/edrv/article/39/5/803/5052770 by guest on 25 September 2020

Downloaded from https://academic.oup.com/edrv/article/39/5/803/5052770 by guest on 25 September 2020

normal female external genitalia, to partial androgen insensitivity syndrome (PAIS) where some androgen action is still exerted, leading to various degrees of ambiguous genitalia, or to mild androgen insensitivity, which produces a very mild, undervirilized male phenotype (normal male genital and somatic development but with little body hair and no male pattern balding) (77). Testosterone (and dihydrotestosterone) have no consistent effect of inducing normal nitrogen retention (anabolic) responses in patients with CAIS (83–86), although some reduced androgen responsiveness is retained by patients with PAIS (84, 87–90). Athletes with CAIS can compete fairly as females because the circulating testosterone, although at adult male levels, has no physiological effect so that, in terms of androgen action and the ensuing physical somatic advantages of male sex, affected individuals are indistinguishable from females and gain no benefits of the sex difference arising from unimpeded testosterone action. A more complex issue arises with athletes having PAIS reflecting the degree of incomplete impairment of AR function. Residual androgen action in such AR mutations is harder to characterize quantitatively, as there is no standardized, objective *in vitro* test to quantify AR functionality. Hence, individuals with PAIS may have adult male circulating testosterone concentrations but variable androgen sensitivity. At present, determination of eligibility to compete in the female category requires a case-by-case evaluation, primarily based on the degree of virilization. The current best available clinical approach to determining the functional impact (degree of functionality/sensitivity) of an AR mutation is based on the degree of somatic, primarily genital, virilization assessed according to the Quigley classification of grade of androgen sensitivity (91).

Congenital adrenal hyperplasia (CAH) is a relatively common defect in adrenal steroidogenesis in the enzymatic pathway, leading to synthesis of cortisol, aldosterone, and sex steroid precursors. The disease varies in severity from life-threatening (adrenal failure) to mild (hirsutism and menstrual irregularity), or even asymptomatic and undiagnosed. The most common mutations causing CAH occur in the 21-hydroxylase enzyme, accounting for 95% of cases (79). The defect leads to a bottleneck, creating a major backing up of precursor steroids that then overflow into other steroid pathways, leading to diagnostic high levels of 17-hydroxyprogesterone and, in female patients, excessive circulating testosterone or other adrenal-source androgen precursors (*e.g.*, androstenedione, dehydroepiandrosterone) that may be converted to testosterone in tissues. A common clinical problem with management of CAH is that glucocorticoid/mineralocorticoid treatment is not always fully effective partly due to variable compliance, which may leave high circulating testosterone, including well into or even above the normal male range (92). It is unlikely

that mild nonclassical congenital adrenal hyperplasia is a major contributor to the mild hyperandrogenism prevalent among elite female athletes. The prevalence of PCOS (6% to 16%) is about 100-fold higher than mild nonclassical congenital adrenal hyperplasia (0.1%) (49), whereas a disproportionately high number of elite female athletes (especially in power sports) have PCOS (45). In one study of hyperandrogenic female athletes, even mild nonclassic adrenal hyperplasia was ruled out by normal 17-hydroxyprogesterone (36) and, in another (47), reported serum androstenedione and cortisol did not differ from controls, ruling out significant congenital adrenal hyperplasia.

## Sex Difference in Muscle, Hemoglobin, Bone, and Athletic Performance Relating to Adult Circulating Testosterone Concentrations

Following puberty, testosterone production increases (16) but remains <2 nmol/L in women, whereas in men testosterone production increases 20-fold (from 0.3 mg/d to 7 mg/d), leading to 15-fold higher circulating testosterone concentrations (15 vs 1 nmol/L). The greater magnitude of sex difference in testosterone production (20-fold) compared with circulating levels (15-fold) is due to women's higher circulating SHBG, which retards testosterone clearance, creating a slower circulating half-time of testosterone. This order-of-magnitude difference in circulating testosterone concentrations is the key factor in the sex difference in athletic performance due to androgen effects principally on muscle, bone, and hemoglobin.

### Muscle

#### Biology
It has been known since ancient times that castration influences muscle function. Modern knowledge of the molecular and cellular basis for androgen effects on skeletal muscle involves effects due to androgen (testosterone, DHT) binding to the AR that then releases chaperone proteins, dimerizes, and translocates into the nucleus to bind to androgen response elements in the promoter DNA of androgen-sensitive genes. This leads to increases in (1) muscle fiber numbers and size, (2) muscle satellite cell numbers, (3) numbers of myonuclei, and (4) size of motor neurons (93). Additionally, there is experimental evidence that testosterone increases skeletal muscle myostatin expression (94), mitochondrial biogenesis (95), myoglobin expression (96), and IGF-1 content (97), which may augment energetic and power generation of skeletal muscular activity.

Customized genetic mouse models can provide unique experimental insight into mammalian physiology that is unobtainable by human experimentation.

*"Sex differences in height, where they exist, are largely dependent on postpubertal differences in circulating testosterone."*

The tight evolutionary conservation of the mammalian reproductive system explains why genetic mouse models have provided consistent, high-fidelity replication of the human reproductive system (98, 99). Genetic males (46,XY) with androgen insensitivity displaying similar features occur through the spontaneous production of inactivating AR mutations in all mammalian species studied, including humans, where they are known as women with CAIS. The converse, genetic females (46,XX) resistant to all androgen action cannot occur naturally in humans or other mammals. This is because fully androgen-resistant females must have both X chromosomes carrying an inactivated AR. In turn, this requires acquiring one X chromosome from their father, and hemizygous males bearing a single X chromosome with an inactive AR produce no sperm, as a functional AR is biologically indispensable for making sperm in any mammal. However, androgen-resistant females can be bred by genetic engineering using the Cre-Lox system (100). An important finding from such studies is that androgen-resistant female mice have essentially the same muscle mass and function as wild-type androgen-sensitive females bearing normal AR, whereas androgen-resistant male mice have smaller and weaker muscle mass and function than do wild-type males and comparable instead with wild-type females (101). This indicates that androgen action, represented by circulating testosterone, is the key determinant of the higher muscle mass and strength characteristic of males compared with females. Furthermore, endogenous circulating testosterone has minimal effects on skeletal muscle mass and strength in female mice because of its low levels. Although these experiments cannot be replicated in humans, their key insight is that the higher circulating testosterone in males is the determinant of the male's greater muscle mass and function compared with females. Nevertheless, there is also evidence that hyperandrogenic women, mostly with PCOS, have increased muscle mass and strength that correlates with mildly increased circulating testosterone in the high-normal male range (36, 47).

### Observational data

There is a clear sex difference in both muscle mass and strength (102–104) even adjusting for sex differences in height and weight (104, 105). On average, women have 50% to 60% of men's upper arm muscle cross-sectional area and 65% to 70% of men's thigh muscle cross-sectional area, and women have 50% to 60% of men's upper limb strength and 60% to 80% of men's leg strength (106). Young men have on average a skeletal muscle mass of >12 kg greater than age-matched women at any given body weight (104, 105). Whereas numerous genes and environmental factors (including genetics, physical activity, and diet) may contribute to muscle mass, the major cause of the sex difference in muscle mass and strength is the sex difference in circulating testosterone.

Age-grade competitive sports records show minimal or no female disadvantage prior to puberty, whereas from the age of male puberty onwards there is a strong and ongoing male advantage. Corresponding to the endogenous circulating testosterone increasing in males after puberty to 15 to 20 nmol/L (sharply diverging from the circulating levels that remain <2 nmol/L in females), male athletic performances go from being equal on average to those of age-matched females to 10% to 12% better in running and swimming events, and 20% better in jumping events (8) (Fig. 1). Corroborative findings are provided by a Norwegian study that examined performance of adolescents in certain athletic events but without reference to contemporaneous circulating testosterone concentrations (107). The striking postpubertal increase in male circulating testosterone provides a major, ongoing, cumulative, and durable advantage in sporting contests by creating greater muscle mass and strength. These sex differences render women unable to compete effectively against men, especially (but not only) in power sports.

These findings are supported by studies of non-athletic women showing that muscle mass is increased in proportion to circulating testosterone in women with mildly elevated testosterone levels due to PCOS (108, 109), a condition that is more prevalent among elite female athletes who exhibit these features (36, 45, 47), often undiagnosed (46), but that may provide an ergogenic advantage (47), consistent with the graded effects of circulating testosterone on explosive performance in men and women (110).

Studies of elite female athletes further corroborate these findings. One study demonstrates dose-response effects of better performance in some (400 m running, 400 m hurdles, 800 m running, hammer throw, pole vault) but not all athletic events correlated with significantly higher endogenous testosterone in female, but not male, athletes. Even within the low circulating testosterone levels prevailing within the normal female range, in these events there was a significant advantage of 1.8% to 4.5% among those in the highest tertile compared with the lowest tertile of endogenous testosterone (35). A further study of elite female athletes corroborates and extends these observations in that endogenous androgens are associated with a more anabolic body composition as well as enhanced muscular performance (36). In this study, 106 Swedish Olympic female athletes were compared with 117 age- and weight (body mass index)-matched sedentary control women for their muscle and bone mass (by dual-energy X-ray absorptiometry), their muscular strength (squat and countermovement jumps), and testosterone and DHT, as well as androgen precursors (dehydroepiandrosterone, androstenedione) and urinary androgen glucuronide metabolites (androsterone,

Downloaded from https://academic.oup.com/edrv/article/39/5/803/5052770 by guest on 25 September 2020

REVIEW

**Figure 1.** Sex differences in performance (in percentage) according to age (in years) in running events, including 50 m to 2 miles (upper left panel), and in jumping events, including high jump, pole vault, triple jump, long jump, and standing long jump (upper right panel) [for details, see Ref. (8)]. The lower panel is a fitted sigmoidal curve plot of sex differences in performance (in percentage) according to age (in years) in running, jumping, and swimming events, as well as the rising serum testosterone concentrations from a large dataset of serum testosterone of males. Note that in the same dataset, female serum testosterone concentrations did not change over those ages, remaining the same as in prepubertal boys and girls. Data are shown as mean and SEM of the pooled sex differences by age. Reproduced with permission from Handelsman DJ. Sex differences in athletic performance emerge coinciding with the onset of male puberty. *Clin Endocrinol (Oxf).* 2017;**87**:68–72.



Downloaded from https://academic.oup.com/edrv/article/39/5/803/5052770 by guest on 25 September 2020

© 2018 ENDOCRINE SOCIETY

etiocholanolone, 3 and 17 3α-diols) measured by LC-MS (36). The athletes displayed higher muscle (and bone) mass than did the sedentary control women, with strength tests correlating strongly with muscle mass whether in total or just in the legs. In turn, muscle mass and strength were correlated with androgens and androgen precursors. Considering that such studies may be confounded by factors such as menstrual phase and dysfunction, as well as heterogeneous sports disciplines, which weaken the power of the study, these findings can be regarded as quite robust.

### Interventional data

Dose-response studies show that in men whose endogenous testosterone is fully suppressed, add-back administration of increasing doses of testosterone that produce graded increases in circulating testosterone causes a dose-dependent (whether expressed according to testosterone dose or circulating levels) increase in muscle mass (measured as lean body mass) and strength (65, 111). Taken together, these studies prove that testosterone doses leading to circulating concentrations from well below to well above the normal male range have unequivocal dose-dependent effects on muscle mass and strength. These data strongly and consistently suggest that the sex difference in lean body mass (muscle) is largely, if not exclusively, due to the differences in circulating testosterone between men and women. These findings have strong implications for power-dependent sport performance and largely explain the potent efficacy of androgen doping in sports.

The key findings providing conclusive evidence that testosterone has prominent dose-response effects in men are reported in studies by Bhasin and colleagues that proved a monotonic dose response,

extending from subphysiological to supraphysiological range for men for testosterone effects on muscle mass, size, and strength in healthy young men, findings that have been replicated and confirmed by an independent group (65). Both sets of studies used a common design of fully suppressing all endogenous testosterone (to castrate levels) for the full duration of the experiment by administering a GnRH analog. In the Bhasin and colleagues studies, participants were then randomized to five groups and each received weekly injections of 25 mg, 50 mg, 125 mg, 300 mg, or 600 mg of testosterone enanthate for 20 weeks. In effect, this was two subphysiological and two supraphysiological testosterone doses. In these studies, the lowest testosterone dose produced a mean serum testosterone of 253 ng/dL (8.8 nmol/L) in younger men and 176 ng/dL (6.1 nmol/L) in older men. The studies showed a consistent dose response for muscle mass and strength that was clearly related to testosterone dose and consequential blood testosterone concentrations (Fig. 2, upper panel).

The study of Finkelstein *et al.* (65) involved the same design and involved 400 healthy men aged 20 to 50 years who had complete suppression of endogenous testosterone for the 16 weeks of the study, with testosterone added back using daily doses of 0, 1.25 g, 2.5 g, 5 g, or 10 g of a topical 1% testosterone gel. This again created a graded dose-response curve for serum testosterone and for muscle mass and strength. The inclusion of a 0 (placebo) dose allowed comparison between the 0 and lowest testosterone dose. The placebo (0) dose produced a serum testosterone of 0.7 nmol/L (the typical mean for castrated men, childhood, and women of any age). Meanwhile, the lowest testosterone dose (1.25 g of gel per day) produced a serum testosterone of 6.9 nmol/L, which is equivalent to that of a male in early to middle puberty. A key finding for this review is that, from this study of men, the increase in serum testosterone from mean of normal female concentration (0.9 nmol/L) to supraphysiological female concentrations (6.9 nmol/L) produced significant increases of 2.3% for total body lean (muscle) mass, 3.0% for thigh muscle area, and 5.5% increase in leg press strength (digitized data pooling of both cohorts from lower panel, Fig. 2).

