# Exhibit 28

```
 1            IN THE UNITED STATES DISTRICT COURT

 2          FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA

 3                  *   *   *   *   *   *

 4   B.P.J., by her next friend and     *

 5   mother, HEATHER JACKSON,           *

 6       Plaintiffs                     * Case No.

 7       vs.                            * 2:21-CV-00316

 8   WEST VIRGINIA STATE BOARD OF       *

 9   EDUCATION, HARRISON COUNTY BOARD OF*

10   EDUCATION, WEST VIRGINIA SECONDARY *

11   SCHOOL ACTIVITIES COMMISSION, W.   *

12   CLAYTON BURCH in his official      *

13   capacity as State Superintendent,  *

14   and DORA STUTLER in her official   *

15   capacity as Harrison County        *

16   Superintendent, PATRICK MORRISEY in*

17

18              VIDEOTAPED DEPOSITION OF

19               MARY D. FRY, PH.D.

20               March 29, 2022

21

22      Any reproduction of this transcript

23       is prohibited without authorization

24          by the certifying agency.
```

```
 1   his official capacity as Attorney  *

 2   General, and THE STATE OF WEST     *

 3   VIRGINIA,                          *

 4      Defendants                      *

 5                      *    *    *    *    *    *

 6

 7                   VIDEOTAPED DEPOSITION OF

 8                    MARY D. FRY, PH.D.

 9                     March 29, 2022

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24
```

1       VIDEOTAPED DEPOSITION

2          OF

3 MARY D. FRY, PH.D.  taken on behalf of the Intervenor

4 herein, pursuant to the Rules of Civil Procedure, taken

5 before me, the undersigned, Nicole Montagano, a Court

6 Reporter and Notary Public in and for the Commonwealth

7 of Pennsylvania, taken via videoconference, on Tuesday,

8 March 29, 2022 at 10:03 a.m.

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

```
 1                   A P P E A R A N C E S

 2

 3   KATHLEEN R. HARTNETT, ESQUIRE

 4   JULIE VEROFF, ESQUIRE

 5   ZOE HELSTROM, ESQUIRE

 6   KATELYN KANG, ESQUIRE

 7   ELIZABETH REINHARDT, ESQUIRE

 8   VALERIA M. PELET DEL TORO, ESQUIRE

 9   Cooley, LLP

10   3 Embarcadero Center

11   20th Floor

12   San Francisco, CA  94111-4004

13        COUNSELS FOR PLAINTIFF

14

15   SRUTI SWAMINATHAN, ESQUIRE

16   Lambda Legal

17   120 Wall Street

18   19th Floor

19   New York, NY  10005-3919

20        COUNSEL FOR PLAINTIFF

21

22

23

24
```

```
 1              A P P E A R A N C E S (cont'd)

 2

 3   DAVID TRYON, ESQUIRE

 4   State Capitol Complex

 5   Building 1, Room E-26

 6   Charleston, WV  25305

 7        COUNSEL FOR STATE OF WEST VIRGINIA

 8

 9   ROBERTA F. GREEN, ESQUIRE

10   Shuman McCuskey Slicer, PLLC

11   1411 Virginia Street East

12   Suite 200

13   Charleston, WV  25301

14        COUNSEL FOR WEST VIRGINIA SECONDARY SCHOOL

15        ACTIVITIES COMMISSION

16

17   JEFFREY M. CROPP, ESQUIRE

18   Steptoe & Johnson

19   400 White Oaks Boulevard

20   Bridgeport, WV  26330

21        COUNSEL FOR HARRISON COUNTY BOARD OF EDUCATION and

22        HARRISON COUNTY SUPERINTENDENT DORA STUTLER

23

24
```

```
1              A P P E A R A N C E S (cont'd)

2

3   KELLY C. MORGAN, ESQUIRE

4   Bailey Wyant

5   500 Virginia Street East

6   Suite 600

7   Charleston, WV  25301

8        COUNSEL FOR WEST VIRGINIA BOARD OF EDUCATION and

9        SUPERINTENDANT W. CLAYTON BURCH

10

11  JOHNATHAN SCRUGGS, ESQUIRE

12  RACHEL CSUTOROS, ESQUIRE

13  Alliance Defending Freedom

14  15100 North 90th Street

15  Scottsdale, AZ  85260

16       COUNSEL FOR INTERVENOR, LAINEY ARMISTEAD

17

18

19

20

21

22

23

24
```

```
 1                       I N D E X

 2

 3   DISCUSSION AMONG PARTIES                    10 - 14

 4   WITNESS: MARY D. FRY, PH.D.

 5   EXAMINATION

 6      By Attorney Tryon                        14 - 234

 7   EXAMINATION

 8      By Attorney Scruggs                     235 - 259

 9   DISCUSSION AMONG PARTIES                   259 - 260

10   CERTIFICATE                                     261

11

12

13

14

15

16

17

18

19

20

21

22

23

24
```

<u>EXHIBIT PAGE</u>

|  |  | <u>PAGE</u> |
| <u>NUMBER</u> | <u>IDENTIFICATION</u> | <u>IDENTIFIED</u> |
| 1 | Declaration | 23 |
| 2 | Expert Report of Dr. Fry | 24 |
| 3 | HB-3293 | 25 |
| 4 | Article by Dr. Fry | 58 |
| 5 | Article | 61 |
| 6 | Fairness and Enjoyment in School Sponsored Youth Sports | 103 |
| 7 | Article | 149 |
| 8 | Article | 159 |
| 9 | Article on Lia Thomas | 211 |
| 11 | Article on Reka Gyorgy | --- |

```
1                           OBJECTION PAGE

2

3    ATTORNEY                                              PAGE

4    Veroff   26, 27, 29, 30, 31, 32, 33, 34, 35, 36, 37, 38,

5    39, 40, 41, 42, 43, 44, 45, 46, 47, 48, 49, 50, 51, 52,

6    53, 54, 57, 59, 60, 62, 66, 67, 73, 74, 85, 91, 92, 93,

7    94, 96, 97, 98, 100, 101, 105, 107, 108, 109, 112, 113,

8    114, 115, 116, 117, 118, 119, 120, 121, 122, 123, 124,

9    125, 131, 135, 137, 138, 139, 145, 154, 156, 157, 162,

10   163, 165, 166, 167, 168, 169, 170, 171, 172, 173, 174,

11   175, 176, 177, 178, 179, 180, 181, 182, 183, 187, 188,

12   189, 190, 194, 195, 197, 198, 199, 200, 203, 204, 206,

13   207, 208, 209, 210, 212, 213, 214, 216, 217, 218, 220,

14   221, 222, 223, 224, 225, 226, 227, 228, 229, 231, 232,

15   234, 237, 239, 240, 241, 242, 243, 244, 245, 246, 248,

16   249, 251, 252, 253, 254, 255, 256, 257, 258, 259

17

18

19

20

21

22

23

24
```

```
 1              S T I P U L A T I O N
 2  ------------------------------------------------------
 3  (It is hereby stipulated and agreed by and between
 4  counsel for the respective parties that reading,
 5  signing, sealing, certification and filing are not not
 6  waived.)
 7  ------------------------------------------------------
 8              P R O C E E D I N G S
 9  ------------------------------------------------------
10                      ---
11              MARY D. FRY, PH.D.,
12  CALLED AS A WITNESS IN THE FOLLOWING PROCEEDING, AND
13  HAVING FIRST BEEN DULY SWORN, TESTIFIED AND SAID AS
14  FOLLOWS:
15                      ---
16              MS. BURKDOLL:  My name is Dana Burkdoll,
17  CSR, Notary for the State of Kansas.
18              ATTORNEY TRYON:  We might want to go off
19  the record.
20              VIDEOGRAPHER:  Going off the record.
21  Current time reads 10:03 a.m.
22  OFF VIDEOTAPE
23                      ---
24  (WHEREUPON, AN OFF RECORD DISCUSSION WAS HELD.)
```

```
1                              ---

2    ON VIDEOTAPE

3               VIDEOGRAPHER:  We are now back on the

4    record my name is Jacob Stock.  I'm a Certified Legal

5    Video Specialist employed by Sargent's Court Reporting

6    Services.  The date today is March 29th, 2022.  The

7    current time reads 10:05 a.m.  Eastern Standard Time.

8    This deposition is being taken remotely by a Zoom

9    conference.  The caption of this case is in the United

10   States District Court for the Southern District of West

11   Virginia, Charleston Division.  BPJ, et al. versus the

12   West Virginia Board of Education, et al.  Civil Action

13   Number 2:21-CV-00316.  The name of the witness is Mary

14   Fry, who has already been sworn in.  Will the attorneys

15   present state their names and the parties they

16   represent?

17               ATTORNEY TRYON:  This is David Tryon

18   representing the State of West Virginia and I'm with the

19   Attorney General's Office.

20               ATTORNEY VEROFF:  Julie Veroff with

21   Cooley, LLP.  I represent the Plaintiff.  And I'll let

22   my co-counsel introduce themselves.

23               ATTORNEY HARTNETT:  Hi.  This is Kathleen

24   Hartnett from Cooley.  I'm in the room with Julie,
```

1    representing Plaintiff.

2                    ATTORNEY KANG:   Hi.  This is Katelyn

3    Kang representing Plaintiffs.

4                    ATTORNEY REINHARDT:  This is Elizabeth

5    Reinhardt with Cooley, also for Plaintiffs.

6                    ATTORNEY HELSTROM:  Zoe Helstrom, with

7    Cooley, also for Plaintiffs.

8                    ATTORNEY SWAMINATHAN:  This is Sruti

9    Swaminathan from Lambda Legal also for Plaintiff.

10                   ATTORNEY SCRUGGS:  Johnathan Scruggs with

11   Alliance for Freedom for the intervening Defendants.

12   And also with me on the Zoom is Rachel Csutoros, also

13   for the intervening Defendant.

14                   ATTORNEY CROPP:  This is Jeffery Cropp

15   from Steptoe & Johnson representing the Defendants

16   Harrison County Board of Education and Superintendent

17   Dora Stutler.

18                   ATTORNEY GREEN:  This is Roberta Green

19   here on behalf of West Virginia Secondary School

20   Activities Commission.

21                   VIDEOGRAPHER:  And if that is everyone we

22   can begin.

23                   ATTORNEY TRYON:  Is Kelly on the line?

24   Did I miss that?

```
 1                    ATTORNEY GREEN:  Actually I just got a

 2   text from Kelly that she can't locate the link.

 3                    ATTORNEY VEROFF:  Let's go off the record

 4   while we reach out to her.

 5                    VIDEOGRAPHER:  Going off the record.  The

 6   time reads 10:08 a.m.

 7   OFF VIDEOTAPE

 8                           ---

 9   (WHEREUPON, A SHORT BREAK WAS TAKEN.)

10                           ---

11   ON VIDEOTAPE

12                    VIDEOGRAPHER:  We are back on the record.

13   The current time reads 10:08 Eastern Standard Time.

14                    ATTORNEY MORGAN:  This is Kelly Morgan on

15   behalf of the West Virginia Board of Education and

16   Superintendant Burch.

17                    ATTORNEY TRYON:  Okay.

18                    Then I think we will move forward now.

19   So prior to going on the record we would limit

20   objections to objection to privilege, objections to

21   scope and objections to form which would include all

22   other objections, and that is when we say objection

23   we'll preserve those objections.  Is that acceptable to

24   you, Julie?
```

```
 1                    ATTORNEY VEROFF:  Yes, thank you so much.

 2                    ATTORNEY TRYON:  Does anybody else have

 3    any objection to doing it that way?  Okay.  Then let's

 4    move forward.

 5                              ---

 6                          EXAMINATION

 7                              ---

 8    BY ATTORNEY TRYON:

 9        Q.    Hello, Professor Fry.  How are you?

10        A.    Doing well.  Thank you.

11        Q.    Do you prefer calling you Professor Green ---

12    excuse me Professor Fry?  Does that work?

13        A.    Sure.

14        Q.    Okay.

15              Can you state your full name for the record

16    please?

17        A.    Mary Diane Fry.

18        Q.    Are you represented by counsel this morning?

19        A.    Yes.

20        Q.    And who is your --- primarily representing you

21    today?

22        A.    Julie, Julie Veroff.

23        Q.    Great.  And have you been deposed before?

24        A.    I have not.
```

1      Q.     Have you testified in court before?

2      A.     One time.

3      Q.     Tell me about that.

4      A.     Years ago my husband and I returned from our

5   honeymoon and we found out we had been robbed.  And a

6   neighbor had seen three guys crawling out of our bedroom

7   window, and so I appeared in court to share what was

8   missing when we returned.

9      Q.     Well, I'm sorry.  That doesn't sound like a

10  great way to end a honeymoon.  So any other times you

11  testified at trial?

12     A.     No.

13     Q.     And when we're speaking, you know, since we're

14  in a deposition, this is a communication privilege

15  unlike any other, but one of the things that we need to

16  make to make it easier for the court reporter to

17  understand what we're doing.  So when I ask you a

18  question please make sure you answer verbally as opposed

19  to just nodding your head.

20         Okay?

21     A.     Okay.

22     Q.     If you don't understand a question that I ask

23  you, tell me and I'll try and rephrase.

24         All right?

1    A.    Sounds good.

2    Q.    And if you answer I'll have to assume that you

3  understood the question.  Do you understand that?

4    A.    Yes.

5    Q.    And as we stated off the record, if you need a

6  break at any time, let us know.  We will break for you

7  and the only caveat on that is once I ask a question you

8  have to wait until you finish your answer before we can

9  take a break.

10         All right?

11   A.    Okay.  Thank you.

12   Q.    Do you have any questions about this proceeding

13  before we get started?

14   A.    No.

15   Q.    Okay.

16         Well, just for the record, this deposition is

17  being conducted as on Cross Examination.  And Professor

18  Fry, did you bring any documents to the deposition

19  today?

20   A.    Yes.

21   Q.    What did you bring?

22   A.    I have before me my Declaration, the House Bill,

23  my expert report and my Vitae.

24   Q.    And when you talk --- mention your Declaration,

1    is this the first one that was filed in the case?  Is

2    that what you mean?

3        A.    Yes.

4        Q.    Is there anyone else in the room with you at

5    this point?

6        A.    No.

7        Q.    What documents did you review in preparation for

8    your deposition today?

9        A.    I reviewed my statement and my Vitae and some of

10   the Court documents, the Complaint and a cursory review

11   of some of the other statements.  I reviewed the

12   Plaintiff's statement and her mother's statement.

13       Q.    Any other Court documents besides the Complaint

14   and the statement with the Plaintiff and the mother?

15       A.    A cursory review of other expert witnesses and,

16   yeah, any of the case documents, a cursory review.

17       Q.    Which expert reports did you look at?

18       A.    I couldn't call them all by name but the expert

19   witnesses that are medical experts.

20       Q.    The Plaintiff's experts or Defendants' or both?

21       A.    Both.

22       Q.    So there is a total of, now including yours,

23   eight expert reports.  Have you seen all of those?

24       A.    You know, I'm not positive.  There was a report

1    from two on each side and then a response, and so I ---

2    and again I didn't read these in detail, but I did have

3    a look at them.

4        Q.    Okay.

5              Was there anything in particular that you were

6    looking for when you looked through those expert

7    reports?

8        A.    No, just trying to get a sense of the case.  I

9    kept a focus on my purpose here today.

10       Q.    And so are you aware of this case?  Do you know

11   who BPJ is?

12       A.    Yes.

13       Q.    And who is BPJ?

14       A.    She is a young athlete in West Virginia who is a

15   transathlete and wanted to play sports in her school.

16       Q.    And you understand BPJ is the Plaintiff.

17             Is that right?

18       A.    Yes.

19       Q.    Do you know who Heather Jackson is?

20       A.    Her mother.

21       Q.    Have you ever spoken to either one of them?

22       A.    I have not.

23       Q.    So I presume by the same rationale you have not

24   met either one of them either.

1           Correct?

2      A.    I have not.

3      Q.    When did you first hear about BPJ?

4      A.    About a year ago I was contacted by Plaintiff's

5  Counsel in late April.

6      Q.    And of course, don't tell me anything that your

7  counsel --- any discussions you had after you were

8  retained by counsel, but prior to being retained by

9  counsel --- well, let me back up.

10          At one point you were retained by counsel to be

11  an expert in this case.

12          Right?

13     A.    Right.

14     Q.    When was that?

15     A.    Late April, early May, I believe.

16     Q.    And what were you first told about the case

17  before you were retained?

18     A.    That this case involved a young athlete who was

19  headed to Middle School and really wanted to be able to

20  play sports.

21     Q.    Were you told which sport?

22     A.    I think so at the time.

23     Q.    So at this point in time do you know which

24  sports BPJ wanted to participate in at the time that BPJ

```
 1   filed the lawsuit?
 2      A.    You know, it's hard to recall.  There's quite a
 3   bit of water under the bridge.  I know now that she
 4   wanted to do cheerleading and run track, and I'm not
 5   sure I could tell you the exact date I knew either one
 6   of those.
 7      Q.    Okay.
 8            Let me rephrase my question because I'm not
 9   asking what the date was, I'm asking if you now know
10   what --- at this time what sport BPJ participated in?
11      A.    Yes.
12      Q.    And which one?
13      A.    She participated in cheerleading and now track.
14      Q.    And so it was cross-country is that the same
15   thing as track?
16      A.    Sorry, cross-country.  It's a different season,
17   cross-country.
18      Q.    Is that part of track and field or is it
19   different?
20      A.    It's a different season, yeah.  I mean,
21   usually it's grouped together, track and cross-country,
22   but I should have said cross-country.  That is what I
23   meant.
24      Q.    Okay.
```

```
1              At the time that you were retained had you
2    already prepared any report similar to what was
3    ultimately filed in this case on your behalf?
4         A.    Yes.
5         Q.    So tell me about that.
6         A.    Okay.
7         Q.    So let me make sure we are communicating.  So
8    before you were contacted by counsel for BPJ, had you
9    already prepared something that what was filed as your
10   Declaration?
11        A.    Yes.
12        Q.    Okay.
13              Tell me about that.
14        A.    Okay.
15              In the spring of 2020 I was contacted to see if
16   I would be willing to be an expert witness first in the
17   Connecticut case, transathlete case and then in Idaho.
18   And those sort of overlapped in the spring of 2020 a
19   little bit, but I've been involved in providing expert
20   reports for both of those.
21        Q.    Okay.
22              So you did serve as an expert witness in the
23   Connecticut case.
24              Is that right?
```

1      A.      Yes.

2      Q.      Was something that you prepared filed in the

3 Connecticut case?

4      A.      Yes.

5      Q.      Same thing in the Idaho case?

6      A.      Yes.

7      Q.      Have you served as an expert witness in any

8 other cases besides those two?

9      A.      I'm serving as an expert witness in the Florida

10 case as well.

11      Q.      But you, to date, have not testified in any of

12 those cases.

13              Right?

14      A.      That's correct.

15      Q.      And you haven't been deposed in those cases

16 either I take it.

17              Right?

18      A.      That's right.  I have not.

19      Q.      Have you actually prepared an expert report for

20 Florida at this point?

21      A.      Yes.

22      Q.      Has that been submitted to court yet?

23      A.      I believe so.

24              ATTORNEY TRYON:  At this point your

```
 1    initial report that was filed with the court, the

 2    initial Declaration.  Let's mark that as Exhibit-1 and I

 3    will ask the court reporter to bring that up.

 4                           ---

 5                    (Whereupon, Exhibit 1, Declaration,

 6                     marked for identification.)

 7                           ---

 8    BY ATTORNEY TRYON:

 9      Q.    And feel free to look at your hard copy as we

10    are discussing these exhibits, okay, Professor?

11      A.    Okay.

12                    ATTORNEY VEROFF:  Sorry.  I think this is

13    the expert report and I think you were asking for the

14    Declaration.

15                    ATTORNEY TRYON:  Yes, right.

16                    VIDEOGRAPHER:  My apologies.

17                    ATTORNEY TRYON:  It should have the Court

18    stamp on the left at the top as I recall.

19                    VIDEOGRAPHER:  I see that.  My apologies.

20    BY ATTORNEY TRYON:

21      Q.    So first of all, I want to establish that this

22    is the Declaration that you first prepared for this

23    case.

24            Is that right?
```

1      A.    Yes.

2                  ATTORNEY TRYON:  And Jake, do you have

3      that marked as Exhibit-1?  Are you able to do that?

4                  VIDEOGRAPHER:  I don't have it marked

5      with a sticker at the moment, but I can mark them if you

6      want me to.

7                  ATTORNEY TRYON:  Yes.  That would be

8      great.

9                  VIDEOGRAPHER:  Okay.

10                 ATTORNEY TRYON:  And what I would like to

11     do, the expert report, which is the one that you

12     previously brought up, Jake, that would be Exhibit-2.

13     So if you could bring that up and make sure we all

14     understand what Exhibit-2 is.

15                            ---

16                 (Whereupon, Exhibit 2, Expert Report of

17                 Dr. Fry, was marked for identification.)

18                            ---

19                 ATTORNEY TRYON:  Will you be able to mark

20     these while we are in this proceeding, Jake.

21                 VIDEOGRAPHER:  I have it on my computer

22     but I'm not on my computer at the moment.  I don't think

23     I can unless we could go off record for me to do so.

24                 ATTORNEY TRYON:  We will keep on going

```
 1   and ask if you recognize what they are and then maybe
 2   during a break you can do that.
 3                   VIDEOGRAPHER:  That works for me.
 4                   ATTORNEY TRYON:  And for the record we
 5   will be looking at the statute, which we will be marking
 6   as Exhibit-3 to this deposition.
 7                              ---
 8                   (Whereupon, Exhibit 3, HB-3293, was
 9                   marked for identification.)
10                              ---
11   BY ATTORNEY TRYON:
12      Q.   So now let's go to Exhibit-2, which is your
13   current expert report.  I'm going to try to manipulate
14   my page so I can see you, Professor, at the same time.
15   I can switch this over to another screen, but it's not
16   working.  Let's try this.  All right.  So looking at
17   Number 4 --- let me back up, paragraph number three, you
18   say you have knowledge of the matters stated in this
19   expert report and Declaration.  I have collected and
20   cite to relevant literature concerning the issues that
21   arise in this litigation.  Do you see that?
22      A.   Yes.
23      Q.   So what are the issues that arise in this
24   litigation as you understand it?
```

 1                    ATTORNEY VEROFF:  I'm sorry.  I'll just

 2  object to the extent that complete paragraph three

 3  wasn't read.

 4                    ATTORNEY TRYON:  Okay.

 5  BY ATTORNEY TRYON:

 6     Q.    Okay.

 7           Feel free to read the entire paragraph if you

 8  want but I'm just asking about that specific clause.

 9     A.    The issues that are relevant are that there's a

10  categorical exclusion of transathletes.  And that is of

11  concern because of the many benefits that athletes reap

12  from having the opportunity to participate in sports.

13     Q.    Any other issues that arise in this litigation?

14     A.    Nothing comes to mind at the moment.

15     Q.    So that's what you refer to when you say issues

16  arise in this litigation, and you said the categorical

17  exclusion of transgender athletes because of benefits

18  athletes receive from sport.  Is that about right?  It's

19  not exactly what you said, but that is about right?

20     A.    Yeah, because of the categorical exclusion of

21  transgender athletes in sports that prevent them from

22  having opportunities to reap all the benefits in sport.

23     Q.    You have said already on the record and you also

24  say in paragraph four that in preparing this expert

```
 1   report and Declaration I reviewed West Virginia HB-3293,

 2   the bill at issue in this litigation.

 3              Right?

 4      A.    Yes.

 5      Q.    So how --- did you read the entire thing?

 6      A.    The entire bill?

 7      Q.    That's my question.

 8      A.    Yes, yes.

 9      Q.    What did the legislature say the purpose is?

10      A.    Well, to prevent transgender females from

11   participating in a sport in West Virginia.

12      Q.    The bill does not use the word transgender at

13   all, does it?

14              ATTORNEY VEROFF:  Sorry.  Mr. Tryon, I'm

15   going to object.  If you're going to ask the witness

16   about the bill, if you could please put it up on the

17   screen so she could have it in front of her.

18              ATTORNEY TRYON:  We will do it in a

19   moment.  I think she's looking at it anyway, so it's

20   been put up on the screen.

21              ATTORNEY VEROFF:  Is that right,

22   Professor Fry?  Do you have a hard copy of the bill in

23   front of you?

24              THE WITNESS:  Yes.
```

```
 1                    ATTORNEY TRYON:  So that would be

 2    Exhibit-3.  Are you finding that, Jake?  You're muted.

 3                    VIDEOGRAPHER:  I'm looking in my folder.

 4    I just had it this morning.  It might be on my other

 5    computer.  Counsel, if you want to go off the record I

 6    can grab that and then get the software to mark these

 7    for you.

 8                    ATTORNEY TRYON:  Okay.

 9                    How long would that take?

10                    VIDEOGRAPHER:  Three minutes.

11                    ATTORNEY TRYON:  Okay.

12                    Let's do that.

13                    VIDEOGRAPHER:  Okay.

14                    I apologize truly.  Going off the record.

15    The current time reads 10:30 a.m.

16    OFF VIDEOTAPE

17                           ---

18    (WHEREUPON, A SHORT BREAK WAS TAKEN.)

19                           ---

20    ON VIDEOTAPE

21                    VIDEOGRAPHER:  We are back on the record.

22    The current time reads 10:34 a.m. Eastern Standard Time.

23                    ATTORNEY TRYON:  And Jake, if you could

24    bring up Exhibit-3 now, please, which is the HB-3293.
```

```
 1   So this has previously been marked but for this

 2   deposition we will mark it as Exhibit-3.

 3   BY ATTORNEY TRYON:

 4      Q.    So this is the House Bill that you --- the law

 5   that you reviewed, Professor Fry?

 6      A.    Yes.

 7      Q.    Excuse me.  And nowhere in here does it use the

 8   word transgender, does it?

 9      A.    No.

10            ATTORNEY VEROFF:  Objection.

11   BY ATTORNEY TRYON:

12      Q.    Take a look at paragraph one --- excuse me,

13   page one, under 18-2-25(e), line 1A, it starts A,

14   legislature hereby finds there are inherent differences

15   between biological males and biological females and that

16   these differences are cause for celebration as

17   determined by the Supreme Court of the United States in

18   United States versus Virginia 1996, in parentheses.  Do

19   you see that?

20      A.    Yes.

21      Q.    Do you agree with that statement?

22            ATTORNEY VEROFF:  Objection.

23   BY ATTORNEY TRYON:

24      Q.    Go ahead.
```

1        A.      Yes.

2        Q.      Number two in parentheses says, these inherent

3    differences are not a valid justification for sex-based

4    classifications that make overbroad generalizations or

5    perpetuate the legal, social and economic inferiority of

6    either sex.  Rather these inherent differences are a

7    valid justification for sex-based classifications when

8    they realistically reflect the fact that the sexes are

9    not similarly situated in certain circumstances, as

10   recognized by the Supreme Court of the United States in

11   Michael V. Sonoma County Association of Intercollegiate

12   Athletics, and NIA in parentheses or National Junior

13   College Athletic Association.  I goofed that.  Sorry.  I

14   skipped a page.  So continuing it said in Michael M. v.

15   Sonoma County Superior Court 1981, in parentheses, and

16   Supreme Court of Appeals in West Virginia in Israel v.

17   Secondary Schools Commission in 1989 in parentheses.

18   Other than the citations of those cases do you agree

19   with that statement?

20                    ATTORNEY VEROFF:  Objection.

21                    THE WITNESS: I believe that it's more

22   complex than just to have a binary understanding of

23   males and females.

24   BY ATTORNEY TRYON:

```
 1      Q.    So let me restrict my question to this part.  It
 2  says these inherent differences are a valid
 3  justification for sex-based classifications when they
 4  realistically reflect the fact that sexes are not
 5  similarly situated in certain circumstances.  That
 6  clause, do you agree with or disagree with?
 7                      ATTORNEY VEROFF:  Objection.
 8                      THE WITNESS: Yeah, I would just say that
 9  it's all --- more complex than just saying that we have
10  males and females.
11  BY ATTORNEY TRYON:
12      Q.    Okay.
13            I'm sorry, what did you say last?
14      A.    Yeah, that it's more complex than just
15  considering them --- everyone fits tightly into a male
16  or female category.
17      Q.    And so you would disagree with that statement?
18                      ATTORNEY VEROFF:  Objection.
19                      THE WITNESS:  Yeah, I would agree with
20  the first sentence, that we shouldn't use these to
21  discriminate.
22  BY ATTORNEY TRYON:
23      Q.    Does that specific clause, you don't agree with
24  that, is that a fair statement?
```

```
 1                    ATTORNEY VEROFF:  Objection.

 2                    THE WITNESS: The first sentence of number

 3   two?

 4   BY ATTORNEY TRYON:

 5     Q.    I'm sorry.  Let me make sure we're clear on the

 6   record.  The phrase that says these inherent differences

 7   are a valid justification for sex-based classifications

 8   when they realistically reflect the fact that sexes are

 9   not similarly situated in certain circumstances, that

10   clause, as I understand your testimony, you do not agree

11   with in its entirety.  Is that true?

12                    ATTORNEY VEROFF:  Sorry, Mr. Tryon.

13   Objection.

14                    THE WITNESS: Right, that's true.

15   BY ATTORNEY TRYON:

16     Q.    Okay.

17           Number three, it says in the context of sports

18   involving competitive stellar contact --- actually,

19   strike that.

20           Let's move down.  I want to make sure I

21   understand.  These are using terms that are defined

22   below, so I want to see if we have a mutual agreement on

23   the meaning of these terms.  And on line 25, as shown on

24   the left-hand side, it defines, quote, biological sex,
```

```
 1   closed quote, means an individual's physical form as a

 2   male or female based solely on the individual's

 3   reproductive biology and genetics at birth.  Do you see

 4   that?

 5        A.    Yes, I see that.

 6        Q.    Is that a fair definition of biological sex?

 7                   ATTORNEY VEROFF:  Objection.

 8                   THE WITNESS: I disagree.  I think it is

 9   more complex than that.

10   BY ATTORNEY TRYON:

11        Q.    Okay.

12              How would you define biological sex?

13                   ATTORNEY VEROFF:  Objection.

14                   THE WITNESS:  Based on multiple factors

15   besides just the reproductive biology in genetics at

16   birth.

17   BY ATTORNEY TRYON:

18        Q.    Okay.

19              And what would your definition be?

20                   ATTORNEY VEROFF:  Objection.

21                   THE WITNESS: I'm not sure.

22   BY ATTORNEY TRYON:

23        Q.    Okay.

24              Well, the reason I ask is because we are
```

1    probably using these terms throughout this deposition

2    today, so I'm trying to make sure we have a mutual

3    understanding of what biological sex means.  So I don't

4    want to try and impose upon you a definition that you

5    are uncomfortable with.

6        A.    Okay.

7        Q.    So if you could give me something that you would

8    be comfortable with, I would appreciate it.

9                    ATTORNEY VEROFF:  Objection.

10                    THE WITNESS:  Yeah, I would feel more

11    comfortable --- yeah, I'm not sure, to be honest.

12   BY ATTORNEY TRYON:

13       Q.    All right.

14             So I assume that the definition of female in

15   here you're also uncomfortable with.  Is that a fair

16   statement?

17       A.    Yes.

18                    ATTORNEY VEROFF:  Objection.

19   BY ATTORNEY TRYON:

20       Q.    How about the definition of male, can we reach

21   an agreement that male means an individual whose

22   biological sex determined at birth is male?

23                    ATTORNEY VEROFF:  Objection.

24                    THE WITNESS: Yes, I would not agree with

```
 1   that.
 2   BY ATTORNEY TRYON:
 3       Q.    You would not agree with that.  Does the word
 4   male have a meaning to you?
 5                    ATTORNEY VEROFF:  Objection.
 6                    THE WITNESS: Yes.  I feel like it's
 7   related to how people see themselves in terms of male or
 8   female.
 9   BY ATTORNEY TRYON:
10       Q.    So it's only --- the term male only means how
11   somebody sees him or herself?
12                    ATTORNEY VEROFF:  Objection.
13                    THE WITNESS:  They view their identity as
14   male and female, I think that's the critical thing.
15   BY ATTORNEY TRYON:
16       Q.    And does biology have any importance at all?
17                    ATTORNEY VEROFF:  Objection.
18                    THE WITNESS: Yes, it does.  It's just not
19   the only factor.
20   BY ATTORNEY TRYON:
21       Q.    So how about this, how about if we will refer to
22   male today, male or boy, we mean someone whose birth ---
23   on whose Birth Certificate it designates them as male or
24   as male?
```

```
 1                    ATTORNEY VEROFF:  Objection.

 2    BY ATTORNEY TRYON:

 3       Q.    Can we use that as a definition today?

 4                    ATTORNEY VEROFF:  Objection.

 5                    THE WITNESS:  I think it's more

 6    appropriate to use the term to refer to people who

 7    identify as male.

 8    BY ATTORNEY TRYON:

 9       Q.    So you don't think there is such a thing as a

10    biological male?  Is that what you are telling me?

11                    ATTORNEY VEROFF:  Objection.

12                    THE WITNESS:  I think term biological

13    male is a complex term, that a lot goes into that.

14    BY ATTORNEY TRYON:

15       Q.    You're familiar with the term cismale, right?

16       A.    Yes.

17       Q.    What does that mean?

18       A.    Well, first is somebody whose identity aligns

19    with their birth characteristics.

20       Q.    Okay.

21             What birth characteristics are those?

22                    ATTORNEY VEROFF:  Objection.

23                    THE WITNESS:  I think the male, female

24    category works in general, but there is people who fall
```

1   in between and may not be from a biological perspective

2   nice and tightly categorized into either of those

3   categories.  So when I say it is complex, it is is not

4   just the way somebody was born or one particular, you

5   know, physical characteristic or so.

