# Exhibit 36

**West Virginia House of Delegates Judiciary Committee Discussion of H.B. 3293**

**March 18, 2021**

| Chairman Capito: | 00:41 | . . . left on the agenda. The bill is 3293. We have a guest presenter with us. We're happy to have her back with the co- with the committee today. And whenever she is ready, she may proceed. |
|---|---|---|
| Counsel: | 00:56 | I thank you Mr., Mr. Chairman. This committee substitute provides that for the purposes of participating in Single Sex Secondary School Interscholastic Athletic events, under the controlled supervision and regulation of the Secondary School Acti- Activities Commission, each county school district shall confirm that the sex of the people identified, on the pupil's original birth certificate provided on his or her admission to public school is the pupil's sex at the time of birth. |
| | | If an original birth certificate was not provided or if the birth certificate provided does not indicate the pupil's sex at the time of birth, a signed physician's statement indicating the pupil's sex based solely on the pupil's unaltered, internal and external reproductive anatomy must be submitted prior to the pupil's participation in single sex secondary school interscholastic ac- ac- athletic events. Prior to the student's participation in single sex inter- secondary school interscholastic athletic events, the SSAC must verify with each county board that each student participating in Single Sex Interscholastic events is participating according to the student's sex at the time of birth. This requirement does not apply to co-educational, uh, sports. And that's a summary of the bill. |
| Chairman Capito: | 02:15 | Thank you very much, Counsel. I appreciate that presentation. Are there questions for Counsel? Are there questions? The Lady from the 4th. |
| Del. Zukoff: | 02:26 | Thank you Mr. Speaker. Do you know if there's any federal re- any federal, um, any federal courts looking at this, um, issue currently? |
| Counsel: | 02:36 | Yeah. There is a case, uh. Grimm versus, I'm not sure I'm going to pronounce the, Glo- Glo- Gloucester County School Board. It's a Fourth Circuit case. It's, it has to do with, uh, a student, uh, transgender male's right to use a male bathroom. |
| Del. Zukoff: | 03:00 | Okay. Nothing involving sports, though? |
| Counsel: | 03:06 | It, it does not, uh, does not- |
| Del. Zukoff: | 03:07 | Specifically? |

| Counsel: | 03:08 | . . . directly a- uh, state anything about sports. |
|---|---|---|
| Del. Zukoff: | 03:11 | Okay. Have we had this come up before the Department of Education? Have we had any issues around this, this bill that, transgender students participating in sports come before the Department of Education as a concern? |
| Counsel: | 03:26 | It is my understanding that there have been no problems on the county level. |
| Del. Zukoff: | 03:26 | Okay. I checked with mine and there weren't. That's why I was just curious if you knew from a statewide perspective. |
| Counsel: | 03:28 | That's what they'd indicated to me. There had been no problems. |
| Del. Zukoff: | 03:39 | Thank you. |
| Chairman Capito: | 03:40 | Gentleman from the 37th. |
| Del. Pushkin: | 03:44 | Thank you, Mr. Chairman. Thank you, counsel. Um, and I'm sorry I missed the first part of the, of your, uh, presentation of the, uh, of the bill here. But would this preclude a female student from participating in a male sport? |
| Counsel: | 03:59 | No. |
| Del. Pushkin: | 04:00 | It would not? |
| Counsel: | 04:01 | No. Under Title IX, a female has to be allowed to participate in a sport. So, if the, for instance, there are no female football, then the female would be allowed to play in, uh, football, um. |
| Del. Pushkin: | 04:15 | All right. And that would be, I mean the only case I can, cases in West Virginia I could think of would be in sports where there aren't female sports that, that the, that the girls participate in the boys sports. That's the only time I've ever heard of it even happen, anything like this happening in West Virginia. |
| Counsel: | 04:29 | It's my understanding there have not been any issues. I, and the, the re- the executive director of the SSAC is here if anyone wants to talk to him. But I believe there are only, the only solely female sports are volleyball and softball. |
| Del. Pushkin: | 04:46 | So this only affects those two sports? |
| Counsel: | 04:46 | Well, well it would affect the single sex. So, in other words, you have single sex—you have women's basketball and, and men's basketball or- |

| Del. Pushkin: | 04:53 | Yeah. |
| Counsel: | 04:54 | . . . and- |
| Del. Pushkin: | 04:55 | Okay. |
| Counsel: | 04:55 | . . . track- |
| Del. Pushkin: | 04:55 | I got you. I got you. |
| Counsel: | 04:56 | Two, two sets. Yeah. |
| Del. Pushkin: | 04:56 | I got you. |
| Counsel: | 04:56 | Yeah. |
| Del. Pushkin: | 04:58 | Okay, thank you. |
| Chairman Capito: | 05:00 | Further questions of Counsel? Further questions of Counsel? Chair, recognize Gentleman from the 17th. |
| Del. Lovejoy: | 05:07 | Thank you, Chairman Capito. Good afternoon, Counsel. Uh, you mentioned that Grimm case. I tried to read a little bit about it, uh, for today. So that was a Fourth Circuit case, um. |
| Counsel: | 05:07 | Mm-hmm (affirmative). |
| Del. Lovejoy: | 05:17 | The Fourth Circuit is a federal Circuit Court of Appeals. It includes the state of West Virginia, right? |
| Counsel: | 05:23 | Correct. |
| Del. Lovejoy: | 05:24 | And in that case, um, this was not a sports case but it, it dealt with the requirement to use facilities on a school ground with the sex assigned at birth. Is that fair? |
| Counsel: | 05:39 | It did. |
| Del. Lovejoy: | 05:40 | Okay. |
| Counsel: | 05:41 | Uh, the, the, uh, Grimm was born a female and wanted to us- and was transitioned to male, and wanted to use the male bathroom. |
| Del. Lovejoy: | 05:50 | So in that case, the court, the Fourth Circuit, um, found that the student's, uh, rights had been violated under Title IX, right? |
| Counsel: | 06:02 | Yes. |

