IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA
CHARLESTON DIVISION

| | |
|---|---|
| B.P.J. by her next friend and mother, HEATHER JACKSON,<br><br>     *Plaintiff*,<br><br>  v.<br><br>WEST VIRGINIA STATE BOARD OF EDUCATION, HARRISON COUNTY BOARD OF EDUCATION, WEST VIRGINIA SECONDARY SCHOOL ACTIVITIES COMMISSION, W. CLAYTON BURCH in his official capacity as State Superintendent, DORA STUTLER in her official capacity as Harrison County Superintendent, and THE STATE OF WEST VIRGINIA,<br><br>     *Defendants*,<br><br>   and<br><br>LAINEY ARMISTEAD,<br><br>     *Defendant-Intervenor*. | Civil Action No. 2:21-cv-00316<br><br>Hon. Joseph R. Goodwin<br><br>**PLAINTIFF'S STATEMENT OF UNDISPUTED MATERIAL FACTS** |

I.   **B.P.J. Is A Girl Who Is Transgender.**

1.    B.P.J. is an eleven-year-old girl who is also transgender. (Ex. 2[1] (Declaration of B.P.J.)

    ¶ 2; Ex. 12 (Deposition Transcript of B.P.J.) at 25:3-5, 25:11-14, 25:23-26:3; Ex. 13

    (Deposition Transcript of Heather Jackson, Jan. 19) at 59:5-6; Ex. 15 (Deposition

    Transcript of Wesley Scott Pepper) at 46:16-20; Dkt. No. 252 (Stipulation of Uncontested

    Facts Agreed to by Harrison County Board of Education, County Superintendent Dora

    Stutler, and Plaintiff) ("County Stip.") ¶ 1; Dkt. No. 270 (Stipulation of Uncontested Facts

    Agreed to by West Virginia State Board of Education, State Superintendent W. Clayton

---

[1] "Ex." refers to an exhibit attached to the April 21, 2022, declaration of Loree Stark submitted in support of Plaintiff B.P.J.'s motion for summary judgment.

Burch, and Plaintiff) (WVBOE Stip.) ¶ 1; Dkt. No. 158 (WVSSAC's Answer to Plaintiff's First Amended Complaint ("WVSSAC Ans.") ¶¶ 1, 6, 30.) B.P.J. was designated male at birth and has a female gender identity. (Ex. 1-A (Declaration of Heather Jackson) at 1; Ex. 1-B at 2.)

2.  B.P.J. is fiercely protected by her mother, Heather Jackson; unconditionally loved by her father, Wesley Pepper; and has the support of her older brothers and grandparents. (Ex. 1 ¶¶ 4, 22–23; Ex. 2 ¶ 5; Ex. 15 at 165:21-166:1, 185:5-16.)

3.  When B.P.J. was in third grade, she socially transitioned at school to living and presenting in accordance with her identity as a girl. (Ex. 1 ¶ 11; Ex. 12 at 39:6-39:24.) "Social transition" means allowing a transgender child to live and be socially recognized in accordance with their gender identity. (Ex. 22 (Declaration and Expert Report of Deanna Adkins, M.D.) ¶ 27.)

4.  B.P.J.'s elementary school and middle school have both acknowledged and respect that B.P.J.'s gender identity is female. (Dkt. No. 252 (County Stip.) ¶ 1.)

5.  When B.P.J. was in elementary school, her school created a gender support plan designed to help "account[]" for and "support[]" B.P.J.'s "authentic gender" at school. (Ex. 1-A at 1; Ex. 2 ¶ 6; Dkt. No. 252 (County Stip.) ¶ 1.)

6.  Under this plan, school staff were informed that B.P.J.'s authentic gender is female, and were instructed to refer to her with her female name and using female pronouns. (Ex. 1-A at 2–3.)

7.  Under the gender support plan, school staff were also informed on how to support B.P.J. if she faced problems from others at school because of her gender. (Ex. 1-A at 2–3.)

8.  B.P.J.'s middle school created a similar plan. (Ex. 1-B.)

9.    Like the elementary school plan, B.P.J.'s middle school gender support plan confirmed that B.P.J.'s parents are aware of and supportive of her gender identity and that B.P.J. "is comfortable with others knowing her gender identity and transition," and provided that "all teachers," students, and multiple administrators and county staff would be made aware of her gender identity. (Ex. 1-B at 2.)

10.    Under the elementary and middle school gender support plans, if anyone has questions about B.P.J.'s identity, teachers and staff should "[b]e open and honest" and respond, "[s]he is [B.P.J.]; and that makes her happy." (Ex. 1-A at 2; Ex. 1-B at 3.)

11.    B.P.J. feels supported by her school given its commitment to treating her as the girl she is. (Ex. 2 ¶ 6; Ex. 12 at 130:3-132:13.)

12.    In 2019, B.P.J. was diagnosed with gender dysphoria by Dr. Gerald Montano, a pediatrician at the University of Pittsburgh Medical Center Children's Hospital of Pittsburgh's Gender and Sexuality Development Program. (Ex. 1 ¶ 13; Ex. 2 ¶ 7; Ex. 20 (Deposition Transcript of Gerald Montano, D.O.) at 93:17-19; Ex. 5 (State of West Virginia's Response to Plaintiff's Second Set of Requests for Admission) No. 5; Ex. 6 (Superintendent Dora Stutler's Responses and Objections to Plaintiff's Second Set of Requests for Admission) No. 5; Ex. 7 (Harrison County Board of Education's Responses and Objections to Plaintiff's Second Set of Requests for Admission) No. 5.)

13.    On June 15, 2020, at the first signs of puberty—known as the "Tanner 2" stage of pubertal development—B.P.J. began receiving puberty delaying (or "blocking") treatment, in accordance with the Endocrine Society's clinical guidelines for treating gender dysphoria. (Ex. 1 ¶ 14.)

14.     B.P.J. has been on puberty delaying treatment for nearly two years. (Ex. 1 ¶ 14; Ex. 2 ¶ 8;
        Ex. 20 at 115:22-116:4; Ex. 19 (Deposition Transcript of Kacie Kidd, M.D.) at 89:22-
        90:18.)

