IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA
CHARLESTON DIVISION

B.P.J. by her next friend and mother, HEATHER
JACKSON,

                *Plaintiff*,

    v.

WEST VIRGINIA STATE BOARD OF
EDUCATION, HARRISON COUNTY BOARD
OF EDUCATION, WEST VIRGINIA
SECONDARY SCHOOL ACTIVITIES
COMMISSION, W. CLAYTON BURCH in his
official capacity as State Superintendent, DORA
STUTLER in her official capacity as Harrison
County Superintendent, and THE STATE OF
WEST VIRGINIA,

                *Defendants*,

    and

LAINEY ARMISTEAD,

                *Defendant-Intervenor*.

Civil Action No. 2:21-cv-00316

Hon. Joseph R. Goodwin

**MEMORANDUM IN SUPPORT OF
PLAINTIFF'S MOTION FOR
SUMMARY JUDGMENT**

## TABLE OF CONTENTS

Page

INTRODUCTION ..................................................................................................... 1

STATEMENT OF UNDISPUTED MATERIAL FACTS ......................................... 2

    I.    B.P.J.'s Identity As A Girl Who Is Transgender. ................................... 2

    II.    B.P.J.'s Desire To Participate On Girls' Sports Teams At School. ........ 4

    III.    West Virginia's Policy For Transgender Athletes Before H.B. 3293 ..... 5

    IV.    H.B. 3293 Categorically Bans Transgender Girls And Women from Participating On Girls' And Women's Sports Teams........................... 6

    V.    B.P.J.'s Lawsuit And Preliminary Injunction. ...................................... 9

PROCEDURAL HISTORY..................................................................................... 10

LEGAL STANDARD.............................................................................................. 11

ARGUMENT .......................................................................................................... 12

    I.    Injunctive Relief Is Properly Directed At Each Defendant. ............... 12

    II.    H.B. 3293 Violates Title IX. .............................................................. 13

        A.    H.B. 3293 Excludes B.P.J. From A Federally Funded Education Program.................................................................. 14

        B.    H.B. 3293 Excludes B.P.J. On The Basis Of Sex. .................. 15

        C.    H.B. 3293 Harms B.P.J. Through Unlawful Discrimination. ................. 15

    III.    H.B. 3293 Violates The Equal Protection Clause............................... 18

        A.    H.B. 3293 Creates A Classification Based On Transgender Status......... 19

        B.    H.B. 3293 Cannot Survive Heightened Scrutiny. .................... 22

            1.    H.B. 3293's Categorical Exclusion Of Transgender Girls Is Not Substantially Related To "Protecting Women's Sports.".................................................................... 24

            2.    H.B. 3293 Is Not Substantially Related To Protecting Women's Safety In Women's Sports........................... 31

            3.    H.B. 3293 Is Not Substantially Related To Compliance With Title IX. ................................................ 32

        C.    H.B. 3293 Undermines The Asserted Interests...................... 33

        D.    H.B. 3293 Fails Any Level Of Scrutiny. ............................... 33

    IV.    This Court Should Issue A Permanent Injunction, As Well As Issue A Declaratory Judgment And Award Nominal Damages. ..................... 35

CONCLUSION........................................................................................................ 37

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Abcor Corp. v. AM Int'l Inc.*,
  916 F.2d 924 (4th Cir. 1990) ................................................12

*Anderson v. Liberty Lobby, Inc.*,
  477 U.S. 242 (1986)................................................12

*Bd. of Trs. of Univ. of Ala. v. Garrett*,
  531 U.S. 356 (2001)................................................34

*Bostock v. Clayton Cnty.*,
  140 S. Ct. 1731 (2020)................................................15

*Celotex Corp. v. Catrett*,
  477 U.S. 317 (1986)................................................12

*Centro Tepeyac v. Montgomery Cnty.*,
  722 F.3d 184 (4th Cir. 2013) ................................................36

*City of Cleburne, Tex. v. Cleburne Living Ctr.*,
  473 U.S. 432 (1985)................................................34

*City of L.A., Cal. v. Patel*,
  576 U.S. 409 (2015)................................................23

*Clark v. Arizona Interscholastic Association*,
  695 F.2d 1126 (9th Cir. 1982) ................................................24, 25, 26, 28

*Cmtys. for Equity v. Mich. High Sch. Athletic Ass'n*,
  80 F. Supp. 2d 729 (W.D. Mich. 2000) ................................................14

*Concrete Works of Colo., Inc. v. City and Cnty. of Denver*,
  321 F.3d 950 (10th Cir. 2003) ................................................22

*Doe v. Snyder*,
  28 F.4th 103 (9th Cir. 2022) ................................................15

*Doe v. Wood Cty. Bd. of Educ.*,
  888 F. Supp. 2d 771 (S.D. W. Va. 2012) ................................................35

*Edmo v. Corizon, Inc.*,
  935 F.3d 757 (9th Cir. 2019) ................................................36

*Eng'g Contractors Ass'n of S. Fla. v. Metro. Dade Cnty.*,
   122 F.3d 895 (11th Cir. 1997) ........................................................22

*Flack v. Wis. Dep't of Health Servs.*,
   328 F. Supp. 3d 931 (W.D. Wis. 2018) ..........................................26

*Grimm v. Gloucester County School Board*,
   972 F.3d 586 (4th Cir. 2020) ..................................................... *passim*

*H.B. Rowe Co. v. Tippett*,
   615 F.3d 233 (4th Cir. 2010) ..........................................................22

*Hecox v. Little*,
   479 F. Supp. 3d 930 (D. Idaho 2020) ......................................... *passim*

*Henry v. Greenville Airport Comm'n*,
   284 F.2d 631 (4th Cir. 1960) ..........................................................35

*J.E.B. v. Ala. ex rel. T.B.*,
   511 U.S. 127 (1994)..........................................................................17

*Kravitz v. U.S. Dep't of Com.*,
   366 F. Supp. 3d 681 (D. Md. 2019) ................................................35

*Lawrence v. Texas*,
   539 U.S. 558 (2003)..........................................................................18

*Legend Night Club v. Miller*,
   637 F.3d 291 (4th Cir. 2011) ..........................................................35

*Lujan v. Nat'l Wildlife Fed'n*,
   497 U.S. 871 (1990)..........................................................................12

*Marietta Mem'l Hosp. v. W.V. Health Care Auth.*,
   No. 16 Civ. 8603, 2016 WL 7363052 (S.D. W. Va. Dec. 19, 2016) ......................................35

*Melendres v. Arpaio*,
   695 F.3d 990 (9th Cir. 2012) ................................................28, 35, 36

*Miss. Univ. for Women v. Hogan*,
   458 U.S. 718 (1982)....................................................................22, 23

*Mitchell v. Data General Corp.*,
   12 F.3d 1310 (4th Cir. 1993) ..........................................................12

*N.C. State Conf. of NAACP v. McCrory*,
   831 F.3d 204 (4th Cir. 2016) ..........................................................21

*Nelson v. NASA*,
   530 F.3d 865 (9th Cir. 2008) ...................................................................36

*Obergefell v. Hodges*,
   576 U.S. 644 (2015) ...............................................................................36

*Preston v. Va. ex rel. New River Cmty. Coll.*,
   31 F.3d 203 (4th Cir. 1994) ...................................................................13

*QueTel Corp. v. Abbas*,
   819 F. App'x 154 (4th Cir. 2020) .........................................................36

*Ret. Comm. of DAK Ams. LLC v. Brewer*,
   867 F.3d 471 (4th Cir. 2017) .................................................................11

*Romer v. Evans*,
   517 U.S. 620 (1996) ...............................................................................34

*Sessions v. Morales-Santana*,
   137 S. Ct. 1678 (2017) ...........................................................................23

*Soule by Stanescu v. Conn. Ass'n of Sch., Inc.*,
   No. 3:20-CV-00201 (RNC), 2021 WL 1617206 (D. Conn. Apr. 25, 2021) ...........................32

*Tuan Anh Nguyen v. INS*,
   533 U.S. 53 (2001) .................................................................................34

*United States v. Playboy Ent. Grp., Inc.*,
   529 U.S. 803 (2000) ..........................................................................26, 27

*United States v. Virginia*,
   518 U.S. 515 (1996) .................................................................... *passim*

*United States v. Windsor*,
   570 U.S. 744 (2013) ...............................................................................34

*Whitaker ex rel. Whitaker v. Kenosha Unified Sch. Dist. No. 1 Bd. of Educ.*,
   858 F.3d 1034 (7th Cir. 2017) ...............................................................15

*Williams v. Bd. of Regents of Univ. Sys. of Ga.*,
   477 F.3d 1282 (11th Cir. 2007) .............................................................14

*Winter v. NRDC, Inc.*,
   555 U.S. 7 (2008) ...................................................................................36

**Statutes**

20 U.S.C.

§ 1681 ............................................................................................................1

§ 1681(a) ......................................................................................................13

W. Va. Code

§ 18-2-25d ...........................................................................................6, 15, 21

§ 18-2-25d(a)(3) ..................................................................................23, 24, 25

§ 18-2-25d(a)(4) ........................................................................................20, 23

§ 18-2-25d(a)(5) ........................................................................................23, 24

§ 18-2-25d(b) .....................................................................................................6

§ 18-2-25d(b)(1) .........................................................................................6, 19

§ 18-2-25d(c) ...............................................................................................6, 9

§ 18-2-25d(c)(2) ..................................................................................6, 22, 31

## INTRODUCTION

B.P.J.[1] is an 11-year-old girl at a public middle school in West Virginia who loves to run and play sports with her friends. Like many kids, she enjoys the friendships, personal challenges, and opportunities to improve that come from being part of a school sports team. But unlike other kids in West Virginia, B.P.J. is forbidden by state law from having that experience simply because she is a girl who is transgender. Last summer, this Court held that West Virginia's H.B. 3293—the law that categorically excludes Plaintiff B.P.J. and other girls and women who are transgender from girls' and women's sports—likely violates the Equal Protection Clause of the Fourteenth Amendment and Title IX of the Education Amendments of 1972, 20 U.S.C. § 1681, *et seq.* (Dkt. No. 67 ("PI Op.").) The Court noted that Defendants had provided "scant evidence that this law addresses any problem at all, let alone an important problem" and concluded that the law "is not substantially related to protecting girls' opportunities in athletics or their physical safety when participating in athletics." (*Id.* at 1, 11.) Accordingly, this Court enjoined all Defendants from enforcing the law against B.P.J. so that she could "sign up for and participate in school athletics in the same way as her girl classmates." (*Id.* at 15.) And B.P.J. has since done so: she ran on the middle school girls' cross-country team in the fall of 2021 without incident and with the support of her family, school, and peers, and she is doing the same this spring on the middle school girls' track team. (Plaintiff's Statement of Undisputed Material Facts ("Pl's SUF") ¶¶ 120–30.)

