IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA
CHARLESTON DIVISION

B.P.J., by her next friend and mother,
HEATHER JACKSON,

*Plaintiff*,

v.

Civil Action No. 2:21-cv-00316
Hon. Joseph R. Goodwin, District Judge

WEST VIRGINIA STATE BOARD OF
EDUCATION, HARRISON COUNTY BOARD
OF EDUCATION, WEST VIRGINIA
SECONDARY SCHOOL ACTIVITIES
COMMISSION, W. CLAYTON BURCH in his
official capacity as State Superintendent,
DORA STUTLER in her official capacity as
Harrison County Superintendent, PATRICK
MORRISEY in his official capacity as Attorney
General, and THE STATE OF WEST VIRGINIA,

*Defendants,*

and

LAINEY ARMISTEAD,

*Defendant-Intervenor*.

**DEFENDANTS HARRISON COUNTY BOARD OF EDUCATION
AND DORA STUTLER'S RESPONSE IN OPPOSITION TO
<u>PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT</u>**

Defendants Harrison County Board of Education ("HCBOE") and County Superintendent Dora Stutler ("Stutler") (collectively the "County Board"), by counsel, submit that, in her motion for summary judgment, Plaintiff has provided no basis for holding *the County Board* liable under Title IX (brought against the HCBOE) or the Equal Protection Clause ("EPC") (brought against Stutler). Rather, Plaintiff more generally argues that H.B. 3293 violates Title IX and the EPC. However, even if H.B. 3293 causes a violation of Title IX and/or the EPC, the County Board cannot be liable to Plaintiff as a matter of undisputed fact and established federal law.[1]

Title IX does not impose liability on the HCBOE unless its own intentional misconduct violates B.P.J.'s rights under Title IX. Yet, nowhere in her summary judgment briefing does Plaintiff allege that the HCBOE engaged in any intentional misconduct of its own. Nor can she do so because the undisputed facts demonstrate that the HCBOE did not engage in any intentional misconduct of its own. Rather, the HCBOE is required to act in accordance with State law. It is the state law that B.P.J. claims causes her harm, not the HCBOE. Regardless of whether Plaintiff has a viable Title IX claim against some other party, she has no viable claim against the HCBOE. To find otherwise would be to impermissibly impose liability on the HCBOE when the HCBOE is not at fault, which is contrary to both U.S. Supreme Court and Fourth Circuit precedent.

Similarly, Stutler cannot be liable to Plaintiff under the EPC unless the County Board, presented with various alternatives, deliberately chose a course of action that violates B.P.J.'s equal protection rights. In other words, Stutler could be liable only if the County Board's own policies, procedures, or customs violate B.P.J.'s rights. Yet, again, nowhere in her summary

---

[1] In addition to her supporting memorandum, Plaintiff also filed a document entitled "Plaintiff's Statement of Undisputed Facts." The County Board objects to this document because many of the alleged facts set forth in the document are in fact disputed, including but not limited to, various facts set forth in the following paragraphs: 16, 17, 18, 28, 44, 49, 58, 71, 72, 85, 88, 89, 90, 95, 108, 115, 131, 132, 133 and 134. The County Board also objects because the document uses and cites to Plaintiff's expert witness opinions as undisputed facts. Those expert opinions, however, are in dispute.

judgment briefing does Plaintiff allege that the County Board has any choice regarding its enforcement of H.B. 3293 or that it has its own policy, procedure, or custom that violates B.P.J.'s rights. That is because the County Board undisputedly has no choice regarding whether to enforce H.B. 3293, and the County Board has no policy, procedure, or custom of its own that violates any of B.P.J.'s equal protection rights. Rather, H.B. 3293 is a state law that was proposed and enacted by the state legislature and was signed by the West Virginia Governor. Clear precedent from this Court, the Fourth Circuit, and the U.S. Supreme Court establishes that Stutler cannot be liable for any EPC violation under these circumstances.

If the Court should decide that a violation of the EPC exists (or might exist) and that Stutler is a proper defendant for the purpose of an injunction, then the County Board is still entitled to summary judgment as to any monetary award to Plaintiff, including, but not limited to, any award of attorneys' fees and costs. Clear precedent from this Court and the Fourth Circuit establish that, when a county official is sued in her official capacity because of her enforcement of *state* law, then suing the county official is a means of suing the state, and the *state* – not the county or the county official – is solely responsible for any monetary award.

Finally, while the HCBOE and Stutler did not have any role in the passage of H.B. 3293, B.P.J. has asserted claims seeking equitable and monetary damages (including costs, expenses, and attorneys' fees) against them. Thus, the HCBOE and Stutler find themselves in the position of having to defend a statute they had no part in creating or passing.  To that extent, they observe that a clear legal basis exists for finding that H.B. 3293 survives legal scrutiny under Title IX and the EPC, and thus, the County Board is not liable to B.P.J for this additional reason.

Because the facts and law relevant to Plaintiff's motion for summary judgment overlap with those cited in the County Board's motion for summary judgment, the County Board hereby incorporates by reference "Defendants Harrison County Board of Education and Dora

Stutler's Memorandum of Law in Support of Their Motion for Summary Judgment" (Doc. 281).

## I. ARGUMENT

### A. Standard of Review.

Rule 56 of the Federal Rules of Civil Procedure provides that the "court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."

### B. The undisputed facts and Plaintiff's motion for summary judgment demonstrate that any injury B.P.J. suffers is not caused by any HCBOE policy or intentional conduct of the HCBOE. Thus, the HCBOE cannot be liable under Title IX.[2]

In her motion, as in her Amended Complaint, Plaintiff does not claim that the HCBOE has any policy or custom of its own that injures B.P.J. Rather, she much more generally argues that, at least as it applies to her, H.B. 3293 violates Title IX. (Doc. 291, at 19-24, 29; Doc. 290, at 20 (¶ 105).) Even if Plaintiff is correct that H.B. 3293 violates Title IX, however, Plaintiff has not and cannot prove that the HCBOE is liable for that violation. The HCBOE is not, and should not be confused for, the State. It is the State's law alone that B.P.J. takes issue with and claims violates Title IX. Therefore, Plaintiff's motion should be denied with regard to the HCBOE.

As the HCBOE set forth in its own motion for summary judgment, "a recipient of federal funds may be liable in damages under Title IX *only for its own misconduct*. *The recipient itself* must 'exclude persons from participation in, . . . deny persons the benefits of, or . . . subject persons to discrimination under' its 'programs or activities' in order to be liable under Title IX." *Davis Next Friend LaShonda D. v. Monroe Cty. Bd. of Educ.*, 526 U.S. 629, 640–41 (1999) (emphasis added) (internal brackets omitted). The Fourth Circuit has echoed that "the implied damages remedy is available only when '*the funding recipient engages in intentional conduct*

---

[2] B.P.J. does not bring her Title IX claim in Count I against County Superintendent Stutler.

that violates the clear terms of the statute.'" *Baynard v. Malone*, 268 F.3d 228, 237 (4th Cir. 2001) (emphasis added) (quoting *Davis*). "When the municipality is acting ***under compulsion of state or federal law, it is the policy contained in that state or federal law***, rather than anything devised or adopted by the municipality, ***that is responsible for the injury***." *Bethesda Lutheran Homes & Servs., Inc. v. Leean*, 154 F.3d 716, 718 (7th Cir. 1998) (emphasis added).

Here, Plaintiff's motion for summary judgment itself sets forth the following undisputed facts, which demonstrate that the HCBOE did not engage in intentional misconduct of its own, but rather that it is compelled by state law to comply with H.B. 3293 to the extent that it goes into effect, and thus, it cannot be liable under Title IX:

1. ***Plaintiff acknowledges that H.B. 3293 <u>compels</u> and <u>requires</u> the HCBOE to exclude B.P.J. from girls' sports teams.***

As Plaintiff acknowledges, "H.B. 3293 requires that all public secondary school or college sports in West Virginia be 'expressly designated' as either 'males,' 'females,' or 'co-ed' based solely on a student's 'biological sex.'" (Doc. 291, at 12 (citing, *inter alia*, W. Va. Code § 18-2-25d(b), (c)).) Under H.B. 3293, as Plaintiff acknowledges, "biological sex" is defined as "'an individual's physical form as a male or female *based solely on the individual's reproductive biology and genetics at birth*.'" (Doc. 291, at 12 (quoting W. Va. Code § 18-2-25d(b)(1) (emphasis added in Doc. 291).) She further acknowledges that H.B. 3293 "provides that '[a]thletic teams or sports designated for females, women, or girls ***shall not*** be open to students of the male sex where selection for such teams is based upon competitive skill or the activity involved is a contact sport.'" (Doc. 291, at 12 (quoting, *inter alia*, W. Va. Code § 18-2-25d(c)(2); emphasis added).)

