IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA
CHARLESTON DIVISION

B.P.J., by her next friend and mother,
HEATHER JACKSON

*Plaintiff,*

v.

WEST VIRGINIA STATE BOARD OF
EDUCATION, HARRISON COUNTY BOARD
OF EDUCATION, WEST VIRGINIA
SECONDARY SCHOOL ACTIVITIES
COMMISSION, W. CLAYTON BURCH in his
official capacity as State Superintendent,
DORA STUTLER in her official capacity as
Harrison County Superintendent, and THE
STATE OF WEST VIRGINIA

*Defendants,*

and

LAINEY ARMISTEAD

*Defendant-Intervenor.*

Case No. 2:21-cv-00316

Hon. Joseph R. Goodwin

Oral Argument Requested

**DEFENDANT-INTERVENOR'S RESPONSE TO PLAINTIFF'S MOTION FOR SUMMARY
JUDGEMENT**

TABLE OF CONTENTS

Table of Authorities ..................................................................................... iii

Introduction ................................................................................................. 1

Counter Statement of Facts ........................................................................ 2

Argument ..................................................................................................... 6

    I.    The Act complies with the Equal Protection Clause ............................ 6

        A.    The Act classifies according to biological sex, not gender identity or transgender status. ...................................... 7

            1.    Biology-based classifications are valid. ............................ 7

            2.    The Act clarifies the traditional understanding that sex-separated sports are based on biology. ....................... 9

            3.    Legislators' statements reflect their support for sex-separated sports teams, not animus based on gender identity. ................................................................ 12

        B.    Separating sports according to biology promotes fairness and safety in women's sports ............................................ 13

            1.    The relevant classification in this case is biological sex. 14

            2.    The Act can exclude B.P.J. from girls' sports because B.P.J. is not similarly situated to female athletes. ......... 15

            3.    Excluding biological males from women's sports helps protect opportunities for female athletes. ....................... 17

            4.    Excluding biological males from women's sports also promotes safety. ............................................................. 19

            5.    The benefits to female athletes outweighs B.P.J.'s alleged harms. ................................................................. 22

    II.    The Act does not violate Title IX ....................................................... 23

    III.    Armistead has a continuing and valid interest to remain in this case. ........................................................................................... 25

Conclusion ................................................................................................. 26

Certificate of Service ................................................................................. 29

## TABLE OF AUTHORITIES

**Cases**

*Adkins v. Rumsfeld,*
    464 F.3d 456 (4th Cir. 2006) ................................................................. 7

*Austin v. Berryman,*
    955 F.2d 223 (4th Cir. 1992) ............................................................... 14

*Bauer v. Lynch,*
    812 F.3d 340 (4th Cir. 2016) ................................................................. 7

*Billups v. City of Charleston,*
    961 F.3d 673 (4th Cir. 2020) ............................................................... 21

*Bostock v. Clayton County,*
    140 S. Ct. 1731 (2020) ........................................................................... 9

*Bray v. Alexandria Women's Health Clinic,*
    506 U.S. 263 (1993) ....................................................................... 7, 12

*Califano v. Boles,*
    443 U.S. 282 (1979) ............................................................................. 14

*City of Los Angeles v. Patel,*
    576 U.S. 409 (2015) ............................................................................. 15

*Clark v. Arizona Interscholastic Association,*
    695 F.2d 1126 (9th Cir. 1982) .................................................. 4, 17, 18

*Craig v. Boren,*
    429 U.S. 190 (1976) ............................................................................. 10

*D.M. by Bao Xiong v. Minnesota State High School League,*
    917 F.3d 994 (8th Cir. 2019) ............................................................... 21

*Dandridge v. Williams,*
    397 U.S. 471 (1970) ............................................................................. 18

*Eline v. Town of Ocean City,*
    7 F.4th 214 (4th Cir. 2021) ................................................................... 7

*Equity In Athletics, Inc. v. Department of Education,*
    639 F.3d 91 (4th Cir. 2011) ............................................................. 9, 25

*Feller v. Brock,*
    802 F.2d 722 (4th Cir. 1986) ............................................................... 26

*Great Atlantic & Pacific Tea Co. v. Cottrell,*
    424 U.S. 366 (1976) ............................................................................. 11

*Gregor v. West Virginia Secondary Schools Activities Commission,*
    No. 2:20-CV-00654, 2020 WL 6292813 (S.D.W. Va. Oct. 27, 2020) .......... 18, 23

*Grimm v. Gloucester County School Board*,
    972 F.3d 586 (4th Cir. 2020) ........................................................................ 23

*Grutter v. Bollinger*,
    188 F.3d 394 (6th Cir. 1999) ........................................................................ 26

*Hang On, Inc. v. City of Arlington*,
    65 F.3d 1248 (5th Cir. 1995) ........................................................................ 23

*Hunt v. Cromartie*,
    526 U.S. 541 (1999) ........................................................................ 13

*Jefferson v. Hackney*,
    406 U.S. 535 (1972) ........................................................................ 12

*Kleczek v. Rhode Island Interscholastic League, Inc.*,
    612 A.2d 734 (R.I. 1992) ........................................................................ 17

*Knussman v. Maryland*,
    272 F.3d 625 (4th Cir. 2001) ........................................................................ 24

*McHenry v. Commissioner of Internal Revenue*,
    677 F.3d 214 (4th Cir. 2012) ........................................................................ 26

*Mercer v. Duke University*,
    190 F.3d 643 (4th Cir. 1999) ........................................................................ 25

*Michael M. v. Superior Court of Sonoma County*,
    450 U.S. 464 (1981) ........................................................................ 1, 7, 10

*Neal v. Board of Trustees of California State Universities*,
    198 F.3d 763 (9th Cir. 1999) ........................................................................ 25

*O'Connor v. Board of Education of School District 23*,
    449 U.S. 1301 (1980) ........................................................................ 25

*Personnel Administrator of Massachusetts v. Feeney*,
    442 U.S. 256 (1979) ........................................................................ 9, 14

*Petrie v. Illinois High School Association*,
    394 N.E.2d 855 (1979) ........................................................................ 17, 22

*Ramirez v. Collier*,
    142 S. Ct. 1264 (2022) ........................................................................ 21

*Reynolds v. Middleton*,
    779 F.3d 222 (4th Cir. 2015) ........................................................................ 21

*Rostker v. Goldberg*,
    453 U.S. 57 (1981) ........................................................................ 10

*Schweiker v. Wilson*,
    450 U.S. 221 (1981) ........................................................................ 14

*Sephardi v. Town of Surfside,*
  No. 99-1566-CIV, 2000 WL 35633163 (S.D. Fla. July 31, 2000) .................... 12

*Shaw v. Hunt,*
  154 F.3d 161 (4th Cir. 1998) ................................................................... 26

*State Farm Mutual Automobile Insurance Co. v. Campbell,*
  538 U.S. 408 (2003) .............................................................................. 9

*Tuan Anh Nguyen v. I.N.S.,*
  533 U.S. 53 (2001) ............................................................................. 7, 8

*United States Railroad Retirement Board v. Fritz,*
  449 U.S. 166 (1980) ............................................................................. 20

*United States v. Salerno,*
  481 U.S. 739 (1987) ............................................................................. 15

*United States v. Staten,*
  666 F.3d 154 (4th Cir. 2011) ....................................................... 18, 19, 20

*United States v. Timms,*
  664 F.3d 436 (4th Cir. 2012) ................................................................. 14

