IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA
CHARLESTON DIVISION

B.P.J., by her next friend and mother, HEATHER
JACKSON,

*Plaintiff*,

v.                                          Civil Action No. 2:21-cv-00316
                                            Hon. Joseph R. Goodwin, District Judge

WEST VIRGINIA STATE BOARD OF
EDUCATION, HARRISON COUNTY BOARD
OF EDUCATION, WEST VIRGINIA
SECONDARY SCHOOL ACTIVITIES
COMMISSION, W. CLAYTON BURCH in his
official capacity as State Superintendent,
DORA STUTLER in her official capacity as
Harrison County Superintendent, and
THE STATE OF WEST VIRGINIA,

*Defendants*,

and

LAINEY ARMISTEAD,

*Defendant-Intervenor*.

**DEFENDANT STATE OF WEST VIRGINIA'S BRIEF IN OPPOSITION TO
PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT**

## <u>TABLE OF CONTENTS</u>

TABLE OF CONTENTS..................................................................................................... i

TABLE OF AUTHORITIES ............................................................................................ ii

INTRODUCTION ............................................................................................................. 1

  A.  The Save Women's Sports Act Complies With And Furthers The Objectives Of Title IX. 5

    1.  The Purposes And Achievements Of Title IX .................................................. 5

    2.  "Sex" Under Title IX Means Biological Sex ................................................... 6

    3.  Biological male athletes identifying as female (including Plaintiff) are not similarly situated in all relevant respects to female athletes ................................................ 7

    4.  Section 25d furthers, not violates, Title IX's Athletic Regulations ............................ 10

  B.  Plaintiff's Equal Protection Claim Fails.............................................................. 12

    1.  The State has important governmental interests for H.B. 3293 ....................... 14

    2.  The stated governmental interests are not prohibited post hoc rationales ...................... 16

    3.  H.B. 3293 is not the product of animus ........................................................ 18

    4.  H.B. 3293 is substantially related to the governmental interests.................................... 20

      a.  The Save Women's Sports Act Protects Equal Athletic Opportunities for Female Athletes ...................................................................................... 21

      b.  The Save Women's Sports Act Protects Female Athlete's Safety ......................... 23

  C.  Plaintiff's As-Applied Challenge Fails ................................................................ 24

  D.  Plaintiff Is Not Entitled To An Injunction Because The Balance Of The Hardships Weighs Against The Plaintiff........................................................................................ 27

CONCLUSION................................................................................................................. 28

## **TABLE OF AUTHORITIES**

**Page(s)**

**Cases**

*Bauer v. Lynch*,
   812 F.3d 340 (4th Cir. 2016) .................................................................8

*Billups v. City of Charleston*,
   S.C., 961 F.3d 673 (4th Cir. 2020).......................................................23

*Bostock v. Clayton Cnty., Ga.*,
   140 S. Ct. 1731 (2020).............................................................................7

*City of Cleburne v. Cleburne Living Ctr.*,
   473 U.S. 432 (1985)...............................................................................12

*Clark v. Ariz. Interscholastic Ass'n.*,
   695 F.2d 1126 (9th Cir. 1982) ...........................................10, 14, 15, 21, 22

*Doe 2 v. Shanahan*,
   755 F. App'x. 19 (D.C. Cir. 2019).........................................................12

*Engquist v. Oregon Dep't of Agr.*,
   553 U.S. 591 (2008)...............................................................................12

*F.S. Royster Guano Co. v. Virginia*,
   253 U.S. 412 (1920).................................................................................8

*Fargo Women's Health Org. v. Schafer*,
   18 F.3d 526 (1994) .................................................................................18

*Farkas v. Miller*,
   151 F.3d 900 (1998)...............................................................................18

*Frontiero v. Richardson*,
   411 U.S. 677 (1973).................................................................................7

*Gonzales v. Carhart*,
   550 U.S. 124 (2007)...............................................................................24

*Grimm v. Gloucester Cnty. Sch. Bd.*,
   972 F.3d 586 (4th Cir. 2020), (Aug. 28, 2020)...............................10, 11

*Hecox v. Little*,
   No. 20-35813 (9th Cir. Nov. 19, 2020), ECF No. 45. Thus, the United States'
   Statement of Interest .............................................................................12

# TABLE OF AUTHORITIES

*(continued)*

**Page(s)**

*Hinkle v. Matthews*,
337 F. Supp. 3d 674 (S.D.W. Va. 2018) ................................................................18

*McCormick v. Sch. Dist. of Mamaroneck*,
370 F.3d 275 (2d Cir. 2004) ................................................................................11

*Michael M. v. Sonoma Cnty. Superior Court*,
450 U.S. 464 (1981) ................................................................................................14

*Minn. Supply Co. v. Raymond Corp.*,
472 F.3d 524 (8th Cir.2006) ................................................................................18

*Mississippi Univ. for Women v. Hogan*,
458 U.S. 718 (1982) ................................................................................................3, 8

*Morrison v. Garraghty*,
239 F.3d 648 (4th Cir. 2001) ................................................................................12

*N. Haven Bd. of Educ. v. Bell*,
456 U.S. 512 (1982) ................................................................................................5

*Neal v. Bd. of Trs. of Cal. State Univs.*,
198 F.3d 763 (9th Cir. 1999) ................................................................................5, 6, 8

*Nordlinger v. Hahn*,
505 U.S. 1 (1992) ................................................................................................12

*Osborne v. United States*, 211 W. Va. 667, 567 S.E.2d 677 (2002) ................................................18

*Petrie v. Ill. High Sch. Ass'n*,
394 N.E.2d 855 (1979) ................................................................................21

*Phillips v. Larry's Drive-In Pharmacy, Inc.*,
220 W. Va. 484, 647 S.E.2d 920 (2007) ................................................................19

*Price Waterhouse v. Hopkins*,
490 U.S. 228 (1989) ................................................................................................3

*Roubideaux v. N.D. Dep't of Corr. & Rehab.*,
570 F.3d 966 (8th Cir. 2009) ................................................................................13, 24

*S.C. Educ. Ass'n v. Campbell*,
883 F.2d 1251 (4th Cir. 1989) ................................................................................19

iii

## TABLE OF AUTHORITIES
*(continued)*

**Page(s)**

*Soule v. Conn Ass'n of Sch*s.,
3:20-cv-00201 (D. Conn. Mar. 24, 2020), ECF No. 75 ............................................................12

*Tuan Anh Nguyen v. INS*,
533 U.S. 53 (2001)......................................................................................................14, 22

*United States v. Playboy Ent. Grp., Inc.*,
529 U.S. 803 (2000)...........................................................................................................13

*United States v. Staten*,
666 F.3d 154 (4th Cir. 2011) .............................................................................................22

*United States v. Virginia*,
518 U.S. 515 (1996)........................................................3, 4, 6, 10, 13, 14, 16, 24

*Van Der Linde Hous., Inc. v. Rivanna Solid Waste Auth.*,
507 F.3d 290 (4th Cir. 2007) ...............................................................................................8

*Ways v. City of Lincoln*,
331 F.3d 596 (8th Cir. 2003) ........................................................................................13, 18

*Yellow Springs Exempted Vill. Sch. Dist. Bd. of Ed. v. Ohio High Sch. Athletic
Ass'n*,
647 F.2d 651 (6th Cir. 1981) ...............................................................................................8

**Constitutional Provision**

U.S. Const. amend. XIV, § 1 ......................................................................................................12

**Statutes**

20 U.S.C. § 1681(a) .....................................................................................................................5

W. Va. Code § 18-2-25c ...........................................................................................................17

W. Va. Code §18-2-25d(4) ..........................................................................................................3

W. Va. Code §18-2-25d(a)(2) ...................................................................................................15

W. Va. Code §18-2-25d(a)(5) ..............................................................................................15, 17

