# EXHIBIT A

1                IN THE UNITED STATES DISTRICT COURT

2            FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA

3                       CHARLESTON DIVISION

4                      * * * * * * * *

5   B.P.J., by her next friend and    *

6   Mother, HEATHER JACKSON,          *

7       Plaintiff                     *  Case No.

8       vs.                           *  2:21-CV-00316

9   WEST VIRGINIA STATE BOARD OF      *

10  EDUCATION, HARRISON COUNTY        *

11  BOARD OF EDUCATION, WEST          *

12  VIRGINIA SECONDARY SCHOOL         *

13  ACTIVITIES COMMISSION, W.         *

14  CLAYTON BURCH in his official     *

15  Capacity as State Superintendent,*  VIDEOTAPED

16  DORA STUTLER in her official      *  VIDEOCONFERENCE

17  Capacity as Harrison County       *  DEPOSITION

18  Superintendent, PATRICK MORRISEY  *      OF

19  In his official capacity as       *  BPJ

20  Attorney General, and THE STATE   *  January 21, 2022

21  OF WEST VIRGINIA,                 *

22      Defendants                    *

23            Any reproduction of this transcript
               is prohibited without authorization
24                  by the certifying agency.

1       VIDEOTAPED VIDEOCONFERENCE DEPOSITION

2                        OF

3   BPJ, taken on behalf of the Defendant, State of West

4   Virginia herein, pursuant to the Rules of Civil

5   Procedure, taken before me, the undersigned, Nicole

6   Montagano, a Court Reporter and Notary Public in and for

7   the State of West Virginia, on Friday, January 21, 2022,

8   beginning at 10:09 a.m.

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

```
 1                    A P P E A R A N C E S

 2

 3    JOSHUA BLOCK, ESQUIRE

 4    American Civil Liberties Union Foundation

 5    125 Broad Street

 6    New York, NY  10004

 7    COUNSEL FOR PLAINTIFF

 8

 9    LOREE STARK, ESQUIRE

10    ACLU of West Virginia

11    P.O. Box 3952

12    Charleston, WV  25339

13        COUNSEL FOR PLAINTIFF

14

15    KATHLEEN R. HARTNETT, ESQUIRE

16    ANDREW BARR, ESQUIRE

17    JULIE VEROFF, ESQUIRE

18    ZOE HELSTROM, ESQUIRE

19    Cooley, LLP

20    3 Embarcadero Center

21    20th Floor

22    San Francisco, CA  94111-4004

23        COUNSELS FOR PLAINTIFF

24
```

```
 1              A P P E A R A N C E S  (cont'd)

 2

 3    SRUTI SWAMINATHAN, ESQUIRE

 4    Lambda Legal

 5    120 Wall Street

 6    19th Floor

 7    New York, NY  10005-3919

 8         COUNSEL FOR PLAINTIFF

 9

10    DAVID TRYON, ESQUIRE

11    CURTIS R.A. CAPEHART, ESQUIRE

12    State Capitol Complex

13    Building 1, Room E-26

14    Charleston, WV  25305

15         COUNSEL FOR STATE OF WEST VIRGINIA

16

17    ROBERTA F. GREEN, ESQUIRE

18    KIMBERLY M. BANDY, ESQUIRE

19    SHANNON ROGERS, ESQUIRE

20    Shuman McCuskey Slicer, PLLC

21    1411 Virginia Street East, Suite 200

22    Charleston, WV  25301

23         COUNSEL FOR WEST VIRGINIA SECONDARY SCHOOL

24         ACTIVITIES COMMISSION
```

```
 1              A P P E A R A N C E S  (cont'd)

 2

 3   SUSAN DENIKER, ESQUIRE

 4   Steptoe & Johnson

 5   400 White Oaks Boulevard

 6   Bridgeport, WV  26330

 7        COUNSEL FOR HARRISON COUNTY BOARD OF EDUCATION and

 8        HARRISON COUNTY SUPERINTENDENT DORA STUTLER

 9

10   KELLY C. MORGAN, ESQUIRE

11   KRISTEN V. HAMMOND, ESQUIRE

12   Bailey Wyant

13   500 Virginia Street East

14   Suite 600

15   Charleston, WV  25301

16        COUNSEL FOR WEST VIRGINIA BOARD OF EDUCATION and

17        SUPERINTENDANT W. CLAYTON BURCH

18

19   TIMOTHY D. DUCAR, ESQUIRE

20   Law Office of Timothy D. Ducar

21   7430 East Butherus Drive

22   Suite E

23   Scottsdale, AZ  85260

24        COUNSEL FOR INTERVENOR, LAINEY ARMISTEAD
```

I N D E X

1

2

3    DISCUSSION AMONG PARTIES                        11  -   15

4    WITNESS: BPJ

5    EXAMINATION

6        By Attorney Capehart                        15  - 122

7    EXAMINATION

8        By Attorney Rogers                         122  - 123

9    EXAMINATION

10       By Attorney Deniker                        123  - 142

11   EXAMINATION

12       By Attorney Hammond                        143  - 144

13   EXAMINATION

14       By Attorney Ducar                          144  - 155

15   DISCUSSION AMONG PARTIES                       155  - 157

16   CERTIFICATE                                          158

17

18

19

20

21

22

23

24

<u>EXHIBIT PAGE</u>

| NUMBER | DESCRIPTION | PAGE IDENTIFIED |
|---|---|---|
| Exhibit 1 | Davis Medical Records | --* |
| Exhibit 1R | Davis Medical Records | --* |
| Exhibit 2 | Davis Medical Records | --* |
| Exhibit 3 | WVU Medical Records | --* |
| Exhibit 4 | UPMC Children's Medical Records | --* |
| Exhibit 5 | UPMC Children's Medical Records | --* |
| Exhibit 6 | UPMC Children's Medical Records | --* |
| Exhibit 7 | UPMC Children's Medical Records | |
| Exhibit 8 | UPMC Children's Medical Records | --* |
| Exhibit 9 | UPMC Children's Medical Records | --* |
| Exhibit 11A | Progress Notes | --* |
| Exhibit 11B | Progress Notes | --* |
| Exhibit 11C | Progress Notes | --* |
| Exhibit 11D | Progress Notes | --* |

```
1                          EXHIBIT PAGE

2

3                                              PAGE

4    NUMBER        DESCRIPTION                  IDENTIFIED

5    Exhibit 12    UPMC Children's Medical

6                  Records                          --*

7    Exhibit 13    UMPC Children's Medical

8                  Records                          --*

9    Exhibit 14    WVU Medical Records             --*

10   Exhibit 15    WVU Medical Records             --*

11   Exhibit 16    WVU Medical Records             --*

12   Exhibit 17    Gender Support Plan             --*

13   Exhibit 18    Preferred Name Request Form     --*

14   Exhibit 19    Gender Support Plan             --*

15   Exhibit 20    Student Information             --*

16   Exhibit 20R   Student Information             --*

17   Exhibit 21    Screening Results              --*

18   Exhibit 21R   Screening Results              --*

19   Exhibit 22    Birth Certificate              --*

20   Exhibit 22R   Birth Certificate              --*

21   Exhibit 23    Heart Walk Article             --

22   Exhibit 23R   Heart Walk Article             --

23   Exhibit 24    Photo                          --

24   Exhibit 24R   Photo                          --
```

```
 1                        EXHIBIT PAGE

 2

 3                                              PAGE

 4    NUMBER        DESCRIPTION              IDENTIFIED

 5    Exhibit 25  WV Record                     --

 6    Exhibit 26  Photo of Mom and BPJ          --

 7    Exhibit 27  Article                       --

 8    Exhibit 28  Article                       --

 9    Exhibit 29  Lambda Legal Article          --

10    Exhibit 30  Declaration of Heather

11                Jackson                       --

12    Exhibit 31  Declaration of BJP            --

13    Exhibit 32  First Amended Complaint       --

14    Exhibit 33  Standards of Care             --

15    Exhibit 34  House Bill 3293               --

16

17

18

19

20

21

22

23    * CONFIDENTIAL EXHIBITS

24
```

```
 1                        OBJECTION PAGE
 2
 3   ATTORNEY                                    PAGE
 4   Hartnett      19, 23, 24, 26, 26, 27, 27, 29, 29, 30, 30,
 5   30, 31, 31, 31, 32, 32, 33, 33, 34, 34, 34, 35, 35, 36,
 6   36, 37, 37, 38, 38, 39, 41, 41, 42, 43, 43, 44, 44, 45,
 7   46, 48, 49, 50, 51, 52, 52, 53, 54, 54, 55, 57, 59, 60,
 8   61, 62, 62, 63, 63, 66, 67, 68, 68, 69, 70, 70, 70, 71,
 9   72, 72, 73, 74, 74, 75, 76, 76, 78, 79, 80, 81, 81, 82,
10   84, 85, 85, 85, 86, 87, 87, 88, 88, 89, 89, 90, 90, 94,
11   94, 95, 96, 97, 97, 98, 99, 100, 100, 101, 101, 102,
12   103, 104, 104, 107, 108, 108, 109, 109, 110, 110, 111,
13   112, 113, 113, 114, 116, 117, 118, 118, 119, 120, 120,
14   121, 121, 128, 133, 135, 137, 139, 140, 142, 144, 146,
15   146, 147, 148, 150, 150, 150, 151, 151, 151, 153, 153,
16   154, 155, 155, 156
17
18
19
20
21
22
23
24
```

```
 1              S T I P U L A T I O N

 2    --------------------------------------------------------

 3    (It is hereby stipulated and agreed by and between

 4    counsel for the respective parties that reading,

 5    signing, sealing, certification and filing are not

 6    waived.)

 7    --------------------------------------------------------

 8              VIDEOGRAPHER:  We're now on the record.

 9    My name is Jacob Stock.  I'm a Certified Legal Video

10    Specialist employed by Sargent's Court Reporting

11    Services, which is located at 210 Main Street,

12    Johnstown, PA 15901.  The date today is January 21st,

13    2022.  The current time reads 10:09 a.m., Eastern

14    Standard Time.  This deposition is being taken remotely

15    by Zoom conference.  The caption of the case is in the

16    United States District Court for the Southern District

17    of West Virginia, Charleston Division, BPJ, by her Next

18    Friend and Mother, Heather Jackson versus West Virginia

19    State Board of Education, et al.  Civil Action Number

20    2:21-CV-00316.  The name of the witness is BPJ.

21              Will the attorneys present state their

22    names and the parties they represent?

23              ATTORNEY CAPEHART:  This is Curtis

24    Capehart for the State of West Virginia.  And with me is
```

1   my colleague, David Tryon.

2                    ATTORNEY HARTNETT:   Good morning.   This

3   is Kathleen Hartnett from Cooley, LLP, for Plaintiff

4   BPJ, who is the witness today.   And the other

5   Plaintiff's Counsel could introduce themselves, first

6   with the others from Cooley and then we could go to

7   ACLU, ACLU of West Virginia and Lambda.

8                    ATTORNEY BARR:   Good morning.   This is

9   Andrew Barr from Cooley, LLP, on behalf of the

10  Plaintiff.

11                   ATTORNEY VEROFF:   Good morning.   This is

12  Julie Veroff from Cooley, LLP, on behalf of the

13  Plaintiff.

14                   ATTORNEY HELSTROM:   Good morning.   This

15  is Zoe Helstrom from Cooley, LLP, on behalf of the

16  Plaintiff.

17                   ATTORNEY BLOCK:   Good morning.   This is

18  Josh Block from ACLU on behalf of Plaintiff.

19                   ATTORNEY STARK:   Good morning.   This is

20  Loree Stark with the ACLU of West Virginia on behalf of

21  the Plaintiff.

22                   ATTORNEY SWAMINATHAN:   Good morning.

23  This is Sruti Swaminathan from Lambda Legal on behalf of

24  Plaintiff.

1          ATTORNEY DENIKER:  Good morning.  I'm
2    Susan Deniker with Steptoe and Johnson, counsel for
3    Defendants Harrison County Board of Education and
4    Harrison County Superintendant Dora Stutler.
5          ATTORNEY GREEN:  Good morning.  This is
6    Roberta Green on behalf of West Virginia Secondary
7    School Activities Commission, and I will let me
8    colleagues introduce.
9          ATTORNEY BANDY:  Hello.  This is Kimberly
10   Bandy also on behalf of West Virginia Secondary School
11   Activities Commission.
12         ATTORNEY HAMMOND:  Good morning.  This is
13   Kristen Hammond.  And Kelly Morgan is also on here with
14   Bailey and Wyant and we represent the West Virginia
15   State Board of Education and Superintendant Burch.
16         ATTORNEY DUCAR:  Good morning.  Timothy
17   Ducar here on behalf of the Intervenor, Lainey
18   Armistead.
19         ATTORNEY HOLCOMB:  Good morning.
20   Christiana Holcomb with Alliance Defending Freedom on
21   behalf of the Intervenor.
22         ATTORNEY CSUTOROS:  Good morning.  This
23   Rachel Csutoros on behalf of Alliance Defending Freedom
24   on behalf of the Intervenor.

1       ATTORNEY BROWN:  And good morning.  Josh
2    Brown on behalf of the Intervenor.
3       VIDEOGRAPHER:  And if that's everybody,
4    the court reporter can swear in the witness so we can
5    begin the deposition.
6       COURT REPORTER:  Can you please raise
7    your hand, BPJ?
8                        ---
9                        BPJ,
10   CALLED AS A WITNESS IN THE FOLLOWING PROCEEDING, AND
11   HAVING FIRST BEEN DULY SWORN, TESTIFIED AND SAID AS
12   FOLLOWS:
13                       ---
14       COURT REPORTER:  Thank you.
15       ATTORNEY HARTNETT:  Before we begin this
16   morning, if it's okay with Mr. Capehart, the parties
17   were going to put on the record a couple of stipulations
18   about objections that they had reached for today's
19   proceedings.  I would just direct the record in this
20   case to the record of the deposition yesterday of
21   Heather Jackson held on January 20th, and the same
22   stipulations with respect to objections for
23   legal/medical and expert testimony with respect to
24   terminology and with respect to potentially

```
 1   mischaracterization of the evidence.  Those same
 2   stipulations would hold today.  And so for the record,
 3   the Plaintiff agrees to that.  And it would be helpful I
 4   think if the other Defendants could just assent to those
 5   stipulations for today on the record.
 6              ATTORNEY DENIKER:  This is Susan Deniker.
 7   I stipulate to that.
 8              ATTORNEY GREEN:  This is Roberta Green on
 9   behalf of WVSSAC.  We stipulate to that.
10              ATTORNEY HAMMOND:  This is Kristen
11   Hammond, and we also stipulate to that.
12              ATTORNEY DUCAR:  This is Tim Ducar.  We
13   also stipulate to that.
14              ATTORNEY CAPEHART:  And the State does as
15   well.
16              ATTORNEY CAPEHART:  Anything else,
17   Kathleen, or should I go ahead?
18              ATTORNEY HARTNETT:  Nothing here.
19              ATTORNEY CAPEHART:  All right.  Thanks
20   very much.
21                        ---
22                   EXAMINATION
23                        ---
24   BY ATTORNEY CAPEHART:
```

```
 1      Q.     Well, good morning.  Nice to finally get to meet
 2  you.  My name is Curtis Capehart, as I said just a
 3  minute ago.  I represent the State of West Virginia in
 4  this.  Now up to this point we've been referring to you
 5  by the initials as BPJ because that is the way you have
 6  been identified in the Complaint that started this
 7  lawsuit.  Now, is that okay or would you prefer that I
 8  call you something else while we're talking here today?
 9  Because initials can be a little awkward.  So if you
10  feel more comfortable with me calling you something
11  else, that's perfectly fine.  You just let me know what
12  that could be.
13      A.     You can call me B███.
14      Q.     Okay.
15             ATTORNEY HARTNETT:  If I could just say
16  for the record, not to interrupt, that we filed with the
17  BPJ initials in light of the Rules of Court, but the
18  Plaintiff Counsel has no objection to you referring to
19  her as B███ in this deposition.
20             ATTORNEY CAPEHART:  Okay.
21  BY ATTORNEY CAPEHART:
22      Q.     You are represented by counsel here today and is
23  that Kathleen, Ms. Hartnett, that was speaking just now?
24      A.     Yes.
```

1    Q.    Have you ever been involved in a lawsuit before?

2    A.    No.

3    Q.    So you've probably never been deposed before,

4    have you?

5    A.    Can you repeat the question?

6    Q.    Sure.  You haven't been deposed before then,

7    have you?

8    A.    No.

9    Q.    Okay.

10         Also if there is a time where you have trouble

11   understanding me or hearing me, just do what you just

12   did there, let me know and I'll try and speak up a

13   little bit.  We don't have the best microphone

14   placements in here, so that might be a thing as we go

15   through today.

16         So as I go through and answer --- I'm sorry, if

17   I go through and ask you questions today, I just need

18   you to try to remember to answer verbally, not just nod

19   your head or shake your head because there is a video,

20   but we need to have those verbal responses so we can

21   truly understand what your answer is.  And if you do not

22   understand a question, that's fine.  You just need to

23   say so so that I can try and put together a better

24   question or try to explain more of what I'm trying to

1   learn.  Okay?

2          Now, if you answer one of questions that I ask

3   you today, we are going to assume that you understand

4   it.  So if there is any kind of confusion, we don't want

5   to deal with any of that.  It's better you just ask me

6   and I'll try and improve my question for you.

7          Does that all make sense?

8   A.     Yes.

9   Q.     Okay.

10         Also, I want to kind of touch on a couple of

11  other things here before I get started with some

12  questioning.  Just understand that we are not here to

13  judge you.  We're just trying to learn some of the facts

14  here, things we don't know.  This lawsuit was filed

15  trying to have a West Virginia State Law declared

16  invalid under the U.S. Constitution and another Federal

17  Law referred to as Title 9.  And that's --- that's

18  pretty serious.  So we, as the lawyers for the State,

19  have an obligation to defend that law.  That means I

20  have to ask you some questions that might make all of us

21  uncomfortable a little bit, but I have an obligation to

22  try and get through these.  That's not my goal.  I'm

23  just trying to find out information.  Okay?

