IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA
CHARLESTON DIVISION

B. P. J., by her next friend and mother,
HEATHER JACKSON,

    Plaintiff,

v.

WEST VIRGINIA STATE BOARD OF
EDUCATION, HARRISON COUNTY
BOARD OF EDUCATION, WEST VIRGINIA
SECONDARY SCHOOL ACTIVITIES
COMMISSION, W. CLAYTON BURCH, in
his official Capacity as State Superintendent,
DORA STUTLER, in her official capacity as
Harrison County Superintendent, and THE
STATE OF WEST VIRGINIA,

    Defendants.

and LAINEY ARMISTEAD,

    Intervenor Defendant.

CIVIL ACTION NO. 2:21-cv-00316
Judge Joseph R. Goodwin

## Memorandum in Support of Motion of Defendant State of West Virginia to (1) Strike Expert Opinion of Professor Mary Fry, (2) Exclude Mary Fry from providing Expert Testimony and (3) for a Daubert Hearing

### INTRODUCTION

Plaintiff challenges West Virginia's HB 3293 ("H.B. 3293"), codified as W. Va. Code § 18-2-25d, ("Section 25d" or the "Save Women's Sports Act"). This statute reserves participation in female athletic events to biological females to protect the integrity, fairness, competitive incentive, and safety of biological female athletes. Specifically it states: "Athletic teams or sports designated for females, women, or girls shall not be open to students of the male sex where selection for such teams is based upon competitive skill or the activity involved is a contact sport." *Id.* § 25d(c)(2). The issues presented by this matter generally are whether Section 25d violates Title IX or the Equal Protection Clause.

While these are fully briefed in the State's Memorandum in Support of Motion for Summary Judgment (ECF No. 287), a short summary here is useful. Title IX provides: "No person in the United States shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any education program or activity receiving Federal financial assistance[.]" 20 U.S.C. §1681(a). The relevant implementing regulation is 34 CFR § 106.41(b), which explicitly allows entities subject to Title IX to "operate or sponsor separate teams for members of each sex where selection for such teams is based upon competitive skill or the activity involved is a contact sport." And § 106.41(c) requires that all subject entities "shall provide equal athletic opportunity for members of both sexes." The only question on this issue is whether separating team members based on biological sex in Section 25d violates this regulation.

The Equal Protection Clause provides: No State shall "deny to any person within its jurisdiction the equal protection of the laws." U.S. Const. amend. XIV, § 1. As long recognized by the Supreme Court, the Equal Protection Clause is "essentially a direction that all persons similarly situated should be treated alike." *City of Cleburne v. Cleburne Living Ctr.*, 473 U.S. 432, 439 (1985). Assuming the Court continues to apply intermediate scrutiny (as it did in the preliminary injunction order), the State first must show that the "classification serves important governmental objectives." *United States v. Virginia*, 518 U.S. 515, 524 (1996) (cleaned up). "[T]he state must persuasively show that certain gender-based classifications serve 'important governmental objectives' and that the statute in question is 'substantially related to the achievement of those objectives.'" *Roubideaux v. N. Dakota Dep't of Corr. & Rehab.*, 570 F.3d 966, 974 (8th Cir. 2009) (citing *Ways v. City of Lincoln*, 331 F.3d 596, 600 (8th Cir.2003) and *Virginia*, 518 U.S. at 533). These are the two questions presented to the Court in evaluating the equal protection claim.

Plaintiff has submitted the expert report of Professor Mary Fry ("Fry Expert Report" (ECF 289-28)). The Court should strike the Fry Expert Report and exclude any future testimony under

Federal Rules of Evidence Rules 401and 702 and *Daubert v. Merrell Dow Pharmaceuticals, Inc.,* 509 U.S. 579 (1993). Professor Fry does not address the issues presented to the Court, and to the extent Fry's opinions arguably relate in some way, Fry is not qualified to opine on them. Further, the Fry Expert Report does not employ a reliable methodology in reaching her conclusions.

**I. Admissibility Standards Under FRE Rules 401 and 702 and under *Daubert*.**

Only relevant evidence is admissible. *See* Fed. R. Evid. ("FRE") Rule 401. Under FRE Rule 702, an expert's testimony is only admissible if it meets "exacting standards of reliability." *Weisgram v. Marley Co.*, 528 U.S. 440, 455 (2000). By filing a *Daubert* motion, the burden shifts to plaintiff to prove that Plaintiff's proffered expert testimony is admissible under *Daubert*. *See Id.* at 596.

FRE Rule 401 (Test for Relevant Evidence) states: "Evidence is relevant if: (a) it has any tendency to make a fact more or less probable than it would be without the evidence; and (b) the fact is of consequence in determining the action."

