IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA
CHARLESTON DIVISION

| | |
|---|---|
| B.P.J., by her next friend and mother, HEATHER JACKSON<br><br>*Plaintiff,*<br><br>    v.<br><br>WEST VIRGINIA STATE BOARD OF EDUCATION, HARRISON COUNTY BOARD OF EDUCATION, WEST VIRGINIA SECONDARY SCHOOL ACTIVITIES COMMISSION, W. CLAYTON BURCH in his official capacity as State Superintendent, DORA STUTLER in her official capacity as Harrison County Superintendent, and THE STATE OF WEST VIRGINIA<br><br>*Defendants*,<br><br>    and<br><br>LAINEY ARMISTEAD<br><br>*Defendant-Intervenor.* | Case No. 2:21-cv-00316<br><br>Hon. Joseph R. Goodwin<br><br>Oral Argument Requested |

MEMORANDUM IN SUPPORT OF DEFENDANT-INTERVENOR'S MOTION TO EXCLUDE
EXPERT TESTIMONY OF MARY FRY

TABLE OF CONTENTS

Table of Authorities .................................................................................. iii

Introduction ............................................................................................... 1

Legal Standard .......................................................................................... 2

Argument ................................................................................................... 3

    I.    Dr. Fry's simplistic opinion that students benefit from sports should be excluded because it is irrelevant to any issues in dispute and unnecessary to assist the trier of fact ...................................................... 4

    II.    Dr. Fry's general opinion that participation, not performance, is paramount in school sports is irrelevant, not the proper subject of expert testimony, and unreliable ........................................................... 6

        A.    Dr. Fry's opinion that participation is paramount is irrelevant because she cannot explain who should be allowed on women's sports teams. .................................................................... 7

        B.    Dr. Fry's opinion that schools should prioritize participation over performance is an inadmissible public-policy opinion, not a scientific opinion. ................................................................... 10

        C.    Dr. Fry's opinion is unreliable because the relevant literature does not support her position. ..................................................... 12

    III.    Dr. Fry's opinion that preserving women's sports for biological women is "arbitrary" should be excluded as unreliable and methodologically unsound ........................................................................ 14

        A.    Dr. Fry cannot explain what "arbitrary" means. ....................... 14

        B.    Dr. Fry provides no scientific evidence that preserving women's sports for biological women harms anyone ................. 16

        C.    Dr. Fry's opinion about exclusions was added to a pre-existing document with no supporting research. .................................... 18

Conclusion ............................................................................................... 19

Certificate of Service ............................................................................... 21

# Table of Authorities

**Cases**

*Board of Trustees, Sheet Metal Workers' National Pension Fund v. Palladium Equity Partners, LLC,*
722 F. Supp. 2d 845 (E.D. Mich. 2010) ........................................................ 11, 12

*Clark, By & Through Clark v. Arizona Interscholastic Association,*
695 F.2d 1126 (9th Cir. 1982) ............................................................... 11

*Cooper v. Smith & Nephew, Inc.,*
259 F.3d 194 (4th Cir. 2001) ............................................................... 2, 3

*Daubert v. Merrell Dow Pharmaceuticals, Inc.,*
43 F.3d 1311, 1315 (9th Cir. 1995) ..................................................... 5, 16

*Daubert v. Merrell Dow Pharmaceuticals, Inc.,*
509 U.S. 579 (1993) ........................................................................... 3

*Doe v. Ortho–Clinical Diagnostics, Inc.,*
440 F. Supp. 2d 465 (M.D.N.C. 2006) ............................................... 16

*Eline v. Town of Ocean City, Maryland,*
7 F.4th 214 (4th Cir. 2021) .............................................................. 10

*General Electric Co. v. Joiner,*
522 U.S. 136 (1997) ......................................................................... 17

*Gregor v. West Virginia Secondary School Activities Commission,*
No. 2:20-cv-00654, 2020 WL 5997057 (S.D.W. Va. Oct. 9, 2020) ..................... 8

*Haller v. AstraZenica Pharmaceuticals LP,*
598 F. Supp. 2d 1271 (M.D. Fla. 2009) .......................................... 18

*In re C.R. Bard, Inc.,*
948 F. Supp. 2d 589 (S.D.W.Va. 2013) ........................................... 15

*In re Davol, Inc./C.R. Bard, Inc., Polypropylene Hernia Mesh Products Liability Litigation,*
546 F. Supp. 3d 679 (S.D. Ohio 2021) ............................................. 7

*In re Lipitor,*
892 F.3d 624 (4th Cir. 2018) .......................................................... 13

*Kumho Tire Co. v. Carmichael,*
526 U.S. 137 (1999) ........................................................................ 2

*Lowery v. Sanofi-Aventis, LLC,*
No. 7:18-cv-00376-RDP, 2021 WL 872620 (N.D. Ala. Mar. 9, 2021) ............... 8

*Maryland Casualty Co. v. Therm-O-Disc, Inc.,*
137 F.3d 780 (4th Cir. 1998) .......................................................... 2

*McCormick ex rel. McCormick v. School District of Mamaroneck*,
    370 F.3d 275 (2d Cir. 2004) ............................................................... 6, 10

*Modern Remodeling, Inc. v. Tripod Holdings, LLC*,
    Civ. A. No. CCB-19-1397, 2021 WL 5234698 (D. Md. Nov. 9, 2021)................ 5

*Neal v. Board of Trustees of California State Universities*,
    198 F.3d 763 (9th Cir. 1999) ............................................................... 10

*Oglesby v. General Motors Corp.*,
    190 F.3d 244 (4th Cir. 1999) ............................................................... 17

