# Exhibit Q



# BRIEFING BOOK

# A REQUEST TO CONGRESS AND THE ADMINISTRATION

# TO SAFEGUARD GIRLS' AND WOMEN'S SPORT

# &

# INCLUDE TRANSGENDER ATHLETES

*The Women's Sports Policy Group acknowledges the complexity of this issue.*
*We are committed to transparency and continual refinement of our work.*
*The most recent update of this Briefing Book will be posted at*
*https://womenssportspolicy.org/references/ as the first document at the top of the page.*

**Prepared by The Women's Sports Policy Working Group (Revised as of February 27, 2021)**
**https://womenssportspolicy.org/**
**Contact: Donna Lopiano for additional information as needed (Donna.Lopiano@gmail.com or**
**call 516-380-1213)**

## SAFEGUARDING GIRLS' AND WOMEN'S SPORTS
## AND INCLUDING TRANSGENDER ATHLETES

**TABLE OF CONTENTS**

|  | Page |
|---|---|
| Women's Sports Policy Working Group | 3 |
| Supporters | 4 |
| Specific Request | 5 |
| The Issue | 5 |
| The Resolution | 7 |
| Definitions | 17 |
| Frequently Asked Questions | |
| About Science and Sex | 18 |
| About Current Law on Sex and Sport | 34 |
| About Policy | 37 |

# WOMEN'S SPORTS POLICY WORKING GROUP

**Donna de Varona, OLY.** Two-time Olympic gold medalist in swimming. In 1965, UPI and AP voted her outstanding woman athlete in the world after she set 18 world records and fastest times. de Varona was a sports broadcasting pioneer as the youngest and one of the first women to work in the industry. As an Emmy recipient, she used her visibility to advise and advocate for the protection and promotion of Title IX as well as for the Ted Stevens Olympic and Amateur Sports Act. As the first President and Chair of the Board of the Women's Sports Foundation, she helped build the organization into a sustainable, influential entity. She has served on presidential commissions for five U.S. Presidents. Currently, de Varona is a member of the International Olympic Committee Communications Commission, and was recently voted onto the U.S. Olympic and Paralympic Committee Board of Directors.

**Martina Navratilova, OLY.** Former professional tennis player and coach. In 2005, *Tennis* magazine selected Navratilova the greatest female tennis player for the years 1975 - 2005. She is considered one of the best female tennis players of all time. Over her career, she won 18 Grand Slam singles titles, 31 Grand Slam women's doubles titles (an all-time record), and 10 Grand Slam mixed doubles titles, for a combined total of 59 major titles, marking the Open Era record for the most Grand Slam titles won by one player, male or female. Coached later in her career by the first trans-woman tennis player, Renée Richards, and long active in LGBTQ rights work and with the women's tennis tour, Navratilova is particularly well-positioned to contribute to thoughtful policy on the inclusion of trans women/girls in women's sport.

**Donna A. Lopiano, Ph.D.** President and founder of Sports Management Resources, LLC, Adjunct Professor of Sports Management, Southern Connecticut State University, former Chief Executive Officer of the Women's Sports Foundation (1992-2007), Director of Women's Athletics, University of Texas at Austin (1975-1992). President of The Drake Group—an organization focused on academic integrity in college sport. A Title IX sports pioneer, Lopiano specializes in gender equity in the educational and Olympic and elite sports spaces. As an athlete, she participated in 26 national championships in four sports and was a nine-time All-American at four different positions in softball, a sport in which she played on six national championship teams.

**Nancy Hogshead-Makar, J.D., OLY,** CEO Champion Women, civil rights lawyer, two-time Olympian, three-time gold medalist and one silver in swimming, U.S. National Team for eight years, 12 Halls of Fame, including the International Women's Sports Hall of Fame and the International Swimming Hall, 20 years of teaching Sports Law and Administration, current Professor at Rutgers University's Global Sports Business MS Program. Women's Sports Foundation - President 1991-1993, Legal Advisor, 2003-2010, Senior Director of Advocacy, 2010-2014.

**Tracy Sundlun, CEO**, Everything Running, Inc., Founding Board Member, National Scholastic Athletics Foundation. Co-Founder and original Director of the National Scholastic (High School) Indoor & Outdoor Track & Field Championships (1984 – Present). Co-Founder, Rock 'n' Roll Marathon Series, at the time the largest running series in the world with over 500,000 participants annually in 29 events in 7 countries (1998 – 2016). Former club and collegiate track coach (including Georgetown, Colorado, USC), guiding over 100 men and women in every event from 15 countries competed in the Olympic Games and international competitions. Six-time Olympic Coach and Manager (1972 – 2016). Inducted into Running USA Hall of Champions.

**Doriane Coleman, J.D.** Professor of Law and Co-Director of the Center for Sports Law & Policy at Duke Law School; Senior Fellow at the Kenan Institute for Ethics and Associate of the Trent Center for Bioethics, Humanities & History of Medicine at Duke University & School Medicine; former collegiate and Swiss national champion in the 800 meters on the track. She has worked for years in domestic and international arenas on anti-doping policy and rules defining eligibility for the women's category. Her writing on sex in sport is widely referenced by policymakers considering the hard questions posed by trans and intersex inclusion in girls' and women's sport.

## SUPPORTERS

**Willie Banks**, **OLY**, three-time Olympian and former world record holder in the triple jump

**Juniper Eastwood**, Trail runner, former D1 Track and Cross-Country runner.  First D1 athlete to compete on a women's team while openly identifying as transgender

**Joanna Harper**, former elite marathoner, transgender athlete and researcher

**Wendy Hilliard**, nine-time member and two-time captain of Team USA in rhythmic gymnastics

**Micki King**, **OLY**, Olympic gold medalist, ten-time national champion in springboard & platform diving

**Greg Louganis, OLY**, four-time Olympic gold medalist in springboard and tower diving, second diver in history to sweep both events in consecutive Olympics, 47 national and 13 world championships

**Edwin Moses**, **OLY**, two-time Olympic gold medalist, two-time World Champion, former world record holder, undefeated in the 400 meter hurdles for 10 years and 107 consecutive races

**Benita Fitzgerald Mosley**, **OLY**, Olympic gold medalist, two-time Olympian, and eight-time national champion in the 100 meters hurdles

**Digit Murphy**, President and Head Coach of the National Women's Hockey League's Toronto Six, 1st female coach to reach 200 wins in the NCAA, coach of numerous Olympians and All-Americans

**Diana Nyad**, one of the greatest ever long-distance swimmers credited with a record setting swim around Manhattan island and being first person to swim from Cuba to Florida without a shark cage

**Renee Richards**, tennis player, one of the first professional athletes to identify as transgender

**Sanya Richards-Ross, OLY**, four-time Olympic gold medalist, six-time World Champion, ranked #1 in the world in the 400 meters from 2005 to 2009 and in 2012

**Sally Roberts,** three-time national wrestling champion, 2003 World Cup Champion, 2003 & 2005 World bronze medalist and a 2008 Olympic alternate

**Lyn St. James**, former Indycar and LeMans racecar driver, first woman to win Indianapolis 500 Rookie of the Year award, and one of *Sports Illustrated*'s "Top 100 Women Athletes of the Century"

**Pam Shriver, OLY**, Olympic gold medalist, winner of over 100 professional singles and doubles championships over 19 years, International Tennis Hall of Fame

**Inge Thompson**, **OLY**, ten-time national champion cyclist, three-time Olympian and two-time podium finisher at the Women's Tour de France

**Champion Women**, non-profit legal advocacy organization for girls and women in sports; harnessing the power of sport for social justice

**The Drake Group**, non-profit advocacy organization committed to defending academic integrity and protecting the health and well-being of athletes participating in collegiate sport

**National Scholastic Athletics Foundation**, non-profit organization created to fund competitive opportunities for high school track and field athletes and host the indoor and outdoor high school nationals

**Wrestle Like A Girl,** non-profit organization empowering girls and women using the sport of wrestling to become leaders in life

# SAFEGUARDING GIRLS' AND WOMEN'S SPORTS
# AND INCLUDING TRANSGENDER ATHLETES

## REQUEST

We ask Congress and the Administration to affirm Title IX's long-standing commitment to providing biological females[1] with equal experiences and opportunities in competitive sport, and to protecting their safety in contact sports, by permitting recipients of federal funds to continue to operate or sponsor separate athletic teams and events for males and females. In addition, we ask Congress and the Administration newly to provide for the participation of transgender girls and women within girls' and women's sports programs with appropriate conditions if they have experienced all or part of male puberty (which is the scientific justification for separate sex sport). These conditions should apply throughout interscholastic and intercollegiate sport, and the U.S. Olympic and Paralympic Movement. This request is limited to *competitive* interscholastic, intercollegiate, and developmental elite athletic programs. It does not affect physical education, intramurals, or recreational sports sponsored by municipalities, schools, and colleges.

## THE ISSUE

**Girls'/Women's Competitive Sport Needs Safeguards and Trans Girls/Women Need to be Included with Appropriate Conditions.**

Sports have been continuously sex-segregated for over 100 years, across disciplines where male sex-linked advantages affect competitive opportunities for females. Congress passed Title IX in 1972 and approved its implementing regulations governing competitive sport in 1975, explicitly permitting girls' and women's sport to exist separate from boys' and men's sport. Law and sports policy makers understood that from the onset of male puberty, male bodies develop such that they are, as a group, faster, stronger, and more powerful than female bodies as a group. The performance gap between male and female athletes that emerges from that point typically ranges from 8-20% depending on the sport and event, and "up to 50% where explosive power and complex movement skills are pivotal."

**Science not Ideology Dictates the Need for Sex Segregation in Sports.**

If sports were not sex-segregated, female athletes would rarely be seen in finals or on victory podiums. Congress has long understood the benefits of sport and the benefits of having the opportunity to train, compete and win. Repeatedly, Congress has affirmed that it wanted both our sons and our daughters to realize those benefits, which are well-documented in the academic literature. Girls and women learn the benefits of teamwork in pursuit of conference, state and national championships; the self-esteem that flows from competent performance of physical skills; the life-changing power of competing against the best and standing on the podium; confidence borne of testing the limits of strength, speed, skill and reaction time; and the power of personal

---

[1]   We use "female" throughout to denote a person's biological sex regardless of their gender identity. We use "trans(gender) girl/woman" throughout to denote a person born male who identifies as a girl/woman.

achievement and public recognition when setting school, meet and other records. And as sports double as an academic and social tool, these lessons and benefits reverberate well beyond the playing field throughout the lives of all female athletes.

