IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA
CHARLESTON DIVISION

B.P.J. by her next friend and mother, HEATHER
JACKSON,

                    *Plaintiff*,

          v.

WEST VIRGINIA STATE BOARD OF
EDUCATION, HARRISON COUNTY BOARD
OF EDUCATION, WEST VIRGINIA
SECONDARY SCHOOL ACTIVITIES
COMMISSION, W. CLAYTON BURCH in his
official capacity as State Superintendent, DORA
STUTLER in her official capacity as Harrison
County Superintendent, and THE STATE OF
WEST VIRGINIA,

                    *Defendants*,

          and

LAINEY ARMISTEAD,

                    *Defendant-Intervenor*.

Civil Action No. 2:21-cv-00316

Hon. Joseph R. Goodwin

**PLAINTIFF'S MEMORANDUM OF LAW IN SUPPORT OF MOTION TO EXCLUDE
THE EXPERT TESTIMONY OF JAMES M. CANTOR**

## TABLE OF CONTENTS

**Page**

STATEMENT OF THE CASE AND FACTUAL BACKGROUND ........................................... 1

LEGAL STANDARD ....................................................................................................... 3

ARGUMENT .................................................................................................................... 5

A.   Dr. Cantor's Primary Opinions Have No Relevance To This Case Because
They Address Issues Beyond The Scope Of The Dispute. ........................................ 6

B.   Dr. Cantor Is Not Qualified To Offer Opinions About The Treatment Of Transgender
Adolescents In This Case. ....................................................................................... 7

    1.   Dr. Cantor Admits That He Is Not Qualified To Offer Opinions
On H.B. 3293 Or Transgender Athletes. ....................................................... 10

C.   Dr. Cantor's Testimony Is Methodologically Unreliable And Unsupported
By Science Or Medicine. ........................................................................................ 12

    1.   Dr. Cantor's Assertions That Transgender Adolescents Are Receiving
"Affirmation On Demand" And That Adolescents Transition Due
To The "Unrealistic Expectation That Transition Will Help Them Fit In"
Are Unsupported. .......................................................................................... 15

    2.   Dr. Cantor Testified That Transgender People Are One Of Three Things:
Autogynephilic, Homosexual, Or Mistaken. ................................................. 17

    3.   Dr. Cantor's Opinion That No Professional Organization Has Articulated A
Meritorious Position Calling Into Question The Basis For The Act Directly
Contradicts The Fourth Circuit's Holding In *Grimm*. ................................... 18

    4.   Dr. Cantor Has Offered Harmful Opinions Related To Transgender
People And Has Been Removed From Respectable Scientific Societies
For Posting Disrespectful Material. ............................................................... 19

D.   Dr. Cantor's Report, Opinions, And Testimony Lack Probative Value And Are Thus
Inadmissible Under Federal Rule Of Evidence 403. ............................................... 20

CONCLUSION ................................................................................................................ 21

## <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Cases**

*Belk, Inc. v. Meyer Corp., U.S.,*
 679 F.3d 146 (4th Cir. 2012) ..........................................................................2, 3

*Bourne ex rel. Bourne v. E.I. DuPont de Nemours & Co.,*
 85 F. App'x 964 (4th Cir. 2004) ...........................................................................6

*Cooper v. Smith & Nephew, Inc.,*
 259 F.3d 194 (4th Cir. 2001) ..........................................................................3, 13

*Daubert v. Merrell Dow Pharms., Inc.,*
 509 U.S. 579 (1993)................................................................................... *passim*

*Dunn v. Sandoz Pharms. Corp.,*
 275 F.Supp.2d 672 (M.D.N.C. 2003) ..................................................................12

*Edmo v. Corizon, Inc.,*
 935 F.3d 757 (9th Cir. 2019) ................................................................................1

*Edwards v. Ethicon, Inc.,*
 No. 12 Civ. 09972, 2014 WL 3361923 (S.D.W. Va. July 8, 2014)..........................7

*Grimm v. Gloucester Cnty. Sch. Bd,*
 972 F.3d 586 (4th Cir. 2020) .................................................................... *passim*

*Hartke v. McKelway,*
 526 F.Supp. 97 (D.D.C. 1981)...........................................................................8, 9

*Knight v. Boehringer Ingelheim Pharms., Inc.,*
 323 F. Supp. 3d 837 (S.D.W.Va. 2018)................................................................6

*Kopf v. Skyrm,*
 993 F.2d 374 (4th Cir. 1993) ................................................................................7

*Kumho Tire Co., Ltd. v. Carmichael,*
 526 U.S. 137 (1999)...............................................................................................4

*Lebron v. Sec'y of Fla. Dep't of Child. and Fams.,*
 772 F.3d 1352 (11th Cir. 2014) ............................................................................8

*In re Lipitor (Atorvastatin Calcium) Mktg., Sales Pracs. & Prod.*
 *Liab. Litig. (No II) MDL 2502,*
 892 F.3d 624 (4th Cir. 2018) ..............................................................................12

*Martinez v. Sakurai Graphic Sys. Corp., No. 04 C 1274,*
 2007 WL 2570362 (N.D. Ill. Aug. 30, 2007) .........................................................8

*Mod. Auto. Network, LLC v. E. All. Ins. Co.*,
  416 F. Supp. 3d 529 (M.D.N.C. 2019) ................................................................3, 8

*Nat'l Ass'n for Rational Sexual Offense L. v. Stein*,
  No. 17 Civ. 53, 2021 WL 736375 (M.D.N.C. Feb. 25, 2021) ............................4, 13

*O'Conner v. Commonwealth Edison Co.*,
  807 F.Supp. 1376 (C.D. Ill. 1992) ...........................................................................8

*Reliastar Life Ins. Co. v. Laschkewitsch*,
  No. 13 Civ. 210-BO, 2014 WL 1430729 (E.D.N.C. Apr. 14, 2014) ........................8

*Sardis v. Overhead Door Corp.*,
  10 F.4th 268 (4th Cir. 2021) ........................................................................ *passim*

