# Exhibit D

1       IN THE UNITED STATES DISTRICT COURT

2      FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA

3             CHARLESTON DIVISION

4             * * * * * * * *

5   B.P.J., by her next friend and    *

6   Mother, HEATHER JACKSON,          *

7       Plaintiff                     *   Case No.

8       vs.                           *   2:21-CV-00316

9   WEST VIRGINIA STATE BOARD OF      *

10  EDUCATION, HARRISON COUNTY        *

11  BOARD OF EDUCATION, WEST          *

12  VIRGINIA SECONDARY SCHOOL         *

13  ACTIVITIES COMMISSION, W.         *

14  CLAYTON BURCH in his official     *

15  Capacity as State Superintendent,* VIDEOTAPED

16  DORA STUTLER in her official      * VIDEOCONFERENCE

17  Capacity as Harrison County       * DEPOSITION

18  Superintendent, PATRICK MORRISEY  *      OF

19  In his official capacity as       * ARON JANSSEN, M.D.

20  Attorney General, and THE STATE   * April 4, 2022

21  OF WEST VIRGINIA,                 *

22      Defendants                    *

23          Any reproduction of this transcript
            is prohibited without authorization
24             by the certifying agency.

1          VIDEOTAPED VIDEOCONFERENCE DEPOSITION

2                          OF

3    ARON JANSSEN, M.D., taken on behalf of the Defendant,

4    State of West Virginia herein, pursuant to the Rules of

5    Civil Procedure, taken before me, the undersigned, Lacey

6    C. Scott, a Court Reporter and Notary Public in and for

7    the State of West Virginia, on Thursday, April 4, 2022,

8    beginning at 9:09 a.m.

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

```
 1                    A P P E A R A N C E S

 2

 3    JOSHUA BLOCK, ESQUIRE

 4    American Civil Liberties Union Foundation

 5    125 Broad Street

 6    New York, NY  10004

 7         COUNSEL FOR PLAINTIFF

 8

 9    KATHLEEN R. HARTNETT, ESQUIRE

10    ANDREW BARR, ESQUIRE

11    ELIZABETH REINHARDT, ESQUIRE

12    VALERIA M. PELE DEL TORO  ESQUIRE

13    Cooley, LLP

14    3 Embarcadero Center, 20th Floor

15    San Francisco, CA  94111-4004

16         COUNSELS FOR PLAINTIFF

17

18    SRUTI SWAMINATHAN, ESQUIRE

19    Lambda Legal

20    120 Wall Street, 19th Floor

21    New York, NY  10005-3919

22         COUNSEL FOR PLAINTIFF

23

24
```

```
 1                A P P E A R A N C E S (cont'd)

 2

 3   DAVID TRYON, ESQUIRE

 4   State Capitol Complex

 5   Building 1, Room E-26

 6   Charleston, WV  25305

 7        COUNSEL FOR STATE OF WEST VIRGINIA

 8

 9   ROBERTA F. GREEN, ESQUIRE

10   Shuman McCuskey Slicer, PLLC

11   1411 Virginia Street East

12   Suite 200

13   Charleston, WV  25301

14        COUNSEL FOR WEST VIRGINIA SECONDARY SCHOOL

15        ACTIVITIES COMMISSION

16

17   SUSAN DENIKER, ESQUIRE

18   Steptoe & Johnson

19   400 White Oaks Boulevard

20   Bridgeport, WV  26330

21        COUNSEL FOR HARRISON COUNTY BOARD OF EDUCATION and

22        HARRISON COUNTY SUPERINTENDENT DORA STUTLER

23

24
```

```
 1              A P P E A R A N C E S (cont'd)

 2

 3    KELLY C. MORGAN, ESQUIRE

 4    Bailey Wyant

 5    500 Virginia Street East

 6    Suite 600

 7    Charleston, WV  25301

 8        COUNSEL FOR WEST VIRGINIA BOARD OF EDUCATION and

 9        SUPERINTENDANT W. CLAYTON BURCH

10

11    RACHEL CSUTOROS, ESQUIRE

12    Alliance Defending Freedom

13    15100 North 90th Street

14    Scottsdale, AZ  85260

15        COUNSEL FOR INTERVENOR, LAINEY ARMISTEAD

16

17    TRAVIS C. BARHAM, ESQUIRE

18    LAWRENCE WILKINSON, LAW CLERK

19    1000 Hurricane Shoals Road NE

20    Suite D 1100

21    Lawrenceville, GA  30043

22        COUNSEL FOR INTERVENOR, LAINEY ARMISTEAD

23

24
```

```
1                          I N D E X

2

3   DISCUSSION AMONG PARTIES                    11 -  13

4   WITNESS: ARON JANSSEN, M.D.

5   EXAMINATION

6       By Attorney Barham                      13 - 295

7   EXAMINATION

8       By Attorney Tryon                       295 - 388

9   CERTIFICATE                                      390

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24
```

1                          EXHIBIT PAGE

2

3                                                PAGE

4     NUMBER    DESCRIPTION                  IDENTIFIED

5     1         Expert Report                    14

6     2         Endocrine Society's Guidelines   32

7     3         World Health Organization        35

8     4         Harvard Medical School Study     43

9     5         American Psychological Association

10              Guidelines                       48

11    6         Lisa Littman Study               53

12    7         Study                            76

13    8         Article by Vandenbussche         82

14    9         Article by Lily Durwood          84

15    10        Statement by Royal Australian and

16              New Zealand College of

17              Psychiatrists                    97

18    11        Policy Change Regarding Hormonal

19              Treatment of Minors             101

20    12        Article by Lisa Nainggolan      106

21    13        Study                           107

22    14        Article Published on Medscape.com 108

23    15        Article in National Health Service 110

24    16        Article by Roberto D'Angelo     115

1                          EXHIBIT PAGE

2

3                                                    PAGE

4     NUMBER    DESCRIPTION                          IDENTIFIED

5     17        Study by Gibson, et al.              126

6     18        Errata Sheet                         130

7     19        Article by Tordoff, et al.           131

8     20        Article by Amy Green, et al.         133

9     21        Article by Turban, et al.            134

10    22        Article by Achille, et al.           135

11    23        Article by Kuper, et al.             137

12    24        Article by van der Miesen, et al.    138

13    25        Article by De Vries                  140

14    26        Article by Biggs                     142

15    27        Article by Costa, et al.             145

16    28        Article by Edwards-Leeper            148

17    29        Article by Edwards-Leeper            149

18    30        Interview by Lisa Selin Davis        176

19    31        Label of Lupron                      218

20    32        Puberty Blockers Document            224

21    33        Endocrine Society's Guidelines       228

22    34        Article by Blakemore                 232

23    35        Article by Guss, et al.              245

24    36        Article by Moseson, et al.           247

```
 1                          EXHIBIT PAGE

 2

 3                                                    PAGE

 4    NUMBER    DESCRIPTION                        IDENTIFIED

 5    37        Article by Steensma                    251

 6    38        Analysis                               251

 7    39        Article by Rae, et al.                 256

 8    40        Article by Carmichael, et al.          262

 9    41        Washington Post Article                268

10    42        Out Sports Article                     271

11    43        Article by Turban, et al.              276

12    44        Article by Ryan, et al.                280

13    45        Article by Klein and Golub             281

14    46        Form                                   315

15

16

17

18

19

20

21

22

23

24
```

OBJECTION PAGE

ATTORNEY                                              PAGE

Block  17, 18, 19, 21, 22, 23, 24, 27, 29, 30, 31, 33,

34, 35, 36, 37, 38, 39, 40, 41, 42, 44, 45, 46, 49, 50,

52, 54, 56, 57, 58, 59, 66, 68, 69, 70, 71, 72, 74, 75,

77, 78, 79, 80, 81, 82, 85, 86, 87, 88, 89, 91, 92, 95,

96, 97, 98, 99, 100, 101, 102, 104, 105, 106, 107, 109,

111, 113, 114, 115, 117, 118, 119, 120, 120, 121, 122,

123, 125, 129, 130, 132, 134, 138, 141, 142, 144, 145,

147, 153, 154, 156, 157, 158, 160, 161, 163, 165, 166,

167, 169, 172, 173, 174, 175, 177, 178, 179, 180, 181,

182, 183, 184, 185, 186, 187, 188, 189, 190, 191, 193,

194, 195, 196, 197, 198, 199, 200, 201, 202, 203, 206,

207, 208, 209, 210, 211, 213, 214, 217, 218, 219, 220,

221, 222, 223, 224, 226, 228, 229, 231, 234, 27, 238,

240, 241, 242, 243, 244, 245, 246, 247, 250, 254, 255,

258, 259, 260, 261, 264, 265, 266, 268, 269, 270, 272,

274, 275, 282, 284, 286, 288, 289, 290, 291, 292, 293,

294, 295, 298, 300, 301, 302, 303, 304, 308, 309, 310,

311, 312, 313, 314, 316, 317, 318, 319, 320, 321, 322,

323, 324, 325, 326, 327, 330, 331, 332, 333, 334, 336,

337, 337

```
 1                  S T I P U L A T I O N

 2     -----------------------------------------------------

 3     (It is hereby stipulated and agreed by and between

 4     counsel for the respective parties that reading,

 5     signing, sealing, certification and filing are not

 6     waived.)

 7     -----------------------------------------------------

 8                  P R O C E E D I N G S

 9     -----------------------------------------------------

10                  ATTORNEY BARHAM:  Counsel has stipulated

11     that our court reporter present this morning can swear

12     in the witness, so I will let the court reporter take

13     care of that.

14                            ---

15                  ARON JANSSEN, M.D.,

16     CALLED AS A WITNESS IN THE FOLLOWING PROCEEDINGS, AND

17     HAVING FIRST BEEN DULY SWORN, TESTIFIED AND SAID AS

18     FOLLOWS:

19                            ---

20                  VIDEOGRAPHER:  My name is Jacob Stock.

21     I'm a Certified Legal Video Specialist employed by

22     Sargent's Court Reporting Services.  The date today is

23     April 4th, 2022.  The time on the video monitor reads

24     9:09 a.m.  This deposition is being taken remotely by
```

```
1   Zoom conference.  The caption is in the United States
2   District Court for the Southern District of West
3   Virginia, Charleston Division, BPJ, et al., versus West
4   Virginia State Board of Education, et al.  Civil Action
5   Number 2:21-CV-00316.  The name of the witness is Aron
6   Janssen.  Will the attorneys present state their names
7   and the parties they represent?
8                ATTORNEY BARHAM:  My name is Travis
9   Barham.  I represent the intervenors in this case.  And
10  with me is Lawrence Wilkinson.
11               ATTORNEY CSUTOROS:  Rachel Csutoros also
12  for intervenor.
13               ATTORNEY TRYON:  This is David Tryon of
14  the West Virginia Attorney General's Office,
15  representing the State of West Virginia.
16               ATTORNEY DENIKER:  Good morning.  Susan
17  Deniker.  Counsel for Defendants Harrison County Board
18  of Education and Superintendent Dora Stutler.
19               ATTORNEY MORGAN:  This is Kelly Morgan on
20  behalf of the West Virginia Board of Education and
21  Superintendent Burch.
22               ATTORNEY GREEN:  This is Roberta Green
23  here on behalf of West Virginia Secondary School
24  Activities Commission.
```

1              ATTORNEY BLOCK:  For Plaintiff BPJ, this

2    is Josh Block from the ACLU.

3              ATTORNEY SWAMINATHAN:  This is Sruti

4    Swaminathan from Lambda Legal on behalf of Plaintiff.

5              ATTORNEY HARTNETT:  Good morning.  This

6    is Kathleen Hartnett at Cooley on behalf of Plaintiff.

7              ATTORNEY BARR:  Andrew Barr from Cooley

8    on behalf of Plaintiff.

9              ATTORNEY PELET DEL TORO:  Good morning.

10   This is Valeria Pelet Del Toro from Cooley on behalf of

11   Plaintiff.

12             ATTORNEY REINHARDT:  This is Elizabeth

13   Reinhardt from Cooley on behalf of Plaintiff.

14             VIDEOGRAPHER:  If that's everyone, the

15   witness has already been sworn in and we can begin.

16                         ---

17                      EXAMINATION

18                         ---

19   BY ATTORNEY BARHAM:

20       Q.    Good morning, Dr. Janssen.

21       A.    Good morning.

22       Q.    Have you ever had a deposition before?

23       A.    No.

24       Q.    All right.

```
 1              I'm going to ask you a series of questions
 2    about this case and your involvement in it.  Do your
 3    best to answer audibly.  Just nodding the head, while it
 4    can be captured on video cannot be captured by our court
 5    reporter, and so we'll try to make her life as easy as
 6    possible.
 7              I'm going to do my best to wait until you finish
 8    an answer before starting the next question.  And I will
 9    ask that you do the same.  We'll probably violate that
10    rule a few times, but cross talk doesn't translate well
11    on the record.  So if you need to take a break at any
12    time today, please let me know and we will do our best
13    to facilitate that as quickly as possible.  I know we
14    need to take a break at two o'clock.
15        A.    I think about 2:30, 2:45, something like that.
16        Q.    Okay.
17              You just let us know when you need to take it.
18    All right.
19                   ATTORNEY BARHAM:  I'm going to show you a
20    document we're going to mark as Exhibit-1.  This will be
21    Tab 90 for online purposes.
22                        ---
23                   (Whereupon, Exhibit 1, Expert Report, was
24                    marked for identification.)
```

1                           ---

2     BY ATTORNEY BARHAM:

3         Q.    This is a copy of your expert report in this

4     case.

5               Is that correct?

6         A.    Yes, that is correct.

7         Q.    If you'll turn to the first page of your CV.

8     It's probably page 21 of this document.  Do you

9     have ---?

10              VIDEOGRAPHER:  This is the videographer.

11    Can I ask Counsel to speak up?  You are kind of getting

12    cutoff at the end of your sentences.

13              ATTORNEY BARHAM:  Pardon.  I will do my

14    best.

15    BY ATTORNEY BARHAM:

16        Q.    Do you have a degree in adult psychiatry?

17        A.    There is not a degree in psychiatry.

18        Q.    Okay.

19              So your academic training in psychiatry began

20    with your psychiatry residency?  Is that how it works?

21        A.    I did a medical degree, where there is

22    psychiatry training and then a residency in adult

23    psychiatry and a fellowship in child psychiatry.

24        Q.    Do you consider yourself trained and

1    professionally competent in using the American

2    Psychiatric Association's Diagnostic and Statistical

3    Manual, DSM-V, to make child and adolescent metal

4    illness or psychiatric diagnoses generally beyond just

5    gender dysphoria?

6         A.    Yes.

7         Q.    Do you have any residency or fellowship in

8    pediatrics?

9         A.    No.

10        Q.    Do you have any residency or fellowship in

11   endocrinology?

12        A.    No.

13        Q.    Do you have any training in sports physiology?

14        A.    No.

15        Q.    Do you have any training in sports medicine?

16        A.    No.

17        Q.    Have you published any papers, conducted any

18   research or given any lectures relating to sports

19   physiology?

20        A.    No.

21        Q.    Have you published any papers, conducted any

22   research or given any lectures relating to sports

23   medicine?

24        A.    No.

```
 1      Q.    Have you published any papers, conducted any

 2   research or given any lectures relating to male

 3   physiological advantages in athletics before, during or

 4   after puberty?

 5      A.    No.

 6                  ATTORNEY BLOCK:  Objection to form.  You

 7   can answer.

 8   BY ATTORNEY BARHAM:

 9      Q.    Have you published any papers, conducted any

10   research or given any lectures relating to the impact of

11   any drugs or hormones on athletic performance?

12      A.    No.

13      Q.    Have you published any papers, conducted any

14   research or given any lectures relating to the impact of

15   testosterone suppression on athletic performance?

16      A.    No.

17      Q.    Have you published any papers, conducted any

18   research or given any lectures relating to the effect of

19   transsex surgeries on athletic performance?

20      A.    No.

21                  ATTORNEY BLOCK:  Objection. Objection to

22   terminology.

23   BY ATTORNEY BARHAM:

24      Q.    Have you published any papers, conducted any
```

```
 1    research or given any lectures relating to the safety

 2    issues and risks to women associated with transgender

 3    participation in female athletics by male athletes?

 4                 ATTORNEY BLOCK:  Objection to form.

 5    Sorry, objection to form.

 6                 THE WITNESS:  Yeah, I think there's a bit

 7    of a premise in there that I don't agree with, but I

 8    have not given any lectures about transgender

 9    participation in sports.

10    BY ATTORNEY BARHAM:

11       Q.    Do you consider --- do you have any professional

12    expertise related to the concept of fairness?

13       A.    I do not.

14       Q.    Do you have any professional expertise on the

15    definition of fairness?

16       A.    I do not.

17       Q.    Would you agree that fairness is an elusive,

18    subjective concept with malleable boundaries?

19                 ATTORNEY BLOCK:  Objection to form.

20                 THE WITNESS:  I do not have an opinion on

21    the definition of fairness.

22    BY ATTORNEY BARHAM:

23       Q.    Have you treated or personally examined BPJ?

24       A.    I have not.
```

1    Q.    You have no direct knowledge as to what Tanner

2    stage BPJ started puberty blockers at the age.

3            Correct?

4    A.    Correct.

5    Q.    You do not know how BPJ's physiology or athletic

6    capabilities compare with genetic females at the same

7    age?

8    A.    I do not.

9            ATTORNEY BLOCK:  Objection to

10   terminology.

11   BY ATTORNEY BARHAM:

12   Q.    This report, Exhibit-1 of 20 pages sets out the

13   complete statement of all opinions that you will testify

14   to at trial.

15           Correct?

16   A.    Which report are you referring to?

17   Q.    The report in front of you, Exhibit-1, Tab 90.

18   A.    And can you repeat the question?  Sorry.

19   Q.    This report sets out a complete statement of all

20   opinions that you will testify to at trial.

21           Correct?

22   A.    I do not know the answer to that.  I mean, I

23   would assume so, but I don't know.  I've never been in a

24   trial, so I don't know if there will be questions asked

```
 1    outside of this document.

 2       Q.    Does this report identify all facts and data

 3    that you considered in forming the opinions that you set

 4    forth in your report?

 5       A.    I wouldn't say it has all facts because I don't

 6    think it is possible to include all facts in an expert

 7    report, but the relevant facts, yes.

 8       Q.    This includes the facts that you'll rely on in

 9    supporting those opinions.

10            Correct?

11       A.    That's correct.

12       Q.    Does your report set out all the reasons for the

13    opinions that you propose to offer?

14       A.    Yes.

15       Q.    Your footnotes cite to I believe 32 scientific

16    or professional articles and you reference some others

17    in your CV.  Are those all the articles that form the

18    basis of the opinions you propose to offer?

19       A.    No.

20       Q.    What other articles form the basis of the

21    opinions you propose to offer?

22       A.    I guess the question is what has formed my

23    professional expertise around gender health, and I've

24    read a lot that aren't necessarily going to be apropos
```

```
 1   to this specific report.
 2       Q.    But those are the articles that you cited and
 3   referenced in this document are those that you relied
 4   upon as the basis of opinions that you intend to offer.
 5             Correct?
 6       A.    That is correct.
 7       Q.    You currently serve as the Clinical Associate
 8   Professor of Child and Adolescent Psychiatry.
 9             Correct?
10       A.    Yes.
11       Q.    And what institution is that with?
12       A.    It is with Northwestern University Feinberg
13   School of Medicine, and Ann and Robert H. Lurie
14   Children's Hospital of Chicago.
15       Q.    And how much of your time in this position is
16   related to discussing or treating gender dysphoric
17   children and adolescents?
18             ATTORNEY BLOCK:  Objection to
19   terminology.
20             THE WITNESS:  It's hard to quantify.
21   Probably about 40 percent of my time is allocated in
22   some way to either clinical care, research or academics
23   around gender health.
24   BY ATTORNEY BARHAM:
```

```
 1       Q.      And what is your compensation for this position?

 2       A.      It is roughly $265,000 a year in salary.

 3       Q.      You also serve as the Vice Chair of the

 4  Pritzker Department of Psychology and Behavioral Health

 5  at the Ann and Robert H. Lurie Children's Hospital of

 6  Chicago.

 7               Correct?

 8       A.      That's correct.

 9       Q.      And how much of your time in this position is

10  related to discussing or treating gender dysphoric

11  children and adolescents?

12               ATTORNEY BLOCK:  Objection to

13  terminology.

14               THE WITNESS:  Again, it is hard to parse

15  out what specific about my leadership role is around

16  gender health but it is a minority of my day-to-day

17  work in that role.

18  BY ATTORNEY BARHAM:

19       Q.      Do you have an approximate percentage?

20       A.      No.

21       Q.      Twenty-five (25) percent, more or less?

22       A.      Probably ten percent.

23       Q.      Ten percent.  Okay.

24               And what is your compensation for that
```

```
 1  position?

 2      A.    I get a stipend of around $30,000.

 3      Q.    You currently serve as the Medical Director of

 4  Outpatient Psychiatric Services at the Lurie Children's

 5  Hospital of Chicago.

 6            Is that correct?

 7      A.    That;s correct.

 8      Q.    And how much of your time in this position is

 9  related to discussing or treating gender dysphoric

10  children and adolescents?

11                  ATTORNEY BLOCK:  Objection to

12  terminology.

13                  THE WITNESS:  About 25 percent of my time

14  is probably spent discussing or related to the health of

15  transgender youth or transgender --- gender diverse

16  youth.

17  BY ATTORNEY BARHAM:

18      Q.    And what is your compensation for that position?

19      A.    There is no compensation.

20      Q.    You currently serve as the Clinical Director of

21  the NYU Gender and Sexuality Services.

22            Is that correct?

23      A.    That is not correct.

24      Q.    When did you conclude your role in that
```

```
 1   position?  I'm referencing page one of your CV.

 2       A.    That was when I moved to Chicago a few years

 3   ago.

 4       Q.    Okay.

 5             So where it says 2011 to present Clinical

 6   Director, NYU Sexuality Service, that is just a typo?

 7       A.    That is a typo, yes.

 8       Q.    You currently serve as the Associate Professor

 9   of Child and Adolescent Psychology at Northwestern

10   University, and we have already discussed that.  Is

11   there a difference between Clinical Associate Professor

12   and Associate Professor of Child and Adolescent

13   Psychiatry?

14       A.    No.

15       Q.    You serve as the Vice Chair of Clinical Affairs

16   at the Pritzker Department of Psychiatry and Behavioral

17   Health at the Lurie Children's Hospital.

18             Correct?

19       A.    That's correct.

20       Q.    And how much time in this position is related to

21   discussing or treating gender dysphoric children and

22   adolescents?

23             ATTORNEY BLOCK:  Objection to

24   terminology.
```

1            THE WITNESS:  I think I answered that one

2    with the guess of about ten percent.

3    BY ATTORNEY BARHAM:

4       Q.    Okay?

5            So that's the same as the Vice Chair of the

6    Department of Psychiatry?

7       A.    Correct.

8       Q.    You currently serve as the Associate Editor for

9    Transgender Health.

10           Correct?

11      A.    That is correct.

12      Q.    And what is your compensation for that position?

13      A.    There is no compensation for that position.

14      Q.    What is that publication's annual income?

15      A.    I do not know.

16      Q.    You serve as a reviewer for LGBT Health.

17           Correct?

18      A.    Yes.

19      Q.    And how much of your time is related --- in that

20   position is related to treating or discussing

21   transgender children and adolescents?

22      A.    I would say 100 percent of my review time with

23   LGBT health is around gender.

24      Q.    Do you receive any compensation for that

1  position?

2      A.    I do not.

3      Q.    Do you receive any compensation for your role as

4  a reviewer with the Journal of the Academy of Child and

5  Adolescent Psychiatry?

6      A.    I do not.

7      Q.    You served in various positions with different

8  professional organizations according to paragraphs 11

9  and 12 of your report.  Do any of those positions

10  provide you financial compensation?

11     A.    No.

12     Q.    You founded and directed Gender Variant Youth

13  and Family Network.

14           Correct?

15     A.    Correct.

16     Q.    What's your compensation for that position?

17     A.    Zero.

18     Q.    What is the entity's annual income or budget?

19     A.    Zero.

20     Q.    You indicate in your report that you have seen

21  approximately 500 transgender patients.

22           Is that correct?

23     A.    That is correct.

24     Q.    How many patients do you see per year?

```
 1              ATTORNEY BLOCK:  Objection to form.
 2              THE WITNESS:  I'd have to look at my
 3    report.  I don't have the information in front of me
 4    right now.
 5    BY ATTORNEY BARHAM:
 6       Q.    Do you have a ballpark of how many patients you
 7    see in a year?
 8       A.    I don't.
 9       Q.    Does this include --- and I'm assuming that your
10    colleagues see additional patients beyond just those
11    that you see.
12              Correct?
13       A.    Correct.
14       Q.    How frequently do you see each patients?
15       A.    I see --- the frequency with which I see
16    patients is dependent upon their clinical need, so
17    between once or twice a week to once every three months.
18       Q.    And how much are patients charged per
19    appointment?
20       A.    Everything is billed to their insurance, so I'm
21    not sure.
22       Q.    Do you receive any other income related to your
23    work on gender dysphoria?
24       A.    I'm being paid for my expert report for this, so
```

1    that's the only other income I receive.

2         Q.    Do you receive any speaking fees?

3         A.    I have received speaking fees for participation

4    and grand rounds as an example.

5         Q.    And how much would those speaking fees run?

6         A.    It is typically about a thousand dollars per

7    event.

8         Q.    Before the last four years had you provided any

9    expert testimony on issues related to gender dysphoria?

10        A.    Can you clarify the difference between

11   testimonies and reports?  I've submitted a report but

12   not ---.

13        Q.    Okay.

14              So you have submitted a report?

15        A.    Correct.

16        Q.    Do you remember what case that involved?

17        A.    That involves Medicaid and top surgery in

18   Arizona.

19        Q.    Okay.

20              Have you ever provided any testimony in trial

21   or deposition before related to gender dysphoria?

22        A.    I have not.

23        Q.    And how much compensation have you received so

24   far in this case?

1      A.     This case so far, none thus far.

2      Q.     How much are you expecting to receive so far in

3   this case?

4      A.     I haven't added up my invoice yet, but I imagine

5   it's probably around $10,000.

6      Q.     Okay.

7             Do you have any professional expertise related

8   to the legal definition of relevance?

9      A.     I do not.

10      Q.     Do you have any legal training or education?

11      A.     I do not.

12      Q.     When you were preparing your report did you

13   consult the Federal Rules of Evidence or any other legal

14   sources as to the meaning of relevance?

15      A.     I did not.

16      Q.     Several people in this case have referenced

17   disorders of sexual development.  Would you agree that

18   gender dysphoria is not a disorder of sexual

19   development?

20             ATTORNEY BLOCK:  Objection to form.

21             THE WITNESS:  Gender dysphoria has not

22   been classified as a disorder of sexual development.

23   BY ATTORNEY BARHAM:

24      Q.     Of the approximately 500 transgender patients

1    you had seen how many suffered from disorder of sexual

2    development?

3        A.    A minority of patients, less than ten.

4        Q.    So you would agree that the vast majority of

5    individuals with gender dysphoria or who assert a

6    transgender identity do not suffer from a disorder of

7    sexual development.

8            Correct?

9                ATTORNEY BLOCK:  Objection to form.

10               THE WITNESS:  The data we have speaks to

11   the majority of people with gender dysphoria do not have

12   a disorder of sex development.

13   BY ATTORNEY BARHAM:

14       Q.    Do you have any reason to believe that BPJ

15   suffers from a disorder of sexual development?

16       A.    I have not reviewed BPJ's case.

17       Q.    Are you aware of any instance in which an

18   individual with a disorder of sexual development has

19   attempted to play on a girls' or women's sports team in

20   West Virginia?

21       A.    I am not aware.

22       Q.    Is it your opinion that a person's gender

23   identity is durable?

24               ATTORNEY BLOCK:  Objection to form.

```
 1                    THE WITNESS:  Can you define durable?
 2   BY ATTORNEY BARHAM:
 3       Q.    Unchanging.
 4                    ATTORNEY BLOCK:  Objection to form.
 5                    THE WITNESS:  It is my testimony that
 6   there is a concept of gender identity that remains
 7   generally fixed for most people throughout their lives.
 8   BY ATTORNEY BARHAM:
 9       Q.    So it's your opinion that a person's gender
10   identity cannot be changed with medical or mental health
11   intervention.
12           Correct?
13                    COURT REPORTER:  Sorry, Counsel, that
14   question one more time.
15   BY ATTORNEY BARHAM:
16       Q.    So it's your opinion that a person's gender
17   identity cannot be changed with medical or mental health
18   intervention.
19           Correct?
20       A.    Yes.
21                    ATTORNEY BARHAM:  I'm going to hand you
22   what we're going to mark as Exhibit-2.  This will be
23   Tab 5.
24                           ---
```

```
 1                        (Whereupon, Exhibit-2, Endocrine

 2                        Society's Guidelines, was marked for

 3                        identification.)

 4                               ---

 5   BY ATTORNEY BARHAM:

 6      Q.    If you'll turn to page 3873 of this document.

 7   This document is the Endocrine Society's Guidelines,

 8   Endocrine Treatment of Gender Dysphoric or Gender

 9   Incongruent Persons, Endocrine Society Clinical Practice

10   Guideline published in 2017.

11            Correct?

12      A.    That is correct.

13      Q.    On page 3873 of this document the Endocrine

14   Society indicates that this continuum gender identity

15   ranged from all male through something in between to all

16   female yet such a classification does not take into

17   account that people may have gender identities outside

18   this continuum.  For instance, some experience

19   themselves as having both a male and female gender

20   identity whereas others completely renounce any gender

21   classification.  There are also reports of individuals

22   experiencing a continuous and rapid involuntary

23   alternation between a male and female identity.

24            Do you see that?
```

1  A.  I don't see that.

2  Q.  Second column, towards the bottom of the page.

3  A.  Yes, I see that.

4  Q.  Is this consistent with your understanding of

5 gender identity?

6      ATTORNEY BLOCK:  Can you give him time to

7 read?

8      ATTORNEY BARHAM:  Gladly.

9      THE WITNESS:  I think there is a

10 difference between a gender identity and how people

11 understand and express that gender identity.  And in the

12 context of this article the rapid involuntary alteration

13 between male and female identity as an example is a case

14 reported of single individuals subjective experience of

15 their gender according to the reference.

16 BY ATTORNEY BARHAM:

17  Q.  And by that you're referring to note ten?

18  A.  Correct.

19  Q.  So according to this document, someone can be

20 one sex or the other, both, neither or in between.

21    Correct?

22      ATTORNEY BLOCK:  Objection to form.

23      THE WITNESS:  I can't speak for the

24 conclusions drawn by the author of this article.

1    BY ATTORNEY BARHAM:

2        Q.    And according to the Endocrine Society a

3    person's gender identity can change rapidly.

4             Correct?

5                       ATTORNEY BLOCK:  Objection to form.

6                       THE WITNESS:  I'm not a part of the

7    Endocrine Society, so I'm not sure how they discuss

8    this.

9    BY ATTORNEY BARHAM:

10       Q.    According to this document, the Endocrine

11   Society is indicating that there are reports, plural, of

12   individuals, plural, experiencing a continuous and rapid

13   involuntary alternation between male and female gender

14   identity.

15            Correct?

16       A.    That is documented in the article.

17       Q.    Okay.

18       A.    I'm not sure of the governance of the Endocrine

19   Society.

20       Q.    Do you think the Endocrine Society Guidelines

21   are wrong?

22                       ATTORNEY BLOCK:  Objection to form.

23                       THE WITNESS:  I think anything relating

24   to gender identity has to be taken in a broader context

```
 1   within both the article in and of itself but in broader

 2   practice and specifically around children and

 3   adolescents.

 4   BY ATTORNEY BARHAM:

 5      Q.    So what is your basis for indicating that this

 6   statement is potentially inaccurate?

 7                      ATTORNEY BLOCK:  Objection to form.

 8                      THE WITNESS:  I think there is more

 9   context that's needed in order to understand the intent

10   of the authors in this particular section.

11                      ATTORNEY BARHAM:  I'm going to hand you

12   what we will mark as Exhibit-3.  This is the document

13   from the World Health Organization entitled Gender and

14   Health.

15                          ---

16                      (Whereupon, Exhibit-3, World Health

17                       Organization, was marked for

18                       identification.)

19                          ---

20   BY ATTORNEY BARHAM:

21      Q.    Are you familiar with the World Health

22   Organization?

23      A.    I've heard of them.

24      Q.    Do you agree with these World Health
```

```
 1    Organization statements?

 2                    ATTORNEY BLOCK:  Objection to form.  Can

 3    he have time to read the document?

 4                    ATTORNEY BARHAM:  Of course.

 5                    VIDEOGRAPHER:  Counsel, is that Tab 10?

 6                    LAW CLERK WILKINSON:  Tab 10.

 7                    ATTORNEY BARHAM:  It is.

 8                    VIDEOGRAPHER:  Okay.  Thank you.

 9                    THE WITNESS:  Can you repeat the

10    question?

11    BY ATTORNEY BARHAM:

12        Q.    Do you agree with these World Health

13    Organization statements?

14        A.    Not in their entirety.

15        Q.    In what parts do you dispute?

16        A.    The word gender as a concept is much more

17    complicated and I do not agree with their

18    characterization in this page.

19        Q.    So the World Health Organization says that

20    gender itself is a social construct and can change over

21    time.

22            Correct?

23                    ATTORNEY BLOCK:  Objection to form.  Does

24    this document have a URL to it?
```

```
 1                    ATTORNEY BARHAM:  It does, but I don't

 2    see it printed on the document.

 3                    LAW CLERK WILKINSON:  We can get it.

 4                    ATTORNEY BARHAM:  We can supply that.

 5                    THE WITNESS:  I agree that it says on the

 6    document that gender varies from society to society and

 7    can change over time.

 8    BY ATTORNEY BARHAM:

 9       Q.    And according to the World Health Organization,

10    gender identity refers to a person's experience of

11    gender which is a social construct.

12            Correct?

13                    ATTORNEY BLOCK:  Objection to form.

14                    THE WITNESS:  I don't see in the document

15    where it refers to gender identity or defines gender

16    identity.

17    BY ATTORNEY BARHAM:

18       Q.    It says gender interacts with different sex,

19    which refers to the different biological and

20    physiological characteristics of males, females,

21    intersex persons such as chromosomes, hormones and

22    reproductive organs.

23            Correct?

24       A.    That is correctly read.  I don't see gender
```

1    identity defined in this document.

2       Q.    Gender identity refers to a person's deeply held

3    internal and individual experience of gender.

4          Correct?

5       A.    That's what it says here, yes.

6       Q.    If an individual asserts an identity of man or

7    both, how can a clinician verify whether that individual

8    is telling the truth?

9                   ATTORNEY BLOCK:  Objection to form.

10                   THE WITNESS:  I'm not sure what exactly

11   that means.  The process of an assessment for gender

12   care involves a complex series of interviews,

13   diagnostics.

14   BY ATTORNEY BARHAM:

15      Q.    So how does the clinician assess whether the

16   patient is accurately relating their experiences?

17      A.    In the typical process, particularly around

18   child and adolescent psychiatry, part of the assessment

19   involves information gathered from multiple contexts.

20      Q.    Such as?

21      A.    Such as parents, schools, caregivers, other

22   providers, history over time, et cetera.

23      Q.    And if --- so how does one assess from those

24   various contexts whether someone who's claiming to be

```
 1  male or both is accurately relating what's going on?
 2              ATTORNEY BLOCK:  Objection to form.
 3              THE WITNESS:  Yeah, I guess I don't
 4  understand the question exactly.  You know, my job is
 5  not necessarily to define what is accurate in someone's
 6  own experience.  It's to understand how that fits into
 7  typical processes and developmental expectations for the
 8  broad range of gender diversity over time.
 9  BY ATTORNEY BARHAM:
10    Q.    How do you determine whether someone in that
11  scenario is accurately understanding his own subjective
12  feelings --- his or her subjective feelings?
13              ATTORNEY BLOCK:  Objection to form.
14              THE WITNESS:  The context of the
15  treatment is really important.  If an individual is
16  seeking specific interventions that require a mental
17  health assessment, there are specific components of that
18  mental health assessment that must be met.
19  BY ATTORNEY BARHAM:
20    Q.    So what are the treatments that would require a
21  mental health assessment?
22    A.    Puberty blocking medications, hormones or
23  surgery.
24    Q.    And what are the interventions that would not
```

1    require mental health evaluations, in your opinion?

2                    ATTORNEY BLOCK:  Objection to form.

3                    THE WITNESS:  It depends upon what

4    guidelines you're talking about and what recommendations

5    that the family is looking for.

6    BY ATTORNEY BARHAM:

7        Q.    Well, what are some of the inventions?  You said

8    there's some interventions that would require a mental

9    health evaluation, so that implies that there are some

10   that would not.  What are the interventions that would

11   not require a mental health evaluation?

12                   ATTORNEY BLOCK:  Objection to form.

13                   THE WITNESS:  You know, parents giving

14   hugs to their kids is not something that a mental health

15   assessment would require.  Providing a way of helping

16   families to understand their kids or asking questions is

17   not something that requires a mental health evaluation

18   and some children will socially transition prior to any

19   assessments by any mental health professional.

20   BY ATTORNEY BARHAM:

21       Q.    How do you determine --- if an individual

22   asserts a gender identity of male or both, how do you

23   determine whether the individual is making a statement

24   based on societal expectations for a particular gender

```
 1   rather than ---?
 2              ATTORNEY BLOCK:  Objection.  Travis, I'm
 3   sorry, the male or both phrasing, is that a quote from
 4   something.  I don't have the paper in front of me, so
 5   just want to clarify.
 6              ATTORNEY BARHAM:  No, that's not a
 7   question from something.  That's just my question.
 8              ATTORNEY BLOCK:  Okay.
 9              THE WITNESS:  Can you repeat the
10   question?
11   BY ATTORNEY BARHAM:
12      Q.   If an individual asserts a gender identity male
13   or both, how can a clinician verify whether the
14   individual is making the statement based on societal
15   expectations for a particular gender rather than his own
16   genuine gender?
17              ATTORNEY BLOCK:  Objection to form.
18              THE WITNESS:  I personally never had
19   anybody assert an identity of male or both, but part of
20   the assessment of --- if we are diagnosing gender
21   dysphoria is understanding the cultural and social
22   contexts and ensuring that folks are not presenting with
23   a gender identity that is incongruent with their sex
24   assigned at birth because of actual or perceived
```

```
 1   cultural advantages.

 2   BY ATTORNEY BARHAM:

 3       Q.    And how does one go about assessing the

 4   motivations behind the claimed gender identity or

 5   transgender sex?

 6                   ATTORNEY BLOCK:  Objection to form.

 7                   THE WITNESS:  For any psychiatric

 8   assessment this is through a combination of interviews,

 9   gathering history from relevant data sources and

10   sometimes for some people structured interviews or

11   scales.

12   BY ATTORNEY BARHAM:

13       Q.    And how long does it take to conduct such an

14   assessment?

15       A.    There is no specific timeframe involved in this

16   assessment.  It really depends upon contextual factors

17   that are hard to nail down.

18       Q.    So if you were treating a child or teenager, how

19   many relevant data sources would you need to get

20   information from in order to make a complete assessment

21   of the child's motivations?

22       A.    I don't think there's ever going to be a

23   concrete answer in terms of how many.  There's not a

24   specific answer of how many sources are necessary.  It's
```

1   however many sources are necessary to gather the

2   relevant information.

3       Q.    So how do you determine whether you have

4   gathered enough information to make a competent

5   assessment?

6       A.    It's hard to state this in a non-pithy way, but

7   that's kind of what the process of psychiatry and child

8   psychiatry training helps you to learn.

9       Q.    Could you explain to someone who doesn't have

10  the training how you come to the conclusion, okay, I've

11  gathered enough information to make a competent

12  assessment?

13      A.    Sure.  I can try.  How accurate is the reporter

14  in their description of their history.  How much does it

15  align with reports from other informants, how much does

16  it match with or is deviant from expected phenotypic

17  processes with the disorders in question and what is the

18  impression of the evaluator about the accuracy of the

19  statements.

20              ATTORNEY BARHAM:  I'm going to show you

21  what we will mark as Exhibit-4, this will be Tab 12.

22                          ---

23              (Whereupon, Exhibit-4, Harvard Medical

24               School Study, was marked for

```
 1              identification.)

 2                      ---

 3   BY ATTORNEY BARHAM:

 4       Q.     Are you familiar with this study?  This is a

 5   study from the Harvard Medical School entitled Gender

 6   Fluidity:  What it Means and Why Support Matters?

 7                      ATTORNEY BLOCK:  Objection.

 8                      THE WITNESS:  This looks like a popular

 9   website article and not a study.

10   BY ATTORNEY BARHAM:

11       Q.     Are you familiar with the author, Dr. Sabrina

12   Katz --- Sabra Katz-Wise?

13       A.     Dr. Katz-Wise has published in the world of

14   transgender health.  I'm not familiar with them

15   personally, I don't know them.

16       Q.     Do you know Dr. Katz-Wise at least by

17   reputation?

18       A.     I don't.  I've only read some studies.

19       Q.     But you would agree that she is highly respected

20   in this area.

21              Correct?

22       A.     I would not be able to offer an opinion.

23       Q.     But she is widely published in this area.

24              Correct?
```

1          ATTORNEY BLOCK:  Objection to form.

2          THE WITNESS:  From my recollection, yes.

3  BY ATTORNEY BARHAM:

4     Q.    At the bottom of page two of this document, Dr.

5  Katz-Wise indicates that while some people develop a

6  gender identity early in childhood others may identify

7  with one gender at one time and then another gender

8  later on.

9          Is that correct?

10    A.    You're reading that accurately, yeah.

11    Q.    So according to this article, on page three a

12 gender fluid person is one whose gender identity changes

13 frequently.

14         Correct?

15         ATTORNEY BLOCK:  Objection to form.

16         THE WITNESS:  I do not --- I have not

17 read it in here that it is defined in that way and

18 that's not how I would define gender fluidity.

19 BY ATTORNEY BARHAM:

20    Q.    At least you see the statement at the first full

21 paragraph at the top of page three, ultimately anyone

22 who identifies as gender fluid, is a gender fluid person

23 often the term is used for a person's gender expression

24 or gender identity, essentially their internal sense of

1    self changes frequently?

2                    ATTORNEY BLOCK:  Objection.  We're

3    jumping quickly from pages.  Can you give him some more

4    time to read before answering the question?

5                    ATTORNEY BARHAM:  Certainly.

6                    THE WITNESS:  Yes.  I'm not seeing where

7    that is here.  Can you point that out for me?

8    BY ATTORNEY BARHAM:

9        Q.    Top of page three, just above that, how is

10   gender fluidity related to health in child and teens?

11       A.    Gender fluidity is a very nonspecific term that

12   means very different things to different people.  In the

13   practice of the clinical work with transgender and

14   gender diverse youth, kids who are self identifying as

15   gender fluid, I want to understand what it means to them

16   and what that definition is for that individual.  I

17   don't think there is one established definition of

18   gender fluidity that has been agreed upon.

19       Q.    But at least some respected professionals in

20   this arena indicate that the term gender fluidity means

21   that the person's internal sense of self, their gender

22   identity changes frequently.

23             Correct?

24                    ATTORNEY BLOCK:  Objection to form.

1          THE WITNESS:  I can't speak to what Dr.

2     Katz-Wise is using to define it.  The way I would

3     describe gender fluidity, again outside the context of

4     how my patients are actually using the term, is that

5     understanding of the expression of gender identity may

6     change over time.

7     BY ATTORNEY BARHAM:

8       Q.    So you said that their understanding of gender

9     identity can change over time.  Dr. Katz-Wise says that

10    their gender identity changes frequently?

11          Is that correct?

12      A.    That's what it stated in this popular press

13    article.

14      Q.    And Dr. Katz-Wise is an Assistant Professor in

15    Adolescent and Young Adult Medicine at Boston Children's

16    Hospital.

17          Is that correct?

18      A.    I would have to take your word for that.

19      Q.    Okay.

20          Are you aware that she co-directs the Harvard

21    Sexual Orientation and Gender Identity Expression Equity

22    Research Collaborative?

23      A.    I do not know the term, no.

24          ATTORNEY BARHAM:  I'm going to show you

```
 1    what we will mark as Exhibit-5, and this will be Tab 13.
 2                            ---
 3                    (Whereupon, Exhibit-5, American
 4                    Psychological Association Guidelines,
 5                    was marked for identification.)
 6                            ---
 7    BY ATTORNEY BARHAM:
 8       Q.    This document is the American Psychological
 9    Association Guidelines for Psychological Practice with
10    Transgender and Gender Non-Conforming People.
11              Correct?
12       A.    That is correct.
13       Q.    And on page 836 of this document the APA writes
14    just as some people experience their sexual orientation
15    as being fluid or variable, some people also experience
16    their the gender identity as fluid.
17              Correct?
18       A.    Can you show me on the page where that is?
19       Q.    The bottom of the first paragraph in the first
20    column of page 836.
21       A.    Yes.
22       Q.    So the APA Guidelines say that gender identity
23    can be fluid or changing.
24              Correct?
```

```
 1              ATTORNEY BLOCK:  Objection to form.

 2              THE WITNESS:  Well, I think the important

 3   piece is some people experience gender identity as fluid

 4   or variable.

 5   BY ATTORNEY BARHAM:

 6      Q.    So it can be fluid or changing?

 7            Correct?

 8              ATTORNEY BLOCK:  Objection to form.

 9   BY ATTORNEY BARHAM:

10      Q.    For at least some people.

11            Correct?

12              THE WITNESS:  As I would describe it and

13   understand it, that's the experience of expression of

14   gender identity can be fluid over time, which is

15   different.

16   BY ATTORNEY BARHAM:

17      Q.    How is that different to say that one's gender

18   identity changes?

19      A.    It's getting a little complicated in terms of

20   the concepts that we're talking about, but the identity

21   that gender identity is something that is inherently

22   fixed, that how people understand, experience it and

23   express it can change over time.  That's the difference.

24      Q.    But the American Psychological Association at
```

1    least describes gender identity as being fluid.

2            Correct?

3                    ATTORNEY BLOCK:  Objection to form.

4                    THE WITNESS:  In the article that you

5    have put in front of me it describes that people's

6    experience of their gender identity is fluid over time.

7    BY ATTORNEY BARHAM:

8        Q.    Let's go back to Tab 5, which is Exhibit-2.  Are

9    you familiar with the Endocrine Society Guidelines?

10       A.    I am.

11       Q.    Is it your view that these guidelines were

12   developed through rigorous scientific processes?

13                   ATTORNEY BLOCK:  Objection to form.

14                   THE WITNESS:  I agree.

15   BY ATTORNEY BARHAM:

16       Q.    Would you agree that these guidelines were

17   developed by among the most respected researchers in the

18   field?

19                   ATTORNEY BLOCK:  Objection to form.

20                   THE WITNESS:  I wouldn't disagree with

21   that, no.

22   BY ATTORNEY BARHAM:

23       Q.    Do you respect Dr. Hembree of Columbia

24   University Medical Center?

1      A.     I do.

2      Q.     Do you respect Dr. Cohen-Kettenis of the

3  University of Amsterdam?

4      A.     I would say I respect all of these clinicians

5  and researchers, although Sabine Hannema I am not

6  familiar personally.

7      Q.     If you will turn to page 3879 of this document.

8  Right under the heading evidence this article reports

9  that the large majority, about 85 percent of prepubertal

10  children with a childhood diagnosis did not remain GD,

11  slash, gender incongruent in adolescence.

12            Is that correct?

13      A.     That is correctly read, yes.

14      Q.     And footnote 20 of this document cites to Dr.

15  Steensma, de Vries, Cohen-Kettenis article in 2013?

16      A.     That's correct.

17      Q.     These are extensively published original peer

18  reviewed research --- peer reviewed researchers in the

19  field.

20            Correct?

21      A.     Correct.

22      Q.     So this committee reveals evidence that the

23  large majority of children, about 85 percent, with a

24  childhood diagnosis do not remain gender dysphoric in

1    gender adolescence.

2            Correct?

3                    ATTORNEY BLOCK:  Objection to form.

4                    THE WITNESS:  Yeah, in these studies have

5    been published primarily by the Dutch clinic the rates

6    of dissentience of the diagnosis of gender dysphoria has

7    been upwards of 85 percent.

8    BY ATTORNEY BARHAM:

9        Q.    And at the bottom of the first column of

10   page 3879 the committee indicates that their clinical

11   experience suggests that the persistence of gender

12   dysphoria or gender incongruence can only be reliably

13   assessed after the first signs of puberty.

14           Is that correct?

15       A.    That is what is written, yes.

16       Q.    You have not offered an opinion in your report

17   as to whether or --- whether or to what transgender

18   identity has a biological basis.

19           Is that correct?

20       A.    Let me just make sure that I'm reviewing it.  I

21   have not offered an opinion.

22       Q.    If you will turn to page 76 of Exhibit-2, Tab 5.

23   The committee with all of its experience and presenting

24   all the evidence said that gender dysphoria in children,

1   quote, does not invariably persist into adolescence and

2   adulthood.

3          Is that correct?

4   A.    That is correct.

5   Q.    In fact, this committee concluded that that

6   gender dysphoria, a minority of prepubertal children

7   appears to persist in adolescence.

8          Is that correct?

9   A.    That is correct.

10  Q.    I'm going to turn your attention to --- this

11  will be Tab 15, Exhibit-6.

12                      ---

13          (Whereupon, Exhibit-6, Lisa Littman

14           Study, was marked for identification.)

15                      ---

16  BY ATTORNEY BARHAM:

17  Q.    This is a 2021 study by Lisa Littman entitled

18  Individuals Treated for Gender Dysphoria with a Medical

19  and/or Surgical Transition who Subsequently

20  De-transitioned.

21          Is that correct?

22  A.    That is correct.

23  Q.    Are you familiar with this study?

24  A.    I am.

54

1      Q.    The study was based on survey responses from a

2  hundred adult individuals who were approved for hormonal

3  and/or surgical transition, underwent such transition,

4  lived in a transgender identity for a period of years

5  and then decided to de-transition or revert to a gender

6  identity associated with their biological sex.

7           Is that correct?

8      A.    That is my understanding of the study, yes.

9      Q.    And all of the subjects had detransitioned by

10  discontinuing their medications, having surgeries to

11  reverse the effects of transition or both.

12          Correct?

13              ATTORNEY BLOCK:  Objection to form.  Are

14  you reading something?

15              ATTORNEY BARHAM:  I'm referencing

16  page two, column two, at the bottom of the page.

17              THE WITNESS:  My recollection from the

18  study was that this was all self report, so there was no

19  way to verify if that was correct or true.

20  BY ATTORNEY BARHAM:

21      Q.    But that's at least what the participants

22  reported.

23          Correct?

24      A.    From my recollection.  I'd have to reread the

```
 1   entire study to say for sure but that is my
 2   recollection, yes.
 3       Q.    And if you turn to page eight of the second
 4   column, under the heading de-transition?
 5       A.    I don't have page numbers on mine.
 6              ATTORNEY BLOCK:  Do you reference the
 7   page number at the top?
 8              ATTORNEY BARHAM:  The source contains no
 9   page numbers, making it difficult.
10   BY ATTORNEY BARHAM:
11       Q.    Under the heading detransition it's the page
12   right before table four.
13              ATTORNEY BLOCK:  I'm sorry.  Can I see
14   the heading on the document?  Just for the record, this
15   doesn't appear to be a paginated version of the article
16   where, you know, when I pull it up I get a publication,
17   date and pages.  So I don't know if this is the final
18   version of the article or not, but you can proceed with
19   the questions.
20              ATTORNEY BARHAM:  Counsel, I'll return to
21   your concerns, Mr. Block.
22   BY ATTORNEY BARHAM:
23       Q.    Do you see the one page before the page that
24   contains Table 4?
```

1       A.      I do.

2       Q.      Do you see the heading detransition?

3       A.      I do.

4       Q.      And it says there that when participants decided

5    to detransition they were a mean age of 26.4 years old.

6            Correct?

7       A.      That is correct.

8       Q.      Have you read this study before today?

9       A.      I have.

10      Q.      So doesn't this study at least suggest that

11   patients may think they have a sense of belonging to the

12   opposite sex but can be mistaken?

13                      ATTORNEY BLOCK:  Objection to form.

14                      THE WITNESS:  I think what this study

15   does is hear experiences from a select group of

16   individuals who are motivated to participate in the

17   study about detransition and hear their experiences of

18   their care.

19   BY ATTORNEY BARHAM:

20      Q.      But the study still indicates that those

21   individuals had a sense of belonging to the opposite sex

22   and later concluded that they were were mistaken.

23            Is that correct?

24      A.      You will have to forgive my clinician nature

1  here, but language is important when working with

2  patients who are transitioning.  I don't know if that's

3  the language that they would use or if that is the

4  language that was used in this particular survey.

5      Q.    But the effect of detransitioning is that they

6  at one time thought they belonged to the opposite sex

7  and then later concluded that they did not?

8                  ATTORNEY BLOCK:  Objection to the form.

9                  THE WITNESS:  Again, I think we would

10 want to know specifically what each individual person,

11 how they described their process.  I don't know what

12 detransition means to those who are taking a relatively

13 anonymous survey, so it's hard to draw a conclusion

14 about the specific nature of it.  The generally accepted

15 upon definition of detransition is generally aligned

16 with somebody who reverts back to a gender identity or

17 gender expression that is more aligned with their sex

18 assigned at birth.

19 BY ATTORNEY BARHAM:

20     Q.    This study defines detransition as discontinuing

21 medications, having surgeries to reverse the effect of

22 transition or both.

23                  Is that correct?  It is on page two?

24     A.    Show me where on page two.

1    Q.    The second column of page two, at the bottom of

2    the page?

3                      ATTORNEY BLOCK:  Objection to form.

4                      THE WITNESS:  Yeah.  I'm not seeing that

5    Dr. Littman is specifically defining detransition but

6    describing the objective of the study for folks who

7    detransitioned by those aspects that you noted.

8    BY ATTORNEY BARHAM:

9    Q.    Okay.

10          But she notes in the last paragraph on that

11   page the objective of the current study was to describe

12   the population of individuals, skipping, who then

13   detransitioned by discontinuing medications, having

14   surgery to reverse the effects of transition or both?

15   A.    That's correct.

16   Q.    So she is indicating what she understands

17   detransitioning to mean in this article.

18          Correct?

19                      ATTORNEY BLOCK:  Objection to form.

20                      THE WITNESS:  Again I'm not sure how she

21   specifically defines detransition.  It is not

22   necessarily made clear in that statement.

23   BY ATTORNEY BARHAM:

24   Q.    Is it true that people may mistake feelings

1   resulting from trauma, mental illness or homophobia for

2   a genuine sense of transgender identity?

3                     ATTORNEY BLOCK:  Objection to form.

4                     THE WITNESS:  I think there are a lot of

5   complicated experiences that people may have that make

6   them question their gender identity.

7   BY ATTORNEY BARHAM:

8       Q.    So it's at least possible that people could

9   mistake feelings resulting from trauma, mental illness

10  or homophobia for genuine sense of transgender identity.

11          Correct?

12                    ATTORNEY BLOCK:  Objection to form.

13                    THE WITNESS:  I don't disagree with that,

14  no.

15  BY ATTORNEY BARHAM:

16      Q.    You said it's complicated, so it sounds like it

17  would be hard sometimes for a clinician to tell with

18  certainty what's going on?

19                    ATTORNEY BLOCK:  Objection to form.

20                    THE WITNESS:  What I would describe is

21  that in anything related to mental health that there are

22  complications and nuances.  This is no different.

23  BY ATTORNEY BARHAM:

24      Q.    Now, I believe you alluded to this a moment ago.

1  You mentioned that this is a self-reporting study and it

2  obviously concerns an emotionally fraught area of gender

3  identity.  So is it your position that this does not

4  produce scientifically meaningful results?

5      A.    I don't know what you mean by scientifically

6  meaningful.

7      Q.    Do you believe that this --- the results of this

8  article are scientifically reliable?

9      A.    It depends upon what question is being asked.

10  As a blanket, any kind of selection bias, particularly

11  for this study based upon where the participants were

12  drawn from makes us not want to draw conclusions about

13  their generalized applicability of this study to other

14  transgender folks, including other folks who may have

15  detransitioned, but the goal of science is not

16  necessarily to draw widely applicable conclusions, but

17  to put us in a position where we can ask more questions

18  and improve our care for our patients.

19      Q.    Now, why do you say --- why do you highlight

20  concerns about where the participants were drawn from?

21      A.    I highlight that because it creates a sense of

22  selection bias, which potentially, as I said, can reduce

23  the why applicability of the conclusions drawn.

24      Q.    And why do you say that there is a potential for

 1   selection bias in this article?

 2      A.    Based upon the websites that Dr. Littman has

 3   drawn her participants.

 4      Q.    And why do you have concerns about those

 5   websites?

 6      A.    I have concerns about the websites because of

 7   the contents of those websites.

 8      Q.    And what is contents of those websites that

 9   causes you concern?

10      A.    The content of the websites is unscientific.

11   And I guess I'm not sure how to articulate it in a most

12   defined way very specific to answering a set of

13   questions that reenforces the prestudy hypotheses.

14      Q.    So which websites that she drew participants

15   from cause you concern?

16      A.    As an example, Fourth Wave Now is a website that

17   Dr. Littman had used for some of her study recruitment.

18      Q.    And why are you concerned about the use of

19   Fourth Wave now in the recruitment process?

20      A.    What I would say is that when you're designing a

21   study that presupposes the conclusion and the website is

22   designed to attract people who presuppose that

23   conclusion, that limits the applicability of the

24   results.  It just have to be taken into account.  It

1    doesn't mean that there isn't data from this kind of

2    snowball recruitment that isn't valuable and I wouldn't

3    say that there isn't value to some of Dr. Littman's

4    work, specifically this study as compared to the last,

5    though you have to take it in the context with which it

6    was developed.

7        Q.    So are you suggesting that Dr. Littman

8    presupposed the conclusion that she wanted to reach in

9    designing this survey?

10       A.    I'm less familiar with the design of this study

11   than previous studies that she has designed, which I

12   would say that was correct.

13       Q.    What other websites did she use in the process

14   to cause you concern?

15       A.    I'm not as familiar with this study, so I don't

16   know if she specifically identified which websites.  And

17   I can't recall right now on the others which they were.

18       Q.    If you look at page three she discusses the

19   method and the participants and procedures.  Would

20   reviewing that refresh your recollection as to any

21   concerns about participants?

22       A.    It would not because she does not describe the

23   specific fora.  She describes a closed Facebook group,

24   Tumbler, Twitter and Reddit, but those are large

1    websites that have a lot of different kind of content.

2        Q.    So is it your position that it's not possible to

3    know whether anonymous or any results have any relation

4    to true fact in actual case histories?

5        A.    That is not my position.

6        Q.    Do you have any --- you mentioned earlier

7    something about how these were anonymous results.  So is

8    it possible to know whether they actually corresponded

9    with true cases?

10       A.    I think anonymous surveys, you have to really

11   dig into the specifics of the survey design in order to

12   draw conclusions.  And again, with any study in any

13   survey in particular you just want to make sure you have

14   an understanding of that context how broadly to draw

15   conclusions.

16       Q.    Would you agree that online recruitment does not

17   provide a statistically meaningful sample?

18       A.    I would not agree with that.

19       Q.    Is it your position --- how can an online

20   recruitment produce a statistically meaningful sample?

21       A.    I think I would need to understand the context

22   of what you mean by statistically meaningful.  There is

23   a difference between a survey that could be potentially

24   poorly designed and yet reach statistical significance.

1  You would need to understand the broader context in

2  order to draw conclusions about what that statistical

3  significance means and that means really digging into

4  the specific methodology of this study.  There is a vast

5  literature about efficacy of survey data and it really

6  depends on the specifics.

7      Q.   We've previously referenced paragraph eight of

8  your report where you mention you've seen approximately

9  500 transgender patients.

10             ATTORNEY BLOCK:  Travis, sorry, not to

11  avoid a pending question, but we're almost at one hour,

12  so if this is a good time, if you're moving to a

13  different subject maybe this would be a good time to

14  break.

15             ATTORNEY BARHAM:  Let me wrap up a few

16  more and then we will do that.

17             ATTORNEY BLOCK:  Thanks.

18  BY ATTORNEY BARHAM:

19      Q.   Your clinical practice for children and

20  adolescents started in 2013, about eight years ago.

21             Is that correct?

22      A.   No, I finished medical school in 2011 and have

23  been working with adults, children and adolescents since

24  then.

1    Q.    Okay.

2    A.    Actually that's when I finished --- to go back,

3    that's when I finished my residency and fellowship.  I

4    finished medical school in 2006.  I can't believe it's

5    been long.

6    Q.    And when did you begin your work in child and

7    adolescent psychiatry?

8    A.    I had child and adolescent psychiatry

9    experiences when I was in medical school.

10    Q.    When did you begin practicing child and

11    adolescent psychiatry?

12    A.    That's not a very specific term.  I practiced

13    child psychiatry as a medical student in my training.

14    Q.    When were you licensed, when were you first

15    licensed to practice child and adolescent psychiatry?

16    A.    There's no specific license to practice child

17    psychiatry.  Anybody who is --- has a medical license

18    can practice any medical specialty.  I was Board

19    Certified in Child and Adolescent Psychiatry, which is a

20    different process and I would have to look through to

21    recall the date.  I'm assuming that it's 2012 or 2013.

22    2013 is when I was Board Certified.

23    Q.    So when did you begin --- and you finished your

24    fellowship in child and adolescent psychiatry when?

1    A.    2011.

2    Q.    2011.  When did you begin treating as a child

3 and adolescent psychiatrist children with gender

4 dysphoria?

5              ATTORNEY BLOCK:  Objection to form.

6              THE WITNESS:  I saw children with gender

7 dysphoria during my residency and in my fellowship.

8 BY ATTORNEY BARHAM:

9    Q.    And your fellowship?

10    A.    Between 2006 and 2009.

11    Q.    And what proportion of those patients socially

12 transitioned?

13    A.    Of all of the patients that I saw in my training

14 or in all of the patients that I've seen over my time as

15 a physician?

16    Q.    Let's go first with the training.

17    A.    It was a much smaller number, so probably if I

18 were to guess, and I'm going back, probably close to

19 95 percent.

20    Q.    Ninety-five (95) percent socially transitioned

21 when you were in training?

22    A.    Yes.

23    Q.    And how many of your patients overall have

24 socially transitioned?

1      A.     I'm not sure how to answer that question.  Over

2  the course of our time working together, before I

3  started seeing them or --- I'm not sure how to

4  accurately answer that question.

5      Q.     Over the --- just in general how many of your

6  patients socially transitioned, not just while they were

7  being treated under your care?

8      A.     And these are patients who are seeing me

9  specifically through the context of gender or of those

10  500 transgender patients?

11      Q.     Of the 500 transgender patients.

12      A.     Probably --- I mean, it's a guess but probably

13  in the order of 85 percent.

14      Q.     And what proportion of the 500 patients used

15  puberty blockers?

16      A.     Probably a minority of those patients.  If I had

17  to guess, probably 20 percent or less.

18      Q.     And what percent of those 500 transgender

19  patients used cross sex hormones?

20      A.     I don't have my records in front of me, so it

21  would really just be a guess, but probably close to the

22  same percentage that socially transitioned, probably a

23  little bit less than that.

24      Q.     If I recall correctly that's about 85 percent?

1       A.     Probably somewhere on the order of that.

2                     ATTORNEY BLOCK:  Would now be a good time

3    for that break?

4                     ATTORNEY BARHAM:  One last question.

5    BY ATTORNEY BARHAM:

6       Q.     What systems do you have in place to track these

7    patients five years after they have been in your care?

8       A.     I have the same systems as most psychiatrists.

9    We see the patients within our care.  Folks will reach

10   out to us after time has passed and it's one of the

11   great pleasures of being a child psychiatrist, we get to

12   see folks longitudinally.  So there is not a specific

13   system apart from mutual care.

14      Q.     So you rely on them to reach out to you.

15             Is that correct?

16                    ATTORNEY BLOCK:  Objection to form.

17                    THE WITNESS: It depends on context.

18   BY ATTORNEY BARHAM:

19      Q.     But do you have any systematic way of tracking

20   all patients five years after they leave your care?

21      A.     There is no systematic way of tracking all

22   patients.

23                    ATTORNEY BARHAM:  All right.  Let's take

24   a break.  How long would you all like?

1              ATTORNEY BLOCK:  Five minutes.

2              ATTORNEY BLOCK:  Should we go off the

3    record?

4              VIDEOGRAPHER:  Going off, 10:14 a.m.

5    OFF VIDEOTAPE

6                        ---

7    (WHEREUPON, A SHORT BREAK WAS TAKEN.)

8                        ---

9    ON VIDEOTAPE

10             VIDEOGRAPHER:  Back on the record.  The

11   time is 10:27 am.

12   BY ATTORNEY BARHAM:

13     Q.    Moments ago we were discussing Dr. Littman's

14   2021 study, that was Tab 15, Exhibit 6.  Are you aware

15   of any studies that contradict Dr. Littman's data?

16     A.    Can you be more specific?

17     Q.    Are you aware of any studies that contradict Dr.

18   Littman's work survey in this article in Exhibit-6 that

19   find fault with her data?

20             ATTORNEY BLOCK:  Objection to the form.

21             THE WITNESS: Yeah.  I'm sorry.  I don't

22   think I understand the question.  There are other

23   articles that have been written about detransition and

24   clinical experiences of patients that have

```
 1   detransitioned who have described those experiences.

 2   There has not been a specific survey designed of

 3   detransitioners outside of this one that I'm aware of.

 4   BY ATTORNEY BARHAM:

 5       Q.    Has anyone written an article finding fault with

 6   the way Dr. Littman interpreted the data that ---?

 7                     ATTORNEY BLOCK:  Objection to form.

 8                     THE WITNESS:  For this specific data set

 9   or for previous?

10   BY ATTORNEY BARHAM:

11       Q.    For this specific data set?

12       A.    For this specific data set, from my

13   recollection, this was studied --- or published just

14   recently so I'm not aware of any.  It doesn't mean that

15   there aren't.

16       Q.    Are you aware of any studies that contradict Dr.

17   Littman's conclusions in this 2021 article?

18       A.    If you give me a moment I will read the

19   conclusion.

20                     ATTORNEY BLOCK:  Objection to form.

21                     THE WITNESS:  Insomuch as Dr. Littman's

22   conclusion is that there's no single narrative to

23   explain the experiences of all individuals who

24   detransitioned and we should take care to avoid painting
```

1  the population with a broad brush, I agree with that

2  conclusion.

3  BY ATTORNEY BARHAM:

4    Q.    Are you aware of any studies that contradict her

5  conclusions not just in the conclusion section but her

6  description of the detransitioners?

7            ATTORNEY BLOCK:  Objection to the form.

8            THE WITNESS:  I think it's hard to

9  provide a specific answer to that question.  We have to

10  look at each study and judge each individual study based

11  upon the merits.  The conclusions she draws are from a

12  subset of patients with a very specific viewpoint, and I

13  agree with her and her conclusion that there needs to be

14  more research to better understand the broader

15  implications of this care.

16  BY ATTORNEY BARHAM:

17    Q.    You're not aware of any article that has been

18  published specifically critiquing this 2021 study by Dr.

19  Littman.

20            Is that correct?

21    A.    Not that I'm aware of.

22            ATTORNEY BLOCK:  Objection to form.

23  BY ATTORNEY BARHAM:

24    Q.    A few moments ago we were also talking about the

```
 1   patients that you have treated, the 500 transgender

 2   patients you referenced in your report, and you

 3   mentioned that about 20 percent or less of those had

 4   used puberty blockers.  I'm wondering why that

 5   percentage is so low.

 6                    ATTORNEY BLOCK:  Objection to form.

 7                    THE WITNESS:  I don't know.  Low compared

 8   to what?  I think it's important to understand the

 9   context that in 2011, when I first started my gender

10   program, that puberty blocking medications were not

11   widely available, cost upwards of $3,000 a month and

12   were not covered by most insurance.  So puberty blockers

13   were not something that were available in the same way

14   they are now.  And I also saw a fair number of adults

15   and older adolescents for whom puberty blockers are not

16   indicated.

17   BY ATTORNEY BARHAM:

18      Q.   So of the 500 patients that you reference in

19   paragraph eight of your report, what percentage of those

20   are adults?

21      A.    I would really have to go back and look.  I

22   mean, in my current practice, I see adolescents and

23   young adults, so kind of parsing out artificially who is

24   18 and up, it would take some time to do that.  Probably
```

1   in the order of 75 percent are children in adolescence,

2   25 percent adults.  But of course, over 2011 to now, a

3   lot of those folks are now adults.

4       Q.    And when I'm asking about these percentages I

5   mean when you were treating them.  What percentage of

6   the patients you were treating were children?

7       A.    That's my best guess.

8       Q.    Seventy-five (75) percent?

9       A.    Yes.

10      Q.    And are you distinguishing between prepubertal

11  children and adolescents in that 75 percent or both?

12      A.    That's both.

13      Q.    Of that 75 --- of all the patients you've seen,

14  at the time you saw them, how many were prepubertal

15  children?

16      A.    Probably --- and again, I have to give this a

17  major caveat.  I would have to go back and look through

18  everything, but I would say probably 25 percent of that

19  75 percent were prepubertal at the time of initial

20  assessment.

21      Q.    And so then the remaining 75 percent of 75 would

22  be adolescents.

23            Is that correct?

24      A.    Correct.

1            <u>ATTORNEY BLOCK</u>:   Objection to form.

2    <u>BY ATTORNEY BARHAM</u>:

3        Q.    How many of your patients of those 500 patients

4    have detransitioned in a year?

5        A.    It's kind of a hard question to answer.  The one

6    patient who self identifies as having detransitioned

7    started seeing me after she had detransitioned.

8        Q.    Have any of your patients detransitioned while

9    under your care?

10       A.    Not that I'm aware of.

11       Q.    And is the one patient who detransitioned before

12   starting to see you, is that the only patient you're

13   aware of of the 500 that has detransitioned?

14       A.    That is the only one that I'm aware of, yes.

15   But can I clarify that of those 500 patients there are

16   certainly those who did not choose to transition.

17       Q.    And how many of the 500 chose not to transition?

18       A.    If I had to guess, probably about 10 to 20,

19   probably ten percent.

20       Q.    And did they make that decision before puberty

21   began?

22       A.    It was a mix.

23       Q.    Of those who chose not to transition, how many

24   were children when they made that decision?

1    A.    I couldn't tell you at that point, but

2 significantly more were the prepubertal youth than

3 adolescents.

4    Q.    This is a sensitive question.  I mean no offense

5 by it, but how many of the 500 patients have made the

6 sad decision to commit suicide?

7                    ATTORNEY BLOCK:  I'm sorry.  I couldn't

8 heat that.  Can you speak up?

9 BY ATTORNEY BARHAM:

10   Q.    How many of the 500 patients have made the sad

11 decision to commit suicide?

12                    ATTORNEY BLOCK:  Objection to form.

13                    THE WITNESS:  Is your question how many

14 have completed suicide?

15 BY ATTORNEY BARHAM:

16   Q.    Correct.

17   A.    Of those 500 patients, zero.

18   Q.    How many of those 500 patients have been

19 hospitalized for a psychiatric illness?

20   A.    I do not have that information in front of me.

21   Q.    Do you have any general idea?

22   A.    I don't.

23   Q.    After five or more years what percentage of your

24 patients would be characterized as lost to follow-up?

1    A.    Lost to follow-up is a specific term used in

2  studies, so it's not something that I would use to

3  describe my patients.

4    Q.    How many patients do you lose contact with after

5  five years?

6    A.    Again, I don't know how to answer that question.

7  I've been at my current role for three, so I haven't

8  lost touch with any significant number of patients.

9    Q.    What about patients that you saw before you were

10  in your current position?

11    A.    I'm not in contact with patients from my

12  previous role.

13                    ATTORNEY BARHAM:  All right.  Let's go to

14  Tab 110.  This is Exhibit-7 I believe.

15                          ---

16                    (Whereupon, Exhibit-7, Study, was marked

17                     for identification.)

18                          ---

19  BY ATTORNEY BARHAM:

20    Q.    Are you familiar with this study?

21    A.    I am not.

22    Q.    Have you seen it before today?

23    A.    I have not.

24    Q.    On page one this again has been --- it's

```
 1    paginated in the top right corner or top inside corner.

 2    On page one the first sentence of the last paragraph

 3    says gender transition is as scientifically fascinating

 4    as it is socially controversial for it poses significant

 5    professional and bioethical challenges for those

 6    clinicians working in the field of gender dysphoria.

 7              Do you agree that gender detransition poses

 8    significant professional and bioethical challenges for

 9    professionals treating gender dysphoria?

10                   ATTORNEY BLOCK:  Objection to form.

11                   THE WITNESS:  I don't necessarily agree

12    with the language.  And certainly don't agree with the

13    author to use something that's scientifically

14    fascinating.  What I think is that every decision that

15    we make in child psychiatry in particular is fraught

16    with ethical challenges.  This is not any different from

17    the ethical challenges that we face with a lot of other

18    interventions.

19    BY ATTORNEY BARHAM:

20       Q.    What challenges does detransition pose to your

21    profession in your view?

22                   ATTORNEY BLOCK:  Objection to form.

23                   THE WITNESS:  I don't see how it poses

24    any challenges to my work.
```

1    BY ATTORNEY BARHAM:

2      Q.    Page three of this article, the authors identify

3    several things that may prompt a person's decision to

4    detransition including understanding how past trauma,

5    internalized sexism and other psychological difficulties

6    influence the experience of gender dysphoria.

7           Correct?

8                 ATTORNEY BLOCK:  Objection.  Can you give

9    him a chance to read?

10                ATTORNEY BARHAM:  Of course.

11                THE WITNESS:  And can you repeat what you

12   said?

13   BY ATTORNEY BARHAM:

14     Q.    On page three the authors identify several

15   things that may prompt a person's decision to

16   detransition including, quote, understanding how past

17   trauma, internalized sexism and other psychological

18   difficulties influence the experience of gender

19   dysphoria.

20          Correct?

21     A.    Sorry.  Just give me a second to look at the

22   context here.

23     Q.    Sure.

24     A.    I agree that's how it is written and there

```
 1    appears to be no basis from which the author has built

 2    that assertion.  There is no methods described in this

 3    whatsoever.

 4        Q.    I believe the author in that instance is citing

 5    Dodsworth 2020, Gonzalez 2019, Herzog 2017, and one,

 6    two, three, four other studies.

 7              Do you see that?

 8        A.    I see those studies.  I'd have to look at the

 9    specific studies in order to understand the implications

10    and the context.

11        Q.    But the authors obviously seem to have a basis

12    or at least a citation basis for what they're saying.

13              Is that correct?

14                    ATTORNEY BLOCK:  Objection to form.

15                    THE WITNESS:  Again, without knowing the

16    specifics of those studies it's hard for me to say.

17    BY ATTORNEY BARHAM:

18        Q.    The authors also indicate that solving previous

19    psychological or slash emotional problems that

20    contributed to gender dysphoria may prompt the decision

21    to detransition.

22              Is that correct?

23        A.    Where is that?

24        Q.    They are citing Butler and Hutchinson, 2020,
```

1  Stella 2016.  It is the same paragraph.

2      A.    Got it.  Yeah I don't know what solving a

3  psychological or emotional problem means in this

4  context.

5      Q.    But these authors are at least indicating that

6  solving these problems, however they mean the term, may

7  prompt a decision to detransition.

8          Is that correct?

9              ATTORNEY BLOCK:  Objection to form.

10             THE WITNESS:  I think I've answered how I

11 can answer that.

12 BY ATTORNEY BARHAM:

13     Q.    Okay.

14         Let's go back to Tab 15, which is Exhibit-6.

15 This was the Littman study that we were discussing a

16 moment ago.  On page three --- excuse me, according to

17 Table 5, on page nine, 60 percent of the participants in

18 this survey reported that they became more comfortable

19 identifying as their natal sex.

20         Is that correct?

21             ATTORNEY BLOCK:  Objection to form.

22             THE WITNESS:  I see 65 percent of those

23 assigned female at birth and 48 of those assigned male

24 at birth reported that.

1   BY ATTORNEY BARHAM:

2      Q.    So 45 and 15 is 60, so that would be 60 percent

3   of the 100 participants in the study.

4          Correct?

5                ATTORNEY BLOCK:  Objection to form.

6                THE WITNESS:  I believe.

7   BY ATTORNEY BARHAM:

8      Q.    I'm sorry.  I didn't hear your answer.

9      A.    I trust your math, yes.

10     Q.    Okay.

11         And on page 12, under the heading discussion,

12  this survey indicates that only a small percentage of

13  detransitioners, 24 percent, informed the clinicians and

14  clinics that facilitated their transfer that they ---

15  their transition that they had detransitioned.

16         Is that correct?

17               ATTORNEY BLOCK:  Objection to form.

18               THE WITNESS:  Yes, the participants in

19  the study, that is correct.

20  BY ATTORNEY BARHAM:

21     Q.    And you testified a moment ago, if I recall

22  correctly, please correct me if I'm wrong, that you are

23  aware of only one patient in your career that has

24  detransitioned.

1          Is that correct?

2     A.    That I'm aware of, yes.

3     Q.    Let's go to Tab 116, which is Exhibit-8.

4                        ---

5          (Whereupon, Exhibit-8, Article by

6           Vandenbussche, was marked for

7           identification.)

8                        ---

9  BY ATTORNEY BARHAM:

10    Q.    Are you familiar with this article?

11    A.    I have not read this article.

12    Q.    And this is a 2021 article by I believe a

13 gentleman named --- or an individual named

14 Vandenbussche, Detransitioned Related Needs in Sports.

15         Is that correct?

16    A.    That is correct.

17    Q.    Did you review this article when preparing your

18 report?

19    A.    I did not.

20    Q.    If you look at page four this article examined a

21 sample survey of 237 detransitioners.

22         Is that correct?

23              ATTORNEY BLOCK:  Objection.  Can you give

24 him time to read the document he has never seen before.

1          ATTORNEY BARHAM:  Certainly.

2          THE WITNESS:  Can you repeat the

3    question?

4    BY ATTORNEY BARHAM:

5      Q.    This article highlights the results of a survey

6    of 237 detransitioners.

7          Correct?

8      A.    Yes, as they are defining detransitioning, yes.

9      Q.    And on page five these authors --- these

10   researchers report that 70 percent of participants

11   detransitioned because they realized that their gender

12   dysphoria was related to other issues.

13          Correct?

14     A.    Correct.

15     Q.    And that was the most common reported reason for

16   detransitioning.

17          Correct?

18     A.    As they stated, yes.

19     Q.    In paragraph 43 of your report you cite Lisa

20   Littman's 2018 study.  Paragraph 43.  And you highlight

21   what you describe as serious methodological flaws that

22   render the study meaningless.

23          Is that correct?

24     A.    Correct.

1              ATTORNEY BARHAM:  I want to show you

2  Tab 117, and this will be Exhibit 9.  It will be an

3  article by Lily Durwood entitled Mental Health and Self

4  Worth in Socially Transitioned Transgender People.

5                         ---

6              (Whereupon, Exhibit-9, Article by Lily

7              Durwood, was marked for identification.)

8                         ---

9  BY ATTORNEY BARHAM:

10     Q.    Are you familiar with this article?

11     A.    I am.

12     Q.    You cited this in footnote nine of your report

13  as demonstrating the treatment associated with social

14  transitions.

15          Correct?

16     A.    I have to look at the specific footnote.  I know

17  I cited it, but I don't know if it was citing to that

18  specific conclusion.

19     Q.    By all means take a look.

20     A.    Can you point me to where my footnote is?

21     Q.    Footnote nine is --- let me find it myself.

22              ATTORNEY SWAMINATHAN:  It's page 11.

23              THE WITNESS:  Yes.

24  BY ATTORNEY BARHAM:

1    Q.    The Durwood article in 2017 is a survey of

2  children and their parents about the children's mental

3  health.

4         Is that correct?

5    A.    Correct.

6    Q.    The children in the Durwood article were not

7  surveyed or assessed by clinicians.

8         Is that correct?

9    A.    I don't know the answer to that.  I'd have to

10  look at the specific ---.

11    Q.    Well, if this is a self report it would be

12  reporting what the children themselves said.

13         Correct?

14              ATTORNEY BLOCK:  Objection.  Let him have

15  time to read the article.

16              THE WITNESS:  The trans youth project was

17  directed by Dr. Ulson involved clinicians in the

18  assessment of the children and their families.  So I'm

19  not sure specifically.  I would have to go through the

20  methods of this one particularly for me to recall.

21              As you will see from the procedure on

22  page 117 whenever possible parents and children

23  completed the measurements in separate rooms or far

24  enough in the same room to be out of ear shot.  And so

1    they were researchers who were boarded who were

2    participating in these interviews with the kids and

3    their families.

4    BY ATTORNEY BARHAM:

5        Q.    But those researchers were just recording what

6    the students said out loud?

7        A.    Correct.

8        Q.    So there's no clinical assessment of the

9    children as part of this survey.

10            Is that correct?

11                ATTORNEY BLOCK:  Object to form.

12                THE WITNESS:  I wouldn't be able to

13   answer that question.  It depends upon how it's used.

14   In a research context you might be using the same

15   instruments that we would use for clinical assessments,

16   but for the sake of research purposes it's not used in

17   that way.

18   BY ATTORNEY BARHAM:

19       Q.    But the purpose of this article was just to

20   record what the children said as a self report.

21            Is that correct?

22                ATTORNEY BLOCK:  Objection to form.

23                THE WITNESS:  As far as I understand the

24   point of this article, they utilized child self report

```
 1   which is what is typically used in children mental

 2   health studies.

 3   BY ATTORNEY BARHAM:

 4      Q.    According to page --- the second page of this

 5   article, which is page 117, the participants were

 6   recruited through word of mouth, national and local

 7   support groups, summer camps and online forums for

 8   families of transgender and gender nonconforming youth.

 9           Correct?

10      A.    That is correct.

11      Q.    Frequently in your report you refer to

12   gender-affirming care.  What in your view are the

13   components of gender-affirming care?

14                 ATTORNEY BLOCK:  Objection to form.

15                 THE WITNESS:  I think that there is no

16   one agreed upon use of that term and it is used by

17   different people in different context to mean whatever

18   they want it to mean, depending upon who is asking the

19   questions.  The way that I define it, for my own

20   practice, is that it's important for children to be

21   heard and listened to, that any particular gender

22   identity outcome is not better than any other and that

23   the child and families should be directing the process

24   with appropriate assessments and interventions.
```

1    BY ATTORNEY BARHAM:

2        Q.    How do you handle a situation where parental

3    desires may be differ than the child's desires?

4        A.    That is almost a universal phenomenon of

5    parenthood, so there's not an atypical process.  When

6    there is disagreement about specific issues in the

7    treatment plan those interventions are going to be

8    tailored to the individual families based upon their

9    need.

10       Q.    So when you use gender-affirming care what do

11   you view as the different components or different

12   aspects of gender-affirming care in your practice?

13                     ATTORNEY BLOCK:  Objection to form.

14                     THE WITNESS:  I think that is also going

15   to be highly context dependent.  I'm a psychiatrist and

16   I see a lot of children with complex psychiatric needs,

17   so my process for gender-affirming care is going to be

18   different than what somebody else might describe as

19   gender-affirming care, but I think I highlighted what I

20   see as the components of it for myself.

21   BY ATTORNEY BARHAM:

22       Q.    I've missed in your list of the different

23   components, so could you explain again what do you see

24   as the components of gender-affirming care?

1      A.     That it should be child and family led, that

2   listening to and understanding the child is an important

3   aspect of the process and that there is no gender

4   identity outcome that is privileged over another.  I'm

5   sure I said it slightly differently than the last time

6   around but the concepts are the same.

7      Q.     Do you consider social transition to be a

8   component of gender-affirming care?

9      A.     I think that understanding the risks, benefits

10  and alternatives of social transition is a part of

11  gender-affirming care.  In that way, sometimes

12  recommending not socially transitioning is a part of

13  gender-affirming care.

14     Q.     But gender-affirming care can be an approach

15  used as part of gender-affirming care.

16          Is that correct?

17                 ATTORNEY BLOCK:  Objection to the form.

18                 THE WITNESS:  Can you repeat the

19  question?

20  BY ATTORNEY BARHAM:

21     Q.     Social transitioning can be a method used as

22  part of gender-affirming care.

23          Correct?

24     A.     It is an option.

1    Q.    An available tool.

2          Correct?

3    A.    Yes.

4    Q.    Is it your belief that social transition is a

5    type of medical or mental health treatment for gender

6    dysphoria?

7    A.    It's a hard question to answer.  Social

8    transition is a pretty diverse concept that's hard to

9    get as a categorical variable to study, but the

10   implication is that there's a lot of things that are

11   often helpful for mental health that aren't specifically

12   mental health treatments, right, like exercise, regular

13   sleep.  These aren't specific mental health

14   interventions but nevertheless have impacts on mental

15   health outcomes.

16   Q.    Well, in paragraph 90 --- I mean paragraph 36 of

17   your report you say that social transition is a

18   treatment for gender dysphoria?

19   A.    Yeah I would agree with that.

20   Q.    So what kind of treatment is it?

21   A.    It's a psychosocial intervention.

22   Q.    Psychosocial.  What does social transitioning

23   include in your view?

24   A.    I have to recall if I provided an operational

91

```
 1    definition for it in my report.  Essentially what we're
 2    talking about is an alignment of gender role and gender
 3    identity.  So that's transition of name, pronouns, hair,
 4    participation in sex-segregated activities, et cetera.
 5        Q.    And so social transition in your view means the
 6    participation in girls or boys athletic teams in
 7    competitions consistent with ones gender identity.
 8            Is that correct?
 9        A.    Again, it's going to be context dependent.  It
10    is not a yes or no question around social transition.
11    What we're going to be doing in the context of an
12    assessment is understanding the risks and benefits of
13    all the various options that we have.
14        Q.    I understand that it can differ from person to
15    person, but participation in girls or boys athletic
16    teams in competition consistent with one's gender
17    identity is an aspect, a possible aspect, of social
18    transitioning.
19            Correct?
20        A.    It may be an option for some students, yes.
21        Q.    Do you consider the use of puberty blockers to
22    be an available tool as part of gender-affirming care?
23        A.    I do.
24            ATTORNEY BLOCK:  Objection to form.
```

```
 1    BY ATTORNEY BARHAM:

 2        Q.    Do you consider the use of cross sex hormones to

 3    be an available tool as part of gender-affirming care?

 4                    ATTORNEY BLOCK:   Objection to form.

 5                    THE WITNESS: Gender-affirming care can

 6    include hormones.

 7    BY ATTORNEY BARHAM:

 8        Q.    Are there any other available tools that you use

 9    as part of gender-affirming care?

10        A.    Yes, there is a lot of tools that I use that are

11    involved in gender-affirming care.  Work with the family

12    is one big piece of it.  Work with the school is

13    another.  Referrals for surgery when indicated,

14    recommendations for assessment and treatment of any

15    co-occurring mental health disorder is a part of it.

16        Q.    What is your role in the prescribing of puberty

17    blockers?

18        A.    I'm occasionally in the role of doing a mental

19    health assessment prior to initiation of those

20    medications.

21        Q.    And are you the individual who would prescribe

22    the puberty blockers?

23        A.    I am not.

24        Q.    What type of professional would be responsible
```

1    for the prescribing?

2        A.    In the clinics that I have worked these are

3    either adolescent medicine specialists or pediatric

4    endocrinologists.

5        Q.    And is the same true with cross sex hormones?

6        A.    Yes.

7        Q.    In your report you describe gender-affirming

8    care as the prevailing model of care for transgender

9    youth.

10            Is that correct?  And I'm referencing

11   paragraph 15 of your report.

12       A.    Yes.

13       Q.    Later on in your report you refer to prevailing

14   standards of care, paragraph 18, paragraph 26, for

15   example.  By that are you referring to gender-affirming

16   care?

17       A.    Which paragraph?

18       Q.    Eighteen (18) and 26.

19       A.    I would say that it is a part of what I'm

20   referring to but not the entirety of what I'm referring

21   to.

22       Q.    What else are you referring to in paragraph 18

23   and 26 when you say prevailing standards of car?

24       A.    This would include a lot of components,

 1   including both the Endocrine Society Guidelines, the

 2   World Professional Association for Transgender Health

 3   Guidelines as well as recommendations and ethical

 4   guiding principles of the various governing bodies that

 5   we all work with.

 6       Q.    And you would describe those various documents

 7   that you just referenced as reflecting gender-affirming

 8   care.

 9             Correct?

10       A.    I would have to go through, for example, the

11   Endocrine Society Guidelines to know whether or not they

12   use that specific term.  Again, I think I just want to

13   make sure that I'm emphasizing that gender-affirming

14   care does not have an agreed upon definition so it's

15   controversial and I wouldn't know how to answer that

16   question.

17       Q.    As you use the term and as you define the term

18   in your practice, would you consider the WPATH standards

19   to fall under the umbrella of gender-affirming care?

20       A.    I would yes.

21       Q.    And would you consider the Endocrine Society

22   Guidelines to fall under the umbrella of

23   gender-affirming care?

24       A.    I would, yes.

```
 1      Q.      In paragraph 15 of your report you claim that
 2  gender-affirming care is endorsed by at least five
 3  professional associations.
 4                  ATTORNEY BLOCK:  Objection to form.
 5  BY ATTORNEY BARHAM:
 6      Q.      And you reference others.  What other
 7  organizations are you alluding to in paragraph 15 of
 8  your report?
 9      A.      I don't want to get the name of the organization
10  incorrect, but National Association of Social Workers
11  and the National Association of Marital and Family
12  Therapists have released statements about it, but I
13  don't have specific recollection of those sitting here
14  today.
15      Q.      Okay.
16              Are there any other organizations besides those
17  and those listed in paragraph 15?
18      A.      There likely are but none that are coming to
19  mind today.
20      Q.      When you were preparing your report did you
21  consult the standards of care articulated by any
22  international professional organizations?
23      A.      Yes.
24      Q.      Which ones?
```

1      A.      Both the Endocrine Society Guidelines as well as

2  the WPATH standards of care.

3      Q.      Any other international or professional

4  organizations?

5      A.      Not that I can recall, no.

6      Q.      Are you aware that international and

7  professional organizations have been moving away from

8  using puberty blockers and cross sex hormones on

9  children and adolescents under the age of 16?

10                    ATTORNEY BLOCK:  Objection to form.

11                    THE WITNESS:  I don't see that that is

12  necessarily accurate.  I'm going to have to take a break

13  in five minutes if that is okay.

14                    ATTORNEY BARHAM:  This would be the

15  perfect time.

16                    THE WITNESS:  I will be quick.

17                    VIDEOGRAPHER:  Going off the record.  The

18  current reads 11:01.

19  OFF VIDEOTAPE

20                              ---

21  (WHEREUPON, A SHORT BREAK WAS TAKEN.)

22                              ---

23  ON VIDEOTAPE

24                    VIDEOGRAPHER:  Back on the record.  The

```
 1    current time is 11:06 a.m.
 2                    ATTORNEY BARHAM:  I'm going to show you
 3    what we will mark as Exhibit 10, this will be Tab 91.
 4                              ---
 5                    (Whereupon, Exhibit-10, Statement by
 6                     Royal Australian and New Zealand College
 7                     of Psychiatrists, was marked for
 8                     identification.)
 9                              ---
10    BY ATTORNEY BARHAM:
11       Q.    This is a statement from the Royal Australian
12    and New Zealand College of Psychiatrists.
13            Correct?
14                    ATTORNEY BLOCK:  Objection.  Can you give
15    him a chance to look at the document?
16                    THE WITNESS:  It's what it says.  I don't
17    know what the government structure of this organization
18    is or how they release their statements or how they are
19    developed.
20    BY ATTORNEY BARHAM:
21       Q.    This is Position Statement 103, according to the
22    document.
23            Correct?
24       A.    I will take your word for it if that's what it
```

```
 1   says.

 2        Q.    Right below the title.  And it was published in

 3   August of 2021.

 4              Is that correct?

 5        A.    I don't know where it says that.

 6        Q.    Right below the tab.

 7        A.    Got it.

 8        Q.    The Royal Australian and New Zealand College of

 9   Psychiatrists is the professional body of psychiatrists

10   for those two countries.

11              Is that correct?

12              ATTORNEY BLOCK:  Objection.

13              THE WITNESS:  I do not know that.

14   BY ATTORNEY BARHAM:

15        Q.    I'm sorry.  I didn't catch your answer.

16        A.    I do not know.

17        Q.    According to page three of this document, the

18   Royal College has concluded that there are, quote,

19   polarized views and mixed evidence regarding treatment

20   options for people presenting with gender identity

21   concerns, especially children and young people.

22              Do you see that?

23        A.    I see that.

24        Q.    Do you agree with their assessment?
```

```
1        A.     Yes.

2        Q.     So this means that professionals can disagree

3    with each other as to how to treat children and young

4    people with gender dysphoria.

5             Is that correct?

6                 ATTORNEY BLOCK:  Objection to form.

7                 THE WITNESS:  Yeah.  I think any

8    treatment decision, you're going to have professionals

9    disagreeing with you about the best course of action.

10   This isn't any different than that.

11   BY ATTORNEY BARHAM:

12       Q.     And on page four of the document the Royal

13   College says that psychiatric assessment and treatment

14   should be both --- should be both based on available

15   evidence and allow for full exploration of a person's

16   gender identity.  And it emphasizes the importance of

17   the psychiatrist's role to undertake for assessment in

18   evidence-based treatment ideally as part of a

19   multidisciplinary team, especially highlighting

20   distinguishing issues which may need addressing and

21   treating.  Do you agree with the Royal College's

22   emphasis on psychiatrists' role and how it's important

23   to ensure appropriate care for gender dysphoria?

24                 ATTORNEY BLOCK:  Objection to form.
```

1          THE WITNESS:  Psychiatrists are often a

2     useful adjunct to the team, but isn't a necessary

3     requirement.  There are many other mental health

4     professionals who have expertise and can fill this role.

5     BY ATTORNEY BARHAM:

6        Q.     And what other professionals do you think could

7     fill this role?

8        A.     This would be licensed clinical mental health

9     professionals.

10       Q.     And those would include?

11       A.     Psychologists, social workers, marital and

12    family therapists and there are probably other titles

13    that are governed by their regulatory boards that I

14    don't recall right now.

15    BY ATTORNEY BARHAM:

16       Q.     And on what are you basing your disagreement

17    with the Royal College's emphasis on the importance of

18    the psychiatrist's role

19                   ATTORNEY BLOCK:  Objection to form and

20    characterization of the document.

21                   THE WITNESS:  The WPATH standards of care

22    as an example does not dictate necessary involvement of

23    a psychiatrist.  And I would have to review the

24    Endocrine Society, but I don't believe that they

```
 1   specifically --- from my guild either.
 2   BY ATTORNEY BARHAM:
 3      Q.   Is it true that psychiatrists have training and
 4   skills that psychologists and marital therapists and
 5   social workers do not have?
 6      A.    That is correct.
 7                   ATTORNEY BARHAM:  I'm going to hand you
 8   what we will mark as Exhibit-11.  And this will be
 9   Tab 92 for those watching online.
10                            ---
11                   (Whereupon, Exhibit-11, Policy Change
12                   Regarding Hormonal Treatment of Minors,
13                   was marked for identification.)
14                            ---
15   BY ATTORNEY BARHAM:
16      Q.   This document is an announcement of a policy
17   change regarding hormonal treatment of minors with
18   gender dysphoria at Astrid Lidgren Children's Hospital.
19   Are you aware that this is the main gender clinic in
20   Sweden?
21                   ATTORNEY BLOCK:  Objection to form.
22                   THE WITNESS:  I don't see any specific
23   information about this document that reports where it's
24   from.
```

BY ATTORNEY BARHAM:

   Q.   Are you aware of Astrid Lindgren Hospital by reputation?

   A.   I don't know if that's the name of it.  No, I don't recall the specific name of the Swedish Children's Hospital.

   Q.   Are you aware that the Swedish Agency for Health Technology Assessment and Assessment of Social Services published an overview of the knowledge base which showed a lack of evidence of both long-term consequences of the treatments of gender dysphoria?

   A.   I have heard ---.

          ATTORNEY BLOCK:  Objection to form and where are you quoting from?

          ATTORNEY BARHAM:  Halfway through the first paragraph of the background section on page one.

          ATTORNEY BLOCK:  I'm sorry.  Where was this document obtained from?

          ATTORNEY BARHAM:  I can supply that information, but this is an announcement of a policy change from a Children's Hospital in Sweden.

          ATTORNEY BLOCK:  Just for the record, this doesn't seem to have a walk --- like --- it just looks like words on a page without other sourcing on it.

1          <u>ATTORNEY BARHAM</u>:  Your objection is

2     noted.

3          <u>THE WITNESS</u>:  I mean without speaking to

4     the providence of the document, I have heard that there

5     was a change within the Swedish establishment in regards

6     to prepubertal youth or prepubertal youth.

7     <u>BY ATTORNEY BARHAM</u>:

8          Q.    And what was your understanding of that change?

9          A.    I would have to look through the specifics to

10     know for sure.

11          Q.    What is your general understanding of the nature

12     of that change?

13          A.    My general understanding was there was a pause

14     on some of the treatments, medical treatments available

15     for children with gender dysphoria.

16          Q.    And by pause, at least according to this

17     document, it means that they had decided hormonal

18     treatments, i.e. puberty blocking and cross sex

19     hormones, will not be initiated in gender-dysphoric

20     patients under the age of 16.

21          Correct?  First bullet point in executive

22     decisions.

23          A.    Again, not knowing the providence of this

24     document, that's what this document says, yes.

1      Q.     Are you aware that the United Kingdom's National

2   Health Service put an end to initiating hormone

3   treatment in new cases of individuals under 16?

4                   ATTORNEY BLOCK:  Objection to form and

5   foundation.

6                   THE WITNESS:  My understanding is that

7   it's under litigation right now and a final decision has

8   not been reached, but I could be wrong about that.

9   BY ATTORNEY BARHAM:

10     Q.     Are you aware that that's at least a current

11  practice to put an end to initiating hormonal treatment

12  in new patients --- in new cases of individuals under

13  16?

14                  ATTORNEY BLOCK:  Objection to form.

15                  THE WITNESS:  Can you repeat the

16  question?

17  BY ATTORNEY BARHAM:

18     Q.     Are you aware that the United Kingdom's National

19  Services' current practice is to put an end to

20  initiating hormonal treatments in new cases of

21  individuals under 16?

22                  ATTORNEY BLOCK:  Objection to form and

23  foundation.

24                  THE WITNESS:  I do not have the NHS

1    policies in front of me, so I cannot speak to that.

2              ATTORNEY BARHAM:   The document Exhibit

3    --- what number are on, 11.

4              LAW CLERK WILKINSON:   11, yes

5    BY ATTORNEY BARHAM:

6       Q.   Exhibit 11 indicates, quote, the United

7    Kingdom's National Health Service put an end to

8    initiating hormonal treatment in new cases of

9    individuals under 16.   Do you have any reason to believe

10   that that statement is inaccurate?

11             ATTORNEY BLOCK:   Just objection that this

12   document came out at a certain time and so it's just not

13   clear what timeframe, you know, this question is

14   referring to.   And just another objection to this

15   document.   This appears to be a translation ---.

16             ATTORNEY BARHAM:   Your objection is

17   noted.   And we've already agreed that there are the

18   three objections, so I will ask you to cease the

19   speaking objections.

20             THE WITNESS:   I have reason to doubt it.

21   Yes.

22   BY ATTORNEY BARHAM:

23      Q.   What is your reason to doubt it?

24      A.   My understanding is that there were legal

1    processes involved that have changed the landscape of

2    this care in the U.K.

3        Q.    Are you aware of the National Health Service

4    reinitiating hormonal treatments in new cases of

5    individuals under 16?

6        A.    I am unsure.  That's where my doubt is.

7        Q.    But you're aware that at one time they put an

8    end to those treatments for individuals under the age of

9    16?

10       A.    Yes.

11                   ATTORNEY BLOCK:  Objection to form.

12                   THE WITNESS:  Yes.

13                   ATTORNEY BARHAM:  I'm going to show you

14   what we will mark as Exhibit-12.  This is a document ---

15   an article by Lisa Nainggolan.  I'm probably butchering

16   the last name.

17                   LAW CLERK WILKINSON:  Tab 93.

18                   ATTORNEY BARHAM:  Tab 93, entitled

19   Hormonal Treatment of Youth with Gender Dysphoria Stops

20   in Sweden.

21                            ---

22                   (Whereupon, Exhibit-12, Article by Lisa

23                   Nainggolan, was marked for

24                   identification.)

```
 1                           ---
 2   BY ATTORNEY BARHAM:
 3      Q.    In the fourth paragraph it indicates that other
 4   centers in Sweden that treat gender dysphoria youth in
 5   Loom and Licopene will follow the lead of the ALB.  Are
 6   you aware that those two clinics had made the same
 7   decision as the Astrid Lindgren Children's Hospital?
 8      A.    I am not.
 9                  ATTORNEY BARHAM:  I'm going to show you
10   what we will mark as Exhibit-4 --- I mean, I'm sorry
11   Tab 94, Exhibit 13.
12                           ---
13                  (Whereupon, Exhibit-13, Study, was marked
14                   for identification.)
15                           ---
16   BY ATTORNEY BARHAM:
17      Q.    Are you aware that Finland has similarly
18   reversed its course issuing new guidelines that allow
19   puberty blockers only on a case by case basis after
20   extensive psychiatric assessment?
21                  ATTORNEY BLOCK:  Objection to form.  And
22   can you give the witness and me a chance to see this
23   document?  Can the document be scrolled down?
24                  THE WITNESS:  What I can say about this
```

```
 1   document is that I don't --- I've not heard of what

 2   Cohere Finland is and how their recommendations impact

 3   policies on the ground in Finland.

 4   BY ATTORNEY BARHAM:

 5      Q.    So are you not familiar with Cohere as an

 6   entity?

 7      A.    Correct.

 8      Q.    And that was a question.  Are you?

 9      A.    I am not.

10      Q.    Have you seen this document before today?

11      A.    I have not.

12              ATTORNEY BARHAM:  I'm going to show you

13   what we'll mark as Exhibit 14, and this will be Tab 95

14   for those watching at a distance.

15                       ---

16              (Whereupon, Exhibit-14, Article Published

17               on Medscape.com, was marked for

18               identification.)

19                       ---

20   BY ATTORNEY BARHAM:

21      Q.    This is an article by Betsy McCall published on

22   Medscape.com on October 7th, 2021.

23              Is that correct?

24      A.    Yes.
```

1    Q.    If you look at the third paragraph from the

2    bottom.  Ms. McCall reports that Scandinavian countries,

3    most notably Finland, once eager advocates for the

4    gender-affirmative approach, have pulled back and issued

5    new treatment guidelines in 2020, stating that

6    psychotherapy rather than gender reassignment should be

7    the first line of treatment for gender dysphoric youth.

8    Do you see that?

9    A.    I see that.

10   Q.    Do you agree with that approach?

11                  ATTORNEY BLOCK:  Objection to form.

12                  THE WITNESS:  Medscape is a popular press

13   forum for discussing issues and the language that is

14   used by this author implies to me that this is not

15   somebody who has a great deal of expertise or

16   understanding in this field.

17   BY ATTORNEY BARHAM:

18   Q.    Do you agree with using psychotherapy rather

19   than gender reassignment as the first line of treatment

20   for gender dysphoric youth?

21   A.    The term gender reassignment in and of itself is

22   not a meaningful term in this context, and so it's

23   unclear what this particular author is trying to get

24   across.  And it's a false dichotomy that is being

```
 1    positive that doesn't actually happen.
 2       Q.    Are you aware that Finland had issued new
 3    treatment guidelines in 2020?
 4       A.    I don't recall the specifics of when guidelines
 5    were recommended.  But based upon the document that you
 6    placed in front of me it seems to be yes.  But I think
 7    the description of those guidelines and what you put in
 8    front of me as the Cohere guidelines, which again I'm
 9    not sure what they actually represent in terms of their
10    policies, there are contradictions there.
11                    ATTORNEY BLOCK:  I'm sorry.  I want to
12    put on the record this document about Finland also
13    appears to be a translation from the original by the
14    Society for Evidence Based Gender Medicine whose website
15    describes it as an unofficial translation.  So I just
16    want to note that for the record.
17                    ATTORNEY BARHAM:  So noted.  I'm going to
18    show you what we will mark as Exhibit 15, Tab 96.
19                          ---
20                    (Whereupon, Exhibit-15, Article in
21                     National Health Service, was marked for
22                     identification.)
23                          ---
24    BY ATTORNEY BARHAM:
```

1    Q.    And I will direct your attention to page 13.

2    This is a --- to identify the document for the record.

3    This is an Evidence Reviewed Gonadotrophin Releasing

4    Hormone Analogs for Children and Adolescents with Gender

5    Dysphoria, from the National Health Service in 2021 ---

6    or in 2020.  On page 13, right at the beginning of the

7    conclusions section the authors indicate that the

8    results of studies that reported impact on the critical

9    outcomes of gender dysphoria and mental health and the

10   important outcomes of body image and psychosocial impact

11   in children and adolescents with gender dysphoria are a

12   very low certainty using modified grade.  They suggest

13   little change with GnRH analogs from baseline to

14   follow-up.  Do you see that?

15   A.    I do not.

16   Q.    First paragraph, under the conclusion.

17   A.    Yes, I see that.

18   Q.    Do you have any scientific basis for disputing

19   this conclusion?

20            ATTORNEY BLOCK:  Objection.  Let him read

21   the document.

22            THE WITNESS:  I mean, without having seen

23   this before, I'm not sure what the scoping was for how

24   they defined which studies to include, which ones were

1   excluded, which would be required in a validated

2   metaanalysis type approach.  So without a very specific

3   description of the methodology it's going to be hard for

4   me to make an educated statement.

5   BY ATTORNEY BARHAM:

6       Q.    If you look at page three of the document, under

7   executive summary it highlights the nine observational

8   studies that were included in the evidence review.

9       A.    Yeah, in a metaanalysis or even a systematic

10  review one of the processes that occurs is you define as

11  the authors what you are searching for, what are the

12  exclusionary and inclusionary criteria for each

13  individual study and a list of every single study that

14  was reviewed and why or why not it was included.  That

15  is missing here, so it's --- I don't know how the

16  authors decided which ones to include or which ones not

17  to include, which makes it hard to draw a conclusion

18  from the report as it stands.

19      Q.    Have you seen any other reports that suggest

20  that the evidence being discussed on page 13 under the

21  conclusions heading isn't anything higher than a very

22  low certainty using modified grade?

23      A.    I'm not 100 percent familiar with modified grade

24  as a methodology, so I can't speak to how that would

1    apply to other studies.

2        Q.    And the next paragraph the authors indicate that

3    studies found differences in outcome could represent

4    changes that are either a questionable clinical value or

5    the studies themselves are not reliable and changes

6    could be due to confounding bias or chance.  Do you

7    agree that that is possible?

8                    ATTORNEY BLOCK:  Objection to form.

9                    THE WITNESS:  Well, I agree that all

10   things are possible, that scientific literature is not

11   always 100 percent drawing any conclusions.  But again,

12   without knowing specifically how they included what they

13   included or why they included what they included and why

14   they opt to remove others, it's not possible for me to

15   draw a specific conclusion from this.

16   BY ATTORNEY BARHAM:

17       Q.    In paragraph 34 of your report you distinguish

18   Dr. Levine's approach to treating gender dysphoria as

19   --- or you describe it as gender identity conversion

20   model.  Do you recall that?

21       A.    Yes.

22       Q.    In your view are there two approaches to

23   treating gender dysphoria in children and adolescents,

24   the gender-affirming model and the conversion therapy

1    model?

2              ATTORNEY BLOCK:  Objection to form.

3              THE WITNESS:  I would not agree with that

4    characterization.

5    BY ATTORNEY BARHAM:

6    Q.    How many other approaches do you see?  How do

7    you categorize the different approaches for treating

8    gender dysphoria in children and adolescents?

9    A.    I don't agree with the premise, but there

10   specific defined treatment paradigms that are used.  I

11   think there are --- there are elements of conversion

12   therapy as I referred to in my report.  There are

13   elements of gender-affirming care and there is a

14   spectrum in between that.

15   Q.    What are the elements --- what are the elements

16   of identity --- gender identity conversion model in your

17   mind?

18   A.    I think the primary element as I understand it

19   in conversion therapy is a presupposition that a

20   transgender outcome is an inherently negative outcome

21   and that engagement or interventions should be put into

22   place in order to make that outcome the least likely as

23   possible.

24   Q.    And in your mind gender-affirming care is care

 1    that affirms that child's gender identity.

 2         Correct?

 3                     ATTORNEY BLOCK:  Objection to form.

 4                     THE WITNESS: As I described earlier,

 5    there are multiple components to how I would define

 6    gender-affirming therapy.

 7                     ATTORNEY BARHAM:  Let's go to Exhibit 16,

 8    this will be Tab 97.

 9                           ---

10                     (Whereupon, Exhibit-16, Article by

11                     Roberto D'Angelo, was marked for

12                     identification.)

13                           ---

14    BY ATTORNEY BARHAM:

15         Q.    This is an article by Roberto D'Angelo published

16    in 2020, entitled One Science Does Not Fit All.  Are you

17    familiar with these authors?

18         A.    Not personally, no.

19         Q.    Are you familiar with them by reputation?

20         A.    Looking at Dr. D'Angelo's footnotes, given that

21    he works for the Society for Evidence Based Gender

22    Medicine, then I might draw some conclusions from that.

23         Q.    And what conclusions would you draw from that?

24         A.    That there is a presupposition that transgender

```
1   identity is a negative outcome.

2      Q.    And why would you draw that conclusion from that

3   association?

4      A.    Based upon the description of the care on the

5   website.  But that would be an assumption.  I would

6   never do that on any individual basis for any of these

7   authors without knowing them.

8      Q.    Beyond the association, do you have any reason

9   to doubt the scholarly integrity of the authors here?

10     A.    I think you can't really talk about scholarly

11  integrity when it's a letter to the editor.  It's not

12  the same --- same level of evidence as another study

13  would be.

14     Q.    It's a letter to the editor that cites 37

15  different sources.

16            Is that correct?  I'm looking at the last page.

17     A.    The sources aren't numbered, so I don't know how

18  many sources it has, but ---.

19                   ATTORNEY BLOCK:  Let him look at it.

20  BY ATTORNEY BARHAM:

21     Q.    The references at the end are numbered.  Excuse

22  me.  I apologize.  I was looking at the wrong document.

23     A.    There are 37 footnotes.  I would assume that you

24  are correct on that.
```

```
 1     Q.    We are talking about this letter to the editor

 2  --- let me clarify for the record because I was looking

 3  at the wrong document prior to questioning for which I

 4  apologize.  This letter to the editor contains

 5  approximately two pages of typed materials listing the

 6  references that it uses.

 7            Correct?

 8     A.    Yes, correct.

 9     Q.    Did you review this article when preparing your

10  report?

11     A.    I did not.

12     Q.    Did you review this article before today?

13     A.    I have not.

14     Q.    The article reviews the document published by

15  Turban, et al., in 2020, a study by Turban, et al, in

16  2020.

17            Is that correct?

18     A.    It does.

19                ATTORNEY BLOCK:  Objection to form.

20  BY ATTORNEY BARHAM:

21     Q.    If you look at the last page, that article is

22  the same article that you cited in paragraph 34 of your

23  report.

24            Is that correct?
```

1      A.    That's correct.

2      Q.    This D'Angelo, et al. criticized Turban on

3   page one for his simplistic affirmation versus

4   conversion binary --- or I should state permeates his

5   narrative and establishes a foundation for their

6   analysis and conclusions.  Do you see that on the first

7   page?

8      A.    What page?

9      Q.    The first page, second column, middle paragraph.

10     A.    I see that, yes.

11     Q.    These authors state the notion that all therapy

12  interventions for gender dysphoria can be categorically

13  classified into this simplistic binary betrays a

14  misunderstanding of the complexity of psychotherapy.

15  Would you agree with that statement?

16             ATTORNEY BLOCK:  Objection to form and

17  asking him questions about an article he hasn't read.

18             THE WITNESS:  The premise of that

19  statement implies a cognition on behalf of the authors

20  of that study that I don't think is necessarily

21  accurate.  I don't think that the authors of the Turban

22  study would suggest that there is a simple binary of

23  therapy interventions.

24  BY ATTORNEY BARHAM:

1    Q.    And you would also say there's not a simplistic

2  binary.

3          Is that correct?

4    A.    That is correct.

5    Q.    So in paragraph 34 of your report you're not

6  trying to draw a --- you're not trying to draw some sort

7  of dichotomy between Dr. Levine's approach and yours?

8                ATTORNEY BLOCK:  Objection to form.

9                THE WITNESS:  It is less helpful for me

10  to describe it as identifying a dichotomy but really

11  more focused on the goals of treatment approach.  And if

12  the goal of the treatment approach is a conversion type

13  goal, then I think there is a draw between that and the

14  standard of care of the affirmative model.

15  BY ATTORNEY BARHAM:

16    Q.    So that in your view are there two different

17  treatment goals when treating gender dysphoria?  We can

18  categorize treatment approaches by the goals, conversion

19  therapy versus the gender-affirming model that you have

20  outlined?

21                ATTORNEY BLOCK:  Objection to form.

22                THE WITNESS:  The way I would describe

23  the goal of the gender-affirming model is to have a

24  healthy, resilient child whatever the gender identity

1   ends up being, whether that is a cisgender identity or

2   transgender identity.  The difference between that and a

3   conversion therapy is again a presupposition that a

4   transgender identity is an inherently worse outcome

5   which is not focused on the overall mental health and

6   wellbeing of the child.

7   BY ATTORNEY BARHAM:

8      Q.   I understand the distinction that you're making.

9   I'm trying to understand are there --- as we assess

10  different people's approaches to this area, can we

11  characterize them by the goals of their approach into a

12  gender-affirming model and a conversion therapy model

13  and those are basically two different camps.

14          Is that correct?

15              ATTORNEY BLOCK:  Objection to form.

16              THE WITNESS: We cannot.

17  BY ATTORNEY BARHAM:

18     Q.   And in saying that I'm not trying to say that

19  therapeutic techniques belong in one or the other.  I'm

20  just trying to say can we categorize treatment

21  approaches by the goals?

22              ATTORNEY BLOCK:  Objection to form.

23  BY ATTORNEY BARHAM:

24     Q.   Because that seems to be what you are doing in

```
 1   paragraph 34 of your report.
 2       A.    There's a process versus an outcome question
 3   that I'm just not understanding the distinction between
 4   for as I'm defining conversion therapy here, it is a
 5   specific goal that a transgender outcome is a negative
 6   outcome.  For gender-affirming therapy or interventions
 7   there is no presupposed outcome that is better than
 8   another other than building the mental health and
 9   well-being of the child.
10       Q.    Okay.
11       A.    And there is many different ways of approaching
12   that question and intervening that are going to be
13   outside of the scope of a goal-based approach.
14       Q.    It still sounds and again I'm just trying to
15   explore and understand what you're saying here.  It
16   still sounds like there is one approach that has a goal
17   in your view of having the child return to comfort with
18   the child's natal sex and then there is another approach
19   that has a goal that says I don't care where you end up.
20   Is that fair to say?
21                   ATTORNEY BLOCK:  Objection to form.
22                   THE WITNESS:  Again, I think it really
23   narrows down what's a highly complex question, so it's
24   really hard to give an answer to that.  But if we define
```

1    conversion as approach one and everything else outside

2    of that, I can work with that if that is helpful for

3    having further discussion or asking more questions.

4    BY ATTORNEY BARHAM:

5        Q.    Is that the way you would describe this

6    situation in the field at present?

7        A.    It is not the way I would describe the situation

8    in the field.

9        Q.    On page five of this article ---.

10                ATTORNEY BLOCK:  I'm sorry, which

11   article?

12                ATTORNEY BARHAM:  On Tab 97 of

13   Exhibit 16.  Dr. D'Angelo's article.

14   BY ATTORNEY BARHAM:

15       Q.    It sounds to me like you are rejecting what

16   these authors describe as a conflation of ethical

17   non-affirming psychotherapy and conversion therapy, next

18   to the last paragraph on the page.

19                ATTORNEY BLOCK:  Objection.  Please give

20   him time to read the page.

21                THE WITNESS:  I've never seen of or heard

22   a definition for ethical non-affirmative psychotherapy,

23   so I don't know what that means.

24   BY ATTORNEY BARHAM:

1        Q.     Is it your position that there is no such thing?

2        A.     I have never heard of such a thing.

3        Q.     On page six, in the first column, the authors

4    write, in fact, some homophobic societies and indeed

5    families that reject homosexuality among their children

6    have embraced the affirmative biomedical pathway, which

7    poses questions as to whether, quote, affirmative care

8    in some cases in some instances serve the role of gay

9    conversion therapy.  Do you believe that that's a

10   legitimate concern?

11       A.     I do not.

12       Q.     Why not?

13       A.     As I mentioned before, affirmative care is not

14   presupposed any one specific outcome.

15       Q.     Do you think that someone can have a concern

16   that affirmative care could serve the role regardless of

17   its dole, serve the role of gay conversion therapy?

18                    ATTORNEY BLOCK:  Objection to form.

19                    THE WITNESS:  Well, the authors appear to

20   have that concern.  It is not a concern that has been

21   borne out by the literature in my clinical experience.

22   BY ATTORNEY BARHAM:

23       Q.     Do you believe that the authors are reasonable

24   in having that concern?

1     A.    I can't speak to what the authors' motivations

2  are for writing this.  I do not know.

3     Q.    Based on your knowledge of the field, do you

4  believe that that's a reasonable concern?

5     A.    I do not.

6     Q.    Why not?

7     A.    Because understanding the overlap and the

8  interaction between gender identity and sexuality and

9  sexual orientation is a part of the assessment process

10 in affirming care.

11    Q.    At the bottom of page one the authors write, if

12 anything other than affirmation is viewed as GICE ---.

13    A.    What page is that?

14    Q.    On page six, I'm sorry.  Same page you were on

15 with the gay affirmative therapy or gay conversion

16 therapy.  The last paragraph in column one of page six.

17 If anything other than affirmation is viewed as GICE, it

18 follows that the provision of psychotherapy in these

19 clinical scenarios can be seen as harmful conversion

20 efforts.  If these therapeutic efforts do not aim to

21 convert or consolidate an identity but instead aim to

22 help individuals gain a deeper understanding of their

23 discomfort with themselves, the factors that have

24 contributed to their distress and their motivations for

1   seeking transition.  Is it your position that there are

2   no therapeutic interventions that do not aim to convert

3   or consolidate an identity?

4                    ATTORNEY BLOCK:  Objection to form.

5                    THE WITNESS:  What I would say is that

6   helping individuals gain a deeper understanding of their

7   discomfort with themselves, the factors contributing to

8   their distress and their motivations for seeking

9   transition is a vital and inherent part of

10  gender-affirming care.

11  BY ATTORNEY BARHAM:

12     Q.    But a moment ago you indicated that you were not

13  aware of any ethical non-affirmative psychotherapy?

14     A.    That is not a phrase that I have heard or have

15  heard described.  What the passage that you are

16  referring to describes is a very typical process

17  involved in any kind of standard of care around anything

18  really is understanding motivations and understanding

19  distress.  There is nothing --- there is nothing novel

20  about that description of care that is not already under

21  the umbrella of affirming care.

22     Q.    And a little bit later in that paragraph, I

23  believe at the top of column two of page six, the

24  authors right both conversion and affirmative therapy

```
 1    efforts carry the risk of undue influence potentially
 2    compromising patient autonomy.  Do you agree that that
 3    is a possibility?
 4        A.    Again, I'm not sure what the authors are
 5    referring to when they say affirmation therapy efforts
 6    because what they're describing as ethical,
 7    non-affirmative interventions falls to me under the
 8    clear rubric of affirming care, so I don't know what
 9    they mean by this.
10        Q.    Okay.
11            In paragraph 35 of your report you indicate ---
12    you stated research indicates that social transitioning
13    significantly improves the mental health of transgender
14    young people.
15            Is that correct?
16        A.    Yes.
17                ATTORNEY BARHAM:  And I'm going to show
18    you what we will mark as Exhibit 17.  This is Tab 118
19    for those following from a distance.  This is a study by
20    Gibson, et al. published in 2021.
21                        ---
22                (Whereupon, Exhibit 17, Study by Gibson,
23                et al., was marked for identification.)
24                        ---
```

BY ATTORNEY BARHAM:

Q.    You've cited this article in footnote nine of your report.

Is that correct?

A.    Let me just double check.  I believe so.  Yes.

Q.    Under methods on page one of Exhibit-17 it indicates this a cross-sectional study.

Is that correct?

A.    That is correct.

Q.    Can cross-sectional studies be used to demonstrate causation?

A.    Not on their own, no.

Q.    So this study does not show that social transitions caused any improvement in mental health.

Correct?

A.    This study demonstrated that there was a correlation between improved mental health and social transition.

Q.    So it did not show causation.

Is that correct?

A.    It did not show causation.

Q.    I'm going to show you Exhibit 9.  Let's go back to Exhibit 9.

LAW CLERK WILKINSON:  Tab 117.

BY ATTORNEY BARHAM:

Q.    Tab 117.  This is the article by Lily Durwood, et al. published in 2017.  You cited this article also in footnote nine of your report.

Is that correct?

A.    That is correct.

Q.    And we have previously discussed how this article reports what children and parents said about the children's mental health.

Is that correct?

A.    That is correct.

Q.    Really a self report.

Correct?

A.    I think we went through that earlier.  It was not just a self report.  These were interview led evaluations.

Q.    But an interview led self report.

Correct?

A.    There were also parent reports that were ---.

Q.    And so self reports of children, parental reports about their children.

Correct?

A.    Correct.

Q.    Okay.

```
 1              And then in footnote nine you also cite a study
 2   by Olson, et al. in 2016, footnote nine of your report.
 3              Correct?
 4      A.    That is correct.
 5      Q.    And in footnote nine you indicate that alleged
 6   statistical errors in that article have already been
 7   corrected in 2018.
 8              Correct?
 9      A.    Correct.
10      Q.    And for that assertion you cite a study by
11   Olson, et al. in 2018.
12              Is that correct?
13      A.    I don't see that.
14                   ATTORNEY BLOCK:  Objection.  Where are
15   you at?
16                   THE WITNESS:  I don't see it.  If you can
17   point to me where that is.
18   BY ATTORNEY BARHAM:
19      Q.    Footnote nine, on page 11, small statistical
20   errors in Olson 2016 had already been corrected in 2018,
21   see Olson, et al., 2018, mental health of transgender
22   student who are supported in their identity throughout.
23      A.    Yes.
24      Q.    Is that correct?
```

1     A.     Yes.

2                    ATTORNEY BARHAM:   I'm going to show you

3     what we are going to mark as Exhibit 18.   This will be

4     tab 119.

5                              ---

6                    (Whereupon, Exhibit-18, Errata Sheet, was

7                    marked for identification.)

8                              ---

9     BY ATTORNEY BARHAM:

10    Q.     This is the errata sheet that you cited in

11    footnote nine of your report.

12           Is that correct?

13    A.     That is correct.

14    Q.     The only change in this 2018 article is the

15    highlight and missing common from the 2016 article.

16            Is that correct?

17                    ATTORNEY BLOCK:   Objection to form.

18                    THE WITNESS:   Yes.

19    BY ATTORNEY BARHAM:

20    Q.     In paragraph 40 of your report you say that

21    studies have repeatedly documented puberty blocking

22    medication and gender-affirming hormone therapy are

23    associated with mental health benefits in both the short

24    and long term.

1           Is that correct?

2     A.     That is correct.

3     Q.     And the studies that you're citing for that

4  assertion are those listed in footnote 14 of your

5  report.

6           Correct?

7     A.     That is correct.

8     Q.     Are there any others that you are referencing?

9     A.     Those are the only that I'm referencing.

10    Q.     In paragraph 41 of your report you claim that

11  Dr. Cantor fails to discuss many of the studies

12  documenting the benefits of puberty blocking medication.

13  Which of the studies in footnote 14 did he fail to

14  discuss?

15    A.     I would need to review Dr. Cantor's report to

16  know specifically.

17    Q.     Do you recall now which ones he failed to

18  discuss?

19    A.     I do not.

20           ATTORNEY BARHAM:   All right.   I'm going

21  to show you what we will mark as Exhibit-19, and this is

22  Tab 98.

23                      ---

24           (Whereupon, Exhibit-19, Article by

 1    Tordoff,                    et al., was marked for

 2    identification.)

 3                          ---

 4    BY ATTORNEY BARHAM:

 5        Q.    This is an article by Tordoff, et al, published

 6    in 2022, entitled Mental Health Outcomes in Transgender

 7    and Non-Binary Youth Receiving Gender-Affirming Care.

 8    This is one of the studies that you cited in footnote 14

 9    of your report?

10        A.    That is correct.

11        Q.    According to table one on page five of this

12    report 65 percent of the participants were also

13    receiving mental health therapy.

14              Is that correct?

15        A.    That is correct.

16        Q.    So it's not possible to determine how much of

17    the improvement was due to puberty blocking medication

18    and gender-affirming hormone therapy and how much was

19    due to the mental health therapy.

20              Correct?

21                    ATTORNEY BLOCK:  Objection to form.

22                    THE WITNESS:  There is a lot of questions

23    in that one singular question about study design and

24    what we know about the history of transgender health

```
 1   outcomes prior to the existence of gender-affirming
 2   care.  As this study is designed, it is not designed in
 3   such a way to be able to specifically keep that apart.
 4               ATTORNEY BARHAM:  All right.
 5               I'm going to show you what we will mark
 6   as Exhibit-20, and this will be Tab 99.
 7                         ---
 8               (Whereupon, Exhibit-20, Article by Amy
 9                Green, et al., was marked for
10                identification.)
11                         ---
12   BY ATTORNEY BARHAM:
13      Q.    This is the second article.  This is an article
14   by Amy Green entitled ---- it says et al. entitled
15   Association of Gender Affirming Hormone Therapy with
16   Depression, Thoughts of Suicide and Attempted Suicide
17   Among Transgender and Nonbinary Youth published in 2021.
18   This is the second article that you cited in footnote 14
19   of your report.
20               Is that correct?
21      A.    That is correct.
22      Q.    On page six of this report, column two, the
23   authors indicate that causation cannot be inferred due
24   to this study's cross-sectional design.
```

```
 1              Correct?
 2      A.      That is correct.
 3      Q.      This study also does not prove that puberty
 4  blocking medication and gender-affirming hormone therapy
 5  caused any improvements.
 6              Correct?
 7                  ATTORNEY BLOCK:  Objection to form.
 8                  THE WITNESS:  This study was not designed
 9  to show a causal outcome, no.
10                  ATTORNEY BARHAM:  Let's go to Exhibit 21,
11  this will be Tab 100.
12                              ---
13                  (Whereupon, Exhibit-21, Article by
14                   Turban, et al., was marked for
15                   identification.)
16                              ---
17  BY ATTORNEY BARHAM:
18      Q.      This is an article by Turban, et al. published
19  in 2020 entitled Pubertal Risks for Transgender Youth
20  and Risks of Suicide Ideation --- Suicidal Ideation?
21                  ATTORNEY BLOCK:  Objection to misreading
22  the name of the study.
23  BY ATTORNEY BARHAM:
24      Q.      This is the third article that you cited in
```

1    footnote 13 of your report.

2            Is that correct?

3    A.    That is correct.

4    Q.    And on page seven of this article the authors

5    also indicate that limitations include the

6    cross-sectional --- the study's cross-sectional design,

7    which does not allow for determination of causation.

8            Is that correct?

9    A.    That is correct.

10   Q.    So this study does not prove that puberty

11   blocking medication and gender affirming hormone therapy

12   caused any improvements.

13           Correct?

14   A.    This study was not designed to demonstrate

15   causation.

16           ATTORNEY BARHAM:  I'm going to show you

17   what we will mark as Exhibit-22.  This is an article by

18   Achille, et al. entitled Longitudinal Impact of Gender

19   Affirming Endocrine Intervention on Mental Health and

20   Well-being of Transgender Youths, Preliminary Results

21   published in 2020.

22                        ---

23           (Whereupon, Exhibit-22, Article by

24            Achille, et al., was marked for

1                   identification.)

2                        ---

3    BY ATTORNEY BARHAM:

4        Q.    You also cited this article in footnote 14 of

5    your report.

6            Is that correct?

7        A.    Yes, I did.

8        Q.    And on page two of this report, the bottom of

9    the first column, the authors write that most

10   subjects --- quote, most subjects were followed by

11   mental health professionals, closed quote, and quote,

12   those that were not were encouraged to see a mental

13   health professional.

14           Correct?

15       A.    That is correct.

16       Q.    And on page three, the first column, the authors

17   say that after statistically adjusting for psychiatric

18   medication and engagement in counseling, quote, most

19   predictors did not reach statistical significance.

20           Is that correct?

21       A.    Where are you?

22       Q.    Page three, column one, under regression

23   analysis.

24       A.    Correct.

1          ATTORNEY BARHAM:   I'm going to show you

2    what we will mark as Exhibit-23, this is Tab 102.

3                         ---

4              (Whereupon, Exhibit-23, Article by Kuper,

5                 et al., was marked for identification.)

6                         ---

7    BY ATTORNEY BARHAM:

8      Q.    This is an article by Kuper, et al. published in

9    2020, entitled Body Dissatisfaction and Mental Health

10   Outcomes of Youth on Gender Affirming Hormone Therapy.

11   On page six --- let me rephrase that for the record.

12   You cited this article in footnote 14 of your report.

13          Is that correct?

14     A.    That is correct.

15     Q.    According to Table 2 on page six none of the

16   results for those receiving puberty suppression were

17   statistically significant.

18          Correct?

19     A.    I need a few minutes.

20     Q.    Take your time.

21     A.    As I read the bottom of that table, there are a

22   number of analyses that reached statistical

23   significance.

24     Q.    But if you look at the lines for each one under

```
 1   each of the scores, body dissatisfaction, depressive

 2   symptoms, depressive symptoms QIDS, anxiety symptoms,

 3   panic symptoms, generalized anxiety symptoms, social

 4   anxiety symptoms, separation anxiety symptoms, school

 5   avoidance symptoms, the lines marked puberty suppression

 6   have no superscript on them.

 7            Is that correct?

 8                  ATTORNEY BLOCK:  Objection to form.

 9                  THE WITNESS:  That is correct.

10   BY ATTORNEY BARHAM:

11     Q.   So none of those --- none of the specific

12   findings regarding individuals on puberty suppression

13   only were statistically significant.

14            Is that correct?

15     A.   None of them were statistically significant as

16   measured by their reports.

17                  ATTORNEY BARHAM:  I'm going to show you

18   what we will mark as Exhibit-24.  This will be Tab 103.

19                         ---

20                  (Whereupon, Exhibit-24, Article by van

21                   der Miesen, et al., marked for

22                   identification.)

23                         ---

24   BY ATTORNEY BARHAM:
```

```
 1       Q.    This is an article by van der Miesen, et al.,
 2  published in 2020 entitled Psychological Functioning in
 3  Transgender Adolescents Before and After Gender
 4  Affirmative Care Compared with Cisgender General
 5  Population of Peers.  You cited this article in footnote
 6  14 of your report.
 7            Is that correct?
 8       A.    That is correct.
 9       Q.    The authors on page five, in column two, the
10  authors of this study ---.
11       A.    What page?
12       Q.    Page five.
13       A.    I have that in the 700s.
14       Q.    Oh 703, sorry.  703.  The fifth page, but it's
15  paginated 703.  The authors of this study indicate that,
16  quote, due to its cross-sectional design, the present
17  study cannot provide evidence about the direct benefits
18  of puberty suppression over time and long-term mental
19  health outcomes?
20            Correct?
21       A.    I don't see where that is.
22       Q.    Next to the last paragraph in the second column.
23  The third and most important --- skipping the
24  cross-sectional design of this study different
```

1  participants in the groups before and after puberty

2  suppression may potentially limit the results?

3      A.    Yes, I see that.

4      Q.    The present study can therefore not provide

5  evidence about the direct benefits of puberty

6  suppression over time and the long-term mental health

7  outcomes.

8          Is that correct?

9      A.    That is correct.

10     Q.    So the authors of this study indicate that

11  conclusions about the long-term benefits of puberty

12  suppression should thus be made with extreme caution,

13  meaning prospective long-term follow-up studies with

14  repeated measured design of individuals being followed

15  over time to confirm.

16          Is that correct?

17     A.    That is correct.

18          ATTORNEY BARHAM:  I'm going to show you

19  what we will mark as Exhibit-25.  This will be Tab 104.

20                    ---

21          (Whereupon, Exhibit-25, Article by de

22          Vries, was marked for identification.)

23                    ---

24  BY ATTORNEY BARHAM:

1     Q.     This is an article by van der Miesen --- or I

2   mean De Vries, et al --- excuse me, De Vries, et al.,

3   2014, Young Adult Psychosocial Outcome After Puberty

4   Suppression and Gender Reassignment.  This is the last

5   article you cite in footnote 14 of your report.

6           Is that correct?

7     A.     That is correct.

8     Q.     At the Dutch clinic patients who receive puberty

9   blockers also receive psychotherapy.

10          Is that correct?

11    A.     That is correct.

12    Q.     So again, there is no way to determine how much

13  of the improvement reflected in this study is due to the

14  puberty blockers and how much is due to the

15  psychotherapy.

16          Correct?

17              ATTORNEY BLOCK:  Objection to the form.

18              THE WITNESS:  Let me restate my response

19  to the previous question.  The Dutch clinic always

20  recommends participation in therapy.  I'm not a

21  100 percent certain that every participant participated

22  in the therapy as directed.

23  BY ATTORNEY BARHAM:

24    Q.     For the most part, the Dutch model combined

```
 1    psychotherapy with puberty blockers.

 2            Correct?

 3                     ATTORNEY BLOCK:  Objection.

 4                     THE WITNESS:  That is correct.  And may I

 5    state that I think that is part of the reason that the

 6    van der Miesen study is quite important because it does

 7    start to look at the impact of being on the wait list

 8    and the impacts of just getting psychotherapy alone

 9    versus access to puberty suppression and/or hormones.

10                     ATTORNEY BARHAM:  I'm going to show you

11    what we're going to mark as Exhibit-26.  Tab 105.

12                              ---

13                     (Whereupon, Exhibit-26, Article, was

14                      marked for identification.)

15                              ---

16    BY ATTORNEY BARHAM:

17       Q.    This is an article by Michael Biggs published in

18    2020, Gender Dysphoria and Psychological Functioning in

19    Adolescents Treated with GnRHa.  Are you familiar with

20    this study?

21                     ATTORNEY BLOCK:  Objection,

22    mischaracterizes the document.

23    BY ATTORNEY BARHAM:

24       Q.    Are you familiar with this letter to the editor?
```

 1      A.    I have not read this letter to the editor.

 2      Q.    If you look at bottom of page one continuing

 3 onto page two, the author writes an additional

 4 complication with this treatment is that the Dutch model

 5 combines GnRHa with psychological support so the two

 6 effects are inevitably conflated.  Do agree with that

 7 statement?

 8      A.    I do not.

 9      Q.    Why?

10      A.    Use of GnRH logs for this kind of intervention

11 were first used in 1999.  So every --- every transgender

12 person prior to 1999 had no access to this kind of

13 treatment.  Between 1999 and probably about 2014 these

14 medications were not widely available and so unavailable

15 for use for most people.  So we have the clinical

16 experience of adults, talking retrospectively, about

17 their experiences as well as the patients that we have

18 treated that did versus did not have access to these

19 interventions.  So we have both clinical experience and

20 some retrospective data that looks at this question

21 specifically.

22      Q.    Can retrospective data demonstrate causation?

23      A.    In some cases it can.

24      Q.    But retrospective data is subject to recall by

1    us in other drawbacks that undermind its reliability.

2              Correct?

3                    ATTORNEY BLOCK:  Objection to form.

4                    THE WITNESS: It depends upon the type of

5    data that is being calculated.

6    BY ATTORNEY BARHAM:

7        Q.    Why do you mean by that?

8        A.    If it is qualitative interview data, yes, there

9    is retrospective data that reviews contemporary

10   documentation and charts, lab results, imaging results,

11   et cetera.  That is less confounded by that kind of

12   bias.

13       Q.    When we are talking about people recalling their

14   experiences before hormone therapy was available that

15   would be the qualitative type of data.

16             Correct?

17       A.    Correct.  And when analyzing that data you have

18   to take that into account.

19       Q.    So that still doesn't help me understand why you

20   disagree with that statement because the Dutch model

21   combines hormones with psychosocial --- psychological

22   support, the two effects are inevitably conflated?

23       A.    We have a long history of people receiving

24   psychological support alone.  And with the addition of

1    these interventions and this model of care, outcomes

2    improve with specific measures around gender dysphoria.

3        Q.    Over that time the psychological support would

4    have evolved as more understanding was gained.

5            Correct?

6        A.    One would hope, yes.

7                ATTORNEY BLOCK:  Objection to form.

8    BY ATTORNEY BARNHAM:

9        Q.    But for the individuals who receive treatment

10   under the Dutch model, receiving both the hormones and

11   the psychological support, it's impossible to determine

12   how much improvement was due to the psychological

13   support and how much was due to the hormones.

14           Correct?

15               ATTORNEY BLOCK:  Objection to form.

16               THE WITNESS:  There has not been a study

17   that has sought to identify the specific percentage of

18   impact of those two.

19               ATTORNEY BARHAM:  All right.

20               I'm going to show you what we will mark

21   as Exhibit 27.

22                          ---

23               (Whereupon, Exhibit 27, Article, was

24                marked for identification.)

```
 1                              ---

 2    BY ATTORNEY BARHAM:

 3       Q.     Tab 106.  This is an article by Costa, et al.

 4    In 2015 Psychological Support, Puberty Expression and

 5    Psychosocial Functioning in Adolescents with Gender

 6    Dysphoria.

 7              Is that correct?

 8       A.     That is correct.

 9       Q.     You cite this article in footnote 14 of your

10    report.

11              Is that correct?

12       A.     That's correct.

13       Q.     Now, in this study there were two groups of

14    adolescents, those who receive both puberty --- I mean,

15    both therapy and puberty blockers at the outset and

16    those who received just therapy at the outset.

17              Correct?

18       A.     I'll need a minute to refresh myself.

19       Q.     Sure.  And I'm referencing pages 228, the second

20    column over to 229, the top of the first column.

21       A.     That's correct.

22       Q.     And on page 2211 going over to 2212, the

23    author's note that the difference between the

24    immediately eligible group and the delayed eligible
```

1    group failed to reach significance.

2           Correct?

3      A.    So as I read this, immediately eligible group

4    who had a higher in psychosocial functioning did not

5    show any significant improvement after 12 months, but

6    after 12 months there was a statistical difference.

7      Q.    Then it says finally, even if the end or

8    follow-up study, plan three, immediately eligible group

9    had a five point higher CGAS score than the delayed

10   eligible group, this difference failed to reach

11   significance.

12          Correct?

13     A.    That's correct.  What I have to point out there,

14   is CGAS is the children's global assessment scale, and

15   not a measure of gender dysphoria or quality of life or

16   distress in body.

17     Q.    Is it a measure of a child's mental health?

18               ATTORNEY BLOCK:  Objection.

19               THE WITNESS:  It is a rough and very

20   precise measure of general functioning.

21   BY ATTORNEY BARHAM:

22     Q.    But it is the scale that this study was using.

23          Correct?

24     A.    That is correct.

```
 1              ATTORNEY BARHAM:  Let's go to tab 28.

 2                        ---

 3              (Whereupon, Exhibit 28, Article by

 4               Edwards-Leeper, was marked for

 5               identification.)

 6                        ---

 7              THE WITNESS:

 8              And to clarify the CGAS is something that

 9    is clinician rated of remedy objective criteria.

10    BY ATTORNEY BARHAM:

11         Q.    Do you want to take a break?

12         A.    In a few minutes if that's okay.

13         Q.    Are you aware of Dr. Edwards-Leeper's reputation

14    in the field?

15         A.    I am.

16         Q.    Are you personally acquainted with Dr.

17    Edwards-Leeper?

18         A.    I am.

19         Q.    Have the two of you worked together in the

20    American Psychiatric Academics Association?

21         A.    We have not worked together through the American

22    Psychiatric Association.  Dr. Edwards-Leeper is a

23    psychologist.

24         Q.    She served as a member of the task force to
```

```
 1  develop practice guidelines for working with transgender

 2  individuals?  Have you served in a similar capacity with

 3  the American Psychiatric Association?

 4      A.    I have.  And we both worked together on the

 5  WPATH standards of care provision.

 6      Q.    You anticipated my next question.  So you would

 7  agree that Dr. Edwards-Leeper is considered an

 8  international expert in this area.

 9          Correct?

10      A.    Yes.  Dr. Edwards-Leeper is a complicated figure

11  right now, but yes, she has a lot of expertise.

12          ATTORNEY BARHAM:  I want to show you what

13  we will mark as Exhibit 29.  This is Tab 29.

14                        --

15          (Whereupon, Exhibit 29, Article by

16          Edwards-Leeper, was marked for

17          identification.)

18                        ---

19          ATTORNEY BLOCK:  I imagine you have a lot

20  of questions about this next document, and I just want

21  to make sure the witness has a chance to have a bathroom

22  break if it's going to go on for ten minutes or more.

23          ATTORNEY BARHAM:  I have no objection to

24  that.
```

```
 1                    THE WITNESS:  Five minutes.

 2                    ATTORNEY BARHAM:  We will take five

 3    minutes.

 4                    VIDEOGRAPHER:  Going off the record.  The

 5    time is 12:12 p.m.

 6    OFF VIDEO

 7                              ---

 8    (WHEREUPON, A SHORT BREAK WAS TAKEN.)

 9                              ---

10    ON VIDEO

11                    VIDEOGRAPHER:  We are back on the record

12    the current time reads 12:21 p.m.

13    BY ATTORNEY BARHAM:

14       Q.    A moment ago we were discussing Dr.

15    Edwards-Leeper and you commented that she is a

16    complicated individual.

17            What did you mean by that?

18       A.    What I mean is that she has published some

19    things in popular press that have led me to be talking

20    about her here.

21       Q.    And would one of those be the document before

22    you Exhibit 29?

23       A.    That is correct.

24       Q.    This is an article published in the Washington
```

```
 1   Post by Dr. Edwards-Leeper and Dr. Anderson.

 2           Is that correct?

 3   A.     That is correct.

 4   Q.     What is it --- are there any other publications

 5   that Dr. Edwards-Leeper has written recently that caused

 6   you to describe her as a complicated figure?

 7   A.     No, no.

 8   Q.     So just this one article.

 9           Is that correct?

10   A.     Yes.

11   Q.     Are you familiar with Dr. Anderson?

12   A.     I am.

13   Q.     She is a clinical psychiatrist?

14   A.     She is a psychologist.

15   Q.     A psychologist.  And Dr. Anderson has been

16   working with transgender youth for a long time.

17           Is that correct?

18   A.     I'm not a hundred percent familiar with Dr.

19   Anderson's history, I don't know.

20   Q.     Was she in the field before you?

21   A.     I don't know.

22   Q.     Dr. Anderson is also a transgender.

23           Is that correct?

24   A.     That is correct.
```

1    Q.    Dr. Anderson is a member of the American

2   Psychological Association Committee tasked with writing

3   guidelines and working with transgender individuals.

4         Is that correct?

5   A.    I do not know.

6    Q.    Dr. Anderson is a former president of the U.S.

7   Professional Association for Transgender Health.

8         Is that correct?

9   A.    That is correct.

10   Q.    Dr. Anderson is a former board member for the

11   World Professional Association for Transgender Health.

12        Correct?

13   A.    I'm not sure.

14   Q.    Beyond the committee assignments listed on

15   page two of your CV have you held any committee

16   assignments for the USPATH or WPATH Organizations?

17   A.    Not additional committee assignments than WPATH

18   or USPATH, no.

19   Q.    In this copy published in the Washington Post

20   Dr. Edwards-Leeper and Dr. Anderson summarizes a

21   situation of a 13-year old natal girl with no prior

22   history of gender dysphoria.  Some issues of sexual

23   assault and depression and then an abrupt announcement

24   of this child of transgender identity.

```
 1              Does that summarize the scenario they outline?

 2       A.     That is the scenario they outlined.

 3                    ATTORNEY BLOCK:  Objection to form.

 4  BY ATTORNEY BARNHAM:

 5       Q.     What percent of your patients first present as a

 6  team without a prior gender dysphoria diagnosis?

 7       A.     Well, first I just want to address the scenario

 8  with Patricia, this is a popular press article, so I

 9  have no idea if Patricia is a real person or an amalgam.

10       Q.     Understood.

11       A.     I hope it's an amalgam, because it would be

12  unethical to not have consent to publish this story.

13  Whether or not a child has a diagnosis of gender

14  dysphoria before they come to see me is dependent upon

15  if they've had previous evaluations, so it's dependent.

16  I don't have a specific number for you.

17       Q.     In general, how many of your patients first

18  present as a team versus first presenting as a child?

19       A.     That is very different, depending upon which

20  cite that I was practicing at.  So in New York I saw

21  more prepubertal youth than I do in Chicago.

22       Q.     So in New York, what percent of your patients

23  first presented as adolescents versus children?

24       A.     I think I answered that question earlier.  If I
```

1    remember it was 25 percent of the 75 percent.

2        Q.    And in Chicago how many --- what percentage of

3    your patients present as adolescents versus as teen?

4        A.    Probably 90 percent during adolescence.

5        Q.    And are those all adolescents who first

6    presented as adolescents or did they first present with

7    gender dysphoria as a child?

8        A.    It's a combination of both.

9        Q.    So of your adolescent patients how many

10   presented first as an adolescent, and how many presented

11   as a child?

12       A.    I don't have that information in front of me.

13       Q.    Do you have a general ballpark idea?

14       A.    No, I mean, the question --- I guess what I'm

15   struggling with is that there are a lot of adolescents

16   who I see who presented the first as adolescent, but

17   have clear symptoms of gender dysphoria going back to

18   childhood.  So I'm not sure how to characterize those

19   children in your question.

20       Q.    What percent of the patients that present

21   themselves to you first as an adolescent are natal

22   female?

23                 ATTORNEY BLOCK:  Objection to

24   terminology.

1          <u>THE WITNESS:</u>  I would say in the clinic

2   where I'm practicing, currently certainly over half of

3   the children presenting in adolescence for the first

4   time are assigned female at birth.

5   <u>BY ATTORNEY BARHAM:</u>

6       Q.    And in New York, what percent of the patients

7   that presented to you first as an adolescent or natal

8   female?

9       A.    In New York it was more even split between those

10  assigned female and those assigned male at birth.

11      Q.    And here when you say it's more than 50 percent

12  are we talking 75 percent, we're talking 80 percent,

13  90 percent?

14      A.    I don't have that information in front of me, so

15  I couldn't tell you specifically.  It would be a guess.

16      Q.    Do you have a range?

17      A.    I don't.  I don't.  More than 50 is the closest

18  that I can get right now.

19      Q.    More than 75 percent?

20      A.    Probably not, no.

21      Q.    So somewhere between 50 and 75?

22      A.    That's a good guess.

23      Q.    What proportion of teen girls presenting at your

24  clinic have suffered sexual assault or abuse of any

1    sort?

2        A.    So if we're talking assigned females at birth,

3    is that what you mean?

4        Q.    Yes.  Natal females.

5        A.    Between one out four and one out of eight

6    assigned females at birth who do not identify as

7    transgender have exposure to sexual assault and trauma f

8    some kind.  What we know from the literature is that

9    rates of sexual assault and sexual abuse of transgender

10   youth is higher than that and my patients are relatively

11   similar to that, so probably in the order of 25 to

12   30 percent.

13       Q.    What policies do you have in place to ensure

14   adequate counseling and therapy for that trauma before

15   making any decisions regarding hormones?

16                    ATTORNEY BLOCK:  Objection to form.

17                    THE WITNESS:  Assessing co-occurring

18   psychiatric disorders or stressors or traumas is an

19   inherent part of any assessment.

20   BY ATTORNEY BARHAM:

21       Q.    Beyond just it being an inherent part of any

22   assessment, do you have any other policies or standards

23   that you use to ensure that the trauma is addressed

24   before making decisions regarding hormones?

1          ATTORNEY BLOCK:  Objection to form.

2          THE WITNESS:  I mean, I don't have a

3    written down policy.  Incorporating understanding of

4    trauma is always going to be an important part of any

5    informed assessment prior to moving forward with an

6    intervention.

7    BY ATTORNEY BARHAM:

8    Q.    Do you agree or disagree that before prescribing

9    hormones to a teen girl who has suffered sexual abuse or

10   depression, medical professionals have a responsibility

11   to confirm that the patient has received a thorough

12   mental health assessment, including investigating how

13   other mental health issues and any other changes in her

14   life might be contributing to her desire are perceived

15   transgender identification?

16          ATTORNEY BLOCK:  Objection to form and

17   terminology.

18          THE WITNESS:  So for any child regardless

19   of gender, who we are recommending a medical or surgical

20   intervention, we are assessing for the presence of

21   gender dysphoria, the presence of co-occurring

22   psychiatric disorders and their impact on that diagnosis

23   or the capacity to consent to treatment, and a clear

24   understanding of the risks, benefits and alternatives of

1    whatever that intervention may be.

2    BY ATTORNEY BARHAM:

3        Q.    So then --- and that would include investigating

4    how other mental health issues and other changes in her

5    life might be contributing to her desire or perceived

6    transgender identification?

7        A.    That is correct.

8                    ATTORNEY BLOCK:  Objection to terminology

9    and pronouns.

10   BY ATTORNEY BARHAM:

11       Q.    Do you agree or disagree that the standards of

12   care recommend mental support and comprehensive

13   assessment for all dysphoric youth before starting

14   medical interventions?

15       A.    I would agree that the current recommendations,

16   which are in the process of being updated recommend that

17   a mental health assessment be in place.  And it's not a

18   mandate that psychotherapy is a requirement prior to

19   initiation of medical care for gender dysphoria, and it

20   is not indicated for every patient.

21       Q.    And that's partly because the standards of care

22   are guidelines not mandates.

23                    Correct?

24       A.    It's mostly because of the indications for the

1   patient's best interest that psychotherapy is not a

2   requirement for folks who are otherwise doing well.

3      Q.    But it's also true that the standards of care

4   are guidelines not mandates.

5         Correct?

6      A.    That is correct.  They are guidelines.

7      Q.    On page two of this article the author is ---

8   and by this article I'm referring to tab 29.  The author

9   has indicated that a study of ten pediatric gender

10  clinics in Canada found that half do not require

11  psychological assessment before initiating puberty

12  blockers or hormones.

13       Is that your policy?

14     A.    Where is this in the article?  I don't see it.

15     Q.    The bottom of page two?

16     A.    What I want to emphasize is this is an opt ed

17  and a popular press outlet and not a study.  So I have

18  no idea where they gathered their information about this

19  or the accuracy of the statement, nor do I know what the

20  authors meant by a psychological assessment.

21     Q.    I understand.  I did not mean to imply that

22  this article Exhibit --- tap 29 is a study.  I was

23  merely quoting the authors, that a study of ten

24  pediatric gender clinics found that half do not require

```
 1   psychological assessment before initiating puberty

 2   blockers or hormones.  My question to you is, is that

 3   your policy?

 4                   ATTORNEY BLOCK:  Objection to form.

 5                   THE WITNESS:  Again, I can't speak to the

 6   accuracy of Dr. Edwards-Leeper and Dr. Anderson's

 7   description of a study that I haven't seen.

 8   BY ATTORNEY BARHAM:

 9   Q.    I'm not asking you to.  I'm asking do you have

10   --- is it your policy at your clinic that you do not

11   require psychological assessments before initiating

12   puberty blockers for hormones?

13   A.    We require psychological assessments prior to

14   initiation, yes.

15                   ATTORNEY TRYON:  Travis, it's Dave Tryon.

16   You referred to this as Tab 29, I believe you mean

17   Exhibit 29.  Is that right?

18                   ATTORNEY BARHAM:  It's both Exhibit 29

19   and Tab 29.

20   BY ATTORNEY BARHAM:

21   Q.    When patients come to you referred by a

22   pediatrician or counselor with no expertise in gender

23   dysphoria assessment or diagnosis, what policies do you

24   have to ensure that the patients receive full and
```

```
 1   adequate course of mental healthcare before prescribing

 2   life altering hormones?

 3                    ATTORNEY BLOCK:  Objection to form.

 4                    THE WITNESS:  As a mental health

 5   professional I'm not the person who is prescribing those

 6   treatments.

 7   BY ATTORNEY BARHAM:

 8      Q.    Before you recommend someone for eligibility for

 9   life-altering hormones?

10                    ATTORNEY BLOCK:  Objection to form.

11                    THE WITNESS:  Prior to making a

12   recommendation of hormone initiation I'm doing my own

13   assessment and ensuring that those standards are met.

14   BY ATTORNEY BARHAM:

15      Q.    So beyond your own assessments do you have any

16   policies that guide that process?

17      A.    Our clinic has its own policies dependent upon

18   clinical practice or whether or not patients are

19   enrolled in a particular trial, but it is the standard

20   of care as laid out by both Endocrine Society and WPATH

21   that adolescent patients have a psychological

22   assessment.  There's a lot of latitude for what that

23   actually means.

24      Q.    And on page three of this document, Exhibit 29,
```

1    the bottom of the first paragraph the authors write as a

2    result we may be harming some of the young people we

3    strive to support, people who may not be prepared for

4    the gender transitions they are being rushed into.

5              Do you share the concern of these authors?

6    A.    I don't have numbers on my end.  Which --- where

7    is it?

8    Q.    (Indicating).

9    A.    Got it.  Can you repeat the question?  Sorry.

10   Q.    The authors express concern that we may be ---

11   quote, we may be harming some of the young people we

12   strive to support, people who may not be prepared for

13   the gender transitions they are being rushed into.

14             Do you share the author's concern?

15   A.    I do not.  These are tested hypotheses that can

16   be researched, and this is not what this is.

17   Q.    You said you have no concern that people are

18   being rushed into gender transitions?

19   A.    This is a supposition by these two authors that

20   people are being rushed into gender transition.  I'm not

21   sure what that means, and that has not been the clinical

22   experience that I've had nor what the guidelines

23   recommend.

24   Q.    So you were not aware of people being rushed

1    into transitions that they are not ready for?

2        A.    That has not been my experience, no.

3        Q.    On page four towards the bottom of the page, the

4    authors reference a recent study of 100 detransitioners,

5    38 percent of whom reported that they believe their

6    original dysphoria had been caused by something specific

7    such as trauma, abuse or mental health condition.

8    Fifty-five (55) percent of whom said they did not

9    receive adequate evaluation from a Dr. Or mental health

10   professional before starting transition.

11          Are you aware of that study that authors

12   reference here?

13                    ATTORNEY BLOCK:  Object to form.

14                    THE WITNESS:   I am --- I'm assuming

15   because I think they have a footnote in here somewhere,

16   but it is not in this particular article, but they are

17   receiving to the recent 2021 Littman study

18   detransitioners.

19   BY ATTORNEY BARHAM:

20       Q.    Do you share the concern that some have been

21   misdiagnosed as transgender when their gender dysphoria

22   was, in fact, not innate, but cause by something

23   specific, such as trauma, abuse or mental health

24   condition?

1    A.    I really don't mean to parse this, but I don't

2    know what Dr. Edwards-Leeper or Dr. Anderson's concerns

3    are, but the evidence that we have from the literature

4    and from our clinical experience is that this is not a

5    broad experience of most children.

6    Q.    And what literature, are you referencing when

7    you say we referenced the literature?

8    A.    I'm referencing the literature that I cited in

9    my report.

10   Q.    And which specific portions of your report are

11   you referencing?

12   A.    Let me just take a moment.  What I'm referencing

13   is the longitudinal studies in particular that have

14   followed these kids over time.

15   Q.    And which ones would those be in your report?

16   A.    Really anything from the Dutch clinic is going

17   to have a longitudinal focus to them, but I think what's

18   more important is that in all of these studies, which

19   include some of the Dutch studies both in childhood and

20   adults that have looked at regret rates or detransition

21   have shown that this is a very infrequent occurrence,

22   and there has been nothing I've read within the

23   scientific literature that in, any way, tries to

24   operationalize this idea of children being forced into

1    or pressured into transition.

2        Q.    What steps do you take to ensure that gender

3    dysphoria, the child's --- the child's or teen's gender

4    dysphoria was not caused by something specific such as

5    trauma, abuse or mental health condition before

6    recommending someone for puberty blocking or cross sex

7    hormones?

8                    ATTORNEY BLOCK:  Objection to form.

9                    THE WITNESS:  I perform a thorough

10   evaluation.

11   BY ATTORNEY BARHAM:

12       Q.    Anything beyond the thorough evaluation?

13       A.    A very thorough evaluation.  It involves

14   multiple steps as I described earlier.

15       Q.    So this comprehensive --- the authors actually

16   talk about a comprehensive assessment on page three of

17   their article.  And they indicate that comprehensive

18   assessment and gender exploratory therapy helps ---

19   quote, helps a young person peel back the layers of

20   their developing adolescent identity and examines

21   factors that contribute to their dysphoria.  And those

22   include --- so what steps did you take to identify the

23   factors that may contribute to a child's or teen's sense

24   of dysphoria?

1              ATTORNEY BLOCK:  Objection to form.

2              THE WITNESS:  It is a thorough assessment

3    and there are multiple factors within that assessment

4    that speak to those concerns specifically.

5    BY ATTORNEY BARHAM:

6       Q.    And what are those multiple factors?

7       A.    Understanding developmental history, getting

8    multiple performance, doing the diagnostic assessment of

9    any co-occurring mental health conditions and ensuring

10   that those are adequately explored and understood.

11      Q.    What factors in a transgender identity do you

12   identify as most often contributing to gender dysphoria?

13              ATTORNEY BLOCK:  Objection to form.

14              THE WITNESS:  I think it's complicated to

15   answer that in a short way, because not every child who

16   identifies as transgender would meet diagnostic criteria

17   for gender dysphoria.  And specifically, if we agreed

18   with the premise that the gender dysphoria is being

19   caused by trauma that's specifically a rule out of the

20   diagnosis of gender dysphoria.  So that is part of what

21   we're doing in an assessment is to understand the role

22   of other potential factors in helping a kid explore and

23   understand their identity.

24   BY ATTORNEY BARHAM:

1    Q.    Then allow me to clarify the question.  What

2  factors other than an innate transgender identity do you

3  identify as most often contributing to a child's

4  transgender identification?

5                    ATTORNEY BLOCK:  Objection to form.

6                    THE WITNESS:  The children that I have

7  treated over my years of doing this work that describe a

8  gender identity that is inconsistent who don't

9  ultimately meet the criteria for gender dysphoria are

10  often children who have been subjected to multiple types

11  of trauma.  That would be one of the factors.

12  BY ATTORNEY BARHAM:

13    Q.    What other ones would you identify?

14    A.    The other factors are around parental conflicts.

15  That's probably the other large cohort of kids when

16  exploration is the full come around which parents,

17  particularly divorcing parents, are acting in conflict.

18    Q.    So by that you mean, for example one parent

19  supporting an affirmation approach and the other raising

20  concerns about proceeding in that direction?

21                    ATTORNEY BLOCK:  Objection to form.

22                    THE WITNESS:  That's not an infrequent

23  occurrence and this is a very rare outcome to that, but

24  in that cohort of patients who desist, I would say in

1   their identities that is a shared characteristic of some

2   of the patients that I have seen.

3   <u>BY ATTORNEY BARHAM</u>:

4       Q.    So you have not only two factors that could

5   contribute to a child's transgender identification,

6   other than ---?

7       A.    Can I stop you, sir?  I'm not identifying that

8   as a cause or a causal factor in a core gender identity.

9   It is the understanding and expression of that identity

10  that often changes.

11      Q.    Okay.

12           And that is why I was trying to talk about

13  transgender identification more broadly.  But you've

14  identified two factors that contribute to that not

15  necessarily causal but contribute.  Are there any others

16  that you have identified as most often contributing

17  as ---?

18      A.    Not that I have seen.

19      Q.    The authors on page three express a concern

20  about other influences that patients can be subjected

21  to, so as in these assessments patients reflect on the

22  duration of the dysphoria they feel they continue a

23  gender --- the intersection of sexual orientation, et

24  cetera, social media, internet and peer influences.

1          Do you share concerns that teens maybe misled by

2     TikTok or other social media to self diagnose as

3     transgender when, in fact, other factors have driven

4     their gender dysphoria or their transgender

5     identification?

6                    ATTORNEY BLOCK:  Objection to form.

7                    THE WITNESS:  To clarify transgender

8     isn't a diagnosis, so I'm not concerned about that

9     specifically.  And I think that's the study of all

10    phenomenon, whether or not this is occurring, but again,

11    as a part of a comprehensive gender assessment, we are

12    looking at multiple factors beyond a child's

13    self-report.

14    BY ATTORNEY BARHAM:

15         Q.   So do you share concerns that teens may be

16    misled by social media to self declare as transgender

17    when, in fact, other factors have driven their gender

18    dysphoria?

19                    ATTORNEY BLOCK:  Objection.

20                    THE WITNESS:  I would not characterize it

21    in that way.

22    BY ATTORNEY BARHAM:

23         Q.   How would you characterize it?

24         A.   I would characterize it by taking exploration of

```
 1   an identity via TikTok for what it is, as a normal

 2   process of adolescent development and having a child who

 3   self identifies as transgender as a result of seeing a

 4   video on TikTok is not going to be the child who meets

 5   the typical phenomenology that we would see with gender

 6   dysphoria.  That is part of the assessment that we are

 7   evaluating.

 8        Q.    Okay.

 9              So then in general, you don't agree with the

10   concerns that the authors raise regarding the influence

11   of social media, internet and peer influences.

12              Correct?

13        A.    I would say it's a matter of degree.  I don't

14   think social media has been a particularly healthy thing

15   for kids in general, and understanding how it impacts

16   kids is something that we all need to be learning more

17   about.

18        Q.    In the last paragraph on page three, the authors

19   talk about how the WPATH recommends collaborative

20   approach that involves parents and take into account the

21   complexities of adolescents.

22              Do you see that?

23        A.    Yes.

24        Q.    Do you understand the WPATH standards of care
```

1    for adolescents to call for a collaborative approach

2    that involves both parents whenever possible?

3        A.    There is not a specific call out within the

4    standards of care for my recollection that say both

5    parents need be involved, but that's certainly implied

6    and is the general practice to include all parents or

7    all family members who are involved in the child's life

8    whomever is going to need to be in the room in order to

9    both get a clear understanding of what's going on as

10   well as make sure the child gets the adequate support to

11   be able to thrive.

12       Q.    So is it your understanding that the WPATH

13   standards of care would allow treatment to proceed based

14   on the consent of one parent?

15       A.    As we talked about earlier, these are guidelines

16   and not mandates.  In practice within the United States

17   almost all consent processes for puberty suppression and

18   hormones go through a two parent consent process

19   whenever possible, even though that is not a requirement

20   of the law.

21       Q.    What I'm trying to get to is what is the

22   requirements of the guidelines, recognizing that the

23   guidelines are not mandatory, but do the guidelines

24   allow for treatment based on the consent of one parent?

1      A.    I think one of the limitations of an

2  international document is that there is not going to be

3  that level of specificity because consent laws are going

4  to be different from state to state, not to mention

5  country to country.

6      Q.    Okay.

7            On page two --- I'm sorry, on page three ---

8  let me clarify again.  I'm sorry I confused myself.  On

9  page two the authors write that after exploring who she

10  was --- after a year of exploring who she was, Patricia

11  no longer felt she was a boy, she decided to stop

12  binding her breasts and wearing boys clothes.

13         What proportion of those who present at your

14  clinic change their minds and decided to remain with or

15  return to the gender identity of their natal sex before

16  undergoing any hormonal treatments?

17                ATTORNEY BLOCK:  Objection to form.

18                THE WITNESS:  I'm one practitioner in my

19  clinic, so I don't have the data on everybody.  And I

20  think a lot of that is going to depend upon the

21  population that you are seeing.

22  BY ATTORNEY BARHAM:

23     Q.    What proportion of your patients then changed

24  their mind and decide to remain or return to the gender

```
 1    identity of their natal sex before undergoing any

 2    hormonal treatments?

 3                    ATTORNEY BLOCK:  Objection to form.

 4                    THE WITNESS:  I would say a minority of

 5    patients.

 6    BY ATTORNEY BARHAM:

 7        Q.    Do you have a range?

 8        A.    I don't.  I think when you were asking those

 9    questions at the beginning about my 500 transgender

10    patients in that cohort, and I think 75 percent pursued

11    some things, but being that 25 percent that didn't.

12    Somewhere in there.

13        Q.    On page five of this document, the last page the

14    authors report a rising a number of detransitioners that

15    clinicians report seeing.  Are you aware of this rising

16    number of detransitioners?

17                    ATTORNEY BLOCK:  Objection to form.

18                    THE WITNESS:  I'm aware that these two

19    authors are raising that it's a possibility.  It is not

20    something that I've seen published in the literature.

21    BY ATTORNEY BARHAM:

22        Q.    Have you seen a rising number of detransitioners

23    at your clinic?

24        A.    I think the question is whether or not the
```

1    percentage is changing and that's not an answer we know.

2    I think by definition the more people you see the more

3    folks --- the detransition you're going to see.  And the

4    difference of children who had access to gender care now

5    compared to a decade ago is just orders of magnitude

6    different.  But I don't know or there has not been any

7    evidence that I've seen that the percentage of kids who

8    detransition is any different now than it was a decade

9    ago.

10    Q.    A few paragraphs above what we were just looking

11   at, it says only a quarter of these individuals told

12   their doctors they had reversed their transitions making

13   this population especially hard to track.  Would you

14   agree that this population is difficult to track?

15                     ATTORNEY BLOCK:  Objection to form.

16                     THE WITNESS:   Again, this is not a study

17   and so it's hard to kind of make a pronouncement about a

18   population without a defined understanding of what that

19   population actually is.  Our folks who don't talk to

20   their medical professionals about dissatisfaction in

21   their care, a difficult population to treat, I think,

22   probably by definition that is true.

23   BY ATTORNEY BARHAM:

24    Q.    And to be clear, I wasn't asking if they're

1    difficult to treat, I was just asking would you agree

2    they're difficult to track?

3        A.    I think by definition, yes, if they are not

4    reaching out to their providers or dropping out of

5    studies, yes.

6        Q.    The next to last paragraph of this article

7    begins by saying the pressure by activists, medical and

8    mental health providers along with a national LGBT

9    organizations to silence the voices of detransitioners

10   and sabotage the discussion around what is occurring in

11   the field is unconscionable.  Do you agree that it is

12   concerning that certain organizations are seeking to

13   silence the voice of detransitioners?

14                ATTORNEY BLOCK:  Objection to form.

15                THE WITNESS:  It is not my experience

16   that organizations are seeking to silence the voices of

17   folks who identify as detransitioners, no.

18   BY ATTORNEY BARHAM:

19       Q.    If they were would you agree that that is

20   unconscionable?

21                ATTORNEY BLOCK:  Objection to form.

22                THE WITNESS:  My job as a psychiatrist

23   and a child psychiatrist in particular is to understand

24   the kid who is sitting in front of me in that very

1  moment.  I want to understand how to best meet their

2  needs.  So anything that is going to interfere with me

3  being able to understand that is going to be a problem

4  for me.

5             ATTORNEY BARHAM:  I'm going to show you

6  what we will mark as Exhibit-30.  This is also Tab 30.

7                          ---

8             (Whereupon, Exhibit-30, Interview by Lisa

9             Selin Davis, was marked for

10            identification.)

11                          ---

12 BY ATTORNEY BARHAM:

13    Q.    This is an interview written up by Lisa Selin

14 Davis of Quillette entitled Trans Pioneer Explains her

15 Resignation from the U.S. Professional Association for

16 Transgender Health, published at the beginning of 2022.

17 Are you familiar with this article?

18    A.    I am not.

19    Q.    I'm going to direct your attention to

20 page three.  This is an interview with Dr. Anderson, the

21 same individual who is a co-author of the Washington

22 Post article we were just discussing.

23            Correct?

24    A.    That is correct.

1     Q.    On page three Dr. Anderson states, the data are

2  very clear that adolescent girls are coming to gender

3  clinics in greater proportion than adolescent boys and

4  this is a change in the last couple of years and it's an

5  open question, what do we make of that.  We really don't

6  know what's going on and we should be concerned about

7  it.  Does her experience match your experience?

8                     ATTORNEY BLOCK:  Objection to form.

9                     THE WITNESS:  I think it's consistent in

10  the literature that we've seen more assigned females at

11  birth presenting for care than in the past.

12  BY ATTORNEY BARHAM:

13     Q.    And have you seen this change in balance since

14  approximately 2015?

15     A.    I don't know if I would say --- I could point to

16  one specific year, but with each year it seems like

17  that's --- I think probably that's when the data came

18  out that that demonstrated it.

19     Q.    When do you recall beginning to see this trend

20  develop?

21     A.    I think one of the challenges is that the scope

22  of the literature is limited to a few very specific

23  subsets of where clinical care is practiced, and so we

24  have to just be careful not to completely generalize.

1   So in these specific clinics what we have seen is a

2   preponderance and an increase of assigned females at

3   birth.  I can't speak to this being a national

4   phenomenon, but the literature probably certainly all

5   points in that direction.  I think personally for me I

6   just started to see more assigned females at birth

7   presenting in adolescence I think in the mid 2010s is

8   not unreasonable.

9       Q.    Is there any test in scientific understanding as

10  to why this trend in the literature is developing?

11      A.    There is not.

12      Q.    Do you agree that this is something that

13  practitioners should be very concerned about before

14  agreeing to administer sterilizing cross sex hormones to

15  teen girls?

16                  ATTORNEY BLOCK:  Objection to form.

17                  THE WITNESS:  The thing that's important

18  is what are the specific factors of the child in the

19  family that is sitting in front of you and how to ensure

20  that that child has gotten appropriate care and that

21  we're making a recommendation based upon the best

22  interest of that individual child that is irrespective

23  of population-based changes that are happening.

24  BY ATTORNEY BARHAM:

1    Q.    Don't you need to assess though whether the

2   individual in front of you is exemplar of that national

3   --- of that trend in the literature?

4    A.    That's where --- that's where an assessment

5   comes in.

6    Q.    So you would agree then that practitioners

7   should be concerned about this trend before deciding to

8   administer hormones.

9         Correct?

10        ATTORNEY BLOCK:  Objection to form.

11        THE WITNESS:  What I'm stating is that

12  the guidelines for what's involved in assessment have

13  been relatively clear and that we want to make the

14  decisions based upon what's in the best interest and

15  understanding of the patient and family that we are

16  seeing.  We should always be concerned.  We should

17  always be building up our understanding of the field, as

18  well as some of the epidemiology of the field.  But that

19  doesn't change the individual experiences of the patient

20  and the family that we're meeting with.

21  BY ATTORNEY BARHAM:

22   Q.    Okay.

23        At the bottom of page four Dr. Anderson says

24  that she is, quote, worried that there is a new group of

1    adolescents who have preexisting mental health problems

2    and are looking for an explanation about who they are.

3    And there's a bit of I would say fantasy about seeking

4    to form an identity that may then explain their

5    distress.  You would agree that the adolescent years can

6    be distressing for many teens, whether they are

7    transgender or not.

8         Correct?

9              ATTORNEY BLOCK:  Objection to form.

10             THE WITNESS:  I would wholly agree with

11   that, yes.

12   BY ATTORNEY BARHAM:

13   Q.    Do you share the concern that some teens who

14   present at clinics are indulging in a fantasy about what

15   a transgender identity will do for them and their

16   distress?

17   A.    I would not put it in that way, no.

18   Q.    As part of your assessment do you have to --- as

19   part of your thorough assessment do you have to assess

20   whether the teen is incorrectly assessing what a

21   transgender identity would do for them and their

22   distress?

23   A.    A part of any formed --- informed consent

24   process is assessing the understanding of the child and

1    the family's understanding of the risks, benefits and

2    alternatives of that specific intervention.  That would

3    include an unrealistic belief about what the potential

4    benefits may be.

5         Q.    All right.

6              I want to go to page five of this document.

7    Dr. Anderson indicates earlier today I talked to some

8    parents who brought their child to a health

9    professional.  The child is seen three times by a

10   therapist and then recommended for hormones.  The

11   therapist never talked to the parents.  Do you share her

12   concern that three sessions with a mental health

13   providers is far less than required before a competent

14   diagnosis of a durable transgender identity can be made?

15                     ATTORNEY BLOCK:  Objection to the form.

16                     THE WITNESS:  I would not.  The objection

17   as I read it in this article that you've put in front of

18   me with the interview with Dr. Anderson, her concern

19   seems to be more about not having spoken to the parents

20   prior to the recommendation.  And I can't take her word

21   for it that this was true.  We hear a lot of things from

22   parents who express frustration with care that is

23   ultimately found not to be accurate.

24   BY ATTORNEY BARHAM:

1    Q.    Would you share the concern that prescribing

2  hormones if one parent is strongly opposed to it is

3  creating a likelihood of family conflict that is going

4  to likely be destabilizing and harmful to the child?

5              ATTORNEY BLOCK:  Objection to the form.

6  Are you referencing something in the article or is this

7  your own question?

8              ATTORNEY BARHAM:  I am referencing

9  page six, where Dr. Anderson says you don't want to rush

10  ahead with a kid, giving them encouragement that they're

11  going to get hormones until we bring their parents

12  along.  Battling the parents is a no win proposition.

13  BY ATTORNEY BARHAM:

14    Q.    So just to be clear about the question do you

15  share the concern that prescribing hormones if one

16  parent is strongly opposed is likely creating the

17  likelihood of family conflict that may be separately

18  destabilizing and harmful to the child?

19              ATTORNEY BLOCK:  Objection to the form

20  and foundation.

21              THE WITNESS:  What I hear Dr. Anderson's

22  concern from this is that battling with parents is a

23  no-win proposition.  I think that's different from

24  recommending a treatment that not all parents agree to.

```
 1    I think it's about the work of psychotherapy, which
 2    involves understanding and hearing parents' experiences
 3    and objections.
 4    BY ATTORNEY BARHAM:
 5        Q.    Do you think that prescribing hormones if one
 6    parent is strongly opposed is likely creating family
 7    conflict that may be separately destabilizing and
 8    harmful to the child?
 9        A.    I can't answer that question without a specific
10    family scenario in front of me.  I have seen the
11    opposite be the case where the conflict is the creation
12    of the lack of consensus as opposed to the other way
13    around.  And I've seen kids in my experience treating
14    kids who had parents who have opted out of any
15    decisional capacity and the kid's medical care but
16    nevertheless do much better when given access to this
17    care.
18        Q.    But it is also possible that prescribing
19    hormones over the objection of one parent can create
20    conflict within the family.
21            Correct?
22                ATTORNEY BLOCK:  Objection to the form.
23                THE WITNESS:  Understanding the impact of
24    any intervention is a part of that consent process.
```

1    BY ATTORNEY BARHAM:

2        Q.    I'm just asking if that's a possible outcome?

3        A.    Yes.

4        Q.    All right.

5              Is it your opinion that it's unreasonable to

6    exclude from female teams biological males, and by that

7    I mean people with XY chromosomes, who have gained a

8    physiological advantage as a result of undergoing male

9    puberty?

10       A.    This is outside of the scope of what I was

11   providing my testimony on.

12       Q.    Well, in paragraph 52 of your report you say no

13   reasonable mental health professional could think the

14   act in question is anything but harmful to the mental

15   health of transgender youth and that preventing

16   transgender youth from participating in the same

17   activities as their peers undermines their ability to

18   socially transition and prevents transgender youth from

19   accessing important educational and social benefits.

20             So I'm asking you is it your opinion that it's

21   unreasonable to exclude from female teams biological

22   males who have gained a physiological advantage as a

23   result of undergoing male puberty?

24             ATTORNEY BLOCK:  Objection to form and

1  scope.

2          THE WITNESS:  Again, I can testify to the

3  mental health aspects of exclusion.  I can't testify to

4  the endocrinologic changes of the physiologic changes in

5  sports specifically.

6  BY ATTORNEY BARHAM:

7     Q.    I'm not asking you to testify to the

8  endocrinology aspects of this.  I'm just asking is it

9  your opinion that if we assume that an individual has

10  gained physiological advantage as a result of undergoing

11  male puberty that it is still unfair to --- or

12  unreasonable to exclude them from competing on a women's

13  team?

14          ATTORNEY BLOCK:  Objection to form and

15  scope.

16          THE WITNESS:  That is not an assumption I

17  feel comfortable making.

18  BY ATTORNEY BARHAM:

19     Q.    Well, if you say that it is no reasonable mental

20  health professional can say that this Act is anything

21  but harmful to the mental health of transgender youth

22  that doesn't depend upon whether the child has undergone

23  male puberty or not.

24          Is that correct?

1    A.    That is correct.

2    Q.    So even if the child --- even if the individual

3  has undergone male puberty you're saying that no

4  reasonable mental health professional could think that

5  the Act is anything but harmful, barring them from

6  competing on the women's team is anything but harmful.

7          Is that correct?

8    A.    I would say exclusion and isolation from access

9  to same aged peer activities is likely to be harmful

10 from a mental health perspective.

11   Q.    To what extent can puberty blockers started

12 late, such as age 14, unring the bell by reversing

13 physical changes in male puberty?

14          ATTORNEY BLOCK:  Sorry, I can't hear the

15 questions.

16 BY ATTORNEY BARHAM:

17   Q.    To what extent do puberty blockers started late,

18 for example age 14, unring the bell by reversing the

19 physical changes of male puberty?

20          ATTORNEY BLOCK:  Objection to form and

21 scope.

22          THE WITNESS:  It is a complicated

23 question that is best left to an endocrinologist to

24 answer.

1  BY ATTORNEY BARHAM:

2      Q.   Can puberty blockers reverse the physical

3  changes of male puberty to the genitals?

4                  ATTORNEY BLOCK:  Objection to form and

5  scope?

6                  THE WITNESS:  It's the same answer.  I

7  would defer to an endocrinologist on that response.

8  BY ATTORNEY BARHAM:

9      Q.   Can puberty blockers reverse the physical

10  changes to the hair?

11                  ATTORNEY BLOCK:  Same objections.

12                  THE WITNESS:  Again, I would defer to an

13  endocrinologist.

14  BY ATTORNEY BARHAM:

15      Q.   Can they reverse the physical changes to the

16  voice or the muscles?

17                  ATTORNEY BLOCK:  Same objections.

18                  THE WITNESS:  Same answer.

19  BY ATTORNEY BARHAM:

20      Q.   Can they reverse the effect --- the physical

21  changes of male puberty to the heart or lung size?

22                  ATTORNEY BLOCK:  Same objection.

23                  THE WITNESS:   Same answer.

24  BY ATTORNEY BARNHAM:

1    Q.    Isn't it true that puberty blockers just stop

2    further typical male development?

3                    ATTORNEY BLOCK:  Same objections.

4                    THE WITNESS:  I would --- I would give

5    two responses.  One, I would want an endocrinologist to

6    weigh in on the specifics, but clearly puberty blockers

7    are also prescribed to folks assigned females at birth

8    as well.  There's more than just impacts on testosterone

9    as a result of these medications.

10   BY ATTORNEY BARHAM:

11   Q.    I understand, but you make recommendations for

12   whether people are eligible to receive puberty blocking

13   hormones.

14          Is that correct?

15   A.    That is correct.

16   Q.    So you have to have some understanding of the

17   effects of these medications.

18          Is that correct?

19   A.    That is correct.

20   Q.    So isn't it true that puberty blockers

21   administered to natal males should stop further typical

22   male development?

23                    ATTORNEY BLOCK:  Objection to form and

24   scope.

1          THE WITNESS:   I'd have the same answer,

2   and they do more than that.

3   BY ATTORNEY BARNHAM:

4      Q.    What else do they do?

5      A.    Again, I would defer to the endocrinologist for

6   the specific pathophysiology of how GnRH analogs affect

7   a complicated physiology of the body.

8      Q.    But what is your understanding of how they

9   affect because you said they also do other things?

10          ATTORNEY BLOCK:  Objection to form and

11   scope.

12          THE WITNESS:   I think I answered it.   In

13   the GnRH analogs are given an anatomic manner compared

14   to the pulsatile way in which GnRH is released during

15   the puberty, which is what causes the suppression of

16   other hormones more than just testosterone and estrogen.

17   BY ATTORNEY BARNHAM:

18      Q.    If puberty blocking hormones are administered to

19   a natal male, do they cause that individual to undergo

20   typically female pubertal development?

21          ATTORNEY BLOCK:   Objection to form and

22   scope.

23          THE WITNESS:   They do not.

24   BY ATTORNEY BARHAM:

1      Q.    So they just stop further male development.

2            Correct?

3                      ATTORNEY BLOCK:  Same objections.

4                      THE WITNESS:  As kind of a Gestalt pithy

5      response, yes, they cause puberty for assigned females

6      at birth and assigned males at birth who are given these

7      medications.

8      BY ATTORNEY BARNHAM:

9      Q.    When does puberty typically begin in biological

10     males?

11                     ATTORNEY BLOCK:  Same objections.

12                     THE WITNESS:  Those are very known data

13     that an endocrinologist could tell you.

14     BY ATTORNEY BARHAM:

15     Q.    I'm sure, though, that as a psychiatrist you

16     have a general understanding of what ages puberty

17     typically begins in biological males?

18                     ATTORNEY BLOCK:  Same objections.

19                     THE WITNESS:  I do, however, I am

20     assessing individuals who come through my office.  And

21     regardless of what the population says about when

22     puberty is typical, it's going to depend upon who that

23     individual child is and when they develop puberty.

24     BY ATTORNEY BARHAM:

1     Q.     I understand, but my question isn't about an

2  individual.  My question is when does it typically begin

3  in biological males.

4                    ATTORNEY BLOCK:  Same objections.

5                    THE WITNESS:  Again, this is a very

6  knowable fact-based answer in a population level.  It's

7  not information I have in front of me.

8  BY ATTORNEY BARHAM:

9     Q.     So you have no --- is it your testimony that you

10  have no information as to when puberty typically begins

11  in biological females?

12                    ATTORNEY BLOCK:  Can I just give a

13  standing objection to questions asking the witness about

14  the effects --- the endocrinology effects of blockers

15  and hormones, so I don't have to make an objection each

16  time?

17                    ATTORNEY BARHAM:  Yes.

18                    THE WITNESS:  My testimony is I don't

19  want to give an imprecise answer for a question that

20  there is a specific answer to.

21  BY ATTORNEY BARHAM:

22     Q.     What is your understanding, as you sit here

23  today, as to when puberty typically begins in males?

24     A.     The range for typical puberty in males tends to

 1    be around the 12ish mark.  But there is a broad

 2    variability.  And again, there is an answer that exists

 3    for this question that I don't have in front of me.

 4         Q.    Are you familiar with Tanner stages of puberty?

 5         A.    I am.

 6         Q.    What are the different Tanner stages of puberty?

 7         A.    Tanner stages one through five are the different

 8    Tanner stages.

 9         Q.    So what is Tanner stage one in biological males?

10         A.    It depends upon if we're talking about genitalia

11    or chest development, but it's no pubertal changes,

12    so ---.

13         Q.    And what is two?

14         A.    Two is at the initial stages of pubertal changes

15    that you start to see.  The specifics of the Tanner

16    staging is something that you need to be trained on.  I

17    would not claim myself as an expert in being able to

18    accurately access the Tanner stage of a child.

19         Q.    Do you know when --- at what ages Tanner Stage 2

20    typically initiates in biological males?

21         A.    Again, it's going to be an individualized

22    experience and that's why we do assessments.

23         Q.    Do you have a range, an age range as to when it

24    typically begins?

1    A.    When we talk about the onset of puberty, we're

2    talking about Tanner stage two typically.

3    Q.    And at what age do those typically arise?

4    A.    For assigned males at birth or assigned females?

5    Q.    For biological males.

6                ATTORNEY BLOCK:  Objection to

7    terminology.

8                THE WITNESS:  So for folks assigned male

9    at birth, again, we're going to see it in that 12-ish

10   range.

11   BY ATTORNEY BARHAM:

12   Q.    And Tanner Stage 3, what is that?

13   A.    Further development.  There's tables and charts

14   you would have to look at.  I'm not going to be able to

15   use language to describe it in an accurate way.

16   Q.    And when --- approximately when, what age range

17   does Tanner Stage 3 begin in biological males?

18   A.    That's not an answer that I can give you.

19   Q.    And what is Tanner Stage 4?

20   A.    The same answer is further progression of

21   pubertal changes.

22   Q.    And do you know what age range that typically

23   begins in biological males?

24   A.    Same answer as before.  That's not an answer I

1  have here.

2      Q.    And would the same answers hold true for Tanner

3  Stage 5?  Is that a yes?

4      A.    That's a yes.  I forgot that nodding ---.

5      Q.    Yes.  You've been pretty good today.  I've been

6  impressed.

7            Doesn't the position that allowing biological

8  males to play on a girls team if they blocked puberty

9  before it begins create pressure for parents and

10  children to make puberty blocking decision at a young

11  age?

12                    ATTORNEY BLOCK:  Objection to form.

13  BY ATTORNEY BARHAM:

14      Q.    Sort of put them in a now or never situation?

15      A.    Of those 500 patients that I have seen, that has

16  never come up as a concern.

17      Q.    The athletic issue has never come up as a

18  concern?

19      A.    It has not.

20      Q.    Do you think it would --- as a practitioner in

21  the field do you think it would even be ethical for the

22  State of West Virginia to structure its law in a way

23  that puts now or never pressure on parents and children

24  who are dealing with gender dysphoria to decide at an

```
 1   early age whether to stop the natural development of

 2   puberty?

 3                    ATTORNEY BLOCK:  Objection to form.

 4                    THE WITNESS:  As a child psychiatrist in

 5   this field we're doing individual-based assessments with

 6   the children and families that are in front of us.  And

 7   what that means in the context of this question is that

 8   we are assessing all of their different activities,

 9   interests and working with all the systems that we can

10   to ensure a safe and appropriate set of decisions that

11   are going to lead to the best outcomes for this

12   individual child and not a medical emphasis that is

13   outside of the scope that I can answer.

14   BY ATTORNEY BARHAM:

15        Q.    But you're familiar with the ethical standards

16   of your field.

17              Is that correct?

18        A.    I am, yes.

19        Q.    Under those ethical standards would it be

20   ethical for the State to structure its law in a way that

21   puts this kind of now or never pressure on parents and

22   children?

23                    ATTORNEY BLOCK:  Objection to form.  Also

24   the witness is in shadow.  I can't really see him for
```

```
 1    the camera.

 2                    THE WITNESS:  Is that better?

 3                    ATTORNEY BLOCK:  Yes.

 4                    THE WITNESS:  Can you repeat the

 5    question?  I'm sorry.

 6    BY ATTORNEY BARHAM:

 7        Q.   As someone familiar with the ethical standards

 8    of psychiatry, do you think it would be ethical for the

 9    State of West Virginia to structure its law in a way

10    that puts now or never pressure on parents and children

11    who are dealing with gender dysphoria to decide at an

12    early age whether to stop the natural development of

13    puberty?

14                    ATTORNEY BLOCK:  Objection to form.

15                    THE WITNESS:  I mean that's a question

16    that has a testable hypothesis.  Does X intervention

17    lead to this kind of pressure?  That's not a study that

18    I've ever seen nor has it been my clinical experience

19    that it's been the case.

20    BY ATTORNEY BARHAM:

21        Q.   Would it be ethical to put that kind of pressure

22    on someone under the ethical standards of the field of

23    psychiatry?

24                    ATTORNEY BLOCK:  Objection to form and
```

1    foundation?

2                    THE WITNESS:  It is a very theoretical

3    question that really doesn't enter into it when we are

4    one on one with these kids and their families.

5    BY ATTORNEY BARHAM:

6       Q.    I'm not asking about one on one interactions

7    with kids and families.  I'm asking in general in theory

8    is it ethical to put that kind of pressure on someone?

9                    ATTORNEY BLOCK:  Objection to form and

10   foundation.

11                   THE WITNESS:  I'm sorry I can't give a

12   better answer, but ensuring that a child is making a

13   decision without coercion is a part of the informed

14   consent process.

15   BY ATTORNEY BARHAM:

16      Q.    Is it your opinion that it is unreasonable to

17   exclude from female teams biological males who begin

18   undergoing male puberty but are now on puberty blockers?

19                   ATTORNEY BLOCK:  Objection to form and

20   scope.

21                   THE WITNESS:  Can you repeat the

22   question?

23   BY ATTORNEY BARHAM:

24      Q.    Is it your opinion that it is unreasonable to

1    exclude from female teams biological males who begin

2    undergoing male puberty but are now on puberty blockers?

3        A.    Is it unethical is the question?

4        Q.    Unreasonable.

5        A.    Unreasonable.  I would defer to kind of our

6    physiology and endocrinology experts and our medical

7    ethics experts in rendering an opinion on that

8    specifically.

9        Q.    Is it your opinion that it is harmful to youth's

10   mental health to be excluded from female teams

11   biological males who begin undergoing male puberty but

12   are now on puberty blockers?

13       A.    What I would say is that exclusion as well as

14   specific legal exclusion from activities of same-aged

15   peers is likely to be harmful for a kid's mental health.

16       Q.    Now, the Act in question does not prevent a

17   biological male who has gender dysphoria from competing

18   on the boys team.

19            Is that correct?

20            ATTORNEY BLOCK:  Objection to form and

21   scope.

22            THE WITNESS:  I'd need to know specifics.

23   I don't know what you're referring to.  I think lots of

24   people have different policies around how this actually

1    works.

2    BY ATTORNEY BARHAM:

3        Q.    I'm asking your understanding of the statute

4    upon which you're opining.

5        A.    Can you repeat the question, please?

6        Q.    The Act in question does not prevent a

7    biological male who is experiencing gender dysphoria

8    from competing on the boys team.

9             Correct?

10                ATTORNEY BLOCK:  Objection to form and

11   scope.

12                THE WITNESS:  So one, I don't know what

13   biological male necessarily means.

14   BY ATTORNEY BARHAM:

15       Q.    An individual with XY chromosomes, natal male?

16       A.    So assigned male at birth can have a number of

17   reasons why they might not be able to play on the boys

18   team, including intensity of gender dysphoria.

19       Q.    But the law does not prevent them from playing

20   on the boys team.

21             Correct?

22       A.    From my read of the law it does not prevent them

23   from playing on the boys team.  Again, from a mental

24   health perspective, their gender dysphoria may.

1    Q.    So is it harmful to the mental health of a

2   biological male who is experiencing gender dysphoria to

3   be excluded from the women's team even if he is on

4   puberty blockers?

5                     ATTORNEY BLOCK:  Objection to form and

6   terminology.

7                     THE WITNESS:  Any potential exclusions

8   from a peer-appropriate activity has the potential to

9   have negative consequences on the mental health of that

10   girl.  And again, that's going to be something that on

11   an individual basis we are assessing.

12   BY ATTORNEY BARHAM:

13    Q.    And that would be irrespective of whether the

14   individual is on puberty blockers, begins to undergo

15   male puberty or not.

16          Correct?

17    A.    An individual assessment is going to be

18   inherently tailored to wherever an individual is.

19                     ATTORNEY BARHAM:  Why don't we pause for

20   lunch?

21                     ATTORNEY BLOCK:  Let's go off the record.

22                     VIDEOGRAPHER:  Going off the record.  The

23   current time reads 1:24 p.m.

24   OFF VIDEOTAPE

```
 1                              ---

 2   (WHEREUPON, A SHORT BREAK WAS TAKEN.)

 3                              ---

 4   ON VIDEOTAPE

 5                   VIDEOGRAPHER:  Back on the record.  The

 6   current time reads 1:53 p.m.

 7   BY ATTORNEY BROOKS:

 8     Q.    What does puberty suppression or puberty

 9   blockers do?

10                   ATTORNEY BLOCK:  Objection to form and

11   scope.

12                   THE WITNESS:  I think I answered that

13   question before.  So they suppress the endogenous

14   release of testosterone and estrogen as well as some

15   other hormones.

16   BY ATTORNEY BARHAM:

17     Q.    How does puberty suppression differ from cross

18   sex hormones?

19                   ATTORNEY BLOCK:  Same objection.

20                   THE WITNESS:  Totally different

21   medication.  One suppress hormones and the other is a

22   direct hormone itself.

23   BY ATTORNEY BARHAM:

24     Q.    So cross sex hormones are given with the
```

```
 1   intention of causing development typical to the other

 2   sex.

 3           Correct?

 4      A.    It depends upon the context in which hormones

 5   are used.  And again, I would defer for my endocrinology

 6   colleagues on the specifics.

 7      Q.    So if cross sex hormones are given to a natal

 8   male as part of treatment for gender dysphoria, what is

 9   the intention?

10           ATTORNEY BLOCK:  Objection to form.

11           THE WITNESS:  As I understand it, if an

12   assigned male at birth is given cross sex hormones that

13   is estrogen in order to provide the effects of estrogen

14   on the body.

15   BY ATTORNEY BARHAM:

16      Q.    And the effects of estrogen on the body are what

17   natal females would naturally experience as a result of

18   puberty.

19           Correct

20      A.    I mean, that is correct, yes.

21      Q.    And so if a natal female is given cross sex

22   hormones, she's being given testosterone to create the

23   effects that natal males would naturally experience

24   through puberty.
```

1          Correct?

2     A.    Typically speaking, an assigned female at birth

3   is going to be receiving testosterone and will have the

4   subsequent effects as a result of having testosterone in

5   the bloodstream.

6     Q.    Maybe I was confused, a natal male who is given

7   cross sex hormones?

8     A.    You were right.

9     Q.    I was right, okay.  At what Tanner stage do you

10  recommend that a patient begin puberty blocker hormones?

11    A.    Again, that's going to depend upon an

12  individualized assessment with the family, but never

13  before Tanner Stage 2 of puberty.

14    Q.    And in what age does Tanner Stage 2 begin again?

15              ATTORNEY BLOCK:  Asked and answered.

16              THE WITNESS:  I think I answered that

17  question.  It really depends upon the person.

18  BY ATTORNEY BARHAM:

19    Q.    And typically ---.

20    A.    And for an assigned male at birth we're talking

21  12-ish, but again I would refer to my endocrinology

22  colleagues on the specific dates.

23    Q.    And through what Tanner stage do you recommend

24  that a patient remain on puberty blockers?

1    A.    That's not a question I can speak to.  That's a

2  question for the physician or provider who's prescribing

3  that specific medication.

4    Q.    So after you recommend that a patient receive

5  puberty blocking hormones, what is your continuing

6  involvement in the puberty blocking process?

7    A.    My continuing involvement really depends upon

8  the individual child and family for the sake of a mental

9  health assessment.  For the initiation of puberty

10  suppression it's an assessment for the initiation of

11  puberty suppression.  The involvement thereafter is

12  really dependent upon what the individual needs of that

13  child are.

14    Q.    Do you play any role in continuing to advise

15  whether the patient can continue to receive puberty

16  blocking hormones or come off of them?

17    A.    It really depends upon the context.  If the

18  child is seeking to come off of puberty suppression

19  because of a shift in their understanding of their

20  identity, certainly that's a conversation that I would

21  be involved in.  If they are coming off of puberty

22  suppression because they have a sufficient amount of

23  testosterone or estrogen in their system that they are

24  no longer requiring that from a medical purpose, that's

1    not a discussion that I'm privy to.

2        Q.    When you are discussing puberty blockers with

3    patients and their parents do you describe them as

4    placing a pause on puberty?

5        A.    That's not specific language that I use.

6        Q.    Do you describe them as being reversible?

7        A.    Again, that's not a language that I use.  I'm

8    much more specific in my discussions.

9        Q.    So on the issue of whether puberty blocking

10   hormones are reversible, what do you tell parents and

11   patients?

12       A.    I would say, by and large, most of the effects

13   of puberty suppression are reversible.

14       Q.    And when you say by and large what effects are

15   you referencing?

16       A.    What I'm referencing is that the literature is

17   still an open book and we are constantly seeking and

18   learning new information.  We want to understand what

19   those potential new data tell us about the efficacy,

20   safety, et cetera, of these interventions.

21       Q.    So when you say they are by and large the

22   effects are reversible, which effects are you

23   referencing are the by and large?

24       A.    When I say by and large, it's really a caveat to

1   allow for the things that we don't yet know.

2       Q.    So which effects are reversible?

3       A.    Virtually all of the effects that we're aware of

4   are reversible.

5       Q.    When you're discussing puberty blockers with

6   patients and their parents do you describe them as safe?

7       A.    Safe isn't a binary concept in my world.  There

8   is no such thing as anything that is completely safe or

9   unsafe.  So we talk about gradations of risk with any

10  intervention.

11      Q.    So for puberty blockers what are the --- what's

12  the gradation of risk?

13      A.    It is individualized to the specific needs of

14  the child and the family.

15      Q.    In general, what is your understanding of the

16  gradations of risk across the board?

17                  ATTORNEY BLOCK:  Objection to form.

18                  THE WITNESS:  I don't have a better

19  answer for you because that's the whole process of doing

20  an informed consent process, is understanding what are

21  the specific risks and benefits and alternatives for

22  that individual child.

23  BY ATTORNEY BARHAM:

24      Q.    Are you aware of the literature regarding any

1   testing of puberty blocking hormones and the gradations

2   of risks presented in those tests?

3        A.    I'm not sure what you mean by tests.

4                  ATTORNEY BLOCK:  Objection to form.

5                  THE WITNESS:  I'm not sure what you mean

6   by testing.

7   BY ATTORNEY BARHAM:

8        Q.    Don't medications undergo testing before they

9   can be used?

10       A.    There's a wide variety of processes by which

11  medications are approved or not approved for certain

12  indications.

13                 ATTORNEY BARHAM:  Let's go to Tab 5.  I

14  believe that's Exhibit-2.

15                 LAW CLERK WILKINSON:  Exhibit-2.

16  BY ATTORNEY BARHAM:

17       Q.    It's the Endocrine Society Guidelines from 2017.

18                 THE WITNESS:   Yes.

19  BY ATTORNEY BARHAM:

20       Q.    On page 3880 the Endocrine Society states we

21  suggest that clinicians begin pubertal hormone

22  suppression therapy --- pubertal hormone suppression

23  after girls and boys first exhibit physical changes of

24  puberty, Tanner stages G-2/B-2.  Is that consistent with

```
 1    your practice?

 2                    ATTORNEY BLOCK:  Objection to form.

 3                    THE WITNESS:   This is --- the document,

 4    as I read it, is a set of guidelines for the practice of

 5    care that should be individually applied to each child

 6    and family.  My practice takes these recommendations and

 7    individually applies them to the specific risks,

 8    benefits and alternatives for the child sitting in front

 9    of me.

10    BY ATTORNEY BARHAM:

11       Q.    On the prior page in number 1.4 the Endocrine

12    Society recommends against puberty blocking and gender

13    affirming hormone treatment in prepubertal children.  Do

14    you approve the use of puberty blockers before puberty?

15       A.    I do not.

16       Q.    You didn't recommend or prescribe any puberty

17    blockers for BPJ.

18             Is that correct?

19       A.    I have not.

20       Q.    You did not evaluate BPJ before he started

21    taking puberty blockers.

22             Is that correct?

23       A.    I have not evaluated her or seen her, these

24    materials.
```

1    Q.    Is it your opinion that no responsible clinics

2    begin puberty blocking before puberty begins?

3                   ATTORNEY BLOCK:  Objection to form and

4    scope.

5                   THE WITNESS:  There's no indication to

6    start puberty blocking agents until Tanner Stage 2.

7    BY ATTORNEY BARHAM:

8    Q.    Isn't it true that there have been no Phase I

9    clinical trials to test the safety of GnRH inhibitors

10   for this age group?

11   A.    That is my understanding, but I would have to

12   specifically review the literature with that question in

13   mind.  I'm not familiar --- completely familiar with the

14   phased nomenclature in this context.

15   Q.    Isn't it true that there have been no Phase I

16   clinical trials to test the safety of GnRH inhibitors

17   for this duration?

18   A.    Again I would need to find a definition of what

19   you are referring to by Phase I specifically.

20   Q.    Isn't it true there have been no clinical trials

21   per FDA rules for this use of puberty blockers?

22   A.    I don't know what is meant by per FDA rules.

23   Q.    Food and Drug Administration rules?

24   A.    Yeah.  I'm not familiar with what their rules

1    are.  There have been clinical trials of these

2    medications for this purpose.

3         Q.    Which clinical trials are you referencing?

4         A.    There are clinical trials through the Dutch

5    clinic.  There is also an ongoing clinical trial here in

6    the U.S., a multi-phase study.

7         Q.    That study is still ongoing.

8              Correct.

9         A.    That is correct.

10        Q.    So there are no completed clinical trials in the

11   United States under FDA rules.

12             Correct?

13        A.    I am not ---.

14                  ATTORNEY BLOCK:  Objection to the form.

15                  THE WITNESS:  I can't say that I'm

16   familiar with all clinical trials that have ever

17   happened, so that's not a statement I can answer.

18   BY ATTORNEY BARHAM:

19        Q.    You're not aware of any, though?

20        A.    I don't know what is meant by Phase I and what

21   specifically is registered with the FDA for their

22   purposes versus the copious numbers of clinical trials

23   that have happened.

24        Q.    Are you aware of any clinical trials in the

1    United States that have been completed regarding the

2    safety of using puberty blockers for gender dysphoria?

3                    ATTORNEY BLOCK:  Objection to form.

4                    THE WITNESS:  Yeah, I'm not sure how I

5    can answer that because I'm not aware of all of the

6    trials that have occurred.

7                    ATTORNEY BLOCK:  Counsel, can we have a

8    discussion about the scope of this deposition?  I'm

9    happy to have it off the record.  I don't want it to

10   influence the witness at all, but this is a rebuttal

11   witness addressing specific issues and it seems that,

12   you know, there are a lot of questions that are just

13   really far outside the scope.  So I'd love to have a

14   discussion.

15                   ATTORNEY BARHAM:  I'm happy to go off the

16   record.

17                   VIDEOGRAPHER:  Going off the record.  The

18   current time reads 2:07 p.m.

19   OFF VIDEOTAPE

20                          ---

21   (WHEREUPON, AN OFF RECORD DISCUSSION WAS HELD.)

22                          ---

23   ON VIDEOTAPE

24                   VIDEOGRAPHER:  Back on the record.  The

1    current time reads 2:17 p.m.

2    BY ATTORNEY BARHAM:

3        Q.    We were looking at Tab 5, which is Exhibit-2,

4    page 3874.  About three-quarters down the first column

5    the Endocrine Society indicates, quote, in the future we

6    need more rigorous evaluations of the effectiveness and

7    safety of endocrine and surgical protocols and

8    specifically highlight the need to include a careful

9    assessment of the effect of prolonged delay of puberty

10   in adolescence on bone health, gonadal function and the

11   brain.

12           Do you see that?

13       A.    I see that, yes.

14       Q.    Do you agree that more rigorous evaluations of

15   the safety of endocrine and surgical protocols are

16   needed?

17       A.    I would agree that that's an important goal for

18   all treatments, yes.

19       Q.    Do you agree that because, as the Endocrine

20   Society indicated here, that these evaluations are

21   needed in the future, that this --- that they have not

22   been done yet?

23       A.    Well, this is published in 2017.  There are

24   ongoing trials that are happening now, and some that

1    have had at least preliminary data presented at various

2    meetings that have looked at some of these.

3        Q.    So the issue here is the prolong delay of

4    puberty.  You would agree that it's quite different from

5    treating individuals with precocious puberty.

6        Correct?

7                    ATTORNEY BLOCK:  Objection to form and

8    scope.

9                    THE WITNESS:  As a non-endocrinologist I

10   wouldn't hazard an opinion on that.

11   BY ATTORNEY BARHAM:

12       Q.    Do you treat individuals for precocious puberty?

13       A.    I do not.

14       Q.    Do you agree with the Endocrine Society that

15   there have not yet been a study of how the prolonged

16   delay of puberty affects bone health?

17                    ATTORNEY BLOCK:  Objection to form and

18   scope.

19                    THE WITNESS:  I don't know if I can

20   answer that in the most accurate way.  I know I've seen

21   preliminary data presented at various meetings about

22   impacts on bone health, but I'm not as familiar with the

23   endocrine literature as I am with the mental health

24   literature.

1    BY ATTORNEY BARHAM:

2       Q.    Do you agree that there has not yet been a study

3    on the prolonged effect of --- the prolonged delay of

4    puberty affecting gonadal function?

5                     ATTORNEY BLOCK:  Objection to form and

6    scope.

7                     THE WITNESS:  Same answer as to the last

8    one.

9    BY ATTORNEY BARNHAM:

10      Q.    And that is the same as fertility?

11            Correct?

12      A.    There has been more study fertility in those

13   populations.

14      Q.    Do you agree there has not yet been a study on

15   how the prolonged delay of puberty affects the brain?

16      A.    There are ongoing studies.

17      Q.    None complete yet?

18      A.    None that have published thus far that I'm aware

19   of again.

20      Q.    And when you say there are ongoing studies of

21   bone health, none have published so far that you're

22   aware of.

23            Correct?

24      A.    I know I have seen data published at various

1  national and international meetings, so I could not

2  answer that question accurately.  I think things have

3  been published on bone health, but I'm not familiar with

4  --- I'm not as familiar with the endocrinologic

5  literature as I am the mental health literature.

6      Q.    Are you aware of any studies that have been

7  completed regarding the prolonged delay of puberty

8  affecting the cognitive, emotional, social and sexual

9  development?

10     A.    Can you repeat the question?

11     Q.    Are you aware of any studies that have been

12 completed regarding the prolonged delay --- of how the

13 prolonged delay of puberty affects the cognitive,

14 emotional, social and sexual development?

15     A.    There have been a number of studies including

16 studies that we have referenced here that have looked at

17 long-term psychosocial outcomes for these kids.  So

18 certainly some of those items have been looked at quite

19 extensively.  Some have not yet or have studies that are

20 ongoing.

21     Q.    If the Endocrine Society is indicating that all

22 of this is needed research, why are you --- what do you

23 tell parents about the relative safety of puberty

24 blocking hormones?

1    A.    What I would say this was published in 2017, and

2  so we would want to update since then about any

3  literature since then on these potential risks.  What I

4  want to do is make sure that the endocrinologist or the

5  adolescent medicine specialist, whoever it is that is

6  prescribing the specific treatment knows how to have

7  those discussions based on the psychiatric needs of the

8  patients that I'm seeing.

9    Q.    Let's turn to 3872 in this document.  The

10  Endocrine Society indicates that the task force followed

11  the approach recommended by the grading of

12  recommendations and assessments, development and

13  evaluation group.  The international group with

14  expertise in the development and implementation of

15  evidence based guidelines.  Do you see that in the

16  second column?

17    A.    Yes.

18    Q.    And in this document they indicate that the use

19  of the phrase we recommend and the number one are strong

20  recommendations --- use the phrase we recommend ---

21  recommendations use the phrase of we suggest in number

22  two.

23         Is that correct?

24    A.    Correct.

1    Q.    So the recommendations regarding the use of

2    puberty blockers are based on low quality evidence.

3         Correct?

4                   ATTORNEY BLOCK:  Objection to form.

5                   THE WITNESS:  What I can state is how

6    this particular working group within the Endocrine

7    Society characterized it using the assessment tool and

8    using this assessment tool that is how it was graded for

9    the sake of this set of guidelines.

10   BY ATTORNEY BARHAM:

11   Q.    Were you aware of this when you drafted your

12   report?

13   A.    Yes.

14   Q.    Do you agree or disagree with this assessment of

15   the quality of the evidence?

16   A.    Based upon how they did it, I would agree.  In

17   the world of child psychiatry this is very common.

18   There is very little that we have in terms of very

19   mainstream standard of care treatments that has anything

20   other than poor quality of evidence based upon using

21   these standards.

22                   ATTORNEY BARHAM:  I'm going to hand you

23   what we will mark as Exhibit 31, and that will be

24   Tab 76?

1          THE WITNESS:   Thanks.

2          LAW CLERK WILKINSON:  You're welcome.

3                    ---

4          (Whereupon, Exhibit 31, Label of Lupron,

5           was marked for identification.)

6                    ---

7    BY ATTORNEY BARHAM:

8      Q.    This is the label of Lupron, pharmaceutical

9    label for Lupron.  Right at the top of page one, this

10   label indicates that Lupron is approved for puberty

11   blocking or delay for precocious puberty.

12          Correct?

13     A.    That is correct.

14     Q.    And precocious puberty is a hormonal imbalance.

15          Correct?

16     A.    I think there's a precise terminology for

17   precocious puberty that involves more than just a

18   hormonal imbalance.

19     Q.    But it's a malfunction of hormonal controls in

20   the brain?

21          ATTORNEY BLOCK:  Objection to the form.

22          THE WITNESS:  My understanding as a

23   non-endocrinologist is that's initiation of puberty much

24   earlier than anticipated or expected based upon the

 1   history of the family.

 2   BY ATTORNEY BARHAM:

 3       Q.    So Lupron is inspected and approved by the FDA

 4   for safety and efficacy for precocious puberty not for

 5   all other possible uses.

 6           Correct?

 7       A.    Correct.

 8       Q.    And Lupron was tested only for delaying puberty

 9   up until the normal age of puberty.

10           Correct?

11                   ATTORNEY BLOCK:  Objection to form.

12                   THE WITNESS:  I'm not familiar with the

13   literature that was used for gaining the FDA approval

14   for this indication.

15   BY ATTORNEY BARHAM:

16       Q.    If you turn to section 14.1, 14.1 you'll see

17   that it says that this --- Lupron was tested for monthly

18   administration on 6 males and 49 females.

19           Is that correct?

20       A.    That is correct.

21       Q.    And on the next page you'll see it was tested

22   for three months administration on 8 males and 76

23   females.

24           Is that correct?

```
 1        A.     I do not see where it says that.

 2        Q.     14.2?

 3        A.     Yes.

 4        Q.     Do you know why the test was weighted towards

 5   girls?

 6               ATTORNEY BLOCK:  Objection to form and

 7   scope and foundation.

 8               THE WITNESS:  It would be a mere

 9   supposition on my end.

10   BY ATTORNEY BARHAM:

11        Q.     Is it because precocious puberty is more common

12   in girls?

13        A.     I would defer to an endocrinologist on this

14   epidemiology of that.

15        Q.     But the goal of using Lupron in this context is

16   to help steer the body into healthy and normal

17   development.

18          Correct?

19               ATTORNEY BLOCK:  Objection to form,

20   scope.

21               THE WITNESS:  Generally speaking I would

22   agree with that.

23   BY ATTORNEY BARHAM:

24        Q.     Prescribing Lupron or other GnRH for gender
```

```
 1    dysphoria disrupts hormones and developments at an early

 2    stage.

 3         Correct?

 4              ATTORNEY BLOCK:  Objection to the form

 5    and scope.

 6              THE WITNESS:  Again, as a mental health

 7    professional, this would be outside of my area of

 8    expertise to comment on that.

 9    BY ATTORNEY BARHAM:

10      Q.    Would you agree that normal pubertal development

11    includes bone growth, such as height?

12              ATTORNEY BLOCK:  Objection to form and

13    scope.

14              THE WITNESS:  Yes, I would.

15    BY ATTORNEY BARHAM:

16      Q.    Would you agree that normal pubertal development

17    can include bone strengthening?

18              ATTORNEY BLOCK:  Objection to form and

19    scope.

20              THE WITNESS:  Specifics of that question

21    are really outside of my scope of understanding in the

22    practice that I have.

23    BY ATTORNEY BARHAM:

24      Q.    But in general, you would agree that bones get
```

1  stronger during puberty, especially for men?

2              ATTORNEY BLOCK:  Objection to form and

3  scope.

4              THE WITNESS:  My understanding is that

5  the process of bone health is a quite dynamic, not

6  static nor binary process, so it's more complicated than

7  I feel that I can answer that question to.

8  BY ATTORNEY BARHAM:

9     Q.    But do bones generally get stronger as puberty

10 progresses?

11             ATTORNEY BLOCK:  Objection to form and

12 scope.

13             THE WITNESS:  Again, I think it's a more

14 complicated answer than a yes or a no but I'm not ---.

15 BY ATTORNEY BARHAM:

16    Q.    Would you agree that normal pubertal development

17 includes brain development?

18    A.    Yes.

19    Q.    Each of these things have stopped or decreased

20 by the administration of puberty blockers.

21          Correct?

22    A.    I don't think we can say that it's been stopped

23 or decreased.  There's not a term decreasing brain

24 development that has been studied or referred to in the

 1   literature as I'm aware of it.

 2       Q.    Slower brain development?

 3                 ATTORNEY BLOCK:  Objection to form.

 4                 THE WITNESS:  Slower isn't a word that

 5   I've used, seen in the literature either.

 6                 ATTORNEY TRYON:  Travis, can you speak up

 7   just a little bit more, please?

 8                 ATTORNEY BARHAM:  Certainly.

 9   BY ATTORNEY BARHAM:

10       Q.    Would you agree that normal pubertal development

11   also includes psychosocial development of an adult

12   identity as a sexual being contemporaneous with ones

13   peers?

14       A.    I would say I would agree with that as an

15   adolescent developmental process, not necessarily as a

16   pubertal developmental process.

17       Q.    What's the --- what's your distinction between

18   an adolescent pubertal development --- excuse me, an

19   adolescent developmental process and a pubertal

20   developmental process?

21       A.    As an example, folks who have delayed puberty,

22   so 16-year olds who I have seen that have yet to undergo

23   all stages of puberty nevertheless develop a sense of

24   identity independent of the fact that their puberty has

```
 1   been delayed.
 2      Q.    But their development in that regard is not
 3   contemporaneous with their peers.
 4           Correct?
 5                   ATTORNEY BLOCK:  Objection to form.
 6                   THE WITNESS:  In my specific hypothetical
 7   some of their development is going to be contemporaneous
 8   with their peers.  Some of it will not be.
 9                   ATTORNEY BARHAM:  I'm going to show you
10   what we will mark as Exhibit 32.  This will be Tab 73.
11                             ---
12                   (Whereupon, Exhibit 32, Puberty Blockers
13                    Document, marked for identification.)
14                             ---
15                   THE WITNESS:  Can I ask a clarifying
16   question, it is 2:32 east coast time, not central.
17                   ATTORNEY SWAMINATHAN:  Yes.
18                   LAW CLERK WILKINSON:  Tab 73.
19   BY ATTORNEY BARHAM:
20      Q.    This document is a hand out --- or it's from the
21   --- I'm going to butcher the name, Doernbecher
22   Children's Hospital at OHSU from their gender clinic and
23   about puberty blockers document.  At the bottom of page
24   three, this document indicates that researchers have not
```

```
 1   finished studying how safe puberty blockers are in the

 2   long-term.

 3            Do you agree with that?

 4   A.       Yeah, I would agree with that.

 5   Q.       On the next page this document says that because

 6   puberty block --- because blocking puberty hormones can

 7   weaken your bones, it is best to just take them for just

 8   two or three years.

 9            Do you agree or disagree?

10   A.       That is outside of my scope of expertise.

11            Again, this is a public facing the most like

12   website.  I can't be quite certain what the context of

13   this is, but the individualized discussions you're

14   having with patients and families is always going to be

15   more complex than one or two sentences.

16   Q.       Do you expect to offer any opinion in this case

17   that puberty blockers administered according to your

18   guidelines are safe and reversible?

19   A.       I don't --- I guess I don't understand the

20   question.  I provided my expert testimony and my

21   testimony is focused on the mental health effects of

22   various interventions.

23   Q.       Okay.

24            Do you anticipate saying anything about the
```

1   reversibility of puberty blockers?

2       A.    Other than what I have already discussed, I

3   don't think so.

4       Q.    Let's go to tab 5, I think that's Exhibit 2.

5   And on page 3874, again, about two-thirds down the first

6   column, the Endocrine Society says we still need to

7   study the effects of puberty blocking hormones on

8   gonadal function.

9             Correct?

10      A.    Yes.

11      Q.    That refers to hormone secretion.

12            Correct?

13      A.    Hormone secretion?

14      Q.    Uh-huh (yes).

15      A.    I'm not sure what you mean by that.

16      Q.    Gonadal function refers to the achievement of

17  the production by the gonads of fertile ova or sperm.

18            Correct?

19                  ATTORNEY BLOCK:  Objection to form and

20  scope.

21                  THE WITNESS:  I can't speak to the

22  author's intent for how they used that language.  It's

23  broader in scope from my perspective than that.

24  BY ATTORNEY BARHAM:

1    Q.    Does it include the achievement of production of

2  fertile ova or sperm?

3    A.    That is a component, yes.

4    Q.    What other components do you have in mind for

5  that term?

6    A.    For gonadal development includes size, shape,

7  sexual functioning.

8    Q.    On page 31, I want to go to --- have we done

9  Tab 6 yet?

10           ATTORNEY BARHAM:  I want to introduce

11  what will be marked as Exhibit 33, this will be Tab 6.

12  These are Endocrine Society guidelines from 2009.

13           LAW CLERK WILKINSON:  I don't think I

14  have that.

15           ATTORNEY BARHAM:  Maybe we do.

16           LAW CLERK WILKINSON:  Six?

17           ATTORNEY BARHAM:  Uh-huh (yes).

18           LAW CLERK WILKINSON:  Uh-uh (no).

19  BY ATTORNEY BARHAM:

20    Q.    We will go back to Tab 5 then, Exhibit 2.  Would

21  you agree that if the administration for puberty

22  blockers for gender dysphoria has irreversible effects

23  on brain development, that would be a serious safety

24  problem?

1              ATTORNEY BLOCK:  Objection to form.

2              THE WITNESS:   All risks are graded risk

3   an benefits as well as alternatives for each individual

4   child.

5   BY ATTORNEY BARHAM:

6      Q.    But if it had an irreversible affect on brain

7   development that would still be a serious concern,

8   regardless of the gradations that we would have to

9   consider and address it?

10             ATTORNEY BLOCK:  Objection to form.

11             THE WITNESS:  There are a number of

12  interventions that lead to irreversible changes that are

13  beneficial and are not of concern to safety.

14             ATTORNEY BARHAM:  All right.

15             Do we have Tab 32?

16             LAW CLERK WILKINSON:  That one I have.

17             ATTORNEY BARHAM:  This will be Exhibit

18  33, Tab 32 just to make it conducive.

19                        ---

20             (Whereupon, Exhibit 33, Endocrine

21              Society's Guidelines, was marked for

22              identification.)

23                        ---

24  BY ATTORNEY BARHAM:

1    Q.   And if you look on --- at the end of the

2  document where it says for more information, it stated

3  this is a document from the National Institute of Mental

4  Health.

5          Correct?

6             ATTORNEY BLOCK:  Objection to form,

7  foundation.

8             THE WITNESS:  I have no idea of what the

9  context of this website is or what this is from.

10  BY ATTORNEY BARHAM:

11    Q.   But it gives the National Institute of Mental

12  Health's website.

13          Is that correct?

14    A.   It does.

15    Q.   And it says for more information you can e-mail

16  the National Institute of Mental Health e-mail address.

17          Correct?

18    A.   That is correct.

19    Q.   And that's a part of the National Institute.

20          Right?

21    A.   It is.

22    Q.   And the citations it's drawing from articles in

23  1999 and 2000.

24          Correct?

1      A.      That is correct.

2      Q.      On page one in the middle column, the article

3  describes gray matter at the thinking part of the brain.

4              Do you agree with that description?

5      A.      I would describe it as a gross

6  mischaracterization of the complexity of the brain.

7      Q.      What is your understanding of the function of

8  the gray matter?

9      A.      That is one element of it.  I think it is a lot

10 of nuance, I guess is the word that I'm looking for.

11 It's not characterized by that much of a pithy phrase,

12 not of a neuropathologist.

13     Q.      The article talks about a second wave of

14 production in gray matter that peaks around age 11 in

15 girls and 12 in boys.  And the article refers to that as

16 just prior to puberty.  In terms of Tanner stages that

17 would be around Tanner 2 for most boys and girls, would

18 it not?

19     A.      That would be Tanner Stage 1.

20     Q.      That would be Tanner Stage 1.  But by 11 or 12

21 you have already --- by age 12-ish in boys, it's typical

22 for puberty blockers to have been administered.

23             Correct?

24     A.      To use the language of this article, the

 1    differences in Tanner stages is caused by the, quote,

 2    surging sex hormones not the other way around.  So it's

 3    not about age, but it's the exposure to hormones that

 4    causes the Tanner stages to develop.

 5        Q.    Have you made a study yourself about the timing

 6    of brain gray matter development and the puberty

 7    hormones in causing that development?

 8        A.    I have not.

 9        Q.    Do you have any reason to doubt the timing and

10    nature of development as set out in this National

11    Institute of Health publication?

12              ATTORNEY BLOCK:  Objection to form and

13    foundation.

14              THE WITNESS:  I only have the context of

15    this article that you've put in front of me for the

16    first time and in this article they describe the brain

17    changes just happening prior to puberty, which is prior

18    to when we would be initiating any interventions

19    medically.

20    BY ATTORNEY BARHAM:

21        Q.    And it says though that it is possibly the

22    thickening peaks around 11 or 12, depending on girls and

23    boys and that's possibly related to the influence of

24    surging sex hormones.

1            Correct?

2       A.    If that's what it says, yes.

3       Q.    Do you know --- have you conducted any studies

4  to determine the effect of administering puberty

5  blockers during the ordinary years of puberty and how

6  that would impact the ordinary development of brain

7  matter in the brain of a child?

8       A.    I have not, but it kind of sounds like that is

9  conflating this as a study, which is definitely not.

10      Q.    No, I'm just asking if you had conducted any

11  such studies?

12      A.    I have not.

13      Q.    Are you aware of any such studies?

14      A.    There are studies that are ongoing now.

15      Q.    That are ongoing.

16            ATTORNEY BARHAM:  Okay.

17            I'm going to show you what we marked as

18  Exhibit 34, this will be Tab 33.

19                      ---

20            (Whereupon, Exhibit 34, Article by

21            Blakemore, et al., was marked for

22            identification.)

23                      ---

24  BY ATTORNEY BARHAM:

1    Q.    This is an article by Blakemore, et al.,

2    published in 2010, The Role of Puberty in the Developing

3    Adolescent Brain.  On page 929, the article states the

4    ages at which these peaks in gray matter volume were

5    observed correspond to the sexually dimorphic ages

6    gonadarche, I'm mispronouncing that, onset which

7    suggests possible interactions between puberty hormones

8    and gray matter development.

9         Do you agree or disagree with that statement?

10   A.    I'm not seeing where you're referring to this.

11   Q.    On page 929, first column right above the role

12   of puberty in gray matter development?

13   A.    As stated in this study, the changes were

14   observed to correspond to the ages which suggest

15   possible interactions.  I have no objection to the idea

16   that there are possible interactions between puberty

17   hormones and gray matter development, but again, outside

18   the field of my expertise.

19   Q.    Okay.

20        It also refers to other MRI studies showing a

21   gradual emergence of sexual dimorphisms across puberty.

22   Do you know what sexual dimorphism of the brain means?

23   A.    I do.

24   Q.    What does it mean?

1    A.    Differences that are measurable between folks

2    assigned female and folks assigned male at birth is

3    typically how that is described.

4    Q.    On the first page of this document it says

5    throughout adolescence there are changes in the

6    structure and function of the brain, sexual dimorphism

7    in many of these changes suggest possible relationships

8    to puberty.

9         This article is saying that the available

10   evidence suggests sex links puberty hormones to play a

11   role in stimulating brain development; do you agree?

12                    ATTORNEY BLOCK:  Objection to form.

13                    THE WITNESS:  Certainly I agree that

14   exposure to sex hormone is a part of brain development

15   for all people.  We know less about the developing brain

16   for transgender youth.

17   BY ATTORNEY BARHAM:

18   Q.    Do you agree this includes a aspects of brain

19   development that differ between healthy males and

20   healthy females?

21                    ATTORNEY BLOCK:  Objection as to form.

22                    THE WITNESS:  I don't.  I haven't seen

23   any literature that speaks to that specific question.

24   BY ATTORNEY BARHAM:

1     Q.     Okay.

2            Let's go back to Exhibit 2, page 3882?

3                   ATTORNEY BLOCK:  What page was that,

4     Counsel?

5                   ATTORNEY BARHAM:  3882.

6     BY ATTORNEY BARHAM:

7     Q.     Under the heading side effects, the article

8     indicates that the primary risk of pubertal suppression

9     in GD, gender incongruent adolescents may include,

10    ellipses, unknown effects on brain development, do you

11    see that?

12    A.     I see that.

13    Q.     And in the first column of 3883 indicates that

14    animal data suggests there may be effects of GnRH

15    analogs on cognitive function.

16           Do you see that?

17    A.     I see that.

18    Q.     Cognitive function means the ability to think.

19           Correct?

20    A.     That is one aspect of cognitive functioning.

21    Q.     Do you tell parents and patients that the

22    Endocrine Society has indicated that there are unknown

23    effects on brain development related to the use of

24    puberty blocking hormones?

1    A.    I typically use language that is more similar to

2  how they actually described it in this article which is

3  to say that it may have unknown effects on brain

4  development.

5    Q.    Okay.

6              ATTORNEY BARHAM:  Let's go to Tab 32,

7  which we have already looked at and that is Exhibit.

8              LAW CLERK WILKINSON:  Exhibit 33.

9  BY ATTORNEY BARHAM:

10   Q.    Exhibit 33?

11             ATTORNEY GREEN:  Travis, this is Roberta

12  Green.  I'm sorry to interrupt.  I wondered if you

13  wouldn't mind keeping your voice up I'm just having

14  trouble hearing.  No doubt it's me but it'd be great.

15  Thank you.

16             ATTORNEY BARHAM:  It may also be where

17  I'm located in the room, but I'm getting it from enough

18  people, so I appreciate the reminder.

19             VIDEOGRAPHER:  Counsel, did you say

20  Exhibit 33.

21             ATTORNEY BARHAM:  Exhibit 33.

22  BY ATTORNEY BARHAM:

23   Q.    Page two at the top refers to the gray matter

24  --- or the white matter and how research purports a wave

1    of white matter growth that begins at the front of the

2    brain in early childhood, moves to the side after

3    puberty, striking growth spurts can be seen from age 6

4    to 13 in areas connecting brain regions specialized for

5    language and understanding special relationships.  Ages

6    11, 12 and 13 are sort of the heart and center of

7    puberty.

8              Correct?

9                   ATTORNEY BLOCK:  Objection to form.

10                   THE WITNESS:   It depends upon the child.

11   BY ATTORNEY BARHAM:

12      Q.    In general?

13                   ATTORNEY BLOCK:  Same objection.

14                   THE WITNESS:  I don't want it to be like

15   I'm parsing this out, but it's really important.  We

16   can't apply population based data onto an individual and

17   make conclusions about it.

18   BY ATTORNEY BARHAM:

19      Q.    But we can assess population-based data as to

20   when puberty is generally occurring and generally it's

21   occurring around the ages of 11 to 13?

22      A.    I would agree with the statement that puberty is

23   generally occurring within those age ranges, yes.

24      Q.    And that is also approximately when puberty

1    blocking hormones are being prescribed.

2            Is that true?

3       A.    It depends upon the individual.

4       Q.    But generally around age 12 is what you

5    indicated earlier.

6            Correct?

7       A.    It really depends upon the individual.  To

8    clarify, it's based upon Tanner stage as one element,

9    age has one element, psychosocial functioning has

10   another, family choices.  It's a calculus of the risks,

11   benefits and alternatives that guide when we decide to

12   intervene if we decide to intervene.

13      Q.    So you would agree that a teenage brain and

14   cognitive development across puberty is a very

15   complicated area and one that's not easily understood.

16           Correct?

17               ATTORNEY BLOCK:  Objection to form.

18               THE WITNESS:  Yes, adolescent brain

19   development is a complicated phenomenon for sure.  I

20   have no objection to that.

21   BY ATTORNEY BARHAM:

22      Q.    Is that an area of your professional research

23   and investigation?

24      A.    Specifically on neuroscience with regard to

```
 1   adolescent development, no, it is not.

 2                   ATTORNEY BARHAM:  Let's go to Tab 8.

 3                   THE WITNESS:  I need to take another

 4   bathroom break.

 5                   ATTORNEY BARHAM:  Let's just take a break

 6   now.  Let's go off the record.

 7                   VIDEOGRAPHER:  Going off the record.  The

 8   current time reads 2:53 p.m.

 9   OFF VIDEOTAPE

10                            ---

11   (WHEREUPON, A SHORT BREAK WAS TAKEN.)

12                            ---

13   ON VIDEOTAPE

14                   VIDEOGRAPHER:  Back on the record.  The

15   current time reads 3:00 p.m.

16   BY ATTORNEY BARHAM:

17      Q.    Are you an expert on suicide and suicidality?

18      A.    I guess I don't know exactly how to qualify that

19   response.  I know more than most people about suicide

20   and suicidality, yes.

21      Q.    Have you made any systematic study of suicide

22   among the thousands treated at the NYU Gender and

23   Sexuality Service?

24      A.    I have not.
```

1    Q.    Have you made any systematic studies of suicide

2  among the thousands treated at the Lurie Children's

3  Hospital here in Chicago?

4    A.    I have a study ongoing.

5    Q.    Has that study generated any preliminary results

6  yet?

7    A.    It has not.

8    Q.    Have you made any systemic studies of suicide

9  among the thousands you've treated at the Gender Variant

10  Youth and Family Network?

11    A.    That is not a clinical service.

12    Q.    Are you aware that suicide for any reason is

13  extremely rare among children younger than 15?

14            ATTORNEY BLOCK:  Objection to form.

15            THE WITNESS:  I would disagree with that

16  as a statement.  It's among one of the top causes of

17  death for children of ages 10 to 15.

18  BY ATTORNEY BARHAM:

19    Q.    And what's your basis for saying that?

20    A.    The CDC data.

21    Q.    Did you cite that data in your report?

22    A.    I did not.

23    Q.    You're not offering an opinion that BPJ faced a

24  high suicide risk unless put on puberty blockers.

```
 1              Correct?

 2       A.    I am not.

 3       Q.    Has any responsible health authority or

 4  organization made a claim that the use of puberty

 5  blockers relate to suicide?

 6              ATTORNEY BLOCK:  Objection to form.

 7              THE WITNESS:  I mean, that's a big list.

 8  I don't think any that I'm aware of have made the claim,

 9  especially when it comes to causation.

10  BY ATTORNEY BARHAM:

11       Q.    In paragraph 19 of your report you refer to

12  gender-affirming hormone therapy and you make similar

13  statements in paragraphs 39, 40, 41 and 42.  What do you

14  mean by gender affirming hormone therapy?

15       A.    Typically speaking when I'm referring to

16  gender-affirming hormone therapy, these are hormones

17  that are aligned with the gender identity.

18       Q.    So that means the administration of cross sex

19  hormones.

20              Is that correct?

21              ATTORNEY BLOCK:  Objection to form.

22              THE WITNESS:  Yeah.  I mean, I think I

23  would call them gender-affirming hormones.  That is how

24  typically they are referred to in the literature.
```

1   BY ATTORNEY BARHAM:

2      Q.    So this means that you would administer

3   testosterone to natal females.

4          Correct?

5                 ATTORNEY BLOCK:  Objection to form.

6                 THE WITNESS:   I personally would not,

7   but ---.

8   BY ATTORNEY BARHAM:

9      Q.    Cross sex hormones or gender-affirming hormones

10  refers to the administration of testosterone to natal

11  females.

12         Correct?

13     A.    Or assigned females at birth, yes, that's

14  correct.

15     Q.    And it means the administration of testosterone

16  suppression of estrogen for natal males.

17         Correct?

18                ATTORNEY BLOCK:  Objection to form.

19                THE WITNESS:  Assigned male at birth,

20  yes.

21  BY ATTORNEY BARHAM:

22     Q.    You mean assigned males at birth?

23     A.    Yes.  Is that what I not said?  Sorry.

24     Q.    What is your role in the administration of cross

1  sex hormones?

2    A.    It depends on the child and the family, but my

3  role is most often as a mental health professional who

4  is either doing the assessment or providing care for the

5  co-occurring psychiatric disorders that are present in

6  that individual child.

7    Q.    Cross sex hormones prevent rather than enable an

8  adolescent from becoming capable of reproducing

9  sexually.

10        Correct?

11            ATTORNEY BLOCK:  Objection to the form.

12            THE WITNESS:  That's not something that I

13  can answer.  That's out of the scope of my expertise.

14  BY ATTORNEY BARHAM:

15    Q.    You lack an understanding of the effects of

16  administering cross sex hormones?

17            ATTORNEY BLOCK:  Objection to form.

18            THE WITNESS:  I would disagree with that

19  statement.

20  BY ATTORNEY BARHAM:

21    Q.    So my question is what is the effect of

22  administering cross sex hormones on an adolescent's

23  ability to develop and become capable of reproducing

24  sexually?

1    A.    It's a highly complicated question that depends

2  upon a lot of factors that are above the scope of my

3  testimony here.  As an example, there are many adult

4  transgender men who become pregnant despite being on

5  testosterone for many years.

6    Q.    And what studies are you referencing that

7  support that statement?

8    A.    I'm not referencing any studies to this.  I'm

9  referencing personal experiences.

10   Q.    Okay.

11         Cross sex hormones cannot cause an adolescent

12 to develop the genitalia associated with his or her ---

13 his or her desired transgender identity.

14         Correct?

15              ATTORNEY BLOCK:  Objection to form.

16              THE WITNESS:  That's correct.

17 BY ATTORNEY BARHAM:

18   Q.    Cross sex hormones also cannot achieve male

19 height in a natal female.

20         Correct?

21              ATTORNEY BLOCK:  Objection to form.

22              THE WITNESS:  I would defer to my

23 endocrine colleagues on that answer.

24 BY ATTORNEY BARHAM:

```
 1      Q.    Can cross sex hormones change the hip and leg

 2   configuration in a natal male to match that of a natal

 3   female?

 4                   ATTORNEY BLOCK:  Objection to form.

 5                   THE WITNESS:  I would defer to my

 6   endocrine colleagues on that question.

 7                   ATTORNEY BARHAM:  Let's go to Tab 77.

 8   This is probably new.

 9                   LAW CLERK WILKINSON:  Yes.

10                   ATTORNEY BARHAM:  This is an article by

11   Guss, et al. in 2015, entitled Transgender and Gender

12   Non-Conforming Adolescent Care.  This will be

13   Exhibit 35.

14                            ---

15                   (Whereupon, Exhibit-35, Article by Guss,

16                    et al., was marked for identification.)

17                            ---

18   BY ATTORNEY BARHAM:

19      Q.    Are you familiar with the authors?

20                   LAW CLERK WILKINSON:  I'm sorry.  I gave

21   you the wrong one.  Here is the right one.

22                   THE WITNESS:  I know Dr. Shumer.  And we

23   read something by Katz-Wise earlier.  I don't know Carly

24   Guss.
```

BY ATTORNEY BARHAM:

Q.    Page four of this document indicates that if a patient is on cross sex hormones it's important to remind them that the side effects may be infertility.

Is that correct?

A.    Where are you pointing to?

Q.    The top of page four.

A.    Yes.

Q.    Do you agree with that statement?

A.    I agree.

Q.    Do you know of any long-term studies that will change to what extent infertility caused by taking cross sex hormones can be reversed later in life?

A.    There are ongoing studies now, but I'm not aware of any that have published anything.

Q.    Have you studied the literature regarding mental health problems in adults resulting from sterility?

ATTORNEY BLOCK:  Objection to form.

THE WITNESS:  I don't know what you mean by studied.  I don't think probably more than any cursory manner.

BY ATTORNEY BARHAM:

Q.    The use of cross sex hormones to affirm a transgender identity is an off-label use.

1          Correct?

2                    ATTORNEY BLOCK:  Objection to

3     terminology.

4                    THE WITNESS:  If by off label you mean

5     off label for the FDA?

6     BY ATTORNEY BARHAM:

7       Q.    Yes.

8       A.    Yeah, as far as I know.  Again, I'm not

9     prescribing these medications as a psychiatrist.

10      Q.    Earlier you mentioned that some of your

11    patients, some trans --- some women --- natal females

12    who identify as male have been able to become pregnant.

13    Do you recall that testimony?

14      A.    I did not say anything about my patients, I said

15    those were personal experiences.

16      Q.    Personal experiences.  I'm sorry.  I assumed it

17    was patients, so thank you for that correction.  I would

18    like to show you Tab 81.  This is going to be an article

19    by Moseson, et al. in 2020, entitled Pregnancy

20    Intentions and Outcomes, tab 81 for those at home and

21    Exhibit 36 for the record.

22                         --

23                    (Whereupon, Exhibit-36, Article by

24                    Moseson, et al., was marked for

1           identification.)

2                  ---

3  BY ATTORNEY BARHAM:

4     Q.    Are you familiar with this study?

5     A.    Certainly not the details of it.  This is the

6  first time I'm recalling looking at it.

7     Q.    Are you aware of any other studies regarding the

8  ability of individuals taking cross sex hormones to

9  become pregnant?

10    A.    There are a number of ongoing studies that are

11 looking into those questions, yes.

12    Q.    If you look at Table 3 on page number 36, this

13 table indicates there were 79 pregnancies among the

14 respondents who have ever used testosterone.

15          Do you see that?

16    A.    Yes.

17    Q.    And there were 342 among those who have never

18 used testosterone.

19          Do you see that?

20    A.    I see that.

21    Q.    But only 15 of these pregnancies occurred after

22 initiating testosterone.  Is that correct?  And I'm

23 referencing page 33 when I say that, at the bottom of

24 page 33.

 1                    ATTORNEY BLOCK:   Where is this on page

 2     33?

 3                    ATTORNEY BARHAM:   The very last line on

 4     page 33 extending over onto page 35.

 5                    THE WITNESS:   I see on Table 2 the number

 6     of pregnancies after initiating testosterone was 15.

 7     BY ATTORNEY BARHAM:

 8     Q.     So the other 337 of the pregnancies tell us

 9     nothing about the impact of testosterone on female

10     fertility and the possible impact of birth defects.

11            Correct?

12     A.     Well, the question about fertility certainly

13     doesn't speak to us being able to understand it more

14     based upon the data points.   And without reading the

15     article I don't know if the author said anything about

16     birth defects.

17     Q.     On page 35 it indicates that 2 of the 15 --- or

18     4 of the 15 pregnancies that started while taking

19     testosterone half of them ended in miscarriage.

20            Correct?

21     A.     Yes.

22     Q.     One ended in abortion and one was not reported.

23            Correct?

24     A.     I don't see where that is.

1      Q.     It's the same line.  Two of these four

2   pregnancies ended in miscarriage, parentheses, one ended

3   in abortion in the outcome and testosterone duration for

4   the other four were not reported?

5      A.     Yes.

6      Q.     Okay.

7           And there is no data given on the other outcome

8   of the other 11 pregnancies.  So this article does not

9   document a single live birth to a natal female at any

10  time after taking testosterone.

11          Correct?

12          ATTORNEY BLOCK:  Objection to form.  And

13  give him a chance to read, please.

14          THE WITNESS:  I would really have to read

15  the article quite closely to agree with that.  I'm not

16  seeing the text in this article to support that.  In the

17  Pregnancy Intentions and Outcomes, as I'm reading it, it

18  discusses what the potential outcomes are, but it didn't

19  parse those into who had testosterone before or after,

20  so I'm not sure.

21  BY ATTORNEY BARHAM:

22     Q.     Okay.

23          Let me shift gears and turn to paragraph 37 of

24  your report.  There you indicate --- you state that

```
1   there is no evidence supporting Dr. Levine's speculation

2   that allowing prepubertal children to sexually

3   transition puts children on a conveyor belt to becoming

4   transgender adolescents and adults.  And you say

5   evidence shows that prepubertal children who are likely

6   to have a stable transgender identity into adolescence

7   are the children who are most likely to articulate a

8   strong and consistent need to socially transition.

9          Do you see that?

10     A.    I see that.

11     Q.    And in footnote 11 you cite an article by

12  Steensma published in 2013.

13          Is that correct?

14     A.    That's correct.

15              ATTORNEY BARHAM:  I will show you what

16  we're going to mark as Exhibit 37, Tab 120, and I will

17  also show you Tab 121, which is Exhibit 38.

18                      ---

19              (Whereupon, Exhibit-37, Article by

20               Steensma, was marked for

21               identification.)

22              (Whereupon, Exhibit-38, Analysis, was

23               marked for identification.)

24                      ---
```

BY ATTORNEY BARHAM:

   Q.   Tab 120, Exhibit 37, is the Steensma article that you cited in footnote 11 of your report.

       Is that correct?

   A.   That is correct.

   Q.   Let's look at Table 1 on page 584.  And it gives --- in the first four columns it gives numbers on persistence and desistance among the study subjects. And about halfway down it delineates how many of the persisting boys and girls and desisting boys and girls had a childhood diagnosis of gender identity disorder.

       Correct?

   A.   Correct.

   Q.   And it also breaks down how many were subthreshold.  I'm presuming that means for gender identity disorder.

       Correct?

   A.   That is correct.

   Q.   So according to Table 1, 91.3 of the 23 persisting boys had gender identity disorder.

       Correct?

   A.   Correct.

   Q.   So that means about 21 of the 23 persisting boys had that condition.

```
 1            Correct.

 2     A.     Correct.

 3     Q.     And according to Table 1, 95.8 of the 24

 4  persisting girls had the same diagnosis or 23 of the 24.

 5            Correct?

 6     A.     That's correct.

 7     Q.     And according to the same Table, 39.3 of the 56

 8  desisting boys had that diagnosis.

 9            Correct?

10     A.     That is correct.

11     Q.     So that's 22 of the 56.

12            Correct?

13     A.     I'll take your word for the math.

14     Q.     Well, you can see it on Exhibit-121 (sic).  On

15  Table 1, 58.3 of the 24 desisting girls had gender

16  identity disorder or 14 of the 24.

17            Correct?

18     A.     Correct.

19     Q.     Do you see any reason to dispute the figures set

20  forth on Exhibit --- on Tab 121, Exhibit 39 ---

21  Exhibit 38?

22     A.     No, I have no reason to ---.

23            ATTORNEY SWAMINATHAN:  I think he is

24  looking at the wrong document.
```

1    BY ATTORNEY BARHAM:

2       Q.    I'm talking about this.

3       A.    Got it.  So this is a transposition from

4    Table 1?

5       Q.    Correct.

6       A.    I mean, I'm going to   have ---.

7                   ATTORNEY BLOCK:  Just objection.  I'm

8    sorry, can we put on the record what this document is?

9    Is it a reprint of what's in the Steensma or is it new

10   analysis that ---?

11                  ATTORNEY BARHAM:  Exhibit 38 is an

12   analysis of the Steensma 2013 article that is

13   Exhibit 37.

14                  ATTORNEY BLOCK:  Thank you.  And is

15   there an author of the analysis?

16                  ATTORNEY BARHAM:  I'm sorry.  Say that

17   again.

18                  ATTORNEY BLOCK:  Is there an author of

19   this analysis?

20                  ATTORNEY BARHAM:  Yes, it was me.

21   BY ATTORNEY BARHAM:

22      Q.    So according to the figures that have been

23   calculated from table one of the Steensma article, 80

24   children --- of the 80 children who had gender identity

```
 1    disorder, 44 persisted and 36 desisted.

 2              Is that correct?

 3                    ATTORNEY BLOCK:  Objection to give the

 4    witness a chance to see it on his own what the figures

 5    are.

 6                    THE WITNESS:  I'm not sure I understand

 7    what your question is.

 8    BY ATTORNEY BARHAM:

 9      Q.    Of the children with the --- the 80 children who

10    had a diagnosis of gender identity disorder, 44

11    persisted and 36 desisted.

12              Is that correct?

13      A.    I would have to do the math myself for me to say

14    yes to that, but it's about right.

15      Q.    So according to Steensma figures, of the

16    children with the strongest transgender identity as

17    children 55 percent persisted and 45 percent desisted.

18              Correct?

19                    ATTORNEY BLOCK:  Objection to form.

20                    THE WITNESS:   Again, I would have to run

21    those numbers myself in order to --- unless it's

22    referred to already in the article, but that sounds

23    about right.

24    BY ATTORNEY BARHAM:
```

1      Q.     In footnote 12 of your report, paragraph 37, you

2   cite an article by Rae saying for the proposition that

3   socially transitioning before puberty did not increase

4   children's cross gender identification and deferring

5   transgender did not decrease cross gender

6   identification.

7             Is that correct?

8      A.     That is correct.

9                    ATTORNEY BARHAM:  All right.

10                   Let's turn to Tab 108.  This will be

11   Exhibit 39, and it will be an article by Rae, et al.

12   published in 2019, Predicting Early Childhood Gender

13   Transitions.

14                   ATTORNEY BLOCK:  It's 2:22 central time.

15   So the witness has to take a break at 2:30?

16                   THE WITNESS:  I can do 2:45.

17                        ---

18                   (Whereupon, Exhibit 39, Article by Rae,

19                    et al., marked for identification.)

20                        ---

21   BY ATTORNEY BARHAM:

22      Q.     Exhibit 39 is the article that you cited in

23   footnote 12 of your report.

24             Is that correct?

1      A.     That's correct.

2      Q.     On page 679 the author indicates that

3  replication of this affect is muted preferably from

4  longitudinal study comparing a single group of children

5  before and after transition.

6            Correct?

7      A.     That's correct.

8      Q.     And the authors also indicate that they tested a

9  sample skewed by race, class, parental that education

10 and political affiliation that may or may not affect the

11 children that are socially transitioning now or in the

12 future.

13           Correct?

14     A.     That is correct.

15     Q.     And they also indicate that follow-up occurred

16 only two years after testing and some of the children

17 who had not transitioned could transition in the future

18 and some who had transitioned could not revert in the

19 future.

20           Correct?

21     A.     Correct.

22     Q.     And they indicated that there sample is likely

23 an over estimate of how many gender conforming children

24 in the general population will socially transition.

1          Correct?

2     A.     Where is that in the article?

3     Q.     Second column of page 679.

4     A.     Yes.

5     Q.     Same column they also indicate that they relied

6   on a convenient sample of individuals recruited through

7   lists and events serving transgender children and gender

8   non-conforming children.

9          Correct?

10    A.     That is correct.

11    Q.     Let's go back to Tab 5, which is Exhibit 2.

12  Page 3879, the Endocrine Society indicates that if

13  children have completely socially transitioned they have

14  my greater difficulty returning to the original gender

15  on entering puberty.

16         Is that correct?

17    A.     That's correct.  It says it there, but that's

18  based on supposition.

19    Q.     Footnote 40 --- reference number 40 supposition

20  --- reference number 40 is an article by Steensma, et

21  al., published in 2011.

22         Are you saying that that's a supposition?

23              ATTORNEY BLOCK:  Objection to form.

24              THE WITNESS:  No, I'm saying that the

```
 1   part of that article that refers to the theoretical risk

 2   is based not on any data that was collected by the

 3   researchers in that study.

 4   BY ATTORNEY BARHAM:

 5       Q.    The Endocrine Society also indicates that the

 6   social transition has been found to contribute to the

 7   likelihood of persistence.

 8             Is that correct?

 9       A.    That is a misstating of Dr. Steensma.

10       Q.    That is what the Endocrine Society has

11   concluded.

12             Correct?

13                 ATTORNEY BLOCK:  Objection to form.

14                 THE WITNESS:  That is what they have

15   written here in the article you presented, yes.

16                 ATTORNEY BARHAM:  Let's go to Tab 97

17   number ---.

18                 LAW CLERK WILKINSON:  Exhibit 16.

19   BY ATTORNEY BARHAM:

20       Q.    Exhibit Number 16, and we are going to be

21   looking at the sixth page of this document.  And Dr.

22   D'Angelo, et al. article indicates that since almost all

23   the children treated with puberty blockers proceeded to

24   cross sex hormones concerns have been raised that
```

```
 1    puberty blockers may consolidate gender dysphoria in

 2    young people putting them on a lifelong path of

 3    biomedical invention.

 4            Is that correct?

 5                    ATTORNEY BLOCK:  Object is to form.

 6                    THE WITNESS:  Can you show me where that

 7    is on this page?

 8    BY ATTORNEY BARHAM:

 9      Q.    The first column on the second paragraph.  The

10    second column.

11                    ATTORNEY TRYON:  Jake, can you scroll

12    down a bit?

13                    THE WITNESS:  I would not agree with how

14    you asked that question, I guess.  Can you repeat it or

15    clarify?

16    BY ATTORNEY BARHAM:

17      Q.    I just was reading what it said.  They indicate

18    in this section additionally since almost all of the

19    children treated with puberty blockers proceed to cross

20    sex hormones citing de Vries 2014, concerns have been

21    raised at puberty blockers may consolidate gender

22    dysphoria in young people, putting them on a lifelong

23    path of biomedical interventions?

24      A.    It's bit of a logical leap and also just
```

1    incorrect.  The de Vries study specifically was looking

2    at the children in the Amsterdam clinic, which is not

3    broadly applicable to other gender clinics across the

4    rest of the world.

5        Q.    But you relied upon de Vries 2014 article in

6    your report as well, didn't you?

7        A.    I agree.  Yeah.

8        Q.    So there are professionals who have raised these

9    concerns and hold the concerns that social transitioning

10   cannot change the outcome for a child.

11          Is that correct?

12          ATTORNEY BLOCK:  Objection to form.

13          THE WITNESS:  I think there's two

14   different questions.  The first question is, do I agree

15   with this statement that almost all children treated

16   with puberty blockers proceed to cross sex hormones?

17   That is not data that we have nor does this article

18   point to data other than the Dutch clinic that has a

19   very specific protocol.

20          The question about whether social

21   transition changes a child's trajectory is a different

22   question.  It is a question that the Dutch have raised

23   as a possibility, but has not, I have not seen any

24   literature that provides evidence for that.

1    BY ATTORNEY BARHAM:

2       Q.    But you will recognize that there are some

3    researchers in the field who have raised these concerns

4    and do hold these concerns.

5            Correct?

6       A.    There are researchers in the field who ask these

7    questions, yes.

8                    ATTORNEY BARHAM:  Let's go to Tab 38.

9                    ATTORNEY TRYON:  How late are we going in

10   this session; until 2:30 or 2:45?

11                   ATTORNEY BARHAM:  The witness has

12   indicated he can go to 2:45.

13                   ATTORNEY TRYON:  Okay.

14                   ATTORNEY BARHAM:  Exhibit 40 is an

15   article by Carmichael, et al. 2021, Short-term Outcomes

16   of Pubertal Suppression in a Selected Cohort of 12 to 15

17   year old Young People.  If you'll turn to page 12.

18                           ---

19                   (Whereupon, Exhibit 40, Article by

20                    Carmichael, et al., was marked for

21                    identification.)

22                           ---

23   BY ATTORNEY BARHAM:

24      Q.    Are you familiar with this paper?

```
 1       A.    I have not read through this paper, yet.

 2       Q.    The lead authors are associated with the

 3  Tavistock?

 4       A.    That is correct.

 5       Q.    And that's part of the National Health Services

 6  of the UK.

 7             Is that correct?

 8       A.    That is correct?

 9       Q.    And it's the leading and most respected clinic

10  in the UK.

11             Correct?

12       A.    That I can't answer.

13       Q.    If you'll look at page 12, the authors indicate

14  that one young person decided to stop GnRHa and did not

15  start cross sex hormones due to continued uncertainty

16  and concerns about the side effects of cross sex

17  hormones, the remaining 43 or 98 percent elected to

18  start cross sex hormones.

19             Is that correct?

20       A.    Correct.

21       Q.    So the vast majority of these children who

22  received puberty blockers went onto take cross sex

23  hormones.

24             Correct?
```

1    A.    That is correct.

2    Q.    Would you agree that the majority of children

3  who receive puberty blockers go on and take cross sex

4  hormones?

5              ATTORNEY BLOCK:  Objection to form.

6              THE WITNESS:   That is not a question

7  that we have an answer to based upon the literature.  A

8  majority of patients with gender dysphoria that are

9  prescribe puberty blockers are not involved in clinical

10  care at either the Tavistock clinic or the Amsterdam

11  clinic.

12  BY ATTORNEY BARHAM:

13    Q.    Is it --- in your practice, do the majority of

14  children who receive puberty blockers for gender

15  dysphoria go on to take cross sex hormones?

16    A.    Based upon the demographic of the patients that

17  I'm seeing, particularly in Chicago, yes, but I'm not

18  seeing the younger kids as much as I did in New York.

19    Q.    So as a practical and ethical matter the

20  decision to put a child on puberty blockers must be

21  considered as equivalent of a decision to put the

22  children on cross sex hormones with all of the

23  considerations and full consent obligations listed in

24  that decision.

```
 1            Correct?
 2                    ATTORNEY BLOCK:  Objection to form.
 3                    THE WITNESS:  No.
 4    BY ATTORNEY BARHAM:
 5        Q.    Why do you say --- why do you disagree?
 6        A.    Inherent in the informed consent process is a
 7    specific discussion of the risk benefits and
 8    alternatives of a specific intervention.  Hormones are
 9    not puberty blockers, it's a separate discussion.
10        Q.    Even though the vast majority according to the
11    research and according to your testimony go onto take
12    cross sex hormones?
13                    ATTORNEY BLOCK:  Objection to form and
14    mischaracterizes testimony.
15                    THE WITNESS:  A description of the
16    potential trajectories of development is a part of the
17    discussion in an informed consent process for the
18    engagement with puberty suppression agents.  It's not
19    the same as informed consent process discussion around
20    the use of hormones at that time.
21    BY ATTORNEY BARHAM:
22        Q.    So when you're having an informed consent
23    discussion surrounding the decision to start puberty
24    blockers, do you discuss with parents and patients the
```

1    dangers associated with cross sex hormones?

2       A.    This is going to be very individualized

3    discussions that we have with families.  It's a very

4    momentous decision to make this kind of treatment

5    choice.  The potential trajectories are all discussed

6    and there's risk to everything.  I don't think it is

7    useful to use the term dangers in the context of medical

8    care but it's about weighing risks of interventions but

9    also weighing the risks of non-intervening.  And it's

10   appropriate to have those discussions about what those

11   potential outcomes may be with each individual kid.

12      Q.    How do you get informed consent from a child?

13      A.    You get assent from a child, but you get

14   informed consent from a parent.

15      Q.    How do you get --- how can a child even begin to

16   understand the implications of starting puberty blockers

17   and then potentially going to cross sex hormones, the

18   effects that that may have on the fertility when the

19   child is 12-ish?

20              ATTORNEY BLOCK:  Objection to form.

21              THE WITNESS:  Well, I have a skewed

22   perspective here because of the work that I do, but

23   there are 12-year-olds who are often much more capable

24   of having that kind of informed decision than many

1   adults that I have encountered, which is to say it's an

2   individualized assessment based upon multiple things,

3   including the cognitive status of the child, their

4   capacity to engage back and forth and have an open

5   discussion and a realistic discussion about the

6   potential benefits, risks and alternatives in specific

7   intervention.

8   BY ATTORNEY BARHAM:

9       Q.    Is it your position that most 12-year-olds have

10   a better understanding or a better capability of making

11   decisions about their long-term fertility than adults?

12       A.    It is not my position and I will reflect that

13   that was a statement meant in jest, but it does reflect

14   some sense of reality in terms of the maturity level of

15   12-year-olds, not speaking to the maturity level of most

16   20-somethings in the world.

17               ATTORNEY BARHAM:   I think this would be a

18   good time to pause for your appointment and give you a

19   few moments before that starts, so we'll go off the

20   record.

21               VIDEOGRAPHER:   Going off the record.   The

22   current time reads 3:37 p.m.

23   OFF VIDEOTAPE

24                           ---

```
 1   (WHEREUPON, A SHORT BREAK WAS TAKEN.)

 2                            ---

 3   ON VIDEOTAPE

 4                  VIDEOGRAPHER:  Back on the record the

 5   current time reads 4:31 p.m.

 6                  ATTORNEY BARHAM:  All right.  Let's go to

 7   Tab 16, which will be Exhibit Number 41.

 8                            ---

 9                  (Whereupon Exhibit 41, Washington Post

10                  Article, was marked for identification.)

11                            ---

12   BY ATTORNEY BARHAM:

13     Q.    This is will be a Washington Post article from

14   January 10, 2022.  Are you aware of the 2021/2022 season

15   swimming events surrounding the University of

16   Pennsylvania's swimmer Lia Thomas?

17                  ATTORNEY BLOCK:  Objection to scope.

18                  THE WITNESS:  I have not been following

19   closely, but I've heard about it.

20   BY ATTORNEY BARHAM:

21     Q.    Okay.

22            On page three of Exhibit 41, the article

23   references that Lia Thomas in her first year in the

24   Women's Division after more than a year of testosterone
```

1   suppression set the Women's Division record in two

2   events.

3           Do you see that?

4     A.    I see that, yes.

5     Q.    And Lia Thomas beat the best time of women's

6   Olympian Torri Huske in the 200 freestyle.

7           Do you see that?

8     A.    I see that.

9           ATTORNEY BLOCK:  I just want to note an

10  objection to foundation, that there's no URL.  This

11  appears to be cut and pasted.  So I'm just noting that

12  for the record.

13          ATTORNEY BARHAM:  And I would note For

14  the record that there is an URL at the bottom of page

15  --- at the bottom of each page.

16          ATTORNEY BLOCK:  Thanks.  It's not

17  visible from what's on the screen.

18          ATTORNEY BARHAM:  Okay.

19          Just trying to be clear.

20  BY ATTORNEY BARHAM:

21    Q.    Is it your position that it is fair for Lia

22  Thomas to compete in the Women's Division of swimming?

23          ATTORNEY BLOCK:  Objection to scope.

24          THE WITNESS:  I don't have an opinion on

1   the fairness.

2   BY ATTORNEY BARHAM:

3       Q.    Do you believe that it's beneficial to Lia

4   Thomas' mental health to compete in the Women's

5   Division?

6       A.    I couldn't tell you that unless I had evaluated

7   Lia Thomas herself.

8       Q.    But it's your opinion as expressed in

9   paragraph 52 of your report that no reasonable mental

10  health professional could conclude that the Act is

11  anything but harmful to the mental health of transgender

12  youth.

13          Is that correct?

14      A.    I would say youth as a class, yes, that is

15  correct, but the specific details of that impact are not

16  going to be known and I wouldn't care to surmise on it

17  for a specific individual that is not under my care.

18      Q.    Okay.

19          But it's your position that allowing a

20  transgender --- or allowing natal males to compete in

21  the Women's Division if they are gender dysphoric is

22  beneficial to their mental health, in general.

23          Correct?

24              ATTORNEY BLOCK:   Objection to terminology

and form.

          THE WITNESS: In my report, excluding

transgender youth can be harmful to their mental health.

BY ATTORNEY BARHAM:

  Q.   And when you say excluding them you mean

excluding them from competition consistent with their

gender identity.

       Is that correct?

  A.   That is correct.

         ATTORNEY BARHAM:  All right.

         I want to show you Tab 17 now.  This will

be Exhibit-42.

                ---

         (Whereupon, Exhibit 42, Out Sports

         Article, was marked for identification.)

                ---

BY ATTORNEY BARHAM:

  Q.   Have you read about Iszac Henig before today?

  A.   I have not.

  Q.   This is an article from Out Sports published on

January 9th, 2022, by Karleigh Webb entitled Trans

swimmers Lia Thomas and Iszac Henig went head-to-head in

the pool, each getting wins.  Are you aware that Iszac

Henig is a biological female who identifies as male?

1    A.    I have not heard of Iszac Henig until today at

2 least by name.

3    Q.    Do you see on the first page of this article the

4 article reads Henig, a trans man competing on the

5 women's swimming team at Yale?

6    A.    I see that, yes.

7    Q.    So in this event a biological male identifies as

8 female, Lia Thomas, competed against a biological female

9 who identifies as male, Iszac Henig, in the women's

10 competition?

11             ATTORNEY BLOCK:  Objection can you give

12 him a chance to read the article.  He's never seen or

13 heard of this before?

14             THE WITNESS:  It seems that is what

15 stipulated in the article.

16 BY ATTORNEY BARHAM:

17    Q.    Okay.

18         According to the terminology you prefer, do you

19 consider Henig to be anything other than a man?

20             ATTORNEY BLOCK:  Objection to form.

21             THE WITNESS:   I will typically ask the

22 individuals that I'm working with or engaging with how

23 they choose to define their own sense of labels.  Not

24 knowing Iszac I can't speak for him.

1    BY ATTORNEY BARHAM:

2        Q.    Okay.

3              But according to the terminology that you've

4    been using Iszac would be an individual assigned female

5    sex at birth and identifying as male.

6              Correct?

7        A.    Again, I don't see ---

8        Q.    Henig a trans man?

9        A.    --- a description of his words to describe his

10   identity, so I can't say how he identifies himself, but

11   it appears through that that's how --- that is the

12   implication of the article at least.

13       Q.    In the article it uses masculine pronouns to

14   refer to Henig.

15             Correct?

16       A.    Yes.

17       Q.    Do you think it'd beneficial to Henig's mental

18   health to compete on the women's team?

19       A.    Again, I can't answer that unless I had

20   evaluated Henig myself.

21       Q.    In general, if you have a transgender individual

22   who wants to compete on the team consistent his or her

23   biological sex, do you think it's beneficial to his or

24   her mental health to be allowed to do so?

1          ATTORNEY BLOCK:  Objection to form.

2          THE WITNESS:   Again, this is an

3   individualized discussion that you have with patients.

4   With the patients that I've had I have had patients who

5   would be harmed by having to compete with the cohort of

6   kids who were aligned with their sex assigned at birth.

7   BY ATTORNEY BARHAM:

8     Q.    I understand your position about kids who are

9   forced to do something, what about kids who want to

10  compete with that same cohort, do you think it's

11  beneficial to allow them to compete as they see fit?

12    A.    As a mental health professional working with

13  kids and families, it really is an individualized

14  discussion.  There is not going to be a specific answer

15  that's universal for all kids.

16    Q.    Do you believe that if Henig were prevented from

17  competing with the women's team as desired, that it

18  could be harmful to Henig's mental health ---

19          ATTORNEY BLOCK:  Objection to form.

20  BY ATTORNEY BARHAM:

21    Q.    --- possibly?

22    A.    I can't speak to the specifics about a person

23  that I've never evaluated.

24    Q.    If it is harmful to someone's mental health to

```
 1    be prevented from participating in athletics on a team
 2    consistent with their gender identity, could it be
 3    harmful to their mental health to be prevented from
 4    competing on a team consistent with their biological sex
 5    if they so wanted to?
 6                    ATTORNEY BLOCK:  Objection to form.
 7                    THE WITNESS:  I think there's a whole
 8    host of hypotheticals that could potentially be
 9    possible.
10    BY ATTORNEY BARHAM:
11        Q.    And that is one of them?
12                    ATTORNEY BLOCK:  Objection to form.
13                    THE WITNESS:  That's possible.
14                    ATTORNEY BARHAM:  Okay.
15    BY ATTORNEY BARHAM:
16        Q.    In paragraph 34 of your report you write a
17    recent study found people who reported experiencing
18    those conversion efforts were more likely to report an
19    attempted suicide, especially those who reported
20    receiving such therapy in childhood.
21             Do you see that?
22        A.    I see that.
23        Q.    And there we are talking about conversion
24    therapy.
```

```
 1              Is that correct?

 2     A.    We're talking specifically about the study

 3 participants on perceptive perceptions of conversion

 4 therapy.

 5     Q.    But that's what's meant by those conversion

 6 efforts.

 7              Correct?

 8     A.    Correct.

 9     Q.    In footnote six you cite an article by Turban

10 published in 2020.

11              Is that correct?

12     A.    That is correct.

13              ATTORNEY BARHAM:   All right.

14              I'm going to show you Tab 113, which will

15 be Exhibit 43.

16                       ---

17              (Whereupon, Exhibit 43, Article by

18              Turban, et al., was marked for

19              identification.)

20                       ---

21 BY ATTORNEY BARHAM:

22     Q.    This is an article published by Turban, et al.

23 published in 2020, it's entitled Association Between

24 Recalled Exposure to Gender Identity Conversion Efforts
```

1    and Psychological Distress and Suicide Attempts Among

2    Transgender Adults.  This is the article that you cited

3    in your report.

4              Is that correct?

5        A.    That is correct.

6        Q.    And this is the article cited in footnote six as

7    support for the proposition that studies that found that

8    people who reported conversion efforts are more likely

9    to have reported suicide.

10             Correct?

11       A.    That's correct.

12       Q.    On page two of this article the authors --- and

13   by this article I'm referring to Exhibit 43.  The

14   authors note that they rely upon data from the National

15   Center for Transgender Quality and its 2015 transgender

16   survey.

17             Correct?

18       A.    That is correct.

19       Q.    On page eight of this document, the authors

20   admit that it is cross sectional study designed

21   precludes determination of causation.

22             Correct?

23       A.    I don't have page numbers.  Which one is that?

24       Q.    It's the one with strengths and limitations at

```
 1    the heading at the bottom.
 2        A.    Can you repeat the question?
 3        Q.    On page eight, the authors admit that the
 4    studies cross-sectional study design precludes
 5    determination of causation.
 6              Correct?
 7        A.    That is correct.
 8        Q.    The authors also admit that those with worse
 9    mental health or internalized transphobia may have been
10    more likely to seek out conversion therapy rather than
11    non GICE therapy suggesting conversion efforts itself
12    were not causative of these poor mental health outcomes.
13              Correct?
14        A.    That is what is written, correct.
15        Q.    Okay.
16              So this study does not establish a causal link
17    between conversion therapy and suicidality.
18              Correct?
19        A.    That is correct.
20        Q.    The authors also admit that they lack data
21    regarding the degree to which GICE occurred.
22              Correct?
23        A.    That is correct.
24        Q.    And they also admit that they lacked information
```

 1    as to what specific modalities were used.

 2            Correct?

 3    A.    That is correct.

 4    Q.    Turban et al., in 2020 also admits that

 5    participants were not recruited via random sampling and

 6    thus the sample may not be nationally representative.

 7            Is that correct?

 8    A.    That is correct.

 9    Q.    In paragraph 37 you go on to say that

10    conclusions further supported by extensive evidence that

11    rejection of a young person's gender identity by family

12    and peers is the strongest predictor for adverse mental

13    health outcomes.

14            Is that correct?

15    A.    That is correct.

16    Q.    And you cite in that article --- you cite in

17    footnote seven an article by Ryan, et al. published in

18    2010.

19            Is that correct?

20    A.    I'm not seeing that.

21    Q.    In footnote seven?

22    A.    Oh, in footnote seven, yes.

23            ATTORNEY BARHAM:  I'm going to show you

24    what we will mark as Exhibit-44, which is Tab 114, an

1  article by Ryan, et al. published in 2010 entitled

2  Family Acceptance in Adolescence and the Health of LGBT

3  Young Adults.

4                          ---

5                   (Whereupon, Exhibit-44, Article by Ryan,

6                   et al., was marked for identification.)

7                          ---

8  BY ATTORNEY BARHAM:

9      Q.    This is the article that you cited in footnote

10  seven of your report.

11             Correct?

12      A.    That is correct.

13      Q.    On page 206, in the second column, the authors

14  note that they relied on a sample of 245 people.

15             Is that correct?

16      A.    That is correct.

17      Q.    Of that sample, only nine percent identified as

18  transgender.

19             Correct?  That's on page 208.

20      A.    Correct.

21      Q.    That means we're talking about nine people.

22             Correct?  245 times nine percent is 22.05.

23      A.    I'll take your math.

24      Q.    On page 210 the authors admit that they cannot

 1    claim that this sample is representative of the general

 2    population of LGBT individuals.

 3              Is that correct?

 4       A.    That is correct.

 5       Q.    On page 210 to 211 the authors recognize that

 6    this is a retrospective study, which, quote, allows for

 7    the potential of recall bias in describing specific

 8    family reactions to their LGBT identity.

 9              Correct?

10       A.    That is correct.

11       Q.    And then in footnote seven of your report you

12    also cite an article by Klein and Golub published in

13    2016.

14              Correct?

15       A.    That is correct.

16       Q.    All right.

17              ATTORNEY BARHAM:   I'm going to show you

18    what we will mark as Exhibit 45, which is Tab 15.

19                           ---

20              (Whereupon, Exhibit-45, Article by Klein

21               and Golub, was marked for

22               identification.)

23                           ---

24    BY ATTORNEY BARHAM:

1    Q.    This is an article by Klein and Golub entitled

2  Family Rejection as a Predictor of Suicide Attempts.

3  This article simply says that family rejection is a

4  predictor of suicide attempts and substance abuse among

5  transgender and gender non-conforming adults.

6        Correct?

7              ATTORNEY BLOCK:  Objection.  Can you

8  point to where you are reading from?

9              ATTORNEY BARHAM:  The title.

10             THE WITNESS:  They identify as a

11 predictor, yes.

12 BY ATTORNEY BARHAM:

13   Q.    In fact, the word strongest does not even appear

14 in this article.

15       Is that correct?

16             ATTORNEY BLOCK:  Objection.

17             THE WITNESS:  I would have to read the

18 whole article.

19             ATTORNEY BLOCK:  Let him read it.

20             THE WITNESS:   The authors note on

21 page 195 on a multi-variant model moderate levels of

22 family rejection were associated with almost twice the

23 odds of attempted suicide and high levels of family

24 rejection were associated with almost three and a half

1   times the odds of attempted suicide.  While there is not

2   any use of the word stronger, I don't see any additional

3   risks that were highlighted in this specific study.

4   BY ATTORNEY BARHAM:

5       Q.    Okay.

6             On page 197 stemming over on to 198 the authors

7   admit that they relied on data NTDS that use sampling

8   techniques that were not random and included a

9   homogenous study population that was largely white,

10  educated and employed.

11            Correct?

12      A.    That is correct.

13      Q.    Do you agree with them that this limits the

14  generalizability of the article's findings?

15      A.    I do.

16      Q.    The authors also admit that the cross sectional

17  nature of the data did not allow us to determine any

18  causal relationship between family rejection and the

19  negative health-related outcomes.

20            Correct?

21      A.    Correct.

22      Q.    The authors also indicate that they did not have

23  any information about the timeframe within which family

24  rejection occurred, including what precipitated the

```
 1   event, the severity of the rejection or whether this
 2   changed over time.
 3              Correct?
 4   A.    Correct.
 5   Q.    Do you agree with them that these factors might
 6   have influenced their results?
 7   A.    Sure.
 8   Q.    All right.
 9              Let's go to Tab 97, which is Exhibit 16.  This
10   article we discussed before, but this reviews the Turban
11   article that you cited in footnote seven of your report.
12              Is that correct?
13   A.    That is correct.
14   Q.    Or footnote six of your report.  Okay.
15              And in your report you are using the Turban
16   2020 article to critique the use of what you describe as
17   conversion therapy.
18              Is that correct?
19              ATTORNEY BLOCK:  Objection to form.
20              THE WITNESS:  I'm just pulling this up
21   where I have it.  As I stated in my report, the Turban
22   article found that people who reported experiencing
23   those conversion efforts were more likely to have
24   reported attempting suicide.
```

1    BY ATTORNEY BARHAM:

2       Q.    So you're using it to critique what you

3    described as conversion therapy.

4             Is that fair?

5       A.    I think that's fair.

6       Q.    On page two of Dr. D'Angelo's letter to the

7    editor he notes at the top of the first --- towards the

8    top of the first column that Turban's analysis used data

9    from the 2015 USTS survey of transgender identifying

10   individuals, this survey is convenient sampling

11   methodology which generates lower quality data.

12            Would you agree that convenient sampling

13   generates low quality data?

14      A.    Convenient sampling generates lower quality

15   data.  And then some other statistical method of study

16   design.  One of the ways that you want to counteract

17   that potential for low quality of data is to have

18   increased number of participants.  The difference of

19   27,000 participants in this particular survey analysis

20   versus say 100 in another, 40 in another does add a

21   little bit more context to the applicability of these

22   findings.

23      Q.    Right below that Dr. D'Angelo, et al. notes that

24   the participants were recruited through transgender

```
 1    advocacy organizations and subjects were asked to pledge

 2    to promote survey among friends and family.  This

 3    recruiting method yielded a large but highly skewed

 4    sample.  Would you agree that the sample for this survey

 5    was highly skewed?

 6                    ATTORNEY BLOCK:  Objection to form.

 7                    THE WITNESS:  I think we'd have to

 8    understand what specifically you mean by skewed and

 9    skewed in what way.  It's hard to know.

10    BY ATTORNEY BARHAM:

11        Q.    The authors go on in Table 1 to demonstrate what

12    they mean by skewing of the data.  Upon reviewing their

13    information, would you agree that the sample was skewed?

14                    ATTORNEY BLOCK:  Objection to form.

15                    THE WITNESS:   Again, I'm not sure skewed

16    in comparative --- comparison to what?

17    BY ATTORNEY BARHAM:

18        Q.    The authors continue on page two by saying that

19    a number of additional data irregularities in the USTS

20    raise further questions about the quality of the data

21    captured by the survey.  They talk about how high number

22    of survey participants had not transitioned medically or

23    socially, significant number reported no intention to

24    transition in the future.  The information about
```

 1    treatments does not appear to be accurate as a number of

 2    respondents reported the initiation of puberty blockers

 3    after the age 18, which is highly improbable.  Further,

 4    the survey has developed special waiting due to

 5    unexpected high proportion of respondents who reported

 6    that they were exactly 18 years old.  Do you agree that

 7    these irregularities raise serious questions about the

 8    reliability of the data?

 9        A.    I think these are all elements that you want to

10    take into context as you're establishing validity of the

11    data and the conclusions that could be drawn.

12        Q.    The second column of page two, the authors note

13    that the emphasis on the survey's goals to highlight the

14    injustices suffered by transgender people during the

15    recruitment stage in the introduction of the survey

16    instrument itself made it eligible for reporting adverse

17    experiences due to demand bias.

18            Do you agree that this demand bias likely

19    skewed the responses?

20        A.    I wouldn't agree that it likely, but that

21    implies that we have data that we don't have.  It's a

22    possibility that these authors are raising.

23        Q.    Now, the authors also note that the experience

24    of detransitioners and the sisters were not included, as

1  they were disqualified from completing the survey.  They

2  note that this failure is a serious oversight.

3         Do you agree with them that that's a serious

4  oversight?

5                    ATTORNEY BLOCK:  Objection to form.

6                    THE WITNESS:  I would need to look at the

7  specific survey instructions for the survey in question

8  to understand the validity of that.  I don't see how in

9  the context of this that folks who detransitioned were

10 specifically excluded, but ---.

11 BY ATTORNEY BARHAM:

12     Q.    Did you review ---?

13     A.    Can you point to where that --- where in the

14 original article or the study that those folks are

15 excluded specifically.  I may have missed it.

16     Q.    I don't have the original survey on hand at the

17 moment.  If it proved that they were excluded, would you

18 agree that that would be a serious oversight?

19                    ATTORNEY BLOCK:  Objection to form.

20                    THE WITNESS:  It would really depend on

21 how that was done and what the language was used.

22 Without seeing it I can't make a comment otherwise.

23 BY ATTORNEY BARHAM:

24     Q.    What if there was no language involved, it was

1    just those who indicated that they were either desisting

2    or detransitioning or not included in the data set?

3        A.    I would need to see the context of it in order

4    to make a judgment on the validity of that structure.

5        Q.    On page four of this document.  The authors note

6    that Turban's hypothesis is further weakened by a

7    significant flaw in their data analysis failure to

8    control for individuals pre-GICE exposure mental health

9    exposure status, noting that this is a potential

10   compound and may mask reverse causation.

11           Do you have any scientific basis for disputing

12   that concern?

13       A.    Let me review this part of the paper, please.

14               ATTORNEY BLOCK:  Just objection.  I don't

15   think he read the full the sentence.

16               THE WITNESS:  I have not seen any

17   literature on specific risks or predictors for

18   individuals who would be exposed to gender identity

19   conversion efforts, and so the supposition inherent in

20   this paragraph that the authors are making that an

21   individual's underlying poor mental health led to their

22   experience of gender identity conversion efforts is not

23   supported by my understanding of the literature.

24   BY ATTORNEY BARHAM:

1    Q.    Do you have any reason to dispute a potential

2   for a confound or the potential for masking reversed

3   causation that the authors identify here?

4    A.    As I described, I haven't seen any literature

5   that speaks to this nor has that been my clinical

6   experience.

7    Q.    On page two of this document the authors note

8   that Turban's conclusions rest on the assumption that

9   they have a valid way of determining whether or not the

10   respondent was exposed to the unethical practice of

11   conversion therapy.  Do you agree that this lack of

12   context in detail renders the question incapable of

13   differentiating between ethical non-affirming ---

14   non-affirmative neutral and counters unethical

15   conversion therapy?

16    A.    I do not.

17                    ATTORNEY BLOCK:  Sorry, objection to

18   form.

19   BY ATTORNEY BARHAM:

20    Q.    Back on page four the authors note that the

21   failure to control for the subjects' baseline mental

22   health makes it impossible to determine whether the

23   mental health or suicidality of a subject person stayed

24   the same or potentially even improved after the

 1   non-affirming encounter.  Do you have any scientific

 2   basis for disputing this observation?

 3                    ATTORNEY BLOCK:  Objection to form.

 4                    THE WITNESS:  Again, if we wanted to go

 5   back to the Turban study itself and look more

 6   specifically at their methodology and their description

 7   that would be a more accurate way of getting a potential

 8   ups and downs side of this study other than this letter

 9   to the editor.

10   BY ATTORNEY BARHAM:

11     Q.    But do you have any basis for -- any scientific

12   basis for disputing that observation?

13                    ATTORNEY BLOCK:  Objection to form.

14                    THE WITNESS:  This question gets to a

15   very specific type of study designed methodology.  That

16   is something that typically is done by a data scientist,

17   which is not where my level of expertise is.  There are

18   nuances in it.  What I would say is in a population as

19   large of a survey that having a denominator as high as

20   they had helps to reduce the chances of confounders like

21   the authors in this letter to the editor are describing

22   as problematic.

23   BY ATTORNEY BARHAM:

24     Q.    A little bit later on page five the authors

1    highlight the cross sectional design of the USTS and

2    indicate that presenting a highly confounded association

3    of causation is a serious error.

4         Do you agree that presenting a confounded

5    association as causation is a serious error?

6                    ATTORNEY BLOCK:  Objection to form.

7                    THE WITNESS:  I have not claimed nor do I

8    understand my reading of the Turban, et al. article to

9    claim causation when an association has been found, and

10   in fact, they specifically called out that it was not

11   causative or at least the analysis could not prove it

12   was causative with a cross-sectional design.

13   BY ATTORNEY BARHAM:

14   Q.   So when you wrote paragraph 34 of your report

15   and said that a study found that people who reported

16   experiencing these conversion efforts were more likely

17   to have reported attempting suicide, especially those

18   who reported receiving such therapy in childhood, were

19   you suggesting that the conversion efforts caused the

20   suicide attempts?

21   A.   I believe in my testimony I am saying that there

22   is a relationship between those who are exposed to

23   conversion efforts and those who have described

24   reporting attempting suicide.

1    Q.    And how would you describe that relationship?

2    A.    As an association.

3    Q.    Is association a synonym for correlation?

4              ATTORNEY BLOCK:  Objection to form.

5              THE WITNESS:  It depends on the context,

6    but generally in plain English association and

7    correlation are relative synonyms for one another.

8    BY ATTORNEY BARHAM:

9    Q.    In this specific context of your report, when

10   you say that you are reporting an association, were you

11   using association in correlation to synonyms?

12   A.    As far as I know I was, yeah.

13   Q.    Have you had patients impacted by not being

14   allowed to play sports consistent with their gender

15   identity?

16   A.    On occasion, yes.

17   Q.    Approximately how many such patients?

18   A.    On the order of less than two or three.

19   Q.    What sports were those patients participating

20   in?

21   A.    I do not recall the specific.  These were ---

22   the two or three that I had were all in the order of

23   between five, six and seven-year-olds.

24   Q.    What was your follow-up with each patient?

1    A.    With those particular kids?

2    Q.    Yes.

3    A.    Without having their charts in front of me, it's

4  hard to expound.  My typical process would be

5  understanding why it's happening, what they need and how

6  to coordinate with whatever program to help make sure

7  that the kid gets the support that is going to be most

8  beneficial to them.

9    Q.    Are you offering an opinion that the State of

10  West Virginia does not have a strong interest in

11  ensuring safe competition for women?

12              ATTORNEY BLOCK:  Objection to form.

13              THE WITNESS:  My testimony is about the

14  mental health impacts.  I don't have an opinion on the

15  state interests of West Virginia in this regard.

16  BY ATTORNEY BARHAM:

17    Q.    Are you offering an opinion that the State of

18  West Virginia does not have a strong interest in

19  ensuring fair competition?

20              ATTORNEY BLOCK:  Objection to form.

21              THE WITNESS:  Same answer.

22  BY ATTORNEY BARHAM:

23    Q.    Would you agree that ensuring fairness and

24  safety is an important state interest.

1        ATTORNEY BLOCK:  Objection to form and

2   scope.

3        THE WITNESS:  Same answer.

4        ATTORNEY BARHAM:  All right.  I believe

5   those are all my questions for today.  I will turn the

6   floor over to Mr. Tryon.

7        ATTORNEY TYRON:  Okay.

8        Here I am.

9                      ---

10                  EXAMINATION

11                      ---

12  BY ATTORNEY TRYON:

13     Q.    My name's David Tryon.  I am with the West

14  Virginia Attorney General's Office and represent the

15  State of West Virginia.  So we've got about an hour

16  left.  Do you want to just keep on going and finish up

17  or would you like to take a break for five minutes

18  before we finish up?

19     A.    I think let's keep going.  If I have to take a

20  break, I'll let you know.  I appreciate it.

21     Q.    Okay.

22        You bet.  Happy to help you out that way again.

23  I just want to follow up, first of all, on a couple of

24  questions about the Turban study, if I may, that we were

```
 1    just discussing.  And Exhibit 16 I believe was the

 2    document that addressed that Turban study.

 3         A.    I see Exhibit 16 as the letter to the editor

 4    from D'Angelo, et al.

 5         Q.    And that's the one that we were just looking at

 6    addressing the Turban study.

 7               Right?

 8         A.    Correct.

 9         Q.    So let me just ask you, you did cite the Turban

10    study in your report.

11               Right?

12         A.    Yes.

13         Q.    Yeah, and that was to support your opinion.

14               Right?

15         A.    That is to support my opinion, yes.

16         Q.    Now, before you used it did you do something to

17    cite check it to see if there were any articles that

18    either challenged it or critiqued it or criticized it?

19         A.    I would say that a routine review of the

20    literature is a part of my day-to-day practice.  This

21    particular article did not come up in that review.

22         Q.    Okay.

23               Is there a way to specifically search for it to

24    see if --- to look at it and then do a search and see
```

1    what other articles are quoted or cited?

2        A.    My guess is there probably is, I'm not aware of

3    it.

4        Q.    But I think you said you were not aware of the

5    letter which is Exhibit 16 prior to issuing your expert

6    report.

7              Is that right?

8        A.    That is correct.

9        Q.    Would it have been helpful to have seen that

10   ahead of time?

11       A.    I think it would have been helpful for me to

12   feel more prepared in this deposition.  I don't think it

13   would have changed any of my report.

14       Q.    If you had that, would you have investigated

15   those criticisms to see if they were failed criticisms?

16       A.    The authors of the Turban study had raised most

17   of those criticisms themselves in the context of their

18   report.

19       Q.    And did you independently look at it and

20   determine if they were --- if that caused you some

21   concerns?

22       A.    Concerns wouldn't be the right word.  It's about

23   weighing the evidence and making sure that we understand

24   context and applicability.  There's nothing in this

1    letter to the editor that changes those demands from my

2    reading of the Turban article.

3       Q.    So you are saying that this letter in the Turban

4    article --- I'm sorry, you're saying this letter to the

5    editor does not raise any new issues at all than what

6    the Turban study itself raised.

7              Is that right?

8       A.    I would have to read through this in a more

9    detailed manner to say for certain that no single issue

10   has been addressed.  None of which we discussed today

11   are elements that hadn't been addressed, either by

12   myself reading the Turban article or by the Turban, et

13   al. in the article itself.

14      Q.    But you do not raise any of those concerns in

15   your report, do you?

16              ATTORNEY BLOCK:  Objection to form.

17              THE WITNESS:  No.  No, not specifically.

18   BY ATTORNEY TRYON:

19      Q.    Okay.  Fair enough.

20              If you can follow your report now, which I'm

21   forgetting which exhibit that is, Exhibit 1.  Thank you.

22              So first of all, you said you were retained by

23   Counsel for the Plaintiffs as an expert.  Can you tell

24   me when you were retained, please?

```
 1        A.    I would have to pull up my invoice to give you

 2    the specific date, and I'm guessing Mr. Block might have

 3    that information at the ready.

 4        Q.    Unfortunately, I can't depose him.  I would love

 5    to, but I don't think he would agree to that.  So as

 6    best you can recall --- first of all, was it this year

 7    or last year?

 8        A.    It was this year to the best of my recollection.

 9        Q.    Okay.

10              Was it after the other expert reports came out

11    or before?

12        A.    I believe I was hired or retained.  I don't know

13    what the correct terminology is so forgive me, after the

14    development of the additional expert reports.  It was

15    the rebuttal to those reports that led to my being

16    retained to my recollection.

17        Q.    I'm sorry?

18        A.    From my recollection.  And I'm terrible with

19    dates, so I apologize for that.

20        Q.    In paragraph four, you say --- you explain what

21    you viewed and you mention the reports of Dr. Safer.

22    Does that refer to Dr. Safer's original report that was

23    filed with the Court and his rebuttal report --- strike

24    that.
```

1        Does that --- so he filed something with the

2   Court originally.  Did you review that one?

3      A.    It was the original report that I had reviewed.

4      Q.    Okay.

5            So let me just be clear.  So he filed an

6   original report back in --- last year and then issued a

7   new report in February of this year and then issued a

8   rebuttal report.  So a total of three.  Did you see all

9   three of those?

10     A.    I would have to see them ---.

11                 ATTORNEY BLOCK:  Object to form.

12                 THE WITNESS:  I would have to see them in

13  front of me to know if it was something that I had read.

14  I don't know the terminology well enough to know if I

15  was reading the original report or rebuttal report or

16  the third type.

17  BY ATTORNEY TRYON:

18     Q.    So one of them was expert report which was

19  issued I believe in February of this year.  I believe

20  you saw that one.

21     A.    Again, I would have to see the report in front

22  of me to know if it was the one I saw.

23     Q.    Okay.

24            There was another one which was labeled as

 1    rebuttal.  Do you remember if you saw that one?

 2       A.    I would have to go back through my notes.  I

 3    don't have it in front of me, so I apologize for not

 4    recalling.

 5       Q.    Well, let me ask you this question.  Do you

 6    remember how many reports you saw from Dr. Safer?

 7       A.    All I can say is I remember seeing at least two.

 8       Q.    Very good.  And Dr. Adkins, how many of her

 9    reports did you see?

10       A.    I can't be certain, but I think I also saw two

11    of hers.

12       Q.    And I'll represent to you that each of them

13    issued a rebuttal report.  And did you read their

14    rebuttal reports prior to preparing your rebuttal

15    report?

16       A.    I don't have the documentation in front of me in

17    terms of when I was spending time on what piece of this

18    process.  That's a part of my notes that are not here

19    today.

20       Q.    Do you know why you were asked to issue a

21    rebuttal report if Dr. Safer and Dr. Adkins were both

22    issuing rebuttal reports?

23                    ATTORNEY BLOCK:  Objection.  Just don't

24    discuss any of the contents of your communications with

```
 1    the attorneys.

 2                    ATTORNEY TRYON:  Correct.

 3                    THE WITNESS:  My understanding was to

 4    rebut the reports of Dr. Levine and Dr. Cantor.

 5    BY ATTORNEY TRYON:

 6       Q.    Is your rebuttal different than the rebuttals of

 7    Dr. Adkins and Dr. Safer?

 8                    ATTORNEY BLOCK:  Objection to form.

 9                    THE WITNESS:  Yes.

10    BY ATTORNEY TRYON:

11       Q.    Pardon me?

12       A.    Yes.

13       Q.    Does your rebuttal report have any opinions

14    which are different from Dr. Safer and Dr. Adkins'

15    reports?

16                    ATTORNEY BLOCK:  Objection to form.

17                    THE WITNESS:  I think it's hard without

18    the specific reports in front of me.  I know they were

19    long documents and I was specifically rebutting the

20    reports of Dr. Levine and Cantor.

21    BY ATTORNEY TRYON:

22       Q.    Do you have any specific reports that are not

23    rebutting Dr. Levine and Dr. Cantor?

24       A.    The process of developing this rebuttal report
```

1    was for that specific intent.

2       Q.    So you don't believe you have any original

3    opinions to report; would that be a fair statement?

4                    ATTORNEY BLOCK:  Objection to form.

5                    THE WITNESS:  I'm not --- I guess I'm not

6    sure what you mean by original opinions.

7    BY ATTORNEY TRYON:

8       Q.    So let's move on.  Do you recall the Costa

9    study?

10      A.    Yes, we had reviewed one Costa study earlier.

11   Can you remind me of the exhibit number?

12      Q.    I believe it's Exhibit 27?

13      A.    All right.  Okay.

14      Q.    I believe that during that discussion you

15   referred to the standards in there as being rough or

16   imprecise measure and --- let me get this right, and not

17   objective criteria.

18           Do you remember that?

19      A.    I had described the CGAS, the Children's Global

20   Assessment Scale, as an imprecise measure of children's

21   functioning.

22      Q.    And you said not having any objective criteria;

23   can you help with that?

24      A.    Yes, it's a scale from zero to a hundred that is

1    very gestalt that the clinician uses to rate a child.

2    It's not an instrument that I find clinically useful.

3        Q.   Is it not clinically useful because it doesn't

4    have objective criteria?

5        A.   I wouldn't say it's fair to say that there are

6    no objective criteria, but there are at times

7    contradictory objective criteria within the CGAS.  And

8    again I would he have to see the CGAS in front of me to

9    point out those specifics, but there are other

10   functions, or other ways of measuring outcomes than the

11   CGAS.

12       Q.   What is an objective criteria?  What does that

13   term mean in other words?

14                   ATTORNEY BLOCK:  Objection to form.

15                   THE WITNESS:  I guess what would say is

16   we would want a psychometrically valid approach for

17   answering a question, ideally that is of clinical

18   relevance.

19   BY ATTORNEY TRYON:

20       Q.   Can you just repeat your answer for me?  I

21   didn't quite understand it.

22       A.   Probably not the same language.  A

23   psychometrically valid tool that in an ideal world

24   provides some kind of clinical relevance.

```
1    Q.    Okay.

2          You said psychometrically valid tool.

3          Did I get that right?

4    A.    Psychometrically validated tool, yes.

5    Q.    Validated?

6    A.    Yes.

7    Q.    What is that?

8    A.    Essentially you want to understand that the

9    measure you're using is measuring what it says to

10   measure and is reliable across multiple domains.  The

11   CGAS has been widely used in research, it's just not my

12   favorite tool because I don't find it to have that

13   second domain of having that clinical utility.

14   Q.    Let me ask you to take a look at paragraph 19 of

15   your opinion?

16   A.    I'm looking at it now.

17   Q.    You say at one point it says contrary to the

18   portrayal.  Do you see that sentence?

19   A.    I see that, yes.

20   Q.    Contrary to the portrayal in Dr. Levine and Dr.

21   Cantor's reports, gender-affirming treatment also

22   requires a careful and thorough assessment of a

23   patient's mental health, including co-occurring

24   conditions, history of trauma, and substance abuse among
```

```
 1   many other factors.  My question for you is with respect

 2   to your language, a careful and thorough assessment, and

 3   I'd like to then know are there psychometrically

 4   validated tools used to do that?

 5       A.    There are on occasion, and particularly when

 6   we're looking at research outcomes for transgender youth

 7   there are a number of psychometrically validated

 8   screenings or outcome measures that are used.

 9       Q.    What are those?

10       A.    These include most importantly the Utrecht

11   Gender Dysphoria Scale, the Body Image Scale,

12   historically what's in the Dutch data, the Toronto data,

13   and the Costa data and The Tavistock Clinic, all of them

14   were participatory in kind of the informal research

15   group that agreed to collect the same measures, so these

16   included the Achenbach, CBCL, and they use self report.

17       Q.    I'm sorry.  What was the first one you said

18   before Body Image Scale?

19       A.    Utrecht Gender Dysphoria Scale.

20       Q.    Utrecht Gender Dysphoria Scale?

21       A.    Correct.

22       Q.    What is that?

23       A.    It's a measure of the degree and intensity of

24   gender dysphoria.
```

```
 1      Q.    How is it --- what does it look like?  Does it

 2  have a series of scale one to ten on different issues or

 3  what is it?

 4      A.    It's a series of questions that I'd have to have

 5  in front of me to give a better job of describing, but

 6  it provides a rating of --- I can't remember what the

 7  range is, from zero to somewhere in the low dozens, that

 8  correlates with the intensity of gender dysphoria.

 9      Q.    Is that something that you use in your practice

10  to diagnose gender dysphoria?

11      A.    It is an element that I have used.

12      Q.    Do you use that with every patient?

13      A.    It is not something that I use with every

14  patient.  The contents of the Utrecht Gender Dysphoria

15  Scale are generally pieces that I'm getting or gathering

16  from every clinical encounter without necessarily

17  utilizing the specific tool.

18      Q.    This statement, a careful and thorough

19  assessment, does that have a --- is there a source for

20  that particular standard?

21      A.    There are a number of sources for this

22  particular standard.  The general practice of children's

23  mental health from my guild in child adolescence

24  psychiatry, there are years of training and
```

1  certification in order for you to have demonstrated a

2  careful and thorough assessment.  In order to get Board

3  Certified I had to do a careful and thorough assessment

4  in front of a board of examiners, so this is inherent to

5  the practice of mental health.

6      Q.   Is there --- but there is no requirement that

7  these various standardized tools that you mentioned to

8  me, these psychometrically valid tools have to be used,

9  is there?

10     A.   There isn't, and there is not a clinical

11  verification that they be used in every instance.  For

12  the sake of these kind of studies, it's important to

13  have these validated tools so we're all speaking the

14  same language and that outcomes can be tracked over

15  time, but not necessarily in every clinical event is it

16  going to be warranted.

17     Q.   If you don't use them in every clinical event,

18  then how can how can you adequately track something

19  across patients if you wanted to do a study?

20              ATTORNEY BLOCK:  Objection to form.

21              THE WITNESS:  As an example there are a

22  number of psychometrically validated tools that cannot

23  be administered at every clinical encounter, otherwise

24  they would be rendered invalid.  So there's a lot of

1 nuance in these specific tools and I think that level of

2 nuance is really a clinical judgment based upon

3 professional and prevailing standards.

4 BY ATTORNEY TRYON:

5    Q.   Okay.

6      So there's no objective measure of someone

7 other than --- well, let me back up.  So different

8 psychiatrists would come up with different conclusions.

9      Is that right?

10        ATTORNEY BLOCK:  Objection to form.

11        THE WITNESS:  I don't think that's

12 related to what I was speaking about.  I think different

13 psychiatrists would utilize different instruments to

14 provide an assessment, and that's going to change from

15 person to person.  I can't speak to diagnostic

16 reliability for a psychiatrist that I haven't met or

17 trained.

18 BY ATTORNEY TRYON:

19    Q.   Let me ask you how long you would normally spend

20 with a child before --- or adolescent before prescribing

21 puberty blockers?

22        ATTORNEY BLOCK:  Objection to form.

23        THE WITNESS:  There is not going to be a

24 single answer to that question.  It really is dependent

1  on the requirements of the assessment, as well as the

2  individual factors of that child and that family.

3  BY ATTORNEY TRYON:

4      Q.    Could ten minutes be long enough?

5      A.    Not in my opinion.

6      Q.    What about 30 minutes?

7      A.    Likely not.

8      Q.    How about an hour?

9      A.    It would be very atypical in my practice to

10  spend that little time prior to making a recommendation

11  for puberty suppression.  I do a much more thorough

12  assessment than an hour.

13      Q.    So how long would a thorough assessment normally

14  take?

15                  ATTORNEY BLOCK:  Objection to form.

16  BY ATTORNEY TRYON:

17      Q.    You said more than an hour I think?

18      A.    Correct.  I would say more than an hour.  I

19  think maybe there's a ceiling, but not a roof.  What I

20  mean by that that is there are certain criteria required

21  in order to make a recommendation for a treatment for

22  gender dysphoria to be offered.  Those include a

23  diagnosis of gender dysphoria, a recognition of any

24  co-occurring mental health issues and whether or not

```
 1    they are adequately well controlled enough to be able to

 2    proceed with care.  And a clear understanding of the

 3    risks, benefits and alternatives of that treatment.

 4    There's no specific timeframe on that as an assessment.

 5        Q.    How many visits would you expect to be adequate

 6    for a careful and thorough assessment?

 7                     ATTORNEY BLOCK:  Objection to form.

 8                     THE WITNESS:  And I apologize, it's ---

 9    I'm not trying to be evasive.  It really is going to

10    depend upon each individual child.

11    BY ATTORNEY TRYON:

12        Q.    What about is one enough?  Have you ever done it

13    --- given a recommendation for puberty blocker after

14    only one visit for an hour?

15                     ATTORNEY BLOCK:  Compound question.

16                     THE WITNESS:  I have never given a

17    recommendation for puberty suppression after a one hour

18    visit personally.

19    BY ATTORNEY TRYON:

20        Q.    What's the minimum time that you think is

21    adequate?

22                     ATTORNEY BLOCK:  Objection to form.

23                     THE WITNESS:  As I said, I don't think

24    it's based on time.  It's based about the content.
```

1    There are circumstances in which patients have been

2    followed for several years by therapists, that can

3    provide a tremendous amount of collateral information

4    including information provided by parents, family

5    members, community providers, et cetera, that can allow

6    more abbreviated assessment for some people.

7    BY ATTORNEY TRYON:

8       Q.    Is someone as consistently spending only an hour

9    with one patient, with each patient for recommending

10   puberty blockers, that would look kind of like a rubber

11   stamp recommendation wouldn't it?

12                ATTORNEY BLOCK:  Objection.

13   BY ATTORNEY TRYON:

14      Q.    Assuming that it's happening?

15                ATTORNEY BLOCK:  Objection to form.

16                THE WITNESS:  I would have to see the

17   specifics in order to make any kind of comment.

18   BY ATTORNEY TRYON:

19      Q.    Isn't it fair for Dr. Levine or Cantor to

20   express concern that in actual practice that may be

21   happening?

22                ATTORNEY BLOCK:  Objection to form.

23                THE WITNESS:  I have not seen anywhere in

24   Dr. Cantor or Dr. Levine's report or within the

1    literature that this is a pervasive thing that is

2    happening.

3    BY ATTORNEY TRYON:

4        Q.    Well, it's not tracked at all so we wouldn't

5    know, would we, one way or the other?

6                    ATTORNEY BLOCK:  Objection to form.

7                    THE WITNESS:  It is a question that could

8    be asked.  I don't think it's for me to make

9    suppositions, nor do I think it is for Dr. Cantor and

10   Dr. Levine to make suppositions about the critical care

11   of transgender youth in this context.

12   BY ATTORNEY TRYON:

13       Q.    Is there any --- is there any place where you

14   report any central location where you or your clinic

15   report how much time and effort and what your thorough

16   examination is so that it can be tracked?

17       A.    The site where I'm at now is part of a four-site

18   NIH trial that has published on the specific assessment

19   processes that the kids who are involved in the study

20   engage in.

21       Q.    How many kids are in that trial?

22       A.    I'm not a specific participant in the

23   organization of that trial, so I don't have that

24   information in front of me.

1    Q.    Does your clinic report to that trial?

2    A.    My gender clinic, the gender clinic within the

3    hospital that I work in, there are many patients who are

4    enrolled in that trial, yes.

5    Q.    But it's certainly not mandated, right?

6    A.    No.

7    Q.    When these careful and thorough assessments are

8    done, what type of documentation should be used for

9    that?

10          ATTORNEY BLOCK:  Objection to form.

11          THE WITNESS:  That's a very contextual

12   question.  We have prevailing standards in terms of what

13   should and shouldn't be documented through various

14   professional organizations, but that's going to change

15   from state to state, country to country.

16   BY ATTORNEY TRYON:

17   Q.    And what about in the State of West Virginia?

18   A.    I have no knowledge of documentation

19   requirements in the State of West Virginia.

20   Q.    How about in the United States in general?

21   A.    As far as I'm aware, there are no universal

22   recommendations in terms of specifics of how things are

23   documented.

24   Q.    Are there any organizations like the WPATH or

1  any other organizations that do give recommendations on

2  what documentation to use in America?

3      A.    WPATH has certainly provided some educational

4  events in terms of best practices in documenting, but

5  these aren't specific guidelines or recommendations.  I

6  think it is notable to say that the Dutch clinic in

7  particular has been quite vigorous in their production

8  of research and is quite well respected in the world in

9  terms of how things are structured, and they actually

10 don't even have a letter that their clinicians write

11 and/or see initiation of puberty suppression for

12 gender-affirming hormones.

13              ATTORNEY TRYON:  Jake, if you could bring

14 up the exhibit entitled Adolescent Medicine,

15 Confidential Patient Questionnaire, which has been

16 redacted?

17              VIDEOGRAPHER:  Do you want that marked?

18              ATTORNEY TYRON:  Yes, please, wherever we

19 are at in the next number.

20              VIDEOGRAPHER:  I believe we're at 44.

21              LAW CLERK WILKINSON:  46.

22              ATTORNEY SWAMINATHAN:  46.

23                          ---

24              (Whereupon, Exhibit-46, Form, was marked

```
 1                        for identification.)

 2                            ---

 3                   ATTORNEY TRYON:  If you could bring that

 4   up, Jake.

 5                   VIDEOGRAPHER:  Yes.  Give me one second.

 6   I'm just marking that right now.  We might have to mark

 7   this one physically.  The program won't mark it because

 8   it's a redacted document.

 9                   ATTORNEY TRYON:  Okay.  Then we'll do

10   that to bring that up.  And then, if you could, Jake,

11   just scroll down in this.  I just have a couple

12   questions about this form.

13                   THE WITNESS:  Okay.

14                   ATTORNEY TRYON:  Go onto the next page

15   down.

16   BY ATTORNEY TRYON:

17      Q.   Have you ever seen a form like this?

18                   ATTORNEY BLOCK:  Objection to form.  No

19   pun intended.

20                   THE WITNESS:  Could you be a little more

21   specific?  I mean, I've seen --- this is kind of very

22   typical for a lot of intake-type documents in mental

23   health clinics or in medical clinics.

24   BY ATTORNEY TRYON:
```

1    Q.    So you would characterize this as a typical

2  intake form?

3                      ATTORNEY BLOCK:  Objection.

4                      THE WITNESS:  I wouldn't characterize it

5  in that way.  I have seen typical intake forms that

6  resemble this in some ways.

7  BY ATTORNEY TRYON:

8    Q.    Would this be something that you would consider

9  adequate to document a careful and thorough assessment?

10                     ATTORNEY BLOCK:  Objection to form.

11                     THE WITNESS:  Again, without knowing the

12 context of the individual's practice, it's impossible

13 for me to say.

14 BY ATTORNEY TRYON:

15   Q.    Is this a form that you would use for careful

16 and thorough assessment of a patient's mental health?

17                     ATTORNEY BLOCK:  Objection to form.

18                     THE WITNESS:  I don't use this form.  I

19 can't say whether or not I was in the context this

20 provider was practicing that I wouldn't use this form as

21 part of my assessment.

22 BY ATTORNEY TRYON:

23   Q.    Fair enough.  Do you use it as a part of your

24 careful thought thorough assessment of the patient's

1    mental health, are there any other forms that you expect

2    to see in the caregiver's file about that patient's

3    mental health?

4        A.    Not specifically.

5        Q.    This would be adequate?

6                    ATTORNEY BLOCK:  Objection to form.

7                    THE WITNESS:    Again, I can't speak to

8    the adequacy of it without understanding the context of

9    the rest of the treatment.

10   BY ATTORNEY TRYON:

11       Q.    Is there any certification that you think is

12   necessary or appropriate for someone to diagnose gender

13   dysphoria?

14       A.    There is no universal certification process.

15   What we have are guidelines and recommendations for

16   ensuring that folks for the mental health prospective,

17   again, medical professionals are able to diagnose gender

18   dysphoria, but from the mental health prospective, it's

19   recommended that we are licensed clinical professionals

20   that have some, if not an expert level of understanding

21   of gender identity issues and having continuing

22   education in the field.  These are ongoing

23   recommendations.  I wouldn't say it was the expertise,

24   but knowledge about standard of care that's congruent

1   with how other disorders are also treated.

2      Q.    Let me ask you about paragraph 16 of your

3   report.

4            Do you see the last sentence there?

5      A.    Yes.

6      Q.    It says HB-3293 does not affect elementary

7   students --- elementary school students who are

8   transgender boys?

9      A.    Yes.

10     Q.    So you previously testified that puberty is ---

11  starts on the average about age 12 for males.

12           Right?

13                   ATTORNEY BLOCK:  Objection to form.

14                   THE WITNESS:  Again, I would defer to our

15  --- that's an answerable question based upon national

16  data that I don't have in front of me, but 12-ish is,

17  yes.

18  BY ATTORNEY TRYON:

19     Q.    And the range would be --- from what I read, the

20  range is generally between 8 and 14 years old.

21           Right?

22     A.    Again, I would defer to my endocrine colleagues,

23  but yes, that's --- that's pretty typical.

24     Q.    And you're aware that boys go into Middle School

1    as early as 11 years old or sometimes even earlier.

2          Right?

3     A.    I can't say that I'm familiar with how each

4    state organizes their primary and secondary education

5    systems.  I'm familiar with how it was in New York and

6    Illinois, and that was occasionally the case.

7     Q.    So if an 11-year-old who has not gone through

8    puberty is in Middle School, then this would definitely

9    apply to some pre-pubescent children.

10          Right?

11                ATTORNEY BLOCK:  Objection to form.

12   BY ATTORNEY TRYON:

13    Q.    I'm sorry, I didn't make that clear.  So if

14   there are prepubescent boys that are in middle school,

15   then HB-3293 would affect them.

16          Right?

17    A.    I would have to put HB-3293 in front of me to

18   --- to know specifically.  I'd have to refamiliarize

19   myself with it, the specifics of it.

20    Q.    I'm sorry to interrupt you.

21    A.    Yeah, I wouldn't want to comment on something I

22   don't have in front of me right now.

23    Q.    Okay.

24          So just so you know I had to relocate from my

```
 1   office to my home, and there's a poodle in here that you

 2   may hear.  So forgive if you hear the interruption.

 3                    ATTORNEY BLOCK:  Objection to the

 4   poodle.

 5                    ATTORNEY TRYON:  Let me take one second.

 6   I will be right back.

 7                    THE WITNESS:  Maybe now is a good time

 8   for bathroom break.

 9                    ATTORNEY BLOCK:  Let's go off the record.

10                    VIDEOGRAPHER:  Going off the record the

11   time reads 5:46 p.m.

12   OFF VIDEO

13                         ---

14   (WHEREUPON, A SHORT BREAK WAS TAKEN.)

15                         ---

16   ON VIDEO

17                    ATTORNEY TYRON:  Okay let's go back on

18   the record.

19                    VIDEOGRAPHER:  Back on the record the

20   current time reads 5:50 p.m.

21   BY ATTORNEY TRYON:

22      Q.   Let me direct you to paragraph 26 of your

23   report?

24      A.   Yep.
```

1    Q.    So there's the --- let's see, starting with the

2  word prepubertal children who he insists are children

3  with non-conforming gender expression who realize at the

4  onset of puberty that their gender identity is

5  consistent with their sex assigned at birth.  Their

6  understanding of their gender identity changes at the

7  onset of puberty, but their gender identity does not.

8  So that's really a circular argument unless there's some

9  objective external way of proving what that child's

10 gender identity actually is, wouldn't you agree?

11                    ATTORNEY BLOCK:  Objection to form.

12                    THE WITNESS:  I think that the research

13 that we have on inherent gender identity is relatively

14 recent and needs a little bit more robust follow-up.

15 What we have are studies of cognition as well as some

16 very limited brain imaging studies that point to some

17 element of gender identity that has an objective

18 criteria to it.  These are not studies that are

19 significant enough or have enough participants for us to

20 draw any kind of significant conclusions, but it does

21 speak when paired with clinical experiences of kids who

22 have desisted that the way that they describe their

23 identity is that it is not a fix or a change in their

24 sense of self but more about the expression of their

1    behaviors and their understanding of how they fit into

2    the world that has changed.

3       Q.    So as you say it's too early to really know for

4    sure which of these things it is, right?

5                    ATTORNEY BLOCK:  Objection to form.

6                    THE WITNESS:  What I would say is it's a

7    preponderance of clinical experience and the studies

8    that we do have point to this being much more likely.

9    BY ATTORNEY TRYON:

10      Q.    Much more likely, is that your testimony?

11      A.    Based on my clinical experiences, yes.

12      Q.    But there's no way that anyone outside of ---

13   there's no objective measurement to make that

14   determination, right?

15                   ATTORNEY BLOCK:  Objection to form.

16                   THE WITNESS:  The way that I would

17   describe it is that gender dysphoria as a diagnosis

18   includes both identity-based criteria that are objective

19   and are measured through the course of the scales that

20   we talked about earlier, as well as measures of role and

21   behavior and congruence with your body.  These are

22   things that are tracked over time in the studies that we

23   have, and when a child desists from that diagnosis of

24   gender dysphoria it is clear at that point that it was

1   primarily the gender role based behaviors that were

2   leading to this diagnosis as opposed to a change in

3   identity.

4   BY ATTORNEY TRYON:

5       Q.    You were freezing up on me, so let me just see

6   if I can understand this by looking at the

7   transcription.  If a child explains the reasons why he

8   or she has a different gender identity, that his or her

9   natal sex, the natal sex designation then later says the

10  opposite, there is really no way of telling whether or

11  not it's just the person's gender identity or the

12  understanding of the identity has changed based on that

13  child's or person's statements.

14          Right?

15                ATTORNEY BLOCK:  Objection to form.

16                THE WITNESS:  I would say to complicate

17  matters even further, a number of the studies that are

18  used to describe this desistance phenomenon were first

19  carried out under the DSM-IV.  On the DSM-IV the

20  diagnosis was gender disorder in childhood.  And in that

21  nomenclature, an identity that is incongruent with sex

22  assigned at birth was not one of the required elements.

23  And so there are children who are described in the

24  common parlance as transgender because they met criteria

1  for what was then gender identity disorder, who

2  nevertheless discussed any identity incongruent with

3  their sex at birth.  So that makes it hard to draw firm

4  conclusions about data captured under the DSM-IV.

5  BY ATTORNEY TRYON:

6     Q.    And you are familiar with that diagnostic and

7  statistical manual of mental disorders.

8           Right?

9     A.    I am.

10    Q.    And you cited it in your reports.

11          Right?

12    A.    Correct.

13    Q.    That is a manual to assist in the diagnosis of

14 mental disorders.

15          Right?

16    A.    That is correct.

17    Q.    Is there a value of to classifying a condition

18 as a mental disorders?

19               ATTORNEY BLOCK:  Objection to form.

20               THE WITNESS:  I don't know if I can offer

21 an expert opinion on that.  I have a biased --- talk

22 about a selection bias as a psychiatrist and a mental

23 health professional.  I think it's important for us to

24 destigmatize mental illness as much as possible, so

1    whatever is going to allow folks access to care, I'm

2    relatively neutral on placing a value on whether or not

3    something is a diagnosis or not.

4    BY ATTORNEY TRYON:

5        Q.    A manual does not recommend any treatments, only

6    tools for diagnosis.

7              Is that right?

8                   ATTORNEY BLOCK:  Objection to form.

9                   THE WITNESS:  The main goal of DSM for

10   classifying diagnoses and ensuring stability or

11   reliability of those diagnoses across practice

12   locations.

13   BY ATTORNEY TRYON:

14       Q.    That does not recommend or even provide any

15   treatments.

16             Right?

17       A.    The text of the DSM often recommends or

18   describes treatments.

19       Q.    Does it describe treatments for gender

20   dysphoria?

21       A.    The text was recently revised for gender

22   dysphoria, and so I really want to see the text in front

23   of me for me to talk about it.

24       Q.    So in the DSM-V you don't know if it has any

1   recommendations for treatments in it for gender

2   dysphoria?

3       A.    I don't know in the revised text how much was

4   changed without familiarizing myself with it.  And I'm

5   happy to look at it.  It's a quick read, but primarily

6   the DSM-V as it comes to gender dysphoria is a

7   description of the phenomenology not a recommendation

8   for treatments.

9       Q.    And when was it revised?

10      A.    It was just released about a week ago, maybe

11   two.

12      Q.    Let me ask you to take a look at your report,

13   paragraph 51.  You say to the contrary, as noted

14   previously, stigma and discrimination have been shown to

15   have a profoundly harmful impact on the mental health of

16   transgender people and other minority groups.  Now, when

17   you say stigma and discrimination, you're not referring

18   specifically to not allowing, as using your term, a

19   transgender girl to participate on a girls sports team

20   to be that type of stigma or discrimination, are you?

21                  ATTORNEY BLOCK:  Objection to the form.

22                  THE WITNESS:  The reference that I

23   referred to in my report I would want to look at,

24   because they had an operational term for stigma and

1  discrimination.  However, there has been literature, I

2  can't remember the names of the authors or the date of

3  the study, that look at specific laws that are enacted

4  to discriminate  against LGBT people and impact on both

5  mental health and medical health, and so those kind of

6  discrimination laws certainly do have real felt impact

7  for transgender folks.

8  BY ATTORNEY TRYON:

9      Q.    So are you saying that this sentence is

10 referring to a law such as HB-3293 or not?

11     A.    I think, as I stated, for the sake of this

12 expert report, the Yhuto reference from 2015 is what I'm

13 using to craft that statement.

14     Q.    I'm sorry, the what from 2015?

15     A.    Footnote number 21.

16     Q.    What are those profound impacts of mental health

17 that you are referring to?

18     A.    Well, as I mentioned earlier in my report are

19 correlation between many exposures that transgender

20 individuals have and increased rates of suicide, self

21 harm, substance use, exposure to trauma that have

22 certainly profound negative impacts for the folks who

23 are experiencing them.

24     Q.    And of those harms that you have just mentioned

1  are you aware of any of them caused by --- to a child or

2  person who was not --- who was a transgender female not

3  allowed to participate on a girls or woman's athletic

4  team?

5      A.    As I had testified to earlier, I think I said

6  I've had two or three patients who are excluded from

7  sports teams, one of which was a child who was assigned

8  male at birth, who at age six was not allowed to

9  participate in the sport.  I can't remember what support

10  it was.  This was a child who was heckled and kicked out

11  of the group of friends that were participating in that

12  sport which led to negative mental health consequences

13  for that individual child.

14      Q.    What specific --- I presume that's thoughts of

15  suicidality.

16           Right?

17      A.    Thankfully at that age they were not.

18      Q.    How did that child adapt to the situation?

19      A.    Well, we worked with the child, the family and

20  the sports team, to understand what this child may need

21  and ended up --- I think it was T ball, I think ended up

22  joining the T ball team.

23      Q.    So how much --- how much of a delay was there

24  between wanting to join the T ball team and being

1    allowed to join the T ball team?

2       A.    This was years ago, so I don't recall the

3    specifics.

4       Q.    Would it be your testimony that any delay at all

5    between the time of identifying for a natal male

6    identifying as a female and participating on a female

7    team would be profoundly harmful?

8                    ATTORNEY BLOCK:  Objection to form.

9                    THE WITNESS:  I have not seen any studies

10   that have asked that question or could speak to the

11   duration of time between exclusion from an activity and

12   the mental health impacts.

13   BY ATTORNEY TRYON:

14      Q.    Is it your position that as soon as the child or

15   person who is a natal male determines or identifies as a

16   female, that that person should be immediately allowed

17   to play on female teams?

18                   ATTORNEY BLOCK:  Objection to form and

19   scope.

20                   THE WITNESS:  I'm not able to answer that

21   question.  I think that's out of the scope of my

22   expertise.

23   BY ATTORNEY TRYON:

24      Q.    Let me ask it differently because I didn't ask

1    it quite as artfully as I could have.  You indicated

2    profoundly harmful or have a profoundly harmful impact.

3    So if a child or adolescent or adult, adult meaning

4    anyone through collegiate age, were to be a natal male

5    and identify as a female and is not allowed to

6    immediately participate on female teams, would that be

7    profoundly harmful, would it have a profoundly harmful

8    impact on their mental health?

9       A.    That would require an individualized assessment

10   of that child or young adult in order to understand the

11   potential impacts specific to that individual.

12      Q.    What if they were required to wait a full year,

13   would that be profoundly --- have a profoundly harmful

14   impact on the mental health of that person?

15                  ATTORNEY BLOCK:  Objection to form.

16                  THE WITNESS:  Same answer.

17   BY BY ATTORNEY TRYON:

18      Q.    Well as a general rule, do you have any opinion

19   as a general rule?

20                  ATTORNEY BLOCK:  Objection to form.

21                  THE WITNESS:  General rule of what?  I'm

22   not understanding the question.

23   BY ATTORNEY TRYON:

24      Q.    Let me try again.  So is there --- do you have a

1    general --- I mean you made a generalized statement here

2    in the last sentence of paragraph 51.  So my question

3    is, as it pertains to this generalized statement, is

4    there any delay that would not cause a profoundly

5    harmful impact on the mental health of transgender

6    people if they are denied the opportunity to immediately

7    participate in the sports team of their gender identity?

8               ATTORNEY BLOCK:  Objection to form and

9    characterization.

10               THE WITNESS:  It's a long sentence with a

11    lot of clauses.  I'm trying to --- I'm trying to parse

12    them all out to make sure that I'm answering this

13    accurately.  As I testified to in my report, there's

14    evidence of discrimination, stigma and bias leading to

15    individual harms.  The specific manifestation of those

16    harms are highly individualized and require individual

17    assessment of each child and family in order to know.

18    Which is why you can't speak to the specific impacts for

19    each individual child, but what we know are

20    population-based data.

21    Q.    Is it your view that if after a psychiatrist or

22    psychologist or appropriate healthcare individual

23    determines that there would be a profoundly harmful

24    impact that healthcare professional should be the one to

1   determine whether or not the child should be allowed to

2   participate on a girl's team?

3       A.    I don't have a specific opinion about how sports

4   administration vary from state to state.  I know it's

5   very different from state to state.  What I would say is

6   from a mental health perspective my goal is to help our

7   kids access spaces that are going to be health promoting

8   and build resilience.  I think it's important for health

9   professionals to be involved in the decisions that are

10  made, but I can't speak to the legislative process

11  within the scope of my expertise.

12      Q.    Is the mental health of the cisgender females

13  who might be at a disadvantage of the participation of a

14  transgender female on the team, is their mental health

15  important?

16                  ATTORNEY BLOCK:  Objection to form.

17                  THE WITNESS:  I would say first that the

18  mental health of cisgender children who have

19  participated in sports is certainly attestable

20  hypothesis to explore and it's not research that I have

21  seen, nor that I'm aware that it exists.  Beyond that,

22  you know, my expertise does not extend to this

23  population as you have asked this question.

24  BY ATTORNEY TRYON:

1    Q.   So then let me ask that specifically, have you

2  treated any cisgender females that have been upset about

3  transgender females participating on the girls team?

4    A.   I have treated cisgender girls who have had

5  transgender teammates.  I have not treated anybody who

6  has expressed any concern or harm from that.

7    Q.   Do you acknowledge that there are those

8  cisgender girls who are suffering from psychological

9  harm from that?

10           ATTORNEY BLOCK:  Objection to form.

11           THE WITNESS:  I would not acknowledge

12  that.  That is not data that I have seen nor has been my

13  personal experience with patients that I have seen or

14  other colleagues who have described this.

15  BY ATTORNEY TRYON:

16    Q.   Are you aware that some of Lia Thomas' cisgender

17  teammates are very upset about Lia Thomas participating

18  on the female swimming team?

19           ATTORNEY BLOCK:  Objection to form.

20           THE WITNESS:  I haven't read much about

21  Lia Thomas or her teammates prior to today, so I'm not

22  aware of any specifics to that.

23  BY ATTORNEY TRYON:

24    Q.   Have you read anything about that incident ---

1 excuse me, that situation?

2    A.    Well, I've read something today.

3    Q.    Prior to today?

4    A.    Which did not mention about teammates being

5 upset.  I've heard about it, but I have not read it.

6    Q.    So you're aware of it?

7    A.    I'm vaguely aware of it, yes.  I've not done any

8 primary research into it.

9                    ATTORNEY BLOCK:  Could we get a time

10 check?

11                    VIDEOGRAPHER:  It looks like I got about

12 three minutes left.

13                    ATTORNEY TRYON:  I speak really fast.

14 BY ATTORNEY TRYON:

15    Q.    Well, is there benefits in --- for example, you

16 said that HB --- you've read HB-3293 and you're aware

17 that it does require --- well, first of all, are you

18 aware that HB-3293 does not use the word transgender at

19 all or trans woman or trans girl at all?

20    A.    I would want to look at it specifically to

21 double check that that's correct, but I would take your

22 word for it.

23    Q.    And so in HB-3293, it does require that all

24 biological males must --- let me rephrase that, that

1    biological males may not compete on girls teams.

2              Do you understand that?

3      A.    I don't, because biological male as a term is

4    certainly up for debate.

5      Q.    Which word would you like to use?

6      A.    I don't know if there's going to be an answer

7    for that in the context of this particular bill.  I

8    think ---.

9      Q.    How about natal male, does that work?

10     A.    Sure.  We can use that.  I would typically use

11   assigned male at birth, but yes.

12     Q.    Okay.

13             So natal males under this Bill are not allowed

14   to participate on girls sports teams.

15             Do you understand that?

16                  ATTORNEY BLOCK:  Objection to form.

17                  THE WITNESS:  Yeah.  And I apologize I

18   really don't mean to be parsing, if the text of the Bill

19   is biological males, what that just means is that that

20   is a complex term that doesn't have a universal

21   acceptance.  But I understand that the goal of the Bill

22   is for folks assigned male at birth, not to participate

23   in women's sports teams, yes.

24   BY ATTORNEY TRYON:

1    Q.    If a --- to use your term, a person assigned
2  male at birth is told that that person may not
3  participate on girls sports, and as in so many other
4  things in life, you are told that's the rule and you
5  have to live with it, is there value in learning coping
6  skills to deal with rules that you don't agree with and
7  abide by them?

8                    ATTORNEY BLOCK:  Objection to form.

9                    THE WITNESS:  I guess the way I would
10  approach it is that if we look at the data, clinical
11  experiences and from the testimonies of transgender
12  individuals that they face enough on a daily basis
13  stigma discrimination exclusion, that they all would
14  benefit from a healthy development of coping skills.
15  Nowhere in the field of psychiatry is it recommended
16  that we expose people to traumatic events for them to
17  develop coping skills to manage through.

18  BY ATTORNEY TRYON:

19    Q.    Well, not to intentionally do so, but there's
20  laws and rules that you made that said you have to live
21  with those rules then it's your position that the rules
22  need to be changed to comply with the wishes of that
23  person?

24                    ATTORNEY BLOCK:  Objection to form.

1              THE WITNESS:  Again my expert testimony

2   is rebutting the testimony of Dr. Levine and Cantor.  I

3   can't speak to the specific legislative processes in

4   terms of the best way for states to approach a complex

5   issue such as this.

6              ATTORNEY TRYON:  I have no further

7   questions.  Thank you for your time I appreciate it.

8              THE WITNESS:  Thank you.  What is your

9   poodle's name?  Can I ask that off the record?

10             ATTORNEY BLOCK:  We don't have any

11  Redirect questions.  Dr. Janssen will review the

12  transcript.

13             ATTORNEY GREEN:  This is Roberta Green on

14  behalf of WVSSAC.  No questions.

15             ATTORNEY MORGAN:  This is Kelly Morgan on

16  behalf of the West Virginia Board of Education and

17  Superintendant Burch.  I don't have any questions.

18  Thank you.

19             ATTORNEY DENIKER:  Dr. Janssen, thank you

20  for your time today, this is Susan Deniker.  I have no

21  questions.

22             THE WITNESS:  Thank you, guys.

23             VIDEOGRAPHER:  Going off the record.  The

24  current time reads 6:18 p.m.

1                    * * * * * * * *

2        VIDEOTAPED DEPOSITION CONCLUDED AT 6:18 P.M.

3                    * * * * * * * *

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

340

1    STATE OF WEST VIRGINIA   )

2                    CERTIFICATE

3          I, Nicole Montagano, a Notary Public in

4    and for the State of West Virginia, do hereby

5    certify:

6          That the witness whose testimony appears

7    in the foregoing deposition, was duly sworn by me

8    on said date, and that the transcribed deposition

9    of said witness is a true record of the testimony

10   given by said witness;

11         That the proceeding is herein recorded

12   fully and accurately;

13         That I am neither attorney nor counsel

14   for, nor related to any of the parties to the

15   action in which these depositions were taken, and

16   further that I am not a relative of any attorney

17   or counsel employed by the parties hereto, or

18   financially interested in this action.

19         I certify that the attached transcript

20   meets the requirements set forth within article

21   twenty-seven, chapter forty-seven of the West

22   Virginia.

23   

24                          Nicole Montagano,

25                          Court Reporter