IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA
CHARLESTON DIVISION

| | |
|---|---|
| B.P.J. by her next friend and mother, HEATHER JACKSON, | |
| *Plaintiff*, | |
| v. | |
| WEST VIRGINIA STATE BOARD OF EDUCATION, HARRISON COUNTY BOARD OF EDUCATION, WEST VIRGINIA SECONDARY SCHOOL ACTIVITIES COMMISSION, W. CLAYTON BURCH in his official capacity as State Superintendent, DORA STUTLER in her official capacity as Harrison County Superintendent, and THE STATE OF WEST VIRGINIA, | Civil Action No. 2:21-cv-00316 Hon. Joseph R. Goodwin |
| *Defendants*, | |
| and | |
| LAINEY ARMISTEAD, | |
| *Defendant-Intervenor*. | |

**PLAINTIFF'S MEMORANDUM OF LAW IN SUPPORT OF MOTION TO EXCLUDE THE EXPERT TESTIMONY OF STEPHEN B. LEVINE**

## TABLE OF CONTENTS

**Page**

INTRODUCTION AND BACKGROUND ................................................................ 1

LEGAL STANDARD.......................................................................................... 2

ARGUMENT ..................................................................................................... 4

    DR. LEVINE'S PRIMARY OPINIONS HAVE NO RELEVANCE TO THE
    CASE. ........................................................................................................ 5

    1.    Dr. Levine's Opinions About The Standards Of Care For Transgender
        Adolescents Are Irrelevant And Should Be Excluded.......................... 6

    2.    Dr. Levine Admitted That He Does Not Understand How His Testimony
        Is Being Used In This Case.................................................................. 7

DR. LEVINE IS NOT QUALIFIED TO OFFER OPINIONS ABOUT THE MEANING
OF "BIOLOGICAL SEX" OR TREATMENTS FOR PRE-PUBERTAL
CHILDREN WITH GENDER DYSPHORIA............................................................. 8

    1.    Dr. Levine Is Not Qualified To Offer Opinions About The Meaning Of
        "Biological Sex." ................................................................................. 9

    2.    Dr. Levine Is Not Qualified To Offer Opinions About Treatment For Pre-
        Pubertal Children Or Adolescents. ..................................................... 12

DR. LEVINE'S TESTIMONY IS METHODOLOGICALLY UNRELIABLE AND
UNSUPPORTED BY SCIENCE OR MEDICINE....................................................... 13

    1.    Dr. Levine Falsely Asserts That Providers Are Providing Rapid
        Affirmation Care To Transgender Adolescents.................................. 14

    2.    Dr. Levine's Assertion That There Are Widely Varying Views About The
        Appropriate Treatment For Gender Dysphoria Is Simply Wrong. ..................... 16

    3.    Dr. Levine's Opinion That Accessing Gender-Confirming Care Is
        Experimental And Unethical Is Unfounded....................................... 17

    4.    Dr. Levine's Opinions Directly Contradict The Fourth Circuit's Holding
        In *Grimm*............................................................................................ 20

    5.    Dr. Levine's Report, Opinions, And Testimony Lack Probative Value And
        Are Thus Inadmissible Under Federal Rule Of Evidence 403. .......................... 22

CONCLUSION................................................................................................... 23

# TABLE OF AUTHORITIES

**Page(s)**

## Cases

*Belk, Inc. v. Meyer Corp., U.S.*,
    679 F.3d 146 (4th Cir. 2012) ..................................................................................3

*Bourne v. E.I. DuPont de Nemours & Co.*,
    85 F. App'x 964 (4th Cir. 2004) .............................................................................5

*Brandt v. Rutledge*,
    551 F. Supp. 3d 882 (E.D. Ark. 2021) ...............................................................2, 17

*Cooper v. Smith & Nephew, Inc.*,
    259 F.3d 194 (4th Cir. 2001) ..............................................................................3, 15

*Daubert v. Merrell Dow Pharms., Inc.*,
    509 U.S. 578 (1993)................................................................................3, 4, 13, 23

*Dunn v. Sandoz Pharm. Corp.*,
    275 F. Supp. 2d 672 (M.D.N.C. 2003) ..................................................................15

*Dura Auto. Sys. of Ind., Inc. v. CTS Corp.*,
    285 F.3d 609 (7th Cir. 2002) ................................................................................10

*Edmo v. Idaho Department of Correction*,
    358 F. Supp. 3d 1103 (D. Idaho 2018) ....................................................................2

*Grimm v. Gloucester Cnty. Sch. Bd.*,
    972 F.3d 586 (4th Cir. 2020) ..........................................................13, 14, 20, 21

*Hecox v. Little*,
    479 F. Supp. 3d 930 (D. Idaho 2020) ......................................................................2

*Kadel v. North Carolina State Health Plan for Teachers and State Employees*,
    12 F.4th 422 (4th Cir. 2021) ...........................................................................19, 21

*Knight v. Boehringer Ingelheim Pharm., Inc.*,
    323 F. Supp. 3d 837 (S.D. W.Va. 2018).................................................................5

*Kopf v. Skyrm*,
    993 F.2d 374 (4th Cir. 1993) ..............................................................................7, 8

*Kumho Tire Co., Ltd. v. Carmichael*,
    526 U.S. 137 (1999)................................................................................................4

*Lebron v. Sec. of Fla. Dept. of Children and Families*,
    772 F.3d 1352 (11th Cir. 2014) ..............................................................................8

*In re Lipitor (Atorvastatin Calcium) Mktg., Sales Pracs. & Prod. Liab. Litig. (No II) MDL 2502*,
    892 F.3d 624 (4th Cir. 2018) ................................................................................15

*Martinez v. Sakurai Graphic Sys. Corp.*,

No. 04 Civ. 1274, 2007 WL 2570362 (N.D. Ill. Aug. 30, 2007)..............................................9

*Mod. Auto. Network, LLC v. E. All. Ins. Co.*,
416 F. Supp. 3d 529 (M.D.N.C. 2019) ...........................................................................3, 8

*Nat'l Ass'n for Rational Sexual Offense L. v. Stein*,
No. 17 Civ. 53, 2021 WL 736375 (M.D.N.C. Feb. 25, 2021) ..................................4

*Nease v. Ford Motor Co.*,
848 F.3d 219 (4th Cir. 2017) ...........................................................................................7

*Norsworthy v. Beard*,
87 F. Supp. 3d 1164 (N.D. Cal. 2015) .........................................................................1, 2

*O'Conner v. Commonwealth Edison Co.*,
807 F. Supp. 1376 (C.D. Ill. 1992) ................................................................................9

*Reliastar Life Ins. Co. v. Laschkewitsch*,
No. 13 Civ. 210, 2014 WL 1430729 (E.D.N.C. Apr. 14, 2014)..................................8

