# Exhibit I

Stephen Levine
December 21, 2020

IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF FLORIDA
TALLAHASSEE DIVISION

CASE NO. 4:20-cv-00020-MW/MAF

JAMI CLAIRE, KATHRYN LANE and
AHMIR MURPHY,

    Plaintiffs,

vs.

FLORIDA DEPARTMENT OF
MANAGEMENT SERVICES, et al,

    Defendants.

_____

ZOOMED DEPOSITION OF STEPHEN B. LEVINE, M.D.

Monday, December 21, 2020

9:30 a.m. - 2:51 p.m.

Via Zoom

Tallahassee, Florida 32308

STENOGRAPHICALLY REPORTED BY:

SANDRA L. NARGIZ
RPR, CM, CRR, CRC, FPR, CCR-GA

Job No. 166551

Stephen Levine
December 21, 2020

Page 2

```
 1    APPEARANCES: (All appearing via Zoom.)

 2              ON BEHALF OF THE PLAINTIFFS:

 3              SOUTHERN LEGAL COUNSEL, INC.
                1229 NW 12th Avenue
 4              Gainesville, FL  32601
                352.271.8347
 5              BY: JODI SIEGEL, ESQUIRE
                jodi.siegel@southernlegal.org
 6              SIMONE MICHELLE CHRISS, ESQUIRE
                simone.chriss@southernlegal.org
 7

 8              LEGAL SERVICES OF GREATER MIAMI
                4343 West Flagler Street, #100
 9              Miami, FL  33134
                305.438.3809
10              BY:  JOCELYN JAUREGUI ARMAND, ESQUIRE
                jjauregui@legalservicesmiami.org
11              PAMELA FLORES, ESQUIRE
                pflores@legalservicesmiami.org
12
                ACLU OF FLORIDA
13              4343 W Flagler Street, #400
                Miami, FL 33134
14              786.363.2700
                BY: DANIEL TILLEY, ESQUIRE
15              dtilley@aclufl.org

16              ON BEHALF OF THE DEFENDANT DMS/SECRETARY
                SATTER:
17
                HENRY BUCHANAN HUDSON SUBER & CARTER
18              P.O. BOX 14079
                Tallahassee, FL  32317
19              850.222.2920
                BY: MIRIAM COLES, ESQUIRE
20              mcoles@henryblaw.com

21
                ALSO PRESENT:
22
                Samantha Howell
23

24

25
```

Stephen Levine
December 21, 2020

```
 1                    I N D E X

 2   WITNESS                                          PAGE
     STEPHEN B. LEVINE, M.D.                            5
 3
         Direct Examination by Mr. Tilley               5
 4       Cross Examination by Ms. Coles               171

 5

 6

 7

 8   (STENOGRAPHER'S NOTE:  Exhibits were received
     premarked electronically; only Exhibits 1, 2, 3, 7,
 9   10, 11 and 13 were referred to in deposition.)

10

11                   INDEX OF EXHIBITS

12
     NO.       DESCRIPTION                              ID
13
     1    Levine expert report                          70
14   2    Psychotherapeutic Approaches to Sexual       109
          Problems: An Essential Guide for Mental
15        Health Professionals
     3    Dhejne study                                 165
16   7    Standards of Care, V7                         48
     10   Kosilek report                                83
17   11   Soneeya 2011 report                           94
     13   Soneeya case trial transcript                167
18

19

20

21

22
     CERTIFICATE OF OATH                               181
23   CERTIFICATE OF REPORTER                           182
     READ AND SIGN LETTER                              183
24   ERRATA SHEET                                      184

25
```

Stephen Levine
December 21, 2020

Page 29

1  right?
2      A   No, that is. I think -- we'll quibble
3  over the word only. If you use the word
4  predominantly, I would say they are predominantly
5  taking care of. They are a specialty clinic for the
6  transgender.
7      Q   So predominantly treating transgender
8  people, but not 100 percent?
9      A   That's my guess.
10     Q   Okay. What sorts of treatments do you
11 provide for your patients with gender dysphoria?
12     A   Psychiatric evaluation of the patient and
13 the family, the parents and the other siblings;
14 psychotherapy to further the process of
15 understanding this whole phenomenon; recommendations
16 for hormones and occasionally recommendations for --
17 depending on the biologic sex of the patient, for
18 genital or breast surgery.
19     Q   How many patients have you recommended
20 hormone therapy for?
21     A   You mean over 47 years?
22     Q   Let's start with the 47 years, yeah.
23     A   I don't know. Can I give you a gross
24 estimate?
25     Q   Sure.

