IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA
CHARLESTON DIVISION

B.P.J. by her next friend and mother, HEATHER
JACKSON,

                  *Plaintiff*,

      v.

WEST VIRGINIA STATE BOARD OF
EDUCATION, HARRISON COUNTY BOARD
OF EDUCATION, WEST VIRGINIA
SECONDARY SCHOOL ACTIVITIES
COMMISSION, W. CLAYTON BURCH in his
official capacity as State Superintendent, DORA
STUTLER in her official capacity as Harrison
County Superintendent, and THE STATE OF
WEST VIRGINIA,

                  *Defendants*,

      and

LAINEY ARMISTEAD,

                  *Defendant-Intervenor*.

Civil Action No. 2:21-cv-00316

Hon. Joseph R. Goodwin

**CONSOLIDATED MEMORANDUM
IN OPPOSITION TO
DEFENDANTS' MOTIONS FOR
SUMMARY JUDGMENT**

## TABLE OF CONTENTS

Page

INTRODUCTION ......................................................................................................... 1

ARGUMENT ................................................................................................................ 3

I.  DEFENDANTS FAILED TO COMPLY WITH AND MEET THEIR BURDEN
    UNDER FEDERAL RULE OF CIVIL PROCEDURE 56 AND THEIR
    MOTIONS ACCORDINGLY SHOULD BE DENIED. .................................................... 3

    A.  Defendants' Statements Concerning H.B. 3293's Enactment Are
        Unsupported By The Record And Based On Inadmissible Hearsay. ................... 4

    B.  Defendants' Assertions Of Alleged Differences In Athletic Performance
        Between Boys and Girls Are Immaterial, Inadmissible, And Disputed. ............... 6

    C.  Defendants' Assertions About The Policies Of Other Sporting
        Organizations Are Inadmissible And Wrong. ........................................................ 8

    D.  Defendants' Assertions About Out-Of-State Athletes Are Immaterial And
        Inadmissible. ....................................................................................................... 9

II. ALL DEFENDANTS ARE PROPERLY SUBJECT TO SUIT, AS THIS
    COURT'S PREVIOUS ORDER RECOGNIZED AND AS THE RECORD NOW
    CONFIRMS. ........................................................................................................ 11

    A.  The State Board of Education And Superintendent Clayton W. Burch Are
        Proper Defendants. ............................................................................................ 12

        1.  The State Board Has A Mandatory Duty To Implement H.B. 3293
            Through Rulemaking. ................................................................................. 12

        2.  The State Board Defendants Control The Entities That Enforce
            H.B. 3293. ................................................................................................. 14

        3.  B.P.J. Has Properly Stated A Title IX Claim Against The State
            Board And An Equal Protection Clause Claim Against
            Superintendent Burch. ............................................................................... 16

    B.  The County Board Of Education And Superintendent Dora Stutler Are
        Proper Defendants. ............................................................................................ 16

        1.  The County Board Is A Proper Defendant Under Title IX. ......................... 17

        2.  Superintendent Stutler Is A Proper *Ex parte Young* Defendant
            Under The Equal Protection Clause. .......................................................... 19

i

    C.     WVSSAC Is A Proper Defendant. ....................................................... 20

          1.     The Commission Is Required To Enforce H.B. 3293 Against B.P.J. ...... 20

          2.     WVSSAC Is A State Actor. .................................................... 22

          3.     WVSSAC Has Controlling Authority Over Secondary School Athletics In West Virginia And Is Thus Subject To Title IX. ................ 24

III.    H.B. 3293 VIOLATES THE EQUAL PROTECTION CLAUSE AND SUMMARY JUDGMENT SHOULD BE ENTERED FOR PLAINTIFF—NOT ANY DEFENDANT. ........................................................................ 26

    A.     H.B. 3293 Targets B.P.J. For Different And Unequal Treatment Because She Is A Girl Who Is Transgender. ...................................................... 26

    B.     Defendants Misapply Heightened Scrutiny By Examining The Wrong Classification Under the Wrong Standard. .......................................... 33

    C.     H.B. 3293's Categorical Exclusion Of Transgender Girls Is Not Substantially Related To Defendants' Asserted Interests. .................................. 37

          1.     H.B. 3293's Categorical Exclusion Of Transgender Girls Is Not Substantially Related To "Protecting Women's Sports." ........................ 38

          2.     H.B. 3293 Is Not Substantially Related To Protecting Women's Safety In Women's Sports. ...................................................... 44

IV.    H.B. 3293 VIOLATES TITLE IX AND SUMMARY JUDGMENT SHOULD BE ENTERED FOR PLAINTIFF—NOT ANY DEFENDANT. ........................................... 47

    A.     H.B. 3293 Excludes B.P.J. On The Basis Of Sex. ................................. 47

    B.     H.B. 3293 Harms B.P.J. Through Unlawful Discrimination. .............................. 48

    C.     Title IX's Athletic Regulations Do Not Define Transgender Girls As Males Or Authorize Discrimination Against Them. ............................................ 49

V.    PERMANENT INJUNCTIVE RELIEF IS WARRANTED AND SHOULD BE GRANTED. ........................................................................ 52

CONCLUSION ............................................................................. 52

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*A.B. by C.B. v. Hawaii State Dep't of Educ.*,
  386 F. Supp. 3d 1352 (D. Hawai'i 2019) ..............................................................25

*Alston v. Va. High Sch. League, Inc.*,
  144 F. Supp. 2d 526 (W.D. Va. 1999) ..................................................................24

*Anderson v. Liberty Lobby, Inc.*,
  477 U.S. 242 (1986) ................................................................................................4

*Bayard v. Marlone*,
  268 F.3d 228 (4th Cir. 2001) ..........................................................................17, 18

*Bd. of Trs. of State Univ. of N.Y. v. Fox*,
  492 U.S. 469 (1989) ..............................................................................................35

*Bethesda Lutheran Homes & Servs., Inc. v. Leean*,
  154 F.3d 716 (7th Cir. 1998) ................................................................................18

*Billups v. City of Charleston*,
  961 F.3d 673 (4th Cir. 2020) ................................................................................47

*Bostic v. Schaefer*,
  760 F.3d 352 (4th Cir. 2014) ................................................................................19

*Bostock v. Clayton Cnty.*,
  140 S. Ct. 1731 (2020) ................................................................................28, 29, 51

*Bradwell v. Illinois*,
  83 U.S. 130 (1872) ..........................................................................................36, 37

*Brentwood Acad. v. Tenn. Secondary Sch. Athletic Ass'n*,
  531 U.S. 288 (2001) ..........................................................................................22, 23

*Califano v. Jobst*,
  434 U.S. 47 (1977) ................................................................................................34

*California v. Webster*,
  430 U.S. 313 (1977) ..............................................................................................36

*Celotex Corp. v. Catrett*,
  477 U.S. 317 (1986) ................................................................................................3

*City of L.A., Cal. v. Patel*,
    576 U.S. 409 (2015)..........................................................................................................34

*Clapper v. Amnesty Int'l USA*,
    568 U.S. 398 (2013)..........................................................................................................13

*Clark v. Arizona Interscholastic Association*,
    695 F.2d 1126 (9th Cir. 1982) ...................................................................................39, 40

*Cmtys. for Equity v. Mich. High Sch. Athletic Ass'n*,
    80 F. Supp. 2d 729 (W.D. Mich. 2000) ................................................................23, 24, 25

*Condiff v. Hart Cnty. Sch. Dist.*,
    770 F. Supp. 2d 876 (W.D. Ky. 2011)..............................................................................18

*Daubert v. Merrell Dow Pharms., Inc.*,
    509 U.S. 579 (1993).........................................................................................6, 7, 42, 46

*Disability Rights South Carolina v. McMaster*,
    24 F.4th 893 (4th Cir. 2022) ...........................................................................................15

*Doe v. Snyder*,
    28 F.4th 103 (9th Cir. 2022) ...........................................................................................47

*Fabian v. Hosp. of Cent. Conn.*,
    172 F. Supp. 3d 509 (D. Conn. 2016)...............................................................................51

*Fitzgerald v. Barnstable Sch. Comm.*,
    555 U.S. 246 (2009)..........................................................................................................18

*Gantt v. Whitaker*,
    57 F. App'x 141 (4th Cir. 2003) ......................................................................................10

*Greene v. Scott*,
    637 F. App'x 749 (4th Cir. 2016) ....................................................................................10

*Gregor v. West Virginia Secondary School Activities Commission*,
    No. 2:20-cv-00654, 2020 WL 5997057 (S.D. W. Va. Oct. 9, 2020)...............................33, 34

*G.G. ex rel. Grimm v. Gloucester Cnty. Sch. Bd.*,
    822 F.3d 709 (4th Cir. 2016) ...........................................................................................51

*Grimm v. Gloucester County School Board*,
    972 F.3d 586 (4th Cir. 2020) ................................................................................. *passim*

*H.B. Rowe Co. v. Tippett*,
    615 F.3d 233 (4th Cir. 2010) ...........................................................................................47

iv

*Harley v. Wilkinson*,
    988 F.3d 766 (4th Cir. 2021) .........................................................................35, 36

*Hecox v. Little*,
    479 F. Supp. 3d 930 (D. Idaho 2020) ...................................................30, 34, 38, 40

*Huisha-Huisha v. Mayorkas*,
    No. 21-100 (EGS), 2021 WL 4206688 (D.D.C. Sept. 16, 2021)...........................13

*Hutto v. S.C. Ret. Sys.*,
    773 F.3d 536 (4th Cir. 2014) ...............................................................................15

*Imaginary Images, Inc. v. Evans*,
    612 F.3d 736 (4th Cir. 2010) ...............................................................................40

*Israel by Israel v. W. Va. Secondary Sch. Activities Comm'n*,
    182 W. Va. 454 (W. Va. 1989)........................................................................22, 23

*J.E.B. v. Alabama*,
    511 U.S. 127 (1994).............................................................................................36

*Jones v. W. Va. State Bd. of Educ.*,
    218 W. Va. 52 (W. Va. 2005) ....................................................................... *passim*

*Joy v. Daniels*,
    479 F.2d 1236 (4th Cir. 1973) .............................................................................23

*State ex rel. Lambert by Lambert v. W. Va. State Bd. of Educ.*,
    191 W. Va. 700 (W. Va. 1994) .......................................................................14, 16

*Larson v. Valente*,
    456 U.S. 228 (1982)............................................................................................19

*Lawrence v. Texas*,
    539 U.S. 558 (2003)............................................................................................49

*Lexmark Int'l Inc. v. Static Control Components, Inc.*,
    572 U.S. 118 (2014)............................................................................................13

*Libertarian Party of Va. v. Judd*,
    718 F.3d 308 (4th Cir. 2013) ...............................................................................13

*Make the Rd. N.Y. v. McAleenan*,
    405 F. Supp. 3d 1 (D.D.C. 2019) ....................................................................13, 14

*Make the Rd. N.Y. v. Wolf*,
    962 F.3d 612 (D.C. Cir. 2020) .............................................................................14

*Martin v. Ballard*,
　No. 2:14-cv-16158, 2015 WL 5484136 (S.D. W.Va. Sept. 17, 2015)....................................38

*Mayo v. WVSSAC*,
　223 W. Va. 88 (W. Va. 2008) .................................................................................................22

*McGee v. Cole*,
　115 Supp. 3d 765 (S.D. W.Va. 2015) ..............................................................................16, 19

*McGee v. Va. High Sch. League, Inc.*,
　No. 2:11CV00035, 2011 WL 4501035 (W.D. Va. Sept. 28, 2011)................................20, 23

*Md. Highways Contractors Ass'n, Inc. v. Maryland*,
　933 F.2d 1246 (4th Cir. 1991) ..................................................................................................5

*Md. Shall Issue, Inc. v. Hogan*,
　971 F.3d 199 (4th Cir. 2020) .................................................................................................13

*Michael M. v. Sonoma Cnty. Super. Ct.*,
　450 U.S. 464 (1981)................................................................................................................41

*Miller v. Albright*,
　523 U.S. 420 (1998)................................................................................................................36

*Miss. Univ. for Women v. Hogan*,
　458 U.S. 718 (1982)................................................................................................................31

*Monell v. Department of Social Services*,
　436 U.S. 658 (1978)..........................................................................................................18, 19

*Moseley v. Branker*,
　550 F.3d 312 (4th Cir. 2008) .................................................................................................38

*N.C. State Conf. of NAACP v. McCrory*,
　831 F.3d 204 (4th Cir. 2016) .................................................................................................29

*O'Connor v. Bd. of Ed. of Sch. Dist. 23*,
　449 U.S. 1301 (1980)..............................................................................................................34

*Peltier v. Charter Day Sch., Inc.*,
　8 F.4th 251 (4th Cir. 2021) ....................................................................................................52

*Ret. Comm. of DAK Ams. LLC v. Brewer*,
　867 F.3d 471 (4th Cir. 2017) ...................................................................................................4

*Ritchie v. Aker Kvaerner Songer, Inc.*,
　No. 6:07-CV-00959, 2009 WL 10705555 (S.D. W. Va. Nov. 13, 2009) ................................5

*Robertson v. Jackson*,
    972 F.2d 529 (4th Cir. 1992) ...........................................................................15

*Rostker v. Goldberg*,
    453 U.S. 57 (1981).............................................................................................36

*Sessions v. Morales-Santana*,
    137 S. Ct. 1678 (2017).................................................................................36, 37

*Sierra Club v. Dep't of the Interior*,
    899 F.3d 260 (4th Cir. 2018) .........................................................................13

*Smith v. NCAA*,
    266 F.3d 152 (3d Cir. 2001)............................................................................24

*Susan B. Anthony List v. Driehaus*,
    573 U.S. 149 (2014)....................................................................................13, 14

*Tineo v. Att'y Gen. U.S. of Am.*,
    937 F.3d 200 (3d Cir. 2019)............................................................................34

*Tuan Anh Nguyen v. I.N.S.*,
    533 U.S. 53 (2001)...........................................................................34, 36, 37, 40

*United States v. Alabama*,
    778 F.3d 926 (11th Cir. 2015) .......................................................................52

*United States v. Chester*,
    628 F.3d 673 (4th Cir. 2010) .........................................................................35

*United States v. Virginia*,
    518 U.S. 515 (1996)................................................................................... *passim*

*Whitaker By Whitaker v. Kenosha Unified Sch. Dist. No. 1 Bd. of Educ.*,
    858 F.3d 1034 (7th Cir. 2017) ..................................................................31, 47

*Williams v. Bd. of Regents of Univ. Sys. of Ga.*,
    477 F.3d 1282 (11th Cir. 2007) .....................................................................25

**Statutes**

20 U.S.C.
    § 1681(a) ............................................................................................................52
    § 1681(a)(5) .......................................................................................................52
    § 1681(a)(6)(B) .................................................................................................52

W. Va. Code
    § 18-2-5 ............................................................................................................14
    § 18-2-25 ..........................................................................14, 17, 20, 25
    § 18-2-25d ..................................................................................20, 24
    § 18-2-25d(b)(1) ..........................................................................27, 40
    § 18-2-25d(c)(2) ............................................................................44
    § 18-2-25d(e) ................................................................................12
    § 18-3-3 ..........................................................................................16
    § 18-4-10 ........................................................................................17
    § 18-5-1 ..........................................................................................17
    § 18-5-13 ........................................................................................17

**Other Authorities**

34 C.F.R. § 106.41(b) ........................................................................50, 51

Fed. R. Civ. P. 56 ..........................................................................2, 3, 11

Letter from Norma V. Cantu, Assistant Sec'y for Civ. Rts., to Colleagues (Jan. 16, 1996) ....................................................................................................50

Letter from James A. Ferg-Cadima, Acting Deputy Assistant for Policy, U.S. Dep't of Educ. Office for Civil Rights, to Emily Prince (Jan. 7, 2015) ..................50

Letter from Catherine E. Lhamon, Ass't Sec. for Civil Rights, U.S. Dep't of Educ. and Vanita Gupta, Principal Dep. Ass't Attorney for Civil Rights, U.S. Dep't of Justice (May 13, 2016) ........................................................................50

Memorandum from Reed D. Rubinstein, Principal Deputy Gen. Couns., for Kimberly M. Richey, Acting Assistant Sec'y of the Off. For Civ. Rts. (Jan. 8, 2021) ..............................................................................................50

## INTRODUCTION

Defendants' motions for summary judgment should be denied and summary judgment should be granted for Plaintiff B.P.J.

