IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA
CHARLESTON DIVISION

B.P.J., by her next friend and mother,
HEATHER JACKSON,

                              *Plaintiff*,

v.                                               Civil Action No. 2:21-cv-00316
                                                 Hon. Joseph R. Goodwin, District Judge

WEST VIRGINIA STATE BOARD OF
EDUCATION, HARRISON COUNTY BOARD
OF EDUCATION, WEST VIRGINIA
SECONDARY SCHOOL ACTIVITIES
COMMISSION, W. CLAYTON BURCH in his
official capacity as State Superintendent,
DORA STUTLER in her official capacity as
Harrison County Superintendent, PATRICK
MORRISEY in his official capacity as Attorney
General, and THE STATE OF WEST VIRGINIA,

                              *Defendants,*

and

LAINEY ARMISTEAD,

                              *Defendant-Intervenor*.


**DEFENDANTS HARRISON COUNTY BOARD OF EDUCATION
AND DORA STUTLER'S REPLY IN SUPPORT OF
THEIR MOTION FOR SUMMARY JUDGMENT**

14740884

Defendants Harrison County Board of Education ("HCBOE") and County Superintendent Dora Stutler ("Stutler") (collectively, the "County Board"), by counsel, submit this reply in support of their motion for summary judgment pursuant to Rule 56 of the Federal Rules of Civil Procedure. It is undisputed that no misconduct, policy, or custom by the County Board has caused B.P.J. any injury; rather, as Plaintiff acknowledges, her alleged injury stems solely from a State law that the County Board is compelled to enforce. Under these circumstances, the HCBOE and Stutler cannot be liable to Plaintiff. Indeed, Plaintiff concedes that her sole claim against Stutler is an *Ex parte Young* claim – that is, Plaintiff has sued Stutler as a means of suing the *State*, not the County Board. Thus, the County Board is not liable to Plaintiff and cannot be liable for any award of monetary damages (including but not limited to attorneys' fees or costs) that Plaintiff may be awarded.

Additionally, while the HCBOE and Stutler did not have any role in the passage of H.B. 3293, B.P.J. has asserted claims seeking equitable and monetary damages (including costs, expenses, and attorneys' fees) against them. Thus, the HCBOE and Stutler observe that a clear legal basis exists for finding that H.B. 3293 survives legal scrutiny under Title IX and the Equal Protection Clause ("EPC"), and thus, the County Board is not liable to B.P.J for this additional reason.

## I.      STANDARD OF REVIEW

Because, in her response brief, Plaintiff cites to the Court's Memorandum Opinion & Order granting Plaintiff's motion for a preliminary injunction (Doc. 67) and to the Court's Memorandum Opinion & Order denying the County Board (and other defendants') motions to dismiss (Doc. 129), it is worth briefly reviewing differences between the standards for those motions and the present motion for summary judgment.

"A plaintiff seeking a preliminary injunction must establish," among other elements, "that he is likely to succeed on the merits[.]" *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20, 129

14740884

S. Ct. 365, 374, 172 L. Ed. 2d 249 (2008) (citations omitted). (*See also* Doc. 67, at 6.) When determining the County Board's Rule 12(b)(6) motion to dismiss, the Court took the facts alleged in the complaint as true because such motions merely "test[] the legal sufficiency of a complaint or pleading." (Doc. 129, at 6-7 (citing *Giarratano v. Johnson*, 521 F.3d 298, 302 (4th Cir. 2008); *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009)).)

At the summary judgment stage, however, the undisputed material facts are dispositive, not the allegations in the complaint or any likelihoods. A summary judgment movant must show "that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).

It is also important to note that, when it granted Plaintiff's motion for a preliminary injunction, the Court considered only Plaintiff's challenge of H.B. 3293 *as applied* to B.P.J.; it left for "a later stage of litigation" the question of whether H.B. 3293 "is facially unconstitutional[.]" (Doc. 67, at 4, 9, 11.) Similarly, when the Court denied the County Board's motion to dismiss, it found that B.P.J. had plausibly alleged an injury to *B.P.J.* – not to anyone else. (Doc. 129, at 7.) Thus, the Court has not come to any conclusion, even at the preliminary injunction or motion to dismiss stage, regarding Plaintiff's facial challenge to H.B. 3293.

## II.   PLAINTIFF'S MISCHARACTERIZATION OF PURPORTEDLY UNDISPUTED FACTS MAKES IT APPEAR AS IF THE COUNTY BOARD HAS MORE GOVERNANCE AND CONTROL THAN IT ACTUALLY HAS

As a preliminary matter, the County Board will address certain facts that Plaintiff claims are undisputed, but which are actually disputed.

Plaintiff claims that the County Board does not dispute that "the County Board is the governing body of Harrison County's public education system and that Superintendent Stutler is responsible for executing educational policies under the direction of the State and County Boards of Education, including regarding interscholastic athletics." (Doc. 331, at 25-26 (citing W. Va.

Code §§ 18-5-1, 18-4-10).) To the contrary, the County Board does not dispute what is contained in the statutory sections that Plaintiff cited, but they differ from Plaintiff's characterization of them. That is, W. Va. Code § 18-5-1 provides in part that "[e]ach county school district shall be under the supervision and control of a county board of education[.]" And W. Va. Code § 18-4-10 provides in part that the county superintendent shall, "under the direction of the state board, execute all its education policies[.]"

Thus, the County Board *does* dispute Plaintiff's assertions to the extent that they contradict or are not supported by the statutory sections Plaintiff cites to, particularly because Plaintiff ascribes governance and control to the County Board, where it should be ascribed to the State and the State Board pursuant to clear statutory terms. Specifically, the County Board disputes that it is "the governing body of Harrison County's public education system." While the County Board admits that, pursuant to the West Virginia Code, it supervises and controls the Harrison County school district, the State still *governs* the County Board, and the County Board is required to enforce state laws applicable to it. The County Board further disputes that W. Va. Code § 18-4-10 makes Superintendent Stutler responsible for executing any policies under the direction of the County Board; rather, her obligation under that statutory section is to execute the State Board's education policies.

The County Board has consistently taken the position that it is compelled to enforce H.B. 3293, a position that is plain from the statutory language and that is undisputed in this civil action. To the extent that Plaintiff attempts to obscure that fact by mischaracterizing statutes applicable to the County Board in order to make it appear as if the County Board has more governance and control than it has, the County Board disputes Plaintiff's characterizations. However, this dispute is not a genuine dispute of material fact. Plaintiff has admitted that the County Board is compelled to enforce H.B. 3293, a State law, to the extent that it goes into effect, and it is undisputed that the

County Board has engaged in no misconduct and has no policy or custom of its own that causes B.P.J.'s alleged injury. These undisputed facts entitle the County Board to summary judgment.

## III.   THE HCBOE IN PARTICULAR CANNOT BE LIABLE TO PLAINTIFF UNDER TITLE IX, AND IN HER RESPONSE, PLAINTIFF FAILED TO ADDRESS THE PRIMARY AUTHORITY THAT COMPELS THIS CONCLUSION[1]

Plaintiff – because she cannot – has not distinguished the primary authority (*Davis*) that the HCBOE cited to in support of its motion for summary judgment on the Title IX claim. Indeed, she does not address *Davis* anywhere in her response brief. Instead, Plaintiff unsuccessfully attempts to distinguish two other cases the HCBOE cited, *Baynard* and *Bethesda Lutheran*, and she argues to no avail that Title IX claims must be analyzed differently than EPC claims. Conspicuously absent from Plaintiff's response brief is any attempt to distinguish *Davis*, the U.S. Supreme Court case that makes it clear that the HCBOE cannot be liable to Plaintiff under Title IX. Plaintiff has also conspicuously failed to attempt to argue that the decision in *Grimm* did not hinge on the fact that a school board policy is what caused the injury and thus gave rise to school board liability in that case. Plaintiff thus has offered no reason why the HCBOE is not entitled to summary judgment on her Title IX claim.

