IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA
CHARLESTON DIVISION

B. P. J., by her next friend and mother,
HEATHER JACKSON,

       Plaintiff,

v.

WEST VIRGINIA STATE BOARD OF
EDUCATION, HARRISON COUNTY
BOARD OF EDUCATION, WEST VIRGINIA
SECONDARY SCHOOL ACTIVITIES
COMMISSION, W. CLAYTON BURCH, in
his official Capacity as State Superintendent,
DORA STUTLER, in her official capacity as
Harrison County Superintendent, and THE
STATE OF WEST VIRGINIA,

       Defendants.

and LAINEY ARMISTEAD,

       Intervenor Defendant.

CIVIL ACTION NO. 2:21-cv-00316
Judge Joseph R. Goodwin


**DEFENDANT STATE OF WEST VIRGINIA'S REPLY MEMORANDUM IN SUPPORT
OF MOTION FOR SUMMARY JUDGMENT**

# TABLE OF CONTENTS

TABLE OF CONTENTS ................................................................................................. i

TABLE OF AUTHORITIES ......................................................................................... ii

I.  Summary Of Plaintiff's Now Briefed Case ....................................................... 1

II.  Summary Reply to Pl. Memo. in Op. .............................................................. 2

III.  The State's Responses to Specific Criticisms ................................................ 4

The Need for Rules, Regulations and Laws ............................................................. 4

Background Materials .............................................................................................. 6

"Biological Sex" and *Grimm* .............................................................................. 8

The Statute's Definition of "Biological Sex" contemplates Sex Hormones ......... 11

Legislator and Other Statements ........................................................................... 11

Must Be Similarly Situated in All Relevant Respects .......................................... 11

Team Participation Based on Gender .................................................................... 12

B.P.J.'s "refusal to run with the boys team." ....................................................... 12

Denigration or Inferiority? .................................................................................... 13

*Hecox* and *Clark* ............................................................................................. 13

Title IX is an Important Governmental Interest for the Statute ............................ 14

B.P.J. Displaced Biological Girls .......................................................................... 14

Reproductive Biology and Genetics Trigger Testosterone Generation and Levels ............. 15

The State's Charts Demonstrate the Male Advantage ........................................... 15

Social Factors. ....................................................................................................... 16

Sweeping Bans of the Sports Organizations ......................................................... 16

B.P.J. May Run With Other Boys, Despite B.P.J.'s "refusal to run with the boys team[.]"  18

CONCLUSION ........................................................................................................ 20

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Billups v. City of Charleston,*
    S.C., 961 F.3d 673 (4th Cir. 2020)....................................................17

*Clark v. Arizona Interscholastic Association,*
    695 F.2d 1126 (9th Cir. 1982) ...............................................13, 14

*F.S. Royster Guano Co. v. Virginia,*
    253 U.S. 412 (1920)....................................................................12

*Grimm v. Gloucester Cnty. Sch. Bd.,*
    972 F.3d 586 (4th Cir. 2020) ...........................................9, 10

*Hecox v. Little,*
    479 F.Supp. 3d 930 (D. Idaho 2020) ...................................13

*i.e. N.C. State Conf. of NAACP v. McCrory,*
    831 F.3d 204 (4th Cir. 2016) ...............................................10

*Imaginary Images, Inc. v. Evans,*
    612 F.3d 736 (4th Cir. 2010) ...............................................17

*Lawrence v. Texas,*
    539 U.S. 575 (2003)....................................................................18

*Petrie v. Illinois High Sch. Ass'n,*
    75 Ill. App. 3d 980, 394 N.E.2d 855 (1979) ........................14

*Phillips v. Larry's Drive-In Pharmacy, Inc.,*
    220 W. Va. 484, 647 S.E.2d 920 (2007).................................11

*Rector v. Approved Fed. Sav. Bank,*
    265 F.3d 248 (4th Cir. 2001) .................................................4

*United States v. Virginia,*
    518 U.S. 515 (1996).................................................................2, 7

*Van Der Linde Hous., Inc. v. Rivanna Solid Waste Auth.,*
    507 F.3d 290 (4th Cir. 2007) .................................................12

*Vill. of Hoffman Ests. v. Flipside, Hoffman Ests., Inc.,*
    455 U.S. 489 (1982)....................................................................8

## TABLE OF AUTHORITIES
### (*continued*)

**Page(s)**

*Ways v. City of Lincoln*,
   331 F.3d 596 (8th Cir. 2003) ................................................................7

*Wilson v. Wal-Mart Stores, Inc.*,
   117 F.3d 1429 (10th Cir. 1997) ...........................................................3

**Statute**

W. Va. Code §18-2-25d(b)(1)..........................................................11, 15

**Regulation**

34 CFR § 106.41 ...................................................................................8

**Rules**

Fed. R. Evid. 101(b)(6) ..................................................................6, 19

Fed. R. Evid. 902(6)...................................................................6, 15, 19

Fed. R. Evid. 1006 .............................................................................15

**Other Authorities**

Caroline Kitchener, *An 11-year-old trans girl was barred from her school's cross-country team. She's suing,* THE LILY (June 2, 2021) ..............................19

E. Barrett Prettyman, Jr., *The Supreme Court's Use of Hypothetical Questions at Oral Argument*, 33 CATH. U. L. REV. 555, 591 (1984)..........................18

*Full stop*, CAMBRIDGE DICTIONARY...................................................15

*Girl*, CAMBRIDGE DICTIONARY ........................................................4

Katie Barns, *Young transgender athletes caught in middle of states' debates,* ESPN (Sept. 1, 2021)..........................................................................19

Lacie Pierson, *Lawsuit: Bridgeport girl says she can't run cross country because of transgender athlete ban,* CHARLESTON GAZETTE-MAIL (May 26, 2021)............................19

## I.  Summary Of Plaintiff's Now Briefed Case.

Plaintiff's case rests on the contention that B.P.J. is similarly situated to biological girls in *some* ways and therefore must be treated as a girl for *all* purposes.  Plaintiff asserts that, although B.P.J. was born as a male (Jackson Dep. at 98:14-99:3, ECF No. 285-2; Montano Dep. 98:23-99:11, ECF No. 305-2), B.P.J. is a "girl who is transgender."  Am. Compl at ¶30; *see also* Adkins Decl. at ¶ 30, ECF No. 289-23 (using this same terminology).  In more direct parlance, B.P.J. is a biological boy who identifies as a girl—and therefore is a transgender girl.

