IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA
CHARLESTON DIVISION

B.P.J., by her next friend and mother, HEATHER JACKSON,

*Plaintiff,*

v.

WEST VIRGINIA STATE BOARD OF EDUCA-TION, HARRISON COUNTY BOARD OF ED-UCATION, WEST VIRGINIA SECONDARY SCHOOL ACTIVITIES COMMISSION, W. CLAYTON BURCH in his official capacity as State Superintendent, DORA STUTLER in her official capacity as Harrison County Superin-tendent, and THE STATE OF WEST VIR-GINIA,

*Defendants,*

and

LAINEY ARMISTEAD,

*Defendant-Intervenor.*

Case No. 2:21-cv-00316

Hon. Joseph R. Goodwin

DEFENDANT-INTERVENOR & THE STATE OF WEST VIRGINIA'S
MEMORANDUM IN RESPONSE
TO PLAINTIFF'S MOTION TO EXCLUDE THE EXPERT TESTIMONY OF
DR. JAMES M. CANTOR

## TABLE OF CONTENTS

TABLE OF AUTHORITIES ................................................................................................. iv

INTRODUCTION ............................................................................................................. 1

GOVERNING LEGAL STANDARDS .................................................................................. 1

ARGUMENT .................................................................................................................... 2

I.    Dr. Cantor is strongly qualified to provide expert testimony. ..................... 2

    A.    Dr. Cantor's professional qualifications and publication record are strong and on-point. ....................................................................... 2

    B.    Rule 702 does not require narrow specialization. .............................. 6

    C.    The fact that Dr. Cantor is not offering certain opinions in no way undercuts his qualification to offer the opinions he is offering. .......... 8

    D.    Dr. Cantor has provided expert testimony on gender dysphoria, including in children, and has never been excluded as unqualified. .... 8

II.    B.P.J.'s criticisms of Dr. Cantor's methodology are without merit. ........... 9

    A.    B.P.J.'s objection that some of Dr. Cantor's opinions "contradict" the Fourth Circuit's findings in *Grimm* are no basis for exclusion. ... 9

    B.    B.P.J.'s objection that Dr. Cantor's opinions contradict "widely accepted" beliefs is no basis for exclusion. ....................................... 11

    C.    Dr. Cantor's extensive citation to peer-reviewed scientific literature is appropriate, strengthening the reliability of his opinions. ........................................................................................... 12

    D.    Dr. Cantor's opinions are reliable because he accounts for contrary scientific literature. ........................................................... 13

III.    Defendants agree with much of B.P.J.'s relevance objection—but only if applied consistently to all parties and experts. ......................................... 13

    A.    Dr. Cantor's proffered testimony responds to and rebuts assertions and evidence introduced by B.P.J. and B.P.J.'s experts. ................................................................................. 13

    B.    If B.P.J.'s contentions and evidence concerning gender dysphoria, gender identity, treatment alternatives, and their outcomes are admitted, then Dr. Cantor's evidence is admissible. ....................... 17

IV.    B.P.J.'s miscellaneous criticisms of Dr. Cantor's evidence are without merit and do not negate its relevance or reliability. .................................. 19

    A.    Dr. Cantor's references to private communications and media reports are appropriate and permissible. ......................................... 19

B.     Dr. Cantor's evidence concerning desistence rates among children with gender dysphoria is well grounded. ........................................... 20

C.     B.P.J. offers no basis for excluding Dr. Cantor's opinions as to what contributes to a person's gender dysphoria. ........................... 21

D.     Any divergence between Dr. Levine and Dr. Cantor is no grounds for excluding either. ......................................................................... 21

E.     B.P.J.'s contention that only a member of a professional association can analyze its policy statements is baseless. .............. 22

V.     Dr. Cantor's testimony easily passes Rule 403's balancing test. ............... 22

CONCLUSION ............................................................................................................ 23

CERTIFICATE OF SERVICE ....................................................................................... 25

## TABLE OF AUTHORITIES

**Cases**

*Clark v. Edison,*
    881 F. Supp. 2d 192 (D. Mass. 2012) ................................................................ 7

*Daubert v. Merrell Dow Pharms., Inc.,*
    509 U.S. 579 (1993) ....................................................... 2, 11, 12, 17

*Eghnayem v. Bos. Scientific Corp.,*
    57 F. Supp. 3d 658 (S.D. W.Va. 2014) ...................................... 2, 8, 11, 12, 13

*Foster v. Sakhai,*
    210 W. Va. 716 (2001) ............................................................................ 7

*Gen. Elec. Co. v. Joiner,*
    522 U.S. 136 (1997) ............................................................................. 12

*Grimm v. Gloucester Cnty. Sch. Bd.,*
    400 F. Supp. 3d 444 (E.D. Va. 2019) ............................................... 10

*Grimm v. Gloucester Cnty. Sch. Bd.,*
    972 F.3d 586 (4th Cir. 2020) ........................................................ 9, 10

*Hartke v. McKelway,*
    526 F. Supp. 97 (D.D.C. 1981) .......................................................... 6

*Huskey v. Ethicon, Inc.,*
    29 F. Supp. 3d 691 (S.D. W.Va. 2014) ................................... 7, 8, 9, 11, 17, 22

*Hysell v. Raleigh Gen. Hosp.,*
    2020 WL 3130423 (S.D. W.Va. Jun. 12, 2020) ................................. 7

*In re C.R. Bard, Inc.,*
    948 F. Supp. 2d 589 (S.D. W.Va. 2013) ....................................... 5, 15

*In re Heparin Prods. Liabl. Litig.,*
    803 F. Supp. 2d 712 (S.D. Ohio 2011) ............................................ 17

*In re Lipitor (Atorvastatin Calcium) Mktg. Sales Pracs. &*
    *Prods.' Liab. Litig. (No. II) MDL 2502,*
    892 F.3d 624 (4th Cir. 2018) ................................... 1, 2, 9, 13, 21, 22

*Knight v. Boehringer Ingelheim Pharms., Inc.,*
    323 F. Supp. 3d 809 (S.D. W.Va. 2018) .............................. 9, 12, 13

*Kolbe v. O'Malley,*
    42 F. Supp. 3d 768 (D. Md. 2014) ...................................... 12, 19, 20

*Kopf v. Skyrm,*
    993 F.2d 374 (4th Cir. 1993) ............................................ 2, 11, 17, 22

*Kovari v. Brevard Extraditions, LLC,*
    461 F. Supp. 3d 353 (W.D. Va. 2020) ............................................................. 11

*Kumho Tire Co. v. Carmichael,*
    526 U.S. 137 (1999) ........................................................................................ 22

*Lebron v. Sec'y of Fla. Dep't of Child. & Fams.,*
    772 F.3d 1352 (11th Cir. 2014) ....................................................................... 6

*Martinez v. Sakurai Graphic Sys. Corp.,*
    2007 WL 2570362 (N.D. Ill. Aug. 30, 2007) ................................................... 6

*McReynolds v. Sodexho Marriott Servs., Inc.*
    349 F. Supp. 2d 30 (D.D.C. 2004) ................................................................. 21

*Md. Cas. Co. v. Therm-O-Disc., Inc.,*
    137 F.3d 780 (4th Cir. 1998) ........................................................................... 2

*Mitchell v. United States,*
    141 F.3d 8 (1st Cir. 1998) ............................................................................... 7

*O'Conner v. Commonwealth Edison Co.,*
    807 F. Supp. 1376 (C.D. Ill. 1992) ................................................................. 6

*Otto v. City of Boca Raton,*
    981 F.3d 854 (11th Cir. 2020) ....................................................................... 12

*Payton v. Abbott Labs,*
    780 F.2d 147 (1st Cir. 1985) ........................................................................... 7

