IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA
CHARLESTON DIVISION

| | |
|---|---|
| B.P.J., by her next friend and mother, HEATHER JACKSON<br><br>*Plaintiff,*<br><br>  v.<br><br>WEST VIRGINIA STATE BOARD OF EDUCATION, HARRISON COUNTY BOARD OF EDUCATION, WEST VIRGINIA SECONDARY SCHOOL ACTIVITIES COMMISSION, W. CLAYTON BURCH in his official capacity as State Superintendent, DORA STUTLER in her official capacity as Harrison County Superintendent, and THE STATE OF WEST VIRGINIA<br><br>*Defendants*<br><br>  and<br><br>LAINEY ARMISTEAD<br><br>*Defendant-Intervenor.* | Case No. 2:21-cv-00316<br><br>Hon. Joseph R. Goodwin |

DEFENDANT-INTERVENOR AND THE STATE OF WEST VIRGINIA'S MEMORANDUM IN
RESPONSE TO PLAINTIFF'S MOTION TO EXCLUDE THE EXPERT TESTIMONY OF DR.
STEPHEN B. LEVINE

# TABLE OF CONTENTS

Table of Authorities ...................................................................................................iii

Introduction ............................................................................................................ 1

Legal Standard ....................................................................................................... 2

Argument ................................................................................................................ 3

    I.    B.P.J.'s attack on Dr. Levine's qualifications is without merit. ............. 3

        A.    Dr. Levine is amply qualified to offer his expert opinion on the reality and nature of "biological sex." ..................................... 4

        B.    Dr. Levine is well-qualified to offer his expert opinion as to the nature, diagnosis, treatment options, and outcomes of gender dysphoria in individuals, including in children and adolescents. ................................................................................ 6

    II.    The "methodology" behind Dr. Levine's proffered opinions amply satisfies the requirements of *Daubert* and Rule 702. .......................... 11

        A.    Dr. Levine did not proffer an expert opinion that "providers are providing rapid affirmation care to transgender adolescents." But he has cited evidence amply supporting that conclusion. ........................................................................ 13

        B.    Dr. Levine has not opined that gender-affirming care is unethical, and his opinion that it is "experimental" is amply supported and reliable. ............................................................... 15

        C.    B.P.J.'s denial that "there are widely varying views about the appropriate treatment for gender dysphoria" is specious and not grounds for disqualification under *Daubert* or Rule 702. ..... 16

        D.    B.P.J.'s contention that some of Dr. Levine's opinions "directly contradict the Fourth Circuit's holding in *Grimm*" is irrelevant to this motion. ............................................................. 18

    III.    Defendant-Intervenor and the State of West Virginia agree with much of B.P.J.'s relevance objections—but only if applied consistently to all parties and experts. ................................................ 19

Conclusion ............................................................................................................ 22

Certificate of Service ............................................................................................ 25

TABLE OF AUTHORITIES

Cases

*Bell v. Tavistock*,
[2020] EWHC (Admin) 3274 (Eng.) ................................................................. 9

*Bell v. Tavistock*,
[2021] EWCA (Civ) 1363 ................................................................................. 9

*Brandt v. Rutledge*,
551 F. Supp. 3d 882 (E.D. Ark. 2021) ............................................................. 9

*Cavallo v. Star Enterprise*,
100 F.3d 1150 (4th Cir. 1996) ......................................................................... 2

*Daubert v. Merrell Dow Pharmaceuticals, Inc.*,
509 U.S. 579 (1993) ................................................................................. *passim*

*Doe v. Snyder*,
28 F.4th 103 (9th Cir. 2022) ............................................................................ 8

*Edmo v. Idaho Department of Corrections*,
358 F. Supp. 3d 1103 (D. Idaho, 2018) ........................................................... 9

*Eghnayem v. Boston Scientific Corporation*,
57 F. Supp. 3d 658 (S.D.W.Va. 2014) ................................................ 2, 12, 17

*Friendship Heights Associates v. Koubek*,
785 F.2d 1154 (4th Cir. 1986) ......................................................................... 4

*Grimm v. Gloucester County School Board*,
400 F. Supp. 3d 444 (E.D. Va. 2019) ............................................................ 18

*Grimm v. Gloucester County School Board*,
972 F.3d 586 (4th Cir. 2020) ......................................................................... 18

*Hecox v. Little*,
479 F. Supp. 3d 930 (D. Idaho, 2020) ............................................................. 9

*Hennessy-Waller v. Snyder*,
529 F. Supp. 3d 1031 (D. Ariz. 2021) ............................................................. 8

*Kolbe v. O'Malley*,
42 F. Supp. 3d 768 (D. Md. 2014) ................................................................. 12

*Kopf v. Skyrm*,
993 F.2d 374 (4th Cir. 1993) ........................................................................... 4

*Kosilek v. Spencer*,
    774 F.3d 63 (1st Cir. 2014) ...................................................................... 9

*Norsworthy v. Beard*,
    87 F. Supp. 3d 1164 (N.D. Cal. 2015) .................................................... 9

*Otto v. City of Boca Raton*,
    981 F.3d 854 (11th Cir. 2020) ................................................................ 3

*Thomas J. Kline, Inc. v. Lorillard, Inc.*,
    878 F.2d 791 (4th Cir. 1989) .................................................................. 4

*United States v. Moreland*,
    437 F.3d 424 (4th Cir. 2006) .................................................................. 2

*Whole Woman's Health v. Paxton*,
    10 F.4th 430 (5th Cir. 2021) .................................................................. 3

## Other Authorities

WPATH, Standards of Care Version 8 Chapter Draft for Public Comment –
    Adolescent, at 22 (Dec. 2021),
    https://www.wpath.org/media/cms/Documents/SOC%20v8/SOC8%20Chapters
    %20for%20Public%20Comment/SOC8%20Chapter%20Draft%20for%20Public
    %20Comment%20-%20Adolescent.pdf?_t=1638731433 ........................... 14, 16

## Rules

Fed. R. Civ. P. 26 ...................................................................................... 1, 13

Fed. R. Evid. 702 ...................................................................................... *passim*

## INTRODUCTION

B.P.J.'s motion to exclude the proffered testimony of Dr. Stephen Levine is both ironic and without merit.

Dr. Levine's expertise and relevant qualifications are immense: he has been treating individuals suffering from gender dysphoria for more than 45 years—long before the issue was a "trend" popularized by social media "influencers." Daubert Resp. App. to the Def.-Intervenor and the State of W.V.'s Joint Mem. in Resp. to Pl.'s Mots. to Exclude Experts' Test. (Daubert Resp. App.) 37–38 (Anderson 2022 at 2, 3).[1] And he is an M.D. psychiatrist with a decades-long practice focused on issues of sexual science, function, dysfunction, and gender identity. He is thoroughly qualified to speak to the reality and definition of "biological sex."

