# SECOND SUPPLEMENTAL APPENDIX TO DEFENDANT-INTERVENOR'S MOTION FOR SUMMARY JUDGMENT

TABLE OF CONTENTS:

SECOND SUPPLEMENTAL APPENDIX TO DEFENDANT-INTERVENOR'S MOTION FOR SUMMARY JUDGMENT

|  | Description | Appendix Page Number(s) |
|---|---|---|
| 1 | Deposition Transcript of Lainey Armistead | 3 |
| 2 | Defendant-Intervenor's Responses to Plaintiff's First Set of Interrogatories | 78 |
| 3 | Email from Counsel Regarding Supplemental Disclosures | 101 |
| 4 | WVSSAC Board of Directors – Transgender Policy | 114 |

```
 1              IN THE UNITED STATES DISTRICT COURT
 2          FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA
 3                     CHARLESTON DIVISION
   _____
 4  B.P.J. by her next friend and)
 5  mother, HEATHER JACKSON,      )
 6           Plaintiff,           )
      vs.                         ) Case No.
 7  WEST VIRGINIA STATE BOARD OF ) 2:21-cv-00316
 8  EDUCATION, HARRISON COUNTY    )
    BOARD OF EDUCATION, WEST      )
 9  VIRGINIA SECONDARY SCHOOL     )
10  ACTIVITIES COMMISSION, W.     )
    CLAYTON BURCH in his official)
11  capacity as State             )
12  Superintendent, DORA STUTLER,)
    in her official capacity as  )
13  Harrison County               )
14  Superintendent, and THE STATE)
15  OF WEST VIRGINIA,             )
             Defendants,          )
16  LAINEY ARMISTEAD,             )
17          Defendant-Intervenor.)
   _____)
18              REMOTE VIDEOTAPED DEPOSITION OF
19                      LAINEY ARMISTEAD
20                  Friday, March 11, 2022
21                        Volume I
22  Reported by:
23  ALEXIS KAGAY, CSR No. 13795
24  Job No. 5082427
25  PAGES 1 - 175
```

Page 1

Armistead Second Supp. App. 0003

| | |
|---|---|
| 1    IN THE UNITED STATES DISTRICT COURT<br>2   FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA<br>3      CHARLESTON DIVISION<br>    _____<br>4  B.P.J. by her next friend and)<br>5  mother, HEATHER JACKSON,   )<br>6      Plaintiff,     )<br>     vs.        ) Case No.<br>7  WEST VIRGINIA STATE BOARD OF ) 2:21-cv-00316<br>8  EDUCATION, HARRISON COUNTY  )<br>    BOARD OF EDUCATION, WEST   )<br>9  VIRGINIA SECONDARY SCHOOL   )<br>10 ACTIVITIES COMMISSION, W.   )<br>    CLAYTON BURCH in his official)<br>11 capacity as State       )<br>12 Superintendent, DORA STUTLER,)<br>   in her official capacity as )<br>13 Harrison County        )<br>14 Superintendent, and THE STATE)<br>15 OF WEST VIRGINIA,      )<br>     Defendants,    )<br>16 LAINEY ARMISTEAD,     )<br>17    Defendant-Intervenor.)<br>   _____)<br>18<br>19    Videotaped deposition of LAINEY ARMISTEAD,<br>20 Volume I, taken on behalf of Plaintiff, with all<br>21 participants appearing remotely, beginning at<br>22 12:03 p.m. and ending at 5:03 p.m. on Friday,<br>23 March 11, 2022, before ALEXIS KAGAY, Certified<br>24 Shorthand Reporter No. 13795.<br>25<br>                         Page 2 | 1  APPEARANCES (Continued):<br>2<br>3  For defendants Harrison County Board of Education and<br>4  Superintendent Dora Stutler:<br>5    STEPTOE & JOHNSON PLLC<br>6    BY:  SUSAN L. DENIKER<br>7    Attorney at Law<br>8    400 White Oaks Boulevard<br>9    Bridgeport, West Virginia 26330<br>10   304.933.8154<br>11   Susan.Deniker@Steptoe-Johnson.com<br>12<br>13<br>14 For the State of West Virginia:<br>15   WEST VIRGINIA ATTORNEY GENERAL<br>16   BY:  DAVID TRYON<br>17   Attorney at Law<br>18   112 California Avenue<br>19   Charleston West Virginia 25305-0220<br>20   681.313.4570<br>21   David.C.Tryon@wvago.gov<br>22<br>23<br>24<br>25<br>                         Page 4 |
| 1  APPEARANCES (via Zoom Videoconference):<br>2<br>3  For the Intervenor:<br>4    ALLIANCE DEFENDING FREEDOM<br>5    BY:  CATIE KELLEY<br>6    BY:  JONATHAN SCRUGGS<br>7    BY:  CHRISTIANA HOLCOMB<br>8    BY:  RACHEL CSUTOROS<br>9    BY:  HAL FRAMPTON<br>10   BY:  TIMOTHY DUCAR<br>11   Attorneys at Law<br>12   20116 Ashbrook Place<br>13   Suite 250<br>14   Ashburn, Virginia 20147<br>15   CKelly@adflegal.org<br>16   JScruggs@adflegal.org<br>17   CHolcomb@adflegal.org<br>18   RCsutoros@adflegal.org<br>19   TDucar@adflegal.org<br>20<br>21<br>22<br>23<br>24<br>25<br>                         Page 3 | 1  APPEARANCES (Continued):<br>2<br>3  For West Virginia Secondary School Activities<br>4  Commission:<br>5    SHUMAN MCCUSKEY & SLICER<br>6    BY:  ROBERTA GREEN<br>7    Attorney at Law<br>8    1411 Virginia Street E<br>9    Suite 200<br>10   Charleston, West Virginia 25301-3088<br>11   RGreen@Shumanlaw.com<br>12<br>13 For West Virginia Board of Education and Superintendent<br>14 Burch, Heather Hutchens as general counsel for the<br>15 State Department of Education:<br>16   BAILEY & WYANT, PLLC<br>17   BY:  KELLY MORGAN<br>18   Attorney at Law<br>19   500 Virginia Street<br>20   Suite 600<br>21   Charleston, West Virginia 25301<br>22   KMorgan@Baileywyant.com<br>23<br>24<br>25<br>                         Page 5 |

2 (Pages 2 - 5)

Armistead Second Supp. App. 0004

1 APPEARANCES (Continued):
2
3 For Plaintiff:
4    LAMBDA LEGAL
5    BY:  SRUTI SWAMINATHAN
6    Attorney at Law
7    120 Wall Street
8    Floor 19
9    New York, New York 10005-3919
10   SSwaminathan@lambdalegal.org
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
Page 6

1 APPEARANCES (Continued):
2
3 For the Plaintiff:
4    AMERICAN CIVIL LIBERTIES UNION
5    BY:  JOSHUA A. BLOCK
6    125 Broad Street
7    18th Floor
8    New York, New York 10004
9    JBlock@aclu.org
10   212.549.2500
11
12 Also Present:
13   MITCH REISBORD - VERITEXT CONCIERGE
14
15 Videographer:
16   DAVE HALVORSON
17
18
19
20
21
22
23
24
25
Page 8

1 APPEARANCES (Continued):
2
3 For The Plaintiff, B.P.J.:
4    COOLEY
5    BY:  KATHLEEN HARTNETT
6    BY:  ELIZABETH REINHARDT
7    BY:  KATELYN KANG
8    BY:  ANDREW BARR
9    BY:  MATT MARTINEZ
10   BY:  JULIE VEROFF
11   Attorneys at Law
12   500 Boylston Street
13   14th Floor
14   Boston, Massachusetts 02116-3740
15   617.937.2305
16   Khartnett@cooley.com
17   EReinhardt@cooley.com
18   KKang@Cooley.com
19   ABarr@Cooley.com
20   MMartinez@Cooley.com
21   JVeroff@cooley.com
22
23
24
25
Page 7

1              INDEX
2 WITNESS                    EXAMINATION
3 LAINEY ARMISTEAD
4 Volume I
5
6        BY MR. BARR              14
7
8
9            EXHIBITS
10 NUMBER        DESCRIPTION        PAGE
11 Exhibit 43   West Virginia State University   122
12             Board of Governors Document, BOG
13             #14 Policy, Title: Unlawful
14             Discrimination and Harassment,
15             Sexual Harassment, Grievance
16             Procedures, Child Abuse and
17             Neglect Reporting and
18             Relationships
19
20
21
22
23
24
25
Page 9

3 (Pages 6 - 9)

Armistead Second Supp. App. 0005

| | PREVIOUSLY MARKED EXHIBITS | |
|---|---|---|
| 1 | | |
| 2 | NUMBER | PAGE |
| 3 | Exhibit 34 | 78 |
| 4 | Exhibit 39 | 144 |
| 5 | Exhibit 40 | 149 |

Page 10

1    MS. VEROFF:  This is Julie --

2    MS. KANG:  This is --

3    MS. VEROFF:  Oh, sorry, Katelyn, go ahead.

4    MS. KANG:  Hi.  This is Katelyn Kang from

5 Cooley on behalf of the plaintiff.

6    MS. VEROFF:  This is Julie Veroff from Cooley,

7 LLP, on behalf of the plaintiff.

8    MS. REINHARDT:  This is Elizabeth Reinhardt

9 with Cooley, LLP, for the plaintiff.

10    MS. SWAMINATHAN:  This is Sruti --

11    MR. BLOCK:  Josh --

12    MS. SWAMINATHAN:  -- Swaminathan -- sorry,

13 Josh, go ahead.

14    MR. BLOCK:  No, no, you go ahead.

15    MS. SWAMINATHAN:  This is Sruti Swaminathan

16 from Lambda Legal on behalf of the plaintiff.

17    MR. BLOCK:  Josh Block from the ACLU on behalf

18 of plaintiff.

19    MS. HOLCOMB:  If that's everyone from

20 Plaintiff, this is Christiana Holcomb with Alliance    12:05:29

21 Defending Freedom on behalf of the intervenor,

22 Lainey Armistead.

23    And with me, we also have my colleague

24 Hal Frampton, Jonathan Scruggs, Catie Kelley,

25 Rachel Csutoros and Timothy Ducar.    12:05:42

Page 12

1        Friday, March 11, 2022

2            12:03 p.m.

3    THE VIDEOGRAPHER:  Okay.  Good afternoon.

4    We are on the record at 12:04 p.m. on

5 March 11th, 2022.  This is media unit 1 in the    12:03:44

6 video-recorded deposition of Lainey Armistead in the

7 matter of B.P.J. by Heather Jackson versus

8 West Virginia State Board of Education, et al.

9    It's filed in the U.S. District Court for the

10 Southern District of West Virginia in the Charleston    12:04:04

11 Division.  The case number is 2:21-cv-00316.

12    This deposition is being held virtually.  My

13 name is Dave Halvorson.  I'm the videographer here from

14 Veritext.  And I'm here with the court reporter,

15 Alexis Kagay, also from Veritext.    12:04:25

16    Counsel, can you please all identify

17 yourselves so the witness can be sworn in.

18    MR. BARR:  Yes.  Good afternoon.

19    This is Andrew Barr from the law firm

20 Cooley, LLP.  I'll have the rest of my co-counsel    12:04:37

21 introduce themselves before defense and intervenor

22 counsel.

23    THE VIDEOGRAPHER:  Okay.

24    MS. HARTNETT:  Hi.  This is Kathleen Hartnett

25 from Cooley for the plaintiffs.    12:04:48

Page 11

1    MS. DENIKER:  Good afternoon

2    This is Susan Deniker, counsel for defendants

3 Harrison County Board of Education and Superintendent

4 Dora Stutler

5    MS. MORGAN:  Kelly Morgan on behalf of the    12:05:56

6 West Virginia Board of Education and

7 Superintendent Burch

8    MS. ROGERS:  This is Shannon Rogers on behalf

9 of the West Virginia Secondary School Activities

10 Commission  And I believe Roberta Green is on Zoom on    12 06:07

11 behalf of the SSAC as well

12    MS GREEN:  I am  Thank you

13    MR TRYON:  This is David Tryon from the West

14 Virginia Attorney General's Office on behalf of the

15 State of West Virginia    12:06:21

16    THE VIDEOGRAPHER:  Is that everyone?  Last

17 chance

18    All right  Go ahead, let's swear in the

19 witness, please

20    (Witness sworn )    12:06:34

21    THE VIDEOGRAPHER:  Please proceed

22    MR BARR:  Before we get started, I just

23 wanted to memorialize for the record that the parties

24 have agreed that objections to form will preserve all

25 objections other than privilege and that there will be    12:06:58

Page 13

4 (Pages 10 - 13)

Armistead Second Supp. App. 0006

1 no speaking objections on the record.

2      And, Attorney Holcomb, if you could confirm

3 that.

4      MS. HOLCOMB: I concur. Thank you.

5      MR. BARR: Would the rest of defense counsel    12:07:08

6 please also concur.

7      MS. DENIKER: This is Susan Deniker. I'm in

8 agreement with that.

9      MS. MORGAN: This is Kelly Morgan. I'm in

10 agreement.    12:07:22

11      MS. ROGERS: This is Shannon Rogers. I'm in

12 agreement.

13      MR. TRYON: That's fine.

14      MR. BARR: Okay. I believe that's all defense

15 counsel.    12:07:38

16

17           LAINEY ARMISTEAD,

18 having been administered an oath, was examined and

19 testified as follows:

20

21           EXAMINATION

22 BY MR. BARR:

23   Q  Good afternoon. My name is Andrew Barr. I'm

24 with the law form of Cooley, LLP. I'm located in

25 Denver. I use the pronouns of he and him, and I'm    12:07:40

Page 14

1 representing the plaintiff B.P.J. in this case.

2      Would you please state your name and spell it

3 for the record.

4   A  Lainey Armistead, L A-I-N-E-Y

5 A-R-M-I-S-T-E-A-D.    12:08:01

6   Q  And which pronouns do you use?

7   A  She/her.

8   Q  Is it okay with you -- is it okay with you if

9 I refer to you as "Ms. Armistead" today?

10   A  That's okay.    12:08:14

11   Q  Am I pronouncing your name correctly?

12   A  Yes.

13   Q  So before we get started, I want to discuss a

14 few things about the process for today.

15      The oath you've taken is the same oath you    12:08:28

16 would take in a court of -- courtroom.

17      Do you understand that?

18   A  Yes.

19   Q  That means you must testify truthfully and not

20 leave out any important facts.    12:08:36

21      Is there any reason you cannot testify

22 truthfully today?

23   A  No.

24   Q  Okay. Please give verbal answers to my

25 questions. Nonverbal answers, such as nodding or    12:08:45

Page 15

1 shaking your head, can't be reflected in the

2 transcript; and, therefore, I need you to answer

3 verbally.

4      Do you understand?

5   A  Yes.    12:08:54

6   Q  If you don't understand a question that I ask,

7 I promise you it isn't a trick question; I probably

8 just worded it poorly. So just ask me to ask again,

9 okay?

10   A  Okay.    12:09:07

11   Q  And what that does mean is if you do not ask

12 me to reword it, I'll assume you understood the

13 question, okay?

14   A  Okay.

15   Q  At no point today am I asking about the    12:09:17

16 substance of communications that you've had with your

17 attorneys. So if I ask a question and you think that's

18 what I'm asking, please do not give me any

19 information you have, based on conversation with your

20 attorney, okay?    12:09:32

21   A  Got it.

22   Q  We're obviously on the -- the Zoom platform,

23 which makes it very important we don't speak over each

24 other. So let me finish my question, and I will let

25 you finish your answer. Understood?    12:09:47

Page 16

1   A  Got it.

2   Q  And then we're here today talking about

3 House Bill 3293 that's been codified at West Virginia

4 Code 18-2-25d. I'm going to refer to that just as

5 "H.B. 3923" -- or "3293." Is that okay?    12:10:09

6   A  Yes.

7   Q  I'm also certainly going to mess those numbers

8 up and perhaps call it 3923 or something else.

9      Do you understand that if I talk about

10 House Bill 3293 or a similar set of numbers, I'm    12:10:23

11 actually talking about House Bill 3293?

12   A  Yes.

13   Q  Okay. There's a couple of words we're going

14 to be using today that I just want to explain to you

15 what I mean by those words so that we have -- we all    12:10:31

16 have a similar understanding about what I'm asking.

17      When I say the word "cisgender," I mean

18 someone whose gender identity matches the sex they were

19 assigned at birth.

20      Do you understand what that means?    12:10:52

21      MS. HOLCOMB: Objection to form.

22      MR. TRYON: Objection.

23      MR. BARR: And, defense counsel, I'm willing

24 to give you a standing objection to terminology

25 throughout this because I feel like we've established,    12:10:58

Page 17

5 (Pages 14 - 17)

Armistead Second Supp. App. 0007

1 over the past couple of weeks, we're just going to have
2 a fundamental disagreement on terminology, and I don't
3 think there's a reason you should have to object every
4 single time I say the word "transgender" or
5 "cisgender."                                    12:11:11
6       MR. TRYON: I'm objecting -- I'm objecting to
7 your definitional actions -- instructions.  Excuse me.
8       MR. BARR: Understood.
9 BY MR. BARR:
10      Q  Ms. Armistead, do you know what I mean when I   12:11:23
11 say the word "cisgender"?
12      A  I understand what you are referring to.
13      Q  Okay.  Just to be clear, what am I referring
14 to?
15      A  You are talking about a biological male.   12:11:36
16      Q  Well, let's -- let's make sure we're all
17 talking about the same thing here.
18         When I say "cisgender," I'm saying someone
19 whose gender identity matches the sex they were
20 assigned at birth.                             12:11:52
21         Is that something that you are able to
22 understand moving forward in this deposition?
23      MR. TRYON: Objection.
24      MS. HOLCOMB: Object to form.
25      THE WITNESS: I understand what you are   12:12:04
                                          Page 18

1 referring to.
2       MR. BARR: Okay.  Hold on.  My lights just
3 turned off for some reason.
4       I apologize.  In making an effort to be
5 environmentally friendly, my lights turn off every 47   12:12:29
6 minutes, so I'll try to avoid that.
7 BY MR. BARR:
8       Q  Same thing, Ms. Armistead, when I say
9 "transgender," what I'm referring to is someone whose
10 gender identity does not match the sex they were   12:12:41
11 assigned at birth.
12         Do you understand that?
13      MR. TRYON: Objection.
14      MS. HOLCOMB: Same objection.
15      THE WITNESS: I understand what you are   12:12:48
16 referring to.
17 BY MR. BARR:
18      Q  So when I say the word "cisgender" or
19 "transgender" today, those are the definitions I am
20 using.                                         12:12:54
21      A  Okay.
22      Q  When I say "B.P.J.," I'm referring to the
23 plaintiff in this case.
24         Do you understand that?
25      A  Yes.                                   12:13:06
                                          Page 19

1       Q  Did you prepare for this deposition?
2       A  Yes.
3       Q  How?
4       MS. HOLCOMB: And I'll just object to the
5 extent that it calls for any privileged attorney-client   12:13:23
6 communications, but, Lainey, you can answer.
7       THE WITNESS: I prepared with my attorneys.
8 BY MR. BARR:
9       Q  Other than speaking with your attorneys, did
10 you do anything else to prepare for this deposition?   12:13:33
11      A  No.
12      Q  Did you review any documents?
13      A  When I was speaking to my attorneys.
14      Q  Okay.  Which documents were those?
15      A  Documents that have already been turned over   12:13:56
16 to the plaintiff, such as my declaration.
17      Q  Other than your declaration, what documents
18 did you review?
19      A  I reviewed documents that we turned over to
20 the plaintiff.                                 12:14:18
21      Q  I understand.  I'm asking which ones.
22      A  I don't recall all the documents that we
23 reviewed or turned over to the plaintiff.
24      Q  Well, let's just work on identifying some of
25 those.                                         12:14:34
                                          Page 20

1          So you said the declaration  Beyond the
2 declaration, what did you review to prepare for this
3 deposition?
4       A  I reviewed scholarship information  I
5 reviewed text messages with my mom and my declaration   12:14:52
6       Q  Is that it?
7       A  I don't recall all of the documents that I
8 reviewed
9       Q  When did you review these?
10      A  Within the last week           12:15:10
11      Q  But the only thing you remember looking at was
12 your declaration, some text messages and scholarship
13 information
14         Did I understand that correctly?
15      A  Yes                            12:15:26
16      Q  Have you ever had your deposition taken
17 before?
18      A  No
19      Q  Have you ever testified at trial?
20      A  No                              12:15:41
21      Q  Did you bring anything with you today?
22      A  My laptop
23      Q  Are you referring to your laptop during this
24 deposition?
25      A  What do you mean?              12:15:58
                                          Page 21

                                    6 (Pages 18 - 21)

Armistead Second Supp. App. 0008

1  Q  So explain to me why you brought your laptop
2  to the deposition.
3  A  So I could be in the deposition via Zoom.
4  Q  Is there anyone else in the room with you?
5  A  Yes.                              12:16:20
6  Q  Who else is in the room?
7  A  Christiana and Catie.
8  Q  And by "Christiana" and "Catie," you're
9  referring to your attorneys?
10  A  Yes.                             12:16:39
11  Q  Other than your laptop, did you bring anything
12  else with you today?
13  A  I brought water, snacks, a book bag, a laptop
14  charger.
15  Q  Any documents?                    12:17:02
16  A  No.
17  Q  Have you ever been a party to a lawsuit?
18  A  No.
19  Q  Other than this case, have you ever intervened
20  in a lawsuit?                        12:17:21
21  A  No.
22  Q  Did you know what an intervenor was prior to
23  this lawsuit?
24  A  Kind of.
25  Q  What is your understanding of an intervenor?  12:17:39

Page 22

1  A  My understanding is that it's someone who can
2  intervene for a certain side that they support and
3  hopefully maintain the bill or law and keep it in
4  place.
5  Q  And was that your understanding before or   12:18:02
6  after you intervened in this case?
7  A  After.
8  Q  What was your understanding of an intervenor
9  before this case?
10  A  It was a vague understanding that I had heard  12:18:16
11  from a TV show or something.  It wasn't a clear
12  understanding.
13  Q  So what was that vague understanding?
14  A  Someone who supports a bill or law.
15  Q  Why did you decide to intervene in this case?  12:18:40
16  A  Because I care about women's sports and the
17  sport that I play, and I think that it's a good law.
18  Q  How did you decide to actually intervene?
19  I understand you support the bill, but it
20  sounds like you didn't really understand what an  12:19:10
21  intervenor was prior to this lawsuit, so I'm trying to
22  understand how you actually intervened in this case.
23  MS. HOLCOMB:  And I'll just object to the
24  extent it calls for any communications between Lainey
25  and myself.                          12:19:23

Page 23

1  THE WITNESS:  I don't know how to answer that
2  question without divulging privileged information.
3  BY MR. BARR:
4  Q  Let me ask it a different way.
5  Prior to discussing this case with the ADF,   12:19:32
6  were you interested in intervening?
7  And by "ADF," I mean your attorneys.
8  A  No.
9  Q  Was intervening an easy decision?
10  A  No.                             12:19:53
11  Q  Why not?
12  A  Because it's not always easy standing up for
13  what you believe when you know other people do not also
14  believe in that, and it's a public thing, and I was
15  nervous about it.                     12:20:21
16  Q  Did you talk with anyone about the decision
17  prior to making it?
18  MS. HOLCOMB:  Same objection.
19  BY MR. BARR:
20  Q  Other than your attorneys.           12:20:34
21  A  Yes.
22  Q  Who?
23  A  My parents, my coach and my siblings.
24  Q  Anyone else?
25  A  I may have talked about it with my best friend  12:20:56

Page 24

1  before I chose to intervene.
2  Q  Explain to me those discussions with your
3  parents.
4  A  I asked them what they thought about the law
5  and how they -- if they thought that intervening would  12:21:28
6  be a good decision on my part, and they supported me.
7  Q  Did you approach your parents about
8  intervening, or did your parents approach you about
9  intervening?
10  A  I approached my parents.            12:21:48
11  Q  And you said your parents supported your
12  decision; is that right?
13  A  Yes.
14  Q  Did they explain why they supported your
15  decision?                           12:22:10
16  A  Soccer is a huge deal in my family, and it's
17  something that I grew up with, and my dad grew up
18  coaching me and other female athletes and male
19  athletes, and he thinks that it was a good -- he thinks
20  that it's a good law because he's seeing the   12:22:34
21  differences, and he encouraged me.
22  Q  What about your mom?
23  A  My mom is supportive in all that I do.
24  Q  There's nothing you have done your mom doesn't
25  support?                            12:22:56

Page 25

7 (Pages 22 - 25)

Armistead Second Supp. App. 0009

**Page 26**

1  A  She is supportive with everything that I do.

2  Q  When did you reach out to your attorneys, ADF?

3     MS. HOLCOMB:  Again, objection to the extent

4  it calls for communications, Lainey, between your

5  attorneys and you.                    12:23:22

6     MR. BARR:  I'm just asking about the initial

7  reach-out.  There certainly wouldn't have been a

8  relationship between client and attorney at that point.

9     THE WITNESS:  I don't recall the exact time

10 when I first got in contact with ADF.        12:23:34

11 BY MR. BARR:

12 Q  Was it before or after the bill had been

13 passed?

14 A  After.

15 Q  So are -- are we thinking June timeframe of   12:23:48

16 last year?

17 A  I don't recall an exact date.

18 Q  Just give me a -- a timeframe.  I'm trying to

19 understand the sequence of events.

20 A  I would say it was sometime in 2021.        12:24:21

21 Q  So you don't recall even time of year that you

22 had reached out to them?

23 A  I don't remember the first conversation I had

24 with her, no.

25 Q  And who is "her" in that sentence?          12:24:40

**Page 27**

1  A  My attorney, Christiana.

2  Q  How did you find ADF when you decided you

3  wanted to intervene?

4  A  My mom has a friend who works for ADF.

5  Q  Who is that friend?                  12:25:08

6  A  Jamie Metzger.

7  Q  Did your mom speak with Jamie about this case?

8     MS. HOLCOMB:  Object to form.

9     THE WITNESS:  I can't comment on the

10 conversations that my mom has with other people.   12:25:25

11 BY MR. BARR:

12 Q  I didn't ask for the substance.  I'm just

13 asking if your mom reached out to her friend regarding

14 this case.

15    MS. HOLCOMB:  Again, object to form.       12:25:40

16    THE WITNESS:  I'm not sure if my mom reached

17 out to her or not.

18 BY MR. BARR:

19 Q  So you spoke to your parents about

20 intervening, your mom happened to have a friend at ADF,  12:25:50

21 and that's how you got connected with ADF.  Am I

22 understanding that correctly?

23 A  No.

24 Q  So what happened?

25 A  I don't know how to answer that question   12:26:11

**Page 28**

1  without giving privileged information -- information

2  with my attorney and I.

3  Q  I certainly don't want privileged information.

4     Would it be fair to say that the first time

5  you thought about intervening in this case was in   12:26:20

6  connection with the discussion with your attorneys?

7  A  Yes.

8  Q  And you don't recall when that was?

9  A  It was sometime last year.

10 Q  Was it your -- your mom's friend Jamie who   12:26:42

11 encouraged you to join as an intervenor?

12 A  No.

13 Q  Who encouraged you to join as an intervenor?

14    MR. TRYON:  Objection.

15    THE WITNESS:  I made the decision after   12:27:12

16 talking with my -- I made the decision after a lot of

17 thought, prayer and then communications with my

18 parents.

19 BY MR. BARR:

20 Q  What's Jamie's last name?              12:27:33

21 A  Metzger.

22 Q  Do you know what Jamie Metzger does at ADF?

23 A  I do not.

24 Q  How does your mom know Jamie?

25    MS. HOLCOMB:  Object to form.           12:27:51

**Page 29**

1     THE WITNESS:  My -- through my mom's adoption

2  agency.

3  BY MR. BARR:

4  Q  Could you explain that with a little more

5  detail, please?                      12:28:05

6  A  I'm not sure exactly how they know each other,

7  but I do believe that it was from my mom's adoption

8  agency, and Jamie writes articles about adoption.

9  Q  Help me understand.  Your mom knows Jamie

10 because of articles that Jamie has written that pertain  12:28:37

11 to adoptions?

12 A  I believe so.

13 Q  What's the nature of these articles?

14    MS. HOLCOMB:  Object to form.

15    THE WITNESS:  It's about adoption.        12:28:55

16 BY MR. BARR:

17 Q  But specifically, what is -- what -- is

18 Jamie -- what is Jamie saying in these articles about

19 adoption?

20    MS. HOLCOMB:  Object to form.           12:29:08

21    THE WITNESS:  I don't know.  You'd have to

22 read them.

23 BY MR. BARR:

24 Q  Have you read them?

25 A  I might have read one of them.  I don't really  12:29:17

8 (Pages 26 - 29)

Armistead Second Supp. App. 0010

recall. It was a long time ago.
Q Would you consider your mom friends with Jamie or just happens to read Jamie's articles?
A I'm not sure on their relationship. I can't speculate on that. 12:29:47
Q What's your understanding?
A I believe Jamie has interviewed my mom for adoption purposes.
Q Did Jamie reach out to your mom regarding this case? 12:30:02
MS. HOLCOMB: Object to form.
MR. TRYON: Objection.
THE WITNESS: No.
BY MR. BARR:
Q So your mom reached out to Jamie; is that 12:30:12 right?
A No.
MS. HOLCOMB: Object to form.
BY MR. BARR:
Q So explain to me what happened. 12:30:21
A What happened with what?
Q Well, you -- you told me that you found ADF because your mom was friends with Jamie. Did I get that right?
A Yes. 12:30:43

Page 30

Q You also told me that Jamie didn't reach out to your mom and your mom didn't reach out to Jamie; right?
A Regarding this case.
Q Well, that's -- that's what I'm trying to 12:30:59 understand.
How did you get connected with ADF for this case?
A I don't know how to answer that question without giving privileged information. 12:31:09
Q Okay. What did your siblings think about you intervening in the case?
A They were supportive.
Q Explain to me those discussions you had with them. 12:31:31
A I asked them what their opinion was on the law, and they agreed with the substance of the law, and they said that I would be brave to participate in the case.
Q What do you think they meant when they said 12:31:54 you would be brave?
MS. HOLCOMB: Object to form.
THE WITNESS: I don't know -- I can't speculate on what they were thinking.
BY MR. BARR: 12:32:07

Page 31

Q You know what the word "brave" means; right?
MS. HOLCOMB: Object to form.
THE WITNESS: I have an understanding of the word "brave."
BY MR. BARR: 12:32:24
Q So why would your siblings describe you as brave for intervening in a lawsuit?
MS. HOLCOMB: Object to form.
THE WITNESS: I don't know exactly what they were thinking whenever they described me as brave. 12:32:39
BY MR. BARR:
Q What did your coach think when you talked about intervening?
MS. HOLCOMB: Object to form.
THE WITNESS: I don't know what my coach was 12:32:49 thinking.
BY MR. BARR:
Q What did your coach say to you in response to you telling your coach you might intervene in this case? 12:32:57
A She told me that she would be supportive, although she wasn't sure if she would want, herself, to get involved with the case, but she was supportive of my decision to get involved in the case.
Q Why didn't any of your teammates try to 12:33:20

Page 32

intervene with you?
MS. HOLCOMB: Object to form.
THE WITNESS: I don't know why they did not decide to, but at least one of them was interested.
BY MR. BARR: 12:33:40
Q Who is that?
MS. HOLCOMB: And I will just object to the extent that this calls for communication in anticipation of litigation, but, Lainey, you may answer. 12:33:50
THE WITNESS: Sinead.
BY MR. BARR:
Q Could you say that name again, please?
A Sinead.
Q How do you spell that? 12:33:58
A S-I-N-E-A-D.
Q What's Sinead's last name?
A Samarczuk.
Q That's going to take a minute, so bear with us as we try to spell that one. 12:34:23
Go ahead, please.
A S-A-M-A-R-C-Z-U-K.
Q Do you mind if I just refer to your teammate as "Sinead" because the last name I'm certainly going to mess up? 12:34:46

Page 33

1    A   That is fine.
2    Q   Why did Sinead ultimately decide not to
3  intervene?
4        MS. HOLCOMB:  Object to form and to the extent
5  it calls for privileged communications with counsel.    12:34:57
6        THE WITNESS:  I don't know how to answer that
7  without divulging confidential information --
8  privileged information.
9  BY MR. BARR:
10   Q   You said Sinead's on your team; right?    12:35:09
11   A   Yes.
12   Q   You never discussed this with Sinead?
13   A   Discussed it when with Sinead?
14   Q   Well, let's start at the beginning.
15       Tell me about the first discussion you had    12:35:36
16  with Sinead about intervening in this lawsuit.
17   A   I asked her if she should want to intervene
18  with me.
19   Q   You approached Sinead about interviewing.  Did
20  I get that right?                                  12:35:59
21   A   Yes.
22   Q   How did you get the idea to approach Sinead?
23       MS. HOLCOMB:  Again, objection, to the extent
24  it calls for privileged communications.
25  BY MR. BARR:                                       12:36:07
                                                     Page 34

1    Q   I'll rephrase.
2        Other than a discussion with your attorney,
3  why did you approach Sinead to intervene in this case?
4    A   She and I are very close friends.
5    Q   Did you approach anyone else on your team?    12:36:27
6    A   Yes.
7    Q   Who?
8    A   Brooklyn.
9    Q   What's Brooklyn's last name?
10   A   Pritt.                                        12:36:43
11   Q   Anyone else?
12   A   No, I did not approach anyone else on my team
13  to intervene for this case.
14   Q   Why didn't you ask your entire team, if this
15  is an important lawsuit to protect women's sports?    12:37:07
16   A   I'm not as close with all of my teammates for
17  something that was such a big deal.  They -- I'm
18  very -- I love my teammates, we are close, but this is
19  something that I was nervous about, intervening, and it
20  was a big decision to make, so I just wanted to see    12:37:33
21  what Brooklyn and Sinead thought about it.
22   Q   Did you discuss that with Sinead and Brooklyn?
23   A   Discuss what?
24   Q   Did you invite them to intervene in the case?
25   A   I asked them if they would be interested in    12:37:56
                                                     Page 35

1  doing so.
2    Q   And, presumably, they said no; right?
3    A   By the time they had reached a decision, it
4  was too late for other people to intervene, is my
5  understanding.                                     12:38:17
6    Q   Well, what decision did they reach?
7    A   Both of them wanted to get involved in some
8  type of way, but it was too late for Sinead, and
9  Brooklyn is very, very busy with school and work and
10  other things, so she just didn't have the time.    12:38:49
11   Q   I asked a -- little bit of a different
12  question.
13       They ultimately both decided not to intervene;
14  right?
15   A   That wasn't their decision.  It was too late    12:38:57
16  for Sinead.
17   Q   Had it not been too late, would Sinead have
18  joined?
19   A   I believe so, but I can't answer that for
20  certain.                                           12:39:17
21   Q   Is Sinead still a student at West Virginia
22  State University?
23   A   She is currently in England.
24   Q   Is she still a student at West Virginia State
25  University?                                        12:39:33
                                                     Page 36

1    A   I believe she's still enrolled, yes.
2    Q   Is she still on your team?
3    A   I believe she's still on the team.  She's just
4  taking a semester off, but -- she might return; she
5  might not.                                          12:39:48
6    Q   Is Brooklyn still a student at West Virginia
7  State?
8    A   Yes.
9    Q   Is Brooklyn still on your team?
10   A   Yes.                                           12:40:02
11   Q   Are there any other of your teammates who you
12  believe might be -- let me rephrase that.
13       Are there any other of your teammates that you
14  believe would have intervened but for a timing issue?
15   A   It's possible.                                 12:40:19
16   Q   A lot of things are possible.  I'm asking if
17  there's any specific names you have of someone who
18  believe you would like to have intervened.
19   A   I can't speculate on what other people want.
20   Q   So you have no reason to think that there's    12:40:42
21  another one of your teammates who would have liked to
22  intervened?
23       MR. TRYON:  Objection.
24       THE WITNESS:  Again, I can't speculate on what
25  other people want.                                 12:40:59
                                                     Page 37

10 (Pages 34 - 37)

Armistead Second Supp. App. 0012

| Page 38 | Page 40 |
|---|---|
| 1 BY MR. BARR: | 1   Q   And where does Kyler live? |
| 2   Q   I'm not asking you to speculate. | 2   A   Louisville, Kentucky. |
| 3       Do you have reason to believe that any of your | 3   Q   And what school does Declan attend? |
| 4 other teammates wanted to intervene in this case? | 4   A   Brescia University. |
| 5       MS. HOLCOMB:  Object to form.        12:41:06 | 5   Q   I'm sorry, what's it called?        12:44:23 |
| 6       MR. TRYON:  Objection. | 6   A   Brescia. |
| 7       THE WITNESS:  I don't know. | 7   Q   Where is that located? |
| 8 BY MR. BARR: | 8   A   In Owensboro, Kentucky. |
| 9   Q   Can you provide me with the name of one of | 9   Q   It's close to home. |
| 10 your teammates, other than Sinead and Brooklyn, who  12:41:20 | 10       What is your adopted brother's name?        12:44:39 |
| 11 wanted to intervene in this case? | 11   A   David. |
| 12       MR. TRYON:  Objection. | 12   Q   What does David do? |
| 13       MS. HOLCOMB:  Object to form. | 13   A   I'm not sure. |
| 14       The witness:  I don't know what my teammates | 14   Q   When is the last time you spoke with David? |
| 15 would have wanted to do.        12:41:37 | 15   A   When I was 16.        12:44:52 |
| 16 BY MR. BARR: | 16   Q   Where does David live? |
| 17   Q   Where are you from? | 17   A   I have no idea.  I'm not sure. |
| 18   A   Owensboro, Kentucky. | 18   Q   What's your adopted sister's name? |
| 19   Q   What's the closest big city to Owensboro, just | 19   A   Gabby. |
| 20 so I can understand geography?        12:42:02 | 20   Q   Are Gabby and David biological siblings?        12:45:19 |
| 21   A   Louisville, Kentucky. | 21   A   Yes. |
| 22   Q   Did you grew up a Cardinals fan? | 22   Q   When is the last time you spoke to Gabby? |
| 23   A   No. | 23   A   I'm not sure. |
| 24   Q   Does that make you a UK fan? | 24   Q   Was it around the last time you spoke to David |
| 25   A   Yes.        12:42:20 | 25 or some other time?        12:45:47 |

| Page 39 | Page 41 |
|---|---|
| 1   Q   How old are you? | 1       MS. HOLCOMB:  Object to form. |
| 2   A   21. | 2       THE WITNESS:  I'm not sure.  It was a long |
| 3   Q   Did you grow up in the same house as your | 3 time ago. |
| 4 parents? | 4 BY MR. BARR: |
| 5   A   Yes.        12:42:43 | 5   Q   I take it you don't know where Gabby lives?        12:45:55 |
| 6   Q   You mentioned siblings.  How many siblings do | 6   A   No. |
| 7 you have? | 7   Q   Are David and Gabby still in touch with your |
| 8   A   I have two biological brothers. | 8 parents? |
| 9   Q   Only because of the way you phrased that, do | 9   A   I'm not sure. |
| 10 you have a sibling that you wouldn't consider        12:43:07 | 10   Q   Are David and Gabby still in touch with Kyler?  12:46:14 |
| 11 biological? | 11       MS. HOLCOMB:  Object to form. |
| 12   A   I have two adopted siblings, but, | 12       THE WITNESS:  I'm not sure. |
| 13 unfortunately, I am not in contact with them anymore. | 13 BY MR. BARR: |
| 14   Q   How old are your -- are -- are your adopted | ██████████████████████ |
| 15 siblings also brothers?        12:43:26 | █  ████████  █████████ |
| 16   A   They are siblings, a brother and sister. | █  ████████  ████████████ |
| 17   Q   As you described it, your biological siblings, | █  ████████  █████████████ |
| 18 what are their names? | █  ████████ |
| 19   A   Kyler and Declan. | ██  ████████  █████████████ |
| 20   Q   Did you say Kyler, with a K?        12:43:47 | █  ████████  ██████████████ |
| 21   A   Yes. | █  ████████ |
| 22   Q   What does Kyler do? | 23   Q   And Gabby went with him? |
| 23   A   Kyler works at UPS. | 24   A   No.  She was older, so she was already out of |
| 24   Q   And what about Declan? | 25 our house.        12:47:04 |
| 25   A   He is a student athlete in university.        12:44:02 | |

11 (Pages 38 - 41)

Armistead Second Supp. App. 0013

1    Q  Okay  What do you currently do?
2    A  I am a student athlete
3      MS  HOLCOMB: Just -- may I jump in here for a
4  moment, Andrew?
5      MR  BARR: Yes          12:47:26
6      MS  HOLCOMB: Do you need a break?
7      I -- I understand you may be moving to a
8  different line of questioning
9      Do you need a break?  Okay
10     Andrew, would you be amenable to --     12:47:32
11     MR  BARR: No worries  We'll take a break
12     How about we come back at 1:00?  Does that
13  work for you?
14     MS  HOLCOMB: That works great  Thank you
15     THE VIDEOGRAPHER: Okay  We are going off the  12:47:43
16  record -- sorry  We're going off the record  The time
17  is 12:48 p m , and this is the end of Media Unit No  1
18     (Recess )
19     THE VIDEOGRAPHER: All right  We are back on
20  the record at 1:00 p m , and this is the beginning of    01:00:18
21  Media Unit No  2
22     Go ahead, please
23  BY MR  BARR:
24    Q  Ms  Armistead, you stated you were a student
25  at West Virginia State University; is that right?     01:00:26

Page 42

1    A  Yes.
2    Q  Are you employed anywhere?
3    A  Yes.
4    Q  Where do you work?
5    A  I work as a work-study student, and I work at    01:00:37
6  Red Lobster.
7    Q  What's a work-study student?
8    A  I work in the Dean's office of my college.
9    Q  And what do you do there?
10    A  I answer the phone, run errands, talk to        01:00:56
11  professors.
12    Q  Largely administrative tasks, am I
13  understanding that correctly?
14    A  Yes.
15    Q  And what do you do at Red Lobster?     01:01:17
16    A  I'm a server.
17    Q  Any other jobs at the moment?
18    A  If you consider soccer a job, then sure.
19    Q  Do you consider soccer a job?
20    A  I love it, but I have to show up, and I'm     01:01:36
21  getting a scholarship for it, so...
22    Q  Let's talk about soccer separately.
23     Other than Red Lobster and the Dean's office,
24  do you have any other jobs?
25    A  No.                01:01:50

Page 43

1    Q  Where is West Virginia State University?
2    A  Like, the address?
3    Q  The city.
4    A  Dunbar.
5    Q  If I call it "West Virginia State," will that   01:02:10
6  be okay with you?
7    A  Yes.
8    Q  Did you grow up rooting for West Virginia
9  State?
10    A  No.                01:02:26
11    Q  You mentioned UK earlier.  Was that your team
12  growing up?
13    A  Sure.
14    Q  You tell me.  I'm just asking.
15    A  I like it.  I wouldn't say I necessarily had a  01:02:39
16  team growing up.
17    Q  What conference is West Virginia State in?
18    A  The Mountain East Conference.
19    Q  How many teams are in that conference?
20    A  I'm not sure.            01:02:57
21    Q  Is it closer to ten or closer to 20?
22    A  Closer to ten.
23    Q  Are those schools all located within
24  West Virginia?
25    A  I don't think so, but I'm not sure where     01:03:20

Page 44

1  they're all located.
2    Q  Are you aware that the NCAA has divisions?
3    A  Yes.
4    Q  What division is West Virginia State in for
5  girls' soccer?              01:03:36
6    A  Division II.
7    Q  How many NCAA divisions are there?
8    A  Three.
9    Q  What is your understanding of the difference
10  between Division I, II and III?           01:03:54
11    A  I believe it's based off of school size and
12  the ability for D-I and D-II to give athletic aid and
13  scholarship.
14    Q  Is one division generally thought to be more
15  competitive than another?           01:04:16
16    A  Division I is usually thought to be more
17  competitive, but I think all three are very
18  competitive.  We're college athletes.
19    Q  Do you think Division I is more competitive?
20    A  I think --              01:04:34
21     MR. TRYON: Objection.
22     THE WITNESS: I think that we're all very
23  competitive.
24  BY MR. BARR:
25    Q  I don't take issue with that.  I'm -- I'm sure  01:04:56

Page 45

12 (Pages 42 - 45)

Armistead Second Supp. App. 0014

1 you're right there. I'm just asking if you believe
2 Division I is more competitive than Division II.
3      MS. HOLCOMB: Object to form.
4      MR. TRYON: Objection.
5      THE WITNESS: What do you mean by          01:05:13
6 "competitive"?
7 BY MR. BARR:
8   Q  As a general matter, if a Division I women's
9 soccer team played a Division II women's soccer team,
10 who would you expect to win?          01:05:16
11      MS. HOLCOMB: Objection.
12      THE WITNESS: Generally, we would expect the
13 Division I team to win.
14 BY MR. BARR:
15   Q  How big is West Virginia State, in terms of   01:05:33
16 student size?
17   A  Couldn't tell you.
18   Q  How did you pick West Virginia State?
19   A  There were a myriad of reasons.
20   Q  What -- what was the primary reason?          01:05:51
21   A  Because of the opportunity that West Virginia
22 State gave me.
23   Q  What opportunity is that?
24   A  To play soccer -- to play soccer and have a
25 very good scholarship.          01:06:15

Page 46

1   Q  Did you consider going to any other colleges?
2   A  Yes.
3   Q  How many?
4   A  How many did I visit or consider? What do you
5 mean?          01:06:43
6   Q  Let's start with, how many other colleges did
7 you consider attending?
8   A  I'm not sure.
9   Q  Less than 20?
10   A  Less than 20.          01:06:57
11   Q  Less than ten?
12   A  Seriously considered, yes, less than ten.
13   Q  Less than five?
14   A  Probably about five.
15   Q  What -- what were the five colleges you          01:07:14
16 seriously considered attending?
17      MS. HOLCOMB: Object to form.
18      MR. TRYON: I also object.
19      THE WITNESS: I didn't say that it was
20 definitely five.          01:07:34
21 BY MR. BARR:
22   Q  I'll rephrase. I'm not trying to put words in
23 your mouth.
24      Tell me the colleges you seriously considered
25 attending.          01:07:41

Page 47

1   A  West Virginia State, Austin Peay,
2 Transylvania, Kentucky Wesleyan. And that's all of the
3 ones that I seriously considered.
4   Q  Other than West Virginia State, did you have
5 an opportunity to play soccer at those schools?          01:08:17
6   A  Yes.
7   Q  Which ones?
8   A  Kentucky Wesleyan and Transylvania.
9   Q  Did Kentucky Wesleyan offer you a scholarship?
10   A  For what?          01:08:47
11   Q  For soccer.
12   A  I had communications with their coach, but
13 there was nothing official for an athletic scholarship.
14   Q  To make sure I'm clear, there was no official
15 offer of an athletic scholarship at Kentucky Wesleyan?   01:09:11
16   A  I don't believe so.
17   Q  Same question for Transylvania, were you
18 offered an athletic scholarship for Transylvania?
19   A  Transylvania is a D-III school, so they can't
20 give athletic scholarship.          01:09:32
21   Q  Were you offered an athletic scholarship for
22 any school other than West Virginia State?
23   A  Yes.
24   Q  What school is that?
25   A  Brescia University.          01:09:46

Page 48

1   Q  I'm sorry, you cut out. Could you repeat
2 that?
3   A  Brescia.
4   Q  Is that the same school that your brother goes
5 to?          01:09:59
6   A  Indeed.
7   Q  But you weren't seriously considering
8 attending that school, were you?
9   A  No.
10   Q  Any other schools offer you an athletic          01:10:14
11 scholarship?
12   A  Many schools e-mailed me saying that they
13 would give me scholarships, but I never really
14 conversed with any others ones, no.
15   Q  So no formal offers for athletic scholarships   01:10:33
16 other than the two we just discussed?
17   A  No formal offers, correct.
18   Q  Is Kentucky Wesleyan a Division I or
19 Division II school?
20   A  Division II.          01:10:52
21   Q  What do you study at West Virginia State?
22   A  Political science.
23   Q  Anything else?
24   A  What do you mean?
25   Q  Let me ask it a different way. What's your   01:11:20

Page 49

13 (Pages 46 - 49)

Armistead Second Supp. App. 0015

1 major, currently?

2   A   Political science.

3   Q   Do you have a minor?

4   A   I am on track to get a minor in psychology.

5   Q   What year are you, in terms of freshman,   01:11:48

6 sophomore, etcetera?

7   A   I -- this will be my third year of college.

8   Q   And when you say "this," as we sit here today,

9 in March, you're a junior, or you are saying the

10 upcoming school year that starts in August, you'll be a   01:12:06

11 junior?

12   A   What do you mean?

13   Q   I'm trying to understand if you've been

14 attending West Virginia State for four semesters or

15 6 semesters.   01:12:22

16   A   I have attended it for six semesters, I think.

17 Since fall of 2019, and I have continuously studied at

18 West Virginia State.

19   Q   Thank you.  That's helpful.  And that answers

20 the question.   01:12:44

21     Are you on track to graduate at the end of

22 next school year?

23   A   I am not sure of my exact graduation plans

24 yet.

25   Q   What do you mean by that?   01:12:57

Page 50

1   A   I mean that I could graduate this May,

2 tentatively, but I definitely want to utilize my NCAA

3 eligibility and possibly continue playing and studying

4 at West Virginia State.

5   Q   I think I read you have two years of   01:13:25

6 eligibility left; is that right?

7   A   If I graduate in May, I'll actually have three

8 years of eligibility left.

9   Q   If you graduate in May, do you plan on using

10 that eligibility either at West Virginia State or some   01:13:43

11 other institution?

12   A   I would love to.

13   Q   Do you have any current plans to do that?

14   A   My plans aren't set in stone yet.  I had

15 health concerns this past semester.  So as long as I   01:14:01

16 can figure that out and my body allows it, I would

17 definitely want to continue playing soccer.

18   Q   I certainly don't want to get into your health

19 concerns at all.  I am curious if they impact your

20 ability to play soccer.   01:14:20

21   A   They --

22     MR. TRYON:  Objection.

23     THE WITNESS:  They don't actually affect my

24 abilities to play.

25 ///

Page 51

1 BY MR. BARR:

2   Q   So help me understand how that impacts your

3 decision on graduation.

4   A   Because I have to decide if I want to take

5 medicine that would impair me to play, but as it   01:15:01

6 currently is, I can play.

7   Q   So I'm not a doctor, I don't understand how

8 any of that works, but what I hear you saying is if you

9 do whatever the doctors are saying is an option, you'd

10 have to stop playing soccer; is that right?   01:15:22

11     MR. TRYON:  Objection.

12     MS. HOLCOMB:  Object to form.

13     THE WITNESS:  I'm not my doctor either.  I

14 just know the options, and I'm weighing them carefully

15 to decide what my next step will be, and I'm not sure   01:15:35

16 yet, but I would love to stay in West Virginia and play

17 soccer.  And I am still currently on the team, so...

18 BY MR. BARR:

19   Q   Were you in with the roster for -- the season

20 is over right now; right?   01:15:54

21   A   We are in a spring semester, but yes, it is a

22 fall sport.

23   Q   So, currently, there's no practices or games;

24 right?

25   A   We are in the spring semester, so there is   01:16:07

Page 52

1 practices, it's just not for our season.

2   Q   I don't -- I don't understand.  What do you

3 mean?

4   A   So, typically, in collegiate sports, you have

5 a season, and right now, we're in our offseason, but we   01:16:28

6 are still allowed to practice and play scrimmage games,

7 according to NCAA rules.

8   Q   And those are official practices and official

9 scrimmages?

10   A   With our coach in West Virginia, yes,   01:16:43

11 West Virginia State.

12   Q   Are you still participating in those practices

13 and scrimmages?

14   A   Yes.

15   Q   As we sit here today, do you expect to be on   01:16:52

16 the team next fall?

17   A   I would love to be.

18   Q   Slightly different question.

19     Do you expect to be?

20   A   I am not sure what the future holds yet   01:17:12

21 because of the health concerns, and I have to carefully

22 see and weigh the options.

23   Q   I understand that.

24     When do you think you'll have to make that

25 decision?  I assume your coach is interested.   01:17:37

Page 53

14 (Pages 50 - 53)

Armistead Second Supp. App. 0016

1    A  She hasn't given me a specific time to make
2  the decision yet.
3    Q  Do you have an expectation of when that
4  timeframe will be?
5    A  I don't make the rules.                    01:17:54
6    Q  Just asking if you have an expectation of when
7  that timeframe will be, if you need to decide if you're
8  going to play or not.
9      MS. HOLCOMB:  Objection.
10     THE WITNESS:  I don't have an expectation.     01:18:10
11  BY MR. BARR:
12    Q  When is scholarship awarded for next school
13  year?
14    A  For whom?
15    Q  For you.                              01:18:27
16    A  Typically, we re-sign the paper in the spring,
17  stating our scholarship, but my coach can decide when
18  to allow us to sign the papers.  Some people sign in
19  June, July, August.  It's up to our coach.
20    Q  When did you sign last year?            01:19:04
21    A  Sometime in the spring.
22    Q  February?
23    A  I think that's winter.
24    Q  Okay.  When -- what month did you sign your
25  scholarship award last year?                    01:19:33

Page 54

1    A  I'm not sure.
2    Q  Where would we have to go to find that date
3  out?
4    A  I don't know.  I don't have any papers on it.
5    Q  It sounds like you signed a paper, and I'm     01:19:44
6  just trying to figure out when.
7      MS. HOLCOMB:  Object to form.
8      THE WITNESS:  I'm not sure of the exact date.
9  It was sometime in 2021.
10  BY MR. BARR:                              01:19:59
11    Q  So what is the spring to you, if it doesn't
12  include February?
13     MS. HOLCOMB:  Object to form.
14     THE WITNESS:  Maybe March through June.
15  BY MR. BARR:                              01:20:17
16    Q  So as you sit here today, you believe that you
17  would have signed your scholarship award package
18  sometime between March and June of last year; is that
19  right?
20    A  Yes.                                01:20:28
21    Q  Do you expect that that same timeframe would
22  apply to this year?
23    A  I don't know.
24    Q  Do you have any reason to think it won't?
25     MR. TRYON:  Objection.                   01:20:55

Page 55

1      THE WITNESS:  My coach is very patient.  And
2  seeing as I'm a captain and a starter, I'm sure that
3  she would give me as much time as she could to keep me
4  on the team.
5  BY MR. BARR:                              01:21:08
6    Q  What is your coach's name?
7    A  Lisa Mann.
8    Q  How do you spell your coach's last name?
9    A  M-A-N-N.
10    Q  Have you had discussions with Coach Mann about  01:21:22
11  the possibility of you not playing next year?
12    A  Yes.
13    Q  Explain -- when was the first conversation you
14  had with Coach Mann regarding the possibility you don't
15  play next year?                           01:21:38
16    A  Sometime in February.
17    Q  How many discussions have you had with
18  Coach Mann regarding the possibility you don't play
19  next year?
20    A  I'm not sure.                          01:21:56
21    Q  More than five?
22    A  I'm not sure.
23    Q  More than ten?
24     MS. HOLCOMB:  Object to form.
25     THE WITNESS:  I don't know.                01:22:17

Page 56

1  BY MR. BARR:
2    Q  More than 20?
3      MS. HOLCOMB:  Object to form.
4      THE WITNESS:  I don't recall saying it was
5  more than ten either.                        01:22:24
6  BY MR. BARR:
7    Q  It sounds like you're not sure.  I'm just
8  trying to get a range here.
9    A  More than one, less than 20, probably.
10    Q  And that's the closest estimate you can give   01:22:37
11  on the number of discussions you've had with Coach Mann
12  about this?
13    A  Yes.
14     MR. TRYON:  Objection.
15  BY MR. BARR:                              01:22:50
16    Q  What -- what was Coach Mann's response?
17    A  She wants me to do what's best for me.
18    Q  Did she say anything else?
19    A  She would love for me to stay on the team.
20    Q  Did she also say that she would like to use    01:23:07
21  that scholarship award for a different player if you're
22  not going to come back?
23    A  She did not tell me that.
24    Q  What else did she say?
25    A  To keep her updated.                     01:23:25

Page 57

15 (Pages 54 - 57)

Armistead Second Supp. App. 0017

| | |
|---|---|
| 1  Q  Have you kept her updated? | 1  Q  Did I read somewhere you want to be a lawyer? |
| 2  A  As much as I possibly can, because I'm not | 2  A  Yes. |
| 3 sure what my future holds yet. | 3  Q  Does West Virginia State have a law school? |
| 4  Q  So what did you tell her in your first update? | 4  A  No. |
| 5  A  I don't recall what I told her on the first  01:23:47 | 5  Q  Have you considered, upon graduation, going to  01:27:07 |
| 6 update. | 6 law school? |
| 7  Q  So you've updated your coach at least once, | 7  A  Yes. |
| 8 but you have no recollection of what you told | 8  Q  Did you take the LSAT? |
| 9 Coach Mann? | 9  A  Yes. |
| 10  A  I didn't say that.  You asked what I said on  01:24:07 | 10  Q  Have you applied to law school?  01:27:17 |
| 11 my first update.  I'm not sure.  There's been a couple | 11  A  Yes. |
| 12 conversations, more than one, like I said. | 12  Q  Where did you apply? |
| 13  Q  Okay.  If we take all the update meetings | 13  A  I applied to University of Florida, FSU and |
| 14 together, what have -- what have you conveyed to | 14 ASU. |
| 15 Coach Mann?  01:24:23 | 15  Q  Warm states.  Totally understand.  01:27:41 |
| 16  A  I've conveyed that I am still wanting to | 16  Any other schools? |
| 17 practice and be a part of the team, and I'm not sure | 17  A  I don't think I've sent in my official |
| 18 what my plans are for the fall. | 18 applications to any other schools, no. |
| 19  Q  At no point Coach Mann said, hey, it would be | 19  Q  What other schools are you planning to send an |
| 20 really nice to know by X date?  01:24:46 | 20 official application to?  01:27:59 |
| 21  A  She would like to know, but she's never given | 21  A  Possibly the University of Houston. |
| 22 me an exact date, no. | 22  Q  Any others? |
| 23  Q  Did she give you a timeframe? | 23  A  I haven't really considered it because I'm not |
| 24  A  No. | 24 sure if I'm even going to be going to law school in the |
| 25  Q  If you graduate in May, can you still play on  01:24:57 | 25 fall.  01:28:15 |
| <div align="right">Page 58</div> | <div align="right">Page 60</div> |
| 1 the team? | 1  Q  You've applied to three programs; is that |
| 2  A  Yes. | 2 right?  FSU, UF and ASU? |
| 3  Q  How? | 3  A  Yes. |
| 4  A  Because I am interested in possibly getting a | 4  Q  Have you been admitted? |
| 5 Master's degree at West Virginia State, and I still  01:25:20 | 5  A  I haven't gotten any decisions.  01:28:28 |
| 6 have three years of NCAA eligibility, which would mean | 6  Q  When do you expect to hear back? |
| 7 I can continue playing in the fall. | 7  A  Hopefully soon. |
| 8  Q  So you would play as a graduate student; is | 8  Q  If you get in, will you go? |
| 9 that right? | 9  A  I don't know, because I would still love to |
| 10  A  That is what I'm saying.  01:25:36 | 10 continue playing soccer.  I'm not ready to give it up  01:28:56 |
| 11  Q  What Master's are you interested in pursuing? | 11 yet. |
| 12  A  Master's of Public Administration. | 12  Q  Is there any reason you can't play soccer at |
| 13  Q  When's the application due for that? | 13 FSU or UF or ASU? |
| 14  A  I'm not sure.  I'd have to ask the professor. | 14  A  I'm not sure if I would be able to play soccer |
| 15  Q  Have you looked into it?  01:25:56 | 15 and do law school.  01:29:13 |
| 16  A  I see the chair of the department or of the | 16  Q  So it's not an eligibility concern; it's just |
| 17 Master's of Public Administration a couple times a | 17 a timing concern? |
| 18 week, and yes, we have discussed it. | 18  A  Yes. |
| 19  Q  How long of a program is that? | 19  Q  Do you think you'd make the team at FSU? |
| 20  A  It depends on the -- how many hours you take,  01:26:15 | 20  MS. HOLCOMB:  Object to form.  01:29:29 |
| 21 but I would expect a year and a half. | 21  MR. TRYON:  Objection. |
| 22  Q  Why are you interested in getting a Master's | 22  THE WITNESS:  I would hope so.  That would be |
| 23 of Public Administration? | 23 cool. |
| 24  A  It would mean continuing my academic career | 24 BY MR. BARR: |
| 25 and athletic career, which are both things that I love.  01:26:48 | 25  Q  Am I mistaken?  Didn't Florida State win the  01:29:42 |
| <div align="right">Page 59</div> | <div align="right">Page 61</div> |

<div align="right">16 (Pages 58 - 61)</div>

Armistead Second Supp. App. 0018

1 national championship a couple of years ago for women's
2 soccer?
3      A   They could have.  I don't keep up with FSU
4 sports.
5      Q   Do you expect you'd make the team at        01:29:54
6 University of Florida?
7      MS. HOLCOMB:  Object to form.
8      MR. TRYON:  Objection.
9      THE WITNESS:  I don't know.
10 BY MR. BARR:                                        01:30:09
11     Q   I presume you don't know if you would make the
12 team at Arizona State either?
13     MS. HOLCOMB:  Same objection.
14     THE WITNESS:  I don't make the decisions for
15 those coaches.                                      01:30:20
16 BY MR. BARR:
17     Q   If you get into law school, are you going to
18 try out for the team, or that's the end of soccer?
19     MR. TRYON:  Objection.
20     MS. HOLCOMB:  Object to form.      01:30:28
21     THE WITNESS:  I don't know.  I definitely
22 don't think that I said if I get into law school, I'm
23 definitely -- it's definitely the end of law school --
24 or soccer, I mean.
25 ///

Page 62

1 BY MR. BARR:
2      Q   Have you reached out to the coaches at any of
3 those programs?
4      A   No.  That would be illegal to do because I'm
5 not in the transfer portal.                         01:30:54
6      Q   You're not transferring; you're graduating;
7 right?
8      A   I still --
9      MS. HOLCOMB:  Object to the form.
10     MR. BARR:  I'm sorry, could you repeat that?      01:31:04
11 That got --
12     MS. HOLCOMB:  I would like to put my objection
13 back on the record, please.
14     You can go.
15     THE WITNESS:  I still can't reach out to those   01:31:12
16 schools.
17 BY MR. BARR:
18     Q   When are you able to reach out to those
19 schools?
20     A   I haven't looked into that because I really   01:31:17
21 love playing at West Virginia State University.
22     Q   But if I understand you correctly, there's a
23 possibility you end up in law school, come the fall;
24 right?
25     MS. HOLCOMB:  Object to form.      01:31:41

Page 63

1      MR. TRYON:  Objection.
2      THE WITNESS:  As you said earlier, a lot of
3 things are possible.
4 BY MR. BARR:
5      Q   Well, you've applied to three of them, and    01:31:52
6 you're waiting to hear back; right?
7      MR. TRYON:  Objection.
8      MS. HOLCOMB:  Object to form.
9      THE WITNESS:  I want to play soccer at
10 West Virginia State.                                01:32:05
11 BY MR. BARR:
12     Q   But you couldn't do that if you were in law
13 school; right?
14     MS. HOLCOMB:  Object to form.
15     THE WITNESS:  I could not do that if I was in   01:32:13
16 law school, correct.
17 BY MR. BARR:
18     Q   Is the only interest you have in the Master's
19 of Public Administration to play soccer?
20     A   That's not the only reason.              01:32:32
21     Q   What other reasons are there?
22     A   I would be learning and getting a better
23 education while I was playing soccer and cultivating
24 relationships and learning important school skills.
25     Q   Why do you think you could play soccer in the   01:33:07

Page 64

1 Master's program, but not during a law school program?
2      A   I don't know if a Master's program is as
3 vigorous as law school will be.
4      Q   When do you intend to apply for the Master's
5 program?                                            01:33:30
6      MS. HOLCOMB:  Object to form.
7      THE WITNESS:  As I said earlier, I still don't
8 know what I'm going to be doing yet.
9 BY MR. BARR:
10     Q   Would you say it's more likely than not that   01:33:42
11 you graduate this May?
12     MR. TRYON:  Objection.
13     THE WITNESS:  I'm not sure.
14 BY MR. BARR:
15     Q   What's your expectation, sitting here today?   01:33:54
16     MS. HOLCOMB:  Object to form.
17     THE WITNESS:  It's really not set in stone
18 yet.
19 BY MR. BARR:
20     Q   I'm not asking if it's set in stone.  I'm just   01:34:09
21 saying today, March 11th, are you expecting to graduate
22 in May?
23     MS. HOLCOMB:  Object to form.
24     MR. TRYON:  Objection.
25     THE WITNESS:  It's possible.          01:34:24

Page 65

17 (Pages 62 - 65)

Armistead Second Supp. App. 0019

BY MR. BARR:

Q   Ms. Armistead, do you plan on graduating in May? It's two months away. It's a fairly straightforward question.

MS. HOLCOMB:  Andrew, I don't mean to provide   01:34:38 a speaking objection, but I do think this is getting a little bit excessive and harassing. That has been asked and answered. I suggest that you move on.

MR. BARR:  Attorney Holcomb, I'm asking a very simple question that hasn't been answered. I'm just   01:34:50 asking what her expectation is for two months from today, that's it.

MS. HOLCOMB:  And she has told you multiple times that she does not yet know. That is asked and answered. Please proceed.   01:35:01

MR. BARR:  Well, the question stands.

THE WITNESS:  I am not sure, but if I do, I would still like to continue my education at West Virginia State.

BY MR. BARR:   01:35:21

Q   When do you expect that you'll know if you're going to graduate in May?

MS. HOLCOMB:  Object to form.

THE WITNESS:  I don't know. Hopefully before May.   01:35:43

Page 66

---

BY MR. BARR:

Q   Has Coach Mann talked to you about graduation?

MS. HOLCOMB:  Object to form.

THE WITNESS:  What do you mean?

BY MR. BARR:   01:36:03

Q   When -- in one or more of those updates you've had with Coach Mann, have you talked about graduation with her?

A   I think, yes.

Q   What did Coach Mann say?   01:36:31

A   She wants me to get my Master's degree at State, if I chose to graduate this May, or she would want me to not graduate and just get two Bachelor's degrees so I could continue on in the fall without graduating.   01:36:58

Q   What other Bachelor degree are you considering?

MS. HOLCOMB:  Object to form.

THE WITNESS:  It's not -- I'm not certain. I would be interested in psychology.   01:37:13

BY MR. BARR:

Q   Did you file a form to graduate in May?

A   Yes.

Q   When did you file that form?

A   Sometime before the due date.   01:37:28

Page 67

---

MR. BARR:  Attorney Holcomb, can you produce that because that's certainly relevant to your discovery request?

MS. HOLCOMB:  We can certainly see if we can obtain that.   01:37:52

MR. BARR:  Thank you.

While we're at it, if you could obtain the scholarship agreements that happened in the last two years and their date of signature, that would also clearly fall within our discovery request.   01:38:02

MS. HOLCOMB:  Yeah, we don't have access to those, Lainey does not have them in her possession, but we can see if we can obtain them.

MR. BARR:  Thank you.

BY MR. BARR:   01:38:11

Q   Do you have any plans to withdraw the form you've already filed to graduate in two months?

A   Filing the form doesn't automatically mean that I graduate.

Q   I'm just asking if you have any plans to   01:38:27 withdraw the form.

A   I don't know what my plans are yet.

Q   But sitting here today, you have no plans to do that?

MS. HOLCOMB:  Object to form.   01:38:35

Page 68

---

THE WITNESS:  Sitting here today, I am not sure what my future holds yet.

BY MR. BARR:

Q   I understand that. But your future for the two -- next two months, do you plan on withdrawing that   01:38:48 form?

MS. HOLCOMB:  Objection to form.

MR. TRYON:  Objection.

THE WITNESS:  I'm not sure.

BY MR. BARR:   01:39:07

Q   Have you talked to your parents about graduating?

A   Yes.

Q   Explain to me those discussions.

A   We have talked about all of the different   01:39:19 options that I have, one being which I could graduate, another where I continue without graduating and get another Bachelor's degree, another where I get a Master's degree at State or go to law school.

But as I said earlier, there are a lot of   01:39:48 options that I have to weigh carefully, but I would definitely love to be at West Virginia State.

Q   What would your dad like you to do?

A   What?

MS. HOLCOMB:  I'm sorry, could you please   01:40:03

Page 69

18 (Pages 66 - 69)

Armistead Second Supp. App. 0020

1 restate the question?

2     MR. BARR: Yes, absolutely.

3 BY MR. BARR:

4     Q  In having those discussions you just

5 described, what is your understanding of what your dad   01:40:09

6 would like you to do?

7     A  He wants me to decide for myself, and he said

8 that he would support my decision.

9     Q  He has no preference?

10     MS. HOLCOMB: Object to form.   01:40:28

11     THE WITNESS: I don't know what my dad's

12 preference is.

13 BY MR. BARR:

14     Q  So you've had these discussions with your

15 parents and your dad just stated whatever you decide is   01:40:39

16 fine with him?

17     MR. TRYON: Objection.

18     MS. HOLCOMB: Object to form.

19     THE WITNESS: He wants me to do what I deem

20 best for myself. I'm the one who is going to be   01:40:54

21 graduating or staying or playing soccer. So,

22 ultimately, both of my parents want me to decide to do

23 what's best for me.

24     Would he love to continue seeing me play

25 because I've been playing since I was little? I'm -- I   01:41:13

Page 70

1 would assume he would.

2 BY MR. BARR:

3     Q  Does your mom have a preference for what you

4 do?

5     MS. HOLCOMB: Object to form.   01:41:23

6     THE WITNESS: She said that she would be

7 supportive.

8 BY MR. BARR:

9     Q  I understand that. And I'm sure your parents

10 would be supportive. I'm just curious if your mom has   01:41:36

11 a preference for what decision you make for yourself.

12     MS. HOLCOMB: Object to form.

13     MR. TRYON: Objection.

14     THE WITNESS: I know she likes watching me

15 play soccer, but I can't answer on what she wants me to   01:41:52

16 do.

17 BY MR. BARR:

18     Q  So you've had the discussions about graduating

19 with your parents, and as far as you can tell, they're

20 okay with whatever you choose?   01:42:02

21     MR. TRYON: Objection. Come on.

22     MS. HOLCOMB: Objection.

23     THE WITNESS: They'll be supportive, I

24 believe.

25 ///

Page 71

1 BY MR. BARR:

2     Q  Do your parents want you to go to law school?

3     MS. HOLCOMB: Object to form.

4     THE WITNESS: I'm not sure exactly what they

5 want me to do with my life.   01:42:35

6 BY MR. BARR:

7     Q  Have you talked to them about the Master's of

8 Public Administration?

9     A  Yes.

10     Q  What did they say about that?   01:42:47

11     A  They told me that they would be supportive of

12 whatever I did. I believe my mom would like me to get

13 my MPA.

14     Q  Do you believe your dad wants you to get your

15 MPA?   01:43:17

16     MS. HOLCOMB: Object to form.

17     MR. TRYON: Objection.

18     THE WITNESS: I don't know. My parents would

19 want me to do whatever I see fit.

20 BY MR. BARR:   01:43:30

21     Q  But sitting here today, you're just not sure

22 what that is?

23     MS. HOLCOMB: Object to form.

24     MR. TRYON: Objection again.

25     THE WITNESS: I don't think that's what I   01:43:48

Page 72

1 said.

2 BY MR. BARR:

3     Q  What did you say?

4     A  They want me to do what I think is best for my

5 future.   01:43:56

6     Q  Maybe my question wasn't clear, I'm sorry.

7     My question was, sitting here today, you don't

8 know what you think is best for your future?

9     MS. HOLCOMB: Object to form.

10     THE WITNESS: I know what I would love to do,   01:44:12

11 and that's to continue playing the sport that I love.

12 BY MR. BARR:

13     Q  But it's uncertain whether that will happen or

14 not?

15     MS. HOLCOMB: Object to form.   01:44:23

16     MR. TRYON: I'm sorry, Mr. Barr, could you

17 repeat that? I couldn't hear it.

18     MR. BARR: Yes, I said, and it's uncertain

19 whether that will happen?

20     MS. HOLCOMB: Object to form.   01:44:34

21     THE WITNESS: I don't know yet.

22 BY MR. BARR:

23     Q  Do you know who B.P.J. is?

24     A  I know that that's the plaintiff.

25     Q  What do you know about B.P.J.?   01:44:53

Page 73

19 (Pages 70 - 73)

Armistead Second Supp. App. 0021

1   A  There's nothing that I know for certain about
2  B.P.J. other than she's the plaintiff.
3   Q  What do you mean there's nothing you know for
4  certain?
5   A  You asked me what I knew about her.  I don't    01:45:16
6  know who that is.  I don't know who -- I know that
7  P.B. -- B.P.J. is the plaintiff.
8   Q  You've never met or spoke with B.P.J. before?
9   A  No.
10   Q  Are you aware that B.P.J. is 11 years old?    01:45:32
11   A  I don't know.
12   Q  Are you aware that B.P.J. ran cross-country on
13  her middle school's girls' cross-country team last
14  year?
15   A  I don't know.                              01:45:51
16   Q  You don't know that?
17   A  (No response.)
18   Q  I'm sorry, that was a question.
19      You -- you're not -- you're not aware that
20  B.P.J. ran on her middle school's girls' cross-country    01:46:02
21  team last fall?
22   A  I don't know.
23   Q  You don't know, or you're not aware of that?
24      MS. HOLCOMB:  Objection.
25      THE WITNESS:  I don't know.                01:46:28

Page 74

1  BY MR. BARR:
2   Q  Are you aware that B.P.J.'s middle school
3  supports her inclusion on the girls' team?
4   A  I don't know.
5   Q  Are you aware that B.P.J.'s school has a    01:46:54
6  transgender support plan for B.P.J.?
7   A  I don't know.
8   Q  Do you know anything about B.P.J's athletic
9  interests?
10      MS. HOLCOMB:  Object to form.              01:47:31
11      THE WITNESS:  I don't know.
12  BY MR. BARR:
13   Q  Sitting here today, do you know anything about
14  B.P.J. at all other than the fact --
15      MS. HOLCOMB:  Object to form.              01:47:47
16  BY MR. BARR:
17   Q  -- that B.P.J. is the plaintiff?
18      MS. HOLCOMB:  Object to form.
19      THE WITNESS:  I believe that B.P.J. doesn't
20  like the law from West Virginia.                01:47:59
21  BY MR. BARR:
22   Q  What law is that?
23   A  H.B. -- sorry, the numbers, I forget -- 3293.
24   Q  You -- I get distracted with the numbers all
25  the time, so don't worry about that.            01:48:24

Page 75

1      So other than your understanding that
2  B.P.J. doesn't like H.B. 3293, do you know anything
3  else about B.P.J.?
4   A  No.
5   Q  Would you be surprised to learn that B.P.J.'s    01:48:48
6  school didn't have to cut any girls when they allowed
7  B.P.J. to play on the girls' team last year?
8      MS. HOLCOMB:  Object to form.
9      THE WITNESS:  I don't know.
10  BY MR. BARR:                                   01:49:10
11   Q  What is your understanding of how
12  B.P.J. placed in the cross-country events that she
13  participated in last year?
14   A  I don't know.
15   Q  Do you have any understanding at all?  First?    01:49:26
16  Last?  Middle of the pack?
17   A  I don't know.
18   Q  Do you know how many events B.P.J.
19  participated in last year for cross-country?
20   A  No.                                        01:49:51
21   Q  Did you run cross-country growing up?
22   A  No.  I would run races, but it wasn't
23  organized cross-country.
24   Q  What kind of races?
25   A  Just in elementary school, we would have races    01:50:13

Page 76

1  once a year.
2   Q  Explain -- explain that to me  Some sort
3  of -- everybody in the school goes down to the field
4  and runs a distance, something like that?
5   A  Something like that, divided by grade and    01:50:35
6  gender
7   Q  Did you win?
8   A  Yes
9   Q  Every time?
10   A  Yes                                        01:50:55
11   Q  Were you first for everyone in your grade?
12   A  For all the girls, yes
13   Q  What years is this?
14   A  Kindergarten through fifth grade
15   Q  Have you been a part of any other organized or    01:51:13
16  semiorganized running events, other than that?
17   A  No
18      MR BARR:  Let's go off the record
19      THE VIDEOGRAPHER:  All right  I was on mute
20      Okay  We're going off the record  The time    01:51:37
21  is 1:52 p m , and this is the end of Media Unit
22  Number 2
23      One moment
24      (Recess )
25      THE VIDEOGRAPHER:  Okay  We are back on the    02:06:12

Page 77

20 (Pages 74 - 77)

Armistead Second Supp. App. 0022

1  record at 2:06 p.m., and this is the beginning of Media
2  Unit No. 3.
3       Go ahead, please.
4       MR. BARR:  Ms. Armistead, I just introduced to
5  you and your counsel what has been previously marked as  02:06:24
6  West Virginia Exhibit 34.  Let me know you've got that
7  in front of you.
8       THE WITNESS:  I have it in front of me.
9  BY MR. BARR:
10      Q  Do you recognize this document?       02:06:34
11      A  It looks like H.B. 3293.
12      Q  Have you read this before?
13      A  Sorry?
14      Q  Have you read what is now Exhibit WV-34 prior
15  to seeing it now?                              02:07:02
16      A  I have read a little bit of it before, but not
17  the whole thing.
18      Q  What part of it did you read before?
19      A  The -- article 2, paragraph 1 and 2.
20      Q  Did you read anything else?            02:07:29
21      A  Not a full read, no.
22      Q  So prior to today, article 2, section 1 and 2,
23  you've -- you've read, but everything else -- this will
24  be -- I'm just trying to gauge timing -- it will be new
25  for you?                                       02:07:56

Page 78

1       A  Yeah.
2       Q  What is your understanding of the impact of
3  H.B. 3293?
4       A  My understanding is that it will keep
5  biological women competing with biological women in    02:08:10
6  sports.
7       Q  Where did you get that understanding?
8       MS. HOLCOMB:  I'll just object to the extent
9  it calls for any communications with counsel, but
10  Lainey, you may answer.                        02:08:28
11      THE WITNESS:  Through conversations with my
12  attorney.
13  BY MR. BARR:
14      Q  Other than in discussions with your attorney,
15  do you have any other reason to think that's what    02:08:42
16  H.B. 3293 does?
17      A  I had heard that that's what they did too.
18      Q  Who did you hear that from?
19      A  I don't remember exactly.
20      Q  Do you remember when you had that       02:09:25
21  conversation?
22      MS. HOLCOMB:  Object to form.
23      THE WITNESS:  I don't know how to answer that
24  question without giving privileged information.
25  ///

Page 79

1  BY MR. BARR:
2       Q  Let me ask it a different way.
3       Is your entire understanding of the impact of
4  H.B. 3293 based on discussions with your attorney?
5       A  Yes.                                   02:09:43
6       Q  Under this law, can B.P.J. play on a girls'
7  school sports team?
8       MS. HOLCOMB:  Object to form.
9       MR. TRYON:  Objection.
10      THE WITNESS:  I can't make a legal        02:10:15
11  determination.
12  BY MR. BARR:
13      Q  Is it your understanding that this law would
14  prohibit B.P.J. from playing on her school's girls'
15  team?                                         02:10:28
16      A  I'm not sure.
17      Q  So sitting here today, you don't know one way
18  or the other whether B.P.J. could play on the girls'
19  team based --
20      MS. HOLCOMB:  Ob- --                       02:10:44
21  BY MR. BARR:
22      Q  -- on this law?
23      MS. HOLCOMB:  Sorry.  Object to form.
24      THE WITNESS:  I'm not sure because I'm not an
25  attorney.                                      02:10:54

Page 80

1  BY MR. BARR:
2       Q  What is your understanding of what happens if
3  you win in this lawsuit?
4       A  I'm not sure.
5       Q  Why did you think it would be important to    02:11:11
6  intervene if you don't understand the impact of
7  intervening?
8       A  I believe that keeping this law in place will
9  result in fair and equitable playing for women in -- in
10  sports.                                        02:11:37
11      MR. BARR:  That wasn't my question.
12      Court Reporter, can you read back the
13  question, please.
14      (Record read.)
15      MS. HOLCOMB:  I'll just object to form.    02:12:03
16      THE WITNESS:  I understand that intervening
17  means that I think that the bill is a good step of
18  legislation, and I believe that it will help keep the
19  playing fields even and equal, and that's why I thought
20  it was so important to intervene.              02:12:38
21  BY MR. BARR:
22      Q  That brings me back to -- maybe I just didn't
23  understand your answer before.
24      What happens if you win?
25      A  I guess the law stays as it is.        02:12:57

Page 81

21 (Pages 78 - 81)

Armistead Second Supp. App. 0023

1   Q   And what happens if you lose?
2   A   I can't speculate on what will happen if I
3   lose.  I'm not sure.
4   Q   Do you have any understanding at all?
5       MS. HOLCOMB:  Object to form.        02:13:21
6       MR. TRYON:  Objection.
7       THE WITNESS:  I don't know.
8   BY MR. BARR:
9   Q   Why did you intervene in the lawsuit if you
10  don't know what happens if you win or lose?   02:13:39
11      MS. HOLCOMB:  Object to form.
12      MR. TRYON:  Objection.
13      THE WITNESS:  Again, that's not what I said.
14      I understand that if -- if this law stays in
15  place, that women will be protected and it will keep   02:13:53
16  the playing field even and equitable for women in
17  sports.
18  BY MR. BARR:
19  Q   Which women?
20  A   Women --                             02:14:05
21      MS. HOLCOMB:  Objection.
22      THE WITNESS:  I'm confused on your question.
23  BY MR. BARR:
24  Q   Well, you said that the law will protect
25  women's sports, something along those lines, and I'm   02:14:25

                                            Page 82

1   asking, which women is it protecting?
2   A   Women.
3   Q   All women?
4   A   Biological women in sports.
5   Q   When did you first become aware of this law?   02:14:43
6       MS. HOLCOMB:  Object to form and also to the
7   extent that it calls for privileged information.
8       MR. BARR:  You know, Christiana, I would be
9   willing to just -- I'm not trying to get any privileged
10  information at all.  And if the answer is that   02:15:03
11  Ms. Armistead didn't know about this law until she
12  spoke with your office, I'll -- I'll move on.  I'm just
13  trying to understand.
14      MS. HOLCOMB:  Sure.  We've -- this is also
15  asked and answered a couple of times, which is in part   02:15:14
16  while I raised the objection again.  But yes, I will
17  continue to maintain attorney-client privileged
18  objections.
19  BY MR. BARR:
20  Q   Okay.  So I'll ask again, when did you first   02:15:26
21  become aware of this law?
22      MS. HOLCOMB:  Same objection.
23      THE WITNESS:  I can't answer that without
24  divulging privileged information with my attorney.
25  BY MR. BARR:                             02:15:37

                                            Page 83

1   Q   Was Jamie Metzger part of that conversation?
2   A   No.
3   Q   I don't want to know anything that was said,
4   but who was at that -- who was present for that
5   conversation?                          02:15:55
6   A   Christiana.
7   Q   Anyone else?
8   A   No.
9   Q   But you don't recall when that conversation
10  happened?                              02:16:13
11      MS. HOLCOMB:  Objection to form again.
12      THE WITNESS:  Sometime in 2021.
13  BY MR. BARR:
14  Q   Was it on the phone?
15  A   I don't recall.                     02:16:30
16  Q   Was it in person?
17  A   No.
18  Q   So it was in some type of virtual format,
19  phone, computer, something like that?
20  A   Yes.                               02:17:01
21  Q   Did Ms. Holcomb reach out to you, or did you
22  reach out to Ms. Holcomb?
23      MS. HOLCOMB:  Again, objection to the extent
24  it calls for privileged information.
25      And I'm not sure why we're retreading ground   02:17:13

                                            Page 84

1   that's already been covered, Counsel.
2       MR. BARR:  I went back and looked at the
3   transcript, and I still don't fully understand, so I'm
4   just trying to make sure we have clarify on the record.
5       MS. HOLCOMB:  I also want to just state my   02:17:24
6   objection to revisiting ground already trod.
7       MR. BARR:  Noted.
8       THE WITNESS:  I don't know how to give you an
9   answer without divulging attorney-client privileges.
10  BY MR. BARR:                             02:17:38
11  Q   Ms. Holcomb can certainly correct me, but the
12  manner in -- who -- who reached out to who wouldn't be
13  a privileged communication, I'm aware of, and I didn't
14  hear Ms. Holcomb direct you not to answer based on
15  privilege.  So I'll ask the question again.   02:17:55
16      Did Ms. Holcomb reach out to you?
17  A   Yes.
18  Q   Does this law apply to club sports?
19      MR. TRYON:  Objection.
20      MS. HOLCOMB:  Object to form.        02:18:20
21      THE WITNESS:  I don't know.
22  BY MR. BARR:
23  Q   Does it apply to grade school sports?
24      MS. HOLCOMB:  Objection to form.
25      MR. TRYON:  Objection.              02:18:28

                                            Page 85

                                    22 (Pages 82 - 85)

Armistead Second Supp. App. 0024

1       THE WITNESS:  I don't know.
2   BY MR. BARR:
3       Q   Does it apply to intramural sports at
4   West Virginia State?
5       MR. TRYON:  Objection.                    02:18:38
6       MS. HOLCOMB:  Objection to form.
7       THE WITNESS:  I don't know.
8   BY MR. BARR:
9       Q   Does it apply to all the schools in your
10  conference?                                   02:18:48
11      MS. HOLCOMB:  Objection.
12      MR. TRYON:  Objection.
13      THE WITNESS:  I don't know.
14  BY MR. BARR:
15      Q   Does it apply to all school-sponsored sports   02:18:58
16  in West Virginia?
17      MS. HOLCOMB:  Object to form.
18      MS. MORGAN:  Object to form.
19      MR. TRYON:  Objection.
20      THE WITNESS:  I don't know.               02:19:08
21  BY MR. BARR:
22      Q   Tell me what you do know about this law.
23      A   I don't know anything because I'm not an
24  attorney.
25      Q   So to the extent you've said things about this   02:19:22

Page 86

1   law in other contexts, you didn't have a basis to say
2   that?
3       MS. HOLCOMB:  Object to form.
4       THE WITNESS:  Can you repeat the question?
5   BY MR. BARR:                                  02:19:42
6       Q   Sure.  I understood your last answer to be
7   that you don't understand the scope or impact of this
8   law because you're not a lawyer.  Did I say that
9   correctly?
10      MS. HOLCOMB:  Object to form.             02:19:56
11      THE WITNESS:  That's not what I said.
12  BY MR. BARR:
13      Q   What did you say?
14      A   I said I'm not going to make legal
15  commentation on something that I can't make legal   02:20:03
16  commentation on because I'm not an attorney.
17      Q   And by "legal commentation," you mean whether
18  or not the law applies to a particular school or a
19  particular person; is that right?
20      MS. HOLCOMB:  Object to form.             02:20:23
21  BY MR. BARR:
22      Q   You tell me what you meant by "legal
23  commentation."
24      A   Any legal commentary, I'm going to say I don't
25  know.                                         02:20:36

Page 87

1       Q   And discussing the impact of this law would
2   fall in legal commentary, as far as you understand it?
3       A   What do you mean, the impact?
4       Q   Well, I asked if you knew if this law applied
5   to club sports.  Is that something that you would   02:20:56
6   consider legal commentary?
7       A   I don't know if it applies.
8       Q   And then I asked if this law applied to every
9   school in your conference.  Is that something you would
10  consider legal commentary?                    02:21:20
11      A   I said I don't know.
12      Q   And then I said, tell me what you do know
13  about this law.
14      MS. HOLCOMB:  Object to form.
15      THE WITNESS:  What my understanding is, is   02:21:26
16  that this will protect women in sports.
17  BY MR. BARR:
18      Q   What do you mean by "protect"?
19      A   Women are built different than biological men.
20  Biological men are stronger, fitter, faster, have a   02:22:09
21  bigger stature, in general, than women.  So this law,
22  it was put into place to protect women, women's safety
23  and their interests.
24      Q   Is this law accomplishing what you just said
25  by excluding transgender women?               02:22:28

Page 88

1       MS. HOLCOMB:  Object to form.
2       MR. TRYON:  Objection.
3       THE WITNESS:  Can you restate the question,
4   please?
5       MR. BARR:  Is --                          02:22:45
6       Court Reporter, could you read the question
7   back, please.
8       (Record read.)
9       MS. HOLCOMB:  Same objection.
10      THE WITNESS:  Can you restate it in a     02:23:05
11  different way?
12  BY MR. BARR:
13      Q   Is it that you don't understand the question?
14      MS. HOLCOMB:  Object to form.
15      THE WITNESS:  I just would like you to restate   02:23:11
16  it in a different way.
17  BY MR. BARR:
18      Q   You just told me a series of things that you
19  believe the law is accomplishing; that right?
20      A   Yes.                                  02:23:27
21      Q   And you said fairness, and I believe you said
22  safety; is that right?
23      A   Correct.
24      Q   And my question to you is, how is this law
25  accomplishing those goals?                    02:23:41

Page 89

23 (Pages 86 - 89)

Armistead Second Supp. App. 0025

1       MS. HOLCOMB: Object to form.
2       THE WITNESS: By -- by protecting fairness and
3 safety for biological women in sports.
4 BY MR. BARR:
5    Q I understand that that's what you believe the    02:24:01
6 goal of the law to be. I'm asking how it does that.
7       MS. HOLCOMB: Object to form.
8       MR. TRYON: Objection.
9       THE WITNESS: That's not for me to interpret.
10 BY MR. BARR:    02:24:13
11    Q Well, you're intervening in this lawsuit to
12 protect the law. I'm trying to understand why.
13       What do you think this law is doing? How does
14 it accomplish those goals?
15       MS. HOLCOMB: Object to form.    02:24:22
16       MR. TRYON: Objection.
17       THE WITNESS: I don't know. I think I already
18 answered your question.
19 BY MR. BARR:
20    Q So you don't know how the law accomplishes    02:24:36
21 those goals; you're just aware that those are the goals
22 of the law?
23       MR. TRYON: Objection.
24       MS. HOLCOMB: Object to form.
25       THE WITNESS: I'm aware that that's what, I    02:24:52

Page 90

1 believe, the law would be doing if it's in effect, yes.
2 BY MR. BARR:
3    Q If the law is in effect, can B.P.J. play on a
4 girls' team?
5       MS. HOLCOMB: Object to form.    02:25:00
6       THE WITNESS: I don't know.
7 BY MR. BARR:
8    Q If the law is in effect, can a transgender
9 woman play on a girls' team?
10       MS. HOLCOMB: Object to form.    02:25:13
11       MR. TRYON: Objection.
12       THE WITNESS: I don't know.
13 BY MR. BARR:
14    Q Does this law apply to contact sports?
15       MS. HOLCOMB: Object to form.    02:25:40
16       THE WITNESS: I don't know.
17 BY MR. BARR:
18    Q Does this law apply to noncontact sports?
19       MS. HOLCOMB: Object to form.
20       THE WITNESS: I don't know.    02:25:57
21 BY MR. BARR:
22    Q Do you have any understanding what sports this
23 law applies to?
24       MS. HOLCOMB: Object to form.
25       THE WITNESS: I don't know.    02:26:09

Page 91

1 BY MR. BARR:
2    Q Do you know if this law applies to esports,
3 when people sit around and play video games on behalf
4 of their school?
5       MS. HOLCOMB: Object to form.    02:26:28
6       THE WITNESS: I don't know.
7 BY MR. BARR:
8    Q Do you know if this law is different than the
9 NCAA's policy regarding transgender women playing
10 school sports?    02:26:45
11       MS. HOLCOMB: Object to form.
12       THE WITNESS: I don't know.
13 BY MR. BARR:
14    Q You said it's your understanding this law will
15 protect women for safety and fairness reasons. Did I    02:27:02
16 understand that correctly?
17    A Yes.
18    Q Are there any other things that this law does?
19       MS. HOLCOMB: Object to form.
20       THE WITNESS: I told you what my understanding    02:27:15
21 was.
22 BY MR. BARR:
23    Q I'm just trying to make sure I'm comprehensive
24 in understanding what you told me. I heard "fairness
25 and safety." Is there anything else?    02:27:31

Page 92

1       MS. HOLCOMB: Object to form.
2       THE WITNESS: I don't know.
3 BY MR. BARR:
4    Q Would you be surprised to learn that this law
5 does not apply to every school in your conference?    02:28:01
6       MS. HOLCOMB: Objection.
7       MR. TRYON: Objection.
8       THE WITNESS: I don't know.
9 BY MR. BARR:
10    Q You don't know if you would be surprised, or    02:28:11
11 you didn't know that that was the case?
12       MS. HOLCOMB: Object to form.
13       MR. TRYON: Objection.
14       THE WITNESS: I just don't know.
15 BY MR. BARR:    02:28:24
16    Q I heard you. I'm trying to figure out what
17 you don't know.
18       Do you not know that the law doesn't apply to
19 every school in your conference?
20       MS. HOLCOMB: Object to form.    02:28:34
21       MR. TRYON: Objection.
22       THE WITNESS: I don't know. No, I don't know.
23 BY MR. BARR:
24    Q Is this law changing things from the way they
25 were before?    02:29:00

Page 93

24 (Pages 90 - 93)

Armistead Second Supp. App. 0026

1    MS. HOLCOMB:  Object to form.
2    MR. TRYON:  Objection.
3    THE WITNESS:  I don't know.
4 BY MR. BARR:
5    Q  Would you expect that if a law is passed, it's   02:29:15
6 meant to change things?
7    MS. HOLCOMB:  Object to form.
8    MR. TRYON:  Objection.
9    THE WITNESS:  I don't know.
10 BY MR. BARR:                                              02:29:25
11   Q  Do you know any transgender people?
12   MR. TRYON:  Objection.
13   MS. HOLCOMB:  Object to form.
14   THE WITNESS:  I have an -- had an acquaintance
15 a few years ago, that there are rumors that they have    02:29:55
16 transitioned or started a transition or something, but
17 I'm really not certain.
18 BY MR. BARR:
19   Q  Who is that person?
20   A  I don't know the name they currently go by.    02:30:09
21   Q  Well, I appreciate you not using their former
22 name.
23      Other than that person, do you know any
24 transgender people?
25   MS. HOLCOMB:  Object to form.                    02:30:29
                                                  Page 94

1    Q  What do you know about puberty blockers?
2    MR. TRYON:  Objection.
3    MS. HOLCOMB:  Object to form.
4    THE WITNESS:  I don't know.
5 BY MR. BARR:                                              02:32:11
6    Q  Have you ever heard of puberty blockers?
7    A  I've heard of that.
8    Q  What is your understanding of what puberty
9 blockers are?
10   MR. TRYON:  Objection.                           02:32:27
11   MS. HOLCOMB:  Same objection.
12   THE WITNESS:  I don't know.
13 BY MR. BARR:
14   Q  So you've heard of it, but you don't have an
15 understanding of what it means?                          02:32:33
16   A  Correct.
17   Q  Have you ever heard of hormone replacement
18 therapy?
19   A  Yes.
20   Q  Do you have an understanding of what that is?   02:32:46
21   MS. HOLCOMB:  Object to form.
22   THE WITNESS:  I don't know.
23 BY MR. BARR:
24   Q  I'm sorry, I didn't hear you.
25   A  I don't know.                                  02:32:56
                                                  Page 96

1    THE WITNESS:  Not to my knowledge, but I don't
2 know.
3 BY MR. BARR:
4    Q  Have you ever competed in a soccer game with
5 or against someone who's transgender?                    02:30:44
6    A  I'm not sure.  I don't know.
7    Q  Are there any transgender women playing on a
8 team in the Mountain East Conference.
9    MR. TRYON:  Objection.
10   THE WITNESS:  I don't know.                        02:31:05
11 BY MR. BARR:
12   Q  Have you ever heard of the phrase "inner sense
13 of self"?
14   A  No.
15   Q  If I asked you to tell me what that phrase     02:31:20
16 means, would you be able to do that?
17   MR. TRYON:  Objection.
18   MS. HOLCOMB:  Object to form.
19   THE WITNESS:  No.
20 BY MR. BARR:                                              02:31:27
21   Q  Have you ever seen that phrase written on a
22 piece of paper?
23   A  It's possible.  I do a lot of reading.
24   Q  But nothing specific comes to mind?
25   A  Correct.                                        02:31:42
                                                  Page 95

1    Q  Do you have any thoughts about what happens to
2 someone who starts puberty blockers before going
3 through puberty?
4    A  I don't know.
5    Q  Have you ever read anything that describes    02:33:22
6 what might happen to someone who takes puberty blockers
7 before going through puberty?
8    A  I'm not sure.
9    Q  Do you think transgender girls are faster than
10 you?                                                     02:33:50
11   MR. TRYON:  Objection.
12   A  I think in general, biological males are
13 stronger, fitter, faster and have a bigger stature than
14 women do.
15 BY MR. BARR:                                              02:34:11
16   Q  My question was, do you think transgender
17 girls are faster than you?
18   MR. TRYON:  Objection.
19   MS. HOLCOMB:  Objection; form.
20   THE WITNESS:  I think in general, biological     02:34:18
21 males are faster than me, yes.
22 BY MR. BARR:
23   Q  So if I'm hearing you correctly, and I'm not
24 trying to put words in your mouth, your response was    02:34:44
25 that all biological males are faster than you?          02:34:44
                                                  Page 97

25 (Pages 94 - 97)

Armistead Second Supp. App. 0027

| | |
|---|---|
| 1    MR. TRYON:  Objection. | 1    MS. HOLCOMB:  I'm sorry, Andrew, we didn't |
| 2    MS. HOLCOMB:  Objection. | 2 fully hear your question. |
| 3 BY MR. BARR: | 3    MR. BARR:  I asked if it was her belief that |
| 4   Q  Is that what you said? | 4 transgender girls are bigger than her. |
| 5   A  I believe I said in general.    02:34:57 | 5    THE WITNESS:  In general, biological men are   02:37:20 |
| 6   Q  Do you believe that all transgender girls -- | 6 bigger than women, yes. |
| 7 let me rephrase it. | 7 BY MR. BARR: |
| 8    Do you believe, in general, transgender girls | 8   Q  Where did you form that opinion? |
| 9 are faster than you? | 9   A  Observation. |
| 10    MS. HOLCOMB:  Objection --    02:35:12 | 10   Q  Is that it?    02:37:40 |
| 11    MR. TRYON:  Objection; asked and answered. | 11   A  Yes.  Looking around, in everyday life, I can |
| 12    THE WITNESS:  I already answered that. | 12 see that biological men are typically bigger than me. |
| 13 BY MR. BARR: | 13   Q  Do you recognize there's a difference between |
| 14   Q  You answered about biological males.  I'm | 14 transgender women and biological men? |
| 15 asking about transgender girls.    02:35:24 | 15    MS. HOLCOMB:  Object to form.    02:38:11 |
| 16    MS. HOLCOMB:  Object to form. | 16    THE WITNESS:  I don't know. |
| 17    MR. TRYON:  Objection. | 17 BY MR. BARR: |
| 18    THE WITNESS:  I believe biological males are | 18   Q  Why do you keep using the phrase "biological |
| 19 in gen- -- are generally faster than females. | 19 male"? |
| 20 BY MR. BARR:    02:35:36 | 20    MS. HOLCOMB:  Object to form.    02:38:24 |
| 21   Q  Every time that I ask about a transgender girl | 21    THE WITNESS:  Because that's my vocabulary. |
| 22 and you respond with "biological males," are we, from | 22 BY MR. BARR: |
| 23 your perspective, talking about the same thing, the | 23   Q  Why don't you also say "biological female," |
| 24 same group of people? | 24 then? |
| 25   A  Yes.    02:35:47 | 25    MS. HOLCOMB:  Object to form.    02:38:51 |
| Page 98 | Page 100 |
| 1   Q  So if I ask a question and you respond saying | 1    MR. TRYON:  Objection. |
| 2 "biological males," I can understand you to be, from my | 2    THE WITNESS:  I don't know. |
| 3 perspective, my definition, meaning a transgender girl; | 3 BY MR. BARR: |
| 4 is that right? | 4   Q  So a typical conversation, you'll say "women" |
| 5    MS. HOLCOMB:  Object to form.    02:36:02 | 5 and "biological males"?    02:39:01 |
| 6    MR. TRYON:  Objection. | 6    MS. HOLCOMB:  Object to form. |
| 7    THE WITNESS:  I'm just going to answer the | 7    THE WITNESS:  I don't know.  Probably not. |
| 8 questions how I know to answer the questions. | 8 BY MR. BARR: |
| 9 BY MR. BARR: | 9   Q  So why do you keep saying that today? |
| 10   Q  I understand, but I'm just trying to speed    02:36:14 | 10    MS. HOLCOMB:  Object to form.    02:39:14 |
| 11 this up for both of us.  If I can understand that when | 11    MR. TRYON:  Objection. |
| 12 I say "transgender girl" and you respond with | 12    THE WITNESS:  Because I'm choosing to. |
| 13 "biological male," if we're -- if you're answering the | 13 BY MR. BARR: |
| 14 question I'm asking, and we're all talking about the | 14   Q  Why are you making that decision? |
| 15 same group of people with our understood difference of   02:36:27 | 15    MS. HOLCOMB:  Object to form.    02:39:26 |
| 16 opinion there, it's going to allow us to run through | 16    THE WITNESS:  That's how I'm choosing to |
| 17 the next set of questions faster, but I'm happy to not | 17 answer your questions. |
| 18 do that if you don't want to. | 18 BY MR. BARR: |
| 19    MS. HOLCOMB:  Object to form. | 19   Q  Okay.  Well, let me -- help me.  What is a |
| 20    MR. TRYON:  Objection.    02:36:40 | 20 biological male?    02:39:41 |
| 21    THE WITNESS:  I'm still going to answer how | 21    MS. HOLCOMB:  Object to form. |
| 22 I've been answering. | 22    THE WITNESS:  Someone who -- I believe someone |
| 23 BY MR. BARR: | 23 whose gender is male, assigned male at birth and is a |
| 24   Q  Okay.  Do you believe that transgender girls | 24 male. |
| 25 are bigger than you?    02:37:04 | 25 BY MR. BARR:    02:40:09 |
| Page 99 | Page 101 |

Veritext Legal Solutions
866 299-5127

Armistead Second Supp. App. 0028

```
 1    Q   That's a biological male?
 2    A   Yes.
 3    Q   What word do you describe someone who was
 4  assigned male at birth, but their gender identity is
 5  female?                                    02:40:25
 6         MS. HOLCOMB:  Object to form.
 7         THE WITNESS:  I would say "biological male."
 8  BY MR. BARR:
 9    Q   So explain to me the difference between what I
10  ask and what you're saying for biological male.  02:40:43
11         MR. TRYON:  Objection.
12         MS. HOLCOMB:  Object to form.
13         THE WITNESS:  I'm sorry?
14  BY MR. BARR:
15    Q   If I heard you correctly, you said a      02:40:58
16  biological male is someone who is assigned the sex of
17  male at birth, has a gener -- gender identity of male.
18  Did I get that correct?
19         MS. HOLCOMB:  Object to form.
20         THE WITNESS:  I'm not sure.  I'm not a doctor.  02:41:13
21  BY MR. BARR:
22    Q   Okay.  Let's -- let's start over.  I must have
23  misheard you.
24         What is your understanding of what a
25  biological male is?                          02:41:22
                                              Page 102
```

```
 1    A   I'm not a doctor.
 2    Q   I -- I understand that you're not a doctor.
 3         What is your understanding of what a
 4  biological male is?
 5    A   I don't know.                          02:41:32
 6    Q   The court reporter could tell us, but I bet
 7  you used the word -- the phrase "biological male" more
 8  than 30 times.  What does it mean?
 9         MS. HOLCOMB:  Object to form.
10         MR. TRYON:  I'm just going to object.  Asked  02:42:17
11  and answered.
12         THE WITNESS:  Someone who was -- I think
13  someone who was assigned male at birth and identifies
14  as a male.
15  BY MR. BARR:                                02:42:41
16    Q   Okay.  That's what I heard you say the first
17  time, so I appreciate you clarifying that.
18         What do you call someone who was assigned male
19  at birth but identifies as a female?
20         MS. HOLCOMB:  Object to form.          02:42:52
21         THE WITNESS:  Biological male.
22  BY MR. BARR:
23    Q   So regardless how the person identifies, you
24  would call them a biological male?
25         MR. TRYON:  Objection.                 02:43:09
                                              Page 103
```

```
 1         THE WITNESS:  I didn't say what I would call
 2  them.  That's just how I'm referring to what you're
 3  asking today, biological males.
 4  BY MR. BARR:
 5    Q   So if it wasn't today, what would you refer to  02:43:22
 6  them as?
 7         MS. HOLCOMB:  Object to form.
 8         MR. TRYON:  Objection.
 9         THE WITNESS:  I would think it's someone who's
10  a biological male.                           02:43:42
11         MR. BARR:  Court Reporter, could you read the
12  answer prior to the last answer, please.
13         (Record read.)
14  BY MR. BARR:
15    Q   So what would you call them?           02:44:05
16         MS. HOLCOMB:  Object to form.
17         THE WITNESS:  If someone asks me to call them
18  by a certain name, then I would, but that doesn't mean
19  that it changes what I am considering a biological
20  male.                                       02:44:22
21  BY MR. BARR:
22    Q   Could you explain that?  Because that doesn't
23  make any sense to me.
24    A   I would respect what someone would want their
25  name to be called.                          02:44:36
                                              Page 104
```

```
 1    Q   So if somebody walked up and said, I'm a
 2  transgender female, you would refer to them as a
 3  transgender female?
 4    A   I --
 5         MS. HOLCOMB:  Object to form.           02:44:52
 6         MR. TRYON:  Objection.
 7         THE WITNESS:  If someone asked me to call them
 8  by "Joe," then I would call them by their name -- by
 9  what name that they told me that they wanted to be
10  called, which would be "Joe," "Michael," whatever it  02:45:04
11  would be, but that doesn't change my answer of
12  biological male.
13  BY MR. BARR:
14    Q   I think I understand what you're -- you are
15  saying that you would respect the name that they would  02:45:18
16  like to be called, but regardless, you would still
17  consider someone who was assigned male at birth a
18  biological male?
19    A   Yes.
20    Q   Where did you learn that phrase?        02:45:37
21         That's not how most people talk in day-to-day
22  conversation, so I'm trying to understand why you're
23  choosing to use it today.
24    A   I thought it would clarify the conversation so
25  you would know what I was talking about.      02:46:01
                                              Page 105
```

Veritext Legal Solutions
866 299-5127

Armistead Second Supp. App. 0029

**Page 106**

1    Q   And why did you think that?

2    A   Because of your terms that you've been using.

3    Q   I don't -- I don't understand.  The terms that

4  I'm using have led -- let you to use the term

5  "biological male"?          02:46:30

6      MR. TRYON:  Objection.

7      MS. HOLCOMB:  Object to form.

8      THE WITNESS:  I think it's -- it's clarifying

9  the conversation, but I will just refer to all

10  biological males as "males" from now on, if you would  02:46:42

11  prefer.

12  BY MR. BARR:

13    Q   No, you should answer however you feel most

14  comfortable.  I'm just trying to make sure I

15  understand.          02:46:52

16      When did you first use the phrase "biological

17  male"?

18    A   I couldn't tell you.

19    Q   You've been using it your whole life?

20    A   I might have said it a long time ago at some  02:47:04

21  point.  I'm not sure.

22    Q   If you were to introduce me to your brother,

23  would you say, This is Declan, a biological male?

24      MR. TRYON:  Objection; harassment.

25      MS. HOLCOMB:  Object to form.      02:47:22

**Page 107**

1      THE WITNESS:  No.

2  BY MR. BARR:

3    Q   How would you introduce me to Declan?

4    A   "This is Declan."

5    Q   So what changed that you want to use the  02:47:38

6  phrase "biological male" today if you don't use it in

7  common speak?

8      MR. TRYON:  Objection; asked and answered

9  about three times now.

10      MS. HOLCOMB:  Object to form.      02:47:53

11      THE WITNESS:  I think I answered that.

12  BY MR. BARR:

13    Q   Just give me a moment.

14      Did I hear you say earlier that you're not

15  aware of having been on a team with a transgender girl?  02:48:35

16    A   I'm not aware of that, no.

17    Q   Have you ever been injured by a transgender

18  girl?

19    A   Not to my knowledge.

20    Q   Have you ever been harmed by a transgender  02:48:55

21  girl?

22      MR. TRYON:  Objection.

23      MS. HOLCOMB:  Object to form.

24      THE WITNESS:  Not to my knowledge.

25  ///

**Page 108**

1  BY MR. BARR:

2    Q   Do you play any sports at West Virginia State

3  other than soccer?

4    A   No.

5    Q   Do you have plans to play any other sports at  02:49:31

6  West Virginia State other than soccer?

7    A   No.

8    Q   Do you believe that H.B. 3293 applies to the

9  West Virginia women's soccer team?

10      MS. HOLCOMB:  Object to form.      02:49:48

11      THE WITNESS:  I'm not sure.

12  BY MR. BARR:

13    Q   What position do you play?

14    A   Left center back.

15    Q   Have you always played that position?    02:50:03

16    A   No.

17    Q   What position did you play before that?

18    A   I've played in many different positions on the

19  soccer field.

20    Q   And when did you become a left center back as  02:50:24

21  a regular position?

22    A   My sophomore year of college.

23    Q   What position were you your freshman year of

24  college?

25    A   Left wingback or left center back.      02:50:41

**Page 109**

1    Q   Why did you change?

2    A   I was needed for the left center back

3  position.

4    Q   Your choice or the coach's choice?

5      MS. HOLCOMB:  Object to form.      02:51:11

6      THE WITNESS:  My coach's choice.

7  BY MR. BARR:

8    Q   You don't seem happy with that choice; is that

9  right?

10      MS. HOLCOMB:  Object to form.      02:51:22

11      THE WITNESS:  I love both positions probably

12  equally.

13  BY MR. BARR:

14    Q   Well, I was a wingback, and I loved running,

15  you know, the edges of the field, so I would understand  02:51:39

16  if you were a little upset about it, but in any event.

17      Is your team good?

18    A   Yes.

19    Q   How long has West Virginia State had a team, a

20  women's soccer team?          02:52:00

21    A   Since fall of 2019.

22    Q   You were on the inaugural team; right?

23    A   Yes.

24    Q   Did you play your freshman year?

25    A   Yes.          02:52:21

28 (Pages 106 - 109)

| | |
|---|---|
| 1  Q  Did you start? | 1    Q  I imagine it was a big step to -- to qualify |
| 2  A  Yes. | 2 this year. |
| 3  Q  Every game? | 3    A  Yes. It was impressive for our first official |
| 4  A  I was injured, but other than that, yes. | 4 season in the NCAA. |
| 5  Q  How were you injured?              02:52:41 | 5    Q  Over the last three years, have you played a  02:55:59 |
| 6  A  I had to sit out one game for a fractured | 6 college called "Notre Dame"? And I'm not talking about |
| 7 foot, and I think that's it for my freshman year. | 7 the Fighting Irish. I'm talking about the Notre Dame |
| 8  Q  What was your record freshman year? | 8 in your conference. |
| 9  A  I don't recall. Good. It was good, though. | 9    A  Yes. |
| 10  Q  More wins than losses?              02:53:15 | 10    Q  Did you play the Fighting Irish?          02:56:13 |
| 11  A  Yes. | 11    A  No, we didn't. |
| 12  Q  Did you go to the conference tournament that | 12    Q  So if I -- if I talk about Notre Dame, you'll |
| 13 year? | 13 understand I'm talking about the Notre Dame in your |
| 14  A  Since it was an inaugural season, no. | 14 conference? |
| 15  Q  The conference didn't allow you to play?  02:53:41 | 15    A  Yes.                          02:56:23 |
| 16    Explain that. | 16    Q  Do you know where Notre Dame is located? |
| 17  A  For first-year teams, although we were playing | 17    A  I'm not sure. |
| 18 games and competing, it was not for the title. That is | 18    Q  Would it surprise you to find out it is not in |
| 19 how I still have an extra year of NCAA eligibility and | 19 West Virginia? |
| 20 one of the reasons that I decided to come to      02:54:03 | 20      MS. HOLCOMB: Object to -- object to form.    02:56:36 |
| 21 West Virginia State. | 21      THE WITNESS: That wouldn't surprise me. |
| 22  Q  I understood the part about eligibility. | 22 BY MR. BARR: |
| 23    Why did that encourage you to attend | 23    Q  How about a school called "Frostburg"? |
| 24 West Virginia State? | 24    A  What about it? |
| 25  A  Because it would let me play soccer for  02:54:15 | 25    Q  Have you played a game against Frostburg?   02:56:53 |
| Page 110 | Page 112 |

| | |
|---|---|
| 1 longer. | 1    A  Yes. |
| 2  Q  What was your team's record last year, 2020? | 2    Q  Do you know where Frostburg is located? |
| 3  A  I'm not sure of the record, but we qualified | 3    A  Not in West Virginia. |
| 4 for the tournament. | 4    Q  I'm asking you. |
| 5  Q  Did you win the tournament?          02:54:36 | 5    A  I don't know. It was a guess.          02:57:06 |
| 6  A  No. | 6    Q  Would you be surprised to find out it's not in |
| 7  Q  Did you make it to the finals? | 7 West Virginia? |
| 8  A  No. | 8      MS. HOLCOMB: Object to form. |
| 9  Q  How did you guys do? | 9      THE WITNESS: No. |
| 10  A  We lost in the first round.          02:54:51 | 10 BY MR. BARR:                          02:57:15 |
| 11  Q  What about this year, 2021? | 11    Q  Do you have any understanding of whether |
| 12  A  Oh, I was answering for this last season, | 12 H.B. 3293 applies to Notre Dame? |
| 13 sorry. | 13      MS. HOLCOMB: Object to form. |
| 14  Q  No, that's okay. | 14      THE WITNESS: I don't know. |
| 15    So in 2021, this year, you qualified for the  02:55:14 | 15 BY MR. BARR:                          02:57:28 |
| 16 tournament, but didn't make it past the first round; is | 16    Q  The same question for Frostburg. |
| 17 that right? | 17      MS. HOLCOMB: Same objection. |
| 18  A  Yes. | 18      MR. TRYON: Objection. |
| 19  Q  What happened in 2020, last year? | 19      THE WITNESS: I don't know. |
| 20    I imagine COVID impacted your season or  02:55:23 | 20 BY MR. BARR:                          02:57:40 |
| 21 something, but I'm still curious how you-all did. | 21    Q  If you end up playing on the team next year, |
| 22  A  Yes, COVID impacted it. So instead of the | 22 do you anticipate you'll play against Notre Dame? |
| 23 fall, we played a shorter spring season. And I don't | 23      MS. HOLCOMB: Object to form. |
| 24 remember how we did, but we didn't get into the | 24      THE WITNESS: Most likely. |
| 25 tournament.                          02:55:41 | 25 /// |
| Page 111 | Page 113 |

29 (Pages 110 - 113)

Armistead Second Supp. App. 0031

1 BY MR. BARR:
2     Q   And you say most likely because they're one of
3 the schools in your conference; right?
4     A   Right.
5     Q   Do you also expect that if you were to play on   02:58:02
6 the team next year, you would play against Frostburg,
7 given that Frostburg is in your conference?
8         MS. HOLCOMB:  Object to form.
9         THE WITNESS:  It's likely.
10 BY MR. BARR:                                            02:58:17
11     Q   Do you have any understanding whether a
12 transgender woman can play on Frostburg or Notre Dame's
13 team?
14        MR. TRYON:  Objection.
15        MS. HOLCOMB:  Object to form.                    02:58:37
16        THE WITNESS:  I don't know.
17 BY MR. BARR:
18     Q   If you found out that a transgender woman was
19 on Notre Dame or Frostburg's team, what would you do?
20        MR. TRYON:  Objection.                           02:58:46
21        MS. HOLCOMB:  Object to form.
22        THE WITNESS:  I would play a soccer game.
23 BY MR. BARR:
24     Q   I understand you have a medical concern that
25 may impact soccer, but assuming that everything goes     02:59:19

Page 114

1 well for you and that doesn't impact your game, do you
2 plan on playing competitive soccer after college?
3         MS. HOLCOMB:  Object to form.
4         THE WITNESS:  What kind of competitive soccer?
5 BY MR. BARR:                                             02:59:35
6     Q   Do you have -- fair.  I'll ask a different
7 question.
8         Do you have any plans to play soccer
9 postgraduation, of any kind?
10     A   If the opportunity arises, I would love to      02:59:50
11 continue playing soccer.
12     Q   What type of opportunities are you aware of
13 for playing soccer postgraduation?
14     A   I'm sure in many cities there are women's
15 teams that I could join for things like that.           03:00:26
16     Q   So some type of recreational, fun league is
17 what you're referencing?
18     A   Yes.
19     Q   Any plans of trying out or trying to join the
20 U.S. women's national team?                             03:00:47
21     A   No.
22     Q   Do you know anybody on that team?
23     A   No.
24     Q   Would you agree with me they're probably the
25 best players in the country, if not the world, when it  03:01:10

Page 115

1 comes to women's soccer?
2         MS. HOLCOMB:  Object to form.
3         THE WITNESS:  I think that they are amazing
4 athletes.
5 BY MR. BARR:                                             03:01:30
6     Q   What was your reaction when you saw that they
7 recently got equal pay for women on the national team?
8         MS. HOLCOMB:  Object to form.
9         THE WITNESS:  I was happy for them.
10 BY MR. BARR:                                            03:01:53
11     Q   Did you happen to see their game last month in
12 Texas?
13     A   I did not.
14     Q   Did you see the team came out publicly
15 supporting transgender youth?                           03:02:06
16        MR. TRYON:  Objection.
17        MS. HOLCOMB:  Object to form.
18        THE WITNESS:  I did not see that.
19        MR. BARR:  We can go off the record.
20        THE VIDEOGRAPHER:  All right.  We are going      03:02:28
21 off the record.  The time is 3:03 p.m., and this is the
22 end of Media Unit No. 3.
23        (Recess.)
24        THE VIDEOGRAPHER:  We where back on the record
25 at 3:13 p.m., and this is the beginning of Media Unit   03:13:03

Page 116

1 No. 4.
2         Go ahead, please.
3 BY MR. BARR:
4     Q   Ms. Armistead, do you know what Title IX is?
5     A   I -- I've heard of it before.                   03:13:19
6     Q   What is your understanding of Title IX?
7     A   I believe it's to give equal opportunities to
8 women.
9     Q   Do you have any other understandings about
10 Title IX?                                               03:13:46
11     A   I don't know for certain.
12     Q   So if I heard you correctly, Title IX is about
13 protecting women's rights; is that right?
14        MR. TRYON:  Objection.
15        MS. HOLCOMB:  Object to form.                    03:14:14
16        THE WITNESS:  In my opinion, yes.
17 BY MR. BARR:
18     Q   How did you form that opinion?
19     A   I believe we have to have Title IX trainings
20 to participate in collegiate athletics.                 03:14:31
21     Q   And those are annual, aren't they?
22     A   Yes.
23     Q   So at this point, you've attended three
24 Title IX trainings; is that right?
25     A   I'm not sure about the third one yet.           03:14:45

Page 117

30 (Pages 114 - 117)

Armistead Second Supp. App. 0032

| Page 118 | Page 120 |
|---|---|
| 1   Q So you know you've attended two and possibly a | 1 BY MR. BARR: |
| 2 third; is that fair? | 2   Q Just any law. |
| 3   A I believe so, yes. | 3   MS. HOLCOMB: Object to form. |
| 4   Q Who conducts that training? | 4   THE WITNESS: I believe that living in the |
| 5   A I think it might be online. I'm not for sure. 03:15:05 | 5 United States allows all people in the United States to 03:18:01 |
| 6   Q That wasn't a fair question, I'm sorry. | 6 have rights and protections under the Constitution. |
| 7   Is that put on by your school? | 7 BY MR. BARR: |
| 8   A Yes. | 8   Q And that would include transgender women? |
| 9   Q So as a student athlete, you're required to | 9   MR. TRYON: Objection. |
| 10 sit through a Title IX training on some type of basis. 03:15:27 | 10   THE WITNESS: That would include everyone. 03:18:19 |
| 11 Is that accurate? | 11 BY MR. BARR: |
| 12   A Yes. | 12   Q Does West Virginia State do a good job of |
| 13   Q What did you learn at those trainings? | 13 protecting women's rights? |
| 14   A I don't recall specifics. | 14   MS. HOLCOMB: Object to form. |
| 15   Q Do you believe that your school complies with 03:15:50 | 15   THE WITNESS: I don't have any reason to think 03:18:39 |
| 16 Title IX? | 16 that it doesn't. |
| 17   MS. HOLCOMB: Object to form. | 17 BY MR. BARR: |
| 18   MR. TRYON: Objection. | 18   Q Have any of your school's policies regarding |
| 19   THE WITNESS: I don't know. | 19 Title IX harmed you? |
| 20 BY MR. BARR: 03:16:09 | 20   MS. HOLCOMB: Object to form. 03:18:53 |
| 21   Q Do you have any reason to think your school | 21   THE WITNESS: I don't know what you're asking. |
| 22 doesn't comply with Title IX? | 22 BY MR. BARR: |
| 23   A I have no reason to think that, no. | 23   Q Has your school ever done something, on the |
| 24   Q Do women's rights include transgender women's | 24 premise that Title IX requires them to do so, that you |
| 25 rights? 03:16:30 | 25 disagree with? 03:19:16 |

| Page 119 | Page 121 |
|---|---|
| 1   MS. HOLCOMB: Object to form. | 1   MS. HOLCOMB: Object to form. |
| 2   MR. TRYON: Objection. | 2   THE WITNESS: Not to my knowledge. |
| 3   THE WITNESS: I believe that women's -- | 3 BY MR. BARR: |
| 4 whenever I am referring to women's rights, I'm | 4 ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ |
| 5 referring to biological women's rights. 03:16:48 | 5 ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ |
| 6 BY MR. BARR: | 6 ▮ ▮▮▮▮▮ |
| 7   Q Does that mean transgender women don't have | 7 ▮ ▮▮▮▮▮▮▮▮ |
| 8 rights? | 8 ▮▮▮▮▮▮▮▮▮ |
| 9   MR. TRYON: Objection. | 9 ▮ ▮▮▮▮▮▮ ▮▮▮ |
| 10   MS. HOLCOMB: Object to form. 03:16:57 | 10 |
| 11   THE WITNESS: That's definitely not what I | 11 |
| 12 said. | 12   MR. BARR: Let's go off the record. |
| 13 BY MR. BARR: | 13   MS. HOLCOMB: Yeah, that sounds great. |
| 14   Q If Title IX protects women's rights, but not | 14   THE VIDEOGRAPHER: Hang on. Hang on. Hang |
| 15 transgender women's rights, what rights do transgender 03:17:14 | 15 on. 03:20:30 |
| 16 women have? | 16   We're going off the record. The time is |
| 17   MR. TRYON: Objection; asked and answered. | 17 3:21 p.m. |
| 18   MS. HOLCOMB: Object to form. | 18   (Recess.) |
| 19   THE WITNESS: I don't know. | 19   THE VIDEOGRAPHER: All right. We are back on |
| 20 BY MR. BARR: 03:17:34 | 20 the record at 3:29 p.m. 03:28:54 |
| 21   Q Do you think transgender women should be | 21   Go ahead, please. |
| 22 protected by the law? | 22   (Lainey Armistead left the room.) |
| 23   MR. TRYON: Objection. | 23 ▮▮▮▮▮▮▮▮▮▮▮▮▮▮ |
| 24   MS. HOLCOMB: Object to form. | 24 ▮▮▮▮▮▮▮▮▮▮▮▮▮ |
| 25   By what law? 03:17:50 | 25 ▮▮▮▮▮▮▮▮▮▮▮ 03:29:02 |

31 (Pages 118 - 121)

Armistead Second Supp. App. 0033

14    (Lainey Armistead entered the room.)
15        MR. BARR: Ms. Armistead, I've introduced an    03:29:49
16 exhibit, Exhibit 43. Let me know when you've got it in
17 front of you.
18    (Exhibit 43 was marked for identification
19    by the court reporter and is attached hereto.)
20        THE WITNESS: Got it.    03:30:12
21    MS. HOLCOMB: If you'll hold for just one
22 moment, I don't.
23    Okay. You're good to proceed. Thank you.
24 BY MR. BARR:
25    Q Do you recognize the document, Ms. Armistead?    03:30:19

Page 122

1    A Um.
2    Q I can ask a different question.
3        Is this the policy that would have presented
4 to you on an annual basis as part of the Title IX
5 training at West Virginia State University?    03:30:42
6    A It could have been.
7    Q So this document, Exhib- -- Exhibit 43, is
8 entitled "Unlawful Discrimination and Harassment,
9 Sexual Harassment, Grievance Procedures, Child Abuse
10 and Neglect Reporting and Relationships."    03:31:14
11    Did I read that correctly, Ms. Armistead?
12    A Yes.
13    Q And this is published by the West Virginia
14 State University Board of Governors as BOG Policy
15 No. 14.    03:31:31
16    Did I read that correctly?
17    A Yes.
18    Q You have the right to read this whole policy,
19 if you would like; otherwise, I can direct you to
20 specific questions. You let me know what you prefer.    03:31:38
21    A You can direct me.
22    Q Okay. If you go to the bottom of page 1,
23 you'll see section 3.1. Tell me when you see that.
24    A Got it.
25    Q Cognoscente of the break we just had, I'm    03:31:58

Page 123

1 going to just pinpoint a couple of specific words and
2 phrases for you; however, if you would like to read the
3 whole paragraph, you're more than welcome to do so,
4 okay?
5    3.1 says (as read):    03:32:10
6    "Title IX of the Education
7    Amendments...and other state and
8    federal laws prohibit unlawful
9    discrimination on the basis of sex."
10    Do you see that?    03:32:23
11    A I do see that.
12    Q Did I read that correctly?
13    A Yes.
14    Q If you keep going, it says (as read):
15    "In accordance with The West Virginia    03:32:37
16    Higher Education Policy Commission and
17    Board of Governors Policy #17, the
18    University considers" --
19    And I'm going to skip through some of these.
20    (As read):    03:32:47
21    -- sex and gender and gender identity
22    as protected under federal, state and
23    local antidiscrimination laws as
24    protected characteristics and will not
25    permit unlawful discrimination or    03:33:00

Page 124

1    harassment.
2    Did you follow that?
3    A Yes.
4    Q What do you understand the phrase "basis of
5 sex" mean -- to mean?    03:33:15
6    A I believe that that is referring to the gender
7 of someone.
8    Q Do you have any reason to dispute your
9 school's statement that Title IX and other state and
10 federal laws prohibit unlawful discrimination on the    03:33:45
11 basis of sex?
12    MS. HOLCOMB: Object to form.
13    THE WITNESS: I don't know.
14 BY MR. BARR:
15    Q You don't know if you have a reason to dispute    03:33:59
16 it, or you just don't know if that's true?
17    MS. HOLCOMB: Object to form.
18    THE WITNESS: I don't know if I have a reason
19 to dispute it.
20 BY MR. BARR:    03:34:08
21    Q Does that mean you don't have a reason to
22 dispute it?
23    MS. HOLCOMB: Object to form.
24    THE WITNESS: I don't know.
25 ///

Page 125

32 (Pages 122 - 125)

Armistead Second Supp. App. 0034

1  BY MR. BARR:
2      Q   Okay.  Scroll down and you'll go to
3  section 5.1.  Are you there?
4      A   Yes.
5      Q   All right.  The very first clause, and that's   03:34:28
6  where we'll stop, it says (as read):
7          "The University prohibits Protected
8          Class Discrimination and Harassment."
9          Did I read that correctly?
10     A   Yes.                          03:34:40
11     Q   Do you know what discrimination is?
12         MS. HOLCOMB:  Object to form.
13         THE WITNESS:  I have heard that word before.
14  BY MR. BARR:
15     Q   What is your understanding of the meaning of   03:34:57
16  the word "discrimination"?
17         MR. TRYON:  Objection.
18         MS. HOLCOMB:  Object to form.
19         THE WITNESS:  I think it's a broad word, and
20  it would be hard for your -- me to give you a   03:35:16
21  definition without looking it up.
22  BY MR. BARR:
23     Q   Okay.  How about harassment, do you know what
24  the word "harassment" means?
25         MS. HOLCOMB:  Object to form.          03:35:26

Page 126

1          MR TRYON:  Objection
2          THE WITNESS:  I have a good idea of what the
3  word "harassment" means
4          MR BARR:  Okay  Let's --
5          MR TRYON:  Excuse me, Andrew, can we excuse   03:35:41
6  the witness for a minute?  I'd like to talk about
7  something on the record without -- without the witness
8          MS HOLCOMB:  You can step out
9          (Lainey Armistead left the room )
10         MR TRYON:  Christiana, is she out of the   03:35:57
11  room?
12         MS HOLCOMB:  Yes, she is now
13         MR TRYON:  So, you know, forgive me, but I
14  don't understand how this witness could possibly
15  provide any useful information about a school policy   03:36:06
16  that is full of legalisms, and if you want to depose
17  somebody on it, it ought -- ought to be the school,
18  about what the school -- school's view is on this form
19         What her form -- her views on this form are
20  seem to me to be completely irrelevant, and I'm not   03:36:19
21  sure why we're going through this  I -- I suppose you
22  can -- can do this, but it seems like a waste of time
23         And could you just kind of enlighten me how
24  you think this is in some way relevant, especially with
25  this witness?                      03:36:33

Page 127

1          MR. BARR:  This is the Title IX policy in a
2  case about Title IX, and I'm just curious what the
3  witness's understanding of Title IX is.
4          MR. TRYON:  But it doesn't matter what this
5  witness's understanding of Title IX is.  That is in   03:36:45
6  fact the legal dispute across the country about what
7  Title IX means.
8          So how is this witness in any way relevant to
9  what Title IX --
10         MR. BARR:  Mr. Tryon --          03:36:56
11         MR. TRYON:  -- actually means?
12         MR. BARR:  Mr. Tryon, do you want to have this
13  discussion off the record, or no?
14         MR. TRYON:  No, I wanted it on the record so I
15  can understand what you're doing --          03:37:04
16         MR. BARR:  Okay.  And --
17         MR. TRYON:  -- and why we're going to spend an
18  hour talking about a form that she just can't possibly
19  give a legal interpretation on.
20         MR. BARR:  I'm not asking for a legal   03:37:13
21  interpretation.  I have every right to ask about this,
22  as you acknowledged.  So if we're going to stay on the
23  record, let's just keep going.
24         MR. TRYON:  I didn't really acknowledge that,
25  but go ahead.  So you're not -- you can't justify to me   03:37:18

Page 128

1  why we're doing this?
2          MR. BARR:  I just told you why we're doing
3  this.
4          MR. TRYON:  Yeah, but she can't -- she's not
5  competent -- she's not a competent witness to talk   03:37:27
6  about this policy.  And anything you get from her is
7  going to be completely irrelevant at trial.
8          Can't we just cut this part out and move on?
9          MR. BARR:  No, Mr. Tryon, we cannot.
10         MR. TRYON:  All right.  Well, I'm --   03:37:43
11         MR. BARR:  I recall there is --
12         MR. TRYON:  -- making my objection on the
13  record for any further questions on this, for this
14  witness.
15         MS. HOLCOMB:  I'll likewise object.   03:37:51
16         If we're ready, I'll have her brought back in.
17         MR. BARR:  Thank you.
18         (Lainey Armistead entered the room.)
19  BY MR. BARR:
20     Q   Sorry for all the up-and-down, Ms. Armistead.   03:38:44
21         If you could scroll down to section 23,
22  please.  And inside 23, go to the definition of
23  Title IX.  It's maybe four pages after the section
24  starts.
25     A   Okay.                          03:39:22

Page 129

33 (Pages 126 - 129)

Armistead Second Supp. App. 0035

| | |
|---|---|
| 1     MR. TRYON: I'm sorry, where are we? | 1     Do you see that? |
| 2     MR. BARR: Mr. Tryon, we are looking at the | 2   A. Yes. |
| 3 definition of Title IX in section 23 of Exhibit 43. | 3   Q. So according to this policy, Title IX |
| 4 BY MR. BARR: | 4 prohibits discrimination on the basis of sex. |
| 5   Q. Ms. Armistead --     03:39:38 | 5     We just looked at what the definition of basis 03:41:44 |
| 6     MR. TRYON: Thank you. | 6 of sex is, and it includes transgender status, doesn't |
| 7 BY MR. BARR: | 7 it? |
| 8   Q. Ms. Armistead, do you see that it says (as | 8     MS. HOLCOMB: Object to form. |
| 9 read): | 9     MR. TRYON: Objection. |
| 10     "'Title IX' means Title IX of the   03:39:40 | 10     THE WITNESS: That was --     03:41:52 |
| 11     Education Amendments of 1972. | 11 BY MR. BARR: |
| 12     Title IX prohibits discrimination on | 12   Q. We can scroll up -- I'm sorry, I didn't mean |
| 13     the basis of sex in education programs | 13 to cut you off. What did you say? |
| 14     or activities receiving federal | 14   A. That was written on -- what I read, yes. |
| 15     financial assistance"?     03:39:49 | 15   Q. Okay. So according to this policy, on the  03:42:06 |
| 16     Did I read that correctly? | 16 basis of sex includes transgender status; is that |
| 17   A. Yes. | 17 correct? |
| 18   Q. Okay. So let's stay in section 23. Scroll up | 18   A. That is what I read. |
| 19 just a little bit, and you'll see a definition for on | 19   Q. And according to this policy, on the basis of |
| 20 the basis of sex. Tell me when you're there.  03:40:04 | 20 sex includes gender identity; right?     03:42:22 |
| 21   A. Got it. | 21     MR. TRYON: I'm objecting to any further |
| 22   Q. (As read): | 22 questions on this document for this witness. Will you |
| 23     "'On the Basis of Sex' or 'Based on | 23 give me a standing objection for that, please? |
| 24     Sex' means gender, gender identity, | 24     MR. BARR: Noted. |
| 25     including transgender status, sexual  03:40:17 | 25     THE WITNESS: I don't know.     03:42:46 |
| Page 130 | Page 132 |

| | |
|---|---|
| 1     orientation and/or stereotypical | 1 BY MR. BARR: |
| 2     notions of what is female/feminine | 2   Q. Do you went to go back up and look at the |
| 3     versus male/masculine or a failure to | 3 definition on the basis of sex again? |
| 4     conform to those gender stereotypes." | 4   A. That's not necessary. |
| 5     Did I read that correctly?     03:40:30 | 5   Q. Do you agree with me that on the basis of sex, 03:42:54 |
| 6   A. Yes. | 6 as it relates to this policy, includes transgender |
| 7   Q. Scroll up just a little bit further and you'll | 7 status and gender identity? |
| 8 see a definition for education program or activity. | 8     MS. HOLCOMB: Object to form. |
| 9 Tell me when you see that. | 9     THE WITNESS: That's what I read. |
| 10   A. Got it.     03:40:53 | 10 BY MR. BARR:     03:43:07 |
| 11   Q. (As read): | 11   Q. And that education programs or activities |
| 12     "'Education Program or Activity' | 12 includes school-sponsored athletics; right? |
| 13     includes locations, events, or | 13     MS. HOLCOMB: Object to form. |
| 14     circumstances over which the | 14     THE WITNESS: It could mean that. |
| 15     University exercises substantial   03:41:00 | 15 BY MR. BARR:     03:43:22 |
| 16     control" -- | 16   Q. We just looked at the definition of education |
| 17     I'm going to skip through the next part and | 17 programs and activities, and it included |
| 18 then go to "athletic programs." | 18 school-sponsored athletics; right? |
| 19     Do you see that? | 19     MS. HOLCOMB: Object to form. |
| 20   A. Yes.     03:41:10 | 20     THE WITNESS: That was the definition that was 03:43:37 |
| 21   Q. Did I read that correctly, knowing that I | 21 presented. |
| 22 excerpted part of that definition? | 22 BY MR. BARR: |
| 23   A. Yes. | 23   Q. So using the definitions that were presented |
| 24   Q. So let's scroll back down to the definition of | 24 in this policy, Title IX prohibits discrimination on |
| 25 Title IX, the first definition you looked at.  03:41:27 | 25 the basis of transgender status or gender identity and 03:43:55 |
| Page 131 | Page 133 |

34 (Pages 130 - 133)

Armistead Second Supp. App. 0036

1 school-sponsored athletics receiving federal financial
2 assistance; right?
3        MS. HOLCOMB:  Object to form.
4        THE WITNESS:  I'm not really sure exactly what
5 the policy is talking about.                      03:44:17
6 BY MR. BARR:
7     Q   Would you agree with me that I read that
8 correctly, using the definitions provided in the
9 policy?
10    A   I heard what you said based on the document    03:44:23
11 that you presented.
12    Q   Did I say it correctly based on the document
13 that I presented?
14    A   Yes.
15    Q   Isn't that exactly what you are seeking to do  03:44:43
16 in this lawsuit?
17        MS. HOLCOMB:  Object to form.
18        MR. TRYON:  Objection.
19        THE WITNESS:  No.
20 BY MR. BARR:                                       03:45:10
21    Q   How isn't it?
22        MS. HOLCOMB:  Object to form.
23        MR. TRYON:  Objection.
24        THE WITNESS:  I don't know.
25 ///
                                              Page 134

1 BY MR. BARR:
2     Q   If you win in this lawsuit, wouldn't that mean
3 that B.P.J. would be excluded on the basis of her
4 transgender status and gender identity from
5 participating on the school-sponsored girls' team?    03:45:48
6        MS. HOLCOMB:  Object to form.
7        MR. TRYON:  Objection.
8        THE WITNESS:  I'm not a lawyer, so I can't
9 answer that.
10 BY MR. BARR:                                       03:46:05
11    Q   In any of the discovery responses that you've
12 prepared for this case, did you acknowledge that
13 B.P.J. would be excluded from the girls' team at her
14 school because of H.B. 3293?
15        MS. HOLCOMB:  Object to form.          03:46:24
16        THE WITNESS:  I don't know.
17 BY MR. BARR:
18    Q   Did you review the discovery responses before
19 they were sent over to us?
20    A   Yes.                              03:46:35
21    Q   Do you recall any discovery responses
22 regarding whether B.P.J. would be excluded from her --
23 her school's girls' cross-country team?
24    A   I don't recall.
25    Q   Let's keep talking about B.P.J.  We earlier   03:46:53
                                              Page 135

1 discussed that B.P.J. participated in several
2 cross-country events in the fall of 2021.
3        Do you remember that?
4     A   I remember what you said about that.
5     Q   And if I remember what you said, you didn't    03:47:19
6 have a -- an understanding of whether B.P.J.
7 participated, how many times she participated or how
8 she did.  Is that accurate?
9     A   Correct.
10    Q   And, in fact, you didn't have an understanding  03:47:35
11 of what B.P.J. had done at all as it relates to
12 athletics, if I understood you correctly?
13    A   I don't know anything -- I don't really know
14 B.P.J., the plaintiff, so I can't comment on her
15 personal -- their personal successes or how they do in  03:47:58
16 events.
17    Q   Okay.  I'm not asking you to accept my
18 terminology here, okay?
19        Will you accept that B.P.J. is a transgender
20 girl who played on a girls' team, just for the purposes  03:48:17
21 of this question?  I'm not asking you to understand or
22 agree with my terminology.
23        MS. HOLCOMB:  Object to form.
24        MR. TRYON:  Objection.
25 ///
                                              Page 136

1 BY MR. BARR:
2     Q   I'll just ask the question.  I'm not trying to
3 be tricky.  I just want to make sure that you
4 understand what I'm asking.
5        Given that B.P.J. is a transgender girl, do    03:48:38
6 you expect that she won the events that she
7 participated in?
8        MS. HOLCOMB:  Object to form.
9        THE WITNESS:  I --
10       MR. TRYON:  Objection.              03:48:52
11       THE WITNESS:  -- don't know.
12 BY MR. BARR:
13    Q   What's your expectation based on what you told
14 me earlier about advantages?
15       MS. HOLCOMB:  Same objection.        03:49:01
16       MR. TRYON:  Objection.
17       THE WITNESS:  I don't know how B.P.J.
18 performed, and I wouldn't be expected to know how
19 she -- they performed.
20 BY MR. BARR:                              03:49:20
21    Q   Would you be surprised if B.P.J. got last
22 place?
23       MR. TRYON:  Objection.
24       MS. HOLCOMB:  Object to form.
25       THE WITNESS:  I don't know.          03:49:32
                                              Page 137

                                      35 (Pages 134 - 137)

Armistead Second Supp. App. 0037

1 BY MR. BARR:
2      Q   I realize you don't know how B.P.J. placed,
3 and I'm not asking that question.
4          My question is, would you be surprised if
5 B.P.J. got last?                          03:49:48
6      A   I understood your question, and again, I don't
7 know.
8      Q   So you have no -- nothing would surprise you,
9 whether B.P.J. got first or last or something in
10 between?                                 03:50:00
11         MS. HOLCOMB:  Object to form.
12         MR. TRYON:  Objection.
13         THE WITNESS:  That's not what I said.
14 BY MR. BARR:
15     Q   Okay.  What did you say?          03:50:38
16     A   I just said I don't know, from your question.
17 In general, I would think that -- I believe that
18 biological males have advantages, but does that mean in
19 all cases that happens?  Maybe; maybe not.
20         But I don't really know the specifics or what   03:51:00
21 to be expected from B.P.J. because I don't know that
22 person.
23     Q   Okay.  You raised a good question.
24         Do you expect that there might be exceptions
25 to these advantages that you've talked about?    03:51:13
Page 138

1      A   I think that it's -- I'm bigger than some
2 biological males, but in general, biological males are
3 bigger, stronger, faster than me, and it should -- and
4 only biological women should be competing against me.
5      Q   And that was for two reasons, fairness and   03:51:41
6 safety; right?
7      A   Yes.
8      Q   What safety concern do you have with middle
9 school cross-country and B.P.J. participating on the
10 girls' team?                             03:51:58
11         MS. HOLCOMB:  Object to form.
12         THE WITNESS:  I'm intervening for all women
13 athletes and sports, and that includes contact sports
14 that I'm a part of.
15 BY MR. BARR:                             03:52:18
16     Q   B.P.J. is the plaintiff here, and B.P.J.
17 doesn't play a contact sport.  So I'm asking where the
18 safety issue comes up -- comes in on middle school
19 cross-country.
20         MS. HOLCOMB:  Same objection.     03:52:35
21         MR. TRYON:  Objection.
22         THE WITNESS:  My concerns are fairness and
23 safety for all women athletes in all sports.
24 BY MR. BARR:
25     Q   Understood.  What is the safety concern for   03:52:47
Page 139

1 middle school cross-country and B.P.J. participating on
2 the girls' team?
3          MS. HOLCOMB:  Object to form.
4          THE WITNESS:  I don't know.
5 BY MR. BARR:                             03:53:00
6      Q   When it comes to fairness, what fairness are
7 you concerned about?
8      A   In general, biological males are faster than
9 biological women.
10     Q   So I'm not putting words in your mouth.    03:53:32
11         Is the concern that the transgender girl would
12 win the race to the detriment of the cisgender girl?
13 Is that the fairness concern?
14         MR. TRYON:  Objection.
15         MS. HOLCOMB:  Object to form.       03:53:44
16         THE WITNESS:  That is not the only concern.
17 BY MR. BARR:
18     Q   What are the other concerns?
19     A   It's just not fair for biological males to
20 compete with biological women in any sports.    03:54:31
21     Q   I heard you that.  I'm trying to
22 understand why you believe that.
23         MS. HOLCOMB:  I'm sorry, was there a question?
24         MR. BARR:  Yes.
25 ///
Page 140

1 BY MR. BARR:
2      Q   Why do you believe that?
3      A   I believe I already answered that question.
4      Q   Could you tell me it again because I certainly
5 didn't hear it.  I'm trying to understand why you   03:55:03
6 believe that B.P.J. creates a fairness issue running
7 middle school cross-country on the girls' team?
8          MS. HOLCOMB:  Objection to form.
9          MR. TRYON:  Objection.
10         THE WITNESS:  Because, in general, biological   03:55:23
11 males are stronger, fitter, faster than biological
12 women.
13 BY MR. BARR:
14     Q   And if I understand you, the concern would be
15 that transgender girls would win and cisgender girls   03:55:38
16 would not because of these advantages you're talking
17 about; is that right?
18         MS. HOLCOMB:  Objection to form.
19         THE WITNESS:  I'm aware of my blessings and
20 opportunities that I was able to have because of the   03:55:57
21 fair playing that I have seen throughout my life, and I
22 want to make sure that I fight for that for other
23 women, to make sure that they are not having to compete
24 with biological males, in whatever sport that they do.
25 ///
Page 141

36 (Pages 138 - 141)

Armistead Second Supp. App. 0038

BY MR. BARR:

1 BY MR. BARR:

2 Q I understand. And you've told me that you

3 want to do that for two reasons, safety and fairness;

4 is that right?

5 A Yes. 03:56:27

6 Q And we talked about safety with middle school

7 cross-country, and you stated you don't know what the

8 safety issue is with B.P.J. running cross-country on

9 the girls' team; right?

10 MS. HOLCOMB: Object to form. 03:56:49

11 THE WITNESS: I don't know.

12 BY MR. BARR:

13 Q Right. So the two things that you're

14 concerned about, safety and fairness, we've talked

15 about safety, and now I'm trying to understand what 03:57:04

16 would be unfair about B.P.J. running cross-country on

17 the girls' team at her middle school.

18 MR. TRYON: Objection.

19 MS. HOLCOMB: Objection to form.

20 THE WITNESS: H.B. 3293 is to promote equality 03:57:31

21 for all women in all sports, so I think that that

22 answers my -- your question.

23 BY MR. BARR:

24 Q Perhaps I'm just not following. I don't know

25 how that answers the question about what fairness issue 03:57:53

Page 142

1 arises with B.P.J. running on the girls' cross-country

2 team at her middle school.

3 MS. HOLCOMB: I'm going to object as asked and

4 answered multiple times.

5 MR. BARR: Attorney Holcomb, if you can tell 03:58:07

6 me what the answer is, I'll be happy to move on. I

7 haven't heard an answer yet.

8 MS. HOLCOMB: I think she's answered your

9 question at least three times to the best of her

10 ability. So it's asked and answered. 03:58:17

11 MR. BARR: I'll -- I'll try it a different

12 way.

13 BY MR. BARR:

14 Q Ms. Armistead, can you point to any specific

15 fairness issue you're concerned about as it relates to 03:58:25

16 B.P.J. running on the girls' cross-country team at her

17 middle school?

18 MS. HOLCOMB: Objection to form.

19 THE WITNESS: I am not certain for specifics

20 on her -- on B.P.J., but I do know that this law 03:59:04

21 promotes fairness and equality for all women, including

22 those who run cross-country at age 11 and college

23 athletes in a contact sport, such as myself.

24 BY MR. BARR:

25 Q Okay. Just to make sure that I've understood 03:59:26

Page 143

1 you, you -- do not have a specific fairness issue to

2 point to based on my last question. Did I understand

3 that correctly?

4 MS. HOLCOMB: Object to form.

5 MR. TRYON: Objection. 03:59:37

6 THE WITNESS: That's not what I said. I just

7 said overall it's -- it wouldn't be fair for all women.

8 BY MR. BARR:

9 Q But specifics, there's no specific thing you

10 can point to for B.P.J.; right? 03:59:50

11 A I don't know.

12 MR. BARR: I -- I've introduced an exhibit.

13 It's actually previously marked as Exhibit 39. Let me

14 know when you have it.

15 THE WITNESS: Got it. 04:00:35

16 BY MR. BARR:

17 Q Have you ever heard of the Doddridge

18 Invitational cross-country meet?

19 A No.

20 Q If you would like to read the e-mail and look 04:00:45

21 at the exhibit, please let me know; otherwise, I'll

22 just ask my question. It's whatever is best for you.

23 A I read it.

24 Q Okay. If you could scroll down to page 2,

25 please, you'll see two tables. The table on the left 04:01:13

Page 144

1 says "BMS XC-Boys," and the table on the right says

2 "BMS XC-Girls."

3 Do you see that?

4 A Yes.

5 Q Do you know what BMS references? 04:01:32

6 A I do not.

7 Q I'll represent to you that it's Bridgeport

8 Middle School.

9 Have you ever heard of Bridgeport Middle

10 School? 04:01:46

11 A No.

12 Q Okay. And then on the table on the right, it

13 also says "BMS," which, again, is Bridgeport Middle

14 School.

15 Do you know what XC-Girls means? 04:01:56

16 A Yes.

17 Q What does that mean?

18 A Cross-country girls.

19 Q Okay. So let's focus on the table on the

20 right. 04:02:12

21 Do you see that there are approximately 20

22 names -- or 20 times listed? The names have been

23 redacted for privacy reasons. Do you see that?

24 A Yes.

25 Q And you see that one name has not been 04:02:29

Page 145

Armistead Second Supp. App. 0039

| | |
|---|---|
| 1 redacted, and that's B███ H███-███. | 1   A   No. |
| 2      Do you see that? | 2   Q   Would you have any basis to state that |
| 3   A   Yes. | 3 B.P.J. impacted the team time -- |
| 4   Q   I'm going to represent to you that | 4      MS. HOLCOMB:  Object to form. |
| 5 B███ H███-███ is B.P.J., the plaintiff in this   04:02:39 | 5      Sorry, I didn't mean to cut you off.   04:06:05 |
| 6 case, okay? | 6      THE WITNESS:  I don't know. |
| 7   A   Okay. | 7 BY MR. BARR: |
| 8   Q   What do you think this table that is entitled | 8   Q   You don't know how the team time is |
| 9 "BMS XC-Girls" is telling us? | 9 determined? |
| 10      MS. HOLCOMB:  Object to form.   04:02:57 | 10   A   Correct.   04:06:18 |
| 11      THE WITNESS:  I don't know. | 11   Q   And, therefore, you would have no basis to |
| 12 BY MR. BARR: | 12 state whether B.P.J.'s times impacted the |
| 13   Q   Does it look like it may be a listing of | 13 Bridgeport Middle School team time; correct? |
| 14 individual students' times at the | 14   A   I don't know. |
| 15 Doddridge Invitational on Thursday, September 16th?   04:03:15 | 15   Q   I just want to make sure we're clear on the   04:06:37 |
| 16   A   Yes. | 16 record. |
| 17   Q   And if we look at that table on the right, it | 17      You don't know what? |
| 18 has three columns, one for distance, one for actual | 18   A   What was your question again? |
| 19 time and one for pace per mile. | 19   Q   I'm asking if you have any basis to state |
| 20      Do you see that?   04:03:30 | 20 whether B.P.J. impacted the Bridgeport Middle School   04:06:54 |
| 21   A   Yes. | 21 team time at the Doddridge Invitational. |
| 22   Q   And this table on the right, we're just | 22      MS. HOLCOMB:  Object to form. |
| 23 talking about girls; right? | 23      THE WITNESS:  I don't know. |
| 24      MS. HOLCOMB:  Object to form. | 24 BY MR. BARR: |
| 25      THE WITNESS:  That is what the document says.   04:03:49 | 25   Q   You don't know whether B.P.J. did or didn't   04:07:15 |
| Page 146 | Page 148 |

| | |
|---|---|
| 1 BY MR. BARR: | 1 impact it? |
| 2   Q   Okay.  How did B.P.J. do at the | 2      MS. HOLCOMB:  Object to form. |
| 3 Doddridge Invitational, according to this table? | 3      THE WITNESS:  I don't know. |
| 4   A   B.P.J. ran 1.9 miles in 21 minutes and | 4 BY MR. BARR: |
| 5 50 seconds.   04:04:18 | 5   Q   So you wouldn't be in a position to state that   04:07:31 |
| 6   Q   B.P.J. finished towards the back of the | 6 B.P.J. led to some other student's time not being |
| 7 Bridgeport Middle School girls; right? | 7 included in the team time; right? |
| 8      MS. HOLCOMB:  Object to form. | 8   A   Can you say that again, please? |
| 9      THE WITNESS:  B.P.J. wasn't in the lead, no. | 9   Q   Sure.  You're not in a position to state one |
| 10 BY MR. BARR:   04:04:46 | 10 way or the other whether B.P.J.'s time impacted another   04:07:56 |
| 11   Q   In fact, B.P.J. finished in 13th of 16 | 11 student's time included on the team time at the |
| 12 finishes; right? | 12 Doddridge Invitational? |
| 13      MS. HOLCOMB:  Object to form. | 13      MS. HOLCOMB:  Object to form. |
| 14      THE WITNESS:  That might be what the table | 14      THE WITNESS:  Correct.  I don't run |
| 15 shows.   04:05:13 | 15 cross-country.  I do know about soccer, though.   04:08:17 |
| 16 BY MR. BARR: | 16      MR. BARR:  I've introduced another exhibit. |
| 17   Q   Do you see on the table how a few of the times | 17 It's previously been marked as Exhibit 40.  Please let |
| 18 are highlighted yellow and the rest are white? | 18 me know when it appears. |
| 19   A   Yes. | 19      THE WITNESS:  Got it. |
| 20   Q   What does that yellow highlighting mean?   04:05:29 | 20      MS. HOLCOMB:  I'm sorry, give me one moment.   04:09:02 |
| 21      MS. HOLCOMB:  Object to form. | 21 Mine is still attempting to refresh. |
| 22      THE WITNESS:  I don't know. | 22      MR. BARR:  No problem.  Tell me when you're |
| 23 BY MR. BARR: | 23 ready. |
| 24   Q   Do you know how middle school cross-country | 24      MS. HOLCOMB:  All right.  I'm ready.  Thank |
| 25 team times are determined?   04:05:45 | 25 you.   04:09:22 |
| Page 147 | Page 149 |

Armistead Second Supp. App. 0040

| | |
|---|---|
| 1     MR. BARR:  Sure. | 1     MR. TRYON:  Objection. |
| 2 BY MR. BARR: | 2     MS. HOLCOMB:  I'm going to object to form. |
| 3     Q   Ms. Armistead, Exhibit 40, do you see tables | 3     THE WITNESS:  I have no idea. |
| 4 similar to the tables we just saw on Exhibit 39? | 4 BY MR. BARR: |
| 5     A   They look similar.          04:09:31 | 5     Q   If I told you it meant time trial place, would   04:12:43 |
| 6     Q   But in this case, the right-hand table says | 6 you be willing to accept that for purposes of this |
| 7 "BMS," which we've discussed is Bridgeport Middle | 7 exhibit? |
| 8 School, "XC-Girls," cross-country girls, for the | 8     MS. HOLCOMB:  Object to form. |
| 9 Ritchie County event on Saturday, October 1st. | 9     MR. TRYON:  Objection. |
| 10     Do you see that?          04:09:53 | 10     THE WITNESS:  Yes.          04:12:54 |
| 11     A   Yes. | 11 BY MR. BARR: |
| 12     Q   Do you have any understanding of what the | 12     Q   On October 7th, 2021, what place did |
| 13 highlighted parts of this table mean? | 13 B.P.J. earn? |
| 14     A   No. | 14     MS. HOLCOMB:  Object to form. |
| 15     Q   How did B.P.J. do in this event?          04:10:07 | 15     THE WITNESS:  According to this document,   04:13:21 |
| 16     MS. HOLCOMB:  Object to form. | 16 24th. |
| 17     THE WITNESS:  According to the table, she | 17 BY MR. BARR: |
| 18 didn't place -- B.P.J. didn't place in the top half. | 18     Q   How many participants are indicated to have |
| 19 BY MR. BARR: | 19 participated, on this document? |
| 20     Q   And I'm happy for you to look at the rest of   04:10:45 | 20     A   28.          04:13:29 |
| 21 Exhibit 40, and you can take as much time as you would | 21     Q   So on October 7, 2021, according to |
| 22 like, but I'll represent to you that B.P.J. never has | 22 Exhibit 40, B.P.J. got 24th of 28 participants; is that |
| 23 times that are highlighted in this exhibit. | 23 right? |
| 24     But my understanding is you don't have an | 24     A   That's what the document indicates. |
| 25 understanding whether the highlighting has some   04:11:03 | 25     Q   And let's move over to August 24th.          04:13:52 |
| Page 150 | Page 152 |
| 1 indication one way or the other; is that right? | 1     What place did B.P.J. get on August 24th? |
| 2     MS. HOLCOMB:  Object to form. | 2     MS. HOLCOMB:  Object to form. |
| 3     THE WITNESS:  As stated, I am not a | 3     THE WITNESS:  30th. |
| 4 cross-country runner, so no, I don't know. | 4 BY MR. BARR: |
| 5 BY MR. BARR:          04:11:27 | 5     Q   And I'm not going to ask you the total   04:14:15 |
| 6     Q   If you could scroll to the last page of | 6 participants, because that column is very hard to |
| 7 Exhibit 40. | 7 interpret and I want to be unfair, but you would |
| 8     Are you there? | 8 agree with me that B.P.J. was at the very low end of |
| 9     A   Yes. | 9 that table as well? |
| 10     Q   You'll see at the top it says "Time Trial   04:11:42 | 10     A   Lower than others.          04:14:34 |
| 11 Comparison." | 11     Q   Lower than almost everybody else; right? |
| 12     Did I read that correctly? | 12     MS. HOLCOMB:  Object to form. |
| 13     A   You did. | 13     THE WITNESS:  That is what the document |
| 14     Q   And then in the two columns to the right of | 14 indicates. |
| 15 that, there's the cross-country time trial at   04:11:56 | 15 BY MR. BARR:          04:14:54 |
| 16 Bridgeport City Park on October 7th, 2021, and the | 16     Q   Do you still think it's unfair for B.P.J. to |
| 17 column to the right of that is the cross-country time | 17 participate? |
| 18 trial, Bridgeport City Park, on August 24th, 2021. | 18     MS. HOLCOMB:  Object to form. |
| 19     Do you see that? | 19     MR. TRYON:  Objection. |
| 20     A   Yes.          04:12:12 | 20     THE WITNESS:  It also looks like B.P.J. was   04:15:06 |
| 21     Q   Inside those columns, on the far left side, | 21 competing against people in sixth, seventh and eighth |
| 22 there's a subcolumn that says "TT Place." | 22 grade.  So I don't know if sixth-graders are typically |
| 23     Do you see that? | 23 in the top of their class. |
| 24     A   Yes. | 24 BY MR. BARR: |
| 25     Q   What do you think TT Place means?          04:12:27 | 25     Q   Based on this document, do you still think   04:15:33 |
| Page 151 | Page 153 |

39 (Pages 150 - 153)

Armistead Second Supp. App. 0041

1  it's unfair for B.P.J. to have participated?
2       MS. HOLCOMB:  Object to form.
3       MR. TRYON:  Objection.
4       THE WITNESS:  Based on this document, I don't
5  know.                              04:15:49
6  BY MR. BARR:
7    Q  Do you still believe B.P.J. has superior speed
8  compared to her classmates, having seen these
9  documents?
10      MR. TRYON:  Objection.          04:16:05
11      MS. HOLCOMB:  Objection to form.
12      THE WITNESS:  This document doesn't really
13 give a fair comparison.
14 BY MR. BARR:
15   Q  Why not?                       04:16:15
16   A  As I said, B.P.J. is competing with people in
17 sixth, seventh and eighth grade.  And in my experience,
18 whenever I was in sixth grade, playing soccer, I was
19 having difficulties against the seventh- and
20 eighth-graders.                     04:16:40
21      MR. BARR:  Attorney Holcomb, we've been going
22 for about an hour.  Do you want a break, or do you want
23 to keep going?
24      MS. HOLCOMB:  Would you like a break, Lainey?
25      THE WITNESS:  Let's go.         04:17:01

Page 154

1       MS HOLCOMB: Andrew, any estimate of how much
2  longer you plan to go?
3       MR BARR: No, sorry  Some of these questions
4  that I expected to go quick have taken a little longer
5  than anticipated  So I would hate to give any false   04:17:18
6  expectations there
7       MS MORGAN: Andrew, this is Kelly Morgan
8  I'm just asking because of family obligations again
9  here  Are we looking at an hour or two --
10      THE VIDEOGRAPHER: Are we going to go off --   04:17:29
11      MR BARR: Let's go off the record
12      THE VIDEOGRAPHER: Are we going to --
13      MR BARR: Yeah, let's go off the record
14      THE VIDEOGRAPHER: Okay  One moment
15      We're going off the record  The time is   04:17:34
16 4:18 p m , and this is the end of Media Unit No  4
17      (Recess)
18      THE VIDEOGRAPHER: All right  We are back on
19 the record at 4:37 p m , and this is the beginning of
20 Media Unit No  5                    04:37:25
21      Please go ahead
22 BY MR BARR:
23   Q  Ms Armistead, I was going through my notes
24 and realized I didn't ask you the question I thought
25 was most important, which is, what's your favorite   04:37:34

Page 155

1  soccer team?  Do you have one?
2    A  Chelsea.
3    Q  Kind of going through some tough times with
4  ownership of Chelsea at the moment, but -- okay.  So
5  you do follow professional soccer?         04:37:48
6    A  A little bit, yes.
7    Q  Do you -- do you follow any women's
8  professional teams?
9    A  I keep up with the U.S. women's national team
10 a little bit.                         04:38:01
11   Q  But other than the national team?
12   A  No.
13   Q  I'm a Liverpool fan, so I had to ask.
14      Okay.  So, clearly, you love soccer.  I
15 understand all that.  I want to understand why you love  04:38:19
16 soccer.  And, specifically, what do you get out of it?
17   A  I get an opportunity to compete and -- I get
18 so much out of soccer.  It keeps me in shape.  I have
19 the ability to make great friends and lasting
20 connections with my teammates.  And I'm still friends   04:38:46
21 with teammates from high school and club teams.  And
22 I've learned a lot about perseverance and teamwork,
23 cooperation.  There's so much that soccer has taught me
24 throughout my life, and I wouldn't be the person I am
25 today without it.                     04:39:06

Page 156

1    Q  I know you focused on soccer, but do you think
2  that would be true of most athletes' experience, having
3  played sports in a -- you know, as a child or adult?
4       MS. HOLCOMB:  Object to form.
5       THE WITNESS:  I believe that a lot of people   04:39:29
6  probably have the same experiences as I do, but I can't
7  speak for sure on other people's experiences.
8  BY MR. BARR:
9    Q  Understood.  You said you played club -- club
10 soccer.  Did I hear that right?         04:39:41
11   A  Yes.
12   Q  Do you still play club stocker?
13   A  No.  I'm unable to do so due to being a
14 college athlete.
15   Q  When did you start playing club soccer?   04:39:57
16   A  Probably around seven or eight years old.
17   Q  Did your school offer a soccer team when you
18 were seven or eight years old?
19   A  I don't believe so.  I just played club until
20 I was able to play in middle school.      04:40:21
21   Q  When did your stop playing club soccer?
22   A  My senior year of high school.
23   Q  Were you ever invited to an ODP program,
24 Olympic developmental program?
25   A  Yes.                           04:40:43

Page 157

40 (Pages 154 - 157)

Armistead Second Supp. App. 0042

| | |
|---|---|
| 1    Q   Did you attend? | 1       MS. HOLCOMB: Object to form. |
| 2    A   I attended for a little bit before moving | 2       THE WITNESS: I would probably say my club |
| 3 school -- or before moving across the state, so... | 3 team was better. |
| 4    Q   Where were you living before Owensboro? | 4    Q   That's generally true, right, the club team is   04:44:06 |
| 5    A   I am from Owensboro, and then I moved to   04:41:03 | 5 a more select group of athletes than any particular |
| 6 Louisville, Kentucky, and then I moved back to | 6 school, as a general matter? |
| 7 Owensboro. | 7    A   In general, yes. |
| 8    Q   And those two cities are far enough apart you | 8    Q   Any of your club teammates play college |
| 9 had to change club teams as part of that move? | 9 soccer?           04:44:28 |
| 10    A   Yes.          04:41:27 | 10    A   Yes. |
| 11    Q   And did I understand that one of those teams | 11       MS. HOLCOMB: Object to form. |
| 12 offered the ODP and the other one did not; is that | 12       THE WITNESS: Yes. |
| 13 right? | 13 BY MR. BARR: |
| 14    A   ODP is more of a state -- a state development | 14    Q   Any of them playing with or against you in |
| 15 program. So I could have continued to do so, but where   04:41:40 | 15 Mountain East Conference?         04:44:41 |
| 16 I moved, it would have been three hours to drive | 16    A   No. |
| 17 instead of just right beside my hometown. | 17    Q   Do you think those athletes benefitted from |
| 18    Q   How long did you participate in the ODP? | 18 soccer similarly to the way you did? |
| 19    A   I don't recall. Not long. | 19       MS. HOLCOMB: Object to form. |
| 20    Q   Not long?         04:42:08 | 20       THE WITNESS: I can't speak on their   04:44:59 |
| 21       Did you have the opportunity to do any | 21 experiences. |
| 22 traveling for ODP? | 22       MR. TRYON: Excuse me, sorry to interrupt, but |
| 23    A   Not ODP, but I had the opportunity to travel | 23 Kelly just texted me, and she said she's in the waiting |
| 24 for my club team. | 24 room trying to get in, if the court reporter could let |
| 25    Q   What -- what was the name of your club team?   04:42:21 | 25 her in.          04:45:17 |
| Page 158 | Page 160 |

| | |
|---|---|
| 1    A   Kentucky Fire. | 1       THE REPORTER: Ms. Morgan, are you in? |
| 2    Q   Was that the -- did you have a different club | 2       MS. MORGAN: Yes, I am. Thank you. |
| 3 team when you moved and what was the name of that? | 3       THE REPORTER: Okay. Sorry about that. |
| 4    A   Owensboro. | 4 BY MR. BARR: |
| 5    Q   And it was when you were on Kentucky Fire that   04:42:39 | 5    Q   Do you have any social media accounts?    04:45:47 |
| 6 you had the ODP opportunities; is that right? | 6    A   Yes. |
| 7    A   Yes. | 7    A   I admittedly don't, so please bear with me in |
| 8    Q   How old were you when that happened? | 8 clunky language, but what platforms do you have an |
| 9    A   I don't remember. | 9 account with? |
| 10    Q   I'm -- was it seven or eight when you started?   04:42:58 | 10    A   I have an account with Twitter, Instagram,    04:46:02 |
| 11 Was it when you were 18 as -- | 11 Facebook, Snapchat. And those are the only ones that I |
| 12    A   Probably middle school. | 12 use. |
| 13    Q   Did you benefit from the ODP? | 13 BY MR. BARR: |
| 14    A   I did not benefit from ODP, but I definitely | 14    Q   Do you use them daily? |
| 15 benefitted from club.        04:43:18 | 15    A   Most days.         04:46:24 |
| 16    Q   Did any of your schools offer a women's soccer | 16    Q   Have people ever reached out to you on those |
| 17 team before West Virginia State? | 17 platforms to talk about this law or your participation |
| 18    A   High schools? | 18 in the lawsuit? |
| 19    Q   Sure. Did your high school have a women's | 19    A   Yes. |
| 20 soccer team?        04:43:37 | 20    Q   Does it happen regularly?      04:46:52 |
| 21    A   Yes. | 21    A   No. |
| 22    Q   Did you play on it? | 22    Q   Has it happened one time? five times? ten |
| 23    A   I did. | 23 times? |
| 24    Q   Was your club team or your high school team | 24    A   I'm not sure. Not very many times. |
| 25 better?         04:43:54 | 25    Q   More than once, less than 20; is that fair?   04:47:12 |
| Page 159 | Page 161 |

41 (Pages 158 - 161)

Armistead Second Supp. App. 0043

1    A   Yes.
2    Q   More than five times, less than 20?
3    A   I would probably just say less than ten, and
4 that's as close as I would feel comfortable getting.
5    Q   Do you remember if that was via Facebook or    04:47:30
6 one of the other platforms you described?
7    A   I think it was on Facebook and Twitter.
8    Q   Have you ever sent a message or reached out to
9 people about this lawsuit or the law using one of those
10 social media accounts?                    04:48:02
11   A   No.
12   Q   Has anyone ever e-mailed you about this law,
13 other than your attorneys?
14   A   I don't think so.
15   Q   Have you ever e-mailed anyone about this law?   04:48:22
16   A   I shared information with a friend who was
17 interested in intervening.
18   Q   Is that one of the friends you told me about
19 earlier, Sinead or Brooklyn?
20   A   Yes.  Sinead.                        04:48:55
21   Q   Are you familiar with the NCAA's image and
22 likeness policy?
23   A   I am.
24   Q   What's your understanding of how the -- is it
25 okay if I call it the NIL policy?            04:49:13

Page 162

1    A   Yes.
2    Q   What's your understanding of the NIL policy?
3    A   My understanding is that athletes can benefit
4 from their name; and, two, they are -- sign contracts
5 with companies and be a name for a -- for a brand and   04:49:37
6 get paid for doing so.
7    Q   Is it okay with you if I reference what you
8 just described as an endorsement?
9    A   If that's how you want to reference it, sure.
10   Q   We can call it whatever you'd like.  I just am   04:49:59
11 trying to use a faster word than that whole
12 description.
13   A   That's fine.
14   Q   Are you currently under an endorsement deal
15 with anyone?                            04:50:13
16   A   No.
17   Q   Do you have any plans to be under an
18 endorsement deal?
19   A   I'm not sure.  I would like to try.  That
20 would be something I would be interested in.  Of       04:50:31
21 course, it was just a very recent law that was created,
22 a new -- a new policy, so I haven't really looked into
23 it too much yet.
24   Q   Is it accurate to say you'd be interested in
25 it, but sitting here today, you don't have any specific   04:50:54

Page 163

1 plans to enter into an endorsement deal?
2    A   Yes.
3    Q   Have you ever been interviewed related to this
4 lawsuit by someone other than your attorney?
5    A   No.                              04:51:16
6    Q   No reporters, TV appearances, anything like
7 that?
8    A   No.
9    Q   Do you know who Selina Soule is?
10   A   No.                              04:51:39
11   Q   Do you know who Chelsea Mitchell is?
12   A   No.
13   Q   Do you know who Christina Mitchell is?
14   A   No.
15   Q   Do you know who Alanna Smith is?       04:52:00
16   A   No.
17   Q   Do you know who Lanay Sultz is?
18   A   No.
19   Q   Do you know who Margaret O'Neil is?
20   A   No.                              04:52:13
21   Q   Do you know who Cynthia Monteleone is?
22   A   No.
23   Q   Do you know who Madison Kenyon is?
24   A   No.
25   Q   Do you know who Mary Kate Marshall is?    04:52:26

Page 164

1    A   No.
2    Q   Do you know who Darcy Ashoff is?
3    A   No.
4    Q   Do you know anyone on the University of
5 Pennsylvania's women's swimming or diving team?       04:52:41
6    A   I do not.
7    Q   Do you know who Haley Tan is?
8    A   No.
9    Q   And just to make sure I'm being fair with you,
10 there's a chance the last name is Tani.              04:53:00
11       So do you know anyone named Haley Tani?
12   A   No.
13   Q   Do you know anyone who claims to have been
14 harmed by a transgender girl or woman playing on a
15 girls' team, specifically?                     04:53:17
16       MS. HOLCOMB:  Object to form.
17       THE WITNESS:  No, I don't know personally.
18 BY MR. BARR:
19   Q   Have you spoken with any of the people I just
20 named?                                04:53:30
21   A   No, I don't think so.  No.
22   Q   I have a list of about 25 more people.  I can
23 cut that short if I just understand that you haven't
24 spoken to anyone who's claimed to have been harmed by a
25 transgender woman's participation on a girls' team.  Is   04:53:51

Page 165

42 (Pages 162 - 165)

Armistead Second Supp. App. 0044

1 that accurate?
2        MS. HOLCOMB:  Object to form.
3        THE WITNESS:  I don't -- I don't know the
4 names -- I don't know how to give you that information
5 without --                                    04:54:10
6 BY MR. BARR:
7    Q  I'll just go through them.  That's fine.  I
8 was just trying to make this --
9    A  I -- I wouldn't know the names.  I've talked
10 to two girls that were clients of Christiana's, but I   04:54:18
11 don't know -- or recall their names.
12   Q  Are those two girls a party to this lawsuit?
13   A  No.
14   Q  When did you speak to them?
15   A  After I decided to intervene, probably.  Maybe  04:54:40
16 before.
17   Q  How did you locate these two girls?
18        MS. HOLCOMB:  And I'll just object generally
19 to the extent it calls for attorney-client privileged
20 communications.                               04:55:01
21        You may answer.
22        THE WITNESS:  Just by Christiana.
23 BY MR. BARR:
24   Q  What did you discuss with these two girls?
25   A  They just told me about their experiences that  04:55:24

Page 166

1 they've had in their lawsuits, and that was the extent
2 of it.
3    Q  Did you ask to speak with them, or did they
4 ask to speak with you?
5        MS. HOLCOMB:  Object to form.          04:55:45
6        THE WITNESS:  I don't know how to answer that
7 without divulging client-attorney privilege.
8 BY MR. BARR:
9    Q  I'll -- I'll ask a different way because I
10 certainly don't want any privileged communications.   04:55:59
11        Did you ask to be put in touch with these two
12 girls?
13   A  I could have.  I don't recall.
14   Q  You don't know their names?
15   A  I do not recall their names.            04:56:23
16   Q  And if I'm understanding correctly, you found
17 these two girls through your counsel?
18   A  Yes.
19   Q  Did these two girls encourage you to intervene
20 in this case?                                 04:56:51
21   A  They just told me about their experiences.
22   Q  What experiences are you talking about?
23   A  Their experience with their lawsuits.
24   Q  What did they tell you?
25   A  I don't recall specifics of the conversation,  04:57:20

Page 167

1 but it was encouraging, what they told me.  That's what
2 I remember from it.
3    Q  What do you mean it was encouraging, what they
4 told you?  Encouraging what?
5    A  It wasn't encouraging anything specifically.   04:57:36
6 It was just encouraging to me what they were saying.
7    Q  I understood.  I misunderstood.
8        So you found the conversation encouraging.
9        I -- I feel like I might have misunderstood
10 that.                                         04:57:52
11        So is that what you're saying, you found the
12 conversation encouraging?
13   A  Yes.
14   Q  And you don't remember if this happened before
15 or after you decided to intervene?            04:58:02
16        MS. HOLCOMB:  Objection to form.
17        THE WITNESS:  I do not recall.
18 BY MR. BARR:
19   Q  Was it before or after you were put in touch
20 with your attorney?                           04:58:17
21        MS. HOLCOMB:  Objection to form.
22        THE WITNESS:  Well, I said -- I already
23 answered that.
24 BY MR. BARR:
25   Q  Maybe I misunderstood.                  04:58:32

Page 168

1        Your -- so your -- your attorney put you in
2 touch with these people; you just don't remember who
3 asked for the contact; is that correct?
4    A  Yes.
5    Q  Have you spoken with those two girls more than  04:58:49
6 once?
7    A  No.
8    Q  Other than those two girls, have you spoken
9 with anyone else about this lawsuit beyond your family,
10 those two friends you told me about and your attorneys?  04:59:03
11   A  Yes.
12   Q  Who else?
13   A  My best friend.
14   Q  And who is that?
15   A  Allison.                                04:59:16
16   Q  You might have told me that earlier, and I may
17 have forgotten, so I apologize if that's what happened.
18        What is Allison's last name?
19   A  Raymond.
20   Q  Is Allison a classmate of yours?        04:59:27
21   A  No.  She is a hometown friend.  We went to
22 high school together.
23   Q  Anyone else?
24   A  Yes.  Two other hometown friends.
25   Q  Who -- who are those friends?           04:59:45

Page 169

43 (Pages 166 - 169)

Armistead Second Supp. App. 0045

**Page 170**

1    A   Savanna and Haley.

2    Q   Anyone else?

3    A   My extended family, when they visited for the

4  holidays.

5    Q   What was the nature of those discussions?        05:00:03

6    A   I wanted to keep them updated on my life, and

7  I told them about H.B. -- the law -- 3293, and all of

8  my family was encouraging and supportive.

9    Q   And just so you know, if you say "the law," I

10  understand you're talking about H.B. 3293.  It's very        05:00:30

11  hard for me to remember the number, so I'm very

12  sympathetic to that.

13        Did you write an op-ed?

14    A   I'm sorry?

15    Q   Did you write an opinion piece for a        05:00:55

16  newspaper?

17    A   I -- I don't know what you're talking about.

18    Q   Okay.  So sitting here today, everything we've

19  talked about, do you object to B.P.J. playing on the

20  Bridgeport Middle School girls' cross-country team?        05:01:15

21    MS. HOLCOMB:  Objection to form.

22    THE WITNESS:  I don't know.

23    MR. BARR:  Okay.  That's it for me.  I'm happy

24  to turn it over to everyone else.  I do want a couple        05:01:32

25  of minutes just to make sure that my notes are clean.

**Page 171**

1  So I do reserve that right, but I'm happy to pass it to

2  Mr. Tryon or whoever else is in line.

3        And -- and, Ms. Armistead, thank you for your

4  time today.  I apologize for a long day on a Friday,

5  but hopefully you're able to make whatever -- whatever        05:01:47

6  plans you had tonight still.

7    THE WITNESS:  Thank you.

8    MR. TRYON:  Hello, Ms. Armistead.  How are

9  you?

10    THE WITNESS:  I'm good.  How are you?        05:02:03

11    MR. TRYON:  I'm good.  So thank you so much

12  for your time.  We always appreciate when deponents

13  come in and take their time to participate in these --

14  these situations.

15        And I have no questions, so thank you for your        05:02:14

16  time.

17    MS. DENIKER:  This is Susan Deniker.  I have

18  no questions.  Thank you.

19    MS. MORGAN:  This is Kelly Morgan.  I don't

20  have any questions.  Thank you, Lainey.        05:02:34

21    MS. ROGERS:  This is Shannon Rogers.  I don't

22  have any questions.  Thank you.

23    MR. TRYON:  So can we go off the record now?

24  Are we done?

25    MR. BARR:  I believe Attorney Holcomb may or        05:02:59

**Page 172**

1  may not have questions   I just want to make sure that

2  it's clear

3    MS  HOLCOMB:  I do not have any questions

4  Thank you   Just wanted to confirm there were no

5  further defendants        05:03:09

6    MR  BARR:  And with -- we -- we can go off the

7  record   And there's too many people on the same thing

8  to understand who is going to speak next, so I -- I

9  understand that

10    THE VIDEOGRAPHER:  So we -- are we done for        05:03:15

11  the day, then, or are we going to come back on?

12    MR  BARR:  I -- I believe we're finished

13  unless I hear otherwise --

14    THE VIDEOGRAPHER:  Okay

15    MR  BARR:  -- from counsel        05:03:22

16    THE VIDEOGRAPHER:  So I'm -- I'm going go

17  close the record then   All right?

18        Okay   We are off the record at 5:04 p m , and

19  this ends today's testimony given by Lainey Armistead

20        The total number of media used was five and        05:03:35

21  will be retained by Veritext Legal Solutions

22        (TIME NOTED:  5:03 p m )

23

24

25

**Page 173**

1        I, LAINEY ARMISTEAD, do hereby declare under

2  penalty of perjury that I have read the foregoing

3  transcript; that I have made any corrections as appear

4  noted, in ink, initialed by me, or attached hereto;

5  that my testimony as contained herein, as corrected, is

6  true and correct.

7        EXECUTED this _____ day of _____,

8  20____, at _____, _____.

9          (City)          (State)

10

11

12

13

14        _____

15        LAINEY ARMISTEAD

16        VOLUME I

Armistead Second Supp. App. 0046

```
 1  RE: BPJ vs. WEST VIRGINIA STATE BOARD OF EDUCATION
 2  LAINEY ARMISTEAD (JOB NO. 5082427)
 3
 4        E R R A T A   S H E E T
 5  PAGE_____ LINE_____ CHANGE_____
 6  _____
 7  REASON_____
 8  PAGE_____ LINE_____ CHANGE_____
 9  _____
10  REASON_____
11  PAGE_____ LINE_____ CHANGE_____
12  _____
13  REASON_____
14  PAGE_____ LINE_____ CHANGE_____
15  _____
16  REASON_____
17  PAGE_____ LINE_____ CHANGE_____
18  _____
19  REASON_____
20  PAGE_____ LINE_____ CHANGE_____
21  _____
22  REASON_____
23
24  _____  _____
25  LAINEY ARMISTEAD            Date
```

Page 174

```
 1
 2
 3        I, the undersigned, a Certified Shorthand
 4  Reporter of the State of California, do hereby certify:
 5        That the foregoing proceedings were taken
 6  before me at the time and place herein set forth; that
 7  any witnesses in the foregoing proceedings, prior to
 8  testifying, were placed under oath; that a record of
 9  the proceedings was made by me using machine shorthand
10  which was thereafter transcribed under my direction;
11  further, that the foregoing is an accurate
12  transcription thereof.
13        I further certify that I am neither financially
14  interested in the action nor a relative or employee of
15  any attorney of any of the parties.
16        IN WITNESS WHEREOF, I have this date subscribed
17  my name.
18        Dated: March 25, 2022
19
20
21
22  _____
23     ALEXIS KAGAY
24     CSR NO. 13795
25
```

Page 175

45 (Pages 174 - 175)

Armistead Second Supp. App. 0047

[& - acknowledge]

**&**

**&**   4:5 5:5,16

**0**

**00316**   1:7 2:7
11:11
**02116-3740**   7:14

**1**

**1**   1:25 11:5 42:17
78:19,22 123:22
**1.9**   147:4
**10004**   8:8
**10005-3919**   6:9
**11**   1:20 2:23 11:1
74:10 143:22
**112**   4:18
**11776**   175:22
**11th**   11:5 65:21
**120**   6:7
**122**   9:11
**125**   8:6
**12:03**   2:22 11:2
**12:04**   11:4
**12:48**   42:17
**13795**   1:23 2:24
175:24
**13th**   147:11
**14**   9:6,13 123:15
**1411**   5:8
**144**   10:4
**149**   10:5
**14th**   7:13
**16**   40:15 147:11
**16th**   146:15
**17**   124:17
**175**   1:25
**18**   159:11
**18-2-25d**   17:4
**18th**   8:7
**19**   6:8

**1972**   130:11
**1:00**   42:12,20
**1:52**   77:21
**1st**   150:9

**2**

**2**   42:21 77:22
78:19,19,22,22
144:24
**20**   44:21 47:9,10
57:2,9 145:21,22
161:25 162:2
173:8
**200**   5:9
**20116**   3:12
**20147**   3:14
**2019**   50:17 109:21
**2020**   111:2,19
**2021**   26:20 55:9
84:12 111:11,15
136:2 151:16,18
152:12,21
**2022**   1:20 2:23
11:1,5 175:18
**21**   39:2 147:4
**212.549.2500**   8:10
**23**   129:21,22 130:3
130:18
**24th**   151:18
152:16,22,25
153:1
**25**   165:22 175:18
**250**   3:13
**25301**   5:21
**25301-3088**   5:10
**25305-0220**   4:19
**26330**   4:9
**28**   152:20,22
**2:06**   78:1
**2:21**   1:7 2:7 11:11

**3**

**3**   78:2 116:22
**3.1**   124:5
**3.1.**   123:23
**30**   103:8
**304.933.8154**   4:10
**30th**   153:3
**3293**   17:3,5,10,11
75:23 76:2 78:11
79:3,16 80:4
108:8 113:12
135:14 142:20
170:7,10
**34**   10:3 78:6,14
**39**   10:4 144:13
150:4
**3923**   17:5,8
**3:03**   116:21
**3:13**   116:25
**3:21**   121:17
**3:29**   121:20

**4**

**4**   117:1 155:16
**40**   10:5 149:17
150:3,21 151:7
152:22
**400**   4:8
**43**   9:11 122:16,18
123:7 130:3
**47**   19:5
**4:18**   155:16
**4:37**   155:19

**5**

**5**   155:20
**5.1.**   126:3
**50**   147:5
**500**   5:19 7:12
**5082427**   1:24
174:2

**5:03**   2:22 172:22
**5:04**   172:18

**6**

**6**   50:15
**600**   5:20
**617.937.2305**   7:15
**681.313.4570**   4:20

**7**

**7**   152:21
**78**   10:3
**7th**   151:16 152:12

**a**

**abarr**   7:19
**abilities**   51:24
**ability**   45:12 51:20
143:10 156:19
**able**   18:21 61:14
63:18 95:16
141:20 157:20
171:5
**absolutely**   70:2
**abuse**   9:16 123:9
**academic**   59:24
**accept**   136:17,19
152:6
**access**   68:11
**accomplish**   90:14
**accomplishes**
90:20
**accomplishing**
88:24 89:19,25
**account**   161:9,10
**accounts**   161:5
162:10
**accurate**   118:11
136:8 163:24
166:1 175:11
**acknowledge**
128:24 135:12

Page 1

Armistead Second Supp. App. 0048

[acknowledged - asked]

**acknowledged** 128:22
**aclu** 12:17
**aclu.org** 8:9
**acquaintance** 94:14
**action** 175:14
**actions** 18:7
**activities** 1:10 2:10 5:3 13:9 130:14 133:11,17
**activity** 131:8,12
**actual** 146:18
**address** 44:2
**adf** 24:5,7 26:2,10 27:2,4,20,21 28:22 30:22 31:7
**adflegal.org** 3:15 3:16,17,18,19
**administered** 14:18
**administration** 59:12,17,23 64:19 72:8
**administrative** 43:12
**admitted** 61:4
**admittedly** 161:7
**adopted** 39:12,14 40:10,18
**adoption** 29:1,7,8 29:15,19 30:8
**adoptions** 29:11
**adult** 157:3
**advantages** 137:14 138:18,25 141:16
**affect** 51:23
**afternoon** 11:3,18 13:1 14:23
**age** 143:22

**agency** 29:2,8
**ago** 30:1 41:3 62:1 94:15 106:20
**agree** 115:24 133:5 134:7 136:22 153:8
**agreed** 13:24 31:17
**agreement** 14:8,10 14:12
**agreements** 68:8
**ahead** 12:3,13,14 13:18 33:21 42:22 78:3 117:2 121:21 122:5 128:25 155:21
**aid** 45:12
**al** 11:8
**alanna** 164:15
**alexis** 1:23 2:23 11:15 175:23
**alliance** 3:4 12:20
**allison** 169:15,20
**allison's** 169:18
**allow** 54:18 99:16 110:15
**allowed** 53:6 76:6
**allows** 51:16 120:5
**amazing** 116:3
**amenable** 42:10
**amendments** 124:7 130:11
**american** 8:4
**andrew** 7:8 11:19 14:23 42:4,10 66:5 100:1 122:4 127:5 155:1,7
**annual** 117:21 123:4
**answer** 16:2,25 20:6 24:1 27:25

31:9 33:10 34:6 36:19 43:10 71:15 79:10,23 81:23 83:10,23 85:9,14 87:6 99:7,8,21 101:17 104:12,12 105:11 106:13 135:9 143:6,7 166:21 167:6
**answered** 66:8,10 66:15 83:15 90:18 98:11,12,14 103:11 107:8,11 119:17 141:3 143:4,8,10 168:23
**answering** 99:13 99:22 111:12 121:11
**answers** 15:24,25 50:19 142:22,25
**anticipate** 113:22
**anticipated** 155:5
**anticipation** 33:9
**antidiscrimination** 124:23
**anybody** 115:22
**anymore** 39:13
**apart** 158:8
**apologize** 19:4 169:17 171:4
**appear** 173:3
**appearances** 3:1 4:1 5:1 6:1 7:1 8:1 164:6
**appearing** 2:21
**appears** 149:18
**application** 59:13 60:20
**applications** 60:18
**applied** 60:10,13 61:1 64:5 88:4,8

**applies** 87:18 88:7 91:23 92:2 108:8 113:12
**apply** 55:22 60:12 65:4 85:18,23 86:3,9,15 91:14,18 93:5,18
**appreciate** 94:21 103:17 122:10 171:12
**approach** 25:7,8 34:22 35:3,5,12
**approached** 25:10 34:19
**approximately** 145:21
**arises** 115:10 143:1
**arizona** 62:12
**armistead** 1:16,19 2:16,19 9:3 11:6 12:22 14:17 15:4 15:9 18:10 19:8 42:24 66:2 78:4 83:11 117:4 121:22 122:14,15 122:25 123:11 127:9 129:18,20 130:5,8 143:14 150:3 155:23 171:3,8 172:19 173:1,15 174:2,25
**article** 78:19,22
**articles** 29:8,10,13 29:18 30:3
**ashbrook** 3:12
**ashburn** 3:14
**ashoff** 165:2
**asked** 25:4 31:16 34:17 35:25 36:11 58:10 66:8,14

Page 2

Armistead Second Supp. App. 0049

[asked - barr]

74:5 83:15 88:4,8
95:15 98:11 100:3
103:10 105:7
107:8 119:17
143:3,10 169:3
**asking**  16:15,18
17:16 20:21 26:6
27:13 37:16 38:2
44:14 46:1 54:6
65:20 66:9,11
68:20 83:1 90:6
98:15 99:14 104:3
113:4 120:21
128:20 136:17,21
137:4 138:3
139:17 148:19
155:8
**asks**  104:17
**assault**  122:2
**assaulted**  41:17
**assigned**  17:19
18:20 19:11
101:23 102:4,16
103:13,18 105:17
**assistance**  130:15
134:2
**assume**  16:12
53:25 71:1
**assuming**  114:25
**asu**  60:14 61:2,13
**athlete**  39:25 42:2
118:9 157:14
**athletes**  25:18,19
45:18 116:4
139:13,23 143:23
157:2 160:6,17
163:3
**athletic**  45:12
48:13,15,18,20,21
49:10,15 59:25
75:8 131:18

**athletics**  117:20
133:12,18 134:1
136:12
**attached**  122:19
173:4
**attempting**  149:21
**attend**  40:3 110:23
158:1
**attended**  50:16
117:23 118:1
158:2
**attending**  47:7,16
47:25 49:8 50:14
**attorney**  4:7,15,17
5:7,18 6:6 13:14
14:2 16:20 20:5
26:8 27:1 28:2
35:2 66:9 68:1
79:12,14 80:4,25
83:17,24 85:9
86:24 87:16
122:10 143:5
154:21 164:4
166:19 167:7
168:20 169:1
171:25 175:15
**attorneys**  3:11
7:11 16:17 20:7,9
20:13 22:9 24:7
24:20 26:2,5 28:6
162:13 169:10
**august**  50:10
54:19 151:18
152:25 153:1
**austin**  48:1
**automatically**
68:18
**avenue**  4:18
**avoid**  19:6
**award**  54:25 55:17
57:21

**awarded**  54:12
**aware**  45:2 74:10
74:12,19,23 75:2,5
83:5,21 85:13
90:21,25 107:15
107:16 115:12
141:19

**b**

**b.p.j's**  75:8
**b.p.j.**  1:4 2:4 7:3
11:7 15:1 19:22
73:23,25 74:2,7,8
74:10,12,20 75:6
75:14,17,19 76:2,3
76:7,12,18 80:6,14
80:18 91:3 135:3
135:13,22,25
136:1,6,11,14,19
137:5,17,21 138:2
138:5,9,21 139:9
139:16,16 140:1
141:6 142:8,16
143:1,16,20
144:10 146:5
147:2,4,6,9,11
148:3,20,25 149:6
150:15,18,22
152:13,22 153:1,8
153:16,20 154:1,7
154:16 170:19
**b.p.j.'s**  75:2,5 76:5
148:12 149:10
**bachelor**  67:16
**bachelor's**  67:13
69:18
**back**  42:12,19
57:22 61:6 63:13
64:6 77:25 81:12
81:22 85:2 89:7
108:14,20,25
109:2 116:24

121:19 122:5
129:16 131:24
133:2 147:6
155:18 158:6
172:11
**bag**  22:13
**bailey**  5:16
**baileywyant.com**
5:22
**barr**  7:8 9:6 11:18
11:19 13:22 14:5
14:14,22,23 17:23
18:8,9 19:2,7,17
20:8 24:3,19 26:6
26:11 27:11,18
28:19 29:3,16,23
30:14,19 31:25
32:5,11,17 33:5,12
34:9,25 38:1,8,16
41:4,13,19 42:5,11
42:23 45:24 46:7
46:14 47:21 52:1
52:18 54:11 55:10
55:15 56:5 57:1,6
57:15 61:24 62:10
62:16 63:1,10,17
64:4,11,17 65:9,14
65:19 66:1,9,16,20
67:1,5,21 68:1,6
68:14,15 69:3,10
70:2,3,13 71:2,8
71:17 72:1,6,20
73:2,12,16,18,22
75:1,12,16,21
76:10 77:18 78:4
78:9 79:13 80:1
80:12,21 81:1,11
81:21 82:8,18,23
83:8,19,25 84:13
85:2,7,10,22 86:2
86:8,14,21 87:5,12

Page 3

Armistead Second Supp. App. 0050

[barr - brescia]

| | | | |
|---|---|---|---|
| 87:21 88:17 89:5 | 148:7,24 149:4,16 | 91:1 98:5,6,8,18 | 105:12,18 106:5 |
| 89:12,17 90:4,10 | 149:22 150:1,2,19 | 99:24 101:22 | 106:10,16,23 |
| 90:19 91:2,7,13,17 | 151:5 152:4,11,17 | 108:8 117:7,19 | 107:6 119:5 121:9 |
| 91:21 92:1,7,13,22 | 153:4,15,24 154:6 | 118:3,15 119:3 | 138:18 139:2,2,4 |
| 93:3,9,15,23 94:4 | 154:14,21 155:3 | 120:4 125:6 | 140:8,9,19,20 |
| 94:10,18 95:3,11 | 155:11,13,22 | 138:17 140:22 | 141:10,11,24 |
| 95:20 96:5,13,23 | 157:8 160:4,13 | 141:2,3,6 154:7 | **birth** 17:19 18:20 |
| 97:15,22 98:3,13 | 161:4,13 165:18 | 157:5,19 171:25 | 19:11 101:23 |
| 98:20 99:9,23 | 166:6,23 167:8 | 172:12 | 102:4,17 103:13 |
| 100:3,7,17,22 | 168:18,24 170:23 | **benefit** 159:13,14 | 103:19 105:17 |
| 101:3,8,13,18,25 | 171:25 172:6,12 | 163:3 | **bit** 36:11 66:7 |
| 102:8,14,21 | 172:15 | **benefitted** 159:15 | 78:16 130:19 |
| 103:15,22 104:4 | **based** 16:19 45:11 | 160:17 | 131:7 156:6,10 |
| 104:11,14,21 | 80:4,19 85:14 | **best** 24:25 57:17 | 158:2 |
| 105:13 106:12 | 130:23 134:10,12 | 70:20,23 73:4,8 | **blessings** 141:19 |
| 107:2,12 108:1,12 | 137:13 144:2 | 115:25 121:24 | **block** 8:5 12:11,14 |
| 109:7,13 112:22 | 153:25 154:4 | 143:9 144:22 | 12:17,17 |
| 113:10,15,20 | **basis** 87:1 118:10 | 169:13 | **blockers** 96:1,6,9 |
| 114:1,10,17,23 | 123:4 124:9 125:4 | **bet** 103:6 | 97:2,6 |
| 115:5 116:5,10,19 | 125:11 130:13,20 | **better** 64:22 | **bms** 145:1,2,5,13 |
| 117:3,17 118:20 | 130:23 132:4,5,16 | 159:25 160:3 | 146:9 150:7 |
| 119:6,13,20 120:1 | 132:19 133:3,5,25 | **beyond** 21:1 169:9 | **board** 1:7,8 2:7,8 |
| 120:7,11,17,22 | 135:3 148:2,11,19 | **big** 35:17,20 38:19 | 4:3 5:13 9:12 11:8 |
| 121:3,12 122:6,15 | **bear** 33:19 161:7 | 46:15 112:1 | 13:3,6 123:14 |
| 122:24 125:14,20 | **b▮▮▮▮** 146:1,5 | **bigger** 88:21 97:13 | 124:17 174:1 |
| 126:1,14,22 127:4 | **beginning** 2:21 | 99:25 100:4,6,12 | **body** 51:16 |
| 128:1,10,12,16,20 | 34:14 42:20 78:1 | 139:1,3 | **bog** 9:12 123:14 |
| 129:2,9,11,17,19 | 116:25 155:19 | **bill** 17:3,10,11 | **book** 22:13 |
| 130:2,4,7 132:11 | **behalf** 2:20 12:5,7 | 23:3,14,19 26:12 | **boston** 7:14 |
| 132:24 133:1,10 | 12:16,17,21 13:5,8 | 81:17 | **bottom** 123:22 |
| 133:15,22 134:6 | 13:11,14 92:3 | **biological** 18:15 | **boulevard** 4:8 |
| 134:20 135:1,10 | **belief** 100:3 | 39:8,11,17 40:20 | **boylston** 7:12 |
| 135:17 137:1,12 | **believe** 13:10 | 79:5,5 83:4 88:19 | **boys** 145:1 |
| 137:20 138:1,14 | 14:14 24:13,14 | 88:20 90:3 97:12 | **bpj** 174:1 |
| 139:15,24 140:5 | 29:7,12 30:7 | 97:20,25 98:14,18 | **brand** 163:5 |
| 140:17,24 141:1 | 36:19 37:1,3,12,14 | 98:22 99:2,13 | **brave** 31:18,21 |
| 141:13 142:1,12 | 37:18 38:3 45:11 | 100:5,12,14,18,23 | 32:1,4,7,10 |
| 142:23 143:5,11 | 46:1 48:16 55:16 | 101:5,20 102:1,7 | **break** 42:6,9,11 |
| 143:13,24 144:8 | 71:24 72:12,14 | 102:10,16,25 | 123:25 154:22,24 |
| 144:12,16 146:12 | 75:19 81:8,18 | 103:4,7,21,24 | **brescia** 40:4,6 |
| 147:1,10,16,23 | 89:19,21 90:5 | 104:3,10,19 | 48:25 49:3 |

Page 4

Armistead Second Supp. App. 0051

[bridgeport - coaches]

**bridgeport** 4:9
145:7,9,13 147:7
148:13,20 150:7
151:16,18 170:20
**bring** 21:21 22:11
122:5
**brings** 81:22
**broad** 8:6 126:19
**brooklyn** 35:8,21
35:22 36:9 37:6,9
38:10 162:19
**brooklyn's** 35:9
**brother** 39:16
41:18 49:4 106:22
**brother's** 40:10
**brothers** 39:8,15
**brought** 22:1,13
129:16
**built** 88:19
**burch** 1:10 2:10
5:14 13:7
**busy** 36:9

**c**

**c** 33:22
**california** 4:18
175:4
**call** 17:8 44:5
103:18,24 104:1
104:15,17 105:7,8
162:25 163:10
**called** 40:5 104:25
105:10,16 112:6
112:23
**calls** 20:5 23:24
26:4 33:8 34:5,24
79:9 83:7 84:24
166:19
**capacity** 1:11,12
2:11,12
**captain** 56:2

**cardinals** 38:22
**care** 23:16
**career** 59:24,25
**carefully** 52:14
53:21 69:21
**case** 1:6 2:6 11:11
15:1 19:23 22:19
23:6,9,15,22 24:5
27:7,14 28:5
30:10 31:4,8,12,19
32:20,23,24 35:3
35:13,24 38:4,11
93:11 121:8 128:2
135:12 146:6
150:6 167:20
**cases** 138:19
**catie** 3:5 12:24
22:7,8 122:5
**center** 108:14,20
108:25 109:2
**certain** 23:2 36:20
67:19 74:1,4
94:17 104:18
117:11 143:19
**certainly** 17:7
26:7 28:3 33:24
51:18 68:2,4
85:11 141:4
167:10
**certified** 2:23
175:3
**certify** 175:4,13
**chair** 59:16
**championship**
62:1
**chance** 13:17
165:10
**change** 94:6
105:11 109:1
158:9 174:5,8,11
174:14,17,20

**changed** 107:5
**changes** 104:19
**changing** 93:24
**characteristics**
124:24
**charger** 22:14
**charleston** 1:3 2:3
4:19 5:10,21
11:10
**chelsea** 156:2,4
164:11
**child** 9:16 123:9
157:3
**choice** 109:4,4,6,8
**cholcomb** 3:17
**choose** 71:20
**choosing** 101:12
101:16 105:23
**chose** 25:1 67:12
**christiana** 3:7
12:20 22:7,8 27:1
83:8 84:6 127:10
166:22
**christiana's**
166:10
**christina** 164:13
**circumstances**
131:14
**cisgender** 17:17
18:5,11,18 19:18
140:12 141:15
**cities** 115:14 158:8
**city** 38:19 44:3
151:16,18 173:9
**civil** 8:4
**ckelly** 3:15
**claimed** 165:24
**claims** 165:13
**clarify** 85:4
105:24

**clarifying** 103:17
106:8
**class** 126:8 153:23
**classmate** 169:20
**classmates** 154:8
**clause** 126:5
**clayton** 1:10 2:10
**clean** 170:25
**clear** 18:13 23:11
48:14 73:6 148:15
172:2
**clearly** 68:10
156:14
**client** 20:5 26:8
83:17 85:9 166:19
167:7
**clients** 166:10
**close** 35:4,16,18
40:9 162:4 172:17
**closed** 122:3
**closer** 44:21,21,22
**closest** 38:19
57:10
**club** 85:18 88:5
156:21 157:9,9,12
157:15,19,21
158:9,24,25 159:2
159:15,24 160:2,5
160:9
**clunky** 161:8
**coach** 24:23 32:12
32:15,18,19 48:12
53:10,25 54:17,19
56:1,10,14,18
57:11,16 58:7,9,15
58:19 67:2,7,10
**coach's** 56:6,8
109:4,6
**coaches** 62:15
63:2

Veritext Legal Solutions
866 299-5127 Armistead Second Supp. App. 0052

[coaching - counsel]

coaching  25:18
code  17:4
codified  17:3
cognoscente
  123:25
colleague  12:23
college  43:8 45:18
  50:7 108:22,24
  112:6 115:2
  143:22 157:14
  160:9
colleges  47:1,6,15
  47:24
collegiate  53:4
  117:20
column  151:17
  153:6
columns  146:18
  151:14,21
come  42:12 57:22
  63:23 71:21
  110:20 171:13
  172:11
comes  95:24 116:1
  139:18,18 140:6
comfortable
  106:14 162:4
comment  27:9
  136:14
commentary
  87:24 88:2,6,10
commentation
  87:15,16,17,23
commission  1:10
  2:10 5:4 13:10
  124:16
common  107:7
communication
  33:8 85:13
communications
  16:16 20:6 23:24

26:4 28:17 34:5
  34:24 48:12 79:9
  166:20 167:10
companies  163:5
compared  154:8
comparison
  151:11 154:13
compete  140:20
  141:23 156:17
competed  95:4
competent  129:5,5
competing  79:5
  110:18 139:4
  153:21 154:16
competitive  45:15
  45:17,18,19,23
  46:2,6 115:2,4
complaint  121:4
  121:25
completely  127:20
  129:7
complies  118:15
comply  118:22
comprehensive
  92:23
computer  84:19
concern  61:16,17
  114:24 139:8,25
  140:11,13,16
  141:14
concerned  140:7
  142:14 143:15
concerns  51:15,19
  53:21 139:22
  140:18
concierge  8:13
concur  14:4,6
conducts  118:4
conference  44:17
  44:18,19 86:10
  88:9 93:5,19 95:8

110:12,15 112:8
  112:14 114:3,7
  160:15
confidential  34:7
confirm  14:2
  172:4
conform  131:4
confused  82:22
connected  27:21
  31:7
connection  28:6
connections
  156:20
consider  30:2
  39:10 43:18,19
  47:1,4,7 88:6,10
  105:17
considered  47:12
  47:16,24 48:3
  60:5,23
considering  49:7
  67:17 104:19
considers  124:18
constitution  120:6
contact  26:10
  39:13 91:14
  139:13,17 143:23
  169:3
contained  173:5
contexts  87:1
continue  51:3,17
  59:7 61:10 66:18
  67:14 69:17 70:24
  73:11 83:17
  115:11
continued  4:1 5:1
  6:1 7:1 8:1 158:15
continuing  59:24
continuously
  50:17

contracts  163:4
control  131:16
conversation
  16:19 26:23 56:13
  79:21 84:1,5,9
  101:4 105:22,24
  106:9 167:25
  168:8,12
conversations
  27:10 58:12 79:11
conversed  49:14
conveyed  58:14,16
cool  61:23
cooley  7:4 11:20
  11:25 12:5,6,9
  14:24
cooley.com  7:16
  7:17,18,19,20,21
cooperation
  156:23
correct  49:17
  64:16 85:11 89:23
  95:25 96:16
  102:18 132:17
  136:9 148:10,13
  149:14 169:3
  173:6
corrected  173:5
corrections  173:3
correctly  15:11
  21:14 27:22 43:13
  63:22 87:9 92:16
  97:23 102:15
  117:12 123:11,16
  124:12 126:9
  130:16 131:5,21
  134:8,12 136:12
  144:3 151:12
  167:16
counsel  5:14 11:16
  11:20,22 13:2

Page 6

Armistead Second Supp. App. 0053

[counsel - development]

14:5,15 17:23
34:5 78:5 79:9
85:1 167:17
172:15
**country** 74:12,13
74:20 76:12,19,21
76:23 115:25
128:6 135:23
136:2 139:9,19
140:1 141:7 142:7
142:8,16 143:1,16
143:22 144:18
145:18 147:24
149:15 150:8
151:4,15,17
170:20
**county** 1:8,13 2:8
2:13 4:3 13:3
150:9
**couple** 17:13 18:1
58:11 59:17 62:1
83:15 124:1
170:24
**course** 163:21
**court** 1:1 2:1 11:9
11:14 15:16 81:12
89:6 103:6 104:11
122:19 160:24
**courtroom** 15:16
**covered** 85:1
**covid** 111:20,22
**created** 163:21
**creates** 141:6
**cross** 74:12,13,20
76:12,19,21,23
135:23 136:2
139:9,19 140:1
141:7 142:7,8,16
143:1,16,22
144:18 145:18
147:24 149:15

150:8 151:4,15,17
170:20
**csr** 1:23 175:24
**csutoros** 3:8 12:25
**cultivating** 64:23
**curious** 51:19
71:10 111:21
128:2
**current** 51:13
**currently** 36:23
42:1 50:1 52:6,17
52:23 94:20
163:14
**cut** 49:1 76:6
129:8 132:13
148:5 165:23
**cv** 1:7 2:7 11:11
**cynthia** 164:21

## d

**d** 15:5 33:16 45:12
45:12 48:19
**dad** 25:17 69:23
70:5,15 72:14
**dad's** 70:11
**daily** 161:14
**dame** 112:6,7,12
112:13,16 113:12
113:22 114:19
**dame's** 114:12
**darcy** 165:2
**date** 26:17 55:2,8
58:20,22 67:25
68:9 174:25
175:16
**dated** 175:18
**dave** 8:16 11:13
**david** 4:16 13:13
40:11,12,14,16,20
40:24 41:7,10,14
**david.c.tryon** 4:21

**day** 105:21,21
171:4 172:11
173:7
**days** 161:15
**deal** 25:16 35:17
163:14,18 164:1
**dean's** 43:8,23
**decide** 23:15,18
33:4 34:2 52:4,15
54:7,17 70:7,15,22
**decided** 27:2
36:13 110:20
166:15 168:15
**decision** 24:9,16
25:6,12,15 28:15
28:16 32:24 35:20
36:3,6,15 52:3
53:25 54:2 70:8
71:11 101:14
**decisions** 61:5
62:14
**declan** 39:19,24
40:3 106:23 107:3
107:4
**declaration** 20:16
20:17 21:1,2,5,12
**declare** 173:1
**deem** 70:19
**defendant** 1:17
2:17
**defendants** 1:15
2:15 4:3 13:2
172:5
**defending** 3:4
12:21
**defense** 11:21 14:5
14:14 17:23
**definitely** 47:20
51:2,17 62:21,23
62:23 69:22
119:11 159:14

**definition** 99:3
126:21 129:22
130:3,19 131:8,22
131:24,25 132:5
133:3,16,20
**definitional** 18:7
**definitions** 19:19
133:23 134:8
**degree** 59:5 67:11
67:16 69:18,19
**degrees** 67:14
**delving** 122:9
**deniker** 4:6 13:1,2
14:7,7 171:17,17
**denver** 14:25
**department** 5:15
59:16
**depends** 59:20
**deponents** 171:12
**depose** 127:16
**deposition** 1:18
2:19 11:6,12
18:22 20:1,10
21:3,16,24 22:2,3
**describe** 32:6
102:3
**described** 32:10
39:17 70:5 162:6
163:8
**describes** 97:5
**description** 9:10
163:12
**detail** 29:5
**details** 122:9
**determination**
80:11
**determined**
147:25 148:9
**detriment** 140:12
**development**
158:14

Page 7

Armistead Second Supp. App. 0054

[developmental - event]

**developmental** 157:24

**difference** 45:9 99:15 100:13 102:9

**differences** 25:21

**different** 24:4 36:11 42:8 49:25 53:18 57:21 69:15 80:2 88:19 89:11 89:16 92:8 108:18 115:6 123:2 143:11 159:2 167:9

**difficulties** 154:19

**direct** 85:14 123:19,21

**direction** 122:12 175:10

**disagree** 120:25

**disagreement** 18:2

**discovery** 68:3,10 135:11,18,21

**discrimination** 9:14 123:8 124:9 124:25 125:10 126:8,11,16 130:12 132:4 133:24

**discuss** 15:13 35:22,23 166:24

**discussed** 34:12,13 49:16 59:18 136:1 150:7

**discussing** 24:5 88:1

**discussion** 28:6 34:15 35:2 128:13

**discussions** 25:2 31:14 56:10,17 57:11 69:14 70:4

**developmental** 70:14 71:18 79:14 80:4 170:5

**dispute** 125:8,15 125:19,22 128:6

**distance** 77:4 146:18

**distracted** 75:24

**district** 1:1,2 2:1,2 11:9,10

**divided** 77:5

**diving** 165:5

**division** 1:3 2:3 11:11 45:4,6,10,14 45:16,19 46:2,2,8 46:9,13 49:18,19 49:20

**divisions** 45:2,7

**divulging** 24:2 34:7 83:24 85:9 167:7

**doctor** 52:7,13 102:20 103:1,2

**doctors** 52:9

**document** 9:12 78:10 122:25 123:7 132:22 134:10,12 146:25 152:15,19,24 153:13,25 154:4 154:12

**documents** 20:12 20:14,15,17,19,22 21:7 22:15 154:9

**doddridge** 144:17 146:15 147:3 148:21 149:12

**doing** 36:1 65:8 90:13 91:1 128:15 129:1,2 163:6

**dora** 1:12 2:12 4:4 13:4

**drive** 158:16

**ducar** 3:10 12:25

**due** 59:13 67:25 157:13

**dunbar** 44:4

**e**

**e** 5:8 15:4,5 33:16 49:12 144:20 162:12,15 174:4,4 174:4

**earlier** 44:11 64:2 65:7 69:20 107:14 135:25 137:14 162:19 169:16

**earn** 152:13

**east** 44:18 95:8 160:15

**easy** 24:9,12

**ed** 170:13

**edges** 109:15

**education** 1:8,8 2:8,8 4:3 5:13,15 11:8 13:3,6 64:23 66:18 124:6,16 130:11,13 131:8 131:12 133:11,16 174:1

**effect** 91:1,3,8

**effort** 19:4

**eight** 157:16,18 159:10

**eighth** 153:21 154:17,20

**either** 51:10 52:13 57:5 62:12

**elementary** 76:25

**eligibility** 51:3,6,8 51:10 59:6 61:16 110:19,22

**elizabeth** 7:6 12:8

**employed** 43:2

**employee** 175:14

**encourage** 110:23 167:19

**encouraged** 25:21 28:11,13

**encouraging** 168:1 168:3,4,5,6,8,12 170:8

**endorsement** 163:8,14,18 164:1

**ends** 172:19

**england** 36:23

**enlighten** 127:23

**enrolled** 37:1

**enter** 164:1

**entered** 122:14 129:18

**entire** 35:14 80:3

**entitled** 123:8 146:8

**environmentally** 19:5

**equal** 81:19 116:7 117:7

**equality** 142:20 143:21

**equally** 109:12

**equitable** 81:9 82:16

**ereinhardt** 7:17

**errands** 43:10

**especially** 127:24

**esports** 92:2

**established** 17:25

**estimate** 57:10 155:1

**et** 11:8

**etcetera** 50:6

**event** 109:16 150:9,15

Page 8

Armistead Second Supp. App. 0055

[events - florida]

**events** 26:19 76:12
76:18 77:16
131:13 136:2,16
137:6
**everybody** 77:3
153:11
**everyday** 100:11
**exact** 26:9,17
50:23 55:8 58:22
**exactly** 29:6 32:9
72:4 79:19 134:4
134:15
**examination** 9:2
14:21
**examined** 14:18
**exceptions** 138:24
**excerpted** 131:22
**excessive** 66:7
**excluded** 121:24
135:3,13,22
**excluding** 88:25
**excuse** 18:7 127:5
127:5 160:22
**executed** 173:7
**exercises** 131:15
**exhib** 123:7
**exhibit** 9:11 10:3,4
10:5 78:6,14
122:16,16,18
123:7 130:3
144:12,13,21
149:16,17 150:3,4
150:21,23 151:7
152:7,22
**exhibits** 9:9 10:1
**expect** 46:10,12
53:15,19 55:21
59:21 61:6 62:5
66:21 94:5 114:5
137:6 138:24

**expectation** 54:3,6
54:10 65:15 66:11
137:13
**expectations**
155:6
**expected** 137:18
138:21 155:4
**expecting** 65:21
**experience** 154:17
157:2 167:23
**experiences** 157:6
157:7 160:21
166:25 167:21,22
**explain** 17:14 22:1
25:2,14 29:4
30:20 31:14 56:13
69:14 77:2,2
102:9 104:22
110:16 121:7
**extended** 170:3
**extent** 20:5 23:24
26:3 33:8 34:4,23
79:8 83:7 84:23
86:25 166:19
167:1
**extra** 110:19

**f**

**facebook** 161:11
162:5,7
**fact** 75:14 128:6
136:10 147:11
**facts** 15:20
**failure** 131:3
**fair** 28:4 81:9
115:6 118:2,6
140:19 141:21
144:7 154:13
161:25 165:9
**fairly** 66:3
**fairness** 89:21
90:2 92:15,24

139:5,22 140:6,6
140:13 141:6
142:3,14,25
143:15,21 144:1
**fall** 50:17 52:22
53:16 58:18 59:7
60:25 63:23 67:14
68:10 74:21 88:2
109:21 111:23
136:2
**false** 155:5
**familiar** 162:21
**family** 25:16 155:8
169:9 170:3,8
**fan** 38:22,24
156:13
**far** 71:19 88:2
151:21 158:8
**faster** 88:20 97:9
97:13,17,21,25
98:9,19 99:17
139:3 140:8
141:11 163:11
**favorite** 155:25
**february** 54:22
55:12 56:16
**federal** 124:8,22
125:10 130:14
134:1
**feel** 17:25 106:13
162:4 168:9
**female** 25:18
100:23 102:5
103:19 105:2,3
131:2
**females** 98:19
**feminine** 131:2
**field** 77:3 82:16
108:19 109:15
**fields** 81:19

**fifth** 77:14
**fight** 141:22
**fighting** 112:7,10
**figure** 51:16 55:6
93:16
**file** 67:22,24
**filed** 11:9 68:17
**filing** 68:18
**finals** 111:7
**financial** 130:15
134:1
**financially** 175:13
**find** 27:2 55:2
112:18 113:6
**fine** 14:13 34:1
70:16 163:13
166:7
**finish** 16:24,25
**finished** 147:6,11
172:12
**finishes** 147:12
**fire** 159:1,5
**firm** 11:19
**first** 26:10,23 28:4
34:15 56:13 58:4
58:5,11 76:15
77:11 83:5,20
103:16 106:16
110:17 111:10,16
112:3 126:5
131:25 138:9
**fit** 72:19
**fitter** 88:20 97:13
141:11
**five** 47:13,14,15
47:20 56:21
161:22 162:2
172:20
**floor** 6:8 7:13 8:7
**florida** 60:13
61:25 62:6

Page 9

Armistead Second Supp. App. 0056

[focus - girls]

focus  145:19
focused  157:1
follow  125:2 156:5
    156:7
following  142:24
follows  14:19
foot  110:7
foregoing  173:2
    175:5,7,11
forget  75:23
forgive  127:13
forgotten  169:17
form  13:24 14:24
    17:21 18:24 27:8
    27:15 28:25 29:14
    29:20 30:11,18
    31:22 32:2,8,14
    33:2 34:4 38:5,13
    41:1,11 46:3
    47:17 52:12 55:7
    55:13 56:24 57:3
    61:20 62:7,20
    63:9,25 64:8,14
    65:6,16,23 66:23
    67:3,18,22,24
    68:16,18,21,25
    69:6,7 70:10,18
    71:5,12 72:3,16,23
    73:9,15,20 75:10
    75:15,18 76:8
    79:22 80:8,23
    81:15 82:5,11
    83:6 84:11 85:20
    85:24 86:6,17,18
    87:3,10,20 88:14
    89:1,14 90:1,7,15
    90:24 91:5,10,15
    91:19,24 92:5,11
    92:19 93:1,12,20
    94:1,7,13,25 95:18
    96:3,21 97:19

98:16 99:5,19
100:8,15,20,25
101:6,10,15,21
102:6,12,19 103:9
103:20 104:7,16
105:5 106:7,25
107:10,23 108:10
109:5,10 112:20
113:8,13,23 114:8
114:15,21 115:3
116:2,8,17 117:15
117:18 118:17
119:1,10,18,24
120:3,14,20 121:1
125:12,17,23
126:12,18,25
127:18,19,19
128:18 132:8
133:8,13,19 134:3
134:17,22 135:6
135:15 136:23
137:8,24 138:11
139:11 140:3,15
141:8,18 142:10
142:19 143:18
144:4 146:10,24
147:8,13,21 148:4
148:22 149:2,13
150:16 151:2
152:2,8,14 153:2
153:12,18 154:2
154:11 157:4
160:1,11,19
165:16 166:2
167:5 168:16,21
170:21
formal  49:15,17
121:4
format  84:18
former  94:21

forth  175:6
forward  18:22
    122:11
found  30:22
    114:18 167:16
    168:8,11
four  50:14 129:23
fractured  110:6
frampton  3:9
    12:24
freedom  3:4 12:21
freshman  50:5
    108:23 109:24
    110:7,8
friday  1:20 2:22
    11:1 171:4
friend  1:4 2:4
    24:25 27:4,5,13,20
    28:10 162:16
    169:13,21
friendly  19:5
friends  30:2,23
    35:4 156:19,20
    162:18 169:10,24
    169:25
front  78:7,8
    122:17
frostburg  112:23
    112:25 113:2,16
    114:6,7,12
frostburg's  114:19
fsu  60:13 61:2,13
    61:19 62:3
full  78:21 127:16
fully  85:3 100:2
fun  115:16
fundamental  18:2
further  129:13
    131:7 132:21
    172:5 175:11,13

future  53:20 58:3
    69:2,4 73:5,8
    122:7

g

gabby  40:19,20,22
    41:5,7,10,14,23
game  95:4 110:3,6
    112:25 114:22
    115:1 116:11
games  52:23 53:6
    92:3 110:18
gauge  78:24
gen  98:19
gender  17:18
    18:19 19:10 77:6
    101:23 102:4,17
    124:21,21 125:6
    130:24,24 131:4
    132:20 133:7,25
    135:4
gener  102:17
general  4:15 5:14
    46:8 88:21 97:12
    97:20 98:5,8
    100:5 138:17
    139:2 140:8
    141:10 160:7,8
general's  13:14
generally  45:14
    46:12 98:19 160:5
    166:18
geography  38:20
getting  43:21 59:4
    59:22 64:22 66:6
    162:4
girl  98:21 99:3,12
    107:15,18,21
    136:20 137:5
    140:11,12 165:14
girls  45:5 74:13,20
    75:3 76:6,7 77:12

Page 10

Armistead Second Supp. App. 0057

[girls - heard]

80:6,14,18 91:4,9
97:9,17 98:6,8,15
99:24 100:4 135:5
135:13,23 136:20
139:10 140:2
141:7,15,15 142:9
142:17 143:1,16
145:2,15,18 146:9
146:23 147:7
150:8,8 165:15,25
166:10,12,17,24
167:12,17,19
169:5,8 170:20
**give**   15:24 16:18
17:24 26:18 45:12
48:20 49:13 56:3
57:10 58:23 61:10
85:8 107:13 117:7
126:20 128:19
132:23 149:20
154:13 155:5
166:4
**given**   54:1 58:21
114:7 137:5
172:19
**giving**   28:1 31:10
79:24
**go**   12:3,13,14
13:18 33:21 42:22
55:2 61:8 63:14
69:19 72:2 77:18
78:3 94:20 110:12
116:19 117:2
121:12,21 122:4
122:11 123:22
126:2 128:25
129:22 131:18
133:2 154:25
155:2,4,10,11,13
155:21 166:7
171:23 172:6,16

**goal**   90:6
**goals**   89:25 90:14
90:21,21
**goes**   49:4 77:3
114:25
**going**   17:4,7,13
18:1 33:19,24
42:15,16 47:1
54:8 57:22 60:5
60:24,24 62:17
65:8 66:22 70:20
77:20 87:14,24
97:2,7 99:7,16,21
103:10 116:20
121:16 124:1,14
124:19 127:21
128:17,22,23
129:7 131:17
143:3 146:4 152:2
153:5 154:21,23
155:10,12,15,23
156:3 172:8,11,16
**good**   11:3,18 13:1
14:23 23:17 25:6
25:19,20 46:25
81:17 109:17
110:9,9 120:12
122:4,23 127:2
138:23 171:10,11
**gotten**   61:5
**governors**   9:12
123:14 124:17
**grade**   77:5,11,14
85:23 153:22
154:17,18
**graders**   153:22
154:20
**graduate**   50:21
51:1,7,9 58:25
59:8 65:11,21
66:22 67:12,13,22

68:17,19 69:16
**graduating**   63:6
66:2 67:15 69:12
69:17 70:21 71:18
**graduation**   50:23
52:3 60:5 67:2,7
**great**   42:14 121:13
156:19
**green**   5:6 13:10,12
**grew**   25:17,17
38:22
**grievance**   9:15
123:9
**ground**   84:25 85:6
**group**   98:24 99:15
160:6
**grow**   39:3 44:8
**growing**   44:12,16
76:21
**guess**   81:25 113:5
**guys**   111:9

## h

**h**   174:4
**h.b.**   17:5 75:23
76:2 78:11 79:3
79:16 80:4 108:8
113:12 135:14
142:20 170:7,10
**hal**   3:9 12:24
**haley**   165:7,11
170:1
**half**   59:21 150:18
**halvorson**   8:16
11:13
**hand**   150:6
**hang**   121:14,14,14
**happen**   73:13,19
82:2 97:6 116:11
161:20
**happened**   27:20
27:24 30:20,21

68:8 84:10 111:19
159:8 161:22
168:14 169:17
**happens**   30:3 81:2
81:24 82:1,10
97:1 138:19
**happy**   99:17 109:8
116:9 143:6
150:20 170:23
171:1
**harassing**   66:7
**harassment**   9:14
9:15 106:24 123:8
123:9 125:1 126:8
126:23,24 127:3
**hard**   126:20 153:6
170:11
**harmed**   107:20
120:19 165:14,24
**harrison**   1:8,13
2:8,13 4:3 13:3
**hartnett**   7:5 11:24
11:24
**hate**   155:5
**head**   16:1
**health**   51:15,18
53:21
**hear**   41:20 52:8
61:6 64:6 73:17
79:18 85:14 96:24
100:2 107:14
141:5 157:10
172:13
**heard**   23:10 79:17
92:24 93:16 95:12
96:6,7,14,17
102:15 103:16
117:5,12 126:13
134:10 140:21
143:7 144:17
145:9

 Armistead Second Supp. App. 0058

[hearing - including]

| | | | |
|---|---|---|---|
| **hearing** 97:23 | 72:23 73:9,15,20 | 141:18 142:10,19 | **identify** 11:16 |
| **heather** 1:5 2:5 | 74:24 75:10,15,18 | 143:3,5,8,18 144:4 | **identifying** 20:24 |
| 5:14 11:7 | 76:8 79:8,22 80:8 | 146:10,24 147:8 | **identity** 17:18 |
| **held** 11:12 | 80:20,23 81:15 | 147:13,21 148:4 | 18:19 19:10 102:4 |
| **hello** 171:8 | 82:5,11 83:6,14,22 | 148:22 149:2,13 | 102:17 124:21 |
| **help** 29:9 52:2 | 84:11,21,22,23 | 149:20,24 150:16 | 130:24 132:20 |
| 81:18 101:19 | 85:5,11,14,16,20 | 151:2 152:2,8,14 | 133:7,25 135:4 |
| **helpful** 50:19 | 85:24 86:6,11,17 | 153:2,12,18 154:2 | **ii** 45:6,10,12 46:2 |
| **helping** 122:10 | 87:3,10,20 88:14 | 154:11,21,24 | 46:9 49:19,20 |
| **hereto** 122:19 | 89:1,9,14 90:1,7 | 155:1 157:4 160:1 | **iii** 45:10 48:19 |
| 173:4 | 90:15,24 91:5,10 | 160:11,19 165:16 | **illegal** 63:4 |
| **hey** 58:19 | 91:15,19,24 92:5 | 166:2,18 167:5 | **image** 162:21 |
| **hi** 11:24 12:4 | 92:11,19 93:1,6,12 | 168:16,21 170:21 | **imagine** 111:20 |
| **high** 156:21 | 93:20 94:1,7,13,25 | 171:25 172:3 | 112:1 |
| 157:22 159:18,19 | 95:18 96:3,11,21 | **hold** 19:2 122:21 | **impact** 51:19 79:2 |
| 159:24 169:22 | 97:19 98:2,10,16 | **holds** 53:20 58:3 | 80:3 81:6 87:7 |
| **higher** 124:16 | 99:5,19 100:1,15 | 69:2 | 88:1,3 114:25 |
| **highlighted** | 100:20,25 101:6 | **holidays** 170:4 | 115:1 149:1 |
| 147:18 150:13,23 | 101:10,15,21 | **home** 40:9 | **impacted** 111:20 |
| **highlighting** | 102:6,12,19 103:9 | **hometown** 158:17 | 111:22 148:3,12 |
| 147:20 150:25 | 103:20 104:7,16 | 169:21,24 | 148:20 149:10 |
| **holcomb** 3:7 12:19 | 105:5 106:7,25 | **hope** 61:22 | **impacts** 52:2 |
| 12:20 14:2,4 | 107:10,23 108:10 | **hopefully** 23:3 | **impair** 52:5 |
| 17:21 18:24 19:14 | 109:5,10 112:20 | 61:7 66:24 171:5 | **important** 15:20 |
| 20:4 23:23 24:18 | 113:8,13,17,23 | **hormone** 96:17 | 16:23 35:15 64:24 |
| 26:3 27:8,15 | 114:8,15,21 115:3 | **hour** 128:18 | 81:5,20 155:25 |
| 28:25 29:14,20 | 116:2,8,17 117:15 | 154:22 155:9 | **impressive** 112:3 |
| 30:11,18 31:22 | 118:17 119:1,10 | **hours** 59:20 | **inadvertently** |
| 32:2,8,14 33:2,7 | 119:18,24 120:3 | 158:16 | 122:11 |
| 34:4,23 38:5,13 | 120:14,20 121:1 | **house** 17:3,10,11 | **inaugural** 109:22 |
| 41:1,11 42:3,6,14 | 121:13,23 122:10 | 39:3 41:21,25 | 110:14 |
| 46:3,11 47:17 | 122:13,21 125:12 | **houston** 60:21 | **include** 55:12 |
| 52:12 54:9 55:7 | 125:17,23 126:12 | **huge** 25:16 | 118:24 120:8,10 |
| 55:13 56:24 57:3 | 126:18,25 127:8 | **hutchens** 5:14 | **included** 133:17 |
| 61:20 62:7,13,20 | 127:12 129:15 | **i** | 149:7,11 |
| 63:9,12,25 64:8,14 | 132:8 133:8,13,19 | | **includes** 131:13 |
| 65:6,16,23 66:5,9 | 134:3,17,22 135:6 | **idea** 34:22 40:17 | 132:6,16,20 133:6 |
| 66:13,23 67:3,18 | 135:15 136:23 | 127:2 152:3 | 133:12 139:13 |
| 68:1,4,11,25 69:7 | 137:8,15,24 | **identification** | **including** 130:25 |
| 69:25 70:10,18 | 138:11 139:11,20 | 122:18 | 143:21 |
| 71:5,12,22 72:3,16 | 140:3,15,23 141:8 | **identifies** 103:13 | |
| | | 103:19,23 | |

Veritext Legal Solutions
866 299-5127

Armistead Second Supp. App. 0059

[inclusion - kind]

**inclusion** 75:3
**index** 9:1
**indicated** 152:18
**indicates** 152:24
153:14
**indication** 151:1
**individual** 146:14
**information** 16:19
21:4,13 24:2 28:1
28:1,3 31:10 34:7
34:8 79:24 83:7
83:10,24 84:24
127:15 162:16
166:4
**initial** 26:6
**initialed** 173:4
**injured** 107:17
110:4,5
**ink** 173:4
**inner** 95:12
**inside** 129:22
151:21
**instagram** 161:10
**institution** 51:11
**instructions** 18:7
**intend** 65:4
**intention** 122:8
**interest** 64:18
**interested** 24:6
33:4 35:25 53:25
59:4,11,22 67:20
162:17 163:20,24
175:14
**interests** 75:9
88:23
**interpret** 90:9
153:7
**interpretation**
128:19,21
**interrupt** 160:22

**intervene** 23:2,15
23:18 25:1 27:3
32:19 33:1 34:3
34:17 35:3,13,24
36:4,13 38:4,11
81:6,20 82:9
166:15 167:19
168:15
**intervened** 22:19
23:6,22 37:14,18
37:22
**intervening** 24:6,9
25:5,8,9 27:20
28:5 31:12 32:7
32:13 34:16 35:19
81:7,16 90:11
139:12 162:17
**intervenor** 1:17
2:17 3:3 11:21
12:21 22:22,25
23:8,21 28:11,13
**interviewed** 30:7
164:3
**interviewing**
34:19
**intramural** 86:3
**introduce** 11:21
106:22 107:3
**introduced** 78:4
122:15 144:12
149:16
**investigation**
122:2
**invitational**
144:18 146:15
147:3 148:21
149:12
**invite** 35:24 122:5
**invited** 157:23
**involved** 32:23,24
36:7 122:1

**irish** 112:7,10
**irrelevant** 127:20
129:7
**issue** 37:14 45:25
139:18 141:6
142:8,25 143:15
144:1
**ix** 117:4,6,10,12
117:19,24 118:10
118:16,22 119:14
120:19,24 121:5
121:25 123:4
124:6 125:9 128:1
128:2,3,5,7,9
129:23 130:3,10
130:10,12 131:25
132:3 133:24

**j**

**j** ███████ 1:5 2:5
11:7 146:1,5
**jamie** 27:6,7 28:10
28:22,24 29:8,9,10
29:18,18 30:2,7,9
30:15,23 31:1,2
84:1
**jamie's** 28:20 30:3
**jblock** 8:9
**job** 1:24 43:18,19
120:12 174:2
**jobs** 43:17,24
**joe** 105:8,10
**johnson** 4:5
**johnson.com** 4:11
**join** 28:11,13
115:15,19
**joined** 36:18
**jonathan** 3:6
12:24
**josh** 12:11,13,17
**joshua** 8:5

**jscruggs** 3:16
**julie** 7:10 12:1,6
**july** 54:19
**jump** 42:3
**june** 26:15 54:19
55:14,18
**junior** 50:9,11
**justify** 128:25
**jveroff** 7:21

**k**

**k** 33:22 39:20
**kagay** 1:23 2:23
11:15 175:23
**kang** 7:7 12:2,4,4
**kate** 164:25
**katelyn** 7:7 12:3,4
**kathleen** 7:5 11:24
**keep** 23:3 56:3
57:25 62:3 79:4
81:18 82:15
100:18 101:9
124:14 128:23
135:25 154:23
156:9 170:6
**keeping** 81:8
**keeps** 156:18
**kelley** 3:5 12:24
**kelly** 5:17 13:5
14:9 155:7 160:23
171:19
**kentucky** 38:18,21
40:2,8 48:2,8,9,15
49:18 158:6 159:1
159:5
**kenyon** 164:23
**kept** 58:1
**khartnett** 7:16
**kind** 22:24 76:24
115:4,9 127:23
156:3

Page 13

Armistead Second Supp. App. 0060

[kindergarten - lines]

**kindergarten**
77:14
**kkang** 7:18
**kmorgan** 5:22
**knew** 74:5 88:4
**know** 18:10 22:22
24:1,13 27:25
28:22,24 29:6,21
31:9,23 32:1,9,15
33:3 34:6 38:7,14
41:5 52:14 55:4
55:23 56:25 58:20
58:21 61:9 62:9
62:11,21 65:2,8
66:14,21,24 68:22
70:11 71:14 72:18
73:8,10,21,23,24
73:25 74:1,3,6,6,6
74:11,15,16,22,23
74:25 75:4,7,8,11
75:13 76:2,9,14,17
76:18 78:6 79:23
80:17 82:7,10
83:8,11 84:3 85:8
85:21 86:1,7,13,20
86:22,23 87:25
88:7,11,12 90:17
90:20 91:6,12,16
91:20,25 92:2,6,8
92:12 93:2,8,10,11
93:14,17,18,22,22
94:3,9,11,20,23
95:2,6,10 96:1,4
96:12,22,25 97:4
99:8 100:16 101:2
101:7 103:5
105:25 109:15
112:16 113:2,5,14
113:19 114:16
115:22 117:4,11
118:1,19 119:19

120:21 122:16
123:20 125:13,15
125:16,18,24
126:11,23 127:13
132:25 134:24
135:16 136:13,13
137:11,17,18,25
138:2,7,16,20,21
140:4 142:7,11,24
143:20 144:11,14
144:21 145:5,15
146:11 147:22,24
148:6,8,14,17,23
148:25 149:3,15
149:18 151:4
153:22 154:5
157:1,3 164:9,11
164:13,15,17,19
164:21,23,25
165:2,4,7,11,13,17
166:3,4,9,11 167:6
167:14 170:9,17
170:22
**knowing** 131:21
**knowle** 122:7
**knowledge** 95:1
107:19,24 121:2
122:7
**knows** 29:9
**kyler** 39:19,20,22
39:23 40:1 41:10

**l**

**l** 4:6 15:4
**lainey** 1:16,19
2:16,19 9:3 11:6
12:22 14:17 15:4
20:6 23:24 26:4
33:9 68:12 79:10
121:22 122:14
127:9 129:18
154:24 171:20

172:19 173:1,15
174:2,25
**lambda** 6:4 12:16
**lambdalegal.org**
6:10
**lanay** 164:17
**language** 161:8
**laptop** 21:22,23
22:1,11,13
**largely** 43:12
**lasting** 156:19
**late** 36:4,8,15,17
**law** 3:11 4:7,17
5:7,18 6:6 7:11
11:19 14:24 23:3
23:14,17 25:4,20
31:17,17 60:3,6,10
60:24 61:15 62:17
62:22,23 63:23
64:12,16 65:1,3
69:19 72:2 75:20
75:22 80:6,13,22
81:8,25 82:14,24
83:5,11,21 85:18
86:22 87:1,8,18
88:1,4,8,13,21,24
89:19,24 90:6,12
90:13,20,22 91:1,3
91:8,14,18,23 92:2
92:8,14,18 93:4,18
93:24 94:5 119:22
119:25 120:2
143:20 161:17
162:9,12,15
163:21 170:7,9
**laws** 124:8,23
125:10
**lawsuit** 22:17,20
22:23 23:21 32:7
34:16 35:15 81:3
82:9 90:11 134:16

135:2 161:18
162:9 164:4
166:12 169:9
**lawsuits** 167:1,23
**lawyer** 60:1 87:8
135:8
**lead** 147:9
**league** 115:16
**learn** 76:5 93:4
105:20 118:13
**learned** 156:22
**learning** 64:22,24
**leave** 15:20
**led** 106:4 149:6
**left** 41:21 51:6,8
108:14,20,25,25
109:2 121:22
127:9 144:25
151:21
**legal** 6:4 12:16
80:10 87:14,15,17
87:22,24 88:2,6,10
128:6,19,20
172:21
**legalisms** 127:16
**legislation** 81:18
**liberties** 8:4
**life** 72:5 100:11
106:19 141:21
156:24 170:6
**lights** 19:2,5
**liked** 37:21
**likeness** 162:22
**likes** 71:14
**likewise** 129:15
**limits** 122:11
**line** 42:8 171:2
174:5,8,11,14,17
174:20
**lines** 82:25

Veritext Legal Solutions
866 299-5127 Armistead Second Supp. App. 0061

[lisa - metzger]

lisa  56:7
list  165:22
listed  145:22
listing  146:13
litigation  33:9
little  29:4 36:11
  66:7 70:25 78:16
  109:16 130:19
  131:7 155:4 156:6
  156:10 158:2
live  40:1,16
liverpool  156:13
lives  41:5
living  120:4 158:4
llp  11:20 12:7,9
  14:24
lobster  43:6,15,23
local  124:23
locate  166:17
located  14:24 40:7
  44:23 45:1 112:16
  113:2
locations  131:13
long  30:1 41:2
  51:15 59:19
  106:20 109:19
  158:18,19,20
  171:4
longer  41:15 111:1
  122:2 155:2,4
look  133:2 144:20
  146:13,17 150:5
  150:20
looked  59:15
  63:20 85:2 131:25
  132:5 133:16
  163:22
looking  21:11
  100:11 126:21
  130:2 155:9

looks  78:11 153:20
lose  82:1,3,10
losses  110:10
lost  111:10
lot  28:16 37:16
  64:2 69:20 95:23
  156:22 157:5
louisville  38:21
  40:2 158:6
love  35:18 43:20
  51:12 52:16 53:17
  57:19 59:25 61:9
  63:21 69:22 70:24
  73:10,11 109:11
  115:10 156:14,15
loved  109:14
low  153:8
lower  153:10,11
lsat  60:8

## m

m  15:5 33:22 56:9
machine  175:9
madison  164:23
mail  144:20
mailed  49:12
  162:12,15
maintain  23:3
  83:17
major  50:1
making  19:4 24:17
  101:14 129:12
male  18:15 25:18
  99:13 100:19
  101:20,23,23,24
  102:1,4,7,10,16,17
  102:17,25 103:4,7
  103:13,14,18,21
  103:24 104:10,20
  105:12,17,18
  106:5,17,23 107:6
  131:3

males  97:12,21,25
  98:14,18,22 99:2
  101:5 104:3
  106:10,10 121:9
  138:18 139:2,2
  140:8,19 141:11
  141:24
mann  56:7,10,14
  56:18 57:11 58:9
  58:15,19 67:2,7,10
mann's  57:16
manner  85:12
march  1:20 2:23
  11:1,5 50:9 55:14
  55:18 65:21
  175:18
margaret  164:19
marked  10:1 78:5
  122:18 144:13
  149:17
marshall  164:25
martinez  7:9
mary  164:25
masculine  131:3
massachusetts
  7:14
master's  59:5,11
  59:12,17,22 64:18
  65:1,2,4 67:11
  69:19 72:7
match  19:10
matches  17:18
  18:19
matt  7:9
matter  11:7 46:8
  128:4 160:7
mccuskey  5:5
mean  16:11 17:15
  17:17 18:10 21:25
  24:7 46:5 47:5
  49:24 50:12,25

51:1 53:3 59:6,24
  62:24 66:5 67:4
  68:18 74:3 87:17
  88:3,18 103:8
  104:18 119:7
  125:5,5,21 132:12
  133:14 135:2
  138:18 145:17
  147:20 148:5
  150:13 168:3
meaning  99:3
  126:15
means  15:19 17:20
  32:1 81:17 95:16
  96:15 126:24
  127:3 128:7,11
  130:10,24 145:15
  151:25
meant  31:20 87:22
  94:6 152:5
media  11:5 42:17
  42:21 77:21 78:1
  116:22,25 155:16
  155:20 161:5
  162:10 172:20
medical  114:24
medicine  52:5
meet  144:18
meetings  58:13
memorialize  13:23
men  88:19,20
  100:5,12,14
mentioned  39:6
  44:11
mess  17:7 33:25
message  162:8
messages  21:5,12
met  74:8
metzger  27:6
  28:21,22 84:1

Veritext Legal Solutions
866 299-5127

Armistead Second Supp. App. 0062

[michael - object]

| | | | |
|---|---|---|---|
| **michael**  105:10 | **month**  54:24 | 166:11 167:14,15 | **numbers**  17:7,10 |
| **middle**  74:13,20 | 116:11 | **national**  62:1 | 75:23,24 |
| 75:2 76:16 139:8 | **months**  66:3,11 | 115:20 116:7 | |
| 139:18 140:1 | 68:17 69:5 | 156:9,11 | **o** |
| 141:7 142:6,17 | **morgan**  5:17 13:5 | **nature**  29:13 | |
| 143:2,17 145:8,9 | 13:5 14:9,9 86:18 | 170:5 | **o'neil**  164:19 |
| 145:13 147:7,24 | 155:7,7 161:1,2 | **ncaa**  45:2,7 51:2 | **oaks**  4:8 |
| 148:13,20 150:7 | 171:19,19 | 53:7 59:6 110:19 | **oath**  14:18 15:15 |
| 157:20 159:12 | **mother**  1:5 2:5 | 112:4 | 15:15 175:8 |
| 170:20 | **mountain**  44:18 | **ncaa's**  92:9 162:21 | **ob**  80:20 |
| **mile**  146:19 | 95:8 160:15 | **necessarily**  44:15 | **object**  18:3,24 |
| **miles**  147:4 | **mouth**  47:23 | **necessary**  133:4 | 20:4 23:23 27:8 |
| **mind**  33:23 95:24 | 97:24 140:10 | **need**  16:2 42:6,9 | 27:15 28:25 29:14 |
| **mine**  149:21 | **move**  66:8 83:12 | 54:7 | 29:20 30:11,18 |
| **minor**  50:3,4 | 129:8 143:6 | **needed**  109:2 | 31:22 32:2,8,14 |
| **minute**  33:19 | 152:25 158:9 | **neglect**  9:17 | 33:2,7 34:4 38:5 |
| 127:6 | **moved**  158:5,6,16 | 123:10 | 38:13 41:1,11 |
| **minutes**  19:6 | 159:3 | **neither**  175:13 | 46:3 47:17,18 |
| 147:4 170:25 | **moving**  18:22 42:7 | **nervous**  24:15 | 52:12 55:7,13 |
| **misheard**  102:23 | 122:11 158:2,3 | 35:19 | 56:24 57:3 61:20 |
| **mistaken**  61:25 | **mpa**  72:13,15 | **never**  34:12 49:13 | 62:7,20 63:9,25 |
| **misunderstood** | **multiple**  66:13 | 58:21 74:8 150:22 | 64:8,14 65:6,16,23 |
| 168:7,9,25 | 143:4 | **new**  6:9,9 8:8,8 | 66:23 67:3,18 |
| **mitch**  8:13 | **mute**  77:19 | 78:24 163:22,22 | 68:25 70:10,18 |
| **mitchell**  164:11,13 | **myriad**  46:19 | **newspaper**  170:16 | 71:5,12 72:3,16,23 |
| **mmartinez**  7:20 | | **nice**  58:20 | 73:9,15,20 75:10 |
| **mom**  21:5 25:22 | **n** | **nil**  162:25 163:2 | 75:15,18 76:8 |
| 25:23,24 27:4,7,10 | | **nodding**  15:25 | 79:8,22 80:8,23 |
| 27:13,16,20 28:24 | **n**  15:4 33:16 56:9 | **noncontact**  91:18 | 81:15 82:5,11 |
| 29:9 30:2,7,9,15 | 56:9 | **nonverbal**  15:25 | 83:6 85:20 86:17 |
| 30:23 31:2,2 71:3 | **name**  11:13 14:23 | **noted**  85:7 132:24 | 86:18 87:3,10,20 |
| 71:10 72:12 | 15:2,11 28:20 | 172:22 173:4 | 88:14 89:1,14 |
| **mom's**  28:10 29:1 | 33:13,17,24 35:9 | **notes**  155:23 | 90:1,7,15,24 91:5 |
| 29:7 | 38:9 40:10,18 | 170:25 | 91:10,15,19,24 |
| **moment**  42:4 | 56:6,8 94:20,22 | **notions**  131:2 | 92:5,11,19 93:1,12 |
| 43:17 77:23 | 104:18,25 105:8,9 | **notre**  112:6,7,12 | 93:20 94:1,7,13,25 |
| 107:13 122:22 | 105:15 145:25 | 112:13,16 113:12 | 95:18 96:3,21 |
| 149:20 155:14 | 158:25 159:3 | 113:22 114:12,19 | 98:16 99:5,19 |
| 156:4 | 163:4,5 165:10 | **number**  9:10 10:2 | 100:15,20,25 |
| **monteleone** | 169:18 175:17 | 11:11 57:11 77:22 | 101:6,10,15,21 |
| 164:21 | **named**  165:11,20 | 170:11 172:20 | 102:6,12,19 103:9 |
| | **names**  37:17 39:18 | | 103:10,20 104:7 |
| | 145:22,22 166:4,9 | | 104:16 105:5 |

Veritext Legal Solutions
866 299-5127 Armistead Second Supp. App. 0063

[object - p.m.]

106:7,25 107:10
107:23 108:10
109:5,10 112:20
112:20 113:8,13
113:23 114:8,15
114:21 115:3
116:2,8,17 117:15
118:17 119:1,10
119:18,24 120:3
120:14,20 121:1
125:12,17,23
126:12,18,25
129:15 132:8
133:8,13,19 134:3
134:17,22 135:6
135:15 136:23
137:8,24 138:11
139:11 140:3,15
142:10 143:3
144:4 146:10,24
147:8,13,21 148:4
148:22 149:2,13
150:16 151:2
152:2,8,14 153:2
153:12,18 154:2
157:4 160:1,11,19
165:16 166:2,18
167:5 170:19
**objecting**   18:6,6
132:21
**objection**   17:21,22
17:24 18:23 19:13
19:14 24:18 26:3
28:14 30:12 34:23
37:23 38:6,12
41:16 45:21 46:4
46:11 51:22 52:11
54:9 55:25 57:14
61:21 62:8,13,19
63:12 64:1,7
65:12,24 66:6

69:7,8 70:17
71:13,21,22 72:17
72:24 74:24 80:9
82:6,12,21 83:16
83:22 84:11,23
85:6,19,24,25 86:5
86:6,11,12,19 89:2
89:9 90:8,16,23
91:11 93:6,7,13,21
94:2,8,12 95:9,17
96:2,10,11 97:11
97:18,19 98:1,2,10
98:11,17 99:6,20
101:1,11 102:11
103:25 104:8
105:6 106:6,24
107:8,22 113:17
113:18 114:14,20
116:16 117:14
118:18 119:2,9,17
119:23 120:9
126:17 127:1
129:12 132:9,23
134:18,23 135:7
136:24 137:10,15
137:16,23 138:12
139:20,21 140:14
141:8,9,18 142:18
142:19 143:18
144:5 152:1,9
153:19 154:3,10
154:11 168:16,21
170:21
**objections**   13:24
13:25 14:1 83:18
**obligations**   155:8
**observation**   100:9
**obtain**   68:5,7,13
**obviously**   16:22
122:8

**october**   150:9
151:16 152:12,21
**odp**   157:23 158:12
158:14,18,22,23
159:6,13,14
**offer**   48:9,15
49:10 157:17
159:16
**offered**   48:18,21
158:12
**offers**   49:15,17
**office**   13:14 43:8
43:23 83:12
**official**   1:10,12
2:10,12 48:13,14
53:8,8 60:17,20
112:3
**offseason**   53:5
**oh**   12:3 111:12
**okay**   11:3,23
14:14 15:8,8,10,24
16:9,10,13,14,20
17:5,13 18:13
19:2,21 20:14
31:11 42:1,9,15
44:6 54:24 58:13
71:20 77:20,25
83:20 99:24
101:19 102:22
103:16 111:14
122:23 123:22
124:4 126:2,23
127:4 128:16
129:25 130:18
132:15 136:17,18
138:15,23 143:25
144:24 145:12,19
146:6,7 147:2
155:14 156:4,14
161:3 162:25
163:7 170:18,23

172:14,18
**old**   39:1,14 74:10
157:16,18 159:8
**older**   41:24
**olympic**   157:24
**once**   58:7 77:1
161:25 169:6
**ones**   20:21 48:3,7
49:14 161:11
**ongoing**   122:3
**online**   118:5
**op**   170:13
**opinion**   31:16
99:16 100:8
117:16,18 170:15
**opportunities**
115:12 117:7
141:20 159:6
**opportunity**   46:21
46:23 48:5 115:10
156:17 158:21,23
**option**   52:9
**options**   52:14
53:22 69:16,21
**organized**   76:23
77:15
**orientation**   131:1
**ought**   127:17,17
**overall**   144:7
**owensboro**   38:18
38:19 40:8 158:4
158:5,7 159:4
**ownership**   156:4

| p |
|---|

**p.b.**   74:7
**p.m.**   2:22,22 11:2
11:4 42:17,20
77:21 78:1 116:21
116:25 121:17,20
155:16,19 172:18
172:22

Armistead Second Supp. App. 0064

[pace - please]

pace  146:19
pack  76:16
package  55:17
page  9:10 10:2
 123:22 144:24
 151:6 174:5,8,11
 174:14,17,20
pages  1:25 129:23
paid  163:6
paper  54:16 55:5
 95:22
papers  54:18 55:4
paragraph  78:19
 124:3
parents  24:23 25:3
 25:7,8,10,11 27:19
 28:18 39:4 41:8
 69:11 70:15,22
 71:9,19 72:2,18
park  151:16,18
part  25:6 58:17
 77:15 78:18 83:15
 84:1 110:22 123:4
 129:8 131:17,22
 139:14 158:9
participants  2:21
 152:18,22 153:6
participate  31:18
 117:20 153:17
 158:18 171:13
participated  76:13
 76:19 136:1,7,7
 137:7 152:19
 154:1
participating
 53:12 135:5 139:9
 140:1
participation
 161:17 165:25
particular  87:18
 87:19 160:6

parties  13:23
 175:15
parts  150:13
party  22:17
 166:12
pass  171:1
passed  26:13 94:5
patient  56:1
pay  116:7
peay  48:1
penalty  173:2
pennsylvania's
 165:5
people  24:13
 27:10 36:4 37:19
 37:25 54:18 92:3
 94:11,24 98:24
 99:15 105:21
 120:5 153:21
 154:16 157:5
 161:16 162:9
 165:19,22 169:2
 172:7
people's  157:7
p███████  146:1,5
performed  137:18
 137:19
perjury  173:2
permit  124:25
perseverance
 156:22
person  84:16
 87:19 94:19,23
 103:23 138:22
 156:24
personal  136:15
 136:15
personally  165:17
perspective  98:23
 99:3

pertain  29:10
phone  43:10 84:14
 84:19
phrase  95:12,15
 95:21 100:18
 103:7 105:20
 106:16 107:6
 125:4
phrased  39:9
phrases  124:2
pick  46:18
piece  95:22 170:15
pinpoint  124:1
place  3:12 23:4
 81:8 82:15 88:22
 137:22 150:18,18
 151:22,25 152:5
 152:12 153:1
 175:6
placed  76:12
 138:2 175:8
plaintiff  1:6 2:6,20
 6:3 7:3 8:3 12:5,7
 12:9,16,18,20 15:1
 19:23 20:16,20,23
 73:24 74:2,7
 75:17 136:14
 139:16 146:5
plaintiffs  11:25
plan  51:9 66:2
 69:5 75:6 115:2
 155:2
planning  60:19
plans  50:23 51:13
 51:14 58:18 68:16
 68:20,22,23 108:5
 115:8,19 163:17
 164:1 171:6
platform  16:22
platforms  161:8
 161:17 162:6

play  23:17 46:24
 46:24 48:5 51:20
 51:24 52:5,6,16
 53:6 54:8 56:15
 56:18 58:25 59:8
 61:12,14 64:9,19
 64:25 70:24 71:15
 76:7 80:6,18 91:3
 91:9 92:3 108:2,5
 108:13,17 109:24
 110:15,25 112:10
 113:22 114:5,6,12
 114:22 115:8
 139:17 157:12,20
 159:22 160:9
played  46:9
 108:15,18 111:23
 112:5,25 136:20
 157:3,9,19
player  57:21
players  115:25
playing  51:3,17
 52:10 56:11 59:7
 61:10 63:21 64:23
 70:21,25 73:11
 80:14 81:9,19
 82:16 92:9 95:7
 110:17 113:21
 115:2,11,13
 141:21 154:18
 157:15,21 160:14
 165:14 170:19
please  11:16 13:19
 13:21 14:6 15:2
 15:24 16:18 29:5
 33:13,21 42:22
 63:13 66:15 69:25
 78:3 81:13 89:4,7
 104:12 117:2
 121:21 129:22
 132:23 144:21,25

Veritext Legal Solutions
866 299-5127 Armistead Second Supp. App. 0065

[please - question]

149:8,17 155:21
161:7
**pllc**  4:5 5:16
**point**  16:15 26:8
58:19 106:21
117:23 143:14
144:2,10
**policies**  120:18
**policy**  9:13 92:9
123:3,14,18
124:16,17 127:15
128:1 129:6 132:3
132:15,19 133:6
133:24 134:5,9
162:22,25 163:2
163:22
**political**  49:22
50:2
**poorly**  16:8
**portal**  63:5
**position**  108:13,15
108:17,21,23
109:3 149:5,9
**positions**  108:18
109:11
**possession**  68:12
**possibility**  56:11
56:14,18 63:23
**possible**  37:15,16
64:3 65:25 95:23
**possibly**  51:3 58:2
59:4 60:21 118:1
127:14 128:18
**postgraduation**
115:9,13
**practice**  53:6
58:17
**practices**  52:23
53:1,8,12
**prayer**  28:17

**prefer**  106:11
123:20
**preference**  70:9
70:12 71:3,11
**premise**  120:24
**prepare**  20:1,10
21:2
**prepared**  20:7
135:12
**present**  8:12 84:4
**presented**  123:3
133:21,23 134:11
134:13
**preserve**  13:24
**presumably**  36:2
**presume**  41:21
62:11
**previously**  10:1
78:5 144:13
149:17
**primary**  46:20
**prior**  22:22 23:21
24:5,17 78:14,22
104:12 122:7
175:7
**pritt**  35:10
**privacy**  145:23
**privilege**  13:25
85:15 167:7
**privileged**  20:5
24:2 28:1,3 31:10
34:5,8,24 79:24
83:7,9,17,24 84:24
85:13 166:19
167:10
**privileges**  85:9
**probably**  16:7
47:14 57:9 101:7
109:11 115:24
157:6,16 159:12
160:2 162:3

166:15
**problem**  149:22
**procedures**  9:16
123:9
**proceed**  13:21
66:15 122:23
**proceedings**  175:5
175:7,9
**process**  15:14
**produce**  68:1
**professional**  156:5
156:8
**professor**  59:14
**professors**  43:11
**program**  59:19
65:1,1,2,5 131:8
131:12 157:23,24
158:15
**programs**  61:1
63:3 130:13
131:18 133:11,17
**prohibit**  80:14
124:8 125:10
**prohibits**  126:7
130:12 132:4
133:24
**promise**  16:7
**promote**  142:20
**promotes**  143:21
**pronouncing**
15:11
**pronouns**  14:25
15:6
**protect**  35:15
82:24 88:16,18,22
90:12 92:15
**protected**  82:15
119:22 124:22,24
126:7
**protecting**  83:1
90:2 117:13

120:13
**protections**  120:6
**protects**  119:14
**provide**  38:9 66:5
127:15
**provided**  134:8
**psychology**  50:4
67:20
**puberty**  96:1,6,8
97:2,3,6,7
**public**  24:14 59:12
59:17,23 64:19
72:8
**publicly**  116:14
**published**  123:13
**purposes**  30:8
136:20 152:6
**pursuing**  59:11
**put**  47:22 63:12
88:22 97:24 118:7
122:6 167:11
168:19 169:1
**putting**  140:10

## q

**qualified**  111:3,15
**qualify**  112:1
**question**  16:6,7,13
16:17,24 24:2
27:25 31:9 36:12
48:17 50:20 53:18
66:4,10,16 70:1
73:6,7 74:18
79:24 81:11,13
82:22 85:15 87:4
89:3,6,13,24 90:18
97:16 99:1,14
100:2 113:16
115:7 118:6
121:11 123:2
136:21 137:2
138:3,4,6,16,23

Armistead Second Supp. App. 0066

[question - reporting]

140:23 141:3
142:22,25 143:9
144:2,22 148:18
155:24
**questioning** 42:8
**questions** 15:25
99:8,8,17 101:17
123:20 129:13
132:22 155:3
171:15,18,20,22
172:1,3
**quick** 155:4

**r**

**r** 15:5 33:22 174:4
174:4
**race** 140:12
**races** 76:22,24,25
**rachel** 3:8 12:25
**raised** 83:16
138:23
**ran** 74:12,20 147:4
**range** 57:8
**raymond** 169:19
**rcsutoros** 3:18
**reach** 26:2,7 30:9
31:1,2 36:6 63:15
63:18 84:21,22
85:16
**reached** 26:22
27:13,16 30:15
36:3 63:2 85:12
161:16 162:8
**reaction** 116:6
**read** 29:22,24,25
30:3 51:5 60:1
78:12,14,16,18,20
78:21,23 81:12,14
89:6,8 97:5
104:11,13 123:11
123:16,18 124:2,5
124:12,14,20

126:6,9 130:9,16
130:22 131:5,11
131:21 132:14,18
133:9 134:7
144:20,23 151:12
173:2
**reading** 95:23
**ready** 61:10
129:16 149:23,24
**realize** 138:2
**realized** 155:24
**really** 23:20 29:25
49:13 58:20 60:23
63:20 65:17 94:17
128:24 134:4
136:13 138:20
154:12 163:22
**reason** 15:21 18:3
19:3 37:20 38:3
46:20 55:24 61:12
64:20 79:15
118:21,23 120:15
125:8,15,18,21
174:7,10,13,16,19
174:22
**reasons** 46:19
64:21 92:15
110:20 139:5
142:3 145:23
**recall** 20:22 21:7
26:9,17,21 28:8
30:1 57:4 58:5
84:9,15 110:9
118:14 129:11
135:21,24 158:19
166:11 167:13,15
167:25 168:17
**receiving** 130:14
134:1
**recess** 42:18 77:24
116:23 121:18

155:17
**recognize** 78:10
100:13 122:25
**recollection** 58:8
**record** 11:4 13:23
14:1 15:3 42:16
42:16,20 63:13
77:18,20 78:1
81:14 85:4 89:8
104:13 110:8
111:2,3 116:19,21
116:24 121:12,16
121:20,24 122:7
127:7 128:13,14
128:23 129:13
148:16 155:11,13
155:15,19 171:23
172:7,17,18 175:8
**recorded** 11:6
**recreational**
115:16
**red** 43:6,15,23
**redacted** 145:23
146:1
**refer** 15:9 17:4
33:23 104:5 105:2
106:9
**reference** 163:7,9
**referenced** 122:1
**references** 145:5
**referencing**
115:17
**referring** 18:12,13
19:1,9,16,22 21:23
22:9 104:2 119:4
119:5 125:6
**reflected** 16:1
**refresh** 149:21
**regarding** 27:13
30:9 31:4 56:14
56:18 92:9 120:18

135:22
**regardless** 103:23
105:16
**regular** 108:21
**regularly** 161:20
**reinhardt** 7:6 12:8
12:8
**reisbord** 8:13
**related** 164:3
**relates** 133:6
136:11 143:16
**relationship** 26:8
30:4
**relationships** 9:18
64:24 123:10
**relative** 175:14
**relevant** 68:2
121:8 127:24
128:8
**remember** 21:11
26:23 79:19,20
111:24 136:3,4,5
159:9 162:5 168:2
168:14 169:2
170:11
**remote** 1:18
**remotely** 2:21
**repeat** 49:1 63:10
73:17 87:4
**rephrase** 35:1
37:12 47:22 98:7
**replacement** 96:17
**reported** 1:22
**reporter** 2:24
11:14 81:12 89:6
103:6 104:11
122:19 160:24
161:1,3 175:4
**reporters** 164:6
**reporting** 9:17
123:10

Armistead Second Supp. App. 0067

**[represent - secondary]**

**represent** 145:7 146:4 150:22
**representing** 15:1
**request** 68:3,10
**required** 118:9
**requires** 120:24
**reserve** 171:1
**respect** 104:24 105:15
**respond** 98:22 99:1,12
**response** 32:18 57:16 74:17 97:24
**responses** 135:11 135:18,21
**rest** 11:20 14:5 147:18 150:20
**restate** 70:1 89:3 89:10,15
**result** 81:9
**retained** 172:21
**retreading** 84:25
**return** 37:4
**review** 20:12,18 21:2,9 135:18
**reviewed** 20:19,23 21:4,5,8
**revisiting** 85:6
**reword** 16:12
**rgreen** 5:11
**right** 13:18 25:12 30:16,24 31:3 32:1 34:10,20 36:2,14 42:19,25 46:1 51:6 52:10 52:20,20,24 53:5 55:19 59:9 61:2 63:7,24 64:6,13 77:19 87:19 89:19 89:22 99:4 109:9 109:22 111:17

114:3,4 116:20 117:13,24 121:15 122:3 123:18 126:5 128:21 129:10 132:20 133:12,18 134:2 139:6 141:17 142:4,9,13 144:10 145:1,12,20 146:17,22,23 147:7,12 149:7,24 150:6 151:1,14,17 152:23 153:11 155:18 157:10 158:13,17 159:6 160:5 171:1 172:17
**rights** 117:13 118:24,25 119:4,5 119:8,14,15,15 120:6,13
**ritchie** 150:9
**roberta** 5:6 13:10
**rogers** 13:8,8 14:11,11 171:21 171:21
**room** 22:4,6 121:22 122:14 127:9,11 129:18 160:24
**rooting** 44:8
**roster** 52:19
**round** 111:10,16
**rules** 53:7 54:5
**rumors** 94:15
**run** 43:10 76:21 76:22 99:16 143:22 149:14
**runner** 151:4
**running** 77:16 109:14 141:6

142:8,16 143:1,16
**runs** 77:4

**s**

**s** 15:5 33:16,22 174:4
**safety** 88:22 89:22 90:3 92:15,25 139:6,8,18,23,25 142:3,6,8,14,15
**samarczuk** 33:18
**saturday** 150:9
**savanna** 170:1
**saw** 116:6 150:4
**saying** 18:18 29:18 49:12 50:9 52:8,9 57:4 59:10 65:21 99:1 101:9 102:10 105:15 168:6,11
**says** 124:5,14 126:6 130:8 145:1 145:1,13 146:25 150:6 151:10,22
**scholarship** 21:4 21:12 43:21 45:13 46:25 48:9,13,15 48:18,20,21 49:11 54:12,17,25 55:17 57:21 68:8
**scholarships** 49:13 49:15
**school** 1:9 2:9 5:3 13:9 36:9 40:3 45:11 48:19,22,24 49:4,8,19 50:10,22 54:12 60:3,6,10,24 61:15 62:17,22,23 63:23 64:13,16,24 65:1,3 69:19 72:2 75:2,5 76:6,25 77:3 80:7 85:23 86:15 87:18 88:9

92:4,10 93:5,19 112:23 118:7,15 118:21 120:23 121:5 127:15,17 127:18 133:12,18 134:1 135:5,14 139:9,18 140:1 141:7 142:6,17 143:2,17 145:8,10 145:14 147:7,24 148:13,20 150:8 156:21 157:17,20 157:22 158:3 159:12,19,24 160:7 169:22 170:20
**school's** 74:13,20 80:14 120:18 125:9 127:18 135:23
**schools** 44:23 48:5 49:10,12 60:16,18 60:19 63:16,19 86:9 114:3 159:16 159:18
**science** 49:22 50:2
**scope** 87:7
**scrimmage** 53:6
**scrimmages** 53:9 53:13
**scroll** 126:2 129:21 130:18 131:7,24 132:12 144:24 151:6
**scruggs** 3:6 12:24
**season** 52:19 53:1 53:5 110:14 111:12,20,23 112:4
**secondary** 1:9 2:9 5:3 13:9

Veritext Legal Solutions
866 299-5127 Armistead Second Supp. App. 0068

[seconds - sounds]

seconds  147:5
section  78:22
    123:23 126:3
    129:21,23 130:3
    130:18
see  35:20 53:22
    59:16 68:4,13
    72:19 100:12
    116:11,14,18
    123:23,23 124:10
    124:11 130:8,19
    131:8,9,19 132:1
    144:25 145:3,21
    145:23,25 146:2
    146:20 147:17
    150:3,10 151:10
    151:19,23
seeing  25:20 56:2
    70:24 78:15
seeking  134:15
seen  95:21 141:21
    154:8
select  160:6
self  95:13
selina  164:9
semester  37:4
    51:15 52:21,25
semesters  50:14
    50:15,16
semiorganized
    77:16
send  60:19
senior  157:22
sense  95:12 104:23
sent  60:17 135:19
    162:8
sentence  26:25
separately  43:22
september  146:15
sequence  26:19

series  89:18
seriously  47:12,16
    47:24 48:3 49:7
server  43:16
set  17:10 51:14
    65:17,20 99:17
    175:6
seven  157:16,18
    159:10
seventh  153:21
    154:17,19
sex  17:18 18:19
    19:10 102:16
    124:9,21 125:5,11
    130:13,20,23,24
    132:4,6,16,20
    133:3,5
sexual  9:15 122:2
    123:9 130:25
sexually  41:17
shaking  16:1
shannon  13:8
    14:11 171:21
shape  156:18
shared  162:16
short  165:23
shorter  111:23
shorthand  2:24
    175:3,9
show  23:11 43:20
shows  147:15
shuman  5:5
shumanlaw.com
    5:11
sibling  39:10
siblings  24:23
    31:11 32:6 39:6,6
    39:12,15,16,17
    40:20
side  23:2 151:21

sign  54:16,18,18
    54:20,24 163:4
signature  68:9
    175:22
signed  55:5,17
similar  17:10,16
    150:4,5
similarly  160:18
simple  66:10
sinead  33:11,14,24
    34:2,12,13,16,19
    34:22 35:3,21,22
    36:8,16,17,21
    38:10 162:19,20
sinead's  33:17
    34:10
single  18:4
sister  39:16
sister's  40:18
sit  50:8 53:15
    55:16 92:3 110:6
    118:10
sitting  65:15 68:23
    69:1 72:21 73:7
    75:13 80:17
    163:25 170:18
situations  171:14
six  50:16
sixth  153:21,22
    154:17,18
size  45:11 46:16
skills  64:24
skip  124:19
    131:17
slicer  5:5
slightly  53:18
smith  164:15
snacks  22:13
snapchat  161:11
soccer  25:16 43:18
    43:19,22 45:5

46:9,9,24,24 48:5
    48:11 51:17,20
    52:10,17 61:10,12
    61:14 62:2,18,24
    64:9,19,23,25
    70:21 71:15 95:4
    108:3,6,9,19
    109:20 110:25
    114:22,25 115:2,4
    115:8,11,13 116:1
    149:15 154:18
    156:1,5,14,16,18
    156:23 157:1,10
    157:15,17,21
    159:16,20 160:10
    160:18
social  161:5
    162:10
solutions  172:21
somebody  105:1
    127:17
soon  61:7
sophomore  50:6
    108:22
sorry  12:3,12 40:5
    41:20 42:16 49:1
    63:10 69:25 73:6
    73:16 74:18 75:23
    78:13 80:23 96:24
    100:1 102:13
    111:13 118:6
    129:20 130:1
    132:12 140:23
    148:5 149:20
    155:3 160:22
    161:3 170:14
sort  77:2
soule  164:9
sounds  23:20 55:5
    57:7 121:13

Veritext Legal Solutions
866 299-5127
Armistead Second Supp. App. 0069

[southern - sure]

**southern** 1:2 2:2
11:10
**speak** 16:23 27:7
107:7 157:7
160:20 166:14
167:3,4 172:8
**speaking** 14:1
20:9,13 66:6
**specific** 37:17 54:1
95:24 123:20
124:1 143:14
144:1,9 163:25
**specifically** 29:17
156:16 165:15
168:5
**specifics** 118:14
138:20 143:19
144:9 167:25
**speculate** 30:5
31:24 37:19,24
38:2 82:2
**speed** 99:10 154:7
**spell** 15:2 33:15,20
56:8
**spend** 128:17
**spoke** 27:19 40:14
40:22,24 74:8
83:12
**spoken** 165:19,24
169:5,8
**sponsored** 86:15
133:12,18 134:1
135:5
**sport** 23:17 52:22
73:11 139:17
141:24 143:23
**sports** 23:16 35:15
53:4 62:4 79:6
80:7 81:10 82:17
82:25 83:4 85:18
85:23 86:3,15

88:5,16 90:3
91:14,18,22 92:10
108:2,5 139:13,13
139:23 140:20
142:21 157:3
**spring** 52:21,25
54:16,21 55:11
111:23
**sruti** 6:5 12:10,15
**ssac** 13:11
**sswaminathan**
6:10
**standing** 17:24
24:12 132:23
**stands** 66:16
**start** 34:14 47:6
102:22 110:1
157:15
**started** 13:22
15:13 94:16
159:10
**starter** 56:2
**starts** 50:10 97:2
129:24
**state** 1:7,11,14 2:7
2:11,14 4:14 5:15
9:11 11:8 13:15
15:2 36:22,24
37:7 42:25 44:1,5
44:9,17 45:4
46:15,18,22 48:1,4
48:22 49:21 50:14
50:18 51:4,10
53:11 59:5 60:3
61:25 62:12 63:21
64:10 66:19 67:12
69:19,22 85:5
86:4 108:2,6
109:19 110:21,24
120:12 121:23
122:1 123:5,14

124:7,22 125:9
148:2,12,19 149:5
149:9 158:3,14,14
159:17 173:9
174:1 175:4
**stated** 42:24 70:15
142:7 151:3
**statement** 125:9
**states** 1:1 2:1
60:15 120:5,5
**stating** 54:17
**stature** 88:21
97:13
**status** 130:25
132:6,16 133:7,25
135:4
**stay** 52:16 57:19
128:22 130:18
**staying** 70:21
**stays** 81:25 82:14
**step** 52:15 81:17
112:1 127:8
**steptoe** 4:5,11
**stereotypes** 131:4
**stereotypical**
131:1
**stocker** 157:12
**stone** 51:14 65:17
65:20
**stop** 52:10 126:6
157:21
**straightforward**
66:4
**street** 5:8,19 6:7
7:12 8:6
**stronger** 88:20
97:13 139:3
141:11
**student** 36:21,24
37:6 39:25 42:2
42:24 43:5,7

46:16 59:8 118:9
**student's** 149:6,11
**students** 146:14
**studied** 50:17
**study** 43:5,7 49:21
**studying** 51:3
**stutler** 1:12 2:12
4:4 13:4
**subcolumn** 151:22
**subscribed** 175:16
**substance** 16:16
27:12 31:17
**substantial** 131:15
**successes** 136:15
**suggest** 66:8
**suite** 3:13 5:9,20
**sultz** 164:17
**superintendent**
1:12,14 2:12,14
4:4 5:13 13:3,7
**superior** 154:7
**support** 23:2,19
25:25 70:8 75:6
**supported** 25:6,11
25:14
**supporting** 116:15
**supportive** 25:23
26:1 31:13 32:21
32:23 71:7,10,23
72:11 170:8
**supports** 23:14
75:3
**suppose** 127:21
**sure** 18:16 27:16
29:6 30:4 32:22
40:13,17,23 41:2,9
41:12 43:18 44:13
44:20,25 45:25
47:8 48:14 50:23
52:15 53:20 55:1
55:8 56:2,20,22

Page 23

Armistead Second Supp. App. 0070

[sure - think]

57:7 58:3,11,17
59:14 60:24 61:14
65:13 66:17 69:2
69:9 71:9 72:4,21
80:16,24 81:4
82:3 83:14 84:25
85:4 87:6 92:23
95:6 97:8 102:20
106:14,21 108:11
111:3 112:17
115:14 117:25
118:5 127:21
134:4 137:3
141:22,23 143:25
148:15 149:9
150:1 157:7
159:19 161:24
163:9,19 165:9
170:25 172:1
**surprise** 112:18,21
138:8
**surprised** 76:5
93:4,10 113:6
137:21 138:4
**susan** 4:6 13:2
14:7 171:17
**susan.deniker**
4:11
**swaminathan** 6:5
12:10,12,12,15,15
**swear** 13:18
**swimming** 165:5
**sworn** 11:17 13:20
**sympathetic**
170:12

**t**

**t** 15:5 174:4,4
**table** 144:25 145:1
145:12,19 146:8
146:17,22 147:3
147:14,17 150:6

150:13,17 153:9
**tables** 144:25
150:3,4
**take** 15:16 33:19
41:5 42:11 45:25
52:4 58:13 59:20
60:8 150:21
171:13
**taken** 2:20 15:15
21:16 155:4 175:5
**takes** 97:6
**talk** 17:9 24:16
43:10,22 105:21
112:12 127:6
129:5 161:17
**talked** 24:25 32:12
67:2,7 69:11,15
72:7 138:25 142:6
142:14 166:9
170:19
**talking** 17:2,11
18:15,17 28:16
98:23 99:14
105:25 112:6,7,13
128:18 134:5
135:25 141:16
146:23 167:22
170:10,17
**tan** 165:7
**tani** 165:10,11
**tasks** 43:12
**taught** 156:23
**tducar** 3:19
**team** 34:10 35:5
35:12,14 37:2,3,9
44:11,16 46:9,9,13
52:17 53:16 56:4
57:19 58:17 59:1
61:19 62:5,12,18
74:13,21 75:3
76:7 80:7,15,19

91:4,9 95:8
107:15 108:9
109:17,19,20,22
113:21 114:6,13
114:19 115:20,22
116:7,14 135:5,13
135:23 136:20
139:10 140:2
141:7 142:9,17
143:2,14 147:25
148:3,8,13,21
149:7,11 156:1,9
156:11 157:17
158:24,25 159:3
159:17,20,24,24
160:3,5 165:5,15
165:25 170:20
**team's** 111:2
**teammate** 33:23
**teammates** 32:25
35:16,18 37:11,13
37:21 38:4,10,14
156:20,21 160:9
**teams** 44:19
110:17 115:15
156:8,21 158:9,11
**teamwork** 156:22
**tell** 34:15 44:14
46:17 47:24 57:23
58:4 71:19 86:22
87:22 88:12 95:15
103:6 106:18
123:23 130:20
131:9 141:4 143:5
149:22 167:24
**telling** 32:19 146:9
**ten** 44:21,22 47:11
47:12 56:23 57:5
161:22 162:3
**tentatively** 51:2

**term** 106:4
**terminology** 17:24
18:2 136:18,22
**terms** 46:15 50:5
106:2,3
**testified** 14:19
21:19
**testify** 15:19,21
**testifying** 175:8
**testimony** 172:19
173:5
**texas** 116:12
**text** 21:5,12
**texted** 160:23
**thank** 13:12 14:4
42:14 50:19 68:6
68:14 122:13,23
129:17 130:6
149:24 161:2
171:3,7,11,15,18
171:20,22 172:4
**therapy** 96:18
**thereof** 175:12
**thing** 18:17 19:8
21:11 24:14 78:17
98:23 144:9 172:7
**things** 15:14 36:10
37:16 59:25 64:3
86:25 89:18 92:18
93:24 94:6 115:15
142:13
**think** 16:17 18:3
23:17 31:11,20
32:12 37:20 44:25
45:17,19,20,22
50:16 51:5 53:24
54:23 55:24 60:17
61:19 62:22 64:25
66:6 67:9 72:25
73:4,8 79:15 81:5
81:17 90:13,17

Page 24

[think - trying]

| | | | |
|---|---|---|---|
| 97:9,12,16,20 | 151:17 152:5 | 171:4 | 98:21 99:3,12,24 |
| 103:12 104:9 | 155:15 161:22 | today's 172:19 | 100:4,14 105:2,3 |
| 105:14 106:1,8 | 171:4,12,13,16 | told 30:22 31:1 | 107:15,17,20 |
| 107:11 110:7 | 172:22 175:6 | 32:21 58:5,8 | 114:12,18 116:15 |
| 116:3 118:5,21,23 | timeframe 26:15 | 66:13 72:11 89:18 | 118:24 119:7,15 |
| 119:21 120:15 | 26:18 54:4,7 | 92:20,24 105:9 | 119:15,21 120:8 |
| 126:19 127:24 | 55:21 58:23 | 129:2 137:13 | 130:25 132:6,16 |
| 138:17 139:1 | times 59:17 66:14 | 142:2 152:5 | 133:6,25 135:4 |
| 142:21 143:8 | 83:15 103:8 107:9 | 162:18 166:25 | 136:19 137:5 |
| 146:8 151:25 | 136:7 143:4,9 | 167:21 168:1,4 | 140:11 141:15 |
| 153:16,25 157:1 | 145:22 146:14 | 169:10,16 170:7 | 165:14,25 |
| 160:17 162:7,14 | 147:17,25 148:12 | tonight 171:6 | transition 94:16 |
| 165:21 | 150:23 156:3 | top 150:18 151:10 | transitioned 94:16 |
| thinking 26:15 | 161:22,23,24 | 153:23 | transylvania 48:2 |
| 31:24 32:10,16 | 162:2 | total 153:5 172:20 | 48:8,17,18,19 |
| thinks 25:19,19 | timing 37:14 | totally 60:15 | travel 158:23 |
| third 50:7 117:25 | 61:17 78:24 | touch 41:7,10,14 | traveling 158:22 |
| 118:2 | timothy 3:10 | 167:11 168:19 | trial 21:19 129:7 |
| thought 25:4,5 | 12:25 | 169:2 | 151:10,15,18 |
| 28:5,17 35:21 | title 9:13 110:18 | tough 156:3 | 152:5 |
| 45:14,16 81:19 | 117:4,6,10,12,19 | tournament | trick 16:7 |
| 105:24 155:24 | 117:24 118:10,16 | 110:12 111:4,5,16 | tricky 137:3 |
| thoughts 97:1 | 118:22 119:14 | 111:25 | trod 85:6 |
| three 45:8,17 51:7 | 120:19,24 121:5 | track 50:4,21 | true 125:16 157:2 |
| 59:6 61:1 64:5 | 121:25 123:4 | training 118:4,10 | 160:5 173:6 |
| 107:9 112:5 | 124:6 125:9 128:1 | 123:5 | truthfully 15:19 |
| 117:23 143:9 | 128:2,3,5,7,9 | trainings 117:19 | 15:22 |
| 146:18 158:16 | 129:23 130:3,10 | 117:24 118:13 | try 19:6 32:25 |
| thursday 146:15 | 130:10,12 131:25 | transcribed | 33:20 62:18 |
| time 18:4 26:9,21 | 132:3 133:24 | 175:10 | 143:11 163:19 |
| 28:4 30:1 36:3,10 | today 15:9,14,22 | transcript 16:2 | trying 23:21 26:18 |
| 40:14,22,24,25 | 16:15 17:2,14 | 85:3 173:3 | 31:5 47:22 50:13 |
| 41:3,21 42:16 | 19:19 21:21 22:12 | transcription | 55:6 57:8 78:24 |
| 54:1 56:3 75:25 | 50:8 53:15 55:16 | 175:12 | 83:9,13 85:4 |
| 77:9,20 98:21 | 65:15,21 66:12 | transfer 63:5 | 90:12 92:23 93:16 |
| 103:17 106:20 | 68:23 69:1 72:21 | transferring 63:6 | 97:24 99:10 |
| 116:21 121:16 | 73:7 75:13 78:22 | transgender 18:4 | 105:22 106:14 |
| 127:22 146:19 | 80:17 101:9 104:3 | 19:9,19 75:6 | 115:19,19 137:2 |
| 148:3,8,13,21 | 104:5 105:23 | 88:25 91:8 92:9 | 140:21 141:5 |
| 149:6,7,10,11,11 | 107:6 156:25 | 94:11,24 95:5,7 | 142:15 160:24 |
| 150:21 151:10,15 | 163:25 170:18 | 97:9,16 98:6,8,15 | 163:11 166:8 |

Veritext Legal Solutions
866 299-5127 Armistead Second Supp. App. 0072

[tryon - useful]

**tryon**   4:16 13:13
13:13 14:13 17:22
18:6,23 19:13
28:14 30:12 37:23
38:6,12 41:16
45:21 46:4 47:18
51:22 52:11 55:25
57:14 61:21 62:8
62:19 64:1,7
65:12,24 69:8
70:17 71:13,21
72:17,24 73:16
80:9 82:6,12,21
85:19,25 86:5,12
86:19 89:2 90:8
90:16,23 91:11
93:7,13,21 94:2,8
94:12 95:9,17
96:2,10 97:11,18
98:1,11,17 99:6,20
101:1,11 102:11
103:10,25 104:8
105:6 106:6,24
107:8,22 113:18
114:14,20 116:16
117:14 118:18
119:2,9,17,23
120:9 126:17
127:1,5,10,13
128:4,10,11,12,14
128:17,24 129:4,9
129:10,12 130:1,2
130:6 132:9,21
134:18,23 135:7
136:24 137:10,16
137:23 138:12
139:21 140:14
141:9 142:18
144:5 152:1,9
153:19 154:3,10
160:22 171:2,8,11

171:23
**tt**   151:22,25
**turn**   19:5 170:24
**turned**   19:3 20:15
20:19,23
**tv**   23:11 164:6
**twitter**   161:10
162:7
**two**   39:8,12 49:16
51:5 66:3,11
67:13 68:8,17
69:5,5 118:1
139:5 142:3,13
144:25 151:14
155:9 158:8 163:4
166:10,12,17,24
167:11,17,19
169:5,8,10,24
**type**   36:8 84:18
115:12,16 118:10
**types**   122:9
**typical**   101:4
**typically**   53:4
54:16 100:12
153:22

---

**u**

**u**   33:22
**u.s.**   11:9 115:20
156:9
**uf**   61:2,13
**uk**   38:24 44:11
**ultimately**   34:2
36:13 70:22
**um**   123:1
**unable**   157:13
**uncertain**   73:13
73:18
**undersigned**   175:3
**understand**   15:17
16:4,6 17:9,20
18:12,22,25 19:12

19:15,24 20:21
21:14 23:19,20,22
26:19 29:9 31:6
38:20 42:7 50:13
52:2,7 53:2,23
60:15 63:22 69:4
71:9 81:6,16,23
82:14 83:13 85:3
87:7 88:2 89:13
90:5,12 92:16
99:2,10,11 103:2
105:14,22 106:3
106:15 109:15
112:13 114:24
122:10 125:4
127:14 128:15
136:21 137:4
140:22 141:5,14
142:2,15 144:2
156:15,15 158:11
165:23 170:10
172:8,9
**understanding**
17:16 22:25 23:1
23:5,8,10,12,13
27:22 30:6 32:3
36:5 43:13 45:9
70:5 76:1,11,15
79:2,4,7 80:3,13
81:2 82:4 88:15
91:22 92:14,20,24
96:8,15,20 102:24
103:3 113:11
114:11 117:6
121:25 126:15
128:3,5 136:6,10
150:12,24,25
162:24 163:2,3
167:16
**understandings**
117:9

**understood**   16:12
16:25 18:8 87:6
99:15 110:22
136:12 138:6
139:25 143:25
157:9 168:7
**unfair**   142:16
153:7,16 154:1
**unfortunately**
39:13
**union**   8:4
**unit**   11:5 42:17,21
77:21 78:2 116:22
116:25 155:16,20
**united**   1:1 2:1
120:5,5
**university**   9:11
36:22,25 39:25
40:4 42:25 44:1
48:25 60:13,21
62:6 63:21 122:1
123:5,14 124:18
126:7 131:15
165:4
**unlawful**   9:13
123:8 124:8,25
125:10
**upcoming**   50:10
**update**   58:4,6,11
58:13
**updated**   57:25
58:1,7 170:6
**updates**   67:6
**ups**   39:23
**upset**   109:16
**use**   14:25 15:6
57:20 105:23
106:4,16 107:5,6
161:12,14 163:11
**useful**   127:15

Veritext Legal Solutions
866 299-5127   Armistead Second Supp. App. 0073

[usually - witness]

**usually** 45:16
**utilize** 51:2

**v**

**vague** 23:10,13
**verbal** 15:24
**verbally** 16:3
**veritext** 8:13
  11:14,15 172:21
**veroff** 7:10 12:1,3
  12:6,6
**versus** 11:7 131:3
**video** 11:6 92:3
**videoconference**
  3:1
**videographer** 8:15
  11:3,13,23 13:16
  13:21 42:15,19
  77:19,25 116:20
  116:24 121:14,19
  155:10,12,14,18
  172:10,14,16
**videotaped** 1:18
  2:19
**view** 127:18
**views** 127:19
**vigorous** 65:3
**virginia** 1:2,7,9,15
  2:2,7,9,15 3:14
  4:9,14,15,19 5:3,8
  5:10,13,19,21 9:11
  11:8,10 13:6,9,14
  13:15 17:3 36:21
  36:24 37:6 42:25
  44:1,5,8,17,24
  45:4 46:15,18,21
  48:1,4,22 49:21
  50:14,18 51:4,10
  52:16 53:10,11
  59:5 60:3 63:21
  64:10 66:19 69:22
  75:20 78:6 86:4

86:16 108:2,6,9
  109:19 110:21,24
  112:19 113:3,7
  120:12 122:1
  123:5,13 124:15
  159:17 174:1
**virtual** 84:18
**virtually** 11:12
**visit** 47:4
**visited** 170:3
**vocabulary**
  100:21
**volume** 1:21 2:20
  9:4 173:16
**vs** 1:6 2:6 174:1

**w**

**w** 1:10 2:10
**waiting** 64:6
  160:23
**walked** 105:1
**wall** 6:7
**want** 15:13 17:14
  28:3 32:22 34:17
  37:19,25 51:2,17
  51:18 52:4 60:1
  64:9 67:13 70:22
  72:2,5,19 73:4
  84:3 85:5 99:18
  104:24 107:5
  121:23 122:6
  127:16 128:12
  137:3 141:22
  142:3 148:15
  153:7 154:22,22
  156:15 163:9
  167:10 170:24
  172:1
**wanted** 13:23 27:3
  35:20 36:7 38:4
  38:11,15 105:9
  128:14 170:6

172:4
**wanting** 58:16
**wants** 57:17 67:11
  70:7,19 71:15
  72:14
**warm** 60:15
**waste** 127:22
**watching** 71:14
**water** 22:13
**way** 24:4 36:8
  39:9 49:25 80:2
  80:17 89:11,16
  93:24 127:24
  128:8 143:12
  149:10 151:1
  160:18 167:9
**we've** 17:25 83:14
  142:14 150:7
  154:21 170:18
**week** 21:10 59:18
**weeks** 18:1
**weigh** 53:22 69:21
**weighing** 52:14
**welcome** 124:3
**went** 41:23 85:2
  133:2 169:21
**wesleyan** 48:2,8,9
  48:15 49:18
**west** 1:2,7,8,15 2:2
  2:7,8,15 4:9,14,15
  4:19 5:3,10,13,21
  9:11 11:8,10 13:6
  13:9,13,15 17:3
  36:21,24 37:6
  42:25 44:1,5,8,17
  44:24 45:4 46:15
  46:18,21 48:1,4,22
  49:21 50:14,18
  51:4,10 52:16
  53:10,11 59:5
  60:3 63:21 64:10

66:19 69:22 75:20
  78:6 86:4,16
  108:2,6,9 109:19
  110:21,24 112:19
  113:3,7 120:12
  122:1 123:5,13
  124:15 159:17
  174:1
**when's** 59:13
**whereof** 175:16
**white** 4:8 147:18
**willing** 17:23 83:9
  152:6
**win** 46:10,13
  61:25 77:7 81:3
  81:24 82:10 111:5
  135:2 140:12
  141:15
**wingback** 108:25
  109:14
**wins** 110:10
**winter** 54:23
**withdraw** 68:16
  68:21
**withdrawing** 69:5
**witness** 9:2 11:17
  13:19,20 18:25
  19:15 20:7 24:1
  26:9 27:9,16
  28:15 29:1,15,21
  30:13 31:23 32:3
  32:9,15 33:3,11
  34:6 37:24 38:7
  38:14 41:2,12,17
  45:22 46:5,12
  47:19 51:23 52:13
  54:10 55:8,14
  56:1,25 57:4
  61:22 62:9,14,21
  63:15 64:2,9,15
  65:7,13,17,25

Veritext Legal Solutions
866 299-5127 Armistead Second Supp. App. 0074

[witness - zoom]

| | | | |
|---|---|---|---|
| 66:17,24 67:4,19 | 135:16 137:9,11 | 119:5,14,15 | 56:11,15,19 59:21 |
| 69:1,9 70:11,19 | 137:17,25 138:13 | 120:13 156:7,9 | 74:14 76:7,13,19 |
| 71:6,14,23 72:4,18 | 139:12,22 140:4 | 159:16,19 165:5 | 77:1 108:22,23 |
| 72:25 73:10,21 | 140:16 141:10,19 | **won**   137:6 | 109:24 110:7,8,13 |
| 74:25 75:11,19 | 142:11,20 143:19 | **word**   17:17 18:4 | 110:17,19 111:2 |
| 76:9 78:8 79:11 | 144:6,15 146:11 | 18:11 19:18 32:1 | 111:11,15,19 |
| 79:23 80:10,24 | 146:25 147:9,14 | 32:4 102:3 103:7 | 112:2 113:21 |
| 81:16 82:7,13,22 | 147:22 148:6,23 | 126:13,16,19,24 | 114:6 157:22 |
| 83:23 84:12 85:8 | 149:3,14,19 | 127:3 163:11 | **years**   51:5,8 59:6 |
| 85:21 86:1,7,13,20 | 150:17 151:3 | **worded**   16:8 | 62:1 68:9 74:10 |
| 87:4,11 88:15 | 152:3,10,15 153:3 | **words**   17:13,15 | 77:13 94:15 112:5 |
| 89:3,10,15 90:2,9 | 153:13,20 154:4 | 47:22 97:24 124:1 | 157:16,18 |
| 90:17,25 91:6,12 | 154:12,25 157:5 | 140:10 | **yellow**   147:18,20 |
| 91:16,20,25 92:6 | 160:2,12,20 | **work**   20:24 36:9 | **york**   6:9,9 8:8,8 |
| 92:12,20 93:2,8,14 | 165:17 166:3,22 | 42:13 43:4,5,5,5,7 | **youth**   116:15 |
| 93:22 94:3,9,14 | 167:6 168:17,22 | 43:8 | |
| 95:1,10,19 96:4,12 | 170:22 171:7,10 | **works**   27:4 39:23 | **z** |
| 96:22 97:20 98:12 | 175:16 | 42:14 52:8 | **z**   33:22 |
| 98:18 99:7,21 | **witness's**   128:3,5 | **world**   115:25 | **zoom**   3:1 13:10 |
| 100:5,16,21 101:2 | **witnesses**   175:7 | **worries**   42:11 | 16:22 22:3 |
| 101:7,12,16,22 | **woman**   91:9 | **worry**   75:25 | |
| 102:7,13,20 | 114:12,18 165:14 | **write**   170:13,15 | |
| 103:12,21 104:1,9 | **woman's**   165:25 | **writes**   29:8 | |
| 104:17 105:7 | **women**   79:5,5 | **written**   29:10 | |
| 106:8 107:1,11,24 | 81:9 82:15,16,19 | 95:21 132:14 | |
| 108:11 109:6,11 | 82:20 83:1,2,3,4 | **wv**   78:14 | |
| 112:21 113:9,14 | 88:16,19,21,22,25 | **wvago.gov**   4:21 | |
| 113:19,24 114:9 | 90:3 92:9,15 95:7 | **wyant**   5:16 | |
| 114:16,22 115:4 | 97:14 100:6,14 | **x** | |
| 116:3,9,18 117:16 | 101:4 116:7 117:8 | **x**   58:20 | |
| 118:19 119:3,11 | 119:7,16,21 120:8 | **xc**   145:1,2,15 | |
| 119:19 120:4,10 | 139:4,12,23 140:9 | 146:9 150:8 | |
| 120:15,21 121:2 | 140:20 141:12,23 | **y** | |
| 121:24 122:5,20 | 142:21 143:21 | | |
| 125:13,18,24 | 144:7 | **y**   15:4 | |
| 126:13,19 127:2,6 | **women's**   23:16 | **yeah**   68:11 79:1 | |
| 127:7,14,25 128:8 | 35:15 46:8,9 62:1 | 121:13 122:6 | |
| 129:5,14 132:10 | 82:25 88:22 108:9 | 129:4 155:13 | |
| 132:22,25 133:9 | 109:20 115:14,20 | **year**   26:16,21 28:9 | |
| 133:14,20 134:4 | 116:1 117:13 | 50:5,7,10,22 54:13 | |
| 134:19,24 135:8 | 118:24,24 119:3,4 | 54:20,25 55:18,22 | |

Veritext Legal Solutions
866 299-5127

Armistead Second Supp. App. 0075

Federal Rules of Civil Procedure

Rule 30


(e) Review By the Witness; Changes.

(1) Review; Statement of Changes. On request by the
deponent or a party before the deposition is
completed, the deponent must be allowed 30 days
after being notified by the officer that the
transcript or recording is available in which:

(A) to review the transcript or recording; and

(B) if there are changes in form or substance, to
sign a statement listing the changes and the
reasons for making them.

(2) Changes Indicated in the Officer's Certificate.
The officer must note in the certificate prescribed
by Rule 30(f)(1) whether a review was requested
and, if so, must attach any changes the deponent
makes during the 30-day period.



DISCLAIMER:  THE FOREGOING FEDERAL PROCEDURE RULES
ARE PROVIDED FOR INFORMATIONAL PURPOSES ONLY.
THE ABOVE RULES ARE CURRENT AS OF APRIL 1,
2019.  PLEASE REFER TO THE APPLICABLE FEDERAL RULES
OF CIVIL PROCEDURE FOR UP-TO-DATE INFORMATION.

VERITEXT LEGAL SOLUTIONS
COMPANY CERTIFICATE AND DISCLOSURE STATEMENT

Veritext Legal Solutions represents that the foregoing transcript is a true, correct and complete transcript of the colloquies, questions and answers as submitted by the court reporter. Veritext Legal Solutions further represents that the attached exhibits, if any, are true, correct and complete documents as submitted by the court reporter and/or attorneys in relation to this deposition and that the documents were processed in accordance with our litigation support and production standards.

Veritext Legal Solutions is committed to maintaining the confidentiality of client and witness information, in accordance with the regulations promulgated under the Health Insurance Portability and Accountability Act (HIPAA), as amended with respect to protected health information and the Gramm-Leach-Bliley Act, as amended, with respect to Personally Identifiable Information (PII). Physical transcripts and exhibits are managed under strict facility and personnel access controls. Electronic files of documents are stored in encrypted form and are transmitted in an encrypted fashion to authenticated parties who are permitted to access the material. Our data is hosted in a Tier 4 SSAE 16 certified facility.

Veritext Legal Solutions complies with all federal and State regulations with respect to the provision of court reporting services, and maintains its neutrality and independence regardless of relationship or the financial outcome of any litigation. Veritext requires adherence to the foregoing professional and ethical standards from all of its subcontractors in their independent contractor agreements.

Inquiries about Veritext Legal Solutions' confidentiality and security policies and practices should be directed to Veritext's Client Services Associates indicated on the cover of this document or at www.veritext.com.

CONFIDENTIAL

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT WEST VIRGINIA
CHARLESTON DIVISION

| | |
|---|---|
| B.P.J. by her next friend and mother, HEATHER JACKSON,<br><br>*Plaintiff*,<br><br>v.<br><br>WEST VIRGINIA STATE BOARD OF EDUCATION, HARRISON COUNTY BOARD OF EDUCATION, WEST VIRGINIA SECONDARY SCHOOL ACTIVITIES COMMISSION, W. CLAYTON BURCH in his official capacity as State Superintendent, DORA STUTLER in her official capacity as Harrison County Superintendent, and THE STATE OF WEST VIRGINIA,<br><br>*Defendants*,<br><br>and<br><br>LAINEY ARMISTEAD,<br><br>*Defendant-Intervenor*. | Civil Action No. 2:21-cv-00316<br><br>Hon. Joseph R. Goodwin<br><br>**DEFENDANT-INTERVENOR'S RESPONSES TO PLAINTIFF'S FIRST SET OF INTERROGATORIES** |

Pursuant to Rules 26 and 33 of the Federal Rules of Civil Procedure and the applicable Local Rules of the District of West Virginia and this Court, Defendant-Intervenor Lainey Armistead provides the following answers to Plaintiff's First Set of Interrogatories to Defendant-Intervenor.

///

1

Armistead Second Supp. App. 0078

CONFIDENTIAL

## GENERAL OBJECTIONS

1.      Ms. Armistead objects to the following Definitions presented in Plaintiff's First Set of Interrogatories to Defendant-Intervenor:

> **4. CONCERNING is defined as information, things, COMMUNICATIONS, or DOCUMENTS that reflect, relate to, identify, constitute, embody, describe, discuss, summarize, evidence, reference, comment on, or concern in any way the subject matter of the request.**

Objection: Ms. Armistead objects to the definition of the term "concern" to the extent it seeks to impose an obligation beyond that contemplated by the local rules and will interpret "concerning" in accordance with the meaning specified in Southern District of West Virginia Local Rule 26.2(c)(7).

> **5. DOCUMENT means any written, printed, typed, recorded, magnetic, punched, copied, graphic or tangible thing in, upon, or from which information may be embodied, translated, conveyed, or stored (including, but not limited to, correspondence, memoranda, notes, records, books, papers, telegrams, telexes, dictation or other audio tapes, video tapes, computer tapes, computer discs, computer printouts, microfilm, microfiche, worksheets, diaries, calendars, photographs, charts, drawings, sketches, and all other writings or drafts thereof) as defined in Federal Rule of Civil Procedure 34(a), Federal Rule of Civil Procedure 45, and Federal Rule of Evidence 1001, whether or not labeled "confidential." DOCUMENT includes material posted on YOUR social media accounts, including, but not limited to, https://twitter.com/LaineyArmistead. A draft or non-identical copy is a separate DOCUMENT within the meaning of this term.**

2

Armistead Second Supp. App. 0079

CONFIDENTIAL

Objection: Ms. Armistead objects to the definition of the term "document" and will interpret "document" in accordance with the meaning specified in Southern District of West Virginia Local Rule 26.2(c)(7).

**8. YOU, YOUR, or YOURS means Lainey Armistead as includes your agents, representatives, affiliates, attorneys, and consultants.**

Objection: Ms. Armistead objects to the definition of "you, your, or yours" to the extent it purports to require Ms. Armistead to answer on behalf of any other person or based on knowledge not in her possession. Ms. Armistead has no duty to and will not produce or identify documents or information that are not in her possession, custody, or control (as Plaintiff's counsel similarly noted in Plaintiff's Supplemental and Amended Responses and Objections to Defendant the State of West Virginia's First Set of Interrogatories and Requests for Production, pg. 2). The responses to these Interrogatories are made by Lainey Armistead only.

Moreover, Ms. Armistead objects to the extent this definition presumes to seek the identification of documents or communications protected by the attorney-client or the work product privilege—including those communications which include the mental impressions, conclusions, or opinions of counsel—which are not discoverable under the Federal Rules of Civil Procedure. All of Ms. Armistead's communications with her counsel of record and their agents have been in the course and scope of representing her in this litigation, and Ms. Armistead objects to any request to identify documents or communications between or among Ms. Armistead, her agents, her counsel of record, and/or their agents from June 30, 2021, to present. Ms. Armistead notes that that Plaintiff's counsel clarified in a letter to counsel for the State that Plaintiff "is not seeking the Attorney General's litigation files, but rather is seeking non-privileged responsive documents." *See, e.g.*, Letter from Kathleen Hartnett to Curtis Capehart et

Armistead Second Supp. App. 0080

CONFIDENTIAL

al., 1 (Dec. 30, 2021). Ms. Armistead assumes the same is true for her counsel of record.

2.      Ms. Armistead objects to the following Instruction presented in Plaintiff's First

Set of Interrogatories to Defendant-Intervenor:

> **3.  If YOU or YOUR counsel assert that any information responsive to any**
> **Interrogatory is privileged or otherwise protected from discovery, YOU must**
> **comply with the requirements of Federal Rule of Civil Procedure 26(b)(5) as to each**
> **DOCUMENT, COMMUNICATION, thing, or piece of information for which a**
> **claim of privilege or protection from discovery is made. For any DOCUMENT or**
> **information withheld on the grounds that it is privileged or otherwise claimed to be**
> **excludable from discovery, identify the information or DOCUMENT, describe its**
> **subject matter and date, identify all authors and all recipients (including copied and**
> **blind copied recipients), and specify the basis for the claimed privilege or other**
> **grounds of exclusion.**

Objection: Ms. Armistead objects to Instruction #3 to the extent it presumes to impose an

obligation beyond what is required by FRCP 26(b)(5). All of Ms. Armistead's communications

with her counsel of record have been in the course and scope of representing her in this litigation,

and Ms. Armistead objects to any request to identify documents or communications between or

among Ms. Armistead, her agents, her counsel of record, and/or their agents from June 30, 2021,

to present. Ms. Armistead further objects to producing a communication-by-communication

privilege log of these attorney-client privileged and work product-protected documents and

communications because producing such a log would be disproportionate to the needs of this

case, unnecessary for the purpose of assessing the privilege claims, and is not required by the

Federal Rules of Civil Procedure. Ms. Armistead notes that that Plaintiff's counsel clarified in a

Armistead Second Supp. App. 0081

CONFIDENTIAL

letter to counsel for the State that Plaintiff "is not seeking the Attorney General's litigation files, but rather is seeking non-privileged responsive documents" and requested a privilege log for "responsive-pre-litigation materials" deemed privileged by the State. See, e.g., Letter from Kathleen Hartnett to Curtis Capehart et al., 1 (Dec. 30, 2021). Ms. Armistead assumes the same is true for her counsel of record.

3.     Finally, Ms. Armistead objects to any other instruction or definition that imposes a burden beyond the scope of the Federal Rules of Civil Procedure, local rules, or other law.

## INTERROGATORY RESPONSES

**INTERROGATORY NO. 1:** Identify all PERSONS who provided information in preparation of YOUR Answer to the First Amended Complaint and/or YOUR Declaration accompanying YOUR Motion to Intervene (ECF Nos. 95, 95-1) and for each such PERSON, state the following:

(a) Their name, address, and telephone number;

(b) Their relationship to YOU; and

(c) A description of the information they provided.

**RESPONSE:** Objection: Ms. Armistead objects to this interrogatory to the extent it presumes to seek information protected by the attorney-client and/or attorney work-product privilege, which are not discoverable.

Without waiving this objection, Ms. Armistead identifies the following individuals:

Lucy Armistead
Relationship: Mother
2301 Crescent Hill Drive, Owensboro, KY 42303
270-993-4109
Accuracy of family background information

Armistead Second Supp. App. 0082

CONFIDENTIAL

Dale Armistead
Relationship: Father
2301 Crescent Hill Drive, Owensboro, KY 42303
270-929-2502
Accuracy of family background information


**INTERROGATORY NO.  2:** Identify all of YOUR COMMUNICATIONS regarding the

participation of students who are transgender playing on school sports teams, and the date,

contents, and participants of the COMMUNICATION.

**RESPONSE:** <u>Objection</u>: Ms. Armstead objects to identifying "all communications" because this

request is overly broad, unduly burdensome, and disproportionate to the needs of this case in that

it requests all communications about a topic Ms. Armstead has ever had with anyone from

January 1, 2019, to present. Plaintiffs further object to identifying "all communications" because

it is overly broad and unduly burdensome in that it conceivably seeks every conversation, phone

call, email, text message, social media message, letter, and every other form of written

communication Ms. Armstead has ever had with anyone from January 1, 2019, to present.

Taken together, this request requires Ms. Armstead to recall every communication she has had

over years as well as its date, time, and participants, determine whether those communications

discussed the identified topic, and identify those communications.

   Ms. Armstead further objects to identifying "all communications" to the extent this

interrogatory presumes to seek the identification of documents or communications protected by

the attorney-client or the work product privilege—including those communications which

include the mental impressions, conclusions, or opinions of counsel—which are not discoverable

under the Federal Rules of Civil Procedure. All of Ms. Armstead's communications with her

counsel of record and their agents have been in the course and scope of representing her in this

litigation, and Ms. Armstead objects to any request to identify documents or communications

Armistead Second Supp. App. 0083

CONFIDENTIAL

between or among Ms. Armistead, her agents, her counsel of record, and/or their agents from June 30, 2021, to present. Ms. Armistead further objects to producing a communication-by-communication privilege log of these attorney-client privileged and work product-protected documents and communications because producing such a log would be disproportionate to the needs of this case, unnecessary for the purpose of assessing the privilege claims, and is not required by the Federal Rules of Civil Procedure. Ms. Armistead notes that that Plaintiff's counsel clarified in a letter to counsel for the State that Plaintiff "is not seeking the Attorney General's litigation files, but rather is seeking non-privileged responsive documents" and requested a privilege log for "responsive-pre-litigation materials" deemed privileged by the State. See, e.g., Letter from Kathleen Hartnett to Curtis Capehart et al., 1 (Dec. 30, 2021). Ms. Armistead assumes the same is true for her counsel of record.

Without waiving these objections, Ms. Armistead identifies the following individuals with whom she has had verbal conversations:

- Lucy Armistead
  o Ms. Armistead occasionally talks with her mom about H.B. 3293, this litigation, and males competing in women's sports. These conversations have taken place after HB 3293 was passed by the West Virginia legislature in 2021, generally by phone and over the 2021 holidays, but Ms. Armistead does not recall specific dates.

- Dale Armistead
  o Ms. Armistead occasionally talks with her dad about H.B. 3293, this litigation, and males competing in women's sports. These conversations have taken place over the 2021 holidays, but Ms. Armistead does not recall specific dates.

- WVSU soccer teammates
  o Ms. Armistead occasionally talks with her various teammates about H.B. 3293, this litigation, and males competing in women's sports. These conversations took place after Ms. Armistead filed for intervention in this lawsuit, but she does not recall specific dates or conversations.

- Alison Raymond
  o Ms. Armistead occasionally talks with her friend, Alison Raymond, about H.B.

Armistead Second Supp. App. 0084

CONFIDENTIAL

3293, this litigation, and males competing in women's sports. These conversations have taken place throughout school year and to the best of her recollection after Ms. Armistead filed for intervention in this lawsuit, but Ms. Armistead does not recall specific dates.

- Savannah Sowders
  - Ms. Armistead occasionally talks with her friend, Savannah Sowders, about H.B. 3293, this litigation, and males competing in women's sports. These conversations have taken place throughout school year and to the best of her recollection after Ms. Armistead filed for intervention in this lawsuit, but Ms. Armistead does not recall specific dates.

- Hailey Lancaster
  - Ms. Armistead occasionally talks with her friend, Hailey Lancaster, about H.B. 3293, this litigation, and males competing in women's sports. These conversations have taken place throughout school year and to the best of her recollection after Ms. Armistead filed for intervention in this lawsuit, but Ms. Armistead does not recall specific dates.

- Eeclan Armistead
  - At the time she filed the lawsuit, and again over Christmas break, Ms. Armistead spoke with her brother about H.B. 3293, this litigation, and males competing in women's sports. Ms. Armistead does not recall specific dates.

- Kyler Armistead
  - At the time she filed the lawsuit, and again over Christmas break, Ms. Armistead spoke with her brother about H.B. 3293, this litigation, and males competing in women's sports. Ms. Armistead does not recall specific dates.

- Scott Armistead
  - Over the holidays, Ms. Armistead spoke with her extended family about H.B. 3293, this litigation, and males competing in women's sports. Ms. Armistead does not recall specific dates.

- Kevin Armistead
  - Over the holidays, Ms. Armistead spoke with her extended family about H.B. 3293, this litigation, and males competing in women's sports. Ms. Armistead does not recall specific dates.

- Jesse Armistead
  - Over the holidays, Ms. Armistead spoke with her extended family about H.B. 3293, this litigation, and males competing in women's sports. Ms. Armistead does not recall specific dates.

- Mary Lou Madigan

Armistead Second Supp. App. 0085

     o  Over the holidays, Ms. Armistead spoke with her extended family about H.B. 3293, this litigation, and males competing in women's sports. Ms. Armistead does not recall specific dates.

Ms. Armistead further identifies the communications produced in response to Plaintiff's Request for Production #6, available at L.Armistead 000002–7, 177–81, 183, 185–86, 189–92.

**INTERROGATORY NO. 3:** Identify all PERSONS who are transgender who play sports at West Virginia State University or against whom you expect to play sports while you attend West Virginia State University, and for each PERSON, state the following:

    (a) Their name, address, and telephone number.

**RESPONSE:** Ms. Armistead states that she is not currently aware of any males competing on a women's team at West Virginia State University, nor on a team that she expects to compete against while she attends West Virginia State University. But Ms. Armistead does not ask athletes at West Virginia State University, or any of her competitors, about their internal sense of self. Moreover, she would not expect to be aware of information about sports other than women's soccer. But with the preliminary injunction in place against West Virginia's Save Women's Sports Act, she could at any point in the season encounter a male athlete competing on an opposing women's soccer team. Ms. Armistead is at greater risk of encountering a male in women's collegiate soccer than if the law were in effect.

**INTERROGATORY NO. 4:** Identify all PERSONS who are transgender that YOU have played with or against in athletics since you started playing soccer at age seven to the present, and for each PERSON, state the following:

    (a) Their name, address, and telephone number.

**RESPONSE:** <u>Objection:</u> Ms. Armistead objects to this question on the grounds of relevance and

Armistead Second Supp. App. 0086

CONFIDENTIAL

overbreadth, as it encompasses individuals and sports teams outside of those covered by West Virginia's Save Women's Sports Act—including club and high school soccer teams in Kentucky. It is also overbroad and unduly burdensome insomuch as it asks her to recall everyone she has played with or against over the course of more than 10 years, dating back to when she was very young.

Without waiving the objection, and with the caveat that Ms. Armistead has not specifically inquired of every athlete she has ever competed against from age seven to present and she would have no reason to know about her competitor's internal sense of self, she is not aware of having personally competed against a male athlete in the female sports category. Ms. Armistead is, however, aware that other female athletes across the country have had this experience.

**INTERROGATORY NO. 5:** Identify all PERSONS who are transgender that YOU know or have known personally, and for each PERSON, state the following:

   (a) Their name, address, and telephone number;

   (b) Their relationship to YOU.

**RESPONSE:** <u>Objection:</u> Ms. Armistead objects to this question on the grounds of relevance. Who Ms. Armistead does or does not know has no bearing on any claim or defense in this case. She further objects on the grounds of overbreadth, as it is not limited in any way to atheltes or individuals who are subject to West Virginia's Save Women's Sports Act. It is also overbroad and unduly burdensome to the extent that it asks her to recall every individual she has ever known and determine their internal sense of self.

Without waiving the objection—and while again noting that Ms. Armistead does not ask her family, friends, coaches, teammates, and other acquaintances questions about their internal

Armistead Second Supp. App. 0087

CONFIDENTIAL

sense of self—Ms. Armistead states that she is not aware of any.

**INTERROGATORY NO. 6:**  Identify all PERSONS who are transgender that YOU are aware of, other than Plaintiff, who are participating in sports at any level in West Virginia, and for each PERSON, state the following:

>  (a) Their name, address, and telephone number;

>  (b) Their relationship to YOU.

**RESPONSE:** Objection: Ms. Armistead objects to this interrogatory on the grounds that it is not relevant and overbroad because it encompasses athletes competing in sports that are not covered by the terms of the Save Women's Sports Act.

Without waiving these objections—and while again noting that Ms. Armistead does not ask people questions about their internal sense of self—Ms. Armistead states that she is not aware of any.

**INTERROGATORY NO. 7:** Identify all of YOUR COMMUNICATIONS regarding H.B. 3293, or any other potential legislation in 2020 or 2021 regarding the participation of transgender athletes, and the date, content, and participants of the COMMUNICATION.

**RESPONSE:** Objection: Ms. Armistead objects to this interrogatory on the grounds that "potential legislation" is vague and overbroad because it could encompass passing remarks made by lawmakers in legislative debate and therefore could include countless pieces of "potential legislation." Ms. Armistead will entertain a narrower and clearer question. In the meanwhile, she will answer Interrogatory #7 narrowed to the following:

> "Identify all of YOUR COMMUNICATIONS regarding H.B. 3293 regarding the participation of transgender athletes, and the date, content, and participants of the COMMUNICATION."

Armistead Second Supp. App. 0088

CONFIDENTIAL

Ms. Armistead also objects to this interrogatory to the extent it presumes to seek the identification of documents or communications protected by the attorney-client or the work product privilege—including those communications which include the mental impressions, conclusions, or opinions of counsel—which are not discoverable under the Federal Rules of Civil Procedure. All of Ms. Armistead's communications with her counsel of record have been in the course and scope of representing her in this litigation, and Ms. Armistead objects to any request to identify documents or communications between or among Ms. Armistead, her agents, her counsel of record, and/or their agents from June 30, 2021, to present. Ms. Armistead further objects to producing a communication-by-communication privilege log of these attorney-client privileged and work product-protected documents and communications because producing such a log would be disproportionate to the needs of this case, unnecessary for the purpose of assessing the privilege claims, and is not required by the Federal Rules of Civil Procedure. Ms. Armistead notes that that Plaintiff's counsel clarified in a letter to counsel for the State that Plaintiff "is not seeking the Attorney General's litigation files, but rather is seeking non-privileged responsive documents" and requested a privilege log for "responsive-pre-litigation materials" deemed privileged by the State. See, e.g., Letter of Kathleen Hartnett to Curtis Capehart et al., dated December 30, 2021, pg. 1. Ms. Armistead assumes the same is true for her counsel of record. Ms. Armistead is not otherwise withholding any documents or communications on the grounds of privilege.

Without waiving these objections, Ms. Armistead states that she has had verbal conversations regarding H.B. 3293 with the individuals identified in response to Interrogatory #2. Ms. Armistead further identifies the written communications produced in response to Plaintiff's Request for Production #1, available at L.Armistead 000003–7, 177–78, 182–83, 191–

Armistead Second Supp. App. 0089

92.

**INTERROGATORY NO. 8:** Identify all PERSONS who are transgender in West Virginia that YOU are aware of who have taken away "a spot on the team, a starting position on the field, an athletic scholarship, the opportunity to benefit from her likeness, or recognition and awards," as stated in YOUR Declaration accompanying YOUR Motion to Intervene (ECF Nos. 95, 95-1), from a cisgender woman or girl.

**RESPONSE:** Objection: Ms. Armistead objects to the mischaracterization of her Declaration as speaking of taking opportunities away from "a cisgender woman or girl."

Without waiving the objection, Ms. Armistead is glad to say she is not personally aware of any males in West Virginia who have taken opportunities from women or girls. Protecting women's athletic opportunities—including spots on the team and athletic scholarships—is a purpose of West Virginia's Save Women's Sports Act. Moreover, Ms. Armistead again notes that she does not ask competitors about their internal sense of self, and nor would she have any reason to be aware of what is taking place outside of West Virginia.

**INTERROGATORY NO. 9:** Describe how if at all you were harmed by athletics policies in West Virginia prior to H.B. 3293.

**RESPONSE:** Objection: Ms. Armistead objects to the interrogatory on grounds on vagueness, ambiguity, and overbreadth. It does not define what it means by "athletic policies in West Virginia," nor does it explain which such policies the Plaintiff is referring to. Ms. Armistead will entertain a narrower and clearer question.

In a good faith effort to offer a response, Ms. Armistead notes that prior to HB 3293, it was unclear whether male athletes who identify as female could compete on public West

13

Virginia female sports teams. This exposed Ms. Armistead in the 2019–20 and 2020–21 soccer season to the possibility that she could be forced to face a male athlete on the field of play as has happened to other female athletes in many other places across the country.

**INTERROGATORY NO. 10:** Describe all injuries you have received from playing sports since you started playing soccer at age seven to the present, and, if caused by another PERSON, the PERSON causing the injuries; for each such PERSON, state the following:

    (a) Their name, address, and telephone number;

    (b) Their relationship to YOU and/or Plaintiff.

**RESPONSE:** <u>Objection</u>: Ms. Armistead objects to the interrogatory because "caused by" is vague. It is unclear whether this term means the final cause, proximate cause, but-for cause, or some other link in the causal change.

    Without waiving the objection, Ms. Armistead states that she received:

- a concussion in the fall of 2021;
- four or five broken toes (two in college; two or three in middle school and high school);
- bruised ribs in high school;
- fractured feet her freshman year of college.

Ms. Armistead received these injuries while playing middle school, high school, and/or collegiate soccer. Ms. Armistead does not recall whether these injuries were caused by direct physical contact with another person, but each of these injuries were received in the course of competition against other female athletes and would not have been received but for the soccer competition.

**INTERROGATORY NO. 11:** Identify all PERSONS with whom you communicated about participating in this lawsuit and for each such PERSON, state the following:

14

CONFIDENTIAL

(a) Their name, address, and telephone number;

(b) Their relationship to YOU; and

(c) A description of the COMMUNICATION.

**RESPONSE:** <u>Objection</u>: Ms. Armistead objects to this interrogatory to the extent it presumes to seek the identification of documents or communications protected by the attorney-client or the work product privilege—including those communications which include the mental impressions, conclusions, or opinions of counsel—which are not discoverable under the Federal Rules of Civil Procedure. All of Ms. Armistead's communications with her counsel of record have been in the course and scope of representing her in this litigation, and Ms. Armistead objects to any request to identify documents or communications between or among Ms. Armistead, her agents, her counsel of record, and/or their agents from June 30, 2021, to present. Ms. Armistead further objects to producing a communication-by-communication privilege log of these attorney-client privileged and work product-protected documents and communications because producing such a log would be disproportionate to the needs of this case, unnecessary for the purpose of assessing the privilege claims, and is not required by the Federal Rules of Civil Procedure. Ms. Armistead notes that that Plaintiff's counsel clarified in a letter to counsel for the State that Plaintiff "is not seeking the Attorney General's litigation files, but rather is seeking non-privileged responsive documents" and requested a privilege log for "responsive-pre-litigation materials" deemed privileged by the State. See, e.g., Letter from Kathleen Hartnett to Curtis Capehart et al., 1 (Dec. 30, 2021). Ms. Armistead assumes the same is true for her counsel of record. Ms. Armistead is not otherwise withholding any privileged documents.

Without waiving this objection, Ms. Armistead states that she communicated with counsel of record, as well as the persons listed in response to Interrogatory #2. Those

Armistead Second Supp. App. 0092

communications are described in the answer to Interrogatory #2.

**INTERROGATORY NO. 12:**  Identify YOUR new financial opportunities, such as benefitting from YOUR image and likeness as referenced in YOUR Declaration accompanying YOUR Motion to Intervene (ECF Nos. 95, 95-1), that you received due to playing soccer, and the dollar amount of those opportunities.

**RESPONSE:** Ms. Armistead states that she has benefitted financially from her WVSU soccer scholarship for the past three years. In the 2019-20 academic year, her scholarship amounted to $28,000. Because Ms. Armistead is no longer living in the dorms (and therefore has fewer expenses), her scholarship amount for the 2020–21 and 2021–22 academic years were slightly less, but she does not recall the exact dollar amount.

Moreover, Ms. Armistead notes that in her Declaration accompanying her Motion to Intervene at ¶ 27 she stated:

> [Soccer] opened new financial opportunities, such as benefitting from my image and likeness.

And later at ¶ 42 of her Declaration she stated:

> Allowing males into women's athletics allows a person with a male body to take opportunities away from female atheltes—whether that is a spot on the team, a starting position on the field, an athletic scholarship, the *opportunity to benefit from her likeness,* or recognition and awards—and is contrary to the entire purpose of women's sports. (emphasis added)

Ms. Armistead states that the financial opportunities she referenced in her declaration include those now available to all collegiate female atheltes after the NCAA changed its name, image, and likeness policy in July 2021 (just two months before she filed her declaration). Given the recent nature of this policy change, and her busy school, work, and practice schedule, Ms. Armistead has not yet sought to financially benefit from her name, image, and likeness, though

Armistead Second Supp. App. 0093

she would consider doing so in the future.

**INTERROGATORY NO. 13:** Identify all governmental interests that YOU believe are advanced by H.B. 3293.

**RESPONSE:** Objection: Ms. Armistead objects to this interrogatory to the extent it seeks a legal determination.

Without waiving the objection, Ms. Armistead states that she believes that that H.B. 3293, West Virginia's Save Women's Sport Act, serves to 1) ensure fairness and equal opportunity for female athletes, 2) promote safety for female athletes, and 3) comply with Title IX. Ms. Armistead also notes that discovery is ongoing, and she reserves the right to supplement this list as discovery progresses.

**INTERROGATORY NO. 14:** State all facts that support YOUR argument that the governmental interests identified in Interrogatory No. 13 are advanced by H.B. 3293.

**RESPONSE:** Objection: Ms. Armistead objects to this interrogatory as overbroad because it requests "all facts"—rather than material facts—and it is not possible or reasonable to identify every conceivable fact that supports her argument. Ms. Armistead further objects on the basis that many of the material facts supporting the government interests advanced by H.B. 3293 are well-known and available to Plaintiff.

Without waiving the objection, Ms. Armistead states: first, males and females are biologically different. Males as a class have inherent physical advantages over females as a class that give males advantages in athletic competition involving competitive skill or contact. Those advantages—which include strength, speed, and size—will be detailed in Defendants' forthcoming expert reports which will be provided in accordance with this Court's scheduling

Armistead Second Supp. App. 0094

CONFIDENTIAL

order. Similarly, those biological differences render females more vulnerable to greater physical harm when competing in a contact or team sport with a male. This, too, will be detailed in Defendants' forthcoming expert reports which will be provided in accordance with this Court's scheduling order. In the interim, Ms. Armistead points to the State of West Virginia's Response in opposition to Plaintiff's Motion for Preliminary Injunction (DN 49) and the attached exhibits—particularly those of Dr. Levine, Dr. Brown, Chelsea Mitchell, Dr. Cantor, and Dr. Carlson—the H.B. 3293 legislative findings and history, the legislative history of Title IX and its implementing regulations, and the discovery already produced by the State. Ms. Armistead further refers Plaintiffs to the facts identified in Intervenors' Memorandum in Opposition to Plaintiff's Motion for Preliminary Injunction and Exhibits, *Hecox v. Little*, Case No. 1:20-cv-00184 (D. Idaho June 9, 2020), ECF Nos. 46, 46-1, 46-2, and Intervenor-Appellants' Opening Brief at the 9th Circuit  and Intervenor-Appellants Reply Brief from *Hecox v. Little*, Case No. 20-35813 (9th Cir. Nov. 12, 2020, Jan. 8, 2021), ECF Nos. 33, 111, as well as Plaintiffs' Motion for Preliminary Injunction with Exhibits in *Soule v. Connecticut Association of Schools*, Case No. 3:20-cv-00201 (D. Conn. Feb. 12, 2020), ECF No. 12, and Opening Brief of Appellants and Reply Brief of Appellants in *Soule v. Connecticut Association of Schools*, Case No. 21-1365 (2d. Cir. July 12, 2021, Oct. 28, 2021), ECF Nos. 40, 197, all of which are available to Plaintiff's counsel via PACER.

Second, there are examples across the country—and around the world—of males competing in the female category in all levels of sport and taking away athletic opportunities from female athletes, including but not limited to:

- **Women's Basketball** – A 50-year-old, 6-foot-6-inch man, who played on a college men's team 30 years prior, played on a women's junior college basketball team. A male athlete made headlines as the first openly male athlete on an NCAA Division I women's basketball team.

18

CONFIDENTIAL

- **Women's Beach Handball** – A male athlete, who formerly played on an NCAA Division III women's soccer team, now plays for Team USA Women's Beach Handball.

- **Women's Bodybuilding** – A male who had competed in men's bodybuilding in the past started competing as a woman.

- **Women's Cross Country** – A male runner competes on an NCAA Division I women's cross country team and was named the conference's "Women's Athlete of the Week."

- **Women's Cycling** – Several male athletes have participated in women's cycling events (examples here and here).

- **Women's Dodgeball** – A male athlete who once competed on the Canadian men's dodgeball team later competed on Canada's women's team.

- **Women's Football** – Several male athletes who had previously competed on men's football teams now compete in women's football (examples here and here).

- **Women's Golf** – A male athlete was approved to compete in the Ladies European Tour in 2004. And another male athlete was recently permitted to compete in the 2020 Women's World Long Drive Competition.

- **Women's Hockey** – A male hockey player participates in the Canadian Women's Hockey League.

- **Women's MMA (Mixed Martial Arts)** – A male MMA fighter who competes as a woman broke a female opponent's eye socket and gave her a concussion.

- **Women's Powerlifting** – A male powerlifter competed as a female and broke several records before being disqualified.

- **Women's Roller Derby** – A male athlete is part of a women's roller derby team that has won the world championships three times. And another male athlete is poised to be the next women's roller derby star.

- **Women's Rowing** – Two male athletes were part of a rowing team that competed in a women's boat race in Canada.

- **Women's Rugby** – Several male athletes compete on women's rugby teams. One is celebrated for injuring the female athletes they play against.

- **Women's Running** – Three male runners were permitted to qualify and race as women at the 2018 Boston Marathon.

- **Women's Soccer** – A male athlete earned a spot on an NCAA Division III women's soccer team. Another male athlete began playing on a college women's soccer team after previously playing on the men's team.

- **Women's Softball** – A male high school student earned one of 15 spots on the girls' varsity softball team.

- **Women's Swimming** – A male swimmer who competed for three years on the men's team shatters women's records. Another male swimmer competed on the men's team for three years before competing on the women's team.

Armistead Second Supp. App. 0096

- **Women's Track & Field** – Two male athletes swept girls' high school competitions in Connecticut. A male athlete in Alaska competed and placed at the girl's state championships. A male runner prevented a teen girl from winning her first-ever high school track meet. A male college runner swept first place at the 2020 NlainCAA Division I Big Sky Indoor Track & Field Championships in the women's mile. And another male college athlete won the 400-meter hurdles at the NCAA Division II women's national championships.
- **Women's Volleyball** – A male athlete competes on a NCAA Division III women's volleyball team. Male athletes have also competed on women's professional teams in the U.S. and Brazil.
- **Women's Weightlifting** – This Australian weightlifter set master's world records in the women's category despite being a male.
- **Women's Wrestling** – A male competes in women's professional wrestling.

Third, males who identify as males have also tried to compete on female sports teams.

*See, e.g., Clark, By and Through Clark v. Arizona Interscholastic Ass'n,* 695 F.2d 1126, 1128 (9th Cir. 1982). Finally, Ms. Armistead notes that discovery is ongoing, and she reserves the right to supplement this response as discovery progresses.

**INTERROGATORY NO. 15:** Identify all ways that YOU believe the governmental interests identified in Interrogatory No. 13 are advanced by H.B. 3293 as applied to B.P.J.

**RESPONSE:** Objection: Ms. Armistead objects to this interrogatory as it calls for a legal determination. Moreover, Ms. Armistead objects because the law need not be a perfect fit in advancing the government's interest: all that is required is that the law substantially advance the government's interest so Ms. Armistead objects to the extent the question assumes otherwise and misstates the law.

Without waiving the objection, Ms. Armistead states that for the same reasons H.B. 3293 advances the State's interests broadly when applied to other biological males regardless of their individual athletic ability or medical treatments received, it also advances the same interest when applied to Plaintiff. Specifically, by ensuring that females do not compete against any males,

Armistead Second Supp. App. 0097

CONFIDENTIAL

including B.P.J., 1) the law ensures fairness and equal opportunity for female athletes, 2) safety for female athletes, and 3) compliance with Title IX. Ms. Armistead further refers Plaintiff to the facts identified in Armistead's Memorandum in Support of Moton to Intervene [DN 95] and its attachments in this case; Intervenors' Memorandum in Opposition to Plaintiff's Motion for Preliminary Injunction and Exhibits, *Hecox v. Little*, Case No. 1:20-cv-00184 (D. Idaho June 9, 2020), ECF Nos. 46, 46-1, 46-2, and Intervenor-Appellants' Opening Brief at the 9th Circuit  and Intervenor-Appellants Reply Brief from *Hecox v. Little*, Case No. 20-35813 (9th Cir. Nov. 12, 2020, Jan. 8, 2021), ECF Nos. 33, 111, as well as Plaintiffs' Motion for Preliminary Injunction with Exhibits in *Soule v. Connecticut Association of Schools*, Case No. 3:20-cv-00201 (D. Conn. Feb. 12, 2020), ECF No. 12, and Opening Brief of Appellants and Reply Brief of Appellants in *Soule v. Connecticut Association of Schools*, Case No. 21-1365 (2d. Cir. July 12, 2021, Oct. 28, 2021), ECF Nos. 40, 197,, all of which are available to Plaintiff's counsel via PACER.

Finally, please see the answers and objections to Interrogatory #14 and #15, including the facts and materials referenced therein. Ms. Armistead also notes that discovery is ongoing and she reserves the right to supplement as discovery progresses.

**INTERROGATORY NO. 16:** State all facts that support YOUR argument that the governmental interests identified in Interrogatory No. 13 are advanced by H.B. 3293 as applied to B.P.J.

**RESPONSE:** <u>Objection</u>: Ms. Armistead objects to this interrogatory as overbroad because it requests "all facts"—rather than material facts—and it is not possible or reasonable to identify every conceivable fact that supports her argument. Ms. Armistead further objects on the basis that many of the material facts supporting the government interests advanced by H.B. 3293 are well-known and available to Plaintiff. Ms. Armistead further notes that the law need not be a

Armistead Second Supp. App. 0098

CONFIDENTIAL

perfect fit in advancing the government's interest: all that is required is that the law substantially advance the government's interest so Ms. Armistead objects to the extent the question assumes otherwise and misstates the law.

Without waiting the objection, Ms. Armistead states that the same facts that support H.B. 3293's advancement of the State's interests with respect to biological males generally also apply to B.P.J. specifically, and Ms. Armistead refers Plaintiff to the objections and answers to Interrogatories #13 and #14.

Finally, Ms. Armistead also notes that discovery is ongoing and she reserves the right to supplement as discovery progresses.

Armistead Second Supp. App. 0099

CONFIDENTIAL

## **VERIFICATION**

I, Lainey Armistead, pursuant to 28 U.S.C. § 1746 declare under penalty of perjury under the laws of the United States of American that the foregoing is true and correct to the best of my knowledge.

*Lainey Armistead*

Executed on February 2, 2022

As to objections:

*Christiana Holcomb*

Christiana Holcomb
*Counsel for Defendant-Intervenor*

23

| From: | Christiana Kiefer |
|---|---|
| To: | Kang, Katelyn L |
| Cc: | Jonathan Scruggs; Hal Frampton; Rachel Csutoros; Timothy Ducar; Brandon Steele; Joshua Brown; Loree Stark; Barr, Andrew D; Avatara Smith-Carrington; Carl Charles; Tara Borelli; Reinhardt, Elizabeth F; Joshua Block; Veroff, Julie M.; Hartnett, Kathleen; Sruti Swaminathan; "kmorgan@baileywyant.com"; "khammond@baileywyant.com"; "rgreen@Shumanlaw.com"; "kbandy@shumanlaw.com"; Pelet del Toro, Valeria M.; "susan.deniker@steptoe-johnson.com"; "Jeffrey.Cropp@steptoe-johnson.com"; "Curtis.R.A.Capehart@wvago.gov"; "david.c.tryon@wvago.gov"; "Doug.P.Buffington@wvago.gov"; "mtaylor@baileywyant.com"; NWard |
| Subject: | RE: BPJ v WV | Plaintiff"s Responses & Objections to Intervenor"s First & Second Discovery Requests [IWOV-IWOV_FileDocs.FID1333803] |
| Attachments: | image001.png |

Hi Katelyn,

Thank you for your email and for the productive conversation on February 17.

At the outset, Intervenor-Defendant reiterates that her discovery requests are proper because they seek information "relevant to a[] party's claim or defense and [they are] proportional to the needs of the case." Fed R. Civ. P. 26(b)(1). Plaintiff's transgender status is squarely at issue in this case, and Plaintiff has made a variety of allegations concerning that status, including that it is deeply rooted, durable, and persistent over a long period of time. Defendant-Intervenor is entitled to take discovery on those points and, particularly as narrowed below, is asking for very limited information that is imminently proportionate to the needs of the case.

Ms. Armistead also notes that her discovery requests specifically did not seek information already disclosed to another party (see, *e.g.*, Intervenor-Defendant's First Set of Interrogatories to Plaintiff, No. 3).

**Intervenor's Interrogatory #2**
Thank you for clarifying that—to the best of Plaintiff's recollection—Dr. Montano was the first health care provider who was notified that B.P.J. identified as a girl.

**Intervenor's Interrogatory #4**
In light of Plaintiff's request for a "more specific definition of 'gender identity,'" Intervenor is willing to narrow the topics covered by this request to communications concerning B.P.J.'s participation in girls' athletics, Plaintiff's request that school or athletic entities recognize B.P.J. as a girl, and any request for pharmaceutical or surgical intervention for B.P.J. to "transition."

As noted, Intervenor is willing to exclude "family members and/or friends" from this Interrogatory. Please supplement your answer with the identification of communications with medical personnel, school administrators, sports coaches, extracurricular activity administrators or facilitators.

Finally, because Plaintiff is unable to identify the first time a health care provider was notified that B.P.J. identified as a girl, please identify relevant communications from January 2019 to present.

**Intervenor's Interrogatory #5**
Thank you for agreeing to supplement your response with communications that B.P.J. and/or Heather Jackson may have had with other individuals regarding B.P.J.'s desire to play sports.

**Intervenor's Interrogatory # 9**

Thank you for agreeing to supplement your response with communications that B.P.J. and/or Heather Jackson may have had with other individuals regarding H.B. 3293.

**Intervenor's Request for Production #1**

Thank you for confirming that Plaintiff is not withholding medical records on relevance or privilege grounds.

**Intervenor's Request for Production #2**

Thank you for agreeing to supplement your responses to this Request by searching for and producing Heather Jackson's and B.P.J.'s social media content related to H.B. 3293, to proposed legislation regarding transgender athletes, to the participation of transgender athletes in school sports, and to B.P.J.'s participation in school athletics.

Please also include searches for the ACLU and material that discusses B.P.J.'s gender identity, transgender status, or social transition.  We will narrow the timeframe of our request from July 2017 to present.
-
**Intervenor's Request for Production #3**

Thank you for confirming that Plaintiff is willing to supplement responses to this Request by searching for and producing written or electronic communications related to H.B. 3293, to proposed legislation regarding transgender athletes, to the participation of transgender athletes in school sports, and to B.P.J.'s participation in school athletics.

Please also search for social media content that material that discusses B.P.J.'s gender identity, transgender status, or social transition.

**Intervenor's Request for Production #4**

Thank you for confirming that Plaintiff is not aware of additional responsive information.
-
**\*\*\***

To briefly memorialize our conversation about Ms. Armistead's production:

**Plaintiff's Interrogatory #7**

Intervenor is not aware of additional communications concerning potential legislation from 2020 or 2021 regarding transgender athlete participation in sports responsive to this request, but reserves the right to supplement her answer as discovery progresses.
-
**Plaintiff's Interrogatory #12**

In addition to her scholarship and having not financially benefitted to date  from her name, image, and likeness, Ms. Armistead is not aware of any other information responsive to this request.
-
**Plaintiff's Interrogatory #14 & #16**

As discussed, Intervenor's responses were supplemented with the defense expert reports, which

were produced on February 23, 2022.

-
**Plaintiff's Request for Production #1**
Intervenor noted that, to the best of her knowledge, the text messages she produced include both the time and date stamp and represent the entirety of the responsive conversation.

-
**Plaintiff's Request for Production #6**
As agreed, Intervenor produced the Harold Dispatch op-ed on February 23, 2022.

**\*\*\***

Regarding Ms. Armistead's supplemental disclosures served on February 11, 2022, she reiterates that those disclosures were supplemented to align with the Intervenor's responses to Plaintiff's first set of interrogatories served on February 2, 2022.

Plaintiff's Interrogatory 14 asked for "all facts that support YOUR argument that the governmental interests identified in Interrogatory No. 13 are advanced by H.B. 3293." Intervenor answered this question with well-known and publicly available information, and then went beyond her obligation under the federal rules to supplement her initial disclosures. Intervenor attempted to be reasonably comprehensive in identifying individuals who may possess relevant information, including female athletes across the country who have faced competition from male athletes in the female category. Many of these incidents are already well-known to Plaintiff's counsel, and have even been cited in Plaintiff's briefing. *See*, e.g., Plaintiff's Opposition to Motion to Intervene (citing *Hecox v. Little*, 479 F. Supp. 3d 930 (D. Idaho 2020) and *Soule by Stanescu v. Conn. Ass'n of Sch., Inc.*, No. 3:20-cv-00201, 2021 WL 1617206 (D. Conn. Apr. 25, 2021)).

Ms. Armistead may rely on the declaration or testimony of some of these individuals at summary judgment or trial, but has not yet made this decision—nor is Plaintiff entitled to the identification of such persons.

Ms. Armistead also disagrees that her supplemental disclosures were served "after the deadline for written discovery." The February 8, 2022 written discovery deadline was for the issuance of new discovery requests. Ms. Armistead here has supplemented her initial disclosures in a timely manner as required by Fed R. Civ. P. 26(e) based on further review of the universe of available information. Plaintiff is welcome to depose any potential witnesses identified by Ms. Armistead within the discovery deadline and the bounds of Rule 26 and 30.

Kind regards,
Christiana

---

**From:** Kang, Katelyn L <kkang@cooley.com>
**Sent:** Monday, February 21, 2022 9:55 AM
**To:** Christiana Holcomb <cholcomb@adflegal.org>
**Cc:** Jonathan Scruggs <jscruggs@adflegal.org>; Hal Frampton <hframpton@adflegal.org>; Rachel Csutoros <rcsutoros@adflegal.org>; Timothy Ducar <tducar@azlawyers.com>; Brandon Steele <bsteelelawoffice@gmail.com>; Joshua Brown <joshua_brown05@hotmail.com>; Loree Stark

<LStark@acluwv.org>; Barr, Andrew D <abarr@cooley.com>; Avatara Smith-Carrington <asmithcarrington@lambdalegal.org>; Carl Charles <CCharles@lambdalegal.org>; Tara Borelli <Tborelli@lambdalegal.org>; Reinhardt, Elizabeth F <ereinhardt@cooley.com>; Joshua Block <jblock@aclu.org>; Veroff, Julie M. <jveroff@cooley.com>; Hartnett, Kathleen <khartnett@cooley.com>; Sruti Swaminathan <SSwaminathan@lambdalegal.org>; 'kmorgan@baileywyant.com' <kmorgan@baileywyant.com>; 'khammond@baileywyant.com' <khammond@baileywyant.com>; 'rgreen@Shumanlaw.com' <rgreen@Shumanlaw.com>; 'kbandy@shumanlaw.com' <kbandy@shumanlaw.com>; Pelet del Toro, Valeria M. <vpeletdeltoro@cooley.com>; 'susan.deniker@steptoe-johnson.com' <susan.deniker@steptoe-johnson.com>; 'Jeffrey.Cropp@steptoe-johnson.com' <Jeffrey.Cropp@steptoe-johnson.com>; 'Curtis.R.A.Capehart@wvago.gov' <Curtis.R.A.Capehart@wvago.gov>; 'david.c.tryon@wvago.gov' <david.c.tryon@wvago.gov>; 'Doug.P.Buffington@wvago.gov' <Doug.P.Buffington@wvago.gov>; 'mtaylor@baileywyant.com' <mtaylor@baileywyant.com>; NWard <nward@acluwv.org>
**Subject:** RE: BPJ v WV | Plaintiff's Responses & Objections to Intervenor's First & Second Discovery Requests [IWOV-IWOV_FileDocs.FID1333803]

**\*EXTERNAL\***

Hi Christiana,

Thank you for the call on Thursday. We write to respond to your February 8, 2022 email concerning Plaintiff's responses to certain discovery requests, and to memorialize our conversation on February 17.

At the outset, Plaintiff reiterates her view that many of Defendant-Intervenor's requests seek information that does not appear to be relevant to a claim or defense in this case. The currently operative standard allows for discovery of information only if it "is relevant to any party's claim or defense and proportional to the needs of the case," Fed R. Civ. P. 26(b)(1), which replaced the prior "reasonably calculated to lead to the discovery of admissible evidence" language, *see id.* 2015 Advisory Committee Notes. Relatedly, and additionally, many of Defendant-Intervenor's requests appear to seek to challenge whether B.P.J. is a transgender girl and/or question her medical treatment. But that B.P.J. has been diagnosed with gender dysphoria and is transgender is a matter of record, and the propriety of her medical treatment or her gender identity as a general matter (unrelated to her participation in sports) is not the subject of this case.

In addition to seeking irrelevant material, many of Defendant-Intervenor's requests are notably broad and unwarranted, including because B.P.J. has already turned over medical records from all of her providers over a 7-year period, including information that reflects her gender dysphoria diagnosis. Furthermore, B.P.J., her mother, and her father have all provided detailed deposition testimony regarding B.P.J.'s transgender status and participation in athletics, and Defendants are currently in the process of taking the depositions of B.P.J.'s medical providers. Those sources of discovery largely provide the additional details sought by Defendant-Intervenor.

Plaintiff addresses each of the points in Defendant-Intervenor's February 8 email below.

**<u>Interrogatory No. 2</u>**

Armistead Second Supp. App. 0104

As noted in B.P.J.'s Responses and Objections to Defendant-Intervenor's First Set of Discovery Requests ("Responses and Objections"), B.P.J. objects to the phrases "your agent," "expressed gender dysphoria," and "any behavior, statements, actions, or other expression" as vague, ambiguous, and overbroad.  It is unclear what Defendant-Intervenor seeks when she asks for "expressions" of "gender dysphoria"—"gender dysphoria" involves a medical diagnosis, and B.P.J. is neither a medical provider nor a medical expert.  As Plaintiff noted in her Responses and Objections to Interrogatory No. 2, Plaintiff was formally diagnosed with gender dysphoria by Dr. Montano on July 15, 2019.

As stated during our call, to the extent that Defendant-Intervenor is seeking the first time that B.P.J. or her mother informed one of B.P.J.'s health care providers that B.P.J. is a girl, B.P.J. believes that her mother informed Dr. Montano around the time when B.P.J. first began seeking care from him, but cannot recall the exact date.  It is also possible that B.P.J. or her mother earlier apprised a health care provider of some characteristic arguably associated with B.P.J. being a girl, but B.P.J. does not currently recall any such occurrence.

**Interrogatory No. 4**

In response to Interrogatory No. 4, B.P.J. directs Defendant-Intervenor to B.P.J.'s Responses and Objections, and in particular to B.P.J.'s objections on relevance grounds.  This is a case about B.P.J.'s participation in school athletics, and not about B.P.J.'s gender identity writ large.  To the extent this request seeks information other than about sports participation, it is unclear what these requests seek other than to challenge whether B.P.J. is a transgender girl.

Subject to, and without waiving these objections, B.P.J. supplements her response in the first instance by directing Defendant-Intervenor to B.P.J.'s responses to the State of West Virginia's First Set of Discovery Requests, and to the documents produced in response to Requests No. 1 and Requests No. 4.

B.P.J. is appreciative of Defendant-Intervenor's agreement on our call to exclude "family members, and/or friends" from this Interrogatory.  In addition to the above, and as noted on the call, B.P.J. is willing to consider additional supplementation if Defendant-Intervenor is able to provide a more specific definition of "gender identity."

**Interrogatory No. 5**

Subject to, and without waiving the objections in her Responses and Objections, B.P.J. supplements her response in the first instance by directing Defendant-Intervenor to B.P.J.'s responses to the State of West Virginia's First Set of Discovery Requests, and to the documents produced in response to Requests No. 1 and Requests No. 4.  B.P.J. will also supplement her response to Interrogatory No. 5 with communications that B.P.J. and/or Heather Jackson may have had with other individuals regarding B.P.J.'s desire to play sports.

**Interrogatory No. 9**

Subject to, and without waiving the objections in her Responses and Objections, B.P.J. supplements her response in the first instance by directing Defendant-Intervenor to B.P.J.'s responses to the State of West Virginia's First Set of Discovery Requests, and to the documents produced in response to Requests No. 1 and Requests No. 4.  B.P.J. will also supplement her response to Interrogatory No. 9 with communications that B.P.J. and/or Heather Jackson may have had with other individuals regarding H.B. 3293.

**Request for Production No. 1**

As Plaintiff has stated in previous correspondence and during our call, Plaintiff is not withholding any medical records on privilege or relevance grounds.

**Request for Production No. 2**

In response to Request for Production No. 2, B.P.J. directs Defendant-Intervenor to B.P.J.'s Responses and Objections, and in particular to B.P.J.'s objections on relevance and overbreadth grounds.  This is a case about B.P.J.'s participation in school athletics.  It is unclear how B.P.J. and Heather Jackson's social media posts, and especially those going back as far as 7 years (*i.e.*, when B.P.J. was less than four years old), could possibly be relevant to a claim or defense in this case.  In addition to being overly broad, to the extent this request seeks information other than about transgender participation in sports and H.B. 3293 (or similar legislative proposals), it is unclear what these requests seek other than to challenge whether B.P.J. is a transgender girl.

Subject to, and without waiving these objections, B.P.J. is willing to supplement her response to Request for Production No. 2 by searching for and producing social media content related to H.B. 3293, to proposed legislation regarding transgender athletes, to the participation of transgender athletes in school sports, and to B.P.J.'s participation in school athletics.

**Request for Production No. 3**

In response to Request for Production No. 3, B.P.J. directs Defendant-Intervenor to B.P.J.'s Responses and Objections, and in particular to B.P.J.'s objections on relevance and overbreadth grounds.  This is a case about B.P.J.'s participation in school athletics.  Again, it is unclear how B.P.J. and Heather Jackson's email and text messages over a 7-year period about a range of topics unrelated to transgender participation in sports or H.B. 3293 (or similar proposed legislation) are relevant to a claim or defense in this case.  Your request for supplementation is particularly and unnecessarily burdensome given that Defendant-Intervenor has deposed B.P.J., her mother, and her father on all of these topics.

Subject to, and without waiving these objections, B.P.J. is willing to supplement her response to Request for Production No. 3 by searching for and producing emails or text messages related to H.B. 3293, to proposed legislation regarding transgender athletes, to the participation of transgender athletes in school sports, and to B.P.J.'s participation in school athletics.  We have confirmed with our client that Heather Jackson uses only one email address, and that B.P.J. also has access to one

email address.

**Request for Production No. 4**

Plaintiff does not believe she has additional relevant information to provide at this time.  Plaintiff reserves the right to supplement her response to this Request until the close of discovery.

***

Finally, Plaintiff appreciates the clarification that you provided during our February 17 meet and confer regarding Defendant-Intervenor's supplemental initial disclosures.  You explained that you supplemented those disclosures to add individuals otherwise identified in Defendant-Intervenor's interrogatory responses.  When reviewing Defendant-Intervenor's interrogatory responses and initial disclosures, however, Plaintiff noted that there are a number of individuals newly identified in Defendant-Intervenor's initial disclosures that were not identified in Defendant-Intervenor's interrogatory responses.  Can you please explain this discrepancy?

On the call, we also noted that we will need to understand whether you intend to rely on declaration or other testimony from any of the newly added individuals in order to depose them or otherwise week relief based on their addition after the deadline for written discovery.  You were going to take that request back.  Can you let us know if Defendants intend to rely on testimony from any of the newly added individuals at summary judgment or trial?

Best,
Katelyn

---

**From:** Christiana Holcomb <cholcomb@adflegal.org>
**Sent:** Friday, February 11, 2022 6:00 PM
**To:** Kang, Katelyn L <kkang@cooley.com>
**Cc:** Jonathan Scruggs <jscruggs@adflegal.org>; Hal Frampton <hframpton@adflegal.org>; Rachel Csutoros <rcsutoros@adflegal.org>; Timothy Ducar <tducar@azlawyers.com>; Brandon Steele <bsteelelawoffice@gmail.com>; Joshua Brown <joshua_brown05@hotmail.com>; Loree Stark <LStark@acluwv.org>; Barr, Andrew D <abarr@cooley.com>; Avatara Smith-Carrington <asmithcarrington@lambdalegal.org>; Carl Charles <CCharles@lambdalegal.org>; Tara Borelli <Tborelli@lambdalegal.org>; Reinhardt, Elizabeth F <ereinhardt@cooley.com>; Joshua Block <jblock@aclu.org>; Taylor Brown <TBrown@aclu.org>; Veroff, Julie M. <jveroff@cooley.com>; Hartnett, Kathleen <khartnett@cooley.com>; Sruti Swaminathan <SSwaminathan@lambdalegal.org>; 'kmorgan@baileywyant.com' <kmorgan@baileywyant.com>; 'khammond@baileywyant.com' <khammond@baileywyant.com>; 'rgreen@Shumanlaw.com' <rgreen@Shumanlaw.com>; 'kbandy@shumanlaw.com' <kbandy@shumanlaw.com>; Pelet del Toro, Valeria M. <vpeletdeltoro@cooley.com>; 'susan.deniker@steptoe-johnson.com' <susan.deniker@steptoe-johnson.com>; 'Jeffrey.Cropp@steptoe-johnson.com' <Jeffrey.Cropp@steptoe-johnson.com>; 'Curtis.R.A.Capehart@wvago.gov' <Curtis.R.A.Capehart@wvago.gov>; 'david.c.tryon@wvago.gov' <david.c.tryon@wvago.gov>;

Armistead Second Supp. App. 0107

'Doug.P.Buffington@wvago.gov' <Doug.P.Buffington@wvago.gov>; 'mtaylor@baileywyant.com' <mtaylor@baileywyant.com>; NWard <nward@acluwv.org>; 82303_B_P_J_ v_ West Virginia State Board of Education Correspondence <{F1333803}.IWOV_FileDocs@efs.adflegal.org>
**Subject:** RE: BPJ v WV | Plaintiff's Responses & Objections to Intervenor's First & Second Discovery Requests [IWOV-IWOV_FileDocs.FID1333803]

**[External]**

Hi Katelyn,

Thanks for your email. Let's plan for 2:30pm ET on Thursday, February 17. I'll circulate a meeting invitation.

Have a great weekend,
Christiana

**From:** Kang, Katelyn L <kkang@cooley.com>
**Sent:** Thursday, February 10, 2022 4:54 PM
**To:** Christiana Holcomb <cholcomb@adflegal.org>
**Cc:** Jonathan Scruggs <jscruggs@adflegal.org>; Hal Frampton <hframpton@adflegal.org>; Rachel Csutoros <rcsutoros@adflegal.org>; Timothy Ducar <tducar@azlawyers.com>; Brandon Steele <bsteelelawoffice@gmail.com>; Joshua Brown <joshua_brown05@hotmail.com>; Loree Stark <LStark@acluwv.org>; Barr, Andrew D <abarr@cooley.com>; Avatara Smith-Carrington <asmithcarrington@lambdalegal.org>; Carl Charles <CCharles@lambdalegal.org>; Tara Borelli <Tborelli@lambdalegal.org>; Reinhardt, Elizabeth F <ereinhardt@cooley.com>; Joshua Block <jblock@aclu.org>; Taylor Brown <TBrown@aclu.org>; Veroff, Julie M. <jveroff@cooley.com>; Hartnett, Kathleen <khartnett@cooley.com>; Sruti Swaminathan <SSwaminathan@lambdalegal.org>; 'kmorgan@baileywyant.com' <kmorgan@baileywyant.com>; 'khammond@baileywyant.com' <khammond@baileywyant.com>; 'rgreen@Shumanlaw.com' <rgreen@Shumanlaw.com>; 'kbandy@shumanlaw.com' <kbandy@shumanlaw.com>; Pelet del Toro, Valeria M. <vpeletdeltoro@cooley.com>; 'susan.deniker@steptoe-johnson.com' <susan.deniker@steptoe-johnson.com>; 'Jeffrey.Cropp@steptoe-johnson.com' <Jeffrey.Cropp@steptoe-johnson.com>; 'Curtis.R.A.Capehart@wvago.gov' <Curtis.R.A.Capehart@wvago.gov>; 'david.c.tryon@wvago.gov' <david.c.tryon@wvago.gov>; 'Doug.P.Buffington@wvago.gov' <Doug.P.Buffington@wvago.gov>; 'mtaylor@baileywyant.com' <mtaylor@baileywyant.com>; NWard <nward@acluwv.org>
**Subject:** RE: BPJ v WV | Plaintiff's Responses & Objections to Intervenor's First & Second Discovery Requests [IWOV-IWOV_FileDocs.FID1333803]

**\*EXTERNAL\***

Christiana,

Plaintiff is reviewing your email and will respond substantively, reserving all rights.  Regarding your request for a meet and confer, Plaintiff is available from 2-5 eastern on Thursday, February 17. Plaintiff would like to discuss deficiencies in Ms. Armistead's responses, too, including the absence of

any social media information that was requested.  We will send additional information regarding those deficiencies next week.

Best,
Katelyn

---

**From:** Christiana Holcomb <cholcomb@adflegal.org>
**Sent:** Tuesday, February 8, 2022 5:16 PM
**To:** Kang, Katelyn L <kkang@cooley.com>
**Cc:** Jonathan Scruggs <jscruggs@adflegal.org>; Hal Frampton <hframpton@adflegal.org>; Rachel Csutoros <rcsutoros@adflegal.org>; Timothy Ducar <tducar@azlawyers.com>; Brandon Steele <bsteelelawoffice@gmail.com>; Joshua Brown <joshua_brown05@hotmail.com>; Loree Stark <LStark@acluwv.org>; Barr, Andrew D <abarr@cooley.com>; Avatara Smith-Carrington <asmithcarrington@lambdalegal.org>; Carl Charles <CCharles@lambdalegal.org>; Tara Borelli <Tborelli@lambdalegal.org>; Reinhardt, Elizabeth F <ereinhardt@cooley.com>; Joshua Block <jblock@aclu.org>; Taylor Brown <TBrown@aclu.org>; Veroff, Julie M. <jveroff@cooley.com>; Hartnett, Kathleen <khartnett@cooley.com>; Sruti Swaminathan <SSwaminathan@lambdalegal.org>; 'kmorgan@baileywyant.com' <kmorgan@baileywyant.com>; 'khammond@baileywyant.com' <khammond@baileywyant.com>; 'rgreen@Shumanlaw.com' <rgreen@Shumanlaw.com>; 'kbandy@shumanlaw.com' <kbandy@shumanlaw.com>; 'susan.deniker@steptoe-johnson.com' <susan.deniker@steptoe-johnson.com>; 'Jeffrey.Cropp@steptoe-johnson.com' <Jeffrey.Cropp@steptoe-johnson.com>; 'Curtis.R.A.Capehart@wvago.gov' <Curtis.R.A.Capehart@wvago.gov>; 'david.c.tryon@wvago.gov' <david.c.tryon@wvago.gov>; 'Doug.P.Buffington@wvago.gov' <Doug.P.Buffington@wvago.gov>; 'mtaylor@baileywyant.com' <mtaylor@baileywyant.com>; Kang, Katelyn L <kkang@cooley.com>; 82303_B_P_J_ v_ West Virginia State Board of Education Correspondence <{F1333803}.IWOV_FileDocs@efs.adflegal.org>
**Subject:** BPJ v WV | Plaintiff's Responses & Objections to Intervenor's First & Second Discovery Requests [IWOV-IWOV_FileDocs.FID1333803]

**[External]**

---

Hello Katelyn:

Intervenor's counsel are in receipt of Plaintiff's Responses and Objections to Intervenor's First Set of Discovery Requests (served on January 18, 2022) and Plaintiff's Responses and Objections to Intervenor's Second Set of Interrogatories and Requests for Production (served January 24, 2022). We write to note the deficiencies of Plaintiff's responses and production, and request that those deficiencies be cured as quickly as possible.

**Interrogatory #2**
Interrogatory #2 stated: "Identify the first time you or your agent apprised a Health Care Provider of any behavior, statements, actions, or other expression by B.P.J. that expressed gender dysphoria."

Plaintiff's answer was non-responsive. Plaintiff stated *when* B.P.J. was diagnosed with gender

dysphoria, but did not answer the question posed, which was to identify the first time B.P.J. or Heather Jackson apprised a Health Care Provider of a statement, action, or other expression by B.P.J. that expressed gender dysphoria. If Plaintiff intended to communicate that July 15, 2019 was the first time a Health Care Provider was apprised of any symptoms by B.P.J. that expressed gender dysphoria, please state so.

Please supplement your answer.
-
**Interrogatory #4**
Interrogatory #4 stated: "Identify all of your communications with medical personnel, school employees, administrators, sports coaches, extracurricular activity administrators or facilitators, family members, and/or friends concerning B.P.J.'s gender identity since the date identified in Interrogatory No. 2."

Plaintiff's answer was non-responsive. Plaintiff noted that in response to Defendant State of West Virginia's interrogatories B.P.J. had identified medical providers and Defendant representatives with whom B.P.J. and/or Heather Jackson had communicated regarding B.P.J.'s gender identity or athletics.

But B.P.J. failed to identify communications with these individuals. As noted in the Instructions, "identify" when used in connection with a communication "means to describe fully the details of the communication, including the people involved, the date with as much specificity as can be recalled, and the substance of the communication." Plaintiff made no attempt at describing the communications, the people involved, the timeframe, or its substance.

Moreover, Plaintiff did not identify communications B.P.J. and/or Heather Jackson had with any extracurricular activity administrators or facilitators, family members, or friends regarding B.P.J.'s gender identity. During depositions, deponent Wesley Pepper indicated that that such conversations had occurred with family members.

Please supplement your answer.

**Interrogatory #5**
Interrogatory #5 stated: "Identify all of your communications concerning B.P.J.'s desire to play sports with anyone involved with or employed by Bridgeport Middle School or Norwood Elementary School."

Plaintiff's answer was incomplete. Plaintiff identified persons with whom B.P.J. or Heather Jackson purportedly communicated about B.P.J.'s desire to play sports, but failed to identify those communications. As noted in the Instructions, "identify" when used in connection with a communication "means to describe fully the details of the communication, including the people involved, the date with as much specificity as can be recalled, and the substance of the communication." Plaintiff made no attempt at describing the communications, the people involved, the timeframe, or its substance.

Please supplement your answer.

-

**Interrogatory #9**
Interrogatory #9 stated: "Identify all of your communications about this litigation or H.B. 3293, excluding communications with your attorneys."

Plaintiff's answer referred to other discovery responses in which Plaintiff's listed individuals with whom B.P.J. or Heather Jackson communicated. But Plaintiff failed to identify the *communications* that occurred. As noted in the Instructions, "identify" when used in connection with a communication "means to describe fully the details of the communication, including the people involved, the date with as much specificity as can be recalled, and the substance of the communication." Plaintiff made no attempt at describing the communications, the people involved, the timeframe, or its substance.

Moreover, the individuals listed in response to Defendant State of West Virginia's Interrogatory #4 and #5 are medical providers and Defendant representatives. Those listed in response to Intervenor's Interrogatory #12 are public statements to the media. Plaintiff fails to identify any communications—whether written or oral—with friends, family, acquaintances, colleagues of Heather Jackson, etc.

Please supplement your answer.

**Request for Production #1**
Request for Production #1 states: "Please produce all medical records, mental health records, counseling records, or other health records of B.P.J., and any correspondence or reports relating to any such records, from the date identified in Interrogatory No. 2 until the present that have not already been produced in Response to Defendant State of West Virginia."

Plaintiff stated that "all responsive non-privileged documents have been produced." Are documents being withheld on the basis of privilege *other* than those that comprise the litigation file of counsel? (As noted in the Instructions, "[T]hese requests are not seeking documents made by Plaintiff's attorneys and agents which are protected by attorney-client or work-product privileges.")

If Plaintiff is withholding documents on any basis other than what is specifically excluded in the Instructions, please produce a privilege log.

-

**Request for Production #2**
Request for Production #2 states: "Please produce all of B.P.J.'s and Heather Jackson's social media accounts, posts, and content for the past 7 years that include the terms, or relate to, transgender, gender identity, gender dysphoria, the ACLU, sports, and any pictures of B.P.J."

Plaintiff produced nothing, and instead requested a meet and confer. I am available to meet and confer on Thursday, February 17, 2022 between 10:00am ET - 5:00pm ET or Friday, February 18, 2022 between 10:00am ET and noon ET.

-

**Request for Production #3**

Request for Production #3: "Please produce all of your written or electronic commutations over the past 7 years that concern or relate to B.P.J.'s gender identity, gender dysphoria, transgender, identification as female, gender transition, social transition, medical treatment related to B.P.J.'s gender identity, or psychological or other mental health or counseling treatment related to B.P.J.'s gender identity. Please include with this response and explanation of your search methodology, including a list of any search terms utilized, to ensure that you conducted a diligent search for the requested materials."

-
Plaintiff stated that B.P.J. has already produced "all responsive medical records and public statements regarding this litigation and H.B. 3293." But the Interrogatory was not limited solely to B.P.J.'s medical providers and public statements. The Interrogatory requested "all of your written or electronic communications" about the identified topics in the identified timeframe.

To date, Plaintiff has produced only one email from Heather Jackson, not a single email from B.P.J., and not a single text message from either Heather Jackson or B.P.J. This is hardly credible.

Please confirm that the following locations have been diligently searched:
- any and all email addresses belonging to Heather Jackson;
- all text messages on any cell phone belonging to Heather Jackson;
- any and all email address belonging to B.P.J; and
- any text messages on any cell phone belonging to B.P.J.

Please also identify the search terms utilized and methodology, and supplement your answers.

-
**Request for Production #4**

Request for Production #4 states: "Please produce all of your written or electronic commutations over the past 7 years that concern or relate to any alleged mistreatment of B.P.J. that you believe is related to B.P.J.'s gender identity, B.P.J.'s participation in cheerleading, B.P.J.'s participation in sports, and/or B.P.J.'s desire to run competitively. Please include with this response and explanation of your search methodology, including a list of any search terms utilized, to ensure that you conducted a diligent search for the requested materials."

Plaintiff only pointed to B.P.J.'s Complaint and Motion for Preliminary Injunction. If Plaintiff possesses or intends to rely on any documents or other electronic communications from the past 7 years to support any alleged "mistreatment" of B.P.J. that you believe is related to B.P.J.'s gender identity, B.P.J.'s participation in cheerleading, B.P.J.'s participation in sports, and/or B.P.J.'s desire to run competitively, please produce those documents.

~ ~ ~

As noted above, I am available to meet and confer on Thursday, February 17, 2022 between 10:00am ET - 5:00pm ET or Friday, February 18, 2022 between 10:00am ET and noon ET. Please let me know if there's a good time for you.

Kind regards,
Christiana



Christiana Holcomb
Legal Counsel
+1 202 393 8690 (Office)
202-347-3622 (Fax)
cholcomb@adflegal.org
ADFlegal.org

This e-mail message from Alliance Defending Freedom and any accompanying documents or embedded messages is intended for the named recipients only. Because Alliance Defending Freedom is a legal entity engaged in the practice of law, this communication contains information, which may include metadata, that is confidential, privileged, attorney work product, or otherwise protected from disclosure under applicable law. If you have received this message in error, are not a named recipient, or are not the employee or agent responsible for delivering this message to a named recipient, be advised that any review, disclosure, use, dissemination, distr bution, or reproduction of this message or its contents is strictly prohibited. If you have received this message in error, please immediately notify the sender and permanently delete the message. PRIVILEGED AND CONFIDENTIAL - ATTORNEY-CLIENT COMMUNICATION/ATTORNEY WORK PRODUCT.

This email message is for the sole use of the intended recipient(s) and may contain confidential and privileged information. Any unauthorized review, use, disclosure or distribution is prohibited. If you are not the intended recipient, please contact the sender by reply email and destroy all copies of the original message. If you are the intended recipient, please be advised that the content of this message is subject to access, review and disclosure by the sender's Email System Administrator.

This email message is for the sole use of the intended recipient(s) and may contain confidential and privileged information. Any unauthorized review, use, disclosure or distribution is prohibited. If you are not the intended recipient, please contact the sender by reply email and destroy all copies of the original message. If you are the intended recipient, please be advised that the content of this message is subject to access, review and disclosure by the sender's Email System Administrator.

## TRANSGENDER POLICY

## WVSSAC BOARD OF DIRECTORS

In the event a member school, or its governing authority, determines to permit transgender students to participate in interscholastic athletics, the WVSSAC has adopted the following policy to govern such participation:

### I.
### Definitions

*Transgender Student* – a student whose gender identity differs from the student's assigned sex at birth.

*Gender Identity* – a person's deeply-felt internal sense of being male or female.

### II.
### WVSSAC Transgender Student Policy

A Transgender Student shall be eligible to participate in interscholastic athletics in a manner consistent with a member school policy that meets the minimum standards designated by the WVSSAC Board of Directors policy.

The WVSSAC Board of Directors has designated the following as the minimum standards a member school must consider when determining whether a transgender student may participate in interscholastic athletics in a particular sport. A separate determination shall be made by the member school for each sport in which the student seeks to participate.

1. The transgender student's school shall make the initial determination as to whether a student may participate in interscholastic athletics in a gender that does not match the gender assigned to him or her at birth. When determining whether a transgender student is eligible to participate in interscholastic athletics in a manner consistent with the student's gender identity a member school must consider the following:
   a. Whether the student is a "transgender student" as determined based upon applicable regulations and policies of the member school or its governing authority.
   b. Whether the student meets all applicable academic and enrollment eligibility requirements.
   c. Whether fair competition among high school teams would be impacted by the student's participation.
2. The determination of a student's gender assignment for interscholastic athletics shall remain in effect for the duration of the student's high school eligibility.
3. Any member school may appeal the eligibility of a transgender student on the grounds that the student's participation in interscholastic athletics would adversely affect competitive equity or safety of teammates or opposing players.
   a. Any such appeal will be heard by the WVSSAC Board of Directors.
   b. The identity of the student shall remain confidential. All discussion and documentation will be kept confidential and the proceedings will also be confidential unless the student and family make a specific request otherwise.
   c. The WVSSAC Board of Directors will not consider whether the school has properly determined the student's sex assignment. The board's deliberations will be limited to the question of whether the transgender student represents a threat to competitive equity or the safety of teammates or opposing players. Factors to be considered will include, but not be limited to, the age of the student; the athletic experience of the student; the degree to which the student presents a risk of harm to other competitors due to his or her strength, size, or speed; the nature of the sport; and the degree to which fair competition among high school teams would be impacted by the student's participation.

**10**

WVSSAC000008
Armistead Second Supp. App. 0114