IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA
CHARLESTON DIVISION

| | |
|---|---|
| B.P.J. by her next friend and mother, HEATHER JACKSON,<br><br>     *Plaintiff*,<br><br>v.<br><br>WEST VIRGINIA STATE BOARD OF EDUCATION, HARRISON COUNTY BOARD OF EDUCATION, WEST VIRGINIA SECONDARY SCHOOL ACTIVITIES COMMISSION, W. CLAYTON BURCH in his official capacity as State Superintendent, DORA STUTLER in her official capacity as Harrison County Superintendent, and THE STATE OF WEST VIRGINIA,<br><br>     *Defendants*,<br><br>and<br><br>LAINEY ARMISTEAD,<br><br>     *Defendant-Intervenor*. | Civil Action No. 2:21-cv-00316<br><br>Hon. Joseph R. Goodwin |

**PLAINTIFF'S OPPOSITION TO DEFENDANT STATE OF WEST VIRGINIA AND DEFENDANT-INTERVENOR'S MOTIONS TO EXCLUDE THE EXPERT TESTIMONY OF DR. MARY FRY**

# TABLE OF CONTENTS

**Page**

INTRODUCTION ................................................................................................................ 1

LEGAL STANDARD ........................................................................................................ 2

ARGUMENT ...................................................................................................................... 4

I.   Dr. Fry's Opinions About The Psychological And Behavioral Benefits Of
     Athletics To Youth Athletes Are Both Reliable And Relevant. ......................................... 4

     A.    Defendants Fail To Show That Dr. Fry's Testimony About The
           Psychological And Behavioral Benefits Of Sports Is Unreliable. ......................... 4

     B.    Dr. Fry's Testimony About The Psychological And Behavior Benefits Of
           Sports Is Plainly Relevant. ................................................................................. 8

           i.    Dr. Fry's Opinions On Task And Ego Orientation Are Relevant. .............. 8

           ii.   Defendants' Inability To Identify The Benefits Of Sports During
                 Discovery Shows The Necessity And Relevance Of Dr. Fry's
                 Expertise. ............................................................................................. 11

           iii.  Dr. Fry Never Testified That Women Should Not Care About
                 Winning, And Her Testimony About How To Understand The
                 Relationship Between Performance And Benefits Is Relevant. ................. 12

II.  Dr. Fry's Opinion That Arbitrary Categorical Exclusion Is Harmful Is Both
     Reliable And Relevant. ..................................................................................................... 13

     A.    Defendants Fail To Show That Dr. Fry's Testimony About Arbitrary
           Exclusion Is Unreliable. ..................................................................................... 13

     B.    Dr. Fry's Testimony About Arbitrary Exclusion Is Relevant To This
           Court's Determination Of The Irreparable Harm Resulting Absent
           Injunctive Relief. ................................................................................................ 18

CONCLUSION .................................................................................................................. 19

## TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Belk, Inc. v. Meyer Corp. U.S.*,
   679 F.3d 146 (4th Cir. 2012) ................................................................3

*Belville v. Ford Motor Co.*,
   919 F.3d 224 (4th Cir. 2019) ...............................................................3

*Daubert v. Merrell Dow Pharms., Inc.*,
   509 U.S. 579 (1993)...............................................................................3

*Huddleston v. United States*,
   485 U.S. 681 (1988)...............................................................................8

*Nat'l Ass'n for Rational Sexual Offense L. v. Stein*,
   No. 17 Civ. 53, 2021 WL 736375 (M.D.N.C. Feb. 25, 2021) ..................3

*Primiano v. Cook*,
   598 F.3d 558 (9th Cir. 2010) ...............................................................5

*Sardis v. Overheard Door Corp.*,
   10 F.4th 268 (4th Cir. 2021) .................................................................3

*SAS Inst., Inc. v. World Programming Ltd.*,
   125 F. Supp. 3d 579 (E.D.N.C. 2015)....................................................3

*United States v. Curry*,
   977 F.2d 1042 (7th Cir. 1992) ..............................................................4

*United States v. Houdersheldt*,
   No. 19 Cr. 239, 2020 WL 1521805 (S.D. W. Va. Mar. 30, 2020)...........4

*United States v. Moreland*,
   437 F.3d 424 (4th Cir. 2006) ...............................................................4

*United States v. Pansier*,
   576 F.3d 726 (7th Cir. 2009) ...............................................................3

*Westberry v. Gislaved Gummi AB*,
   178 F.3d 257 (4th Cir. 1999) ...............................................................4

**TABLE OF AUTHORITIES**
(continued)

**Page(s)**

**Other Authorities**

Fed. R. Evid.
    401.....................................................................................................................8
    402.....................................................................................................................8
    702..................................................................................................................3, 5
    702(a)................................................................................................................4
    703.....................................................................................................................2

Cheryl P. Stuntz & Maureen R. Weiss, *Achievement goal orientations and
    motivational outcomes in youth sport: The role of social orientations,* 10(2)
    Psych. of Sport and Exercise 255-262 (2009) ............................................6

Isabel Balaguer et al., *Motivational Climate and Goal Orientations as Predictors
    of Perceptions of Improvement, Satisfaction and Coach Ratings Among Tennis
    Players*, 9(6) Scandinavian J. of Med. and Sci. in Sport 381-388 (1999) ...............6

Jeffrey J. Seifriz et al., *The Relationship of Perceived Motivational Climate to
    Intrinsic Motivation and Beliefs About Success in Basketball,* 14(4) J. of Sport
    & Exercise Psych. 375-391 (1992) ............................................................6

