**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA**
**CHARLESTON DIVISION**

| | |
|---|---|
| B.P.J., by her next friend and mother, HEATHER JACKSON *Plaintiff,* <br><br> v. <br><br> WEST VIRGINIA STATE BOARD OF EDUCATION, HARRISON COUNTY BOARD OF EDUCATION, WEST VIRGINIA SECONDARY SCHOOL ACTIVITIES COMMISSION, W. CLAYTON BURCH in his official capacity as State Superintendent, DORA STUTLER in her official capacity as Harrison County Superintendent, and THE STATE OF WEST VIRGINIA <br><br> *Defendants,* <br><br> and <br><br> LAINEY ARMISTEAD <br><br> *Defendant-Intervenor.* | Case No. 2:21-cv-00316 <br><br> Hon. Joseph R. Goodwin <br><br> Oral Argument Requested |

**DEFENDANT-INTERVENOR'S REPLY IN SUPPORT OF HER MOTION FOR SUMMARY JUDGMENT**

TABLE OF CONTENTS

Table of Authorities ...................................................................................iii

Introduction ............................................................................................... 1

Argument .................................................................................................... 2

    I.  Armistead's motion complies with Rule 56. ..................................... 2

    II.  B.P.J.'s attempts to create material fact disputes fall flat. ........................... 3

        A.   Evidence about male participation in women's sports is admissible.... 3

        B.   B.P.J. fails to dispute the material facts about differences between biological males and females. ................................................................. 5

        C.   B.P.J. does not raise a material dispute about other sport organizations' policies. ........................................................................... 7

        D.   The evidence about out-of-state athletes is admissible. ........................ 8

    III. The Act complies with the Equal Protection Clause. ................................... 10

        A.   The Act makes valid distinctions based on biological sex to promote the valid interest of protecting female athletes. ................................... 10

        B.   Intermediate scrutiny requires a reasonable fit, not a perfect one. ... 13

        C.   Intermediate scrutiny repudiates classifications that denigrate women, not laws that protect them. ........................................................ 17

        D.   Sex-separated teams promote opportunities for female athletes. ....... 19

    IV. The Act complies with Title IX ....................................................................... 20

Conclusion .................................................................................................. 21

Certificate of Service ................................................................................. 24

TABLE OF AUTHORITIES

**Cases**

*Adickes v. S.H. Kress & Co.,*
    398 U.S. 144 (1970) ................................................................................ 2

*Alevromagiros v. Hechinger Co.,*
    993 F.2d 417 (4th Cir. 1993) ................................................................ 6

*Anderson v. Liberty Lobby, Inc.,*
    477 U.S. 242 (1986) ................................................................................ 7

*Beale v. Hardy,*
    769 F.2d 213 (4th Cir. 1985) ................................................................ 5

*Blasic v. Chugach Support Services, Inc.,*
    673 F. Supp. 2d 389 (D. Md. 2009) ...................................................... 10

*Brown v. City of Pittsburg,*
    586 F.3d 263 (3d Cir. 2009) .................................................................. 4

*Califano v. Webster,*
    430 U.S. 313 (1977) ................................................................................ 12

*Caner v. Autry,*
    16 F. Supp. 3d 689 (W.D. Va. 2014) ................................................... 8

*Capobianco v. Summers,*
    377 F.3d 559 (6th Cir. 2004) ................................................................ 15

*Celotex Corp. v. Catrett,*
    477 U.S. 317 (1986) .......................................................................... 2, 3

*City of L.A. v. Patel,*
    576 U.S. 409 (2015) ................................................................................ 11

*Clark v. Arizona Interscholastic Association,*
    886 F.2d 1191 (9th Cir. 1989) .............................................................. 19

*De Veloz v. Miami-Dade County,*
    756 F. App'x 869 (11th Cir. 2018) ....................................................... 18

*Downtown Soup Kitchen v. Municipality of Anchorage,*
    406 F. Supp. 3d 776 (D. Alaska 2019) ................................................ 18

*Eline v. Town of Ocean City,*
    7 F.4th 214 (4th Cir. 2021) ................................................................... 18

*Frontiero v. Richardson,*
    411 U.S. 677 (1973) ................................................................................ 18

*Hecox v. Little,*
    479 F. Supp. 3d 930 (D. Idaho 2020) ................................................. 8

*Jones v. Bonta,*
--- F. 4th ----, No. 20-56174, 2022 WL 1485187 (9th Cir. May 11, 2022) .............. 15

*Kolbe v. Hogan,*
849 F.3d 114 (4th Cir. 2017) ................................................................................ 14

*Lorraine v. Markel American Insurance Co.,*
241 F.R.D. 534 (D. Md. 2007) ................................................................................ 4

*Matthews v. National Football League Management Council,*
688 F.3d 1107 (9th Cir. 2012) ................................................................................ 8

*Mississippi University for Women v. Hogan,*
458 U.S. 718 (1982) ............................................................................................. 14

*National Labor Relations Board v. SW General, Inc.,*
137 S. Ct. 929 (2017) ........................................................................................... 12

*Neal v. Board of Trustees of California State Universities,*
198 F.3d 763 (9th Cir. 1999) ................................................................................ 21

*O'Connor v. Board of Education of School District 23,*
449 U.S. 1301 (1980 ..................................................................................... 16, 18

*O'Connor v. Board of Education of School District No. 23,*
645 F.2d 578 (7th Cir. 1981) ................................................................................ 16

*Personnel Administrator of Massachusetts v. Feeney,*
442 U.S. 256 (1979) ....................................................................................... 11, 14

*Phillips v. Borough of Keyport,*
107 F.3d 164 (3d Cir. 1997) .................................................................................. 4

*Ross v. Early,*
746 F.3d 546 (4th Cir. 2014) ................................................................................ 16

*Rostker v. Goldberg,*
453 U.S. 57 (1981) ............................................................................................... 12

*Sansotta v. Town of Nags Head,*
724 F.3d 533 (4th Cir. 2013) .................................................................................. 3

*Textron Inc. Ex. Rel. Homelite Division v. Barber-Coleman Co.,*
903 F. Supp. 1558, (W.D.N.C. 1995) ...................................................................... 6

*Tyger Construction Company Inc. v. Pensacola Construction Co.,*
29 F.3d 137 (4th Cir. 1994) ................................................................................... 6

*Tyler v. Hillsdale County Sheriff's Department,*
837 F.3d 678 (6th Cir. 2016) ......................................................................... 14, 15

iv

*United States v. Chester,*
    628 F.3d 673 (4th Cir. 2010) .................................................................. 14

*United States v. Chovan,*
    735 F.3d 1127 (9th Cir. 2013) ................................................................ 15

