IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA
CHARLESTON DIVISION

| | |
|---|---|
| B.P.J. by her next friend and mother, HEATHER JACKSON, <br><br> *Plaintiff*, <br><br> v. <br><br> WEST VIRGINIA STATE BOARD OF EDUCATION, HARRISON COUNTY BOARD OF EDUCATION, WEST VIRGINIA SECONDARY SCHOOL ACTIVITIES COMMISSION, W. CLAYTON BURCH in his official capacity as State Superintendent, DORA STUTLER in her official capacity as Harrison County Superintendent, and THE STATE OF WEST VIRGINIA, <br><br> *Defendants*, <br><br> and <br><br> LAINEY ARMISTEAD, <br><br> *Defendant-Intervenor*. | Civil Action No. 2:21-cv-00316 <br><br> Hon. Joseph R. Goodwin |

**PLAINTIFF'S OPPOSITION TO DEFENDANT-INTERVENOR AND DEFENDANT STATE OF WEST VIRGINIA'S MOTION TO EXCLUDE THE EXPERT TESTIMONY OF DR. ARON JANSSEN**

1

## TABLE OF CONTENTS

Page

BACKGROUND ................................................................................................................. 1

LEGAL STANDARD .......................................................................................................... 4

ARGUMENT ....................................................................................................................... 4

    I.    Dr. Janssen's Summary Of The Evidence Supporting The Efficacy Of Gender-Affirming Care Is Accurate And Reliable. ............................................... 4

        A.    Dr. Janssen Does Not "Conflate Correlation With Causation." ................ 5

        B.    Defendants' Criticisms Of The Olson Study Are Meritless. .................... 7

        C.    Defendants' Assertions that Dr. Janssen Ignored "Contrary Research" Are Meritless. ............................................................................ 8

    II.    Defendants' Criticisms Of Dr. Janssen's Discussion Of Factors Associated With "Persistence" Are Meritless. ........................................................................ 9

    III.    Defendants' Criticisms Of Dr. Janssen's Testimony Regarding The Effects Of H.B. 3293 Are Meritless. ................................................................................ 10

CONCLUSION .................................................................................................................. 11

## TABLE OF AUTHORITIES

Page

**Cases**

*In re Adoption of Doe*,
    2008 WL 5006172 (Fla. Cir. Ct. Nov. 25, 2008) ....................................................................8

*In re Bair Hugger Forced Air Warming Devices Prod. Liab. Litig.*,
    9 F.4th 768 (8th Cir. 2021) ........................................................................................................5

*In re C. R. Bard, Inc., Pelvic Repair Sys. Prod. Liab. Litig.*,
    No. MDL 2187, 2018 WL 4220622 (S.D. W. Va. Sept. 5, 2018) .............................................4

*Daubert v. Merrell Dow Pharms.*,
    509 U.S. 579 (1993) ..............................................................................................................2, 4

*Eghnayem v. Bos. Sci. Corp.*,
    57 F. Supp. 3d 658 (S.D. W. Va. 2014) ...................................................................................5

*Grimm v. Gloucester Cnty. Sch. Bd.*,
    972 F.3d 586 (4th Cir. 2020) ................................................................................................1, 7

*Maldonado v. Apple, Inc*,
    No. 16 Civ. 04067, 2021 WL 1947512 (N.D. Cal. May 14, 2021) ..........................................7

*Md. Cas. Co. v. Therm-O-Disc, Inc.*,
    137 F.3d 780 (4th Cir. 1998) ....................................................................................................4

*Milward v. Acuity Specialty Prods. Grp., Inc.*,
    639 F.3d 11 (1st Cir. 2011) .......................................................................................................6

*Sullivan v. U.S. Dep't of Navy*,
    365 F.3d 827 (9th Cir. 2004) ....................................................................................................6

*United States v. Sandoval-Mendoza*,
    472 F.3d 645 (9th Cir. 2006) .................................................................................................6, 7

*United States v. W.R. Grace*,
    504 F.3d 745 (9th Cir. 2007) ....................................................................................................6

**Other Authorities**

Federal Rule of Evidence 702 ..........................................................................................................4, 5

Scientific Evidence: Third Edition. Washington, DC: The National Academies
    Press. https://doi.org/10.17226/13163 .....................................................................................6

Plaintiff B.P.J. respectfully submits this memorandum of law in opposition to the motion by Defendant-Intervenor and Defendant State of West Virginia (collectively "Defendants") to exclude the proffered expert testimony of Aron Janssen M.D. from consideration at summary judgment or trial. (*See* Dkt. No. 312 (Defs.' Mot.).)

