IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA
CHARLESTON DIVISION

B.P.J. by her next friend and mother, HEATHER
JACKSON,

<em>Plaintiff</em>,

v.

WEST VIRGINIA STATE BOARD OF
EDUCATION, HARRISON COUNTY BOARD
OF EDUCATION, WEST VIRGINIA
SECONDARY SCHOOL ACTIVITIES
COMMISSION, W. CLAYTON BURCH in his
official capacity as State Superintendent, DORA
STUTLER in her official capacity as Harrison
County Superintendent, and THE STATE OF
WEST VIRGINIA,

<em>Defendants</em>,

and

LAINEY ARMISTEAD,

<em>Defendant-Intervenor</em>.

Civil Action No. 2:21-cv-00316

Hon. Joseph R. Goodwin

**CONSOLIDATED REPLY IN
SUPPORT OF PLAINTIFF'S
MOTION FOR SUMMARY
JUDGMENT**

# TABLE OF CONTENTS

Page

INTRODUCTION ......................................................................................................... 1

ARGUMENT ............................................................................................................... 1

I.    Defendants Fail To Show A Genuine, Material Dispute With Plaintiff's Statement Of Undisputed Material Facts. ................................................................................ 1

II.    All Defendants Are Properly Subject To Suit, As This Court's Previous Order Recognized And As The Record Now Confirms.................................................... 4

    A.    The State Board Of Education And Superintendent Clayton W. Burch Are Proper Defendants. ........................................................................... 4

    B.    The County Board Of Education And Superintendent Dora Stutler Are Proper Defendants. ................................................................................. 5

    C.    WVSSAC Is A Proper Defendant. ....................................................... 7

III.    H.B. 3293 Violates The Equal Protection Clause, And Summary Judgment Should Be Entered For Plaintiff—Not Any Defendant. .................................... 12

    A.    H.B. 3293 Targets B.P.J. For Different And Unequal Treatment Because She Is A Girl Who Is Transgender.................................................... 13

    B.    B.P.J. Is Similarly Situated To Other Girls........................................... 18

    C.    The State's Irrelevant And Inaccurate Criticisms Of Plaintiff, Her Parents, And Her Medical Providers Reflect The Same Disapproval Of Transgender People Animating H.B. 3293. ..................................... 20

    D.    H.B. 3293's Categorical Exclusion Of Transgender Girls Is Not Substantially Related To Defendants' Asserted Interests And So Fails Heightened Scrutiny........................................................................ 24

        1.    H.B. 3293's Categorical Exclusion Of Transgender Girls Is Not Substantially Related To "Protecting Women's Sports." ...................... 26

        2.    H.B. 3293 Is Not Substantially Related To Protecting Women's Safety In Women's Sports. ................................................................ 29

IV.    H.B. 3293 Violates Title IX, And Summary Judgment Should Be Entered For Plaintiff—Not Any Defendant.................................................................... 31

V.    Permanent Injunctive Relief Is Warranted And Should Be Granted. ............... 35

CONCLUSION............................................................................................................ 37

i

# TABLE OF AUTHORITIES

**Page(s)**

## Cases

*A. B. by C.B. v. Hawaii State Dep't of Educ.*,
   386 F. Supp. 3d 1352 (D. Haw. 2019) ...................................................................9

*Alston v. Va. High Sch. League, Inc.*,
   144 F. Supp. 2d 526 (W.D. Va. 1999) ..................................................................6

*Anderson v. Liberty Lobby, Inc.*,
   477 U.S. 242 (1986)................................................................................................4

*Barrs v. S. Conf.*,
   734 F. Supp. 2d 1229 (N.D. Ala. 2010)................................................................9

*Baynard v. Malone*,
   268 F.3d 228 (4th Cir. 2001) ................................................................................6

*Bethesda Lutheran Homes & Servs., Inc. v. Leean*,
   154 F.3d 716 (7th Cir. 1998) ................................................................................6

*Bostock v. Clayton Cnty.*,
   140 S. Ct. 1731 (2020)..........................................................................13, 31, 32, 34

*Brentwood Academy v. Tenn. Secondary Sch. Athletic Ass'n*,
   531 U.S. 288 (2001)................................................................................................9

*Califano v. Boles*,
   443 U.S. 282 (1979)..............................................................................................25

*Cauthorne v. Am. Home Mortg. Corp.*,
   No. 8 Civ. 84, 2008 WL 4316123 (E.D. Va. Sept. 15, 2008)..................................3

*Celotex Corp. v. Catrett*,
   477 U.S. 317 (1986)................................................................................................2

*City of L.A., Cal. v. Patel*,
   576 U.S. 409 (2015)..............................................................................................25

*Cmtys. for Equity v. Mich. High Sch. Athletic Ass'n*,
   80 F. Supp. 2d 729 (W.D. Mich. 2000) .............................................................8, 10

*Cox v. Shalala*,
   112 F.3d 151 (4th Cir. 1997) ................................................................................6

*Dandridge v. Williams*,
   397 U.S. 471 (1970)..............................................................................................25

## TABLE OF AUTHORITIES
### (continued)

**Page(s)**

*Dash v. Mayweather*,
　731 F.3d 303 (4th Cir. 2013) ...................................................3

*Davis Next Friend LaShonda D. v. Monroe Cty. Bd. of Educ.*,
　526 U.S. 629 (1999) ...........................................................6

*Disability Rights South Carolina v. McMaster*,
　24 F.4th 893 (4th Cir. 2022) ..............................................11

*Doe v. Snyder*,
　28 F.4th 103 (9th Cir. 2022) ...............................................31

*Ex parte Young*,
　209 U.S. 123 (1908)............................................................6

*FDIC v. Cashion*,
　720 F.3d 169 (4th Cir. 2013) .............................................2, 4

*First Century Bank, N.C. v. Batelic*,
　No. 11 Civ. 580, 2012 WL 3758238 (S.D.W. Va. Aug. 30, 2012)............................3

*Gebser v. Lago Vista Indep. Sch. Dist.*,
　524 U.S. 274, 290 (1998) ....................................................6

*G.G. ex rel. Grimm v. Gloucester Cnty. Sch. Bd.*,
　822 F.3d 709 (4th Cir. 2016) ..............................................34

*Grimm v. Gloucester Cnty. Sch. Bd.*,
　972 F.3d 586 (4th Cir. 2020) ......................................... *passim*

*Int'l Union, United Auto., Aerospace & Agr. Implement Workers of Am., UAW v.
　Johnson Controls, Inc.*,
　499 U.S. 187, 209 (1991)....................................................6

*Israel by Israel v. W. Va. Secondary Sch. Activities Comm'n*,
　182 W. Va. 454 (1989) .......................................................6

*Jones v. W. Va. State Bd. of Educ.*,
　218 W. Va. 52 (2005) ......................................................7, 11

*Joy v. Daniels*,
　479 F.2d 1236 (4th Cir. 1973) ..............................................8

*Lawrence v. Texas*,
　539 U.S. 558 (2003)...........................................................24

## TABLE OF AUTHORITIES
### (continued)

**Page(s)**

*Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*,
  475 U.S. 574 (1986)...................................................................................2

*McGee v. Va. High Sch. League, Inc.*,
  No. 11 Civ. 35, 2011 WL 4501035 (W.D. Va. Sept. 28, 2011).........................................8

*Md. Shall Issue, Inc. v. Hogan*,
  971 F.3d 199 (4th Cir. 2020) ......................................................................12

*Miller-Hall v. C. R. Bard, Inc.*,
  No. 13 Civ. 7734, 2016 WL 7155763 (S.D.W. Va. Dec. 7, 2016)..........................................2

*Monell v. Department of Social Services*,
  436 U.S. 658 (1978)...................................................................................5

*NCAA v. Tarkanian*,
  488 U.S. 179 (1988)...................................................................................9

*Peltier v. Charter Day Sch., Inc.*,
  8 F.4th 251 (4th Cir. 2021) ........................................................................34

*Phillips v. Larry's Drive-In Pharmacy, Inc.*,
  220 W. Va. 484 (2007) ..............................................................................17

*Sierra Club v. Dep't of the Interior*,
  899 F.3d 260 (4th Cir. 2018) .......................................................................12

*Smith v. NCAA*,
  266 F.3d 152 (3d Cir. 2001)......................................................................8, 9

*South Carolina Educ. Ass'n v. Campbell*,
  883 F.2d 1251 (4th Cir. 1989) .....................................................................17

*Sup. Ct. Va. v. Consumers Union U.S., Inc.*,
  446 U.S. 719 (1980) .................................................................................5

*Tuan Anh Nguyen v. I.N.S.*,
  533 U.S. 53 (2001)................................................................................21, 25

*U.S. R.R. Ret. Bd. v. Fritz*,
  449 U.S. 169 (1980)..................................................................................25

*United States v. Timms*,
  664 F.3d 436 (4th Cir. 2012) .......................................................................25

**TABLE OF AUTHORITIES**
(continued)

Page(s)

*United States v. Virginia*,
    518 U.S. 515 (1996).........................................................................13, 25, 26, 28

*United States v. Windsor*,
    570 U.S. 744 (2013).........................................................................................24

*Vill. of Arlington Heights v. Metro. Hous. Dev. Corp.*,
    429 U.S. 252 (1977).........................................................................................18

*Whitaker By Whitaker v. Kenosha Unified Sch. Dist. No. 1 Bd. of Educ.*,
    858 F.3d 1034 (7th Cir. 2017) .........................................................................31

*Williams v. Bd. of Regents of Univ. Sys. of Ga.*,
    477 F.3d 1282 (11th Cir. 2007) .........................................................................9

*Williamson v. Lee Optical of Okla. Inc.*,
    348 U.S. 483 (1955).........................................................................................25

*Yellow Springs Exempted Village School Dist. Bd. of Ed. v. Ohio High School*
    *Athletic Ass'n*,
    647 F.2d 651 (6th Cir. 1981) ...........................................................................33

**Statutes**

20 U.S.C. § 1681(a) ...............................................................................................35

W. Va. Code
    § 18-2-25 ........................................................................................................11
    § 18-2-25d ......................................................................................................11
    § 18-2-25d(b)(1)..............................................................................................14
    § 18-2-25d(c)(2)..............................................................................................29

**Other Authorities**

34 C.F.R.
    § 106.41(b).................................................................................................33, 34
    § 106.41(c).................................................................................................33, 34

Br. of Amici Curiae 176 Athletes in Women's Sports, *Hecox v. Little*, Dkt. 72
    (Dec. 21, 2020). 479 F. Supp. 3d 930 (D. Idaho 2020) ........................................36

Eastern District of North Carolina Local Civ. R. 56(a)(1) ............................................2

Fed. R. Civ. P. 56...............................................................................................1, 2, 3

**TABLE OF AUTHORITIES**
**(continued)**

**Page(s)**

Fed. R. Evid.
    801(c)(2) ..........................................................................................................................18
    801(d)(2) .........................................................................................................................18

Northern District of Illinois Local R. 56.1(d) ............................................................................2

Southern and Eastern Districts of New York Local Civ. R. 56.1 ..................................................2

## INTRODUCTION

There are no triable questions of fact in this case. There is no factual dispute that B.P.J. is a transgender girl who has socially transitioned and is recognized as a girl by her family, her medical providers, and her school. (Pl's SUF Reply ¶¶ 1-11.) There is no factual dispute that B.P.J. is receiving puberty-delaying medication and, as a result, will not experience the physiological changes accompanying typically male puberty, which are the largest known driver of differences in athletic performance. (Pl's SUF Reply ¶¶ 13-17, 89.) And there is no factual dispute about the small universe of scientific literature that is potentially relevant to this case. (Pl's SUF Reply ¶¶ 71, 85, 89-91.) The parties dispute the significance of some of that literature, but even if the Court were to conclude that Defendants' expert testimony regarding athletic advantage were admissible and draw inferences in Defendants' favor, this case would still turn on the purely legal question: whether any differences between cisgender boys and girls before puberty, which Defendants concede are "modest" at most, can legally justify H.B. 3293's categorical exclusion of B.P.J., a transgender girl, from all girls' sports teams, under all circumstances, based solely on her transgender status. As a matter of law, the answer is "no."

