IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA
CHARLESTON DIVISION

| | |
|---|---|
| B.P.J. by her next friend and mother, HEATHER JACKSON,<br><br>     *Plaintiff*,<br><br>v.<br><br>WEST VIRGINIA STATE BOARD OF EDUCATION, HARRISON COUNTY BOARD OF EDUCATION, WEST VIRGINIA SECONDARY SCHOOL ACTIVITIES COMMISSION, W. CLAYTON BURCH in his official capacity as State Superintendent, DORA STUTLER in her official capacity as Harrison County Superintendent, and THE STATE OF WEST VIRGINIA,<br><br>     *Defendants*,<br><br>   and<br><br>LAINEY ARMISTEAD,<br><br>     *Defendant-Intervenor*. | Civil Action No. 2:21-cv-00316<br><br>Hon. Joseph R. Goodwin<br><br><br>**PLAINTIFF'S REPLY IN SUPPORT OF STATEMENT OF UNDISPUTED MATERIAL FACTS** |

   At the outset, Plaintiff briefly replies to the State's asserted general objections to Plaintiff's Statement of Undisputed Material Facts ("SUF"). These objections are unsupported by either case law or evidentiary support.

   In response to the State's general objections 1 and 4, Plaintiff notes that the Federal Rules of Civil Procedure require that the party moving for summary judgment "show[] that there is no genuine dispute as to any material fact." Fed. R. Civ. P. 56(a). Rule 56 provides no restrictions (implicit or otherwise) on the format the moving party may use to meet its burden. Indeed, many courts, including sister courts in this Circuit, expressly require litigants to provide a separate filing clearly delineating the moving party's undisputed material facts, as Plaintiff has done here. *See, e.g.*, Eastern District of North Carolina Local Civ. R. 56.1(a)(1). In addition, the SUF is not an

additional source of argument or fact. The SUF provides an organized format by which the Court may view the factual assertions that are made in Plaintiff's Motion for Summary Judgment as well as the underlying evidentiary support for those assertions.

In response to the State's objections 5, 8, and 10, Plaintiff notes that the State's objections to "Plaintiff's use of certain terminology" fail to raise any actual dispute, let alone any "genuine, material" dispute. *See Cauthorne v. Am. Home Mortg. Corp.*, No. CIV. 3:08CV84, 2008 WL 4316123, at *1 (E.D. Va. Sept. 15, 2008) ("The mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact.") (quoting *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 247–48 (1986)) (emphasis in original). The State's blanket objections to the testimony of Plaintiff's experts also fail to raise any genuine dispute, because Plaintiff does not rely solely on the testimony of her experts in support of her facts.

Plaintiff addresses each of the State's "specific" objections to the SUF below.[1]

## I.      B.P.J. Is A Girl Who Is Transgender.

**1.      B.P.J. is an eleven-year-old girl who is also transgender. (Ex. 2[2] (Declaration of B.P.J.) ¶ 2; Ex. 12 (Deposition Transcript of B.P.J.) at 25:3-5, 25:11-14, 25:23-26:3; Ex. 13 (Deposition Transcript of Heather Jackson, Jan. 19) at 59:5-6; Ex. 15 (Deposition Transcript of Wesley Scott Pepper) at 46:16-20; Dkt. No. 252 (Stipulation of Uncontested Facts Agreed to by Harrison County Board of Education, County Superintendent Dora Stutler, and Plaintiff) ("County Stip.") ¶ 1; Dkt. No. 270 (Stipulation of Uncontested Facts Agreed to by West Virginia State Board of Education, State Superintendent W. Clayton Burch, and Plaintiff) (WVBOE Stip.) ¶ 1; Dkt. No. 158 (WVSSAC's Answer to Plaintiff's First Amended Complaint ("WVSSAC Ans.") ¶¶ 1, 6, 30.) B.P.J. was designated male at birth and has a female gender identity. (Ex. 1-A (Declaration of Heather Jackson) at 1; Ex. 1-B at 2.)**

---

[1] For the Court's convenience, Plaintiff has consolidated the SUF, the State's response to the SUF, and Plaintiff's reply in support of the SUF into a single document.

[2] "Ex." refers to an exhibit attached to the April 21, 2022, declaration of Loree Stark submitted in support of Plaintiff B.P.J.'s motion for summary judgment. (Dkt. No. 289.)

a. *State's Response: ¶ 1- Contested. B.P.J. is a biological boy (Heather Jackson Dep. at 98:14-99:3, ECF No. 285-2) with XY chromosomes and reproductive anatomy typical of the male sex who identifies as a girl. Intervenor's Appx at 1440-41 (B.P.J Responses to Intervenor's RFA 1, 3, 4), ECF No. 286-1.*

b. <u>Plaintiff's Reply:</u> The State is merely disputing Plaintiff's terminology, and as such it fails to show a genuine, material dispute. *See Cauthorne v. Am. Home Mortg. Corp.*, No. CIV. 3:08CV84, 2008 WL 4316123, at *1 (E.D. Va. Sept. 15, 2008) ("The mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact.") (quoting *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 247–48 (1986)) (emphasis in original). Plaintiff's terminology is consistent with the terminology used in *Grimm v. Gloucester Cnty. Sch. Bd.*, 972 F.3d 586 (4th Cir. 2020), *cert. denied*, 141 S. Ct. 2878 (2021).

2. **B.P.J. is fiercely protected by her mother, Heather Jackson; unconditionally loved by her father, Wesley Pepper; and has the support of her older brothers and grandparents. (Ex. 1 ¶¶ 4, 22–23; Ex. 2 ¶ 5; Ex. 15 at 165:21-166:1, 185:5-16.)**

a. *State's Response: ¶ 2 – Contested. This is irrelevant and not material.*

b. <u>Plaintiff's Reply:</u> The information in ¶ 2 is relevant to show that B.P.J. is recognized as a girl in daily life and, therefore, similarly situated to other girls—not to cisgender boys.

3. **When B.P.J. was in third grade, she socially transitioned at school to living and presenting in accordance with her identity as a girl. (Ex. 1 ¶ 11; Ex. 12 at 39:6-39:24.) "Social transition" means allowing a transgender child to live and be socially recognized in accordance with their gender identity. (Ex. 22 (Declaration and Expert Report of Deanna Adkins, M.D.) ¶ 27.)**

a. *State's Response: ¶ 3 – Contested. Social transition is not a passive measure by which a child is "allowed" to live and be recognized in accordance with a gender identity different from the child's natal sex. Rather, social transition is "the active affirmation of transgender identity" which is "a powerful psychotherapeutic intervention." See Levine Decl. at pp. 6-7, attached as Ex. D to the State's Memorandum in Opposition to the Pl. Brief ("State's Memo. in Op."), filed concurrently herewith. The World Professional Association for Transgender Health (WPATH) does not take a position on whether social transition is appropriate for pre-pubertal children and calls it a "controversial" measure. Id. at p. 24).*

b. <u>Plaintiff's Reply:</u> The State fails to raise a genuine, material dispute of fact. Even if the Court accepts the State's assertions regarding the characteristics of "social transition" as true (assertions which Plaintiff disputes), the State's assertions do not

undermine ¶ 3 that B.P.J. has socially transitioned and is recognized as a girl in daily life.

4.   **B.P.J.'s elementary school and middle school have both acknowledged and respect that B.P.J.'s gender identity is female. (Dkt. No. 252 (County Stip.) ¶ 1.)**

5.   **When B.P.J. was in elementary school, her school created a gender support plan designed to help "account[]" for and "support[]" B.P.J.'s "authentic gender" at school. (Ex. 1-A at 1; Ex. 2 ¶ 6; Dkt. No. 252 (County Stip.) ¶ 1.)**

6.   **Under this plan, school staff were informed that B.P.J.'s authentic gender is female, and were instructed to refer to her with her female name and using female pronouns. (Ex. 1-A at 2–3.)**

7.   **Under the gender support plan, school staff were also informed on how to support B.P.J. if she faced problems from others at school because of her gender. (Ex. 1-A at 2–3.)**

8.   **B.P.J.'s middle school created a similar plan. (Ex. 1-B.)**

9.   **Like the elementary school plan, B.P.J.'s middle school gender support plan confirmed that B.P.J.'s parents are aware of and supportive of her gender identity and that B.P.J. "is comfortable with others knowing her gender identity and transition," and provided that "all teachers," students, and multiple administrators and county staff would be made aware of her gender identity. (Ex. 1-B at 2.)**

10.  **Under the elementary and middle school gender support plans, if anyone has questions about B.P.J.'s identity, teachers and staff should "[b]e open and honest" and respond, "[s]he is [B.P.J.]; and that makes her happy." (Ex. 1-A at 2; Ex. 1-B at 3.)**

11.  **B.P.J. feels supported by her school given its commitment to treating her as the girl she is. (Ex. 2 ¶ 6; Ex. 12 at 130:3-132:13.)**

12.  **In 2019, B.P.J. was diagnosed with gender dysphoria by Dr. Gerald Montano, a pediatrician at the University of Pittsburgh Medical Center Children's Hospital of Pittsburgh's Gender and Sexuality Development Program. (Ex. 1 ¶ 13; Ex. 2 ¶ 7; Ex. 20 (Deposition Transcript of Gerald Montano, D.O.) at 93:17-19; Ex. 5 (State of West Virginia's Response to Plaintiff's Second Set of Requests for Admission) No. 5; Ex. 6 (Superintendent Dora Stutler's Responses and Objections to Plaintiff's Second Set of Requests for Admission) No. 5; Ex. 7 (Harrison County Board of Education's Responses and Objections to Plaintiff's Second Set of Requests for Admission) No. 5.)**

13.  **On June 15, 2020, at the first signs of puberty—known as the "Tanner 2" stage of pubertal development—B.P.J. began receiving puberty delaying (or "blocking") treatment, in accordance with the Endocrine Society's clinical guidelines for treating gender dysphoria. (Ex. 1 ¶ 14.)**

a. *State's Response: ¶ 13 – Contested. Heather Jackson has no qualifications to opine as to the Endocrine Society's clinical guidelines. The State does not concede that the administration of puberty blockers at Tanner Stage 2 is appropriate. Expert opinion to the contrary has been presented here (e.g., Levine Decl. at ¶¶ 78-89, Ex. D to State's Memo. in Opp.), and the issues with Plaintiff's experts' opinions concerning the administration of puberty blockers are addressed in the State's Daubert motions.*

b. <u>Plaintiff's Reply:</u> The State fails to raise a genuine, material dispute of fact. Even if the Court accepts the State's assertions regarding the "appropriate[ness]" of providing puberty blockers at Tanner Stage 2 (assertions which the Plaintiff disputes), these assertions do not undermine the fact that B.P.J. was prescribed puberty blockers at Tanner Stage 2. The protocols of the Endocrine Society's clinical guidelines are also independently discussed at Dkt. No. 289-23 (Adkins Rep.) and Dkt. No. 289-25 (Safer Rep.).

c. *State's Response: ¶¶ 13 through 18 – Contested. The specifics of Plaintiff's puberty suppressing treatment or potential future treatment are not material. As set forth in the State's Memo. in Op., the permissibility of the Save Women's Sports Act does not turn on Plaintiff's individual characteristics, as that is not how intermediate scrutiny works. Thus, the facts surrounding Plaintiff's use of puberty suppressing medication are not relevant or material to the pending dispositive motions. Further, uncontested studies show significant differences in prepubescent boys and girls, both in athletic performance and pre-pubertal testosterone. Actual data show that pre-pubertal biological boys consistently outperform girls in jumping, running, and upper body strength events. Brown Decl. at ¶¶ 71-109, ECF No. 285-7. At 0-5 months males' testosterone levels exceed female levels by as much as 500 percent. Id. at ¶ 68 (citing Mayo Clinic Laboratories).*

d. <u>Plaintiff's Reply:</u> The State fails to raise a genuine, material dispute, because nothing the State asserts here undermines ¶ 14, which states that B.P.J. has been on puberty blockers for two years.

As discussed in Plaintiff's briefing, the State's blanket assertion that Plaintiff's characteristics in her as-applied challenge are "not material" is incorrect, because it is based on an incorrect understanding of heightened scrutiny under the Equal Protection Clause. (Dkt. No. 331 (Pl. MSJ Opp.) at 35.) B.P.J.'s characteristics are relevant to this case, because she is bringing an as-applied challenge to a law that categorically bans all girls who are transgender from playing on girls' teams irrespective of individual circumstances, and part of B.P.J.'s argument is that there is no justification for categorically barring someone in her position from girls' sports teams.

Furthermore, the State's factual additional assertions regarding prepubertal children are neither material nor supported by admissible evidence. The State's assertions are immaterial because it is undisputed that higher levels of circulating

5

testosterone beginning with puberty are the largest driver of average differences in athletic performance between cisgender men and cisgender women, and that athletic differences before puberty are "modest" by comparison. (Dkt. No. 289-30 (Brown Rep.) ¶ 119.) The State's assertions are also inadmissible because they rely on the expert testimony of Dr. Brown and Dr. Carlson, who are both subject to pending *Daubert* challenges. (*See* Dkt. Nos. 316, 328.) Moreover, the State's assertion that five months of elevated testosterone in infant cisgender baby boys provides a lifelong athletic advantage is not even supported by Defendant's own expert reports.

14. **B.P.J. has been on puberty delaying treatment for nearly two years. (Ex. 1 ¶ 14; Ex. 2 ¶ 8; Ex. 20 at 115:22-116:4; Ex. 19 (Deposition Transcript of Kacie Kidd, M.D.) at 89:22-90:18.)**

 a. *State's Response: ¶¶ 13 through 18 – Contested. The specifics of Plaintiff's puberty suppressing treatment or potential future treatment are not material. As set forth in the State's Memo. in Op., the permissibility of the Save Women's Sports Act does not turn on Plaintiff's individual characteristics, as that is not how intermediate scrutiny works. Thus, the facts surrounding Plaintiff's use of puberty suppressing medication are not relevant or material to the pending dispositive motions. Further, uncontested studies show significant differences in prepubescent boys and girls, both in athletic performance and pre-pubertal testosterone. Actual data show that pre-pubertal biological boys consistently outperform girls in jumping, running, and upper body strength events. Brown Decl. at ¶¶ 71-109, ECF No. 285-7. At 0-5 months males' testosterone levels exceed female levels by as much as 500 percent. Id. at ¶ 68 (citing Mayo Clinic Laboratories).*

 <u>Plaintiff's Reply</u>: Same as immediately above in ¶ 13. Furthermore, the State fails to raise a genuine, material dispute, because nothing the State asserts here undermines ¶ 14, which states that B.P.J. has been on puberty blockers for two years.

