**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA
CHARLESTON DIVISION**

| | |
|---|---|
| B.P.J., by her next friend and mother, HEATHER JACKSON<br><br>*Plaintiff,*<br><br>v.<br><br>WEST VIRGINIA STATE BOARD OF EDUCATION, HARRISON COUNTY BOARD OF EDUCATION, WEST VIRGINIA SECONDARY SCHOOL ACTIVITIES COMMISSION, W. CLAYTON BURCH in his official capacity as State Superintendent, DORA STUTLER in her official capacity as Harrison County Superintendent, and THE STATE OF WEST VIRGINIA<br><br>*Defendants,*<br><br>and<br><br>LAINEY ARMISTEAD<br><br>*Defendant-Intervenor.* | Case No. 2:21-cv-00316<br><br>Hon. Joseph R. Goodwin |

**REPLY MEMORANDUM IN SUPPORT OF DEFENDANT-INTERVENOR AND THE STATE OF WEST VIRGINIA'S MOTION TO EXCLUDE EXPERT TESTIMONY OF DR. JOSHUA SAFER**

TABLE OF CONTENTS

Table of Authorities .................................................................................................iii

Introduction ............................................................................................................... 1

Argument .................................................................................................................. 2

    I.  The Court should exclude Dr. Safer's proffered opinions concerning transgender participation and advantage in female athletics because they do not satisfy the requirements of *Daubert*. ................................................. 2

        A.  Dr. Safer's testimony concerning prepubertal athletic advantage should be excluded because it is irrelevant and unreliable. .................... 2

        B.  Dr. Safer's testimony concerning the effects of testosterone suppression and various league rules relating to testosterone suppression should be excluded because it is irrelevant and unreliable. 5

    II.  The Court should exclude Dr. Safer's proffered opinions concerning the supposed ambiguity of "biological sex," disorders of sexual development, and any hypothetical "biological basis" for gender identity, because they are irrelevant and/or unreliable. ................................................................. 7

        A.  Dr. Safer's opinions casting doubt on the scientific validity of the category "biological sex" are unreliable. ................................................. 7

        B.  Dr. Safer's opinions about disorders of sexual development and intersex conditions are not relevant to any issue in this case. ................ 9

        C.  Dr. Safer's opinions asserting an unknown biological cause of transgender identity are irrelevant and unreliable. ............................. 10

    III.  B.P.J. does not seriously defend the remaining opinions of Dr. Safer challenged in Defendants' motion to exclude............................................... 12

        A.  Dr. Safer's opinions concerning male participation and success in women's sports are unreliable and irrelevant. ...................................... 12

        B.  Dr. Safer's opinions concerning fairness should be excluded because he is not an expert and his opinions are unreliable. .................................. 13

        C.  Dr. Safer's opinions concerning the role of sports in education should be excluded because he is not an expert, and his opinions are unreliable. ............................................................................................ 13

Conclusion .............................................................................................................. 13

Certificate of Service............................................................................................... 16

## TABLE OF AUTHORITIES

**Cases**

*Daubert v. Merrell Dow Pharmaceuticals, Inc.*,
   509 U.S. 579 (1993) .................................................................................................. 6

*Eghnayem v. Boston Scientific Corp.*,
   57 F. Supp. 3d 658 (S.D.W. Va. 2014) ................................................................ 6, 11

*Geiger v. Monroe Cnty., Mississippi*,
   No. 1:16-CV-95-DMB-DAS, 2020 WL 5255403 (N.D. Miss. Sept. 3, 2020) ............ 7

*United States v. Carolene Products Co.*,
   304 U.S. 144 (1938) .................................................................................................. 9

*United States v. Chester*,
   628 F.3d 673 (4th Cir. 2010) .................................................................................... 1

*Wood v. Showers*,
   822 F. App'x 122 (3d Cir. 2020) ............................................................................... 7

**Rules**

Fed. R. Evid. 702 ............................................................................................................ 4

**INTRODUCTION**

The West Virginia Sports Act (W. Va. Code § 18-2-25d) protects separate girls' and women's athletics beginning in "secondary school," which begins with sixth or seventh grade depending on school structures. By the end of sixth grade, most boys have begun the pubertal development process; by the end of seventh grade, on average boys are well along in that process (at "Tanner Stage 3"). App. to Def.-Intervenor's Mot. for Summ. J. (App.) 791, ECF No. 286-1 (Adkins Dep. 152:18–153:23).

