### IN THE UNITED STATES DISTRICT COURT
### FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA
### CHARLESTON DIVISION

B. P. J., by her next friend and mother,
HEATHER JACKSON,

    Plaintiff,

v.

WEST VIRGINIA STATE BOARD OF
EDUCATION, HARRISON COUNTY
BOARD OF EDUCATION, WEST VIRGINIA
SECONDARY SCHOOL ACTIVITIES
COMMISSION, W. CLAYTON BURCH, in
his official Capacity as State Superintendent,
DORA STUTLER, in her official capacity as
Harrison County Superintendent, and THE
STATE OF WEST VIRGINIA,

    Defendants.

and LAINEY ARMISTEAD,

    Intervenor Defendant.

CIVIL ACTION NO. 2:21-cv-00316
Judge Joseph R. Goodwin

**Reply Memorandum in Support of Motion of Defendant State of West Virginia (1) to Strike Expert Opinion of Professor Mary Fry, (2) to Exclude Mary Fry from providing Expert Testimony, and (3) for a Daubert Hearing.**

1

# TABLE OF CONTENTS

TABLE OF CONTENTS ................................................................................................................. i

TABLE OF AUTHORITIES .......................................................................................................... ii

    I.    Prof. Fry's Expert Opinion Is Limited To The Issues In The Case ..................................... 1

    II.    Plaintiff Has Not Proven that Prof. Fry's Expert Report is Admissible ............................. 1

        A.    Prof. Fry's Claim that Sports Can Provide Benefits is Not an Issue or Relevant ............ 2

        B.    Loss of Specific Benefits Is Irrelevant to the Claims Presented Here ............................. 4

        C.    H.B. 3293 Does Not Mandate Any Coaching Orientation And Does Not Focus Solely On Winning ..................................................................................................................... 5

        D.    Plaintiff Concedes That Paragraphs 18-36, 38, 40, and 42 Are Irrelevant ...................... 5

        E.    Prof. Fry's Opinion Ignores the Facts in Violation of FRE Rule 702(b) ......................... 6

        F.    Prof. Fry's Opinions on Fairness and Arbitrariness are Beyond Her Expertise and are Irrelevant ......................................................................................................................... 7

        G.    Prof. Fry's Opinions on Which Categorical Bans are Acceptable is Not Based on Any Reliable Methodology .................................................................................................... 8

        H.    B.P.J. Can But Refuses to Participate on Boys Teams ................................................. 10

        I.    Professor Fry's Claim of Harm is Inadmissible ............................................................ 11

CONCLUSION ............................................................................................................................ 12

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Amorgianos v. Nat'l R.R. Passenger Corp*,
　303 F. 3d 256 (2d Cir. 2002)..................................................................................................7

*Daubert v. Merrell Dow Pharms., Inc.*,
　509 U.S. 579 (1993).......................................................................................................1, 5, 7

*In re Lipitor (Atorvastatin Calcium) Mktg., Sales Pracs. & Prod. Liab. Litig. (No II) MDL 2502*,
　892 F.3d 624 (4th Cir. 2018) ...............................................................................................4, 11

*Roubideaux v. N. Dakota Dep't of Corr. & Rehab.*,
　570 F.3d 966 (8th Cir. 2009) ..................................................................................................1

*United States v. Virginia*,
　518 U.S. 515 (1996)................................................................................................................1

**Constitutional Provision**

U.S. Const. amend. XIV, § 1 ........................................................................................................1

**Statutes**

20 U.S.C. § 1681(a) ......................................................................................................................1

W. Va. Code § 18-2-25d ...............................................................................................................1

**Regulations**

34 CFR § 106.41(b) ......................................................................................................................1

34 CFR § 106.41(c) ......................................................................................................................1

**Rules**

Fed. R. Evid. 401 ..............................................................................................................2, 4, 5, 8

Fed. R. Evid. 702 ..................................................................................................................2, 8, 11

