IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA
CHARLESTON DIVISION

| | |
|---|---|
| B.P.J. by her next friend and mother, HEATHER JACKSON,<br><br>*Plaintiff*,<br><br>v.<br><br>WEST VIRGINIA STATE BOARD OF EDUCATION, HARRISON COUNTY BOARD OF EDUCATION, WEST VIRGINIA SECONDARY SCHOOL ACTIVITIES COMMISSION, W. CLAYTON BURCH in his official capacity as State Superintendent, DORA STUTLER in her official capacity as Harrison County Superintendent, and THE STATE OF WEST VIRGINIA,<br><br>*Defendants*,<br><br>and<br><br>LAINEY ARMISTEAD,<br><br>*Defendant-Intervenor*. | Civil Action No. 2:21-cv-00316<br><br>Hon. Joseph R. Goodwin |

**PLAINTIFF'S REPLY MEMORANDUM OF LAW IN SUPPORT OF MOTION TO EXCLUDE THE EXPERT TESTIMONY OF JAMES M. CANTOR**

## TABLE OF CONTENTS

**Page**

INTRODUCTION ........................................................................................................................... 1

I. Dr. Cantor's Opinions Regarding Appropriate Treatment For Transgender Youth Should Be Excluded. ........................................................................................................ 2

    A. Dr. Cantor Is Not Qualified To Offer Opinions About The Treatment Of Pre-Pubertal Transgender Children Or Transgender Adolescents. ........................ 2

    B. Dr. Cantor's Opinions Fall Outside The Scope Of The Parties' Dispute. ............. 4

II. Dr. Cantor's Assertions Regarding Desistance in Adolescents, "Affirmation on Demand," And Causes of Gender Dysphoria Are Not Reliable. ...................................... 9

CONCLUSION .............................................................................................................................. 13

# **TABLE OF AUTHORITIES**

**Page(s)**

**Cases**

*Belk, Inc. v. Meyer Corp., U.S.*,
 679 F.3d 146 (4th Cir. 2012) ..................................................................................................1

*Belville v. Ford Motor Co.*,
 919 F.3d 224 (4th Cir. 2019) ..................................................................................................3

*Cooper v. Smith & Nephew, Inc.*,
 259 F.3d 194 (4th Cir. 2001) ................................................................................................10

*Daubert v. Merrell Dow Pharms., Inc.*,
 509 U.S. 579 (1993)............................................................................................................1, 9

*Dura Auto. Sys. of Ind., Inc. v. CTS Corp.*,
 285 F.3d 609 (7th Cir. 2002) ..................................................................................................3

*Edmo v. Corizon, Inc.*,
 935 F.3d 757 (9th Cir. 2019) ..................................................................................................8

*Edwards v. Ethicon, Inc.*,
 No. 12 Civ. 9972, 2014 WL 3361923 (S.D.W. Va. July 8, 2014)..........................................5

*Eknes-Tucker v. Marshall*,
 No. 22 Civ. 184, 2022 WL 1521889 (M.D. Ala. May 13, 2022) ...........................................4

*Grimm v. Gloucester Cnty. Sch. Bd.*,
 972 F.3d 586 (4th Cir. 2020) ......................................................................................7, 8, 11

*Hysell v. Raleigh Gen. Hosp.*,
 No. 18 Civ. 1375, 2020 WL 3130423 (S.D.W. Va. Jun. 12, 2020).........................................2

*In re Lipitor (Atorvastatin Calcium) Mktg., Sales Pracs. & Prod. Liab. Litig. (No II) MDL 2502*,
 892 F.3d 624 (4th Cir. 2018) ................................................................................................11

*Sardis v. Overhead Door Corp.*,
 10 F.4th 268 (4th Cir. 2021) ...................................................................................................9

**Statutes**

W. Va. Code § 18-2-25d(a)(5) (2021) ...........................................................................................8

**Other Authorities**

Fed. R. Evid. 702 ................................................................................................................2

Plaintiff B.P.J. respectfully submits this reply memorandum of law in support of her motion to exclude the proffered expert testimony of James Cantor, Ph.D. from consideration at summary judgment or trial.

