IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA
CHARLESTON DIVISION

| | |
|---|---|
| B.P.J. by her next friend and mother, HEATHER JACKSON,<br><br>         *Plaintiff*,<br><br>v.<br><br>WEST VIRGINIA STATE BOARD OF EDUCATION, HARRISON COUNTY BOARD OF EDUCATION, WEST VIRGINIA SECONDARY SCHOOL ACTIVITIES COMMISSION, W. CLAYTON BURCH in his official capacity as State Superintendent, DORA STUTLER in her official capacity as Harrison County Superintendent, and THE STATE OF WEST VIRGINIA,<br><br>         *Defendants*,<br><br>   and<br><br>LAINEY ARMISTEAD,<br><br>         *Defendant-Intervenor*. | Civil Action No. 2:21-cv-00316<br><br>Hon. Joseph R. Goodwin |

**PLAINTIFF'S REPLY MEMORANDUM OF LAW IN SUPPORT OF MOTION TO EXCLUDE THE EXPERT TESTIMONY OF STEPHEN B. LEVINE**

## TABLE OF CONTENTS

**Page**

INTRODUCTION ................................................................................................. 1

ARGUMENT ....................................................................................................... 3

I.     Dr. Levine's Opinions Are Not Relevant. ......................................... 3

      A.    Dr. Levine's Opinions About The Standards Of Care For Transgender Adolescents Are Irrelevant And Should Be Excluded.......... 3

      B.    Dr. Levine Admitted That He Does Not Understand How His Testimony Is Being Used In This Case...................................... 4

II.    Dr. Levine Is Not Qualified To Testify About "Biological Sex" Or Treating Gender Dysphoria In Prepubertal Children. ........................... 5

III.   Dr. Levine's Testimony Regarding Treatment For Gender Dysphoria In Adolescents Is Not Reliable And Should Be Excluded. ..................................... 11

      A.    Defendants Misrepresent The Applicable Legal Standard For Reliability................................................................. 11

      B.    Dr. Levine's Claims Regarding "Rapid Affirmation" Are Not Reliable. ................................................................... 12

      C.    Dr. Levine's Claim That There Is No Consensus Regarding Treatment Of Gender Dysphoria In Adolescents Is Not Reliable. .......... 16

      D.    Dr. Levine's Opinion That Gender-Confirming Care Is Experimental And Unethical Is Unreliable............................. 17

CONCLUSION.................................................................................................. 18

# TABLE OF AUTHORITIES

**Page(s)**

## Cases

*Belville v. Ford Motor Co.*,
  919 F.3d 224 (4th Cir. 2019) .............................................................................2, 12

*Daubert v. Merrell Dow Pharms., Inc.*,
  509 U.S. 578 (1993)............................................................................... *passim*

*Dura Auto. Sys. of Ind., Inc. v. CTS Corp.*,
  285 F.3d 609 (7th Cir. 2002) .................................................................................6

*Grimm v. Gloucester Cnty. Sch. Bd.*,
  400 F. Supp. 3d 444 (E.D. Va. 2019) ...............................................................4, 16

*Hennessy-Waller v. Snyder*,
  529 F. Supp. 3d 1031 (D. Ariz. 2021) ....................................................................9

*Kosilek v. Spencer*,
  774 F.3d 63 (1st Cir. 2014)....................................................................................9

*Kumho Tire Co., Ltd. v. Carmichael*,
  526 U.S. 137 (1999)............................................................................................12

*Mod. Auto. Network, LLC v. E. All. Ins. Co.*,
  416 F. Supp. 3d 529 (M.D.N.C. 2019) ...................................................................5

*Nease v. Ford Motor Co.*,
  848 F.3d 219 (4th Cir. 2017) ............................................................................1, 12

*NOA, LLC v. El Khoury*,
  No. 14 Civ. 114, 2017 WL 11566799 (E.D.N.C. Sept. 5, 2017)..............................5

*Norsworthy v. Beard*,
  87 F. Supp. 3d 1164 (N.D. Cal. 2015) ..................................................................10

*O'Conner v. Commonwealth Edison Co.*,
  807 F. Supp. 1376 (C.D. Ill. 1992) .....................................................................2, 6

*Sardis v. Overhead Door Corp.*,
  10 F.4th 268 (4th Cir. 2021) ................................................................................11

*Viva Healthcare Packaging USA Inc. v. CTL Packaging USA Inc.*,
  197 F. Supp. 3d 837 (W.D.N.C. 2016) ...................................................................3

**TABLE OF AUTHORITIES**
**(continued)**

Page(s)

**Other Authorities**

Fed. R. Evid. 702(b), (d) .................................................................................................2

Federal Rule of Evidence 403 .......................................................................................18

Federal Rule of Evidence 702 ..............................................................................1, 11, 17

https://www.judiciary.uk/wp-content/uploads/2021/09/Bell-v-Tavistock-
    judgment-170921.pdf.............................................................................................10

Plaintiff B.P.J. respectfully submits this reply memorandum of law in support of her motion to exclude the proffered expert testimony of Stephen B. Levine, M.D., from consideration at summary judgment or trial.

## INTRODUCTION

Under Federal Rule of Evidence 702, expert testimony must be both "relevant" to the case at hand and "reliable." *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 578, 597 (1993). Dr. Levine's testimony is neither, and exclusion is thus proper.

