```
 1              IN THE UNITED STATES DISTRICT COURT

 2         FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA

 3                      CHARLESTON DIVISION

 4                   *  *  *  *  *  *  *  *

 5   B.P.J., by her next friend and    *

 6   Mother, HEATHER JACKSON,          *

 7        Plaintiff                    *   Case No.

 8        vs.                          *   2:21-CV-00316

 9   WEST VIRGINIA STATE BOARD OF      *

10   EDUCATION, HARRISON COUNTY        *

11   BOARD OF EDUCATION, WEST          *

12   VIRGINIA SECONDARY SCHOOL         *

13   ACTIVITIES COMMISSION, W.         *

14   CLAYTON BURCH in his official     *  CONFIDENTIAL

15   Capacity as State Superintendent,*  VIDEOTAPED

16   DORA STUTLER in her official      *  VIDEOCONFERENCE

17   Capacity as Harrison County       *  DEPOSITION

18   Superintendent, PATRICK MORRISEY  *      OF

19   In his official capacity as       *  KACIE KIDD, M.D.

20   Attorney General, and THE STATE   *  February 21, 2022

21   OF WEST VIRGINIA,                 *

22        Defendants                   *

23             Any reproduction of this transcript
               is prohibited without authorization
24                by the certifying agency.
```

1        CONFIDENTIAL VIDEOTAPED VIDEOCONFERENCE DEPOSITION

2                                    OF

3     KACIE KIDD, M.D., taken on behalf of the Defendant,

4     State of West Virginia herein, pursuant to the Rules of

5     Civil Procedure, taken before me, the undersigned,

6     Nicole Montagano, a Court Reporter and Notary Public in

7     and for the State of West Virginia, on Monday, February

8     21, 2022, beginning at 10:16 a.m.

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

```
 1              A P P E A R A N C E S

 2

 3   JOSHUA BLOCK, ESQUIRE

 4   American Civil Liberties Union Foundation

 5   125 Broad Street

 6   New York, NY  10004

 7   COUNSEL FOR PLAINTIFF

 8

 9   KATHLEEN R. HARTNETT, ESQUIRE

10   ANDREW BARR, ESQUIRE

11   KATELYN KANG, ESQUIRE

12   ZOE HELSTROM, ESQUIRE

13   ELIZABETH REINHARDT, ESQUIRE

14   Cooley, LLP

15   3 Embarcadero Center

16   20th Floor

17   San Francisco, CA  94111-4004

18       COUNSELS FOR PLAINTIFF

19

20

21

22

23

24
```

```
1              A P P E A R A N C E S (cont'd)

2

3    SRUTI SWAMINATHAN, ESQUIRE

4    Lambda Legal

5    120 Wall Street

6    19th Floor

7    New York, NY  10005-3919

8        COUNSEL FOR PLAINTIFF

9

10   DAVID TRYON, ESQUIRE

11   CURTIS R.A. CAPEHART, ESQUIRE

12   State Capitol Complex

13   Building 1, Room E-26

14   Charleston, WV  25305

15       COUNSEL FOR STATE OF WEST VIRGINIA

16

17   ROBERTA F. GREEN, ESQUIRE

18   Shuman McCuskey Slicer, PLLC

19   1411 Virginia Street East

20   Suite 200

21   Charleston, WV  25301

22       COUNSEL FOR WEST VIRGINIA SECONDARY SCHOOL

23       ACTIVITIES COMMISSION

24
```

```
 1              A P P E A R A N C E S (cont'd)

 2

 3   SUSAN DENIKER, ESQUIRE

 4   JEFFREY M. CROPP, ESQUIRE

 5   Steptoe & Johnson

 6   400 White Oaks Boulevard

 7   Bridgeport, WV  26330

 8       COUNSEL FOR HARRISON COUNTY BOARD OF EDUCATION and

 9       HARRISON COUNTY SUPERINTENDENT DORA STUTLER

10

11   KELLY C. MORGAN, ESQUIRE

12   MICHAEL W. TAYLOR, ESQUIRE

13   Bailey Wyant

14   500 Virginia Street East

15   Suite 600

16   Charleston, WV  25301

17       COUNSEL FOR WEST VIRGINIA BOARD OF EDUCATION and

18       SUPERINTENDANT W. CLAYTON BURCH

19

20   CHRISTIANA HOLCOMB, ESQUIRE

21   Alliance Defending Freedom

22   15100 North 90th Street

23   Scottsdale, AZ  85260

24       COUNSEL FOR INTERVENOR, LAINEY ARMISTEAD
```

```
 1              A P P E A R A N C E S (cont'd)

 2

 3   TIMOTHY D. DUCAR, ESQUIRE

 4   Law Office of Timothy D. Ducar

 5   7430 East Butherus Drive, Suite E

 6   Scottsdale, AZ  85260

 7        COUNSEL FOR INTERVENOR, LAINEY ARMISTEAD

 8

 9   TIMOTHY R. LINKOUS, ESQUIRE

10   Lindous Law, PLLC

11   10 Cheat Landing

12   Suite 200

13   Morgantown, WV  26508

14        COUNSEL FOR KACIE KIDD, M.D.

15

16

17

18

19

20

21

22

23

24
```

1                          I N D E X

2

3    DISCUSSION AMONG PARTIES                    10  -   15

4    WITNESS: KACIE KIDD, M.D.

5    EXAMINATION

6        By Attorney Tryon                      16  -  134

7    DISCUSSION AMONG PARTIES                   134  -  136

8    CERTIFICATE                                       137

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

1                        <u>EXHIBIT PAGE</u>

2

3                                              PAGE

4      <u>NUMBER</u>   <u>DESCRIPTION</u>                    <u>IDENTIFIED</u>

5      16       Doctor's Note                      --

6      33       Standards of Care for the

7               Health of Transsexual, Transgender,

8               And Gender Nonconforming People    --

9      35       Doctor's Note                      --

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

<u>OBJECTION PAGE</u>

<u>ATTORNEY</u>                                            <u>PAGE</u>

Hartnett    19, 30, 44, 44, 46, 54, 54, 54, 63, 64, 77,
77, 77, 86, 86, 87, 87, 88, 92, 94, 95, 95, 96, 97, 99,
103, 103, 104, 114, 117, 117, 118, 118, 119, 119, 120,
120, 120, 121, 122, 122, 123, 123, 123, 124, 124, 124,
128, 128, 128, 130, 130, 130, 131, 131, 132, 132, 133

Linkous                                                     23

```
 1                    S T I P U L A T I O N

 2     -----------------------------------------------------

 3     (It is hereby stipulated and agreed by and between

 4     counsel for the respective parties that reading,

 5     signing, sealing, certification and filing are not

 6     waived.)

 7     -----------------------------------------------------

 8                    P R O C E E D I N G S

 9     -----------------------------------------------------

10                    VIDEOGRAPHER: We are now on the record.

11     My name is Jacob Stock.  I'm a Certified Legal Video

12     Specialist employed by Sargent's Court Reporting

13     Services.  The date today is February 21st, 2022, and

14     the current time is 10:16 a.m. Eastern Standard Time.

15     This deposition is being taken remotely by

16     videoconferencing.  The caption of this case in the

17     United States District Court for the Southern District

18     of West Virginia, Charleston Division.  BPJ by her next

19     friend and mother, Heather Jackson v. West Virginia

20     State Board of Education, et al.  Case number

21     2:21-CV-00316.  The name of the witness is Kacie Kidd,

22     M.D.  Will the attorneys present state their names and

23     the parties they represent?

24                    ATTORNEY LINKOUS:  This is Tim Linkous on
```

1  behalf of Kacie Kidd, M.D.

2          ATTORNEY TRYON:  This is David Tryon on

3  behalf of the State of West Virginia.

4          ATTORNEY DENIKER:  This is Susan Deniker

5  on behalf of Defendants Harrison County Board of

6  Education and Superintendant Dora Stutler.

7          ATTORNEY GREEN:  This is Roberta Green on

8  behalf of West Virginia Secondary School Activities

9  Commission.

10          ATTORNEY MORGAN:  This is Kelly Morgan on

11  behalf of West Virginia Board of Education and

12  Superintendant Burch.

13          ATTORNEY HOLCOMB:  This is Christiana

14  Holcomb on behalf of Intervenor, Lainey Armistead.

15          ATTORNEY HARTNETT:  And sorry, I think I

16  was on mute before.  This is Kathleen Hartnett from

17  Cooley for Plaintiff.  And there are several others on

18  the line for Plaintiff from Cooley.

19          ATTORNEY BARR:  Yes.  Good morning.  This

20  is Andrew Barr from Cooley on behalf of Plaintiff.

21          ATTORNEY KANG:  Good morning.  This is

22  Katelyn Kang from Cooley on behalf of the Plaintiff.

23          ATTORNEY REINHARDT:  Good morning.  This

24  is Elizabeth Reinhardt on behalf of Plaintiff.

1          ATTORNEY HELSTROM:  Good morning.  This

2    is Zoe Helstrom from Cooley on behalf of Plaintiff.

3          ATTORNEY SWAMINATHAN:  Good morning.

4    This is Sruti Swaminathan from Lambda Legal on behalf of

5    Plaintiff.

6          ATTORNEY BLOCK:  Good morning.  This is

7    Josh Block from the ACLU on behalf of Plaintiff.

8          VIDEOGRAPHER:  If that's everybody, the

9    court reporter can swear in the witness, and we can

10   begin.

11         ATTORNEY TRYON:  Two things.  So first of

12   all, I went to mention that my colleague, Curtis

13   Capehart, is on this call.  And I wanted to take care of

14   a housekeeping matter before we get started.  I wonder

15   if we could do that, if we could exclude Dr. Kidd for

16   just a moment.

17         VIDEOGRAPHER:

18         Yes, give me one second.

19         ATTORNEY TRYON:

20         Thank you.  So I just wanted to --- we

21   had previously in other depositions we've talked about

22   how we're going to handle objections.  And Mr. Linkous,

23   in some other depositions, we've said that we are going

24   to handle by stating objection for form of the question

1    or directing the witness not to answer for privilege

2    issues.  And Kathleen, are you going to be handling this

3    deposition?

4                    ATTORNEY HARTNETT:  Yes, David.  And

5    would you like to discuss this off the record first and

6    then we can put our agreements on the record?

7                    ATTORNEY TRYON:  Okay.

8                    ATTORNEY HARTNETT:  Can we go off the

9    record?

10                   VIDEOGRAPHER:  Yes.  Going off the

11   record.  The current time is 10:20 a.m.

12   OFF VIDEOTAPE

13                              ---

14   (WHEREUPON, AN OFF RECORD DISCUSSION WAS HELD.)

15                              ---

16   ON VIDEOTAPE

17                   VIDEOGRAPHER:  Back on the record.  The

18   current time is 10:24 a.m.

19                   ATTORNEY TRYON:  Thank you.  So while we

20   were off the record we had a discussion and we've come

21   to an agreement on how to handle objections, that

22   primarily we would be handling objections by stating one

23   of three things, either objection to form, objection as

24   to technology --- or terminology, excuse me, or

1   objection to any privileges or scope.  So I guess that's

2   four.  And Mr. Linkous has said he will strive for that,

3   but has not specifically addressed --- agreed to that.

4   And finally, the counsel for Defendants have indicated

5   that they will --- if there is an objection by counsel

6   for Dr. Kidd, then they will be included within that

7   objection.  So they don't have to object as well.  Is

8   that a fair summary of our discussion?

9                    ATTORNEY HARTNETT:  Just on the last

10  point, it was objections by the witness to Counsel.

11                   ATTORNEY TRYON:  Thank you for correcting

12  me.

13                   ATTORNEY LINKOUS:  Hey, Dave, can I ask a

14  quick question?

15                   ATTORNEY TRYON:  Yes.

16                   ATTORNEY LINKOUS:  Ms. Holcomb, who was

17  on just a second ago, I heard her say she represents an

18  intervenor, and I didn't know there was an intervenor,

19  so who intervened and what's the story there?

20                   ATTORNEY TRYON:  The intervenor is Lainey

21  Armistead, I think that's how you say her last name, who

22  is a colleague student, a female college student who has

23  intervened.

24                   ATTORNEY LINKOUS:

```
 1                      Okay.  Thank you.  I appreciate that.
 2                      ATTORNEY HARTNETT:  And Tim, that's a
 3    gender college student who is seeking to intervene to
 4    defend the state law.
 5                      ATTORNEY LINKOUS:  I see.  Thank you.
 6                      COURT REPORTER:  Josh, one second.  It's
 7    the court reporter.  Can you go off the record, please,
 8    Josh?
 9                      VIDEOGRAPHER:  Going off the record,
10    10:26 a.m.
11    OFF VIDEOTAPE
12                             ---
13    (WHEREUPON, AN OFF RECORD DISCUSSION WAS HELD.)
14                             ---
15    ON VIDEOTAPE
16                      VIDEOGRAPHER:  Back on the record.  The
17    current time reads 10:32 a.m.
18                      ATTORNEY DUCAR:  My name is Tim Ducar.
19    I'm entering an appearance on behalf of the intervenor,
20    Lainey Armistead.
21                      VIDEOGRAPHER:  The court reporter can
22    swear in the witness and we can begin.
23                             - - -
24                      KACIE KIDD, M.D.,
```

1    CALLED AS A WITNESS IN THE FOLLOWING PROCEEDINGS, HAVING

2    FIRST BEEN DULY SWORN, TESTIFIED AND SAID AS FOLLOWS:

3                              - - -

4                          EXAMINATION

5                             ---

6    BY ATTORNEY TRYON:

7        Q.    Dr. Kidd, my name is David Tryon.  I represent

8    the State of West Virginia.  Can you, first of all, tell

9    me how you would prefer that I address you?

10       A.    Hi, I'm Kacie Kidd.  I use she/her pronouns.

11   You're welcome to address me as Kacie or Dr. Kidd.

12       Q.    Very good.  So Kacie --- well, let me call you

13   Dr. Kidd.  Dr. Kidd, are you represented by counsel

14   today?

15       A.    I am.

16       Q.    And who is that?

17       A.    Mr. Linkous.

18       Q.    And how long has he represented you?

19       A.    Well, I can't recall our exact first email

20   exchange.  I think it's been over a month.

21       Q.    Okay.

22             Have you ever been deposed before?

23       A.    I have not.

24       Q.    Have you ever testified at trial before?

1      A.    I have not.

2      Q.    Excuse me.  Sorry about that.  Have you ever

3   been sued before?

4      A.    I have not.

5      Q.    Have you ever been retained as an expert either

6   as a testifying or consulting expert in any litigation

7   or otherwise?

8      A.    I have not.

9      Q.    We are in Federal Court, so the Federal Rules of

10   Procedure apply here.  And under the Federal Rules of

11   Procedures 30(c)(2) it provides for objections by your

12   counsel or other counsel.  And while we were off the

13   record or before --- we have agreed to certain ways to

14   make objections.  And then even if there are objections,

15   you'll still need to answer questions unless your

16   counsel directs you to not do so.

17         Understand?

18      A.    Yes.

19      Q.    Do you have any questions about that?

20      A.    No.

21      Q.    Okay.

22         So when you answer, as you're doing now, please

23   answer verbally rather than a nod or a shake.  The court

24   reporter, especially since she is not currently watching

1    us, will not be able to detect anything other than your

2    actual words.

3              Okay?

4    A.    Yes.

5    Q.    Now, if you don't understand my questions,

6    please say so, and I will try to reframe them or say it

7    in a different way.

8              All right?

9    A.    Okay.

10   Q.    And if you need a break, let us know and we'll

11   make --- we'll try and accommodate that.  The only thing

12   you can't do is take a break after I've asked a

13   question.  So we need to do it before I ask a question.

14   And I'll also note that this deposition is being

15   conducted as upon Cross Examination.

16             Now, are you familiar with the lawsuit that's

17   involved here?

18   A.    I know of the lawsuit loosely.  I don't know

19   significant details.

20   Q.    Okay.

21             Just briefly, the Plaintiff in the case is BPJ.

22   Are you aware of who BPJ is?

23   A.    I am.

24   Q.    And BPJ is suing various Defendants asserting

```
 1    that a law known as HB-3293 is invalid at least as it
 2    pertains to BPJ.  Were you aware of that much?
 3        A.    Not the numbers and name of that law, but
 4    loosely, yes.
 5        Q.    Okay.
 6              Have you heard of the law, loosely known ---
 7    well, it is known as HB-3293, sometimes called the
 8    Women's Sports --- Save Women's Sports Act, and maybe
 9    there's other names for it, too.  Have you heard of the
10    law?
11                    ATTORNEY HARTNETT:  Objection to the
12    form.
13                    THE WITNESS:  In lay media, yes.
14    BY ATTORNEY TRYON:
15        Q.    You haven't actually seen the lawsuit.
16              Is that right?
17        A.    That's correct.
18        Q.    Have you read that law?
19        A.    I can't recall if I read the actual law that
20    passed.
21        Q.    Okay.
22              Have you brought any documents to the
23    deposition with you today?
24        A.    I was told to have the two --- I think they're
```

```
 1   called exhibits, the WPATH Guidelines and my clinical
 2   record.
 3       Q.    Okay.
 4             And do you have those in hard copy or just
 5   electronically?
 6       A.    Both.
 7       Q.    Okay.
 8             And have you reviewed any documents in
 9   preparation for this deposition?
10       A.    Yes.
11       Q.    Which documents are those?
12       A.    They were documents provided by my lawyer
13   telling me about depositions because I add ---.
14             ATTORNEY LINKOUS:  Stop right there, Dr.
15   Kidd.  Communications from me to you and the substance
16   of those communications are privileged.  You don't have
17   to talk about the substance of those.
18   BY ATTORNEY TRYON:
19       Q.    Yes.  All I need to know and I don't want to
20   know what you and your lawyer talked about.  I just want
21   to know what documents you've looked at in preparation
22   for your deposition today.
23       A.    Sure.  So those documents certainly.
24       Q.    Okay.
```

1          So those are the medical records you mentioned,

2    as well as the WPATH standards?

3    A.    Yes.

4    Q.    Anything else?

5    A.    I've certainly reviewed the medical literature

6    in this case but that is an ongoing process that I'm

7    always engaged in.

8    Q.    Okay.

9          Now, on Saturday we received some additional

10   documents from your office, which appear to be similar

11   to what's previously been marked as Exhibit 16.  Do you

12   have those in front of you as well?

13   A.    I'm not familiar with what Exhibit 16 includes.

14              ATTORNEY LINKOUS:  Mr. Tryon, I will just

15   interrupt and say that those records didn't really come

16   from her office, they came from me.  And I sent them to

17   Plaintiff's Counsel, who then provided them to you.

18              ATTORNEY TRYON:  Got it.  And do you know

19   if Dr. Kidd has those in front of her as well?

20              ATTORNEY LINKOUS:  She should, yes.

21              ATTORNEY TRYON:  Okay.

22   BY ATTORNEY TRYON:

23   Q.    So having gone through those --- excuse me one

24   moment.  So just some quick background.  Can you give me

1    your full name and address, please?

2        A.    My home address or my work address?

3        Q.    Both, please.

4        A.    My full name is Kacie Marie Kidd.  My work

5    address is --- depends on if you're looking at my office

6    or clinical practice, but my office is 1 Medical Center

7    Drive, Morgantown, West Virginia, 26506, I believe.  And

8    my home address ---.

9        Q.    Can you slow down just a little bit, please?

10       A.    Sure.

11       Q.    Go ahead.

12       A.    Do you need me to repeat?  My home address is

13   ████████████████████████████████████████████████████

14   ██████

15       Q.    And can you give me your work phone number,

16   please?

17       A.    I would need to check my business card.  Is it

18   okay if I do that?

19       Q.    Yes.

20       A.    My work phone (304) 293-6307.

21       Q.    And I would also like to ask you for your

22   personal phone number, which I would use only in the

23   event that for some reason you were no longer

24   represented by counsel.  Otherwise, I would contact you

1    through counsel.

2              ATTORNEY LINKOUS:  I would --- I just

3    object and instruct her not to answer on that.  I will

4    accept subpoenas and you can contact me through her.  I

5    will continue representing her.  And if not, there will

6    be new counsel assigned and you will be informed of

7    that.

8              ATTORNEY TRYON:  Well, I've never had

9    anyone instruct a witness not to do that before, but

10   I'll move on.

11   BY ATTORNEY TRYON:

12      Q.    Can you tell me where you went to --- about your

13   education, your undergraduate education first, please?

14      A.    Sure.  I received my Bachelor's Degree in

15   biology and women's studies from West Virginia

16   University.  I then went to medical school at West

17   Virginia University School of Medicine.  After that I

18   completed a four-year residency in internal medicine and

19   pediatrics at West Virginia University School of

20   Medicine.  I then completed a three-year fellowship in

21   adolescent medicine at the University of Pittsburgh.

22      Q.    What was your major in your pre-Bachelor's

23   Degree?

24      A.    It was biology and women's studies.

1      Q.      And when did you get your Bachelor's Degree?

2      A.      I graduated with my Bachelor's in 2010.

3      Q.      And medical school, when did you graduate there?

4      A.      2014.

5      Q.      Did you have any particular emphasis at the West

6   Virginia School of Medicine?

7      A.      It's not customary for people to have emphasis

8   in medical school but instead in residency.

9      Q.      Okay.

10             And in your residency what was your specialty

11   or emphasis?

12      A.      I did a dual residency in internal medicine and

13   pediatrics.

14      Q.      And when did you get that?  When did you

15   complete your residency?

16      A.      In 2018.

17      Q.      And then your fellowship, what was that in?

18      A.      Adolescent medicine.

19      Q.      And when did you complete that?

20      A.      In 2021.

21      Q.      Any particular reason that you chose adolescent

22   medicine?

23      A.      Supporting adolescents and young adults is my

24   favorite part of medicine.

1     Q.    Have you had any other specialized training

2   other than what you just discussed?

3     A.    Within adolescent medicine there are several

4   ways to have additional training and I did pursue one of

5   those ways.

6     Q.    And what was that?

7     A.    Gender affirming care.

8     Q.    And in what way did you pursue that?

9     A.    I dedicated much of my clinical training to

10  learning under experts in this space.  I also dedicated

11  my research training in a similar vein, and I engaged in

12  organizations and groups and additional educational

13  opportunities to round out that training.

14    Q.    What experts are you referring to?

15    A.    Doctor Gerald Montano, Doctor Selma Witchell

16  among others.