Studies of the ergogenic effects of supraphysiological concentrations of circulating testosterone require studies administering graded doses of exogenous testosterone for months. Owing to ethical concerns regarding risks of unwanted virilization and hormone-dependent cancers, however, few studies have administered supraphysiological testosterone doses to healthy women. One well-designed, randomized placebo-controlled study of postmenopausal women investigated the effects of different testosterone doses on muscle mass and performance and physical function (112). Sixty-two women (mean age, 53 years) all had a standard estrogen-replacement dose administered during a 12-week run-in period (to

eliminate any hypothetical confounding effects of estrogen deficiency), after which they were randomized to one of five groups receiving weekly injections of testosterone enanthate (doses: 0, 3 mg, 6.25 mg, 12.5 mg, and 25 mg, respectively) for 24 weeks. The increasing doses of testosterone produced an expected dose response in serum testosterone concentrations (by LC-MS), with the highest testosterone dose (25 mg/wk) producing a mean nadir concentration of 7.3 nmol/L. The women whose testosterone concentrations were increased to 7.3 nmol/L achieved significant increases in muscle mass and strength (Table 4), ranging from 4.4% for muscle (lean) mass to between 12% and 26% for measures of muscle strength (chest and leg press, loaded stair climb). As muscle strength measurement is effort-dependent, the placebo-controlled design of the Huang *et al.* (112) study supports the further interpretation that the highest dose of testosterone also had prominent mental motivational effects in the effort-dependent tests of muscle strength. These findings provide salient direct evidence of the ergogenic effects of hyperandrogenism in female athletes confirming that at least up to average circulating testosterone concentrations of 7.3 nmol/L, women display a dose-response relationship similar to that of men, with supraphysiological doses of testosterone leading to significant gains in muscle mass and power.

These effects of testosterone administration on circulating testosterone concentrations and muscle mass and strength in females may be compared with the effects in males from the Finkelstein *et al.* (65) and Bhasin and colleagues studies. In men, the lowest testosterone dose (1.25 g/d) increased mean serum testosterone to 6.9 nmol/L (equivalent to levels seen in early to middle male puberty), resulting in significant increases of total body lean (muscle) mass (2.3%), thigh muscle area (3.0%), and leg press strength (5.5%) compared with the placebo dose that resulted in a serum testosterone of 0.7 nmol/L. In the Huang *et al.* (112) study (Fig. 3), muscle mass and strength in postmenopausal women displayed a flat response at the three lower doses, when circulating testosterone concentrations remain <5 nmol/L, and displayed a significant increase only when the mean circulating testosterone concentration produced by the highest testosterone dose first increased circulating testosterone concentrations >5 nmol/L. This pattern, flat at lower doses and rising at the highest dose, represents the lower plateau and the earliest rising portion, respectively, of the sigmoidal dose-response curve of testosterone for muscle.

Data corroborating the Huang *et al.* study results comes from another well-controlled study in which postmenopausal women who were administered methyl testosterone following a run-in period of estrogen replacement displayed a significant increase in lean (muscle) mass as well as upper and lower limb

Downloaded from https://academic.oup.com/edrv/article/39/5/803/5052770 by guest on 25 September 2020

Downloaded from https://academic.oup.com/edrv/article/39/5/803/5052770 by guest on 25 September 2020

**Figure 2.** Strong dose-response relationship between testosterone dose and circulating concentration with muscle mass and strength in men. The upper panels [from Bhasin *et al.* (111)] display the strong dose-response relationships of muscle mass shown as (A) "lean" or "fat-free" mass or volume of (D) thigh and (E) quadriceps muscle and (C) of leg muscle strength with increasing testosterone dose (upper row) or circulating concentration (middle row). Serum testosterone concentrations are in US units (ng/dL; divide by 28.8 to get nmol/L). Adapted with permission from Bhasin S, Woodhouse L, Casaburi R, et al. Testosterone dose-response relationships in healthy young men. *Am J Physiol Endocrinol Metab.* 2001;281:E1172–E1181. The lower panels [from Finkelstein *et al.* (65)] show the strong dose-response relationships of (B) whole-body muscle mass, (E) thigh muscle mass, and (F) leg press strength with increasing testosterone dose. Cohorts 1 and 2 were treated with the same increasing doses of testosterone but either without (green fill, cohort 1) or with (purple fill, cohort 2) an aromatase inhibitor (anastrozole), which prevents conversion of testosterone to estradiol. The differences between cohorts (*i.e.*, use of anastrozole) was not significant for muscle mass and strength and can be ignored with results of the two cohorts being pooled. Reproduced with permission from Finkelstein JS, Lee H, Burnett-Bowie SA, Pallais JC, *et al.* Gonadal steroids and body composition, strength, and sexual function in men. N Engl J Med 2013;369:1011–1022.



© 2018 ENDOCRINE SOCIETY

power during a 16-week double-blind, parallel group study (113).

Similarly, two prospective studies of the first 12 months of treatment of transmen [female-to-male

(F2M) transgender] shows a consistent major increase in muscle mass and strength due to testosterone administration. In one study testosterone treatment of 17 transmen achieving adult male circulating testosterone levels

**Table 4.** Effects of Testosterone on Muscle Mass and Strength in Women

| Androgen-Sensitive Variable | Baseline | Increase | % Increase |
|---|---|---|---|
| Lean muscle mass, kg | 43 ± 6 | 1.9 ± 0.5 | 4.4 |
| Chest press, W | 100 ± 26 | 26 ± 7 | 26 |
| Leg press, N | 744 ± 172 | 90 ± 30 | 12 |
| Loaded stair-climb power, W | 406 ± 77 | 56 ± 13 | 14 |

With data from Huang G, Basaria S, Travison TG, et al. Testosterone dose-response relationships in hysterectomized women with or without oophorectomy: effects on sexual function, body composition, muscle performance and physical function in a randomized trial. Menopause 2014;21:612–623. Data are shown as mean and SEM derived from Table 1 and digitized from Figure 4 from Huang et al. (112) showing the effects of testosterone (mean circulating concentration, 7.3 nmol/L) on muscle mass and strength in women treated with the highest testosterone dose (n = 11; 25 mg of testosterone enanthate per week).

Downloaded from https://academic.oup.com/edrv/article/39/5/803/5052770 by guest on 25 September 2020

(mean, 31 nmol/L) increased muscle mass by 19.2% (114). In a second study, 23 transmen administered adult male testosterone doses also produced striking increases in total body muscle size and limb muscle size (by 6.5% to 16.6%) and grip strength (by 18%) compared with age-matched untreated control women (115). Conversely, testosterone suppression (using an estrogen-based treatment regimen) in 20 transwomen (M2F transgender) that reduced circulating testosterone levels from adult male range to adult female range led to a 9.4% reduction in muscle mass (measured as cross-sectional area).

### Effects on athletic performance

Muscle growth, as well as the increase in strength and power it brings, has an obvious performance-enhancing effect, in particular in sports that depend on strength and (explosive) power, such as track and field events (107, 110). There is convincing evidence that the sex differences in muscle mass and strength are sufficient to account for the increased strength and aerobic performance of men compared with women and is in keeping with the differences in world records between the sexes (116). The basis for the sex difference in muscle mass and strength is the sex difference in circulating testosterone as clearly shown (for example) by (1) the enhanced athletic performance of men compared with prepubertal boys and women (8); (2) the close correspondence of muscle growth (muscle size) with muscle strength in ascending dose studies in men by Bhasin et al. (111, 117–119) and Finkelstein et al. (65) and in postmenopausal women by Huang et al. (112); (3) the effect of male castration in reducing muscle size and strength, effects that are fully rectified by testosterone replacement; and (4) the striking efficacy of androgen doping on the sports performances of German Democratic Republic female athletes (120).

### Hemoglobin

#### Biology

It is well known that levels of circulating hemoglobin are androgen-dependent and consequently higher in men than in women by 12% on average; however, the physiological mechanism by which androgens such as

testosterone boosts circulating hemoglobin is not fully understood (121). Testosterone increases secretion of and sensitivity to erythropoietin, the main trophic hormone for erythrocyte production and thereby hemoglobin synthesis, as well as suppressing hepcidin (122), a crucial iron regulatory protein that governs the body's iron economy. Hepcidin has to balance the need for iron absorption from foods (the only source of iron required for the body's iron-containing proteins) against the fact that the body has no mechanism to shed excess iron, which can be toxic. Adequate iron availability is essential for normal erythropoiesis and synthesis of key heme, iron-containing oxygen-transporting proteins such as hemoglobin and myoglobin (123) as well as other iron-dependent proteins such as cytochromes and DNA synthesis and repair enzymes. Experimental evidence in mice shows that testosterone increases myoglobin content of muscle with potential for augmenting aerobic exercise performance (96), but this has not been evaluated in humans.

Increasing the amount of hemoglobin in the blood has the biological effect of increasing oxygen transport from lungs to tissues, where the increased availability of oxygen enhances aerobic energy expenditure. This is exploited to its greatest effect in endurance sports (1). The experiments of Ekblom et al. (124) in 1972 (Fig. 4) demonstrated strong linear relationships between changes in hemoglobin [due to withdrawal or retransfusion of 1, 2 or 3 U (400 mL) of blood] and aerobic capacity, established by repeated testing of maximal exercise-induced oxygen consumption before and after each procedure (124). As already noted, circulating hemoglobin levels are on average 12% higher in men than women (125). It may be estimated that as a result the average maximal oxygen transfer will be ~10% greater in men than in women, which has a direct impact on their respective athletic capacities.

#### Observational data

The proposition that sex difference in circulating hemoglobin levels is likely to be due to the sex difference in average circulating testosterone concentrations is supported by the fact that male castration (e.g., for advanced prostate cancer) (126) and androgen deficiency due to reproductive system disorders (127) reduce circulating

hemoglobin in men, eliminating the sex difference, whereas testosterone replacement therapy restores circulating hemoglobin to adult male levels (121, 127, 128).

An unusually informative observational study of women with CAH provides unique insight into testosterone effects on circulating hemoglobin in otherwise healthy women (92). Women with CAH require glucocorticoid replacement therapy but exhibit widely varying levels of hormonal control (79). The degree of poor control is associated with increasing levels of circulating testosterone ranging from normal female concentrations up to 36 nmol/L, and these levels correlate closely ($r$ = 0.56) with levels of circulating hemoglobin (Fig. 5). Interpolating from the dose-response regression, increases in circulating testosterone measured by LC-MS from 0.9 nmol/L to 5 nmol/L, 7 nmol/L, 10 nmol/L, and 19 nmol/L were associated with increases in circulating hemoglobin of 6.5%, 7.8%, 8.9%, and 11%, respectively, establishing a strong dose-response relationship. An 11% increase in circulating hemoglobin translates to a 10% difference in maximal oxygen transfer (124), which may account for virtually all the 12% sex difference in male and female circulating hemoglobin (125). To put this into context, any drug that achieved such increases in hemoglobin would be prohibited in sports for blood doping, as this difference is sufficient to have ergogenic effects, even without taking into account any testosterone effects on muscle mass or strength (for which data were not available in that study). Conversely, among elite female athletes with circulating testosterone in the healthy premenopausal female range, circulating hemoglobin does not correlate with athletic performance (35). In women with the mild hyperandrogenism of PCOS, circulating hemoglobin and hematocrit are reported as not (129) or marginally increased (130), findings that may be influenced by the fact that PCOS is associated with reduced or absent menstruation, thereby reducing the iron loss of regular menstruation.

### Interventional data
In the Bhasin *et al.* (111) studies, in both young and older men the highest testosterone dose produced a 12% increase in blood hemoglobin compared with the lowest dose, reflecting a strong dose-response relationship (Fig. 6) (131). Analogous findings were reported for testosterone treatment effects in postmenopausal women where the highest dose (25 mg weekly) of testosterone, which increased mean serum testosterone to 7.3 nmol/L, had the largest increase (3%) in blood hemoglobin and hematocrit (112).

Corroborative findings are available from studies of transmen (F2M transgender), that is, natal females who subsequently receive testosterone treatment at replacement doses to create adult male circulating testosterone concentrations, who exhibit increases in circulating hemoglobin to male levels [reviewed in (132–134)]. Testosterone treatment in 17 (F2M) transmen that created mean circulating testosterone levels of 31 nmol/L also increased hemoglobin levels by 15% (114). Conversely, one prospective 12-month study of transgender (nonathlete) individuals reported that testosterone suppression (by an estrogen-based regimen) to normal female levels in 20 (M2F) transwomen reduced hemoglobin by 14%.

If such an increase in hemoglobin were produced by any chemical substance, it would be considered doping, according to the World Anti-Doping Code.

### Bone

### Biology
There is extensive experimental evidence from genetic mouse models showing that the sex differences in bone

Downloaded from https://academic.oup.com/edrv/article/39/5/803/5052770 by guest on 25 September 2020






\* Significant difference between mean on treatment change in dose group vs. placebo at 0.05 level. The significance level for the overall dose effect is by likelihood ratio test.

© 2018 ENDOCRINE SOCIETY

**Figure 3.** From Huang *et al.* (112): Dose-response effects on lean (muscle) mass and three measures of muscle strength as a result of increasing doses of weekly testosterone enanthate injections in women. Note the effects on all four parameters (three statistically significant) of the highest testosterone dose, the only one that produced circulating testosterone levels exceeding the normal female range. Reproduced with permission from Huang G, Basaria S, Travison TG, *et al.* Testosterone dose-response relationships in hysterectomized women with or without oophorectomy: effects on sexual function, body composition, muscle performance and physical function in a randomized trial. Menopause 2014;21:612–623.

REVIEW

**Figure 4.** Redrawn results from Ekblom *et al.* (124). Results from the transfusion of additional blood are shown in dark red circles and those after blood withdrawal in light red circles. Adapted with permission from Ekblom B, Goldbarg AN, Gullbring B. Response to exercise after blood loss and reinfusion. J Appl Physiol 1972;33:175–180.