6   BY ATTORNEY TRYON:

7       Q.   Well, I'm just try to understand the term you

8   just gave me.  You said that cisgender is someone that

9   identifies in the same --- identifies with the sex that

10  corresponds with their birth characteristics.  And I'm

11  asking what you meant when you said birth

12  characteristics.

13                  ATTORNEY VEROFF:  Objection.

14                  THE WITNESS:  Yeah, I feel like there's

15  medical terms that go beyond my expertise.  But in my

16  understanding, someone can be born and have

17  characteristics of cross gender.  So using just a binary

18  system where we categorize and put everyone in either a

19  male or female category is limiting and not helpful.

20  BY ATTORNEY TRYON:

21      Q.   So then what is a cisgender person?

22                  ATTORNEY VEROFF:  Objection.

23                  THE WITNESS:  Someone who may align

24  physically at birth with one of the genders.  And also

```
 1   when I say align, those match up with how they perceive

 2   themselves along with their birth characteristics.

 3   BY ATTORNEY TRYON:

 4     Q.    Again you use that term birth characteristics.

 5   I need to know what you mean by that.

 6                   ATTORNEY VEROFF:  Objection.

 7                   THE WITNESS:  Again, using this in --- in

 8   --- from my perspective, I would listen to the doctors

 9   who study this and say that we can't just classify

10   people tightly into these categories.  And some people

11   may share characteristics of either gender at birth and

12   so it may be more complicated.

13   BY ATTORNEY TRYON:

14     Q.    So we still don't even have a definition of

15   cisgender from you.

16                   ATTORNEY VEROFF:  Objection.

17   BY ATTORNEY TRYON:

18     Q.    So you don't know what birth characteristics

19   are?  Is that what you are telling me?

20                   ATTORNEY VEROFF:  Objection, asked and

21   answered?

22                   THE WITNESS:  Yeah, I think some people

23   are born and they fit nicely into these categories of

24   male and female.  I'm just acknowledging that not
```

```
 1   everyone does.  And if they do fit nicely into those,

 2   nicely just meaning that they are --- they, you know,

 3   are considered male at birth and they also perceive that

 4   they are than --- or the other way is female, then that

 5   would be a cisgender person.

 6                   ATTORNEY TRYON:  Jake, how do I get to

 7   the live feed?

 8                   VIDEOGRAPHER:  You mean like the video

 9   feed or like the real time?

10                   ATTORNEY TRYON:  Yes.

11                   VIDEOGRAPHER:  Give me one sec, I'll

12   repost the link.

13                   ATTORNEY TRYON:  Are you going to put

14   that in the chat room?

15                   VIDEOGRAPHER:  It should be visible now.

16   BY ATTORNEY TRYON:

17      Q.   When you --- you used the term now considered

18   male at birth.  Can you tell me what you mean by that?

19                   ATTORNEY VEROFF:  Objection.

20   BY ATTORNEY TRYON:

21      Q.   I'm not trying to trick you.  I'm just trying to

22   establish some definition so we can communicate properly

23   today.

24      A.   Yeah.
```

```
 1                    ATTORNEY VEROFF:  Objection.

 2                    THE WITNESS: Yeah, I think a medical

 3      professional says that a baby has all the

 4      characteristics of a male, right.  I'm just simply

 5      saying that everyone doesn't fit nice and tightly into

 6      that male or female, that there's two cross overs that

 7      the doctors seem to agree on.

 8      BY ATTORNEY TRYON:

 9         Q.    And what the doctors seem to agree on is what

10      they put on the Birth Certificate, right, at least

11      initially?  Fair statement?

12                    ATTORNEY VEROFF:  Objection.

13                    THE WITNESS: Yeah.  I'd say in general

14      doctors choose one or the other that's closest.

15      BY ATTORNEY TRYON:

16         Q.    So at least for purposes of today, when I say

17      male or boy can we agree that I'm referring to someone

18      who on the Birth Certificate, the original Birth

19      Certificate, it is stated that that person is male?

20         A.    I can agree to proceed that way.

21         Q.    Okay.

22               And the same thing with respect to female or

23      girl.

24               Right?
```

```
 1              ATTORNEY VEROFF:  Objection.

 2              THE WITNESS:  Yes.  Can we also agree

 3    that if I -- that I can use the term transfemale to

 4    refer to someone who may share characteristics across

 5    gender and may identify as a female?

 6    BY ATTORNEY TRYON:

 7       Q.    Let's be clear on that.  Please tell me what

 8    your definition of trans --- let's first cite what does

 9    transgender mean?

10              ATTORNEY VEROFF:  Objection.

11              THE WITNESS:  Transgender refers to

12    someone who may have been classified as birth as one

13    gender but identifies as the other gender.

14    BY ATTORNEY TRYON:

15       Q.    And then transgender girl, can you give me your

16    definition of that?

17       A.    Yes, someone who may have been assigned the male

18    sex at birth and identifies as female.

19       Q.    And then transgender boy?

20       A.    Someone who may have been assigned female ---

21    assigned a female gender at birth but perceives ---

22    identifies with a male sex, male gender.

23       Q.    Now, when I asked you about transgender you said

24    someone classified at birth.  And then when I asked you
```

 1   about transgender girl you said assigned.  Is there a

 2   difference between classified and assigned in your mind?

 3                      ATTORNEY VEROFF:  Objection.

 4                      THE WITNESS: No, there wasn't a

 5   distinction there.

 6   BY ATTORNEY TRYON:

 7      Q.    Okay.

 8            And could that sex of a child be assigned

 9   before birth?

10                      ATTORNEY VEROFF:  Objection.

11                      THE WITNESS:  Yeah, possibly.

12   BY ATTORNEY TRYON:

13      Q.    Going back to the bill itself, on line 12, on

14   page two, in the context of sports involving competitive

15   skill or contact biological males and biological females

16   are not, in fact, similarly situated.  Do you agree with

17   that statement?

18                      ATTORNEY VEROFF:  Objection.

19                      THE WITNESS: I'm not sure what that

20   statement means by the fact similarly situated.

21   BY ATTORNEY TRYON:

22      Q.    Okay.

23            Let's go to the next sentence.  Biological

24   males would displace females to a substantial extent if

```
 1    permitted to compete on teams designated for biological

 2    females and then it cites a case.  Do you agree with

 3    that statement?

 4                     ATTORNEY VEROFF:  Objection.

 5                     THE WITNESS:  I believe there can be a

 6    fair playing ground for people who are born male and who

 7    receive treatment, follow the rules and play the sport

 8    for them to be able to participate as females.

 9    BY ATTORNEY TRYON:

10       Q.    So I take it you do not fully agree with that

11    statement.

12             Is that a fair statement?

13       A.    Yeah.

14                     ATTORNEY VEROFF:  Objection.

15                     THE WITNESS: I do not.

16    BY ATTORNEY TRYON:

17       Q.    Item Number 5, line 21 says, classification of

18    teams according to biological sex is necessary to

19    promote equal athletic opportunities for the female sex.

20    Do you agree with that statement?

21                     ATTORNEY VEROFF:  Objection.

22                     THE WITNESS:  Not if it means excluding

23    transgender athletes.

24    BY ATTORNEY TRYON:
```

```
 1      Q.     Okay.

 2             I need to apologize at this point.  On the

 3  floor where I'm at they are doing construction, so

 4  periodically you may hear pounding or other noise, and

 5  I'm sorry about that.

 6             Let me ask you about the definition of another

 7  word that appears periodically, the word arbitrary.  And

 8  I looked that up in a dictionary, an online dictionary,

 9  Cambridge.org, and the definition it gave me was based

10  on chance rather than being planned or based on reason.

11  Is that a fair definition of arbitrary?

12                  ATTORNEY VEROFF:  Objection.

13                  THE WITNESS:  I'm not sure.

14  BY ATTORNEY TRYON:

15      Q.     Okay.

16             What is your definition of arbitrary?

17                  ATTORNEY VEROFF:  Objection.

18                  THE WITNESS:  I'm not sure.

19  BY ATTORNEY TRYON:

20      Q.     You have a Bachelor's Degree.

21             Right?

22      A.     I do.

23      Q.     And a Master's Degree.

24             Right?
```

```
 1      A.     Yes.

 2      Q.     So I recall you also have a Ph.D.

 3             Is that right?

 4      A.     That is right.

 5      Q.     And you can't define for me what arbitrary

 6   means?

 7                      ATTORNEY VEROFF:  Objection.

 8                      THE WITNESS: No, not at the moment.

 9   BY ATTORNEY TRYON:

10      Q.     You used the word arbitrary in this report, yet

11   you don't know what it means?

12                      ATTORNEY VEROFF:  Objection.

13                      THE WITNESS:  Yeah.  Do you want to go to

14   where I used it?

15   BY ATTORNEY TRYON:

16      Q.     No.  I want to know if you, in fact, don't know

17   what arbitrary means?

18                      ATTORNEY VEROFF:  Objection.  I think the

19   witness has asked to see where term is used in her

20   report.  And it would be helpful to show it to her for

21   context.

22                      ATTORNEY TRYON:  Thank you, Counsel.  I

23   would like the witness to tell me how she doesn't know

24   --- since she has a Ph.D., she can't tell me what
```

```
 1    arbitrary means.  And then you won't even agree with the
 2    definition that I found in the Cambridge.org Dictionary.
 3                      ATTORNEY VEROFF:  Objection.
 4                      THE WITNESS: Can you repeat that
 5    definition again?
 6    BY ATTORNEY TRYON:
 7      Q.    Based on chance rather than being planned or
 8    based on reason.
 9      A.    Okay.
10            I'm going to go back and accept that.
11      Q.    Okay.
12            In paragraph seven of your report --- we can go
13    back to the report now.  This is Exhibit-2.  In
14    paragraph seven that is on the screen or you can look at
15    your hard copy, you mention that you spent five years
16    teaching physical education and coaching tennis at
17    schools and summer camps.  Tell me a little bit about
18    your coaching tennis.
19      A.    Yes, I was the head coach of both the boys and
20    the girls team, high school.  And the --- we had a
21    varsity and a junior varsity team.  They competed in the
22    fall season.  That was a team competition.  And then the
23    individual in spring, so it is a year-round sport in
24    Texas.
```

1    Q.    So why did they divide it between varsity and

2  junior varsity?

3    A.    Because some of the kids are --- because it

4  gives the more advanced athletes a chance to compete at

5  the varsity level and can be very inclusive and give a

6  lot of kids an opportunity to play also as well with a

7  junior varsity.

8    Q.    And you had no problem with that, right?

9                    ATTORNEY VEROFF:   Objection.

10                   THE WITNESS:   That's right.

11  BY ATTORNEY TRYON:

12    Q.    And then you said they divided it into boys and

13  girls teams.  Why did they do that?

14                   ATTORNEY VEROFF:   Objection.

15                   THE WITNESS:   Because, in general, that

16  classification works, but there are exceptions to it.

17  BY ATTORNEY TRYON:

18    Q.    And when you said boys, what did you mean by

19  boys?

20    A.    I mean those who may have been classified as a

21  male in their lives and also identify that way.

22    Q.    So the team, the tennis team was based on those

23  who were born, classified as males and also identified

24  that way?

```
 1        A.     Again, I can't speak for every athlete.

 2        Q.     And then when you said there was a girls team,

 3    what did that mean?  What did you have to be to be on

 4    the girls team?

 5        A.     Yeah.  And in general, they are females and see

 6    that classification as appropriate and participate as

 7    females.

 8        Q.     And why is that classification appropriate for

 9    tennis?

10                    ATTORNEY VEROFF:  Objection.

11                    THE WITNESS:  I think it's in general

12    appropriate to have --- to let males and females compete

13    separately.

14    BY ATTORNEY TRYON:

15        Q.     Is that because in general males are better at

16    tennis?

17                    ATTORNEY VEROFF:  Objection.

18                    THE WITNESS: I wouldn't agree with that.

19    BY ATTORNEY TRYON:

20        Q.     Then why is it appropriate to let them compete

21    separately?

22                    ATTORNEY VEROFF:  Objection.

23                    THE WITNESS: Yeah, I think males would,

24    in general, due to, you know, their physical
```

```
 1  characteristics would have a --- could have an
 2  advantage.
 3  BY ATTORNEY TRYON:
 4      Q.    What kind of advantage?
 5                  ATTORNEY VEROFF:  Objection.
 6                  THE WITNESS: Yeah, greater --- greater
 7  testosterone levels, which can lead to --- which can
 8  impact muscle mass and size.
 9  BY ATTORNEY TRYON:
10      Q.   As the coach, did you actually observe that
11  there was a difference, performance difference between
12  boys and girls teams?
13      A.    I would ---.
14      Q.    I'm sorry.  Let me rephrase that.  As the coach,
15  did you actually observe that there was a performance
16  difference between boys and girls?
17      A.    Yes.
18                  ATTORNEY VEROFF:  Objection.
19                  THE WITNESS:  I think if you compare the
20  mean level of ability across the two, then there is a
21  moderate difference, but there was --- there was big
22  differences within each gender.  I had some very
23  talented males and some males that were not very
24  talented.  And the same with females.  Ability levels
```

```
 1    really varied.  And I had females across my years

 2    coaching high school that were stronger than males.  So

 3    it is not a --- you have to be careful to say that every

 4    male out performs every female because that has not been

 5    my experience.

 6    BY ATTORNEY TRYON:

 7        Q.    Understood.  On the average, though, is it safe

 8    to say that the boys out perform the females?

 9                    ATTORNEY VEROFF:  Objection.

10                    THE WITNESS: Right, if we just look at a

11    mean across the gender, yes.

12    BY ATTORNEY TRYON:

13        Q.    Okay.

14              You used the word mean instead of average.  Can

15    you explain?

16        A.    Yes, on average.

17        Q.    Okay.

18              I just want to make sure we are communicating

19    correctly.

20        A.    Sure.

21        Q.    Have you ever done --- looked at the standard

22    deviation, the bell curve for each of those groups?

23                    ATTORNEY VEROFF:  Objection.

24                    THE WITNESS:  I'm familiar with the bell
```

1   curve.  Do you mean ---?

2   BY ATTORNEY TRYON:

3     Q.   Okay.

4       Have you looked at the bell curve for

5   performance between those two groups of tennis players,

6   boys versus girls?

7              ATTORNEY VEROFF:  Objection.

8              THE WITNESS: Okay.

9       I have been --- I haven't collected data

10  that I could share from when I coached high school.

11  What I could say is that, if we took any skill, let's

12  say their ability to serve accurately or hit a crisp

13  volley or hit a solid backhand across the court, that

14  their --- those bell curves are very close to each

15  other, but overall for just looking at the two groups

16  the boys could have a slight advantage.  But those two

17  bell curves, if we are looking at the bottom of those,

18  you're going to say there is tremendous variability with

19  the males and females.  And so it is easy to get kind of

20  focused on this small mean difference across gender when

21  there is huge differences across, you know, each gender

22  as well.

23  BY ATTORNEY TRYON:

24    Q.   Understood.  As far as the first standard

```
 1    deviation, do you know if the first standard deviation
 2    would overlap between two groups?
 3                    ATTORNEY VEROFF:  Objection.
 4                    THE WITNESS:  I think so in high school
 5    tennis, right.
 6    BY ATTORNEY TRYON:
 7       Q.    Okay.
 8             Have you actually --- that's from just your
 9    generalized experience, but have you actually done a
10    data compilation to determine that?
11                    ATTORNEY VEROFF:  Objection.
12                    THE WITNESS:  No.
13    BY ATTORNEY TRYON:
14       Q.    Do you know of such a thing, any studies that do
15    that?
16       A.    I couldn't identify specifically studies, but
17    when I see these things like if I --- if I pick up the
18    Kansas City paper or after the marathon I see males and
19    females interspersed all the way through with their
20    times, right.  So it's not a thing where every male that
21    ran the marathon out performed every female that ran the
22    marathon.  So I think it's pretty consistent that those
23    differences are smaller, too, if we are not talking
24    about the elite of elite athletes.
```

1    Q.    When you were coaching, how long did you coach?

2    A.    I coached four years full time and then my

3    graduate program at Greensboro I was --- I had an

4    assistantship at a Middle School to teach --- to assist

5    teachers with teaching physical education.

6    Q.    In paragraph eight of your report it says that

7    you graduated with a Master of Science in sports

8    psychology/pedagogy from the University of North

9    Carolina in Greensboro, North Carolina, in 1990.  During

10   that did you take any classes in sports biomechanics?

11   A.    I believe I took one.

12   Q.    What is sports biomechanics?

13   A.    Sports biomechanics looks at the study of

14   movement and how to optimize skills and movement

15   patterns.

16   Q.    And is it fair to say that the biomechanics of

17   males and females are different?

18              ATTORNEY VEROFF:  Objection.

19              THE WITNESS:  With regard to everything

20   across the board, like walking?

21   BY ATTORNEY TRYON:

22   Q.    In athletics --- well, we'll talk about in

23   walking.  Is it different in walking?

24              ATTORNEY VEROFF:  Objection.

1          THE WITNESS: I would say there is more

2   similarity across the genders, more variability with age

3   than across genders on most movements.

4   BY ATTORNEY TRYON:

5      Q.    Okay.

6           So you don't think there is a difference

7   between males and females in the context of

8   biomechanics?

9               ATTORNEY VEROFF:  Objection.

10              THE WITNESS:  Yeah, I think I just need

11  something more specific, right, if males in general can

12  generate more power or something in a particular

13  movement, that may be the case.  It is not my area of

14  expertise.

15  BY ATTORNEY TRYON:

16     Q.    Okay.  Fair enough.  Are you a psychologist?

17     A.    I am not.

18     Q.    Are you a psychiatrist?

19     A.    No.

20     Q.    Have you had any clinical experience seeing any

21  patients?

22     A.    Not clinical experience, no.

23     Q.    Other types of experience seeing patients?

24     A.    No.

1     Q.     And so I a presume you never treated any

2  patients?

3     A.     That's correct.

4     Q.     Have you ever worked as a counselor or social

5  worker?

6     A.     No.

7     Q.     Have you ever counseled with kids on either a

8  formal basis or informal basis on mental health issues?

9     A.     I'm on the educational side of sports psychology

10 and so I might provide educational information, right,

11 about how to develop strong mental skills, right, that

12 are going to help you enjoy your sport better and

13 perform better, right.  It's all on the educational

14 side, so not on a diagnosis side or treatment of mental

15 health.  That would be beyond my credentials and I would

16 refer athletes to someone else.

17    Q.     Okay.

18           Have you ever counseled with kids on gender

19 dysphoria issues?

20    A.     I have not.

21    Q.     Have you counseled with kids or young adults on

22 transgender issues?

23    A.     I have not.  To say that would be beyond my

24 expertise and training.

1      Q.     Fair enough.

2             ATTORNEY TRYON:  Well, we've been going a

3    little over an hour.  I'm happy to keep on going.  But

4    if you need a break, let me know.

5             ATTORNEY VEROFF:  I think it would be

6    good to take a short break.

7             VIDEOGRAPHER:  Going off the record.  The

8    current time reads 11:15 Eastern Standard Time.

9    OFF VIDEOTAPE

10                       ---

11   (WHEREUPON, A SHORT BREAK WAS TAKEN.)

12                       ---

13   ON VIDEOTAPE

14            VIDEOGRAPHER:  We are back on the record.

15   The current time reads 11:27 Eastern Standard Time.

16   BY ATTORNEY TRYON:

17      Q.     In paragraph nine of your report you refer to a

18   Coacher's Guide of Maximizing Youth Sport Experience.

19   And did you write that whole book?

20      A.     With colleagues, we did.

21      Q.     Does that book address transgender athletes at

22   all?

23      A.     It addresses how to create an environment that

24   can be inclusive and help all athletes have a great

```
 1   experience.  It's not specifically written --- you know,

 2   it's not about about transgender athletes overall.  What

 3   I would say they're included in the sense that it is

 4   beneficial to be inclusive in sport.

 5       Q.    Is the term transgender, does it appear in the

 6   book at all?

 7       A.    Beyond -- I'm not sure.

 8       Q.    When was that book written?

 9       A.    It was released in 2020.

10       Q.    When was the first time that you became aware of

11   the issue of transgender girls participating in girls

12   sports?

13                   ATTORNEY VEROFF:  Objection.

14                   THE WITNESS: I'm not sure.  Years ago.  I

15   take conferences regularly, or sports psychology

16   conference, and there has been sessions for a long time.

17                   ATTORNEY TRYON:  Let me ask you to take a

18   look at some documents.  Jake, if you can pull up the

19   document Cortisole and Stress Response during the Game

20   and Practice in Female Collegiate Soccer Players.

21                   VIDEOGRAPHER:  Do you want that marked?

22                   ATTORNEY TRYON:  Yes, this would be

23   Number 4.

24                              ---
```

```
 1                    (Whereupon, Exhibit 4, Article by Dr.

 2                    Fry, was marked for identification.)

 3                                ---

 4                    ATTORNEY TRYON:  And just for the court

 5      reporter, my name is spelled T-R-Y-O-N.

 6      BY ATTORNEY TRYON:

 7          Q.    Okay.

 8                This is a document, an article that you wrote,

 9      correct, Professor Fry?

10          A.    This was a Master's thesis from one of our

11      students and I served on her committee.

12          Q.    I see.  Who is Andrew Fry?

13          A.    He's my husband.

14          Q.    Okay.

15                Why did this document only focus on female

16      soccer players?

17          A.    Typically, in a Master's thesis you kind of can

18      keep things smaller and tighter, and it's not like a

19      doctoral dissertation I think would be one of the key

20      reasons.  There's probably been less research with

21      females and cortisol because it's a little more

22      complicated with menstrual cycles and all that, too.

23      And I think this athlete --- I'm sorry, this student was

24      very interested in any female student to the literature.
```

1      Q.    Is there a difference in cortisol and stress

2   responses between male and female soccer players?

3                    ATTORNEY VEROFF:  Objection.

4                    THE WITNESS:  Yeah, you know, this is ---

5   I would need to review this.  And again, it's beyond my

6   expertise in looking at gender differences in cortisol.

7   BY ATTORNEY TRYON:

8      Q.    So I'm a little puzzled.  You said that you're

9   on the committee to review the students' work.  Did I

10   get that about right?

11     A.    I helped with this project, but this was her

12   thesis research, and she also had some I think

13   psychological measures.  This has been a while.  It was

14   published in 2007, but she was --- I'm not even sure I

15   could tell you what year she graduated or if this was

16   right over, but you know, quite a bit of time has

17   passed.  I would have to go back and review this and it

18   is not my primary area of expertise, but I was an author

19   on this paper.

20     Q.    So when you say you're an author, does that mean

21   you wrote portions of it or just supervised it?

22     A.    You know, it varies and I would have to go back

23   to this one.  Honestly, in reviewing it, I haven't

24   looked at this in a long time.

```
1        Q.     Do you know how the student identified if

2   someone was a female?

3        A.     I think she used a female collegiate soccer team

4   and so those were female athletes on the team.

5        Q.     Do you know if any of those female athletes were

6   transfemales?

7        A.     No, I don't.

8        Q.     Would that have made a difference for the study

9   if some were transfemales and others were what I would

10  call biological females?

11                    ATTORNEY VEROFF:   Objection.

12                    THE WITNESS: I don't know.  And I think

13  it would depend on where the transathletes were.

14  BY ATTORNEY TRYON:

15       Q.     Where they were?  What do you mean?

16       A.     I'm sorry, where they --- I'm sorry, Dana just

17  came in with cords and I got distracted for a second.

18  With where they were in the transitioning process.

19                    ATTORNEY TRYON:   Okay.

20                    If you could bring up the next document,

21  Examination of the Psychometric Properties of Perceived

22  Motivational Climate in Sports Questionnaire.

23                    VIDEOGRAPHER:   I'm sorry.  Can you repeat

24  that title?
```

1          ATTORNEY TRYON:  Yes.  Examination of the

2    Psychometric Properties of the Perceived Motivational

3    Climate in Sports Questionnaire.

4          VIDEOGRAPHER:  Okay.

5          Just give me one moment?

6          THE WITNESS:  You may want to take this

7    home for bedtime reading tonight, right.

8          ATTORNEY TRYON:  This is now marked as

9    Exhibit-5, I believe.

10                        ---

11          (Whereupon, Exhibit 5, Article, was

12           marked for identification.)

13                        ---

14   BY ATTORNEY TRYON:

15     Q.    Have you seen this document before?

16     A.    I have.  It's been a while since I looked at it,

17   but, yeah, I have.

18     Q.    And what is the purpose of this document?

19     A.    So there was a measure, a perceived motivational

20   climate of sports questionnaire.  And Maria Newton in

21   her dissertation, she wanted to expand on the measure

22   and create little subscales within what we call task in

23   ego involving climates.  And I think she ran it with a

24   couple of samples here just to be able to test the

1    psychometrics of the measure.

2        Q.    Why was this one limited to female athletes?

3        A.    It's a good question.  Why does any researcher

4    includes females, males and/or both?  Maria had access

5    to, as I remember, a massive tournament, volleyball

6    tournament, and could get the group onboard and be able

7    to access a lot of teams because research is hard to do.

8    You really need to be able to access a number of teams

9    and she was able to do that with this study.

10       Q.    So you don't know why it would be separated to

11   be only for female athletes?

12       A.    I think she was only interested in volleyball

13   and in particular females.

14       Q.    Is there a difference in volleyball between

15   female and male athletes?

16                   ATTORNEY VEROFF:  Objection.

17                   THE WITNESS: A difference in what sense?

18   BY ATTORNEY TRYON:

19       Q.    In psychometric properties, the perceived

20   motivational climate?

21       A.    Okay.

22             So while she didn't look at that in the study

23   because she only had females, so we just have to look at

24   the broader literature, right.  And the theory

```
 1    predictions hold up in that athletes can perceive the
 2    climate as very task involving or ego involving, right.
 3    And in some samples athletes, you know, males or females
 4    may see it one way or another more, but the predictions
 5    just align consistently that if you perceive the task
 6    involving climate at least to good things.  Like people
 7    have more fun and try harder, they're more committed to
 8    their sports, they have better relationships with
 9    others, those kind of things.
10         Q.    All right.
11                    ATTORNEY TRYON:  I'm finished with that
12    exhibit then.  Let me then ask you some other questions.
13    BY ATTORNEY TRYON:
14         Q.    Is your expertise limited to sports psychology?
15         A.    Sports psychology is a broad term, you know, but
16    yes, I would say that is my expertise.  I don't know if
17    you would consider youth sport as a part of that.
18         Q.    I'm sorry.  I missed what you said.
19         A.    The youth sport.
20         Q.    Oh, youth support?
21         A.    Yes, in particular within sports psychology my
22    focus has been on youth.
23         Q.    Okay.
24         A.    Not exclusively.
```

1    Q.    So just to be clear, you are not an exercise

2  physiologist, right?

3    A.    I am not.

4    Q.    And you are not a medical doctor.

5          Correct?

6    A.    That's correct.

7    Q.    And you don't have expertise in the science of

8  performance advantage, do you?

9    A.    No.

10    Q.    And you have no expertise in sports safety.  Is

11  that true?

12    A.    Yes, true.

13    Q.    And do you have any expertise in concussion

14  management?

15    A.    No.

16    Q.    Do you have any expertise in ACL injuries?

17    A.    No.

18    Q.    Have you done any research studies or papers

19  regarding transgender females in sports?

20    A.    No.

21    Q.    Have you taught any classes on that?

22    A.    Not like a complete course, but it's a topic

23  that we can cover in our undergraduate score psychology

24  class.

1    Q.    And so is that a class that you teach?

2    A.    Yes.

3    Q.    And what exactly have you covered with regard to

4    transgender females in that class?

5    A.    So late this semester I'm teaching the class and

6    later in April we have a trans --- a transfemale who is

7    a retired athlete and coach coming in for that day and

8    we will probably take a partial class before that just

9    to have some discussions and lay some groundwork.  It is

10   an educational session where we just --- we have

11   students who may be well informed and passionate about

12   transathletes in sport and we have had other students

13   who have had very little exposure.  So it's not a big

14   --- it's not a big chunk of the class, right, it's a

15   class or two that we touch on it.

16   Q.    Aside from any research, have you attended any

17   seminars or classes on transgender females in sports?

18   A.    Yes.  Typically at our national conference, the

19   Association of Applied Sports Psychology, you know,

20   that's a jampacked schedule, and probably most

21   conferences I'll sit in on a session.  Sometimes they

22   --- they will do a webinar, things like that.  So over

23   the years, yes, I have participated in those.

24   Q.    Have you reviewed any literature on transgender

1  participation in sports to prepare your opinion in this

2  case?

3      A.    Like over the last two years I've read some.  I

4  couldn't point or identify, hey, this is exactly the

5  literature I've read.  Just someone who's reading often

6  in my --- you know, within sports psychology.

7      Q.    Your bibliography doesn't include any papers

8  studying transgender athletes, does it?

9      A.    No.

10     Q.    And have you done any studies or papers

11 regarding the harm to motivation on females when

12 biological boys or trans/transgender girls are allowed

13 to compete on girls teams?

14                ATTORNEY VEROFF:  Objection.

15                THE WITNESS:  I have.

16 BY ATTORNEY TRYON:

17     Q.    Do you mean have not?

18     A.    I'm sorry, have not.

19     Q.    Have you taught any classes on that topic?

20                ATTORNEY VEROFF:  Objection.

21                THE WITNESS:  I have not.

22 BY ATTORNEY TRYON:

23     Q.    Have you attended any seminars or classes on

24 that topic?

1            ATTORNEY VEROFF:  Objection.

2            THE WITNESS: I have not.

3   BY ATTORNEY TRYON:

4      Q.    Have you prepared any papers regarding

5   differences for motivation between males and females?

6            ATTORNEY VEROFF:  Objection.

7            THE WITNESS:  Yes.

8   BY ATTORNEY TRYON:

9      Q.    Okay.

10           Well, what are those?

11     A.    Okay.

12           I think in, oh, gosh --- in --- sometimes in

13  papers we, you know, we see if there were gender

14  differences in terms of motivation.  When there are

15  differences they're slight and we are back to that bell

16  curve mean thing that there might be a slight difference

17  but they don't impact the hypotheses in the sense that

18  --- in the sense that someone has a high task

19  orientation and/or perceives a task involving climate or

20  caring climate, whether you are male or female those

21  predictions hold up in terms of the outcomes.