| Del. Lovejoy: | 06:03 | And also, I think second, second basis was under, was it equal protection? |
| Counsel: | 06:08 | Yes. |
| Del. Lovejoy: | 06:08 | And so, what, what, you know, if we're to do something like this and we have a lawsuit come under Title IX, what are the consequences of a school board in West Virginia being found, like that case, to violate Title IX? I mean what, what's the, what are the consequences? |
| Counsel: | 06:26 | Well, uh, the schools receive federal funds. So that is, they're, they're required to follow the federal guidelines, which would include the Fourth Circuit. Um, there is also a recent executive order, um, and so the, the, the s- board, or the department would, is required to follow federal guidelines. So, um, I think the practical effect would be that under the Fourth Circuit case, uh, which is currently there has been a writ filed before the Supreme Court and, um, Grimm has ex- has, uh, petitioned for additional time to answer. And that is the current procedural history right now with that. Um, so in other words, you know, the, the Supreme Court may or may not take the case. If they do, then Fourth court c-, Fourth Circuit would be controlling. If they did take the case, then of course they would issue an opinion. |
| | | Um, but un- as it stands right now, the department would be bound to if a transgender person wanted to use, for instance, a transgender female wanted to use a female bathroom, they would have to allow that transgender female to use the, the female bathroom under this Fourth Circuit case. But the, the bill, the, they would have to play a different sport. |
| Del. Lovejoy: | 07:47 | So, so let me understand the posture. The Fourth Circuit Court of Appeals has rendered a decision that as it stands now, found that school's policy in, in the bathroom context as opposed to the sports context, to violate Title IX. |
| Counsel: | 08:04 | And, and they did not, um, deal with sports specifically and the, that particular person was not involved in sports. So, it did not deal with locker rooms or sports because he was not involved in sports. |
| Del. Lovejoy: | 08:14 | But the basis of that opinion was the Bostock case, is that what it's called? |
| Counsel: | 08:19 | That was one of the cases that was, yes, quoted. |
| Del. Lovejoy: | 08:22 | Bostock was not, was neither a sports nor a bathroom case, right? |

| | | |
|---|---|---|
| Counsel: | 08:25 | I haven't read that entire case. I just- |
| Del. Lovejoy: | 08:28 | But it's employment case. Yeah. |
| Counsel: | 08:29 | . . . did but, yeah. It, in a, I believe a Supreme Court case. Yes. |
| Del. Lovejoy: | 08:31 | Right. |
| Counsel: | 08:32 | Yes. |
| Del. Lovejoy: | 08:32 | Yes. And so, it's a, it's a, it's a 2020 case and it deals with employment discrimination and the Fourth Circuit applied the holdings in the employment discrimination decision of Bostock to apply to the restroom question. And so, if the Fourth Circuit were to also apply that to this situation, we could be passing a law that puts us in violation of Title IX? |
| Counsel: | 09:00 | I mean, it, it, there, there would be a, a question perhaps. I mean, it, there's a slippery, this, this is literally something that is changing every day across the United States. I mean, literally every time I'm, I go on the internet, there's something different happening. So, um, you know, who know, it's hard to say what a court is going to do. But, you know, it, it is, I think pretty safe to say that something like this would be up for, um, liti- litigation because it is being litigated- |
| Del. Lovejoy: | 09:33 | Yes. |
| Counsel: | 09:33 | . . . throughout the country daily. I mean- |
| Del. Lovejoy: | 09:35 | Yes. And we're going to have some guidance soon, won't we? |
| Counsel: | 09:35 | I'm, I- |
| Del. Lovejoy: | 09:38 | With Fourth Circuit, right? |
| Counsel: | 09:39 | Yeah. I mean, ma- uh, yeah. I guess we'll see what the Supreme Court- |
| Del. Lovejoy: | 09:44 | We have a decision from the Fourth Circuit- |
| Counsel: | 09:44 | Mm-hmm (affirmative). |
| Del. Lovejoy: | 09:46 | . . . and we're s- we're at, somebody's at the doorsteps of the United States Supreme Court saying, "We'd like you to take this up on a, on a writ of cert and that decision has not been made yet." But we will know the results of that decision by the US Supreme Court at some point in the, maybe near future, right? |