15.     "Puberty blocking treatment works by pausing endogenous puberty at whatever stage it is
        at when the treatment begins." (Ex. 22 ¶ 30.)

16.     When administered to transgender girls at the beginning of the "Tanner 2" stage of sexual
        maturity, puberty-blocking medication prevents transgender girls from experiencing levels
        of circulating testosterone above what is typical for non-transgender girls and women. (Ex.
        24 (Expert Report and Declaration of Joshua D. Safer, M.D., F.A.C.P., F.A.C.E.) ¶ 50; Ex.
        25 (Rebuttal Expert Report and Declaration of Joshua D. Safer, M.D., F.A.C.P., F.A.C.E.)
        ¶ 17; Ex. 22 ¶ 31.)

17.     As a result of receiving puberty-delaying medication at the beginning of the "Tanner 2"
        stage of pubertal development, B.P.J. has not gone through her endogenous puberty and
        has not experienced the effects of testosterone that would be typical if she underwent her
        full endogenous puberty. (Ex. 22 ¶¶ 30–31; Ex. 19 at 119:22-120:15.) Specifically, she has
        never experienced levels of circulating testosterone above what is typical for non-
        transgender girls and women. (Ex. 24 ¶ 50; Ex. 25 ¶ 17; Ex. 22 ¶ 31.)

18.     If B.P.J. goes on to receive gender-affirming hormone therapy, she will receive the same
        amount of estrogen during puberty that non-transgender girls generate endogenously and
        will develop the same changes to bone size, skeletal structure, pelvis shape, fat distribution,
        and secondary sex characteristics that are typically experienced by non-transgender girls
        who go through a typically female puberty. (Ex. 25 ¶ 17; Ex. 22 ¶ 43.)

## II. B.P.J.'s Wishes To Participate In And Experience The Benefits Of School Sports.

19. B.P.J. has always liked running and loves playing team sports. (Ex. 2 ¶¶ 3, 13; Ex. 12 at 65:2-4, 145:15-18, 67:21-68:6.)

20. While in elementary school, she enjoyed participating in a recreational cheerleading team with other girls. (Ex. 1 ¶¶ 16–18; Ex. 2 ¶¶ 9–11; Ex. 12 at 72:21-72:22.)

21. As someone who comes from a family of runners, B.P.J. also grew up running and watching her older brothers and mother run competitively and as part of a team. (Ex. 1 ¶ 20; Ex. 2 ¶ 13.)

22. School-sponsored athletics offer a range of educational and social benefits for children and young adults, including camaraderie, cooperation, leadership, teamwork, watching out for fellow players, trust, physical fitness, perseverance, sportsmanship, and discipline. (Dkt. No. 78 (State of West Virginia's Answer to Plaintiff's First Amendment Complaint) ("State Ans.") ¶ 38; Dkt. No. 131 (Lainey Armistead's Answer to Plaintiff's First Amended Complaint) ("Armistead Ans.") ¶ 38; Dkt. No. 156 (West Virginia State Board of Education's Answer to Plaintiff's First Amendment Complaint) ("WVBOE Ans.") ¶ 38; Dkt. No. 157 (Harrison County Board of Education's Answer to Plaintiff's First Amendment Complaint) ("County Ans.") ¶ 38; Dkt. No. 158 (WVSSAC Ans.) ¶ 38; Ex. 27 (Expert Report and Declaration of Mary D. Fry, Ph.D.) ¶¶ 18, 37; Ex. 16 (Deposition Transcript of Harrison County Board of Education 30(b)(6) Designees) at 106:22-106:24, 222:9-17; Ex. 8 (West Virginia State Board of Education's Responses to Plaintiff's Second Set of Requests for Admission) Nos. 45–47; Ex. 17 (Deposition Transcript of WVSSAC 30(b)(6) Designee) at 113:8-11; Ex. 21 (Deposition of Lainey Armistead) at 156:17-25; Dkt. No. 95-1 (Declaration of Lainey Armistead) ¶ 27; Ex. 11 (Lainey Armistead's

Responses and Objections to Plaintiff's Second Set of Requests for Admission) Nos. 44–45.)

23. The benefits from school athletics can contribute to greater success in college and throughout life. (Ex. 27 ¶¶ 18, 37.)

24. These benefits exist regardless of whether a student wins or loses. (Ex. 5 No. 47; Ex. 6 No. 47; Ex. 8 No. 47; Ex. 9 (State Superintendent W. Clayton Burch's Responses to Plaintiff's Second Set of Requests for Admission) No. 47; Ex. 10 (WVSSAC's Responses to Plaintiff's Second Set of Requests for Admission) No. 47; Ex. 11 No. 47; Ex. 27 ¶ 35).

25. These benefits are advanced when all athletes have the opportunity to play the sport they love. (Ex. 27 ¶ 18.)

26. Encouraging student-athletes to focus on improving their own performance and cooperation with teammates maximizes the benefits of athletics for all participants. (Ex. 27 ¶¶ 28–30, 35.)

27. Where coaches create an environment in which student-athletes feel safe, valued, and respected, performance is improved and the benefits of sport are maximized. (Ex. 27 ¶¶ 26, 34.)

28. Excluding students for no other reason than because they are transgender eliminates the benefits of sports for them and diminishes those benefits for all participants. (Ex. 27 ¶¶ 37–41.)

29. B.P.J. has experienced benefits from participating in cheerleading in the past and from participating in cross-country in the 2021-22 school year. (Ex. 1 ¶¶ 17–18, 28; Ex. 2 ¶¶ 10–11, 16–18.)

30.     B.P.J. hopes to continue to experience such benefits from playing on girls' teams in the future. (Ex. 2 ¶ 21.)

**III.    Prior To H.B. 3293, West Virginia Had A Longstanding Policy Of Sex Separation In School Sport And Did Not Categorically Bar Transgender Students From Participating.**

31.     Before it passed H.B. 3293, West Virginia had a general, longstanding, and unchallenged policy establishing separate school sports teams for boys and girls. *See* W. Va. Code R. § 127.