The parties have completed discovery, and the undisputed material facts confirm the correctness of the Court's preliminary injunction order. B.P.J. has presented undisputed evidence showing that she is harmed by H.B. 3293, which discriminates against her on the basis of

---

[1] Pursuant to Federal Rule of Civil Procedure 5.2(a)(3) and Local Rule of Civil Procedure 5.2.1(a)(2), Plaintiff's initials have been used in all public filings, including public filings of declarations from Plaintiff and her mother. In addition to those public filings, a reference list reflecting Plaintiff's full name has been filed with the Court under seal.

transgender status and sex. None of the Defendants nor Defendant-Intervenor has presented evidence showing that H.B. 3293 substantially advances an important governmental interest. And the public interest supports the injunctive relief that the Court has ordered. Simply put, the same reasoning underlying the Court's order granting B.P.J. a preliminary injunction last year remains valid today and supports entry of summary judgment for B.P.J. on her Title IX and Equal Protection Clause claims.

## STATEMENT OF UNDISPUTED MATERIAL FACTS

### I.     B.P.J.'s Identity As A Girl Who Is Transgender.

B.P.J. is an eleven-year-old girl who is also transgender.[2] (Pl's SUF ¶ 1.) B.P.J. was designated male at birth and has a female gender identity. (*Id.*) B.P.J. is fiercely protected by her mother, Heather Jackson; unconditionally loved by her father, Wesley Pepper; and has the support of her older brothers and grandparents. (Pl's SUF ¶ 2.)

When B.P.J. was in third grade, she socially transitioned at school to living and presenting in accordance with her identity as a girl. (Pl's SUF ¶ 3.) "Social transition" means allowing a transgender child to live and be socially recognized in accordance with their gender identity. (*Id.*) B.P.J.'s elementary school and middle school have both acknowledged and respect that B.P.J.'s gender identity is female. (Pl's SUF ¶ 4.)

B.P.J.'s elementary school created a gender support plan designed to help "account[]" for and "support[]" B.P.J.'s "authentic gender" at school. (Pl's SUF ¶ 5.) Under this plan, school staff were informed that B.P.J.'s authentic gender is female, and were instructed to refer to her with her female name and using female pronouns. (Pl's SUF ¶ 6.) School staff were also informed how to

---

[2] In its decision issuing a preliminary injunction, this Court relied upon "the meticulously researched and written opinion in *Grimm v. Gloucester County School Board*, 972 F.3d 586, 594–97 (4th Cir. 2020)" for background information and terminology related to people who are transgender. (PI Op. at 2.)

support B.P.J. if she faced problems from others at school because of her gender. (Pl's SUF ¶ 7.) B.P.J.'s middle school created a similar plan. (Pl's SUF ¶ 8.) Like her elementary school plan, B.P.J.'s middle school gender support plan confirmed that B.P.J.'s parents are aware of and supportive of her gender identity and that B.P.J. "is comfortable with others knowing her gender identity and transition," and provided that "all teachers," students, and multiple administrators and county staff would be made aware of her gender identity. (Pl's SUF ¶ 9.) The gender support plan instructs that if anyone has questions about B.P.J.'s identity, teachers and staff should "[b]e open and honest" and respond, "[s]he is [B.P.J.]; and that makes her happy." (Pl's SUF ¶ 10.) B.P.J. feels supported by her school given its commitment to treating her as the girl she is. (Pl's SUF ¶ 11.)

In 2019, B.P.J. was diagnosed with gender dysphoria by Dr. Gerald Montano, the Medical Director of the University of Pittsburgh Medical Center Children's Hospital of Pittsburgh's Gender and Sexuality Development Program. (Pl's SUF ¶ 12.) On June 15, 2020, at the first signs of puberty—known as the "Tanner 2" stage of pubertal development—B.P.J. began receiving puberty delaying (or "blocking") treatment, in accordance with the Endocrine Society's clinical guidelines for treating gender dysphoria. (Pl's SUF ¶ 13.) Puberty blocking treatment works by pausing endogenous puberty at whatever stage it is at when the treatment begins. (Pl's SUF ¶ 15.) When administered to transgender girls at the beginning of the "Tanner 2" stage of sexual maturity, puberty-blocking medication prevents transgender girls from experiencing levels of circulating testosterone above what is typical for non-transgender girls and women. (Pl's SUF ¶ 16.) As a result, B.P.J. has not gone through her endogenous puberty and has not experienced the effects of testosterone that would be typical if she underwent her full endogenous puberty. (Pl's SUF ¶ 17.)

**II.   B.P.J.'s Desire To Participate On Girls' Sports Teams At School.**

B.P.J. has always liked running and loves playing on team sports. (Pl's SUF ¶ 19.) While in elementary school, she enjoyed participating on a recreational cheerleading team with other girls. (Pl's SUF ¶ 20.) As someone who comes from a family of runners, B.P.J. also grew up running and watching her older brothers and mother run competitively and as part of a team. (Pl's SUF ¶ 21.)

School-sponsored athletics offer a range of benefits for children and young adults, including creating camaraderie and teaching teamwork, which are advanced when all athletes have the opportunity to play the sport they love. (Pl's SUF ¶ 22.) Defendants all acknowledge that these benefits exist regardless of whether a student wins or loses. (Pl's SUF ¶ 24.)

In May of 2021, Ms. Jackson, B.P.J.'s mother, met with B.P.J.'s new principal at Bridgeport Middle School, David Mazza, regarding a gender support plan for B.P.J., which specified the ways the school would support B.P.J. as a girl. (Pl's SUF ¶ 94.) At that same meeting, Ms. Jackson informed Principal Mazza that B.P.J. wanted to participate on the girls' cross-country team. (Pl's SUF ¶ 95.) In response to Ms. Jackson's statement, Principal Mazza communicated that B.P.J. would not be able to run on the girls' cross-country team because of H.B. 3293. (*Id.*)

As B.P.J. explains in her declaration, "I just want the opportunity to participate in school sports like any other girl." (Pl's SUF ¶ 96.) "Running with the girls means a lot to me because I am a girl, and I should be treated like a girl, just like all my friends who are girls. If I did not get to participate in cross-country or track, I would have missed out on the opportunity to spend time with my friends and grow with a new team." (Pl's SUF ¶ 99.) "It is so upsetting and hurtful that some people want to take that chance away from me and treat me differently from everyone else just because I am transgender." (*Id.*) B.P.J.'s mother agrees that "[i]t is wrong and senseless to try to make [B.P.J.] participate on boys' teams when there are girls' teams available. Forcing B.P.J.

4

to compete on the boys' cross-country or track teams when girls' teams are available would completely erase who she is, and it would devastate her because she is a girl." (Pl's SUF ¶ 100.) It would also be "a clear sign to her and others that the state refuses to see her and accept her for the girl that she is." (*Id.*)

### III.   West Virginia's Policy For Transgender Athletes Before H.B. 3293.

Before it passed H.B. 3293, West Virginia already had a general policy establishing separate school sports teams for boys and girls. (Pl's SUF ¶ 31.) Almost all sports in West Virginia at the public secondary school level are separated into boys' and girls' teams. (Pl's SUF ¶ 32.)[3] Under rules established by the West Virginia Secondary School Activities Commission ("WVSSAC")—which were already in existence when H.B. 3293 was enacted—cisgender boys are prohibited from playing on girls' teams at the public secondary school level. (Pl's SUF ¶ 36.) By contrast, girls may choose to play on a boys' team if they wish to do so and no girls' team exists, as is the case with football, baseball, wrestling, and golf. (Pl's SUF ¶ 37.)

West Virginia did not have a law or policy prohibiting girls who are transgender from playing on girls' teams before it passed H.B. 3293. (Pl. SUF ¶ 38.) To the contrary, the WVSSAC Board of Directors had an internal policy that allowed students who are transgender to participate on teams consistent with their gender identity if the transgender student's school allowed them to participate. (Pl's SUF ¶ 39.) Under the internal policy, if another school contested the transgender student's eligibility to play, then the Board of Directors would determine whether the student's participation threatened "competitive equity or the safety of teammates and opposing players."

---

[3] The exceptions are cheerleading, football, baseball, wrestling, and golf. (Pl's SUF ¶ 32.) Cheer teams are always designated as "mixed," whereas football, baseball, wrestling, and golf teams are boys' teams that permit girls to play if they so desire because no separate girls' teams exist, and so are considered "mixed . . . to respond to demand." (Pl's SUF ¶ 33.) In practice, cheer "almost always has boy [and girl] members," but baseball and football are "very seldom" actually mixed. (Pl's SUF ¶ 34.)

(*Id.*) The WVSSAC received no complaints about this internal policy, and the WVSSAC is not aware of any instances of a transgender student attempting to participate under this policy. (Pl's SUF ¶ 40.)

At the college level, since 2011, the National Collegiate Athletic Association ("NCAA") has allowed women who are transgender to participate on women's teams after completing one year of testosterone suppression. (Pl's SUF ¶ 41.) In 2022, the NCAA announced that it had revised its policy to adopt a "sport-by-sport approach" that "calls for transgender participation for each sport to be determined by the policy for the national governing body of that sport, subject to ongoing review and recommendation by the NCAA Committee on Competitive Safeguards and Medical Aspects of Sports to the Board of Governors." (Pl's SUF ¶ 42.)

## IV.    H.B. 3293 Categorically Bans Transgender Girls And Women From Participating On Girls' And Women's Sports Teams.

In April 2021, West Virginia passed H.B. 3293, which categorically bans all girls who are transgender from participating in school sports from middle school through college. (Pl's SUF ¶¶ 43–44 (citing W. Va. Code § 18-2-25d).) Specifically, H.B. 3293 requires that all public secondary school or college sports in West Virginia be "expressly designated" as either "males," "females," or "co-ed" based solely on a student's "biological sex." (Pl's SUF ¶ 45 (quoting W. Va. Code §§ 18-2-25d(b), (c)).) H.B. 3293 defines "[b]iological sex" as "an individual's physical form as a male or female *based solely on the individual's reproductive biology and genetics at birth*." (Pl's SUF ¶ 46 (quoting W. Va. Code § 18-2-25d(b)(1) (emphasis added)).) H.B. 3293 further provides that "[a]thletic teams or sports designated for females, women, or girls shall not be open to students of the male sex where selection for such teams is based upon competitive skill or the activity involved is a contact sport." (Pl's SUF ¶ 47 (quoting W. Va. Code § 18-2-25d(c)(2)).) There is no parallel provision for boys' teams.