In "Plaintiff's Statement of Undisputed Material Facts," Plaintiff further acknowledges that it is undisputed that, "'[a]bsent an injunction, the County Board and County Superintendent would be compelled and required to enforce H.B. 3293 against B.P.J.' . . . The

County Board and County Superintendent's role in enforcing the law is 'mandatory, not merely optional.'" (Doc. 290, at 21 (¶ 109) (citations omitted).) While Plaintiff does not mention it, H.B. 3293 also compels the HCBOE to enforce it by creating a cause of action that may be brought by "any student aggrieved by a violation of" H.B. 3293 "against a county board of education" responsible for the violation.  W. VA. CODE § 18-2-25d(d)(1).

In her summary judgment briefing, Plaintiff writes, "H.B. 3293 employs a definition of 'biological sex' that[] . . . categorically excludes B.P.J. and any other transgender girl from playing sports at the middle school, high school, and collegiate levels." (Doc. 291, at 13 (citation omitted.) As Plaintiff more specifically wrote in "Plaintiff's Statement of Undisputed Material Facts," "Under H.B. 3293, B.P.J. is forbidden from playing on a girls' team at Bridgeport Middle School, or on a girls' athletic team at any public secondary school in West Virginia." (Doc. 290, at 18 (¶ 93) (citations omitted).) Although H.B. 3293 prevents B.P.J. and other transgender girls from playing on West Virginia public higher education and secondary school teams designated for girls, it does not exclude them from participation on school teams designated for boys. W. Va. Code § 18-2-25d(c).

While Plaintiff does not mention these significant and dispositive facts in her summary judgment briefing, it is also undisputed that the County Board did not devise H.B. 3293; has not voted in any way relating to policies concerning H.B. 3293; did not pass any policy, proclamation, or other statement related to H.B. 3293; and has not taken any actions to implement the provisions of H.B. 3293. (County Board Dep., attached as "**Exhibit 1**," at 38, 192; Stipulation of Uncontested Facts (CM/ECF Doc. 252), at 2.) Moreover, the County Board had no role in drafting H.B. 3293, and it provided no comments or thoughts to the Legislature regarding H.B. 3293. (Exhibit 1, at 62.) Neither the County Board nor any of its agents or employees, in their official capacities, did anything officially to advocate for or support H.B. 3293 or to contribute to

its passage. (*Id.* at 191-92.) Also, prior to H.B. 3293's enactment, the County Board had no conversations with the State Board of Education or the WVSSAC about transgender students' participation in sports. (*Id.* at 65, 83.)

In sum, Plaintiff acknowledges that H.B. 3293 (the creation and passage of which the HCBOE was uninvolved with) contains a mandate that the HCBOE has no discretion to ignore, and thus, that if the HCBOE ever enforces H.B. 3293, its enforcement will <u>not</u> be the result of its own intentional (mis)conduct or its own intentional decision; rather, that would be because West Virginia law compels it to do so. Therefore, Plaintiff's motion for summary judgment demonstrates that the HCBOE cannot be liable to her under Title IX due to its enforcement of H.B. 3293.

2.      *Plaintiff acknowledges that the HCBOE permitted B.P.J. to participate on the girls' cross-country and track teams when the Court enjoined enforcement of H.B. 3293, demonstrating that no policy or intentional conduct of the HCBOE has caused her harm.*

In addition to acknowledging that H.B. 3293 affords the HCBOE no discretion regarding whether to enforce its provisions, Plaintiff's brief demonstrates that the HCBOE has no policy of its own that causes the injury to B.P.J. that is alleged in this civil action. According to Plaintiff, when Ms. Jackson informed Bridgeport Middle School that B.P.J. wanted to participate on the girls' cross-country team, "Principal Mazza communicated that B.P.J. would not be able to run on the girls' cross-country team *because of H.B. 3293*." (Doc. 291, at 10 (emphasis added).)[3]

Plaintiff further acknowledges that, after the Court entered "its preliminary injunction on July 21, 2021, B.P.J. was permitted to participate on Bridgeport Middle School's girls' cross-country team" and that in "the spring of 2022, B.P.J. tried out for, made, and began running on the girls' track team at Bridgeport Middle School." (Doc. 291, at 15, 16.) The Court's

---

[3] While Plaintiff has asserted in her "Statement of Undisputed Facts" that Mr. Mazza made this alleged comment, the County Board disputes that Mr. Mazza made this comment. (Exhibit 1, at 220-21.)

preliminary injunction provided that "[w]hile this case is pending, Defendants are enjoined from enforcing Section 18-2-25d [i.e., H.B. 3293] against B.P.J." (Doc. 67, at 14-15.) While the Court's Order further provided that B.P.J. "will be permitted to sign up for and participate in school athletics in the same way as her girl classmates," (Doc. 67, at 15), the enforcement of H.B.3293 was the only thing the Court had to enjoin in order to accomplish that result – it did not also need to enjoin any policy or intentional conduct of the HCBOE.

Indeed, the undisputed evidence shows that the County Board has no policy of its own regarding sex separation in sports. With regard to sports, the County Board has only two policies, neither of which is related to separation by sex. (Exhibit 1, at 56-57, 214.) The County Board also has no policy pertaining to transgender students or transgender students' participation in sports. (*Id.* at 57, 125, 150.)

In sum, Plaintiff's motion for summary judgment and the undisputed evidence show that the HCBOE has no policy of its own that prevents B.P.J., on the basis of her status as a transgender girl, from participating on girls' school sports teams. Therefore, again, Plaintiff's motion for summary judgment shows that the HCBOE cannot be liable under Title IX because no policy or intentional misconduct of its own has caused B.P.J. any injury under Title IX.

3. ***Plaintiff acknowledges that B.P.J.'s schools have demonstrated respect for her and her gender identity and have provided her with a positive educational environment and athletic experience.***

As further evidence that no policy or intentional misconduct by the HCBOE has harmed B.P.J. in violation of Title IX, Plaintiff demonstrates in her briefing that B.P.J. has had overwhelmingly positive experiences at her schools within the HCBOE, including while participating on the girls' cross-country and track teams. Plaintiff's motion states that B.P.J.'s elementary and middle schools acknowledged and respect her female gender identity and that B.P.J. "feels supported by her school given its commitment to treating her as the girl she is." (Doc.

291, at 8-9, 19.) She also acknowledges that, "[f]or years, B.P.J. has lived as a girl and been recognized as a girl at school, where administrators in B.P.J.'s elementary school and middle school have both acknowledged and respected B.P.J.'s female gender identity." (Doc. 291, at 22.)

In her motion, Plaintiff recognizes that B.P.J.'s elementary and middle schools both created gender support plans "designed to help 'account[]' for and 'support[]' B.P.J.'s 'authentic gender' at school" and that under the plan, "school staff were informed that B.P.J.'s authentic gender is female, and were instructed to refer to her with her female name and using female pronouns." (Doc. 291, at 8-9 (citations omitted).) "School staff were also informed how to support B.P.J. if she faced problems from others at school because of her gender." (*Id.*) As a result of these properly-implemented, agreed-to measures, B.P.J. feels supported by her school. (Doc. 291, at 9.) As stated by B.P.J., "'My first cross-country season was awesome, and I felt supported by my coaches and the other girls on the team. . . . We learned about teamwork, having a positive attitude, and how to have fun while being competitive.'" (Doc. 291, at 16.)

For these reasons, Plaintiff's summary judgment briefing and the undisputed facts demonstrate that the HCBOE cannot be liable under Title IX. The HCBOE could be liable "only for its own misconduct," and for liability to attach, that misconduct must be intentional on the part of the HCBOE. *Davis*, 526 U.S. at 640–41; *Baynard*, 268 F.3d at 237. Here, that is undisputedly not the case. There is no dispute that the HCBOE had no role in the creation or passage of H.B. 3293 or that H.B. 3293, to the extent that it goes into effect, compels the HCBOE to enforce it. There is no dispute that the HCBOE has no policy and has engaged in no intentional conduct that has or that will cause any harm to B.P.J. There is no dispute that the HCBOE permitted B.P.J. to try out for and participate on her school's girls' cross-country and track teams when the Court enjoined enforcement of H.B. 3293. And there is no dispute that B.P.J. feels respected by her school administrators, feels supported by her school and her coaches, and has had positive

experiences at her elementary and middle schools, which respect her female gender identity and treat her as the girl she is, including as a participant on girls' sports teams at school.