*United States v. Virginia,*
  518 U.S. 515 (1996) ........................................................................ 10, 24

*Ward v. Rock Against Racism,*
  491 U.S. 781 (1989) ............................................................................. 14

*Williams v. School District of Bethlehem,*
  998 F.2d 168 (3d Cir. 1993) ................................................................... 25

*Williamson v. Lee Optical of Oklahoma Inc.,*
  348 U.S. 483 (1955) .......................................................................... 9, 11

## Statutes

W. Va. Code § 18-2-25d ................................................................ 1, 3, 4, 18

W. Va. Code R. § 127-2-3 ...................................................................... 2, 11

## Rules

Fed. R. Civ. P. 24 ................................................................................. 26

## Regulations

34 C.F.R. § 106.41 ................................................................................ 25

## INTRODUCTION

Plaintiff B.P.J. claims that the Sports Act (W. Va. Code § 18-2-25d) violates Equal Protection and Title IX because it requires B.P.J. to compete on male sports teams like all other biological males. This is problematic, according to B.P.J., because B.P.J. "fully live[s] her life as the girl she is" and takes puberty blockers to prevent increased endogenous testosterone production. Mem. in Supp. of Pl.'s Mot. for Summ. J. (Pl.'s Br.) 36 (Doc. 291).[1] But none of that is relevant to the Act's purpose: ensuring equal opportunities for biological women in sports. That purpose is legitimate, and the Act substantially furthers it. So B.P.J.'s summary-judgment arguments fail for two reasons.

First, the facts prove that B.P.J. is not similarly situated to biological females. Sex-separated teams don't exist to separate boys and girls *simply because* they are boys and girls. Sex-separated teams exist because of the average physiological differences between men and women—differences based on biology, not gender identity. And, as Intervenor Lainey Armistead's experts show, medical interventions cannot biologically transform males into females or equalize the playing field in sports between men and women. Males develop physiological advantages over females—even before puberty.

Second, B.P.J. gets the legal standard wrong. "The relevant inquiry … is not whether the statute is drawn as precisely as it might have been" with respect to B.P.J., "but whether the line chosen by the … Legislature is within constitutional limitations." *Michael M. v. Superior Ct. of Sonoma Cnty.*, 450 U.S. 464, 473 (1981) (plurality opinion). It is. The Supreme Court has "consistently upheld" biology-based distinctions that are based on real, physiological differences between the sexes. *Id.* at 469. These distinctions don't discriminate against persons who assert a transgender

---

[1] All citations to documents filed in this case are to the document's original or bates stamped page number.

identity; they aren't based on sex stereotypes; and they don't violate Title IX, much less the Constitution.

Indeed, B.P.J.'s theory is that *anyone* who identifies as female must be allowed to participate in women's sports, no matter their hormone levels or medical interventions. Yet B.P.J. simultaneously concedes that "gender identity itself is not a useful indicator of athletic performance." App. to Def.-Intervenor's Mot. for Summ. J. (App.) 656 (167:24–168:1) (Doc. 286-1). So B.P.J.'s argument isn't connected to the average physiological differences between men and women that justify sex-separated sports teams in the first place.

Those factual disputes and legal errors mean B.P.J.'s summary-judgment motion should be denied.

## COUNTER STATEMENT OF FACTS[2]

*Sex-separated sports in West Virginia before the Act.* West Virginia regulations have long allowed schools to "sponsor separate teams for members of each sex where selection for such teams is based upon competitive skill." W. Va. Code R. § 127-2-3 (3.8). Yet before the Act was passed, school officials expressed different opinions on whether schools assigned students to teams based solely on sex, or whether schools could assign students based on gender identity. For example, some officials thought that students were assigned to teams according to their legal birth certificate and others thought parents could designate their child's sex for athletic purposes. *See* Supp. App. to Def.-Intervenor's Mot. for Summ. J. (Supp. App.) 755–56 (105:5–106:9); 782–73 (213:11–24; 214:16–20).

---

[2] B.P.J. offers Plaintiff's Statement of Undisputed Material Facts (Doc. 290) in support B.P.J.'s motion for summary judgment. The local rules don't provide for such a statement, and Armistead disputes many of the allegations contained therein. Though Armistead need not respond in kind, she offers this counter statement of facts in response.

After West Virginia officials learned that males who identified as female were competing in women's sports and this was starting to become "an issue," App. 1097 (118:18–20), officials promulgated a "temporary stopgap measure" to ensure safety and fairness for students. App. 1096–97 (117:12–19; 118:8–9). The policy deferred to each school on whether individual student-athletes could compete on the team that matched their gender identity "if everybody was okay with [it]," and the decision "protect[ed] athletes from harm or unfairness because of physical abilities." App. 1096 (117:12–19); 1098 (122:4–123:3).

This policy was never voted on and never became an official rule. App. 1097 (119:9–11); 1098 (124:12–25). And officials at the Commission "never used" the policy because "[n]obody ever brought up a case … to the Board to decide whether or not it was fair or safe." App. 1097 (119:13–16). At least two male students asked local school officials to participate on girls' teams though, App. 1097 (120:20–121:7), including one student who expressed a gender identity that changed day-to-day. *Id.*

*West Virginia passes the Sports Act.* In 2021, West Virginia legislators introduced HB 3293, a bill "[c]larifying participation for sports events to be based on biological sex of the athlete at birth." § 18-2-25d. Most legislators favored the bill because it was not fair for young women to face biological males in competitive sports. Supp. Decl. of Katelyn Kang (Kang Decl.) Ex. C at 31–32 (Doc. 25). For example, one legislator brought up two male athletes in Connecticut who had won "15 girls' state indoor and outdoor championship races from 2017 to '19." *Id.* at 38. He wanted to make sports "as safe as possible" and as "fair as possible." *Id.* Another favored the bill because giving girls a fair playing field gave them a chance to win and "get a college scholarship and further their education." *Id.* at 25. Another believed West Virginia had to provide a fair playing field for female athletes under Title IX, Kang Decl. Ex. F. at 3, and stated that the Act was "not about transgender individuals," but about

3

"protecting sports for women and girls," *id.* at 4. Both chambers of the West Virginia legislature passed the bill, and Governor Justice signed it into law shortly thereafter.

The final bill (the Sports Act) requires schools to designate sports teams "based on biological sex." § 18-2-25d(b)(1). The Act does not allow males to participate on women's teams if "selection for such teams is based upon competitive skill or the activity involved is a contact sport." *Id.* at (c)(2). The Act clarifies "that eligibility of any student to participate on athletic teams or sports designated for biological males is not restricted." Supp. App. 835. Hence, females may participate on men's teams, and "[n]othing" in the statute "shall be construed to restrict the eligibility of any student to participate in any interscholastic, intercollegiate, or intramural athletic teams or sports" for men. § 18-2-25d(c)(3).

*The scientific literature on male participation in women's sports.* There are physiological differences between males and females that give men and adolescent boys a "large, well-documented performance advantages over women and adolescent girls in almost all athletic contests." App. 127. Literature shows that some of these physiological differences are present before puberty. App. 145–156. And "the male advantage increases rapidly, and becomes much larger, as boys undergo puberty." App. 157–58 (¶ 114). There is also "a widespread consensus that the large performance and physiological advantages possessed by males–rather than social considerations or considerations of identity–are precisely the *reason* that most athletic competitions are separated by sex, with women treated as a 'protected class.'" App. 128 (¶ 12); *see also* App. 211–14 (¶¶ 13–17); *Clark v. Ariz. Interscholastic Ass'n* (*Clark I*), 695 F.2d 1126, 1131 (9th Cir. 1982) (describing "average physiological differences").