W. Va. Code §18-2-25d(c)(2) ...................................................................................................17

iv

**TABLE OF AUTHORITIES**
(*continued*)

**Page(s)**

**Regulations**

34 C.F.R. § 106.41 ..............................................................................7, 8, 10, 14, 16

34 C.F.R. § 106.41(b) ......................................................................................5, 15, 17

34 C.F.R. § 106.41(c) .........................................................................................5, 6, 7

34 CFR § 106.32(b)(1) ...............................................................................................7

34 CFR § 106.33 .......................................................................................................7

34 CFR § 106.34 .......................................................................................................7

34 CFR § 106.40 .......................................................................................................7

34 CFR § 106.43 .......................................................................................................7

34 CFR § 106.52 .......................................................................................................7

34 CFR § 106.59 .......................................................................................................7

34 CFR § 106.61 .......................................................................................................7

**Other Authorities**

Haley Tanne, *Who will stand up for me and other women being beaten by
    biological males like Lia Thomas*?, FOX NEWS: OPINION (Mar. 23, 2022, 2:00
    AM)..........................................................................................................................28

NATIONAL INSTITUTES OF HEALTH, OFFICE OF RESEARCH ON WOMEN'S HEALTH,
    HOW SEX AND GENDER INFLUENCE HEALTH AND DISEASE .......................................6

Paulina Dedaj, *Penn swimmer slams school's handling of Lia Thomas saga:
    "They don't actually care about women at all,"* FOX NEWS: SPORTS (Jan. 28,
    2022, 11:10 AM)....................................................................................................28

*Testosterone, Total, Bioavailable, and Free, Serum,* MAYO CLINIC LABORATORIES...................10

U.S. DEP'T OF EDUC., OFFICE OF CIV. RTS., PROTECTING CIVIL RIGHTS,
    ADVANCING EQUITY: REPORT TO THE PRESIDENT AND SECRETARY OF
    EDUCATION, UNDER SECTION 203(B)(1) OF THE DEPARTMENT OF EDUCATION
    ORGANIZATION ACT, FY 13-14 33 (2015) ................................................................6

Now comes the State of West Virginia (the "State") and hereby responds to the Plaintiff's Motion for Summary Judgment and Memorandum in Support ("Pl. MSJ," ECF 291). The State incorporates herein all of the arguments and evidence submitted in its Motion for Summary Judgment (ECF No. 285) and the Memorandum of Law ("State's MSJ Memo.") (ECF No. 287) previously submitted, but further states as follows:

## INTRODUCTION[1]

1.  While Plaintiff's mother has brought this case on behalf of B.P.J., H.B. 3293 is about preserving women's sports, particularly vis-à-vis competitiveness; the safety of biological female athletes; and the preservation of the purpose of Title IX and its regulations. The statute is the State's effort to deal with the important issue of whether biological males can participate in female sports in educational settings and, if so, under what circumstances. This issue has been simmering more broadly in our country for over 40 years and now sees blooming attention on the national and international stages, resulting in a multitude of different approaches on how it should be handled. The spotlight first alighted on this issue in 1976 when tennis player Renee Richards—male by birth—began competing in women's professional tennis as a then-identifying female. The issue has become increasingly wide-spread, and now most athletic organizations, some schools and many States are appropriately enacting rules and laws to address it. *See* State's MSJ Memo. at pp 1-5., ECF No. 287 (explaining the 40 year history and background of the issue of biological males participating on female athletic teams).

2.  B.P.J. is admittedly a biological boy. See Jackson Dep. at 98:14-99:3, ECF No. 285-2. But Jackson recognized B.P.J. as a girl without question following an exchange with B.P.J. when

---

[1] Plaintiff has submitted a Statement of Undisputed Facts ("Plaintiff's SUF"). The State disagrees not only with this procedure, but also with numerous statements made therein. The State is filing concurrently herewith a Response to the Plaintiff's SUF. The State provides below some contrary evidence of particular importance in the narrative.

B.P.J. was a toddler. *Id.* at 106:15-107:22.[2]  Jackson was not surprised because, among other things, B.P.J liked to play with stereotypical girl toys (dolls).  *Id.* at 109:108:24-109:18.

Starting in third or fourth grade, B.P.J. began dressing as a girl at school (*see* Jackson Decl. ¶¶ 11-12, ECF No. 289-2) and has numerous other interests that are stereotypically female.[3]  Asked what it means to be a girl, B.P.J. gave stereotypical answers about how girls look and that girls wear dresses, use makeup and have long hair. B.P.J. Dep. at 30:8-31; 33: 16-22; 35: 13-36; 37: 6-15 B.P.J., influenced in whole or in part by these cultural stereotypes, self-identified as a girl. Indeed, Plaintiff's expert explained that these stereotypes are the result of our culture and that, if the same person were in another culture, he or she might identify as another gender based on those cultural norms and stereotypes.[4]

Of course, all the parties to this case want B.P.J. to be happy, regardless of whether B.P.J. adopts male or female stereotypes.  However, while B.P.J.'s mother insists that if B.P.J. cannot play on the girls' teams it will be hurtful to B.P.J.  (Pl. MSJ. at 4-5, ECF No. 291), none of B.P.J.'s medical providers has ever prescribed such athletic involvement as part of a medical treatment plan.[5]  In fact, no medical or psychological treatment plan can legally or ethically dictate who

---

[2] When B.P.J. at age 3 observed that B.P.J.'s mother did not have the same male body parts that B.P.J. had, B.PJ. asked, "why?"  Jackson responded, "because [you] were born a boy and boys have penises." B.P.J. asserted "that's not right"—"I'm a girl." *Id.* at 100:19-101:24.  Jackson immediately accepted that without dispute. *Id.* at 106:15-107:2.

[3] B.P.J. admittedly now likes to wear dresses—stereotypical girl clothing; likes to wear shoes which B.P.J. perceives to be girl shoes, and selected a stereotypical girl name.  B.P.J. Dep. at 25:3-9, Ex. A.  Heather Jackson added that B.P.J. likes wearing makeup.  Jackson Dep. at 99:18-100:4, ECF No. 285-2.  Per Ms. Jackson,  B.P.J. also wants female anatomy (i.e. breasts and a vagina), but does not understand the sexual implications of those things.  Jackson Dep. at 112:24-116:24.

[4] "The convention that girls wear pink and have longer hair, or that boys wear blue and have shorter hair, are examples of socially constructed gender roles from a particular culture and historical period."  Safer Decl. at ¶20, ECF No.289-24.

[5] Plaintiff's experts suggest that "affirmation treatment," an ambiguous term at best, should include having society conform to all the desires of the gender dysphoric child and that this "affirmation" will improve the child's mental health.  Yet "[n]o study has demonstrated that "affirming" the transgender identity of a child or adolescent produces better mental health outcomes or reduced suicidality relative to psychotherapy and mental health support."  Cantor Decl. at ¶¶ 8, 88- 121, Ex. C.

participates in a specific school sports team.[6]  What Plaintiff proposes as proper, i.e. the removal of an impediment to being on girls' teams, would be to categorize B.P.J.—and anyone similarly situated—on stereotypical notions of gender.  Yet, the Supreme Court does not countenance laws that categorize individuals based on "archaic and stereotypic notions" of gender.  *Mississippi Univ. for Women v. Hogan*, 458 U.S. 718, 725 (1982).  *See also*, *Price Waterhouse v. Hopkins*, 490 U.S. 228, 251 (1989) (the law cannot treat individuals differently based on gender or "sex stereotypes").

By contrast, H.B. 3293 follows Supreme Court directives by categorizing based on biological sex.  It simply requires that any biological male students who choose to participate in school-sponsored sports (which many do not do for various reasons) must participate on the team of that student's natal sex, not the student's stereotypical notions of self-identified gender.  *See* W. Va. Code §18-2-25d(4) ("Classifications based on [stereotypical] gender identity serve no legitimate relationship to the State of West Virginia's interest in promoting equal athletic opportunities for the female sex ")  As the Supreme Court has explained, "[p]hysical differences between men and women . . . are enduring" and render "the two sexes . . . not fungible." *United States v. Virginia*, 518 U.S. 515, at 533 (1996) (cleaned up).

3.  Sports have been part of the American educational system for easily over 100 years.  And because sports are an available activity in public schools, it is important that they be fair and safe.  H.B. 3293 inherently recognizes the need for fairness and safety as well as benefits of sports, including competition.  These sports are, by their nature competitive, thus winning is a benefit.  Fry Dep. at 95:18-96-21, Ex. E.[7]  And contact sports, by nature, create issues of safety for the participants, such as concussions, ACL injuries, and more.  *See* Carlson Decl. at ¶¶ 22-78, ECF

---

[6] Contrary to Plaintiff's repeated assertions to the contrary (*See* e.g.  ECF No. 291 at 6 and 7), H.B. 3293 does not preclude B.P.J. from participating in school sports or force B.P.J. to participate on boys' teams.
[7] Professor Fry's observations are subject to a Daubert challenge, as are Plaintiff's other proffered experts.