24         Now, also if I ask you a question that makes

```
 1   you very uncomfortable, tell me, and I can try, if I
 2   can, to rephrase it in a way to make you not
 3   uncomfortable.  I can't say that I won't ask those kinds
 4   of questions because there's some things that we have to
 5   ask questions about, some things that we need to get
 6   your testimony on, but I'm not trying to make you feel
 7   bad or upset you in any way.
 8           Okay?
 9    A.    Okay.
10           ATTORNEY HARTNETT:  I would just object
11   to the extent you're seeking the witness to agree with
12   your description of your role.  But on the other hand, I
13   appreciate you letting her know that she can let you
14   know if she has an upsetting question.
15   BY ATTORNEY CAPEHART:
16    Q.    Also, I'm just going to --- a word about
17   objections.  Sometimes when we go through these, your
18   lawyer might make an objection.  I may ask a question,
19   Kathleen may same objection, something else.  Now, if
20   that happens, the lawyers may have to have a
21   conversation.  It's unlikely, but the lawyers may have
22   to talk about something, at which point you wouldn't be
23   able to hear us or see us.  We don't think that's going
24   to happen, but we at least want to let you know.
```

```
 1              Also, generally, if your lawyer says objection,
 2    you can go ahead and answer the question unless your
 3    lawyer directs you not to.
 4        A.    Okay.
 5        Q.    Oh, and one last thing.  If you need to take a
 6    break for any reason, go to the bathroom, get more
 7    water, something of that nature, just let me know and we
 8    will take a break as soon as we can.  We just can't take
 9    a break if I've asked a question and we are waiting for
10    you to finish your answer.
11              Does that make sense?
12        A.    Yes.
13        Q.    Okay.  Great.
14              We will try and get through this as quickly as
15    we can.  I'm sure you have a lot of other things that
16    you would rather do on a Friday.  So with that, let me
17    ask you, if you can, to please state your name for the
18    record.
19        A.    First and last?
20        Q.    Yes, please.
21        A.    B████ P██████ J████████.
22        Q.    Great.  What is your address?
23        A.    Could you repeat the question?
24        Q.    Sure.  What is your home address?
```

1    A.    I'm not sure.

2    Q.    Okay.

3          And where do you go to school?

4    A.    Bridgeport Middle School.

5    Q.    Do you remember signing a document called a

6    Declaration back when this lawsuit was first getting

7    started?

8    A.    I can't remember.

9    Q.    Okay.

10         If you could look at --- it's marked Exhibit

11   31.

12             ATTORNEY CAPEHART:  Court Reporter, if

13   you could pull up that exhibit also.

14   BY ATTORNEY CAPEHART:

15   Q.    So do you have Exhibit 31 in front of you?

16   A.    Yes.

17   Q.    It's also up on the screen, just to make sure

18   that we're all looking at this document here?

19             MS. JACKSON:  This is this.

20   BY ATTORNEY CAPEHART:

21   Q.    There's on the screen electronic version of it,

22   too.

23             ATTORNEY HARTNETT:  For the record, we

24   have copies of the exhibits face down in the room with

1    the witness, and the witness may feel free to pick up

2    the exhibit once it's referred to by the questioning

3    counsel and look at the hard copy.

4    BY ATTORNEY CAPEHART:

5        Q.    Okay.

6              Looking at this, now if you look at the last

7    page, I believe it is number page four, it has the

8    initials BPJ there and then some handwritten

9    signature-like initials of BPJ.  Looking at those, do

10   you recognize those?

11       A.    Yes.

12       Q.    And that's your handwriting, I guess?

13       A.    Yes.

14       Q.    Okay.  Thanks very much.

15             Looking at this, does it jog your memory a

16   little bit that this is something you had to deal with

17   back when the lawsuit was started?

18       A.    Not really.

19       Q.    Okay.

20             And do you remember signing it?

21       A.    A little bit.

22       Q.    I know it's been a while, so I thought you might

23   want to go and look at a couple of these things to

24   remember what was in here.

```
 1                    MS. JACKSON:  Do you want to read through

 2    it?

 3                    THE WITNESS:  No.

 4    BY ATTORNEY CAPEHART:

 5      Q.    If you want to take a minute, you can kind of

 6    read all through it.  You just go ahead and let us know

 7    when you've had a chance to do that.

 8                    MS. JACKSON:  You need to tell them when

 9    you're done.

10                    THE WITNESS:  Oh, I'm done.

11    BY ATTORNEY CAPEHART:

12      Q.    Thank you.

13            Now, since you signed this back in May of last

14    year, obviously it's been quite a while since May.  And

15    is anything --- well, let me rephrase.  Back at that

16    time, if you look on page two, this was --- in

17    paragraph 11 you were talking about trying out for

18    cross-country and track.  And obviously, with the

19    passage of time, you tried out for the track team,

20    right, cross-country track team.

21                    ATTORNEY HARTNETT:  Objection, form.

22                    THE WITNESS:  I tried out cross-country.

23    Track is not a sport that was available at that time.

24    BY ATTORNEY CAPEHART:
```

1    Q.    Is track a spring sport?

2    A.    Yes.

3    Q.    Okay.

4          So you tried out for cross-country.  Did you

5    make the cross-country team?

6    A.    Yes.

7    Q.    Back on the bottom of the first page, under the

8    paragraph number four, it describes that you when you

9    were younger would play with your mom's clothes, liked

10   paint and girly items.  Whenever you said girly items

11   there with the quotations around it, what kind of items

12   are those?

13   A.    Items that had maybe unicorns on it, sparkles,

14   anything that would stick out in general that was maybe

15   a mystical creature that was like a unicorn maybe.  I

16   had some stuff that was pandas because I really like

17   pandas, and they were always multi-colored.  And that's

18   about it.

19   Q.    Okay.

20         I'm going to set that off to the side for a

21   minute and just ask you a few other questions.  Your

22   mother told us that you are comfortable explaining your

23   gender identity.  Are you?

24              ATTORNEY HARTNETT:  Objection to form.

1          THE WITNESS:  Yes.

2  BY ATTORNEY CAPEHART:

3     Q.    Can you explain to me what is your gender

4  identity?

5     A.    I am female and I go by the pronoun she or her.

6     Q.    Do you also refer to yourself as a transgender

7  girl?

8     A.    No.  I refer myself as a girl because I am a

9  girl, and that's it.

10    Q.    Okay.

11          Does it bother you if someone does refer to you

12  as a transgender girl?

13    A.    No, because that's still calling me a girl, but

14  I prefer to be called as just a girl.

15    Q.    Okay.

16          Did you have a problem with --- looking back at

17  your Declaration, at Exhibit 31, in paragraph 12 it

18  says, the second line, I am a transgender girl.  Is that

19  okay with you that that's written that way?

20    A.    Yes, that is fine because that is --- that's

21  still showing that I am a girl and that is on a ---

22  that's on my Declaration.

23    Q.    And transgender female or transgender girl, are

24  both of those terms accurate?

1                    ATTORNEY HARTNETT:  Objection to form.

2                    THE WITNESS:  Yes, because I am a

3    transgender female and a transgender girl.

4    BY ATTORNEY CAPEHART:

5      Q.    Okay.

6            I just want to make sure I got the terminology

7    down.  Do you remember the first time you heard the term

8    transgender?

9      A.    I can't remember.

10     Q.    Okay.

11           As long as you remember, you just --- have you

12   always had an understanding of what transgender means?

13     A.    I don't know, I don't think so.

14     Q.    So --- and I'm not trying to put words in your

15   mouth.  I'm just trying to understand.  So do you think

16   there was a time that you didn't, but at some point you

17   learned it, you just don't remember when that was?

18     A.    Yes.

19     Q.    All right.

20           Do you have any recollection of a time when you

21   were not a transgender girl?

22                   ATTORNEY HARTNETT:  Objection to form.

23                   THE WITNESS:  A little bit of a memory,

24   but not much.

```
 1   BY ATTORNEY CAPEHART:

 2      Q.    What kind of a memory do you have --- let me

 3   back up.  How old is that memory?

 4      A.    Four or five years.

 5      Q.    Okay.

 6            Was that memory --- what were you doing that

 7   you can remember, I guess, maybe not being a transgender

 8   girl at that time?

 9                  ATTORNEY HARTNETT:  Objection to form.

10                  THE WITNESS:  I think I was learning

11   something in school and I found it really interesting.

12   BY ATTORNEY CAPEHART:

13      Q.    Okay.

14            You don't remember what that was that you were

15   learning, do you?

16      A.    No.

17      Q.    Your mother also told us that at some point when

18   you were younger you told her that you were a girl.  Do

19   you remember the first time you told your mother that?

20      A.    I can't remember.

21      Q.    Okay.

22            Do you remember the first time you told someone

23   other than your mother that you were a transgender girl?

24                  ATTORNEY HARTNETT:  Objection to form.
```

1          THE WITNESS:   I --- can you say it again?

2  BY ATTORNEY CAPEHART:

3     Q.     Sure.   I will try to make it a little bit

4  better, too.   Do you remember the time that you first

5  told someone other than your mother that you were a

6  girl?

7     A.     Yes.

8     Q.     Okay.

9            Can you tell me about that?

10    A.     It was in school.   It was new, whenever I just

11  came out, and it was the year of 4th grade.

12    Q.     Okay.

13           Do you remember who you were talking to?

14    A.     I don't remember.

15    Q.     Now, you said that was 4th grade, that that was

16  the year that you came out.   Do you use terminology like

17  socially transition when you talk about that time?

18    A.     Could you repeat the question?

19    Q.     Sure.   Let me ask a different one.   Are you

20  familiar with the term social transition or to socially

21  transition?

22    A.     No.

23    Q.     Okay.

24           When you --- and I'm going to use your term,

29

```
1    okay.  When you said you came out in 4th grade and that
2    was the time when you maybe started talking to other
3    people about being a girl, you don't really remember who
4    that was, but generally how was that time for you?
5                    ATTORNEY HARTNETT:  Objection to form.
6                    THE WITNESS:  It was good because I made
7    a lot of new friends.  A lot of people were really nice
8    to me.
9    BY ATTORNEY CAPEHART:
10       Q.    Were your old friends nice to you, too?
11       A.    Yes.
12       Q.    How was everybody at your school, teachers and
13   other folks that worked there?
14                   ATTORNEY HARTNETT:  Objection to form.
15                   THE WITNESS:  They were very good about
16   it.
17   BY ATTORNEY CAPEHART:
18       Q.    Did you have any bad experiences that year?
19       A.    No.
20       Q.    Okay.
21             B████, for you what does it mean to be female
22   or to be a girl?
23       A.    Could you repeat the question?
24       Q.    Sure.  I'm trying to understand your perspective
```

SARGENT'S COURT REPORTING SERVICE, INC.
(814) 536-8908

1    on things, and so that's why I'm just asking, to you,

2    what does it mean to be a girl or to be female?

3              ATTORNEY HARTNETT:  Objection to form.

4              THE WITNESS:  It means --- it means

5    everything.  I've always wanted to be a girl.

6    BY ATTORNEY CAPEHART:

7      Q.    Okay.

8            And what is it about a girl or female that

9    makes them different from boys or males?

10             ATTORNEY HARTNETT:  Objection to form.

11             THE WITNESS:  How they act and how they

12   dress their selves.

13   BY ATTORNEY CAPEHART:

14     Q.    Okay.

15           Anything else other than how they act or how

16   they dress?

17     A.    Not that I can think of right now.

18     Q.    Okay.

19           How do girls or females dress differently than

20   boys or males?

21             ATTORNEY HARTNETT:  Objection to form.

22             THE WITNESS:  Females would wear ---

23   normally wear dresses and males would normally wear

24   tuxedos and suits.  And their casual clothes are most of

```
 1   the time different but sometimes can be the same.

 2   BY ATTORNEY CAPEHART:

 3      Q.    Okay.

 4            So do I look like I'm dressed like a male

 5   because I'm wearing a suit jacket and tie?

 6                    ATTORNEY HARTNETT:  Objection to form.

 7                    THE WITNESS:  Yes.

 8   BY ATTORNEY CAPEHART:

 9      Q.    Okay.

10      A.    Because that is also how you present yourself.

11      Q.    Okay.

12            Is presenting one's self, when you say that, is

13   that different than how one dresses and how one acts or

14   is it both of those together?

15                    ATTORNEY HARTNETT:  Objection to form.

16   Sorry.

17                    THE WITNESS:  It's kind of a mix of all

18   of it.

19   BY ATTORNEY CAPEHART:

20      Q.    Now, when you say that how someone acts is

21   different regarding girls to boys, what do you mean by

22   that?

23      A.    Normally ---.

24                    ATTORNEY HARTNETT:  Objection to form.
```

1          THE WITNESS:  Most of the time males will

2    look very big and buff and females most of the time do

3    not like that look, but some can.

4    BY ATTORNEY CAPEHART:

5      Q.    Okay.

6          What else about how a person acts puts them in

7    a more of a female category than a male category?

8          ATTORNEY HARTNETT:  Objection to form.

9          THE WITNESS:  They would maybe --- they

10   wouldn't want to look like a guy.  A guy wouldn't want

11   to look like a girl and a girl wouldn't want to look

12   like a guy unless --- unless you do, which sometimes

13   people do do that.

14   BY ATTORNEY CAPEHART:

15     Q.    Okay.

16          So if someone is trying to look like a guy,

17   then they are going to wear more what I'll call

18   traditional attire, like you said, maybe like a tuxedo

19   or a suit with a coat and a tie and they may want to

20   look bigger and buff and in an overall way present

21   themselves as male.

22          Is that right?

23          ATTORNEY HARTNETT:  Objection to form.

24          THE WITNESS:  Most of the time but not

```
 1   all the time.

 2   BY ATTORNEY CAPEHART:

 3     Q.     Okay.

 4            Are there actions or things that people do that

 5   make you think this person is acting more like a male or

 6   someone is acting more like a female?

 7                   ATTORNEY HARTNETT:  Objection to form.

 8                   THE WITNESS:  Sometimes.

 9   BY ATTORNEY CAPEHART:

10     Q.     Okay.

11            When you say sometimes what are you thinking

12   about?

13     A.     Maybe people are walking around because

14   sometimes it's how they walk that you can tell and their

15   hair sometimes.

16     Q.     What kind of hair is more male as compared with

17   hair that is more female to you?

18                   ATTORNEY HARTNETT:  Objection to form.

19                   THE WITNESS:  I think longer hair is more

20   ladylike and short hair is more manly, but sometimes

21   people do like an option of that where people --- where

22   guys will like long hair and girls will like short hair.

23   BY ATTORNEY CAPEHART:

24     Q.     I think my father would agree with you on what
```

1   you said there.   Are there other kind of behaviors that

2   people exhibit that are more male or more female besides

3   walking and maybe kind of their physical posture?

4              ATTORNEY HARTNETT:  Objection to form.

5              THE WITNESS:  Not really, no.

6   BY ATTORNEY CAPEHART:

7      Q.    Okay.

8            Besides, as you said, males would be more big

9   and buff and females not really liking that look as

10  much, although some of them do, are there other physical

11  attributes that makes you think someone is more male or

12  more female?

13             ATTORNEY HARTNETT:  Objection to form.

14             THE WITNESS:  Not really.

15  BY ATTORNEY CAPEHART:

16     Q.    Does height have anything to do with it?

17             ATTORNEY HARTNETT:  Objection to form.

18             THE WITNESS:  No, because that can go

19  either way.  That's genetics if you're tall or not.

20  BY ATTORNEY CAPEHART:

21     Q.    As you have been growing up, from what I

22  understand, you talk with your mom a lot.

23            Right?

24     A.    Yes.

1    Q.    Have you ever talked with your mother about what

2    it means to be female?

3    A.    Yes.

4    Q.    Okay.

5          What did your mother --- strike that.

6          Did your mother try to help you as you were

7    going through this process to kind of understand this a

8    little bit more what is male and female?

9                ATTORNEY HARTNETT:  Objection to form.

10               THE WITNESS:  Could you repeat the

11   question?

12   BY ATTORNEY CAPEHART:

13   Q.    Sure.  As you've been growing up and as you've

14   been talking with your mother over the years as you

15   realized, as you said, you're a girl and as we were just

16   talking about, that there are certain things in your

17   mind that go more with being female rather than being

18   male, did you and your mom have conversations about that

19   same kind of thing we were just discussing?

20               ATTORNEY HARTNETT:  Objection to form.

21               THE WITNESS:  Yes.

22   BY ATTORNEY CAPEHART:

23   Q.    Okay.

24         What did you all talk about?

1    A.    We talked about looks and --- mainly looks and

2  that was about it.

3    Q.    Okay.

4          Did you talk about makeup?

5    A.    Yes.

6    Q.    Okay.

7          Is that something to you that is more female or

8  more male?

9    A.    More female, but some males do wear them ---

10 wear it.

11   Q.    Did you and your mom talk about jewelry?

12   A.    Ish, not really because jewelry can be worn by

13 males and females.

14   Q.    That's fair.  I'm wearing some myself right now.

15 Did you all talk about anything else other than those

16 few things that you just provided to me and also the

17 makeup?

18               ATTORNEY HARTNETT:  Objection to form.

19               THE WITNESS:  Not really.

20 BY ATTORNEY CAPEHART:

21   Q.    Okay.

22         Have you ever had any of those kinds of

23 conversations with your father?

24               ATTORNEY HARTNETT:  Objection to form.

1          THE WITNESS:  Not really because I don't

2    think he would understand it because he is a guy that is

3    --- he really --- he likes doing manly stuff and I don't

4    think he'd understand makeup.

5    BY ATTORNEY CAPEHART:

6      Q.    So with all that in mind, I'm just trying to

7    understand how you think about some of these things.

8    How do you define girls and boys?

9          ATTORNEY HARTNETT:  Objection to form.

10          THE WITNESS:  Males try to look muscular

11   and they do --- they lift weights and have short hair,

12   but girls can also do that, but it's most commonly found

13   with guys.  With girls, they usually have long hair, but

14   guys can have that, too.  They wear makeup and have

15   different clothing than males.

16   BY ATTORNEY CAPEHART:

17      Q.    Okay.

18          Are there activities that girls or females like

19   to do that men don't like to do or that males don't like

20   to do?

21          ATTORNEY HARTNETT:  Objection to form.

22          THE WITNESS:  Not really because sports

23   are for everyone and they should --- and every --- and

24   any person should be able to play.

1  BY ATTORNEY CAPEHART:

2     Q.    I thank you for that.  I was making it a little

3  bit more broad than that even though.  Are there other

4  things outside of sports that may be girls and females

5  like to do that typically, from your experience, boys

6  and males don't like to do?

7                 ATTORNEY HARTNETT:  Objection to form.

8                 THE WITNESS:  Not really because anything

9  that a female could do a male could do, and anything a

10  male could do a female could do.

11  BY ATTORNEY CAPEHART:

12     Q.    And among all of your friends, are they mostly

13  girls, mostly boys or all across both boys and girls?