FRE Rule 702 provides:

> A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if:
> (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;
> (b) the testimony is based on sufficient facts or data;
> (c) the testimony is the product of reliable principles and methods; and
> (d) the expert has reliably applied the principles and methods to the facts of the case.

The Plaintiff first needs to establish that Professor Fry has the necessary *qualifications and expertise* comprised of sufficient "knowledge, skill, experience, training, or education" (FRE 702) to offer an opinion on the specific issue of the proposed testimony as it relates to the facts of the case. Second, the plaintiff needs to establish that the expert's opinion is reliable and adheres to relevant methodology and procedures of the field as opposed to mere objective beliefs and fringe practices of the expert's unsupported speculation. *See Daubert,* 509 U.S. at 589-90. FRE 702

similarly requires that the evidence is based on *sufficient data and facts* and are the product of *reliable methodology*, all of which was applied reliably to the facts of the case. District courts "should undertake a rigorous examination of the facts on which the expert relies." *Amorgianos v. Nat'l R.R. Passenger Corp,* 303 F. 3d 256, 267 (2d Cir. 2002). It is "critical that an expert's analysis be reliable at every step" to include how the expert applies facts to the case and form their analysis therein and judges should exclude evidence which lacks good grounds for its conclusions. *Id*.

Third, the Plaintiff must prove that the testimony will directly assist a trier of fact to "determine a fact in issue," (FRE Rule 702) and that the evidence must be tied directly to the facts at issue in the case, i.e., closely related. *Daubert,* 509 U.S. at 591-92. And there must not be too wide a gap between the methodology and the conclusion, inferring the conclusion must be a logical one from the methodology employed. *See Gen. Elec. Co. v. Joiner*, 522 U.S. 136, 146 (1997).

*Daubert* expressly holds that the relevant factors for determining admissibility are "(1) whether a theory or technique has been or can be tested; (2) whether the theory or technique has been subjected to peer review and publication; (3) a technique's known or potential rate of error, and the existence and maintenance of standards controlling the technique's operation; and (4) whether a particular technique or theory has gained general acceptance in the relevant scientific community." *Unites States v. Williams*, 506 F.3d 151, 160 (2d Cir. 2007) (citing *Daubert*, 509 U.S, at 593-94) (cleaned up). Additionally, these standards apply to non-scientific evidence as well, and therefore would apply to any testimony relating to the data-driven justification of the Sports Act. *See Kumho Tire Co., Ltd. v. Carmichael,* 526 U.S. 137 (1999) (noting that *Daubert's* principles apply to all expert testimony).

While *Daubert* hearings are more critical for a jury trial than for a bench trial or hearing, "the *Daubert* standards of relevance and reliability for scientific evidence must nevertheless be met." *Seaboard Lumber Co. v. United States,* 308 F.3d 1283, 1302 (Fed. Cir. 2002). Indeed, even when the judge is the factfinder, "the failure to conduct any form of 'assessment' of an expert and

the proposed testimony before admitting the testimony is an abuse of discretion." *UGI Sunbury LLC v. A Permanent Easement for 1.7575 Acres,* 949 F.3d 825, 833 (3d Cir. 2020).

## II. Professor Fry's Opinions on Benefits of Sports are Is Both Irrelevant and Fail to Apply a Reliable Methodology.

Professor Fry explains that the scope of her expert report is "(1) the psychological and behavioral benefits of sports for youth and young adults (including collegiate athletes); and (2) the conditions that lend themselves to youth and young adults participating in athletics and accessing those benefits when they do participate." Fry Expert Report (Ex. A; "Fry Report") ¶2. Accordingly, her opinions should be limited to that scope.

Generally, Professor Fry unsurprisingly concludes there are (in at least some situations) benefits to playing sports, that certain individual attitude orientations are better than others, and that some coaching styles are preferable over others. But none of this is relevant to the issues in this case, i.e. if the Save Women's Sports Act violates Title IX or the Equal Protection Clause.

Professor Fry first opines that there are benefits to playing sports. Fry Report ¶21. Fry next concludes that there are benefits for athletes to have a "high task orientation" (Fry Report ¶29) and opines that a "task-involving" team climate is preferable over an "ego-involving" climate. Fry Report ¶¶ 32, 34. Indeed, Fry spends the vast majority of the Fry Report (¶¶18-36; 38, 40, 42) discussing ego-involving vs. task-involving athlete orientation and coaching styles and climates.[1] Those observations are interesting for academia and coach training, but they are not remotely in dispute here; they are never mentioned in any pleading and they have nothing to do with this case. Indeed, it is hard to imagine any lawsuit in which those topics would be relevant for expert testimony.