*Persinger v. Norfolk & Western Railway Co.*,
    920 F.2d 1185 (4th Cir. 1990) ........................................................... 5, 6

*Sardis v. Overhead Door Corp.*,
    10 F.4th 268 (4th Cir. 2021) ............................................................. 3, 5

*Security & Exchange Commission v. Ambassador Advisors, LLC*,
    No. 5:20-cv-02274-JMG, 2021 WL 6052589 (E.D. Pa. Dec. 21, 2021)....... 10, 12

*United States v. Bynum*,
    3 F.3d 769 (4th Cir. 1993) .................................................................. 15

*United States v. Crisp*,
    324 F.3d 261 (4th Cir. 2003) ................................................................ 2

*United States v. Lespier*,
    725 F.3d 437 (4th Cir. 2013) ................................................................ 2

*Williams v. School District of Bethlehem, Pennsylvania*,
    998 F.2d 168 (3d Cir. 1993) ............................................................... 11

*Wu v. Mississippi State University*,
    No. 1:13-CV-00002-DMB, 2014 WL 5799972 (N.D. Miss. Nov. 7, 2014) ...... 2, 6

**Statutes**

W. Va. Code § 18-2-25d...................................................................... passim

**Rules**

Fed. R. Evid. 702.................................................................................. 2

**Regulations**

34 C.F.R. § 106.41 ............................................................................... 10

## Introduction

Lainey Armistead intervened in this case to ensure that women and girls have equal opportunities to succeed and excel in their own sports. Armistead did so because Plaintiff B.P.J. has challenged the West Virginia's Sports Act (W. Va. Code § 18-2-25d), arguing that West Virginia must allow biological males who identify as females to compete on female sports teams.

In support of this position, B.P.J. offers the expert testimony of Professor Mary Fry to show that athletes benefit from competing in sports. That premise somehow leads Dr. Fry to conclude that West Virginia should allow biological males on female sports teams. But the conclusion does not follow. Dr. Fry's testimony does not cite any studies, sources, data, or anything else *specific to athletes who identify as transgender*. Her report offers a mere truism that applies to athletes no matter their sex or gender identity—sports benefit those who participate. That testimony does not and cannot illuminate the question before this Court: whether biological men who identify as women should compete on women's sports teams and displace biological women. Thus, Dr. Fry's testimony is irrelevant, her methods unreliable, her findings speculative, and her opinions unhelpful.

Perhaps with one exception. Dr. Fry's testimony does underscore the radical result of B.P.J.'s legal claims. If all athletes benefit from athletic competition and if the state must prioritize participation over performance, then men who identify as men should be allowed to compete on women's teams too. After all, many of these men cannot make men's athletic teams and would benefit from participation on the women's team. But participation isn't the only game in town. Fair competition also counts. So does safety. That's why we have sex-separated teams in the first place. And Dr. Fry cannot explain why women like Ms. Armistead should suffer and lose their opportunities to participate and compete in women's sports in the name of maximizing others' participation. Dr. Fry's response to women like Ms. Armistead is

1

her participation doesn't matter that much. The erasure of women like Ms. Armistead simply underscores that Dr. Fry's testimony is unhelpful and should be excluded.

### Legal Standard

Fed. R. Evid. 702's purpose is to act as a "gatekeeping function" over expert testimony. *United States v. Crisp*, 324 F.3d 261, 265 (4th Cir. 2003). To fulfill this function, courts evaluate whether the experts have "intellectual rigor" in the relevant field and whether the testimony helps the trier of fact "understand the evidence or to determine a fact in issue." *Cooper v. Smith & Nephew, Inc.*, 259 F.3d 194, 203 (4th Cir. 2001) (citing *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 152 (1999)); Fed. R. Evid. 702(a). The helpfulness requirement prohibits expert testimony that merely explains matters "obviously ... within the common knowledge" of the factfinders. *United States v. Lespier*, 725 F.3d 437, 449 (4th Cir. 2013) (citation omitted). And the party proffering the expert testimony must "com[e] forward with evidence" where the court can determine if the testimony is properly admissible. *Maryland Cas. Co. v. Therm-O-Disc, Inc.*, 137 F.3d 780, 783 (4th Cir. 1998).

An expert witness should "help the trier of fact to understand the evidence or determine a fact in issue." *Lespier*, 725 F.3d at 449 (quoting Fed. R. Evid. 702(a)). But if an expert offers testimony about a fact that no party disputes, this testimony is "inappropriate and unnecessary." *Wu v. Miss. State Univ.*, No. 1:13-CV-00002-DMB, 2014 WL 5799972, at *11 (N.D. Miss. Nov. 7, 2014) (citation omitted). And if an expert's testimony relates to matters which are "obviously ... within the common knowledge" of the factfinder, then that testimony will be excluded. *Lespier*, 725 F.3d at 449.

In addition, an expert opinion must be scientifically reliable. To be reliable under Fed. R. Evid. 702, expert opinions must be (1) "based on sufficient facts or data", (2) "the product of reliable principles and methods", and (3) "the product of a

reliable application of those principles and methods to the facts of the case." *Sardis v. Overhead Door Corp.*, 10 F.4th 268, 281 (4th Cir. 2021) (cleaned up) (quoting *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579, 597 (1993)). The court is not required to accept the opinion evidence "that is connected to existing data only by the *ipse dixit* of the expert." *Cooper*, 259 F.3d at 203.

Argument

Dr. Fry offers three basic opinions, none of which are admissible.

*First*, she opines that sports benefit people. This testimony is unnecessary, irrelevant, and does not speak to the question of who should be allowed to participate on women's sports teams. It should therefore be excluded.