The legislative history of Title IX is clear that Congress also understood that even when height, size, and weight are equal, males are incrementally stronger and generate more explosive force, so that if males and females are forced to compete against each other, the physical safety of females is differently at risk.

At the time Title IX's athletics regulations were passed, no one raised the issues of gender identity apart from biological sex, or whether trans girls/women with the post-pubescent advantages of biological males should be allowed to participate in the space created by Congress to secure the sport experiences of biological females. Today, however, trans girls/women are asking for the right to compete in girls' and women's sport, directly against female athletes, even when they retain some or all of their male sex-linked strength, power, and related performance advantages. For many people, the issue is not whether trans girls/women should be included in women's sport. Rather, it is whether female athletes can continue to be safeguarded *and* trans girls/women included within women's sports consistent with their gender identity.

**States are Passing Conflicting Laws.**

[States have taken one of three general approaches to the issue of trans-inclusion in girls' and women's sport](). Ten states expressly require males and females to participate in high school sports according to their birth sex, thereby prohibiting participation in girls' sports by trans girls, whether or not they have begun male puberty or have had hormone therapy. In contrast, seventeen states and the District of Columbia expressly require the inclusion of trans girls in girls' sports without regard to the extent to which they may retain the male-linked physical traits that otherwise justify excluding males from female sport on competitive fairness and safety grounds. Another seventeen states have adopted a policy similar to the NCAA rule, which allows trans girls to compete after taking gender-affirming hormones for a year. Finally, six states have no policy one way or the other regarding gender identity and sport.

**Pending Legal Challenges.**

None of the policies mentioned has been immune from a legal challenge. In Connecticut, one of the states that allows trans girls to compete in girls' sports without regard to whether they have experienced male puberty or are on gender affirming hormones, four female athletes and their mothers have sued their state high school athletic association. They contend that Connecticut's rule, which ignores biological sex and focuses on gender identity, has deprived them of school and state records they would otherwise have held, and from advancing in competitions, including qualifying for state and regional championships and becoming state champions, spots they would otherwise have won. Instead, the rule has allowed two trans girls to dominate their events. The Department of Education has concluded that the state's policy regarding transgender athletes violates Title IX's mandate of equal opportunity for both sexes since biological males are able to win in both the male and the female divisions. At the other end of the country and the political spectrum, Idaho has seen a similar legal battle erupt after it adopted a law mandating that athletic eligibility be based only on birth sex. To date there has been no approach that would include trans girls/women while preserving competitive opportunities for females.

**The Cultural Battle Outside of the Courts has Not Allowed for Respectful Dialogue on Science, Policy, and Best Practices.**

Transgender advocates accuse female athletes, their parents, and supporters of transphobia simply because they recognize the significance of sex in sport. Others seek unnecessarily to exclude all trans girls from all girls' sports regardless of whether they have experienced male puberty or are undergoing gender-affirming therapies. The conflicting positions have sparked a rhetorical battle about who will suffer more harm: trans girls who are prevented from competing as girls, or females who are forced to compete against athletes who have the male sex-linked advantages girls' and women's sport was designed to exclude. Throughout, surveys consistently show Americans want sports opportunities for girls and women. Only a minority of Americans — just 29% according to one recent survey — favor allowing transgender students to participate on the sports team consistent with their gender identity.

**Conflicting Federal Legislative Proposals Take an "Either/Or" Approach.**

Various bills in the 116th Congress would either require identical treatment of — no distinctions allowed between — females and trans girls (H.R. 5 - The Equality Act), or they would preclude all trans girls/women from participating in girls'/women's sports, which would be restricted to biological females (H.R. 5603, H.R. 8932 and S. 4649).

**The Supreme Court in Bostock did not Resolve the Question of Separate Sex Sport.**

Trans girls/women and their advocates argue that the Supreme Court's decision in Bostock v. Clayton County, 590 U.S.___, 140 S. Ct 1731 (2020), mandates the unconditional inclusion of trans girls/women in women's sports. This is misleading at best, as *Bostock* was about workplace discrimination under Title VII, not about sex segregation in competitive sport; in its decision, the Court expressly stated that it was defining "sex" to mean "biological sex" not "gender identity"; and it expressly reserved for another day — did not decide — the issue whether distinctions on the basis of sex are permissible for bathrooms, locker rooms, and sport.

## THE RESOLUTION

It is essential that we continue to safeguard girls' and women's sport. It is also good policy to be inclusive when doing so does not harm the female sports competition or the individuals separate sex sport is designed to protect. Congress and the Administration should make it clear that institutions governed by Title IX of the Education Amendments of 1972 (Title IX), the Ted Stevens Olympic and Amateur Sports Act (the Sports Act), and Title VII of the Civil Rights Act of 1964 (Title VII) will:

> (1) continue to be obligated to provide males and females with equal sporting opportunities on the basis of biological sex, and

> (2) be newly obligated to provide ways to include trans girls/women in girls'/women's sports that ensure competitive fairness and playing-safety without diminishing the protection of biological females.

This two-step approach safeguards the integrity of the existing competitive sport process in which millions of girls and women participate annually. It also incrementally and thoughtfully expands the development of additional sports opportunities for emerging trans girls/women.

Separate sex competitive sport has always been an exception to our general non-discrimination laws. This exception is justified by real physical sex-linked differences that emerge from the onset of male puberty and that have significant implications for athletic performance and playing-safety. The lawfulness of this long-standing exception should be re-affirmed.

At the same time, the government should make it legally possible for trans girls/women to participate in girls'/women's sport in ways that do not affect competitive fairness and playing-safety. Because the onset of male puberty — normally around ages 11 – 12 in boys — is the physical justification for separate sex sport,[2] trans girls and women who have never experienced the onset of male puberty should be included without condition. Trans girls and women who have experienced the onset of male puberty should be included in ways that recognize their male sex-linked advantages in strength, power, and endurance. Some — but not all — trans girls and women are on gender-affirming hormones. Depending on the duration of treatment and the sport and the event, hormones may mitigate those advantages. However, because the evidence is increasingly clear that hormones do not eliminate the legacy advantages associated with male physical development, accommodations can and should take these advantages into account.

Finally, it is important that there be national standards to ensure uniformity across the states. Competitive sport, i.e., sport that primarily focuses on adversarial engagement for places, prizes, and the win, and that leads to records, titles, championships, and ultimately to Team USA, is an interconnected system comprised of high schools, colleges, and universities, and non-school club teams and programs. The former are governed by Title IX. The latter are generally under the jurisdiction of, or sponsored by, the U.S. Olympic and Paralympic Committee (USOPC) and/or regional and national sport governing bodies (NGBs). This integrated system is only local in the first instance, as teams and athletes move from intra-state to interstate and international arenas as competition progresses. Inconsistent local, state, national, and international eligibility standards can create practical impediments to success for individual athletes, teams, and ultimately for the system as a whole.

The International Federations (IFs), whose singular responsibility is the management, promotion, and protection of their sport and its athletes throughout the world, are the most vested in and knowledgeable about the science, safety, and competitive fairness of any entity in their particular domain. They have already committed themselves both to safeguarding the female category and to scientific, evidence-based criteria for the conditional inclusion of trans girls/women in

---

[2]   Endocrinologists explain that puberty in boys should start between ages 9-13 and in girls between ages 8-12; that puberty usually takes 4-5 years to complete so that 95% of boys will have started puberty by age 13. This timing is consistent with the formal position of the Women's Sports Foundation providing that "[p]rior to puberty, females and males should compete with and against each other on coeducational teams." Women's Sports Foundation, Issues Related To Girls and Boys Competing With And Against Each Other In Sports And Physical Activity Settings at 1 (Aug. 14, 2019) (adding that "prior to puberty, there is no gender-based physiological reason to separate females and males in sports competition"), available at https://www.womenssportsfoundation.org/advocacy/girls-and-boys-competing-with-and-against-each-other-in-sports-and-physical-activity-settings/.

girls'/women's sport. The resulting standards are reviewed on an ongoing basis to ensure they are consistent with sport's policy goals and the best available scientific evidence on competitive fairness and safety. To date, no American sports organization or governing body has established a commitment to, or the capacity for, doing this work in a better way or at a higher level than the IFs. Adopting international standards for inclusion and accommodation would thus be a substantively sound and administratively efficient approach to national policy. Equally important is that pegging USA standards to international standards would ensure that our country's athletes and teams — including our juniors who are Team USA's future — can move seamlessly from domestic to international competition, and that none of our elite athletes are ineligible at the outset.

This proposal is designed for *competitive* girls' and women's sport, i.e., sport whose focus is adversarial engagement for places in rounds, finals, on podiums, and for the championship, and for the experiential, financial, and ancillary rewards that flow from success in this space. It is not designed for *participation* or *recreational* sport, i.e., sport whose focus is friendly play for social engagement, health, and welfare. Given its different focus and goals, eligibility standards for participation sport can and should be different from those of competitive sport.

| **TRANS INCLUSION CHART** for **Scholastic & Non-Scholastic Competition** | **SEX STATUS OF TRANS GIRL/WOMAN** | | |
|---|---|---|---|
| | Athlete *has not* experienced (any stage of) male puberty | Athlete *has* experienced some or all of male puberty & is *not on hormones* or has not mitigated their legacy advantage | Athlete *has* experienced some or all of male puberty & is *on hormones* and has mitigated their legacy advantage |
| **Non-Contact Sports Competition** | Included without condition (no different requirements) | Included but no head-to-head competition | Included consistent with international rules e.g., NCAA rule |
| **Contact Sports Competition** | Included without condition (no different requirements) | Included but no head-to-head competition | Included consistent with international rules e.g., NCAA rule |

The choice to peg eligibility to international rules is explained in the text immediately above the table. The current NCAA rule is superficially consistent with international rules; however, because the NCAA is not specific about the degree of mitigation required and does not monitor trans women for compliance, it is significantly flawed as administered. This problem is described below, in Q&A #26. The NCAA rule is noted here as an example of a domestic rule that, if properly administered, is a reasonable accommodation consistent with international rules.

Trans women/girls who are not on gender affirming hormones, i.e., who have full male advantage, or who have not mitigated their advantage at least to the point of meeting the international standard for their sport, should be fully included without condition on girls' and women's teams for all aspects of team activities except for competition itself and any aspects of practice that might implicate playing-safety. In high school, for example, the athlete would participate fully in the camaraderie and socialization associated with team membership. The only firm restriction is head-to-head competition against females.