*SAS Inst., Inc. v. World Programming Ltd.*,
  125 F. Supp. 3d 579 (E.D.N.C. 2015) ...............................................................4, 13

*Thomas J. Kline, Inc. v. Lorillard, Inc.*,
  878 F.2d 791 (4th Cir. 1989) ...................................................................................3

*Wright v. United States*,
  280 F. Supp. 2d 472 (M.D.N.C. 2003) ......................................................................7

**Statutes**

20 U.S.C. § 1681, et seq. ....................................................................................................1

W. Va. Code § 18-2-25d(a)(5) (2021) ...............................................................................6

**Other Authorities**

Federal Rule of Evidence 403 ..............................................................................2, 5, 20

Fed. Rule of Evidence 702 .......................................................................................2, 3

Statement of Undisputed Material Facts ¶ 48, ECF No. 290 ............................................6

Statement of Undisputed Material Facts ¶ 59, ECF No. 290 ..........................................11

## STATEMENT OF THE CASE AND FACTUAL BACKGROUND

Plaintiff, a twelve-year-old girl who is transgender, challenges the legality of H.B. 3293, a law that categorically bars Plaintiff and any other female athletes who are transgender from participating on girls' and women's sports teams in West Virginia.  B.P.J. contends that the law violates her rights under the Equal Protection Clause of the Fourteenth Amendment and discriminates against her based on sex in violation of Title IX of the Education Amendments of 1972, 20 U.S.C. § 1681, et seq.

As part of their defense of H.B. 3293, Defendants identified and disclosed an expert report from Dr. James M. Cantor.  Dr. Cantor disagrees with the views of the mainstream medical community and offers testimony that providing gender-affirming care to transgender youth, including permitting social transition for children and puberty-delaying medication and hormone therapy when indicated for adolescents, does not produce better mental health outcomes and is not the accepted standard of care.  As discussed below, Dr. Cantor's testimony about the proper medical treatment for transgender youth is not relevant to the claims in this litigation, Dr. Cantor is an adult psychiatrist who is not qualified to present himself as an expert on transgender youth, and his speculative opinions have no grounding in reliable scientific principles and methods.

As the Fourth Circuit recognized in *Grimm*, the standards of care for treating gender dysphoria "[d]eveloped by the World Professional Association for Transgender Health (WPATH), the Standards of Care for the Health of Transsexual, Transgender, and Gender Nonconforming People (7th Version 2012) . . . represent the consensus approach of the medical and mental health community."  *Grimm v. Gloucester Cnty. Sch. Bd*, 972 F.3d 586, 595–96 (4th Cir. 2020), *as amended* (Aug. 28, 2020), *cert. denied,* 141 S. Ct. 2878 (2021).  "There are no other competing, evidence-based standards that are accepted by any nationally or internationally recognized medical

professional groups." *Id.*; *see also Edmo v. Corizon, Inc.*, 935 F.3d 757, 769 (9th Cir. 2019) (quoting *Edmo v. Idaho Dep't of Corr.*, 358 F. Supp. 3d 1103, 1125 (D. Idaho 2018)).

Each of Dr. Cantor's proffered opinions is excludable for one or more of three reasons. First, Dr. Cantor's opinions are irrelevant because the opinions he offers about treatment for transgender youth fall outside the scope of the parties' dispute, which is simply whether a law can categorically bar transgender girls and women from girls' and women's sports teams in West Virginia. Second, Dr. Cantor is not qualified to offer opinions about the treatment of pre-pubertal transgender children or transgender adolescents as he does not work with and has not meaningfully studied this population. Third, Dr. Cantor's remaining opinions must be excluded because they are unreliable—they are not based on scientific methodology but rather untested hypotheses, pure speculation, and beliefs that lack any support besides Dr. Cantor's own *ipse dixit*. Because Dr. Cantor's opinions should be excluded pursuant to *Daubert* standards, and because any probative value offered by his testimony is substantially outweighed by the danger of unfair prejudice, confusion of the issues, waste of time, and undue delay under Federal Rule of Evidence 403, this Court must exclude them. Dr. Cantor's testimony is not "relevant to the task at hand." *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579, 597 (1993). Dr. Cantor does not possess the "full range of experience and training" to provide expert testimony in this case. *Belk, Inc. v. Meyer Corp., U.S.*, 679 F.3d 146, 162 (4th Cir. 2012), *as amended* (May 9, 2012) (quoting *United States v. Pansier*, 576 F.3d 726, 737 (7th Cir. 2009)). And Dr. Cantor's testimony is not "the product of reliable principles and methods[.]" Fed. R. Evid. 702. Therefore, Dr. Cantor's proffered opinions do not qualify under Federal Rule of Evidence 702 as admissible expert testimony.

Plaintiff B.P.J. respectfully submits this memorandum of law in support of her motion to exclude the proffered expert testimony of James Cantor, Ph.D. from consideration at summary judgment or trial as inadmissible under Federal Rule of Evidence 702.

## LEGAL STANDARD

Federal Rule of Evidence 702 places "a special gatekeeping obligation" on a trial court to ensure that an expert's testimony is "relevant to the task at hand" and "rests on a reliable foundation." *Daubert*, 509 U.S. at 597; *Sardis v. Overhead Door Corp.*, 10 F.4th 268, 281 (4th Cir. 2021) (quoting *Nease v. Ford Motor Co.,* 848 F.3d 219, 230 (4th Cir. 2017)); *see* Fed. R. Evid. 702 advisory committee note to 2000 amendments (amendment "affirms the trial court's role as gatekeeper," and that "all types of expert testimony present questions of admissibility for the trial court in deciding whether the evidence is reliable and helpful"). The party offering the expert carries the burden of establishing the admissibility of testimony by a preponderance of the evidence. *Cooper v. Smith & Nephew, Inc.*, 259 F.3d 194, 199 (4th Cir. 2001).