*Sardis v. Overhead Door Corp.*,
10 F.4th 268 (4th Cir. 2021) ...........................................................................3, 4, 6, 13

*SAS Inst., Inc. v. World Programming Ltd.*,
125 F. Supp. 3d 579 (E.D.N.C. 2015)...........................................................................4

*Thomas J. Kline, Inc. v. Lorillard, Inc.*,
878 F.2d 791 (4th Cir. 1989) .........................................................................................3

*Viva Healthcare Packaging USA Inc. v. CTL Packaging USA Inc.*,
197 F. Supp. 3d 837 (W.D.N.C. 2016) .........................................................................6

*Wright v. United States*,
280 F. Supp. 2d 472 (M.D.N.C. 2003) .........................................................................8

**Statutes**

20 U.S.C. § 1681, et seq...................................................................................................1

**Other Authorities**

Anthony N. Almazan & Alex S. Keuroghlian, Association Between Gender-
Affirming Surgeries and Mental Health Outcomes, JAMA ....................................18

Federal Rule of Evidence 403.................................................................................1, 4, 21, 22

Federal Rule of Evidence 702.................................................................................1, 2, 3, 10

NIH 2015 and 2022............................................................................................................10

## INTRODUCTION AND BACKGROUND

Plaintiff B.P.J., a twelve-year-old girl who is transgender, challenges the legality of H.B. 3293, a law that categorically bars Plaintiff and any other female athletes who are transgender from participating on girls' and women's sports teams in West Virginia. B.P.J. contends that the law violates her rights under the Equal Protection Clause of the Fourteenth Amendment and discriminates against her based on sex in violation of Title IX of the Education Amendments of 1972, 20 U.S.C. § 1681, *et seq*.

As part of their defense of H.B. 3293, Defendants identified and disclosed an expert report from Dr. Stephen Levine to support the following contentions: (1) there is no consensus or agreed-upon standard of care to treat child or adolescent gender dysphoria; (2) transgender identity is not biologically based; and (3) affirming transgender youth and permitting them to transition are "experimental therapies that have not been shown to improve mental or physical health outcomes." (Swaminathan Decl., Ex. A at iv-v.) The opinions offered by Dr. Levine should be excluded for three reasons: (1) they are irrelevant to the legal questions in this case; (2) Dr. Levine is not qualified to offer this testimony regardless of its relevance; and (3) Dr. Levine's opinions are not based on sufficient facts or data or derived from sufficiently rigorous methodology as required under Federal Rule of Evidence 702. Dr. Levine's proffered opinions should also be excluded because when viewed in the context of Federal Rule of Evidence 403, any probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, waste of time, undue delay, and needless presentation of cumulative evidence.

This is not the first case in which Dr. Levine has sought to offer testimony about transgender people that is irrelevant, beyond his qualifications, or unreliable. In *Norsworthy v. Beard*, a case involving a transgender prisoner, "the Court g[ave] very little weight to the opinions

1

of Levine, whose report misrepresent[ed] the [applicable] Standards of Care; overwhelmingly relie[d] on generalizations about gender dysphoric prisoners, rather than an individualized assessment of Norsworthy; contain[ed] illogical inferences; and admittedly include[d] references to a fabricated anecdote." 87 F. Supp. 3d 1164, 1188 (N.D. Cal. 2015). This finding was echoed in *Edmo v. Idaho Department of Correction*, another district court case involving an incarcerated transgender individual. 358 F. Supp. 3d 1103, 1125–26 (D. Idaho 2018), *vacated in part on other grounds sub nom*, *Edmo v. Corizon, Inc.*, 935 F.3d 757 (9th Cir. 2019) (finding that Dr. Levine "is an outlier in the field of gender dysphoria" and placing "virtually no weight" on his opinions).

Of particular relevance to this case, Dr. Levine's opinions were further diminished in *Hecox v. Little*, a case challenging a similarly unconstitutional ban on athletic participation of transgender girls and women. 479 F. Supp. 3d 930 (D. Idaho 2020). There, the court dismissed Dr. Levine's opinion that "gender affirming policies are harmful to transgender individuals," and "accept[ed] Plaintiffs' evidence regarding the harm forcing transgender individuals to deny their gender identity can cause." *Id.* at 977 n.33. And just last year, another district court strongly discounted his proffered testimony by granting a preliminary injunction against a law banning access to gender-affirming medical care. *See Brandt v. Rutledge*, 551 F. Supp. 3d 882 (E.D. Ark. 2021).

Plaintiff B.P.J. respectfully submits this memorandum of law in support of her motion to exclude the proffered expert testimony of Dr. Stephen B. Levine from consideration at summary judgment or trial as inadmissible under Federal Rule of Evidence 702.

## LEGAL STANDARD

Federal Rule of Evidence 702 places "a special gatekeeping obligation" on a trial court to ensure that an expert's testimony is "relevant to the task at hand" and "rests on a reliable

foundation." *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 578, 597 (1993); *Sardis v. Overhead Door Corp.*, 10 F.4th 268, 281 (4th Cir. 2021); *see* Fed. R. Evid. 702 advisory committee's note to 2000 amendment (amendment "affirms the trial court's role as gatekeeper," and that "all types of expert testimony present questions of admissibility for the trial court in deciding whether the evidence is reliable and helpful"). The party offering the expert carries the burden of establishing the admissibility of testimony by a preponderance of the evidence. *Cooper v. Smith & Nephew, Inc.*, 259 F.3d 194, 199 (4th Cir. 2001).

A trial court must also determine whether the proposed expert is qualified to render the proffered opinion. In doing so, a trial court considers an expert's professional qualifications and "full range of experience and training." *Belk, Inc. v. Meyer Corp., U.S.*, 679 F.3d 146, 162 (4th Cir. 2012), *as amended* (May 9, 2012) (cleaned up). If the purported expert lacks the knowledge, skill, experience, training, or education on the issue for which the opinion is proffered, the trial court must exclude the expert. *See, e.g.*, *Thomas J. Kline, Inc. v. Lorillard, Inc.*, 878 F.2d 791, 799 (4th Cir. 1989); *Mod. Auto. Network, LLC v. E. All. Ins. Co.*, 416 F. Supp. 3d 529, 537 (M.D.N.C. 2019), *aff'd*, 842 F. App'x 847 (4th Cir. 2021). Even if the expert is deemed qualified, the trial court must consider the relevancy of the expert's testimony as "a precondition to admissibility." *Sardis*, 10 F.4th at 282 (cleaned up). To be relevant, the testimony must have "a valid scientific connection to the pertinent inquiry." *Id.* at 281 ("Simply put, if an opinion is not relevant to a fact at issue, *Daubert* requires that it be excluded.").