Stephen Levine
December 21, 2020

Page 37

1    to be directed to the surgeon.
2    Q    Okay.  If a surgeon told you I require a
3    letter for this facial feminization surgery, are
4    there circumstances under which you could see
5    yourself providing a letter, not of recommendation
6    but of authorization, for a person to receive this
7    surgery from the surgeon?
8    A    I could see myself under certain
9    circumstances, if I understood the patient's motives
10   and had a lot of time to discover and discuss this,
11   the history and alternative approaches and wondering
12   about the psychology of wanting this, I could see
13   theoretically.
14       That's what I do, you know, as a
15   psychiatrist; I am trying to investigate the meaning
16   of the wish and the solution that the patient is
17   hoping for, the problem the patient is hoping this
18   would be a solution for.
19       And so I want to be able to consider this
20   and have a respectful, mutual, slow dialogue that is
21   slow, meaning multiple sessions, to consider the
22   nuances of this because, you know, all of us have a
23   self-concept of how handsome we are or pretty we
24   are, and most everyone wants to get a little more
25   handsome and a little more pretty and we are -- we

Page 47

1     Q    Okay.
2     A    I believe that if a surgeon is going to do
3  this, he ought to know what I think -- what I know
4  about the person's history and the person's
5  intellectual capacities and the prices they paid for
6  their gender dysphoria already.
7          For example, the loss of a family and no
8  relations to children, or the inability to have a
9  relationship, an intimate relationship with other
10 people.  I believe the surgeon needs to have an
11 understanding of the person.
12         I don't have an understanding whatsoever
13 of the techniques of surgery.  You see?  I am just a
14 psychiatrist.  And the psychiatrist -- and the
15 surgeon has very little understanding of how a
16 person got to be in his office.  And I believe that
17 the letters of recommendation should capture the
18 humanness of this person and the desperation of this
19 person and the justification that the person uses
20 and the hopes they have for this surgery.  But
21 that's Levine, you know.
22    **Q    I want to show you the WPATH Centers of**
23 **Care section that discusses letters.  This is**
24 **Exhibit 7 which we are going to put on the screen.**
25