Defendants' motions for summary judgment confirm that the entities with the most direct knowledge of and experience with student participation in school sports all oppose H.B. 3293's discriminatory ban. The State Board of Education and State Superintendent Burch ("State Board Defendants") have stipulated that they do not support H.B. 3293; the Harrison County Board of Education and County Superintendent Dora Stutler ("County Board Defendants") have supported B.P.J.'s gender identity and her efforts to play on girls' sports teams; and the West Virginia Secondary School Activities Commission ("WVSSAC") had a policy predating H.B. 3293 that would not have categorically barred B.P.J. from playing on girls' teams. Nevertheless, although these Defendants did not—and do not—support H.B. 3293, they are legally responsible for enforcing it. They are, therefore, properly subject to suit.

Only some Defendants—the State of West Virginia ("State"), Defendant-Intervenor Lainey Armistead and, because they feel compelled to do so, the County Board Defendants—seek to defend H.B. 3293 on the merits. But they do so by misconstruing B.P.J.'s claim as a challenge to the existence of sex-separated sports teams and by ignoring the distinction between transgender girls and cisgender boys. The Fourth Circuit rejected such an effort to erase the identity of transgender students in *Grimm v. Gloucester County School Board*, 972 F.3d 586 (4th Cir. 2020). This Court must and should do the same.

Although the State, Defendant-Intervenor, and County Board Defendants devote many pages to unsubstantiated and immaterial assertions about how boys and girls writ large tend to perform in sports, unfounded fears about allowing young people who are transgender to enjoy the same opportunities as their peers, and isolated anecdotes about college championships, they never

seriously grapple with the core, undisputed facts and law at issue in this case. (Indeed, their submissions disregard the requirements of Federal Rule of Civil Procedure 56 and do not even purport to be based on undisputed material facts.) Plaintiff B.P.J. is a 12-year-old middle school girl who, like many of her peers, loves sports and wants to have fun and be part of a school team with her friends. (Dkt. No. 290 (Pl's Statement of Undisputed Facts ("SUF")) ¶¶ 19, 30, 95-96, 120, 125.) B.P.J. is a girl who is transgender, and she is recognized as a girl in every aspect of her life. (Pl's SUF ¶¶ 1, 3-11.) She has been receiving puberty-delaying medication for two years and, as a result, does not have any of the physiological characteristics attributable to endogenous puberty. (Pl's SUF ¶¶ 13-17.) Yet H.B. 3293 would take the opportunity to play school sports away from her, simply because she is a girl who is transgender. (Pl's SUF ¶¶ 44, 49, 93.)

Contrary to Defendants' assertion, B.P.J. is not "demand[ing]" that participation in school sports be based purely on gender identity. (Dkt. No. 288 (Int. MSJ) at 11.) She is merely demanding that the State meet its high burden to justify its decision to bar her from participating on the girls' cross-country and track teams at her middle school based only on her status as a transgender girl. Her as-applied challenge to H.B. 3293 contends that excluding her from the opportunity to play school sports pursuant to a categorical ban is arbitrary and not justifiable. H.B. 3293's sweeping ban—which excludes all transgender girls from all girls' sports teams under all circumstances—is not substantially related to any claimed governmental interest and instead relies on overbroad stereotypes and fear of people who are different to banish girls who are transgender simply for being transgender.

Because H.B. 3293 prohibits B.P.J. from playing on girls' sports teams without any semblance of adequate justification, its application to B.P.J. violates Title IX of the Education Amendments of 1972 and the Equal Protection Clause of the Fourteenth Amendment. For the

reasons explained in B.P.J.'s opening brief and below, the Court should grant summary judgment in favor of B.P.J. and deny Defendants' motions for summary judgment.

## ARGUMENT

### I.    Defendants Failed To Comply With And Meet Their Burden Under Federal Rule Of Civil Procedure 56 And Their Motions Accordingly Should Be Denied.

In asking this Court to grant summary judgment in their favor, the State, Defendant-Intervenor, and the County Board Defendants proffer a variety of factual assertions in support of their legal arguments. Yet unlike B.P.J., they have made no effort to satisfy their burden under Federal Rule of Civil Procedure 56, which requires parties moving for summary judgment to show that the factual assertions underlying their motions are material and undisputed. *See* Fed. R. Civ. P. 56(c)(1) (requiring movants to "cit[e] to particular parts of materials in the record" or "show[] that the materials cited do not establish the . . . presence of a genuine dispute"); *Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986) (explaining that it is the movant's burden to show "the absence of a genuine issue concerning o any material fact"). These Defendants do not even make clear which assertions in their briefs they believe to be facts, let alone attempt to show that their factual assertions are material and undisputed. Instead, they offer a series of assertions that are inadmissible, immaterial, disputed, and/or unsupported by any citations to the record. Because Defendants have failed to base their motions for summary judgment on undisputed, material facts in the record of this case, they cannot satisfy their burden under Rule 56 and their motions must be denied.[1]

---

[1] The major deficiencies in Defendants' factual assertions are summarized below. In addition, Plaintiff has created charts listing the factual assertions set out in Defendants' briefs and identifying the reasons why they are not properly the basis for summary judgment. Should these charts aid the Court in its resolution of the summary judgment motions, Plaintiff is prepared to file them as exhibits at the Court's request.

Many of Defendants' assertions have no material connection to the legal questions before this Court—whether H.B. 3293's classification based on transgender status as applied to B.P.J. is substantially related to any asserted governmental interest, and whether H.B. 3293 unlawfully discriminates against and harms B.P.J. To the extent any Defendant makes factual assertions that are admissible and disputed, those assertions are ultimately immaterial because they cannot, as a matter of law, satisfy the State's burden on this as-applied challenge to justify H.B. 3293's sweeping categorical ban of all transgender girls and women from all girls' sports under all circumstances. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986) ("Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment."); *Ret. Comm. of DAK Ams. LLC v. Brewer*, 867 F.3d 471, 479 (4th Cir. 2017) ("[A] fact is material if it might affect the outcome of the suit under the governing law.") (quotation marks omitted).

### A. Defendants' Statements Concerning H.B. 3293's Enactment Are Unsupported By The Record And Based On Inadmissible Hearsay.

In an attempt to justify H.B. 3293's enactment, the State and Defendant-Intervenor assert that "males competing in women's sports" have been "an issue" in West Virginia "since at least 2015." (Dkt. No. 287 (State MSJ) at 4; Dkt. No. 288 (Int. MSJ) at 5.) But the undisputed, material facts on this topic show the opposite. WVSSAC stated that it was unaware of a cisgender boy ever playing on a girls' sports team, and that it had "[n]ever been raised as an issue." (Dkt. No. 289-18 (WVSSAC Dep. Tr.) at 116:10-116:18.) The State Board similarly testified that it had "not had an issue" and "didn't see an issue" regarding the participation of transgender girls in sports, and that the Department of Education, State Board, and State Superintendent had never received any complaints regarding the participation of transgender girls in school sports. (Pl's SUF ¶ 68.) Testimony during the legislative hearings for H.B. 3293 reflected no issues with or complaints

about transgender students attempting to participate in athletics. (Pl's SUF ¶¶ 40, 61.) And Governor Justice confirmed upon signing H.B. 3293 that he was unaware of even "one example of a transgender child trying to get an unfair advantage." (Pl's SUF ¶ 62.)

The State and Defendant-Intervenor try to escape these undisputed facts by misrepresenting the testimony from WVSSAC Executive Director Bernie Dolan during WVSSAC's 30(b)(6) deposition. (Dkt. No. 287 (State MSJ) at 4-5; Dkt. No. 288 (Int. MSJ) at 5 (citing Dkt. No. 289-18 (WVSSAC Dep. Tr.) 120:20-121:6).) Mr. Dolan testified that he once told a male student he could not play on the girls' volleyball team and the student responded that he would "be a girl," after which point the student never followed up. (Dkt. No. 289-18 (WVSSAC Dep. Tr.) at 120:20-121:2.) Mr. Dolan also testified that he once heard from a school that it "had one student who one day identified as a girl, next day a boy, and back and forth," but the student never contacted WVSSAC. (*Id.* at 121:3-121:6.) These statements do not demonstrate any "issue" created by the participation of transgender students in school sport—they were merely casual inquiries that did not result in any further action. Moreover, Mr. Dolan's statements about comments made by third parties are inadmissible hearsay if being offered for the truth of the matter asserted. *See Ritchie v. Aker Kvaerner Songer, Inc.*, No. 6:07-CV-00959, 2009 WL 10705555, at *3 (S.D. W. Va. Nov. 13, 2009) (Goodwin, J.) ("[H]earsay evidence, which is inadmissible at trial, cannot be considered on a motion for summary judgment.") (quoting *Md. Highways Contractors Ass'n, Inc. v. Maryland*, 933 F.2d 1246, 1251 (4th Cir. 1991)).

Defendants also point to WVSSAC's transgender athlete policy—which generally allowed transgender students to participate on sports teams consistent with their gender identity—as further evidence that "male" participation in sports in West Virginia was an "issue." (Dkt. No. 287 (State MSJ) at 4; Dkt. No. 288 (Int. MSJ) at 5.) But in fact, Mr. Dolan explained that the policy was

"addressing an issue that *hadn't come to West Virginia*." (Dkt. No. 289-18 (WVSSAC Dep. Tr.) at 118:6-7 (emphasis added); *see also id.* 118:20-21 ("[I]t had not hit West Virginia yet").) Mr. Dolan's testimony also relied on an inadmissible hearsay statement by his predecessor at WVSSAC that in turn relied on inadmissible hearsay statements by unidentified "people" at "national meetings." (Dkt. No. 288 (Int. MSJ) at 5 (citing Dkt. No. 289-18 (WVSSAC Dep. Tr.) at 118:18-20).)

### B.      Defendants' Assertions Of Alleged Differences In Athletic Performance Between Boys and Girls Are Immaterial, Inadmissible, And Disputed.

Defendants' briefs are littered with generic statements about alleged differences in athletic performance between boys and girls. Many of these assertions are not accompanied by any citation to the record.[2] Many are drawn from the testimony of Defendants' proffered expert witnesses, Dr. Brown and Dr. Carlson,[3] which Plaintiff has moved to exclude pursuant to the Federal Rules of Evidence and *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579 (1993). Other of Defendants' statements rely on inadmissible documents not in the record and not produced via the discovery process. For example, the County Board Defendants cite to a track-and-field handbook that has never been produced by any party. (*See, e.g.*, Dkt. No. 281 (County MSJ) at 6–7 (citing "Exhibit 6").) And the State cites to an apparently homemade collection of charts (Dkt. No. 285-8 ("Exhibit

---

[2] (*See, e.g.*, Dkt. No. 287 (State MSJ) at 13 (claiming that "the record shows that males notably outperform females in competitive sports such as track and field and other non-contact sports," and that "numerous large studies bear this out"); *id.* at 14 (claiming that "data shows that even pre-pubertal males have a significant athletic advantage, irrespective of circulating testosterone"); *id.* at 22 (claiming that "this advantage starts as early as six years old" and that "[a] male with a female gender identity does not lose that inherent advantage"); Dkt. No. 281 (County MSJ) at 7 (asserting that "physiological differences between males and females . . . make males, in general, taller, bigger, faster, and stronger").)

[3] (*See* Dkt. No. 287 (State MSJ) at 12-20; Dkt. No. 288 (Int. MSJ) at 9, 11, 12 n.11.)

H")) created by counsel that was not presented in expert testimony, attached to an expert report, part of or produced during discovery, or included anywhere in the record.

B.P.J. disputes these assertions, especially with respect to alleged athletic advantages for pre-pubertal children.[4] But even if Defendants' evidence were both admissible and accepted as true, none of Defendants' assertions could affect the outcome of this case. It is undisputed that any alleged differences in athletic performance between pre-pubertal cisgender boys and pre-pubertal cisgender girls are "modest" when compared with the differences between cisgender men and cisgender women that result from levels of testosterone produced during a typical male puberty. (Pl's SUF ¶ 90.) Even if Defendants could show that pre-pubertal transgender girls have the same alleged advantages of pre-pubertal cisgender boys, and that those advantages persist after transgender girls receive puberty-delaying medication and gender-affirming hormones, it still would not affect the outcome of this case. The issue for the Court to decide is whether, as a matter of law, such "modest" differences alone, and irrespective of individual circumstance, can justify categorically barring B.P.J. and all transgender girls and women from girls' sports. As a matter of law, the answer is no.

---

[4] Specifically, as explained in the rebuttal expert declaration of Dr. Safer, Plaintiff vigorously disputes that a meaningful performance gap between non-transgender boys and non-transgender girls exists for pre-pubertal children (Dkt. No. 289-26 (Rebuttal Expert Report of Joshua D. Safer) ¶¶ 9-12), that any alleged differences are based on innate biology (*id.* ¶ 10), that generalizations about pre-pubertal non-transgender boys apply to pre-pubertal transgender girls (*id.* ¶ 11), and that any alleged similarities in athletic performance persists after transgender girls receive puberty-delaying medication followed by gender-affirming hormone therapy (*id.* ¶ 12). And, as explained in Plaintiff's *Daubert* motions, Dr. Brown and Dr. Carlson's newfound assertions about pre-pubertal youth misrepresent the sources they cite and contradict their own past declarations on the topic.

### C. Defendants' Assertions About The Policies Of Other Sporting Organizations Are Inadmissible And Wrong.

The State and Defendant-Intervenor point to other sports organizations' policies concerning transgender athletes, but get them wrong. For example, the State asserts that "[i]n 2015, U.S. Rugby recognized the serious physical risk of biological males competing against females and completely banned post-pubertal biological males from competing against biological females—with no exceptions." (Dkt. No. 287 (State MSJ) at 1.) The State cites nothing in support of this statement, and in any event, it is incorrect: U.S. Rugby currently allows transgender women to participate on women's rugby teams if their circulating testosterone is below a certain threshold. (Stark Supp. Decl. Ex. 49 (USA Rugby, Transgender Athletes and Participants).)

The State also asserts that UK Sport and World Rugby determined that it is categorically unsafe to have "transfemales on female designated teams" (Dkt. No. 287 (State MSJ) at 20), but this too is wrong. UK Sport (which is not actually a governing body for any particular sport) specifically disclaimed a "one-size fits all approach," and emphasized that sports bodies should work to "accommodate transgender inclusion, fairness, and safety in their sport." (Stark Supp. Decl. Ex. 50 (UK Sports, Guidance for Transgender Inclusion in Domestic Sport).) A "frequently asked questions" document accompanying the UK Sport recommendations explained that the organization was not "giving definitive advice" because "[t]his a complex area and what is right for one sport may not be right for another" and "[n]one of the Sports Councils are regulators." (Stark Supp. Decl. Ex. 51 (UK Sports, Frequently Asked Questions).) And World Rugby expressly *permits* transgender women who did not go through endogenous puberty to participate on women's

teams. (Stark Supp. Decl. Ex. 52 (World Rugby, Transgender Women Guidelines); *see* Dkt. No. 289-33 (Carlson Dep. Tr.) at 127:6-12.)[5]

The State additionally points to the International Amateur Athletic Federation's ("IAAF") 1990 policy and the International Olympic Committee's ("IOC") 2004 policy concerning transgender athletes, each of which required transgender athletes to have undergone surgery (*see* Dkt. No. 287 (State MSJ) at 2-3), but fails to mention that those policies have since been abandoned in favor of more inclusive approaches. The IAAF allows women who are transgender to participate on women's teams after suppressing their circulating testosterone to certain levels. (Stark Supp. Decl. Ex. 55 (New IAAF Rules for Transgender Athletes).) And the IOC utilizes a sport-by-sport framework that emphasizes "[f]airness, [i]nclusion, and [n]on-discrimination" and requires that any restrictions on the participation of transgender athletes be based on rigorous and reliable evidence. (Pl's SUF ¶¶ 80-83.)