### A.   The U.S. Supreme Court's Decision in *Davis* Clearly Demonstrates that the HCBOE Cannot Be Liable to Plaintiff Under Title IX

*Davis* clearly stands for the proposition that a county board of education, like the HCBOE, cannot be liable under Title IX unless its own misconduct constitutes a Title IX violation. In *Davis*, the mother of an alleged sexual harassment victim brought suit against a county board of education

---

[1] Plaintiff claims in her response brief that the County Board "made no effort to satisfy their burden under Federal Rule of Civil Procedure 56." (Doc. 331, at 12.) To the contrary, the County Board has met its burden and has explicitly relied on undisputed facts, including Plaintiff's own acknowledgements. Indeed, none of the facts that Plaintiff claims are disputed have any relevance to the County Board's arguments that the HCBOE in particular cannot be liable to Plaintiff under Title IX and that Stutler in particular cannot be liable for money damages under the EPC. Rather, Plaintiff's argument that certain facts are disputed is relevant only to her claims that H.B. 3293 violates Title IX and the EPC – *not* that the County Board in particular could be liable to Plaintiff for any such alleged violation. (*See* Doc. 331, at 12-20.)

(and others) under Title IX. *Davis Next Friend LaShonda D. v. Monroe Cnty. Bd. of Educ.*, 526 U.S. 629, 632, 119 S. Ct. 1661, 1666, 143 L. Ed. 2d 839 (1999). She alleged that her daughter had been sexually harassed by another student for months, that she had informed various teachers at the school, and that the school's principal was aware of the harassment, but that the harassment did not end until the harasser was charged with and pled guilty to sexual battery. *Id.*, 526 U.S. at 632-35, 119 S. Ct. at 1666-67.

In *Davis*, the U.S. Supreme Court decided that a board of education can be liable for student-on-student harassment in a private suit for money damages – subject to the important caveat "that a recipient of federal funds may be liable in damages under Title IX ***only for its own misconduct. The recipient itself must 'exclud[e] [persons] from participation in, ... den[y] [persons] the benefits of, or ... subjec[t] [persons] to discrimination under' its 'program[s] or activit[ies]' in order to be liable under Title IX.***" *Id.*, 526 U.S. 629, 639–41, 119 S. Ct. 1661, 1669-70 (citations omitted; editing marks in *Davis*; emphasis added).

The *Davis* Court looked to Supreme Court precedent that had concluded "that recipients could be liable in damages only where their own deliberate indifference effectively 'cause[d]' the discrimination[.]" *Id.*, 526 U.S. at 642–43, 119 S. Ct. at 1671 (alteration in *Davis*) (quoting *Gebser v. Lago Vista Indep. Sch. Dist.*, 524 U.S. 274, 291, 118 S. Ct. 1989 (1998); and citing *City of Canton, Ohio v. Harris*, 489 U.S. 378, 383, 109 S. Ct. 1197, 1202, 103 L. Ed. 2d 412 (1989) (recognizing that a municipality will be liable under § 1983 only if "the municipality *itself* causes the constitutional violation at issue" (emphasis in original)).).

The Supreme Court stated that, while schools were already on notice of potential responsibility for their failure to protect students from third parties' torts, "[t]his is not to say that the identity of the harasser is irrelevant. On the contrary, both the 'deliberate indifference' standard and the language of Title IX ***narrowly circumscribe the set of parties whose known acts of sexual***

*harassment can trigger some duty to respond on the part of funding recipients*." *Davis*, 526 U.S. at 644, 119 S. Ct. at 1671-72 (emphasis added). The Supreme Court thus stated, "[d]eliberate indifference makes sense as a theory of direct liability under Title IX *only where the funding recipient has some control over the alleged harassment. A recipient cannot be directly liable for its indifference where it lacks the authority to take remedial action.*" *Id.*, 526 U.S. at 644, 119 S. Ct. at 1672 (emphasis added).

Thus, a number of important limitations exist to Title IX liability. "*If a funding recipient does not engage in harassment directly, it may not be liable for damages unless its deliberate indifference 'subject[s]' its students to harassment.*" *Id.*, 526 U.S. at 644, 119 S. Ct. at 1672 (emphasis added). "Moreover, because the harassment must occur 'under' 'the operations of' a funding recipient, see 20 U.S.C. § 1681(a); § 1687 (defining "program or activity"), the harassment must take place in a context subject to the school district's control[.]" *Id.*, 526 U.S. at 645, 119 S. Ct. at 1672. "*These factors combine to limit a recipient's damages liability to circumstances wherein the recipient exercises substantial control over both the harasser and the context in which the known harassment occurs.* Only then can the recipient be said to 'expose' its students to harassment or 'cause' them to undergo it 'under' the recipient's programs." *Id.* (emphasis added).

The discussion and holding in *Davis* explain why Title IX liability existed in *Grimm* but does <u>not</u> exist against the HCBOE in this case. In *Grimm*, a county school board policy is what prevented the plaintiff, a transgender male, from using the male restrooms at his school. *Grimm v. Gloucester Cty. Sch. Bd.*, 972 F.3d 586, 616 (4th Cir. 2020), *as amended* (Aug. 28, 2020) (citation omitted), *cert. denied sub nom. Gloucester County School Board v. Grimm, Gavin*, No. 20-1163, 2021 WL 2637992 (U.S. June 28, 2021). Thus, in *Grimm*, the school board had engaged in discrimination directly, and that discrimination occurred within a context subject to the school

board's control. Thus, the school board itself had engaged in the misconduct that caused a violation of Title IX.

Here, to the contrary, the HCBOE is not directly engaging in harassment or discrimination. Furthermore, the HCBOE has no "control over the alleged" discrimination, and it "lacks the authority to take remedial action." *See Davis*, 526 U.S. at 644, 119 S. Ct. at 1672. No genuine dispute of material fact exists on these points. First, Plaintiff has acknowledged that H.B. 3293 prohibits B.P.J. from participating on school sports designated for females and that, because it is a state law, the County Board is compelled and required to enforce H.B. 3293 against B.P.J. absent an injunction. (Doc. 290, at ¶¶ 93, 109; Doc. 291, at 12-13.)

Second, it is undisputed that the County Board has no policy or custom of its own that causes the injury B.P.J. claims in this civil action. With regard to sports, the County Board has only two policies, neither of which is related to separation by sex. (County Board Dep., attached as "**Exhibit 1**," at 56-57, 214.) The County Board also has no policy pertaining to transgender students or transgender students' participation in sports. (*Id.* at 57, 125, 150.) As Plaintiff acknowledges, after the Court enjoined enforcement of H.B. 3293, B.P.J. was permitted to participate first on Bridgeport Middle School's girls' cross-country team and then its girls' track team; no policy or custom of the County Board had to be enjoined to enable B.P.J.'s participation in girls' sports. (Doc. 291, at 15, 16; *see* Doc. 67, at 14-15.)

Third, the HCBOE cannot control the context in which the alleged discrimination occurs. *See Davis*, 526 U.S. at 645, 119 S. Ct. at 1672. H.B. 3293 is a state law that was passed by the West Virginia state legislature. The HCBOE had no role in the passage of H.B. 3293. Again, no genuine dispute of material fact exists on this point. It is undisputed that the County Board did not devise or create H.B. 3293; has not voted in any way relating to policies concerning H.B. 3293; did not pass any policy, proclamation, or other statement related to H.B. 3293; and has not taken

any actions to implement the provisions of H.B. 3293. (Exhibit 1, at 38, 192; Stipulation of Uncontested Facts (CM/ECF Doc. 252), at 2.) Moreover, the County Board had no role in drafting H.B. 3293, and it provided no comments or thoughts to the Legislature regarding H.B. 3293. (Exhibit 1, at 62.) Neither the County Board nor any of its agents or employees, in their official capacities, did anything officially to advocate for or support H.B. 3293 or to contribute to its passage. (*Id.* at 191-92.) Also, prior to H.B. 3293's enactment, the County Board had no conversations with the State Board of Education or the WVSSAC about transgender students' participation in sports. (*Id.* at 65, 83.)