Plaintiff further contends that, because B.P.J. identifies as a girl based on numerous stereotypes about girls (i.e. hairstyles, clothing, makeup, etc.), B.P.J. is the same as biological girls for all purposes.  In fact, Plaintiff asserts that B.P.J. "is recognized as a girl in *every* aspect of her life."  Pl. Memo. in Op. at 2, ECF No. 331.  This sameness is a critical assertion underpinning much for Plaintiff's case.   However, it is less than completely accurate in a relevant sense.

B.P.J.'s doctors recognize that, medically, B.P.J. *is* different from girls.  Dr. Montano identified B.P.J. as a male in B.P.J.'s medical records, because "it is important to know what organs that person has."  Montano Dep. 98:23-99:11, ECF No. 305-2.  Dr. Montano confirmed that, unlike girls, B.P.J. cannot menstruate.  *Id.* at 153:12-15.  B.P.J. cannot lactate or bear children (Jackson Dep. 113:10-114:15, ECF No. 285-2) and must take hormones for life (Levine Decl. at ¶129, ECF No. 305-4) assuming that B.P.J. continues to have the "understanding" of being a female.  *See* Janssen Dep. at pp. 46-51, ECF No. 285-3 (asserting that a person's understanding of his or her gender "can change over time.").  B.P.J.'s weight and body mass is tracked on the male BMI chart.  Montano Dep. 118:10-121:4, ECF No. 305-2.  B.P.J. will always be different because B.P.J. will always have chromosomal and other medical differences and

medical issues as a transgender female as compared to biological females for the simple reason that Plaintiff's body is biologically male.

Recognizing these differences is necessary and appropriate in equal protection claims based on sex. The fact that B.P.J. identifies as a female and "refuse[s] to run with the boys team" (Pl. Memo. in Op. at 49, ECF No. 331) does not eliminate these "enduring" "physical differences between men and women." *United States v. Virginia*, 518 U.S. 515, 533 (1996) (cleaned up).

Biological male students should be treated with respect, kindness and consideration – no matter their gender identity. And those identifying as female should never be ridiculed or bullied. But just as it would be improper to medically treat biological males as though they were girls, it likewise would be improper to treat them as biological females for athletic considerations. Because sports, like medical care, are principally concerned with the body itself, not the gender identity of the person who inhabits it.

In B.P.J.'s case, the school treats B.P.J. as a girl with respect to issues raised in the Gender Support Plan. *See* State's MSJ Memo. at 5, ECF No. 287. B.P.J. has never alleged any discrimination at school and has been very happy with all at-school interactions. *See* Pl. Memo. in Sup. of SJ at 9-10, ECF No. 291; Jackson Dep. 230:7-266:14, ECF No. 285-2; and B.P.J. Dep. 124-142, ECF No. 305-1. For all purposes other than athletics, B.P.J. has been treated as a girl based on B.P.J.'s stated gender identity. *Id*. But, again, athletics is different.

## II.  Summary Reply to Pl. Memo. in Op.

Plaintiff's Consolidated Memorandum in Opposition to Defendants' Motions for Summary Judgement ("Pl. Memo. in Op."), ECF No. 331, contains multiple  misstatements of fact and law, misdirection, and straw man arguments. Plaintiff actually contests very few of the State's factual assertions. As such, these are uncontested facts. Plaintiff has allegedly "created

charts listing the [Defendants'] factual assertions" and "identifying the reasons why they are not properly the basis for summary judgment," Pl. Memo. in Op. at 3 n.1, ECF No. 331. and offers to file them. But that is the purpose of the Plaintiff's opposition brief. "[C]ounsel's unverified assertion in [Plaintiff's 60-page] memorandum opposing summary judgment does not comply with Rule 56(f) and results in a waiver." *Wilson v. Wal-Mart Stores, Inc.*, 117 F.3d 1429 (10th Cir. 1997). Therefore those factual assertions are uncontested and any objection thereto is waived.

Plaintiff commences with the speculation that H.B. 3293 is based on "unfounded fears," but provides no admissible evidence of such fears. Pl. Memo. in Op. at 1, ECF No. 331. This accusation is unwarranted. The statute is about athletic facts—facts on performance and safety which Plaintiff could not find a single expert to rebut. *See* State's Memorandum in Support of its Motion for Summary Judgment ("State's MSJ Memo.," ECF No. 287) and supporting expert reports.

In Plaintiff's Memo. in Op., Plaintiff uses semantics to confuse or distract from straightforward points in the State's MSJ Memo. (ECF No. 287).

For example, Plaintiff falsely asserts that H.B. 3293 "effectively" prohibits B.P.J. from participating in school sports. But Plaintiff openly admits that this is B.P.J.'s *choice*. Plaintiff explicitly states that B.P.J. has "clearly expressed her *desire* to run with the girls' team and *refusal* to run with the boys team[.]" Pl. Memo. in Op. at 49, ECF No. 331 (emphasis added). This is not the State's assertion; these are the Plaintiff's words. A child's *refusal* to do something allowed by law is not a legal or practical prohibition, and B.P.J.'s desire for a preferred outcome over another permitted outcome also is not a prohibition.