*Sanchez v. Bos. Scientific Corp.,*
    2014 WL 4851989 (S.D. W.Va. Sept. 29, 2014) ........................................ 8, 21

*Shirt v. Hazeltime,*
    461 F.3d 1011 (8th Cir. 2006) ....................................................................... 10

*State v. Leep,*
    212 W. Va. 57 (2002) ...................................................................................... 7

*Thomas J. Kline, Inc. v. Lorillard, Inc.,*
    878 F.2d 791 (4th Cir. 1989) ....................................................................... 2, 7

*United States v. Moreland,*
    437 F.3d 424 (4th Cir. 2006) ........................................................................... 2

*United States v. Wilson,*
    484 F.3d 267 (4th Cir. 2007) ........................................................................... 9

*Walters v. Prince George's Cnty.,*
    2013 WL 497920 (D. Md. Feb. 7, 2013) .......................................................... 7

*Whole Woman's Health v. Paxton,*
    10 F.4th 430 (5th Cir. 2021) ......................................................................... 11

*Williams v. Brown,*
    244 F. Supp. 2d 965 (N.D. Ill. 2003) ................................................................. 7

**Other Authorities**

WPATH, *Standards of Care Version 7,*
    https://bit.ly/3t0coEv (last visited May 25, 2022) ........................................... 10

**Rules**

FED. R. EVID. 403 ........................................................................................................ 22

FED. R. EVID. 702 ........................................................................................ 1, 2, 3, 7, 17

## INTRODUCTION

In moving to exclude the proffered testimony of Dr. Cantor, B.P.J. attempts to dismiss him as "unqualified." In fact, Dr. Cantor is a Ph.D. psychologist with immense on-point expertise, including multiple peer-reviewed publications to his credit addressing the nature of and therapies for gender dysphoria. B.P.J. attacks Dr. Cantor's "methodology" in arriving at and supporting his opinions, but Dr. Cantor's opinions are appropriately supported by extensive citations to peer-reviewed literature. B.P.J. attempts to dismiss as "irrelevant" testimony on topics relating to gender dysphoria and therapies that are directly put at issue in B.P.J.'s own Complaint, expert submissions, and summary judgment motion. But if B.P.J.'s contentions and proffered evidence on these points are relevant, then Dr. Cantor's evidence is not only relevant, but essential, to this Court's understanding. And B.P.J. asks this Court to decide disputed issues of science as though this were the trial, rather than a pre-trial *Daubert* analysis. None of these criticisms has merit. Dr. Cantor's opinions—spanning 139 paragraphs on 52 pages and citing 109 peer-reviewed articles, professional guidelines, and other sources—are eminently reliable. B.P.J.'s motion should be denied.

## GOVERNING LEGAL STANDARDS

Under FED. R. EVID. 702, an expert witness' testimony is admissible if (a) his "knowledge will help the trier of fact to understand the evidence or to determine a fact in issue"; (b) his "testimony is based on sufficient facts or data"; (c) his "testimony is the product of reliable principles and methods"; and (d) he "has reliably applied the principles and methods to the facts of this case." Notably B.P.J. does not challenge Dr. Cantor's proffered expert evidence under Rule 702(b) or (d).

"The rejection of expert testimony is the exception rather than the rule." *In re Lipitor (Atorvastatin Calcium) Mktg. Sales Pracs. & Prods.' Liab. Litig. (No. II) MDL 2502*, 892 F.3d 624, 631 (4th Cir. 2018). The Court's task here is not to decide who is right or wrong, but only to "make a 'preliminary assessment' of whether the proffered

testimony is both reliable ... and helpful," a test his evidence easily clears. *Eghnayem v. Bos. Scientific Corp.*, 57 F. Supp. 3d 658, 668–69 (S.D. W.Va. 2014). Here, Defendant-Intervenor and the State of West Virginia (collectively "Defendants") must simply "come forward with evidence from which the court can determine that [Dr. Cantor's] testimony is properly admissible." *Md. Cas. Co. v. Therm-O-Disc., Inc.*, 137 F.3d 780, 783 (4th Cir. 1998). They certainly "need not [prove] that [it] is irrefutable or certainly correct." *United States v. Moreland*, 437 F.3d 424, 431 (4th Cir. 2006).

As *Daubert* emphasized, this preliminary assessment does not supplant the "conventional devices" of "vigorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof." *In re Lipitor*, 892 F.3d at 631 (citing *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579, 596 (1993)). These remain the "traditional and appropriate means of attacking shaky but admissible evidence" (though Dr. Cantor's is far from shaky), not "wholesale exclusion by the trial judge." *Id.* (quoting *Daubert*, 509 U.S. at 596).

ARGUMENT

## I.   Dr. Cantor is strongly qualified to provide expert testimony.

When challenging a witness' qualifications, "the test for exclusion is a strict one." *Kopf v. Skyrm*, 993 F.2d 374, 377 (4th Cir. 1993) (quoting *Thomas J. Kline, Inc. v. Lorillard, Inc.*, 878 F.2d 791, 799 (4th Cir. 1989)). As Rule 702 uses "or," one "may be qualified ... in any one of the five ways listed: knowledge, skill, experience, training, or education." *Id.* Dr. Cantor is strongly qualified on multiple counts.

### A.   Dr. Cantor's professional qualifications and publication record are strong and on-point.

In terms of "training" or "education," FED. R. EVID. 702, Dr. Cantor holds master's and doctorate degrees in psychology. Def.-Intervenor's App. in Supp. of Mot. for Summ. J. 452, Doc. 286-1 (App.) (Cantor Rep. App. 1 at 1).[1] Both programs included training in

---

[1]   All citations to filed documents are to the original or bates-stamped page number.

2

child and adolescent psychology. Supp. App. to Def.-Intervenor's Mot. for Summ. J. 219–20, Doc. 300 (Supp. App.) (Cantor Dep. 39:7–15, 42:13–18). His doctoral work included courses and research addressing gender dysphoria, *id.* at 220 (Cantor Dep. 43:10–15, 43:23–44:4, 44:17–45:2), as well as a "clinical internship assessing and treating people with a wide range of sexual and gender identity issues," App. 390 (Cantor Rep. ¶ 1), including people in their "late teens," Supp. App. 221 (Cantor Dep. 46:4–15). He has held multiple academic appointments. App. 453 (Cantor Rep. App. 1 at 2).

In terms of "knowledge," "skill," or "experience," FED. R. EVID. 702, Dr. Cantor has been providing clinical services to individuals who suffer from gender dysphoria across almost 25 years. App. 391 (Cantor Rep. ¶ 4). His experience includes assessing and treating over 100 people "at various stages of considering and enacting both transition and detransition." *Id.* It includes one-on-one counseling with individuals— some in their "late teens, early 20s"—who were "pursuing or wondering if they should pursue medical transition." Supp. App. 221–22 (Cantor Dep. 48:10–18, 50:10–19). In his more recent private practice, he has served at least six to eight gender dysphoric clients between the ages of 16 and 18. *Id.* at 229 (Cantor Dep. 78:6–20).