B.P.J.'s criticism of Dr. Levine's "methodology" is ironic. As demonstrated in Defendant-Intervenor and the State of West Virginia's joint *Daubert* motions directed against testimony of Drs. Adkins, Fry, Janssen, and Safer, B.P.J.'s experts have submitted expert opinions that rest in substantial part on nothing but unsupported and un-cited "say-so." Dr. Levine, by contrast, has carefully supported every one of his opinions with extensive citations to relevant facts, data, and peer-reviewed literature, as is required under Fed. R. Evid. 702 and Fed. R. Civ. P. 26.

And B.P.J.'s criticisms of Dr. Levine's opinions as "irrelevant" are even more ironic in light of B.P.J.'s proffered expert testimony. Dr. Levine's proffered opinions are (with limited exceptions noted below) purely defensive, responding to false and irrelevant scientific contentions first introduced in B.P.J.'s complaint, then elaborated in Drs. Adkins', Fry's, Janssen's, and Safer's expert declarations submitted in support of Plaintiff's motion for preliminary injunction and Rule 26 expert reports and rebuttal reports. As also set out in Defendant-Intervenor and the

---

[1] The Daubert Response Appendix was filed contemporaneously and all citations to filed documents are to the original or bates-stamped page number.

State of West Virginia's joint *Daubert* motions, much of Drs. Adkins', Fry's, Janssen's, and Safer's testimony is irrelevant to any issue presented by B.P.J.'s challenge to West Virginia's Sports Act under Equal Protection and Title IX, and as such it should be excluded.

Provided that B.P.J. and Drs. Adkins, Fry, Janssen, and Safer are precluded from making assertions on the topics delineated in Defendant-Intervenor and the State of West Virginia's joint *Daubert* motions for any purpose during this litigation, Defendant-Intervenor and the State of West Virginia will not seek to do so either. But B.P.J. cannot have it both ways. If B.P.J. is permitted to make assertions on those topics, Defendant-Intervenor and the State of West Virginia cannot be precluded from introducing the (extensive) evidence to the contrary on relevance grounds, either.

## LEGAL STANDARD

Defendant-Intervenor and the State of West Virginia set out the legal standards governing admissibility of expert opinion evidence in detail in their Joint Memoranda in support of their Motions to Exclude Expert Testimony of Drs. Adkins, Fry, Janssen, and Safer, and will not duplicate that recitation here.

What a motion to exclude testimony under the principles of *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993), is *not*, however, is an occasion to decide—before the factfinder has the benefit of live cross-examination and an opportunity to evaluate credibility—whether expert testimony proffered by either side is "irrefutable or certainly correct." *Eghnayem v. Bos. Sci. Corp.*, 57 F. Supp. 3d 658, 668–69 (S.D.W.Va. 2014) (quoting *United States v. Moreland*, 437 F.3d 424, 431 (4th Cir. 2006)). "*Daubert* governs whether evidence is admitted, not how persuasive it must be to the factfinder." *Cavallo v. Star Enter.*, 100 F.3d 1150, 1158 (4th Cir. 1996). The Supreme Court emphasized in *Daubert* that—even in the case of arguably "shaky" expert evidence (which Dr. Levine's will not prove to be)—"Vigorous cross-examination, presentation of contrary evidence, and careful instruction on the burden

2

of proof are the traditional and appropriate means of attacking" that evidence. *Daubert*, 509 U.S. at 596.

Nor can expert opinion evidence properly be excluded because it is a minority view—even a small minority. Indeed, the central change in law worked by the *Daubert* decision was the Court's holding that "'General acceptance' is not a necessary precondition to the admissibility of scientific evidence under the Federal Rules of Evidence." *Daubert*, 509 U.S. at 597. Nor could it be. Science advances when dissenting voices persist and overturn conventional wisdom.[2] *Daubert* recognized this, explaining that "open debate is an essential part of both legal and scientific analyses" and "[s]cientific conclusions are subject to perpetual revision." 509 U.S. at 596–97. As the Eleventh Circuit recently observed in a related context, "It is not uncommon for professional organizations to do an about-face in response to new evidence or new attitudes." *Otto v. City of Boca Raton*, 981 F.3d 854, 869 (11th Cir. 2020); *see also Whole Woman's Health v. Paxton*, 10 F.4th 430, 464–468 (5th Cir. 2021) (Ho, J., concurring) (describing historical examples of radical reversals of "consensus" medical wisdom in medical science).

Indeed, where a trial court excludes expert evidence based on "'general acceptance,' as gauged by publications and *the decisions of other courts*," this is reversible error. *Daubert*, 509 U.S at 597–98 (emphasis added). Repeatedly, B.P.J. attempts to lead this Court into this error.

ARGUMENT

## I.     B.P.J.'s attack on Dr. Levine's qualifications is without merit.

Unlike B.P.J.'s experts, Dr. Levine has taken care to "stay in his lane," and not offer opinions on matters outside his expertise. Thus, he has offered no opinions concerning any aspect of athletic performance, particularly the effects on athletic

---

[2] *See* Thomas Kuhn, *The Structure of Scientific Revolutions* (1962).

performance of any artificially introduced hormones or hormone suppression, or on what is or is not "fair." *Contra* Def.-Intervenor and the State of W. Va.'s App. in Supp. of Mots. to Exclude Expert Test. of Drs. Adkins, Fry, Janssen, and Safer, ECF No. 307-2 (Daubert App.) 154–55 (Safer Rep. ¶ 36).

B.P.J., however, asserts that Dr. Levine lacks appropriate expertise to testify on (a) the nature and reality of "biological sex," and (b) the nature, diagnosis, treatment options, and outcomes of gender dysphoria and transgender identification. These contentions are absurd.

An expert may be qualified by either "knowledge, skill, experience, training or education" to testify "on the issue for which an opinion is proffered." *Kopf v. Skyrm*, 993 F.2d 374, 377 (4th Cir. 1993) (citing *Thomas J. Kline, Inc. v. Lorillard, Inc.,* 878 F.2d 791, 799 (4th Cir. 1989), *cert. denied*, 493 U.S. 1073 (1990)); *see* Fed. R. Evid. 702(a). "The witness' qualifications to render an expert opinion are ... liberally judged by Rule 702. Inasmuch as the rule uses the disjunctive, a person may qualify to render expert testimony in any one of the five ways listed." *Kopf*, 993 F.2d at 377 (citing *Friendship Heights Assocs. v. Koubek*, 785 F.2d 1154, 1159 (4th Cir. 1986)). The expert's qualifications are to be "liberally judged," *id.*, and the hurdle to exclude an expert as insufficiently qualified is "strict." *Kopf*, 993 F.2d at 377 (citing *Thomas J. Kline, Inc.,* 878 F.2d at 799). Dr. Levine is abundantly qualified by his knowledge, skill, experience, training, and/or education to testify on the issues he addresses.