Maria Newton et al., *Psychometric Properties of the Caring Climate Scale in a
    Physical Activity Setting* .............................................................................9

Michelle T. Magyar & Deborah L. Feltz, *The Influence of Dispositional and
    Situational Tendencies on Adolescent Girls' Sport Confidence Sources,* 4(2)
    Psych. of Sports and Exercise 175-190 (2003)...........................................6

Yngvar Ommundsen et al., *Parental and Coach Support or Pressure on
    Psychosocial Outcomes of Pediatric Athletic in Soccer*, 16(6) Clinical J. of
    Sport Med. 522-526 (2006)..........................................................................6

Plaintiff B.P.J. respectfully submits this memorandum in opposition to the motions to exclude the expert testimony of Dr. Mary Fry submitted by Defendant State of West Virginia and Defendant-Intervenor Lainey Armistead (collectively, "Defendants"). (Dkt Nos. 306 (State Mot.), 310 (Int. Mot.) (collectively, Defs.' Mots.).) Because Dr. Fry's expert testimony is both highly relevant to this case and probative of important questions of law and fact in this matter, Defendants' motions to exclude her expert testimony should be denied.

## INTRODUCTION

Defendants do not identify any legitimate basis to exclude the testimony of Dr. Fry. She is well-qualified to serve as an expert in this matter and her expert testimony is relevant. Dr. Fry is qualified to offer expert testimony regarding the psychological and behavioral benefits of sports for youth and young adults, and the conditions that lend themselves to youth and young adults participating in athletics and accessing those benefits when they do participate, including the impact of categorical exclusion from sports under laws like H.B. 3293. She has a doctorate in Sport & Exercise Psychology and is a professor in the Department of Health, Sport & Exercise Sciences at the University of Kansas, a Division I university with a long-standing reputation for expertise in athletics; has generated an extensive body of peer-reviewed scholarship on sport psychology and youth athlete motivation; has held multiple leadership roles within the Association of Applied Sport Psychology and editorial roles on professional journals in her field; and has vast experience studying, researching, and teaching sport psychology and physical education. (*See* Dkt. No. 289-28 (Fry Rep.) ¶¶ 6–15; *see also* Dkt. No. 289-29 (Fry Dep. Tr.) at 110:3-7 ("[F]rom my experience as an athlete and a coach and a scholar in this area . . . [I] can speak to the many benefits [of participation]" and how we can "not exclude athletes from having the opportunity to participate.").) Dr. Fry routinely works with youth athletes and applies sport psychology in the

1

field, including by providing mental skills interventions for athletes and teams at the youth, high school, and collegiate levels. (Dkt. No. 289-28 (Fry Rep.) ¶ 15.) In support of her opinions, Dr. Fry relies on current, peer-reviewed scientific literature, as well as her extensive professional experience. (*Id.* ¶¶ 13–17.) These are precisely the type of facts or data that other "experts in the[ir] particular field would reasonably rely on . . . in forming an opinion on the subject." Fed. R. Evid. 703.

Dr. Fry's testimony is indisputably probative of questions relating to this Court's determination of whether H.B. 3293 violates B.P.J.'s rights under Title IX and the Equal Protection Clause of the Fourteenth Amendment to the U.S. Constitution. Specifically, Dr. Fry provides testimony about the benefits of participation in school sport for youth athletes, and the irreparable harm resulting from a categorical ban on transgender girls and women participating on girls' and women's sports teams. This testimony is relevant to whether, for purposes of the equal protection analysis, H.B. 3293 substantially furthers or actually undermines the State's asserted government interests; to understanding the benefits that B.P.J. would be deprived of under Title IX if she were to be subject to H.B. 3293; and to analyzing the irreparable harm and balance of the equities factors warranting permanent injunctive relief.

For these reasons, and those outlined below, Defendants' motions to exclude should be denied.

## LEGAL STANDARD

Federal Rule of Evidence 702 and the factors set forth in *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, protect the jury from being swayed by unreliable theories in areas beyond the jury's experience or understanding. Fed. R. Evid. 702; 509 U.S. 579 (1993). A trial court must determine whether the proposed expert is qualified to render the proffered opinion. In doing so, a

trial court considers an expert's professional qualifications and "full range of experience and training[.]" *Belk, Inc. v. Meyer Corp. U.S.*, 679 F.3d 146, 162 (4th Cir. 2012), *as amended* (May 9, 2012) (quoting *United States v. Pansier*, 576 F.3d 726, 737 (7th Cir. 2009)). To be relevant, the testimony must have "a valid scientific connection to the pertinent inquiry." *Sardis v. Overheard Door Corp.*, 10 F.4th 268, 281 (4th Cir. 2021) (quoting *Belville v. Ford Motor Co.*, 919 F.3d 224, 232 (4th Cir. 2019)).

If the expert is qualified to offer testimony and the opinions offered by the expert are deemed relevant, a trial court will inquire if the opinion is based on a reliable foundation, which focuses on "the principles and methodology" employed by the expert to assess whether it is "based on scientific, technical, or other specialized *knowledge* and not on belief or speculation." *Id*. at 281 (citations omitted). When addressing an expert whose methodology is grounded in experience, courts use three factors: "1) how the expert's experience leads to the conclusion reached; 2) why that experience is a sufficient basis for the opinion; and 3) how that experience is reliably applied to the facts of the case." *SAS Inst., Inc. v. World Programming Ltd.*, 125 F. Supp. 3d 579, 589 (E.D.N.C. 2015), *aff'd,* 874 F.3d 370 (4th Cir. 2017); *see also Nat'l Ass'n for Rational Sexual Offense L. v. Stein*, No. 17 Civ. 53, 2021 WL 736375, at *3 (M.D.N.C. Feb. 25, 2021).