*United States v. Edge Broadcasting Co.,*
    509 U.S. 418 (1993) ......................................................................... 13, 20

*United States v. O'Brien,*
    391 U.S. 367 (1968) .............................................................................. 12

*United States v. Romer,*
    148 F.3d 359 (4th Cir. 1998) .................................................................. 8

*United States v. Safari,*
    849 F.2d 891 (4th Cir. 1988) .................................................................. 4

*United States v. Strassini,*
    59 F. App'x 550 (4th Cir. 2003) ............................................................. 9

*United States v. Virginia* (*VMI*),
    518 U.S. 515 (1996) ............................................................ 14, 15, 17, 22

*Veney v. Wyche,*
    293 F.3d 726 (4th Cir. 2002) ................................................................ 19

*Ward v. Rock Against Racism,*
    491 U.S. 781 (1989) ........................................................................... 1, 16

*Wilcox v. Lyons,*
    970 F.3d 452 (4th Cir. 2020) ................................................................ 18

*Worldwide Subsidy Group, LLC v. Federation International de
    Football Association,*
    No. 14-00013, 2014 WL 12631652 (C.D. Cal. June 9, 2014) .................... 8

## Statutes

W. Va. Code § 18-2-25d ............................................................................ 1, 20

## Other Authorities

11 James W. Moore, et al., Moore's Federal Practice, § 56.14(4)(b) ............. 10

## Rules

Fed. R. Civ. P. 26(a)(1)(D) ......................................................................... 9

Fed. R. Evid. 201(b) .................................................................................... 8

Fed. R. Evid. 26(e) ...................................................................................... 9

Fed. R. Evid. 801(c) ..................................................................................... 4

## INTRODUCTION

Defendant-Intervenor Lainey Armistead has shown that the Sports Act (W. Va. Code § 18-2-25d) complies with equal protection and Title IX because males and females are not similarly situated in the sports context. Biological differences matter in athletics, as B.P.J. concedes. The Act merely acknowledges these differences and applies a uniform rule, thereby ensuring that women have a fair playing field and equal opportunity to compete and win in West Virginia.

Undeterred, B.P.J. adopts the kitchen-sink approach and faults Armistead for violating the federal rules and insufficiently supporting her motion while (ironically) making general allegations that do not specify which defendant or fact citation B.P.J. complains about. In reality, Armistead has complied with the rules and more than adequately supports her motion. She has filed over 2,000 pages of relevant and admissible evidence and provided a citation for every fact she relies on.

In contrast, B.P.J. emphasizes "facts" immaterial to Armistead's summary-judgment motion. Though B.P.J. makes much of puberty blockers and circulating testosterone levels, these issues are "beside the point, for the validity of the [law] depends on the relation it bears to the overall problem the government seeks to correct, not on the extent to which it furthers the government's interests in an individual case." *Ward v. Rock Against Racism*, 491 U.S. 781, 801 (1989).

B.P.J. all but concedes that the Act is lawful under this standard. So B.P.J. invents a new intermediate-scrutiny standard that requires the state to accommodate the only male in West Virginia who (according to B.P.J.) has ever competed in women's sports. But this theory replaces intermediate scrutiny with strict scrutiny and would give all male athletes a right to participate in women's sports if their gender identity, physiology, or athletic ability places them outside the bounds of the

1

"average" male. *See* Consolidated Memo. in Opp. to Def.'s Mots. for Summ. J. (Pl.'s Resp. Br.) 36 (Doc. 331).[1]

B.P.J.'s argument ultimately eats itself because sex-separated sports exist to accommodate the biological differences between males and females. Take that out of the equation, and the state must eliminate women's sports and sponsor only co-ed teams. This Court should not follow B.P.J. down that path. It should instead grant Armistead and her co-defendants summary judgment and affirm the value of women-only sports.

**ARGUMENT**

Armistead deserves summary judgment. (I) Her motion complies with Rule 56, and (II) there is no material factual dispute. The Sports Act also complies with (III) the Equal Protection Clause and (IV) Title IX.

## I.   Armistead's motion complies with Rule 56.

Facing unfavorable facts and law, B.P.J. tries to distract the Court with vague allegations that Armistead "made no effort" to substantiate her summary-judgment motion. Pl.'s Resp. Br. 3. Yet a few pages later, B.P.J. tries to discredit all the facts Armistead supposedly never cited. *Id.* at 4–11. Of course, Armistead cites plenty of evidence in support of her motion. *See* Def.-Intervenor's Mem. in Supp. of Mot. for Summ. J. (Armistead's SJ Br.) 2–6 (Doc. 288).

B.P.J. then misstates the summary-judgment standard. Pl.'s Resp. Br. at 3 (quoting *Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986)). In reality, Armistead need not "produce evidence showing the absence of a genuine issue of material fact, even with respect to an issue on which the nonmoving party bears the burden of proof." *Celotex*, 477 U.S. at 325 (distinguishing *Adickes v. S.H. Kress & Co.*, 398 U.S. 144 (1970)). Rather, B.P.J. bears the burden to "demonstrate that [B.P.J.] has been

---

[1] All citations to documents filed in this case are to the document's original or bates stamped page number.

2

treated differently from others with whom [B.P.J.] is similarly situated." *Sansotta v. Town of Nags Head*, 724 F.3d 533, 542 (4th Cir. 2013) (citation omitted). So Armistead need not prove a negative at summary judgment; she need only show "an absence of evidence to support [B.P.J.'s] case." *Celotex*, 477 U.S. at 325. Armistead can easily do that and more—she cites undisputed material facts to show she deserves summary judgment.

To be sure, Armistead did not attach a Statement of Undisputed Material Facts to her motion. But neither the federal rules nor local rules require it, and the local rules do not say anything about it, which suggests it's not permitted. No matter, B.P.J. still fails to raise a dispute of material fact opposing Armistead's motion, as noted below. So judgment for Armistead is warranted.

## II.   B.P.J.'s attempts to create material fact disputes fall flat.

Moving from rules to facts, B.P.J. tries to defeat Armistead's motion by attacking the facts on which she relies. This effort fails for four reasons: (A) the evidence of males' trying to play in women's sports is admissible; (B) B.P.J. does not meaningfully dispute that biological males and females differ in athletics; (C) B.P.J. fails to raise a material fact dispute about the various sports organizations' policies; and (D) the examples of athletes across the country are also admissible.