## BACKGROUND

Plaintiff B.P.J. is a 12-year-old girl who is transgender. Because she is transgender, B.P.J. is categorically prohibited from participating with other girls on her middle school's cross-country or track and field teams as a result of H.B. 3293. B.P.J. brought this lawsuit to challenge this categorical exclusion as violating her right to be free from discrimination under Title IX of the Education Amendments of 1972 and the Equal Protection Clause.

In granting a preliminary injunction, this Court addressed the State's "cit[ation] to experts who question when social transition and puberty blocking treatment are appropriate for young people," and made clear that "what is or should be the default treatment for transgender youth is not the question before the court." (Dkt. No. 67 (PI Order) at 3 n.4.) Despite this Court's prior holding, Defendants have once again presented alleged "experts who question when social transition and puberty blocking treatment are appropriate for young people." (*Id.*) Expert reports from Dr. Stephen Levine, Dkt. No. 325-1 (Levine Rep.), and Dr. James Cantor, Dkt. No. 321-1 (Cantor Rep.), launch a broadside attack against the prevailing model of gender-affirming care for transgender youth that has been endorsed by the American Academy of Child and Adolescent Psychiatry, the American Academy of Pediatrics, the American Psychological Association, the American Psychiatric Association, and the American Medical Association, among many other mainstream medical organizations. *See Grimm v. Gloucester Cnty. Sch. Bd.*, 972 F.3d 586, 594 (4th Cir. 2020) (relying on amicus briefs from these organizations).

1

As explained in separate *Daubert* motions, Dr. Levine and Dr. Cantor's testimony have no relevance to the issues before the Court because the appropriate treatment for youth with gender dysphoria is not at issue in this case and, thus, should be excluded. But to protect the evidentiary record in the event that Dr. Levine and Dr. Cantor are allowed to testify, Plaintiff has submitted a rebuttal report form Dr. Aron Janssen to respond to their claims.

Dr. Janssen is well qualified to offer reliable testimony concerning current standards of care for treating gender dysphoria in children and adolescents and the scientific data supporting those practices. (*See* Block Decl., Ex. A (Janssen Rebuttal) ¶ 2.) Dr. Janssen is the Vice Chair of the Pritzker Department of Psychiatry and Behavioral Health at the Ann and Robert H. Lurie Children's Hospital of Chicago ("Children's Hospital"), where he also serves as Clinical Associate Professor of Child and Adolescent Psychiatry and Medical Director for Outpatient Psychiatric Services. (Block Decl., Ex. A (Janssen Rebuttal) ¶ 6.) He is board-certified in Child, Adolescent, and Adult Psychiatry. (*Id.* ¶ 8.) In his clinical practice, he has seen approximately 500 transgender patients. (*Id.*)

Dr. Janssen is also an associate editor of the peer-reviewed publication *Transgender Health* and a reviewer for peer-reviewed journals *LGBT Health* and *Journal of the American Academy of Child and Adolescent Psychiatry*. (*Id.* ¶ 9.) He is the author or co-author of sixteen articles on care for transgender patients and is the co-author of Affirmative Mental Health Care for Transgender and Gender Diverse Youth: A Clinical Casebook (Springer Publishing, 2018). He has also authored or co-authored numerous book chapters on treatment for transgender adults and youth. (*Id.* ¶ 10.)

Dr. Janssen has been a member of the World Professional Association for Transgender Health ("WPATH") since 2011. He has been actively involved in WPATH's revision of its

2

Standards of Care for the Health of Transsexual, Transgender, and Gender-Nonconforming People ("WPATH SOC"), serving as a member of revision committees for both the child and adult mental health chapters of the forthcoming eighth edition of WPATH's Standards of Care. (*Id.* ¶ 11.) He is also the Chair of the American Academy of Child and Adolescent Psychiatry's Sexual Orientation and Gender Identity Committee. (*Id.* ¶ 12.)