Summary judgment should be granted for Plaintiff B.P.J. and Defendants' motions for summary judgment should be denied.

## ARGUMENT

### I.   Defendants Fail To Show A Genuine, Material Dispute With Plaintiff's Statement Of Undisputed Material Facts.

In support of her motion for summary judgment, Plaintiff submitted a Statement of Undisputed Material Facts ("SUF").[1] Defendants offer vague, broad objections to Plaintiff's

---

[1] Although neither the Southern District of West Virginia's Local Rules nor Federal Rule of Civil Procedure 56 specify a particular format by which to identify the undisputed material facts on

SUF—the State and State Board Defendants claim that the assertions in Plaintiff's SUF cannot be deemed undisputed because the parties have "not agreed to them" (Dkt. No. 330 (State Resp. SUF) ¶ 2; *see also* Dkt. No. 299 (State Bd. MSJ Opp.) at 3 n.1); WVSSAC generically contends that it "disputes that" Plaintiff's SUF "are in whole or part 'undisputed' and reserves the right to plead further" (Dkt. No. 298 (WVSSAC MSJ Opp.) at 9 n.24); the County Board Defendants identify 20 statements they claim are disputed but provide no explanation whatsoever (Dkt. No. 301 (County Bd. MSJ Opp.) at 1 n.1); and Defendant-Intervenor notes without further elaboration that she "disputes many of the allegations" (Dkt. No. 302 (Int. MSJ Opp.) at 2 n.2).

These vague objections are wholly insufficient to establish a dispute. To defeat summary judgment, Defendants "must do more than simply show that there is some metaphysical doubt as to the material facts." *FDIC v. Cashion*, 720 F.3d 169, 180-81 (4th Cir. 2013) (quoting *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586–87 (1986)). They "must come forward with specific facts showing that there is a *genuine* issue for trial." *Id.* (emphasis added) (quotation marks omitted). Defendants' generic, unsupported claim there is some undefined "dispute" clearly fails to meet this burden. *See Miller-Hall v. C. R. Bard, Inc.*, No. 13 Civ. 7734, 2016 WL 7155763,

---

which a motion for summary judgment relies, Rule 56 plainly requires parties moving for summary judgment to show that the factual assertions underlying their motions are material and undisputed. *See* Fed. R. Civ. P. 56(c)(1) (requiring movants to "cit[e] to particular parts of materials in the record" or "show[] that the materials cited do not establish the . . . presence of a genuine dispute"); *Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986) (explaining that it is the movant's burden to show "the absence of a genuine issue concerning any material fact"). For the Court's convenience, Plaintiff provided an enumerated statement of undisputed material facts supporting summary judgment, which is the format recommended by local rules of many other federal court districts. *See, e.g.*, Eastern District of North Carolina Local Civ. R. 56.1(a)(1); Southern and Eastern Districts of New York Local Civ. R. 56.1; Northern District of Illinois Local R. 56.1(d). Although State Defendants have objected to this procedure (Dkt. No. 305 (State MSJ Opp.) at 1 n.1), they have prepared an enumerated response. (Dkt. No. 330 (State Resp. SUF).) Together with this reply memorandum of law, Plaintiff has filed an enumerated reply to the State's response. The enumerated statement is provided solely for the Court's convenience and does not contain any substantive information beyond what is already provided in Plaintiff's briefs.

at *1–2 (S.D.W. Va. Dec. 7, 2016) ("Conclusory allegations . . . , without more, are insufficient to preclude the granting of a summary judgment.") (citing *Dash v. Mayweather*, 731 F.3d 303, 311 (4th Cir. 2013)). All facts not specifically disputed should be deemed admitted for purposes of summary judgment. *First Century Bank, N.C. v. Batelic*, No. 11 Civ. 580, 2012 WL 3758238, at *1 (S.D.W. Va. Aug. 30, 2012) (noting that Rule 56(e) provides that a court may . . . consider facts from a motion for summary judgment that go unaddressed as undisputed for purposes of the motion").[2]

As to the subset of facts that the State specifically addresses, the State fails to identify any genuine, material dispute. As documented in Plaintiff's Reply in Support of Statement of Undisputed Facts, the State's alleged "disputes" merely amount to quibbles with Plaintiff's terminology, conclusory statements made without evidentiary or legal support, mischaracterizations of the record, and unsupported, generalized assertions that information clearly relevant to the merits of the case is "irrelevant and immaterial." In many cases, the State fails to dispute the fact entirely. At bottom, the State contends that certain assertions in Plaintiff's SUF are immaterial or less important than other facts. But such contentions do not establish a genuine dispute for trial. *See Cauthorne v. Am. Home Mortg. Corp.*, No. 8 Civ. 84, 2008 WL 4316123, at *1 (E.D. Va. Sept. 15, 2008) ("The mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment;

---

[2] Defendants also cite no authority requiring Plaintiff to have secured Defendants' advance agreement with each fact. Rather, Federal Rule of Civil Procedure 56(c)(1) requires that assertions of undisputed material fact be supported by citations "to particular parts of materials in the record," and that is exactly what Plaintiff has done.

the requirement is that there be no *genuine* issue of *material* fact.") (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247–48 (1986)).[3]

Because no genuine dispute of material fact exists, there are no issues for trial in this case and B.P.J.'s motion for summary judgment should be granted.

## II.    All Defendants Are Properly Subject To Suit, As This Court's Previous Order Recognized And As The Record Now Confirms.

The opposition briefs from the State Board Defendants, County Board Defendants, and WVSSAC repeat the same arguments these parties made in their motions to dismiss and opening briefs in an effort to point fingers at each other and evade liability for B.P.J.'s claims. But as Plaintiff explained in her opening and opposition briefs—and as this Court previously held in denying multiple motions to dismiss—all Defendants are properly subject to B.P.J.'s claims for injunctive relief under the Equal Protection Clause and Title IX.

### A.    The State Board Of Education And Superintendent Clayton W. Burch Are Proper Defendants.

The State Board Defendants' opposition to summary judgment simply incorporates the points made in their opening brief. (Dkt. No. 299 (State Bd. MSJ Opp.) at 1-3.) Plaintiff accordingly incorporates by reference the arguments in her opening and opposition briefs that the State Board is a proper Title IX defendant and Superintendent Burch is a proper Equal Protection Clause defendant. (Dkt. No. 291 (Pl's MSJ) at 12-13; Dkt. No. 331 (Pl's MSJ Opp.) at 12-16.) As set out in those briefs, because the State Board has a mandatory duty under the statute to implement

---

[3] Similarly, none of WVSSAC's alleged disputes rise to the level of a "genuine, material" dispute. For example, WVSSAC complains about Plaintiff's citation to WVSSAC's response to a request to admit that H.B. 3293 bars B.P.J. from participating on girls' sports teams while permitting cisgender girls to participate on those same sports teams, because WVSSAC only responded based on its "information and belief." (Dkt. No. 298 (WVSSAC MSJ Opp.) at 14.) But this vague assertion of "some metaphysical doubt" is insufficient to create "a genuine issue for trial." *Cashion*, 720 F.3d at 180–81.

H.B. 3293 through rulemaking and the State Board and State Superintendent Burch exercise general supervisory authority and ultimate control over the entities that enforce H.B. 3293, B.P.J. has standing to sue and has properly stated Title IX and Equal Protection Clause claims. (*Id.*) Further, the State Board Defendants' legislative immunity argument is misplaced. Even assuming that the promulgation of rules implementing H.B. 3293 is a legislative act, Plaintiff is not merely challenging the act of issuing those rules. She is suing to prevent the enforcement of H.B. 3293 against her, which the State Board Defendants will do by enacting rules implementing H.B. 3293 and then either directly enforcing them against B.P.J. or, if the State Board does not give itself direct enforcement authority under the rules, generally supervising and ultimately controlling the entities that will enforce them against B.P.J. The exercise of enforcement authority is not a legislative act. *See Sup. Ct. Va. v. Consumers Union U.S., Inc.*, 446 U.S. 719, 734 (1980) (distinguishing, for purposes of legislative immunity, between suits where "the sole basis" for the action is "the issuance of . . . the challenged rules" and suits concerning "enforcement authority").

### B.     The County Board Of Education And Superintendent Dora Stutler Are Proper Defendants.

The County Board Defendants likewise do not offer any new arguments in their opposition brief to support their motion for summary judgment. Plaintiff thus incorporates by reference the arguments made in her opening and opposing briefs that the County Board is a proper Title IX defendant and Superintendent Stutler is a proper Equal Protection Clause defendant. (Dkt. No. 291 (Pl's MSJ) at 12-13; Dkt. No. 331 (Pl's MSJ Opp.) at 16-20.)

As set out in those briefs, B.P.J.'s Title IX claims against the County Board do not require her to establish that the County Board acted pursuant to a municipal policy under *Monell v. Department of Social Services*, 436 U.S. 658 (1978). (Dkt. No. 331 (Pl's MSJ Opp.) at 17-19.) In addition, the County Board's argument that it is not liable under Title IX because it lacks the ability

to remedy B.P.J.'s harm, given that H.B. 3293 governs its actions, is also incorrect. (*See* Dkt. No. 301 (County Bd. MSJ Opp.) at 3-4, 8-9 (citing *Davis Next Friend LaShonda D. v. Monroe Cty. Bd. of Educ.*, 526 U.S. 629 (1999); *Baynard v. Malone*, 268 F.3d 228, 237 (4th Cir. 2001); *Bethesda Lutheran Homes & Servs., Inc. v. Leean*, 154 F.3d 716, 718 (7th Cir. 1998)).) This argument overlooks the fundamental principle of the supremacy of federal law. Pursuant to the Supremacy Clause, when there is a conflict between state and federal law, the state statute is preempted by federal law. *See Cox v. Shalala*, 112 F.3d 151, 154 (4th Cir. 1997). It is undisputed that the County Board, as an institution that receives federal funding, is required to comply with Title IX, a federal law. *Alston v. Va. High Sch. League, Inc.*, 144 F. Supp. 2d 526, 530 (W.D. Va. 1999). Pursuant to the Supremacy Clause, then, the County Board *can* take action to remedy the harm H.B. 3293 causes B.P.J.—namely, the County Board can comply with its obligations under Title IX rather than its obligations under H.B. 3293, an illegal state law. *See, e.g.*, *Int'l Union, United Auto., Aerospace & Agr. Implement Workers of Am., UAW v. Johnson Controls, Inc.*, 499 U.S. 187, 209 (1991) ("When it is impossible for an employer to comply with both state and federal requirements, this Court has ruled that federal law pre-empts that of the States."). That the County Board would choose to enforce H.B. 3293 against B.P.J. but for the preliminary injunction does not allow it to escape liability under Title IX. Because the County Board "has authority to address the alleged discrimination and to institute corrective measures," *Gebser v. Lago Vista Indep. Sch. Dist.*, 524 U.S. 274, 290 (1998), the County Board is liable under Title IX.

And B.P.J.'s equal protection claim against Superintendent Stutler is based on her capacity as a state official pursuant to *Ex parte Young*, 209 U.S. 123 (1908), not her capacity as a county official. (*Id.* at 19–20.)