15. **"Puberty blocking treatment works by pausing endogenous puberty at whatever stage it is at when the treatment begins." (Ex. 22 ¶ 30.)**

 a. *State's Response: ¶¶ 13 through 18 – Contested. The specifics of Plaintiff's puberty suppressing treatment or potential future treatment are not material. As set forth in the State's Memo. in Op., the permissibility of the Save Women's Sports Act does not turn on Plaintiff's individual characteristics, as that is not how intermediate scrutiny works. Thus, the facts surrounding Plaintiff's use of puberty suppressing medication are not relevant or material to the pending dispositive motions. Further, uncontested studies show significant differences in prepubescent boys and girls, both in athletic performance and pre-pubertal testosterone. Actual data show that pre-pubertal biological boys consistently outperform girls in jumping, running, and upper body strength events. Brown Decl. at ¶¶ 71-109, ECF No. 285-7. At 0-5 months males' testosterone levels exceed female levels by as much as 500 percent. Id. at ¶ 68 (citing Mayo Clinic Laboratories).*

6

b. <u>Plaintiff's Reply:</u> Same as ¶ 13. Furthermore, nothing the State asserts here disputes ¶ 15 that puberty blocking treatment pauses endogenous puberty at whatever stage it is at when the treatment begins.

16. **When administered to transgender girls at the beginning of the "Tanner 2" stage of sexual maturity, puberty-blocking medication prevents transgender girls from experiencing levels of circulating testosterone above what is typical for non-transgender girls and women. (Ex. 24 (Expert Report and Declaration of Joshua D. Safer, M.D., F.A.C.P., F.A.C.E.) ¶ 50; Ex. 25 (Rebuttal Expert Report and Declaration of Joshua D. Safer, M.D., F.A.C.P., F.A.C.E.) ¶ 17; Ex. 22 ¶ 31.)**

a. *State's Response: ¶¶ 13 through 18 – Contested. The specifics of Plaintiff's puberty suppressing treatment or potential future treatment are not material. As set forth in the State's Memo. in Op., the permissibility of the Save Women's Sports Act does not turn on Plaintiff's individual characteristics, as that is not how intermediate scrutiny works. Thus, the facts surrounding Plaintiff's use of puberty suppressing medication are not relevant or material to the pending dispositive motions. Further, uncontested studies show significant differences in prepubescent boys and girls, both in athletic performance and pre-pubertal testosterone. Actual data show that pre-pubertal biological boys consistently outperform girls in jumping, running, and upper body strength events. Brown Decl. at ¶¶ 71-109, ECF No. 285-7. At 0-5 months males' testosterone levels exceed female levels by as much as 500 percent. Id. at ¶ 68 (citing Mayo Clinic Laboratories).*

b. <u>Plaintiff's Reply:</u> Same as ¶ 13. Furthermore, nothing the State asserts here disputes ¶ 16 regarding the effects of puberty blocking treatment when it is provided to transgender girls at the beginning of Tanner Stage 2.

17. **As a result of receiving puberty-delaying medication at the beginning of the "Tanner 2" stage of pubertal development, B.P.J. has not gone through her endogenous puberty and has not experienced the effects of testosterone that would be typical if she underwent her full endogenous puberty. (Ex. 22 ¶¶ 30–31; Ex. 19 at 119:22-120:15.) Specifically, she has never experienced levels of circulating testosterone above what is typical for non-transgender girls and women. (Ex. 24 ¶ 50; Ex. 25 ¶ 17; Ex. 22 ¶ 31.)**

a. *State's Response: ¶¶ 13 through 18 – Contested. The specifics of Plaintiff's puberty suppressing treatment or potential future treatment are not material. As set forth in the State's Memo. in Op., the permissibility of the Save Women's Sports Act does not turn on Plaintiff's individual characteristics, as that is not how intermediate scrutiny works. Thus, the facts surrounding Plaintiff's use of puberty suppressing medication are not relevant or material to the pending dispositive motions. Further, uncontested studies show significant differences in prepubescent boys and girls, both in athletic performance and pre-pubertal testosterone. Actual data show that pre-pubertal biological boys consistently outperform girls in jumping, running, and upper body strength events. Brown Decl. at ¶¶ 71-109, ECF No. 285-7. At 0-5*

> *months males' testosterone levels exceed female levels by as much as 500 percent. Id. at ¶ 68 (citing Mayo Clinic Laboratories).*

    b. <u>Plaintiff's Reply:</u> Same as ¶ 13. Furthermore, nothing the State asserts here disputes ¶ 17 regarding the effects of puberty blocking treatment on B.P.J.

18. **If B.P.J. goes on to receive gender-affirming hormone therapy, she will receive the same amount of estrogen during puberty that non-transgender girls generate endogenously and will develop the same changes to bone size, skeletal structure, pelvis shape, fat distribution, and secondary sex characteristics that are typically experienced by non-transgender girls who go through a typically female puberty. (Ex. 25 ¶ 17; Ex. 22 ¶ 43.)**

    a. *State's Response: ¶¶ 13 through 18 – Contested. The specifics of Plaintiff's puberty suppressing treatment or potential future treatment are not material. As set forth in the State's Memo. in Op., the permissibility of the Save Women's Sports Act does not turn on Plaintiff's individual characteristics, as that is not how intermediate scrutiny works. Thus, the facts surrounding Plaintiff's use of puberty suppressing medication are not relevant or material to the pending dispositive motions. Further, uncontested studies show significant differences in prepubescent boys and girls, both in athletic performance and pre-pubertal testosterone. Actual data show that pre-pubertal biological boys consistently outperform girls in jumping, running, and upper body strength events. Brown Decl. at ¶¶ 71-109, ECF No. 285-7. At 0-5 months males' testosterone levels exceed female levels by as much as 500 percent. Id. at ¶ 68 (citing Mayo Clinic Laboratories).*

    b. <u>Plaintiff's Reply:</u> Same as ¶ 13. Furthermore, nothing the State asserts here disputes ¶ 18 regarding the effects of gender-affirming treatment on B.P.J.

**II.**     **B.P.J.'s Wishes To Participate In And Experience The Benefits Of School Sports.**

19. **B.P.J. has always liked running and loves playing team sports. (Ex. 2 ¶¶ 3, 13; Ex. 12 at 65:2-4, 145:15-18, 67:21-68:6.)**

    a. *State's Response: ¶¶ 19 through 22 – Contested. These statements concerning Plaintiff's individual characteristics and circumstances are not relevant to the issues in this case and therefore are not "material."*

    b. <u>Plaintiff's Reply:</u> The State's blanket assertion that Plaintiff's characteristics in her as-applied challenge are "not material" is incorrect, because it is based on an incorrect understanding of heightened scrutiny under the Equal Protection Clause. (Dkt. No. 331 (Pl. MSJ Opp.) at 35.) In any event, this fact is relevant to the irreparable harm factor required to receive a permanent injunction. Furthermore, the State does not actually dispute any of the facts here.

20. **While in elementary school, she enjoyed participating in a recreational cheerleading team with other girls. (Ex. 1 ¶¶ 16–18; Ex. 2 ¶¶ 9–11; Ex. 12 at 72:21-72:22.)**

    a. *State's Response: ¶¶ 19 through 22 – Contested. These statements concerning Plaintiff's individual characteristics and circumstances are not relevant to the issues in this case and therefore are not "material."*

    b. Same as immediately above in ¶ 19. This fact is also relevant to B.P.J.'s having been recognized as a girl in daily life for many years.

21. **As someone who comes from a family of runners, B.P.J. also grew up running and watching her older brothers and mother run competitively and as part of a team. (Ex. 1 ¶ 20; Ex. 2 ¶ 13.)**

    a. *¶¶ 19 through 22 – Contested. These statements concerning Plaintiff's individual characteristics and circumstances are not relevant to the issues in this case and therefore are not "material."*

    b. <u>Plaintiff's Reply:</u> Same as ¶ 19.

22. **School-sponsored athletics offer a range of educational and social benefits for children and young adults, including camaraderie, cooperation, leadership, teamwork, watching out for fellow players, trust, physical fitness, perseverance, sportsmanship, and discipline. (Dkt. No. 78 (State of West Virginia's Answer to Plaintiff's First Amendment Complaint) ("State Ans.") ¶ 38; Dkt. No. 131 (Lainey Armistead's Answer to Plaintiff's First Amended Complaint) ("Armistead Ans.") ¶ 38; Dkt. No. 156 (West Virginia State Board of Education's Answer to Plaintiff's First Amendment Complaint) ("WVBOE Ans.") ¶ 38; Dkt. No. 157 (Harrison County Board of Education's Answer to Plaintiff's First Amendment Complaint) ("County Ans.") ¶ 38; Dkt. No. 158 (WVSSAC Ans.) ¶ 38; Ex. 27 (Expert Report and Declaration of Mary D. Fry, Ph.D.) ¶¶ 18, 37; Ex. 16 (Deposition Transcript of Harrison County Board of Education 30(b)(6) Designees) at 106:22-106:24, 222:9-17; Ex. 8 (West Virginia State Board of Education's Responses to Plaintiff's Second Set of Requests for Admission) Nos. 45–47; Ex. 17 (Deposition Transcript of WVSSAC 30(b)(6) Designee) at 113:8-11; Ex. 21 (Deposition of Lainey Armistead) at 156:17-25; Dkt. No. 95-1 (Declaration of Lainey Armistead) ¶ 27; Ex. 11 (Lainey Armistead's Responses and Objections to Plaintiff's Second Set of Requests for Admission) Nos. 44–45.)**

    a. *State's Response: ¶¶ 19 through 22 – Contested. These statements concerning Plaintiff's individual characteristics and circumstances are not relevant to the issues in this case and therefore are not "material."*

    b. <u>Plaintiff's Reply:</u> Same as ¶ 19.

    c. *State's Response: ¶¶ 22 through 28 – Contested. These paragraphs refer to and rely on the proffered expert testimony of Professor Mary Fry, who is subject to a Daubert motion being filed contemporaneously herewith. They are also immaterial and unreliable for the reasons set forth in the State's Daubert motion.*

d. <u>Plaintiff's Reply:</u> The State fails to raise a genuine, material dispute. Even if the Court accepts the State's assertions regarding Dr. Fry's testimony (which Plaintiff disputes), the fact provided here clearly relies on evidence in the record beyond the testimony of Dr. Fry. The State does not dispute any of these other cited sources, which support the fact stated in ¶ 22.

23. **The benefits from school athletics can contribute to greater success in college and throughout life. (Ex. 27 ¶¶ 18, 37.)**

a. *State's Response: ¶¶ 22 through 28 – Contested. These paragraphs refer to and rely on the proffered expert testimony of Professor Mary Fry, who is subject to a Daubert motion being filed contemporaneously herewith. They are also immaterial and unreliable for the reasons set forth in the State's Daubert motion.*

b. <u>Plaintiff's Reply:</u> The State fails to raise a genuine, material dispute. Even if the Court accepts the State's assertions regarding Dr. Fry's testimony (which Plaintiff disputes), Defendants do not actually dispute the fact provided here. (*See* Dkt. Nos. 289-6–289-12 (Defs. Resp. to Pls. RFAs) Nos. 44-45.) Furthermore, this fact is relevant to the irreparable harm factor required for a permanent injunction.

24. **These benefits exist regardless of whether a student wins or loses. (Ex. 5 No. 47; Ex. 6 No. 47; Ex. 8 No. 47; Ex. 9 (State Superintendent W. Clayton Burch's Responses to Plaintiff's Second Set of Requests for Admission) No. 47; Ex. 10 (WVSSAC's Responses to Plaintiff's Second Set of Requests for Admission) No. 47; Ex. 11 No. 47; Ex. 27 ¶ 35).**

a. *State's Response: ¶¶ 22 through 28 – Contested. These paragraphs refer to and rely on the proffered expert testimony of Professor Mary Fry, who is subject to a Daubert motion being filed contemporaneously herewith. They are also immaterial and unreliable for the reasons set forth in the State's Daubert motion.*

b. <u>Plaintiff's Reply:</u> The State fails to raise a genuine, material dispute. Even if the Court accepts the State's assertions regarding Dr. Fry's testimony (which Plaintiff disputes), the fact provided here clearly relies on evidence in the record beyond the testimony of Dr. Fry. The State does not dispute any of these other cited sources, which support the fact stated in ¶ 24.

25. **These benefits are advanced when all athletes have the opportunity to play the sport they love. (Ex. 27 ¶ 18.)**

a. *State's Response: ¶¶ 22 through 28 – Contested. These paragraphs refer to and rely on the proffered expert testimony of Professor Mary Fry, who is subject to a Daubert motion being filed contemporaneously herewith. They are also immaterial and unreliable for the reasons set forth in the State's Daubert motion.*

b. <u>Plaintiff's Reply:</u> Same as ¶ 23.

26.   **Encouraging student-athletes to focus on improving their own performance and cooperation with teammates maximizes the benefits of athletics for all participants. (Ex. 27 ¶¶ 28–30, 35.)**

   a.   *State's Response: ¶¶ 22 through 28 – Contested. These paragraphs refer to and rely on the proffered expert testimony of Professor Mary Fry, who is subject to a Daubert motion being filed contemporaneously herewith. They are also immaterial and unreliable for the reasons set forth in the State's Daubert motion.*

   b.   Plaintiff's Reply: Same as ¶ 23.

27.   **Where coaches create an environment in which student-athletes feel safe, valued, and respected, performance is improved and the benefits of sport are maximized. (Ex. 27 ¶¶ 26, 34.)**

   a.   *State's Response: ¶¶ 22 through 28 – Contested. These paragraphs refer to and rely on the proffered expert testimony of Professor Mary Fry, who is subject to a Daubert motion being filed contemporaneously herewith. They are also immaterial and unreliable for the reasons set forth in the State's Daubert motion.*

   b.   Plaintiff's Reply: Same as ¶ 23.

28.   **Excluding students for no other reason than because they are transgender eliminates the benefits of sports for them and diminishes those benefits for all participants. (Ex. 27 ¶¶ 37–41.)**

   a.   *State's Response: ¶¶ 22 through 28 – Contested. These paragraphs refer to and rely on the proffered expert testimony of Professor Mary Fry, who is subject to a Daubert motion being filed contemporaneously herewith. They are also immaterial and unreliable for the reasons set forth in the State's Daubert motion.*

   b.   Plaintiff's Reply: Same as ¶ 23.