Thus, the overwhelming majority of boys and young men who are excluded by the Sports Act from participating in girls' or women's sports have at least begun significant pubertal development; most are far down that path. An undisputed sea of evidence establishes that these boys and young men have large average physiological and performance advantages over girls. *See* App. 127–37, 157–58 (Brown Rep. ¶¶ 7–41, 114–17). As a result, the historic protection of separate female athletics defined by biology rather than by subjective gender identity—a protection now codified by the Sports Act—is directly and "reasonably related" to the State's strong interest in preserving fair and safe athletic experiences for girls and women and in preserving female athletes' Title IX protections, thereby satisfying the requirement of intermediate scrutiny. *See United States v. Chester*, 628 F.3d 673, 683 (4th Cir. 2010); *see also* Def-Intervenor's Mem. in Supp. of Mot. for Summ. J. (Armistead's SJ Br.) 15–17, ECF No. 288. [1]

Averages admit of exceptions. It is no news that some boys are weaker and slower than some girls. This does not logically undermine the reality of that "reasonable relationship." Evidence of such exceptions are therefore irrelevant to a "reasonable relationship" analysis—precisely because they are exceptions.

---

[1] All citations to documents filed in this case are to the document's original or Bates stamped page number.

B.P.J. tries to distract the Court from the actual requirement of intermediate scrutiny by talking two entirely inconsistent games. First, B.P.J. presents arguments as though a perfect, 100% fit between a legal rule and the State's legitimate interest were required—as though the State has a duty to prove the necessity of the rule for every possible sub-category (those who have not begun puberty, or have blocked puberty, or have suppressed testosterone after puberty), or even for every individual, on a case-by-case basis. No such obligation exists. But at the same time, B.P.J. pursues a theory and a remedy that depend not at all on the physiological characteristics or athletic advantage of any group. In reality, B.P.J.'s demand is that West Virginia must let *all* males who identify as female participate in girls' and women's athletics, regardless of whether they have blocked puberty, suppressed testosterone, or possess typical male physical advantages.

As the State and Armistead (collectively, "Defendants") have explained in more detail in their summary-judgment briefings, neither of these evasions of intermediate scrutiny has merit as a matter of law. As demonstrated in Defendants' opening brief in support of their motion to exclude Dr. Joshua Safer's testimony, his opinion evidence—proffered in support of B.P.J.'s "exceptional sub-category" decoy maneuver—is both irrelevant and unreliable.

## ARGUMENT

**I. The Court should exclude Dr. Safer's proffered opinions concerning transgender participation and advantage in female athletics because they do not satisfy the requirements of *Daubert*.**

**A. Dr. Safer's testimony concerning prepubertal athletic advantage should be excluded because it is irrelevant and unreliable.**

Defendants pointed out that Dr. Safer—who disclaims any expertise in "how much advantage natal males have over natal females in particular sports" (App. 624–25 (Safer Dep. 41:21–42:8); *see also id.* at 631 (Safer Dep. 66:1–67:11))—cited no data in support of his proffered testimony that "[b]efore puberty, age-grade competitive

2

sports records show *minimal or no differences* in athletic performance between non-transgender boys and non-transgender girls." App. to Def.-Intervenor and the State of W. Va.'s Mots. to Exclude Expert Test. of Drs. Adkins, Fry, Janssen, and Safer (Daubert App.) 151, ECF No. 307-2 (Safer Rep. ¶ 25) (emphasis added). The single article he cited for this assertion includes data that demonstrate precisely the opposite. *See* Mem. in Supp. of Def-Intervenor and the State of W. Va.'s Mot. to Exclude Expert Testimony of Dr. Joshua Safer (Defs.' Safer Br.) 7, ECF No. 314. Defendants also noted that Dr. Brown in his report identified multiple peer-reviewed studies that found that prepubertal boys enjoyed significant athletic advantages over prepubertal girls. *Id.* at 7–8. B.P.J. responds with three dodges.