I.      **Prof. Fry's Expert Opinion Is Limited To The Issues In The Case.**

Plaintiff challenges West Virginia's HB 3293 ("H.B. 3293"), codified as W. Va. Code § 18-2-25d ("Section 25d" or the "Save Women's Sports Act"), which states: "Athletic teams or sports designated for females, women, or girls shall not be open to students of the male sex where selection for such teams is based upon competitive skill or the activity involved is a contact sport." *Id.* § 25d(c)(2).   The Court needs to determine if Section 25d violates Title IX[1] and its implementing sports regulations[2] or the Equal Protection Clause,[3] which requires answering:

1.      "Does separating team members based on biological sex in Section 25d violate Title IX or 34 CFR §106.41(c)?"

2.      "Does Section 25d violate the Equal Protection Clause?"  This requires two inquiries:  First, does the State's "classification serve[] important governmental objectives[?]" *United States v. Virginia*, 518 U.S. 515, 524 (1996) (cleaned up).  Second, is Section 25d "substantially related to the achievement of those objectives[?]'" *Roubideaux v. N. Dakota Dep't of Corr. & Rehab.*, 570 F.3d 966, 974 (8th Cir. 2009) (citing *Ways v. City of Lincoln*, 331 F.3d 596, 600 (8th Cir.2003)).[4]

II.     **Plaintiff Has Not Proven that Prof. Fry's Expert Report is Admissible.**

Plaintiff has the burden to prove that Plaintiff's proffered expert testimony is admissible under *Daubert*.  *Daubert v. Merrell Dow Pharms., Inc.,* 509 U.S. 579, 596 (1993).  Plaintiff's

---

[1] "No person in the United States shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any education program or activity receiving Federal financial assistance[.]"  20 U.S.C. §1681(a).
[2] 34 CFR § 106.41(b), which explicitly allows entities subject to Title IX to "operate or sponsor separate teams for members of each sex where selection for such teams is based upon competitive skill or the activity involved is a contact sport."  And § 106.41(c) requires that all subject entities "shall provide equal athletic opportunity for members of both sexes."
[3] No State shall "deny to any person within its jurisdiction the equal protection of the laws." U.S. Const. amend. XIV, § 1.
[4] This analysis presumes that the Court continues to apply intermediate scrutiny, which the State has challenged.

1

Memorandum in Opposition ("Pl. Memo.," ECF No. 346) does not prove that Prof. Fry's Expert Report ("Fry Expert Report," ECF No. 289-28) satisfies either Federal Rules of Evidence ("FRE") Rule 401[5] or 702.[6]

A.     <u>Prof. Fry's Claim that Sports Can Provide Benefits is Not an Issue or Relevant.</u>

As explained in the State's Initial Memorandum ("State's Memo.," ECF No. 306), no one disputes that there can be benefits to playing sports. That is neither in dispute nor has Plaintiff explained how it is relevant to the validity of Section 25d under Title IX or the Equal Protection Clause. Plaintiff responded to the State's point first with further opinion details disconnected to this analysis and second by selectively quoting and notably omitting key parts of the State's discovery responses.

Plaintiff asserts "the entire basis of Dr. Fry's testimony [] is understanding what those psychological and behavioral benefits exactly are," then lists some benefits of sports. Pl. Memo. at 11, ECF No. 346. However, Pl.'s Memo. does not explain how elaborating on the specific benefits would assist the fact finder with any fact or legal element at issue—because it would add nothing considering that no one disputes that there can be benefits to participating in sports. Regardless, in an effort to bolster the idea that these specifics on benefits are relevant and arguably necessary, Pl.'s Memo. presents quotes from the State's Responses to the Plaintiff's Second Set of Requests for Admission ("State's Resp. to Pl. Second RFAs") as though the State refused to acknowledge any benefits existed vis-à-vis sports whatsoever:

> And despite Defendants' claims that these benefits are common knowledge, Defendants refused to identify them in discovery. When asked to admit that "students derive social

---

[5] "Evidence is relevant if: (a) it has any tendency to make a fact more or less probable than it would be without the evidence; and (b) the fact is of consequence in determining the action."