## INTRODUCTION

This is a case about state-sponsored discrimination against girls and women who are transgender and want to participate on interscholastic athletic teams. Although the fact that B.P.J. has had puberty-delaying medication is relevant in responding to Defendant State of West Virginia's ("State") argument that she has an athletic advantage rooted in physiology, Dr. Cantor does not purport to offer any testimony regarding the impact of puberty-delaying medication on any alleged athletic advantage. Instead, he focuses on the propriety of treatment for gender dysphoria in transgender youth writ large. But as this Court previously recognized in its decision issuing a preliminary injunction, "what is or should be the default treatment for transgender youth is not the question before the court." (Dkt. No. 67 (PI Op.) at 3 n.4.)

In her motion to exclude the proffered testimony of Dr. Cantor, (Dkt. No. 320), B.P.J. explained that Dr. Cantor disagrees with the views of the mainstream medical community and offers unsupported opinions regarding the provision of gender-affirming care to transgender youth. There are three questions before this Court: (1) whether the expert testimony is "relevant to the task at hand," *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579, 597 (1993); (2) whether the expert has the "full range of experience and training" qualifying him to offer testimony, *Belk, Inc. v. Meyer Corp., U.S.*, 679 F.3d 146, 162 (4th Cir. 2012), *as amended* (May 9, 2012) (quoting *U.S. v. Pansier*, 576 F.3d 726, 737 (7th Cir. 2009)); and (3) whether the expert testimony presented is "based on sufficient facts or data," "is the product of reliable principles and methods," and

"reliably applied the principles and methods to the facts of the case." Fed. R. Evid. 702. Dr. Cantor fails all three prongs of the test.

First, Dr. Cantor, an adult psychiatrist specializing in paraphilias and hypersexuality, is not qualified to offer opinions about the appropriate treatment for pre-pubertal transgender children or transgender adolescents. Second, Dr. Cantor's opinions are irrelevant because the opinions he offers about treatment for transgender youth fall outside the scope of the parties' dispute. Third, Dr. Cantor's opinions on desistance rates in transgender adolescents, "affirmation on demand," and what contributes to a person's gender dysphoria must be excluded because they are not based on reliable principles and methods, but rather personal opinions and untested hypotheses.

**I.      Dr. Cantor's Opinions Regarding Appropriate Treatment For Transgender Youth Should Be Excluded.**

  **A.      Dr. Cantor Is Not Qualified To Offer Opinions About The Treatment Of Pre-Pubertal Transgender Children Or Transgender Adolescents.**

As discussed in B.P.J.'s motion to exclude, Dr. Cantor is not qualified to offer testimony regarding treatment for transgender youth. Despite their attempt to characterize Dr. Cantor's qualifications as "strong and on-point," Defendant-Intervenor and the State (collectively, "Defendants") fail to show that Dr. Cantor has the requisite experience or training to provide testimony in this case. (Dkt. No. 339 (Cantor Opp.) at 2.) Defendants rely on *Hysell v. Raleigh General Hospital* for the proposition that a "medical expert, otherwise qualified, is not barred from testifying merely because he or she is not engaged in practice as a specialist in the field about which his or her testimony is offered." No. 18 Civ. 1375, 2020 WL 3130423, at *4 (S.D.W. Va. Jun. 12, 2020) (quoting *Foster v. Sakhai*, 210 W. Va. 716, 731 (2001)). However, they conveniently omit *Hysell*'s explanation that, to be qualified, "the physician must have some experience or knowledge on which to base his or her opinion." *Id*. Defendants claim that Dr.

Cantor is qualified to offer opinions on the treatment of pre-pubertal transgender children and transgender adolescents because he has "served at least six to eight gender dysphoric clients between the ages of 16 and 18"—but at his deposition, Dr. Cantor was unable to identify whether these individuals were transgender or suffer from gender dysphoria (Dkt. No. 321-2 (Cantor Dep. Tr.) at 179:15-18, 180:8-13), testified that his primary area of expertise is the study of hypersexuality and paraphilias, and admitted that nearly one hundred percent of his clinical practice focuses on adults. (Dkt. No. 339 (Cantor Opp.) at 3; Dkt. No. 321-2 (Cantor Dep. Tr.) at 140:5–141:24, 179:7-18.) Defendants assert that it is "an advantage, not a defect" that Dr. Cantor has studied "*more* than just gender dysphoria," (Dkt. No. 339 (Cantor Opp.) at 3), but what is clear is that Dr. Cantor has no "scientific, technical, or other specialized knowledge" regarding the treatment of adolescents with gender dysphoria.[1] *Belville v. Ford Motor Co.*, 919 F.3d 224, 232 (4th Cir. 2019) (emphasis omitted). Defendants claim that because Dr. Cantor has treated adults with gender dysphoria, and because those adults were once children, he is qualified to offer testimony pertaining to adolescents with gender dysphoria. (Dkt. No. 339 (Cantor Opp.) at 3–4.) Such illogical leaps in purported expertise should be rejected by this Court. *See Dura Auto. Sys. of Ind., Inc. v. CTS Corp.*, 285 F.3d 609, 614 (7th Cir. 2002) ("A scientist, however well credentialed he may be, is not permitted to be the mouthpiece of a scientist in a different specialty. That would not be responsible science.").