This case is about whether a twelve-year-old transgender girl can participate on the girls' cross-country and track teams at her middle school, and whether the law at issue, H.B. 3293, violates her rights under the Equal Protection Clause and Title IX. Defendants contend that H.B. 3293 is justified by a state interest in protecting women's sports, following Title IX, and protecting women's safety in female athletic sports. (Dkt. No. 290 (Pl's Statement of Undisputed Facts ("SUF")) ¶ 59.) But Dr. Levine's testimony does not speak to any of those issues. Rather, Dr. Levine offers his opinions on the standards of care for transgender adolescents and gender-affirming medical care. Those opinions will not aid this Court in resolving whether H.B. 3293 as applied to B.P.J. violates the Equal Protection Clause and Title IX, and so are irrelevant. *See Nease v. Ford Motor Co.*, 848 F.3d 219, 229 (4th Cir. 2017).

In an effort to avoid exclusion, Defendant-Intervenor and Defendant State of West Virginia's ("State") (collectively, "Defendants") attempt to rehabilitate Dr. Levine's testimony by rewriting the record and misconstruing the relevant *Daubert* standard. But this inappropriate attempt at revisionist history cannot overcome Dr. Levine's (and even Defendants') own concessions in this case. Defendants do not dispute (and indeed, concede) that Dr. Levine's opinions are not tied to the relevant facts of this case. (*See* Dkt. No. 341 (Levine Opp.) at 3–4.) Dr.

Levine admittedly has no understanding of the law being challenged, and is not an expert with respect to issues pertaining to transgender athletes like Plaintiff B.P.J. (Dkt. No. 324 (Levine *Daubert* Mot.) at 7.) His testimony is thus irrelevant.

Nor does Dr. Levine have the requisite qualifications to opine on the topics that he offers, relevant or not. "[N]o medical doctor is automatically an expert in every medical issue merely because he or she has graduated from medical school or has achieved certification in a medical specialty." *O'Conner v. Commonwealth Edison Co*., 807 F. Supp. 1376, 1390 (C.D. Ill. 1992), *aff'd*, 13 F.3d 1090 (7th Cir. 1994). But Dr. Levine's status as a "medical doctor" is essentially all that Defendants offer to support their claim that Dr. Levine is qualified to offer an expert opinion on the meaning of "biological sex." (Dkt. No. 341 (Levine Opp.) at 5.) This is plainly insufficient.

Dr. Levine is also unqualified to offer expert testimony regarding the standard of care for gender dysphoria for prepubertal children. Defendants do not dispute that Dr. Levine's specialty is in adult psychiatric care, and they also do not dispute that he lacks any experience treating prepubertal children with gender dysphoria. (Dkt. No. 325-1 (Levine Rep.) ¶ 5.) Indeed, the fact that multiple courts have discredited Dr. Levine's testimony in recent years, and that his opinions are outliers among all the major medical associations in the United States, makes his testimony "at a minimum, suspect." *Belville v. Ford Motor Co*., 919 F.3d 224, 234 (4th Cir. 2019).

Finally, Dr. Levine's testimony regarding the treatment of gender dysphoria and what he calls "rapid affirmation" is not reliable. Though Defendants now attempt to walk back Dr. Levine's claims—thereby contradicting the clear testimony of their own expert—this belated attempt at rehabilitation does not change the reality that Dr. Levine did not base his opinions in this case "on sufficient facts or data" and did not "reliably appl[y] the principles and methods to the facts of the case." Fed. R. Evid. 702(b), (d).

For these reasons, and those outlined below and in Plaintiff's memorandum of law in support of her motion (Dkt. No. 324 (Levine *Daubert* Mot.)), Dr. Levine's testimony should be excluded.

## ARGUMENT

### I.   Dr. Levine's Opinions Are Not Relevant.

#### A.   Dr. Levine's Opinions About The Standards Of Care For Transgender Adolescents Are Irrelevant And Should Be Excluded.

"The test for relevance, or fit, considers whether expert testimony proffered in the case is sufficiently tied to the facts of the case that it will aid the jury in resolving a factual dispute." *Viva Healthcare Packaging USA Inc. v. CTL Packaging USA Inc.*, 197 F. Supp. 3d 837, 846 (W.D.N.C. 2016) (cleaned up). Dr. Levine's testimony is not tied to any material, factual disputes in this case.

As noted in Plaintiff's Statement of Material Undisputed Facts and Reply, there is no factual dispute that B.P.J. is a transgender girl who has socially transitioned and is recognized as a girl by her family, her medical providers, and her school. (Dkt. No. 358 (Pl's SUF Reply) ¶¶ 1–11.) There is also no factual dispute that B.P.J. has received a diagnosis of gender dysphoria and is receiving puberty-delaying medication, and, as a result, will not experience the physiological changes accompanying typically male puberty. (*Id.* ¶¶ 13–17, 89.) Dr. Levine offers no testimony rebutting (or even discussing) these material, undisputed facts.[1]

Defendants incorrectly claim that B.P.J. has "dragg[ed] these issues" of care for transgender adolescents "into litigation," such that Dr. Levine is a necessary "rebuttal expert." (Dkt. No. 341 (Levine Opp.) at 20.) But as explained at length in Plaintiff's reply memorandum

---

[1] Indeed, Defendants concede that Dr. Levine is not offering any opinions "concerning any aspect of athletic performance." (Dkt. No. 341 (Levine Opp.) at 3–4.)