17    Q.    I'm sorry.  Montano and who is the other one?

18    A.    Selma Witchell.

19    Q.    Can you spell that, please?

20    A.    W-I-T-C-H-E-L-L.

21    Q.    And what was the first name?

22    A.    Selma, S-E-L-M-A.

23    Q.    And where is Selma Witchell?

24    A.    The University of Pittsburgh.

```
 1      Q.     Do you have a license to practice medicine?

 2      A.     I do.

 3      Q.     Where?

 4      A.     In the State of West Virginia.

 5      Q.     Any others?

 6      A.     I previously held a training license in the

 7  State of Pennsylvania when I was a trainee there.

 8      Q.     But currently you do not?

 9      A.     I do not.

10      Q.     And do you have any --- you may have answered

11  this, but do you have any specific specialties?

12      A.     My specialties are pediatrics, internal

13  medicine, adolescent medicine and gender affirming care.

14      Q.     I was wondering if that was my computer dinging

15  or someone else's.

16      A.     I think it may be mine.  Give me a second.  I'll

17  sign out of my email.

18      Q.     Okay.

19      A.     Okay.

20      Q.     Do you have Board Certifications?

21      A.     I do.

22      Q.     What are those?

23      A.     I'm Board Certified in Internal Medicine and

24  Pediatrics.
```

1    Q.    What was necessary to get Board Certification

2  for internal medicine?

3    A.    I was trained in internal medication and many of

4  my patients are adults by legal definition.

5    Q.    I'm sorry.  You broke up.  Can you repeat that

6  please?

7    A.    Sure.  I was trained in internal medicine and

8  eligible to sit that Board Examination.  Additionally, a

9  lot of my patients are over the age of 18.

10    Q.    So you had to sit for a Board Examination.

11         Is that right?

12    A.    I sat for two Board Examinations in Pediatrics

13  and Internal Medicine as well as numerous Board

14  Examinations to be allowed to get to that point.

15    Q.    Okay.

16         And you passed those boards?

17    A.    I did.

18    Q.    Are you a member of any medical societies?

19    A.    I am.

20    Q.    What are those?

21    A.    I am currently a member of the American Academy

22  of Pediatrics.  I'm a member of the Society for

23  Adolescent Health and Medicine.  I am also a member of

24  the World Professional Association for Transgender

1    Health.

2        Q.    Any others?

3        A.    Not that I can recall.

4        Q.    When you said the Society for Adolescent

5    Medicine, did I hear that right?

6        A.    The Society for Adolescent Health and Medicine,

7    abbreviated SAHM, S-A-H-M.

8        Q.    And what do you need to be a member of that,

9    what do you need to do?

10       A.    Most of these organizations have membership

11   tiers for a variety of persons and you need to pay a

12   fee.  But for the purpose of my membership, it's as a

13   physician.  And for the American Academy of Pediatrics I

14   have a special notation in my membership as someone who

15   has passed the board exam for that field.

16       Q.    For WPATH, what do you need to do to be a member

17   there?

18       A.    You need to sign up and pay a fee and check your

19   membership category.  Mine, again, is physician and

20   although I think I may be still listed as a student

21   member based on my training time at the University of

22   Pittsburgh for that membership, but I am also part of

23   their global education initiative, which is an

24   additional training on top of being a member.

1    Q.    I'm sorry, global what initiative?

2    A.    Education initiative.

3    Q.    Are you a member of the ---?

4    A.    I am not.

5    Q.    Are you a member or on the board of any

6  educational organizations?

7    A.    I think it depends on what you mean by

8  educational organization.

9    Q.    Any organizations that try and educate on any

10  issues?

11    A.    Well, broadly, I'm faculty at West Virginia

12  School of Medicine and I routinely educate a variety of

13  learners at a variety of levels.  I'm also part of

14  something called the Tri-State Gender Collaborative,

15  which is a community-based organization that does

16  provide education.

17    Q.    And do you have privileges at any hospitals?

18    A.    I do have privileges at Ruby Memorial Hospital

19  in Morgantown, West Virginia.

20    Q.    Any others?

21    A.    No.

22    Q.    So tell me of your work experience, your

23  professional work experience.

24    A.    Can you restate your question?

1    Q.    Yes.  So I'm interested to learn your work

2    experience, where you have worked and what you have done

3    starting --- I'm not sure exactly --- you've told me

4    about your internship and then I know that you are doing

5    some other things.  So after your internship, did you

6    have any professional --- did you start working right

7    away or did you just do the fellowship or is fellowship

8    considered work?  Help me out, understand your work

9    history.

10                ATTORNEY HARTNETT:  Objection to the

11   form.

12                THE WITNESS:  Medicine training is

13   complicated, and so the internship is part of residency.

14   That was part of the four years that I spent in internal

15   medicine and pediatrics training.  During that time I

16   was working in a variety of settings to obtain training

17   in both of those fields.

18                After that was completed I was also doing

19   training at the University of Pittsburgh.  One could

20   consider all of those work.  And I was a paid employee

21   during that time when I was a trainee as well.

22   BY ATTORNEY TRYON:

23    Q.    What's the first job in which you were actually

24   treating patients?

 1     A.    I have been treating patients since I was a

 2  medical student.

 3     Q.    Okay.

 4           And your first paid job where you were treating

 5  patients?

 6     A.    That would have been the beginning of my

 7  residency, which is often called an internship in

 8  internal medicine and pediatrics.

 9     Q.    And then how about your fellowship, were you

10  treating patients during your fellowship?

11     A.    Yes.

12     Q.    What is your current --- I don't know what the

13  right term would be profession --- excuse me, profession

14  or your work status?

15     A.    I am currently an assistant professor in the

16  Department of Pediatrics at the WVU School of Medicine.

17  I am also the Medical Director of the WVU Medicine

18  Children's Gender and Sexual Development Clinic.

19     Q.    And then do you have a separate practice where

20  you diagnose and treat patients?

21     A.    Under those titles, yes.

22     Q.    Okay.

23           So it's not separate from those?

24     A.    No.

1    Q.    Do you get paid directly by the patients or just

2    only get paid by the West Virginia University?

3    A.    I am dual employed as is the customary practice

4    for physicians who are working at the WV School of

5    Medicine, and so my dual employment goes both through

6    West Virginia University as well as --- I believe it's

7    called UHA, the University Health Associates, but I may

8    need to clarify that.

9    Q.    Okay.

10        As assistant professor what do you do?

11   A.    Assistant professor is my title in my tenure

12   track of employment, and so it's fairly traditional for

13   assistant professors to be the entry point of tenure

14   track position, if that makes sense.  And my role in

15   that is to provide medical care as well as to conduct

16   research and to provide teaching.

17   Q.    So I understood conduct research and also

18   teaching.  What was the first thing you said?

19   A.    To provide clinical care.

20   Q.    What do you teach?

21   A.    I teach a variety of learner types and topics,

22   but they typically center adolescent medicine and gender

23   affirming care or both.

24   Q.    Are there classes specifically on those topics

1    or is it part of a more general class?

2       A.    Most often my teaching is as a guest lecturer

3    for a medical student class or a residency training

4    program or something called grand rounds, which is a

5    teaching opportunity for faculty-level positions.

6       Q.    What types of research do you do?

7       A.    I conduct mix methods research, including

8    qualitative and quantitative analyses, centering gender

9    adversity in people and their experiences as well as the

10   experiences of their family.

11      Q.    How many papers have you published?

12      A.    I don't know that I could give you a complete

13   answer to that question.  I suspect --- I know that it

14   is more than 12.  I suspect less than 20.  It also

15   depends on what you mean by paper.

16      Q.    Okay.

17            When you say provide clinical care --- well,

18   let me come back to that in a minute.  As Medical

19   Director of the West Virginia University --- excuse me,

20   West Virginia University Medicine Children's Gender and

21   Sexual Development --- do I have that title right?

22      A.    Almost.  It's the WVU Medicine Children's Gender

23   and Sexual Development Clinic.

24      Q.    And what is your role?  What do you do in that

1  role?

2      A.    I direct the clinical care of gender diverse

3  intersex and questioning youth, ages approximately 3

4  through 26 in our multi-disciplinary team.

5      Q.    So how is that different then from where you

6  provide clinical care as an assistant professor?

7      A.    Those two jobs descriptions overlap quite a bit.

8      Q.    Are there any parts that do not overlap?

9      A.    I would argue that it's outside of my role as an

10  assistant professor but definitely in my role as the

11  Medical Director of the clinic to have meetings where we

12  discuss the care we provide, to meet with our DEI head

13  more promptly, diversity, equity and inclusion, those

14  sorts of things.

15      Q.    Do you supervise anyone in either of your roles?

16      A.    I often precept trainees, residents and medical

17  students.

18      Q.    Could you repeat that?

19      A.    I often precept trainees, including residents

20  and medical students.

21      Q.    You said preset?

22      A.    Precept, P-R-E-C-E-P-T.  It's a word used in

23  medical care to discuss supervision of trainees.  I'm

24  their preceptor.

```
 1      Q.     And do you supervise them as they are giving

 2   medical care?

 3      A.     Yes.

 4      Q.     Would it be fair to say that you are currently a

 5   treating physician?

 6      A.     Yes.

 7      Q.     And just so I have it right rather than me

 8   trying to restate it, in what areas do you treat

 9   patients?

10      A.     I provide care for adolescents and young adults.

11      Q.     In what areas?

12      A.     In adolescent medicine, in gender affirming

13   care.

14      Q.     Do you provide general --- are you a

15   pediatrician as well?

16      A.     It's complicated.  Adolescent medicine is a

17   complicated --- and there are many adolescent

18   specialists who do provide well child care for young

19   people.  I do that infrequently.  And so for example, if

20   a young person wishes for me to be their primary care

21   provider, I can do that on a limited basis, but the

22   majority of my care is subspecialty care and

23   consultation.

24      Q.     When patients need to come to you do they come
```

1   to you directly or through the University?

2      A.    Can you restate the question?

3      Q.    So it's my understanding that you do treat

4   patients.  And so my question is do they come to you

5   directly or do they go through the University?

6      A.    I'm not understanding what you mean by coming

7   through the University.

8      Q.    How do you --- how do patients come to you?

9      A.    They can call our scheduling line that is

10  available on our website or they can be referred from

11  another physician or provider.

12     Q.    How much of your time is spent with patients

13  versus your time in doing research and teaching and

14  other things?

15     A.    I am 20 percent clinical and 80 percent

16  research.

17     Q.    So when a new patient comes in what is the ---

18  let me back up for a second.  Have you been --- one

19  second.  When you have a new patient come in --- I'm

20  sorry, let me go back to my other question.  Have you

21  been asked to be an expert witness in this case?

22     A.    No.

23     Q.    Tell me about the intake process for a new

24  patient.

1    A.    Well, depending on how a new patient finds us,

2  either through direct scheduling or referral, once they

3  have the visit they usually meet with us for a longer

4  than perhaps expected visit to compare to other

5  pediatric practices.  New patients visit with my team

6  are usually between two and two and a half hours.  An

7  hour of that is typically spent with me and we have a

8  fairly long conversation with the young person, with

9  family members together and separately and then we work

10  together to help support that young person together.

11    Q.    When you say your team, who is on your team?

12    A.    Our team, from my practice, currently includes

13  myself, a child and adolescent psychiatrist, whose name

14  is Dr. Deci, and a clinical therapist, whose name is Ms.

15  Brianna Hayes.

16    Q.    Doctor Steven --- what is his last name?

17    A.    Deci, D-E-C-I.

18    Q.    And Brianna Hayes, what is ---?

19    A.    H-A-Y-E-S.

20    Q.    What's her practice?

21    A.    She is a clinical therapist.

22    Q.    And Doctor Deci, what's the practice?

23    A.    He is a child and adolescent psychiatrist.

24    Q.    When the patient first is coming in --- let me

1    back up just a little bit for some more nuts and bolts

2    in my question.  Do they first meet with a secretary or

3    nurse or fill out papers online?  How does that process

4    --- let's start with someone who is just direct

5    scheduling.

6        A.    And so if someone calls our scheduling line,

7    they are scheduled for a visit.  And they would arrive

8    at their visit time, they would check in.  They would

9    sit in the waiting room.  A nurse would call them back,

10   take their vital signs and they would be put in an exam

11   room with their family.  They arrive with family.  And

12   then our team would see them.

13       Q.    As far as the initial record, setting up the

14   initial record of who this person is and what they're

15   coming in for, who does that?

16       A.    The family when they call when to make a visit

17   will ask for a gender visit, and that's the only

18   questioning that happens at that time.

19       Q.    And then everything else that is input into the

20   patient's records would either be from the nurse or from

21   you or your team?

22       A.    For those who are directly scheduling.  If

23   someone has been referred, it may be that they're

24   referring provider or a scheduler from their referral

1  team put additional documentation in.

2      Q.    Is there any --- okay.

3            So when you meet with the patients, is it

4  initially just you or is it with the entire team first?

5      A.    So it depends.  We like to do a greeting where

6  we all pile in these exam rooms and say hello and

7  introduce ourselves so young people and families know

8  our names and faces.  Sometimes that is not possible for

9  a variety of reasons.  And also sometimes families don't

10 need all of us and may or may not be interested in

11 seeing all of us.  Sometimes families just want to see

12 me or sometimes they just want to see the mental health

13 providers, and we try to accommodate that where we can.

14     Q.    Do you gather their past medical history?

15     A.    Yes.

16     Q.    And is their medical history important?

17     A.    I think that every patient's medical history,

18 medication list, allergies, things like that can be

19 important to their care.

20     Q.    Can you explain to me why?  I mean it may seem

21 obvious to you, but I would like to just understand it.

22     A.    Okay.

23           And so, someone's past medical history could

24 certainly impact their present health, and so part of my

1    routine practice is to ask young people and their

2    families what kind of diagnoses they have had in the

3    past, including things like asthma, allergies, if

4    they've broken their arm before, a whole host of

5    questions.

6        Q.    Are those things relevant to gender care?

7        A.    They could be.

8        Q.    How would allergies be related to gender care?

9        A.    If you had an allergy to a medication that was

10   related or the same as a medication that I could

11   provide, that would be a concern to me.

12       Q.    And do you typically take the history just from

13   the patient or do you reach out to other healthcare

14   providers?

15       A.    I take my history from the patient and parent or

16   guardian in front of me, but I also have access to our

17   electronic health record and I review that as well for

18   meeting new patients.

19       Q.    Tell me about the electronic health record.

20       A.    Our health system uses an electronic health

21   record called Epic.

22       Q.    And what is located in the Epic system?

23       A.    A variety of things, including vital signs from

24   previous visits, notes from prior visits and prior

1   providers, information about the family address and

2   phone number, should we need to mail anything or call

3   them, things like that.

4        Q.    Does the Epic system --- let me back up.  So the

5   Epic system is a system used by West Virginia

6   University.

7             Is that right?

8        A.    WV Medicine specifically and UHA uses Epic I

9   believe in most, if not all, of their hospitals.  I

10  think a couple hospitals are going live with Epic soon.

11  I think it's an incredibly common electronic health

12  record in this country and others I believe.

13       Q.    I've heard of it.  I don't know a lot about it.

14  So tell me, would Epic system that WVU Medicine is

15  using, does it just have information from within the WVU

16  Medicine medical system or does it expand out to all

17  providers in the country, for example?

18       A.    It would be wonderful if it did that if an

19  effective way.  There's a bit of capitalism involved

20  there I suspect, but we do have something called Care

21  Everywhere, which is a tab that you can select and for

22  some circumstances it allows you to see notes from other

23  Epics systems outside of WVU Medicine.

24       Q.    So what is the WVU medical system?  Where else

```
 1   are they tied into?

 2       A.    Can you restate your question?

 3       Q.    First of all, let me make sure I get my

 4   terminology correct.  It's WVU Medical?

 5       A.    WVU Medicine.  I think that's the brand name for

 6   the UHA health family of hospitals and clinics and that

 7   sort of thing.

 8       Q.    So WVU Medicine uses the Epic system and also

 9   you can utilize Care Everywhere.  So my question is,

10   Care Everywhere ties you into what other systems?

11       A.    I don't know the comprehensive list.  It's kind

12   of a bit of luck I think sometimes navigating Care

13   Everywhere.  It's a little bit of what I would consider

14   a clunky system, but Care Everywhere is within Epic.  It

15   is not itself a separate system.

16       Q.    Understood.  But can you recall any other

17   organizations that you can access through Care

18   Everywhere?

19       A.    I know that I can access the University of

20   Pittsburgh in some capacity.  I previously worked in

21   that system, and so I wasn't seeing exactly what it

22   looked like if I was in their system, but I can't really

23   speak to other systems that are connected.

24       Q.    And if a patient comes in and they've had prior
```

```
 1   medical providers, do they typically bring in any copies
 2   of medical records?
 3       A.    That would be wonderful, but it doesn't happen
 4   very often.
 5       Q.    Is the intake process any different for when
 6   someone comes in as a referral patient?
 7       A.    It depends on how they've been referred.  So for
 8   example, sometimes providers will reach out to me
 9   through secure communication within Epic and say they
10   have a patient they wish to refer and they might have
11   questions about how to make that happen.  So there may
12   be an additional layer of communication there.  I often
13   ask questions about urgency of need.  Sometimes patients
14   are needing to see me sooner for a variety of reasons,
15   maybe mental health concerns, that may be just stress
16   about getting a visit, and so I can accommodate those
17   things.
18       Q.    So if the referred physician had information,
19   they can send that to you through the Epic system?
20       A.    They can send me a communication and that may
21   include information that they feel is relevant for me to
22   know about the patient they're sending me.
23       Q.    When they send that communication, what does
24   that look like?  Is that email, texting?
```

1      A.    It's --- it's neither.  It's actually a

2   communication system within Epic.  It's called Inbasket.

3      Q.    And does Inbasket provide for just

4   communications or also sending documents?

5      A.    I believe you can attach documents within those,

6   but I have very intermittent luck of doing so and most

7   folks do not use that feature.

8      Q.    Anything else different about when you receive a

9   referral as opposed to a direct contact?

10               ATTORNEY HARTNETT:  Objection to form.

11               THE WITNESS:  Not that I can think of.

12   BY ATTORNEY TRYON:

13      Q.    Let me ask you generally what types of

14   information do you need to diagnose a problem?

15               ATTORNEY HARTNETT:  Objection to form.

16               THE WITNESS:  Can you restate the

17   question?

18   BY ATTORNEY TRYON:

19      Q.    Yes.  So in your field, are you --- do you

20   diagnose patients?

21      A.    If it is within my scope of practice, yes.

22      Q.    And what type of --- what information do you

23   need to make a diagnosis of your patients?

24      A.    It depends on the patient and the diagnoses I'm

1   considering.

2       Q.     Is there something called objective versus

3   subjective symptoms?

4       A.     Yes.

5       Q.     Can you explain what those are and the

6   difference?

7       A.     Objective tends to refer to things like vital

8   signs or labs, things that we measure.  Subjective tends

9   to refer to things that patients tell us, like that they

10  have headaches or the severity of their headaches.

11      Q.     How do you measure subjective symptoms?

12      A.     You talk with your patient.

13      Q.     Anything else?

14      A.     That's the primary way to diagnose most things

15  is to have a conversation with your patient.

16      Q.     Is there a --- an objective way to measure the

17  subjective symptoms?

18      A.     We have a lot of scales for a lot of things.  We

19  have a lot of diagnostic criteria for a lot of things,

20  but most of medicine would not exist in my opinion if we

21  didn't talk with our patients.

22      Q.     I understand that.  So it sounds like there's

23  not a good way to actually put a measurement on

24  subjective symptoms.

```
 1              Is that a fair statement?

 2                   ATTORNEY HARTNETT:  Object to form.

 3                   THE WITNESS:  They are by nature

 4    subjective.

 5    BY ATTORNEY TRYON:

 6      Q.    So when someone comes to you for gender

 7    dysphoria issues as opposed to other types of medical

 8    issues --- actually, let me start that all over again.

 9    Do you ever treat patients or diagnose patients for

10    things other than gender dysphoria issues?

11      A.    Yes.

12      Q.    What other medical issues do you diagnose or

13    treat?

14      A.    It's a very extensive list.

15      Q.    Okay.

16            Then I won't make you go through it, but can

17    you give me some just general ideas?

18      A.    Dysmenorrhea is an incredibly common thing that

19    I treat and diagnose.

20      Q.    Can you repeat that or spell that, please?

21      A.    Dysmenorrhea, D-Y-S-M-E-N-O-R-R-H-E-A.

22    Dysmenorrhea.

23      Q.    What is that?

24      A.    Dysmenorrhea is difficult periods.  It's a whole
```

```
 1    host of things that lead to heavy bleeding,
 2    uncomfortable bleeding, pain with bleeding, and can
 3    really impact live experience with young people.
 4        Q.    Okay.
 5              Anything else?
 6        A.    As I said, there are many things that I diagnose
 7    and treat.
 8        Q.    Give me a few examples just so I sort of
 9    understand your practice.
10        A.    Okay.
11              Sexually transmitted infections.  I'm an
12    adolescent medicine doctor, so really anything in the
13    pubertal period or young period is in my practice.  But
14    I often screen and treat for sexually-transmitted
15    infections.  I also manage contraception.  I also talk
16    about mood, anxiety, depression.  Would you like more?
17        Q.    I think I'm getting the sense of it.  So let me
18    ask you about gender dysphoria.  Can you give me your
19    definition for what gender dysphoria is?
20        A.    My definition is loosely based on the DSM-V,
21    which has criteria for the diagnosis of gender
22    dysphoria, but it is stress, significant distress often
23    associated with the inconference between one's sex
24    assigned at birth and gender identity lasting longer
```

1  than six months with accompanying things like seeking to

2  present one's self gender expression in line with one's

3  affirmed gender and in opposition to one's sex assigned

4  at birth as well as some other criteria.

5      Q.    Is the actual intake process that we have

6  discussed for someone coming to you for gender dysphoria

7  different than some of these other issues that you've

8  mentioned to me?

9      A.    Can you restate the question?

10     Q.    Sure.

11          When someone comes to you, you have given me

12 sort of the --- explained to me how the intake process

13 works in general.  And my question is, is it any

14 different in general than with respect to someone coming

15 to you with gender dysphoria specifically?

16     A.    In some ways.  I ask a whole lot more questions

17 about gender when we are talking about gender dysphoria,

18 although I ask all of my patients about gender identity.