### Changes in hemoglobin vs maximal oxygen uptake



© 2018 ENDOCRINE SOCIETY

size, mass, and function are due to the sex difference in circulating testosterone. These effects have been reported from studies of global and tissue or cell-selective inactivation of ARs or estrogen receptors that show that androgen effects are mediated by both direct effects on the AR as well as indirect effects mediated via aromatization of testosterone to estradiol to act on estrogen receptors [reviewed in (135)]. Bone grows in length due to epiphyseal chondral growth plates that provide cartilage, forming the matrix for lengthening of long bone, which is terminated by an estrogen-dependent mechanism that depends on aromatization of testosterone to estradiol. Similarly, bone width and density are increased through appositional growth from periosteal and endosteal expansion that depend on bone loading and androgen exposure together with other factors. An important difference between androgen effects on bone compared with effects on muscle or hemoglobin is that developmental bone effects of androgens are likely to be irreversible.

#### Observational data
Men have distinctively greater bone size, strength, and density than do women of the same age. As with muscle, sex differences in bone are absent prior to puberty but then accrue progressively from the onset of male puberty due to the sex difference in exposure to adult male circulating testosterone concentrations [reviewed in (135)]. The earlier onset of puberty and the related growth spurt in girls as well as earlier estrogen-dependent epiphyseal fusion explains shorter stature of girls than boys. As a result, on average men are 7% to 8% taller with longer, denser, and stronger bones, whereas women have shorter humerus and femur cross-sectional areas being 65% to 75% and 85%, respectively, those of men (106).

These changes create an advantage of greater bone strength and stronger fulcrum power from longer bones. Additionally, whereas passing through puberty enhances male physical performance, the widening of the female pelvis during puberty, balancing the evolutionary demands of obstetrics and locomotion (136, 137), retards the improvement in female physical performance, possibly driven by ovarian hormones rather than the absence of testosterone (138, 139).

Sex differences in height have been the most thoroughly investigated measure of bone size, as adult height is a stable, easily quantified measure in large population samples. Extensive twin studies show that adult height is highly heritable with predominantly additive genetic effects (140) that diverge in a sex-specific manner from the age of puberty onwards (141, 142), the effects of which are likely to be due to sex differences in adult circulating testosterone concentrations.

Bone density (total and medullary cross-sectional area) is increased in women with CAH with variably elevated serum testosterone (including into the male range) when it is only partially suppressed by glucocorticoid treatment (143), although more effective glucocorticoid suppression lowers bone density (144).

#### Interventional data
Well-designed, placebo-controlled direct interventional studies of supraphysiological androgen effects on bone in females are few, rarely feasible, and unlikely to be performed for ethical and practical reasons. Unlike muscle, which responds relatively rapidly to androgen effects so that muscle studies in humans can be completed within 3 to 4 months (65, 111, 112, 119, 145), comparable bone studies would typically take a year or more to reach plateau effects. Hence, such direct investigational studies in otherwise healthy women would risk side effects of virilization that may be only slowly and partly reversible, if at all, as well as potential promotion of hormone-dependent cancers making such studies ethically and practically not feasible.

#### Effects on athletic performance
The major effects of men's larger and stronger bones would be manifest via their taller stature as well as the larger fulcrum with greater leverage for muscular limb power exerted in jumping, throwing, or other explosive power activities. The greater cortical bone density and thereby resistance to long bone fractures is unlikely to be relevant to the athletic performance of young athletes, in whom fractures during competition are extremely rare and not expected to be linked to sex. Alternatively, stress fractures in athletes, mostly involving the legs, are more frequent in females with the male protection attributable to their larger and thicker bones (146).

Downloaded from https://academic.oup.com/edrv/article/39/5/803/5052770 by guest on 25 September 2020

### Other androgen-sensitive sex dichotomous effects

#### Biology and observational data

Many if not most other aspects of physiology exhibit sex differences and may therefore enhance the impact of the male advantage in sports performance of the dominant determinants (muscle and hemoglobin). Examples include sex differences in exercise-induced cardiac (147, 148) and lung (149) function and mitochondrial biogenesis and energetics (95). However, the limited knowledge of the magnitude and hormonal mechanisms involved, specifically the degree of androgen dependence of these mechanisms, means that it is difficult to estimate their contribution, if any, toward the sex difference in athletic performance. The sex difference in pulmonary function may be largely explained by the androgen-sensitive sex difference in height, which is a strong predictor of lung capacity and function (149). Further physiological studies of the androgen dependence of other physiological sex differences are awaited with interest.

Psychological differences between men and women on mental function (e.g., rotational orientation) (150) as well as mood, motivation, and behavioral effects may involve androgen-sensitive effects during prenatal and perinatal as well as postpubertal effects (151, 152).

#### Interventional data

There is some limited direct evidence from well-designed, placebo-controlled trials that administration of testosterone or other androgens at supraphysiological doses directly affect mood and behavior, notably inducing hypomania (153). In a randomized placebo-controlled study of testosterone administration in postmenopausal women (112), in case of those receiving the highest dose (the only one causing circulating testosterone levels to exceed the normal female range), there was not only an increase in muscle mass (4.4%) but a strikingly greater increase in muscle strength (12% to 26%), suggesting an enhanced mental motivational effect of testosterone on the effort-dependent tests of muscle strength.

### Alternative Mechanisms Proposed to Explain Sex Differences in Athletic Performance

Alternative explanations for the sex difference in athletic performance, other than it being due to the sex difference in postpubertal circulating testosterone, have been proposed, including (1) sex differences in height because height is a predictor of muscle mass (116), (2) genetic sex differences due to the influence of unspecified Y chromosome genes (154), and (3) sex differences in GH secretion (116).

### Effects of height

One proposal has been that, as men are taller than women, height differences may explain the sex differences in muscle mass and function, which explains some athletic success (116). Numerous factors contribute to the regulation of adult muscle mass, including genetics, race, adiposity, hormones, physical activity (exercise/training), diet, birth order, and bone size (including height) [reviewed in (155)]. Among the nonhormonal factors, genetics explains a large proportion [~50% to 60% from pooled twin studies (156)] of the variability in muscle mass and strength (157, 158) and may be explained in turn by the equally high genetic contributions to circulating testosterone (37, 38). Some factors influencing muscle mass and strength such as physical activity, adiposity, and bone size are also partly androgen-dependent. Prior to puberty there is no sex difference in skeletal features, including height (159, 160). However, with the onset of puberty, girls aged 11 and 12 years are transiently taller than peer-aged boys due to their earlier onset of the female pubertal growth spurt, but from the age of 14 years onward the taller stature in males emerges and stabilizes (141). Hence, similar to muscle mass, sex differences in bone size (including length, density, and height) arise after male puberty establishes the marked dichotomy between men and women in adult circulating testosterone concentrations. Taller height is



**Figure 5.** Plot of circulating hemoglobin against the natural logarithm of serum testosterone in women with congenital adrenal hyperplasia [from Karunasena *et al.* (92)]. The filled circles represent a cohort where serum testosterone was measured by immunoassay. The open triangles denote a second cohort, where serum testosterone was measured by LC-MS. Note the systematic overestimation of testosterone by the immunoassay used in cohort 1 vs LC-MS measurement in cohort 2. Despite that overestimation, however, the correlations were similar in both cohorts. Reproduced under a Creative Commons BY-NC-ND 4.0 license from Karunasena N, Han TS, Mallappa A, *et al.* Androgens correlate with increased erythropoiesis in women with congenital adrenal hyperplasia. Clin Endocrinol (Oxf) 2017;86:19–25.

Downloaded from https://academic.oup.com/edrv/article/39/5/803/5052770 by guest on 25 September 2020

REVIEW

advantageous in some sports (basketball, some football codes, combat sports), but in others (horse racing jockeys, cycling, gymnastics, weightlifting, body-building) short stature provides a greater power/strength-to-weight ratio as well as superior rotational balance, speed, and agility. However, the male advantages in speed, strength, and endurance apply regardless of whether height is advantageous. Hence, the sex differences in height, where they exist, are largely dependent on postpubertal differences in circulating testosterone when sex differences in height are first expressed.

### Genetic effects of Y chromosome

It has also been proposed that the sex difference in athletic performance may be due to genetic effects of an unspecified Y chromosome gene that may dictate taller stature (154), as height is correlated with men's greater muscle mass. The small human Y chromosome has few functional genes and none with a known effect on height other than the short stature homeobox (SHOX) gene, located in the pseudoautosomal regions of the tip of the short arms of X and Y chromosomes (161). Adult height displays an apparent dose dependency on SHOX gene copy number that is a major factor contributing to explaining both the short stature of 45,XO females (Turner syndrome), who have a single copy of the SHOX gene, as well as the tall stature of 47,XXY males (Klinefelter syndrome), who have three copies (161). However, when SHOX copy number is the same, men with additional supernumerary Y chromosomes (*e.g.*, 47,XYY) are the same height as 47,XXY men (162). Hence, there is no evidence supporting dosage-dependent Y chromosomal gene effects on height independent of SHOX gene copy number, nor does men's possession of a Y chromosome explain the height difference between adult men and women. On the contrary, the tall stature of 47,XXY men is at least partly due to the concomitant androgen deficiency leading to pubertal delay. Pubertal delay prolongs long bone growth due to delayed epiphyseal closure, an estrogen-dependent effect that requires adequate production of testosterone as a substrate for aromatization to estradiol, resulting in tall stature. Similar eunuchoidal features and taller stature are evident in 46,XY men with congenital hypogonadotropic hypogonadism (Kallmann syndrome and its variants) with comparable congenital onset of androgen deficiency, also manifest as pubertal delay and long bone overgrowth. Hence, taller height is better explained by impaired testicular function with delayed puberty and epiphyseal closure rather than unspecified Y chromosome dosage effects. In any case, rare aneuploidies in themselves do not explain the sex difference in height in the general population of individuals with normal sex chromosomes.

### Growth hormone

The proposal that the sex difference in muscle mass and function might be due to sex differences in endogenous GH secretion (116) is refuted by the extensive and conclusive clinical evidence that endogenous GH secretion in young women is consistently higher (typically twice as high) as in young men of similar age (163–170). Those findings cannot explain the male advantage in muscle mass and strength unless GH retards muscle growth/function, for which there is no evidence. Furthermore, estrogens inhibit GH-dependent, hepatic IGF-1 production, the major pathway of GH action (171, 172). The weak observational association between low circulating IGF-1 and some, but not other, measures of weak muscle strength and limited mobility among older women may reflect general age-associated debility rather than any specific hormonal effects (173). Finally, the evidence that endogenous GH plays no role in sex differences in muscle mass and function is supported by evidence from the most extensive interventional study of GH treatment to non-GH–deficient adults, daily GH administration for 8 weeks to healthy recreational athletes produced only marginally significant improvement in exercise performance of men and none in women (174). These findings are consistent with the speculation that GH (or IGF-1) may be an amplifier of testosterone effects and therefore be a consequence of the sex difference in circulating testosterone rather than its cause.

## The Impact of Adult Male Circulating Testosterone Concentrations on Sports Performance

Plausible estimates of the magnitude of the ergogenic advantage of adult male circulating testosterone concentrations are feasible from the limited available observational and interventional studies.

Downloaded from https://academic.oup.com/edrv/article/39/5/803/5052770 by guest on 25 September 2020



**Figure 6.** From Coviello *et al.* (131): Depicts the strong dose-response relationship between increasing testosterone dose with resulting change in blood hemoglobin in young and older men. Reproduced with permission from Coviello AD, Kaplan B, Lakshman KM, *et al.* Effects of graded doses of testosterone on erythropoiesis in healthy young and older men. J Clin Endocrinol Metab 2008;93:914–919.

Population data on the ontogeny of puberty show that prior to puberty boys and girls have comparable athletic performance, whereas sex differences in athletic performance emerge coinciding with the rise in circulating testosterone from the onset of male puberty. Male puberty results in circulating testosterone concentrations rising from the prepubertal and female postpubertal range (<2 nmol/L) to adult male circulating testosterone concentrations (18). This is associated with a 10% to 12% better performance in running and swimming events and 20% enhancement in jumping events (8).

A minimal estimate of the impact of adult male testosterone concentrations on muscle size and strength in females is provided by the Huang et al. (112) study of postmenopausal women. In this study the highest testosterone dose (weekly injections of 25 mg of testosterone enanthate) increased mean circulating testosterone from 0.9 nmol/L to 7.3 nmol/L, which is equivalent to the circulating testosterone of boys in early to middle puberty. After 24 weeks of testosterone treatment, the increase in circulating testosterone concentrations led to significant increases in muscle size of 4.4% and in muscle strength of 12% to 26%. Given the limited testosterone dose (and concentration) as well as study duration, it is likely that these findings underestimate the magnitude of the impact that sex difference in circulating testosterone has on muscle mass and strength, and therefore on athletic performance.

Converse effects of reduced athletic performance in athletes who undergo suppression of circulating testosterone concentrations from those in the male into the female range have been reported. Among recreational (nonelite) athletes, an observational study showed a consistent deterioration in athletic performance of transwomen (M2F transgender) athletes corresponding to the suppression of circulating testosterone concentrations (175). Similarly, among elite athletes with circulating testosterone in the male range due to DSDs, comparable findings of athletic performance reduced by an average of 5.7% when circulating testosterone was suppressed from the male range to <10 nmol/L (176). Subsequently, when the IAAF hyperandrogenism rule was suspended in 2015, and so these elite athletes could train and compete with unsuppressed serum testosterone levels, their athletic performances increased by a similar amount. Additionally, circulating hemoglobin levels in these untreated DSD athletes were comparable with male athletes or with female athletes doping with erythropoietin (Fig. 7). However, when circulating testosterone was suppressed to <10 nmol/L the levels of circulating hemoglobin were 12% lower and again comparable with nondoped, non-DSD females, corresponding to the 12% magnitude of the sex difference in hemoglobin between men and women (125).

Congruent findings are also known for an elite female athlete whose serial athletic performance based on publicly available best annual times between 2008 and 2016 for the 800-m running event are depicted in relationship to the original 2011 IAAF hyperandrogenism regulation (Fig. 8).