22     Q.    Are there papers in your bibliography that would

23  show that to be the case that it's the same for boys and

24  girls.  Feel free to take a look at it.  You have got it

```
 1    there.
 2                    VIDEOGRAPHER:  I would note that we
 3    gained another participant.  If they would identify
 4    themselves for the record.
 5                    ATTORNEY PELET:  Good morning.  My name
 6    is Valeria Pelet del Toro for Cooley, LP, for Plaintiff
 7    BPJ.
 8                    THE WITNESS:  Thank you for that time.
 9    The Hogue, Fry and Fry 2017, I have to review that
10    paper.  I can't remember if there were any gender
11    differences.  These were Middle School kids who
12    were ---.
13    BY ATTORNEY TRYON:
14       Q.    Let me stop you for just a second.  Can you tell
15    me what page that's on?
16       A.    Yes, page 14, the second from the last
17    reference.
18       Q.    And which one is it again?
19       A.    The Hogue Fry and Fry, 2017.
20       Q.    Page 14 you said?
21       A.    Yes, page 14, the second reference from the
22    bottom of the page.
23       Q.    I'm seeing Walling, M.D.
24       A.    Okay.  Sorry.
```

```
 1        Q.      Maybe the pagination is different on your copy.

 2        A.      I'm sorry.  Are you looking at the expert report

 3   and Declaration?

 4        Q.      Yes, I am.

 5        A.      Okay.

 6                It should be the same.  If you go in

 7   alphabetical order, Hogue with an H, H-O-G-U-E.

 8        Q.      Okay.

 9                Here is the issue.  I see.  Hogue, et cetera.

10        A.      Yes.

11        Q.      There's two by Hogue.  Which year?  They're both

12   2013.

13        A.      The 2017.

14        Q.      What is the title?

15        A.      The title is the Differential Impact of

16   Motivational Climate on Adolescents Psychological and

17   Physiological Stress Responses.

18                     ATTORNEY TRYON:  It is on page three.

19   Can you bring that up, Jake?  It is under 14.

20                     VIDEOGRAPHER:  I was trying to look for

21   it too.

22                     ATTORNEY VEROFF:  I think there is two

23   page 14s.  So there is a bibliography that directly

24   follows the expert report and then there is the
```

```
 1    citations that are encompassed in Exhibit A, the first

 2    page 14.

 3                    ATTORNEY TRYON:  Thank you, Julie, for

 4    helping us out with that.  I see it now.  I'm sorry for

 5    that confusion.

 6    BY ATTORNEY TRYON:

 7        Q.    You were going to explain that paper.

 8        A.    I'm sorry.  Did you ask me to explain the paper?

 9        Q.    Yes.  You were starting to talk about that, so I

10    would appreciate if you could talk about that?

11        A.    So in this study Middle School kids are

12    recruited to participate in an intervention.  They come

13    in and they learn an activity.  And they're assigned ---

14    randomly assigned to either caring task involving

15    climate or an ego involving climate.  And as they

16    participate across the interventions, their cortisol is

17    measured.  Cortisol is a stress hormone and it can

18    indicate that people are experiencing higher stress.

19    And so in this study we found that athletes in the

20    caring task environment climate, their cortisol levels

21    actually decreased, right, suggesting that they were not

22    stressed.  In addition they had more fun, they indicated

23    they tried harder, they made more progress learning the

24    activity, they experienced, you know, less shame, less
```

1    embarrassment, less anxiety.  That is what I'm recalling

2    from memory, okay.  There are probably a couple of other

3    things.

4              And if they participated in an ego involving

5    climate you got to flip all of those.  They didn't have

6    as much fun, didn't indicate that they wanted to

7    continue with the activity and their cortisol levels

8    were significantly higher than those in the other group.

9    And the results were consistent for males and females.

10   What I would have to go back and check is were there any

11   --- going back to these slight mean differences, were

12   there any differences between the males and females in

13   the other variables.  And that I couldn't tell you

14   without reviewing it.  But in general, the purpose of

15   the study was to see how this environment affects kids

16   and the results were similar for males and females.

17        Q.    And what age group was that?

18        A.    This was Middle School, so six, seven and eight

19   graders.  I think it leaned heavier on the six grade,

20   seven grade participants, but the mean age was probably

21   12.

22        Q.    Any other papers in your bibliography talking

23   about whether or not there is a difference between males

24   and females and how they are motivated, if there is any

```
 1    difference between them that is?

 2       A.    Yeah.  I think with any of these studies,

 3    honestly, I just have to go back and see if there were

 4    any minor little differences between gender, but across

 5    gender the results are consistent.

 6       Q.    Okay.  All right.

 7             Let me ask you, have you prepared any papers

 8    regarding motivations for biological boys identifying as

 9    girls?

10       A.    I have not.

11       Q.    Have you prepared any papers regarding

12    transgender girls?

13       A.    I have not.

14       Q.    Have you studied that issue?

15       A.    No.

16       Q.    Would that be something worth studying?

17       A.    It could --- I'm sorry.  Could you repeat that?

18       Q.    Motivation regarding transgender girls?

19       A.    Yes, it could be valuable.

20       Q.    As far as you know, has anyone studied that?

21       A.    Yeah, I --- you know, I hear people saying, you

22    know, that there is just going to be more and more

23    research coming out.  I think there is isolated papers

24    out there probably that people have had a look at or ---
```

```
 1    but I couldn't name them right now for you.
 2        Q.    Have you prepared any papers regarding coaching
 3    transgender girls versus biological girls?
 4        A.    I have not.
 5                    ATTORNEY VEROFF:  Objection.
 6    BY ATTORNEY TRYON:
 7        Q.    Are you aware of any studies that do address
 8    that?
 9                    ATTORNEY VEROFF:  Objection.
10                    THE WITNESS:  No.
11    BY ATTORNEY TRYON:
12        Q.    Have you prepared any papers regarding the
13    opportunity for collegiate athletic scholarships
14    motivates student athletes?
15        A.    Have I prepared any papers?
16        Q.    That is my question.
17        A.    No.
18        Q.    Would you agree that the opportunity for
19    collegiate athletic scholarships does, in fact, motivate
20    the student athletes?
21        A.    Some student athletes.
22        Q.    Now, you qualify that as some.  Any idea what
23    that percentage might be?
24        A.    No.
```

1        Q.     Are you familiar with Title 9?

2                    ATTORNEY VEROFF:  Objection.

3                    THE WITNESS: Yes, to some degree.

4    BY ATTORNEY TRYON:

5        Q.     Tell me what your understanding of Title 9 is in

6    the context of girls sports.

7                    ATTORNEY VEROFF:  Objection.

8                    THE WITNESS:  More opportunities are

9    provided to girls to the same degree as boys and that

10   fairness is given across other aspects of resources and

11   so on, facilities and things like that.

12   BY ATTORNEY TRYON:

13       Q.     Have you ever written any papers on Title 9?

14       A.     No.

15       Q.     Have you written any papers on college

16   scholarships for girls?

17       A.     On college scholarships for girls?

18       Q.     Yes.

19       A.     No.

20       Q.     So you wouldn't be an expert on that, would you?

21       A.     No.

22       Q.     Have you submitted any comments to the

23   Department of Education on proposed rules or regulations

24   under Title 9?

1      A.     No.

2      Q.     Let me ask you a question a little bit different

3 than the one earlier.  Can the opportunity for

4 scholarships for girls collegiate sports be a motivator

5 for girls to compete in girls sports?

6      A.     It can be for some athletes.

7      Q.     So in paragraph 11 of your expert report, which

8 is Exhibit-2, it says on the national level I've served

9 with the Association of Applied Sports --- Sport

10 Psychology, AASP, as a member of the Program Review

11 Committee.  That is correct, isn't it?

12     A.     Yes.

13     Q.     It's my understanding that the purpose of that

14 organization is primarily to help train coaches.

15            Is that fair?

16     A.     No, that would be not accurate.

17     Q.     Tell me the purpose of it.

18     A.     Okay.

19            It is an organization of professionals that work

20 in the area of sport and exercise psychology and to say

21 there's probably two aims, that these professionals are

22 trying to help people, a wide variety of people across

23 the lifespan reap off the benefits from participation in

24 physical activity and also help people perform up to

1    their potential or help them perform better.  It is a

2    mix of the organization.  There are people who are

3    faculty members and people that are involved in the

4    team, are involved in programs but there's also people

5    that are trained on the clinical side or that are more

6    focused on sort of counseling aspects of sports

7    psychology.

8        Q.    Are you actually a member of the organization?

9        A.    Yes, I am.

10       Q.    Now, on the website it said that there is 2900

11   members in 50 countries.  Is that about right to your

12   knowledge?

13       A.    That sounds right.

14       Q.    So I divided that out.  That would be 58 per

15   country.  That doesn't sound very big per country.  So

16   let me ask you, do you know how many of those are

17   members are in the United States?

18       A.    I don't know.  I would guess it's heavily

19   weighted in the U.S.  I would say over half.  I think

20   there's a lot of countries that might have one person or

21   so.  So even though 50 countries are represented, you

22   know, some of them are small and may have a really small

23   participation, right.

24       Q.    Okay.  Fair enough.

 1          So you mention in this paragraph the

 2   certification exam.  So there is a certification exam.

 3          Is that right?

 4   A.    Yes.  It's pretty new.  There has been a

 5   certification.  The fact that it is exam based is a new

 6   direction over the last few years.

 7   Q.    What is the purpose or meaning of that

 8   certification?

 9   A.    It's called CMPC, Certified Medical Performance

10   Consultant, and it is good for the field because the

11   people who have that credential, it designates sort of,

12   you know, acceptable level of competence to go out and

13   to work with athletes and coaches.  So there is a number

14   of courses people have to have.  They have to have hours

15   of training working directly with athletes.  And then

16   when they complete all those requirements they take ---

17   they take an exam.

18   Q.    Have you taken the exam?

19   A.    I'm --- I'm about to in the coming months.  A

20   little back story on this is that the certification

21   originally came out as I was wrapping up my doctoral

22   training, and I would have needed to stay another year

23   to get the other requirements that I was missing and my

24   doctoral advisor at the time said, you know, yeah, I'd

1  just go and graduate and get rolling in your career.

2  And she wasn't sure if this would take off or how big a

3  deal it would be, and so over the years it has been sort

4  of slow to take off.  I have, for example, people come

5  and say do you have this AASP Certification until the

6  last year or two.  So I think the public is becoming,

7  you know, more aware of it.

8           I was asked to write the chapter in the

9  Essentials Text, which is really the text for people to

10  prepare for the exam.  And so I was asked to write the

11  motivation chapter, a key chapter on motivation

12  theories.  And so there's this double blind system on

13  writing one of the chapters that I needed to wait longer

14  to actually take the exam.  But currently I'm an

15  approved mentor to train students who are seeking the

16  certification.

17     Q.    But you don't have the certification at this

18  point.

19           Correct?

20     A.    Right.  Just as a mentor.  I have --- I received

21  all the thumbs up on every --- on --- you know, you

22  submit a packet of materials showing you have all the

23  credentials and all.  So I've done that.  I just need

24  now to sit for the exam.  And I haven't done that yet.

1    I will probably do it once the semester is over.

2        Q.    Do you consider yourself an athlete?

3        A.    I'm smiling.  I do.

4        Q.    Okay.

5        A.    I work closely with the Women's Inner Sport

6    Network in Kansas City and they say that should be the

7    mantra.  Every female should say I'm an athlete.  I'm

8    not currently competing.

9        Q.    Okay.

10           What sports have you participated in?

11       A.    Tennis and softball were my primary sports.

12       Q.    And when did you compete in or participate in

13   those?

14       A.    Softball was kind of a Middle School thing and I

15   transitioned to tennis as I hit high school and competed

16   through high school and college and then probably

17   through my 20s still competing in tournaments around the

18   state.

19       Q.    So after college were you still competing in

20   some fashion?

21       A.    I was, yeah.  Just one of the nice things about

22   teaching and you have that summer break.  And my friends

23   enjoyed playing so we would play in tournaments around

24   the state.

1       Q.      Did you want to win?

2       A.      I did.

3       Q.      And so were you --- let's go back to the terms

4   you already mentioned, like ego oriented and task

5   oriented, right?

6       A.      Uh-huh (yes), yes.

7       Q.      And so tell me just in layman's terms what those

8   mean.

9       A.      Okay.

10          They were developed in a theory by a guy named

11  John Nicholls and he said --- what he was really --- the

12  question he was trying to address is what should we be

13  doing if we are trying to help every athlete reach their

14  own potential.  And so his theory it has three facets to

15  it.  One is the goal orientation and those refer to your

16  personal definition of success.  And so some people ---

17  he identified two, task orientation and ego.  And people

18  who have a high task orientation, they really feel most

19  successful when they can walk away knowing they gave

20  their best effort and they're focused on their

21  improvement over time.  But that is where genuine

22  feelings of success come.

23          In contrast, some people have a strong ego

24  orientation and they're more focused on how they compare

1    to everyone or are they winning.  And they may say,

2    yeah, good for me, I tried hard, who cares.  What I care

3    about is how did I compare to everyone.  Did I

4    demonstrate confidence?  Did I look better than others,

5    did I win?

6        Q.    And can somebody have both an ego orientation

7    and a task orientation?

8        A.    Yes.  They can be high in both, high in one and

9    low in another.

10        Q.    And when you were playing tennis, were you ---

11    which one were you?  Ego oriented or task oriented?

12        A.    I think I've always had a high task orientation.

13    I just loved sport and the chance to complete, and I

14    would say I had a moderate ego orientation.

15        Q.    Is one better than the other?

16        A.    It depends what your aim is.  If we want

17    athletes to have fun and to keep playing and to try hard

18    to have good relationships with others and to be good

19    sports, then we should try to promote task orientation

20    because ego orientation is not related to those things

21    pretty consistently.

22        Q.    And under your theory then should we try to

23    suppress ego orientation?

24        A.    No.  I think the second part of the theory is

1   what kind of environment we create for our athletes, and

2   so the research is very strong in this area suggesting

3   many benefits when we can create a task and a caring

4   climate for athletes.  So the problem with the climate

5   for a coach is that you really need to pick what am I

6   going to do because you can't do both or it becomes a

7   wash or a neutral environment.  So those features of

8   each of the climates, they're really in direct contrast

9   with one another.

10      Q.    When you say you are an athlete, what does that

11   mean to be an athlete?

12      A.    You know, for me it means someone who just loves

13   having the opportunity to do their best and to try and

14   improve and to walk away on one --- you know, today I'm

15   going to go out there, I'm going to give my best and

16   tomorrow I'm going to get up and go do it again whatever

17   happened, right, because there is just so much fun and

18   joy that comes from having that opportunity.

19      Q.    So just as I recall you said you do like to win,

20   right?

21      A.    I do.

22      Q.    And you can like to win and want to win whether

23   you are personally ego oriented or task oriented, right?

24      A.    Absolutely.  I mean, who plays sports and

1    doesn't want to win.  I mean, that's just sort of a

2    given.  What does winning mean for us, right?  Is it a

3    chance for me to kind of put my chest out and say I'm

4    better than you, I beat you, or is it kind of a

5    celebration of me being able to say, boy, I've worked

6    hard and I can see I'm improving, right.

7        Q.    Right.  But if you are in an environment where

8    you basically are prevented from winning, that would be

9    very discouraging.

10            Right?

11       A.    I'm not aware of any of those environments where

12   you are prevented from winning.

13       Q.    Well, what if the coach doesn't let you play?

14       A.    Does that mean like you're not a starter or ---

15   is that what you're referring to?

16       Q.    Well, if you are just a bench warmer, would that

17   be discouraging to some people?

18       A.    You know, this comes back to the climate.  If a

19   coach is saying you're an important part of this team

20   which is one of the features of a task and caring

21   climate, right, you're valuable, you push everybody,

22   your opportunities are going to be coming.  And what

23   it's really about is let's do all we can to help you

24   keep developing, right.  If we are just like, hey,

1    please stay out of the way, go sit at the end of the

2    bench, go down to the end of the court because I'm

3    working with these few star athletes I've got here, then

4    yeah, it would be discouraging.

5         Q.    Would you agree that rules are important in

6    sports?

7         A.    Yes.

8         Q.    So you mentioned you have played tennis and

9    softball.  And what other sports are you familiar with?

10        A.    Played a little bit of volleyball going through

11   --- yeah, you know, I grew up in Texas and tennis is

12   just a year-round sport, right.

13        Q.    Right.

14        A.    So that is a lot of my experience.  My son is a

15   baseball player, so I've watched an awful lot of

16   baseball as well.

17        Q.    Are you familiar with track and cross-country

18   even though you haven't done it?

19        A.    Yeah, yes.

20        Q.    Are you familiar with football?

21        A.    Yes.

22        Q.    So how about basketball?

23        A.    Yes.

24        Q.    Who is going to go on in the final four?

1      A.      Absolutely.  A little excitement here in town.

2      Q.      Yes.  So do sports have to be athletic to be

3   sports?

4                    ATTORNEY VEROFF:  Objection.

5                    THE WITNESS:  Do they have to be

6   athletic?

7   BY ATTORNEY TRYON:

8      Q.      That is my question.

9      A.      Okay.

10              I think it just depends on how you define

11   athletic.

12     Q.      Well that's what I'm wondering.  So for example,

13   are video games sports?

14     A.      You know, some universities are considering

15   those.  They have sports teams and they are considering

16   that part of the athletics.  It's not my particular area

17   of interest.

18     Q.      Okay.

19              So some sports are solo and some are with

20   teams.

21              Is that a fair statement?

22     A.      Yes and no.  Again, I would say it is how you

23   define it, right.  If you are going to say a track team

24   with the best individual, I would say there is relays

1    and it depends how the coach approaches it.  Are we just

2    a lot of individuals doing our thing out here, are we a

3    team working together?

4    Q.    Well, when you --- so that may be in high school

5    there is teams.  But outside of high school or college

6    there are sports you participate in that, for example, a

7    marathon, you could be on a marathon and simply you're

8    participating as an individual, right?

9    A.    Uh-huh (yes), I agree.

10   Q.    And but --- so some athletic events can be done

11   without being on a team.  Are there others that you can

12   think of besides marathons?

13   A.    Sure.  As people graduate and they can run

14   races, yeah, they can participate in weightlifting.

15   Q.    And a lot of these things ---?

16   A.    They could have ---.

17   Q.    Sorry to interrupt you.  Go ahead.

18   A.    I'm sorry.  They could swim.  I'm just throwing

19   out another one.

20   Q.    Yeah.  So swimming is both --- you do it as a

21   sole --- as an individual but also as part of a team in

22   high school and college, right?

23   A.    Right.

24   Q.    And both cases you, as an individual, want to

1   win in these sports but also you're trying to help your

2   team win.  Is that a fair statement?

3        A.   Yes, at its best.

4        Q.   And there is sometimes when you feel like

5   running, it can be something you just like to run.  You

6   don't have to be on a team or you can compete, you just

7   run on your own, right?

8        A.   That's true.

9        Q.   I see little kids, why walk when you can run.

10  So that's something that you can do alone or you can do

11  with your family, right?

12       A.   Uh-huh (yes).

13       Q.   Is that a yes?

14       A.   Yes, sorry.

15       Q.   Thanks.  And it's something you can do either

16  competitively or not competitively, right?

17       A.   Yes,

18       Q.   Now when you're on a team, for example, a track

19  team, you're competing against other people on your

20  team.

21            Is that right?

22       A.   Again, I would just say --- I would just check

23  --- that is not how I would phrase it if I were a coach,

24  that we're competing against each other.  I would say we

 1   are a team and we are working together to bring out the

 2   best in each one of us, but the goal is every athlete

 3   reach their potential.

 4       Q.    But every one of those kids on a track team

 5   still wants to be the best on the track team as a

 6   general rule, right?

 7       A.    I don't know that that is necessarily true, but

 8   I think they want to compete and they want to do well.

 9   I would agree with that.

10       Q.    I probably overstated that, but many of them ---

11   at least some of them want to be the best on the team,

12   the fastest on the team, right?

13       A.    Yes.

14       Q.    So those are the people that are comparing

15   themselves to others and just want to be --- so they

16   would be ego centered, ego oriented.

17           Is that right?  But not necessarily?

18       A.    Yeah, not necessarily.

19       Q.    Okay.

20       A.    Do you want me to comment on it?

21       Q.    Sure.

22       A.    Okay.

23           If I could just use an example.  Like a track

24   athlete, Al Oerter was an athlete in the '50s and '60s,

he won four gold medals consecutively across four
Olympics, it's crazy, throwing the discus.  And he said
--- a reporter asked him how did you beat the world, how
were you so great, how were you better than everybody
else these four Olympics, and he said --- his response
was like that's nonsense.  It is never about being
better than somebody else.  It's about being the best
that you can be, right.  And so what if is just good
enough.  What if I beat you, good, but maybe I can be so
much better than that.  So for my sights to be set on
just being better than you it is limiting, right.  And
if you are so much better than me and so much less
talented, why don't I just focus every day on being the
best that I can be, right.  So Al Oreter, you think four
time Olympic gold medalist, he's got to be high on ego
orientation.  He's somebody who's really high in task
and would have been lower.  But we could look at other
athletes that would be the flip and definitely.  So when
you say athletes who want to win that doesn't
distinguish the task and ego aspect of it.

    Q.   So task and ego orientation doesn't affect
somebody's desire to win.  Desire to win is separate
from the ego versus task orientation, that's what you're
saying, right?

1      A.    I think it comes down more to what does winning

2   mean.

3      Q.    All sports have rules, we've established that,

4   right?

5      A.    Uh-huh (yes).

6      Q.    Is that a yes?

7      A.    Yes.

8      Q.    The purposes of the rules is, one, tells you how

9   to play the game, right?

10     A.    Yes.

11     Q.    Another is for safety.  You have rules for

12  safety, is that right?

13     A.    Yes.

14     Q.    And you have rules to make things fair, right?

15     A.    Yes.

16     Q.    What other reasons do we have rules in sports?

17  Does that cover it?

18     A.    Nothing else comes to mind right now.

19     Q.    Who generally makes rules for sports?

20     A.    The leagues and sports organizations per se.

21     Q.    Would it be fair to say that the participants

22  rely on the rules?

23     A.    Rely on the rules?

24     Q.    Yes.

1    A.    Fair to say that participants when they join a

2  league or, you know, their understanding that there are

3  rules that they need to abide by.

4    Q.    And they expect that others have to abide by

5  those same rules; right?

6    A.    Yes.

7    Q.    And it is important to have consistent rules,

8  rules that don't change periodically, right?

9    A.    I think rules change all the time in sports.

10   Q.    Why do they change?

11   A.    I think they change because they are recognizing

12  those things that you mentioned that maybe something

13  would be safer or something would be more fair or more

14  inclusive.

15   Q.    And sometimes those changes are made in

16  anticipation of problems, not waiting for problems to

17  happen.

18        Is that fair?

19              ATTORNEY VEROFF:  Objection.

20              THE WITNESS: Yeah, I'm not sure.

21  BY ATTORNEY TRYON:

22   Q.    Okay.

23        What about safety, rules for safety, do

24  sometimes safety rules anticipate problems and sometimes

1    they react to problems that have already occurred?

2                    ATTORNEY VEROFF:  Objection.

3                    THE WITNESS: Yes.

4    BY ATTORNEY TRYON:

5        Q.    Is that a yes?

6        A.    Yes.

7        Q.    And then how about fairness, we have rules

8    designed for fairness and those are sometimes set in

9    motion because of something that has happened, right?

10       A.    Uh-huh (yes).

11       Q.    Yes?

12       A.    Yes.

13       Q.    And other times it's in anticipation of problems

14   that we see might come down the road but we want to set

15   rules for fairness, right?

16                   ATTORNEY VEROFF:  Objection.

17                   THE WITNESS: Yes.

18   BY ATTORNEY TRYON:

19       Q.    And in all sports there is scoring, right?

20       A.    Yes.

21       Q.    That is part of the rules, right?

22       A.    Uh-huh (yes), yes.

23       Q.    And those scores decide who wins, right?

24       A.    Yes.

```
 1      Q.     Would you say scoring is a motivator?

 2      A.     For some athletes.

 3      Q.     When an athlete perceives something as being

 4   unfair, that's a de-motivator, would you agree?

 5                     ATTORNEY VEROFF:  Objection.

 6                     THE WITNESS:  In some cases.

 7   BY ATTORNEY TRYON:

 8      Q.     So sports also have rankings, individual

 9   rankings and team rankings, right?

10      A.     That's right.

11      Q.     And for some athletes those rankings are

12   motivators, right?

13      A.     Yes, for some.

14      Q.     And sports, you give out trophies for winners,

15   right?

16      A.     I'm sorry.  You broke up.

17      Q.     In sports we give out --- at least in some cases

18   we give out trophies to winners, right?

19      A.     In some cases.

20      Q.     So let me see if I understand.  Are you

21   advocating that sports should eliminate scoring?

22                     ATTORNEY VEROFF:  Objection.

23                     THE WITNESS:  No.

24   BY ATTORNEY TRYON:
```

1    Q.    Are you advocating that they should eliminate

2    rankings?

3    A.    I don't think it would hurt at lower levels.  I

4    don't think we need to have have a focus on that when

5    you're five or six years old, on rankings, and we ought

6    to be focused just on learning the game and having fun,

7    but in general I'm not opposed to us having ---

8    identifying winners and ranking teams and so on.

9    Q.    And sports teams, the coaches decide who plays

10   in different positions in different games.

11         Is that right?

12   A.    That's right.

13   Q.    And should how good the student athlete is have

14   anything to do with when, where and how to play

15   according to the coach?

16              ATTORNEY VEROFF:  Objection.

17              THE WITNESS: Should the athlete's talent

18   have something to do with how much playing time they

19   get?

20   BY ATTORNEY TRYON:

21   Q.    That would be a fair way to characterize my

22   question, yes.  What is your answer?

23   A.    I would agree with that particularly as we move

24   up in levels.  I really like the rules that some youth

1    sport leagues have that we have eight-year-olds and

2    we're not just going to say, hey, Julie, you're on the

3    bench because you're not as good so you don't get any

4    playing time.  I like the rules that say everybody gets

5    in there a few innings and gets some playing time or

6    gets to bat, or whatever the sport might be.  So I think

7    it really varies on what sport we are talking about.

8        Q.    Let's look back at your report, Exhibit-2.  Look

9    at paragraph 35.  Do you see that?

10       A.    Yes, I do.

11       Q.    The first sentence says, thus the benefits

12   associated with youth and young adult sport are not

13   limited to whether athletes are winning competitions,

14   where they are ranked in their sport or what level of

15   publicity they are getting.

16            Do you see that?

17       A.    Yes.

18       Q.    So you would agree with me that one of the

19   benefits is the opportunity to win competitions.

20            Right?

21       A.    I would probably word it one of the benefits is

22   the opportunity to compete.

23       Q.    Well, here you say winning.  You say it is not

24   limited to whether athletes are winning, which suggests

1    that winning competitions is one of the benefits.

2            Correct?

3                    ATTORNEY VEROFF:  Objection.

4                    THE WITNESS:  Yeah.  I think what I mean

5    by that is if only --- if you have to win to have a

6    great experience in sports, then half of our teams are

7    not going to have a good experience, right.  So what I'm

8    suggesting here is that and as the data backs this up

9    that if you are in a good climate, then you can go out

10   there and have fun and try hard and maybe your team

11   didn't end up with a winning record, but you can still

12   reap the benefits.  And so it is not the case that only

13   winning teams reap these benefits that come along with

14   sports.

15   BY ATTORNEY TRYON:

16      Q.    So you are saying winning is not a benefit?

17                   ATTORNEY VEROFF:  Objection.

18                   THE WITNESS:  I'm going to say winning

19   can be a benefit.  It's not a primary one in my mind in

20   sport, but yes, winning can help us see our improvement

21   and, you know, winning has its place for sure.

22   BY ATTORNEY TRYON:

23      Q.    And you see athletes when they win, they are

24   pretty excited, aren't they?

1      A.    Many of them are.

2      Q.    Well, have you ever seen anybody disappointed

3  about winning?

4      A.    Maybe not disappointed, but if --- let's just

5  say you are really skilled in tennis and you come and

6  you know, you leave me behind, you beat me 6061, there

7  might not be a lot of joy for you in beating me, right,

8  but for some athletes it might be, hey, it's another win

9  for me and I'm super excited about that.  So that is

10  what I mean.

11      Q.    And where they're ranked in their sport, that is

12  one of the benefits.

13          Right?

14              ATTORNEY VEROFF:  Objection.

15              THE WITNESS: Yeah, I think we may have a

16  different view on benefits.  With benefits I'm just

17  thinking what's going to help us long term.  And it

18  reminds me of this Olympic gold medalist who said her

19  kid was going through kind of a junk drawer and found

20  her gold medal, right.  So winning --- she's a gold

21  medalist, didn't mean as much as all the experience and

22  just reflecting on the ability to give your best effort

23  and to build these relationships and to push yourself so

24  hard.  Those seem like benefits more than, you know, the

```
 1    trophy or something winning.  I'm not disputing that

 2    winning, yeah, can be fun and it is definitely part of

 3    sport.

 4    BY ATTORNEY TRYON:

 5         Q.    Yeah.  And so all those things you just

 6    mentioned certainly are benefits to sports.  I'm not

 7    trying to suggest that's not the case.  I just want to

 8    understand when you say in this paragraph, thus benefits

 9    associated with youth and young adult sports are not

10    limited to whether athletes are winning competitions,

11    where they are ranked in their sport or what level of

12    publicity they are getting, it's not limited to that,

13    but it does include those three things, right?

14                   ATTORNEY VEROFF:  Objection.

15                   THE WITNESS:  I'm going to give you that

16    those are benefits.  I'm just going to put them down

17    lower on what we value.

18    BY ATTORNEY TRYON:

19         Q.    Okay.

20         A.    Or more important benefits.

21         Q.    Is the opportunity to get a college scholarship

22    also a benefit in youth sports?

23         A.    For a very small proportion of children in youth

24    --- in our youth sport world are able to secure college
```

1    scholarships and go on, and so our youth sport world

2    shouldn't be centered around that I believe.

3         Q.    But for those that want to and can get college

4    scholarships, that is a big benefit for them, right?

5         A.    Yes, that's very cool.

6         Q.    And it can be worth tens of thousands of

7    dollars, right?

8         A.    Yes, it can.

9         Q.    And even just being recruited to play on a

10   college team, that's a big benefit for high schoolers,

11   right?

12        A.    Yes, for some.

13        Q.    Well, right, for some.  And in order to get

14   there you need to be able to --- have the opportunity to

15   --- well, strike that.

16             And for obviously a smaller minority still the

17   opportunity to ultimately go on and play professional

18   sports, that is another benefit, right?

19        A.    Yeah, it's a benefit for such a small proportion

20   that, again, I would just say that's not how we should

21   set up our sports world, for those few.

22        Q.    I understand that, but nonetheless there are

23   many who never get to that place, but that's what they

24   strive for and that's one of the reasons why they are in

```
 1   sports, right?
 2                    ATTORNEY VEROFF:  Objection.
 3                    THE WITNESS:  I think there could be
 4   people like that for sure.
 5   BY ATTORNEY TRYON:
 6     Q.    And same thing with scholarships, there are a
 7   lot of kids that want to get scholarships, they may not
 8   get them, but they're in sports because they want to get
 9   that scholarship and they think they'll be able to.
10   Fair statement?
11                    ATTORNEY VEROFF:  Objection.
12                    THE WITNESS: Yeah, I'm not sure what the
13   percentages are.  There are probably a lot more who
14   would like to have a college scholarship who don't
15   receive them because of the small proportion who do,
16   right.  But definitely.  That's called extrinsic
17   motivation.  If I'm just playing a sport because that's
18   the --- that's what I'm going for is a scholarship,
19   yeah, there could definitely be athletes focused along
20   those lines.
21   BY ATTORNEY TRYON:
22     Q.    And would you agree that colleges generally
23   select scholarship athletes from the pool of people that
24   are actually playing high school athletics?  That is a
```

```
 1   correct statement, right?

 2      A.    I would say the majority have played high school

 3   athletics, yes.

 4      Q.    And those that are seeking that scholarship are

 5   athletes who use their high school performance to

 6   compete for college scholarships, right?

 7                       ATTORNEY VEROFF:  Objection.

 8                       THE WITNESS: Yes, probably many do.

 9   BY ATTORNEY TRYON:

10      Q.    And the market for athletic scholarships is, in

11   fact, competitive, right?

12      A.    Many schools it is.  Definitely not all schools,

13   though.

14      Q.    Okay.

15            What would it be otherwise?

16      A.    I think some of the --- some smaller schools

17   just will --- we have a local college that will give

18   students like $8,000 or $10,000 a year towards their

19   tuition fees if they participate on a sport team.  And

20   of course, you know, there has to be some level of skill

21   there, but I wouldn't --- it is a good place for people

22   who want to continue to play a sport but may not have

23   the highest skill levels and definitely aren't being

24   recruited at the division --- for the most part, a
```

1    Division I level or something like that.

2      Q.    But they still compete for that scholarship,

3    fair enough?

4      A.    Yes.

5                    ATTORNEY VEROFF:  We've been going for a

6    little over an hour.  I just wanted to check in see,

7    David, if you have a sense of when you are wrapping up

8    this module.  Maybe it would be a good time to take a

9    break.

10                    ATTORNEY TRYON:  Yes, give me another

11   five minutes and we can break if anybody wants to.

12                    ATTORNEY VEROFF:  Great.

13                    ATTORNEY TRYON:  Well, we can break right

14   now.  I'll leave it up to the witness.  I'm not going to

15   force it upon the witness or Plaintiff's Counsel.  Would

16   you like a short break?

17                    THE WITNESS:  That would be great.  Thank

18   you.

19                    ATTORNEY TRYON:  Let's go back how about

20   20 till.  Does that work?

21                    VIDEOGRAPHER:  Going off the record.  The

22   current time reads 12:32:00 p.m. Eastern Standard Time.