| Counsel: | 10:02 | We would, yes. |
|---|---|---|
| Del. Lovejoy: | 10:04 | Okay. Um, okay. In addition to losing federal funding if you're found to violate Title IX, um, is the successful claimant also entitled to money damages? |
| Counsel: | 10:17 | Uh, in this case, uh, I believe the way I read the case, uh, the, Grimm received $1. I mean, it was not a money case. |
| Del. Lovejoy: | 10:26 | Well, did they also receive an award of attorney's fees? |
| Counsel: | 10:28 | Attorney's fees, yes. |
| Del. Lovejoy: | 10:29 | Yes, which were more than $1. |
| Counsel: | 10:30 | I'm sure. |
| Del. Lovejoy: | 10:31 | Yeah, um. And so, if for instance, we pass a law that before the Supreme Court rules on the case up there, uh, on the writ, that also is found to violate Title IX, then we could lose our, our federal funding and be on the losing end of litigation in a fee shifting situation, right? |
| Counsel: | 10:51 | I- |
| Speaker 6: | 10:51 | One point of order, point of order, Chairman Capito. |
| Chairman Capito: | 10:55 | Gentleman will state his point of order. |
| Speaker 6: | 10:56 | Um, uh. My friend is, uh, asking Counsel, number one, to speculate and number two, to offer personal opinions. Uh, neither of which are technical in nature so, uh, I would ask the line of question be, uh, prohibited. |
| Chairman Capito: | 11:12 | [crosstalk 00:11:12] well I would just, I would just say the chair's ruling is that the, uh, the Gentleman will, will, will stick to the thrust of the bill. I think the Gentleman is asking counsel to make, uh, a legal assessment of a, of a Fourth Circuit opinion, um, and I think it's, uh, appropriate. Uh, and I think it's appropriate for her to make that distinction as Counsel, so I'll allow question to continue. |
| Del. Lovejoy: | 11:32 | Thank you Mr. Chairman. Um, and I'll try to keep it cleaner. If we pass a law that violates Title IX of the federal law, then the result of a violation is a loss of federal funding. That is a, that is a true statement of the law? |
| Counsel: | 11:47 | I don't know the particular, um, process for loss of funding. I mean, I would hope that, um, it wouldn't be, and you know, I |

|  |  | mean, I would say that there would be a process for that. I don't know. I don't think that- |
|---|---|---|
| Del. Lovejoy: | 12:00 | Can I restate as, can or may? If I say that, would that be a fair statement, that you can lose your federal funding if you pass laws that violate Title IX? |
| Counsel: | 12:11 | It's my understanding that the funding the federal government supplies is based upon the assumption that the laws that it enacts will be followed. |
| Del. Lovejoy: | 12:21 | Okay. Thank you very much. Thank you, Mr. Chairman. |
| Chairman Capito: | 12:24 | Further questions of Counsel? Gentleman from the 37th, did you have questions of Counsel? |
| Del. Pushkin: | 12:29 | At the appropriate time  I'd like to ask you now just to take leave of committee for a, a testimony from, uh [crosstalk 00:12:35]- |
| Chairman Capito | 12:34 | At the appropriate time. Chairman from the 50th for counsel. I recognize Gentleman from the 50th. |
| Del. Garcia: | 12:40 | Thank you, counsel. So, when I look at page two of, uh, let's see, what section is this, p- yeah, page two, line 26, subdivision E of section, it's on another page, 5C, um, it appears that—there's a proviso related to if somebody does not, is not able to provide a birth certificate or their birth certificate does not indicate a sex at the time of birth, correct? |
| Counsel: | 13:21 | I'm, I'm sorry. Can you rephrase that again? I see where you- |
| Del. Garcia: | 13:23 | Yeah, yeah. |
| Counsel: | 13:24 | What was your question again? I'm sorry. |
| Del. Garcia: | 13:24 | So, so that relates to—the proviso relates to a situation, um, if someone is unable to provide their original birth certificate or their birth certificate as it states here, does not indicate people's sex at the time of birth. |
| Counsel: | 13:39 | So, yeah. If you look at page one, the first paragraph, when a student is admitted to a public school, they are to provide a birth certificate. So it goes, it's referring back to that birth certificate. But if, for, for it, but there's also, if the birth certificate cannot be provided, then they have to say, have to have an affidavit proviso. So in the case that their birth certificate was not a, supplied or the, the sex was not identified, then that proviso for |

Page 7 of 21

|  |  | the, uh, doctor's affidavit, I mean doctor's statement would apply. Does that answer your question? |
|---|---|---|
| Del. Garcia: | 14:14 | That do- well that doesn't and kind of continuing on further. So, if, if a birth certificate is not provided or if the birth certificate does not indicate the people's sex at the time of birth, I just want to make sure I'm understanding this correctly. So, the, the physician statement that they have to, I guess, they have to figure out about whether the person has unaltered internal and external reproductive anatomy? |
| Counsel: | 14:51 | That's what it says, yes. |
| Del. Garcia: | 14:52 | So, the, that means that anybody who can't fulfill, who can't provide their birth certificate has to undergo an examination, I would imagine some type of genital examination, by that doctor? |
| Counsel: | 15:10 | Well, all of the students are required to have a physical exam to ta- I mean, to participate in sports. |
| Del. Garcia: | 15:17 | But does that necessarily include . . . I mean, you know, again, internal and external reproductive anatomy. I, that, is that something that's normally part of a physical? |
| Counsel: | 15:33 | I don't know. |
| Del. Garcia: | 15:35 | And, and whether it's unaltered. That's, that's what this bill states. |
| Counsel: | 15:40 | That it does, yes. |
| Del. Garcia: | 15:43 | What happens if, if a student has both male and female reproductive anatomy? |
| Counsel: | 15:58 | The bill doesn't address that. |
| Del. Garcia: | 16:03 | That, and, and that's my understanding is, one or 2% of the population of the United States, that, that is, you know, that's, that happens. That's probably not a good, good question for counsel. That's, I didn't really ask a question, so I apologize. That's, that, those are, those are the questions that I have. Thank you. |
| Chairman Capito: | 16:25 | Thank you. Further questions of Counsel? Further questions? I, I had the gent- gent- excuse me, I had the Lady from the 4th followed by the Gentleman from the 13th. |
| Del. Zukoff: | 16:35 | Thank you, Mr. Chairman. Just one last question. You had mentioned when you're answering the Gentleman from the |