32.     Almost all sports in West Virginia at the public secondary school level are separated into boys' and girls' teams. (Ex. 17 109:24-110:4.) The exceptions are cheerleading, football, baseball, wrestling, and golf. (Ex. 10 Nos. 29–30; Ex. 17 at 109:24-110:4.)

33.     Cheer teams are always designated as "coed" or "mixed," whereas football, baseball, wrestling, and golf teams are boys' teams that permit girls to play if they so desire because no separate girls' teams exist, and so are considered "mixed . . . to respond to demand." (Ex. 17 at 104:2-105:6.)

34.     In practice, cheer "almost always has boy [and girl] members," but baseball and football are "very seldom" actually mixed. (Ex. 17 at 104:17-20.)

35.     There are no co-ed teams for cross-country or track at Bridgeport Middle School or at any other public secondary school in West Virginia. (Ex. 10 Nos. 30–31.)

36.     Under rules established by the West Virginia Secondary School Activities Commission ("WVSSAC")—which were already in existence when H.B. 3293 was enacted—cisgender boys are prohibited from playing on girls' teams at the public secondary school level. (Ex. 17 at 105:4-105:16; Ex. 39 (WVSSAC000148) at § 127-2-3.8; Ex. 7 Nos. 38–39; Ex. 8 Nos. 38–39; Ex. 10 Nos. 38–39; Ex. 11 Nos. 38–39.)

37. By contrast, girls may choose to play on a boys' team if they wish to do so and no girls' team exists, as is the case with football, baseball, wrestling, and golf. (Ex. 17 104:2-105:6.)

38. West Virginia did not have a law or policy prohibiting girls who are transgender from playing on girls' teams before it passed H.B. 3293.

39. Before H.B. 3293, the WVSSAC Board of Directors had an internal policy that allowed students who are transgender to participate on teams consistent with their gender identity if the transgender student's school allowed them to participate, based on its considerations of whether that specific student's participation would impact "fair competition among high school teams." (Ex. 37 (WVSSAC000008).) Under the internal policy, if another school contested the transgender student's eligibility to play, then the Board of Directors would determine whether the student's participation threatened "competitive equity or the safety of teammates and opposing players." (*Id.*)

40. The WVSSAC received no complaints about this internal policy, and the WVSSAC is not aware of any instances of a transgender student attempting to participate under this policy. (Ex. 17 at 118:23-119:16.)

41. Since 2011, the National College Athletics Association ("NCAA") has allowed women who are transgender to participate on women's teams after completing one year of testosterone suppression. (Ex. 24 ¶ 38.)

42. In 2022, the NCAA announced that it had revised its policy to adopt a "sport-by-sport approach" that "calls for transgender participation for each sport to be determined by the policy for the national governing body of that sport, subject to ongoing review and recommendation by the NCAA Committee on Competitive Safeguards and Medical Aspects of Sports to the Board of Governors." (Ex. 24 ¶ 39.)

IV.    **H.B. 3293 Categorically Bans Transgender Girls And Women From Participating On Girls' And Women's Sports Teams.**

43.    On April 9, 2021, West Virginia passed H.B. 3293. W. Va. Code § 18-2-25d. H.B. 3293 went into effect 90 days later. *Id.*

44.    H.B. 3293 categorically bans all girls who are transgender from participating in school sports from middle school through college. W. Va. Code § 18-2-25d.

45.    H.B. 3293 requires that all public secondary school or college sports in West Virginia be "expressly designated" as either "males," "females," or "co-ed" based solely on a student's "biological sex." W. Va. Code §§ 18-2-25d(b), (c).

46.    H.B. 3293 defines "[b]iological sex" as "an individual's physical form as a male or female based solely on the individual's reproductive biology and genetics at birth." W. Va. Code § 18-2-25d(b)(1).

47.    H.B. 3293 further provides that "[a]thletic teams or sports designated for females, women, or girls shall not be open to students of the male sex where selection for such teams is based upon competitive skill or the activity involved is a contact sport." W. Va. Code § 18-2-25d(c)(2). There is no parallel provision for boys' teams.

48.    The legislative findings for H.B. 3293 reject the notion of allowing students to play on sports teams consistent with their "gender identity," asserting that "gender identity is separate and distinct from biological sex" and that "[c]lassifications based on gender identity serve no legitimate relationship to the State of West Virginia's interest in promoting equal athletic opportunities for the female sex." W. Va. Code § 18-2-25d(a)(4).

49.    H.B. 3293's definition of "biological sex" categorically excludes B.P.J. and any other transgender girl from playing sports at the middle school, high school, and collegiate levels. (Ex. 5 Nos. 24 (admitting "that H.B. 3293 prohibits Plaintiff B.P.J. from participating on

9

girls' athletic teams at all public secondary schools located in West Virginia"), 36–37; Ex. 6 Nos. 36–37; Ex. 7 Nos. 20–22, 36–37; Ex. 8 Nos. 36–37; Ex. 9 Nos. 20–22, 36–37; Ex. 10 Nos. 36–37; Ex. 11 Nos. 36–37; Dkt. No. 252 (County Stip.) ¶ 2; Dkt. No. 270 (WVBOE Stip.) ¶ 2; Ex. 16 at 100:21-101:4; Ex. 17 at 113:16-20; Ex. 28 (Deposition Transcript of Mary D. Fry, Ph.D.) 180:18-20 (Q. [from Attorney David Tryon] Well, right now the rule is HB-3293, which says that [a] transgender girl must participate on the boys['] team.).)

50. H.B. 3293 does not prohibit a cisgender girl at any public secondary school in West Virginia from joining a girls' athletic team. (Ex. 5 Nos. 34–35; Ex. 6 Nos. 34–35; Ex. 7 Nos. 34–35; Ex. 8 Nos. 34–35; Ex. 9 Nos. 34–35; Ex. 10 Nos. 34–35; Ex. 11 Nos. 34–35; Ex. 16 at 100:2-101:4; Ex. 18 (Deposition Transcript of State Board of Education 30(b)(6) Designee) at 124:11-25, 125:3-19.)