H.B. 3293 employs a definition of "biological sex" that, by design and effect, targets and categorically excludes B.P.J. and any other transgender girl from playing sports at the middle school, high school, and collegiate levels. (Pl's SUF ¶ 49.) By comparison, H.B. 3293 does not prohibit a cisgender girl at any public secondary school in West Virginia from joining a girls' athletic team. (Pl's SUF ¶ 50.)

H.B. 3293's requirement that teams be separated "based solely on the individual's reproductive biology and genetics at birth" is a stark departure from the prior standard used in West Virginia as well as from the standards used by elite sporting organizations. For example, under the policies of the NCAA, World Athletics, and the International Olympic Committee ("IOC"), transgender girls are permitted to compete in women's sport events after suppressing their levels of testosterone for particular periods of time or below particular thresholds, and take into account particular considerations specific to each sport. (Pl's SUF ¶¶ 41–42, 74–83.) A person's genetic makeup and internal and external reproductive anatomy are not useful indicators of athletic performance and have not been used in elite competition for decades. (Pl's SUF ¶ 85.) Indeed, despite H.B. 3293's assumption to the contrary, scientists recognize that a person's sex encompasses different biological components, including sex chromosomes, certain genes, gonads, exposure to sex hormone, internal and external genitalia, and other secondary sex characteristics, which are not always aligned in the same direction. (Pl's SUF ¶ 71.) Moreover, although the precise biological causes of gender identity are unknown, gender identity itself has biological underpinnings, possibly as a result of variations in prenatal exposure to sex hormones, gene sequences, epigenetics, or a combination of factors. (Pl's SUF ¶ 72.)

The sponsors of H.B. 3293 and the accompanying legislative debate made plain that the purpose of H.B. 3293 was to prevent girls who are transgender from playing on girls' sports teams.

Counsel for the House of Delegates Education Committee referred to H.B. 3293 as a "[t]ransgender participation in secondary schools bill," a "[t]ransgender originating bill," and a "bill regarding transgender participation in sports." (Pl's SUF ¶¶ 51–52.) When asked how H.B. 3293 would change the status quo in West Virginia, counsel representing the bill replied that the bill "would affect those that changed their sex after birth" and further explained that H.B. 3293 "would not affect" a man who was assigned a male sex at birth. (Pl's SUF ¶ 53.) Another delegate described the "issue" that H.B. 3923 was designed to address as "two transgender girls" who "were allowed to compete in state track and field meetings in Connecticut." (Pl's SUF ¶ 54.) During the debate in the Senate, one senator expressly noted that "the bill" is "about transgenders," and another shared a constituent letter stating that the "trans movement is an attack upon womanhood."[4] (Pl's SUF ¶¶ 55–56.)

H.B. 3293 was passed without the support of the West Virginia Department of Education, whose General Counsel described the bill as "much ado about nothing." (Pl's SUF ¶¶ 66–67.) Nearly a year after H.B. 3293 was passed, the West Virginia Department of Education still does not support it. (Pl's SUF ¶ 69.) During a House committee hearing of the bill, Sarah Stewart from the West Virginia Department of Education testified that her office had never received any calls or complaints about transgender students participating in athletics. (Pl's SUF ¶ 60.) The bill's sponsors also acknowledged that they were not aware of a single instance of a transgender athlete having ever competed on a secondary school or higher education sports team in West Virginia, let alone any "problem" from such participation. (Pl's SUF ¶ 61.) Indeed, after signing the bill,

---

[4] Other sponsors of the bill made similarly explicit statements. On March 16, 2021, Delegate Jordan Bridges announced on Facebook that he was co-sponsoring H.B. 3293 and then "liked" comments on his post that advocated for physical violence against girls who are transgender, compared girls who are transgender to pigs, and called girls who are transgender by a pejorative term ("tranny"). (Pl's SUF ¶ 57.)

Governor Justice admitted that he could not identify even "one example of a transgender child trying to get an unfair advantage." (Pl. SUF ¶ 62.) He further indicated that the issue purportedly addressed by H.B. 3293 was not a priority for him, stating, "I didn't make it a priority. It wasn't my bill. . . . This is not like it's a big priority to me. . . . I think we only have 12 kids maybe in our state that are transgender-type kids. I mean, for crying out loud . . . I sign hundreds of bills, hundreds of bills. This is not a priority to me." (*Id.*)

Defendants have confirmed that they were not aware of any transgender student athletes participating on an athletic team offered by a public secondary school in West Virginia when H.B. 3293 was passed. (Pl's SUF ¶ 63.) At present, other than B.P.J., Defendants are not aware of a transgender student athlete participating on an athletic team offered by Bridgeport Middle School or any other public secondary school in West Virginia. (Pl's SUF ¶ 64.)

## V.     B.P.J.'s Lawsuit And Preliminary Injunction.

Absent an injunction, H.B. 3293 would forbid B.P.J. from playing on a girls' team at Bridgeport Middle School or any public secondary school in West Virginia. (Pl's SUF ¶ 93.) After this Court issued its preliminary injunction on July 21, 2021, B.P.J. was permitted to participate on Bridgeport Middle School's girls' cross-country team. (Pl's SUF ¶ 120.) There were no complaints associated with B.P.J.'s participation on Bridgeport Middle School's girls' cross-country team, no student was physically harmed, and no student was cut from or otherwise not permitted to participate on the cross-country team as a result of B.P.J.'s participation. (Pl's SUF ¶¶ 127–128, 136.)

B.P.J. enjoyed participating on a team with her friends and classmates. And despite B.P.J. trying her best to win, she was defeated by several of her peers. Among other events, B.P.J. participated in the Mountain Hollar MS Invitational meet and the Doddridge Invitational meet while she was on the cross-country team. (Pl's SUF ¶ 121.) In the Mountain Hollar MS

9

Invitational, B.P.J. placed 51 out of 66 participants. (Pl's SUF ¶ 122.) In the Doddridge Invitational meet, B.P.J. placed 123 out of 150 participants. (Pl's SUF ¶ 123.) But these results did not change the fact that B.P.J. loved her experience and intends to participate alongside her teammates next year. As B.P.J. states in her declaration: "My first cross-country season was awesome, and I felt supported by my coaches and the other girls on the team. I made so many new friends and loved competing with and supporting my teammates. We learned about teamwork, having a positive attitude, and how to have fun while being competitive." (Pl's SUF ¶ 124.)

In the spring of 2022, B.P.J. tried out for, made, and began running on the girls' track team at Bridgeport Middle School. (Pl's SUF ¶ 125.) B.P.J. was "ecstatic" to learn she qualified for the track team and "look[s] forward to many more years of running with [her] peers." (Pl's SUF ¶ 126.)

## PROCEDURAL HISTORY

On May 26, 2021, B.P.J. filed her Complaint and Motion for Preliminary Injunction seeking to enjoin H.B. 3293, which categorically bars her and any other female athletes who are transgender from participating on girls' and women's sports teams in West Virginia. (Dkt. Nos. 1, 2.) The United States of America filed a Statement of Interest in support of B.P.J. on June 17, 2021. (Dkt. No. 42.) The State of West Virginia ("State") moved to intervene on June 17, 2021, and was granted intervention two days later. (Dkt. Nos. 40, 44.)

Defendants opposed B.P.J.'s Motion for Preliminary Injunction on June 23, 2021. (Dkt. Nos. 47–50.) B.P.J. filed her First Amended Complaint ("FAC") on July 16, 2021, and all Defendants but the State moved to dismiss. (Dkt. Nos. 64, 70–77.) On July 21, 2021, this Court granted B.P.J.'s Motion for Preliminary Injunction, finding that B.P.J. was likely to succeed on her claims that H.B. 3293 violated both Title IX and the Equal Protection Clause. (PI Op.)

On September 10, 2021, Defendant-Intervenor Lainey Armistead moved to intervene and was granted permissive intervention on December 1, 2021. (Dkt. Nos. 94, 130.) In granting

Intervenor's motion, the Court noted that, as a student on a women's school sports team in West Virginia, "she will add a perspective not represented by any of the current defendants." (Dkt. No. 130 at 6.) Discovery subsequently revealed that Ms. Armistead will graduate from West Virginia State University in May 2022, before this motion will be resolved, (Pl's SUF ¶ 137), thus eliminating the premise for her participation in this lawsuit.

On the same day that this Court granted the motion to intervene, this Court denied Defendants' motions to dismiss. The Court concluded, among other things, that each Defendant is a proper defendant in this lawsuit because they will be involved in the enforcement of H.B. 3293 against B.P.J. (Dkt. No. 129.)

Discovery closed on March 25, 2022. (Dkt. No. 93.) B.P.J. conducted 30(b)(6) depositions of WVSSAC, the State Board of Education, and the Harrison County Board of Education. (Dkt. Nos. 184–87, 229.) B.P.J. also conducted depositions of Defendants' experts Dr. James Cantor, Dr. Gregory Brown, Dr. Chad Carlson, and Dr. Stephen Levine (Dkt. Nos. 249) and of Defendant-Intervenor Lainey Armistead (Dkt. No. 187.) Defendants deposed B.P.J., her mother Heather Jackson, her father Wesley Pepper, and two of B.P.J.'s medical providers, Dr. Montano and Dr. Kacie Kidd. (Dkt. Nos. 160, 224–25.) Defendants also deposed Plaintiff's experts Dr. Deanna Adkins, Dr. Joshua Safer, Dr. Mary Fry, and Dr. Aron Janssen. (Dkt. Nos. 232–33, 267, 269.)