Particularly with regard to the HCBOE, this case is simply not *Grimm*, in which a county school board policy was the cause of the injury to a transgender male student who wished to use the boys' restrooms. *Grimm v. Gloucester Cty. Sch. Bd.*, 972 F.3d 586, 616 (4th Cir. 2020), *as amended* (Aug. 28, 2020) (citation omitted), *cert. denied sub nom. Gloucester County School Board v. Grimm, Gavin*, No. 20-1163, 2021 WL 2637992 (U.S. June 28, 2021). In *Grimm*, the Fourth Circuit found that the defendant county school board had violated Title IX because the school board had relied "on its own discriminatory notions of what 'sex' means." 972 F.3d at 618 (citation omitted). Unlike in the present case, in *Grimm*, the county school board did not act pursuant to a mandatory state law that it had no discretion to ignore; rather, the county school board acted pursuant to its own decisions and its own policy. This crucial detail distinguishes the HCBOE from the county school board that was sued in *Grimm*. Pursuant to *Davis*, *Baynard*, and *Bethesda Lutheran*, the HCBOE cannot be liable to Plaintiff because it has engaged in no intentional, discriminatory misconduct of its own. Instead, state law compels it to enforce H.B. 3293. The HCBOE cannot be liable under these circumstances.

Because Plaintiff cannot succeed on her Title IX claim against the HCBOE, the HCBOE is entitled to summary judgment on the Title IX claim, and Plaintiff's motion for summary judgment against the HCBOE should be denied.

C. **Because Stutler did not create or pass H.B. 3293, and because any injury B.P.J. suffers is not caused by any policy created by the HCBOE or by Stutler, Stutler cannot be liable for any violation of B.P.J.'s equal protection rights.**[4]

Similar to her Title IX argument, in her summary judgment briefing, Plaintiff does

---

[4] Count II, Plaintiff's EPC claim, is not brought against the HCBOE.

not claim that Stutler (or the County Board) has made a deliberate choice to exclude B.P.J. from girls' athletic teams, and she has not argued that Stutler (or the County Board) in particular has violated B.P.J.'s equal protection rights. Rather, she much more generally argues that H.B. 3293 violates the EPC. (Doc. 291, at 24-40.) But as with her Title IX argument, even if Plaintiff is correct that H.B. 3293 violates her equal protection rights, Plaintiff has not and cannot prove that Stutler (or the County Board) is liable for that violation because the County Board has, and will, do no more than to enforce state law to the extent that state law compels it to do so. Stutler and the County Board are not, and should not be confused for, the State. It is a state law, not any policy or other decision of Stutler or the County Board, that Plaintiff alleges violates her EPC rights. Under these circumstances, Stutler cannot be liable for any EPC violation caused by H.B. 3293.

Crucially, as is set forth in detail in the County Board's brief in support of its own motion for summary judgment (Doc. 281, at 11-17), pursuant to federal law, a local governing body like a county board of education can be held liable only for its own "deliberate choice" – that is, where the county board of education itself causes harm. *City of Canton, Ohio v. Harris*, 489 U.S. 378, 389, 109 S. Ct. 1197, 1205 (1989); *Barker v. Gaylor*, No. 2:20-CV-00357, 2021 WL 3354161, at *9 (S.D.W. Va. Aug. 2, 2021) (slip copy). This Court recently recognized this important point of law, stating that liability under § 1983 "attaches 'only where the municipality itself causes the constitutional violation at issue.'" *Barker*, 2021 WL 3354161, at *9 (quoting *Harris*, 489 U.S. at 385). Where a county has done nothing more than comply with a mandate imposed on it by a state statute, the county and the county official have not violated § 1983.[5]

---

[5] This inquiry is a purely objective one: "[T]he state of mind of local officials who enforce or comply with state or federal regulations is immaterial to whether the local government is violating the Constitution if the local officials could not act otherwise without violating state or federal law. The spirit, the mindset, the joy or grief of local officials has no consequences for the plaintiffs if these officials have no discretion that they could exercise in the plaintiffs' favor." *Bethesda Lutheran*, 154 F.3d at 718.

As the U.S. Supreme Court has stated, local government units cannot "be held liable unless action pursuant to official [local government unit] policy of some nature caused a constitutional tort[.]" *Monell v. Dep't of Soc. Servs. of City of New York*, 436 U.S. 658, 691 (1978); *see also id.* 436 U.S. at 691 n.5 (the same rules apply to actions against local government unit officers because "official-capacity suits generally represent only another way of pleading an action against an entity of which an officer is an agent").  Here, B.P.J. has brought her EPC claim against Stutler in her official capacity as County Superintendent of the HCBOE.

Accordingly, the "first inquiry in any case alleging municipal liability under § 1983 is the question whether there is a direct causal link between *a municipal policy or custom* and the alleged constitutional deprivation."  *Harris*, 489 U.S. at 385, 109 S. Ct. at 1203 (emphasis added). The Supreme Court went on to state,

> *"[Local government unit] liability under § 1983 attaches where— and only where—a deliberate choice to follow a course of action is made from among various alternatives" by [local government unit] policymakers*. . . . Only where [a policy, procedure, custom, etc.] reflects a "deliberate" or "conscious" choice by a [local government unit]—a "policy" as defined by our prior cases—can a [local government unit] be liable for such [policy, etc.] under § 1983.

*Id.*, 489 U.S. at 389, 109 S. Ct. at 1205 (emphasis added; second alteration in original) (citation omitted).

Thus, a local governing body, like a county board of education, can be liable for violating the United States Constitution only under limited circumstances in which "*the action that is alleged to be unconstitutional implements or executes a policy statement, ordinance, regulation, [custom,] or decision officially adopted and promulgated by that body's officers*." *Monell*, 436 U.S. at 690–91 (emphasis added). A "policy" of complying with mandatory state law is not a policy for which a county board of education may be liable under the EPC. As the Seventh

Circuit has recognized, "[i]t is difficult to imagine a municipal policy more innocuous and constitutionally permissible, and whose causal connection to the alleged violation is more attenuated, than the 'policy' of enforcing state law." *Surplus Store & Exch., Inc. v. City of Delphi*, 928 F.2d 788, 791–92 (7th Cir. 1991). "If the language and standards from *Monell* are not to become a dead letter, such a 'policy' simply cannot be sufficient to ground liability against a municipality." *Id.* (citation omitted).[6]

For example, the Fourth Circuit found that Grayson County, Virginia could not be held responsible under 42 U.S.C. § 1983 for personnel decisions made by the Board of Social Services for Grayson County "because the Board did not dismiss plaintiff pursuant to any County policy." *Bockes v. Fields*, 999 F.2d 788, 789 (4th Cir. 1993).

In a recent example, the Fourth Circuit concluded that although a county "can be liable for enforcing a state regulation it has ***voluntarily*** adopted as its own, it cannot be held liable for state statutes it has not consciously adopted into its own policy." *Bruce & Tanya & Assocs.,*

---

[6] *See also Vives v. City of New York*, 524 F.3d 346, 356 (2d Cir. 2008) ("We have held today that a municipality cannot be held liable simply for choosing to enforce the entire Penal Law.") (footnote omitted); *Dakota Rural Action v. Noem*, No. 19-cv-5026, 2019 WL 4546908, at *5 (D.S.D. Sept. 18, 2019) ("Applying this standard [*Monell, et al.*] in this case, Plaintiffs have failed to allege that Pennington County sheriff officials have made any choices at all regarding enforcement of the challenged laws that could cause a violation of Plaintiffs' First Amendment rights. Plaintiffs' allegations show only that a policy choice was made by State officials."); *Elabanjo v. Bellevance*, No. 1:11-CV-349, 2012 WL 4327090, at *5 (M.D.N.C. Sept. 18, 2012) ("The enforcement of a state statute by a municipality does not qualify as a municipal policy or custom sufficient to support § 1983 liability."), *report and recommendation adopted*, No. 1:11-CV-349, 2012 WL 5864004 (M.D.N.C. Nov. 19, 2012); *cf. Echnols v. Parker*, 909 F.2d 795, 801 (5th Cir. 1990) ("[W]hen a state statute directs the actions of an official, as here, the officer, be he state or local, is acting as a state official."); *Doby v. DeCrescenzo*, 171 F.3d 858, 868 (3d Cir. 1999) (accepting that "when a county is merely enforcing state law, without adopting any particular policy of its own, it cannot be held liable under the *Monell* line of cases"); *Humphries v. Los Angeles Cty.*, No. SACV03697JVSMANX, 2012 WL 13014632, at *3 (C.D. Cal. Oct. 17, 2012) ("A municipality cannot be held liable under *Monell* merely for enforcing a state law. . . . But where the municipality makes a deliberate choice from among various alternatives to adopt a particular policy, the municipality can be held liable." (citations omitted).