Because "gender identity itself is not a useful indicator of athletic performance," as B.P.J.'s own expert admits, App. 656 (167:24–168:1), studies have recently examined whether males who identify as female can suppress endogenous

testosterone to compete "on par" with females. The literature increasingly suggests that these types of interventions can never fully neutralize males' inherent physiological advantages. App. 159–176; *see also* App. 247–57. For example, "[i]t is obvious that some of the physiological changes that occur during 'growth and development' across puberty cannot be reversed" in males, including "[l]onger and larger bones that give height, weight, and leverage advantages to men" and "[m]ore advantageous hip shape and configuration as compared to women." App. 167 (¶ 149).

As a result, major sports organizations like USA Powerlifting, World Rugby, and the Sports Council of the United Kingdom have concluded that testosterone suppression cannot eliminate male's physiological advantages. App. 171–76. Other sport organizations allow males to compete in women's sports only in certain circumstances. The NCAA, for example, previously allowed males who identified as transgender and suppressed their testosterone for one year to compete in women's sports. App. 159 (¶ 119). But it recently abandoned that policy for a "sport-by-sport approach" that defers to the policy of the "national governing body of that sport," like USA Swimming. App. 175 (¶ 176). Under USA Swimming's "Athlete Inclusion, Competitive Equity and Eligibility Policy," a male swimmer who wishes to participate in the women's division has the burden of demonstrating that "[f]rom a medical perspective, the prior physical development of the athlete as Male, as mitigated by any medical intervention, does not give the athlete a competitive advantage over the athlete's cisgender Female competitors." App. 175 (¶ 177).

*B.P.J. sues and Lainey Armistead intervenes.* Last year, B.P.J. sued various school officials, asking for an injunction against the Act. B.P.J. is an 11-year-old biological male who identifies as a girl. First Am. Compl. (Compl.) ¶¶ 1–2 (Doc. 64); *see also* App. 1440–41. After this Court issued a preliminary injunction, B.P.J. participated on the Bridgeport middle school's cross-country team this past fall—and

beat numerous competitors in every race B.P.J. participated in. *See* Def.-Intervenor's Mem. in Supp of Mot. for Summ. J. (Armistead's SJ Br.) 5–6 (Doc. 288).

Shortly after this Court issued its injunction, Lainey Armistead sought to intervene to defend the Act. Armistead is a 22-year-old student athlete at West Virginia State University. Supp. App. 4 (¶¶ 1–2). This Court granted Armistead's motion, finding she would "add a perspective not represented by any of the current defendants." Mem. Op. and Order ("Intervention Order") 5–7 (Doc. 130).

Recently, Armistead decided to graduate school in May 2022. Supp. App. 5 (¶ 5). She plans to move to Florida this fall to begin law school, and still has three years of NCAA eligibility remaining. *Id.* (¶¶ 6, 8). Though she is not planning to pursue NCAA soccer "[b]ecause of the academic rigor and time investment required in law school," she is "open to utilizing that eligibility after law school if the right opportunity presents itself" and, regardless, intends to continue playing soccer at some level. *Id.* (¶¶ 7–8).

## ARGUMENT

The Sports Act (I) complies with Equal Protection and (II) does not violate Title IX. What's more, (III) Armistead has a continuing and valid interest to remain in this case.

## I.     The Act complies with the Equal Protection Clause.

B.P.J. asserts that the Act violates Equal Protection because it creates a biology-based classification that facially "targets B.P.J. and other girls who are transgender" and doesn't substantially achieve the state's interests. Pl.'s Br. 19. Just the opposite. The Act's biological distinction (A) is facially neutral as to gender identity, and (B) achieves the state's interests.

**A.     The Act classifies according to biological sex, not gender identity or transgender status.**

Start with B.P.J.'s claim that the Act facially classifies based on transgender status. Not so. The "statute … does not explicitly classify people based on" transgender status "and is thus … neutral on its face." *Adkins v. Rumsfeld*, 464 F.3d 456, 468 (4th Cir. 2006) (cleaned up). Instead, the Act classifies according to biology. *See* Armistead's SJ Br. § I.A. Yet B.P.J. attacks this distinction as facially discriminatory because (1) biology-based classifications affect persons who identify as transgender; (2) sex-separated sports already existed in West Virginia, so the law's biology-based classification targets "transgender girls"; and (3) some legislators made comments about transgender athletes. Pl.'s Br. 19–21. B.P.J is wrong on each count.

**1.     Biology-based classifications are valid.**

B.P.J. argues that only males who identify as female wish to participate in women's sports; therefore, to make biological distinctions is "*ipso facto* to discriminate invidiously against [them] as a class." *Bray v. Alexandria Women's Health Clinic*, 506 U.S. 263, 271 (1993) (refuting similar point in the context of women and abortion). In other words, B.P.J. asserts that the Act's biological classifications rely on sex stereotypes about how males and females should act. *See also* Pl.'s Br. at 22 n.9 (arguing that the Act punishes males who identify as female for "gender non-conformity, thereby relying on sex stereotypes").

But Supreme Court cases "do not support that proposition." *Bray*, 506 U.S. at 271. As Armistead has already explained, the Supreme Court has consistently upheld sex distinctions that represent real average differences between males and females in cases like *Michael M.*, 450 U.S. at 471-73, and *Tuan Anh Nguyen v. I.N.S.*, 533 U.S. 53, 68 (2001). *See* Armistead's SJ Br. 8. The Fourth Circuit has too. *See Bauer v. Lynch*, 812 F.3d 340, 350 (4th Cir. 2016); *Eline v. Town of Ocean City*, 7 F.4th 214, 221 (4th Cir. 2021).

7

The Act's biological classifications are not based on stereotypes either. There is "an undeniable difference" in physiology between men and women. *Nguyen*, 533 U.S. at 68. Those average physiological differences give males a performance advantage in many sports. App. 127 (¶¶ 7–8). "This is not a stereotype" or the result of "irrational or uncritical analysis." *Nguyen*, 533 U.S. at 68 (discussing a mother's "fact of parenthood" at birth). It is a distinction based on biology and scientific study.

And though the Act does not care how masculine or feminine someone acts, B.P.J. believes that the Act violates Equal Protection because B.P.J. "has lived as a girl." Pl.'s Br. 16. So B.P.J. wants this Court to make a constitutional ruling that the state must separate men's and women's sports based on how feminine a particular athlete acts off the playing field. This is something this Court need not and should not do.

Contrary to B.P.J.'s definition of sex, the Act defines the term in a valid and scientific manner. B.P.J.'s own expert used the term "biological sex" in a recent "clinician's guide." Mem. in Supp of Def.-Intervenor's Mot. to Exclude Expert Test. of Dr. Deanna Adkins (Adkins Br.) 6 (filed contemporaneously). And in 2017 the Endocrine Society published "Considering Sex as a Biological Variable in Basic and Clinical Studies: An Endocrine Society Statement" which states that: "[s]ex is a biological concept … all mammals have 2 distinct sexes," and "biological sex is … a fundamental source of intraspecific variation in anatomy and physiology." *Id.*

To be sure, hard cases might arise in rare situations of individuals with severe disorders of sexual development (DSDs). But that situation is not before this Court. "The vast majority of those who experience gender dysphoria or a transgender identity do not suffer from any DSD." App. 318 (¶ 107). B.P.J. doesn't either—B.P.J. has male XY chromosomes and male reproductive anatomy. App. 1440–41. Nor does B.P.J. challenge the Act's application to those with DSDs. After all, no one disputes that the Act can constitutionally exclude males who identify as male even if they have

physical capabilities similar to typical females. If the Act can prevent those males from playing on girls' sports teams, it can prevent males who take puberty blockers too. There is no difficulty applying the male/female dichotomy to B.P.J.