No. 285-5.  Accordingly, schools, athletic organizations, and even legislatures have long taken steps and implemented rules and regulations to maximize fairness and prioritize safety.  The federal government itself undertook such efforts when it recognized the need to promote fairness in sports for female athletes through the Title IX regulations.

For example, school sports are divided by grades, recognizing that, on average, it would be competitively unfair and unsafe for high schoolers to compete against middle schoolers, even if some less-talented or smaller-in-stature high schoolers might prefer to compete against younger athletes.  Similarly, science has confirmed what society has long recognized: generally, biological males are bigger, stronger, and faster than biological females.  For those reasons, schools and athletic organizations have long had rules separating male and female athletes in competitive and contact sports.  H.B. 3293, rather than enacting a "sweeping change" (Pl. MSJ. at 19, ECF No. 291), simply formalized what States and sporting organizations have done for decades.

Given that the "physical differences" "between men and women are enduring" (*see Virginia*, 518 U.S. at 533), separating sports teams on that basis is more fair than doing so based on a student's self-identified gender at any given time.  Ultimately, in sports, bodies compete— gender identities do not.  No one disputes that athletic ability is based far more on biological differences than on a person's gender identity.  Even Plaintiff's proffered expert Joshua Safer explains that "gender identity itself is not a useful indicator of athletic performance."  Safer Dep. at 167:22-24 to 168:1, ECF No. 285-6.  Nevertheless, Plaintiff would base sports teams on gender identity, claiming that gender is immutable and cannot change from time to time.  Yet Plaintiff's proffered experts explain that even if a person's gender identity never changes the person's *understanding* of his or her gender *can* change from time to time.  Atkins Dep. at 226:10-11; 227:8-9; 228:3-4; 230:12-15.  This is a distinction without a difference because if a biological boy

4

understands his gender to be male one year, female the next, and then male again the following year, then the word choice between "changing one's gender identity" vs. "changing one's understanding of gender identity," is meaningless.  Indeed, at least one West Virginian boy has already asked if he can change his gender identity from time to time for that very purpose.  Dolan Dep. at 121:3-6, ECF No. 285-1.  Further, basing a team choice on gender identity is not workable for the myriad of gender identities that Plaintiff's treating physician claims to exist—at least 27, and perhaps as many as 100.  *See* Kidd Dep. at 63:13-64:4, ECF No. 285-9.  Accordingly, Section 25d is fair and proper.

## A.  The Save Women's Sports Act Complies With And Furthers The Objectives Of Title IX.

Plaintiff ignores the purpose of Title IX, attempts to redefine "sex," misstates the test for "similarly situated persons," and totally ignores the most relevant part of Title IX law, i.e., 34 C.F.R. § 106.41(c).  As discussed more fully in the State's MSJ Memo. at 22-28, ECF No. 287, Section 25d complies with Title IX.

### 1.  The Purposes And Achievements Of Title IX.

Title IX was designed to eliminate significant "discrimination against women in education." *Neal v. Bd. of Trs. of Cal. State Univs.*, 198 F.3d 763, 766 (9th Cir. 1999) (citing *N. Haven Bd. of Educ. v. Bell*, 456 U.S. 512, 523-24 & n.13 (1982)).  It mandates that no person "shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any education program or activity receiving Federal financial assistance."  20 U.S.C. § 1681(a).

The Title IX athletic regulations explictly authorize "separate teams for members of each sex where selection for such teams is based upon competitive skill or the activity involved is a contact sport."  34 C.F.R. § 106.41(b).  And § 106.41(c) requires that all subject entities "shall provide equal athletic opportunity for members of both sexes." *Id.* § 106.41(c).  The regulations

consider whether the program provides "levels of competition" that "effectively accommodate the . . . abilities of members of *both* sexes," and whether the program provides equal opportunities for public recognition or "publicity" to *both* sexes. *Id*. §§ 106.41(c)(1), (10) (emphasis added). The Congressionally directed and Presidentially signed Title IX athletic regulations, in place for over 45 years, explicitly recognize a reality of the human condition: the biological differences between males and females (not self-identified gender identities) are "enduring." *Virginia*, 518 U.S. at 533.

Title IX's athletic regulations increased girls' participation in high school athletics from 250,000 in 1972 to 3.25 million in 2011.[8] *See, e.g.*, *Neal*, 198 F.3d at 773 (crediting Title IX for this change). Athletic sports separation based on biological sex is fundamental to the success of Title IX and actions to transform or eviscerate it should be considered with deep care and caution.

### 2. "Sex" Under Title IX Means Biological Sex.

"Biological sex is a clear, scientifically valid, and well-defined category." Cantor Decl. at ¶8, Ex. C. As the historical agency interpretations, implemented regulations, and controlling case law establish, the term "sex" in this context can only reasonably be understood to mean biological sex—not the person's internal sense of being male or female, or their outward presentation of that internally felt sense (sometimes referenced as "gender identity"). "Sex is a biological classification, encoded in our DNA. . . . Sex makes us male or female."[9] By contrast, "transgender identity is not biologically based." Levine Decl. at ¶¶ 18 and 90-96, Ex. D. Claims by proffered experts Safer and Adkins that there is a medical consensus to the contrary are unsupported by any data or realistic studies. *See generally* State's MSJ Memo. at 25-26, ECF No. 287.

---

[8] U.S. Dep't of Educ., Office of Civ. Rts., Protecting Civil Rights, Advancing Equity: Report to the President and Secretary of Education, Under Section 203(b)(1) of the Department of Education Organization Act, FY 13-14 33 (2015), https://www2.ed.gov/about/reports/annual/ocr/report-to-president-and-secretary-of-education-2013-14.pdf.

[9] National Institutes of Health, Office of Research on Women's Health, How Sex and Gender Influence Health and Disease, https://orwh.od.nih.gov/sites/orwh/files/docs/SexGenderInfographic_11x17_508.pdf (last visited May 6, 2022).

Title IX uses the term "sex," and the interpretive regulations use the term "sex" to mean the *two* biological sexes, male and female. *See*, *e.g.*, 34 C.F.R. § 106.41(c) (recipients "shall provide equal athletic opportunity for members of *both* sexes.") (emphasis added). The ordinary meaning of "both" connotes two.

Even the Supreme Court has consistently recognized the term to identify *only two* sexes—male and female. *See Bostock v. Clayton Cnty., Ga.*, 140 S. Ct. 1731, 1739 (2020) (proceeding on the assumption that at the time of Title VII's passage, the term sex "referr[ed] only to biological distinctions between male and female" and did not include "norms concerning gender identity"); *see also Frontiero v. Richardson*, 411 U.S. 677, 686 (1973) (plurality opinion) ("[S]ex, like race and national origin, is an immutable characteristic determined solely by the accident of birth.") 34 CFR §§ 106.32(b)(1), 106.33, 106.34, 106.40, 106.41, 106.43, 106.52, 106.59, and 106.61 (each recognizing two sexes). Contrary to the plain language of the statute and regulations, Plaintiff asserts at least four "genders" or "gender identities." Dr. Kidd, Plaintiff's current medical doctor, asserts that there are in excess of 27 genders, perhaps as many as 100. Kidd Dep. at 63:13-64:4, ECF No. 285-9. Plaintiff's position that a student-athlete be permitted to participate on a team consistent with the athlete's gender identity rather than biological sex would be impossible given this array of gender identities. On which team would biological male athletes identifying as non-binary, bi-gender, agender, nongender, gray gender, etc. participate? Is it whichever team that athlete chooses at any particular time?

Section 25d properly utilizes the commonly accepted definition of the word "sex" as referring to the physiological differences between biological males and females, including medical definitions, statutory and regulatory meanings, and controlling case law from the Supreme Court.

### 3. Biological male athletes identifying as female (including Plaintiff) are not similarly situated in all relevant respects to female athletes.