14     A.    They are mostly girls, but I do have some guy

15  friends.

16     Q.    What do you like to do with your friends that

17  are girls?

18     A.    We hang out, sometimes we play video games.

19     Q.    Do you go --- do you like going to the mall or

20  shopping?  I know that has been harder recently since

21  COVID?

22                 ATTORNEY HARTNETT:  Objection to form.

23                 THE WITNESS:  Sometimes, but not really

24  because of COVID.

1    BY ATTORNEY CAPEHART:

2       Q.    Do you do the same kind of things with your

3    friends that are boys?

4       A.    We also hang out.  We talk about video games, we

5    play video games, so, yes, about the same.

6       Q.    Okay.

7             At some point you decided to change your name.

8    Do you remember when you decided to do that?

9       A.    When I came out.

10      Q.    So in 4th grade, as you mentioned earlier?

11      A.    I came out in the third --- the summer of third

12   grade.  But when I was like actually talking to people

13   and stuff about it, it was 4th grade.  So yes, when I

14   came out.

15      Q.    Okay.

16            And so when did you start going by B████?

17      A.    The summer of third grade.

18      Q.    Did you go by B████ at school at that time, too,

19   or did you wait until fourth grade for that?

20            ATTORNEY HARTNETT:  Objection to form.

21            THE WITNESS:  It was the summer of third

22   grade and I was kind of presenting through third grade,

23   but I didn't go by B████, just --- at that point I

24   waited until fourth grade.

40

BY ATTORNEY CAPEHART:

   Q.    Okay.

        How did you select your new name?

   A.    I've always liked the name, so that's what I liked.

   Q.    Okay.

        And why did you decide at that time that you needed a new name?

   A.    Because I didn't think my name fit for me.

   Q.    Okay.

        And you're familiar with the term dead name.

        Right?

   A.    Yes.

   Q.    Okay.

        Do you remember the first time that you encountered that word --- or I'm sorry, that term?

   A.    That term?  When I came out, I was told that I could be dead named and they told me what that was.  And then later I looked it up and figured out what it was more in depth.

   Q.    Okay.

        Do you remember who it was that had told you that you could be dead named?

   A.    I can't remember.

```
 1      Q.     Was it your mom?

 2      A.     It may have been, but I can't remember.

 3      Q.     From what your mother and your father told us,

 4   it sounds like your mother has been the parent that has

 5   taken you to all but maybe one of your appointments to

 6   talk to people about being a transgender girl.  Is that

 7   about right from your recollection?

 8              ATTORNEY HARTNETT:  Objection to form.

 9              THE WITNESS:  Yes, that is about right.

10   BY ATTORNEY CAPEHART:

11      Q.     Have you had a lot of appointments to talk with

12   doctors or other healthcare providers about being a

13   transgender girl?

14              ATTORNEY HARTNETT:  Objection to form.

15              THE WITNESS:  I wouldn't say it was a

16   lot, but I also wouldn't say it was like a little.  It

17   was a good amount of appointments.

18   BY ATTORNEY CAPEHART:

19      Q.     Okay.

20              After one of those appointments you received a

21   diagnosis of gender dysphoria.  Have you been told that

22   before?

23      A.     Yes.

24      Q.     Okay.
```

```
 1              When was the first time you remember
 2   encountering that term gender dysphoria?
 3      A.    I don't know the date, but I think my mom told
 4   me that I had it.
 5      Q.    Okay.
 6              Do you remember generally when that was?
 7      A.    I can't remember.  It may have been 2021 or
 8   2022.
 9      Q.    Also, when you're remembering something, if you
10   remember it by year, I know that is how I remember a lot
11   of things growing up, if something happened at a
12   particular year of school rather than a calendar year.
13   You know, if that's a frame of remembering for you, too,
14   that is fine also.  Calendar years aren't as important.
15              Do you know what gender dysphoria is?
16      A.    A little bit about it, but I don't know the
17   actual definition.
18      Q.    Okay.
19              Did you look it up and research it like you did
20   dead name after you heard it?
21                  ATTORNEY HARTNETT:  Objection to form.
22                  THE WITNESS:  I don't think so because if
23   I did I'd probably know more about it.
24   BY ATTORNEY CAPEHART:
```

1    Q.    And you said --- do you remember the doctor

2  visit where you first heard one of your doctors use that

3  term?

4    A.    I can't remember.

5    Q.    Do you remember an appointment with Dr. Montano?

6    A.    Yes, I remember some of the appointments with

7  him.

8    Q.    Okay.

9         There is some medical records that show that

10  you had an appointment with Dr. Montano where he did a

11  full assessment of you in the summer of 2019.  Do you

12  remember that by any chance?

13              ATTORNEY HARTNETT:  Objection to form.

14              THE WITNESS:  Not really because that was

15  a long time ago.

16  BY ATTORNEY CAPEHART:

17    Q.    Do you remember any appointment with Dr. Montano

18  that was a longer appointment where you talked about a

19  lot of things?

20              ATTORNEY HARTNETT:  Objection to form.

21              THE WITNESS:  Not really because they all

22  felt like they went by so fast because during the things

23  I usually had to miss a day of school, and I was always

24  thinking about what I missed.

BY ATTORNEY CAPEHART:

   Q.    I did the same thing at your age.

         Whenever you had those appointments with Dr.
Montano or at Dr. Montano's office, I know oftentimes at
those appointments it's not just the doctor, that there
are sometimes other people that work there that will
come in and see a patient during the appointment time.
What do you recall about those appointments and who you
met with?

                    ATTORNEY HARTNETT:  Objection to form.

                    THE WITNESS:  I can't remember, but I ---
I don't remember their name, but I remember a time where
someone else went in there.

BY ATTORNEY CAPEHART:

   Q.    Do you remember the kinds of things that you
would talk about with Dr. Montano or any of the other
people at those appointments?

   A.    Maybe --- I don't know.  I can't remember.

   Q.    When you were at appointments at Dr. Montano's
office, do you recall him or any of his staff running
tests on you?

                    ATTORNEY HARTNETT:  Objection to form.

                    THE WITNESS:  I can't recall.

BY ATTORNEY CAPEHART:

1   Q.    Okay.

2         At those appointments do you remember hearing

3   people talking about how to treat gender dysphoria?

4   A.    I can't remember.

5   Q.    Has your mother discussed with you how your

6   gender dysphoria is being treated now?

7   A.    Maybe back whenever I --- whenever I was

8   diagnosed with it, but I can't remember.

9   Q.    Whenever there's any decisions that have to get

10  made about your treatment for your gender dysphoria,

11  does your mother talk with you about that and explain

12  everything that's happening?

13. A.    Yes.

14  Q.    Okay.

15        When you all are having those conversations and

16  a decision has to be made, does your mother let you make

17  those decisions?

18                ATTORNEY HARTNETT:  Objection to form.

19                THE WITNESS:  Yes, I am part of the

20  making of the decisions what happens to me.

21  BY ATTORNEY CAPEHART:

22  Q.    Okay.

23        Do you and your mother ever disagree about what

24  should be done?

```
1              ATTORNEY HARTNETT:  Objection to form.

2              THE WITNESS:  Not --- not --- I don't

3    think we have, but there is a possibility that could

4    happen or could have happened and I don't recall.

5    BY ATTORNEY CAPEHART:

6       Q.    Okay.

7              Give me just a second.

8              ATTORNEY HARTNETT:  Also, I think it

9    might be a good time to take a quick break just given

10   the youth and amount of water consumption.  So maybe we

11   can take a five to ten-minute bathroom break when it's

12   good for you, Curtis.

13             ATTORNEY CAPEHART:  Oh, yeah, that's

14   actually perfectly fine.

15             ATTORNEY HARTNETT:  Can we take a

16   ten-minute break?  Yeah, let's just take a ten-minute

17   break so we're are not all back too early.

18             ATTORNEY CAPEHART:  Sounds great.

19             VIDEOGRAPHER:  Going off the record.  The

20   current time reads 11:01 a.m.

21   OFF VIDEOTAPE

22                        ---

23   (WHEREUPON, A SHORT BREAK WAS TAKEN.)

24                        ---
```

1   ON VIDEOTAPE

2           VIDEOGRAPHER:   We are back on the record.

3   The current time reads 11:13 a.m.

4   BY ATTORNEY CAPEHART:

5      Q.   Okay.

6         Well, during the break I was going back over

7   some notes and just have a couple of questions that kind

8   of relate to some things we already talked about and

9   then I'm going to move on.

10         Okay?

11      A.   That Declaration that we had looked at earlier,

12   I recall that you had mentioned when you first looked at

13   it you didn't recall seeing it, you didn't recall

14   signing it, you then looked at your initial signatures

15   and then you had read the rest of the document.   After

16   we went through all of that, did that jog your memory

17   any.  Do you remember signing it?

18      A.   I do remember signing it, but I kind of have a

19   little bit of memory seeing it, but I do have a memory

20   signing it.

21      Q.   Okay.

22         Also, when you recalled learning and hearing

23   the term about dead name and that someone might do that

24   to you at school, did anyone actually do that to you at

1   school?

2      A.     Not that I can remember.

3      Q.     Okay.

4             I think you had also said you kind of did some

5   research.  What kind of research did you do looking into

6   that term?

7      A.     Just looking what it meant, looking up what it

8   meant.

9      Q.     Did you look it up in a book or on the internet?

10     A.     The internet.

11     Q.     Okay.

12            Do you recall where on the internet you found

13  it?

14     A.     I think I looked it up on Google and I did

15  another one, but I can't remember what it was.  It was

16  one of the unpopular ones.

17     Q.     Okay.

18            Also, when you were --- or when we were talking

19  about the characteristics or things that make a person

20  more female or more male you had said that height really

21  didn't make a difference, that that was really more

22  genetic.  Do genetics have something more to do with

23  being a girl or a boy?

24                 ATTORNEY HARTNETT:  Objection to form.

```
 1                    THE WITNESS:  I wouldn't know.
 2   BY ATTORNEY CAPEHART:
 3     Q.    Also, is there anything that definitively makes
 4   a person a girl or a female versus a boy or a male?
 5                    ATTORNEY HARTNETT:  Objection to form.
 6                    THE WITNESS:  Could you repeat the
 7   question?
 8   BY ATTORNEY CAPEHART:
 9     Q.    Sure.  And I will preface it with kind of what
10   we were kind of talking about before.  You were
11   describing how there were a lot of things that are
12   typically --- and I don't think you used that word but
13   I'm going to use it, more typically associated with
14   males like tuxedos or suits, short hair, being buff,
15   working out, that sort of thing, and other things that
16   were more typically associated with being female,
17   wearing dresses, longer hair, not preferring to have
18   that maybe over muscled physique, wearing makeup, that
19   sort of thing, and that there were even some other
20   things you said are maybe more associated with males,
21   but that doesn't mean that females don't do it or vice
22   versa.  I think that's what you said.
23          So I'm wondering is there anything in your mind
24   that if you see a person doing that or wearing that or
```

1    whatever that thing might be, is there something that

2    you, if you see it associated with a person, you think

3    only boys do that or only girls do that?

4                    ATTORNEY HARTNETT:  Objection to form.

5                    THE WITNESS:  No, because if I see

6    someone like that and I don't --- I don't immediately

7    go, oh, that's a guy, oh, that's a girl.  I ask them,

8    oh, what are your pronouns, what is your gender

9    identity.  And that's --- that's the better way to

10   figure out what they --- what they are and if they're

11   male or female or what --- if they're nonbinary or

12   whatever they are.

13   BY ATTORNEY CAPEHART:

14       Q.    You mentioned a term nonbinary.  Can you explain

15   what nonbinary means?

16       A.    It is a person that doesn't identify as a male

17   or female and they go by they/them pronouns.

18       Q.    Do you know anyone that is nonbinary?

19       A.    One of my lawyers is.

20       Q.    Do you know anybody at your school or your

21   hometown that is nonbinary?

22       A.    I don't think so.

23       Q.    Okay.

24                    ATTORNEY HARTNETT:  Heather, do you want

1    a minute for a break?

2                    MS. JACKSON:    Just to get a sip of water.

3                    ATTORNEY HARTNETT:    Can you give her a

4    mute to, the court reporter, just to let her work

5    through that?    It's happened to all of us.    No worries.

6                    MS. JACKSON:    It went down the wrong

7    pipe.

8                    ATTORNEY CAPEHART:    And again, if you

9    need to take another break, that's fine, too.    All okay

10   on your end?

11                   MS. JACKSON:    We're good.

12                   ATTORNEY CAPEHART:    Okay.

13   BY ATTORNEY CAPEHART:

14      Q.    I don't want to upset you, but I need to ask a

15   couple of questions about some comments that, according

16   to what we learned, your father had made in the past.

17                   ATTORNEY HARTNETT:    Objection to form.

18                   ATTORNEY CAPEHART:    That wasn't a

19   question, but okay.

20   BY ATTORNEY CAPEHART:

21      Q.    We understand that ---.

22                   ATTORNEY HARTNETT:    Sorry.    Just to make

23   clear my objection was that you were stating that

24   certain statements had been made, and I'm objecting to

```
 1    the foundation.
 2                    ATTORNEY CAPEHART:  Okay.
 3                    ATTORNEY HARTNETT:  Go ahead.
 4    BY ATTORNEY CAPEHART:
 5        Q.    I've looked at some records and there are some
 6    notations and ████████████████████████████████████
 7    ████████████████████████    When we were talking with
 8    your mother she had said she did not know what had
 9    happened there.  Can you tell me what had happened when
10    that occurred?
11                    ATTORNEY HARTNETT:  Objection to form.
12                    THE WITNESS:  Could you repeat the
13    question?
14    BY ATTORNEY CAPEHART:
15        Q.    Sure.  We've seen in some records a notation
16    █████████████████████████████████████████████████████
17    ████████████████████████    Your mother did not
18    know what had happened on that occasion.  She recalled
19    that when this happened, but she didn't know what had
20    actually occurred ██████████████████████████
21             Do you remember that?
22                    ATTORNEY HARTNETT:  Objection to form.
23    Go ahead.
24                    THE WITNESS:  I can't remember, but I'm
```

1    pretty sure it was --- I was scared of something that

2    was --- honestly I shouldn't have been scared of.  It

3    was nowhere near me.  It was probably a spider or

4    something.  But just the phrase ███████████████████

5    ████████████████████████████████  it is like don't be

6    scared of that, there's no reason to.  It's just another

7    use of don't be scared of that.

8    BY ATTORNEY CAPEHART:

9        Q.    Okay.

10            We were --- we were just wondering what had

11   happened there because, as I recall, when this was being

12   discussed yesterday, that your mother indicated you were

13   very upset when you had ████████████████████████████

14   ██████████████████████████████████████████████████████

15   ████████████████████████████  Does that help you

16   remember anything more?

17               ATTORNEY HARTNETT:  Objection, form.

18               THE WITNESS:  Not really.

19   BY ATTORNEY CAPEHART:

20       Q.    Also, we seen a note in one of the medical

21   records that was, again, discussed yesterday and your

22   mother said we would need to ask you about it.  ████████

23   ██████████████████████████████████████████████████████

24   ██████████████████████████████████████████████████████

1   ███████

2               ATTORNEY HARTNETT:   Objection to form.

3               THE WITNESS:   Could you restate the

4   question?

5   BY ATTORNEY CAPEHART:

6       Q.    Sure.   We were looking at some records and there

7   was some notation ████████████████████████████████

8   ████████████████████   Your mother wasn't familiar with

9   that and said we should ask you about it.   So I'm asking

10  you if you recall ever discussing that with one of your

11  treaters?

12              ATTORNEY HARTNETT:   Objection to form.

13              THE WITNESS:   I don't remember discussing

14  that with anyone besides my mom really.   But it was a

15  long time ago, so I --- I can't remember if I did or

16  not.

17  BY ATTORNEY CAPEHART:

18      Q.    Okay.

19            Do you know what that would relate to, that

20  reference ███████████████████████████

21      A.    He probably got mad at me, like really mad in

22  the situation, and he was probably threatening ████████

23  ██████████████████

24      Q.    Has that happened sometimes?

SARGENT'S COURT REPORTING SERVICE, INC.
(814) 536-8908

1    A.    A long time ago.  It doesn't happen anymore now.

2    Q.    Did it happen on multiple occasions or just

3  once?

4    A.    It was --- well, it was a couple of times maybe

5  in like the same three days or something like that, but

6  after those three days it stopped.

7    Q.    Did you talk with your mom about it when that

8  happened?

9    A.    Yes.

10   Q.    Okay.

11         Did she tell you that she was going to talk to

12  your father for you?

13              ATTORNEY HARTNETT:  Objection.  Go ahead.

14              THE WITNESS:  She --- I think she did.

15  She talked to him, and that's why he stopped doing it.

16  BY ATTORNEY CAPEHART:

17   Q.    ███████████████████████?

18   A.    Could you restate it?

19   Q.    Sure.  Do you have appointments from time to

20  time to ████████████████████████████

21  ████████████████████████████

22  ██   ████

23  ██   ████

24      ████████████

1          ATTORNEY CAPEHART:  We've got a fire

2    drill going on.  Hold on, everybody.

3          THE WITNESS:  What happened?

4          MS. JACKSON:  They have a fire alarm

5    going off.

6          THE WITNESS:  Oh.

7          VIDEOGRAPHER:   Do you want to go off the

8    record?

9          ATTORNEY HARTNETT:  We're fine with that.

10         VIDEOGRAPHER:  Going off the record.  The

11   current time reads 11:25 a.m.

12   OFF VIDEOTAPE

13                    ---

14   (WHEREUPON, A SHORT BREAK WAS TAKEN.)

15                    ---

16   ON VIDEOTAPE

17         VIDEOGRAPHER:   Back back on the record.

18   The current time reads 11:41 a.m.

19         ATTORNEY GREEN:  All right.  Thank you

20   and I will just hop in for a minute.  This is Roberta

21   Green on behalf of WVSSAC.  And I just wanted to note

22   for the record the appearance of my co-counsel, Shannon

23   Rogers, who's with me on behalf of WVSSAC.  I just

24   wanted to note that for the record and I'll hop off.

```
 1    Thanks.

 2              ATTORNEY CAPEHART:  Okay.

 3              Now that we are through our building

 4    emergency, if I could ask the court reporter to go back

 5    to the last line of actual testimony.  I don't recall

 6    what point during that event we broke off the record,

 7    but if you could go back and tell us where we were

 8    whenever loud noises started happening.

 9              COURT REPORTER:  The question, sure.  Do

10    you have any appointments from time to ███████████

11    ████████████████████████████████████████████████████

12    ████████████    Answer, yes.  Question, okay.  Who do

13    you meet with?  And then that's when the fire drill

14    happened.

15              ATTORNEY CAPEHART:  Thank you.

16    BY ATTORNEY CAPEHART:

17       Q.    █████, let's just pick up there.  Who do you

18    meet with?

19       A.    I meet with █████   His name is ████████

20       Q.    Okay.

21              Do you know what office or group ███████ is

22    with?

23              ATTORNEY HARTNETT:  Objection to form.

24              THE WITNESS:  Could you repeat the
```

SARGENT'S COURT REPORTING SERVICE, INC.
(814) 536-8908

1   question?