First, no one disputes that there can be benefits to playing sports – it is common knowledge. Further, the benefits (or lack thereof) of participation in sports, an athlete's task vs. ego orientation,

---

[1] Fry also admits that Paragraph 32 of the Fry Declaration is not supported by the source cited in the paragraph. Fry Deposition ("Fry Dep."). Ex. B at 190:23 - 194:8.

or the coaching environment are not at issue in this case. Indeed, there is nothing in Section 25d that mandates any particular coaching style or regulates task vs. ego team orientation. Accordingly, these opinions and declaration paragraphs should be excluded because they cannot "help the trier of fact to understand the evidence or to determine a fact" in the case. FRE Rule 702(a).

Consequently, Fry's foregoing opinions and statements are irrelevant and inadmissible. "Expert testimony which does not relate to any issue in the case is not relevant and, ergo, non-helpful." *Daubert,* 509 U.S. at 591 (cleaned up). *See also Newman v. Motorola, Inc.,* 78 Fed.Appx. 292, 294 (4th Cir. 2003) (evidence speaking to issues not present are irrelevant and inadmissible). Furthermore, this testimony has no tendency to make a fact at issue more or less probable than it would be without the testimony, so under FRE 401(a), it is by definition irrelevant, and under Rule 401(b), it is of no consequence in determining the action. And as a restatement of common knowledge, the Court should exclude them. *United States v. Harrison,* 995 F.2d 532, 534-35 (4th Cir. 1993).

Fry also asserts "<u>Focusing Solely on Performance Outcomes Undermines the Benefits of Sport for Youth and Young Adult Athletes</u>." Fry Report at 5 (heading). Fry opined: "A myopic focus on winning in youth and young adult athletics ignores the other important benefits that school athletics offer young athletes, such as teamwork and camaraderie, which are advanced when all athletes have the opportunity to play the sport they love and reap the benefits of such participation." Fry Report ¶18. Yet Fry is not aware of any schools or colleges having a policy that "focuses solely on performance outcomes." Fry Dep. 121: 15-18, Ex. B. Nor does Fry claim that the Save Women's Sports Act requires such focus. *Id*. at 122: 4-7. Fry testified that there is, in fact, "an appropriate level of focus on winning" (Fry Dep. 123:1-5) and further testified that there is "nothing in H.B. 3293 that says there should be a sole or myopic focus on winning in any of the sports it covers." *Id*. at 124:4-9. Again, Fry addresses something that is neither at issue nor in dispute. This opinion is irrelevant and should be excluded.

The Plaintiff has made clear that B.P.J. wants to compete – and win. B.P.J. desired to "try out" for the girls' team, Am. Compl. ¶¶ 1, 37, and to "compete," Am. Compl ¶¶1, 36, 79, 80, and 83. *See also* B.P.J. Dep. 77:3-19 (B.P.J. "would like to win") and Jackson Dep. 133-134, ECF No. 285-2. But Fry insists that winning is not a primary benefit of sports (Fry Dep. 96:16-21) and winning, rankings, and publicity are "lower on what we value." *Id.* at 98:5-17. "An additional consideration under Rule 702—and another aspect of relevancy—is whether expert testimony proffered in the case is sufficiently tied to the facts of the case that it will aid the jury in resolving a factual dispute." *Daubert*, 509 U.S. at 591 (cleaned up). The fact is B.P.J. wants to win. The fact is athletes compete because they want to win—that is what it means to compete. Fry is not free to ignore those facts, and her opinions ignoring this are not "sufficiently tied to the facts" of this case, are simply irrelevant, and must be excluded. To the extent that Fry's point is that there are other benefits beyond the opportunity to win, those benefits are neither contested or at issue, again rendering this opinion inadmissible.

### III. Fry's Opinions on Fairness and Arbitrariness are Beyond Her Expertise and are Irrelevant.

In Fry's May 7, 2021, Declaration (ECF 2-1), Fry declared: "If athletes are arbitrarily[2] excluded from youth sports, they are, in turn, deprived of those positive experiences and outcomes and their teammates are deprived of a genuinely" optimal sport experience. *Id*. at ¶44. In Fry's January 24, 2022, Declaration (ECF No. 289-27), Fry modified the foregoing to: "If *transgender* students are arbitrarily excluded from youth sports, they are, in turn, deprived of those positive experiences and outcomes and their teammates are deprived of a genuinely optimal sport experience." *Id*. ¶37 (emphasis added). At deposition, Fry was unable to identify any such arbitrary exclusions in any youth sports. Fry Dep. 163:5 – 23. But on further discussion