*Second*, she opines that the proper goal of school sports is to create what she calls a "task-involving climate" that focuses on participation, not competitive performance. Again, this testimony is not relevant because it does not address who should be allowed to participate on women's sports teams. It also usurps the legislature's function by asserting which of many potential policy goals should be paramount, instead of providing a scientific opinion. And it ignores the considerable literature that other goals—namely competitive fairness and safety—also contribute to a positive sports experience. For all of these reasons, Dr. Fry's opinion that participation is paramount should be excluded.

*Third*, Dr. Fry opines that excluding biological men who identify as women from women's sports teams is "arbitrary." This testimony is unreliable because Fry makes no effort to ground her opinion in any kind of scientific methodology, any published scientific evidence, or any independent research. Indeed, she cannot even explain how to determine what is "arbitrary." Because none of her opinions can survive the Court's gatekeeping function, Dr. Fry should be excluded from testifying in this case.

3

I.   **Dr. Fry's simplistic opinion that students benefit from sports should be excluded because it is irrelevant to any issues in dispute and unnecessary to assist the trier of fact.**

Dr. Fry testified that she was "called to be an expert witness in this case to speak to the many benefits that come from participating in sports." Def.-Intervenor's App. in Supp. of Mot. for Summ. J. ("App.") 519–20 (109:24–110:2).[1] Thus, Dr. Fry's primary opinion, which is woven throughout her report and deposition, is that youth sports provide young athletes with positive experiences and various benefits. Def.-Intervenor and the State of W. Va.'s App. in Supp. of Mots. to Exclude Expert Test. of Drs. Adkins, Fry, Janssen, and Safer ("Daubert App.")[2] 72 (¶ 2) (purpose of the report is to offer opinion on "psychological and behavioral benefits of sports for youth"); Daubert App. 76 (¶ 18) ("have the opportunity to play the sport they love and reap the benefits of such participation"); Daubert App. 76 (¶ 19) ("youth sport creates a myriad of benefits"); Daubert App. 81–82 (¶ 37) (describing goals of youth sports as "creating space for athletes to have fun, develop skills, make friends, increase their levels of physical activity, continue their participation over time, and learn valuable life lessons"); Daubert App. 82 (¶ 38) ("Many of the benefits to youth who participate in athletics are documented throughout life."); App. 499 (26:15–22) (ability to "reap all the benefits in sport"); App. 511 (75:23–24) (ability to reap "the benefits from participation in physical activity"); App. 516 (95:18–22) ("one of the benefits is the opportunity to compete.").

This opinion is irrelevant to any "issue in dispute" in this case. *Mod. Remodeling, Inc. v. Tripod Holdings, LLC*, Civ. A. No. CCB-19-1397, 2021 WL

---

[1]   All citations to documents filed in this case are to the document's original or bates stamped page number.

[2] The Daubert Appendix was filed contemporaneously with and attached to Defendant Intervenor and the State of West Virginia's Motion to Exclude Expert Testimony of Dr. Deanna Adkins.

5234698, at *4 (D. Md. Nov. 9, 2021). The proposition that participating in sports is a good thing does not help this Court resolve who should compete on women's sports teams. To qualify as an expert opinion, Fry's opinion must have a "valid scientific connection *to the pertinent inquiry.*" *Sardis*, 10 F.4th at 281 (emphasis added) (citation omitted); *Daubert v. Merrell Dow Pharms., Inc.* ("*Daubert II*"), 43 F.3d 1311, 1315 (9th Cir. 1995) (the expert testimony must be "relevant to the task at hand ... that it logically advances a material aspect of the ... case.") (citation omitted). Here, the pertinent inquiry is whether men who identify as women should compete on *women's* sports teams—not whether they should compete on *any* sports teams. After all, the Sports Act does not prevent men who identity as women from competing on men's teams or co-ed teams; it merely prevents them from competing on women's teams. W. Va. Code § 18-2-25d(c)(2). Thus, the general statement that sports are good sheds no light on the issue before the Court and should be excluded as irrelevant.

In addition, Fry's opinion that sports provide benefits is so prosaic that it is not the proper subject of expert testimony. The opinion is the product of "common sense rather than specialized knowledge." *Mod. Remodeling*, Civ. A. No. CCB-19-1397, 2021 WL 5234698, at *4. The average person already knows that, as a general matter, it's good for kids to play sports, and juries don't need experts to tell them what they already know.

In this respect, Dr. Fry's testimony is similar to the expert opinion excluded in *Persinger v. Norfolk & W. Ry. Co.*, 920 F.2d 1185, 1188 (4th Cir. 1990). There, the Court concluded that jurors did not need an expert to tell them that it is harder to lift an object from a seated position, as opposed to a standing position, especially if the object is far from the body, because jurors already know that. *Id.* Dr. Fry's testimony is the same here. She is merely testifying that sports have benefits. This is something that "typical juror[s]" could deduce for themselves. *Id.* For this reason as well, Dr. Fry's opinion should be excluded.

Finally, Dr. Fry's opinion that sports are good fails to address any issues that are actually in dispute and is therefore unnecessary. None of the parties dispute that students benefit from playing sports.[3] In fact, Ms. Armistead intervened in this lawsuit because she benefitted so much from playing soccer that she wants to ensure that she and other women can continue to benefit from participating in a fair and equal playing field. App. 5. And Congress passed Title IX to ensure women and girls would have equal access to the benefits of playing sports. *See McCormick ex rel. McCormick v. Sch. Dist. of Mamaroneck*, 370 F.3d 275, 286–87 (2d Cir. 2004) ("Title IX was enacted in response to evidence of pervasive discrimination against women with respect to educational opportunities"). Because the benefits of playing sports as a general matter is not in dispute, Dr. Fry's testimony on this issue is "inappropriate and unnecessary" and should be excluded. *Wu*, No. 1:13-CV-00002-DMB, 2014 WL 5799972, at *11.