Respectful alternatives to head-to-head competition should be developed by the institution responsible for the competition and the athletes, who should be afforded flexibility to take into consideration the nature and requirements of the sport and event, the institution's mission, administrative feasibility, and local conditions. Regardless, the goal of the accommodation should be to provide a competitive opportunity under the umbrella of girls' and women's sport. Examples of accommodations that might be adopted depending on the school, sport, and event, might include handicapping, multiple leagues, events, and/or podiums.

The effect of this approach will be that sometimes, a trans girl/woman not on hormones who chooses to compete in girls'/women's sport won't have a direct competitor. This is not a preferred, but also not an unusual situation. For example, sometimes a runner or relay team has to compete against the clock, and sometimes athletes in competitions sorted by weight classes lack an opponent and have to choose to win by forfeit or move up a weight class and compete with a disadvantage. Because this may not be comfortable for some trans athletes, the choice to compete in the boys'/men's category or the girls'/women's category should always be up to the individual based on their personal circumstances and preferences. Either way, they have a place in sport.

Under this proposal, females who identify as boys and men or as gender fluid are always eligible to compete in the girls'/women's category so long as they are not on male gender affirming hormones. Sex-linked traits drive the conditions, not gender identity.

Some events are hybrids, involving both competition and participation, for example, the various mass participation events like road races, triathlons, cross country skiing events, and other similar competitions all over the country and the world, in which participants of all ages and abilities from rank beginners to Olympic Champions toe the line together. These events range in size from a few hundred to many thousands, and while for the great majority of the participants the goal is to get a finisher medal and perhaps a personal best, for some the goal is an overall award or an age-group or other category award, which could be anything from a trophy to thousands of dollars. With virtually no exceptions, these events are conducted under the aegis of and sanctioned by the sport's NGB, and as such are subject to their eligibility rules and thus those of the IF. As both a participatory and a competitive event, any transgender athlete would be welcome to participate without any mitigation at all, but if they want to compete for and accept any prizes, they must meet / comply with the NGB's and IF's mitigation requirements for that sport.

## MODEL STATUTORY AND REGULATORY LANGUAGE
## TO SAFEGUARD WOMEN'S SPORTS & INCLUDE TRANS ATHLETES

The best way to resolve the issue of safeguarding opportunities for females within girls' and women's sport while including trans athletes is to enact standalone federal legislation. This approach would ensure clarity and consistency in the law's treatment of the issue by the federal government, the states, and sport governing bodies. The model language immediately below is thus for a standalone federal statute. Following that is language to amend the Title IX regulations governing separate sex sport, 34 C.F.R. § 106.41, and the Equality Act, in the event lawmakers prefer one or both alternative approaches. All three options are based in and compatible with the Title IX regulations. Approaching law reform related to girls'/women's competitive sport in this way ensures that the extensive web of related statutory, administrative, and case law that exists in this area is not unnecessarily voided by our proposed trans-inclusive law reform measures.

## PROPOSED STANDALONE STATUTE

Schools receiving federal funds and sport governing bodies engaged in interstate commerce [covered entities][3] may operate or sponsor separate competitive sports teams and events based on biological sex[4] where group-based sex-linked traits affect playing-safety and competitive capacity.

(A)    Covered entities shall provide equal athletic opportunities, treatment, services and benefits in kind, quality and availability to male and female athletes.[5]

(B)    Covered entities may restrict eligibility for the female sport category only to females if any male sex-based differences would have a negative impact on the right of females to achieve equality of athletic opportunity.[6]

---

[3]    Schools receiving federal funds are subject to Title IX of the Education Amendments of 1972. Sports governing bodies include public and private non-profit high school and age-group athletic associations, intercollegiate athletic associations, the U.S. Olympic and Paralympic Committee, and their member National Governing Bodies. These organizations may be subject to Title IX and/or the Ted Stevens Olympic and Amateur Sports Act.

[4]    See National Institutes of Health (NIH), Office of Research on Women's Health, Sex & Gender, https://orwh.od.nih.gov/sex-gender, last accessed on January 1, 2021 (explaining that "'[s]ex' refers to biological differences between females and males, including chromosomes, sex organs, and endogenous hormonal profiles. 'Gender' refers to socially constructed and enacted roles and behaviors which occur in a historical and cultural context and vary across societies and over time.")

[5]    For purposes of this statute, "males" means biological males and "females" means biological females. *Id. See also* U.S. Department of Education, Office for Civil Rights, Title IX 1979 Policy Interpretation, *available at* https://www2.ed.gov/about/offices/list/ocr/docs/t9interp.html

[6]    *See* McCormick v. School District of Mamaroneck, 370 F.3d 275 (2nd Cir. 2004) (holding that recipients must provide girls with equal opportunities to compete in championship games.); U.S. Department of Education, Office for Civil Rights, Title IX 1979 Policy Interpretation, *available at* https://www2.ed.gov/about/offices/list/ocr/docs/t9interp.html

(1)     With respect to competitive opportunities, if a covered entity provides male athletes and teams the opportunity to advance to invitational, conference, state, regional, national, and international competition in the boys' and men's division, it must provide a parallel opportunity to female athletes similarly to advance in the girls' and women's division.[7]

(C)     Covered entities that operate or sponsor <u>separate-sex teams and offer</u> a team in a particular sport for members of one sex but operate or sponsor no such team for members of the other sex, and athletic opportunities for members of that sex have previously been limited, members of the excluded sex must be allowed to try-out for the team offered except if the sport involved is a contact sport and the position at issue implicates playing-safety <u>because of sex-linked differences in size, weight, strength, or explosive force</u>. Covered entities may, but are not required, to prohibit members of the excluded sex from trying out for such positions. For the purposes of this part, contact sports include <u>but are not limited to</u> boxing, wrestling, rugby, ice hockey, football, basketball and other sports the purpose or major activity of which involves bodily contact.[8]

(D)     Treatment of Transgender Athletes

Where a covered entity operates or sponsors separate sex teams and events, transgender athletes shall be accommodated as follows:

(1)     Treatment of Transgender Boys and Men

    (a)     Trans boys/men who have not taken gender-affirming hormones may be included in girls' and women's sport or they may compete in boys' and men's sport consistent with (C), the contact sport exception.

    (b)     Trans boys/men who have begun taking gender-affirming hormones

        (i)     may compete in boys' and men's sport consistent with (C)(the contact sport exception), but

        (ii)     may not compete head-to-head against female athletes in girls' and women's sport.

(2)     Treatment of Transgender Girls and Women

    (a)     Trans girls/women who have not begun male puberty do not have significant male sex-linked advantages; they shall be included in girls' and women's sport without conditions or limitations.

    (b)     Trans girls/women who have experienced all or part of male puberty and who have sufficiently mitigated their male sex-linked advantages through surgery and/or gender affirming hormones consistent with the rules of

---

[7]   *Id.*

[8]   This provision would re-codify the contact sports exception in the Title IX Regulation, 34 C.F.R. § 106.41(b).

their sport's international federations, may participate in girls'/women's sport without further conditions or limitations.

(c)     Trans girls/women who have experienced all or part of male puberty and who have not at all, or only partially, mitigated their male sex-linked advantages according to the international federation standards in their sport may be included in girls'/women's sport but not in head-to-head competition against female athletes.[9]

(E)     The private medical information (PMI) necessary to determine an athlete's eligibility must be available to the relevant sports authority. The information, which shall be kept confidential, is strictly limited to confirmation of the athlete's biological sex and of their hormone status over the relevant period of time.[10] All challenges to an athlete's eligibility shall be resolved by the relevant sports authority based on this confirmation.[11]

(F)     Policy, training and competition must encourage a safe, respectful, and affirming environment for all athletes.[12]

(G)     This statute only applies to competitive sport, when the principal objective is to win individual or team championships, titles, medals, or prize money. It does not apply to recreational sport such as physical education classes or intramural events, the principal objective of which is to participate for health and enjoyment.

---

[9]     Head-to-head competition is when two or more athletes compete directly against one another other, for example in the same heat in the pool or on the track, or on the same court in basketball and volleyball. Trans girls/women who have not at all, or only partially, mitigated their male sex-linked advantages who want to be included under the girls'/women's sport umbrella must be accommodated by means that do not involve head-to-head competition. Acceptable accommodations should be developed by sports administrators who are experts in the affected sports and events, but they need not reinvent the wheel. Existing models for co-ed sport and weight and age divisions can be borrowed for this purpose. Examples of acceptable accommodations might include separate events, heats, divisions, or handicapping that permits separate scoring, separate teams, or separate recognition.

[10]    This information should be included on the standard pre-season physical eligibility form that is completed and signed by the athlete's physician. The form should include the following questions for the physician to answer: whether the athlete is or is not transgender; if they are, whether they are or are not on puberty blockers and/or gender affirming hormones; and if they are, the dates of treatment and testosterone levels they have maintained during the relevant period.

[11]    Assuming the relevant sports authority has confirmed the athlete's eligibility according to the relevant rule, no challenge to their inclusion should be entertained in the absence of admissible evidence of fraud.

[12]    In addition to educational programs to ensure a respectful environment, sport governance organizations should adopt and implement policies specifying that any challenge to the eligibility of an athlete shall be to a specified official of the relevant sports authority by confidential email, such query or complaint and reply thereto also subject to (D) above.

**PROPOSED AMENDMENT TO THE EQUALITY ACT (H.R. 5 - 2019)**

Amend SEC. 9. MISCELLANEOUS. as follows:

Within Section 1101. DEFINITIONS AND RULES., by inserting

"(4) SEX.—The term 'sex' includes—
   **"(A) biological sex, including the sex characteristics that account for the physical and physiological differences between males and females;[13]**
   "(B) sex stereotype;
   "(C) pregnancy, childbirth, or a related medical condition;
   "(D) sexual orientation; and
   "(E) gender identity.~~; and~~
   ~~"(D) sex characteristics, including intersex traits.[14]~~

"Section 1106. RULES OF CONSTRUCTION.

   "(A) Sex – Nothing in section 1101 or the provisions of a covered title incorporating a term defined or a rule specified in the section shall be construed –

      "(1) To limit the protection against an unlawful practice on the basis of pregnancy, childbirth, or a related medical condition provided by section 701(k), or

      **"(2) To limit the obligation of programs and institutions covered by Title IX of the Education Amendments of 1972, the Ted Stevens Olympic and Amateur Sport Act, and Title VII of the Civil Rights Act of 1964 to provide separate opportunities on the basis of biological sex when this is necessary to protect the right of biological females to equality in competitive athletics, or**

      **"~~(2)~~(3)** To limit the protection against an unlawful practice on the basis of sex available under any provision of Federal law other than that covered title, prohibiting a practice on the basis of sex."