A trial court must also determine whether the proposed expert is qualified to render the proffered opinion. In doing so, a trial court considers an expert's professional qualifications and "full range of experience and training[.]" *Belk, Inc.*, 679 F.3d 162. If the purported expert lacks the knowledge, skill, experience, training, or education on the issue for which the opinion is proffered, the trial court must exclude the expert. *See, e.g., Thomas J. Kline, Inc. v. Lorillard, Inc.*, 878 F.2d 791, 799 (4th Cir. 1989); *Mod. Auto. Network, LLC v. E. All. Ins. Co.*, 416 F. Supp. 3d 529, 537 (M.D.N.C. 2019), *aff'd*, 842 F. App'x 847 (4th Cir. 2021). Even if the expert is deemed qualified, the trial court must consider the relevancy of the expert's testimony as "a precondition to admissibility." *Sardis,* 10 F.4th at 282 (quoting *Daubert*, 509 U.S. at 592). To be relevant, the testimony must have "a valid scientific connection to the pertinent inquiry." *Id*. at 281 (quoting

*Belville v. Ford Motor Co.*, 919 F.3d 224, 232 (4th Cir. 2019)) ("Simply put, if an opinion is not

relevant to a fact at issue, *Daubert* requires that it be excluded.").

If the opinions offered by the expert are deemed relevant and the expert is qualified to offer

testimony, a trial court will inquire if the opinion is based on a reliable foundation, which focuses

on "the principles and methodology" employed by the expert to assess whether it is "based on

scientific, technical, or other specialized *knowledge* and not on belief or speculation." *Id.* at 281

(citations omitted). When evaluating whether an expert's methodology is reliable, a court

considers, among other things:

> (1) whether the expert's theory can be and has been tested; (2) whether the theory
> has been subjected to peer review and publication; (3) the known or potential rate
> of error of the particular scientific technique; and (4) whether the technique is
> generally accepted in the scientific community.

*Id.*; *see also Kumho Tire Co., Ltd. v. Carmichael*, 526 U.S. 137, 149–50 (1999); *Daubert*, 509 U.S.

at 593–94. While trial courts have "broad latitude" to determine reliability, they must engage in

the gatekeeping process and not simply "delegate the issue to the jury." *Sardis*, 10 F.4th at 281

(quoting *Nease,* 848 F.3d at 229). When addressing an expert whose methodology is grounded in

experience, courts use three factors: "1) how the expert's experience leads to the conclusion

reached; 2) why that experience is a sufficient basis for the opinion; and 3) how that experience is

reliably applied to the facts of the case." *SAS Inst., Inc. v. World Programming Ltd.*, 125 F. Supp.

3d 579, 589 (E.D.N.C. 2015), *aff'd* 874 F.3d 370 (4th Cir. 2017); *see also Nat'l Ass'n for Rational

*Sexual Offense L. v. Stein*, No. 17 Civ. 53, 2021 WL 736375, at *3 (M.D.N.C. Feb. 25, 2021).

Finally, because "[e]xpert evidence can be both powerful and quite misleading because of

the difficulty in evaluating it[,]" "the judge in weighing possible prejudice against probative force

under Rule 403 . . . exercises *more* control over experts than over lay witnesses." *Daubert,* 509

U.S. at 595 (emphasis added) (quoting Weinstein, Rule 702 of the Federal Rules of Evidence Is

Sound; It Should Not Be Amended, 138 F.R.D. 631 (1991).)  "As such, 'the importance of [the] gatekeeping function cannot be overstated.'"  *Sardis*, 10 F.4th at 283 (quoting *United States v. Barton,* 909 F.3d 1323, 1331 (11th Cir. 2018)).

## ARGUMENT

This is a discrimination case about the ability of girls and women who are transgender to participate on school-sponsored athletic teams.  Although the fact that B.P.J. and many other girls and women who are transgender have had puberty-delaying medication or other endocrine care is relevant in responding to the State's argument that they have an athletic advantage rooted in physiology, Dr. Cantor does not purport to offer any testimony regarding these issues.  And as this Court previously recognized in its decision issuing a preliminary injunction, "what is or should be the default treatment for transgender youth is not the question before the court."  (Dkt. No. 67 (PI Op.) at 3 n.4.)

On their face, Dr. Cantor's opinions are irrelevant to the purported justifications of H.B. 3293.  Dr. Cantor's opinion that providing gender-affirming care to transgender youth does not produce better mental health outcomes and is not the accepted standard of care is not relevant to this Court's consideration of whether West Virginia can categorically ban transgender girls and women from girls' and women's sports teams.  In fact, even if the testimony about gender-affirming care provided to adolescents were relevant, Dr. Cantor offers irrelevant testimony about the treatment of prepubertal children and the treatment of adults.  With respect to prepubertal children, Dr. Cantor's testimony and report focus on irrelevant debates about "desistance" and about the appropriateness of social transition for transgender youth.  When discussing transgender adults, his testimony focuses on irrelevant and inaccurate theories about paraphilias and other causes of "transgenderism."

Dr. Cantor's testimony should thus be excluded.

**A. Dr. Cantor's Primary Opinions Have No Relevance To This Case Because They Address Issues Beyond The Scope Of The Dispute.**

The "court must satisfy itself that the proffered testimony is relevant to the issue at hand, for that is 'a precondition to admissibility.'" *Sardis*, 10 F.4th at 282 (quoting *Daubert*, 509 U.S. at 592). To be relevant, the testimony must have "a valid scientific connection to the pertinent inquiry." *Id*. at 281 (quoting *Nease,* 848 F.3d at 232–33). "[I]t is axiomatic that 'expert testimony which does not relate to any issue in the case is not relevant [and] non-helpful.'" *Knight v. Boehringer Ingelheim Pharms.*, *Inc.*, 323 F. Supp. 3d 837, 846 (S.D.W. Va. 2018) (quoting *Edwards v. Ethicon, Inc.*, No. 12 Civ. 09972, 2014 WL 3361923 (S.D.W. Va. July 8, 2014)). In order to be relevant, an opinion needs to "fit" with the facts at issue. *Bourne ex rel. Bourne v. E.I. DuPont de Nemours & Co.*, 85 F. App'x 964, 966 (4th Cir. 2004).