If the opinions offered by the expert are deemed relevant and the expert is qualified to offer testimony, a trial court will inquire if the opinion is based on a reliable foundation, which focuses on "the principles and methodology" employed by the expert to assess whether it is "based on scientific, technical, or other specialized *knowledge* and not on belief or speculation." *Id.* at 281,

3

290 (cleaned up).  When evaluating whether an expert's methodology is reliable, a court considers, among other things:

> (1) whether the expert's theory can be and has been tested; (2) whether the theory has been subjected to peer review and publication; (3) the known or potential rate of error of the particular scientific technique; and (4) whether the technique is generally accepted in the scientific community.

*Id*.; *see Kumho Tire Co., Ltd. v. Carmichael*, 526 U.S. 137, 149–50 (1999); *Daubert*, 509 U.S. at 593–94.  While trial courts have "broad latitude" to determine reliability, they must engage in the gatekeeping process and not simply "delegate the issue to the jury."  *Sardis*, 10 F.4th at 281.  When addressing an expert whose methodology is grounded in experience, courts use three factors: "(1) how the expert's experience leads to the conclusion reached; (2) why that experience is a sufficient basis for the opinion; and (3) how that experience is reliably applied to the facts of the case."  *SAS Inst., Inc. v. World Programming Ltd.*, 125 F. Supp. 3d 579, 589 (E.D.N.C. 2015); *see also Nat'l Ass'n for Rational Sexual Offense L. v. Stein*, No. 17 Civ. 53, 2021 WL 736375, at *3 (M.D.N.C. Feb. 25, 2021).

Finally, because "expert evidence can be both powerful and misleading because of the difficulty in evaluating it," "the judge in weighing possible prejudice against probative force under Rule 403 . . . exercises *more* control over experts than over lay witnesses."  *Daubert*, 509 U.S. at 595 (cleaned up).  As such, "the importance of [the] gatekeeping function cannot be overstated."  *Sardis*, 10 F.4th at 283 (cleaned up).

## ARGUMENT

On its face, Dr. Levine's testimony, which deals with the standards of care and protocols for treating gender dysphoria, is irrelevant to the purported justifications of H.B. 3293.  This case is about the ability of girls and women who are transgender to participate on school-sponsored

athletic teams in accordance with their gender identity.  As this Court previously recognized in its preliminary injunction order, "what is or should be the default treatment for transgender youth is not the question before the court."  (Dkt. No. 67 (PI Op.) at 3 n.4.)  This renders Dr. Levine's testimony irrelevant to the issues before this Court.

Additionally, even if Dr. Levine's opinions about the treatment of transgender children and adolescents were relevant, Dr. Levine would not be qualified to offer them.  Dr. Levine is not a board-certified child and adolescent psychiatrist.  (Swaminathan Decl., Ex. B at 83:12–84:3, 87:1-7.)  As he previously testified, his nearly fifty-year practice has focused predominately on treating adult patients.  (Swaminathan Decl., Ex. B at 79:9–79:11, 87:1–87:4, 87:11–87:13.)  He is particularly unqualified to opine about the use of hormonal interventions to treat gender dysphoria as he is not an endocrinologist.  (Swaminathan Decl., Ex. B at 81:18-23, 81:1–87:4.)  Finally, Dr. Levine's testimony is methodologically unreliable and unsupported by science or medicine, and his opinions are outliers among the scientific community.

### DR. LEVINE'S PRIMARY OPINIONS HAVE NO RELEVANCE TO THE CASE.

"[I]t is axiomatic that expert testimony which does not relate to any issue in the case is not relevant and non-helpful."  *Knight v. Boehringer Ingelheim Pharm., Inc.*, 323 F. Supp. 3d 837, 846 (S.D. W.Va. 2018) (quoting *Edwards v. Ethicon, Inc.*, No. 12 Civ. 9972, 2014 WL 3361923, at *2 (S.D.W.Va. July 8, 2014)).  To be relevant, an opinion must "fit" with the facts at issue.  *Bourne v. E.I. DuPont de Nemours & Co.*, 85 F. App'x 964, 966 (4th Cir. 2004).  "The test for relevance, or fit, considers whether expert testimony proffered in the case is sufficiently tied to the facts of the case that it will aid the jury in resolving a factual dispute."  *Viva Healthcare Packaging USA Inc. v. CTL Packaging USA Inc.*, 197 F. Supp. 3d 837, 846 (W.D.N.C. 2016) (cleaned up).  The

"court must satisfy itself that the proffered testimony is relevant to the issue at hand, for that is a precondition to admissibility." *Sardis*, 10 F.4th at 282 (cleaned up).

1.   **Dr. Levine's Opinions About The Standards Of Care For Transgender Adolescents Are Irrelevant And Should Be Excluded.**

This case is about whether a twelve-year-old transgender girl can participate on the girls' cross-country and track teams at her middle school, and whether the law at issue, H.B. 3293, violates her rights under the Equal Protection Clause and Title IX.  Defendants contend that H.B. 3293 is justified by a state interest in protecting women's sports, following Title IX, and protecting women's safety in female athletic sports.  (Dkt. No. 290 (Pl's Statement of Undisputed Facts ("SUF")) ¶ 59.)  But Dr. Levine's testimony does not speak to any of those issues.  Rather, Dr. Levine's opinions on standards of care for transgender adolescents, and personal opinions on gender-affirming medical care, have been previously recognized as irrelevant by this Court.  When Defendants attempted to present the same testimony in opposition to B.P.J.'s motion for a preliminary injunction, this Court properly recognized that, "The State cites to experts who question when social transition and puberty blocking treatment are appropriate for young people.  But what is or should be the default treatment for transgender youth is not the question before the court."  (PI Op. at 3 n.4.)  The Court's prior analysis is equally true today.  Dr. Levine's testimony is not relevant to this inquiry because it will not help the "trier of fact to understand the evidence or to determine a fact in issue"—namely whether H.B. 3293 is substantially related to West Virginia's asserted interests in protecting women's sports, following Title IX, and protecting women's safety in female athletic sports.  *Nease v. Ford Motor Co.*, 848 F.3d 219, 229 (4th Cir. 2017); (Pl's SUF ¶ 59.).

2.     **Dr. Levine Admitted That He Does Not Understand How His Testimony Is Being Used In This Case.**

To assist the trier of fact, the expert providing testimony must understand the nature of the case and the testimony being provided.  *See Kopf v. Skyrm*, 993 F.2d 374, 377 (4th Cir. 1993). Here, Dr. Levine has no understanding of the law being challenged and is not an expert with respect to issues pertaining to transgender athletes like Plaintiff B.P.J.  When asked whether he is familiar with the law that's being challenged in this case, H.B. 3293, Dr. Levine swiftly replied "no." (Swaminathan Decl., Ex. B at 143:11-14.)  Dr. Levine admitted that he has no opinion as to whether B.P.J. should be permitted to play sports, (*id*. at 42:23–43:1), and testified that he is "not an expert . . . in matters of athletics and physiology," sports medicine, or athletic performance. (Swaminathan Decl., Ex. B at 42:13–42:22, 81:24–82:3.)