Stephen Levine
December 21, 2020

Page 48

```
 1              (Exhibit 7 was marked for identification.)
 2    BY MR. TILLEY:
 3         Q    Let's go to page 27.  It looks like the
 4    document page 27, it's .pdf page 33, Bates stamp
 5    PL 0450524.
 6              You see, Dr. Levine --
 7              MS. COLES:  Can you read that, Dr. Levine?
 8         It looks a little small on my computer.
 9              THE WITNESS:  I can read it.  It says
10         referral for surgery.
11              MS. COLES:  Okay.  Just making sure.
12    BY MR. TILLEY:
13         Q    At the bottom, I am going to start there
14    and then we'll go on to the following page.  At the
15    bottom it says, The recommended content of the
16    referral letters for surgery is as follows:  1, the
17    client's general identifying characteristics -- now
18    we are continuing on to the next page -- number 2,
19    results of the client's psychosocial assessment,
20    including any diagnoses.
21              And then it goes on to 3, 4, 5, and 6.
22              Dr. Levine, can you just review those if
23    you can read it and then let me know if you agree
24    with those statements.
25              (Short pause.)
```

```
 1       A    I don't disagree with the statements, but
 2   each of those statements, of course, need to be
 3   operationalized by the letter writer.  For example,
 4   the first one, identifying characteristics,
 5   oftentimes identifying characteristics would be like
 6   this is a 63-year-old Caucasian veterinarian.  But
 7   there are many other identifying characteristics
 8   that might be included.
 9            So you can interpret these things with
10   terse statements or elaborate statements.  I favor
11   elaborate statements.  For example, I would like to
12   say a divorced father of four, or a roller derby
13   official.  I would like to identify him as much as a
14   person as possible.  But in the history of medicine,
15   race, age, and nourishment passes for identifying
16   information.
17            So the results of the psychosocial
18   assessment, including any diagnosis.  Psychosocial
19   assessment would be the processes in his life
20   history, including any current or past diagnoses,
21   you see.  So substance abuse might be a very
22   important part of number 2.; and the duration.  So
23   if I am writing a letter, if I am one of two people
24   who have been hired to write a letter for genital
25   surgery, and I might have had three visits with the
```

```
 1   not inquiring about your medical history and your
 2   psychiatric history.  But it may be psychologically
 3   beneficial to you and an M.D. may recommend that you
 4   do that.  And that recommendation would be based on
 5   his or her knowledge that you are likely to suffer
 6   from seasonal affective disorder, and the treatment
 7   is bright lights and sunshine.  And sunshine would
 8   be far superior because of its luminescence, the
 9   number of lumens exposed, than bright lights.
10   BY MR. TILLEY:
11       Q    Let's go back just briefly to WPATH.  And
12   I know you mentioned you have a more conservative
13   approach.  So let me ask you this.
14            Is it fair to say that if you personally
15   believed that you would authorize hormones or
16   surgery for someone with gender dysphoria, someone
17   following the WPATH Standards of Care would also
18   believe that?
19       A    Yes.
20       Q    Okay.  Let's talk about insurance for a
21   little bit.  If you recommended that -- if you
22   authorized some form of treatment for gender
23   dysphoria, whether it be hormones or some form of
24   surgery, would you expect that that treatment would
25   be covered by your patient's insurance?
```

```
 1   offering an opinion on transgender people accessing
 2   sex-specific public places; is that right?
 3        A    No.
 4        Q    It's correct that that's not right?
 5        A    You mean like bathrooms, and so forth?
 6        Q    Right.  You are not making an expert
 7   opinion in this case concerning sex-specific spaces;
 8   is that correct?
 9        A    That's right.
10        Q    Okay.  Let's go to page 13.  You say that
11   plaintiffs assert that the WPATH Standards of Care
12   are widely accepted.  Do you see that statement?
13        A    Please tell me what paragraph it's in.
14        Q    Under heading number 4.
15        A    Yes.  Okay.
16        Q    Do you disagree that the WPATH Standards
17   of Care are widely accepted by the major medical and
18   mental health associations?
19        A    No.
20        Q    Okay.  You just think that they are wrong;
21   is that correct?
22        A    Yes, and widely accepted doesn't tell you
23   60 percent or 40 percent.  It just says widely
24   accepted.
25        Q    Okay.  Is it -- how would -- how would you
```

1  You see?

2           So I am saying, please, let me talk to you
3  about human beings here and how important having
4  ongoing lifelong relations with one's children are
5  and being a grandfather or grandmother, and being
6  connected to a family of origin.  I am not talking
7  about categorical bans.  I am talking about being
8  smart.
9  BY MR. TILLEY:
10      Q    Are you aware that this case concerns an
11 insurance exclusion that is categorical at
12 preventing --
13          MS. COLES:  Form.
14 BY MR. TILLEY:
15      Q    -- hormones and surgery as a treatment for
16 gender dysphoria?
17          MS. COLES:  Form.
18      A    I am aware that your plaintiffs are suing
19 to get coverage for -- that is not provided by their
20 particular insurance.  I am aware of that.
21 BY MR. TILLEY:
22      Q    Do you think that exclusion is
23 appropriate?
24          MS. COLES:  Form.
25      A    I've already answered that question, I

1  believe.
2  BY MR. TILLEY:
3      Q    What is the answer?
4      A    That it's a political decision that varies
5  from state to state, and it belongs to the process
6  of political science and the courts and not doctors.
7      Q    And if you yourself were treating them and
8  determined that they understood the risks and you
9  thought the treatment would be psychologically
10 beneficial and provided letters of authorization to
11 them, you would want that treatment to be covered by
12 insurance; is that correct?
13          MS. COLES:  Form.
14     A    I am an agent of the patient, I want
15 what's best for the patient, and especially if the
16 patient couldn't otherwise afford it, I would wish
17 for my patient to have it, yes.
18 BY MR. TILLEY:
19     Q    I know you said you are not about
20 categorical bans, but let me ask you about minors
21 again.
22          Would you support a categorical ban on
23 access to puberty blockers to treat gender
24 dysphoria?
25          MS. COLES:  Form.