The State further claims that "at least 40 national and international athletic organizations have studied this issue and issued their own rules" (Dkt. No. 287 (State MSJ) at 3), but does not cite anything to support that assertion.

### D. Defendants' Assertions About Out-Of-State Athletes Are Immaterial And Inadmissible.

The State and Defendant-Intervenor offer assertions about a handful of adult or college transgender athletes who have no connection to West Virginia and whose experiences are

---

[5] The State similarly mischaracterizes the rules of "the International Quidditch Association," an organization "based on the fictional sport in the Harry Potter series" played by magicians flying on broomsticks. (Stark Supp. Decl. Ex. 54 (International Quidditch Association, What Is Quidditch?).) Although the State claims the International Quidditch Association "allow[s] players to compete on the sports team of their gender-declared identity, switchable at any time" (Dkt. No. 287 (State MSJ) at 4 & n.4), Quidditch does not have sex-separated teams; it is a mixed-gender sport in which "athletes play as their stated gender," with "no more than four players of the same gender" allowed on the field "at one time" to maintain gender inclusivity and diversity. (Stark Supp. Decl. Ex. 53 (International Quidditch Association Rulebook) at 7.)

immaterial to the present challenge. (*See* Dkt. No. 287 (State MSJ) at 1-8; Dkt. No. 288 (Int. MSJ) at 1-4.)

Moreover, the support for these assertions is inadmissible. The State and Defendant-Intervenor cite several statements selected from blog posts and news articles, all of which are inadmissible as hearsay. (*See, e.g.*, Dkt. No. 287 (State MSJ) at 2 & n.1 (blog post quoting Renee Richards' belief that "her past as a man provided her with advantages over her competitors"); *id.* at 3 n.3 (newspaper article quoting Renee Richards referring to the former International Olympic Committee policy as "not a level playing field"); *id.* at 5 & nn.6-7, 7-8 & nn.9-10 (citing content and quotes from news articles about transgender women athletes); Int. MSJ at 4 & nn.2-5 (citing various news articles, including about Olympic athletes and an out-of-state transgender male college swimmer)); *Greene v. Scott*, 637 F. App'x 749, 752 (4th Cir. 2016); *Gantt v. Whitaker*, 57 F. App'x 141, 150 (4th Cir. 2003).

Additionally, Defendant-Intervenor offers declarations from various out-of-state athletes (including college athletes), parents of out-of-state athletes, and former athletes, which should be disregarded as immaterial because the declarants have no connection to B.P.J.'s challenge and as inadmissible because the declarations contain inadmissible hearsay. (*See* Dkt. No. 288 (Int. MSJ) at 2-3). Those statements should be stricken from the record because the declarants were not timely disclosed. On February 11, 2022, four months after making her initial disclosures, and three days after the deadline for written discovery, Defendant-Intervenor identified at least *thirty-seven* additional individuals in "supplemental" disclosures.[6] Defendant-Intervenor then repeatedly refused to engage with Plaintiff's requests that Defendant-Intervenor inform Plaintiff which

---

[6] Defendant-Intervenor also included "[f]emale athletes on the University of Pennsylvania women's swimming and diving team" in her list of "supplemental" disclosures with no further identifying information. (Stark Supp. Decl. Ex. 46 (Int. First Supp. Disclosures).)

witnesses she reasonably believed she might use to support Defendant-Intervenor's claims or defenses. (Stark Supp. Decl. Exs. 46, 59-62 (parties' correspondence).) By this point, the parties had a full deposition schedule through and after the close of discovery on March 25, 2022. Due to Defendant-Intervenor's gamesmanship, Plaintiff was unable to depose these potential witnesses by the close of discovery. Because Plaintiff has had no meaningful opportunity to depose these individuals, this Court should strike these individuals' declarations from the record.

* * *

Defendants' motions are riddled with factual assertions that do not comply with the requirements of and burden imposed by Rule 56 and are inadmissible, immaterial, and/or in dispute. Notably, even if the assertions were properly presented, none create a material, triable issue of fact in Defendants' favor. To the contrary, Defendants' submissions confirm that Plaintiff is the party entitled to summary judgment.

## II.    All Defendants Are Properly Subject To Suit, As This Court's Previous Order Recognized And As The Record Now Confirms.

In moving for summary judgment, the State Board Defendants, the County Board Defendants, and WVSSAC repeat the same arguments they previously made in support of their unsuccessful motions to dismiss. In rejecting those arguments, this Court explained that B.P.J. "has standing to sue the State Board Defendants, the County Board Defendants, and the WVSSAC" because "she has adequately alleged . . . that she will be treated differently on the basis of sex"; that "under H.B. 3293, each defendant will take some action that will cause her asserted harm"; and that "each defendant can redress her claims because a favorable ruling against [them] will prevent them from enforcing the Act as to B.P.J." (Dkt. No. 129 (MTD Op.) at 6.) This Court further held that B.P.J.'s "claims are ripe against each defendant . . . because they do not require any future factual development"—"H.B. 3293 requires each defendant to prevent B.P.J. from

playing on girls' sports teams; no future factual development will change that effect." (*Id.*) Finally, the Court held that B.P.J. plausibly stated claims under Title IX and the Equal Protection Clause against all named Defendants. (*Id.* at 7.)

Discovery has only confirmed the correctness of this Court's earlier decision. For the same reasons it denied their motions to dismiss, the Court should deny their motions for summary judgment.

**A.    The State Board of Education And Superintendent Clayton W. Burch Are Proper Defendants.**

Because the State Board has a mandatory duty under the statute to implement H.B. 3293 through rulemaking and the State Board and State Superintendent Burch exercise controlling authority over the entities that enforce H.B. 3293, B.P.J. has standing to sue and has properly stated Title IX and Equal Protection Clause claims.

1.    <u>The State Board Has A Mandatory Duty To Implement H.B. 3293 Through Rulemaking.</u>

The State Board concedes that H.B. 3293 "compel[s] and require[s]" it to promulgate rules implementing the law's categorical exclusion of girls who are transgender from school sports. (Dkt. No. 270 (Stipulation of Uncontested Facts) ¶ 4); Dkt. No. 289-19 (State Board Dep. Tr.) at 72:15-73:7 (confirming that rules the State Board issues pursuant to H.B. 3293 must be consistent with H.B. 3293 and will not permit transgender girls to participate on girls' sports teams)); *see* W. Va. Code § 18-2-25d(e). The State Board thus has a clear, mandatory role in implementing H.B. 3293, which is enough to render it a proper defendant for injunctive relief. Nonetheless, the State Board asserts that B.P.J. lacks standing to sue it because H.B. 3293 does not specifically require it to enforce the law or its rules against her, and because the required rules "have not yet been drafted." (Dkt. No. 284 (State Board MSJ) at 8, 10.)

As this Court previously held, the State Board is wrong. (MTD Op. at 6.) Article III standing "requires only that the Plaintiff's injury be fairly traceable to the defendant's conduct." *Lexmark Int'l Inc. v. Static Control Components, Inc.*, 572 U.S. 118, 134 n.6 (2014). Traceability does not require the challenged action to be "'the sole or even immediate cause of th[e] injury.'" *Md. Shall Issue, Inc. v. Hogan*, 971 F.3d 199, 212 (4th Cir. 2020) (quoting *Sierra Club v. Dep't of the Interior*, 899 F.3d 260, 283-84 (4th Cir. 2018)). A defendant's action need only be "at least in part responsible" for the plaintiff's injury. *Libertarian Party of Va. v. Judd*, 718 F.3d 308, 316 (4th Cir. 2013). By promulgating rules implementing H.B. 3293 that will be applied to and enforced against B.P.J., the State Board is plainly part of the chain of actions that will cause B.P.J.'s injury.[7]

There also is no uncertainty that the State Board will, in fact, issue rules implementing H.B. 3293; the State Board's duty to do so is mandatory under the law and the State Board would have done so absent this Court's issuance of a preliminary injunction. (Dkt. No. 270 (Stipulation of Uncontested Facts) ¶ 4; Dkt. No. 289-19 (State Board Dep. Tr.) at 72:6-13.) That certain action is sufficient to satisfy Article III. *See Susan B. Anthony List v. Driehaus*, 573 U.S. 149, 158 (2014) ("An allegation of future injury may suffice" to satisfy Article III "if the threatened injury is 'certainly impending,' or there is a 'substantial risk that the harm will occur.'") (quoting *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 414 & n.5 (2013)); *Make the Rd. N.Y. v. McAleenan*, 405 F. Supp. 3d 1, 34 (D.D.C. 2019) (Jackson, J.) ("It is well established that, with respect to Article III standing, 'threatened' agency action in the form of an announced policy change must be taken just

---

[7] Indeed, courts regularly consider suits and order injunctive relief against agencies that promulgate rules they do not directly enforce. *See, e.g.*, *Huisha-Huisha v. Mayorkas*, No. 21-100 (EGS), 2021 WL 4206688, at *3 (D.D.C. Sept. 16, 2021) (granting a preliminary injunction against the Director of the Centers for Disease Control ("CDC") in their official capacity, among other defendants, in a challenge to a rule issued by CDC but implemented by the U.S. Department of Homeland Security), *aff'd in part*, 27 F.4th 748 (D.C. Cir. 2022).

as seriously as already-completed injury.") (quoting *Susan B. Anthony List*, 573 U.S. at 165), *rev'd on other grounds & remanded sub nom. Make the Rd. N.Y. v. Wolf*, 962 F.3d 612 (D.C. Cir. 2020).

Moreover, despite the State Board's assertions to the contrary, H.B. 3293's mandatory rulemaking requirement does *not* confer legislative immunity upon the State Board Defendants. The State Board cites no cases holding that a statutory requirement to issue implementing regulations confers legislative immunity, and Plaintiff is aware of none. (Dkt. No. 284 (State Board MSJ) at 12-14.) That there is no authority for such a novel position is unsurprising; a decision so holding would upend decades of administrative law jurisprudence pursuant to which agencies regularly are held to account for rules issued in response to a statutory requirement.

2.    The State Board Defendants Control The Entities That Enforce H.B. 3293.

The State Board's mandatory rulemaking duty is sufficient to confer standing, but the State Board Defendants are also part of the causal chain of B.P.J.'s injuries because the State Board has "ultimate control" over the County Board and WVSSAC, which must directly enforce H.B. 3293 against B.P.J. *See State ex rel. Lambert by Lambert v. W. Va. State Bd. of Educ.*, 191 W. Va. 700, 709 (W. Va. 1994) (discussing W. Va. Code §§ 18-2-5, 18-2-25); *see infra* at Section II.B-C. The State Board's "ultimate control" over local boards and WVSSAC stems from its constitutional duty "to generally supervise the schools in this state," and extends to any efforts to supervise or regulate extracurricular activities undertaken by the county boards or WVSSAC. *Jones v. W. Va. State Bd. of Educ.*, 218 W. Va. 52, 61 (W. Va. 2005). The State Board Defendants' control involves, *inter alia*, "ensuring that [West Virginia's] county school systems are implementing the [State Board's] policies or procedures" (Dkt. No. 289-19 (State Board Dep. Tr.) at 47:22-24; *see also id.* 35:2-6), reviewing WVSSAC rules and approving or rejecting them (*id.* at 48:24-49:10); *see also* W. Va. Code § 18-2-25, and collecting certifications from school principals wishing to join WVSSAC (Dkt. No. 289-19 (State Board Dep. Tr.) at 47:22-24, 52:18-53:14).

The Fourth Circuit's decision in *Robertson v. Jackson*, 972 F.2d 529 (4th Cir. 1992), is analogous. There, the Fourth Circuit held that a state official was properly enjoined in a case alleging violations of federal regulations governing the acceptance and processing of applications of food stamp assistance, where the state official's role was to "supervise[] and manage[]" the organization overseeing the administration of Virginia's public aid and assistance programs, even though local officials were the ones directly administering the food stamp program. *Id.* at 530-31. Put another way, although the *enforcement* of the policy was handled at the local level, the injunction also bound the state official because of his supervisory and managerial role in the causal chain of enforcement. *See id.* So too here—the State Board Defendants have constitutional and statutory duties to supervise the specific entities that, absent an injunction, would enforce H.B. 3293 against B.P.J., and to do so in the specific context of this case (extracurricular activities).

By contrast, the case on which the State Board relies, *Disability Rights South Carolina v. McMaster*, 24 F.4th 893 (4th Cir. 2022), is far afield. (Dkt. No. 284 (State Board MSJ) at 9-10.) There, the Fourth Circuit held that the "mere fact" of a governor's "general duty to enforce state laws" was not enough to render him a proper defendant for injunctive relief. *McMaster*, 24 F.4th at 901 (quotation marks omitted). Rather, the Fourth Circuit explained, a defendant must have a "role in enforcing the law at issue." *Id.* at 902; *see also id.* (explaining that *Ex parte Young* requires "'some connection with the enforcement of the act'") (quoting *Hutto v. S.C. Ret. Sys.*, 773 F.3d 536, 550 (4th Cir. 2014)). Here, the State Board Defendants have a specific role in enforcing H.B. 3293—they are charged by the statute itself with issuing implementing rules and with supervising the specific entities responsible for enforcing H.B. 3293.

3.    B.P.J. Has Properly Stated A Title IX Claim Against The State Board And An Equal Protection Clause Claim Against Superintendent Burch.

The State Board argues that B.P.J. has failed to state a claim under Title IX because she has not established that the State Board's conduct is a "but-for" cause of her injuries. (Dkt. No. 284 (State Board MSJ) at 11-12.) But for all the same reasons that enforcement of H.B. 3293 is fairly traceable to the State Board absent an injunction, the State Board's enforcement of H.B. 3293 is also a but-for cause of B.P.J.'s injury. *See supra* at Section II.A.1-2.

Likewise, Superintendent Burch contends that B.P.J. has failed to state an Equal Protection Clause claim against him under *Ex parte Young* because she has not established that he "will engage in conduct that will 'discriminate' against Plaintiff on the basis of her" transgender status. (Dkt. No. 284 (State Board MSJ) at 12.) But Superintendent Burch oversees all public schools, county superintendents, and county boards of education in West Virginia, W. Va. Code § 18-3-3, and so necessarily has a role in "enforcing or administering" H.B. 3293. *McGee v. Cole*, 115 Supp. 3d 765, 772 (S.D. W.Va. 2015) (explaining that state and local officials responsible for enforcing or administering state law may be sued under the doctrine of *Ex parte Young*). Moreover, he is responsible for, and has "ultimate control" over, the County Board, which will enforce H.B. 3293 against B.P.J. if the law is not permanently enjoined. *Lambert*, 191 W. Va. at 709. That "ultimate control" ensures that Superintendent Burch is properly joined as a defendant to this suit.