Finally, it is undisputed that the HCBOE has not engaged in any misconduct of its own, and therefore, it cannot be liable under Title IX. *See Davis*, 526 U.S. 629, 639–41, 119 S. Ct. 1661, 1669-70. In addition to the undisputed facts that the HCBOE played no role in the passage of H.B. 3293 and has no policy or custom of its own that causes the injury B.P.J. alleges in this civil action, it is undisputed that B.P.J. feels respected by her school administrators, feels supported by her school and her coaches, and has had positive experiences at her elementary and middle schools, which respect her female gender identity and treat her as the girl she is, including as a participant on girls' sports teams at school. (Doc. 291, at 8-9, 16, 19, 22.)

Thus, the HCBOE cannot be liable under a theory that it directly engaged in discrimination or that it responded to discrimination with deliberate indifference. Accordingly, Plaintiff is not and will not be subject to any alleged discrimination or harassment "'under' 'the operations of' a funding recipient," here, the HCBOE, and thus the HCBOE cannot be liable to Plaintiff under Title IX. *Davis*, 526 U.S. at 645, 119 S. Ct. at 1672 (citing 20 U.S.C. § 1681(a); § 1687 (defining "program or activity")).

Again, Plaintiff's complete failure to address *Davis* demonstrates that the HCBOE's argument pursuant to *Davis* is unassailable. *Davis* clearly establishes that the HCBOE cannot be

liable in damages to Plaintiff under the present circumstances. Furthermore, the arguments that Plaintiff does make cannot alter the conclusion compelled by application of *Davis*, which is that the HCBOE cannot be liable to Plaintiff under Title IX.

**B.     The Arguments that Plaintiff Does Make Regarding Title IX Fail to Demonstrate that the HCBOE Could Be Liable to Plaintiff**

Plaintiff claims that "Title IX does not require that discrimination be pursuant to a municipal policy or custom. It merely requires an act of intentional discrimination." (Doc. 331 (citing *Fitzgerald v. Barnstable Sch. Comm.*, 555 U.S. 246, 257–58, 129 S. Ct. 788, 797, 172 L. Ed. 2d 582 (2009).) Not only has Plaintiff failed to show that the HCBOE engaged in "intentional discrimination," Plaintiff's claim is misleading (and completely ignores the holding in *Davis*).

In *Fitzgerald*, the U.S. Supreme Court determined that the private right of action under Title IX does not preclude plaintiffs from pursuing constitutional claims under 42 U.S.C. § 1983 because "Title IX's protections are narrower in some respects and broader in others." *Id.*, 555 U.S. at 256, 129 S. Ct. at 796. One of the distinctions between the two different actions that the Supreme Court noted is that "a Title IX plaintiff can establish school district liability by showing that a single school administrator with authority to take corrective action responded to harassment with deliberate indifference," whereas an EPC claim requires a plaintiff to "show that the harassment was the result of municipal custom, policy, or practice." *Id.*, 555 U.S. at 257–58, 129 S. Ct. at 797 (citations omitted).

Thus, *Fitzgerald* does not permit a Title IX plaintiff to prevail against a county board of education where the county board did not commit its own misconduct resulting in intentional discrimination; rather, it merely recognizes that a Title IX claim may be sustained if an administrator *with authority to take corrective action* responds to harassment with deliberate indifference. Clearly, that is not the case here. Nothing in *Fitzgerald* permits Plaintiff to succeed

on her Title IX claim against the HCBOE.

Similarly, Plaintiff's citation to a footnote from the U.S. District Court for the Western District of Kentucky cannot salvage her Title IX claim. (*See* Doc. 331, at 27 (citing *Condiff v. Hart Cnty. Sch. Dist.*, 770 F. Supp. 2d 876, 881 n.3 (W.D. Ky. 2011)).) In *Condiff*, the plaintiff alleged that she had been unlawfully retaliated against in violation of Title IX because her employment contract, pursuant to which she was employed as a teacher, was not renewed after she was involved in reporting that her stepdaughter had been sexually harassed by one of her teachers at the high school in the same school district. *Id.*, 770 F. Supp. 2d at 881–84.

In the footnote cited by Plaintiff in the present civil action, the *Condiff* Court merely acknowledged that the plaintiff there could succeed on a Title IX retaliation claim even if the school board had not adopted a discriminatory policy or custom; however, to succeed on her retaliation claim, she had to show that "(1) she engaged in a protected activity; (2) this exercise of protected rights was known to the defendant; (3) the defendant thereafter took adverse employment action against the plaintiff; and (4) there was a causal connection between the protected activity and the adverse employment action." *Id.*, 770 F. Supp. 2d at 881, 881 n.3 (citations omitted). Of course, the present case is not a Title IX retaliation case, and the footnote Plaintiff cites to from the Western District of Kentucky in *Condiff* certainly does not eviscerate the relevant precedent from the U.S. Supreme Court in *Davis* or from the Fourth Circuit in *Baynard*.

Indeed, Plaintiff's distinction of *Baynard* is off point. Plaintiff is correct that no policy of a school board was at issue in *Baynard*. Rather, *Baynard* addressed a former student's claim that a city school board was liable under Title IX based on his allegation that he was molested by his elementary school teacher on an ongoing basis until he entered college. *Baynard v. Malone*, 268 F.3d 228, 232-33 (4th Cir. 2001).

*Baynard* began its analysis of the Title IX claim by stating,

Title IX conditions "an offer of funding on a promise by the recipient not to discriminate, in what amounts essentially to a contract between the Government and the recipient of funds." *Gebser v. Lago Vista Indep. Sch. Dist.,* 524 U.S. 274, 286, 118 S.Ct. 1989, 141 L.Ed.2d 277 (1998). In *Gebser,* the Supreme Court explained that the contractual nature of Title IX requires that a funding recipient have notice that it may be liable for a monetary award, *i.e.,* it must actually be aware of the discrimination and fail to remedy it. *See id.* at 287–88, 118 S.Ct. 1989. ***In other words, a school district may be held liable under Title IX "only for its own misconduct"; the implied damages remedy is available only when "the funding recipient engages in intentional conduct that violates the clear terms of the statute."*** *Davis v. Monroe County Bd. of Educ.,* 526 U.S. 629, 640, 642, 119 S.Ct. 1661, 143 L.Ed.2d 839 (1999).

In accordance with these considerations, the Supreme Court has expressly rejected the use of "principles of *respondeat superior* or constructive notice" for imposing liability on a school district under Title IX. *Gebser,* 524 U.S. at 285, 118 S.Ct. 1989. Rather, the Court held in *Gebser* that ***"a damages remedy will not lie under Title IX unless an official who at a minimum has authority to address the alleged discrimination and to institute corrective measures on the [district's] behalf has actual knowledge of discrimination" and is deliberately indifferent to it.*** *Id.* at 290, 118 S.Ct. 1989.

*Id.*, 268 F.3d at 237 (emphasis added).

The *Baynard* Court determined that the city school board was not liable under Title IX because it had no actual notice that the teacher was abusing a student and because the school's principal, who had been made aware of the teacher's potential to abuse students, ***lacked the power to take corrective action*** (for instance, by discharging the teacher) on behalf of the city school board. *Baynard*, 268 F.3d at 238–39.