Plaintiff claims "B.P.J. is not 'demand[ing]' that participation in school sports be based purely on gender identity," Pl. Memo. in Op. at 2, ECF No. 331, but is instead "demanding that the State . . . justify its decision to bar her from participating on the girls' cross-country and track teams at her middle school based only on her status as a transgender girl." *Id*. Aside from the latter statement having more words than the former, they mean the same thing. B.P.J. is, in fact, is "*refus[ing]* to run with the boys team," Pl. Memo. in Op. at 49, ECF No. 331 (emphasis added), and is demanding to participate on the girls team.

The response brief seems to redefine "girl." Although Plaintiff's mother testified that B.P.J. was born a male, Plaintiff's Memo. in Op. insists without qualification that B.P.J. "is a girl." Pl. Memo. in Op. at 2, ECF No. 331. That can only be claimed by reconstituting the meaning of "girl" from the standard understanding of that solitary, unmodified noun ("a female child or young woman"[1]) into something different. While it may be suggested that words can mean exactly what the user wants them to mean, the real question is "whether you can make words mean so many different things."[2] Indeed, when words are so fluid as to mean whatever the speaker subjectively wants them to mean, they lose meaning and, thus, their utility. By contrast, the Legislature used historically well-established terms in regulating sports participation. H.B. 3293's definition of "female," "male," and biological sex," are consistent with history, biology and common parlance. *See infra*. at 9-11.

## III.  The State's Responses to Specific Criticisms.

<u>The Need for Rules, Regulations and Laws.</u>  Plaintiff continues to question the need for and propriety of regulating the participation rules in sports, particularly as affecting biological

---

[1] Girl, CAMBRIDGE DICTIONARY, https://dictionary.cambridge.org/us/dictionary/english/girl (last visited May 26, 2022).

[2] LEWIS CARROLL, THROUGH THE LOOKING–GLASS AND WHAT ALICE FOUND THERE 123 (The MacMillan Co. 1899) (1862) (cited by (among other courts) *Rector v. Approved Fed. Sav. Bank*, 265 F.3d 248, 255 (4th Cir. 2001)).

males in girls' and women's sports.  *See* Pl. Memo. in Op. at 4-6, ECF No. 331.  At the same

time, Plaintiff's own briefing repeatedly cites the International Olympic Committee, the NCAA,

the WVSCC, and other organizations that are issuing statements and policies on this very issue,

Pl. Statement of Uncontested Facts Memo. in Op. ("Pl. SUF") at ¶¶74-84, ECF No. 290[3], and

now policies and changes from organizations come out frequently.  The State has explained the

background showing that the issue has been percolating for nearly five decades.  State's MSJ

Memo. at 1-5, ECF No. 287.  All of this demonstrates that, not only was this a legitimate issue

for legislative attention, the attention is consistent with that coming from organizations and

governing bodies of sports.

   While Plaintiff incorrectly accuses the State of using hearsay in State's MSJ Memo.,

Plaintiff uses hearsay—that the Governor was unaware of "one example of a transgender child

trying to get an unfair advantage"—to suggest that this was an illegitimate topic for legislative

action.  Pl. Memo. in Op. at 5, ECF No. 331.  The Governor's statement is inadmissible as proof

of anything regarding the presence or absence of transgender children in West Virginia sports

and certainly is not legislative history.  *See* State's Memo. in Op. to Pl. MSJ ("State's Memo. in

Op.") at 18-19, ECF No. 305.

   Plaintiff also misrepresents Mr. Dolan's testimony.  As Plaintiff concedes, Mr. Dolan

testified that he once told a male student he could not play on the girls' volleyball team and the

student responded that he would 'be a girl,' after which point the student never followed up.

WVSSAC Dep. at 120:20-121:2, ECF No. 289-19.  Mr. Dolan also testified that he once heard

from a school that it "had one student who one day identified as a girl, next day a boy, and back

and forth," but the student never contacted WVSSAC. *Id.* at 121:3-121:6; *see also* Pl Memo. in

---

[3] The State contests the Pl. SUF.  *See* State's Resp. to Pl. SUF, ECF No. 330.

Op. at 5, ECF No. 331.  But then Plaintiff prevaricates and claims, without evidence, that these

were "casual inquiries," *id*., seemingly implying that these instances are irrelevant.  Even if they

were "casual inquiries," those inquiries demonstrate that this was and continues to be an issue for

schools, students, and even the Legislature.  These statements are not hearsay because—as

Plaintiff seems to tacitly acknowledge—they are not being offered to prove the truth of those

individuals' reported statements.  Instead, they substantiate that schools and the WVSSAC had

notice that there were inquires on this issue.  And even if the WVSSAC's "transgender policy"

was addressing a nationwide issue that "hadn't come to West Virginia," Pl. Memo. in Op. at 5-6,

ECF No. 331, that still confirms that it was an issue that received attention and some action back

in 2015.  Both WVSSAC and the Legislature's actions turned out to be prescient because, on

May 18, 2021, B.P.J. met with the local school and notified them of B.P.J.'s intent to participate

on the girls' cross country team.  *See* Mazza Dep. at 68:23-69:7, ECF No.305-6,  and Jackson

Dep. at 242:12-25113, ECF No. 285-2.

Background Materials.  Similarly, the news articles, blog posts, websites and other

sources cited in the Background section of the State's MSJ Memo. (State's MSJ Memo. at 1-5,

ECF No. 287) are not hearsay as they are not provided to prove the truth of all of their contents.