When asked for his primary subjects of focus, Dr. Cantor identified "[s]exual orientation, paraphilias, and gender identity." *Id.* at 231 (Cantor Dep. 87:22–25). B.P.J. essentially faults Dr. Cantor for having studied *more* than just gender dysphoria. Cantor Br. at 8–9, Doc. 320 (characterizing his expertise as "hypersexuality and paraphilias," involving sex offenders). Indeed he has, but that is an advantage, not a defect. Both as to age and "condition," the lines are not nearly as sharp as B.P.J. would have it. As Dr. Cantor explained, atypical sexualities— including gender dysphoria—all interrelate, such that research on one "also include[s] the other[s]." Supp. App. 225 (Cantor Dep. 63:4–64:1). As to age, Dr. Cantor has studied human sexuality throughout the entire human lifespan—from prenatal brain development through childhood, adolescence, adulthood, and into the senior

years. *See, e.g.*, *id.* at 224 (Cantor Dep. 59:19–60:1). In his work with adults, "we would often focus on events that happened during childhood and adolescence." *Id.* (Cantor Dep. 61:14–17); *accord id.* at 225 (Cantor Dep. 65:16–19) ("[V]ery many of the issues that we were dealing with were issues that occurred during childhood and adolescence."). His brain scan research studies "an accumulation of everything that has happened over life, very much of which happens in childhood and before childhood." *Id.* at 224 (Cantor Dep. 60:11–21); *accord id.* at 226 (Cantor Dep. 69:3–16) (describing how his testing work as a senior researcher involved "issues pertaining to child and adolescent psychology"). And of course, those who adopt a transgender identity as children or adolescents quickly grow up, and an understanding of the lives and physical and mental health of transgender *adults* is thus urgently relevant to the decisions that parents, mental health professionals, and state officials face as they deal with gender dysphoria in children and adolescents.

Dr. Cantor has also had wider *supervisory* responsibility for treating individuals suffering from gender dysphoria, rising across years from a staff psychologist at the Toronto Sexuality Centre, through Senior Scientist, and finally Director of the entire center. App. 452 (Cantor Rep. App. 1 at 1).

Dr. Cantor's knowledge and expertise are also reflected in his peer-reviewed publications. His decades of study of atypical sexualities, *id.* at 390 (Cantor Rep. ¶ 3), have generated over 50 peer-reviewed articles that cover a range of topics that is indeed wide, but that has repeatedly included "gender identity." *Id.* At least ten discuss gender dysphoria, Supp. App. 231–32 (Cantor Dep. 88:11–93:13) (identifying six); *id.* at 235 (Cantor Dep. 105:21–25) (identifying four more), of which four directly address it in children and adolescents.[2] These include his widely noted 2020 article

---

[2]   App. 454, 457, 459 (Cantor Rep. App. 1 at 3, 6, 8) ((1) Cantor, *Transgender and Gender Diverse Children and Adolescents: Fact-Checking of AAP Policy*, J. OF SEX & MARITAL THERAPY (2020); (2) Zucker, *et al.*, *The Recalled Childhood Gender Identity/Gender Role Questionnaire: Psychometric Properties*, SEX ROLES (2006); (3) Zucker, *et al.*, *Is*

4

in the Journal of Sex & Marital Therapy, *Transgender and Gender Diverse Children and Adolescents, Fact-Checking of AAP Policy*—an article debunking the supposed scientific basis of that organization's policy statement about therapies for gender dysphoria in children—a detailed science-based critique which the American Association of Pediatrics has still failed to rebut. App. 397, 484–91 (Cantor Rep. ¶ 21 & App. 2). He has also authored the gender identity chapter in the last three editions of the *Oxford Textbook of Psychopathology*, *id.* at 391 (Cantor Rep. ¶ 3), "one of the best known such texts in the world," Supp. App. 234 (Cantor Dep. 99:17–19).

Dr. Cantor's profound knowledge relevant to issues of both sexual behavior and identity has prompted his peers to select him to serve on the editorial boards of three professional journals: the *Journal of Sex Research*, the *Archives of Sexual Behavior*, and the *Journal of Sexual Aggression*. App. 390 (Cantor Rep. ¶ 2). And he serves as the editor-in-chief of *Sexual Abuse*, "one of the top-impact, peer reviewed journals in sexual behavior science." *Id.* His editorial board work on these journals continually exposes him to the work of numerous scholars and researchers in the field.

Dr. Cantor's expertise and knowledge have also led to his receiving at least two grants to study gender dysphoria *in adolescents* specifically. Supp. App. 238 (Cantor Dep. 115:7–18); App. 461 (Cantor Rep. App. 1 at 10). At least three professional organizations have asked him to present on these topics. Supp. App. 240 (Cantor Dep. 122:20–123:7); App. 467–68 (Cantor Rep. App. 1 at 16–17).

Like others who filed meritless motions to exclude, B.P.J. "focuses on what [Dr. Cantor] is not." *In re C.R. Bard, Inc.*, 948 F. Supp. 2d 589, 623 (S.D. W.Va. 2013). But this does not change what he is: a researcher and scholar with an international reputation, whose education, training, skills, experience, and knowledge on gender

---

*Gender Identity Disorder in Adolescents Coming out of the Closet?*, J. SEX & MARITAL THERAPY (2008)); Supp. App. 261 (Cantor Dep. 109:11–111:4) (noting how his review of *The Man Who Would Be Queen* discussed gender dysphoria in children and teens).

dysphoria each independently qualifies him to serve as an expert witness in this case.

### B.  Rule 702 does not require narrow specialization.

B.P.J.'s primary attacks on Dr. Cantor's qualifications are that he does not treat children or adolescents. Cantor Br. at 8–10. As reviewed above, this attack is mistaken as a matter of fact. Dr. Cantor possesses both knowledge and experience specific to gender dysphoria in children and adolescents, as reflected in his professional history and in his publications.

It is also mistaken as a matter of law. If an expert possesses relevant "knowledge, skill, experience, training, or education," it is no obstacle if his own primary research or hands-on practice area is somewhat broader or different. B.P.J cites four cases; none points towards any basis to exclude Dr. Cantor's evidence. In one, the Eleventh Circuit excluded an expert on "the treatment of drug abuse" from testifying on "social science or statistics." *Lebron v. Sec'y of Fla. Dep't of Child. & Fams.*, 772 F.3d 1352, 1369 (11th Cir. 2014). But Dr. Cantor has training in statistics by virtue of his undergraduate training in mathematics and his graduate training in psychology, App. 452 (Cantor Rep. App. 1 at 1), and his methodological critiques of certain studies are in line with his knowledge. In another, the court ruled the expert was *qualified* to testify over defendants' objections that he lacked knowledge about the precise type of printing press at issue. *Martinez v. Sakurai Graphic Sys. Corp.*, 2007 WL 2570362, at *2–3 (N.D. Ill. Aug. 30, 2007). In the third, the witness was disqualified because he lacked "personal experience, specific education, or even study of the relevant literature"—but Dr. Cantor possesses all of those. *O'Conner v. Commonwealth Edison Co.*, 807 F. Supp. 1376, 1390 (C.D. Ill. 1992). In the last, the witness "had *no* training or experience" with a newly developed procedure about which she proposed to testify, *Hartke v. McKelway*, 526 F. Supp. 97, 100–01 (D.D.C. 1981) (emphasis added)—again a description that does not fit Dr. Cantor.

Indeed, courts often decline to disqualify experts based on their specialty as

"[o]ne knowledgeable about a particular subject need not be precisely informed about all details of the issues raised in order to offer an expert opinion." *Huskey v. Ethicon, Inc.*, 29 F. Supp. 3d 691, 706–07 (S.D. W.Va. 2014) (quoting *Thomas J. Kline, Inc.*, 878 F.2d at 799). An "expert's specialized knowledge and experience and the issues before the court need not be exact." *Walters v. Prince George's Cnty.*, 2013 WL 497920, at *5 (D. Md. Feb. 7, 2013).