A.   **Dr. Levine is amply qualified to offer his expert opinion on the reality and nature of "biological sex."**

B.P.J. argues that Dr. Levine is not qualified to speak to the question of "biological sex" because he is not an obstetrician who records the sex of babies at

4

birth.[3] Levine Br. 9 (citing Dr. Levine's deposition asking if he has "any experience with the process of assigning sex to newborns at birth."); *see* Supp. App. to Def.-Intervenor's Mot. for Summ. J., ECF No. 300 (Supp. App.) 643 (Levine Dep. 196:21–22); *see also* Daubert App. 38 (Adkins Rebuttal ¶ 7). This is a bizarre criticism given that B.P.J.'s experts who offer opinions *denying* the reality of "biological sex" are also not obstetricians, and do not claim any experience in identifying the sex of infants at birth (absent rare instances of disorders of sexual development). Nor have any of B.P.J.'s experts opined that experience identifying the sex of newborns is necessary to or interchangeable with a scientific understanding of "biological sex." *See* Daubert App. 14–15 (Adkins Rep. ¶¶ 37–38, 40), 150 (Safer Rep. ¶ 23).

It is also a meritless criticism. Dr. Levine is a trained M.D., with all the education in human biology, physiology, and genetics that medical school and a pre-med course of studies provides. He is also deeply experienced with transgender-identifying patients and patients who suffer from gender dysphoria, having worked with such individuals for more than 40 years. *See* Def.-Intervenor's App. in Supp. of Mot. for Summ. J., ECF No. 286-1 (App.) 282 (Levine Rep. ¶ 5) (founding a Gender Identity Clinic in 1974). And, as his expert report makes clear, he has a wide knowledge and understanding of the literature relating not only to "biological sex," but also to what B.P.J.'s experts present as "hard cases"—that is, individuals whose normal genital formation has been impaired by a "disorder of sexual development." *See* App. 288–92 (Levine Rep. ¶¶ 19–27), 313–15 (Levine Rep. ¶¶ 90–96), 318–20 (Levine Rep. ¶¶ 105–111).

---

[3] This Court will search in vain for the testimony in which Dr. Levine supposedly "admitted" that he is not qualified to offer an expert opinion concerning the definition of "biological sex." *See* Levine Br. 9 (citing Dr. Levine's deposition testimony at 196:21–197:5). He said no such thing. *See* Supp. App. 643 (Levine Dep. 196:21–197:5).

Dr. Levine is qualified to offer expert testimony about the reality and nature of "biological sex" under every one of the five criteria listed in Rule 702.

**B.     Dr. Levine is well-qualified to offer his expert opinion as to the nature, diagnosis, treatment options, and outcomes of gender dysphoria in individuals, including in children and adolescents.**

B.P.J., in merely two pages, contends that Dr. Levine is not qualified to offer opinions about gender dysphoria in young people because his personal practice has primarily focused on adults, because he has only treated an estimated six prepubertal children, and because he (supposedly) does not write or research about providing treatment to transgender children. Levine Br. 12–13. These premises are both factually wrong and legally insufficient to disqualify Dr. Levine.

As his curriculum vitae and expert report make clear, Dr. Levine has been involved in diagnosing, understanding, and treating gender dysphoria since the early 1970s, almost from the very inception of gender dysphoria as an identified phenomenon and field of study and practice. While his personal practice has largely (but by no means exclusively) centered on adults, he was the founder and has been the co-director of one of the nation's oldest specialist gender identity clinics for more than 45 years. App. 282 (Levine Rep. ¶ 5). As co-director, he has continually exercised supervisory responsibility for junior psychiatrists and psychologists, who collectively treat patients of all ages.

B.P.J.'s objection that Dr. Levine has personally treated only a small number of children suffering from gender dysphoria is ironic, give that B.P.J.'s proffered expert Dr. Safer testified that he has "*never*," in any context, "cared for prepubertal children." App. 644 (Safer Dep. 119:12–19).

Dr. Levine's expertise relevant to children and adolescents has been repeatedly and unambiguously recognized by his peers. He was asked to and did serve as the chairman of the WPATH committee that developed that organization's fifth edition

6

"Standards of Care" for gender dysphoria (published in 1998), including gender dysphoria in minors. App. 282 (Levine Rep. ¶ 5). Currently, he is an invited member of a committee commissioned by the Cochrane Collaborative (a U.K.-based and internationally respected source of reviews of evidence-based medical practice) that is preparing a comprehensive review of the scientific evidence relating to the effectiveness of puberty blockers and cross-sex hormones to treat gender dysphoria in adolescents. App. 281–82 (Levine Rep. ¶ 4).

It is false that Dr. Levine "does not write or research about providing treatment to transgender children." Levine Br. 13. B.P.J. simply does not *like* what Dr. Levine has published on this topic. But Dr. Levine has published multiple peer-reviewed papers that speak specifically to this topic, each extensively citing into the literature relating to therapies for gender dysphoria in children and adolescents. These publications include:

- *Ethical Concerns About Emerging Treatment Paradigms for Gender Dysphoria*. JOURNAL OF SEX & MARITAL THERAPY (2017) (Analyzing risks and informed consent issues relevant to children and adolescents, including risks and outcomes associated with puberty blockers and cross-sex hormones);

- *Informed Consent for Transgender Patients*, JOURNAL OF SEX & MARITAL THERAPY (2018) (Discussing clinical approaches to evaluating and discussing with patients and families the risks associated with alternative therapies for gender dysphoria in children and adolescents); and

- S. Levine, E. Abbruzzese & J. Mason, *Reconsidering Informed Consent for Trans-Identified Children, Adolescents, and Young Adults,* JOURNAL OF SEX & MARITAL THERAPY (2022) (Analyzing issues affecting the accuracy of diagnoses of gender dysphoria in children, adolescents, and young adults; the quality of evidence available concerning efficacy of treatments and outcomes; and considerations affecting the adequacy of informed consent, referencing an exhaustive bibliography of the

scientific literature pertaining to treatment of gender dysphoria in minors)[4].