"Absolute certainty is not a prerequisite for expert testimony." *United States v. Houdersheldt*, No. 19 Cr. 239, 2020 WL 1521805, at *2 n.2 (S.D. W. Va. Mar. 30, 2020); *accord Westberry v. Gislaved Gummi AB*, 178 F.3d 257, 261 (4th Cir. 1999) ("[T]he court need not determine that the expert testimony a litigant seeks to offer into evidence is irrefutable or certainly correct."). This is because, "[a]s with all other admissible evidence, expert testimony is subject to testing by vigorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof." *United States v. Moreland*, 437 F.3d 424, 431 (4th Cir. 2006) (internal

quotation marks omitted), *overruled on other grounds by Rita v. United States*, 551 U.S. 338 (2007). If the court finds that the expert opinion will help the jury understand an issue outside a layperson's general knowledge, the court should admit such testimony. *See* Fed. R. Evid. 702(a); *United States v. Curry*, 977 F.2d 1042, 1051–52 (7th Cir. 1992).

## ARGUMENT

Defendants ask this Court to preclude Dr. Fry from testifying about the psychological and behavioral benefits of sports, the optimal climate for youth sport participation, and the harms resulting from the arbitrary, categorical exclusion of transgender girls and women from girls' and women's sports teams. (*See* Dkt. Nos. 306, 310 (Defs.' Mots.).) Defendants argue that Dr. Fry's opinions are "basic" and "not relevant because [they do] not address who should be allowed to participate on women's sports teams." (Dkt. No. 310 (Int. Mot.) at 3.) They also argue that Dr. Fry's opinions related to task-involving and ego-involving climates "are not remotely in dispute," (Dkt. No. 306 (State Mot.) at 5) and that her opinions as to exclusion are "unreliable" and not grounded in scientific methodology (Dkt. No. 310 (Int. Mot.) at 3). As explained below, these arguments fail. There is no reasonable basis upon which to exclude Dr. Fry's testimony.

**I.    Dr. Fry's Opinions About The Psychological And Behavioral Benefits Of Athletics To Youth Athletes Are Both Reliable And Relevant.**

**A.    Defendants Fail To Show That Dr. Fry's Testimony About The Psychological And Behavioral Benefits Of Sports Is Unreliable.**

Dr. Fry's testimony regarding the psychological and behavioral benefits of sports is based on her education and training, her professional and research experience, and her knowledge of the literature in the pertinent fields, (Dkt. No. 289-28 (Fry Rep.) ¶ 5), and is plainly reliable, *see* Fed. R. Evid. 702 advisory committee's note to 2000 amendments ("In certain fields, experience is the predominant, if not sole, basis for a great deal of reliable expert testimony."); *Primiano v. Cook*,

598 F.3d 558, 565 (9th Cir. 2010), *as amended* (Apr. 27, 2010) (expert testimony is reliable "if the knowledge underlying it has a reliable basis in the knowledge and experience of the relevant discipline."). Defendants offer various arguments about the reliability of her testimony, but none are valid.

Both the State and Defendant-Intervenor fail to challenge the reliability of Dr. Fry's testimony. The State argues that "Professor Fry's Opinions on Benefits of Sports[] . . . Fail to Apply A Reliable Methodology." (Dkt. No. 306 (State Mot.) at 5.) Yet the State does not—and cannot—offer a single argument undermining Dr. Fry's methodology or disproving her conclusions. (*Id*. at 5–7.) Defendant-Intervenor similarly does not even attempt to undermine Dr. Fry's methodology or conclusions regarding the benefits of sports. (Dkt. No. 310 (Int. Mot.) at 3.) Dr. Fry's analysis and opinions are based on decades of experience and her review of scientific literature. (Dkt. No. 289-28 (Fry Rep.) ¶ 5.) Defendants nonetheless contend that Dr. Fry's opinions are based on "unsupported speculation [,]" (Dkt. No. 306 (State Mot.) at 3), and offer an improper "public policy opinion," (Dkt. No. 310 (Int. Mot.) at 10). In particular, Defendant-Intervenor argues that Dr. Fry's opinion that focusing solely on performance outcomes undermines the benefits of sport for youth and young athletes "is unreliable because it ignores the scholarly evidence that competitive fairness and safety—both goals of [H.B. 3293]—contribute to an enjoyable sports climate." (*Id.* at 12.) But Dr. Fry is not, and never claimed to be, an expert in fairness and safety, and never disputed that fairness and safety are appropriate considerations for youth sport. (Dkt. No. 289-29 (Fry Dep. Tr.) at 64:7-12, 107:8-11.) Moreover, Defendant-Intervenor points to no authority suggesting that fairness and safety are somehow inextricably intertwined with performance outcomes, such that focusing solely on performance outcomes is necessary to advance fairness and safety concerns.

Dr. Fry's testimony that "a myopic focus on winning in youth and young adult athletics ignores the other important benefits that school athletics offer young athletes, such as teamwork and camaraderie, which are advanced when all athletes have the opportunity to play the sport they love and reap the benefits of such participation[,]" (Dkt. No. 289-28 (Fry Rep.) ¶ 18), is not a policy opinion. It is an expert opinion based on careful research and study of the conditions that do—and do not—enable youth and young adults to best reap the benefits of sports.[1] And that expert opinion is not offered in an attempt to address "[h]ow to balance the competing goals of participation, competitive fairness, and safety[,]" (Dkt. No. 310 (Int. Mot.) at 10), or supply the "exact guidelines" governing who should be allowed to participate, (Dkt. No. 289-29 (Fry Dep. Tr.) at 116:22-23). Dr. Fry's testimony pertains to what the impact of H.B. 3293 would be on the climate and benefits of participation in sports at the non-elite level; it is not a policy opinion about "who is eligible for that last spot." (Dkt. No. 310 (Int. Mot.) at 9.)