### A.  Evidence about male participation in women's sports is admissible.

B.P.J. argues that statements about males trying to participate in women's sports are hearsay. Pl.'s Resp. Br. 4–6. Not so. Bernie Dolan, the Executive Director of the West Virginia Secondary Schools Activities Commission, testified that the Commission enacted a policy about male athletic participation because of males' trying to participate in women's sports. App. to Def.-Intervenor's Mot. for Summ. J. (App.) 1097 (118:18–20) (Doc. 286-1). Likewise, Dolan's statements about boys wanting to play on girls' teams (App. 1097 (120:20–121:7)) show what the Commission knew and why it acted. These are "statements that have relevance

simply because they were made." *Lorraine v. Markel Am. Ins. Co.*, 241 F.R.D. 534, 566 (D. Md. 2007); *accord* Fed. R. Evid. 801(c) advisory committee's note ("If the significance of an offered statement lies solely in the fact that it was made, no issue is raised as to the truth of anything asserted, and the statement is not hearsay."). And they show the effect on the listener too. *United States v. Safari*, 849 F.2d 891, 894 (4th Cir. 1988) (a statement is not hearsay if offered to "show [the listener's] knowledge").

B.P.J. also disputes whether boys' participation was "an issue" justifying the Act's enactment. Pl.'s Resp. Br. 4. But of course, West Virginia doesn't need to wait for a flood of men to take over women's sports before acting. Def.-Intervenor's Resp. to Pl.'s Mot. for Summ. J. (Armistead's Resp. Br.) 21 (Doc. 302). It can anticipate the coming problem based on examples across the country and requests made by students in West Virginia. *See Brown v. City of Pittsburg*, 586 F.3d 263, 280 n.17 (3d Cir. 2009) ("[L]egislatures may look outside of their own regional jurisdictions for evidence substantiating the problem to which a given regulation is addressed.").

Despite B.P.J.'s protests, courts have "never required" states to prove that a "factual basis" justifying a law "ha[d] been submitted to the legislative body prior to the enactment of the legislative measure." *Phillips v. Borough of Keyport*, 107 F.3d 164, 178 (3d Cir. 1997) (en banc). "[I]ndividual legislators" can "base their judgments on their own study of the subject matter of the legislation, their communications with constituents, and their own life experience and common sense so long as they come forward with the required showing in the courtroom once a challenge is raised." *Id.* So there's no need to "reenact the legislative measure after parading its evidence through its legislative chamber." *Id.* Armistead and her co-defendants have assembled the record here and more than substantiated that the Act has a legitimate purpose.

4

## B. B.P.J. fails to dispute the material facts about differences between biological males and females.

B.P.J. asserts that the evidence of biological differences between males and females is inadmissible and disputed.[2] Pl.'s Resp. Br. 6–7. But the only facts B.P.J. cites for this dispute come from a footnote and refer to prepubertal children. *Id.* at 7 n.4. That doesn't help B.P.J. Even B.P.J.'s expert Dr. Joshua Safer "accept[s] as fact that men and boys who are appropriately developed have … [better] performance outcomes in certain sports than do cisgender women and cisgender girls again appropriately developed." App. 619 (19:4–8); App. 1535 (Dr. Safer's errata sheet); *see also* Def.-Intervenor's Supp. App. in Supp. of Mot. for Summ. J. (Supp. App.) 79 (¶ 25) (Doc. 300). So it is undisputed that, on average, adolescent and adult males have a physiological advantage in sports over adolescent and adult females. *See* App. 127.

The undisputed evidence goes even further. Though B.P.J. says Dr. Safer disputed a "meaningful performance gap" between prepubertal males and females (Pl.'s Resp. Br. 7 n.4), Dr. Safer *admitted* that the research does show such a gap. App. 636–40 (88:9–102:24).

B.P.J. then raises alleged factual disputes as to prepubertal males who identify as transgender. Pl.'s Resp. Br. 7 n.4. In short, Dr. Safer alleges that males who identify as girls may not have the physiology of typical males and he wonders whether the extensive research on biological males still applies to them. Supp. App. 127–28 (¶¶ 11–12). Dr. Safer also conjectures that biological males who take puberty blockers lose the typical male advantage in sports. Supp. App. 130 (¶¶ 16–17).

But "mere speculation," does not create a genuine dispute of material fact. *Beale v. Hardy*, 769 F.2d 213, 214 (4th Cir. 1985). So opining that "the experience of

---

[2] The admissibility of the testimony of Armistead's experts will be addressed in Armistead's response briefs to B.P.J.'s *Daubert* memoranda, rather than in this summary-judgment reply.

transgender girls *might* be more similar to the experience of cisgender girls than to cisgender boys" doesn't cut it. Supp. App. 128 (¶ 11) (emphasis added); *see Tyger Constr. Co. Inc. v. Pensacola Constr. Co.*, 29 F.3d 137, 142 (4th Cir. 1994) ("An expert's opinion should be excluded when it is based on assumptions which are speculative."). And Dr. Safer even stated that he was "not offering an opinion between those two groups," but he was "simply raising the possibility" that the male performance advantage did not apply to males who identify as female. App. 641 (107:18–21). Armistead has already explained elsewhere that Dr. Safer's opinions are unreliable and theoretical. *See* Memo. in Supp. of Def.-Intervenor and the State of W. Va.'s Mot. to Exclude Expert Testimony of Dr. Joshua Safer (Safer Br.) 7–8 (Doc. 314). These guesses about what we may find if someone just publishes more studies on the topic do not create a genuine fact dispute now. *Textron Inc. Ex. Rel. Homelite Div. v. Barber-Coleman Co.*, 903 F. Supp. 1558, 1565 (W.D.N.C. 1995) ("[A]n expert's subjective opinion is insufficient to withstand a motion for summary judgment because 'we are unprepared to agree that it is so if an expert says it is so.'" (quoting *Alevromagiros v. Hechinger Co.*, 993 F.2d 417, 421 (4th Cir. 1993))); *see also* Safer Br. § I.B. (making this argument).

Let's review the facts. We know that gender identity does not affect athletic performance. App. 656 (167:24–168:1). And we know that males have an athletic advantage before puberty, regardless of the reasons why and regardless of how "modest" (Pl.'s Resp. Br. 7) B.P.J. believes the advantage to be. App. 145–57. So there is no evidence or studies to show that a male who identifies as female loses his athletic advantage simply because of a transgender identity. And Dr. Safer's guesswork about the effects of puberty blockers depends on his faulty premise that prepubertal males do not have an athletic advantage to begin with. This speculation on speculation doesn't create true factual disputes.