In his rebuttal report, Dr. Janssen responds to Dr. Levine and Dr. Cantor's caricatured and inaccurate description of "gender affirming care" as "transition on demand," their distorted description of the relevant scientific data, and their baseless speculation that mental health professionals can and should intervene and provide therapy with the goal of encouraging the patient to identify with their sex assigned at birth. As Dr. Janssen noted, "Dr. Levine and Dr. Cantor criticize the methodology of studies supporting gender-affirming care while proposing a 'therapy only' treatment without any empirical or scientific support whatsoever." (Block Decl., Ex. A (Janssen Rebuttal) ¶ 39.)

In their motion to exclude Dr. Janssen's testimony, Defendants do not contend that Dr. Janssen provided unreliable testimony in correcting Dr. Levine and Dr. Cantor's caricatured descriptions of gender-affirming care, or that Dr. Janssen provided unreliable testimony in demonstrating that Dr. Levine and Dr. Cantor's "therapy only" proposal lacks empirical or scientific support. Instead, Defendants ignore Dr. Janssen's posture as a rebuttal witness and act as though Dr. Janssen is offering affirmative testimony in support of B.P.J.'s claims to establish: (i) that social transition is beneficial, (ii) that puberty-delaying medication is beneficial, (iii) that providers are able to predict whether or not a pre-pubertal child will desist from identifying as transgender once they reach puberty, and (iv) that H.B. 3293 harms the mental health of transgender people. (Dkt. No. 312 (Defs.' Mot.) at 5-6.)

3

As noted above, the efficacy of gender-affirming care is not material to the claims before the court. (Dkt. No. 67 (PI Order) at 3 n.4.) To the extent that Dr. Janssen addresses any of these issues in his report, he does so solely as a rebuttal witness to respond to Defendants' experts' misleading and inaccurate assertions. If the Court excludes the expert reports of Dr. Levine and Dr. Cantor, then Dr. Janssen will not present any testimony at all.

## LEGAL STANDARD

"Under Federal Rule of Evidence 702, expert testimony is admissible if it will 'help the trier of fact to understand the evidence or to determine a fact in issue' and (1) is 'based upon sufficient facts or data' and (2) is 'the product of reliable principles and methods' which (3) has been reliably applied 'to the facts of the case.'" *In re C. R. Bard, Inc., Pelvic Repair Sys. Prod. Liab. Litig.*, No. MDL 2187, 2018 WL 4220622, at *2 (S.D. W. Va. Sept. 5, 2018) (quoting Fed. R. Evid. 702). "A two-part test governs the admissibility of expert testimony. The evidence is admitted if it 'rests on a reliable foundation and is relevant.'" *Id.* (quoting *Daubert v. Merrell Dow Pharms.*, 509 U.S. 579, 597 (1993)). "The proponent of expert testimony does not have the burden to 'prove' anything. However, he or she must 'come forward with evidence from which the court can determine that the proffered testimony is properly admissible.'" *Id.* (quoting *Md. Cas. Co. v. Therm-O-Disc, Inc.*, 137 F.3d 780, 783 (4th Cir. 1998)).

## ARGUMENT

**I.  Dr. Janssen's Summary Of The Evidence Supporting The Efficacy Of Gender-Affirming Care Is Accurate And Reliable.**

The purpose of Dr. Janssen's rebuttal report is to respond to the criticisms of Dr. Levine and Dr. Cantor, and to explain the evidence—including multiple peer-reviewed studies—that has led the major medical professional organizations to recommend gender-affirming care in treating children and adolescents with gender dysphoria. In seeking to exclude that testimony, Defendants

4

improperly attempt to shoehorn their disagreement with Dr. Janssen's testimony into a challenge to its admissibility. But to admit expert testimony under Rule 702, the Court "need not determine that the proffered expert testimony is irrefutable or certainly correct—as with all other admissible evidence, expert testimony is subject to testing by vigorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof." *Eghnayem v. Bos. Sci. Corp.*, 57 F. Supp. 3d 658, 668–69 (S.D. W. Va. 2014) (internal quotation marks, brackets, and citations omitted). Dr. Janssen's testimony—which is consistent with the views of the American Academy of Pediatrics and other mainstream medical organizations—easily clears the threshold of reliability.