**C.      WVSSAC Is A Proper Defendant.**

For the reasons stated in the Court's Motion to Dismiss Order, as well as in Plaintiff's motion for summary judgment and opposition motion, WVSSAC is a proper defendant in this case. (Dkt. No. 129 (MTD Op.) at 6; *see* Dkt. No. 291 (Pl's MSJ) at 12-15; Dkt. No. 331 (Pl's MSJ Opp.) at 20-26.) WVSSAC is a proper defendant under the Equal Protection Clause because it is a state actor, and it is a proper defendant under Title IX because it has controlling authority over a federally funded education program. (*Id.*)

<u>1. WVSSAC is a Proper Defendant Under the Equal Protection Clause.</u>

To state an Equal Protection claim, "[t]he claimed discrimination must be a product of state action as distinguished from a purely private activity." *Jones v. W. Va. State Bd. of Educ.*, 218 W. Va. 52, 58 (2005). The West Virginia Supreme Court has already held—twice—that WVSSAC is a proper defendant for purposes of an Equal Protection Clause claim because its action constitutes "state action." *See id.* (stating, in an equal protection challenge against WVSSAC, that "there [was] no question that the equal protection claim involves state action"); *Israel by Israel v. W. Va. Secondary Sch. Activities Comm'n*, 182 W. Va. 454, 458 & n.4 (1989) (considering an equal protection claim, which "must" involve "state action," against WVSSAC, and explaining that "[e]very court that has considered the question whether associations like the [WV]SSAC are state actors have found that those organizations are so intertwined with the state that their acts constitute state action") (collecting cases).

WVSSAC is a state actor because it is undisputedly entwined with the state. (*See* Dkt. No. 331 (Pl's MSJ Opp.) at 24 (discussing WVSSAC's entwinement with the state)). WVSSAC is "made up of primarily public schools," it "exercise[s] tremendous influence and control over the rules and policies that regulate interscholastic athletics," its "rules and policies are binding on all schools unless they withdraw," and "local school districts are primarily responsible for enforcing

[WVSSAC] rules and policies." *Cmtys. for Equity v. Mich. High Sch. Athletic Ass'n*, 80 F. Supp. 2d 729, 740 (W.D. Mich. 2000); *see also id.* ("[T]he vast majority of circuit courts to consider this issue have concluded that state athletic associations . . . are state actors."); *McGee v. Va. High Sch. League, Inc.*, No. 11 Civ. 35, 2011 WL 4501035, at *2 (W.D. Va. Sept. 28, 2011), *aff'd sub nom. Bailey v. Va. High Sch. League, Inc.*, 488 F. App'x 714 (4th Cir. 2012) ("Because statewide athletic associations are almost entirely comprised of and governed by government entities and representatives, the Supreme Court has deemed these associations to be state actors."); (Dkt. No. 331 (Pl's MSJ Opp.) at 23-24.) That WVSSAC is a "private corporation" does not change that it is a state actor. (Dkt. No. 298 (WVSSAC MSJ Opp.) at 7; *see* Dkt. No. 331 (Pl's MSJ Opp.) at 23 (citing *Joy v. Daniels*, 479 F.2d 1236, 1239 (4th Cir. 1973)).)[4]

For the foregoing reasons, as well as those stated in Plaintiff's opening brief and opposition, WVSSAC is a proper defendant under the Equal Protection Clause.

### 2. WVSSAC is a Proper Defendant Under Title IX.

WVSSAC does not dispute that its member schools, which receive federal funding, have delegated to it "the control, supervision, and regulation of their interscholastic athletic and band activities." (Dkt. No. 331 (Pl's MSJ Opp.) at 25; Dkt. No. 298 (WVSSAC MSJ Opp.) at 2 (acknowledging its "delegated authority").) Having "delegated this duty" to WVSSAC, Bridgeport Middle School has "now lost the power to control interscholastic athletics independent" from the WVSSAC. *Cmtys. for Equity*, 80 F. Supp. 2d at 738. Indeed, it is undisputed that Bridgeport

---

[4] WVSSAC's sole citation in support of its argument that it is not a state actor (and indeed, the sole citation for the majority of the arguments in its brief) is a single, inapposite out-of-circuit case concerning the National Collegiate Athletic Association ("NCAA"), not WVSSAC or any other state-level scholastic athletic association. (*See* Dkt. No. 331 (Pl's MSJ Opp.) at 24 (discussing *Smith v. NCAA*, 266 F.3d 152, 156 (3d Cir. 2001)).) *Smith* involved only a Title IX claim, not an equal protection challenge. Accordingly, Plaintiff addresses it more fully below, when discussing why WVSSAC is a proper defendant under Title IX. *See infra* Section II.C.2.

Middle School must adhere to the WVSSAC's policies and procedures governing interscholastic athletics, and that its failure to do so will result in sanctions. (Dkt. No. 331 (Pl's MSJ Opp.) at 24-25.) As a result, WVSSAC has "controlling authority" over Bridgeport Middle School's secondary school athletic programs, and therefore is properly subject to Title IX. *Id.*; *accord Williams v. Bd. of Regents of Univ. Sys. of Ga.*, 477 F.3d 1282, 1294 (11th Cir. 2007); (*see* Dkt. No. 331 (Pl's MSJ Opp.) at 24-26 (analyzing factors for controlling authority).)

WVSSAC cites a single case, *Smith v. NCAA*, 266 F.3d 152, 156 (3d Cir. 2001), in support of its argument that it lacks "controlling authority," and relies on *Smith*'s language that a school's ability to withdraw from the organization weighs against a finding of control. 266 F.3d at 156; (Dkt. No. 298 (WVSSAC MSJ Opp.) at 9-10.) *Smith* conflicts with the holding of every other court to consider the question whether an athletic association like WVSSAC has "controlling authority" and can be held liable under Title IX. *See A.B. by C.B. v. Hawaii State Dep't of Educ.*, 386 F. Supp. 3d 1352, 1357 (D. Haw. 2019) (collecting cases); *Barrs v. S. Conf.*, 734 F. Supp. 2d 1229, 1235 (N.D. Ala. 2010) (declining to rely on *Smith*).[5]

In *Communities for Equity*, for example, the court considered whether the Michigan High School Athletic Association ("MHSAA") exercised controlling authority and so could be held liable under Title IX. Like WVSSAC, MHSAA "is a private organization," "receives no money from its member schools either directly or indirectly," "membership is purely voluntary," and

---

[5] In addition to the fact that its holding that an association's voluntary membership weighs heavily against Title IX liability is an outlier position, *Smith*'s context is also inapposite. It involved the NCAA, not a state athletic association. In *NCAA v. Tarkanian*, 488 U.S. 179 (1988), the Supreme Court held that the NCAA was not a state actor. The Supreme Court subsequently explained that "dictum in *Tarkanian* pointed to a contrary result . . . with an organization whose member public schools are all within a single State." *Brentwood Academy v. Tenn. Secondary Sch. Athletic Ass'n*, 531 U.S. 288, 298 (2001). WVSSAC, of course, is just such an organization. WVSSAC cites no case involving a state athletic association holding that the mere ability of a member school to withdraw defeats a finding of controlling authority.

member schools can choose to withdraw. 80 F. Supp. 2d at 735, 737, 740. But *Communities for Equity* found that MHSAA nonetheless exercised controlling authority over interscholastic athletics because "the regulation of interscholastic athletics" had been "delegated" to it by "local school districts." *Id.* at 738. As the court explained, "There is only one interscholastic athletic association in the state of Michigan and that is the MHSAA. In a very real sense, the MHSAA has a de facto monopoly over interscholastic sports. This is evidenced by the fact that there is not a single high school in the state of Michigan, that is eligible for MHSAA membership, that is not a member. While local school districts may have the power to disregard MHSAA rules or policies, and the legal authority to leave the Association altogether, these are not realistic options given the nature of interscholastic sports in Michigan." *Id.*

This reasoning applies with full force to WVSSAC. "[N]o public school has ever not been a member"; no public school has ever withdrawn; and WVSSAC's Executive Director does not even know how a public school would do so. (Dkt. No. 289-17 (WVSSAC Dep. Tr.) at 69:3-20.) WVSSAC "has a de facto monopoly over interscholastic sports" at the secondary school level in West Virginia. *Cmtys. for Equity*, 80 F. Supp. 2d at 738.

For the foregoing reasons, as well as those stated in Plaintiff's opening brief and opposition, WVSSAC is a proper defendant under Title IX.[6]

---

[6] The WVSSAC also mischaracterizes what its handbook says regarding WVSSAC's compliance with Title IX. Though the WVSSAC states that its compliance with Title IX is "voluntary," (Dkt. No. 298 (WVSSAC MSJ Opp.) at 11-12), its own handbook makes clear that the WVSSAC is "required" to comply with "federal laws and regulations" like Title IX. (Dkt. No. 332-4 (WVSSAC Rules) at WVSSAC00017.) Indeed, during its deposition, when asked whether the WVSSAC is "currently required to comply with Title IX," the WVSSAC responded: "I would believe that the schools are required to follow Title IX. But I believe we believe it also." (Dkt. No. 289-18 (WVSSAC Dep. Tr.) at 86:22–87:2.)

### 3. B.P.J. Has Standing Against WVSSAC.

WVSSAC is also properly subject to injunctive relief because it is required to implement H.B. 3293 and enforce it against B.P.J. WVSSAC demands that Plaintiff "prove that an order from this Court against WVSSAC could redress" Plaintiff's injury, (Dkt. No. 298 (WVSSAC MSJ Opp.) at 16). That is exactly what Plaintiff has done. In West Virginia, the regulation and supervision of interscholastic athletic events at the secondary school level are delegated to "county boards of education and the West Virginia Secondary School Activities Commission . . . subject to the West Virginia State Board of Education's duty . . . to generally supervise the schools in th[e] state." *Jones*, 218 W. Va. at 61 (citing W. Va. § 18-2-25); (*see also* Dkt. No. 291 (Pl's MSJ.) at 20.) As the entity statutorily designated to supervise and regulate interscholastic athletics in West Virginia, WVSSAC is therefore required to obey H.B. 3293, which governs the "designation of athletic teams or sports sponsored by any public secondary school." W. Va. Code § 18-2-25d. In other words, absent an injunction, WVSSAC "cannot adopt or enforce any policy" allowing girls who are transgender to participate on girls' sports teams, as doing so would "conflict[] with state law." (*See* Dkt. No. 291 (Pl's MSJ) at 13 (citing Dkt. No. 290 (Pl's SUF) ¶ 111); *see* Dkt. No. 298 (WVSSAC MSJ Opp.) at 7; Dkt. No. 331 (Pl's MSJ Opp.) at 21 (acknowledging that any rules promulgated by the State Board pursuant to H.B. 3293 will be "embedded" into WVSSAC's regulations and must be obeyed by WVSSAC).)

WVSSAC's reliance on *Disability Rights South Carolina v. McMaster*, 24 F.4th 893 (4th Cir. 2022), actually supports a determination that WVSSAC is a proper defendant here. (Dkt. No. 298 (WVSSAC MSJ Opp.) at 16.) The Fourth Circuit in *McMaster* explained that a defendant must have a "role in enforcing the law at issue." 24 F.4th at 902. Here, there is no dispute that WVSSAC, which has been statutorily delegated the responsibility of regulating and supervising

11

interscholastic athletics in the West Virginia, will have a role in enforcing H.B. 3293. (Dkt. No. 289-39 (WVSSAC Rules) at WVSSAC000133.) In addition, WVSSAC does not dispute that it is the final decisionmaker in determining a student's eligibility to play sports, and that it will be required to adhere to H.B. 3293 in doing so. (Dkt. No. 331 (Pl's MSJ Opp.) at 21; *see* Dkt. No. 298 (WVSSAC MSJ Opp.) at 7 (acknowledging that WVSSAC determines eligibility appeals).) That other entities, such as the State Board and County Board, may also be involved in enforcing H.B. 3293 does not relieve WVSSAC of liability. For purposes of Article III standing, traceability does not require the challenged action to be "'the sole or even immediate cause of th[e] injury.'" *Md. Shall Issue, Inc. v. Hogan*, 971 F.3d 199, 212 (4th Cir. 2020) (quoting *Sierra Club v. Dep't of the Interior*, 899 F.3d 260, 283–84 (4th Cir. 2018)).