29.   **B.P.J. has experienced benefits from participating in cheerleading in the past and from participating in cross-country in the 2021-22 school year. (Ex. 1 ¶¶ 17–18, 28; Ex. 2 ¶¶ 10–11, 16–18.)**

   a.   *State's Response: ¶¶ 29 and 30 – Contested. Plaintiff's individual characteristics are not material as set forth in the State's Summary Judgment briefing.*

   b.   Plaintiff's Reply: The State's blanket assertion that Plaintiff's characteristics in her as-applied challenge are "not material" is incorrect, because it is based on an incorrect understanding of heightened scrutiny under the Equal Protection Clause. (Dkt. No. 331 (Pl. MSJ Opp.) at 35.) This fact is also relevant to B.P.J.'s Title IX claim (which requires her to show harm as a result of discrimination), and to the irreparable harm factor required to receive a permanent injunction. Furthermore, the State does not actually dispute any of the facts here.

30. **B.P.J. hopes to continue to experience such benefits from playing on girls' teams in the future. (Ex. 2 ¶ 21.)**

    a. *State's Response: ¶¶ 29 and 30 – Contested. Plaintiff's individual characteristics are not material as set forth in the State's Summary Judgment briefing.*

    b. <u>Plaintiff's Reply:</u> Same as immediately above in ¶ 29. Furthermore, B.P.J.'s continued desire to play sports is relevant to B.P.J.'s standing.

**III. Prior To H.B. 3293, West Virginia Had A Longstanding Policy Of Sex Separation In School Sport And Did Not Categorically Bar Transgender Students From Participating.**

31. **Before it passed H.B. 3293, West Virginia had a general, longstanding, and unchallenged policy establishing separate school sports teams for boys and girls. *See* W. Va. Code R. § 127.**

32. **Almost all sports in West Virginia at the public secondary school level are separated into boys' and girls' teams. (Ex. 17 109:24-110:4.) The exceptions are cheerleading, football, baseball, wrestling, and golf. (Ex. 10 Nos. 29–30; Ex. 17 at 109:24-110:4.)**

33. **Cheer teams are always designated as "coed" or "mixed," whereas football, baseball, wrestling, and golf teams are boys' teams that permit girls to play if they so desire because no separate girls' teams exist, and so are considered "mixed . . . to respond to demand." (Ex. 17 at 104:2-105:6.)**

34. **In practice, cheer "almost always has boy [and girl] members," but baseball and football are "very seldom" actually mixed. (Ex. 17 at 104:17-20.)**

35. **There are no co-ed teams for cross-country or track at Bridgeport Middle School or at any other public secondary school in West Virginia. (Ex. 10 Nos. 30–31.)**

36. **Under rules established by the West Virginia Secondary School Activities Commission ("WVSSAC")—which were already in existence when H.B. 3293 was enacted—cisgender boys are prohibited from playing on girls' teams at the public secondary school level. (Ex. 17 at 105:4-105:16; Ex. 39 (WVSSAC000148) at § 127-2-3.8; Ex. 7 Nos. 38–39; Ex. 8 Nos. 38–39; Ex. 10 Nos. 38–39; Ex. 11 Nos. 38–39.)**

    a. *State's Response: ¶ 36 – Contested. None of the policies or rules cited by Plaintiff reference "cisgender" boys. They merely reflect that members of the male sex have long been prohibited from playing on women's sports teams in West Virginia.*

    b. <u>Plaintiff's Reply:</u> The State fails to raise a genuine, material dispute. The State does not actually dispute that cisgender boys are prohibited from playing on girls' teams at the public secondary school level. Furthermore, and as noted in ¶ 36, Defendants WVSSAC, County Board, State Board, and Defendant-Intervenor all admit this fact.

12

37.     By contrast, girls may choose to play on a boys' team if they wish to do so and no girls' team exists, as is the case with football, baseball, wrestling, and golf. (Ex. 17 104:2-105:6.)

38.     West Virginia did not have a law or policy prohibiting girls who are transgender from playing on girls' teams before it passed H.B. 3293.

   a.   *State's Response: ¶ 38 – Contested. This is contradicted by ¶¶ 31 and 36. The policy referenced in ¶ 31 anticipated the separation of boys and girls into their own sex-segregated teams, as stated in ¶ 36. See also Gregor v. W.V. Secondary Sch. Activities Comm'n, No 2:20-cv-00654, 2020 WL 5997057, at \*3 (S.D.W. Va. Oct. 9, 2020).*

   b.   Plaintiff's Reply: The State's response is based on the erroneous and unsupported contention that girls and women who are transgender are the same as "boys." This contention has already been rejected by the Fourth Circuit. *Grimm v. Gloucester Cnty. Sch. Bd.*, 972 F.3d 586, 609 (4th Cir. 2020). Furthermore, the policies and rules cited in ¶¶ 31 and 36 did not expressly address transgender participation (in comparison to the policy addressed in ¶ 39), and the policies and rules discussed in ¶¶ 31 and 36 did not rely on H.B. 3293's narrow definition of "biological sex."

39.     Before H.B. 3293, the WVSSAC Board of Directors had an internal policy that allowed students who are transgender to participate on teams consistent with their gender identity if the transgender student's school allowed them to participate, based on its considerations of whether that specific student's participation would impact "fair competition among high school teams." (Ex. 37 (WVSSAC000008).) Under the internal policy, if another school contested the transgender student's eligibility to play, then the Board of Directors would determine whether the student's participation threatened "competitive equity or the safety of teammates and opposing players." (*Id.*)

   a.   *State's Response: ¶ 39 – Contested. The referenced "policy" was not formalized and was not adopted by the SSAC. Dolan Dep. at 124:12-25, ECF No. 285-1. Rather, when officials learned that males who identified as female competing in women's sports was becoming "an issue," Id. at 118:18-20, they proposed a "temporary stopgap measure" to ensure safety and fairness for students, but that proposal never became an official rule, nor was it ever used or enforced. Id. at 117:12-14; 118:8-9; 119:10-11; 124:12-18; 233:14-15.*

   b.   Plaintiff's Reply: The State fails to raise a material, genuine dispute. ¶ 39 expressly acknowledges that the policy was "internal" and was used by the WVSSAC Board of Directors. The State also does not assert a dispute with any of the quoted language from the transgender policy. In other words, nothing that the State asserts here undermines or creates a dispute with what is stated in ¶ 39.

40.    The WVSSAC received no complaints about this internal policy, and the WVSSAC is not aware of any instances of a transgender student attempting to participate under this policy. (Ex. 17 at 118:23-119:16.)

    a.  *State's Response: ¶ 40 – Contested. There is evidence in the record of male students in West Virginia seeking to participate on girls' teams. See Id. at 120-21.*

    b.  <u>Plaintiff's Reply:</u> The State fails to raise a material, genuine dispute. Even if the Courts accepts this assertion as true, this does not challenge the statements in ¶ 40 that there were zero complaints about the WVSSAC's internal policy, and that there were no instances of a *transgender* student attempting to participate under this policy. Furthermore, the two students that the State refers to did not make any actual effort to participate on girls' teams, and certainly were not evaluated under WVSSAC's transgender policy. (*See* Dkt. No. 331 (Pl. MSJ Opp.) at 5.) The State's response is also based on the erroneous and unsupported contention that girls and women who are transgender are the same as "male[s]."

41.    Since 2011, the National College Athletics Association ("NCAA") has allowed women who are transgender to participate on women's teams after completing one year of testosterone suppression. (Ex. 24 ¶ 38.)

    a.  *State's Response: ¶ 41 – Contested. As the 2011 NCAA policy is no longer current, and it is not the case that the NCAA has a blanket policy allowing males who identify as transgender to participate in women's sports after one year of testosterone suppression. Brown Decl. at ¶ 176, ECF No. 285-7.*

    b.  <u>Plaintiff's Reply:</u> The State fails to raise a material, genuine dispute. Indeed, there is no dispute that the NCAA policy changed, and the subsequent paragraph (¶ 42) acknowledges the new NCAA policy, which the State does not dispute.

42.    In 2022, the NCAA announced that it had revised its policy to adopt a "sport-by-sport approach" that "calls for transgender participation for each sport to be determined by the policy for the national governing body of that sport, subject to ongoing review and recommendation by the NCAA Committee on Competitive Safeguards and Medical Aspects of Sports to the Board of Governors." (Ex. 24 ¶ 39.)

IV.    **H.B. 3293 Categorically Bans Transgender Girls And Women From Participating On Girls' And Women's Sports Teams.**

43.    On April 9, 2021, West Virginia passed H.B. 3293. W. Va. Code § 18-2-25d. H.B. 3293 went into effect 90 days later. *Id.*

44.    H.B. 3293 categorically bans all girls who are transgender from participating in school sports from middle school through college. W. Va. Code § 18-2-25d.

    a.  *¶ 44 – Contested. H.B. 3293 is not a ban and it does not contain the word "transgender"; it provides: "Athletic teams or sports designated for females,*

*women, or girls shall not be open to students of the male sex where selection for such teams is based upon competitive skill or the activity involved is a contact sport." WV Code §18-2-25d. It allows biological males, regardless of gender identity, to participate on any male or co-ed teams, and it does not prohibit their participation on female teams unless "selection for such teams is based upon competitive skill or the activity involved is a contact sport." Id.*

b.  <u>Plaintiff's Reply:</u> The State fails to raise a genuine, material dispute. The State does not actually dispute that under H.B. 3293, girls who are transgender are unable to participate on girls' teams. The State also cites nothing in support of its assertion that H.B. 3293 is "not a ban." *See Miller-Hall v. C. R. Bard, Inc.*, No. 2:13-CV-07734, 2016 WL 7155763, at *1–2 (S.D.W. Va. Dec. 7, 2016) ("Conclusory allegations . . . , without more, are insufficient to preclude the granting of a summary judgment."). The State's response is also based on the erroneous and unsupported contention that girls and women who are transgender are the same as "boys."

45. **H.B. 3293 requires that all public secondary school or college sports in West Virginia be "expressly designated" as either "males," "females," or "co-ed" based solely on a student's "biological sex." W. Va. Code §§ 18-2-25d(b), (c).**

46. **H.B. 3293 defines "[b]iological sex" as "an individual's physical form as a male or female based solely on the individual's reproductive biology and genetics at birth." W. Va. Code § 18-2-25d(b)(1).**

47. **H.B. 3293 further provides that "[a]thletic teams or sports designated for females, women, or girls shall not be open to students of the male sex where selection for such teams is based upon competitive skill or the activity involved is a contact sport." W. Va. Code § 18-2-25d(c)(2). There is no parallel provision for boys' teams.**

48. **The legislative findings for H.B. 3293 reject the notion of allowing students to play on sports teams consistent with their "gender identity," asserting that "gender identity is separate and distinct from biological sex" and that "[c]lassifications based on gender identity serve no legitimate relationship to the State of West Virginia's interest in promoting equal athletic opportunities for the female sex." W. Va. Code § 18-2-25d(a)(4).**

49. **H.B. 3293's definition of "biological sex" categorically excludes B.P.J. and any other transgender girl from playing sports at the middle school, high school, and collegiate levels. (Ex. 5 Nos. 24 (admitting "that H.B. 3293 prohibits Plaintiff B.P.J. from participating on girls' athletic teams at all public secondary schools located in West Virginia"), 36–37; Ex. 6 Nos. 36–37; Ex. 7 Nos. 20–22, 36–37; Ex. 8 Nos. 36–37; Ex. 9 Nos. 20–22, 36–37; Ex. 10 Nos. 36–37; Ex. 11 Nos. 36–37; Dkt. No. 252 (County Stip.) ¶ 2; Dkt. No. 270 (WVBOE Stip.) ¶ 2; Ex. 16 at 100:21-101:4; Ex. 17 at 113:16-20; Ex. 28 (Deposition Transcript of Mary D. Fry, Ph.D.) 180:18-20 (Q. [from Attorney David Tryon] Well, right now the rule is HB-3293, which says that [a] transgender girl must participate on the boys['] team.).)**

a. *State's Response: ¶ 49 – Contested. H.B. 3293 does not categorically exclude anyone from participating in sports. Plaintiff is a biological male as defined by H.B. 3293 and can therefore play on any team designated for males or designated co-ed. Further, H.B. 3293 does not prohibit Plaintiff's participation on female teams unless "selection for such teams is based upon competitive skill or the activity involved is a contact sport." Id. Further, H.B.3293 uses categories consistent with those used by the National Institute of Health. The term "transgender girl" was used for convenience in the Fry deposition after Professor Fry could not understand the terms "biological sex," "biological male," or "cisgender." Fry defined "transgender" as "someone who may have been classified at birth as one gender but identifies as another." Fry Dep. at 32:16-41:13, Ex. E to the State's Memo. in Op.*

b. <u>Plaintiff's Reply:</u> The State fails to raise a genuine, material dispute. The State does not—and cannot—dispute that B.P.J. and any other transgender girl cannot participate on girls' teams under H.B. 3293's definition of "biological sex." The State also makes the conclusory and unsupported assertion that B.P.J. can play on a team designated for males, notwithstanding the evidence that Plaintiff has provided showing that B.P.J. cannot do so. (Dkt. No. 290 (Pl. SUF) at ¶¶ 100-103.) The State also provides no support for its statement that there are sports that B.P.J. could participate in not involving "competitive skill" or "contact." This lack of evidence is insufficient to preclude summary judgment, *see Miller-Hall v. C. R. Bard, Inc.*, No. 2:13-CV-07734, 2016 WL 7155763, at *1–2 (S.D.W. Va. Dec. 7, 2016), and, in any event, is immaterial here where B.P.J. wishes to run cross-country and track.

Furthermore, BPJ wants to run on cross-country and track, both of which involve competitive skill. (Dkt. No. 289-12 (Int. Resp. to Pl. RFA) No. 16-17; Dkt. No. 289-6 (State Resp. to Pl. RFA) No. 16-17.)

**50.   H.B. 3293 does not prohibit a cisgender girl at any public secondary school in West Virginia from joining a girls' athletic team. (Ex. 5 Nos. 34–35; Ex. 6 Nos. 34–35; Ex. 7 Nos. 34–35; Ex. 8 Nos. 34–35; Ex. 9 Nos. 34–35; Ex. 10 Nos. 34–35; Ex. 11 Nos. 34–35; Ex. 16 at 100:2-101:4; Ex. 18 (Deposition Transcript of State Board of Education 30(b)(6) Designee) at 124:11-25, 125:3-19.)**

a. *¶ 50 – Contested. H.B.3293 does not use the word "cisgender," nor does it make any classifications based on whether a person is "cisgender." It makes classifications based on biological sex. Thus, H.B.3293 does not prohibit any biological female, regardless of gender identity, from joining a female athletic team.*

b. <u>Plaintiff's Reply:</u> The State does not raise a genuine, material dispute. The State does not actually dispute that cisgender girls are permitted to play on girls' athletic teams.