First, B.P.J. backtracks, claiming that Dr. Safer's flat assertion of "minimal or no differences" is not "a categorical denial" of differences. Pl.'s Opp'n to Def-Intervenor and Def. State of W. Va's Mot to Exclude the Expert Testimony of Dr. Joshua D. Safer (Pl.'s Safer Resp.) 4–5, ECF No. 350. The distinction eludes us, particularly when he disclaims sufficient expertise to say whether the six percent advantage for boys documented in the only article cited in the relevant paragraph of his report would count as "minimal." Defs.' Safer Br. 7. This means that Dr. Safer has no objective, qualitative threshold to establish what is "minimal," and his characterization of the male/female differences here is simply a bold-sounding declaration lacking supporting data and using terms he is unable to define.

Second, B.P.J. protests that Dr. Safer was only talking about "age-grade competitive sports records," seeking to brush aside the multiple studies that show prepubertal male athletic advantage based on large national physical fitness datasets. Pl.'s Safer Resp. 5. The distinction makes no difference; Dr. Safer also did not cite data demonstrating "minimal or no differences" in "age-grade competitive sports." Even the narrowed opinion is mere say-so absolutely lacking in basis and thus reliability. Further, Figure 1 of the one Handelsman article—which Dr. Safer

3

does cite—shows performance advantages for boys at age 12 in the range of four to six percent and increasing rapidly thereafter. App. 636–37 (Safer Dep. 89:6–90:24); Daubert App. 493 (Handelsman (2018))). That *is* data from "age-grade competitive sport records"—specifically, "current world records for boys and girls between the ages of 5 and 19 years … for a wide range of boys and girls track and field events" including both running and "jumping events." Daubert Resp. Appendix to Def-Intervenor and the State of W. Va.'s Joint Mems. in Resp. to Pl.'s Mot. to Exclude Experts' Test. (Daubert Resp. App.) 315, ECF No. 343-1 (Handelsman (2017)); *see also* Daubert App. 492–93 (Handelsman et al. (2018) at Fig. 1).[2]

Third, B.P.J. persists, attempting to flip the burden by repeating Dr. Safer's assertion that there is "no basis to confidently predict" that prepubertal males who identify as females will enjoy as much athletic advantage over prepubertal girls as boys do on average, and that they "might" not. Pl.'s Safer Resp. 6. Indeed, there *is* an obvious basis: Dr. Brown cites extensive data documenting an average male prepubertal advantage. App. 145–59 (Brown Rep. ¶¶ 71–118). And Dr. Safer acknowledges that there is no known physical way of identifying transgender individuals. App. 669 (Safer Dep. 220:23–221:7). If the latter is true, it follows that prepubertal males who identify as transgender have physiology and capability comparable to that of their non-transgender male peers. But this is irrelevant to this motion directed against Dr. Safer's testimony. The question is not what Defendants and Dr. Brown will or will not be able to prove; the question is whether Dr. Safer may offer as "expert evidence" rank speculation about what "might" be true. The requirements of Fed. R. Evid. 702 and *Daubert* say no.

---

[2] The fact that Handelsman (2019) makes a single assertion that performance differences between boys and girls are "minimal," while reproducing data that demonstrates the opposite, provides a quote but not a scientific or reliable basis for Dr. Safer's assertion.

4

**B. Dr. Safer's testimony concerning the effects of testosterone suppression and various league rules relating to testosterone suppression should be excluded because it is irrelevant and unreliable.**

B.P.J. claims to press only an as-applied challenge and that B.P.J. "has not—and will not" undergo testosterone suppression "after puberty." Pl.'s Safer Resp. 7. And nothing in the Sports Act turns on whether testosterone has been suppressed, in general or to any particular level. Thus, Dr. Safer's extended proffered testimony about testosterone suppression and related policies of organizations, including the NCAA and the IOC, is not relevant to B.P.J. and the Sports Act.