[6] A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if: (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue; (b) the testimony is based on sufficient facts or data; (c) the testimony is the product of reliable principles and methods; and (d) the expert has reliably applied the principles and methods to the facts of the case.

> [and psychological] benefits from participation on athletic teams," the State objected and stated that it "would have to speculate as to whether any or all students 'derive social benefits' [and 'derive psychological benefits'] and what are 'social benefits' [and 'psychological' benefits]." (Dkt. No. 289-6 (State Resp. to Pl.'s Second Set of RFAs) Nos. 44–45.)

Pl. Memo. at 11-12. But this presentation of the State's responses is distinctly incomplete; a more fulsome review provides a distinctly different character as Pl.'s Memo. omitted the key parts of Plaintiff's request and the State's response. The subject Request for Admission ("RFA") and Response actually stated:

> REQUEST NO. 44: *Admit that* students derive social benefits from participation on athletic teams *offered by public secondary schools in West Virginia.*
> RESPONSE: *Objection, The State objects to this Request as it is vague, overbroad and speculative in that it seeks to include all students and the State* would have to speculate as to whether any or all students "derive social benefits" and what are "social benefits." *Without waiver of the foregoing, the State states that it is likely that some students who participate in athletic teams feel that they have benefited in some fashion or fashions and it is likely that some students who participate in athletic teams feel that they have not so benefited.*

State's Resp. to Pl. Second RFA's, No. 44, ECF No. 289-6 (emphasis added to show portions omitted from Pl.'s Memo.).[7] First, the RFA did not ask for a listing of specific benefits; the State did not "refuse to identify them in discovery." Second, contrary to Plaintiff's suggestion, the response explains that it is likely that some students do feel they have benefited, and others do not feel that way. Interestingly, months later, Plaintiff's proffered expert Prof. Fry also agreed with the likelihood that not all student athletes feel that they have benefited, but in fact some *are actually harmed* by sports: "Q. Is it possible that some young people are actually harmed by participation in athletic activities?" Prof. Fry: "Yes, I think so." Fry Dep. 125:4-7, ECF No. 304-2. Prof. Fry explained some harms are abusive coaches, bullying by other students, shame if they don't perform

---

[7] Pl.'s Memo. cites to RFAs 44 and 45. RFA 44 and the State's Response is presented in its entirety here, though RFA 45 and its response are not for brevity. The only differences between RFAs 44 and 45 and their respective responses are the replacement of "social" in RFA 44 (and its response) with "psychological" in RFA 45 (and its response). *See* State's Resp. to Pl. Second RFA's, No. 44, 45, ECF No. 289-6.

3

well, and athletes bullying others (including non-athletes), sometimes with "long-term lasting impacts." *Id.* at 125:9-126:1.[8]

So, not only are Prof. Fry's opinions on this irrelevant, the Professor's expert report never mentioned the potential *harms* until forced to admit them on cross-examination. And, now that Plaintiff has raised this aspect of Prof. Fry's testimony, this is the sort of cherry picking that disqualifies experts generally and disqualifies Prof. Fry specifically. *In re Lipitor (Atorvastatin Calcium) Mktg., Sales Pracs. & Prod. Liab. Litig. (No II) MDL 2502*, 892 F.3d 624, 634 (4th Cir. 2018) ("Result-driven analysis, or cherry-picking, undermines principles of the scientific method and is a quintessential example of applying methodologies (valid or otherwise) in an unreliable fashion.").