---

[1] Dr. Cantor also has no experience researching and writing about treatment for transgender adolescents. In the list of sixty-four articles he has authored or co-authored, only one even mentions transgender children, and Dr. Cantor was not a primary author of the article and did not himself carry out any portion of the study. (Dkt. No. 321-1 (Cantor Rep.) ¶¶ 71–75; Dkt. No. 321-2 (Cantor Dep. Tr.) at 102:8-14.)

As recently as last month, a district court found Dr. Cantor unqualified to provide testimony in a case about transgender minors for the same reasons that B.P.J. moves to exclude his testimony in the present case. *Eknes-Tucker v. Marshall*, No. 22 Civ. 184, 2022 WL 1521889 (M.D. Ala. May 13, 2022).[2] "[T]he [c]ourt gave his testimony regarding the treatment of gender dysphoria in minors very little weight" as Dr. Cantor admitted that: "(1) his patients are, on average, thirty years old; (2) he had never provided care to a transgender minor under the age of sixteen; (3) he had never diagnosed a child or adolescent with gender dysphoria; (4) he had never treated a child or adolescent for gender dysphoria; (5) he had no personal experience monitoring patients receiving transitioning medications; and (6) he had no personal knowledge of the assessments or treatment methodologies used at any Alabama gender clinic." *Id.* at *5.

This Court should similarly reject Dr. Cantor's purported qualifications.

**B.     Dr. Cantor's Opinions Fall Outside The Scope Of The Parties' Dispute.**

Even if Dr. Cantor were qualified to testify about the treatment of gender dysphoria in adolescents—which he is not—that testimony is irrelevant to the issues in this case. This is a case about whether B.P.J. can participate on the same cross-country and track-and-field teams as the other girls at her school. There is no factual dispute that B.P.J. is a transgender girl who has socially transitioned and is recognized as a girl by her family, her medical providers, and her school. (Dkt. No. 358 (Pl.'s Reply in Support of Statement of Undisputed Facts) ¶¶ 1–11.) There is no factual dispute that B.P.J. has received a diagnosis of gender dysphoria and is receiving puberty-delaying medication, and, as a result, will not experience the physiological changes accompanying typical male puberty. (*Id.* ¶¶ 12–17, 89.)

---

[2] While *Eknes-Tucker* was decided after an evidentiary hearing at the preliminary injunction stage, the same reasons for excluding Dr. Cantor's testimony apply equally here.

Strikingly, Defendants claim that "B.P.J. is[] turn[ing] this into a case about the nature of gender identity, therapies for gender dysphoria, and benefits or harms asserted to follow from providing or withholding 'affirmation' or other therapies." (Dkt. No. 339 (Cantor Opp.) at 18.) In fact, Defendants are the ones who dramatically increased the scope and burden of discovery in this case by disclosing experts who attacked the safety and efficacy of generally accepted standards of care. (Dkt. No. 325-1 (Levine Rep.); Dkt. No. 321-1 (Cantor Rep.).) Defendants deposed B.P.J.'s medical providers, Dr. Kacie Kidd and Dr. Gerald Montano, about the safety of gender-affirming care and their respective patient protocols, and sought extensive discovery from her mental health provider as well. Defendants also questioned B.P.J.'s father on this topic. (*See, e.g.*, Dkt. No. 289-16 (Pepper Dep. Tr.) at 177:3-13) (questioning B.P.J.'s father about any risks involving in puberty-delaying treatment); *see also id.* at 177:15-16 ("So you would agree that there are long-term ramifications for puberty blockers . . . ?"); *id.* at 178:1-2 ("Have you discussed the long-term ramifications of taking puberty blockers with BPJ?"); *id.* at 178:10-20 (questioning Mr. Pepper about the risks of hormone therapy).) But this does not make Dr. Cantor's testimony any more relevant to this case.