of law in support of her motion to exclude the testimony of James M. Cantor, it is *Defendants* who focused their discovery inquiries and expert testimony on the safety and efficacy of care for transgender adolescents, despite this Court's earlier admonition that "what is or should be the default treatment for transgender youth is not the question before the court." (Dkt. No. 67 (PI Op.) at 3 n.4.) Like Gavin Grimm, B.P.J. has submitted evidence "to demonstrate the fact that [she] was diagnosed with gender dysphoria and received treatment pursuant to that diagnosis," not for the court "to determine whether that diagnosis was medically sound" or "whether it was medically necessary." *Grimm v. Gloucester Cnty. Sch. Bd.*, 400 F. Supp. 3d 444, 454 (E.D. Va. 2019), *aff'd*, 972 F.3d 586 (4th Cir. 2020). Yet Defendants have nonetheless propounded discovery and proffered expert testimony intended to call into question whether B.P.J.'s treatment was sound and necessary. Indeed, "[t]he great bulk of testimony proffered by Dr. Levine" is focused on attacking the soundness of what Defendants call "affirmation only" treatment. (Dkt. No. 341 (Levine Opp.) at 20.) But again, "what is or should be the default treatment for transgender youth is not the question before the court." (Dkt. No. 67 (PI Op.) at 3 n.4.) Dr. Levine's testimony about rapid affirmation care thus is not relevant.

**B.    Dr. Levine Admitted That He Does Not Understand How His Testimony Is Being Used In This Case.**

Dr. Levine has no understanding of the law being challenged and is not an expert with respect to issues pertaining to transgender athletes like Plaintiff B.P.J. (Dkt. No. 324 (Levine *Daubert* Mot.) at 7.) Defendants do not dispute this point. Instead, Defendants vaguely assert that Dr. Levine "need not be precisely informed about all the details" of the case to offer his opinion. (Dkt. No. 341 (Levine Opp.) at 10.) But Dr. Levine is not merely "not precisely informed"—he admittedly has *no* understanding of the legal or factual issues involved in this case. (Dkt. No. 324

(Levine *Daubert* Mot.) at 7 (admitting that he does not "fully understand that" his testimony will be used against the participation of transgender students in sports and that he does not "know the details of this particular case").) Where an expert's testimony is untethered to the facts of a particular case—as Dr. Levine's testimony is here—his testimony is properly excluded as irrelevant. *See NOA, LLC v. El Khoury*, No. 14 Civ. 114, 2017 WL 11566799, at *11 (E.D.N.C. Sept. 5, 2017) (excluding expert testimony where expert was unfamiliar with facts of the case).[2]

For the foregoing reasons, as well as those provided in Plaintiff's opening brief, Dr. Levine's testimony is irrelevant, and should be excluded.

## II.    Dr. Levine Is Not Qualified To Testify About "Biological Sex" Or Treating Gender Dysphoria In Prepubertal Children.

Dr. Levine lacks the relevant experience and expertise needed to provide an expert opinion on either the scientific meaning of "biological sex" or the treatment of gender dysphoria in prepubertal children. (*See* Dkt. No. 324 (Levine *Daubert* Mot.) at 8–13); *Mod. Auto. Network, LLC v. E. All. Ins. Co.*, 416 F. Supp. 3d 529, 537 (M.D.N.C. 2019), *aff'd,* 842 F. App'x 847 (4th Cir. 2021).

First, Dr. Levine does not have the appropriate expertise to testify on the meaning of "biological sex." Dr. Levine's report and testimony confirm as much. When asked about the bases for his assertions in his expert report concerning definitions of "biological sex" and "sex," (Dkt.

---

[2] Defendants appear to dispute the fact that Dr. Levine opposed the State's usage of a declaration that he had submitted in a previous case in support of their opposition to Plaintiff's motion for a preliminary injunction. (*See* Dkt. No. 341 (Levine Opp.) at 10.) But Dr. Levine's deposition testimony could not be clearer: when asked whether he had "any objection to [his] declaration from one case being submitted in another case without [his] approval," Dr. Levine admitted that he "ha[d] an objection for people using [his] previous testimony" because "every case is somewhat different." (Dkt. No. 325-2 (Levine Dep. Tr.) at 68:9–69:25.)

No. 325-1 (Levine Rep.) ¶ 20 ("Sex is not 'assigned at birth' by humans visualizing the genitals of a newborn; it is not imprecise. Rather, it is clear, binary, and determined at conception.")), Dr. Levine stated that he relied on a "paper" ("Bhargava 2021"), (Dkt. No. 325-2 (Levine Dep. Tr.) at 196:8–198-1). But that paper notes that "[s]ex differences are caused by . . . sex hormones, genes, and environment," and so does not support Dr. Levine's own testimony that sex is "clear, binary, and determined at conception." (Dkt. No. 324 (Levine *Daubert* Mot.) at 11.) His report also relies on two one-page notices from the National Institutes of Health to expound his arguments about the "scientific facts" of sex, (Dkt. No. 325-1 (Levine Rep.) ¶¶ 20–21), but neither defines "biological sex," (Dkt. No. 324 (Levine *Daubert* Mot.) at 10.)