19     Q.    Why do you ask all of your patients about gender

20 identity?

21     A.    It's important that I'm respectful of them and

22 their name and pronouns, and also we know that gender

23 diverse young people, and by my definition that is

24 anyone who's sex assigned at birth and gender identity

1    do not fully align, we know that those young people face

2    health disparities and inequities associated with mental

3    health, and I want to make sure I can address those if

4    they are present.

5                    ATTORNEY TRYON:  Let me just ask the

6    court reporter if you're able to keep up with this?

7                    COURT REPORTER:  Attorney Tryon, if the

8    doctor could speak a little bit slower because I'm ---

9    yeah, a little bit slower, Doctor, please.

10                    THE WITNESS:  Absolutely.

11                    ATTORNEY HARTNETT:  She is doing a great

12   time on the real time, though, but appreciate the point.

13   BY ATTORNEY TRYON:

14       Q.    What is --- what percentage of your practice

15   involves gender dysphoria or gender identity issues?

16       A.    I couldn't give you an exact number, but my

17   guess would be 80 percent.

18       Q.    Now, you mention there's --- this may not be

19   your word, but there's a process for diagnosing gender

20   dysphoria.

21             Is that right?

22       A.    There are diagnostic criteria, yes.

23       Q.    And can you list those for me again?  You

24   started to go through that a little bit, but if you

1    could go through that I would appreciate it.

2        A.    These are located in the DSM-V, and I cannot

3    recite them by memory.

4        Q.    Well, as best as you can, can you tell me what

5    they are?

6        A.    Loosely, the definition of gender dysphoria by

7    my interpretation is that there is distress, often

8    significant distress, associated with an incongruent

9    between one's sex assigned at birth and one's gender

10   identity lasting for at least six months and also

11   inclusive of some other criteria, which include things

12   like desiring to align one's gender expression with

13   one's affirmed gender and in opposition to one's

14   assigned sex.

15       Q.    About how many people have come to you to get an

16   initial diagnosis of gender dysphoria?

17       A.    I want to clarify that most folks, at least a

18   substantial portion of folks don't come to me asking for

19   that diagnosis specifically, but more broadly to have

20   conversations about means of support, although I am able

21   to provide that diagnosis.

22       Q.    Okay.

23             And about how many people have you given that

24   diagnosis to?

1      A.    I couldn't give you an exact number.  I can

2    approximate and say that I have seen well over a hundred

3    patients in my clinic.

4      Q.    And in which or for which you've given a

5    diagnosis or gone through that --- let me start that

6    over.  Of those hundreds, those are the --- those you've

7    actually gone through the process to make a diagnosis of

8    gender dysphoria?

9      A.    I've certainly asked all of the relevant

10    questions.  Sometimes young people and their families

11    don't desire to have that diagnosis listed in their

12    chart due to fear of discrimination.

13      Q.    But you would say you've given that diagnosis

14    for over a hundred patients?

15      A.    I've certainly asked the questions associated

16    with that diagnosis, yes.

17      Q.    Okay.

18            But I'm asking where you've done the actual

19    initial diagnose --- given actual diagnosis of that

20    gender dysphoria, would you say over a hundred or not?

21      A.    It's really hard to say because there is no ---

22    there is no way that one gives a formal diagnosis kind

23    of as a here it is.  It's more of a you meet these

24    criteria.  Let's explore what that means.  Does that

```
 1   feel in line with your life experience.  Sometimes I
 2   have to write it in the chart for the purpose of
 3   insurance coverage, for medication for example.  But
 4   it's a bit more complicated than just saying you checked
 5   the boxes, here is your diagnosis.
 6        Q.    Okay.
 7              Have you ever had a patient that came to you
 8   and you discussed gender dysphoria with that patient and
 9   ultimately you concluded that the patient did not have
10   gender dysphoria?
11        A.    I have.
12        Q.    Are those patients who initially thought they
13   had gender dysphoria and you concluded they did not?
14        A.    Not usually, no.  Those are more often patients
15   who are questioning this part of themselves and
16   exploring their identities as a normal part of
17   adolescent development.
18        Q.    For any of the patients that have come to you
19   and said they thought they had gender dysphoria, have
20   you arrived at a different diagnosis of what was causing
21   their concerns?
22        A.    I can't recall an occasion like that.
23        Q.    Are you familiar with the concept of watchful
24   waiting?
```

1       A.      I am.

2       Q.      Have you ever recommended that to a patient?

3       A.      I have not because it is not recommended by the

4  American Academy of Pediatrics.

5       Q.      Tell me how you are familiar with that.

6       A.      I'm familiar with it through the policy

7  statement on the care of this population of young people

8  from the American Academy of Pediatrics by Rafferty, et

9  al., 2018.

10      Q.      Have you --- tell me that citation again.

11      A.      Sure.  Rafferty, et al., 2018, the American

12  Academy of Pediatrics.

13                  ATTORNEY LINKOUS:  Mr. Tryon, I know

14  we've been going about an hour-and-a-half.  When you get

15  to a logical breaking point, I could use three minutes.

16                  ATTORNEY TRYON:  Okay.

17                  Give me just another couple of minutes

18  and then we will break.

19  BY ATTORNEY TRYON:

20      Q.      Have you read any literature other than that

21  about watchful waiting?

22      A.      That is the literature that most specifically

23  sticks out in my mind.  I'm sure I've read countless

24  articles that discuss this in one form or another.

1    Q.   Are you aware that there are other articles that

2  do recommend watchful waiting?

3              ATTORNEY HARTNETT:  Objection to form.

4              THE WITNESS:  I am not familiar with

5  articles like that from highly-respected medical

6  organizations.

7  BY ATTORNEY TRYON:

8    Q.   Are you aware of any, whether or not they are

9  from highly-respected medical organizations?

10    A.   Not off the top of my head, no.

11    Q.   Have you read their studies?  I mean, this is a

12  Dutch concept.

13          Right?

14              ATTORNEY HARTNETT:  Objection to form.

15              THE WITNESS:  I'm not familiar with what

16  you're talking about.

17  BY ATTORNEY TRYON:

18    Q.   It's called the Dutch Approach, and you're not

19  --- you haven't heard that?

20              ATTORNEY HARTNETT:  Objection to form.

21              THE WITNESS:  I certainly am familiar

22  about the Netherlands and the Dutch and the work they've

23  been doing in this space for more than a decade.

24  BY ATTORNEY TRYON:

1    Q.    And over there watchful waiting is considered an

2    appropriate recommendation.

3          Right?

4    A.    I can't speak to that.  I know from their

5    literature they've demonstrated that the approach we

6    take here in this country when done in their country was

7    very helpful and reduced mental health concerns in their

8    young people.  I believe that's a DeVry study from more

9    than ten years ago.

10   Q.    What is the difference between gender dysphoria

11   and gender nonconformity?

12             ATTORNEY TRYON:  You know what, I will

13   withdraw that question.  We can take a break right now.

14   When we come back we can talk about that.  Okay?

15             ATTORNEY LINKOUS:  We can go off the

16   record.

17             VIDEOGRAPHER:  Going off the record.  The

18   current time reads 11:26 a.m.

19   OFF VIDEOTAPE

20                      ---

21   (WHEREUPON, A SHORT BREAK WAS TAKEN.)

22                      ---

23   ON VIDEOTAPE

24             VIDEOGRAPHER:  We are back on the record.

1    The current time reads 11:37 a.m.

2    BY ATTORNEY TRYON:

3        Q.    Dr. Kidd, when we concluded, when we took our

4    break we were just finishing up talking about watchful

5    waiting.  Let me ask you just one or two more questions

6    about that.  Is watchful waiting something that --- is

7    the only reason that you don't ever recommend that is

8    because of the Rafferty study?

9        A.    So Rafferty is not a study.  It's a policy

10   statement from the American Academy of Pediatrics that

11   summarizes best practice guidelines for gender diverse

12   young people.  And so in that it does not recommend

13   watchful waiting.

14          Additionally, based on my own literature view

15   conducted over the course of my career thus far I have

16   never seen medical literature that supports the use of

17   that practice and is associated with positive mental

18   health outcomes for youth.

19       Q.    Okay.

20          Let me ask you about gender dysphoria versus

21   gender non-conformity.  You're familiar with both those

22   terms.

23          Right?

24       A.    I am.

```
 1      Q.     What's the difference between those two things?

 2      A.     Gender conformity is simply someone rejecting

 3  some tenet of what society presumes they should look

 4  like, act like, think like as it pertains to gender.

 5  And so that could be someone who, like myself, was

 6  assigned female but who is very interested in building

 7  and construction, right.  Typically, that is considered

 8  a more masculine pursuit.  And so that could be gender

 9  non-conformity, and that could extend through my

10  expression.  Perhaps I would want to present myself in a

11  way that is more masculine or more androgenous.  That

12  would also be reflective of gender nonconformity.

13         Where this enters into the territory of gender

14  dysphoria is when you have that significant distress

15  associated with that encumbrance between my sex

16  assignment and my gender identity.  That is the

17  difference.

18      Q.     Could you repeat that last part again?

19      A.     From where?

20             ATTORNEY TRYON:  Can I ask the court

21  reporter to read back that answer?

22             COURT REPORTER:  It is simply someone

23  rejecting of what society presumed they should look

24  like, act like, think like as it pertains to gender.
```

1   And so that could be someone, who like myself, was

2   assigned female but who is very interested in building

3   and construction, right.  Typically that is considered a

4   more masculine pursuit, and so that could be gender

5   non-conformity and that could express through my

6   expression perhaps.  I would want to perhaps myself in

7   --- want to present myself in a way that is perhaps more

8   masculine or androgenous, where this enters into the

9   area of territory of gender dysphoria where you have

10  that significant distress encumbrance in between my

11  gender society.  That is the difference.  That's the

12  part I messed up.

13  BY ATTORNEY TRYON:

14      Q.    Isn't there always some level of anxiety or

15  distress when someone has a gender non-conformity?

16      A.    No, not always.

17      Q.    So then in every event where there is some level

18  of stress or anxiety does it then turn into gender

19  dysphoria?

20      A.    No.  The word that I use is significant or

21  severe, and I believe that language is also echoed in

22  diagnostic criteria.

23      Q.    So when I use the name BPJ, do you know who that

24  is?

 1      A.      I do.

 2      Q.      Who is that?

 3      A.      That is ████, my patient.

 4      Q.      Last name ██████?

 5      A.      I believe it's a hyphenated last name,

 6  ██████████████, but yes.

 7      Q.      Very good.   Thank you for correcting me on that.

 8  Any --- prior to --- strike that.

 9              Do you have any personal relationship with

10  either BPJ or BPJ's family?

11      A.      I am a physician caring for this young person.

12  That is the extent of my relationship with this family

13  and this young person.

14      Q.      When did you first hear of BPJ, with that ---

15  those initials or any other name?

16      A.      I believe the first time I heard about ████ was

17  when Dr. Someshwar, an adolescent medicine specialist

18  who i work with, recommended that she see me.

19      Q.      Remind me how to spell that doctor's name?

20      A.      S-O-M-E-S-C-H-W-A-R (sic), Someshwar.

21      Q.      And how did that come about?

22      A.      So Dr. Someshwar is the division head of

23  Division of Adolescent Medicine and WVU Medicine

24  Children's and my direct supervisor in my current

1    position, but also Dr. Someshwar provides care for

2    gender diverse people, as I do, but she does not provide

3    care for those who are interested in or have received

4    pubertal blockers.

5         Q.   Why not?

6         A.   That is outside of her scope but well within my

7    own, and that is why she wished for me to see ███.

8         Q.   And how did --- and I'm also going to use BPJ

9    because that's the name on the Complaint, number one,

10   and number two, since BPJ is a minor, that's my practice

11   is to refer to people in court proceedings by their

12   initials, all minors.

13             ATTORNEY HARTNETT:  And if I could just

14   --- for the record, this is Kathleen Hartnett for

15   Plaintiff.  It's acceptable to us for you to refer to

16   her as ███ or BPJ in this deposition.  We marked the

17   Complaint BPJ per rules of Court, and we'll mark the

18   parts of this deposition about her medical records, if

19   any, confidential, but Plaintiff has no objection to

20   referring to her in either way.  Thank you.

21             ATTORNEY TRYON:  Well, to be clear, I'm

22   going to continue doing that because if I make the

23   mistake elsewhere, I can be sanctioned by a court, so

24   I'm going to stay with that.

1    BY ATTORNEY TRYON:

2        Q.    So how did BPJ come to the attention to Dr.

3    Someshwar?

4        A.    It is my understanding that Dr. Someshwar had

5    provided care to ███████.

6        Q.    Do you know what care?

7        A.    I had seen a note from Dr. Someshwar.

8        Q.    And what did that note say?

9        A.    I can't recall the contents of that note, simply

10   that I do remember seeing one.

11       Q.    Is that in the records that you mentioned before

12   or the Epic records?

13       A.    It would be in the Epic record, yes.

14       Q.    Do you remember when you had your first contact

15   with BPJ and BPJ's family?

16       A.    I know from my records the exact date.  But

17   without I could easily tell you it was in the fall.  I

18   can look at my records to get you the exact date if that

19   would be helpful.

20       Q.    Before we go there, let me ask you if you have a

21   specific recollection of meeting with BPJ and Heather

22   Jackson.

23       A.    I do.

24       Q.    What do you remember right now about that

1   encounter?

2       A.     I have a mental picture of where ███████ and her

3   mom were sitting in the exam room.  That's most of the

4   extent of what I recall just from my own memory and not

5   reviewing the note.

6       Q.     Do you have a mental memory of the discussions

7   you had with BPJ and BPJ's mother?

8       A.     That would certainly refresh from my review of

9   my own note but also my practice is to have fairly

10  similar structured conversations with families, and so I

11  have a rough template in my brain of what we would have

12  talked about.

13      Q.     Tell me about that template.

14      A.     It involves asking lots of questions about young

15  people, their interests, their journey with gender

16  identity, their family.  Sometimes I ask about pets.

17  It's a whole host of things to get to know the young

18  person and their family.

19      Q.     What does that term mean journey with gender

20  identity?

21      A.     We are all forever growing and evolving and

22  changing as humans.  It's part of the human experience,

23  but particularly as it relates to gender for my patients

24  that's often a bit of a long journey, and so that may be

1    starting from when they are young children.  It may be

2    starting from when they are adolescents.  But

3    regardless, there is always much to talk about with

4    regard to a young person's experience of their own

5    gender identity over time.

6        Q.    And is that gender identity sometimes fluid?

7        A.    It absolutely can be.

8        Q.    Somebody may be for one period of time have a

9    gender identity as one gender and then that can change?

10       A.    Yes.

11                   ATTORNEY HARTNETT:  Object to form.

12   BY ATTORNEY TRYON:

13       Q.    How many genders are there?

14       A.    There are more genders than we understand, can

15   conceptualize or can count.

16       Q.    So over a hundred?

17       A.    Gender is a spectrum.  There is no solid number.

18   It's someone's lived experience.  It's much more

19   complicated than we try to make it by binarizing people.

20       Q.    So setting aside binder --- how do you say that,

21   binderizing?

22       A.    Binarizing people.  Forcing folks into a binary.

23       Q.    I've read some place there's 27 genders.  Would

24   you agree with that or not?

```
 1                    ATTORNEY HARTNETT:  Object to the form.

 2                    THE WITNESS:  I'm certainly not familiar

 3    with that particular study, but I would dispute it as I

 4    could probably list more than 27 myself.

 5    BY ATTORNEY TRYON:

 6       Q.    And when someone is gender fluid what does that

 7    mean?

 8       A.    It depends on the individual, and so these terms

 9    tend to be applied to folks but what matters to me is

10    the individual's definition of themselves.

11       Q.    Have you had any --- well, let me move on to

12    Exhibit 16.

13                    ATTORNEY TRYON:  And let me try to bring

14    this up.  This is going to be a first for me on doing

15    this on the system.

16                    VIDEOGRAPHER:  And I'm here if you need

17    some help or I can pull it up as well.

18                    ATTORNEY TRYON:  So Jacob, when I pull up

19    exhibits file sharing, it wants me to enter a password.

20                    VIDEOGRAPHER:  Did you join with a new

21    link when you rejoined after we got everything fixed?

22                    ATTORNEY TRYON:  I attempted to join with

23    the same link.

24                    VIDEOGRAPHER:  I can set that new one or
```

```
 1    I can just pull it up for you, either/or.
 2              ATTORNEY TRYON:  Why don't you do that.
 3    Can you pull up Exhibit 16, please?
 4              VIDEOGRAPHER:  Yes, just give me one
 5    second.
 6              ATTORNEY TRYON:  No, I had uploaded.
 7    Maybe you can't access them.  I had uploaded three
 8    documents.  One was Exhibit 16 just so we would only
 9    have to look at that one.
10              VIDEOGRAPHER:  Got you.  If you have them
11    uploaded, then I would not have access to them unless
12    you share them as host and share them with me.
13              ATTORNEY TRYON:  Let me see if I can do
14    this.
15              VIDEOGRAPHER:  Also, when you upload if
16    you check mark any of the boxes --- like if you check
17    mark like Defendant's Counsel, they would also all have
18    access to that as well.
19              ATTORNEY TRYON:  Well, it's now rejecting
20    my password.
21              VIDEOGRAPHER:  It might be since it's a
22    probably a different link that you joined the meeting
23    with you might have to hit the forget password and set
24    up a new one.  That one --- the old one that you made
```

```
 1   might be tied to the old link.

 2                   ATTORNEY TRYON:  Let's go off the record

 3   for a second so I can get this straightened out.

 4                   VIDEOGRAPHER:  Going off the record.  The

 5   current time reads 11:52.

 6   OFF VIDEOTAPE

 7                         - - -

 8   (WHEREUPON, A SHORT BREAK WAS TAKEN.)

 9                         - - -

10   ON VIDEOTAPE

11                   VIDEOGRAPHER:  We are back on the record.

12   The current time reads 11:59 a.m.

13   BY ATTORNEY TRYON:

14      Q.    Dr. Kidd, this is what we've marked as Exhibit

15   16.  Do you recognize this?

16      A.    I'm not able to read any of it due to size.

17      Q.    Okay.

18            I'm trying to blow it up.  Does that help?

19      A.    I have not seen it change.  I may be able to do

20   --- I can do it on my end specifically.  Let me do that.

21   I can only see the first page so far, but this does look

22   familiar, yes.

23      Q.    I believe you can click the different pages, 1

24   through 9.
```

 1      A.      I see that now.  Yes.  This looks like my note.

 2      Q.      Do you have a hard copy of that in front of you

 3  as well?

 4      A.      I do.

 5      Q.      Feel free to use either one, just to go through

 6  this.

 7      A.      Yes.

 8      Q.      So my first question is simply what is this

 9  document?

10      A.      So certainly there are pages associated with

11  this packet that I'm not familiar with.  I think they

12  are part from the pull from the health system.  But

13  specifically as it relates to the section that begins

14  ███ is a 11-year-old patient, that is the beginning of

15  my clinical note from our patient visit.

16      Q.      How is the information in here populated into

17  this document?

18      A.      The note itself?

19      Q.      Well, everything in here.  I'm just trying to

20  understand how this document is created.

21      A.      I can't speak to the ancillary information

22  outside of my patient note.  I can tell you how my note

23  was created.

24      Q.      Well, let's start with that then.

1        A.      Okay.

2                I use a note template that has spaces for me to

3        fill in information, as well as some information that is

4        already populated that I can adjust accordingly.

5        Q.      Is that note template in Epic?

6        A.      It is.

7        Q.      And then Epic takes that information and would

8        populate it into a document that looks like what we have

9        before us?

10       A.      Specifically the section that begins ███ is an

11       11-year-old patient, yes.

12       Q.      The other information in here, for example, the

13       visit date, the name, those sorts of things, do you know

14       how those are populated into this document?

15       A.      So let me --- I don't know that you can see

16       where I am in the document, but this portion here that

17       has the WVU Medicine Children's logo, I think it copied

18       poorly.  But from this section down, this is my note

19       template.  Above that ---.

20       Q.      I cannot see where you're at.

21                       ATTORNEY TRYON:  Jacob, can you enable

22       her to show that?

23                       ATTORNEY LINKOUS:  Jacob, you're on mute.

24                       VIDEOGRAPHER:  I have you enabled to mark

```
 1   up the document.  You should be able to put in
 2   highlights or drag us around.  Whatever you do we should
 3   see.
 4                   THE WITNESS:  Okay.
 5                   VIDEOGRAPHER:  If you highlighted that
 6   right there, that's --- I see the highlight.  Does
 7   everyone else see that highlight?
 8                   ATTORNEY TRYON:  No, I can't see it.
 9                   VIDEOGRAPHER:  On page three, around the
10   it looks like the logo.
11                   ATTORNEY LINKOUS:  I see it.
12                   ATTORNEY HARTNETT:  This is Kathleen
13   Hartnett.  Just to make sure I'm clear, is the witness
14   able to move the exhibit in the window but the others
15   who see it cannot?
16                   VIDEOGRAPHER:  Right now I have the
17   witness set to move it.  I can give anybody permission
18   to alter it and move it around and stuff.  And it does
19   that for everybody.  So right now I just have the
20   witness with the permission for that.  Does that make
21   sense?
22                   ATTORNEY TRYON:  Yes.
23                   ATTORNEY HARTNETT:  Yes.
24                   ATTORNEY TRYON:  Yes.
```

1  BY ATTORNEY TRYON:

2     Q.    Is it highlighted in color?

3     A.    It is yellow.

4            ATTORNEY LINKOUS:  Mr. Tryon, she is also

5  on BPJ099.  I don't know if you're on that same page or

6  not.  I think she moved us down to that page.

7            VIDEOGRAPHER:  Let me try something to

8  synch it back up for you, Mr. Tryon.

9            ATTORNEY TRYON:  Okay.

10            VIDEOGRAPHER:  Do you see it now?

11            ATTORNEY TRYON:  I see the document.  I

12  don't see any yellow highlighting.

13  BY ATTORNEY TRYON:

14     Q.    Well, go ahead and describe where you're at.

15     A.    Sure.  There's a logo on one of these pages that

16  has some cookie-cutter people holding hands and it says

17  WV Medicine Children's, although I think the photocopy

18  did not do that logo any justice.  But that is the logo

19  located on the top of my note.  And that logo and

20  everything beneath it is part of my note template.  I am

21  not familiar with how Epic aggregates the additional

22  information in this packet.