Based on the established dose-response relationships, suppression of circulating testosterone to <10 nmol/L would not eliminate all ergogenic benefits of testosterone for athletes competing in female events. For example, according to the Huang et al. (112) study, reducing circulating testosterone to a mean of 7.3 nmol/L would still deliver a 4.4% increase in muscle size and a 12% to 26% increase in muscle strength compared with circulating testosterone at the normal female mean value of 0.9 nmol/L. Similarly, according to the Karunasena et al. (92) study, reducing circulating testosterone concentration to 7 nmol/L would still deliver 7.8% more circulating hemoglobin than the normal female mean value. Hence, the magnitude of the athletic performance advantage in DSD athletes, which depends on the magnitude of elevated circulating testosterone concentrations, is considerably greater than the 5% to 9% difference observed in reducing levels to <10 nmol/L.

The physiological mechanism underlying these observations is further strengthened by prospective controlled studies of initiation of cross-sex hormone treatment in transgender individuals (114, 177). These show that during the first 12 months muscle mass (area) was decreased by 9.4% and hemoglobin levels by 14% in 20 transwomen (M2F transgender) treated with an estrogen-based regimen that reduced circulating testosterone concentrations from the male range to the female range. Conversely, in 17 transmen (F2M transgender) treated for the first time with testosterone for 12 months (which increased circulating testosterone levels to a mean of 31 nmol/L), muscle mass increased by 19.2% and hemoglobin by 15% (114). The muscle mass findings remained stable between 1 and 3 years after initiation of treatment, although fat mass continued to change between 1 and 3 years of testosterone treatment (177). These studies did not report muscle strength, but other studies of testosterone dose-response relationships for muscle mass and strength show consistently positively correlation (65, 93, 117, 119), although with disproportionately greater effect on muscle strength than on muscle mass. Hence, the muscle mass estimates in these prospective treatment initiation studies in transgender individuals likely underestimate the muscle strength gains from elevated testosterone levels where the circulating testosterone markedly exceeds female range to be within the male range as occurs in severe hyperandrogenism of DSD females, poorly controlled transwomen (M2F transgender), or transmen (F2M transgender). These effects are also the biological

Downloaded from https://academic.oup.com/edrv/article/39/5/803/5052770 by guest on 25 September 2020

basis of the ergogenic efficacy of androgen doping in women.

Finally, to put these competitive advantages into context, the winning margin (the difference in performance by which a competitor misses a gold medal, any medal, or making the final) in elite athletic or swimming events during the last three Olympics is <1% equally for both male and female events (Table 5).

### Gaps in Knowledge and Research Limitations

The major limitations on scientific knowledge of the impact of adult male circulating testosterone concentrations on the sex difference in athletic performance is the lack of well-designed studies. Ideally, these would need to replicate adult male circulating testosterone concentrations for sufficient time in women to investigate the effects on muscle, hemoglobin, bone, and other androgen-sensitive measures that display consistent sex dichotomy in the population. However, the ethical and safety concerns preventing such studies hitherto are likely to remain formidable obstacles due to the risk of unacceptable and potentially irreversible virilization as well as of promoting hormone-dependent cancers in women.

With the exception of one interventional study administering a relatively low testosterone dose (i.e., low for males) to women (112), the available evidence comprises observational studies that can only examine the effects of serum testosterone within physiological female limits or sparse and mostly uncontrolled data from intersex/DSD athletes. Although the available observational findings in healthy females are informative, the key question is the magnitude and dose response of effects at still higher circulating testosterone concentrations on the performances of women. Whereas a testosterone dose-response relationship has been established in women at relatively low (for men) testosterone dose and circulating concentrations, it remains unproven (even if clearly plausible) that the testosterone dose-response relationships established in men for muscle, hemoglobin, and bone can be extrapolated to women when they are exposed to higher circulating testosterone concentrations (i.e., comparable with male levels). It is theoretically possible there could be differences between men and women in muscle responses to testosterone, as muscle cell populations might express genetic differences in androgen sensitivity (for which there are no data), or alternatively the long-term prior pattern of testosterone exposure from conception to adulthood might lead to differences in testosterone dose responsiveness after maturity. Although the dose-response relationship in women may be similar to what is seen in men, there is also anecdotal evidence that the dose-response curves may be left shifted so that testosterone has greater potency in women than in men at comparable doses and circulating levels. The prediction is supported by the anecdotal evidence from the surreptitious East German national doping program in which the supervising doctors asserted from their experience of illicit cheating that androgens had more potent ergogenic effects in women than in men (120), a speculative opinion shared by many experienced sports medicine physicians.

There is no known means of increasing endogenous testosterone in women to anything like the requisite degree to attempt to answer these questions. In healthy men, circulating testosterone originates almost exclusively from a single source (testicular Leydig cells) and is subject to tight hypothalamic negative feedback control, so that either direct stimulation (by human chorionic gonadotropin) or indirect reflex effects (e.g., from estrogen blockers operating via negative feedback) to enhance Leydig cell testosterone secretion are feasible. However, similar mechanisms do not operate in women, in whom circulating testosterone originates from three different sources (adrenal, ovary, extraglandular conversion of androgen precursors), none of which is subject to tight testosterone negative feedback control. As a result, it is not feasible to produce a sufficient increase in circulating testosterone in women either by direct ovarian stimulation or indirect reflex effects to test this hypothesis even if doing so were deemed ethical and safe. Alternatively, carefully controlled, graded-dose studies in F2M transgender individuals might be informative but are largely lacking at this time.

Hence, the only feasible design of such studies would be testosterone (or another androgen) administration to healthy young women. The only well-designed, placebo-controlled study of testosterone in



**Figure 7.** Mean hemoglobin concentrations (g/dL) of 12 elite athletes in 4 groups of 3 XY or XX middle-distance runners. The hemoglobin concentrations were collected as a part of the Athlete Biological Passport and analyzed according to the World Anti-Doping Agency standard methods. Each bar (athlete) is the mean of a minimum of three blood samples. In the 46,XY DSD group, blood was collected in a period when the athlete was not undergoing hormonal suppressive treatment.

Downloaded from https://academic.oup.com/edrv/article/39/5/803/5052770 by guest on 25 September 2020

Downloaded from https://academic.oup.com/edrv/article/39/5/803/5052770 by guest on 25 September 2020

otherwise healthy postmenopausal women was re- stricted to relatively low testosterone doses that, al- though clearly supraphysiological for women, were only 20% to 25% of male testosterone replacement doses (112). We are currently performing a double- blind, randomized, placebo-controlled study of the effects of moderately increased testosterone concentra- tion on physical performance and behavior in young healthy women (ClinicalTrials.gov no. NCT03210558). However, obtaining ethical approval to administer supraphysiological testosterone doses that maintain circulating testosterone in the male range for sufficiently prolonged periods, as well as the practical difficulties in recruitment, are likely to remain obstacles to definitive resolution of this question.

In men, analogous ethical concerns over short- and long-term adverse effects delayed the definitive studies of supraphysiological testosterone doses to healthy young and older men but were eventually overcome. This was despite the fact that, uniquely among hor- mones, there is no known disease state in men due to pathologically excessive testosterone secretion. In contrast, in women, supraphysiological testosterone effects are known to produce virilization side ef- fects that may be only slowly and partially, if at all, reversible. However, maintaining clearly supra- physiological testosterone concentrations would re- quire treatment of months (muscle) or years (bone) and would replicate not only a known hyper- androgenic disease state (PCOS) but also potentially increasing risk of hormone-dependent cancers. In these circumstances, it could only be justifiable to replicate in women the salient testosterone dose- response studies available from men if the available evidence of dose-response relationship in men was not sufficiently convincing and/or there was reason to think that these dose-response characteristics would be substantially different in women. Overall, the un- equivocal dose-response evidence in men together with the available overlap evidence in women appears sufficiently persuasive, so that it is doubtful that women would respond differently from men if their circulating testosterone levels were raised to the male range. More broadly, there is no more reason to re- quire separate studies in women vs men than there is for every different ethnic subgroup of people. An aesthetic preference for splitting categories is not a sound reason to require the virtually impossible standard of establishing fresh and comprehensive empirical evidence in women of testosterone dose- response effects ranging into male circulating testos- terone concentrations.

An analogy can be drawn to the World Anti- Doping Agency's practice of accepting salient surro- gate evidence for banning the plethora of existing and new drugs with potential but individually unproven ergogenic effects where it is not feasible or ethical to require direct proof of the ergogenic effects. In that context, the firmly established ergogenic efficacy of androgens (on muscle mass and strength) and increased hemoglobin (on endurance) [evidence reviewed in (1)] mean that chemical substances or methods that increase endogenous testosterone, erythropoietin, or hemoglobin are also considered ergogenic (178). By parity of reasoning, if a condition causes a female athlete's circulating testosterone levels to be in the male range, well exceeding normal female levels, with consequential increases in muscle, he- moglobin, and bone effects (at least), an ergogenic effect may reasonably be assumed.

## Conclusions

The available, albeit incomplete, evidence makes it highly likely that the sex difference in circulating testosterone of adults explains most, if not all, the sex differences in sporting performance. This is based on the dose-response effects of circulating testosterone to increase muscle mass and strength, bone size and strength (density), and circulating hemoglobin, each of which alone increases athletic capacity, as well as other possible sex dichotomous, androgen-sensitive con- tributors such as mental effects (mood, motivation, aggression) and muscle myoglobin content. These facts explain the clear sex difference in athletic per- formance in most sports, on which basis it is com- monly accepted that competition has to be divided into male and female categories.

The first IAAF hyperandrogenism regulation specified a hormonal eligibility criterion of a serum testosterone of <10 nmol/L for an androgen-sensitive athlete's participation in the protected category of female athletic events. This threshold was based on serum testosterone measurements by immunoassays.



**Figure 8.** Best annual 800-m times of an elite female athlete between 2008 and 2016. Data provided by Dr. Richard Auchus, University of Michigan, Ann Arbor, Michigan.

**Table 5.** The Winning Margin in Elite Athletic or Swimming Events During the Last Three Olympics

| Median Margin (%)[a] | n | Win Gold | Win Medal | Make Final |
|---|---|---|---|---|
| Athletics[b] | | | | |
| Running | 81 | 0.62 | 0.31 | 0.22 |
| Jumping | 24 | 0.92 | 0.42 | 0.92 |
| Throwing | 24 | 1.93 | 0.70 | 0.75 |
| Swimming[c] | | | | |
| Backstroke | 12 | 0.56 | 0.28 | 0.16 |
| Breaststroke | 12 | 0.84 | 0.14 | 0.17 |
| Butterfly | 12 | 0.52 | 0.48 | 0.12 |
| Freestyle | 30 | 0.49 | 0.23 | 0.14 |
| Relay | 18 | 0.37 | 0.35 | 0.12 |

[a]Winning margin is defined as the difference (expressed as a percentage of the faster time) between first and second place (Win Gold), between third and fourth place (Win Medal), and between the last into the final and the first that missed out (Make Final). Years (2008, 2012, 2016) and sexes were combined as there were no significant differences in winning margin between them.

[b]Running includes 100 m, 200 m, 400 m, 800 m, 1500 m, 5000 m, 10,000 m, marathon, and 3000-m steeplechase, 110-m (male)/100-m (female) and 400-m hurdles, 4 × 100-m and 4 × 400-m relays, and 20-km and 50-km walk events. Jumping includes high jump, long jump, triple jump, and pole vault events. Throwing includes javelin, shot put, discus, and hammer events. Heptathlon and decathlon were not included as their final results are in points, not times.

[c]Events comprise 100 m and 200 m for the form strokes and 50 m, 100 m, 200 m, 400 m, 800 m (female)/1500 m (male) and marathon 10 km, with the relays being the 4 × 100-m medley and 4 × 100-m and 4 × 200-m freestyle relays.

Downloaded from https://academic.oup.com/edrv/article/39/5/803/5052770 by guest on 25 September 2020

However, no reliable method-independent consensus threshold could be established using commercial testosterone immunoassays, as these assays differ systematically due to method-specific bias arising unavoidably from the specificity of the different proprietary antibodies employed (25). Based on measurements using the more accurate and specific mass spectrometry methods, if the objective is to require female athletes with congenital conditions that cause them to have serum testosterone concentrations in the normal male range to bring those levels down to the same range as other female athletes, then (allowing for PCOS athletes) the threshold used should not be >5.0 nmol/L. This represents a conservative criterion that includes all healthy young (<40 years) women, including those with PCOS. Conversely, this criterion is generous to intersex/DSD females in allowing them to maintain a higher serum testosterone (2 to 5 nmol/L) than most other female competitors in female events even though increases in muscle mass and strength and hemoglobin would be expected in this range. This is so even though the range remains below the circulating testosterone levels of middle male puberty when the major biological effects of men's higher circulating testosterone begin to be fully expressed. Ongoing compliance with the eligibility criterion is also an important variable because the estrogen-based suppression of circulating testosterone, typically using daily administered estrogen products, has a rapid onset and offset. Adequate monitoring to prevent gaming of eligibility criteria would require

regular random rather than announced blood sampling.