23   OFF VIDEOTAPE

24                            ---

```
 1   (WHEREUPON, A SHORT BREAK WAS TAKEN.)

 2                           ---

 3   ON VIDEOTAPE

 4                 VIDEOGRAPHER:  We are back on the record.

 5   The current time reads 12:41 Eastern Standard Time.

 6   BY ATTORNEY TRYON:

 7      Q.    So let me then ask you, Professor Fry, have you

 8   heard of the International View for Sociology of Sport?

 9      A.    That journal?

10      Q.    Yes.

11      A.    Yes, I've heard of it.

12      Q.    Okay.

13            Are you familiar with Warren Whisenant?

14      A.    No.

15      Q.    Okay.

16            How about Jeremy S. Jordan?

17      A.    No.

18      Q.    Okay.  Fair enough.  Let me show you Exhibit ---

19   if we could mark this, I guess we're at Exhibit 6,

20   Fairness and Enjoyment in School Sponsored Youth Sports.

21   If you could bring that up, Jacob.

22                           ---

23                 (Whereupon, Exhibit 6, Fairness and

24                 Enjoyment in School Sponsored Youth
```

```
 1                    Sports, was marked for identification.)

 2                              ---

 3              ATTORNEY TRYON:  Jacob, if you could just

 4   put --- I think we've done this before.  Put this in a

 5   PDF in the chat box, can you do that?

 6              VIDEOGRAPHER:  Yes, I just have to do

 7   that while it is not being shared and then I can share

 8   it again.

 9              ATTORNEY TRYON:  Okay.

10              Well I think we can just share it for now

11   and then we can put it in there.  If not, then if we

12   need to, we can do it.

13              VIDEOGRAPHER:  Okay.

14              I mean, I already have it dragged in.

15              ATTORNEY TRYON:  Great.  It doesn't take

16   long at all.  Great.

17   BY ATTORNEY TRYON:

18     Q.    So have you ever seen this article before?

19     A.    I haven't.  Can you enlarge it a little bit?

20   And what year was this at the top?

21     Q.    It looks like 2008.

22     A.    Thank you.

23              ATTORNEY VEROFF:  If you give the witness

24   a minute if she wants to scroll and get a sense of what
```

1  this is.

2  BY ATTORNEY TRYON:

3      Q.    Well, before I ask you any questions about this

4  let me just ask you some questions overall.  Would you

5  agree that fairness in sports is an important value?

6      A.    Yes.

7                    ATTORNEY VEROFF:  Objection.

8  BY ATTORNEY TRYON:

9      Q.    And have you done any research on the issue of

10  fairness and sports?

11      A.    No.  I'm just hesitating because we have

12  included measures of sportspersonship, being a good

13  sport.  So if you include that then, yes.  But in

14  general, just fairness, I would say no.

15      Q.    Okay.

16            Have you read any papers that specifically

17  focus on fairness in sports?

18      A.    You know, probably, but I couldn't name them.

19      Q.    Okay.

20            Let's go down to --- I really only have one

21  question here, which we'll look at and then if you want

22  to review more of the article you are certainly welcome

23  to do that.  But if you go to what is labeled as page 97

24  at the top.

1    A.    Could I just read the abstract first?  Do you

2  mind?

3    Q.    Yes.

4              VIDEOGRAPHER:  If you need that made

5  bigger, let me know.

6              THE WITNESS:  Maybe one more notch up.

7  Thank you.

8              VIDEOGRAPHER:  You're welcome.

9              THE WITNESS:  Okay.

10 BY ATTORNEY TRYON:

11   Q.    If you turn to 97, and the third full paragraph

12 on that page it says an organizational climate embracing

13 fairness is a critical factor influencing student

14 athletes' attitude towards the sport they participate in

15 and their desire to continue participation.  Do you

16 agree with that statement?

17              ATTORNEY VEROFF:  I will just remind the

18 witness if she would find it helpful to read more

19 context around that statement before you answer, you're

20 welcome to do so.

21              THE WITNESS:  Yes, I think it would be

22 helpful to look at how they measure fairness and, you

23 know, the methods used in the study, but in general I

24 can imagine that, yeah, that this is true.

```
 1   BY ATTORNEY TRYON:

 2      Q.    Okay.

 3            You don't --- just as a general statement you

 4   don't disagree with it?

 5      A.    Right.

 6      Q.    So I'm not going to ask you about any of their

 7   results or anything else, I just wanted to get your

 8   reaction on that statement.  And you are not offering

 9   any expert opinion on fairness in sports.

10            Right?

11      A.    That's right.

12      Q.    Are you offering an expert opinion on whether or

13   not HB-3293 is fair?

14      A.    I'm --- I believe that the sport organizations

15   at every level really value being inclusive and it would

16   be harmful to exclude athletes where they wouldn't have

17   an opportunity to reap the benefits of sport.

18      Q.    And there are a lot of things that go into

19   fairness, right?

20                  ATTORNEY VEROFF:  Objection.

21                  THE WITNESS: Yes.

22   BY ATTORNEY TRYON:

23      Q.    And it requires balancing of interests of

24   various people and groups and values; right?
```

 1                    ATTORNEY VEROFF:  Objection.

 2                    THE WITNESS:  Yes.

 3    BY ATTORNEY TRYON:

 4       Q.    You have not attempted to do that balancing in

 5    connection with HB-3293, have you?

 6                    ATTORNEY VEROFF:  Objection.

 7                    THE WITNESS:  Yeah, I think my expertise

 8    is to weigh in on all the benefits that athletes would

 9    not have an opportunity to reap if they weren't able to

10    participate.  But I think there are people who know a

11    whole lot more more with any sport about how to keep

12    making the rules fair for everyone.

13    BY ATTORNEY TRYON:

14       Q.    Okay.

15             But just to be clear you have not attempted to

16    do that balancing with HB-3293?

17                    ATTORNEY VEROFF:  Objection.

18                    THE WITNESS:  I'm not sure I understand

19    the question.

20    BY ATTORNEY TRYON:

21       Q.    Okay.

22             Let me try again.  We established that fairness

23    depends on balancing a lot of interests and views of

24    different groups, different people, right?

```
 1        A.    Yes.

 2                    ATTORNEY VEROFF:   Objection.

 3    BY ATTORNEY TRYON:

 4        Q.    And that balancing, you have not attempted to do

 5    with respect to 32 --- HB-3293.

 6              Correct?

 7                    ATTORNEY VEROFF:   Objection.

 8                    THE WITNESS:   I think it would be unfair

 9    to categorically exclude a group of athletes from having

10    the opportunity to participate.   So I'm not sure if that

11    --- if you interpret that as balancing or not balancing.

12    BY ATTORNEY TRYON:

13        Q.    Have you balanced the interests --- have you

14    looked at the interests of other people in that decision

15    that went into 32, HB-3293?

16                    ATTORNEY VEROFF:   Objection.

17                    THE WITNESS:   Yes, I think this House

18    Bill is not fair to transfemale athletes.

19    BY ATTORNEY TRYON:

20        Q.    Okay.

21              We will move onto that in little bit then.

22    What is your qualifications to determine fairness?

23                    ATTORNEY VEROFF:   Objection.

24                    THE WITNESS:   I think I was called to be
```

1  an expert witness in this case to speak to the many

2  benefits that come from participating in sports.  And so

3  from my experience as an athlete and a coach and a

4  scholar in this area I think I have, you know, insight

5  and can speak to the many benefits and how we should do

6  all we can to prevent --- or all we can to not exclude

7  athletes from having the opportunity to participate.

8  BY ATTORNEY TRYON:

9      Q.   You said you are a tennis player, right?

10     A.   Yes.

11     Q.   When is the last time you played tennis?

12     A.   I --- there's a wall right outside my office,

13 and so I hit on a backboard.  I haven't played a match

14 in a little while.  I'm not sure the last time was.

15     Q.   And when you played --- the most recent time you

16 played competitively, was that in a league or how does

17 that work?

18     A.   I haven't played leagues in a while.  It was

19 just for fun.  I'd play with a couple of my friends,

20 when we go to conferences, we bring our racquets and we

21 get together and play.  I've moved into, you know, other

22 exercise forms now and I swim and hike and so on.

23     Q.   And so when you were playing tennis, team, is

24 that what it was, on a team?

```
 1        A.      Uh-huh (yes), yes.

 2        Q.      What team was that?

 3        A.      I played USTA leagues.  Those are for adults.

 4   And after college, you know, there is just like a

 5   circuit in Texas that you can sign up for tournaments

 6   all around the State and play and go for ranking.

 7        Q.      But in college you played, right?

 8        A.      Yes.

 9        Q.      And was that on a girls team or a mixed team or

10   what?  I don't know much about tennis so I'm just trying

11   to understand that.

12        A.      Okay.

13                There was a men's and women's team.  We had a

14   head coach for both and assistant.  Maybe in the last

15   year there were separate head coaches, but we worked out

16   together.  We traveled to tournaments together.  When

17   you add up the score you got to --- you got to --- the

18   women had a score and the men had a score, so it wasn't

19   a total team win like that.

20        Q.      Okay.

21                So if you're on the women's team and you go up

22   against some other team and they just said we're going

23   to have boys, we're going to have men participate in the

24   women's team against you, you wouldn't have thought that
```

1  was fair, right?

2                    ATTORNEY VEROFF:  Objection.

3                    THE WITNESS: Well, I'm assuming you mean

4  transfemales playing and ---?

5  BY ATTORNEY TRYON:

6     Q.    I do not mean that.  I meant exactly what I

7  said.  If you go to compete against another team and

8  that team says we have two men, biological men, and they

9  are going to compete against you, you would have said

10  that is not fair, right?

11                    ATTORNEY VEROFF:  Objection.

12                    THE WITNESS: I would have said --- sorry.

13                    ATTORNEY VEROFF:  That is all right.

14                    THE WITNESS:  I think I would have said

15  what are the rules, right.  And if the rules are that

16  somebody could play, then I would say bring them on,

17  right.  And if the rules are that they can't play, then

18  I'd say, yeah, we probably shouldn't do it that way

19  until the rules change, right.

20  BY ATTORNEY TRYON:

21     Q.    So whatever the rules are by definition are

22  fair, right?

23                    ATTORNEY VEROFF:  Objection.

24                    THE WITNESS: No, I didn't say that.  I'm

1    sorry, Julie.

2                    ATTORNEY VEROFF:  No, that's quite all

3    right.

4                    THE WITNESS:  I didn't say the rules are

5    always fair, but I think we have to start somewhere and

6    we have to acknowledge them and respect them.

7    BY ATTORNEY TRYON:

8        Q.   Well, if they said we are going to have these

9    men compete against you and they just changed the rules

10   on you, wouldn't you object to the rules being changed?

11                   ATTORNEY VEROFF:  Objection.

12                   THE WITNESS:  Yeah.  You know, in the

13   context of what is taking place that seems not like a

14   very realistic example in my mind.  So I'm not sure I'm

15   thinking about it.

16   BY ATTORNEY TRYON:

17       Q.   So you don't want to answer my question?

18                   ATTORNEY VEROFF:  Objection.

19                   THE WITNESS:  Yeah, I think it's --- I

20   think what we are talking about is just more

21   complicated, right, and it is not just --- if we are

22   talking about transfemale athletes, I think we are

23   talking about a different ball game than you are.

24   BY ATTORNEY TRYON:

1      Q.    Yeah.   Well, I was not talking about them, at

2  least not yet.   I'm just asking if suddenly men are

3  allowed to compete against women in tennis, whether or

4  not they identify as female, do you think that would be

5  fair to the women?

6                  ATTORNEY VEROFF:   Objection.

7                  THE WITNESS:   Again, I would just go back

8  to the rules.   But just in general, that if I decide

9  today, hey, I will go --- we have a really weak men's

10  tennis team, so today I think I'll go play on the males

11  tennis team, yeah, I don't think that would be right,

12  right, that I could switchover to win.   Right.   The

13  point is can people be their genuine, authenticate self

14  and play with a gender identity that they have.

15  BY ATTORNEY TRYON:

16      Q.    So I mean you're answering your own question

17  your own way, but so that's fine, but you have also said

18  that you think HB-3293, which sets a rule, you think

19  that rule is unfair, right?

20      A.    Yes, I do.

21                  ATTORNEY VEROFF:   Objection.

22  BY ATTORNEY TRYON:

23      Q.    But the legislature balanced a lot of different

24  interests in making that rule, right?

```
 1                    ATTORNEY VEROFF:  Objection.

 2                    THE WITNESS: I don't know.  I don't know

 3       that that is true.

 4       BY ATTORNEY TRYON:

 5          Q.    You don't know one way or the other what

 6       interests they balanced, right?

 7          A.    I don't know what their ---.

 8                    ATTORNEY VEROFF:  Objection.

 9                    THE WITNESS:  --- I don't know what their

10       knowledge base is or their real involvement.  I don't

11       know if they've taken a close look.  It looks like in

12       this situation, that PBJ (sic), that people close to it

13       are saying, hey, let's let this child play, right, and,

14       you know, the world is not going to end and kids can

15       have good experiences and we can --- we can go.  So

16       yeah, I can't speak to what the legislators have --- the

17       background they've done or their mindset.

18       BY ATTORNEY TRYON:

19          Q.    Do you think that the legislation, this

20       legislation should be tailored to each individual?

21                    ATTORNEY VEROFF:  Objection.

22                    THE WITNESS:  No, no.  I think the sport

23       organizations at every level, from the Olympic Committee

24       to the NCAA, all of them are saying we really value
```

1   being inclusive and let's do all we can to, you know,

2   balance these things and make things fair but also being

3   inclusive and not totally excluding a group of athletes.

4   BY ATTORNEY TRYON:

5       Q.    So what would be the rule that you would set up

6   for high school for transgender people --- let me

7   rephrase that.  What would be the rule that you would

8   set up in high school sports for a male who expresses

9   that he is now identifying as female should be allowed

10  to participate in girls sports?

11                  ATTORNEY VEROFF:  Objection.  Go ahead.

12                  THE WITNESS:  Yeah, I think we should

13  rely on the experts and the medical doctors and the

14  exercise physiologists who really study this and can

15  say, hey, across these sports this is --- seems to

16  create a fair playing ground.  I think, you know, it

17  sounds like our local weatherman, we have incoming data,

18  right, but this is relatively new in the sport world and

19  I think all of these researchers are gathering more data

20  all the time that is going to help inform these

21  decisions moving forward on how we create it.  So you

22  know, I'm not an expert to say, hey, what would those

23  exact guidelines be, but just to have a blanket

24  exclusion of all we set the stakes to do a lot of harm,

1    and BPJ would be a recipient of that harm in my opinion.

2    BY ATTORNEY TRYON:

3        Q.    So we should rely on experts about safety for

4    one thing, right?

5                    ATTORNEY VEROFF:  Objection.

6                    THE WITNESS: Yes.

7    BY ATTORNEY TRYON:

8        Q.    And we should also rely upon experts in

9    performance, right?

10                   ATTORNEY VEROFF:  Objection.

11                   THE WITNESS: Yes.

12   BY ATTORNEY TRYON:

13       Q.    So you keep focusing on BPJ, so if we are going

14   to focus on each individual, we have to have in each

15   sport an example of someone who is a male identifying as

16   a female has to be individually evaluated to determine

17   whether that person should be allowed to participate in

18   whatever sport that person wants to be in?

19                   ATTORNEY VEROFF:  Objection.

20                   THE WITNESS:  No, I didn't say that.  And

21   it may be just we could have general guidelines at the

22   high school level.  I'm just saying I'm not --- that is

23   not my expertise as on the performance and exercise

24   physiology of it all to think what would be fair.  I

1  think as we branch up and get to more elite levels, then

2  that seems to be the direction that NCAA is going, that,

3  hey, let's pull in these national governing bodies

4  across the sport because they know the sport the best

5  and are in the best position to maybe offer those

6  guidelines.

7  BY ATTORNEY TRYON:

8      Q.    Do you have an opinion about other --- well, we

9  will get to that later.  Let's go back to your report

10  and if we could go to after paragraph 17.  Well, that

11  doesn't seem right.  There we go.  Okay.  The title of

12  this section on top of page five it says Focusing Solely

13  on Performance Outcomes Undermines the Benefits of Sport

14  for Youth and Young Adult Athletes.  Do you see that?

15     A.    Yes.

16     Q.    Are you aware of any middle schools, elementary

17  schools or high schools that focus primarily on

18  outcomes?

19                 ATTORNEY VEROFF:  Objection.

20                 THE WITNESS:  No.

21  BY ATTORNEY TRYON:

22     Q.    Are you aware of any surveys or studies of

23  middle schools or high schools that find out if there

24  are any schools that focus solely on performance

```
 1    outcomes?

 2                    ATTORNEY VEROFF:  Objection.

 3                    THE WITNESS:  I would just say that it

 4    depends what we mean by solely focus on performance

 5    outcomes.  I think there are coaches out there that

 6    absolutely that is their primary thing and they care

 7    less about the hollistic, you know, wellness and just

 8    the overall experience of their kids and they are just

 9    trying to put the team together that is going to give

10    them the best chance to win.

11    BY ATTORNEY TRYON:

12      Q.    What coaches are you aware of in high school

13    that do that?

14      A.    Just in my experience across years.  I see --- I

15    see coaches that are very focused on winning that use a

16    lot of punishment for mistakes and that seems to be what

17    drives them.

18      Q.    And so you believe there are coaches out there

19    that focus solely on performance outcomes for youth and

20    young adult athletes?

21      A.    Yes, it just seems like a weird way to talk

22    about it, that I'm not sure when --- I mean to put a

23    percentage, if you're asking that, so are there coaches

24    that 100 percent they're just focused on winning and
```

 1    winning only, I'm not sure.  I think there are probably

 2    coaches out there that are.

 3        Q.    Sorry.  Go ahead.

 4        A.    Yeah, probably most, you know, it's not a

 5    100 percent, but when we say primary that that's what's

 6    really driving the boat for them.  I think there are

 7    coaches out there.

 8        Q.    Well, you didn't say primary.  You said solely.

 9    Those are your words, right?

10        A.    Right.

11                    ATTORNEY VEROFF:  Objection.

12    BY ATTORNEY TRYON:

13        Q.    Do you now want to modify that in your opinion?

14                    ATTORNEY VEROFF:  I'm sorry, objection.

15                    THE WITNESS:  Sorry.  I'm just going back

16    to this wording that you're talking about.  Are you

17    saying ---?

18    BY ATTORNEY TRYON:

19        Q.    At the heading.  Right about paragraph 18.

20        A.    Sorry.  I was looking underneath.  Yeah, I mean

21    it in the sense that that seems to be what all the

22    discussion is about, that all were focused on just this

23    isn't fair in terms of performance, and I'm saying that

24    is missing a bigger picture of what youth sport can be.

```
 1        Q.     What discussion is that?  You said that
 2   discussions all about it.  What discussions are you
 3   talking about?
 4                    ATTORNEY VEROFF:  Objection.
 5                    THE WITNESS:  The idea that it's not fair
 6   for transathletes to participate, right.  And the only
 7   reason that we have any concern about this is from the
 8   performance issue.  So in this case, I'm just saying if
 9   we think about BPJ and her being excluded from having
10   the opportunity to play a sport, there's a lot at stake
11   there as well as the other side is saying, hey, is this
12   fair in terms of performance for athletes, right.  That
13   is what I meant by this.
14   BY ATTORNEY TRYON:
15        Q.     So who is --- but you're not aware of any
16   schools or colleges that have a policy of focusing
17   solely on performance outcomes, right?
18        A.     Right.
19        Q.     But you think the statute, HB-3293 solely
20   focuses on performance outcomes?
21                    ATTORNEY VEROFF:  Objection.
22                    THE WITNESS:  I'm not sure what leads me
23   to say that, but I think the statute excludes a group of
24   athletes and that that would be unfortunate that they
```

1    wouldn't have a chance to just reap these benefits that

2    can come from being a sports team.

3    BY ATTORNEY TRYON:

4       Q.    So you are not saying that you believe that

5    HB-3293 focuses solely on performance outcomes, right?

6       A.    Okay.  I'm not saying that.  I think performance

7    outcomes is --- seems to be a piece in it.

8       Q.    Is that an appropriate piece to consider?

9                ATTORNEY VEROFF:  Objection.

10   BY ATTORNEY TRYON:

11      Q.    Let me rephrase that.  Is performance outcomes

12   something that's an appropriate thing for a legislature

13   or a school to focus on?

14               ATTORNEY VEROFF:  Objection.

15               THE WITNESS: Yes.

16   BY ATTORNEY TRYON:

17      Q.    Now, in paragraph 18 itself, you say, the second

18   sentence, a myopic focus on winning in youth and young

19   adult athletes ignore the other important benefits that

20   school athletics offers young athletes such as teamwork

21   and camaraderie which all advance when all athletes have

22   the opportunity to play the sports they love and reap

23   the benefits of such participation.  Do you see that?

24      A.    Yes.

1    Q.    When you say a myopic focus, you're not

2   excluding an appropriate level of focus on winning.

3   Right?

4                    ATTORNEY VEROFF:  Objection.

5                    THE WITNESS:  That's right.

6   BY ATTORNEY TRYON:

7    Q.    Is there a reasonable variance of opinions in

8   the sporting world --- sports world on what exactly the

9   proper focus on winning ought to be versus the other

10  benefits?

11                   ATTORNEY VEROFF:  Objection.

12                   THE WITNESS:  Yes, I think there is an

13  agreement within our field of sport exercise psychology

14  that at the youth sport level the focus should be on

15  giving as many kids as possible a chance to participate

16  in youth support, right.  And then as athletes move up

17  the levels, that there is more emphasis and importance

18  placed on winning.

19  BY ATTORNEY TRYON:

20   Q.    What do you mean by that, as athletes move up

21  the levels?

22   A.    That typically there's a greater focus in high

23  school than middle school, greater focus in middle

24  school than elementary school, not that they have

1    organized sports within their schools, but just compare

2    that to Little League, that as you move up to college,

3    the emphasis on winning may increase and so on.

4        Q.    Thank you.   Would you agree with me that there

5    is nothing in HB-3293 that says there should be a sole

6    or myopic focus on winning in any of the sports it

7    covers?

8                    ATTORNEY VEROFF:  Objection.

9                    THE WITNESS: Yes, I would agree.

10   BY ATTORNEY TRYON:

11       Q.    And the law doesn't say anything anywhere that

12   there are not other benefits to sports other than

13   winning.  Right?

14                   ATTORNEY VEROFF:  Objection.

15                   THE WITNESS: Right.

16                   ATTORNEY VEROFF:  I think if we are going

17   to have any questions about what the law says we should

18   put it back up on the screen.

19                   ATTORNEY TRYON:  I don't have any more

20   questions on that.

21                   ATTORNEY VEROFF:  Thank you.

22   BY ATTORNEY TRYON:

23       Q.    Let's look at paragraph 21 in your report.  You

24   say there are many benefits to young people from

```
 1   participating in athletic activities discussed further
 2   herein.  Do you see that?
 3        A.    Yes.
 4        Q.    Is it possible that some young people are
 5   actually harmed by participation in athletic activities?
 6                    ATTORNEY VEROFF:  Objection.
 7                    THE WITNESS:  Yes, I think so.
 8   BY ATTORNEY TRYON:
 9        Q.    What are some of those possible harms?
10        A.    Some of those harms might be they have abusive
11   coaches that push them too hard physically, that you
12   know, don't treat them in a developmentally appropriate
13   way, that there --- coaches allow like bullying to go
14   on, that kids are made to feel shame if they don't
15   perform well.  Those kind of things.
16        Q.    Outside the coaching, you mentioned bullying.
17   So in sports that happens, right, some athletes bully
18   other athletes, right?
19        A.    It happens sometimes.
20        Q.    And that can have long-term lasting negative
21   impacts, right?
22        A.    Yes.
23        Q.    Are you aware that sometimes those who are
24   athletes also belittle those who are not?
```

1      A.      Yes, I'm aware of that.

2      Q.      Let's move onto paragraph number 23.  In

3  paragraph 23 you talked about achievement goal

4  perspective theory, right?

5      A.      Yes.

6      Q.      Does this theory apply to outside sports, say

7  for example, to academics?

8      A.      Yes, John Nicholls actually started there in

9  classroom research.

10      Q.      So goal perspective theory is about goals,

11  right?

12      A.      Yes.

13      Q.      And how to set goals and how to reach goals?

14      A.      Not exactly.  I would use sort of another area

15  of goal setting, but goal perspective theory is more

16  about what is our --- how do we define success and how

17  are we kind of valuing what is important in life.  Some

18  people think of goal perspective is how we set goals,

19  right, that they need to be specific measurable.  That

20  is sort of another part of the literature.  And instead,

21  Nicholls is just thinking how to understand people's

22  perspective on what they are trying to get out of

23  things, right.  And if you have this task goal

24  perspectives that you are moving through life thinking

1    how can I just give it my best and be the best that I

2    can be.  And if you are moving through life with an ego

3    perspective, you are thinking, hey, how can I

4    demonstrate my competent --- my competence and show

5    other people I'm better.

6        Q.    And that happens in all aspects of life, right,

7    not just in academics?

8        A.    Yes, it's a pretty relevant theory.

9        Q.    You probably see it in faculty lounges and

10   college boards and you will certainly see it lots of

11   places in academia, right?

12       A.    Right, academia from I'm guessing law firms and

13   probably everywhere we go in the world.

14       Q.    You bet.  Absolutely you see it in law firms and

15   pretty much every place, I agree with you.

16             Let me look at paragraph 24 with you.  You say

17   first is the developmental component of achievement goal

18   perspective theory.  Young children are incapable of

19   accurately comparing their ability to others,

20   overestimate their ability and are naturally focused on

21   their effort as a marker of success.  So I'm not saying

22   that's wrong, but I don't see a source for that.  Do you

23   have a source for that statement?

24       A.    I do.  Nicholls 1989 and my dissertation.  I

1    apologize for missing that.

2       Q.    Your dissertation?

3       A.    Yes, I did a --- this was my line of work.

4    Early in my career I did a series of three studies kind

5    of tapping into those, how children gain an

6    understanding of the concepts of effort, luck and

7    ability.

8       Q.    They gain an understanding of concepts of

9    effort, of luck and ability.  Is that what you said?

10      A.    Yes.

11      Q.    What does that mean, luck and ability?

12      A.    So when kids are really little those --- they

13   don't clearly distinguish these.  So they just think,

14   hey, whoever tries hardest, they are going to do the

15   best, right, and they don't recognize ability in the

16   same way that we do as we mature over time and that we

17   understand, hey, gosh, you could run circles around me

18   today, you were a much better, faster or stronger runner

19   than I am, for example, right.  And that doesn't mean

20   that I can't try harder to improve but our ability

21   levels are really different today.

22          So in these studies we set up scenarios and we

23   show kids, and so there's kind of a contrast.  Somebody

24   didn't try hard at all actually outperformed somebody

who seems to be focused and concentrating, and we say,

you know, what do we think is happening here.  And so

these concepts are just really blurred and kids are

saying yeah, you know, this person is definitely trying

harder.  I don't know why they didn't perform very well.

This person looks like they are not trying hard.  But if

they both do it again and they try hard then I think

they will get the same score.  So just this wide variety

of scenarios.  Kids don't distinguish like luck and

ability.  So you know, if you're around little kids, you

know, they like games like Chutes and Ladders or

Candyland.  Those are a hundred percent luck games,

right.  There's no ---.

Q.    Now I understand.  I thought you said lock,

L-O-C-K.  You are saying luck, L-U-C-K?

A.    Right, right.

Q.    Thank you.  I didn't mean to have you go on with

that long explanation when I just misunderstood your one

word.  But thank you for that explanation.  That helps

me understand what you're saying here.

So my --- then I'm just interested in what is it

that at some point little kids somehow realize that they

have overestimated their ability, is that something that

just naturally happens or is it something that other

1   people have to point out for them for them to realize

2   it, whether it be teachers or coaches or just the kids

3   around them?

4       A.    Okay.

5            So just a quick example.  Nicholls would put a

6   list of faces, you know, like generic smiley faces 1 to

7   30 and you go in with a class of five-year-olds and you

8   interview them one at a time.  And you say, okay, this

9   is everybody in your class and they are listed by how

10  good a reader they are, right.  And so this person is

11  the very best in your class, right, this person is just

12  the worst reader, this person is the middle.  Which one

13  is you?  And the mean for kids in kindergarten is like

14  three, which tells us they're all saying well, that's me

15  up there, high, right, I'm the best reader in the class.

16  But as you move through those elementary school years,

17  the mean shifts to like 15 by the time they're say in

18  sixth grade, because when you ask six graders, all

19  right, here's everybody in your class, where do you fit

20  in, they are much more accurate.  And when they ask the

21  teachers, there's no correlation, right, with younger

22  kids, because they are all over the place.  But by the

23  time you get to the upper elementary grades it

24  correlates highly with what the teachers are saying in

1    terms of the kids' reading ability.  And Nicholls said

2    this is so key because it makes Middle School a very key

3    developmental period as kids are gaining this

4    understanding all of a sudden now there is a reason to

5    try your hardest or withdraw effort because you don't

6    want to look silly.  You know that other people might be

7    more skilled than you.  And that's why he was so

8    passionate about this theory.  Even though we are

9    capable of looking at the world that way, we all can

10   choose to just stay focused on our effort and ability

11   and being the best that we can be.

12       Q.    So there are people that --- sorry.

13       A.    That is the other piece of the climate, how do

14   we train teachers and coaches to create that

15   environment.  That tells people keep that task

16   involvement going.

17       Q.    And there are people that continue to

18   overestimate their abilities throughout life, right?

19       A.    Yes.

20       Q.    And that is exacerbated if those people are

21   never corrected to let them know in some way that their

22   abilities are not what they think they are, right?

23                    ATTORNEY VEROFF:  Objection.

24                    THE WITNESS:  Yeah, I'd say our bigger

1    issue within education is not that kids are

2    overestimating but they're --- you know, don't have as

3    high self-esteem or confidence and those type of things.

4    But are there people out there that could be

5    overestimating?  Absolutely.

6    BY ATTORNEY TRYON:

7        Q.    So Nicholls did the study of academic.  Did he

8    do any study athletically?

9        A.    That's where I picked it up and looked in the

10   physical domain and made scenario specific to physical

11   activity and conducted these three studies that looked

12   at effort and luck and ability with kids aged 5 to 12

13   and sort of replicated his work, and we found that kids

14   move through these same levels of understanding in the

15   physical domain where things are a little bit more

16   obvious for us to see, right.  If we're sitting here

17   working on math problems we not be able --- it might not

18   be as evident that, hey, somebody is moving through

19   these and they are stronger, right.  But in the physical

20   domain, when we see each other and move and we can see

21   each other's skill levels, in some of these things move

22   a tiny bit faster but it was the same sort of stages of

23   development, if you will.

24       Q.    Is your dissertation cited in your bibliography?

1       A.      No, it is not.

2       Q.      Is it in your list of publications?

3       A.      It's in my Vitae.

4       Q.      You have a lot of publications.  Can you direct

5   me to it?

6       A.      You're going to go back a ways.  Okay.  So the

7   dissertation study is on 1997, it's on page six.  Fry

8   and Duda.

9       Q.      I see Fry and Duda, 1997.

10      A.      Yes, those are my dissertation studies.  And I

11  followed it up with two studies at the top of that page,

12  Fry 2000.  There are two different studies.

13      Q.      Okay.

14              Let me move on to paragraph 25 of your report.

15  I just goofed on my --- there we go.  I lost all the

16  pictures, so I couldn't see you anymore.  Just one of

17  the hazards of technology.  Okay.  So I'm looking at

18  paragraph 25 and you talk about task.  Here you talk

19  about goal --- primary goal orientations are task and

20  ego orientation, right?

21      A.      Yes.

22      Q.      So you're not saying --- I think you've said

23  this before, but I just want to make sure I understand.

24  You're not saying that ego orientation is bad from an

1    individual basis, are you?  It just kind of sounds like

2    it's a pejorative.  You don't mean it that way, do you?

3        A.    I think it depends on what your aim is and if

4    you have --- if you want athletes to have fun and try

5    hard and have good relationships and, you know, feel

6    good about themselves, have confidence, have empathy for

7    others, things like that, then it's not something we

8    would want to promote is the orientation because across

9    a wide body of literature those just don't lead to what

10   we call adaptive outcomes, right.

11            On the other hand, many elite athletes are high

12   in task and ego orientation, right.  And the big deal

13   here is that people really need that high task

14   orientation to sustain motivation over time with the ups

15   and downs and overcoming injuries, with all of that, but

16   ego orientation isn't necessarily a bad thing in this

17   case.  But it probably isn't great if you don't have

18   that high task orientation to go with it.