|  |  | 17th's question that there's an executive order currently that addresses this issue. Could you give us- |
|---|---|---|
| Counsel: | 16:48 | Oh, I'm sorry. It do- it, there's an executive order that has to do with, um, from, uh, March 8th. |
| Del. Zukoff: | 16:56 | An executive order from? |
| Counsel: | 16:58 | The President, President Biden. |
| Del. Zukoff: | 17:00 | Okay. And what does that say? |
| Counsel: | 17:04 | It is guaranteeing an educational environment free of discrimination on the basis of sex, including ori- sexual orientation and g- or gender identity. |
| Del. Zukoff: | 17:16 | Okay. Thank you. |
| Chairman Capito: | 17:19 | Gentleman from 13th. |
| Del. Zukoff: | 17:20 | I didn't know that. |
| Del. Pinson: | 17:21 | Yes, thank you Mr. Chair, thank you Counsel for your presentation of the bill that's before us. Uh, couple quick questions. I know the question was asked to you, has there been issues of this within the boundaries of our state and I believe that you answered that you weren't aware of any. I'm aware that we do have someone from the SSAC here that could either provide the same answer or their own opinion. Is that correct? |
| Counsel: | 17:51 | Yes, someone, uh, the Executive Director is here. |
| Del. Pinson: | 17:54 | Okay. I'll ask you this. In your preparation of the bill, were you able to find instances in other states where questions surrounding the legality of this same issue have been raised? |
| Counsel: | 18:15 | Yes. |
| Del. Pinson: | 18:16 | Okay. Uh, turning my attention now to the Gavin Grimm case out of Virginia, if I understood your assessment of, of that legal proceeding, the county school board, and I'm not going to try to pronounce it either, they were found to have violated Title IX based on the, the circumstances and the facts surrounding that particular case. Is that correct? |
| Counsel: | 18:53 | Yes, they were. |
| Del. Pinson: | 18:55 | And- |

| Counsel: | 18:55 | Under that case, yes. And under those circumstances, they were. |
|---|---|---|
| Del. Pinson: | 18:55 | So- |
| Counsel: | 18:58 | And equal protection. |
| Del. Pinson: | 19:00 | Thank you. And we, that case did not deal with the legality of transgender athletes at all. We're dealing with something completely separate from that. Is that correct? |
| Counsel: | 19:14 | It did not deal with sports and it said in there that, that issue was not raised because he did not play sports. |
| Del. Pinson: | 19:21 | Okay. That will be all. Thank you. Thank you, Mr. Chair. |
| Chairman Capito: | 19:23 | Further questions of Counsel. Further questions of Counsel. Uh, Counsel, question from the chair. Under, uh, I understand I think, uh, part, partially the holding in Grimm, um, that it, that, that the, the Grimm's equal protection rights were violated that he was not able to access the men's bathroom. Was, was he, is, is Grimm still able to access to women's bathroom? |
| Counsel: | 19:51 | Uh, initially they, uh, had him using the nurse's bathroom and, but there was, it was inconvenient. It sometimes made him late for classes. And so, then they fashioned a separate, um, bathroom for transgender, uh, people and, or, or they redid the stalls. I, I'm- |
| Chairman Capito: | 20:15 | Was he prohibited- |
| Counsel: | 20:15 | But they, they fashioned [crosstalk 00:20:17]- |
| Chairman Capito: | 20:17 | Was he prohibited from using the women's bathroom? |
| Counsel: | 20:18 | It, it, uh, he, this was a transgender male who was an original female. |
| Chairman Capito: | 20:18 | Right. |
| Counsel: | 20:18 | He was put- |
| Chairman Capito: | 20:24 | Right. |
| Counsel: | 20:24 | . . . prohibited from using the male bathroom. |
| Chairman Capito: | 20:26 | Right. Was he prohibited from using the female bathroom? |
| Counsel: | 20:29 | No. |

Page 10 of 21

| Chairman Capito: | 20:30 | Okay. With the holding, is he permitted to use either bathroom still? |
| Counsel: | 20:36 | Uh, it, the holding- |
| Chairman Capito: | 20:38 | If you don't have that, I understand- |
| Counsel: | 20:39 | Let, I mean my, my, well let, let me say he's in college now. So- |
| Chairman Capito: | 20:39 | Okay. |
| Counsel: | 20:43 | . . . this went on for five years. |
| Chairman Capito: | 20:44 | Okay. |
| Counsel: | 20:44 | So, um, it's, it, he's not in high school anymore but- |
| Chairman Capito: | 20:50 | Okay. |
| Counsel: | 20:50 | . . . essentially he, if the, the, he was able to use the bathroom that he identified, that- |
| Chairman Capito: | 20:56 | I understand, I understand- |
| Counsel: | 20:56 | Yeah. |
| Chairman Capito: | 20:57 | . . . the thrust of the, of the whole thing. |
| Counsel: | 20:57 | Mm-hmm (affirmative). |
| Chairman Capito: | 21:00 | I just was curious. Questions? |
| Counsel: | 21:00 | Yeah. |
| Chairman Capito: | 21:02 | The Gentleman from the 37th desires leave of the committee to call a witness. Is that witness on the screen? Oh yeah, okay. Uh. (laughing) Are, are you, uh, able to hear us? |
| Cathryn Oakley: | 21:15 | I am able to hear you. |
| Chairman Capito: | 21:17 | Okay. |
| Cathryn Oakley: | 21:17 | Are you able to hear me? |
| Chairman Capito: | 21:19 | We can hear you. Would you please introduce yourself to the committee and, uh, who you are here representing? |
| Cathryn Oakley: | 21:35 | Yes, definitely. I'm [inaudible 00:21:35]. Hold on one second. |