51. Melissa White, counsel for the House of Delegates Education Committee, referred to H.B. 3293 as a "[t]ransgender participation in secondary schools bill" (Ex. 40 (WVSBOE 000008).)

52. Melissa White also described the bill as a "[t]ransgender originating bill" (Ex. 40 (WVSBOE000039)) and a "bill regarding transgender participation in sports" (Ex. 40 (WVSBOE000009).)

53. During debates over the bill, when asked how H.B. 3293 would change the status quo in West Virginia, the counsel representing the bill replied that the bill "would affect those that changed their sex after birth" and further explained that H.B. 3293 "would not affect" a man who was assigned a male sex at birth. (Ex. 35 (West Virginia House of Delegates Education Committee Testimony, Mar. 18, 2021) at 9.)

54.     A member of the West Virginia House of Delegates and Chairman of the Education Committee, Joe Ellington, described the "issue" that H.B. 3923 was designed to address as "two transgender girls" who "were allowed to compete in state track and field meetings in Connecticut." (Dkt. No. 1-1 (Declaration of Loree Stark) Ex. D (West Virginia House of Delegates, Mar. 25, 2021) at 3; Dkt. No 25 (Supplemental Declaration of Katelyn Kang) Ex. C at 37–38.)

55.     During the debate in the Senate, one senator, Michael J. Maroney, expressly noted that "the bill" is "about transgenders." (Dkt. No. 1-1 (Declaration of Loree Stark) Ex. E (West Virginia Senate, Apr. 8, 2021) at 2; Dkt. No. 25 (Supplemental Declaration of Katelyn Kang) Ex. F at 32.)

56.     Another senator, Rollan Roberts, shared a constituent letter stating that the "trans movement is an attack upon womanhood." (Dkt. No. 1-1 (Declaration of Loree Stark) Ex. E (West Virginia Senate, Apr. 8, 2021) at 3; Dkt. No. 25 (Supplemental Declaration of Katelyn Kang) Ex. F at 32.)

57.     On March 16, 2021, Delegate Jordan Bridges announced on Facebook that he was co-sponsoring H.B. 3293 and then "liked" comments on his post that advocated for physical violence against girls who are transgender, compared girls who are transgender to pigs, and called girls who are transgender by a pejorative term ("tranny"). (Ex. 42 (Jordan Bridges, "Update: The bill passed out of committee," Facebook, https://perma.cc/HA5C-VJ4N (March 16, 2021)).)

58.     The sole justification for H.B. 3293 offered in the legislative text is "promot[ing] equal athletic opportunities for the female sex." W. Va. Code § 18-2-25d(a)(5). The law discusses

equal athletic opportunities only in terms of the "substantial" displacement of female athletes. *Id.* § 18-2-25d(a)(3)-(4).

59. During the discovery period, the State identified additional rationalizations that it claims are advanced by H.B. 3293: (1) "[t]o [p]rotect [w]omen's [s]ports," (2) "[t]o follow Title IX," and (3) "[t]o protect women's safety in female athletic sports." (Ex. 4 (State of West Virginia's Responses to Plaintiff's First Set of Interrogatories) No. 6.)

60. During a House committee hearing of the bill, Sarah Stewart from the West Virginia Department of Education testified that her office had never received any calls or complaints about transgender students participating in athletics. (Ex. 35 at 11.)

61. The bill's sponsors also acknowledged that they were not aware of a single instance of a transgender athlete having ever competed on a secondary school or higher education sports team in West Virginia, let alone any "problem" from such participation. (Dkt. No. 1-1 (Declaration of Loree Stark) Ex. B (West Virginia House of Delegates Education Committee, Mar. 18, 2021) at 1–2, Ex. C (West Virginia House of Delegates Judiciary Committee, Mar. 18, 2021) at 1, Ex. D (West Virginia House of Delegates, Mar. 25, 2021) at 1.)

62. When Governor Justice was asked after signing the bill whether he could give "one example of a transgender child trying to get an unfair advantage," he responded, "No, I can't really tell you one." Ex. 43 (MSNBC on Twitter, https://twitter.com/MSNBC/status/1388132937707802629 [https://perma.cc/G8VM-QGYU] (April 30, 2021).) He further indicated that the issue purportedly addressed by H.B. 3293 was not a priority for him, stating, "I didn't make it a priority. It wasn't my bill. . . . This is not like it's a big priority to me. . . . I think we only have 12 kids maybe in our state that are transgender-type kids. I

mean, for crying out loud . . . I sign hundreds of bills, hundreds of bills. This is not a priority to me." (*Id.*)

63.    Defendants were not aware of any transgender student athletes participating on an athletic team offered by a public secondary school in West Virginia when H.B. 3293 was passed. (Defendants' Responses to Plaintiff's Second Set of Requests for Admission Nos. 40–41.)

64.    Defendants are not currently aware of a transgender student athlete other than B.P.J. participating on an athletic team offered by Bridgeport Middle School or any other public secondary school in West Virginia. (Ex. 5 Nos. 42–43; Ex. 6 Nos. 42–43; Ex. 7 Nos. 42–43; Ex. 8 Nos. 42–43; Ex. 9 Nos. 42–43; Ex. 10 Nos. 42–43; Ex. 11 Nos. 42–43; Ex. 17 at 119:13-16.)

65.    WVSSAC has not received any complaints about transgender students participating in school sports in West Virginia. (Ex. 17 at 120:9-15.)

66.    The West Virginia Department of Education's General Counsel described H.B. 3293 as "much ado about nothing." (Ex. 40 (WVSBOE000006).)

67.    The West Virginia Department of Education did not support H.B. 3293 when it was passed. (Ex. 41 (WVSBOE000038).)

68.    The State Board's 30(b)(6) witness testified that the Board had "not had an issue" and "didn't see an issue" regarding the participation of transgender girls in school sports, and that the Department of Education, State Board, and State Superintendent have never received any complaints regarding students who are transgender participating in school sports. (Ex. 18 at 67:3-10, 101:15-17, 102:12-13, 113:19-114:16, 125:24-126:2, 135:24-136:19).