## LEGAL STANDARD

Summary judgment is warranted when there is no genuine dispute of material fact, and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c). "A dispute is genuine if a reasonable jury could return a verdict for the nonmoving party, and [a] fact is material if it might affect the outcome of the suit under the governing law." *Ret. Comm. of DAK Ams. LLC v. Brewer*, 867 F.3d 471, 479 (4th Cir. 2017) (internal quotation marks omitted). "Factual disputes

that are irrelevant or unnecessary will not be counted." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

Although "the party moving for summary judgment [bears the burden of] showing the absence of a genuine issue as to any material fact," *Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986), bare allegations or denials by the nonmoving party are insufficient to evince a genuine dispute, *Anderson*, 477 U.S. at 249; *see also Mitchell v. Data General Corp.*, 12 F.3d 1310, 1315–16 (4th Cir. 1993). Once such a showing has been made, the burden shifts to the non-moving party to offer specific facts contradicting those averred by the movant. *Lujan v. Nat'l Wildlife Fed'n*, 497 U.S. 871, 888 (1990). The nonmoving party must produce "'significantly probative' evidence" to avoid summary judgment. *Abcor Corp. v. AM Int'l Inc.*, 916 F.2d 924, 929–30 (4th Cir. 1990) (quoting *Anderson*, 477 U.S. at 242). Because Plaintiff's equal protection claim is subject to heightened scrutiny, the ultimate burden of justifying the law's constitutionality "rests entirely on the State." *United States v. Virginia*, 518 U.S. 515, 533 (1996) ("*VMI*").

## ARGUMENT

### I.   Injunctive Relief Is Properly Directed At Each Defendant.

Each named Defendant is a proper subject of injunctive relief because each Defendant is obliged to implement H.B. 3293 and enforce it against B.P.J. As this Court explained in its order denying the motions to dismiss filed by the County Board, the State Board, and WVSSAC, "each defendant will take some action that will cause [B.P.J.] asserted harm" and "each defendant can redress her claims because a favorable ruling against each will prevent them enforcing the Act as to B.P.J." (Dkt. 129 at 6.)

Discovery has confirmed that conclusion. The County Defendants have admitted that "absent an injunction, the County Board and County Superintendent would be compelled and required to enforce H.B. 3293 against B.P.J." and that County Defendants' role in enforcing the

law is "mandatory, not merely optional." (Pl's SUF ¶ 109.) The State Board Defendants have acknowledged that, "[a]bsent an injunction by a court," the State Board and Superintendent Burch "would be compelled and required to follow H.B. 3293" and the State Board "would be compelled and required to promulgate rules implementing H.B. 3293." (Pl's SUF ¶ 110.) And WVSSAC has confirmed that without an injunction, it "cannot adopt or enforce any policy" allowing girls who are transgender to participate on girls' sports teams that "conflicts with state law." (Pl's SUF ¶ 111.)

## II.   H.B. 3293 Violates Title IX.

Title IX provides: "[n]o person . . . shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any education program or activity receiving Federal financial assistance." 20 U.S.C. § 1681(a). To succeed on her Title IX claim, the Court must conclude "(1) that [B.P.J.] was excluded from participation in an education[al] program 'on the basis of sex'; (2) that the educational institution was receiving federal financial assistance at the time; and (3) that improper discrimination caused [her] harm." *Grimm*, 972 F.3d at 616 (citing *Preston v. Va. ex rel. New River Cmty. Coll.*, 31 F.3d 203, 206 (4th Cir. 1994)).[5]

In granting her preliminary injunction motion, this Court held that B.P.J. "demonstrated a likelihood of success on the merits for her Title IX claim." (PI Op. at 13.) With the benefit of discovery, B.P.J. has now demonstrated actual success. Absent the preliminary injunction ordered by this Court, H.B. 3293 would have excluded B.P.J. from girls' athletic teams because she is a transgender girl, and thus "excluded [her] from participation in," "denied [her] the benefits of," and "subjected [her] to discrimination" at school "on the basis of sex," in violation of Title IX. 20

---

[5] B.P.J.'s Title IX claim is pleaded against the State of West Virginia, the State Board of Education, the County Board of Education, and WVSSAC. (FAC at 20; Pl's SUF ¶ 106.)

U.S.C. § 1681(a). Accordingly, the Court should grant summary judgment on B.P.J.'s Title IX claim.

### A.    H.B. 3293 Excludes B.P.J. From A Federally Funded Education Program.

Title IX prohibits sex discrimination in federally funded education programs. As this Court previously explained, "[t]here is no question that Defendants named in this case received federal funding or that the athletic programs run by Harrison County are part of an education program." (PI Op. at 12.) That finding remains correct.

It is undisputed that athletic programs run by secondary schools and colleges are "educational programs" for purposes of Title IX. The State Board and County Board admit to being federally funded. (Pl's SUF ¶ 108.) Each has a duty to control, supervise, regulate, and/or enforce rules related to interscholastic athletic events in West Virginia. (Pl's SUF ¶¶ 108, 114–18.) The same is true of the State of West Virginia.

The only Title IX Defendant that claims not to receive federal funding is WVSSAC, but WVSSAC is subject to Title IX because it exercises control over federally funded athletic programs. (Pl's SUF ¶¶ 116–19.) "[A]ny entity that exercises controlling authority over a federally funded program is subject to Title IX, regardless of whether that entity is itself a recipient of federal aid." *Cmtys. for Equity v. Mich. High Sch. Athletic Ass'n*, 80 F. Supp. 2d 729, 735 (W.D. Mich. 2000); *accord Williams v. Bd. of Regents of Univ. Sys. of Ga.*, 477 F.3d 1282, 1294 (11th Cir. 2007).

WVSSAC was given controlling authority over secondary school athletics by the State and County Boards, rendering it a controlling authority over a federally funded program and subject to Title IX. (Pl's SUF ¶ 116.) For example, member schools must follow WVSSAC's rules and regulations when "conducting interscholastic athletic[s]" and when determining whether a student is eligible to play secondary school sports, and WVSSAC's Board of Directors has "the power to

decide all cases of eligibility of students and participants in interscholastic athletic[s]." (Pl's SUF ¶¶ 117–118.) Indeed, WVSSAC explicitly acknowledges in its own athletic handbook that it must comply with Title IX. (Pl's SUF ¶ 119.)

### B.    H.B. 3293 Excludes B.P.J. On The Basis Of Sex.

As before, this Court should have "'little difficulty holding' that [H.B. 3293] discriminat[es] against [B.P.J.] 'on the basis of sex.'" (PI Op. at 12 (quoting *Grimm*, 972 F.3d at 616).) Under binding precedent from the Fourth Circuit, discrimination based on transgender status is discrimination "on the basis of sex" under Title IX. *Grimm*, 972 F.3d at 616; *accord Doe v. Snyder*, 28 F.4th 103, 114 (9th Cir. 2022); *Whitaker ex rel. Whitaker v. Kenosha Unified Sch. Dist. No. 1 Bd. of Educ.*, 858 F.3d 1034, 1051 (7th Cir. 2017). The reason, as this Court explained, is simple: "The law could not exclude B.P.J. from a girls' athletics team without referencing her 'biological sex' as defined in the statute. Her sex 'remains a but-for cause' of her exclusion under the law." (PI Op. at 12 (quoting *Grimm*, 672 F.3d at 616).)

### C.    H.B. 3293 Harms B.P.J. Through Unlawful Discrimination.

As this Court previously held, "B.P.J. is harmed by this law," which "unlawfully discriminates against B.P.J." by "treat[ing her] worse than girls with whom she is similarly situated because she alone cannot join the team corresponding to her gender identity." (PI Op. at 13.) The material facts are undisputed and confirm that H.B. 3293 unlawfully discriminates against B.P.J. and causes her harm.

"In the Title IX context, discrimination 'mean[s] treating that individual worse than others who are similarly situated.'" *Grimm*, 972 F.3d at 618 (quoting *Bostock v. Clayton Cnty.*, 140 S. Ct. 1731, 1741 (2020)). The Fourth Circuit in *Grimm* explained that a transgender boy who was excluded from using the boys' restrooms "was treated worse than students with whom he was similarly situated because he alone could not use the restroom corresponding with his gender.

Unlike the other boys, he had to use either the girls['] restroom or a single-stall option. In that sense, he was treated worse than similarly situated students." *Id.* The Fourth Circuit also had "no difficulty holding that Grimm was harmed" as a result of this discrimination because being excluded from the same restrooms as other boys made Grimm feel "stigmatized and isolated" and "invite[d] more scrutiny and attention from other students, very publicly branding all transgender students with a scarlet 'T'." *Id.* at 617–18 (internal quotation marks and alterations omitted).

Likewise, here, H.B. 3293 unlawfully discriminates against B.P.J. by categorically excluding her from participating on the same sports team as her similarly situated girl classmates. B.P.J. is similarly situated to other girls. For years, B.P.J. has lived as a girl and been recognized as a girl at school, where administrators in B.P.J.'s elementary school and middle school have both acknowledged and respected B.P.J.'s female gender identity. (Pl's SUF ¶¶ 1–11.) When B.P.J. was in elementary school, her school created a gender support plan designed to help "account[]" for and "support[]" B.P.J.'s "authentic gender" at school. (Pl's SUF ¶ 5.) Under the gender support plan, school staff are informed that B.P.J.'s authentic gender is female, are instructed to refer to her with her female name, and are instructed to refer to B.P.J. using female pronouns. (Pl's SUF ¶ 6.) Her middle school gender support plan provides for the same. (Pl's SUF ¶¶ 8–9.) B.P.J. feels supported by her school given its commitment to treating her as the girl she is. (Pl's SUF ¶ 11.) As this Court correctly explained, in light of the reality of B.P.J.'s day-to-day life, "Plaintiff is not most similarly situated with cisgender boys; she is similarly situated to other girls." (PI Op. at 7.)

Although B.P.J. is similarly situated to other girls, under H.B. 3293, she is prohibited from trying out for and participating on the girls' sports teams. As this Court stated, "All other students in West Virginia secondary schools—cisgender girls, cisgender boys, transgender boys, and

16

students falling outside of any of these definitions trying to play on the boys' teams—are permitted to play on sports teams that best fit their gender identity." (PI Op. at 12.)

The exclusion not only prevents B.P.J. from participating in school sports with other girls, but also effectively prohibits her from participating in school athletics entirely. According to B.P.J.'s mother, "[f]orcing B.P.J. to compete on the boys' cross-country or track teams when girls' teams are available would completely erase who she is, and it would devastate her because she is a girl. My daughter is simply saying, 'Accept me for who I am,'" and that "[f]orcing her to run with the boys is a clear sign to her and others that the state refuses to see her and accept her for the girl that she is." (Pl's SUF ¶ 100.) As B.P.J. put it, "[being a girl] means—it means everything." (Pl's SUF ¶ 98.) "I am not a boy. I do not want to run with the boys when there is a girls' team and I should not have to run with the boys when there is a girls' team." (*Id.*) B.P.J. also does not have the option of running on a co-ed team, as there is no co-ed cross-country or track team at Bridgeport Middle School or at any other public secondary school in West Virginia. (Pl's SUF ¶ 101.) As in *Grimm*, "[t]he [law's] use of 'biological [sex]' to classify students has the effect of shunting individuals like [B.P.J.]—who *may not* [participate on the girls' team] because of their 'biological [sex],' and who *cannot* [participate on the boys' team] because of their gender identity'—[out of school athletics] altogether." 972 F.3d at 620 (Wynn, J., concurring).