In cases where a court found local government liability, it has generally been because the local government unit's conduct was not mandated, but merely allowed by (or unrelated to) state or federal law. *See, e.g., Cooper v. Dillon*, 403 F.3d 1208, 1221–22 (11th Cir. 2005) (police officer's enforcement of state criminal law with no allegation that state law also made it mandatory for him to have done so).

*Inc. v. Bd. of Supervisors of Fairfax Cty., Virginia*, 854 F. App'x 521, 532 (4th Cir. 2021) (unpublished). Thus, the Court found that the defendant county could be liable for enforcing a section of a state statute "because it consciously chose to enforce" it, but that the county could not be liable for harms caused by a section of the statute it did not adopt as its own policy. *Id.* at 531-32.  The Court noted that its decision aligned with "[t]he majority of our sister circuits to consider the question," which "have suggested that a local government can be subjected to *Monell* liability if it makes an independent choice to enforce or follow parameters set by state law, rather than being obliged to do so." *Id.* at 530.

In accordance with this established federal law, Stutler could be held liable under the EPC only for the County Board's own policies, procedures, customs, or other deliberate or conscious choices. She cannot be held liable for acts that were not the result of the County Board's deliberate, conscious choice to follow a course of action made from among various alternatives. It is therefore clear that Stutler cannot be held liable under the EPC because the County Board has made no deliberate or conscious choice; rather, it has no discretion but is compelled to enforce H.B. 3293 to the extent that it goes into effect.

Based on the same undisputed facts set forth above (in subsection B, which is incorporated into this argument) demonstrating why the County Board cannot be liable under Title IX, the County Board cannot be liable under the EPC. The following undisputed facts, including assertions by Plaintiff, demonstrate that Stutler cannot be liable under the EPC:

1) ***As Plaintiff has conceded, H.B. 3293 provides the County Board with no discretion to make a deliberate, conscious choice regarding whether to enforce it.*** Rather, H.B. 3293 compels the County Board to enforce it. (Doc. 290, at 21 (¶ 109).) Plaintiff acknowledges that it is undisputed that, "'[a]bsent an injunction, the County Board and County Superintendent would be compelled and required to enforce H.B. 3293 against B.P.J.' . . . The County Board and

County Superintendent's role in enforcing the law is 'mandatory, not merely optional.'" (Doc. 290, at 21 (¶ 109) (citations omitted).) Plaintiff also recognizes that "[u]nder H.B. 3293, B.P.J. is forbidden from playing on a girls' team at Bridgeport Middle School, or on a girls' athletic team at any public secondary school in West Virginia." (Doc. 290, at 18 (¶ 93) (citations omitted).) The County Board had no part in the creation or passage of H.B. 3293, and it did nothing to support the bill or to contribute to its passage. (Exhibit 1, at 38, 62, 191-92.) Stutler cannot be liable for a violation of B.P.J.'s EPC rights simply because state law compels her to enforce H.B. 3293.

2)      ***No policy or other deliberate choice by the County Board causes the harm alleged in this civil action.*** Plaintiff's civil action challenges H.B. 3293, not any policy or other deliberate choice by the County Board. Moreover, H.B. 3293 is all that Plaintiff needs to challenge to obtain the relief she seeks, as indicated by the fact that H.B. 3293 was all the Court needed to enjoin to ensure that B.P.J. could participate on her school's girls' sports teams. (Doc. 67, at 14-15.) As Plaintiff acknowledges, she has participated on her school's girls' cross-country and track teams since the Court entered its preliminary injunction. (Doc. 291, at 15, 16.) The only existing impediment to B.P.J.'s participation on girls' sports teams at Bridgeport Middle School is H.B. 3293; the County Board has only two policies regarding sports, neither of which is related to separation by sex. (Exhibit 1, at 56-57, 214.) The County Board also has no policy pertaining to transgender students or transgender students' participation in sports. (*Id.* at 57, 125, 150.)

Because the County Board has made no deliberate choice and has no policy, custom, or procedure that prevents B.P.J. from participating on her school's girls' sports teams, it cannot be liable to Plaintiff for the alleged violation of B.P.J.'s EPC rights.

3)      ***Plaintiff acknowledges that the County Board has provided B.P.J. with a supportive and respectful school environment and "awesome" athletics experiences, further demonstrating that no County Board policy, procedure, custom, or other deliberate choice has***

***violated her EPC rights.*** As Plaintiff acknowledges, the undisputed evidence is that B.P.J.'s elementary and middle schools have recognized her female gender identity and committed "to treating her as the girl she is." (Doc. 291, at 8-9, 19, 22.) Her schools' proper implementation of their commitment to treating B.P.J. as a girl has resulted in B.P.J. feeling supported by her school and coaches and respected by her schools' administrators. (Doc. 291, at 8-9, 16, 19, 22.) In B.P.J.'s words, her "'first cross-country season was awesome, and I felt supported by my coaches and the other girls on the team.'" (Doc. 291, at 16 (citing B.P.J.'s Declaration, Pl.'s SUF ¶ 124).)

Plaintiff's positive experiences at school, including in her participation on girls' sports teams, demonstrates that the HCBOE has made no deliberate choice that violates B.P.J.'s EPC rights. To the contrary, once the Court relieved the HCBOE of its mandated enforcement of H.B. 3293 against B.P.J., it permitted B.P.J. to participate in school sports just like any other girl.

In sum, Plaintiff's summary judgment briefing and the undisputed facts demonstrate that Stutler cannot be liable under the EPC. A county board of education, or its superintendent, can be liable only if they, themselves, cause harm by making their own "deliberate choice" among available alternatives. *Harris*, 489 U.S. at 389, 109 S. Ct. at 1205; *Barker*, 2021 WL 3354161, at *9. Here, that is undisputedly <u>not</u> the case. It is undisputed that (a) Stutler and the County Board had no role in the creation or passage of H.B. 3293; (b) H.B. 3293, to the extent that it goes into effect, compels Stutler to enforce it and creates a cause of action against county boards of education for "[a]ny student aggrieved by a violation of" the H.B. 3293, *see* W. VA. CODE § 18-2-25d(c)(2), (d)(1); (c) Stutler and the County Board have not consciously adopted the H.B. 3293 into the County Board's own policy; (d) Stutler and the County Board have no policy and have made no deliberate choice that has or could cause any harm to B.P.J.; (e) the County Board permitted B.P.J. to try out for and participate on her school's girls' cross-country and track teams when the Court enjoined enforcement of H.B. 3293; and (f) B.P.J. feels respected by her school

administrators, feels supported by her school and her coaches, and has had positive experiences at her schools, which respect her female gender identity and treat her as the girl she is, including as a participant on girls' sports teams at school.

Therefore, B.P.J. cannot establish liability for her EPC claim because she cannot prove – and indeed has not even alleged or argued – that the alleged unconstitutional conduct arose from "a policy statement, ordinance, regulation, or decision officially adopted and promulgated by" the HCBOE's officers or Stutler.  *Monell*, 436 U.S. at 690. Because Stutler cannot be liable for Plaintiff's EPC claim, Stutler is entitled to summary judgment on the EPC claim, and Plaintiff's motion for summary judgment against Stutler should be denied.

**D. The HCBOE is not a proper defendant even for purposes of an injunction, and if Stutler is retained as a defendant for purposes of an injunction, then she should be retained solely as a state – not a county – official, and any award assessed against her is the responsibility of the State, not the County Board.**

While Plaintiff does not argue that the HCBOE, in particular, is liable under Title IX or that Stutler, in particular, is liable under the EPC, Plaintiff does claim that the County Board "is a proper subject of injunctive relief" due to its obligation to enforce H.B. 3293 as to B.P.J. (Doc 291, at 18.) As shown above, the HCBOE cannot be liable to B.P.J. under Title IX, and Stutler cannot be liable to B.P.J. under the EPC.

However, the County Board recognizes that this Court has stated that, "[u]nder the doctrine of *Ex parte Young,* a plaintiff may challenge the constitutionality of a state law . . . by bringing suit against an official, in her official capacity, for enforcing or administering that law or rule. . . . If the plaintiff succeeds, any judgment against the official in her official capacity," including an award of attorneys' fees, "'imposes liability on the entity that [s]he represents.'" *McGee v. Cole*, 115 F. Supp. 3d 765, 772 (S.D.W. Va. 2015) (alteration in *McGee*) (citing, *inter alia*, *Ex parte Young,* 209 U.S. 123, 155–56 (1908)).