> **2.   The Act clarifies the traditional understanding that sex-separated sports are based on biology.**

Because the Act's biological classifications are facially valid, B.P.J. tries to find animus outside the statutory text. But "[t]he calculus of effects, the manner in which a particular law reverberates in a society, is a legislative and not a judicial responsibility." *Pers. Adm'r of Mass. v. Feeney*, 442 U.S. 256, 272 (1979). Equal Protection "goes no further than the invidious discrimination." *Williamson v. Lee Optical of Okla. Inc.*, 348 U.S. 483, 489 (1955).

B.P.J. first tries to infer animus by saying the Act only affects males who identify as female given the state's prior rules. According to B.P.J., West Virginia never "categorically prohibited girls who are transgender from participating on girls' teams in school sports prior to H.B. 3293" but "allowed transgender girls to participate on girls' athletic teams." Pl.'s Br. 19. But "there is a good deal more to the story than" B.P.J.'s "abbreviated account tells." *State Farm Mut. Auto. Ins. Co. v. Campbell*, 538 U.S. 408, 431 (2003) (Ginsburg, J., dissenting).

Until recently, (most) everyone agreed that sex meant biological sex and that women's sports teams should be for biological women. *See generally Equity In Athletics, Inc. v. Dep't of Educ.*, 639 F.3d 91, 95–97 (4th Cir. 2011) (describing history of Title IX and athletic regulations). No one ever asked if women's sports teams should be open to men because that was never an issue, at least not in West Virginia. *See Bostock v. Clayton Cnty.*, 140 S. Ct. 1731, 1755 (2020) (Alito, J., dissenting) (noting that gender identity was "a concept that was essentially unknown" over 50

years ago). Indeed, the Supreme Court has long used the term sex and gender interchangeably for this reason.[3]

So until recently, West Virginia officials could safely equate gender with biological sex. Even B.P.J. admits that "there were no known examples of transgender athletes participating in sports … in West Virginia at the time H.B. 3293 was passed." Pl.'s Br. 26–27. And when Dave Mazza, the Principal of Bridgeport Middle School, was asked if males had ever participated in girls' sports, Mazza said they "never came to that situation … up until this year." Supp. App. 787 (233:14–15) (referring to 2021). Again, teams for "boys" were for biological males, and teams for "girls" were for biological females.

When males started to compete in girls' sports across the country, this became "an issue," App. 1097 (118:18–20), and local West Virginia officials were unsure what existing rules required. Dora Stutler, the superintendent of Harrison County Schools (where Bridgeport is located), testified that before the Act, B.P.J. "would have been rostered as what her birth certificate said," Supp. App. 755–56 (105:5–106:9), and B.P.J.'s birth certificate says B.P.J. is male. Supp. App. at 840. Then Mazza testified that rosters are based on "whichever gender" a parent or athlete provides to the school. Supp. App. 783 (214:16–20). And according to the Commission executive director, the Commission tried to get ahead of this issue by formulating a "temporary stopgap measure." App. 1097 (118:4–9). That policy deferred to schools "if everybody was okay with [it]," and the determination "protect[ed] athletes from harm or unfairness because of physical abilities." App. 1096 (117:12–19). Contrary to the B.P.J.'s portrait of events, the Act was not a "sweeping change to [the] landscape,"

---

[3] *E.g.*, *United States v. Virginia*, 518 U.S. 515, 546 (1996) (single-sex school); *Rostker v. Goldberg*, 453 U.S. 57, 59 (1981) (selective service act); *Michael M.*, 450 U.S. 464 (plurality opinion) (statutory rape law); *Craig v. Boren*, 429 U.S. 190 (1976) (drinking-age law).

Pl.'s Br. 19, because this was a new frontier. Local officials were confused and applying different standards, so the state stepped in.[4]

Of course, these officials should not have been confused. Like Title IX, state regulations at the time permitted schools to "sponsor separate teams for members of each sex where selection for such teams is based upon competitive skill." W. Va. Code R. § 127-2-3 (3.8). Under the plain meaning of "sex," that provision allows division based on biology, not gender identity, and its application to sports involving competitive skill confirms this meaning. *See* Armistead's SJ Br. 23–24. But practice does not always match theory or text. The state can reasonably clarify its rules to remedy confusion and changing conditions.

Whatever patchwork of policies existed before the Act, B.P.J.'s point is a red herring. Taking the evidence in Armistead's favor—as this Court must when evaluating B.P.J.'s motion—shows that West Virginia had no uniformly enforced rule about women's sports. According to the Commission policy, schools could do whatever they wanted.[5] That shows West Virginia could step in to implement a rule that aimed for consistency, fairness, and safety for all student athletes in the state. "States retain 'broad power' to legislate … in matters of local concern." *Great Atl. & Pac. Tea Co. v. Cottrell*, 424 U.S. 366, 371 (1976). They can enact "reform … one step at a time" to fix the problems that seem the "most acute," or they can select one problem to fix while "neglecting the others." *Williamson*, 348 U.S. at 487, 489. Here, "[t]he very complexity

---

[4] Stutler, Mazza, and Dolan's testimonies on this topic contain several inconsistencies. Dora Stutler, for example, testified that students are assigned to teams based on their gender in the West Virginia Education Information System (WVEIS). Supp. App. 756 (106:3–4). Principal Mazza testified that WVEIS is not used to create team rosters. *Id.* at 783 (214:10–13) And the Commission recognized students as "whatever the school identified them [as] in WVEIS." App. 1096 (117:6-7).

[5] This is putting aside Armistead's position that Title IX mandates sex-separated teams in some circumstances and sports.

of the problem[] suggests that there will be more than one constitutionally permissible method of solving [it]." *Jefferson v. Hackney*, 406 U.S. 535, 546–47 (1972). So West Virginia's choice to enact a biology-based rule does not show animus. It "reflects little more than an attempt to clarify the existing [policies], without any accompanying discriminatory intent." *Sephardi v. Town of Surfside*, No. 99-1566-CIV, 2000 WL 35633163, at *8 (S.D. Fla. July 31, 2000).

### 3. Legislators' statements reflect their support for sex-separated sports teams, not animus based on gender identity.

In addition to the text of the Act, legislators' statements do not undermine the Act. *Contra* Pl.'s Br. 21 (claiming that legislators' statements show animus toward persons who identify as transgender).

At most, some legislators said they wanted to preserve women's sports for biological women and exclude males who identify as female from girls' sports. And protecting opportunities for biological women is a valid government purpose, not an invalid one. Armistead's SJ Br. § I.A. Under B.P.J.'s theory, legislators could never explain that "only biological females can become pregnant," if they want to prohibit pregnancy discrimination only against females or provide prenatal benefits only to females. This argument would restrict a legislature's ability to articulate *any* desire to protect biological women.