"[T]he Constitution only forbids arbitrary differentiations among groups of persons who are *similar in all aspects relevant to attaining the legitimate objectives of legislation*." *Van Der Linde Hous., Inc. v. Rivanna Solid Waste Auth.,* 507 F.3d 290, 293 (4th Cir. 2007) (citing *F.S. Royster Guano Co. v. Virginia*, 253 U.S. 412, 415 (1920) (emphasis added). Plaintiff insists that for purposes of Title IX, Plaintiff is similarly situated to biological girls. Plaintiff provides neither legal support nor logical reasoning to support this.[10] In fact, under Title IX, a plaintiff must show that he or she is similarly situated in *all* relevant respects. In the case of athletics under Title IX and 34 C.F.R. § 106.41, courts look to "average physical differences between the sexes." *Yellow Springs Exempted Vill. Sch. Dist. Bd. of Ed. v. Ohio High Sch. Athletic Ass'n*, 647 F.2d 651, 657 (6th Cir. 1981). Moreover, "[m]en and women are not physiologically the same for the purposes of physical fitness programs." *Bauer v. Lynch*, 812 F.3d 340, 350 (4th Cir. 2016).

It is certainly true that B.P.J. looks and acts like a girl in many stereotypical ways. While that may make B.P.J. similarly situated to biological females for some purposes, it does not make B.P.J. similarly situated to a female athlete for purposes of Title IX and 34 C.F.R. § 106.41. "Title IX was enacted in order to remedy discrimination that results from stereotyped notions[.]" *Neal,* 198 F.3d at 768. And, the Supreme Court does not condone discrimination that categorizes individuals based on "archaic and stereotypic notions" of gender. *Hogan*, 458 U.S. at 725.

Plaintiff's doctors determined that B.P.J. has gender dysphoria, based largely on B.P.J.'s representations to those doctors; of B.P.J.'s preferences to wear stereotypically female clothing and hairstyles; and a self-professed identity as a girl, despite being a biological male.[11] Neither

---

[10] To be fair, Plaintiff does cite this Court's initial preliminary injunction for this proposition. However, this is faulty as it relies on a *preliminary* ruling and is nothing more than an *ipse dixit* statement.

[11] B.P.J.'s first visit with Dr. Montano was only 45 minutes. (See Exhibit 4 to Montano's deposition showing an entry time of 10:05(top of p.1) and a completion time of 10:51(see page 6)). At that brief visit, B.P.J. submitted a completed two-page medical admission-type form (attached to Montano Dep. as Ex. 36) and reported these stereotypical

these stereotypes nor a diagnosis of gender dysphoria[12] make B.P.J. "similarly situated in all relevant respects" to biological girls in athletics.

Plaintiff argues, based on the report of proffered expert Safer, that there is no athletic difference between Plaintiff and biological females. This is based on the dubious claim that athletic differences are based solely on circulating testosterone and that there is no difference between pre-pubescent males and females—either in performance or testosterone levels. [13]  Dr. Safer relies on two studies to claim that "[b]efore puberty, boys and girls have the same level of circulating testosterone." Safer Decl.. at ¶ 24, ECF No. 289-25. But neither of his cited studies says so. In fact, both performance statistics and prepubescent testosterone level data tell a different story. Dr. Brown cites numerous uncontested studies showing that there are significant differences in prepubescent boys and girls, both in athletic performance and pre-pubertal testosterone. Actual data from extensive international studies show that pre-pubertal biological boys consistently outperform girls in jumping, running, and upper body strength events, sometimes in drastic fashion. Brown Decl. at ¶¶ 71-109, ECF No. 285-7. This may well be because at 0-5 months, males' testosterone levels exceed female levels by as much as 500 percent (Brown Decl. at ¶ 68,

---

[12] preferences. Based on this, Dr. Montano diagnosed B.P.J. as having gender dysphoria and immediately prescribed a body changing puberty blocker treatment, to be inserted at a future date. Montano Dep. at 96:21-104:15, Ex. B, and Exhibit 45 thereto. Dr. Kidd, B.P.J.'s current doctor, relied upon Dr. Montano's gender stereotype-based diagnosis. Kidd Dep. at 75:21-76:13; 100:22-102:13., ECF No. 285-9. Notably, such a psychological diagnosis is not akin to a diagnosis of a physical medical issue that can be identified via independent objective tesing. In fact, Dr. Janssen, Plaintiff's rebuttal expert, opined that he would not give such a diagnosis based such a minimal interaction  Dr. Janssen opined that multiple visits over time would be necessary.  Janssen Dep. at 309; 19-311:18, ECF No. 285-3.

[12] After this this diagnosis, Dr. Montano testified that B.P.J's medical records as of December 31, 2021 are correct. Those B.P.J. records state: "**Gender identity: Male**." *See* Montano Dep. at 154:18-155:24  (Ex. B hereto) and Ex. 45 thereto.

[13] Plaintiff's expert provided that "after the initiation of puberty blocking treatment, a girl who is transgender will experience none of the impacts of testosterone that would be typical if she underwent her full endogenous puberty." Adkins Decl. at ¶ 30, ECF No. 289-23.  However, this says nothing of the prepubescent testosterone levels reported by the Mayo Clinic nor the actual performance date of pre-pubescent male athletes vs. female athletes of the same age.

ECF No. 285-7) (citing Mayo Clinic Laboratories).[14]  This is science which the Legislature must acknowlege.

### 4.  Section 25d furthers, not violates, Title IX's Athletic Regulations.

Nothing in Section 25d is contrary to Title IX or its implementing regulations.  Title IX *requires* some different treatment between the biological sexes.  *See* 34 § CFR 106.41(b).   It does not prohibit or even allow different treatment based on gender identity.  Plaintiff accepts that Title IX authorizes sports teams separated by sex.  Nevertheless, B.P.J. seeks to join the separate female cross country and track teams.  But allowing biological males to participate on female teams would be contrary to the very basis for the separation.  The Save Women's Sports Act's designation of biological boys playing on male teams is consistent with, and supports the purposes of, Title IX.  So not only does the statute not violate Title IX, it strengthens the goals of Title IX in West Virginia.

It has long been recognized in law that biological females and biological males are different in ways that are relevant to athletics because of physiological differences between males and females.  *See Virginia*, 518 U.S. at 533; *see also Clark v. Ariz. Interscholastic Ass'n.*, 695 F.2d 1126, 1131 (9th Cir. 1982) (excluding males from the girls' volleyball team because it is a "physiological fact" that "males would have an undue advantage competing against women).

Plaintiff cites (and misquotes) *Grimm v. Gloucester Cnty. Sch. Bd.*, 972 F.3d 586, 610 (4th Cir. 2020), *as amended* (Aug. 28, 2020), *cert. denied*, 141 S. Ct. 2878, (2021).  ECF 291 at 17.  But the holding of *Grimm*, while ruling on the school bathroom usage for *one* specific student, does not apply here.  *Grimm* does not interpret Title IX or its implementing regulations as they relate to athletics.  Indeed, it never once mentioned 34 C.F.R. § 106.41, the Title IX regulation at

---

[14]   *Testosterone,   Total,   Bioavailable,   and   Free,   Serum,* MAYO CLINIC LABORATORIES, https://www.mayocliniclabs.com/test-catalog/overview/83686#Clinical-and-Interpretive (accessed May 11, 2022).

issue here.  In fact, *Grimm* determined that the policy, as-applied to that transgender male, was not substantially related to *the governmental interest of privacy* in that case because plaintiff Grimm, a high school student, had "physical features commonly associated with the male sex."  *Id.* at 621 (Wynn J. Concurring).

There are no privacy issues here.  And while changing physical appearance may ameliorate privacy concerns in properly re-configured bathrooms (as the school district had done), identifying as female, even if accompanied by puberty blockers or hormone treatment, does not eliminate male performance advantages or safety concerns in girls' sports.  *See infra* Section B.4.a.