2   BY ATTORNEY CAPEHART:

3       Q.    Sure.   Is ██████████████████ or is

4   ████████ part of a ██████████████?

5       A.    I don't know.

6       Q.    Do you know the name --- I'm sorry.  I cut you

7   off.  Go ahead.

8       A.    I just go to him for ██████████  That's ---.

9       Q.    Okay.

10          How often do you meet with ██████████

11      A.    It just depends because sometimes maybe it's

12  once a month, but it can be anytime.  If we call him and

13  we need to go, he usually has a spot open.

14      Q.    Okay.

15          And just generally speaking, what kind of

16  things do you discuss with ██████████

17      A.    ████████████████████████████████

18  ████████████

19      Q.    Okay.

20          Whenever you meet with ██████████ do you go in

21  alone or does your mother go in with you?

22      A.    It depends.  It usually starts with me and my

23  mom in there, then she waits out in the lobby and we

24  talk.  And sometimes I go out and my mother talks to him

1    and then we get back --- we both go in the room at the

2    end and then we say bye and then we leave.

3        Q.    Okay.

4              And how do you like that process, going to talk

5    to ██████████

6        A.    I love it because I can talk about ████ ██

7    ██████████

8        Q.    Does that help you to feel better?

9        A.    Uh-huh (yes).

10       Q.    Do you know --- excuse me, do you know whether

11   you have had any ████████████████████████████?

12             ATTORNEY HARTNETT:   Objection to form.

13             THE WITNESS:   Could you rephrase that?

14   BY ATTORNEY CAPEHART:

15       Q.    Yes.  And let me back up and ask another

16   question I had forgotten to ask earlier.  Do you know

17   what ████████ profession is?

18       A.    I don't know.

19       Q.    Okay.

20       A.    All I know is that he is a ████████  That's

21   what I know.

22       Q.    Okay.

23             And do you know whether ████████ is a ████████ of

24   some sort or just a ████████

```
 1                    ATTORNEY HARTNETT:  Objection to form.

 2                    THE WITNESS:  I do not know.

 3     BY ATTORNEY CAPEHART:

 4        Q.    Okay.  Okay.

 5              Now, if you could look at Exhibit 34.  Do you

 6     have the document marked as Exhibit 34 in front of you?

 7     It says West Virginia Legislature at the top and then in

 8     the middle of the page there's a line that says House

 9     Bill 3293.

10        A.    Yes, we have that.

11        Q.    Okay.  Great.

12              Have you ever seen this before?

13        A.    I don't think so.

14        Q.    Okay.

15              So if you --- this is just of kind of a cover

16     page for what was House Bill 3293 that passed the

17     legislature and was signed the Governor last year.  This

18     is the --- this is the bill, the law that your lawsuit

19     is challenging.

20              Now, if you look --- start looking at page two

21     you'll see there is a lot of text here.  Have you seen

22     any of this before?  You don't have to read it all, just

23     kind of glance over it.  And if you think you may have

24     seen parts before, you can say so, but ---.
```

```
1      A.      I don't think I've seen this before.

2      Q.      Okay.  Okay.  All right.

3              Well, I'm not going to ask you to read the

4   whole thing right now.  I'm just going to ask you about

5   a couple of parts of it.

6              Okay?

7      A.      Uh-huh (yes).

8      Q.      Because there's a lot to read here.

9              ATTORNEY HARTNETT:  I'll just refer to

10  our standing objection.  Thank you.

11             ATTORNEY CAPEHART:  Sure.  Sure.

12  BY ATTORNEY CAPEHART:

13     Q.      On what's marked at the bottom of the page as

14  page two you'll see that there are kind of a column of

15  numbers that run down the left-hand side of the page

16  there.  The top number on page two should be a ten?

17     A.      Uh-huh (yes).

18     Q.      Okay.

19             And I'll just refer to those lines to direct

20  you to a couple of spots.  Okay.  And just so you know,

21  that's a standard part of what a bill looks like so that

22  whenever they're looking at legislation people can refer

23  to a procedure or line.  That way they can follow it

24  more easy.
```

1        So the lines I'm going to direct you to are 25

2   and 26.  This is a definition that is set forth in this

3   bill and it is down in West Virginia Code.  So just read

4   that and let me know when you've read that definition in

5   this bill.

6      A.    I've read it.

7      Q.    Okay.

8        Do you think that's a proper definition of

9   biological sex?

10               ATTORNEY HARTNETT:  Objection to

11   terminology.  Make that a standing objection.

12               THE WITNESS:  I would not know that if I

13   --- if that would be ---.

14   BY ATTORNEY CAPEHART:

15      Q.    Okay.

16        Have you ever heard people use language like

17   biological sex or biological female?

18               ATTORNEY HARTNETT:  Objection to form.

19               THE WITNESS:  Yes, I've heard people use

20   that.

21   BY ATTORNEY CAPEHART:

22      Q.    Okay.

23        Has anyone ever explained what they mean when

24   they have used that terminology around you?

1        A.     I don't think so or I just can't remember.

2        Q.     Okay.

3               This definition, at lines 25 and 26, does this,

4   based on the way that you have heard people use the term

5   in the past, is this about what you think they meant?

6                       ATTORNEY HARTNETT:   Objection to form.

7                       THE WITNESS:   Yes.

8   BY ATTORNEY CAPEHART:

9        Q.     Okay.

10              So now that you've read that in this bill

11  that's what that term means, look up at lines 21 and 22

12  and let me know when you've read those two lines.

13       A.     Okay.

14       Q.     Do you agree with that statement at lines 21 and

15  22?

16                      ATTORNEY HARTNETT:   Objection to form.

17                      THE WITNESS:   I don't because I think if

18  someone wants to play on the girls team, like me, they

19  should be able to even though they are --- they're not

20  following that requirement.

21  BY ATTORNEY CAPEHART:

22       Q.     Okay.

23              Before I move on to ask some questions about

24  cheerleading and track, I just want to talk about a

64

1    couple of other words that we were just touching on.

2    But I just want to make sure that we understand each

3    other or at least you understand me.  You have heard

4    people use the term biological female or the term

5    biological male before.

6            Is that correct?

7    A.    Yes.

8    Q.    Okay.

9            And just so we're clear, if I use the term

10   biological female or biological girl, I'm describing

11   people who were determined to be female at the time of

12   birth.  Okay?  I'm not looking at the statute.  I'm just

13   saying like if I use that term, that's what I'm talking

14   about.  Just so that if I use a word and you're not sure

15   what I mean, I'm trying to explain in advance so there's

16   no confusion.  Does that make sense?

17   A.    Yes.

18   Q.    Okay.

19           And also, if I say biological male or

20   biological boy I mean someone who was determined to be

21   male at the time of birth.

22   A.    Yes.

23   Q.    So if I use that --- if I use that kind of

24   terminology that is what I'm talking about, people who

1   were determined to be that at the time of birth.  Okay?

2           When did you first get interested in sports?

3       A.    I've always liked running.  And I think

4   running's a sport, so since I could walk and run.

5       Q.    What kind of sports, in addition to running,

6   have you been interested in?

7       A.    Cheering was one.  I was a little bit interested

8   in volleyball, but not anymore.

9       Q.    Why not?

10      A.    I just never --- I just didn't --- I just lost

11   liking of it.

12      Q.    Whenever I say interested in --- let me

13   rephrase.  Whenever you say that you are interested in

14   running, you were interested in cheer and been part of a

15   team and for a short time you are interested in

16   volleyball but aren't really interested anymore, do you

17   mean interested in participating and playing those

18   sports?

19      A.    Yes.

20      Q.    Okay.

21           Are there other sports that you have been

22   interested in from the perspective of being a viewer but

23   maybe not a participant?

24      A.    Could you repeat the question?

1    Q.    Sure.   Besides the three that you just talked

2    about, running, cheer, volleyball, are there other

3    sports that you have an interest in as a viewer, as a

4    person that's in the stand watching it, or watching it

5    on television, but you don't have an interest in playing

6    or taking part?

7    A.    I like watching football.

8    Q.    Okay.

9          Anything else?

10   A.    That's about it.

11   Q.    Does your mom watch football?

12   A.    Yeah.   We like the same team.

13   Q.    What team?

14   A.    The Cleveland Browns.

15   Q.    Do you like any other football teams?

16   A.    Not really, no.

17   Q.    Do you just watch professional football or do

18   you watch college, too?

19   A.    Just professional.

20   Q.    Now, have your parents encouraged you to be

21   involved in sports?

22          ATTORNEY HARTNETT:   Objection to form.

23          THE WITNESS:   I'd say so that they

24   encouraged me.

1   BY ATTORNEY CAPEHART:

2       Q.    Okay.

3             Now that you've been on a couple of different

4   kind of teams, girls cross-country and also cheer when

5   you were younger, do you enjoy getting to compete as

6   part of a team?

7       A.    Yes, I do.

8       Q.    If you were in a sport where you weren't on a

9   team, that you were just an individual on a team, would

10  you enjoy that also?

11      A.    No, because that's not --- that's not on ---

12  you're not on a team, you're not doing teamwork, that's

13  just by yourself.

14      Q.    So is the bigger appeal to you in sports being

15  part of a team, being part of a group, working towards a

16  common goal?

17                  ATTORNEY HARTNETT:  Objection to form.

18                  THE WITNESS:  Could you repeat the

19  question?

20  BY ATTORNEY CAPEHART:

21      Q.    Sure.  You said you wouldn't really like being

22  in an individual sport, maybe something like, I don't

23  know, figure skating maybe, because you wouldn't be part

24  of a team, you would be --- that you like being part of

1    a team?

2      A.    Yes.

3      Q.    So is that what draws you to some of the sports

4    that you are interested in, the team aspect?

5      A.    Yeah, the team aspect and I can make new

6    friends.

7      Q.    Do you consider yourself competitive whenever

8    you're playing sports or when you're playing games with

9    your friends?

10             ATTORNEY HARTNETT:  Objection to form.

11             THE WITNESS:  I want to call myself

12   competitive.  I'm just a person that likes playing

13   games.  I'm not like, oh, I got to win.  I just like

14   playing them, doing sports.

15   BY ATTORNEY CAPEHART:

16     Q.    Okay.

17             Do you have some friends that are like that?

18     A.    Yeah, I have a couple of friends.

19     Q.    I think we all have a couple of friends that are

20   like that.

21             So in those sports that you're interested in,

22   including football, do you think rules are really

23   important in sports?

24             ATTORNEY HARTNETT:  Objection to form.

1          THE WITNESS:  Yes, I think rules are

2    important because you wouldn't want someone having an

3    unfair advantage, like cheating.

4    BY ATTORNEY CAPEHART:

5       Q.    Right.

6       A.    And like ---.

7       Q.    Sorry.  Go ahead.

8       A.    Like in baseball, I don't know what it's called,

9    but getting a better grip on the ball, that's cheating.

10   That's not fair.

11      Q.    So do you think rules are a big part of or an

12   important part of making sure that sports are fair?

13      A.    Yes.

14          ATTORNEY HARTNETT:  Objection to form.

15   Sorry, B██████  Just make sure you give me a chance to

16   object, but you should then give your answer.  So let's

17   try that one again.

18          ATTORNEY CAPEHART:  Court Reporter, can

19   you repeat the last question?

20          THE WITNESS:  Could you repeat the last

21   question?

22          COURT REPORTER:  Question, so do you

23   think rules are a big part of or an important part of

24   making sure that sports are fair?

1               ATTORNEY HARTNETT:  Objection to form.

2               THE WITNESS:  I think they are a big part

3 of making sports fair.

4 BY ATTORNEY CAPEHART:

5   Q.   What does it mean for sports, for competition to

6 be fair?

7               ATTORNEY HARTNETT:  Objection to form.

8               THE WITNESS:  Well, sometimes it can mean

9 losing --- maybe winning unfair and winning things

10 because if people are cheating then they could get --- I

11 don't know if there's a cash prize.  So if they cheat,

12 they're going to get that.  That's not fair because they

13 get something out of cheating.

14 BY ATTORNEY CAPEHART:

15   Q.   So it sounds like that you're saying that if

16 somebody breaks a rule like the one that you were

17 talking about in baseball, and by breaking that rule

18 that helps them to win or beat someone else, that that

19 wouldn't be fair.  Is that what you're ---?

20               ATTORNEY HARTNETT:  Objection.

21               THE WITNESS: Yes.

22 BY ATTORNEY CAPEHART:

23   Q.   I'm sorry.  I think I lost part of your answer

24 there.

```
 1      A.     Yes, that's what I'm saying.

 2      Q.     Who do you think should make up the rules for

 3  sports?

 4                  ATTORNEY HARTNETT:  Objection to form.

 5                  THE WITNESS:  I don't know.

 6  BY ATTORNEY CAPEHART:

 7      Q.     I'm going to ask you a couple of questions about

 8  your time on cheerleading.  How many years were you on

 9  the cheer team?

10      A.     I was on the cheer team for two years.

11      Q.     Okay.

12             And if I recall from what your mother had told

13  us, it was part of the Bridgeport Youth --- is it

14  Bridgeport Youth Football League?  Is that what it was?

15                  MS. JACKSON:  Yes.

16                  COURT REPORTER:  I'm sorry.  Ms. Jackson,

17  did you say yes or was it the witness.  I'm sorry.

18                  MS. JACKSON:  I said yes.

19  BY ATTORNEY CAPEHART:

20      Q.     My understanding is that that's not affiliated

21  with the schools in any way, that's an independent, what

22  a lot of people would maybe call midget football league

23  and that that league has cheerleading teams also.

24             Is that right?
```

```
 1                    ATTORNEY HARTNETT:  Objection to form.
 2                    THE WITNESS:  Yes.  Sorry.
 3   BY ATTORNEY CAPEHART:
 4       Q.    Okay.
 5             I just want to make sure I understood that.
 6   That's how things were when my daughter did midget cheer
 7   --- midget league cheer, also.
 8         What team were you on like B, C D?  Do you
 9   recall?
10                    ATTORNEY HARTNETT:  Objection to form.
11                    THE WITNESS:  I was on Bridgeport Pee Wee
12   Red.
13   BY ATTORNEY CAPEHART:
14       Q.    Okay.
15             And were the members of that team all within
16   --- all the same age or within a year of each other?
17       A.    They were within a year of each other.
18       Q.    So was that third and fourth or fourth and
19   fifth?
20       A.    I think it was fourth and fifth.
21       Q.    Did you enjoy being on the cheerleading team?
22       A.    Yeah, it was really fun.
23       Q.    Did you like cheering at sidelines at games more
24   than competition cheer?
```

1          ATTORNEY HARTNETT:  Objection to form.

2          THE WITNESS:  I did like cheering on

3   sidelines better because I had stage fright and I feel

4   whenever I was cheering on the sidelines most of the

5   people were paying attention to the game, so I didn't

6   have as much stage fright.  But at competition, that was

7   the main thing that everyone was focusing on.

8   BY ATTORNEY CAPEHART:

9      Q.    When you would be part of the team and working

10   on your competition cheer, you all did stunts.

11          Is that correct?

12      A.    Yes, that is correct.

13      Q.    Did you get to be a flyer or were you a base?

14      A.    I was a base.

15      Q.    Did you enjoy that more than going up in the

16   air?

17      A.    Definitely, because I have a fear of heights.

18      Q.    Understandable.  So now that you're in Middle

19   School you were on the cross-country track team this

20   fall and you're also interested in running track.

21          Is that correct?

22      A.    Yes.

23      Q.    Okay.

24          I know I've seen in some reports and maybe in

1  your Declaration, too, you mentioned that there were

2  other people in your family that had run.  Is that the

3  basis for your interest in being on cross-country and

4  also doing track this spring?

5      A.    Yes.

6      Q.    Bridgeport Middle doesn't have coed teams, does

7  it?

8                  ATTORNEY HARTNETT:  Objection to form.

9                  THE WITNESS:  Could you repeat the

10  question?

11  BY ATTORNEY CAPEHART:

12      Q.    Sure.  Do you know what a coed team is?  Have

13  you heard that term before?

14      A.    No.

15      Q.    Okay.

16          I realize I'm probably dating myself a little

17  bit there.  That term is not really used all that

18  frequently maybe nowadays, but that just essentially

19  means that coed would be, you know, boys and girls all

20  on the same team together.  And I guess you don't.  You

21  just have a boys team and a girl teams.

22          Right?

23      A.    Yes.

24                  ATTORNEY HARTNETT:  Objection to form.

1          THE WITNESS:   Sorry.

2    BY ATTORNEY CAPEHART:

3      Q.    Now, in this --- for spring track you're going

4    to try out for the girls team.

5          Correct?

6      A.    Yes.

7      Q.    Now, that tryout and also the one for

8    cross-country track, are those competitive tryouts where

9    everybody has to run and be timed?

10         ATTORNEY HARTNETT:   Objection to form.

11         THE WITNESS:   Kind of because when we did

12    cross-country, all of us made it.   But I was told that

13    the year before, when I was in 5th grade, that they had

14    to cut people because there was too many.   So I think

15    that they only cut people if there's not --- if there is

16    too many.

17    BY ATTORNEY CAPEHART:

18     Q.    Do you know how many there were on cross-country

19    this fall?

20     A.    I don't know.

21     Q.    Okay.

22         If there is some upper limit, though, your team

23    didn't reach that limit in terms of participants?

24     A.    I think it may have been exactly the limit or

SARGENT'S COURT REPORTING SERVICE, INC.
(814) 536-8908

1  less, but I don't know.

2     Q.    You don't remember anyone that tried out not

3  making the team, though?

4     A.    Nope.  Everyone made it if they didn't quit.

5     Q.    Okay.

6           Do you remember how many meets or events you

7  went to this past fall?

8     A.    I don't know for a fact, but it was around seven

9  to eight.

10    Q.    And were all of those competitive team events

11  where they were tracking everyone's times with a team

12  placing at the end?