---

[2] Remarkably, Fry – despite using the term numerous times in the expert report – initially would not or could not define or agree to a definition of "arbitrary." "Q: Let me ask you about the definition of another word that appears periodically, the word arbitrary. And I looked that up in a dictionary, an online dictionary, Cambridge.org, and the definition it gave me was based on chance rather than being planned or based on reason. Is that a fair definition of arbitrary? A: I'm not sure. Q. Okay. What is your definition of arbitrary? A: I'm not sure." Fry Dep. 44:1 – 45:8.

recognized that "categorical exclusions" can be fair when the athletes "have another area where they can compete." *Id.*, 164:1 – 166:3.

Fry even agreed that *it would not* be arbitrary to exclude transgender students for "safety concerns or performance concerns" if supported by "data that experts come to agree" on. Fry Dep. 166:5 – 167:24. Fry admitted to having no expertise with respect to "safety concerns or performance concerns, *Id.*, and to not being "the best person to make" decisions regarding rules on "when transgender girls can participate in those specific girls sports[.]" *Id.*, at 168. Fry ultimately agreed that "we should rely on experts" for "safety" and "performance" issues. *Id.* at 117:3 – 11.

Fry further agreed that not all transgender girls should be allowed on girls' teams – she just doesn't know which ones. *Id.* at 208:21 – 209:8 ("it would be okay to exclude some transgenders—transgender girls from competing on girls teams but not all"). According to Fry, before allowing a biological male who identifies as a female to participate on a girls' team, "we would want that person to transition." *Id.* at 173:5-22. But Fry could not explain what degree of transitioning would be "necessary" to participate, *Id.* at 174, or how long a person "has to live as a girl before participating on the girls team." *Id.* at 183:10-17. Fry "is not the best person for that[.]" *Id.* Fry also could not explain on which team (i.e. males, females, or other) nonbinary or bigender athletes should play. *Id.* 171 - 173. Summarizing, Fry admitted that these issues are "just really hard stuff." *Id.* at 213:24 – 214:1.

Fry agreed that while "fairness in sports is an important value," *Id.* at 105:3-6, "the right question is what's fair to everyone, not just to the transgender person, but also to the biological girls[.]" *Id.* at 225:17 – 226:2. And Fry agreed that "the question is how do we balance that inclusion and fairness." *Id.* However, although Fry referenced the importance of fairness to all in sports, Fry has not done research or written papers on "fairness in sports," *Id.* at 105, and disclaimed offering an opinion on the issue. Nevertheless, Fry agreed that "there are a lot of things that go into fairness" and "balancing of interests," *Id.* at 107: 18-23, but had not attempted to do

8

that balancing in connection with H.B. 3293. *Id*. at 107: 6 – 108:112. Fry is admittedly "not an expert on what's fair and what's unfair," *Id*. at 197: 9-13, and it was not a "primary area of study" for Fry. *Id*. Thus, Fry has no qualifications "by knowledge, skill, experience, training, or education" regarding what is fair or what is unfair in this context. *See* FRE Rule 702. Nor do her listed qualifications qualify her to determine what is "arbitrary" in this context.

Nevertheless, Fry does espouse a novel and arbitrary theory of exclusion. Despite opining on the great benefits of sports and Fry's "wish" for every school district to do "everything possible to include as many kids, as many athletes as they could," Fry Dep. 252:5-9, Fry would allow males who do not perform well enough to run on a boys track team to participate on a female team if they identify as a female. *Id.* at 254:5-14. But, if a male does not perform well enough to run on a boys track team, but does not identify as a girl, Fry says the child should not be allowed to be on the girls team – simply because of the child's self-identity – not for any scientifically-based reason. *Id.* Thus, based on solely on that arbitrary designation, the child would be excluded from participating in a favored sport on a favored team and lose the benefits that Fry insists are so important. *Id.* at 251:2 – 254:14.

Further, despite Fry's lack of fairness expertise and lack of study in the area, Fry speculated that "it is not an option" for BPJ to be on the boys teams: "I just point to BPJ [sic], right, who has identified as a girl for a long time and looks very much like a girl[.]" *Id.* at 176:20 – 177:13. If there is any *arbitrary* characteristic of participating on a girls' team, it is using the characteristic of whether the person "looks very much like a girl." Fry's speculation here is certainly not "the product of reliable principles and methods." FRE Rule 702(c). *See also Higginbotham*, 85 Fed.Appx. at 915 (where the court held conclusions derived from speculation were inadmissible). This further disqualifies Fry as an expert.