## II.     Dr. Fry's general opinion that participation, not performance, is paramount in school sports is irrelevant, not the proper subject of expert testimony, and unreliable.

Dr. Fry opines that, as a general matter, school sports should prioritize participation and avoid a "myopic focus on winning." Daubert App. 76 (¶ 18). Her report spends considerable ink discussing the benefits of what she calls a "task-involving and caring" environment that focuses on participation and making

---

[3] WVSSAC's Resp. to Pl.'s Second Reqs. for Admis., Daubert App. 257 (¶ 44) ("admits that there are benefits to participating on athletic teams – opportunity for leadership, personal health, camaraderie and cooperation"); W. Va. State Bd. of Educ.'s Resp. to Pl.'s Second Reqs. for Admis., Daubert App. 277–78 (¶ 44) ("there are certain benefits to students from participation on athletic teams offered by public secondary schools in West Virginia."); Burch's Resp. to Pl.'s Second Reqs. for Admis., Daubert App. 304–05 (¶ 44); Harrison Cty. Bd. of Educ.'s Resp. and Obj. to Pl.'s Second Set of Req. for Admis., Daubert App. 329 (¶ 44); Stutler's Resp. and Obj. to Pl.'s Second Reqs. for Admis. Daubert App. 353 (¶ 44); W. Va.'s Resp. to Pl.'s Second Reqs. for Admis., Daubert App. 368 (¶ 44) ("likely that some students who participate in athletic teams feel they have benefitted in some fashion").

everyone feel important, Daubert App. 78 (¶ 26), rather than an "ego-involving" climate that focuses on competition and performance, Daubert App. 80 (¶ 32). *See also* Daubert App. 76–81 (¶¶ 18–36). The basic opinion embodied by this section of the report is that schools should prioritize a climate "geared to include all participants." Daubert App. 83 (¶ 41).

This opinion fails to fit the facts of this case because (A) it does not answer the question of *who* should be allowed to participate on a women's sports team and thus misses what is at issue in this case. In addition, it (B) is a public policy opinion, not a scientific opinion, and is therefore not the proper subject to expert testimony. Finally, any attempt to apply Dr. Fry's opinion to argue against the Sports Act (C) is unreliable because Dr. Fry's relevant scholarly literature demonstrates that competitive fairness and safety—both goals of the Sports Act—are part and parcel of creating an enjoyable and beneficial climate for participants in youth sports.

### A.   Dr. Fry's opinion that participation is paramount is irrelevant because she cannot explain who should be allowed on women's sports teams.

Expert testimony must relate to an "issue in the case" or it is irrelevant, and not helpful. *In re Davol, Inc./C.R. Bard, Inc., Polypropylene Hernia Mesh Prod. Liab. Litig.*, 546 F. Supp. 3d 679, 686 (S.D. Ohio 2021) (citation omitted). Thus, Dr. Fry's opinions must "fit" with the facts of the case. *Id.* Here, however, Dr. Fry's opinion that schools should create a task-oriented climate focused on participation rather than performance does not aid the trier of fact in determining who should be allowed to compete on what team.

As an initial matter, even Fry seems confused as to what her opinion has to do with the Sports Act. She does not advocate for laws *requiring* a task-oriented environment. App. 526 (136:17–23). She agrees that nothing in West Virginia law adopts an ego-promoting philosophy, which is her name for the climate she advocates against. App. 542 (198:6–9). She further agrees that the Sports Act does not focus

solely on performance outcomes, nor does it evince a myopic focus on winning, nor does it deny that athletics confer benefits beyond winning. App. 523 (122:4–124:15). She therefore fails to draw any logical connection between the Sports Act and her opinion that task-oriented, participation-focused climates are good while ego-oriented, performance-focused climates are bad. Her opinion should be excluded for this reason alone. *Cf. Lowery v. Sanofi-Aventis, LLC*, No. 7:18-cv-00376-RDP, 2021 WL 872620, at *18 (N.D. Ala. Mar. 9, 2021) (excluding expert opinion because it did not connect to facts of the case).

If anything, Dr. Fry's opinion about prioritizing participation through a task-involving climate *undermines* B.P.J.'s case because it should not matter who is on what team. If participation is the primary goal, and competitive performance secondary, then the Sports Act should be upheld because it does not preclude B.P.J. from participating in sports. Rather, it allows B.P.J. to participate in all men's and co-ed sports. W. Va. Code § 18-2-25d(b)(1), (c)(1) (which requires public schools to designate sports teams "based on biological sex"). B.P.J. can therefore access the benefits of participation referenced in Dr. Fry's opinion. Put another way, the Sports Act permits B.P.J. to participate in sports, just not on the terms B.P.J. wants. *Gregor v. W.V. Secondary Sch. Activities Comm'n*, No. 2:20-cv-00654, 2020 WL 5997057, at *3 (S.D.W. Va. Oct. 9, 2020) (Title IX does not require access to one team if "there are other … opportunities available to her."). Since the Sports Act does not preclude B.P.J.'s participation in sports, Dr. Fry's opinion that participation is paramount is of no relevance to this litigation.