---

[13]   See National Institutes of Health (NIH), Office of Research on Women's Health, Sex & Gender, https://orwh.od.nih.gov/sex-gender, last accessed on January 1, 2021 (explaining that "'[s]ex' refers to biological differences between females and males, including chromosomes, sex organs, and endogenous hormonal profiles. 'Gender' refers to socially constructed and enacted roles and behaviors which occur in a historical and cultural context and vary across societies and over time.")

[14]   "Sex characteristics" as a term and category includes intersex traits which appears in (4) (A) above.

## PROPOSED AMENDMENT TO THE TITLE IX REGULATIONS (34 C.F.R. § 106.41)

(a) *General.* No person shall, on the basis of sex, be excluded from participation in, be denied the benefits of, be treated differently from another person or otherwise be discriminated against in any interscholastic, intercollegiate, club or intramural athletics offered by a recipient, and no recipient shall provide any such athletics separately on such basis.

(b) *Separate teams.* Notwithstanding the requirements of paragraph (a) of this section, a recipient may operate or sponsor separate teams **based on biological sex** where selection for such teams is based upon competitive skill or the activity involved is a contact sport. However, where a recipient operates or sponsors **separate-sex teams and offers** a team in a particular sport for members of one sex but operates or sponsors no such team for members of the other sex, and athletic opportunities for members of that sex have previously been limited, members of the excluded sex must be allowed to try-out for the team offered, **except if** the sport involved is a contact sport **and the position at issue implicates physical playing-safety because of sex-linked differences in size, weight, strength, and explosive force.**[15] **A recipient may, but is not required to, prohibit members of the excluded sex from trying out for such positions.** For the purposes of this part, contact sports include **but are not limited to** boxing, wrestling, rugby, ice hockey, football, basketball and other sports the purpose or major activity of which involves bodily contact.

**(c) *Treatment of Transgender Athletes.***

   **(1)   Because trans girls/women who have not begun male puberty do not have significant male sex-linked advantages, they shall be included in girls' and women's sport without conditions or limitations.**

   **(2)   Trans boys/men who have not taken gender-affirming hormones may be included in girls' and women's sport without conditions or limitations.**

   **(3)   Trans girls/women who have experienced all or part of male puberty and who have sufficiently mitigated their male sex-linked advantages — through surgery and/or gender affirming hormones consistent with the rules of their international federations — may participate in girls'/women's sport without additional conditions or limitations.**

   **(4)   Trans girls/women who have experienced all or part of male puberty and who have not, or only insufficiently, mitigated their male sex-linked advantages according to the international federation standards in their sport may be accommodated within girls'/women's sports but not in head-to-head competition with female athletes.**

---

[15]   Because the contact sport exception is permissive not mandatory, schools may allow girls/women to try out for positions on boys'/men's contact sports teams. This is least controversial when the position at issue — as opposed to the sport in general — does not involve a high risk of significant physical impact. See, e.g., Vanderbilt kicker Sarah Fuller first woman to score in Power 5 football game, ESPN News Service, December 12, 2020.

**(5)** **The private medical information (PMI) necessary to determine an athlete's eligibility must be available to the relevant sports authority. The information, which shall be kept confidential, is strictly limited to confirmation of the athlete's biological sex and of their hormone status over the relevant period of time.[16] All challenges to an athlete's eligibility shall be resolved by the relevant sports authority based on this confirmation.[17]**

**(6)** **Policy and training should encourage a safe, respectful, and affirming environment for all women and girls.**

---

[16]  This information should be included on the standard pre-season physical eligibility form that is completed and signed by the athlete's physician. The form should include the following questions for the physician: whether the athlete is or is not transgender; if they are, whether they are or are not on puberty blockers and/or gender affirming hormones; and if they are, the dates of treatment and testosterone levels they have maintained during the relevant period.

[17]  Assuming the relevant sports authority has confirmed the athlete's eligibility according to the relevant rule, no challenge to their inclusion should be entertained in the absence of admissible evidence of fraud.

# DEFINITIONS

**ACCOMMODATION** — The process of adapting or adjusting to someone or something without changing the underlying goal or design, e.g., in a workplace or educational program. In the context of sport, accommodation means adjusting an aspect of girls'/women's event to include trans girls with male sex-linked advantages in a way that does not diminish participation and competitive opportunities for females. Examples of accommodations already in use in sport include handicapping, separate heats, separate scoring and/or separate and equal teams. This list is not exhaustive.

**ANTI-DOPING** — The effort against doping in sport. Doping is the use of prohibited substances and methods. Prohibited Substances Lists in the United States are maintained by the United States Anti-Doping Agency (USADA) and the National Collegiate Athletic Association (NCAA). Testosterone is a steroid on both Prohibited Substances Lists. Its exogenous use by athletes is banned. The testosterone levels of international-caliber athletes are monitored by regular urine and blood tests to ensure they do not fluctuate beyond both their own naturally-occurring levels, and the normal group ranges for their sex.

**CISGENDER (CIS)** — An adjective that describes a person who is neither transgender nor gender fluid. It is also used to describe a person whose gender identity is consistent with their natal sex.

**CIS MALE** — A person whose biological sex is male who is neither transgender nor gender fluid.

**CIS FEMALE** — A person whose biological sex is female who is neither transgender nor gender fluid.

**COMPETITIVE FAIRNESS** — The state of play when the rules reflect — and events are conducted — consistent with the design of the sport. For example:
- Weight categories are fair when groups of comparably sized athletes are matched against one another. For example, a wrestling match is considered fair when the competitors compete in their narrowly defined weight classes and referees ensure that competitors' actions are authorized from within a range of permissible maneuvers.
- Age categories are fair when they recognize and mitigate competitive differences conferred on the body due to the age of the competitor.
- Similarly, sex segregated sport classifies athletes by their biological sex because of the significant performance gap between male athletes and female athletes, and to ensure that female athletes have the same competitive opportunities as their male counterparts. In this context, competitive fairness requires rules that safeguard the female category and the female athletes who reasonably rely on its integrity.

**CONFIDENTIAL MEDICAL INFORMATION** — Information, including protected health information (PHI), that is normally treated confidentially but is relevant for the determination of eligibility for sports participation and therefore shared in a limited way for this limited purpose.

**FEMALE** — An individual whose biological sex is female. Biological sex is sometimes referred to as natal sex. In contrast with males, females have ovaries, not testes; they make eggs, not sperm; and their endocrine system is estrogenic, not androgenic.

**GENDER** — Sometimes used as a synonym for sex; or to connote the complex relationship between physical sex-linked traits and one's internal sense of self as male, female, both, or neither; or one's sex-related expression.

**GENDER AFFIRMING HORMONES** — Medication taken by some trans people to counter their biological sex and affirm their gender identity. For example, trans girls/women may take estrogen to counter their male secondary sex traits and to feminize their bodies. Similarly, trans boys/men may take testosterone to counter their female secondary sex traits and to masculinize their bodies.

**GENDER AFFIRMING SURGERY** — Procedures undertaken by some trans people to construct or remove secondary sex traits to better reflect their gender identity, e.g., surgery to remove or construct breasts, and/or surgery to remove testes or ovaries and/or construct gender-conforming genitals.

**GENDER IDENTITY** — A person's deeply held inner sense of themselves as male, female, fluid, or neither. A person's gender identity may be different from their biological sex.

**LEGACY ADVANTAGE** — The permanent or long-lived physical effects of experiencing puberty in the male body. The term refers to the considerable size and strength advantages that remain even after hormone treatments or surgical procedures.

**MALE** — An individual whose biological sex is male. Biological sex is sometimes referred to as natal sex. In contrast with females, males have testes, not ovaries; they make sperm, not eggs; and their endocrine system is androgenic not estrogenic.

**PERFORMANCE GAP** — The percentage difference between male athletic performances and female athletic performances that result from biological sex-linked differences. Some individual females surpass some individual males, but depending on the sport and event, the gap between elite male performances and elite female performances overall generally ranges from 8-20%, and up to 50% in sports and events featuring explosive power. The very best elite female performances are regularly surpassed by non-elite male performances. Together with the commitment to sex equality, the substantial performance gap justifies separate sex teams and events.

**PLAYING-SAFETY** — The physical safety of athletes on the field of play.

**PUBERTY** — The period of sexual maturation and the development of fertility. Sexual maturation includes the development of secondary sex characteristics—the physical features associated with a male phenotype on the one hand, and a female phenotype on the other. In girls, the onset of puberty is generally between ages 8 and 13. In boys, it is generally between ages 9 and 14.

**SEX ASSIGNED / RECORDED AT BIRTH** — The designation of a newborn child's sex on their official birth record based on inspection of their external genitalia. This designation may be

incorrect in the case of an infant with a difference of sex development (DSD) that affected the development of their genitals. Sex recorded on birth certificates, passports, or drivers' licenses may or may not reflect biological sex and should not be determinative of eligibility for competition.

**SEX / BIOLOGICAL SEX** — Male or female, one of two classifications by which most organisms are grouped on the basis of their reproductive organs and functions. A person's sex also refers to the cluster of sex-linked characteristics or traits—i.e., chromosomal, gonadal, endocrinological (hormonal), and phenotypic characteristics, commonly used to distinguish males from females.

**SEX-LINKED DIFFERENCES** — Physical and physiological differences that are tied to being biologically male or biologically female. For purposes of sport, the main sex-linked differences are tied to the endogenous (natural) production in biological males of much higher levels of testosterone beginning from the onset of male puberty and continuously throughout the competitive athletic career.

**SEX SEGREGATION** — Refers to separating people by sex or by particular sex-linked traits such as testosterone. Formal sex segregation in competitive sports is constitutional because it is empowering not subordinating, and because it is the only way to ensure that females as a group have the same sports opportunities, experiences and successes as males as a group.

**TESTOSTERONE / TESTOSTERONE RANGES** — A hormone classified as an anabolic, androgenic steroid that builds tissue. In childhood, males and females produce about the same, small amount of testosterone. At the onset of puberty, the male testes begin to produce much more than the female ovaries. From that point forward, the normal female range[18] remains low and narrow, from 0.06 to 1.68 nmol/L, and the normal male range is relatively high and wide, from 7.7 to 29.4 nmol/L.