Dr. Cantor's opinions are simply not relevant to any purported justification Defendants have offered for H.B. 3293, which focus on athletic opportunities and notions of protecting women in sports. *See, e.g.*, W. Va. Code § 18-2-25d(a)(5) (2021) (offering sole justification of "promot[ing] equal athletic opportunities for the female sex"); (Dkt. No. 290 (Pl's Statement of Undisputed Facts ("SUF")) ¶ 48) (State's purported justifications are limited to "protect[ing]" women in sports and complying with Title IX). Indeed, Dr. Cantor disclaimed any intent to offer opinions about those issues. He is offering no opinion regarding the extent to which a person assigned male at birth purportedly has any athletic advantage, (Swaminathan Decl., Ex. B at 161:4-8); the extent to which transgender women or girls have any supposed athletic advantage, (*id*. at 223:3-10); or whether H.B. 3293 should apply to college athletics, (*id*. at 178:18-23.)

Instead, Dr. Cantor's opinions in this case focus on issues not relevant to this case: the standards of care for treatment of transgender youth.  For example, Dr. Cantor proposes to offer the opinion that "[a]ffirmation of a transgender identity in minors who suffer from early-onset or adolescent-onset gender dysphoria is not an accepted 'standard of care.'"  (Swaminathan Decl., Ex. A at 3 ¶ 8(e).)  But this opinion is unrelated to any interest proffered by the State.  (Pl's SUF ¶ 59.)  And as this Court already has recognized, "what is or should be the default treatment for transgender youth is not the question before the court."  (PI Op. at 3 n.4.)  Accordingly, Dr. Cantor's disagreement with the established standard of care in this Circuit—untethered to any governmental interest proffered by Defendants—does not "fit" with the facts at issue and has no relevance here.[1]

## B.    Dr. Cantor Is Not Qualified To Offer Opinions About The Treatment Of Transgender Adolescents In This Case.

To render expert testimony, the witness must possess the requisite "knowledge, skill, experience, training, or education" that would assist the trier of fact.  *Kopf v. Skyrm*, 993 F.2d 374, 377 (4th Cir. 1993); *Wright v. United States*, 280 F. Supp. 2d 472, 478 (M.D.N.C. 2003) ("A witness may testify as to his specialized knowledge so long as he is qualified as an expert based on any combination of knowledge, skill, experience, training, or education.").  If not qualified, the expert's testimony is unreliable.  *Reliastar Life Ins. Co. v. Laschkewitsch*, No. 13 Civ. 10-BO,

---

[1] Dr. Cantor's other opinions about adults are even farther afield.  For example, Dr. Cantor opines on "adult-onset gender dysphoria" and mental health issues in transgender adults, which is completely irrelevant to the issue of whether a twelve-year-old transgender girl should be able to participate on the girls' cross-country team at her school.  (Swaminathan Decl., Ex. A at 12–14); *see, e.g.*, *Edwards v. Ethicon, Inc.*, No. 12 Civ. 09972, 2014 WL 3361923, at *15 (S.D.W. Va. July 8, 2014) (excluding expert opinion about complications future patients might experience as irrelevant to the plaintiff's claims).

2014 WL 1430729, at *1 (E.D.N.C. Apr. 14, 2014); *see, e.g.*, *Mod. Auto. Network, LLC*, 416 F. Supp. 3d at 537 (affirming the district court's exclusion of an expert because they lacked experience relevant to the matters at issue); *Lebron v. Sec'y of Fla. Dep't of Child. & Fams.*, 772 F.3d 1352, 1369 (11th Cir. 2014) (holding expert witness was properly excluded who did not propose to testify about matters growing naturally and directly out of research he had conducted independent of the litigation).

Dr. Cantor is not qualified to offer his opinions regarding treatment protocols for transgender youth. "[A]n expert's qualifications must be within the same technical area as the subject matter of the expert's testimony; in other words, a person with expertise may only testify as to matters within that person's expertise." *Martinez v. Sakurai Graphic Sys. Corp., No. 04 C 1274*, 2007 WL 2570362, at *2 (N.D. Ill. Aug. 30, 2007); *see also Lebron*, 772 F.3d at 1369. "Generalized knowledge of a particular subject will not necessarily enable an expert to testify as to a specific subset of the general field of the expert's knowledge." *Martinez*, 2007 WL 2570362 at *2. "For example, no medical doctor is automatically an expert in every medical issue merely because he or she has graduated from medical school or has achieved certification in a medical specialty." *O'Conner v. Commonwealth Edison Co.*, 807 F.Supp. 1376, 1390 (C.D. Ill. 1992), *aff'd*, 13 F.3d 1090 (7th Cir. 1994); *see also, e.g.*, *Hartke v. McKelway*, 526 F.Supp. 97, 100–101 (D.D.C. 1981), *aff'd*, 707 F.2d 1544 (D.C. Cir. 1983).

Dr. Cantor's primary area of expertise is the study of hypersexuality and paraphilias,[2] and nearly one hundred percent of his clinical practice focuses on adults. (Swaminathan Decl., Ex. B

---

[2] "The term 'paraphilia'…[m]ost broadly[] refers to the highly atypical sexual interest that dominate a person's life and interact with or prevent them from having an otherwise typical sexual life." (Swaminathan Decl., Ex. B at 139:20–25.)

at 140:5–141:24, 179:7-18.)  He has publicly stated that his "primary research opportunities have involved studying sex offenders, mostly pedophiles and persons with other atypical sexualities whose behaviors led them into the legal system." (Swaminathan Decl., Ex. E; Swaminathan Decl., Ex. B at 140:5–141:24.)