When asked whether he understood that he is being paid as an expert by the Defendants in this case to submit testimony that will be used against the participation of transgender students in sports, Dr. Levine replied, "I don't think I fully understand that."  (*Id.* at 253:10-19.)  When asked whether he understood that his opinion in this case is being used to "support excluding an eleven-year-old transgender girl from a middle school track team that wants her to play on it," Dr. Levine said that he "already told" Plaintiff's counsel that he "[does not] know the details of this particular case."  (*Id*. at 249:1-9.)  When asked whether "allowing a transgender girl to participate on a girl[s] team, consist with her gender identity, is harmful to the transgender girl," Dr. Levine testified, "I don't think it would harm the child to the extent that it reinforces their current identity."  (*Id*. at 153:13–154:1.)

Dr. Levine was also "shocked" to hear that Defendants attached the declaration he provided in the *Tingley v. Ferguson et. al.*, (Washington, May 2021) case to their Preliminary Injunction

motion without his consent.  (*Id*. at 68:14–69:1.)  When asked whether he has "any objection to [his] declaration from one case being submitted in another case without [his] approval," he stated that, "personally, [he] does have an objection for people using [his] previous testimony" because he doesn't believe that it's "fair" to him given that "every case is somewhat different" and he feels that it is "[his] work product."  (*Id*.)

* * *

The opinions expressed by Dr. Levine are insufficiently tied to the facts of this case such that they would aid a factfinder, and should therefore be excluded as irrelevant.

### DR. LEVINE IS NOT QUALIFIED TO OFFER OPINIONS ABOUT THE MEANING OF "BIOLOGICAL SEX" OR TREATMENTS FOR PRE-PUBERTAL CHILDREN WITH GENDER DYSPHORIA.

To render expert testimony, the witness must possess the requisite "knowledge, skill, experience, training, or education" that would assist the trier of fact.  *Kopf v. Skyrm*, 993 F.2d 374, 377 (4th Cir. 1993); *Wright v. United States*, 280 F. Supp. 2d 472, 478 (M.D.N.C. 2003) ("A witness may testify as to his specialized knowledge so long as he is qualified as an expert based on any combination of knowledge, skill, experience, training, or education.").  If not qualified, the expert's testimony is unreliable.  *Reliastar Life Ins. Co. v. Laschkewitsch*, No. 13 Civ. 210, 2014 WL 1430729, at *1 (E.D.N.C. Apr. 14, 2014); *see, e.g.*, *Mod. Auto. Network, LLC*, at 537 (affirming the district court's exclusion of an expert because they lacked experience relevant to the matters at issue); *Lebron v. Sec. of Fla. Dept. of Child. & Fams.*, 772 F.3d 1352, 1369 (11th Cir. 2014) (holding expert witness was properly excluded who did not propose to testify about matters growing naturally and directly out of research he had conducted independent of the litigation).

Moreover, "an expert's qualifications must be within the same technical area as the subject matter of the expert's testimony; in other words, a person with expertise may only testify as to matters within that person's expertise." *Martinez v. Sakurai Graphic Sys. Corp.*, No. 04 Civ. 1274, 2007 WL 2570362, at *2 (N.D. Ill. Aug. 30, 2007). "Generalized knowledge of a particular subject will not necessarily enable an expert to testify as to a specific subset of the general field of the expert's knowledge." *Id*. "For example, no medical doctor is automatically an expert in every medical issue merely because he or she has graduated from medical school or has achieved certification in a medical specialty." *O'Conner v. Commonwealth Edison Co.*, 807 F. Supp. 1376, 1390 (C.D. Ill. 1992), *aff'd*, 13 F.3d 1090 (7th Cir. 1994).

**1.     Dr. Levine Is Not Qualified To Offer Opinions About The Meaning Of "Biological Sex."**

In Section II of his report, Dr. Levine purports to offer an expert opinion regarding the definition of "biological sex," but Dr. Levine has no qualifications to offer an expert opinion on this topic, a fact he admitted at deposition. (Swaminathan Decl., Ex. B at 196:21–197:6.) Despite this lack of qualifications, Dr. Levine strings together what can best be described as cherry-picked generalizations from disconnected sources that take quotations out of context while ignoring other portions that clearly contradict his views.

First, Dr. Levine is not qualified to discuss the medical and scientific communities' understanding of the biological elements of sex. Dr. Levine is a psychiatrist with no experience treating pre-pubertal transgender children and no expertise relating to endocrinology or biology. The opinions in his report regarding the biological basis of sex consist of out-of-context quotations from an Endocrine Society article ("Bhargava 2021") and references to a National Institute of Health research notice ("NIH 2015") and an info-graph about how sex and gender affect disease

("NIH 2022"). (*See* Swaminathan Decl., Ex. C; Swaminathan Decl., Ex. A ¶¶ 19–27.) Instead of relying on any expertise or experience of his own, he merely stitches together selected excerpts from these unrelated sources to discuss matters on which he has no independent expertise. Rule 702 requires more. *See Dura Auto. Sys. of Ind., Inc. v. CTS Corp.*, 285 F.3d 609, 614 (7th Cir. 2002) ("A scientist, however well credentialed he may be, is not permitted to be the mouthpiece of a scientist in a different specialty.").

Second, even if Dr. Levine were qualified to provide an expert opinion based on the NIH 2015 and 2022 sources or the Bhargava 2021 article, he does not employ any reliable methodology in forming his opinion that sex is clear, binary, and determined at conception based solely on chromosomes and reproductive capabilities. (Swaminathan Decl., Ex. A ¶ 20.) First, Dr Levine cites an infographic entitled "How Sex and Gender Influence Health and Disease," which has no publication date, and does not use the term "biological sex." Nor does this one-page document proport to provide a complete and scientifically accurate definition of sex, but rather identifies how health and disease risks affect "women" and "men" broadly, identifying risk variables tied to those categories that are biologically and socially constructed. (*See* Swaminathan Decl., Ex. D.) Dr. Levine's methodology is further unreliable when he attempts to construe an NIH research notice about including "sex as a biological variable in research" as support for his assertion that sex is only determined at birth based on chromosomes and reproductive capacity. (*See* Swaminathan Decl., Ex. E.) The notice contains no definition of sex all, in fact. Instead, and what Dr. Levine erroneously omits from his quotation is the notice's explanation of its background and purpose, which is to call attention to the disparity in biomedical research whereby "[m]ore often than not, basic and preclinical biomedical research has focused on male animals and cells. An over-reliance on male animals and cells may obscure understanding of key sex influences on health processes

10

and outcomes."  *Id*.  Dr. Levine's suggestion that a statement from the NIH that studies and data must account for sex as a biological variable to acknowledge differences in health and disease outcomes supports his unqualified opinion about the meaning of "biological sex" is methodologically unsound.