**B.    The County Board Of Education And Superintendent Dora Stutler Are Proper Defendants.**

The County Board Defendants argue that they cannot be liable for B.P.J.'s Title IX and equal protection claims because they did not participate in the creation or passing of H.B. 3293 and any injury suffered by B.P.J. was not caused by a County Board Defendants' policy. As it did before, the Court should reject those arguments. The County Board Defendants do not dispute that the County Board is the governing body of Harrison County's public education system and that

16

Superintendent Stutler is responsible for executing educational policies under the direction of the State and County Boards of Education, including regarding interscholastic athletics. W. Va. Code §§ 18-5-1, 18-4-10. Nor do the County Board Defendants dispute that consistent with that authority, they control, supervise, and regulate Bridgeport Middle School's interscholastic athletics. W. Va. Code §§ 18-5-13, 18-2-25; (Dkt. No. 289-17 (County Dep. Tr.) at 53:24–54:10 (explaining sports fall under the County Board Defendants' jurisdiction); MTD Op. at 7 (noting the County Board has delegated some level of control, supervision, and regulation to WVSSAC).) In fact, the County Board Defendants admit they are required to enforce H.B. 3293 absent an injunction. (Dkt. No. 281 (County MSJ) at 2, 4-5; Dkt. No. 50 (County PI Opp.) at 8; Dkt. No. 252 (Stipulation of Facts) at ¶¶ 3-4; Dkt. No. 73 (County MTD) at 2, 6; *see also* Dkt. No. 289-17 (County Dep. Tr.) at 44:15-45:12, 145:1-145:5.) As this Court already held, H.B. 3293 "requires" the County Board Defendants "to prevent B.P.J. from playing on girls' sports teams." (MTD Op. at 6.) No facts developed via discovery change that conclusion.

1.    The County Board Is A Proper Defendant Under Title IX.

The County Board first contends that it is not liable under Title IX because it did not play a role in enacting H.B. 3293. (Dkt. No. 281 (County MSJ) at 9.) But the County Board's level of involvement in the law's enactment is inconsequential for the Title IX analysis. Title IX asks whether the County Board will knowingly subject B.P.J to discrimination on the basis of sex as a result of its role in enforcing H.B. 3293 against her. The County Board admits that, but for the injunction, it would be required to enforce H.B. 3293 against B.P.J. (Pl's SUF ¶ 109.) That undisputed fact is dispositive.

The County Board cites *Bayard v. Marlone*, 268 F.3d 228, 237 (4th Cir. 2001), for the proposition that it cannot be liable for a State policy it is mandated to enforce. (Dkt. No. 281 (County MSJ) at 8.) *Baynard* said no such thing. In that case, the court held the school board could

17

not be held liable because no supervisory official had "actual notice" of the unlawful harassment by a teacher and so the municipality could not "knowingly" discriminate in violation of Title IX— not because a state policy was at issue. 268 F.3d at 238. Here, by contrast, it is indisputable that the County Board had "actual notice" of H.B. 3293 and its application to and effect on B.P.J., *id.*, and as soon as its "mandatory" role of enforcing the law is triggered (Pl's SUF ¶ 109), it will "knowingly" discriminate against B.P.J., *Bayard*, 268 F.3d at 238.

The County Board also relies on *Bethesda Lutheran Homes & Services, Inc. v. Leean*, 154 F.3d 716 (7th Cir. 1998), in support of its claim that it is not responsible for B.P.J.'s injury because the discrimination results from a state policy, not a municipal one. (Dkt. No. 281 (County MSJ) at 10, 12-13.) But unlike the constitutional claims in *Bethesda Lutheran Homes* brought pursuant to *Monell v. Department of Social Services*, 436 U.S. 658 (1978), Title IX does not require that discrimination be pursuant to a municipal policy or custom. It merely requires an act of intentional discrimination. *See, e.g.*, *Fitzgerald v. Barnstable Sch. Comm.*, 555 U.S. 246, 257-58 (2009) (distinguishing between *Monell* and Title IX claims); *Condiff v. Hart Cnty. Sch. Dist.*, 770 F. Supp. 2d 876, 881 n.3 (W.D. Ky. 2011) ("Defendants' application of the *Monell* 'policy or custom' standard to Title IX claims is incorrect and not supported by the case law.") Here, the County Board has stipulated that, absent an injunction, H.B. 3293 "prevents B.P.J. from participating on sports teams that are designated for girls and that are sponsored by Bridgeport Middle School"; the County Board "would be compelled and required to enforce [H.B.] 3293"; and "[H.B.] 3293 would have prevented the Harrison County Board of Education from permitting B.P.J. to participate on the Bridgeport Middle School girls' cross-country team." (Dkt. No. 252 (Stipulation of Facts) ¶¶ 2-4.)

Finally, the County Board argues that it is not a proper defendant because it can only provide B.P.J. relief in Harrison County. (Dkt. No. 281 (County MSJ) at 10.) But local relief is necessary and significant for B.P.J. because she resides and attends school in Harrison County. (Pl's SUF ¶ 93.) In any case, it is well-established that a defendant is a proper party even if it can only provide partial relief. *Larson v. Valente*, 456 U.S. 228, 243 n.15 (1982) ("[A] plaintiff satisfies the redressability requirement when [s]he shows that a favorable decision will relieve a discrete injury to [her]self. [S]he need not show that a favorable decision will relieve [her] *every* injury.") (emphasis in original). B.P.J. has shown that enjoining the County Board Defendants from enforcing H.B. 3293 will relieve a "discrete injury" to her by allowing her to participate on sports teams at Bridgeport Middle School. No further showing of redressability is necessary.

### 2. Superintendent Stutler Is A Proper *Ex parte Young* Defendant Under The Equal Protection Clause.

Echoing arguments made by the County Board with respect to Title IX, Superintendent Stutler argues that she is not a proper defendant for B.P.J.'s equal protection claim because she is enforcing West Virginia state law and not the County's own municipal policy or custom. (Dkt. No. 281 (County MSJ) at 12.) But B.P.J. is not bringing a *Monell* claim against Superintendent Stutler in her capacity as a county official; she is bringing an *Ex parte Young* claim against Superintendent Stutler in her capacity as a state official. As Chief Judge Chambers explained in *McGee v. Cole*, "local and county officials may be considered state officials for purposes of an *Ex parte Young* suit where they are responsible for enforcing or administering state law rather than local or county policies." 115 F. Supp. 3d 765, 773 (S.D. W. Va. 2015). Superintendent Stutler admits that she will be "tasked with enforcing the Act to the extent it goes into effect." (Dkt. No. 281 (County MSJ) at 1.) She therefore is a proper defendant for purposes of enjoining H.B. 3293. *See Bostic v. Schaefer*, 760 F.3d 352, 371 n.3 (4th Cir. 2014) (noting that municipal court clerk

19

could be enjoined from enforcing unconstitutional state law under *Ex parte Young* when he merely had "some connection with the enforcement of the act").[8]

### C.   WVSSAC Is A Proper Defendant.

WVSSAC's only argument for summary judgment is that it is not a proper defendant under the Equal Protection Clause and Title IX. This argument fails because WVSSAC (1) is required to enforce H.B. 3293 against B.P.J., (2) is a state actor under the Equal Protection Clause, and (3) has controlling authority over secondary school interscholastic athletics in West Virginia for purposes of Title IX.

### 1.   The Commission Is Required To Enforce H.B. 3293 Against B.P.J.

WVSSAC does not dispute that it is required to comply with H.B. 3293. Nor could it, as H.B. 3293 governs the "designation of athletic teams or sports sponsored by any public secondary school." W. Va. Code § 18-2-25d. In West Virginia, the regulation and supervision of interscholastic athletic events at the secondary school level are delegated to "county boards of education and the West Virginia Secondary School Activities Commission . . . subject to the West Virginia State Board of Education's duty . . . to generally supervise the schools in the state." *Jones*, 218 W. Va. at 61 (citing W. Va. § 18-2-25); (Dkt. No. 289-11 (WVSSAC's Resp. to RFAs) Nos. 51-52) (admitting that WVSSAC member schools have "delegate[d] the control, supervision, and regulation of their interscholastic athletic . . . activities to [WVSSAC]" and that WVSSAC "supervise[s] and control[s] interscholastic athletics . . . among member schools").) Because

---

[8] Superintendent Stutler also contends that if she does enforce H.B. 3293, she will be acting as a State official rather than as a County official and so any award assessed against her, including the $1.00 in nominal damages sought and attorneys' fees, is the responsibility of the State, not the Harrison County Board of Education. (Dkt. No. 281 (County MSJ) at 15.) The proper time to raise that issue is in connection with a post-judgment motion for attorney's fees, not during the merits. *See McGee*, 115 F. Supp. 3d at 773 (apportioning attorneys' fees between county and state after final judgment had already been entered).

WVSSAC is statutorily designated to supervise and regulate interscholastic athletics in West Virginia, it is required to follow H.B. 3293, and is thus properly subject to an injunction.

WVSSAC's argument to the contrary—that it is immune from liability because H.B. 3293 requires the State Board to promulgate rules—is wrong. As WVSSAC concedes, any rules promulgated by the State Board pursuant to H.B. 3293 will be "embedded" into WVSSAC's regulations and must be obeyed by WVSSAC. (Dkt. No. 277 (WVSSAC MSJ) at 10; Dkt. No. 289-11 (WVSSAC's Resp. to RFAs) at No. 56; Dkt. No. 289-18 (WVSSAC Dep. Tr.) at 47:17-47:20 (admitting that WVSSAC is required to follow the rules and regulations of WVSSAC's rule book).) Among the ways H.B. 3293 and implementing rules will affect WVSSAC is that WVSSAC will have to adhere to H.B. 3293 and its implementing rules when adjudicating a student's eligibility to play sports. Students must comply with WVSSAC's rules and regulations to participate in school athletics, and WVSSAC acts as the "final" decisionmaker of a student's eligibility to play sports. (*See* Dkt. No. 289-18 (WVSSAC Dep. Tr.); at 73:4-73:9; Dkt. No. 289-40 (WVSSAC Leg. Rule) at WVSSAC000138, WVSSAC000147-165.) Accordingly, as the State Board emphasized, WVSSAC plays a role in determining B.P.J.'s eligibility to participate on the girls' sports team at Bridgeport Middle School. (*See* Dkt. No. 284 (State Board MSJ) at 8-9 (explaining that B.P.J.'s eligibility to play sports would be determined by WVSSAC).) Further, H.B. 3293 will prevent WVSSAC from using its internal policy regarding transgender athletes, which allowed schools to determine eligibility and, in the event of a dispute, authorized the WVSSAC Board of Directors to determine whether the student's participation threatened

"competitive equity or the safety of teammates and opposing players." (Stark Supp. Decl. Ex. 47 (WVSSAC Transgender Policy).)[9]

Thus, as this Court has already held, absent an injunction, WVSSAC is required to enforce H.B. 3293 against B.P.J. (MTD Op. at 6 ("[A] favorable ruling against [WVSSAC] will prevent [it] from enforcing the Act as to B.P.J."); Dkt. No. 289-11 (WVSSAC's Resp. to RFAs) at Nos. 36-37, 50.) As such, WVSSAC is a proper defendant in this case.

### 2. WVSSAC Is A State Actor.

As the West Virginia Supreme Court has recognized when striking down a WVSSAC regulation, "[e]very court that has considered the question whether associations like the [WVSSAC] are state actors have found that these organizations are so intertwined with the state that their acts constitute state action." *Israel by Israel v. W. Va. Secondary Sch. Activities Comm'n*, 182 W. Va. 454, 458 n.4 (W. Va. 1989); *accord Brentwood Acad. v. Tenn. Secondary Sch. Athletic Ass'n*, 531 U.S. 288, 295 (2001) (determining that a state interscholastic athletic association's actions qualify as "state action" under the Fourteenth Amendment). Notably, WVSSAC fails even to mention *Israel* in its brief. Instead, it erroneously claims that "WVSSAC has never been adjudicated a state actor." (Dkt. No. 277 (WVSSAC MSJ) at 4.) But the West Virginia Supreme Court has *twice* adjudicated that WVSSAC is a state actor, in both *Israel*, 182 W. Va. at 458, and *Jones*, 218 W. Va. at 58 (deciding an equal protection claim against WVSSAC and explaining that "there is no question that the equal protection claim involves state action").

WVSSAC's citation to *Mayo v. WVSSAC*, 223 W. Va. 88 (W. Va. 2008), is inapposite. There, the court found that WVSSAC is not a state *agency*. *Id.* at 96. But whether an entity is a

---

[9] WVSSAC's assertion that its policies and regulations—which predated H.B. 3293—are "gender/transgender neutral" is also irrelevant. (Dkt. No. 277 (WVSSAC MSJ) at 221-23.) H.B. 3293 has changed state law, which WVSSAC concedes it is bound to follow. (Dkt. No. 289-11 (WVSSAC's Resp. to RFAs) at Nos. 36-37, 50.)

state *agency* is distinct from whether an entity is state *actor*—indeed, it is well-settled law that even private parties (*i.e.*, non-state agencies) may be held liable under the Fourteenth Amendment as state actors. *See, e.g.*, *Joy v. Daniels*, 479 F.2d 1236, 1239 (4th Cir. 1973).

And WVSSAC is clearly a state actor here. Contrary to WVSSAC's assertions—which are unsupported by the case law—WVSSAC's alleged lack of "direct" federal funding is not dispositive. It has long been established that where an entity such as WVSSAC is "so intertwined with the state," its "acts constitute state action." *Israel*, 182 W. Va. at 458 n.4 (collecting cases); *see also Jones*, 218 W. Va. at 58. Here, WVSSAC is "made up of primarily public schools" and is composed of public officials, namely "principals or designee[s], of those public . . . secondary schools which have certified in writing to the State Superintendent . . . of West Virginia . . . that they have elected to delegate the control, supervision, and regulation of their interscholastic athletic and band activities." (Dkt. No. 289-40 (WVSSAC Leg. Rule) at WVSSAC0000134; Stark Supp. Decl. Ex. 45 (WVSSAC Resps. to Pl's First Set of Interrogatories) at No. 8 (reflecting list of member schools).) Other courts have determined high school commissions to be state actors where these factors were present. *See McGee v. Va. High Sch. League, Inc.*, No. 2:11CV00035, 2011 WL 4501035, at *2 (W.D. Va. Sept. 28, 2011), *aff'd sub nom. Bailey v. Va. High Sch. League, Inc.*, 488 F. App'x 714 (4th Cir. 2012) ("Because statewide athletic associations are almost entirely comprised of and governed by government entities and representatives, the Supreme Court has deemed these associations to be state actors."); *Cmtys. for Equity v. Mich. High Sch. Athletic Ass'n*, 80 F. Supp. 2d 729, 740 (W.D. Mich. 2000) (collecting cases); *Brentwood Acad.*, 531 U.S. at 299–303 (holding association's regulatory activity may and should be treated as state action owing to the pervasive entwinement of state school officials in the structure of the association). Given the undisputed entwinement of WVSSAC with the state here, WVSSAC is a state actor.

23

WVSSAC's citation to *Smith v. NCAA*, 266 F.3d 152 (3d Cir. 2001), upon which nearly the entirety of its argument relies (Dkt. No. 277 (WVSSAC MSJ) at 15-18, 21, 24), is also inapposite. As WVSSAC itself notes, the organization in *Smith* (the NCAA) "did not assume control" of the "program that directly received the [federal] funds." (*Id.* at 15 n.53.) By contrast, WVSSAC concedes in its brief that it is statutorily authorized to "control, supervise, and regulate interscholastic athletic events" in West Virginia, and that this power is delegated to WVSSAC by its member schools. (*Id.* at 3, 6.) WVSSAC "exercises tremendous influence and control over the rules and policies that regulate interscholastic athletics." *Cmtys. for Equity*, 80 F. Supp. 2d at 740; W. Va. Code § 18-2-25d. For instance, the rules and regulations that WVSSAC promulgates are "binding . . . rules and policies" on member schools, and no member school is permitted to issue its own rules that conflict with the rules promulgated by WVSSAC. (Dkt. No. 289-40 (WVSSAC Leg. Rule) at WVSSAC0000134 ("The principal or designee [of a member school] is and shall be responsible for conducting interscholastic athletic and band activities . . . in accordance with the constitution, bylaws, rules and regulations of the Commission"); Dkt. No. 289-18 (WVSSAC Dep. Tr.) at 71:5-71:14); *see Cmtys. for Equity*, 80 F. Supp. 2d at 740. Member schools that fail to obey WVSSAC's rules are sanctioned. (*See* Dkt. No. 289-18 (WVSSAC Dep. Tr.) at 72:23-73:8.)