In distinguishing *Baynard*, Plaintiff argues only that the County Board has actual notice of H.B. 3293's application to and effect on B.P.J. (Doc. 331, at 27.) What Plaintiff ignores is far more telling. That is, Plaintiff ignores that, pursuant to *Baynard*, (1) the County Board can be liable ***only for its own misconduct***, and (2) the County Board cannot be liable because it lacks the power to take any corrective action, as it is compelled to enforce H.B. 3293 to the extent that it goes into

effect. Pursuant to the Fourth Circuit's decision in *Baynard*, which is mandatory precedent in this circuit, the County Board cannot be liable to Plaintiff.

Plaintiff also attempts to distinguish *Bethesda Lutheran*. In that case, the Seventh Circuit addressed a claim brought under 42 U.S.C. § 1983 and alleged constitutional and statutory violations; no Title IX claim was at issue there. However, given the holdings of *Davis* and *Baynard*, and considering the holding in *Grimm*, it is equally true for Title IX cases as it is for § 1983 cases that when a "municipality is acting under compulsion of state or federal law, it is the policy contained in that state or federal law, rather than anything devised or adopted by the municipality, that is responsible for the injury." *Bethesda Lutheran Homes & Servs., Inc. v. Leean*, 154 F.3d 716, 718 (7th Cir. 1998) And, as it was in *Bethesda Lutheran*, it is also true in Title IX cases that this "position has the virtue of minimizing the occasions on which federal constitutional law enforced through section 1983" – or federal statutory law, in Title IX cases – "puts local government at war with state government." *Id.*

Indeed, when discussing liability under Title IX, the *Davis* Court looked to another Supreme Court case that recognized that a municipality could face liability under § 1983 only if it "*itself* causes the constitutional violation at issue." *Davis*, 526 U.S. at 642–43, 119 S. Ct. at 1671 (citing *Harris*, 489 U.S. at 383, 109 S. Ct. at 1202 (emphasis in original)). Thus, while *Bethesda Lutheran* was not a Title IX case, its recognition that a municipality cannot be held liable for acts made under compulsion of state law is equally true for Title IX cases.

Pursuant to the plain terms of the U.S. Supreme Court's decision in *Davis* and the Fourth Circuit's decision in *Baynard*, the HCBOE cannot be liable to Plaintiff under Title IX as a matter of law. The HCBOE's motion for summary judgment on Count I should therefore be granted.

IV.   **PLAINTIFF ACKNOWLEDGES THAT HER SOLE CLAIM AGAINST STUTLER IS AN *EX PARTE YOUNG* CLAIM BROUGHT IN STUTLER'S CAPACITY AS A STATE – NOT A COUNTY – OFFICIAL; THEREFORE, THE COUNTY BOARD CANNOT BE LIABLE FOR ANY AWARD OF MONEY DAMAGES, AND ANY SUCH AWARD MUST BE ASSESSED AGAINST THE STATE ALONE**

In her response to Stutler's motion for summary judgment, Plaintiff writes, "B.P.J. is not bringing a *Monell* claim against Superintendent Stutler in her capacity as a county official; she is bringing an *Ex parte Young* claim against Superintendent Stutler in her capacity as a state official." (Doc. 331, at 28.) Thus, Plaintiff essentially concedes the County Board's point that Stutler cannot be liable as an official of the HCBOE because no policy or custom of the HCBOE has or will cause the injury that B.P.J. claims in this civil action. It necessarily follows that any award of money damages, including an award for attorneys' fees and costs, *cannot* be the responsibility of the County Board; rather, any money damages assessed against Stutler is the sole responsibility of the State, which is the sole entity she will represent to the extent that she enforces H.B. 3293.

Indeed, in conceding that her claim against Stutler in Count II is an *Ex parte Young* claim, not a *Monell* claim, Plaintiff cites to this Court's decision in *McGee v. Cole*. As is set forth in detail in the County Board's opening brief (Doc. 281, at 17-19), *McGee* clearly provides that, when a county official is sued in his or her capacity as a State official due to his or her enforcement of State legislation, as is the case with Superintendent Stutler in this civil action, then any money damages assessed against the official "will be the responsibility of the State of West Virginia." *McGee v. Cole*, 115 F. Supp. 3d 765, 779 (S.D.W. Va. 2015). Under circumstances such as those present in *McGee* and in the present civil action, the County Board cannot be even jointly and severally liable for money damages, including any award of attorneys' fees and costs. *Id.*, 115 F. Supp. 3d at 777 n.3.

Thus, if the Court decides to retain Stutler as a defendant pursuant to *Ex parte Young*, then the County Board's motion for summary judgment on any claim for money damages, including

but not limited to an award of attorneys' fees and costs, should be granted. Plaintiff claims that the proper time to raise the issue of which party is responsible for a monetary award is in a post-judgment motion. However, Plaintiff cites to no authority stating that the summary judgment phase is an improper time to make such a determination. Rather, Plaintiff cites only to *McGee*, which addressed the issue when the plaintiffs to that action moved for attorneys' fees and costs after the plaintiffs were successful on their motion for summary judgment. *McGee*, 115 F. Supp. 3d at 770. Nothing in *McGee* indicates that this is an improper subject for determination on a motion for summary judgment.

In sum, there is no genuine dispute of material fact; if Stutler is retained as a defendant to Count II, she is undisputedly retained in her capacity as a State official pursuant to *Ex parte Young* due to her responsibility to enforce a State law. Pursuant to *McGee*, that means that the State alone is responsible for any award of money damages, including attorneys' fees and costs, that may be assessed against her. Accordingly, the County Board is entitled to summary judgment on Plaintiff's claim for money damages against it, including but not limited to an award of attorneys' fees and costs. Any damages assessed against Stutler are the sole responsibility of the State. The County Board's motion for summary judgment on Plaintiff's claim for money damages should therefore be granted.[2]

---

[2] The HCBOE is not a proper defendant even for the purpose of an injunction. *McGee* and *Ex parte Young* do not stand for the proposition that an *entity* such as the HCBOE is a proper defendant for purposes of an injunction where an alleged *statutory* injury arises from the enforcement of a state law; rather, only a suit against a local *official* is permitted as a means of suing the State for an allegedly *unconstitutional* act. *McGee*, 115 F. Supp. 3d at 772; *Ex parte Young*, 209 U.S. 123, 157 (1908) (recognizing that "an officer of the state" may be made "a party defendant in a suit to enjoin the enforcement of an act alleged to be unconstitutional" if "the state officer, by virtue of his office, has some connection with the enforcement of the act"). The HCBOE is not an official, and it has been sued only for an alleged statutory violation (of Title IX), not for an allegedly unconstitutional act. Therefore, the HCBOE is not a proper defendant even for purposes of an injunction, and its motion for summary judgment should be granted. The HCBOE should be dismissed as a defendant entirely.

## V.    A CLEAR LEGAL BASIS EXISTS FOR FINDING THAT H.B. 3293 DOES NOT VIOLATE TITLE IX OR THE EPC

### A.    The County Board Properly Cited to Sources and Undisputed Material Facts in its Opening Memorandum of Law

In her response brief, Plaintiff attempts to call into question some of the sources and claims that the County Board relied on in its opening brief in support of its motion for summary judgment. In this section, the County Board clarifies that it properly cited to sources and undisputed facts in its opening memorandum of law.

It is true, as Plaintiff points out (Doc. 331, at 15 n.2) that the County Board did not provide a citation for the statement on page 7 of its brief (Doc. 281) relating to physiological differences between males and females. However, Plaintiff's statement is nevertheless misleading. The County Board wrote that, "*as explained in greater detail below in Section II.E.*, the physiological differences between males and females that make males, in general, taller, bigger, faster, and stronger than females, lead to legitimate concerns about competitive fairness to, and the safety of, biological females when playing sports with and against biological males." (Doc. 281, at 8 (emphasis added).) Within Section II.E., the County Board provided citations for its evidence. (Doc. 281, at 21-22, 24-29.) For example, the County Board cited to the Expert Report of Dr. Brown, which states that men "are, on average, taller, stronger, and faster" than women. (Doc. 281, at 21 (citing "Exhibit 7" to Doc. 281, at 8).)