They are background; they are examples of the universe of items that gave the Legislature notice

of a national trend and a growing issue.  And the Legislature is not bound by the technicalities

and nuances of hearsay rules in moving forward with legislation.  Plaintiff does not contest that

these articles, posts, and websites exist or are genuine.[4]  Indeed, Plaintiff has cited many of these

same sources in briefs and has even submitted declarations confirming their existence.  *See* Pl.

SUF at ¶¶74-84, ECF No. 330.

---

[4] Plaintiff's do not contest the authenticity of these articles and newspapers and these documents are self-authenticating under FRE 902(6) and 101(b)(6).

More importantly, as the State has already briefed, the standard is whether the objective is "important" and "genuine," *Virginia*, 518 U.S. at 533 (cleaned up).  The Legislature is entitled to anticipate problems based on what it observes, within not only the State but elsewhere.  *Ways v. City of Lincoln,* 331 F.3d 596, 600 (8th Cir. 2003); se*e generally* State's Memo. in Op. at 13, 17-18, ECF No. 305.

Plaintiff then provides additional background supporting the State's position that the Legislature was not addressing an imagined issue unnecessary to consider when Plaintiff noted that UK Sport (in one of its materials) "was not 'giving definitive advice' because [t]his is a complex area."  Pl. Memo. in Op. at 8, ECF No. 331.  Further, Plaintiff affirms that both the International Amateur Athletic Federation and the International Olympic Committee have recognized that this was an issue nationally and internationally since at least 1990.  *Id.* at 9.  Those organizations have changed policies over time and cannot all agree on what solution is proper even now.  *See* State's MSJ Memo. at 3-4, ECF No. 287.[5]  Plaintiff also affirms that the International Quidditch Association (the "IQA") found the need to promulgate rules on this issue and now allows players to participate as their gender of choice (i.e. male or female) which they can change at any time (except during a game).[6]  *Id.*  So, instead of somehow undermining the State's position, Plaintiff has confirmed that this issue has been before schools, sports organizations, and government organizations for many years.  It should surprise no one that West Virginia decided to address this in 2021.  Moreover, the differing policies by the various sports organizations again emphasizes that there is no consensus on the correct policy, which again validates that West Virginia's policy does not violate the Equal Protection Clause.

---

[5] The State notes that the reference to U.S. Rugby in the State's MSJ Memo. at 3, ECF No. 287 should have referenced World Rugby.  Plaintiff helpfully notes that U.S. Rugby has adopted a different policy than World Rugby.  See Pl. Memo. in Op. at 8, ECF No. 331.

[6] The State agrees with Plaintiff that the IQA does not have sex segregated teams.

"Biological Sex" and *Grimm.*  It is, of course, important that statutes have clear definitions so that all affected parties be aware of the statute's impacts.  Otherwise, the statute might be void for vagueness.  *See, e.g., Vill. of Hoffman Ests. v. Flipside, Hoffman Ests., Inc.*, 455 U.S. 489, 499 (1982) (the Constitution demands enough clarity to not "inhibit the exercise of constitutionally protected rights").  A good definition is always "outcome-driven" in the sense that it tells the regulated parties what outcome the Legislature was trying to achieve in passing the given law.  Accordingly, H.B. 3293's definition is rather direct and elementary. Nevertheless, Plaintiff critiques the statute's definition of "biological sex," to which it refers as "carefully crafted," as operating to exclude transgender girls from female teams and being "outcome-driven."  Pl. Memo. in Op. at 27, ECF No. 331.

Among other of Plaintiff's mis-directions is to misstate the statute's operative provision based on the term "biological sex" to say it is a prohibition against transgender girls.  In fact, Plaintiff's response brief attacks H.B. 3293 as a "categorical" exclusion, bar, or ban approximately 20 times with varying phraseology.  *See e.g.* Pl. Memo. in Op. at 1, 2, 4, 7, ECF No. 331.  It does not categorically address transgender females or any gender identity in any way; it ignores gender identity and speaks in terms of "sex."  What the statute *does* categorically prohibit is biological males—all biological males—from competing against biological females in female sports.  It is very direct and honest about that and the concern that males, as having physical competitive advantages compared to females, should not be in the protected space of female sports.  This is the same concern that led to the Title IX regulations regarding sex-separated teams.  *See* 34 CFR § 106.41.

8

The Plaintiff misstates the statute to imply that the Legislature is biased against transgender females while ignoring the three valid and important governmental interests underlying the statute. *See generally* State's MSJ Memo. at 11-17, ECF No. 287, and State's Memo. in Op. at 20-24, ECF No. 305.  If the Legislature harbored animus against transgender females, it strains logic and credulity to suggest that this animus would not extend to transgender males, as well, in which event the Legislature would enact laws that "categorically" affect both transgender males and females.  The statute is not an assault motivated by animus against the category of transgender persons—if it was, it fails in thatit (i) ignores gender identity classifications entirely, and (ii) does not prevent females (inclusive of those females identifying as male, i.e. transgender males) that desire to engage in competition with and against males from trying out for male teams (where otherwise appropriate).  In any event, the State has already extensively rebutted the claim of animus.  *See* State Memo. in Op. at 18-20, ECF No. 305.  In truth, H.B. 3293 reflects the relevant concern, i.e. the physical competitive imbalances of men over women and attendant concerns, and is carefully crafted to prevent that eventuality from depriving females of athletic opportunities in female sports.