For example, when defendants sought to exclude two psychiatrists "because neither is a child psychiatrist nor board-certified in that field," the court denied that motion, noting that their specialty "may affect the weight the jury chooses to give their testimony, but not its admissibility." *Williams v. Brown*, 244 F. Supp. 2d 965, 967 (N.D. Ill. 2003). Similarly, when a plaintiff sought to exclude a psychiatrist because he did not "specialize in trauma-induced memory disorders," the court denied this motion because this expert, like Dr. Cantor here, "ha[d] written several leading articles" concerning a topic at issue in that case—"the debate among specialists on whether repressed memory occurs in trauma victims." Any issues with his qualifications were "properly addressed on cross-examination, not by excluding the testimony altogether." *Clark v. Edison*, 881 F. Supp. 2d 192, 210 (D. Mass. 2012).[3]

The fact that the physician is not a *specialist* in the precise field in which he is giving his opinion "affects not the admissibility of his opinion but the weight the jury may place on it" if it appears that he otherwise satisfies *Daubert's* eligibility requirement. *Mitchell v. United States*, 141 F.3d 8, 15 (1st Cir. 1998) (quoting *Payton v. Abbott Labs*, 780 F.2d 147, 155 (1st Cir. 1985)). Thus, a pathologist was permitted to testify concerning the "properties of polypropylene" despite objections that he was

---

[3]  Under the West Virginia rule for expert witnesses—which is "virtually identical" to FED. R. EVID. 702, *State v. Leep*, 212 W. Va. 57, 66 (2002)—"a medical expert, otherwise qualified, is not barred from testifying merely because he or she is not *engaged in practice* as a specialist in the field about which his or her testimony is offered." *Hysell v. Raleigh Gen. Hosp.*, 2020 WL 3130423, at *4 (S.D. W.Va. Jun. 12, 2020) (quoting *Foster v. Sakhai*, 210 W. Va. 716, 731 (2001)).

not a "material scientist, biochemist, or biomedical engineer," because the testimony would fall within the "general" knowledge of his profession, which "involved a broad range of disciplines." *Eghnayem*, 57 F. Supp. 3d at 671–72; *Sanchez v. Bos. Scientific Corp.*, 2014 WL 4851989, at *19–20 (S.D. W.Va. Sept. 29, 2014) (same). Similarly, an "academic physician" who "pursues research endeavors and teaches" on relevant subjects was qualified even though he did "not treat patients for these conditions." *Sanchez*, 2014 WL 4851989, at *20; *accord Huskey*, 29 F. Supp. 3d at 713–14 (finding witness obstetrician and gynecologist qualified despite "never perform[ing] a ... mesh-related procedure"); *Huskey*, 29 F. Supp. 3d at 731 (finding infectious disease doctor qualified despite not being a "urologist, gynecologist, or urogynecologist" and having "never implanted a pelvic mesh device").

In short, even if Dr. Cantor lacked the record of specific on-point education, training, experience, research, and publication that he possesses, the mere fact that his knowledge, skill, experience, training, and education is *broader* than B.P.J. prefers would provide no reason to disqualify him.

## C.   The fact that Dr. Cantor is not offering certain opinions in no way undercuts his qualification to offer the opinions he is offering.

B.P.J. dramatically claims: "Dr. Cantor admits that he is not qualified to offer" various opinions, citing one page of deposition testimony, Cantor Br. at 10, that says nothing about Dr. Cantor's qualifications. The questions asked if he was offering various opinions, and he "stayed in his lane." Opinions he *is not* offering have no impact on his qualification to give the opinions he *is* offering.

## D.   Dr. Cantor has provided expert testimony on gender dysphoria, including in children, and has never been excluded as unqualified.

While the Court will perform its own analysis, it is informative that Dr. Cantor has provided expert testimony relating to gender identity and dysphoria in three prior cases. App. 391, 483 (Cantor Rep. ¶ 5 & App. 1 at 32). In two of these, he "summarize[d] the science on gender identity," much as he has done here. Supp. App. 214–

8

15 (Cantor Dep. 21:23–22:22). In a third, he provided expert testimony concerning gender dysphoria in children when divorcing parents disagreed as to whether the child should transition. *Id.* at 286 (Cantor Dep. 306:17–307:8). These prior expert engagements each required him to immerse himself yet again in the relevant literature as he prepared his opinions and testimony. In none of these cases did the court exclude him as lacking appropriate qualifications. *Id.* at 215 (Cantor Dep. 25:19–21).

## II.   B.P.J.'s criticisms of Dr. Cantor's methodology are without merit.

B.P.J. raises certain complaints which are (more or less) directed not against Dr. Cantor's expertise, but against his methodology or conclusions. None has merit.

Under Rule 702, there "is no mechanistic test for determining if an expert's proffered relevant testimony is also reliable." *Knight v. Boehringer Ingelheim Pharms., Inc.*, 323 F. Supp. 3d 809, 821 (S.D. W.Va. 2018). Rather, "'the test of reliability is flexible' and 'the law grants [this Court] the same broad latitude when it decides *how* to determine reliability as it enjoys in respect to its ultimate reliability determination.'" *Id.* (quoting *United States v. Wilson*, 484 F.3d 267, 274 (4th Cir. 2007)). But this Court's "focus 'must be solely on the principles and methodology, not the conclusions they generate.'" *In re Lipitor*, 892 F.3d at 631; *Huskey*, 29 F. Supp. 3d at 701 (same). As before, Rule 702 liberalized "the introduction of relevant expert evidence," meaning that this Court "need not determine that [Dr. Cantor's] testimony ... is irrefutable or certainly correct." *In re Lipitor*, 892 F.3d at 632.

### A.   B.P.J.'s objection that some of Dr. Cantor's opinions "contradict" the Fourth Circuit's findings in *Grimm* are no basis for exclusion.

Repeatedly, B.P.J. complains that Dr. Cantor's opinions are inconsistent with what the Fourth Circuit allegedly "held." Cantor Br. at 1, 2, 15, 17–19 (citing *Grimm v. Gloucester Cnty. Sch. Bd.*, 972 F.3d 586 (4th Cir. 2020)).

In 2019, based on whatever factual and expert record was put before it by the parties in that litigation, that district court granted summary judgment, and the

Fourth Circuit affirmed in 2020. *Grimm*, 972 F.3d 586. But factual findings in one case are just that—factual findings.[4] They are not precedential legal holdings. On a different, fuller, and more recent record, a separate court may—indeed must—reach its own conclusions, based on the facts put before it. A different court's factual findings in a separate case have literally no intersection with any of the eligibility criteria set out in *Daubert* and its progeny.

Indeed, the idea of "locking down" the science—such that one court would be bound by science-related factual findings of a different court, on a different record, years earlier—would be particularly pernicious in a field such as transgender health, which WPATH describes as "rapidly evolving." *Daubert* Resp. App. 889 (WPATH at 7).[5] Even WPATH's own "Standards of Care" are under "perpetual revision," with version 8 now in process.[6] Whatever the Fourth Circuit may have been led to believe based on *Grimm's* record and *amicus* filings, no version of WPATH guidelines reflects firm science. As Dr. Cantor explained, independent and standardized assessments of evidentiary basis have uniformly rated WPATH's guidelines as "Do not recommend." App. 397 (Cantor Rep. ¶ 20). And "public healthcare systems throughout the world"— including Sweden, Finland, the United Kingdom, Australia, and New Zealand—"have been withdrawing their earlier support for childhood transitions," transitions B.P.J.'s experts advocate. *Id.* at 398 (Cantor Rep. ¶ 23). Put simply, "[s]cience evolves, and scientific methods that once were considered unassailable truths have been discarded over time," and Rule 702 does not allow courts to impose "scientific *stare decisis*." *Shirt v. Hazeltine*, 461 F.3d 1011, 1026 (8th Cir. 2006).