The Court may contrast these articles that specifically focus on children and adolescents, and the many other articles Dr. Levine has authored across decades that address gender identity and gender dysphoria more generally,[5] against the record of B.P.J.'s proffered expert, Dr. Adkins, who has published only a *single* peer-reviewed paper concerning gender dysphoria.[6]

In light of Dr. Levine's above knowledge and publications, it is unsurprising that Dr. Levine's expert testimony about gender dysphoria in minors has been admitted and relied on by multiple courts internationally. Recently, a District Court in Arizona relied on testimony of Dr. Levine by name in denying a preliminary injunction against a law affecting insurance coverage for transition surgeries in minors. *Hennessy-Waller v. Snyder*, 529 F. Supp. 3d 1031, 1041–42 (D. Ariz. 2021). The Ninth Circuit in turn relied on Dr. Levine's testimony without naming him in affirming that lower court's decision. *See Doe v. Snyder*, 28 F.4th 103, 109 (9th Cir. 2022).

In 2020, a U.K. High Court of Justice relied on Dr. Levine's expert submission to conclude (among other things) that the use of puberty blockers to treat gender dysphoria must be considered still "experimental," and that "the consequences of the treatment are highly complex and potentially lifelong and life changing in the most

---

[4] As of May 23, 2022, Dr. Levine's published article has been viewed 26,739 times. *See* Daubert Resp. App. 573.

[5] See in Dr. Levine's curriculum vitae under the heading "Research and Invited Papers," the articles numbered 21, 22, 24, 25, 47, 85, 88, 89, 98, 142, 143, 144, 145, 146. App. 367–77.

[6] See item 4 on Dr. Adkins list of publications in "Refereed Journals," Lapinski et al. (2018). Daubert App. 25, 574. *See also* App. 759 (Adkins Dep. 24:20–25:1) (Item 3, Tejwani et al. (2017) "does not speak at all to questions of gender identity.").

fundamental way imaginable," and that there is "very limited knowledge of the degree to which it will or will not benefit them." *Bell v. Tavistock* [2020] EWHC (Admin) 3274 (Eng.); *Bell v. Tavistock* [2021] EWCA (Civ) 1363 at ¶¶ 134, 143, *reversed on other grounds*.

And the First Circuit sitting *en banc* extensively cited and relied on Dr. Levine's expert testimony after full trial and cross-examination in a case exclusively concerning treatment of gender dysphoria in adults. *See Kosilek v. Spencer*, 774 F.3d 63, 77–79, 87–89 (1st Cir. 2014) (*en banc*).

B.P.J. cites a single case, *Norsworthy v. Beard*, 87 F. Supp. 3d 1164 (N.D. Cal. 2015), that discredited Dr. Levine's expert declaration in a case concerning treatments under prison conditions, prior to an opportunity to hear Dr. Levine's live testimony. Levine Br. 1–2. And Dr. Levine was not retained in and provided no testimony in the *Edmo v. Idaho Department of Corrections* case B.P.J. cites, 358 F. Supp. 3d 1103 (D. Idaho, 2018) (Levine Br. 2), nor "discredited" or even mentioned in *Brandt v. Rutledge*, 551 F. Supp. 3d 882 (E.D. Ark. 2021) which Plaintiff also cites. Levine Br. 2.

The district court in *Hecox v. Little*, 479 F. Supp. 3d 930 (D. Idaho, 2020) mentioned but dismissed Dr. Levine's detailed expert declaration in that case out of hand, based solely on a citation to the very different *Norsworthy* prison therapy case, without discussing or evaluating Dr. Levine's credentials or the opinions and evidence actually submitted to the *Hecox* court. The *Hecox* court thus fell afoul of the principle that a court may not deny the admissibility of proffered expert evidence based solely on "the decisions of other courts." *Daubert*, 509 U.S. at 597–98.

In short, no court, anywhere in the world, has ever found Dr. Levine unqualified under Rule 702 to offer expert testimony concerning the nature, diagnosis, treatment options, and outcomes of gender dysphoria and transgender identification in individuals of *any* age, including children and adolescents.

B.P.J. also rewrites Dr. Levine's testimony, claiming that he was "shocked" to learn that his declaration from a previous case was submitted in opposition to Plaintiff's motion for a preliminary injunction (he said no such thing[7]) and implies that this, along with Dr. Levine's limited knowledge of the legal issues in this case, somehow negates his qualifications as an expert. Of course this does not. Dr. Levine has now provided an expert report and deposition testimony particular to *this* case.

And it is his job as a scientific expert to provide helpful testimony concerning science—he is not tasked to know, understand, or opine on the legal significance of that science. "One knowledgeable about a particular subject need not be precisely informed about all the details of the issues raised in order to offer an opinion." *Kopf*, 992 F.2d at 377 (citation omitted). B.P.J.'s complaint that Dr. Levine claims no expertise in athletics and offers no opinion on the ultimate question in this case (Levine Br. 7) is misguided and peculiar. Even B.P.J.'s proffered expert, Dr. Adkins, likewise claims no expertise in athletics ("Yeah, I don't study sports," App. 791 (Adkins Dep. 151:12–13)). The problem is that—despite lacking such expertise—she *does* offer opinions on questions of sport policy and the Sports Act.

B.P.J. also accuses Dr. Levine of holding "outlier" views, as though that negates his expertise. Levine Br. 13. But this is an attempt to sneak back in the "general acceptance" standard that *Daubert* expressly rejects. *Supra* at 3. The courtroom remains a forum in which minority scientific views—if they satisfy the basic reliability requirements of *Daubert*—will be heard and weighed, not shouted down.

B.P.J.'s accusation is also factually untrue. As Dr. Levine sets out in his report, major European health authorities have within the last two years shifted strongly

---

[7] *See* Levine Br. 7–8. Dr. Levine actually said, "the first time I submitted an expert opinion report, I was shocked that people had read it who weren't involved in the case." Supp. App. 612 (Levine Dep. at 68:24–69:1).

towards the cautious view that Dr. Levine advocates, prohibiting use of puberty blockers as a treatment for gender dysphoria except in rare cases. App. 311 (Levine Rep. ¶ 82). Major government-sponsored literature reviews report that all studies cited in support of "affirming" care (such as B.P.J.'s experts advocate) are "very low quality." App. 330–32 (Levine Rep. ¶¶ 140–47).

And other prominent voices in the field—including former USPATH board member Dr. Laura Anderson (who is transgender)—are now speaking up to warn that unquestioning affirmation is "harming ... young people." *See* Daubert Resp. App. 234 (Edwards-Leeper, Anderson at 3); App. 304–05 (Levine Rep. ¶¶ 63–64), 309 (Levine Rep. ¶ 75), 311–12 (Levine Rep. ¶ 83), 316 (Levine Rep. ¶ 99)[8]. This is a concern that some American medical organizations and deeply invested practitioners are ignoring developing science and increasingly isolating themselves from the evolving understanding of the international medical community. Indeed, none of B.P.J.'s contentions here has any bearing on Dr. Levine's expertise for purposes of a *Daubert* analysis.