Relatedly, Dr. Fry is not, as the State contends, "speculat[ing] that women do not, or should not, care about winning." (Dkt. No. 310 (Int. Mot.) at 10.) Dr. Fry never purported to offer such an opinion, and in fact testified, "[W]ho plays sports and doesn't want to win[?]" (Dkt. No. 289-29 (Fry Dep. Tr.) at 82:24–83:6.) Her point, informed by her expertise and grounded in rigorous

---

[1] (*See generally* Dkt. No. 289-28 (Fry Rep.) (citing Isabel Balaguer et al., *Motivational Climate and Goal Orientations as Predictors of Perceptions of Improvement, Satisfaction and Coach Ratings Among Tennis Players*, 9(6) Scandinavian J. of Med. and Sci. in Sport 381-388 (1999); Yngvar Ommundsen et al., *Parental and Coach Support or Pressure on Psychosocial Outcomes of Pediatric Athletic in Soccer*, 16(6) Clinical J. of Sport Med. 522-526 (2006); Michelle T. Magyar & Deborah L. Feltz, *The Influence of Dispositional and Situational Tendencies on Adolescent Girls' Sport Confidence Sources,* 4(2) Psych. of Sports and Exercise 175-190 (2003); Jeffrey J. Seifriz et al., *The Relationship of Perceived Motivational Climate to Intrinsic Motivation and Beliefs About Success in Basketball,* 14(4) J. of Sport & Exercise Psych. 375-391 (1992); Cheryl P. Stuntz & Maureen R. Weiss, *Achievement goal orientations and motivational outcomes in youth sport: The role of social orientations,* 10(2) Psych. of Sport and Exercise 255-262 (2009)).)

research, is that *how* youth and young adults are encouraged to think about winning matters to their experience of the psychological and behavioral benefits of sports. As Dr. Fry explained during her deposition, the pertinent question related to winning that her research bears on is: "What does winning mean for us[?] . . . Is it a chance[] to [puff] my chest out and say I'm better than you, I beat you, or is it . . . a celebration of me being able to say, boy, I've worked hard and I can see I'm improving[.]" (*Id.* at 83:2-6.)

Defendants also attempt to discredit Dr. Fry's testimony because "she has never counseled children with gender dysphoria" nor "counseled children on mental health issues." (Dkt. No. 310 (Int. Mot.) at 9 n.4.) But Dr. Fry is not offering testimony on diagnosing or treating mental health issues in youth athletes or athletes with gender dysphoria, and nothing in her opinions turns on considerations specific to the diagnosis and treatment of gender dysphoria. (Dkt. No. 289-29 (Fry Dep. Tr.) at 55:9-16 ("I'm on the educational side of sports psychology[,] . . . so I might provide educational information . . . about how to develop strong mental skills . . . that are going to help you enjoy your sport better and perform better . . . . It's all on the educational side, so not on a diagnosis side or treatment of mental health. That would be beyond my credentials and I would refer athletes to someone else.").) Such attempts to exclude Dr. Fry's testimony should be dismissed by this Court.

*** 

There is no dispute that Dr. Fry—who holds a Ph.D. and is a professor and a sport psychology expert—can reliably testify about the psychological and behavioral benefits of sport for youth and young adults.

**B.      Dr. Fry's Testimony About The Psychological And Behavior Benefits Of Sports Is Plainly Relevant.**

"Rules 401 and 402 [of the Federal Rules of Evidence] establish the broad principle that relevant evidence—evidence that makes the existence of any fact [that is of consequence] more or less probable—is admissible unless the Rules provide otherwise." *Huddleston v. United States*, 485 U.S. 681, 687 (1988). Dr. Fry's testimony regarding the psychological and behavioral benefits of sports for youth and young adults, and the conditions that lend themselves to youth and young adults participating in athletics and accessing those benefits when they do participate, is plainly relevant to the issues in this case and, thus, should not be excluded.

Namely, the State argues that "benefits to playing sports" and "athlete orientation and coaching styles and climates" are "interesting for academia and coach training, but[] are not remotely in dispute here" and "have nothing to do with this case." (Dkt. No. 306 (State Mot.) at 5; *see also* Dkt. No. 310 (Int. Mot.) at 9-10.) But the issue at the heart of this case is whether categorically barring transgender girls and women from participating on girls' and women's sports team and depriving them of the benefits of participation *is harmful* to transgender athletes like B.P.J under Title IX and Equal Protection Clause of the Fourteenth Amendment. Dr. Fry's testimony informs this Court of the psychological and behavioral benefits that are entirely lost for youth athletes who are excluded.