6

But even putting these facts aside, Armistead's summary-judgment motion does not hinge on whether prepubertal biological males have athletic advantages in sports. Remember, "the substantive law will identify which facts are material." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). Here, the question is not, as B.P.J. asserts, whether "modest" differences between prepubertal boys and girls "justify categorically barring" males who identify as women from women's and girls' sports. Pl.'s Resp. Br. 7. Rather, the first relevant question is one of classification— and the relevant classification here is biological sex. *See* Armistead's Resp. Br. § I.B.1. B.P.J. bears the burden to show that a biological male who identifies as a girl is similarly situated to biological females in the sports context. B.P.J. doesn't clear that first hurdle. *See* Armistead's SJ Br. § I.B. The next relevant question is whether the Act is substantially related to West Virginia's important interest in promoting fairness and safety in women's sports. *See* Armistead's Resp. Br. 19. And even putting aside the evidence about prepubertal children, only a small fraction of the population identifies as transgender, and an even smaller percentage wants to participate in sports. Armistead's Resp. Br. 19. B.P.J. has already conceded that the Act validly applies to the vast majority of males. And this concession proves that the means-end fit is more than reasonable when it comes to promoting safety and fairness for female athletes. *Id.* The undisputed facts show that the Act substantially furthers West Virginia's goals.

### C. B.P.J. does not raise a material dispute about other sport organizations' policies.

B.P.J. says that Armistead incorrectly characterizes certain sports organizations' policies and that they are inadmissible. Pl.'s Resp. Br. 8–9. But B.P.J. doesn't cite a single instance of Armistead's misstating the policies. Nor does B.P.J. provide a reason for calling the policies inadmissible, *id.*, which is especially notable since B.P.J. relies on them too, Mem. in Supp. of Pl.'s Mot. for Summ. J. (Pl.'s SJ Br.)

6–7 (Doc. 291). As this usage seems to concede, this Court can judicially notice these policies. *See* Fed. R. Evid. 201(b). At most, B.P.J. quibbles over non-material aspects of the state's characterizations of these policies. For example, B.P.J. notes that males identifying as women may compete on U.S. women's rugby teams if their testosterone is low enough. Pl.'s Resp. Br. 8. Armistead never misstated this fact, but B.P.J.'s observation doesn't change the reality that sports organizations refuse to adopt the line B.P.J. draws. The Court should reject this non-argument.

**D. The evidence about out-of-state athletes is admissible.**

B.P.J. also labels the evidence about specific athletes across the country as "immaterial and inadmissible." Pl.'s Resp. Br. 9. This is incorrect. The Court may take judicial notice of "a fact that is not subject to reasonable dispute" when it is generally known or "can be accurately and readily determined from sources whose accuracy cannot reasonably be questioned." Fed. R. Evid. 201(b). The news articles and sporting results that Armistead cites do just that. *See Caner v. Autry*, 16 F. Supp. 3d 689, 695 n.7 (W.D. Va. 2014) (collecting cases); Armistead's SJ Br. 7. The results of sporting events—some of which are reported in the various news articles—are not subject to dispute and are accurately recorded. *See Matthews v. Nat'l Football League Mgmt. Council*, 688 F.3d 1107, 1113 (9th Cir. 2012) (judicially noticing number of games a professional football team played via NFL website); *Worldwide Subsidy Grp., LLC v. Fed'n Int'l de Football Ass'n*, No. 14-00013, 2014 WL 12631652, at *2 (C.D. Cal. June 9, 2014) (judicially noticing "outcome of several soccer matches" that was "available on FIFA's website"). This Court may also take judicial notice of the articles to show that these issues have "received local and national attention." *Hecox v. Little*, 479 F. Supp. 3d 930, 961 n.16 (D. Idaho 2020). Plus, on the whole, the news articles are cited for purposes other than their truth, so they are not hearsay. *United States v. Romer*, 148 F.3d 359, 368 (4th Cir. 1998) (holding that district court did not err in admitting a newspaper article where it "simply was introduced in the area of the

reactions to the article and certain comments that may have been made about it"), *abrogated on other grounds as recognized by United States v. Strassini*, 59 F. App'x 550, 552 (4th Cir. 2003).

Moving on, the declarations Armistead cited at summary judgment are also admissible despite B.P.J.'s timeliness protests. On February 2, Armistead responded to B.P.J.'s broad interrogatories (Second Supp. App. to Def.-Intervenor's Mot. for Summ. J. (Second Supp. App.) 78–100) and then supplemented her initial disclosures with related information on February 11, just over a month after the initial-disclosure deadline and *a month and half before* discovery closed on March 25.[3] Even more to the point, there is no deadline for supplemental disclosures—either in the scheduling order or the federal rules. *See* Fed. R. Evid. 26(e). In a February 25 email to B.P.J.'s counsel, Armistead's counsel explained that these supplemental disclosures were made to align with Armistead's earlier discovery responses. Second Supp. App. 103 And Armistead's counsel even noted that "Ms. Armistead may rely on the declaration or testimony of some of these individuals at summary judgment or trial, but has not yet made this decision." *Id.* So B.P.J. is complaining about timely disclosures, but B.P.J. had the opportunity to conduct depositions of the disclosed individuals. B.P.J. just chose not to. This Court should not strike timely disclosed witnesses now.[4]

---

[3] B.P.J. complains that Armistead's supplemental disclosures came four months after Armistead's initial disclosures, which is irrelevant. B.P.J.'s own discovery requests triggered the need to supplement the initial disclosures. To be clear, though, the supplemental disclosures came just over a month after Armistead's deadline for her initial disclosures: January 3, 2022. Fed. R. Civ. P. 26(a)(1)(D).

[4] While B.P.J. says that Armistead missed her February 8 deadline (Pl.'s Resp. Br. 10–11), that deadline was for written discovery *requests*—not written discovery responses, much less any deadline for supplementing responses or initial disclosures.

B.P.J. also asserts that "the declarations contain inadmissible hearsay," but B.P.J. does not identify any specific instances of alleged hearsay in the declarations. Pl.'s Resp. Br. 10. Given this lack of specificity, Armistead need not and cannot respond. *See Blasic v. Chugach Support Servs., Inc.*, 673 F. Supp. 2d 389, 395 (D. Md. 2009) ("An objecting party must 'spell out the nature of the defects clearly and distinctly.'" (quoting 11 James W. Moore, et al., Moore's Federal Practice, § 56.14(4)(b))). This Court should ignore these conclusory accusations.[5]

## III.  The Act complies with the Equal Protection Clause.

B.P.J. attacks the Act under equal protection for targeting male athletes who identify as transgender and for not accommodating B.P.J. individually. But to get there, B.P.J. "misconceives the nature of both the governmental interest at issue and the manner in which we examine statutes alleged to violate equal protection." *Tuan Anh Nguyen v. I.N.S.*, 533 U.S. 53, 69 (2001). In reality, (A) the Act classifies according to biological sex, to promote a valid interest in protecting opportunities for female athletes; (B) intermediate scrutiny requires a reasonable means-end fit, not a perfect one; (C) equal protection eschews classifications that denigrate women, not classifications that uplift them; and (D) the Act substantially furthers the state's valid interests in protecting women's sports.