### A. Dr. Janssen Does Not "Conflate Correlation With Causation."

Defendants' primary attack on Dr. Janssen is that he allegedly "conflates correlation with causation." (Dkt. No. 312 (Defs' Mot.) at 2.) Dr. Janssen does no such thing. As even Defendants acknowledge in their motion, Dr. Janssen agrees that each of the studies document only an association between gender-affirming care and improved health outcomes. (*Id.* at 8, 11-12.)

But the fact that a particular study by itself does not *prove* causation does not mean that it is unreliable for experts in a particular field to consider the study along with other available evidence to *infer* a causal relationship. "An inference of causation based on the totality of the evidence may be reliable even if no one line of evidence supports a reliable inference of causation by itself." *In re Bair Hugger Forced Air Warming Devices Prod. Liab. Litig.*, 9 F.4th 768, 781 (8th Cir. 2021), *cert. denied sub nom. 3M Co. v. Amador*, No. 21-1100, 2022 WL 1528522 (U.S. May 16, 2022); *see id.* at 779–80 (explaining that it is "not necessarily unreliable for the experts to rely on [an observational study] to draw an inference of causation just because the study itself recognized, consistent with these principles, that the association did not establish causation. So long as an expert does the work 'to bridge the gap between association and causation,' a study

disclaiming having proven causation may nevertheless support such a conclusion."); *Milward v. Acuity Specialty Prods. Grp., Inc.*, 639 F.3d 11, 24 (1st Cir. 2011) (holding that district court erred in excluding expert testimony because "none of the studies purports to give direct support" for causal relationship and explaining that the expert witness "did not claim that the studies provided direct support" and "ma[de] clear that he was using them as indirect support"); *United States v. W.R. Grace*, 504 F.3d 745, 765 (9th Cir. 2007) (holding that "the fact that a study is associational—rather than an epidemiological study intended to show causation—does not bar it from being used to inform an expert's opinion about the dangers of asbestos releases").

Relying on studies showing associations to draw causal inferences is especially necessary in the context of medicine because "medical knowledge is often uncertain. The human body is complex, etiology is often uncertain, and ethical concerns often prevent double-blind studies calculated to establish statistical proof. This does not preclude the introduction of medical expert opinion testimony when medical knowledge 'permits the assertion of a reasonable opinion.'" *United States v. Sandoval-Mendoza*, 472 F.3d 645, 655 (9th Cir. 2006) (quoting *Sullivan v. U.S. Dep't of Navy*, 365 F.3d 827, 833–34 (9th Cir. 2004)). "Because few medical recommendations are based on randomized trials (the least biased level of evidence) physicians frequently and necessarily face uncertainty in making testing and treatment decisions and tradeoffs: Very few treatments come without some risk, and in many disciplines, clear evidence of efficacy and risks of treatment are lacking." National Academies of Sciences, Engineering, and Medicine. 2011. Reference Manual on Scientific Evidence: Third Edition. Washington, DC: The National Academies Press. https://doi.org/10.17226/13163. Even Defendants' expert Dr. Cantor agrees: "[I]n medical research, where we cannot manipulate people in ways that would clear up difficult questions, all studies will have a fault. In science, we do not, however, reject every study with any

6

identifiable short-coming—rather, we gather a diversity of observations, made with their diversity of compromises to safety and ethics (and time and cost, etc.)." (*See* Dkt. No. 321-1 (Cantor Rep.) ¶ 87.)