For the foregoing reasons, Plaintiff has standing against WVSSAC.

## III.   H.B. 3293 Violates The Equal Protection Clause, And Summary Judgment Should Be Entered For Plaintiff—Not Any Defendant.

Defendants either deny that this case is an as-applied challenge to H.B. 3293 or grossly misrepresent the nature of that challenge. (*See* Dkt. No. 301 (County Bd. MSJ Opp.) at 26 (wrongly claiming that B.P.J. seeks both facial and as-applied relief); Dkt. No. 305 (State MSJ Opp.) at 25 (claiming that B.P.J.'s as-applied challenge turns in part on her like for the color pink and interest in "bottom surgery").) To be clear, B.P.J. challenges H.B. 3293 as applied to her—a girl who is transgender, who is recognized as a girl in every aspect of her life, and who has been receiving puberty-delaying medication for two years and, as a result, does not have any of the physiological characteristics attributable to endogenous puberty. (Dkt. No. 290 (Pl's SUF) ¶¶ 1, 3-11, 13-17.) Nothing in Defendants' opposition briefing changes the clear conclusion that the State has wholly failed to satisfy its "demanding" burden to justify barring B.P.J. from girls' sports teams pursuant

to H.B. 3293's categorical exclusion of all transgender girls from all secondary school and collegiate girls' sports. *United States v. Virginia*, 518 U.S. 515, 533 (1996) ("*VMI*").

The Court should hold that H.B. 3293 violates the Equal Protection Clause as applied to B.P.J. and grant her summary judgment.

A. **H.B. 3293 Targets B.P.J. For Different And Unequal Treatment Because She Is A Girl Who Is Transgender.**

B.P.J.'s opening and opposition briefs explained in detail how H.B. 3293 targets B.P.J. for different and unequal treatment because she is a girl who is transgender. (Dkt. No. 291 (Pl's MSJ) at 19-21; Dkt. 331 (Pl's MSJ Opp.) at 26-33.) Nothing in Defendants' opposition briefs undermines that obvious conclusion. *See Grimm v. Gloucester Cnty. Sch. Bd.*, 972 F.3d 586, 608–10 (4th Cir. 2020) (rejecting school district's argument that "all students are treated the same" and making clear that preventing boys and girls who are transgender from participating in the same activities as other boys and girls based on their sex assigned at birth constitutes discrimination based on transgender status).

First, as they did in their opening briefs, Defendants in their opposition briefs resist the obvious conclusion that H.B. 3293 discriminates on the basis of transgender status. They argue that H.B. 3293 does not discriminate against transgender girls because it "does not explicitly classify people based on transgender status." (Dkt. No. 302 (Int. MSJ Opp.) at 7 (quotation marks omitted); *see also* Dkt. No. 305 (State MSJ Opp.) at 20 ("The word 'transgender' or any derivative thereof does not appear in either the original bill or the bill as adopted.").) But a law need not explicitly use the word "transgender" to discriminate on that basis. *See Bostock v. Clayton Cnty.*, 140 S. Ct. 1731, 1744 (2020) ("[I]t's irrelevant what an employer might call its discriminatory practice, how others might label it, or what else might motivate it.").

Defendants also maintain that H.B. 3293 "treats all biological males *the same*, whether they identify as females *or* males." (Dkt. No. 305 (State MSJ Opp.) at 12; *see also* Dkt. No. 302 (Int. MSJ Opp.) at 17 (claiming the question at hand is "whether it's appropriate to separate the typical male from the typical female in sports"); Dkt. No. 301 (County MSJ Opp.) at 25 ("[T]hose 'similarly situated' under H.B. 3293 are biological males, regardless of gender identity.").) But as this Court observed in its Order granting B.P.J. a preliminary injunction, that framing is "misleading." (Dkt. No. 67 (PI Order) at 7.) The law's carefully crafted statutory definition of "biological sex," which operates to exclude girls who are transgender from girls' sports teams; the fact that West Virginia already provided for sex separation in sport prior to H.B. 3293; and the legislative record all create "an inescapable conclusion that [H.B. 3293] discriminates on the basis of transgender status." (Dkt. No. 67 (PI Order) at 7.)

Defendant-Intervenor claims that H.B. 3293's definition of "biological sex" is "valid and scientific." (Dkt. No. 302 (Int. MSJ Opp.) at 8.) As support, she notes that Plaintiff's expert witness Dr. Deanna Adkins and the Endocrine Society have used the term "biological sex." (*Id.*) But she notably does not claim that Dr. Adkins and the Endocrine Society have *defined* the term as H.B. 3293 does—"solely" in terms of a person's "reproductive biology and genetics at birth." W. Va. Code § 18-2-25d(b)(1). And in fact, "valid and scientific" sources all utilize a broader definition of "sex" to account for the multiple biological components of sex, which include sex chromosomes, certain genes, gonads, exposure to sex hormone, internal and external genitalia, and other secondary sex characteristics. (Dkt. No. 290 (Pl's SUF) ¶ 71); *see Grimm*, 972 F.3d at 621 (Wynn, J., concurring); (Dkt. No. 332-13 (Bhargava, A. et al., Considering Sex as a Biological Variable in Basic and Clinical Studies: An Endocrine Society Scientific Statement. Endocrine Rev. 42:219-258 (2021)); Dkt. No. 332-14 (Am. Psych. Assoc.: Diagnostic & Statistical Manual of

14

Mental Disorders (5th ed. 2013) at 829)); Dkt. No. 289-26 (Safer Rebuttal) ¶¶ 5-7.) Unlike these scientific definitions of "biological sex," H.B. 3293's outcome-driven definition forbids any consideration of sex hormones.

Defendant-Intervenor next claims that H.B. 3293 did not work any meaningful change regarding the participation of transgender girls in school sports, arguing that because there had "never" been any "issue" in West Virginia with transgender girls wanting to participate in school sports, "West Virginia officials could safely equate gender with biological sex." (Dkt. No. 302 (Int. MSJ Opp.) at 9-10.) But it is undisputed that prior to H.B. 3293, no law or policy in West Virginia categorically prohibited girls who are transgender from playing on girls' sports teams. (Dkt. No. 290 (Pl's SUF) ¶ 38.) On the contrary, the only policy concerning transgender athletes that did exist—an internal policy adopted by WVSSAC's Board of Directors—*allowed* transgender students to participate on teams consistent with their gender identity if the transgender student's school permitted them to do so. (Dkt. No. 290 (Pl's SUF) ¶ 39.) Under that internal policy, if another school contested the transgender student's eligibility to play, then WVSSAC's Board of Directors would determine whether the student's participation threatened "competitive equity or the safety of teammates and opposing players." (*Id.*)[7] Against that backdrop, the *only*

---

[7] WVSSAC claims that Plaintiff's description of this policy is a "mischaracterization" because the policy "was internal guidance . . . provided to the Board for the instance of an advanced appeal, which has never occurred." (Dkt. No. 298 (WVSSAC MSJ Opp.) at 15.) But the policy's status as "internal guidance" and the fact that WVSSAC's Board of Directors never had to deploy it because no one ever disputed a transgender student's participation in school sports does not mean that the policy was somehow not actually a policy or non-operative. The policy was "approved" by the Board of Directors and "provided to the Board for the instance of an advanced appeal." (*Id.*; Dkt. No. 289-17 (WVSSAC Dep. Tr.) at 131:17, 142:9-12.) WVSSAC's Executive Director Bernie Dolan also informed multiple third parties about the policy and presented it as operative. Specifically, Mr. Dolan told Melissa White, Chief Counsel for the House of Delegates Education Committee, "that [WVSSAC] had a Board policy for transgender [students]" and gave her a copy; brought a copy of the policy with him when he attended a meeting of the legislature's Democratic

change worked by H.B. 3293 compared to the status quo at the time of the law's enactment is the categorical exclusion of transgender girls from girls' teams.[8]

Finally, Defendant-Intervenor and the State ignore that multiple legislators and their staff were candid and unambiguous that the law's focus is on transgender students. The Chief Counsel of the House Committee on Education, the committee from which the bill originated, referred to H.B. 3293 as a "[t]ransgender participation in secondary schools bill," a "[t]ransgender originating bill," and a "bill regarding transgender participation in sports." (Dkt. No. 290 (Pl's SUF) ¶¶ 51-52.) The Chairman of the Education Committee described the "issue" that H.B. 3923 was designed to address as "two transgender girls" who "were allowed to complete in state track and field meetings in Connecticut." (*Id.* ¶ 54.) When asked how H.B. 3293 would change the status quo in West Virginia, counsel representing the bill replied that the bill "would affect those that changed their sex after birth" and further explained that H.B. 3293 "would not affect" a man who was assigned a male sex at birth. (*Id.* ¶ 53.) And a State Senator remarked that "the bill" is "about transgenders." (*Id.* ¶ 55.)

Legislators not only made express that H.B. 3293 discriminates on the basis of transgender status, but also were clear that, at least for some legislators, the bill was the product of fear and dislike of transgender people. Defendant-Intervenor and the State endeavor to sanitize this

---

Caucus (Dkt. No. 298 (WVSSAC MSJ Opp.) at 14 n.54); informed member schools' principals about the policy at regional principals' meetings "for a number of years" (Dkt. No. 289-17 (WVSSAC Dep. Tr.) at 132:1–133:3; 159:6-24); and wrote to the Executive Director of the South Dakota High School Activities Association that "WV has a board policy that is not in our by laws" pursuant to which WVSSAC "support[s] whatever the local school's determination" but allows for "an appeal on safety and competitive balance" (Second Supp. Decl. of Loree Stark, Ex. 65 (WVSSAC000223-24).)

[8] Defendant-Intervenor's acknowledgment that there was no history of any issue created by the participation of transgender athletes in school sports in West Virginia prior to H.B. 3293's enactment is further confirmation that H.B. 3293 is a law in search of a problem.

legislative history. Defendant-Intervenor asserts that, "[a]t most, some legislators said they wanted to preserve women's sports for biological women and exclude males who identify as female from girls' sports." (Dkt. No. 302 (Int. MSJ Opp.) at 12.) The State likewise claims that "nothing in the history of H.B. 3293" indicates that legislators suggested girls who are transgender "are to be treated with anything other than respect and courtesy." (Dkt. No. 305 (State MSJ Opp.) at 20.) In fact, during the debate over the bill in the Senate, one State Senator favorably shared a constituent letter stating that the "trans movement is an attack upon womanhood." (Dkt. No. 290 (Pl's SUF) ¶¶ 55-56.) A House Delegate and co-sponsor of the bill stated that she did not "want all this mixing and matching and whatever" of transgender students with non-transgender students in "locker rooms." (Dkt. No. 25 (Supp. Kang Decl.) Ex. C at 30.) Another House Delegate who co-sponsored the bill "liked" comments on his Facebook post announcing his co-sponsorship that advocated for physical violence against girls who are transgender, compared girls who are transgender to pigs, and called girls who are transgender by a pejorative term ("tranny"). (Dkt. No. 290 (Pl's SUF) ¶ 57.) Such statements hardly convey respect and courtesy.