16

51. **Melissa White, counsel for the House of Delegates Education Committee, referred to H.B. 3293 as a "[t]ransgender participation in secondary schools bill" (Ex. 40 (WVSBOE 000008).)**

    a. *State's Response: ¶¶ 51 and 53 – Contested. Melissa White's hearsay statements are not legislative history and not considered admissible "facts." See State's Memo. in Opp. at 19-21.*

    b. <u>Plaintiff's Reply:</u> The State offers no support for its conclusory assertions—it instead cites generally to portions of its memorandum that do not even discuss Melissa White's statements. The State also misconstrues the law cited in its opposition regarding legislative statements. (*See* Pl. Reply at 15-16.)

    Furthermore, these statements are not hearsay. Plaintiff is not offering the statements for the truth of the matter asserted, but to reflect how the bill was represented to others by legislators and legislative staff. In addition, even if the statements were submitted for the truth of the matter asserted, they are excluded from the definition of hearsay as admissions of a party opponent. Fed. R. Civ. P. 801(d)(2).

52. **Melissa White also described the bill as a "[t]ransgender originating bill" (Ex. 40 (WVSBOE000039)) and a "bill regarding transgender participation in sports" (Ex. 40 (WVSBOE000009).)**

    a. *State's Response: ¶¶ 51 and 53 – Contested. Melissa White's hearsay statements are not legislative history and not considered admissible "facts." See State's Memo. in Opp. at 19-21.*

    b. <u>Plaintiff's Reply:</u> Same as immediately above in ¶ 51.

53. **During debates over the bill, when asked how H.B. 3293 would change the status quo in West Virginia, the counsel representing the bill replied that the bill "would affect those that changed their sex after birth" and further explained that H.B. 3293 "would not affect" a man who was assigned a male sex at birth. (Ex. 35 (West Virginia House of Delegates Education Committee Testimony, Mar. 18, 2021) at 9.)**

    a. *State's Response: ¶¶ 51 and 53 – Contested. Melissa White's hearsay statements are not legislative history and not considered admissible "facts." See State's Memo. in Opp. at 19-21.*

    b. <u>Plaintiff's Reply:</u> Same as ¶ 51.

54. **A member of the West Virginia House of Delegates and Chairman of the Education Committee, Joe Ellington, described the "issue" that H.B. 3923 was designed to address as "two transgender girls" who "were allowed to compete in state track and field meetings in Connecticut." (Dkt. No. 1-1 (Declaration of Loree Stark) Ex. D (West**

Virginia House of Delegates, Mar. 25, 2021) at 3; Dkt. No 25 (Supplemental Declaration of Katelyn Kang) Ex. C at 37–38.)

a. *State's Response: ¶¶ 54 through 57 – Contested. Statements by individual legislators are not admissible as "facts." Id.*

b. <u>Plaintiff's Reply:</u> The State misconstrues the law cited in its opposition regarding legislative statements. (*See* Pl. Reply at 15-16.) Regardless of whether legislative statements constitute "legislative history" under West Virginia law, "contemporary statements by members of the decisionmaking body" are relevant under federal law to determine whether a statute is passed for a discriminatory purpose. *Vill. of Arlington Heights v. Metro. Hous. Dev. Corp.*, 429 U.S. 252, 268 (1977). Furthermore, the State's conclusory assertion that these statements are not "facts" is unsupported, and it is unclear what the State means when it asserts that these statements are not "facts." To the extent that the State is implying that these statements are inadmissible as hearsay, they are not. Plaintiff is not offering the statements for the truth of the matter asserted, but to reflect how the bill was represented to others by legislators and legislative staff. In addition, even if the statements were submitted for the truth of the matter asserted, they are excluded from the definition of hearsay as admissions of a party opponent. Fed. R. Civ. P. 801(d)(2).

55. **During the debate in the Senate, one senator, Michael J. Maroney, expressly noted that "the bill" is "about transgenders." (Dkt. No. 1-1 (Declaration of Loree Stark) Ex. E (West Virginia Senate, Apr. 8, 2021) at 2; Dkt. No. 25 (Supplemental Declaration of Katelyn Kang) Ex. F at 32.)**

a. *State's Response: ¶¶ 54 through 57 – Contested. Statements by individual legislators are not admissible as "facts." Id.*

b. <u>Plaintiff's Reply:</u> Same as ¶ 54.

56. **Another senator, Rollan Roberts, shared a constituent letter stating that the "trans movement is an attack upon womanhood." (Dkt. No. 1-1 (Declaration of Loree Stark) Ex. E (West Virginia Senate, Apr. 8, 2021) at 3; Dkt. No. 25 (Supplemental Declaration of Katelyn Kang) Ex. F at 32.)**

a. *State's Response: ¶¶ 54 through 57 – Contested. Statements by individual legislators are not admissible as "facts." Id.*

b. <u>Plaintiff's Reply:</u> Same as ¶ 54.

57. **On March 16, 2021, Delegate Jordan Bridges announced on Facebook that he was co-sponsoring H.B. 3293 and then "liked" comments on his post that advocated for physical violence against girls who are transgender, compared girls who are transgender to pigs, and called girls who are transgender by a pejorative term**

18

("tranny"). (Ex. 42 (Jordan Bridges, "Update: The bill passed out of committee," Facebook, https://perma.cc/HA5C-VJ4N (March 16, 2021)).)

    a. *State's Response: ¶¶ 54 through 57 – Contested. Statements by individual legislators are not admissible as "facts." Id.*

    b. <u>Plaintiff's Reply:</u> Same as ¶ 54.

**58.** **The sole justification for H.B. 3293 offered in the legislative text is "promot[ing] equal athletic opportunities for the female sex." W. Va. Code § 18-2-25d(a)(5). The law discusses equal athletic opportunities only in terms of the "substantial" displacement of female athletes. *Id.* § 18-2-25d(a)(3)-(4).**

    a. *State's Response: ¶ 58 – Contested. This is not fact—it is argumentative. H.B. 3293's preamble and the findings speak for themselves. They also reference "contact sports" and use language very similar to Title IX in explaining the purpose of the law.*

    b. <u>Plaintiff's Reply:</u> The State fails to meet its burden of showing a genuine, material dispute. The State cites nothing in support of its assertions. Furthermore, the State does not actually identify a dispute—it does not dispute the quoted legislative text in ¶ 58.

**59.** **During the discovery period, the State identified additional rationalizations that it claims are advanced by H.B. 3293: (1) "[t]o [p]rotect [w]omen's [s]ports," (2) "[t]o follow Title IX," and (3) "[t]o protect women's safety in female athletic sports." (Ex. 4 (State of West Virginia's Responses to Plaintiff's First Set of Interrogatories) No. 6.)**

    a. *State's Response: ¶ 59 – Contested. This is not fact—it is argumentative. What Plaintiff is calling "additional rationalizations" were already implicit or explicit in the bill. See State's Memo. in Opp. at 16-18.*

    b. <u>Plaintiff's Reply:</u> The State does not identify a genuine, material dispute. Even if the Court accepts as true that these additional rationalizations were "implicit or explicit in the bill," the State still fails to show a substantial relationship between these asserted interests and H.B. 3293. (Dkt. No. 291 (Pl. MSJ) at 24-33; Dkt. No. 331 (Pl. Opp MSJ) at 37-47; Pl. Reply at 23-29).

**60.** **During a House committee hearing of the bill, Sarah Stewart from the West Virginia Department of Education testified that her office had never received any calls or complaints about transgender students participating in athletics. (Ex. 35 at 11.)**

    a. *State's Response: ¶¶ 60 through 62 – Contested. Plaintiff cherry-picks statements made by the Governor and during various legislative hearings, which are not material in isolation.*

    b.  <u>Plaintiff's Reply:</u> The State fails to meet its burden of showing a genuine, material dispute, as the State cites nothing in support of this assertion. The State also offers zero support as to why the statements are "cherry-pick[ed]" and are "not material in isolation." Furthermore, Sarah Stewart's testimony is entirely consistent with documents and testimony that the State Board has provided in this litigation. (*See, e.g.*, Dkt. No. 289-9 (State Board Resp. to Pl. RFAs) Nos. 40-43.) The State also fails to contest the actual truth of Sarah Stewart's statements.

**61.    The bill's sponsors also acknowledged that they were not aware of a single instance of a transgender athlete having ever competed on a secondary school or higher education sports team in West Virginia, let alone any "problem" from such participation. (Dkt. No. 1-1 (Declaration of Loree Stark) Ex. B (West Virginia House of Delegates Education Committee, Mar. 18, 2021) at 1–2, Ex. C (West Virginia House of Delegates Judiciary Committee, Mar. 18, 2021) at 1, Ex. D (West Virginia House of Delegates, Mar. 25, 2021) at 1.)**

    a.  *State's Response: ¶¶ 60 through 62 – Contested. Plaintiff cherry-picks statements made by the Governor and during various legislative hearings, which are not material in isolation.*

    b.  <u>Plaintiff's Reply:</u> The State fails to meet its burden of showing a genuine, material dispute, as the State cites nothing in support of this assertion. The State also offers no support as to why the statements are "cherry-pick[ed]" and are "not material in isolation." Furthermore, the State fails to contest the actual truth of the statements that there was "any problem" from transgender athletes participating in sports teams in West Virginia.

**62.    When Governor Justice was asked after signing the bill whether he could give "one example of a transgender child trying to get an unfair advantage," he responded, "No, I can't really tell you one." Ex. 43 (MSNBC on Twitter, https://twitter.com/MSNBC/status/1388132937707802629 [https://perma.cc/G8VM-QGYU] (April 30, 2021).) He further indicated that the issue purportedly addressed by H.B. 3293 was not a priority for him, stating, "I didn't make it a priority. It wasn't my bill. . . . This is not like it's a big priority to me. . . . I think we only have 12 kids maybe in our state that are transgender-type kids. I mean, for crying out loud . . . I sign hundreds of bills, hundreds of bills. This is not a priority to me." (*Id.*)**

    a.  *State's Response: ¶¶ 60 through 62 – Contested. Plaintiff cherry-picks statements made by the Governor and during various legislative hearings, which are not material in isolation.*

    b.  <u>Plaintiff's Reply:</u> The State fails to meet its burden of showing a genuine, material dispute, as the State cites nothing in support of this assertion. The State also offers no support as to how the statements are "cherry-pick[ed]" and are "not material in isolation."

63.   **Defendants were not aware of any transgender student athletes participating on an athletic team offered by a public secondary school in West Virginia when H.B. 3293 was passed. (Defendants' Responses to Plaintiff's Second Set of Requests for Admission Nos. 40–41.)**

    a.   *State's Response: ¶¶ 63 through 66 and 68 – Contested. There were issues with the potential for males who identify as females to try to participate in women's sports in West Virginia. West Virginia officials were aware that this was an issue based on national trends and other information. See ECF 287 at 1-5.*

    b.   <u>Plaintiff's Reply:</u> The State fails to identify a genuine, material dispute. Even assuming the State's characterizations to be true (which Plaintiff disputes), they do not demonstrate that a transgender student athlete participated on an athletic team offered by a public secondary school in West Virginia when H.B. 3293 was passed. Furthermore, the State does not actually dispute that they were not aware of anyone who is transgender participating in sports in West Virginia.

64.   **Defendants are not currently aware of a transgender student athlete other than B.P.J. participating on an athletic team offered by Bridgeport Middle School or any other public secondary school in West Virginia. (Ex. 5 Nos. 42–43; Ex. 6 Nos. 42–43; Ex. 7 Nos. 42–43; Ex. 8 Nos. 42–43; Ex. 9 Nos. 42–43; Ex. 10 Nos. 42–43; Ex. 11 Nos. 42–43; Ex. 17 at 119:13-16.)**

    a.   *State's Response: ¶¶ 63 through 66 and 68 – Contested. There were issues with the potential for males who identify as females to try to participate in women's sports in West Virginia. West Virginia officials were aware that this was an issue based on national trends and other information. See ECF 287 at 1-5.*

    b.   <u>Plaintiff's Reply:</u> The State fails to identify a genuine, material dispute. Like the above, even if the Court accepts as true the State's characterization of the evidence, it does not contradict ¶ 64 that Defendants "are not currently aware of a transgender student athlete other than B.P.J. participating on an athletic team."

65.   **WVSSAC has not received any complaints about transgender students participating in school sports in West Virginia. (Ex. 17 at 120:9-15.)**

    a.   *State's Response: ¶¶ 63 through 66 and 68 – Contested. There were issues with the potential for males who identify as females to try to participate in women's sports in West Virginia. West Virginia officials were aware that this was an issue based on national trends and other information. See ECF 287 at 1-5.*

    b.   <u>Plaintiff's Reply:</u> The State does not actually identify a genuine, material dispute. Even if the Court accepts as true the State's characterizations of the evidence, it does not contradict ¶ 65 that the "WVSSAC has not received any complaints about transgender students participating in school sports in West Virginia."

66.    **The West Virginia Department of Education's General Counsel described H.B. 3293 as "much ado about nothing." (Ex. 40 (WVSBOE000006).)**

   a.   *State's Response: ¶¶ 63 through 66 and 68 – Contested. There were issues with the potential for males who identify as females to try to participate in women's sports in West Virginia. West Virginia officials were aware that this was an issue based on national trends and other information. See ECF 287 at 1-5.*

   b.   <u>Plaintiff's Reply:</u> The State does not actually identify a genuine, material dispute. Even if the Court accepts as true the State's characterization of the evidence, it does not contradict the fact that the West Virginia Department of Education's General Counsel described H.B. 3293 as "much ado about nothing."

67.    **The West Virginia Department of Education did not support H.B. 3293 when it was passed. (Ex. 41 (WVSBOE000038).)**

   a.   *State's Response: ¶¶ 67 and 69 – Contested. The West Virginia Department of Education's political position on H.B. 3293 is not a "fact" which is material or relevant to whether the law is a permissible exercise of state authority.*

   b.   <u>Plaintiff's Reply:</u> The State's conclusory and unsupported assertion fails to create a genuine, material dispute. The State offers zero evidence beyond mere allegation that the West Virginia Department of Education's positions are immaterial and irrelevant to this case. *See Miller-Hall v. C. R. Bard, Inc.*, No. 2:13-CV-07734, 2016 WL 7155763, at *1–2 (S.D.W. Va. Dec. 7, 2016) ("Conclusory allegations . . . , without more, are insufficient to preclude the granting of a summary judgment."). And in any event, the State Board's position regarding H.B. 3293 is clearly material and relevant. As the entity statutorily responsible to "supervise the schools in this state," *Jones v. W. Va. State Bd. of Educ.*, 218 W. Va. 52, 61 (W. Va. 2005), the State Board is much closer to this case's issues than the State, and the State Board's position on the bill is thus relevant to whether the law is actually substantially related to a governmental interest.