A significant justification for the Sports Act is the undisputed, large physiological advantage that males have over females once pubertal changes begin.[3] And B.P.J. acknowledges that biological males who do not identify as transgender represent the "vast majority" of the male population. Pl.'s Safer Resp. 14. With those facts in hand, the question of whether some small percentage of males may reduce their athletic advantage *after* puberty through testosterone suppression is irrelevant to the "reasonable relationship" test of intermediate scrutiny. The entire discussion is a distraction and confusion.

Dr. Safer's attempt to evade the uniform finding of recent research that testosterone suppression does *not* eliminate male physiological advantage (Defs.' Safer Br. at 10–11) is rhetorical rather than science based and reliable. It is true that sporting bodies are struggling with questions of societal priorities, trade-offs, and how to "accommodate" males who identify as female in sport. Pl.'s Safer Resp. 10. But no scientific voice within the last several years has published data showing—or has even contended—that testosterone suppression can effectively eliminate male advantage

---

[3] As Figure 1 in the Handelsman (2018) article relied on by Dr. Safer illustrates, these differences escalate, showing up fairly early in the puberty process, rather than manifesting only once that process is "completed," as B.P.J. suggests. Pl.'s Safer Resp. 8; Daubert App. 493.

5

and female safety risks in *any* sport, and Dr. Safer cites none. On that, the recent science is, as Defendants have said, "decisive." Defs.' Safer Br. 11.

In fact, the most that Dr. Safer himself is willing to say is that *maybe* testosterone suppression could eliminate all male advantage in some (unidentified) sport or even "could" place the testosterone-suppressed individuals "at a net *disadvantage* in [unidentified] sports." Daubert App. 160 (Safer Rep. ¶ 52).

Relying on Dr. Safer's assertions, B.P.J. argues that the demonstrated male speed advantage (for those with testosterone suppression) in a 1.5-mile run "does not necessarily translate into an athletic advantage in any particular athletic event." Pl.'s Safer Resp. 8–9. This position is inexplicable given the importance of running speed in many sports, including (most obviously) track events. But Dr. Safer has disclaimed knowledge as to what would constitute "meaningful" competition in sport (App. 652 (Safer Dep. 151:22–152:11)) and as to how much advantage would constitute either a "minimal" or "very large" advantage. App. 638, 640 (Safer Dep. 95:6–11, 103:4–10). So his views as to what might constitute "an athletic advantage in any particular athletic event" should be given no weight. Pl.'s Safer Resp. 8–9.

In sum, Dr. Safer never asserts that testosterone suppression *does* eliminate all advantages in *any* sport, nor does he identify any sport in which he even believes such a result to be likely. Such vague "might be" speculations are not evidence with a "valid scientific connection," *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579, 592 (1993), and Dr. Safer has not provided sufficient evidence to show that his opinions are based "on a reliable, scientific method." *Eghnayem v. Boston Sci. Corp.*, 57 F. Supp. 3d 658, 680 (S.D.W. Va. 2014).

Because the question of post-puberty testosterone suppression is not relevant to B.P.J.'s personal situation, to any question asked by the Sports Act, or to any relief sought by B.P.J., these questions of science and all of Dr. Safer's proffered testimony

concerning league policies relating to testosterone suppression are irrelevant.[4] Attempting to distract the Court, B.P.J. asserts that it is "precisely the problem" that the Sports Act does not make exceptions based on "consideration of circulating testosterone." Pl.'s Safer Resp. 11. But B.P.J. has never asked this Court to impose a regime in which eligibility for female athletics would turn on "circulating testosterone" levels. Indeed, such a regime would be intrusive and utterly impractical for junior high and high schools to administer safely and consistently.

II. **The Court should exclude Dr. Safer's proffered opinions concerning the supposed ambiguity of "biological sex," disorders of sexual development, and any hypothetical "biological basis" for gender identity, because they are irrelevant and/or unreliable.**

A. **Dr. Safer's opinions casting doubt on the scientific validity of the category "biological sex" are unreliable.**

Dr. Safer's assertion that the term "biological sex" is "imprecise" is debunked both by sources cited by Dr. Safer himself and by many other sources (as Defendants demonstrated in their opening memorandum). And Dr. Safer and B.P.J. ignore the fact that if there *were* any "imprecision" in that phrase standing alone, the legislature eliminated it by adopting an express and specific definition: as determined "solely" by "reproductive biology and genetics."