B. <u>Loss of Specific Benefits Is Irrelevant to the Claims Presented Here.</u> Assuming that Prof. Fry's testimony that athletes sometimes benefit from participation, is admissible, the particular benefits would only be relevant to a determination of a claim where benefits and their loss are elements of the claim or otherwise part of a court's requisite analysis. For example, a consequential damages claim necessarily considers such issues,[9] but there is no such claim here. Consequently, this testimony has no tendency to make a fact at issue more or less probable than it would be without the testimony. Therefore, under FRE 401(a), Prof. Fry's testimony is irrelevant.

---

[8] Pl.'s Memo. is similarly selective and incomplete in its discussion of RFA 47. *See* Pl.'s Memo. in Op. at 12, ECF No. 346. It addresses only a portion of the State's objection, giving a misleading impression that the State simply refused to engage with the potential for benefits reaped irregardless of victory or finishing placement. The State's full response follows: "The State objects to this Request as it is vague, overbroad and speculative in that it seeks to include all participating students and what constitutes a benefit for students. Each student would likely have an opinion unique to that student. Further, the State would have to speculate as to the answer for each and every child. Further objecting, the terms 'win' or 'lose' are somewhat vague and may or may not apply to all athletic situations. Without waiver of the foregoing, the State states that it is likely that some middle school students who participate in interscholastic athletics feel that they receive benefits regardless whether [sic] they outright 'win' or 'lose' and that others do not." State's Resp. to Pl. Second RFA's, No. 47, ECF No. 289-6.

[9] For example, if an athlete claimed that an illegal denial of participation by a coach caused the athlete to lose the benefit of $5,000 for some reason, then that would affect damages, but it would not be relevant as to whether the coach violated the law.

4

And under Rule 401(b), it is of no consequence in determining the action. *See also Daubert,* 509 U.S. at 591 (cleaned up). It must be excluded.

        C.     <u>H.B. 3293 Does Not Mandate Any Coaching Orientation And Does Not Focus Solely On Winning.</u> In effort to present relevance for Prof. Fry's testimony discussing "a sole" or "myopic focus on winning" that "ignores" other important benefits, Plaintiff responds that Prof. Fry's "testimony pertains to what the impact of H.B. 3293 would be on the climate and benefits of participation in sports at the non-elite level[.]" Pl. Memo. at 6, ECF No. 346. The trouble with that characterization is that Prof. Fry does not "believe that HB-3293 focuses solely on performance outcomes." Fry Dep. 122:4-7, ECF No. 304-2.[10] Indeed, Fry's testimony was that "there is nothing in HB-3293 that says there should be a sole or myopic focus on winning in any of the sports it covers[,]" *id.* at 124:4-15, and Prof. Fry even agreed that "performance outcomes" are, in fact, an "appropriate thing for a legislature or a school to focus on[.]" Fry Dep. 122:11-15. The Professor's recognition that H.B. 3293's focus is not "myopically-focused on winning" demonstrates that Prof. Fry's "myopic focus" testimony is not relevant. .

        D.     <u>Plaintiff Concedes That Paragraphs 18-36, 38, 40, and 42 Are Irrelevant.</u> The State pointed out that paragraphs 18-36, 38, 40, and 42 of Fry's Declaration are irrelevant because they discuss ego-involving vs. task-involving athlete orientation and coaching styles and climates, but Section 25d does not mandate or regulate any particular coaching style or task vs. ego orientation. State's Memo. at 5, ECF No. 306. Moreover, Prof. Fry does not think "there should be a statewide or nation-wide rule" "to help foster caring and task involving climate." Fry Dep. 200:1-9, ECF No. 304-2. Pl.'s Memo. does not attempt to explain the relevance of these paragraphs. Rather, Plaintiff simply references or cites to several of those same paragraphs then asserts that "climate

---

[10] And Prof. Fry is unaware of any schools or colleges with such a sole focus. Fry Dep. 121:15-18, ECF No. 304-2.

and benefits is directly relevant to this case, because H.B. 3293 imposes a particular climate that tells student athletes that performance and winning are more important than inclusion and participation." Pl. Memo. at 10, ECF No. 346. This statement is clearly not based on the text of the statute; again, Section 25d does nothing to mandate coaching style or climate, task or ego orientation, or anything in that vein. Rather, this statement is presented as practically an opinion, but it is not an opinion enunciated or espoused by Prof. Fry. To be clear, Prof. Fry's Declaration does not render this as an opinion, and Plaintiff's counsel cannot present an opinion that the expert did not.