Defendants attempt to position Dr. Cantor as a rebuttal witness to counter information presented in B.P.J.'s Complaint and expert declarations regarding B.P.J.'s diagnosis and treatment. (Dkt. No. 339 (Cantor Opp.) at 14.) But the undisputed facts that B.P.J. was diagnosed with gender dysphoria and has received puberty-delaying treatment do not necessitate responses about the propriety of that diagnosis or the safety and efficacy of the treatment received. Defendants themselves admit that H.B. 3293 does not "prohibit or favor any particular treatment for gender dysphoria or deny eligibility for girls' or women's athletics, based on what treatment path for gender dysphoria a particular student may follow." (*Id.*); *see, e.g.*, *Edwards v. Ethicon, Inc.*, No.

5

12 Civ. 9972, 2014 WL 3361923, at *15 (S.D. W.Va. July 8, 2014) (excluding expert opinion about complications future patients might experience as irrelevant to the plaintiff's claims). They further state that what is relevant is whether B.P.J. has any athletic advantage over her cisgender female peers, and whether there is any evidence of injury to cisgender girls by the inclusion of transgender girls in school athletics. (Dkt. No. 339 (Cantor Opp.) at 14.) Dr. Cantor's testimony speaks to none of these purported justifications.

Dr. Cantor's opinion that providing gender-affirming care to transgender youth does not produce better mental health outcomes and is not the accepted standard of care is also not relevant to this Court's consideration of whether West Virginia can categorically ban transgender girls and women from girls' and women's school-sports teams. Defendants attempt to characterize Dr. Cantor's opinions by stating, without any support, that "Dr. Cantor documents that social transition (a psychotherapeutic intervention which B.P.J. demands the State actively participate in by allowing students to participate in sports based on gender identity rather than sex) has not been shown to improve mental or physical health, nor to decrease the risk of suicide." (Dkt. No. 339 (Cantor Opp.) at 16.) Defendants further position him as testifying to the "critical" understanding of "just how much weight should be accorded to allegations of 'harm' or 'suicide' if eligibility for female sports remains defined by [sex assigned at birth]." (*Id*. at 18.) But Dr. Cantor makes no effort to weigh such concerns in his report, is unable to cite any evidence regarding measurable harms or suicidality rates, and instead proposes a blanket withholding of social transition in prepubertal children with gender dysphoria. (Dkt. No. 321-1 (Cantor Rep.) ¶¶ 88–94; Dkt. No. 321-2 (Cantor Dep. Tr.) at 210:2-25.) Defendants should not be permitted to mischaracterize B.P.J.'s as-applied challenge and the Court should exclude Dr. Cantor's irrelevant and inaccurate

opinions (some of which Defendants' own expert, Stephen B. Levine, disagrees with[3]) regarding the permissibility of social transition.

Defendants similarly attempt to rewrite the relevance of Dr. Cantor's testimony as pertaining to what "B.P.J.'s Complaint and experts represent to this court[:] that 'affirmation' is the only accepted response to gender dysphoria in young people." (Dkt. No. 339 (Cantor Opp.) at 16.) Defendants sorely misrepresent B.P.J.'s arguments in this case. Instead of defending H.B. 3293 based on the asserted governmental interests in promoting equal athletic opportunity and safety, the State has launched an attack on B.P.J.'s identity and the care she receives. (Dkt. No. 305 (State MSJ Opp.) at 1–3, 8–9, 25–26.) B.P.J.'s expert, Dr. Deanna Adkins, simply explained that "[e]xperiences of discrimination and gender-minority stress associated with rejection and non-affirmation are correlated with suicidal ideation[.]" (Dkt. No. 307-2 (Adkins Rep.) ¶ 22; *see also id.* at 2 n.2 (citing an advance draft of the next version of World Professional Association for Transgender Health Standards of Care ("WPATH SOC")).) Her testimony draws from the standard of care that is widely accepted by the medical community,[4] as acknowledged by the Fourth Circuit in *Grimm v. Gloucester County School Board*, 972 F.3d 586 (4th Cir. 2020), *as amended* (Aug. 28, 2020), (noting that the standards of care for treating gender dysphoria "[d]eveloped by the [WPATH] . . . represent the consensus approach of the medical and mental

---

[3] Dr. Cantor opposes allowing transgender children to live in accordance with their gender identity (Dkt. No. 321-2 (Cantor Dep. Tr.) at 210:2-25), but another of Defendants' proffered experts, Stephen B. Levine, "cooperate[s] with" social transition and even has supported "people who already had social transition . . . in the face of their parents' objection." (Dkt. No. 325-2 (Levine Dep. Tr.) at 141:7-11.)