Defendants do not address these clear deficiencies in their opposition, and instead suggest that any "trained M.D.[] with all the education in human biology, physiology, and genetics that medical school and a pre-med course of studies" who has treated transgender patients is necessarily qualified to speak to the scientific understanding of "biological sex." (Dkt. No. 341 (Levine Opp.) at 5.) But the simple facts of having "graduated from medical school" and pursued "a medical specialty" do not themselves make Dr. Levine an expert in biological sex or any other "medical issue." *See O'Conner*, 807 F. Supp. at 1390. Defendants' suggestion otherwise misstates the applicable standard here. *Dura Auto. Sys. of Ind., Inc. v. CTS Corp.*, 285 F.3d 609, 614 (7th Cir. 2002) ("The *Daubert* test must be applied with due regard for the specialization of modern science. A scientist, however well credentialed he may be, is not permitted to be the mouthpiece of a scientist in a different specialty."). Dr. Levine has failed to demonstrate that any of his purported expertise on "biological sex" comes from his own study of or even familiarity with the applicable scientific literature or the communities that do understand the term. Instead, he relies on evidence

that either does not speak to or contradicts his own testimony. Dr. Levine thus is not qualified to opine on the meaning of "biological sex."

Second, as B.P.J. explained previously, Dr. Levine specializes in adult psychiatric care, not child or adolescent psychiatric care, and his report and testimony further affirm that he has almost *zero* experience treating prepubertal children with gender dysphoria. (Dkt. No. 325-1 (Levine Rep.) ¶ 5.) Defendants do not deny Dr. Levine's own testimony that, over his 48-year-career, he has seen approximately six prepubertal children and fifty adolescent children *total*. (Dkt. No. 325-2 (Levine Dep. Tr.) at 87:1-7, 11–13.) Instead, Defendants assert that Dr. Levine, as "co-director [of a gender identity clinic] . . . has continually exercised supervisory responsibility for junior psychiatrists and psychologists, who collectively treat patients of all ages." (Dkt. No. 341 (Levine Opp.) at 6.) But they offer no citation to the record for that claim, nor any evidence indicating how many prepubertal or adolescent patients those junior providers have treated or explaining the nature of Dr. Levine's supervision, let alone any evidence suggesting that Dr. Levine gained personal expertise in treating prepubertal children with gender dysphoria via such supervision.

In addition to his very limited experience in treating prepubertal children and adolescents, Dr. Levine's own research and publications do not focus on issues pertaining to transgender adolescents. Accordingly, Dr. Levine's report primarily cites to publications of his that do not focus on prepubertal children or adolescents. (Dkt. No. 325-1 (Levine Rep.).) Defendants nonetheless argue that Dr. Levine has authored or co-authored "*multiple*" articles relating to transgender children and adolescents, but cite to only *three* articles out of 180 published by Dr. Levine, two of which Plaintiff discussed in her motion to exclude. (Dkt. No. 341 (Levine Opp.) at 7 (emphasis added).) However, like "Ethical Concerns" and "The Psychiatrist's Role," discussed in Plaintiff's motion, (Dkt. No. 324 (Levine *Daubert* Mot.) at 12), "Informed Consent" and

"Reconsidering Informed Consent" merely reflect Dr. Levine's personal views, rather than the results of his studies or research.

Defendants use their opposition brief to criticize Plaintiff's expert, Dr. Joshua D. Safer, for having limited experience treating prepubertal children. (Dkt. No. 341 (Levine Opp.) at 6.) That criticism is misplaced. Dr. Safer was not retained to provide expert testimony on the treatment of gender dysphoria in prepubertal children and adolescents, but rather to opine on topics relating to the regulation of transgender women playing women's sports and the policies of athletic organizations regarding participation of transgender women. (Dkt. No. 289-25 (Safer Rep.) at 1.) The extent of his experience treating prepubertal children has nothing to do with his qualifications to offer that testimony. Dr. Levine, on the other hand, focuses his opinions on the diagnosis and treatment of gender dysphoria. (Dkt. No. 325-1 (Levine Rep.). at 5–9.) Dr. Levine's very limited experience in treating and caring for transgender prepubertal children and adolescents is thus highly relevant to determining that he is not qualified to offer opinions on that subject.

Contrary to Defendants' suggestion, Dr. Levine's position as the chairman of the World Professional Association of Transgender Health ("WPATH") committee that developed the fifth edition "Standards of Care" for gender dysphoria does not make him qualified to speak to these issues. (Dkt. No. 341 (Levine Opp.) at 7.) There is no indication that Dr. Levine himself had any involvement in the section of the standards relating to gender dysphoria in minors. Indeed, Dr. Levine's own description of that position does not even mention a section on gender dysphoria in minors. (Dkt. No. 325-1 (Levine Rep.) ¶ 5.) Defendants likewise do not point to any record evidence elucidating Dr. Levine's role on a committee commissioned by the Cochrane Collaboration, or on the scope of the expertise that he will provide. (Dkt. No. 341 (Levine Opp.) at 7.) What is clear from the record, however, is that Dr. Levine is not recognized as an expert in

providing treatment to transgender children by his own private employer, who by his own admission does not refer children to him as patients, nor by University Hospitals' LGBTQ and Gender Care Program, which he admitted did not consult with him in the forming of the clinic or in their ongoing work. (Dkt. No. 325-2 (Levine Dep. Tr.) at 113:19–114:4.) He is not qualified under the *Daubert* standard to offer opinions on matters relating to the standards of care of transgender children, and his personal beliefs should not be upheld as evidence in this case.