23     Q.   Okay.

24            Do you know who enters in the information, for

1    example, the date of birth and the visit date?

2        A.    That information is likely entered at the time

3    of the visit being scheduled, although that is not part

4    of my role and so I cannot be certain.

5        Q.    At the very top of that page, I think it's the

6    same page, do you see it's got a number --- MRN number.

7    Is that the patient's number that's assigned?

8        A.    I have an E number on my screen that's below the

9    date of the visit encounter.  That is in my note

10   template.  That is the patient's medical record number,

11   that E number.

12       Q.    So I'm seeing MRN: E2003446?

13       A.    Yes.  And I know that you're having trouble

14   seeing my highlighting, and I don't know if you can see

15   that piece.  I pulled that number into my notes.  I'm

16   not sure where you're referring to it, but that is the

17   number.

18       Q.    Right at the top, I'm looking at the very top of

19   this page, page --- it's labeled BPJ099, and it's page

20   one.

21       A.    I can see it here.

22       Q.    Yes.  Now I see you're highlighting, although

23   it's not yellow.  Okay.  So then if you move over to the

24   right and it says sex M.  Does that stand for male?

1    A.    It does.

2    Q.    And who would input that that BPJ's sex is male?

3    A.    I cannot speak with certainty, but my guess

4 would be the person who collected the insurance

5 information.

6    Q.    And why would --- if BPJ identifies as a female,

7 as I think you say later on, why would that be put there

8 as male?

9    A.    The sex marker has to line up with the insurance

10 for the purposes of billing in the medical system.

11    Q.    Is that the only reason?

12    A.    That's the reason that I'm familiar with.

13    Q.    So you did not put that information in there?

14    A.    I did not.

15    Q.    If you can scroll down where it says desired to

16 be treated as other gender.

17    A.    Sure.

18    Q.    It shows the name pronouns of she and her.

19    Right?

20    A.    Yes.

21    Q.    And if I scroll down further I look at and I see

22 under gender dysphoria patient describes this experience

23 for themselves as --- why do you use a different pronoun

24 down there?

1     A.    That's part of my standard note template.  The

2  things before the colons in these sections are part of a

3  note template.

4     Q.    Okay.

5           Then back up to desire to be rid of secondary

6  sex characteristics.  It says expectations for today's

7  visit.  That's part of the template?

8     A.    It is before the colon.

9     Q.    Right.  And so that template is something that's

10  created by Epic or by someone else?

11     A.    That's a note template that I created within

12  Epic.

13     Q.    I see.  And so it says want to establish care.

14  That seems obvious to me, but can you explain that?

15     A.    This was my first time seeing ██████.  And as

16  part of my first visit with all of my patients I ask,

17  you know, what are their expectations or goals for

18  today's visit.  And when I asked that question, ██████

19  and her mom responded that they wanted to establish care

20  today.  I'm not sure exactly who said that.  I suspect

21  it was mom.

22     Q.    And next it says has ████████████  since

23  June 2020 placed by Dr. Montano at UPMC.  And you put

24  that in there?

```
 1      A.     I did.

 2      Q.     And how did you know about that ████████████?

 3      A.     I suspect that mom told me.  That information

 4   was provided to me during this visit.  But also it was

 5   in the medical record that I would have briefly reviewed

 6   prior to this visit.

 7      Q.     What medical record is that?

 8      A.     The notes that are available for me in Epic.

 9      Q.     So you're telling me that in Epic there would be

10   some notes that stated that there was an ███████, a

11   ██████████████?

12      A.     I believe Dr. Someshwar's note referred to it,

13   yes.

14      Q.     Did you ever ask Dr. Montano if he had placed

15   that ████████?

16      A.     I don't recall specifically asking Dr. Montano

17   if he placed the ████████, no.

18      Q.     Did you do anything to confirm that the ████████

19   was in place?

20      A.     I examined ███████'s arm.  I palpated the ████████.

21   I noted the small scar at the insertion site.  I also

22   confirmed it based on lab testing.

23      Q.     Next, under desire to gain secondary sex

24   characteristics of other gender, slash --- other gender,
```

```
 1    colon, that was part of the form?

 2        A.    That was part of my note template, yes.

 3        Q.    And you created that?

 4        A.    I did.  I should note it's based off of a

 5    template from those that taught me.

 6        Q.    Which would be whom?

 7        A.    Dr. Montano.

 8        Q.    Under there it has --- under severity, wanting

 9    to be other gender, other gender is based on the

10    following, hair style and clothing and desire for

11    hormone therapy, which you created that template.

12              Right.

13        A.    Yes, everything before the colon.

14        Q.    And you inputted feminine, feminine in the

15    future.

16              Right?

17        A.    I did, based on our conversation during this

18    visit.

19        Q.    Are those the things upon which you made a

20    determination --- strike that.

21              Did you make a determination that ███ was

22    gender dysphoric?

23        A.    If you review the criteria for diagnosis for

24    gender dysphoria it's that essentially insistent,
```

```
 1  persistent, consistent, incongruence associated with

 2  significant distress, as I discussed earlier, plus two

 3  or more of a list of criteria.  This note outlines those

 4  criteria.  And so based on the responses to questions

 5  that I asked in relation to my documentation here, yes,

 6  ████  does meet the diagnostic criteria for gender

 7  dysphoria.

 8      Q.    Did you actually make a diagnosis?

 9      A.    ████  already had that diagnosis prior to seeing

10  me.

11      Q.    And that was --- who made that diagnosis?

12      A.    I suspect the first person was Dr. Montano,

13  although I don't know that for sure.

14      Q.    And who told you that she already --- that BPJ

15  already had such a diagnosis?

16      A.    The medical record.

17      Q.    And that medical record which was from Dr.

18  Someshwar?

19      A.    And Doctor Someshwar would have had one of those

20  notes, yes.

21      Q.    Any other notes that would have said that?

22      A.    Likely notes from ████'s therapist.

23      Q.    And you have access to ████'s therapist's ---

24  excuse me, BPJ's therapist --- let me start that over.
```

1   You had information from BPJ's therapist?

2        A.    I had documentation.

3                   ATTORNEY HARTNETT:  Object to form.

4                   THE WITNESS:  Of her record.

5   BY ATTORNEY TRYON:

6        Q.    Is that also on Epic?

7        A.    Yes.

8        Q.    So I want to go back to this part where it says

9   desire to gain secondary sex characteristics.  So are

10  hairstyle and clothing the only bases to determine if

11  someone is gender dysphoric?

12                  ATTORNEY HARTNETT:  Object to form.

13                  THE WITNESS:  No.

14  BY ATTORNEY TRYON:

15       Q.    What other?

16       A.    Potential criteria, potential things that we

17  look for.  There's no one single criterion.

18       Q.    But those are the only things that are listed in

19  this form.

20            Right?

21                  ATTORNEY HARTNETT:  Object to form.

22                  THE WITNESS:  In that particular section.

23  BY ATTORNEY TRYON:

24       Q.    And desire for hormone therapy in the future.

1    What additional hormone therapy was desired?

2        A.    Estrogen.

3        Q.    And were you told why?

4        A.    I can't recall our exact conversation, but it is

5    my typical practice to have pretty detailed

6    conversations about where a young person is in their

7    chem thought process and understanding of what estrogen

8    could mean for them.

9        Q.    And what could it mean for them?

10       A.    It could meaning gaining secondary sex

11   characteristics of the other gender.

12       Q.    Such as?

13       A.    Breast growth.

14       Q.    Any others?

15       A.    Several others.

16       Q.    What are those?

17       A.    Thinning of hair follicles, softening of skin.

18   Those are the primary.

19       Q.    I'm sorry.  What did you say about hair

20   follicles?

21       A.    Thinning, making the hair follicles less

22   apparent on the body especially.

23       Q.    And do you recall discussing those with BPJ and

24   BPJ's mother?

1    A.    I can't recall the specifics of that encounter,

2    but is my standard practice to have those discussions.

3    Q.    Up at the top of that page, do you see at the

4    very top where it says ███████████, comma, and it's

5    blocked out?

6    A.    Yes.

7    Q.    So --- let me back up.  This document was

8    produced to Plaintiff's Counsel then gave it to us.

9    Were you involved in that production to Plaintiff's

10   Counsel?

11   A.    I was not.

12   Q.    Okay.

13         Let me move on to the next page.  And let me

14   ask you, during this conversation was BPJ joined by

15   Heather the entire time?

16   A.    It is my standard practice to talk to young

17   people alone for at least a portion of their visit, and

18   so I suspect I did that during this visit.

19   Q.    Do you recall during this visit anyone other

20   than you were involved as far as healthcare providers?

21   A.    It is often that I have trainees with me, most

22   often in the role of shadows to witness how I talk to

23   patients, how I gather this information, that sort of

24   thing, how I provide care.  I do not recall having a

1    trainee with me that day, but my memory could be

2    mistaken there.

3        Q.    And in your memory was anyone else from WVU in

4    that meeting?

5        A.    From WV Medicine?

6        Q.    Yes.

7        A.    I don't think so because I know that the other

8    members of my multidisciplinary team were not a part of

9    this conversation as ████ was already established with

10   a mental health therapist.

11       Q.    Under past medical history --- and I'm now on

12   page two of this document, it shows mental health HX.

13   What is that?  What does HX stand for?

14       A.    It's a common medical abbreviation for the word

15   history.

16       Q.    In this past medical history that you have put

17   here, the source is --- what was the source?

18       A.    This source was very likely ████'s mother.

19       Q.    Under social history do you see that?

20       A.    I do.

21       Q.    Is there anything in there that affects or would

22   affect a determination or a diagnosis of BPJ having

23   gender dysphoria?

24       A.    These items in the social history are really

 1   about getting to know ▮▮▮▮ and her family dynamic and

 2   more about her generally.  These are not directly

 3   related to her gender identity.

 4       Q.    And let me just confirm up at the top of the

 5   page it says --- it shows the date being 9/16/2021.  Was

 6   that the date of the visit?

 7       A.    To the best of my recollection, yes.

 8       Q.    On the next page it shows patient active problem

 9   list.  Do you see that?

10       A.    I do.

11       Q.    And what --- it says WCC well check.  Is that

12   something that you inputted?

13       A.    It is not.  So this is a problem list that is

14   maintained in Epic usually by the patient's primary care

15   provider.

16       Q.    Who is this patient's primary care provider?

17       A.    I do not recall.

18       Q.    Is there anything on this form that would tell

19   you?

20       A.    On this particular form, no, although in the

21   Epic record that would likely be noted, at least to the

22   extent of my note.  It is not written in my notes.  It

23   may have been in some of these ancillary pages that I'm

24   not as familiar with.

1    Q.    During the visit did you discuss any of these

2    items under the diagnosis --- well, excuse me, under the

3    patient active problem list?

4    A.    Not to my recollection, no.

5    Q.    I'm sorry.  Let me finish my question.  The six

6    bullet points that are listed there, you did not input

7    any of those?

8    A.    That is correct.

9    Q.    And you didn't discuss any of those with BPJ or

10   BPJ's mother?

11   A.    Not to my recollection, no.

12   Q.    Now, the next paragraph of notes, was that

13   something that you inputted?

14   A.    It is.

15   Q.    And you ordered labs to confirm that the ███ was

16   likely to release medication.  Do I understand that

17   correctly?

18   A.    I ordered labs to confirm that the ███ was

19   continuing to release the medication, as I suspected it

20   would be, yes.

21   Q.    Why do you do that?

22   A.    It's routine and to make sure that the ███ is

23   functioning as we expect it to.  And for my practice I

24   usually check those labs every 6 to 12 months.

```
 1      Q.      How is the ███ supposed to function?

 2      A.      So the ███ has a medication called ██████.

 3   ██████ is a gonadotropin-releasing hormone agonist,

 4   or abbreviated a GRNHA.  A GRNHA works at the level of a

 5   hypervolemic pituitary gonadal access to suppress that

 6   access and subsequent release of sex hormones, either

 7   testosterone or estrogen, depending on the sex assigned

 8   at birth.

 9      Q.      Is it the same medication for both to stop

10   either testosterone or estrogen or is it different?

11      A.      It is the same medication.  It works in the same

12   way.

13      Q.      And did you also discuss that a ███ scan be

14   done?

15      A.      I had a discussion with ███ and her mother

16   about why I thought a ███ scan could be helpful and

17   they opted to get one.

18      Q.      It says I shared resources with mom to connect

19   her to local parents support programs.  Who were those

20   resources?

21      A.      I am connected to community organizations run by

22   parents wherein parents can talk with other parents of

23   gender diverse people.  My abbreviation for the program

24   I referred ███'s mom to is, in fact, next to ███'s
```

1    mom's email.  It's abbreviated POT for the Parent

2    Outreach Program.

3        Q.    At the bottom it says on the day of the

4    encounter a total of 60 minutes was spent on this

5    patient encounter, including review of historical

6    information, examination, documentation of post

7    activities.  And my question is what was the historical

8    information?

9        A.    That would have been the conversation with ███

10   and her mom talking about the medical history as well as

11   my pre-review of the chart prior to this visit.

12       Q.    And then the examination, what would that

13   entail?

14       A.    For ████, to my memory, that included making

15   sure that ████'s heart and lungs sounded normal and

16   generally evaluating how she was able to communicate,

17   how she moved about the room, those sorts of things are

18   the aspects of my physical exam.

19       Q.    And when it refers to documentation, what is

20   that referring to?

21       A.    The actual writing of this note.

22       Q.    Anything that is not in this note?

23       A.    It would have also involved me ordering the labs

24   and the ████ scan, writing why I was ordering the ████

1    scan, things of that nature.

2       Q.    And what would the post visit activities refer

3    to?

4       A.    That could be things like reviewing the labs if

5    they came back the same day.  This is a billing

6    statement and only includes the time spent during that

7    same day.

8                    ATTORNEY LINKOUS:  I'm sorry.  Can you

9    repeat that?

10                   THE WITNESS:  It is a billing statement

11   and so it is referring to activities that were

12   undertaken on that day.

13   BY ATTORNEY TRYON:

14      Q.    In your discussion with BPJ and BPJ's mother was

15   there any indication that BPJ had ever had any suicidal

16   ideations, suicide plans, threats or attempts?

17      A.    Not to my recollection.

18      Q.    Did you ask?

19      A.    I likely did.  That is part of my standard

20   practice.

21      Q.    Why do you ask that?

22      A.    Because gender diverse young people like ██████

23   base health inequities particularly as it relates to

24   mental health, although that's at population level and

1   does not necessarily apply to ███.

2        Q.    Why wouldn't it apply to ███?

3        A.    That's a population statistic, and so ███ is

4   her own person and may or may not be in line population

5   statistics more promptly.

6        Q.    And now I understand.  Do you know if BPJ has

7   ever been hospitalized for anything?

8        A.    I reviewed the chart and don't recall a specific

9   example of hospitalization.  I think there may have been

10  notes from emergency sorts of visits, but I don't

11  remember an inpatient hospitalization.

12       Q.    Before this visit had BPJ ever been diagnosed

13  with any mental or emotional illnesses?

14                  ATTORNEY HARTNETT:  Object to form.

15                  THE WITNESS:  Mom specifically mentioned

16  gender dysphoria, which is a diagnosis within the DSM-V,

17  which is a diagnostic and statistical manual and so I

18  suppose that could count.

19  BY ATTORNEY TRYON:

20       Q.    Well, is that a mental or emotional illness?

21                  ATTORNEY HARTNETT:  Object to form.

22                  THE WITNESS:  It depends on your

23  interpretation.  It is a diagnosis in the DSM-V.

24  BY ATTORNEY TRYON:

1    Q.    Okay.

2         It is a diagnosis.  Is it a diagnosis of mental

3    illness?

4                   ATTORNEY HARTNETT:  Objection to form.

5                   THE WITNESS:  That is a very challenging

6    question, and so the short answer is gender dysphoria is

7    significant distress, and it is that distress that can

8    be considered a mental health concern.  Being gender

9    diverse or transgender is not a pathology.

10   BY ATTORNEY TRYON:

11   Q.    Can you define then for our purposes what you

12   consider --- or based on DSM-V, what is a mental

13   illness?

14                  ATTORNEY HARTNETT:  Object to form.

15                  THE WITNESS:  Can you rephrase the

16   question?

17   BY ATTORNEY TRYON:

18   Q.    Yes.  So you referred to the DSM-V.

19         Right?

20   A.    I mentioned it, yes.

21   Q.    Does that define what a mental illness is?

22   A.    The DSM-V is the diagnostic and statistical

23   manual of essentially all of the things that the

24   American Psychiatric Association considers in their

1  wheelhouse for diagnoses.  And so things like depression

2  and anxiety are certainly in there but also things like

3  gender dysphoria.

4      Q.    Does it define the term mental illness?

5      A.    I can't recall.  It's a very broad term.

6      Q.    Other than gender dysphoria, were there any

7  other mental or emotional issues or problems that you

8  were aware that BPJ had been diagnosed with?

9      A.    Not that I can ---.

10              ATTORNEY HARTNETT:  Object to the form.

11              ATTORNEY TRYON:  Jacob, can you pull up

12  Exhibit 33, please?  Actually, I take that back.  Let's

13  stick with this exhibit a little bit longer.

14              VIDEOGRAPHER:  You got it.

15              ATTORNEY TRYON:  I apologize for that.

16  BY ATTORNEY TRYON:

17      Q.    So turning to page six of this exhibit?

18      A.    I'm unable to do that on my end.

19      Q.    I can.

20      A.    I can now, yeah.

21      Q.    Okay.

22              If you can go down to where it shows --- sorry,

23  it would be on actually page eight, eight of nine, I

24  believe.  And this was part of the testing that you

1    would have requested.

2            Is that right?

3        A.    This is one of those forms that Epic has

4    compiled for you, but it does look like it is of the

5    labs that I ordered, yes.

6        Q.    When this came back did you review it?

7        A.    I did.

8        Q.    And it shows under components testosterone total

9    serum.  Do you see that?

10        A.    Let me highlight and make sure we're looking at

11    the same thing.  Here?

12        Q.    Yes.

13        A.    Yes.

14        Q.    And if you go lower it shows the total serum and

15    it shows value of less than 7.0.

16            Right?

17        A.    Yes.

18        Q.    And down below it shows the Tanner reference

19    stages and for prepubertal, 7-20 for Stage 1.

20            Right?

21        A.    I can see that.

22        Q.    So does that testosterone level indicate that

23    BPJ was at Tanner Stage 1?

24        A.    No, that is not a correct interpretation.

1    Q.    Could you please interpret it for me?

2    A.    Sure.  So the testosterone level demonstrates

3  that it is suppressed, actually below a detectable

4  threshold of 7.0 for the purposes of this lab.  It is

5  important to note that all bodies, unless they are too

6  young or being blocked, make testosterone and that

7  includes people who are assigned female.  And so I

8  myself right now very likely, in fact I'm extremely

9  confident, have a level much higher than seven of

10  testosterone because that is normal for an adult female.

11  And so ████'s testosterone based on this level is fully

12  suppressed.  The reason that the Tanner stage reference

13  guidelines are in this record is that other folks use

14  this lab to monitor pubertal progression.  ████ was

15  Tanner stage prior to the rod and was at Tanner 2 at

16  that time.  And so this table is not relevant to ████,

17  just a refresh in the lab that her testosterone is fully

18  suppressed.

19                    ATTORNEY TRYON:  Okay.

20                    Now let's turn to Exhibit 33.

21                    VIDEOGRAPHER:  Before I show it, you said

22  33.

23                    ATTORNEY TRYON:  I didn't hear you.

24                    VIDEOGRAPHER:  Before I show it, you said

```
 1  33.

 2                 Correct?

 3                 ATTORNEY TRYON:  Right.  I sent you two

 4  other forms.

 5                 VIDEOGRAPHER:  I just wanted to make sure

 6  before I showed it.

 7                 ATTORNEY TRYON:  Yes.

 8                 VIDEOGRAPHER:  And does everybody see

 9  that.

10                 THE WITNESS:  Yes.

11                 ATTORNEY TRYON:  I do.

12  BY ATTORNEY TRYON:

13    Q.    Great.  So if we could go forward into page 11.

14  Sorry, it's going to be page 11 of the document itself,

15  so it looks like that will be page --- I'm not sure.

16         And Dr. Kidd, if you have the hard copy it might

17  be easier to read.  It depends on which one you want to

18  look at.  So the first two sentences of this read

19  through --- actually maybe the first three sentences.

20  Why don't you go ahead and read them to yourself.  We

21  don't need to read them out loud.

22                 VIDEOGRAPHER:  While she's reading that,

23  Mr. Tryon, I also gave you permission to mark the

24  document as well if you need to highlight something or
```

1     guide the witness.

2                    ATTORNEY TRYON:  Thank you.

3                    VIDEOGRAPHER:  You're welcome.

4     BY ATTORNEY TRYON:

5          Q.    Have you finished?

6          A.    I have.

7          Q.    Great.  So this indicates that gender dysphoria

8     during childhood is not evidently continued to childhood

9     rather than the dysphoria persists and resulted for only

10    6 to 23 percent of the children.

11              Right?

12                   ATTORNEY HARTNETT:  Object to form.

13                   THE WITNESS:  I believe, which are a bit

14    dated, but yes, that is what it says.

15    BY ATTORNEY TRYON:

16         Q.    Do you think that percentage has changed?

17         A.    I think our understanding of diagnostic

18    criteria, for example many of those studies were from

19    when we used GID, a different diagnostic criteria, that

20    has evolved additional these guidelines from WV are from

21    2012, I believe.  There is a new version that is set to

22    come out in the I think late winter of this coming year

23    that I was involved in giving feedback for.

24         Q.    Yes.  That version has not yet been accepted or

```
 1   issued, has it?

 2      A.    Not yet.  It's expected like within the winter.

 3      Q.    Assuming that's accepted, since it's still out

 4   for comment, but assuming it's accepted, how does it

 5   change in the eighth version, how does it change this

 6   language?

 7      A.    To be clear, it's still not out for comment.

 8   The comment period has ended and it's now back with its

 9   writing committee.  But there is more space given, to my

10   recollection, for exploring those differences by

11   diagnostic criteria that we did inform this prior

12   studies.  I think it's important, though, to center

13   ██████  in this conversation.    ██████  is an adolescent,

14   meaning that the second paragraph discussing the

15   likelihood of her gender identity is more relevant.

16      Q.    And under these guidelines what is the

17   percentage of persistence for adolescents?

18      A.    I couldn't cite a specific number because again

19   it's complicated, but it is the majority is my

20   understanding.

21      Q.    So when BPJ originally identified as being a

22   girl, BPJ was a child.

23            Right?

24      A.    I believe social transition was in third grade,
```

1  so into adolescence but perhaps not quite there yet

2  depending on your definition of adolescence.