A related matter is how long such a threshold of circulating testosterone should be maintained prior to competition. In both intersex/DSD and transgender individuals, the developmental effects of adult male circulating testosterone concentrations will have established the sex difference in muscle, hemoglobin, and bone, some of which is fixed and irreversible (bone size) and some of which is maintained by the male circulating testosterone concentrations (muscle, hemoglobin). The limited available prospective evidence from initiation of transgender cross-sex hormone treatment suggests that the advantageous increases in muscle and hemoglobin due to male circulating testosterone concentrations are induced or reversed during the first 12 months and the androgenic effects may plateau after time. This time course is much faster than the somatic effects of male puberty, which evolve over years and for some variables (e.g., peak bone mass) are not complete for up to a decade after the start of puberty. However, the abrupt hormonal changes induced by medical treatment in intersex/DSD or transgender individuals may be telescoped compared with male puberty where circulating testosterone concentrations increase irregularly and incompletely for some years. Additional data are available from the unique investigative model of men undergoing castration for prostate cancer. Just as androgen sensitivity to testosterone may differ between tissues (65), the time course of offset of

androgen effects following withdrawal of male testosterone concentrations may also differ between the major androgen-responsive tissues. For example, circulating hemoglobin shows a progressive fall for 6 months reaching a nadir and plateau at 12 to 16 months in six studies involving 534 men undergoing medical castration for prostate cancer (179–184). Although these studies of older men with prostate cancer must be extrapolated with caution, age, stage of disease, race, and baseline circulating

testosterone concentration did not affect the rate or extent of decline in hemoglobin (179, 181). Comparable longitudinal studies of muscle loss, strength, and performance following castration for prostate cancer are well summarized (185), showing progressive loss for 24 months (see Fig. 4). Further clinical studies to define the time course of changes, mainly offset, in testosterone-dependent effects, notably on muscle and hemoglobin, are badly needed to determine the optimal duration for cross-sex hormone effects in sports.

Downloaded from https://academic.oup.com/edrv/article/39/5/803/5052770 by guest on 25 September 2020

## References

1. Handelsman DJ. Performance enhancing hormones in sports doping. In: DeGroot LJ, Jameson JL, eds. *Endocrinology*. 7th ed. Philadelphia, PA: Elsevier Saunders; 2015:441–454.

2. Coleman SK. Sex in sport. Available at: ssrn.com/abstract=2928106. Accessed 22 October 2017.

3. Lee PA, Nordenström A, Houk CP, Ahmed SF, Auchus R, Baratz A, Baratz Dalke K, Liao LM, Lin-Su K, Looijenga LH III, Mazur T, Meyer-Bahlburg HF, Mouriquand P, Quigley CA, Sandberg DE, Vilain E, Witchel S; Global DSD Update Consortium. Global disorders of sex development update since 2006: perceptions, approach and care [published correction appears in *Horm Res Paediatr*. 2016;85(3):180]. *Horm Res Paediatr*. 2016;**85**(3):158–180.

4. Southren AL, Tochimoto S, Carmody NC, Isurugi K. Plasma production rates of testosterone in normal adult men and women and in patients with the syndrome of feminizing testes. *J Clin Endocrinol Metab*. 1965;**25**(11):1441–1450.

5. Horton R, Tait JF. Androstenedione production and interconversion rates measured in peripheral blood and studies on the possible site of its conversion to testosterone. *J Clin Invest*. 1966;**45**(3):301–313.

6. Southren AL, Gordon GG, Tochimoto S. Further study of factors affecting the metabolic clearance rate of testosterone in man. *J Clin Endocrinol Metab*. 1968;**28**(8):1105–1112.

7. Saez JM, Forest MG, Morera AM, Bertrand J. Metabolic clearance rate and blood production rate of testosterone and dihydrotestosterone in normal subjects, during pregnancy, and in hyperthyroidism. *J Clin Invest*. 1972;**51**(5):1226–1234.

8. Handelsman DJ. Sex differences in athletic performance emerge coinciding with the onset of male puberty. *Clin Endocrinol (Oxf)*. 2017;**87**(1):68–72.

9. Auchus RJ. Endocrinology and women's sports: the diagnosis matters. *Law Contemp Probl*. 2017;**80**:127–138.

10. Foddy B, Savulescu J. Time to re-evaluate gender segregation in athletics? *Br J Sports Med*. 2011;**45**(15):1184–1188.

11. Handelsman DJ. Androgen physiology, pharmacology and abuse. In: DeGroot LJ, Jameson JL, eds. *Endocrinology*. 7th ed. Philadelphia, PA: Elsevier Saunders; 2015:2368–2393.

12. Miller WL, Auchus RJ. The molecular biology, biochemistry, and physiology of human steroidogenesis and its disorders. *Endocr Rev*. 2011;**32**(1):81–151.

13. Abreu AP, Kaiser UB. Pubertal development and regulation. *Lancet Diabetes Endocrinol*. 2016;**4**(3):254–264.

14. Horton R, Shinsako J, Forsham PH. Testosterone production and metabolic clearance rates with

volumes of distribution in normal adult men and women. *Acta Endocrinol (Copenh)*. 1965;**48**:446–458.

15. Rivarola MA, Saez JM, Meyer WJ, Jenkins ME, Migeon CJ. Metabolic clearance rate and blood production rate of testosterone and androst-4-ene-3,17-dione under basal conditions, ACTH and HCG stimulation. Comparison with urinary production rate of testosterone. *J Clin Endocrinol Metab*. 1966;**26**(11):1208–1218.

16. Courant F, Aksglaede L, Antignac JP, Monteau F, Sorensen K, Andersson AM, Skakkebaek NE, Juul A, Bizec BL. Assessment of circulating sex steroid levels in prepubertal and pubertal boys and girls by a novel ultrasensitive gas chromatography-tandem mass spectrometry method. *J Clin Endocrinol Metab*. 2010;**95**(1):82–92.

17. Davison SL, Bell R, Donath S, Montalto JG, Davis SR. Androgen levels in adult females: changes with age, menopause, and oophorectomy. *J Clin Endocrinol Metab*. 2005;**90**(7):3847–3853.

18. Handelsman DJ, Sikaris K, Ly LP. Estimating age-specific trends in circulating testosterone and sex hormone-binding globulin in males and females across the lifespan. *Ann Clin Biochem*. 2016;**53**(Pt 3):377–384.

19. Rothman MS, Carlson NE, Xu M, Wang C, Swerdloff R, Lee P, Goh VH, Ridgway EC, Wierman ME. Reexamination of testosterone, dihydrotestosterone, estradiol and estrone levels across the menstrual cycle and in postmenopausal women measured by liquid chromatography–tandem mass spectrometry. *Steroids*. 2011;**76**(1-2):177–182.

20. Müller RK. History of doping and doping control. *Handb Exp Pharmacol*. 2010;(195):1–23.

21. Rosner W, Hankinson SE, Sluss PM, Vesper HW, Wierman ME. Challenges to the measurement of estradiol: an Endocrine Society position statement. *J Clin Endocrinol Metab*. 2013;**98**(4):1376–1387.

22. Rosner W, Auchus RJ, Azziz R, Sluss PM, Raff H. Position statement: utility, limitations, and pitfalls in measuring testosterone: an Endocrine Society position statement. *J Clin Endocrinol Metab*. 2007;**92**(2):405–413.

23. Handelsman DJ, Wartofsky L. Requirement for mass spectrometry sex steroid assays in the *Journal of Clinical Endocrinology and Metabolism*. *J Clin Endocrinol Metab*. 2013;**98**(10):3971–3973.

24. Handelsman DJ. Mass spectrometry, immunoassay and valid steroid measurements in reproductive medicine and science. *Hum Reprod*. 2017;**32**(6):1147–1150.

25. Sikaris K, McLachlan RI, Kazlauskas R, de Kretser D, Holden CA, Handelsman DJ. Reproductive hormone reference intervals for healthy fertile young men:

evaluation of automated platform assays. *J Clin Endocrinol Metab*. 2005;**90**(11):5928–5936.

26. Turpeinen U, Linko S, Itkonen O, Hämäläinen E. Determination of testosterone in serum by liquid chromatography-tandem mass spectrometry. *Scand J Clin Lab Invest*. 2008;**68**(1):50–57.

27. Kushnir MM, Blamires T, Rockwood AL, Roberts WL, Yue B, Erdogan E, Bunker AM, Meikle AW. Liquid chromatography–tandem mass spectrometry assay for androstenedione, dehydroepiandrosterone, and testosterone with pediatric and adult reference intervals. *Clin Chem*. 2010;**56**(7):1138–1147.

28. Salameh WA, Redor-Goldman MM, Clarke NJ, Reitz RE, Caulfield MP. Validation of a total testosterone assay using high-turbulence liquid chromatography tandem mass spectrometry: total and free testosterone reference ranges. *Steroids*. 2010;**75**(2):169–175.

29. Neale SM, Hocking R, Biswas M, Turkes A, Rees D, Rees DA, Evans C. Adult testosterone and calculated free testosterone reference ranges by tandem mass spectrometry. *Ann Clin Biochem*. 2013;**50**(Pt 2):159–161.

30. Kelsey TW, Li LQ, Mitchell RT, Whelan A, Anderson RA, Wallace WH. A validated age-related normative model for male total testosterone shows increasing variance but no decline after age 40 years [published correction appears in *PLoS One*. 2015;10(2):e0117674]. *PLoS One*. 2014;**9**(10):e109346.

31. Hart RJ, Doherty DA, McLachlan RI, Walls ML, Keelan JA, Dickinson JE, Skakkebaek NE, Norman RJ, Handelsman DJ. Testicular function in a birth cohort of young men. *Hum Reprod*. 2015;**30**(12):2713–2724.

32. Travison TG, Vesper HW, Orwoll E, Wu F, Kaufman JM, Wang Y, Lapauw B, Fiers T, Matsumoto AM, Bhasin S. Harmonized reference ranges for circulating testosterone levels in men of four cohort studies in the United States and Europe. *J Clin Endocrinol Metab*. 2017;**102**(4):1161–1173.

33. Haring R, Hannemann A, John U, Radke D, Nauck M, Wallaschofski H, Owen L, Adaway J, Keevil BG, Brabant G. Age-specific reference ranges for serum testosterone and androstenedione concentrations in women measured by liquid chromatography-tandem mass spectrometry. *J Clin Endocrinol Metab*. 2012;**97**(2):408–415.

34. Bui HN, Sluss PM, Blincko S, Knol DL, Blankenstein MA, Heijboer AC. Dynamics of serum testosterone during the menstrual cycle evaluated by daily measurements with an ID-LC-MS/MS method and a 2nd generation automated immunoassay. *Steroids*. 2013;**78**(1):96–101.

35. Bermon S, Garnier PY. Serum androgen levels and their relation to performance in track and field: mass spectrometry results from 2127 observations in male and female elite athletes. *Br J Sports Med.* 2017;**51**(17):1309–1314.

36. Eklund E, Berglund B, Labrie F, Carlström K, Ekström L, Hirschberg AL. Serum androgen profile and physical performance in women Olympic athletes. *Br J Sports Med.* 2017;**51**(11):1301–1308.

37. Travison TG, Zhuang WV, Lunetta KL, Karasik D, Bhasin S, Kiel DP, Coviello AD, Murabito JM. The heritability of circulating testosterone, oestradiol, oestrone and sex hormone binding globulin concentrations in men: the Framingham Heart Study. *Clin Endocrinol (Oxf).* 2014;**80**(2): 277–282.

38. Coviello AD, Zhuang WV, Lunetta KL, Bhasin S, Ulloor J, Zhang A, Karasik D, Kiel DP, Vasan RS, Murabito JM. Circulating testosterone and SHBG concentrations are heritable in women: the Framingham Heart Study. *J Clin Endocrinol Metab.* 2011;**96**(9):E1491–E1495.

39. Fui MN, Dupuis P, Grossmann M. Lowered testosterone in male obesity: mechanisms, morbidity and management. *Asian J Androl.* 2014;**16**(2): 223–231.

40. Corona G, Rastrelli G, Monami M, Saad F, Luconi M, Lucchese M, Facchiano E, Sforza A, Forti G, Mannucci E, Maggi M. Body weight loss reverts obesity-associated hypogonadotropic hypogonadism: a systematic review and meta-analysis. *Eur J Endocrinol.* 2013;**168**(6):829–843.

41. Sartorius G, Spasevska S, Idan A, Turner L, Forbes E, Zamojska A, Allan CA, Ly LP, Conway AJ, McLachlan RI, Handelsman DJ. Serum testosterone, dihydrotestosterone and estradiol concentrations in older men self-reporting very good health: the healthy man study. *Clin Endocrinol (Oxf).* 2012;**77**(5): 755–763.

42. Webb ML, Wallace JP, Hamill C, Hodgson JL, Mashaly MM. Serum testosterone concentration during two hours of moderate intensity treadmill running in trained men and women. *Endocr Res.* 1984;**10**(1):27–38.

43. Cano Sokoloff N, Misra M, Ackerman KE. Exercise, training, and the hypothalamic-pituitary-gonadal axis in men and women. *Front Horm Res.* 2016; **47**:27–43.

44. Bozdag G, Mumusoglu S, Zengin D, Karabulut E, Yildiz BO. The prevalence and phenotypic features of polycystic ovary syndrome: a systematic review and meta-analysis. *Hum Reprod.* 2016;**31**(12): 2841–2855.

45. Hagmar M, Berglund B, Brismar K, Hirschberg AL. Hyperandrogenism may explain reproductive dysfunction in Olympic athletes. *Med Sci Sports Exerc.* 2009;**41**(6):1241–1248.

46. Eliakim A, Marom N, Galitskaya L, Nemet D. Hyperandrogenism among elite adolescent female athletes. *J Pediatr Endocrinol Metab.* 2010;**23**(8): 755–758.

47. Rickenlund A, Carlström K, Ekblom B, Brismar TB, von Schoultz B, Hirschberg AL. Hyperandrogenicity is an alternative mechanism underlying oligomenorrhea or amenorrhea in female athletes and may improve physical performance. *Fertil Steril.* 2003; **79**(4):947–955.

48. Falhammar H, Nordenström A. Nonclassic congenital adrenal hyperplasia due to 21-hydroxylase deficiency: clinical presentation, diagnosis, treatment, and outcome. *Endocrine.* 2015;**50**(1):32–50.

49. Auchus RJ. The classic and nonclassic concenital adrenal hyperplasias. *Endocr Pract.* 2015;**21**(4): 383–389.

50. Moran LJ, Mundra PA, Teede HJ, Meikle PJ. The association of the lipidomic profile with features of polycystic ovary syndrome. *J Mol Endocrinol.* 2017; **59**(1):93–104.