19       Q.    So let's move on to paragraph 26.  Okay.  So in

20   the last sentence, I think it is the next to last

21   sentence.  Okay.  The sentence that starts when the

22   environment created by coaches and others is a caring

23   environment, do you see that part?

24       A.    Yes.

1    Q.    It continues, athletes are more likely to

2  perceive the overall climate as task-involving.  A

3  caring environment is one where athletes feel safe,

4  welcome, comfortable and valued and are treated with

5  kindness and respect by all in the sports setting.  You

6  wrote that, right?

7    A.    Yes.

8    Q.    And that means a caring environment for all

9  athletes, right?

10    A.    Yes.

11    Q.    And a caring environment also requires rules?

12    A.    Yes.

13    Q.    A caring environment still includes the coach

14  --- let me rephrase that.  A caring environment still

15  includes the coach and officials and requires them to

16  make calls that make --- that some athletes don't like

17  and may even get upset, right?

18                    ATTORNEY VEROFF:  Objection.

19                    THE WITNESS: Right.

20  BY ATTORNEY TRYON:

21    Q.    So how do you square that with a caring

22  environment when the rules are going to make some

23  athletes unhappy?

24    A.    So this is about coaches kind of saying, yes, I

1    want to be intentional and I want to do everything I can

2    to create this environment that is going to help bring

3    out the best in my athletes, right, and I don't have

4    total control over what my athletes perceive.  I'm just

5    going to do what I can to promote these features that

6    are in the last sentence.  I'm also going to get

7    athletes, trying to get them to buy in so that they see

8    how valuable this is if we create this caring

9    task-involving climate.  It doesn't in any way mean, you

10   know, we're not going to get a bad call or things aren't

11   going to happen, things don't go our way, somebody

12   starts before I do.  Right.  All kinds of things.  Those

13   are just part of sports, right, but this refers to the

14   coaches buying into this truckload of research that we

15   have that shows how we can help all athletes have a good

16   experience.

17       Q.    You're not advocating for laws requiring a task

18   oriented environment, are you?

19       A.    No.  That would be tempting.  No.  We're just

20   saying if our goal is to help athletes reach their

21   potential, then we have a lot of scholarship to guide

22   --- to guide what we do.  We know a lot about how to

23   make that happen.

24       Q.    Do you think coaches are unfair if they don't

1    adopt a task oriented approach?

2                    ATTORNEY VEROFF:  Objection.

3                    THE WITNESS:  I think they do a lot of

4    harm, right, and they set athletes up to experience all

5    these negative aspects, right, and they don't have fun

6    and they don't try as hard.  They don't have as good a

7    relationship, they experience shame.  And all of that

8    stuff just means that a lot of kids aren't going to

9    stick with it and we are going to lose a lot.  And that

10   just has long-term implications for people living

11   physically active lives, right.  When you have bad

12   experiences, you know, a lot of people are running back

13   out there to keep participating.

14   BY ATTORNEY TRYON:

15       Q.    Well, officials make calls all the time that

16   upset athletes.  Athletes think they're unfair or

17   they're wrong.  You're a tennis player.  You remember

18   John McEnroe?

19       A.    I do.

20       Q.    He yelled all the time.  All the time is an

21   exaggeration.  He frequently claimed the calls the

22   officials made were unfair, right?

23       A.    Yes.

24       Q.    Do you think that the umpires should have

 1  changed their calls to satisfy him in order to provide a

 2  more caring environment for him?

 3                    ATTORNEY VEROFF:  Objection.

 4                    THE WITNESS:  I think they should have

 5  taken him out of a few tournaments and I feel like that

 6  would have nipped it in the bud.  But with respect to a

 7  caring and task-involving climate, what you're trying to

 8  say is we are trying to treat everyone with kindness and

 9  respect and we're going to understand that officials are

10  out there trying to do the best they can, and they're

11  going to make mistakes just like all of us make

12  mistakes.  And so the goal would be for us to be

13  respectful.  And if we feel like bad calls are made we

14  would deal with it in a respectful way, right, but we

15  don't deal with it like Will Smith did, right, like when

16  he --- we're trying to learn to control our emotions,

17  right, and wow, it just makes sport a powerful arena

18  when athletes can learn those terms.

19  BY ATTORNEY TRYON:

20      Q.    Right.  I understand that.  And I'm just asking,

21  so you got rules, you got calls by higher powers and you

22  got to live by those rules.  And if you think they're

23  unfair then you should ask them to have them changed,

24  right?

1 A. Yes.

2 Q. But it is still a caring environment and just

3 because you think it is unfair to you in particular

4 doesn't make it uncaring.

5 Is that a fair statement?

6 ATTORNEY VEROFF:  Objection.

7 THE WITNESS:  You know, the way research

8 is done is you're asking every athlete on the team to

9 fill out a survey, right.  So it doesn't mean that there

10 is a 100 percent agreement, right.  I may feel like the

11 coach isn't fair, hasn't given me a fair shot, right,

12 and somebody else may not feel that way.  But in

13 general, there's sort of a consensus on most teams, you

14 know, that people are seeing it more similarly.

15 BY ATTORNEY TRYON:

16 Q. Yes, I guess I'm just asking specifically about

17 rules.  Rules by their very nature, they are not caring,

18 they don't care about individuals.  They are just set

19 there and you need to follow them, right?

20 ATTORNEY VEROFF:  Objection.

21 THE WITNESS: Yeah.  Hopefully they have

22 been established in a caring way, thinking about what is

23 best for athletes, but there is just so many things

24 across sports that are not necessarily fair, right, and

1 so we just kind of have to keep the focus on the rules.

2 I had an athlete tell me that his teammate has been

3 diagnosed with MS and that doesn't seem very fair,

4 right, that a young person has to go through that, but

5 I'm glad that they are part of a caring and

6 task-involving team where they want this athlete to

7 continue to be part of the team, right.  And in more of

8 an ego involving team, we might just say, hey, sorry,

9 you are really going to impair our ability to win.

10 That's our focus, that's why we are here, so you know,

11 have a good life, right.  And I mean, what's happening

12 is they are just working with this athlete to still be a

13 vital part of the team.

14 BY ATTORNEY TRYON:

15   Q.   Do you think you need to be an athlete to have a

16 fulfilling life?

17   A.   No.

18   Q.   I'm glad to hear you say that because I'm not

19 much of an athlete.

20          ATTORNEY TRYON:  Well, if people want to

21 break for lunch now, I'm okay with that.  I can take a

22 break now or we can keep on going.  Whatever Dr. Fry ---

23 Professor Fry, whatever your preference is and other

24 counsel?

1          THE WITNESS:  It might be nice to have a

2     break at this point.

3          ATTORNEY TRYON:  Okay.  Do you want to go

4     and get some lunch?

5          THE WITNESS:  Yes, sounds good.

6          ATTORNEY TRYON:  How long do you need?  I

7     don't know what your environment is around you, if you

8     brought a lunch or there's a restaurant nearby.  Is half

9     an hour long enough?  Do you need longer?

10          THE WITNESS:  No, a half hour would be

11     great.

12          ATTORNEY TRYON:  Then why don't we take a

13     break and come back at ten minutes after the hour?

14          THE WITNESS:  Okay.

15          VIDEOGRAPHER:  Going off the record.  The

16     current time reads 1:40 p.m. Eastern Standard Time.

17     OFF VIDEOTAPE

18                         ---

19     (WHEREUPON, A SHORT BREAK WAS TAKEN.)

20                         ---

21     ON VIDEOTAPE

22          VIDEOGRAPHER:  We are back on the record.

23     The current time reads 2:11:00 p.m. Eastern Standard

24     Time.

1    BY ATTORNEY TRYON:

2    Q.    Okay.

3          Let's go back to paragraph 30 of your report.

4    It says athletes high in task orientation also report

5    greater confidence and perceived ability and task

6    orientation has been correlated with both self and team

7    efficacy and greater perceived confidence ---

8    competence, excuse me.  You are saying greater

9    confidence and perceived ability.  Perceived ability is

10   different than reality, isn't it?

11   A.    Yes.

12   Q.    Are you saying that is a good thing?

13   A.    In the psychology world it is pretty well

14   accepted that perceptions are very important.  So yeah,

15   you are right in identifying that this is athletes'

16   perceptions of their ability.  And so athletes who have

17   a high task orientation in turn, you know, seem to have

18   more confidence and believe that they have higher

19   ability.

20   Q.    And then in paragraph 31 you say, by contrast,

21   ego orientation, i.e. the non-pejorative descriptive

22   term for defining success based on ability and

23   performance outcomes is not correlated with perceived

24   ability in general confidence of athletes high in ego

1  orientation was more of based on their perception of

2  ability and having a strong physical presence.  But in

3  that first sentence it indicates --- it suggests that

4  ego orientation is based on actual reality --- excuse,

5  actual ability rather than perceived ability.  Do I

6  understand that indication correctly?

7       A.    Where do you see that it is on actual ability?

8       Q.    Okay.

9             Let me start that over.  So in the sentence it

10  says, by contrast, ego orientation i.e. the

11  non-pejorative descriptive term for defining success

12  based on ability and performance outcomes is not

13  correlated with perceived ability in general.  Does that

14  mean it's correlated with actual ability rather than

15  perceived ability?

16      A.    Okay.  I understand.  No.  No, what it means is

17  that if you're --- if you're somebody who's high in task

18  orientation, then you're feeling successful when you

19  give your best effort, when you see improvement, right.

20  Those are things we have more control over.  And so when

21  you're focused that way you tend to have higher

22  perceptions of ability, right, because that is your

23  focus.  If you are high in ego orientation, right, and

24  so I'm feeling successful if I out perform others, if I

1    win, if I demonstrate competence, right, to a greater

2    degree than other people, right, so if that doesn't

3    happen but that is how I judge success, then chances are

4    my perceptions of ability are going to be lower.

5            If I'm the star on the team and I judge success

6    based on how I compare to others, then I probably get a

7    lot of kudos and get reenforced for that.  So that's why

8    we will guess there is no correlation there in the way

9    there is task, right.  And that is why Nicholls was most

10   concerned about people high in ego orientation who had

11   lower perceptions of ability, because it makes us

12   vulnerable.  That's why I'm so focused and care about

13   I'm not --- you know I'm not as good.  Does that make

14   sense?

15   Q.    I'm processing it.  I still want to understand

16   it a little better.  In paragraph 30, athletes high in

17   task orientation also report greater confidence in

18   perceived ability.  Am I right that perceived ability is

19   not actual ability?

20   A.    Right, it's not.  Items would just tap into I

21   would be responding to a question like I'm really good

22   at basketball or something, I'm very skilled in

23   basketball or I'm not very skilled and I would be

24   answering it on a quantitative scale, so it would be my

1    perception of it.

2        Q.    Isn't it important that athletes understand

3    their actual ability rather than just their perceived

4    ability?

5                    ATTORNEY VEROFF:   Objection.

6                    THE WITNESS:   I think it's important for

7    coaches to share with athletes where they are and what

8    they can do to keep improving.   I'm not sure it's super

9    beneficial that we need to go around and tell athletes,

10   hey, you're not very good, this person is better than

11   you, right, those are just kind of distractions, but

12   helping people see where they are and what they can do

13   to improve, yeah, would seem valuable.

14   BY ATTORNEY TRYON:

15       Q.    In order for an athlete to improve doesn't the

16   athlete need to understand where he or she is rather

17   than just where he or she perceives him or herself to

18   be?

19       A.    Yes, we get into kind of --- are we talking like

20   morbid ability, right, or --- and so in that sense do I

21   need to tell --- I've got five athletes here.   Do I need

22   to make sure they all know where they rank between one

23   and five, right, in my mine who's the best?   Or do I

24   just need to take each athlete aside, right, and make

 1    sure that they understand here's some areas you could

 2    really improve on, and I care less about even having a

 3    conversation about who's the best right now, right, that

 4    this person is better than this person, right, it's

 5    moot.  And that's where Nicholls was coming from.  What

 6    if we as coaches did more just to focus people on,

 7    right, on what they could do to keep improving?

 8        Q.    And athletics it is certainly obvious, though,

 9    what your athletic ability is at least as far things

10    involving racing times, for example, you get your times

11    so you know what your ability is as compared to yourself

12    or as compared to other people, right?

13        A.    Right.  I think there is just a lot in sport

14    that's giving us feedback of how we compare to others.

15    And also when we see these times it's --- that's

16    information that we can track how we're improving,

17    right, and how we are doing.

18        Q.    So why do we share with people --- well, strike

19    that.  I will move on.

20             Okay.  Paragraph 32, please.  Let me know when

21    you see that.

22        A.    I see it.  Thanks.

23        Q.    Athletes high in ego orientation report lower

24    companionship and greater conflict with teammates.  For

```
 1   that phrase --- you can go ahead and read the whole
 2   sentence if you want, but I want to ask you a question
 3   about that phrase or that clause.
 4        A.    Okay.
 5        Q.    So for that clause you cite Balaguer in that
 6   study, right?
 7        A.    Yes, Balaguer (corrects pronunciation).
 8        Q.    Thank you for helping me pronounce that,
 9   Balaguer.  And is there anything else on which you base
10   that first clause?
11        A.    Yes, there are other references.  This paragraph
12   in general is just referring to we have better
13   relationships, right, when people are high in task
14   orientation.  They're really valuing that aspect of
15   helping each other improve.  And in an ego orientation,
16   when, I'm just kind of zoned in on me and me wanting to
17   show that I'm better than my teammates, right, it just
18   sets things up to not having as good a relationship.
19   This doesn't mean that every athlete out there that is
20   high in orientation, it just means there's a tendency
21   that this correlates --- that you're much more likely to
22   see this when people have a high ego orientation.
23        Q.    So I'm just --- my question is a little more
24   precise.  Thank you for that explanation.  But the first
```

1    clause there you cite only to Balaguer.  I'm asking if

2    there are other sources for that contention that

3    athletes high in ego orientation report lower

4    companionship and greater conflict with teammates.  And

5    if there are other things, what are those other studies?

6        A.    Like Smith and Small found that in youth sport

7    athletes, you know, didn't like their coach as much,

8    didn't think their coach knew as much about the sport,

9    didn't like their teammates as much when they had like

10   high ego orientation.

11       Q.    Is there a reason why you didn't cite Smith and

12   Small for that proposition?

13       A.    Yes.  Yeah, I think it crosses documents.  We

14   could have added another, you know, 150 references

15   probably.  Tried to keep it more manageable, which it's

16   just consistent, that if that is something that you care

17   about, the quality of relationships, then it doesn't

18   come out often as --- you know, it comes out with the

19   task orientation, not an ego.

20       Q.    Well, the reason I'm asking this is I read that

21   Balaguer report, and I did not see anything in there

22   that supported this proposition of this first clause of

23   this sentence.  Are you confident that it's in there?

24       A.    It would be good for me to review.

1     Q.    If I showed you the article would you be able to

2  locate it without too much difficulty?

3     A.    I'm not sure.  I'd probably just have to review

4  it.  But having ---.

5                    ATTORNEY TRYON:  Well, let's bring it up,

6  and maybe I've just missed it.  And so that would be ---

7  the name of it is Motivational Climate and Goal

8  Orientations as Predictors of Perceptions of Improvement

9  Satisfaction in Coach Ratings Among Tennis Players.

10  Educators.  So Jake, if you could find that and pull

11  that up.

12                    VIDEOGRAPHER:  Do you want it marked?

13                    ATTORNEY TRYON:  Yes.  I think we are on

14  8 now, right?

15                    VIDEOGRAPHER:  I think it's 7, unless I

16  missed something.

17                    ATTORNEY TRYON:  Well, I will take your

18  word for that.

19                         ---

20                    (Whereupon, Exhibit 7, Article, was

21                     marked for identification.)

22                         ---

23                    ATTORNEY TRYON:  You know what, I should

24  ask you, Jake, go ahead and put that in the chat room so

1    that Professor Fry can download it and look at it real

2    quick.

3                        VIDEOGRAPHER:  Already did.

4                        ATTORNEY TRYON:  Great.

5    BY ATTORNEY TRYON:

6        Q.    So Professor Fry, you can either look at this

7    with me or it might be best if you just double check in

8    the chat room and then it should download it and you

9    should be able to bring it up and look through there at

10   your --- I don't want to say leisure but how you would

11   prefer to do it.

12       A.    Okay.  I may have to get help here because it's

13   not appearing on my end.

14       Q.    Do you see it in the chat room?

15       A.    Yeah, I can click on it, but then it takes me to

16   some case view net thing and it says I need a code and

17   password.  I'm using their system, so I'm guessing it's

18   related to that.

19                       VIDEOGRAPHER:  Not the link.  There

20   should be a PDF document you can just click open.

21                       THE WITNESS:  Okay.

22                       VIDEOGRAPHER:  I don't know how it is on

23   an iPad, so I will admit I'm at a loss.

24                       THE WITNESS:  Okay.

```
 1   BY ATTORNEY TRYON:

 2      Q.    Are you able to look at it now?

 3                  VIDEOGRAPHER:  The document called 007 at

 4   the beginning?

 5                  THE WITNESS:  When I click on the chat

 6   I'm just seeing one link listed.

 7   BY ATTORNEY TRYON:

 8      Q.    Underneath the link there should be a PDF.

 9      A.    Okay.  It's not showing up for me.

10      Q.    Okay.

11                  VIDEOGRAPHER:  Alternatively, Counsel, I

12   can give remote control of the document to her so that

13   she can scroll on it herself.

14                  ATTORNEY TRYON:  Let's do that.

15                  VIDEOGRAPHER:  Okay.

16                  THE WITNESS:  Thank you.

17                  VIDEOGRAPHER:  You should have control if

18   you just try to click on the screen and you just scroll

19   it and move it.  Perfect.

20                  THE WITNESS:  Okay.

21                  So how do I move the document?

22                  VIDEOGRAPHER:  So if you would move the

23   cursor like over here and drag it.

24                  THE WITNESS:  Sorry.  Can you say that
```

```
 1   again?

 2                    VIDEOGRAPHER:  You can control the mouse

 3   cursor right now, so you would have to move it over here

 4   and just drag it down or click on this down arrow down

 5   here?

 6                    THE WITNESS:  So I don't really have a

 7   mouse, right, with this.  It's just using my finger on

 8   the screen.

 9                    VIDEOGRAPHER:  Right.  If it works like

10   normal iPad things, then you would --- to click

11   something you would double tap it and then hold, which

12   sounds convoluted.

13                    ATTORNEY TRYON:  Well, if you have any

14   difficulties with it, why don't we let Jake take control

15   and scroll down with it?

16                    THE WITNESS:  Okay.

17                    I think Dana is outside, if you want me

18   to get her to help real quick to save time.

19                    ATTORNEY TRYON:  I'll tell you what,

20   let's do this.  This is not a critical point for me.  I

21   just wanted to try and understand this.  So let's come

22   back to this later.  All right?

23                    THE WITNESS:  Okay.

24                    ATTORNEY TRYON:  We have time.
```

BY ATTORNEY TRYON:

Q.    In paragraph 32, you talked several times about the climate, right?

A.    Yes.

Q.    And in the sentence it says despite the ego involving climates emphasis on the performance outcomes results across studies suggest the benefits of task involving climate may have a direct impact on athletic performance and ultimately improve performance outcomes. So that sentence is talking about the climate, not the individual's orientation, right?

A.    That's correct.

Q.    And you say it may have a direct impact.  So by may that is not suggesting that it's probable, it is just saying that it might.  Is that a fair statement?

A.    Yes.

Q.    Then let me move down to paragraph 33.

A.    Can I just say on that point ---?

Q.    Yes.

A.    I think this is an area within our body of research that there is less support for, but the studies that are in place would suggest that perceptions of a task involving climate would lead to greater performance.  So there is some evidence for that, but I

1    would agree it's not strong and that is why the wording

2    is softer there, right, but there is no evidence

3    suggesting that perceptions in an ego involving climate

4    would lead to better performance.  And so on the one

5    hand people just might be thinking, wow, that's a

6    no-brainer, right, if all you care about performance go

7    with that ego involving climate, but for all these other

8    reasons we would argue it makes sense, right.  If people

9    are having more fun and having better relationships and

10   trying hard and so on, that it might lead to better

11   performance.

12       Q.    In paragraph 33 you talk about young athletes

13   with a high ego orientation participating in a variety

14   of sports have reported higher traits and state

15   cognitive and somatic anxiety as well as greater

16   concentration dysfunction, maladaptive perfectionism and

17   concern over making mistakes.  Now, my question is,

18   isn't that true for basically any endeavor, that there's

19   going to be --- you're going to have anxiety in trying

20   to succeed?

21                    ATTORNEY VEROFF:  Objection.

22                    THE WITNESS: You know, definitely anxiety

23   and stress is part of sport.  With these climates though

24   what we're seeing consistently is that athletes report

1    that when they perform their best they were less

2    bothered by stress and anxiety.  In fact, the kind of

3    epitome of being --- what we call being in flow, right,

4    you just --- you feel high confidence, you're

5    concentrating well, you're not worried about

6    distractions, you 're not stressed, right.  And so

7    consistently people would report a higher ego

8    orientation, they just --- no matter how it's measured

9    all this kind of bad stuff that we'd rather take out,

10   right, and not have people worried about, young athletes

11   worried about, they just experience it more.  So the

12   cognitive anxiety is what's going on up here, right,

13   worry and doubt, and the somatic anxiety is I can't get

14   a grip on my heart rate, my muscles feel tense, I have

15   butterflies and those kinds of things.  So we see that

16   more with athletes high in ego orientation.

17        Q.    Well, when you were going through college and

18   getting your Ph.D., you were striving to do your very

19   best and you were striving to succeed and get As to get

20   your Ph.D.  All of those things are something that

21   requires you to succeed and to convince other people how

22   good you are, right?

23        A.    To succeed and make the world better.

24        Q.    Right, but to get a Ph.D. that's a tough --- is

1   that an easy thing to do?

2     A.   No, it is not.

3     Q.   And it is based on what other people think of

4   you and your work, right?

5     A.   Yeah.  I mean, there's requirements to complete

6   a Ph.D. for sure that involve other people.

7     Q.   And they're judging your work, right?

8     A.   Right.

9     Q.   And that creates, I presume, for most people it

10  creates a lot of anxiety.  Did it for you?

11               ATTORNEY VEROFF:  Objection.

12               THE WITNESS:  You know, at times it was

13  stressful, but I enjoyed every minute of it.  And so

14  some of this comes back to anxiety is pretty typical and

15  we're going to experience that, but what I'm feeling

16  about it is helping people develop strong coping skills

17  so that they can deal with that stress and anxiety.  And

18  that is, you know, another study that we recently

19  published that people who perceived a caring task

20  involving climate reported greater coping skills, right.

21  BY ATTORNEY TRYON:

22     Q.   And to develop those coping skills you need to

23  sometimes follow the rules of others like those on the

24  Ph.D. committee, if that's the right terminology, rather

```
 1   than saying, hey, committee you're wrong, I'm right, you
 2   have to do what I say, right?
 3                    ATTORNEY VEROFF:  Objection.
 4                    THE WITNESS:  I'm not sure that's related
 5   to coping skills, but what you said is true, it does
 6   take place when you're  working on a Ph.D.
 7   BY ATTORNEY TRYON:
 8     Q.    And pretty much every part of life you can't
 9   just say I don't like your rules, do it my way and get
10   your way, you have to cope with the world as it is, not
11   as you want it to be all the time, right?
12     A.    Right.
13                    ATTORNEY VEROFF:  Objection.
14   BY ATTORNEY TRYON:
15     Q.    And that's a hard thing, right?
16     A.    It is.
17     Q.    But it builds character, doesn't it?
18     A.    It sure can.
19     Q.    So let me move on then.  I think I understand
20   what you're saying in this paragraph.  Looking at
21   paragraph 35, okay, let me see if we addressed some of
22   these things.  Have you studied depression and mental
23   health with athletes?
24     A.    No, it's not my area.  Yes, I've read some, but
```

1    no, it's not an area that I studied in depth.

2        Q.    So you haven't written on it?

3        A.    We might have a study where we include some

4    parameters of psychological well-being, like studies

5    with kids, looking at how the climate relates to a

6    caring climate relating to reporting greater hope and

7    happiness and less depression and sadness, but studying

8    like depression is not a primary area for me.

9        Q.    Have you looked at the issue for athletes

10   between injuries and mental health or depression?

11       A.    No, no.

12       Q.    Are you aware that there are studies and papers

13   on that issue?

14       A.    Yes.

15       Q.    Okay.

16            Let me ask you to take a look at --- well,

17   before we go, have you heard of the American College of

18   Sports Medicine?

19       A.    I have.

20       Q.    And are they well regarded?

21       A.    Yes.

22       Q.    Have you heard of Andrew Wolanin?

23       A.    I have not.

24                ATTORNEY TRYON:   Okay.

1              Well, let's bring up this exhibit, which

2    will be then Exhibit --- I think this will be --- well,

3    I will just ask, Jake, help me out with numbers.  The

4    title is Depression and Athletes, Prevalence and Risk

5    Factors.

6                   VIDEOGRAPHER:  I believe we're on Number

7    8 now.

8                   ATTORNEY TRYON:  Okay.  Perfect.

9                   VIDEOGRAPHER:  Just give me one moment.

10                          ---

11                  (Whereupon, Exhibit 8, Article, was

12                   marked for identification.)

13                          ---

14   BY ATTORNEY TRYON:

15      Q.    Have you seen this document that I now marked as

16   Exhibit-8 before?

17      A.    No, I haven't.  Jake, can you show the top again

18   please?

19                  VIDEOGRAPHER:  That is as far up as it

20   goes.

21                  THE WITNESS:  Okay.

22   BY ATTORNEY TRYON:

23      Q.    Are you familiar with any of the three authors?

24      A.    No.

1    Q.    So I am going to ask you about several parts in

2    here, so it might be helpful to have --- try one more

3    time to see if you can --- give you access to it, to

4    give you control over the screen so you can scroll down.

5    And you should be able to treat it just like anything

6    else on your iPad, with your fingers or however you do

7    it.

8    A.    So when I click on control it has like a

9    keyboard and then it has a question mark.

10                   ATTORNEY TRYON:  Jake, any input?

11                   VIDEOGRAPHER:  It sounds like it's just

12   bringing up the iPad keyboard and there should be

13   something that looks like a keyboard and that minimizes

14   the keyboard itself so you can just get back to the

15   screen.

16                   ATTORNEY VEROFF:  I'm sorry, Dr. Fry.

17                   THE WITNESS:  No, go ahead.

18                   ATTORNEY VEROFF:  I was just going to

19   ask, Dave, is there any way to get in touch with Dana.

20   Maybe we could send her the PDF and have her print them

21   so that the witness could have hard copies.  That might

22   make this all work a little bit easier for any --- for

23   this or any other studies that you would want her to

24   look at.

```
 1               ATTORNEY TRYON:  Yeah, except they're in

 2    a hotel room now.  That's one of the --- is Dana outside

 3    the door did you say?

 4               THE WITNESS:  Yes, is it okay if I just

 5    check with her because I think she has a little business

 6    center set up maybe.

 7               ATTORNEY VEROFF:  If we can go off the

 8    record for a moment.

 9               ATTORNEY TRYON:  Great.

10               VIDEOGRAPHER:  Going off the record.  The

11    current time reads 239 p.m. Eastern Standard Time.

12    OFF VIDEOTAPE

13                         ---

14    (WHEREUPON, A SHORT BREAK WAS TAKEN.)

15                         ---

16    ON VIDEOTAPE

17               VIDEOGRAPHER:  We are back on the record.

18    The current time reads 2:42 p.m. Eastern Standard Time.

19               ATTORNEY TRYON:  Okay.  If you can now

20    look at --- give me a moment.  Let's look at your

21    original report on page 12, that would be Exhibit-1.

22               VIDEOGRAPHER:  Did you say page 12 or

23    paragraph 12?

24               ATTORNEY TRYON:  Page 12.
```

```
 1                    VIDEOGRAPHER:  Okay.

 2                    ATTORNEY TRYON:  Okay, right there is

 3     great.

 4     BY ATTORNEY TRYON:

 5          Q.    Okay.

 6                Do you see that, Doctor Fry?

 7          A.    Yes.

 8          Q.    So the title you have here is Excluding Groups

 9     from Participating in High school Athletics would

10     Deprive Them and Their Teammates of a Wide Range of

11     Educational Benefits.  Did you write that?

12          A.    Yes.

13          Q.    Okay.

14                Then I would like to compare that to the title

15     that you have in your latest report, if you could bring

16     that up, and that is on page ten.  So here you change

17     groups from to excluding transgender students.  Why did

18     you make that change?

19          A.    I think just because it's specific to this case.

20          Q.    Well, the specifics of this case were the same

21     before as they are now, so do you have any better

22     explanation?

23                    ATTORNEY VEROFF:  Objection.

24                    THE WITNESS:  You know, I edit everything
```

1    I write, and so if I see something that may clarify more

2    or change a word, you know, that makes it better, then I

3    would do that.  I think that's what happened here.

4    BY ATTORNEY TRYON:

5      Q.    Are you aware of any groups being excluded from

6    participating in youth or adult athletics?

7                     ATTORNEY VEROFF:  Objection.

8                     THE WITNESS: You know, I think a lot of

9    times kids with disabilities are kept out.  I think kids

10   who have limited financial resources sometimes are

11   limited.  I think groups are --- so it may not be a rule

12   that you cannot play, but you know, there are other

13   groups who miss out on the opportunities to play.

14   BY ATTORNEY TRYON:

15     Q.    Other than that, can you think of any groups

16   that are excluded by any rule or requirements from any

17   athletic activities?

18                     ATTORNEY VEROFF:  Objection.

19                     THE WITNESS:  Not that's coming to mind

20   that are, you know, like obvious or stated in the rules,

21   but I think there's personal different ethnic, minority

22   groups, for example, that might have less exposure to

23   sport, things like that.

24   BY ATTORNEY TRYON:

 1     Q.    Let me ask you about Special Olympics.  Is the

 2   entrance into Special Olympics --- do you know anything

 3   about --- let me back up.  You're aware of what Special

 4   Olympics is, right?

 5     A.    Yes, I'm aware of it.

 6     Q.    And do you know if there are specific

 7   requirements in order to be able to participate in

 8   Special Olympics?

 9     A.    I know there are.  I couldn't tell you what they

10   are across the different categories and all.

11     Q.    Can able bodied athletes and able minded

12   athletes participate in Special Olympics?

13     A.    Special Olympics was created to give athletes

14   --- okay.  Dana said she hadn't received those.  Just to

15   double check, that it is Dana@midwestreporters.net.

16   It's not .com.

17                    VIDEOGRAPHER:  I will double check it.

18                    THE WITNESS:  Thank you.

19                    ATTORNEY TRYON:  Sorry to interrupt your

20   flow.

21   BY ATTORNEY TRYON:

22     Q.    So my question was can able-bodied athletes and

23   able-minded athletes participate in Special Olympics,

24   and you started to say Special Olympics was created.

1      A.      Right.   The answer is no, they can't

2 participate.

3      Q.      So that is an exclusion, right?

4      A.      Yes.

5      Q.      And it's a categorical exclusion, right?

6      A.      Yes.

7      Q.      Do you think it's a fair exclusion?

8              ATTORNEY VEROFF:   Objection.

9              THE WITNESS:   Sorry.   Yes, in this case.

10 BY ATTORNEY TRYON:

11      Q.      And why?

12      A.      Because those able-bodied athletes have another

13 area where they can compete.

14      Q.      And so Special Olympics is especially designated

15 for certain athletes who are not able to compete against

16 able-bodied and able-minded athletes, right?

17      A.      Uh-huh (yes), yes.

18      Q.      So it's essentially a protected category, right?

19              ATTORNEY VEROFF:   Objection.

20              THE WITNESS:   Yes.   I don't know if it is

21 protection so much, as just provide an opportunity.

22 BY ATTORNEY TRYON:

23      Q.      And that exclusion is of --- with respect to

24 Special Olympics, you wouldn't call that arbitrary,

1    would you?

2                    ATTORNEY VEROFF:   Objection.

3                    THE WITNESS: No.

4    BY ATTORNEY TRYON:

5       Q.    Now, if we go down in paragraph 37, the second

6    sentence says, if transgender students are arbitrarily

7    excluded from youth sports they are, in turn, deprived

8    of those positive experiences and outcomes and their

9    teammates are deprived of a genuinely optimal sports

10   experience.

11              Do you see that?

12      A.    I do.

13      Q.    If that exclusion is based on safety concerns or

14   performance concerns then it would not be arbitrary.

15              Correct?

16                    ATTORNEY VEROFF:   Objection.

17                    THE WITNESS:   If there were strong

18   evidence for those.

19   BY ATTORNEY TRYON:

20      Q.    And just --- I think we covered this, but I just

21   want to make sure I'm correct, you are not an expert on

22   safety issues, right?