| Chairman Capito: | 21:35 | Mark, go up and mute that. |
|---|---|---|
| Mark: | 21:37 | Should I mute that computer? Well, then she won't be able to hear us. |
| Chairman Capito: | 21:39 | Yes, you're right. |
| Cathryn Oakley: | 21:40 | Yeah, I can hear you. What, I'll turn my volume down while I'm introducing myself and then I'll turn it back up so I can hear you. Um, my name is Cathryn Oakley and I am the, uh, State Legislative Director and Senior Counsel at the Human Rights Campaign. Um, the Human Rights Campaign is the nation's largest organization working for equality for the LGBTQ community. Um, and I'm here on behalf of our more than three million members and supporters nationwide, including many in West Virginia, um, in opposition to the bill. And I stand ready to answer questions and, and also provide a brief statement if you allow. |
| Chairman Capito: | 22:19 | Thank you very much, Ms. Oakley. We appreciate you taking time on your Friday to be with us, as they say. So if you would, please raise your right hand. We'll swear you in. Then we'll allow questioning. Would you please raise your right hand? Do you swear to tell the truth, the whole truth and nothing but the truth? |
| Cathryn Oakley: | 22:34 | I do. |
| Chairman Capito: | 22:38 | Thank you very much. Chair recognize chairman from 37th for questions. |
| Del. Pushkin: | 22:41 | Thank you, Mr. Chairman. |
| Chairman Capito: | 22:43 | Hm? Oh. |
| Del. Pushkin: | 22:44 | Thank you, Mr. Chairman and, um, thank you for, uh, attending, uh, uh, the, uh, whatever service we're using now, uh, Ms. Oakley. Can you hear me? |
| Cathryn Oakley: | 22:53 | I can. Thank you so much for having me and, um, and to Mark for facilitating my being able to be here. |
| Del. Pushkin: | 22:59 | Okay. And, um, so you've, you, I guess you followed cases like this throughout the country, right? That's, that's part of your job at the Human Rights Campaign, is that correct? |
| Cathryn Oakley: | 23:09 | That's correct. |

| Del. Pushkin: | 23:10 | Okay. Have you, there was asked of Counsel and, and she didn't know of anybody. Do, do you know of any cases in West Virginia? |
| Cathryn Oakley: | 23:18 | I do not know of any cases in West Virginia. |
| Del. Pushkin: | 23:21 | Okay. Um, the, the, but you have . . . Well, first of all, uh, I guess this is based on a premise that a, um, a, uh, transgender athlete would have some sort of advantage over, uh, other participants. Do you, is, I'm trying, have you heard of an actual advantage being created by transgender athletes? |
| Cathryn Oakley: | 23:46 | Yeah. Thank you for that question. That's a really important question. And I'll preface this by saying that groups like the National Women's Law Center and, uh, the Women's Sports Foundation, Women Leaders in College Sports all support inclusive polices that allow transgender athletes to participate. Um, and I, that is because, uh, to, to your excellent point, um, transgender kids, and I, you know, particularly this conversation ends focusing on transgender girls, um, transgender girls, like all girls, uh, have a variety of different bodies. They have a variety of different talents. They have a variety of different interests. |
| | | Some of them will be tall, some of them are short. Some of them are fast, some of them are slow. Some of them will have excellent hand-eye coordination. Others of them will not. Um, and so, you know, the trans pop- the trans population is, is fairly small. Uh, if you are, really only concerned with trans girls, that's then half of that number. And then of course, of those, uh, trans girls, you're, you're talking about only a few that are going to be interested in sports, um, and have, you know, sort of the combination of interest of, of physical capability, um, mental drive, work ethic to be able to excel. |
| Del. Pushkin: | 23:46 | Mm-hmm (affirmative). |
| Cathryn Oakley: | 25:00 | And I think very much to your point, the reason that we do not actually see, uh, instances of problems, uh, in, in the states, um, even though 16 states allow trans youth to participate in sports consistent with their gender identity and have done so for many years, um, there, there are in fact not issues in the states. Um, there is one, uh, case of Connecticut which we can speak about that much has been made of. |
| | | Um, I think it's really been misrepresented what's happened in Connecticut. So, I'm happy to help, uh, diffuse some of the misinformation about that. Um, but there, this is just simply not a problem, particularly in elementary and secondary schools. Um, some of the bills that we're seeing, I know not this one, uh, deal also with collegiate athletics. So, I'll also just say that the NCAA |

has had a policy for more than 10 years regulating, uh, trans, uh, participation in sports. And they also have not seen, you know, women's sports collapse as a result of, uh, people pretending to be girls in order to compete and excel.

| | | |
|---|---|---|
| Del. Pushkin: | 26:06 | Okay. Well I, I have a couple concerns about what the real consequences that, uh, this legislation could also have and that would, again, with my next question, um, do you have any statistics on like, about mental health issues or even suicide rates among the transgender teens? |
| Cathryn Oakley: | 26:29 | Yes. Um, you know, I want to preface this by saying that, uh, for transgender teens who are able to receive, um, age appropriate, medically necessarily care, um, the numbers are quite different. And in fact, having just one supportive adult in a trans youth's life can make a tremendous difference. But yes, um, trans youths experience extremely high levels of anxiety and depression, um, and also have an extremely high rate unfortunately of suicide and suicidality. Um, particularly, as I say, when they are not, um, supported by adults in their lives.