69.     The West Virginia Department of Education and the State Superintendent still do not

support H.B. 3293. (Dkt. No. 270 (WVBOE Stip.) ¶ 5.)

**V.      H.B. 3293's Exclusive Reliance On "Biological Sex" And Categorical Bar To The Participation Of Transgender Women And Girls Is A Stark Departure From The Inclusive Policies Of Major Sporting Associations.**

70.     H.B. 3293 classifies school sports teams "according to biological sex" and defines

"biological sex" as "an individual's physical form as male or female based solely on the

individual's reproductive biology and genetics at birth." W. Va. Code § 18-2-25d(a)(5),

(b)(1).

71.     Scientists recognize that a person's sex encompasses different biological components,

including sex chromosomes, certain genes, gonads, exposure to sex hormone, internal and

external genitalia, and other secondary sex characteristics, which are not always aligned in

the same direction. (Ex. 25 ¶¶ 5–6 (and sources cited therein)); Ex. 23 (Exhibit 4 to

Deposition Transcript of Deanna Adkins, M.D. (Hembree WC, et al. Endocrine Treatment

of Gender Dysphoria/Gender Incongruent Persons: An Endocrine Society Clinical Practice

Guideline. J Clin Endocrinol Metab 2017; 102:3869-3903 ("Endocrine Society Guidelines

2017") at 3875)).)

72.     Although the precise biological causes of gender identity are unknown, gender identity

itself has biological underpinnings, possibly as a result of variations in prenatal exposure

to sex hormones, gene sequences, epigenetics, or a combination of factors. (Ex. 25 ¶ 6 (and

sources cited therein); Ex. 23 (Endocrine Society Guidelines 2017 at 3874–75).)

73.     H.B. 3293's requirement that teams be separated "based solely on the individual's

reproductive biology and genetics at birth" is a stark departure from the prior policy in

West Virginia and is not the rule used by elite sporting organizations.

74.     The NCAA, World Athletics, and the International Olympic Committee ("IOC") all permit transgender girls and women to compete in women's sport events after suppressing their levels of testosterone for particular periods of time or below particular thresholds. (Dkt. No. 78 (State Ans.) ¶ 42; Dkt. No. 131 (Armistead Ans.) ¶ 42; Dkt. No. 156 (WVBOE Ans.) ¶ 42; Dkt. No. 157 (County Ans.) ¶ 42; Dkt. No. 158 (WVSSAC Ans.) ¶ 42; Ex. 24 ¶¶ 27–39.)

75.     The NCAA's policy is described above. *See supra* ¶¶ 41–42. The NCAA policy aims to "preserve[] opportunity for transgender-student athletes." (Ex. 45 (NCAA, *Board of Governors updates transgender participation policy* (Jan. 19, 2022), https://www.ncaa.org/news/2022/1/19/media-center-board-of-governors-updates-transgender-participation-policy.aspx).)

76.     Since 2011, World Athletics, the international governing body for track-and-field athletics, has required that women with elevated levels of circulating testosterone lower their levels of testosterone below a threshold amount in order to compete in elite international women's sports competitions. (Ex. 24 ¶ 27.)

77.     In 2019, World Athletics adopted regulations allowing women who are transgender to participate in elite international women's sports competitions if their total testosterone level in serum is beneath a particular threshold—5 nmol/L—for at least one year before competition. (Ex. 24 ¶ 29.)

78.     The IOC published formal eligibility rules for the participation of transgender women in 2003. Those rules required that transgender women athletes could compete in women's events only if they had genital surgery, a gonadectomy (*i.e.*, removal of the testes), and legal documentation of female sex. (Ex. 24 ¶ 31.)

79.   In 2015, the IOC adopted new policies allowing women who are transgender to participate on women's teams if they demonstrated that their total testosterone level in serum was below 10 nmol/L for at least one year prior to competition. (Ex. 24 ¶ 33.)

80.   In 2021, the IOC adopted a new "Framework on Fairness, Inclusion, and Non-Discrimination on the Basis of Gender Identity and Sex Variations," which replaces the 2015 guidance. (Ex. 24 ¶ 34.)

81.   Unlike the IOC's 2003 and 2015 policies, the IOC's 2021 framework does not attempt to adopt a single set of eligibility standards for the participation of transgender athletes that would apply universally to every IOC sport. Instead, the 2021 framework provides a set of governing principles for sporting bodies to follow when adopting eligibility rules for their particular sport. (Ex. 24 ¶ 35.)

82.   Under the 2021 framework, "[n]o athlete should be precluded from competing or excluded from competition on the .exclusive ground of an unverified, alleged or perceived unfair competitive advantage due to their sex variations, physical appearance and/or transgender status." (Ex. 24 ¶ 36.) "Until evidence . . . determines otherwise, athletes should not be deemed to have an unfair or disproportionate competitive advantage due to their sex variations, physical appearance and/or transgender status." (Ex. 24 ¶ 36.)

83.   The 2021 framework further provides that "[a]ny restrictions arising from eligibility criteria should be based on robust and peer reviewed research that: (a) demonstrates a consistent, unfair, disproportionate competitive advantage in performance and/or an unpreventable risk to the physical safety of other athletes; (b) is largely based on data collected from a demographic group that is consistent in gender and athletic engagement with the group that the eligibility criteria aim to regulate; and (c) demonstrates that such

disproportionate competitive advantage and/or unpreventable risk exists for the specific sport, discipline and event that the eligibility criteria aim to regulate." (Ex. 24 ¶ 37.)

84. USA Swimming recently adopted a policy allowing girls and women who are transgender to apply to compete in elite events if they demonstrate that their "prior physical development . . . as mitigated by any medical intervention, does not give the athlete a competitive advantage over the athlete's cisgender [f]emale competitors" and they "demonstrate[] that the concentration of testosterone in the athlete's serum has been less than 5 nmol/L . . . continuously for a period of at least thirty-six (36) months before the date of the Application." (Ex. 29 (Declaration of Gregory A. Brown, P.H.D., F.A.C.S.M.) ¶ 177.)