B.P.J.'s exclusion inflicts serious harm because it "both stigmatizes and isolates B.P.J." (PI Op. at 12.) As in *Grimm,* B.P.J.'s exclusion "very publicly brand[s]" her and "all transgender students with a scarlet 'T'"— marking them, publicly, as different from their peers. 972 F.3d at 617–18 (internal quotation marks and alterations omitted); *cf. J.E.B. v. Ala. ex rel. T.B.*, 511 U.S. 127, 142 (1994) (explaining that when a juror is excluded based on sex "[t]he message it sends to all those in the courtroom, and all those who may later learn of the discriminatory act, is that certain

17

individuals, for no reason other than gender, are presumed unqualified"). The separate and unequal treatment to which H.B. 3293 subjects B.P.J. is stigmatizing, isolating, and hurtful (Pl's SUF ¶¶ 96–104), and "is an invitation to subject" B.P.J. and other girls who are transgender to further "discrimination both in the public and in the private spheres." *Lawrence v. Texas*, 539 U.S. 558, 575 (2003).

H.B. 3293 also deprives B.P.J. of the educational and social benefits that all other students can obtain from participating in school sports. Defendants and Defendant-Intervenor all acknowledge the benefits of participating in sports, including cooperation, leadership, teamwork, watching out for fellow players, trust, physical fitness, perseverance, sportsmanship, and discipline. (Pl's SUF ¶ 22.) B.P.J. is acutely aware of the harm resulting from being deprived of the benefits and life skills that other girls are allowed to experience through sports. As she explains, "running with the girls means a lot to me because I am a girl, and I should be treated like a girl, just like all my friends who are girls. If I did not get to participate in cross-country or track, I would have missed out on the opportunity to spend time with my friends and grow with a new team." (Pl's SUF ¶ 99.)

For all these reasons, H.B. 3293 violates Title IX.

## III.    H.B. 3293 Violates The Equal Protection Clause.

The Equal Protection Clause of the Fourteenth Amendment provides that "[n]o State shall . . . deny to any person within its jurisdiction the equal protection of the laws." U.S. Const. amend. XIV, § 1. This Court correctly held that B.P.J. demonstrated a clear likelihood of success on the merits of her equal protection claim (PI Op. at 6–11), and discovery has confirmed that B.P.J. is entitled to summary judgment on this claim. Specifically, H.B. 3293 establishes criteria for participation in school sports that categorically bar girls who are transgender from participating on girls' teams and constitute discrimination based on transgender status and sex. *See Grimm*, 972

F.3d at 608–10. Such discrimination must withstand heightened equal protection scrutiny to be constitutional. *Id.* at 607. Defendants did not meet that "exacting" burden, which "rests entirely on the state," at the preliminary injunction stage, and they cannot meet it now. *See VMI*, 518 U.S. at 553.[6]

### A.    H.B. 3293 Creates A Classification Based On Transgender Status.

On its face, H.B. 3293 targets B.P.J. and other girls who are transgender for discriminatory treatment. Sex separation in sports already existed in West Virginia as a matter of regulation and longstanding (and unchallenged) practice prior to the enactment of H.B. 3293. (Pl's SUF ¶ 31); *cf. Hecox v. Little*, 479 F. Supp. 3d 930, 982 (D. Idaho 2020) ("[W]hile general sex separation on athletic teams for men and women may promote sex equality and provide athletic opportunities for females, that separation preexisted the Act and has long been the status quo in Idaho."). And no existing law or policy in West Virginia categorically prohibited girls who are transgender from participating on girls' teams in school sports prior to H.B. 3293. (Pl's SUF ¶ 38.) On the contrary, prior to H.B. 3293, the WVSSAC's internal policy—which governed Bridgeport Middle School's girls' cross-country team—allowed transgender girls to participate on girls' athletic teams. (Pl's SUF ¶ 39.)

H.B. 3293 is a sweeping change to that landscape. By its plain text, purpose, and effect, H.B. 3293 singles out girls who are transgender through a definition of "biological sex" that categorically excludes them from participating in school sports based only on their transgender status and sex. Specifically, H.B. 3293 excludes students from sports teams based on "biological sex" and defines "biological sex" solely in terms of "reproductive biology and genetics at birth."

---

[6] B.P.J.'s Equal Protection Clause claim is pleaded against State Superintendent W. Clayton Burch, County Superintendent Dora Stutler, and WVSSAC. (FAC at 22; Pl's SUF ¶ 107; Dkt. No. 127 (dismissing without prejudice B.P.J.'s equal protection claim against the Attorney General in his official capacity).)

(Pl's SUF ¶ 46 (quoting W. Va. Code § 18-2-25d(b)(1)).) The legislative findings for H.B. 3293 reject the notion of allowing students to play on sports teams consistent with their "gender identity," asserting that "gender identity is separate and distinct from biological sex" and that "[c]lassifications based on gender identity serve no legitimate relationship to the State of West Virginia's interest in promoting equal athletic opportunities for the female sex." (Pl's SUF ¶ 48 (quoting W. Va. Code § 18-2-25d(a)(4)).)[7]

"[W]hen the State . . . defines students by their sex assigned at birth, . . . the State's objective is clear: to define transgender girls as 'boys' and then to prevent them from participating on girls' athletic teams." (Dkt. No. 42 ("Statement of Interest of the United States") at 16.) As explained above, H.B. 3293's definition of "biological sex" does not reflect the medical understanding of sex, or the criteria used by elite sports organizations to determine participation. (Pl's SUF ¶¶ 71, 41–42, 74–84.) To the contrary, H.B. 3293 uses an "ends-driven definition[] of 'biological [sex]'" to "guarantee a particular outcome": Barring girls who are transgender from qualifying as girls for purposes of school sports and thereby categorically excluding them from girls' teams and therefore from school sports altogether. *Grimm*, 972 F.3d at 626 (Wynn, J. concurring). This discrimination affects only transgender girls—"cisgender boys, cisgender girls, and transgender boys are all unaffected by the law's central tenet" that "non-cisgender girls may not participate on a girls' sports team." (PI Op. at 7.)

Superintendent Burch, Superintendent Stutler, and WVSSAC have all conceded that H.B. 3293 treats girls who are transgender differently from girls who are cisgender, allowing the latter

---

[7] The Legislature puzzlingly made this "finding" even though H.B. 3293 recognizes that "gender identity"-based classifications have "no legitimate relationship" to the State's asserted interest (Pl's SUF ¶ 48 (quoting W. Va. Code § 18-2-25d(a)(4)), which only underscores why H.B. 3293's exclusion of girls who are transgender (but not other girls) cannot stand.

to participate on sports teams designated for girls but categorically barring the former. (Pl's SUF ¶¶ 49–50.) Accordingly, these Defendants agree that H.B. 3293 bars B.P.J., a girl who is transgender, from participating on girls' sports teams. (Pl's SUF ¶ 49.) The State too admits "that H.B. 3293 prohibits Plaintiff B.P.J. from participating on girls' athletic teams at all public secondary schools located in West Virginia." (*Id.*)

The legislative history confirms what is clear from the statutory text—that H.B. 3293 was specifically designed to and does exclude girls who are transgender, and only girls who are transgender, from participating on girls' sports teams. Legislative staff described the bill as a "[t]ransgender participation in secondary schools bill," a "[t]ransgender originating bill," and a "bill regarding transgender participation in sports." (Pl's SUF ¶¶ 51–52.) Sponsors and supporters of the bill also made clear that it was "about transgenders" and "would affect those that changed their sex after birth" and that the "issue" that H.B. 3923 was designed to address was "two transgender girls" in Connecticut who competed in school track and field events. (Pl's SUF ¶¶ 53–55.)[8]

Given this legislative record, the carefully crafted statutory definitions to exclude girls who are transgender, and the fact that sex separation in sport in West Virginia preexisted H.B. 3293, "there is an inescapable conclusion that Section 18-2-25d discriminates on the basis of transgender status." (PI Op. at 7.); *cf. N.C. State Conf. of NAACP v. McCrory*, 831 F.3d 204, 214 (4th Cir. 2016) (striking down voting previsions that were crafted "with almost surgical precision" to target Black voters).

---

[8] Another legislator shared a constituent letter calling the "trans movement . . . an attack upon womanhood." (Pl's SUF ¶ 56.) Delegate Jordan Bridges also announced on Facebook that he was co-sponsoring H.B. 3293 and then "liked" comments on his post that advocated for physical violence against girls who are transgender, compared girls who are transgender to pigs, and called girls who are transgender by a pejorative term ("tranny"). (Pl's SUF ¶ 57.)

## B.      H.B. 3293 Cannot Survive Heightened Scrutiny.

Because H.B. 3293 discriminates against B.P.J. based on both transgender status and sex, it is subject to heightened equal protection scrutiny. *Grimm*, 972 F.3d at 607–10. As this Court previously acknowledged, *Grimm* decided that "intermediate, or heightened, scrutiny" applies "to laws that classify people according to transgender status" and *stare decisis* requires that this Court follow *Grimm*'s holding. (PI Op. at 8.)[9] Moreover, H.B. 3293 additionally is subject to heightened scrutiny because it discriminates against girls as compared to boys.[10]

To survive heightened scrutiny, the government must provide an "exceedingly persuasive justification" for H.B. 3293's discriminatory classification. *VMI*, 518 U.S. at 534; *see also Miss. Univ. for Women v. Hogan*, 458 U.S. 718, 724 (1982). Any asserted justification "must be genuine, not hypothesized or invented post hoc in response to litigation," and the government "must not rely on overbroad generalizations about the different talents, capacities, or preferences of males and females." *VMI*, 518 U.S. at 533; *see also H.B. Rowe Co. v. Tippett*, 615 F.3d 233, 242 (4th Cir. 2010) (requiring the government to produce "sufficient probative evidence in support of its stated rationale for enacting a gender preference" (quoting *Eng'g Contractors Ass'n of S. Fla. v. Metro. Dade Cnty.*, 122 F.3d 895, 910 (11th Cir. 1997))); *Concrete Works of Colo., Inc. v. City*

---

[9] *Grimm* explained that laws that discriminate against transgender people by barring them from spaces consistent with their gender identity "rest[] on a sex-based classification" and "punish transgender persons for gender non-conformity, thereby relying on sex stereotypes." 972 F.3d at 608. *Grimm* further held that transgender people also "constitute at least a quasi-suspect class." *Id.* at 607.