Importantly, *county officials are considered to be "state officials* for purposes of an *Ex parte Young* suit *where they are responsible for enforcing or administering state law rather than local or county policies*." *Id.* at 773 (emphasis added).  For example, when "same-sex couples challenged Virginia's same-sex marriage ban" by suing a *city clerk* who had denied one of the couples a marriage license, the "U.S. Court of Appeals for the Fourth Circuit held that the *clerk* was a proper defendant *through which to sue the state of Virginia* under *Ex parte Young* because he was responsible for enforcing Virginia's same-sex marriage ban." *Id.* (emphasis added) (citing *Bostic v. Schaefer*, 760 F.3d 352 (4th Cir. 2014)).

The U.S. District Court for the Southern District of West Virginia's decision in *McGee* is directly on point with the situation in this case.  In *McGee*, which involved determining which party was responsible for paying attorneys' fees when *county clerks* enforced a West Virginia state law, the District Court stated:

> The Court agrees with Defendant Clerks. Sections 48–2–104 and 48–2–401 of the West Virginia Code were state laws prohibiting same-sex marriage. Each Plaintiff couple attempted to obtain a marriage license, and each was denied by one of the defendants pursuant to these state laws. . . . The State has not provided, and the Court has not found, any evidence that Defendant Clerks were administering county rules or policies rather than state law. Moreover, the clerks had no discretion to disregard state law and issue marriage licenses to the plaintiffs. . . . It is clear that Defendant Clerks were required by state law to deny marriage licenses to the plaintiffs and administered state law when they did so. The clerks were thus acting as state agents, rather than county officials, at the time of Plaintiffs' injuries. Accordingly, they are considered state officials for the purposes of this *Ex parte Young* suit. *See Bostic,* 760 F.3d at 371 n. 2; *Brotherton [v. Cleveland],* 173 F.3d [552] at 566 [(6th Cir. 1999)].
>
> Furthermore, although not named as a defendant in this case, the State was clearly the intended target of this litigation. *See Hutto [v. Finney],* 437 U.S. [678] at 700, 98 S. Ct. 2565 [(1978)] ("[S]uits brought against individual officers for injunctive relief are for all practical purposes suits against the State itself."). Not only did the Court grant an injunction preventing the clerks from administering

the same-sex marriage ban, it declared two of the State's laws unconstitutional. This declaration is part and parcel of the total relief obtained and **shows that the State, not the clerks, is responsible for the legislation that violated Plaintiffs' civil rights.** For the foregoing reasons, the **attorneys' fees assessed against Defendant Clerks will be the responsibility of the State of West Virginia**.

*McGee*, 115 F. Supp. 3d at 778–79 (emphasis added); s*ee also Brotherton v. Cleveland*, 173 F.3d 552, 566 (6th Cir. 1999) ("Where county officials are sued simply for complying with state mandates that afford no discretion, they act as an arm of the State.") (citations omitted).

   The *McGee* Court found that the clerks themselves and the counties for which they worked were *not* jointly and severally liable for attorneys' fees, because the clerks were sued in their official capacities, and they represented only the State at the time of the plaintiffs' injury. *Id.*, 115 F. Supp. 3d at 777 n.3.

   Just as in *McGee*, here, the State is clearly the intended target of the litigation. Stutler and the HCBOE have been named as defendants in this civil action only because they must enforce State law – not because of any policy or custom of their own. Any civil rights violation H.B. 3293 could cause B.P.J. is a result of the State's legislation; whether or not it agrees with it, the County Board is compelled to enforce State law to the extent that it goes into effect.

   As a result, in enforcing H.B. 3293, Stutler would be acting as a State agent, and would be considered a State official rather than a county official. Thus, if the Court determines that Stutler, who was sued only in her official capacity, should be retained as a defendant to Count II pursuant to *Ex parte Young* for injunction purposes, then any damages, costs, expenses, and/or fees assessed against her must be paid by the State, which is the only government entity that she would represent if she is ever required to enforce the State's Act.

   The HCBOE, on the other hand, is not a proper defendant even for the sole purpose of an injunction. *McGee* (like *Ex party Young*) does not stand for the proposition that an *entity*

such as the HCBOE is a proper defendant for purposes of an injunction where an alleged *statutory* injury arises from the enforcement of a state law; rather, it permits only a suit against a local *official* as a means of suing the State for an allegedly *unconstitutional* act. *McGee*, 115 F. Supp. 3d at 772; *Ex parte Young*, 209 U.S. at 157, 28 S. Ct. at 453 (1908) (recognizing that "an officer of the state" may be made "a party defendant in a suit to enjoin the enforcement of an act alleged to be unconstitutional" if "the state officer, by virtue of his office, has some connection with the enforcement of the act"). The HCBOE is not an official, and it has been sued only for an alleged violation of Title IX, not for an allegedly unconstitutional act. Therefore, the HCBOE is not a proper defendant even for purposes of an injunction.

In summary, there is no reason or basis in law to retain the HCBOE as a defendant because, as detailed above, there is no basis to hold the HCBOE liable for any Title IX violation as alleged in Count I, it is not a state officer, and it is not named as a defendant to the EPC claim in Count II. Therefore, Plaintiff's motion for summary judgment against the HCBOE should be denied, and the HCBOE's motion for summary judgment should be granted.

If Stutler is retained as a defendant to Count II for the sole purpose of an injunction, and if any monetary award, including but not limited to attorneys' fees and costs, is assessed against Stutler on Count II, that award must be paid by the State, not by the County Board or Stutler, as a matter of law and undisputed fact. Therefore, to the extent that Plaintiff seeks summary judgment against Stutler with regard to B.P.J.'s claims for any monetary award, her motion should be denied. At most, Stutler may be retained as a defendant to Count II as a State agent for injunction purposes only, and any monetary award must be paid by the State.

### E.  B.P.J.'s claims against the County Board should be dismissed on the additional basis that H.B. 3293 does not violate Title IX or the EPC.

As demonstrated above, the County Board is not the entity that *caused* any

purported violation of Title IX or the EPC, a sufficient reason to deny Plaintiff's motion for summary judgment (and to grant summary judgment to the County Board). Undisputedly, the County Board had no part in the creation or passage of H.B. 3293, and it undisputedly has no policy of its own that prevents B.P.J. from joining girls' sports teams based on transgender status. However, because the County Board has been sued for damages, fees, and costs over H.B. 3293, the County Board finds itself in the position of defending H.B. 3293. Thus, as set forth in the following sections, the County Board observes that a legal foundation clearly exists for finding that H.B. 3293 does not violate Title IX or the EPC. (*See also* Doc. 281, at 18-29.)

### 1. Title IX permits sex-separated sports to promote sex equality.

B.P.J. can prove a violation of Title IX occurred only if she was excluded from participating in an education program due to sex, and "improper discrimination caused [her] harm." *Grimm*, 972 F.3d at 616. Plaintiff's argument that a Title IX violation occurred fails because she has not shown that "improper discrimination" has occurred.

Plaintiff relies heavily on the Fourth Circuit's decision in *Grimm* to support her Title IX argument. *Grimm* addressed a transgender boy's ability to use the boys' restroom at his school.[7] The Court found that his exclusion on the basis of his sex was improper discrimination. However, important interests are at stake in the present civil action, which were not present in *Grimm*. That crucial difference renders the different treatment of cisgender girls and transgender girls *in athletics* <u>not</u> "improper discrimination" even though different treatment of cisgender and transgender students with regard to restroom use was determined to be "improper discrimination" in *Grimm*. Bathroom use does not implicate the concerns and interests that participation in athletics

---

[7] When analogizing to *Grimm*, Plaintiff uses bracketed phrases that make it appear as if *Grimm* addressed participation in athletics. (*See* Doc. 291, at 23, 31.) To be clear, *Grimm* addressed a transgender male student's restroom use – it in no way addressed transgender students' participation in school athletics.

implicates, including important safety and displacement (i.e., lost opportunity) concerns for cisgender females.

There can be no question that the possibility of displacement of cisgender females certainly exists, and the prevention of such a result is one of the purposes of H.B. 3293 – just as it is one of the purposes of Title IX regulations. Specifically, Title IX regulations permit sex-separated sports teams "where selection for such teams is based upon competitive skill or the activity involved is a contact sport." 34 C.F.R. § 106.41(b). The regulations also require recipients to "provide equal athletic opportunity for members of both sexes," including by considering whether the "levels of competition effectively accommodate the interests and abilities of members of both sexes." 34 C.F.R. § 106.41(c). These provisions are important to promote sex equality.[8]

As stated by expert witness Gregory A. Brown, Ph.D., FACSM, in his report:

> [M]en, adolescent boys, and prepubertal male children perform better in almost all sports than women, adolescent girls, and prepubertal female children because of their inherent physiological advantages. In general, men, adolescent boys, and prepubertal male children, can run faster, output more muscular power, jump higher, and possess greater muscular endurance than women, adolescent girls, and prepubertal female children. These advantages become greater during and after male puberty, but they exist before puberty.