This animus theory just repackages B.P.J.'s textual argument that biological sex is not a real concept but a sex stereotype that discriminates based on gender identity. No court has accepted that universal theory. And the theory makes little sense in the athletic context where everyone agrees that biological differences between men and women are real, and matter. If the state can seek to protect biological women (and it can), then legislators can surely defend drawing a biological line without animus. *See Bray*, 506 U.S. at 270 (opposing abortion did not reflect

animus against women because "it cannot be denied that there are common and respectable reasons for opposing it, other than hatred of, or condescension toward (or indeed any view at all concerning), women as a class").

At the very least, B.P.J.'s animus argument cannot possibly succeed at summary judgment where all inferences must be taken in Armistead's favor. "Summary judgment in favor of the party with the burden of persuasion … is inappropriate when the evidence is susceptible of different interpretations or inferences by the trier of fact." *Hunt v. Cromartie*, 526 U.S. 541, 553 (1999). And here, those inferences indicate that the legislators validly wanted to protect women's sports. For example, some legislators spoke about the situation in Connecticut where two male athletes who identify as female won 15 state championships in women's track events and displaced female athletes like Selina Soule, Alanna Smith, and Chelsea Mitchell numerous times. Kang Decl. Ex. C at 38. Other legislators spoke about the need to protect women's sports. Kang Decl. Ex. F at 4. These statements don't show animus. Like the female athletes in Connecticut, these legislators want to keep women's sports for women only so "girls in the future can continue to compete in the sports they love." App. 47 (¶ 45).

### B.    Separating sports according to biology promotes fairness and safety in women's sports.

Having established that the Act categorizes athletes according to sex without animus or reference to transgender status, the question is whether this is a valid means to a valid end. It is. (1) The relevant classification is biological sex; and (2) because B.P.J. is a biological male, the Act can exclude B.P.J. from girls' sports; (3) this protects opportunities for female athletes and (4) helps promote safety; and (5) the benefits outweigh alleged harms.

### 1.  The relevant classification in this case is biological sex.

B.P.J. believes that the "substantial-relationship inquiry focuses on those against whom the law discriminates—here, girls who are transgender," because "[n]o other group is prohibited from playing on the sports team consistent with their gender identity." Pl.'s Br. 23. This flawed foundation undermines B.P.J.'s entire argument.

Armistead has already explained that the Act does not target males who assert a transgender identity. "[I]t is obvious that the statute, viewed more broadly, also negatively impacts men[.]" *Austin v. Berryman*, 955 F.2d 223, 227 (4th Cir. 1992). The Act applies to males who identify as male just like it applies to males who identify as female, so "the group excluded is not congruent with [Plaintiff's] class." *Schweiker v. Wilson*, 450 U.S. 221, 232 (1981). That means the statute is facially neutral as to gender identity and there's no "reason to infer antipathy." Armistead's SJ Br. 20 (quoting *Feeney*, 442 U.S. at 272).

B.P.J. cannot get around this by focusing only on those who are (according to B.P.J.) most affected by the law. Every plaintiff "will frame the constitutional issue in a manner most favorable to their claim," but that doesn't control the inquiry. *Califano v. Boles*, 443 U.S. 282, 293–94 (1979). "Most laws classify, and many affect certain groups unevenly, even though the law itself treats them no differently from all other members of the class described by the law." *Feeney*, 442 U.S. at 271–72. These types of "uneven effects upon particular groups within a class are ordinarily of no constitutional concern." *Id.*; *see* Armistead's SJ Br. 20.

Instead, the Court must focus on "the particular classifications being made," (biological males), not the individual characteristics of less than 1% of the population. *United States v. Timms*, 664 F.3d 436, 447–48 (4th Cir. 2012). "[T]he validity of the [law] depends on the relation it bears to the overall problem the government seeks to correct, not on the extent to which it furthers the government's interests in an individual case." *Ward v. Rock Against Racism*, 491 U.S. 781, 801 (1989) (discussing

narrow tailoring); Armistead's SJ Br. § I.C.. And the fact that B.P.J. brings an "as applied" challenge also does not matter. *Id.*

B.P.J.'s appeal to *City of L.A. v. Patel* is inapt. 576 U.S. 409 (2015). *Patel* evaluated "how courts analyze facial challenges" under *Salerno*'s "no set of circumstances" test. *Id.* at 417–18 (citing *United States v. Salerno*, 481 U.S. 739, 745 (1987)). Surely that isn't the test B.P.J. is advocating for here—B.P.J. has already conceded that the Act's applications are lawful most of the time. Armistead's SJ Br. 9. More important, *Patel* evaluated a law authorizing warrantless searches under the Fourth Amendment. 576 U.S. at 417. *Patel* doesn't say anything about equal-protections challenges, and neither the Supreme Court nor the Fourth Circuit has ever applied *Patel* to an Equal Protection claim.[6]

### 2. The Act can exclude B.P.J. from girls' sports because B.P.J. is not similarly situated to female athletes.

B.P.J. asserts without basis that "B.P.J. does not have any of the 'average physiological differences' that were stipulated in *Clark* to provide an athletic advantage" over females. Pl.'s Br. 28. This fact isn't material, and it's thoroughly contradicted by the evidence anyway.

B.P.J.'s claim is that (1) increased testosterone during puberty is the main cause of physiological differences between men and women; (2) B.P.J. is taking puberty blockers; so (3) B.P.J. won't develop the physiological advantages of a typical male who's gone through puberty. Pl.'s Br. 28. This argument rests on a negative inference, not evidence.

None of B.P.J.'s experts offer actual evidence, whether studies or papers, that puberty blockers eliminate male's athletic advantages, because males have athletic advantages before they even begin puberty. As Dr. Brown explained, "there is no published scientific evidence that the administration of puberty blockers to males

---

[6] Nor has any other circuit court, based on counsel's research.

before puberty eliminates the pre-existing athletic advantage that prepubertal males have over prepubertal females." App. 176.

One of B.P.J.'s experts (Dr. Safer) attempts to get around this by claiming that "there is no evidence that prepubertal transgender girls have any such pre-existing biological athletic advantages." Supp. App. 130 (¶ 16). This is incorrect. There *is* evidence that pre-pubertal boys have physiological advantages over girls, including articles in published, peer-reviewed journals. App. 145–157. Dr. Safer believes this evidence is not compelling, *see* Supp. App. 127 (¶ 9), but that is at best a fact dispute. It is false to say that "there is no evidence" at all of male advantage before puberty.

B.P.J. goes even further though and says the Act cannot categorically exclude "transgender girls and women who have already gone through endogenous puberty" and who have thereafter suppressed their testosterone. Pl.'s Br. 29. But, as even B.P.J. seems to acknowledge, studies increasingly show that testosterone suppression does not make a male "on par" with females once they have experienced puberty. App. 159–176 (§ V); 247–257 (§ VII). One study of males in the Air Force who had 1 to 2 years of testosterone suppression found they "could still do 33% more pushups per minute" than the average female under 30. App. 161 (¶ 130). And because they weighed more, they "were not only doing 1/3 more pushups per minute, but were lifting significantly more weight with each pushup." *Id.*

Indeed, these studies are likely the reason organizations like USA Swimming now require males who identify as female to both suppress their testosterone and prove that they don't retain any physiological advantages connected to male development. *See supra* at 5. Additionally, even major sport policies like the NCAA's don't help B.P.J. because they don't adopt B.P.J.'s theory that gender identity *alone* should determine participation on women's sports, regardless of a person's circulating testosterone levels or medical interventions. Armistead's SJ Br. 12–13. For example, the NCAA, World Athletics, the International Olympic Committee only allowed males

16

who identify as female to participate in women's sports *if* they suppressed their testosterone. *See* App. 170 (¶¶ 158–62). That underscores that B.P.J.'s legal theory—which requires West Virginia to allow males who identify as female on women's sports teams regardless of hormone level or medical intervention—cannot be correct. It is not workable, and B.P.J. cites no major athletic organization that has adopted it.