Under *Bostock* and the controlling regulations, Section 25d *does* treat similarly situated people the same.  As noted, Title IX athletic regulations contemplate two sexes based on *biological* sex.  It does not contemplate segregating sports based on multifarious genders (*see* Kidd Dep. at 63:13-64:4, ECF No. 285-9) or on athletes whose "gender identity" either changes or whose understanding of gender "can change over time."  *See* Janssen Dep. at 47:1-6, ECF No. 285-3. Under Title IX and its unchallenged, implemented regulations, schools *must* consider students' sex, not identity, when determining whether male and female student athletes have equal opportunities to participate.  *See generally,  McCormick v. Sch. Dist. of Mamaroneck*, 370 F.3d 275 (2d Cir. 2004).  There is a lack of equal treatment under Title IX when there is "a difference, on the basis of sex, in benefits" "that has a negative impact on athletes of *one* sex" compared with benefits, services, or opportunities available to athletes of *the other* sex."  *Id*. at 293 (emphasis added).

Ultimately, Plaintiff seeks to have the State (and most other Defendants) improperly categorize sports teams on the basis of gender identity, thereby redefining eligibility for participation in women's sports.  By defining such eligibility on the basis of biological sex,

11

however, Section 25d disregards gender identity—it does not discriminate "on the basis" of it. There is no Title IX violation here.[15]

## B.  Plaintiff's Equal Protection Claim Fails.

No State shall "deny to any person within its jurisdiction the equal protection of the laws." U.S. Const. amend. XIV, § 1. The Equal Protection Clause is "essentially a direction that all persons *similarly situated* should be treated alike." *City of Cleburne v. Cleburne Living Ctr.*, 473 U.S. 432, 439 (1985) (emphasis added).  The provision "simply keeps governmental decisionmakers from treating differently persons who are in *all* relevant respects alike." *Nordlinger v. Hahn*, 505 U.S. 1, 10 (1992) (emphasis added).  It is "a shield against arbitrary classifications." *Engquist v. Oregon Dep't of Agr.*, 553 U.S. 591, 598 (2008).  As such, a plaintiff asserting a violation of the Equal Protection Clause must "demonstrate that he has been treated differently from others with whom he is similarly situated and that the unequal treatment was the result of intentional or purposeful discrimination." *Morrison v. Garraghty*, 239 F.3d 648, 654 (4th Cir. 2001).  Biological male athletes identifying as female are not similarly situated in all relevant respects to biological female athletes.  See *supra* at pp. 9-11.

By contrast, Section 25d treats all biological males *the same*, whether they identify as females *or* males.  It prohibits *all* biological males from participating in female sports.  It also treats all biological females the same regardless of how they identify.  Therefore, it does not discriminate against transgender athletes.  *See Doe 2 v. Shanahan*, 755 F. App'x. 19, 23-25 (D.C.

---

[15] From the enactment of the Title IX women's athletics regulations until as late as January 2021, the U.S. Department of Education and the Department of Justice have repeatedly taken a position consistent with that set forth in Section 25d, both before and after *Bostock*.  *See* ECF No. 287 nn.14-16. ; *see also* Statement of Interest of the United States, *Soule v. Conn Ass'n of Schs.*, 3:20-cv-00201 (D. Conn. Mar. 24, 2020), ECF No. 75; Br. of United States as Amicus Curiae, *Hecox v. Little,* No. 20-35813 (9th Cir. Nov. 19, 2020), ECF No. 45. Thus, the United States' Statement of Interest in this case contradicts its long-held view without subjecting this new interpretation to public review and comment.

Cir. 2019) (reversing a finding that requiring military personnel to serve in their biological sex was a blanket transgender ban).

Assuming the Court continues to apply intermediate scrutiny (as it did in the preliminary injunction order), the State first must show that the "classification serves important governmental objectives." *Virginia*, 518 U.S. at 524 (cleaned up).  For an objective to be "important," it cannot stem from "overbroad generalizations about the different talents, capacities, or preferences of males and females."  *Id*. at 533. The objective must also be "genuine."  *Id*.  "[T]he state must persuasively show that certain gender-based classifications serve 'important governmental objectives' and that the statute in question is 'substantially related to the achievement of those objectives.'" *Roubideaux v. N.D. Dep't of Corr. & Rehab.*, 570 F.3d 966, 974 (8th Cir. 2009) (citing *Ways v. City of Lincoln,* 331 F.3d 596, 600 (8th Cir. 2003).  Contrary to Plaintiff's assertion, there is no requirement that the legislature fully enunciated the governmental interests at the time it enacted the law.  In any event, the Legislature adequately gave notice of the important governmental interests when enacting the law.  See *infra* at pp. 17-19.

Second, the State must show that "the discriminatory means employed are substantially related to the achievement of those objectives."  *Virginia*, 518 U.S. at 524 (cleaned up).  Notably, neither element of the test requires a realized "problem"; it is always appropriate for legislatures to address issues that, as here, have been around for years or decades.[16]

Importantly, this heightened standard does not mandate that all sex-based classifications must fail; rather, the "[p]hysical differences between men and women . . . are enduring" and render

---

[16] Plaintiff's brief asserts that the State must show "'an actual problem' exists" under "heightened scrutiny," pointing to *United States v. Playboy Ent. Grp., Inc.*, 529 U.S. 803 (2000).  *See* Pl. MSJ Memo. at 26, ECF No. 291.  However, *Playboy* was a First Amendment case, making the "heightened scrutiny" there *strict* scrutiny—not the intermediate scrutiny applicable in an equal protection case such as the one at bar.  In short, *Playboy* is inapropos.

"the two sexes . . . not fungible." *Virginia*, 518 U.S. at 533 (cleaned up); *accord Tuan Anh Nguyen v. INS*, 533 U.S. 53, 68 (2001). Indeed, "[t]o fail to acknowledge even our most basic biological differences . . . risks making the guarantee of equal protection superficial, and so disserving it." *Nguyen*, 533 U.S. at 73. Accordingly, laws may (and should) acknowledge the physical differences between men and women, so long as such sex-based classifications do not "create or perpetuate the legal, social, and economic inferiority of women." *Virginia*, 518 U.S. at 534; *see, e.g.*, *Nguyen*, 533 U.S. 53 (upholding law requiring unmarried citizen fathers, but not mothers, to officially acknowledge relationship to foreign-born child in order to pass U.S. citizenship to such child because of biological differences between the sexes). In short, when applying this standard, the Supreme Court takes "into account actual differences between the sexes, including physical ones." *Clark,* 695 F.2d at 1129 (citing *Michael M. v. Sonoma Cnty. Superior Court*, 450 U.S. 464, 468-69 (1981)); *see Nguyen*, 533 U.S. at 73.

Section 25d satisfies intermediate scrutiny. It serves the important governmental objectives long recognized by many international athletic organizations, the SSAC, and Title IX, *see* 34 CFR § 106.41, namely providing equal athletic opportunities to biological females and protecting the safety of biological female athletes. By precluding all biological males—regardless of their gender identity—from competing on teams designated for biological females, Section 25d directly protects these interests.[17]

### 1. The State has important governmental interests for H.B. 3293.

As stated in the State's MSJ Memo. at 11-13, the State has three important interests for H.B. 3293—namely providing equal athletic opportunities to biological females and protecting the

---

[17] Contrary to Plaintiff's claims, the law does not have an overly broad sweep. For example, it does not prohibit biological females from joining teams of biological males because that is not necessary to meet the governmental objectives.

safety of biological female athletes, both of which are consistent with, and in fulfillment of Title IX.

It is uncontested and well-established that "[t]here is no question" that "promoting equality of athletic opportunity between the sexes" is "a legitimate and important governmental interest" justifying rules excluding males from female sports.  *Clark*, 695 F.2d at 1131.  *See also,* 34 C.F.R § 106.41(b) (recognizing the governmental interest of girls-only teams under Title IX).  West Virginia followed the federal government's long-standing view, stating:  "[c]lassification of teams according to biological sex is necessary to promote equal athletic opportunities for the female sex." W. Va. Code §18-2-25d(a)(5).

Safety for female athletes is also an important governmental interest for "contact sports" including "boxing, wrestling, rugby, ice hockey, football, basketball and other sports the purpose or major activity of which involves bodily contact." 34 CFR § 106.41(b).  The SSAC's 2015 board policy (Ex. 6 to Dolan Dep.  ECF No. 285-1), while not binding (*See id*. at 124:12-25), also recognized the importance of "the safety of teammates or opposing players" in the context of separate female athletic teams.  *See id.* at 117-119 and Ex. 6 thereto.  This reflects the "inherent differences" which "realistically reflect the fact that the sexes are not similarly situated" in the context of contact sports.  *See* W. Va. Code §18-2-25d(a)(2).  *See generally* State's MSJ  Memo. at 17-21, ECF No. 287.