13                ATTORNEY HARTNETT:  Objection to form.

14                THE WITNESS:  Yes, there was.

15  BY ATTORNEY CAPEHART:

16    Q.    Okay.

17          How did you all do this fall?

18    A.    We did very good.

19    Q.    Great.  Did you place at most of the events that

20  the team went to?

21                ATTORNEY HARTNETT:  Objection to form.

22  BY ATTORNEY CAPEHART:

23    Q.    And by team I mean did the team place at the

24  event that your team participated in?

77

1    A.    Most of the time, yes.  Some of them weren't,

2  but we always got close.

3    Q.    Did your team get first place at any of the

4  events?

5    A.    Yes.

6    Q.    How did that feel to be part of a team that got

7  first place at one of these events?

8    A.    It felt awesome.  It felt great.

9    Q.    Okay.

10         So just because I don't know a tremendous

11  amount about cross-country or track and field, for

12  cross-country do you understand how the scoring works or

13  how the timing ends up with a team being first place or

14  second place or last place?

15    A.    I do not know.

16    Q.    But you would like to win, right?  You would

17  like your team to win.

18         Right?

19    A.    Yes.

20    Q.    What track sports do you want to run in this

21  spring, track events I should say?

22    A.    I'm thinking about doing long distance.

23    Q.    And by long distance what does that mean in

24  terms of the actual distance?

1    A.    There is a mile, two miles, and I think there

2    may be a three-mile one.

3    Q.    So are you training to build up your stamina to

4    those right now?

5    A.    Not currently just because it is really cold

6    out.

7    Q.    That's fair.  Just like I was asking you to help

8    me understand a little bit about how cross-country does

9    its scoring and placing, I think I know a little bit

10   more about track and field.  In events like the distance

11   runs, the one, two or even --- one mile, two mile or

12   even longer distances, there are individual places in

13   each of those events.

14        Correct?

15   A.    Uh-huh (yes).

16   Q.    So do the first, second, third place finishers

17   get metals in those?

18             ATTORNEY HARTNETT:  Objection to form.

19             THE WITNESS:  I'm not sure because this

20   would be my first year doing track.

21   BY ATTORNEY CAPEHART:

22   Q.    And do you know whether the outcome of those

23   individual races are then factored into some overall

24   team standing?

1    A.    I do not know.

2    Q.    Okay.

3          Now, at all of these events that you have

4    participated in this past fall with the girls track team

5    and then the ones that you would like to be part of this

6    spring for track and field, those are just girls teams

7    against girls teams.

8          Is that correct?

9                ATTORNEY HARTNETT:  Objection to form.

10                THE WITNESS:  I do not know because,

11   again, this is my first year.

12   BY ATTORNEY CAPEHART:

13   Q.    Okay.

14         Now, at the cross-country events you went to

15   this past fall, when your team got first place, that was

16   just competing against a girls team.

17         Correct?

18   A.    Yes.

19   Q.    Okay.

20         At those same events or meets are there also

21   boys teams present?

22   A.    Yes.

23   Q.    Okay.

24         But your team only competed against the girls

1   teams.

2           Correct?

3     A.    Yes.

4     Q.    Would you have liked for your teams to have

5   competed against boys teams and girls teams?

6     A.    At a couple of meets they did.  But when they

7   do, they only tallied the girls points and the guys

8   teams differently and then they did the teams' totals.

9     Q.    Okay.

10          Did anyone explain to you why they did that

11  that way?

12    A.    I don't know.

13    Q.    Okay.

14          Do you think that they may have done those

15  tallies differently because someone thought that boys

16  could run faster than girls?

17              ATTORNEY HARTNETT:  Objection to form.

18              THE WITNESS:  I don't know.  I don't know

19  that.

20  BY ATTORNEY CAPEHART:

21    Q.    Okay.

22    A.    But whenever we started the --- a different ---

23  like the guys would go five minutes before and then five

24  minutes later the girls would go, so it was easier to

81

```
 1   tally up all the points.

 2      Q.    Okay.

 3            Do you think that the boys can run faster than

 4   the girls?

 5                   ATTORNEY HARTNETT:  Objection to form.

 6                   THE WITNESS:  I do not believe so because

 7   I also think that is a genetic thing, if you are fast or

 8   not.

 9   BY ATTORNEY CAPEHART:

10      Q.    Okay.

11            From what I remember reading somewhere you're

12   pretty good with math.

13            Is that fair to say?

14      A.    Yes.

15                   ATTORNEY HARTNETT:  Objection to form.

16                   THE WITNESS:  Sorry.

17                   ATTORNEY HARTNETT:  That is okay.

18   BY ATTORNEY CAPEHART:

19      Q.    Do you know what statistics are?

20      A.    I am familiar with the word, but I don't know

21   what it means.

22      Q.    Okay.

23            Would you and your teammates sometimes compare

24   times after meets?
```

1    A.    Sometimes.

2    Q.    Okay.

3          And at the cross-country events, was the course

4    that you would run a different length every time?

5    A.    It was always around 2 miles to 2.3, so --- so

6    not really.

7    Q.    Okay.

8          I was just curious because I have a number of

9    friends that are athletes and they really seem to enjoy

10   talking about statistics, you know, how fast they run or

11   in baseball a batting average or in football a

12   quarterback's completion percentage or something, that

13   those are, it seems for folks in and around sports, ways

14   that you can try to evaluate or to get a sense of

15   something about a person or group of people.  Have you

16   heard and seen statistics talked about when you watch

17   those football broadcasts with your mom?

18             ATTORNEY HARTNETT:  Objection to the

19   narrative and to the question form.

20             THE WITNESS:  Could you repeat the

21   question?

22             ATTORNEY CAPEHART:  Sure.

23   BY ATTORNEY CAPEHART:

24   Q.    Have you seen or heard statistics talked about

 1    on those football broadcasts that you watch with your

 2    mom?

 3        A.    Sometimes, but I don't really pay attention to

 4    those because I mainly like watching the game.

 5        Q.    That's fair.

 6                    MS. JACKSON:  Excuse me.  She needs to

 7    use the restroom.

 8                    ATTORNEY CAPEHART:  Absolutely.  Take a

 9    break.

10                    MS. JACKSON:  Can you get through?

11                    VIDEOGRAPHER:   Going off the record.

12    The current time reads 12:18 p.m.

13    OFF VIDEOTAPE

14                         ---

15    (WHEREUPON, A SHORT BREAK WAS TAKEN.)

16                         ---

17    ON VIDEOTAPE

18                    VIDEOGRAPHER:  We are back on the record.

19    The current time reads 12:25 p.m.

20    BY ATTORNEY CAPEHART:

21        Q.    All right.

22              Well, let's see.  When we left off I was just

23    asking you about things about statistics.  Have you ever

24    looked up any statistical data about cross-country for

84

1   people your age?

2      A.    No, I have not looked up the statistics for

3   people my age.

4      Q.    And I think I framed that question as for

5   cross-country.  Have you ever done that with track and

6   field, for example, the one mile or the two mile?

7      A.    No, I have not.

8      Q.    If you were to see statistics that show that, on

9   average, 11-year-old biological boys were 20 percent

10  faster than 11-year-old biological females in the mile

11  run, would that surprise you?

12                 ATTORNEY HARTNETT:  Objection to form.

13                 THE WITNESS:  Yes, because I think

14  biological --- it's all about genetics, if you're fast

15  or not.

16  BY ATTORNEY CAPEHART:

17     Q.    So if you're fast or not is about genetics?

18     A.    I think it is, but it could be not.

19     Q.    Okay.

20            If that were true, that there is a statistic

21  somewhere that shows that 11-year-old biological boys

22  are 20 percent faster than biological girls of the same

23  age, would it be fair to have the biological boys

24  running in the mile race with biological girls?

1          ATTORNEY HARTNETT:  Objection to form.

2          THE WITNESS:  Can you say the question

3    again?

4    BY ATTORNEY CAPEHART:

5     Q.    Sure.  If there were statistics that did show

6    that difference of 20 percent between biological boys at

7    a certain age and biological girls at that same age,

8    would it be fair to allow biological boys to run that

9    same race as the biological girls?

10         ATTORNEY HARTNETT:  Objection to form.

11         THE WITNESS:  If they identify as a

12   female, then I think, yes.  But if not, then I don't

13   think that it should.

14   BY ATTORNEY CAPEHART:

15    Q.    Okay.

16         So you said if they identify as a female, then

17   they should be able to run with the biological girls?

18    A.    Yes.

19    Q.    Did I hear you right?

20    A.    Yes.

21    Q.    Okay.

22         So then could any biological boy be on the

23   girls team so long as they identify as female?

24         ATTORNEY HARTNETT:  Objection to form.

```
 1                    THE WITNESS:  I think so.  Sorry.

 2                    ATTORNEY HARTNETT:  Sorry.

 3   BY ATTORNEY CAPEHART:

 4      Q.    And when you say they identify as female, just

 5   explain that to me so I make sure I understand it.

 6      A.    When people are transgender from male to female,

 7   like me, that's what I think is identifying as a female.

 8      Q.    Okay.

 9            Is it enough for someone in your mind to

10   identify as female for them to just say that they

11   believe they're female or do they need to do something

12   more than that?

13                    ATTORNEY HARTNETT:  Objection to form.

14                    THE WITNESS:  I think they need to have

15   an appearance and there has to be a reason.  Like ---

16   well, not a reason, but they have to --- they have to

17   not just say, oh, I identify as female, I should run.

18   They should have already been transitioned.  It can't

19   just be out of nowhere.  Like, oh, all of the sudden,

20   now that I started, I just realize that I can do this,

21   oh, I'm transgender.  That's --- I don't think that ---

22   I think maybe --- I don't know, a year into the

23   transition that you should be able to.

24   BY ATTORNEY CAPEHART:
```

1    Q.    Okay.

2         So when you say a year into their transition

3    do, you mean like just their social transition, the way

4    they are presenting themselves?

5    A.    Yes.

6    Q.    Okay.

7         For that kind of hypothetical person that you

8    were describing there, if they had gone a year into

9    their transition, as I think you've described it, then

10   in your mind that's what they need to do so that they

11   could be on the girls team?

12                ATTORNEY HARTNETT:   Objection to form.

13                THE WITNESS:   Yes.

14   BY ATTORNEY CAPEHART:

15   Q.    Okay.

16        Do they --- do they need to be doing something

17   else like taking puberty blockers or something of that

18   nature?

19                ATTORNEY HARTNETT:   Objection to form.

20                THE WITNESS:   I think they should be on

21   puberty blockers to do it because if they have hit

22   puberty, then that's a different story because they hit

23   puberty and that's not changeable.

24   BY ATTORNEY CAPEHART:

1     Q.    Okay.

2         When they hit puberty and that's not

3   changeable, explain that to me a little if you can.

4              ATTORNEY HARTNETT:  Objection to form.

5   Go ahead.

6              THE WITNESS:  If they've hit puberty,

7   then they are maturing and they are going to get a

8   deeper voice.  A girl would get a bigger Adam's apple

9   and then that's really it.  And I think that gives them

10  more of an unfair advantage.  I could be wrong, but I

11  think after they hit puberty, I don't know, I think

12  something happens, but I'm not sure.

13  BY ATTORNEY CAPEHART:

14    Q.    Do you think there is something else that

15  happens besides the depth of voice and the Adam's apple?

16    A.    I think they may get faster because their

17  testosterone levels will rise.

18    Q.    Okay.

19        And do you think that's not an issue for

20  someone that hasn't gone through puberty yet?

21             ATTORNEY HARTNETT:  Objection to form.

22             THE WITNESS:  Sorry.  Yes, because their

23  testosterone levels, if they are on puberty blockers,

24  won't be as high and they won't be --- it won't be high

```
 1    and it won't give them any advantage.

 2    BY ATTORNEY CAPEHART:

 3        Q.    If there was someone in that situation that

 4    wasn't on puberty blockers, do you think that would be

 5    unfair for that person to be on a girls team?

 6                    ATTORNEY HARTNETT:  Objection to form.

 7                    THE WITNESS:  As long as they haven't hit

 8    puberty, then I think it's fine.  But if they have hit

 9    puberty, then I think they should maybe go on hormone

10    blockers and then maybe then, because I --- I could be

11    wrong, but I think their testosterone levels will drop

12    if they go on hormone blockers after puberty.

13    BY ATTORNEY CAPEHART:

14        Q.    Okay.

15              Do you think that they also need to be getting

16    treated for gender dysphoria?

17                    ATTORNEY HARTNETT:  Objection to form.

18                    THE WITNESS:  I don't think that matters

19    because if they don't have gender dysphoria, why should

20    they be getting treated for it.

21    BY ATTORNEY CAPEHART:

22        Q.    So if there was a person that went through that,

23    a biological boy who had done all the things that you

24    say needed to be done and they could be on the girls
```

1    team, but at some point in the future that person

2    decided they wanted to, I don't know, revert back to

3    being on the boys team for sports, should that be

4    allowed?

5                    ATTORNEY HARTNETT:  Objection to form.

6                    THE WITNESS:  If they want to, then yes,

7    go ahead, because they will --- if they are --- if they

8    still have the requirements to be on the girls team,

9    then they will be on puberty blockers and then the

10   testosterone levels will still be low.  So --- but if

11   they get off, then they'll just raise back, and they

12   could still run on the boys team, but they can't run on

13   the girls.

14   BY ATTORNEY CAPEHART:

15      Q.    Okay.

16            You've been talking about puberty blockers like

17   a person that knows about them, which I think you do.

18   What do you know about puberty blockers?

19                    ATTORNEY HARTNETT:  Objection to the

20   preamble and to the form.

21                    THE WITNESS:  Okay.

22            Could you repeat the question?

23   BY ATTORNEY CAPEHART:

24      Q.    Sure.  What do you know about puberty blockers?

SARGENT'S COURT REPORTING SERVICE, INC.
(814) 536-8908

91

     A.    They stop hormone levels from rising and they

have --- they have a chance for --- they have side

effects, but if you are transgender they can help ---

they can help with the process of a transition because

it will stop you from hitting puberty and you won't grow

an Adam's apple, you won't grow facial hair and your

voice won't get deeper.

     Q.    Okay.

           You're receiving puberty blocking medications

now.

           Is that correct?

     A.    Yes, that's correct.

     Q.    Okay.

           Did you want to start that medication to delay

or prevent puberty?

     A.    Yes, that is correct.

     Q.    Okay.

           We had talked some about your doctors'

appointments before.  You had some appointments before

receiving the puberty blockers.

           Correct?

     A.    Yes, that is correct.

     Q.    Okay.

           Do you remember an appointment where you talked



```
 1    with a doctor about getting puberty blocking meds?

 2         A.    Yes.
```







18        ATTORNEY CAPEHART:   I think this is a

19   good spot to take a break.   The next part that I'm going

20   to get into I think is going to take a little more time

21   than we have.   I see it's 12:41, so if it's all right

22   with everyone, I suggest we go off the record and talk

23   about when we come back.

24        ATTORNEY HARTNETT:   That's fine with us.



```
 1                    VIDEOGRAPHER:   Going off the record.   The
 2   current time reads 12:41 p.m.
 3   OFF VIDEOTAPE
 4                           ---
 5   (WHEREUPON, A SHORT BREAK WAS TAKEN.)
 6                           ---
 7   ON VIDEOTAPE
 8                    VIDEOGRAPHER:   We are back on the record.
 9   The current time reads 1:19 p.m.
10   BY ATTORNEY CAPEHART:
11      Q.    Okay.
12            Well, before I move onto something else, I just
13   wanted to follow up on something that you had mentioned
14   before the break, B████.   And I hope you had a good
15   break.   You had mentioned testosterone before.   Where
16   had you learned about what testosterone is?
17      A.    The doctors.
18      Q.    Okay.
19            Like Dr. Montano, those people?
20      A.    Yes.
21   ████  ███████████████████████████████████████
22   ███████████████████████████████████████████████████
23           █████████████████████   ████████████████████
24           ███████████████████   ███████████████████████
```



10    BY ATTORNEY CAPEHART:

11       Q.    Okay.

12            You had mentioned before in relation to a

13    biological boy running on a girls team and that they

14    would need to, I think you had said --- I'm not trying

15    to put words in your mouth, but I think you had said

16    something along the lines that they would need to be

17    taking some kind of medication relative to the

18    testosterone if they were either going through puberty

19    or had gone through puberty.

20            ATTORNEY HARTNETT:   Objection to form.

21    BY ATTORNEY CAPEHART:

22       Q.    Do you remember that when we were talking

23    earlier?

24       A.    Yes.

1    Q.    Okay.

2          Why did you mention testosterone relative to

3    how a biological boy might be performing in running?

4    A.    Because I think that --- that after --- whenever

5    you half an increase of testosterone, that --- I think

6    that increases your athletic ability, but I could be

7    wrong there.

8    Q.    Okay.  Fair enough.

9          Do you know that because of what the doctors

10   had talked to you about?

11                    ATTORNEY HARTNETT:  Objection to form.

12                    THE WITNESS:  I am pretty sure, yeah.

13   BY ATTORNEY CAPEHART:

14   Q.    Okay.

15         Have you had done any independent research

16   yourself to learn more about testosterone?

17   A.    I don't recall.  I may have, but I don't

18   remember.

19   Q.    Okay.

20         Do you recall reading the Complaint in this

21   lawsuit?

22   A.    I do not.

23   Q.    Okay.

24         If you could look at Exhibit 32 for just a

99

1   minute.   Okay.   It says Exhibit WV-32 at the bottom

2   right corner and has a lot of other words, but in

3   boldface in the upper right center are the words First

4   Amended Complaint.   Okay.   This is as it says is the

5   First Amended Complaint, means there was an original

6   Complaint that had been amended once in its first

7   Amended Complaint.   Do you recall ever having seen this

8   before now that you are getting a chance to look at it?

9       A.      Yes, I think so.

10      Q.      Okay.

11              Do you remember reading over it yourself?

12      A.      I don't think so.

13      Q.      Okay.

14              Do you remember anyone discussing with you what

15   was in the Complaint?

16      A.      I think I discussed it with my mom.

17      Q.      But you don't know everything that's in here

18   because you haven't read it yourself.

19              Is that correct?

20      A.      I don't.

21                   ATTORNEY HARTNETT:   Objection.

22                   THE WITNESS:   I don't remember if I have

23   or haven't.