Fry clearly does not have any education or other "sufficient specialized knowledge" on either fairness or arbitrariness to provide an expert opinion on these issues. *Wheeling Pittsburgh Steel Corp. v. Beelman River Terminals*, Inc., 254 F.3d 706, 715 (8th Cir. 2001). Indeed, these

9

issues "exceed the scope of [Fry's] expertise." *Id*. Therefore, Fry's declarations and testimony on these issues should be stricken and barred.

Further, Fry's own speculation on what might be fair or non-arbitrary shows a total lack of understanding and complete lack of any scientific or other accepted methodology on fairness and arbitrariness in participation in female sports. Fry does not have any "reliable methodologies" to be "reliably applied" on these issues, she provides no methodologies at all. *In re Lipitor (Atorvastatin Calcium) Mktg., Sales Pracs. & Prod. Liab. Litig. (No II) MDL 2502,* 892 F.3d 624, 637 (4th Cir. 2018). Indeed, any opinions Fry does have regarding these issues are nothing more than impermissible and inadmissible speculation. *Higginbotham,* 85 Fed.Appx. at 915. As such, Fry should not be permitted to testify on these issues. Fry simply has no expertise to inform the court if Section 25d is arbitrary. Besides Fry's lack of qualifications, speculative assertions, and lack of reliable methodologies, the Court should "not permit the parties to use experts to usurp the [fact-finder's] function by allowing an expert to testify as to" whether the subject law is arbitrary. *Eghnayem v. Bos. Sci. Corp*., 57 F. Supp. 3d 658, 670 (S.D.W. Va. 2014).

Finally, Fry believes that the school must honor the feelings of B.P.J., who chooses to participate on the girls teams, but that "biological girls who are uncomfortable with a biological male identifying as a female or a transgender girl "playing on the girls team" just "have to deal with it." Fry Dep. at 178:10-13;179:19. This is not backed by any expertise, science or any methodology. It is simply another more of Fry's "ipse dixit statement[s]" which are "simply not sufficient as a matter of law." *McEwen v. Baltimore Washington Med. Ctr. Inc.*, 404 F. Appx 789, 791 (4th Cir. 2010). Again, giving a personal opinion that biological females should just "deal with" competing against and possibly losing to biological males based on Fry's speculation that women do not, or should not, care about winning is not admissible, and the Court should exclude it. *See Higginbotham,* 85 Fed.Appx. at 915 (4th Cir. 2004) (where the court held conclusions derived from speculation were inadmissible).

## CONCLUSION

For the foregoing reasons the Court should grant this motion, strike the Declarations of Professor Fry and exclude Fry from submitting any at any hearing or trial.

Respectfully submitted,

PATRICK MORRISEY
  *West Virginia Attorney General*

/s/ *Curtis R. A. Capehart*
Douglas P. Buffington II (WV Bar # 8157)
  *Chief Deputy Attorney General*
Curtis R.A. Capehart (WV Bar # 9876)
  *Deputy Attorney General*
David C. Tryon (WV Bar #14145)
  *Deputy Solicitor General*
OFFICE OF THE WEST VIRGINIA ATTORNEY GENERAL
State Capitol Complex
1900 Kanawha Blvd. E, Building 1, Room E-26
Charleston, WV 25305-0220
Telephone: (304) 558-2021
Facsimile: (304) 558-0140
Email:  David.C.Tryon@wvago.gov

*Counsel for Plaintiff, STATE OF WEST VIRGINIA*

DATE: May 12, 2022

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA
CHARLESTON DIVISION

B. P. J., by her next friend and mother,
HEATHER JACKSON,

    Plaintiff,

v.

WEST VIRGINIA STATE BOARD OF
EDUCATION, HARRISON COUNTY
BOARD OF EDUCATION, WEST VIRGINIA
SECONDARY SCHOOL ACTIVITIES
COMMISSION, W. CLAYTON BURCH, in
his official Capacity as State Superintendent,
DORA STUTLER, in her official capacity as
Harrison County Superintendent, and THE
STATE OF WEST VIRGINIA BOARD OF
EDUCATION, et al.,

    Defendants.

and LAINEY ARMISTEAD,

    Intervenor Defendant.

CIVIL ACTION NO. 2:21-cv-00316
Judge Joseph R. Goodwin

## CERTIFICATE OF SERVICE

    I hereby certify that, on this 12th day of May 2022, I electronically filed the foregoing Memorandum with the Clerk of Court and all parties using the CM/ECF System.

                                                  */s/ Curtis R. A. Capehart*
                                                  Curtis R. A. Capehart