Moreover, although Dr. Fry values participation, she admits that not everyone who wants to play a given sport should get a spot on the women's team. To the contrary, while Dr. Fry believes cutting players should be minimized, she concedes that schools can rightly limit the number of players per team and cut prospective players accordingly. App. 543 (202:22–204:12). Further, she contends that some

8

prospective players—for example, biological males who identify as males—should be categorically excluded from women's sports teams, even if they cannot make the men's team and are thus completely excluded from participating in the given sport. App. 556 (254:6–14). In other words, her opinion that participation is paramount admits numerous exceptions.

These exceptions further preclude her opinion from having any relevance to this case, as her opinion does not get at *who* should be excluded from women's sports in the inevitable event that exclusions are necessary. Nor does it explain why some categorical exclusions from women's sports (biological men who identify as men) are acceptable to her, while others (biological men who identify as women) are not, even if the end result—a student not participating in sport—is the same.

If schools can limit some participation in women's sports teams, as Dr. Fry admits they can, App. 543 (202:22–203:6), then someone has to decide who gets the last spot: a biological male who identifies as female, a biological male who identifies as male, or a biological female. Dr. Fry's high-level opinion that participation generally matters more than performance does not answer the brass-tacks question at the heart of this case: who is eligible for that last spot.[4]   Thus, her general

---

[4] To be clear, Dr. Fry's report does not contend schools should prioritize the participation of biological males with gender dysphoria over the participation of other groups. And nothing in Dr. Fry's professional experience would allow her to render any such opinion. She admits she has no experience dealing with athletes with gender dysphoria. App. 506 (55:7–24). She has never counseled children with gender dysphoria or related issues as it "would be beyond [her] expertise and training." App. 506 (55:18–24). In fact, she has also not counseled children on mental health issues at all. App. 506 (55:7–16). All of her experience is on the "educational side" of mental health, not with diagnosis or treatment. App. 506 (55:13–14.) She's not a psychologist or a psychiatrist. App. 506 (54:16–19). She has no clinical experience seeing or treating any patients, let alone athletes who identity as transgender. App. 506 (54:23–55:3). Thus, she is in no position to contend that sports participation is *more* important for transgender students than for anyone else, and her report does not make that contention.

knowledge about task-oriented climates and participation "does not make her testimony or opinions relevant to the discrete issue in this case." *Eline v. Town of Ocean City, Maryland*, 7 F.4th 214, 223 (4th Cir. 2021) (holding that expert's general expertise in societal attitudes toward human sexuality did not make her opinions relevant to the specific issue of public sensibilities in Ocean City, Maryland toward female toplessness).

### B. Dr. Fry's opinion that schools should prioritize participation over performance is an inadmissible public-policy opinion, not a scientific opinion.

Dr. Fry's opinion about participation is also irrelevant because it arrogates the legislature's role in setting policy. How to balance the competing goals of participation, competitive fairness, and safety is a legislative decision and not the proper subject matter for an expert opinion. *Sec. & Exch. Comm'n v. Ambassador Advisors, LLC*, Civ. No. 5:20-cv-02274-JMG, 2021 WL 6052589, at *6 (E.D. Pa. Dec. 21, 2021) (quotation omitted) (holding that opinion that "consistency and predictability in regulatory enforcement are of paramount importance" and that inconsistency in enforcement will harm the SEC "might be well-suited for an amicus brief or a comment submitted during an SEC rulemaking, but they are not appropriate for expert testimony at trial").

Indeed, Congress already balanced those interests by enacting Title IX for the purpose of providing equal "athletic opportunities" for women and girls to compete on sports teams. 34 C.F.R. § 106.41; *see McCormick ex rel. McCormick*, 370 F.3d at 289. The drafters of Title IX noted that "[m]ale athletes had been given an enormous head start" against their female counterparts. *Neal v. Bd. of Trs. of Cal. State Univs.*, 198 F.3d 763, 767 (9th Cir. 1999). And Congress exercised its legislative judgment to prioritize giving women and girls the right to fair competition. *See Williams v. Sch. Dist. of Bethlehem, Pa.*, 998 F.2d 168, 175 (3d Cir. 1993) ("'Athletic opportunities'

means real opportunities, not illusory ones.") So did the West Virginia legislature in enacting the Sports Act for the purpose of "promot[ing] equal athletic opportunities for the female sex." W. Va. Code § 18-2-25d(a)(5).

Dr. Fry's opinion that participation is paramount ignores the other valid goals a legislature can pursue in setting sports policy. Deferring to Dr. Fry would simply substitute her legislative judgment for Congress's and the West Virginia legislature's. In Congress's judgment, sex-separated sports teams are necessary to provide the fair competition that Title IX sought to create, as physiological advantages in men would "displace females to a substantial extent" if they were both forced to try out for the same team. *Clark, By & Through Clark v. Arizona Interscholastic Ass'n*, 695 F.2d 1126, 1131 (9th Cir. 1982). And Congress sought to "equalize[ ]"athletic opportunities between men and women. *Id.* Dr. Fry's testimony that participation is more important than competitive performance is nothing more than a policy disagreement that cannot be the subject of expert testimony. *Bd. of Trs., Sheet Metal Workers' Nat'l Pension Fund v. Palladium Equity Partners*, LLC, 722 F. Supp. 2d 845, 853 (E.D. Mich. 2010) (expert opinion on effect of private equity industry is a "policy-type argument[ ]" that "fall[s] outside of the scope of expert testimony"); *see* Mem. in Supp. of Pl.'s Mot. for Summ. J. 12, ECF No. 291.

At bottom, Dr. Fry's emphasis on participation does not bolster B.P.J.'s express arguments but argues for eliminating the female sports category entirely. After all, that's the best way to maximize participation. Taking the argument to its logical conclusion, a state could, *contra* the policy goals of Title IX, eliminate sex-separated sports altogether and place everyone on the same team as long as everyone gets to participate. Or a state could, again *contra* the goals of Title IX, allow a biological male who identifies as a male to be cut from the men's team and then join the women's team—something that even Dr. Fry disagrees with. App. 556 (254:6–10). Neither

scenario would violate her principle that "the climate of youth sports should be geared to include all participants." Daubert App. 83 (¶ 41).