**TRANSGENDER (TRANS)** — An adjective describing a person whose gender identity is not the same as their biological sex. The person may or may not choose to transition medically through the use of gender-affirming hormones or surgery.

**TRANS BOY/MAN** — A person whose biological sex is female, while their gender identity is male; one who transitions from female to male.

**TRANS GIRL/WOMAN** — A person whose biological sex is male, while their gender identity is female; one who transitions from male to female.

**UNCONDITIONAL INCLUSION** — Inclusion in a category, classification, or group without preconditions, such as including a trans girl/woman in girls'/women's sport without first requiring her to reduce her male sex-linked advantages.

---

[18] We use the word "normal" throughout this document consistent with its standard scientific meaning, i.e., the normal range is the range within which almost all readings or levels occur. In medicine, the normal range is sometimes also referred to as the reference range.

# FREQUENTLY ASKED QUESTIONS

## I.  ABOUT SCIENCE AND SEX

**Q1.    What is "biological sex"?**
A1.    Biological sex is the designation of an individual as male or female based on reproductive organs and associated primary and secondary sex characteristics. Biologically, they are either female with ovaries/eggs and an estrogenic endocrine system, or they are male with testes/sperm and an androgenic endocrine system.

**Q2.    What are sex differences?**
A2.    Sex differences are anatomical and physiological differences that are determined by or related to biological sex. Males on the one hand and females on the other have distinct genetic and chromosomal, gonadal, endocrinological, and phenotypic (external secondary) characteristics. The field of sex differences in biomedical research specifically studies these distinctions, which have implications not only for reproduction and sport, but also for immunology and cardiovascular health, among other things. As the Institute of Medicine has explained, "basic biochemical differences" exist between males and females even "at the cellular and molecular levels."

**Q3.    Why do we have separate sex sport?**
A3.    We have separate sex sport and eligibility criteria based on biological sex because this is the only way we can assure that female athletes have the same opportunities as male athletes not only to participate but also to win in competitive sport. We also separate males and females in contact sports for reasons related to on-the-field playing-safety. From the onset of male puberty, male bodies develop such that they are as a group faster, stronger, and more powerful than female bodies as a group. The performance gap between male and female athletes that emerges from that point typically ranges from 8-20%, but up to 50% depending on the sport and event. If we did not separate athletes on the basis of biological sex - if we used any other physical criteria - we would never see females in finals and on podiums.

**Q4.    Couldn't we have eligibility criteria for the two divisions (male and female) based on some different (other than sex) physical criteria?**
A4.    No. There are no other physical criteria that could be used to determine eligibility that would similarly assure sex equality in competitive sport. Based on those different criteria, e.g., matching leg length, wing span, height, weight, etc., males as a group would always outperform females as a group because their biological sex differences, primarily testosterone levels in the male range from the onset of puberty and throughout the athletic career. Team USA stars Missy Franklin and Ryan Lochte illustrate this point well. They are both multiple Olympic and world champions in swimming. Both had first class training, coaching, and support. Both are 6'2" with reported 6'4" wingspans. Both held the world record in the 200 meters backstroke. But had they raced each other on their best days, Lochte would have finished about a half lap ahead of Franklin. In 2012, the year Franklin set her world record, her time of 2:04.06 would have placed her in a tie for 50th in the U.S. men's Olympic Trials.

**Q5.    If a boy and a girl are the same height, weight, and body build, aren't they likely to be essentially the same athletically?**

A5.    No. Testosterone-driven sex differentiation at puberty results in males developing larger hearts and higher capacity for oxygen transport and carbohydrate processing, as well as different skeletal and muscular composition. All of these characteristics provide males with superior strength, speed, power, and endurance.

**Q6.    What do scientific experts estimate is the sports performance advantage of post pubescent males?**

A6.    Experts estimate the male advantage is normally between 8 and 20% depending on the sport and event, and up to 50% in sports and events featuring explosive power. For example: Team USA's best female high jumper is Vashti Cunningham, NFL star Randall Cunningham's daughter. She is regularly ranked among the top ten best female high jumpers in the world. Her best jump as a professional (6' 6 ½") is regularly surpassed by dozens of U.S. high school boys.

As the chart immediately below — comparing California high school performances — shows, this isn't a phenomenon exclusive to professionals. Because the performance gap emerges at the onset of male puberty, as a group, high school girls have no chance against high school boys as a group.

**2019 CALIFORNIA REGIONAL HIGH JUMP RESULTS[19]**

| REGION | BEST HIGH SCHOOL BOY | BEST HIGH SCHOOL GIRL | % DIFFERENCE |
|---|---|---|---|
| Central | 6'10" | 5'10" | 14.63% |
| Central Coast | 6'6" | 5'6" | 15.38% |
| Los Angeles | 6'2" | 5'2" | 16.22% |
| North Coast | 6'10" | 5'5" | 20.73% |
| Northern | 6'5" | 5'6" | 14.29% |
| Oakland | 5'11" | 4'10" | 18.31% |
| Sac-Joaquin | 6'8" | 5'8 1/4" | 14.69% |
| San Diego | 6'8" | 5'10 1/2" | 11.88% |
| San Francisco | 6'0" | 4'10" | 19.44% |
| Southern | 7'0" | 5'8 1/2" | 18.45% |

---

[19]   This chart is based on data from Athletics.net, California High Jump Results, accessed on September 25, 2019.

**Q7.    Are advocacy groups correct when they say that it's a myth and an outdated stereotype that females can't compete with males?**

A7.    No. It is a fact - not myth or outdated stereotype - that starting from the onset of male puberty, i.e., starting in middle school, there is an average 8-20% performance gap between males and females, which reaches to 50% in some sports and events. The proposition that better resources and support for female athletes can change biological imperatives and competitive results is false. Some individual females can and will outperform some individual males. But even the very best female athletes are routinely surpassed not only by the very best male athletes but also by second tier male athletes. For example, the world records in the indoor men's and outdoor women's shot put are quite similar — 74' 10 1/2" for the men and 74'3" for the women. But the women's shot put is 8.8 lbs. while the men's is almost twice as heavy at 16 lbs. The same pattern holds for the women's world records in all of the races on the track from 100 meters to 10,000 meters. Indeed, not only are those records surpassed by many men each year, they are also surpassed by many high school boys. The pattern also holds for high school athletes who aren't yet superstars. With rare exceptions, from the onset of male puberty, even the best high school girls have no chance to succeed against high school boys.

**Q8.    What does testosterone have to do with separate sex sport—why are we always hearing about testosterone in this context?**

A8.    Testosterone is an anabolic-androgenic steroid. *Anabolic* steroids build body tissue, including but not limited to bone and muscle tissue and red blood cells. *Androgenic* steroids are responsible for male sex differentiation, i.e., for the development of male primary sex characteristics (in utero), and male secondary sex characteristics (in puberty). Because of its body building and sex differentiation effects, testosterone produced *endogenously* (naturally within the human body) is the primary driver of the sex differences in athletic performance, i.e., of the performance gap between male and female athletes. Beginning at puberty, at approximately age 11, the male testes begin producing significantly more testosterone than they did earlier in childhood, and also significantly more than is ever produced by female ovaries. This increased production triggers the onset of male puberty, and thereafter <u>builds and sustains the male body in the respects that matter for sports performance</u>: speed, strength, power, and endurance. The *exogenous* use of testosterone (doping) is banned by all national and international sports organizations because of these anabolic effects.

**Q9.    What do people mean when they say that there is a "male range" and a "female range" for testosterone?**

A9.    Both males and females produce testosterone naturally in their bodies, males primarily in the testes and females primarily in the ovaries. Starting from the onset of male puberty, generally about age 11, testes begin to produce much more testosterone than ovaries. From that point forward, the normal female range is between 0.06 and 1.68 nanomoles per liter (nmol/L), and the normal male range is between 7.7 and 29.4 nmol/L. The gap between top of the female range and the bottom of the male range is 6.02 nmol/L. Converted to ng/dL — the metric typically used in medicine in the U.S. — the normal female range is from 1.73 to 48.45 ng/dL, the normal male range is from 222 to 848 ng/dL, and the gap between the top of the female range and the bottom of the male range is 173 ng/dL.

The figure below was published this year in the Journal of the American Medical Association (JAMA). It represents data from the U.S. National Health and Nutrition Examination Survey (NHANES). It shows the increase in testosterone concentration in male youth starting from age 11 onward, as well as the gap that emerges as a result between male and female testosterone levels.



(from J. Senefeld et al., JAMA Research Letter (2020))

**Q10.   Don't some healthy females produce testosterone in the "male" range?**
A10.   No. Although females do produce testosterone, mainly in their ovaries, healthy post-pubertal females never produce testosterone levels as high as post-pubertal males. Throughout childhood, up until the onset of male puberty, male and female testosterone levels are about the same; but from the onset of male puberty, male testes produce significantly more testosterone than female ovaries. From that point forward, normal female testosterone levels fall in a narrow range between 0.06 and 1.68 nanomoles per liter (nmol/L), and male levels fall in a broader range between 7.7 and 29.4 nmol/L. The gap between the normal male range and the normal female range is wide. As the following figure indicates, there is no overlap. Some biological females have higher than normal female testosterone levels, for example if they have polycystic ovaries, but again, no healthy female has a testosterone level even close to the normal male range.



This figure shows the normal female testosterone range on the left and the normal male range on the right. It also shows the abnormal testosterone ranges that can be produced by people with certain differences of sex development (DSDs). Some people with DSD prefer to describe themselves as intersex. The conditions marked in red are among those that affect genetic (biological) females. Those marked in green are two that affect (genetic) biological males. Those conditions are described further in the answer to Question 27 below.

Some advocates for trans and intersex athletes claim that there is an overlap in the normal ranges. This claim is not supported by the data or the current peer-reviewed literature. Their argument depends on the existence of a small number of outlier (abnormal) readings, i.e., on a small number of higher-than-normal female T readings and a small number of lower-than-normal male T readings. These abnormal readings are used by advocates to construct a "spectrum" that *appears* to negate the normal bimodal distribution by "filling in" the gap between the two ranges.[20] The figure above shows one way this optical effect can be achieved. It requires ignoring that more than 99% of the population has readings in the normal ranges, and then "filling in" the gap between those ranges with readings from the less than 1% of the population that has an intersex condition.