At his deposition, Dr. Cantor admitted that he is not an endocrinologist, has not personally diagnosed any child or adolescent with gender dysphoria, has never personally treated any child or adolescent for gender dysphoria, and does not provide psychotherapy counseling to children or adolescents with gender dysphoria.  (Swaminathan Decl., Ex. B at 179:1-14.)  None of Dr. Cantor's professional roles have involved significant contact—or in many cases, any contact—with children or adolescents.  During Dr. Cantor's fellowship at the Center for Addiction and Mental Health ("CAMH"), the average age of the patients he provided one-on-one therapy to was early 40s, the youngest being in their "late teens, early 20s." (*Id.* at 50:10-19.)  Approximately 80 percent of the patients that Dr. Cantor saw at CAMH had been adjudicated as sex offenders.  (*Id.* at 151:7-10.)  When Dr. Cantor assumed his next professional role at Queen Elizabeth Hospital in Montreal, he did not provide psychotherapy to children or adolescents—he "predominantly worked with adults who came in with depression and anxiety disorders[.]" (*Id.* at 54:7-14.)  Subsequently, while completing his post-doctoral studies within the law and mental health program, Dr. Cantor did not work with children and adolescents with gender dysphoria. (*Id.* at 61:4-8.)  Dr. Cantor then became Senior Scientist at CAMH, where even while supervising the work of his interns, Dr. Cantor testified that he never worked directly with children or adolescents with gender dysphoria.  (*Id.* at 68:22–69:2.)  His supervision of the CAMH interns never involved research around puberty-delaying treatment prescribed to transgender adolescents nor hormone therapy prescribed to transgender adults.  (*Id.* at 132:11-19.)  In fact, in Dr. Cantor's current private practice, he has only

treated "about six to eight patents ages 16 to 18," and was unable to identify whether these patients were transgender or had gender dysphoria. (*Id*. at 179:15-18, 180:8-13.)

Dr. Cantor admitted at his deposition—as he must—that he has almost no experience researching and writing about or administering mental health treatment to transgender adolescents. Indeed, in the list of 64 articles he has authored or co-authored, only one even mentions transgender children ("The Recalled Childhood Gender Identity"), and Dr. Cantor was not a primary author of the article and did not himself carry out any portion of the study. (Swaminathan Decl., Ex. B at 102:8-14.)

In sum, Dr. Cantor is not recognized as an expert in providing treatment to transgender children or adolescents, does not have the requisite qualifications to provide treatment to transgender children or adolescents, has never treated nor delivered any psychiatric care to transgender children or adolescents in his day-to-day practice, has never written about or researched the provision of care to transgender children and adolescents, and has extremely limited experience working with children and adolescents in any capacity. (*Id*. at 179:4-14.) For all these reasons, Dr. Cantor is not qualified under the *Daubert* standards to offer opinions on matters relating to the care of transgender children.

### 1. Dr. Cantor Admits That He Is Not Qualified To Offer Opinions On H.B. 3293 Or Transgender Athletes.

Astonishingly, Dr. Cantor admitted that he is not providing any testimony relating to the three purported governmental interests that the State of West Virginia ("State") asserts are advanced by H.B. 3293: 1) to protect women's sports; 2) to follow Title IX; and 3) to protect women's safety in female athletic sports. (Pl's SUF ¶ 59.) When asked whether he is "offering an expert opinion with respect to whether H.B. 3293 serves the interest of protecting women's

sports," Dr. Cantor responded he "[hadn't] been asked that, no." (Swaminathan Decl., Ex. B at 178:3-6.) When asked whether he is "offering an opinion with respect to whether H.B. 3293 serves the interest of following Title IX," Dr. Cantor responded that he "[hadn't] been asked that, no." (Swaminathan Decl., Ex. B at 178:7-10.) When asked whether he is "offering an opinion with respect to whether H.B. 3293 serves the interest of protecting women's safety in female athletic sports," Dr. Cantor again responded that he "[had not] been asked that, no." (Swaminathan Decl., Ex. B at 178:11-14.) When asked whether he has "any opinions on whether H.B. 3293 should apply to college athletes," Dr. Cantor responded that he has "no opinion in any direction." (Swaminathan Decl., Ex. B at 178:18-20.)

***

The opinions expressed by Dr. Cantor are insufficiently tied to the facts of this case so that they will aid a factfinder in determining whether a categorical ban on transgender girls and women participating on girl's and women's sports team is lawful, and should therefore be excluded as irrelevant.

**C.     Dr. Cantor's Testimony Is Methodologically Unreliable And Unsupported By Science Or Medicine.**

Expert testimony should only be admitted if its methodology is sufficiently reliable. *Sardis*, 10 F.4th at 281.  Dr. Cantor's opinions fall far short of the reliability standard.  Dr. Cantor's theory that "it remains entirely *plausible* that the psychotherapy [alone without] puberty blockers caused the improvements" in the mental health of transgender adolescents is pure speculation that has never been tested.  (Swaminathan Decl., Ex. A at ¶ 54 (emphasis added).)  But plausibility does not satisfy any standard for an expert opinion.  Such speculative opinions should be excluded, especially given this Circuit's holding that "proffered evidence that has a greater potential to mislead than to enlighten should be excluded."  *In re Lipitor (Atorvastatin Calcium) Mktg., Sales Pracs. & Prod. Liab. Litig. (No II) MDL 2502*, 892 F.3d 624, 632 (4th Cir. 2018) (quoting *Westberry v. Gislaved Gummi AB*, 178 F.3d 257, 261 (4th Cir. 1999); *see also Dunn v. Sandoz Pharms. Corp.*, 275 F.Supp.2d 672, 684 (M.D.N.C. 2003) ("[S]peculation is unreliable evidence and is inadmissible").