Dr. Levine also fundamentally misrepresents the Bhargava 2021 article by conflating its use of "gender" with "gender identity," even though the article makes clear distinctions between those terms: "Gender includes perception of the individual as male, female, or other, both by the individual and by society.  *Gender identity* is a psychological concept that refers to an individual's self-perception."  (Swaminathan Decl., Ex. C at 8.)  Dr. Levine plucks out this isolated quote ("[s]ex often influences gender, but gender cannot influence sex") to paint a misleading picture that the article supports his pre-determined conclusions about sex, but the article directly undermines Dr. Levine's claims.  (*Id*. at 10.)  The introduction of the article explains that "[s]ex differences are caused by 3 major factors—sex hormones, genes, and environment."  (*Id*. at 2.) And the article goes on to explain that, while the precise causative factor [of gender identity] is unknown, "there is ample but incomplete evidence for biological substrates—neuroanatomic, genetic, and hormonal—for gender orientation."  (*Id*. at 9.)

Finally, Dr. Levine spends eight pages of his report offering the opinion that "transgender identity is not biologically based," again, without the qualifications to do so.  (Swaminathan Decl., Ex. C ¶¶ 91–96.)  But again, the veracity of B.P.J.'s identity as a transgender girl is not at issue in this case, and Dr. Levine's testimony should be excluded.

11

2.    **Dr. Levine Is Not Qualified To Offer Opinions About Treatment For Pre-Pubertal Children Or Adolescents.**

Dr. Levine indicated in his report that for almost fifty years, his "specialties have included psychological problems and conditions relating to individuals' sexuality and sexual relations, therapies for sexual problems, and the relationship between love, intimate relationships, and wider mental health." (Swaminathan Decl., Ex. C ¶ 2.)  Dr. Levine specializes in adult psychiatric care, not adolescent psychiatric care.  Dr. Levine's proffered report and deposition testimony *are* in alignment about the fact that he lacks any experience treating any prepubertal children with gender dysphoria.  (Swaminathan Decl., Ex. C ¶ 5.)  Dr. Levine testified at his deposition that over the course of his 48-year-career, he has only seen an estimated six prepubertal children, and of those six, he could not recall that he saw any of them more than *one* time.  (Swaminathan Decl., Ex. D at 87:1-7.)  Similarly, over the course of his career, Dr. Levine has only seen approximately fifty adolescent patients *total*, including both cisgender and transgender patients.  (*Id*. at 87:1–87:4, 87:11–87:13.)

Dr. Levine's research and literature similarly do not focus on issues pertaining to transgender adolescents.  Indeed, in the list of over 180 articles he has authored or co-authored, only two even mention transgender adolescents ("Ethical Concerns" and "The Psychiatrist's Role"), and only to echo Dr. Levine's personal views on their care, not to report any study he has completed.  (Swaminathan Decl., Ex. A ¶ 15-18.)  At his deposition, Dr. Levine testified that he rejects the medical community's widely accepted and authoritative guidance for transgender care. Dr. Levine's outlier views on the World Professional Association for Transgender Health Standards of Care ("WPATH SOC") are in direct conflict with not only the "leading medical, public health and mental health organizations" but also with this Circuit's description of the

mainstream medical consensus.  *Grimm v. Gloucester Cnty. Sch. Bd.*, 972 F.3d 586, 594 n.1 (4th Cir. 2020); see *also* 972 F.3d at 595 (noting that the WPATH SOC "represent the consensus approach of the medical and mental health community . . . and have been recognized by various courts, including this one, as the authoritative standards of care").

Dr. Levine is not recognized as an expert in providing treatment to transgender children by his private employer who by his own admission does not refer children to him as patients, nor by University Hospitals' LGBTQ and Gender Care Program, which he admitted did not consult with him in the forming of the clinic or in their ongoing work.  (Swaminathan Decl., Ex. B at 113:19–114:4.)  He does not write or research about providing treatment to transgender children, nor does he deliver any psychiatric care to them in his day-to-day practice.  Dr. Levine is not qualified under the *Daubert* standard to offer opinions on matters relating to the standards of care of transgender children, and he cannot use his personal beliefs as evidence in this case.

\* \* \*

In sum, Dr. Levine's lack of experience with treating transgender children and adolescents, and unfamiliarity with the issues at hand warrant exclusion of his opinions regarding care for transgender adolescents.

### DR. LEVINE'S TESTIMONY IS METHODOLOGICALLY UNRELIABLE AND UNSUPPORTED BY SCIENCE OR MEDICINE.

Expert testimony should only be admitted if its methodology is sufficiently reliable. *Sardis*, 10 F.4th at 281.  Here, Dr. Levine's opinions fail all indicia of reliability.  Dr. Levine testified at his deposition that with respect to the treatment of adolescent gender dysphoria, there is a "lack of evidence, from [his] perspective, as to which approach is scientifically based." (Swaminathan Decl., Ex. B at 212:12-17.)  This opinion is a clear outlier based on the Fourth

Circuit's detailed treatment of the medical consensus in this area. *Grimm*, 972 F.3d at 595–96.  As this Court has already acknowledged, the proper medical treatment for transgender youth is not at issue in this case, but even if it were, Dr. Levine has previously admitted in testimony under oath that the WPATH SOC are widely accepted and that the care he provides patients for the treatment of gender dysphoria is generally aligned with the SOC.  (Swaminathan Decl., Ex. I at 145:16-24; Ex O at 55:13-17; 56:2-5; 112:16-21; 176:8-16; 225:24–226:17; Ex. I at 103:11-19.)  He testified, without providing any source beyond his own personal views, that in the WPATH SOC v7, "there was much less interest in the pathways to transgenderism and more interest in the treatment of transgenderism, and so it became too many advocates."  (Swaminathan Decl., Ex. B at 225:25–226:3.)  But beyond his own personal beliefs, Dr. Levine presents no evidence that the SOC are unreliable, or that there are any other scientific guidelines that practitioners should follow in providing gender affirming care to transgender adolescents.  (Swaminathan Decl., Ex. A at 24–28.)  Regardless, Dr. Levine's personal opinions about the standards of care and guidelines for transgender adolescent care should be excluded in the present case as they are not relevant, as this Court has stated, to the issue of whether transgender girls and women should be allowed to participate on girls' and women's sports teams in West Virginia.