For these reasons, WVSSAC is a state actor.

3.      WVSSAC Has Controlling Authority Over Secondary School Athletics In West Virginia And Is Thus Subject To Title IX.

WVSSAC has controlling authority over public school athletic programs at the secondary level in West Virginia, including Bridgeport Middle School's athletic program, and thus is subject to suit and injunction under Title IX. (Pl's SUF ¶¶ 116-19); *see Alston v. Va. High Sch. League, Inc.*, 144 F. Supp. 2d 526, 533 (W.D. Va. 1999) (holding that an association is brought "into the scope of Title IX" when member schools cede to it the authority to regulate interscholastic

athletics). It is undisputed that WVSSAC is composed of member schools that receive federal funds, including Bridgeport Middle School. (Dkt. No. 158 (WVSSAC Ans.) ¶ 9.) It is also undisputed that these federal-funds-receiving member schools have "elected to delegate the control, supervision, and regulation of their interscholastic athletic and band activities" to WVSSAC. (Dkt. No. 289-40 (WVSSAC Leg. Rule) at WVSSAC0000134); *Jones*, 218 W. Va. at 61 (quoting W. Va. Code § 18-2-25). These federal-funds-receiving schools have thus ceded to WVSSAC "controlling authority" over their secondary school athletics. As such, WVSSAC has controlling authority over Bridgeport Middle School's athletic program, and Bridgeport Middle School must adhere to the WVSSAC's policies and procedures governing interscholastic athletics. (*See* Dkt. No. 289-18 (WVSSAC Dep. Tr.) at 71:5-71:14.)

Therefore, and regardless of whether WVSSAC *directly* receives federal funding, it is liable under Title IX. *See Cmtys. for Equity*, 80 F. Supp. 2d at 735 (holding that "any entity that exercises controlling authority over a federally funded program is subject to Title IX, regardless of whether that entity is itself a recipient of federal aid"); *see also Williams v. Bd. of Regents of Univ. Sys. of Ga.*, 477 F.3d 1282, 1294 (11th Cir. 2007) ("[I]f we allowed funding recipients to cede control over their programs to indirect funding recipients but did not hold indirect funding recipients liable for Title IX violations, we would allow funding recipients to . . . avoid Title IX liability."); *A.B. by C.B. v. Hawaii State Dep't of Educ.*, 386 F. Supp. 3d 1352, 1357-58 (D. Hawai'i 2019) (describing cases holding that "an entity that has controlling authority over a federally funded program is also subject to the anti-discrimination provisions of Title IX" as "persuasive and instructive" and holding that an interscholastic association with controlling authority over federally funded interscholastic athletic programs was plausibly alleged to be subject to Title IX). Indeed, even WVSSAC itself recognizes that it is bound by Title IX in its own

25

handbook. (Dkt. No. 277 (WVSSAC MSJ) at 5; Stark Supp. Decl. Ex. 48 (WVSSAC Rules and Regulations) at WVSSAC000017 ("As required by federal laws and regulations, the West Virginia Secondary School Activities Commission does not discriminate on the basis of sex, race, color, religion . . . . State and Federal laws include Title IX, Education Amendments of 1972"); *see also* Dkt. No. 289-18 (WVSSAC Dep. Tr.) at 86:22-87:2.)

As such, the WVSSAC is subject to suit and injunction under Title IX.

## III.   H.B. 3293 Violates The Equal Protection Clause And Summary Judgment Should Be Entered For Plaintiff—Not Any Defendant.

The Court in its preliminary injunction order correctly concluded that Plaintiff was likely to succeed on the merits of her equal protection claim. The summary judgment record vindicates this Court's prediction and makes clear Plaintiff's success on the merits of this claim. By contrast, no Defendant has shown a basis for summary judgment in its favor on this claim. Indeed, only three Defendants—the State, Superintendent Stutler, and Defendant-Intervenor (referred to in this section as "Defendants")—seek to defend H.B. 3293 as consistent with the Equal Protection Clause. But they come nowhere close to satisfying the State's "demanding" burden. *United States v. Virginia*, 518 U.S. 515, 533 (1996) ("*VMI*"). Instead, they misrepresent the discriminatory classification at issue, misapply heightened scrutiny, and fail to demonstrate that H.B. 3293's categorical exclusion of all transgender girls from all secondary school and collegiate sports is substantially related to the governmental interests claimed to be at stake. The Court therefore should hold that H.B. 3293 violates the Equal Protection Clause as applied to B.P.J. and grant her summary judgment.

### A.   H.B. 3293 Targets B.P.J. For Different And Unequal Treatment Because She Is A Girl Who Is Transgender.

Defendants resist the obvious conclusion that H.B. 3293 discriminates on the basis of transgender status. They maintain that H.B. 3293 "does not discriminate against transgender"

students because it "treats all biological males *the same*, whether they identify as females *or* males," and "prohibits *all* biological males from participating in female sports." (Dkt. No. 287 (State MSJ) at 9; *see also* Dkt. No. 288 (Int. MSJ) at 19-20; Dkt. No. 281 (County MSJ) at 18-29.) This Court rightly rejected that characterization as "misleading" in its Order granting B.P.J. a preliminary injunction. (Dkt. No. 67 (PI Op.) 7.) The law's carefully crafted statutory definition of "biological sex," which operates to exclude girls who are transgender from girls' sports teams; the fact that West Virginia already provided for sex separation in sport prior to H.B. 3293; and the legislative record all create "an inescapable conclusion that [H.B. 3293] discriminates on the basis of transgender status." (PI Op. 7.)

To start, H.B. 3293 employs an outcome-driven definition of "biological sex"—defined "solely" by a person's "reproductive biology and genetics at birth," W. Va. Code § 18-2-25d(b)(1)—to prevent girls who are transgender from playing on girls' teams. The Legislature did not, as the State claims, "rel[y] on the commonly accepted definition of the word 'sex' as referring to the physiological differences between biological males and females" when drafting H.B. 3293. (Dkt. No. 287 (State MSJ) at 26; *see also* Dkt. No. 288 (Int. MSJ) at 11-12 (wrongly suggesting that sex is properly understood to be comprised only of genetics and reproductive biology).) Scientists do not define "biological sex" as limited only to reproductive biology and genetics at birth. Rather, they recognize that the biological components of sex include sex chromosomes, certain genes, gonads, exposure to sex hormone, internal and external genitalia, and other secondary sex characteristics, which are not always aligned in the same direction. (Pl's SUF ¶ 71); *see Grimm*, 972 F.3d at 621 (Wynn, J., concurring).

The sources on which Defendants rely when discussing the meaning of "biological sex" only reinforce Plaintiff's undisputed evidence that the accepted meaning of "sex" is broader than

27

the definition used in H.B. 3293. Specifically, the State points to the American Psychiatric Association's DSM-5, the Endocrine Society's Statement on Sex Differences in Research, and the Supreme Court's opinion in *Bostock v. Clayton Cnty.*, 140 S. Ct. 1731 (2020). (Dkt. No. 287 (State MSJ) at 6.) But the DSM-5 defines sex by reference to "sex chromosomes, gonads, *sex hormones*, and non-ambiguous internal and external genitalia." (Stark Supp. Decl. Ex. 58 (Am. Psych. Assoc.: Diagnostic & Statistical Manual of Mental Disorders (5th ed. 2013) at 829 (emphasis added).) Similarly, the Endocrine Society explains that "[s]ex differences are caused by 3 major factors— *sex hormones*, genes, and environment." (Stark Supp. Decl. Ex. 57 (Bhargava, A. et al. Considering Sex as a Biological Variable in Basic and Clinical Studies: An Endocrine Society Scientific Statement. Endocr Rev. 42:219-258 (2021)) (emphasis added); *see also* Dkt. No. 289- 26 (Safer Rebuttal) ¶¶ 5-7).[10] And *Bostock* did not endorse the Legislature's unduly narrow definition of "biological sex." Because *Bostock* did not "turn[] on the outcome of the parties' debate" about the meaning of "sex," the Court simply accepted the plaintiff-employees' concession "for argument's sake" that "sex" as used in Title VII "refer[s] only to biological distinctions between male and female," without purporting to define what those "biological distinctions" are

---

[10] The State misleadingly cites to a press release about the Endocrine Society's Statement instead of the actual article, which directly contradicts the State's assertion that sex ordinarily is determined solely by genetics and reproductive anatomy. For example, the article cautions that "karyotypic analysis may be misleading, as there are well-described 46,XX males" and "46,XY females." (Stark Supp. Decl. Ex. 57 (Bhargava) at 221.) The article also explains how physical sexual differentiation occurs when genes interact with hormones and environmental factors in utero and during puberty. (*Id.* at 222 (discussing "Sexual Differentiation Caused by Gonadal and Non-Gonadal Hormones); *id.* at 223 (discussing "Influence of Gonadal Steroid Hormones and Nongonadal Hormones in Brain Development"); *id.* at 225 ("Given that the critical and sensitive periods for sexual differentiation are defined by the production and response to gonadal steroids, it is not surprising that steroids are the primary drivers of developmental origins of sex differences in brain (and probably other tissues) and behavior."); *id.* at 227 (discussing "Hormonal Versus Sex Chromosome Effects" and explaining that "[s]ex differences are caused by 3 major factors—sex hormones, genes on sex chromosomes/autosomes, and environment").)

and leaving open the possibility that sex as used in 1964 "capture[d] more than anatomy and reach[ed] at least some norms concerning gender identity and sexual orientation." 140 S. Ct. at 1739.

Instead of incorporating all the "biological" components of sex reflected in the very scientific definitions to which the State points, H.B. 3293 focuses "solely" on a person's genetics and reproductive anatomy at birth, and forbids consideration of sex hormones, even though hormones are the only biological component of sex that have been proven to produce meaningful advantages in athletic performance. As in *Grimm*, the statute's "ends-driven definition" is crafted "to ensure the desired outcome": that girls who are transgender are categorically prohibited from participating on girls' sports teams. 972 F.3d at 621-22, 626 (Wynn, J., concurring) (explaining that a school board's definition of "biological gender" discriminated against transgender student by "conveniently ignor[ing]" the impact of hormone therapy and "instead narrow[ing] its definition of 'biological gender' to refer to . . . what physical sex characteristics a person was born with" as opposed to their "actual physiology"); *cf. N.C. State Conf. of NAACP v. McCrory*, 831 F.3d 204, 214 (4th Cir. 2016) (striking down voting previsions that were crafted "with almost surgical precision" to target Black voters).

Defendants further deny that H.B. 3293 targets girls who are transgender by seeking to cast the issue at hand as whether sex separation in sport is permissible. (*See, e.g.*, Dkt. No. 288 (Int. MSJ) at 7-9.) B.P.J. "does not challenge sex-separated [teams]; [she] challenges the [statute's] discriminatory exclusion of [her]self from the sex-separated [sports team] matching [her] gender identity." *Grimm*, 972 F. 3d at 618. West Virginia already had a longstanding policy establishing sex separated sports teams, and almost all sports in West Virginia at the public secondary school level are separated into boys' and girls' teams. *See* W. Va. Code R. § 127-2-3.8; (Pl's SUF ¶¶ 31-

29

32). West Virginia did not, however, have any law or policy prohibiting girls who are transgender from playing on girls' teams prior to H.B. 3293. (Pl's SUF ¶ 38.) The WVSSAC Board of Directors' internal policy allowed transgender students to participate in school sports on a case-by-case basis. (Pl's SUF ¶ 39.) Against that backdrop, the *only* change worked by H.B. 3293 compared to the status quo at the time of the law's enactment is the categorical exclusion of transgender girls from girls' teams. The sponsor for H.B. 3293 confirmed as much when explaining that H.B. 3293 only "would affect those that changed their sex after birth." (Pl's SUF ¶ 53); *cf. Hecox v. Little*, 479 F. Supp. 3d 930, 982 (D. Idaho 2020) ("[W]hile general sex separation on athletic teams for men and women may promote sex equality and provide athletic opportunities for females, that separation preexisted the Act and has long been the status quo in Idaho.")

Defendants' argument that H.B. 3293 is not targeted at girls who are transgender based on their transgender status is also belied by the legislative history. Despite Defendants' attempts to obfuscate, the Legislature's purpose in enacting H.B. 3293 is not subject to serious debate because legislators and their staff expressly announced the law's purpose. Melissa White, Chief Counsel of the House Committee on Education, the committee from which the bill originated, referred to H.B. 3293 as a "[t]ransgender participation in secondary schools bill," a "[t]ransgender originating bill," and a "bill regarding transgender participation in sports." (Pl's SUF ¶¶ 51-52.) The Chairman of the Education Committee described the "issue" that H.B. 3923 was designed to address as "two transgender girls" who "were allowed to complete in state track and field meetings in Connecticut." (Pl's SUF ¶ 54) And a State Senator remarked that "the bill" is "about transgenders." (Pl's SUF ¶ 55.)

At bottom, Defendants' contention that H.B. 3293 does not discriminate against girls who are transgender because it treats all "biological males" the same echoes the same argument

unsuccessfully made by the school district in *Grimm*. *See* 972 F.3d at 609 (noting that "the Board contends that all students are treated the same"). The Fourth Circuit soundly rejected that argument and made clear that preventing girls who are transgender from participating in the same activities as other girls based on their sex assigned at birth does not treat them "the same" as everyone else but rather constitutes discrimination based on transgender status. *Id.* at 608-10; *see also Whitaker By Whitaker v. Kenosha Unified Sch. Dist. No. 1 Bd. of Educ.*, 858 F.3d 1034, 1051 (7th Cir. 2017) (abrogated on other grounds). As in *Grimm*, H.B. 3293's "use of 'biological [sex]' to classify students has the effect of shunting individuals like [B.P.J.]—who may not [participate on the girls' team] because of their 'biological [sex],' and who cannot [participate on the boys' team] because of their gender identity'—[out of school athletics] altogether." *Id.* at 620 (Wynn, J., concurring).[11]

The way to treat B.P.J. "the same" as other students is to treat her like other girls. It is undisputed that, for years, B.P.J. has lived as a girl and been recognized as a girl at school, where administrators at B.P.J.'s elementary school and middle school have acknowledged and respected B.P.J.'s female gender identity. (Pl's SUF ¶¶ 1-11.) Both schools created gender support plans for B.P.J. to help "account[]" for and "support[]" B.P.J.'s "authentic gender" at school. (Pl's SUF ¶¶ 5, 8.) Under these plans, school staff, teachers, administrators, and students are informed that B.P.J.'s authentic gender is female and are instructed to refer to her with her female name and

---

[11] Defendant-Intervenor, the State, and the County Board all attempt to distinguish *Grimm* by contending that the privacy interest asserted there is not at issue here. (Dkt. No. 281 (County MSJ) at 20; Dkt. No. 287 (State MSJ) at 27; Dkt. No. 288 (Int. MSJ) at 18.) But that is a distinction without a difference. Like the school district's policy in *Grimm*, H.B. 3293 targets individuals for categorical exclusion based on their transgender status. Whether that targeting is supported by a constitutionally adequate justification is determined by applying heightened scrutiny, not by short-circuiting it. *See Miss. Univ. for Women v. Hogan*, 458 U.S. 718, 724 n.9 (1982) ("[W]hen a classification expressly discriminates on the basis of gender, the analysis and level of scrutiny applied to determine the validity of the classification do not vary simply because the objective appears acceptable to individual Members of the Court.").

female pronouns. (Pl's SUF ¶¶ 6, 8-9.) The plans encourage openness and honesty about the fact that "[s]he is [B.P.J.]; and that makes her happy." (Pl's SUF ¶ 10.) B.P.J. feels supported by her school given its commitment to treating her as the girl she is. (Pl's SUF ¶ 11.) The County Board Defendants and WVSSAC—the Defendants most involved in B.P.J.'s day-to-day experience in school and scholastic sports—acknowledge that B.P.J. is a girl. (Dkt. No. 277 (WVSSAC MSJ) at 10 ("Plaintiff B.P.J. is an 11-year-old girl . . ."); Dkt. No. 281 (County MSJ) at 2 ("B.P.J. is an eleven-year-old transgender girl").) Given the reality of B.P.J.'s identity and day-to-day life, this Court previously explained that B.P.J. "is not most similarly situated with cisgender boys; she is similarly situated to other girls." (PI Op. at 7.)