Additionally, Plaintiff claims that the County Board's reliance on the National Federation of State High School Associations' ("NFHS") *Rules Book, Track and Field and Cross Country* (2020) is an "inadmissible document[]" because it has "never been produced by any party." (Doc. 331, at 15.) Plaintiff is incorrect on this issue. The NFHS *Rules Book* was produced in discovery by the County Board. (*See* relevant portion of "Defendants Harrison County Board Of Education and Dora Stutler's Responses and Objections to Plaintiff's First Set of Requests for Production to

Defendants Harrison County Board of Education and Dora Stutler," p. 5, attached as "**Exhibit 2**.") Moreover, Plaintiff cites to no authority to support her position that the NFHS *Rules Book* is inadmissible, and the County Board knows of no reason why it would be inadmissible.

Furthermore, the West Virginia Code of State Rules (WVSSAC regulations) provide that the cross country and track and field "rules published by the NFHS are the official rules for all interscholastic competition unless otherwise provided by Commission modification." W. Va. Code R. §§ 127-3-22.1, 127-3-29.1. It does not make sense that the official rules for cross country and track and field in West Virginia would be inadmissible in this civil action, which centers on the question of who may participate in those sports on girls' teams.

Plaintiff also "vigorously disputes" that pre-pubertal children have meaningful performance gaps based on biological sex "and that any alleged similarities in athletic performance persists [sic] after transgender girls receive puberty-delaying medication followed by gender-affirming hormone therapy[.]" (Doc. 331, at 16 n.4.) Assuming that a genuine dispute exists on these points, however, the dispute is not material and so it is not an impediment to the County Board's motion for summary judgment.

Plaintiff ignores that she has filed a *facial* challenge to H.B. 3293, not just an as-applied challenge; thus, as is explained in greater detail below, all of H.B. 3293's potential applications should be considered – not just its application to B.P.J. For example, H.B. 3293 applies not just to middle schools but also to high school and college/university-level female sports teams. *See* W. Va. Code Ann. § 18-2-25d(c)(1) (indicating that H.B. 3293 applies to "athletic teams or sports that are sponsored by any public secondary school or a state institution of higher education"). Thus, H.B. 3293 applies to, for example, cisgender males, nonbinary individuals, and transgender females who have gone through puberty with little or no medical treatment and thus have the physical development of a typical cisgender male.

Thus, even if medical treatment can reduce the differences between transgender and cisgender girls to a "modest" level (Doc. 331, at 16), there still is a possibility that, absent H.B. 3293, cisgender female athletes will end up competing against one or more nonbinary or transgender female athletes who have not had any or all available medical treatment and have therefore undergone endogenous male puberty. Therefore, as discussed in more detail below, Plaintiff's dispute about performance gaps with regard to pre-pubertal individuals and individuals who have received medical treatment is not a material dispute that permits her claims to survive summary judgment.

### B.   H.B. 3293 Does Not Violate Title IX, Which Permits Sex-Separated Sports to Promote Sex Equality

To succeed on a Title IX claim, a plaintiff must prove "(1) that [the plaintiff] was excluded from participation in an education program 'on the basis of sex'; (2) that the educational institution was receiving federal financial assistance at the time; and (3) that ***improper*** discrimination caused [the plaintiff] harm." *Grimm*, 972 F.3d at 616 (citation omitted; emphasis added). Not all discrimination is "improper." Indeed, Title IX regulations allow for certain types of discrimination, including by permitting sex-separated sports teams. 34 C.F.R. § 106.41(b).

Plaintiff's argument that a Title IX violation occurred fails because she has not shown that *improper* discrimination has occurred. Plaintiff argues that, on the basis of sex, H.B. 3293 excludes her from female sports offered by an education institution that receives federal financial assistance and that she is harmed by the exclusion. (Doc. 331, at 56.) It is true that H.B. 3293 – as Title IX regulations permit – provides for sex-separated sports teams. It is also true that H.B. 3293 excludes B.P.J. from participation on her school's sports teams designated for females.

But the key to the analysis, again, is what Plaintiff excludes from her argument. That is, what Plaintiff fails to show is that H.B. 3293's separate treatment of biological boys and biological

girls with regard to participation in athletics (its "discrimination") is *improper*.

Title IX regulations permit a funding recipient to "operate or sponsor separate [athletic] teams for members of each sex where selection for such teams is based upon competitive skill or the activity involved is a contact sport." 34 C.F.R. § 106.41(b). The regulations also require recipients to "provide equal athletic opportunity for members of both sexes," including by considering whether the "levels of competition effectively accommodate the interests and abilities of members of both sexes."  34 C.F.R. § 106.41(c).

Provisions such as those contained in the Title IX regulations are important to promote sex equality. H.B. 3293 similarly promotes sex equality in sports by (a) drawing a line on the basis of "biological" sex, that is, "an individual's physical form as a male or female based solely on the individual's reproductive biology and genetics at birth," and (b) permitting only "biological females" to participate on "[a]thletic teams or sports designated for females . . . where selection for such teams is based upon competitive skill or the activity involved is a contact sport." W. Va. Code § 18-2-25d. The line that H.B. 3293 draws similarly situates all "biological" males, regardless of gender identity, and all "biological" males are treated the same. That is, all such similarly situated individuals are prohibited from participating on athletic teams or sports designated for females. By this means, H.B. 3293 provides female athletes with an equal playing field in terms of both competition/opportunity and safety.

It follows that H.B. 3293 is lawful under Title IX because it promotes Title IX's purpose of promoting sex equality in athletics. *See, e.g.*, *Cohen v. Brown Univ.*, 991 F.2d 888, 897 (1st Cir. 1993) ("Equal opportunity to participate lies at the core of Title IX's purpose."); *Clark, By and Through Clark v. Arizona Interscholastic Ass'n*, 695 F.2d 1126, 1130 (9th Cir. 1982) (noting that cases have upheld boys' exclusion from girls' teams as "a legitimate means of providing athletic opportunities for girls" due to innate physical differences between the sexes); *O'Connor v. Bd. of*

*Ed. of Sch. Dist. No. 23*, 645 F.2d 578, 582 (7th Cir. 1981) ("Title IX aims to provide equal opportunity in educational programs" and permits "separate-sex teams and . . . exclusion of girls from" certain boys' teams); *Lafler v. Athletic Bd. of Control*, 536 F. Supp. 104, 106 (W.D. Mich. 1982) ("Although many courts have recognized a woman's right to an equal opportunity to participate in sports, . . . courts have also recognized that such equal opportunity may be provided through separate teams or competitions for men and women. . . . The regulations promulgated under Title IX . . . specifically permit the establishment of separate male and female teams in contact sports. The United States Congress, in calling for the provision of 'equal opportunity to amateur athletes ... to participate ... without discrimination on the basis of ... sex ...' in the Amateur Sports Act, 36 U.S.C. s 391(b)(6), anticipated that such equal opportunity would sometimes be provided through the use of separate programs for men and women. . . .") (citations omitted).

Importantly, the analysis in *Grimm* is not applicable or dispositive here because the *Grimm* Court did not address athletics. Whereas transgender students may use restrooms corresponding with their gender identity without imposing the dangers of decreased opportunities for, and compromised safety of, cisgender females, these concerns are present regarding athletic participation.

It is these concerns that make H.B. 3293 lawful under Title IX, which permits sex-separated teams and promotes sex equality, because sex-related physical differences make a difference in contact sports and on teams involving competitive skill. That is, cisgender females who compete with and against individuals who are not cisgender females may lose out on opportunities, for example, opportunities to start on or even play for a team, opportunities to win, and opportunities for scholarships. And competing against individuals who are not cisgender females in contact sports may cause cisgender females to suffer more physical injuries. (*See* Doc. 281, at 21-22, 24-29.)