Regardless, Plaintiff bases much of its argument on isolated statements in *Grimm v. Gloucester Cnty*. Sch. Bd., 972 F.3d 586, 621 (4th Cir. 2020), *as amended* Aug. 28, 2020, *cert. denied*, 141 S. Ct. 2878 (2021).  In support of Plaintiff's disapproval of the statute's definition of "biological sex," Plaintiff's Memorandum purportedly cites to a singular judge's view of the term.  Pl. Memo. in Op. at 27, ECF No. 331 (citing *Grimm*, 972 F.3d at 621 (Wynn, J., concurring)).  There are two problems with this.

*First*, Plaintiff repeatedly cites Judge Wynn as though his concurrence is controlling.  It is not.  Judge Wynn was alone in his concurrence.  He could not convince either the author of the

majority or the dissent to go along with his solitary commentary.  Judge Wynn's dicta has the same weight as the dissent—that is none.

*Second*, and more importantly, in *Grimm*, the term that was the subject of discussion and analysis was *not* "biological sex"—it was "biological gender."  Judge Wynn explained: "the Board seemingly created the concept of 'biological gender' *sua sponte*," (*Grimm*, 972 F.3d at 621), as opposed to "biological sex."  The Judge explained that "'biological gender,' on its face, conflates two medical concepts: a person's biological sex (a set of physical traits) and gender (a deeply held sense of self)."  *Id*.  Thus, Judge Wynn was not even commenting on the term "biological sex" except to say that it consists of (as the statute's definition contemplates) "physical traits."[7]

The dissent, with the same number of judges as the concurrence, points out "Title IX was enacted in 1972, and its implementing regulations were promulgated shortly thereafter. And during that period of time, virtually every dictionary definition of 'sex' referred to the physiological distinctions between males and females—particularly with respect to their reproductive functions."  *Grimm*, 972 F.3d at 632 (Neimeyer, J., dissenting).  The majority had no response to this.

Plaintiff also incorrectly suggests that *Grimm* "made clear that preventing girls who are transgender from participating in the *same activities* as other girls" constitutes improper discrimination.  *Id*. at 31 (emphasis added).  *Grimm* said no such thing – it was limited to a bathroom privacy issue, *not* all activities.

_____

[7] Oddly, Plaintiff tries to bolster Judge Wynn's concurrence with a reference to an irrelevant voting rights case involving race discrimination, *i.e. N.C. State Conf. of NAACP v. McCrory*, 831 F.3d 204 (4th Cir. 2016).  The analysis here is very different from that in voting rights cases and race discrimination cases.

The Statute's Definition of "Biological Sex" contemplates Sex Hormones.  Plaintiff complains that Section 25d's definition of biological sex uses "reproductive biology and genetics at birth," W. Va. Code §18-2-25d(b)(1), and that this definition "forbids consideration of sex hormones."  Pl. Memo. in Op. at 29, ECF No. 331.[8]  This ignores that which is common knowledge, namely that an individual's hormonal secretions are determined by that person's "reproductive biology and genetics at birth."  Male testes secrete testosterone and female ovaries secrete estrogen and progesterone.  And that is why doctors rely on the birth sex to determine which cross-sex hormones to prescribe for transgender people. Adkins Dep. at 55:4-56:15, ECF No. 285-4.  And this dictates that males who later in life identify as females are given puberty blockers and female hormones.  While the Legislature could have adopted a broader or different definition, there is nothing deficient about the Legislature's chosen definition.

Legislator and Other Statements.  Plaintiff continues to improperly cite individual legislators and Melissa White for legislative history.  Pl. Memo. in Op. at 30, ECF No. 331. Individual legislator statements are not legislative history, and the West Virginia Supreme Court of Appeals has generally rejected them for determining legislative intent in this context.  *Phillips v. Larry's Drive-In Pharmacy, Inc*., 220 W. Va. 484, 489, 647 S.E.2d 920 (2007); *see generally* State's Memo. in Op. at 17-18, ECF No. 287.  The legislative history for H.B. 3293 is limited to the various versions of the statute.  *Id*.  Further, Plaintiff never deposed these persons, thus their out-of-court and not-under-oath statements are hearsay.

Must Be Similarly Situated in All Relevant Respects.  After full discovery (including B.P.J.'s medical records, B.P.J.'s doctors' depositions, expert reports, and expert depositions), it has become clear that B.P.J. identifies as a female based on cultural stereotypes.  For some

---

[8] Notably, both Title IX and its implementing regulations use the term "sex" and neither one "consider[s]" sex hormones as part of the statute or the regulations.

purposes, B.P.J. may be similarly situated to girls, but not for athletic purposes.  *See* State's

Memo. in Op. at 8-10, ECF No. 305; *see generally* Brown Decl., ECF No. 285-7, and Carlson

Decl., ECF No. 285-5.  Indeed, to be similarly situated to girls for athletic purposes, B.P.J. must

be "similar in *all aspects relevant to attaining the legitimate objectives of legislation*."  *Van Der*

*Linde Hous., Inc. v. Rivanna Solid Waste Auth.,* 507 F.3d 290, 293 (4th Cir. 2007) (citing *F.S.*

*Royster Guano Co. v. Virginia*, 253 U.S. 412, 415 (1920) (emphasis added).  B.P.J. does not

meet that test.

> <u>Team Participation Based on Gender.</u>  The State proposed the following reasonable

question:

> Plaintiff's position that a student-athlete be permitted to participate on a team consistent
> with the athlete's gender identity rather than biological sex would be impossible given
> this array of [at least 27] gender identities.  On which team would biological male
> athletes identifying as non-binary, bi-gender, agender, nongender, gray gender, etc.
> participate?  Is it whichever team that athlete chooses at any particular time?