---

[4]   The district court highlighted how the submissions of *amici* that the Fourth Circuit quoted were only "evidence of the views of the organizations that prepared them," including WPATH, and "not ... substantive evidence of the accuracy of such views." *Grimm v. Gloucester Cnty. Sch. Bd.*, 400 F. Supp. 3d 444, 455 (E.D. Va. 2019).
[5]   The *Daubert* Response Appendix was filed contemporaneously.
[6]   The first six versions of these ever-evolving standards were published in 1979, 1980, 1981, 1990, 1998, and 2001. WPATH, *Standards of Care Version 7*, https://bit.ly/3t0coEv (last visited May 25, 2022).

**B.    B.P.J.'s objection that Dr. Cantor's opinions contradict "widely accepted" beliefs is no basis for exclusion.**

B.P.J. claims that Dr. Cantor's views are unreliable because they allegedly diverge from a "broad consensus" of scientists and professional organizations. Cantor Br. at 14; *accord id.* at 12–13. This is both false and irrelevant.[7]

As Dr. Cantor documents, major international health authorities are now withdrawing support for use of puberty blockers for children, aligning with his views rather than those advocated by B.P.J.'s experts. App. 398 (Cantor Rep. ¶ 23).

But even if there *were* a stable "consensus" among the relevant international mental health community, it would not matter. Indeed, the central change in law worked by *Daubert* was the Court's holding that "'[g]eneral acceptance' is not a necessary precondition of the admissibility of scientific evidence under the Federal Rules of Evidence." *Daubert*, 509 U.S. at 597. Science can no more be "locked down" by supposed consensus than by judicial precedent, and for similar reasons. *See Whole Woman's Health v. Paxton*, 10 F.4th 430, 465 (5th Cir. 2021) (Ho, J., concurring) (observing how "scientists don't always follow the science," how they often reject "new evidence because it contradicts established norms," and how they are "susceptible to peer pressure, careerism, ambition, and fear of cancel culture").[8] Nor are statements from professional entities graven in stone, as both this Court and Dr. Cantor recognize.[9] *Huskey*, 29 F. Supp. 3d at 732; *Eghnayem*, 57 F. Supp. 3d at 720, 722; App.

---

[7]    B.P.J. faults Dr. Cantor for disagreeing with the allegedly "mainstream" approach of "gender-affirming care." Cantor Br. at 1, 5. But as Dr. Janssen testified: "there is no one agreed upon use of that term and it is used by different people in different contexts to mean whatever they want it to mean, depending upon who is asking the questions." App. 931 (Janssen Dep. 87:11–19). Later, he "emphasiz[ed] that gender-affirming care does not have an agreed upon definition" and is "controversial." *Id.* at 929 (Janssen Dep. 94:12–15). Nothing in Rule 702 or *Daubert* prevents Dr. Cantor from disagreeing with an approach that has no inherent meaning.

[8]    Hence, Dr. Cantor's status with the Society for the Scientific Study of Sexuality has no impact on his reliability. Cantor Br. at 19 n.5. *See Daubert* Resp. App. 113–27 (explaining what occurred).

[9]    Expert testimony as to what professional standards mean is admissible. *See, e.g.*, *Kopf*, 993 F.2d at 378; *Kovari v. Brevard Extraditions, LLC*, 461 F. Supp. 3d 353, 374–75 (W.D. Va. 2020).

431–32 (Cantor Rep. ¶¶ 107–08). "It is not uncommon for professional organizations to do an about-face in response to new evidence or new attitudes." *Otto v. City of Boca Raton*, 981 F.3d 854, 869 (11th Cir. 2020).

Thus, when a trial court excluded expert evidence based on "general acceptance as gauged by publications and the decisions of other courts," this was reversible error. *Daubert*, 509 U.S. at 597–98. B.P.J. attempts to lead this Court into that error.

### C. Dr. Cantor's extensive citation to peer-reviewed scientific literature is appropriate, strengthening the reliability of his opinions.

Dr. Cantor's report itself rebuts B.P.J.'s claim that his opinions "have no grounding in reliable scientific standards and principles." Cantor Br. at 1. While Dr. Cantor's personal experience and knowledge is extensive, *see supra* Part I, it is also "acceptable for an expert to rely on the studies of other experts in reaching his own opinions," and proffered expert testimony may be based on "a literature review." *Kolbe v. O'Malley*, 42 F. Supp. 3d 768, 780 (D. Md. 2014).

Indeed, it is improper for an expert to rely on his own *ipse dixit*, *Knight*, 323 F. Supp. 3d at 821 (citing *Gen. Elec. Co. v. Joiner*, 522 U.S. 136, 146 (1997)). Dr. Cantor has not done so. Rather, over 52 pages and 139 paragraphs, he cited 92 peer-reviewed scientific articles that provide support for and part of the basis for his opinions. That is *thirteen times* as many citations to supporting scientific literature as either of the direct testimony reports submitted by B.P.J.'s medical experts:

| Expert | Cited Sources | Cited Peer-Reviewed Sources |
|--------|---------------|------------------------------|
| Dr. Adkins | 10 | 7 |
| Dr. Safer | 16 | 7 |
| Dr. Cantor | 109[10] | 92 |

It is B.P.J.'s experts, not Dr. Cantor, who rely on mere say-so rather than science and "make sweeping statements without support." *Eghnayem*, 57 F. Supp. 3d at 677, 706.

---

[10]   Dr. Cantor's 106-source bibliography includes one article he did not cite and omits four that he did.

### D.    Dr. Cantor's opinions are reliable because he accounts for contrary scientific literature.

An expert's testimony can be unreliable if he "cherry-picks relevant data," *In re Lipitor*, 892 F.3d at 634, or "fails to account for contrary scientific literature," *Eghnayem*, 57 F. Supp. 3d at 676. Dr. Cantor steered clear of these methodological potholes. He explained where and why he disagreed with B.P.J.'s experts, noting where they misrepresented the views of the scientists they cited, where they relied on sources later judged to be of low reliability, and where they ignored international developments. App. 394–400 (Cantor Rep. ¶¶ 13–27). When explaining how it is not possible to predict which children will persist, he discussed the conflicting claims of another research team, explaining how their statistics actually confirm his conclusion. *Id.* at 406 (Cantor Rep. ¶ 44). When explaining how transition is not proven to improve mental health, Dr. Cantor identified studies that have been invoked to claim the opposite, before discussing methodological flaws in those studies and additional research that confirms his conclusions. *Id.* at 409–12 (Cantor Rep. ¶¶ 54–59). He extensively detailed efforts to replicate the positive results that Dutch clinicians reported. *Id.* at 413–15 (Cantor Rep. ¶¶ 62–67). Then he addressed various claims that could be leveled against his opinions. *Id.* at 421–31 (Cantor Rep. ¶¶ 81–106). This comprehensive review of the relevant scientific literature bolsters the reliability of Dr. Cantor's methodology and demonstrates why it passes Rule 702's flexible test. *Knight*, 323 F. Supp. 3d at 821.

## III.    Defendants agree with much of B.P.J.'s relevance objection—but only if applied consistently to all parties and experts.

### A.    Dr. Cantor's proffered testimony responds to and rebuts assertions and evidence introduced by B.P.J. and B.P.J.'s experts.

Confronted with actual *science* concerning gender dysphoria, its treatments, and their outcomes, B.P.J. executes a remarkable about face, attacking all of Dr. Cantor's testimony as "irrelevant" because it does not concern "athletic opportunities and notions of protecting women in sports." Cantor Br. at 6.

The objection is remarkable because the great bulk of Dr. Cantor's evidence is offered in *rebuttal* to contentions introduced by B.P.J. in the Complaint, in expert declarations submitted in connection with B.P.J.'s preliminary injunction motion, in B.P.J.'s experts' reports, and in the statement of facts recently submitted in support of B.P.J.'s motion for summary judgment.