## II. The "methodology" behind Dr. Levine's proffered opinions amply satisfies the requirements of *Daubert* and Rule 702.

B.P.J. contends that certain of Dr. Levine's opinions should be excluded because they are not "derived from sufficiently rigorous methodology." Levine Br. 1, 13. Both B.P.J.'s targets and criticisms are misguided.

Where Dr. Levine quotes from relevant literature to further substantiate his opinions, B.P.J. accuses him (without evidence) of "cherry-picking" and taking things "out of context." Levine Br. 9, 18. But of course it is not possible to quote each cited

---

[8] B.P.J. provides no scientific support for the accusation that Dr. Levine's proffered opinions are "outliers." Levine Br. 5. Instead, B.P.J. cherry-picks a quote from one case that addressed issues not present here. As explained by *Daubert*, a court's decision is not scientific evidence that affects an expert's reliability under Rule 702. *See Daubert*, 509 U.S at 597–98.

article in its entirety (Dr. Levine cites more than 90 articles), and an expert may "pick data from many different sources to serve as circumstantial evidence for a particular hypothesis," consider "scientific literature" and "rely on the studies of other experts" to form his opinions, so long as he also "base[s] his opinions on a reliable scientific method." *Eghnayem*, 57 F. Supp. 3d at 677, 680. "It is acceptable for an expert to rely on the studies of other experts in reaching his own opinions," and proffered expert testimony may be based on "a literature review." *Kolbe v. O'Malley*, 42 F. Supp. 3d 768, 780 (D. Md. 2014). Indeed, B.P.J.'s experts avoid the difficulty of carefully excerpting data from different sources and considering scientific literature by citing *absolutely nothing* to support many of their opinions. But this is not reliable, as an expert may not "make sweeping statements without support," such as identifying specific scientific literature, sufficient facts, and data. *Eghnayem*, 57 F. Supp. 3d at 677, 706.

Where B.P.J. cannot deny the reality of the literature that Dr. Levine cites, B.P.J. simply accuses Dr. Levine of being "wrong," and of contradicting a supposed "consensus." Levine Br. 13, 16. But as reviewed above, now is not the time to decide who is right, and disagreement with a consensus (if such existed) is no grounds for excluding expert testimony under Rule 702 and *Daubert*. The trier of fact will decide later—with the benefit of cross-examination—which view is more convincing. *Supra* at 2–3. B.P.J. cites *no case* where an expert's testimony was *excluded* under *Daubert* because it differed from a "consensus," and this Court should decline to do so here.

B.P.J. accuses Dr. Levine of ignoring sources and opinions inconsistent with Dr. Levine's own opinions. On the contrary, Dr. Levine engages extensively with contrary views and literature. *See* App. 311–13, (Levine Rep. ¶¶ 81–88), 314–15 (Levine Rep. ¶¶ 92–96), 319–20 (Levine Rep. ¶¶ 110–11), 333 (Levine Rep. ¶¶ 151), 336–38 (Levine Rep. ¶¶ 162–66, 168 n.11), 342–43 (Levine Rep. ¶ 184). Rather, it is

B.P.J.'s experts who can claim a so-called consensus only by utterly ignoring the extensive scientific literature and respected voices who disagree with their views.

A. **Dr. Levine did not proffer an expert opinion that "providers are providing rapid affirmation care to transgender adolescents." But he has cited evidence amply supporting that conclusion.**

Plaintiff oddly attacks a supposed expert opinion from Dr. Levine that "providers are providing rapid affirmation care to transgender adolescents." Levine Br. 14–16. No such assertion occurs anywhere in Dr. Levine's expert report,[9] and his one-line answer asserting such in response to a deposition question could scarcely satisfy his advance-disclosure obligations under Rule 26. With that said, sources cited by Dr. Levine in his expert report *do* amply establish that some providers in this country are encouraging social and medical transition without adequate evaluation, disclosures, or meaningfully informed consent, and that respected voices in the field are concerned that young people are suffering avoidable harm as a result.

Among other examples, Dr. Levine cites Dr. Erica Anderson, herself transgender-identifying, a prominent psychologist, the first president of USPATH, and a former board member of the international WPATH, who has repeatedly decried the "sloppy, dangerous care" where providers "are hastily dispensing medicine or recommending medical doctors prescribe it—without following the strict guidelines that govern this treatment." Daubert Resp. App. 233 (Edwards-Leeper and Anderson at 2). As a result, Dr. Edwards-Leeper helped draft new language in the forthcoming Version 8 WPATH Standards of Care, clarifying that "it is important to establish that the young person has experienced *several years* of persistent gender incongruence or

---

[9] It is disappointing, at best, that B.P.J. accuses Dr. Levine of giving opinions that are "flat out false," with no support for that accusation. Levine Br. 14. Indeed, B.P.J. cites Levine's expert report at ¶ 50 as a supposed quote regarding "rapid affirmation care," but that phrase/term neither appears in that paragraph nor anywhere else in Dr. Levine's expert report.

gender diversity prior to initiating gender-affirming hormones or providing gender-affirming surgeries."[10]

Dr. Levine likewise cites a very recent peer-reviewed article which discusses and cites additional peer-reviewed literature reporting that some individuals "express having been too enthusiastically 'affirmed' in their identities by their clinicians, which led to a poor understanding of the medical procedures," and "regret not having received a sufficient exploration of their previous psychological and emotional problems before transitioning." Daubert Resp. App. 260–61 (Expósito-Campos (2021) at 4–5). Another peer-reviewed survey of 100 individuals who desisted in their transgender identity found that 55% "felt that they did not receive an adequate evaluation from a doctor or mental health professional before starting transition." Daubert App. 591 (Littman (2021) at 1). Certainly, such facts are at least evidence of over-hasty encouragement of social and/or medical transition by some clinicians for some patients.

And there is more. But again, now is not the time to decide disputed facts or questions of science. This just shows that (1) B.P.J.'s attack against Dr. Levine's reliability is not directed toward an expert opinion disclosed in his expert report and (2) Dr. Levine's answer to the deposition question about gender-affirming care is reliably supported by sufficient facts, data, and peer-reviewed literature cited in his expert report.