**i.      Dr. Fry's Opinions On Task And Ego Orientation Are Relevant.**

Dr. Fry opines that "understanding what motivates youth and young adults to participate in athletics in the first place is essential for understanding how they can access" the benefits derived from participating in athletic activities. (Dkt. No. 289-28 (Fry Rep.) ¶ 21.) Dr. Fry described in her report and testified at her deposition that motivation is shaped by outside factors, which can

8

reinforce either a task orientation or an ego orientation. (*Id.* ¶ 26.) "When the environment created by coaches and others is a caring environment, athletes are more likely to . . . feel safe, welcome, comfortable, and valued, and are treated with kindness and respect by all in the sport setting." (*Id.* (citing Maria Newton et al., *Psychometric Properties of the Caring Climate Scale in a Physical Activity Setting*, 16(1) Revista de Psicologia Del Deporte 67-84 (2007)).) "A climate that is both task-involving and caring is one in which coaches do the following: recognize and reward effort and improvement; foster cooperation among teammates; make everyone feel they play an important role on the team; treat mistakes as part of the learning process; and encourage an atmosphere where everyone is treated with mutual kindness and respect." (*Id.*) Alternatively, an ego orientation is "more often based on[] perceptions of ability and having a strong physical presence" and has an "emphasis on performance outcomes." (*Id.* ¶¶ 31, 32.)

Dr. Fry identifies several benefits of participation in a task-involving climate: "the strong and positive association with interpersonal and team dynamics[,]" "peer acceptance, less conflict with peers, and a greater satisfaction with the coach[,]" and "great confidence and perceived ability[.]" (*Id.* ¶¶ 29, 30 (citing Balaguer et al.; Ommundsen et al.; Magyar & Feltz; Seifriz et al.; Stuntz & Weiss).) Additionally, Dr. Fry testified that "athletes in [a] caring task environment climate" have decreased cortisol levels, "suggesting that they [are] not stressed. In addition, they [have] more fun, they[] tr[y] harder, [and] they [make] more progress learning [an] activity." (Dkt. No. 289-29 (Fry Dep. Tr.) at 70:19–71:9, 237:14-23 (in a task-involving climate, youth athletes "reap the physical benefits of being in better health[] both psychologically and physically.") In an ego-involving climate, one that prioritizes performance and winning, youth athletes "[do not] have as much fun, did [no]t indicate that they wanted to continue with the activity[,] and their cortisol levels were significantly higher than those in the other group." (*Id.* at 70:19–71:9.) Although

Defendant-Intervenor argues that Dr. Fry's "general knowledge about task-oriented climates and participation" is not relevant to the case, the benefits identified by Dr. Fry directly speak to what opportunities are lost for transgender girls and women when they are unable to participate on girls' and women's sports teams. (Dkt. No. 310 (Int. Mot.) at 9–10.) And the relationship between climate and benefits is directly relevant to this case, because H.B. 3293 imposes a particular climate that tells student athletes that performance and winning are more important than inclusion and participation. Specifically, Defendants argue that H.B. 3293's purpose is to prevent cisgender girls from ever being "displaced" by a transgender girl in any ranking (whether first or last place). Defendants' justification of the law is premised on the idea that if even a single cisgender female athlete doesn't make the team or finishes one place below a transgender female athlete, the cisgender athlete is sufficiently harmed such that a categorical exclusion of all transgender females from all sports is warranted. This singular focus on performance fosters the ego-involving climate—as well as its attendant negative effects—on all athletes participating under the law.

Dr. Fry's testimony is that preserving the experience of sport for youth and young adults is about more than just winning and is better achieved by focusing on the many benefits resulting from participation. Under Title IX, the question is whether B.P.J. is losing out on benefits because of a categorical ban on her participation on the girls' cross-country and track teams—and Dr. Fry's testimony aids this Court in finding that B.P.J.'s claim is meritorious. Similarly, Defendants offer no credible argument that B.P.J. herself has substantially displaced cisgender girls such that her categorical exclusion from girls' sports teams is justified under an equal protection analysis. They simply repeat the argument that because B.P.J. did not place last at every single one of her cross-country meets, she "displaced" cisgender girls who finished after her and therefore her exclusion is warranted. However, "BPJ would be a recipient of[] harm" resulting from "blanket exclusion,"

(Dkt. No. 289-29 (Fry Dep. Tr.) at 116:23–117:1), and will be deprived of her rights under the Equal Protection Clause.

    ii.  **Defendants' Inability To Identify The Benefits Of Sports During Discovery Shows The Necessity And Relevance Of Dr. Fry's Expertise.**

    Additionally, Defendants' own responses (or lack thereof) to Plaintiff's discovery requests demonstrate a need for Dr. Fry's testimony on the benefits of sports. The State and Defendant-Intervenor both make reductionist arguments that Dr. Fry's testimony that "sports benefit people" is "unnecessary," (Dkt. No. 310 (Int. Mot.) at 3), and "common knowledge," (Dkt. No. 306 (State Mot.) at 5). Defendant-Intervenor goes so far to say that "[t]he average person already knows [that sports provide benefits]" and "as a general matter, it's good for kids to play sports[.]" (Dkt. No. 310 (Int. Mot.) at 5.) But these simplistic arguments ignore the entire basis of Dr. Fry's testimony, which is understanding what those psychological and behavioral benefits exactly are. Dr. Fry identifies several benefits, both immediate and long-term, that students reap when they participate in school sports: building teamwork and camaraderie, (Dkt. No. 289-28 (Fry Rep.) ¶ 18), "enhanced social relationships[,]" (*id*. ¶ 32), stronger mental skills including their use of goal setting, ability to concentrate, remain worry free, cope with adversity and peak under pressure, act with confidence, and be open to receiving feedback from coaches, (*id*. ¶ 34), and a higher likelihood of finishing college and actively engaging in planning for their future after their sport career ends, (*id*. ¶ 38).