### A.  The Act makes valid distinctions based on biological sex to promote the valid interest of protecting female athletes.

B.P.J. claims that Armistead "examines the wrong classification," because the Act supposedly employs an "outcome-driven definition of 'biological sex'" that secretly classifies based on transgender status. Pl.'s Resp. Br. 27, 34. B.P.J. also alleges that West Virginia legislators passed the Act with a discriminatory purpose. These claims have no merit because biology-based classifications are valid.

---

[5] B.P.J. also cites a number of out-of-court statements in B.P.J.'s own summary-judgment motion. *E.g.*, Pl.'s SJ Br. 21 n.8.

As Armistead already noted, courts use three steps to determine the relevant classification in this scenario. First, courts "must begin with the statutory classification itself." Armistead's SJ Br. 7. If the statute is facially neutral, courts then ask if it is "'overtly or covertly designed to prefer' a certain class." *Id.* at 19. Third, courts ask "whether the adverse effect reflects invidious … discrimination." *Id.*

As to the first question, the Act classifies athletes according to biological sex. Armistead's SJ Br. § I.A. The biological classes of "male" and "female" are scientifically valid. Armistead's Resp. Br. 8. And contrary to what B.P.J. claims, the Act does not say anything about transgender identity, nor is gender identity relevant to promoting the Act's purpose. Armistead's SJ Br. 12–14. *City of L.A. v. Patel*, 576 U.S. 409 (2015), is also inapt as Armistead explained already. Armistead's Resp. Br. 15. In fact, B.P.J. can't cite a single case applying *Patel*'s methodology to an equal-protection claim.

Moving to the second question, B.P.J. fails to show that the Act covertly discriminates against transgender identities. The Act affects all males, not just males who identify as transgender. Armistead's SJ Br. 19–20. Any disproportionate "impact is essentially an unavoidable consequence of a legislative policy that has in itself always been deemed to be legitimate." *Pers. Adm'r of Mass. v. Feeney*, 442 U.S. 256, 279 n.25 (1979). And though B.P.J. says that the state previously did not exclude male athletes who identify as transgender from women's teams, B.P.J.'s historical analysis is misleading at best. Armistead's Resp. Br. § I.A.2.[6]

---

[6] For example, B.P.J. mischaracterizes the Commission's "transgender athlete policy," claiming it "generally allowed transgender students to participate on sports teams consistent with their gender identity." Pl.'s Resp. Br. 5. But inclusion was not the "general" rule. That policy (which was never adopted) allowed each school to make an "initial determination" and required schools to consider the impact on "fair competition." Second Supp. App. 114. It also provided for an appeal process anytime a student's participation "would adversely affect competitive equity or safety." *Id.*

Third, the Act was not passed for an invidious discriminatory purpose. Statements by West Virginia legislators show a legitimate interest in protecting women's sports. *Id.* § I.A.3. Besides, "[i]nquiries into congressional motives or purposes are a hazardous matter." *United States v. O'Brien*, 391 U.S. 367, 383 (1968). And "floor statements by individual legislators rank among the least illuminating forms of legislative history." *N.L.R.B. v. SW Gen., Inc.*, 137 S. Ct. 929, 943 (2017). "What motivates one legislator to make a speech about a statute is not necessarily what motivates scores of others to enact it, and the stakes are sufficiently high for [the Court] to eschew guesswork." *O'Brien*, 391 U.S. at 384.

Taking B.P.J.'s arguments to their logical end would mean that biology-based classifications are inherently discriminatory because they always overlap or contradict alleged transgender identities. Under that logic, the state could never establish a biological classification to help biological women. That would upend at least 50 years of equal-protection jurisprudence and silently reverse Supreme Court decisions upholding laws that favored "female wage earners to compensate for past employment discrimination," *Califano v. Webster*, 430 U.S. 313, 318 (1977), or validating the government's ability to require "every male citizen" between 18 and 26 to register for the draft, *Rostker v. Goldberg*, 453 U.S. 57, 59 (1981). It would mean the state could never separate men's and women's sports, even when a biological male who identifies as a man wants to compete against women.

But "[p]rinciples of equal protection do not require [the legislature] to ignore … reality." *Nguyen*, 533 U.S. at 66. "There is nothing irrational or improper in the recognition" of biological differences between the sexes. *Id.* at 68. The Act properly recognizes that reality. Males and females are built differently when it comes to sports. Armistead's SJ Br. § I.A; Armistead's Resp. Br. 4–5. "This is not a stereotype." *Nguyen*, 533 U.S. at 68. In fact, this is the only reason sex-separated sports exist—to

protect opportunities for female athletes that would not exist if they had to compete against men. Armistead's SJ Br. § I.A.

This shows that protecting opportunities for biological females is a legitimate government interest. And the state can enact biology-based classifications to further that interest. Under this proper framework, B.P.J.'s argument quickly falls apart.

**B. Intermediate scrutiny requires a reasonable fit, not a perfect one.**

B.P.J. argues that Armistead uses the "wrong 'intermediate scrutiny' standard" because she cites cases outside the equal-protection context. Pl.'s Resp. Br. 35. According to B.P.J., intermediate scrutiny under equal protection requires more than a "reasonable fit" and so the Act must accommodate the only male (according to B.P.J.) in West Virginia's history who has competed on a girls' sports team. *See* Pl.'s Resp. Br. 40 ("there was no evidence of transgender girls even participating in school sports in West Virginia prior to H.B. 3293"); *see also* Pl.'s SJ Br. 8–9. But this analysis replaces the right intermediate-scrutiny standard with the wrong standard—one that courts have never used before.

This Court already identified the correct standard, requiring the state to show only "*a reasonable fit* between the challenged statute and a substantial governmental objective." Mem. Op. & Order (Order) 8 (Doc. 67) (emphasis added). And "this question cannot be answered by limiting the inquiry to whether the governmental interest is directly advanced as applied to a single person or entity." *United States v. Edge Broad. Co.*, 509 U.S. 418, 427 (1993). In other words, West Virginia can "protect its interest by applying a prophylactic rule," and it need not "go further and to prove that the state interests … were advanced by applying the rule in [B.P.J.'s] particular case." *Id.* at 431.