In this case, Dr. Janssen's inferences from the existing scientific literature are not only reliable; they represent the widely accepted views of virtually every major medical organization. *See Grimm*, 972 F.3d at 594 (relying on amicus brief from medical community). Reliability in this context must be assessed based on "what a good physician would [accept] in determining what is reliable knowledge in the medical profession," not based on Defendants' views of what inferences are reliable. *Sandoval-Mendoza*, 472 F.3d at 655 (internal quotation marks and alterations omitted); *cf. Maldonado v. Apple, Inc*, No. 16 Civ. 04067, 2021 WL 1947512, at *17–18 (N.D. Cal. May 14, 2021) ("[E]vidence on these questions is supplied by experts in the field, not from experts in other fields talking about 'good science generally.'").

Defendants' motion to exclude based on reliability should be denied.

### B. Defendants' Criticisms Of The Olson Study Are Meritless.

Dr. Janssen explains in his report that "for prepubertal transgender children with intense, persistent gender dysphoria, there is substantial evidence that, in appropriate cases, socially transitioning can have significant mental health benefits." (Block Decl., Ex. A (Janssen Rebuttal) ¶ 35.) Specifically, he notes that multiple peer-reviewed studies have found that the "mental health profiles" of children who socially transition are in "close alignment with their non-transgender peers, finding only slightly higher levels of anxiety and no elevated levels of depression." (*Id.* (citing Gibson, 2021, Durwood 2017, and Olson 2016).)

Defendants point to a critique of Olson 2016 by W.R. Schumm, who attempted—unsuccessfully—to reanalyze the Olson study's raw data and show statistical errors in the paper. (Dkt. No. 321-1 (Cantor Rep.) ¶¶ 15-16, 100 (citing Schumm, W. R., & Crawford, D. W. (2020).

7

Is research on transgender children what it seems? Comments on recent research on transgender children with high levels of parental support. *The Linacre Quarterly, 87,* 9–24)). But Defendants have not laid a foundation to show that Schumm's methods are reliable. Several years ago, Schumm attempted to perform a similar exercise to show that children of gay parents have worse outcomes in life. A court rejected Schumm's effort as unreliable, finding that Schumm "applies statistical standards that depart from conventions in the field." *In re Adoption of Doe*, 2008 WL 5006172, at *12 (Fla. Cir. Ct. Nov. 25, 2008). In any event, the only actual error that Schumm identified in Olson's raw data requiring a correction was a missing comma. *See* Olson, K.R., *et al.* (2018). *Mental Health of Transgender Children Who Are Supported in Their Identities* (Errata). PEDIATRICS. 142(2):e20181436. Defendants' motion to exclude Dr. Janssen's testimony based on Schumm's flawed critique of Olson should therefore be denied.

    **C.    Defendants' Assertions that Dr. Janssen Ignored "Contrary Research" Are Meritless.**

Dr. Janssen also collected a substantial body of peer-reviewed research documenting a correlation between providing puberty-delaying medication and improved mental health outcomes. (Block Decl., Ex. A (Janssen Rebuttal) ¶ 40.) Dr. Janssen did not, as Defendants claim, ignore "contrary research" in Sweden, Finland, or the United Kingdom. (Dkt. No. 312 (Defs.' Mot.) at 13.) The documents from these countries cited by Defendants are not "contrary research." They are reviews of research on gender affirming medical care for adolescents and practice recommendations based on the same body of research that Dr. Janssen discusses.

Defendants have also not laid a proper evidentiary foundation establishing the authenticity and significance of many of these documents. Several of the documents were labeled as "unofficial translations" from an organization calling itself "Society for Evidence Based Medicine," which opposes gender affirming care. (Dkt. No. 321-4 (Janssen Dep.) at 110:2-16.) Another document is

8

a news story reflecting the United Kingdom's response to a legal ruling that was subsequently overturned on appeal. (*Id.* at 105:6-106:12.)

None of the European documents cited by Defendants are grounds for excluding the consensus views of mainstream medical associations in America as unreliable.