The State contends that statements by legislators are not legislative history under West Virginia Law. (Dkt. No. 305 (State MSJ Opp.) at 18.) The State blatantly misrepresents the cases it cites in support of that proposition.[9] And regardless whether such statements are legislative

---

[9] The Supreme Court of West Virginia did not, as the State claims, hold that "legislators' statements cannot be legislative history." (Dkt. 305 (State MSJ Opp.) at 18.) *Phillips v. Larry's Drive-In Pharmacy, Inc.*, 220 W. Va. 484 (2007), addressed whether a court may "consider *the post-enactment testimony* of a former member of the Legislature regarding the intent behind the entire Legislature's enactment of a statute," a question prompted by the plaintiffs' introduction of "five affidavits of former legislators" prepared "nearly two decades" after the challenged bill's passage. 220 W. Va. at 489–90 (emphasis added). It did not address the propriety of considering legislators' statements made during a bill's debate and passage, and certainly did not hold that such contemporaneous statements are inadmissible. The State's citation to *South Carolina Education Association v. Campbell*, 883 F.2d 1251 (4th Cir. 1989), is also inapposite, as the district court

history under state law, the Supreme Court has made clear that under *federal* law "contemporary statements by members of the decisionmaking body" are relevant to determine whether a statute was passed for a discriminatory purpose. *Vill. of Arlington Heights v. Metro. Hous. Dev. Corp.*, 429 U.S. 252, 268 (1977). These statements also are not "hearsay." (Dkt. No. 305 (State MSJ Opp.) at 18.) Plaintiff is not offering them for the truth of the matter asserted, but rather to reflect how H.B. 3293 was represented to other legislators and the public by legislators and legislative staff. *See* Fed. R. Evid. 801(c)(2). They are also statements of a party opponent offered against an opposing party. *Id.* 801(d)(2).

There is no question that H.B. 3293—like the policy at issue in *Grimm*—discriminates on the basis of transgender status.

### B.     B.P.J. Is Similarly Situated To Other Girls.

Following from their misguided claim that H.B. 3293 treats all "biological males" the same, Defendants ask this Court to consider B.P.J. to be similarly situated to cisgender boys. (Dkt. No. 301 (County Bd. MSJ Opp.) at 25; Dkt. No. 302 (Int. MSJ Opp.) at 17; Dkt. No. 305 (State MSJ Opp.) at 12.) But transgender girls and cisgender boys are not one in the same, and Defendants' "framing" reveals their "own bias"—namely, their "belie[f] that [B.P.J.'s] gender identity is a choice." *Grimm*, 972 F.3d at 610.

B.P.J. is a girl. For years, she has lived and been recognized as a girl by her family, school administrators, teachers, and peers. (Dkt. No. 290 (Pl's SUF) ¶¶ 1-11.) She has received a diagnosis of gender dysphoria and has been taking puberty-delaying medication for nearly two years. (Dkt. No. 290 (Pl's SUF) ¶¶ 12-13.) To B.P.J., being a girl "means everything." (Dkt. No. 290 (Pl's

---

there considered "*trial testimony* of past and present members" of the state legislature, not contemporaneous statements made by legislators during their consideration of a bill. *Id.* at 1264 (emphasis added). The Fourth Circuit made clear in that case that "legislative motive" *is* relevant in "sex discrimination cases." *Id.* at 1259.

SUF) ¶ 138.) Given B.P.J.'s deep and persistent identity as a girl, this Court previously explained that B.P.J. "is not most similarly situated with cisgender boys; she is similarly situated to other girls." (Dkt. No. 67 (PI Order) at 7.) As in *Grimm*, "[a]dopting [the State's] framing of [B.P.J.'s] equal protection claim here would only vindicate [the State's] own misconceptions" and would "fail[] to meaningfully reckon with what it means for [B.P.J.] to be a transgender [girl]." 972 F.3d at 610 & n.10 (internal quotation marks omitted).

Superintendent Stutler attempts to distinguish *Grimm* by noting that the policy at issue there concerned restrooms, not athletics. (Dkt. No. 301 (County MSJ Opp.) at 26.) But that is a distinction without a difference. In explaining that Gavin Grimm, a transgender boy, "was similarly situated to other boys," the Fourth Circuit emphasized that Grimm's "medically confirmed, persistent and consistent gender identity" was that of a boy. 972 F.3d at 610. The Fourth Circuit's conclusion that Grimm was similarly situated to other boys had nothing to do with the specifics of restrooms; it had everything to do with Grimm's identity and how he lived his life.[10]

The State claims without citation that "Plaintiff asserts at least four 'genders' or 'gender identities,'" and maintains that it "would be impossible" to allow B.P.J. to participate on teams with other girls "given this array of gender identities." (Dkt. No. 305 (State MSJ Opp.) at 7.) But

---

[10] The "not similarly situated" arguments advanced by defendants there are notably like the arguments being advanced here. Namely, the school board in *Grimm* argued that Grimm was "not similarly situated to cisgender boys . . . because Grimm's 'choice of gender identity did not cause biological changes in his body, and Grimm remain[ed] biologically female.'" 972 F.3d at 609–10. Defendants' argument here is much the same.

Moreover, Superintendent Stutler effectively concedes that B.P.J. is *not* similarly situated to cisgender boys because "B.P.J. has had medical treatment, including nearly two years of puberty-delaying treatment, and she plans to receive gender-affirming hormone therapy, such that she will not undergo puberty typical of cisgender males," and so will not experience "levels of circulating testosterone and other physical traits typical of cisgender males." (Dkt. No. 301 (County MSJ Opp.) at 26-27.)

19

the State imagines complexity where this case presents none. B.P.J., like Gavin Grimm, "'consistently, persistently, and insistently' express[es] a binary gender." *Grimm*, 972 F.3d at 596. It was certainly not "impossible" for B.P.J.'s school administrators to recognize and treat B.P.J. as the girl that she is in all aspects of her scholastic life. (Dkt. No. 290 (Pl's SUF) ¶¶ 4-11.) As in *Grimm*, B.P.J. "does not challenge sex-separated" athletic teams based on the binary categories of boys and girls; she "challenges the [statute's] discriminatory exclusion of [herself] from the sex-separated [team] matching [her] gender identity." 972 F.3d at 618.

Ultimately, Defendants "completely miss[] the reality of what it means to be a transgender [girl]." *Grimm*, 972 F.3d at 624 (Wynn, J., concurring). To ignore that reality and treat B.P.J. as a cisgender boy is to treat her unequally.

### C.    The State's Irrelevant And Inaccurate Criticisms Of Plaintiff, Her Parents, And Her Medical Providers Reflect The Same Disapproval Of Transgender People Animating H.B. 3293.

To vindicate her right to equal protection under the law, B.P.J. had to "write[] in depth about her history—revealing publicly what are inherently private details—to educate both the court and public." (Dkt. No. 67 (PI Order) at 2.) Instead of merely defending H.B. 3293 based on the asserted governmental interests in promoting equal athletic opportunity and safety, the State seizes on the highly personal details B.P.J. has shared to launch a gratuitous attack on B.P.J. herself, as well as her parents and medical providers. (Dkt. No. 305 (State MSJ Opp.) 1-3, 8-9, 25-26.) But the State's narrative does not match reality. By dismissively referring to the most intimate details of B.P.J.'s life as merely a "student's stereotypical notions of self-identified gender" (Dkt. No. 305 (State MSJ Opp.) at 3), the State only exposes the "misconception and prejudice" at the

heart of this discriminatory law. *Grimm*, 972 F.3d at 615 (quoting *Tuan Anh Nguyen v. I.N.S.*, 533 U.S. 53, 73 (2001)).[11]

This is a case about whether B.P.J. can participate on the same cross-country and track-and-field teams as other girls at her school. The relevant facts about B.P.J.'s life are that she has socially transitioned and is recognized as a girl in daily life and that, as a result of receiving puberty-delaying medication, she has not—and will not—experience the increased levels of circulating testosterone that would accompany endogenous puberty. B.P.J.'s underclothes and her desire to have genital surgery when she is an adult are completely irrelevant to the issues at hand, and it is difficult see any legitimate purpose for the State to sensationalize and fixate on those facts. (*See* Dkt. No. 305 (State MSJ Opp.) 25-26.)[12]

---

[11] Defendant-Intervenor takes the same tactic, reducing B.P.J.'s identity to a question of "how feminine a particular athlete acts off the playing field." (Dkt. No. 302 (Int. MSJ Opp.) at 8.)

[12] The State condescendingly asserts that when "[a]sked what it means to be a girl, B.P.J. gave stereotypical answers about how girls look and that girls wear dresses, use makeup and have long hair." (Dkt. No. 305 (State MSJ Opp.) at 2.) During their five-hour deposition of a then-11-year-old, defense counsel asked a series of awkward questions about B.P.J.'s understanding of how girls and boys might typically walk, dress, and behave. B.P.J. responded those questions by accurately describing stereotypes in society while also making clear that those generalizations are not true for everyone. (*See* Dkt. No. 289-13 (BPJ Dep. Tr.) at 30:19–31:1 (Q: "How do girls or females dress differently than boys or males?" A: "Females would wear --- normally wear dresses and males would normally wear tuxedos and suits. And their casual clothes are most of the time different but sometimes can be the same."); *id.* at 31:20–32:3 (Q: "Now, when you say that how someone acts is different regarding girls to boys, what do you mean by that?" A: "Most of the time males will look very big and buff and females most of the time do not like that look, but some can."); *id.* at 32:6-13 (Q: "What else about how a person acts puts them in a more of a female category than a male category?" A: They would maybe --- they wouldn't want to look like a guy. A guy wouldn't want to look like a girl and a girl wouldn't want to look like a guy unless --- unless you do, which sometimes people do do that."); *id.* at 32:16–33:1 (Q: "So if someone is trying to look like a guy, then they are going to wear more what I'll call traditional attire, like you said, maybe like a tuxedo or a suit with a coat and a tie and they may want to look bigger and buff and in an overall way present themselves as male. Is that right?" A: "Most of the time, but not all of the time.").)

It is also difficult to see a legitimate basis for the State to express its disapproval of B.P.J.'s parents and medical providers. The State mocks B.P.J.'s mother for "recogniz[ing] B.P.J. as a girl without question following an exchange with B.P.J. when she was a toddler." (Dkt. No. 305 (State MSJ Opp.) 1-2.) Ms. Jackson's testimony, which describes in intimate detail the many ways in which B.P.J.'s acute distress with her anatomy manifested and her many conversations with B.P.J., bears little resemblance to the State's grotesque caricature. (*See* Dkt. No. 289-15 (Jackson Dep. Tr. Jan. 20) at 99:5–112:23.)[13]

The State also expresses disapproval of B.P.J.'s medical providers. The fact that B.P.J. is a transgender girl who has been diagnosed with gender dysphoria is simply not a triable question of fact. (Dkt. No. 290 (Pl's SUF) ¶ 12.) Yet—without any basis for doing so—the State refers to B.P.J. as having merely been "ostensibly diagnosed with gender dysphoria," insinuating disagreement with that diagnosis without presenting any contrary evidence. (Dkt. No. 305 (State MSJ Opp.) at 25.) The State then makes several false assertions about B.P.J.'s medical care. To start, the State falsely asserts that Dr. Gerald Montano at the University of Pittsburgh Children's Hospital, the provider who first diagnosed B.P.J. with gender dysphoria in 2019, "immediately prescribed body changing puberty blocker treatment, to be inserted at a later date." (Dkt. No. 305 (State MSJ Opp.) at 8-9 n.11.) But the medical records make clear that B.P.J.'s doctors did not prescribe puberty-delaying treatment until after the first signs of puberty, which did not occur until June 2020. (Dkt. No. 290 (Pl's SUF) ¶ 13; Dkt. No. 289-21 (Montano Dep. Tr.) at 138:13-18.) The

---

[13] The State also gets basic facts wrong.  B.P.J. was three to four years old when the conversations occurred, not "a toddler."  (*See* Dkt. No. 289-15 (Jackson Dep. Tr. Jan. 20) at 97:22-23, 99:12-17, 172:15-17; Dkt. No. 305 (State MSJ Opp.) at 2.)  There is also nothing inherently suspicious about a three- to four-year-old being aware of their gender identity. *See Grimm*, 972 F.3d at 596 ("For many of us, gender identity is established between the ages of three and four years old.") (citing Br. of Medical Amici).