68.    **The State Board's 30(b)(6) witness testified that the Board had "not had an issue" and "didn't see an issue" regarding the participation of transgender girls in school sports, and that the Department of Education, State Board, and State Superintendent have never received any complaints regarding students who are transgender participating in school sports. (Ex. 18 at 67:3-10, 101:15-17, 102:12-13, 113:19-114:16, 125:24-126:2, 135:24-136:19).**

   a.   *State's Response: ¶¶ 67 and 69 – Contested. The West Virginia Department of Education's political position on H.B. 3293 is not a "fact" which is material or relevant to whether the law is a permissible exercise of state authority.*

   b.   <u>Plaintiff's Reply:</u> Same as immediately above in ¶ 67.

    c.   *State's Response: ¶¶ 63 through 66 and 68 – Contested. There were issues with the potential for males who identify as females to try to participate in women's sports in West Virginia. West Virginia officials were aware that this was an issue based on national trends and other information. See ECF 287 at 1-5.*

    d.   <u>Plaintiff's Reply:</u> The State does not actually identify a genuine, material dispute. Even if the Court accepts as true the State's assertions, they do not contradict the fact that the State Board's 30(b)(6) witness testified that it had "not had an issue" and "didn't see an issue" regarding the participation of transgender girls in school sports, and that the Department of Education had "never received any complaints regarding students who are transgender participating in school sports."

69.    **The West Virginia Department of Education and the State Superintendent still do not support H.B. 3293. (Dkt. No. 270 (WVBOE Stip.) ¶ 5.)**

    a.   *State's Response: ¶¶ 67 and 69 – Contested. The West Virginia Department of Education's political position on H.B. 3293 is not a "fact" which is material or relevant to whether the law is a permissible exercise of state authority.*

    b.   <u>Plaintiff's Reply:</u> The State's conclusory and unsupported assertion fails to create a genuine, material dispute. The State offers no evidence beyond mere allegation that the West Virginia Department of Education's positions are immaterial and irrelevant to this case.

V.    **H.B. 3293's Exclusive Reliance On "Biological Sex" And Categorical Bar To The Participation Of Transgender Women And Girls Is A Stark Departure From The Inclusive Policies Of Major Sporting Associations.**

70.    **H.B. 3293 classifies school sports teams "according to biological sex" and defines "biological sex" as "an individual's physical form as male or female based solely on the individual's reproductive biology and genetics at birth." W. Va. Code § 18-2-25d(a)(5), (b)(1).**

71.    **Scientists recognize that a person's sex encompasses different biological components, including sex chromosomes, certain genes, gonads, exposure to sex hormone, internal and external genitalia, and other secondary sex characteristics, which are not always aligned in the same direction. (Ex. 25 ¶¶ 5–6 (and sources cited therein)); Ex. 23 (Exhibit 4 to Deposition Transcript of Deanna Adkins, M.D. (Hembree WC, et al. Endocrine Treatment of Gender Dysphoria/Gender Incongruent Persons: An Endocrine Society Clinical Practice Guideline. J Clin Endocrinol Metab 2017; 102:3869-3903 ("Endocrine Society Guidelines 2017") at 3875)).)**

    a.   *State's Response: ¶ 71 – Contested. The contention that H.B. 3293's definition of "biological sex" is scientifically inappropriate is wrong for the reasons set forth in the State's Memo. in Op., the Daubert motions concerning the opinions of Drs. Adkins and Safer, and the expert opinions proffered by the State.*

    b. <u>Plaintiff's Reply:</u> The State fails to identify a genuine, material dispute. The State does not actually dispute the underlying assertions of the cited source that sex encompasses all of the factors listed in the Hembree et al. article. Indeed, the sources that it cites in its own motion for summary judgment expressly acknowledge that "sex" is composed of factors beyond solely reproductive anatomy and genetics at birth. (*See* Dkt. No. 331 (Pl. MSJ Opp.) at 27-28 (discussing Dkt. No. 305 (State MSJ) at 287).)

72. **Although the precise biological causes of gender identity are unknown, gender identity itself has biological underpinnings, possibly as a result of variations in prenatal exposure to sex hormones, gene sequences, epigenetics, or a combination of factors. (Ex. 25 ¶ 6 (and sources cited therein); Ex. 23 (Endocrine Society Guidelines 2017 at 3874–75).)**

    a. *State's Response: ¶ 72 – Contested. "[T]here is substantial evidence that the "biological basis" theory is incorrect[.]" Levine Decl. at ¶ 97, and generally at ¶¶ 92-105, Ex. D. to the State's Memo. in Op. This is further addressed in the Daubert motion concerning the opinions of Dr. Janssen.*

    b. <u>Plaintiff's Reply:</u> The State fails to raise a genuine, material dispute. Dr. Levine is not qualified to offer an expert opinion on this topic. (*See* Dkt. No. 324 (Levine *Daubert* Mot.).)

73. **H.B. 3293's requirement that teams be separated "based solely on the individual's reproductive biology and genetics at birth" is a stark departure from the prior policy in West Virginia and is not the rule used by elite sporting organizations.**

    a. *State's Response: ¶ 73 – Contested. This is argumentative, not a fact, and does not cite any facts. H.B. 3293 is not a "stark departure from the prior policy in West Virginia," as West Virginia has a long history of sports separation by biological sex as set forth above and in the State's Memo. in Op. Also, the statement that separation by biological sex "is not the rule used by elite sporting organizations" is unsupported and does not define or specify any "elite sporting organizations."*

    b. <u>Plaintiff's Reply:</u> The State does not identify a genuine, material dispute. The State provides no evidence that West Virginia previously separated sports "based solely on the individual's reproductive biology and genetics at birth." Furthermore, the State's assertion that Plaintiff fails to "define or specify any 'elite sporting organizations'" is contradicted by Plaintiff's subsequent paragraph, which identifies three elite sporting organizations.

74. **The NCAA, World Athletics, and the International Olympic Committee ("IOC") all permit transgender girls and women to compete in women's sport events after suppressing their levels of testosterone for particular periods of time or below particular thresholds. (Dkt. No. 78 (State Ans.) ¶ 42; Dkt. No. 131 (Armistead Ans.) ¶ 42; Dkt. No. 156 (WVBOE Ans.) ¶ 42; Dkt. No. 157 (County Ans.) ¶ 42; Dkt. No. 158 (WVSSAC Ans.) ¶ 42; Ex. 24 ¶¶ 27–39.)**

  a. *State's Response: ¶ 74 – Contested. The NCAA recently abandoned its former policy allowing males to compete in women's sports after a year of suppressing testosterone and instead adopted a sport-by-sport approach that defers to the policy of the national governing body for that sport. Brown Decl. at ¶ 176, ECF No. 285-7. It is therefore incorrect to state that they permit participation provided a certain level or duration of testosterone suppression, as not every sports-governing body grants such permission. World Rugby, for example, does not allow such participation despite testosterone suppression. Id. at ¶ 171.*

  b. <u>Plaintiff's Reply:</u> The State fails to identify a genuine, material dispute. The subsequent paragraph expressly notes that the NCAA changed its policy in 2022. Furthermore, the State does not challenge the fact that World Athletics and the IOC all permit transgender girls and women to compete in women's sports events after suppressing their levels of testosterone.

   The State also mischaracterizes Plaintiff's facts as stating that "every sports-governing body grants such permission." Plaintiff makes no such claim here.

**75. The NCAA's policy is described above. *See supra* ¶¶ 41–42. The NCAA policy aims to "preserve[] opportunity for transgender-student athletes." (Ex. 45 (NCAA, *Board of Governors updates transgender participation policy* (Jan. 19, 2022), <u>https://www.ncaa.org/news/2022/1/19/media-center-board-of-governors-updates-transgender-participation-policy.aspx</u>).)**

  a. *State's Response: ¶¶ 75 through 84 – Contested. Sports organization's policies are not determinative of whether the Sports Act is a permissible exercise of state authority.*

  b. <u>Plaintiff's Reply:</u> The State fails to show a genuine, material dispute. The State cites nothing in support of its conclusory statement. Furthermore, the State's assertion contradicts its own reliance on the World Rugby policy, as can be seen in its response to ¶ 74, its motion for summary judgment, and its opposition motion. (*See* Dkt. No. 287 (State MSJ) at 17; Dkt. No. 305 (State Opp.) at 15-16, 23.)

**76. Since 2011, World Athletics, the international governing body for track-and-field athletics, has required that women with elevated levels of circulating testosterone lower their levels of testosterone below a threshold amount in order to compete in elite international women's sports competitions. (Ex. 24 ¶ 27.)**

  a. *¶¶ 75 through 84 – Contested. Sports organization's policies are not determinative of whether the Sports Act is a permissible exercise of state authority.*

  b. <u>Plaintiff's Reply:</u> Same as immediately above in ¶ 75.

**77. In 2019, World Athletics adopted regulations allowing women who are transgender to participate in elite international women's sports competitions if their total**

testosterone level in serum is beneath a particular threshold—5 nmol/L—for at least one year before competition. (Ex. 24 ¶ 29.)

    a.   *State's Response:* *¶¶ 75 through 84 – Contested. Sports organization's policies are not determinative of whether the Sports Act is a permissible exercise of state authority.*

    b.   <u>Plaintiff's Reply:</u> Same as ¶ 75.

78.    **The IOC published formal eligibility rules for the participation of transgender women in 2003. Those rules required that transgender women athletes could compete in women's events only if they had genital surgery, a gonadectomy (*i.e.*, removal of the testes), and legal documentation of female sex. (Ex. 24 ¶ 31.)**

    a.   *State's Response:* *¶¶ 75 through 84 – Contested. Sports organization's policies are not determinative of whether the Sports Act is a permissible exercise of state authority.*

    b.   <u>Plaintiff's Reply:</u> Same as ¶ 75.

79.    **In 2015, the IOC adopted new policies allowing women who are transgender to participate on women's teams if they demonstrated that their total testosterone level in serum was below 10 nmol/L for at least one year prior to competition. (Ex. 24 ¶ 33.)**

    a.   *State's Response:* *¶¶ 75 through 84 – Contested. Sports organization's policies are not determinative of whether the Sports Act is a permissible exercise of state authority.*

    b.   <u>Plaintiff's Reply:</u> Same as ¶ 75.

80.    **In 2021, the IOC adopted a new "Framework on Fairness, Inclusion, and Non-Discrimination on the Basis of Gender Identity and Sex Variations," which replaces the 2015 guidance. (Ex. 24 ¶ 34.)**

    a.   *State's Response:* *¶¶ 75 through 84 – Contested. Sports organization's policies are not determinative of whether the Sports Act is a permissible exercise of state authority.*

    b.   <u>Plaintiff's Reply:</u> Same as ¶ 75.

81.    **Unlike the IOC's 2003 and 2015 policies, the IOC's 2021 framework does not attempt to adopt a single set of eligibility standards for the participation of transgender athletes that would apply universally to every IOC sport. Instead, the 2021 framework provides a set of governing principles for sporting bodies to follow when adopting eligibility rules for their particular sport. (Ex. 24 ¶ 35.)**

a. *State's Response: ¶¶ 75 through 84 – Contested. Sports organization's policies are not determinative of whether the Sports Act is a permissible exercise of state authority.*

b. Plaintiff's Reply: Same as ¶ 75.

82. **Under the 2021 framework, "[n]o athlete should be precluded from competing or excluded from competition on the exclusive ground of an unverified, alleged or perceived unfair competitive advantage due to their sex variations, physical appearance and/or transgender status." (Ex. 24 ¶ 36.) "Until evidence . . . determines otherwise, athletes should not be deemed to have an unfair or disproportionate competitive advantage due to their sex variations, physical appearance and/or transgender status." (Ex. 24 ¶ 36.)**

a. *State's Response: ¶¶ 75 through 84 – Contested. Sports organization's policies are not determinative of whether the Sports Act is a permissible exercise of state authority.*

b. Plaintiff's Reply: Same as ¶ 75.

83. **The 2021 framework further provides that "[a]ny restrictions arising from eligibility criteria should be based on robust and peer reviewed research that: (a) demonstrates a consistent, unfair, disproportionate competitive advantage in performance and/or an unpreventable risk to the physical safety of other athletes; (b) is largely based on data collected from a demographic group that is consistent in gender and athletic engagement with the group that the eligibility criteria aim to regulate; and (c) demonstrates that such disproportionate competitive advantage and/or unpreventable risk exists for the specific sport, discipline and event that the eligibility criteria aim to regulate." (Ex. 24 ¶ 37.)**

a. *State's Response: ¶¶ 75 through 84 – Contested. Sports organization's policies are not determinative of whether the Sports Act is a permissible exercise of state authority.*

b. Plaintiff's Reply: Same as ¶ 75.

84. **USA Swimming recently adopted a policy allowing girls and women who are transgender to apply to compete in elite events if they demonstrate that their "prior physical development . . . as mitigated by any medical intervention, does not give the athlete a competitive advantage over the athlete's cisgender [f]emale competitors" and they "demonstrate[] that the concentration of testosterone in the athlete's serum has been less than 5 nmol/L . . . continuously for a period of at least thirty-six (36) months before the date of the Application." (Ex. 29 (Declaration of Gregory A. Brown, P.H.D., F.A.C.S.M.) ¶ 177.)**

     a. *State's Response: ¶¶ 75 through 84 – Contested. Sports organization's policies are not determinative of whether the Sports Act is a permissible exercise of state authority.*

     b. <u>Plaintiff's Reply:</u> Same as ¶ 75.

**85.    A person's genetic makeup and internal and external reproductive anatomy are not useful indicators of athletic performance and have not been used in elite competition for decades. (Ex. 24 ¶ 49.)**

     a. *State's Response: ¶ 85 – Contested. Dr. Safer's opinions are subject to a Daubert motion, and Plaintiff's statement is contradicted by the actual data. See supra at (f). See also Brown expert report, ECF 285-7 (detailing performance differences between biological males and biological females).*

     b. <u>Plaintiff's Reply:</u> The State's response relies on the testimony of Dr. Brown, which is inadmissible for the reasons explained in the pending *Daubert* motion. (Dkt. No. 316 (Brown *Daubert* Mot.).) In any event, the State's proffered evidence fails to identify a genuine, material dispute, as nothing in Dr. Brown's expert report identifies a link between "internal and external reproductive anatomy" and genetic makeup" and "athletic performance." Indeed, the State itself hypothesizes that alleged differences in athletic performance before puberty are a result of higher levels of circulating testosterone experienced by infant cisgender boys from age 0 to 5 months—not genetics or anatomy. (Dkt. No. 287 (State MSJ) at 14.) The State also offers no evidence to contradict ¶ 85 that these factors "have not been used in elite competition for decades."