What is remarkable is that B.P.J.'s response makes no effort to defend Dr. Safer's opinion—that "biological sex" defined by reference to "reproductive biology and genetics" "do[es] not reflect any medical understanding of sex—directed against that statutory definition. Defs.' Safer Br. 15–17. That is because the assertion cannot

---

[4] Even if relevant, Dr. Safer cannot base his expert opinion "on policies promulgated by an organization," unless the expert explains "the process by which they developed their standards[.]" *Geiger v. Monroe Cnty., Mississippi*, No. 1:16-CV-95-DMB-DAS, 2020 WL 5255403, at *7 (N.D. Miss. Sept. 3, 2020). Safer must also "establish the reliability of the policies" and explain "the process by which they developed their standards." *Wood v. Showers*, 822 F. App'x 122, 124 (3d Cir. 2020) (affirming the rejection of an expert for failure to follow this standard). Safer has not done so.

7

be supported. B.P.J. has no response to (1) the fact that the 2017 Endocrine Society Guidelines (co-authored by Dr. Safer) clearly consider "genetic/gonadal sex" (the category adopted by the legislature) to be a useful and adequately defined scientific category (*see* Daubert App. 523), (2) the statement in the Handelsman et al. (2018) article relied on by Dr. Safer that "*all* facets of biological sex are *almost always* aligned" (Daubert App. 484 (emphases added)), and (3) the 2021 Endocrine Society Policy Statement that the sexual traits that "typically differ in males and females are tightly linked" to each other, all "controlled" by the presence of XY or XX chromosomes (i.e., "genetics") (Daubert App. 381). *See* Defs.' Safer Br. 16–17. In other words, once you have identified "genetic sex," all the rest of the "tightly linked" "typical[]" sex-specific biological characteristics follow as the night follows the day in "almost al[l]" cases. Daubert App. 381. Indeed, B.P.J. acknowledges that the fit is perfect for "the *vast* majority of the population."[5] Pl.'s Safer Resp. 14 (emphasis added). If so, then "biological sex" defined by reference to "reproductive biology and genetics" is the very archetype of a well-defined, clear, and useful biological or medical category.

      B.P.J. disputes none of that. Instead, B.P.J. (through Drs. Safer and Adkins) prefers to distract by talking at length about the very rare *exceptions* to this almost universal reality. But nothing follows from rare exceptions; B.P.J. is just wrong in asserting that it is "the critical point" that the full set of healthy, typical sex-specific biological characteristics "are not *always* aligned." *Id.* at14. It is not a critical point;

---

[5] B.P.J.'s passing assertion that the biological components of sex are not aligned "for people who are transgender" is just attorney say-so. B.P.J. cannot even cite B.P.J.'s own experts for such a statement. Given the admissions of B.P.J.'s experts that almost no transgender individuals suffer from any disorder of sexual development (App. 669 (Safer Dep. 219:10–220:15)), and that no biological measurement that differentiates between transgender and non-transgender individuals with any statistical significance has been discovered (App. 669 (Safer Dep. 220:23–221:1)), the assertion is not just unsupported—it is counterfactual.

8

it is not even material. B.P.J. is trying to paint fleas as elephants. The fact that a minute percentage of individuals have one leg or no legs does not negate the scientific and medical validity of the statement that humans are a bipedal species.

Neither Safer nor B.P.J. cites any authority endorsing the proposition that sex as defined by "reproductive biology and genetics" "does not reflect any medical understanding" of sex. Daubert App. 158 (Safer Rep. ¶ 48) The assertion is say-so unsupported by a scientific methodology, and it is false. The West Virginia Legislature has chosen an appropriate and well-defined definition of "biological sex" for purposes of implementing a policy to protect fair and safe athletic experiences for biological females. Dr. Safer's proffered testimony to the contrary does not satisfy the "reliability" requirement of *Daubert*.