In fact, as referenced above, Prof. Fry has said nearly the opposite:

Q. So you are not saying that you believe that HB-3293 focuses solely on performance outcomes, right?

A. Okay. I'm not saying that. I think performance outcomes is --- seems to be a piece in it.

* * *

Q. [ ] Is performance outcomes something that's an appropriate thing for a legislature or a school to focus on?

THE WITNESS: Yes.

Fry Dep. 122:4-15. Thus, paragraphs 18-36, 38, 40, and 42 of Prof. Fry's Report, which discuss concepts unregulated by and absent from Section 25d, remain irrelevant and should be stricken.

E.     Prof. Fry's Opinion Ignores the Facts in Violation of FRE Rule 702(b). The State explained that Prof. Fry's opinion is not "sufficiently tied to the facts of the case" because she does not recognize that B.P.J. wants to compete to win. State's Memo. at 7, ECF No. 306. Plaintiff responds by misstating the State's position in asserting that: "contrary to the State's claim, Dr. Fry did not claim that winning is unimportant to youth athletes." Pl. Memo. at 12, ECF No. 346. The

State never claimed this; rather, the State accurately cited Fry as follows: "But Fry insists that winning is not a primary benefit of sports (Fry Dep. 96:16-21 ECF No. 304-2) and winning, rankings, and publicity are 'lower on what we value.' *Id.* at 98:5-17." State's Memo. at 7. This again runs counter to the evidence of the importance of winning to B.P.J. individually and is unsupported as to women generally.[11] And it is irrelevant to the issues in the case.

Plaintiff does not rebut this evidence but reminds us of Prof. Fry's irrelevant suggestions that "you can go out there and have fun" even if you do not win and that "the focus should be on giving as many kids as possible the opportunity to participate." Pl. Memo. at 13. Plaintiff did not connect either one of these suggestions to the factual evidence or issues as required by *Daubert*. *Daubert*, 509 U.S. at 591 (cleaned up) ("An additional consideration under Rule 702—and another aspect of relevancy—is whether expert testimony proffered in the case is sufficiently tied to the facts of the case that it will aid the jury in resolving a factual dispute."); *see also*, *Amorgianos v. Nat'l R.R. Passenger Corp,* 303 F. 3d 256, 267 (2d Cir. 2002) (District courts "should undertake a rigorous examination of the facts on which the expert relies.").

F.   Prof. Fry's Opinions on Fairness and Arbitrariness are Beyond Her Expertise and are Irrelevant. The State argued that Prof. Fry is both unqualified to opine as to whether H.B. 3293 is fair or arbitrary and that Prof. Fry admitted that it would not be arbitrary to exclude transgender athletes "for safety and performance concerns." State's Memo. at 8-10, ECF No. 306. Plaintiff did not respond to this. Accordingly, Plaintiff admits that Prof. Fry is not qualified to opine as to the fairness or arbitrariness of the Statute.

Instead, Plaintiff argues that if someone else determines that H.B. 3293 is a "categorical, arbitrary exclusion of an entire group," then such exclusion may be harmful in some respects in

---

[11] *See* B.P.J. Dep. 77:3-19 (B.P.J. "would like to win"), ECF No. 301-1; Jackson Dep. 133-134 ECF No. 285-2.