[4] All major medical associations endorse and follow the treatment protocols established by the WPATH in the SOC Version 7. (Dkt No. 321-5 (Understanding the Wellbeing of LGBTQI+ Populations) at 361.)

health community"). Defendants should not be permitted to misrepresent B.P.J.'s claims in this case.

Defendants also distort Dr. Cantor's testimony regarding the accepted protocols for treating gender dysphoria by stating that "Dr. Cantor explains the (extremely) limited scientific basis" of statements by the WPATH SOC. (Dkt. No. 339 (Cantor Opp.) ¶ 5.) Although Dr. Cantor's testimony regarding the WPATH SOC is not relevant to the issues in this case, his actual testimony, without explanation, is that there is wide disagreement about the appropriate treatment for gender dysphoria, and that the WPATH SOC are not accepted by the scientific community of which he claims to be a part. (Dkt. No. 321-1 (Cantor Rep.) ¶ 8(e).) As the Fourth Circuit recognized in *Grimm*, beyond the WPATH SOC, "[t]here are no other competing, evidence-based standards that are accepted by any nationally or internationally recognized medical professional groups." 972 F.3d 586 (4th Cir. 2020); *see also Edmo v. Corizon, Inc.*, 935 F.3d 757, 769 (9th Cir. 2019) ("'[B]ased on the best available science and expert professional consensus,' the WPATH [SOC] provide 'flexible clinical guidelines' 'to meet the diverse health care needs of[]transgender[] and gender nonconforming people.'")

\*\*\*

Dr. Cantor's opinions are simply not relevant to any purported justification Defendants have offered for H.B. 3293, which focus on athletic opportunities and notions of protecting women in sports. *See* W. Va. Code § 18-2-25d(a)(5) (2021) (offering sole justification of "promot[ing] equal athletic opportunities for the female sex"); (Dkt. No. 290 (Pl's Statement of Undisputed Facts) ¶¶ 48, 59 (State's purported justifications are limited to "protect[ing]" women in sports and complying with Title IX).) Indeed, Dr. Cantor disclaimed any intent to offer opinions about any

8

of those issues.[5] For the reasons articulated above, Dr. Cantor's opinions on matters relating to the care of transgender children should be excluded under *Daubert*.

## II. Dr. Cantor's Assertions Regarding Desistance in Adolescents, "Affirmation on Demand," And Causes of Gender Dysphoria Are Not Reliable.

Expert testimony should only be admitted if its methodology is sufficiently reliable. *Sardis v. Overhead Door Corp.*, 10 F.4th 268, 281 (4th Cir. 2021). As B.P.J. explained in her motion, Dr. Cantor's opinions fall far short of the reliability standard. (Dkt. No. 320 (Cantor *Daubert* Mot.) at 12–19.) One such unreliable opinion presented by Dr. Cantor is that "the majority" of prepubertal children who experience gender dysphoria will cease to be transgender. (Dkt. No. 321-2 (Cantor Dep. Tr.) at 191:11-24; 212:19–213:3 ("[R]esearch has unanimously shown that the majority of children with gender dysphoria desist—that is, cease to experience such dysphoria by or during puberty.").) Defendants argue (and provide no support for the notion) that children and adolescents diagnosed with gender dysphoria "exhibit high levels of desistence if left to the natural maturation process free from social and medical transition." (Dkt. No. 339 (Cantor Opp.) at 19.) Dr. Cantor, without any evidence, claims that "only a minority of gender dysphoric children persist in feeling gender dysphoric in the first place" and that providing gender-affirming care "increases the probability of unnecessary transition and unnecessary medical risks." (Dkt. No. 321-2 (Cantor Dep. Tr.) at 213:22–214:11.) Dr. Cantor has no experience in his own practice with persistence or desistence in children with gender dysphoria, and he does not offer any support for this