Unable to show how Dr. Levine is qualified to discuss these two topics, Defendants note that a handful of courts have used Dr. Levine's testimony in other cases concerning transgender individuals. But two of those cases are far afield from the issues in this case and Dr. Levine's proffered testimony. As Defendants acknowledge (Dkt. No. 341 (Levine Opp.) at 9), *Kosilek v. Spencer*, 774 F.3d 63, 69 (1st Cir. 2014), concerned the medically necessary surgery for an incarcerated transgender *adult*, not the treatment of gender dysphoria in prepubertal children or adolescents. And *Hennessy-Waller v. Snyder*, 529 F. Supp. 3d 1031, 1042 (D. Ariz. 2021), *aff'd* 28 F.4th 103, 114–15 (9th Cir. 2022), concerned insurance coverage for chest reconstructive surgery for a teenage boy who is transgender—a procedure not relevant to B.P.J. or the issues in this litigation. The *Hennessy-Waller* court considered Dr. Levine's testimony in concluding, for purposes of a preliminary injunction motion, that the plaintiffs had "not clearly shown [that] the surgery [was] medically necessary" or that it was "safe and effective for correcting or ameliorating their gender dysphoria." *Id.* Defendants also downplay how the U.K. decision that "relied on Dr. Levine's expert submission," (Dkt. No. 341 (Levine Opp.) at 8), was reversed on appeal because

the "inappropriate" lower court decision ignored the principle that "it was for clinicians rather than the court to decide on competence."[3]

As Plaintiff noted in her motion, multiple courts have discredited Dr. Levine's testimony in recent years. Even Defendants concede that a district court "discredited Dr. Levine's expert declaration in a case concerning treatments under prison conditions." (Dkt. No. 341 (Levine Opp.) at 9 (citing *Norsworthy v. Beard*, 87 F. Supp. 3d 1164 (N.D. Cal. 2015)).) Defendants, however, mischaracterize the other three cases that have cast doubt on Dr. Levine's opinions. (Dkt. No. 341 (Levine Opp.) at 9.) For instance, in *Edmo v. Idaho Department of Corrections*, the court dismissed Dr. Levine as an "outlier," reasoned that "[h]is training materials do not reflect opinions that are generally accepted in the field of gender dysphoria," and gave "virtually no weight to the opinions of Defendant's experts." 358 F. Supp. 3d 1103, 1125–26 (D. Idaho 2018), *vacated in part on other grounds sub nom*, *Edmo v. Corizon, Inc.*, 935 F.3d 757 (9th Cir. 2019).[4] Contrary to Defendants' assertions that Dr. Levine's testimony was not discredited in *Brandt v. Rutledge* because he was not "mentioned" in the opinion, (Dkt. No. 341 (Levine Opp.) at 9), the court discounted Dr. Levine's testimony when it found that gender-affirming treatment is supported by medical evidence and may be medically appropriate and necessary when caring for transgender minors. *Compare* 551 F. Supp. 3d 882, 891 (E.D. Ark. 2021) *with* (Dkt. No. 324 (Levine *Daubert* Mot.) at 17–20 (citing Dr. Levine's unreliable and unsupported testimony that gender-affirming care is harmful to adolescents)). The district court in *Hecox v. Little* similarly rejected Dr. Levine's opinion that "gender-affirming policies . . . are instead harmful to transgender individuals" and

---

[3] https://www.judiciary.uk/wp-content/uploads/2021/09/Bell-v-Tavistock-judgment-170921.pdf.
[4] The *Edmo* court noted that Dr. Levine derogatorily compared gender confirmation surgery to "providing augmentation for women distressed about their small breasts" during a training for prison staff on gender confirmation surgery. 358 F. Supp. 3d at 1125.

accepted the plaintiffs' evidence "regarding the harm forcing transgender individuals to deny their gender identity can cause." 479 F. Supp. 3d 930, 977 n.33 (D. Idaho 2020).

For these reasons, Dr. Levine is not qualified to provide an expert opinion on the meaning of "biological sex" or treating gender dysphoria in prepubertal children.

## III. Dr. Levine's Testimony Regarding Treatment For Gender Dysphoria In Adolescents Is Not Reliable And Should Be Excluded.

As B.P.J. explained in her motion to exclude, Dr. Levine's opinions about the standards of care, guidelines, and practices regarding the treatment of gender dysphoria in adolescents are not reliable. (Dkt. No. 324 (Levine *Daubert* Mot.) at 13–22.) Rather than defend the reliability of many of Dr. Levine's claims, Defendants walk them back and instead offer more modest arguments. But these belated concessions do not change the reality that Dr. Levine did not base his opinions in this case "on sufficient facts or data" and did not "reliably appl[y] the principles and methods to the facts of the case." Fed. R. Evid. 702.

### A. Defendants Misrepresent The Applicable Legal Standard For Reliability.

As outlined in Plaintiff's opening brief, Federal Rule of Evidence 702 places "a special gatekeeping obligation" on a trial court to ensure that an expert's testimony is "relevant to the task at hand" and "rests on a reliable foundation." *Daubert*, 509 U.S. at 597; (Dkt. No. 324 (Levine *Daubert* Mot.) at 2–3.) When evaluating whether an expert's methodology is reliable, a court considers, among other things: "(1) whether the expert's theory or technique 'can be (and has been) tested'; (2) 'whether the theory or technique has been subjected to peer review and publication'; (3) 'the known or potential rate of error' inherent in the expert's theory or technique; and (4) whether the expert's methodology is generally accepted in his field of expertise." *Sardis v.*

*Overhead Door Corp.*, 10 F.4th 268, 281 (4th Cir. 2021); *see Kumho Tire Co., Ltd. v. Carmichael*, 526 U.S. 137, 149–50 (1999); (Dkt. No. 324 (Levine *Daubert* Mot.) at 3–4.)