3      Q.    How do you define adolescence?

4      A.    It depends.  The World Health Organization puts

5  numbers on young people, and so I believe they say age

6  10 to 19.  But that's not necessarily reflective of

7  pubertal changes, which is how I would define

8  adolescence.  And it's normal for pubertal changes to

9  begin at age nine.

10      Q.    And for --- well, let me just ask you, so since

11  this is the current and existing guideline and --- or

12  excuse me, standard of care, which you said you

13  subscribe to.

14      Right?

15          ATTORNEY HARTNETT:  Object to form.

16          THE WITNESS:  Well, I think it is

17  important to note if I may in this document.

18  BY ATTORNEY TRYON:

19      Q.    I apologize.  I didn't hear that.

20      A.    It's possible, I would like to point out on

21  page two, page number two on that part of it where it

22  lists the standards of care are flexible clinical

23  guidelines, that's a critical piece of all of this.  And

24  so they are not a kind of rule book but instead a

```
 1    guideline and there are many circumstances to deviate

 2    based on an individual patient circumstance.

 3        Q.    So you pick and choose what you agree with?

 4              ATTORNEY HARTNETT:  Object to form.

 5              THE WITNESS:  Not at all.  I follow

 6    numerous guidelines, including those from the American

 7    Academy of Pediatrics, but I also shape them to fit the

 8    needs of the patient.

 9    BY ATTORNEY TRYON:

10        Q.    Do you share with BPJ and BPJ's mother the

11    statistics that 6 to 23 percent of children due to

12    dysphoria --- excuse me, that the dysphoria persists

13    into adulthood for only 6 to 23 percent of children?

14    Did you share that with BPJ or BPJ's mother?

15              ATTORNEY HARTNETT:  Object to form.

16              THE WITNESS:  I believe the comment was

17    not relevant to the patient in front of me.

18    BY ATTORNEY TRYON:

19        Q.    Did you share with BPJ or BPJ's mother the fact

20    that not all adolescents persist into adulthood?

21        A.    I create space for people to explore their

22    gender identities.  I do not assume that any of us will

23    wake up tomorrow feeling the way we feel today about our

24    gender identity.
```

 1      Q.      So the answer is no, you did not share that with

 2   them?

 3      A.      I create space to have that conversation.

 4      Q.      Did you have a discussion in which you told BPJ

 5   or BPJ's mother that BPJ's gender dysphoria may not

 6   persist into adulthood?

 7      A.      I specifically in my practice make space to have

 8   conversations about fluidity and gender identity.

 9      Q.      That doesn't mean anything to me.  What do you

10   mean create space?

11                      ATTORNEY HARTNETT:  Object to form.

12                      THE WITNESS:  We have a conversation

13   where I explain to young people that I don't expect them

14   to be the same person every day for the rest of their

15   lives.  And if they feel that circumstances have changed

16   or if their family feels that circumstances have changed

17   the rod that ████ has is fully reversible and it's

18   always an option to remove that rod if it was in ████'s

19   best interest, which I did not feel it was at the time

20   of our encounter.

21   BY ATTORNEY TRYON:

22      Q.      Did you tell BPJ or BPJ's mother that gender

23   dysphoria does not always persist for adolescents into

24   adulthood?

1    A.    I don't think I said that exact thing, no.

2    Q.    As I understand it --- well, let me back up.

3  Did BPJ or BPJ's mother tell you how it came about that

4  BPJ identified as being a girl instead of a boy?

5    A.    I can't remember our exact conversation, but it

6  is my standard practice to ask questions relative to

7  that point and so I suspect, yes, we had that

8  conversation.

9    Q.    You don't remember anything about that

10  conversation relative what I just asked you?

11    A.    Not beyond what is documented in my note.

12    Q.    In your notes it says that patient has

13  identified gender diverse since, and then you inserted

14  around age two.  Does that refresh your recollection at

15  all as far as what happened at around age two?

16    A.    I document what is talked about during the

17  visit, and so yes, that would have been the

18  conversation.

19    Q.    Do you remember anything else about BPJ

20  identifying as a girl around age two?

21          ATTORNEY HARTNETT:  Object to reading

22  from the document that is not before the witness.

23          ATTORNEY TRYON:  She has a hard copy.

24          ATTORNEY HARTNETT:  I don't know where

```
 1    you're reading from.  Can you tell us where you are

 2    reading from?

 3                    ATTORNEY TRYON:  Sure.  It's on page one

 4    of the --- well, it's on page three of the actual

 5    exhibit and page one of Dr. Kidd's office notes.

 6                    ATTORNEY LINKOUS:  It's okay.  I think

 7    Dr. Kidd has her office notes in front of her.  Go

 8    ahead, Doctor.

 9    BY ATTORNEY TRYON:

10    Q.    So I'm just asking when it says patient has

11    identified as gender diverse since and then you inputted

12    around age two, comma, she said she was a girl around

13    age three, does that refresh your recollection about

14    your conversation about how that came about?

15    A.    Somewhat, yes.

16    Q.    Okay.

17          And what do you remember now?

18    A.    Specifically that ████ and her mom more likely

19    in this conversation would have told me that for me to

20    write it down and so likely ████'s mom said that she

21    identified as gender diverse in some capacity, be that a

22    girl or otherwise, but first said she was a girl at age

23    three.  And that's a common differentiation.  It's often

24    children exhibit behaviors and interests that are
```

1    gendered in a direction parents may not expect.  And

2    that aligns with that question you had earlier about

3    non-conformity.

4        Q.    Do you remember anything else about that

5    conversation relating to that?

6        A.    Well, my next line is that third grade was when

7    she started to wear girl clothes comfortably.  I think I

8    had a typo there.  I meant to write comfortably instead

9    of comfortable.  And that social transition was the

10   summer before third grade.

11       Q.    And you have no other recollection about the

12   conversation?

13       A.    I do not.

14       Q.    Very good.

15              ATTORNEY HARTNETT:  I object to form on

16   the last question.  Sorry.

17   BY ATTORNEY TRYON:

18       Q.    Was the father, Wesley Pepper, in this meeting?

19       A.    No.  My appointment with ██████ was with ██████

20   and her mom.

21       Q.    Did you ever talk to Wesley Pepper?

22       A.    I have not yet, though I expect to in the

23   future.

24              ATTORNEY TRYON:  Let's take a quick ---

```
 1   off the record for just one moment.

 2                   VIDEOGRAPHER:  We are going off the

 3   record.  The current time reads 12:48 p.m.

 4   OFF VIDEOTAPE

 5                           - - -

 6   (WHEREUPON, A SHORT BREAK WAS TAKEN.)

 7                           - - -

 8   ON VIDEOTAPE

 9                   VIDEOGRAPHER:  We are back on the record.

10   The current time reads 12:48 p.m.

11   BY ATTORNEY TRYON:

12      Q.    So back in Exhibit 33, if we go to what's at the

13   bottom of the page, page 15 of the document itself.  And

14   I have a question for you on paragraph two.  If you can

15   take some time and review that and then I will ask you a

16   question.

17      A.    Beginning with assessment of gender dysphoria?

18      Q.    Correct.

19      A.    Okay.

20      Q.    Are you ready?

21      A.    Yes.

22      Q.    Great.  So the second sentence says a

23   psychodiagnostic and psychiatric assessment covering the

24   areas of emotional functioning, peer and other social
```

1    relationships and intellectual functioning, slash,

2    school achievement should be performed.

3           Did I read that correctly?

4    A.    I believe so.

5    Q.    Do you know if a psychodiagnostic and

6    psychiatric assessment was performed?

7    A.    And so during my visit, portions of that were

8    absolutely performed.  But ▉▉▉▉ had those kinds of

9    discussions previously based on my review of the notes

10   and my experience working with Dr. Montano.

11   Q.    So and --- okay.

12          I understand you have had experience with Dr.

13   Montano, but how do you know that those were performed

14   for BPJ specifically?

15   A.    I know Dr. Montano's routine practice because he

16   is one of my teachers and I'm very confident in his

17   skills.

18   Q.    I understand that.  But for BPJ specifically,

19   are you aware if it was done?

20   A.    Based on my review of the chart, I had every

21   indication that --- and I want to quote this, a

22   psychodiagnostic assessment covering areas of emotional

23   functioning, peer and other social relationships and

24   intellectual functioning and school achievement was

1    performed.

2        Q.    By whom?

3        A.    By Dr. Montano.

4        Q.    Okay.

5              And there was something in the records that

6    shows that?

7        A.    I was able to see portions of Dr. Montano's

8    note.  It's that Care Everywhere thing we were talking

9    about before, that they're not complete notes.  But

10   based on my understanding of what I was reading, Dr.

11   Montano had the same conversation with ███ that he had

12   with all of the patients that I have witnessed him

13   talking to.

14       Q.    What were in his notes that said that since we

15   don't have those?

16       A.    And so I can't recall exactly what was in his

17   notes, but his notes are templated very similarly to my

18   notes in that they explore things like mental health

19   concerns, like school functioning, like peer support and

20   family support, things of that nature.

21       Q.    And what does --- what's his title or his

22   specialty?

23       A.    So Dr. Montano is the Clinical Director of the

24   Gender and Sexual Development Clinic at the Children's

1   Hospital of Pittsburgh.  He is Board Certified in

2   Pediatrics and he is an expert in pediatric gender

3   affirming care.

4       Q.    Is he a psychologist or a psychiatrist?

5                   ATTORNEY HARTNETT:  Object to form.

6                   THE WITNESS:  He is an adolescent

7   medicine specialist.  And adolescent medicine

8   specialists have extensive training and experience in

9   mental health support for young people.

10  BY ATTORNEY TRYON:

11      Q.    Is that a qualification --- does he have

12  qualifications that you don't?

13                  ATTORNEY HARTNETT:  Object to form.

14                  THE WITNESS:  I am not aware.  He may

15  well.  But he certainly had tons of training in the

16  space as have I.

17  BY ATTORNEY TRYON:

18      Q.    Okay.

19            But you are not a psychiatrist or a

20  psychologist.

21            Right?

22      A.    I am neither of those two things.  That is

23  correct.

24      Q.    So when it says psychiatric assessments, what

```
 1   qualifications do you believe is necessary to do a
 2   psychiatric assessment?
 3       A.    Someone who has extensive training and
 4   background in psychiatric diagnoses like anxiety,
 5   depression, and for these purposes gender dysphoria.
 6       Q.    And you're asserting you have that
 7   qualification?
 8       A.    I do have that qualification, yes.
 9       Q.    Now, if we wanted these notes out of Epic that
10   you referenced, how would we get those?
11       A.    I honestly am not sure how that system works or
12   the process of you getting those notes works.
13       Q.    Who has control over those?
14               ATTORNEY HARTNETT:  Objection to form.
15               THE WITNESS:  I don't know.
16               ATTORNEY LINKOUS:  Mr. Tryon, I can be of
17   benefit if you would like.
18               ATTORNEY TRYON:  Sure.
19               ATTORNEY LINKOUS:  Health Information
20   Management at West Virginia University Hospitals, Inc.
21   is the owner of the Epic medical records.  I can also
22   send you an address for that.
23               ATTORNEY TRYON:  That would be wonderful
24   if you would do that.
```

```
 1                    ATTORNEY LINKOUS:  I would be happy to.
 2                    ATTORNEY TRYON:  Can you email that to
 3   me?
 4                    ATTORNEY LINKOUS:  Yes, absolutely.
 5                    ATTORNEY TRYON:  You have either mine
 6   or ---?
 7                    ATTORNEY LINKOUS:  Yes.
 8                    ATTORNEY TRYON:  If not, you have
 9   Curtis'.
10              Right?
11                    ATTORNEY LINKOUS:  I do, yes.
12                    ATTORNEY TRYON:  That would be wonderful.
13   Thanks.
14                    ATTORNEY HARTNETT:  This is Kathleen
15   Hartnett.  Are you asking for the full Epic records for
16   Dr. Kidd or --- I just was unclear of what records
17   you're asking for.
18                    ATTORNEY TRYON:  Well, I'm a little
19   unclear what exactly there is in Epic, so it's hard for
20   me to ask.  So I guess I would be probably asking for
21   all of the records in Epic for BPJ.
22                    ATTORNEY HARTNETT:  Okay.
23              Just for the record, as you know, the
24   Plaintiff has requested BPJ's records from WV Medical,
```

1   produced what we have and this Saturday --- and maybe

2   Mr. Linkous can speak to it further, we produced

3   additional records that were apparently the printout

4   that Dr. Kidd was able to see, even though that's not

5   what the records department produced.  Just for the

6   record, we produced all records that we received from

7   WVU Medical, which was in our requests were all records

8   that exist.

9                ATTORNEY LINKOUS:  Sure.  And to expedite

10  things, I can certainly --- if counsel agree, I can

11  certainly produce to Kathleen the records I have

12  obtained from WVU, because I represent WVU, obviously,

13  and then Kathleen can redact and send them on.

14               ATTORNEY HARTNETT:  We have done that.

15  Is that the records that you sent this weekend.

16               ATTORNEY LINKOUS:  That is Dr. Kidd's

17  office visit.  I have access to BPJ's records from the

18  health system that go beyond Dr. Kidd's visit.

19               ATTORNEY HARTNETT:  Okay.

20               I mean, obviously whatever you would like

21  to do would be helpful, but I guess for the record to be

22  clear we've asked for and to our knowledge received all

23  documents related to BPJ's treatment by WVU Medical.

24  And that's what we produced to the other parties.  And

 1    then we understood this weekend that you were able to

 2    --- Dr. Kidd is able to see something different in her

 3    interphase, and so --- which appeared to be largely

 4    additional administrative information, and we produced

 5    that document as soon as we received it from you on

 6    Saturday.

 7              ATTORNEY LINKOUS:  That's correct.  I can

 8    do it however you would like.

 9              ATTORNEY TRYON:  So Mr. Linkous, we would

10    like to get the rest of the documents that are in the

11    Epic system that we don't already have.  And we will go

12    over the other documents that I got over the weekend

13    next.  But if there are additional documents in the Epic

14    system, we'd like to obtain those.

15              ATTORNEY LINKOUS:  Okay.

16              ATTORNEY HARTNETT:  Just to be clear, are

17    you asking for the --- sorry, the documents from the

18    Epic system from WVU Medical?

19              ATTORNEY TRYON:  Are you asking me?

20              ATTORNEY HARTNETT:  Yes, just because I

21    think what the witness has stated is that the Epic

22    system is used by different institutions, and so I think

23    --- I'm just trying to be clear if you are asking Mr.

24    Linkous for the documents from WVU Medical's Epic system

1    or you are trying to seek more broadly all of the

2    documents about BPJ that may be out there in the, you

3    know, in the Epic systems of other institutions, which

4    it doesn't sound like he is the person that would be

5    able to get that for you.

6              ATTORNEY TRYON:  Right.  That's my

7    understanding.  So whatever Mr. Linkous has access to,

8    including Epic and the Care System, which is part of

9    Epic.

10             ATTORNEY LINKOUS:  I only have access to

11   West Virginia University records, and that would include

12   these --- what was the tab called again, Care Everywhere

13   tab.  And I can certainly produce that.  I would prefer

14   to produce that in a link to Kathleen and then let

15   Kathleen look at it.  It may be duplicative of what she

16   already has and then she can produce.

17             ATTORNEY TRYON:  I will agree to that.

18             ATTORNEY HARTNETT:  And I will just make

19   a representation for the record that we'll produce it

20   even if it's duplicative just to make clear to the

21   Defendants that we are producing everything we have.

22   And I would expect that those --- any records that were

23   referred to in a different institution have been sought

24   and received from that institution, such as Dr. Montano.

1           ATTORNEY LINKOUS:  And just, Mr. Tryon, I

2   want to be completely transparent with you so when you

3   get the records you can understand any distinction or

4   differences that might be in them.  When I get records

5   from West Virginia University I have my nursing staff

6   organize them, Bates stamp them and bookmark them in a

7   PDF document so they're in a format that I typically use

8   for case by case by case.  So for instance, the exhibit

9   you are about to use will have my unique Bates stamp

10  number on it at the bottom center.  I can produce them

11  certainly in that Bates stamped organized, bookmarked

12  fashion to Kathleen or I can produce the native

13  documents as they came to me, however you would like.

14  Does that make sense?

15          ATTORNEY TRYON:  Native, you mean without

16  the Bates stamp?

17          ATTORNEY LINKOUS:  Yes.  So for instance,

18  West Virginia University may end me --- I'm making it up

19  --- a thousand pages of medical records for a patient.

20  I give that to my nursing staff who organizes it by

21  provider, by date, and they bookmark it so you can go to

22  this date, this date, this date, this lab result, this

23  admission, this ER, this pediatrician and you can

24  navigate the records quickly.  So I have my nursing

```
 1   staff do that for me.

 2                    ATTORNEY TRYON:  That's great.

 3                    ATTORNEY LINKOUS:  I can produce that if

 4   you'd like.  That way there's a Bates stamp and it shows

 5   you every one through how many ever there are.

 6                    ATTORNEY TRYON:  That's fantastic.  I

 7   appreciate it.

 8                    ATTORNEY LINKOUS:  Sure.

 9                    ATTORNEY TRYON:  So I would like to now

10   turn to Exhibit 35.  If you could pull that up, Jacob.

11                    VIDEOGRAPHER:  Can you see that?

12                    ATTORNEY TRYON:  Yes.

13                    ATTORNEY TYRON:  Yes.

14                    VIDEOGRAPHER:  And again, the witness and

15   Mr. Tryon, you have permission to move to pages,

16   highlight that, et cetera.

17                    ATTORNEY TRYON:  Thank you.

18   BY ATTORNEY TRYON:

19      Q.    So Dr. Kidd, my first question simply, do you

20   recognize this document?

21      A.    I recognize that it is a face sheet, and I think

22   this may have been part of the packet that I was sent.

23                    ATTORNEY HARTNETT:  Could I ask for the

24   record what --- we can only see one page at a time and I
```

1  don't have this exhibit.  So I'd be happy to pull the

2  document that Mr. Linkous gave us and that we produced

3  to you, but what Bates numbers are on this document?

4           ATTORNEY TRYON:  Sure.  They got cut off

5  because the Bates number is so close to the bottom that

6  when I printed it out ---.

7           VIDEOGRAPHER:  And Attorney Hartnett, I

8  did submit this document, which basically means it is

9  now shared with everybody.  If you go to the top and

10 click on files, then that --- exhibit file sharing, you

11 should be able to see it off to the right.

12           ATTORNEY HARTNETT:  I do.

13           VIDEOGRAPHER:  And you should be able to

14 download that yourself.

15           ATTORNEY HARTNETT:  Appreciate it.  Thank

16 you.

17           VIDEOGRAPHER:  You're welcome.

18           ATTORNEY TRYON:  And Mr. Linkous' Bates

19 numbers are 101103 through 101137.

20           ATTORNEY HARTNETT:  And these were, just

21 for the record, the documents that we produced on

22 Saturday from Mr. Linkous with Bates BPJ 02510 to BPJ

23 02545.

24 BY ATTORNEY TRYON:

1    Q.    Okay.

2         Dr. Kidd, I'm not sure I understood your

3    answer.  What do you understand this document to be?

4    A.    I just scrolled through it and it looks like

5    some supportive documentation around my note.

6    Q.    Would there be any information in this document

7    that's not in Exhibit 16?

8    A.    Is Exhibit 16 the document we reviewed

9    previously.

10   Q.    Yes, it is the --- it's your notes and the lab

11   information.

12   A.    I can't speak to the nuance in this ancillary

13   documentation.  I'm sure that there is information on

14   the face sheet if it was not present in the prior

15   packet, Exhibit 16, but my notes should be the same in

16   both packets.

17   Q.    Now, there are places where there have been

18   redactions of names.

19        Do you see that?

20   A.    Are you referring to --- let me use my

21   highlighter again.

22   Q.    On the very first page that you look at there

23   are three places where information is blocked out, which

24   yeah, you've highlighted it.

1      A.     Yes, I can see that.

2      Q.     Did you have any involvement in that --- in

3  blocking that out or redacting it?

4      A.     No, no, I did not.

5                      ATTORNEY HARTNETT:  For the record,

6  Plaintiff produced these to you with that information

7  redacted at the request of Mr. Linkous.

8  BY ATTORNEY TRYON:

9      Q.     On the second page of this exhibit, if you can

10  go there, under the organs inventory, none of that is

11  filled out.  Is there a reason for that?

12     A.     So this is a form that is optional to complete

13  in Epic and is not part of my standard practice for

14  adolescents.

15     Q.     So underneath admission diagnosis, slash, and

16  reasons for visits, do you see that?

17     A.     I do not --- oh, down here at the bottom, yes, I

18  see that now.

19     Q.     What is ICD-10-CM?

20     A.     That is the system that we use for billing codes

21  ICD-10 specifically, I'm not sure what the -CM refers

22  to.

23     Q.     And under it, it says long-term, parentheses,

24  current, closed paren, use of other agents affecting

1    estrogen receptors and estrogen levels.  And that's

2    under the admission diagnosis and reason for visit.  So

3    tell me what that means.

4        A.    I have to assume because I myself did not enter

5    in that code I believe that that is an umbrella code

6    that the code I actually entered falls under.  But

7    again, I can't be positive about that.  The code I would

8    have ---.

9        Q.    Go ahead.

10       A.    The code I would have entered was likely

11   something along the lines of long-term use of a

12   gonadotropin-releasing hormone agonist or GRNHA.

13       Q.    And is that a diagnosis or reason for visit?

14       A.    So that is a reason to get the labs and the

15   scan that I subsequently ordered.  And so when you order

16   labs or imaging you have to tell insurance why it is

17   medically relevant.  And so that is the purpose of that

18   code.

19       Q.    During your visit with BPJ and BPJ's mother, did

20   you actually make any diagnoses?

21                   ATTORNEY HARTNETT:  Objection to form.

22                   THE WITNESS:  To my recollection, no new

23   diagnoses that had not already been made.