51. Münzker J, Lindheim L, Adaway J, Trummer C, Lerchbaum E, Pieber TR, Keevil B, Obermayer-Pietsch B. High salivary testosterone-to-androstenedione ratio and adverse metabolic phenotypes in women with polycystic ovary syndrome. *Clin Endocrinol (Oxf).* 2017; **86**(4):567–575.

52. O'Reilly MW, Kempegowda P, Jenkinson C, Taylor AE, Quanson JL, Storbeck KH, Arlt W. 11-Oxygenated C19 steroids are the predominant androgens in polycystic ovary syndrome. *J Clin Endocrinol Metab.* 2017;**102**(3):840–848.

53. Handelsman DJ, Teede HJ, Desai R, Norman RJ, Moran LJ. Performance of mass spectrometry steroid profiling for diagnosis of polycystic ovary syndrome. *Hum Reprod.* 2017;**32**(2):418–422.

54. Pasquali R, Zanotti L, Fanelli F, Mezzullo M, Fazzini A, Morselli Labate AM, Repaci A, Ribichini D, Gambineri A. Defining hyperandrogenism in women with polycystic ovary syndrome: a challenging perspective. *J Clin Endocrinol Metab.* 2016; **101**(5):2013–2022.

55. Yang Y, Han Y, Wang W, Du T, Li Y, Zhang J, Yang D, Zhao X. Assessing new terminal body and facial hair growth during pregnancy: toward developing a simplified visual scoring system for hirsutism. *Fertil Steril.* 2016;**105**(2):494–500.

56. Tosi F, Fiers T, Kaufman JM, Dall'Alda M, Moretta R, Giagulli VA, Bonora E, Moghetti P. Implications of androgen assay accuracy in the phenotyping of women with polycystic ovary syndrome. *J Clin Endocrinol Metab.* 2016;**101**(2):610–618.

57. Daan NM, Jaspers L, Koster MP, Broekmans FJ, de Rijke YB, Franco OH, Laven JS, Kavousi M, Fauser BC. Androgen levels in women with various forms of ovarian dysfunction: associations with cardiometabolic features. *Hum Reprod.* 2015;**30**(10): 2376–2386.

58. Bui HN, Sluss PM, Hayes FJ, Blincko S, Knol DL, Blankenstein MA, Heijboer AC. Testosterone, free testosterone, and free androgen index in women: reference intervals, biological variation, and diagnostic value in polycystic ovary syndrome. *Clin Chim Acta.* 2015;**450**:227–232.

59. Keefe CC, Goldman MM, Zhang K, Clarke N, Reitz RE, Welt CK. Simultaneous measurement of thirteen steroid hormones in women with polycystic ovary syndrome and control women using liquid chromatography-tandem mass spectrometry. *PLoS One.* 2014;**9**(4):e93805.

60. Yasmin E, Balen AH, Barth JH. The association of body mass index and biochemical hyperandrogenaemia in women with and without polycystic ovary syndrome. *Eur J Obstet Gynecol Reprod Biol.* 2013;**166**(2):173–177.

61. Janse F, Eijkemans MJ, Goverde AJ, Lentjes EG, Hoek A, Lambalk CB, Hickey TE, Fauser BC, Norman RJ. Assessment of androgen concentration in women: liquid chromatography–tandem mass spectrometry and extraction RIA show comparable results. *Eur J Endocrinol.* 2011;**165**(6):925–933.

62. Jedel E, Gustafson D, Waern M, Sverrisdottir YB, Landén M, Janson PO, Labrie F, Ohlsson C, Stener-Victorin E. Sex steroids, insulin sensitivity and sympathetic nerve activity in relation to affective symptoms in women with polycystic ovary syndrome. *Psychoneuroendocrinology.* 2011;**36**(10): 1470–1479.

63. Legro RS, Schlaff WD, Diamond MP, Coutifaris C, Casson PR, Brzyski RG, Christman GM, Trussell JC, Krawetz SA, Snyder PJ, Ohl D, Carson SA,

Steinkampf MP, Carr BR, McGovern PG, Cataldo NA, Gosman GG, Nestler JE, Myers ER, Santoro N, Eisenberg E, Zhang M, Zhang H; Reproductive Medicine Network. Total testosterone assays in women with polycystic ovary syndrome: precision and correlation with hirsutism. *J Clin Endocrinol Metab.* 2010;**95**(12):5305–5313.

64. Stener-Victorin E, Holm G, Labrie F, Nilsson L, Janson PO, Ohlsson C. Are there any sensitive and specific sex steroid markers for polycystic ovary syndrome? *J Clin Endocrinol Metab.* 2010;**95**(2): 810–819.

65. Finkelstein JS, Lee H, Burnett-Bowie SA, Pallais JC, Yu EW, Borges LF, Jones BF, Barry CV, Wulczyn KE, Thomas BJ, Leder BZ. Gonadal steroids and body composition, strength, and sexual function in men. *N Engl J Med.* 2013;**369**(11):1011–1022.

66. Donovan KA, Gonzalez BD, Nelson AM, Fishman MN, Zachariah B, Jacobsen PB. Effect of androgen deprivation therapy on sexual function and bother in men with prostate cancer: a controlled comparison. *Psychooncology.* 2018;**27**(1):316–324.

67. Buena F, Swerdloff RS, Steiner BS, Lutchmansingh P, Peterson MA, Pandian MR, Galmarini M, Bhasin S. Sexual function does not change when serum testosterone levels are pharmacologically varied within the normal male range. *Fertil Steril.* 1993; **59**(5):1118–1123.

68. Sartorius GA, Ly LP, Handelsman DJ. Male sexual function can be maintained without aromatization: randomized placebo-controlled trial of dihydrotestosterone (DHT) in healthy, older men for 24 months. *J Sex Med.* 2014;**11**(10):2562–2570.

69. Liu PY, Swerdloff RS, Christenson PD, Handelsman DJ, Wang C; Hormonal Male Contraception Summit Group. Rate, extent, and modifiers of spermatogenic recovery after hormonal male contraception: an integrated analysis. *Lancet.* 2006;**367**(9520): 1412–1420.

70. Walsh PC, Swerdloff RS. Biphasic effect of testosterone on spermatogenesis in the rat. *Invest Urol.* 1973;**11**(3):190–193.

71. Singh J, O'Neill C, Handelsman DJ. Induction of spermatogenesis by androgens in gonadotropin-deficient (hpg) mice. *Endocrinology.* 1995;**136**(12): 5311–5321.

72. Handelsman DJ, Spaliviero JA, Simpson JM, Allan CM, Singh J. Spermatogenesis without gonadotropins: maintenance has a lower testosterone threshold than initiation. *Endocrinology.* 1999; **140**(9):3938–3946.

73. Juel Mortensen L, Blomberg Jensen M, Christiansen P, Rønholt AM, Jørgensen A, Frederiksen H, Nielsen JE, Loya AC, Grønkær Toft B, Skakkebæk NE, Rajpert-De Meyts E, Juul A. Germ cell neoplasia in situ and preserved fertility despite suppressed gonadotropins in a patient with testotoxicosis. *J Clin Endocrinol Metab.* 2017;**102**(12):4411–4416.

74. Cunha-Silva M, Brito VN, Macedo DB, Bessa DS, Ramos CO, Lima LG, Barroso PS, Arnhold IJP, Segaloff DL, Mendonca BB, Latronico AC. Spontaneous fertility in a male patient with testotoxicosis despite suppression of FSH levels. *Hum Reprod.* 2018;**33**(5):914–918.

75. Mendonca BB, Batista RL, Domenice S, Costa EM, Arnhold IJ, Russell DW, Wilson JD. Steroid 5α-reductase 2 deficiency. *J Steroid Biochem Mol Biol.* 2016;**163**:206–211.

76. Mendonca BB, Gomes NL, Costa EM, Inacio M, Martin RM, Nishi MY, Carvalho FM, Tibor FD, Domenice S. 46,XY disorder of sex development (DSD) due to 17β-hydroxysteroid dehydrogenase type 3 deficiency. *J Steroid Biochem Mol Biol.* 2017; **165**(Pt A):79–85.

Downloaded from https://academic.oup.com/edrv/article/39/5/803/5052770 by guest on 25 September 2020

77. Quigley CA, De Bellis A, Marschke KB, el-Awady MK, Wilson EM, French FS. Androgen receptor defects: historical, clinical, and molecular perspectives. *Endocr Rev.* 1995;**16**(3):271–321.

78. Lucas-Herald A, Bertelloni S, Juul A, Bryce J, Jiang J, Rodie M, Sinnott R, Boroujerdi M, Lindhardt Johansen M, Hiort O, Holterhus PM, Cools M, Guaragna-Filho G, Guerra-Junior G, Weintrob N, Hannema S, Drop S, Guran T, Darendeliler F, Nordenstrom A, Hughes IA, Acerini C, Tadokoro-Cuccaro R, Ahmed SF. The long-term outcome of boys with partial androgen insensitivity syndrome and a mutation in the androgen receptor gene. *J Clin Endocrinol Metab.* 2016;**101**(11):3959–3967.

79. El-Maouche D, Arlt W, Merke DP. Congenital adrenal hyperplasia. *Lancet.* 2017;**390**(10108): 2194–2210.

80. Bermon S, Garnier PY, Hirschberg AL, Robinson N, Giraud S, Nicoli R, Baume N, Saugy M, Fénichel P, Bruce SJ, Henry H, Dollé G, Ritzen M. Serum androgen levels in elite female athletes. *J Clin Endocrinol Metab.* 2014;**99**(11):4328–4335.

81. Imperato-McGinley J, Peterson RE, Gautier T, Sturla E. Androgens and the evolution of male-gender identity among male pseudohermaphrodites with 5α-reductase deficiency. *N Engl J Med.* 1979;**300**(22): 1233–1237.

82. Kang HJ, Imperato-McGinley J, Zhu YS, Rosenwaks Z. The effect of 5α-reductase-2 deficiency on human fertility. *Fertil Steril.* 2014;**101**(2):310–316.

83. Strickland AL, French FS. Absence of response to dihydrotestosterone in the syndrome of testicular feminization. *J Clin Endocrinol Metab.* 1969;**29**(9): 1284–1286.

84. Rosenfield RL, Lawrence AM, Liao S, Landau RL. Androgens and androgen responsiveness in the feminizing testis syndrome. Comparison of complete and "incomplete" forms. *J Clin Endocrinol Metab.* 1971;**32**(5):625–632.

85. Hamilton CR Jr, Kliman B. Anabolic effect of dihydrotestosterone in testicular feminization syndrome. *Metabolism.* 1971;**20**(9):870–877.

86. Zachmann M, Zagalak M, Völlmin JA, Gitzelmann RP, Prader A. Influence of testosterone on urinary ¹⁵N-balance in normal subjects and patients with testicular feminization. *Clin Chim Acta.* 1977;**77**(2): 147–157.

87. Tincello DG, Saunders PT, Hodgins MB, Simpson NB, Edwards CR, Hargreaves TB, Wu FC. Correlation of clinical, endocrine and molecular abnormalities with in vivo responses to high-dose testosterone in patients with partial androgen insensitivity syndrome. *Clin Endocrinol (Oxf).* 1997;**46**(4): 497–506.

88. Grino PB, Isidro-Gutierrez RF, Griffin JE, Wilson JD. Androgen resistance associated with a qualitative abnormality of the androgen receptor and responsive to high dose androgen therapy. *J Clin Endocrinol Metab.* 1989;**68**(3):578–584.

89. Lundberg Giwercman Y, Nikoshkov A, Lindsten K, Byström B, Pousette A, Knudtzon J, Alm J, Wedell A. Response to treatment in patients with partial androgen insensitivity due to mutations in the DNA-binding domain of the androgen receptor. *Horm Res.* 2000;**53**(2):83–88.

90. Holterhus PM, Sinnecker GH, Hiort O. Phenotypic diversity and testosterone-induced normalization of mutant L712F androgen receptor function in a kindred with androgen insensitivity. *J Clin Endocrinol Metab.* 2000;**85**(9):3245–3250.

91. Quigley CA. *The androgen receptor: physiology and pathophysiology.* In: Nieschlag E, Behre HM, eds. *Testosterone: Action, Deficiency, Substitution.* 2nd ed. Berlin, Germany: Springer-Verlag; 1998:33–106.

92. Karunasena N, Han TS, Mallappa A, Elman M, Merke DP, Ross RJ, Daniel E. Androgens correlate with increased erythropoiesis in women with congenital adrenal hyperplasia. *Clin Endocrinol (Oxf).* 2017;**86**(1):19–25.

93. Herbst KL, Bhasin S. Testosterone action on skeletal muscle. *Curr Opin Clin Nutr Metab Care.* 2004;**7**(3): 271–277.

94. Dubois V, Laurent MR, Sinnesael M, Cielen N, Helsen C, Clinckemalie L, Spans L, Gayan-Ramirez G, Deldicque L, Hespel P, Carmeliet G, Vanderschueren D, Claessens F. A satellite cell-specific knockout of the androgen receptor reveals myostatin as a direct androgen target in skeletal muscle. *FASEB J.* 2014;**28**(7):2979–2994.

95. Usui T, Kajita K, Kajita T, Mori I, Hanamoto T, Ikeda T, Okada H, Taguchi K, Kitada Y, Morita H, Sasaki T, Kitamura T, Sato T, Kojima I, Ishizuka T. Elevated mitochondrial biogenesis in skeletal muscle is associated with testosterone-induced body weight loss in male mice. *FEBS Lett.* 2014;**588**(10): 1935–1941.

96. Mänttäri S, Anttila K, Järvilehto M. Testosterone stimulates myoglobin expression in different muscles of the mouse. *J Comp Physiol B.* 2008;**178**(7): 899–907.