23      A.    That's right.

24      Q.    And you are also not an expert on performance

1  issues, right?

2      A.     That's right.

3      Q.     What would you call strong evidence?

4             ATTORNEY VEROFF:  Objection.

5             THE WITNESS:  I call it data that the

6  experts come to agree that --- you know, how they can

7  guide the rules for sport, right, and balance inclusion

8  and fairness.

9  BY ATTORNEY TRYON:

10     Q.     Would you agree with me that not all experts

11 agree on everything, even with their own field, right?

12     A.     That's right.

13     Q.     Is there a minimum number of experts that would

14 have to agree before it's strong evidence or is that

15 sort of a --- I don't know how to say it.  What do you

16 think?

17            ATTORNEY VEROFF:  Objection.

18            THE WITNESS:  I think with respect to

19 this case, that organizations can, you know, weigh in on

20 the evidence there to see --- I mean, there is just a

21 lot of injury within sport that happens, right, it's

22 just part of sport.  So I think they would have to

23 really consider the evidence to see if there are safety

24 concerns for having transathletes participate.

BY ATTORNEY TRYON:

Q.    Do you think in high school that every sport should have a different rule of when transgender girls can participate in those specific girls sports?

ATTORNEY VEROFF:  Objection.

THE WITNESS: You know, I just come back to my expertise and why I've been asked to be on this case is just to address the benefits that athletes receive from participating in sport.  So I wouldn't perceive that they are at the high school level.  There is different rules for every sport, but I don't know where we will be down the road, right, as we just figure all this out and strive to include all athletes.

BY ATTORNEY TRYON:

Q.    So you don't know what the rules should be?

ATTORNEY VEROFF:  Objection.

THE WITNESS:  Right, I'm not the best person to make those decisions.  I think we need people who are studying these issues, and that is beyond my expertise.

BY ATTORNEY TRYON:

Q.    Fair enough.  I don't want you to go beyond your expertise.  Well, let me ask you just some related questions.  And you may say the same thing on this, but

```
 1    I'm going to ask you and we will see if you have any

 2    thoughts.  You may have already answered this, but let

 3    me ask you these.  On what teams should student athletes

 4    participate on if they are transgender?  If they are a

 5    transgender girl, should they participate on boys or

 6    girls teams?

 7                     ATTORNEY VEROFF:  Objection.

 8                     THE WITNESS:  I think it depends what the

 9    rules are, but, you know, over the last decade across

10    organizations, organizations have found a way to allow

11    transgender females to participate.

12    BY ATTORNEY TRYON:

13        Q.    And those rules have changed over time, right?

14        A.    They do.

15        Q.    NCAA just changed its rules, right?

16                     ATTORNEY VEROFF:  Objection.

17    BY ATTORNEY TRYON:

18        Q.    Did you answer?

19        A.    You know, I'm not sure of the latest.  I thought

20    they were going to leave --- yeah, they're going to be

21    looking at other options and getting feedback from the

22    governing bodies is my understanding.

23        Q.    Are you aware of what the Rugby Association

24    says?
```

```
 1              ATTORNEY VEROFF:  Objection.

 2              THE WITNESS: No.

 3   BY ATTORNEY TRYON:

 4      Q.    Are you aware of USA Swimming, what their rules

 5   are?

 6              ATTORNEY VEROFF:  Objection.

 7              THE WITNESS: I couldn't tell you all the

 8   details, but I know USA Swimming really is trying to

 9   find a way to be inclusive, and so I know at the youth

10   levels that transgender youth are able to participate,

11   right, and that they have allowed some rule changes for

12   what swimsuit kids wear and things like that.

13   BY ATTORNEY TRYON:

14      Q.    But those transgender girls have to --- or

15   transgender women have to meet certain requirements

16   before they can participate on a female team.

17          Right?

18              ATTORNEY VEROFF:  Objection.

19              THE WITNESS: Yes.

20   BY ATTORNEY TRYON:

21      Q.    Are you aware of the specifics?

22      A.    No.  I've read some of this, but I'm not sure

23   I've retained it and it's not something that I spent a

24   long time on across sports.
```

```
1        Q.     Okay.

2               Let me ask you then if you have ever heard of

3   the term nonbinary?

4        A.     I have heard of that term.

5        Q.     Is this a fair definition, that it is people who

6   do not describe themselves or their genders as fitting

7   in the category of man or woman?  Does that sound like a

8   fair definition?

9                    ATTORNEY VEROFF:  Objection.

10                   THE WITNESS: Yes.

11  BY ATTORNEY TRYON:

12       Q.     Should a biological male who identifies as

13  nonbinary who is an athlete participate in high school

14  on the boys or girls team?

15                   ATTORNEY VEROFF:  Objection.

16                   THE WITNESS:  I think it depends on what

17  the rules are.  And I think the goal of the sport

18  organizations seems to be how can we look at these

19  issues and just still try to be as inclusive as

20  possible.

21  BY ATTORNEY TRYON:

22       Q.     What are the rules on that in high school?

23                   ATTORNEY VEROFF:  Objection.

24                   THE WITNESS:  Right, it seems to vary
```

1    across states.

2    BY ATTORNEY TRYON:

3        Q.    Do you know of any rule --- do you know of any

4    rule that specifically addresses nonbinary athletes?

5                        ATTORNEY VEROFF:  Objection.

6                        THE WITNESS: No.

7    BY ATTORNEY TRYON:

8        Q.    Have you heard the term bigender?

9                        ATTORNEY VEROFF:  Objection.

10                       THE WITNESS: Yes.

11   BY ATTORNEY TRYON:

12       Q.    The definition that I have read is a person who

13   identifies as bigender has two genders.  Is that your

14   understanding as well?

15                       ATTORNEY VEROFF:  Objection.

16                       THE WITNESS: Yes.

17   BY ATTORNEY TRYON:

18       Q.    And in high school the biological male

19   identifies as bigender and wants to participate on a

20   girls sports team, should that be allowed?

21                       ATTORNEY VEROFF:  Objection.

22                       THE WITNESS:  I think greater context is

23   needed.  There's a --- you know, understand what's going

24   on with that particular athlete.  And again, I just want

1    to --- this is a little bit beyond my expertise and I'm

2    here to just reenforce that there is a lot of benefits

3    for all athletes to be able to participate.

4    BY ATTORNEY TRYON:

5        Q.    What if a biological male wants to be on a girls

6    team, even though he does not identify as a girl, should

7    he be allowed to do so?

8                    ATTORNEY VEROFF:   Objection.

9                    THE WITNESS:   No.

10   BY ATTORNEY TRYON:

11       Q.    And why not?

12       A.    Because he's wanting to play on a --- on a

13   female team and he doesn't --- hasn't transitioned and

14   isn't identifying as a female.

15       Q.    If a biological male wants to participate on a

16   girls team and identifies as a female but has not

17   transitioned in any way, should he be allowed to

18   participate on the girls team?

19                    ATTORNEY VEROFF:   Objection.

20                    THE WITNESS: In --- in general I would

21   say no, but we're missing the context.  What if this was

22   ---  yeah, I think we want that person to transition.

23   BY ATTORNEY TRYON:

24       Q.    Okay.

```
 1              What transitioning would be necessary?
 2                   ATTORNEY VEROFF:  Objection.
 3                   THE WITNESS:  I think that's out for
 4  debate, discussion, and to figure out at these different
 5  levels of sports what that criteria is going to be.
 6  BY ATTORNEY TRYON:
 7     Q.    So in high school is it simply changing your
 8  name to a female name, would that --- for a male to
 9  change to a female name, would that be adequate to then
10  be allowed to play on the girls team?
11                   ATTORNEY VEROFF:  Objection.
12                   THE WITNESS:  No, I'd say in general that
13  wouldn't be the case.
14  BY ATTORNEY TRYON:
15     Q.    Okay.
16           If that person, in addition to changing his
17  name to a female name and says I want to be addressed
18  using female pronouns, is that adequate?
19                   ATTORNEY VEROFF:  Objection.
20                   THE WITNESS:  I think that we've got this
21  kind of continuum it sounds like, right, to what degree
22  people are transitioning to know transitioning.  And to
23  just have a blanket statement that no one --- that no
24  transathlete can ever participate in sport ever across
```

```
 1   the universe is harmful for many athletes, right.  And
 2   so these specifics of where we are going to go with what
 3   the criteria is for athletes, right, I think there's a
 4   lot of people studying these issues and weighing in and
 5   I'm not one of those individuals who's really studying
 6   this stuff in detail at that level, but I do know ---.
 7   BY ATTORNEY TRYON:
 8      Q.    Sorry.  Go ahead.
 9      A.    I do know that inclusion in sport has many
10   benefits and that it would be a shame to not hold a
11   category of athletes out to participate.
12      Q.    So there would be nothing to stop a male
13   athlete, a biological male athlete identifying as a
14   female from participating on a boys team, right?
15                   ATTORNEY VEROFF:  Objection.
16                   THE WITNESS:  Right.  I did not state
17   that.  I'm not sure what that criteria should be, but it
18   helps us balance, being inclusive and also being fair.
19   BY ATTORNEY TRYON:
20      Q.    So it's not excluding that person from
21   participating in sports, it's just excluding that person
22   from participating on the team that person wants to
23   participate on, right?
24                   ATTORNEY VEROFF:  Objection.
```

1                    THE WITNESS:  If we understand that

2    transathletes are identifying with a particular gender,

3    so in this case transfemales, then no, that wouldn't be

4    an option to go participate on a male team.

5    BY ATTORNEY TRYON:

6        Q.    Well, why is that not an option?

7        A.    Right, well, I just point to PBJ, right, who has

8    identified as a girl for a long time and looks very much

9    like a girl and is the --- I believe the principal said,

10   you know, we're just creating problems.  This little

11   girl can be with her friends, can run cross-country, can

12   reap all these benefits, right, and it's not an option

13   to send her over to the boys team because she is a girl.

14       Q.    Do you need to look like a girl to be on the

15   girls team?

16                    ATTORNEY VEROFF:  Objection.

17                    THE WITNESS:  No, I'm not sure what that

18   means.

19   BY ATTORNEY TRYON:

20       Q.    Well, there are girls that look masculine that

21   are girls and they, of course, want to be on the girls

22   team.  I would presume you would agree they should be on

23   the girls team, right?

24                    ATTORNEY VEROFF:  Objection.

1          THE WITNESS: Right, there are --- you

2    know, we may get into a debate about what is masculine

3    or feminine if we're saying that --- you're describing

4    somebody as more --- a female that's more masculine, but

5    maybe other people see it that there's a feminine

6    quality to whatever, being strong, yeah, having a solid

7    build, those things.

8    BY ATTORNEY TRYON:

9      Q.    Well, you're the one that pointed out that BPJ

10   looks like a little girl and suggesting that that was

11   one of the reasons that BPJ should be on the girls team.

12   Did I understand that incorrectly?

13     A.    What, I meant to emphasize is that she sees

14   herself as a girl, and so we put her in a really

15   uncomfortable spot to say you can't be with the girls

16   and you have to go be with the boys even though in your

17   heart of hearts you know you're a girl.

18     Q.    Can that be uncomfortable for the biological

19   girls on the girls team if biological boys who identify

20   themselves as internally as being girls are allowed to

21   participate on the girls team?

22          ATTORNEY VEROFF:  Objection.

23          THE WITNESS:  Could --- you know, could

24   the fact that a transgender girl is participating in a

1    sport, on a team, could that make someone feel

2    uncomfortable?  Definitely it's possible.

3    BY ATTORNEY TRYON:

4       Q.    Not only is it possible, but it happens, right?

5                    ATTORNEY VEROFF:  Objection.

6                    THE WITNESS:  Yes, I think it probably

7    happens.  It probably happens both ways, that there are

8    also teammates that are very supportive.

9    BY ATTORNEY TRYON:

10      Q.    But the feelings of the biological girls who are

11   uncomfortable with a biological male identifying as a

12   female or a transgender girl, as you have said, their

13   feelings are important too, right?

14                   ATTORNEY VEROFF:  Objection.

15                   THE WITNESS:  You know, pulling from my

16   expertise, if we're trying to create this caring task

17   involving climate, then yes, it would be very important

18   for a coach to sit down with those athletes and talk and

19   encourage them.  If the transfemale athlete is playing

20   by the rules and has done everything that has been asked

21   and they are part of a team, then coaches should really

22   talk with the athletes than help them understand, help

23   them not let this be a distraction, help them embrace

24   all their teammates, right.  There is so much in the

1    sport that any of us on a team might like to change,

2    right, or wish our teammates did other things, right,

3    wish they worked harder or wish they used less

4    recreational drugs or anything, right, but we are a team

5    and we come together and we just support each other and

6    we keep the focus on being the best we can be every day.

7    BY ATTORNEY TRYON:

8       Q.    So biological girls just need to knuckle under

9    and accept things the way that you want them to be.  Is

10   that what you are saying?

11                  ATTORNEY VEROFF:  Objection.

12                  THE WITNESS:  I'm saying being part of a

13   team is challenging, and for some people having a

14   teammate that is transgender may be one of those

15   challenges they have to deal with.  But everyone is

16   dealing with challenges with the teams, right.  And if

17   that transgender athlete is there playing by the rules,

18   right, and is allowed to be there, then yeah, I guess

19   the others have to deal with it.

20   BY ATTORNEY TRYON:

21      Q.    So on the other hand, you can tell that

22   transgender female to participate on the boys team and

23   the coach on the boys team would sit down with the boys

24   and say you will not make fun of this child, you accept

```
 1    this child as one of our own even though this child is a
 2    transgender female, this transgender female will be on
 3    the boys team and you will treat this transgender female
 4    with respect and be a full part of the team, right, that
 5    coach could do that?
 6                    ATTORNEY VEROFF:  Objection.
 7                    THE WITNESS: Yes, the problem is that the
 8    transgender athlete is a female, right, and has the
 9    right to participate with the female team.
10    BY ATTORNEY TRYON:
11       Q.    Where is that right found?  You just said she
12    has that right.  Where is that right?
13                    ATTORNEY VEROFF:  Objection.
14                    THE WITNESS:  I mean as it comes within
15    the rules, right.  I'm sorry, Julie.  I mean, as it
16    falls within the rules, right.
17    BY ATTORNEY TRYON:
18       Q.    Well, right now the rule is HB-3293, which says
19    that that transgender girl must participate on the boys
20    team.  And since that is the rule, following your ---
21    your logic, you go to the boys team and the boys coach
22    and you say this child is going to be participating in
23    this team, you will welcome her with open arms onto our
24    team just as we do on football, we open with --- welcome
```

```
 1    with open arms girls who are playing on a boys football

 2    team, right?

 3                    ATTORNEY VEROFF:  Objection.

 4                    THE WITNESS:  My understanding in this

 5    case is that the judge is --- has kind of looked at the

 6    evidence and said right now I think there is potential

 7    discrimination and so we're going to let BPJ continue to

 8    compete and all through this so ---.

 9    BY ATTORNEY TRYON:

10        Q.    That's right, the Judge did say that for now,

11    but he did not say that for everything.  But I'm asking

12    for a more general rule.  Putting aside BPJ, as a

13    general rule, why would you say coach of the boys team,

14    you will allow these transgender girls to come and play

15    on your team and you will welcome them with open arms

16    just as we do with our football teams that allow girls

17    to play on them?

18                    ATTORNEY VEROFF:  Objection.

19    BY ATTORNEY TRYON:

20        Q.    Because after all, as you said, the transgender

21    girl is a girl and so should be allowed to play on the

22    boys team if she chooses?

23                    ATTORNEY VEROFF:  Objection.

24                    THE WITNESS:  I think football is a great
```

1   sport, and I wish they had male and female teams.

2   Typically, it's just a male team, so a female who wants

3   to play football doesn't have another option.  But in

4   this case BPJ and others who identify as a female and

5   should be able to compete with other females, their

6   friend group and --- so I see that as an indifference.

7   BY ATTORNEY TRYON:

8        Q.     Their friend group?  So girls can't have boy

9   friends?

10       A.     No.  I meant it --- sorry, I meant in this case

11   BPJ is saying her closest friends are on the girls team.

12   She is a girl and she --- and so it would be harmful,

13   not fair to not let her compete with that team.

14       Q.     How do you define fair?  You told me before you

15   are not an expert on fairness.  Are you now saying that

16   you do know what is fair?

17                    ATTORNEY VEROFF:  Objection.

18                    THE WITNESS:  I'm just keeping focused on

19   what the rules are and the Judge has ruled right now

20   that BPJ should be able to compete with the girls

21   because she is a girl, and so from my perspective,

22   that's where it stands right now.

23   BY ATTORNEY TRYON:

24       Q.     Okay.

1          That's just because that's what the Judge said

2    then, right?

3                    ATTORNEY VEROFF:  Objection.

4                    THE WITNESS: No.  I think the core issue

5    is BPJ identifies as a girl, has lived the majority of

6    her life as a girl and wants to be able to participate

7    in her school activities as a girl, including

8    cross-country.

9    BY ATTORNEY TRYON:

10      Q.    So how long do you think a transgender girl has

11   to live as a girl before participating on the girls

12   team?

13                   ATTORNEY VEROFF:  Objection.

14                   THE WITNESS:  Again, I think I'm not the

15   best person for that line of inquiry.  I'm not sure, but

16   I know others are studying that, those kind of issues,

17   and can add greater insight to it.

18   BY ATTORNEY TRYON:

19      Q.    Okay.

20      A.    I'm just someone who would hate to see BPJ not

21   be allowed to participate in her school activities, just

22   to be told no, I'm sorry.

23      Q.    On the girls team?

24      A.    Right.

 1      Q.     And of course, not all athletes compete on

 2  teams.  Sometimes if they just love to run, if that is

 3  the key, they just love to run, they don't have to be on

 4  a team to run, right?

 5      A.     Right.

 6                    ATTORNEY TRYON:  So we have gone for an

 7  hour.  And I would like to get some documents printed

 8  since we're not able to easily look at them on your

 9  iPad.  So why don't we go off the record to see if we

10  can get that taken care of.  Is that okay with you,

11  Julie?

12                    ATTORNEY VEROFF:  That is great.  Thank

13  you.

14                    VIDEOGRAPHER:  Going off the record.  The

15  current time reads 3:15 p.m. Eastern Standard Time.

16  OFF VIDEOTAPE

17                         ---

18  (WHEREUPON, A SHORT BREAK WAS TAKEN.)

19                         ---

20  ON VIDEOTAPE

21                    VIDEOGRAPHER:  We are back on the record.

22  The current time reads 3:37 p.m. Eastern Standard Time.

23  BY ATTORNEY TRYON:

24      Q.     Professor Fry, thank you for helping us with

```
 1    that technical issue.

 2         A.    No problem.

 3         Q.    I would like you to find the exhibit that says

 4    Depression in Athletes.  It should be Exhibit-8, I

 5    believe.

 6         A.    I've got it.

 7         Q.    Okay.

 8               I've lost you.  There you are.  Okay.  Let me

 9    find the right page I'm outlining to.  Okay.  So Exhibit

10    8 is Depression in Athletes:  Prevalence and Risk

11    Factors by Andrew Wolanin and other authors, right?

12         A.    Yes.

13         Q.    So I wanted to ask you about a passage on the

14    second page of this, which is page 57, under the title

15    Sports Injuries and Depression at the bottom of the

16    first column.  So I will just read the passage that I

17    have a question about and if you choose to read it, too,

18    if you want to read it more --- in fact, did you already

19    read the abstract on this earlier?

20         A.    I just did.

21         Q.    Okay.

22               So you've read the abstract.  My question is

23    on, as I said, under Sports Injuries and Depression.

24    And I will just read into the record, Bruer and Petrie,
```

1    seven in parentheses, were among the first researchers

2    to compare depression symptoms between athletes who had

3    and had not experienced injuries.  In this retrospective

4    study it was found that athletes who experienced an

5    injury during the previous year reported significantly

6    higher depression symptom scores than those reported by

7    non-injured athletes, as measured by the Validated

8    Center for Epidemiological Studies Depression,

9    parentheses, CES-D scale.  Do you see that?

10        A.    I do.

11        Q.    And my question is do you have any reason to

12   dispute this or contest this finding in this statement?

13        A.    No.

14        Q.    Would it be fair to say that you agree with it?

15        A.    You know, it's retrospective, so they're going

16   back in time and asking, hey, when you were injured what

17   was going on, but no, I would accept this is --- could

18   be a legitimate finding.

19        Q.    Okay.

20              Then in the next column, first full paragraph,

21   there has been a recent surge of evidence suggesting

22   that sports concussions can lead to changes in emotional

23   state, parentheses, 14, closed paren, period.

24   Furthermore, there is recent evidence to suggest that

```
 1    sports concussions can have long-lasting emotional
 2    impact.  And my question is, do you have any reason to
 3    contest this statement?  And feel free to look at it and
 4    make sure I'm not reading it out of context.
 5         A.    No, I don't contest this.
 6         Q.    Then in the beginning of the last full paragraph
 7    on the page it says, while the relationship between
 8    concussion and depression may be significant there is
 9    also evidence to suggest that a concussion may have the
10    same effect as other injuries on mental health.  For
11    example, Main Wearing, et al., 18 in parentheses,
12    conducted a study to examine the differences between
13    emotional responses in athletes who had a concussion
14    compared with anterior cruciate ligament, ACL, injury.
15    They found that athletes with ACL injuries had more
16    severe levels of depression and longer duration of
17    depression compared to those athletes with concussion.
18    Do you see that?
19         A.    I do.
20         Q.    And do you have any reason to contest that
21    statement?
22               ATTORNEY VEROFF:  I'll just object to the
23    extent this statement relies on a study that is actually
24    not before the witness.
```

BY ATTORNEY TRYON:

Q.    Go ahead, you may answer.

A.    Okay.

You know, there is probably just a lot of background to this, so I agree.  I haven't read this one but I would jus say ACL injuries can be extensive and last over months, right, and take an athlete out of sports for months.  Whereas a concussion, you know, it varies in severity and somebody might be back relatively quickly in comparison.  But, you know, both of --- both of these injuries are not fun for athletes to deal with and, yeah, can cause stress and depression.

Q.    Okay.

So I think you would agree that it's important for athletes to avoid injuries where possible, right?

A.    Right, right, and --- yeah.

Q.    And would you agree that it is important to have rules in place to avoid injuries where possible?

A.    Yes, I would agree.

Q.    And would you agree that we don't need to wait for actual harm before putting rules in place to prevent harm if it's reasonably foreseeable?

ATTORNEY VEROFF:  Objection.

THE WITNESS:  Yeah, the keyword is

```
 1   reasonably.
 2   BY ATTORNEY TRYON:
 3      Q.    Right.  So you agree with that but focusing on
 4   the word reasonably, right?
 5                    ATTORNEY VEROFF:  Objection.
 6                    THE WITNESS:  Right.
 7   BY ATTORNEY TRYON:
 8      Q.    Would you agree that segregation of male and
 9   female sports is at least in part to protect girls from
10   injury, at least for some sports?
11                    ATTORNEY VEROFF:  Objection.
12                    THE WITNESS:  Possibly.  I would just
13   note that there is tremendous variability within each
14   gender and if that were totally what was driving this
15   then we really would be concerned about some, for
16   example, not as strong males competing against bigger,
17   stronger males and same with females.  So the issue just
18   transcend gender, you know, it's an issue within each
19   gender.
20   BY ATTORNEY TRYON:
21      Q.    Well, you said you had some familiarity with
22   Title 9, right?
23      A.    Yes.
24      Q.    And Title 9 divides sports into boys --- male
```

```
 1    and female sports in some instances, right?

 2                    ATTORNEY VEROFF:  Objection.

 3                    THE WITNESS:  Yes.

 4    BY ATTORNEY TRYON:

 5       Q.    And in particular, with respect to contact

 6    sports, right?

 7                    ATTORNEY VEROFF:  Objection.

 8                    THE WITNESS:  Yes.

 9    BY ATTORNEY TRYON:

10       Q.    And would it be fair to say that those contact

11    sports Title 9 does that specifically to --- for safety

12    purposes?

13                    ATTORNEY VEROFF:  Objection.

14                    THE WITNESS: I think it's fair to say

15    that that is a --- is a concern, yeah.

16    BY ATTORNEY TRYON:

17       Q.    You wouldn't say that Title 9, the regulations

18    for Title 9 that regulate that, do you think those are

19    unfair or should be determined to be illegal?

20                    ATTORNEY VEROFF:  Objection.

21                    THE WITNESS:  Right, no.

22    BY ATTORNEY TRYON:

23       Q.    So let's go back to the study by --- I will say

24    it wrong, in Balaguer?
```

```
 1      A.      Yes, Balaguer.

 2      Q.      Balaguer, thank you.   Do you speak French?

 3      A.      No, but she is one of my favorite people in the

 4   world.

 5      Q.      Oh, okay.

 6                   VIDEOGRAPHER:  Counsel help me out here,

 7   which exhibit number is that?

 8                   THE WITNESS:  Maybe 2.

 9                   ATTORNEY TRYON:  No, the Balaguer.

10                   VIDEOGRAPHER:  If you can tell me the

11   title I can tell you the number.

12                   ATTORNEY TRYON:  I'm sorry.

13                   VIDEOGRAPHER:  I said if you can tell me

14   the title I can tell you the number.

15                   ATTORNEY TRYON:  Here it is.  I think it

16   is number 7, Motivational Climate and Goal Orientation

17   as predictors of Perceptions.

18                   VIDEOGRAPHER:  Correct, that would be

19   Number 7.

20   BY ATTORNEY TRYON:

21      Q.      And is that printed out for you, Professor Fry?

22      A.      Yes.

23      Q.      And going back in the report --- let me see if I

24   can find the right paragraph.  Here we go, paragraph 32
```

1   of your most recent report.  Okay.  So the first clause

2   of that first sentence says athletes high in ego

3   orientation report lower companionship and greater

4   conflicts with teammates and you cite Balaguer for that

5   proposition.  I simply was not able to find that

6   proposition in the Balaguer report.  By the way, the

7   University of Valencia, where is that?  Is that in

8   Spain?

9       A.    It is.

10      Q.    Then why does Elizabeth have a French name?  I'm

11  sorry.  If you could just look through and tell me if

12  you can see the language that supports your language in

13  paragraph 32.

14      A.    Yeah, yeah, just one more second.  Yeah, okay.

15  They give you this.  I think this wasn't the best

16  article.  It was referring to the coach instead of the

17  teammates with this one.  But if you would look on ---

18  or maybe --- 383, that paragraph in the middle of the

19  first column.  Yeah, just a little bit lower.  But the

20  wording in this paragraph on the left, yeah, if you can

21  fit the whole thing in again.  Right.  So partway down

22  it's just asking about --- to write your current coach

23  or somebody that --- so one would be just doesn't

24  coincide at all with the coach I would like to have

```
 1   versus my ideal coach.  So the lower rating on the coach

 2   is just --- that is not a good thing when you're going

 3   this is not the coach that I want, right, or all the way

 4   up to this is my ideal coach.  So it supports the

 5   findings that relationships aren't that strong, but it

 6   is not the best study --- or you know, it shouldn't have

 7   been slotted there because it's just referring to the

 8   coach instead of the athletes.  If you look at that

 9   table underneath where we're looking now, Table 2.

10   BY ATTORNEY TRYON:

11        Q.    I'm looking at it.

12        A.    Whoops, is that it.  Under satisfaction and so

13   the middle part on the left and the bottom one,

14   satisfaction with the coach, you can just see that the

15   more you perceive a task climate, the more you are

16   thinking this is the ideal coach, I'd like to have, the

17   more respect I have for the coach, or however you want

18   to put that in your words and the more you perceive an

19   ego climate the less and the more on the task

20   orientation, you are more likely to just say this is a

21   coach I'm glad I have.  And with the ego orientation,

22   it's just not significant --- so anyway, it supports

23   the results for saying overall, but that was not the

24   best reference there.  It shouldn't have been used right
```

1    there.

2        Q.    So just to make sure I understand then, the

3    Balaguer report does not actually support the idea that

4    athletes high in ego orientation report lower

5    companionship and greater conflict with teammates,

6    right?

7                        ATTORNEY VEROFF:  Objection.

8                        THE WITNESS:  Right.

9    BY ATTORNEY TRYON:

10       Q.    Do you believe Smith and Small does?

11       A.    Yeah.  You know, a little while ago when we were

12   looking at that passage, it just included like ten

13   variables that were cognitive anxiety and worry and

14   concentration disruption and I don't know, five other

15   things, a lot of ways to measure stress.  And so across

16   these studies a lot of ways that these relationships

17   with coaches and athletes, but it's not like everyone is

18   using one uniform measure.  Yeah, so there's probably

19   more studies showing that you have better relationships

20   when people perceive a task involving climate or have a

21   task orientation and then it's kind of a mix on the ego

22   side.  So sometimes that comes out and sometimes it

23   doesn't.

24       Q.    Don't studies show that the best mix is a high

1   ego orientation and a high task orientation?

2               ATTORNEY VEROFF:  Objection.

3               THE WITNESS: No, I wouldn't agree with

4   that, that mixes --- it's not necessarily that that is

5   harmful, right, having a high task and high ego.  But to

6   say it is the best, no, I wouldn't say that.

7   BY ATTORNEY TRYON:

8      Q.   Is Smith and Small cited in the bibliography?

9      A.   One of their articles by Grossbar is, but that

10  is looking more at the orientations in climate.  That

11  one, I lost that page.  I was just trying to see if

12  there was another one.  There is one by Cummings, 2007,

13  Is Winning Everything, the Contributions of Climate

14  and ---.

15     Q.   And that is going to tell me that --- is going

16  to support the statement that ego orientation creates

17  more conflict?

18     A.   No, no.  I'm not sure.  I think I'd have to step

19  back and review to tell you for sure what those are, but

20  I can certainly do that.

21     Q.   All right.

22         Well, let's move on.  I don't want to keep you

23  here any longer than we need to be here.

24     A.   Thank you.  I appreciate that.

 1     Q.    You bet.  So let me redirect your attention to

 2   paragraph 39.  So in the last --- let's see, the

 3   sentence that says because these positive benefits are

 4   fostered in task involving environment, arbitrary

 5   exclusions can cause harm not only to the athletes who

 6   are excluded but also to the other athletes on the team.

 7   Can you tell me what harms it causes to other athletes

 8   on the team?

 9     A.    It could cause harm to athletes who aren't

10   allowed to have their --- their friends participate,

11   their friends who should be on the team, right, if ---

12   BPJ was not allowed to participate and her friends

13   really were looking forward to that being a part of the

14   sport, right.  The sport experience is to share that

15   together.  That could be harmful.  It is also just, you

16   know, it could be a missed opportunity to --- for kids

17   to learn and to grow and to become more familiar and to

18   become more accepting, right.

19     Q.    So if that's the case, couldn't the coach just

20   say to them I know you would like to have your friend on

21   the team, but that's not the way it works and help them

22   work through that, just as you told me the coach can

23   counsel kids who disagree with the decisions --- some

24   other decisions?

```
 1              ATTORNEY VEROFF:  Objection.

 2              THE WITNESS:  Okay.

 3              Definitely a coach could do that, but

 4   that doesn't change the fact that --- that it could be

 5   harmful in the sense that knowing that other people you

 6   care about and evaluate are being excluded in an unfair

 7   way.

 8   BY ATTORNEY TRYON:

 9      Q.    And that term, the unfair way, is something that

10   you said that you are not an expert on what's fair and

11   what's unfair, right?

12      A.    Right.  I said it's not a primary area of study,

13   right.

14      Q.    Yeah.  Well, I want to ask you a question.  I

15   think you're referring to the Plaintiff as PBJ, with

16   first letter being P.

17              Am I hearing you right?

18      A.    I didn't think so.  But it does --- but BPJ.

19   Sorry.

20      Q.    All right.  I want to make sure we're all saying

21   the correct initials.

22              VIDEOGRAPHER:  Excuse me, Counsel.  If I

23   could interrupt for a second.  If I could just ask the

24   witness to kind of sit up.  You're starting to slouch
```

```
 1   down and your head is getting cut off in the video.
 2   Thank you.
 3                    THE WITNESS:  All right.  Sorry about
 4   that.
 5   BY ATTORNEY TRYON:
 6      Q.    You're not saying that any West Virginia sports
 7   organization or educational education has adopted an
 8   ego-promoting philosophy, are you?
 9      A.    I'm not.
10      Q.    And you don't know of any coaches in West
11   Virginia that have either, right?
12                    ATTORNEY VEROFF:  Objection.
13                    THE WITNESS:  No.
14   BY ATTORNEY TRYON:
15      Q.    And a team can build a task oriented climate
16   with sports separated by sex, right?
17      A.    That's right.
18      Q.    Do you know if female teams are better at
19   building task oriented climates than boys teams or vice
20   versa?
21      A.    Yeah.  It's possible to build a strong task
22   involving caring climate in both teams with males and
23   females.  There may be a slight tendency across some
24   studies where those scores come out a little bit higher
```

1   for females than males, but it's not consistent, right,

2   but females sometimes really value that --- those social

3   aspects of the sport.  Not that males don't, but maybe a

4   slightly higher --- if we're looking at those bell

5   curves again, they would be really close, but it's

6   possible that for --- if we are looking at guys they

7   might come out a little bit higher on the ego aspects of

8   the climate and females the task.