Um, and we have also found by the way that there is, uh, there is true harm, um, even with bills that are, uh, are challenging trans identity, even when they're introduced but not passed. |
| Del. Pushkin: | 26:29 | Hm. |
| Cathryn Oakley: | 27:24 | The rhetoric around those bills can be extremely harmful to transgender youth who are hearing them at home. |
| Del. Pushkin: | 27:33 | So even though it's unlikely that, that there's going to be participation from transgender girls in sports because we haven't seen it in a whole lot of places, the bill itself could be harmful just for a group that's already extremely alienated, is what you're saying, right? |
| Cathryn Oakley: | 27:48 | That's exactly what I'm saying. It's that there's actually no harm here that's being addressed by a piece of legislation like this, but, uh, there's, there's no, there's no, uh, no purpose for it. But there is harm perpetrated by it. |
| Del. Pushkin: | 27:48 | That's what I was getting at. |
| Cathryn Oakley: | 28:01 | Um, and particularly should it pass, you know, it's targeting an extremely vulnerable group of youth uh- |
| Del. Pushkin: | 28:06 | Right. |
| Cathryn Oakley: | 28:07 | . . . who as you say, are already experiencing extreme amounts of discrimination. And I, I do think that when we hear this idea that |

there might be boys who are pretending, um, to be transgender women in order to get an advantage, transgender girls in order to be at an advantage, um, given the amount of discrimination that transgender youth face, uh, it's, it's really, uh, extremely difficult to imagine that that's something that anybody would do.

| Del. Pushkin: | 28:31 | All right. Just a couple more questions. Um, I'm thinking now about, uh, like cisgender girls meaning a female, assigned a female at birth, identifies as a female, a female athlete, okay, who happens to be . . . Have you heard of any instances where it's a female athlete who just happens to be maybe tall, maybe, uh, more muscular than the other girls and the opposing team, or the opposing coach or opposing parents, uh, might make, uh, an accusation that, that, uh, she's not a girl? And then because of a law like this, they would like check into her background or something. Or, or it's been, being brought up because of a law like this. Have you heard of any instances of that, like that sort of thing happening? |
|---|---|---|
| Cathryn Oakley: | 29:20 | Yeah. Well, it, so there, there's only, um, well now two laws, that are, have passed that are on the books about this. One of them was passed only last week and hasn't yet gone. Last week, I think it was signed. And it has not gone into effect. Um, the other is the, uh, is the similar law that passed in Idaho last year, the HB500. Um, that law has been enjoined. It was challenged, um, in, uh, in the Ninth Circuit and, um, is currently enjoined, suspended from going into effect. So, we haven't had any of these laws in place yet that would give rise to that kind of a, uh, situation. |
| Del. Pushkin: | 29:57 | Ah- |
| Cathryn Oakley: | 29:57 | However, certainly that would be a side effect of what these bills would do is allow for the harassment of cisgender- |
| Del. Pushkin: | 29:57 | Yeah. |
| Cathryn Oakley: | 30:06 | . . . girls who are simply bigger and stronger. And I'll say, I'm 5'10". You can't, probably can't tell over Zoom. Um, I've been 5'10" since I was in sixth grade. Uh, and I promise you that did not come with any kind of sports advantage, no matter what people might think. Um, but certainly, you know, this idea that cisgender girls might be harassed for, you know, going through puberty early or being the first ones to grow, uh, that is, that's absolutely, um, possible that, that, that this bill will enable, uh, harassment for those girls. |
| Del. Pushkin: | 30:39 | Well your answer led me to one last question. First of all, I guess two if you count this one. You're an attorney with the Human Rights Campaign, right? You're a, you're a- |

| Cathryn Oakley: | 30:39 | Yes. |
|---|---|---|
| Del. Pushkin: | 30:46 | . . . you're an attorney? And you said this law hasn't been enacted anywhere 'cause it's in court. So, is it constitutional? |
| Cathryn Oakley: | 30:53 | No. |
| Del. Pushkin: | 30:54 | Okay. Thanks. That's all the questions I have, Mr. Chairman. Thank you very much. |
| Chairman Capito: | 30:59 | Further questions from Ms. Oakley? Further questions from, for Ms. Oakley? Ms. Oakley, thank you so much for being with us today. Uh, I'm sure there's nowhere else you'd rather be on a Friday afternoon. |
| Cathryn Oakley: | 31:11 | Never. Thank you so much. I appreciate it. |
| Chairman Capito: | 31:14 | Of course. Is there further desire by or of any member of the committee to call a witness, um, either that may be in the hallway or that might, uh, come to us virtually? Does any other member of the committee desire leave of the committee? Okay. If not, are there amendments to the bill? Are there amendments to the committee substitute? If not, chair recognizes Gentleman from the 32nd to move the committee substitute. |
| Del. Haynes: | 31:45 | Thank you, Chairman Capito. [inaudible 00:31:48] recommendation that we do that. |
| Chairman Capito: | 31:47 | You have heard the Gentleman's motion. Is there discussion? Gentleman from the 17th. |
| Del. Lovejoy: | 31:52 | Thank you, Mr. Chairman. [inaudible 00:31:53] full opposition to the bill. The timing of the bill is not the best. Um, I think that we have, this is another solution in search of the problem. But even more than that, we have legal guidance on this. We have a case from the Fourth Circuit in August of 2020 which tells you a law in this very area of Title IX. That decision is currently on appeal to the US Supreme Court. I don't know when they will rule but probably before, maybe before we get home or shortly thereafter we'll know whether the granted decision stands. Now, my friends have brought up some questions about that Grimm decision, and my good friend from the 13th said, "Well it's completely separate." |
| | | And I tell you that, that it is true the Grimm case does not deal with sports, but the Grimm case deals with the same issue. You have a school board that enacts a policy that says, students are required to use this facility, um, of the gender assigned at birth, okay. Um, and the Supreme Court, or excuse me, the Fourth Circuit struck it down, said you can't do that without violating |