85. A person's genetic makeup and internal and external reproductive anatomy are not useful indicators of athletic performance and have not been used in elite competition for decades. (Ex. 24 ¶ 49.)

86. Some people with 46,XY chromosomes may have inactive testosterone receptors (a syndrome called "complete androgen insensitivity syndrome, CAIS") which means they do not respond to testosterone despite very high levels. (Ex. 24 ¶ 26(b).)

87. Usually, people with CAIS have female gender identity and have external genitalia that are typically female. They do not develop the physical characteristics associated with typical male puberty. (Ex. 24 ¶ 26(b).)

88. It has long been recognized that women with CAIS do not have an athletic advantage over other women simply by virtue of having XY chromosomes. (Ex. 24 ¶ 59.)

89. There is a medical consensus that the largest known biological cause of average differences in athletic performance between non-transgender men as a group and non-transgender

women as a group is circulating testosterone beginning with puberty. (Ex. 24 ¶ 25; Ex. 25 ¶ 8; Ex. 29 ¶ 114 ("While boys exhibit some performance advantage even before puberty, it is both true and well known to common experience that the male advantage increases rapidly, and becomes much larger, as boys undergo puberty and become men.").)

90. Before puberty, boys and girls typically have the same levels of circulating testosterone, and age-grade competitive sports records show only modest differences in athletic performance between non-transgender boys and non-transgender girls. (Ex. 24 ¶¶ 24–25; Ex. 26 (Exhibit 4 to Deposition Transcript of Joshua D. Safer (Handelsman 2018 ("Age-grade competitive sports records show minimal or no female disadvantage prior to puberty[.]"))); Ex. 26 ¶ 114 (describing differences as "modest").)

91. There have been no studies purporting to establish that any modest differences in athletic performance between pre-pubertal cisgender boys and pre-pubertal cisgender girls are attributable to innate physiology as opposed to social factors. (Ex. 30 (Deposition Transcript of Gregory A. Brown) at 94:19-23; Ex. 25 ¶ 9.)

92. H.B. 3293 does not provide for any consideration of circulating testosterone levels. W. Va. Code § 18-2-25d.

**VI.    H.B. 3293 Harms B.P.J.**

93. Under H.B. 3293, B.P.J. is forbidden from playing on a girls' team at Bridgeport Middle School, or on a girls' athletic team at any public secondary school in West Virginia. (Ex. 5 Nos. 20-24; Ex. 6 Nos. 20-24; Ex. 7 Nos. 20-24; Ex. 8 Nos. 20-24; Ex. 9 Nos. 20-24; Ex. 10 Nos. 20-24; Ex. 11 Nos. 20-24; Dkt. No. 252 (County Stip.) ¶ 2; Dkt. No. 270 (WVBOE Stip.) ¶ 2.)

94.  In May 2021, B.P.J.'s mother, Heather Jackson, met with B.P.J.'s new Principal at Bridgeport Middle School, David Mazza, regarding a gender support plan for B.P.J., which specified the ways the school would support B.P.J. as a girl. (Ex. 1 ¶ 23; Ex. 16 at 95:25-96:6).

95.  At that same meeting, Ms. Jackson informed Principal Mazza that B.P.J. wanted to participate on the girls' cross-country team. (Ex. 1 ¶ 24; Ex. 1-B at 5; Ex. 14 (Deposition Transcript of Heather Jackson (Jan. 20, 2022)) at 250:14-252:7; Ex. 16 at 220:2-16.) In response to Ms. Jackson's statement, Principal Mazza communicated to Ms. Jackson that B.P.J. would not be able to run on the girls' cross-country team because of H.B. 3293. (Ex. 1 ¶ 24; Ex. 12 at 129:21-130:2, 106:16-21, 107:3-11; Ex. 13 at 21:22-22:16; Ex. 14 at 250:8-251:12; Ex. 16 at 220:19-22; Dkt. No. 157 (County Ans.) ¶¶ 63–65.)

96.  B.P.J. "just want[s] the opportunity to participate in school sports like any other girl." (Ex. 2 ¶ 21.)

97.  Forcing B.P.J. to run on the boys' team would be stigmatizing, isolating, hurtful, and devastating for her. (Ex. 1 ¶¶ 30–31; Ex. 2 ¶¶ 14–16, 21.)

98.  According to B.P.J., "[Being a girl] means—it means everything." (Ex. 12 29:24-30:5.) "I am not a boy. I do not want to run with the boys when there is a girls' team and I should not have to run with the boys when there is a girls' team." (Ex. 2 ¶ 15; *see also* Ex. 12 at 120:24-121:4.)

99.  According to B.P.J., "[r]unning with the girls means a lot to me because I am a girl, and I should be treated like a girl, just like all my friends who are girls. If I did not get to participate in cross-country or track, I would have missed out on the opportunity to spend time with my friends and grow with a new team." (Ex. 2 ¶ 16.) "It is so upsetting and

hurtful that some people want to take that chance away from me and treat me differently from everyone else just because I am transgender." (Ex. 2 ¶ 21.)

100.   According to B.P.J.'s mother, "[i]t is wrong and senseless to try to make [B.P.J.] participate on boys' teams when there are girls' teams available. Forcing B.P.J. to compete on the boys' cross-country or track teams when girls' teams are available would completely erase who she is, and it would devastate her because she is a girl." (Ex. 1 ¶ 30.) "Forcing her to run with the boys is a clear sign to her and others that the state refuses to see her and accept her for the girl that she is." (Ex. 1 ¶ 31.)

101.   B.P.J. does not have the option of running on a co-ed team, as there is no co-ed cross-country or track team at Bridgeport Middle School or at any other public secondary school in West Virginia. (Ex. 10 Nos. 30–31.)

102.   Preventing B.P.J. from playing sports with other girls will deprive B.P.J. of experiences of competition, friendship, and responsibility that come from participation in school sports. (Ex. 1 ¶¶ 28, 31; Ex. 2 ¶¶ 10–11, 14, 16–18.)

103.   It is hurtful and frustrating for B.P.J. to be denied the opportunity to play on girls' sports teams, and to be treated differently because she is transgender. (Ex. 2 ¶¶ 14, 21.)