[10] The law provides that "[a]thletic teams or sports designated for females, women, or girls shall not be open to students of the male sex." W. Va. Code § 18-2-25d(c)(2). There is no parallel provision for teams and sports designated for male students. Only girls are therefore vulnerable to the challenge that they do not satisfy the law's definition of female "biological sex." Boys, by contrast, face no risk of being the focus of an action brought against a county board of education or state institution of higher education by a student allegedly aggrieved by a violation of the law. *Id.* § 18-2-25d(d)(1). The law triggers heightened scrutiny on this basis as well. *See VMI*, 518 U.S. at 555 ("[A]ll gender-based classifications today warrant heightened scrutiny." (internal quotation marks omitted)).

*and Cnty. of Denver*, 321 F.3d 950, 959 (10th Cir. 2003) (demanding "'reasoned analysis rather than the mechanical application of traditional, often inaccurate, assumptions'" (quoting *Miss. Univ. for Women*, 458 U.S. at 726)).

At a minimum, the government must show that "the classification serves 'important governmental objectives and that the discriminatory means employed are substantially related to the achievement of those objectives.'" (PI Op. at 8 (quoting *Miss. Univ. for Women*, 458 U.S. at 724).) "Moreover, the classification must substantially serve an important governmental interest today, for in interpreting the equal protection guarantee, we have recognized that new insights and societal understandings can reveal unjustified inequality that once passed unnoticed and unchallenged." *Sessions v. Morales-Santana*, 137 S. Ct. 1678, 1690 (2017) (internal quotation marks, citations, and brackets omitted).

In this case, the substantial-relationship inquiry focuses on those against whom the law discriminates—here, girls who are transgender, as the impact of H.B. 3293 is to bar girls who are transgender from playing on girls' teams. No other group is prohibited from playing on the sports team consistent with their gender identity. *Cf. City of L.A., Cal. v. Patel*, 576 U.S. 409, 418 (2015) ("The proper focus of the constitutional inquiry is the group for whom the law is a restriction, not the group for whom the law is irrelevant."). And because this lawsuit is an as-applied challenge seeking relief for B.P.J. (FAC at 23–24 (Prayer for Relief) ¶¶ A–C seeking declaratory and injunctive relief for B.P.J.), the Court's focus is on H.B. 3293's application to B.P.J. (PI Op. at 9.)

The sole justification offered for H.B. 3293 in the legislative text is "promot[ing] equal athletic opportunities for the female sex." (Pl's SUF ¶ 58 (quoting W. Va. Code § 18-2-25d(a)(5)).) The law discusses the State's interest in equal athletic opportunities only in terms of the "substantial" displacement of female athletes. (*Id.* (quoting W. Va. Code § 18-2-25d(a)(3)-(4)).)

During the discovery period, the State identified additional *post hoc* rationalizations that it claims are advanced by H.B. 3293: (1) "[t]o [p]rotect [w]omen's [s]ports," (2) "[t]o follow Title IX," and (3) "[t]o protect women's safety in female athletic sports." (Pl's SUF ¶ 59.) This Court should reject the State's belated *post hoc* effort to proffer these interests as justification for the law "in response to litigation." *VMI*, 518 U.S. at 533. Indeed, the latter two interests are nowhere mentioned in H.B. 3293—the words "Title IX" and "safety" do not appear in the bill. But in any event, all three asserted justifications for H.B. 3293 are meritless and completely disconnected from the statute's sweeping categorical exclusion of transgender girls such that the only conceivable purpose served by the law is "an invalid interest of excluding transgender women and girls from women's sports entirely." *Hecox*, 479 F. Supp. 3d at 984–85.

### 1. H.B. 3293's Categorical Exclusion Of Transgender Girls Is Not Substantially Related To "Protecting Women's Sports."

Although providing equal athletic opportunities is an important governmental interest, "the discriminatory means employed" by H.B. 3293 are not substantially related to that interest. *VMI*, 518 U.S. at 533 (internal quotation marks omitted). As noted, West Virginia already provided for separate sports teams for boys and girls before H.B. 3293. (Pl's SUF ¶ 31.) H.B. 3293 is premised on the notion that the preexisting law was insufficient and that the exclusion of girls who are transgender "is necessary to promote equal athletic opportunities for the female sex." W. Va. Code § 18-2-25d(a)(5). To survive heightened scrutiny, Defendants must provide an "exceedingly persuasive" reason why the specific exclusion of transgender girls is necessary to "protect" women's sports. They cannot do so.

H.B. 3293 points to *Clark v. Arizona Interscholastic Association*, 695 F.2d 1126 (9th Cir. 1982), to support its discriminatory exclusion of transgender girls. *See* W. Va. Code § 18-2-25d(a)(3). Citing *Clark*, the Legislature claimed that "[b]iological males would displace females

to a substantial extent if permitted to compete on teams designated for biological females." *Id.* But *Clark* had nothing to do with transgender student athletes. Rather, *Clark* concerned a school district policy preventing cisgender boys from playing volleyball on the girls' team in a school district that did not sponsor a boys' volleyball team but provided "overall [athletic] opportunit[ies]" to boys that were "not inferior" to those provided to girls. 695 F.2d at 1131–32. There, the parties *stipulated* that boys would "on average be potentially better volleyball players than girls," thus creating an "undue advantage." *Id.* at 1127, 1131. Based on those stipulated facts, *Clark* concluded that the district's policy of excluding boys from girls' volleyball survived heightened scrutiny because (1) women had historically been deprived of athletic opportunities compared to men, (2) the boys and girls at the school had an equal number of overall athletic opportunities, and (based on the stipulation) (3) "due to average physiological differences, males would displace females to a substantial extent if they were allowed to compete for positions on the volleyball team." *Id.* at 1131.

As another district court explained, "*Clark*'s holding regarding general sex separation in sport, as well as the justifications for such separation, do not appear to be implicated by allowing transgender [girls and] women to participate on [girls' and] women's teams." *Hecox*, 479 F. Supp. 3d at 976. The permissibility of providing "separate but equal [athletic teams] in schools on a male/female basis . . . says nothing about what happened in this case [under H.B. 3293]: separation of transgender [girls] from their cisgender counterparts through a policy that ensures that transgender [girls] may [participate in] neither male nor female [teams] due to the incongruence between their gender identity and their sex-assigned-at-birth." *Grimm*, 972 F.3d at 625 (Wynn, J., concurring). Each prong of *Clark*'s reasoning is inapplicable here.

**First,** as noted by the district court in *Hecox*, unlike cisgender men and boys, "women who are transgender have historically been discriminated against, not favored." 479 F. Supp. 3d at 977. "Discrimination against transgender people takes many forms," including "high rates of employment discrimination, economic instability, and homelessness"; "frequent[] . . . harassment" in "schools," "medical settings," and "retail stores"; "physical assault in places such as schools . . . and places of public accommodation"; higher rates of violent crime; and policies excluding them from military service and health care, among other areas of public life. *Grimm*, 972 F.3d at 611–12. "[O]ne would be hard-pressed to identify a class of people more discriminated against historically . . . than transgender people." *Id.* at 610–11 (quoting *Flack v. Wis. Dep't of Health Servs.*, 328 F. Supp. 3d 931, 953 (W.D. Wis. 2018)).

**Second,** under H.B. 3293, girls who are transgender undisputedly do *not* have the same number of overall athletic opportunities as their peers. Barring B.P.J. and other girls who are transgender from participating on girls' teams prevents them from participating in *any* sex-separated sports. They are not boys and so cannot participate on boys' teams, and co-ed opportunities at public secondary schools in West Virginia are illusory, as they are available only in an extremely limited set of sports—cheerleading, football, baseball, wrestling, and golf. (Pl's SUF ¶ 32.) By contrast, the boys in *Clark* who were excluded from participating in girls' volleyball still had an equal number of overall athletic opportunities. 695 F.2d at 1127.

**Third,** there simply is no evidence of transgender girls displacing, much less "substantially" displacing, cisgender girls in school sports in West Virginia. Under heightened scrutiny, "the Government must present more than anecdote and supposition" to show that "an actual problem" exists. *United States v. Playboy Ent. Grp., Inc.*, 529 U.S. 803, 822 (2000). But as the bill's sponsor and Governor Justice have acknowledged, there were no known examples of

transgender athletes participating in sports—and certainly no examples of transgender girls dominating or otherwise displacing cisgender girls—in West Virginia at the time H.B. 3293 was passed. (Pl's SUF ¶¶ 61–62.) Notably, when Governor Justice was asked after signing the bill whether he could give "one example of a transgender child trying to get an unfair advantage," he responded, "No, I can't really tell you one." (Pl's SUF ¶ 62.) Indeed, each Equal Protection Clause Defendant admits that it is unaware of a single transgender girl playing on a girls' sports team in West Virginia other than B.P.J., as does Defendant-Intervenor. (Pl's SUF ¶ 64.) Moreover, no Defendant has received any complaint about B.P.J.'s participation on the girls' cross-country team at Bridgeport Middle School. (Pl's SUF ¶¶ 65, 127.) Unsurprisingly then, the State Board testified that it had "not had an issue" and "didn't see an issue" regarding the participation of transgender girls in school sports, and that the Department of Education, State Board, and State Superintendent had never received any complaints regarding the participation of transgender girls in school sports. (Pl's SUF ¶ 68.) The West Virginia Department of Education's General Counsel accordingly described H.B. 3293 as "much ado about nothing." (*Id*.) The West Virginia Department of Education and the State Superintendent do not support H.B. 3293. (Pl's SUF ¶ 69.)