---

[8] *See, e.g.*, *Cohen v. Brown Univ.*, 991 F.2d 888, 897 (1st Cir. 1993) ("Equal opportunity to participate lies at the core of Title IX's purpose."); *Clark, By and Through Clark v. Arizona Interscholastic Ass'n*, 695 F.2d 1126, 1130 (9th Cir. 1982) (noting that cases have upheld boys' exclusion from girls' teams as "a legitimate means of providing athletic opportunities for girls" due to innate physical differences between the sexes); *O'Connor v. Bd. of Ed. of Sch. Dist. No. 23*, 645 F.2d 578, 582 (7th Cir. 1981) ("Title IX aims to provide equal opportunity in educational programs" and permits "separate-sex teams and . . . exclusion of girls from" certain boys' teams); *Lafler v. Athletic Bd. of Control*, 536 F. Supp. 104, 106 (W.D. Mich. 1982) ("Although many courts have recognized a woman's right to an equal opportunity to participate in sports, . . . courts have also recognized that such equal opportunity may be provided through separate teams or competitions for men and women. . . . The regulations promulgated under Title IX . . . specifically permit the establishment of separate male and female teams in contact sports. The United States Congress, in calling for the provision of 'equal opportunity to amateur athletes ... to participate ... without discrimination on the basis of ... sex ...' in the Amateur Sports Act, 36 U.S.C. s 391(b)(6), anticipated that such equal opportunity would sometimes be provided through the use of separate programs for men and women. . . .") (citations omitted).

(*See* Excerpts from Expert Report of Dr. Brown, attached as "**Exhibit 2**," at 4.) Moreover, citing to several sources, Dr. Brown found "in the literature a widespread consensus that the large performance and physiological advantages possessed by males – rather than social considerations or considerations of identity – are precisely the *reason* that most athletic competitions are separated by sex, with women treated as a 'protected class.'" (*Id.* at 8-10 (emphasis supplied)*.*)

According to several of the sources cited by Dr. Brown, "'[t]he main justification [for sex separation in sports] is to allow women a chance to win, as women have major disadvantages against men who are, on average, taller, stronger, and faster and have greater endurance due to their larger, stronger, muscles and bones as well as a higher circulating hemoglobin level.'" (Exhibit 2, at 8 (citation omitted).) Moreover, "'[w]e have separate sex sport and eligibility criteria based on biological sex because this is the only way we can assure that female athletes have the same opportunities as male athletes not only to participate but to win in competitive sport.'" (*Id.* at 9 (citation omitted).)

As a result, competing with biological males may cause girls to lose out on various opportunities, including opportunities to start for a team, to play for a team, or to even make a team, as well as opportunities for scholarships and an opportunity to win.

Additionally, the safety of cisgender females is a significant concern, particularly with regard to contact sports when they compete against persons other than other cisgender females. Thus, one important interest that both H.B. 3293 and Title IX regulations address is cisgender females' safety. Plaintiff argues that the only justification provided within H.B. 3293 is "'promot[ing] equal athletic opportunities for the female sex,'" which she argues does not include the purpose of promoting cisgender females' safety. (Doc. 291, at 29-30 (quoting, *inter alia*, W. Va. Code § 18-2-25d(a)(5)).) However, safety is a key purpose of H.B. 3293, which also states that the "inherent differences between biological males and biological females" "are a valid

justification for sex-based classifications when they realistically reflect the fact that the sexes are not similarly situated in certain circumstances[.]" W. Va. Code § 18-2-15d(a)(1)-(2).

Reading these provisions together, it follows that the Legislature was concerned about female athletes' safety, or at least about broader equality concerns that include female athletes' safety. That is, "equal athletic opportunities for the female sex" include an equal opportunity to avoid unnecessary injury (and displacement) caused by "the fact that the sexes are not similarly situated" with regard to physical characteristics relevant to safety in athletics, including males' typically larger and stronger muscles and bones. Thus, the argument that a purpose and justification for H.B. 3293 is to protect the safety of cisgender females who participate in school sports is not a "belated *post hoc* effort to proffer [this safety] interest[] as justification for the law," as Plaintiff claims. (*See* Doc. 291, at 30, 37.) Rather, it is an important concern addressed by both H.B. 3293 and Title IX regulations (34 C.F.R. § 106.41(b)-(c)). While cross-country and track may not involve safety issues the same way a contact sport does, it is possible that B.P.J. will at some time in the future decide to play one or more contact sports (and that other trangender female students will decide to play contact sports).

Again, the analysis in *Grimm* is not dispositive or even applicable here because the *Grimm* Court did not address athletics. Whereas transgender students may use restrooms corresponding with their gender identity without imposing the dangers of decreased opportunities for, and compromised safety of, cisgender females, these concerns are present regarding athletic participation. It is these concerns that make H.B. 3293 lawful under Title IX, which permits sex-separated teams and promotes sex equality, because biological sex-related physical differences make a difference in contact sports and on teams involving competitive skill.

Thus, sex-separated sports are lawful and permissible under Title IX. Moreover, in compliance with Title IX, H.B. 3293 defines "male" and "female" in a way intended to promote

the goal of sex equality in athletics. Furthermore, and using the same language used in the Title IX regulations, H.B. 3293 separates sports teams based on sex "where selection for such teams is based upon competitive skill or the activity involved is a contact sport." W. Va. Code § 18-2-25d(c)(2); 34 C.F.R. § 106.41(b). As a result, B.P.J. cannot prove that H.B. 3293 violates Title IX, and her motion for summary judgment on Count I should be denied.

### 2. H.B. 3293 is substantially related to an important government purpose and thus survives scrutiny under the EPC.[9]

"The Equal Protection Clause of the Fourteenth Amendment provides that '[n]o State shall . . . deny to any person within its jurisdiction the equal protection of the laws. It is 'essentially a direction that all persons similarly situated should be treated alike.'" *Grimm*, 972 F.3d at 606 (quoting *City of Cleburne v. Cleburne Living Ctr.*, 473 U.S. 432 (1985)). EPC challenges based on sex, as here, are subject to intermediate scrutiny. *See H.B. Rowe Co. v. Tippett*, 615 F.3d 233, 242 (4th Cir. 2010). Under intermediate scrutiny, the challenged classification must serve an important government purpose, and the means employed must be substantially related to that purpose. *U.S. v. Virginia*, 518 U.S. 515, 524, 532-33 (1996).

Plaintiff argues that "the government must provide an 'exceedingly persuasive justification' for H.B. 3293's discriminatory classification" in order to survive heightened scrutiny. (Doc. 291, at 28 (quoting *Virginia*, 518 U.S. at 534, 116 S. Ct. at 2276).) As this Court has recognized, however, Justice Ginsburg's use of the term "exceedingly persuasive justification" in *U.S. v. Virginia* did not change the jurisprudence in this area; she merely used a different term for the same concept. (Memorandum Opinion & Order, Doc. 67 ("To survive a review under

---

[9] The County Board hereby incorporates by reference the arguments it made in "Defendant Harrison County Board of Education and Defendant Dora Stutler in her Official Capacity's Response in Opposition to Plaintiff's Motion for Preliminary Injunction" regarding why the Act survives scrutiny under the EPC. (Doc. 50, at 15-22.) For purposes of brevity, a truncated version of those arguments is presented here.

intermediate scrutiny, the government must provide an "exceedingly persuasive justification" for the classification created by a law or policy. . . . At a minimum, the government must show that "the classification serves important governmental objectives and that the discriminatory means employed are substantially related to the achievement of those objectives." (citations omitted)).) *See also Cohen v. Brown Univ.*, 101 F.3d 155, 183–84 (1st Cir. 1996).

In the end, under intermediate scrutiny, "how important" the government interest must be is only "important," and "how closely related" the means must be to the achievement of that interest is only "substantially related." *Virginia*, 518 U.S. at 524. Courts routinely accept that a classification that relies on some degree of generality can still be "substantially related" to its end.[10] Furthermore, "'legislatures are presumed to have acted within their constitutional power despite the fact that, in practice, their laws result in some inequality.'" *Nordlinger v. Hahn*, 505 U.S. 1, 10 (1992) (quoting *McGowan v. Maryland*, 366 U.S. 420, 425–26 (1961)).