### 3. Excluding biological males from women's sports helps protect opportunities for female athletes.

Having established that the Act creates a valid classification based on biological sex and that B.P.J.'s individual circumstances are insufficient to warrant summary judgment (in addition to being disputed), this Court must decide whether it's appropriate to separate the typical male from the typical female in sports. When the question is correctly framed this way, the answer must be yes.

Everyone agrees that as a general rule West Virginia can properly exclude males from women's sports. *See* Armistead's SJ Br. 17. Separate teams provide more opportunities and a fair playing field for female athletes by preventing the displacement of females by males because of the average physiological differences between the sexes. *See id.* at 8–10.

That means cases like *Clark I* are on point. 695 F.2d at 1131. B.P.J. says "*Clark* had nothing to do with transgender student athletes" because the policy there prohibited "cisgender boys from playing volleyball on the girls' team." Pl.'s Br. 25. But like B.P.J., the plaintiff in *Clark I* was a biological male who sued to participate on the girls' sports teams. 695 F.2d at 1127. The court let the school exclude the student because of the average physiological differences between the sexes, not because of the student's gender identity. *Id.* at 1131. The same is true in other cases saying males cannot compel access to girls' teams. *E.g., Kleczek v. R.I. Interscholastic League, Inc.*, 612 A.2d 734, 738–39 (R.I. 1992) (field hockey); *Petrie v. Ill. High Sch. Ass'n*, 394 N.E.2d 855, 861–62 (1979) (volleyball).

17

B.P.J.'s other attempts to distinguish *Clark I* fall flat. First, B.P.J. argues that "unlike cisgender men and boys, 'women who are transgender have historically been discriminated against, not favored.'" Pl.'s Br. 26. Yet B.P.J. seems to concede that "redressing past discrimination against women" is a valid governmental interest. *Clark I*, 695 F.2d at 1131. Assuming B.P.J. is correct about historic discrimination against persons who identify as transgender, that does not invalidate efforts to remedy discrimination against biological women. "[T]he Equal Protection Clause does not require that a State must choose between attacking every aspect of a problem or not attacking the problem at all." *Dandridge v. Williams*, 397 U.S. 471, 486–87 (1970). The state is "entitled to address one societal problem at a time." *United States v. Staten*, 666 F.3d 154, 166 (4th Cir. 2011).

Second, B.P.J. emphasizes that "B.P.J. and other girls who are transgender" do not have the same athletic opportunities as other males because "[t]hey are not boys and so cannot participate on boys' teams." Pl.'s Br. 26. That's incorrect. The Act states that schools "*shall*" designate teams based on biological sex, and "nothing in [the Act] shall be construed to restrict the eligibility of *any* student to participate in" sports for boys and men. § 18-2-25d(c) (emphases added). As already explained, the fact that B.P.J. does not desire to participate on the boys' team doesn't mean the Act prevents B.P.J. "from participating in *any* sex-separated sports." Pl.'s Br. 26. The harm is "irreparable only when the person cannot participate in the sport at all." *Gregor v. W. Va. Secondary Sch. Activities Comm'n*, No. 2:20-CV-00654, 2020 WL 6292813, at *4 (S.D.W. Va. Oct. 27, 2020). And here, B.P.J. has an opportunity to participate in B.P.J.'s desired sport whereas the plaintiff in *Clark I* did not because the school "only sponsor[ed] interscholastic volleyball teams for girls." 695 F.2d at 1127.

Third, B.P.J. has displaced girls in every cross-country race B.P.J. has participated in, *see* Armistead's SJ Br. 6, and other males who identify as female

18

could do the same but for the Act. As a sixth grader, B.P.J. even beat Bridgeport teammates and competitors who were in the eighth grade. *Id.* Perhaps school administrators "didn't see an issue" with B.P.J. bumping girls down the scoreboard. Pl.'s Br. at 27. But "placements matter to athletes," App. 61 (¶ 17), particularly in track and cross-country events where teams win or lose based on accumulating points from individual placements.[7] *E.g.*, App. 28 (¶ 37); 37 (¶ 24); 43 (¶ 24).

Ironically, B.P.J.'s attempt to minimize the harm from this type of displacement only highlights the Act's constitutionality. B.P.J. asserts that "transgender people make up a small percentage of the population: … 0.7% of thirteen- to seventeen-year-olds." Pl.'s Br. 27. "The number of transgender people who wish to participate in school-sponsored athletics is even smaller." *Id.* And the number of people who wish to participate in sports according to their transgender identity is even smaller than that. *See* Armistead's SJ Br. 21. But if the Act furthers its legitimate purpose as applied to 99%+ of males, that is a more-than reasonable fit. The Fourth Circuit said a law that fulfilled its purpose 33.3% of the time was a reasonable fit. *Staten*, 666 F.3d at 166–67 (gun restrictions were a reasonable fit to tackle 33.3% "recidivism rate among domestic violence misdemeanants"). The Act easily clears that bar.

### 4. Excluding biological males from women's sports also promotes safety.

B.P.J. argues that the Court should not consider safety justifications because (1) the statute doesn't explicitly mention safety, and (2) the statute's reach sweeps "too broadly." This is wrong for several reasons.

---

[7] This is particularly true in cross-country, where scoring adds together the placement of the top-five runners from a team, and the team with the lowest score wins. So a runner like B.P.J. who finishes in the bottom half of a race can still bump down a top five runner from another team and materially impact that team's placement on the podium.

First, the Supreme "Court has never insisted that a legislative body articulate its reasons for enacting a statute," "particularly … where the legislature must necessarily engage in a process of line-drawing." *U.S. R.R. Ret. Bd. v. Fritz*, 449 U.S. 166, 179 (1980). And safety is hardly a post hoc rationalization when the "legislative history directly supports this position." *Staten*, 666 F.3d at 161. Several legislators debating the Act supported it to promote the safety of athletes, in addition to promoting fairness for women. *E.g.*, Kang Decl. Ex. C at 38.

Even so, the Act promotes safety on its face. Like Title IX, the Act acknowledges "the effect of … innate sex-based differences on the health *and safety* of the athlete" through "the express authorization of sex-separated teams for sports with higher perceived injury risk—i.e., 'contact sports.'" App. 212 (¶ 14) (emphasis added). As Dr. Carlson explains, average differences between the sexes increase the risk of injury to females in sports like soccer, basketball, and lacrosse that involve collisions with bodies or equipment. *See* App. 221–234 (§§ IV–V). Of course, safety is part of promoting a fair playing field for female athletes too. Competing against males inflicts stress that can negatively affect the performance of women and girls. App. 19 (¶ 54). Safety concerns would only make things worse. *See* Armistead's SJ Br. 2–3.

Armistead has also presented the court with anecdotal evidence that women and girls have legitimate safety concerns about competing against males. Cynthia Monteleone witnessed female athletes who were scared to play defense against a male in volleyball because of how hard he spiked the ball. *Id.* And Armistead knows from experience that she is more likely to be hurt playing against males than females in a no-holds-barred game of soccer. *Id.* at 6.