Dr. Chad Carlson, MD, FACSM, the only safety expert in this case, concluded that "[t]he science of sex-specific differences in physiology, intersecting with the physics of sports injury, leaves little doubt that participation by biological males in these types of girls' or women's sports, based on gender identity, creates significant additional risk of injury for the biologically female participants competing alongside these transgender athletes."  Carlson Decl. at 2, ECF No. 285-5.

World Rugby and UK Sports Council reached the same conclusion. *Id.* Indeed, direct competition between males and females is "unsafe in sports which allow physical contact and collisions." *Id.* at 3.

Finally, H.B. 3293 is consistent with and supportive of the objectives of Title IX and the Title IX athletic regulations – 34 C.F.R. § 106.41. *See* Section A.1, *supra* and Section B.2, *infra*.

### 2.  The stated governmental interests are not prohibited post hoc rationales.

Plaintiff cites *Virginia*, 518 U.S. at 533 for the proposition that this Court should reject the State's governmental interests of safety and compliance with Title IX as impermissible "post hoc" justifications.  First, *Virginia* does not require that a legislature fully enunciate its governmental interest prior to the passage of a law and second, even if it did, the Legislature provided ample notification and justification of these governmental interests at the time of passage.

In *Virginia*, the Court explained "[t]he justification must be genuine, not hypothesized or invented *post hoc* in response to litigation.  And it must not rely on overbroad generalizations about the different talents, capacities, or preferences of males and females." *Virginia*, 518 U.S. at 533. The key is not when the governmental interest was enunciated, it is whether the interest is "genuine."  In *Virginia*, the Court was skeptical of the genuineness of the State of Virginia's stated governmental interest of educational diversity.  *Virginia,* 518 U.S. at 536-537.  The Court concluded that "Virginia's alleged pursuit of diversity through single-sex educational options" was neither genuine nor found in the history of the institution, and, in fact, "a range of educational opportunities for men and women was scarcely contemplated" in 1839, when VMI was established by the Commonwealth. *Id.* at 536.

The opposite is true for the Save Women's Sports Act.  The State's important governmental interests are not only genuine and obvious—as explained above—but they are apparent from the

preamble and text of the law, the limited legislative history, and the location of the statutes that precede them in the code.

First, the preamble (1) explicitly mentions "Classification of teams according to biological sex is necessary to promote equal athletic opportunities for the female sex" (W. Va. Code § 18-2-25d(a)(5)); (2) references safety issues, explaining "[i]n the context of sports involving . . . contact,[18] biological males and biological females are not in fact similarly situated" (*id.*) (emphasis added); and (3) addresses Title IX by using the exact language contained in the Title IX athletic regulations, stating that female designated athletic teams "shall not be open to students of the male sex *where selection for such teams is based upon competitive skill or the activity involved is a contact sport.*" W. Va. Code §18-2-25d(c)(2) (emphasis added). (*Cf.* 34 C.F.R. § 106.41(b) (allowing "separate teams for members of each sex *where selection for such teams is based upon competitive skill or the activity involved is a contact sport*") (emphasis added)).

Second, the legislative history of the law, which is limited to the various versions of the law, shows that the legislature was addressing these important governmental interests. The original bill would have modified W. Va. Code § 18-2-25c and required that the student's sex "shall be the pupil's sex for the purposes of participating in single-sex secondary school interscholastic athletic events" irrespective of whether it was a competitive or contact sport.[19] The law as passed by both houses narrowed the bill to only cover the above-referenced governmental interests.

Finally, the purposes of the law are manifest in its location within the West Virginia Code. Section 18-2-25d follows after (a) the athletic safety provisions (in educational settings) governing

---

[18] While it should be obvious that contact sports raise safety issues, sports literature which long preceded this law has well documented the safety risks of contact sports. *See* Carlson Decl. at ¶¶ 22-78, ECF No. 285-5.
[19] *See* Ex. G, originating H.B. 3293, amending §18-25-5c.

concussions and head injuries (18-2-25a); (b) the emergency action plans for responding to injuries (18-2-25b); and (c) the requirement for defibrillators at certain events (18-2-25c). The government need not "offer evidence of [a] localized" impact, "but rather can rely upon the experiences of other communities[.]" *Ways*, 331 F.3d at 599 (citing *Farkas v. Miller,* 151 F.3d 900, 903 (1998)). That principle certainly applies here based on the history of the issue leading up to the passage of this law. *See* State's MSJ Memo. at 1-4, ECF No. 287. Thus, there can be little doubt that these are genuine governmental concerns, not some post hoc justifications made up 100 years post-enactment, as was the case in *Virginia.*

### 3. H.B. 3293 is not the product of animus.

Plaintiff makes the scurrilous and unsubstantiated accusation that the State of enacted the statute based on "fear and disapproval of transgender women" (Pl. MSJ Memo. at 33, ECF No. 291) and "fear, discomfort or moral disapproval." *Id.* at 34. Plaintiff's "evidence" for this is isolated hearsay and double hearsay comments allegedly made by a few legislators (Pl MSJ Memo. at 8, ECF No. 291), which Plaintiff mischaracterizes as "legislative history." This is wrong and these comments may not be considered in evaluating the validity of the governmental interest.

If a court, whether state or federal, seeks to discern legislative intent outside the statute itself, it must follow the interpretive laws of the subject state. "Statutory interpretation is a question of law." *Minn. Supply Co. v. Raymond Corp.,* 472 F.3d 524, 537 (8th Cir.2006). This Court adopted the West Virginia Supreme Court of Appeals' holding that "a statute must be construed in accordance with the import of its language." *Hinkle v. Matthews*, 337 F. Supp. 3d 674, 681 (S.D.W. Va. 2018), *aff'd sub nom. Hinkle v. Safe-Guard Prod. Int'l, LLC*, 839 F. App'x 770 (4th Cir. 2020) (citing Syl. Pt. 4, Osborne v. United States, 211 W. Va. 667, 567 S.E.2d 677 (2002)). *See also, Fargo Women's Health Org. v. Schafer,* 18 F.3d 526, 530–31 (1994) (applying North

Dakota principles of statutory interpretation in considering the constitutionality of a North Dakota law).

Under West Virginia law, legislators' statements cannot be legislative history. The West Virginia Supreme Court of Appeals has rejected them for any evidentiary purposes. *Phillips v. Larry's Drive-In Pharmacy, Inc*., 220 W. Va. 484, 489, 647 S.E.2d 920 (2007). In that case, the court rejected them as "[un]corroborated by *the legislative history* because the Legislature failed to preserve any *record of the committee meetings* to which the affidavits refer." *Id*. (emphasis added). In other words, committee reports, not legislator statements—even sworn statements—are not legislative history. Moreover, "courts should not be placed in the position of passing upon the credibility of legislators and ex-legislators. A court should also recognize that 'the understanding of one or a few members of the Legislature is not necessarily determinative of legislative intent.'" *Id*. Further, "no guarantee can issue that those who supported [a legislator's] proposal shared his view of its compass." *Id*. (cleaned up).

Plaintiff's tendered legislator-statements are even more tenuous than those in *Phillips* because they are not even sworn statements. They are simply hearsay statements, hearsay Facebook posts and thumbs up clicks. Plaintiff did not even attempt to depose those individuals to learn, under oath, the validity and meaning of such unreliable social media posts. Even if individual legislators' statements were relevant, only a few legislators out of the 134 legislators made any arguably objectionable statements. That can hardly represent the sense of the entire lawmaking body. Indeed, the Fourth Circuit reversed the district court because it admitted "over the appellants' objections, the testimony of present and past members of the General Assembly as to legislative motive." *S.C. Educ. Ass'n v. Campbell*, 883 F.2d 1251, 1260 (4th Cir. 1989). This Court should reject Plaintiff's proffered statements.

Plaintiff also incorrectly claims that the law "targets" transgender girls.  It does not.  It does exactly what it says it does—it targets fairness in competitive girls' sports and girls' safety in contact sports.  The word "transgender" or any derivative thereof does not appear in either the original bill or the bill as adopted.  While a few legislators did use that terminology as a shorthand reference, H.B. 3293 does not.  Plaintiff's ongoing efforts to twist the intent and wording of the statute are misleading.