24   BY ATTORNEY CAPEHART:

100

```
1        Q.    Okay.

2              You don't remember if you have or have not.

3   Okay.

4              Now, I think we had talked before about the

5   fact that your lawsuit is challenging the HB 3293.  You

6   may have remembered we had looked at that very briefly

7   and I had directed you to a couple of parts of it and

8   you had said you hadn't read the whole thing.  And I

9   will also represent to you that it also had some other

10  definitions in there for biological male and female.  Do

11  you believe there is a difference between biological

12  males and biological females?

13             ATTORNEY HARTNETT:  Objection to form and

14  the preamble.

15             THE WITNESS:  I don't know.

16  BY ATTORNEY CAPEHART:

17       Q.    Okay.

18             You don't know if there is any difference

19  between a biological boy and a biological girl?

20             ATTORNEY HARTNETT:  Objection to form.

21             THE WITNESS:  I don't know.  I don't know

22  if there is a difference.

23  BY ATTORNEY CAPEHART:

24       Q.    Okay.
```

```
 1          Do you think there are physical differences
 2   between a biological boy and a biological girl?
 3                  ATTORNEY HARTNETT:  Objection.
 4                  THE WITNESS:  Could you repeat the
 5   question?
 6   BY ATTORNEY CAPEHART:
 7     Q.    Sure.  Do you think there are physical
 8   differences between a biological boy and a biological
 9   girl?
10     A.    Yes.
11     Q.    Okay.
12                  ATTORNEY HARTNETT:  And I just have a
13   standing objection in terminology, but I will not
14   continue to make that objection.
15                  ATTORNEY CAPEHART:  Noted.  Thank you.
16   BY ATTORNEY CAPEHART:
17     Q.    What do you understand the physical differences
18   are between a biological boy and a biological girl?
19     A.    A biological boy has a penis and a biological
20   girl has a vagina.
21     Q.    Okay.
22          Do you believe there are any other physical
23   differences between a biological boy and a biological
24   girl?
```

```
1      A.    There --- yes, but that part could be with

2   either one, because long hair could also be with a guy

3   or like that's --- like if a girl, a biological girl,

4   would probably have long hair, but a guy could also have

5   long hair.  And then a guy could have --- a guy could

6   have short hair and a girl could also have that.  And a

7   biological guy would probably want to look muscular, but

8   a biological girl would probably --- could probably want

9   to look like that.

10      Q.    So apart from a superficial difference like hair

11   length or how much someone works out and also the

12   difference in genitalia, are you aware of any other

13   differences?

14                  ATTORNEY HARTNETT:  Objection to form.

15                  THE WITNESS:  Not that I can think of

16   right now.

17   BY ATTORNEY CAPEHART:

18      Q.    Okay.  Okay.

19            Can you all look at Exhibit 26?  Do you have

20   Exhibit 26?

21      A.    Yes.

22      Q.    This looks like it is an article from the

23   Gazette Mail.  If you flip to the second page of the

24   exhibit, the fourth block of text up from the bottom it
```

103

```
 1    reads, quote, I just want to run, I come from a family

 2    of runners, close quoted, P████ J██████ said in a news

 3    release.  Quote, I know how hurtful a law like this is

 4    to all kids like me who just want to play sports with

 5    their classmates, and I'm doing this for them.  Trans

 6    kids deserve better, closed quote.  B████, do you

 7    remember talking to a reporter before this article got

 8    written?

 9        A.    Yes.

10        Q.    Okay.

11              And the quoted language that I was just reading

12    there that's also in the exhibit, do you remember saying

13    that?

14        A.    Yes.

15        Q.    Okay.

16              So those are your words, no one was

17    paraphrasing something you were trying to tell them

18    then?

19        A.    No.

20        Q.    Okay.

21              Is a trans kid an appropriate term to use?

22                    ATTORNEY HARTNETT:  Objection, form.

23                    THE WITNESS:  Could you repeat the

24    question?
```

BY ATTORNEY CAPEHART:

Q.    Sure.  In the quote it says trans kids deserve better.  I'm just curious, is trans kids a normal term that is used and is acceptable to use?

ATTORNEY HARTNETT:  Objection, form.

THE WITNESS:  Could you repeat the question one more time?

BY ATTORNEY CAPEHART:

Q.    Sure.  And I'm not trying to trick you.  I'm just trying to understand because you used the term trans kids, and I think I've seen it in maybe another article, too, and I just thought I encountered it another experience.  So I'm asking the question is that an acceptable term to use to refer to transgender boys or transgender girls?

ATTORNEY HARTNETT:  Same objection.

THE WITNESS:  Yes.

BY ATTORNEY CAPEHART:

Q.    Is it okay to call you a trans kid?

A.    If you don't know that I don't know my name and you know I'm trans, then yes, that's acceptable.  But if you know my name and you're purposely calling me that, then not really, but it's still fine.

Q.    Yeah.  And I don't intend to.  I was just

```
1   curious ---

2     A.    Yes.

3     Q.    --- from the nuances and the acceptable use of

4   the term.  So thank you.  Excuse me.  If you can look

5   at Exhibit 27.

6              ATTORNEY HARTNETT:  And just for the

7   record and the witness's knowledge, B████, you should

8   feel free to review the full exhibit before you answer

9   questions if you want to.

10             THE WITNESS:  Okay.

11             MS. JACKSON:  So that's the first page.

12             ATTORNEY CAPEHART:  You all just let me

13  know whenever you're ready to proceed.

14             Okay?

15             ATTORNEY HARTNETT:  I'm sorry.  I think

16  B████ is ready.

17             THE WITNESS:  Yeah.

18             ATTORNEY CAPEHART:  Okay.  Thank you.

19  BY ATTORNEY CAPEHART:

20    Q.    I'm going to try to make sure I direct you to

21  the proper page.  It looks like it's the last page of

22  the text, which looks like it's about the fourth to the

23  last page of the exhibit.  At the top of the page the

24  test begins with the word when Justice.  Right there.
```

1    Have you all found that on your hard copy?

2        A.    Yes.

3        Q.    Okay.  All right.

4              So let's see, this first block here that reads

5    when Justice signed the Bill banning transgender girls

6    from sports teams, B█████ was devastated she said.  Then

7    another quote, I felt horrible because I knew then I

8    couldn't run with the other girls.  Do you remember

9    talking to the author of this piece before it came out?

10       A.    Yes.

11       Q.    Okay.

12             And does that quote seem right?  Do you

13   remember saying that?

14       A.    Yes.

15       Q.    Okay.

16             Now, I recall earlier you mentioned that you

17   hadn't read the bill, the new law yourself, but here you

18   said you couldn't run with the other girls after the

19   Governor signed it.  How did you know that since you

20   hadn't read through the bill?

21       A.    I was told by my mom.

22       Q.    Okay.

23             Do you remember when you and your mother had

24   that discussion?

```
 1      A.     I don't remember.

 2      Q.     All right.

 3             Were you aware of this bill before your mom

 4   told you that it was now a law?

 5      A.     I was aware of it, but I didn't know that it was

 6   going to get signed.

 7      Q.     Okay.

 8             What did you know about it before your mom told

 9   you it was signed and was now a law?

10      A.     That I wouldn't be able to run with the girls

11   once it got signed.

12      Q.     Okay.  All right.

13             If you move down to and look at the fourth

14   block of text there on the page it says as hard as it is

15   to be a trans kid and a mother of a trans kid, suddenly

16   thrust into the public eye in a conservative state,

17   B▇▇▇  and Jackson agree that the potential payoff makes

18   it all worth it.  You don't have a problem with the

19   author using trans kid there, do you?

20      A.     No.

21      Q.     Okay.

22             How hard has it been in Bridgeport and Lost

23   Creek to be a trans kid, as the author says?

24                       ATTORNEY HARTNETT:  Objection to form.
```

108

1          THE WITNESS:  Could you --- could you

2    repeat the question?

3    BY ATTORNEY CAPEHART:

4      Q.    Sure.  This little bit of language here is

5    talking about it being hard to be a trans kid and the

6    mother of a trans kid, so my question is how hard has

7    that been on you in Bridgeport and Lost Creek?

8               ATTORNEY HARTNETT:  Objection to form.

9               THE WITNESS:  Well, a lot of the people

10   don't support it and don't agree with it, so that's what

11   makes it hard.

12   BY ATTORNEY CAPEHART:

13     Q.    Okay.

14          You had said that school had gone really well

15   with your transition.

16          Correct?

17     A.    Uh-huh (yes).

18     Q.    Okay.

19          So are these people you're describing now, are

20   these all people outside of school?

21               ATTORNEY HARTNETT:  Objection to form.

22               THE WITNESS:  Yes.

23   BY ATTORNEY CAPEHART:

24     Q.    Okay.

```
 1              What kind of people are these?

 2                   ATTORNEY HARTNETT:  Objection to form.

 3                   THE WITNESS:  Usually adults.

 4    BY ATTORNEY CAPEHART:

 5       Q.   Okay.

 6            Are these people you know or strangers?

 7       A.   Strangers.

 8       Q.   Well, what have they done?

 9       A.   Just not --- just be mean in general.

10       Q.   Well, how are they being mean?

11       A.   They don't support it.  Sometimes people call me

12    names, just be mean.

13       Q.   Okay.

14            Does this happen often?

15       A.   Not as much now, but it used to happen a lot.

16       Q.   When you say used to happen a lot, do you mean

17    back at the time that you transitioned or before that or

18    after that?

19       A.   Well ---.

20                   ATTORNEY HARTNETT:  Objection to form.

21                   THE WITNESS:  Well, at the time and a

22    little bit after because I was so --- I was new to it

23    and I didn't know how to handle people like being

24    meaning about it.
```

BY ATTORNEY CAPEHART:

   Q.    Okay.

       Would people be mean to you when your parents were around?

   A.    They wouldn't do it like directly to my face usually.  They would say it to my mom or my dad and then my parents would tell me.  So it wasn't usually directly to me.

   Q.    So when they would say these things, you weren't in the presence of these people when they were saying them?

   A.    Most of the time, yes.

   Q.    Oh, okay.

       But then your mom and your dad would have people say things to them and then your mom and dad would tell you about what other people had said?

       ATTORNEY HARTNETT:  Objection to form.

BY ATTORNEY CAPEHART:

   Q.    Is that correct?

   A.    Yes, but sometimes they wouldn't tell me just I'm assuming to try not to make me sad.

   Q.    Have any other kids ever said the kind of things to you that your parents said adults had told them?

       ATTORNEY HARTNETT:  Objection to form.

```
 1                    THE WITNESS:  No.

 2    BY ATTORNEY CAPEHART:

 3      Q.    No?  Do you and your family attend a church?

 4      A.    Not anymore.

 5      Q.    Okay.

 6            Did you before?

 7      A.    For a short period of time, yes.

 8      Q.    Okay.

 9            Did you ever have any issues or problems there?

10      A.    No.

11      Q.    So there weren't any adults at that church that

12    were mean to you or that said mean things to your

13    parents that you know of?

14      A.    At that time I was not transitioned yet, so

15    there was no comments like that.

16      Q.    Okay.

17            Do you remember when you had said your mom had

18    explained to you because the bill was now signed you

19    wouldn't be able to run, did she explain what part of

20    the new law would stop you from running?

21                    ATTORNEY HARTNETT:  Objection to form.

22                    THE WITNESS:  No, she just told me that

23    because of this I couldn't run.

24    BY ATTORNEY CAPEHART:
```

112

```
 1      Q.     Okay.

 2             And because you haven't read the bill yourself,

 3      you don't have any knowledge of what part of the bill

 4      prevents you from running.

 5             Is that correct?

 6      A.     Yes.

 7                    ATTORNEY HARTNETT:  Objection to form.

 8      BY ATTORNEY CAPEHART:

 9      Q.     Thank you.   All right.  Let's see Exhibit 28.

10      I just was going to interject that you are free to read

11      the entirety if you would like to, the 20 pages.  It's a

12      lot, but I have no problem telling you the only thing

13      I'm going to ask you about is the portion on the last

14      page, the part under the subtitle B████'s trials.

15                    MS. JACKSON:  Thank you.

16                    ATTORNEY CAPEHART:  You're welcome.

17                    THE WITNESS:  I'm ready.

18      BY ATTORNEY CAPEHART:

19      Q.     Okay.  Great.

20             Do you remember talking to this author from

21      ESPN?

22      A.     I can't remember.

23      Q.     It sounds like your tryouts were pretty

24      challenging.
```

SARGENT'S COURT REPORTING SERVICE, INC.
(814) 536-8908

1              Is that true?

2        A.    Yes.

3        Q.    Okay.

4              Do you recall expressing anything to this

5    reporter that's quoted here or otherwise described?

6                   ATTORNEY HARTNETT:   Objection to the

7    form.

8                   THE WITNESS:   Could you repeat the

9    question?

10   BY ATTORNEY CAPEHART:

11       Q.    Sure.  Do you recall saying this part that's

12   quoted here about your friends or discussing any of the

13   rest of it with the reporter?

14       A.    I don't remember, but I think I remember saying

15   maybe some of this, but I can't remember.  I can't

16   remember.

17       Q.    Okay.  Okay.

18             And it seems like you were understandably

19   excited to have made the team.

20             Is that right?

21       A.    Yes.

22       Q.    Okay.

23             How many girls were on the team this past fall?

24                   ATTORNEY HARTNETT:   Objection.  I'm

114

1    sorry.

2                        THE WITNESS:   I don't know.

3    BY ATTORNEY CAPEHART:

4        Q.    Okay.

5              And you were the only transgender girl on the

6    team.

7              Is that correct?

8                        ATTORNEY HARTNETT:   Objection to form.

9                        THE WITNESS:   As I knew of, there may

10   have been people that haven't come yet, but of what I

11   knew I was the only one.

12   BY ATTORNEY CAPEHART:

13       Q.    So far as you know, you're the only transgender

14   girl on the team.

15             Is that correct?

16       A.    Yes.

17       Q.    Okay.  Okay.

18             Exhibit 29, which is much shorter.  Okay.  Take

19   a look at that, however much you would like to, and then

20   let me know whenever you'd like to proceed.

21       A.    I'm done reading.

22       Q.    Okay.

23             Let's see.  Just below kind of the mid point of

24   the page, about the third block of real text it starts

1    off with a quote there and it says, quote, I just want

2    to run and the State wants to stop me from running as

3    part of a team at my school, end quote, said B████, an

4    11-year0old Middle School student.  Quote, I love

5    running and being part of the team and the State of West

6    Virginia should explain in court why they won't let me,

7    end quote.  Do you remember saying or writing that?

8        A.    I remember saying that.

9        Q.    Okay.

10              Who did you say that to?

11       A.    I can't remember.

12       Q.    Okay.

13             But those are all your words.

14             Correct?

15       A.    Uh-huh (yes).

16       Q.    Okay.

17       A.    Yes.

18       Q.    In what ways --- strike that.

19             When you say that the State of West Virginia

20   should explain in court why they won't let you be part

21   of the team, are you referring to HB-3293?

22       A.    Yes.

23       Q.    But as you said earlier, you're not sure what

24   part of that prevents you from running, you just know

1    that it does because you have been told that.

2            Correct?

3                    ATTORNEY HARTNETT:  Objection to form.

4                    THE WITNESS:  Yes.

5    BY ATTORNEY CAPEHART:

6    Q.    Okay.

7            Sorry for that.  B███████, are you aware of or

8    have you read anything that the State has filed with the

9    Court in this case?

10   A.     I think I've skimmed through a couple of things,

11   but not really read them.

12   Q.    Okay.

13           Those couple of things that you think you have

14   skimmed through, do you recall what those were?

15   A.     One of them was the one thing we just read ---

16   the thing that we went through just a little bit, I

17   skimmed through that.  And there was another one, but I

18   don't remember which one it was.

19   Q.    Okay.

20           The thing that we went just went through, I

21   apologize, we have gone through a few things.

22   A.     Just now, the one just now I skimmed through,

23   couple of paragraphs.  I'm pretty sure at least.

24   Q.    Do you mean Exhibit 29?

1              MS. JACKSON:   This?

2              THE WITNESS:   Yes.

3    BY ATTORNEY CAPEHART:

4       Q.    Exhibit 29 is not anything that the State has

5    written.  I'm just explaining what this is.  And my

6    understanding is that this is a news release from Lambda

7    Legal.  So you think there may have been something else,

8    though, that you looked at, you're just not really sure?

9       A.    Yeah.

10      Q.    Okay.  Okay.

11            Give me just a second to check a couple of

12   things.  Okay.  There's a couple of things to just run

13   through real quick and then I think I might be done.

14   One, just following back up on the thought of why the

15   State won't let you run, why do you think, to use your

16   words from this press release, that the State won't let

17   you run?

18      A.    Could you repeat the question?

19      Q.    Sure.  In the release here there is, as you

20   said, your language saying that you want the State to

21   explain in court why they won't let you, referring back

22   to being part of a team and running.  Why do you --- why

23   do you think that is?

24            ATTORNEY HARTNETT:   Objection.  Form.

SARGENT'S COURT REPORTING SERVICE, INC.
(814) 536-8908

```
 1                    THE WITNESS:  Because I don't think there

 2   is a good enough reason for me to not be able to run.

 3   BY ATTORNEY CAPEHART:

 4     Q.    Okay.

 5          When you say there's not a good enough reason,

 6   has someone spoken to you or explained some reason why

 7   they think that the State wouldn't let you run?

 8                    ATTORNEY HARTNETT:  Objection to form.

 9                    THE WITNESS:  Could you repeat the

10   question?

11                    ATTORNEY CAPEHART:  Court Reporter, can

12   read that question back for us?

13                    COURT REPORTER:  When you say there is

14   not a good enough reason, has someone --- has someone

15   --- I'm sorry.  When you say there's not a good enough

16   reason, has someone spoken to you or explained some

17   reason why they think that the State wouldn't let you

18   run?

19                    ATTORNEY HARTNETT:  Objection.

20                    THE WITNESS:  No one has explained the

21   reason, but that's why I think there's not a good enough

22   reason for me to not run.

23   BY ATTORNEY CAPEHART:

24     Q.    So you have not had any conversations with
```

```
 1    anyone who could explain what reasons the State may have
 2    presented as to why they passed this bill?
 3                    ATTORNEY HARTNETT:  I would just object
 4    to the extent this would entail any conversations with
 5    your lawyers, B████, and you should not testify about
 6    those conversations.  If there are conversations other
 7    than ones with your lawyer, you can testify about that.
 8                    THE WITNESS:  What was --- can you repeat
 9    the question?
10    BY ATTORNEY CAPEHART:
11       Q.   Sure.  And to pick up on Kathleen's comment, I'm
12    not trying to get you to divulge any confidential
13    communications that you had with your lawyers, but I'm
14    just trying to understand your comment where you said
15    that there is not a good enough reason and that no one
16    has explained a reason why the State passed this bill.
17    So I'm asking you what kind of conversations have you
18    had, if any, with anyone other than your lawyers about
19    the reason why this bill may have been passed?
20       A.   I haven't had any conversations with any of my
21    lawyers.
22       Q.   Okay.
23            Have you talked with your mom about why this
24    law may have been passed?
```

120

1    A.    I don't think I have, no.

2    Q.    And you already said you have not looked at any

3  of the State's filings or documents that it has put in

4  before the Court in this case?