But no one thinks participation is the only thing that matters. Not even Dr. Fry herself. In fact, she admitted that a legislature could rightly focus on performance outcomes. App. 523 (122:11–15). And she agreed that fairness is an important value in sports. App. 518 (105:3–6). Thus, while creating a task-oriented climate that focuses on participation may be a fine goal, even Dr. Fry admits it shouldn't be the only goal. And it is up to the federal and state legislatures—not an expert witness— to determine how to balance those various goals. *Bd. of Trs., Sheet Metal Workers Nat'l Pension Fund*, 772 F. Supp. 2d at 853 (rejecting "policy-type" arguments from an expert); *Sec. & Exch. Comm'n v. Ambassador Advisors, LLC*, Civ. No. 5:20-cv-02274-JMG, 2021 WL 6052589, at *6 (E.D. Pa. Dec. 21, 2021) (rejecting public policy opinions). Thus, Dr. Fry's opinion is not the proper subject of expert testimony and should be excluded.

### C.   Dr. Fry's opinion is unreliable because the relevant literature does not support her position.

Dr. Fry's opinion that participation is paramount in youth sports has nothing to do with the Sports Act as set forth above. But to the extent B.P.J. tries to use it to imply some fault in the Sports Act, the opinion is unreliable because it ignores the scholarly evidence that competitive fairness and safety—both goals of the Sports Act—contribute to an enjoyable sports climate.[5]

In fact, the very studies Dr. Fry cites demonstrate that fair competition and safety matter a great deal to sub-elite athletes. For example, Dr. Fry cites a study by

---

[5] This argument appears in B.P.J.'s summary judgment motion. Memo. in Supp. of Pl.'s Mot. for Summ. J. 12, ECF No. 291. B.P.J. attempts to use Dr. Fry's contention that participation matters more than competition to imply the Court should prioritize B.P.J.'s participation over the loss of equal and fair competition imposed on female athletes like Ms. Armistead.

Newton to show that a "caring environment" is where athletes feel safe, welcome, comfortable, and valued. Daubert App. 629; Daubert App. 78 (¶ 26). Notably, Dr. Fry acknowledges that feeling "safe" is part and parcel of a caring environment. Daubert App. 78 (¶ 26). What Dr. Fry leaves out is that the Newton study also demonstrates that athletes feel cared for when they perceive they are "treated fairly." Daubert App. 640. Thus, fairness and safety are both part of the equation.

Dr. Fry also cites a study by MacDonald for the proposition that a climate purely focused on winning does not lead to greater performance outcomes in young athletes. Daubert App. 80 (¶ 32). But that study also demonstrates that "competitive excitement" is the strongest predictor of initiative. Daubert App. 620. So if athletes are not in an environment they perceive as competitive, they will show less initiative during their athletic performance. Thus, again, students gain the most benefits when they perceive that sports are fair. Daubert App. 629.

And although Fry was unfamiliar with a peer-reviewed study by Whisenant and Jordan on the subject, Daubert App. 914, she agreed with their basic conclusion that students' perceptions of fairness in a sport is a critical factor in their attitude and continued participation in the sport. App. 519 (106:11–24). In sum, the relevant literature shows that the benefits of sports participation are inextricably linked to safety and fair competition. Thus, to the extent her opinion that participation is paramount is used to fault the Sports Act for taking fairness and safety into account, the opinion is unreliable because it ignores the scholarly literature on the importance of fairness and safety to a positive sports climate. *In re Lipitor*, 892 F.3d 624, 634 (4th Cir. 2018) ("Result-driven analysis, or cherry-picking, undermines principles of the scientific method and is a quintessential example of applying methodologies (valid or otherwise) in an unreliable fashion.").

13

III.   **Dr. Fry's opinion that preserving women's sports for biological women is "arbitrary" should be excluded as unreliable and methodologically unsound.**

Dr. Fry opines that if biological males who identify as female are "arbitrarily excluded from youth sports, they are, in turn, deprived" of the benefits of sports. Daubert App. 81–82 (¶ 37). And, according to Fry, "arbitrary exclusions can cause harm" to excluded athletes and other athletes on the team. Daubert App. 82 (¶ 39).

As an initial matter, this opinion has no bearing on this case, as the Sports Act does not exclude anyone from youth sports, much less do so arbitrarily. It merely requires biological males to play on men's or co-ed teams. W. Va. Code § 18-2-25d(c)(2). Accordingly, Dr. Fry's opinion should be excluded as irrelevant for this reason alone.

Even assuming that what Dr. Fry means is that she considers it "arbitrary" and therefore harmful to exclude biological males who identify as female from participating on the women's team, the opinion is not reliable because (A) Dr. Fry articulates no reliable scientific conception of what is "arbitrary," (B) Dr. Fry provides no scientific evidence that separating teams by biological sex is harmful to anyone, and (C) the history of Dr. Fry's report demonstrates that she simply added the word "transgender" to a preexisting document without any scientific basis for the addition.