As the leading experts in the field have established, however, the overlap argument is not supported by the data points themselves, which do not distinguish between (1) doped and non-doped females; (2) females and males with differences of sex development; and (3) male readings taken at rest and following strenuous exercise—the latter has been established to lower normal levels temporarily. Additionally, they measure testosterone by immunoassay — which is inaccurate at lower testosterone concentrations in women — rather than by state-of-the-art methodology, i.e., by mass spectrometry.[21] Once those errors are corrected, the overlap disappears.

[20]   Advocates may refer to this older paper to support their claim: Healy ML, et al., Endocrine profiles in 693 elite athletes in the postcompetition setting. Clin Endocr. 2014; 81(2): 294-305. PMID: 24593684.

[21]   Handelsman DJ, Hirschberg AL, Bermon S. Circulating Testosterone as the Hormonal Basis of Sex Differences in Athletic Performance. Endocr Rev. 2018;39(5):803-29. Epub 2018/07/17. Clark RV, Wald JA, Swerdloff RS, Wang C, Wu FCW, Bowers LD, Matsumoto AM 2019 Large divergence in testosterone concentrations between

**Q11.   Don't elite female athletes have high testosterone levels—isn't this what makes them good athletes?**

A11.   No. Elite female athletes generally have testosterone levels within the normal female range, i.e., below 1.68 nmol/L. If they have the condition known as polycystic ovary syndrome (PCOS), they may have testosterone levels up to 3 nmol/L, or, in rare instances, up to 4.8 nmol/L. This is why some sports organizations, wishing to be inclusive of all possible healthy biological females, set their maximum testosterone level at 5 nmol/L.

**Q12.   Why have many sports organizations adopted a testosterone test for their eligibility standard for inclusion in women's sport?**

A12.   Testosterone is an excellent proxy for biological sex and a valid basis for an eligibility rule for the women's category for the following reasons:

- Testosterone is the primary driver of the sex differences in athletic performance;
- Sport already tests for and monitors testosterone levels as part of the normal anti-doping process; and
- Different sex testing protocols are more intrusive and, in some cases, less accurate.

No other single criterion so comprehensively addresses sport's and society's concerns about the testing protocol.

**Q13.   Why have some sports organizations adopted the testosterone level of 5 nmol/L as the upper limit for inclusion in the female category?**

A13.   Some sports organizations have adopted the level of 5 nmol/L as the upper limit for inclusion in the female category because it represents the outermost bounds that a healthy biological female — regardless of her legal or gender identity — can reach naturally. Almost all females, including elite athletes, have testosterone levels well below 5 nmol/L. The normal female range is between 0.06 and 1.68 nmol/L. Even females with the condition known as polycystic ovary syndrome (PCOS) — which can dramatically raise testosterone levels — only very occasionally reach 3 nmol/L, with rare readings up to 4.8 nmol/L. Setting the level at 5 nmol/L assures that no otherwise healthy biological female could be excluded by the standard. Given that 5 nmol/L is already high, however, some international federations are considering the lower limit of 3 nmol/L.

**Q14.   Why is only the female category policed for testosterone levels—why doesn't sport also set an upper limit for the male category?**

A14.   The female category was carved out from open (mixed or co-ed) sport as a protected space where females could compete only against each other and not also against males. It was designed specifically to exclude males, i.e., people with male sex-linked performance advantages. Testosterone is the primary driver of these sex-linked advantages. The male category is not policed because it does not need protection from itself; it was not designed to exclude or regulate males with natural male testosterone levels. Elite sport does, however, monitor testosterone levels in all athletes, male and female, for exogenous use of (i.e., doping with) androgens, including testosterone.

_____

men and women: Frame of reference for elite athletes in sex-specific competition in sports, a narrative review. Clin Endocrinol (Oxf) 90:15-22.

**Q15.** **Are advocacy groups correct when they say that there is no evidence that trans girls/women have an advantage over females in sport?**

A15.   No. They are wrong. Trans girls/women are biologically male. Consequently, unless they go on puberty blockers and then on gender affirming hormones <u>before</u> the onset of male puberty, they benefit from normal male sex development and differentiation. There is overwhelming evidence that individuals who are biologically male — however they identify — have an athletic advantage over individuals who are biologically female—however they identify. Gender identity is unrelated to athletic ability. Additionally, there is <u>convincing evidence</u>[22] that, depending on the task, skill, sport, or event, trans women maintain male sex-linked (legacy) advantages even after a year on standard gender-affirming hormone treatment.

**Q16.** **Are advocacy groups correct when they say that any remaining advantages males have over females in sport are the result of cultural stereotypes and lesser opportunities for development, training, and competition?**

A16.   No. They are wrong. Although stereotypes and opportunities can affect the degree of the performance gap between the best females and the best males, the data and science are clear that for almost all sports and events the gap itself is biologically-based and immutable.

**Q17.** **What does it mean physically or biologically to say that someone is "transgender"?**

A17.   A transgender person is currently defined as someone who identifies as other than their biological sex. For example, a trans girl/woman is someone who identifies as a girl/woman even though they are biologically male. A person does not need to take gender affirming hormones or have surgery to be considered transgender. Some transgender people are not on hormones and have not had surgery. Some transgender people take hormones but do not have surgery. And some transgender people do both. Whether a transgender person takes hormones, the level at which they choose to set their hormones, and whether they have surgery, are all matters of personal choice, medical advice, and/or opportunity.

**Q18.** **Do all trans girls/women have a testosterone advantage?**

A18.   No. Those trans girls/women who *never* experience the onset of male puberty do not develop the secondary sex characteristics that are responsible for the performance gap between male and female athletes. Preventing male puberty involves taking puberty blockers before its onset, and thereafter transitioning to gender affirming hormones that keep testosterone levels consistently within the female range. In contrast, trans girls/women who go on blockers and/or gender affirming hormones and/or have a gonadectomy only *after* they experience some or all of male puberty retain a "legacy advantage" as a result of this experience. The degree of their legacy

---

[22]   (1) Roberts TA, Smalley J, Ahrendt D. Effect of gender affirming hormones on athletic performance in transwomen and transmen: implications for sporting organisations and legislators. Br J Sports Med. 2020. Epub 2020/12/09. (2) Hilton EN, Lundberg TR. Transgender Women in The Female Category of Sport: Perspectives on testosterone suppression and performance advantage. Sports Medicine. 2021;51:(in press) (PMID 33289906 and doi: 10.1007/s40279-020-01389-3). (3) Handelsman DJ, Hirschberg AL, Bermon S. Circulating Testosterone as the Hormonal Basis of Sex Differences in Athletic Performance. Endocr Rev. 2018;39(5):803-29. Epub 2018/07/17. See also (4) Gooren LJ, Bunck MC. Transsexuals and competitive sports. Eur J Endocrinol. 2004;151(4):425-9. (5) Wiik A, Lundberg TR, Rullman E, et al. Muscle Strength, Size, and Composition Following 12 Months of Gender-affirming Treatment in Transgender Individuals. J Clin Endocrinol Metab. 2020;105(3). Epub 2019/12/04.

advantage depends on a combination of factors including: the extent to which they have experienced puberty; whether they had a gonadectomy (surgical removal of their testes); the levels at which they maintain their circulating testosterone; and the particular sport and event in which they compete.

**Q19.  What is meant by "legacy advantages" in the discussion of trans girls/women in girls/women's sport?**

A19.   Legacy advantages are the male sex-linked advantages that remain even after a trans girl/woman has gone on gender affirming hormones and/or gender affirming surgery. They are the benefits for sport of having gone through all or part of puberty as a male.

**Q20.  Does transgender inclusion have anything to do with doping or performance enhancing drugs (PEDs), and if so, what's the connection?**

A20.   Doping is the exogenous use — the taking — of prohibited performance enhancing drugs (PEDs), including testosterone and other body building androgens. These are among the substances that propelled the East German women to victory in the Olympic Games and World Championships in the 1970s and 1980s, costing clean American women and Team USA to lose out on medals they would otherwise have won. Some American athletes have also doped with androgens, but not in the systematic and state-sponsored way as the East Germans, and more recently the Russians. Trans girls/women who want to be included in girls'/women's events are not doping; that is, they aren't taking PEDs to compete. But their natural testosterone levels build strength, speed, and power in the same way that doping does; and because their natural levels are much higher than even those of doped female athletes, the effect on competition is the same or more overwhelming for the clean females in the field.

**Q21.  Do we have any data on the impact of trans girls with no medical intervention in girls' high school sports?**

A21.   Yes. The data that exist about trans girls with no medical intervention are consistent with the fact that they are biologically male. For example, based on its interpretation of the State of Connecticut's Equality Act, the Connecticut Interscholastic Athletic Conference (CIAC) permits trans girls to compete in girls' events even if they have not yet gone on puberty blockers or gender affirming hormones. (The CIAC places no physical or physiological conditions on their inclusion in girls' events). Two trans girls who used to compete on their schools' boys' teams moved to the girls' teams when they came out as trans. They immediately dominated their events at their conference, state, and regional competitions, even though their performances would have been insufficient to qualify them for post-season play had they competed in the boys' divisions. And although they started competing in girls' events before they began taking gender-affirming hormones, they continued to be among the best girls in their events even after they publicly stated they had started on puberty blockers and hormones. All told, just these two trans girls took "15 women's state championship titles (titles held in 2016 by nine different Connecticut female athletes) and . . . more than 85 opportunities to participate in higher level competitions from female track athletes in the 2017, 2018, and 2019 seasons."[23]

---

[23]   Verified Complaint for Declaratory and Injunctive Relief and Damages, Seoule et al. v. CIAC, Case No. 3:20-cv-00201, paragraph #77, filed in the United States District Court for the District of Connecticut (Feb. 12, 2020). These results are limited to conference, state and regional championships. They do not include all of the

# 2017-2020 Impact on Female Students in Connecticut from Participation of Two Trans Girls in One Sport

**Loss of Sports Participation Opportunities and Major Awards in a State with a Policy of Unconditional Inclusion of Trans Girls Without the Application of Mitigation Standards**



**This chart reflects the impact on female track and field athletes that resulted from the Connecticut Interscholastic Athletic Conference's policy of unconditional inclusion of trans girls based on gender identity. These impacts occurred at conference, class, state, and New England championships, as well as three invitational track and field meets over a period of four years. Each impact is an instance that an individual female athlete was affected by this policy.**

### Championships and Awards - 133 Impacts

**Team Championship:** 23 females were denied a Connecticut State Open team championship

**Individual & Relay Championships:** 93 instances where a female was denied an individual or relay championship

**All-New England Awards:** 17 instances where a female was denied an All-New England honor

### Records - 11 Impacts

**Meet Records:** 11 instances where a female lost a meet record

### Participation - 91 Impacts

**Finals Participation:** 39 instances where a female was denied the opportunity to advance to finals

**Meet Qualification:** 52 instances where a female was denied the opportunity to advance to a championship meet

---

regular season or invitational events at which opportunities to move on through competitions to finals and/or wins and podium spots were affected.