Dr. Cantor asserts without any evidence whatsoever that his views are accepted and shared by the amorphous and unspecific "scientific community."  (Swaminathan Decl., Ex. B at 210:2-25.)  Dr. Cantor asserts that "several scores" of people, comprised of individuals he is "in regular contact with," agree with his opinions as to withholding social transition in prepubertal children with gender dysphoria.  (*Id*.)  He admitted that his communications with these individuals, primarily sex researchers and sex therapists (none of whom specialize in care of transgender patients), are his "primary source" of evidence for the assertion that "practitioners support withholding social transition in prepubertal patients with gender dysphoria."  (*Id.* at 211:4-15, 211:17-22.)  Dr. Cantor's opinions thus are not rooted in science—they are personal opinions he

has formed through communications with groups of individuals who he is in routine contact with, and who are not practitioners specializing in the treatment of children and adolescents with gender dysphoria.[3]

Furthermore, Dr. Cantor fails to address how his experience and communications with other "sexologists"—which he claims are sufficient foundation for his opinions—leads to the conclusions he draws in this case. *See*, *e.g.*, *Cooper*, 259 F.3d at 200 (affirming the exclusion of an expert because he "asserted what amounted to a wholly conclusory finding based upon his subjective beliefs rather than any valid scientific method."); *SAS Inst.*, 125 F. Supp. 3d at 589; *see also Nat'l Ass'n. for Rational Sexual Offense L.*, 2021 WL 736375, at *3 (excluding expert where offering party failed to establish how expert's "experience leads to his conclusions nor how those experiences have been reliably applied to the facts").

Another unreliable opinion presented by Dr. Cantor is that "the majority" of prepubertal children who experience gender dysphoria will cease to be transgender. (Swaminathan Decl., Ex. B at 191:11-24; 212:19-213:3 ("[R]esearch has unanimously shown that the majority of children with gender dysphoria desist – that is, cease to experience such dysphoria by or during puberty."). Dr. Cantor's only support for this concept is "11 studies listed on [his] blog." (Swaminathan Decl., Ex. B at 206:12–207:11.) Upon closer inspection, these sources are woefully inadequate to support his assertion. All of his sources suffer from the same malady: they purported to show desistance among children who were identified as having gender dysphoria under prior versions of the

---

[3] Even Defendants' other experts disagree with Dr. Cantor. Dr. Cantor opposes allowing transgender children to live in accordance with their gender identity, (Swaminathan Decl., Ex. B at 210:2-25), but Defendants' proposed expert, Dr. Stephen Levine, "cooperate[s] with" social transition and even has supported "people who already had social transition . . . in the face of their parents' objection." (Swaminathan Decl., Ex. H (Levine Dep.) at 141:7-11.)

American Psychiatric Association's Diagnostic and Statistical Manual ("DSM"). Those versions included a now-obsolete and overly broad diagnosis for "Gender Identity Disorder in Children," which differs in key ways from the current DSM-5 diagnostic criteria for "Gender Dysphoria in Children." As another expert in this matter explained, the older Gender Identity Disorder diagnosis did not require a finding that the child had a gender identity different from the sex assigned at birth. (Swaminathan Decl., Ex. D at 324:16–325:4.) As a result, those older studies tended to mischaracterize gender-nonconforming children as transgender. Such studies cannot be relied on to draw conclusions regarding "desistance" in prepubertal youth diagnosed with gender dysphoria.

Similarly, Dr. Cantor criticizes studies showing positive outcomes for transgender children who access puberty-delaying treatment as unreliable because there is "no method of separating how much of its result was due to psychotherapy versus due to medical intervention." (*Id*. at 252:6-10.) But this criticism is not meaningful: these studies nonetheless indicate that gender-affirming care leads to positive outcomes for transgender youth. (*See e.g.*, Swaminathan Decl., Ex. B at 233:1-10, 229:16-22.)

Chief among Dr. Cantor's many unreliable opinions is his assertion that wide disagreement exists about the appropriate treatment for gender dysphoria and that the SOC are not accepted by his amorphous and unspecified "scientific community." (Swaminathan Decl., Ex. A at ¶ 8(c).) Contrary to Dr. Cantor's personal feelings, which were formed as discussed above through communications with "several scores" of people who do not specialize in care of transgender patients, there *is broad consensus* about the appropriate treatment for gender dysphoria. All major medical associations endorse and follow the treatment protocols established by the WPATH in the SOC Version 7. (Swaminathan Decl., Ex. E ¶ 27.) This factual reality calls into serious question the reliability of this proffered opinion.

Additionally, Dr. Cantor's testimony directly contradicts the Fourth Circuit's recognition that "we now have modern accepted treatment protocols for gender dysphoria," which have been "[d]eveloped by the World Professional Association for Transgender Health (WPATH) . . . [and] represent the consensus approach of the medical and mental health community[.]" *Grimm,* 972 F.3d at 595. The Fourth Circuit recognizes these treatment protocols "as *the authoritative standards of care*," finding that "[t]here are no other competing, evidence-based standards . . . accepted by any nationally or internationally recognized medical professional groups." *Id.* at 595–96 (emphasis added) (quoting *Edmo*, 935 F.3d at 769).

1.    **Dr. Cantor's Assertions That Transgender Adolescents Are Receiving "Affirmation On Demand" And That Adolescents Transition Due To The "Unrealistic Expectation That Transition Will Help Them Fit In" Are Unsupported.**

Dr. Cantor's most strikingly unreliable opinion is that "[b]ecause only a minority of gender dysphoric children persist in feeling gender dysphoric in the first place, 'transition-on-demand' . . . 'increases the probability of unnecessary transition and unnecessary medical risks.'" (Swaminathan Decl., Ex. B at 213:22–214:11.) Again, in making this broad and unfounded assertion, Dr. Cantor relies only on "those 11 studies" on his blog. (*Id*. at 215:17–217:19.) Dr. Cantor has no experience in his own practice with persistence or desistence in children with gender dysphoria, and he does not offer any support for this proposition from practitioners who actually treat gender dysphoria in children. (*Id.*)

When asked whether "any patient ever [came] to [him] asking for affirmation on demand," Dr. Cantor's response was "no." (*Id*. at 181:11-13.) When asked what his basis was for saying that providers are providing "affirmation on demand to children and adolescents with gender dysphoria," Dr. Cantor responded that his "only evidence" is from the following sources:

"Through several venues.  I get that information from parents, from people, you know, in society who e-mail me asking for help.  There's a large number of media reports of it happening through the world, U.S., Canada and Europe.  And there's now been – there are now several governmental entities, mostly in Europe, are now beginning more formal . . . investigations of it."  (*Id*. at 181:14-25; 184:5-10.)