1.      **Dr. Levine Falsely Asserts That Providers Are Providing Rapid Affirmation Care To Transgender Adolescents.**

In addition, some of Dr. Levine's opinions are misleading at best, or flat out false.  For example, Dr. Levine testified at his deposition that "there is a practice of rapid affirmation [of gender dysphoria] happening in the United States."  (Swaminathan Decl., Ex. B at 124:10-13.)  Dr. Levine's only support for the notion that clinicians in the United States are performing "rapid affirmation care," a claim he also makes in his report, (Swaminathan Decl., Ex. A ¶ 50), is from

14

unidentified parents who have allegedly contacted him with complaints about their child's treatment.  (Swaminathan Decl., Ex. B at 120:6–123:20, 130:1-12 ("[I]t could be that parents that are having negative experiences are the ones that are seeking you out, correct? Yes . . . people come to see me because they think I have knowledge or attitude that is consistent with their position."); 128:14-15 ("parental reports that are consistent over time, to me, is good data").  Such plainly unreliable and speculative opinions should be excluded, especially given the Fourth Circuit's holding that "proffered evidence that has a greater potential to mislead than to enlighten should be excluded." *In re Lipitor (Atorvastatin Calcium) Mktg., Sales Pracs. & Prod. Liab. Litig. (No II) MDL 2502*, 892 F.3d 624, 632 (4th Cir. 2018); *see also Dunn v. Sandoz Pharm. Corp.*, 275 F. Supp. 2d 672, 684 (M.D.N.C. 2003) ("speculation is unreliable evidence and is inadmissible").

Dr. Levine claims his contact with "concerned parents" and providers at a local clinic who consulted him about "borderline personality kids," (Swaminathan Decl., Ex. B at 122:5-7, 126:1-7), is sufficient foundation for his opinion that rapid affirmation care is being provided.  But he fails to address how this purported contact leads to his conclusions and how such cherry-picked, anecdotal testimony is reliably applied to the facts here.  (Swaminathan Decl., Ex. B at 120:9–121:3, 125:16–127:2 ("Q . . . [O]ther than the people at the Cleveland Clinic, have you spoken to any other gender-affirming professionals about their practices? A . . . the answer to your question is no"));  *see*, *e.g.*, *Cooper*, 259 F.3d at 200 (affirming the exclusion of an expert because he "asserted what amounted to a wholly conclusory finding based upon his subjective beliefs rather than any valid scientific method").  Dr. Levine's testimony on this point should be excluded.

2.   **Dr. Levine's Assertion That There Are Widely Varying Views About The Appropriate Treatment For Gender Dysphoria Is Simply Wrong.**

Chief among Dr. Levine's many unreliable opinions is his assertion that wide disagreement exists about the appropriate treatment for gender dysphoria and that the SOC are not accepted by the scientific community.  (Swaminathan Decl., Ex. A ¶¶ 66–73.)  In addition to contravening the Fourth Circuit's recognition of a mainstream consensus about this care as explained above, this is objectively incorrect.   There *is broad consensus* about the appropriate treatment for gender dysphoria, as evidenced by the fact that all major medical associations, the largest health systems in the United States (Department of Veterans Affairs, Kaiser-Permanente, the Federal Bureau of Prisons), and most major health insurers endorse and follow the treatment protocols established by the WPATH in the SOC Version 7.  (Swaminathan Decl., Ex. G.)  Indeed, "[a] number of professional medical organizations have joined WPATH in recognizing that gender affirming care is medically necessary for transgender people."  (*Id*. at 361)  This includes, among others, the American Medical Association, American Psychiatric Association, American Psychological Association, American Academy of Family Physicians, American Academy of Pediatrics, American College of Obstetricians and Gynecologists, and the Endocrine Society.  (*Id*.)  Dr. Levine himself admitted at his deposition that he believes "medical certainty is a joke," (Swaminathan Decl., Ex. B at 75:11-12), and that he does not "actually believe that people like [him] ought to be recommending [care]."  (*Id*. at 117:13-19.)

This factual reality, combined with Dr. Levine's *own admissions* about his use of the WPATH treatment protocols, calls into serious question the reliability of this proffered opinion.  (Swaminathan Decl., Ex. B at 182:5-9, Ex. H at 112:16-21.)  Dr. Levine even admitted this in a prior deposition in December 2020, acknowledging that he continues to utilize the WPATH SOC

when writing letters to authorize hormones or surgery for someone with gender dysphoria. (Swaminathan Decl., Ex. P at 29:10-18; 37:2-13; 47:22–49:3; 103:11-19.)   At the *Claire* deposition, Dr. Levine confessed that he does not dispute that the WPATH SOC is widely accepted, but just maintains, without evidence, that they are "wrong," even though his clinical care continues to be consistent with these standards.  (*Id.* at 145:16-24.)  Dr. Levine fails to show how his experience leads to this conclusion, and his testimony is rendered unreliable.

### 3.  Dr. Levine's Opinion That Accessing Gender-Confirming Care Is Experimental And Unethical Is Unfounded.

Without any basis, Dr. Levine asserts that "hormonal interventions to treat gender dysphoria are experimental in nature and have not been shown to be safe, but rather put an individual at risk of a wide range of long-term and even life-long harms."  (Swaminathan Decl., Ex. A ¶ 18k1.)  Additionally, Dr. Levine claims that "the causes and treatment of gender dysphoria has low scientific quality."  (*Id.* ¶ 140.)  Dr. Levine's opinions are both inaccurate and unreliable. In fact, just last year, another federal district court drew the exact opposite conclusion of the testimony Dr. Levine submitted there when it enjoined Arkansas' state law seeking to ban gender-confirming treatment for minors.  *See Brandt*, 551 F. Supp. 3d 882.  In doing so, the *Brandt* court explicitly found that: (a) "Gender-affirming treatment is supported by medical evidence that has been subject to rigorous study;" and (b) "Every major expert medical association recognizes that gender-affirming care for transgender minors may be medically appropriate and necessary to improve the physical and mental health of transgender people."  *Id*. at 891.  Dr. Levine's testimony on the quality and nature of gender affirming care should be excluded.