Ignoring these "dispositive realities," *VMI*, 518 U.S. at 550, the State asserts without evidence that allowing B.P.J. to continue to participate on teams with other girls will "create[] a conundrum for schools facing" what the State derisively refers to as a "vast array of gender identities." (Dkt. No. 287 (State MSJ) at 25.) But B.P.J.'s case "is limited to how school [athletic] policies implicate the rights of [a] transgender student[] who 'consistently, persistently, and insistently' express[es] a binary gender." *Grimm*, 972 F.3d at 596. The undisputed facts in this case show that B.P.J.'s school administrators did not face any "conundrum" recognizing B.P.J. as the girl that she is. (Pl's SUF ¶¶ 4-11.)

As in *Grimm*, "[a]dopting [the State's] framing of [B.P.J.'s] equal protection claim here would only vindicate [the State's] own misconceptions" and would "fail to meaningfully reckon with what it means for [B.P.J.] to be a transgender [girl]." 972 F.3d at 610 & n.10 (internal quotation marks omitted). Leaving B.P.J. with only the ability to compete on a boys' team would provide "no choice at all because" it "completely misses the reality of what it means to be a

transgender [girl]." *Id.* at 624 (Wynn, J., concurring).[12] To ignore that reality and treat B.P.J. as a cisgender boy is to treat her unequally.

### B.   Defendants Misapply Heightened Scrutiny By Examining The Wrong Classification Under the Wrong Standard.

Defendants concede, as they must, that *Grimm* requires this Court to examine discrimination against transgender students under heightened equal protection scrutiny. (Dkt. No. 281 (County MSJ) at 22; Dkt. No. 287 (State MSJ) at 9; Dkt. No. 288 (Int. MSJ) at 7.) As *Grimm* explained, discrimination against transgender students constitutes a form of sex discrimination for two "independent reasons." 972 F.3d at 609. Policies discriminating against transgender students (1) inherently "create[] sex-based classifications," and (2) "punish transgender persons for gender non-conformity, thereby relying on sex stereotypes." *Id.* at 608. *Grimm* also held that transgender individuals constitute a quasi-suspect class in their own right. *Id.* at 610-13.

While begrudgingly conceding that heightened scrutiny applies, Defendants fail to apply it correctly. They propose a heightened scrutiny test in which the only question is the constitutionality of providing sex-separated teams for boys and girls. According to Intervenor, B.P.J.'s identity as a girl and her actual physiological characteristics are of "no matter." (Dkt. No. 288 (Int. MSJ) at 15.) Misleadingly quoting language from a Supreme Court decision applying rational basis review, Intervenor contends that "[t]he broad legislative classification must be

---

[12] Defendant-Intervenor's reliance on *Gregor v. West Virginia Secondary School Activities Commission*, No. 2:20-cv-00654, 2020 WL 5997057 (S.D. W. Va. Oct. 9, 2020), is misplaced. (Dkt. No. 288 (Int. MSJ) at 25.) The female plaintiff in *Gregor* wished to participate on the boys' soccer team *instead* of the girls' soccer team, which she agreed was available to her. 2020 WL 5997057 at *2-3. This Court noted that the "crucial difference" between the case before it and other sex discrimination in sport cases granting relief was that the plaintiff's school *did* offer her the opportunity to participate on a girls' soccer team, which she had done for two years. *Id. Gregor* observed that some courts had found irreparable harm where the plaintiff "cannot participate in the sport at all," and this is just such a case. *Id.* If B.P.J. cannot participate on the girls' team, she cannot participate at all.

judged by reference to characteristics typical of the affected classes rather than by focusing on selected, atypical examples." (*Id.* at 15 (quoting *Califano v. Jobst*, 434 U.S. 47, 55 (1977) (applying rational basis review to distinctions between married and unmarried individuals).) In this upside-down version of heightened scrutiny, discrimination against transgender students must be evaluated by ignoring the fact that they are transgender.[13]

Defendants' depiction of heightened scrutiny is based on two fundamental errors:

*First*, Defendants' version of heightened scrutiny examines the wrong classification. When assessing the law's applications, "[t]he proper focus of the constitutional inquiry is the group for whom the law is a restriction, not the group for whom the law is irrelevant." *City of L.A., Cal. v. Patel*, 576 U.S. 409, 418 (2015). As noted above, the relevant classification at issue in this case is the categorical ban on the participation of girls who are transgender. Sex separation in sports already existed in West Virginia as a matter of regulation and longstanding practice prior to H.B. 3293. (Pl's SUF ¶ 39.) H.B. 3293's definition of "biological sex" was drafted to separate transgender girls from cisgender girls and exclude the former from participating on girls' teams. And as Defendants concede, that is exactly what the law does. (Pl's SUF ¶¶ 49-50.) H.B. 3293 does not prohibit any other group from playing on the sports team consistent with their gender

---

[13] To the extent that Intervenor suggests that "as applied" challenges are not cognizable under the Equal Protection Clause, that suggestion directly conflicts with *Grimm* itself, which upheld an as-applied challenge by a transgender student under both the Equal Protection Clause and Title IX. *Grimm*, 972 F.3d at 593, 606-07; *see also Tineo v. Att'y Gen. U.S. of Am.*, 937 F.3d 200, 215 (3d Cir. 2019) (holding that law upheld in *Nguyen* as facially constitutional was unconstitutional as applied to petitioner); *Hecox*, 479 F. Supp. 3d at 989 (granting a preliminary injunction with respect to plaintiffs' as-applied Equal Protection Clause claim).

Intervenor's argument about as-applied challenges also misrepresents *O'Connor v. Bd. of Ed. of Sch. Dist. 23*, 449 U.S. 1301 (1980) (Stevens, J., in chambers). That decision, like *Gregor*, 2020 WL 5997057, involved a cisgender girl who was excluded from the boys' team but still could compete on the girls' team.

identity. Additionally, under *Grimm*, transgender people constitute a quasi-suspect class in their own right. Accordingly, to justify the law under heightened scrutiny, Defendants must show that the exclusion of transgender girls *in particular*—not, as they claim, transgender girls and cisgender boys lumped into a single "biological males" group—is substantially related to an important governmental interest.

*Second*, Defendants' version of heightened scrutiny applies the wrong "intermediate scrutiny" standard. Instead of applying the intermediate scrutiny standard used in equal protection cases, Defendants apply the "reasonable fit" standard used by the Fourth Circuit to evaluate restrictions on the Second Amendment under intermediate scrutiny. The Fourth Circuit drew the "reasonable fit" Second Amendment standard from the Supreme Court's standard for evaluating commercial speech. *See United States v. Chester*, 628 F.3d 673, 683 (4th Cir. 2010) (adopting standard from *Bd. of Trs. of State Univ. of N.Y. v. Fox*, 492 U.S. 469, 480 (1989)). Under that test, the government need only "establish[] a reasonable fit between the challenged law and a substantial governmental objective." *Harley v. Wilkinson*, 988 F.3d 766, 769 (4th Cir.), *cert. denied sub nom*. *Harley v. Garland*, 142 S. Ct. 426 (2021). "Moreover, in making this determination, [the Fourth Circuit does] not consider any individual characteristics of the person raising the as-applied challenge but focuse[s] entirely on the statute itself and the evidence addressing statutory purpose and fit." *Id.*

Intermediate scrutiny for sex and gender discrimination under the Equal Protection Clause requires far more. Sex and gender classifications carry a "strong presumption" of unconstitutionality, *VMI*, 518 U.S. at 532 (quoting *J.E.B. v. Alabama*, 511 U.S. 127, 152 (1994) (Kennedy, J., concurring)), and impose a "demanding . . . burden of justification" on the government, *id.* at 533. Instead of requiring a "reasonable" fit for a "substantial" objective, *Harley*,

988 F.3d at 769, heightened equal protection scrutiny requires a "substantial[]" relationship to an "important" objective, *VMI*, 518 U.S. at 533. "The fit between the means and the important end" must be "'exceedingly persuasive,'" not merely reasonable. *Tuan Anh Nguyen v. I.N.S.*, 533 U.S. 53, 70 (2001) (quoting *VMI*, 518 U.S. at 533).

Far from eliminating "atypical examples" from the constitutional analysis (Dkt. No. 288 (Int. MSJ) at 15), Supreme Court decisions applying heightened scrutiny to sex and gender discrimination emphasize that "estimates of what is appropriate for *most*" men and women as a group cannot "justify denying opportunit[ies]" to people who fall "outside the average description." *VMI*, 518 U.S. at 550.[14] "Even if stereotypes frozen into legislation have 'statistical support,' [the Supreme Court's] decisions reject measures that classify unnecessarily and overbroadly by gender when more accurate and impartial lines can be drawn." *Sessions v. Morales-Santana*, 137 S. Ct. 1678, 1693 n.13 (2017). Indeed, a frequent "[c]haracteristic of sex-based classifications," is that they "may hold true for many, even most, individuals." *Miller v. Albright*, 523 U.S. 420, 460 (1998) (Ginsburg, J., dissenting).[15]

There is also no exception to heightened scrutiny for discrimination based on physiological characteristics. So-called "inherent differences" may not be used "for denigration," "for artificial

---

[14] Ignoring the majority holding in *VMI*, the County Board instead recites arguments about *Rostker v. Goldberg*, 453 U.S. 57 (1981), and *California v. Webster*, 430 U.S. 313 (1977) (per curiam), that are drawn from the *dissent* in *VMI*. (Dkt. No. 281 (County MSJ) at 28 n.13); *VMI*, 518 U.S. at 573 (Scalia, J., dissenting).

[15] Instead of accurately reflecting modern equal protection jurisprudence, Intervenor's articulation of heightened scrutiny bears a closer resemblance to Justice Bradley's concurring opinion in *Bradwell v. Illinois*, 83 U.S. 130 (1872), which upheld as constitutional prohibitions on women practicing law. Justice Bradley stated that "the paramount destiny and mission of woman are to fulfil the noble and benign offices of wife and mother," and reasoned that even though many women are unmarried and do not have children, "the rules of civil society must be adapted to the general constitution of things, and cannot be based upon exceptional cases." *Id.* at 141-42.

constraints on an individual's opportunity," or to perpetuate "legal, social, and economic inferiority." *VMI*, 519 U.S. at 533-34. For example, when the Supreme Court in *Nguyen* upheld a law requiring unmarried U.S.-citizen fathers—but not mothers—to formerly acknowledge parenthood to confer citizenship to children born abroad, the Court did not focus solely on whether the distinction reflected a "biological difference[]." 533 U.S. at 73. The Court also emphasized that the statute "was not marked by misconception or prejudice," *id.*, and that the father's burden of acknowledging parenthood was "minimal" and easily met without "inordinate and unnecessary hurdles," *id.* at 70; *see Morales-Santana*, 137 S. Ct. at 1694 (emphasizing these features of the Court's analysis).

Under a proper application of heightened equal protection scrutiny, then, the relevant question is not whether creating separate sports teams for boys and girls is substantially related to an important government interest. Instead, the question is whether there is a substantial relationship between a categorical rule barring all girls who are transgender from playing alongside their female peers and an important government interest. *See Grimm*, 972 F.3d at 625 (Wynn, J., concurring) ("[S]eparate but equal [sports teams] in schools on a male/female basis . . . says nothing about what happened in [H.B. 3293]: separation of transgender students from their cisgender counterparts through a policy that ensures that transgender students may [participate in] neither male nor female [teams] due to the incongruence between their gender identity and their sex-assigned-at-birth."). As explained in Plaintiff's memorandum in support of summary judgment and below, there is not.

### C. H.B. 3293's Categorical Exclusion Of Transgender Girls Is Not Substantially Related To Defendants' Asserted Interests.

The State claims only two interests allegedly served by H.B. 3293— "providing equal athletic opportunities to biological females and protecting the safety of female athletes." (Dkt. No.

287 (State MSJ) at 11.)[16] But Defendants do not show—as they must for the law to survive heightened scrutiny—that categorically barring girls who are transgender from girls' sports is substantially related to addressing those alleged concerns. They continue to be unable to offer a single piece of credible evidence that girls who are transgender have substantially displaced cisgender girls in scholastic sports in West Virginia or caused them physical injury; largely ignore the specifics of this case; and fail to offer any persuasive argument to justify the law's incredibly broad sweep. The asserted justifications for H.B. 3293 are so disconnected from the statute's operation in practice that the only conceivable purpose served by the law is "an invalid interest of excluding transgender women and girls from women's sports entirely." *Hecox*, 479 F. Supp. 3d at 984-85.

      1.      <u>H.B. 3293's Categorical Exclusion Of Transgender Girls Is Not Substantially Related To "Protecting Women's Sports."</u>

Defendants have failed to present an "'exceedingly persuasive'" reason why categorically excluding transgender girls from all athletic opportunities in secondary school and college is necessary to create equal athletic opportunities for women in general or cisgender girls in particular. *VMI*, 518 U.S. at 534. Their argument that H.B. 3293 is substantially related to avoiding the substantial displacement of cisgender girls by transgender girls centers on alleged differences

---

[16] Although the State indicated during the discovery period that it believed H.B. 3293 advanced an important government interest in "follow[ing] Title IX" (Pl's SUF ¶ 59), the State does not make that argument in its summary-judgment motion. (Dkt. No. 287 (State MSJ) at 11.) Intervenor and the County Board likewise do not contend that H.B. 3293 satisfies heightened scrutiny because it substantially advances an interest in compliance with Title IX. (Dkt. No. 281 (County MSJ) at 22-23 (identifying the interests served as avoiding "competitive disadvantage" and "injury").) Any argument that H.B. 3293 substantially advances an important government interest in Title IX compliance has therefore been waived. *See Moseley v. Branker*, 550 F.3d 312, 325 n.7 (4th Cir. 2008) ("[A]rguments not specifically raised and addressed in opening brief . . . are deemed waived."); *Martin v. Ballard*, No. 2:14-cv-16158, 2015 WL 5484136, at *18 (S.D. W.Va. Sept. 17, 2015) (Goodwin, J.) (same).

in athletic performance between men and women. (Dkt. No. 281 (County MSJ) at 23-24; Dkt. No. 287 (State MSJ) at 13-14; Dkt. No. 288 (Int. MSJ) at 9.) That argument fails for multiple reasons.

First, B.P.J.'s own running times confirm that she has no advantages outside the typical range of cisgender girls her age. (Pl's SUF ¶¶ 122-23.) Indeed, B.P.J.'s running times were *below average* as compared to her peers participating in girls' cross-country. At two of her meets, she placed 51 out of 66 competitors and 123 out of 150 competitors. (Pl's SUF ¶¶ 122-23.) The State and Intervenor nevertheless assert that because B.P.J. did not place *dead last* at all her cross-country meets, she "displaced" cisgender girls who finished after her. (Dkt. No. 287 (State MSJ) at 2-22; Dkt. No. 288 (Int. MSJ) at 5.) But the contention that placing anything other than absolute last place constitutes substantial displacement justifying a categorical ban on the participation of all transgender girls in all school sports is so extreme it cannot be credited. That unreasonable position reveals that Defendants' real objection is to B.P.J.'s mere presence on the girls' team, full stop.