In sum, sex-separated sports are lawful, and H.B. 3293 defines "male" and "female" in a way intended to promote the goal of sex equality in athletics, in compliance with Title IX. Therefore, the County Board's motion for summary judgment on the Title IX claim should be granted.

### C.      H.B. 3293 is substantially related to important government purposes and thus survives scrutiny under the EPC

"The Equal Protection Clause of the Fourteenth Amendment provides that '[n]o State shall . . . deny to any person within its jurisdiction the equal protection of the laws.  It is 'essentially a direction that all persons similarly situated should be treated alike.'" *Grimm*, 972 F.3d at 606 (quoting *City of Cleburne v. Cleburne Living Ctr.*, 473 U.S. 432 (1985)). EPC challenges based on sex, as here, are subject to intermediate scrutiny.  *See H.B. Rowe Co. v. Tippett*, 615 F.3d 233, 242 (4th Cir. 2010).  The County Board has not misapplied intermediate (also called "heightened") scrutiny, as Plaintiff claims. Indeed, Plaintiff and the County Board cited to the same case and to the same standard for analyzing whether H.B. 3293 survives heightened/intermediate scrutiny.[3]

That is, under intermediate scrutiny, "how important" the government interest must be is only "important," and "how closely related" the means must be to the achievement of that interest is only "substantially related." *United States v. Virginia*, 518 U.S. 515, 532–33, 116 S. Ct. 2264, 2275, 135 L. Ed. 2d 735 (1996). Intermediate scrutiny, unlike strict scrutiny, does not require the government to prove that a classification is "'narrowly tailored'" to "'further compelling

---

[3] Without citing to the County Board's briefing, Plaintiff also claims that "Defendants' version of heightened scrutiny applies the wrong 'intermediate scrutiny' standard" in that they have applied "the 'reasonable fit' standard used by the Fourth Circuit to evaluate restrictions on the Second Amendment under immediate scrutiny." (Doc. 331, at 44.) Regardless of whether Plaintiff is correct about the "reasonable fit" standard, the County Board did not apply a "reasonable fit" standard but, rather, the same standard, from the same case, that Plaintiff has applied. The County Board's opening brief states, "Under intermediate scrutiny, the challenged classification must serve an important government purpose, and the means employed must be substantially related to that purpose. *U.S. v. Virginia*, 518 U.S. 515, 524, 532-33 (1996)." (*See* Doc. 331, at 44-45 (Plaintiff applied the standard set forth in *Virginia*, 518 U.S. at 532).)

governmental interests.'" *See Johnson v. California*, 543 U.S. 499, 505, 125 S. Ct. 1141, 1146, 160 L. Ed. 2d 949 (2005) (citation omitted). Courts routinely accept that a classification that relies on some degree of generality can still be "substantially related" to its end.

A blanket rule limiting selective service registration to men, for example, satisfied intermediate scrutiny even "assuming that a small number of women could be drafted for noncombat roles" because "Congress simply did not consider it worth the added burdens of including women in draft and registration plans." *Rostker v. Goldberg*, 453 U.S. 57, 81 (1981). Additionally, a social security rule advantageous to women satisfied intermediate scrutiny because "women *on the average* received lower retirement benefits than men." *Califano v. Webster*, 430 U.S. 313, 318 n.5 (1977).

Plaintiff claims that, in citing to *Rostker*, the County Board has focused on the dissent rather than the majority holding in *U.S. v. Virginia*. (Doc. 331, at 45 n.14.) However, *Rostker* is still good law, and the County Board cited to it, not to the dissent in *Virginia*, which mentions it. (*See* Doc. 281, at 29 n.13.) Furthermore, the majority opinion in *Virginia* acknowledges that "[p]hysical differences between men and women[] . . . are enduring[.]" *Virginia*, 518 U.S. at 533, 116 S. Ct. at 2276 (citation omitted).

In *Virginia*, the Supreme Court determined "that the Constitution's equal protection guarantee precludes Virginia from reserving exclusively to men the unique educational opportunities" afforded at Virginia Military Institute ("VMI"). *See id.*, 518 U.S. at 519, 116 S. Ct. at 2269. That is, it considered the admission of *women* (who desired and were qualified for such admission) into a previously *all-male* group. As Plaintiff notes in her brief, the *Virginia* Court found that generalizations about women could not "justify denying opportunity to women whose talent and capacity place them outside the average description," particularly considering that VMI's educational method might not have suited most men, either. *Id.*, 518 U.S. at 550, 116 S. Ct.

at 2284. Thus, the Supreme Court determined that generalizations about most women was an insufficient justification for excluding all women from VMI, even those with the desire, ability, and qualifications to succeed at VMI.

Importantly, however, the *Virginia* Court did not consider the question of whether individuals whose "reproductive biology and genetics at birth" are *male* should be permitted to join athletic teams (or any other group) designated solely for *females*. For this reason and because of the different contexts, the interests at stake were significantly different than they are here. In *Virginia*, the government interests at stake were (1) the educational benefits and diverse educational approaches attendant to single-sex education and (2) the school's unique approach to character development and leadership training, which the government contended would have to be modified if women were admitted. *Id.*, 518 U.S. at 534–35, 116 S. Ct. at 2276. In *Virginia*, there was no concern for the safety or displacement of/lost opportunities for males (much less females) at VMI due to the admission of females. The issues at stake in *Virginia* were clearly distinct from the ones at stake here.

Here, the safety of and displacement of/lost opportunities for female athletes are important government interests justifying H.B. 3293. Plaintiff is incorrect when she states that the County Board has not refuted her assertion that safety is a *post hoc* rationalization for H.B. 3293. (*See* Doc. 331, at 53; County Board's Resp. to Pl.'s Mot. for Summ. J., Doc. 301, at 23-24.) To the contrary, safety is a key purpose of H.B. 3293, which states that the State has an "interest in promoting equal athletic opportunities for the female sex" and that the "inherent differences between biological males and biological females" "are a valid justification for sex-based classifications when they realistically reflect the fact that the sexes are not similarly situated in certain circumstances[.]" W. Va. Code § 18-2-15d(a)(1)-(2), (4).

Reading these provisions together, it follows that the Legislature was concerned about

female athletes' safety, or at least about broader equality concerns that necessarily include female athletes' safety. That is, "equal athletic opportunities for the female sex" include an equal opportunity to avoid unnecessary injury (and displacement) caused by "the fact that the sexes are not similarly situated" with regard to physical characteristics relevant to safety in athletics, including males' typically larger and stronger muscles and bones. Thus, the argument that a purpose and justification for H.B. 3293 is to protect the safety of cisgender females who participate in school sports is <u>not</u> a "*post hoc* rationalization 'invented . . . in response to litigation,'" as Plaintiff claims. (*See* Doc. 331, at 53 (quoting *Virginia*, 518 U.S. at 533).) Rather, it is an important concern addressed by both H.B. 3293 and Title IX regulations (34 C.F.R. § 106.41(b)-(c)). While cross-country and track may not involve safety issues the same way a contact sport does, it is possible that B.P.J. will at some time in the future decide to play one or more contact sports and that other transgender female students will decide to play contact sports.

Additionally, Plaintiff's argument that H.B. 3293 sweeps too broadly to be substantially related to the government's interest in safety (Doc. 331, at 53) ignores that H.B. 3293 also seeks to further the interest of competitive fairness. It is not logical to argue that H.B. 3293 is not substantially related to an interest in safety simply because it also relates to an interest in competitive fairness. Some sports, like soccer, implicate both interests, whereas other sports may implicate only one of the government's interests; nevertheless, both interests justify the law and are substantially related to H.B. 3293's means of accomplishing those interests.