State's MSJ Memo. at 7, ECF No. 287.  Plaintiff did not answer—because Plaintiff cannot

answer.  Instead Plaintiff engages in mis-direction, claiming that reference to the various

numerous genders is derisive.  It is not—B.P.J.'s doctor, Dr. Kidd, is the one who (rather

confidently) claimed the ability to count perhaps as many as 100 genders.  Kidd Dep. at 63:13-

64:4, ECF No. 285-9.  So the question remains.  And the question itself demonstrates the wisdom

of H.B. 3293's approach to separate sports based on biological sex rather than a gender identity

as Plaintiff would have it.

> <u>B.P.J.'s "refusal to run with the boys team."</u>  Plaintiff repeats again that "[i]f B.P.J.

cannot participate on the girls' team, she cannot participate at all."  Pl. Memo. in Op. at 33 n.12,

ECF No. 331.  At the risk of repeating an earlier point, this it is not true.  What is true is

Plaintiff's explicit concession that B.P.J. has "clearly expressed her *desire* to run with the girls'

team and *refusal* to run with the boys team[.]"  Pl. Memo. in Op. at 49, ECF No. 331 (emphasis added).  B.P.J.'s refusal does not preclude participation "at all."

Denigration or Inferiority?  Plaintiff appears to suggest that that the State is using the statute "for denigration" of women or to perpetuate "inferiority" of women.  Pl. Memo. in Op. at 36-37, ECF 331.  In fact, there is no supporting evidence for such accusations here.  There is no admissible evidence that that the Legislature enacted the statute to denigrate either women or people who identify as transgender.  And there is no evidence that the Legislature acted to perpetuate any unsuggested inferiority of male athletes who identify as females.  To the contrary, H.B. 3293 recognizes that biological males, including those who identify as females (i.e. transgender females), have advantages relative to biological females *in the athletic context*, which is the only relevant context of the statute.  *See generally* State's Memo. in Op. at 18-20, ECF No. 331.  And so H.B 3293 in fact helps and promotes female sports.

*Hecox* and *Clark.*  Plaintiff relies heavily on another questionable legal source—a single district court case in Idaho, *Hecox v. Little*, 479 F.Supp. 3d 930 (D. Idaho 2020)—while denigrating *Clark v. Arizona Interscholastic Association*, 695 F.2d 1126 (9th Cir. 1982).  Even *Hecox* recognizes that this "involves complex issues."  479 F.Supp.3d at 943.  And *Hecox* is far from resolution as it awaits further action by the 9th Circuit in an appeal filed September 17, 2020.

By contrast, the 9th Circuit was very clear that, "due to average physiological differences, males would displace females to a substantial extent if they were allowed to compete" against girls.  *Clark*, 695 F.2d at 1131.  The Court of Appeals further recognized "there is no question that the Supreme Court allows for these average real differences between the sexes to be

13

recognized or that they allow gender to be used as a proxy in this sense if it is an accurate proxy." *Id.*

Further, Plaintiff's suggestion that sports could be segregated based on other characteristics has been dismissed as "too difficult to devise" and "could only be done on a very subjective basis and would not be practical." *Petrie v. Illinois High Sch. Ass'n*, 75 Ill. App. 3d 980, 988, 394 N.E.2d 855, 862 (1979).

Title IX is an Important Governmental Interest for the Statute. Contrary to Plaintiff's puzzling comment that the State does not argue in its summary judgement motion that Title IX is an important governmental interest supporting H.B. 3293, Pl. Memo. in Op. at 38 n.16, ECF No. 331, the State explained that Section 25d(c)(2) "reflects 34 CFR § 106.41(b), which explicitly allows entities subject to Title IX to 'operate or sponsor separate teams for members of each sex where selection for such teams is based upon *competitive skill* or the activity involved is *a contact sport*.' (emphasis added)." State's MSJ Memo. at 7, ECF No. 287. And "[Section 25d] serves the important governmental objectives long recognized by many international athletic organizations, the SSAC, and Title IX (*see* 34 CFR § 106.41)[.]" *Id.* at 11. Finally, "the law strengthens the goals of Title IX in West Virginia." *Id.* at 23; *see also generally id.* at 22-28. Thus, in short, the State did argue that furthering Title IX is an important governmental interest supporting H.B. 3293.

B.P.J. Displaced Biological Girls. Plaintiff's claim that B.P.J. has not displaced any female athletes has been debunked. *See* State's MSJ Memo. at 21-22, ECF No. 287, and State's Memo. in Op. at 27, ECF No.305. Plaintiff's only response is that B.P.J.'s displacement of others is not a "substantial displacement." Pl. Memo. in Op. at 39, ECF No. 331. On the contrary, it is a substantial displacement for the girls whom B.P.J. displaces. The statute is there

to protect all biological females—not just a substantial percentage—and the State need not prove that all, or even a substantial number of females have been or will be displaced by B.P.J. or other biological males (or the degree of displacement) in order to justify the statute.  Neither Title IX nor the Equal Protection Clause suggests that such is the test.  Plaintiff has no law to support this novel proposition.[9]

Reproductive Biology and Genetics Trigger Testosterone Generation and Levels.  It is fair to say that the presence of certain reproductive organs in a person's body does not, by itself, necessarily affect athletic performance, particularly because doctors now can remove such organs and add others (or a semblance thereof).  But, the existence of a child's "reproductive biology and genetics," *see* W. Va. Code §18-2-25d(b)(1), at birth indicates the very thing that Plaintiff insists (Pl. Memo. in Op. at 40, ECF No. 331) is so important—testosterone.  To state common knowledge, biological boys produce a lot more of it than biological girls do – as every expert in this case has recognized.  The difference starts even before puberty and increases drastically during puberty.  And the proof is in the pudding.  The data show that boys excel over girls athletically in nearly every category at nearly every age.  *See* State's Memo. in Op. at 9, 10, 21, ECF No. 305; Brown Decl. at ¶68, ECF No. 285-7; and Carlson Decl. at ¶49, ECF 285-5.