As set out in Defendants' *Daubert* motions directed against B.P.J.'s experts (Drs. Safer, Adkins, and Janssen), Defendants agree that the nature of and therapies for gender dysphoria should not be relevant to this litigation. West Virginia's Sports Act draws no lines based on gender identity. Nor does it prohibit or favor any particular treatment for gender dysphoria or deny eligibility for girls' or women's athletics, based on what treatment path for gender dysphoria a particular student may follow.[11] What is relevant to the reasonableness and "fit" of the West Virginia Sports Act is the evidence of persistent athletic advantage for biological males, beginning even before puberty, which Dr. Brown has documented and which no expert of B.P.J. refutes, and the evidence of increased risk of injury to girls and women if biological males are allowed onto their courts and playing fields, as documented by Dr. Carlson, and which no expert of B.P.J. refutes.

But B.P.J. cannot have it both ways. If B.P.J. insists on introducing irrelevant evidence concerning treatments for gender dysphoria or transgender identification (whether through expert or fact witnesses), Defendants' experts must rebut B.P.J.'s inaccurate evidence, to avoid confusion and prejudice. If evidence on these topics is to be excluded as irrelevant, it must be excluded categorically, from expert *and* fact witnesses, from all parties. It makes no difference that Dr. Cantor's evidence does not

---

[11]  Dr. Adkins states that West Virginia's Sports Act "does not have any effect on" decisions about "appropriate behavioral and medical care for minors with gender dysphoria." App. to Def.-Intervenor & State of W.Va.'s Mots. to Exclude Expert Testimony of Drs. Adkins, Fry, Janssen, and Safer 42–43, Doc. 307-2 (*Daubert* App.) (Adkins Rebuttal Rep. ¶ 14).

pertain to "any purported justification *Defendants* have offered for H.B. 3293." Cantor Br. at 6 (emphasis added). Rebuttal of supposed facts advanced by B.P.J.'s experts in support of B.P.J.'s theories is an equally important and legitimate role for Defendants' experts. *In re C.R. Bard, Inc.*, 948 F. Supp. 2d at 638 (admitting evidence of testing done only to rebut evidence sponsored by opposing expert).

Specific examples of B.P.J.'s assertions bearing on the nature of gender dysphoria and on treatment alternatives for children and adolescents who suffer from it, to which Dr. Cantor's testimony responds, include:

1.  B.P.J.'s Complaint and experts represent to this Court that the idea of two biological sexes is outdated and scientifically invalid.[12] Dr. Cantor critiques the unscientific nature of this argument, highlights widespread acceptance and use of the binary categories of the biological sexes in recent scientific literature (evidence Drs. Adkins and Safer ignore), and assesses counter-arguments. App. 399–400, 421–31 (Cantor Rep. ¶¶ 25–26, 81–106).

2.  B.P.J.'s Complaint and experts represent to this Court that transgender identity is fixed and biologically based, extensively discussing "disorders of sexual development" as supposed evidence of that biological basis.[13] Dr. Cantor cites extensive evidence that transgender identity is often *not* fixed, details the lack of significant scientific evidence for any biological basis for transgender identification, and explains how "disorders of sexual development" are a genetic and developmental phenomenon distinct from gender identity. App. 394, 399–400 (Cantor Rep. ¶¶ 13, 25–27).

3.  B.P.J.'s expert asserts to this Court that failure to permit biologically male

---

[12]  Compl. ¶¶ 19–23, Doc. 64; *Daubert* App. 14–19 (Adkins Rep. ¶¶ 37–49); *Daubert* App. 150–52, 158, 197–98 (Safer Rep. ¶¶ 23–26, 47–48; Safer Rebuttal Rep. ¶¶ 5–7); Pl.'s Stmt. of Facts ¶¶ 70–73, Doc. 290; Pl.'s Summ. J. Br. at 7, 19–20.

[13]  Compl. ¶¶ 19–23; *Daubert* App. 150, 198 (Safer Rep. ¶ 21; Safer Rebuttal Rep. ¶ 7); *Daubert* App. 9, 41 (Adkins Rep. ¶ 18; Adkins Rebuttal Rep. ¶11); *Daubert* App. 120 (Janssen Rep. ¶ 26); Pl.'s Stmt. of Facts ¶ 27; Pl.'s Summ. J. Br. at 7.

youths who suffer from gender dysphoria to participate in female athletics will interfere with "part of [their] medical care,"[14] and cause "extreme harm," including suicide.[15] Dr. Cantor documents that social transition (a psychotherapeutic intervention which B.P.J. demands the State actively participate in by allowing students to participate in sports based on gender identity rather than sex) has not been shown to improve mental or physical health, nor to decrease the risk of suicide. Dr. Cantor further documents what B.P.J.'s experts omit: that multiple studies have found that strikingly high rates of suicide persist even *after* social and medical "affirmation" of a transgender identity. App. 394–96, 423–26 (Cantor Rep. ¶¶ 14–17, 88–94).

4. B.P.J.'s Complaint and experts represent to this court that "affirmation" is the only accepted response to gender dysphoria in young people.[16] Dr. Cantor documents the current wide range of views among mental health professionals as to the appropriateness of social transition and hormonal interventions for young people, including the increasing number of international health authorities that are shifting away from approving such interventions, precisely because of the lack of evidence of efficacy and safety. App. 396–98 (Cantor Rep. ¶¶ 19–23).

5. B.P.J.'s Complaint and experts repeatedly cite WPATH's so-called "Standards of Care" along with "guidelines" and statements published by various professional organizations as though these represented "consensus" and authoritative science.[17] Dr. Cantor explains the (extremely) limited

---

[14]  Compl. ¶ 82.
[15]  *Daubert* App. 9–12 (Adkins Rep. ¶¶ 20–28); *id.* at 131–32 (Janssen Rep. ¶¶ 50–52).
[16]  Compl. ¶¶ 25–29; *Daubert* App. 10 (Adkins Rep. ¶ 22); *Daubert* App. 119–31 (Janssen Rep. ¶¶ 24–49).
[17]  Compl. ¶ 25; *Daubert* App. 10 (Adkins Rep. ¶ 24); *Daubert* App. 148 (Safer Rep. ¶¶ 11–13); *Daubert* App. 117 (Janssen Rep. ¶ 15); Pl.'s Stmt. of Facts ¶¶ 13–18; Pl.'s Summ. J. Br. at 3.

scientific basis of these statements and also details how many of these organizational position statements do not actually support the positions that B.P.J. would have this Court believe represent "consensus." App. 396–98, 431–41 (Cantor Rep. ¶¶ 19–23, 107–39) (analyzing eight statements).

None of these propositions, whether true or false, bears in any way on whether the West Virginia's Sports Act, which defines biological sex and prohibits biological males from participating in female sports, has a sufficient nexus to the State's undoubted interest in providing fair and safe athletic experiences for biological females, in furtherance of Title IX's concern for female sports, to satisfy a "rational basis" or a "substantial relationship" test. As the (unrebutted) expert evidence of Drs. Brown and Carlson amply demonstrates, when it comes to fairness and safety in sports, it is biology, not gender identity, that matters, and the line the Sports Act draws has a very substantial—indeed tight—relationship to the interests it aims to further.