---

[10] WPATH, Standards of Care Version 8 Chapter Draft for Public Comment – Adolescent, at 22 (Dec. 2021), https://www.wpath.org/media/cms/Documents/SOC%20v8/SOC8%20Chapters%20for%20Public%20Comment/SOC8%20Chapter%20Draft%20for%20Public%20Comment%20-%20Adolescent.pdf?_t=1638731433 (last visited May 25, 2022) (emphasis added).

B. **Dr. Levine has not opined that gender-affirming care is unethical, and his opinion that it is "experimental" is amply supported and reliable.**

Again setting up straw men, B.P.J. attacks Dr. Levine for opining that "gender-affirming care" is unethical. Levine Br. 17. But Dr. Levine offered no such opinion. He did opine that it is unethical to tell a parent that unless a child transitions, he or she will kill themselves, App. 337 (Levine Rep. ¶ 166); to prescribe treatments where the risks outweigh the benefits, App. 313 (Levine Rep. ¶ 89); to treat a patient who shows signs of suicidality without making use of known techniques for reducing suicidal thoughts, App. 338 (Levine Rep. ¶ 167); or to prescribe a course of treatment without obtaining meaningful informed consent, App. 341–42 (Levine Rep. ¶ 181). Plaintiff does not—and scarcely could—dispute any of this as unreliable.

Dr. Levine *has* opined that evidence as to the efficacy and safety of social and hormonal transition therapies is "low grade," and that such therapies remain "experimental," and has cited extensive scientific literature and evidence in support of this opinion. *See* App. 342–49 (Levine Rep. ¶¶ 182–201). In order to attack this opinion, B.P.J. is obliged to ignore the very sources that Plaintiff's own experts repeatedly rely on.

In connection with the drafting of the Endocrine Society 2017 Clinical Guidelines for treating gender dysphoria, which B.P.J.'s proffered expert, Dr. Safer, helped draft, and which Drs. Adkins and Safer cite repeatedly in their expert reports, the committee "commissioned two systematic reviews" to review treatment protocols for gender dysphoria. But these systematic reviews found that "The quality of evidence was ... low," Daubert App. 527 (Endocrine Society (2017) at 3873), and noted that "In the future, we need more rigorous evaluations of the effectiveness and safety of endocrine and surgical protocols," Daubert App. 528 (Hembree (2017) at 3874). The Guidelines conclude, "there is much that is still unknown with respect to gender

15

identity." Daubert App. 529 (Endocrine Society (2017) at 3875). This is indeed Dr. Levine's point.

The conclusion of other governmental and independent reviews of available evidence concerning safety and efficacy of puberty blockers and cross-sex hormones that all such evidence is "very low quality" has been cited above. *Supra* at 10–11.

Similarly, the current WPATH Standards of Care cautions, "To date, no controlled clinical trials of any feminizing/masculinizing hormone regimen have been conducted to evaluate safety or efficacy in producing physical transition," and WPATH "strongly recommend[s] that hormone providers regularly review the literature for new information." Daubert App. 999 (WPATH Standards of Care Version 7 (2012) at 47). And the draft forthcoming WPATH Standards of Care Version 8 states, "A key challenge in adolescent transgender care is the quality of evidence for effectiveness of gender affirming medical treatments."[11]

### C. B.P.J.'s denial that "there are widely varying views about the appropriate treatment for gender dysphoria" is specious and not grounds for disqualification under *Daubert* or Rule 702.

B.P.J.'s experts obviously have strong views about treatments for gender dysphoria, and those views may even be "majority" views (although, as WPATH's own Standards of Care and formal positions recently adopted by European countries cited by Dr. Levine suggest, there is by no means certainty on treatments for gender dysphoria among the medical and mental health community globally (*see* App. 304–05 (Levine Rep. ¶¶ 62–64), 311–12 (Levine Rep. ¶¶ 82–83)).

It requires willful blindness on B.P.J.'s part to deny that professional opinions vary widely as to whether, when, and how social transition and hormonal interventions can prudently be recommended. Dr. Levine's report thoroughly documents this recognized diversity of views from sources that cannot be dismissed

---

[11] WPATH at 4, *supra* n. 10.

as "at the fringes"—including sources relied on by B.P.J.'s experts.[12] App. 302–05 (Levine Rep. ¶¶ 55–64), 308–13 (Levine Rep. ¶¶ 74–87). So much evidence establishes this diversity of views on appropriate treatments for gender dysphoria that it cannot be fully reproduced here, and this Court should refer to the above-cited portions of Dr. Levine's report.

By way of example, however, the WPATH Standards of Care (which B.P.J. erroneously points to as representing "consensus") takes no position with respect to social transition of prepubescent children, noting that "This is a controversial issue, and divergent views are held by health professionals," and instead calls on mental health professionals to "support [families] as they work through the options and implications" "*[r]egardless* of a family's decisions regarding transition." Daubert App. 969 (WPATH Standards of Care Version 7 at 17) (emphasis added). Similarly, WPATH notes that views as to eligibility of children for puberty blockers "differ[ ] among countries and centers," and that "Not all clinics offer puberty suppression." Daubert App. 965 (WPATH Standards of Care Version 7 at 13). The "anti-puberty-blocker" views of various European health authorities and prominent voices in the field have been noted above. *Supra* at 10–11.

It is the blatant *disregard* of all this opposing scientific evidence by B.P.J.'s experts that violates *Daubert's* minimum requirement that "reliable" scientific opinion evidence must "account for" opposing evidence. *Eghnayem*, 57 F. Supp. 3d at

---

[12] In an apparent effort to undermine Dr. Levine's reliability, B.P.J. cites a number of studies in a footnote. Levine Br. 18, n.2. But B.P.J. utterly fails to explain how these studies contradict Dr. Levine's opinions on the overall low-grade scientific evidence. And while B.P.J. claims that Dr. Levine "ignores studies contrary to his belief," two of the studies that B.P.J. cites are among those that Dr. Levine also cites to support his opinions. *Id.*; see App. 353, 360 (Levine Rep. Bibliography).