    And despite Defendants' claims that these benefits are common knowledge, Defendants refused to identify them in discovery. When asked to admit that "students derive social [and psychological] benefits from participation on athletic teams," the State objected and stated that it "would have to speculate as to whether any or all students 'derive social benefits' [and 'derive

psychological benefits'] and what are 'social benefits' [and 'psychological' benefits]." (Dkt. No. 289-6 (State Resp. to Pl.'s Second Set of RFAs) Nos. 44–45.) Similarly, when posed the same questions in written discovery, Defendant-Intervenor responded that "Ms. Armistead has no personal or independent knowledge of the social benefits [and psychological benefits] that students other than herself may or may not derive from participating on athletic teams." (Dkt. No. 289-12 (Int. Resp. to Pl.'s Second Set of RFAs) Nos. 44–45.) When asked to "admit that middle school students who participate in interscholastic athletics receive benefits regardless of whether they win or lose," the State objected and stated that the request was "vague, overbroad and speculative" as to "what constitutes a benefit for students" and what the terms "win" or "lose" mean. (Dkt. No. 289-6 (State Resp. to Pl.'s Second Set of RFAs) at No. 47.) Defendant-Intervenor likewise responded that "Ms. Armistead has no personal or independent knowledge of all the benefits that middle school students may or may not receive from participating in interscholastic athletics regardless whether they win or lose." (Dkt. No. 289-12 (Int. Resp. to Pl.'s Second Set of RFAs) No. 47.)

Dr. Fry's testimony is not only relevant, but also necessary given Defendants' inability to identify what benefits are derived from participation in sports.

### iii.   Dr. Fry Never Testified That Women Should Not Care About Winning, And Her Testimony About How To Understand The Relationship Between Performance And Benefits Is Relevant.

As noted above, contrary to the State's claim, Dr. Fry did not claim that winning is unimportant to youth athletes. The State's own view, unsupported by any citation, is that "athletes compete because they want to win—that is what it means to compete." (Dkt. No. 306 (State Mot.) at 7.) The relevant, unrebutted testimony Dr. Fry offers this Court is not about whether the desire

to win is natural or important, but rather about *how* athletes are encouraged to think about performance. Dr. Fry testified:

> [I]f you have to win to have a great experience in sports, then half of our teams are not going to have a good experience . . . . So what I'm suggesting here is that and as the data backs this up that if you are in a good climate, then you can go out there and have fun and try hard and maybe your team didn't end up with a winning record, but you can still reap the benefits. And so it is not the case that ***only*** winning teams reap these benefits that come along with sports.

(Dkt. No. 289-29 (Fry Dep. Tr.) at 96:4-14 (emphasis added).) Accordingly, she explained, "there is an agreement within [the] field of sport exercise psychology that[,] at the youth sport level[,] the focus should be on giving as many kids as possible a chance to participate in youth [sport] . . . . And then as athletes move up the levels, that there is more emphasis and importance placed on winning." (*Id.* at 123:12-18.) The State simply misses this nuance, preferring its own, unsubstantiated views on what matters in youth sports. Dr. Fry's research-backed, unrebutted testimony that the benefits of sports extend beyond winning is plainly relevant.

***

Because Dr. Fry's testimony is reliable and relevant, Defendants' motions to exclude it should be rejected.

## II. Dr. Fry's Opinion That Arbitrary Categorical Exclusion Is Harmful Is Both Reliable And Relevant.

### A. Defendants Fail To Show That Dr. Fry's Testimony About Arbitrary Exclusion Is Unreliable.

Dr. Fry offers the opinion that "[t]he climate of youth sport must be geared to include all participants," (Dkt. No. 289-28 (Fry Rep.) ¶ 41), and that "arbitrarily excluding transgender students from teams undermines a task-involving climate, which, in turn, diminishes the positive outcomes for all youth and collegiate athletes," (*id.* ¶ 39 (citing Balaguer et al.; Ommundsen, et al.). Both the State and Defendant-Intervenor argue that Dr. Fry's testimony pertaining to the

13

harms of categorical exclusion is "unreliable and methodologically unsound," (Dkt. No. 310 (Int. Mot.) at 14), and "beyond her expertise," (Dkt. No. 306 (State Mot.) at 7). They fixate their arguments on one word, "arbitrary," contending that because Dr. Fry did not initially agree to the State's proffered definition of "arbitrary" at her deposition, her testimony is somehow unreliable. (Dkt. Nos. 306 (State Mot.) at 7 n.2; 310 (Int. Mot.) at 14–15.) This does not follow.

The State argues that "Fry simply has no expertise to inform the court if [H.B. 3293] is arbitrary." (Dkt. No. 306 (State Mot.) at 10.) Fundamentally, the State appears to misunderstand the opinion they seek to exclude. Dr. Fry is not offering expert testimony as to whether H.B. 3293 is arbitrary—she is offering the testimony that a categorical, arbitrary exclusion of an entire group of people is harmful to young athletes. In other words, her expert testimony is about the *result* of a categorical, arbitrary exclusion, not what constitutes a categorical, arbitrary exclusion. The State argues that Dr. Fry's testimony is unreliable because she "was unable to identify any[] arbitrary exclusions in any youth sports." (*Id.* at 7.) But this is plainly inaccurate—Dr. Fry testified that students with disabilities and students with limited financial means are often arbitrarily excluded from youth sports. (Dkt. No. 289-29 (Fry Dep. Tr.) at 163:5-11 ("Q. Are you aware of any groups being excluded from participating in youth or adult athletics? . . . . THE WITNESS: You know, I think a lot of times kids with disabilities are kept out. I think kids who have limited financial resources sometimes are limited.").)