B.P.J. has no answer and instead applies a different intermediate-scrutiny standard without every saying so. But B.P.J. cites no cases to justify this theory. And the "exceedingly persuasive" language that B.P.J. does invoke does not change the

underlying standard. The Supreme Court has always used that phrase as a synonym for—not a deviation from—the traditional intermediate-scrutiny standard. *See*, *e.g.*, *Nguyen*, 533 U.S. at 70; *United States v. Virginia* (*VMI*), 518 U.S. 515, 524, 533 (1996); *Miss. Univ. for Women v. Hogan*, 458 U.S. 718, 724 (1982); *Feeney*, 442 U.S. at 273.

Contrary to what B.P.J. claims, intermediate scrutiny under the Equal Protection Clause does not require "far more" than intermediate scrutiny under every other constitutional provision. Pl.'s Resp. Br. 35. There's just one test. "Although the various forms of intermediate scrutiny differ in precise terminology, they essentially share the same substantive requirements." *United States v. Chester*, 628 F.3d 673, 683 (4th Cir. 2010) (cleaned up and citation omitted). "They *all* require the asserted governmental end to be more than just legitimate, either 'significant,' 'substantial,' or 'important' … and require the fit between the challenged regulation and the asserted objective be reasonable, not perfect." *Id.* (cleaned up and emphasis added).

*Kolbe v. Hogan* illustrates the point. *Kolbe* concerned both a Second Amendment *and* an equal protection claim against a law that prohibited members of the public, but not retired law enforcement, from possessing certain assault weapons. 849 F.3d 114, 146 (4th Cir. 2017). It denied these groups were similarly situated because of police officers' specialized training. *Id.* at 147. And in doing so, the court did not care that one of the plaintiffs was a "retired Master-At-Arms of the United States Navy" with "extensive training with firearms and magazines similar to those banned by the Act." Br. for Pls.-Appellants, *Kolbe*, 849 F.3d 114 (No. 14-1945), 2014 WL 5680384 at 19. The plaintiffs' individual characteristics did not matter and did not change the outcome.

Other circuits agree: "While the vocabulary of intermediate scrutiny varies across courts, *all* forms of the standard require" an important government objective and a "reasonable fit between the challenged regulation and the asserted objective." *Tyler v. Hillsdale Cnty. Sheriff's Dep't*, 837 F.3d 678, 693 (6th Cir. 2016) (cleaned up

and emphasis added); *accord United States v. Chovan*, 735 F.3d 1127, 1139 (9th Cir. 2013). So courts have applied equal-protection cases to determine whether gun laws were a "reasonable fit" to promote public safety. *Jones v. Bonta*, --- F. 4th ----, No. 20-56174, 2022 WL 1485187, at *19 (9th Cir. May 11, 2022); *see also Tyler*, 837 F.3d at 694 (citing *VMI*, 518 U.S. at 533). And courts have said that intermediate scrutiny under the First Amendment is not "materially different" from intermediate scrutiny under the Equal Protection Clause. *Capobianco v. Summers*, 377 F.3d 559, 564 (6th Cir. 2004).

Supreme Court cases like *Nguyen* prove that the normal intermediate-scrutiny standard applies in the equal-protection context too. *Nguyen* upheld a law that required unwed U.S. citizen fathers, but not mothers, to acknowledge or show parenthood to transmit citizenship to their foreign-born child. 533 U.S. at 59, 70. Like males and females in the sports context, "[f]athers and mothers are not similarly situated with regard to the proof of biological parenthood," so "[t]he imposition of a different set of rules ... with respect to fathers and mothers is neither surprising nor troublesome from a constitutional perspective." *Id.* at 63. The biological distinction in that case was a "reasonable substitute" for promoting the state's interests, and it did not need to achieve the state's "ultimate objective in every instance." *Id.* at 66, 70 (obligations placed on fathers were a "reasonable substitute" for "opportunity" of a parent-child relationship "manifest between mother and child at the time of birth").

*Nguyen* also affirmed that alternative means to a different end doesn't invalidate the state's chosen methods. *Contra* Pl.'s Resp. Br. 41, 46. The state need not "elect one particular mechanism from among many possible methods ... even if that mechanism arguably might be the most scientifically advanced method." *Nguyen*, 533 U.S. at 63. So B.P.J. can protest that West Virginia "could have" implemented a dozen alternative methods to promote fairness in sports, and it still won't invalidate the Act. *Nguyen*, 533 U.S. at 64; *see also* Armistead's SJ Br. 14.

Though Armistead need not run up the score, *O'Connor v. Board of Education of School District 23* also supports her point. 449 U.S. 1301 (1980) (Stevens, J., in chambers). There, Justice Stevens affirmed that a sex-based classification is constitutional if it "is *reasonable* in substantially all of its applications" even though "it appears arbitrary in an individual case." *Id.* at 1306 (emphasis added). On remand, the Seventh Circuit affirmed that sex-separated teams substantially further the government's objectives even if there exists a less "restrictive alternative." *O'Connor v. Bd. of Ed. of Sch. Dist. No. 23*, 645 F.2d 578, 581 (7th Cir. 1981).

B.P.J. stubbornly brushes *O'Connor* aside because it "involved a cisgender girl." Pl.'s Resp. Br. 34 n.13. But *O'Connor* doesn't say anything about the girl's gender identity. Plus, a person's gender identity doesn't make any difference. Whether it's an exceptional female athlete who can compete with the boys, a male with no skill who can't compete with the boys (Armistead's SJ Br. 17–18), or a male who identifies as female and doesn't want to compete with the boys (like B.P.J.), a law isn't unlawful because "it appears arbitrary in an individual case." *O'Connor*, 449 U.S. at 1306 (Stevens, J., in chambers).

These cases show that B.P.J.'s argument is really a Trojan Horse, hiding a strict-scrutiny analysis under an intermediate-scrutiny veneer. Though B.P.J. plays up the effects of puberty blockers and "the reality of B.P.J.'s identity" (Pl.'s Resp. Br. 32, 41), B.P.J.'s individual circumstances do not affect the equal-protection analysis. "The interest served by the [Act] must be judged 'on the relation it bears to the overall problem the government seeks to correct, not on the extent to which it furthers the government's interests in an individual case.'" *Ross v. Early*, 746 F.3d 546, 556 n.6 (4th Cir. 2014) (citing *Ward*, 491 U.S. at 801).

This all makes sense. If B.P.J.'s theory was correct and intermediate scrutiny required "far more" than a reasonable fit, the state couldn't justify sex-separated

sports in the first place. That cannot be right. This just shows that B.P.J.'s legal theory is wrong.