**II.     Defendants' Criticisms Of Dr. Janssen's Discussion Of Factors Associated With "Persistence" Are Meritless.**

In their expert reports, Dr. Levine and Dr. Cantor say that a certain percentage of prepubertal children naturally desist from identifying as transgender once they reach adolescence. Based on that data, Dr. Levine and Dr. Cantor go on to assert that mental health professionals should engage in therapy to encourage children to "desist" and speculate that allowing children to socially transition will put them on a "conveyor belt" path to becoming transgender adolescents and adults. (*See* Dkt. No. 325-1 (Levine Rep.) ¶¶ 131-34.) Dr. Janssen responded to those unfounded speculations by explaining in his report that "[m]ental health providers cannot change a prepubertal child's gender identity or prevent them from being transgender, just as mental health providers cannot change a cisgender child's gender identity." (Block Decl., Ex. A (Janssen Rebuttal) ¶ 26; *see also* Janssen Dep. 31:16-20.) In particular, he noted, "Prepubertal children who 'desist' are children with non-conforming gender expression who realize with the onset of puberty that their gender identity is consistent with their sex assigned at birth. Their understanding of their gender identity changes with the onset of puberty, but their gender identity does not." (Block Decl., Ex. A (Janssen Rebuttal) ¶ 26.)

Dr. Janssen further explained that "[w]e cannot definitively determine which prepubertal children will go on to identify as transgender when they reach adolescence, but we know that children with gender dysphoria who persist into puberty are more likely to have expressed a consistent, persistent, and insistent understanding of their gender identity from a young age." (*Id.*)

Dr. Janssen also pointed to a recent study showing that socially transitioning before puberty did not increase children's cross-gender identification, and deferring transition did not decrease cross-gender identification. (*Id.* ¶ 37.)

Defendants criticize Dr. Janssen's testimony by accusing Dr. Janssen of saying something he never said. Defendants paraphrase Dr. Janssen as saying that "persistence can be predicted." (Dkt. No. 312 (Defs.' Mot.) at 14.) But Dr. Janssen did not say that. He said that children who have a consistent, persistent, and insistent understanding of their gender identity are *comparatively* more likely to persist than other prepubertal children with dysphoria. He did not claim that persistence of particular children could be reliably predicted. That is why the "primary goal of gender-affirming care is to help a child understand their own gender identity and build resilience and mental wellness in a child and family, without privileging any one outcome over another." (Block Decl., Ex. A (Janssen Rebuttal) ¶ 28.) Defendants' motion to exclude on this basis should be denied.

### III. Defendants' Criticisms Of Dr. Janssen's Testimony Regarding The Effects Of H.B. 3293 Are Meritless.

In his rebuttal report, Dr. Janssen responds to Dr. Levine and Dr. Cantor's arguments that the mental and physical health of transgender youth would be improved by withholding gender-affirming care or deterring them from socially transitioning. As Dr. Janssen explains:

> The overarching theme of Dr. Levine and Dr. Cantor's reports is that transgender people as a group have greater rates of a variety of negative social outcomes and co-occurring conditions over the course of their lives and that, to avoid those negative outcomes and conditions, mental health providers should withhold gender-affirming care to discourage transgender youth from growing into transgender adults. Discriminating against transgender people, or withholding gender-affirming care, will not prevent those people from being transgender. And excluding transgender adolescent girls and women from female sports teams will not cure their gender dysphoria or improve their mental health. To the contrary, as noted previously, stigma and discrimination have been shown to have a profoundly harmful impact on the mental health of transgender people and other minority groups.

(Block Decl., Ex. A (Janssen Rebuttal) ¶ 50.) Dr. Janssen further explains that "[n]o reasonable mental health professional with relevant experience treating children and adolescents could conclude that H.B. 3293 is anything but harmful to the mental health of transgender youth." (*Id.* ¶ 52.)

In attacking Dr. Janssen's testimony as unreliable because, they claim, it is not based on scientific data, Defendants again ignore that his testimony is a rebuttal report, not part of B.P.J.'s case-in-chief. Dr. Janssen is responding to the arguments by Dr. Levine and Dr. Cantor that treating transgender students in accordance with their gender identity for purposes of school athletics would somehow be harmful to their mental health. In that context, Dr. Janssen explains that no reasonable mental health professional could reach such a conclusion.