State further falsely asserts that Dr. Kidd at West Virginia University relied solely on Dr. Montano's diagnosis. (Dkt. No. 305 (State MSJ Opp.) at 8-9 n.11.) But the testimony from Dr. Kidd makes clear that she conducted her own intake assessment and that B.P.J.'s responses to that assessment demonstrated that she met the diagnostic criteria for gender dysphoria. (*See* Dkt. No. 289-20 (Kidd Dep. Tr.) at 75:23–76:7.) The State also falsely asserts that Plaintiff's rebuttal expert, Dr. Aron Janssen, testified that he "would not give such a diagnosis based on such a minimal interaction" and that "multiple visits over time would be necessary." (Dkt. No. 305 (State MSJ Opp.) at 8-9 n.11.) But Dr. Janssen was asked about the amount of time he would normally spend before prescribing puberty-delaying medication, not about the amount of time spent before making a gender dysphoria diagnosis. (*See* Dkt. No. 321-4 (Janssen Dep. Tr.) at 309:19-21.) As to prescribing puberty-delaying medication, Dr. Janssen repeatedly stated there is no particular "minimum amount of time" required to make a recommendation for treating gender dysphoria because the amount of time necessary depends on the particular patient. (*See* Dkt. No. 321-4 (Janssen Dep. Tr.) 311:9-10 ("It really is going to depend upon each individual child"); *id.* at 311:23-24 ("As I said, I don't think it's based on time. It's based about the content.").)[14]

Beyond the State's specific criticisms of B.P.J., her family, and her doctors, the State repeatedly indicates that it does not think that "gender identity" is a valid concept at all. (*See* Dkt. No. 305 (State MSJ Opp.) at 3 (describing a person's gender identity as merely "stereotypical notions of gender") *id.* at 4 (referring to a "student's self-identified gender at any given time"); *id.*

---

[14] The State goes on to fault Dr. Montano for not noticing a typographical error in metadata retrieved from a hospital's computer system, which erroneously lists B.P.J.'s gender identity as "male." (Dkt. No. 305 (State MSJ Opp.) at 9 n.12 (citing Montano Dep. Ex. 45).) The State could have asked directly about the typographical error during his deposition, but instead counsel decided to administer a proof-reading exam by asking Dr. Montano to "look through" the document "and tell me if everything in here looks to be correct?" (Dkt. No. 289-21 (Montano Dep. Tr. ) at 155:5-6.)

at 5 (comparing a transgender girl to a boy who says he wants to change genders to join the volleyball team); *id.* at 6 (asserting that "the biological differences between males and females (not self-identified gender identities) are 'enduring'").) "[E]mbedded in the [State's] framing is its own bias: it believes that [B.P.J.'s] gender identity is a choice, and it privileges sex-assigned-at-birth over [her] medically confirmed, persistent and consistent gender identity." *Grimm*, 972 F.3d at 610.

The same intent to discriminate permeates H.B. 3293. "[H]istorical experience and decades of scientific inquiry have established that transgender individuals have an innate conception of themselves as belonging to one gender," which is "foundational to their essential personhood." *Grimm*, 972 F.3d at 624 (Wynn, J., concurring). Yet, H.B. 3293 effectively erases transgender girls by defining them as indistinguishable from cisgender boys. H.B. 3293's text—and the exclusion it mandates—imposes a stigma far beyond athletics and "is an invitation to subject [transgender] persons to discrimination both in the public and in the private spheres." *Lawrence v. Texas*, 539 U.S. 558, 575 (2003); *cf. United States v. Windsor*, 570 U.S. 744, 772 (2013) (explaining that refusal to recognize marriages of same-sex couples "tells those couples, and all the world, that their otherwise valid marriages are unworthy of federal recognition"). "Of course, deriding those who are different—whether due to discomfort or dislike—is not new. But the Constitution's guarantee of equal protection prohibits the law from countenancing such discrimination." *Grimm*, 972 F.3d at 627 (Wynn, J., concurring).

### D. H.B. 3293's Categorical Exclusion Of Transgender Girls Is Not Substantially Related To Defendants' Asserted Interests And So Fails Heightened Scrutiny.

As explained B.P.J.'s opposition brief, Defendants' upside-down version of heightened scrutiny analyzes the wrong classification under the wrong standard by importing a constitutional standard from cases concerning commercial speech and firearm regulations. (Dkt. No. 331 (Pl's

MSJ Opp.) at 34-37.) The proper standard for heightened scrutiny under the Equal Protection Clause imposes a "demanding . . . burden of justification" on the government. *VMI*, 518 U.S. at 533. The State must show a "substantial[]" relationship to an "important" objective, *id.*, and "[t]he fit between the means and the important end" must be "'exceedingly persuasive,'" not merely reasonable, *Nguyen*, 533 U.S. at 70 (quoting *VMI*, 518 U.S. at 533).[15] Contrary to the State's suggestion that a government may discriminate against a protected group without "a realized 'problem,'" (Dkt. No. 305 (State MSJ Opp.) at 13), a law based merely on "fears" that have not "materialized" will not survive heightened scrutiny. *Grimm*, 972 F.3d at 614.

To justify H.B. 3293, Defendants must show that the exclusion of transgender girls *in particular*—not, as they claim, transgender girls and cisgender boys lumped into a single "biological males" group—is substantially related to an important governmental interest. (Dkt. No. 331 (Pl's MSJ Opp.) at 34-35.) That is because "[t]he proper focus of the constitutional inquiry is the group for whom the law is a restriction, not the group for whom the law is irrelevant." *City of L.A., Cal. v. Patel*, 576 U.S. 409, 418 (2015).[16]

Defendants have not met this high burden. They have not shown, and cannot show, that categorically barring girls who are transgender from girls' sports is substantially related to "providing equal athletic opportunities to biological females and protecting the safety of biological female athletes." (Dkt. No. 305 (State MSJ Opp.) at 14-15.)

---

[15] Defendant-Intervenor repeatedly tries to downplay the rigorous inquiry imposed by heightened scrutiny by quoting from cases applying only rational basis review. (*See* Dkt. No. 302 (Int. MSJ Opp.) at 9, 11, 14, 18, 20 (citing *Williamson v. Lee Optical of Okla. Inc.*, 348 U.S. 483 (1955); *Califano v. Boles*, 443 U.S. 282 (1979); *Dandridge v. Williams*, 397 U.S. 471 (1970); *U.S. R.R. Ret. Bd. v. Fritz*, 449 U.S. 169 (1980)).)

[16] Defendant-Intervenor tries to cast *Patel* as "inapt" (Dkt. No. 302 (Int. MSJ Opp.) at 15), but she elsewhere admits that the constitutional inquiry "must focus on 'the particular classifications being made.'" (*Id.* at 14 (quoting *United States v. Timms*, 664 F.3d 436, 447–48 (4th Cir. 2012)).)

1.    H.B. 3293's Categorical Exclusion Of Transgender Girls Is Not Substantially Related To "Protecting Women's Sports."

Defendants have not demonstrated an "'exceedingly persuasive'" connection between barring B.P.J. from girls' sports pursuant to a categorical exclusion of transgender girls from all scholastic athletic opportunities and creating equal athletic opportunities for cisgender girls. *VMI*, 518 U.S. at 534. Defendants' arguments all rest on their mantra that, generally, males athletically outperform females, and repeat the same points made in their opening briefs about the import of that alleged advantage to a categorical exclusion of transgender girls. (*See, e.g.*, Dkt. No. 301 (County MSJ Opp.) at 27; Dkt. No. 302 (Int. MSJ Opp.) at 1; Dkt. No. 305 (State MSJ Opp.) at 32.) Plaintiff incorporates her prior arguments that H.B. 3293 is not substantially related to avoiding the substantial displacement of female athletes and briefly addresses the key points below. (Dkt. No. 291 (Pl's MSJ) at 24-30; Dkt. No. 331 (Pl's MSJ Opp.) at 38-43.)

B.P.J. has been receiving puberty-delaying treatment for nearly two years and has never experienced levels of circulating testosterone above what is typical for non-transgender girls. (Dkt. No. 67 (PI Order) at 10; Dkt. No. 290 (Pl's SUF) ¶¶ 13-17.) If B.P.J. goes on to receive gender-affirming hormone therapy, she will receive the same amount of estrogen during puberty that non-transgender girls generate endogenously and will develop the same changes to bone size, skeletal structure, pelvis shape, fat distribution, and secondary sex characteristics that are typically experienced by non-transgender girls who go through a typically female puberty. (Dkt. No. 290 (Pl's SUF) ¶ 18.) In these respects, B.P.J. is similarly situated to women with complete androgyne insensitivity syndrome ("CAIS") who have XY chromosomes but inactive testosterone receptors. (Dkt. No. 290 (Pl's SUF) ¶ 86.) It has long been accepted—and Defendants do not dispute—that because women with CAIS do not experience the effects of testosterone, they do not have an

athletic advantage over other women simply by virtue of having XY chromosomes. (Dkt. No. 290 (Pl's SUF) ¶ 88.)

Defendants maintain that children assigned male at birth have a biological athletic advantage over children assigned female at birth even before puberty and that this alleged advantage persists after receiving puberty-delaying medication followed by gender-affirming hormone therapy. (Dkt. No. 301 (County MSJ Opp.) at 28; Dkt. No. 302 (Int. MSJ Opp.) at 1, 4, 15-16; Dkt. No. 305 (State MSJ Opp.) at 9-10, 21.) But as Defendants' own expert Gregory Brown admits, any alleged differences in athletic performance between non-transgender boys and non-transgender girls exist before puberty are "modest" when compared to the differences caused by increased circulating testosterone during puberty. (Dkt. No. 290 (Pl's SUF) ¶ 90.) Indeed, the 2018 Handelsman study on which Brown extensively relies found that "[a]ge-grade competitive sports records show minimal or no female disadvantage prior to puberty." (Second Supp. Decl. of Loree Stark, Ex. 66 (Handelsman, David, et al., *Circulating Testosterone as the Hormonal Basis of Sex Differences in Athletic Performance*, Pediatrics, 142(4), Endocrine Reviews, 39: 803–29, at 812, doi: 10.1542/peds.2018-2162).) Brown also admits that there have been no studies purporting to establish that any modest differences in athletic performance are attributable to innate physiology as opposed to social factors. (Dkt. No. 290 (Pl's SUF) ¶ 91; Dkt. No. 331 (Pl's MSJ Opp.) at 42.) And Defendants do not present *any* evidence that, as a group, transgender girls who receive puberty-delaying treatment followed by gender-affirming hormone therapy have average athletic performances that are better than the average athletic performances of cisgender girls as a group. (Dkt. No. 331 (Pl's MSJ Opp.) at 42-43.)[17]

---

[17] Defendants attempt to improperly flip the burden onto B.P.J. to identify peer-reviewed studies or performance proving that transgender girls and women who have received puberty-delaying

Defendants also offer no credible argument that B.P.J. herself has substantially displaced cisgender girls such that her categorical exclusion from girls' sports teams is justified under heightened scrutiny. They simply repeat the argument that because B.P.J. did not place *dead last* at every single one of her cross-country meets, she "displaced" cisgender girls who finished after her and therefore her exclusion is warranted. (Dkt. No. 302 (Int. MSJ Opp.) at 18; Dkt. No. 305 (State MSJ Opp.) at 27.) That position is not an assessment of substantial displacement; it is an objection to B.P.J.'s mere presence on a girls' team.