**86.    Some people with 46,XY chromosomes may have inactive testosterone receptors (a syndrome called "complete androgen insensitivity syndrome, CAIS") which means they do not respond to testosterone despite very high levels. (Ex. 24 ¶ 26(b).)**

     a. *State's Response: ¶¶ 86 through 88 – Contested. The use of the word "may" is speculative and not a fact and not permissible for expert testimony. Further, as set forth more fully in the Summary Judgment briefing and the Daubert motions concerning Drs. Adkins and Safer, disorders of sexual development like CAIS are not material to this case.*

     b. <u>Plaintiff's Reply:</u> The State's assertion that use of the word "may" is "speculative mischaracterizes the way the term is used in ¶ 86. The State does not dispute that people with CAIS exist. Information about women with CAIS is relevant and material because it demonstrates that average sex-based differences in athletic performance are not determined by chromosomes. Rather, those differences are determined by the body's response to testosterone.

**87.    Usually, people with CAIS have female gender identity and have external genitalia that are typically female. They do not develop the physical characteristics associated with typical male puberty. (Ex. 24 ¶ 26(b).)**

a. *State's Response: ¶¶ 86 through 88 – Contested. The use of the word "may" is speculative and not a fact and not permissible for expert testimony. Further, as set forth more fully in the Summary Judgment briefing and the Daubert motions concerning Drs. Adkins and Safer, disorders of sexual development like CAIS are not material to this case.*

b. Plaintiff's Reply: Same as immediately above in ¶ 86.

88. **It has long been recognized that women with CAIS do not have an athletic advantage over other women simply by virtue of having XY chromosomes. (Ex. 24 ¶ 59.)**

a. *State's Response: ¶¶ 86 through 88 – Contested. The use of the word "may" is speculative and not a fact and not permissible for expert testimony. Further, as set forth more fully in the Summary Judgment briefing and the Daubert motions concerning Drs. Adkins and Safer, disorders of sexual development like CAIS are not material to this case.*

b. Plaintiff's Reply: Same as ¶ 86.

89. **There is a medical consensus that the largest known biological cause of average differences in athletic performance between non-transgender men as a group and non-transgender women as a group is circulating testosterone beginning with puberty. (Ex. 24 ¶ 25; Ex. 25 ¶ 8; Ex. 29 ¶ 114 ("While boys exhibit some performance advantage even before puberty, it is both true and well known to common experience that the male advantage increases rapidly, and becomes much larger, as boys undergo puberty and become men.").)**

a. *State's Response: ¶ 89 – Contested. Dr. Gregory Brown shows that circulating testosterone is not the only biological cause of differences in athletic performance between males and females. See Brown Expert Report, ECF 285-7.*

b. Plaintiff's Reply: The State fails to raise a genuine, material dispute, as the State's response is not inconsistent with ¶ 89. Plaintiff never states that circulating testosterone is the "only" cause of purported differences in athletic performance, but that circulating testosterone is the "largest known biological cause of average differences in athletic performance." The State does not dispute this fact here.

90. **Before puberty, boys and girls typically have the same levels of circulating testosterone, and age-grade competitive sports records show only modest differences in athletic performance between non-transgender boys and non-transgender girls. (Ex. 24 ¶¶ 24–25; Ex. 26 (Exhibit 4 to Deposition Transcript of Joshua D. Safer (Handelsman 2018 ("Age-grade competitive sports records show minimal or no female disadvantage prior to puberty[.]"))); Ex. 26 ¶ 114 (describing differences as "modest").)**

a.  *State's Response: ¶ 90 - Contested. The Handelsman study in fact shows competitively significant male advantages over females before puberty. See Safer Dep. at 89:6-90:24; 94:18-95:3; 95:6- 11; 103:4-10, ECF No. 285-6; see also Brown Decl. at ¶¶ 68, 71-109, ECF No. 285-7 (performance data of prepubescent children shows the same male advantages over females before puberty). Further, Dr. Safer's opinions are subject to a Daubert motion and are clearly disputed.*

b.  <u>Plaintiff's Reply</u>: The State's assertions regarding the Handelsman study and its characterizations of prepubertal performance differences as "significant" are unsupported by its cited source. The Handelsman study itself states: "Age-grade competitive sports records show minimal or no female disadvantage prior to puberty." (Second Supp. Decl. of Loree Stark, Ex. 66 (Handelsman, David, et al., *Circulating Testosterone as the Hormonal Basis of Sex Differences in Athletic Performance*, Pediatrics, 142(4), Endocrine Reviews, 39: 803–829, at 812, doi: 10.1542/peds.2018-2162) at 812.) Dr. Safer never agrees with the State's assertion that the Handelsman study shows "significant male advantages over females before puberty." In fact, while discussing a graph in the Handelsman study comparing ten-year-old girls and boys, Dr. Safer states that "the graph that we are looking at includes arrow bars that include the possibility that boys would have—that the girls would have a superior outcome . . . Where the data are either small or are suspect or not significant, then all of that collectively certainly is—would be included as minimal to non-existent." (*See* Dkt. No. 289-27 (Safer Dep. Tr.) at 98:14-20.)

Even if Dr. Safer's opinions are found to be "genuinely" disputed, ¶ 90 does not rely on Dr. Safer's opinions but on a peer-reviewed article published by different individuals, which is independently cited by Defendants' own proffered experts. (*See, e.g.*, Dkt. No. 289-30 (Brown Rep.) ¶ 12.)

91.  **There have been no studies purporting to establish that any modest differences in athletic performance between pre-pubertal cisgender boys and pre-pubertal cisgender girls are attributable to innate physiology as opposed to social factors. (Ex. 30 (Deposition Transcript of Gregory A. Brown) at 94:19-23; Ex. 25 ¶ 9.)**

a.  *State's Response: ¶ 91 – Contested. Dr. Brown provided evidence that there is a biological component to the performance differences between pre-pubertal males and females and copious data that such differences are often decisive in head-to-head competition. See State's Memo. in Supp. of MSJ at 14-15, ECF No. 287, and Brown Decl. at ¶¶ 68-109, ECF No. 285-7.*

b.  <u>Plaintiff's Reply</u>: The State mischaracterizes the record. As noted in this fact, it is Defendants' own expert Dr. Brown who admits that he is unable to "quantify[] the effects of social causes" versus "physiological factors" on differences in athletic performance between prepubertal boys and girls. (*See* Dkt. No. 316 (Brown *Daubert* Mot.) at 14.)

92.  **H.B. 3293 does not provide for any consideration of circulating testosterone levels. W. Va. Code § 18-2-25d.**

**VI.      H.B. 3293 Harms B.P.J.**

93.      Under H.B. 3293, B.P.J. is forbidden from playing on a girls' team at Bridgeport
         Middle School, or on a girls' athletic team at any public secondary school in West
         Virginia. (Ex. 5 Nos. 20-24; Ex. 6 Nos. 20-24; Ex. 7 Nos. 20-24; Ex. 8 Nos. 20-24; Ex.
         9 Nos. 20-24; Ex. 10 Nos. 20-24; Ex. 11 Nos. 20-24; Dkt. No. 252 (County Stip.) ¶ 2;
         Dkt. No. 270 (WVBOE Stip.) ¶ 2.)

94.      In May 2021, B.P.J.'s mother, Heather Jackson, met with B.P.J.'s new Principal at
         Bridgeport Middle School, David Mazza, regarding a gender support plan for B.P.J.,
         which specified the ways the school would support B.P.J. as a girl. (Ex. 1 ¶ 23; Ex. 16
         at 95:25-96:6).

95.      At that same meeting, Ms. Jackson informed Principal Mazza that B.P.J. wanted to
         participate on the girls' cross-country team. (Ex. 1 ¶ 24; Ex. 1-B at 5; Ex. 14
         (Deposition Transcript of Heather Jackson (Jan. 20, 2022)) at 250:14-252:7; Ex. 16 at
         220:2-16.) In response to Ms. Jackson's statement, Principal Mazza communicated to
         Ms. Jackson that B.P.J. would not be able to run on the girls' cross-country team
         because of H.B. 3293. (Ex. 1 ¶ 24; Ex. 12 at 129:21-130:2, 106:16-21, 107:3-11; Ex. 13
         at 21:22-22:16; Ex. 14 at 250:8-251:12; Ex. 16 at 220:19-22; Dkt. No. 157 (County
         Ans.) ¶¶ 63–65.)

96.      B.P.J. "just want[s] the opportunity to participate in school sports like any other girl."
         (Ex. 2 ¶ 21.)

         a.    *State's Response: ¶¶ 96 through 104 – Contested. These are arguments, not facts.
               Moreover, as noted above and in the State's Memo. in Op. and ECF 287, Plaintiff's
               individual characteristics are not relevant or material to whether H.B. 3293 is a
               permissible exercise of state authority.*

         b.    Plaintiff's Reply: The State's blanket assertion that Plaintiff's characteristics in her
               as-applied challenge are "not material" is incorrect, because it is based on an
               incorrect understanding of heightened scrutiny under the Equal Protection Clause.
               (Dkt. No. 331 (Pl. MSJ Opp.) at 35.) This fact is relevant to her Title IX claim,
               which requires her to show harm as a result of discrimination, and also to the
               irreparable harm factor required for a permanent injunction. Furthermore, the State
               offers no support for its assertion that B.P.J.'s desire to participate in school sports
               like any other girl is an "argument." This is a fact relevant to B.P.J.'s standing.

97.      Forcing B.P.J. to run on the boys' team would be stigmatizing, isolating, hurtful, and
         devastating for her. (Ex. 1 ¶¶ 30–31; Ex. 2 ¶¶ 14–16, 21.)

         a.    *State's Response: ¶¶ 96 through 104 – Contested. These are arguments, not facts.
               Moreover, as noted above and in the State's Memo. in Op. and ECF 287, Plaintiff's
               individual characteristics are not relevant or material to whether H.B. 3293 is a
               permissible exercise of state authority.*

b. <u>Plaintiff's Reply</u>: The State's blanket assertion that Plaintiff's characteristics in her as-applied challenge are "not material" is incorrect, because it is based on an incorrect understanding of heightened scrutiny under the Equal Protection Clause. (Dkt. No. 331 (Pl. MSJ Opp.) at 35.) This fact is relevant to the irreparable harm factor required to receive a permanent injunction, and it is also relevant to the merits of B.P.J.'s Title IX and Equal Protection claims. Furthermore, the State offers no support for its assertion that this is an "argument."

98. **According to B.P.J., "[Being a girl] means—it means everything." (Ex. 12 29:24-30:5.) "I am not a boy. I do not want to run with the boys when there is a girls' team and I should not have to run with the boys when there is a girls' team." (Ex. 2 ¶ 15; *see also* Ex. 12 at 120:24-121:4.)**

a. *State's Response: ¶¶ 96 through 104 – Contested. These are arguments, not facts. Moreover, as noted above and in the State's Memo. in Op. and ECF 287, Plaintiff's individual characteristics are not relevant or material to whether H.B. 3293 is a permissible exercise of state authority.*

b. <u>Plaintiff's Reply</u>: The State's blanket assertion that Plaintiff's characteristics in her as-applied challenge are "not material" is incorrect, because it is based on an incorrect understanding of heightened scrutiny under the Equal Protection Clause. (Dkt. No. 331 (Pl. MSJ Opp.) at 35.) This fact is relevant to the irreparable harm factor required for a permanent injunction, and it is also relevant to the merits of B.P.J.'s Title IX and Equal Protection claims. Furthermore, the State offers no support for its assertion that the statements in B.P.J.'s personal declaration are "arguments."

99. **According to B.P.J., "[r]unning with the girls means a lot to me because I am a girl, and I should be treated like a girl, just like all my friends who are girls. If I did not get to participate in cross-country or track, I would have missed out on the opportunity to spend time with my friends and grow with a new team." (Ex. 2 ¶ 16.) "It is so upsetting and hurtful that some people want to take that chance away from me and treat me differently from everyone else just because I am transgender." (Ex. 2 ¶ 21.)**

a. *State's Response: ¶¶ 96 through 104 – Contested. These are arguments, not facts. Moreover, as noted above and in the State's Memo. in Op. and ECF 287, Plaintiff's individual characteristics are not relevant or material to whether H.B. 3293 is a permissible exercise of state authority.*

b. <u>Plaintiff's Reply</u>: The State's blanket assertion that Plaintiff's characteristics in her as-applied challenge are "not material" is incorrect, because it is based on an incorrect understanding of heightened scrutiny under the Equal Protection Clause. (Dkt. No. 331 (Pl. MSJ Opp.) at 35.) This fact is relevant to the irreparable harm factor required for a permanent injunction, and it is also relevant to the merits of B.P.J.'s Title IX and Equal Protection claims. Furthermore, the State offers no

support for its assertion that the statements in B.P.J.'s personal declaration are "arguments."

100. **According to B.P.J.'s mother, "[i]t is wrong and senseless to try to make [B.P.J.] participate on boys' teams when there are girls' teams available. Forcing B.P.J. to compete on the boys' cross-country or track teams when girls' teams are available would completely erase who she is, and it would devastate her because she is a girl." (Ex. 1 ¶ 30.) "Forcing her to run with the boys is a clear sign to her and others that the state refuses to see her and accept her for the girl that she is." (Ex. 1 ¶ 31.)**

   a. *State's Response: ¶¶ 96 through 104 – Contested. These are arguments, not facts. Moreover, as noted above and in the State's Memo. in Op. and ECF 287, Plaintiff's individual characteristics are not relevant or material to whether H.B. 3293 is a permissible exercise of state authority.*

   b. <u>Plaintiff's Reply</u>: The State's blanket assertion that Plaintiff's characteristics in her as-applied challenge are "not material" is incorrect, because it is based on an incorrect understanding of heightened scrutiny under the Equal Protection Clause. (Dkt. No. 331 (Pl. MSJ Opp.) at 35.) This fact is relevant to the irreparable harm factor required for a permanent injunction, and it is also relevant to the merits of B.P.J.'s Title IX and Equal Protection claims. Furthermore, the State offers no support for its assertion that statements from B.P.J.'s mother's declaration are "arguments."