### B. Dr. Safer's opinions about disorders of sexual development and intersex conditions are not relevant to any issue in this case.

B.P.J. does not claim to suffer any DSD or intersex condition, and it has long been established that equal-protection principles do not obligate state legislatures to resolve every aspect of an issue when enacting a law to address that issue. *United States v. Carolene Prods. Co.*, 304 U.S. 144, 151 (1938). If and when a student who suffers from a DSD so severe that he or she falls outside that set of almost all individuals for whom biological sex is unambiguous (*see* Daubert App. 484 (Handelsman (2018)) ("all facets of biological sex are almost always aligned")) ever seeks to play in female athletics in West Virginia, that will be time enough for West Virginia courts to determine how to apply the Sports Act to such individuals. The hypothetical existence of rare but unrealized hard cases is irrelevant to the question of whether the line drawn by the Sports Act is "reasonably related" to the Legislature's legitimate goal of preserving fair and safe athletic experiences for biological girls and women in West Virginia.

Nor do rare cases of developmental defects prove that "sex-based differences in athletic performance are not determined by chromosomes" (Pl.'s Safer Resp. 17) any more than the existence of babies born with no legs could prove that the bipedal nature of the healthy human race is not determined by our chromosomes. B.P.J.'s assertion is a rhetorical debating point, not scientific fact or even scientific reasoning.

### C. Dr. Safer's opinions asserting an unknown biological cause of transgender identity are irrelevant and unreliable.

Dr. Safer flatly asserts that "gender identity itself has biological underpinnings." Daubert App. 198 (Safer Rebuttal ¶ 7). The assertion is irrelevant, unsupported, and unsupportable.

Debates about the nature of and therapeutic responses to transgender identification and gender dysphoria are categorically irrelevant to the question of whether separating sport by biological sex is "reasonably related" to the goal of providing fair, safe, and equal athletic opportunities for girls and women. And it is *non sequitur* to assert that the search for a biological basis is relevant because "it demonstrates that H.B. 3293's definition of 'biological sex' is not scientifically accurate." Pl.'s Safer Resp. 15. Even if transgender identification had some biological basis, that would in no way impeach the reality and empirically demonstrated importance of the category—biological sex—that is the focus of the Sports Act. Defs.' Safer Br. 19–21.

As to reliability, Dr. Safer admits that "the precise biological causes of gender identity are unknown" and can only speculate that transgender identification may result from "variations in prenatal exposure to sex hormones, gene sequences, epigenetics, or a combination of factors." Daubert App. 198 (Safer Rebuttal ¶ 7). And he does not point to any objective biological indicia that might be used to detect a transgender identity or diagnose gender dysphoria.

10

B.P.J. offers no defense of Dr. Safer's proffered speculations except to point to still more sources that tell us that no biological basis for transgender identification has been identified. The Endocrine Society's Clinical Practice Guideline that B.P.J. assures the Court gathers "[t]he evidence supporting a biological basis" report that scientists have "failed to find" any distinctive hormone level or marker associated with transgender identification (Daubert App. 528 (Hembree et al. (2017))), and that efforts to find a genetic basis "have been inconsistent and without strong statistical significance." *Id.* at 529. Indeed, the Guideline co-authored by Dr. Safer goes no further than asserting that hormones "may" or "potential[ly]" play a role. *Id.* at 530. "May" and "potential" are terms suited to speculation, but not to claiming or explaining statistically significant relationship. So it is unsurprising that B.P.J. does not claim a single statistically significant correlation between any "potential" biological factor and transgender identification.

It is telling that B.P.J. is unable to cite a single source that asserts that transgender identification *does* (rather than might) have a biological basis. And B.P.J. cites no source that contradicts the facts that *no* biological factor causing (or even statistically correlated with) transgender identification has been identified by science despite multiple efforts reported in the literature, and that *no* biological/physical test exists that can determine whether an individual does or will identify as transgender. Defs.' Safer Br. 20–21.