7

Prof. Fry's opinion. *See e.g.* Pl. Memo. at 14, ECF No. 346. But the only relevant inquiry for the Court is whether the Statute's recognition of the categories of biological males and biological females and the requirement that only biological females may participate on female teams violates either Title IX or the Equal Protection Clause. The Professor's opinion on the potential consequences of an unidentified, hypothetical circumstance constituting a "categorical, arbitrary exclusion" is not necessary or informative to making that determination, which turns on the facts of this case. Since Plaintiff admits that Prof. Fry cannot opine on whether H.B. 3293's categories are arbitrary,[12] the Professor's testimony does not meet the requirements of either FRE Rule 401 or 702.

G. Prof. Fry's Opinions on Which Categorical Bans are Acceptable is Not Based on Any Reliable Methodology. Despite the conclusion that Prof. Fry's lack of qualifications disqualified her from opining on fairness and arbitrariness, Plaintiff expounds on one category of exclusions that Prof. Fry finds objectionable. Specifically, Prof. Fry concluded that "it would be unfair to categorically exclude a group of athletes from having the opportunity to participate." Fry Dep. at 109: 8-10, ECF No. 304-2; *see generally* Pl. Memo. at 13-15, ECF No. 346 (discussing supposed arbitrariness of certain categorical exclusions).

---

[12] Pl.'s Memo. conflates "arbitrary exclusion" with any exclusion or lessened participation. Plaintiff asserts that Prof. Fry "testified that students with disabilities students with limited financial means are often arbitrarily excluded from youth sports." *See e.g.* Pl. Memo. at 14, ECF No. 346. The question being answered by Prof. Fry, though, did not contemplate arbitrariness at all. *See* Fry Dep. at 163:5-6, ECF No. 304-2. Regardless, the lack of participation by Prof. Fry's identified groups is not arbitrary, especially under the definition Prof. Fry eventually acceded was correct: "Based on chance rather than being planned or based on reason." Fry Dep 44:6-46:10. Kids with disabilities are often unable to participate in standard competition as a consequence of their disabilities, which led to a separate category of competition in the form of Special Olympics. *See* Fry Dep. at 164:1-166:3. Also, many sports have some associated costs (sometimes low, sometimes high) borne by the athletes; though many schools often have some affiliated booster organizations, there is not always sufficient funding to provide full support for young athletes of limited resources. This is again not arbitrary as there is a reason for the impact referenced by Prof. Fry; as she testified, "it may not be a rule that you cannot play, but you know, there are other groups who miss out on the opportunities to play." *See* Fry Dep. at 163:11-13.

But Plaintiff ignores Prof. Fry's non-scientific conclusions regarding other categorical bans the Professor finds acceptable:

- Prof. Fry did not disapprove of a categorical ban of biological males from participation on female teams for a year while any such male undergoes testosterone suppression treatment. Fry Dep. at 237:24-239:24.

- Prof. Fry said that other unspecified categorical bans would be acceptable, but could not articulate the category that she would find acceptable. "[I]t would be okay to exclude some transgenders—transgender girls from competing on girls teams but not all." *Id*. at 208:21-209:8.

- Prof. Fry accepts the categorical ban of kids who cannot meet the cutoff in tryouts. *Id*. at 243:12; 244:23.

- Prof. Fry accepts a categorical ban of all biological males who identify as males from girls teams, even if they are not athletically able to be on the boys teams and will not displace any girls on the girls team. *Id*. at 173:5-9 and 241:8-244:24.

- Prof. Fry further opines that a categorical ban of biological males who identify as a females from participating on a girls team is appropriate, unless they have "transitioned." *Id*. at. 173:15-22.

- Prof. Fry opined that a categorical ban of biological males identifying as females from participating on a girls team is appropriate even if they have changed to a female name, but not transitioned further, because that is not enough of a transition. *Id*. at 174:7-13.