---

[5] Dr. Cantor is offering no opinion regarding the extent to which a person assigned male at birth purportedly has any athletic advantage, (Dkt. No. 321-2 (Cantor Dep. Tr.) at 161:4-8); the extent to which transgender girls or women have any supposed athletic advantage, (*id*. at 223:3-10); or whether H.B. 3293 should apply to college athletics, (*id*. at 178:18-23). Similarly, when asked whether he is "offering an opinion with respect to whether H.B. 3293 serves the interest of protecting women's safety in female athletic sports[,]" Dr. Cantor responded that he "[had not] been asked that, no." (*Id*. at 178:11-14.)

proposition from practitioners who actually treat gender dysphoria in children. (*Id.* at 215:17–217:18.)

Dr. Cantor instead speculates that pediatric endocrinologists and youth mental health providers—individuals who, unlike him, actually work with gender dysphoric youth—are providing affirming treatment without following rigorous treatment protocols. Unsurprisingly, Dr. Cantor was unable to identify a single instance of a provider providing "affirmation on demand," and his personal opinion is inadequate to support any conclusion that such practice is occurring. (*Id.* at 182:17-21, 183:16-24.) He was similarly unable to identify any scientific literature that demonstrates that providers are providing "affirmation on demand" to children and adolescents with gender dysphoria. (*Id.* at 184:11-14); *see, e.g.*, *Cooper v. Smith & Nephew, Inc.*, 259 F.3d 194, 200 (4th Cir. 2001) (affirming the exclusion of an expert because he "asserted what amounted to a wholly conclusory finding based upon his subjective beliefs rather than any valid scientific method"). Dr. Cantor's opinions regarding desistance and "affirmation on demand" should be excluded.

In advocating for the withholding of social and medical interventions in gender dysphoric youth, Dr. Cantor also criticizes studies showing positive outcomes for transgender children who access puberty-delaying treatment as unreliable because there is "no method of separating how much of its result was due to psychotherapy versus due to medical intervention." (Dkt. No. 321-2 (Cantor Dep. Tr.) at 252:6-10; Dkt. No. 339 (Cantor Opp.) at 18 ("Dr. Cantor explains how various published studies lacked important controls to exclude possible 'confounding' effects, and so cannot tell us whether reported mental health improvements were due to social or medical 'transition' (including cross-sex hormones), to the concurrent psychotherapy received by the patients, to 'natural maturation' during the teen years, or to some combination of these.").) Dr.

10

Cantor's theory that "it remains entirely *plausible* that the psychotherapy [alone without] puberty blockers caused the improvements" in the mental health of transgender adolescents is pure speculation that Defendants agree has never been tested. (Dkt. No. 321-1 (Cantor Rep.) ¶ 54 (emphasis added).) But plausibility does not satisfy any standard for an expert opinion, and Defendants' attempt to frame Dr. Cantor's testimony as "explaining that there were multiple 'plausible' explanations of mental health improvements," (Dkt. No. 339 (Cantor Opp.) at 18 n.18), only underscores the lack of reliability for his opinion. (*See, e.g.*, Dkt. No. 321-2 (Cantor Dep. Tr.) at 233:1-10, 229:16-22.) Such speculative opinions promulgated by Dr. Cantor should be excluded, especially given the Fourth Circuit's holding that "proffered evidence that has a greater potential to mislead than to enlighten should be excluded." *In re Lipitor (Atorvastatin Calcium) Mktg., Sales Pracs. & Prod. Liab. Litig. (No II) MDL 2502*, 892 F.3d 624, 632 (4th Cir. 2018) (quoting *Westberry v. Gislaved Gummi AB*, 178 F.3d 257, 261 (4th Cir. 1999)).

Defendants additionally argue that Dr. Cantor "rebuts the assertions of B.P.J. and B.P.J.'s experts that transgender identity is inherent and immune to outside influence." (Dkt. No. 339 (Cantor Opp.) at 21.) Defendants characterize such testimony as "background information," (*id*.), but Dr. Cantor's views, which pathologize transgender people in stark contradiction to the Fourth Circuit's recognition that being transgender is a normal variation in human development, are unsupported, harmful, and unfit for use by the Court.[6] Dr. Cantor testified that only three factors—"autogynephilia, homosexuality, or a mistake they've made as a . . . younger individual"—can "motivate a person to want to live as the other sex" (Dkt. No. 321-2 (Cantor Dep. Tr.) at 143:8-

---

[6] The Fourth Circuit has explained that "just like being cisgender, being transgender is natural and is not a choice." *Grimm*, 972 F.3d at 594. The Fourth Circuit also acknowledged that "[b]eing transgender is also not a psychiatric condition, and implies no impairment in judgment, stability, reliability, or general social or vocational capabilities." *Id.* (quotation marks omitted).