Defendants attempt to read out the "general acceptance" prong from the *Daubert* standard. (*See* Dkt. No. 339 (Levine Opp.) at 3, 10) (accusing Plaintiff of "attempt[ing] to sneak back in the 'general acceptance' standard that *Daubert* expressly rejects"). But as the Fourth Circuit has held, even after *Daubert*, "'general acceptance' is nonetheless relevant to the reliability inquiry," and "'widespread acceptance can be an important factor in ruling particular evidence admissible[.]'" *Nease*, 848 F.3d at 229; *Belville*, 919 F.3d at 234 (affirming district court's exclusion of expert witness because expert witness's testing method "was, at a minimum, suspect because it had been rejected by NASA and NHTSA"). Here, Dr. Levine's outlier status in the scientific community is a factor which underscores the unreliability of his testimony overall. *See Daubert*, 509 U.S. at 589 ("[U]nder the Rules the trial judge must ensure that any and all scientific testimony or evidence admitted is not only relevant, but reliable.").

Similarly, Defendants assert that Plaintiff is trying to exclude Dr. Levine's opinions simply because they are "a minority view." (Dkt. No. 341 (Levine Opp.) at 3, 10). But Plaintiff has moved to exclude Dr. Levine's testimony because he is not qualified to offer those opinions, his opinions are not credibly supported by scientific evidence, and his opinions are based on misrepresentations of other sources. *Daubert*, 509 U.S. at 589.

### B.     Dr. Levine's Claims Regarding "Rapid Affirmation" Are Not Reliable.

In both his expert report and deposition testimony, Dr. Levine repeatedly claimed that clinicians in the United States are providing "rapid affirmation care," which he defines as "a commitment to be affirmative in . . . being a cheerleader for social transition or taking hormones or having one's breasts removed after what [Dr. Levine] would consider to be an inadequate

evaluation." (Dkt. No. 325-2 (Levine Dep. Tr.) at 116:4-10; *see also id.* at 120:6–121:3 (explaining the basis for his view that clinicians in the United States are performing rapid affirmation care); *id.* at 123:10-15 (claiming that "perhaps 50% of the people who . . . have consulted [him]" claimed that their child had been diagnosed and prescribed treatment in one hour); *id.* at 124:10-13 ("Q: And you've made the representation that there is a practice of rapid affirmation happening in the United States; correct? THE WITNESS: As—as far as I know yes."); *id.* at 125:11-15 (stating that his view that rapid affirmation care is happening in the United States is based on "multiple sources, both directly in my clinical practice, both—what I read about sometimes in these legal proceedings, legal documents and . . . from my colleagues"); *id.* at 127:24–128:9 (stating that he had heard of rapid affirmation care directly from "15 sets of parents" and indirectly from "over a hundred" people); Dkt. No. 325-1 (Levine Rep.) ¶ 50 ("[S]ome advocates and practitioners . . . promote and recommend that any expression of transgender identity should be immediately accepted as decisive, and thoroughly affirmed."); *id.* ¶ 51 ("Some advocates . . . assert that unquestioning affirmation of any claim of transgender identity in children is essential."); *id.* ¶ 53 ("[P]rompt and thorough affirmation of a transgender identity . . . is currently being reinforced by an echo-chamber of approval from other like-minded child-oriented professionals who do not sufficiently consider the known negative medical and psychiatric outcomes of trans adults."); *id.* ¶ 75 (citing source claiming that "children and adolescents are being subjected to puberty blockers and hormonal intervention far too quickly"); *id.* ¶ 83 (similar); *id.* ¶ 132 (discussing "vocal practitioners of prompt affirmation").)

Despite the multiple references outlined above, Defendants assert that Dr. Levine never opined that transgender adolescents are being provided rapid affirmation care. (Dkt. No. 341 (Levine Opp.) at 13.) They claim that Dr Levine instead pointed to sources "establish[ing] that

some providers in this country are encouraging social and medical transition without adequate evaluation, disclosures, or meaningfully informed consent." (*Id.*) But Defendants are attempting to create a distinction where none exists—as noted, Dr. Levine himself defined rapid affirmation care as affirming and encouraging transition and treatment absent what he considers to be an adequate evaluation. (Dkt. No. 325-2 (Levine Dep. Tr.) at 116:4-10.) Defendants' effort to deploy creative wordsmithing to avoid the exclusion of Dr. Levine's testimony should be rejected.

Defendants make no effort to defend Dr. Levine's reliance on anecdotal complaints from parents who contacted him, underscoring that his proffered opinion on rapid affirmation care should be disregarded as unreliable and speculative. Instead, they point to three sources that they claim "amply establish" that clinicians are providing rapid affirmation care. (Dkt. No. 341 (Levine Opp.) at 13.) None are reliable (or relevant).

The first, a newspaper essay by Laura Edwards-Leeper and Erica Anderson briefly describes an anecdote wherein a therapist "simply affirmed [a 13-year-old's] new identity" as a transgender boy. (Dkt. No. 343-1 (Defs.' *Daubert* Resp. App.) at 233.) The essay provides no information about the duration or content of the meeting or the information to which the provider had access.[5] The essay further claims that "many providers . . . are hastily dispensing medicine" (*id.*), but provides no authority for that assertion. On the contrary, the essay's authors admit that "[p]roviders and their behavior haven't been closely studied." (*Id.* at 234.) Defendants have not shown that an opinion piece in a publication for a general audience is the type of material experts

---

[5] The 13-year-old described in the article may not have even been real. (*See* Dkt. No. 321-4 (Janssen Dep. Tr.) at 153:7-12 (suggesting that the described adolescent might be "an amalgam" rather than "a real person" "because it would be unethical to not have consent to publish this story").)

in the field of child psychiatry would rely on when forming professional opinions on the subject. The authors' claims therefore cannot transform Dr. Levine's speculation into reliable testimony.