24   BY ATTORNEY TRYON:

1    Q.    On the fourth page, which at the bottom center

2  is 101 to 106, do you see --- let's see.  I'm blowing it

3  up on my screen.  Does it get any larger on yours?

4    A.    No, but I have it zoomed in on mine.

5                  VIDEOGRAPHER:  Mr. Tryon, if you

6  highlight or write with the pencil tool, that will share

7  it with everybody.  But the zoom feature --- or the

8  zooming is specific to each person.  So each person can

9  zoom in on the page that whatever their preference is.

10  BY ATTORNEY TRYON:

11    Q.    Okay.

12          So I tried to highlight this one part that says

13  it says gender dysphoria.  Did it highlight on your

14  screen?

15    A.    Where patient describes this experience for

16  themselves as?

17    Q.    Yes.

18    A.    Yes.

19    Q.    So before the colon that's part of the form.

20          Is that right?

21    A.    That's correct.

22    Q.    And then the rest of that language you added?

23    A.    That language came from ████ and I typed it in

24  to this note.

```
 1        Q.    Do you remember any more about the conversation

 2   with BPJ about those words?

 3        A.    I can't speak more to what other words were

 4   said, but I try to write these as directly as the young

 5   person provides them to me, and I didn't make any

 6   additional notation.  I make additional notation if the

 7   young person's experience is unexpected or different

 8   from my experience in working with gender diverse young

 9   people.  And so in my practice this would suggest that

10   this was what ██████ said and that her experience she

11   described was very similar to other young people that I

12   have cared for.

13        Q.    What does it mean angel, slash, devil on

14   shoulder kind of feeling?

15        A.    To my recollection, ██████ kind of described that

16   what you often see depicted in media, that there were

17   kind of parts of who she was that were in conflict.  And

18   my interpretation based on my memory was that those

19   parts of her were her gender identity and what society

20   kind of expects of her because of her sex assignment.

21   That's that distress that is associated with the gender

22   dysphoria diagnostic code.

23        Q.    What did society expect from BPJ?

24        A.    Typically when babies are assigned male at birth
```

1    we expect them to identify as boys and eventually men

2    and to live their lives as such.

3        Q.    Do you remember anything specifically about BPJ,

4    though, about what BPJ thought society expected of BPJ?

5        A.    I can't recall specifically if ███ spoke to

6    that.

7        Q.    What does society expect of boys and men?

8                    ATTORNEY HARTNETT:  Object to form.

9                    THE WITNESS:  Can you restate that

10   question?

11   BY ATTORNEY TRYON:

12       Q.    Well, I'm just going back to what you said, you

13   said society expects certain things of boys and I think

14   you used the terminology of those that are assigned male

15   at birth and they expect certain things of boys and

16   certain things when they grow up to be men.

17       A.    Society.

18                   ATTORNEY HARTNETT:  Object to form.

19                   THE WITNESS:  To be very clear on this,

20   society expects --- in my experience if someone is

21   assigned male that they identify as male, simply put.

22   BY ATTORNEY TRYON:

23       Q.    Okay.

24               Well, what specifically does society expect of

```
 1  men?
 2                  ATTORNEY HARTNETT:  Object to form.
 3                  THE WITNESS:  Can you rephrase that?
 4  BY ATTORNEY TRYON:
 5     Q.    Well, you're telling me that society expects
 6  certain things of boys and men.  I want to know what you
 7  are saying that society expects from them.
 8                  ATTORNEY HARTNETT:  Object to form.
 9                  THE WITNESS:  I'm simply stating is that
10  folks who are assigned male are expected to identify as
11  male.  That is what society expects.
12  BY ATTORNEY TRYON:
13     Q.    And what does that mean to identify as male?
14     A.    To have one's sense of gender for one's self be
15  on the masculine spectrum.
16     Q.    What's on the masculine spectrum?
17     A.    There is a very helpful tool for this that I
18  often use in talking about gender identity.  It's called
19  the gender unicorn, and it diagrams this out really
20  nicely.  But essentially there are masculine and
21  feminine and nonbinary and other gender components in
22  all of us to some varying degree.  And when I say
23  masculine I mean that the masculine component is
24  dominant.
```

1      Q.    What are masculine components?

2      A.    It's a bit of a cultural and time, so temporally

3  associated sort of thing, and I talk about this with

4  patients and families, but it's often how we

5  communicate, how we carry ourselves, what our place and

6  role in society is, lots of expectations.  But when

7  we're talking about gender identity, it's this inherent

8  sense of self as it relates to gender.

9            ATTORNEY TRYON:  I would ask the court

10  reporter to read back my question, please.

11            COURT REPORTER:  What are the masculine

12  components?

13  BY ATTORNEY TRYON:

14      Q.    Please answer that question.

15            ATTORNEY HARTNETT:  Object to form.

16            THE WITNESS:  They are not specific

17  components but instead a sense of self.

18  BY ATTORNEY TRYON:

19      Q.    So there are no masculine components?

20            ATTORNEY HARTNETT:  Object to form.

21            THE WITNESS:  There is not a checkbox for

22  masculinity, although society does impose ideas on us.

23  BY ATTORNEY TRYON:

24      Q.    Well, you used term masculine components.  I

1  didn't.  What were you referring to?

2      A.    Those thoughts that society has about what is

3  masculine.

4      Q.    Which are what?

5      A.    I think it depends on the society in question.

6      Q.    Okay.

7            Our society here in West Virginia?

8                ATTORNEY HARTNETT:  Object to form.

9                THE WITNESS:  Here in West Virginia one

10 may masculine things are --- things like I gave the

11 example earlier of interest in construction, right, and

12 what we were discussing earlier, interest in hunting.

13 While there are many folks who consider those things

14 feminine as well, they stereotypically masculine in our

15 society by my interpretation.

16 BY ATTORNEY TRYON:

17     Q.    So that would be your stereotype?

18                ATTORNEY HARTNETT:  Object to form.

19                THE WITNESS:  The stereotype that I

20 observe in our society as part of my job.

21 BY ATTORNEY TRYON:

22     Q.    So how have you reported your observations as to

23 what constitutes a masculine component?

24                ATTORNEY HARTNETT:  Object to form.

```
1                    ATTORNEY TRYON:  Do you have a list?
2                    THE WITNESS:  Could you repeat the
3      question?
4      BY ATTORNEY TRYON:
5         Q.    Do you have a list of what you've observed to be
6      masculine components in our society here in West
7      Virginia?
8                    ATTORNEY HARTNETT:  Object to form.
9                    THE WITNESS:  I do not have a list, no.
10     BY ATTORNEY TRYON:
11        Q.    So just when you're talking to a young person
12     how do you know what constitutes a masculine component?
13        A.    I think that's irrelevant for the purposes of
14     discussing someone's gender identity as they see it
15     themselves and instead more relevant to conversations
16     about society's expectations of them.
17        Q.    You say it's relevant or irrelevant?
18        A.    It is relevant in some ways as to how they see
19     themselves certainly.  The primary thing we focus on is
20     how the young person experiences their gender identity.
21        Q.    How did BPJ experience BPJ's identity?
22        A.    She identified as a girl.
23        Q.    And what does that mean then?
24        A.    It means that in her own mind and her own sense
```

1    of self she is a girl.  She sees herself as a girl.  Her

2    relationships with people are based on her own internal

3    sense of self as a girl.

4        Q.    Did BPJ tell her what components constitute

5    being a girl?

6                    ATTORNEY HARTNETT:  Object to form.

7                    THE WITNESS:  Not to my recollection.

8    BY ATTORNEY TRYON:

9        Q.    So just the fact that BPJ said I identify as a

10   girl, that was enough?

11                   ATTORNEY HARTNETT:  Object to form.

12                   THE WITNESS:  No one knows their own

13   lived experience better than the individual themselves.

14   And so when young people tell me how they identify, I

15   explore what that mean for them.  But ████ identifies

16   as a girl and so she is a girl.

17   BY ATTORNEY TRYON:

18       Q.    So you explored that with BPJ.  Can you tell me

19   about that exploration, what it meant for BPJ to be a

20   girl?

21       A.    Only to the extent that I documented it and

22   based on my standard practice.  I don't recall the

23   specifics of our conversation beyond that.

24       Q.    So if someone comes to you and says --- who is a

```
 1   girl who was, as you say, assigned the sex of female at
 2   birth, that says I identify as a male, but all outward
 3   appearances --- let me rephrase that.  Let me just start
 4   over.  If a young woman of any age comes to you and says
 5   I identify as a male, is that in and of itself enough to
 6   establish gender --- now I'm forgetting the terminology,
 7   sorry, gender dysphoria?
 8                   ATTORNEY HARTNETT:  Object to form.
 9                   THE WITNESS:  It is not because, as we
10   discussed, there are specific diagnostic criteria for
11   that diagnosis.
12   BY ATTORNEY TRYON:
13     Q.    And that is they have to identify as such for
14   six months?
15                   ATTORNEY HARTNETT:  Object to form.
16                   THE WITNESS:  I'm happy to review based
17   on my memory, but I would refer to the DSM-V and that
18   specific diagnostic criteria.
19   BY ATTORNEY TRYON:
20     Q.    What if that persons says I don't care about
21   DSM-V, you know, I was assigned girl at birth, but I
22   identify as a girl, that's not good enough?
23                   ATTORNEY HARTNETT:  Object to form.
24                   THE WITNESS:  I think you are confusing
```

1    the difference between gender dysphoria, the diagnosis,

2    and gender identity, the experience.

3    BY ATTORNEY TRYON:

4       Q.    Thank you for clarifying.  So for someone to

5    have a gender identity different than what they are

6    quote assigned at birth, they just simply need to say

7    that they have a different gender identity.

8              Is that right?

9                    ATTORNEY HARTNETT:  Object to form.

10                    THE WITNESS:  They also don't have to say

11   it.  It's something they know in their own minds for

12   themselves and for them to share or not.

13   BY ATTORNEY TRYON:

14      Q.    But if they share that, is it your view that

15   that person needs to accept that, that other folks need

16   to accept that?

17                    ATTORNEY HARTNETT:  Object to form.

18                    THE WITNESS:  It's my view that no one

19   can know inside someone's else's mind better than that

20   person themselves.

21   BY ATTORNEY TRYON:

22      Q.    Do others --- should others be required to

23   accept that or not?

24                    ATTORNEY HARTNETT:  Object to form.

```
1                        THE WITNESS:  I can't speak to that more
2    broadly.  All I can talk about is ████ and what she
3    told me.
4    BY ATTORNEY TRYON:
5        Q.    Okay.
6              If we could turn now to page --- okay.  I'm
7    looking at what is page 18 of 36.  Do you see that?
8        A.    I do.
9        Q.    Okay.  So ---.
10                       ATTORNEY HARTNETT:  Could I just say for
11   the record it's the document with the 101120 at the
12   bottom?
13                       ATTORNEY TRYON:  Correct.
14                       ATTORNEY HARTNETT:  Thank you.
15   BY ATTORNEY TRYON:
16       Q.    And it says --- under messages sent it shows
17   delivery and it shows on 10/25/2021 it looks like a
18   message was sent to Matthew Bunner.  Is that a correct
19   interpretation of that?
20       A.    That would be my guess, although I'm not
21   familiar with that exact message nor is this kind of
22   usually how I see this report.  So outside of this
23   setting, I wouldn't necessarily have access to this
24   view.
```

1      Q.    Do you remember talking to or sending a message

2  to Mr. Bunner on 10/25/2021?

3      A.    No, I don't have recollection of that and I

4  suspect it was not me who sent the message.

5      Q.    Okay.

6           Then down below further it says call

7  information and it references Steven Deci and you and

8  --- that's all.  It references a call apparently on

9  9/16/2021.  Do you know what that is about?

10     A.    I don't.  I don't recall receiving a phone call.

11 I do know that is the date of the visit and the time of

12 the visit, and so this may be what it is referring to.

13     Q.    Okay.

14          Now, I'm on page 21, which is at the bottom of

15 the page.  The bottom is 101123.  And under here it

16 shows today's visit.  There's a box there.  Do you see

17 that?

18     A.    I do.

19     Q.    And who inputted this information?

20     A.    It depends on what information you're referring

21 to, and I only know partial answers to that question.

22     Q.    Okay.

23          The blood pressure?

24     A.    It is our standard practice that the nurse takes

1    the blood pressure and then enters it into the chart.

2        Q.    The same thing with the BMI and the weight?

3        A.    So the nurse would take a weight and measure

4    height and then the computer would automatically

5    calculate a BMI.

6        Q.    Okay.

7              And the temperature, the nurse does that as

8    well?

9        A.    Yes.

10       Q.    And the pulse?

11       A.    Yes.

12       Q.    And it says under that percentiles calculated

13   using cc, paren, boys 2, dash, 20 years, closed paren.

14   Do you see that there?

15       A.    I do.

16       Q.    And so why is that percentage using the boys

17   chart as opposed to a girls chart?

18       A.    Because in Epic the sex designation carries over

19   to the gender marker, and so that is what chart is used.

20       Q.    Is there a reason to determine percentiles for

21   the child?

22       A.    The BMI percentiles are important for youth as

23   BMI itself is a poor measure and so BMI percentile is

24   the standard based on my training that is used.

1    Q.    And why is that important?

2    A.    It's important to look at growth and development

3    throughout childhood.  Children are not fixed as adults

4    often are in their height, for example.

5    Q.    So if BPJ identifies as a female, why not use

6    the female chart?

7                    ATTORNEY HARTNETT:  Object to the form.

8                    THE WITNESS:  It's a question and it's a

9    limitation of our health system and our health record.

10   BY ATTORNEY TRYON:

11   Q.    So you don't think it matters which chart is

12   used, whether it's a male or female?

13                   ATTORNEY HARTNETT:  Object to form.

14                   THE WITNESS:  I certainly think it

15   matters.

16   BY ATTORNEY TRYON:

17   Q.    And why does it matter?

18   A.    It matters because these charts are slightly

19   different and based on a child's growth trajectory it

20   may be better to use one chart over the other or even

21   both to make sure that a child growth trajectory is on

22   target.

23   Q.    Did you prescribe any treatment for BPJ?

24                   ATTORNEY HARTNETT:  Object to form.

1              THE WITNESS:  No new treatment.  I did

2    continue with ███.  For example, we did not discontinue

3    the ███ during my visit.

4    BY ATTORNEY TRYON:

5         Q.    Is --- let me see if I can pronounce this right.

6    ████████████ hormone, what is that?

7         A.         ████████████ hormone or LH is a hormone that is

8    downregulated by the presence of the ███.  It is a

9    hormone that goes on to stimulate a secretion of sex

10   hormone in the body throughout.

11        Q.    Do you anticipate any of --- prescribing any

12   further treatment?

13        A.    So I think I have a visit with ████ coming up

14   next month and at that point we will be discussing ████

15   and her family's goals and discussing options like

16   ████████.  We began that conversation at our first

17   visit.

18        Q.    And what about options such as surgery?

19        A.    I'm not a surgeon, and in my experience, ████

20   is very young to be making kind of long-term plans in

21   that direction, although if she has questions I will

22   answer them to the best of my ability.

23        Q.    So if that's something that BPJ wanted, is there

24   something that you would --- is that something you would

```
 1   refer BPJ to someone else?

 2                   ATTORNEY HARTNETT:  Object to form.

 3                   THE WITNESS:  When appropriate.

 4   BY ATTORNEY TRYON:

 5      Q.    Do you have someone in particular --- well, have

 6   you ever referred anybody to another specialist for

 7   surgery?

 8      A.    Yes.

 9      Q.    Who have you referred them to?

10      A.    Well, there are usually surgical centers as well

11   as individual surgeons, but it depends on what the young

12   person is seeking and what their insurance coverage is,

13   where their family is located, and a host of other

14   factors.

15      Q.    How many referrals have you made for surgery?

16                   ATTORNEY HARTNETT:  Object to form,

17   scope.  Go ahead.

18                   THE WITNESS:  I couldn't speak to that

19   specifically.  I don't know off the top of my head.

20   BY ATTORNEY TRYON:

21      Q.    More than one?

22      A.    Yes.

23                   ATTORNEY HARTNETT:  Same objection.

24   BY ATTORNEY TRYON:
```

1      Q.    Can you just give me the names of a couple of

2   folks who do this type of --- do surgery for gender

3   transition?

4                    ATTORNEY HARTNETT:  Objection, form,

5   scope.

6                    THE WITNESS:  What type of surgery are we

7   talking about?

8   BY ATTORNEY TRYON:

9      Q.    Sex reassignment surgery.

10                   ATTORNEY HARTNETT:  Objection.  This

11  deposition concerns the diagnosis and treatment of

12  Plaintiff, BPJ aka █████  ████████████.  I would like

13  to understand how this line of questioning is at all

14  relevant to that.

15                   ATTORNEY TRYON:  To understand the future

16  of possible treatments.

17                   ATTORNEY HARTNETT:  She has not testified

18  to any such future possible treatment with BPJ or --- I

19  just don't understand why having her list the names of

20  providers to conduct surgeries has anything at all to do

21  with BPJ's diagnosis or treatment.

22  BY ATTORNEY TRYON:

23     Q.    You can answer the question.

24     A.    Can you restate the question?

```
 1      Q.    Can you give me a list of providers for a sex

 2  reassignment surgery that you've referred people to?

 3                  ATTORNEY HARTNETT:  Object to the form

 4  and scope.

 5                  THE WITNESS:  Sex reassignment surgery is

 6  very broad, and so I'm not able to give you a specific

 7  list of surgeons without further clarity.

 8  BY ATTORNEY TRYON:

 9      Q.    Then I guess I need to ask you what is included

10  within sex reassignment surgery.

11      A.    It's a rather long list, but none of this

12  pertains to ███  right now and may not in the future.

13      Q.    But you have referred folks out for some form of

14  sex reassignment surgery or not?

15                  ATTORNEY HARTNETT:  Object to form.

16                  THE WITNESS:  I have referred patients

17  for a variety of needs outside of my scope of practice,

18  yes.

19  BY ATTORNEY TRYON:

20      Q.    Can you recall the name of even one of the

21  surgeons you've referred people to?

22                  ATTORNEY HARTNETT:  Same objection and

23  asked and answered.

24                  THE WITNESS:  John Pang.
```

1    BY ATTORNEY TRYON:

2        Q.    How do you spell the last name?

3        A.    P-A-N-G.

4        Q.    Give me two more and we will be done.

5                ATTORNEY HARTNETT:  Objection to scope

6    and form and harassing the witness.

7                ATTORNEY LINKOUS:  If you can recall, you

8    can tell him.

9                THE WITNESS:  And there are usually teams

10   and not individual surgeons, but Toby Meltzer is someone

11   whose name I had mentioned previously.  And I'm thinking

12   of centers, and so there's lots of folks in centers.

13   BY ATTORNEY TRYON:

14       Q.    Give me a center name?

15       A.    The Hopkins Clinic.

16       Q.    Is that in West Virginia?

17       A.    It is not.  In fact, none of these providers

18   are.

19       Q.    I see.  Okay.

20               ATTORNEY TRYON:  Let's go off the record.

21   Let me take just a very short break and see if there are

22   any other questions that I have.

23               VIDEOGRAPHER:  Going off the record.  The

24   current time reads 1:32 p.m.

```
1    OFF VIDEOTAPE

2                         - - -

3    (WHEREUPON, A SHORT BREAK WAS TAKEN.)

4                         - - -

5    ON VIDEOTAPE

6                 VIDEOGRAPHER:  We are back on the record.

7    The current time reads 1:41 p.m.

8                 ATTORNEY TRYON:  Dr. Kidd, I want to

9    thank you very much for your time.  I have no further

10   questions for you at this time.  In the rare event that,

11   unlikely I will say, event that the Epic records somehow

12   show something that we need to reconvene this for, then

13   I would want to reconvene this.  Otherwise, I have no

14   further questions.  And you have the option to --- well,

15   your counsel will advise you you have the option to read

16   this or waive reading.  So that's all I have.  Thanks

17   again.

18                 ATTORNEY HARTNETT:  And this is Kathleen

19   Hartnett for Plaintiff.  I just would like to

20   provisionally mark the transcript as confidential in

21   light of the discussion of medical records.  And we'll

22   do a more specific designation when we review.

23                 And I also just wanted to state from the

24   Plaintiff's perspective, the deposition is closed
```

1   because we made the production requested of us, but we

2   will, as I noted, review with what Mr. Linkous sent and

3   we will send to Defendants anything responsive to RFP-1

4   per the way we have responded to date in this

5   litigation.

6          ATTORNEY LINKOUS:  If there are no more

7   questions, we will read and sign.  And you may send her

8   deposition transcript to me and I will facilitate the

9   errata process to the doctor.

10          ATTORNEY TRYON:  Any other Defendants

11   have any other questions?

12          ATTORNEY CROPP:  This is Jeff Cropp for

13   Defendant Harrison County Board of Education and Doris

14   Stutler.  I came on for Susan Deniker who had to leave

15   early.  We have no questions today.

16          ATTORNEY GREEN:  This is Roberta Green

17   here on behalf of West Virginia Secondary School

18   Activities Commission.  No questions.

19          ATTORNEY TAYLOR:  This is Michael Taylor

20   on behalf of the West Virginia State Board of Education.

21   Kelly Morgan had to step off, so I jumped on, and we

22   have no questions.

23          ATTORNEY TRYON:  Mr. Ducar, you are

24   muted.

1              ATTORNEY DUCAR:   Thank you.   Timothy

2      Ducar on behalf of the Intervenor Lainey Armistead.   We

3      have no questions.

4              ATTORNEY TRYON:   Thank you, everyone.

5              VIDEOGRAPHER:   That concludes this

6      deposition.   The current time reads 1:43 p.m.   Thank

7      you, Counsel.