97. Ferrando AA, Sheffield-Moore M, Yeckel CW, Gilkison C, Jiang J, Achacosa A, Lieberman SA, Tipton K, Wolfe RR, Urban RJ. Testosterone administration to older men improves muscle function: molecular and physiological mechanisms. *Am J Physiol Endocrinol Metab.* 2002;**282**(3):E601–E607.

98. Matzuk MM, Lamb DJ. The biology of infertility: research advances and clinical challenges. *Nat Med.* 2008;**14**(11):1197–1213.

99. Matzuk MM, Lamb DJ. Genetic dissection of mammalian fertility pathways. *Nat Cell Biol.* 2002; **4**(Suppl):S41–S49.

100. Walters KA, Simanainen U, Handelsman DJ. Molecular insights into androgen actions in male and female reproductive function from androgen receptor knockout models. *Hum Reprod Update.* 2010;**16**(5):543–558.

101. MacLean HE, Chiu WS, Notini AJ, Axell AM, Davey RA, McManus JF, Ma C, Plant DR, Lynch GS, Zajac JD. Impaired skeletal muscle development and function in male, but not female, genomic androgen receptor knockout mice. *FASEB J.* 2008; **22**(8):2676–2689.

102. Morrow JR Jr, Hosler WW. Strength comparisons in untrained men and trained women athletes. *Med Sci Sports Exerc.* 1981;**13**(3):194–197.

103. Miller AE, MacDougall JD, Tarnopolsky MA, Sale DG. Gender differences in strength and muscle fiber characteristics. *Eur J Appl Physiol Occup Physiol.* 1993;**66**(3):254–262.

104. Janssen I, Heymsfield SB, Wang ZM, Ross R. Skeletal muscle mass and distribution in 468 men and women aged 18–88 yr. *J Appl Physiol.* 2000;**89**(1): 81–88.

105. Hosler WW, Morrow JR Jr. Arm and leg strength compared between young women and men after allowing for differences in body size and composition. *Ergonomics.* 1982;**25**(4):309–313.

106. Sale DG. Neuromuscular function. In: Tarnopolsky M, ed. *Gender Differences in Metabolism: Practical and Nutritional Implications.* Boca Raton, FL: CRC Press; 1999:61–86.

107. Tønnessen E, Svendsen IS, Olsen IC, Guttormsen A, Haugen T. Performance development in adolescent track and field athletes according to age, sex and sport discipline. *PLoS One.* 2015;**10**(6):e0129014.

108. Carmina E, Guastella E, Longo RA, Rini GB, Lobo RA. Correlates of increased lean muscle mass in women with polycystic ovary syndrome. *Eur J Endocrinol.* 2009;**161**(4):583–589.

109. Douchi T, Oki T, Yamasaki H, Kuwahata R, Nakae M, Nagata Y. Relationship of androgens to muscle size and bone mineral density in women with polycystic ovary syndrome. *Obstet Gynecol.* 2001; **98**(3):445–449.

110. Cardinale M, Stone MH. Is testosterone influencing explosive performance? *J Strength Cond Res.* 2006; **20**(1):103–107.

111. Bhasin S, Woodhouse L, Casaburi R, Singh AB, Bhasin D, Berman N, Chen X, Yarasheski KE, Magliano L, Dzekov C, Dzekov J, Bross R, Phillips J, Sinha-Hikim I, Shen R, Storer TW. Testosterone dose-response relationships in healthy young men. *Am J Physiol Endocrinol Metab.* 2001;**281**(6): E1172–E1181.

112. Huang G, Basaria S, Travison TG, Ho MH, Davda M, Mazer NA, Miciek R, Knapp PE, Zhang A, Collins L, Ursino M, Appleman E, Dzekov C, Stroh H, Ouellette M, Rundell T, Baby M, Bhatia NN, Khorram O, Friedman T, Storer TW, Bhasin S. Testosterone dose-response relationships in hysterectomized women with or without oophorectomy: effects on sexual function, body composition, muscle performance and physical function in a randomized trial. *Menopause.* 2014;**21**(6):612–623.

113. Dobs AS, Nguyen T, Pace C, Roberts CP. Differential effects of oral estrogen versus oral estrogen-androgen replacement therapy on body composition in postmenopausal women. *J Clin Endocrinol Metab.* 2002;**87**(4):1509–1516.

114. Elbers JM, Asscheman H, Seidell JC, Gooren LJ. Effects of sex steroid hormones on regional fat depots as assessed by magnetic resonance imaging in transsexuals. *Am J Physiol.* 1999;**276**(2 Pt 1): E317–E325.

115. Van Caenegem E, Wierckx K, Taes Y, Schreiner T, Vandewalle S, Toye K, Lapauw B, Kaufman JM, T'Sjoen G. Body composition, bone turnover, and bone mass in trans men during testosterone treatment: 1-year follow-up data from a prospective case-controlled study (ENIGI). *Eur J Endocrinol.* 2015; **172**(2):163–171.

116. Sonksen P. Determination and regulation of body composition in elite athletes. *Br J Sports Med.* 2018; **52**(4):219–229.

117. Storer TW, Woodhouse L, Magliano L, Singh AB, Dzekov C, Dzekov J, Bhasin S. Changes in muscle mass, muscle strength, and power but not physical function are related to testosterone dose in healthy older men. *J Am Geriatr Soc.* 2008;**56**(11):1991–1999.

118. Bhasin S, Parker RA, Sattler F, Haubrich R, Alston B, Umbleja T, Shikuma CM; AIDS Clinical Trials Group Protocol A5079 Study Team. Effects of testosterone supplementation on whole body and regional fat mass and distribution in human immunodeficiency virus-infected men with abdominal obesity. *J Clin Endocrinol Metab.* 2007;**92**(3):1049–1057.

119. Bhasin S, Woodhouse L, Casaburi R, Singh AB, Mac RP, Lee M, Yarasheski KE, Sinha-Hikim I, Dzekov C, Dzekov J, Magliano L, Storer TW. Older men are as responsive as young men to the anabolic effects of graded doses of testosterone on the skeletal muscle. *J Clin Endocrinol Metab.* 2005;**90**(2):678–688.

120. Franke WW, Berendonk B. Hormonal doping and androgenization of athletes: a secret program of the German Democratic Republic government. *Clin Chem.* 1997;**43**(7):1262–1279.

121. Shahani S, Braga-Basaria M, Maggio M, Basaria S. Androgens and erythropoiesis: past and present. *J Endocrinol Invest.* 2009;**32**(8):704–716.

122. Bachman E, Travison TG, Basaria S, Davda MN, Guo W, Li M, Connor Westfall J, Bae H, Gordeuk V,

Downloaded from https://academic.oup.com/edrv/article/39/5/803/5052770 by guest on 25 September 2020

Bhasin S. Testosterone induces erythrocytosis via increased erythropoietin and suppressed hepcidin: evidence for a new erythropoietin/hemoglobin set point. *J Gerontol A Biol Sci Med Sci.* 2014;**69**(6): 725–735.

123. Ordway GA, Garry DJ. Myoglobin: an essential hemoprotein in striated muscle. *J Exp Biol.* 2004; **207**(Pt 20):3441–3446.

124. Ekblom B, Goldbarg AN, Gullbring B. Response to exercise after blood loss and reinfusion. *J Appl Physiol.* 1972;**33**(2):175–180.

125. Murphy WG. The sex difference in haemoglobin levels in adults—mechanisms, causes, and consequences. *Blood Rev.* 2014;**28**(2):41–47.

126. Grossmann M, Zajac JD. Hematological changes during androgen deprivation therapy. *Asian J Androl.* 2012;**14**(2):187–192.

127. Snyder PJ, Peachey H, Berlin JA, Hannoush P, Haddad G, Dlewati A, Santanna J, Loh L, Lenrow DA, Holmes JH, Kapoor SC, Atkinson LE, Strom BL. Effects of testosterone replacement in hypogonadal men. *J Clin Endocrinol Metab.* 2000;**85**(8):2670–2677.

128. Roy CN, Snyder PJ, Stephens-Shields AJ, Artz AS, Bhasin S, Cohen HJ, Farrar JT, Gill TM, Zeldow B, Cella D, Barrett-Connor E, Cauley JA, Crandall JP, Cunningham GR, Ensrud KE, Lewis CE, Matsumoto AM, Molitch ME, Pahor M, Swerdloff RS, Cifelli D, Hou X, Resnick SM, Walston JD, Anton S, Basaria S, Diem SJ, Wang C, Schrier SL, Ellenberg SS. Association of testosterone levels with anemia in older men: a controlled clinical trial. *JAMA Intern Med.* 2017;**177**(4):480–490.

129. Berria R, Gastaldelli A, Lucidi S, Belfort R, De Filippis E, Easton C, Brytzki R, Cusi K, Jovanovic L, DeFronzo R. Reduction in hematocrit level after pioglitazone treatment is correlated with decreased plasma free testosterone level, not hemodilution, in women with polycystic ovary syndrome. *Clin Pharmacol Ther.* 2006;**80**(2):105–114.

130. Han Y, Kim HS, Lee HJ, Oh JY, Sung YA. Metabolic effects of polycystic ovary syndrome in adolescents. *Ann Pediatr Endocrinol Metab.* 2015;**20**(3): 136–142.

131. Coviello AD, Kaplan B, Lakshman KM, Chen T, Singh AB, Bhasin S. Effects of graded doses of testosterone on erythropoiesis in healthy young and older men. *J Clin Endocrinol Metab.* 2008;**93**(3):914–919.

132. Irwig MS. Testosterone therapy for transgender men. *Lancet Diabetes Endocrinol.* 2017;**5**(4):301–311.

133. Velho I, Fighera TM, Ziegelmann PK, Spritzer PM. Effects of testosterone therapy on BMI, blood pressure, and laboratory profile of transgender men: a systematic review. *Andrology.* 2017;**5**(5): 881–888.

134. Jacobeit JW, Gooren LJ, Schulte HM. Safety aspects of 36 months of administration of long-acting intramuscular testosterone undecanoate for treatment of female-to-male transgender individuals. *Eur J Endocrinol.* 2009;**161**(5):795–798.

135. Almeida M, Laurent MR, Dubois V, Claessens F, O'Brien CA, Bouillon R, Vanderschueren D, Manolagas SC. Estrogens and androgens in skeletal physiology and pathophysiology. *Physiol Rev.* 2017; **97**(1):135–187.

136. Sharma K, Gupta P, Shandilya S. Age related changes in pelvis size among adolescent and adult females with reference to parturition from Naraingarh, Haryana (India). *Homo.* 2016;**67**(4):273–293.

137. Fischer B, Mitteroecker P. Allometry and sexual dimorphism in the human pelvis. *Anat Rec (Hoboken).* 2017;**300**(4):698–705.

138. Riesenfeld A. Functional and hormonal control of pelvic width in the rat. *Acta Anat (Basel).* 1978; **102**(4):427–432.

139. Berdnikovs S, Bernstein M, Metzler A, German RZ. Pelvic growth: ontogeny of size and shape sexual dimorphism in rat pelves. *J Morphol.* 2007;**268**(1): 12–22.

140. Polderman TJ, Benyamin B, de Leeuw CA, Sullivan PF, van Bochoven A, Visscher PM, Posthuma D. Meta-analysis of the heritability of human traits based on fifty years of twin studies. *Nat Genet.* 2015; **47**(7):702–709.

141. Jelenkovic A, Sund R, Hur YM, Yokoyama Y, Hjelmborg JV, Möller S, Honda C, Magnusson PK, Pedersen NL, Ooki S, Aaltonen S, Stazi MA, Fagnani C, D'Ippolito C, Freitas DL, Maia JA, Ji F, Ning F, Pang Z, Rebato E, Busjahn A, Kandler C, Saudino KJ, Jang KL, Cozen W, Hwang AE, Mack TM, Gao W, Yu C, Li C, Corley RP, Huibregtse BM, Derom CA, Vlietinck RF, Loos RJ, Heikkilä K, Wardle J, Llewellyn CH, Fisher A, McAdams TA, Eley TC, Gregory AM, He M, Ding X, Bjerregaard-Andersen M, Beck-Nielsen H, Sodemann M, Tarnoki AD, Tarnoki DL, Knafo-Noam A, Mankuta D, Abramson L, Burt SA, Klump KL, Silberg JL, Eaves LJ, Maes HH, Krueger RF, McGue M, Pahlen S, Gatz M, Butler DA, Bartels M, van Beijsterveldt TC, Craig JM, Saffery R, Dubois L, Boivin M, Brendgen M, Dionne G, Vitaro F, Martin NG, Medland SE, Montgomery GW, Swan GE, Krasnow R, Tynelius P, Lichtenstein P, Haworth CM, Plomin R, Bayasgalan G, Narandalai D, Harden KP, Tucker-Drob EM, Spector T, Mangino M, Lachance G, Baker LA, Tuvblad C, Duncan GE, Buchwald D, Willemsen G, Skytthe A, Kyvik KO, Christensen K, Öncel SY, Aliev F, Rasmussen F, Goldberg JH, Sørensen TI, Boomsma DI, Kaprio J, Silventoinen K. Genetic and environmental influences on height from infancy to early adulthood: an individual-based pooled analysis of 45 twin cohorts. *Sci Rep.* 2016;**6**(1):28496.