9   BY ATTORNEY TRYON:

10     Q.    Can we look at paragraph 41 of your report,

11   please?

12     A.    Yes.

13     Q.    So you say the climate of youth sports must be

14   geared to include all participants, so that teams are

15   more likely to help every athlete maximize their

16   potential.  Now, the word must is a mandatory word,

17   right?

18     A.    Yeah.  I think it means must in the sense that

19   that's our aim, to maximize the potential of every

20   athlete.  If that's our aim, then it is pretty key to

21   creating that climate.

22     Q.    So who would be the --- what entity would be the

23   one to enforce that?

24              ATTORNEY VEROFF:  Objection.

1                THE WITNESS:  Right, I think it comes

2    down to a matter of administrators in sport leagues and

3    having a desire to provide coaching education, try to

4    help coaches understand this research and to help foster

5    caring and task involving climate.

6    BY ATTORNEY TRYON:

7        Q.    Are you suggesting there should be a statewide

8    or nation-wide rule on this?

9        A.    No.

10               ATTORNEY VEROFF:  Objection.

11               THE WITNESS:  No, I'm not suggesting.

12   I'm sorry, Julie.

13               ATTORNEY VEROFF:  That is quite okay.  Go

14   ahead.

15               THE WITNESS:  No, I'm not suggesting

16   that, although I would just note that Canada has a basic

17   coaching education for anyone who is going to work with

18   even very young athletes, right, and then they have

19   these different levels that people need to go through

20   this coaching education because they really value trying

21   to help create inclusive environments that help kids

22   focus on their effort and improvement and can be set up

23   in a way to bring out the best in any child.

24   BY ATTORNEY TRYON:

1    Q.    So what you said in Canada, they have this, who

2    has this?

3    A.    I believe it kind of trickled down from the

4    government, that they just said --- you know, in the

5    States, in the U.S., our model is if you have a

6    heartbeat, right, and you're willing, let's put you with

7    a team because we just want --- want to have as many

8    teams and neighborhoods where kids can participate.  But

9    in Canada they just set the bar higher and they said if

10   you're going to work with kids, we want you to have some

11   basic coaching education.  And so it's just a rule

12   across their sort of sporting government.

13   BY ATTORNEY TRYON:

14   Q.    You say sporting government.  Are you saying the

15   national government is doing this or some sporting

16   organization?  I don't know much --- anything about

17   Canada as far as that is concerned.

18   A.    Yeah.  You know, I would have to look at that

19   more closely.  Definitely their sporting organizations,

20   but I'm not sure that doesn't trickle down from some of

21   their government rules, but I won't say that for the

22   record.  For the record, I'll just say that they do

23   require any use for a coach to have a basic introduction

24   to coaching education, which would include some of these

1    concepts.

2       Q.    But you're not advocating that for the United

3    States, are you?

4       A.    No.

5       Q.    Okay.

6             Let's see, so my next question is you say so

7    that teams are more likely to help every athlete ---

8    I'm sorry, strike that.

9             Still that first clause.   The climate of youth

10   sport must be geared to include all participants.   So

11   who gets to participate?   When you say all participants

12   what do you mean by that?

13      A.    Hopefully, we have an avenue for all young

14   people to gain some exposure to youth sport, so all

15   athletes who want to.

16      Q.    Okay.

17            So in some sports and high school athletes and

18   in college you have tryouts.   And if you don't make the

19   tryouts, you don't make the team.

20            Right?

21      A.    That's right.

22      Q.    And do you think that's okay or do you think

23   that we should do away with tryouts and everybody should

24   be on the team if they want to be on the team?

1     ATTORNEY VEROFF:  Objection.

2     THE WITNESS: I think there is a lot of

3 benefits to looking at high school sports and including

4 as many athletes as we can.  But no, I wouldn't say that

5 I'm against all --- everywhere we should have a no cut

6 policy.  But I think it's valuable to look and say, hey,

7 are we including as many kids as we can.  Because the

8 evidence supports that kids feel more connected at

9 school, you know, their attendance is better.  There's a

10 lot pluses when kids get that opportunity to

11 participate.

12 BY ATTORNEY TRYON:

13  Q. Don't sports sometimes take kids away from their

14 academics?

15     ATTORNEY VEROFF:  Objection.

16     THE WITNESS:  They sometimes do for some

17 kids.

18 BY ATTORNEY TRYON:

19  Q. For a lot of kids, isn't it?

20  A. I'm not sure what the percentages are, but yeah,

21 some kids may be less focused on academics.

22  Q. And that is why a lot of schools actually have

23 rules on minimum academic scores that you are getting in

24 order to be on a team, right?

1    A.    Probably so, yes.

2    Q.    So going back to cutting kids off teams, that's

3    a thing where kids, if they don't perform at a certain

4    level, they're cut from the team or never allowed onto

5    the team, right?

6    A.    Right.

7    Q.    And so if somebody does better than you on that

8    team, then you are at a disadvantage, right?

9              ATTORNEY VEROFF:   Objection.

10   BY ATTORNEY TRYON:

11   Q.    If you are cut from the team?

12   A.    Yes.

13   Q.    Now, you say from an educational standpoint it

14   is optimal to encourage all athletes to do the best they

15   can and to help all athletes enjoy the sport they love,

16   right?

17   A.    Uh-huh (yes).   Yes.

18   Q.    So when you say from an educational perspective

19   let me just ask you --- do you feel like you are an

20   expert on education or teaching methodology?

21   A.    It depends.   When I say an educational

22   perspective I mean from the sports psychology

23   literature.   And you know, it's not what I study in ---

24   sorry, I'm just going to think for a second.

1    Q.    Take your time.  I want to get an accurate

2  answer from you.  I'm not trying to fool you or

3  anything.

4    A.    Thank you.  Yeah, I think this is building on

5  achievement goal perspective theory that just as we

6  should be helping all kids be the best that they can be,

7  right, and if we're not doing that, then we're more

8  likely setting it up to just focus on those kids who we

9  think are going to be the best and the highest

10  achievers, but to keep the focus on helping every

11  athlete, every student, be the best that they can be I

12  think is really a valuable aim.

13    Q.    Do you know how many schools in West Virginia

14  have sports programs?

15    A.    I do not.

16    Q.    Do you have any idea of what percentage of kids

17  are in athletic programs in West Virginia schools?

18    A.    I don't.

19    Q.    Do you know about in any of the universities in

20  West Virginia?

21    A.    No, I don't know.

22    Q.    Take a look at paragraph 42.  Read that.  I'm

23  not going to read it all out loud, but I do have some

24  questions for you about paragraph 42.

1      A.      Okay.  Okay.

2      Q.      As far as I can tell, this paragraph has nothing

3  to do with House Bill 3293, does it?

4                      ATTORNEY VEROFF:  Objection.

5                      THE WITNESS:  I think it takes a bigger

6  picture perspective of just the youth sport world, and

7  so what's true for parents, for this parent, Jim

8  Thompson, who had a child who experienced so much

9  negative, you know, interactions when he first signed up

10  for sport, that Jim Thompson was like, wow, this is

11  crazy, and he went on to start this organization to

12  provide coaching education for --- you know, for

13  coaches.  He has materials for parents, for officials,

14  but you know, reading it, it makes me think it would be

15  healthy for all of us to step back and just say, hey,

16  let's not get too, too over crazy about this, right.

17  And in the case of BPJ, right, how cool if we can let

18  her have the experience of running cross-country school

19  and wouldn't it be a shame if we just had a blanket

20  exclusion of kids based on their gender identity.

21  BY ATTORNEY TRYON:

22      Q.      Okay.

23              But what does that have to do with HB-3293?

24                      ATTORNEY VEROFF:  Objection.

1              THE WITNESS:  You know, it's probably

2    just a matter of how we interpret this, but if we --- if

3    we have legislators just making a blanket decision that

4    across our state no child in secondary education, no

5    athletes in universities who are transathletes can

6    participate, it feels like we are really doing a

7    disadvantage to those athletes and not allowing them to

8    participate and reap the benefits.  And I think Jim

9    Thompson here is just saying there is just so many

10   benefits and what if we were all united and saying how

11   can we come in and just make sport be all it can be.

12   Parents play a big role in that, but they're definitely

13   not the only party that does.

14   BY ATTORNEY TRYON:

15      Q.   Is it your position then that a child or youth,

16   a young adult should be allowed to participate on

17   whatever team that child identifies as being a gender

18   associated with that team?  That wasn't very artfully

19   said, so let me try again.  Is it your position that any

20   child that identifies as a girl should be allowed to

21   participate on a girls team or women's team as the case

22   may be?

23              ATTORNEY VEROFF:  Objection.

24              THE WITNESS:  It's my position that when

1    I look at the sport organizations across this country

2    and internationally that sport leaders are recognizing

3    that we want to balance fairness with inclusion and that

4    there has been success in that already and that that is

5    something that we can do and that we don't have to just

6    exclude all trans athletes from participating in sport.

7    BY ATTORNEY TRYON:

8        Q.    So you have not answered my question directly.

9    Is that because you don't want to or because you don't

10   feel like you can?

11               ATTORNEY VEROFF:  Objection.

12               THE WITNESS:  I feel like it's more

13   complex than what you're mapping it out.  When we talk

14   about transathletes and their gender identity and

15   whether they may be transitioning and all these other

16   factors, it's just a bigger picture than saying any male

17   should be able to decide at any moment I want to compete

18   as a female.  No, we have to have guidelines in place

19   that are fair and inclusive.

20   BY ATTORNEY TRYON:

21       Q.    So if we just narrowed down the statute somewhat

22   to imply with your views on that, then you think it

23   would be okay to exclude some transgenders ---

24   transgender girls from competing on girls teams but not

1   all?

2                    ATTORNEY VEROFF:   Objection.

3   BY ATTORNEY TRYON:

4       Q.    Is that right?

5       A.    Right.  I think that's what's happening right

6   now, right, there are like criteria within the NCAA, for

7   example, and athletes have meet that criteria to

8   participate as a transgender female.

9       Q.    And so a statute that did that you would find

10  okay?

11                   ATTORNEY VEROFF:   Objection.

12                   THE WITNESS:   I believe sport

13  organizations and leaders are going to be able to find a

14  way to balance inclusion and fairness, and what that may

15  look like across sports or different levels, yeah, I'm

16  not an expert on that and couldn't outline all that for

17  you right now.  I could just say it makes me sad when

18  athletes are excluded and not given a chance to reap all

19  these amazing benefits from being a part of sport.

20  BY ATTORNEY TRYON:

21      Q.    I hear you, but I still want to know if you

22  believe that there's a place for the State to pass laws

23  to regulate that?

24                   ATTORNEY VEROFF:   Objection.

1          THE WITNESS:  Yeah, I don't think the

2    State legislators in my view are the best position.  I

3    feel like the sport organizations and sport leaders and

4    people really invested and knowledgeable and involved in

5    the sports at different levels should be making these

6    calls.

7    BY ATTORNEY TRYON:

8       Q.    So you don't believe that the State should pass

9    any law whatsoever regulating participation of

10   transgender girls in girls sports?

11          ATTORNEY VEROFF:  Objection.

12          THE WITNESS:  Yeah, I'm not speaking to

13   every possible law that could ever be invented, but with

14   regard to this House Bill, right, I think it's

15   unfortunate to have just a blanket exclusion for

16   transathletes, for transfemales.

17   BY ATTORNEY TRYON:

18      Q.    Fair enough.  What about maybe a --- well, let

19   me just ask this question.  When kids are competing, is

20   it their identity that's competing or is it their body

21   that's competing?

22          ATTORNEY VEROFF:  Objection.

23          THE WITNESS:  I'm sorry.  I wouldn't even

24   know where to begin to address that question or what

1    even ---.

2    BY ATTORNEY TRYON:

3        Q.    Let me see, you're not an expert on puberty

4    blockers therapy for boys or young men who want to be on

5    the girls teams, right?

6        A.    I am not.

7        Q.    And you're not an expert on testosterone

8    suppression for boys or young men who wanted to be on a

9    girls team, right?

10       A.    That is correct.

11       Q.    And you are not an expert on hormone therapy for

12   boys or young men who want to compete on girls teams,

13   right?

14       A.    That's correct.

15       Q.    Let's take a look at Exhibit-11.

16                   ATTORNEY TRYON:  Jake, if you could bring

17   that up.  Excuse me, Exhibit-9.  I beg your pardon.  I

18   have to relabel some of these.

19                            ---

20                   (Whereupon, Exhibit 9, Article on Lia

21                   Thomas, was marked for identification.)

22                            ---

23   BY ATTORNEY TRYON:

24       Q.    So I'm sure you expected that I was going to ask

1    you some questions about Lia Thomas, didn't you?

2       A.    I didn't know what to expect, honestly.

3                   ATTORNEY VEROFF:  Objection.

4                   THE WITNESS:  I didn't know what to

5    expect.

6    BY ATTORNEY TRYON:

7       Q.    Of course, the whole issue with Lia Thomas has

8    been in the news a lot, and so I want to ask you about

9    --- this is an article in Fox News.  It says Penn

10   Swimmer Slams School's Handling of Lia Thomas Saga.

11   They Don't Actually Care about Women at All.  So have

12   you seen this article?

13      A.    No.

14      Q.    But you are aware of the Lia Thomas what I will

15   call controversy, right?

16      A.    Yes.

17      Q.    So the first paragraph says a swimmer on

18   University of Pennsylvania Women's team says she feels

19   the school's decision to allow transgender swimmer Lia

20   Thomas to compete has created an unfair balance within a

21   sport that prioritizes Thomas's rights over that of

22   biological female student athletes.  A student who spoke

23   to Fox New Digital on the condition of anonymity out of

24   fear of retribution said she was hopeful after learning

1  the NCAA's decision last week to update its policies of

2  allowing transgender girls to compete based on hormone

3  levels.  And then skipping down it says stuff like that,

4  it's not just the difference between two girls and how

5  one may have slightly larger lungs that gives them a

6  slight advantage.  These are monumental advantages that

7  biological males just develop through puberty and it's

8  not something that a year of hormone treatments, in

9  brackets, can suppress because they still have all the

10  muscle mass that they had for the last 20 years, closed

11  quote.  Do you believe that this swimmer is justified in

12  her feelings about this being unfair?

13              ATTORNEY VEROFF:  Objection.

14              THE WITNESS:  I believe this swimmer has

15  the right to her opinion, for sure.

16  BY ATTORNEY TRYON:

17     Q.    Do you agree that it was unfair for Lia Thomas

18  to compete with the girls on the team?

19              ATTORNEY VEROFF:  Objection.

20              THE WITNESS: The NCAA has set these

21  standards in place and Lia Thomas followed everything,

22  she has followed the rules and so it's really

23  unfortunate to see how much hate and lack of respect and

24  lack of kindness has been thrown her way.  It's just

1  really hard stuff.  I understand that athletes --- this

2  is new and I think each sport will be just looking at

3  the criteria they use and so, you know, they may tweak

4  some things along the way.  But I don't think we can

5  take it out on Lia Thomas who has done everything that

6  has been asked of her.

7  BY ATTORNEY TRYON:

8    Q.    Is there anything that you are aware of --- this

9  swimmer doesn't say I hate Lia Thomas.  You just started

10  out talking about hate.  Where do you get that from?

11                      ATTORNEY VEROFF:  Objection.

12                      THE WITNESS:  From everything coming from

13  social media.  And so she fears retribution and wants to

14  stay anonymous.  Lia Thomas I feel has a lot of courage

15  to put herself out there knowing that there is going to

16  be a lot of people unhappy and a lot of pushback and,

17  you know, kind of couple of things that she says is just

18  referring to be who she is, ready to compete.  And so

19  I'm acknowledging this is a really difficult situation,

20  right, for swimmers, for her teammates, but I think in

21  this case we have to wait to see what the NCAA and what

22  the USA Swim group decides to do and what they decide is

23  fair.  And they have ongoing studies about how to be

24  inclusive and yet fair, and I'm confident that we can

1  keep pursuing that and there may be a learning curve for

2  us, right, or it may be that this is determined with

3  data over time that this is exactly what the criteria

4  needs to be.

5  BY ATTORNEY TRYON:

6      Q.    So let's turn to the third page underneath that

7  picture, it says --- keep going down. I'm sorry. More

8  please, below the next picture. There we go. And right

9  --- so the paragraph, it says they are just proving,

10  once again, that they don't actually care about women

11  athletes, the swimmer said of the University of

12  Pennsylvania. They said they care and that they're here

13  for our emotions, but why do we have to be gracious

14  losers? Who are you you to tell me that I shouldn't

15  want to win because I do want to win. I'm swimming.

16  I'm dedicating more than 20 hours a week to the sport.

17  And obviously I want to win. You can't just tell me

18  that I should be happy with second place. I'm not. And

19  these people in Penn's administrative department who

20  just think that women should just roll over, it's

21  disturbing and it's reminiscent of the 1970s when the

22  are fighting for Title 9 and stuff like that. They

23  don't actually care about women at all. What would you

24  say to this swimmer?

1          <u>ATTORNEY VEROFF</u>:  Objection.

2          <u>THE WITNESS</u>:  I'd say I just recognize

3    that you're really frustrated with this and you don't

4    agree with it and that we --- well, I think, you know

5    when stuff is new and we don't have a lot of experience

6    or exposure to it, you know, that is really hard.  I

7    just reflect back to my first semester at college and I

8    was just having lunch at a long table with lots of

9    women, and my roommate told me afterwards that every

10   person that we had lunch with, which was a lot, that

11   they were all gay.  And I had no idea, never --- I grew

12   up in Texas, never talked to anybody, never knew anybody

13   that I knew was gay, was probably just naive.

14          And so down the road now, some people

15   that I'm closest to and love in the world are gay and it

16   is not anything that I give any thought to.  It's like,

17   you know, crazy that is what happens over time.  And I

18   see the same thing happening with transgender athletes.

19   We're just going to --- who would want to have the

20   courage to come out and just put your lives out there

21   and your family and do everything that they have to do,

22   too, and so I think we'll all just grow and we'll learn

23   more about what this experience is and we'll be able to

24   see, right, that here is just another athlete like me.

1   We have more in common than we don't.  And I think over

2   time a lot of views will change and we'll just keep

3   working on trying to be as fair as we can on what the

4   criteria should be.  But with this athlete I would say

5   nothing changes for you.  What you are trying to do is

6   be the absolute very best that you can be, right, and so

7   let's keep working hard, let's keep seeing what you can

8   do.  In swimming, that's a nice sport to just be able to

9   stay focused on your time and your performance and

10  proving your technique.

11  BY ATTORNEY TRYON:

12     Q.    And so you are saying that this girl should be a

13  gracious loser, period, right?

14                ATTORNEY VEROFF:  Objection.

15                THE WITNESS:  No.  I'm saying if that

16  suggests that every transgender female that ever

17  competes in sports is going to be every female, right,

18  and that's just crazy, so --- and you know, I'm not

19  following it that closely, but Lia Thomas has lost races

20  as well.  So just to say that she is here.

21  BY ATTORNEY TRYON:

22     Q.    Right.

23     A.    And I'm just a big loser for now because I can

24  never, you know, beat her, no, you just go out there and

1    compete because that's what sports is about.

2         Q.    And that --- sorry, go ahead.  I thought you

3    were finished.

4         A.    Sorry.  It's just out of, you know, some of

5    these rules are things that are just out of her control

6    so she needs to stay focused on what she can focus on.

7         Q.    Is it your view that these girls that are

8    objecting to Lia Thomas being on the team are doing it

9    because they hate Lia Thomas?

10                   ATTORNEY VEROFF:  Objection.

11                   THE WITNESS:  No, no, I don't know any of

12   these athletes.

13   BY ATTORNEY TRYON:

14        Q.    Let me ask you to take a look at Exhibit-11.

15   Let me know when you have it.

16        A.    Okay, I have it.

17        Q.    This is the opening paragraph and this says

18   Virginia Tech, fifth year Reka Gyorgy has released a

19   letter to NCAA addressing her opinion on the

20   organization's controversial transgender policy which

21   allowed Penn fifth year Lia Thomas to compete at the

22   NCAA championships last week.  And if we can turn to the

23   page we can see the actual letter written by this

24   swimmer.  It is in italics.  And let me start with the

1    second paragraph.  My name is Reka Gyorgy of Hungary.  I

2    am a 2016 Rio Olympian, represented Virginia Tech for

3    the past five years, a two-time ACC champion, two time

4    all-American and three-time honorable mention

5    all-American.  And then skipping down one paragraph she

6    says, Micka, if I'm saying her name right, says I'm

7    writing this letter right now in hopes that the NCAA

8    will open their eyes and change these rules in the

9    future.  It doesn't promote our sport in a good way and

10   I think it's disrespectful against the biologically

11   female swimmers who are competing in the NCAA.

12            And then I want to skip down --- well, let's

13   just continue on the next paragraph.  I don't want to

14   skip too much.  I swam the 500 free at NCAA on

15   March 17th, 2022, where I got 17th which means I didn't

16   make it back to the finals and first alternate.  I am a

17   fifth-year senior.  I have been top 16 and top 8 and I

18   know how much a privilege it is to make finals at a big

19   --- at a meet this big.  This is my last college meet

20   ever and I feel frustrated.  It feels like that final

21   spot was taken away from me because of the NCAA's

22   decision to let someone who is not a biological female

23   compete.  I know you can say I had the opportunity to

24   swim faster, make the top 16, but this situation makes

1    it a bit different and I can't help but be angry or sad.

2    It hurts me, my team and other women in the pool.  One

3    spot was taken away from a girl that got 9th in the 500

4    free and didn't make it back to the A final, preventing

5    her from being an all-American.  Every event that

6    transgender athletes competed in was one spot taken away

7    from biological females throughout the meet.  Do you

8    disagree with Reka Gyorgy?

9                     ATTORNEY VEROFF:  Objection.

10                    THE WITNESS:  I recognize that she is

11   very frustrated and feels that this decision wasn't

12   fair.  You know, if we're looking at a bigger picture I

13   think sport organizations at the Olympic level,

14   international level, national level, are all invested in

15   keeping this value of inclusion, right, and trying to

16   balance that with fairness, and so I think it's

17   something these organizations are really going to keep

18   working on and that ---.

19   BY ATTORNEY TRYON:

20       Q.    Sorry.  Go ahead.

21       A.    And that they are going to be able to find a

22   good spot that is somewhere --- somewhere in a place

23   that can be respectful, be it transfemale athletes and

24   also the female athletes on these teams.

1      Q.    So you talk about a good spot.  You don't know

2  what that good spot is.

3           Is that right?

4                ATTORNEY VEROFF:   Objection.

5                THE WITNESS:   No, I don't --- sorry,

6  Julie, but I'm confident that there are many people

7  looking --- spending a lot of time and trying to figure

8  out how to answer some of these questions.  In response

9  to this athlete, she's probably knocked out a lot of

10  other female athletes because maybe she had more

11  advantages along the way, right.  Maybe her parents were

12  able to put her in good programs or good coaching and

13  things like that.  So you know, it's just never like a

14  --- we like to just think what a sweet, perfect world it

15  is where everyone has the same opportunities and, you

16  know, there's just a lot that's not fair out there,

17  right, across for athletes, but I think we do the best

18  we can, which is what the NCAA has tried to do at this

19  point.  And like I said, things may be changing, yeah,

20  but then --- but just to go back to the other side, for

21  the answer to be a blanket exclusion of all transgender

22  athletes at every level is not helping us move forward.

23  BY ATTORNEY TRYON:

24      Q.    But you think even Lia Thomas should have been

1    allowed to participate in this swim meet, right?

2              ATTORNEY VEROFF:  Objection.

3              THE WITNESS:  Yeah, I don't think it

4    matters what I think because I'm just not that emersed

5    in the sport to know everything.  So whether it's ten

6    whatever it is nanomols per liter or whether, you know,

7    that's going to change, I don't know, but I think she

8    --- I respect her, she did everything the sport has

9    asked her to do.  And she says she gets in the pool

10   every day and gives it her best effort.  And those are

11   the kind of teammates I like to have, right, that are

12   that way.  So I think everybody can --- her teammates

13   can look at this as maybe they can make each other

14   better and grow as human beings and make the world

15   better.

16   BY ATTORNEY TRYON:

17      Q.    So again you think Lia Thomas's teammates should

18   just knuckle under and be happy about it and be

19   complete, is that right?

20              ATTORNEY VEROFF:  Objection.

21              THE WITNESS:  I feel sympathy and empathy

22   for so many athletes that are dealing with difficult

23   challenges, right, including these athletes, right, and

24   I just acknowledge, yeah, it must be tough, right,

1  you've just been doing your thing in your sport for a

2  long time and then you happen to be at the center stage

3  of some of this taking place, but, you know, it's just a

4  lot of challenges that athletes are dealing with on many

5  levels and so I don't think they are unique in, you

6  know, it's not like they are the only athletes that have

7  challenges to deal with.

8  BY ATTORNEY TRYON:

9      Q.    Do you think that --- are you equating the fact

10  that this swimmer might have had some advantages in her

11  life to the fact that Lia Thomas had been --- had gone

12  through puberty and was maybe as much as a foot taller

13  than the other swimmers, those are just the same thing?

14      A.    No.

15                ATTORNEY VEROFF:  Objection.

16                THE WITNESS:  I'm sorry.  I'm not

17  equating those.  I'm just simply saying what I feel as

18  the truth, that not everybody out there has all the same

19  opportunities, right, and access and great coaching and

20  facilities and everything else.  So I think the NCAA is

21  trying to do the best that they can and everybody is

22  learning, right, so ---.

23  BY ATTORNEY TRYON:

24      Q.    One of the things that we are learning that

```
 1  these other girls, biological girls, are feeling very

 2  marginalized.  Does that count for anything?

 3                  ATTORNEY VEROFF:  Objection.

 4                  THE WITNESS:  I think there is a lot that

 5  our field of sports psychology can offer here in terms

 6  of helping people work through these things.  But I

 7  would just go back to if we think the answer is to

 8  exclude all transgender female athletes from competing,

 9  then that's not right, and so we're going to have to

10  maneuver this, we are all going to have to be involved

11  in helping figure out how to move forward.

12  BY ATTORNEY TRYON:

13     Q.    Let me just be clear, HB-3293 does not exclude

14  any athletes from competing in sports, does it?

15                  ATTORNEY VEROFF:  Objection.

16                  THE WITNESS:  Okay.

17                  From my perception it does because BPJ is

18  a female and wants to compete with her female peers.

19  BY ATTORNEY TRYON:

20     Q.    Okay.

21     A.    So I don't see that as a good option for her to

22  compete with the males.

23     Q.    What about Lia Thomas?  I mean, Lia Thomas looks

24  like a male?
```

1            ATTORNEY VEROFF:  Objection.

2    BY ATTORNEY TRYON:

3      Q.    And couldn't he compete on the male team as he

4    had been for years and then the coach on that team

5    simply say, yeah, Lia Thomas now goes by she, but Lia

6    Thomas is going to compete on the boys teams and you

7    guys just need to respect that?

8            ATTORNEY VEROFF:  Objection.

9            THE WITNESS:  As a cisgender female it's

10   hard to fathom that you wake up and you just feel like

11   you are in the wrong body, right.  And the more I've

12   read over the years and the more I've heard people share

13   their stories, it must just be excruciatingly painful to

14   go through life and feel like that's your situation, and

15   so ---.

16   BY ATTORNEY TRYON:

17     Q.    Right.  And nobody is disagreeing with that,

18   nobody is contesting that, just the question --- the

19   right question is what's fair to everyone, not just to

20   the transgender person, but also to the biological

21   girls.

22           Isn't that the question?

23           ATTORNEY VEROFF:  Objection.

24           THE WITNESS:  Right.  I think the

```
 1   question is how do we balance that inclusion and

 2   fairness.

 3   BY ATTORNEY TRYON:

 4     Q.    I'm almost finished.  I'm going to read you a

 5   series of statements and please tell me if you agree or

 6   disagree.  Either one is fine.  I just want to

 7   understand your position.  Or you may say I don't know.

 8   That's fine too.  The first statement, there are

 9   physiological differences between natal males and natal

10   females.

11              ATTORNEY VEROFF:  Objection.  Apologies,

12   objection.

13              THE WITNESS:  True.

14              ATTORNEY VEROFF:  Sorry to --- Mr. Tryon,

15   are these your documents or are these statements coming

16   from a  document somewhere.

17              ATTORNEY TRYON:  No, these are my

18   statements.

19              ATTORNEY VEROFF:  Thank you for the

20   clarification.

21   BY ATTORNEY TRYON:

22     Q.    Second, there are physiological difference in

23   natal males and natal females that result in males

24   having a significant performance advantage over
```

```
 1    similarly gifted age and trained females in nearly all
 2    athletic events after puberty?
 3                    ATTORNEY VEROFF:  Objection.
 4    BY ATTORNEY TRYON:
 5        Q.    Agree or disagree?
 6                    ATTORNEY VEROFF:  Objection.
 7                    THE WITNESS:  I think there is exceptions
 8    to this, but as a general rule that is true.
 9    BY ATTORNEY TRYON:
10        Q.    Number three, there are physiological
11    differences between males and females that result in
12    males having a significant performance advantage over
13    similarly gifted aged and trained females in nearly all
14    athletic events during puberty as opposed to after
15    puberty.  Do you agree or disagree?
16                    ATTORNEY VEROFF:  Objection.
17                    THE WITNESS:  Yeah, I think it --- I
18    think that statement somewhat depends on what we define
19    as significant.
20    BY ATTORNEY TRYON:
21        Q.    Fair enough.  Four, there are physiological
22    differences between males and females that result in
23    males having a significant performance advantage over
24    similarly gifted aged and trained females in all
```

1    athletic events before puberty?

2                    ATTORNEY VEROFF:  Objection.

3                    THE WITNESS: Disagree.

4    BY ATTORNEY TRYON:

5        Q.    Okay.

6              Number five, there is not scientific evidence

7    that any amount or duration of cross sex hormone

8    therapy, puberty blockers, androgen inhibitors or cross

9    sex hormones, eliminates all physiological advantages

10   that result in males performing better than females in

11   nearly all athletic events?

12                   ATTORNEY VEROFF:  Objection.

13                   THE WITNESS: Okay.

14             And I'm just going to say that is beyond

15   my expertise and knowledge of that literature.

16   BY ATTORNEY TRYON:

17       Q.    Males who have recently --- excuse me, males who

18   have received such therapy retain sufficient male

19   physiological traits that enhance athletic performance

20   vis-à-vis similarly aged females from a physiological

21   perspective more accurately characterized as male ---

22   agree or disagree?

23                   COURT REPORTER:  I'm sorry, Counsel.  Can

24   you restate that question?  I missed it.

1                    ATTORNEY TRYON:  Sure.

2    BY ATTORNEY TRYON:

3        Q.    Males who have received such therapy that I

4    mentioned in question number five retain sufficient male

5    physiological traits that enhance athletic performance

6    vis-a-vis similarly aged females and are thus from a

7    physiological perspective more accurately characterized

8    as male and not female?

9                    ATTORNEY VEROFF:  Objection.

10                   THE WITNESS:  Again, I would say that

11   exceeds my expertise.

12                   ATTORNEY TRYON:  Fair enough.  Let me go

13   off the record for just a few minutes.  I think I've

14   covered everything, but I just want to make sure, and

15   then I will turn the time over to my co-Defendants if

16   they have any questions.  So just give me five minutes

17   to go off the record.  Is that all right with everyone?

18                   ATTORNEY VEROFF:  Thank you.

19                   THE WITNESS:  Yes.

20                   VIDEOGRAPHER:  Going off the record.  The

21   time reads 4:45 p.m. Eastern Standard Time.

22   OFF VIDEOTAPE

23                            ---

24   (WHEREUPON, A SHORT BREAK WAS TAKEN.)

1                        ---

2    ON VIDEOTAPE

3                    VIDEOGRAPHER:  We are back on the record.

4    The current time is 4:53 p.m. Eastern Standard Time.

5                    ATTORNEY VEROFF:  Excellent.  Thank you.

6    Mr. Tryon, in our last exchange with Professor Fry you

7    read a series of statements and I asked you if these

8    statements were coming from any documents.  You said,

9    no, these are my statements.  And I just want to put on

10   the record that it appears that in some of those

11   statements you were reading from portions of the report

12   of Doctor Brown, one of Defendant's expert witnesses.