Page 16 of 21

Title IX. So if you have a policy based on a law that says you have to use or play in the team of the gender assigned at birth, it's not that much of a leap in logic to think that the same thing would apply, especially since Grimm was based on Bostock, which is another 2020 case written by Justice Gorsuch that applied, um, uh, the Title VII of the Civil Rights Act, um, that said discrimination based on sexual orientation and gender identity in the employment context.

So, you know, if you don't think that's the way it's going to go, what's the harm in giving it a couple months to find out what the law's going to be? Save our schools from Title IX violations and, and all the stuff that, um, that comes along with it. And so, I, that's the legal ground. All right. But more than that, I want to talk about the human ground.

Um, I don't know if you know a lot of transgender youth. Um, there's a lot of misconception, there's a lot of myths, there's a lot of stories about what kind of people they are. Um, they get sometimes per- put on these labels as some kind. They're, they're trying to sneak into bathrooms or get unfair competitive advantages and kind of demonized. And we do that a lot. I submit that if you will spend some time talking to some and you p- I promise you, you have them in your district, you'll find that they're like every other kid. And maybe a little worse in the sense that they face things that none of us maybe understand.

They're not trying to get over on anything. They're trying to stay alive today. They're trying to make it through the day, uh, in a, in a world that frankly is, is a little more cruel maybe than it should be. So for me, if I have a child and, and I know several in my, in my district, that the one thing that they have that makes them feel like a part of something, like a human being with dignity and respect, is being on that team, or, or running in that practice, I'm not going to take it away from them and, and, and put them back into this, this, this category or subject them to a, what my friend talked, the, the external genitalia inspection. I'm just not going to do that. I don't think it's right. I don't think it's what we need to do for kids.

We've made it a long time being able to figure out how to play sports together and how to use bathrooms and all that. We don't need a law to tell us. Uh, but if you think we need a law, you'll have one here in, in a couple of months. So for those reasons Mr. Chairman I, I can't support this bill and I hope that, that my friends will join me in opposition.

| Chairman Capito: | 35:25 | Further discussion. Gentleman from the 50th. |

| | | |
|---|---|---|
| Del Garcia: | 35:34 | Thank you Mr. Chairman. I'm speaking in opposition of this bill. As somebody who's represented female, uh, women who've been sexually assaulted in prisons, I didn't come to Charleston to force unwanted invasive sexual assaults of young girls, young boys. That's what this bill does. That's what you're doing if you vote yes on this. That's what the language says. That a doctor, that, this isn't a health, this isn't an examination for the purpose of seeing whether somebody's in good health. This is somebody, a doctor looking at whether there's unaltered internal and external reproductive anatomy. |
| | | That is disgusting. This bill singles out a group of people who face a challenging world. And I also didn't come down to Charleston to push somebody over the cliff if they're getting to the point of, of thinking about whether this life is worth living. That is crap. We shouldn't be doing this. Every single human being is made in the image of God. Every single one, whether you understand it or not. Whether you agree with how somebody lives or not, that's what we're talking about here today. I cannot support this bill. |
| Chairman Capito: | 37:42 | Further discussion. Chair recognizes Lady from the 4th. |
| Del. Zukoff: | 37:47 | Thank you Mr. Chairman. I'm also going to re- I'm also going to not support this bill for several reasons, both of which are, have already been mentioned from my friend from the 17th and the 50th. But I'm going to actually come at this from the aspect of a mother and my two daughters. And I raise my children to respect people as they are, not as some preconceived notion of what society thinks they should be. Or to ever put myself in a position that I could understand internally someone's mind, how they were made in the womb, how they came out feeling, how they felt about, you know, um, that they felt that they were always a boy. |
| | | I recently, and you all can look this up, there's a gentleman this week who just pre- he, he testified in the Missouri State Capital this week on a transgender bill similar. Has a, has a, um, child that was born as a boy, always identified as a male. And they, he and his, her mother made him dress as a boy, keep his haircut as a boy, um, had issues. And he had major issues. Was sad all the time, um, asked to dress in his sister's clothes and one day she was outside playing in the front yard with her brother and he called out to them to come to dinner. And she said, "No, it's time. I want to go across the street and play. Daddy, if I come in and change my clothes, can I go?" |
| | | And he realized what he was doing to that child by trying to make them something that they were not. And from a mother's perspective, I happened to be the mother of two very good |

athletes. They're adults now. One of my daughters was a two time all-state softball pitcher and a two time all-state basketball guard when she was in high school. My other daughter was a swimmer and qualified every year for the state meets and she swam in college.