104.   Allowing Defendants to enforce H.B. 3293 against B.P.J. would send a signal to B.P.J. that her state refuses to see her for the girl that she is. (Ex. 1 ¶ 31.)

**VII.   B.P.J.'s Lawsuit Challenges Her Exclusion From Girls' Sports Under H.B. 3293.**

105.   B.P.J. filed this lawsuit on May 26, 2021, arguing that H.B. 3293 as applied to her violates Title IX of the Education Amendments of 1972, 20 U.S.C. § 1681, and the Equal Protection Clause of the United States Constitution. (Dkt. No. 1 (Complaint).)

106.   B.P.J.'s Title IX claim is pleaded against the State of West Virginia, the State Board of Education, the County Board of Education, and the WVSSAC. (Dkt. No. 64 (First Amended Complaint) at 20.)

107.   B.P.J.'s Equal Protection Clause claim is pleaded against State Superintendent W. Clayton Burch, County Superintendent Dora Stutler, and the WVSSAC. (Dkt. No. 64 (First Amended Complaint) at 22; Dkt. No. 127 (Order dismissing without prejudice B.P.J.'s equal protection claim against the Attorney General in his official capacity).)

108.   The Harrison County Board of Education is the governing body of Harrison County's public education system. W. Va. Code § 18-5-1. The County Superintendent is responsible for executing educational policies under the direction of the State Board and County Board, including interscholastic athletics. W. Va. Code § 18-4-10.

109.   "[A]bsent an injunction, the County Board and County Superintendent would be compelled and required to enforce H.B. 3293 against B.P.J." (Dkt. No. 252 (County Stip.) at ¶¶ 3–4.) The County Board and County Superintendent's role in enforcing the law is "mandatory, not merely optional." (Dkt. No. 73 (Harrison County Board of Education's Memo in Support of Motion to Dismiss First Amended Complaint) at 2, 6; *see also* Ex. 16 at 44:15-45:12, 145:1-145:5.)

110.   "Absent an injunction by a court," the State Board and Superintendent Burch "would be compelled and required to follow H.B. 3293" and the State Board "would be compelled and required to promulgate rules implementing H.B. 3293." (Dkt. No. 270 (WVBOE Stip.) ¶¶ 3–4; *see also* Ex. 18 at 118:1-3.)

111.   Without an injunction, the WVSSAC "cannot adopt or enforce any policy" allowing girls who are transgender to participate on girls' sports teams that "conflicts with state law." (Ex. 10 No. 50.)

112.   The State Board is federally funded. (Dkt. No. 156 (WVBOE Ans.) ¶ 90; *see also* Ex. 18 at 39:19-40:3.)

113.   The County Board is federally funded. (Dkt. No. 157 (County Ans.) ¶ 90; *see also* (Dkt. No. 252 (County Stip.) ¶ 8); Ex. 7 No. 66).)

114.   The State Board has a duty to control, supervise, regulate, and/or enforce rules related to interscholastic athletic events in West Virginia. *See* W. Va. Code § 18-2-25; (Ex. 18 at 35:22-24.)

115.   The County Board has a duty to control, supervise, regulate, and/or enforce rules related to interscholastic athletic events in West Virginia. *See* W. Va. Code §§ 18-2-25, 18-5-13; (Ex. 16 at 53:24-54:10.)

116.   WVSSAC was given controlling authority over federally funded secondary school athletic programs by the State and County Boards. W. Va. Code § 18-2-25; (Ex. 39 (WVSSAC000133-38) (outlining the WVSSAC's powers over secondary schools and their athletics)).

117.   WVSSAC member schools must follow WVSSAC's rules and regulations when "conducting interscholastic athletic[s]" (Ex. 39 (WVSSAC0000134)) and when determining whether a student is eligible to play secondary school sports. (Ex. 17 at 73:4-73:8.)

118. WVSSAC's Board of Directors has "the power to decide all cases of eligibility of students and participants in interscholastic athletic[s]." (Ex. 39 (WVSSAC000138); *see also* Ex. 17 at 61:25-62:13.)

119. WVSSAC's athletic handbook provides that it must comply with Title IX. (Ex. 38 (WVSSAC000017).)

**VIII. This Court's Preliminary Injunction Allowed B.P.J. To Participate On Her School's Girls' Cross-Country And Track Teams, All Without Incident.**

120. After this Court issued its preliminary injunction on July 21, 2021, B.P.J. was permitted to participate on Bridgeport Middle School's girls' cross-country team. (Ex. 5 No. 6; Ex. 6 No. 6; Ex. 7 No. 6; Ex. 8 No. 6; Ex. 9 No. 6; Ex. 10 No. 6; Ex. 11 No. 6.)

121. B.P.J. participated in the Mountain Hollar MS Invitational meet and the Doddridge Invitational meet while she was on the cross-country team. (Ex. 1 ¶ 27.)

122. In the Mountain Hollar Invitational, B.P.J. placed 51 out of 66 participants. (Ex. 1 ¶ 27; Ex. 33 (Mountain Hollar Invitational Stats).)

123. In the Doddridge Invitational meet, B.P.J. placed 123 out of 150 participants. (Ex. 1 ¶ 27; Ex. 34 (Doddridge Invitational Stats, HCBOE_1167-HCBOE_1168).)

124. According to B.P.J: "My first cross-country season was awesome, and I felt supported by my coaches and the other girls on the team. I made so many new friends and loved competing with and supporting my teammates. We learned about teamwork, having a positive attitude, and how to have fun while being competitive." (Ex. 2 ¶ 18.)

125. In Spring 2022, B.P.J. tried out for, made, and began running on the girls' track team at Bridgeport Middle School. (Ex. 3 (Plaintiff's Second Set of Supplemental Responses and Objections to State of West Virginia's First Set of Interrogatories and Requests for Production) No. 9.)

126.   B.P.J. was "ecstatic" to learn she qualified for the track team and "look[s] forward to many more years of running with [her] peers." (Ex. 2 ¶¶ 20–21.)