The lack of any evidence supporting the State's asserted interest is hardly a surprise. As this Court noted, "[t]ransgender people make up a small percentage of the population: 0.6% of the adult population generally, and 0.7% of thirteen- to seventeen-year-olds." (PI Op. at 11); *see also Hecox*, 479 F. Supp. 3d at 977 ("Although the ratio of males to females is roughly one to one, less than one percent of the population is transgender."). "The number of transgender people who wish to participate in school-sponsored athletics is even smaller." (PI Op. at 11.) Indeed, "B.P.J. is the only transgender student at her school interested in school-sponsored athletics." (*Id.*)

But even if B.P.J. were not the only transgender girl in West Virginia known to have expressed an interest in school sports, the "dispositive realit[y]," *VMI*, 518 U.S. at 550, is that B.P.J. does not have any of the "average physiological differences" that were stipulated in *Clark* to provide an athletic advantage, 695 F.3d at 1131. There is a medical consensus that the largest known biological cause of average differences in athletic performance between non-transgender men as a group and non-transgender women as a group is circulating testosterone beginning with puberty. (Pl's SUF ¶ 89.)[11] As this Court previously acknowledged, B.P.J., an 11-year-old middle schooler who identifies as a girl, has been receiving puberty-delaying treatment for nearly two years and has not undergone puberty typical of people assigned male at birth. (PI Op. at 10.) Because B.P.J. began receiving puberty-blocking medication at the beginning of the "Tanner 2" stage of development, she has never experienced levels of circulating testosterone above what is typical for non-transgender girls and women. (Pl's SUF ¶¶ 13–17.) If B.P.J. goes on to receive gender-affirming hormone therapy, she will receive the same amount of estrogen during puberty that non-transgender girls generate endogenously and will develop the same changes to bone size, skeletal structure, pelvis shape, fat distribution, and secondary sex characteristics that are typically experienced by non-transgender girls who go through a typically female puberty. (Pl's SUF ¶ 18.)

Certainly, B.P.J. herself has not substantially displaced cisgender female athletes. Her participation on the Bridgeport Middle School's girls' cross-country team did not interfere with the participation of other girls, let alone substantially so. And at two of her meets last fall, B.P.J.

---

[11] Although Defendants' proffered expert Dr. Gregory Brown asserts that boys have physiological advantages even before puberty—an assertion that will be the subject of a forthcoming *Daubert* motion—he agrees that the largest driver of athletic advantage comes from puberty and testosterone. (Pl's SUF ¶ 89.) Moreover, Dr. Brown also admits that there have been no studies purporting to establish that any modest differences in athletic performance between pre-pubertal cisgender boys and pre-pubertal cisgender girls are attributable to innate physiology as opposed to social factors. (Pl's SUF ¶ 91.)

placed 51 out of 66 competitors and 123 out of 150 competitors, respectively. (Pl's SUF ¶¶ 122–23.) Even Defendant-Intervenor could not identify "any specific fairness issue" related to B.P.J.'s participation in girls' cross-country at her middle school. (Pl's SUF ¶ 129.) Simply put, "permitting B.P.J. to participate on the girls' teams would not take away athletic opportunities from other girls" and would not "significantly, if at all, prevent other girls from participating." (PI Op. at 11.)

Finally, even with respect to transgender girls and women who have already gone through endogenous puberty, H.B. 3293's categorical exclusion is not substantially related to an asserted interest in eliminating alleged competitive advantages. The NCAA, World Athletics, and IOC all allow women who are transgender to compete in women's athletic events after suppressing their levels of testosterone for particular periods of time or below particular thresholds, and take into account particular considerations specific to each sport. (Pl's SUF ¶¶ 41–42, 74–83; *see also* PI Op. at 10.)[12] Unlike H.B. 3293, these sporting associations' policies aim to "preserve[] opportunity for transgender-student athletes," not categorically eliminate them. (Pl's SUF ¶ 75; *see also id.* ¶ 80.) Before H.B. 3293 was passed, WVSSAC similarly had a policy that allowed students who are transgender to participate on teams consistent with their gender identity if the transgender student's school allowed them to participate, based on its considerations of whether that specific student's participation would impact "fair competition among high school teams." (Pl's SUF ¶ 39.) Under that internal policy, if another school contested the transgender student's eligibility to play,

---

[12] Similarly, USA Swimming recently adopted a policy allowing girls and women who are transgender to apply to compete in elite events if they demonstrate that their "prior physical development . . . as mitigated by any medical intervention, does not give the athlete a competitive advantage over the athlete's cisgender [f]emale competitors" and they "demonstrate[] that the concentration of testosterone in the athlete's serum has been less than 5 nmol/L . . . continuously for a period of at least thirty-six (36) months before the date of the Application." (Pl's SUF ¶ 84.)

then the WVSSAC Board of Directors would determine whether the student's participation threatened "competitive equity or the safety of teammates and opposing players." (*Id.*)

Defendants have proffered an expert witness, Dr. Brown, to testify that suppressing testosterone does not eliminate an athletic advantage that transgender women on average allegedly have over cisgender women on average. That expert is the subject of a forthcoming *Daubert* motion. But even if the testimony were deemed admissible, it would be insufficient to carry Defendants' burden under heightened scrutiny to justify why the State replaced its pre-existing case-by-case policy of *inclusion* with a categorical across-the-board rule of *exclusion* of all transgender women under all circumstances. "That the Act essentially bars consideration of circulating testosterone illustrates the Legislature appeared less concerned with ensuring equality in athletics than it was with ensuring exclusion of transgender women athletes." *Hecox*, 479 F. Supp. 3d at 984; *cf. Grimm*, 972 F.3d at 623–24 (Wynn, J., concurring).

In sum, as applied to B.P.J. and on its face, H.B. 3293 is not substantially related to creating equal athletic opportunities for women in general or cisgender women in particular. The challenged policy categorically excludes a group—transgender girls—that constitutes less than 1% of the population, rather than a group—cisgender boys—that constitutes 50%; denies them *all* athletic opportunities; and does so absent any evidence that, if allowed to compete on girls' teams, they would substantially displace cisgender girls. Even Defendant-Intervenor responded, "I don't know," when asked whether she "object[ed] to B.P.J. playing on the Bridgeport Middle School girls' cross-country team." (Pl's SUF ¶ 130.) H.B. 3293's broad sweep absent any evidence whatsoever of substantial displacement makes clear that the law's aim is to discriminate, not to achieve any legitimate goal.

2.      **H.B. 3293 Is Not Substantially Related To Protecting Women's Safety In Women's Sports.**

Additionally, although H.B. 3293 itself makes no mention of safety, Defendant State of West Virginia advances the *post hoc* rationale that the law protects safety in women's sports. H.B. 3293 is not substantially related to that interest. Setting aside that such *post hoc* rationalizations cannot be considered by this Court, this justification for H.B. 3293 similarly fails.

To start, H.B. 3293 sweeps far too broadly to be substantially related to Defendants' *post hoc* safety interest. H.B. 3293 is not limited to contact and collision sports, but includes any sport involving "competitive skill," and thus bars girls who are transgender from sports that do not involve any contact, such as cross-country and track. *See* W. Va. Code § 18-2-25d(c)(2). Accordingly, this Court previously explained that, "as applied to B.P.J., this law cannot possibly protect the physical safety of other girl athletes. Cross country and track are not contact sports. The physical ability of one athlete does not put another in danger . . . ." (PI Op. at 11.) Indeed, Defendant-Intervenor herself could not identify any safety concern resulting from B.P.J.'s participation on her middle school girls' cross-country team (Pl's SUF ¶ 135), and the State admits it is not aware of any middle school girl who was physically harmed by B.P.J.'s participation on the Bridgeport Middle School girls' cross-country team (Pl's SUF ¶ 136).[13]

Moreover, there simply is no evidence that girls who are transgender pose a safety threat to girls who are cisgender when they play together on girls' sports teams. Defendants' own putative expert Dr. Carlson acknowledges that girls and women who are transgender have competed in a

---

[13] To the extent Defendants' safety argument is based on the notion that girls who are transgender have physiological characteristics different from those of girls who are cisgender that affect athletic performance, H.B. 3293 is also overbroad in that it applies even to transgender girls and women who have never experienced endogenous puberty as a result of hormone blocking medication and gender-affirming hormones (like B.P.J.), and to transgender girls and women who have reduced their circulating testosterone levels with gender-affirming hormones.

wide range of contact and collision sports in high school and college, including basketball, soccer, volleyball, softball, lacrosse, and women's tackle football, without any reported injuries to cisgender girls. (Pl's SUF ¶ 131.) Dr. Carlson's asserted safety concerns are the product of "stereotypes and suppositions, not actual evidence." (Decl. of Loree Stark, Exh. 25 (Dr. Safer Rebuttal Report) ¶ 25.)

Further, there is no evidence that any safety concern would be unpreventable, necessitating the total exclusion of girls who are transgender from all school sports. There are significant variations in height, weight, and muscle mass within the population of cisgender girls, and within the population of cisgender boys, such that student athletes all the time play with or compete against students who are bigger, faster, and/or stronger than them, whether they are participating in single sex or co-ed teams. (Pl's SUF ¶ 132.) As the County Superintendent and the principal of B.P.J.'s school explained, any safety considerations attendant to these differences already are addressed through even-handed rules and the use of proper equipment. (Pl's SUF ¶ 133.) Likewise, any actual safety concerns attendant to girls who are transgender playing on girls' sports teams— and again, there are none—"can be addressed through even-handed rules instead of discriminating based on transgender status." (Pl's SUF ¶ 134.)

### 3.    H.B. 3293 Is Not Substantially Related To Compliance With Title IX.

H.B. 3293 also is not substantially related to an interest in adhering to Title IX; to the contrary, it violates Title IX, for all the reasons explained above. *See supra* Argument (II). No court has ever held that Title IX *requires* schools to exclude girls who are transgender from participating on girls' sports teams. And the only court to have considered such an argument rejected it. *See Soule by Stanescu v. Conn. Ass'n of Sch., Inc.*, No. 3:20-CV-00201 (RNC), 2021 WL 1617206, at *10 (D. Conn. Apr. 25, 2021).

### C.    H.B. 3293 Undermines The Asserted Interests.

Not only is H.B. 3293 not substantially related to the goal of protecting girls' opportunities in sports, but it actually undermines the benefits that girls can obtain by playing sports. As Plaintiff's unrebutted expert Dr. Fry explains, a principal goal of school athletics (as opposed to elite athletics, which, as noted, expressly *permit* women who are transgender to compete on women's teams (Pl's SUF ¶¶ 41–42, 74–84)) is for students to develop skills, make friends, increase physical activity, and learn valuable life lessons—all of which can contribute to greater success in college and throughout life. (Pl's SUF ¶¶ 22–23.) These are precisely the types of benefits B.P.J. has experienced from participating in cheerleading and cross-country and hopes to continue to experience from playing on girls' teams in the future. (Pl's SUF ¶¶ 29–30.)

Encouraging student-athletes to focus on improving their own performance and cooperating with teammates maximizes the benefits of athletics for all participants. (Pl's SUF ¶ 26.) Where coaches create an environment in which student-athletes feel safe, valued, and respected, performance is improved and the benefits of sport are maximized. (Pl's SUF ¶ 27.) Excluding students for no other reason than because they are transgender eliminates the benefits of sports for them and diminishes those benefits for all participants. (Pl's SUF ¶ 28.) H.B. 3293 thus prevents all girls and women from realizing the benefits and values of participating in sports.