An EPC plaintiff must first show "governmental treatment dissimilar to that received by others similarly situated." *Republican Party of N.C. v. Martin*, 980 F.2d 943, 953 (4th Cir. 1992). For EPC purposes, "similarly situated" means "persons who are in all relevant respects alike." *Nordlinger*, 505 U.S. at 10. Here, those "similarly situated" under H.B. 3293 are biological males, regardless of gender identity, and the "relevant respects" are physical attributes relevant to competitive fairness and safety. H.B. 3293 closes biological females' teams to all biological males because biological sex, not gender identity, causes the problems that H.B. 3293 seeks to prevent, notably competitive fairness and safety.

---

[10] A blanket rule limiting selective service registration to men, for example, thus satisfied intermediate scrutiny even "assuming that a small number of women could be drafted for noncombat roles" because "Congress simply did not consider it worth the added burdens of including women in draft and registration plans." *Rostker v. Goldberg*, 453 U.S. 57, 81 (1981). Additionally, a social security rule advantageous to women satisfied such scrutiny because "women *on the average* received lower retirement benefits than men." *Califano v. Webster*, 430 U.S. 313, 318 n.5 (1977).

Importantly, these concerns were not present in *Grimm*, which addressed restroom use – not safety and fairness concerns unique to participation in athletics, making *Grimm* non-dispositive here. Moreover, "there is no question that the Supreme Court allows for these average real [physiological] differences between the sexes to be recognized or that they allow gender to be used as a proxy in this sense if it is an accurate proxy." *Clark, By & Through Clark v. Arizona Interscholastic Ass'n*, 695 F.2d 1126, 1131 (9th Cir. 1982) (citing *Kahn v. Shevin*, 416 U.S. 351, 355, 94 S. Ct. 1734, 1737 (1974); *Michael M. v. Superior Ct. of Sonoma Cty.*, 450 U.S. 464, 469, 101 S. Ct. 1200, 1204 (1981); *Orr v. Orr,* 440 U.S. 268, 280-82, 99 S. Ct. 1102, 1112-13 (1979)).

Notably, Plaintiff appears to have brought both an "as applied" and a facial challenge to H.B. 3293. (*See* Memorandum Opinion & Order, Doc. 67 ("Whether the law [W. Va. Code § 18-2-25d] is facially unconstitutional is an issue raised in the Complaint and will be resolved at a later stage of litigation."); Am. Compl., Doc. 64, at 24 ¶ C (seeking preliminary and permanent injunctions of the enforcement of H.B. 3293 that is not limited to its application to B.P.J.); Doc. 291, at 25 ("On its face, H.B. 3293 targets B.P.J. and other girls who are transgender for discriminatory treatment."); *id.* at 36 ("as applied to B.P.J. and on its face, H.B. 3293 is not substantially related to creating equal athletic opportunities for women in general or cisgender women in particular"); *but see id.* at 41 ("this Court should also permanently enjoin Defendants from enforcing H.B. 3293 against B.P.J." (citing Am. Compl., Doc. 64, at 24 ¶ C)).)

Thus, H.B. 3293 must be analyzed both as it would be applied to B.P.J. and as it may be applied to other transgender females who wish to play school sports. B.P.J. has had medical treatment, including nearly two years of puberty-delaying treatment, and she plans to receive gender-affirming hormone therapy, such that she will not undergo puberty typical of cisgender males. (*See* Doc. 291, at 34.) She claims that she has not personally "substantially displaced cisgender female athletes," at least at this stage of her athletic life. (*See* Doc. 291, at 34-35.)

But other transgender females who wish to play school sports may not receive the medical treatment B.P.J. has had and plans to have in the future and, thus, they will experience (or are already experiencing) levels of circulating testosterone and other physical traits typical of cisgender males. (*See* Doc. 291, at 34.) To permit transgender females who, despite their gender identity are in a cisgender male's physical condition, to participate on girls' athletic teams would be to risk the competitive fairness and safety of females' school sports. Indeed, as Plaintiff notes in her summary judgment briefing, the NCAA, World Athletics, International Olympic Committee ("IOC"), and USA Swimming all require transgender females to undergo medical treatment before permitting them to compete in womens' sporting events. (Doc. 291, at 35, 35 n.12.) While they are not as specific as the NCAA, World Athletics, IOC, or USA Swimming's provisions, H.B. 3293's provisions are still "substantially related" to the important government interest of "promot[ing] equal athletic opportunities for the female sex," including fair opportunities to compete without unnecessarily compromising athletes' safety. *See* W. Va. Code § 18-2-25d(a)(5).

A primary purpose of H.B. 3293 is to help ensure competitive fairness. As confirmed by expert reports in this case, biological males are, on average, bigger, stronger, and faster than biological females.[11] (Exhibit 2, at 10-22; Excerpts from Expert Report of Chad Carlson, M.D., FACM, attached as "**Exhibit 3**," at 24-33.) As was detailed in "Defendants

---

[11] *See, e.g.*, *Clark*, 695 F.2d at 1129–31, which discussed other cases, including *Petrie v. Illinois High School Athletic Association,* 75 Ill. App.3d 980, 31 Ill. Dec. 653, 394 N.E.2d 855 (1979), in which the court found that exclusion of boys from girls' teams "was a legitimate means of providing athletic opportunities for girls," noted "that the classification of teams based on sex was based on the innate physical differences between the sexes, [rather than on] generalizations that are archaic . . . [or attitudes of] romantic paternalism," acknowledged "that the sexual classification could be avoided by classifying directly on the basis of physical differences such as height or weight, but concluded that such classifications would be too difficult to devise, . . . primarily because of strength differentials between the sexes," concluded that "[h]andicapping competitions . . . would be difficult and contrary to the interest of achieving the best competition possible," noted that "multi-tiered teams . . . [would be] too expensive to impose on the schools," and concluded "that sex was the only feasible classification to promote the legitimate and substantial state interest of providing for interscholastic athletic opportunities for girls." *Clark*, 695 F.2d at 1130 (internal quotations and citations omitted).

Harrison County Board of Education and Dora Stutler's Memorandum of Law in Support of Their Motion for Summary Judgment" (Doc. 281, at 24-26), compared to (cisgender) females, on average, (cisgender) males have, for example, greater arm and leg strength; an overwhelming 10-12% advantage in running after puberty; the ability to jump higher and farther and to throw and kick farther; advantages in cardiovascular endurance, muscular strength, muscular endurance, speed/agility and power tests from the age of six; stronger handgrips; and better performance in push-ups and bent-arm hangs. (Exhibit 2, at 10-12, 14-16, 28-29 (citations omitted).)

Biological males' many athletic advantages cause unfairness for biological females who have to compete against them in sports. In prohibiting biological males from playing on female sports teams or competing in female sports, H.B. 3293 serves the important government purpose of allowing biological females to play sports and compete in a fair environment.

Evidence in this case also shows that physiological differences between biological males and biological females will increase the frequency and the severity of injury to females if biological males are allowed to compete against biological females.[12] (Exhibit 3, at 9.) As Dr. Carlson concluded, "[m]ales exhibit large average advantages in size, weight, and physical capacity over females—often falling far outside female ranges.  Even before puberty, males have a performance advantage over females in most athletic events." (*Id.*)

The risk of female injury is even greater when considering studies showing that females have an enhanced susceptibility to suffering an injury in sports.  To support this opinion, Dr. Carlson cited to multiple studies demonstrating that girls (around middle school age) have higher rates of injury in sports than do boys. (Exhibit 3, at 34 (citations omitted).) Dr. Carlson also cited to research and a study indicating that females are more susceptible to Anterior Cruciate

---

[12] As shown above in section E.1., H.B. 3293's purpose of enhancing safety in womens' sports is not merely a *post hoc* justification.

Ligament ("ACL") injuries and concussions. (Exhibit 3, at 35-45.) Furthermore, "females on average suffer materially greater cognitive impairment than males" when they suffer a concussion. (*Id.*, at 38-39 (citations omitted).) Therefore, "when females compete against each other, they already have higher rates of concussive injury than males, across most sports. The addition of biologically male athletes into women's contact sports will inevitably increase the risk of concussive injury to girls and women[.]" (Exhibit 3, at 41.) Clearly, protecting the safety of biological female athletes is an important purpose. In prohibiting biological males from playing on female sports teams, H.B. 3293 advances the important government purpose of protecting the safety of biological female athletes.