B.P.J. does not offer any rebuttal evidence from any expert who studies sports injuries. Instead, B.P.J. counters that there aren't "reported injuries to cisgender girls" competing against males in women's sports, so Dr. Carlson's testimony must be based on speculation. Pl.'s Br. 31–32. But an absence of reported injuries is not

20

surprising because injuries to females competing against males is "inadequately tracked." Supp. App. 523 (156:15-16); *see also id.* at 515 (124:25–125:4).

No matter, "in assessing risk, a government need not wait for the flood before building the levee." *Ramirez v. Collier*, 142 S. Ct. 1264, 1288 n.2 (2022) (Kavanaugh, J., concurring). "[C]ommon sense and the holdings of prior cases" is "sufficient to establish" the government's interest. *Billups v. City of Charleston*, 961 F.3d 673, 685 (4th Cir. 2020) (quoting *Reynolds v. Middleton*, 779 F.3d 222, 227 (4th Cir. 2015)). This tells us that excluding male athletes who are *on average* bigger, faster, and stronger than female athletes will promote the safety of females in contact sports. *E.g.*, *Kleczek*, 612 A.2d at 739 (sex "classifications … will help promote safety").[8] The state "is entitled to rely on common sense and logic, as well as case law and the experience of other jurisdictions, when defending the" Act. *Reynolds*, 779 F.3d at 227.

And though B.P.J. tries to paint the Act as unnecessary and "much ado about nothing," Pl.'s Br. 27, the truth is that many student-athletes and parents object to males participating in women's sports. If only a few female athletes or parents complain openly about it, it is because many young athletes "are afraid to stand up and speak out for fear of retaliation from coaches, schools, the media, and strangers." App. 38 (¶ 29). Indeed, some advocates of males' participating in women's sports label persons who disagree prejudiced and bigoted. *E.g.*, Pl.'s Br. 33–34.

Of course, B.P.J. does not really challenge the state's ability to maintain sex-separated teams based on safety or that safety is a valid government interest. B.P.J. agrees it's important that "student-athletes feel safe." *See* Pl.'s Br. 33. And B.P.J.'s experts agree that the state can exclude males with "physical characteristics developed during puberty" to promote safety in the context of "contact and collision

---

[8] *See also D.M. by Bao Xiong v. Minn. State High Sch. League*, 917 F.3d 994, 1003 (8th Cir. 2019) ("The [*Kleczek*] court, understandably, had concerns about participants' safety if boys were allowed on the teams.").

sports." Supp. App. 133 (¶ 24). Yet B.P.J. posits that the state should have tailored its approach to individuals instead of excluding males categorically.

Armistead has already refuted this. *See* Armistead's SJ Br. 15–18. There is always an injury risk in sports. As B.P.J. explains, "[t]here are significant variations in height, weight, and muscle mass within the population of cisgender girls, and within the population of cisgender boys, such that student athletes all the time play with or compete against students who are bigger, faster, and/or stronger than them." Pl.'s Br. 32. This is exactly Armistead's point: "all systems of classifications for competition" are "overbroad and underbroad" to some extent. *Petrie*, 394 N.E.2d at 862; *see* Armistead's SJ Br. 17–18. But that doesn't invalidate laws like the Act that use biology-based classifications. Otherwise, *all* sex-separated sports are invalid. *See* Armistead SJ Br. 17. And if any classification system is arbitrary, it's separating athletes according to gender identity because that does not promote safety or fairness. Armistead's SJ Br. 11–12.

So the Act lives or dies with sex-separated sports: if B.P.J. has a right to participate in women's athletics, other males can equally compel access to the women's teams. *Id.* at 12–13, 18. To say otherwise would truly be discrimination based on gender identity. The state cannot give B.P.J. that right without extending it to numerous other males, and that would be the end of women's sports.

### 5. The benefits to female athletes outweighs B.P.J.'s alleged harms.

B.P.J. believes that excluding males from girls' sports hurts other girls because the "principal goal" of girls' interscholastic sports is to "develop skills, make friends, increase physical activity, and learn valuable life lessons." Pl.'s Br. 33. That misses the point.

First, though every athlete has varied reasons for participating in sports, many of them "train to win; not to win second place or receive a participation trophy."

App. 43 (¶ 23). But you don't need an expert to tell you that "water is wet." *Hang On, Inc. v. City of Arlington*, 65 F.3d 1248, 1257 (5th Cir. 1995). B.P.J. cannot dismiss the importance of providing female athletes with an opportunity to win just because one of B.P.J's expert said winning isn't important.

Second, many of the benefits of interscholastic sports, like developing skills and learning valuable life lessons, come from giving girls a meaningful opportunity to compete and win on a fair playing field. *See* App. 42 (¶ 24). It's striking that B.P.J. and experts like Dr. Fry call winning a second-tier benefit, when winning and setting records helps athletes obtain scholarships and other opportunities that "contribute to greater success in college and throughout life." Pl.'s Br. 33. Forcing female athletes to compete against males takes that opportunity away. And for female athletes who have competed and lost to males who identify as female, the experience was devastating. *See* Armistead's SJ Br. 2–3.

Third, B.P.J.'s theory suggests schools can't impose any criteria or standards for competition at all. After all, Dr. Fry conceded that students lose the benefits of participating in sports anytime anyone is excluded. App. 557 (259:4–18). So some would-be teammates won't make the team because they don't have the talent, don't have the grades, or because they're male and can't compete on the girls' team. The boys' team can still benefit from B.P.J.'s participation though. The harm is "irreparable only when the person cannot participate in the sport at all." *Gregor*, 2020 WL 6292813, at *4.

## II.  The Act does not violate Title IX

Armistead has already refuted B.P.J.'s claim that the Act violates Title IX. Armistead's SJ Br. § II. B.P.J.'s claim is largely that this Court must follow *Grimm v. Gloucester County School Board*, 972 F.3d 586 (4th Cir. 2020). And though Armistead believes *Grimm* was wrongly decided, *Grimm* doesn't control this case

23

because it didn't consider or decide that biology-based classifications inherently discriminate based on transgender status. Armistead's SJ Br. 24. Nor could it have, given the numerous Supreme Court cases upholding biological sex classifications. *See supra* p.7.

Here, Armistead need only address one argument: that the Act makes B.P.J. feel "stigmatized and isolated" and "publicly brand[s] all transgender students with a scarlet 'T'." Pl.'s Br. 16–17. This doesn't have merit for three reasons.

First, B.P.J.'s argument is that anyone who asserts a transgender identity is stigmatized if they can't compete on the team that matches their transgender identity. This makes clear that B.P.J.'s theory is all or nothing: either the state lets every male who identifies as female compete on the women's team or (according to B.P.J.) it violates Title IX. Armistead has already explained why that's incorrect. *See* Armistead's SJ Br. 22–24. This also shows that expert testimony about B.P.J.'s medical interventions isn't necessary to decide Armistead's motion for summary judgment.

Second, B.P.J. takes for granted that girls belong on the girls' team because they have a feminine identity and boys belong on the boys' team because they have a masculine identity. *See* Pl.'s Br. 18. ("because I am a girl, and I should be treated like a girl"). This "rel[ies] on overbroad generalizations about the different talents, capacities, or preferences of males and females." *United States v. Virginia*, 518 U.S. 515, 533 (1996). Equal Protection doesn't sanction differential treatment of persons "simply because they are women" or men. *Id.* at 532. That's why "gender classifications that appear to rest on nothing more than conventional notions about the proper station in society for males and females have been declared invalid time and again by the Supreme Court." *Knussman v. Maryland*, 272 F.3d 625, 636 (4th Cir. 2001) (collecting cases). It's also why Title IX regulations allow sex-separated

teams *only* "where selection for such teams is based upon competitive skill or the activity involved is a contact sport." 34 C.F.R. § 106.41.