Moreover, the Legislature did not "target" transgender girls or respond out of a "fear of" or "disapproval of transgender people."  The Legislature did not, for example, disapprove of their lifestyle, require them to dress according to their natal sex stereotype, require that they use their birth names in school or their natal sex pronouns, prohibit them from participating in any sports at all, or segregate them from other students in the classroom or elsewhere.  To the contrary, there is absolutely no suggestion in any laws, rules, regulations, legislative pronouncements, or otherwise that they are to be treated with anything other than respect and courtesy, and there is nothing in the history of H.B. 3293 to indicate otherwise.  Nor is there anything in the entire record that anyone in B.P.J.'s school or in the State has treated B.P.J. with anything other than the utmost respect.  In fact, B.P.J. and family have been happy with all interactions with B.P.J.'s school officials.  *See* Brief of Defendant Harrison County BOE and Dora Stetler at 2-3, ECF No. 281. Instead, the Legislature targeted the referenced important interests and regulated team eligibility appropriately.

### 4.  H.B. 3293 is substantially related to the governmental interests.

Section 25d protects the State's important interests based on the well-known "innate physical differences between the sexes, rather than on generalizations that are 'archaic' or attitudes

of romantic paternalism." *Clark I*, 695 F.2d at 1130 (cleaned up) (*quoting Petrie v. Ill. High Sch. Ass'n*, 394 N.E.2d 855, 862 (1979)). *See generally* State's MSJ Memo. at 13-17, ECF No. 287.

### a. The Save Women's Sports Act Protects Equal Athletic Opportunities for Female Athletes.

Section 25d is designed to be, and is, substantially related to the important goal of ensuring equal opportunities for females in sports. As expressed by Plaintiff's proffered expert, Joshua Safer, "gender identity itself is not a useful indicator of athletic performance." Ex. F, Safer Dep. at 167:22-24 to 168:1, ECF No. 285-6. This is because the record shows that males notably outperform females in competitive sports such as track and field and other non-contact sports. It is an established physiological fact recognized by numerous courts, shown by performance data, and explained by well-known researchers. *See, e.g., Clark*, 695 F.2d at 1131 (noting that rule excluding boys from girls' team "is simply recognizing the physiological fact that males would have an undue advantage competing against women," and would diminish opportunities for females) and W. Va. Resp. at Ex. I, ECF No. 49.

The advantage starts before puberty. *See supra* at p.11. Males have an initial testosterone boost after birth, with a 500% initial advantage over females. Brown Decl. at ¶68, ECF No.285-7. Indeed, "[r]esearch shows that sex-based discrepancies in lean muscle mass begin to be established from infancy, and persist through childhood to adolescence." Carlson Decl. at ¶49, ECF No.285-5 (citing studies). Actual data from extensive international studies show that prepubertal biological boys consistently outperform girls in jumping, running, and upper body strength events, sometimes in massive degrees. Brown Decl. at ¶¶ 71-109, ECF No. 285-7. *See also, generally,* State's MSJ Memo. at 13-17, ECF No. 287.

Plaintiff's experts have claimed that this athletic advantage can be eliminated via puberty blockers and hormone treatments. But there is no performance data to support this assertion.[20] In fact, the opposite is true. While testosterone suppression may reduce male advantages, the existing studies "report that testosterone suppression for a full year (and in some cases much longer) does not come close to eliminating male advantages in strength (hand grip, leg strength, and arm strength) or running speed." Brown Decl. at ¶122, ECF No. 285-7; *see generally id*. at ¶¶122-174 and State's MSJ Memo. at 13-17, ECF No. 287.

Moreover, as the Supreme Court has made clear in applying intermediate scrutiny, the fact that athletic opportunities might be equalized through other means or by other measures is of no constitutional consequence. *Nguyen*, 533 U.S. at 70. Put another way, the existence of even "wiser alternatives than the one chosen does not serve to invalidate the policy [of excluding males from female sports] since it is substantially related to the goal" of providing fair and equal opportunities for females to participate in athletics. *Clark I*, 695 F.2d at 1132. Demanding that the statute provide an exact solution as to every plaintiff that brings an as-applied challenge would effectively disregard intermediate scrutiny by improperly demanding a perfect fit between the sex-based classification and the relevant government interest. Intermediate scrutiny requires that the "fit between the challenged regulation and the asserted objective be reasonable, not perfect." *United States v. Staten*, 666 F.3d 154, 162 (4th Cir. 2011) (emphasis added).

Thus, the actual evidence shows that the Save Women's Sports Act's requirement that only biological females may participate on female teams is based on science, and that it is substantially related to the important governmental objective of ensuring equal athletic opportunities for females.

---

[20] The same is true for Plaintiff's suggestion that the wide-ranging prepubertal male performance advantages are the result of "social factors." See Pl. MSJ Memo. at 28, fn. 11, ECF 291.

### b.  The Save Women's Sports Act Protects Female Athlete's Safety.

A second governmental interest supporting the Save Women's Sports Act is the fundamental interest in the safety of girls and women in contact sports.  That interest is implicit in the Title IX sports regulations, is recognized by World Rugby and UK Sports (*see* Carlson Decl. at 1-3, ECF No. 285-5) and here in West Virginia by SSAC.  And it is self-evident in the very nature of contact sports.  *See generally* State's MSJ Memo. at 17-21, ECF No. 287, and *generally* Carlson Decl. (ECF No. 285-5)

The biological sex classification is substantially related to the purpose of safety in female sports, and science supports that classification.  Expert Dr. Chad Carlson is a sports medical doctor with extensive qualifications.  *See, generally, id.*  He fully documents the science behind what is "self-evident to most people familiar with sports injuries that if men and women were to participate together in competitive contact sports, there would be higher rates of injury in women." *Id.* at ¶24. The West Virginia Legislature is just as familiar with this common-sense observation as anyone observing men's and women's contact sports.  *See Billups v. City of Charleston*, S.C., 961 F.3d 673, 685 (4th Cir. 2020) (governments can use "common sense" to establish a governmental interest).

Some assert that "hormonal manipulation of a male athlete can feminize the athlete enough that he is comparable with females" for these purposes (Carleson at ¶80), but "none of the relevant transgender eligibility policies [of sports organizations]. . . requires any demonstration that it has actually achieved that effect[.]" *Id.* at ¶81.  "In fact, the relevant evidence strongly indicates that no amount of testosterone suppression can eliminate male physiological advantages relevant to performance and safety". *Id.* at ¶83, and *generally* at ¶¶79-97.

The only organizations that actually have examined the safety of biological women in the debate over transfemale athletes in female sports have determined that it is not safe to have transfemales on female designated teams. *See id.* at ¶¶94 and 86. Moreover, Plaintiff has no studies or sports medical experts that support such a claim. Indeed, Plaintiff's expert Safer acknowledges that he does not have a view on "whether it is reasonable to exclude a natal male with a transgender identity from participation" in various girls high school contact sports. Safer Dep. at 173-175, ECF No. 285-6.

In any event, governments need not await injury before acting, particularly when injury can be anticipated and prevented. This issue has been present in sports for over four decades, but now that the number of children and youths identifying as transgender has shot up to over 100 times historical rates (Carlson Decl. at 59, ECF No. 285-5), the Legislature can reasonably act now—the Constitution does not require waiting for more data or actual injuries to West Virginia student-athletes. As Dr. Carlson explains: "policymakers have an important and pressing duty" to act proactively to "establish [safety] policies governing participation of biological males in female athletics[.]" *Id.* at 59. That is exactly what West Virginia has done, using a classification that is "substantially related to the achievement of those objectives." *Virginia*, 518 U.S. at 524. Accordingly, Section 25d meets the constitutional requirements under the Equal Protection Clause.

## C.  Plaintiff's As-Applied Challenge Fails

"The Equal Protection Clause generally requires the government to treat similarly situated people alike." *Roubideaux v.*, 570 F.3d at 974 (cleaned up). "[I]t is necessary [for the Plaintiff] to "precisely define" the claim in order to determine what government action is being challenged." *Id.* Further, as-applied challenges based on the equal protection clause can succeed only if the law violates the Constitution "in discrete and well-defined instances." *Gonzales v. Carhart*, 550 U.S.