5              ATTORNEY HARTNETT:   Objection, MT.

6              THE WITNESS:   I don't think so.

7  BY ATTORNEY CAPEHART:

8    Q.    Okay.

9          You don't recall whether you have seen those,

10 but you don't believe so, is that what you said

11 previously?

12             ATTORNEY HARTNETT:   Objection, MT.

13             THE WITNESS:   Yes.

14 BY ATTORNEY CAPEHART:

15   Q.    Okay.

16         Real briefly, look back at Exhibit 31, which is

17 the Declaration that you looked at when we started.

18 Just let me know when you have it.

19   A.    We have the Declaration.

20   Q.    Okay.

21         Look at page three, if you would.  Got it?

22   A.    Uh-huh (yes), yes.

23   Q.    Okay.

24         There at paragraph number 13 it says, I do not

121

```
 1    want to run with the boys and I should not have to run
 2    with the boys.  What's wrong with running with the boys?
 3        A.    I'm not a boy.  I'm a girl.  I should be able to
 4    run with the girls.
 5        Q.    Okay.
 6              Are there any competitive concerns if you did
 7    run with the boys?
 8                    ATTORNEY HARTNETT:  Objection.  Form.
 9                    THE WITNESS:  No.  I just think I'm a
10    girl and I shouldn't have to run with the boys.  I
11    should be able to run with the girls because I am a
12    girl.
13    BY ATTORNEY CAPEHART:
14        Q.    Okay.
15              One other --- one other quick question for you.
16    Do you know that under the law you could run with the
17    boys if you wanted to.
18              Right?
19                    ATTORNEY HARTNETT:  Objection to form.
20                    THE WITNESS:  That I could if I wanted
21    to, but that's not --- I'm not running with the boys
22    because I am a girl.
23    BY ATTORNEY CAPEHART:
24        Q.    Okay.
```

```
 1              I just wanted to make sure that someone had
 2    apprised you that the law does not prevent that, that
 3    new law.  Fair enough.  And I believe that's everything
 4    I have for you right now.  Thank you very much for your
 5    patience.
 6              ATTORNEY CAPEHART:  And whoever the next
 7    person in line wants to take over the questioning, go
 8    right ahead.
 9              ATTORNEY HARNETT:  And I know we haven't
10    gone for an hour yet, but I just wanted to check to see,
11    B███, do you need a bathroom break before we do more
12    questions?
13              THE WITNESS:  I'm good.
14              ATTORNEY ROGERS:  I think I'm next if I'm
15    understanding the order that was established earlier
16    this week.
17              Is that right?
18              ATTORNEY HARTNETT:  I believe Roberta
19    went next.
20              ATTORNEY ROGERS:  All right.
21                          ---
22                      EXAMINATION
23                          ---
24    BY ATTORNEY ROGERS:
```

123

```
 1      Q.      Hi, B█████.  My name is Shannon Rogers.  I am one

 2   of the attorneys that represents the West Virginia

 3   Secondary School Activities Commission, which is

 4   sometimes referred to as the WVSSAC.  And so when I'm

 5   saying WVSSAC that's what I'm referring to.

 6           Does that make sense?

 7      A.      Yes.

 8      Q.      Okay.

 9           Had you ever had heard of the WVSSAC before?

10      A.      I don't think so.

11      Q.      Okay.

12           Do you know if you have ever spoken to anybody

13   who is with the WVSSAC?

14      A.      I don't know.

15      Q.      You don't know?  Okay.

16           Do you know if anybody --- well, strike that.

17           So you don't think you've ever communicated or

18   you just don't remember?

19      A.      I don't think I've ever communicated.

20                   ATTORNEY ROGERS:  Okay.

21               I don't have any other questions.  Thank

22   you, B█████.

23                           ---

24                   EXAMINATION
```

```
  1                           ---

  2    BY ATTORNEY DENIKER:

  3        Q.    Hi, B█████.  My name is Susan Deniker.  I'm an

  4    attorney who works at a law firm called Steptoe and

  5    Johnson, and I represent the Harrison Board of Education

  6    and the Superintendant Dora Stutler.  Thank you for your

  7    time today.  I know it has been a long day and I know

  8    it's hard to sit in front of a computer screen, so thank

  9    you.  You've done a really great job.

 10            I'm going to ask you a few questions about your

 11    experience in school and in cross-country.  If I ask you

 12    anything that doesn't make sense or that you don't

 13    understand, please let me know.  You've done a really

 14    great job with that today, but will you let me know if I

 15    ask you something that you don't understand?

 16        A.    Yes.

 17        Q.    Very good.

 18            And then also, if you need to take a break at

 19    any time, just let me know and we'll be glad to take a

 20    break.

 21            Okay?

 22        A.    Okay.

 23        Q.    So yesterday I got to ask some questions of your

 24    mom and she told me that you went to elementary school
```

125

```
 1    at Norwood Elementary.

 2              Is that correct?

 3    A.    Yes.

 4    Q.    And did you go to Norwood Elementary School from

 5    kindergarten through the fifth grade?

 6    A.    Yes.

 7    Q.    How did you like Norwood?

 8    A.    It was a nice school.  I really enjoyed it.

 9    Q.    Did you have a good experience there?

10    A.    Yeah.

11    Q.    Was Mrs. Stutler your principal for a period of

12    the time that you were at Norwood Elementary School?

13    A.    Yes.

14    Q.    Did you know her then?

15    A.    Like know her --- could you repeat the question?

16    Q.    Sure.  No.  It probably wasn't a very good

17    question.  Did you sometimes have interactions with Mrs.

18    Stutler when she was your principal?

19    A.    Yes.

20    Q.    And how was that?  Was she nice with you when

21    you dealt with her?

22    A.    Yes.

23    Q.    Did you think she was a good principal?

24    A.    Yes.
```

126

```
1     Q.    Who was the principal after Mrs. Stutler?

2     A.    Mrs. Shields.

3     Q.    And did you like Mrs. Shields?

4     A.    Yeah.

5     Q.    Was she nice to you when you were at school?

6     A.    Yes.

7     Q.    Now, I know you said earlier that you came out

8  in the fourth grade.

9           Is that right?

10    A.    I came out in the summer of third grade, but in

11 school it was in the fourth grade.

12    Q.    Okay.

13          And something else I should have said to you at

14 the beginning is that I want to use terms that you're

15 comfortable with.  And so if I don't use the right

16 terms, you correct me.

17          Okay?

18    A.    Okay.

19    Q.    So when you started school in the fourth grade

20 it is my understanding then you came to school

21 presenting as a girl, as a female.

22          Is that correct?

23    A.    Yes.

24    Q.    And did you have any discussions with your
```

1    teachers or the principal or anyone else at Norwood

2    about making that change?

3        A.    Yes.

4        Q.    Tell me about those communications that you

5    would have had.

6        A.    I think it was the day before school started we

7    went to the school to establish where --- everything

8    about what the teacher should be calling me, where my

9    bathroom would be and everything like that.

10       Q.    Were you part of that meeting, B████?

11       A.    Yes.

12       Q.    Do you recall who else was in that meeting?

13       A.    There was Mrs. Louder, it was the principal.  I

14   don't know if it at the time it was Mrs. Stutler or Mrs.

15   Shields and someone else.  I can't remember their name.

16       Q.    Was the school counselor maybe part of that

17   meeting?

18       A.    I think so.

19       Q.    Was Mrs. Louder your teacher that year?

20       A.    Yes.

21       Q.    And was your mom also in that meeting?

22       A.    Yes.

23       Q.    Anyone else that you remember?

24       A.    Not really, no.

1    Q.    Were you happy with what came out of that

2  meeting?

3    A.    Yes.

4    Q.    You were comfortable with the agreements that

5  was reached with regard to the name that would be used

6  and the bathroom facilities and any other accommodations

7  that would be made for you?

8                ATTORNEY HARTNETT:   Objection.

9                THE WITNESS:   Yes.

10 BY ATTORNEY DENIKER:

11   Q.    And then how did fourth grade go?   Was it a good

12 --- was it a good year for you?

13   A.    Yeah.

14   Q.    Did you feel that the teachers and the principal

15 and the other employees of the school were supportive of

16 you?

17   A.    Yes, very.

18   Q.    Good.   And did you feel that they treated you

19 kindly and fairly?

20   A.    Yes.

21   Q.    And it sounds like from your earlier testimony

22 that you also had a good experience with the students in

23 the school.

24          Is that correct?

1    A.    Yes.

2    Q.    Tell me about your fifth grade year at Norwood

3    Elementary School.  Did you have a good experience that

4    year?

5    A.    Yes.  There was brand new teachers and my

6    teacher was Ms. Watson.  She was a very nice teacher.

7    Q.    And do you feel that everyone at the school was

8    supportive of you?

9    A.    Yes.

10   Q.    Did you feel that everybody treated you in a

11   fair and kind manner?

12   A.    Yes.

13   Q.    And so you had a good school year in fifth grade

14   as well?

15   A.    Yes.

16   Q.    Do you recall having any other meetings in

17   fourth or fifth grade to discuss your transitioning to

18   being --- to presenting as a girl at school?

19   A.    Not that I can remember.  Beginning of fourth

20   grade was the only one I think.

21   Q.    And then it's my understanding that this year

22   you started at Bridgeport Middle School.

23         Is that right?

24   A.    Yes.

1     Q.    And are you in the sixth grade this year, B████?

2     A.    Yes.

3     Q.    Do you remember when you were in Norwood

4 Elementary School having a meeting and filling out a

5 document that was called a Gender Support Plan?

6     A.    Yes, I remember that.

7     Q.    And did you participate in the meeting where

8 that plan was discussed?

9     A.    Yes.

10     Q.    And did you think that that was a good meeting?

11     A.    Yes.

12     Q.    Were you happy with the outcome of what was

13 agreed upon at that meeting?

14     A.    Yes.

15     Q.    And then you had another one of those meetings

16 with school officials before you started at the Middle

17 School.

18         Is that right?

19     A.    Yes.

20     Q.    And I think that that meeting happened in May of

21 2021, which would have been the end of your fifth grade

22 year.

23         Is that --- does that sound right?

24     A.    Yes.

```
 1      Q.    And were you a part of that meeting?

 2      A.    Yes.

 3      Q.    Do you remember who else was a part of that

 4  meeting?

 5      A.    We had my new principal, Mr. Mazza, the

 6  counselor there, Mrs. Shields and my mom.

 7      Q.    And were you comfortable with what was discussed

 8  and agreed upon at that meeting?

 9      A.    Yes.

10      Q.    And how has sixth grade been so far?

11      A.    It's been good.

12      Q.    Do you like Mr. Mazza?

13      A.    Yes.

14      Q.    He is your principal this year.

15            Is that right?

16      A.    Yes.

17      Q.    Do you feel like Mr. Mazza is supportive of you?

18      A.    Yes, very.

19      Q.    Good.  And do you think that he treats you in a

20  kind and fair manner?

21      A.    Yes.

22      Q.    How are your classes this year?  Do you like

23  them?

24      A.    Yeah, I like my classes.  I have really nice
```

1    teachers.

2       Q.    I think I saw that you are a straight A student.

3    Maybe I saw that in something that your mom wrote.

4             Is that right?

5       A.    Yes.

6       Q.    Congratulations.  Good for you.  Do you feel

7    that your teachers are fair and supportive of you?

8       A.    Yes.

9       Q.    And are you comfortable with the arrangements

10   that the school has made for you this year in terms of

11   addressing how you want to present at school as being a

12   girl?

13      A.    Yes.

14      Q.    I know that we have discussed today sports and

15   your participation in sports, and I heard you say that

16   you love running.

17            Is that right?

18      A.    Yes.

19      Q.    And I understand that you tried out for the

20   girls cross-country team.

21            Is that correct?

22      A.    Yes.

23      Q.    So I want to talk to you a little bit about that

24   process.  The cross-country team, did they do some

1  training and conditioning over the summer before the

2  year started?

3      A.    Yes.  There was a week of conditioning before

4  the season started.

5      Q.    And did that happen over the summer?

6      A.    Yes.

7      Q.    Did you participate in that conditioning?

8      A.    Yes.

9      Q.    And how was that experience?  Was that a

10  positive experience for you?

11      A.    Yes.

12      Q.    And then tryouts I think were in August for

13  cross-country.

14            Is that right?

15      A.    Yes.

16      Q.    And were you permitted to try out for the girls

17  cross-country team?

18      A.    Could you ---?

19      Q.    Let me rephrase that.  Were you allowed to try

20  out for the girls cross-country team?

21                  ATTORNEY HARTNETT:  Objection to form.

22                  THE WITNESS:  Yes.

23  BY ATTORNEY DENIKER:

24      Q.    And was that the team you wanted to try out for?

134

```
1       A.      Yes.

2       Q.      And did you make the team?

3       A.      Yes.

4       Q.      And I think you said this year they didn't have

5   any cuts.

6               Is that right?

7       A.      Yes.

8       Q.      Who were your coaches for cross-country this

9   year?

10      A.      I had Ms. Schoonmaker, Ms. --- Coach Flesher and

11  Coach McBrayer.

12      Q.      And did they coach both the girls and the boys

13  cross-country teams?

14      A.      Yes.

15      Q.      How was your season?

16      A.      It was good.

17      Q.      Did you like cross-country?

18      A.      Yes.

19      Q.      Did you believe that your coaches treated your

20  fairly and kindly this season?

21      A.      Yes.

22      Q.      Did you feel that they were supportive of you?

23      A.      Yes.

24      Q.      So you think it's fun to run up hills and
```

135

1    through water and mud, B█████?

2        A.    Yes.

3        Q.    Because that's what cross-country is about,

4    isn't it?

5        A.    Yes.

6        Q.    It's a hard sport I think.  Do you think it's

7    hard?

8        A.    It depends if you've done it before and how much

9    you run normally.

10       Q.    Do you think you would like to do it again?

11       A.    Yes.

12       Q.    And I heard you talk a little bit about track.

13   Are there other --- is track something that you're

14   interested in doing?

15       A.    Yes.

16       Q.    And I heard you said you might want to be --- do

17   the distance running in track.

18             Is that right?

19       A.    Yes.

20       Q.    You're a tough girl.  Cross-country and distance

21   running and track, those are the hard once, aren't they?

22                      ATTORNEY HARTNETT:  Objection to form.

23                      THE WITNESS:  It just depends if you've

24   ran before or whatever you've done.

SARGENT'S COURT REPORTING SERVICE, INC.
(814) 536-8908

1  BY ATTORNEY DENIKER:

2    Q.    I think that you're right.  I think it depends

3  how good of shape you're in.  Are you planning to

4  condition in the off season?

5    A.    If it's not freezing, then yes.

6    Q.    I understand.  We were talking about what a cold

7  day it is here in West Virginia, isn't it?

8    A.    Yes.

9    Q.    B████, has anybody in the school system ever

10  told you that Harrison County Schools wouldn't let you

11  participate on a girls sports team for any reason?

12              ATTORNEY HARTNETT:  Objection to form.

13              THE WITNESS:  After a bill was passed,

14  not --- I don't think there was because when the bill

15  was passed, I already went trying out and then we ---

16  then the whatever it was called where I could do ---

17  where I could play in the sports team from the Judge

18  came out.

19  BY ATTORNEY DENIKER:

20    Q.    And I just want to make clear, did any of your

21  coaches ever tell you that you couldn't run on the girls

22  team?

23    A.    No.

24    Q.    Did Mr. Mazza ever tell you that you couldn't

```
 1   run on the girls team?

 2       A.     No.

 3       Q.     Did any of your teachers tell you that you

 4   couldn't run on the girls team?

 5       A.     No.

 6       Q.     And did Mrs. Stutler ever tell you that you

 7   couldn't run on the girls team?

 8       A.     There was not a cross-country back then, so I

 9   couldn't run whenever she was my principal, so ---.

10       Q.     And that was when you were in elementary school.

11              Is that right?

12       A.     Yes.

13       Q.     And that's a good point that you brought up,

14   B████.     There aren't any school sports in elementary

15   school in Harrison County, are there?

16              ATTORNEY HARTNETT:  Objection to form.

17              THE WITNESS:  No, you're very limited to

18   them and most of them aren't even in the school.  You

19   have to do them outside of school.

20   BY ATTORNEY DENIKER:

21       Q.     Did you have any school-sponsored sports at

22   Norwood Elementary School?

23       A.     I don't know.  I don't --- yeah, I don't know.

24       Q.     Okay.
```

1         Did you try out or participate in any sports

2    that were run by the school while you were at Norwood?

3    A.    I --- no.

4    Q.    And so let me go back and ask you about Mrs.

5    Stutler.  So it's kind of funny.  You had Mrs. Stutler

6    as your principal at Norwood for a little bit.

7         Is that right?

8    A.    Yes.

9    Q.    And do you know where she went after she left

10   Norwood?

11   A.    The Board of Education.

12   Q.    She did.  She went to the Central Board Office.

13   And did you know that she's now the Superintendant of

14   Schools?

15   A.    I did not know that.  I just knew she went to

16   the Board of Education.

17   Q.    Well, she's actually your school superintendant

18   now.  And have you had any communications with her since

19   she became superintendant?

20   A.    No.

21   Q.    Well, now you know who your superintendant is.

22   So if you see her at school you can call her

23   Superintendant Stutler now.

24         B███, let me check my notes and see if I have

 1    any other questions.  I think I'm just about done.

 2           B███, did you have any conversations with

 3    anybody that works for the Harrison County Board of

 4    Education, teachers, principals, anybody like that,

 5    coaches, regarding this House Bill 3293?

 6                    ATTORNEY HARTNETT:  Objection to form.

 7                    THE WITNESS:  Could you repeat the

 8    question?

 9    BY ATTORNEY DENIKER:

10        Q.    Sure.  Did you talk with anybody who works for

11    the Harrison County Board of Education or is somehow

12    connected with the Board of Education about House Bill

13    3293?

14        A.    I think I did.  I think I may have.  I'm not

15    sure.  I can't remember her name.  It started with an S,

16    I know that.

17        Q.    Do you know what that --- what the woman you're

18    referring to, do you know what her job was?