A.   **Dr. Fry cannot explain what "arbitrary" means.**

Dr. Fry's opinion that preventing biological men who identify as women from playing women's sports is "arbitrary" is not reliable because the word "arbitrary," as Fry uses it, has no scientific content. Indeed, she cannot explain what she means by that term. During her deposition, defendants' counsel provided Dr. Fry with a dictionary definition of "arbitrary." App. 503 (44:6–10). At first, Dr. Fry would not accept this definition, but she also could not provide her own definition. App. 503–504 (44:6–46:10). Finally, she accepted the dictionary definition—"based on chance

14

rather than being planned or based on reason"—but provided no scientific methodology for applying that definition to this case. *Id.*

If Dr. Fry's use of the word "arbitrary" referred to a scientific concept, as opposed to simply her own personal beliefs, there would be some replicable method for determining which exclusions are "arbitrary" and which ones are permissible. After all, "'[s]cientific' knowledge is generated through the scientific method—subjecting testable hypotheses to the crucible of experiment in an effort to disprove them. An opinion that defies testing, however defensible or deeply held, is not scientific." *United States v. Bynum*, 3 F.3d 769, 773 (4th Cir. 1993).

Here, Dr. Fry provides no method for determining why some exclusions are, in her view, permissible, whereas others are "arbitrary." Dr. Fry concedes that some limitations on sports participation are permissible and inevitable. She is not opposed to all cut policies. App. 543 (202:22–203:6); App. 504 (47:1–7). And she agrees with separating school teams into varsity and junior-varsity levels to provide the more gifted athletes with "a chance to compete at the varsity level." App. 504 (47:4–5). She likewise has no issue in general with the male/female stratification in sports because males have a physical "advantage" over females in sports. App. 504 (47:12–16); App. 504 (48:20–49:2). Plus, she thinks it inappropriate to allow a biological male who identifies as male to compete on the women's team. App. 552 (241:8–23).

But Dr. Fry provides no method for determining or explaining why these exclusions are acceptable to her but excluding biological men who identify as women from women's teams is "arbitrary." Daubert App. 81–82 (¶¶ 37, 39). She just asserts it. *Id.* For that reason, her opinion is a classic *ipse dixit* that should be excluded. *In re C.R. Bard, Inc.*, 948 F. Supp. 2d 589, 605 (S.D.W.Va. 2013) (excluding opinion because it is "lacking in any reliable basis and methodology and is simply an *ipse dixit* opinion.").

### B.   Dr. Fry provides no scientific evidence that preserving women's sports for biological women harms anyone.

Dr. Fry asserts that preventing biological males who identify as female from playing women's sports harms the students excluded from the women's team, the other athletes on the women's team, and the task-involving climate as a whole. Daubert App. 82 (¶ 39). But she fails to link this conclusion to any scientific evidence.

Dr. Fry admits that she has done no independent research on participation in sports by athletes who identify as transgender. App. 508 (64:18–20); App. 509 (66:10–21). Indeed, her most recent book publication does not refer to, mention, or speak to transgender persons competing in sports. App. 506 (57:5–7). "Where proffered expert testimony is not based on independent research, but instead on such a literature review, the party proffering such testimony must come forward with other objective, verifiable evidence that the testimony is based on scientifically valid principles." *Doe v. Ortho–Clinical Diagnostics, Inc.*, 440 F. Supp. 2d 465, 470 (M.D.N.C. 2006) (cleaned up) (citing *Daubert II*, 43 F.3d at 1317–18). Normally, this is done by giving "proof that the research and analysis supporting the proffered conclusions have been subjected to normal scientific scrutiny through peer review and publication." *Daubert II*, 43 F.3d at 1318.

But Dr. Fry presents no such scholarly or peer-reviewed evidence. Indeed, she admits that her bibliography contains no papers studying transgender athletes. App. 509 (66:7–9). In support of her statement that "arbitrarily excluding transgender students from teams undermines a task-involving climate, which, in turn, diminishes the positive outcomes for all youth and collegiate athletes," Daubert App. 82 (¶ 39) she cites two sources: a paper by Balaguer et al. (Daubert App. 370) and one by Ommundsen et al. (Daubert App. 655). Neither paper says anything at all about these athletes.

16

In fact, neither paper studied the effects of excluding anyone, much less athletes who identity as transgender. The Balaguer paper studied "the relationship of goal orientations and the perceived motivational climate created by the coach in relation to 219 competitive Spanish tennis players," concluding that a coach-created task-oriented climate was associated with higher levels of athlete satisfaction. Daubert App. 371, 376. The Ommundsen paper studied the effects of "supportive and/or pressuring influences of parents and coaches" on the "maladaptive perfectionist tendencies, relationships to friends, and competency perceptions" of 677 Norwegian soccer players, the vast majority of whom were boys. Daubert App. 655. The authors reported that when players perceived their parents or coaches as overly critical of their performance, the players "report[ed] believing less in their soccer capabilities, worrying about their performance, and perceiving a less friendly peer atmosphere on their teams." Daubert App. 658.

So these two cited sources in no way show that excluding biological males who identify as female from women's sports will have any effect on the athlete excluded, the other members of the team, or a task-involving climate.

Ultimately, Dr. Fry's opinion is mere conjecture—she is speculating that excluding biological men who identify as women from women's teams will cause harm, but she provides no evidence that this outcome is "more likely than other available possibilities." *Oglesby v. Gen. Motors Corp.*, 190 F.3d 244, 251 (4th Cir. 1999). With neither relevant experience nor any peer-reviewed research supporting her conclusions, Dr. Fry's opinion is a classic *ipse dixit* that should be excluded. *Gen. Elec. Co. v. Joiner*, 522 U.S. 136, 146 (1997) ("[N]othing in either *Daubert* or the Federal Rules of Evidence requires a district court to admit opinion evidence that is connected to existing data only by the *ipse dixit* of the expert.").