**T MILLER - SPRINTS**
**55 meters indoors and 100 meters outdoors**

| GRADE | Hormone Status* | Event | Connecticut Boys' State Rankings | Connecticut Girls' State Rankings |
|---|---|---|---|---|
| 9th | not on gender affirming hormones | Indoor-55m | 662nd | 32nd |
| | | Outdoor-100m | 326th | 2nd |
| 10th | not on gender affirming hormones | Indoor-55m | 377th | 5th |
| | | Outdoor-100m | 181st | 1st |
| 11th | not on gender affirming hormones | Indoor-55m | 118th | 1st |
| | | Outdoor-100m | 165th | 1st |
| 12th | on gender affirming hormones | Indoor-55m | 335th | 3rd |
| | | Outdoor-100m | - / - | - / - |

Miller competed on the boys' track team her freshman year and through the winter of her sophomore year. She came out publicly as transgender in the middle of 10th grade, and then switched to the girls' team for her remaining two-and-a-half years of eligibility.

Her hormone status for each season is derived from publicly-available information.[24] Because that information indicates she went on hormones for the first time only at the end of the 2019 outdoor season, i.e., sometime in May, and because her best time that year was run before then, she is listed here as "not on hormones" for the year.

The table shows rankings for the 55 meters indoors first, followed by the 100 meters outdoors. The rankings in blue font show the division she actually competed in, and the point at which she switched from the boys' to the girls' division. Simply by walking off of the track in the boys' events and walking onto the track in the girls' events, she went from barely being in the top 400 in the state to being #1 in the state.

The girls' rankings for her 9th grade year are those she would have achieved based on her times as run in boys' events. The boys' rankings for her sophomore, junior, and senior years are those she

---

[24]   See, e.g., Beyond the Labels: Meet Terry Miller, Runner's Space.com, May 26, 2019, available at https://www.runnerspace.com/gprofile.php?mgroup_id=44531&do=news&news_id=576791 (implying that Miller attended NSAF Nationals as a spectator not a competitor in her junior year, 2019, because she was not eligible to compete there, and Miller herself suggesting that she began taking hormones only in the latter part of that same year).

would have achieved based on her times as run in girls' events. There were no rankings for the 100 meters outdoors her 12th grade year (2020) because the season was cancelled due to COVID.

**A YEARWOOD - SPRINTS**
**55 meters indoors and 100 meters outdoors**

| GRADE | Hormone Status* | Event | Connecticut Boys' State Rankings | Connecticut Girls' State Rankings |
|---|---|---|---|---|
| 9th | not on gender affirming hormones | Indoor-55m | - / - | - / - |
| | | Outdoor-100m | 422nd | 4th |
| 10th | on gender affirming hormones | Indoor-55m | 392nd | 5th |
| | | Outdoor-100m | 470th | 3rd |
| 11th | on gender affirming hormones | Indoor-55m | 194th | 2nd |
| | | Outdoor-100m | 449th | 5th |
| 12th | on gender affirming hormones | Indoor-55m | 170th | 1st |
| | | Outdoor-100m | - / - | - / - |

Yearwood competed on the girls' team all four years in high school. She came out publicly as transgender in the 9th grade. Her hormone status for each season is derived from publicly available information.[25] The table shows rankings for the 55 meters indoors first, followed by the 100 meters outdoors. The boys' rankings listed on the table are those she would have achieved based on her times run in girls' events. There were no rankings for the 100 meters outdoors her 12th grade year (2020), because the season was cancelled due to COVID.

We don't have statistics on the number of trans girls who have competed in girls' events in high school sports. However, it appears that, at least in the past, most were already on gender-affirming hormones by the time they sought to participate on girls' teams; trans advocacy groups seems generally to assume that this is the case when they speak to the issue. However, we are at a juncture

---

[25]   See, e.g., Jeff Jacobs, As We Rightfully Applaud Yearwood, We Must Acknowledge Many Questions Remain, Hartford Current, June 17, 2017, available at https://www.courant.com/sports/hc-jacobs-column-yearwood-transgender-0531-20170530-column.html (reporting that Yearwood's father "said his daughter will begin consultations in June [2017] about hormonal treatment"). That was at the end of 9th grade. The fact that she competed at NSAF Nationals in 11th grade (March 2019) means that she was on hormones in 10th grade.

in history where trans girls who are <u>not</u> on hormones are just beginning to ask to be included in girls' competitions. In part this is because the standard of care in trans-medicine now recommends that trans-kids "come out" socially before they transition medically; and many physicians now require that kids wait until they are 16 to go on gender-affirming hormones. For a trans girl, going out for a girls' school sports team is one way to come out socially. We are thus increasingly likely to face situations like that in Connecticut where trans athletes seek to compete in girls'/women's sport while not on hormones.

**Q22.** **Do we have any data on the impact of trans boys with or without medical intervention in high school sports?**

A22.      Yes. The medical community now recommends that trans kids "come out" socially before they transition medically. While some trans girls have opted to go out for a girls' school sports team as one way to come out socially, this option is not so easily available to trans boys who, because they are biologically female, are unlikely to make a boys' team. As a result, some trans boys have chosen to come out socially while remaining on the girls' team. This has allowed them to continue to participate and to remain competitive in high school sport. Some trans girls have chosen this same path, coming out socially while remaining on the boys' team.

**Q23.** **When post-pubescent trans girls take gender-affirming hormones, do their athletic performances decline? If so, does any performance or "legacy" advantage remain?**

A23.      Going on gender affirming hormones causes a decline in circulating levels of testosterone which, if consistently maintained over time, has some effect on athletic performance. This effect seems to be primarily on endurance, not on strength and power. The effect on speed seems to be dependent on the extent to which the event is endurance- as opposed to strength- and power-based. Thus, the nature and extent of the decline in male performance advantage, also known as the "legacy advantage", appears to depend on the sport and the event. It also depends on the extent to which the individual experienced male puberty before they began their physical transition, and on how high they choose to maintain their testosterone levels once they do go on gender affirming hormones. Regardless, as we explain in our answer to Question 15, the current state of the peer reviewed literature is that legacy advantages remain significant.

**Q24.** **Why do some sports organizations and governing bodies — including the NCAA — require that trans girls/women reduce their testosterone levels for a year before they can compete in girls'/women's events?**

A24.      The NCAA, the IOC, and many international federations (IFs) and national governing bodies (NGBs), require trans girls/women to reduce their testosterone levels for at least a year before they can compete in girls'/women's events. This accommodation is a policy compromise, based in the hypothesis that if a trans girl/woman reduces her testosterone levels into the female range and keeps her levels consistently within that range for at least a year, her male-linked advantages will decline to the point that it is fair to include her in girls'/women's competition. The hypothesis itself is based in the fact that trans girls/women are biologically male and that testosterone is the primary driver of the performance gap between male and female athletes. Just how much gender affirming hormones reduces her male sex-linked advantages and what "legacy advantages" remain is the subject of ongoing investigation.

**Q25.** **Is there strong scientific evidence that trans girls/women have an unfair advantage over biological females even after a year of androgen-suppressing treatment?**

A25.    Yes. As our answer to Question 15 details, several peer-reviewed studies, including one based on data from the U.S. military, have confirmed that trans women retain their male sex-linked advantages even after a year on gender affirming hormones. This is especially the case for sports and events that are not endurance-based. Because of these retained advantages, USA Powerlifting and World Rugby have recently concluded that it isn't possible fairly and safely to include trans women in women's competition. Other international sports federations have rejected the International Olympic Committee's 2015 guidance suggesting that trans women be included in women's competition so long as they reduce their testosterone levels to the bottom of the male range (under 10 nmol/L). The latter federations, e.g., those that govern the sports of track and field, tennis, cycling, and rowing, have reduced the required testosterone level to within the female range.

**Q26.** **Is the NCAA's testosterone rule for trans women athletes sufficient to ensure fairness to and the safety of the biological females in the field?**

A26.    No, not as currently administered. The NCAA rule is superficially similar to that of the IOC and other sports governing bodies in that it focuses on testosterone levels; however, as administered it currently lacks their rigor and detail. It provides only that trans women athletes need to be on gender affirming hormones for at least a year. It does not specify that they need to bring their testosterone levels into the female range; it does not require them to keep their levels consistently within that range; and it does not monitor their compliance. The hypothesis that reducing testosterone levels winds down the male performance advantage sufficient to ensure fairness to and safety for the female athletes in the field depends not only on getting those levels into the female range, but also maintaining them consistently within that range throughout the operative period. The NCAA rule has been properly criticized, including by trans women athletes and their coaches, for its lack of monitoring and guidance in these respects.

**Q27.** **What if any is the relationship between intersex and trans athletes?**

A27.    Intersex conditions result from differences in biological sex development. They are also known as differences of sex development or DSDs. There are many different intersex conditions, but those that are relevant for sport all involve biological males — individuals with an XY karyotype, testes, and testosterone levels in the male range — whose sex development was atypical in some respect. For example, their external genitalia might not be fully formed or their androgen receptors may be less than typically sensitive. Athletes with such intersex conditions may be raised as male or female. People who are transgender do not generally consider themselves to be intersex. The two are related in sport to the extent that they may both involve biological males with full or partial male advantage who seek eligibility to compete in girls'/women's sport.

The following table is illustrative. It is from an exhibit in the case brought by South African runner Caster Semenya against her international federation (the IAAF now World Athletics) at the Court of Arbitration for Sport (CAS) in Switzerland. Semenya is sometimes described as intersex. In 2019, CAS upheld the federation's eligibility rules for the women's category. Those rules require affected athletes to verifiably reduce their testosterone levels to within the normal female range for a 12-month period before they can compete in that category. Switzerland's Supreme Court affirmed the CAS decision in 2020.