When asked whether he had ever spoken to providers who claim to provide affirmation on demand to children and adolescents with gender dysphoria, his response was "no."  (*Id*. at 182:17-21.)  When asked whether any provider at CAMH (his former employer) provides affirmation on demand, his response was again "no."  *Id*. at 183:16-24.  In other words, Dr. Cantor was unable to identify a single instance of a provider providing affirmation on demand, and his "evidence" is woefully inadequate to support any conclusion that such practice is occurring.  Similarly, Dr. Cantor was unable to identify any scientific literature that demonstrates that providers are providing affirmation on demand to children and adolescents with gender dysphoria.  (*Id*. at 184:11-14.)

Another stark example of Dr. Cantor's opinions failing to meet methodological reliability is his assertion that "a child experiencing depression from social isolation might develop hope – and the unrealistic expectation – that transition will help them fit in, this time as and with the other sex." (Swaminathan Decl., Ex. A at ¶ 69; Ex. B at 218:18–219:20.)  Dr. Cantor himself admitted at his deposition that this "hypothesis hasn't been . . . tested," and therefore has no probative value. (Swaminathan Decl., Ex B at 219:15-20.)

None of Dr. Cantor's unsubstantiated hypotheses justify denying treatment to transgender adolescents, which is not at issue in this case regardless.

### 2.      Dr. Cantor Testified That Transgender People Are One Of Three Things: Autogynephilic, Homosexual, Or Mistaken.

The Fourth Circuit has held conclusively that "just like being cisgender, being transgender is natural and is not a choice." *Grimm*, 972 F.3d at 594.  The Fourth Circuit also acknowledges that "[b]eing transgender is also not a psychiatric condition, and implies no impairment in judgment, stability, reliability, or general social or vocational capabilities." *Id.* (quotation marks omitted).  By contrast, Dr. Cantor egregiously espouses that only three factors can "motivate a person to want to live as the other sex."  (Swaminathan Decl., Ex. B at 143:8-10.)  At his deposition, Dr. Cantor testified that "anyone who is transgender is transgender either due to autogynephilia,[4] homosexuality, or a mistake they've made as a . . . younger individual."  (*Id.* at 145:7-15 ("[T]hat's the best summary we have of the – of the existing research").)  Dr. Cantor asserted that homosexuality "can motivate a person to feel gender dysphoric" and "be the source of the desire to change."  (*Id.* at 143:20-144:1.)  In justifying his third theory, Dr. Cantor stated that young individuals "mistake the emotions that they're having to be gender dysphoria when they're actually motivated by something else, for example, a desire to not be associated with the sex that they would be biologically associated with."  (*Id.* at 144:9-15.)  Dr. Cantor's testimony is not only in direct conflict with Fourth Circuit precedent, but is a harmful, outlier opinion in the scientific community.  Dr. Cantor does not believe that individuals can be transgender unless they fall into one of his three purported pathways.  His views, which pathologize transgender people in stark contradiction to the Fourth Circuit's recognition that being transgender is a normal variation in human development, are irrelevant, harmful, and unfit for use by the Court.

---

[4] Autogynephilia refers to an extreme outlier hypothesis that transgender people become transgender out of a sense of sexual arousal.  (*Id.* at 142:3-8.)

3.    **Dr. Cantor's Opinion That No Professional Organization Has Articulated A Meritorious Position Calling Into Question The Basis For The Act Directly Contradicts The Fourth Circuit's Holding In *Grimm*.**

Dr. Cantor spends a great deal of time in his report critiquing the statements of preeminent medical and behavioral health organizations that recognize the standard of care for treating gender dysphoria.  (Swaminathan Decl., Ex. A at ¶¶ 107–39.)  Dr. Cantor's critiques, however, are misleading, misconstrue the current standards of care, and flout Circuit law.  As just one example, Dr. Cantor quotes selectively from the Endocrine Society's clinical guidelines to misleadingly suggest that the guidelines recommend "address[ing] mental health issues *before* embarking on transition," and that they do "not endorse any affirmation-only approach."  (Swaminathan Decl., Ex. A at ¶ 119–20 (emphasis added).)  But this is incorrect.  In fact, the guidelines affirmatively *recommend* that adolescents with gender dysphoria receive medical treatment and endorse "gender-affirming" care throughout.  (*See, e.g.*, Swaminathan Decl., Ex. F at 3871 §§ 2.1-2.5 (recommending treatment with puberty-delaying medication and hormones).)

Dr. Cantor is additionally unqualified to opine on these professional organizations as he lacks any involvement with them.  He testified that he is not a member of WPATH, has never advised the WPATH in any capacity, has never been involved in developing the SOC, and could not recall the most recent version of the SOC.  (Swaminathan Decl., Ex. B at 203:1–204:24.)  Similarly, Dr. Cantor is not a member of the Endocrine Society, was not involved in the development of the Endocrine Society guidelines in 2009 or in 2017, is not aware of the scientific literature conducted by the Endocrine Society in developing the guidelines, and does not hold himself out as an expert in how the guidelines were developed.  (*Id*. at 201:8–202:19.)

18

Dr. Cantor's attack on these professional organizations also defies this Circuit's recognition that they constitute the "*leading* medical, public health, and mental health organizations" regarding treatment for transgender adolescents. *Grimm*, 972 F.3d at 594 n.1 (emphasis added). *Grimm* relied heavily on the amici curiae brief submitted by many of the same organizations to explain the treatment protocols for transgender adolescents, citing these organizations as "our foremost medical, mental health, and public health organizations." *Id.* at 612; *see also id.* at 594–613 (citing the amici curiae brief nine times).

### 4. Dr. Cantor Has Offered Harmful Opinions Related To Transgender People And Has Been Removed From Respectable Scientific Societies For Posting Disrespectful Material.