Dr. Levine alleges that because transgender adults face increased vulnerability to negative life outcomes, providing any "'affirmative' treatment," particularly to adolescents, is experimental

and unethical.  (Swaminathan Decl., Ex. A ¶¶ 18i, 18kl, 154.)  This opinion cannot satisfy the reliability standard because Dr. Levine cherry-picks studies and misrepresents others, and because he has previously testified that he authorizes both hormone therapy and, where appropriate, surgical interventions for his own patients—*i.e.*, the very forms of care he suggests in his report are experimental and unethical.[1]

Dr. Levine ignores studies contrary to his belief and omits recent studies demonstrating that medical treatments for transgender adolescents and adults have favorable outcomes across many measures.[2]  Additionally, in an effort to support his own view, Dr. Levine distorts studies

---

[1] (Swaminathan Decl., Ex. E at 73:4-7 ("Q: Is the worrisomeness about a patient's future health, is that a reason to ban all medical care for gender dysphoria? A: Absolutely not."); 84:21-85:1 ("Q: Given all those concerns you have, is that a reason to deny all medical interventions to people with gender dysphoria? A: No …."); 85:4-11 ("Q: Are those concerns you raised justifications in your mind for denying medical interventions to people who have gender dysphoria? A: You know, I'm not advocating denying endocrine treatment or surgical treatment."); 152:1-6 ("Q: do you think because that study showed that some people committed suicide after gender affirming surgery that no patient should be able to access gender affirming surgery? A: That would be illogical"); 154:3-5 ("Q: But you're not recommending total bans on gender affirming surgery? A: I'm not recommending total bans."); 160:23-25 ("I did not say that gender affirming treatment in general should be stopped. I've never said that.").)

[2] Laura E. Kuper et al., Body Dissatisfaction and Mental Health Outcomes of Youth on Gender-Affirming Hormone Therapy, 145 Pediatrics e20193006 (2020). doi: 10.1542/peds.2019-3006.; Polly Carmichael et al., Short-term Outcomes of Pubertal Suppression in a Selected Cohort of 12 to 15 Year Old People with Persistent Gender Dysphoria in the UK, 16 PLOS ONE e0243894 (2021). doi: 10.1371/journal.pone.0243894.; Valeria P. Bustos et al., Regret after Gender-affirmation Surgery: A Systematic Review and Meta-analysis of Prevalence, 9 Plastic and Reconstructive Surgery Global Open e3477 (2021).doi: 10.1097/gox.0000000000003477;Anna I.R. van der Miesen et al., Psychological Functioning in Transgender Adolescents Before and After Gender-Affirmative Care Compared With Cisgender General Population Peers, 66 Journal of Adolescent Health 699-704 (2020). doi: 10.1016/j.jadohealth.2019.12.018.; Rikke Simonsen et al., Sociodemographic Study of Danish Individuals Diagnosed with Transsexualism, 3 Sexual Medicine 109-117 (2015); Mohammad Hassan Murad et al., Hormonal Therapy and Sex Reassignment: A Systematic Review and Meta-Analysis of Quality of Life and Psychosocial Outcomes, 72 Clinical Endocrinology 214-231 (2010); Anthony N. Almazan & Alex S.

beyond the authors' explicit intentions or design.  In particular, a plethora of studies show that trans people experience pervasive stigma and discrimination, resulting in health disparities.  Dr. Levine baselessly claims that receiving gender-confirming care *causes* those disparities and is therefore experimental, relying most heavily on two articles that expressly do not support this assertion.  (Swaminathan Decl., Ex. A ¶ 155.)  First, he relies on a study by Cecilia Dhejne, a scholar in the field who has publicly and specifically said that Dr. Levine's assertion is a mischaracterization of her work.  (*Id*.)  Her study directly states that it is not designed to "address whether [gender-affirming care] is an effective treatment or not," (*see* Swaminathan Decl, Ex. F at 2), yet that is exactly the purpose for which Dr. Levine attempts to use it.  When confronted at deposition in *Kadel* about the inapplicability of Dr. Dhejne's work to his personal theory, Dr. Levine admitted that the study design created a serious limitation in drawing any conclusions about the efficacy of the care.  (Swaminathan Decl., Ex. H at 156:7-11.)  The second study (Simonsen 2015) that Dr. Levine misrepresents to support his claim that gender confirming care is experimental likewise cautioned that it should not be used to evaluate whether or not gender affirming care is beneficial.  (Swaminathan Decl., Ex. A ¶ 155.)  Despite this warning, Dr. Levine implies that the article demonstrates a causal relationship between receiving gender-confirming surgery and higher death rates.  (*Id*.)  But the Simonsen study itself states that "the present study design does not allow for determination of causal relations between HT (hormone therapy) and SRS (sex reassignment surgery) and somatic morbidity or mortality."  (*See* Swaminathan Decl., Ex. G at 241–47.)

---

Keuroghlian, Association Between Gender-Affirming Surgeries and Mental Health Outcomes, JAMA Surgery (2021). doi: 10.1001/jamasurg.2021.0952.

Ultimately, Dr. Levine fails to cite any literature that supports his belief that gender confirming care is experimental and unethical.  Moreover, despite his arguments about gender confirming care in his expert report, Dr. Levine authorizes exactly this care for his patients who need it.  (Swaminathan Decl., Ex. H at 55:13-17; 56:2-5; 112:16-21; 176:8-16.)  When asked if he believes that because a study showed that some people committed suicide *no patient* should be able to access gender affirming surgery, Dr. Levine responded, "that would be illogical."  (*Id*. at 151:25–152:6.)  And when asked if all the concerns he has are justifications for denying medical interventions to all people with gender dysphoria, he responded, "I'm not advocating denying endocrine treatment or surgical treatment."  (*Id*. at 85:4-11.)

**4.      Dr. Levine's Opinions Directly Contradict The Fourth Circuit's Holding In *Grimm*.**

Dr. Levine's opinions contradict the clear medical consensus described in binding Fourth Circuit precedent.  Because the Fourth Circuit's precedent informs review of the issues, Dr. Levine's opinions do not help this Court.  The Fourth Circuit's detailed discussion of this consensus in the recently decided *Grimm v. Gloucester Cnty. Sch. Bd.* help demonstrate that Dr. Levine's opinions are unreliable.  His attempts to disparage the credibility of the WPATH and diminish the SOC as ideological and unscientific fail and are ironically contrary to his testimony about treatment he provides transgender patients in private practice, which follows the SOC. (Swaminathan Decl., Ex. A ¶¶ 69–73.)  Additionally, his "opinion" is unreliable, as it directly contravenes the consensus described by the Fourth Circuit in *Grimm*:

> Fortunately, we now have modern accepted treatment protocols for gender dysphoria. Developed by the World Professional Association for Transgender Health (WPATH), the Standards of Care for the Health of Transsexual, Transgender, and Gender Nonconforming People (7th Version 2012) (hereinafter "WPATH Standards of Care") represent the consensus approach of the medical and mental health community, Br. of Medical Amici 13, and have been recognized by various courts, including this one, as the authoritative standards of care, *see*

20

*De'lonta v. Johnson*, 708 F.3d 520, 522–23 (4th Cir. 2013); *see also Edmo*, 935 F.3d at 769; *Keohane v. Jones*, 328 F. Supp. 3d 1288, 1294 (N.D. Fla. 2018), *vacated sub nom. Keohane v. Fla. Dep't of Corrs. Sec'y*, 952 F.3d 1257 (11th Cir. 2020).  There are no other competing, evidence-based standards that are accepted by any nationally or internationally recognized medical professional groups." *Edmo*, 935 F.3d at 769 (quoting *Edmo v. Idaho Dep't of Corr.*, 358 F. Supp. 3d 1103, 1125 (D. Idaho 2018)).