Second, as Plaintiff explained in her memorandum in support of summary judgment, the justifications for sex separation in sport offered in *Clark v. Arizona Interscholastic Association*, 695 F.2d 1126 (9th Cir. 1982), a case on which H.B. 3293 relies, *see* W. Va. § 18-2-25d(a)(3), are not "implicated by allowing transgender [girls and] women to participate on [girls' and] women's teams." (Dkt. No. 281 (Pl. MSJ) at 25 (quoting *Hecox*, 479 F. Supp. 3d at 976).) Namely, unlike cisgender men and boys, girls and "women who are transgender have historically been discriminated against, not favored." (*Id.* at 26 (quoting *Hecox*, 479 F. Supp. 3d at 977).) And whereas cisgender boys excluded from participating in girls' sports still have an equal number of overall athletic opportunities, under H.B. 3293, girls who are transgender in West Virginia do not—they are prohibited from playing on girls' teams, cannot play on boys' teams, and have

extremely limited co-ed options, leaving them with virtually no overall athletic opportunities. (*Id.*) Further, there was no evidence of transgender girls even participating in school sports in West Virginia prior to H.B. 3293, let alone participating and substantially displacing cisgender girls. (*Id.* at 26-27.) The facts underpinning each of these reasons are undisputed (and indisputable).[17]

It is also undisputed that H.B. 3293 does not condition participation on girls' teams on the largest known biological driver of average differences between the athletic performance of men as a group and women as a group—circulating testosterone levels beginning at puberty. (Pl's SUF ¶ 89.) There is no evidence that sex chromosomes or reproductive anatomy at birth alone have any demonstrated effect on athletic ability. (Pl's SUF ¶ 85.) Yet H.B. 3293 defines "biological sex" "solely" in terms of "reproductive biology and genetics at birth." W. Va. Code § 18-2-25d(b)(1). It does not permit any consideration of circulating testosterone. *Id.*; (Pl's SUF ¶ 92.) Because the differences that H.B. 3293 has made dispositive of participation on girls' sports teams—sex chromosomes and reproductive anatomy at birth—are not substantially related to athletic performance and to the substantial displacement of cisgender girls by transgender girls, the law cannot survive heightened scrutiny.[18]

---

[17] Defendant-Intervenor endeavors to excuse the total lack of any evidence of a problem in West Virginia by claiming that "the West Virginia legislature can 'rely on the experiences of other jurisdictions' to craft its own legislation." (Dkt. No. 288 (Int. MSJ) at 4 (quoting *Imaginary Images, Inc. v. Evans*, 612 F.3d 736, 742 (4th Cir. 2010).) But she does not cite any equal protection case for that proposition, and certainly not one applying heightened scrutiny; rather, she cites only cases concerning regulations of sexually oriented entertainment, where the government need only "fairly support" its policy, *Imaginary Images*, 612 F.3d at 742 (quotation marks omitted), not offer an "exceedingly persuasive" fit between means and ends, *Nguyen*, 533 U.S. at 70.

[18] The State asserts that the statute's "legislative findings, even in the context of the equal protection analysis, are 'entitled to great deference.'" (Dkt. No. 287 (State MSJ) at 7 (quoting *Michael M. v. Sonoma Cnty. Super. Ct.*, 450 U.S. 464, 470 (1981) (plurality) without noting that it is a plurality opinion).) The quoted language about "great deference" referred to the deference

Moreover, B.P.J. has not and will not experience the increase in circulating testosterone typical of people who go through endogenous male puberty because she has received puberty-delaying treatment since the onset of puberty. (Pl's SUF ¶¶ 16-17.) Defendants do not present any evidence that, as a group, transgender girls who receive puberty-delaying treatment followed by gender-affirming hormone therapy have average athletic performances that are better than the average athletic performances of cisgender girls as a group. Indeed, Defendants do not identify any studies examining the athletic performance of transgender girls and women who received puberty-delaying medication and did not experience endogenous male puberty. (*See* Dkt. No. 289-31 (Brown Dep. Tr.) at 99:8-11 (admission by Dr. Brown that he is unaware of any studies purporting to measure the athletic performance or physical fitness of transgender girls); Dkt. No. 289-30 (Brown Rep.) ¶ 110 (admission by Dr. Brown that he is unaware of any research concerning the athletic performance of transgender women who received puberty-delaying medication).)[19]

---

owed the findings of the Supreme Court of California, not deference to legislative findings. *See Michael M.*, 450 U.S. at 470.  Heightened equal protection scrutiny is demanding, not deferential. *See VMI*, 518 U.S. at 555 (explaining that "[t]he Fourth Circuit plainly erred in exposing Virginia's VWIL plan to a deferential analysis").

[19] The studies cited by Dr. Brown on which the State and Defendant-Intervenor rely all involved testosterone suppression by *post*-pubertal individuals or individuals who had already begun their endogenous puberty. (*See, e.g.*, Dkt. No. 287 (State MSJ) at 15-16 (citing Brown Rep. ¶ 134 (study involving adult Air Force members), ¶ 111 (study involving individuals in their mid-teens), ¶¶ 112-13 (study involving individuals approximately two years into puberty)).) The State also points to a single out-of-state, college-level transgender woman—Cece Tefler—as an "illustrative" "anecdote[]" supporting its claim "regarding the advantage of males" even after testosterone suppression, and asserts without any citation to the record that Cece "dominated" when competing in an event. (Dkt. No. 287 (State MSJ) at 16.)

In keeping with this dearth of evidence about the relative athletic performance of transgender girls and women who did not experience endogenous puberty, even World Rugby, which has a more restrictive policy concerning the participation of transgender female athletes than other elite sporting organizations, recognizes that there is no scientific basis to prohibit transgender women from participating on women's teams if they have not experienced endogenous male puberty. (Stark Supp. Decl. Ex. 52 (World Rugby, Transgender Women Guidelines).)

Nonetheless, Defendants contend that children assigned male at birth have a biological athletic advantage over children assigned female at birth even before puberty and that this alleged advantage persists after receiving puberty-delaying medication followed by gender-affirming hormone therapy. (Dkt. No. 281 (County MSJ) at 24-25; Dkt. No. 287 (State MSJ) at 14.) That claim is based on highly flawed assertions by Dr. Brown and Dr. Carlson that are the subject of *Daubert* motions, and the State's own unauthenticated compilation of data regarding pre-pubertal youth's performance outcomes in track and field that should have been introduced via expert testimony. (Dkt. No. 287 (State MSJ) at 14 (citing Ex. H-1).) But even if the testimony from Dr. Brown and Dr. Carlson and the State's makeshift charts are deemed admissible, they do not create a triable question of fact sufficient to uphold the constitutionality of H.B. 3293's categorical ban. As Dr. Brown admits, the alleged differences in athletic performance between non-transgender boys and non-transgender girls before puberty are "modest" when compared to the differences caused by increased circulating testosterone during puberty. (Pl's SUF ¶ 90.) And there have been no studies purporting to establish that any modest differences in athletic performance between pre-pubertal non-transgender boys and pre-pubertal non-transgender girls are attributable to innate biological causes (let alone the two biological criteria specified in H.B. 3293) as opposed to social factors, such as greater encouragement of athleticism in young boys. (Dkt. No. 289-27 (Safer Dep. Tr.) at 114; *see also* Pl's SUF ¶¶ 90-91; Dkt. No. 289-26 (Safer Rebuttal) ¶ 9.) The State's cobbled-together charts suffer from the same defects.

Even as to transgender girls and women who have already gone through endogenous puberty—which B.P.J. has not—Defendants fail to produce any evidence justifying H.B. 3293's sweeping categorical exclusion in all circumstances, including when transgender girls and women who have gone through endogenous puberty suppress their circulating testosterone. It is undisputed

that there have been only two studies examining the effects of gender-affirming hormone therapy on the athletic performance of transgender female athletes. (Dkt. No. 289-25 (Safer Rep.) ¶¶ 55-57; Dkt. No. 289-26 (Safer Rebuttal) ¶ 19). The studies on which Defendants and their putative experts rely, by contrast, only measure discrete characteristics such as muscle size or grip strength. (Dkt. No. 289-30 (Brown Rep.) ¶¶ 153-56.) But Dr. Brown himself has expressed caution about drawing strong conclusions from this limited universe of data, opining that "whether it is safe and fair to include transgender athletes and athletes with DSD in women's sports comes down a few facts that can be extrapolated, lots of opinions, and an interesting but complicated discussion." (Stark Supp. Decl. Ex. 56 (Brown Dep. Tr. Ex. 73); *see also* Dkt. No. 289-31 (Brown Dep. Tr.) at 176:20-24.)

Consistent with the lack of evidence justifying a categorical exclusion, multiple sporting organizations, including the National Collegiate Athletic Association, World Athletics, and the International Olympic Committee, permit transgender girls to compete in women's sports after suppressing their levels of testosterone for particular periods of time or below particular thresholds, and take into account particular considerations specific to each sport. (Pl's SUF ¶¶ 41-42, 74-83; Dkt. No. 291 (Pl. MSJ) at 6, 29 & n.12.)

Because heightened scrutiny applies, the burden of justification is "demanding" and "rests entirely" on the State of West Virginia. *VMI*, 518 U.S. at 533. As a matter of law, the existing scientific literature amassed by Defendants is insufficient to justify the sweeping ban that West Virginia has enacted.[20]

---

[20] The State contends that H.B. 3293 was drafted "narrowly" (Dkt. No. 287 (State MSJ) at 6), but nothing could be further from the truth—H.B. 3293 is a categorical ban, reaching all girls who are transgender in all sports at all levels from middle school onward, regardless of hormone blockers or gender-affirming therapy. To the extent the State suggests that the law's application to sports

2.    H.B. 3293 Is Not Substantially Related To Protecting Women's Safety In
Women's Sports.

No Defendant refutes the undisputed fact that "protecting women's safety" is not a justification for H.B. 3293 given by the Legislature, but rather is a *post hoc* rationalization "invented . . . in response to litigation." *VMI*, 518 U.S. at 533; (*see* Pl's SUF ¶ 58; Dkt. No. 291 (Pl. MSJ) at 23-24). For that reason alone, the Court should reject Defendants' effort to justify H.B. 3293 based on an interest in protecting women's safety. But even if the Court were to consider this *post hoc* rationale, it should hold that H.B. 3293 is not substantially related to any safety interest.

First, H.B. 3293 sweeps far too broadly to be substantially related to Defendants' *post hoc* safety interest. The law categorically bars girls who are transgender from sports that do not involve any contact, including cross-country and track, the two sports that B.P.J. plays. *See* W. Va. Code § 18-2-25d(c)(2). No Defendant even attempts to justify this incredibly wide reach. No Defendant contends that girls who are transgender pose a safety threat to girls who are cisgender in the context of non-contact sports—let alone offers any evidence proving as much. Even Defendants' putative expert, Dr. Carlson, focuses only on contact sports involving a risk of collision, and expressly disclaimed having any expert opinion concerning cross-country or track and field.[21]

---

based on "competitive skill' or involving "contact" is a meaningful limitation (*id.* at 7), the State fails to identify a single sport available at a secondary school in West Virginia that does not fall into one of those two categories.

[21] (*See* Dkt. No. 289-32 (Carlson Rep.) at 9-10 ¶ 12; *id.* at 56 (explaining that his conclusions apply to "contact or collision sports, sports involving projectiles, or sports where a stick is used to strike something"); Dkt. No. 289-33 (Carlson Dep. Tr.) at 114:17-21 ("I'm providing an opinion on the potential effects on safety of a biological male . . . crossing over into a woman's sport and participating in contact and collision sports."); *id.* at 160:17-19 ("I was asked to provide a report on safety risks as [it] relates to participation in . . . contact [or] collision sports."); *id.* at 160:22-161:2 (confirming that "contact and collision sports does not include cross-country" or "track and field").)

44

Unsurprisingly, then, no Defendant contends that B.P.J. poses a safety threat to the other girls running on middle school cross-country and track teams. To the contrary, Defendant-Intervenor could not identify any safety concern resulting from B.P.J.'s participation on Bridgeport Middle School's girls' cross-country team (Pl's SUF ¶ 135) and the State admits it is unaware of any middle school girl who was physically harmed by B.P.J.'s participation (Pl's SUF ¶ 136). Dr. Carlson also testified that he did not know whether B.P.J.'s participation on these girls' teams would pose more of a safety risk than the participation of any other cisgender girl. (Dkt. No. 289-33 (Carlson Dep. Tr.) at 160:6-13; *see also id.* at 200:9-12 (admitting that he is not aware of any research concerning the athletic performance of transgender girls who have received puberty-delaying treatment).)

Second, as to contact sports, Defendants offer no evidence that girls who are transgender pose a safety threat to girls who are cisgender. Defendants cite assertions from Dr. Carlson about the alleged physiological differences and injury rates between males and females. (Dkt. No. 281 (County MSJ) at 25-28; Dkt. No. 287 (State MSJ) at 18-20; Dkt. No. 288 (Int. MSJ) at 9.) But Dr. Carlson admitted that although girls and women who are transgender have competed in a number of contact and collision sports at the high school, collegiate, and professional levels, he is not aware of any injuries to cisgender girls and women that have resulted from transgender girls' and women's participation. (Dkt. No. 289-33 (Carlson Dep. Tr.) at 155:20-156:8.) He also admitted that he is not aware of any evidence that the participation of transgender girls and women in sports has increased the frequency and severity of injury suffered by cisgender female athletes. (*Id.* at 156:9-16).[22]

---

[22] The State offers just one example of an injury resulting in a competition between a transgender woman and a cisgender woman—an orbital fracture during a mixed-martial arts fight. (Dkt. No.

Further, as explained in a separate *Daubert* motion, Dr. Carlson disclaimed any expertise in offering policy recommendations and his predictions about future injuries are based on uninformed speculation and guesswork. Dr. Carlson acknowledges that there are intra-sex differentiations among cisgender women in terms of size, speed, and strength that could lead to increased safety risks for other athletes. (Dkt. No. 289-32 (Carlson Rep.) ¶ 78.) If the presence of an athlete above a certain threshold height or body weight were to pose an unacceptably heightened risk to safety in particular contact or collision sports, then there is no logical reason to exclude all transgender girls (even when they fall below that threshold) while allowing a potentially greater number of cisgender girls to participate (even when they fall above that threshold). Sporting organizations can provide generally applicable limitations on height or weight for all girls and women—whether transgender or cisgender—without using transgender status as an inaccurate proxy. (*See* Dkt. No. 289-26 (Safer Rebuttal) ¶ 27; Pl's SUF ¶¶ 132-34.)

Recognizing the utter lack of support for the idea that girls who are transgender pose a safety threat to girls who are cisgender when they play together on girls' sports teams, the State claims that the Legislature did not need to have any actual evidence before it of a safety problem to categorically bar girls who are transgender from girls' sports. (Dkt. No. 287 (State MSJ) at 20; *see also* Dkt. No. 288 (Int. MSJ) at 8-9.) But to survive heightened scrutiny, an asserted interest cannot be based on "fears" that have not "materialized." *Grimm*, 972 F.3d at 614. "[S]ufficient

---

287 (State MSJ) at 19.) But Dr. Carlson testified that he does not know how common orbital fractures in mixed-martial arts are. (Dkt. No. 289-33 (Carlson Dep. Tr) at 158:7-11). And mixed-martial arts is not a scholastic or collegiate sport.

probative evidence" is required. *H.B. Rowe Co. v. Tippett*, 615 F.3d 233, 242 (4th Cir. 2010).[23]

Defendants here have offered none.