### (1) *Plaintiff brought a facial challenge to H.B. 3293, and thus all persons who may be affected must be considered, not just B.P.J.*

Plaintiff states that she is not challenging sex separation in sports teams but rather her own exclusion from girls' school sports teams. (Doc. 331, at 38.) However, Plaintiff has brought a facial challenge to H.B. 3293, and thus its application to cisgender females, cisgender males, transgender

females who are not in B.P.J.'s position, and all others affected or potentially affected must also be considered. *See City of Los Angeles, Calif. v. Patel*, 576 U.S. 409, 418, 135 S. Ct. 2443, 2451, 192 L. Ed. 2d 435 (2015) (when a facial challenge is brought, the legislation is analyzed based on "'its impact on those whose conduct it affects,'" that is, "'the group for whom the law is a restriction,'" although "[u]nder the most exacting standard the Court has prescribed for facial challenges, a plaintiff must establish that a 'law is unconstitutional in all of its applications.'" (citations omitted).)

Plaintiff argues, for example, that B.P.J. did not substantially displace cisgender girls at two of her cross-country meets because her performance was below average. She argues that the fact that she did not come in last place does not justify "a categorical ban on the participation of *all transgender girls* in all school sports." (Doc. 331, at 48 (emphasis added).)

What Plaintiff fails to mention is that not all transgender females have had the medical care that B.P.J. has had and plans to have. Some, rather, are going through or have gone through endogenous male puberty and thus have developed typically male physical characteristics – the very characteristics that give rise to the need for sex separation in sports in the first place. Those transgender females may wish to participate in sports, and their participation would compromise cisgender females' safety and athletic opportunities. Even with regard to her as-applied challenge, Plaintiff does not account for the possibility that B.P.J. will choose to (or have to), for various potential reasons, forego medical treatment and, perhaps, take up contact sports.

Thus, even if, as Plaintiff claims, safety and competitive fairness are more related to circulating testosterone than "an individual's physical form as a male or female based solely on the individual's reproductive biology and genetics at birth," W. Va. Code § 18-2-25d(b)(1), H.B. 3293 is still substantially related to the achievement of the goals of competitive fairness and safety

in females' sports.[4] H.B. 3293 does not have to be "narrowly tailored" to a "compelling" interest because strict scrutiny undisputedly does not apply here. Thus, the line H.B. 3293 has drawn, which is at "reproductive biology and genetics at birth," is one that is intended to, and that does, substantially relate to the goals of protecting females' ability to compete in a fair sports environment without unnecessarily increasing their risk of injury.

> ### (2)    Some line needs to be drawn to protect competitive fairness and safety in women's sports, and the line that H.B. 3293 draws satisfies intermediate scrutiny

Some line needs to be drawn in order to help maximize safety and competitive fairness in sports. In fact, all of the sporting organizations that Plaintiff cited to in her briefing – the National Collegiate Athletic Association, World Athletics, International Olympic Committee, International Amateur Athletic Federation, World Rugby, and U.S. Rugby, for example – have set or allowed for standards that govern the circumstances under which transgender females may participate in female athletic events. (*See, e.g.*, Doc. 331, at 17-18, 52 (citations omitted).) H.B. 3293 also draws such a line, and the line it draws survives intermediate scrutiny.

While B.P.J. has consistently identified as a girl and has received medical treatment, it is possible that her situation will change; for example, for various reasons, she may cease her medical treatment or decline additional treatment; she may decide to participate in a contact sport; and/or she may become a much more winning competitor as she ages. And of course, there are other transgender females who have not had the benefit of the same medical treatment that B.P.J. has

---

[4] Plaintiff argues that the County Board waived any argument with regard to the EPC analysis that H.B. 3293 advances an important government interest in complying with Title IX because it has argued only that the interests are competitive disadvantage and safety. (Doc. 331, at 47 n.16.) While it is true that the interests the County Board focused on in its opening memorandum with regard to the EPC analysis were safety and competitive fairness, the County Board has also consistently argued that H.B. 3293 is in line with Title IX regulations and furthers the purpose of Title IX to promote equal opportunities for females. (*See, e.g.*, Doc. 281, at 20-21, *including* at 20 n.9; Doc. 50, at 14-15, *including* at 14 n.58.) Therefore, the County Board objects to Plaintiff's claim that it waived any argument on that point.

had and plans to have, as well as nonbinary individuals who may not obtain medical treatment. Such individuals may decide that they want to play on a school sports team designated for females. Thus, the interests in competitive fairness and safety need to be addressed; again, some line needs to be drawn. At issue in this facial challenge to H.B. 3293 is not just whether B.P.J.'s participation on girls' sports teams poses the risks that H.B. 3293 seeks to prevent, but whether the line that H.B. 3293 has drawn in order to address those risks is lawful under Title IX and the EPC.

In fact, even Plaintiff's expert, Joshua Safer, opined based on a retrospective study of military fitness tests that gender-affirming hormone therapy negated "any advantage transgender women had over non-transgender women in performing push-ups and sit-ups" – *but only "after 2 years."* (Safer Expert Report, Doc. 289-25 at 18 ¶ 56 (citation omitted; emphasis added).) Moreover, in the study, transgender women ran 1.5 miles 21% faster than cisgender women, and after receiving gender-affirming hormone therapy, they still ran that distance 12% faster. (*Id.* (citation omitted).) Thus, their advantage was reduced by less than half; it was far from eliminated.

Safer further opined that "[b]ecause different sports require different types of physical performance, the studies suggest that the existence and extent of a performance advantage may vary from sport to sport" even after a transgender woman receives gender-affirming hormone therapy. (*Id.*, ¶ 57.) While Safer opined that this means that performance advantages "should not be subject to a categorical across-the-board rule," (*id.*), the studies he cites to reveal that performance advantages can and do persist following gender-affirming hormone therapy and that some rule is necessary in order to level the playing field for cisgender women.

Ultimately, Plaintiff's facial and as-applied challenge to H.B. 3293 is about more than B.P.J. and whether she currently creates the risks H.B. 3293 seeks to prevent. It is about the fairness to and safety of any number of cisgender female athletes. It is of inadequate constitutional significance that any particular student has not gained some or all of the differences in physical

characteristics that medical intervention either can or cannot equalize, or even the possibility that a more perfect line exists than then one that H.B. 3293 draws. There is no reason, under heightened/intermediate scrutiny, to require the State to place "limitations on height or weight for all girls and women—whether transgender or cisgender—without using transgender status as" a proxy, or to use circulating testosterone as the line, as Plaintiff suggests. (*See* Doc. 331, at 49, 55.) A perfect or even best possible fit between a government's chosen means (*i.e.*, the classification) and its important goals is not what intermediate scrutiny demands. Intermediate scrutiny tolerates such imperfections in classifications.

> **(3)     *This case is distinct from Grimm in that it addresses important government interests that were not implicated in Grimm***

Finally, again, this case is simply not *Grimm*. In her response brief, Plaintiff (as she did in her memorandum of law in support of her own motion for summary judgment (Doc. 291 at 23-25, 31)) liberally refers to and inserts brackets into quotes from *Grimm* to make it appear as if *Grimm* addressed transgender student athletes' participation on school sports teams. (*See* Doc. 331, at 38, 40, 41, 46.) However, ***Grimm did not address participation in athletics***; it addressed the much different issue of restroom use.

Plaintiff claims that the County Board attempted to distinguish *Grimm* by arguing "that the privacy interest asserted there is not at issue here" and that "that is a distinction without a difference." (Doc. 331, at 40 n.11 (citing Doc. 281, at 20 [ECF p.21].) To the contrary, the County Board argued essentially the opposite, and the distinction is key. That is, the County Board did not argue that a privacy interest present in *Grimm* is not present here. Rather, the County Board pointed out that the important safety and fairness interests at stake *here* were not present in *Grimm*. Whereas transgender individuals may use restrooms corresponding with their gender identity without compromising anyone's safety or competitive fairness/decreased opportunities, those two

interests are at stake in athletics, and those are the precise interests that H.B. 3293 protects.