The State's Charts Demonstrate the Male Advantage.  There is no authentication problem with the State's Exhibit H charts and graphs. Pl. Memo. in Op. at 42, ECF No. 331.  These demonstrative aids are based on the data in the studies cited therein.  Further, Dr. Brown cites those studies in his expert report and they are self-authenticating under FRE Rule 902(6).  *See* Fed. R. Evid. 902(6); *see also Id.* at Rule 1006 (Summaries to Prove Content).  Moreover, they

---

[9] Use of the term "full stop" seems a near-concession that Plaintiff's "substantial displacement" line of argument cannot withstand continued examination.   *See full stop*, CAMBRIDGE DICTIONARY, https://dictionary.cambridge.org/us/dictionary/english/full-stop (last visited 5/26/2022) (Full stop "used at the end of a sentence, usually when you are angry, to say you will not continue to discuss a subject.").

accurately show the advantage biological male athletes have over female athletes.  Contrary to

Plaintiff's intimation that "modest" performance differences between pre-pubertal males and pre-

pubertal females is inconsequential, even a passing familiarity with sports informs that any

performance differences—minor, modest, or mediocre—can translate into significant differences

in results, especially in foot races such as Plaintiff's chosen disciplines.  *See* Brown Decl. at

¶¶71-113, ECF No. 285-7. Indeed, "in track the differences between first and second place" is

"often 0.5 – 0.7%." *Id.* at ¶35.

Social Factors.  Plaintiff hypothesizes that the observed advantages illustrated by the

State's Exhibit H might be caused by social factors.  Plaintiff has no evidence to support this—it

is pure speculation.  More importantly, it does not matter whether these male advantages are

caused by biological factors or social factors.  The critical take-away is that the advantage

exists—it is real—and the data shows that the Legislature had an important reason to pass this

law to protect women's sports, protect women's safety, and to preserve the objectives of Title IX

in West Virginia.

Sweeping Bans of the Sports Organizations.  Plaintiff characterizes H.B.3293 as a

"sweeping ban" in multiple spots.  *See e.g.* Pl. Memo. in Op. at 43, ECF No. 331.  Yet, shortly

before or after these mentions, Plaintiff seems to praise the sweeping policies imposed by

various sports organizations. *See, e.g., id.*  Interestingly, those organizations' policies frequently

categorically ban any and all transgender female athletes from participating in female sports until

they meet certain criteria – which criteria may keep transgender women from participating on

women's teams for years (and which have changed over time).  *See, e.g.,* policy changes noted

by both Plaintiff and Defendants by the National College Athletic Association, the International

Olympic Committee and the International Athletic Federation; *see* Pl. Memo. in Op. at 9, ECF

No. 331.  Even more puzzling, if the different sports have different rules (which they do), a transgender female athlete may have to participate as a female in one sport, but then the next day, week or month, participate as a male in another sport.  Such is the reality of the varying approaches to contending with the complexities of this issue.  But even if Plaintiff prefers that odd arrangement, that preference (and the patchwork of different approaches extant in the world) does not demonstrate that HB 3293 violates the Equal Protection Clause.

Plaintiff falsely claims that "no Defendant refutes" that "protecting women's safety" is a "*post hoc* rationalization."  Pl. Memo. in Op. at 44, ECF No. 331.  First, that is not the standard for a legitimate governmental interest and, second, the State contests this.  *See* State's Memo. in Op. at 16-18, ECF No. 306.  But Plaintiff is right that the safety justification applies to contact sports more than to non-contact/non-collision competitive sports.  And it is an important one.  Just because there have not been enough transgender females participating in female contact sports to result in study-supporting injuries and statistics does not invalidate the scientific analysis performed by Dr. Carlson.  It is telling that Plaintiff has been unable to find a single sports safety expert to counter Dr. Carlson's carefully researched and documented expert report.  To distract from this, Plaintiff seeks to mischaracterize Dr. Carlson's hard science as "uninformed speculation and guesswork."  Pl. Memo. in Op. at 46, ECF No. 331.  With no expert to counter Dr. Carlson, the only speculation presented here is in Plaintiff's briefing.   And, as the State already explained, the Legislature could rely on common sense, *Billups v. City of Charleston*, S.C., 961 F.3d 673, 685 (4th Cir. 2020), and "may also rely on the experiences of other jurisdictions and on findings expressed in other cases," *Imaginary Images, Inc. v. Evans*, 612 F.3d 736, 742 (4th Cir. 2010).  *See generally* State's MSJ Memo. at 5, 17-21, ECF No. 287.

Finally on this issue, even if no West Virginia athlete had raised the issue before H.B. 3293's enactment (which in fact had happened),[10] that does not mean that the Legislature cannot or should not address it.  In fact, federal courts consider as-yet-unseen scenarios with frequency, even with purely hypothetical questions.  *See* E. Barrett Prettyman, Jr., *The Supreme Court's Use of Hypothetical Questions at Oral Argument*, 33 CATH. U. L. REV. 555, 591 (1984).  If courts can look to hypotheticals to address legal questions, certainly the West Virginia Legislature can look to anticipated problems, informed by what is happening in the country (and beyond) to anticipate and address those issues.