**B.   If B.P.J's contentions and evidence concerning gender dysphoria, gender identity, treatment alternatives, and their outcomes are admitted, then Dr. Cantor's evidence is admissible.**

Rule 702 sets forth two types of relevance: helping the trier of fact "to determine a fact in issue," or to "to understand the evidence." FED. R. EVID. 702. Thus, evidence is irrelevant only if it "does not relate to any issue in the case." *Huskey*, 29 F. Supp. 3d at 702 (quoting *Daubert*, 509 U.S. at 591). Relevance is "broadly interpreted," with "helpfulness to the trier of fact" being its "touchstone," *Kopf*, 993 F.2d at 377. In complex scientific settings, even extensive "background information" may be "a necessary predicate" to understanding more directly relevant evidence and questions. *In re Heparin Prods. Liabl. Litig.*, 803 F. Supp. 2d 712, 745 (S.D. Ohio 2011). Drawing from FED. R. EVID. 702's advisory notes, the *Heparin Products* court reasoned: "[I]t might also be important in some cases for an expert to educate the factfinder about general principles, without ever attempting to apply these principles to the specific facts of the case." *Id.*

17

If B.P.J. is permitted to turn this into a case about the nature of gender identity, therapies for gender dysphoria, and benefits or harms asserted to follow from providing or withholding "affirmation" or other therapies, then all of Dr. Cantor's evidence easily clears the Rule 702 relevance bar. As illustrated above, much of Dr. Cantor's evidence responds *directly* to and rebuts specific contentions of B.P.J. and B.P.J.'s experts. The rest will assist the trier of fact to "understand the evidence."

For example, B.P.J.'s summary judgment brief devotes twelve pages to arguing that the Court should involve itself in weighing competing interests. Pl.'s Summ. J. Br. at 22–34. This is incorrect as a matter of law. Def.-Intervenor's Summ. J. Resp. Br. at 24, Doc. 302. But if such an exercise were attempted, it would be critical to know just how much weight should be accorded to allegations of "harm" or "suicide" if eligibility for female sports remains defined by biological sex. This, in turn, requires a careful understanding of the literature invoked to support those claims.

Dr. Cantor explains how various published studies lacked important controls to exclude possible "confounding" effects, and so cannot tell us whether reported mental health improvements were due to social or medical "transition" (including cross-sex hormones), to the concurrent psychotherapy received by the patients, to "natural maturation" during the teen years, or to some combination of these. App. 409–11 (Cantor Rep. ¶¶ 54–57). Indeed, even B.P.J.'s expert, Dr. Janssen, agreed that at least three studies cited by B.P.J.'s experts could not actually establish that the administration of hormones caused the claimed benefits. *Id.* at 942, 939–40 (Janssen Dep. 146:3–147:16, 135:16–136:24, 139:1–140:17.)[18]

---

[18]   B.P.J. latches onto Dr. Cantor's use of the word "plausible" in this context to assert that he is merely speculating. Cantor Br. at 12. On the contrary, Dr. Cantor was explaining that there were multiple "plausible" explanations of mental health improvements reported in certain studies and that without appropriate controls in those studies it was impossible to determine which of these "plausible" factors caused the improvements. This is not speculation; it is a frank, rigorous, scientific assessment of defects or limitations in study methodology.

B.P.J. complains that Dr. Cantor reviews facts and data concerning adult gender dysphoria and transgender identification. Cantor Br. at 7 n.1. But this evidence will be helpful to a proper understanding of issues and therapies relating to gender dysphoria in children and adolescents, in order to dispel mistaken assumptions that observations based on adult populations (*e.g.*, high levels of persistence) can be assumed to apply to childhood populations, which instead exhibit high levels of desistence if left to the natural maturation process free from social and medical transition. As Dr. Cantor explained, the notion that they all "represent the same phenomenon" is one of "the most widespread public misunderstandings about transsexualism and people with gender dysphoria," spread by both "misinformation circulated today" and "expert misstatements." App. 400–01 (Cantor Rep. ¶¶ 28–29).

## IV.   B.P.J.'s miscellaneous criticisms of Dr. Cantor's evidence are without merit and do not negate its relevance or reliability.

### A.   Dr. Cantor's references to private communications and media reports are appropriate and permissible.

B.P.J. objects to Dr. Cantor's references to private communications and anecdotal reports in connection with two of his opinions. Cantor Br. at 12–13, 15–16.

In his report, Dr. Cantor outlined a range of variations within the "affirmation" school of thought, identifying "affirmation on demand" as the "most extreme" version. App. 426–30 (Cantor Rep. ¶¶ 95–103). This is hardly controversial, and B.P.J. does not actually dispute it. Instead, B.P.J. attempts to make something of Dr. Cantor's testimony at deposition that he believes that some clinics are effectively practicing "affirmation on demand" based on personal communications from parents, "media reports," and newly-launched investigations by "governmental entities." Supp. App. 254–55 (Cantor Dep. 181:14–25, 184:5–10). Yet it is perfectly permissible for experts to rely on anecdotal evidence. *Kolbe*, 42 F. Supp. 3d at 781 (noting cases do "not stand for the proposition that an expert can never rely on anecdotal evidence, they expressly contemplate the use of such evidence"). Indeed, some issues require the use of such

evidence. *Id.* at 781 n.16. This is especially true when those engaging in the scrutinized practice have reason to deny that they are doing so. Supp. App. 254–55 (Cantor Dep. 181:14–184:10). In any case, other scholars—including Dr. Laura Anderson, a prominent practitioner in the field who identifies as transgender—have highlighted and criticized the same treatment approach. *See Daubert* Resp. App. 232–36 (Edwards-Leeper & Anderson (2021)); *Daubert* App. 591 (Littman (2021) at 1).

Similarly, B.P.J. complains that Dr. Cantor testified that he had conversations or communications with "very many scientists in my field," "close[ ] to a hundred," including many "clinicians [who] ... have or had trans clients," who "generally agree with me" concerning the risks and lack of evidence of efficacy of social transition among prepubertal children. Supp. App. 262 (Cantor Dep. 210:3–211:22). Dr. Cantor did not identify any of these conversations as a *basis* for any of the opinions he proffers, and he did identify supporting peer-reviewed literature. At deposition, he simply answered the questions asked—although again this type of information about communications from other professionals would be additional admissible and relevant evidence rebutting B.P.J.'s claims of "consensus."

### B. Dr. Cantor's evidence concerning desistence rates among children with gender dysphoria is well grounded.

B.P.J. attacks Dr. Cantor's evidence concerning the high rate of "desistence" among gender dysphoric children, claiming his "only support for this concept is '11 studies listed on [his] blog.'" Cantor Br. at 13. This is a weak attack on strong evidence. The same exhaustive list of peer-reviewed, published studies appears in Dr. Cantor's own peer-reviewed and widely cited critique of the APA policy statement. App. 404, 491 (Cantor Rep. ¶ 37 & App. 2 at 7). Other sources such as the Endocrine Society Guidelines relied on by B.P.J.'s own experts cite some of the very same studies to reach the very same conclusion. *Daubert* App. 530 (Hembree, *et al.* (2017) at 3876).

B.P.J. derides these studies as "woefully inadequate" because they did not

involve the DSM-V. Cantor Br. at 13–14. But as Dr. Cantor explained: "This criticism would be valid only if there existed any studies using DSM-5 against which to compare [them]." App. 423 (Cantor Rep. ¶ 86). But the "DSM-5 is still too recent for there yet to have been long-term follow-up studies." *Id.* However, the fact that "outcome studies are the same across DSM-III, DSM-III-R, DSM-IV, and DSM-IV-TR" undercuts the validity of this objection. *Id.*

Of course, B.P.J.'s experts may argue a different view, but that is simply a dispute on the substance, not an issue for resolution at the *Daubert* stage. The Court's focus now "must be solely on the principles and methodology, not the conclusions they generate." *In re Lipitor*, 892 F.3d at 631 (cleaned up).

### C.   B.P.J. offers no basis for excluding Dr. Cantor's opinions as to what contributes to a person's gender dysphoria.