676–77. And again, even if there *were* a stable "consensus" (there is not), that would be no grounds to exclude Dr. Levine's carefully substantiated opinions on this point.[13]

**D.    B.P.J.'s contention that some of Dr. Levine's opinions "directly contradict the Fourth Circuit's holding in *Grimm*" is irrelevant to this motion.**

In 2019, based on whatever factual and expert record was put before it by the parties in that litigation, the court in *Grimm v. Gloucester County School Board* entered summary judgment, and that judgment was affirmed on that record by the Fourth Circuit in 2020. 972 F.3d 586 (4th Cir. 2020). Factual findings in one case are just that—factual findings. They are not precedential legal holdings.[14] On a different, fuller, and more recent record, a separate court must reach its own conclusions, based on the facts put before it. Plaintiff's arguments that some of Dr. Levine's opinions are inconsistent with some of the court's factual findings in *Grimm* is irrelevant to this Court's ultimate factual determinations, and to this *Daubert* motion. A different

---

[13] Dr. Levine's testimony that "51 percent medical certainty is a joke," Supp. App. 613 (Levine Dep. at 74:1–75:12), undermines neither his expertise nor his opinions. His point, repeated from a professor of long ago, is that in the immensely complicated field of medicine, what science thinks it knows repeatedly changes, and that keeping an open mind to new information is critical. With that in mind, any claim of "medical certainty" is indeed hubris. Nor did Dr. Levine's testimony that "people like me" should not be recommending specific therapeutic paths in the area of gender dysphoria in any way contradict his expertise. Rather, his point was a critical one of respect for patient autonomy: "Whether I think in that particular case it's a wise thing or not, it's not my decision to make. I don't actually believe that people like me ought to be recommending. I think we ought to be educating, evaluating, and informing and the parents and the child make the decision with my supportive help." Supp. App. 623 (Levine Dep. at 117:13–19). Plaintiff's attempt to twist this wise counsel into something negative is baseless.

[14] The District Court in *Grimm* admitted the submissions of *amici* in that case only as "evidence of the views of the organizations that prepared them, and not as substantive evidence of the accuracy of such views." *Grimm v. Gloucester Cty. Sch. Bd.*, 400 F. Supp. 3d 444, 455 (E.D. Va. 2019). The Fourth Circuit then quoted these admitted amici briefs in the background section of its opinion. *see Grimm*, 972 F.3d at 594–96.

court's factual findings in a separate case have literally no intersection with any of the eligibility criteria set out in Rule 702 and *Daubert*.

Indeed, the idea of "locking down" the science—such that one court would be bound by science-related factual findings of a different court, on a different record, years earlier—would be particularly pernicious in a field such as transgender health, which WPATH describes as "rapidly evolving." Daubert Resp. App. 889 (WPATH at 7). Even WPATH's own "Standards of Care" are under "perpetual revision" (Version 8 is in process)[15]. *Daubert*, 509 U.S. at 596–97.

More broadly, the Supreme Court recognized in *Daubert* that "[s]cientific conclusions are subject to perpetual revision," and that as a result "open debate is an essential part of both legal and scientific analyses." *Id.* B.P.J. cites no case in which inconsistency with prior factual findings in an entirely separate case is even mentioned as a possible factor that could justify excluding otherwise qualified expert evidence under Rule 702. And as explained earlier, where a trial court excludes expert evidence based on "*the decisions of other courts*," this is reversible error. *Daubert*, 509 U.S at 597–98 (emphasis added). *Supra* at 3.

## III.   Defendant-Intervenor and the State of West Virginia agree with much of B.P.J.'s relevance objections—but only if applied consistently to all parties and experts.

B.P.J. asserts that Dr. Levine's proffered testimony concerning "standards of care for transgender adolescents" and "gender-affirming medical care" are irrelevant, pointing to this Court's statement, in its opinion granting a preliminary injunction, that "what is or should be the default treatment for transgender youth is not a

---

[15] The first six of WPATH's ever-evolving Standards of Care were published in 1979, 1980, 1981, 1990, 1998, and 2001. Daubert App. 949 (Standards of Care Version 7). Dr. Levine began treating individuals with gender dysphoria in 1973, before the first version of the WPATH Standards of Care was even published. App. 282 (Levine Rep. ¶ 5). Dr. Levine chaired the committee that drafted the fifth version. *Id.*

question before the court." Levine Br. 6 (quoting PI Op. at 3 n.4). The objection is largely accurate, but odd, because it is *B.P.J.* who keeps dragging these issues into litigation, in disregard of both plain logic and this Court's prior statements.

West Virginia's Sports Act draws no lines based on gender identity. Nor does it prohibit or favor any particular treatment protocols for gender dysphoria or deny eligibility for girls' or women's athletics based on a particular student's individualized treatment for gender dysphoria.[16]

Nevertheless, B.P.J.'s experts proffer extensive opinion evidence concerning the "affirmation only" treatment protocol that they favor. The great bulk of testimony proffered by Dr. Levine (as well as much of that proffered by Dr. Cantor) simply rebuts this material. Defendant-Intervenor and the State of West Virginia have already filed joint *Daubert* motions asking the Court to exclude such testimony from B.P.J.'s proffered experts as irrelevant (among other grounds). If those motions are granted, Defendant-Intervenor and the State of West Virginia will not seek to introduce this rebuttal expert evidence.

But B.P.J. cannot have it both ways. If B.P.J. insists on introducing irrelevant evidence concerning treatment protocols for gender dysphoria or transgender identification (whether through expert or fact witnesses), Defendant-Intervenor the State of West Virginia's experts must be permitted to rebut B.P.J.'s inaccurate evidence, to avoid confusion and prejudice. *See* Fed. R. Evid. 403. If evidence on these topics is to be excluded as irrelevant, however, it must be excluded categorically: from expert and fact witnesses from all parties.

---

[16] Dr. Adkins states in her rebuttal report that the Sports Act "does not have any effect on" decisions about "appropriate behavioral and medical care for minors with gender dysphoria." Daubert App. 42–43 (Adkins Rebuttal ¶ 14).

Specific examples of B.P.J.'s assertions bearing on standards of care and treatment alternatives for children and adolescents who suffer from gender dysphoria, to which Dr. Levine's testimony responds, include:

- B.P.J.'s Complaint and experts represent to this Court that transgender identity is fixed and biologically based. *See* Compl. ¶¶ 18–19; Daubert App. 150 (Safer Rep. ¶21), 198 (Safer Rebuttal ¶ 7); Daubert App. 9 (Adkins Rep. ¶ 18), 41 (Adkins Rebuttal ¶ 11). Dr. Levine cites extensive evidence that transgender identity is often *not* fixed and he details the *lack* of significant scientific evidence for any biological basis for transgender identification. App. 284–325 (Levine Rep. ¶¶ 14–126).

- B.P.J.'s Complaint and expert, Dr. Adkins, represent to this court that "affirmation," including social transition and hormonal interventions, is "safe" and "avoid[s] serious harm." Compl. ¶¶ 23–25, 81; Daubert App. 10 (Adkins Rep. ¶ 22), 13 (Adkins Rep. ¶ 34); 46–49 (Adkins Rebuttal ¶¶ 21, 24). Dr. Levine cites extensive peer-reviewed literature to document that the "safety" of these physical and psychological interventions has by no means been demonstrated, and that on the contrary these measures expose young people to well-documented and serious risks of both physical and mental health harm over the long term. App. 325–51 (Levine Rep. ¶¶ 127–207).