Defendant-Intervenor similarly fails to undermine the reliability of Dr. Fry's testimony. She argues that Dr. Fry's opinions are unreliable because Dr. Fry believes that cisgender boys and men can be properly excluded from girls' and women's sports teams, yet the categorical exclusion of transgender girls and women from girls' and women's teams is arbitrary. (Dkt. Nos. 310 (Int. Mot.) at 7–9; 289-29 (Fry Dep. Tr.) at 241:8-19.) Again, this argument is based on an inappropriate

14

assumption that cisgender boys and men are the same as transgender girls and women. And in any event, Dr. Fry was clear in her expert report and in her deposition testimony that she is not offering an expert opinion on whether H.B. 3293 is arbitrary. Defendants *chose* to ask for her views on sex separation and H.B. 3293 during the deposition, thereby eliciting her personal opinion that sex separation in sports generally is non-arbitrary and that categorically excluding all transgender girls and women from girls' and women's teams is arbitrary, but she repeatedly made clear that those views were not part of her expert opinion. (Dkt. No. 289-29 (Fry Dep. Tr.) at 48:20–49:22, 54:6–14.)

The State also repeatedly misconstrues Dr. Fry's testimony. The State alleges that "[Dr.] Fry does espouse a novel and arbitrary theory of exclusion," claiming she "would allow males who do not perform well enough to run on a boys track team to participate on a female team if they identify as a female," but not if they "do[] not identify as a girl." (Dkt. No. 306 (State Mot.) at 9.) But Dr. Fry never suggested any criteria of her own to govern sports participation policies, and certainly never offered or endorsed the confused "theory" set forth by the State. Instead, what Dr. Fry actually said was that cisgender males can participate on the male sports team, and transgender females can try out for the women's team, but there is no guarantee that either athlete makes the team. (Dkt. No. 289-29 (Fry Dep. Tr.) at 254:6-14; 252:9-16 ("Boys and girls try out for teams and . . . don't make it . . . . I'm distinguishing that from just arbitrarily saying this whole group of athletes, you don't have the right to even try out for the team.").) And in response to questions from the State that asked for opinions beyond those in her expert report, Dr. Fry simply testified that "what [the] criteria is going to be" for transgender girls to participate on girls' teams is still being determined at various sporting levels. (*Id.* at 173:15–174:5.) She repeatedly stated that "inclusion and fairness" must be balanced, (*id.* at 167:7-8), and that what "makes [her] sad [is]

when athletes are excluded and not given a chance to reap all [the] amazing benefits from being a part of sport," (*id.* at 209:12-19). She also reminded the State and Defendant-Intervenor at multiple points that she was not offering expert testimony on fairness, but rather on the benefits of sport, the conditions that best elicit those benefits, and the harms of exclusion from sport.

Defendant-Intervenor also attempts to discredit Dr. Fry's testimony by stating that there is no scientific evidence that "preventing [transgender girls and women] from playing [girls' and] women's sports harm the students excluded from the [girls' and] women's team, the other athletes on the [girls' and] women's team, and the task-involving climate as a whole." (Dkt. No. 310 (Int. Mot.) at 16.) But Dr. Fry's testimony precisely lays out what the harms of exclusion are to both cisgender and transgender athletes, including, but not limited to, the following: a loss of "extremely valuable . . . educational experience through the secondary schools," (Dkt. No. 289-29 (Fry Dep. Tr.) at 240:22–241:6), "a missed opportunity [] for kids to learn and to grow and to become more familiar and to become more accepting," (*id.* at 196:9-18), and the harms resulting from "knowing that other people you care about and evaluate are being excluded in an unfair way," (*id.* at 197:3-7).

The State also asserts that Dr. Fry "speculat[es]" that "it's not an option to send [B.P.J.] over to the boy[']s team because she is a girl." (*Id.* at 176:12-13; Dkt. No. 306 (State Mot.) at 9.) But Dr. Fry was not speculating. B.P.J. made clear in her declaration, which Dr. Fry reviewed, that she cannot play on the boy's team, and as this Court recognized, forcing B.P.J. to play on the boy's team is not an option: H.B. 3293 "stigmatizes and isolates" her, and she "will be treated worse than girls with whom she is similarly situated because she alone cannot join the team corresponding to her gender identity." (Dkt. No. 67 (PI Order) at 12–13.) Dr. Fry's testimony is

not speculative per B.P.J.'s own testimony and this Court's observation and is therefore admissible.

Defendants also misrepresent Dr. Fry's views about the experience of cisgender girls who have or compete against transgender teammates. They claim that Dr. Fry "believes that the school must honor the feelings of B.P.J., who chooses to participate on the girls['] teams, but that 'biological girls' who are uncomfortable with a biological male identifying as a female or a transgender girl 'playing on the girls team just have to deal with it.'" (Dkt. Nos. 306 (State Mot.) at 10; 310 (Int. Mot.) at 19.) That characterization badly misrepresents Dr. Fry's thoughtful testimony, which connected the State's questions during her deposition about how to respond to cisgender female athletes struggling with the idea of playing alongside transgender female athletes to her research on the psychological and behavioral benefits of youth sports and how best to achieve them. She said, "[w]ith this athlete[,] I would say[,] nothing changes for you. What you are trying to do is be the absolute very best that you can be, . . . and so let's keep working hard, let's keep seeing what you can do. In swimming, that's a nice sport to just be able to stay focused on your time and your performance and [im]proving your technique." (Dkt. No. 289-29 (Fry Dep. Tr.) at 217:4-10.) She also acknowledged that "being part of a team is challenging, and for some people having a teammate that is transgender may be one of those challenges they have to deal with." (*Id*. at 179:12-19.) She further asserted that "we have to have guidelines in place that are fair and inclusive," (*id.* at 208:18-19), and that we can achieve that balance by means other than "exclud[ing] all trans athletes from participating in sport." (*Id*. at 208:1-6.)