## C. Intermediate scrutiny repudiates classifications that denigrate women, not laws that protect them.

B.P.J. makes much of *VMI*, where the Supreme Court said that an all-male military institute violated equal protection. 518 U.S. at 534. According to B.P.J., "estimates of what is appropriate for most men and women as a group cannot justify denying opportunities to people who fall outside the average description," so the Act cannot "classify unnecessarily and overbroadly by gender when more accurate and impartial lines can be drawn." Pl.'s Resp. Br. 36 (cleaned up). Once again, B.P.J. misapprehends what the Supreme Court said.

To be sure, the "Court … has carefully inspected official action that closes a door or denies opportunity to women (or to men)." *VMI*, 518 U.S. at 532. Sex "classifications may not be used … to create or perpetuate the legal, social, and economic inferiority of women." *Id.* at 534. That's what the Virginia Military Institute's exclusionary policy did—it provided a prestigious military education for "the Commonwealth's sons" but made "no provision whatever for her daughters." *Id.* at 540.

Still, *VMI* (which was decided before *Nguyen*) affirmed that equal protection "does *not* make sex a proscribed classification." *Id.* at 533 (emphasis added). "Physical differences between men and women … are enduring," and sex classifications are allowed "to advance full development of the talent and capacities of our Nation's people." *Id.* That's what the Act does—it promotes fairness and safety for female athletes that would not exist without women-only sports.

Far from "denying opportunit[ies] to women" because of "estimates of what is appropriate for *most women*," the Act does exactly the opposite. *VMI*, 518 U.S. at 550. "[W]omen whose talent and capacity place them outside the average description" are

free to try out for the men's team. *Id.* And "[t]here is no stigma attached" to males because they can't compete on the women's team. Armistead's SJ Br. 10. Just as "an eighth grader must face competition from talented seventh graders without reciprocal rights," boys can be forced "to compete with talented girls without reciprocal rights" too. *O'Connor*, 449 U.S. at 1306 n.4 (Stevens, J., in chambers).

B.P.J. simply misses the forest for the trees. Sex-based classifications trigger intermediate scrutiny because "the sex characteristic frequently bears no relation to ability to perform or contribute to society." *Wilcox v. Lyons*, 970 F.3d 452, 459 (4th Cir. 2020) (quoting *Frontiero v. Richardson*, 411 U.S. 677, 686 (1973)). Sports are different though. In the sports context, the average physiological differences between men and women do matter, and those differences are not stereotypes. Armistead's Resp. Br. 8; *see also* Armistead's SJ Br. 8–10. That's why the government can consider biology-based differences to protect women's sports. *Contra* Pl.'s Resp. Br. 36.

B.P.J.'s claim only makes sense if this Court accepts that biological sex *is* a sex stereotype, a claim which would undermine sex-based classifications everywhere. Consider homeless shelters for women who "have escaped from sex trafficking or been abused or battered, primarily at the hands of men." *Downtown Soup Kitchen v. Mun. of Anchorage*, 406 F. Supp. 3d 776, 781 (D. Alaska 2019) (granting injunction against local law forcing women's homeless shelter to accept biological males). Or what about nudity ordinances that differentiate between men and women to protect the public's "moral sensibilities." *Eline v. Town of Ocean City*, 7 F.4th 214, 221 (4th Cir. 2021). Or what about sex separation that makes immanent sense in prisons or jails, where "female and male inmates are not housed together" because of the "serious and real" risk of harassment, assault, rape, and even murder. *De Veloz v. Miami-Dade Cnty.*, 756 F. App'x 869, 877 (11th Cir. 2018). B.P.J.'s theory would not even allow prisons to consider "well-documented reality that institutions for females generally are much

18

less violent than those for males" to make protective-housing decisions. *Veney v. Wych*e, 293 F.3d 726, 734 (4th Cir. 2002). B.P.J.'s theory would invalidate all sex-separated sports as well. No case has ever said that or gone that far. This Court should not be the first to do so.

### D. Sex-separated teams promote opportunities for female athletes.

B.P.J. claims that the Act does not substantially promote fairness and safety for female athletes. That is incorrect for at least two reasons.

First, it does not matter if B.P.J. ran slower than B.P.J.'s sixth-, seventh-, and eighth- grade competitors in cross-country races. *Contra* Pl.'s Resp. Br. 39. Placing 51st out of 66 competitors should not be surprising; Armistead had difficulty competing "against the seventh- and eighth-graders" when she was in the sixth grade too. Second Supp. App. 42 (154:16–20). But the important point is that displacing even "one [female] player" sets back "the goal of equal participation by females in interscholastic athletics." *Clark v. Ariz. Interscholastic Ass'n*, 886 F.2d 1191, 1193 (9th Cir. 1989). That has nothing to do with B.P.J.'s "mere presence." Pl.'s Resp. Br. 39. It has everything to do with displacement and protecting opportunities for female athletes.

Second, B.P.J. rinses and repeats prior arguments that the Act can't define biological sex according to genetics and reproductive organs when it could have used other measurements, like circulating testosterone levels. *See* Pl.'s Resp. Br. 40. Again, this misconceives how equal-protection analysis works. Arguments that the state "could have" done this or "could have" done that don't invalidate a law under intermediate scrutiny. *See infra* at 12. The Act need not employ "the most scientifically advanced method." *Nguyen*, 533 U.S. at 63. It's acceptable for the Act to be overbroad or underbroad in certain circumstances, which is, on some level, inevitable with sex-separated sports. Armistead's Resp. Br. 22. Besides, the Act is

accurately applied more than 99% of the time. *Id.* at 19. So B.P.J.'s hyperbolic attacks on the means-end fit ring hollow.

Plus, the Act does not apply to elementary schools when differences between the sexes are smaller. *See* § 18-2-25d(c)(1) (covering secondary schools and schools of higher education). Instead, it applies at roughly the age that children begin puberty. App. 143 (¶ 69) (explaining puberty begins around age 11). And though B.P.J. ignores it, there *is* evidence that sex chromosomes affect athletic performance even before then. *See* App. 145–56. This shows that the Act substantially promotes the state's interest, "even if it were true, which it is not, that applying the general statutory restriction to [B.P.J.] in isolation, would no more than marginally" promote that interest. *Edge Broad.*, 509 U.S. at 430.

Armistead has already refuted B.P.J.'s remaining arguments elsewhere. *See* Armistead's Resp. Br. § I.B.3–4. She need not repeat herself here. The Act substantially furthers an important government interest and complies with equal protection.

## IV.   The Act complies with Title IX

The Act not only complies with the Equal Protection Clause; it complies with Title IX too.