Dr. Janssen's testimony regarding the harm of H.B. 3293 and similar policies is eminently reliable. Although there are no studies about the mental health impacts of excluding transgender people in the specific context of sports, there is a wealth of clinical experience showing that treating transgender students in a manner inconsistent with their gender identity and excluding adolescents from their peers is harmful to their mental health. *See generally* American Psychological Association Resolution on Supporting Sexual/Gender Diverse Children and Adolescents in Schools (2020) at 5 (supporting inclusion of transgender youth in school activities and sports consistent with their gender identity). Dr. Janssen could properly rely on that clinical experience in concluding that H.B. 3293 will inflict similar harm, and Defendants' motion to exclude his testimony should be denied.

## CONCLUSION

For all these reasons, Defendants' motion to exclude Dr. Janssen's testimony should be denied in its entirety.

Dated: May 26, 2022

Joshua Block*
AMERICAN CIVIL LIBERTIES UNION
FOUNDATION
125 Broad St.
New York, NY 10004
Phone: (212) 549-2569
jblock@aclu.org

Avatara Smith-Carrington*
LAMBDA LEGAL
3500 Oak Lawn Avenue, Suite 500
Dallas, TX 75219
Phone: (214) 219-8585
asmithcarrington@lambdalegal.org

Carl Charles*
Tara Borelli*
LAMBDA LEGAL
158 West Ponce De Leon Ave., Ste. 105
Decatur, GA 30030
Phone: (404) 897-1880
ccharles@lambdalegal.org

Sruti Swaminathan*
LAMBDA LEGAL
120 Wall Street, 19th Floor
New York, NY 10005
Phone: (212) 809-8585
sswaminathan@lambdalegal.org

Andrew Barr*
COOLEY LLP
1144 15th St. Suite 2300
Denver, CO 80202-5686
Phone: (720) 566-4000
abarr@cooley.com

Respectfully submitted,
/s/ *Loree Stark*

Loree Stark (Bar No. 12936)
Nick Ward (Bar No. 13703)
AMERICAN CIVIL LIBERTIES UNION OF WEST
VIRGINIA FOUNDATION
P.O. Box 3952
Charleston, WV 25339-3952
Phone: (914) 393-4614
lstark@acluwv.org

Kathleen Hartnett*
Julie Veroff*
Zoë Helstrom*
COOLEY LLP
3 Embarcadero Center, 20th Floor
San Francisco, CA 94111
Phone: (415) 693-2000
khartnett@cooley.com

Katelyn Kang*
Valeria M. Pelet del Toro*
COOLEY LLP
55 Hudson Yards
New York, NY 10001-2157
Phone: (212) 479-6000
kkang@cooley.com

Elizabeth Reinhardt*
COOLEY LLP
500 Boylston Street, 14th Floor
Boston, MA 02116-3736
Phone: (617) 937-2305
ereinhardt@cooley.com

**Visiting Attorneys*

*Attorneys for Plaintiff*

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA
CHARLESTON DIVISION

| | |
|---|---|
| B.P.J. by her next friend and mother, HEATHER JACKSON,<br><br>*Plaintiff*,<br><br>v.<br><br>WEST VIRGINIA STATE BOARD OF EDUCATION, HARRISON COUNTY BOARD OF EDUCATION, WEST VIRGINIA SECONDARY SCHOOL ACTIVITIES COMMISSION, W. CLAYTON BURCH in his official capacity as State Superintendent, DORA STUTLER in her official capacity as Harrison County Superintendent, and THE STATE OF WEST VIRGINIA,<br><br>*Defendants*,<br><br>and<br><br>LAINEY ARMISTEAD,<br><br>*Defendant-Intervenor*. | Civil Action No. 2:21-cv-00316<br><br>Hon. Joseph R. Goodwin |

**CERTIFICATE OF SERVICE**

    I, Loree Stark, do hereby certify that on this 26th day of May, 2022, I electronically filed a true and exact copy of ***Plaintiff's Opposition to Defendant-Intervenor and Defendant State of West Virginia's Motion to Exclude the Expert Testimony of Dr. Aron Janssen*** with the Clerk of Court and all parties using the CM/ECF System.

                                      */s/ Loree Stark*
                                      Loree Stark
                                      West Virginia Bar No. 12936