Ultimately, the disagreement between the parties about the import of any alleged differences in athletic performance among prepubertal youth thus is a legal one, not a triable factual one—namely, does the minimal data that at best shows a "modest" difference in performance outcomes provide an exceedingly persuasive reason for excluding B.P.J. from all girls' sports teams. The answer is no. There is no evidence that the two characteristics on which H.B. 3293 conditions participation on girls' teams—reproductive anatomy and sex chromosomes—alone have any demonstrated effect on athletic ability. (Dkt. No. 290 (Pl's SUF) ¶ 85.) And H.B. 3293 forecloses even consideration of circulating testosterone, the largest known biological driver of average differences between the athletic performance of men as a group and women as a group beginning at puberty. (Dkt. No. 290 (Pl's SUF) ¶¶ 89, 92.) [18]

---

medication do not, on average, have any athletic advantages compared with cisgender girls and women. Dkt. No. 305 (State MSJ Opp.) at 22.  But under heightened scrutiny, "[t]he burden of justification . . . rests entirely on the State." *VMI*, 518 U.S. at 533.

[18] The State speculates that the alleged difference in athletic performance between prepubertal cisgender boys and prepubertal cisgender girls "may well be because at 0-5 months, males' testosterone levels exceed female levels by as much as 500 percent." (Dkt. No. 305 (State MSJ Opp.) at 9; *see also id.* at 21.) But the State has offered no evidence—whether from their proffered expert witnesses or anywhere else—supporting its speculation about a relationship between temporarily higher testosterone levels in infants assigned a male sex at birth and an athletic

Defendants fall back on a general assertion that the legislature need not have chosen the "wiser" way of achieving its goal so long as the means chosen are substantially related to the important government interest. (Dkt. No. 305 (State MSJ Opp.) at 22.; *see also* Dkt. No. 301 (County MSJ Opp.) at 29-30.) But they fail to engage with the critical requirement for that rule to apply—proving that the means chosen (here, categorically barring transgender girls from girls' sports teams based *only* on reproductive anatomy and sex chromosomes) are substantially related to the asserted interest. Because the differences that H.B. 3293 has made dispositive of participation on girls' sports teams—sex chromosomes and reproductive anatomy at birth—are not substantially related to athletic performance and to the substantial displacement of cisgender girls by transgender girls, the law cannot survive heightened scrutiny.

### 2.   H.B. 3293 Is Not Substantially Related To Protecting Women's Safety In Women's Sports.

H.B. 3293 sweeps much too broadly to be substantially related to Defendants' asserted safety interest—or for safety to have been the statute's primary concern.[19] H.B. 3293 categorically bars girls who are transgender from sports that do not involve any contact, including cross-country and track, the two sports that B.P.J. plays. *See* W. Va. Code § 18-2-25d(c)(2). But Defendants

---

performance advantage. And State's focus on the impact of circulating testosterone levels highlights the irrationality of H.B. 3293, which does not permit any consideration of hormone levels but instead focuses "solely" on reproductive anatomy and sex chromosomes at birth.

[19] Defendants attempt to show that protecting women's safety is not a *post hoc* concern. (Dkt. No. 301 (County MSJ Opp.) at 22-23; Dkt. No. 305 (State MSJ Opp.) at 17.) But H.B. 3293 provides no reason to conclude that the law was responding to safety concerns. Indeed, the words "safe" and "safety" do not appear anywhere in H.B. 3293. Defendant-Intervenor nonetheless claims that "the Act promotes safety on its face," and misleadingly states: "[T]he Act acknowledges 'the effect of . . . innate sex-based differences on the health and safety of the athlete' through 'the express authorization of sex-separated teams for sports with higher perceived injury risk—i.e., 'contact sports.'" (Dkt. No. 302 (Int. MSJ Opp.) at 20.) The language she quotes, however, is from Chad Carlson's expert report, not H.B. 3293. And H.B. 3293 does not concern just contact sports—it reaches sports involving competitive skill, even where there is no contact or risk of collision.

repeatedly discuss the claimed interest in safety as arising *only* in the context of contact sports. (Dkt. No. 305 (State MSJ Opp.) at 15 ("Safety for female athletes is . . . an important governmental interest for 'contact sports.'"); *id.* at 23 ("A second governmental interest supporting [H.B. 3293] is the fundamental interest in the safety of girls and women in contact sports."); Dkt. No. 302 (Int. MSJ Opp.) at 19 ("[A]verage differences between the sexes increase the risk of injury to females in sports . . . that involve collisions with bodies or equipment."); *id.* at 21 ("[E]xcluding male athletes . . . will promote the safety of females in contact sports."). The legislative decision o ban girls who are transgender from non-contact sports was not—and could not have been—motivated by safety concerns.

No Defendant contends that girls who are transgender pose a safety threat in the context of non-contact sports or otherwise attempts to argue that the asserted safety interest provides an exceedingly persuasive reason—or any reason—to categorically bar girls who are transgender from non-contact sports. And no Defendant contends that B.P.J. poses a safety threat to the other girls running on middle school cross-country and track teams. To the contrary, Defendant-Intervenor could not identify any safety concern resulting from B.P.J.'s participation on Bridgeport Middle School's girls' cross-country team (Dkt. No. 290 (Pl's SUF) ¶ 135) and the State admits it is unaware of any middle school girl who was physically harmed by B.P.J.'s participation (Dkt. No. 290 (Pl's SUF) ¶ 136). Defendants' other unsubstantiated claims about the supposed safety threat created by girls who are transgender fail for the reasons explained in Plaintiff's prior briefing. (Dkt. No. 291 (Pl's MSJ) at 31-32; Dkt. No. 331 (Pl's MSJ Opp.) at 45-47.)

Superintendent Stutler tries to escape the import of H.B. 3293's undue breadth by arguing that, "[w]hile cross-country and track may not involve safety issues the same way a contact sport does, it is possible that B.P.J. will at some time in the future decide to play one or more contact

sports (and that other transgender female students will decide to play contact sports)." (Dkt. No. 301 (County MSJ Opp.) at 23.) That baseless speculation cannot justify B.P.J.'s categorical exclusion from girls' sports teams or defeat B.P.J.'s as-applied challenge.

For all these reasons, H.B. 3293 violates B.P.J.'s rights under the Equal Protection Clause.

## IV.    H.B. 3293 Violates Title IX, And Summary Judgment Should Be Entered For Plaintiff—Not Any Defendant.

Defendants' opposition briefing fails to proffer any meaningful challenge to the reality that H.B. 3293 as applied to B.P.J. violates Title IX. Their arguments do nothing to contradict the fact that, due to H.B. 3293, B.P.J. (1) will be excluded from participation in an education program offered by an education institution that receives federal financial assistance (2) on the basis of sex and (3) suffer harm.[20]

### A.    H.B. 3293 Excludes B.P.J. On The Basis Of Sex.

Discrimination against transgender students is discrimination "on the basis of sex" for purposes of Title IX. *Grimm*, 972 F.3d at 616; *accord Doe v. Snyder*, 28 F.4th 103, 114 (9th Cir. 2022); *Whitaker By Whitaker v. Kenosha Unified Sch. Dist. No. 1 Bd. of Educ.*, 858 F.3d 1034, 1051 (7th Cir. 2017). This Court has already applied this precedent and correctly concluded that H.B. 3293 "discriminat[es] against [B.P.J.] 'on the basis of sex'" because B.P.J.'s "sex 'remains a but-for cause' of her exclusion under the law." (Dkt. No. 67 (PI Order) at 12 (quoting *Grimm*, 672 F.3d at 616).) Defendants' opposition briefs do nothing to disturb this conclusion.

### B.    H.B. 3293 Harms B.P.J. Through Unlawful Discrimination.

"In the Title IX context, discrimination 'mean[s] treating that individual worse than others who are similarly situated.'" *Grimm*, 972 F.3d at 618 (quoting *Bostock*, 140 S. Ct. at 1741). H.B.

---

[20] There is no dispute that H.B. 3293 excludes B.P.J. and other girls and women who are transgender from federally funded education programs.

3293 categorically excludes B.P.J. from participating on the same sports team as her similarly situated girl classmates. If applied to her, that exclusion will deprive B.P.J. of the opportunity to participate in school sports and to access the extremely valuable educational benefits associated with participating in school sports, including building camaraderie with her peers; developing skills in cooperation, leadership, teamwork, trust, discipline, perseverance, and sportsmanship; and increasing her physical fitness. (Dkt. No. 290 (Pl's SUF) ¶ 22.) These benefits can contribute to a student's success in college and throughout life. (Dkt. No. 290 (Pl's SUF) ¶ 23.)

This Court had "little difficulty holding" that H.B. 3293 treats B.P.J. worse than cisgender girls to whom she is similarly situated and so "discriminates against [B.P.J.] 'on the basis of sex.'" (Dkt. No. 67 (PI Order) at 12 (citing *Grimm*, 972 F.3d at 616); *accord Bostock*, 140 S. Ct. at 1741).) As this Court stated, "All other students in West Virginia secondary schools—cisgender girls, cisgender boys, transgender boys, and students falling outside of any of these definitions trying to play on the boys' teams—are permitted to play on sports teams that best fit their gender identity." (Dkt. No. 67 (PI Order) at 12.)

Defendants resist this Court's prior holding, which is borne out by the record evidence, that B.P.J. "is similarly situated" to cisgender girls. (Dkt. No. 67 (PI Order) at 13.) They maintain that B.P.J. is most similarly situated to cisgender boys, and that any harm she claims to suffer because of H.B. 3293 is due to her own generalizations and stereotypes regarding her identity. (Dkt. No. 305 (State MSJ Opp.) at 8; Dkt. No. 302 (Int. MSJ Opp.) at 24.) They are wrong.

As discussed above, *see* Section III.B, B.P.J. lives and is recognized as a girl in every aspect of her life. (Dkt. No. 290 (Pl's SUF) ¶¶ 1, 3-11.) She has been receiving puberty-delaying medication for two years and, as a result, has not developed any physiological characteristics attributable to endogenous puberty. (*Id.*; *id.* ¶¶ 13-17.) The reality of B.P.J.'s day-to-day life

reflects that, for purposes of accessing the educational benefits of school and scholastic activities, she "is not most similarly situated with cisgender boys; she is similarly situated to other girls." (Dkt. No. 67 (PI Order) at 7.)

Defendants suggest that *Grimm* does not inform the similarly situated analysis here, because *Grimm* involved privacy issues related to restrooms, not athletics. (Dkt. No. 305 (State MSJ Opp.) at 10-11; Dkt. No. 302 (Int. MSJ Opp.) at 23-24; Dkt. No. 301 (County MSJ Opp.) at 20-21.) But the Fourth Circuit's determination that Gavin Grimm, a transgender boy, was similarly situated to cisgender boys for purposes of the Title IX analysis did not turn on considerations specific to restrooms and privacy. Utilizing that same inquiry here, B.P.J. is similarly situated to other girls. (Dkt. No. 67 (PI Op.) at 7.)[21]

### C.     Title IX's Athletic Regulations Do Not Define Transgender Girls As Males Or Authorize Discrimination Against Them.