101. **B.P.J. does not have the option of running on a co-ed team, as there is no co-ed cross-country or track team at Bridgeport Middle School or at any other public secondary school in West Virginia. (Ex. 10 Nos. 30–31.)**

   a. *State's Response: ¶¶ 96 through 104 – Contested. These are arguments, not facts. Moreover, as noted above and in the State's Memo. in Op. and ECF 287, Plaintiff's individual characteristics are not relevant or material to whether H.B. 3293 is a permissible exercise of state authority.*

   b. <u>Plaintiff's Reply</u>: The State's blanket assertion that Plaintiff's characteristics in her as-applied challenge are "not material" is incorrect, because it is based on an incorrect understanding of heightened scrutiny under the Equal Protection Clause. (Dkt. No. 331 (Pl. MSJ Opp.) at 35.) This fact is relevant to the irreparable harm factor required to receive a permanent injunction, and it is also relevant to the merits of B.P.J.'s Title IX and Equal Protection claims. Furthermore, the State offers no support for its assertion that these statements are "arguments"—the existence or non-existence of a co-ed cross-country or track team at Bridgeport Middle School is clearly a "fact."

102. **Preventing B.P.J. from playing sports with other girls will deprive B.P.J. of experiences of competition, friendship, and responsibility that come from participation in school sports. (Ex. 1 ¶¶ 28, 31; Ex. 2 ¶¶ 10–11, 14, 16–18.)**

a. *State's Response: ¶¶ 96 through 104 – Contested. These are arguments, not facts. Moreover, as noted above and in the State's Memo. in Op. and ECF 287, Plaintiff's individual characteristics are not relevant or material to whether H.B. 3293 is a permissible exercise of state authority.*

b. <u>Plaintiff's Reply</u>: The State's blanket assertion that Plaintiff's characteristics in her as-applied challenge are "not material" is incorrect, because it is based on an incorrect understanding of heightened scrutiny under the Equal Protection Clause. (Dkt. No. 331 (Pl. MSJ Opp.) at 35.) This fact is relevant to the irreparable harm factor required for a permanent injunction, and it is also relevant to the merits of B.P.J.'s Title IX and Equal Protection claims. Furthermore, the State offers no support for its assertion that statements from the personal declarations of B.P.J. and her mother are "arguments."

103. **It is hurtful and frustrating for B.P.J. to be denied the opportunity to play on girls' sports teams, and to be treated differently because she is transgender. (Ex. 2 ¶¶ 14, 21.)**

a. *State's Response: ¶¶ 96 through 104 – Contested. These are arguments, not facts. Moreover, as noted above and in the State's Memo. in Op. and ECF 287, Plaintiff's individual characteristics are not relevant or material to whether H.B. 3293 is a permissible exercise of state authority.*

b. <u>Plaintiff's Reply</u>: The State's blanket assertion that Plaintiff's characteristics in her as-applied challenge are "not material" is incorrect, because it is based on an incorrect understanding of heightened scrutiny under the Equal Protection Clause. (Dkt. No. 331 (Pl. MSJ Opp.) at 35.) This fact is relevant to the irreparable harm factor required to receive a permanent injunction, and it is also relevant to the merits of B.P.J.'s Title IX and Equal Protection claims. Furthermore, the State offers no support for its assertion that B.P.J.'s statements from her personal declaration are "arguments."

104. **Allowing Defendants to enforce H.B. 3293 against B.P.J. would send a signal to B.P.J. that her state refuses to see her for the girl that she is. (Ex. 1 ¶ 31.)**

a. *State's Response: ¶¶ 96 through 104 – Contested. These are arguments, not facts. Moreover, as noted above and in the State's Memo. in Op. and ECF 287, Plaintiff's individual characteristics are not relevant or material to whether H.B. 3293 is a permissible exercise of state authority.*

b. <u>Plaintiff's Reply</u>: Same as immediately above in ¶ 103.

VII. **B.P.J.'s Lawsuit Challenges Her Exclusion From Girls' Sports Under H.B. 3293.**

105. **B.P.J. filed this lawsuit on May 26, 2021, arguing that H.B. 3293 as applied to her violates Title IX of the Education Amendments of 1972, 20 U.S.C. § 1681, and the Equal Protection Clause of the United States Constitution. (Dkt. No. 1 (Complaint).)**

106.   B.P.J.'s Title IX claim is pleaded against the State of West Virginia, the State Board of Education, the County Board of Education, and the WVSSAC. (Dkt. No. 64 (First Amended Complaint) at 20.)

107.   B.P.J.'s Equal Protection Clause claim is pleaded against State Superintendent W. Clayton Burch, County Superintendent Dora Stutler, and the WVSSAC. (Dkt. No. 64 (First Amended Complaint) at 22; Dkt. No. 127 (Order dismissing without prejudice B.P.J.'s equal protection claim against the Attorney General in his official capacity).)

108.   The Harrison County Board of Education is the governing body of Harrison County's public education system. W. Va. Code § 18-5-1. The County Superintendent is responsible for executing educational policies under the direction of the State Board and County Board, including interscholastic athletics. W. Va. Code § 18-4-10.

109.   "[A]bsent an injunction, the County Board and County Superintendent would be compelled and required to enforce H.B. 3293 against B.P.J." (Dkt. No. 252 (County Stip.) at ¶¶ 3–4.) The County Board and County Superintendent's role in enforcing the law is "mandatory, not merely optional." (Dkt. No. 73 (Harrison County Board of Education's Memo in Support of Motion to Dismiss First Amended Complaint) at 2, 6; *see also* Ex. 16 at 44:15-45:12, 145:1-145:5.)

110.   "Absent an injunction by a court," the State Board and Superintendent Burch "would be compelled and required to follow H.B. 3293" and the State Board "would be compelled and required to promulgate rules implementing H.B. 3293." (Dkt. No. 270 (WVBOE Stip.) ¶¶ 3–4; *see also* Ex. 18 at 118:1-3.)

111.   Without an injunction, the WVSSAC "cannot adopt or enforce any policy" allowing girls who are transgender to participate on girls' sports teams that "conflicts with state law." (Ex. 10 No. 50.)

112.   The State Board is federally funded. (Dkt. No. 156 (WVBOE Ans.) ¶ 90; *see also* Ex. 18 at 39:19-40:3.)

113.   The County Board is federally funded. (Dkt. No. 157 (County Ans.) ¶ 90; *see also* (Dkt. No. 252 (County Stip.) ¶ 8); Ex. 7 No. 66).)

114.   The State Board has a duty to control, supervise, regulate, and/or enforce rules related to interscholastic athletic events in West Virginia. *See* W. Va. Code § 18-2-25; (Ex. 18 at 35:22-24.)

115.   The County Board has a duty to control, supervise, regulate, and/or enforce rules related to interscholastic athletic events in West Virginia. *See* W. Va. Code §§ 18-2-25, 18-5-13; (Ex. 16 at 53:24-54:10.)

116.   WVSSAC was given controlling authority over federally funded secondary school athletic programs by the State and County Boards. W. Va. Code § 18-2-25; (Ex. 39

(WVSSAC000133-38) (outlining the WVSSAC's powers over secondary schools and their athletics)).

117.  WVSSAC member schools must follow WVSSAC's rules and regulations when "conducting interscholastic athletic[s]" (Ex. 39 (WVSSAC0000134)) and when determining whether a student is eligible to play secondary school sports. (Ex. 17 at 73:4-73:8.)

118.  WVSSAC's Board of Directors has "the power to decide all cases of eligibility of students and participants in interscholastic athletic[s]." (Ex. 39 (WVSSAC000138); *see also* Ex. 17 at 61:25-62:13.)

119.  WVSSAC's athletic handbook provides that it must comply with Title IX. (Ex. 38 (WVSSAC000017).)

**VIII.  This Court's Preliminary Injunction Allowed B.P.J. To Participate On Her School's Girls' Cross-Country And Track Teams, All Without Incident.**

120.  After this Court issued its preliminary injunction on July 21, 2021, B.P.J. was permitted to participate on Bridgeport Middle School's girls' cross-country team. (Ex. 5 No. 6; Ex. 6 No. 6; Ex. 7 No. 6; Ex. 8 No. 6; Ex. 9 No. 6; Ex. 10 No. 6; Ex. 11 No. 6.)

   a.  *State's Response:  ¶¶ 120 through 130 – Contested. Plaintiff's individual characteristics, including the specifics of Plaintiff's participation in girls' sports, are not material or relevant to whether H.B. 3293 is a permissible exercise of state authority, as set forth more fully in the State's summary judgment briefing.*

   b.  Plaintiff's Reply: The State's blanket assertion that Plaintiff's characteristics in her as-applied challenge are "not material" is incorrect, because it is based on an incorrect understanding of heightened scrutiny under the Equal Protection Clause. (Dkt. No. 331 (Pl. MSJ Opp.) at 35.) Furthermore, the State does not (and it could not) contest the fact that this Court issued a preliminary injunction and that B.P.J. participated on Bridgeport Middle School's girls' cross-country team. (Dkt. No. 67 (PI Order); Dkt. No. 289-6 (State's Resp. to Pls RFAs) No. 6.)

121.  B.P.J. participated in the Mountain Hollar MS Invitational meet and the Doddridge Invitational meet while she was on the cross-country team. (Ex. 1 ¶ 27.)

   a.  *State's Response:  ¶¶ 120 through 130 – Contested. Plaintiff's individual characteristics, including the specifics of Plaintiff's participation in girls' sports, are not material or relevant to whether H.B. 3293 is a permissible exercise of state authority, as set forth more fully in the State's summary judgment briefing.*

   b.  Plaintiff's Reply: Same as immediately above in ¶ 120. Furthermore, Defendant-Intervenor and the State rely on B.P.J.'s performance results in order to argue that H.B. 3293 is "substantially related" to government interests. (Dkt. No. 288 (Int.

MSJ) at 5-6; Dkt. No. 305 (State MSJ Opp.) at 27; Dkt. No. 302 (Int. MSJ Opp.) at 18-19.) The State cannot attempt to rely on B.P.J.'s characteristics in support of its own arguments while simultaneously dismissing B.P.J.'s individual characteristics as "immaterial."

122.    **In the Mountain Hollar Invitational, B.P.J. placed 51 out of 66 participants. (Ex. 1 ¶ 27; Ex. 33 (Mountain Hollar Invitational Stats).)**

   a.   *¶¶ 120 through 130 – Contested. Plaintiff's individual characteristics, including the specifics of Plaintiff's participation in girls' sports, are not material or relevant to whether H.B. 3293 is a permissible exercise of state authority, as set forth more fully in the State's summary judgment briefing.*

   b.   Plaintiff's Reply: Same as ¶ 121.

   c.   *State's Response: ¶ 122 – Contested. B.P.J. displaced 9 participants in the Mountain Hollar Invitational, some of whom were biological females.*

   d.   Plaintiff's Reply: The State is merely disputing Plaintiff's terminology (*i.e.*, "placing" 51 out of 66 participants versus "displacing" 9 other participants), and as such it fails to show a genuine, material dispute. In any event, what constitutes "displacement" is a legal dispute rather than a factual one. Furthermore, the State does not actually contest the fact stated here.

123.    **In the Doddridge Invitational meet, B.P.J. placed 123 out of 150 participants. (Ex. 1 ¶ 27; Ex. 34 (Doddridge Invitational Stats, HCBOE_1167-HCBOE_1168).)**

   a.   *State's Response: ¶¶ 120 through 130 – Contested. Plaintiff's individual characteristics, including the specifics of Plaintiff's participation in girls' sports, are not material or relevant to whether H.B. 3293 is a permissible exercise of state authority, as set forth more fully in the State's summary judgment briefing.*

   b.   Plaintiff's Reply: The State's blanket assertion that Plaintiff's characteristics in her as-applied challenge are "not material" is incorrect, because it is based on an incorrect understanding of heightened scrutiny under the Equal Protection Clause. (Dkt. No. 331 (Pl. MSJ Opp.) at 35.)

   c.   *State's Response: ¶ 123 – Contested. B.P.J. displaced 27 participants in the Doddridge Invitational, some of whom were biological females. B.P.J. also displaced teammates in the October 1, 2021, Ritchie County meet. Stutler Dep. at 183-184, Ex. F to the State's Memo. in Op.*

   d.   Plaintiff's Reply: The State is merely disputing Plaintiff's terminology (*i.e.*, "placing" 123 out of 150 participants versus "displacing" 27 other participants), and as such it fails to show a genuine, material dispute. In any event, what constitutes "displacement" is a legal dispute rather than a factual one. Furthermore, the State does not actually contest the fact stated here.

124. **According to B.P.J: "My first cross-country season was awesome, and I felt supported by my coaches and the other girls on the team. I made so many new friends and loved competing with and supporting my teammates. We learned about teamwork, having a positive attitude, and how to have fun while being competitive." (Ex. 2 ¶ 18.)**

    a. *State's Response:  ¶¶ 120 through 130 – Contested. Plaintiff's individual characteristics, including the specifics of Plaintiff's participation in girls' sports, are not material or relevant to whether H.B. 3293 is a permissible exercise of state authority, as set forth more fully in the State's summary judgment briefing.*

    b. <u>Plaintiff's Reply</u>: The State's blanket assertion that Plaintiff's characteristics in her as-applied challenge are "not material" is incorrect, because it is based on an incorrect understanding of heightened scrutiny under the Equal Protection Clause. (Dkt. No. 331 (Pl. MSJ Opp.) at 35.) This statement is also relevant to the irreparable harm factor required for a permanent injunction. Furthermore, the State does not actually contest the fact stated here.

125. **In Spring 2022, B.P.J. tried out for, made, and began running on the girls' track team at Bridgeport Middle School. (Ex. 3 (Plaintiff's Second Set of Supplemental Responses and Objections to State of West Virginia's First Set of Interrogatories and Requests for Production) No. 9.)**

    a. *State's Response:  ¶¶ 120 through 130 – Contested. Plaintiff's individual characteristics, including the specifics of Plaintiff's participation in girls' sports, are not material or relevant to whether H.B. 3293 is a permissible exercise of state authority, as set forth more fully in the State's summary judgment briefing.*

    b. <u>Plaintiff's Reply</u>: Same as immediately above in ¶ 124.

126. **B.P.J. was "ecstatic" to learn she qualified for the track team and "look[s] forward to many more years of running with [her] peers." (Ex. 2 ¶¶ 20–21.)**

    a. *State's Response:  ¶¶ 120 through 130 – Contested. Plaintiff's individual characteristics, including the specifics of Plaintiff's participation in girls' sports, are not material or relevant to whether H.B. 3293 is a permissible exercise of state authority, as set forth more fully in the State's summary judgment briefing.*

    b. <u>Plaintiff's Reply</u>: Same as ¶ 124.

127. **There were no complaints associated with B.P.J.'s participation on Bridgeport Middle School's girls' cross-country team. (Dkt. No. 252 (County Stip.) ¶ 5; Ex. 5 No. 9; Ex. 6 No. 9; Ex. 7 No. 9; Ex 8 No. 9; Ex. 9 No. 9; Ex. 10 No. 9; Ex. 11 No. 9.)**

    a. *State's Response:  ¶¶ 120 through 130 – Contested. Plaintiff's individual characteristics, including the specifics of Plaintiff's participation in girls' sports, are not material or relevant to whether H.B. 3293 is a permissible exercise of state authority, as set forth more fully in the State's summary judgment briefing.*

      b.  <u>Plaintiff's Reply</u>: Same as ¶ 124.