It is not the role of an expert to present hypotheses as though they were facts, or to tell the factfinder what scientists are speculating about, but have been unable to prove. Rather, the role of the expert is to tell the factfinder "what is known," based on "good grounds." *Eghnayem*, 57 F. Supp. 3d at 680.

11

### III. B.P.J. does not seriously defend the remaining opinions of Dr. Safer challenged in Defendants' motion to exclude.

#### A. Dr. Safer's opinions concerning male participation and success in women's sports are unreliable and irrelevant.

Defendants moved to exclude Dr. Safer's proffered testimony concerning transgender participation and success in female athletics as lacking any reliable basis. Defs.' Safer Br. 5–6. In response, B.P.J. makes no effort to identify any reliable basis for those opinions, denies that Dr. Safer offered any such opinions—and asks that Defendants' motion be "denied" as to opinions B.P.J. claims Dr. Safer did not offer. B.P.J.'s goal is to muddy the water and keep the door open to slipping those opinions in at trial nonetheless.

If Dr. Safer proposes to opine that males who identify as females who do not compete in female athletics do not take athletic victories and opportunities away from biological girls and women (Pl.'s Safer Resp. 18), the point is indisputable, but irrelevant. The *problem* addressed by the Sports Act is that males who *do* participate in female athletics deprive girls and women of equal opportunities to succeed (as Dr. Brown extensively documents) and impose increased risks of injury on girls and women in contact sports (as Dr. Carlson extensively documents).

B.P.J. identifies no support for Dr. Safer's assertion that males identifying as females have competed in NCAA and secondary school athletics "for many years." Instead, B.P.J. asserts that Defendants' expert Dr. Carlson said the same thing. Pl.'s *Id.* He did not. Rather, this is a novel and expanding concern for female athletics, and almost all the instances identified by Dr. Carlson were within the recent few years. B.P.J. complains vociferously that Dr. Safer's inability to identify "specific instance[s]" evincing that transgender competition had occurred "for many years" pertained only to "contact or collision sports." *Id.* at 19. But neither in his report nor in his testimony did Dr. Safer identify such instances reaching back "many years" for *any* sport, contact or non-contact. Dr. Safer should not be permitted to offer baseless

12

testimony about the history of male participation and success in female athletic competition.

### B. Dr. Safer's opinions concerning fairness should be excluded because he is not an expert and his opinions are unreliable.

B.P.J. admits that Dr. Safer has no expertise in evaluating what is or is not fair. Nonetheless, in his report Dr. Safer made an affirmative assertion attempting to belittle the "unfair[ness]" of the physiological advantages and success enjoyed by males in female athletics. *See* Defs.' Safer Br. 14. Even if Dr. Safer were merely passing on the opinions of others (his assertion is not thus phrased), an expert cannot be used as a pack animal to carry into court the opinions of others on topics in which he or she has no expertise. Dr. Safer should be precluded from any testimony concerning what is or is not fair, or how fairness could or should be evaluated.

### C. Dr. Safer's opinions concerning the role of sports in education should be excluded because he is not an expert, and his opinions are unreliable.

B.P.J. has no defense of Dr. Safer's proffered testimony concerning how the "broader role of education" does or should bear on school policies concerning participation by biological males in female athletics. The testimony identified in Defendants' opening brief (Defs.' Safer Br. 15) is outside any expertise claimed by Dr. Safer, and therefore should not be permitted.

## CONCLUSION

Trial of this matter will be sufficiently complex without permitting the introduction of speculation and opinion ungrounded in peer-reviewed science and reliable methodology. For the reasons set forth above and in Defendants opening Memorandum in Support of Motion to Exclude Expert Testimony of Dr. Joshua Safer, this Court should exclude the proffered opinions of Dr. Safer identified in that opening memorandum as irrelevant, unreliable, or both.

Respectfully submitted this 2nd day of June, 2022.