Prof. Fry has also testified that she is not qualified to discuss categorical bans at all: "I think there's a lot of people studying these issues and weighing in and I'm not one of those

9

individuals who's really studying this stuff in detail at that level." *Id.* at 174:16-175:6. Even if qualified, Prof. Fry provided no scientific, reliable methodology to explain why—if maximizing participation and inclusion is so important—some categorical bans are acceptable and even appropriate while others are not. Prof. Fry's testimony on this subject must be excluded.

Prof. Fry did provide scientifically-grounded testimony in one instance on this subject, specifically that it would *not* be arbitrary to exclude transgender students for "safety concerns or performance concerns" if supported by "data that experts come to agree" on. Fry Dep. 166:5–167:24, ECF No. 304-2. Fry ultimately agreed that "we should rely on experts" for "safety" and "performance" issues. *Id*. at 117:3-11. In this case, the State's experts Dr. Chad Carlson and Dr. Greg Brown fit that bill.

H. <u>B.P.J. Can But Refuses to Participate on Boys Teams.</u> In response to the State's Memo., Pl.'s Memo. asserts that Prof. Fry was not speculating when opining that the boys team was not an option, pointing to B.P.J.'s declaration. Pl. Memo. at 16, ECF No. 346. But that is not in the Professor's filed expert report (ECF No. 289-28), and Prof. Fry effectively contradicted herself on this idea during deposition. Prof. Fry first confirmed that "there would be nothing to stop a male athlete, a biological male athlete identifying as a female [i.e. B.P.J.] from participating on a boys team[.]"[13] Fry Dep. 175:12-18. Prof. Fry then refused to agree that "it's not excluding that person from participating in sports, it's just excluding that person from participating on the team that person wants to participate on[.]" *Id.* 175:20-176:4. When inquiring further on this, the Professor fell into reliance on unscientific stereotypes: " Right, well, I just point to PBJ, [sic] right,

---

[13] Plaintiff repeatedly suggests that the terms "cisgender" and "cismale" were used throughout the deposition. They were used infrequently, in part because Prof. Fry could not define those terms any better than she could define the word "arbitrary." *See* Fry Dep. at 36:15-40:7, ECF No. 304-2. (Prof. Fry defined "cismale" as "somebody whose identity aligns with their birth characteristics," but was never able to define "birth characteristics.")

10

who has identified as a girl for a long time *and looks very much like a girl*[,]" but then could not say what it means "to look like a girl." *Id*. at 176:6-18 (emphasis added).

This is not "the product of reliable principles and methods," as required by FRE Rule 702(c). *In re Lipitor,* 892 F.3d at 637 (experts must use "reliable methodologies."). Without a solid reliable methodology, it is, in fact, speculative as a matter of expert opinion. *See* Pl. Memo. at 16 (citing State's. Memo. at 9). Consequently, Prof. Fry may not testify on this. Further, Plaintiff then quotes the order granting the preliminary injunction and intimates that the Professor's words are derived from the order. *See id.* (citing PI Order at 12-13, ECF No. 67). This is disingenuous. Prof. Fry never endorsed the PI order or suggested she was giving that as her opinion. And, a preliminary ruling is not the equivalent of nor can it rest as the foundation for an expert opinion.

Moreover, the Professor has no expertise or qualifications on whether or not B.P.J. "can" participate on a boys team. B.P.J. is eligible to participate on the boys cross country and track teams. But B.P.J. has simply and "clearly expressed her *desire* to run with the girls' team and *refus[ed]* to run with the boys team[.]" Pl. Memo. at 49, ECF No. 331 (emphasis added).

I. <u>Professor Fry's Claim of Harm is Inadmissible.</u> Pl.'s Memo. cites Prof. Fry for the opinions that she is "sad when athletes are excluded" (Fry Dep. 209:17-19, ECF No. 304-2) and that categorical exclusions can be harmful to excluded athletes (*id*. at 174:20-175:6). *See* Pl. Memo. at 18, ECF No. 346. Further, Prof. Fry opines that B.P.J. would be "a recipient of [the] harm." Pl. Memo. at 15, ECF No. 346 (citing Fry Dep. 116:21-117:1). Prof. Fry is not qualified to opine as to any such harm to athletes, though. She is not a psychologist, a psychiatrist, a counselor, or a social worker and has no clinical experience seeing patients. Fry Dep. 54:16-55:6.