11

10; 145:7-15), and that individuals cannot be transgender unless they fall into one of his three purported pathways. Defendants do not—and cannot—offer any evidence to rebut B.P.J.'s contention that Dr. Cantor's opinions are harmful and unreliable outliers in the scientific community, and his testimony should thus be excluded. (Dkt. No. 339 (Cantor Opp.) at 21.)

## CONCLUSION

For the foregoing reasons, B.P.J.'s motion to exclude the testimony of James M. Cantor should be granted.

Dated: June 2, 2022

Joshua Block*
AMERICAN CIVIL LIBERTIES UNION
FOUNDATION
125 Broad St.
New York, NY 10004
Phone: (212) 549-2569
jblock@aclu.org

Avatara Smith-Carrington*
LAMBDA LEGAL
3500 Oak Lawn Avenue, Suite 500
Dallas, TX 75219
Phone: (214) 219-8585
asmithcarrington@lambdalegal.org

Carl Charles*
Tara Borelli*
LAMBDA LEGAL
158 West Ponce De Leon Ave., Ste. 105
Decatur, GA 30030
Phone: (404) 897-1880
ccharles@lambdalegal.org

Sruti Swaminathan*
LAMBDA LEGAL
120 Wall Street, 19th Floor
New York, NY 10005
Phone: (212) 809-8585
sswaminathan@lambdalegal.org

Andrew Barr*
COOLEY LLP
1144 15th St. Suite 2300
Denver, CO 80202-5686
Phone: (720) 566-4000
abarr@cooley.com

Respectfully submitted,
/s/ *Loree Stark*

Loree Stark (Bar No. 12936)
Nick Ward (Bar No. 13703)
AMERICAN CIVIL LIBERTIES UNION OF WEST
VIRGINIA FOUNDATION
P.O. Box 3952
Charleston, WV 25339-3952
Phone: (914) 393-4614
lstark@acluwv.org

Kathleen Hartnett*
Julie Veroff*
Zoë Helstrom*
COOLEY LLP
3 Embarcadero Center, 20th Floor
San Francisco, CA 94111
Phone: (415) 693-2000
khartnett@cooley.com

Katelyn Kang*
Valeria M. Pelet del Toro*
COOLEY LLP
55 Hudson Yards
New York, NY 10001-2157
Phone: (212) 479-6000
kkang@cooley.com

Elizabeth Reinhardt*
COOLEY LLP
500 Boylston Street, 14th Floor
Boston, MA 02116-3736
Phone: (617) 937-2305
ereinhardt@cooley.com

**Visiting Attorneys*
*Attorneys for Plaintiff*

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA
CHARLESTON DIVISION

| | |
|---|---|
| B.P.J. by her next friend and mother, HEATHER JACKSON,<br><br>*Plaintiff*,<br><br>v.<br><br>WEST VIRGINIA STATE BOARD OF EDUCATION, HARRISON COUNTY BOARD OF EDUCATION, WEST VIRGINIA SECONDARY SCHOOL ACTIVITIES COMMISSION, W. CLAYTON BURCH in his official capacity as State Superintendent, DORA STUTLER in her official capacity as Harrison County Superintendent, and THE STATE OF WEST VIRGINIA,<br><br>*Defendants*,<br><br>and<br><br>LAINEY ARMISTEAD,<br><br>*Defendant-Intervenor*. | Civil Action No. 2:21-cv-00316<br><br>Hon. Joseph R. Goodwin |

**CERTIFICATE OF SERVICE**

I, Loree Stark, do hereby certify that on this 2nd day of June, 2022, I electronically filed a true and exact copy of ***Plaintiff's Reply Memorandum of Law in Support of Motion to Exclude the Expert Testimony of James M. Cantor*** with the Clerk of Court and all parties using the CM/ECF System.

/s/ Loree Stark
Loree Stark
West Virginia Bar No. 12936

14