Defendants next point to an article from Pablo Expósito-Campos, which they claim "discusses and cites additional peer-reviewed literature reporting that some individuals 'express having been too enthusiastically 'affirmed' in their identities by their clinicians, which led to a poor understanding of the medical procedures,' and 'regret not having received a sufficient exploration of their previous psychological and emotional problems before transitioning.'" (Dkt. No. 341 (Levine Opp.) at 14) (quoting Dkt. No. 343-1 (Defs.' *Daubert* Resp. App. (Expósito-Campos 2021 at 4–5) at 260–61.) But Dr. Levine does not rely on the Expósito-Campos article to support his assertions about rapid affirmation care; he cites the article only for his claims about allegedly increasing rates of desistance, and does not rely on the portion of the article Defendants now invoke. (Dkt. No. 325-1 (Levine Rep.) ¶ 119 (citing Expósito-Campos 2021 at 270).) Nor does Dr. Levine cite the articles summarizing interviews with "detransitioners" on which Expósito-Campos relies. (Dkt. No. 343-1 (Defs.' *Daubert* Resp. App. (Expósito-Campos 2021) at 260–61 (citing Yoo 2018 and Van Baalen & Boon 2015).) Dr. Levine likewise did not cite the third article to which Defendants point, a 2021 survey by Lisa Littman, to support his asserts about rapid affirmation care. (Dkt. No. 341 (Levine Opp.) at 14.) Rather, he cited it only in the context of his discussion of detransition. (Dkt. No. 325-1 (Levine Rep.) ¶¶ 120–21, 124, 126, 204.) Defendants cannot attempt to rehabilitate Dr. Levine's reliability by substituting their own preferred literature—which itself relies on unsubstantiated anecdotes and so suffers from the same evidentiary flaws as Dr. Levine's sources—for the actual bases for Dr. Levine's opinions.

**C.     Dr. Levine's Claim That There Is No Consensus Regarding Treatment Of Gender Dysphoria In Adolescents Is Not Reliable.**

One of the central claims in Dr. Levine's expert report is that "[t]here is no consensus or agreed 'standard of care' concerning therapeutic approaches to child or adolescent gender dysphoria." (Dkt. No. 325-1 (Levine Rep.) at 22; *see also id.* ¶ 78 ("There is likewise no broadly accepted standard of care with respect to use of puberty blockers."); *id.* ¶ 88 ("[T]here is . . . no consensus concerning best practices or a 'standard of care' in this area."); (Dkt. No. 324 (Levine *Daubert* Mot.) at 16.) As Plaintiff explained in her motion to exclude, Dr. Levine's assertion is wrong and therefore not reliable—all major medical associations, the largest health systems in the United States, and most major health insurers endorse and follow a specific set of protocols for treating gender dysphoria. (Dkt. No. 324 (Levine *Daubert* Mot.) at 16.) Indeed, the Fourth Circuit recently recognized that the WPATH Standards of Care, which "outline appropriate treatments for [people] with gender dysphoria," "represent the consensus approach of the medical and mental health community . . . and have been recognized by various courts, including this one, as the authoritative standards of care." *Grimm*, 972 F.3d at 595–96.[6] Dr. Levine himself did not dispute

---

[6] Defendants dismiss *Grimm*'s statement on this point as "factual findings" that "are not precedential" here, and accuse B.P.J. of trying to "'lock[] down' the science." (Dkt. No. 341 (Levine Opp.) at 18–19.) But the Fourth Circuit's acknowledgment that WPATH supplies the consensus approach on the treatment of gender dysphoria remains accurate. Defendants' proffered experts, including Dr. Levine, have not presented any reliable evidence that, since *Grimm*, WPATH's Standards of Care have been displaced by another evidence-based set of standards that is nationally accepted. As *Grimm* acknowledged, "[i]t goes without saying that one can always find a doctor who disagrees with mainstream medical professional organizations on a particular issue." 972 F.3d at 596 n.3. That Dr. Levine claims to disagree with WPATH—despite himself using WPATH treatment protocols (Dkt. No. 324 (Levine *Daubert* Mot.) at 16–17)—and identifies a few other providers who likewise disagree does not change the fact that "[t]here are no other competing, evidence-based standards [regarding treatment of gender dysphoria] that are accepted by any nationally or internationally recognized medical professional groups." *Grimm*, 972 F.3d at 595–96 (quoting *Edmo*, 935 F.3d at 769).

the existence of this consensus at a previous deposition. (Dkt. No. 324 (Levine *Daubert* Mot.) at 16 (quoting Dkt. No. 325-9 (Levine Dep. Tr. in *Claire v. Fla. Dep't of Mgmt. Servs.*) at 145:16–24).)