8                       * * * * * * *

9           VIDEOTAPED VIDEOCONFERENCE DEPOSITION

10                   CONCLUDED AT 1:43 P.M.

11                      * * * * * * *

12

13

14

15

16

17

18

19

20

21

22

23

24

137

```
 1   STATE OF WEST VIRGINIA  )

 2                  CERTIFICATE

 3        I, Nicole Montagano, a Notary Public in

 4   and for the State of West Virginia, do hereby

 5   certify:

 6        That the witness whose testimony appears

 7   in the foregoing deposition, was duly sworn by me

 8   on said date, and that the transcribed deposition

 9   of said witness is a true record of the testimony

10   given by said witness;

11        That the proceeding is herein recorded

12   fully and accurately;

13        That I am neither attorney nor counsel

14   for, nor related to any of the parties to the

15   action in which these depositions were taken, and

16   further that I am not a relative of any attorney

17   or counsel employed by the parties hereto, or

18   financially interested in this action.

19        I certify that the attached transcript

20   meets the requirements set forth within article

21   twenty-seven, chapter forty-seven of the West

22   Virginia.
```



```
23
24                                 Nicole Montagano,
25                                 Court Reporter
```



WPATH — WORLD PROFESSIONAL ASSOCIATION for TRANSGENDER HEALTH

www.wpath.org

# Standards of Care

## for the Health of Transsexual, Transgender, and Gender Nonconforming People

The World Professional Association for Transgender Health

7th Version



EXHIBIT
WV-33



# Standards of Care

## for the Health of Transsexual, Transgender, and Gender Nonconforming People

The World Professional Association for Transgender Health

7th Version[1] | www.wpath.org

---

1   This is the seventh version of the Standards of Care. The original SOC were published in 1979. Previous revisions were in 1980, 1981, 1990, 1998, and 2001.

The Standards of Care
7TH VERSION

# Table of Contents

I.    Purpose and Use of the Standards of Care . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .1

II.   Global Applicability of the Standards of Care . . . . . . . . . . . . . . . . . . . . . . . . .3

III.  The Difference between Gender Nonconformity and Gender Dysphoria . . . . . . . . . . . . .4

IV.   Epidemiologic Considerations . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .6

V.    Overview of Therapeutic Approaches for Gender Dysphoria . . . . . . . . . . . . . . . . . . . . .8

VI.   Assessment and Treatment of Children and Adolescents with Gender Dysphoria . . . . .10

VII.  Mental Health  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .21

VIII. Hormone Therapy . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .33

IX.   Reproductive Health . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .50

X.    Voice and Communication Therapy . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .52

XI.   Surgery. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .54

XII.  Postoperative Care and Follow-Up . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .64

XIII. Lifelong Preventive and Primary Care . . . . . . . . . . . . . . . . . . . . . . . . . . . .65

XIV.  Applicability of the *Standards of Care* to People Living in Institutional Environments . . .67

XV.   Applicability of the *Standards of Care* to People With Disorders of Sex Development . . .69

# References

. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .72

# Appendices:

A.   Glossary. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .95

B.   Overview of Medical Risks of Hormone Therapy . . . . . . . . . . . . . . . . . . . . . . . .97

C.   Summary of Criteria for Hormone Therapy and Surgeries . . . . . . . . . . . . . . . . . . . .104

D.   Evidence for Clinical Outcomes of Therapeutic Approaches . . . . . . . . . . . . . . . . . .107

E.   Development Process for the *Standards of Care, Version 7*. . . . . . . . . . . . . . . . . . .109

# Purpose and Use of the Standards of Care

The World Professional Association for Transgender Health (WPATH)[1] is an international, multidisciplinary, professional association whose mission is to promote evidence-based care, education, research, advocacy, public policy, and respect for transgender health. The vision of WPATH is to bring together diverse professionals dedicated to developing best practices and supportive policies worldwide that promote health, research, education, respect, dignity, and equality for transsexual, transgender, and gender nonconforming people in all cultural settings.

One of the main functions of WPATH is to promote the highest standards of health care for individuals through the articulation of *Standards of Care (SOC) for the Health of Transsexual, Transgender, and Gender Nonconforming People*. The SOC are based on the best available science and expert professional consensus.[2] Most of the research and experience in this field comes from a North American and Western European perspective; thus, adaptations of the SOC to other parts of the world are necessary. Suggestions for ways of thinking about cultural relativity and cultural competence are included in this version of the SOC.

The overall goal of the SOC is to provide clinical guidance for health professionals to assist transsexual, transgender, and gender nonconforming people with safe and effective pathways to achieving lasting personal comfort with their gendered selves, in order to maximize their overall health, psychological well-being, and self-fulfillment. This assistance may include primary care, gynecologic and urologic care, reproductive options, voice and communication therapy, mental health services (e.g., assessment, counseling, psychotherapy), and hormonal and surgical treatments. While this is primarily a document for health professionals, the SOC may also be used by individuals, their families, and social institutions to understand how they can assist with promoting optimal health for members of this diverse population.

WPATH recognizes that health is dependent upon not only good clinical care but also social and political climates that provide and ensure social tolerance, equality, and the full rights of citizenship. Health is promoted through public policies and legal reforms that promote tolerance and equity

---

1   Formerly the Harry Benjamin International Gender Dysphoria Association

2   *Standards of Care (SOC), Version 7* represents a significant departure from previous versions. Changes in this version are based upon significant cultural shifts, advances in clinical knowledge, and appreciation of the many health care issues that can arise for transsexual, transgender, and gender nonconforming people beyond hormone therapy and surgery (Coleman, 2009a, b, c, d).

for gender and sexual diversity and that eliminate prejudice, discrimination, and stigma. WPATH is committed to advocacy for these changes in public policies and legal reforms.

## The Standards of Care Are Flexible Clinical Guidelines

The SOC are intended to be flexible in order to meet the diverse health care needs of transsexual, transgender, and gender nonconforming people. While flexible, they offer standards for promoting optimal health care and guiding the treatment of people experiencing gender dysphoria – broadly defined as discomfort or distress that is caused by a discrepancy between a person's gender identity and that person's sex assigned at birth (and the associated gender role and/or primary and secondary sex characteristics) (Fisk, 1974; Knudson, De Cuypere, & Bockting, 2010b).

As for all previous versions of the SOC, the criteria put forth in this document for hormone therapy and surgical treatments for gender dysphoria are clinical guidelines; individual health professionals and programs may modify them. Clinical departures from the SOC may come about because of a patient's unique anatomic, social, or psychological situation; an experienced health professional's evolving method of handling a common situation; a research protocol; lack of resources in various parts of the world; or the need for specific harm reduction strategies. These departures should be recognized as such, explained to the patient, and documented through informed consent for quality patient care and legal protection. This documentation is also valuable for the accumulation of new data, which can be retrospectively examined to allow for health care – and the SOC – to evolve.

The SOC articulate standards of care but also acknowledge the role of making informed choices and the value of harm reduction approaches. In addition, this version of the SOC recognizes and validates various expressions of gender that may not necessitate psychological, hormonal, or surgical treatments. Some patients who present for care will have made significant self-directed progress towards gender role changes, transition, or other resolutions regarding their gender identity or gender dysphoria. Other patients will require more intensive services. Health professionals can use the SOC to help patients consider the full range of health services open to them, in accordance with their clinical needs and goals for gender expression.

World Professional Association for Transgender Health

# 11

# Global Applicability of the Standards of Care

While the SOC are intended for worldwide use, WPATH acknowledges that much of the recorded clinical experience and knowledge in this area of health care is derived from North American and Western European sources. From place to place, both across and within nations, there are differences in all of the following: social attitudes towards transsexual, transgender, and gender nonconforming people; constructions of gender roles and identities; language used to describe different gender identities; epidemiology of gender dysphoria; access to and cost of treatment; therapies offered; number and type of professionals who provide care; and legal and policy issues related to this area of health care (Winter, 2009).

It is impossible for the SOC to reflect all of these differences. In applying these standards to other cultural contexts, health professionals must be sensitive to these differences and adapt the SOC according to local realities. For example, in a number of cultures, gender nonconforming people are found in such numbers and living in such ways as to make them highly socially visible (Peletz, 2006). In settings such as these, it is common for people to initiate a change in their gender expression and physical characteristics while in their teens, or even earlier. Many grow up and live in a social, cultural, and even linguistic context quite unlike that of Western cultures. Yet almost all experience prejudice (Peletz, 2006; Winter, 2009). In many cultures, social stigma towards gender nonconformity is widespread and gender roles are highly prescriptive (Winter et al., 2009). Gender nonconforming people in these settings are forced to be hidden, and therefore may lack opportunities for adequate health care (Winter, 2009).

The SOC are not intended to limit efforts to provide the best available care to all individuals. Health professionals throughout the world — even in areas with limited resources and training opportunities — can apply the many core principles that undergird the SOC. These principles include the following: Exhibit respect for patients with nonconforming gender identities (do not pathologize differences in gender identity or expression); provide care (or refer to knowledgeable colleagues) that affirms patients' gender identities and reduces the distress of gender dysphoria, when present; become knowledgeable about the health care needs of transsexual, transgender, and gender nonconforming people, including the benefits and risks of treatment options for gender dysphoria; match the treatment approach to the specific needs of patients, particularly their goals for gender expression and need for relief from gender dysphoria; facilitate access to appropriate care; seek patients' informed consent before providing treatment; offer continuity of care; and be prepared to support and advocate for patients within their families and communities (schools, workplaces, and other settings).

The Standards of Care
7TH VERSION

Terminology is culturally and time-dependent and is rapidly evolving. It is important to use respectful language in different places and times, and among different people. As the SOC are translated into other languages, great care must be taken to ensure that the meanings of terms are accurately translated. Terminology in English may not be easily translated into other languages, and vice versa. Some languages do not have equivalent words to describe the various terms within this document; hence, translators should be cognizant of the underlying goals of treatment and articulate culturally applicable guidance for reaching those goals.

# III

# The Difference Between Gender Nonconformity and Gender Dysphoria

## Being Transsexual, Transgender, or Gender Nonconforming Is a Matter of Diversity, Not Pathology

WPATH released a statement in May 2010 urging the de-psychopathologization of gender nonconformity worldwide (WPATH Board of Directors, 2010). This statement noted that "the expression of gender characteristics, including identities, that are not stereotypically associated with one's assigned sex at birth is a common and culturally-diverse human phenomenon [that] should not be judged as inherently pathological or negative."

Unfortunately, there is stigma attached to gender nonconformity in many societies around the world. Such stigma can lead to prejudice and discrimination, resulting in "minority stress" (I. H. Meyer, 2003). Minority stress is unique (additive to general stressors experienced by all people), socially based, and chronic, and may make transsexual, transgender, and gender nonconforming individuals more vulnerable to developing mental health concerns such as anxiety and depression (Institute of Medicine, 2011). In addition to prejudice and discrimination in society at large, stigma can contribute to abuse and neglect in one's relationships with peers and family members, which in turn can lead to psychological distress. However, these symptoms are socially induced and are not inherent to being transsexual, transgender, or gender nonconforming.

4                                                World Professional Association for Transgender Health

# Gender Nonconformity Is Not the Same as Gender Dysphoria

*Gender nonconformity* refers to the extent to which a person's gender identity, role, or expression differs from the cultural norms prescribed for people of a particular sex (Institute of Medicine, 2011). *Gender dysphoria* refers to discomfort or distress that is caused by a discrepancy between a person's gender identity and that person's sex assigned at birth (and the associated gender role and/or primary and secondary sex characteristics) (Fisk, 1974; Knudson, De Cuypere, & Bockting, 2010b). Only *some* gender nonconforming people experience gender dysphoria at *some* point in their lives.

Treatment is available to assist people with such distress to explore their gender identity and find a gender role that is comfortable for them (Bockting & Goldberg, 2006). Treatment is individualized: What helps one person alleviate gender dysphoria might be very different from what helps another person. This process may or may not involve a change in gender expression or body modifications. Medical treatment options include, for example, feminization or masculinization of the body through hormone therapy and/or surgery, which are effective in alleviating gender dysphoria and are medically necessary for many people. Gender identities and expressions are diverse, and hormones and surgery are just two of many options available to assist people with achieving comfort with self and identity.

Gender dysphoria can in large part be alleviated through treatment (Murad et al., 2010). Hence, while transsexual, transgender, and gender nonconforming people may experience gender dysphoria at some point in their lives, many individuals who receive treatment will find a gender role and expression that is comfortable for them, even if these differ from those associated with their sex assigned at birth, or from prevailing gender norms and expectations.


# Diagnoses Related to Gender Dysphoria

Some people experience gender dysphoria at such a level that the distress meets criteria for a formal diagnosis that might be classified as a mental disorder. Such a diagnosis is not a license for stigmatization or for the deprivation of civil and human rights. Existing classification systems such as the *Diagnostic Statistical Manual of Mental Disorders (DSM)* (American Psychiatric Association, 2000) and the *International Classification of Diseases (ICD)* (World Health Organization, 2007) define hundreds of mental disorders that vary in onset, duration, pathogenesis, functional disability, and treatability. All of these systems attempt to classify clusters of symptoms and conditions, not the individuals themselves. A disorder is a description of something with which a person might struggle, not a description of the person or the person's identity.

Thus, transsexual, transgender, and gender nonconforming individuals are not inherently disordered. Rather, the distress of gender dysphoria, when present, is the concern that might be diagnosable and for which various treatment options are available. The existence of a diagnosis for such dysphoria often facilitates access to health care and can guide further research into effective treatments.

Research is leading to new diagnostic nomenclatures, and terms are changing in both the *DSM* (Cohen-Kettenis & Pfäfflin, 2010; Knudson, De Cuypere, & Bockting, 2010b; Meyer-Bahlburg, 2010; Zucker, 2010) and the *ICD*. For this reason, familiar terms are employed in the *SOC* and definitions are provided for terms that may be emerging. Health professionals should refer to the most current diagnostic criteria and appropriate codes to apply in their practice areas.



# IV

# Epidemiologic Considerations

Formal epidemiologic studies on the incidence[3] and prevalence[4] of transsexualism specifically or transgender and gender nonconforming identities in general have not been conducted, and efforts to achieve realistic estimates are fraught with enormous difficulties (Institute of Medicine, 2011; Zucker & Lawrence, 2009). Even if epidemiologic studies established that a similar proportion of transsexual, transgender, or gender nonconforming people existed all over the world, it is likely that cultural differences from one country to another would alter both the behavioral expressions of different gender identities and the extent to which gender dysphoria – distinct from one's gender identity – is actually occurring in a population. While in most countries, crossing normative gender boundaries generates moral censure rather than compassion, there are examples in certain cultures of gender nonconforming behaviors (e.g., in spiritual leaders) that are less stigmatized and even revered (Besnier, 1994; Bolin, 1988; Chiñas, 1995; Coleman, Colgan, & Gooren, 1992; Costa & Matzner, 2007; Jackson & Sullivan, 1999; Nanda, 1998; Taywaditep, Coleman, & Dumronggittigule, 1997).

For various reasons, researchers who have studied incidence and prevalence have tended to focus on the most easily counted subgroup of gender nonconforming individuals: transsexual individuals who experience gender dysphoria and who present for gender-transition-related care at specialist gender clinics (Zucker & Lawrence, 2009). Most studies have been conducted in European

---

3  **incidence**—the number of new cases arising in a given period (e.g., a year)
4  **prevalence**—the number of individuals having a condition, divided by the number of people in the general population

World Professional Association for Transgender Health

countries such as Sweden (Wålinder, 1968, 1971), the United Kingdom (Hoenig & Kenna, 1974), the Netherlands (Bakker, Van Kesteren, Gooren, & Bezemer, 1993; Eklund, Gooren, & Bezemer, 1988; van Kesteren, Gooren, & Megens, 1996), Germany (Weitze & Osburg, 1996), and Belgium (De Cuypere et al., 2007). One was conducted in Singapore (Tsoi, 1988).

De Cuypere and colleagues (2007) reviewed such studies, as well as conducted their own. Together, those studies span 39 years. Leaving aside two outlier findings from Pauly in 1968 and Tsoi in 1988, ten studies involving eight countries remain. The prevalence figures reported in these ten studies range from 1:11,900 to 1:45,000 for male-to-female individuals (MtF) and 1:30,400 to 1:200,000 for female-to-male (FtM) individuals. Some scholars have suggested that the prevalence is much higher, depending on the methodology used in the research (for example, Olyslager & Conway, 2007).

Direct comparisons across studies are impossible, as each differed in their data collection methods and in their criteria for documenting a person as transsexual (e.g., whether or not a person had undergone genital reconstruction, versus had initiated hormone therapy, versus had come to the clinic seeking medically-supervised transition services). The trend appears to be towards higher prevalence rates in the more recent studies, possibly indicating increasing numbers of people seeking clinical care. Support for this interpretation comes from research by Reed and colleagues (2009), who reported a doubling of the numbers of people accessing care at gender clinics in the United Kingdom every five or six years. Similarly, Zucker and colleagues (2008) reported a four- to five-fold increase in child and adolescent referrals to their Toronto, Canada clinic over a 30-year period.

The numbers yielded by studies such as these can be considered minimum estimates at best. The published figures are mostly derived from clinics where patients met criteria for severe gender dysphoria and had access to health care at those clinics. These estimates do not take into account that treatments offered in a particular clinic setting might not be perceived as affordable, useful, or acceptable by all self-identified gender dysphoric individuals in a given area. By counting only those people who present at clinics for a specific type of treatment, an unspecified number of gender dysphoric individuals are overlooked.

Other clinical observations (not yet firmly supported by systematic study) support the likelihood of a higher prevalence of gender dysphoria: (i) Previously unrecognized gender dysphoria is occasionally diagnosed when patients are seen with anxiety, depression, conduct disorder, substance abuse, dissociative identity disorders, borderline personality disorder, sexual disorders, and disorders of sex development (Cole, O'Boyle, Emory, & Meyer III, 1997). (ii) Some crossdressers, drag queens/kings or female/male impersonators, and gay and lesbian individuals may be experiencing gender dysphoria (Bullough & Bullough, 1993). (iii) The intensity of some people's gender dysphoria fluctuates below and above a clinical threshold (Docter, 1988). (iv) Gender nonconformity among FtM individuals tends to be relatively invisible in many cultures, particularly to Western health

professionals and researchers who have conducted most of the studies on which the current estimates of prevalence and incidence are based (Winter, 2009).

Overall, the existing data should be considered a starting point, and health care would benefit from more rigorous epidemiologic study in different locations worldwide.

# V

# Overview of Therapeutic Approaches for Gender Dysphoria

## Advancements in the Knowledge and Treatment of Gender Dysphoria

In the second half of the 20th century, awareness of the phenomenon of gender dysphoria increased when health professionals began to provide assistance to alleviate gender dysphoria by supporting changes in primary and secondary sex characteristics through hormone therapy and surgery, along with a change in gender role. Although Harry Benjamin already acknowledged a spectrum of gender nonconformity (Benjamin, 1966), the initial clinical approach largely focused on identifying who was an appropriate candidate for sex reassignment to facilitate a physical change from male to female or female to male as completely as possible (e.g., Green & Fleming, 1990; Hastings, 1974). This approach was extensively evaluated and proved to be highly effective. Satisfaction rates across studies ranged from 87% of MtF patients to 97% of FtM patients (Green & Fleming, 1990), and regrets were extremely rare (1-1.5% of MtF patients and <1% of FtM patients; Pfäfflin, 1993). Indeed, hormone therapy and surgery have been found to be medically necessary to alleviate gender dysphoria in many people (American Medical Association, 2008; Anton, 2009; The World Professional Association for Transgender Health, 2008).

As the field matured, health professionals recognized that while many individuals need both hormone therapy and surgery to alleviate their gender dysphoria, others need only one of these treatment options and some need neither (Bockting & Goldberg, 2006; Bockting, 2008; Lev, 2004). Often with the help of psychotherapy, some individuals integrate their trans- or cross-gender feelings into the gender role they were assigned at birth and do not feel the need to feminize or masculinize their body. For others, changes in gender role and expression are sufficient to alleviate

gender dysphoria. Some patients may need hormones, a possible change in gender role, but not surgery; others may need a change in gender role along with surgery, but not hormones. In other words, treatment for gender dysphoria has become more individualized.

As a generation of transsexual, transgender, and gender nonconforming individuals has come of age – many of whom have benefitted from different therapeutic approaches – they have become more visible as a community and demonstrated considerable diversity in their gender identities, roles, and expressions. Some individuals describe themselves not as gender nonconforming but as unambiguously cross-sexed (i.e., as a member of the other sex; Bockting, 2008). Other individuals affirm their unique gender identity and no longer consider themselves either male or female (Bornstein, 1994; Kimberly, 1997; Stone, 1991; Warren, 1993). Instead, they may describe their gender identity in specific terms such as transgender, bigender, or genderqueer, affirming their unique experience that may transcend a male/female binary understanding of gender (Bockting, 2008; Ekins & King, 2006; Nestle, Wilchins, & Howell, 2002). They may not experience their process of identity affirmation as a "transition," because they never fully embraced the gender role they were assigned at birth or because they actualize their gender identity, role, and expression in a way that does not involve a change from one gender role to another. For example, some youth identifying as genderqueer have always experienced their gender identity and role as such (genderqueer). Greater public visibility and awareness of gender diversity (Feinberg, 1996) has further expanded options for people with gender dysphoria to actualize an identity and find a gender role and expression that is comfortable for them.

Health professionals can assist gender dysphoric individuals with affirming their gender identity, exploring different options for expression of that identity, and making decisions about medical treatment options for alleviating gender dysphoria.

## Options for Psychological and Medical Treatment of Gender Dysphoria

For individuals seeking care for gender dysphoria, a variety of therapeutic options can be considered. The number and type of interventions applied and the order in which these take place may differ from person to person (e.g., Bockting, Knudson, & Goldberg, 2006; Bolin, 1994; Rachlin, 1999; Rachlin, Green, & Lombardi, 2008; Rachlin, Hansbury, & Pardo, 2010). Treatments options include the following:

* Changes in gender expression and role (which may involve living part time or full time in another gender role, consistent with one's gender identity);

* Hormone therapy to feminize or masculinize the body;

The Standards of Care
7TH VERSION

- Surgery to change primary and/or secondary sex characteristics (e.g., breasts/chest, external and/or internal genitalia, facial features, body contouring);

- Psychotherapy (individual, couple, family, or group) for purposes such as exploring gender identity, role, and expression; addressing the negative impact of gender dysphoria and stigma on mental health; alleviating internalized transphobia; enhancing social and peer support; improving body image; or promoting resilience.

## Options for Social Support and Changes in Gender Expression

In addition (or as an alternative) to the psychological and medical treatment options described above, other options can be considered to help alleviate gender dysphoria, for example:

- Offline and online peer support resources, groups, or community organizations that provide avenues for social support and advocacy;

- Offline and online support resources for families and friends;

- Voice and communication therapy to help individuals develop verbal and non-verbal communication skills that facilitate comfort with their gender identity;

- Hair removal through electrolysis, laser treatment, or waxing;

- Breast binding or padding, genital tucking or penile prostheses, padding of hips or buttocks;

- Changes in name and gender marker on identity documents.