142. Jelenkovic A, Hur YM, Sund R, Yokoyama Y, Siribaddana SH, Hotopf M, Sumathipala A, Rijsdijk F, Tan Q, Zhang D, Pang Z, Aaltonen S, Heikkilä K, Öncel SY, Aliev F, Rebato E, Tarnoki AD, Tarnoki DL, Christensen K, Skytthe A, Kyvik KO, Silberg JL, Eaves LJ, Maes HH, Cutler TL, Hopper JL, Ordoñana JR, Sánchez-Romera JF, Colodro-Conde L, Cozen W, Hwang AE, Mack TM, Sung J, Song YM, Yang S, Lee K, Franz CE, Kremen WS, Lyons MJ, Busjahn A, Nelson TL, Whitfield KE, Kandler C, Jang KL, Gatz M, Butler DA, Stazi MA, Fagnani C, D'Ippolito C, Duncan GE, Buchwald D, Derom CA, Vlietinck RF, Loos RJ, Martin NG, Medland SE, Montgomery GW, Jeong HU, Swan GE, Krasnow R, Magnusson PK, Pedersen NL, Dahl-Aslan AK, McAdams TA, Eley TC, Gregory AM, Tynelius P, Baker LA, Tuvblad C, Bayasgalan G, Narandalai D, Lichtenstein P, Spector TD, Mangino M, Lachance G, Bartels M, van Beijsterveldt TC, Willemsen G, Burt SA, Klump KL, Harris JR, Brandt I, Nilsen TS, Krueger RF, McGue M, Pahlen S, Corley RP, Hjelmborg JV, Goldberg JH, Iwatani Y, Watanabe M, Honda C, Inui F, Rasmussen F, Huibregtse BM, Boomsma DI, Sørensen TI, Kaprio J, Silventoinen K. Genetic and environmental influences on adult human height across birth cohorts from 1886 to 1994. *eLife.* 2016;**5**: e20320.

143. Bechtold S, Beyerlein A, Bonfig W, Dalla Pozza R, Putzker S, Otto R, Schmidt H, Schwarz HP. Sexual difference in bone geometry of adult patients with classical congenital adrenal hyperplasia: data using peripheral quantitative computed tomography. *Horm Res Paediatr.* 2014;**82**(3): 171–178.

144. Falhammar H, Filipsson H, Holmdahl G, Janson PO, Nordenskjöld A, Hagenfeldt K, Thorén M. Fractures and bone mineral density in adult women with 21-hydroxylase deficiency. *J Clin Endocrinol Metab.* 2007;**92**(12):4643–4649.

145. Bhasin S, Storer TW, Berman N, Callegari C, Clevenger B, Phillips J, Bunnell TJ, Tricker R, Shirazi A, Casaburi R. The effects of supraphysiologic doses of testosterone on muscle size and strength in normal men. *N Engl J Med.* 1996;**335**(1):1–7.

146. Moreira CA, Bilezikian JP. Stress fractures: concepts and therapeutics. *J Clin Endocrinol Metab.* 2017; **102**(2):525–534.

147. Foryst-Ludwig A, Kintscher U. Sex differences in exercise-induced cardiac hypertrophy. *Pflugers Arch.* 2013;**465**(5):731–737.

148. Gibala MJ, Gillen JB, Percival ME. Physiological and health-related adaptations to low-volume interval training: influences of nutrition and sex. *Sports Med.* 2014;**44**(Suppl 2):S127–S137.

149. Townsend EA, Miller VM, Prakash YS. Sex differences and sex steroids in lung health and disease. *Endocr Rev.* 2012;**33**(1):1–47.

150. Levine SC, Foley A, Lourenco S, Ehrlich S, Ratliff K. Sex differences in spatial cognition: advancing the conversation. *Wiley Interdiscip Rev Cogn Sci.* 2016; **7**(2):127–155.

151. Hines M. Prenatal testosterone and gender-related behaviour. *Eur J Endocrinol.* 2006;**155**(Suppl 1): S115–S121.

152. Hines M, Spencer D, Kung KT, Browne WV, Constantinescu M, Noorderhaven RM. The early postnatal period, mini-puberty, provides a window on the role of testosterone in human neurobehavioural development. *Curr Opin Neurobiol.* 2016;**38**:69–73.

153. Pope HG Jr., Kouri EM, Hudson JI. Effects of supraphysiologic doses of testosterone on mood and aggression in normal men: a randomized controlled trial. *Arch Gen Psychiatry.* 2000;**57**(2): 133–140.

154. Ferguson-Smith MA, Bavington LD. Natural selection for genetic variants in sport: the role of Y chromosome genes in elite female athletes with 46, XY DSD. *Sports Med.* 2014;**44**(12):1629–1634.

155. Heymsfield SB, Gonzalez MC, Lu J, Jia G, Zheng J. Skeletal muscle mass and quality: evolution of modern measurement concepts in the context of sarcopenia. *Proc Nutr Soc.* 2015;**74**(4):355–366.

156. Silventoinen K, Sammalisto S, Perola M, Boomsma DI, Cornes BK, Davis C, Dunkel L, De Lange M, Harris JR, Hjelmborg JV, Luciano M, Martin NG, Mortensen J, Nistico L, Pedersen NL, Skytthe A, Spector TD, Stazi MA, Willemsen G, Kaprio J. Heritability of adult body height: a comparative study of twin cohorts in eight countries. *Twin Res.* 2003;**6**(5):399–408.

157. Beunen G, Thomis M. Gene powered? Where to go from heritability (h2) in muscle strength and power? *Exerc Sport Sci Rev.* 2004;**32**(4):148–154.

158. Silventoinen K, Magnusson PK, Tynelius P, Kaprio J, Rasmussen F. Heritability of body size and muscle strength in young adulthood: a study of one million Swedish men. *Genet Epidemiol.* 2008;**32**(4):341–349.

159. Seeman E. Pathogenesis of bone fragility in women and men. *Lancet.* 2002;**359**(9320):1841–1850.

160. Nishiyama KK, Macdonald HM, Moore SA, Fung T, Boyd SK, McKay HA. Cortical porosity is higher in boys compared with girls at the distal radius and distal tibia during pubertal growth: an HR-pQCT study. *J Bone Miner Res.* 2012;**27**(2):273–282.

161. Oliveira CS, Alves C. The role of the SHOX gene in the pathophysiology of Turner syndrome. *Endocrinol Nutr.* 2011;**58**(8):433–442.

162. Ottesen AM, Aksglaede L, Garn I, Tartaglia N, Tassone F, Gravholt CH, Bojesen A, Sørensen K, Jørgensen N, Rajpert-De Meyts E, Gerdes T, Lind AM, Kjaergaard S, Juul A. Increased number of sex

Downloaded from https://academic.oup.com/edrv/article/39/5/803/5052770 by guest on 25 September 2020

163. Wideman L, Weltman JY, Shah N, Story S, Veldhuis JD, Weltman A. Effects of gender on exercise-induced growth hormone release. *J Appl Physiol.* 1999;**87**(3):1154–1162.

164. Veldhuis JD, Roemmich JN, Rogol AD. Gender and sexual maturation-dependent contrasts in the neuroregulation of growth hormone secretion in prepubertal and late adolescent males and females—a general clinical research center-based study. *J Clin Endocrinol Metab.* 2000;**85**(7):2385–2394.

165. Veldhuis JD. Gender differences in secretory activity of the human somatotropic (growth hormone) axis. *Eur J Endocrinol.* 1996;**134**(3):287–295.

166. Ho KY, Evans WS, Blizzard RM, Veldhuis JD, Merriam GR, Samojlik E, Furlanetto R, Rogol AD, Kaiser DL, Thorner MO. Effects of sex and age on the 24-hour profile of growth hormone secretion in man: importance of endogenous estradiol concentrations. *J Clin Endocrinol Metab.* 1987;**64**(1):51–58.

167. Veldhuis JD, Roelfsema F, Keenan DM, Pincus S. Gender, age, body mass index, and IGF-I individually and jointly determine distinct GH dynamics: analyses in one hundred healthy adults. *J Clin Endocrinol Metab.* 2011;**96**(1):115–121.

168. Veldhuis JD, Patrie JT, Brill KT, Weltman JY, Mueller EE, Bowers CY, Weltman A. Contributions of gender and systemic estradiol and testosterone concentrations to maximal secretagogue drive of burst-like growth hormone secretion in healthy middle-aged and older adults. *J Clin Endocrinol Metab.* 2004;**89**(12):6291–6296.

169. Roelfsema F, Veldhuis JD. Growth hormone dynamics in healthy adults are related to age and sex and strongly dependent on body mass index. *Neuroendocrinology.* 2016;**103**(3-4):335–344.

170. Pritzlaff-Roy CJ, Widemen L, Weltman JY, Abbott R, Gutgesell M, Hartman ML, Veldhuis JD, Weltman A. Gender governs the relationship between exercise intensity and growth hormone release in young adults. *J Appl Physiol.* 2002;**92**(5):2053–2060.

171. Leung KC, Doyle N, Ballesteros M, Sjogren K, Watts CK, Low TH, Leong GM, Ross RJ, Ho KK. Estrogen inhibits GH signaling by suppressing GH-induced JAK2 phosphorylation, an effect mediated by SOCS-2. *Proc Natl Acad Sci USA.* 2003;**100**(1):1016–1021.

172. Ho KK, O'Sullivan AJ, Wolthers T, Leung KC. Metabolic effects of oestrogens: impact of the route of administration. *Ann Endocrinol (Paris).* 2003;**64**(2):170–177.

173. Cappola AR, Bandeen-Roche K, Wand GS, Volpato S, Fried LP. Association of IGF-I levels with muscle strength and mobility in older women. *J Clin Endocrinol Metab.* 2001;**86**(9):4139–4146.

174. Meinhardt U, Nelson AE, Hansen JL, Birzniece V, Clifford D, Leung KC, Graham K, Ho KK. The effects of growth hormone on body composition and physical performance in recreational athletes: a randomized trial. *Ann Intern Med.* 2010;**152**(9):568–577.

175. Harper J. Race times for transgender athletes. *Journal of Sporting Cultures and Identities.* 2015;**6**(1):1–9.

176. Bermon S. Androgens and athletic performance of elite female athletes. *Curr Opin Endocrinol Diabetes Obes.* 2017;**24**(3):246–251.

177. Elbers JM, Asscheman H, Seidell JC, Megens JA, Gooren LJ. Long-term testosterone administration increases visceral fat in female to male transsexuals. *J Clin Endocrinol Metab.* 1997;**82**(7):2044–2047.

178. Handelsman DJ. Clinical review: the rationale for banning human chorionic gonadotropin and estrogen blockers in sport. *J Clin Endocrinol Metab.* 2006;**91**(5):1646–1653.

179. Asbell SO, Leon SA, Tester WJ, Brereton HD, Ago CT, Rotman M. Development of anemia and recovery in prostate cancer patients treated with combined androgen blockade and radiotherapy. *Prostate.* 1996;**29**(4):243–248.

180. Strum SB, McDermed JE, Scholz MC, Johnson H, Tisman G. Anaemia associated with androgen deprivation in patients with prostate cancer receiving combined hormone blockade. *Br J Urol.* 1997;**79**(6):933–941.

181. Bogdanos J, Karamanolakis D, Milathianakis C, Repousis P, Tsintavis A, Koutsilieris M. Combined androgen blockade-induced anemia in prostate cancer patients without bone involvement. *Anticancer Res.* 2003;**23**(2C):1757–1762.

182. Choo R, Chander S, Danjoux C, Morton G, Pearse A, Deboer G, Szumacher E, Loblaw A, Cheung P, Woo T. How are hemoglobin levels affected by androgen deprivation in non-metastatic prostate cancer patients? *Can J Urol.* 2005;**12**(1):2547–2552.

183. Chander S, Choo R, Danjoux C, Morton G, Pearse A, Deboer G, Szumacher E, Loblaw A, Cheung P, Woo T. Effect of androgen suppression on hemoglobin in prostate cancer patients undergoing salvage radiotherapy plus 2-year buserelin acetate for rising PSA after surgery. *Int J Radiat Oncol Biol Phys.* 2005;**62**(3):719–724.

184. Golfam M, Samant R, Eapen L, Malone S. Effects of radiation and total androgen blockade on serum hemoglobin, testosterone, and erythropoietin in

patients with localized prostate cancer. *Curr Oncol.* 2012;**19**(4):e258–e263.

185. Storer TW, Miciek R, Travison TG. Muscle function, physical performance and body composition changes in men with prostate cancer undergoing androgen deprivation therapy. *Asian J Androl.* 2012;**14**(2):204–221.

## Acknowledgments
The authors are grateful for helpful insights and comments from Alan Vernec and Osquel Barroso (World Anti-Doping Agency), Peter Harcourt (Australian Football League, Federation of International Basketball Associations), and Richard Budgett (IOC).

*Correspondence and Reprint Requests:* David J. Handelsman, PhD, ANZAC Research Institute, University of Sydney, Hospital Road, Concord Hospital, Sydney, New South Wales 2139, Australia. E-mail: djh@anzac.edu.au.

*Disclosure Summary:* D.J.H. is a medical and scientific consultant for the IAAF and to the Australian Sports Anti-Doping Agency. He is a member of the World Anti-Doping Agency's Health, Medicine and Research Committee and of the IOC working group on hyperandrogenic female and transgender athletes. He has received institutional grant support from Besins Healthcare and Lawley for investigator-initiated clinical studies in testosterone pharmacology and has provided expert testimony in testosterone litigation. A.L.H. is a medical and scientific consultant for the Swedish Olympic Committee and a member of the IAAF and IOC working groups on hyperandrogenic female athletes and transgender athletes. She has received grant support from the IAAF for a study on testosterone and physical performance in women. S.B. is a medical and scientific consultant for the IAAF and a member of the IAAF and IOC working groups on hyperandrogenic female athletes and transgender athletes. The authors have no other involvement with any entity having a financial interest in the material discussed in the manuscript. Opinions expressed in this review are the personal views of the authors and do not represent those of the IAAF, IOC, World Anti-Doping Agency, or Swedish Olympic Committee.

## Abbreviations
AR, androgen receptor; CAH, congenital adrenal hyperplasia; CAIS, complete androgen insensitivity syndrome; DSD, disorder (or difference) of sex development; F2M, female-to-male; IAAF, International Association of Athletic Federations; IOC, International Olympic Committee; LC-MS, liquid chromatography–mass spectrometry; M2F, male-to-female; PAIS, partial androgen insensitivity syndrome; PCOS, polycystic ovary syndrome; SHOX, short stature homeobox.

Downloaded from https://academic.oup.com/edrv/article/39/5/803/5052770 by guest on 25 September 2020