13                   ATTORNEY TRYON:  Well, in response, they

14   were generated from that, but they are not his

15   statements precisely, so --- and I think that I

16   represented that correctly if you are suggesting that I

17   misrepresented it.

18                   ATTORNEY VEROFF:  Thank you.

19                   ATTORNEY TRYON:  More over I don't think

20   I need to reference the source of my questions, but I

21   appreciate your statement.

22                   ATTORNEY VEROFF:  Thank you.  I was just

23   clarifying, I thought that the answer that you gave

24   earlier was your statements and was inaccurate, and so I

```
 1   just wanted to clarify that for the record.
 2                   ATTORNEY TRYON:  Well, I believe it to be
 3   accurate, but we'll agree to disagree perhaps.
 4   BY ATTORNEY TRYON:
 5      Q.    So back to my questions, Professor Fry, it seems
 6   that you have a specific view about transgender girls or
 7   women participating on girls or women's teams.
 8            Is that a fair statement?
 9                   ATTORNEY VEROFF:  Objection.
10                   THE WITNESS: Can you be more specific?
11   BY ATTORNEY TRYON:
12      Q.    So you indicated numerous times of your belief,
13   generally, that trans --- that males who identify as
14   females should be allowed to participate on girls teams.
15        Right?
16                   ATTORNEY VEROFF:  Objection.
17                   THE WITNESS:  Again, I've stated that I'm
18   opposed to having a blanket exclusion policy for all
19   transfemale athletes.
20   BY ATTORNEY TRYON:
21      Q.    When did you arrive at that position?
22      A.    I'm not sure.
23      Q.    Was it sometime in the past two years or
24   somewhere before then?
```

1      A.      I'd say before then, but I'm not sure.

2      Q.      Okay.

3              Do you have any idea at all what timeframe?

4                      ATTORNEY VEROFF:  Objection.  Asked and

5      answered.

6                      THE WITNESS:  I'm really not sure.  You

7      know, things just kind of blur over time.

8      BY ATTORNEY TRYON:

9      Q.      Sure.

10     A.      But I'm a fan of trying to let athletes

11     participate.  So I'm not sure.  I definitely learned

12     more over the last few years and may come from a more

13     knowledgeable position but I think it's one I felt for

14     sometime.

15     Q.      For more than ten years?

16                     ATTORNEY VEROFF:  Objection.

17                     THE WITNESS:  You know, it's just hard to

18     say.  I don't remember this being part of the

19     conversation so much ten years ago, so if someone had

20     asked, yeah, I'm really not sure how to put a timeframe

21     on it.

22     BY ATTORNEY TRYON:

23     Q.      Do you know when the first time is you heard of

24     the idea of transgender women participating or

1    transgender females participating on girls sports?

2        A.     Again, I don't know.  You know, I've been

3    attending sports psychology conferences for the last

4    30 years, and I don't remember the first time I sat in

5    on a session, or you know, began to learn more.

6        Q.     Okay.

7        A.     I really don't.

8        Q.     Very good.  What's the total compensation that

9    you received or that you've charged for in this case so

10   far?

11       A.     In this case?

12       Q.     Yes, in this case.

13       A.     Yeah, I haven't turned in a bill, so I haven't

14   received anything.

15       Q.     So how much have you incurred so far as fees in

16   this case?

17       A.     Yeah, I've --- I think it's in the ballpark of

18   eight to ten hours probably prior to today.

19       Q.     And what is your hourly rate?

20       A.     $250.

21       Q.     And how about in the other three cases combined,

22   how much have you --- how many hours have you expended?

23       A.     Probably eight to ten hours for the Connecticut

24   and Idaho cases together.

1    Q.    And Florida?

2    A.    In Florida, four.

3    Q.    So when you first ---?

4    A.    Sorry.

5    Q.    Sorry, go ahead.

6    A.    Four to six, and I billed for four, though, so I

7    received a thousand for Florida --- in the Florida case.

8    Q.    Do I understand correctly then that the first

9    report that you did was for Connecticut?

10    A.    We started that one and then there was ---

11    that's when COVID hit and the season was on hold.    I

12    would have to go back and look.    But I think the first

13    one that was filed ended up being Idaho even though we

14    started on Connecticut --- or I was part of the

15    Connecticut one.

16    Q.    And you believe you are able to put this whole

17    report together in eight to ten hours for Connecticut?

18                ATTORNEY VEROFF:    Objection.

19                THE WITNESS:    Yes.

20    BY ATTORNEY TRYON:

21    Q.    And your billing rate is the same for all of

22    them?

23    A.    That's correct.

24                ATTORNEY TRYON:    I don't have any further

1    questions.  And so thank you for your time.  It is

2    always stressful and so I appreciate it.  I recognize

3    that it was stressful and that I do appreciate your

4    patience and your time.  Thanks?

5                    THE WITNESS:  Thank you.  Thanks very

6    much.

7                    ATTORNEY SCRUGGS:  I guess I will jump in

8    since none of the other Defendants want to.

9                    ATTORNEY TRYON:  Go ahead.

10                   ATTORNEY SCRUGGS:  Okay.

11                           ---

12                        EXAMINATION

13                           ---

14   BY ATTORNEY SCRUGGS:

15       Q.    Hello, Doctor Fry.  How are you doing?  Can you

16   hear me okay?

17       A.    I can.  Doing well.  Thank you.

18       Q.    So my name is Johnathan Scruggs.  I'm an

19   attorney for the intervening Defendant, Lainey

20   Armistead, in this case.  So I'm just going to ask you a

21   few questions.  The good news is I won't ask many

22   questions as the prior testimony, and I can't since we

23   are limited in time.  So I will try to go quick.  But

24   the most important question actually I have for you is

1    what is your favorite barbecue place in Memphis?  That's

2    the real question.

3         A.    I guess I'd have to go with the Rendezvous.  My

4    husband and I had our first date there.  That was kind

5    of special.

6         Q.    Well, I'm from there originally, so that's why I

7    asked.

8         A.    Where are you from?

9         Q.    I'm from Memphis, the Memphis area originally.

10        A.    Okay.

11        Q.    I'm more partial to central barbecue places, but

12   they're all good.  So anyway, I want to turn a little

13   bit to paragraph 38 of your expert report.  It is

14   Exhibit 2 there.  And I want to turn you more toward the

15   end of that paragraph where it says when athletes are

16   excluded from participating in the sport or in a climate

17   where they do not feel accepted or respected, they do

18   not have the opportunity to reap these benefits.  Now,

19   what benefits are you talking about there?

20        A.    The benefits of participating in sport and to

21   --- yeah, sorry, let me read this one more time, this

22   paragraph, please.

23        Q.    Absolutely.

24        A.    Yeah, so I was referring to the benefits

```
 1    highlighted throughout this statement that come from

 2    having a chance to participate in a really positive

 3    climate.  But in this particular paragraph saying that

 4    there's some advantages to females who are able to

 5    participate, right, and might be more likely to go on to

 6    college and those things.

 7       Q.    Let's just talk generally real quick.  Can you

 8    outline, kind of, just as general benefit beyond that

 9    one specific one you mentioned?

10                   ATTORNEY VEROFF:  Objection.  Asked and

11    answered.

12    BY ATTORNEY SCRUGGS:

13       Q.    You can answer the question.

14       A.    Okay.  Well, throughout the statement these

15    benefits of being able to participate in sport, you

16    know, in a caring climate that, you know, people can

17    have fun, can have good experiences and good

18    relationships with coaches and athletes.  They can have

19    --- just reap the physical benefits of being in better

20    health and --- both psychologically and physically.

21    They can express greater empathy for others, and you

22    know, better sportspersonship, right, really evaluate

23    being a respectful competitor and things like that.

24       Q.    Now, in your last sentence in paragraph 38, you
```

```
 1    don't have a timeframe mentioned in terms of when

 2    athletes are excluded from participating in sports they

 3    don't have the opportunity to reap these benefits.  Do

 4    you mean when they don't have an opportunity for a

 5    substantial period of time or any type of loss of

 6    participation for any period of time?

 7        A.    So when athletes are excluded from sport --- I'm

 8    not sure I'm following you, but if they were excluded

 9    for a day or two, are you saying would that be a big

10    deal or are they excluded for a whole season or

11    they ---?

12        Q.    Sure.  Sure.  I'm just wondering if you can put

13    that in a timeframe?

14        A.    No, but I would grant that if they're excluded

15    for a day or something like that, we wouldn't be here

16    talking about it probably, but yeah, on a bigger scale.

17        Q.    But you would agree that if students were

18    excluded from participating in high school sports for

19    four years, they would miss out on the opportunities for

20    participating in youth sports?

21        A.    Yes.

22        Q.    And I assume the same is for a year.

23              Correct?

24        A.    Yes.
```

1    Q.    Let's say there's a policy as far as males with

2   female gender identities to undergo testosterone

3   suppression for a year before they can participate on

4   the girl's team, would that policy force at least some

5   athletes to miss out on some opportunities associated

6   with youth sports?

7                    ATTORNEY VEROFF:  Objection.

8                    THE WITNESS:  It could.

9   BY ATTORNEY SCRUGGS:

10    Q.    Well, could you envision where it wouldn't?

11                    ATTORNEY VEROFF:  Objection.

12                    THE WITNESS:  I'm just thinking they

13   might have other options or could play on a co-gender

14   team that's maybe not part of their school, what they

15   really wanted to do was on their school, but there could

16   be another possibility.

17   BY ATTORNEY SCRUGGS:

18    Q.    Yeah, so being a situation where they only

19   wanted to be on their school and had to undergo

20   testosterone suppression for a year to do so, they would

21   lose out on those benefits for that year.

22         Correct?

23                    ATTORNEY VEROFF:  Objection.

24                    THE WITNESS: Uh-huh (yes).

1   BY ATTORNEY SCRUGGS:

2      Q.    Now, earlier we discussed HB-3293 the law that

3   is at issue in the case.  Now, I don't want to retread a

4   lot of old ground, but I just want to put it in your

5   words.  So what is the problem, in your opinion, with

6   this law?

7                  ATTORNEY VEROFF:  Objection as to scope.

8                  THE WITNESS:  I think it's --- you know,

9   provides a blanket of exclusion of transgender female

10  athletes from participating in the secondary and college

11  level, and that is unfortunate and harmful.

12  BY ATTORNEY SCRUGGS:

13     Q.    Ma'am, I'm sorry your answer broke up there.  I

14  think my internet connection was a bit faulty.  Can I

15  ask the court reporter to read back that answer?

16                       ---

17  (WHEREUPON, COURT REPORTER READS BACK PREVIOUS ANSWER)

18                       ---

19  BY ATTORNEY SCRUGGS:

20     Q.    And how harmful exactly?

21                  ATTORNEY VEROFF:  Objection.

22                  THE WITNESS:  It is harmful, because I

23  think what school districts are trying to do is help

24  every child reach their own potential and bring out

```
1    their best and but we have these activities available
2    but we are telling a particular group of kids that you
3    can't participate in these activities and these maybe
4    very important to them and be extremely valuable part of
5    their educational experience through the secondary
6    schools.
7    BY ATTORNEY SCRUGGS:
8       Q.    Got it.  Got it.  And now earlier in your
9    testimony you mentioned you didn't think it's a problem
10   if a male --- that would be a male that was excluded
11   from, for example, the women's girl track team.
12             Do you remember that?
13                   ATTORNEY VEROFF:  Objection.
14                   THE WITNESS:  I'm sorry, did you say a
15   male who identifies as a male?
16   BY ATTORNEY SCRUGGS:
17      Q.    Yes, yes.  From the women's sports team?
18      A.    Right.  The team for the females is for the
19   females, right, so I would agree.
20      Q.    So you don't think HB-3293 is not problematic in
21   that situation?
22                   ATTORNEY VEROFF:  Objection.
23                   THE WITNESS: Right.
24   BY ATTORNEY SCRUGGS:
```

1    Q.   And that's true even if that male loses out on

2 an opportunity from participating on the girl's track

3 team?

4                ATTORNEY VEROFF:  Objection.

5                THE WITNESS:  Right.  Right.  But they're

6 identifying as a male and can perform on a --- can

7 participate on the male's team.

8 BY ATTORNEY SCRUGGS:

9    Q.   So they can participate on the male's team and

10 that is why they talk about it?

11               ATTORNEY VEROFF:  Objection.

12               THE WITNESS: Right.

13 BY ATTORNEY SCRUGGS:

14    Q.   What if that male athlete is not fast enough to

15 run on the male team?

16               ATTORNEY VEROFF:  Objection.

17               THE WITNESS:  In say cross-country

18 or ---?

19 BY ATTORNEY SCRUGGS:

20    Q.   Yes.  On cross country is not fast enough for

21 the male team, cannot run on the male team, should that

22 male at least be able to participate on the female track

23 team?

24               ATTORNEY VEROFF:  Objection.

1              THE WITNESS:  Right, no, no.  No people

2    at tryouts do not make teams.  But he is a male,

3    identifying as a male then he should stick with that

4    team.

5    BY ATTORNEY SCRUGGS:

6       Q.    So in that situation, it doesn't matter, that

7    male athlete doesn't have another option?

8              ATTORNEY VEROFF:  Objection.

9              THE WITNESS:  Right.

10   BY ATTORNEY SCRUGGS:

11      Q.    Okay.

12            Wouldn't it be more inclusive to allow the man

13   to participate on the female track team?

14             ATTORNEY VEROFF:  Objection.

15             THE WITNESS:  I don't see it like that,

16   right.  There's a male track team and a male can try out

17   for the that.  And the good news is with cross-country

18   they can handle a lot of athletes so often there is not

19   a cut policy in cross-country.

20   BY ATTORNEY SCRUGGS:

21      Q.    Well, I think I can easily give a scenario where

22   the male can't make the male track team, but there is an

23   open slot on the female track team, so that males who

24   identify as males, should that person be able to

1    participate on the female track team?

2                         ATTORNEY VEROFF:  Objection.

3                         THE WITNESS: No.  Sorry.  No.  No, I

4    don't think so.

5    BY ATTORNEY SCRUGGS:

6       Q.    Well, why doesn't --- why shouldn't we value

7    their participation on an athletic team?

8                         ATTORNEY VEROFF:  Objection.

9                         THE WITNESS: I don't think we're saying

10   we wouldn't value that, right.  That happens all the

11   time.

12   BY ATTORNEY SCRUGGS:

13      Q.    Yeah.  I'm saying why don't we value --- why

14   don't we promote their participation in athletics and

15   allow them to participate on the female track team?

16                        ATTORNEY VEROFF:  Objection.  And please

17   let the witness finish her answer.

18                        THE WITNESS:  I think there's a team for

19   this male athlete to at least try out for and go for and

20   so I don't see the issue that we're not being inclusive

21   and giving this athlete an opportunity to try out for

22   that team.  Across teams and across schools, many

23   athletes try out for sports and don't make the team.

24   BY ATTORNEY SCRUGGS:

```
 1        Q.      Well, BPJ can try out for the male track team.

 2        Correct?

 3                        ATTORNEY VEROFF:   Objection.

 4                        THE WITNESS:   That doesn't seem to be a

 5        viable option since BPJ is a female.

 6        BY ATTORNEY SCRUGGS:

 7        Q.      Gotcha.  Okay.  Let me turn you toward

 8        paragraph 37 in your expert report, again I'm going to

 9        ask you about the second question --- the second -- or

10        the last sentence, excuse me, there, where it says if

11        transgender students are arbitrarily excluded from these

12        sports they are in turn deprived of this positive

13        experience as an outcome and their teammates are

14        deprived of a generally optimal sport experience.  Did I

15        read that correctly?

16        A.      Yes, I think so.

17        Q.      Now, would you agree that if we just said any

18        student is excluded from youth sports, they are deprived

19        of those positive experiences and outcomes and their

20        teammates are deprived of a generally optimal sports

21        experience?

22        A.      Yeah, I'm not thinking of a situation where that

23        is not the case right now.

24        Q.      So would you agree that if it said if any
```

1   student, no matter their gender identity, were

2   arbitrarily excluded from youth sports, they are

3   deprived of those positive experiences and outcomes?

4     A.    I would just add that based on their gender

5   identity, right.  So you could have a trans female

6   athlete who tries out for a team and doesn't make it,

7   right, we're not including that in the same ballpark

8   here with just having a blanket statement that

9   transfemale athletes may not participate.

10    Q.    I guess I'm not really following you.  But

11  again, you would agree that if any students are

12  arbitrarily excluded, they reap the benefits from youth

13  sports?

14              ATTORNEY VEROFF:  Objection.  Asked and

15  answered.

16              THE WITNESS:  No, I wouldn't agree with

17  that.  I would need the context of that because the

18  example I'm giving is transgender female athlete tries

19  out for a female team and doesn't make it, right, and so

20  would be excluded for that reason, that they're --- this

21  team is limited in how many positions they have and they

22  --- particular, you know, some kids try and don't make

23  the team.

24  BY ATTORNEY SCRUGGS:

1    Q.    Let me turn you to your Declaration, your

2  initial expert Declaration, I think it's Exhibit 1, and

3  then let me turn you to paragraph 44 and just read the

4  second sentence, which says, if athletes are arbitrarily

5  excluded from youth sports, they are, in turn, deprived

6  of those positive experiences and outcomes and their

7  teammates are deprived of a generally task involving and

8  caring sports climate.  Do you see that?

9    A.    I do.

10   Q.    And are you referring to all athletes there?

11   A.    I think the point is arbitrarily there.

12   Q.    Uh-huh (yes).

13   A.    Right, then --- so if we're just saying we

14  should have a cut policy because that's not fair, right,

15  that's not what I'm insinuating here, right, just saying

16  but to have this --- make this decision that as a

17  blanket statement that certain group of athletes can't

18  participate, can't try out, can't participate, then,

19  yes, I think the statement is true.

20   Q.    Yes, I think we are saying the same thing.  Let

21  me ask it another way.  Again, focusing on the

22  arbitrarily, if all athletes --- if any athlete is

23  arbitrarily excluded, that creates a problem in your

24  mind?

1              ATTORNEY VEROFF:   Objection.   Asked and

2    answered.

3              THE WITNESS:   Yes, I think it changes the

4    meaning to say if any athletes, any athlete under any

5    circumstances, but I just mean --- athletes here.

6    BY ATTORNEY SCRUGGS:

7       Q.    Yeah, I'm not saying under any circumstances.   I

8    guess what I'm trying to figure out is what role does an

9    athlete's gender identity play in that sentence.   It

10   says if athletes were arbitrarily excluded, so I assume

11   there could be a male athlete who identifies as male.

12   If that athlete is arbitrarily excluded, that creates a

13   problem that you identify in that paragraph?

14      A.    I'm not familiar with --- sorry, Julie.

15              ATTORNEY VEROFF:   Objection.

16              THE WITNESS:   I'm not familiar with that

17   case where the male athlete is arbitrarily prevented

18   from participating.   I'm not sure what you're referring

19   to there.

20   BY ATTORNEY SCRUGGS:

21      Q.    Well, let's think about a situation on the

22   sports team where a coach cuts an athlete, a female

23   athlete who identifies as female and instead it favors

24   the coach's own daughter, for example.   You would

1    consider that an arbitrary exclusion, right?

2                    ATTORNEY VEROFF:  Objection.

3                    THE WITNESS:  No.  We'd have to know a

4    whole lot more about that situation.

5    BY ATTORNEY SCRUGGS:

6        Q.    Okay.

7        A.    Maybe the coach's daughter deserves to be on

8    the team and if the team can only handle so many maybe

9    that's how it had to be.  But to make the assumption

10   that because it was the coach's daughter that it wasn't

11   a fair process ---.

12       Q.    I'm assuming that was the only reason that the

13   athletes have been chosen and someone else is excluded?

14       A.    In other words, if a coach just says I don't

15   like you, I don't want you on my team.

16       Q.    Exactly.

17       A.    It seems like there would be guidelines in place

18   for someone to appeal that to the Athletic Director and

19   so on, and yeah, that doesn't sound like it'd be very

20   fair to not give someone a chance.

21       Q.    Exactly.  And that kind of principle applies

22   regardless of someone's gender identity?

23                    ATTORNEY VEROFF:  Objection.

24                    THE WITNESS:  Okay.  Yeah.  If I'm

1    following you, yes, I think.

2    BY ATTORNEY SCRUGGS:

3        Q.    Yeah.   Now, switching gears slightly, you

4    mentioned --- to go back --- let's go back actually to

5    your expert report, paragraph 37.   And again, that last

6    sentence that transgender students are arbitrarily

7    excluded, what is the situation when a transgender

8    student is not arbitrarily excluded from youth sports

9    --- or let me strike that.   Let me rephrase.

10            What is a situation, to use your term,

11   transgender student doesn't make the sports team and

12   that's not arbitrary?   Did you hear that question?

13       A.    Sorry, I thought the court reporter was asking

14   for it to be repeated or something.

15       Q.    No.   I'm sorry.

16       A.    No, that's okay.   I lost something, okay.   So

17   you're saying, for example, a transfemale athlete tries

18   out for a female athletic team and doesn't make it?.

19       Q.    I'm asking is that an example of a non-arbitrary

20   exclusion?

21       A.    Yes.   In general, I would say, yes, without

22   having more details, all right, but it doesn't ---

23   transathletes, right, would just have the right to try

24   out, the right to, you know, potentially participate,

1    but it doesn't mean that everyone would make the team.

2       Q.    Got it.  So that situation where you have the

3    male athlete who identifies as female, right, and just

4    doesn't make the team, do they lose out on the

5    experiences and opportunities associated with

6    participating in sports?

7                    ATTORNEY VEROFF:  Objection.

8                    THE WITNESS:  Yeah, it depends.  You

9    know, some might participate in another sport, right, or

10   find another avenue, but the potential is there for

11   that, yeah.

12   BY ATTORNEY SCRUGGS:

13      Q.    So in a situation where there is no other

14   opportunity or avenue, but we are saying that athlete

15   just can't make that team because they just don't have

16   that athletic skill, in that situation they would lose

17   out on the opportunity outcomes associated with

18   participating on that team?

19                   ATTORNEY VEROFF:  Objection.

20   BY ATTORNEY SCRUGGS

21      Q.    So the word arbitrary doesn't really determine

22   whether someone benefits from the experience and

23   outcomes of participating in youth sports?

24                   ATTORNEY VEROFF:  Objection.

1          THE WITNESS:  Right.  Inherent within

2    sports, unfortunately, particularly at the secondary

3    level, is that not all schools are in a position to let

4    every child participant who wants to, right, and so

5    there is a cut policy.  Personally, because of

6    everything I've outlined today, I wish every school

7    district was doing everything possible to include as

8    many kids, as many athletes as they could, right, but

9    that's not the reality.  Boys and girls try out for

10   teams and they get --- you know, they don't make it.  I

11   just saw this clip this weekend, Billy Mills, Olympic

12   gold medalist, right, he was cut from his track team as

13   a freshman, right.  So that happens.  And I'm

14   distinguishing that from just arbitrarily saying this

15   whole group of athletes, you don't have the right to

16   even try out for the team.

17   BY ATTORNEY SCRUGGS:

18     Q.    But in terms of taking advantage of the benefits

19   associated with sports, it's not so much why someone is

20   excluded but just the fact that they are excluded?

21              ATTORNEY VEROFF:  Objection, asked and

22   answered.

23              THE WITNESS:  I would say it's important

24   to consider why they are excluded.

1   BY ATTORNEY SCRUGGS:

2     Q.   Okay.

3         And why is that important?

4     A.   Because I believe it's harmful to just have a

5   blanket exclusion of a group of athletes like

6   transathletes to say you don't have the right to

7   participate in your school activities, to try out,

8   right, and to be part of these teams and activities.

9     Q.   Well, I'm asking with respect to your expertise

10  about benefiting from the outcome and advantages of

11  participating in sports.  It seems to me that any type

12  of exclusion from sports was by definition maybe cannot

13  take advantage of this opportunity to benefit.  Isn't

14  that correct?

15             ATTORNEY VEROFF:  Objection.  Asked and

16  answered.

17             THE WITNESS:  No.  I'm speaking

18  specifically about sport because that's what's on the

19  table in this case, but you know, somebody else might

20  really experience a caring task involving climate and

21  have great opportunities in other activities of school

22  that they're passionate about, like school or music,

23  right.  But if like BPJ, if her passion is sport,

24  wanting to run track, right, then --- and there's just a

1   blanket statement saying you're  not --- you can't, you

2   can't try out for the women's track team, right, then

3   that would prevent her from the potential benefits that

4   she could be reaping, right, and just enhancing her

5   school experience.

6      Q.    Got it.  Like the male that identifies as male

7   and can't participate on either the males sports team or

8   the female sports team?

9                    ATTORNEY VEROFF:  Objection.

10                    THE WITNESS:  Right.  The distinction is

11   that he can participate on the male team.  He can try

12   out, right, just like the transgender female can try out

13   for the women's team, but there's no guarantee that the

14   athletes make the team.

15   BY ATTORNEY SCRUGGS:

16      Q.    Exactly.  So I mentioned to you that I represent

17   Lainey Armistead.  And I will represent to you that she

18   is a female soccer player on the West Virginia State

19   University soccer team.  Now, I think earlier you

20   mentioned that you reviewed some documents in the case.

21   Did you happen to run across any documents mentioning

22   Ms. Armistead?

23      A.    Yes, I read her statement.  It's been a little

24   bit of time, so I might need to be refreshed on it, but

1    I did take a look at that.

2        Q.    Okay.

3             Well, let me go to Exhibit --- paragraph 41 of

4    your expert report.

5                    VIDEOGRAPHER:  What number did you say,

6    Counsel?

7                    ATTORNEY SCRUGGS:  Paragraph 41.

8                    VIDEOGRAPHER:  Thank you.

9    BY ATTORNEY SCRUGGS:

10       Q.    And it says the climate of youth sport must be

11   geared to include all participants so the teams are more

12   likely to help every athlete maximize their potential.

13   From an educational perspective it is optimal to

14   encourage all athletes to do the best they can and to

15   help all athletes enjoy the sport that they love.

16            Did I read that correctly?

17       A.    Yes.

18       Q.    So I assume that would include Ms. Armistead in

19   your opinion.

20            Correct?

21                    ATTORNEY VEROFF:  Objection.

22                    THE WITNESS:  I think some of the ideas

23   hold, but you know, we were referring here to the

24   climate of youth sport.  Typically in our field we

1  consider youth sport through high school and we would

2  separate that from collegiate sport.

3  BY ATTORNEY SCRUGGS:

4     Q.    Do you think it would be wrong to say that we

5  should not --- you know, strike that.

6        Do you think that we shouldn't gear athletic or

7  college sports to include all participants?

8              ATTORNEY VEROFF:  Objection.

9              THE WITNESS:  You know, at a place like

10  the University of Kansas where I am, we have different

11  levels and so you have the D-1 sport, right, and then

12  you have club sport where people who don't have the

13  skill level or the experience to play a D-1 sport can

14  try out for the club sport those --- I think there's

15  like 40 teams or maybe more we have, and the skill level

16  among those sport club teams really varies, right.  You

17  got some, that are not hit and giggle, you know, just

18  everyone's welcome and they don't have --- you know, a

19  cut policy.  Others are pretty competitive and maybe

20  competing at national levels.

21              But you have another level of intermurals

22  that is open to every student on campus can sign up,

23  because they want to play whatever it is basketball or

24  indoor soccer or something.  So I think ideally, you

know, universities should offer lots of opportunities

for people to participate in sport.

It is not realistic that every student on

campus could participate in you know D-1 sport or

whatever the level, you know, a school might have.

BY ATTORNEY SCRUGGS:

Q.    So Doctor, if we had a male that identifies as

female, it wouldn't be problematic to exclude that

person from the female collegiate track team?

ATTORNEY VEROFF:  Objection.

THE WITNESS:  I think it depends on what

the rules are in place, but if this transgender female

meets the criteria and participates, right, that that is

great.

BY ATTORNEY SCRUGGS:

Q.    Well, again, assuming the rules are --- the

rules of West Virginia are in place and says we now

require all natal males to participate on the male team

rather than on the female team, why can't we just tell

the male college athletes to identify as females, they

can go play on the club sports club team?

ATTORNEY VEROFF:  Objection.

THE WITNESS:  I think the transgender

female athlete should have the right to participate on

```
 1    whichever of those levels that they want to participate
 2    on.   Right.   The female D-1 team the sports team, the
 3    intermural team, they should have the right to try out
 4    as long as they meet the criteria that's in place.
 5    BY ATTORNEY SCRUGGS:
 6        Q.    Do you feel that Ms. Armistead should have the
 7    right to participate on the female women's soccer team?
 8                    ATTORNEY VEROFF:  Objection.
 9                    THE WITNESS:  Yes.
10    BY ATTORNEY SCRUGGS:
11        Q.    Doctor Fry, you would agree that if Ms.
12    Armistead lost her spot on the soccer team to a male
13    soccer play who identifies as female, Ms. Armistead
14    would be deprived of the positive experiences associated
15    with participating on that soccer team?
16                    ATTORNEY VEROFF:  Objection.
17                    THE WITNESS:  Right.  If the transgender
18    female is meeting the criteria that's in place by the
19    NCAA, right, and then --- and makes the team and someone
20    else doesn't make the team, right, I would say that's
21    --- that's part of sport just like Ms. Armistead, I
22    think, right, if she tried out and she didn't make the
23    team because there's other cisfemale athletes that had a
24    better performance or made the team, but either way she
```

 1   would be missing out on the benefits if she didn't make

 2   the team.

 3   BY ATTORNEY SCRUGGS:

 4      Q.    And that's not my point.  I understand your

 5   argument.  I understand that, as a matter of fact, she

 6   would lose out on the benefits and opportunities for

 7   participating on the sports team.

 8              ATTORNEY VEROFF:  I'm going to object to

 9   Counsel testifying.

10   BY ATTORNEY SCRUGGS:

11      Q.    I'm asking if you agree with that?

12              ATTORNEY VEROFF:  Objection to the

13   question.

14              THE WITNESS:  Yeah, I'm agreeing that

15   athletes try out for teams, and when they don't make it,

16   it's hard for them to reap the benefits of being part of

17   their team if they, you know, don't participate and

18   aren't part of that.

19              ATTORNEY SCRUGGS:  I understand.  I have

20   no further questions.  Thank you, Dr. Fry.

21              ATTORNEY CROPP:  This is Jeffrey Cropp,

22   Counsel for Defendant Harrison County Board of

23   Education, and Superintendant Dora Stutler.  I have no

24   questions.

1                ATTORNEY GREEN:  This is Roberta Green on

2    behalf of West Virginia Secondary School Activities

3    Commission.  I have no questions.

4                ATTORNEY MORGAN:  This is Kelly Morgan on

5    behalf of the West Virginia Board of Education and

6    Superintendant Burch.  I have no questions.

7                ATTORNEY TRYON:  And this is Dave Tryon.

8    I have no further questions, unless the Defense Counsel

9    does.  Excuse me, Plaintiff's Counsel.

10                ATTORNEY VEROFF:  No, we don't have any

11    further questions.  The witness will read and sign

12    later.

13                VIDEOGRAPHER:  Okay.

14                 If there's no further questions that

15    concludes this deposition.  The current time reads

16    5:38 p.m. Eastern Standard Time.

17                * * * * * * *

18         VIDEOTAPED DEPOSITION CONCLUDED AT 5:38 P.M.

19                * * * * * * *

20

21

22

23

24

```
 1                COMMONWEALTH OF PENNSYLVANIA)

 2                COUNTY OF PHILADELPHIA        )

 3                        CERTIFICATE

 4                I, Nicole Montagano, a Notary Public in and

 5     for the Commonwealth of Pennsylvania, do hereby certify:

 6                 That the foregoing proceedings, deposition

 7     of Mary D. Fry, Ph.D., was reported by me on March 29,

 8     2022 and that I, Nicole Montagano, read this transcript,

 9      and that I attest that this transcript is a true and

10                 accurate record of the proceeding.

11                 That the witness was first duly sworn to

12      testify to the truth, the whole truth, and nothing but

13     the truth and that the foregoing deposition was taken at

14                 the time and place stated herein.

15                 I further certify that I am not a relative,

16        employee or attorney of any of the parties, nor a

17     relative or employee of counsel, and that I am in no way

18         interested directly or indirectly in this action.

19                 Dated the 4 day of April,  2022

20
          COMMONWEALTH OF PENNSYLVANIA
             NOTARIAL SEAL                    Nicole S. Montagano,
          NICOLE S. MONTAGANO, Notary Public
          Philadelphia, Philadelphia County, PA    Court Reporter
          My Commission Expires Feb. 7, 2019

23

24
```