So, I can tell you my personal life for 20 years was running with those girls year-round, every sport they were in. They're, some of their best friends to this day as adults are the people that they participated in sports with. It helped them create lifelong friendships. They learned about leadership. They learned about how to get along with other people. All of the aspects that we find that sports, that we all love about sports.

And I think by taking these, taking, asking these children not to participate in the one thing that may bring them joy is just simply wrong. It's wrong for us to make that decision. This decision's going to be made for us very quickly. I think we have better things to do with our time in the West Virginia legislature than put this type of legislation forth. Thank you.

| Chairman Capito: | 40:33 | Is there further discussion? Chair recognizes the Gentleman from the 13th. |

| Del. Pinson: | 40:39 | Thank you, Mr. Chair. I'll speak in favor of the bill that's in front of us today. Um, I don't think that maybe some of the dialog that, that has taken place over the last several minutes, several days, several weeks surrounding this topic is meant to be what it, what it has become. Uh, the bill that's in front of us today, uh, does not mean that individuals of this committee or of this body do not respect someone, do not have dignity for someone, despite whatever their gender might be. |

The bill that's in front of us today is trying to place guardrails on the very sports that, that we're talking about, and the participation of those sports. Uh, we have spoke some today about the requests for a birth certificate in order for individuals to be able to participate in these sports. It's not been uncommon for us to request birth certificates for education and sports in the past for age-specific reasons. Just in a quick Google search, one can find that, uh, there is such a thing as age subjectivity where someone perceives themselves to be much younger or much older than they actually are.

And we would agree or at least hope we would agree that guardrails would need to be in place if someone, let's say my age, would want to participate in sports based on a different age. So, what, what we're doing here, and I hope that it's not lost in the dialog, but what we're doing here is talking about placing guardrails on these sports. It's not meant to be demeaning or

disrespectful. In fact, I would argue that for the individuals who are participating in their sports based on their natural-born gender, uh, I would argue that to them, it would seem that, that we are being very respectful to their natural-born gender. Thank you, Mr. Chair.

| | | |
|---|---|---|
| Chairman Capito: | 43:19 | Chair recognizes the Gentleman from, the Gentleman from the 37th. |
| Del. Pushkin: | 43:23 | Thank you Chairman Capito. Um, as one who has age subjectivity, I think I'm a lot younger than I actually am by the way, but, um, I apologize. You know, we're here at this late hour, uh, debating a bill that I complete, I feel is completely unnecessary. One of the, you know, my friend from the 13th's talking about guardrails. I'll tell you that most roads don't have guardrails because there's not a danger there. You put guardrails up where there's an actual, real danger of someone going off the side of the road but we don't have a single case of it. We are truly creating, looking for a solution in search of a problem and the solution itself is more problematic than the perceived problem. |
| | | We heard through testimony, this is one of the most alienated groups you can think of. Teens who are struggling with their own identity at the . . . All teens are struggling with their own identity. But especially, transgender teens who are, are incredibly alienated and struggling, we're going to, their legislature is, is up, here at 4:00 on a Friday, uh, deliberating this bill that's aimed directly at them for no apparent reason 'cause we don't even have any cases of it here. |
| | | So I would not, I mean I, I definitely wouldn't assign motives. I don't know what everybody's motives are. I'm sure there are some folks who really think this is a problem. I would beg of you to do some research and see and you'll find out it hasn't been a problem. And I think that there's a lot of us here who are wondering how they're going to vote. And they don't, they know it's not really a problem but they're still kind of not sure how they're going to come down on this vote. And I would just pray that you can muster up half the courage that these kids have who we're alienating with this bill. If you could muster up half the courage they have and vote this, this bill down 'cause it's completely unnecessary. |
| Chairman Capito: | 45:15 | Is there further discussion on a motion? Is there further discussion? If not, the question before the committee is on the Gentleman from the 32nd's motion to report out the committee substitute for House Bill 3293 to the full house for the recommendation of the committee substitute do pass. All in favor, please signify by saying aye. |

Page 20 of 21

| Audience: | 45:31 | Aye. |
|-----------|-------|------|
| Chairman Capito: | 45:32 | All those opposed, please signify by saying no. |
| Audience: | 45:34 | No. |
| Chairman Capito: | 45:36 | Aye's appear to have it. |
| Audience: | 45:38 | Division. |
| Chairman Capito: | 45:39 | Division's been called. Please raise one hand if you are in favor. One hand if you are opposed. On the question of adoption, there are 16 yes's and five no's. The motion is adopted and the committee substitute for House Bill 3293 will be reported into the floor with a recommendation that it do pass. There are two subcommittees, uh, that are out there. Actually, there's three subcommittees that are out there. Um, and I believe some of those intend to perhaps meet next week. So, uh, listen for those announcements on the floor. Is there any further business to come before the committee? If not, everybody have a nice weekend. Gentleman from the 32nd. |
| Del. Haynes: | 46:33 | 9:30 |
| Chairman Capito: | 46:36 | 9:30. |
| Del. Haynes: | 46:37 | And Mr. Chairman, I move we adjourn. |
| Chairman Capito: | 46:40 | All those in favor please signify by saying aye. |
| Audience: | 46:43 | Aye. |
| Chairman Capito: | 46:43 | All oppose, no. Aye's appear to have it. |