127.   There were no complaints associated with B.P.J.'s participation on Bridgeport Middle School's girls' cross-country team. (Dkt. No. 252 (County Stip.) ¶ 5; Ex. 5 No. 9; Ex. 6 No. 9; Ex. 7 No. 9; Ex. 8 No. 9; Ex. 9 No. 9; Ex. 10 No. 9; Ex. 11 No. 9.)

128.   No student was cut from or otherwise not permitted to participate on the cross-country team as a result of B.P.J.'s participation. (Dkt. No. 252 (County Stip.) ¶ 6.)

129.   Defendant-Intervenor could not identify "any specific fairness issue" related to B.P.J.'s participation in girls' cross-country at her middle school. (Ex. 21 at 143:14-20.)

130.   Defendant-Intervenor responded, "I don't know," when asked whether she "object[ed] to B.P.J. playing on the Bridgeport Middle School girls' cross-country team." (Ex. 21 170:13-170:22.)

131.   Girls and women who are transgender have competed in a wide range of contact and collision sports in high school and college, including basketball, soccer, volleyball, softball, lacrosse, and women's tackle football, without any reported injuries to cisgender girls. (Ex. 31 (Declaration of Dr. Chad T. Carlson, M.D., F.A.C.S.M.) at 1; Ex. 32 (Deposition Transcript of Dr. Chad T. Carlson) at 124:6-125:4, 154:12-156:16.)

132.   There are significant variations in height, weight, and muscle mass within the population of cisgender girls, and within the population of cisgender boys, such that student athletes all the time play with or compete against students who are bigger, faster, and/or stronger than them, whether they are participating in single sex or co-ed teams. (Ex. 25 at 12 ¶ 27; Ex. 28 at 49:19-50:5, 51:18-22, 52:16-24, 189:13-19.)

133.   Any safety considerations attendant to differences in height, weight, and muscle mass are already addressed in West Virginia secondary schools through even-handed rules and the use of proper equipment. (Ex. 16 at 164:3-14, 228:14-22.)

134.   Any actual safety concerns attendant to girls who are transgender playing on girls' sports teams "can be addressed through even-handed rules instead of discriminating based on transgender status." (Ex. 25 at ¶ 4(d).)

135.   Defendant-Intervenor could not identify any safety concern resulting from B.P.J.'s participation on her middle school girls' cross-country team. (Ex. 21 at 139:25-140:4, "Q: . . . What is the safety concern for middle school cross-country and B.P.J. participating on the girls' team? . . . THE WITNESS: I don't know.")

136.   The State does not know of any middle school girl who was physically harmed by B.P.J.'s participation on the Bridgeport Middle School girls' cross-country team. (Ex. 5 No. 10.)

**IX.    Lainey Armistead Will Graduate West Virginia State University In May 2022.**

137.   Defendant-Intervenor Lainey Armistead will graduate from West Virginia State University in May 2022. (Ex. 22 at 67:21-25.)

Dated: April 21, 2022

Joshua Block*
AMERICAN CIVIL LIBERTIES UNION
FOUNDATION
125 Broad St.
New York, NY 10004
Phone: (212) 549-2569
jblock@aclu.org

Avatara Smith-Carrington*
LAMBDA LEGAL
3500 Oak Lawn Avenue, Suite 500
Dallas, TX 75219
Phone: (214) 219-8585
asmithcarrington@lambdalegal.org

Carl Charles*
Tara Borelli*
LAMBDA LEGAL
158 West Ponce De Leon Ave., Ste. 105
Decatur, GA 30030
Phone: (404) 897-1880
ccharles@lambdalegal.org

Sruti Swaminathan*
LAMBDA LEGAL
120 Wall Street, 19th Floor
New York, NY 10005
Phone: (212) 809-8585
sswaminathan@lambdalegal.org

Andrew Barr*
COOLEY LLP
1144 15th St. Suite 2300
Denver, CO 80202-5686
Phone: (720) 566-4000
abarr@cooley.com

Respectfully submitted,
/s/ *Loree Stark*

Loree Stark (Bar No. 12936)
Nick Ward (Bar No. 13703)
AMERICAN CIVIL LIBERTIES UNION OF WEST
VIRGINIA FOUNDATION
P.O. Box 3952
Charleston, WV 25339-3952
Phone: (914) 393-4614
lstark@acluwv.org

Kathleen Hartnett*
Julie Veroff*
Zoë Helstrom*
COOLEY LLP
3 Embarcadero Center, 20th Floor
San Francisco, CA 94111
Phone: (415) 693-2000
khartnett@cooley.com

Katelyn Kang*
Valeria Pelet del Toro*
COOLEY LLP
55 Hudson Yards
New York, NY 10001-2157
Phone: (212) 479-6000
kkang@cooley.com

Elizabeth Reinhardt*
COOLEY LLP
500 Boylston Street, 14th Floor
Boston, MA 02116-3736
Phone: (617) 937-2305
ereinhardt@cooley.com

*Visiting Attorneys*

*Attorneys for Plaintiff*

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA
CHARLESTON DIVISION

B.P.J. by her next friend and mother, HEATHER
JACKSON,

         *Plaintiff*,

     v.

WEST VIRGINIA STATE BOARD OF
EDUCATION, HARRISON COUNTY BOARD
OF EDUCATION, WEST VIRGINIA
SECONDARY SCHOOL ACTIVITIES
COMMISSION, W. CLAYTON BURCH in his
official capacity as State Superintendent, DORA
STUTLER in her official capacity as Harrison
County Superintendent, and THE STATE OF
WEST VIRGINIA,

         *Defendants*,

      and

LAINEY ARMISTEAD,

         *Defendant-Intervenor*.

Civil Action No. 2:21-cv-00316

Hon. Joseph R. Goodwin

**CERTIFICATE OF SERVICE**

**CERTIFICATE OF SERVICE**

    I, Loree Stark, do hereby certify that on this 21st day of April, 2022, I electronically filed a true and exact copy of the ***Statement of Undisputed Material Facts*** with the Clerk of Court and all parties using the CM/ECF System.

                    */s/ Loree Stark*
                    Loree Stark
                    West Virginia Bar No. 12936