### D.    H.B. 3293 Fails Any Level Of Scrutiny.

Instead of furthering an important governmental interest, the plain text of H.B. 3293 and its operation in practice advances only an "invalid interest of excluding transgender women and girls from women's sports entirely, regardless of their physiological characteristics." *Hecox*, 479 F. Supp. 3d at 984–85. The pretextual nature of the State's claimed justification of advancing equality in sports is confirmed by the context surrounding H.B. 3293's enactment. The legislative history makes clear that the law was passed out of fear and disapproval of transgender women and

girls and was "'marked by misconception and prejudice.'" *Grimm*, 972 F.3d at 615 (quoting *Tuan Anh Nguyen v. INS*, 533 U.S. 53, 73 (2001)). Even the original name of the statute—the "Save Women's Sports Act"—reflects the Legislature's view of transgender girls as a threat from whom non-transgender girls are in need of saving. *Cf. United States v. Windsor*, 570 U.S. 744, 751 (2013) (explaining that the title of the "The Defense of Marriage Act" confirms its discriminatory purpose).

H.B. 3293 thus would fail under any standard of review. The statute imposes a sweeping, categorical bar on transgender girls' participation in school sports from middle school through college, including club and intramural. It applies to girls who are transgender regardless whether they have gone through endogenous puberty, the age at which they transitioned, the level of their circulating testosterone, or the level and sport in which they want to compete. "The breadth of the [law] is so far removed from [the] particular justifications" put forth in support of it, that it is "impossible to credit them." *Romer v. Evans*, 517 U.S. 620, 635 (1996). Under any standard of scrutiny, the Legislature's generalized fear, discomfort, or moral disapproval of a group of people is not a legitimate governmental interest for imposing unequal treatment. *See City of Cleburne, Tex. v. Cleburne Living Ctr.*, 473 U.S. 432, 448 (1985); *see also Bd. of Trs. of Univ. of Ala. v. Garrett*, 531 U.S. 356, 374 (2001) (Kennedy, J., concurring) (explaining that irrational discrimination "rises not from malice or hostile animus alone" and "may result as well from insensitivity caused by simple want of careful, rational reflection or from some instinctive mechanism to guard against people who appear to be different in some respects from ourselves"); (PI Op. at 1) (recognizing that "[a] fear of the unknown and discomfort with the unfamiliar have motivated many of the most malignant harms committed by our country's governments on their own citizens")).

IV.     **This Court Should Issue A Permanent Injunction, As Well As Issue A Declaratory Judgment And Award Nominal Damages.**

In addition to issuing a declaratory judgment that H.B. 3293 violates B.P.J.'s rights under Title IX and the Equal Protection Clause (FAC Prayer for Relief ¶¶ A-B) and awarding nominal damages (*id.* ¶ E), this Court should also permanently enjoin Defendants from enforcing H.B. 3293 against B.P.J. (*id.* ¶ C). To obtain a permanent injunction, a plaintiff must show: (1) irreparable injury, (2) remedies at law are inadequate to compensate for that injury, (3) the balance of hardships between the plaintiff and defendant warrants a remedy, and (4) an injunction would not disserve the public interest. *Legend Night Club v. Miller*, 637 F.3d 291, 297 (4th Cir. 2011) (citation omitted). When "the government is a party, and 'the government's interest is the public interest,' the last two factors merge." *Kravitz v. U.S. Dep't of Com.*, 366 F. Supp. 3d 681, 755 (D. Md. 2019) (citations omitted).

**First,** B.P.J. has shown irreparable harm. As discussed, H.B. 3293 violates B.P.J.'s rights under Title IX and the Equal Protection Clause. *See supra* Argument (II-III). Because B.P.J. has established success on the merits of her claims under Title IX and the Equal Protection Clause, she has established irreparable harm. *See Melendres v. Arpaio*, 695 F.3d 990, 1002 (9th Cir. 2012) ("It is well established that the deprivation of constitutional rights 'unquestionably constitutes irreparable injury.'" (citation omitted)); *Henry v. Greenville Airport Comm'n*, 284 F.2d 631, 633 (4th Cir. 1960); *Doe v. Wood Cty. Bd. of Educ.*, 888 F. Supp. 2d 771, 777 (S.D. W. Va. 2012) (describing a violation of Title IX as constituting irreparable harm) (Goodwin, J.); *Marietta Mem'l Hosp. v. W.V. Health Care Auth.*, No. 16 Civ. 8603, 2016 WL 7363052, at *8 (S.D. W. Va. Dec. 19, 2016) ("Where a person's constitutional right will be denied if an action is allowed to continue, an irreparable harm will be established."). Indeed, this Court "ha[d] little difficulty finding that

B.P.J. is harmed by [H.B. 3293]," and that such harm would be irreparable "if this law were to take full effect." (PI Op. at 12–13.)

Due to this Court's preliminary injunction, B.P.J. has been able to fully live her life as the girl she is and able to do what she loves—participate in team sports—like any other girl at Bridgeport Middle School. She experienced camaraderie, competition, physical fitness, and personal development as a member of the girls' cross-country team last fall, and recently joined her school's girls' track team. (Pl's SUF ¶¶ 29, 124–25.) Permanent injunctive relief is necessary to preserve B.P.J.'s ability to continue to play on girls' teams and save her from "[d]ignitary wounds [that] cannot always be healed with the stroke of a pen." *Obergefell v. Hodges*, 576 U.S. 644, 678 (2015).

**Second,** monetary damages are inadequate to compensate B.P.J.'s irreparable injuries. *Melendres*, 695 F.3d at 1002; *QueTel Corp. v. Abbas*, 819 F. App'x 154, 157 (4th Cir. 2020). The deprivation of constitutional rights cannot be remedied through damages. *See, e.g.*, *Edmo v. Corizon, Inc.*, 935 F.3d 757, 798 (9th Cir. 2019) (citing *Nelson v. NASA*, 530 F.3d 865, 882 (9th Cir. 2008), *rev'd and remanded on other grounds*, 562 U.S. 134 (2011)).

**Third,** the balance of hardships and the public interest weigh heavily in favor of granting a permanent injunction. In evaluating the balance of equities, courts "must balance the competing claims of injury and must consider the effect on each party of the granting or withholding of the requested relief." *Winter v. NRDC, Inc.*, 555 U.S. 7, 24 (2008) (citation omitted). It is always in the public interest to "uphold[] constitutional rights." *Centro Tepeyac v. Montgomery Cnty.*, 722 F.3d 184, 191 (4th Cir. 2013) (en banc) (internal quotation marks omitted).

Further, were H.B. 3293 to take effect, it would have devastating consequences for B.P.J. and her development. Taking away B.P.J.'s opportunity to play sports with other girls will not only

deprive B.P.J. of experiences of competition, friendship, and responsibility, but it will cause her pain and distress. (Pl's SUF ¶¶ 97–100, 103–04.) Defendants, by contrast, have not experienced any injury resulting from this Court's preliminary injunction. A permanent injunction would maintain the status quo and let B.P.J. continue to play.

## CONCLUSION

For the foregoing reasons, B.P.J.'s motion for summary judgment should be granted.

Dated: April 21, 2022

Joshua Block*
AMERICAN CIVIL LIBERTIES UNION
FOUNDATION
125 Broad St.
New York, NY 10004
Phone: (212) 549-2569
jblock@aclu.org

Avatara Smith-Carrington*
LAMBDA LEGAL
3500 Oak Lawn Avenue, Suite 500
Dallas, TX 75219
Phone: (214) 219-8585
asmithcarrington@lambdalegal.org

Carl Charles*
Tara Borelli*
LAMBDA LEGAL
158 West Ponce De Leon Ave., Ste. 105
Decatur, GA 30030
Phone: (404) 897-1880
ccharles@lambdalegal.org

Sruti Swaminathan*
LAMBDA LEGAL
120 Wall Street, 19th Floor
New York, NY 10005
Phone: (212) 809-8585
sswaminathan@lambdalegal.org

Andrew Barr*
COOLEY LLP
1144 15th St. Suite 2300
Denver, CO 80202-5686
Phone: (720) 566-4000
abarr@cooley.com

Respectfully submitted,
/s/ *Loree Stark*

Loree Stark (Bar No. 12936)
Nick Ward (Bar No. 13703)
AMERICAN CIVIL LIBERTIES UNION OF WEST
VIRGINIA FOUNDATION
P.O. Box 3952
Charleston, WV 25339-3952
Phone: (914) 393-4614
lstark@acluwv.org

Kathleen Hartnett*
Julie Veroff*
Zoë Helstrom*
COOLEY LLP
3 Embarcadero Center, 20th Floor
San Francisco, CA 94111
Phone: (415) 693-2000
khartnett@cooley.com

Katelyn Kang*
Valeria Pelet del Toro*
COOLEY LLP
55 Hudson Yards
New York, NY 10001-2157
Phone: (212) 479-6000
kkang@cooley.com

Elizabeth Reinhardt*
COOLEY LLP
500 Boylston Street, 14th Floor
Boston, MA 02116-3736
Phone: (617) 937-2305
ereinhardt@cooley.com

*Visiting Attorneys*

*Attorneys for Plaintiff*

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA
CHARLESTON DIVISION

| | |
|---|---|
| B.P.J. by her next friend and mother, HEATHER JACKSON,<br><br>        *Plaintiff*,<br><br>    v.<br><br>WEST VIRGINIA STATE BOARD OF EDUCATION, HARRISON COUNTY BOARD OF EDUCATION, WEST VIRGINIA SECONDARY SCHOOL ACTIVITIES COMMISSION, W. CLAYTON BURCH in his official capacity as State Superintendent, DORA STUTLER in her official capacity as Harrison County Superintendent, and THE STATE OF WEST VIRGINIA,<br><br>        *Defendants*,<br><br>    and<br><br>LAINEY ARMISTEAD,<br><br>        *Defendant-Intervenor*. | Civil Action No. 2:21-cv-00316<br><br>Hon. Joseph R. Goodwin<br><br>**CERTIFICATE OF SERVICE** |

**CERTIFICATE OF SERVICE**

I, Loree Stark, do hereby certify that on this 21st day of April, 2022, I electronically filed a true and exact copy of the ***Memorandum in Support of Plaintiff's Motion for Summary Judgment*** with the Clerk of Court and all parties using the CM/ECF System.

                                  */s/ Loree Stark*
                                  Loree Stark
                                  West Virginia Bar No. 12936