Ultimately, Plaintiff's facial and as-applied challenge to H.B. 3293 is about more than B.P.J. and whether she creates the risks H.B. 3293 seeks to prevent. It is about the fairness to and safety of any number of cisgender female athletes. It is of inadequate constitutional significance that any particular student has not gained some or all of the differences in physical characteristics that medical intervention either can or cannot equalize. A perfect or even best possible fit between a government's chosen means (*i.e.*, the classification) and its important goals is not what intermediate scrutiny demands. Intermediate scrutiny tolerates such imperfections in classifications.

B.P.J. argues that participation on girls' sports teams should be determined not based on biological sex at birth but on circulating testosterone levels. However, the science on the relationship between testosterone levels and the promotion of fairness and safety is debated. More importantly, the possibility that testosterone levels are *a* way to accomplish H.B. 3293's goals does not, under intermediate scrutiny, necessarily mean that testosterone levels are *the only* constitutionally permissible way to do so. That is, "the alternative chosen may not maximize equality, and may represent trade-offs between equality and practicality. But . . . even the existence

of wiser alternatives than the one chosen does not serve to invalidate the policy here since it is substantially related to the goal." *Clark*, 695 F.2d at 1131–32 (citation omitted). Because H.B. 3293 survives intermediate scrutiny, B.P.J. cannot prove that H.B. 3293 violates the EPC. As a result, Stutler is entitled to summary judgment on that claim.

For these reasons, the County Board observes that a clear basis exists for finding that H.B. 3293 does not violate the EPC and that, thus, Plaintiff's motion for summary judgment and attendant relief (including monetary awards and a permanent injunction) should be denied.

### III. CONCLUSION

For the foregoing reasons, the HCBOE and Stutler respectfully request that the Court **DENY** Plaintiff's Motion for Summary Judgment. Her motion against the HCBOE should be denied because it cannot be liable for the State's law, and thus it cannot be liable on the sole claim against it. Stutler has not violated any right of B.P.J.'s, and thus, she also cannot be liable to Plaintiff. If Stutler is retained as a defendant to Count II for purposes of an injunction, then she must be retained as an agent of the State, not of the HCBOE. Thus, to the extent that Plaintiff moves for any damages or other monetary award against Stutler, including any award for attorneys' fees and costs, her motion should be denied because any monetary award is the sole responsibility of the State.  Finally, H.B. 3293 does not violate Title IX or the EPC for the reasons stated herein.

Respectfully submitted this 12th day of May, 2022.

*/s/ Susan L. Deniker*
Susan L. Deniker          (WV ID #7992)
Jeffrey M. Cropp          (WV ID #8030)
STEPTOE & JOHNSON PLLC          400 White Oaks Boulevard
OF COUNSEL          Bridgeport, WV 26330-4500
(304) 933-8000

*Counsel for Defendants Harrison County Board of Education and Dora Stutler*

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA
CHARLESTON DIVISION

B.P.J., by her next friend and mother, HEATHER
JACKSON,

*Plaintiff*,

v.                                                    Civil Action No. 2:21-cv-00316
                                                      Hon. Joseph R. Goodwin, District Judge

WEST VIRGINIA STATE BOARD OF
EDUCATION, HARRISON COUNTY BOARD
OF EDUCATION, WEST VIRGINIA
SECONDARY SCHOOL ACTIVITIES
COMMISSION, W. CLAYTON BURCH in his
official capacity as State Superintendent,
DORA STUTLER in her official capacity as
Harrison County Superintendent, PATRICK
MORRISEY in his official capacity as Attorney
General, and THE STATE OF WEST VIRGINIA,

*Defendants,*

and

LAINEY ARMISTEAD,

*Defendant-Intervenor*.

## **CERTIFICATE OF SERVICE**

I hereby certify that on 12th day of May, 2022, I electronically filed the foregoing

"Defendants Harrison County Board of Education and Dora Stutler's Response in Opposition to

Plaintiff's Motion for Summary Judgment" with the Clerk of the Court using the CM/ECF system,

which will send notification of such filing to all counsel of record.

14673380

**Joshua A. Block, Esquire**
AMERICAN CIVIL LIBERTIES UNION
FOUNDATION
125 Broad Street 18th Floor
New York, NY 10004
*Counsel for Plaintiff*


**Loree Stark, Esquire**
**Nicholas P. Ward, Esquire**
AMERICAN CIVIL LIBERTIES UNION
OF WEST VIRGINIA
1614 Kanawha Boulevard East
Charleston, WV  25311
*Counsel for Plaintiff*

**Avatara A. Smith-Carrington, Esquire**
LAMBDA LEGAL
3500 Oak Lawn Avenue Suite 500
Dallas, TX 75219
*Counsel for Plaintiff*

**Carl Solomon Charles, Esquire**
**Tara L. Borelli, Esquire**
LAMBDA LEGAL
158 West Ponce De Leon Avenue, Suite 105
Decatur, GA 30030
*Counsel for Plaintiff*

**Sruti J. Swaminathan, Esquire**
LAMBDA LEGAL
120 Wall Street 19th Floor
New York, NY 10005
*Counsel for Plaintiff*

**Kathleen R. Hartnett, Esquire**
**Julie Veroff, Esquire**
**Zoë Helstrom, Esquire**
COOLEY LLP
3 Embarcadero Center, 20th Floor
San Francisco, CA 94111
*Counsel for Plaintiff*


**Katelyn Kang, Esquire**
**Valeria M. Pelet del Toro, Esquire**
COOLEY LLP
55 Hudson Yards
New York, NY 10001
*Counsel for Plaintiff*

**Elizabeth Reinhardt, Esquire**
COOLEY LLP
500 Boylston Street, 14th Floor
Boston, MA 02116-3736
*Counsel for Plaintiff*

**Andrew D. Barr, Esquire**
COOLEY LLP
1144 15th Street Suite 2300
Denver, CO 80202
*Counsel for Plaintiff*


**Roberta F. Green, Esquire**
**Kimberly M. Bandy, Esquire**
**Shannon M. Rogers, Esquire**
SHUMAN McCUSKEY & SLICER
PO Box 3953
Charleston, WV 25339-3953
*Counsel for Defendant WV Secondary
School Activities Commission*

14673380

**Kelly C. Morgan, Esquire**
**Kristen Vickers Hammond, Esquire**
**Michael W. Taylor, Esquire**
BAILEY & WYANT
PO Box 3710
Charleston, WV 25337-3710
*Counsel for Defendants WV State Board of*
*Education and W. Clayton Burch*

**Douglas P. Buffington, II, Esquire**
**Curtis R. Capehart, Esquire**
**David C. Tryon, Esquire**
WV ATTORNEY GENERAL'S
OFFICE
State Capitol Complex
Building 1, Room 26E
1900 Kanawha Boulevard East
Charleston, WV 25305-0220
*Counsel for Defendant The State of*
*West Virginia*

**Brandon Steele, Esquire**
**Joshua D. Brown, Esquire**
THE LAW OFFICES OF BRANDON S.
STEELE
3049 Robert C. Byrd Drive, Suite 100
Beckley, WV 25801
*Counsel for Defendant-Intervenor Lainey*
*Armistead*

**Jonathan Scruggs, Esquire**
**Roger G. Brooks, Esquire**
**Henry W. Frampton, IV, Esquire**
ALLIANCE DEFENDING FREEDOM
15100 N. 90th Street
Scottsdale, AZ 85260
*Counsel for Defendant-Intervenor*
*Lainey Armistead*

**Christina Holcomb, Esquire**
ALLIANCE DEFENDING FREEDOM
440 First Street NW, Suite 600
Washington, DC 20001
*Counsel for Defendant-Intervenor Lainey*
*Armistead*

**Rachel Csutoros, Esquire**
**Tyson Langhofer, Esquire**
ALLIANCE DEFENDING FREEDOM
44180 Riverside Parkway
Lansdowne, VA 20176
*Counsel for Defendant-Intervenor*
*Lainey Armistead*

**Travis Barham, Esquire**
ALLIANCE DEFENDING FREEDOM
1000 Hurricane Shoals Rd NE
STE D-1100
Lawrenceville GA 30043
*Counsel for Defendant-Intervenor Lainey*
*Armistead*

**Timothy D. Ducar, Esquire**
Law Offices of Timothy D. Ducar, PLC
7430 E. Butherus Drive, Suite E
Scottsdale, AZ 85260
*Counsel for Defendant-Intervenor*
*Lainey Armistead*

STEPTOE & JOHNSON PLLC
Of Counsel

*/s/ Susan L. Deniker*
Susan L. Deniker          (WV ID #7992)
Jeffrey M. Cropp          (WV ID #8030)
400 White Oaks Boulevard
Bridgeport, WV 26330-4500
(304) 933-8000

*Counsel for Defendants Harrison County Board*
*of Education and Dora Stutler*

14673380