The evidence also refutes B.P.J.'s claims. Iszac Henig identifies as a male but competes on the women's swim team in accordance with Henig's biological sex. Armistead's SJ Br. 4. And numerous female athletes compete on and have even sued to play on the boys' team, even when a girls' team was available. *E.g.*, *O'Connor v. Bd. of Educ. of Sch. Dist. 23*, 449 U.S. 1301 (1980) (basketball); *Mercer v. Duke Univ.*, 190 F.3d 643 (4th Cir. 1999) (football).

Third, whatever harm B.P.J. alleges, this Court should not lose sight of Title IX's purpose or the harm to female athletes forced to compete against male-bodied competitors. Armistead's SJ Br. 2–3. "[T]he motivation for promulgation of [Title IX's] regulation on athletics was the historic emphasis on boys' athletic programs to the exclusion of girls' athletic programs in high schools as well as colleges." *Williams v. Sch. Dist. of Bethlehem*, 998 F.2d 168, 175 (3d Cir. 1993). Remedying this wrong has sometimes affected boys. For example, a school may "bring itself into Title IX compliance … by decreasing athletic opportunities for" men. *Neal v. Bd. of Trs. of Cal. State Univs.*, 198 F.3d 763, 770 (9th Cir. 1999); *see also Equity In Athletics*, 639 F.3d at 95–97. A school may also offer sports for girls only without allowing boys to try out, even though girls may try out for sports offered only to boys. *See* 34 C.F.R. § 106.41 ("members of the excluded sex must be allowed to try-out" for a sport only offered "for members of one sex" if "athletic opportunities for members of that sex have previously been limited"). None of these things violate Title IX.

## III. Armistead has a continuing and valid interest to remain in this case.

Although Armistead graduates this spring, her participation in this case is still justified. After all, "liberal intervention is desirable to dispose of as much of a controversy involving as many apparently concerned persons as is compatible with

efficiency and due process." *Feller v. Brock*, 802 F.2d 722, 729 (4th Cir. 1986). And Armistead need not have standing to participate. *Shaw v. Hunt*, 154 F.3d 161, 165 (4th Cir. 1998) ("party who lacks standing can nonetheless take part in a case as a permissive intervenor"); *accord Grutter v. Bollinger*, 188 F.3d 394, 398 (6th Cir. 1999) ("[A]n intervenor need not have the same standing necessary to initiate a lawsuit."). For permissive intervention, Armistead only needs a "claim or defense that shares with the main action a common question of law or fact." Fed. R. Civ. P. 24(b)(1)(B). Then, the heart of the inquiry is whether allowing the intervention will cause undue delay or prejudice. *McHenry v. Comm'r of Internal Revenue*, 677 F.3d 214, 225 (4th Cir. 2012) (calling "'undue delay' and 'prejudice'" "the core considerations delineated for consideration by Rule 24(b)(3)").

Here, the Court need not speculate. Armistead is already a party to this case and has timely contributed to both the factual and legal development of the issues through her own testimony and "arguments … that … differ from those of the current defendants." Intervention Order 6; *see* Armistead's SJ Br. § II.D (arguing Title IX sometimes requires sex separation in sports). For these reasons, Armistead is still a proper party to this case.

## CONCLUSION

Sex-separated teams exist to accommodate the average physiological differences between men and women. These differences stem from biology, not gender identity. This means that sex-separated teams aren't based on sex stereotypes or animus. Yet B.P.J. insists that biological males who identify as female belong on the women's team, regardless of medical interventions, hormone levels, or athletic ability. It's impossible to reconcile these two positions because B.P.J.'s argument does not promote fairness or safety in any way. Untethered from any objective standard of

sex, B.P.J.'s theory doesn't allow for a women's-only category to even exist. These arguments should be rejected and B.P.J.'s motion for summary judgment denied.

Respectfully submitted this 12th day of May, 2022.

/s/ Brandon S. Steele
_____

Brandon Steele, WV Bar No. 12423
Joshua D. Brown, WV Bar No. 12652
The Law Offices of Brandon S. Steele
3049 Robert C. Byrd Drive, Suite 100
Beckley, WV 25801
(304) 253-1230
(304) 255-1520 Fax
bsteelelawoffice@gmail.com
joshua_brown05@hotmail.com

Tyson C. Langhofer, VA Bar No. 95204*
Rachel A. Csutoros, MA Bar No. 706225*
Alliance Defending Freedom
44180 Riverside Parkway
Lansdowne, VA 20176
(571) 707-2119
(571) 707-4790 Fax
tlanghofer@adflegal.org
rcsutoros@adflegal.org

Travis C. Barham, GA Bar No. 753251*
Alliance Defending Freedom
1000 Hurricane Shoals Road NE, Ste D-1100
Lawrenceville, GA 30043
(770) 339-0774
(770) 339-0774 Fax
tbarham@adflegal.org

Timothy D. Ducar, AZ Bar No. 015307*
Law Offices of Timothy D. Ducar, PLC
7430 E. Butherus Drive, Suite E
Scottsdale, AZ 85260
(480) 502-2119
(480) 452-0900 Fax
tducar@azlawyers.com

Jonathan Scruggs, AZ Bar No. 030505*
Roger G. Brooks, NC Bar No. 16317*
Henry W. Frampton, IV, SC Bar No. 75314*
Alliance Defending Freedom
15100 N. 90th Street
Scottsdale, AZ 85260
(480) 444-0020
(480) 444-0028 Fax
jscruggs@adflegal.org
rbrooks@adflegal.org
hframpton@adflegal.org

Christiana Holcomb, DC Bar No. 176922*
Alliance Defending Freedom
440 First Street NW, Suite 600
Washington, DC 20001
(202) 393-8690
(202) 347-3622 Fax
cholcomb@adflegal.org

*Visiting Attorneys
Attorneys for Defendant-Intervenor

28

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA
CHARLESTON DIVISION

B.P.J., by her next friend and mother,
HEATHER JACKSON

                                    *Plaintiff,*

    v.

WEST VIRGINIA STATE BOARD OF
EDUCATION, HARRISON COUNTY BOARD
OF EDUCATION, WEST VIRGINIA
SECONDARY SCHOOL ACTIVITIES
COMMISSION, W. CLAYTON BURCH in his
official capacity as State Superintendent,
DORA STUTLER in her official capacity as
Harrison County Superintendent, and THE
STATE OF WEST VIRGINIA

                                    *Defendants,*

    and

LAINEY ARMISTEAD

                        *Defendant-Intervenor.*

Case No. 2:21-cv-00316

Hon. Joseph R. Goodwin

## CERTIFICATE OF SERVICE

I, Brandon Steele, hereby certify that on May 12, 2022, I electronically filed a true and exact copy of ***Defendant-Intervenor's Response to Plaintiff's Motion for Summary Judgement*** with the Clerk of Court and all parties using the CM/ECF system.

*/s/ Brandon S. Steele*
Brandon Steele, WV Bar No. 12423
The Law Offices of Brandon S. Steele
3049 Robert C. Byrd Drive, Suite 100
Beckley, WV 25801
(304) 253-1230
(304) 255-1520 Fax
bsteelelawoffice@gmail.com

*Attorney for Defendant-Intervenor*