124, 167 (2007).  The Plaintiff has not provided a precisely or well-defined description of the scope of the "as-applied" challenge.  While Plaintiff has not fulfilled this obligation, Plaintiff's brief suggests that the "well defined instance" here is that Plaintiff is a biological male with particular characteristics, who and wishes to participate on girls non-contact sports teams.  To enumerate such relevant characteristics, Plaintiff:

1.      Is 11 years old;

2.      Identifies as a female;

3.      Has "presented" as a female by wearing stereotypical female clothes and stereotypical underclothes (i.e. a bra), preferring stereotypical hairstyles (i.e. long) and preferring a stereotypical female color (i.e. pink) (see *supra* at p3);

4.      Has ostensibly been diagnosed with gender dysphoria;

5.      Has received puberty blockers starting at the beginning of puberty;

6.      Intends to have "bottom surgery" as soon as allowed;

7.      Intends to use cross-sex hormones as soon as allowed; and

8.      Has performed at a pace that will not displace any females.

Characteristics nos. 1-3 are purely stereotypical gender characteristics and do nothing to eliminate the competitive performance advantages biological boys have over biological girls. Simply identifying as a female will not suddenly change that advantage.  Plaintiff's mother Heather Jackson, takes the extreme position that any male should be permitted to participate on a girls' team as long as the athlete claims to identify as female.  Jackson Dep. 136:14-137:16, ECF No. 285-2; However, nearly all athletic organizations have rejected this position and do not allow biological males to participate on female teams just because they "identify" as females.  In

addition, wearing stereotypical female clothing and hairstyles should never be the qualifier for joining a female team.  Therefore, characteristics nos. 1-3 cannot satisfy an as-applied challenge.

Characteristic no. 4—a psychological diagnosis that the patient is distressed that he or she identifies differently than his or her natal sex—also does not eliminate those advantages, even combined with characteristics 1-3.

As for characteristic no. 5—pre-pubertal boys, in fact, can and do present a performance threat to girls competitively even without going through puberty.  *See* Brown Decl. ¶¶68, 71-10, ECF No. 285-7 and  *supra* at pp. 11 and 23.   And while puberty blockers may affect the future performance of a person so treated, Plaintiff has not presented any data supporting that notion, because there is no such data.

Similarly, "bottom surgery" and hormones (characteristics nos. 6 & 7) cannot prevent or eliminate the male advantage.   Despite Plaintiff's theoretical claims that only circulating testosterone affects athletic performance, Plaintiff has presented no actual data to support that claim.

Finally, Plaintiff claims that since B.P.J.'s performance did not displace biological girls, the law should not stop Plaintiff from competing on girls' teams.  This is flawed.  First, if the crux of an as-applied challenge here is whether Plaintiff's performance was not fast enough to pose a competitive threat keeping biological girls off the team, then the law would need to also allow any biological male on any girls' team—as long as he shows that he is not a competitive threat to biological girls making the team.  Otherwise, the law would discriminate against boys based solely on their gender identity, which is exactly what the Plaintiff claims the law is doing now.

Also, this performance seems inconsistent with the core fundament of "competitive" sports, i.e. to compete against others in pursuit of victory.  Indeed, both B.P.J. and B.P.J.'s mother have

expressly stated that B.P.J. wishes to compete and win.  Am . Compl. ¶ 1 (ECF 64); B.P.J Dep. at 77:3-19, Ex. A. ; Jackson Dep. at 133-134, ECF No. 285-2.

But assuming that all these characteristics together are the Plaintiff's precisely or well-defined description of the scope of the "as-applied" challenge, Plaintiff fails because the most important element, characteristic no. 8, does not match the Plaintiff.  While supposedly "[n]o other Bridgeport Middle School student was displaced by B.P.J.'s participation on the girls' cross-country team" (Defendant Harrison BOE – Plaintiff B.P.J. Stipulation at ¶6, ECF No. 252), B.P.J., did, in fact, displace other female athletes, including Bridgeport Middle School girls.  In the October 1, 2021 Ritchie County meet, B.P.J. beat three girl classmates, displacing them from higher finishing positions and higher rankings.  Stutler Dep. at 183-184, Ex. F, and Ex. 40 thereto.  B.P.J. similarly displaced at least 27 other athletes there and another 15 at the Mountain Hollar MS Invitational, some of whom were likely biological girls from other schools. Plaintiff's  SUF at ¶¶ 122-123, ECF No. 290.  Thus, BPJ fails even under the final categorization.

So, even as-applied to this "very specific instance," the law is substantially related to the governmental interest of protecting biological girls from unfair competition.

## D.  Plaintiff Is Not Entitled To An Injunction Because The Balance Of The Hardships Weighs Against The Plaintiff.

Plaintiff speaks only of B.P.J.'s sadness if not allowed on a girls' team.  Yet this is not a one sided equation.  Biological female athletes have been upset, embittered, and emotionally devastated because they have been forced to compete against biological males identifying as females.  For example, the University of Pennsylvania allowed Lia Thomas, a biological male swimmer now identifying as female after competing for years as a male, to compete on its female swim team.  Biological young women objected in strong terms regarding fair competition and the personal impact of these events, saying: "They're just proving, once again, that they don't actually

care about their women athletes[.]"; "They say that they care and that they're here for our emotions, but why do we have to be gracious losers? . . . Who are you to tell me that I shouldn't want to win because I do want to win.  I'm swimming.  I'm dedicating more than 20 hours a week to the sport."; and "Obviously, I want to win.  You can't just tell me I should be happy with second place.  I'm not."[21]   Other biological girls also expressed their fairness concerns over this issue.[22]  Neither the State nor the Court can ignore the need for fairness to biological females.  The Court should deny any permanent injunction.

## CONCLUSION

The State of West Virginia respectfully asks that this Court deny Plaintiff's Motion for Summary Judgment and the various forms of relief Plaintiff requests therewith.

Respectfully submitted,

PATRICK MORRISEY
  *West Virginia Attorney General*

/s/ *Curtis R. A. Capehart*
Douglas P. Buffington II (WV Bar # 8157)
  *Chief Deputy Attorney General*
Curtis R.A. Capehart (WV Bar # 9876)
  *Deputy Attorney General*
David C. Tryon (WV Bar #14145)
  *Deputy Solicitor General*
OFFICE OF THE WEST VIRGINIA ATTORNEY GENERAL
State Capitol Complex
1900 Kanawha Blvd. E, Building 1, Room E-26
Charleston, WV 25305-0220
Telephone: (304) 558-2021
Facsimile: (304) 558-0140
Email:  David.C.Tryon@wvago.gov

---

[21] Paulina Dedaj, *Penn swimmer slams school's handling of Lia Thomas saga: "They don't actually care about women at all,"* FOX NEWS: SPORTS (Jan. 28, 2022, 11:10 AM), https://www.foxnews.com/sports/lia-thomas-penn-swimming-teammate-interview.
[22] *See* Haley Tanne, *Who will stand up for me and other women being beaten by biological males like Lia Thomas?*, FOX NEWS: OPINION (Mar. 23, 2022, 2:00 AM), https://www.foxnews.com/opinion/women-sports-biological-males-lia-thomas.

*Counsel for Plaintiff, STATE OF WEST VIRGINIA*

<u>DATE: May 12, 2022</u>

**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA
CHARLESTON DIVISION**

**B. P. J., by her next friend and mother,
HEATHER JACKSON,**

> **Plaintiff,**

**v.**

**WEST VIRGINIA STATE BOARD OF
EDUCATION, HARRISON COUNTY
BOARD OF EDUCATION, WEST VIRGINIA
SECONDARY SCHOOL ACTIVITIES
COMMISSION, W. CLAYTON BURCH, in
his official Capacity as State Superintendent,
DORA STUTLER, in her official capacity as
Harrison County Superintendent, and THE
STATE OF WEST VIRGINIA,**

> **Defendants.**

**and LAINEY ARMISTEAD,**

> **Intervenor Defendant.**

**CIVIL ACTION NO. 2:21-cv-00316
Judge Joseph R. Goodwin**

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that, on this 12th day of May, 2022, I electronically filed the foregoing with the Clerk of Court and all parties using the CM/ECF System.

*/s/ Curtis R. A. Capehart*
Curtis R. A. Capehart

30