19        A.    I do not know.

20        Q.    Was it a teacher or a principal?

21        A.    I don't know that.  I just --- she was at one of

22    our meetings, and I think we may have talked a little

23    bit about that.

24        Q.    And was that one of your Gender Support Plan

```
 1   meetings?

 2      A.    Yes.

 3      Q.    Okay.

 4            And was that the one before you were going into

 5   Middle School?

 6      A.    I think.  I can't remember.  I just --- I can't

 7   remember, but I think she either talked about that or

 8   the Gender Support Plan.

 9      Q.    Okay.

10            Do you remember what she said about House Bill

11   3293?

12      A.    I do not.  Because she may have not talked about

13   it.  She --- because she was there at one of our

14   meetings, so she could have not, but I think she did.

15      Q.    But you don't remember what was said?

16      A.    I don't.

17      Q.    Okay.

18            Do you remember any conversations with anybody

19   at school or anybody affiliated with the school about

20   House Bill 3293?

21                    ATTORNEY HARTNETT:  Objection, form.

22                    THE WITNESS:  Not that I can think of off

23   the top of my head.

24   BY ATTORNEY DENIKER:
```

1    Q.   And B████, I should have clarified.  Do you know

2  what I'm talking about when I say House Bill 3293?

3    A.   Yeah, HB-3293.  Yes.

4    Q.   Okay.

5        I just wanted to make sure that you knew what I

6  was talking about.  I thought that you did.

7        B████, if you had any concerns about how you

8  were being treated at school, would you feel comfortable

9  going to talk to Mr. Mazza about that?

10    A.   Yes.  If I was being treated bad, then I would

11  talk to Mr. Mazza.

12    Q.   Would you also feel comfortable going to some of

13  your teachers about that?

14    A.   Yes.

15    Q.   But do you feel that overall all of the teachers

16  and administrators, including your principals at

17  Bridgeport Middle School, have been supportive of your

18  status as a transgender student?

19    A.   Could you repeat the question?

20    Q.   Sure.  And I apologize, it was a long one.  Do

21  you believe that the teachers and administrators, and

22  that would include the principals and the other

23  employees at Bridgeport Middle School, have been

24  supportive of your transgender status?

142

```
 1      A.     Yes, I think they have been supportive.

 2      Q.     When you were on the cross-country team did you

 3   believe your teammates were supportive of you?

 4      A.     Yes.

 5      Q.     And how about in school, have you had any issues

 6   with other students or problems with students related to

 7   your transgender status?

 8              ATTORNEY HARTNETT:  Objection to form.

 9              THE WITNESS:  No.  No.

10              ATTORNEY DENIKER:  B█████, those are all

11   the questions I have for you now.  Thanks so much for

12   your time today.

13              ATTORNEY HARTNETT:  We can take a break.

14   I think this might be a good time to take a break and

15   then we can come back for questions.

16              VIDEOGRAPHER:  Okay.  Going off the

17   record.  The current time reads 2:28 p.m.

18   OFF VIDEOTAPE

19                        ---

20   (WHEREUPON, A SHORT BREAK WAS TAKEN.)

21                        ---

22   ON VIDEOTAPE

23              VIDEOGRAPHER:  We are back on the record.

24   The current time reads 2:42 p.m.
```

143

```
 1                              --

 2                          EXAMINATION

 3                             ---

 4   BY ATTORNEY HAMMOND:

 5       Q.    Hi, B█████.  My name is Kristen Hammond.  And I'm

 6   an attorney with the law firm of Bailey and Wyant.  And

 7   I represent the West Virginia State Board of Education

 8   and the State Superintendant Clayton Burch.  And I just

 9   have I think a few questions for you today.  Do you know

10   what the State Board of Education is?

11       A.    I don't know.

12       Q.    Okay.

13             And do you know or have you ever heard of the

14   West Virginia State Superintendant Clayton Burch?

15       A.    No.

16       Q.    Okay.

17             So I guess since you do not know them, do you

18   have any memory or any recall of maybe talking to

19   anybody at the State level or at the Board of Education

20   level regarding this lawsuit or regarding the House Bill

21   or your sports?  How about we limit it to that?

22       A.    I don't remember if I have or not.

23       Q.    Okay.

24             So you just don't recall.  Could you possibly
```

1  have talked to somebody?

2              ATTORNEY HARTNETT:  Objection to form.

3              THE WITNESS:  Could you repeat the

4  question?

5  BY ATTORNEY HAMMOND:

6     Q.   Yes.  I just want to see --- you say you don't

7  recall talking to anybody.  Do you think that it's a

8  possibility that you did talk to somebody or you don't

9  believe that you've talked to anybody?

10    A.   I don't believe I've talked to anybody.

11             ATTORNEY HAMMOND:  Okay.  Thank you for

12 your time.  I just had a couple of questions, and that's

13 all I have for you today.  Thank you.

14                         ---

15                      EXAMINATION

16                         ---

17 BY ATTORNEY DUCAR:

18    Q.   Good afternoon, B███.  I'm Timothy Ducar.  I

19 represent the Intervenor in this case.  I wanted to ask

20 you a question about Exhibit 29.  Do you have that

21 available?

22             MS. JACKSON:  Give me a second to find

23 it.

24             ATTORNEY DUCAR:  Yes, that's it.  Can you

1    scroll down just four paragraphs?   Thank you.

2    BY ATTORNEY DUCAR:

3        Q.    B██████, you had testified earlier that paragraph

4    that starts with I just want to run, that you had ---

5    that's a quote from you.

6              Correct?

7        A.    Yes.

8        Q.    I just wanted to know, is that a quote that you

9    wrote on paper and provided to somebody or wrote on a

10   computer and provided to somebody or did you actually

11   say that with your --- verbally?

12       A.    I said that.

13       Q.    Verbally?

14       A.    Yeah, I said that verbally.

15       Q.    Thank you.   When did you decide you liked

16   running?

17       A.    I've always liked running.   It's from when I

18   could walk, I liked running.

19              ATTORNEY DUCAR:   We're done with this

20   exhibit, Mr. Court Reporter.   Thank you.

21   BY ATTORNEY DUCAR:

22       Q.    When did you decide you wanted to try out for

23   the girls cross-country team?

24       A.    I've always wanted to do cross-country, so when

146

```
 1    I had the chance I decided I wanted to.

 2        Q.    And did you know about it because your brothers

 3   ran?

 4        A.    Yes.

 5        Q.    Did your mom encourage you to try out for the

 6   girls team?

 7                    ATTORNEY HARTNETT:  Objection to form.

 8                    THE WITNESS:  Yes.  Yes, she encouraged

 9   me.

10   BY ATTORNEY DUCAR:

11        Q.    And these try-outs were last summer.

12              Correct?

13        A.    Yes.

14        Q.    Going into sixth grade?

15        A.    Yes.

16        Q.    Did your dad encourage you to try out for the

17   girls team?

18        A.    Yes.

19        Q.    Earlier you testified that you did well in

20   cross-country.  Did you have any rankings?

21                    ATTORNEY HARTNETT:  Object to the form.

22                    THE WITNESS:  I --- could you rephrase

23   the question?

24   BY ATTORNEY DUCAR:
```

1      Q.     Do you have any idea how well you did on your

2  team as an individual?

3      A.     I don't know.

4      Q.     Do they keep track of individual times and ---?

5      A.     I think they put it on a website.

6      Q.     Is that something you have ever seen?

7      A.     My mom looks at it, but I don't.

8      Q.     Do you have any indication whether or not you

9  were one of the better runners or not one of the better

10  runners on the team?

11                 ATTORNEY HARTNETT:  Objection to form.

12                 THE WITNESS:  I don't know.  I think I

13  was good.

14  BY ATTORNEY DUCAR:

15      Q.     Do you want to run cross-country again next

16  year?

17      A.     Yes.

18      Q.     Track tryouts are coming up in the spring.

19             Correct?

20      A.     Yes.

21      Q.     And you intend to try out for track?

22      A.     Yes.

23      Q.     Do you want to compete in any other sports

24  besides track and cross-country?

```
 1      A.    Not really.

 2      Q.    Why not?

 3      A.    I don't find any other sport really interesting

 4  besides running.

 5      Q.    You said trusting?

 6      A.    Interesting.

 7      Q.    What does that mean?

 8      A.    What is interesting?

 9      Q.    Oh, interesting.  I misheard you.  Thank you.

10  And I think I misheard you on something else, so I'm

11  going to re-ask the question.  Do you like to compete?

12              ATTORNEY HARTNETT:  Objection to the

13  form.

14              THE WITNESS:  I'm not a really

15  competitive person.  I just play a sport because I think

16  it's fun.

17  BY ATTORNEY DUCAR:

18      Q.    Do you consider yourself a good athlete?

19      A.    Yes.

20      Q.    What makes you a good athlete?

21      A.    I'm good at running, good at the sports I do.

22      Q.    Do you try hard to win?

23      A.    Yes.  Well --- yes.

24      Q.    Have you talked to anybody else about playing
```

1   other sports other than cross-country and track?

2      A.    I've talked to my mom about playing other

3   sports.

4      Q.    What sports have you talked to her about?

5      A.    Volleyball and maybe basketball.

6      Q.    And describe for me what you guys talked about

7   as far as volleyball and basketball?

8      A.    We talked about trying new sports.

9      Q.    When did you two talk about those subjects?

10     A.    I can't remember.

11     Q.    Was it in the last six months or ---?

12     A.    I don't --- I can't remember.

13     Q.    Did you bring up the idea of playing volleyball

14  to her?

15     A.    Yes.

16     Q.    And what did she say?

17     A.    That's a good idea.

18     Q.    Did she say that about basketball as well?

19     A.    I think she may have brought up basketball, but

20  I can't remember.  It may have been me or her.

21     Q.    Did you feel like she was encouraging you to

22  play volleyball?

23     A.    She liked the idea.  So I wouldn't say

24  encouraged, but she thought it was a good idea.

150

1    Q.    Did she think playing basketball was a good

2    idea?

3                    ATTORNEY HARTNETT:  Objection to form.

4                    THE WITNESS:  I think so, yes.

5    BY ATTORNEY DUCAR:

6    Q.    And as you sit here right now, you don't have

7    any plans to go out for a volleyball or a basketball

8    team.

9            Correct?

10   A.    No, not right now.  No.

11   Q.    Do you foresee yourself running on the

12   cross-country team or on the track team later in high

13   school?

14                   ATTORNEY HARTNETT:  Objection to form.

15                   THE WITNESS:  Yes, yes.

16   BY ATTORNEY DUCAR:

17   Q.    Do you see yourself running on the cross-country

18   team or track team if you ever go to college on a

19   college team?

20                   ATTORNEY HARTNETT:  Same objection.

21   Objection to form.

22                   THE WITNESS:  Maybe, but I haven't

23   thought that far ahead.

24   BY ATTORNEY DUCAR:

151

1    Q.    Sure.   When was the first time you remember

2  thinking that you wanted to be a girl?

3                    ATTORNEY HARTNETT:   Objection to form.

4                    THE WITNESS:   I can't remember.

5  BY ATTORNEY DUCAR:

6    Q.    Do you remember the first time you talked to

7  somebody about the fact that you wanted to become a

8  girl?

9                    ATTORNEY HARTNETT:   Objection.

10                   THE WITNESS:   I also can't --- I don't

11  remember.

12  BY ATTORNEY DUCAR:

13    Q.    There's a statement in the record that indicates

14  you feel like a girl.   What does feeling like a girl

15  mean?

16                   ATTORNEY HARTNETT:   Objection to form.

17                   THE WITNESS:   I just know that I want to

18  be a girl and I feel like a girl inside.

19  BY ATTORNEY DUCAR:

20    Q.    You picked out the name B████ for yourself.

21        Correct?

22    A.    Yes.

23    Q.    When did you do that?

24    A.    Whenever I transitioned.

152

```
 1      Q.    Going into fourth grade?

 2      A.    Yes.

 3      Q.    How did you pick that name?

 4      A.    I've always liked it.

 5      Q.    Me, too.  I have a daughter named B███████

 6            Did anyone else help you pick that name?

 7      A.    I think my friends liked that name, too.

 8      Q.    When did you start wearing girl's clothing at

 9  home?

10      A.    I mean, I've always wanted my mom's clothes, so

11  I really started dressing like that maybe at home, third

12  grade, the year of third grade.

13      Q.    Did you ask your parents if you could do it or

14  did you just do it?

15      A.    I just did it.

16      Q.    What was their reaction?

17      A.    Positive.

18      Q.    When did you first ask your parents to refer to

19  you as she or her?

20      A.    When I transitioned.

21      Q.    Going into fourth grade?

22      A.    Yes.

23      Q.    When did you start presenting as a girl in other

24  ways at home?  I guess that would be makeup, other ways
```

1  besides clothing.

2                    ATTORNEY HARTNETT:  Objection to form.

3                    THE WITNESS:  Could you restate the

4  question, please?

5  BY ATTORNEY DUCAR:

6     Q.    Yeah.  I'll withdraw that question.

7           When did you start presenting as a girl at

8  home?

9     A.    It started when I was really young.

10                   ATTORNEY HARTNETT:  Objection.

11                   THE WITNESS:  But I fully started wearing

12  clothes on my own, not wearing my mother's, around the

13  third-grade year.

14  BY ATTORNEY DUCAR:

15    Q.    Do you wear jewelry?

16    A.    Not a lot.  I used to wear earrings but not

17  anymore.

18    Q.    Do you wear makeup?

19    A.    No.

20    Q.    Are there other ways you presented at home as a

21  girl besides dressing as a girl?

22    A.    Well, I always wanted girly --- a girly room and

23  girly items.

24    Q.    And you started wearing girls clothing in fourth

```
 1   grade.

 2            Correct?

 3    A.      Yes.

 4    Q.      Do you recall the first time you saw a doctor or

 5   a therapist about your desire to be a girl?

 6    A.      I can't remember.

 7    Q.      How did you first learn about puberty blocking

 8   treatment?

 9    A.      Could you repeat the question, please?

10    Q.      How did you first learn about puberty blocking

11   treatment?

12    A.      My mom.  My mom told me about it whenever I

13   transitioned.

14    Q.      And is that something that you wanted to do?

15    A.      Yes.

16    Q.      At some point you wanted to start hormone

17   therapy?

18    A.      Yes.

19    Q.      Do you know what that means?

20    A.      Getting female hormones.

21    Q.      B███, do you ever feel anxious?

22                    ATTORNEY HARTNETT:  Objection to form.

23                    ATTORNEY DUCAR:  Let me restate that.

24   That's fair.
```

155

1  BY ATTORNEY DUCAR:

2     Q.    Does the fact that you are transitioning make

3  you feel anxious?

4     A.    No.

5     Q.    Does the fact that you're part of this lawsuit

6  make you feel anxious?

7              ATTORNEY HARTNETT:  Objection to form.

8              THE WITNESS:  No.

9  BY ATTORNEY DUCAR:

10    Q.    Do you know what the word anxious means?

11    A.    Nervous.

12    Q.    Do you know what gender dysphoria is?

13    A.    Yes.

14    ████  █████████████████████████████████████████

15  ████████████████████

16            █████████████████  █████████████████

17            ██████████████  ██████████████████████

18  ███████████████████████████████

19            ATTORNEY DUCAR:  Thank you, B████.  I

20  have no further questions for you today.

21            ATTORNEY CAPEHART:  We have no further

22  questions at this time.  We're just going to note as we

23  have in the last two depositions the possibility of

24  having to revisit something.  If for some reason some

156

1  medical records would could to light, although I

2  understand that's unlikely, we're still noting that, but

3  you would object to that?

4           ATTORNEY HARTNETT:  Yes, we object, but

5  we appreciate you making the record you want to make.

6           ATTORNEY CAPEHART:  Thank you.

7           ATTORNEY HARTNETT:  I'm sorry.  Just on

8  that point, though, I mean, is there any specific item

9  that you lack today that you need to make a record?

10           ATTORNEY CAPEHART:  I think our concern

11  has been the possibility of new records that might be

12  produced following the depositions.

13           ATTORNEY HARTNETT:  Okay.  Thank you.

14           ATTORNEY CAPEHART:  Thank you.

15           ATTORNEY HARTNETT:  I mean, is anyone

16  else going to have any further questioning?  Sorry.

17  Just for the witness's awareness, we're confirming

18  whether or not there will be additional questioning from

19  any Defendant.

20           ATTORNEY ROGERS:  I don't have any

21  further questions.

22           ATTORNEY DENIKER:  I have no further

23  questions.  Thank you again for your time today, B█████.

24           ATTORNEY HAMMOND:  I have no further

1    questions.  Thank you.

2                    ATTORNEY DUCAR:  I have nothing further.

3    Thank you.

4                    ATTORNEY HARTNETT:  And we also have no

5    questions for the witness today.

6                    VIDEOGRAPHER:  Okay.  If there are no

7    further questions, that concludes today's deposition.

8    And the current time reads 3:01 p.m.

9                    COURT REPORTER:  Is it reading and

10   signing for your client?

11                   ATTORNEY HARTNETT:  Yes.  I'm sorry.  I

12   meant to say that on the record.

13                   * * * * * * *

14              VIDEOTAPED VIDEOCONFERENCE DEPOSITION

15                   CONCLUDED AT 3:01 P.M.

16                   * * * * * * *

17

18

19

20

21

22

23

24

158

1    STATE OF WEST VIRGINIA  )

2                         CERTIFICATE

3            I, Nicole Montagano, a Notary Public in

4    and for the State of West Virginia, do hereby

5    certify:

6            That the witness whose testimony appears

7    in the foregoing deposition, was duly sworn by me

8    on said date, and that the transcribed deposition

9    of said witness is a true record of the testimony

10   given by said witness;

11           That the proceeding is herein recorded

12   fully and accurately;

13           That I am neither attorney nor counsel

14   for, nor related to any of the parties to the

15   action in which these depositions were taken, and

16   further that I am not a relative of any attorney

17   or counsel employed by the parties hereto, or

18   financially interested in this action.

19           I certify that the attached transcript

20   meets the requirements set forth within article

21   twenty-seven, chapter forty-seven of the West

22   Virginia.

23           OFFICIAL SEAL
             NOTARY PUBLIC
24           STATE OF WEST VIRGINIA          Nicole Montagano,
             Nicole Montagano
             Sargent's Court Reporting Service, Inc.
             HUB Business Center Suites
25           Martinsburg WV 25401                Court Reporter
             My Commission Expires November 26, 2026