### C.    Dr. Fry's opinion about exclusions was added to a pre-existing document with no supporting research.

The unreliability of Dr. Fry's opinion is further demonstrated by the change from her original declaration in this case to her subsequent expert report. Her original declaration filed at the preliminary-injunction stage does not relate to this case or use the word "transgender" at all. Her declaration just says that "excluding groups of athletes" undermines the benefits of sports. Decl. of Professor Mary D. Fry, PHD ("Fry Decl.") ¶ 48, ECF No. 2-1. In this original declaration, she opines there are "many benefits" to all young people who "participat[e] in athletic activities." *Id.* ¶ 18. And everyone who participates in sports will garner the benefits "throughout life." *Id.* at ¶ 45.

But when she filed her expert report, Dr. Fry added the word "transgender" to her declaration for the first time. And she slightly changed the paragraph that discussed "excluding groups" from sports. It now reads: "arbitrarily excluding transgender students from teams" undermines the benefits of sports. App. 82 (¶ 39) (emphasis added). And in support of this new exclusion statement, she cites the same two articles as before: the Balaguer and Ommundsen articles discussed above, neither of which discusses exclusion of anyone, much less exclusion of transgender athletes. Fry Decl. ¶ 48; App. 81–82 (¶¶ 37, 39). Thus, Dr. Fry simply added the word "transgender" to make the opinion sound more relevant to this case without adding any research, any scholarly publications, or any peer-reviewed literature to support that change.

By changing her opinion to make it more relevant without adding supporting research, Dr. Fry demonstrated that her opinion is a moving target based on the needs of the litigation, not on any reliable scientific research or methodology. *Cf. Haller v. AstraZenica Pharms. LP*, 598 F. Supp. 2d 1271, 1296–97 (M.D. Fla. 2009)

(rejecting expert opinion that shifted based on needs of litigation). Accordingly, her opinion should be excluded.

## Conclusion

According to Dr. Fry, when a biological male who identifies as female cannot compete on a women's sports team, it's "arbitrary" and causes harm. But when a biological female is displaced from a women's team by a biological male, it's perfectly acceptable, and the biological female should just knuckle under and accept it. This is a personal opinion, not a scientific one, and it is not the stuff of proper expert testimony. For the foregoing reasons, the Court should exclude the opinions proffered in this case by Dr. Fry.

Respectfully submitted this 12th day of May, 2022.

*/s/ Brandon S. Steele*

| | Brandon Steele, WV Bar No. 12423 |

Tyson C. Langhofer, VA Bar No. 95204*
Rachel A. Csutoros, MA Bar No. 706225*
Alliance Defending Freedom
44180 Riverside Parkway
Lansdowne, VA 20176
(571) 707-2119
(571) 707-4790 Fax
tlanghofer@adflegal.org
rcsutoros@adflegal.org

Travis C. Barham, GA Bar No. 753251*
Alliance Defending Freedom
1000 Hurricane Shoals Road NE, Ste D-1100
Lawrenceville, GA 30043
(770) 339-0774
(770) 339-0774 Fax
tbarham@adflegal.org

Timothy D. Ducar, AZ Bar No. 015307*
Law Offices of Timothy D. Ducar, PLC
7430 E. Butherus Drive, Suite E
Scottsdale, AZ 85260
(480) 502-2119
(480) 452-0900 Fax
tducar@azlawyers.com

Brandon Steele, WV Bar No. 12423
Joshua D. Brown, WV Bar No. 12652
The Law Offices of Brandon S. Steele
3049 Robert C. Byrd Drive, Suite 100
Beckley, WV 25801
(304) 253-1230
(304) 255-1520 Fax
bsteelelawoffice@gmail.com
joshua_brown05@hotmail.com

Jonathan Scruggs, AZ Bar No. 030505*
Roger G. Brooks, NC Bar No. 16317*
Henry W. Frampton, IV, SC Bar No. 75314*
Alliance Defending Freedom
15100 N. 90th Street
Scottsdale, AZ 85260
(480) 444-0020
(480) 444-0028 Fax
jscruggs@adflegal.org
rbrooks@adflegal.org
hframpton@adflegal.org

Christiana Holcomb, DC Bar No. 176922*
Alliance Defending Freedom
440 First Street NW, Suite 600
Washington, DC 20001
(202) 393-8690
(202) 347-3622 Fax
cholcomb@adflegal.org

*Visiting Attorneys*
*Attorneys for Defendant-Intervenor*

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA
CHARLESTON DIVISION

B.P.J., by her next friend and mother,
HEATHER JACKSON

<em>Plaintiff,</em>

v.

WEST VIRGINIA STATE BOARD OF
EDUCATION, HARRISON COUNTY BOARD
OF EDUCATION, WEST VIRGINIA
SECONDARY SCHOOL ACTIVITIES
COMMISSION, W. CLAYTON BURCH in his
official capacity as State Superintendent,
DORA STUTLER in her official capacity as
Harrison County Superintendent, and THE
STATE OF WEST VIRGINIA

<em>Defendants,</em>

and

LAINEY ARMISTEAD

<em>Defendant-Intervenor.</em>

Case No. 2:21-cv-00316

Hon. Joseph R. Goodwin

## Certificate of Service

I, Brandon Steele, hereby certify that on May 12, 2022, I electronically filed a true and exact copy of the forgoing with the Clerk of Court and all parties using the CM/ECF system.

/s/ Brandon S. Steele
Brandon Steele, WV Bar No. 12423
The Law Offices of Brandon S. Steele
3049 Robert C. Byrd Drive, Suite 100
Beckley, WV 25801
(304) 253-1230
(304) 255-1520 Fax
bsteelelawoffice@gmail.com

*Attorney for Defendant-Intervenor*