**COMPARING BIOLOGICAL SEX TRAITS**
**FOR PURPOSES OF GIRLS' AND WOMEN'S SPORT**
**(from IAAF Exhibit in Semenya and ASA v. IAAF)**

| | Typical Male | Person with 5-ARD (not on hormones) | Person who is Transgender MTF (not on hormones | Typical Female |
|---|---|---|---|---|
| Chromosomes | 46 XY | 46 XY | 46 XY | 46 XX |
| Gonads and Gametes | Testes & Sperm | Testes & Sperm | Testes & Sperm | Ovaries & Eggs |
| Endocrine system | Androgenic | Androgenic | Androgenic | Estrogenic |
| Sex hormones | Testosterone levels in male range | Testosterone levels in male range | Testosterone levels in male range | Testosterone levels in female range |
| Primary sex characteristics (develop in utero) | Testes, epididymis & vas deferens, prostate | Testes, epididymis & vas deferens, vestigial prostate | Testes, epididymis & vas deferens, prostate | Ovaries, fallopian tubes, uterus, vagina |
| Virilisation on puberty | Yes | Yes | Yes | No |
| Secondary sex characteristics (develop at puberty) | Male | Male | Male | Female |
| External genitalia | Penis, scrotum | Varies | Penis, scrotum | Clitoris, labia |
| Legal sex | Male | Varies | Varies | Female |
| Gender Identity | Male | Varies | Female | Female |

## II.    ABOUT CURRENT LAW ON SEX AND SPORT

**Q28:   What law or laws currently provide for separate sex sport?**
A28:    Separate sex sport is regulated by a combination of statutes, regulations, and caselaw. This includes the Ted Stevens Olympic and Amateur Sports Act, Title IX and its regulations, the Equity in Athletics Disclosure Act, and court decisions interpreting their terms.

**Q29:   Are advocacy groups correct when they say that the law affords females the right to participate, not the right to win and set records, in sport?**
A29:    No. They are wrong. The point of the laws that create and regulate separate sex sport is to ensure that females have the same opportunities as males not only to participate but also to succeed. In addition to competing, this includes the fair ability to win and set records in regional, national, and international competitions. No male or female has an individual legal right to win or set records in their respective divisions, but <u>as a class</u>, females have the legal right to win and set records in girls' and women's sport, just as males that have that right in boys' and men's sport.

**Q30:   How would the redefinition of "sex" in federal law to include gender identity affect the legal status quo? For example, would it allow schools and sports organizations including the NCAA and USOPC to continue to maintain separate sex sport?**
**A30:**    The re-definition of "sex" to include "gender identity" in a law that prohibits discrimination "on the basis of sex" would mean that programs receiving federal funds and operating in interstate commerce could not lawfully distinguish a biological female from a trans girl/woman. This would make it prima facie unlawful to do what is currently permitted, i.e., to have teams and events that are separated on the basis of biological sex. It would also make it prima facie unlawful to use testosterone — a sex-linked trait — as an eligibility criterion for inclusion in girls' and women's elite sport, e.g., as is currently required by the NCAA, the USOPC, the IOC, and the international sports federations. Both separate sex sport itself and eligibility criteria based on biological sex and sex-linked traits like testosterone are currently lawful exceptions to general prohibitions on sex discrimination. For this to remain the case, the Equality Act would need to be amended to provide for an express exception for sport.

**Q31:   Why do proponents of the Equality Act (EA) assert that the redefinition of sex won't affect girls' and women's sport?**
A31.    Many of the EA's advocates argue that the proposed EA Act won't affect Title IX, without explaining why. Alternatively, others argue that, even if it does, Congress could restore separate sex sport after the EA's enactment, through specific legislation or regulations addressing sport. Restoring separate sex sport after the EA's enactment is highly unlikely as a matter of standard legal analysis, legislative history, and politics.

The EA is designed to amend the Civil Rights Act of 1964. The definitions in that statute have been and will continue to be the basis for interpreting or defining the same words as used in all other civil rights legislation. That is, Congress cannot re-define "sex" in the principal statute and not have that definition apply directly or indirectly to the use of that term in other legislation. In

fact, many of the EA proponents intend precisely this—make the change to the definition in the principal legislation, and this will automatically change the definition in related legislation. Moreover, as a matter of standard legal analysis, absent a legislative carve out for sport — i.e., an explicit acknowledgement of an exception — any newly enacted, categorical prohibition on discrimination between biological females and trans girls/women would be presumed to supersede any earlier legislation to the contrary, including Title IX.

The legislative history of the EA makes clear that its proponents intend for it to apply to sport with no conditions or exceptions and thus, to prohibit any distinctions between biological females and trans girls/women. At the House Judiciary Committee Hearings, both the witnesses and Democrats on the Committee insisted that trans girls/women be included in girls' and women's sport without any conditions because "trans girls are girls, trans women are women, period." And on the floor of the House, a bill was rejected by a vote of 181 to 228 that would have retained the longstanding exception in Title IX for separate sex sport based on biology. (Specifically, Congressman Steube proposed legislation providing that, "Nothing in this Act or any amendment made by this Act may be construed to diminish any protection under Title IX of the Education Amendments of 1972.") The Equality Act then passed the House by a vote of 236 to 173. This legislative history would be instructive in the future were the question to arise whether Congress intended to permit or preclude distinctions on the basis of biological sex.

The natural experiment with state versions of the EA also make clear that an explicit exception is necessary to maintain sex segregated sports and spaces. In those contexts, trans advocates argue that under the state EAs, it is impermissible to separate or in any way differently to treat trans girls within girls' sport. They make these arguments even though state legislatures did not consider sports as they were enacting their EA legislation.

**Q32.    How does the recent Supreme Court decision in *Bostock v. Clayton County* (2020) affect separate sex sport—does it prohibit all distinctions on the basis of sex, including in sport?**

A32.    In *Bostock*, the Supreme Court ruled that "sex" in Title VII means "biological sex." Contrary to what many proponents of the EA argue, *Bostock* did not define (or re-define) "sex" to include "gender identity." Rather, it held that Title VII's general prohibition of discrimination "on the basis of sex" precludes discrimination that takes into account a transgender employee's sex and gender identity. Firing a person because they are transgender — i.e., because their gender identity is nonconforming — requires taking their sex into account, and this is prohibited by Title VII. Because the case involved Title VII's general non-discrimination provision, not an existing exception that allows taking sex into account, the Court wrote that it was leaving the lawfulness of exceptions — including in bathrooms, locker rooms, and sport — for another day. *Bostock* explicitly did not rule on the lawfulness of the current scheme under Title IX and the other sport statutes.

Proponents of the EA nevertheless assert that *Bostock* applies to sport, completely ignoring the Court's express pronouncement to the contrary. Specifically, in cases pending in the lower courts, they argue that *Bostock* supports the redefinition of "sex" to include "gender identity", and that the decision requires the inclusion of trans girls/women in girls' and women's Title IX sport. Notably, however, they are inconsistent in their application of *Bostock* to the question whether administrators can lawfully distinguish biological females from transgender women and girls. For

example, in pending federal cases in Connecticut and Idaho, advocates for transgender athletes argue that their inclusion in girls' high school sports must be full and unconditional, without regard to whether they are on gender affirming hormones. However, in the Idaho matter, in which college sports are also at issue, they don't challenge the NCAA rule which distinguishes female athletes from transgender athletes by requiring trans women to undergo a year of gender affirming hormone treatments before they can compete in women's sport. They support the position that in college, conditions on transgender inclusion are permissible. This distinction between high school and college may make good policy sense; but it is an acknowledgement of the continued lawfulness not only of the NCAA rule, but also more generally of what that rule represents, i.e., the lawfulness of distinctions on the basis of sex in sport. It is also a tacit acknowledgment of the fact that — as the Supreme Court itself announced — *Bostock* is not dispositive in this area.

**Q33.   Does the law currently allow schools to distinguish females from trans girls/women? Can accommodations be developed that lawfully provide for their conditional inclusion in girls'/women's sport?**

A33:   The sex exception to general nondiscrimination law requires the exclusion of biological males from most girls' and women's sport. There is no case yet that finally resolves the question whether an exception to this general rule should be made for biological males who identify as women and girls. It is standard practice, however, for the courts to permit (and sometimes even to require) accommodations when there are good reasons for doing so, and when this is possible without imposing an undue burden. Thus, accommodations that would allow trans girls/women to compete in girls'/women's sport should be permissible so long as they meet these standard criteria.

## III.   ABOUT POLICY

**Q34:   What are the principles that the Women's Sport Policy Working Group used to develop its approach to trans-inclusion in girls'/women's sport?**

A34.   The principles that guided the Working Group in the development of its approach to trans inclusion in girls'/women's sport are the following:

1.  Women's sport is designed to provide a space where biological females – whatever their gender identity – can compete only against each other and not also against biological males—whatever their gender identity. The design is based in compelling data and scientific evidence on the immutable performance gap between male athletes and female athletes. This separate sex space should be preserved and safeguarded. Girls' and women's participation in competitive sport nurtures individual health and development, contributes to the welfare of the community, and powers society's perception of the strength and value of women and girls.

2.  Trans girls and women are biologically male and so per the design would normally be excluded. However, because their inclusion could also produce real value both for the individuals concerned and for society, we should work to avoid unnecessary distinctions and exclusions.

3.  Physical sex-linked differences between males and females are largely determined from the onset of male puberty; it is these differences that justify separate sex sport, and thus, they must be taken into account in developing responsible policy for girls' and women's sport.

4.  Protocols for co-ed sports are instructive, as is the related tradition in law and policy of looking for ways to include rather than to exclude when this is possible without doing harm to an otherwise valuable institutional design. Being transgender does not change the fact of one's biological sex. Where it is recognized in existing co-ed sports policy that sex is relevant to fairness and safety, it cannot be ignored simply because an individual identifies as transgender. Similarly, where existing co-ed sports policy recognizes that sex is not relevant to fairness and safety, the goal should be unconditional inclusion.

5.  Specifically rejected as guiding principles are the unscientific, politically driven mantras that claim that:

    ▪ "sex-linked differences including testosterone levels are indistinguishable from other differences like height, weight, wingspan, and foot shape";

    ▪ "the performance gap between male and female athletes is based in myth, stereotype, and cultural inequities";

    ▪ "the physical legacy advantages associated with developing as a biological male don't exist or matter to sports performance";

    ▪ "there is no evidence that transwomen and girls have a competitive advantage over females"; and

    ▪ "females only have the right to participate not to win".

    These patently false claims have no place in a serious discussion of the policy question whether and how to include transgender athletes in girls' and women's sport.