Dr. Cantor is unfit to provide testimony in this case given his history of promulgating disturbing and offensive content about transgender people.[5]  In Dr. Cantor's blogpost, Sexology Today, for example, Dr. Cantor suggests that transgender people are "atypical," and writes that "only very few trans kids still want to transition by the time they are adults.  Instead, they generally turn out to be *regular* gay or lesbian folks."  (Swaminathan Decl. Ex. G; Ex. B at 187:17–188:9 (testifying that "non-regular gay or lesbian folks" are people "with a paraphilia or with a fetish that makes the determination of their sexual orientation a bit moot"); Ex. B at 188:15–189:1 (testifying that "if a child's gender dysphoria were to persist and they continued to want to transition by the time they are adults," that would be "atypical") (emphasis added).)

---

[5] Dr. Cantor was a member of the Society for the Scientific Study of Sexuality, a group dedicated to "forward[ing] and promot[ing] the conduct and dissemination of sex research," for twenty-seven years.  (Swaminathan Decl., Ex. A. at 96; Ex. B at 284:19-22; 287:11-13.)  After his twenty-seven-year membership, Dr. Cantor was suspended and removed from the society's online forum after its Board determined that Dr. Cantor had violated one of its guidelines by posting "disrespectful" content relating to transgender people.  (Swaminathan Decl., Ex. B. at 288:10-13 ("[T]hey told me what I said they deemed to be disrespectful"); 288:16-18 ("Q . . . [D]id what you say deal with issues relating to transgender people or gender dysphoric people? A. Yes."))

19

**D.      Dr. Cantor's Report, Opinions, And Testimony Lack Probative Value And Are Thus Inadmissible Under Federal Rule Of Evidence 403.**

Finally, the Court should exclude evidence if its introduction will result in unfair prejudice, confusion of the issues, or result in misleading testimony.  Fed. R. Evid. 403.  As noted above, Dr. Cantor offers no opinions on any factual dispute in this case, and, in any event, the opinions he offers are irrelevant and unreliable.  Consideration of his testimony would waste time and create confusion.  The testimony would also result in prejudice, as the testimony seeks to sow confusion about the veracity of Plaintiffs' gender identity, gender dysphoria diagnosis, and other experiences—issues unrelated to whether transgender girls and women should be allowed to participate on girls' and women's sports teams in West Virginia.  Accordingly, Dr. Cantor's testimony fails to satisfy the requirements of Federal Rule of Evidence 403 and should be excluded.

## CONCLUSION

WHEREFORE, based on the foregoing, Plaintiff respectfully request that this Court grant the instant motion and exclude all of Dr. Cantor's purported expert testimony because it is not admissible under *Daubert* and the Federal Rules of Evidence.

Dated: May 12, 2022

Joshua Block*
AMERICAN CIVIL LIBERTIES UNION
FOUNDATION
125 Broad St.
New York, NY 10004
Phone: (212) 549-2569
jblock@aclu.org

Avatara Smith-Carrington*
LAMBDA LEGAL
3500 Oak Lawn Avenue, Suite 500
Dallas, TX 75219
Phone: (214) 219-8585
asmithcarrington@lambdalegal.org

Carl Swaminathan*
Tara Borelli*
LAMBDA LEGAL
158 West Ponce De Leon Ave., Ste. 105
Decatur, GA 30030
Phone: (404) 897-1880
cSwaminathan@lambdalegal.org

Sruti Swaminathan*
LAMBDA LEGAL
120 Wall Street, 19th Floor
New York, NY 10005
Phone: (212) 809-8585
sswaminathan@lambdalegal.org

Andrew Barr*
COOLEY LLP
1144 15th St. Suite 2300
Denver, CO 80202-5686
Phone: (720) 566-4000
abarr@cooley.com

Respectfully submitted,
/s/ *Loree Stark*

Loree Stark (Bar No. 12936)
Nick Ward (Bar No. 13703)
AMERICAN CIVIL LIBERTIES UNION OF WEST
VIRGINIA FOUNDATION
P.O. Box 3952
Charleston, WV 25339-3952
Phone: (914) 393-4614
lstark@acluwv.org

Kathleen Hartnett*
Julie Veroff*
Zoë Helstrom*
COOLEY LLP
3 Embarcadero Center, 20th Floor
San Francisco, CA 94111
Phone: (415) 693-2000
khartnett@cooley.com

Katelyn Kang*
Valeria M. Pelet del Toro*
COOLEY LLP
55 Hudson Yards
New York, NY 10001-2157
Phone: (212) 479-6000
kkang@cooley.com

Elizabeth Reinhardt*
COOLEY LLP
500 Boylston Street, 14th Floor
Boston, MA 02116-3736
Phone: (617) 937-2305
ereinhardt@cooley.com
*Visiting Attorneys
Attorneys for Plaintiff

21

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA
CHARLESTON DIVISION

B.P.J. by her next friend and mother, HEATHER
JACKSON,

                    *Plaintiff*,

     v.

WEST VIRGINIA STATE BOARD OF
EDUCATION, HARRISON COUNTY BOARD
OF EDUCATION, WEST VIRGINIA
SECONDARY SCHOOL ACTIVITIES
COMMISSION, W. CLAYTON BURCH in his
official capacity as State Superintendent, DORA
STUTLER in her official capacity as Harrison
County Superintendent, and THE STATE OF
WEST VIRGINIA,

                    *Defendants*,

     and

LAINEY ARMISTEAD,

                    *Defendant-Intervenor*.

Civil Action No. 2:21-cv-00316

Hon. Joseph R. Goodwin

## CERTIFICATE OF SERVICE

I, Loree Stark, do hereby certify that on this 12th day of May, 2022, I electronically filed a true

and exact copy of ***Plaintiff's Memorandum of Law in Support of Motion to Exclude the Expert***

***Testimony of James M. Cantor*** with the Clerk of Court and all parties using the CM/ECF System.

                                   */s/ Loree Stark*
                                   Loree Stark
                                   West Virginia Bar No. 12936