*Grimm*, 972 F.3d at 595–96.  Further irreconcilable with available data and the consensus of the medical community, Dr. Levine asserts that gender dysphoria is a psychiatric condition. (Swaminathan Decl., Ex. A ¶ 92.)  The Fourth Circuit disagrees, holding that: "Being transgender is also not a psychiatric condition, and implies no impairment in judgment, stability, reliability, or general social or vocational capabilities."  *Grimm*, 972 F.3d at 594 (internal quotations omitted); *see also Kadel v. N.C. State Health Plan for Tchr.s & State Emps.*, 12 F.4th 422, 427 (4th Cir. 2021).

As Judge Gregory observed in an appeal involving healthcare for transgender people, "just like being cisgender, being transgender is natural and is not a choice."  *Kadel*, 12 F.4th at 427 (Gregory, J.) (quoting *Grimm*, 972 F.3d at 594).  Dr. Levine testified, "[I]f I could put [young people that were experiencing gender dysphoria] on a pathway of being non-transgender, I would expect that the vast majority of them would end up to be homosexual in their orientation" and "cisgender."  (Swaminathan Decl., Ex. B at 223:12-25.)[3]  But the Fourth Circuit has found that "mental health practitioners' attempt[s] to convert transgender people's gender identity to conform with their sex assigned at birth . . . did not alleviate dysphoria, but rather caused shame and

---

[3] Dr. Levine further testified that "even though medical psychiatric knowledge does not know how to transform a person from a trans state to a cis state or a previous state, it doesn't mean that life doesn't transform people into detransitioned people."  (*Id*. at 228:12–230:3.)

psychological pain." *Grimm*, 972 F.3d at 595.  Fourth Circuit precedent renders much of Dr.

Levine's testimony unreliable.

**5.      Dr. Levine's Report, Opinions, And Testimony Lack Probative Value And Are Thus Inadmissible Under Federal Rule Of Evidence 403.**

Finally, the Court should exclude evidence if its introduction will result in unfair prejudice,

confusion of the issues, or result in misleading testimony.  Fed. R. Evid. 403.  As noted above, Dr.

Levine offers no opinions on any factual dispute in this case, and, in any event, the opinions he

offers are unreliable and in direct conflict with Fourth Circuit precedent.  Consideration of his

testimony would create confusion and result in prejudice, as the testimony seeks to challenge

Plaintiffs' gender identity, gender dysphoria diagnosis, and the care that she and other transgender

youth receive—all issues that are unrelated to whether the State of West Virginia can prevent

B.P.J. from running on the girls' cross-country and track teams at her middle school based on her

transgender status.   Accordingly, Dr. Levine's testimony fails to satisfy the requirements of

Federal Rule of Evidence 403 and should be excluded.

## CONCLUSION

WHEREFORE, based on the foregoing, Plaintiff respectfully requests that this Court grant

the instant motion and exclude all of Dr. Levine's purported expert testimony because it is not

admissible under *Daubert* and the Federal Rules of Evidence.

Dated: May 12, 2022

Joshua Block*
AMERICAN CIVIL LIBERTIES UNION
FOUNDATION
125 Broad St.
New York, NY 10004
Phone: (212) 549-2569
jblock@aclu.org

Avatara Smith-Carrington*
LAMBDA LEGAL
3500 Oak Lawn Avenue, Suite 500
Dallas, TX 75219
Phone: (214) 219-8585
asmithcarrington@lambdalegal.org

Carl Charles*
Tara Borelli*
LAMBDA LEGAL
158 West Ponce De Leon Ave., Ste. 105
Decatur, GA 30030
Phone: (404) 897-1880
ccharles@lambdalegal.org

Sruti Swaminathan*
LAMBDA LEGAL
120 Wall Street, 19th Floor
New York, NY 10005
Phone: (212) 809-8585
sswaminathan@lambdalegal.org

Andrew Barr*
COOLEY LLP
1144 15th St. Suite 2300
Denver, CO  80202-5686
Phone: (720) 566-4000
abarr@cooley.com

Respectfully submitted,
/s/ *Loree Stark*

Loree Stark (Bar No. 12936)
Nick Ward (Bar No. 13703)
AMERICAN CIVIL LIBERTIES UNION OF WEST
VIRGINIA FOUNDATION
P.O. Box 3952
Charleston, WV 25339-3952
Phone: (914) 393-4614
lstark@acluwv.org

Kathleen Hartnett*
Julie Veroff*
Zoë Helstrom*
COOLEY LLP
3 Embarcadero Center, 20th Floor
San Francisco, CA 94111
Phone: (415) 693-2000
khartnett@cooley.com

Katelyn Kang*
Valeria M. Pelet del Toro*
COOLEY LLP
55 Hudson Yards
New York, NY 10001-2157
Phone: (212) 479-6000
kkang@cooley.com

Elizabeth Reinhardt*
COOLEY LLP
500 Boylston Street, 14th Floor
Boston, MA 02116-3736
Phone: (617) 937-2305
ereinhardt@cooley.com
*Visiting Attorneys
Attorneys for Plaintiff

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA
CHARLESTON DIVISION

B.P.J. by her next friend and mother, HEATHER
JACKSON,

*Plaintiff*,

v.

WEST VIRGINIA STATE BOARD OF
EDUCATION, HARRISON COUNTY BOARD
OF EDUCATION, WEST VIRGINIA
SECONDARY SCHOOL ACTIVITIES
COMMISSION, W. CLAYTON BURCH in his
official capacity as State Superintendent, DORA
STUTLER in her official capacity as Harrison
County Superintendent, and THE STATE OF
WEST VIRGINIA,

*Defendants*,

and

LAINEY ARMISTEAD,

*Defendant-Intervenor*.

Civil Action No. 2:21-cv-00316

Hon. Joseph R. Goodwin

### CERTIFICATE OF SERVICE

I, Loree Stark, do hereby certify that on this 12th day of May, 2022, I electronically filed a true

and exact copy of ***Plaintiff's Memorandum of Law in Support of Motion to Exclude the Expert***

***Testimony of Stephen B. Levine*** with the Clerk of Court and all parties using the CM/ECF System.

*/s/ Loree Stark*
Loree Stark
West Virginia Bar No. 12936

24