## IV. H.B. 3293 Violates Title IX And Summary Judgment Should Be Entered For Plaintiff—Not Any Defendant.

The summary judgment record firmly establishes that H.B. 3293 as applied to B.P.J. violates Title IX. No Defendant has provided any basis for summary judgment in any Defendant's favor on the Title IX claim because, due to H.B. 3293, B.P.J. (1) will be excluded from participation in an education program offered by an education institution that receives federal financial assistance (2) on the basis of sex and (3) suffer harm. There is no dispute that H.B. 3293 excludes B.P.J. and other girls and women who are transgender from federally funded education programs.[24]

### A. H.B. 3293 Excludes B.P.J. On The Basis Of Sex.

Under binding Fourth Circuit precedent, discrimination against transgender students is discrimination "on the basis of sex" for purposes of Title IX. *Grimm*, 972 F.3d at 616; *accord Doe v. Snyder*, 28 F.4th 103, 114 (9th Cir. 2022); *Whitaker*, 858 F.3d at 1051. Applying that precedent, this Court has already—and correctly—concluded that H.B. 3293 "discriminat[es] against [B.P.J.] 'on the basis of sex'" because B.P.J.'s "sex 'remains a but-for cause' of her exclusion under the law." (PI Op. at 12 (quoting *Grimm*, 672 F.3d at 616)).)

---

[23] The State's reference to reliance on "common sense" (Dkt. No. 287 (State MSJ) at 18) is drawn from a First Amendment intermediate scrutiny case, not an equal protection heightened scrutiny case. *See Billups v. City of Charleston*, 961 F.3d 673, 685 (4th Cir. 2020).

[24] As noted above, WVSSAC is the only Defendant that claims it does not receive federal funding, but WVSSAC is subject to Title IX because it exercises controlling authority over federally funded athletic programs. *See supra* Section II.C.

**B.      H.B. 3293 Harms B.P.J. Through Unlawful Discrimination.**

"In the Title IX context, discrimination means treating that individual worse than others who are similarly situated." *Grimm*, 972 F.3d at 618 (internal quotation marks and brackets omitted). As this Court has noted, H.B. 3293 "unlawfully discriminates against B.P.J." by "treat[ing her] worse than girls with whom she is similarly situated because she alone cannot join the team corresponding to her gender identity." (PI Op. at 13.)

Despite Defendants' assertions to the contrary (Dkt. No. 288 (Int. MSJ) at 25; *see also* Dkt. No. 287 (State MSJ) at 9-10; Dkt. No. 281 (County MSJ) at 22), the reality of B.P.J.'s day-to-day life reflects that, for purposes of accessing the educational benefits of school and scholastic activities, "[p]laintiff is not most similarly situated with cisgender boys; she is similarly situated to other girls." (PI Op. at 7); *see supra* Section III.A (detailing how B.P.J. has for years lived as a girl and been recognized as a girl at school).

As a girl who is transgender, "B.P.J. is harmed by this law." (PI Op. at 13.) To experience the educational and social benefits that are reaped from participating in school sports, B.P.J. cannot be categorically excluded from participating on girls' sports teams based on her transgender status. Defendants agree that H.B. 3293 forbids B.P.J. from playing on a girls' team at Bridgeport Middle School, and on a girls' athletic team at any public secondary school in West Virginia (Pl's SUF ¶ 93), and Defendants have not and cannot assert any facts to contradict the reality that forcing B.P.J. to participate on a boys' team would be isolating, hurtful, and devastating for her. (Pl's SUF ¶ 97.)

Nor can Defendants refute that all students other than girls who are transgender like B.P.J. are allowed to participate in school sports consistent with their gender identity, such that H.B. 3293 singles out B.P.J. from other girls and requires her—but no other girl—to try out for the boys' team. (Pl's SUF ¶¶ 49-50.) As this Court previously stated, "All other students in West Virginia

48

secondary schools—cisgender girls, cisgender boys, transgender boys, and students falling outside of any of these definitions trying to play on the boys' teams—are permitted to play on sports teams that best fit their gender identity." (PI Op. at 12.) By excluding only B.P.J. and girls who are transgender, H.B. 3293 "very publicly brand[s]" B.P.J. "with a scarlet 'T,'" stigmatizing her and setting her apart from her peers. *Grimm*, 972 F.3d at 617-18 (internal quotation marks and alterations omitted). The separate and unequal treatment to which H.B. 3293 subjects B.P.J. is harmful, (Pl's SUF ¶¶ 96-104), and "is an invitation to subject" B.P.J. and other girls who are transgender to further "discrimination both in the public and in the private spheres." *Lawrence v. Texas*, 539 U.S. 558, 575 (2003).

Defendants' position that B.P.J. is not harmed by H.B. 3293 because she "may still compete on the boys' team like every other male" (Dkt. No. 288 (Int. MSJ) at 25) does not engage with this reality, and instead manufactures a "solution" that would erase B.P.J.'s identity and cause her great harm. *See Grimm*, 972 F.3d at 624 (Wynn, J., concurring) (requiring students to choose between using the restroom associated with their physiology or a private, single-stall restroom "is no choice at all because" the policy "completely misses the reality of what it means to be a transgender [girl]"). Not only has B.P.J. clearly expressed her desire to run with the girls' team and refusal to run with the boys' team because she is a girl, (Pl's SUF ¶¶ 97-100), there is also no co-ed cross-country or track team at Bridgeport Middle School or any other public secondary school in West Virginia. (Pl's SUF ¶ 101.) Because H.B. 3293 would prevent B.P.J. from participating on girls' sports teams, it effectively prohibits her from participating in school athletics entirely.

### C.     Title IX's Athletic Regulations Do Not Define Transgender Girls As Males Or Authorize Discrimination Against Them.

Defendants claim that Title IX authorizes schools to discriminate against transgender students because the statute's implementing regulations allow schools to provide "separate teams

for members of each sex," 34 C.F.R. § 106.41(b), and refer to "both sexes," *id.* § 106.41(c). (Dkt.

No. 281 (County MSJ) at 21; Dkt. No. 287 (State MSJ) at 22-23; Dkt. No. 288 (Int. MSJ) at 23.)

That is wrong. Neither Title IX nor its implementing regulations define transgender girls as boys

or authorize discrimination against transgender students in school sports.[25]

Title IX and its regulations do not purport to define transgender students by their sex

assigned at birth or other particular physiological characteristics. As the Fourth Circuit has

previously explained, the reference in Title IX and its regulations to "both sexes" (or similar

language) "refers to male and female students" but does not address "how a school should

determine whether a transgender individual is a male or female." *G.G. ex rel. Grimm v. Gloucester*

*Cnty. Sch. Bd.,* 822 F.3d 709, 720 (4th Cir. 2016), *vacated and remanded*, 137 S. Ct. 1239 (2017).

The State erroneously claims that the Supreme Court in *Bostock* "use[d] the term 'sex' to mean

---

[25] The State claims that the U.S. Department of Education and the U.S. Department of Justice have "repeatedly taken a position consistent" with H.B. 3293 regarding Title IX. (State MSJ at 28 n.20.) In support of its assertion, the State cites to a 1996 Letter to Colleagues that says nothing about transgender people, and to a 2021 Memorandum that specifically states that it is "Archived And Not For Reliance" because it was "issued without the review required under the Department's Rulemaking and Guidance Procedures." Letter from Norma V. Cantu, Assistant Sec'y for Civ. Rts., to Colleagues (Jan. 16, 1996), https://www2.ed.gov/about/offices/list/ocr/docs/clarific.html; Memorandum from Reed D. Rubinstein, Principal Deputy Gen. Couns., for Kimberly M. Richey, Acting Assistant Sec'y of the Off. For Civ. Rts. (Jan. 8, 2021), https://www2.ed.gov/about/offices/list/ocr/correspondence/other/ogc-memorandum-01082021.pdf. Far from supporting West Virginia, the Department of Education's Office for Civil Rights originally gave notice in 2015 that "[t]he Department's Title IX regulations permit schools to provide sex-segregated . . . athletic teams . . . [and] [w]hen a school elects to separate or treat students differently on the basis of sex in those situations, a school generally must treat transgender students consistent with their gender identity." Letter from James A. Ferg-Cadima, Acting Deputy Assistant for Policy, U.S. Dep't of Educ. Office for Civil Rights, to Emily Prince (Jan. 7, 2015), https://www2.ed.gov/about/offices/list/ocr/letters/20150107-title-ix-prince-letter.pdf. In 2016, OCR stated unequivocally that "transgender students must be allowed to participate in such activities . . . consistent with their gender identity." Letter from Catherine E. Lhamon, Ass't Sec. for Civil Rights, U.S. Dep't of Educ. and Vanita Gupta, Principal Dep. Ass't Attorney for Civil Rights, U.S. Dep't of Justice (May 13, 2016), https://www2.ed.gov/about/offices/list/ocr/letters/colleague-201605-title-ix-transgender.pdf.

'biological distinctions between male and female.'" (Dkt. No. 287 (State MSJ) at 6 (quoting *Bostock*, 140 S. Ct. at 1738-39); *see also id.* at 25-26.). In fact, *Bostock* conspicuously *refused* to adopt that definition of sex and specifically reserved the question whether the statutory term "sex" bears "a broader scope, capturing more than anatomy and reaching at least some norms concerning gender identity." 140 S. Ct. at 1739.

Both at the time Title IX's regulations were adopted and today, definitions of sex did not embrace "a hard-and-fast binary division on the basis of reproductive organs." *G.G.*, 822 F.3d at 721-22 (collecting definitions); *see also Fabian v. Hosp. of Cent. Conn.*, 172 F. Supp. 3d 509, 526 (D. Conn. 2016) (same). But even if the term sex in Title IX and its regulations were limited to biological and physiological characteristics, that limitation would still not dictate how to provide separate teams to students who, as a result of puberty-delaying medication or gender affirming hormone therapy "possess a mix of [typically] male and female physical characteristics." *Grimm*, 972 F.3d at 621 (Wynn, J., concurring).

In any event, regardless what definition of sex is used, the text of the Title IX athletics regulations does not purport to authorize discrimination against transgender students or anyone else. Rather, the regulations allow for sex-separated sports teams "where selection for such teams is based upon competitive skill or the activity involved is a contact sport," 34 C.F.R. § 106.41(b), and require that any sex-separated athletic opportunities be "equal" to one another, *id.* § 106.41(c). They do not authorize discrimination against transgender students by categorically excluding them from the athletic activities provided to their cisgender peers. Nor could they do so without running afoul of Title IX's statutory anti-discrimination mandate. 20 U.S.C. § 1681(a). As the Fourth Circuit explained in *Grimm* when discussing a Title IX subsection authorizing schools to provide separate toilet facilities on the basis of sex, "the implementing regulation cannot override the

51

statutory prohibition against discrimination on the basis of sex," and "[a]ll it suggests is that the act of creating sex-separated restrooms in and of itself is not discriminatory." 972 F.3d at 618; *accord Peltier v. Charter Day Sch., Inc.*, 8 F.4th 251, 271 (4th Cir. 2021) (explaining that because plain text of Title IX encompasses dress codes, agency could not exempt dress codes from statute's reach), *reh'g en banc granted on other grounds*, 2021 WL 4892153 (4th Cir. Oct. 19, 2021).[26]

For all these reasons, H.B. 3293 violates B.P.J.'s rights under Title IX.

## V.     Permanent Injunctive Relief Is Warranted And Should Be Granted.

For the reasons set out in Plaintiff's memorandum in support of her motion for summary judgment, this Court should issue a permanent injunction, as well as issue a declaratory judgment and award nominal damages. (Dkt. No. 291 (Pl. MSJ) at 35-37.) Other than their arguments about success on the merits, no Defendant makes any other argument that permanent injunctive relief is not warranted.

## CONCLUSION

For the foregoing reasons, Defendants' motions for summary judgment should be denied and B.P.J.'s motion for summary judgment should be granted.

---

[26] Intervenor compares the regulation to other exemptions in the statutory text. (Dkt. No. 288 (Int. MSJ) at 23 (citing 20 U.S.C. §§ 1681(a)(5), 1681(a)(6)(B).) But those exemptions are enumerated in the statutory text as specific contexts in which Title IX's prohibition on "discrimination" "shall not apply." 20 U.S.C. § 1681(a). By contrast, Congress did not exempt athletics from Title IX's broad coverage, and when "Congress has explicitly enumerated a discrete exception to a general rule," courts may "not imply additional exceptions absent a clear direction to the contrary." *United States v. Alabama*, 778 F.3d 926, 934 (11th Cir. 2015).

Dated: May 12, 2022

Joshua Block*
AMERICAN CIVIL LIBERTIES UNION
FOUNDATION
125 Broad St.
New York, NY 10004
Phone: (212) 549-2569
jblock@aclu.org

Avatara Smith-Carrington*
LAMBDA LEGAL
3500 Oak Lawn Avenue, Suite 500
Dallas, TX 75219
Phone: (214) 219-8585
asmithcarrington@lambdalegal.org

Carl Charles*
Tara Borelli*
LAMBDA LEGAL
158 West Ponce De Leon Ave., Ste. 105
Decatur, GA 30030
Phone: (404) 897-1880
ccharles@lambdalegal.org

Sruti Swaminathan*
LAMBDA LEGAL
120 Wall Street, 19th Floor
New York, NY 10005
Phone: (212) 809-8585
sswaminathan@lambdalegal.org

Andrew Barr*
COOLEY LLP
1144 15th St. Suite 2300
Denver, CO 80202-5686
Phone: (720) 566-4000
abarr@cooley.com

Respectfully submitted,
/s/ *Loree Stark*

Loree Stark (Bar No. 12936)
Nick Ward (Bar No. 13703)
AMERICAN CIVIL LIBERTIES UNION OF WEST
VIRGINIA FOUNDATION
P.O. Box 3952
Charleston, WV 25339-3952
Phone: (914) 393-4614
lstark@acluwv.org

Kathleen Hartnett*
Julie Veroff*
Zoë Helstrom*
COOLEY LLP
3 Embarcadero Center, 20th Floor
San Francisco, CA 94111
Phone: (415) 693-2000
khartnett@cooley.com

Katelyn Kang*
Valeria Pelet del Toro*
COOLEY LLP
55 Hudson Yards
New York, NY 10001-2157
Phone: (212) 479-6000
kkang@cooley.com

Elizabeth Reinhardt*
COOLEY LLP
500 Boylston Street, 14th Floor
Boston, MA 02116-3736
Phone: (617) 937-2305
ereinhardt@cooley.com

*Visiting Attorneys*

*Attorneys for Plaintiff*

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA
CHARLESTON DIVISION

| | |
|---|---|
| B.P.J. by her next friend and mother, HEATHER JACKSON,<br><br>        *Plaintiff*,<br><br>        v.<br><br>WEST VIRGINIA STATE BOARD OF EDUCATION, HARRISON COUNTY BOARD OF EDUCATION, WEST VIRGINIA SECONDARY SCHOOL ACTIVITIES COMMISSION, W. CLAYTON BURCH in his official capacity as State Superintendent, DORA STUTLER in her official capacity as Harrison County Superintendent, and THE STATE OF WEST VIRGINIA,<br><br>        *Defendants*,<br><br>        and<br><br>LAINEY ARMISTEAD,<br><br>        *Defendant-Intervenor*. | Civil Action No. 2:21-cv-00316<br><br>Hon. Joseph R. Goodwin<br><br>**CERTIFICATE OF SERVICE** |

## CERTIFICATE OF SERVICE

I, Loree Stark, do hereby certify that on this 12th day of May, 2022, I electronically filed a true and exact copy of the ***Memorandum in Support of Plaintiff's Motion for Summary Judgment*** with the Clerk of Court and all parties using the CM/ECF System.

                                        */s/ Loree Stark*
                                        Loree Stark
                                        West Virginia Bar No. 12936