Accordingly, the County Board observes that a clear legal basis exists to find that H.B. 3293 survives intermediate scrutiny. "'[L]egislatures are presumed to have acted within their constitutional power despite the fact that, in practice, their laws result in some inequality.'" *Nordlinger v. Hahn*, 505 U.S. 1, 10 (1992) (quoting *McGowan v. Maryland,* 366 U.S. 420, 425–26 (1961)). Therefore, the County Board's motion for summary judgment on the EPC claim should be granted.

## VI.    CONCLUSION

For all of the foregoing reasons, the HCBOE and Stutler respectfully request that the Court **GRANT** their Motion for Summary Judgment. The HCBOE is entitled to summary judgment on the sole claim against it, and it should be dismissed as a defendant. Stutler has not violated any right of B.P.J.'s, and thus, she is also entitled to summary judgment. If Stutler, as an agent of the State, is retained as a defendant to Count II for purposes of an injunction, then any damages or other monetary award, including any award for attorneys' fees and costs, that may be assessed against her must be paid by the State. Therefore, the HCBOE and Stutler are entitled to summary judgment on Counts I and II, as well as B.P.J.'s claim for monetary damages, including any award for attorneys' fees and costs, against them.

Respectfully submitted this 26th day of May, 2022.


STEPTOE & JOHNSON PLLC
  OF COUNSEL

*/s/ Susan L. Deniker*
Susan L. Deniker          (WV ID #7992)
Jeffrey M. Cropp          (WV ID #8030)
400 White Oaks Boulevard
Bridgeport, WV 26330-4500
(304) 933-8000

*Counsel for Defendants Harrison County Board of Education and Dora Stutler*

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA
CHARLESTON DIVISION

B.P.J., by her next friend and mother, HEATHER
JACKSON,

*Plaintiff,*

v.                                                         Civil Action No. 2:21-cv-00316
                                                           Hon. Joseph R. Goodwin, District Judge

WEST VIRGINIA STATE BOARD OF
EDUCATION, HARRISON COUNTY BOARD
OF EDUCATION, WEST VIRGINIA
SECONDARY SCHOOL ACTIVITIES
COMMISSION, W. CLAYTON BURCH in his
official capacity as State Superintendent,
DORA STUTLER in her official capacity as
Harrison County Superintendent, PATRICK
MORRISEY in his official capacity as Attorney
General, and THE STATE OF WEST VIRGINIA,

*Defendants,*

and

LAINEY ARMISTEAD,

*Defendant-Intervenor.*

## **CERTIFICATE OF SERVICE**

I hereby certify that on 26th day of May, 2022, I electronically filed the foregoing

"Defendants Harrison County Board of Education and Dora Stutler's Reply in Support of Their

Motion for Summary Judgment" with the Clerk of the Court using the CM/ECF system, which

will send notification of such filing to all counsel of record.

14740884

**Joshua A. Block, Esquire**
AMERICAN CIVIL LIBERTIES UNION
FOUNDATION
125 Broad Street 18th Floor
New York, NY 10004
*Counsel for Plaintiff*


**Loree Stark, Esquire**
**Nicholas P. Ward, Esquire**
AMERICAN CIVIL LIBERTIES UNION
OF WEST VIRGINIA
1614 Kanawha Boulevard East
Charleston, WV  25311
*Counsel for Plaintiff*

**Avatara A. Smith-Carrington, Esquire**
LAMBDA LEGAL
3500 Oak Lawn Avenue Suite 500
Dallas, TX 75219
*Counsel for Plaintiff*

**Carl Solomon Charles, Esquire**
**Tara L. Borelli, Esquire**
LAMBDA LEGAL
158 West Ponce De Leon Avenue, Suite 105
Decatur, GA 30030
*Counsel for Plaintiff*

**Sruti J. Swaminathan, Esquire**
LAMBDA LEGAL
120 Wall Street 19th Floor
New York, NY 10005
*Counsel for Plaintiff*

**Kathleen R. Hartnett, Esquire**
**Julie Veroff, Esquire**
**Zoë Helstrom, Esquire**
COOLEY LLP
3 Embarcadero Center, 20th Floor
San Francisco, CA 94111
*Counsel for Plaintiff*

**Katelyn Kang, Esquire**
**Valeria M. Pelet del Toro, Esquire**
COOLEY LLP
55 Hudson Yards
New York, NY 10001
*Counsel for Plaintiff*

**Elizabeth Reinhardt, Esquire**
COOLEY LLP
500 Boylston Street, 14th Floor
Boston, MA 02116-3736
*Counsel for Plaintiff*

**Andrew D. Barr, Esquire**
COOLEY LLP
1144 15th Street Suite 2300
Denver, CO 80202
*Counsel for Plaintiff*

**Roberta F. Green, Esquire**
**Kimberly M. Bandy, Esquire**
**Shannon M. Rogers, Esquire**
SHUMAN McCUSKEY & SLICER
PO Box 3953
Charleston, WV 25339-3953
*Counsel for Defendant WV Secondary
School Activities Commission*

**Kelly C. Morgan, Esquire**
**Kristen Vickers Hammond, Esquire**
**Michael W. Taylor, Esquire**
BAILEY & WYANT
PO Box 3710
Charleston, WV 25337-3710
*Counsel for Defendants WV State Board of*
*Education and W. Clayton Burch*

**Douglas P. Buffington, II, Esquire**
**Curtis R. Capehart, Esquire**
**David C. Tryon, Esquire**
WV ATTORNEY GENERAL'S
OFFICE
State Capitol Complex
Building 1, Room 26E
1900 Kanawha Boulevard East
Charleston, WV 25305-0220
*Counsel for Defendant The State of*
*West Virginia*

**Brandon Steele, Esquire**
**Joshua D. Brown, Esquire**
THE LAW OFFICES OF BRANDON S.
STEELE
3049 Robert C. Byrd Drive, Suite 100
Beckley, WV 25801
*Counsel for Defendant-Intervenor Lainey*
*Armistead*

**Jonathan Scruggs, Esquire**
**Roger G. Brooks, Esquire**
**Henry W. Frampton, IV, Esquire**
ALLIANCE DEFENDING FREEDOM
15100 N. 90th Street
Scottsdale, AZ 85260
*Counsel for Defendant-Intervenor*
*Lainey Armistead*

**Christina Holcomb, Esquire**
ALLIANCE DEFENDING FREEDOM
440 First Street NW, Suite 600
Washington, DC 20001
*Counsel for Defendant-Intervenor Lainey*
*Armistead*

**Rachel Csutoros, Esquire**
**Tyson Langhofer, Esquire**
ALLIANCE DEFENDING FREEDOM
44180 Riverside Parkway
Lansdowne, VA 20176
*Counsel for Defendant-Intervenor*
*Lainey Armistead*

**Travis Barham, Esquire**
ALLIANCE DEFENDING FREEDOM
1000 Hurricane Shoals Rd NE
STE D-1100
Lawrenceville GA 30043
*Counsel for Defendant-Intervenor Lainey*
*Armistead*

**Timothy D. Ducar, Esquire**
Law Offices of Timothy D. Ducar, PLC
7430 E. Butherus Drive, Suite E
Scottsdale, AZ 85260
*Counsel for Defendant-Intervenor*
*Lainey Armistead*

STEPTOE & JOHNSON PLLC
  Of Counsel

**/s/ Susan L. Deniker**
Susan L. Deniker          (WV ID #7992)
Jeffrey M. Cropp          (WV ID #8030)
400 White Oaks Boulevard
Bridgeport, WV 26330-4500
(304) 933-8000

*Counsel for Defendants Harrison County Board*
*of Education and Dora Stutler*

14740884