B.P.J. May Run With Other Boys, Despite B.P.J.'s "refusal to run with the boys team[.]" Plaintiff repeats Heather Jackson's speculation and false dichotomy that forcing B.P.J. to participate on a boys' team would be harmful to B.P.J.  Pl. Memo. in Op. at 48, ECF No. 331.  No one, least of all the State or other Defendants, is forcing B.P.J. to do anything.  In fact, Plaintiff admits that B.P.J. is not forced to run on the boys' team but rather that B.P.J. has "clearly expressed her *desire* to run with the girls' team and *refusal* to run with the boys team[.]" Pl. Memo. in Op. at 49, ECF No. 331 (emphasis added).  B.P.J.'s personal desires and refusals do not trigger a violation of either the Equal Protection Clause or Title IX.

B.P.J. Has Not Faced Discriminatory Treatment at School.  Finally, Plaintiff invokes *Lawrence v. Texas*, 539 U.S. 575 (2003) and the threat of a "Scarlet T."  Pl. Memo. In Op. at 49, ECF No. 331.  H.B. 3293 says nothing about sodomy or sexual relations; those things remain personal and unregulated.  And the statute does nothing to "further discrimination against B.P.J. or others."  *Id.*  As has been discussed here and elsewhere, including in Plaintiff's filings, B.P.J.

---

[10] As mentioned above, volleyball is a contact sport and at least one male student athlete has already considered a female gender identity and inquired about participating on the female team, not entirely unlike the Plaintiff in *Clark*. *See supra* at 5.

has been supported in the community and school as a "transgender girl" and had overwhelmingly positive experiences. *See Supra* at 3; Jackson Dep. 230:7-266:14, ECF No. 285-2; and Memo. of Harrison Cnty. Sch. Bd. at 3-4, ECF No. 278.  There is absolutely no evidence that B.P.J. has suffered, or will suffer some "Scarlet T"—quite the contrary, based on the record here.  Nor is there any evidence here that any transgender person in West Virginia has suffered from such discrimination.  This argument is built on speculation that there is general societal phobia of or animosity towards transgender persons and transgender female athletes in West Virginia—and that discrimination is certain and unavoidable.  This is not evidence; it is fearmongering that ignores the only evidence in this case of how a transgender girl has actually been treated.

The reality is the opposite outside the Plaintiff's locale, as well.  The media has only said positive things about B.P.J. and B.P.J.'s efforts to compete as a girl. [11] [12]

\* \* \*

There is little doubt that there are many stakeholders in this issue.  There is no doubt that the issue was debated by the Legislature.  And there can be no reasonable doubt but there are three strong and important governmental interests in play here.  The performance data and the safety data confirm the validity of the governmental interests and that the statutory classification is substantially related to the governmental objectives.

---

[11] *See, e.g.,* Caroline Kitchener, *An 11-year-old trans girl was barred from her school's cross-country team. She's suing,* THE LILY (June 2, 2021), https://www.thelily.com/an-11-year-old-trans-girl-was-barred-from-her-schools-cross-country-team-shes-suing/; Lacie Pierson, *Lawsuit: Bridgeport girl says she can't run cross country because of transgender athlete ban*, CHARLESTON GAZETTE-MAIL (May 26, 2021),
https://www.wvgazettemail.com/news/legal_affairs/lawsuit-bridgeport-girl-says-she-cant-run-cross-country-because-of-transgender-athlete-ban/article_d8da17a0-a573-52ac-b788-d157b26bb0fa.html; Katie Barns, *Young transgender athletes caught in middle of states' debates,* ESPN (Sept. 1, 2021),
https://www.espn.com/espn/story/_/id/32115820/young-transgender-athletes-caught-middle-states-debates.
[12] The Court can take judicial notice of these articles and take note that they are self-authenticating.  FRE 902(6) and 101(b)(6).  They are noted to show the media treatment of B.P.J., not the truthfulness of their respective contents. Consequently, they present no hearsay issue.

## CONCLUSION

The State of West Virginia respectfully asks that this Court grant the State's Motion for

Summary Judgment and dismiss all of Plaintiff's claims and confirm that H.B. 3293 is valid.

Respectfully submitted,

PATRICK MORRISEY
  *West Virginia Attorney General*

/s/ *Curtis R. A. Capehart*
Douglas P. Buffington II (WV Bar # 8157)
  *Chief Deputy Attorney General*
Curtis R.A. Capehart (WV Bar # 9876)
  *Deputy Attorney General*
David C. Tryon (WV Bar #14145)
  *Deputy Solicitor General*
OFFICE OF THE WEST VIRGINIA ATTORNEY
GENERAL
State Capitol Complex
1900 Kanawha Blvd. E, Building 1, Room E-26
Charleston, WV 25305-0220
Telephone: (304) 558-2021
Facsimile: (304) 558-0140
Email:  David.C.Tryon@wvago.gov

*Counsel for Plaintiff, STATE OF WEST VIRGINIA*

DATE: May 26, 2022

20

**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA
CHARLESTON DIVISION**

**B. P. J., by her next friend and mother,
HEATHER JACKSON,**

     **Plaintiff,**

**v.**

**WEST VIRGINIA STATE BOARD OF
EDUCATION, HARRISON COUNTY
BOARD OF EDUCATION, WEST
VIRGINIA SECONDARY SCHOOL
ACTIVITIES COMMISSION,
W. CLAYTON BURCH, in his official
Capacity as State Superintendent, DORA
STUTLER, in her official capacity as
Harrison County Superintendent, and
THE STATE OF WEST VIRGINIA,**

     **Defendants.**

**and LAINEY ARMISTEAD,**

     **Intervenor Defendant.**

**CIVIL ACTION NO. 2:21-cv-00316
Judge Joseph R. Goodwin**

## CERTIFICATE OF SERVICE

I hereby certify that, on this 26th day of May, 2022, I electronically filed the foregoing with the Clerk of Court and all parties using the CM/ECF System.

*/s/ Curtis R. A. Capehart*
Curtis R. A. Capehart

21