B.P.J. complains of Dr. Cantor's testimony about what factors can contribute to someone experiencing gender dysphoria. Cantor Br. at 17. Dr. Cantor made it clear he was presenting "the best summary we have of the ... existing research." Supp. App. 245 (Cantor Dep. 145:7–15). This background information will assist the trier of fact to understand broader evidence concerning gender dysphoria. It also directly rebuts the assertions of B.P.J. and B.P.J.'s experts that transgender identity is inherent and immune to outside influence. Cross-examination will afford B.P.J. opportunity to dispute this summary, but B.P.J. identifies no basis to exclude it.

### D.   Any divergence between Dr. Levine and Dr. Cantor is no grounds for excluding either.

B.P.J. points to an alleged disagreement between Dr. Levine and Dr. Cantor. Cantor Br. at 13 n.3. But when an expert's report and deposition diverge, this is material for cross-examination, not exclusion. *Sanchez*, 2014 WL 4851989, at *21 ("[T]he existence of an inconsistent expert opinion does not mandate exclusion of the expert under *Daubert*."); *McReynolds v. Sodexho Marriott Servs., Inc.*, 349 F. Supp. 2d 30, 40 (D.D.C. 2004) (noting contradictions between report and deposition "go to

credibility, rather than *Daubert's* standard of admissibility"). If this is true of discrepancies between the report and deposition of one witness, it applies with all the more force to any alleged disagreements between experts.

### E. B.P.J.'s contention that only a member of a professional association can analyze its policy statements is baseless.

B.P.J. claims that only a member of a professional association can analyze its standards. Cantor Br. at 18. This is nonsense, supported by no authority. Notably, Dr. Cantor published a peer-reviewed article fact-checking the American Association of Pediatrics, App. 485–91 (Cantor Rep. App. 2), demonstrating that his peers in the field imposed no such requirement. *Daubert* merely ensures that "an expert, whether basing testimony upon professional studies or personal experience, employs in the courtroom the same level of intellectual rigor that characterizes the practice of an expert in the relevant field." *In re Lipitor*, 892 F.3d at 631 (quoting *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 152 (1999)). Even if Dr. Cantor had not reviewed every article the Endocrine Society consulted in preparing its own "guidelines," Cantor Br. at 18,[19] he does not have to be aware of every detail of every source for his opinions to be admissible. *Huskey*, 29 F. Supp. 3d at 709, 713, 731, 734; *Kopf*, 993 F.2d at 377.

## V. Dr. Cantor's testimony easily passes Rule 403's balancing test.

B.P.J. ends with a conclusory argument that Dr. Cantor's evidence should be excluded as "confusing" under FED. R. EVID. 403's balancing analysis. Cantor Br. at 20. In reality, B.P.J. is simply asking this Court to exclude evidence contrary to that which B.P.J. has introduced and relies on, on the theory that contrary evidence would be "confusing" and "prejudicial." But it is the very role of trials to hear and resolve contradictory evidence. B.P.J. cites no case excluding otherwise admissible expert

---

[19]   In fact, B.P.J.'s criticism mischaracterizes Dr. Cantor's testimony. Dr. Cantor disclaimed knowledge of what "kind of scientific literature review" the Endocrine Society committee conducted, not of the literature on which it relied. Supp. App. 259 (Cantor Dep. 201:15–18).

evidence under such a theory.

## CONCLUSION

As explained above, the Court should exclude as irrelevant all expert or fact testimony and evidence, from *any* party or witness, relating to the origin and nature of transgender identity, therapies for gender dysphoria or transgender identification, and the outcomes resulting from providing or withholding such, and should deny B.P.J.'s motion to exclude the testimony of Dr. Cantor in all other respects.

Respectfully submitted this 26th day of May, 2022.

PATRICK MORRISEY
   *West Virginia Attorney General*

*/s/ Brandon S. Steele*
Brandon Steele, WV Bar No. 12423
Joshua D. Brown, WV Bar No. 12652
The Law Offices of Brandon S. Steele
3049 Robert C. Byrd Drive, Suite 100
Beckley, West Virginia 25801
Telephone: (304) 253–1230
Facsimile: (304) 255–1520
bsteelelawoffice@gmail.com
joshua_brown05@hotmail.com

Jonathan Scruggs, AZ Bar No. 030505*
Roger G. Brooks, NC Bar No. 16317*
Henry W. Frampton, IV, SC Bar No. 75314*
Alliance Defending Freedom
15100 N. 90th Street
Scottsdale, Arizona 85260
Telephone: (480) 444–0020
Facsimile: (480) 444–0028
jscruggs@adflegal.org
rbrooks@adflegal.org
hframpton@adflegal.org

Christiana Holcomb, DC Bar No. 176922*
Alliance Defending Freedom
440 First Street NW, Suite 600
Washington, DC 20001
Telephone: (202) 393–8690
Facsimile: (202) 347–3622
cholcomb@adflegal.org

*/s/ Curtis R.A. Capehart*
Douglas P. Buffington II, WV Bar #8157
   *Chief Deputy Attorney General*
Curtis R.A. Capehart, WV Bar #9876
   *Deputy Attorney General*
David C. Tryon, WV Bar #14145
   *Deputy Solicitor General*
OFFICE OF THE WEST VIRGINIA ATTORNEY GENERAL
State Capitol Complex
1900 Kanawha Blvd. E., Building 1, Room E-26
Charleston, West Virginia 25305-0220
Telephone: (304) 558–2021
Facsimile: (304) 558–0140
David.C.Tryon@wvago.gov

   *Counsel for Defendant,*
   STATE OF WEST VIRGINIA

(signatures continued on next page)

Tyson C. Langhofer, VA Bar No. 95204*
Rachel A. Csutoros, MA Bar No. 706225*
Alliance Defending Freedom
44180 Riverside Parkway
Lansdowne, Virginia 20176
Telephone: (571) 707–2119
Facsimile: (571) 707–4790
tlanghofer@adflegal.org
rcsutoros@adflegal.org

Travis C. Barham, GA Bar No. 753251*
Alliance Defending Freedom
1000 Hurricane Shoals Road NE, Ste D-
1100
Lawrenceville, Georgia 30043
Telephone: (770) 339–0774
Facsimile: (770) 339–0774
tbarham@adflegal.org

Timothy D. Ducar, AZ Bar No. 015307*
Law Offices of Timothy D. Ducar, PLC
7430 E. Butherus Drive, Suite E
Scottsdale, Arizona 85260
Telephone: (480) 502–2119
Facsimile: (480) 452–0900
tducar@azlawyers.com

**\* *Visiting Attorneys***

    *Attorneys for Defendant-Intervenor*

**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA
CHARLESTON DIVISION**

B.P.J., by her next friend and mother, HEATHER JACKSON,

*Plaintiff,*

v.

WEST VIRGINIA STATE BOARD OF EDUCA-TION, HARRISON COUNTY BOARD OF ED-UCATION, WEST VIRGINIA SECONDARY SCHOOL ACTIVITIES COMMISSION, W. CLAYTON BURCH in his official capacity as State Superintendent, DORA STUTLER in her official capacity as Harrison County Superin-tendent, and THE STATE OF WEST VIR-GINIA,

*Defendants*

and

LAINEY ARMISTEAD,

*Defendant-Intervenor.*

Case No. 2:21-cv-00316

Hon. Joseph R. Goodwin

**CERTIFICATE OF SERVICE**

I, Brandon Steele, hereby certify that on May 26, 2022, I electronically filed a true and exact copy of the foregoing document with the Clerk of Court and all parties using the CM/ECF system.

*/s/ Brandon S. Steele*
Brandon Steele, WV Bar No. 12423
The Law Offices of Brandon S. Steele
3049 Robert C. Byrd Drive, Suite 100
Beckley, WV 25801
(304) 253–1230
(304) 255–1520 Fax
bsteelelawoffice@gmail.com

*Attorney for Defendant-Intervenor*