- B.P.J. and B.P.J.'s expert, Dr. Adkins, assert to this Court that failure to permit biologically male youths who suffer from gender dysphoria to participate in female athletics will interfere with "part of [their] identity and medical care," Compl. ¶ 78, and cause "extreme[ ] harm[ ]." Daubert App. 9–12 (Adkins Rep. ¶¶ 20–28). Dr. Levine documents that social transition (a psychotherapeutic intervention which B.P.J. demands the State actively participate in and facilitate by allowing students to participate on sports teams based on gender identity rather than biological sex) has *not* been shown to improve mental or physical health, nor to decrease the risk of suicide. App. 329–41 (Levine Rep. ¶¶ 138–78).

- B.P.J.'s Complaint and expert, Dr. Adkins, represent to this Court that "affirmation" is the only accepted response to gender dysphoria in young people. Compl. ¶¶ 23–25; Daubert App. 10 (Adkins Rep. ¶ 22). Dr. Levine documents the current wide range of views among mental health professionals as to the appropriateness of social transition and hormonal interventions for young people, including the increasing number of health authorities in other developed countries that are shifting away from approving such interventions, precisely because of the lack of evidence of efficacy and safety. App. 302–13 (Levine Rep. ¶¶ 55–89).

In fact, none of these propositions, whether true or false, bears in any way on the question of whether the West Virginia Sports Act—which defines biological sex and preserves female teams for biological females has a sufficient nexus to the State's undoubted interests in providing fair and safe athletic experiences for biological females, in furtherance of Title IX's concerns regarding female sports, to satisfy intermediate scrutiny. As amply demonstrated by the expert evidence of Dr. Gregory Brown and Dr. Chad Carlson, when it comes to fairness and safety in sports, it is biology, not gender identity, that matters, and the line drawn by the Sports Act thus has a very substantial—indeed tight—relationship to the interests that it furthers.

## CONCLUSION

For the reasons set forth above, this Court should exclude as irrelevant all expert or fact testimony and evidence relating to the nature of transgender identity, therapies and treatment protocols for gender dysphoria or transgender identification, and the outcomes resulting from such therapies and treatment protocols or denial of such therapies and treatment protocols, and should deny Plaintiff's motion to exclude the testimony of Dr. Stephen Levine, M.D., in all other respects.

Respectfully submitted this 12th day of May, 2022.

PATRICK MORRISEY
  *West Virginia Attorney General*

/s/ Brandon S. Steele
Brandon Steele, WV Bar No. 12423
Joshua D. Brown, WV Bar No. 12652
The Law Offices of Brandon S. Steele
3049 Robert C. Byrd Drive, Suite 100
Beckley, WV 25801
(304) 253-1230
(304) 255-1520 Fax
bsteelelawoffice@gmail.com
joshua_brown05@hotmail.com

Jonathan Scruggs, AZ Bar No.
030505*
Roger G. Brooks, NC Bar No. 16317*
Henry W. Frampton, IV, SC Bar No.
75314*
Alliance Defending Freedom
15100 N. 90th Street
Scottsdale, AZ 85260
(480) 444-0020
(480) 444-0028 Fax
jscruggs@adflegal.org
rbrooks@adflegal.org
hframpton@adflegal.org

Christiana Holcomb, DC Bar No.
176922*
Alliance Defending Freedom
440 First Street NW, Suite 600
Washington, DC 20001
(202) 393-8690
(202) 347-3622 Fax
cholcomb@adflegal.org

/s/ Curtis R. A. Capehart
Douglas P. Buffington II (WV Bar # 8157)
  *Chief Deputy Attorney General*
Curtis R.A. Capehart (WV Bar # 9876)
  *Deputy Attorney General*
David C. Tryon (WV Bar #14145)
  *Deputy Solicitor General*
OFFICE OF THE WEST VIRGINIA ATTORNEY
GENERAL
State Capitol Complex
1900 Kanawha Blvd. E, Building 1, Room
E-26
Charleston, WV 25305-0220
Telephone: (304) 558-2021
Facsimile: (304) 558-0140
Email:  David.C.Tryon@wvago.gov

*Counsel for Defendant, STATE OF
WEST VIRGINIA*

(signatures continued on next page)

23

Tyson C. Langhofer, VA Bar No.
95204*
Rachel A. Csutoros, MA Bar No.
706225*
Alliance Defending Freedom
44180 Riverside Parkway
Lansdowne, VA 20176
(571) 707-2119
(571) 707-4790 Fax
tlanghofer@adflegal.org
rcsutoros@adflegal.org

Travis C. Barham, GA Bar No.
753251*
Alliance Defending Freedom
1000 Hurricane Shoals Road NE, Ste
D-1100
Lawrenceville, GA 30043
(770) 339-0774
(770) 339-0774 Fax
tbarham@adflegal.org

Timothy D. Ducar, AZ Bar No.
015307*
Law Offices of Timothy D. Ducar, PLC
7430 E. Butherus Drive, Suite E
Scottsdale, AZ 85260
(480) 502-2119
(480) 452-0900 Fax
tducar@azlawyers.com


*Visiting Attorneys
Attorneys for Defendant-Intervenor

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA
CHARLESTON DIVISION

| | |
|---|---|
| B.P.J., by her next friend and mother, HEATHER JACKSON<br><br>*Plaintiff,*<br><br>    v.<br><br>WEST VIRGINIA STATE BOARD OF EDUCATION, HARRISON COUNTY BOARD OF EDUCATION, WEST VIRGINIA SECONDARY SCHOOL ACTIVITIES COMMISSION, W. CLAYTON BURCH in his official capacity as State Superintendent, DORA STUTLER in her official capacity as Harrison County Superintendent, and THE STATE OF WEST VIRGINIA<br><br>*Defendants,*<br><br>    and<br><br>LAINEY ARMISTEAD<br><br>*Defendant-Intervenor.* | Case No. 2:21-cv-00316<br><br>Hon. Joseph R. Goodwin |

## CERTIFICATE OF SERVICE

I, Brandon Steele, hereby certify that on May 26, 2022, I electronically filed a true and exact copy of the forgoing with the Clerk of Court and all parties using the CM/ECF system.

*/s/ Brandon S. Steele*
Brandon Steele, WV Bar No. 12423
The Law Offices of Brandon S. Steele
3049 Robert C. Byrd Drive, Suite 100
Beckley, WV 25801
(304) 253-1230
(304) 255-1520 Fax
bsteelelawoffice@gmail.com

*Attorney for Defendant-Intervenor*

25