**B.     Dr. Fry's Testimony About Arbitrary Exclusion Is Relevant To This Court's Determination Of The Irreparable Harm Resulting Absent Injunctive Relief.**

As Dr. Fry explains, a principal goal of school athletics is for students to develop skills, make friends, increase physical activity, and learn valuable life lessons—all of which can contribute to greater success in college and throughout life. (Dkt. No. 290 (Pl's Statement of Undisputed Facts) ¶¶ 22–23.) These are precisely the types of benefits B.P.J. has experienced from participating in cheerleading and cross-country and hopes to continue to experience from playing on girls' teams in the future. (*Id.* ¶¶ 29–30.) Dr. Fry offers the opinion that "[e]ncouraging student-athletes to focus on improving their own performance and cooperation with teammates maximizes the benefits of athletics for all participants[,]" (*id.* ¶ 26), and that "[e]xcluding students for no other reason than because they are transgender eliminates the benefits of sports for them and diminishes those benefits for all participants," (*id.* ¶ 28). H.B. 3293 thus prevents all girls and women from realizing the benefits and values of participating in sports.

Dr. Fry's testimony is specifically relevant to this Court's determination of whether a categorical ban on transgender girls and women participating in girls' and women's sports deprives them of the psychological and behavioral benefits associated with sport, and causes harm to the excluded transgender student athletes in violation of Title IX and the Equal Protection Clause of the Fourteenth Amendment. Dr. Fry opines that "a categorical exclusion of trans athletes" is "of concern because of the many benefits that athletes reap from having the opportunity to participate in sports." (Dkt. No. 289-29 (Fry Dep. Tr.) at 26:9-12.) She similarly testified to the fact that "BPJ would be a recipient of [the] harm" resulting from a "blanket exclusion." (*Id.* at 116:21–117:1.) As a result, Dr. Fry's testimony regarding arbitrary exclusion is relevant to the claims in this case.

**CONCLUSION**

For the reasons above, Plaintiff respectfully requests that this Court deny Defendant State of West Virginia and Defendant-Intervenor Lainey Armistead's motions to exclude the expert testimony of Dr. Mary Fry.

Dated: May 26, 2022

Joshua Block*
AMERICAN CIVIL LIBERTIES UNION FOUNDATION
125 Broad St.
New York, NY 10004
Phone: (212) 549-2569
jblock@aclu.org

Avatara Smith-Carrington*
LAMBDA LEGAL
3500 Oak Lawn Avenue, Suite 500
Dallas, TX 75219
Phone: (214) 219-8585
asmithcarrington@lambdalegal.org

Carl Swaminathan*
Tara Borelli*
LAMBDA LEGAL
158 West Ponce De Leon Ave., Ste. 105
Decatur, GA 30030
Phone: (404) 897-1880
ccharles@lambdalegal.org

Sruti Swaminathan*
LAMBDA LEGAL
120 Wall Street, 19th Floor
New York, NY 10005
Phone: (212) 809-8585
sswaminathan@lambdalegal.org

Andrew Barr*
COOLEY LLP
1144 15th St. Suite 2300
Denver, CO 80202-5686
Phone: (720) 566-4000
abarr@cooley.com

Respectfully submitted,
*/s/ Loree Stark*

Loree Stark (Bar No. 12936)
Nick Ward (Bar No. 13703)
AMERICAN CIVIL LIBERTIES UNION OF WEST
VIRGINIA FOUNDATION
P.O. Box 3952
Charleston, WV 25339-3952
Phone: (914) 393-4614
lstark@acluwv.org

Kathleen Hartnett*
Julie Veroff*
Zoë Helstrom*
COOLEY LLP
3 Embarcadero Center, 20th Floor
San Francisco, CA 94111
Phone: (415) 693-2000
khartnett@cooley.com

Katelyn Kang*
Valeria M. Pelet del Toro*
COOLEY LLP
55 Hudson Yards
New York, NY 10001-2157
Phone: (212) 479-6000
kkang@cooley.com

Elizabeth Reinhardt*
COOLEY LLP
500 Boylston Street, 14th Floor
Boston, MA 02116-3736
Phone: (617) 937-2305
ereinhardt@cooley.com

*Visiting Attorneys*

*Attorneys for Plaintiff*

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA
CHARLESTON DIVISION

B.P.J. by her next friend and mother, HEATHER
JACKSON,

          *Plaintiff*,

       v.

WEST VIRGINIA STATE BOARD OF
EDUCATION, HARRISON COUNTY BOARD
OF EDUCATION, WEST VIRGINIA
SECONDARY SCHOOL ACTIVITIES
COMMISSION, W. CLAYTON BURCH in his
official capacity as State Superintendent, DORA
STUTLER in her official capacity as Harrison
County Superintendent, and THE STATE OF
WEST VIRGINIA,

          *Defendants*,

       and

LAINEY ARMISTEAD,

          *Defendant-Intervenor*.

Civil Action No. 2:21-cv-00316

Hon. Joseph R. Goodwin

## CERTIFICATE OF SERVICE

I, Loree Stark, do hereby certify that on this 26th day of May, 2022, I electronically filed a

true and exact copy of ***Plaintiff's Opposition to Defendant State of West Virginia and Defendant-***

***Intervenor's Motions to Exclude the Expert Testimony of Dr. Mary Fry*** with the Clerk of Court

and all parties using the CM/ECF System.

                */s/ Loree Stark*
                Loree Stark
                West Virginia Bar No. 12936