Because the relevant classification in this case is biological sex, B.P.J. cannot be similarly situated to biological females. Armistead's SJ Br. § I.B. B.P.J.'s theory— that gender identity alone should control—reinforces this. Sex-separated sports exist because of the average physiological differences between males and females. Armistead's SJ Br. § I.A. Yet B.P.J. believes that teams should be separated according to gender identity, which depends on B.P.J.'s preferences, how B.P.J. identifies, and "how B.P.J. has … lived as a girl." Pl.'s Resp. Br. 48. But even if these things are all true, they have no connection to athletic ability. *See* Armistead's SJ Br. 12–14, 19. Sex-separated sports don't exist to accommodate gender identities, much

less a "clearly expressed … desire to run with the girls' team." Pl.'s Resp. Br. 49. Even worse, categorizing students because they have stereotypically male or female names, wear stereotypically male or female clothes, or compete on stereotypically male or female sports teams is a recipe for disaster. *See* Armistead's SJ Br. 19; *see also* Armistead's Resp. Br. 8. Courts should shun, not reinforce, sex-stereotypes like these.

That means B.P.J. is not "excluded from participating on girls' sports teams based on her transgender status." Pl.'s Resp. Br. 48. The Act treats B.P.J. like every other male, and the Act says nothing about transgender identities. Indeed, biological females who identify as transgender may participate on whichever team they prefer because the Act is concerned with biology, not gender identity. *See* Armistead's SJ Br. § I.B; *cf. id.* at 14 (citing example of a NCAA female athlete who identifies as male competing in women's division).

This accords with Title IX's purpose: protecting opportunities for women and girls that have historically been denied to them. Armistead's SJ Br. 26. In fact, Title IX sometimes requires sex-separated teams to provide women with real "opportunities to enjoy the thrill of victory, the agony of defeat, and the many tangible benefits that flow from just being given a chance to participate in … athletics." *Neal v. Bd. of Trs. of Cal. State Univs.*, 198 F.3d 763, 773 (9th Cir. 1999).

Armistead has already refuted B.P.J.'s remaining arguments in her other briefs. *See* Armistead's SJ Br. § II; Armistead's Resp. Br. § II. The Act complies with Title IX, and this Court should order summary judgement for Armistead and her co-defendants.

## CONCLUSION

The heart of B.P.J.'s claim is that biological sex is an inherently discriminatory concept, and that the state cannot ever consider biology to distinguish between men and women. Yet the Supreme Court has said just the opposite and consistently upheld

laws that accommodate the real physiological differences between the sexes. After all, that's why we have sex-separated sports.

In this respect, B.P.J. never engages with the fundamental question in this case: if men's and women's teams are not separated according to biology, what is the justification for them to exist at all? B.P.J. assumes that separating teams based on gender identity is valid. But equal protection doesn't permit differential treatment of persons "simply because they are women" and men, or because of "generalizations about 'the way women [and men] are.'" *VMI*, 518 U.S. at 532, 550.

Instead of engaging with this question, B.P.J. attempts to shoehorn a strict-scrutiny analysis into an intermediate-scrutiny façade, demanding that the Court vindicate the preferences of a single male against the interests of all female athletes in West Virginia. That is not what equal protection or Title IX demands. This Court should affirm West Virginia's decision to protect women-only sports and grant Armistead and her co-defendants summary judgment.

Respectfully submitted this 26th day of May, 2022.

/s/ Brandon S. Steele

Brandon Steele, WV Bar No. 12423
Joshua D. Brown, WV Bar No. 12652
The Law Offices of Brandon S. Steele
3049 Robert C. Byrd Drive, Suite 100
Beckley, WV 25801
(304) 253-1230
(304) 255-1520 Fax
bsteelelawoffice@gmail.com
joshua_brown05@hotmail.com

Tyson C. Langhofer, VA Bar No. 95204*
Rachel A. Csutoros, MA Bar No. 706225*
Alliance Defending Freedom
44180 Riverside Parkway
Lansdowne, VA 20176
(571) 707-2119
(571) 707-4790 Fax
tlanghofer@adflegal.org
rcsutoros@adflegal.org

Travis C. Barham, GA Bar No. 753251*
Alliance Defending Freedom
1000 Hurricane Shoals Road NE, Ste D-1100
Lawrenceville, GA 30043
(770) 339-0774
(770) 339-0774 Fax
tbarham@adflegal.org

Timothy D. Ducar, AZ Bar No. 015307*
Law Offices of Timothy D. Ducar, PLC
7430 E. Butherus Drive, Suite E
Scottsdale, AZ 85260
(480) 502-2119
(480) 452-0900 Fax
tducar@azlawyers.com

Jonathan Scruggs, AZ Bar No. 030505*
Roger G. Brooks, NC Bar No. 16317*
Henry W. Frampton, IV, SC Bar No. 75314*
Alliance Defending Freedom
15100 N. 90th Street
Scottsdale, AZ 85260
(480) 444-0020
(480) 444-0028 Fax
jscruggs@adflegal.org
rbrooks@adflegal.org
hframpton@adflegal.org

Christiana Holcomb, DC Bar No. 176922*
Alliance Defending Freedom
440 First Street NW, Suite 600
Washington, DC 20001
(202) 393-8690
(202) 347-3622 Fax
cholcomb@adflegal.org

*Visiting Attorneys
Attorneys for Defendant-Intervenor

**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA
CHARLESTON DIVISION**

| | |
|---|---|
| B.P.J., by her next friend and mother, HEATHER JACKSON<br><br>*Plaintiff,*<br><br>  v.<br><br>WEST VIRGINIA STATE BOARD OF EDUCATION, HARRISON COUNTY BOARD OF EDUCATION, WEST VIRGINIA SECONDARY SCHOOL ACTIVITIES COMMISSION, W. CLAYTON BURCH in his official capacity as State Superintendent, DORA STUTLER in her official capacity as Harrison County Superintendent, and THE STATE OF WEST VIRGINIA<br><br>*Defendants,*<br><br>  v.<br><br>LAINEY ARMISTEAD<br><br>*Defendant-Intervenor.* | Case No. 2:21-cv-00316<br><br>Hon. Joseph R. Goodwin |

**CERTIFICATE OF SERVICE**

I, Brandon Steele, hereby certify that on May 26, 2022, I electronically filed a true and exact copy of ***Defendant-Intervenor's Reply in Support of Her Motion for Summary Judgment*** with the Clerk of Court and all parties using the CM/ECF system.

*/s/ Brandon S. Steele*
Brandon Steele, WV Bar No. 12423
The Law Offices of Brandon S. Steele
3049 Robert C. Byrd Drive, Suite 100
Beckley, WV 25801
(304) 253-1230
(304) 255-1520 Fax
bsteelelawoffice@gmail.com

*Attorney for Defendant-Intervenor*