Defendants restate their misleading arguments that Title IX authorizes schools to discriminate against transgender students because Title IX's implementing regulations permit "separate teams for members of each sex," 34 C.F.R. § 106.41(b), and refer to "both sexes," *id.* § 106.41(c). (Dkt. No. 305 (State MSJ Opp.) at 7, 10; Dkt. No. 302 (Int. MSJ Opp.) at 24-25; Dkt. No. 301 (County MSJ Opp.) at 21.) But as B.P.J. sets out in her opposition brief, neither Title IX

---

[21] The State contends that in cases involving athletics, courts must determine the group to whom a student is similarly situated by looking at "average physical differences." (Dkt. No. 305 (State MSJ Opp.) at 8.) But the case it cites for that proposition, *Yellow Springs Exempted Vill. Sch. Dist. Bd. of Ed. v. Ohio High Sch. Athletic Ass'n*, 647 F.2d 651 (6th Cir. 1981), says no such thing. That case concerned the constitutionality of an athletic association's rule proscribing co-educational teams. *Id.* at 652. It did not concern whether or how to compare individual students and their athletic abilities to determine if certain students are similarly situated to one another.

not its implementing regulations define transgender girls as boys or authorize discrimination against transgender students in school sport. (Dkt. No. 331 (Pl's MSJ Opp.) at 49-52.)[22]

Title IX and its regulations do not purport to define transgender students by their sex assigned at birth or other particular physiological characteristics. As the Fourth Circuit has explained, the reference in Title IX and its regulations to "both sexes" (or similar language) "refers to male and female students" but does not address "how a school should determine whether a transgender individual is a male or female." *G.G. ex rel. Grimm v. Gloucester Cnty. Sch. Bd.,* 822 F.3d 709, 720 (4th Cir. 2016), *vacated and remanded*, 137 S. Ct. 1239 (2017). The State erroneously claims that the Supreme Court in *Bostock* "proceed[ed] on the assumption that . . . the term sex 'referr[ed] only to biological distinctions between male and female' and did not include 'norms concerning gender identity . . .'" (Dkt. No. 305 (State MSJ Opp.) at 7 (quoting *Bostock*, 140 S. Ct. at 1739).) But, in fact, *Bostock* conspicuously *refused* to adopt that definition of sex and specifically reserved the question whether the statutory term "sex" bears "a broader scope, capturing more than anatomy and reaching at least some norms concerning gender identity." 140 S. Ct. at 1739.

The text of the Title IX athletics regulations does not purport to authorize discrimination against transgender students or anyone else. The regulations allow for sex-separated sports teams "where selection for such teams is based upon competitive skill or the activity involved is a contact sport," 34 C.F.R. § 106.41(b), and require that any sex-separated athletic opportunities be "equal" to one another, *id.* § 106.41(c). They do not authorize discrimination against transgender students by categorically excluding them from the athletic activities provided to their cisgender peers. Nor

---

[22] Defendants also repeat their assertions about safety and substantial displacement to support their position that H.B. 3293 furthers Title IX. (Dkt. No. 301 (County MSJ Opp.) at 21-23; Dkt. No. 302 (Int. MSJ Opp.) at 25.) Plaintiff addresses those points above. *See supra* Section III.D.

could they do so without running afoul of Title IX's statutory anti-discrimination mandate. 20 U.S.C. § 1681(a). As the Fourth Circuit explained in *Grimm* when discussing a Title IX regulation authorizing schools to provide separate toilet facilities on the basis of sex, "the implementing regulation cannot override the statutory prohibition against discrimination on the basis of sex," and "[a]ll it suggests is that the act of creating sex-separated restrooms in and of itself is not discriminatory." 972 F.3d at 618; *accord Peltier v. Charter Day Sch., Inc.*, 8 F.4th 251, 271 (4th Cir. 2021) (explaining that because plain text of Title IX encompasses dress codes, agency could not exempt dress codes from statute's reach), *reh'g en banc granted on other grounds*, 2021 WL 4892153 (4th Cir. Oct. 19, 2021).[23]

For all these reasons, H.B. 3293 violates B.P.J.'s rights under Title IX.

## V.   Permanent Injunctive Relief Is Warranted And Should Be Granted.

If H.B. 3293 is allowed to bar B.P.J. from playing on her school's girls' sports teams, she will be irreparably harmed. In particular, she will be deprived of her rights under the Equal Protection Clause and Title IX, which alone is sufficient to establish irreparable harm; she will be deprived of the experiences of competition, friendship, and responsibility that Defendants are so concerned with preserving for cisgender girls; and she will be subjected to stigma, discrimination, pain, and distress. (*See* Dkt. No. 291 (Pl's MSJ) at 16-18, 35-37.) She will also be deprived of the many psychological, behavioral, and physical benefits associated with participating in school

---

[23] Defendant-Intervenor also claims that B.P.J.'s Title IX argument amounts to "all or nothing"— *i.e.*, a sports participation law will violate Title IX unless it permits all transgender girls to participate on all girls' teams in all circumstance. (Dkt. No. 302 (Int. MSJ Opp.) at 24.) Not so. B.P.J. is simply challenging H.B. 3293's "all or nothing" rule that bars her from playing on a girls' sports team pursuant to a categorical ban. She is not asking the Court to say whether other hypothetical laws governing the participation of girls who are transgender in school sports would comply with Title IX.

sports, which are valuable in themselves and can also contribute to greater success in college and throughout life. (Dkt. No. 290 (Pl's SUF) ¶¶ 22-23.)

The State and Defendant-Intervenor deny that subjecting B.P.J. to discrimination under H.B. 3293 will cause her any harm because, they say, she can run on the boys' team. (Dkt. No. 302 (Int. MSJ Opp.) at 17 ("[T]he fact that B.P.J. does not desire to participate on the boys' team doesn't mean the act prevents B.P.J. 'from participating in *any* sex-separated sports.'"); *see also* Dkt. No. 305 (State MSJ Opp.) at 3 n.6 ("H.B. 3293 does not preclude B.P.J. from participating in school sports or force B.P.J. to participate on boys' teams.").) But again, that argument reduces B.P.J.'s status and identity as a girl who is transgender to a mere preference, a framing *Grimm* rejected. As B.P.J.'s mother explained, "[f]orcing B.P.J. to compete on the boys' cross-country or track teams when girls' teams are available would completely erase who she is, and it would devastate her because she is a girl. My daughter is simply saying, 'Accept me for who I am.'" (Dkt. No. 290 (Pl's SUF) ¶ 100.)

Just like the policy in *Grimm*, H.B. 3293's "has the effect of shunting individuals like [B.P.J.]—who may not [participate on the girls' team] because of their 'biological [sex],' and who cannot [participate on the boys' team] because of their gender identity'—out of school athletics] altogether." 972 F.3d at 620 (Wynn, J., concurring). The handful of isolated hearsay statements from cisgender female collegiate athletes to which the State points do not outbalance these concrete, demonstrated harms to B.P.J. (Dkt. No. 305 (State MSJ Opp.) at 27-28.)[24]

---

[24] Defendant-Intervenor asserts that "the truth is that many student-athletes and parents object to males participating in women's sports." (Dkt. No. 302 (Int. MSJ Opp.) at 21.) But she ignores that there are also many student-athletes, including cisgender girls, who *support* inclusive policies for transgender athletes. *See, e.g.*, Br. of Amici Curiae 176 Athletes in Women's Sports, *Hecox v. Little*, Dkt. No. 72 (Dec. 21, 2020), 479 F. Supp. 3d 930 (D. Idaho 2020). And although Defendant-Intervenor's briefing stridently advocates for B.P.J.'s exclusion, Ms. Armistead herself is far more

This Court should issue a permanent injunction, as well as issue a declaratory judgment and award nominal damages. (*See* Dkt. No. 291 (Pl's MSJ) at 35-37; Dkt. No. 64 (First Amended Complaint) at 24.)

## CONCLUSION

For the foregoing reasons, Defendants' motions for summary judgment should be denied and B.P.J.'s motion for summary judgment should be granted.

---

equivocal, stating "I don't know" when asked whether she "object[ed] to B.P.J. playing on the Bridgeport Middle School girls' cross-country team." (Dkt. No. 290 (Pl's SUF) ¶ 130.)

Dated: May 26, 2022

Joshua Block*
AMERICAN CIVIL LIBERTIES UNION
FOUNDATION
125 Broad St.
New York, NY 10004
Phone: (212) 549-2569
jblock@aclu.org

Avatara Smith-Carrington*
LAMBDA LEGAL
3500 Oak Lawn Avenue, Suite 500
Dallas, TX 75219
Phone: (214) 219-8585
asmithcarrington@lambdalegal.org

Carl Charles*
Tara Borelli*
LAMBDA LEGAL
158 West Ponce De Leon Ave., Ste. 105
Decatur, GA 30030
Phone: (404) 897-1880
ccharles@lambdalegal.org

Sruti Swaminathan*
LAMBDA LEGAL
120 Wall Street, 19th Floor
New York, NY 10005
Phone: (212) 809-8585
sswaminathan@lambdalegal.org

Andrew Barr*
COOLEY LLP
1144 15th St. Suite 2300
Denver, CO 80202-5686
Phone: (720) 566-4000
abarr@cooley.com

Respectfully submitted,
/s/ *Loree Stark*

Loree Stark (Bar No. 12936)
Nick Ward (Bar No. 13703)
AMERICAN CIVIL LIBERTIES UNION OF WEST
VIRGINIA FOUNDATION
P.O. Box 3952
Charleston, WV 25339-3952
Phone: (914) 393-4614
lstark@acluwv.org

Kathleen Hartnett*
Julie Veroff*
Zoë Helstrom*
COOLEY LLP
3 Embarcadero Center, 20th Floor
San Francisco, CA 94111
Phone: (415) 693-2000
khartnett@cooley.com

Katelyn Kang*
Valeria M. Pelet del Toro*
COOLEY LLP
55 Hudson Yards
New York, NY 10001-2157
Phone: (212) 479-6000
kkang@cooley.com

Elizabeth Reinhardt*
COOLEY LLP
500 Boylston Street, 14th Floor
Boston, MA 02116-3736
Phone: (617) 937-2305
ereinhardt@cooley.com

*Visiting Attorneys*

*Attorneys for Plaintiff*

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA
CHARLESTON DIVISION

B.P.J. by her next friend and mother, HEATHER
JACKSON,

               *Plaintiff*,

        v.

WEST VIRGINIA STATE BOARD OF
EDUCATION, HARRISON COUNTY BOARD
OF EDUCATION, WEST VIRGINIA
SECONDARY SCHOOL ACTIVITIES
COMMISSION, W. CLAYTON BURCH in his
official capacity as State Superintendent, DORA
STUTLER in her official capacity as Harrison
County Superintendent, and THE STATE OF
WEST VIRGINIA,

               *Defendants*,

        and

LAINEY ARMISTEAD,

               *Defendant-Intervenor*.

Civil Action No. 2:21-cv-00316

Hon. Joseph R. Goodwin

**CERTIFICATE OF SERVICE**

**CERTIFICATE OF SERVICE**

I, Loree Stark, do hereby certify that on this 26th day of May, 2022, I electronically filed a true and exact copy of the *Reply Memorandum in Support of Plaintiff's Motion for Summary Judgment* with the Clerk of Court and all parties using the CM/ECF System.

                                      */s/ Loree Stark*
                                      Loree Stark
                                      West Virginia Bar No. 12936