**128.**  **No student was cut from or otherwise not permitted to participate on the cross-country team as a result of B.P.J.'s participation. (Dkt. No. 252 (County Stip.) ¶ 6.)**

      a.  *State's Response:  ¶¶ 120 through 130 – Contested. Plaintiff's individual characteristics, including the specifics of Plaintiff's participation in girls' sports, are not material or relevant to whether H.B. 3293 is a permissible exercise of state authority, as set forth more fully in the State's summary judgment briefing.*

      b.  <u>Plaintiff's Reply</u>: Same as ¶ 124.

**129.**  **Defendant-Intervenor could not identify "any specific fairness issue" related to B.P.J.'s participation in girls' cross-country at her middle school. (Ex. 21 at 143:14-20.)**

      a.  *State's Response:  ¶¶ 120 through 130 – Contested. Plaintiff's individual characteristics, including the specifics of Plaintiff's participation in girls' sports, are not material or relevant to whether H.B. 3293 is a permissible exercise of state authority, as set forth more fully in the State's summary judgment briefing.*

      b.  <u>Plaintiff's Reply</u>: Same as ¶ 124.

      c.  *State's Response: The Intervenor, as a college student, has no reason to have a developed opinion on middle schoolers.*

      d.  <u>Plaintiff's Reply:</u> The State offers nothing in support of this conclusory assertion. Defendant-Intervenor chose to become involved in a case concerning an as-applied challenge by a middle schooler to defend a law's application to that middle schooler. As a result, Defendant-Intervenor should be expected to have a "developed opinion" on the facts relevant to this case. Indeed, Defendant-Intervenor was originally proffered in this case as ostensibly offering a perspective not provided by the other Defendants. (Dkt. No. 95 (Int. Mot. to Intervene) at 17.)

        However, to the extent the State insists that Defendant-Intervenor lacks "developed opinion[s]" on the issues relevant to this case, then this is only further evidence that Defendant-Intervenor should be dismissed. (*See* Pl. Mot. for Recon. at 4-7.)

**130.**  **Defendant-Intervenor responded, "I don't know," when asked whether she "object[ed]" to B.P.J. playing on the Bridgeport Middle School girls' cross-country team." (Ex. 21 170:13-170:22.)**

      a.  *State's Response:  ¶¶ 120 through 130 – Contested. Plaintiff's individual characteristics, including the specifics of Plaintiff's participation in girls' sports, are not material or relevant to whether H.B. 3293 is a permissible exercise of state authority, as set forth more fully in the State's summary judgment briefing.*

      b.  <u>Plaintiff's Reply</u>: Same as immediately above in ¶ 129.

    c. *State's Response: ¶ 129 through 130 – Contested. The Intervenor, as a college student, has no reason to have a developed opinion on middle schoolers.*

    d. <u>Plaintiff's Reply:</u> Same as ¶ 129.

**131.**  **Girls and women who are transgender have competed in a wide range of contact and collision sports in high school and college, including basketball, soccer, volleyball, softball, lacrosse, and women's tackle football, without any reported injuries to cisgender girls. (Ex. 31 (Declaration of Dr. Chad T. Carlson, M.D., F.A.C.S.M.) at 1; Ex. 32 (Deposition Transcript of Dr. Chad T. Carlson) at 124:6-125:4, 154:12-156:16.)**

    a. *State's Response: ¶ 131 – Contested. This is a misstatement of Dr. Carlson's testimony, as Dr. Carlson noted that sports organizations do not track participation by males who identify as females so as to create reportable statistics on injury rates. See, e.g., Carlson Dep. at 124:25-125:4; 155:11-156:16, ECF No. 285-5.*

    b. <u>Plaintiff's Reply</u>: The State fails to raise a genuine, material dispute. The State does not actually dispute that there have been no reported injuries to cisgender girls, and the State's speculation regarding the reason for that fact does not create a dispute with respect to the fact itself.

**132.**  **There are significant variations in height, weight, and muscle mass within the population of cisgender girls, and within the population of cisgender boys, such that student athletes all the time play with or compete against students who are bigger, faster, and/or stronger than them, whether they are participating in single sex or co-ed teams. (Ex. 25 at 12 ¶ 27; Ex. 28 at 49:19-50:5, 51:18-22, 52:16-24, 189:13-19.)**

    a. *State's Response: ¶¶ 132-34 – Contested. This is argumentative, not a fact, and if use of proper safety equipment addressed all safety concerns, then there would be no reason to make other types of segregations in sports, such as segregating middle schoolers from high schoolers in contact sports. Dr. Carlson's report details the categorical differences between biological males and biological females and how those differences affect the safety of biological males playing female sports. Id. at ¶¶ 42-97. And Dr. Carlson testified that those risks cannot be eliminated through rule changes without changing the essence of the sport. Id. at 134:8-16. Dr. Safer also admitted that allowing someone who has gone through male puberty to play women's contact sports created a safety concern. Safer Dep. at 168:12-170:16, ECF No. 285-6.*

    b. <u>Plaintiff's Reply:</u> The State fails to identify a genuine, material dispute. Nothing the State offers in its response regarding "safety concerns" contradicts the fact that there are "significant variations" in "height, weight, and muscle mass" within the populations of cisgender boys and girls. The State also does not actually dispute that student athletes play with and compete against students who are bigger, faster, and/or stronger than them. The State also offers no evidence that the factual statements in ¶ 132 are argumentative.

The State's assertions regarding safety are also not supported by the cited evidence. Dr. Safer specifically did *not* admit that allowing someone who has undergone typically male puberty to participate would automatically create a safety concern. (*See* Dkt. No. 289-27 (Safer Dep. Tr.) at 170:15-16 ("I'm not aware of that in and of itself being a safety concern.")). Moreover, Dr. Carlson did not assert that there were "categorical differences" between every transgender woman and every cisgender woman. Dr. Carlson said he was discussing average differences "from a population standpoint" and "can't speak to how that would apply to any given individual." (Dkt. No. 289-33 (Carlson Dep. Tr.) at 202:18-22; Second Supp. Decl. of Loree Stark, Ex. 64 (Carlson Errata).)

133.  **Any safety considerations attendant to differences in height, weight, and muscle mass are already addressed in West Virginia secondary schools through even-handed rules and the use of proper equipment. (Ex. 16 at 164:3-14, 228:14-22.)**

   a.  *State's Response: ¶¶ 132-34 – Contested. This is argumentative, not a fact, and if use of proper safety equipment addressed all safety concerns, then there would be no reason to make other types of segregations in sports, such as segregating middle schoolers from high schoolers in contact sports. Dr. Carlson's report details the categorical differences between biological males and biological females and how those differences affect the safety of biological males playing female sports. Id. at ¶¶ 42-97. And Dr. Carlson testified that those risks cannot be eliminated through rule changes without changing the essence of the sport. Id. at 134:8-16. Dr. Safer also admitted that allowing someone who has gone through male puberty to play women's contact sports created a safety concern. Safer Dep. at 168:12-170:16, ECF No. 285-6.*

   b.  <u>Plaintiff's Reply:</u> The State fails to raise a genuine, material dispute with the facts stated here. The State offers no evidence to demonstrate that these measures have been inadequate.

   The State's assertions regarding safety are also not supported by the cited evidence. Dr. Safer specifically did *not* admit that allowing someone who has undergone typically male puberty to participate would automatically create a safety concern. (*See* Dkt. No. 289-27 (Safer Dep. Tr.) at 170:15-16 ("I'm not aware of that in and of itself being a safety concern.").) Moreover, Dr. Carlson did not assert that there are "categorical differences" between every transgender woman and every cisgender woman. Dr. Carlson said he was discussing average differences "from a population standpoint" and "can't speak to how that would apply to any given individual." (Dkt. No. 289-33 (Carlson Dep. Tr.) at 202:18-22; Second Supp. Decl. of Loree Stark, Ex. 64 (Carlson Errata).)

134.  **Any actual safety concerns attendant to girls who are transgender playing on girls' sports teams "can be addressed through even-handed rules instead of discriminating based on transgender status." (Ex. 25 at ¶ 4(d).)**

a. *State's Response: ¶¶ 132-34 – Contested. This is argumentative, not a fact, and if use of proper safety equipment addressed all safety concerns, then there would be no reason to make other types of segregations in sports, such as segregating middle schoolers from high schoolers in contact sports. Dr. Carlson's report details the categorical differences between biological males and biological females and how those differences affect the safety of biological males playing female sports. Id. at ¶¶ 42-97. And Dr. Carlson testified that those risks cannot be eliminated through rule changes without changing the essence of the sport. Id. at 134:8-16. Dr. Safer also admitted that allowing someone who has gone through male puberty to play women's contact sports created a safety concern. Safer Dep. at 168:12-170:16, ECF No. 285-6.*

Plaintiff's Reply: The State fails to raise a genuine, material dispute. The State's assertions regarding safety are also not supported by the cited evidence. Dr. Safer specifically did *not* admit that allowing someone who has undergone typically male puberty to participate would automatically create a safety concern. (*See* Dkt. No. 289-27 (Safer Dep. Tr.) at 170:15-16 ("I'm not aware of that in and of itself being a safety concern.").) Moreover, Dr. Carlson did not assert that there are "categorical differences" between every transgender woman and every cisgender woman. Dr. Carlson said he was discussing average differences "from a population standpoint" and "can't speak to how that would apply to any given individual." (Dkt. No. 289-33 (Carlson Dep. Tr.) at 202:18-22; Second Supp. Decl. of Loree Stark, Ex. 64 (Carlson Errata).)

135. **Defendant-Intervenor could not identify any safety concern resulting from B.P.J.'s participation on her middle school girls' cross-country team. (Ex. 21 at 139:25-140:4, "Q: . . . What is the safety concern for middle school cross-country and B.P.J. participating on the girls' team? . . . THE WITNESS: I don't know.")**

a. *State's Response: ¶ 135 – Contested. The safety concerns attendant to men who identify as women playing women's contact sports are matters to be addressed by experts, not by Lainey Armistead, a college student, and have been addressed by Respondent's expert, Dr. Chad Carlson. See, generally, Carlson Decl., ECF No. 285-5.*

b. Plaintiff's Reply: The State offers nothing in support of this conclusory assertion. Defendant-Intervenor chose to become involved in a case concerning an as-applied challenge by a middle schooler to defend a law's application to that middle schooler. As a result, Defendant-Intervenor should be expected to have a "developed opinion" on the facts relevant to this case. Indeed, Defendant-Intervenor was proffered in this case as ostensibly offering a perspective not currently provided by the parties. (Dkt. No. 95 (Int. Mot. to Intervene) at 17.)

However, to the extent the State insists that Defendant-Intervenor lacks "developed opinion[s]" on the issues relevant to this case, then this is only further evidence that Defendant-Intervenor should be dismissed. (*See* Pl. Mot. for Recon. at 4-7.)

136.    The State does not know of any middle school girl who was physically harmed by B.P.J.'s participation on the Bridgeport Middle School girls' cross-country team. (Ex. 5 No. 10.)

IX.    **Lainey Armistead Will Graduate West Virginia State University In May 2022.**

137.    Defendant-Intervenor Lainey Armistead will graduate from West Virginia State University in May 2022. (Ex. 22 at 67:21-25.)

Dated: May 26, 2022

Joshua Block*
AMERICAN CIVIL LIBERTIES UNION
FOUNDATION
125 Broad St.
New York, NY 10004
Phone: (212) 549-2569
jblock@aclu.org

Avatara Smith-Carrington*
LAMBDA LEGAL
3500 Oak Lawn Avenue, Suite 500
Dallas, TX 75219
Phone: (214) 219-8585
asmithcarrington@lambdalegal.org

Carl Charles*
Tara Borelli*
LAMBDA LEGAL
158 West Ponce De Leon Ave., Ste. 105
Decatur, GA 30030
Phone: (404) 897-1880
ccharles@lambdalegal.org

Sruti Swaminathan*
LAMBDA LEGAL
120 Wall Street, 19th Floor
New York, NY 10005
Phone: (212) 809-8585
sswaminathan@lambdalegal.org

Andrew Barr*
COOLEY LLP
1144 15th St. Suite 2300
Denver, CO 80202-5686
Phone: (720) 566-4000
abarr@cooley.com

Respectfully submitted,
/s/ *Loree Stark*

Loree Stark (Bar No. 12936)
Nick Ward (Bar No. 13703)
AMERICAN CIVIL LIBERTIES UNION OF WEST
VIRGINIA FOUNDATION
P.O. Box 3952
Charleston, WV 25339-3952
Phone: (914) 393-4614
lstark@acluwv.org

Kathleen Hartnett*
Julie Veroff*
Zoë Helstrom*
COOLEY LLP
3 Embarcadero Center, 20th Floor
San Francisco, CA 94111
Phone: (415) 693-2000
khartnett@cooley.com

Katelyn Kang*
Valeria M. Pelet del Toro*
COOLEY LLP
55 Hudson Yards
New York, NY 10001-2157
Phone: (212) 479-6000
kkang@cooley.com

Elizabeth Reinhardt*
COOLEY LLP
500 Boylston Street, 14th Floor
Boston, MA 02116-3736
Phone: (617) 937-2305
ereinhardt@cooley.com

**Visiting Attorneys*

*Attorneys for Plaintiff*

44

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA
CHARLESTON DIVISION

B.P.J. by her next friend and mother, HEATHER
JACKSON,

        *Plaintiff*,

      v.

WEST VIRGINIA STATE BOARD OF
EDUCATION, HARRISON COUNTY BOARD
OF EDUCATION, WEST VIRGINIA
SECONDARY SCHOOL ACTIVITIES
COMMISSION, W. CLAYTON BURCH in his
official capacity as State Superintendent, DORA
STUTLER in her official capacity as Harrison
County Superintendent, and THE STATE OF
WEST VIRGINIA,

        *Defendants*,

     and

LAINEY ARMISTEAD,

        *Defendant-Intervenor*.

Civil Action No. 2:21-cv-00316

Hon. Joseph R. Goodwin

**CERTIFICATE OF SERVICE**

**CERTIFICATE OF SERVICE**

I, Loree Stark, do hereby certify that on this 26th day of May, 2022, I electronically filed a true and exact copy of the ***Reply in Support of Statement of Undisputed Material Facts*** with the Clerk of Court and all parties using the CM/ECF System.

        */s/ Loree Stark*
        Loree Stark
        West Virginia Bar No. 12936

45