/s/ Brandon S. Steele
Brandon Steele, WV Bar No. 12423
Joshua D. Brown, WV Bar No. 12652
The Law Offices of Brandon S. Steele
3049 Robert C. Byrd Drive, Suite 100
Beckley, WV 25801
(304) 253-1230
(304) 255-1520 Fax
bsteelelawoffice@gmail.com
joshua_brown05@hotmail.com

Jonathan Scruggs, AZ Bar No. 030505*
Roger G. Brooks, NC Bar No. 16317*
Henry W. Frampton, IV, SC Bar No. 75314*
Alliance Defending Freedom
15100 N. 90th Street
Scottsdale, AZ 85260
(480) 444-0020
(480) 444-0028 Fax
jscruggs@adflegal.org
rbrooks@adflegal.org
hframpton@adflegal.org

Christiana Holcomb, DC Bar No. 176922*
Alliance Defending Freedom
440 First Street NW, Suite 600
Washington, DC 20001
(202) 393-8690
(202) 347-3622 Fax
cholcomb@adflegal.org

PATRICK MORRISEY
  *West Virginia Attorney General*

/s/ Curtis R. A. Capehart
Douglas P. Buffington II (WV Bar # 8157)
  *Chief Deputy Attorney General*
Curtis R.A. Capehart (WV Bar # 9876)
  *Deputy Attorney General*
David C. Tryon (WV Bar #14145)
  *Deputy Solicitor General*
OFFICE OF THE WEST VIRGINIA ATTORNEY GENERAL
State Capitol Complex
1900 Kanawha Blvd. E, Building 1, Room E-26
Charleston, WV 25305-0220
Telephone: (304) 558-2021
Facsimile: (304) 558-0140
Email: David.C.Tryon@wvago.gov

*Counsel for Defendant, STATE OF WEST VIRGINIA*

(signatures continued on next page)

Tyson C. Langhofer, VA Bar No. 95204*
Rachel A. Csutoros, MA Bar No. 706225*
Alliance Defending Freedom
44180 Riverside Parkway
Lansdowne, VA 20176
(571) 707-2119
(571) 707-4790 Fax
tlanghofer@adflegal.org
rcsutoros@adflegal.org

Travis C. Barham, GA Bar No. 753251*
Alliance Defending Freedom
1000 Hurricane Shoals Road NE, Ste D-1100
Lawrenceville, GA 30043
(770) 339-0774
(770) 339-0774 Fax
tbarham@adflegal.org

Timothy D. Ducar, AZ Bar No. 015307*
Law Offices of Timothy D. Ducar, PLC
7430 E. Butherus Drive, Suite E
Scottsdale, AZ 85260
(480) 502-2119
(480) 452-0900 Fax
tducar@azlawyers.com


*Visiting Attorneys
*Attorneys for Defendant-Intervenor*

15

**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA
CHARLESTON DIVISION**

| | |
|---|---|
| B.P.J., by her next friend and mother, HEATHER JACKSON<br><br>*Plaintiff,*<br><br>v.<br><br>WEST VIRGINIA STATE BOARD OF EDUCATION, HARRISON COUNTY BOARD OF EDUCATION, WEST VIRGINIA SECONDARY SCHOOL ACTIVITIES COMMISSION, W. CLAYTON BURCH in his official capacity as State Superintendent, DORA STUTLER in her official capacity as Harrison County Superintendent, and THE STATE OF WEST VIRGINIA<br><br>*Defendants,*<br><br>and<br><br>LAINEY ARMISTEAD<br><br>*Defendant-Intervenor.* | Case No. 2:21-cv-00316<br><br>Hon. Joseph R. Goodwin |

**CERTIFICATE OF SERVICE**

I, Brandon Steele, hereby certify that on June 2, 2022, I electronically filed a true and exact copy of ***Reply Memorandum in Support of Defendant-Intervenor and the State of West Virginia's Motion to Exclude Expert Testimony of Dr. Joshua Safer*** with the Clerk of Court and all parties using the CM/ECF system.

*/s/ Brandon S. Steele*
Brandon Steele, WV Bar No. 12423
The Law Offices of Brandon S. Steele
3049 Robert C. Byrd Drive, Suite 100
Beckley, WV 25801
(304) 253-1230
(304) 255-1520 Fax
bsteelelawoffice@gmail.com

*Attorney for Defendant-Intervenor*

16