11

She has never spoken with B.P.J. or Heather Jackson (*id.* at 18:10-22) and does not claim any experience treating or meeting with transgender athletes.

Prof. Fry's opinion that H.B. 3293's categories of biological males and biological females is harmful to biological males identifying as girls is improper cherry-picking. Prof. Fry ignores the potential harm to biological females who object to the participation of biological males identifying as females. In fact, for "biological girls who are uncomfortable with a biological male identifying as a female or a transgender girl" playing on the girls team—even after the explanatory efforts by coaches and others that she testified should appropriately accompany such situations—Prof. Fry testified, "yeah, I guess the others have to deal with it." *Id*. at 178:10-13; 179:19 and *see generally,* Pl. Memo. at 17-18. Prof. Fry exhibited little belief in potential harm—psychological or emotional—regarding those biological females who think it is unfair to compete against males and who want to win. She would advise them that "nothing changes for you. What you are trying to do is be the absolute very best that you can be, right, and so let's keep working hard, let's keep seeing what you can do." Fry Dep. 217:4-10. Plaintiff seeks to blunt this cherry-picking of harm concerns by characterizing Prof. Fry's comments as "thoughtful." Pl. Memo. at 17. The Professor's comments are not thoughtful; they are focused on one set of concerns and unwilling to afford equal weight, consideration, and support to the legitimate concerns of another group. As stated above, the Professor's cherry picking disqualifies her as an expert.

## *CONCLUSION*

For the foregoing reasons, the Court should grant the State's motion, strike the Expert Report of Prof. Fry, and exclude Fry from submitting any testimony at any hearing or trial.

Respectfully submitted,

PATRICK MORRISEY
  *West Virginia Attorney General*

/s/ *Curtis R. A. Capehart*
Douglas P. Buffington II (WV Bar # 8157)
  *Chief Deputy Attorney General*
Curtis R.A. Capehart (WV Bar # 9876)
  *Deputy Attorney General*
David C. Tryon (WV Bar #14145)
  *Deputy Solicitor General*
OFFICE OF THE WEST VIRGINIA ATTORNEY
GENERAL
State Capitol Complex
1900 Kanawha Blvd. E, Building 1, Room E-26
Charleston, WV 25305-0220
Telephone: (304) 558-2021
Facsimile: (304) 558-0140
Email:  David.C.Tryon@wvago.gov

*Counsel for Plaintiff, STATE OF WEST VIRGINIA*

DATE: June 2, 2022

13

# IN THE UNITED STATES DISTRICT COURT
# FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA
# CHARLESTON DIVISION

**B. P. J., by her next friend and mother, HEATHER JACKSON,**

    Plaintiff,

v.

**WEST VIRGINIA STATE BOARD OF EDUCATION, HARRISON COUNTY BOARD OF EDUCATION, WEST VIRGINIA SECONDARY SCHOOL ACTIVITIES COMMISSION, W. CLAYTON BURCH, in his official Capacity as State Superintendent, DORA STUTLER, in her official capacity as Harrison County Superintendent, and THE STATE OF WEST VIRGINIA BOARD OF EDUCATION, et al.,**

    Defendants.

**and LAINEY ARMISTEAD,**

    Intervenor Defendant.

**CIVIL ACTION NO. 2:21-cv-00316**
**Judge Joseph R. Goodwin**

## CERTIFICATE OF SERVICE

I hereby certify that, on this 2nd day of June 2022, I electronically filed the foregoing Memorandum with the Clerk of Court and all parties using the CM/ECF System.

                                                  */s/ Curtis R. A. Capehart*

                                                  Curtis R. A. Capehart