Defendants do not attempt to justify Dr. Levine's unsupportable claim that the medical community has not coalesced around a consensus approach to treating gender dysphoria in adolescents. Instead, they assert that "now is not the time to decide who is right, and disagreement with a consensus (if such existed) is no grounds for excluding expert testimony under Rule 702 and *Daubert*." (Dkt. No. 341 (Levine Opp.) at 12.) But Defendants miss the point; B.P.J.'s argument is that Dr. Levine's failure to accurately communicate the state of play in the medical community regarding treatment of gender dysphoria renders his opinion about the lack of consensus unreliable. As to that argument, Defendants have no response.

### D. Dr. Levine's Opinion That Gender-Confirming Care Is Experimental And Unethical Is Unreliable.

As explained in Plaintiff's motion, Dr. Levine's claim that gender-confirming care is "experimental" (Dkt. No. 325-1 (Levine Rep.) at 49, 61) is inaccurate and unreliable (Dkt. No. 324 (Levine *Daubert* Mot.) at 17–20.) Defendants do not attempt to rebut Plaintiff's argument that Dr. Levine ignores and omits many studies demonstrating that gender-affirming care has produced favorable outcomes for transgender adolescents and adults, and distorts the findings of others. (*Id.* at 18–19.) Instead, Defendants endeavor to shore up Dr. Levine's claim by stating that the evidence regarding "the efficacy and safety of social and hormonal transition therapies is 'low grade,'" and noting the lack of controlled clinical trials studying gender-confirming hormones. (Dkt. No. 341 (Levine Opp.) at 17–18.) Low quality evidence does not, however, render treatment "experimental"—neither Dr. Levine nor Defendants provide any support for that inferential leap.

And as Dr. Adkins explained, random control trials are not always an appropriate methodology, particularly where, as in the context of puberty blockers and gender-affirming hormone therapy, withholding care is known to cause harm. (Dkt. No. 345-5 (Adkins Reb.) ¶ 30.)[7]

## CONCLUSION

For the reasons above, Plaintiff's motion to exclude the testimony of Stephen B. Levine should be granted.

---

[7] Defendants do not directly challenge Dr. Levine's exclusion under Federal Rule of Evidence 403. For the reasons stated in Plaintiff's opening brief, Dr. Levine's testimony should also be excluded because it lacks probative value: he offers unreliable opinions that are unrelated to any factual disputes in this case, and any consideration of his testimony would only create confusion and result in prejudice. (Dkt. No. 324 (Levine *Daubert* Mot.) at 22.)

Dated: June 2, 2022

Respectfully submitted,

/s/ Loree Stark

Joshua Block*
AMERICAN CIVIL LIBERTIES UNION FOUNDATION
125 Broad St.
New York, NY 10004
Phone: (212) 549-2569
jblock@aclu.org

Loree Stark (Bar No. 12936)
Nick Ward (Bar No. 13703)
AMERICAN CIVIL LIBERTIES UNION OF WEST
VIRGINIA FOUNDATION
P.O. Box 395
Charleston, WV 25339-3952
Phone: (914) 393-4614
lstark@acluwv.org

Avatara Smith-Carrington*
LAMBDA LEGAL
3500 Oak Lawn Avenue, Suite 500
Dallas, TX 75219
Phone: (214) 219-8585
asmithcarrington@lambdalegal.org

Kathleen Hartnett*
Julie Veroff*
Zoë Helstrom*
COOLEY LLP
3 Embarcadero Center, 20th Floor
San Francisco, CA 94111
Phone: (415) 693-2000
khartnett@cooley.com

Carl Charles*
Tara Borelli*
LAMBDA LEGAL
158 West Ponce De Leon Ave., Ste. 105
Decatur, GA 30030
Phone: (404) 897-1880
ccharles@lambdalegal.org

Katelyn Kang*
Valeria M. Pelet del Toro*
COOLEY LLP
55 Hudson Yards
New York, NY 10001-2157
Phone: (212) 479-6000
kkang@cooley.com

Sruti Swaminathan*
LAMBDA LEGAL
120 Wall Street, 19th Floor
New York, NY 10005
Phone: (212) 809-8585
sswaminathan@lambdalegal.org

Elizabeth Reinhardt*
COOLEY LLP
500 Boylston Street, 14th Floor
Boston, MA 02116-3736
Phone: (617) 937-2305
ereinhardt@cooley.com

Andrew Barr*
COOLEY LLP
1144 15th St. Suite 2300
Denver, CO 80202-5686
Phone: (720) 566-4000
abarr@cooley.com

*Visiting Attorneys

Attorneys for Plaintiff

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA
CHARLESTON DIVISION

B.P.J. by her next friend and mother, HEATHER
JACKSON,

*Plaintiff*,

v.

WEST VIRGINIA STATE BOARD OF
EDUCATION, HARRISON COUNTY BOARD
OF EDUCATION, WEST VIRGINIA
SECONDARY SCHOOL ACTIVITIES
COMMISSION, W. CLAYTON BURCH in his
official capacity as State Superintendent, DORA
STUTLER in her official capacity as Harrison
County Superintendent, and THE STATE OF
WEST VIRGINIA,

*Defendants*,

and

LAINEY ARMISTEAD,

*Defendant-Intervenor*.

Civil Action No. 2:21-cv-00316

Hon. Joseph R. Goodwin

## CERTIFICATE OF SERVICE

I, Loree Stark, do hereby certify that on this 2nd day of June, 2022, I electronically filed a

true and exact copy of *Plaintiff's Reply Memorandum of Law in Support of Motion to Exclude

the Expert Testimony of Stephen B. Levine* with the Clerk of Court and all parties using the

CM/ECF System.

/s/ Loree Stark
Loree Stark
West Virginia Bar No. 12936