# VI

# Assessment and Treatment of Children and Adolescents with Gender Dysphoria

There are a number of differences in the phenomenology, developmental course, and treatment approaches for gender dysphoria in children, adolescents, and adults. In children and adolescents, a rapid and dramatic developmental process (physical, psychological, and sexual) is involved and

World Professional Association for Transgender Health

there is greater fluidity and variability in outcomes, particular in prepubertal children. Accordingly, this section of the *SOC* offers specific clinical guidelines for the assessment and treatment of gender dysphoric children and adolescents.

# Differences between Children and Adolescents with Gender Dysphoria

An important difference between gender dysphoric children and adolescents is in the proportion for whom dysphoria persists into adulthood. Gender dysphoria during childhood does not inevitably continue into adulthood.[5] Rather, in follow-up studies of prepubertal children (mainly boys) who were referred to clinics for assessment of gender dysphoria, the dysphoria persisted into adulthood for only 6-23% of children (Cohen-Kettenis, 2001; Zucker & Bradley, 1995). Boys in these studies were more likely to identify as gay in adulthood than as transgender (Green, 1987; Money & Russo, 1979; Zucker & Bradley, 1995; Zuger, 1984). Newer studies, also including girls, showed a 12-27% persistence rate of gender dysphoria into adulthood (Drummond, Bradley, Peterson-Badali, & Zucker, 2008; Wallien & Cohen-Kettenis, 2008).

In contrast, the persistence of gender dysphoria into adulthood appears to be much higher for adolescents. No formal prospective studies exist. However, in a follow-up study of 70 adolescents who were diagnosed with gender dysphoria and given puberty suppressing hormones, all continued with the actual sex reassignment, beginning with feminizing/masculinizing hormone therapy (de Vries, Steensma, Doreleijers, & Cohen-Kettenis, 2010).

Another difference between gender dysphoric children and adolescents is in the sex ratios for each age group. In clinically referred, gender dysphoric children under age 12, the male/female ratio ranges from 6:1 to 3:1 (Zucker, 2004). In clinically referred, gender dysphoric adolescents older than age 12, the male/female ratio is close to 1:1 (Cohen-Kettenis & Pfäfflin, 2003).

As discussed in section IV and by Zucker and Lawrence (2009), formal epidemiologic studies on gender dysphoria – in children, adolescents, and adults – are lacking. Additional research is needed to refine estimates of its prevalence and persistence in different populations worldwide.

---

5   Gender nonconforming behaviors in children may continue into adulthood, but such behaviors are not necessarily indicative of gender dysphoria and a need for treatment. As described in section III, gender dysphoria is not synonymous with diversity in gender expression.

The Standards of Care
7TH VERSION

## Phenomenology in Children

Children as young as age two may show features that could indicate gender dysphoria. They may express a wish to be of the other sex and be unhappy about their physical sex characteristics and functions. In addition, they may prefer clothes, toys, and games that are commonly associated with the other sex and prefer playing with other-sex peers. There appears to be heterogeneity in these features: Some children demonstrate extremely gender nonconforming behavior and wishes, accompanied by persistent and severe discomfort with their primary sex characteristics. In other children, these characteristics are less intense or only partially present (Cohen-Kettenis et al., 2006; Knudson, De Cuypere, & Bockting, 2010a).

It is relatively common for gender dysphoric children to have co-existing internalizing disorders such as anxiety and depression (Cohen-Kettenis, Owen, Kaijser, Bradley, & Zucker, 2003; Wallien, Swaab, & Cohen-Kettenis, 2007; Zucker, Owen, Bradley, & Ameeriar, 2002). The prevalence of autistic spectrum disorders seems to be higher in clinically referred, gender dysphoric children than in the general population (de Vries, Noens, Cohen-Kettenis, van Berckelaer-Onnes, & Doreleijers, 2010).

## Phenomenology in Adolescents

In most children, gender dysphoria will disappear before or early in puberty. However, in some children these feelings will intensify and body aversion will develop or increase as they become adolescents and their secondary sex characteristics develop (Cohen-Kettenis, 2001; Cohen-Kettenis & Pfäfflin, 2003; Drummond et al., 2008; Wallien & Cohen-Kettenis, 2008; Zucker & Bradley, 1995). Data from one study suggest that more extreme gender nonconformity in childhood is associated with persistence of gender dysphoria into late adolescence and early adulthood (Wallien & Cohen-Kettenis, 2008). Yet many adolescents and adults presenting with gender dysphoria do not report a history of childhood gender nonconforming behaviors (Docter, 1988; Landén, Wålinder, & Lundström, 1998). Therefore, it may come as a surprise to others (parents, other family members, friends, and community members) when a youth's gender dysphoria first becomes evident in adolescence.

Adolescents who experience their primary and/or secondary sex characteristics and their sex assigned at birth as inconsistent with their gender identity may be intensely distressed about it. Many, but not all, gender dysphoric adolescents have a strong wish for hormones and surgery. Increasing numbers of adolescents have already started living in their desired gender role upon entering high school (Cohen-Kettenis & Pfäfflin, 2003).

World Professional Association for Transgender Health

Among adolescents who are referred to gender identity clinics, the number considered eligible for early medical treatment – starting with GnRH analogues to suppress puberty in the first Tanner stages – differs among countries and centers. Not all clinics offer puberty suppression. If such treatment is offered, the pubertal stage at which adolescents are allowed to start varies from Tanner stage 2 to stage 4 (Delemarre-van de Waal & Cohen-Kettenis, 2006; Zucker et al., in press). The percentages of treated adolescents are likely influenced by the organization of health care, insurance aspects, cultural differences, opinions of health professionals, and diagnostic procedures offered in different settings.

Inexperienced clinicians may mistake indications of gender dysphoria for delusions. Phenomenologically, there is a qualitative difference between the presentation of gender dysphoria and the presentation of delusions or other psychotic symptoms. The vast majority of children and adolescents with gender dysphoria are not suffering from underlying severe psychiatric illness such as psychotic disorders (Steensma, Biemond, de Boer, & Cohen-Kettenis, published online ahead of print January 7, 2011).

It is more common for adolescents with gender dysphoria to have co-existing internalizing disorders such as anxiety and depression, and/or externalizing disorders such as oppositional defiant disorder (de Vries et al., 2010). As in children, there seems to be a higher prevalence of autistic spectrum disorders in clinically referred, gender dysphoric adolescents than in the general adolescent population (de Vries et al., 2010).

## Competency of Mental Health Professionals Working with Children or Adolescents with Gender Dysphoria

The following are recommended minimum credentials for mental health professionals who assess, refer, and offer therapy to children and adolescents presenting with gender dysphoria:

1. Meet the competency requirements for mental health professionals working with adults, as outlined in section VII;

2. Trained in childhood and adolescent developmental psychopathology;

3. Competent in diagnosing and treating the ordinary problems of children and adolescents.

The Standards of Care
7TH VERSION

# Roles of Mental Health Professionals Working with Children and Adolescents with Gender Dysphoria

The roles of mental health professionals working with gender dysphoric children and adolescents may include the following:

1. Directly assess gender dysphoria in children and adolescents (see general guidelines for assessment, below).

2. Provide family counseling and supportive psychotherapy to assist children and adolescents with exploring their gender identity, alleviating distress related to their gender dysphoria, and ameliorating any other psychosocial difficulties.

3. Assess and treat any co-existing mental health concerns of children or adolescents (or refer to another mental health professional for treatment). Such concerns should be addressed as part of the overall treatment plan.

4. Refer adolescents for additional physical interventions (such as puberty suppressing hormones) to alleviate gender dysphoria. The referral should include documentation of an assessment of gender dysphoria and mental health, the adolescent's eligibility for physical interventions (outlined below), the mental health professional's relevant expertise, and any other information pertinent to the youth's health and referral for specific treatments.

5. Educate and advocate on behalf of gender dysphoric children, adolescents, and their families in their community (e.g., day care centers, schools, camps, other organizations). This is particularly important in light of evidence that children and adolescents who do not conform to socially prescribed gender norms may experience harassment in school (Grossman, D'Augelli, & Salter, 2006; Grossman, D'Augelli, Howell, & Hubbard, 2006; Sausa, 2005), putting them at risk for social isolation, depression, and other negative sequelae (Nuttbrock et al., 2010).

6. Provide children, youth, and their families with information and referral for peer support, such as support groups for parents of gender nonconforming and transgender children (Gold & MacNish, 2011; Pleak, 1999; Rosenberg, 2002).

Assessment and psychosocial interventions for children and adolescents are often provided within a multi-disciplinary gender identity specialty service. If such a multidisciplinary service is not available, a mental health professional should provide consultation and liaison arrangements with a pediatric endocrinologist for the purpose of assessment, education, and involvement in any decisions about physical interventions.

14

World Professional Association for Transgender Health

# Psychological Assessment of Children and Adolescents

When assessing children and adolescents who present with gender dysphoria, mental health professionals should broadly conform to the following guidelines:

1. Mental health professionals should not dismiss or express a negative attitude towards noncon-forming gender identities or indications of gender dysphoria. Rather, they should acknowledge the presenting concerns of children, adolescents, and their families; offer a thorough assess-ment for gender dysphoria and any co-existing mental health concerns; and educate clients and their families about therapeutic options, if needed. Acceptance and removal of secrecy can bring considerable relief to gender dysphoric children/adolescents and their families.

2. Assessment of gender dysphoria and mental health should explore the nature and characteris-tics of a child's or adolescent's gender identity. A psychodiagnostic and psychiatric assessment – covering the areas of emotional functioning, peer and other social relationships, and intel-lectual functioning/school achievement – should be performed. Assessment should include an evaluation of the strengths and weaknesses of family functioning. Emotional and behavioral problems are relatively common, and unresolved issues in a child's or youth's environment may be present (de Vries, Doreleijers, Steensma, & Cohen-Kettenis, 2011; Di Ceglie & Thüm-mel, 2006; Wallien et al., 2007).

3. For adolescents, the assessment phase should also be used to inform youth and their families about the possibilities and limitations of different treatments. This is necessary for informed consent, but also important for assessment. The way that adolescents respond to information about the reality of sex reassignment can be diagnostically informative. Correct information may alter a youth's desire for certain treatment, if the desire was based on unrealistic expecta-tions of its possibilities.

# Psychological and Social Interventions for Children and Adolescents

When supporting and treating children and adolescents with gender dysphoria, health professionals should broadly conform to the following guidelines:

1. Mental health professionals should help families to have an accepting and nurturing response to the concerns of their gender dysphoric child or adolescent. Families play an important role in the psychological health and well-being of youth (Brill & Pepper, 2008; Lev, 2004). This also ap-plies to peers and mentors from the community, who can be another source of social support.

The Standards of Care
7TH VERSION

2. Psychotherapy should focus on reducing a child's or adolescent's distress related to the gender dysphoria and on ameliorating any other psychosocial difficulties. For youth pursuing sex reassignment, psychotherapy may focus on supporting them before, during, and after reassignment. Formal evaluations of different psychotherapeutic approaches for this situation have not been published, but several counseling methods have been described (Cohen-Kettenis, 2006; de Vries, Cohen-Kettenis, & Delemarre-van de Waal, 2006; Di Ceglie & Thümmel, 2006; Hill, Menvielle, Sica, & Johnson, 2010; Malpas, in press; Menvielle & Tuerk, 2002; Rosenberg, 2002; Vanderburgh, 2009; Zucker, 2006).

Treatment aimed at trying to change a person's gender identity and expression to become more congruent with sex assigned at birth has been attempted in the past without success (Gelder & Marks, 1969; Greenson, 1964), particularly in the long term (Cohen-Kettenis & Kuiper, 1984; Pauly, 1965). Such treatment is no longer considered ethical.

1. Families should be supported in managing uncertainty and anxiety about their child's or adolescent's psychosexual outcomes and in helping youth to develop a positive self-concept.

2. Mental health professionals should not impose a binary view of gender. They should give ample room for clients to explore different options for gender expression. Hormonal or surgical interventions are appropriate for some adolescents, but not for others.

3. Clients and their families should be supported in making difficult decisions regarding the extent to which clients are allowed to express a gender role that is consistent with their gender identity, as well as the timing of changes in gender role and possible social transition. For example, a client might attend school while undergoing social transition only partly (e.g., by wearing clothing and having a hairstyle that reflects gender identity) or completely (e.g., by also using a name and pronouns congruent with gender identity). Difficult issues include whether and when to inform other people of the client's situation, and how others in their lives should respond.

4. Health professionals should support clients and their families as educators and advocates in their interactions with community members and authorities such as teachers, school boards, and courts.

5. Mental health professionals should strive to maintain a therapeutic relationship with gender nonconforming children/adolescents and their families throughout any subsequent social changes or physical interventions. This ensures that decisions about gender expression and the treatment of gender dysphoria are thoughtfully and recurrently considered. The same reasoning applies if a child or adolescent has already socially changed gender role prior to being seen by a mental health professional.

World Professional Association for Transgender Health

## Social Transition in Early Childhood

Some children state that they want to make a social transition to a different gender role long before puberty. For some children, this may reflect an expression of their gender identity. For others, this could be motivated by other forces. Families vary in the extent to which they allow their young children to make a social transition to another gender role. Social transitions in early childhood do occur within some families with early success. This is a controversial issue, and divergent views are held by health professionals. The current evidence base is insufficient to predict the long-term outcomes of completing a gender role transition during early childhood. Outcomes research with children who completed early social transitions would greatly inform future clinical recommendations.

Mental health professionals can help families to make decisions regarding the timing and process of any gender role changes for their young children. They should provide information and help parents to weigh the potential benefits and challenges of particular choices. Relevant in this respect are the previously described relatively low persistence rates of childhood gender dysphoria (Drummond et al., 2008; Wallien & Cohen-Kettenis, 2008). A change back to the original gender role can be highly distressing and even result in postponement of this second social transition on the child's part (Steensma & Cohen-Kettenis, 2011). For reasons such as these, parents may want to present this role change as an exploration of living in another gender role, rather than an irreversible situation. Mental health professionals can assist parents in identifying potential in-between solutions or compromises (e.g., only when on vacation). It is also important that parents explicitly let the child know that there is a way back.

Regardless of a family's decisions regarding transition (timing, extent), professionals should counsel and support them as they work through the options and implications. If parents do not allow their young child to make a gender role transition, they may need counseling to assist them with meeting their child's needs in a sensitive and nurturing way, ensuring that the child has ample possibilities to explore gender feelings and behavior in a safe environment. If parents do allow their young child to make a gender role transition, they may need counseling to facilitate a positive experience for their child. For example, they may need support in using correct pronouns, maintaining a safe and supportive environment for their transitioning child (e.g., in school, peer group settings), and communicating with other people in their child's life. In either case, as a child nears puberty, further assessment may be needed as options for physical interventions become relevant.

The Standards of Care
7TH VERSION

# Physical Interventions for Adolescents

Before any physical interventions are considered for adolescents, extensive exploration of psychological, family, and social issues should be undertaken, as outlined above. The duration of this exploration may vary considerably depending on the complexity of the situation.

Physical interventions should be addressed in the context of adolescent development. Some identity beliefs in adolescents may become firmly held and strongly expressed, giving a false impression of irreversibility. An adolescent's shift towards gender conformity can occur primarily to please the parents and may not persist or reflect a permanent change in gender dysphoria (Hembree et al., 2009; Steensma et al., published online ahead of print January 7, 2011).

Physical interventions for adolescents fall into three categories or stages (Hembree et al., 2009):

1. *Fully reversible interventions*. These involve the use of GnRH analogues to suppress estrogen or testosterone production and consequently delay the physical changes of puberty. Alternative treatment options include progestins (most commonly medroxyprogesterone) or other medications (such as spironolactone) that decrease the effects of androgens secreted by the testicles of adolescents who are not receiving GnRH analogues. Continuous oral contraceptives (or depot medroxyprogesterone) may be used to suppress menses.

2. *Partially reversible interventions*. These include hormone therapy to masculinize or feminize the body. Some hormone-induced changes may need reconstructive surgery to reverse the effect (e.g., gynaecomastia caused by estrogens), while other changes are not reversible (e.g., deepening of the voice caused by testosterone).

3. *Irreversible interventions*. These are surgical procedures.

A staged process is recommended to keep options open through the first two stages. Moving from one stage to another should not occur until there has been adequate time for adolescents and their parents to assimilate fully the effects of earlier interventions.

# Fully Reversible Interventions

Adolescents may be eligible for puberty suppressing hormones as soon as pubertal changes have begun. In order for adolescents and their parents to make an informed decision about pubertal delay, it is recommended that adolescents experience the onset of puberty to at least Tanner Stage 2. Some children may arrive at this stage at very young ages (e.g., 9 years of age). Studies

evaluating this approach only included children who were at least 12 years of age (Cohen-Kettenis, Schagen, Steensma, de Vries, & Delemarre-van de Waal, 2011; de Vries, Steensma et al., 2010; Delemarre-van de Waal, van Weissenbruch, & Cohen Kettenis, 2004; Delemarre-van de Waal & Cohen-Kettenis, 2006).

Two goals justify intervention with puberty suppressing hormones: (i) their use gives adolescents more time to explore their gender nonconformity and other developmental issues; and (ii) their use may facilitate transition by preventing the development of sex characteristics that are difficult or impossible to reverse if adolescents continue on to pursue sex reassignment.

Puberty suppression may continue for a few years, at which time a decision is made to either discontinue all hormone therapy or transition to a feminizing/masculinizing hormone regimen. Pubertal suppression does not inevitably lead to social transition or to sex reassignment.

**Criteria for puberty suppressing hormones**

In order for adolescents to receive puberty suppressing hormones, the following minimum criteria must be met:

1. The adolescent has demonstrated a long-lasting and intense pattern of gender nonconformity or gender dysphoria (whether suppressed or expressed);

2. Gender dysphoria emerged or worsened with the onset of puberty;

3. Any co-existing psychological, medical, or social problems that could interfere with treatment (e.g., that may compromise treatment adherence) have been addressed, such that the adolescent's situation and functioning are stable enough to start treatment;

4. The adolescent has given informed consent and, particularly when the adolescent has not reached the age of medical consent, the parents or other caretakers or guardians have consented to the treatment and are involved in supporting the adolescent throughout the treatment process.

**Regimens, monitoring, and risks for puberty suppression**

For puberty suppression, adolescents with male genitalia should be treated with GnRH analogues, which stop luteinizing hormone secretion and therefore testosterone secretion. Alternatively, they may be treated with progestins (such as medroxyprogesterone) or with other medications that block testosterone secretion and/or neutralize testosterone action. Adolescents with female genitalia should be treated with GnRH analogues, which stop the production of estrogens and

The Standards of Care
7TH VERSION

progesterone. Alternatively, they may be treated with progestins (such as medroxyprogesterone). Continuous oral contraceptives (or depot medroxyprogesterone) may be used to suppress menses. In both groups of adolescents, use of GnRH analogues is the preferred treatment (Hembree et al., 2009), but their high cost is prohibitive for some patients

During pubertal suppression, an adolescent's physical development should be carefully monitored – preferably by a pediatric endocrinologist – so that any necessary interventions can occur (e.g., to establish an adequate gender appropriate height, to improve iatrogenic low bone marrow density) (Hembree et al., 2009).

Early use of puberty suppressing hormones may avert negative social and emotional consequences of gender dysphoria more effectively than their later use would. Intervention in early adolescence should be managed with pediatric endocrinological advice, when available. Adolescents with male genitalia who start GnRH analogues early in puberty should be informed that this could result in insufficient penile tissue for penile inversion vaginoplasty techniques (alternative techniques, such as the use of a skin graft or colon tissue, are available).

Neither puberty suppression nor allowing puberty to occur is a neutral act. On the one hand, functioning in later life can be compromised by the development of irreversible secondary sex characteristics during puberty and by years spent experiencing intense gender dysphoria. On the other hand, there are concerns about negative physical side effects of GnRH analog use (e.g., on bone development and height). Although the very first results of this approach (as assessed for adolescents followed over 10 years) are promising (Cohen-Kettenis et al., 2011; Delemarre-van de Waal & Cohen-Kettenis, 2006), the long-term effects can only be determined when the earliest treated patients reach the appropriate age.

## Partially Reversible Interventions

Adolescents may be eligible to begin feminizing/masculinizing hormone therapy, preferably with parental consent. In many countries, 16-year-olds are legal adults for medical decision-making and do not require parental consent. Ideally, treatment decisions should be made among the adolescent, the family, and the treatment team.

Regimens for hormone therapy in gender dysphoric adolescents differ substantially from those used in adults (Hembree et al., 2009). The hormone regimens for youth are adapted to account for the somatic, emotional, and mental development that occurs throughout adolescence (Hembree et al., 2009).

World Professional Association for Transgender Health

The Standards of Care
7TH VERSION

## Irreversible Interventions

Genital surgery should not be carried out until (i) patients reach the legal age of majority in a given country, and (ii) patients have lived continuously for at least 12 months in the gender role that is congruent with their gender identity. The age threshold should be seen as a minimum criterion and not an indication in and of itself for active intervention.

Chest surgery in FtM patients could be carried out earlier, preferably after ample time of living in the desired gender role and after one year of testosterone treatment. The intent of this suggested sequence is to give adolescents sufficient opportunity to experience and socially adjust in a more masculine gender role, before undergoing irreversible surgery. However, different approaches may be more suitable, depending on an adolescent's specific clinical situation and goals for gender identity expression.

## Risks of Withholding Medical Treatment for Adolescents

Refusing timely medical interventions for adolescents might prolong gender dysphoria and contribute to an appearance that could provoke abuse and stigmatization. As the level of gender-related abuse is strongly associated with the degree of psychiatric distress during adolescence (Nuttbrock et al., 2010), withholding puberty suppression and subsequent feminizing or masculinizing hormone therapy is not a neutral option for adolescents.

# VII
# Mental Health

Transsexual, transgender, and gender nonconforming people might seek the assistance of a mental health professional for any number of reasons. Regardless of a person's reason for seeking care, mental health professionals should have familiarity with gender nonconformity, act with appropriate cultural competence, and exhibit sensitivity in providing care.

This section of the *SOC* focuses on the role of mental health professionals in the care of adults seeking help for gender dysphoria and related concerns. Professionals working with gender dysphoric children, adolescents, and their families should consult section VI.