# APPENDIX TO DEFENDANT-INTERVENOR'S MOTION FOR SUMMARY JUDGMENT

TABLE OF CONTENTS:

APPENDIX TO DEFENDANT-INTERVENOR'S MOTION FOR SUMMARY JUDGMENT

| Description | Appendix Page Number(s) |
|---|---|
| Declaration of Lainey Armistead | 1 |
| Declaration of Chelsea Mitchell | 9 |
| Declaration of Christina Mitchell | 20 |
| Declaration of Alanna Smith | 33 |
| Declaration of Selina Soule | 39 |
| Declaration of Darcy Aschoff | 49 |
| Declaration of Cynthia Monteleone | 54 |
| Declaration of Madison Kenyon | 59 |
| Declaration of Mary Marshall | 65 |
| Declaration of Haley Tanne | 70 |
| Declaration of Linnea Saltz | 75 |
| 2019 NCAA Division II Outdoor Track & Field Championship Results (Excerpt) | 80 |
| 2020 Big Sky Indoor Track & Field Championship Results (Excerpt) | 82 |
| 2020 Women's Ivy League Swimming & Diving Championship Results | 87 |
| 2020 NCAA Division I Women's Swimming & Diving Championship Results (500 Yard Freestyle) | 109 |

| | |
|---|---|
| 2020 NCAA Division I Women's Swimming & Diving Championship Results (100 Yard Freestyle) | 113 |
| Declaration of Gregory A. Brown, PH.D, FACSM | 116 |
| Declaration of Dr. Chad T. Carlson, M.D., FACSM | 198 |
| Declaration of Dr. Stephen B. Levine, M.D. | 276 |
| Declaration of James M. Cantor, PH.D | 384 |
| Deposition of Mary D. Fry, PH.D | 492 |
| Deposition of Dr. Joshua Safer, M.D. | 614 |
| Deposition of Dr. Deanna Adkins, M.D. | 753 |
| Deposition of Dr. Aron Janssen, M.D. | 905 |
| Deposition of Bernard Dolan | 1067 |
| Deposition of Dr. Kacie Kidd, M.D. | 1142 |
| Deposition of B.P.J. | 1279 |
| Plaintiff's Responses and Objections to Defendant-Intervenor Lainey Armistead's First Set of Requests for Admission | 1437 |
| Plaintiff's Responses and Objections to Intervenor Lainey Armistead's Third Set of Interrogatories and Second and Third Sets of Requests for Admission | 1487 |
| Defendant Harrison County Board of Education's Responses and Objections to Plaintiff's Second Set of Requests for Admission | 1511 |
| Errata Sheet to Deposition of Dr. Joshua Safer, M.D. | 1535 |
| Harrison County Board of Education Document Production: HCBOE 01167–01172 | 1538 |

| Harrison County Board of Education Document Production: HCBOE 01265–01268 | 1544 |

Armistead p. 0001

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA**
**CHARLESTON DIVISION**

| | |
|---|---|
| B.P.J, by her next friend and mother, HEATHER JACKSON<br><br>*Plaintiff,*<br><br>v.<br><br>WEST VIRGINIA STATE BOARD OF EDUCATION, HARRISON COUNTY BOARD OF EDUCATION, WEST VIRGINIA SECONDARY SCHOOL ACTIVITIES COMMISSION, W. CLAYTON BURCH in his official capacity as State Superintendent, DORA STUTLER in her official capacity as Harrison County Superintendent, and THE STATE OF WEST VIRGINIA<br><br>*Defendants,*<br><br>and<br><br>LAINEY ARMISTEAD<br><br>*Defendant-Intervenor.* | Case No. 2:21-cv-00316<br><br>Hon. Joseph R. Goodwin |

**<u>DECLARATION OF LAINEY ARMISTEAD</u>**

I, Lainey Armistead, under penalty of perjury, declare as follows:

1.      I am a twenty-two-year-old resident of Charleston, West Virginia, in Kanawha County, and have personal knowledge of the information below.

2.      I am a junior and female athlete at West Virginia State University (WVSU) in Charleston, West Virginia, where I am a member of the women's soccer team. Soccer is my passion and life-defining pursuit.

***Athletics Background***

3.      I come from a family of talented athletes. My dad was a multi-sport athlete in high school and an All-American soccer player in college. He later coached club soccer. My

1

mom was a high school and collegiate cheerleader. Two of my brothers went on to play soccer in college.

4.       Soccer was like the air I breathed growing up. I first kicked a soccer ball at three years old—almost as soon as I could walk. I grew up playing pick-up soccer games with my brothers, being coached by my dad on technique, and cheering at soccer matches alongside my family.

5.       I started playing on club soccer teams in my home state of Kentucky at age seven and continued competing on club teams through the end of my high school career.

6.       I was excited to enjoy success on those club soccer teams. When I was just nine years old, my club soccer team won the indoor U.S. Youth Futsall National Championships—which is the largest and most prestigious indoor youth soccer competition in the country. It was an unforgettable experience.

7.       I later went on to help my club soccer team win state championships during my freshman and sophomore years of high school. Those wins pushed me to try even harder.

8.       Also during my sophomore year of high school, I had the honor of being selected from my club soccer team (Kentucky Fire) as one of only 20 girls in the nation to be invited to compete in a showcase soccer event in Las Vegas.

9.       In addition to club soccer, I also competed on my school's middle school and high school soccer teams. One of my favorite memories from that time was helping my high school soccer team win the state championship during my freshman year of high school.

*Competing in Women's Collegiate Athletics*

10.     It was my dream to play soccer in college. And I hoped my hard work would pay off with a college scholarship. I know, however, that athletic scholarships are limited and competitive.

11.     After visiting approximately ten different colleges, I decided to visit West Virginia State University (WVSU), a public state university. I immediately knew this was where I wanted to attend college and I committed the same day.

12.     WVSU offered me a soccer scholarship to compete on its women's soccer team. That scholarship helps pay for my education and brings me one step closer to my dream of being a lawyer someday.

13.     Without a scholarship, I likely would have attended a college in my hometown and been saddled with school loans. My athletic scholarship opened the door for me to attend the school of my choice.

14.     WVSU is an NCAA Division II soccer team and competes in the NCAA Mountain East Conference.

15.     There are 11 players per team (22 players total) on the soccer field at any given time, though teams may have two or three times that many players total. Those 11 starting positions are highly coveted and competitive.

16.     Team players are grouped into four general categories:

    a.   the front, or attacking positions, which are called strikers;

    b.   the midfielder positions;

    c.   the defender positions;

    d.   and the goalie.

17.     I play starting left wingback on the soccer field, which is a defender position. But I "attack" a lot, which means I run up and down the field much of the game.

18.     I also have the privilege of serving as team captain. This is a leadership position that is voted on by both players and coach, and has responsibilities that include organizing the team, determining what jerseys to wear, serving as liaison between the players and coaches, and also serving as liaison between the players and referee.

19.     In 2020, I received the Stinger Award for "Female Teammate of the Year" in WVSU women's soccer.

20.     Due to the COVID-19 pandemic, I currently have three years of NCAA eligibility left.

21.     My teammates and I train hard to win. We do running drills, weightlifting, and watch replay videos of our prior games to evaluate how we can improve.

22.     But it is not always easy. I have made many sacrifices over the course of my athletic career to play the sport that I love. I have missed school dances and spring breaks; family events; and friends' birthdays. I have given up my weekends and free time. I stay at school late for practice and get up early to train.

23.     But I make these sacrifices because I want to be the best that I can be. I want to win—not just for myself, but also for my teammates. And it is that love of winning that helps me press through when the going gets tough.

24.     I love my sport. It's exhilarating to see all the training and hard work that we put in at practice pay off on the field.

Pl. Resp. App. 0005

25.     Soccer is called the "beautiful sport"—and for good reason. It is the most played sport in the world. Like music, soccer transcends culture. You can play a pick-up game of soccer with anyone regardless of language or background.

26.     But soccer is also beautiful because it takes incredible teamwork to achieve a win. Soccer is a 90-minute game. It is much more difficult for women to run nonstop for a full 90-miuntes than it is for men. As a result, women's soccer games are different than men's. We have to be more cohesive. We pass the ball more, communicate more, and rely on our teammates more. But rather than a downside, I see teamwork as a thing of beauty. I love accomplishing things as a group. And when I step on the field with those ten other women, I know they have my back and I have theirs. We play hard for each other. As a result, my teammates have become some of my closest friends.

27.     Soccer also taught me life skills like mental and physical toughness, perseverance, and good sportsmanship. It taught me that hard work and discipline pay off. It taught me the value of teamwork. It provided leadership opportunities that will benefit my future career. It opened new financial opportunities, such as benefitting from my image and likeness. It has given me lasting friendships with my teammates. And it has given me something to strive for. I would not be the person I am today without soccer.

### Safety Concerns in Soccer

28.     Soccer is a rough contact sport, and injuries are common among female athletes.

29.     From my own observations, concussions, knee injuries, and ankle injuries are the most common injuries incurred by soccer players. In the first couple games of the WVSU fall 2021 soccer season alone, members of my team suffered all three of these injuries.

5

30.    Playing a rough contact sport with other girls is one thing. But having played pick-up soccer games with my brothers and street soccer with men, I have realized that playing a rough contact sport with men is entirely different.

31.    Males are generally stronger, fitter, faster, and have a bigger stature than women, which gives them advantages of strength, speed, and size in soccer. They compete at a faster pace. They kick the ball harder. They have physical frames that are generally larger.

32.    Thankfully, I can enjoy a casual pick-up game of soccer with men because they take it easier on me. They do not go "all-in" because they know they could hurt me. But it would be a different story if a male was seriously competing and making full use of his strength, speed, and size in a soccer match against me. Based on my long experience playing competitive team soccer, I would be more worried that I could be injured by a male than a female competitor in a game in which players are trying their hardest to win.

**Fairness in Women's Sports**

33.    A couple years ago, I heard about female track athletes in Connecticut who lost to biological males competing in their races. I learned that these two males won 15 women's state championship titles in girls' high school track and field. I was appalled and heartbroken for those girls. It felt so unfair. But I was thankful that those athletes had the courage to stand up.

34.    I also heard that a male who competed on the University of Montana men's team track and cross-country team began competing in women's cross-country and track events and displaced collegiate female athletes.

35.    So when I heard that West Virginia's legislature passed the Save Women's Sports Act to protect the integrity of women's sports, I enthusiastically supported it.

36.     I never dreamed this would be an issue in West Virginia. And I never thought this issue could personally impact my competition till I learned a lawsuit had been filed against the new West Virginia law to protect women's sports.

37.     Getting involved in this lawsuit was a weighty decision. I sought a lot of counsel and considered my options carefully before deciding to become involved in a case of this public importance and controversy. It's not always easy standing up for what you believe in.

38.     And I know from experience in friendly competitions against men that facing a male in a soccer game changes the entire dynamics on the field and poses not just fairness but safety concerns, as well.

39.     If forced to compete against a male athlete, I would have to face the hard decision of competing on an unfair playing field with heightened safety risks, or not competing at all.

40.     A single male on my team could displace me or one of my teammates from a starting position—or a position on the team.

41.     Even if the male athlete was on my team—arguably giving my team an advantage—I would treat that individual with respect and kindness, but it would still be unfair to displace a female athlete from her place on the field or from that position. And it also would not be fair to the female players on the opposing team.

42.     Allowing males into women's athletics allows a person with a male body to take opportunities away from female athletes—whether that is a spot on the team, a starting position on the field, an athletic scholarship, the opportunity to benefit from her likeness, or recognition and awards—and is contrary to the entire purpose of women's sports.

43.     Women's sports exist to give girls like me a chance to compete in sports on a level playing field.

7

Armistead App. 0008

44.      Women have worked so hard to be taken seriously on the athletic level.

45.      I fear that too many women feel pressured to remain silent about their beliefs.

46.      I want other little girls in the future, or my own daughters, to not have to worry about competing against males. I also fear that girls in the future might consider not playing at all if they feel they cannot win against a physically superior male. Winning is the motivation for a lot of us who played sports for years.

47.      I believe that protecting fairness in women's sports is a women's rights issue. This isn't just about fair play for me: it's about protecting fairness and safety for female athletes across West Virginia. It's about ensuring that future generations of female athletes are not discriminated against but have access to the same equal athletic opportunities that shaped my life.

48.      Being an athlete in college has made me even more passionate about the sport that I play. I want fairness and equality in sports. And I want to ensure those standards are protected for other girls, too.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct.

*Lainey Armistead*

Lainey Armistead
Dated: April 20, 2022

Admitted 7103. 0009

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA
CHARLESTON DIVISION

| | |
|---|---|
| B.P.J, by her next friend and mother, HEATHER JACKSON,<br><br>*Plaintiff,*<br><br>v.<br><br>WEST VIRGINIA STATE BOARD OF EDUCATION, HARRISON COUNTY BOARD OF EDUCATION, WEST VIRGINIA SECONDARY SCHOOL ACTIVITIES COMMISSION, W. CLAYTON BURCH in his official capacity as State Superintendent, DORA STUTLER in her official capacity as Harrison County Superintendent, and THE STATE OF WEST VIRGINIA,<br><br>*Defendants*<br><br>and<br><br>LAINEY ARMISTEAD,<br><br>*Defendant-Intervenor.* | Case No. 2:21-cv-00316<br><br>Hon. Joseph R. Goodwin |

## DECLARATION OF CHELSEA MITCHELL

I, Chelsea Mitchell, declare as follows:

1.        I am a nineteen-year-old graduate of Canton High School in Canton, Connecticut, and a sophomore student athlete at the College of William and Mary in Williamsburg, Virginia.

2.        As an elite female athlete, I had the deflating experience of competing against and losing to male athletes in the girls' category throughout all four years of my high school career. I personally lost four state championship titles, two All-New England awards, medals, points, placements, and publicity due to an unfair state athletic policy that permits males to compete in girls' sports in Connecticut.

1

Administrative No. 0010

3.      I hope that by sharing my experience, no other female athlete will have to face the heartache and loss that I did.

*Athletic Background*

4.      Sports are a big part of my family. My sisters and I each started playing organized sports in kindergarten and later became multi-sport athletes. My oldest sister was captain of her high school soccer and track teams and went on to run collegiate track. My younger sister plays high school soccer and runs track, and also played lacrosse and basketball for a time. And I played basketball until eighth grade. I was the leading scorer on my varsity soccer team and a four-year starter. And I am a short distance sprinter and long-jumper.

5.      My dad dedicated 15 years to coaching our soccer and basketball teams. My mom was our number one cheerleader, driving us to and from games, and volunteering her time so that we could play the sports we loved.

6.      I started running track in middle school. My older sister ran it, and I decided to give it a try. I loved it: the competitiveness, how it makes me feel, and the opportunity to win.

7.      I'm quite proud of my high school athletic achievements, which include:

- High School All-American for Long Jump, 2020 – NSAF (top 6 nationally)
- Girls Outdoor Track Athlete of the Year, 2019 – Connecticut High School Coaches Association
- Bo Kolinsky Female Athlete of the Year, 2019 – Hartford Courant (soccer and track)
- New England Champion in 100m
- 3 State Open Championships – 55m, 100m, Long Jump
- 8 State Championships – 55m, 100m, 200m, 300m, Long Jump x3, 4x100 relay
- 20 Conference Championships
- Hold the Conference Meet Records in all my events – 55m, 300m, LJ, 100m, 200m, LJ
- MVP award for track every season of high school career.
- Most goals scored in school history for girls' soccer.
- Most championship titles in school history for any athlete, male or female.

2

Anderton App. 0011

- Being the only female in school history to win a State or New England Championship in track and field. Thirteen different male athletes have won titles.

8.      I am proud of what I've accomplished. But it hasn't been easy.

9.      I have made a ton of sacrifices to compete—giving up what many would consider the "normal" teenage life by watching what I eat, skipping the parties, and going to bed early. I spend several hours a day at the track and in the weight room. Track meets are all-day events that start early and end late. I usually train or compete six days a week, with Sunday often my only day off when we are in-season. I do all of this to strengthen my body and improve my technique in hopes of running just a few tenths of a second faster or jumping just a few inches farther.

10.     I do not mind the early mornings and long, tiring days when I know the competition is fair. Because when the competition is fair, I know I have a decent shot at winning. But my high school experience was anything but fair.

***Males competing in Connecticut girls' track***

11.     During my freshman year of high school, my mom informed me that a male would be competing in the girls' category.

12.     Later, we learned that the Connecticut Interscholastic Athletic Conference (CIAC) —the athletic association that set the rules for school sports in Connecticut—had passed a policy allowing biological males who identify as female to compete in the girls' category.

13.     From the Spring 2017 outdoor track season through the Winter 2020 indoor track season[1]—six track seasons—I competed against biological males in my track and field athletic events due to the CIAC policy.

---

[1] The Spring 2020 outdoor season was cancelled due to the global COVID-19 pandemic.

14.     Over the course of my high school career, I competed head-to-head with male

athletes 27 times. I never won a race in which both male athletes were running.

***2016-2017 Freshman Year***

15.     I first competed against a male in girls' track and field as a fourteen-year-old

freshman at the Spring 2017 State Open Championship.

16.     On the way to this meet, I was instructed by my coach to respond "no comment"

if asked about the issue of males competing in the female category.

17.     In the 100m final at the 2017 outdoor State Open, I placed 7th overall. The top

six receive a medal and qualify to advance to the New England Regional Championship: one of

those top six spots was taken by male athlete Andraya Yearwood:

**Table 1: 2017 CIAC State Open Women's Outdoor Track 100m Results (June 5, 2017)**[2]

| Place | Grade | Sex | Name | Time | High School |
|-------|-------|-----|------|------|-------------|
| 1* | 12 | F | Caroline O'Neil | 12.14s | Daniel Hand |
| 2* | 12 | F | Kathryn Kelly | 12.36s | Lauralton Hall |
| 3* | 9 | M | Andraya Yearwood | 12.41s | Cromwell |
| 4* | 11 | F | Tia Marie Brown | 12.44s | Windsor |
| 5* | 12 | F | Kiara Smith | 12.59s | Jonathan Law |
| 6* | 11 | F | Kate Hall | 12.62s | Stonington |
| 7 | 9 | F | Chelsea Mitchell | 12.69s | Canton |
| 8 | 12 | F | Tiandra Robinson | FS | Weaver |

* Qualified for the New England Championship.

18.     If not for Yearwood's participation in the girls' category, I would have medaled

and had the honor of advancing to the prestigious regional championship as a freshman.

---

[2] AthleticNet, https://www.athletic.net/TrackAndField/meet/306453/results/f/1/100m, last visited
June 2, 2020.

Attachment 12 - 0013

*2017-2018 Sophomore Year*

19.     During my sophomore year, I learned that Andraya Yearwood's school was reclassified to the Class S division for indoor track events—which was the same class as my school.

20.     This news was upsetting for me because I would now be racing against a male competitor at both the Class S championship and the State Open championship.

21.     At the February 10, 2018, indoor Class S Championship in the 300m, I was knocked out of advancing to the State Open by just one spot—a spot was taken by Andraya.

22.     As a competitive person, I often check Athletic.net, a website that lists high school track rankings. One day, I noticed a new girl, named Terry Miller, at the top of the charts. Terry was running times better than I ever hoped to run. But my coach told me later that it must be some mistake—perhaps Terry was entered in the wrong race. Terry had competed as a boy for the previous three seasons.

23.     On April 27, 2018, at the first invitational race of the Spring 2018 outdoor season, I was seeded in the 100m in a lane beside not just one, but two male athletes: Terry Miller and Andraya Yearwood.

24.     I distinctly remember seeing Terry look over to Andraya and say: "You and me, one and two." At fifteen years old, I felt extremely intimidated to run against bigger, faster, and stronger male competitors.

25.     But Terry was right. I should have won that 100m race; but instead, Terry and Andraya took first and second place, while I placed third.

26.     Similarly, at the Spring 2018 outdoor State Open Championship, Terry won the women's 100m event by a wide margin, while Andraya finished second.

27.     But for CIAC's policy, I would have won second place statewide:

5

Admitted 123. 0014

**Table 2: 2018 CIAC State Open Championship Women's Outdoor Track 100m Results (June 4, 2018)[3]**

| Place | Grade | Sex | Name | Time | High School |
|-------|-------|-----|------|------|-------------|
| 1* | 10 | M | Terry Miller | 11.72s | Bulkeley |
| 2* | 10 | M | Andraya Yearwood | 12.29s | Cromwell |
| 3* | 11 | F | Bridget Lalonde | 12.36s | RHAM |
| 4* | 10 | F | Chelsea Mitchell | 12.39s | Canton |
| 5* | 11 | F | Maya Mocarski | 12.47s | Fairfield Ludlowe |
| 6* | 10 | F | Selina Soule | 12.67s | Glastonbury |
| 7 | 12 | F | Tia Marie Brown | 12.71s | Windsor |
| 8 | 11 | F | Ayesha Nelson | 12.80s | Hillhouse |

* Qualified for the New England Championship.

28.     Bridget Lalonde beat me by just three-hundredths of a second, but I was so relieved that she did. Emotionally, it was less of a loss to be denied runner-up status than to be denied a first place State Open Championship—a feat almost unheard of for a high school sophomore.

29.     At the 2018 outdoor New England Regional Championship, I placed seventh in the 100m. Only the top six medal and receive the All New England award—one of those top six spots was taken by Terry.

30.     Had I earned the title of All New England, I would have made Canton High School history as the first Canton female athlete to win this prestigious award.

*2018-2019 Junior Year*

31.     In the fall of my junior year, I learned that male athlete Terry Miller transferred to Bloomfield, another Class S school.

32.     I was devastated, fearing that with two males competing in my division, my chances of ever winning a state championship in sprints were now over.

---

[3] AthleticNet, https://www.athletic.net/TrackAndField/meet/334210/results/f/1/100m, last visited June 2, 2020.

33.     I trained harder than ever, spending countless hours to shave mere fractions of seconds off of my times. I never missed a practice, squeezed in extra workouts where I could, and saw my race times consistently drop.

34.     But it was not enough. And my fears of losing championship after championship were realized in the Winter and Spring 2019 seasons.

35.     At the February 7, 2019, indoor Class S State Championship, Terry finished first in the 55m. I placed second. But for the CIAC's policy, I would have been named the Class S State Champion in the 55m.

36.     The February 16, 2019, indoor State Open Championship saw similar results and a similar impact. Terry and Andraya finished first and second respectively in both the preliminary and final Women's 55m races, each time defeating the fastest girl by a wide margin. I placed third in the final.

37.     But for CIAC's policy, I would have won the 2019 State Open Championship in the 55m dash:

**Table 3: 2019 CIAC State Open Championship Women's Indoor Track 55m Preliminary Results (February 16, 2019)[4]**

| Place | Grade | Sex | Name | Time | High School |
|-------|-------|-----|------|------|-------------|
| 1* | 11 | M | Terry Miller | 7.00s | Bloomfield |
| 2* | 11 | M | Andraya Yearwood | 7.07s | Cromwell |
| 3* | 12 | F | Cori Richardson | 7.24s | Windsor |
| 4* | 11 | F | Chelsea Mitchell | 7.27s | Canton |
| 5* | 12 | F | Kate Shaffer | 7.27s | Conard |
| 6* | 12 | F | Ayesha Nelson | 7.29s | Hillhouse |
| 7* | 12 | F | Maya Mocarski | 7.34s | Fairfield Ludlowe |
| 8 | 11 | F | Selina Soule | 7.37s | Glastonbury |
| 9 | 10 | F | Kisha Francois | 7.41s | East Haven |

* Qualified for the women's 55m final.

---

[4] AthleticNet, https://www.athletic.net/TrackAndField/meet/352707/results/f/1/55m, last visited June 2, 2020.

7

**Table 4: 2019 CIAC State Open Championship Women's Indoor Track 55m Final Results (February 16, 2019)[5]**

| Place | Grade | Sex | Name | Time | High School |
|-------|-------|-----|------|------|-------------|
| 1* | 11 | M | Terry Miller | 6.95s | Bloomfield |
| 2* | 11 | M | Andraya Yearwood | 7.01s | Cromwell |
| 3* | 11 | F | Chelsea Mitchell | 7.23s | Canton |
| 4* | 12 | F | Kate Shaffer | 7.24s | Conard |
| 5* | 12 | F | Ayesha Nelson | 7.26s | Hillhouse |
| 6* | 12 | F | Maya Mocarski | 7.33s | Fairfield Ludlowe |
| 7 | 12 | F | Cori Richardson | 7.39s | Windsor |

* Qualified for the New England Championship.

38.     Instead, I was not named State Open Champion in the 55m, I received a bronze medal instead of a gold medal, and I did not make Canton High School history as the first ever Canton female athlete to be named a State Open Champion.

39.     However, after the 55m race, I returned to the finals of the long jump, which had no males competing. While listening to them announce Terry as the winner and new meet record holder in the 55m, I won the long jump event to solidify my place in the Canton record books as the first Canton indoor track athlete—male or female—to be named a State Open Champion.

40.     State Champions are recognized as All-State Athletes, an award listed on college applications, scholarship applications, and college recruiting profiles. State Champions are invited to the All-State Banquet, and get their name celebrated on a banner in their high school gym. I did not receive any of these awards for the 55m. But I was able to receive these awards for my long jump championship.

41.     After the State Open Championship, I was repeatedly referred to in the press as the "third-place competitor, who is not transgender." I was the fastest biological girl in the 55m race at the State Open Championship, but the press did not mention my name—I felt invisible.

---

[5] *Id*.

42.     At the March 2, 2019, indoor New England Regional Championship, Terry took first and Andraya took third place in the 55m dash. I missed medaling and being named All New England Champion by just two spots—two spots that were taken by male competitors.

43.     Following Terry Miller's sweep of the CIAC's Indoor Class S, State Open, and New England titles in the 55m dash and 300m, Terry was named "All-Courant girls indoor track and field athlete of the year" by the Hartford Courant newspaper. This felt like an injustice to my fellow female athletes.

44.     In the Spring 2019 outdoor season, I competed against both Terry and Andraya in the Class S Championship. At this event, I ran the fastest biological female times in the 100m and 200m across all state class meets.

45.     But because of the CIAC's policy, being the fastest biological girl just was not good enough to experience the thrill of victory. Instead, at the 2019 Class S Championship, Terry placed first in the 100m and 200m, while I placed second in both events. I won the long jump and received a state title. But because of the CIAC's policy, I took home only one state title instead of three.

46.     The trend continued at the 2019 outdoor State Open Championship as Terry easily won the women's 200m race. But for CIAC's policy, Cori Richardson would have won the state championship, Alanna Smith would have finished runner-up, and Olivia D'Haiti would have advanced to the New England Championship:

**Table 5: 2019 CIAC State Open Championship Women's Outdoor Track 200m Final Results (June 3, 2019)[6]**

| Place | Grade | Sex | Name | Time | High School |
|-------|-------|-----|------|------|-------------|

[6] AthleticNet, https://www.athletic.net/TrackAndField/MeetResults.aspx?Meet=364088&show=all, last visited June 2, 2020.

9

| 1* | 11 | M | Terry Miller | 24.33s | Bloomfield |
| 2* | 12 | F | Cori Richardson | 24.75s | Windsor |
| 3* | 9 | F | Alanna Smith | 25.01s | Danbury |
| 4* | 11 | F | Chelsea Mitchell | 25.24s | Canton |
| 5* | 12 | F | Nichele Smith | 25.38s | East Hartford |
| 6* | 12 | F | Bridget Lalonde | 25.55s | RHAM |
| 7 | 12 | F | Olivia D'Haiti | 25.63s | Kolbe-Cathedral |

* Qualified for the New England Championship.

47.     But I did receive one opportunity to compete on a more level playing field. At the Spring 2019 State Open Championship in the 100m, Terry, the top-seed in the race, false-started and was disqualified. This opened the door for me: I was able to relax, focus on my race, and win. I set a personal record of 11.67 seconds, made Canton High School history as the first sprinter to be a state open champion in any sprint event, medaled, received significant media publicity, and advanced to the New England Regional Championships.

48.     I went on to win the New England Regional Championships in the 100m dash and was named All New-England. Here, too, I made Canton High School history as the first female to win a New England Championship.

49.     Thereafter, I was awarded Track Athlete of the Year by the Connecticut High School Coaches Association, and the Hartford Courant named me 2019 All-Courant Girls Outdoor Track and Field Athlete of the Year and the Bo Kolinsky Female Athlete of the Year (across all sports).

50.     My new personal record, State Open Champion and All New-England awards put me in a much better recruiting position for college scholarships—all because a false start that prevented a male from competing against me in the women's division leveled the playing field.

***2019-2020 Senior Year***

51.     A similar scenario played out in the Winter 2020 season. At the indoor Class S Championship 55m race, Andraya Yearwood—the top seed in the race and the individual ranked

10

number one in the state for the women's 55m dash—false-started and was disqualified. That false start opened the door for me to not only win the CIAC Class S Championship in the 55m dash, but also to advance to the 2020 Connecticut State Open Championship in the 55m event and win.

52.     To my disappointment, the 2020 Spring outdoor season—the final track season of my high school career — was cancelled in light of the global COVID-19 pandemic.

53.     It feels defeating to know that records at my high school, CIAC, AthleticNet, MySportsResults, CT.Milesplit.com, and others do not reflect the four state titles and two All New England awards I should have earned. It is upsetting to know that the meet records of many great female athletes before me have also been wiped from the books.

54.     Competing against males makes me feel anxious and stressed. And stress has a negative impact on my athletic performance.

55.     I try to stay positive, to take support from family and friends, but it is hard when I know that I must compete against those who have a biological advantage because they were born male.

56.     I hope that future female athletes will not have to endure the anxiety, stress, and performance losses that I have while competing under a policy that allows males to compete in the female category.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct.

_____
Chelsea Mitchell
Dated: April 13, 2022

Armistead App. 0020

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA**
**CHARLESTON DIVISION**

| | |
|---|---|
| B.P.J, by her next friend and mother, HEATHER JACKSON, <br><br> *Plaintiff,* <br><br> v. <br><br> WEST VIRGINIA STATE BOARD OF EDUCATION, HARRISON COUNTY BOARD OF EDUCATION, WEST VIRGINIA SECONDARY SCHOOL ACTIVITIES COMMISSION, W. CLAYTON BURCH in his official capacity as State Superintendent, DORA STUTLER in her official capacity as Harrison County Superintendent, and THE STATE OF WEST VIRGINIA, <br><br> *Defendants* <br><br> and <br><br> LAINEY ARMISTEAD, <br><br> *Defendant-Intervenor.* | Case No. 2:21-cv-00316 <br><br> Hon. Joseph R. Goodwin |

## DECLARATION OF CHRISTINA MITCHELL

I, Christina L. Mitchell, under penalty of perjury, declare as follows:

1.      I am a forty-eight-year-old resident of Canton, Connecticut, in Hartford County, and have personal knowledge of the information below.

2.      I am the mother of three female athletes. My daughters are now ages twenty-three, nineteen, and fifteen and have competed in soccer, basketball, and track. Our family life has been centered around sports since the girls were just little, spending most nights and nearly every weekend at the soccer field, in the gym, or at the track.

### *Family Athletics Background*

3.      I ran track and played basketball in high school. My husband played many sports and was the star of his high school basketball team. We have a competitive spirit that we have

1

Admin_02-B-P- 0021

passed on to our girls. Whether it's board games, March Madness brackets, or a pickup game of soccer in the yard, our family enjoys a good competition.

4.      My husband volunteered his time as a youth soccer and basketball coach for the town of Canton for fifteen years. He would race home from his office job to try and make it to the field or gym in time for practice. Some seasons he coached two of our daughters' teams, which meant practice four nights a week and four games each weekend. It was exhausting but he loved every minute of it.

5.      I volunteered on the Board for the Canton Youth Soccer Association for eight years. As registrar, I had to enforce strict age categories for the teams. Kids were allowed to "play up" on an older team but were never allowed to "play down" on a team for younger kids. Soccer teams were also separated by sex beginning in first grade. Boys' teams were designated as co-ed so that girls who wanted to sign up for the boys' team could "play up". Girls' teams were restricted to females in the registration system.

6.      When my oldest daughter reached high school, I turned my volunteer efforts to the Canton Athletic Booster Club. I worked to get a concession stand built and stadium lighting installed at the high school track and field. In 2017, I was presented with the Dubuc Service to Canton Award in recognition for my years of volunteer service to the school and community.

7.      All three of our daughters have excelled at sports. Our oldest daughter, Emily, was a varsity soccer and track athlete in high school. She was captain of both teams in her senior year and went on to compete on the women's track team in college.

8.      Our youngest daughter, Kennedy, is a sophomore in high school and competes in soccer and track as well. She plays outside defensive back in soccer and her team made it to the

2

Admin. Rec. 0022

state championship this year. She is a long jumper and sprinter in track. She hopes to continue with one of these sports in college.

9.      Our middle daughter, Chelsea, has proven herself as an exceptional athlete. Like her sisters, she had success in both soccer and track in high school. As a little girl on the soccer field, you could see her natural ability to run – she could come from 20 yards behind and beat anyone to the ball. When she got to high school, she added a heavy dose of hard work to that natural gift and made the most of it on the track.

***2017 Outdoor Track Season – Freshman year***

10.      In April of 2017, the outdoor season of track and field in Connecticut was just getting started and Chelsea was ranked among the top sprinters in the state. She was coming off the indoor season where she set school records in the 55m and 300m at her very first meet.

11.      There was one other freshman posting times in the top ten, Andraya Yearwood. I soon learned from an article in the Hartford Courant that Yearwood was a male identifying as female and running for Cromwell. I was confused by the piece, which seemed to celebrate this, and found it hard to believe that the schools, coaches, and state officials would allow it to continue. I saw it as a clear violation of women's rights under Title IX.

12.      Chelsea worked hard that season and placed 2nd at the Class S state championship in all three of her events - the 100m, 200m, and 4x100 relay. The top five in each event advance to the State Open Championship to compete against the top twenty-five athletes in the state. Making it to the State Open is a huge accomplishment and Chelsea had qualified in all three events as a freshman. We were very proud and excited for her.

13.      I knew that one of the other twenty-five competitors at the State Open would be Andraya Yearwood. The CIAC had allowed Yearwood to compete at the Class M state

3

Appendix 0023

championships and take the girls' title in the 100m and 200m races. One of the girls who placed second, Kate Hall, was interviewed following the race – "I can't really say what I want to say". The silencing of the girls had begun.

14.     I had shielded Chelsea from much of the news up to this point, but the night before the race we felt we needed to prepare her for what she would face the next day. I told her there would be a boy who identified as a girl in her race and that she had to try to focus on herself and block out the rest. We knew that this would be a blow to her mental game but didn't want her to be surprised by it at the start line.

15.     Chelsea's first race against a biological male was on a really big stage. The State Open is held at New Britain stadium, one of the biggest outdoor tracks in Connecticut. It is always packed with spectators and many college coaches attend to see potential recruits in action.

16.     For me, it was my first time watching this unfair policy play out in person. As someone who has now watched my daughter race against males more than twenty times, I can attest to how difficult it has been every single time. The girls are forced into a race that they know is rigged against them. They are told to be quiet and be a good sport. They watch as officials casually ignore the foundational principle of sport – fair play. They see the media there, waiting to celebrate the travesty and daring the girls to speak against it. The message to these girls was very clear – nobody cares about your rights. As a woman it was infuriating and as a mom it was heartbreaking. I can only imagine what it felt like to be one of the girls in the race.

17.     The 2017 Outdoor State Open was Chelsea's first tangible loss to a biological male. She took 7th place in the finals of the 100m. She missed advancing to the New England Championship by one spot. Yearwood had placed 3rd.

4

Administrative 0024

18.     In a stroke of luck, one of the six automatic qualifiers to New England, Caroline O'Neil, had to decline her spot. We got the call later that night that as the 7th place finisher, Chelsea could go and compete. We were so grateful.

19.     A few days later at the New England Championships, I watched as Yearwood's 2nd place finish in the 100m again took something tangible from female athletes. Madison Post from Maine didn't make the finals. Katya Levasseur from New Hampshire missed the top six and lost out on the All-New England designation. Kyla Hill from Massachusetts took home a 3rd place medal instead of silver. The ripple effect of Connecticut's policy had spread to our neighboring states.

***2018 Indoor Track Season – Sophomore Year***

20.     I hoped that common sense would prevail, and this would work itself out before the next season. It didn't. Yearwood took home the 2018 Indoor Class S State Championship title in the 55m and placed 2nd in the 300m. Chelsea recorded another lost opportunity due to the policy as she missed advancing to the State Open in the 300m by one spot. Patricia Jurkowski should have taken home the 55m title and other girls lost opportunities to advance to finals or score points for their team. With every race, the list of female sprinters impacted by the policy grew longer. I knew I couldn't remain silent about it any longer.

21.     Following the 2018 Indoor State Championships, I began to advocate for a change in policy. I first spoke to the Assistant Superintendent of Canton Schools, Dr. Jordan Grossman. I asked if he thought the Board of Education could help, but he advised against taking the issue to them. Instead, he gave me the name of the CIAC Executive Director so I could follow up with them directly.

5

Administrative. 0025

22.     I went to work on a letter to the CIAC asking for a solution to protect the rights of the female athletes in our state. I included the Canton principal, athletic director, coach, and assistant superintendent on the email. The CIAC replied that they were unwilling to consider changing the policy and listed various reasons. I addressed each reason with my own points – I was thorough and respectful – but I received no reply.

*2018 Outdoor Track Season – Sophomore Year*

23.     The night before the first big meet of the outdoor season, we realized that a second male was competing in girls' sprint events. It was hard to believe at first, I remember thinking that surely this wasn't really happening. Terry Miller had competed for three seasons on the boys' team. Looking at the race results online, it was clear that Miller was an average runner that hadn't even qualified to compete at the boys' state championships just a few weeks earlier. After switching to the girls' team, Miller was suddenly ranked first in the state. I reached out to Chelsea's coach immediately. It seemed it was true; this was really happening.

24.     The two male athletes took first and second in the 100m race the next day – Chelsea finished 3rd. With two males competing, it was clear that the number of lost opportunities for Chelsea and female sprinters across the state would now be double.

25.     I again wrote to the Canton athletic director and principal to let them know that there were now two male athletes competing in girls' track. I asked them to urge the CIAC to change the policy before more harm was done but nothing changed.

26.     Miller swept the sprint events at the Class M championship, taking three state titles. Yearwood was close behind. Girls were sidelined, missing finals and advancement to the Open. Anyone who tried to speak out was quickly silenced. Chelsea was thankfully in Class S

and took home three state titles of her own. But she would again head to the State Open to compete against males.

27.    The State Open was a circus. Miller and Yearwood took 1st and 2nd in the 100m. The media was out in full force, waiting to ask the first female finisher how she felt about taking 3rd place. We were glad Chelsea took 4th and didn't have to deal with the emotions of being the one to lose a state title and her banner in the gym. Bridget LaLonde was the unlucky girl this time. Other girls lost points for their team, medals, and opportunities to advance to the New England Championship. The list of females impacted was very long at this point.

28.    There was more of the same at the New England Championship. The top six athletes from Maine, Vermont, New Hampshire, Massachusetts, Rhode Island, and Connecticut were there to compete for the title. It was a sunny day at a beautiful track and field facility at the University of New Hampshire, an incredible experience. But a cloud hung over the event as the female athletes were again denied a fair race.

29.    I watched as Miller swept the 100m and 200m races at the New England championship. Chloe Alfieri, a senior from Massachusetts, took second place in both events. Miller was interviewed after each win, as is customary for the champion. Chloe missed out on those titles and that recognition. It was awful to watch.

30.    Chelsea took 7th place in the 100m. The top six are given the All-New England designation, so it was another tangible loss that she directly felt. Athletes set goals for themselves—they don't expect to achieve the top spot right out of the gate. It is a progression. Being named All-New England was the goal she had set for the day and she hadn't reached it because they allowed a male to compete in her race.

7

31.     Following the New England Championship, I called my state senator, Kevin Witkos. He urged me to seek help from the school administration, as he did not agree with the CIAC that Connecticut law required this policy. He felt that if asked by member schools, CIAC could change the policy and restore fairness for the female athletes.

32.     I immediately followed up with an email to Canton school officials including Chelsea's coach, the athletic director, the principal, the assistant superintendent, and the superintendent. I asked them to contact the CIAC and urge a change in policy. Nobody responded to my email.

33.     At the end of June, Senator Witkos reached out to me and said that he would work with the Connecticut Speaker of the House to draft a letter to the superintendents of all schools, but not until after the November elections, five months away. That letter never happened.

34.     In July, I scheduled an in-person meeting with the principal, Drew DiPippo. I asked what the process was to formally request a change in CIAC policy. He said he would look into it and let me know. He noted that there would be a new CIAC Executive Director starting in August and that perhaps the policy would be revisited. I never heard back from him on the process to request a change.

35.     During the fall, we learned that Terry Miller had transferred to a Class S school. Chelsea cried as I drove her home from soccer that night. She knew that meant she would now face males not just at the State Open, but at the Class S championship as well. In her mind, it meant she would never win another state championship race.

*2019 Indoor Track Season – Junior Year*

36.     A few weeks before the state championships arrived, I drafted another letter to CIAC Executive Director, Glenn Lungarini, to again ask for fairness for female athletes and a

8

Administrative Appx. 0028

change in policy. The CIAC responded that they would not consider my request for a rule change because I was just a parent. I soon learned there was a new "gender committee" commissioned by the CIAC that would make a recommendation in the summer. It was an endless game of shifting responsibility and delaying any meaningful discussion.

37.     As the championships drew near, I dreaded what was to come. I had watched many other girls lose the state title they deserved. This time it was Chelsea's turn. As a junior, she was stronger, more experienced, and her times had improved significantly. She was the fastest female in the 55m at both the Class S championship and the State Open. But Miller went home with both of those titles. Jillian Mars was the fastest female in the 300m – she too was robbed of her titles. And, of course, more girls lost the chance to advance to finals, or the Open, or the New England Championship. Female athletes lost out on podium spots and medals and points for their team. Chelsea lost out on another All-New England designation after finishing 8th at the championship in Boston.

38.     The list of girls who had been directly harmed was pages long by now, but the CIAC did not care. They showed so little regard for the rights of the female track athletes in our state it was staggering. The coaches and administrators remained silent, no doubt fearful for their jobs. But there was one girl who was not afraid to speak up, Selina Soule. We watched her bravely tell her story on national television one night and knowing that we weren't alone in our fight made all the difference.

39.     I asked my principal to schedule time for me to meet with CIAC director, Glenn Lungarini. As we sat in the principal's office at Canton High School and I shared the list of the girls who had been directly harmed by the policy, it became clear that they had no intention of changing anything. I expressed my concerns that the CIAC policy was violating the rights of my

Anonymous Ex. 29. 0029

daughter and the other female athletes under Title IX. Mr. Lungarini's response was that my daughter had only the right to participate, not to win.

40.     The CIAC director was not interested in alternative solutions or fairness for females. He did not seem at all bothered that the CIAC's unwillingness to address the issue had placed all of these kids directly in the center of a highly controversial international political debate. He tossed about slogans like "transwomen are women" and his arguments lacked any logical consistency or regard for the rights of females. I left feeling angry but resolved to advocate for Chelsea and all of the girls being harmed.

41.     Following that meeting, I asked to meet with our school's Title IX coordinator, Lori Devito. I called the State of Connecticut's Title IX Coordinator, Dr. Adrian Wood, to discuss my options for filing a Title IX complaint. I spoke with an attorney, Robin Cecere, at the Connecticut Department of Education. I called the Office of Civil Rights for the U.S. Department of Education in Boston. Multiple times I was told by these government officials that girls have the right to participate, not to win. I began to believe it must be part of the talking points being circulated on this issue or in some presentation somewhere. It certainly didn't stem from any regulation or case law on Title IX that I had found.

42.     I contacted the Canton Board of Education and the topic was added to the agenda for their next meeting. I was given three minutes to speak about something that had been impacting us for two years. I followed up with more emails to the Board of Education but would seldom get a reply. The one-way dialogue was not an effective means of discussion.

43.     I continued to send research papers and information to Glenn Lungarini at the CIAC. He abruptly notified me that he would no longer receive my emails because I was just a parent. Everything would have to come from a member school. I went back to the Board of

Admin. Rec. 0030

Education and asked them to contact the CIAC to request a public forum be held so that parents could bring their concerns forward. Canton Superintendent, Kevin Case, assured me he would ask for one, but it never happened.

44.     I emailed my state representative, Leslee Hill, and my state senator, Kevin Witkos. I contacted two female coaches from the Connecticut High School Coaches Association (CHSCA) to ask for their help requesting a rule change. In all of these cases, I explained the devastating impact this was having on female athletes in our state. And yet, at the end of the day, not a single person would help us get the policy changed.

***2019 Outdoor Track Season – Junior Year***

45.     The Outdoor season added more names to the list of girls impacted by the policy. It was Chelsea's fifth season competing against males. My efforts to convince school and state officials to fix the policy had failed. I felt sure that nobody was going to take steps to change things unless their hand was forced.

46.     The state championships should have been an exciting day, but I dreaded watching the injustice play out again. I understood how demoralizing and disrespectful it was to these girls and felt sickened by the whole thing. Chelsea lost the Class S championship in the 100m and 200m to Miller– her tally was now at four state titles lost to biological males. She headed to the State Open expecting more of the same.

47.     It was her third year in a row competing against males in the 100m at the State Open. None of us were looking forward to watching males break the female records, take home the title, and give their post-race interviews. This year would be different though.

48.     In what I often describe as a gift from above, there was a false-start in the 100m by Miller. Chelsea saw the playing field leveled a bit, and she was going to make the most of it.

Her win in the 100m that day was extraordinary for so many reasons and I will be forever grateful she had that moment. What unfolded at that stadium was emotional not just for us, but many in the crowd. We had so many strangers come up and hug her and tell us how happy they were for her. She ran a time that is still her personal best, even three years later.

49.     Other awards and opportunities flowed from her success that day, and I often think of how sad it would have been if that false start hadn't happened and she had never had those experiences. It shouldn't need to be said, but girls shouldn't have to hope for a false start to get their chance at fair competition.

50.     I continued to pursue opportunities to advocate for the girls. I had a meeting with Connecticut Deputy Attorney General Peggy Chapple and three other members of the AG's office. I met with Governor Lamont's General Counsel, Bob Clark. I spoke with several state lawmakers and asked them to pass legislation. I wrote letters to my U.S. Representative, Jahana Hayes, and my U.S. Senator, Richard Blumenthal. And while some were sympathetic to our position, they were unwilling to do anything to help.

51.     I also looked for support from well-known feminist organizations such as Women's Sports Foundation, National Women's Law Center, and National Organization of Women. It was just unbelievable to learn that these organizations did not support our advocacy for fairness in women's sports. They issued statements to publicly say so. They completely ignored the impact it was having on our female athletes and seemed shockingly uneducated about the harm that will flow from eliminating sex-based rights in law. Thankfully, many other women's organizations are taking their place and stand with us in this fight.

12

Admitted Exp. 0032

*2020 Indoor Track Season – Senior Year*

52.     After years of asking school, state, and federal officials for help, we did what we felt was our last resort. Two days before what would end up being Chelsea's final state championships, we filed a federal lawsuit. Chelsea was taking a public stand for herself and other female athletes. We hoped that this might finally make a difference and that what she went through wouldn't have to happen to anyone else. It took a great deal of courage, and I was very proud of her.

53.     Since then, many more people are aware of her story. We have submitted testimony on both state and federal legislation. Several states have successfully passed laws to protect female sports and many more are now debating the issue. She has bravely given interviews and told her story in national publications. There was a time when she was afraid to speak out, and I was afraid for her future if she did. But we are no longer afraid.

54.     We will continue to fight for policy and laws to be based on facts about science and biology, not ideology. We will exercise our right to speak out on issues that affect us without fear. We hope that in the end, the sex-based rights of females will be acknowledged and respected and fairness will be restored in our sports.


        Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct.

Christina Mitchell

Dated: April 12, 2022

13

Appx. 0033

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA**
**CHARLESTON DIVISION**

| | |
|---|---|
| B.P.J, by her next friend and mother, HEATHER JACKSON, | |
| *Plaintiff,* | |
| v. | |
| WEST VIRGINIA STATE BOARD OF EDUCATION, HARRISON COUNTY BOARD OF EDUCATION, WEST VIRGINIA SECONDARY SCHOOL ACTIVITIES COMMISSION, W. CLAYTON BURCH in his official capacity as State Superintendent, DORA STUTLER in her official capacity as Harrison County Superintendent, and THE STATE OF WEST VIRGINIA, | Case No. 2:21-cv-00316 <br><br> Hon. Joseph R. Goodwin |
| *Defendants* | |
| and | |
| LAINEY ARMISTEAD, | |
| *Defendant-Intervenor.* | |

## <u>DECLARATION OF ALANNA SMITH</u>

I, Alanna Smith, declare as follows:

1.      I am an eighteen-year-old senior at Danbury High School in Danbury, Connecticut.

2.      Though I am an elite female track athlete, I have personally experienced the devasting impact of competing against—and losing to—male athletes in my sport.

3.      Though I only competed against these athletes during my freshman year of high school, they still impacted my placements, public recognition, medals, records, and how I physically and mentally prepared for competition.

1

*Athletic Background*

4.      I was born into a family of athletes. My dad is a Major League Baseball Hall of Fame relief pitcher. My mom ran track in high school and still runs recreationally. One maternal uncle played professional football. Another played professional baseball. My twin brother is a three-sport athlete.

5.      Sports was a big part of my world from a very young age, as I attended my dad's MLB games and events and ran with my mom. Having a twin brother who is naturally athletic helped instill a competitive drive in me, because as a little girl I loved to beat him in foot races at every opportunity.

6.      The sports legacy that surrounds me was not something I consciously thought about—it just became a part of who I am. And without thinking about it too seriously, I knew I had the potential to excel athletically.

7.      It wasn't until I started running with mom and developing endurance and strength that I considered competitively running track. So, in middle school, mom enrolled me in the local middle school track program. Between 2015 and 2018, I tried shot put, the long jump, the 55-meter dash, the 100-meter, 200-meter, 400-meter, and 800-meter races.

8.       As I tried different track and field competitions, I realized that I enjoyed and excelled at running shorter distances. That's when I knew I wanted to concentrate on the 100-meter, 200-meter, and 400-meter distances. I wanted to run and get it over with!

9.      During middle school, I became a three-peat 100-meter Connecticut State Champion. In eighth grade, I was also the 400-meter state champion.

Administrator 0035

10.     My freshman year of high school I was a varsity cheerleader in the fall and winter and made it to the 2019 Connecticut High School Coaches Association All-State cheerleading team.

11.     After cheerleading finished, I started outdoor track in the spring of 2019. I was nervous. The first few practices were hard. I felt that my teammates had high expectations based on my middle school track performance. And it didn't help that the first few track meets were outside in cold or rainy weather, courtesy of New England.

12.     But I won. And it felt amazing. I had proven to myself, the coaches, and my teammates that I could be a contributor to a winning season.

13.     As my freshman season played out, I set personal, conference, state and regional facility records; improved my personal strength and technique; and accomplished personal goals. I contributed to the Danbury High School sweeping the 2019 outdoor FCIAC, Class LL, State Open, and New England Regional Championship competitions, and received numerous honors such as The Ruden Report Player of the Week, The Ruden Report Player of the Year, the 2019 All-FCIAC First Team in the 100-meter, 200-meter, 400-meter, 2019 CHSCA All-State Girls' Outdoor Track, and was a recognizable component of the 2019 CHSCA Connecticut Team of the Year award.

14.     Excelling on the track and setting personal records gives me a sense of personal achievement and confidence that carries over into all parts of my life. I love training, I love competing. Competing against girls like myself who work hard is rewarding. I compete to be the best, to be the fastest, to be a champion.

Armstrong - 0036

*Competition Against Males*

15.     In spite of my focused, diligent practice and training, my success on the track has been limited by biological males competing in the girl's high school track in Connecticut.

16.     I first competed against a male at the New York Relays in April 2019. My team was invited to attend, along with teams from approximately seventeen other states. I knew going in that there would be a male athlete named Terry Miller from another Connecticut school in my race, and I was upset. I knew I wouldn't win, and I knew we girls were competing for second place and beyond. As expected, Terry won the 100-meter dash. I placed fourth. Had Terry not competed in that race I would have been recognized as third place.

17.     I learned later that Terry had competed for three seasons in Connecticut boys' high school track before switching to girls' track.

18.     Later that season, I found out I would be racing against Terry Miller and a second male athlete, Andraya Yearwood, in the 100-meter dash at the 2019 Connecticut State Open that.

19.     After learning this news, I thought "I don't stand a chance to win."  I felt defeated before I even got set in my blocks. Terry was in the lane next to me in the 100-meter finals, and I assumed going in that Terry would win. Terry was disqualified from the race due to a false start. I felt badly for Terry as an athlete, but I could tell the rest of us girls were a bit relieved that the race would now be a little more fair.

20.     Also at the 2019 Connecticut State Open, I raced Terry Miller in the women's 200-meter dash. Terry placed first. Because of a male in my race, I was pushed from second place to third place.

21.     Thus, at the 2019 State Open, I had one fair race: the 400-meter dash. I won that event.

Appendix 136  0037

22.     From the State Open Championship, I advanced to the New England Regional Championship meet, which is quite an accomplishment for any athlete, but especially a freshman.

23.     I won the 400-meter title at the New England Regional Championships. It was exhilarating, not only because I won, but because my race was free of male athletes. It was a level playing field.

24.     The 200-meter dash was a different story. I would have also been runner-up in the 200-meter and received a silver medal and earned my team more overall points, but Terry Miller placed first and pushed me down in the rankings to third. Third place is nothing to be ashamed of if it is won fair-and-square, but my race was anything but fair.

25.     My story is not unique. Girls across Connecticut have experienced similar displacement, loss of recognition, and even championship title losses solely because my state allowed two biological males to compete against biological females. Between 2017-2020, these two male competitors won 15 women's state championship titles and set 17 new meet records in track and field. These statistics are in the back of my mind no matter how hard I train and how well I perform

26.     Even though the males have graduated now and are no longer competing against us girls in Connecticut, we still feel the effects of their participation. For example, in the 2022 Connecticut indoor track and field season—long after Terry Miller and Andraya Yearwood graduated—I ran a 6:96 time in the 55m dash. This would have set a new Connecticut girls' state record. But back in 2019, Terry Miller set a record of 6.95 in the 55m dash, eclipsing my best time. If not for Terry competing in the girls' category three years ago, I would have been

recognized for my accomplishment—setting a new record for female athletes in my state.

*Fairness in Women's Sports*

27.     It has taken me years to develop the personal confidence and sense of belonging I now feel on my track team. The addition of males to girls' sports fills me with a sense of defeat before I even set up in the blocks. I deserve the opportunity to be confident, to be running against girls who have the same biological makeup that I do.

28.     The addition of males in girls' sports is frustrating and disappointing to me. So often I go to the blocks and know that I am the fastest girl on the line. But I also know that my best effort will not be enough when I'm faced with a competitor who is bigger, faster, and stronger than me simply because he was born male.

29.     I want to make sure that female athletes of today and tomorrow do not have to face the same sense of defeat, disappointment, and lack of support that I have felt. So many girls across my state believe the situation is unfair but are afraid to stand up and speak out for fear of retaliation from coaches, schools, the media, and strangers.

30.     I am proud of all female athletes who stay strong and do their very best when rules and laws put unfair challenges in their way. I am proud to be a voice for female athletes who are surrounded by unfairness in their sport.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct.

Alanna Smith

Alanna Smith
Dated: 04/12/2022

Admitted 1138-0039

**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA
CHARLESTON DIVISION**

| | |
|---|---|
| B.P.J, by her next friend and mother, HEATHER JACKSON,<br><br>          *Plaintiff,*<br><br>  v.<br><br>WEST VIRGINIA STATE BOARD OF EDUCATION, HARRISON COUNTY BOARD OF EDUCATION, WEST VIRGINIA SECONDARY SCHOOL ACTIVITIES COMMISSION, W. CLAYTON BURCH in his official capacity as State Superintendent, DORA STUTLER in her official capacity as Harrison County Superintendent, and THE STATE OF WEST VIRGINIA,<br><br>          *Defendants*<br><br>  and<br><br>LAINEY ARMISTEAD,<br><br>        *Defendant-Intervenor.* | Case No. 2:21-cv-00316<br><br>Hon. Joseph R. Goodwin |

## DECLARATION OF SELINA SOULE

I, Selina Soule, under penalty of perjury, declare as follows:

1.  I am a nineteen-year-old resident of Boca Raton, Florida, in Palm Beach County and have personal knowledge of the information below.

2.  I am a sophomore and female athlete at Florida Atlantic University (FAU) in Boca Raton, Florida. Competing in track and field is my passion.

### *Athletics Background*

3.  Sports are a huge part of my family. Both of my parents were multi-sport athletes. My dad competed in track, cross-country, baseball, and football. My mom was a competitive runner and figure skater, and now coaches figure skating.

1

Anonymous App. 0040

4.      My mom first coaxed me onto the ice rink at Rockefeller Center when I was just three years old. At age five, I started taking figure skating lessons. During elementary school, I began entering figure skating competitions—something I continued through my sophomore year of high school.

5.      Figure skating was something my mom and I did together. We spent a lot of time on the ice, as she not only helped me learn to skate but even skated with me at times. By age thirteen, I was a volunteer figure skating coach helper, which turned into a paid coaching position at age fifteen. I continued coaching figure skating until I moved away for college.

6.      The axel jump—a figure skating showstopper!—is my favorite figure skating element. Figure skating is not only a beautiful, graceful sport, but it is athletic too. It requires strength, speed, balance, and skill to execute those jumps and spins.

7.      But I remember one thing very distinctively about figure skating: I did not like the scoring. Scoring was subjective; it was harder to clearly measure my achievements. (This is one reason I love track. My race times clearly show how fast I run so scoring is objective, not based on the subjective opinion of an individual judge.

8.      My mom introduced me to running when I was just five years old. I began running in our community's summer mile-long "fun runs" with my mom. Even at that young age, I knew two things with certainty: I loved to run, and I hated running long distances!

9.      When I was around eight years old, my mom signed me up for my first Hershey Track and Field meet that was held in our town in the spring. It was the first time I set foot on a track—and I loved it. I realized that I was fast, and that I enjoyed competing to win. Running became my passion. And I enjoyed some success in the Hershey events as I competed there in

Add.App. 0041

third through sixth grade. For example, I qualified twice for state level meets. In sixth grade, I won all three of my events.

10.     After the Hershey events, I competed in the Nutmeg State games, the largest amateur multi-sport sporting event in my home state of Connecticut. These meets were ones my mom and I could do together. My favorite memory of the Nutmeg games was that my mom taught me how to long jump just a couple weeks before my first competition. And I went on to *win* the long jump that year for my age category.

11.     But my freshman year at Glastonbury High School in Connecticut was my first school opportunity to compete in track and field. It was my first time on a school team with organized team practices and workouts—and I loved it.

12.     Track and field competitions involve a variety of races and events. In track there are sprints, middle distance races, long-distance races, relay races, and hurdle races. And field events include long jump, triple jump, high jump, pole vault, shot put, discus throw, javelin throw, and hammer throw.

13.     I am a short-distance sprinter and long-jumper. During high school, I competed in the 55-meter dash, 100-meter dash, 200-meter dash, the 4x200 and 4x100-meter relays, and the long jump. I also ran the 300-meter dash a handful of times.

14.     When I joined my high school track team in my freshman year, I quickly became the school's best long jumper. And after only a few competitions, I became the permanent starter for the 4x200-meter relay.

15.     I am proud of my high school athletic accomplishments. I was a ten-time All-Conference Honoree recipient, a five-time state title holder, three-time All New England award

3

recipient, a four-time National qualifier, and set five new Glastonbury high school records (including one that was previously set in 1976.

16.     Track means everything to me. It is my passion and my happy place. When I run, I set aside everything else in life and just run.

***Facing Male Competition in Girls' Track***

17.     But my high school track and field experience was not without frustration. During all four years of high school, I had the deflating experience of competing against male athletes in the girls' category.

18.     The first time I competed against a male athlete in the girls' category was during my freshman year of high school at the May 2017 Middletown Invitational in the 200-meter dash. The gun went off at the start of the race, the male athlete left most of us girls in the dust. I knew immediately that this was not right and that girls would miss opportunities to succeed. Just days later, that same male went on to win the 2017 Connecticut Interscholastic Athletic Conference (CIAC) Class M Women's outdoor track championship in both the 100-meter and the 200-meter sprints.

19.     The losses happened again and again. During my sophomore year, another male athlete joined girls' track and I had to face two male competitors at the 3rd Greater Bristol outdoor track and field invite in the 200-meter dash. The males took first and second; I crossed the finish line third. Had the males not been competing in the girls' category, I would have won that race.

20.     These two males, Terry Miller and Andraya Yearwood, impacted my placement at statewide championship meets. At the 2018 CIAC State Open Championship in the Women's Outdoor 100-meter dash, the males again took first and second. Because of their participation in

4

Appendix 271 App. 0043

the women's category, I was bumped down to sixth place when I should have earned fourth place.

21.     But one of my more painful memories of loss involved the 2019 Connecticut State Open Championship. I missed qualifying for the state championship 55-meter final by just one spot, and the chance to qualify for the New England Regional championship by just two spots. The top two spots were taken by males. If not for those two male competitors in my race, I would have had the opportunity to compete in the championship final and for a coveted spot at the New England Regional championship.

22.     While I was in high school, these two males collectively won 15 Connecticut women's state championship titles in girls' high school track and field and set 17 new individual meet records.

23.     It is demoralizing and frustrating to compete against someone who has unfair physical advantages over you, because no matter how hard I train or how hard I try, there is nothing I can do to overcome that disparity. We girls train to win; not to win second place or receive a participation trophy. Some girls I know were so demoralized by the experience of losing to males that they abandoned certain track events and changed sporting events entirely. Other times coaches tried to convince girls to change their events just so the girls would have a chance to succeed.

24.     Because of male competition, I have lost opportunities to compete at world class tracks. I have lost opportunities to compete in front of college coaches and scouts. I have lost opportunities to win titles and public recognition of my achievements. I have lost opportunities to win recognition and event points for my school.

Admitted Ex. 0044

25.     And the heartbreaking thing is that my story is not unique. Many other girls across the state of Connecticut lost out on similar opportunities.

26.     It felt so unfair. I knew I had to stand up. My parents and I reached out to school administrators and coaches. We reached out to CIAC officials to ask for a policy change. But no one would listen to us. Instead, they silenced us.

27.     My parents and I were left with no other option but to file a federal lawsuit to protect the integrity of women's sports under Title IX. It was a huge step, a scary step. But someone needed to speak out for girls in Connecticut. That lawsuit is still ongoing.

***Competing in Women's Collegiate Athletics***

28.     It was my dream to run track in college. Despite the unfairness of my high school track experience, I hoped to put that experience behind me and have a fresh start and level playing field in college.

29.     After visiting several colleges, I decided to attend the College of Charleston in South Carolina. I attended the College of Charleston in 2020-21 for my freshman year. However, it was a tough school year with COVID and at the end of the year, I re-visited my options.

30.     I received an offer to run for Florida Atlantic University, and I immediately knew that was the right fit for me. My dream has always been to attend college and run in Florida, and I finally have the opportunity to fulfill that goal. And I had always hoped to end up somewhere warm with lots of sunshine, so competing in Florida was a dream come true.

31.     FAU has a NCAA Division I track and field team and competes in the East Division of Conference USA.

32.     Being part of the team is quite an honor. And there are many additional side benefits to being a collegiate athlete: access to top-tier coaching, facilities, and equipment;

Administrator 0045

consultation with nutritionists and dieticians; paid travel to games, academic support services; medical and wellness care; access to psychologists; access to the NCAA Student Assistance Fund; team gear and apparel; and the opportunity to make money on my own name, image, and likeness.

33. For example, the Florida Panthers, a professional ice hockey team, recently announced that they were sponsoring FAU female athletes and giving us an opportunity to partner with them. I do not yet know all that will entail, but we receive tickets to home games, team apparel, the opportunity to partner with their brand. As athletes, we also have the opportunity to make money on our name, image, and likeness by appearing in ad campaigns for brands like Nike and Adidas.

34. At the end of the 2021-22 academic year, I will still have four more years of NCAA eligibility due to COVID.

35. My teammates and I train hard to win. We weightlift, complete running drills, and run sprints time and time again. It takes incredible work and dedication to win a race determined by hundredths of a second. I have trained much of my life striving to shave mere fractions of seconds off my race times.

36. I had to make many sacrifices over the course of my athletic career to play the sport I love. I have missed school dances and spring breaks, family events and holiday trips, and friends' birthdays and vacations. I have given up weekends and free time. I stayed late after school for practice. And the commitment to track has only increased during my time spent training in college.

Appx125 Jass. 0046

37.     But I make these sacrifices because I want to be the best that I can be. I want to win—not just for myself, but also for my teammates. And the motivation to win is what compels me to train as hard as I can.

38.     I love my sport. I get on the track and I can let everything in my life go and I can be free to focus on running. It's exhilarating to see all the training and hard work pay off on the track.

39.     But track has taught me more than just how to run fast down the track. I have also learned life skills. It has taught me physical and mental toughness. I have learned perseverance and good sportsmanship. I have learned that hard work pays off. And that making sacrifices to excel at something reaps future benefits. It opened new financial opportunities, personal development opportunities, and even academic opportunities. And it has given me something to strive for.

40.     I am currently majoring in criminal justice with the goal of being a lawyer. But I always have my eyes on the track, and I would love to go pro after college if the right door opens.

### *Fairness in Women's Sports*

41.     When I heard that Florida's legislature passed the Fairness in Women's Sports Act in late April 2021 to protect the integrity of women's sports, I enthusiastically supported it.

42.     In fact, it was my incredible honor to be invited to attend the bill signing ceremony in early June 2021 because my own personal story had played such a role in motivating lawmakers to pass a bill protecting Florida's female athletes. Little did I know at the time that Florida's Fairness in Women's Sports Act would later protect me, too, as I start competing for a public university women's team in Florida.

8

Adams, et al. 0047

43.    When that law was later challenged in federal court, I decided to speak up for girls who are afraid of retaliation from the media, school officials, and coaches and filed a motion to intervene in the lawsuit. I fear that too many women feel pressured to remain silent about their real views. And if someone does not speak up for women, I fear that we could see the end of women's sports. There will be boys' sports and co-ed sports. But women's sports as we know it will be gone.

44.    I know from my own past experience in high school that males competing in women's sports takes away opportunities from women—whether that is a spot on the team, a spot on the podium, an athletic scholarship, the ability to benefit from her likeness, or recognition and awards—and it defies the entire purpose of having separate women's sports.

45.    Woman have fought hard for many years to have equal athletic opportunities. I want to make sure that girls in the future can continue to compete in the sports they love. If girls do not have equal opportunities, I fear they may choose not to be involved in sports at all if they feel they cannot win or possibly even get physically hurt competing against a stronger, faster male.

46.    I believe that ensuring an equal playing field for women to be champions in their own sport is a women's rights issue. But this isn't just about fair play and winning for me. I want to protect the fairness and safety of women's sports for female athletes everywhere. I want to ensure that future generations of women have access to the same equal athletic opportunities that shaped me and my love of sports.

App. 2d Supp. 0048

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true

and correct.

Selina Soule

Dated: 4/13/2022

Armistead App. 0049

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA
CHARLESTON DIVISION

| | |
|---|---|
| B.P.J, by her next friend and mother, HEATHER JACKSON,<br><br>*Plaintiff,*<br><br>  v.<br><br>WEST VIRGINIA STATE BOARD OF EDUCATION, HARRISON COUNTY BOARD OF EDUCATION, WEST VIRGINIA SECONDARY SCHOOL ACTIVITIES COMMISSION, W. CLAYTON BURCH in his official capacity as State Superintendent, DORA STUTLER in her official capacity as Harrison County Superintendent, and THE STATE OF WEST VIRGINIA,<br><br>*Defendants*<br><br>  and<br><br>LAINEY ARMISTEAD,<br><br>*Defendant-Intervenor.* | Case No. 2:21-cv-00316<br><br>Hon. Joseph R. Goodwin |

## DECLARATION OF DARCY ASCHOFF

1.      I am a 2 year resident of Lehi, Utah, and have personal knowledge of the information below.

2.      As a former collegiate athlete, high school varsity volleyball coach, and mother of two competitive high school volleyball players, I have observed the mental and psychological toll on female athletes of being forced to compete against a male.

*Athletic Background*

3.      Volleyball runs in my family. My mom played as a youth, I competed in college, and now my daughters are star high school volleyball athletes with dreams of competing in college.

1

Armistead - 0050

4.      I began playing competitive volleyball as a freshman at Delta High School as a middle blocker. During my senior year, my volleyball team won the 1995 Utah State Championship, and I was awarded MVP (most valuable player for our team.

5.      Throughout my sophomore, junior, and senior years of high school, I also played club volleyball.

6.      I was recruited and given a scholarship to play varsity volleyball at Dixie State College (now Dixie State University, an NCAA Division I school. From 1996 to 1997, I played for Dixie State College.

7.      After my sophomore year of college, I transferred to Hawaii Pacific University, an NCAA Division II school, where I was also offered a volleyball scholarship. From 1998 to 1999 during my junior and senior years of college, I played volleyball for Hawaii Pacific University.

8.      In 1998, during my junior year of college, my Hawaii Pacific volleyball team won the NCAA Division II Nationals Championship. This was the highlight of my volleyball career.

9.      In 2016, my entire Hawaii Pacific University volleyball team was inducted into Hawaii Pacific's Hall of Fame to honor our 1998 Nationals Championship.

10.     I continued to play volleyball recreationally after college. My two daughters, Ajah and Jahslyn, have said that one of their earliest memories is watching me play recreational volleyball at a park across the street from our home. I would bring my daughters with me, and Ajah would beg whoever was on the sidelines not playing volleyball to pass the ball with her.

11.     Both of my daughters went to volleyball summer camp at young ages, and eventually began competing in school and club volleyball.

12.     As my girls reached high school, I started coaching their school and club teams.

2

Admitted - 0051

13.     In 2015, I coached Lanakila club volleyball for the 14 and under team, and in 2016 I coached Lanakila club volleyball for the 12 and under team, respectively.

14.     From 2018 to 2020, I also coached girl's Hawaiian Style Volleyball, a competitive club volleyball team on Maui. In the 2018-2019 season, I coached the girls' 14 and under team, and in the 2019-2020 season I coached the girls' 16 and under team.

15.     I served as assistant girls' varsity volleyball coach at Maui High School during the 2018 and 2019 seasons. Maui High School competes in the Maui Interscholastic League of the Hawaii High School Athletic Association.

***My Daughters' Experience Competing Against a Male Athlete***

16.     The 2019-2020 volleyball season was my girls' final volleyball season at Maui High on our beloved island of Maui. Ajah was a sophomore and a team captain, and Jahslyn was a freshman. The Maui High team was a young team in a building season.

17.     Ajah and Jahslyn worked so hard to develop their volleyball skills to become their best. They attended summer camps, participated in daily practice during high school season, and then continued to play volleyball year-round with highly competitive national club teams. These teams travel nationally and practice 2-3 times per week.

18.     But despite my daughters' hard work, the 2019-2020 varsity girls' volleyball season was unusually tough: they were forced to face a male athlete on another team.

19.     Both of my daughters knew this athlete, Jhene Saribay, from summer volleyball camps because training is co-ed. From what I learned, this male competed on the Kamehameha boys' volleyball team for several years, and only recently switched to competing on the girls' team.

3

Archived 27152. 0052

20.     My daughters heard rumors from other girls on the Maui High team that this male athlete was planning to play on the Kamehameha High girls' varsity volleyball team, but at first they didn't believe it.

21.     I first heard about the situation from the Maui High head coach. Initially I thought it was a joke: this could not be happening. But it was. And our coach's hands were tied—the Maui High athletic director made clear that our head coach could not make waves about this situation, or he would lose his job. Other parents at Maui High were upset but were not willing to act.

22.     My daughters competed against this athlete 3 times and their volleyball team lost every match.

23.     Based on my observations as a mother and assistant coach at my daughters' volleyball games, this male athlete dominated Maui varsity girls' volleyball in the 2019-2020 season. He dominated playing time. He jumped higher. He spiked the ball harder and faster and further. From my perspective, he was one of the best hitters on Maui, despite his average stature.

24.     The girls, on the other hand, were nervous and intimidated by the male on the other side of the net. They seemed mentally defeated before stepping onto the court. They would often "duck and cover" or assume a defensive position rather than prepare to respond to his spikes. My daughters said they were afraid of getting hurt. My daughters' teammates told us that they felt demoralized. Some wondered why they should even bother playing in matches against Kamehameha that season, because they knew the male athlete's team would beat them.

25.     Volleyball is a very physical sport. And a male competing in girls' volleyball is a safety issue. I'm concerned that one of my daughters could be hurt, or that a male could take away their scholarship opportunities to compete in college.

4

26.     Both of my daughters love the friendships they built through volleyball, as well as the comradery and competitive nature of the sport. They grew stronger and more powerful in hitting and jumping. They gained self-confidence and poise. I am proud of their hard work and drive to be the best they can be at their sport. Volleyball is all about testing your limits—how high you can jump, fast you can run, hard you can swing—and knowing that males have an advantage makes it hard for girls to compete.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct.

Darcy Asenoff

Dated: **4-19-22**

5

App. 152 - 0054

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA
CHARLESTON DIVISION

| | |
|---|---|
| B.P.J, by her next friend and mother, HEATHER JACKSON, <br><br> *Plaintiff,* <br><br> v. <br><br> WEST VIRGINIA STATE BOARD OF EDUCATION, HARRISON COUNTY BOARD OF EDUCATION, WEST VIRGINIA SECONDARY SCHOOL ACTIVITIES COMMISSION, W. CLAYTON BURCH in his official capacity as State Superintendent, DORA STUTLER in her official capacity as Harrison County Superintendent, and THE STATE OF WEST VIRGINIA, <br><br> *Defendants* <br><br> and <br><br> LAINEY ARMISTEAD, <br><br> *Defendant-Intervenor.* | Case No. 2:21-cv-00316 <br><br> Hon. Joseph R. Goodwin |

## DECLARATION OF CYNTHIA MONTELEONE

I, Cynthia Monteleone under penalty of perjury, declare as follows:

1.      I am a forty-six-year-old resident of Lahaina, Maui County, Hawaii, and have personal knowledge of the information below.

2.      I am a mother, a coach, and track and field athlete for Team USA. Both my daughter and I have had the frustrating experience of competing against a male athlete in our sport.

### My Competition Against a Male Athlete

3.      In September 2018, I competed at the World Masters Athletics Championships in Malaga, Spain. I was eager to put my hard work to the test. And it paid off: I took bronze in the W40 400, along with USA golds in the 4x100 and 4x400.

1

Appendix 2 p. 0055

4.      But I was shocked to find out that one of my competitors was a biological male from Colombia who had just recently started identifying as female. The athlete had a much larger build than any of the female athletes.

5.      I began to ask questions as to the fairness of this issue. The European officials stopped the track meet, conferred, and decided that the race had to continue and urged me to file a complaint with the Team USA managers.

6.      Not only did the Team USA managers refuse to file a complaint or inquiry, they warned that for my own safety, I should not speak up about this issue.

7.      My freedom of speech is important to me. I will not be silenced. I continue to defy this directive and speak up because I see firsthand the harm being done to my fellow female athletes.

8.      This is not about being a sore loser—I beat the male athlete by just a few tenths of a second. This is about fairplay for all women. The same male athlete just a year later beat my USA teammate in the hurdles for a place on the podium at the 2019 World Masters Athletics Championships in Poland.

9.      I see the psychological and emotional heartbreak of women. After training so hard to be the best that they can be at their sport, and spending so much time away from their families, they are devasted to see that sacrifice wasted because they were beaten by a biological advantage that no amount of training or sacrifice can overcome.

10.      Many of the girls I coach suffer from anxiety over having to compete against male athletes. We all know the powerful scientific neurotransmitter connection between our minds and our bodies: When you *think* you can win, you have a better chance of doing it. It's proven.

Anonymous Ex. 0056

11.     Science and common sense tell us that male and female bodies are different. No amount of testosterone suppression can change the amount of myonuclei in a male body, making it easier at any point in their life to build more muscle than the female sex. Not only that these cellular level advantages dictate that male bodies will be more powerful with faster twitch fibers than those of the female sex.

12.     Women are not just hormones. Our athletic performance is impacted by our cycle, birth control, and pregnancy—something no male who identifies as female has to address.

13.     As a masters athlete, I am especially concerned because female hearts shrink as we age, while the male hearts enlarge, all of this despite any "hormone treatment."

***My Daughter's Competition Against a Male Athlete***

14.     But it was not just on the world stage that I experienced the demoralizing trend of males displacing females in their own competitions; it was also on my home island of Maui, Hawaii.

15.     A year and a half after my experience in Spain, my daughter, Margaret, lined up for her very first high school track meet. I had watched proudly as my strong and determined girl did all the right things – made personal, difficult sacrifices to train her body to be as fast and fit as possible for her first race.

16.     Yet all her hard work seemed for naught as she raced against a male-bodied athlete who had just transferred from the boys' volleyball team to the girls' team the season before. The athlete breezed right by Margaret to win first place, pushing her into second place.

17.     My daughter lost her very first race to this athlete who ran so fast in the first 100 meters of the 400-meter race that the individual could have set a state record.

Amicus 155b 0057

18.     The Maui athletic community is small and tightknit. I learned that this biological male had grown up wrestling and had just injured a girl during volleyball, giving her a concussion with a powerful spike. This individual was casually trying out track and had trained only two weeks before running next to my daughter who had trained all year.

19.     This athlete also raced against the girls I coached. One senior girl was crying because she told me she knew there was nothing she could do to win the conference championship that she had dreamed of winning since she was a freshman. She told me, right after that male athlete raced, that she was quitting track, even though I told her she had what it took to possibly run in college. She turned to me and asked, "What's the point, if it's not fair?"

20.     COVID cancelled the rest of our season, but these horrible memories were never cancelled from my mind. We must consider the mental and physical health and safely of the biological female athletes and provide an equal and level playing field for them to achieve all of the opportunities the male sex has.

21.      We must not hold the feelings and mental health of one group as more important than another. The mental health of our daughters, granddaughters, sisters, and teammates matter.

22.     All of the lessons I teach as a coach about hard work paying off: these lessons fall apart when a mid-level male athlete doesn't have to work as hard and can beat our hardest working, most talented females.

23.     In 2019 in Hawai'i, about 350 out of 700 male athletes ran faster than the fastest female in Hawai'i. Quite literally, a mediocre boy could beat the best girl. Tens of thousands of high school boys could run faster than the most decorated Olympian in history, Allyson Felix. If we do not protect women's sports, our girls will see their athletic dreams crushed.

4

Appendix Pg. 0058

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct.

_____
Cynthia Monteleone

Dated: April 19, 2022

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA**
**CHARLESTON DIVISION**

| | |
|---|---|
| B.P.J, by her next friend and mother, HEATHER JACKSON, | |
| *Plaintiff,* | |
| v. | Case No. 2:21-cv-00316 |
| WEST VIRGINIA STATE BOARD OF EDUCATION, HARRISON COUNTY BOARD OF EDUCATION, WEST VIRGINIA SECONDARY SCHOOL ACTIVITIES COMMISSION, W. CLAYTON BURCH in his official capacity as State Superintendent, DORA STUTLER in her official capacity as Harrison County Superintendent, and THE STATE OF WEST VIRGINIA, | Hon. Joseph R. Goodwin |
| *Defendants* | |
| and | |
| LAINEY ARMISTEAD, | |
| *Defendant-Intervenor.* | |

**DECLARATION OF MADISON KENYON**

I, Madison Kenyon, declare as follows:

1.      I am a twenty-year-old resident of Pocatello, Idaho, and have personal knowledge of the information below.

2.      I am a junior and female athlete at Idaho State University in Pocatello, Idaho, where I compete in women's cross-country and track. Running is my passion.

***Athletics Background***

3.      Athletics has been my world from a very young age. Both of my parents were high school athletes, so competition—especially among my siblings—was like the air I breathed growing up.

1

Administrator. 0060

4.      I first kicked a soccer ball at age three, and I was hooked. That first encounter with a ball led me to compete for 15 years on various club soccer teams.

5.      Through playing soccer, I learned both that I am fiercely competitive and that I love to run.

6.      Admittedly, I hated running at first, because it is hard work. But the more I ran, the faster I got and the more I enjoyed it.

7.      In 6th grade, that love of running and competition led me to try cross-country—a sport I have competed in every fall since. In my freshman year of high school, I also started running track.

8.      Running is my happy place. I love pushing my body to its limits, spending time outdoors, and doing it all with a sense of camaraderie and fun alongside some of my closest friends.

9.      I'm proud of my accomplishments. In high school, I set five different school records, and as a sophomore was even voted unanimously by our coaches for the honor of "athlete of the year."

***Competing in Women's Collegiate Athletics***

10.      I decided to attend college at Idaho State University (ISU) because it is a big university nestled in a small town with plenty of opportunities for outdoor activity and track competition. The athletic scholarship I received from ISU has not only helped finance my athletic career but has also helped finance my dream of becoming a nurse someday. I am currently pursuing a degree in nursing.

Appendix 270 - p. 0061

11.     As an ISU freshman in the 2019-2020 academic year, I made the cross-country team and competed in the 4-kilometer (2.49-mile), 3-mile, 5-kilometer (3.12-mile), and 6-kilometer (3.73-mile) events. I was thrilled.

12.     But that enthusiasm turned into confusion when, at the start of the fall 2019 cross-country season, I was informed that I would be competing against a male athlete.

13.      At first, I was incredulous that any biological male would be allowed to compete in the women's category. This couldn't be happening.

14.     So I researched the student. I found out that June Eastwood competed on the University of Montana's men's cross-country team for three years, before switching to compete on its women's cross-country team. I also learned that while competing as a man, Eastwood ran times in at least one event that was faster than the NCAA collegiate women's record. My heart sank.

15.      So as I got into position at the starting line of my first ever collegiate cross-country race, I faced a hurdle I never expected to encounter: a male athlete.

16.     In the 2019 cross-country season, I lost to Eastwood three times:

   a.   2019 Montana State Cross-Country Classic in the 3-mile event.

   b.   2019 Big Sky Cross-Country Championships in the 5k event.

   c.   2019 NCAA Division I Mountain Region XC Championships in the 6k event.

17.     In all three races, Eastwood not only beat me by a significant margin, but also bumped me down to a lower placement than I would have received had I only competed against other women. That may not seem like a big deal to some, but placements matter to athletes. I want to know that I earned my placement fair and square. Fair competition pushes me to better myself and try harder; unfair competition leaves me feeling frustrated and defeated.

3

App. No. 102- 0062

18.     It was discouraging. My heart sank as I watched Eastwood placing and medaling in the women's cross-country races in meet after meet.

19.     Cross-country athletes, like me, usually also compete in indoor and outdoor track. So, during the winter 2020 indoor track season, I competed in the 3k (1.86-mile), the mile, and the distance medley relay events.

20.     Again, I raced this male athlete during the indoor track season. At the 2020 Stacy Dragila Open Women's Indoor Mile, Eastwood took 2nd place and I took 8th. Eighth place is nothing to be ashamed of if won fairly—especially as a freshman competing in a race dominated by juniors and seniors—but the competition is not fair when one of the athletes in the women's category is a male with the strength and speed advantages that come from male physiology.

21.     And at the 2020 Indoor Big Sky Championship I, along with three other ISU teammates, competed in the distance medley relay against Eastwood's relay team. A distance medley relay is made up of a 1200-meter leg, a 400-meter leg, an 800-meter leg, and a 1600-meter leg. Montana State's relay team was in 6th place before Eastwood began the final 1600-meter leg of the race. During Eastwood's leg, Eastwood advanced Montana's relay team not one or two, but *four* positions to finish in 2nd place. My team took 5th, though we would have placed 4th if not for Eastwood's participation. We lost not only a placement, but team points as well.

22.     Also at the Big Sky Championship, I watched in disbelief as one of my teammates lost her bronze medal and place on the championship podium because Eastwood took first place in my teammate's women's mile event and bumped her to fourth place. It was heartbreaking to watch.

4

Adams-FWS-WV-19. 0063

### *Fairness in Women's Sports*

23.     I believe that allowing males to enter women's sports defeats the entire idea of fair competition.  Sex segregation in sports helps maintain fair competition so that no athlete has an unfair advantage over another. And it helps ensure that if women like me work hard, we have a shot at winning.

24.     I am studying nursing and plan to enter the medical field. In my biology coursework, it is clear that the biological differences between male and female are not matters of personal opinion, or features that can be changed or chosen. I *am* female, not because I chose to be female, or identify as female, but because every cell in my body is marked with XX chromosomes and my entire body developed in alignment with those female markers.

25.     But you do not need to be a medical expert to understand this. I know from everyday experience that since the boys in my class went through puberty, the males around me are generally bigger, faster, and stronger than the females, simply because they are male. Even the rules of sport implicitly acknowledge this. For example, men's cross-country races are longer than women's cross-country races.

26.     In March 2020, Idaho became the first state in the country to pass a law to protect women's sports. H.B. 500, the Fairness in Women's Sports Act, protects women's sports by ensuring that only female athletes compete in sports designated for women or girls. I intervened in a lawsuit to help defend that law because I want my races to be fair and a test of skill and hard work. I do not want to wonder whether I am training countless hours for inevitable defeat, or whether I will even have a chance to win against a physically advantaged male athlete.

27.     I fear that if we are no longer allowed by law to recognize the objective existence of women, that it will be a huge loss to women's rights.

5

Admitted 2116a. 0064

28.     Sports was like the air I breathed growing up, and I want my kids to have that same experience. And as hard as my teammates and I work to be competitive, I do not want to see women's sports fade away as a separate category because males compete in women's divisions, and women give up trying to compete because they do not think they can win. I fear that we will soon effectively have men's sports and co-ed sports, but no dedicated category for females only.

29.     And I do not want to see women lose their legal protection and progress under the law because we can no longer identify what a woman is.

30.     To my knowledge, June Eastwood has graduated. But I learned through my involvement in defending Idaho's Fairness in Women's Sports Act that another male, Lindsay Hecox, wants to compete on the women's team at Boise State University—a university that my team competes against. And if Title IX and Idaho's law aren't upheld, other males will almost certainly follow.

31.     I believe everyone should be able to compete, but it must be done fairly. It is not fair for women's competitions to be open to male athletes. And women's sports itself will lose its meaning, and its specialness, if males can be redefined as females.


Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct.

Madison Kenyon

Dated: April 14, 2022

6

Admitted 0065

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA**
**CHARLESTON DIVISION**

|  |  |
|---|---|
| B.P.J, by her next friend and mother, HEATHER JACKSON, | |
| *Plaintiff,* | |
| v. | Case No. 2:21-cv-00316 |
| WEST VIRGINIA STATE BOARD OF EDUCATION, HARRISON COUNTY BOARD OF EDUCATION, WEST VIRGINIA SECONDARY SCHOOL ACTIVITIES COMMISSION, W. CLAYTON BURCH in his official capacity as State Superintendent, DORA STUTLER in her official capacity as Harrison County Superintendent, and THE STATE OF WEST VIRGINIA, | Hon. Joseph R. Goodwin |
| *Defendants* | |
| and | |
| LAINEY ARMISTEAD, | |
| *Defendant-Intervenor.* | |

## DECLARATION OF MARY MARSHALL

I, Mary Marshall, declare as follows:

1.      I am a twenty-one-year-old resident of Twin Falls, Idaho, and have personal knowledge of the information below.

2.      I am a senior and female athlete at Idaho State University in Pocatello, Idaho, where I compete in cross-country and track and field.

***Athletics Background***

3.      I first started playing basketball at 7 or 8 years old, and I continued through my sophomore year of high school. I enjoyed the competition, the adrenaline rush, and the sheer fun of the game.

1

App. No. 373 p. 0066

4.      In 8th grade, I started running track. My sophomore year of high school I started running cross country to get in shape for basketball. But to my surprise, I found out that I loved running *more* than playing basketball! So, I kept running races. And my sophomore year of high school, I dropped basketball altogether and started focusing on cross country and track.

5.      I discovered that I am good at running. In two back-to-back years, my high school medley relay team won the State championship in our division. My junior year I won the state championship in the 300 intermediate hurdles. And in my senior year of high school, I won the State championship in the 800m for my division.

6.      I love to run. It gives me confidence, improves my mood, and allows me to explore the great outdoors on foot. But being a competitive female athlete is about more than just running long distances. It is about community. My teammates have become my closest friends. We push each other to be our best, help one another through disappointments and losses, and cheer one another on as we celebrate victories. We travel together for sporting events and share overnight lodging: it's like a sisterhood. We enjoy one another so much that we even spend our free time together. Through running competitively, I have made some of my closest lifelong friends.

### Competing in Women's Collegiate Athletics

7.      I chose to attend college at Idaho State University (ISU) because it is close to home and I really liked my track coaches. And I am grateful to be one of the lucky ones to benefit from a women's track scholarship.

8.      In college, I am primarily a mid-distance track athlete, focusing on shorter distances like the 800-meter and the mile. But I also compete in cross-country to stay in shape. In cross-country, I generally compete in the 5k.

2

9.      Training is hard work. On Tuesdays and Thursdays, I usually have a two-hour workout with my team. On alternate days, my teammates and I get together for a five-to-six-mile run. Additionally, we have an hour-long weightlifting session on Mondays and Wednesdays.

10.      But in the fall of my sophomore year of college, I learned that I would be racing against a male athlete who was competing on the University of Montana women's team because he identifies as female. I was appalled. I do not know how anyone could think this was fair to female athletes. Males are naturally fitter and faster than females.

11.      I raced against this athlete, June Eastwood, not once, but twice. First, I competed against Eastwood in the Montana State Cross-Country Classic 3-mile event in the fall of 2019. And then I competed against Eastwood again in January 2020 at the Stacy Dragila Indoor mile event.

12.      I lost both times. I was displaced and pushed down to a lower spot in the rankings than I would have earned had the playing field been level.

13.      When I lose to another woman, I assume that she must train harder than I do and it drives me to work harder. If I lose to a man, it feels completely different. It's deflating. I wonder whether he works as hard as I do, whether he was even trying, or was that an easy race for him. It makes me think that no matter how hard I try, my hard work and effort will not matter.

14.      Members of the men's track team sometimes do easy runs with me and my teammates on the women's track team. But we women are under no illusion that we would be competitive in a race against these men. Even our easy runs are at different paces. For example, an easy run for women is usually at an 8:30 pace, while an easy pace for men is around 7:30.

3

Adkins 000.0068

*Fairness in Women's Sports*

15.      When I first heard about Idaho's H.B. 500 Fairness in Women's Sports Act, I was really excited. I hoped that this would be the solution we needed to keep men out of women's sports. And that's why—when the law was later challenged in court — I chose to stand up and intervene in the lawsuit to defend the law. I wanted to make sure that the voices of women were heard.

16.      I have personally seen the negative impact on women when Eastwood was allowed to compete against women's teams, and I fear that as men realize they only need to "identify" as women in order to compete in the women's category, others might follow suit. In fact, I learned through my lawsuit that a male athlete, Lindsay Hecox, wants to compete on the Boise State women's track and cross-country team—a team that I compete against. I want to stop this before it becomes popular.

17.      I want to preserve the camaraderie and sisterhood that comes from competing with an all-female team. There is no way that I would feel comfortable sharing a hotel room with a male athlete, regardless of how that person identified.

18.      And I want other young women to benefit from sports as I did. I did well in high school sports. But if a boy had decided to compete against me in basketball, or track, or cross-country, I am not sure that I would have kept on competing. Success drives endeavor. And if I knew that I could not win, I might have dropped out of sports altogether.

19.      That very idea concerns me. Sports has played such an important role in my life. It taught me how to work in groups and as a team. It taught me how to persist through disappointment. It taught me that if I put in the work, I will get the results. It has taught me how to interact with people I do not know, and how to respond to those in authority over me. It has

4

given me the confidence to study business, marketing, management, and economics at ISU

because I hope to be an entrepreneur and own a business someday. These are the benefits that I

want to preserve for the next generation of women.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and

correct.

*Mary Marshall*

Mary Kate Marshall

Dated: 4/19/22

5

Appendix 0070

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA
CHARLESTON DIVISION

B.P.J, by her next friend and mother, HEATHER JACKSON,

*Plaintiff,*

v.

WEST VIRGINIA STATE BOARD OF EDUCATION, HARRISON COUNTY BOARD OF EDUCATION, WEST VIRGINIA SECONDARY SCHOOL ACTIVITIES COMMISSION, W. CLAYTON BURCH in his official capacity as State Superintendent, DORA STUTLER in her official capacity as Harrison County Superintendent, and THE STATE OF WEST VIRGINIA,

*Defendants*

and

LAINEY ARMISTEAD,

*Defendant-Intervenor.*

Case No. 2:21-cv-00316

Hon. Joseph R. Goodwin

## DECLARATION OF HALEY TANNE

I am a 22 year-old senior at Southern Utah University and have personal knowledge of the information below.

### *Athletic Background*

1.     I have always loved running. As a kid, I was fast and could outrun a lot of people. But I didn't get into running seriously until the summer before my freshman year of high school. My older sister (who later ran in college) "forced" me to get up early with her and run. Once I got into shape, I loved it.

2.     As a high school freshman, my coach pulled me aside and said that I had the potential to run in college. I was surprised!

1

Administrator 0071

3.      And I started training harder. My family wasn't financially well off so I worked hard to earn the participation fees and gear fees to run in high school. I worked in my coach's woodshop over the summer, and later transitioned to be a pool instructor to earn money.

4.      It was a lot of work. I worked throughout my summers, went to bed early and missed out on the typical teenage experience of my peers.

5.      In high school, I was our school's top ranked female athlete. I felt a lot of pressure being at the top. But the desire to be the best and potentially earn a scholarship for college kept me pushing to stay at the top.

6.      Being a female athlete is not easy and requires sacrifice. To get faster and hold my spot required a lot of self-discipline in my diet, bedtime, and homework.

7.      My teammates say I'm fiercely loyal. I'm hardworking, smart, reliable, and I invest deeply in relationships.

8.      I love racing! I love the feeling when my legs are burning, almost numb, lungs are burning, arms are burning and so fatigued. But when you cross that finish line, all the pain melts away.

9.      There are never "days off" in the life of a distance runner.  You have to really love running to excel in this sport.  I have many favorite runs near the Southern Utah University campus. I love the Canyon Run, Dikes Run, and the Main Street Run.  I love running in this part of Utah and losing myself to the scenery.  It gives me temporary relief from stresses or negative emotions I'm facing.

10.     When I was deciding on which college to attend, I looked all throughout Utah. I had many options, and many schools were interested. But I ultimately decided to go to Southern Utah University because of the team dynamic and the kind, caring, and capable coaches.

Appendix 172. 0072

11.     Going to college was something that was not a likely option for me because of the low-income status I came from.  Gratefully, running allowed me to earn a scholarship and attend college.  Running has completely shaped my college career. It has taught me even greater discipline than I had in high school. I have learned mental toughness from hard workouts and practices. I have also developed many leadership traits from being on a team, and even though I am one of the youngest runners on the team as a sophomore, I still have a position of leadership.

12.     My teammates have made my college athletic career worth it. We are with each other through anything and everything. My teammates have seen me at my lowest lows and my highest highs. It is a special bond, and we are all so close. While we have a lot of personalities on the team, we all mesh together so well. I love my teammates and every one of those girls means the world to me.

13.     One day I want to be nurse and nursing school will be my next step. I've always been interested in the human body and medicine and I have always wanted to be involved in a health career. After nursing school, I would like to settle down and move forward in my career and have a family.

***Competition Against a Male Athlete***

14.     I remember learning that there was a male signed up to compete on the women's cross-country team at the University of Montana. My coach sat us all down before the season started and informed us that there was a male who transitioned and would be racing against us. I remember being so shocked. I never imagined this would happen in my lifetime.

15.     This male, June Eastwood, had competed on the men's team for three years and was not an exceptional athlete. But even as a mid-level runner, Eastwood posted times that were faster than women's NCAA records.

3

Mantia. 0073

16.    I competed against Eastwood twice and I lost to Eastwood both times. The first time I competed against Eastwood was in the 2019 Big Sky Cross Country Championships. I also competed against Eastwood in the NCAA Division 1 Mountain Region Cross Country Championships.

17.    One of my teammates, Madison Fruchey, was also knocked off from being an All-Conference athlete because of June Eastwood's involvement. Eastwood was in the top-10 and Madison was 11th. You can mentally exclude Eastwood from the top 10, but when the All-Conference list was published, Madison's name was not on it.

18.    Eastwood's participation is frustrating. My teammate lost opportunities for accomplishments she worked hard to achieve. I do not want to have anger towards Eastwood, but when I see Eastwood lining up in a women's race, it just feels wrong.

19.    Eastwood has an advantage when competing. Us women are already at a loss once Eastwood stands at the starting line. Eastwood's presence is intimidating, and it is hard to mentally compete at our best when we know we can't win.

20.    Males run track with more physicality than women. They throw elbows and compete with a more aggressive strategy. They are especially more aggressive in college and when they progress to more elite races.

21.    Like I mentioned earlier, obtaining an athletic scholarship was vital to pursuing my dream of being a nurse. Running was the only way I could afford to participate in academic programs at my school. When I heard Eastwood was participating on the University of Montana's girls' team through a girls' scholarship, it was frustrating. There is a limited number of athletic scholarships that each school can distribute, and Eastwood took an opportunity from

another woman.  It makes you wonder if there may have been another female athlete in my shoes that may not have been able to afford school without an athletic scholarship.

**Fairness in Women's Sports**

22.    Title IX was created to provide a space for women, like me, to compete on a fair playing field and be a champion in my own sport. But allowing males to compete in women's sports destroys that opportunity and sets women back half a century.

23.    Generally speaking, males are stronger, faster, and bigger than woman. June Eastwood towered over the female competitors like me. And if men take over, I fear that women will lose the drive to compete in the sport altogether.

24.    Eastwood displaced women in races and in scholarships. Because of Eastwood's involvement, a woman missed the opportunity to receive an athletic scholarship and may have impeded her ability to attend school at all. Women should not have their opportunities taken by biological males.

25.    I decided to stand up and speak out because I don't want my daughters to have to deal with what I've had to deal with. I want to protect women's sports for all the women that will come behind me.

26.    I know what I'm doing is right and I know what we're fighting for is right.


Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct.

_____
Haley Panne

Dated:  April 19, 2022

5

Appendix 27174. 0075

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA**
**CHARLESTON DIVISION**

| | |
|---|---|
| B.P.J, by her next friend and mother, HEATHER JACKSON,<br><br>*Plaintiff,*<br><br>v.<br><br>WEST VIRGINIA STATE BOARD OF EDUCATION, HARRISON COUNTY BOARD OF EDUCATION, WEST VIRGINIA SECONDARY SCHOOL ACTIVITIES COMMISSION, W. CLAYTON BURCH in his official capacity as State Superintendent, DORA STUTLER in her official capacity as Harrison County Superintendent, and THE STATE OF WEST VIRGINIA,<br><br>*Defendants*<br><br>and<br><br>LAINEY ARMISTEAD,<br><br>*Defendant-Intervenor.* | Case No. 2:21-cv-00316<br><br>Hon. Joseph R. Goodwin |

## <u>DECLARATION OF LINNEA SALTZ</u>

I, Linnea Saltz, declare as follows:

1.      I am a resident of Washington, D.C., and a former elite track athlete at both Southern Utah University and Georgetown University.

*Athletic Background*

2.      Growing up, I loved cheer, gymnastics, and dance. But with a brother who ran cross-country and a mother who ran triathlons, I decided to try out for track my sophomore year of high school. I surprised everyone—including myself—by running the fastest time of my high school tryouts in the 400-meter.

3.      That initial success on the track led to a love of running. I joined my varsity girls' track team and even competed on a club team. By my senior year, I gave up all other

1

Admin. Rec. 0076

extracurricular activities and focused on getting faster and stronger in order to be the best version of myself.

4. That hard work paid off with an athletic scholarship to run track for Southern Utah University. I received offers from bigger schools, but ultimately chose to attend SUU because I could tell they really cared about their athletes.

5. Being a student-athlete opened doors for me to make connections on campus and provided a ready-made support and friendship network in my teammates.

6. But being a collegiate athlete is not easy. It involves early morning workouts and afternoon practices; weekend travel for meets; and lots of self-discipline in diet, bedtime, and homework. I missed out on sleeping in, spring break, and social events.

7. But it was absolutely worth it. Every time I earned a new Big Sky Championship medal or put my name on the record book for my school, it made all the sacrifice worth it.

8. I am proud of what I achieved in my time at SUU. I am a two-time Big Sky Champion in the 800-meter, once in outdoor and once in indoor. And by the time I graduated, I held seven school records:

- indoor 4x400-meter relay,
- indoor distance medley relay,
- indoor 400-meter,
- indoor 600-meter,
- indoor 800-meter,
- outdoor 800-meter,
- outdoor 4x4 relay.

***Competition against a male athlete***

9. My senior year of college, I learned about a male athlete at the University of Montana who would be competing in women's cross-country and track.

2

Appendix 178. 0077

10.     This male, June Eastwood, had competed for three years on the men's team and was not a stand-out athlete. But even as a mid-level male athlete, Eastwood still posted times as a man that were faster than multiple women's NCAA records.

11.     In the fall of 2019, Eastwood bested some of my teammates in cross country competitions. I thought it was so unfair. Why would someone who knows they have a physiological advantage over these women compete against them?

12.     After my teammates' experience, I spent weeks reading the NCAA's transgender handbook. The NCAA policy at that time—which had been in place since 2011—required males to undergo one year of testosterone suppression before competing on a women's team. I thought this could not be true. I could see for myself that testosterone suppression did not eliminate the male advantage. (Thankfully, the NCAA scrapped that old policy in late 2021, but did not replace it with any policy that actually protects female athletes.)

13.     In the winter of 2020, I learned that Eastwood would be competing in the indoor Big Sky Conference Track and Field Championships.

14.     As the defending 800-meter Big Sky Conference Champion, I immediately jumped online to see what I was going to have to be competing against this season. All hope was lost when I realized that the male athlete was going to be competing against had a personal best time of 1:55 in the 800-meter, not only 10 seconds faster than the best time I had posted the season prior, but faster than the NCAA women's record in the event.

15.     I took a step back and realized that my senior year was no longer going to be about the sacrifices, hard work, pain, and dedication I had put forth the last four years. It was going to be about fairness in women's sports being stripped away right in front of me. Title IX was passed in order to create an equal and fair playing field for all—yet allowing male athletes to

3

compete in women's sports discourages young women and deters them from their sports. Sports that encourage independence, strength, strong will, and give you the confidence of being a competitive athlete.

16.     Instead of looking forward to my races, I was anxious. I could not bear the thought of losing my Big Sky Championship title to a former male athlete. I tried hard to focus on my training, but it was mentally exhausting to anticipate racing a male athlete with all the advantages of male puberty.

17.     To my relief, Eastwood did not enter the 800-meter race. But I competed against Eastwood in the distance medley relay (DMR). In the middle of that relay, after finishing my leg, I overhead the University of Montana coach cuing this athlete from the sidelines, telling Eastwood to do something I had never heard in competition: to slow down. Eastwood took the University of Montana's relay team from nearly the bottom of the pack to a 2nd place finish.

18.     Eastwood also bested some of my SUU teammates in the women's mile at Big Sky. Remarkably, this athlete finished four seconds ahead of the next competitor—a massive amount of time in an elite track competition.

***Fairness in Women's Sports***

19.     Female-only sports exist for a reason: to give women like me the chance to podium, showcase our talents, and receive the recognition our hard work and talent deserve. But allowing a male to compete in the women's category shatters these opportunities.

20.     Simply by observation, males are generally bigger, faster, and stronger than women. Eastwood's over six-foot-tall frame towered over the female competitors. June's cadence, stride length, broader shoulders, and lack of fatty tissue around the hips and chest all

4

Appendix 178. 0079

spoke to June's male advantage. Personally, I would find it demeaning to stand on the podium beneath an athlete that had been on the podium with boys a couple years ago.

21.     It is mentally draining to run against a male athlete. While in prior years I could just focus on my training, in 2020, I spent a lot of time in preseason stressing over competing against a male.

22.     It only takes three males to displace females on the podium. And only eight males to displace females from All-Conference honors, and even worse from first-team All-American status which some women athletes could only dream of accomplishing.

23.     I don't want to look back at the SUU school record books five or ten years down the line to find my name erased by males.

24.     Because if men take over, I fear that women will lose the drive to compete in sports entirely.

25.     Men are able to celebrate fairness in their sports, so it should only make sense that we can as well. It is discouraging for girls and women to think that they may have to compete against an individual that has a biological advantage over them. Taking away our opportunities will run us out of the sports world, which we already had to fight so hard to be a part of.


Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct.

_Linnea Saltz_
Linnea Saltz

Dated: April 14, 2022

App. 271179. 0080

2019 NCAA Division II Outdoor Track & Field
Championships (Excerpt)
May 23-25, 2019
Available at:
http://leonetiming.com/2019/Outdoor/NCAADII/Re
sults.pdf
[permalink: https://perma.cc/BB84-YJPL]
(last visited: April 20, 2022)

Leone Timing and Results Services - Contractor License          Hy-Tek's MEET MANAGER  9:12 PM  5/25/2019  Page 3

**NCAA Division II**
**Outdoor Track & Field Championships**
**Hosted By Texas A&M Kingsville  - 5/23/2019 to 5/25/2019**
**Results**

**Finals ...  (Women 5000 Meter Run)**

| | Name | Yr | School | Finals | |
|---|---|---|---|---|---|
| 18 | Dania Holmberg | SO | Seattle Pacific | 17:54.06 | |
| 19 | Malena Grover | SR | Adams State | 18:00.77 | |
| 20 | Chloe Flora | SO | Lee | 18:02.64 | |
| 21 | Cynthia Togom | FR | Cen Missouri | 18:03.95 | |
| 22 | Chloe Cook | SR | CO Mines | 18:24.29 | |
| --- | Allie Ludge | JR | Grand Valley St | DNF | |

**Women 10000 Meter Run**
Meet Record:    33:17.39 M 5/26/2011  Sarah Porter

| | Name | Yr | School | Finals | |
|---|---|---|---|---|---|
| **Finals** | | | | | |
| 1 | Caroline Kurgat | SR | Alaska Anchorage | 36:34.31 | 10 |
| 2 | Leah Hanle | JR | Mount Olive | 37:20.46 | 8 |
| 3 | Gina Patterson | JR | Grand Valley St | 37:33.19 | 6 |
| 4 | Jessica Gockley | SO | Grand Valley St | 37:40.52 | 5 |
| 5 | Kaylee Bogina | JR | Adams State | 37:43.89 | 4 |
| 6 | Eileen Stressling | SR | Azusa Pacific | 38:02.76 | 3 |
| 7 | Alexa Shindruk | SR | Cen Washington | 38:04.69 | 2 |
| 8 | Allison Dorr | SR | Saginaw Valley | 38:05.52 | 1 |
| 9 | Kathryn Etelamaki | JR | Ferris State | 38:16.78 | |
| 10 | Ida Narbuvoll | JR | U-Mary | 38:43.20 | |
| 11 | Hope Jones | JR | So Indiana | 38:46.90 | |
| 12 | Malena Grover | SR | Adams State | 38:51.72 | |
| 13 | Billie Hatch | SO | Dixie State | 39:01.07 | |
| 14 | Emily Byrd | JR | Michigan Tech | 39:27.23 | |
| 15 | Leah Lewis | JR | Dallas Baptist | 39:51.54 | |
| 16 | Michaela Reynolds | SR | CO Mines | 39:58.06 | |
| 17 | Cassidy Ahrens | SR | West Colorado | 40:16.52 | |
| 18 | Jax Heckers | SO | CSU San Marcos | 41:15.31 | |
| --- | Brianna Coy | JR | Walsh | DNF | |
| --- | Alexandria Tucker | SO | Chico State | DNF | |

**Women 100 Meter Hurdles**
Meet Record:    12.70 M 5/23/2013  Vashti Thomas

| | Name | Yr | School | Prelims | |
|---|---|---|---|---|---|
| **Preliminaries** | | | | | |
| 1 | Courtney Nelson | SR | Pittsburg St | 12.99Q | 4.1 |
| 2 | Erin Hodge | SR | Lindenwood | 13.37Q | 4.8 |
| 3 | Danielle Kohlwey | SR | MN Duluth | 13.52Q | 3.4 |
| 4 | Monisha Lewis | JR | San Francisco St | 13.22Q | 4.1 |
| 5 | CeCe Telfer | SR | Franklin Pierce | 13.49Q | 4.8 |
| 6 | Mariyah Vongsaveng | SR | Cen Washington | 13.97Q | 3.4 |
| 7 | Briana Burt | SR | So. Conn. St | 13.77q | 4.1 |
| 8 | Morgan Smith | SR | MO Southern | 13.92q | 4.1 |
| 9 | Julia Hammerschmidt | SR | U-Mary | 14.03 | 3.4 |
| 10 | Tamia Prince | JR | Concordia-CA | 14.03 | 4.8 |
| 11 | Danielle Scantlebury | FR | St. Augustine's | 14.12 | 3.4 |
| 12 | SheQuilla McClain | SO | Shorter | 14.13 | 4.8 |
| 13 | Leah Molter | SR | OK Baptist | 14.14 | 3.4 |
| 14 | Nia Vance | JR | Cal Poly Pomona | 14.22 | 4.1 |
| 15 | Oweneika Watson | JR | Adams State | 14.34 | 3.4 |
| 16 | Carolyn Hackel | JR | MN State | 14.36 | 3.4 |
| 17 | Jordan Nash | SR | Angelo State | 14.40 | 4.8 |

| | | | | | |
|---|---|---|---|---|---|
| 18 | Chelsea Walker | SO | Christian Bros | 14.48 | 4.1 |
| --- | Jordan Hammond | JR | NW Missouri | DNF | 4.8 |

**Women 100 Meter Hurdles**
Meet Record:    12.70 M 5/23/2013  Vashti Thomas

| | Name | Yr | School | Finals | |
|---|---|---|---|---|---|
| **Finals** | | | | | |
| 1 | Courtney Nelson | SR | Pittsburg St | 13.06 | 10 |
| 2 | Monisha Lewis | JR | San Francisco St | 13.29 | 8 |
| 3 | Danielle Kohlwey | SR | MN Duluth | 13.31 | 6 |
| 4 | Erin Hodge | SR | Lindenwood | 13.47 | 5 |
| 5 | CeCe Telfer | SR | Franklin Pierce | 13.56 | 4 |
| 6 | Briana Burt | SR | So. Conn. St | 13.83 | 3 |
| 7 | Mariyah Vongsaveng | SR | Cen Washington | 13.87 | 2 |
| 8 | Morgan Smith | SR | MO Southern | 13.98 | 1 |

**Women 400 Meter Hurdles**
Meet Record:    55.42 M 5/27/2017  Tia-Adana Belle

| | Name | Yr | School | Prelims | |
|---|---|---|---|---|---|
| **Preliminaries** | | | | | |
| 1 | CeCe Telfer | SR | Franklin Pierce | 58.18Q | |
| 2 | Shannon Kalawan | JR | St. Augustine's | 59.18Q | |
| 3 | Sidney Trinidad | SO | Cen Washington | 59.78Q | |
| 4 | Jordan Hammond | JR | NW Missouri | 59.68Q | |
| 5 | Kissi-Ann Brown | SR | Lincoln-MO | 59.92Q | |
| 6 | Jessica Eby | SO | Grand Valley St | 1:00.34Q | |
| 7 | Minna Sveard | SO | TAMU-Commerce | 1:00.16q | |
| 8 | Hanneke Oosterwegel | SR | Northern State | 1:00.23q | |
| 9 | Chelsea Walker | SO | Christian Bros | 1:00.31 | |
| 10 | Erykah Weems | JR | Cen Washington | 1:00.43 | |
| 11 | Claudia Cox | JR | UC San Diego | 1:01.12 | |
| 12 | Faith Roberson | JR | Angelo State | 1:01.24 | |
| 13 | Miyah Golden | SR | Shorter | 1:01.35 | |
| 14 | Kelly Strand | SR | UC San Diego | 1:01.79 | |
| 15 | Monisha Lewis | JR | San Francisco St | 1:02.10 | |
| 16 | Janeth Moya | SR | Cal St. LA | 1:02.13 | |
| 17 | Brittney Augustin | FR | Lees-McRae | 1:02.69 | |
| 18 | Danielle Scantlebury | FR | St. Augustine's | 1:02.71 | |
| 19 | Leah Molter | SR | OK Baptist | 1:03.37 | |

**Women 400 Meter Hurdles**
Meet Record:    55.42 M 5/27/2017  Tia-Adana Belle

| | Name | Yr | School | Finals | |
|---|---|---|---|---|---|
| **Finals** | | | | | |
| 1 | CeCe Telfer | SR | Franklin Pierce | 57.53 | 10 |
| 2 | Minna Sveard | SO | TAMU-Commerce | 59.21 | 8 |
| 3 | Sidney Trinidad | SO | Cen Washington | 59.49 | 6 |
| 4 | Hanneke Oosterwegel | SR | Northern State | 1:00.29 | 5 |
| 5 | Jordan Hammond | JR | NW Missouri | 1:01.24 | 4 |
| 6 | Kissi-Ann Brown | SR | Lincoln-MO | 1:01.35 | 3 |
| 7 | Jessica Eby | SO | Grand Valley St | 1:01.35 | 2 |

Appellate. 0082

2020 Big Sky Indoor Track & Field Championship
Results (Excerpt)
February 27-29, 2020
Available at:
https://bigskyconf.com/documents/2020/3/27//2020
_bsc_itf_final_results_single_column.pdf?id=6627
[permalink: https://perma.cc/U4LX-23M6]
(last visited: April 20, 2022)

Admin #132  0083

Big Sky Conference - For Office Use Only License                                    Hy-Tek's MEET MANAGER  11:06 AM  3/27/2020  Page 4

**2020 Big Sky Indoor Track & Field Championships - 2/27/2020 to 2/29/2020**
Holt Arena
Results

### Preliminaries ...   (Women 800 Meter Run)

| | Name | School | Seed | Prelims | H# |
|---|---|---|---|---|---|
| 8 | Morley, Bryn | Northern Arizona | | 2:14.26 q | 1 |
| 9 | Williams, Isabella | Weber State | 2:15.25 | 2:14.75 | 1 |
| 10 | Dilmore, Faith | Idaho | 2:17.53 | 2:15.82 | 3 |
| 11 | Kyro, Alexi | Montana State | 2:13.69 | 2:15.97 | 1 |
| 12 | Drennen, Maddie | Eastern Washington | 2:19.88 | 2:17.75 | 2 |
| 13 | Osipenko, Viktorija | Northern Colorado | 2:17.74 | 2:18.25 | 3 |
| 14 | Timmons, Presley | Idaho State | 2:16.95 | 2:18.74 | 1 |
| 15 | Henderson, Shayla | Idaho State | 2:19.20 | 2:18.75 | 2 |
| 16 | Good, Megan | Montana State | 2:17.84 | 2:19.22 | 1 |
| 17 | Marshall, Mary Kate | Idaho State | 2:16.78 | 2:24.72 | 2 |

### Women 800 Meter Run

| | | | | | |
|---|---|---|---|---|---|
| BSC Champ: | 2:07.05 | ! | 2001 | **Stephanie Hansen, Weber State** | |
| BSC All-Time: | 2:03.07 | # | 2011 | **Lea Wallace, Sacramento State** | |
| Arena: | 2:01.84 | $ | 2000 | **Regina Jacobs, Golden Spike** | |

| | Name | School | Prelims | Finals | Points |
|---|---|---|---|---|---|
| **Finals** | | | | | |
| 1 | Saltz, Linnea | Southern Utah | 2:13.48 | 2:08.00 | 10 |
| 2 | Loff, Melanie | Northern Arizona | 2:12.49 | 2:09.63 | 8 |
| 3 | Ramsay, McKenna | Montana State | 2:13.62 | 2:11.33 | 6 |
| 4 | Pecha, Anna | Idaho | 2:13.72 | 2:12.56 | 5 |
| 5 | Story, Krista | Idaho | 2:13.41 | 2:14.31 | 4 |
| 6 | Carlson, Patricia | Montana State | 2:13.82 | 2:15.22 | 3 |
| 7 | Morley, Bryn | Northern Arizona | 2:14.26 | 2:15.83 | 2 |
| 8 | Thacker, Malaina | Idaho | 2:13.71 | 2:15.88 | 1 |

### Women 1 Mile Run

| | | | | | |
|---|---|---|---|---|---|
| BSC Champ: | 4:34.24 | ! | 2006 | **Johanna Nilsson, Northern Arizona** | |
| BSC All-Time: | 4:32.49 | # | 2003 | **Johanna Nilsson, Northern Arizona** | |
| Arena: | 4:47.70 | $ | 1976 | **Wendy Knudson, Colorado** | |

| | Name | School | Seed | Finals | H# | Points |
|---|---|---|---|---|---|---|
| **Finals** | | | | | | |
| 1 | Eastwood, June | Montana | 4:45.83 | 4:50.28 | 2 | 10 |
| 2 | Malaspina, Mikayla | Northern Arizona | 4:48.95 | 4:54.78 | 2 | 8 |
| 3 | Thacker, Malaina | Idaho | 4:52.65 | 4:55.01 | 2 | 6 |
| 4 | Olsen, Molly | Idaho State | 4:52.65 | 4:57.03 | 2 | 5 |
| 5 | Eitel, Pipi | Northern Arizona | 4:48.61 | 5:00.41 | 2 | 4 |
| 6 | Morley, Bryn | Northern Arizona | 4:46.35 | 5:00.85 | 2 | 3 |
| 7 | Bries, Jesselyn | Northern Arizona | 4:52.75 | 5:01.52 | 2 | 2 |
| 8 | Reiss, Annika | Northern Arizona | 4:54.32 | 5:04.70 | 1 | 1 |
| 9 | Taylor, Harley | Southern Utah | 5:05.27 | 5:05.22 | 1 | |
| 10 | Quinones, Amy | Sacramento St. | 4:53.71 | 5:06.49 | 2 | |
| 11 | Williams, Isabella | Weber State | 4:53.91 | 5:06.58 | 2 | |
| 12 | Carlson, Patricia | Montana State | 4:55.02 | 5:07.53 | 1 | |
| 13 | Leatham, Cheyenne | Weber State | 4:56.25 | 5:08.81 | 1 | |
| 14 | Pratt, Michelle | Weber State | 4:57.33 | 5:08.98 | 1 | |
| 15 | Duncan, Cagnei | Sacramento St. | 4:53.18 | 5:12.03 | 2 | |
| 16 | Tanne, Haley | Southern Utah | 5:00.32 | 5:12.52 | 1 | |
| 17 | DeBos, Madisan | Southern Utah | 5:03.52 | 5:16.05 | 1 | |
| 18 | Drennen, Maddie | Eastern Washington | 5:10.86 | 5:17.24 | 1 | |

Anritsu 133. 0084

Big Sky Conference - For Office Use Only License                    Hy-Tek's MEET MANAGER  11:06 AM  3/27/2020  Page 5

**2020 Big Sky Indoor Track & Field Championships - 2/27/2020 to 2/29/2020**
Holt Arena
Results

## Finals ...  (Women 1 Mile Run)

| | Name | School | Seed | Finals | H# | Points |
|---|---|---|---|---|---|---|
| 19 | Klemic, Kaysie | Southern Utah | 5:17.35 | 5:19.14 | 1 | |
| 20 | Wilson, Emily | Northern Colorado | 5:14.58 | 5:29.70 | 1 | |

## Women 3000 Meter Run

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| BSC Champ: | 9:20.61 | ! | 2004 | **Ida Nilsson, Northern Arizona** | | | |
| BSC All-Time: | 9:06.61 | # | 2003 | **Johanna Milsson, Northern Arizona** | | | |
| Arena: | 9:27.27 | $ | 1983 | **Jill Molen, Utah** | | | |

| | Name | School | Seed | Finals | H# | Points |
|---|---|---|---|---|---|---|
| **Finals** | | | | | | |
| 1 | Malaspina, Mikayla | Northern Arizona | 9:37.01 | 9:47.05 | 2 | 10 |
| 2 | Olsen, Molly | Idaho State | 9:34.02 | 9:48.12 | 2 | 8 |
| 3 | Pittis, Emily | Montana | 9:53.79 | 9:48.98 | 2 | 6 |
| 4 | Mitchell, MarLee | Weber State | 9:47.50 | 9:48.98 | 2 | 5 |
| 5 | Swenson, Kelsey | Idaho | 9:58.39 | 9:52.08 | 2 | 4 |
| 6 | Bries, Jesselyn | Northern Arizona | 9:48.13 | 9:59.69 | 2 | 3 |
| 7 | Rasmussen, Delaney | Northern Arizona | 9:52.73 | 10:00.37 | 2 | 2 |
| 8 | Eitel, Pipi | Northern Arizona | 9:46.56 | 10:00.96 | 2 | 1 |
| 9 | Frissell, Beatrix | Montana | 9:53.57 | 10:01.12 | 2 | |
| 10 | Gibson, Kaila | Portland State | 9:42.58 | 10:03.89 | 2 | |
| 11 | Kyro, Alexi | Montana State | | 10:04.22 | 1 | |
| 12 | Campos, Nathalia | Idaho | 10:09.23 | 10:05.77 | 1 | |
| 13 | Wall, Bailey | Weber State | 10:05.57 | 10:07.26 | 1 | |
| 14 | Maness, Gillian | Montana State | 9:48.65 | 10:11.37 | 2 | |
| 15 | Eastwood, June | Montana | 9:59.82 | 10:14.04 | 2 | |
| 16 | Riordan, Abby | Northern Arizona | 10:08.03 | 10:15.72 | 1 | |
| 17 | Victor, Rachel | Sacramento St. | 10:15.30 | 10:19.62 | 1 | |
| 18 | Reiss, Annika | Northern Arizona | 10:03.49 | 10:21.72 | 2 | |
| 19 | Engebretsen, Samantha | Montana | 10:15.93 | 10:21.85 | 1 | |
| 20 | Duncan, Cagnei | Sacramento St. | 9:56.90 | 10:25.88 | 2 | |
| 21 | DeBos, Madisan | Southern Utah | 10:04.65 | 10:27.20 | 1 | |
| 22 | Taylor, Harley | Southern Utah | 9:52.63 | 10:27.78 | 2 | |
| 23 | Harris, Shanee | Weber State | 10:21.81 | 10:27.99 | 1 | |
| 24 | Alicke, Laura | Idaho State | 10:01.53 | 10:32.31 | 2 | |
| 25 | Rosin, Adelyn | Weber State | 10:24.33 | 10:32.33 | 1 | |
| 26 | Tanne, Haley | Southern Utah | 9:52.38 | 10:32.78 | 2 | |
| 27 | Simard, Samantha | Southern Utah | 10:24.01 | 10:33.58 | 1 | |
| 28 | Nettesheim, Lily | Weber State | 10:27.32 | 10:37.30 | 1 | |
| 29 | Bushar, Josie | Southern Utah | 10:27.50 | 10:44.60 | 1 | |
| 30 | Quinones, Amy | Sacramento St. | | 10:46.99 | 1 | |
| 31 | Ross, Miranda | Portland State | 10:32.59 | 11:04.69 | 1 | |

## Women 5000 Meter Run

| | | | | | | |
|---|---|---|---|---|---|---|
| BSC Champ: | 16:35.08 | ! | 1992 | **Kari McKay, Eastern Washington** | | |
| BSC All-Time: | 15:45.76 | # | 2018 | **Paige Gilchrist, Northern Arizona** | | |
| Arena: | 16:33.60 | $ | 1981 | **Aileen O'Connor, Virgina** | | |

| | Name | School | Seed | Finals | Points |
|---|---|---|---|---|---|
| **Finals** | | | | | |
| 1 | Malaspina, Mikayla | Northern Arizona | 16:11.00 | 17:00.25 | 10 |
| 2 | Swenson, Kelsey | Idaho | | 17:07.80 | 8 |
| 3 | Mitchell, MarLee | Weber State | 16:57.09 | 17:18.58 | 6 |

Admitted 12.2020.0085

Big Sky Conference - For Office Use Only License                                     Hy-Tek's MEET MANAGER  11:06 AM  3/27/2020  Page 7

**2020 Big Sky Indoor Track & Field Championships - 2/27/2020 to 2/29/2020**
Holt Arena
Results

## Women 60 Meter Hurdles

| | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| BSC Champ: | 8.19 | ! | 2014 | | Shaye Springall, Southern Utah | | | | |
| BSC All-Time: | 8.19 | # | 2014 | | Shaye Springhall, Southern Utah | | | | |
| Arena: | 8.00 | $ | 2000 | | Sharon Jewell, Golden Spike | | | | |

| | Name | School | Prelims | Finals | H# | Points |
|---|---|---|---|---|---|---|
| **Finals** | | | | | | |
| 1 | Sorensen, Kate | Weber State | 8.54 | 8.51 | 2 | 10 |
| 2 | Evans, Morgan | Montana State | 8.74 | 8.60 | 1 | 8 |
| 3 | Okemgbo, Nyenuchi | Eastern Washington | 8.61 | 8.61 | 2 | 6 |
| 4 | Ellis, Olivia | Montana | 8.85 | 8.65 | 1 | 5 |
| 5 | Johnson, Semaye | Northern Colorado | 8.79 | 8.72 | 2 | 4 |
| 6 | Carter, Elena | Montana State | 8.88 | 8.73 | 1 | 3 |
| 7 | Coffey, Artearra | Sacramento St. | 8.73 | 8.75 | 1 | 2 |
| 8 | Tolliver, Destiny | Southern Utah | 8.87 | 9.06 | 2 | 1 |

## Women 4x400 Meter Relay

| | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| BSC Champ: | 3:40.23 | ! | 2018 | | , Northern Arizona | | | | |
| BSC All-Time: | 3:41.82 | # | 1989 | | , Northern Arizona | | | | |
| Arena: | 3:37.28 | $ | 1981 | | , Adelphi University | | | | |

| | Team | Relay | | Seed | Finals | H# | Points |
|---|---|---|---|---|---|---|---|
| **Finals** | | | | | | | |
| 1 | Sacramento St. | A | | 3:48.66 | 3:47.07 | 3 | 10 |
| | 1) Bedingfield, Shilah | 2) Correa-Gonazalez, Jasmin | 3) Coffey, Artearra | | 4) Revera, Mikayla | | |
| 2 | Southern Utah | A | | 3:49.20 | 3:47.87 | 3 | 8 |
| | 1) Lott, Brooklyn | 2) Saltz, Linnea | 3) Green, Peyton | | 4) Reid, Gizelle | | |
| 3 | Idaho State | A | | 3:52.82 | 3:48.61 | 2 | 6 |
| | 1) Holmes, Olivia | 2) VanVleet, Brianna | 3) Gallagher, Indi | | 4) Vanvleet Sturgis, Ashley | | |
| 4 | Northern Arizona | A | | 3:51.50 | 3:48.88 | 3 | 5 |
| | 1) Wilson, Madeline | 2) Jackson, Jada | 3) Loff, Melanie | | 4) Onyemaobi, Miracle | | |
| 5 | Northern Colorado | A | | 3:48.16 | 3:49.25 | 3 | 4 |
| | 1) Schuetz, Kelsi | 2) Ellis, Gabrielle | 3) Osipenko, Viktorija | | 4) Pettit, Mackenzie | | |
| 6 | Weber State | A | | 3:53.60 | 3:49.26 | 2 | 3 |
| | 1) Barnes, Emily | 2) Brown, Andee | 3) Morgan-King, Emily | | 4) Sorensen, Kate | | |
| 7 | Montana State | A | | 3:53.91 | 3:51.12 | 2 | 2 |
| | 1) Brockel, Maddie | 2) Smith, Delaney | 3) Ramsay, McKenna | | 4) Carlson, Patricia | | |
| 8 | Idaho | A | | 3:59.09 | 3:54.54 | 1 | 1 |
| | 1) Kurucz, Aaryanna | 2) Crouch, Camryn | 3) Pecha, Anna | | 4) Paven, Lauren | | |
| 9 | Montana | A | | 3:57.48 | 3:59.28 | 1 | |
| | 1) Ellis, Olivia | 2) Bell, Cree | 3) Harmon, Abby | | 4) Mane, Jaree | | |
| 10 | Eastern Washington | A | | 4:01.73 | 4:01.98 | 1 | |
| | 1) Bowles, Sophie | 2) Knight, Madelyn | 3) Petsch, Katie | | 4) Okemgbo, Nyenuchi | | |

## Women Distance Medley

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| BSC Champ: | 11:34.01 | ! | 2018 | | , Northern Arizona | | |
| BSC All-Time: | 11:13.18 | # | 2006 | | , Northern Arizona | | |
| Arena: | 11:24.04 | $ | 1981 | | , Iowa State | | |

| | Team | Relay | | Seed | Finals | Points |
|---|---|---|---|---|---|---|
| **Finals** | | | | | | |
| 1 | Northern Arizona | A | | | 11:48.97 | 10 |
| | 1) Bries, Jesselyn | 2) Eitel, Pipi | 3) Chloe, Barylski | | 4) Loff, Melanie | |
| 2 | Montana | A | | | 11:51.69 | 8 |
| | 1) Engebretsen, Samantha | 2) Mane, Jaree | 3) Dahms, Carly | | 4) Eastwood, June | |

Big Sky Conference - For Office Use Only License                                         Hy-Tek's MEET MANAGER 11:06 AM 3/27/2020 Page 8

**2020 Big Sky Indoor Track & Field Championships – 2/27/2020 to 2/29/2020**
**Holt Arena**
**Results**

### Finals ...   (Women Distance Medley)

| | Team | Relay | Seed | Finals | Points |
|---|---|---|---|---|---|
| 3 | Weber State | A | | 11:53.38 | 6 |
| | 1) Pratt, Michelle | 2) Barnes, Emily | 3) Leatham, Cheyenne | 4) Wall, Bailey | |
| 4 | Sacramento St. | A | 11:56.27 | 11:54.74 | 5 |
| | 1) Duncan, Cagnei | 2) Correa-Gonazalez, Jasmin | 3) Quinones, Alexa | 4) Victor, Rachel | |
| 5 | Idaho State | A | 12:39.79 | 12:05.88 | 4 |
| | 1) Kenyon, Madi | 2) Martin, Kyndal | 3) Henderson, Shayla | 4) Olsen, Molly | |
| 6 | Montana State | A | 12:07.35 | 12:05.98 | 3 |
| | 1) Carlson, Patricia | 2) Good, Megan | 3) Kyro, Alexi | 4) Maness, Gillian | |
| 7 | Idaho | A | 12:15.04 | 12:13.55 | 2 |
| | 1) Dilmore, Faith | 2) Kurucz, Aaryanna | 3) Pecha, Erica | 4) Baker, Nell | |
| 8 | Southern Utah | A | | 12:15.58 | 1 |
| | 1) Simard, Samantha | 2) Kehr, Laura | 3) Klemic, Kaysie | 4) DeBos, Madison | |

### Women High Jump

| | | | | | |
|---|---|---|---|---|---|
| BSC Champ: | 6-01.25 | ! | 2006 | Britney Rogers, Northern Arizona | |
| BSC All-Time: | 6-02 | # | 1988 | Amber Welty, Idaho State | |
| Arena: | 6-03.25 | $ | 1984 | Lisa Bernhagen, Wood River High School | |

| | Name | School | Seed | Finals | Points |
|---|---|---|---|---|---|
| **Finals** | | | | | |
| 1 | Corbett, Lucy | Montana State | 1.75m | 1.72m | 10 |
| 2 | Booth, Jane | Montana | 1.70m | J1.72m | 8 |
| 3 | Vanvleet Sturgis, Ashley | Idaho State | 1.71m | J1.72m | 6 |
| 4 | Hayes, Julia | Idaho | 1.68m | J1.72m | 5 |
| 5 | VanVleet, Brianna | Idaho State | 1.63m | 1.64m | 3 |
| 5 | Radtke, Morgan | Montana | 1.65m | 1.64m | 3 |
| 5 | Orton, Kapri | Idaho State | 1.62m | 1.64m | 3 |
| 8 | Christopherson, Courtney | Weber State | 1.63m | J1.64m | .50 |
| 8 | Dozier, Shelby | Sacramento St. | 1.66m | J1.64m | .50 |
| 10 | Phenix, NeNe | Northern Colorado | 1.71m | J1.64m | |
| 11 | Wilson, Madeline | Northern Arizona | 1.64m | 1.59m | |
| 11 | Dunleavy, Ceil | Portland State | 1.65m | 1.59m | |
| 13 | Turner, Anya | Northern Colorado | 1.60m | J1.59m | |
| 13 | Thareek, Rebecca | Eastern Washington | 1.67m | J1.59m | |
| 13 | Nelson, Ginger | Idaho State | 1.67m | J1.59m | |
| 16 | Bauer, McKayla | Northern Colorado | 1.65m | J1.59m | |
| 16 | Johnson, Zoe | Montana State | 1.65m | J1.59m | |
| --- | Elliott, Taylor | Portland State | 1.71m | NH | |
| --- | Barnes, Emily | Weber State | 1.63m | NH | |
| --- | Oates, Alyssa | Eastern Washington | 1.67m | NH | |
| --- | Dodge, Abby | Montana | 1.58m | NH | |
| --- | Pettit, Mackenzie | Northern Colorado | 1.69m | NH | |
| --- | Wilson, Madison | Eastern Washington | 1.67m | NH | |

### Women Pole Vault

| | | | | | |
|---|---|---|---|---|---|
| BSC Champ: | 14-02 | ! | 2012 | Keisa Monterola, Eastern Washington | |
| BSC All-Time: | 14-04 | # | 2012 | Keisa Monterola, Eastern Washington | |
| Arena: | 15-06 | $ | 2003 | Stacy Dragila, Nike | |

| | Name | School | Seed | Finals | Points |
|---|---|---|---|---|---|
| **Finals** | | | | | |
| 1 | Anger, Brooke | Idaho State | 3.91m | 3.98m | 10 |
| 2 | Schultz, Savannah | Eastern Washington | 4.10m | 3.93m | 8 |

Appendix 0087

2022 Women's Ivy League Swimming & Diving
Championship Results
February 16-19, 2022
Available at:
http://www.meetresults.com/2022/ivies/results.ht
ml
[permalink: https://perma.cc/RFA7-6YDX]
(last visited: April 20, 2022)

Adidas27,197. 0088

4/20/22, 12:08 PM

```
              Licensed to Harvard University - Site License
                          HY-TEK's MEET MANAGER 8.0 2/20/2022 02:09 PM
                      Women's Ivy League Swimming & Diving Championships
                         February 16-19, 2022 - Harvard University
                                        Results
```

## Event 1  Women 200 Yard Medley Relay

```
===============================================================================
 Meet Record: M 1:37.30      2018 Yale
                             H.Vanderwel, C.O'Leary, M.Zimmerman, B.Hindley
 Pool Record: P 1:37.30      2018 Yale
                             H.Vanderwel, C.O'Leary, M.Zimmerman, B.Hindley
   NCAA A Std: A 1:36.40
   NCAA B Std: B 1:37.05
     School                                    Seed     Finals Points
===============================================================================
  1 Princeton University                     1:38.96    1:38.66   64
     1) Pappas, Alexa FR              2) Wang, Vivian SR
     3) Venema, Nikki JR              4) Bradley, Christina JR
  2 Yale University                          1:37.48    1:38.91   56
     1) Wagner, Lindsey SO            2) Buckley, Marykate JR
     3) Pilkinton, Ophelia SO         4) Henig, Iszac JR
  3 Harvard University                       1:40.80    1:39.14   54
     1) Pasadyn, Felicia SR           2) Denisenko, Aleksandra FR
     3) Carr, Abigail FR              4) Brenner, Mandy FR
  4 Brown University                         1:41.71    1:40.22   52
     1) Reznicek, Jenna FR            2) Willhite, Kellie SO
     3) Chidley, Nell JR              4) Scott, Samantha SO
  5 University of Pennsylvania               1:40.31    1:40.33   50
     1) Kannan, Hannah SR             2) Maizes, Rachel SR
     3) Chong, Vanessa FR             4) Kaczorowski, Margot JR
  6 Columbia University                      1:42.27    1:42.05   48
     1) Pruden, Mary SR               2) Walker, Allegra SO
     3) Wang, Emily SR                4) Arevalo, Isabelle JR
  7 Cornell University                       1:44.19    1:43.17   46
     1) Munoz, Aviva JR               2) Tsai, Sophia FR
     3) Gruvberger, Anna SO           4) Wongso, Priscilla SO
  8 Dartmouth College                        1:46.95    1:44.54   44
     1) Zhang, Connie JR              2) Zhang, Rachel FR
     3) Howley, Mary FR               4) Wortzman, Zoe JR
```

## Event 2  Women 800 Yard Freestyle Relay

```
===============================================================================
 Meet Record: M 6:59.92      2020 Harvard
                             M. Dahlke, S. Shelton, K. Quist, F. Pasadyn
 Pool Record: P 7:05.06      2018 Harvard
                             M. Dahlke, K. Quist, G. Enoch, M. Popp
   NCAA A Std: A 7:00.86
   NCAA B Std: B 7:05.88
     School                                    Seed     Finals Points
===============================================================================
  1 Harvard University                       7:15.97    7:06.66   64
     1) Pasadyn, Felicia SR           2) Shelton, Samantha JR
     3) Bullock, Addie Rose SO        4) Hamlin, Molly FR
  2 Yale University                          7:16.64    7:08.33   56
     1) Henig, Iszac JR               2) Massey, Alexandra FR
     3) Jones, Raime JR               4) Moesch, Marlise SR
  3 University of Pennsylvania               7:14.50    7:09.91   54
     1) Thomas, Lia SR                2) Kaczorowski, Margot JR
     3) Kalandadze, Anna Sofia JR     4) O'Leary, Bridget JR
  4 Princeton University                     7:18.36    7:16.00   52
     1) Venema, Nikki JR              2) Marquardt, Ellie SO
     3) Liu, Amelia JR                4) Valdman, Nathalie SO
  5 Columbia University                      7:20.76    7:16.55   50
```

Appellate 27188. 0089

4/20/22, 12:08 PM

```
          1) Ganihanova, Aziza SO          2) Jubin, Olivia JR
          3) Martin, Allison FR            4) Breiter, Callie SO
        6 Dartmouth College                        7:36.02   7:20.86   48
          1) Post, Ashley JR               2) Leko, Mia JR
          3) Wiener, Sophie FR             4) Wortzman, Zoe JR
        7 Brown University                         7:29.88   7:21.75   46
          1) Podurgiel, Anna FR            2) Barrett, Sara FR
          3) Bilgin, Zehra FR              4) Orange, Audrey JR
        8 Cornell University                       7:33.06   7:27.74   44
          1) Parker, Melissa JR            2) Syrkin, Alex FR
          3) Sih, Angelica SO              4) DuPont, Schuyler FR
```

Event 3  Women 500 Yard Freestyle
```
===============================================================================
  Meet Record: M 4:36.37       2020 Ellie Marquardt (Princeton)
  Pool Record: P 4:37.64       2007 Kate Ziegler (Fish)
   NCAA A Std: A 4:35.76
   NCAA B Std: B 4:47.20
    Name                     Year School        Prelims     Finals Points
===============================================================================
A - Final
  1 Thomas, Lia               SR Penn            4:41.19    4:37.32P   32
  2 Buroker, Catherine        SO Penn            4:47.22    4:44.83B   28
  3 Marquardt, Ellie          SO Princeton       4:48.61    4:46.63B   27
  4 Kalandadze, Anna Sofia    JR Penn            4:46.62    4:47.54    26
  5 Loomis, Ashley            SR Yale            4:49.24    4:48.72    25
  6 Ganihanova, Aziza         SO Columbia        4:48.60    4:48.88    24
  7 Cavanagh, Erin            FR Harvard         4:47.38    4:49.04    23
  8 Thompson, Mikki           SR Harvard         4:49.99    4:52.59    22
B - Final
  9 O'Leary, Bridget          JR Penn            4:50.20    4:47.77    20
 10 Girotto, Amelia           FR Penn            4:51.87    4:49.88    17
 11 Kim, Junseo               FR Yale            4:51.64    4:50.20    16
 12 Rose, Carlie              FR Harvard         4:52.20    4:50.26    15
 13 Appleton, Emily           FR Princeton       4:54.10    4:51.66    14
 14 Valdman, Nathalie         SO Princeton       4:52.80    4:51.72    13
 15 Hazlett, Kate             SO Harvard         4:54.05    4:53.53    12
 16 Barrett, Sara             FR Brown           4:52.14    4:54.11    11
C - Final
 17 Jubin, Olivia             JR Columbia        4:54.85    4:52.20     9
 18 Giddings, Grace           SR Penn            4:56.83    4:55.91     7
 19 Minnigh, Sarah            JR Dartmouth       4:56.37    4:56.03     6
 20 Antoniuk, Bella           FR Brown           5:00.94    4:56.16     5
 21 Iorini, Maria             SO Brown           4:57.45    4:58.27     4
 22 Mannion, Macey            SO Princeton       5:01.16    4:58.65     3
 23 Orange, Audrey            JR Brown           4:54.30    4:58.68     2
 24 Breiter, Callie           SO Columbia        4:58.56    5:02.20     1
```

Event 3  Women 500 Yard Freestyle
```
===============================================================================
  Meet Record: M 4:36.37       2020 Ellie Marquardt (Princeton)
  Pool Record: P 4:37.64       2007 Kate Ziegler (Fish)
   NCAA A Std: A 4:35.76
   NCAA B Std: B 4:47.20
    Name                     Year School          Seed     Prelims
===============================================================================
Preliminaries
  1 Thomas, Lia               SR Penn            4:34.06    4:41.19B
  2 Kalandadze, Anna Sofia    JR Penn            4:47.93    4:46.62B
  3 Buroker, Catherine        SO Penn            4:58.67    4:47.22
  4 Cavanagh, Erin            FR Harvard         4:47.98    4:47.38
  5 Ganihanova, Aziza         SO Columbia        4:50.71    4:48.60
  6 Marquardt, Ellie          SO Princeton       4:47.28    4:48.61
  7 Loomis, Ashley            SR Yale            4:52.23    4:49.24
  8 Thompson, Mikki           SR Harvard         5:02.27    4:49.99
```

Admitted 27189. 0090

```
  --------------------------------------------------------------
   9 O'Leary, Bridget       JR Penn            5:03.20    4:50.20
  10 Kim, Junseo            FR Yale            4:53.98    4:51.64
  11 Girotto, Amelia        FR Penn            4:55.47    4:51.87
  12 Barrett, Sara          FR Brown           4:52.57    4:52.14
  13 Rose, Carlie           FR Harvard         4:54.43    4:52.20
  14 Valdman, Nathalie      SO Princeton       4:54.31    4:52.80
  15 Hazlett, Kate          SO Harvard         4:56.20    4:54.05
  16 Appleton, Emily        FR Princeton       4:53.07    4:54.10
  --------------------------------------------------------------
  17 Orange, Audrey         JR Brown           4:57.48    4:54.30
  18 Jubin, Olivia          JR Columbia        4:57.20    4:54.85
  19 Minnigh, Sarah         JR Dartmouth       5:07.26    4:56.37
  20 Giddings, Grace        SR Penn            4:54.25    4:56.83
  21 Iorini, Maria          SO Brown           4:58.88    4:57.45
  22 Breiter, Callie        SO Columbia        4:54.27    4:58.56
  23 Antoniuk, Bella        FR Brown           4:53.03    5:00.94
  24 Mannion, Macey         SO Princeton       5:01.01    5:01.16
  --------------------------------------------------------------
  25 Caverly, Gillian       SR Cornell         5:22.63    5:01.67
  26 Cianciolo, Christina   SO Dartmouth       5:13.70    5:01.91
  --------------------------------------------------------------
  27 Larsen, Clare          SR Columbia        5:02.48    5:03.18
  28 Jiang, Joy             FR Penn            5:00.53    5:03.66
  29 Danko, Allie           FR Cornell         4:59.45    5:04.34
  30 Peng, Jessica          JR Columbia        5:03.15    5:04.39
  31 Munoz, Aviva           JR Cornell         5:05.35    5:05.77
  32 Durak, Anna            SR Princeton       5:10.71    5:05.81
  33 Pujadas, Riley         FR Columbia        5:08.07    5:06.31
  34 Wiener, Sophie         FR Dartmouth       5:12.46    5:06.97
  35 Barry, Hayden          FR Dartmouth       5:18.17    5:08.40
  36 Maizes, Deedee         SR Cornell         5:11.01    5:10.61

Event 4  Women 200 Yard IM
  ===========================================================================
  Meet Record: M 1:55.09        2013 Katie Meili (Columbia)
  Pool Record: P 1:57.11        1981 Tracy Caulkins (Nashville)
   NCAA A Std: A 1:53.66
   NCAA B Std: B 1:59.94
    Name                  Year School          Prelims     Finals Points
  ===========================================================================
A - Final
   1 Shelton, Samantha      JR Harvard         1:59.48    1:58.03B  32
   2 Pasadyn, Felicia       SR Harvard         1:58.86    1:58.25B  28
   3 Whitmire, Liza         SO Princeton       2:00.82    1:59.29B  27
   4 Denisenko, Aleksandra  FR Harvard         2:01.16    2:00.69   26
   5 Jones, Raime           JR Yale            2:02.28    2:01.24   25
   6 Weng, Vivian           FR Yale            2:01.64    2:01.90   24
   7 Buckley, Maggie        FR Harvard         2:02.15    2:01.94   23
  -- Yeager, Jess           SO Princeton       1:59.48 DQ 1:58.49
         Head did not break the surface by 15 meters - fly
B - Final
   9 McDonald, Margaux      SO Princeton       2:02.35    2:01.31   20
  10 Podurgiel, Anna        FR Brown           2:02.41    2:01.65   17
  11 Leko, Mia              JR Dartmouth       2:02.85    2:02.48   16
  12 Paoletti, Olivia       JR Yale            2:02.68    2:02.90   15
  13 Chong, Vanessa         FR Penn            2:02.69    2:03.08   14
  14 Pytel, Isabella        FR Penn            2:02.41    2:03.31   13
  15 Korbly, Isabella       FR Princeton       2:03.12    2:03.42   12
  16 Boeckman, Anna         FR Penn            2:02.82    2:03.52   11
C - Final
  17 Martin, Allison        FR Columbia        2:03.42    2:02.67    9
  18 Lukawski, Audrey       SR Brown           2:03.62    2:02.85    7
  19 Maizes, Rachel         SR Penn            2:03.66    2:03.06    6
  20 Baldari, Alessandra    SR Yale            2:03.70    2:03.27    5
```

Administration 0091

4/20/22, 12:08 PM

```
   21 Wang, Vivian             SR Princeton          2:03.26    2:03.45    4
   22 Sutter, Olivia           SO Cornell            2:04.83    2:03.80    3
   23 Williams, Marie          SO Cornell            2:03.92    2:04.56    2
   24 Chen, Jaime              FR Princeton          2:05.02    2:06.16    1

Event 4  Women 200 Yard IM
===============================================================================
Meet Record: M 1:55.09        2013 Katie Meili (Columbia)
Pool Record: P 1:57.11        1981 Tracy Caulkins (Nashville)
 NCAA A Std: A 1:53.66
 NCAA B Std: B 1:59.94
    Name                    Year School          Seed       Prelims
===============================================================================
Preliminaries
    1 Pasadyn, Felicia        SR Harvard            2:00.20    1:58.86B
    2 Yeager, Jess            SO Princeton          2:00.86    1:59.48B
    2 Shelton, Samantha       JR Harvard            2:02.16    1:59.48B
    4 Whitmire, Liza          SO Princeton          2:00.54    2:00.82
    5 Denisenko, Aleksandra   FR Harvard            2:01.45    2:01.16
    6 Weng, Vivian            FR Yale               2:06.74    2:01.64
    7 Buckley, Maggie         FR Harvard            2:02.84    2:02.15
    8 Jones, Raime            JR Yale               2:02.99    2:02.28
  ---------------------------------------------------------------------
    9 McDonald, Margaux       SO Princeton          2:02.04    2:02.35
   10 Podurgiel, Anna         FR Brown              2:04.52    2:02.41
   10 Pytel, Isabella         FR Penn               2:02.70    2:02.41
   12 Paoletti, Olivia        JR Yale               2:04.63    2:02.68
   13 Chong, Vanessa          FR Penn               2:01.41    2:02.69
   14 Boeckman, Anna          FR Penn               2:03.23    2:02.82
   15 Leko, Mia               JR Dartmouth          2:05.81    2:02.85
   16 Korbly, Isabella        FR Princeton          2:05.65    2:03.12
  ---------------------------------------------------------------------
   17 Wang, Vivian            SR Princeton          2:03.18    2:03.26
   18 Martin, Allison         FR Columbia           2:03.22    2:03.42
   19 Lukawski, Audrey        SR Brown              2:04.57    2:03.62
   20 Maizes, Rachel          SR Penn               2:12.74    2:03.66
   21 Baldari, Alessandra     SR Yale               2:06.24    2:03.70
   22 Williams, Marie         SO Cornell            2:05.60    2:03.92
   23 Sutter, Olivia          SO Cornell            2:05.53    2:04.83
   24 Chen, Jaime             FR Princeton          2:04.37    2:05.02
  ---------------------------------------------------------------------
   25 Walker, Allegra         SO Columbia           2:03.26    2:05.08
   26 Takabayashi, Miku       SR Brown              2:02.67    2:05.56
  ---------------------------------------------------------------------
   27 Estabrook, Grace        SR Penn               2:06.02    2:05.65
   28 Unas, Julia             FR Columbia           2:05.91    2:06.03
   29 Laster, Susannah        JR Dartmouth          2:13.66    2:07.73
   30 Chang, Allison          SR Cornell            2:06.88    2:07.96
   31 Petersen, Amanda        FR Cornell            2:09.44    2:09.13
   32 Parker, Bridget         SO Dartmouth          2:17.64    2:09.92
   33 Hu, Ashley              FR Columbia           2:08.24    2:11.17
   34 Moon, Zoe               FR Dartmouth          2:16.37    2:12.01
   35 Wu, Amy                 SO Cornell            2:13.99    2:13.79
   -- xHeilbrun, Maddie       SR Harvard            2:07.59    X2:06.86

Event 5  Women 50 Yard Freestyle
===============================================================================
Meet Record: M 21.83          2019 Bella Hindley (Yale)
Pool Record: P 22.34          2018 Bella Hindley (Yale)
 NCAA A Std: A 21.66
 NCAA B Std: B 22.76
    Name                    Year School          Prelims    Finals Points
===============================================================================
A - Final
    1 Henig, Iszac            JR Yale                22.17      21.93P   32
```

Armistead 00. 0092

4/20/22, 12:08 PM

```
   2 Venema, Nikki          JR Princeton       22.65     22.30P  28
   3 Scott, Samantha        SO Brown           22.80     22.81   27
   4 Bradley, Christina     JR Princeton       23.02     23.02   26
   5 Wortzman, Zoe          JR Dartmouth       23.05     23.03   25
   6 Pilkinton, Ophelia     SO Yale            23.06     23.05   24
   7 Brenner, Mandy         FR Harvard         22.90     23.08   23
   8 Liu, Amelia            JR Princeton       23.12     23.30   22
 B - Final
   9 Wagner, Lindsey        SO Yale            23.14     23.12   20
  10 Post, Ashley           JR Dartmouth       23.25     23.22   17
  11 Parker, Melissa        JR Cornell         23.30     23.30   16
  12 Arevalo, Isabelle      JR Columbia        23.44     23.35   15
  13 Macdonald, Emily       FR Columbia        23.43     23.39   14
  14 Secrest, Jennifer      JR Princeton       23.26     23.42   13
  15 Kaczorowski, Margot    JR Penn            23.50     23.44   12
  16 Carter, Camryn         JR Penn            23.51     23.46   11
 C - Final
  17 Willhite, Kellie       SO Brown           23.54     23.38    9
  18 Healy, Marissa         SO Yale            23.59     23.42    7
  19 Wongso, Priscilla      SO Cornell         23.60     23.57    6
  20 Buckley, Marykate      JR Yale            23.78     23.69    5
  21 Young, Georgia         SO Columbia        23.77     23.79    4
  22 Myers, Andie           SR Penn            23.68     23.85    3
  23 Wang, Emily            SR Columbia        23.74     23.88    2
  24 Gruvberger, Anna       SO Cornell         23.80     23.94    1

Event 5  Women 50 Yard Freestyle
===========================================================================
 Meet Record: M 21.83     2019 Bella Hindley (Yale)
 Pool Record: P 22.34     2018 Bella Hindley (Yale)
   NCAA A Std: A 21.66
   NCAA B Std: B 22.76
    Name                   Year School         Seed      Prelims
===========================================================================
Preliminaries
   1 Henig, Iszac           JR Yale            22.05     22.17P
   2 Venema, Nikki          JR Princeton       22.59     22.65B
   3 Scott, Samantha        SO Brown           23.13     22.80
   4 Brenner, Mandy         FR Harvard         22.91     22.90
   5 Bradley, Christina     JR Princeton       22.81     23.02
   6 Wortzman, Zoe          JR Dartmouth       23.82     23.05
   7 Pilkinton, Ophelia     SO Yale            23.06     23.06
   8 Liu, Amelia            JR Princeton       23.06     23.12
   --------------------------------------------------------------
   9 Wagner, Lindsey        SO Yale            23.39     23.14
  10 Post, Ashley           JR Dartmouth       23.72     23.25
  11 Secrest, Jennifer      JR Princeton       23.61     23.26
  12 Parker, Melissa        JR Cornell         23.15     23.30
  13 Macdonald, Emily       FR Columbia        23.38     23.43
  14 Arevalo, Isabelle      JR Columbia        23.21     23.44
  15 Kaczorowski, Margot    JR Penn            23.44     23.50
  16 Carter, Camryn         JR Penn            23.84     23.51
   --------------------------------------------------------------
  17 Willhite, Kellie       SO Brown           23.51     23.54
  18 Healy, Marissa         SO Yale            23.33     23.59
  19 Wongso, Priscilla      SO Cornell         23.39     23.60
  20 Myers, Andie           SR Penn            24.31     23.68
  21 Wang, Emily            SR Columbia        23.57     23.74
  22 Young, Georgia         SO Columbia        23.84     23.77
  23 Buckley, Marykate      JR Yale            25.14     23.78
  24 Gruvberger, Anna       SO Cornell         23.69     23.80
   --------------------------------------------------------------
  25 Bullock, Addie Rose    SO Harvard         23.41     23.86
  26 Matsushima, Sage       JR Brown           24.27     23.87
   --------------------------------------------------------------
```

Administrative 0093

4/20/22, 12:08 PM

```
  27 Moesch, Marlise          SR Yale            24.56       24.05
  28 Zhang, Tori              FR Cornell         24.19       24.09
  29 Tsai, Sophia             FR Cornell         23.93       24.18
  30 Zhang, Connie            JR Dartmouth       25.03       24.39
  31 Syrkin, Alex             FR Cornell         24.65       24.50
  32 Wong, Anthea             FR Columbia        24.00       24.53
  33 Zwart, Eleanor           JR Dartmouth       24.92       24.63
  34 Zhang, Rachel            FR Dartmouth       24.80       24.74
  35 Van Steyn, Kenna         SR Dartmouth       27.17       25.18
  36 Kramer, Katherine        FR Dartmouth       25.70       25.95
  37 Hamlen, Izzy             FR Dartmouth       25.89       26.00
  -- xLe, Tina                JR Columbia        23.77      X24.20
  -- xOhr, Joelle             SO Cornell         24.25      X24.37
```

**Event 6  Women 1 mtr Diving**
```
===========================================================================
  Meet Record: M 314.20     2016 Mikaela Thompson (Harvard)
  Pool Record: P 324.15     1987 Jenny Greene (Harvard)
  NCAA A Std: A 265.00
    Name                   Year School        Prelims     Finals Points
===========================================================================
A - Final
   1 Laverty, Katie           FR Harvard         246.55      288.15A  32
   2 Herculano, Morgane       SR Harvard         272.95      282.95A  28
   3 Lawrence, Esther         SR Harvard         269.15      274.55A  27
   4 Edvalson, Remi           FR Harvard         257.45      268.45A  26
   5 Francella, Olivia        JR Penn            247.05      254.45   25
   6 Geier, Evie              JR Harvard         259.40      249.45   23.5
   6 Diakova, Alice           SO Columbia        245.95      249.45   23.5
   8 Seltzer, Maddie          FR Princeton       252.15      242.75   22
B - Final
   9 Henderson, Hayden        FR Yale            243.80      266.85A  20
  10 Lichen, Isabella         JR Dartmouth       244.95      261.85   17
  11 Jendritz, Elise          JR Cornell         245.10      261.55   16
  12 Wotovich, Amy            FR Harvard         239.45      252.00   15
  13 Mitchell, Liv            SR Brown           239.40      249.95   14
  14 Williams, Demetra        SR Cornell         242.60      245.40   13
  15 Milne, Georgi            SR Harvard         240.55      242.95   12
  16 Rosendalh, Brighida      SR Columbia        240.40      239.70   11
```

**Event 6  Women 1 mtr Diving**
```
===========================================================================
  Meet Record: M 314.20     2016 Mikaela Thompson (Harvard)
  Pool Record: P 324.15     1987 Jenny Greene (Harvard)
  NCAA A Std: A 265.00
    Name                   Year School          Seed      Prelims
===========================================================================
Preliminaries
   1 Herculano, Morgane       SR Harvard         291.80      272.95A
   2 Lawrence, Esther         SR Harvard         284.48      269.15A
   3 Geier, Evie              JR Harvard         281.63      259.40
   4 Edvalson, Remi           FR Harvard         286.43      257.45
   5 Seltzer, Maddie          FR Princeton       279.80      252.15
   6 Francella, Olivia        JR Penn            264.60      247.05
   7 Laverty, Katie           FR Harvard         285.98      246.55
   8 Diakova, Alice           SO Columbia        294.68      245.95
   9 Jendritz, Elise          JR Cornell         289.35      245.10
  10 Lichen, Isabella         JR Dartmouth       292.10      244.95
  11 Henderson, Hayden        FR Yale            291.50      243.80
  12 Williams, Demetra        SR Cornell         286.58      242.60
  13 Milne, Georgi            SR Harvard         266.00      240.55
  14 Rosendalh, Brighida      SR Columbia        268.43      240.40
  15 Wotovich, Amy            FR Harvard         298.05      239.45
  16 Mitchell, Liv            SR Brown           285.08      239.40
  17 Feord, Julia             JR Brown           277.80      236.20
```

Admin. #e. 27193. 0094

4/20/22, 12:08 PM

```
18 Lee, Michelle              SR Columbia        274.73   234.80
19 Miclau, Elizabeth          SO Harvard         273.98   229.55
20 Johnsson-Stjernstrom, Ha   SO Princeton       251.35   224.80
21 Palacios, Alyssa           FR Dartmouth       288.45   219.40
22 Thibodeau, Genevieve       FR Yale            266.85   218.10
23 Chin, Audrey               SO Harvard         240.00   216.95
24 Brinker, Alexa             FR Brown           267.15   206.25
25 Singh, Ishani              SO Yale            241.70   202.30
26 Shao, Stephanie            FR Yale            306.75   198.95
27 Parker, Madeleine          FR Penn            234.38   197.40
28 Ennis, Maya                FR Yale            269.25   190.15
29 Stein, Samantha            SO Penn            216.52   163.35
30 Jin, Laurel                FR Yale            272.33   149.85
```

## Event 7  Women 200 Yard Freestyle Relay

```
===========================================================================
Meet Record: M 1:29.69       2017 Yale
                 B. Hindley, K. Rogers, M. Zimmerman, K. Zhou
Pool Record: P 1:30.50       2018 Harvard
                 M. Colby, I. Wall, J. Li, M. Dahlke
 NCAA A Std: A 1:28.43
 NCAA B Std: B 1:29.21
   School                                    Seed     Finals Points
===========================================================================
 1 Yale University                        1:30.14   1:29.66M  64
     1) Henig, Iszac JR          2) Wagner, Lindsey SO
     3) Pilkinton, Ophelia SO    4) Healy, Marissa SO
 2 Princeton University                   1:31.22   1:30.38P  56
     1) Bradley, Christina JR    2) Liu, Amelia JR
     3) Venema, Nikki JR         4) Secrest, Jennifer JR
 3 Harvard University                     1:32.48   1:31.90   54
     1) Brenner, Mandy FR        2) Shelton, Samantha JR
     3) Bullock, Addie Rose SO   4) Hamlin, Molly FR
 4 University of Pennsylvania             1:33.67   1:32.45   52
     1) Kaczorowski, Margot JR   2) Thomas, Lia SR
     3) Kannan, Hannah SR        4) Carter, Camryn JR
 5 Brown University                       1:33.70   1:32.75   50
     1) Scott, Samantha SO       2) Reznicek, Jenna FR
     3) Willhite, Kellie SO      4) Matsushima, Sage JR
 6 Columbia University                    1:33.69   1:32.97   48
     1) Wang, Emily SR           2) Macdonald, Emily FR
     3) Young, Georgia SO        4) Arevalo, Isabelle JR
 7 Dartmouth College                      1:36.75   1:33.08   46
     1) Wortzman, Zoe JR         2) Post, Ashley JR
     3) Wiener, Sophie FR        4) Leko, Mia JR
 8 Cornell University                     1:33.64   1:33.86   44
     1) Wongso, Priscilla SO     2) Zhang, Tori FR
     3) Gruvberger, Anna SO      4) Parker, Melissa JR
```

## Event 8  Women 1000 Yard Freestyle

```
===========================================================================
Meet Record: M 9:33.43       2008 Alicia Aemisegger (Princeton)
Pool Record: P 9:28.49       2007 Kate Ziegler (Fish)
   Name                     Year School        Seed     Finals Points
===========================================================================
 1 Buroker, Catherine         SO Penn         9:56.25   9:43.54   32
 2 Kalandadze, Anna Sofia     JR Penn         9:48.15   9:50.05   28
 3 Ganihanova, Aziza          SO Columbia    10:04.73   9:53.92   27
 4 Giddings, Grace            SR Penn         9:58.45   9:57.15   26
 5 Loomis, Ashley             SR Yale         9:58.46   9:57.92   25
 6 Barrett, Sara              FR Brown       10:01.75   9:58.96   24
 7 Rose, Carlie               FR Harvard     10:14.20   9:59.40   23
 8 Girotto, Amelia            FR Penn        10:06.22  10:02.02   22
 9 Ruppert-Gomez, Marcella    JR Harvard     10:11.87  10:02.70   20
10 Valdman, Nathalie          SO Princeton   10:04.03  10:07.62   17
```

Admin#: 27194  0095

4/20/22, 12:08 PM

```
   11 Minnigh, Sarah           JR Dartmouth     10:39.27   10:08.65   16
   12 Yoon, Grace              FR Harvard       10:23.13   10:10.22   15
   13 Paoletti, Isabella       FR Yale          10:12.35   10:12.51   14
   14 Cianciolo, Christina     SO Dartmouth     10:43.39   10:14.50   13
   15 Danko, Allie             FR Cornell       10:16.26   10:15.13   12
   16 Antoniuk, Bella          FR Brown         10:13.97   10:18.05   11
   17 Mannion, Macey           SO Princeton     10:22.26   10:19.39    9
   18 Takabayashi, Miku        SR Brown         10:36.64   10:19.97    7
   19 Jiang, Joy               FR Penn                NT   10:20.06    6
   20 Maizes, Deedee           SR Cornell       10:41.76   10:33.72    5
   21 Barry, Hayden            FR Dartmouth     10:56.19   10:41.50    4
```

**Event 9   Women 400 Yard IM**

```
===========================================================================
 Meet Record: M 4:06.15        2009 Alicia Aemisegger (Princeton)
 Pool Record: P 4:04.63        1981 Tracy Caulkins (Nashville)
  NCAA A Std: A 4:03.62
  NCAA B Std: B 4:17.30
     Name                    Year School        Prelims    Finals Points
===========================================================================
A - Final
   1 Pasadyn, Felicia         SR Harvard        4:13.45   4:10.45B   32
   2 Thompson, Mikki          SR Harvard        4:13.86   4:14.14B   28
   3 Pruden, Mary             SR Columbia       4:17.22   4:15.00B   27
   4 Marquardt, Ellie         SO Princeton      4:17.60   4:16.15B   26
   5 Cavanagh, Erin           FR Harvard        4:17.17   4:16.24B   25
   6 Yeager, Jess             SO Princeton      4:16.99   4:17.94    24
   7 Paoletti, Olivia         JR Yale           4:18.70   4:18.48    23
   8 Paoletti, Isabella       FR Yale           4:18.85   4:25.46    22
B - Final
   9 Hazlett, Kate            SO Harvard        4:18.88   4:16.05B   20
  10 Whitmire, Liza           SO Princeton      4:21.91   4:18.19    17
  11 Appleton, Emily          FR Princeton      4:20.30   4:18.27    16
  12 Kim, Junseo              FR Yale           4:20.80   4:18.82    15
  13 Yoon, Grace              FR Harvard        4:19.01   4:18.91    14
  14 Boeckman, Anna           FR Penn           4:20.63   4:20.00    13
  15 Buckley, Maggie          FR Harvard        4:21.72   4:22.17    12
  16 Boyer, Liz               JR Harvard        4:22.72   4:23.78    11
C - Final
  17 Clements, Emily          SO Brown          4:23.22   4:19.20     9
  18 Brault, Ellie            FR Brown          4:24.44   4:20.44     7
  19 Whall, Emma              SR Brown          4:27.84   4:22.53     6
  20 Sutter, Olivia           SO Cornell        4:23.28   4:22.75     5
  21 Williams, Marie          SO Cornell        4:31.17   4:26.58     4
  22 Unas, Julia              FR Columbia       4:34.02   4:30.43     3
  23 Ruppert-Gomez, Marcella  JR Harvard        4:28.71   4:34.33     2
  24 Parker, Bridget          SO Dartmouth      4:37.68   4:40.15     1
```

**Event 9   Women 400 Yard IM**

```
===========================================================================
 Meet Record: M 4:06.15        2009 Alicia Aemisegger (Princeton)
 Pool Record: P 4:04.63        1981 Tracy Caulkins (Nashville)
  NCAA A Std: A 4:03.62
  NCAA B Std: B 4:17.30
     Name                    Year School         Seed     Prelims
===========================================================================
Preliminaries
   1 Pasadyn, Felicia         SR Harvard        4:13.82   4:13.45B
   2 Thompson, Mikki          SR Harvard        4:25.40   4:13.86B
   3 Yeager, Jess             SO Princeton           NT   4:16.99B
   4 Cavanagh, Erin           FR Harvard        4:13.69   4:17.17B
   5 Pruden, Mary             SR Columbia       4:18.92   4:17.22B
   6 Marquardt, Ellie         SO Princeton      4:13.99   4:17.60
   7 Paoletti, Olivia         JR Yale           4:18.97   4:18.70
   8 Paoletti, Isabella       FR Yale           4:25.22   4:18.85
```

PX0327 0096

4/20/22, 12:08 PM

```
--------------------------------------------------------------------
 9 Hazlett, Kate          SO Harvard        4:17.49    4:18.88
10 Yoon, Grace            FR Harvard              NT    4:19.01
11 Appleton, Emily        FR Princeton      4:18.41    4:20.30
12 Boeckman, Anna         FR Penn           4:25.02    4:20.63
13 Kim, Junseo            FR Yale           4:25.08    4:20.80
14 Buckley, Maggie        FR Harvard        4:22.18    4:21.72
15 Whitmire, Liza         SO Princeton      4:19.77    4:21.91
16 Boyer, Liz             JR Harvard        4:23.09    4:22.72
--------------------------------------------------------------------
17 Clements, Emily        SO Brown          4:27.06    4:23.22
18 Sutter, Olivia         SO Cornell        4:26.60    4:23.28
19 Brault, Ellie          FR Brown          4:25.15    4:24.44
20 Whall, Emma            SR Brown          4:33.38    4:27.84
21 Ruppert-Gomez, Marcella JR Harvard       4:30.90    4:28.71
22 Williams, Marie        SO Cornell        4:29.96    4:31.17
23 Unas, Julia            FR Columbia       4:28.67    4:34.02
24 Parker, Bridget        SO Dartmouth      4:53.56    4:37.68
--------------------------------------------------------------------
25 Petersen, Amanda       FR Cornell        4:34.69    4:37.93
```

**Event 10  Women 100 Yard Butterfly**

```
============================================================================
Meet Record: M 51.57      2013 Alex Forrester (Yale)
Pool Record: P 51.89      2018 Miki Dahlke (Harvard)
 NCAA A Std: A 50.92
 NCAA B Std: B 53.76
   Name                  Year School          Prelims    Finals Points
============================================================================
A - Final
 1 Venema, Nikki          JR Princeton      53.63     52.42B    32
 2 Carr, Abigail          FR Harvard        53.86     52.69B    28
 3 Henig, Iszac           JR Yale           53.53     52.82B    27
 4 Massey, Alexandra      FR Yale           53.73     53.59B    26
 5 Chidley, Nell          JR Brown          54.56     54.00     25
 6 Reznicek, Jenna        FR Brown          54.00     54.08     24
 7 Bradley, Christina     JR Princeton      54.39     54.16     23
 8 Matsushima, Sage       JR Brown          54.63     54.64     22
B - Final
 9 Pilkinton, Ophelia     SO Yale           54.83     54.33     20
10 Myers, Andie           SR Penn           54.84     54.56     17
11 Kannan, Hannah         SR Penn           54.76     54.74     15.5
11 Chong, Vanessa         FR Penn           54.79     54.74     15.5
13 Murphy, Quinn          FR Yale           55.15     54.87     14
14 Secrest, Jennifer      JR Princeton      55.06     54.94     13
15 Bilgin, Zehra          FR Brown          54.83     54.97     12
16 Wang, Emily            SR Columbia       55.01     55.26     11
C - Final
17 Brenner, Mandy         FR Harvard        55.42     54.48      9
18 Martin, Allison        FR Columbia       55.25     55.05      7
19 Baldari, Alessandra    SR Yale           55.19     55.24      6
20 Peng, Jessica          JR Columbia       55.36     55.25      5
21 Howley, Mary           FR Dartmouth      55.57     55.42      4
22 Chen, Jaime            FR Princeton      55.57     55.43      3
23 Pappas, Alexa          FR Princeton      55.44     56.02      2
24 Gruvberger, Anna       SO Cornell        55.65     56.50      1
```

**Event 10  Women 100 Yard Butterfly**

```
============================================================================
Meet Record: M 51.57      2013 Alex Forrester (Yale)
Pool Record: P 51.89      2018 Miki Dahlke (Harvard)
 NCAA A Std: A 50.92
 NCAA B Std: B 53.76
   Name                  Year School          Seed     Prelims
============================================================================
```

**Preliminaries**

```
 1 Henig, Iszac            JR Yale                  NT    53.53B
 2 Venema, Nikki           JR Princeton          52.64    53.63B
 3 Massey, Alexandra       FR Yale               54.41    53.73B
 4 Carr, Abigail           FR Harvard            53.00    53.86
 5 Reznicek, Jenna         FR Brown              54.05    54.00
 6 Bradley, Christina      JR Princeton          53.41    54.39
 7 Chidley, Nell           JR Brown              54.65    54.56
 8 Matsushima, Sage        JR Brown              55.13    54.63
----------------------------------------------------------------
 9 Kannan, Hannah          SR Penn               55.22    54.76
10 Chong, Vanessa          FR Penn               54.67    54.79
11 Bilgin, Zehra           FR Brown              55.38    54.83
11 Pilkinton, Ophelia      SO Yale                  NT    54.83
13 Myers, Andie            SR Penn               55.62    54.84
14 Wang, Emily             SR Columbia           54.62    55.01
15 Secrest, Jennifer       JR Princeton          54.99    55.06
16 Murphy, Quinn           FR Yale               56.16    55.15
----------------------------------------------------------------
17 Baldari, Alessandra     SR Yale               55.06    55.19
18 Martin, Allison         FR Columbia           55.70    55.25
19 Peng, Jessica           JR Columbia           55.06    55.36
20 Brenner, Mandy          FR Harvard            55.83    55.42
21 Pappas, Alexa           FR Princeton          54.81    55.44
22 Chen, Jaime             FR Princeton          55.20    55.57
22 Howley, Mary            FR Dartmouth          57.37    55.57
24 Gruvberger, Anna        SO Cornell            55.81    55.65
----------------------------------------------------------------
25 Healy, Marissa          SO Yale               54.95    55.69
26 Wong, Anthea            FR Columbia           55.62    55.77
----------------------------------------------------------------
27 Waterson, Rebecca       FR Brown              56.46    56.23
28 Macdonald, Emily        FR Columbia           56.44    56.50
29 Hailu, Hannah           FR Columbia           56.50    56.64
30 Wortzman, Zoe           JR Dartmouth             NT    57.46
31 Zhang, Tori             FR Cornell            56.82    57.76
-- xRippon, Caylene        SR Brown              56.73   X56.40
-- xNewnam, Anna           SR Penn               56.69   X56.94
```

**Event 11  Women 200 Yard Freestyle**
```
================================================================
 Meet Record: M 1:43.78      2020 Miki Dahlke (Harvard)
 Pool Record: P 1:45.00      2018 Miki Dahlke (Harvard)
  NCAA A Std: A 1:42.98
  NCAA B Std: B 1:47.12
    Name                  Year School        Prelims    Finals Points
================================================================
A - Final
 1 Thomas, Lia             SR Penn             1:44.91   1:43.12M  32
 2 Shelton, Samantha       JR Harvard          1:47.42   1:45.82B  28
 3 Hamlin, Molly           FR Harvard          1:46.66   1:47.33   27
 4 Post, Ashley            JR Dartmouth        1:48.09   1:47.48   26
 5 Moesch, Marlise         SR Yale             1:48.25   1:48.09   25
 6 O'Leary, Bridget        JR Penn             1:48.79   1:48.29   24
 7 Kaczorowski, Margot     JR Penn             1:48.48   1:48.73   23
 8 Leko, Mia               JR Dartmouth        1:47.96   1:49.29   22
B - Final
 9 Jones, Raime            JR Yale             1:48.89   1:48.17   20
10 Weng, Vivian            FR Yale             1:49.56   1:48.48   17
11 Podurgiel, Anna         FR Brown            1:48.94   1:49.17   16
12 Parker, Melissa         JR Cornell          1:50.45   1:50.01   15
13 Breiter, Callie         SO Columbia         1:50.56   1:50.18   14
14 Liu, Amelia             JR Princeton        1:51.63   1:50.19   13
15 Carter, Camryn          JR Penn             1:49.93   1:50.27   12
16 Jubin, Olivia           JR Columbia         1:51.34   1:50.30   11
```

4/20/22, 12:08 PM

```
C - Final
 17 Orange, Audrey        JR Brown            1:51.64   1:51.80    9
 18 Valdman, Nathalie     SO Princeton        1:52.62   1:52.14    7
 19 Wiener, Sophie        FR Dartmouth        1:52.17   1:52.36    6
 20 Syrkin, Alex          FR Cornell          1:52.28   1:52.43    5
 21 Iorini, Maria         SO Brown            1:54.09   1:52.56    4
 22 DuPont, Schuyler      FR Cornell          1:52.94   1:52.60    3
 23 Young, Georgia        SO Columbia         1:53.54   1:53.03    2
 24 Larsen, Clare         SR Columbia         1:52.88   1:53.32    1
```

Event 11  Women 200 Yard Freestyle

```
===============================================================================
 Meet Record: M 1:43.78     2020 Miki Dahlke (Harvard)
 Pool Record: P 1:45.00     2018 Miki Dahlke (Harvard)
   NCAA A Std: A 1:42.98
   NCAA B Std: B 1:47.12
   Name                  Year School           Seed      Prelims
===============================================================================
Preliminaries
  1 Thomas, Lia          SR Penn             1:41.93   1:44.91P
  2 Hamlin, Molly        FR Harvard          1:49.44   1:46.66B
  3 Shelton, Samantha    JR Harvard          1:50.63   1:47.42
  4 Leko, Mia            JR Dartmouth        1:50.64   1:47.96
  5 Post, Ashley         JR Dartmouth        1:52.39   1:48.09
  6 Moesch, Marlise      SR Yale             1:48.65   1:48.25
  7 Kaczorowski, Margot  JR Penn             1:55.27   1:48.48
  8 O'Leary, Bridget     JR Penn             1:49.56   1:48.79
  -----------------------------------------------------------------
  9 Jones, Raime         JR Yale             1:49.51   1:48.89
 10 Podurgiel, Anna      FR Brown            1:49.88   1:48.94
 11 Weng, Vivian         FR Yale             1:50.06   1:49.56
 12 Carter, Camryn       JR Penn             1:54.78   1:49.93
 13 Parker, Melissa      JR Cornell          1:49.61   1:50.45
 14 Breiter, Callie      SO Columbia         1:50.17   1:50.56
 15 Jubin, Olivia        JR Columbia         1:49.42   1:51.34
 16 Liu, Amelia          JR Princeton        1:50.03   1:51.63
  -----------------------------------------------------------------
 17 Orange, Audrey       JR Brown            1:51.69   1:51.64
 18 Wiener, Sophie       FR Dartmouth        1:54.59   1:52.17
 19 Syrkin, Alex         FR Cornell          1:51.40   1:52.28
 20 Valdman, Nathalie    SO Princeton        1:49.84   1:52.62
 21 Larsen, Clare        SR Columbia         1:52.12   1:52.88
 22 DuPont, Schuyler     FR Cornell          1:53.03   1:52.94
 23 Young, Georgia       SO Columbia         1:52.34   1:53.54
 24 Iorini, Maria        SO Brown            1:52.75   1:54.09
  -----------------------------------------------------------------
 25 Durak, Anna          SR Princeton        1:54.60   1:54.31
 26 Arevalo, Isabelle    JR Columbia         1:52.73   1:54.53
  -----------------------------------------------------------------
 27 Scott, Samantha      SO Brown            1:58.52   1:55.56
 28 Sih, Angelica        SO Cornell          1:53.67   1:55.99
 29 Maizes, Deedee       SR Cornell          1:54.84   1:57.23
 -- xLe, Tina            JR Columbia         1:53.14   X1:52.41
```

Event 12  Women 100 Yard Breaststroke

```
===============================================================================
 Meet Record: M  58.44      2013 Katie Meili (Columbia)
 Pool Record: P  59.64      2012 Katie Meili (Columbia)
   NCAA A Std: A  58.46
   NCAA B Std: B 1:01.84
   Name                  Year School          Prelims   Finals Points
===============================================================================
A - Final
  1 Denisenko, Aleksandra FR Harvard          1:01.57   1:00.96B  32
  2 Buckley, Marykate     JR Yale             1:02.48   1:01.69B  28
```

4/20/22, 12:08 PM

```
    3 Franks, Ava             FR Yale          1:02.32   1:01.96   27
    4 McDonald, Margaux       SO Princeton     1:02.21   1:02.48   26
    5 Maizes, Rachel          SR Penn          1:02.50   1:02.76   25
    6 Pytel, Isabella         FR Penn          1:02.77   1:02.88   24
    7 Estabrook, Grace        SR Penn          1:02.46   1:03.07   23
    8 Willhite, Kellie        SO Brown         1:02.88   1:03.20   22
 B - Final
    9 Lukawski, Audrey        SR Brown         1:03.27   1:02.76   20
   10 Brault, Ellie           FR Brown         1:04.23   1:03.05   17
   11 Hu, Ashley              FR Columbia      1:03.60   1:03.30   16
   12 Boyer, Liz              JR Harvard       1:03.66   1:03.47   15
   13 Liu, Hannah             FR Penn          1:03.45   1:03.57   14
   14 Walker, Allegra         SO Columbia      1:03.42   1:04.15   13
   15 Wang, Vivian            SR Princeton     1:03.53   1:04.23   12
   16 Wu, Amy                 SO Cornell       1:05.07   1:04.76   11
 C - Final
   17 Tsai, Sophia            FR Cornell       1:05.20   1:04.44    9
   18 Chang, Allison          SR Cornell       1:06.04   1:05.11    7
   19 Van Steyn, Kenna        SR Dartmouth     1:05.17   1:05.65    6
   20 Zhang, Rachel           FR Dartmouth     1:07.44   1:07.66    5
```

Event 12  Women 100 Yard Breaststroke
```
===========================================================================
Meet Record: M  58.44       2013 Katie Meili (Columbia)
Pool Record: P  59.64       2012 Katie Meili (Columbia)
 NCAA A Std: A  58.46
 NCAA B Std: B 1:01.84
    Name                    Year School          Seed      Prelims
===========================================================================
Preliminaries
    1 Denisenko, Aleksandra   FR Harvard       1:02.54   1:01.57B
    2 McDonald, Margaux       SO Princeton     1:02.46   1:02.21
    3 Franks, Ava             FR Yale          1:01.47   1:02.32
    4 Estabrook, Grace        SR Penn          1:02.96   1:02.46
    5 Buckley, Marykate       JR Yale          1:01.82   1:02.48
    6 Maizes, Rachel          SR Penn          1:03.79   1:02.50
    7 Pytel, Isabella         FR Penn          1:02.66   1:02.77
    8 Willhite, Kellie        SO Brown         1:03.29   1:02.88
   ---------------------------------------------------------------
    9 Lukawski, Audrey        SR Brown         1:03.58   1:03.27
   10 Walker, Allegra         SO Columbia      1:02.76   1:03.42
   11 Liu, Hannah             FR Penn          1:02.17   1:03.45
   12 Wang, Vivian            SR Princeton     1:02.17   1:03.53
   13 Hu, Ashley              FR Columbia      1:03.18   1:03.60
   14 Boyer, Liz              JR Harvard       1:03.48   1:03.66
   15 Brault, Ellie           FR Brown         1:03.39   1:04.23
   16 Wu, Amy                 SO Cornell       1:06.38   1:05.07
   ---------------------------------------------------------------
   17 Van Steyn, Kenna        SR Dartmouth     1:07.61   1:05.17
   18 Tsai, Sophia            FR Cornell       1:05.99   1:05.20
   19 Chang, Allison          SR Cornell       1:05.13   1:06.04
   20 Zhang, Rachel           FR Dartmouth     1:08.08   1:07.44
   -- xRippon, Caylene        SR Brown              NT   X1:06.14
   -- xOhr, Joelle            SO Cornell       1:09.19   X1:09.36
```

Event 13  Women 100 Yard Backstroke
```
===========================================================================
Meet Record: M 52.34        2019 Bella Hindley (Yale)
Pool Record: P 52.45        2018 Heidi Vanderwel (Yale)
 NCAA A Std: A 50.93
 NCAA B Std: B 53.94
    Name                    Year School       Prelims   Finals Points
===========================================================================
 A - Final
    1 Reznicek, Jenna         FR Brown          52.43     52.94B  32
```

```
    2 Korbly, Isabella          FR Princeton         53.85      53.88B   28
    3 Wagner, Lindsey           SO Yale              54.66      54.36    27
    4 Hamlin, Molly             FR Harvard           54.25      54.38    26
    5 Kannan, Hannah            SR Penn              53.76      54.42    25
    6 Murphy, Quinn             FR Yale              54.72      54.54    24
    7 Pappas, Alexa             FR Princeton         55.04      55.23    23
    8 Bullock, Addie Rose       SO Harvard           55.20      55.30    22
B - Final
    9 Carr, Abigail             FR Harvard           55.42      54.20    20
   10 Matsushima, Sage          JR Brown             55.66      55.60    17
   11 Pruden, Mary              SR Columbia          55.47      55.62    16
   12 Howley, Mary              FR Dartmouth         56.28      55.76    15
   13 Clements, Emily           SO Brown             56.40      56.01    13.5
   13 Waterson, Rebecca         FR Brown             56.22      56.01    13.5
   15 Munoz, Aviva              JR Cornell           56.02      56.45    12
   16 Caverly, Gillian          SR Cornell           56.58      56.92    11
C - Final
   17 Laster, Susannah          JR Dartmouth         57.42      56.31    9
   18 Pujadas, Riley            FR Columbia          56.68      56.47    7
   19 Hamlen, Izzy              FR Dartmouth         56.92      56.76    6
   20 Hailu, Hannah             FR Columbia          57.07      57.05    5
   21 Zhang, Connie             JR Dartmouth         57.60      57.50    4
   22 Sih, Angelica             SO Cornell           57.99      58.07    3
   23 Zwart, Eleanor            JR Dartmouth         57.77      58.15    2
   24 Kramer, Katherine         FR Dartmouth         59.36      58.67    1

Event 13  Women 100 Yard Backstroke
===========================================================================
  Meet Record: M 52.34      2019 Bella Hindley (Yale)
  Pool Record: P 52.45      2018 Heidi Vanderwel (Yale)
   NCAA A Std: A 50.93
   NCAA B Std: B 53.94
    Name                      Year School           Seed       Prelims
===========================================================================
Preliminaries
    1 Reznicek, Jenna           FR Brown             52.94      52.43P
    2 Kannan, Hannah            SR Penn              54.71      53.76B
    3 Korbly, Isabella          FR Princeton         55.45      53.85B
    4 Hamlin, Molly             FR Harvard           54.43      54.25
    5 Wagner, Lindsey           SO Yale              53.58      54.66
    6 Murphy, Quinn             FR Yale              54.64      54.72
    7 Pappas, Alexa             FR Princeton         54.39      55.04
    8 Bullock, Addie Rose       SO Harvard           55.35      55.20
   --------------------------------------------------------------------
    9 Carr, Abigail             FR Harvard           54.65      55.42
   10 Pruden, Mary              SR Columbia          55.68      55.47
   11 Matsushima, Sage          JR Brown             56.67      55.66
   12 Munoz, Aviva              JR Cornell           56.73      56.02
   13 Waterson, Rebecca         FR Brown             56.34      56.22
   14 Howley, Mary              FR Dartmouth         57.52      56.28
   15 Clements, Emily           SO Brown             56.48      56.40
   16 Caverly, Gillian          SR Cornell           56.90      56.58
   --------------------------------------------------------------------
   17 Pujadas, Riley            FR Columbia          56.62      56.68
   18 Hamlen, Izzy              FR Dartmouth         59.52      56.92
   19 Hailu, Hannah             FR Columbia          57.30      57.07
   20 Laster, Susannah          JR Dartmouth         59.81      57.42
   21 Zhang, Connie             JR Dartmouth         59.25      57.60
   22 Zwart, Eleanor            JR Dartmouth         59.22      57.77
   23 Sih, Angelica             SO Cornell           57.09      57.99
   24 Kramer, Katherine         FR Dartmouth       1:00.41      59.36
   --------------------------------------------------------------------
   25 Moon, Zoe                 FR Dartmouth       1:00.77      59.83
   -- xMoore, Sophia            FR Yale              56.13      X56.08
   -- xNewnam, Anna             SR Penn                 NT      X59.62
```

```
Event 14  Women 400 Yard Medley Relay
===============================================================================
Meet Record: M 3:32.72       2020 Harvard
                             F. Pasadyn, J. Yegher, M. Dahlke, K. Quist
Pool Record: P 3:34.22       2018 Yale
                             H. Vanderwel, C. O'Leary, M. Zimmerman, B. Hindley
 NCAA A Std: A 3:31.66
 NCAA B Std: B 3:33.78
    School                                        Seed      Finals Points
===============================================================================
 1 Yale University                               3:37.49   3:36.10   64
    1) Wagner, Lindsey SO                2) Buckley, Marykate JR
    3) Massey, Alexandra FR              4) Henig, Iszac JR
 2 Princeton University                          3:39.60   3:38.63   56
    1) Korbly, Isabella FR               2) McDonald, Margaux SO
    3) Venema, Nikki JR                  4) Bradley, Christina JR
 3 Brown University                              3:43.62   3:41.72   54
    1) Reznicek, Jenna FR                2) Lukawski, Audrey SR
    3) Chidley, Nell JR                  4) Scott, Samantha SO
 4 University of Pennsylvania                    3:40.97   3:41.87   52
    1) Kannan, Hannah SR                 2) Estabrook, Grace SR
    3) Chong, Vanessa FR                 4) Thomas, Lia SR
 5 Columbia University                           3:46.55   3:44.25   50
    1) Ganihanova, Aziza SO              2) Walker, Allegra SO
    3) Wang, Emily SR                    4) Macdonald, Emily FR
 6 Dartmouth College                             3:51.77   3:45.35   48
    1) Howley, Mary FR                   2) Van Steyn, Kenna SR
    3) Leko, Mia JR                      4) Post, Ashley JR
 7 Cornell University                            3:50.79   3:48.25   46
    1) Munoz, Aviva JR                   2) Wu, Amy SO
    3) Gruvberger, Anna SO               4) Wongso, Priscilla SO
-- Harvard University                                    3:40.88 DQ 3:35.82
    Early take-off swimmer #3
    1) Pasadyn, Felicia SR               2) Denisenko, Aleksandra FR
    3) Carr, Abigail FR                  4) Brenner, Mandy FR

Event 15  Women 1650 Yard Freestyle
===============================================================================
Meet Record: M 15:57.34      2009 Alicia Aemisegger (Princeton)
Pool Record: P 15:50.23      1981 Kim Linehan (Longhorn)
 NCAA A Std: A 15:52.41
 NCAA B Std: B 16:30.59
    Name                  Year School        Seed      Finals Points
===============================================================================
 1 Buroker, Catherine     SO Penn         16:23.72   16:21.17B   32
 2 Marquardt, Ellie       SO Princeton    16:34.66   16:28.22B   28
 3 Kalandadze, Anna Sofia JR Penn         16:31.12   16:28.85B   27
 4 Loomis, Ashley         SR Yale              NT    16:36.57   26
 5 Giddings, Grace        SR Penn         16:44.50   16:37.79   25
 6 Girotto, Amelia        FR Penn         17:11.04   16:41.17   24
 7 Barrett, Sara          FR Brown        16:46.54   16:47.86   23
 8 Minnigh, Sarah         JR Dartmouth    17:40.40   16:48.35   22
 9 Jubin, Olivia          JR Columbia          NT    16:49.80   20
10 Appleton, Emily        FR Princeton    16:45.59   16:53.62   17
11 O'Leary, Bridget       JR Penn              NT    16:53.92   16
12 Rose, Carlie           FR Harvard      17:02.13   16:56.05   15
13 Paoletti, Isabella     FR Yale              NT    17:00.65   14
14 Whall, Emma            SR Brown             NT    17:00.83   13
15 Orange, Audrey         JR Brown        17:13.49   17:05.76   12
16 Ruppert-Gomez, Marcella JR Harvard     16:56.38   17:06.04   11
17 Cianciolo, Christina   SO Dartmouth         NT    17:11.28    9
18 Antoniuk, Bella        FR Brown        17:01.85   17:12.66    7
19 Danko, Allie           FR Cornell      17:04.31   17:14.64    6
20 Mannion, Macey         SO Princeton         NT    17:15.62    5
```

```
   21 Takabayashi, Miku          SR Brown                    NT   17:18.05    4
   22 Durak, Anna                SR Princeton                NT   17:40.30    3
   23 Barry, Hayden              FR Dartmouth           18:15.71   17:54.27    2
```

**Event 16  Women 200 Yard Backstroke**

```
===============================================================================
 Meet Record: M 1:52.56     2020 Felicia Pasadyn (Harvard)
 Pool Record: P 1:54.64     2018 Quinn Scannell (Pennsylvania)
  NCAA A Std: A 1:50.50
  NCAA B Std: B 1:57.11
     Name                    Year School          Prelims     Finals Points
===============================================================================
A - Final
   1 Pasadyn, Felicia           SR Harvard           1:55.69    1:53.58P   32
   2 Massey, Alexandra          FR Yale              1:58.02    1:57.39    28
   3 Murphy, Quinn              FR Yale              1:58.09    1:57.42    27
   4 Whitmire, Liza             SO Princeton         1:57.08    1:57.44    26
   5 Kannan, Hannah             SR Penn              1:57.61    1:57.54    25
   6 Korbly, Isabella           FR Princeton         1:57.97    1:57.71    24
   7 Pruden, Mary               SR Columbia          1:58.65    1:59.13    23
   8 Ganihanova, Aziza          SO Columbia          1:58.16    1:59.27    22
B - Final
   9 Hazlett, Kate              SO Harvard           1:58.96    1:57.26    20
  10 Clements, Emily            SO Brown             1:59.50    1:59.25    17
  11 Jones, Raime               JR Yale              2:00.59    1:59.61    16
  12 Bullock, Addie Rose        SO Harvard           1:59.47    1:59.87    15
  13 Cavanagh, Erin             FR Harvard           2:01.03    2:00.40    14
  14 Munoz, Aviva               JR Cornell           2:01.03    2:00.43    13
  15 Chidley, Nell              JR Brown             2:00.02    2:00.65    12
  16 Laster, Susannah           JR Dartmouth         2:01.41    2:00.71    11
C - Final
  17 Waterson, Rebecca          FR Brown             2:02.62    2:01.60     9
  18 Carter, Camryn             JR Penn              2:01.48    2:01.70     7
  19 Howley, Mary               FR Dartmouth         2:02.17    2:01.77     6
  20 Caverly, Gillian           SR Cornell           2:01.79    2:01.79     5
  21 Pujadas, Riley             FR Columbia          2:01.89    2:01.86     4
  22 Hailu, Hannah              FR Columbia          2:02.88    2:02.49     3
  23 Williams, Marie            SO Cornell           2:01.74    2:02.70     2
  24 Sutter, Olivia             SO Cornell           2:03.55    2:03.19     1
```

**Event 16  Women 200 Yard Backstroke**

```
===============================================================================
 Meet Record: M 1:52.56     2020 Felicia Pasadyn (Harvard)
 Pool Record: P 1:54.64     2018 Quinn Scannell (Pennsylvania)
  NCAA A Std: A 1:50.50
  NCAA B Std: B 1:57.11
     Name                    Year School            Seed     Prelims
===============================================================================
Preliminaries
   1 Pasadyn, Felicia           SR Harvard           1:54.97    1:55.69B
   2 Whitmire, Liza             SO Princeton         1:58.40    1:57.08B
   3 Kannan, Hannah             SR Penn              1:59.69    1:57.61
   4 Korbly, Isabella           FR Princeton         1:59.43    1:57.97
   5 Massey, Alexandra          FR Yale              1:57.32    1:58.02
   6 Murphy, Quinn              FR Yale              1:58.18    1:58.09
   7 Ganihanova, Aziza          SO Columbia          1:58.23    1:58.16
   8 Pruden, Mary               SR Columbia          1:59.28    1:58.65
  -----------------------------------------------------------------------
   9 Hazlett, Kate              SO Harvard           1:57.75    1:58.96
  10 Bullock, Addie Rose        SO Harvard           2:03.08    1:59.47
  11 Clements, Emily            SO Brown             1:58.89    1:59.50
  12 Chidley, Nell              JR Brown             2:01.77    2:00.02
  13 Jones, Raime               JR Yale              2:00.71    2:00.59
  14 Cavanagh, Erin             FR Harvard           1:58.23    2:01.03
  14 Munoz, Aviva               JR Cornell           2:02.97    2:01.03
```

```
 16 Laster, Susannah        JR Dartmouth       2:07.95    2:01.41
----------------------------------------------------------------
 17 Carter, Camryn          JR Penn            2:02.91    2:01.48
 18 Williams, Marie         SO Cornell         2:01.13    2:01.74
 19 Caverly, Gillian        SR Cornell         2:02.86    2:01.79
 20 Pujadas, Riley          FR Columbia        2:02.66    2:01.89
 21 Howley, Mary            FR Dartmouth       2:05.64    2:02.17
 22 Waterson, Rebecca       FR Brown           2:03.77    2:02.62
 23 Hailu, Hannah           FR Columbia        2:02.60    2:02.88
 24 Sutter, Olivia          SO Cornell         2:04.31    2:03.55
----------------------------------------------------------------
 25 Hamlen, Izzy            FR Dartmouth       2:09.31    2:03.99
 26 DuPont, Schuyler        FR Cornell         2:04.95    2:05.82
----------------------------------------------------------------
 27 Zhang, Connie           JR Dartmouth       2:13.04    2:06.30
 28 Moon, Zoe               FR Dartmouth       2:09.79    2:06.32
 29 Sih, Angelica           SO Cornell         2:03.48    2:06.54
 30 Kramer, Katherine       FR Dartmouth       2:09.68    2:06.72
 31 Zwart, Eleanor          JR Dartmouth       2:10.17    2:08.09
 -- xMoore, Sophia          FR Yale            2:02.21   X2:03.48
 -- xHeilbrun, Maddie       SR Harvard         2:05.86   X2:05.15
 -- Reznicek, Jenna         FR Brown           1:58.63 DQ 2:04.77
      False start
```

**Event 17  Women 100 Yard Freestyle**

```
================================================================
 Meet Record: M 47.85      2019 Bella Hindley (Yale)
 Pool Record: P 48.64      2018 Miki Dahlke (Harvard)
   NCAA A Std: A 47.18
   NCAA B Std: B 49.51
     Name                  Year School        Prelims    Finals Points
================================================================
A - Final
  1 Thomas, Lia            SR Penn            48.71      47.63M   32
  2 Henig, Iszac           JR Yale            47.80      47.82M   28
  3 Venema, Nikki          JR Princeton       49.66      48.81B   27
  4 Hamlin, Molly          FR Harvard         49.52      49.38B   26
  5 Pilkinton, Ophelia     SO Yale            49.94      49.67    25
  6 Kaczorowski, Margot    JR Penn            50.06      49.86    24
  7 Wagner, Lindsey        SO Yale            49.85      49.89    23
  8 Post, Ashley           JR Dartmouth       50.12      50.42    22
B - Final
  9 Shelton, Samantha      JR Harvard         50.15      50.25    20
 10 Bradley, Christina     JR Princeton       50.59      50.26    17
 11 Weng, Vivian           FR Yale            50.66      50.28    16
 12 Parker, Melissa        JR Cornell         50.37      50.41    15
 13 Macdonald, Emily       FR Columbia        50.65      50.54    14
 14 Liu, Amelia            JR Princeton       50.41      50.61    13
 15 Scott, Samantha        SO Brown           50.52      50.85    12
 16 Podurgiel, Anna        FR Brown           50.82      50.97    11
C - Final
 17 Arevalo, Isabelle      JR Columbia        50.86      50.56     9
 18 Wongso, Priscilla      SO Cornell         51.02      50.66     7
 19 Brenner, Mandy         FR Harvard         51.02      50.68     6
 20 Moesch, Marlise        SR Yale            51.14      50.81     5
 21 Wortzman, Zoe          JR Dartmouth       50.90      50.94     4
 22 Secrest, Jennifer      JR Princeton       51.17      51.23     3
 23 Breiter, Callie        SO Columbia        51.48      51.72     2
 24 Healy, Marissa         SO Yale            51.83      51.98     1
```

**Event 17  Women 100 Yard Freestyle**

```
================================================================
 Meet Record: M 47.85      2019 Bella Hindley (Yale)
 Pool Record: P 48.64      2018 Miki Dahlke (Harvard)
   NCAA A Std: A 47.18
```

Univ. Case 0104

4/20/22, 12:08 PM

```
    NCAA B Std: B 49.51
    Name                      Year School              Seed    Prelims
================================================================================
Preliminaries
  1 Henig, Iszac             JR Yale                 48.03    47.80M
  2 Thomas, Lia              SR Penn                 49.42    48.71B
  3 Hamlin, Molly            FR Harvard              50.97    49.52
  4 Venema, Nikki            JR Princeton            49.67    49.66
  5 Wagner, Lindsey          SO Yale                    NT    49.85
  6 Pilkinton, Ophelia       SO Yale                 49.88    49.94
  7 Kaczorowski, Margot      JR Penn                 50.11    50.06
  8 Post, Ashley             JR Dartmouth            51.40    50.12
  --------------------------------------------------------------------
  9 Shelton, Samantha        JR Harvard              50.95    50.15
 10 Parker, Melissa          JR Cornell              50.82    50.37
 11 Liu, Amelia              JR Princeton            50.11    50.41
 12 Scott, Samantha          SO Brown                51.40    50.52
 13 Bradley, Christina       JR Princeton            49.91    50.59
 14 Macdonald, Emily         FR Columbia             50.60    50.65
 15 Weng, Vivian             FR Yale                 51.03    50.66
 16 Podurgiel, Anna          FR Brown                51.43    50.82
  --------------------------------------------------------------------
 17 Arevalo, Isabelle        JR Columbia             51.04    50.86
 18 Wortzman, Zoe            JR Dartmouth            52.61    50.90
 19 Brenner, Mandy           FR Harvard              50.91    51.02
 19 Wongso, Priscilla        SO Cornell              50.80    51.02
 21 Moesch, Marlise          SR Yale                 51.01    51.14
 22 Secrest, Jennifer        JR Princeton            51.92    51.17
 23 Breiter, Callie          SO Columbia             52.62    51.48
 24 Healy, Marissa           SO Yale                 52.29    51.83
  --------------------------------------------------------------------
 25 Gruvberger, Anna         SO Cornell              51.65    51.88
 26 Larsen, Clare            SR Columbia             51.35    51.91
  --------------------------------------------------------------------
 27 Young, Georgia           SO Columbia             51.62    51.94
 28 Bilgin, Zehra            FR Brown                52.15    52.19
 28 Wang, Emily              SR Columbia             51.64    52.19
 30 Baldari, Alessandra      SR Yale                 51.16    52.47
 31 Tsai, Sophia             FR Cornell              52.30    52.69
 32 Zhang, Tori              FR Cornell              52.22    52.98
 33 Wiener, Sophie           FR Dartmouth            53.92    53.00
 -- xLe, Tina                JR Columbia             51.48   X51.67
 -- xOhr, Joelle             SO Cornell              52.59   X52.54
```

**Event 18  Women 200 Yard Breaststroke**

```
  Meet Record: M 2:08.47      2020 Jaycee Yegher (Harvard)
  Pool Record: P 2:09.37      2010 Susan Kim (Yale)
  NCAA A Std: A 2:06.58
  NCAA B Std: B 2:13.97
    Name                      Year School             Prelims   Finals Points
================================================================================
A - Final
  1 Denisenko, Aleksandra    FR Harvard              2:13.78   2:11.93B  32
  2 Franks, Ava              FR Yale                 2:15.73   2:12.79B  28
  3 McDonald, Margaux        SO Princeton            2:16.38   2:14.88   27
  4 Pytel, Isabella          FR Penn                 2:16.70   2:15.11   26
  5 Thompson, Mikki          SR Harvard              2:14.56   2:15.46   25
  6 Lukawski, Audrey         SR Brown                2:16.15   2:15.82   24
  7 Paoletti, Olivia         JR Yale                 2:16.47   2:15.87   23
  8 Boeckman, Anna           FR Penn                 2:16.38   2:16.12   22
B - Final
  9 Estabrook, Grace         SR Penn                 2:17.24   2:16.02   20
 10 Brault, Ellie            FR Brown                2:17.37   2:16.50   17
 11 Buckley, Maggie          FR Harvard              2:17.33   2:17.33   16
```

MilliporeSigma 0105

4/20/22, 12:08 PM

```
 12 Buckley, Marykate        JR Yale          2:17.10   2:17.82  15
 13 Liu, Hannah              FR Penn          2:17.78   2:17.99  14
 14 Maizes, Rachel           SR Penn          2:18.33   2:18.20  13
 15 Walker, Allegra          SO Columbia      2:18.04   2:18.56  12
 16 Wang, Vivian             SR Princeton     2:19.92   2:20.22  11
C - Final
 17 Chang, Allison           SR Cornell       2:21.65   2:19.28   9
 18 Hu, Ashley               FR Columbia      2:20.23   2:20.06   7
 19 Willhite, Kellie         SO Brown         2:19.97   2:20.35   6
 20 Unas, Julia              FR Columbia      2:24.40   2:22.51   5
 21 Wu, Amy                  SO Cornell       2:25.05   2:23.22   4
 22 Van Steyn, Kenna         SR Dartmouth     2:25.10   2:24.01   3
 23 Petersen, Amanda         FR Cornell       2:23.09   2:24.94   2
 24 Parker, Bridget          SO Dartmouth     2:26.36   2:25.27   1
```

**Event 18  Women 200 Yard Breaststroke**

```
===============================================================================
 Meet Record: M 2:08.47       2020 Jaycee Yegher (Harvard)
 Pool Record: P 2:09.37       2010 Susan Kim (Yale)
   NCAA A Std: A 2:06.58
   NCAA B Std: B 2:13.97
    Name                     Year School           Seed    Prelims
===============================================================================
Preliminaries
  1 Denisenko, Aleksandra    FR Harvard         2:14.31   2:13.78B
  2 Thompson, Mikki          SR Harvard         2:22.35   2:14.56
  3 Franks, Ava              FR Yale            2:12.56   2:15.73
  4 Lukawski, Audrey         SR Brown           2:17.36   2:16.15
  5 Boeckman, Anna           FR Penn            2:18.42   2:16.38
  5 McDonald, Margaux        SO Princeton       2:16.52   2:16.38
  7 Paoletti, Olivia         JR Yale            2:17.02   2:16.47
  8 Pytel, Isabella          FR Penn            2:16.75   2:16.70
  -------------------------------------------------------------------
  9 Buckley, Marykate        JR Yale            2:16.23   2:17.10
 10 Estabrook, Grace         SR Penn            2:18.16   2:17.24
 11 Buckley, Maggie          FR Harvard         2:18.43   2:17.33
 12 Brault, Ellie            FR Brown           2:18.85   2:17.37
 13 Liu, Hannah              FR Penn            2:17.47   2:17.78
 14 Walker, Allegra          SO Columbia        2:17.96   2:18.04
 15 Maizes, Rachel           SR Penn            2:25.73   2:18.33
 16 Wang, Vivian             SR Princeton       2:18.75   2:19.92
  -------------------------------------------------------------------
 17 Willhite, Kellie         SO Brown           2:18.04   2:19.97
 18 Hu, Ashley               FR Columbia        2:17.92   2:20.23
 19 Chang, Allison           SR Cornell         2:17.32   2:21.65
 20 Petersen, Amanda         FR Cornell         2:23.58   2:23.09
 21 Unas, Julia              FR Columbia        2:23.92   2:24.40
 22 Wu, Amy                  SO Cornell         2:23.70   2:25.05
 23 Van Steyn, Kenna         SR Dartmouth       2:29.43   2:25.10
 24 Parker, Bridget          SO Dartmouth       2:35.39   2:26.36
  -------------------------------------------------------------------
 25 Zhang, Rachel            FR Dartmouth       2:27.46   2:26.97
 -- xMoore, Sophia           FR Yale            2:26.76   X2:21.87
```

**Event 19  Women 200 Yard Butterfly**

```
===============================================================================
 Meet Record: M 1:54.60       2013 Alex Forrester (Yale)
 Pool Record: P 1:52.99       1981 Mary T. Meagher (Lakeside)
   NCAA A Std: A 1:53.20
   NCAA B Std: B 1:59.23
    Name                     Year School        Prelims   Finals Points
===============================================================================
A - Final
  1 Carr, Abigail            FR Harvard         1:58.08   1:57.26B  32
  2 Chong, Vanessa           FR Penn            2:00.03   1:58.17B  28
```

4/20/22, 12:08 PM

```
   3 Massey, Alexandra        FR Yale         2:00.32   1:58.72B  27
   4 Yeager, Jess             SO Princeton    1:59.19   1:58.75B  26
   5 Chidley, Nell            JR Brown        1:59.97   1:59.63   25
   6 Leko, Mia                JR Dartmouth    1:57.65   1:59.70   24
   7 Kim, Junseo              FR Yale         2:00.45   1:59.92   23
   8 Yoon, Grace              FR Harvard      2:00.54   2:01.13   22
B - Final
   9 Martin, Allison          FR Columbia     2:01.75   2:00.17   20
  10 Jiang, Joy               FR Penn         2:01.08   2:00.99   17
  11 Bilgin, Zehra            FR Brown        2:00.90   2:01.84   16
  12 Myers, Andie             SR Penn         2:01.48   2:02.00   15
  13 Peng, Jessica            JR Columbia     2:02.58   2:02.35   14
  14 Pappas, Alexa            FR Princeton    2:03.96   2:02.53   13
  15 Boyer, Liz               JR Harvard      2:02.62   2:03.05   12
  16 Whall, Emma              SR Brown        2:03.56   2:06.71   11
C - Final
  17 Wong, Anthea             FR Columbia     2:04.81   2:03.47    9
  18 Iorini, Maria            SO Brown        2:04.31   2:04.14    7
  19 Chen, Jaime              FR Princeton    2:06.49   2:06.69    6
  20 DuPont, Schuyler         FR Cornell      2:08.95   2:06.99    5
  21 Syrkin, Alex             FR Cornell      2:10.29   2:08.24    4
```

**Event 19  Women 200 Yard Butterfly**
```
===========================================================================
 Meet Record: M 1:54.60       2013 Alex Forrester (Yale)
 Pool Record: P 1:52.99       1981 Mary T. Meagher (Lakeside)
   NCAA A Std: A 1:53.20
   NCAA B Std: B 1:59.23
     Name                    Year School           Seed    Prelims
===========================================================================
Preliminaries
   1 Leko, Mia                JR Dartmouth    2:00.23   1:57.65B
   2 Carr, Abigail            FR Harvard      1:58.61   1:58.08B
   3 Yeager, Jess             SO Princeton    1:57.83   1:59.19B
   4 Chidley, Nell            JR Brown        1:59.35   1:59.97
   5 Chong, Vanessa           FR Penn         2:00.14   2:00.03
   6 Massey, Alexandra        FR Yale         1:57.51   2:00.32
   7 Kim, Junseo              FR Yale         2:01.27   2:00.45
   8 Yoon, Grace              FR Harvard      2:03.17   2:00.54
  -----------------------------------------------------------------
   9 Bilgin, Zehra            FR Brown        2:01.71   2:00.90
  10 Jiang, Joy               FR Penn         2:00.79   2:01.08
  11 Myers, Andie             SR Penn         2:04.21   2:01.48
  12 Martin, Allison          FR Columbia     2:01.42   2:01.75
  13 Peng, Jessica            JR Columbia     2:02.04   2:02.58
  14 Boyer, Liz               JR Harvard      2:02.01   2:02.62
  15 Whall, Emma              SR Brown        2:03.48   2:03.56
  16 Pappas, Alexa            FR Princeton    2:03.27   2:03.96
  -----------------------------------------------------------------
  17 Iorini, Maria            SO Brown        2:04.46   2:04.31
  18 Wong, Anthea             FR Columbia     2:03.66   2:04.81
  19 Chen, Jaime              FR Princeton    2:02.10   2:06.49
  20 DuPont, Schuyler         FR Cornell      2:06.37   2:08.95
  21 Syrkin, Alex             FR Cornell      2:07.54   2:10.29
  -- xRippon, Caylene         SR Brown        2:04.89   X2:05.32
```

**Event 20  Women 3 mtr Diving**
```
===========================================================================
 Meet Record: M 360.55        2015 Caitlin Chambers (Princeton)
 Pool Record: P 360.55        2015 Caitlin Chambers (Princeton)
   NCAA A Std: A 280.00
     Name                    Year School        Prelims   Finals Points
===========================================================================
A - Final
   1 Miclau, Elizabeth        SO Harvard       261.45    315.20A  32
```

Swim2 27206 0107

4/20/22, 12:08 PM

```
  2 Milne, Georgi            SR Harvard           310.35   311.20A   28
  3 Lawrence, Esther         SR Harvard           292.95   302.90A   27
  4 Edvalson, Remi           FR Harvard           277.75   292.05A   26
  5 Williams, Demetra        SR Cornell           271.35   281.30A   25
  6 Jendritz, Elise          JR Cornell           282.90   276.10    24
  7 Laverty, Katie           FR Harvard           264.05   274.30    23
  8 Geier, Evie              JR Harvard           300.10   274.15    22
B - Final
  9 Herculano, Morgane       SR Harvard           253.65   304.45A   20
 10 Shao, Stephanie          FR Yale              248.10   278.65    17
 11 Henderson, Hayden        FR Yale              254.45   276.15    16
 12 Wotovich, Amy            FR Harvard           257.40   274.80    15
 13 Seltzer, Maddie          FR Princeton         253.75   274.65    14
 14 Francella, Olivia        JR Penn              246.50   263.70    13
 15 Rosendalh, Brighida      SR Columbia          243.70   247.95    12
 16 Brinker, Alexa           FR Brown             228.90   209.40    11
```

Event 20  Women 3 mtr Diving
```
===============================================================================
Meet Record: M 360.55        2015 Caitlin Chambers (Princeton)
Pool Record: P 360.55        2015 Caitlin Chambers (Princeton)
  NCAA A Std: A 280.00
    Name                    Year School            Seed      Prelims
===============================================================================
Preliminaries
  1 Milne, Georgi            SR Harvard           303.68   310.35A
  2 Geier, Evie              JR Harvard           291.90   300.10A
  3 Lawrence, Esther         SR Harvard           330.65   292.95A
  4 Jendritz, Elise          JR Cornell           321.08   282.90A
  5 Edvalson, Remi           FR Harvard           290.78   277.75
  6 Williams, Demetra        SR Cornell           312.00   271.35
  7 Laverty, Katie           FR Harvard           300.50   264.05
  8 Miclau, Elizabeth        SO Harvard           317.63   261.45
  9 Wotovich, Amy            FR Harvard           321.53   257.40
 10 Henderson, Hayden        FR Yale              323.55   254.45
 11 Seltzer, Maddie          FR Princeton         291.15   253.75
 12 Herculano, Morgane       SR Harvard           295.80   253.65
 13 Shao, Stephanie          FR Yale              268.80   248.10
 14 Francella, Olivia        JR Penn              275.10   246.50
 15 Rosendalh, Brighida      SR Columbia          293.55   243.70
 16 Brinker, Alexa           FR Brown             275.40   228.90
 17 Thibodeau, Genevieve     FR Yale              260.03   228.70
 18 Jin, Laurel              FR Yale              277.75   227.55
 19 Johnsson-Stjernstrom, Ha SO Princeton         246.23   226.60
 20 Singh, Ishani            SO Yale              256.43   224.95
 21 Ennis, Maya              FR Yale              266.78   220.80
 22 Mitchell, Liv            SR Brown             304.00   220.25
 23 Parker, Madeleine        FR Penn              244.80   218.95
 24 Feord, Julia             JR Brown             306.45   217.35
 25 Diakova, Alice           SO Columbia          292.73   215.15
 26 Lichen, Isabella         JR Dartmouth         259.65   213.20
 27 Lee, Michelle            SR Columbia          257.33   210.35
 28 Chin, Audrey             SO Harvard           245.70   195.80
 29 Stein, Samantha          SO Penn              221.20   189.25
 30 Palacios, Alyssa         FR Dartmouth         298.15   185.90
```

Event 21  Women 400 Yard Freestyle Relay
```
===============================================================================
Meet Record: M 3:14.48       2020 Harvard
                       F. Pasadyn, K. Quist, S. Shelton, M. Dahlke
Pool Record: P 3:18.25        2015 Princeton
                       C. McIlmail, N. Larson, E. McDonald, M. Veith
  NCAA A Std: A 3:14.50
  NCAA B Std: B 3:16.35
    School                                       Seed    Finals Points
```

ivies 0108

4/20/22, 12:08 PM

```
================================================================================
 1 University of Pennsylvania                  3:22.50   3:17.80P 64
    1) Thomas, Lia SR              2) Kaczorowski, Margot JR
    3) Kannan, Hannah SR           4) Carter, Camryn JR
 2 Harvard University                           3:19.40   3:19.17   56
    1) Pasadyn, Felicia SR         2) Shelton, Samantha JR
    3) Denisenko, Aleksandra FR    4) Hamlin, Molly FR
 3 Yale University                              3:17.61   3:19.71   54
    1) Pilkinton, Ophelia SO       2) Wagner, Lindsey SO
    3) Weng, Vivian FR             4) Franks, Ava FR
 4 Princeton University                         3:20.87   3:21.66   52
    1) Bradley, Christina JR       2) Liu, Amelia JR
    3) Marquardt, Ellie SO         4) Secrest, Jennifer JR
 5 Columbia University                          3:23.69   3:22.44   50
    1) Macdonald, Emily FR         2) Jubin, Olivia JR
    3) Ganihanova, Aziza SO        4) Arevalo, Isabelle JR
 6 Dartmouth College                            3:29.56   3:24.03   48
    1) Post, Ashley JR             2) Leko, Mia JR
    3) Howley, Mary FR             4) Wortzman, Zoe JR
 7 Cornell University                           3:24.49   3:24.40   46
    1) Wongso, Priscilla SO        2) Gruvberger, Anna SO
    3) Tsai, Sophia FR             4) Parker, Melissa JR
 8 Brown University                             3:26.68   3:25.40   44
    1) Podurgiel, Anna FR          2) Scott, Samantha SO
    3) Reznicek, Jenna FR          4) Orange, Audrey JR

            Women - Team Rankings - Through Event 21

 1. Harvard University         1503.5  2. Yale University           1258
 3. University of Pennsylvania  1256  4. Princeton University       1074
 5. Brown University            904   6. Columbia University       706.5
 7. Dartmouth College           563   8. Cornell University         508
```

Ohio 27208 0109

2022 NCAA Division I Women's Swimming &
Diving Championship Results (500 Yard
Freestyle)
March 16-19, 2022
Available at: https://swimmeetresults.tech/NCAA-
Division-I-Women-2022/220316F003.htm
[permalink:  https://perma.cc/JUD4-N2W6]
(last visited: April 20, 2022)

4/20/22, 12:13 PM

Refresh

Print Result

```
NCAA Division I Championship Meet
                2022 NCAA Division I Women's
                Swimming & Diving Championships

 Event 3  Women 500 Yard Freestyle
========================================================================
        NCAA: N 4:24.06  3/16/2017 Katie Ledecky, Stanford
        Meet: M 4:24.06  3/16/2017 Katie Ledecky, Stanford
    American: A 4:24.06  3/16/2017 Katie Ledecky, Stanford
     US Open: O 4:24.06  3/16/2017 Katie Ledecky, Stanford
        Pool: P 4:30.81  3/17/2016 Leah Smith, Virginia
    Name                    Year School        Prelims      Finals Points
========================================================================
                      === Championship Final ===

  1 Thomas, Lia             5Y Penn            4:33.82    4:33.24    20
    r:+0.76  25.25      52.80 (27.55)
        1:20.59 (27.79)     1:48.43 (27.84)
        2:16.24 (27.81)     2:44.12 (27.88)
        3:11.80 (27.68)     3:39.29 (27.49)
        4:06.74 (27.45)     4:33.24 (26.50)
  2 Weyant, Emma            FR Virginia        4:37.25    4:34.99    17
    r:+0.73  25.59      53.04 (27.45)
        1:20.91 (27.87)     1:48.66 (27.75)
        2:16.33 (27.67)     2:44.17 (27.84)
        3:11.98 (27.81)     3:39.90 (27.92)
        4:07.73 (27.83)     4:34.99 (27.26)
  3 Sullivan, Erica         FR Texas           4:36.79    4:35.92    16
    r:+0.66  25.34      52.62 (27.28)
        1:20.30 (27.68)     1:48.25 (27.95)
        2:16.22 (27.97)     2:44.41 (28.19)
        3:12.74 (28.33)     3:40.98 (28.24)
        4:08.96 (27.98)     4:35.92 (26.96)
  4 Forde, Brooke           5Y Stanford        4:38.19    4:36.18    15
    r:+0.65  25.89      53.30 (27.41)
        1:21.09 (27.79)     1:48.85 (27.76)
        2:16.71 (27.86)     2:44.59 (27.88)
        3:12.43 (27.84)     3:40.16 (27.73)
        4:08.35 (28.19)     4:36.18 (27.83)
  5 Pfeifer, Evie           5Y Texas           4:37.39    4:37.29    14
    r:+0.78  25.85      53.27 (27.42)
        1:21.03 (27.76)     1:49.08 (28.05)
        2:17.27 (28.19)     2:45.23 (27.96)
        3:13.27 (28.04)     3:41.58 (28.31)
        4:09.87 (28.29)     4:37.29 (27.42)
  6 McKenna, Paige          FR Wisconsin       4:37.36    4:37.35    13
    r:+0.73  25.47      52.97 (27.50)
        1:21.03 (28.06)     1:49.02 (27.99)
        2:17.09 (28.07)     2:45.09 (28.00)
        3:13.17 (28.08)     3:41.40 (28.23)
        4:09.65 (28.25)     4:37.35 (27.70)
  7 McMahon, Kensey         SR Alabama         4:38.76    4:40.06    12
    r:+0.73  25.96      53.81 (27.85)
        1:21.43 (27.62)     1:49.54 (28.11)
        2:17.97 (28.43)     2:46.43 (28.46)
        3:15.11 (28.68)     3:43.92 (28.81)
        4:12.58 (28.66)     4:40.06 (27.48)
  8 Tankersley, Morgan      SR Stanford        4:38.65    4:40.08    11
    r:+0.70  26.03      53.96 (27.93)
        1:22.08 (28.12)     1:50.49 (28.41)
```

```
              2:18.81 (28.32)      2:47.05 (28.24)
              3:15.09 (28.04)      3:43.21 (28.12)
              4:11.84 (28.63)      4:40.08 (28.24)


                    === Consolation Final ===


    9 Mrozinski, Julia       FR Tennessee        4:39.60   4:37.35    9
      r:+0.66  25.29         53.45 (28.16)
              1:21.82 (28.37)      1:50.33 (28.51)
              2:18.72 (28.39)      2:47.24 (28.52)
              3:15.51 (28.27)      3:43.55 (28.04)
              4:11.10 (27.55)      4:37.35 (26.25)
   10 Mull, Lola             SO Northwestern     4:40.70   4:38.37    7
      r:+0.69  26.09         54.01 (27.92)
              1:22.23 (28.22)      1:50.73 (28.50)
              2:19.25 (28.52)      2:47.94 (28.69)
              3:16.04 (28.10)      3:44.23 (28.19)
              4:11.78 (27.55)      4:38.37 (26.59)
   11 Mathieu, Tylor         JR Florida          4:39.07   4:38.62    6
      r:+0.75  26.15         54.25 (28.10)
              1:22.72 (28.47)      1:51.21 (28.49)
              2:19.74 (28.53)      2:47.99 (28.25)
              3:16.05 (28.06)      3:44.24 (28.19)
              4:11.97 (27.73)      4:38.62 (26.65)
   12 Coetzee, Dune          FR Georgia          4:40.24   4:38.78    5
      r:+0.73  25.67         53.62 (27.95)
              1:21.89 (28.27)      1:50.22 (28.33)
              2:18.69 (28.47)      2:46.91 (28.22)
              3:15.44 (28.53)      3:43.85 (28.41)
              4:11.72 (27.87)      4:38.78 (27.06)
   13 Laning, Erica          5Y ASU              4:40.70   4:38.90    4
      r:+0.73  25.84         53.34 (27.50)
              1:21.33 (27.99)      1:49.54 (28.21)
              2:17.98 (28.44)      2:46.43 (28.45)
              3:15.17 (28.74)      3:43.78 (28.61)
              4:11.97 (28.19)      4:38.90 (26.93)
   14 Nordin, Emma           5Y ASU              4:40.78   4:39.17    3
      r:+0.70  26.13         54.06 (27.93)
              1:22.28 (28.22)      1:50.59 (28.31)
              2:19.03 (28.44)      2:47.49 (28.46)
              3:15.48 (27.99)      3:43.36 (27.88)
              4:11.43 (28.07)      4:39.17 (27.74)
   15 Donohoe, Madelyn       JR Virginia         4:39.61   4:40.49    2
      r:+0.64  26.23         54.37 (28.14)
              1:22.71 (28.34)      1:51.21 (28.50)
              2:19.69 (28.48)      2:48.10 (28.41)
              3:16.44 (28.34)      3:45.16 (28.72)
              4:13.24 (28.08)      4:40.49 (27.25)
   16 McCulloh, Abigail      FR Georgia          4:40.58   4:41.17    1
      r:+0.67  26.20         54.57 (28.37)
              1:22.97 (28.40)      1:51.44 (28.47)
              2:20.06 (28.62)      2:48.68 (28.62)
              3:17.22 (28.54)      3:45.78 (28.56)
              4:14.02 (28.24)      4:41.17 (27.15)
```

## Women - Team Rankings - Through Event 3

| | | | |
|---|---|---|---|
| 1. Virginia | 93 | 2. Texas | 88 |
| 3. Stanford | 80 | 4. California | 56 |
| 5. Alabama | 50 | 6. Louisville | 46 |
| 7. NC State | 44 | 8. Tennessee | 43 |
| 9. Georgia | 40 | 10. Ohio St | 38 |
| 11. Florida | 32 | 12. Wisconsin | 27 |
| 13. Michigan | 26 | 14. Penn | 20 |
| 15. Arizona St | 19 | 16. Southern California | 18 |

Anixter 0112

| 16. Kentucky      | 18 | 18. Northwestern | 15 |
|-------------------|----|------------------|----|
| 19. UNC           | 10 | 20. Indiana      | 8  |
| 21. Virginia Tech | 2  | 21. Arizona      | 2  |

Case 0113

2022 NCAA Division I Women's Swimming &
Diving Championship Results (100 Yard
Freestyle)
March 16-19, 2022
Available at: https://swimmeetresults.tech/NCAA-
Division-I-Women-2022/220316F017.htm
[permalink: https://perma.cc/88Q9-4C5L]
(last visited: April 20, 2022)

Appendix 273 0114

4/20/22, 12:14 PM

Refresh

Print Result

NCAA Division I Championship Meet
                    2022 NCAA Division I Women's
                    Swimming & Diving Championships

Event 17  Women 100 Yard Freestyle
====================================================================
        NCAA: N 45.56  3/18/2017 Simone Manuel, Stanford
        Meet: M 45.56  3/17/2017 Simone Manuel, Stanford
    American: A 45.56  3/18/2017 Simone Manuel, Stanford
    US Open: O 45.56  3/18/2017 Simone Manuel, Stanford
        Pool: P 46.05  3/19/2022 Gretchen Walsh, Virginia
    Name                  Year School         Prelims     Finals Points
====================================================================
                    === Championship Final ===

 1 Walsh, Gretchen       FR Virginia         46.78    46.05P  20
   r:+0.75  22.10        46.05 (23.95)
 2 Scott, Morgan         SR Alabama          47.27    46.78   17
   r:+0.65  22.08        46.78 (24.70)
 3 Berkoff, Katharine    JR NCSU             46.89    46.95   16
   r:+0.67  22.41        46.95 (24.54)
 4 Dupre, Cora           JR Alabama          47.51    47.08   15
   r:+0.60  22.54        47.08 (24.54)
 5 Henig, Iszac          JR Yale             47.55    47.32   13.5
   r:+0.60  22.65        47.32 (24.67)
 5 Albiero, Gabi         SO Louisville       47.45    47.32   13.5
   r:+0.60  22.90        47.32 (24.42)
 7 Countie, Grace        SR UNC              47.50    47.36   12
   r:+0.73  22.67        47.36 (24.69)
 8 Thomas, Lia           5Y Penn             47.37    48.18   11
   r:+0.73  23.19        48.18 (24.99)

                    === Consolation Final ===

 9 Huske, Torri          FR Stanford         48.12    46.98    9
   r:+0.60  22.32        46.98 (24.66)
10 MacNeil, Maggie       SR Michigan         47.77    47.42    7
   r:+0.63  22.65        47.42 (24.77)
11 Flynn, Lindsay        FR Michigan         47.94    47.67    6
   r:+0.66  22.88        47.67 (24.79)
12 Alons, Kylee          SR NCSU             48.02    47.68    5
   r:+0.64  22.77        47.68 (24.91)
13 Ivey, Isabel          SR California       47.61    47.71    4
   r:+0.70  22.76        47.71 (24.95)
14 Zenick, Katherine     SO Ohio St          47.91    47.85    3
   r:+0.61  22.88        47.85 (24.97)
15 Antoniou, Kalia       SR Alabama          47.84    47.93    2
   r:+0.67  23.16        47.93 (24.77)
16 Bates, Talia          JR Florida          48.14    47.95    1
   r:+0.70  23.13        47.95 (24.82)

              Women - Team Rankings - Through Event 17

  1. Virginia            433.5   2. Stanford             327
  3. Texas               292     4. Alabama              243
  5. NC State            233     6. California           155
  7. Louisville          153.5   8. Ohio St              143
  9. Michigan            139    10. Tennessee            118
 11. UNC                 103    12. Florida               91
 13. Southern California  89    14. Wisconsin             86

| | | | |
|---|---|---|---|
| 15. Georgia | 85.5 | 16. Kentucky | 82.5 |
| 17. Indiana | 82 | 18. Northwestern | 68 |
| 19. Penn | 44.5 | 20. Minnesota | 43 |
| 21. Miami (Florida) | 41.5 | 22. Arizona | 35.5 |
| 23. Virginia Tech | 31 | 24. Duke | 27 |
| 25. Missouri | 25 | 26. Arizona St | 22 |
| 27. Yale | 14.5 | 28. Arkansas | 11 |
| 29. South Carolina | 9 | 30. Rutgers | 6 |
| 30. Notre Dame | 6 | 32. UCLA | 4 |
| 32. Lsu | 4 | 34. Wyoming | 2 |
| 34. San Diego St | 2 | 34. Harvard | 2 |
| 37. Texas A&M | 1 | | |

## IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA
## CHARLESTON DIVISION

B.P.J., by her next friend and mother, HEATHER JACKSON,

<em>Plaintiff,</em>

vs.

WEST VIRGINIA STATE BOARD OF EDUCATION; HARRISON COUNTY BOARD OF EDUCATION; WEST VIRGINIA SECONDARY SCHOOLS ACTIVITIES COMMISSION; W. CLAYTON BURCH, in his official capacity as State Superintendent, DORA STUTLER, in her official capacity as the Harrison County Superintendent, and the STATE OF WEST VIRGINIA,

<em>Defendants,</em>

and

LAINEY ARMISTEAD,

<em>Defendant-Intervenor.</em>

Case No. 2:21-cv-00316

Hon. Joseph R. Goodwin

### DECLARATION OF GREGORY A. BROWN, PH.D., FACSM

I, Dr. Gregory A. Brown, pursuant to 28 U.S. Code § 1746, declare under penalty of perjury under the laws of the United States of America that the facts contained in my Expert Declaration of Gregory A. Brown, Ph.D., FACSM in the Case of B.P.J. v. West Virginia State Board of Education, attached hereto, are true and correct to the best of my knowledge and belief, and that the opinions expressed therein represent my own expert opinions.

Executed on February 23, 2022.

Gregory A. Brown

Brown 0117

G. Brown

Expert Report, B.P.J. v. WV BOE et al.

eisai-21217 0118

G. Brown                                                Expert Report, B.P.J. v. WV BOE et al.

Expert Report of

Gregory A Brown, Ph.D. FACSM

In the case of B.P.J. vs. West Virginia State Board of Education.

Hineman 0119

## Table of Contents

Table of Contents...................................................................................................... iv

Personal Qualifications and Disclosure.................................................................... 1

Overview .................................................................................................................. 4

I. The scientific reality of biological sex ................................................................ 5

II. Biological men, or adolescent boys, have large, well-documented performance advantages over women and adolescent girls in almost all athletic contests........................ 7

      A.     Men are stronger. ................................................................. 10

      B.     Men run faster..................................................................... 12

      C.     Men jump higher and farther. .............................................. 15

      D.     Men throw, hit, and kick faster and farther. ....................... 16

      E.     Males exhibit faster reaction times. .................................... 17

III. Men have large measured physiological differences compared to women which demonstrably or likely explain their performance advantages. ........................... 17

      A.     Men are taller and heavier than women ............................. 18

      B.     Males have larger and longer bones, stronger bones, and different bone configuration.................................................. 18

      C.     Males have much larger muscle mass................................. 20

      D.     Females have a larger proportion of body fat. .................... 20

      E.     Males are able to metabolize and release energy to muscles at a higher rate due to larger heart and lung size, and higher hemoglobin concentrations. ....................................................... 21

IV. The role of testosterone in the development of male advantages in athletic performance .............................................................................................................. 23

      A.     Boys exhibit advantages in athletic performance even before puberty. ................................................................................ 25

G. Brown                                                    Expert Report, B.P.J. v. WV BOE et al.

B.   The rapid increase in testosterone across male puberty drives characteristic male physiological changes and the increasing performance advantages. ....................................................................... 37

V. The available evidence shows that suppression of testosterone in a male after puberty has occurred does not substantially eliminate the male athletic advantage...................... 39

A.   Empirical studies find that males retain a strong performance advantage even after lengthy testosterone suppression...................... 39

B.   Testosterone suppression does not reverse important male physiological advantages. .................................................................. 46

C.   Responsible voices internationally are increasingly recognizing that suppression of testosterone in a male after puberty has occurred does not substantially reverse the male athletic advantage. ....................... 50

Conclusions ............................................................................................................ 56

Bibliography ............................................................................................................ a

Appendix 1 – Data Tables ...................................................................................... h

Presidential Physical Fitness Results ................................................................. h

Data Compiled from Athletic.Net....................................................................... j

Appendix 2 – Scholarly Publications in Past 10 Years .......................................... n

Brown 0121

G. Brown                                    Expert Report, B.P.J. v. WV BOE et al.

## Personal Qualifications and Disclosure

I serve as Professor of Exercise Science in the Department of Kinesiology and Sport Sciences at the University of Nebraska Kearney, where I teach classes in Exercise Physiology among other topics. I am also the Director of the General Studies program. I have served as a tenured (and nontenured) professor at universities since 2002.

In August 2002, I received a Doctor of Philosophy degree from Iowa State University, where I majored in Health and Human Performance, with an emphasis in the Biological Bases of Physical Activity. In May 1999, I received a Master of Science degree from Iowa State University, where I majored in Exercise and Sport Science, with an emphasis in Exercise Physiology.

I have received many awards over the years, including the Mortar Board Faculty Excellence Honors Award, College of Education Outstanding Scholarship / Research Award, and the College of Education Award for Faculty Mentoring of Undergraduate Student Research. I have authored more than 40 refereed publications and more than 50 refereed presentations in the field of Exercise Science. I have authored chapters for multiple books in the field of Exercise Science. And I have served as a peer reviewer for over 25 professional journals, including *The American Journal of Physiology*, the *International Journal of Exercise Science*, the *Journal of Strength and Conditioning Research*, and *The Journal of Applied Physiology*.

My areas of research have included the endocrine response to testosterone prohormone supplements in men and women, the effects of testosterone prohormone supplements on health and the adaptations to strength training in men, the effects of energy drinks on the physiological response to exercise, and assessment of various athletic training modes in males and females. Articles that I have published that are closely related to topics that I discuss in this white paper include:

- Studies of the effect of ingestion of a testosterone precursor on circulating testosterone levels in young men. Douglas S. King, Rick L. Sharp, Matthew D. Vukovich, Gregory A. Brown, et al., *Effect of Oral Androstenedione on Serum Testosterone and Adaptations to Resistance Training in Young Men: A Randomized Controlled Trial*, JAMA 281: 2020-2028 (1999); G. A. Brown, M. A. Vukovich, et al., *Effects of Anabolic Precursors on Serum Testosterone Concentrations and Adaptations to Resistance Training in Young Men*, Int J Sport Nutr Exerc Metab 10: 340-359 (2000).

- A study of the effect of ingestion of that same testosterone precursor on circulating testosterone levels in young women. G. A. Brown, J. C. Dewey, et

1

Defs.' App. 0122

G. Brown                                    Expert Report, B.P.J. v. WV BOE et al.

al., *Changes in Serum Testosterone and Estradiol Concentrations Following Acute Androstenedione Ingestion in Young Women*, HORM METAB RES 36: 62-66 (2004.)

- A study finding (among other things) that body height, body mass, vertical jump height, maximal oxygen consumption, and leg press maximal strength were higher in a group of physically active men than comparably active women, while the women had higher percent body fat. G. A. Brown, Michael W. Ray, et al., *Oxygen Consumption, Heart Rate, and Blood Lactate Responses to an Acute Bout of Plyometric Depth Jumps in College-Aged Men And Women*, J. STRENGTH COND RES 24: 2475-2482 (2010).

- A study finding (among other things) that height, body mass, and maximal oxygen consumption were higher in a group of male NCAA Division 2 distance runners, while women NCAA Division 2 distance runners had higher percent body fat. Furthermore, these male athletes had a faster mean competitive running speed (~3.44 min/km) than women (~3.88 min/km), even though the men ran 10 km while the women ran 6 km. Katherine Semin, Alvah C. Stahlnecker, Kate A. Heelan, G. A. Brown, et al, *Discrepancy Between Training, Competition and Laboratory Measures of Maximum Heart Rate in NCAA Division 2 Distance Runners*, JOURNAL OF SPORTS SCIENCE AND MEDICINE 7: 455-460 (2008).

- A presentation at the 2021 American Physiological Society New Trends in Sex and Gender Medicine Conference entitled "Transwomen Competing in Women's Sports: What We Know and What We Don't". I have also authored an August 2021 entry for the American Physiological Society Physiology Educators Community of Practice Blog (PECOP Blog) titled "The Olympics, Sex, and Gender in the Physiology Classroom."

A list of my published scholarly work for the past 10 years appears as an Appendix.

Armistead_0123

G. Brown                                          Expert Report, B.P.J. v. WV BOE et al.

## Purpose of this Declaration

I have been asked by counsel for Defendant State of West Virginia and Intervenor Defendant Lainey Armistead in the matter of *B.P.J. by her next friend and mother Heather Jackson, v. State of West Virginia State Board of Education, et al.* to offer my opinions about the following: (a) whether males have inherent advantages in athletic performance over females, and if so the scale and physiological basis of those advantages, to the extent currently understood by science and (b) whether the sex-based performance advantage enjoyed by males is eliminated if feminizing hormones are administered to male athletes who identify as transgender (and in the case of prepubertal children, whether puberty blockers eliminate the advantage). In this declaration, when I use the terms "boy" or "male," I am referring to biological males based on the individual's reproductive biology and genetics as determined at birth. Similarly, when I use the terms "girl" or "female," I am referring to biological females based on the individual's reproductive biology and genetics as determined at birth. When I use the term transgender, I am referring to persons who are males or females, but who identify as a member of the opposite sex.

I have previously provided expert information in cases similar to this one in the form of a written declaration and a deposition in the case of *Soule vs. CIAC* in the state of Connecticut, and in the form of a written declaration in the case of *Hecox vs. Little* in the state of Idaho. I have not previously testified as an expert in any trials.

The opinions I express in this declaration are my own, and do not necessarily reflect the opinions of my employer, the University of Nebraska.

I have been compensated for my time serving as an expert in this case at the rate of $150 per hour. My compensation does not depend on the outcome in the case.

3

## Overview

In this declaration, I explore three important questions relevant to current discussions and policy decisions concerning inclusion of transgender individuals in women's athletic competitions. Based on my professional familiarity with exercise physiology and my review of the currently available science, including that contained in the many academic sources I cite in this report, I set out and explain three basic conclusions:

- At the level of (a) elite, (b) collegiate, (c) scholastic, and (d) recreational competition, men, adolescent boys, or male children, have an advantage over equally aged, gifted, and trained women, adolescent girls, or female children in almost all athletic events;

- Biological male physiology is the basis for the performance advantage that men, adolescent boys, or male children have over women, adolescent girls, or female children in almost all athletic events; and

- The administration of androgen inhibitors and cross-sex hormones to men or adolescent boys after the onset of male puberty does not eliminate the performance advantage that men and adolescent boys have over women and adolescent girls in almost all athletic events. Likewise, there is no published scientific evidence that the administration of puberty blockers to males before puberty eliminates the pre-existing athletic advantage that prepubertal males have over prepubertal females in almost all athletic events.

In short summary, men, adolescent boys, and prepubertal male children perform better in almost all sports than women, adolescent girls, and prepubertal female children because of their inherent physiological advantages. In general, men, adolescent boys, and prepubertal male children, can run faster, output more muscular power, jump higher, and possess greater muscular endurance than women, adolescent girls, and prepubertal female children. These advantages become greater during and after male puberty, but they exist before puberty.

Further, while after the onset of puberty males are on average taller and heavier than females, a male performance advantage over females has been measured in weightlifting competitions even between males and females matched for body mass.

Male advantages in measurements of body composition, tests of physical fitness, and athletic performance have also been shown in children before puberty. These advantages are magnified during puberty, triggered in large part by the higher testosterone concentrations in men, and adolescent boys, after the onset of

PltffsWV_ 0125

G. Brown                                           Expert Report, B.P.J. v. WV BOE et al.

male puberty. Under the influence of these higher testosterone levels, adolescent boys and young men develop even more muscle mass, greater muscle strength, less body fat, higher bone mineral density, greater bone strength, higher hemoglobin concentrations, larger hearts and larger coronary blood vessels, and larger overall statures than women. In addition, maximal oxygen consumption (VO$_2$max), which correlates to ~30-40% of success in endurance sports, is higher in both elite and average men and boys than in comparable women and girls when measured in regard to absolute volume of oxygen consumed and when measured relative to body mass.

Although androgen deprivation (that is, testosterone suppression) may modestly decrease some physiological advantages that men and adolescent boys have over women and adolescent girls, it cannot fully or even largely eliminate those physiological advantages once an individual has passed through male puberty.


## Evidence and Conclusions

## I.   The scientific reality of biological sex

1.    The scientific starting point for the issues addressed in this report is the biological fact of dimorphic sex in the human species. It is now well recognized that dimorphic sex is so fundamental to human development that, as stated in a recent position paper issued by the Endocrine Society, it "must be considered in the design and analysis of human and animal research. . . . Sex is dichotomous, with sex determination in the fertilized zygote stemming from unequal expression of sex chromosomal genes." (Bhargava et al. 2021 at 220). As stated by Sax (2002 at 177), "More than 99.98% of humans are either male or female." All humans who do not suffer from some genetic or developmental disorder are unambiguously male or female.

2.    Although sex and gender are used interchangeably in common conversation, government documents, and in the scientific literature, the American Psychological Association defines sex as "physical and biological traits" that "distinguish between males and females" whereas gender "implies the psychological, behavioral, social, and cultural aspects of being male or female (i.e., masculinity or femininity)" (https://dictionary.apa.org, accessed January 14, 2022). The concept that sex is an important biological factor determined at conception is a well-established scientific fact that is supported by statements from a number of respected organizations including, but not limited to, the Endocrine Society (Bhargava et al. 2021 at 220), the American Physiological Society (Shah 2014), the Institute of Medicine, and the National Institutes of Health (Miller 2014 at H781-82). Collectively, these and other organizations have stated that every cell has a sex

5

and every system in the body is influenced by sex. Indeed, "sex often influences gender, but gender cannot influence sex." (Bhargava 2021 at 228.)

3.      To further explain: "The classical biological definition of the **2 sexes** is that females have ovaries and make larger female gametes (eggs), whereas males have testes and make smaller male gametes (sperm) … the definition can be extended to the ovaries and testes, and in this way the categories—female and male—can be applied also to individuals who have gonads but do not make gametes … sex is dichotomous because of the different roles of each sex in reproduction." (Bhargava 2021 at 221.) Furthermore, "sex determination begins with the inheritance of XX or XY chromosomes" (Bhargava 2021 at 221.) And, "Phenotypic sex differences develop in XX and XY embryos as soon as transcription begins. The categories of X and Y genes that are unequally represented or expressed in male and female mammalian zygotes … cause phenotypic sex differences" (Bhargava 2021 at 222.)

4.      Although disorders of sexual development (DSDs) are sometimes confused with discussions of transgender individuals, the two are different phenomena. DSDs are disorders of physical development. Many DSDs are "associated with genetic mutations that are now well known to endocrinologists and geneticists." (Bhargava 2021 at 225) By contrast, a sense of transgender identity is usually not associated with any physical disorder, and "a clear biological causative underpinning of gender identity remains to be demonstrated." (Bhargava 2021 at 226.)

5.      Further demonstrating the biological importance of sex, Gershoni and Pietrokovski (2017) detail the results of an evaluation of "18,670 out of 19,644 informative protein-coding genes in men versus women" and reported that "there are over 6500 protein-coding genes with significant S[ex]D[ifferential] E[xpression] in at least one tissue. Most of these genes have SDE in just one tissue, but about 650 have SDE in two or more tissues, 31 have SDE in more than five tissues, and 22 have SDE in nine or more tissues" (Gershoni 2017 at 2-3.) Some examples of tissues identified by these authors that have SDE genes include breast mammary tissue, skeletal muscle, skin, thyroid gland, pituitary gland, subcutaneous adipose, lung, and heart left ventricle. Based on these observations the authors state "As expected, Y-linked genes that are normally carried only by men show SDE in many tissues" (Gershoni 2017 at 3.) A stated by Heydari et al. (2022, at 1), "Y chromosome harbors male-specific genes, which either solely or in cooperation with their X-counterpart, and independent or in conjunction with sex hormones have a considerable impact on basic physiology and disease mechanisms in most or all tissues development."

6.      In a review of 56 articles on the topic of sex-based differences in skeletal muscle, Haizlip et al., (2015) state that "More than 3,000 genes have been

identified as being differentially expressed between male and female skeletal muscle." (Haizlip 2015 at 30.) Furthermore, the authors state that "Overall, evidence to date suggests that skeletal muscle fiber-type composition is dependent on species, anatomical location/function, and sex" (Haizlip 2015 at 30.) The differences in genetic expression between males and females influence the skeletal muscle fiber composition (i.e. fast twitch and fast twitch sub-type and slow twitch), the skeletal muscle fiber size, the muscle contractile rate, and other aspects of muscle function that influence athletic performance. As the authors review the differences in skeletal muscle between males and females they conclude, "Additionally, all of the fibers measured in men have significantly larger cross-sectional areas (CSA) compared with women." (Haizlip 2015 at 31.) The authors also explore the effects of thyroid hormone, estrogen, and testosterone on gene expression and skeletal muscle function in males and females. One major conclusion by the authors is that "The complexity of skeletal muscle and the role of sex adding to that complexity cannot be overlooked." (Haizlip 2015 at 37.) The evaluation of SDE in protein coding genes helps illustrate that the differences between men and women are intrinsically part of the chromosomal and genetic makeup of humans which can influence many tissues that are inherent to the athletic competitive advantages of men compared to women.

## II.    Biological men, or adolescent boys, have large, well-documented performance advantages over women and adolescent girls in almost all athletic contests.

7.    It should scarcely be necessary to invoke scientific experts to "prove" that men are on average larger, stronger, and faster than women. All of us, along with our siblings and our peers and perhaps our children, have passed through puberty, and we have watched that differentiation between the sexes occur. This is common human experience and knowledge.

8.    Nevertheless, these differences have been extensively studied and measured. I cited many of these studies in the first paper on this topic that I prepared, which was submitted in litigation in January 2020. Since then, in light of current controversies, several authors have compiled valuable collections or reviews of data extensively documenting this objective fact about the human species, as manifest in almost all sports, each of which I have reviewed and found informative. These include Coleman (2020), Hilton & Lundberg (2021), World Rugby (2020), Harper (2021), Hamilton (2021), and a "Briefing Book" prepared by the Women's Sports Policy Working Group (2021). The important paper by Handelsman et al. (2018) also gathers scientific evidence of the systematic and large male athletic advantage.

9.    These papers and many others document that men, adolescent boys, and prepubertal male children, substantially outperform comparably aged women,

adolescent girls and prepubertal female children, in competitions involving running speed, swimming speed, cycling speed, jumping height, jumping distance, and strength (to name a few, but not all, of the performance differences). As I discuss later, it is now clear that these performance advantages for men, adolescent boys, and prepubertal male children, are inherent to the biological differences between the sexes.

10.    In fact, I am not aware of any scientific evidence today that disproves that after puberty men possess large advantages in athletic performance over women–so large that they are generally insurmountable for comparably gifted and trained athletes at every level (i.e.  (a) elite, (b) collegiate, (c) scholastic, and (d) recreational competition). And I am not aware of any scientific evidence today that disproves that these measured performance advantages are at least largely the result of physiological differences between men and women which have been measured and are reasonably well understood.

11.    My use of the term "advantage" in this paper must not be read to imply any normative judgment. The adult female physique is simply different from the adult male physique. Obviously, it is optimized in important respects for the difficult task of childbearing. On average, women require far fewer calories for healthy survival. Evolutionary biologists can and do theorize about the survival value or "advantages" provided by these and other distinctive characteristics of the female physique, but I will leave that to the evolutionary biologists. I use "advantage" to refer merely to performance advantages in athletic competitions.

12.    I find in the literature a widespread consensus that the large performance and physiological advantages possessed by males–rather than social considerations or considerations of identity–are precisely the *reason* that most athletic competitions are separated by sex, with women treated as a "protected class." To cite only a few statements accepting this as the justification:

- Handelsman et al. (2018) wrote, "Virtually all elite sports are segregated into male and female competitions. The main justification is to allow women a chance to win, as women have major disadvantages against men who are, on average, taller, stronger, and faster and have greater endurance due to their larger, stronger, muscles and bones as well as a higher circulating hemoglobin level." (803)

- Millard-Stafford et al. (2018) wrote "Current evidence suggests that women will not swim or run as fast as men in Olympic events, which speaks against eliminating sex segregation in these individual sports" (530) "Given the historical context (2% narrowing in swimming over 44 y), a reasonable assumption might be that no more than 2% of the

current performance gap could still potentially be attributed to sociocultural influences.", (533) and "Performance gaps between US men and women stabilized within less than a decade after federal legislation provided equal opportunities for female participation, but only modestly closed the overall gap in Olympic swimming by 2% (5% in running)." (533) Dr. Millard-Stafford, a full professor at Georgia Tech, holds a Ph.D. in Exercise Physiology and is a past President of the American College of Sports Medicine.

- In 2021, Hilton et al. wrote, "most sports have a female category the purpose of which is the protection of both fairness and, in some sports, safety/welfare of athletes who do not benefit from the physiological changes induced by male levels of testosterone from puberty onwards." (204)

- In 2020 the Swiss High Court ("Tribunal Fédéral") observed that "in most sports . . . women and men compete in two separate categories, because the latter possess natural advantages in terms of physiology."[1]

- The members of the Women's Sports Policy Working Group wrote that "If sports were not sex-segregated, female athletes would rarely be seen in finals or on victory podiums," and that "We have separate sex sport and eligibility criteria based on biological sex because this is the only way we can assure that female athletes have the same opportunities as male athletes not only to participate but to win in competitive sport. . . . If we did not separate athletes on the basis of biological sex–if we used any other physical criteria–we would never see females in finals or on podiums." (WSPWG Briefing Book 2021 at 5, 20.)

- In 2020, the World Rugby organization stated that "the women's category exists to ensure protection, safety and equality for those who do not benefit from the biological advantage created by these biological performance attributes." (World Rugby Transgender Women Guidelines 2020.)

- In 2021 Harper et al. stated "…the small decrease in strength in transwomen after 12–36 months of GAHT [Gender Affirming Hormone Therapy] suggests that transwomen likely retain a strength advantage

---

[1] "dans la plupart des sports . . . les femmes et les hommes concourent dans deux catégories séparées, ces derniers étant naturellement avantagés du point de vue physique." Tribunal Fédéral decision of August 25, 2020, Case 4A_248/2019, 4A_398/2019, at §9.8.3.3.

9

over cisgender women." (7) and "…observations in trained transgender individuals are consistent with the findings of the current review in untrained transgender individuals, whereby 30 months of GAHT may be sufficient to attenuate some, but not all, influencing factors associated with muscular endurance and performance." (8)

- Hamilton et al. (2021), in a consensus statement for the International Federation of Sports Medicine (FIMS) concluded that "Transwomen have the right to compete in sports. However, cisgender women have the right to compete in a protected category." (1409)

13.     While the sources I mention above gather more extensive scientific evidence of this uncontroversial truth, I provide here a brief summary of representative facts concerning the male advantage in athletic performance.

### A. Men are stronger.

14.     Males exhibit greater strength throughout the body. Both Handelsman et al. (2018) and Hilton & Lundberg (2021) have gathered multiple literature references that document this fact in various muscle groups.

15.     Men have in the neighborhood of 60%-100% greater **arm strength** than women. (Handelsman 2018 at 812.)[2] One study of elbow flexion strength (basically, bringing the fist up towards the shoulder) in a large sample of men and women found that men exhibited 109% greater isometric strength, and 89% higher strength in a single repetition. (Hilton 2021 at 204, summarizing Hubal (2005) at Table 2.)

16.     **Grip strength** is often used as a useful proxy for strength more generally. In one study, men showed on average 57% greater grip strength than women. (Bohannon 2019.) A wider meta-analysis of multiple grip-strength studies not limited to athletic populations found that 18- and 19-year-old males exhibited in

---

[2] Handelsman expresses this as women having 50% to 60% of the "upper limb" strength of men. Handelsman cites Sale, *Neuromuscular function*, for this figure and the "lower limb" strength figure. Knox et al., *Transwomen in elite sport* (2018) are probably confusing the correct way to state percentages when they state that "differences lead to decreased trunk and lower body strength by 64% and 72% respectively, in women" (397): interpreted literally, this would imply that men have **almost 4x as much** lower body strength as do women.

the neighborhood of 2/3 greater grip strength than females. (Handelsman 2017 Figure 3, summarizing Silverman 2011 Table 1.)[3]

17.     In an evaluation of maximal isometric handgrip strength in 1,654 healthy men, 533 healthy women aged 20-25 years and 60 "highly trained elite female athletes from sports known to require high hand-grip forces (judo, handball)," Leyk et al. (2007) observed that, "The results of female national elite athletes even indicate that the strength level attainable by extremely high training will rarely surpass the 50th percentile of untrained or not specifically trained men." (Leyk 2007 at 415.)

18.     Men have in the neighborhood of 25%-60% greater **leg strength** than women. (Handelsman 2018 at 812.) In another measure, men exhibit 54% greater knee extension torque and this male leg strength advantage is consistent across the lifespan. (Neder 1999 at 120-121.)

19.     When male and female Olympic weightlifters of the same body weight are compared, the top males lift weights between 30% and 40% greater than the females of the same body weight. But when top male and female performances are compared in powerlifting, without imposing any artificial limitations on bodyweight, the male record is 65% higher than the female record. (Hilton 2021 at 203.)

20.     In another measure that combines many muscle groups as well as weight and speed, moderately trained males generated 162% greater punching power than females even though men do not possess this large an advantage in any single bio-mechanical variable. (Morris 2020.) This objective reality was subjectively summed up by women's mixed-martial arts fighter Tamikka Brents, who suffered significant facial injuries when she fought against a biological male who identified as female and fought under the name of Fallon Fox. Describing the experience, Brents said:

> "I've fought a lot of women and have never felt the strength that I felt in a fight as I did that night. I can't answer whether it's because she was born a man or not because I'm not a doctor. I can only say, I've never felt so overpowered ever in my life, and I am an abnormally strong female in my own right."[4]

---

[3] Citing Silverman, *The secular trend for grip strength in Canada and the United States*, J. Ports Sci. 29:599-606 (2011).

[4] http://whoatv.com/exclusive-fallon-foxs-latest-opponent-opens-up-to-whoatv/ (last accessed October 5, 2021).

### B. Men run faster.

21.     Many scholars have detailed the wide performance advantages enjoyed by men in running speed. One can come at this reality from a variety of angles.

22.     Multiple authors report a male speed advantage in the neighborhood of 10%-13% in a variety of events, with a variety of study populations. Handelsman et al. 2018 at 813 and Handelsman 2017 at 70 both report a male advantage of about 10% by age 17. Thibault et al. 2010 at 217 similarly reported a stable 10% performance advantage across multiple events at the Olympic level. Tønnessen et al. (2015 at 1-2) surveyed the data and found a consistent male advantage of 10%-12% in running events after the completion of puberty. They document this for both short sprints and longer distances. One group of authors found that the male advantage increased dramatically in ultra-long-distance competition (Lepers & Knechtle 2013.)

23.     A great deal of current interest has been focused on track events. It is worth noting that a recent analysis of publicly available sports federation and tournament records found that men enjoy the *least* advantage in running events, as compared to a range of other events and metrics, including jumping, pole vaulting, tennis serve speed, golf drives, baseball pitching speed, and weightlifting. (Hilton 2021 at 201-202.) Nevertheless, as any serious runner will recognize, the approximately 10% male advantage in running is an overwhelming difference. Dr. Hilton calculates that "approximately 10,000 males have personal best times that are faster than the current Olympic 100m female champion." (Hilton 2021 at 204.) Professors Doriane Coleman, Jeff Wald, Wickliffe Shreve, and Richard Clark dramatically illustrated this by compiling the data and creating the figure below (last accessed on February 10, 2022, at https://bit.ly/35yOyS4), which shows that the *lifetime best performances* of three female Olympic champions in the 400m event—including Team USA's Sanya Richards-Ross and Allyson Felix—would not match the performances of "literally thousands of boys and men, including thousands who would be considered second tier in the men's category" *just in 2017 alone*: (data were drawn from the International Association of Athletics Federations (IAAF) website which provides complete, worldwide results for individuals and events, including on an annual and an all-time basis).

Defendant's 0133

G. Brown

Expert Report, B.P.J. v. WV BOE et al.



Comparing the Best Elite Females to Boys and Men:
Personal Bests for 3 Female Gold Medalists versus 2017 Performances by Boys and Men

G. Brown                                                    Expert Report, B.P.J. v. WV BOE et al.

24.    Professor Coleman and her colleague Wicklyffe Shreve also created the
table below (last accessed on February 10, 2022, at https://bit.ly/37E1s2X), which
"compares the number of men—males over 18—competing in events reported to the
International Association of Athletics Federation whose results in each event in
2017 would have ranked them above the very best elite woman that year."

| TABLE 2 – World's Best Woman v. Number of Men Outperforming | | | |
|---|---|---|---|
| Event | Best Women's Result | Best Men's Result | # of Men Outperforming |
| 100 Meters | 10.71 | 9.69 | 2,474 |
| 200 Meters | 21.77 | 19.77 | 2,920 |
| 400 Meters | 49.46 | 43.62 | 4,341 |
| 800 Meters | 1:55.16* | 1:43.10 | 3,992+ |
| 1500 Meters | 3:56.14 | 3:28.80 | 3,216+ |
| 3000 Meters | 8:23.14 | 7:28.73 | 1307+ |
| 5000 Meters | 14:18.37 | 12:55.23 | 1,243 |
| High Jump | 2.06 meters | 2.40 meters | 777 |
| Pole Vault | 4.91 meters | 6.00 meters | 684 |
| Long Jump | 7.13 meters | 8.65 meters | 1,652 |
| Triple Jump | 14.96 meters | 18.11 meters | 969 |

25.    The male advantage becomes insuperable well before the
developmental changes of puberty are complete. Dr. Hilton documents that even
"schoolboys"–defined as age 15 and under–have beaten the female world records in
running, jumping, and throwing events. (Hilton 2021 at 204.)

26.    Similarly, Coleman and Shreve created the table below (last accessed
on February 10, 2022, at https://bit.ly/37E1s2X), which  "compares the number of
boys—males under the age of 18—whose results in each event in 2017 would rank
them above the single very best elite [adult] woman that year:" data were drawn
from the International Association of Athletics Federations (IAAF) website

| TABLE 1 – World's Best Woman v. Under 18 Boys | | | |
|---|---|---|---|
| Event | Best Women's Result | Best  Boys' Result | # of Boys Outperforming |
| 100 Meters | 10.71 | 10.15 | 124+ |
| 200 Meters | 21.77 | 20.51 | 182 |
| 400 Meters | 49.46 | 45.38 | 285 |
| 800 Meters | 1:55.16* | 1:46.3 | 201+ |
| 1500 Meters | 3:56.14 | 3:37.43 | 101+ |
| 3000 Meters | 8:23.14 | 7:38.90 | 30 |
| 5000 Meters | 14:18.37 | 12:55.58 | 15 |
| High Jump | 2.06 meters | 2.25 meters | 28 |
| Pole Vault | 4.91 meters | 5.31 meters | 10 |
| Long Jump | 7.13 meters | 7.88 meters | 74 |
| Triple Jump | 14.96 meters | 17.30 meters | 47 |

14

27.     In an analysis I have performed of running events (consisting of the 100 m, 200 m, 400 m, 800 m, 1500 m, 5000 m, and 10000 m) in the Division 1, Division 2, and Division 3 NCAA Outdoor track championships for the years of 2010-2019, the average performance across all events of the 1st place man was 14.1% faster than the 1st place woman, with the smallest difference being a 10.2% advantage for men in the Division 1 100 m race.  The average 8th place man across all events (the last place to earn the title of All American) was 11.2% faster than 1st place woman, with the smallest difference being a 6.5% advantage for men in the Division 1 100 m race. (Brown et al. Unpublished observations, to be presented at the 2022 Annual Meeting of the American College of Sports Medicine.)

28.     Athletic.net® is an internet-based resource providing "results, team, and event management tools to help coaches and athletes thrive."  Among the resources available on Athletic.net are event records that can be searched by nationally or by state age group, school grade, and state. Higerd (2021) in an evaluation of high school track running performance records from five states(CA, FL, MN, NY, WA), over three years (2017 – 2019) observed that males were 14.38% faster than females in the 100M (at 99), 16.17% faster in the 200M (at 100), 17.62% faster in the 400M (at 102), 17.96% faster in the 800M (at 103), 17.81% faster in the 1600M (at 105), and 16.83% faster in the 3200M (at 106).

## C. Men jump higher and farther.

29.     Jumping involves both leg strength and speed as positive factors, with body weight of course a factor working against jump height. Despite their substantially greater body weight, males enjoy an even greater advantage in jumping than in running. Handelsman 2018 at 813, looking at youth and young adults, and Thibault 2010 at 217, looking at Olympic performances, both found male advantages in the range of 15%-20%. See also Tønnessen 2015 (approximately 19%); Handelsman 2017 (19%); Hilton 2021 at 201 (18%). Looking at the vertical jump called for in volleyball, research on elite volleyball players found that males jumped on average 50% higher during an "attack" at the net than did females. (Sattler 2015; see also Hilton 2021 at 203 (33% higher vertical jump).)

30.     Higerd (2021) in an evaluation of high school high jump performance available through the track and field database athletic.net®, which included five states (CA, FL, MN, NY, WA), over three years (2017 – 2019) (at 82) observed that in 23,390 females and 26,843 males, females jumped an average of 1.35 m and males jumped an average of 1.62 m, for an 18.18% performance advantage for males (at 96). In an evaluation of long jump performance in 45,705 high school females and 54,506 high school males the females jumped an average of 4.08 m and males jumped an average of 5.20 m, for a 24.14% performance advantage for males (at 97).

31.     The combined male advantage of body height and jump height means, for example, that a total of seven women in the WNBA have ever dunked a basketball in the regulation 10 foot hoop,[5] while the ability to dunk appears to be almost universal among NBA players: "Since the 1996–97 season (the earliest data is available from Basketball-Reference.com), 1,801 different [NBA] players have combined for 210,842 regular-season dunks, and 1,259 out of 1,367 players (or 92%) who have played at least 1,000 minutes have dunked at least once."[6]

### D. Men throw, hit, and kick faster and farther.

32.     Strength, arm-length, and speed combine to give men a large advantage over women in throwing. This has been measured in a number of studies.

33.     One study of elite male and female baseball pitchers showed that men throw baseballs 35% faster than women—81 miles/hour for men vs. 60 miles/hour for women. (Chu 2009.) By age 12, "boys' throwing velocity is already between 3.5 and 4 standard deviation units higher than the girls'." (Thomas 1985 at 276.) By age seventeen, the *average* male can throw a ball farther than 99% of seventeen-year-old females. (Lombardo 2018; Chu 2009; Thomas 1985 at 268.) Looking at publicly available data, Hilton & Lundberg found that in both baseball pitching and the field hockey "drag flick," the *record* ball speeds achieved by males are more than 50% higher than those achieved by females. (Hilton 2021 at 202-203.)

34.     Men achieve serve speeds in tennis more that 15% faster than women; and likewise in golf achieve ball speeds off the tee more than 15% faster than women. (Hilton 2021 at 202.)

35.     Males are able to throw a javelin more than 30% farther than females. (Lombardo 2018 Table 2; Hilton 2021 at 203.)

36.     Men serve and spike volleyballs with higher velocity than women, with a performance advantage in the range of 29-34%. (Hilton 2021 at 204 Fig. 1.)

37.     Men are also able to kick balls harder and faster. A study comparing collegiate soccer players found that males kick the ball with an average 20% greater velocity than females. (Sakamoto 2014.)

---

[5] https://www.espn.com/wnba/story/_/id/32258450/2021-wnba-playoffs-brittney-griner-owns-wnba-dunking-record-coming-more.

[6] https://www.si.com/nba/2021/02/22/nba-non-dunkers-patty-mills-tj-mcconnell-steve-novak-daily-cover

Scientific 0137

G. Brown                                                      Expert Report, B.P.J. v. WV BOE et al.

### E. Males exhibit faster reaction times.

38.     Interestingly, men enjoy an additional advantage over women in reaction time–an attribute not obviously related to strength or metabolism (e.g. V0$_2$max). "Reaction time in sports is crucial in both simple situations such as the gun shot in sprinting and complex situations when a choice is required. In many team sports this is the foundation for tactical advantages which may eventually determine the outcome of a game." (Dogan 2009 at 92.) "Reaction times can be an important determinant of success in the 100m sprint, where medals are often decided by hundredths or even thousandths of a second." (Tønnessen 2013 at 885.)

39.     The existence of a sex-linked difference in reaction times is consistent over a wide range of ages and athletic abilities. (Dykiert 2012.) Even by the age of 4 or 5, in a ruler-drop test, males have been shown to exhibit 4% to 6% faster reaction times than females. (Latorre-Roman 2018.) In high school athletes taking a common baseline "ImPACT" test, males showed 3% faster reaction times than females. (Mormile 2018.) Researchers have found a 6% male advantage in reaction times of both first-year medical students (Jain 2015) and world-class sprinters (Tønnessen 2013).

40.     Most studies of reaction times use computerized tests which ask participants to hit a button on a keyboard or to say something in response to a stimulus. One study on NCAA athletes measured "reaction time" by a criterion perhaps more closely related to athletic performance–that is, how fast athletes covered 3.3 meters after a starting signal. Males covered the 3.3 meters 10% faster than females in response to a visual stimulus, and 16% faster than females in response to an auditory stimulus. (Spierer 2010.)

41.     Researchers have speculated that sex-linked differences in brain structure, as well as estrogen receptors in the brain, may be the source of the observed male advantage in reaction times, but at present this remains a matter of speculation and hypothesis. (Mormile at 19; Spierer at 962.)

### III.  Men have large measured physiological differences compared to women which demonstrably or likely explain their performance advantages.

42.     No single physiological characteristic alone accounts for all or any one of the measured advantages that men enjoy in athletic performance. However, scientists have identified and measured a number of physiological factors that contribute to superior male performance.

17

### A. Men are taller and heavier than women

43.     In some sports, such as basketball and volleyball, height itself provides competitive advantage. While some women are taller than some men, based on data from 20 countries in North America, Europe, East Asia, and Australia, the 50th percentile for body height for women is 164.7 cm (5 ft 5 inches) and the 50th percentile for body height for men is 178.4 cm (5 ft 10 inches). Helping to illustrate the inherent height difference between men and women, from the same data analysis, the 95th percentile for body height for women is 178.9 cm (5 feet 10.43 inches), which is only 0.5 cm taller than the 50th percentile for men (178.4 cm; 5 feet 10.24 inches), while the 95th percentile for body height for men is 193.6 cm (6 feet 4.22 inches). (Roser 2013.)

44.     To look at a specific athletic population, an evaluation of NCAA Division 1 basketball players compared 68 male guards and 59 male forwards to 105 female guards and 91 female forwards, and found that on average the male guards were 187.4 ± 7.0 cm tall and weighed 85.2 ± 7.4 kg while the female guards were 171.6 ± 5.0 cm tall and weighed 68.0 ± 7.4 kg.  The male forwards were 201.7 ± 4.0 cm tall and weighed 105.3 ± 5.9 kg while the female forwards were 183.5 ± 4.4 cm tall and weighed 82.2 ± 12.5 kg. (Fields 2018 at 3.)

### B. Males have larger and longer bones, stronger bones, and different bone configuration.

45.     Obviously, males on average have longer bones. "Sex differences in height have been the most thoroughly investigated measure of bone size, as adult height is a stable, easily quantified measure in large population samples. Extensive twin studies show that adult height is highly heritable with predominantly additive genetic effects that diverge in a sex-specific manner from the age of puberty onwards." (Handelsman 2018 at 818.) "Pubertal testosterone exposure leads to an ultimate average greater height in men of 12–15 centimeters, larger bones, greater muscle mass, increased strength and higher hemoglobin levels." (Gooren 2011 at 653.)

46.     "Men have distinctively greater bone size, strength, and density than do women of the same age. As with muscle, sex differences in bone are absent prior to puberty but then accrue progressively from the onset of male puberty due to the sex difference in exposure to adult male circulating testosterone concentrations." (Handelsman 2018 at 818.)

47.     "[O]n average men are 7% to 8% taller with longer, denser, and stronger bones, whereas women have shorter humerus and femur cross-sectional

18

areas being 65% to 75% and 85%, respectively, those of men." (Handelsman 2018 at 818.)

48.   Greater height, leg, and arm length themselves provide obvious advantages in several sports. But male bone geometry also provides less obvious advantages. "The major effects of men's larger and stronger bones would be manifest via their taller stature as well as the larger fulcrum with greater leverage for muscular limb power exerted in jumping, throwing, or other explosive power activities." (Handelsman 2018 at 818.)

49.   Male advantage in bone size is not limited to length, as larger bones provide the mechanical framework for larger muscle mass. "From puberty onwards, men have, on average, 10% more bone providing more surface area. The larger surface area of bone accommodates more skeletal muscle so, for example, men have broader shoulders allowing more muscle to build. This translates into 44% less upper body strength for women, providing men an advantage for sports like boxing, weightlifting and skiing. In similar fashion, muscle mass differences lead to decreased trunk and lower body strength by 64% and 72%, respectively in women. These differences in body strength can have a significant impact on athletic performance, and largely underwrite the significant differences in world record times and distances set by men and women." (Knox 2019 at 397.)

50.   Meanwhile, distinctive aspects of the female pelvis geometry cut against athletic performance. "[T]he widening of the female pelvis during puberty, balancing the evolutionary demands of obstetrics and locomotion, retards the improvement in female physical performance." (Handelsman 2018 at 818.) "[T]he major female hormones, oestrogens, can have effects that disadvantage female athletic performance. For example, women have a wider pelvis changing the hip structure significantly between the sexes. Pelvis shape is established during puberty and is driven by oestrogen. The different angles resulting from the female pelvis leads to decreased joint rotation and muscle recruitment ultimately making them slower." (Knox 2019 at 397.)

51.   There are even sex-based differences in foot size and shape. Wunderlich & Cavanaugh (2001) observed that a "foot length of 257 mm represents a value that is … approximately the 20th percentile men's foot lengths and the 80th percentile women's foot lengths." (607) and "For a man and a woman, both with statures of 170 cm (5 feet 7 inches), the man would have a foot that was approximately 5 mm longer and 2 mm wider than the woman." (608). Based on these, and other analyses, they conclude that "female feet and legs are not simply scaled-down versions of male feet but rather differ in a number of shape characteristics, particularly at the arch, the lateral side of the foot, the first toe, and the ball of the foot." (605) Further, Fessler et al. (2005) observed that "female foot length is consistently smaller than male foot length" (44) and concludes that

"proportionate foot length is smaller in women" (51) with an overall conclusion that "Our analyses of genetically disparate populations reveal a clear pattern of sexual dimorphism, with women consistently having smaller feet proportionate to stature than men." (53)

52.     Beyond simple performance, the greater density and strength of male bones provide higher protection against stresses associated with extreme physical effort: "[S]tress fractures in athletes, mostly involving the legs, are more frequent in females, with the male protection attributable to their larger and thicker bones." (Handelsman 2018 at 818.)

### C. Males have much larger muscle mass.

53.     The fact that, on average, men have substantially larger muscles than women is as well known to common observation as men's greater height. But the male advantage in muscle size has also been extensively measured. The differential is large.

54.     "On average, women have 50% to 60% of men's upper arm muscle cross-sectional area and 65% to 70% of men's thigh muscle cross-sectional area, and women have 50% to 60% of men's upper limb strength and 60% to 80% of men's leg strength. Young men have on average a skeletal muscle mass of >12 kg greater than age-matched women at any given body weight." (Handelsman 2018 at 812. See also Gooren 2011 at 653, Thibault 2010 at 214.)

55.     "There is convincing evidence that the sex differences in muscle mass and strength are sufficient to account for the increased strength and aerobic performance of men compared with women and is in keeping with the differences in world records between the sexes." (Handelsman 2018 at 816.)

56.     Once again, looking at specific and comparable populations of athletes, an evaluation of NCAA Division 1 basketball players consisting of 68 male guards and 59 male forwards, compared to 105 female guards and 91 female forwards, reported that on average the male guards had $77.7 \pm 6.4$ kg of fat free mass and $7.4 \pm 3.1$ kg fat mass while the female guards had $54.6 \pm 4.4$ kg fat free mass and $13.4 \pm 5.4$ kg fat mass.  The male forwards had $89.5 \pm 5.9$ kg fat free mass and $15.9 \pm 5.6$ kg fat mass while the female forwards had $61.8 \pm 5.9$ kg fat free mass and $20.5 \pm 7.7$ kg fat mass. (Fields 2018 at 3.)

### D. Females have a larger proportion of body fat.

57.     While women have smaller muscles, they have proportionately more body fat, in general a negative for athletic performance. "Oestrogens also affect body

composition by influencing fat deposition. Women, on average, have higher percentage body fat, and this holds true even for highly trained healthy athletes (men 5%–10%, women 8%–15%). Fat is needed in women for normal reproduction and fertility, but it is not performance-enhancing. This means men with higher muscle mass and less body fat will normally be stronger kilogram for kilogram than women." (Knox 2019 at 397.)

58.   "[E]lite females have more (<13 vs. <5 %) body fat than males. Indeed, much of the difference in [maximal oxygen uptake] between males and females disappears when it is expressed relative to lean body mass. . . . Males possess on average 7–9 % less percent body fat than females." (Lepers 2013 at 853.)

59.   Knox et al. observe that both female pelvis shape and female body fat levels "disadvantage female athletes in sports in which speed, strength and recovery are important," (Knox 2019 at 397), while Tønnessen et al. describe the "ratio between muscular power and total body mass" as "critical" for athletic performance. (Tønnessen 2015 at 7.)

## E. Males are able to metabolize and release energy to muscles at a higher rate due to larger heart and lung size, and higher hemoglobin concentrations.

60.   While advantages in bone size, muscle size, and body fat are easily perceived and understood by laymen, scientists also measure and explain the male athletic advantage at a more abstract level through measurements of metabolism, or the ability to deliver energy to muscles throughout the body.

61.   Energy release at the muscles depends centrally on the body's ability to deliver oxygen to the muscles, where it is essential to the complex chain of biochemical reactions that make energy available to power muscle fibers. Men have multiple distinctive physiological attributes that together give them a large advantage in oxygen delivery.

62.   Oxygen is taken into the blood in the lungs. Men have greater capability to take in oxygen for multiple reasons. "**[L]ung capacity** [is] larger in men because of a lower diaphragm placement due to Y-chromosome genetic determinants." (Knox 2019 at 397.) Supporting larger lung capacity, men have "greater cross-sectional area of the trachea"; that is, they can simply move more air in and out of their lungs in a given time. (Hilton 2021 at 201.)

63.   More, male lungs provide superior oxygen exchange even for a given volume: "The greater lung volume is complemented by testosterone-driven **enhanced alveolar multiplication** rate during the early years of life. Oxygen exchange takes place between the air we breathe and the bloodstream at the alveoli,

so more alveoli allows more oxygen to pass into the bloodstream. Therefore, the greater lung capacity allows more air to be inhaled with each breath. This is coupled with an improved uptake system allowing men to absorb more oxygen." (Knox 2019 at 397.)

64.    "Once in the blood, oxygen is carried by haemoglobin. **Haemoglobin concentrations** are directly modulated by testosterone so men have higher levels and can carry more oxygen than women." (Knox 2019 at 397.) "It is well known that levels of circulating hemoglobin are androgen-dependent and consequently higher in men than in women by 12% on average…. Increasing the amount of hemoglobin in the blood has the biological effect of increasing oxygen transport from lungs to tissues, where the increased availability of oxygen enhances aerobic energy expenditure." (Handelsman 2018 at 816.) (See also Lepers 2013 at 853; Handelsman 2017 at 71.) "It may be estimated that as a result the average maximal oxygen transfer will be ~10% greater in men than in women, which has a direct impact on their respective athletic capacities." (Handelsman 2018 at 816.)

65.    But the male metabolic advantage is further multiplied by the fact that men are also able to **circulate more blood per second** than are women. "Oxygenated blood is pumped to the active skeletal muscle by the heart. The left ventricle chamber of the heart is the reservoir from which blood is pumped to the body. The larger the left ventricle, the more blood it can hold, and therefore, the more blood can be pumped to the body with each heartbeat, a physiological parameter called 'stroke volume'.The female heart size is, on average, 85% that of a male resulting in the stroke volume of women being around 33% less." (Knox 2018 at 397.) Hilton cites different studies that make the same finding, reporting that men on average can pump 30% more blood through their circulatory system per minute ("cardiac output") than can women. (Hilton 2021 at 202.)

66.    Finally, at the cell where the energy release is needed, men appear to have yet another advantage. "Additionally, there is experimental evidence that testosterone increases . . . **mitochondrial biogenesis**, myoglobin expression, and IGF-1 content, which may augment energetic and power generation of skeletal muscular activity." (Handelsman 2018 at 811.)

67.    "Putting all of this together, men have a much more efficient cardiovascular and respiratory system." (Knox 2019 at 397.) A widely accepted measurement that reflects the combined effects of all these respiratory, cardiovascular, and metabolic advantages is referred to as "$VO_2$max," which refers to the maximum rate at which an individual can consume oxygen during aerobic

exercise.[7] Looking at 11 separate studies, including both trained and untrained individuals, Pate et al. concluded that men have a 50% higher $VO_2$max than women on average, and a 25% higher $VO_2$max in relation to body weight. (Pate 1984 at 92. See also Hilton 2021 at 202.)

## IV.   The role of testosterone in the development of male advantages in athletic performance.

68.   The following tables of reference ranges for circulating testosterone in males and females are presented to help provide context for some of the subsequent information regarding athletic performance and physical fitness in children, youth, and adults, and regarding testosterone suppression in transwomen and athletic regulations. These data were obtained from the Mayo Clinic Laboratories (available at https://www.mayocliniclabs.com/test-catalog/overview/83686#Clinical-and-Interpretive, accessed January 14, 2022).

Reference ranges for serum testosterone concentrations in males and females.

| Age | Males | Females |
|---|---|---|
| 0 – 5 months | 2.6 – 13.9 nmol/l | 0.7 – 2.8 nmol/l |
| 6 months – 9 years | 0.2 – 0.7 nmol/l | 0.2 – 0.7 nmol/l |
| 10 – 11 years | 0.2 – 4.5 nmol/l | 0.2 – 1.5 nmol/l |
| 12 -13 years | 0.2 – 27.7 nmol/l | 0.2 – 2.6 nmol/l |
| 14 years | 0.2 – 41.6 nmol/l | 0.2 – 2.6 nmol/l |
| 15 – 16 years | 3.5 – 41.6 nmol/l | 0.2 – 2.6 nmol/l |
| 17 – 18 years | 10.4 – 41.6 nmol/l | 0.7 – 2.6 nmol/l |
| 19 years and older | 8.3 – 32.9 nmol/l | 0.3 – 2.1 nmol/l |

Please note that testosterone concentrations are sometimes expressed in units of ng/dl, and 1 nmol/l = 28.85 ng/dl.

69.   Tanner Stages can be used to help evaluate the onset and progression of puberty and may be more helpful in evaluating normal testosterone concentrations than age in adolescents.  "Puberty onset (transition from Tanner stage I to Tanner stage II) occurs for boys at a median age of 11.5 years and for girls

---

[7] $VO_2$max is "based on hemoglobin concentration, total blood volume, maximal stroke volume, cardiac size/mass/compliance, skeletal muscle blood flow, capillary density, and mitochondrial content." International Statement, *The Role of Testosterone in Athletic Performance* (January 2019), available at https://law.duke.edu/sites/default/files/centers/sportslaw/Experts_T_Statement_2019.pdf.

at a median age of 10.5 years. . . . Progression through Tanner stages is variable. Tanner stage V (young adult) should be reached by age 18." (https://www.mayocliniclabs.com/test-catalog/overview/83686#Clinical-and-Interpretive, accessed January 14, 2022).

Reference Ranges for serum testosterone concentrations by Tanner stage

| Tanner Stage | Males | Females |
|---|---|---|
| I (prepubertal) | 0.2 – 0.7 nmol/l | 0.7 – 0.7 nmol/l |
| II | 0.3 – 2.3 nmo/l | 0.2 – 1.6 nmol/l |
| III | 0.9 – 27.7 nmol/l | 0.6 – 2.6 nmol/l |
| IV | 2.9 – 41.6 nmol/l | 0.7 – 2.6 nmol/l |
| V (young adult) | 10.4 – 32.9 nmol/ | 0.4 – 2.1 nmol/l |

70.    Senefeld et al. (2020 at 99) state that "Data on testosterone levels in children and adolescents segregated by sex are scarce and based on convenience samples or assays with limited sensitivity and accuracy." They therefore "analyzed the timing of the onset and magnitude of the divergence in testosterone in youths aged 6 to 20 years by sex using a highly accurate assay" (isotope dilution liquid chromatography tandem mass spectrometry). Senefeld observed a significant difference beginning at age 11, which is to say about fifth grade.

Serum testosterone concentrations (nmol/L) in youths aged 6 to 20 years measured using isotope dilution liquid chromatography tandem mass spectrometry (Senefeld et al. ,2020, at 99)

| Age (y) | Boys | | | Girls | | |
|---|---|---|---|---|---|---|
| | 5th | 50th | 95th | 5th | 50th | 95th |
| 6 | 0.0 | 0.1 | 0.2 | 0.0 | 0.1 | 0.2 |
| 7 | 0.0 | 0.1 | 0.2 | 0.0 | 0.1 | 0.3 |
| 8 | 0.0 | 0.1 | 0.3 | 0.0 | 0.1 | 0.3 |
| 9 | 0.0 | 0.1 | 0.3 | 0.1 | 0.2 | 0.6 |
| 10 | 0.1 | 0.2 | 2.6 | 0.1 | 0.3 | 0.9 |
| 11 | 0.1 | 0.5 | 11.3 | 0.2 | 0.5 | 1.3 |
| 12 | 0.3 | 3.6 | 17.2 | 0.2 | 0.7 | 1.4 |
| 13 | 0.6 | 9.2 | 21.5 | 0.3 | 0.8 | 1.5 |
| 14 | 2.2 | 11.9 | 24.2 | 0.3 | 0.8 | 1.6 |
| 15 | 4.9 | 13.2 | 25.8 | 0.4 | 0.8 | 1.8 |
| 16 | 5.2 | 14.9 | 24.1 | 0.4 | 0.9 | 2.0 |
| 17 | 7.6 | 15.4 | 27.0 | 0.5 | 1.0 | 2.0 |
| 18 | 9.2 | 16.3 | 25.5 | 0.4 | 0.9 | 2.1 |
| 19 | 8.1 | 17.2 | 27.9 | 0.4 | 0.9 | 2.3 |
| 20 | 6.5 | 17.9 | 29.9 | 0.4 | 1.0 | 3.4 |

24

Brown 0145

G. Brown                                                Expert Report, B.P.J. v. WV BOE et al.

## A. Boys exhibit advantages in athletic performance even before puberty.

71.     It is often said or assumed that boys enjoy no significant athletic advantage over girls before puberty. However, this is not true. Writing in their seminal work on the physiology of elite young female athletes, McManus and Armstrong (2011) reviewed the differences between boys and girls regarding bone density, body composition, cardiovascular function, metabolic function, and other physiologic factors that can influence athletic performance.  They stated, "At birth, boys tend to have a greater lean mass than girls. This difference remains small but detectable throughout childhood with about a 10% greater lean mass in boys than girls prior to puberty." (28) "Sexual dimorphism underlies much of the physiologic response to exercise," and most importantly these authors concluded that, "Young girl athletes are not simply smaller, less muscular boys." (23)

72.     Certainly, boys' physiological and performance advantages increase rapidly from the beginning of puberty until around age 17-19. But much data and multiple studies show that significant physiological differences, and significant male athletic performance advantages in certain areas, exist before significant developmental changes associated with male puberty have occurred.

73.     Starting at birth, girls have more body fat and less fat-free mass than boys. Davis et al. (2019) in an evaluation of 602 infants reported that at birth and age 5 months, infant boys have larger total body mass, body length, and fat-free mass while having lower percent body fat than infant girls. In an evaluation of 20 boys and 20 girls ages 3-8 years old, matched for age, height, and body weight Taylor et al. (Taylor 1997) reported that the "boys had significantly less fat, a lower % body fat and a higher bone-free lean tissue mass than the girls" when "expressed as a percentage of the average fat mass of the boys", the girls' fat mass was 52% higher than the boys "…while the bone-free lean tissue mass was 9% lower" (at 1083.) In an evaluation of 376 prepubertal [Tanner Stage 1] boys and girls, Taylor et al. (2010) observed that the boys had 21.6% more lean mass, and 13% less body fat (when expressed as percent of total body mass) than did the girls. In a review of 22 peer reviewed publications on the topic, Staiano and Katzmarzyk (2012) conclude that "… girls have more T[otal]B[ody]F[at] than boys throughout childhood and adolescence. (at 4.)

74.     In the seminal textbook, *Growth, Maturation, and Physical Activity*, Malina et al. (2004) present a summary of data from Gauthier et al. (1983) which present data from "a national sample of Canadian children and youth" demonstrating that from ages 7 to17, boys have a higher aerobic power output than do girls of the same ages when exercise intensity is measured using heart rate

25

(Malina at 242.) That is to say, that at a heart rate of 130 beats per minute, or 150, or 170, a 7 to 17 year old boy should be able to run, bike, or swim faster than a similarly aged girl.

75.    Considerable data from school-based fitness testing exists showing that prepubertal boys outperform comparably aged girls in tests of muscular strength, muscular endurance, and running speed. These sex-based differences in physical fitness are relevant to the current issue of sex-based sports categories because, as stated by Lesinski et al. (2020), in an evaluation "of 703 male and female elite young athletes aged 8–18" (1) "fitness development precedes sports specialization" (2) and further observed that "males outperformed females in C[ounter]M[ovement]J[ump], D[rop]J[ump], C[hange]o[f]D[irection speed] performances and hand grip strength." (5).

76.    Tambalis et al. (2016) states that "based on a large data set comprising 424,328 test performances" (736) using standing long jump to measure lower body explosive power, sit and reach to measure flexibility, timed 30 second sit ups to measure abdominal and hip flexor muscle endurance, 10 x 5 meter shuttle run to evaluate speed and agility, and multi-stage 20 meter shuttle run test to estimate aerobic performance (738). "For each of the fitness tests, performance was better in boys compared with girls (p < 0.001), except for the S[it and] R[each] test (p < 0.001)." (739)  In order to illustrate that the findings of Tambalis (2016) are not unique to children in Greece, the authors state "Our findings are in accordance with recent studies from Latvia [ ] Portugal [ ] and Australia [Catley & Tomkinson (2013)]."(744).

77.    The 20-m multistage fitness test is a commonly used maximal running aerobic fitness test used in the Eurofit Physical Fitness Test Battery and the FitnessGram Physical Fitness test. It is also known as the 20-meter shuttle run test, PACER test, or beep test (among other names; this is not the same test as the shuttle run in the Presidential Fitness Test). This test involves continuous running between two lines 20 meters apart in time to recorded beeps. The participants stand behind one of the lines facing the second line and begin running when instructed by the recording. The speed at the start is quite slow. The subject continues running between the two lines, turning when signaled by the recorded beeps. After about one minute, a sound indicates an increase in speed, and the beeps will be closer together. This continues each minute (level). If the line is reached before the beep sounds, the subject must wait until the beep sounds before continuing. If the line is not reached before the beep sounds, the subject is given a warning and must continue to run to the line, then turn and try to catch up with the pace within two more 'beeps'. The subject is given a warning the first time they fail to reach the line (within 2 meters) and eliminated after the second warning.

G. Brown                                                      Expert Report, B.P.J. v. WV BOE et al.

78.     To illustrate the sex-based performance differences observed by Tambalis, I have prepared the following table showing the number of laps completed in the 20 m shuttle run for children ages 6-18 years for the low, middle, and top decile (Tambalis 2016 at 740 & 742), and have calculated the percent difference between the boys and girls using the same equation as Millard-Stafford (2018).

Performance difference between boys and girls ÷ Girls performance

**Number of laps completed in the 20m shuttle run for children ages 6-18 years**

|  | Male | | | Female | | | Male-Female % Difference | | |
|---|---|---|---|---|---|---|---|---|---|
| Age | 10th %ile | 50th %ile | 90th %ile | 10th %ile | 50th %ile | 90th %ile | 10th %ile | 50th %ile | 90th %ile |
| 6 | 4 | 14 | 31 | 4.0 | 12.0 | 26.0 | 0.0% | 16.7% | 19.2% |
| 7 | 8 | 18 | 38 | 8.0 | 15.0 | 29.0 | 0.0% | 20.0% | 31.0% |
| 8 | 9 | 23 | 47 | 9.0 | 18.0 | 34.0 | 0.0% | 27.8% | 38.2% |
| 9 | 11 | 28 | 53 | 10.0 | 20.0 | 40.0 | 10.0% | 40.0% | 32.5% |
| 10 | 12 | 31 | 58 | 11.0 | 23.0 | 43.0 | 9.1% | 34.8% | 34.9% |
| 11 | 15 | 36 | 64 | 12.0 | 26.0 | 48.0 | 25.0% | 38.5% | 33.3% |
| 12 | 15 | 39 | 69 | 12.0 | 26.0 | 49.0 | 25.0% | 50.0% | 40.8% |
| 13 | 16 | 44 | 76 | 12.0 | 26.0 | 50.0 | 33.3% | 69.2% | 52.0% |
| 14 | 19 | 50 | 85 | 12.0 | 26.0 | 50.0 | 58.3% | 92.3% | 70.0% |
| 15 | 20 | 53 | 90 | 12.0 | 25.0 | 47.0 | 66.7% | 112.0% | 91.5% |
| 16 | 20 | 54 | 90 | 11.0 | 24.0 | 45.0 | 81.8% | 125.0% | 100.0% |
| 17 | 18 | 50 | 86 | 10.0 | 23.0 | 50.0 | 80.0% | 117.4% | 72.0% |
| 18 | 13 | 48 | 87 | 8.0 | 23.0 | 39.5 | 62.5% | 108.7% | 120.3% |

79.     The Presidential Fitness Test was widely used in schools in the United States from the late 1950s until 2013 (when it was phased out in favor of the Presidential Youth Fitness Program and FitnessGram, both of which focus on health-related physical fitness and do not present data in percentiles). Students participating in the Presidential Fitness Test could receive "The National Physical Fitness Award" for performance equal to the 50th percentile in five areas of the fitness test, "while performance equal to the 85th percentile could receive the Presidential Physical Fitness Award." Tables presenting the 50th and 85th percentiles for the Presidential Fitness Test for males and females ages 6 – 17, and differences in performance between males and females, for curl-ups, shuttle run, 1 mile run, push-ups, and pull-ups appear in the Appendix.

80.     For both the 50th percentile (The National Physical Fitness Award) and the 85th percentile (Presidential Physical Fitness Award), with the exception of curl-ups in 6-year-old children, boys outperform girls.  The difference in pull-ups for the 85th percentile for ages 7 through 17 are particularly informative with boys

27

outperforming girls by 100% – 1200%, highlighting the advantages in upper body strength in males.

81.    A very recent literature review commissioned by the five United Kingdom governmental Sport Councils concluded that while "[i]t is often assumed that children have similar physical capacity regardless of their sex, . . . large-scale data reports on children from the age of six show that young males have significant advantage in cardiovascular endurance, muscular strength, muscular endurance, speed/agility and power tests," although they "score lower on flexibility tests." (UK Sports Councils' Literature Review 2021 at 3.)

82.    Hilton et al., also writing in 2021, reached the same conclusion: "An extensive review of fitness data from over 85,000 Australian children aged 9–17 years old showed that, compared with 9-year-old females, 9-year-old males were faster over short sprints (9.8%) and 1 mile (16.6%), could jump 9.5% further from a standing start (a test of explosive power), could complete 33% more push-ups in 30 [seconds] and had 13.8% stronger grip." (Hilton 2021 at 201, summarizing the findings of Catley & Tomkinson 2013.)

83.    The following data are taken from Catley & Tomkinson (2013 at 101) showing the low, middle, and top decile for 1.6 km run (1.0 mile) run time for 11,423 girls and boys ages 9-17.

**1.6 km run (1.0 mile) run time for 11,423 girls and boys ages 9-17**

| Age | Male 10th %ile | Male 50th %ile | Male 90th %ile | Female 10th %ile | Female 50th %ile | Female 90th %ile | Male-Female % Difference 10th %ile | Male-Female % Difference 50th %ile | Male-Female % Difference 90th %ile |
|---|---|---|---|---|---|---|---|---|---|
| 9 | 684 | 522 | 423 | 769.0 | 609.0 | 499.0 | 11.1% | 14.3% | 15.2% |
| 10 | 666 | 511 | 420 | 759.0 | 600.0 | 494.0 | 12.3% | 14.8% | 15.0% |
| 11 | 646 | 500 | 416 | 741.0 | 586.0 | 483.0 | 12.8% | 14.7% | 13.9% |
| 12 | 621 | 485 | 408 | 726.0 | 575.0 | 474.0 | 14.5% | 15.7% | 13.9% |
| 13 | 587 | 465 | 395 | 716.0 | 569.0 | 469.0 | 18.0% | 18.3% | 15.8% |
| 14 | 556 | 446 | 382 | 711.0 | 567.0 | 468.0 | 21.8% | 21.3% | 18.4% |
| 15 | 531 | 432 | 373 | 710.0 | 570.0 | 469.0 | 25.2% | 24.2% | 20.5% |
| 16 | 514 | 423 | 366 | 710.0 | 573.0 | 471.0 | 27.6% | 26.2% | 22.3% |
| 17 | 500 | 417 | 362 | 708.0 | 575.0 | 471.0 | 29.4% | 27.5% | 23.1% |

84.    Tomkinson et al. (2018) performed a similarly extensive analysis of literally millions of measurements of a variety of strength and agility metrics from the "Eurofit" test battery on children from 30 European countries. They provide detailed results for each metric, broken out by decile. Sampling the low, middle, and top decile, 9-year-old boys performed better than 9-year-old girls by between 6.5%

G. Brown                                                      Expert Report, B.P.J. v. WV BOE et al.

and 9.7% in the standing broad jump; from 11.4% to 16.1% better in handgrip; and from 45.5% to 49.7% better in the "bent-arm hang." (Tomkinson 2018.)

85.    The Bent Arm Hang test is a measure of upper body muscular strength and endurance used in the Eurofit Physical Fitness Test Battery. To perform the Bent Arm Hang, the child is assisted into position with the body lifted to a height so that the chin is level with the horizontal bar (like a pull up bar). The bar is grasped with the palms facing away from body and the hands shoulder width apart. The timing starts when the child is released. The child then attempts to hold this position for as long as possible. Timing stops when the child's chin falls below the level of the bar, or the head is tilted backward to enable the chin to stay level with the bar.

86.    Using data from Tomkinson (2018; table 7 at 1452), the following table sampling the low, middle, and top decile for bent arm hang for 9- to 17-year-old children can be constructed:

**Bent Arm Hang time (in seconds) for children ages 9 - 17 years**

| | Male | | | Female | | | Male-Female % Difference | | |
|---|---|---|---|---|---|---|---|---|---|
| Age | 10th %ile | 50th %ile | 90th %ile | 10th %ile | 50th %ile | 90th %ile | 10th %ile | 50th %ile | 90th %ile |
| 9 | 2.13 | 7.48 | 25.36 | 1.43 | 5.14 | 16.94 | 48.95% | 45.53% | 49.70% |
| 10 | 2.25 | 7.92 | 26.62 | 1.42 | 5.15 | 17.06 | 58.45% | 53.79% | 56.04% |
| 11 | 2.35 | 8.32 | 27.73 | 1.42 | 5.16 | 17.18 | 65.49% | 61.24% | 61.41% |
| 12 | 2.48 | 8.79 | 28.99 | 1.41 | 5.17 | 17.22 | 75.89% | 70.02% | 68.35% |
| 13 | 2.77 | 9.81 | 31.57 | 1.41 | 5.18 | 17.33 | 96.45% | 89.38% | 82.17% |
| 14 | 3.67 | 12.70 | 38.39 | 1.40 | 5.23 | 17.83 | 162.14% | 142.83% | 115.31% |
| 15 | 5.40 | 17.43 | 47.44 | 1.38 | 5.35 | 18.80 | 291.30% | 225.79% | 152.34% |
| 16 | 7.39 | 21.75 | 53.13 | 1.38 | 5.63 | 20.57 | 435.51% | 286.32% | 158.29% |
| 17 | 9.03 | 24.46 | 54.66 | 1.43 | 6.16 | 23.61 | 531.47% | 297.08% | 131.51% |

87.    Evaluating these data, a 9-year-old boy in the 50th percentile (that is to say a 9-year-old boy of average upper body muscular strength and endurance) will perform better in the bent arm hang test than 9 through 17-year-old girls in the 50th percentile. Similarly, a 9-year-old boy in the 90th percentile will perform better in the bent arm hang test than 9 through 17-year-old girls in the 90th percentile.

88.    Using data from Tomkinson et al. (2017; table 1 at 1549), the following table sampling the low, middle, and top decile for running speed in the last stage of the 20 m shuttle run for 9- to 17-year-old children can be constructed.

G. Brown                                                    Expert Report, B.P.J. v. WV BOE et al.

**20 m shuttle Running speed (km/h at the last completed stage)**

| Age | Male 10th %ile | Male 50th %ile | Male 90th %ile | Female 10th %ile | Female 50th %ile | Female 90th %ile | Male-Female % Difference 10th %ile | Male-Female % Difference 50th %ile | Male-Female % Difference 90th %ile |
|---|---|---|---|---|---|---|---|---|---|
| 9 | 8.94 | 10.03 | 11.13 | 8.82 | 9.72 | 10.61 | 1.36% | 3.19% | 4.90% |
| 10 | 8.95 | 10.13 | 11.31 | 8.76 | 9.75 | 10.74 | 2.17% | 3.90% | 5.31% |
| 11 | 8.97 | 10.25 | 11.53 | 8.72 | 9.78 | 10.85 | 2.87% | 4.81% | 6.27% |
| 12 | 9.05 | 10.47 | 11.89 | 8.69 | 9.83 | 10.95 | 4.14% | 6.51% | 8.58% |
| 13 | 9.18 | 10.73 | 12.29 | 8.69 | 9.86 | 11.03 | 5.64% | 8.82% | 11.42% |
| 14 | 9.32 | 10.96 | 12.61 | 8.70 | 9.89 | 11.07 | 7.13% | 10.82% | 13.91% |
| 15 | 9.42 | 11.13 | 12.84 | 8.70 | 9.91 | 11.11 | 8.28% | 12.31% | 15.57% |
| 16 | 9.51 | 11.27 | 13.03 | 8.71 | 9.93 | 11.14 | 9.18% | 13.49% | 16.97% |
| 17 | 9.60 | 11.41 | 13.23 | 8.72 | 9.96 | 11.09 | 10.09% | 14.56% | 19.30% |

89.     Evaluating these data, a 9-year-old boy in the 50th percentile (that is to say a 9-year-old boy of average running speed) will run faster in the final stage of the 20 m shuttle run than 9 through 17-year-old girls in the 50th percentile. Similarly, a 9-year-old boy in the 90th percentile will run faster in the final stage of the 20-m shuttle run than 9 through 15, and 17-year-old girls in the 90th percentile and will be 0.01 km/h (0.01%) slower than 16-year-old girls in the 90th percentile.

90.     Just using these two examples for bent arm hang and 20-m shuttle running speed (Tomkinson 2107, Tomkinson 2018) based on large sample sizes (thus having tremendous statistical power) it becomes apparent that a 9-year-old boy will be very likely to outperform similarly trained girls of his own age and older in athletic events involving upper body muscle strength and/or running speed.

91.     Another report published in 2014 analyzed physical fitness measurements of 10,302 children aged 6 -10.9 years of age, from the European countries of Sweden, Germany, Hungary, Italy, Cyprus, Spain, Belgium, and Estonia. (De Miguel-Etayo et al. 2014.) The authors observed "… that boys performed better than girls in speed, lower- and upper-limb strength and cardiorespiratory fitness." (57) The data showed that for children of comparable fitness (i.e. 99th percentile boys vs. 99th percentile girls, 50th percentile boys vs. 50th percentile girls, etc.) the boys outperform the girls at every age in measurements of handgrip strength, standing long jump, 20-m shuttle run, and predicted $VO_2$max (pages 63 and 64, respectively).  For clarification, $VO_2$max is the maximal oxygen consumption, which correlates to 30-40% of success in endurance sports.

92.     The standing long jump, also called the Broad Jump, is a common and easy to administer test of explosive leg power used in the Eurofit Physical Fitness Test Battery and in the NFL Combine. In the standing long jump, the participant stands behind a line marked on the ground with feet slightly apart. A two-foot take-

off and landing is used, with swinging of the arms and bending of the knees to provide forward drive. The participant attempts to jump as far as possible, landing on both feet without falling backwards. The measurement is taken from takeoff line to the nearest point of contact on the landing (back of the heels) with the best of three attempts being scored.

93.     Using data from De Miguel-Etayo et al. (2014, table 3 at 61), which analyzed physical fitness measurements of 10,302 children aged 6 -10.9 years of age, from the European countries of Sweden, Germany, Hungary, Italy, Cyprus, Spain, Belgium, and Estonia, the following table sampling the low, middle, and top decile for standing long jump for 6- to 9-year-old children can be constructed:

**Standing Broad Jump (cm) for children ages 6-9 years**

|  | Male | | | Female | | | Male-Female % Difference | | |
|---|---|---|---|---|---|---|---|---|---|
| Age | 10th %ile | 50th %ile | 90th %ile | 10th %ile | 50th %ile | 90th %ile | 10th %ile | 50th %ile | 90th %ile |
| 6-<6.5 | 77.3 | 103.0 | 125.3 | 69.1 | 93.8 | 116.7 | 11.9% | 9.8% | 7.4% |
| 6.5-<7 | 82.1 | 108.0 | 130.7 | 73.6 | 98.7 | 121.9 | 11.5% | 9.4% | 7.2% |
| 7-<7.5 | 86.8 | 113.1 | 136.2 | 78.2 | 103.5 | 127.0 | 11.0% | 9.3% | 7.2% |
| 7.5-<8 | 91.7 | 118.2 | 141.6 | 82.8 | 108.3 | 132.1 | 10.7% | 9.1% | 7.2% |
| 8-<8.5 | 96.5 | 123.3 | 146.9 | 87.5 | 113.1 | 137.1 | 10.3% | 9.0% | 7.1% |
| 8.5-<9 | 101.5 | 128.3 | 152.2 | 92.3 | 118.0 | 142.1 | 10.0% | 8.7% | 7.1% |

94.     Another study of Eurofit results for over 400,000 Greek children reported similar results. "[C]ompared with 6-year-old females, 6-year-old males completed 16.6% more shuttle runs in a given time and could jump 9.7% further from a standing position." (Hilton 2021 at 201, summarizing findings of Tambalis et al. 2016.)

95.     Silverman (2011) gathered hand grip data, broken out by age and sex, from a number of studies. Looking only at the nine direct comparisons within individual studies tabulated by Silverman for children aged 7 or younger, in eight of these the boys had strength advantages of between 13 and 28 percent, with the remaining outlier recording only a 4% advantage for 7-year-old boys. (Silverman 2011 Table 1.)

96.     To help illustrate the importance of one specific measure of physical fitness in athletic performance, Pocek (2021) stated that to be successful, volleyball "players should distinguish themselves, besides in skill level, in terms of above-average body height, upper and lower muscular power, speed, and agility. Vertical jump is a fundamental part of the spike, block, and serve." (8377) Pocek further stated that "relative vertical jumping ability is of great importance in volleyball regardless of the players' position, while absolute vertical jump values can differentiate players not only in terms of player position and performance level but in their career trajectories." (8382)

G. Brown                                                    Expert Report, B.P.J. v. WV BOE et al.

97.     Using data from Ramírez-Vélez (2017; table 2 at 994) which analyzed vertical jump measurements of 7,614 healthy Colombian schoolchildren aged 9 -17.9 years of age the following table sampling the low, middle, and top decile for vertical jump can be constructed:

**Vertical Jump Height (cm) for children ages 9 - 17 years**

|      | Male | | | Female | | | Male-Female % Difference | | |
| --- | --- | --- | --- | --- | --- | --- | --- | --- | --- |
|      | 10th | 50th | 90th | 10th | 50th | 90th | 10th | 50th | 90th |
| Age  | %ile | %ile | %ile | %ile | %ile | %ile | %ile | %ile | %ile |
| 9    | 18.0 | 24.0 | 29.5 | 16.0 | 22.3 | 29.0 | 12.5% | 7.6% | 1.7% |
| 10   | 19.5 | 25.0 | 32.0 | 18.0 | 24.0 | 29.5 | 8.3% | 4.2% | 8.5% |
| 11   | 21.0 | 27.0 | 32.5 | 19.5 | 25.0 | 31.0 | 7.7% | 8.0% | 4.8% |
| 12   | 22.0 | 27.5 | 34.5 | 20.0 | 25.5 | 31.5 | 10.0% | 7.8% | 9.5% |
| 13   | 23.0 | 30.5 | 39.0 | 19.0 | 25.5 | 32.0 | 21.1% | 19.6% | 21.9% |
| 14   | 23.5 | 32.0 | 41.5 | 20.0 | 25.5 | 32.5 | 17.5% | 25.5% | 27.7% |
| 15   | 26.0 | 35.5 | 43.0 | 20.2 | 26.0 | 32.5 | 28.7% | 36.5% | 32.3% |
| 16   | 28.0 | 36.5 | 45.1 | 20.5 | 26.5 | 33.0 | 36.6% | 37.7% | 36.7% |
| 17   | 28.0 | 38.0 | 47.0 | 21.5 | 27.0 | 35.0 | 30.2% | 40.7% | 34.3% |

98.     Similarly, using data from Taylor (2010; table 2, at 869) which analyzed vertical jump measurements of 1,845 children aged 10 -15 years in primary and secondary schools in the East of England, the following table sampling the low, middle, and top decile for vertical jump can be constructed:

**Vertical Jump Height (cm) for children 10 -15 years**

|      | Male | | | Female | | | Male-Female % Difference | | |
| --- | --- | --- | --- | --- | --- | --- | --- | --- | --- |
|      | 10th | 50th | 90th | 10th | 50th | 90th | 10th | 50th | 90th |
| Age  | %ile | %ile | %ile | %ile | %ile | %ile | %ile | %ile | %ile |
| 10   | 16.00 | 21.00 | 29.00 | 15.00 | 22.00 | 27.00 | 6.7% | -4.5% | 7.4% |
| 11   | 20.00 | 27.00 | 34.00 | 19.00 | 25.00 | 32.00 | 5.3% | 8.0% | 6.3% |
| 12   | 23.00 | 30.00 | 37.00 | 21.00 | 27.00 | 33.00 | 9.5% | 11.1% | 12.1% |
| 13   | 23.00 | 32.00 | 40.00 | 21.00 | 26.00 | 34.00 | 9.5% | 23.1% | 17.6% |
| 14   | 26.00 | 36.00 | 44.00 | 21.00 | 28.00 | 34.00 | 23.8% | 28.6% | 29.4% |
| 15   | 29.00 | 37.00 | 44.00 | 21.00 | 28.00 | 39.00 | 38.1% | 32.1% | 12.8% |

99.     As can be seen from the data from Ramírez-Vélez (2017) and Taylor (2010), males consistently outperform females of the same age and percentile in vertical jump height. Both sets of data show that an 11-year-old boy in the 90th percentile for vertical jump height will outperform girls in the 90th percentile at ages 11 and 12, and will be equal to girls at ages 13, 14, and possibly 15. These data indicate that an 11-year-old would be likely to have an advantage over girls of the same age and older in sports such as volleyball where "absolute vertical jump

32

Video 0153

G. Brown                                                    Expert Report, B.P.J. v. WV BOE et al.

values can differentiate players not only in terms of player position and performance level but in their career trajectories." (Pocek 2021 at 8382.)

100.   Boys also enjoy an advantage in throwing well before puberty. "Boys exceed girls in throwing velocity by 1.5 standard deviation units as early as 4 to 7 years of age. . . The boys exceed the girls [in throwing distance] by 1.5 standard deviation units as early as 2 to 4 years of age." (Thomas 1985 at 266.) This means that the average 4- to 7-year-old boy can out-throw approximately 87% of all girls of his age.

101.   Record data from USA Track & Field indicate that boys outperform girls in track events even in the youngest age group for whom records are kept (age 8 and under).[8]

### American Youth Outdoor Track & Field Record times in age groups 8 and under (time in seconds)

| Event | Boys | Girls | Difference |
|---|---|---|---|
| 100M | 13.65 | 13.78 | 0.95% |
| 200M | 27.32 | 28.21 | 3.26% |
| 400M | 62.48 | 66.10 | 5.79% |
| 800M | 148.59 | 158.11 | 6.41% |
| 1500M | 308.52 | 314.72 | 2.01% |
| **Mean** | | | 3.68% |

102.   Looking at the best times within a single year shows a similar pattern of consistent advantage for even young boys. I consider the 2018 USATF Region 8 Junior Olympic Championships for the youngest age group (8 and under).[9]

### 2018 USATF Region 8 Junior Olympic Championships for the 8 and under age group

| Event | Boys | Girls | Difference |
|---|---|---|---|
| 100M | 15.11 | 15.64 | 3.51% |
| 200M | 30.79 | 33.58 | 9.06% |
| 400M | 71.12 | 77.32 | 8.72% |
| 800M | 174.28 | 180.48 | 3.56% |
| 1500M | 351.43 | 382.47 | 8.83% |
| **Mean** | | | 6.74% |

---

[8] http://legacy.usatf.org/statistics/records/view.asp?division=american&location=outdoor%20track%20%26%20field&age=youth&sport=TF

[9] https://www.athletic.net/TrackAndField/meet/384619/results/m/1/100m

[9] https://www.athletic.net/CrossCountry/Division/List.aspx?DivID=62211

33

Plaintiffs 0154

G. Brown                                                              Expert Report, B.P.J. v. WV BOE et al.

103.    Using Athletic.net[9], for 2021 Cross Country and Track & Field data for boys and girls in the 7-8, 9-10, and 11-12 year old age group club reports, and for 5th, 6th, and 7th grade for the whole United States I have compiled the tables for 3000 m events, and for the 100-m, 200-m, 400-m, 800-m, 1600-m, 3000-m, long jump, and high jump Track and Field data to illustrate the differences in individual athletic performance between boys and girls, all of which appear in the Appendix. The pattern of males outperforming females was consistent across events, with rare anomalies, only varying in the magnitude of difference between males and females.

104.    Similarly, using Athletic.net, for 2021 Track & Field data for boys and girls in the 6th grade for the state of West Virginia, I have compiled tables, which appear in the appendix, comparing the performance of boys and girls for the 100-m, 200-m, 400-m, 800-m, 1600-m, and 3200-m running events in which the 1st place boy was consistently faster than the 1st place girl, and the average performance of the top 10 boys was consistently faster than the average performance for the top 10 girls.  Based on the finishing times for the 1st place boy and girl in the 6th grade in West Virginia 1600-m race, and extrapolating the running time to a running pace, the 1st place boy would be expected to finish 273 m in front of the 1st place girl, which is 2/3 of a lap on a standard 400-m track, or almost the length of 3 football fields. In comparison, the 1st place boy would finish 66 m in front of the 2nd place boy, and the 1st place girl would finish 20 m in front of the 2nd place girl.

G. Brown                                                         Expert Report, B.P.J. v. WV BOE et al.

**Top 10 West Virginia boys and girls 6th grade outdoor track for 2021 (time in seconds)**

| | 100 m | | | 200 m | | | 400 m | | |
|---|---|---|---|---|---|---|---|---|---|
| | Boys | Girls | | Boys | Girls | | Boys | Girls | |
| 1 | 13.18 | 14.00 | Difference | 26.97 | 29.28 | Difference | 60.04 | 65.50 | Difference |
| 2 | 13.94 | 14.19 | between #1 | 29.38 | 30.05 | between #1 | 60.48 | 67.51 | between #1 |
| 3 | 14.07 | 14.47 | boy and # 1 | 30.09 | 30.34 | boy and # 1 | 66.26 | 68.60 | boy and # 1 |
| 4 | 14.44 | 14.86 | girl | 30.10 | 30.73 | girl | 67.12 | 70.43 | girl |
| 5 | 14.46 | 14.92 | 5.9% | 30.24 | 31.00 | 7.9% | 68.28 | 71.09 | 8.3% |
| 6 | 14.53 | 15.04 | | 30.38 | 31.04 | | 68.36 | 71.38 | |
| 7 | 14.75 | 15.04 | Average | 30.54 | 31.10 | Average | 69.65 | 73.61 | Average |
| 8 | 14.78 | 15.20 | difference | 30.69 | 31.10 | difference | 69.70 | 73.87 | difference |
| 9 | 14.84 | 15.25 | boys vs | 30.74 | 31.35 | boys vs | 69.76 | 74.07 | boys vs |
| | | | girls | | | girls | | | girls |
| 10 | 14.94 | 15.28 | 2.9% | 30.99 | 31.64 | 2.4% | 70.63 | 74.21 | 5.6% |

| | 800 m | | | 1600 m | | | 3200 m | | |
|---|---|---|---|---|---|---|---|---|---|
| | Boys | Girls | | Boys | Girls | | Boys | Girls | |
| 1 | 147.2 | 164.5 | Difference | 305.5 | 357.8 | Difference | 678.4 | 776.6 | Difference |
| 2 | 147.9 | 166.1 | between #1 | 318.1 | 361.6 | between #1 | 750.0 | 809.8 | between #1 |
| 3 | 152.1 | 167.2 | boy and # 1 | 322.0 | 379.8 | boy and # 1 | 763.3 | 811.0 | boy and # 1 |
| 4 | 153.2 | 170.2 | girl | 336.0 | 385.2 | girl | 766.3 | 843.0 | girl |
| 5 | 155.3 | 171.0 | 10.6% | 342.2 | 390.2 | 14.6% | 771.7 | 850.6 | 12.7% |
| 6 | 159.5 | 171.5 | | 348.0 | 392.0 | | 782.8 | 852.1 | |
| 7 | 159.9 | 174.8 | Average | 356.6 | 393.3 | Average | 794.1 | 858.0 | Average |
| 8 | 167.8 | 174.9 | difference | 357.5 | 395.7 | difference | 803.0 | 862.8 | difference |
| 9 | 169.2 | 175.9 | boys vs | 362.4 | 398.1 | boys vs | 812.1 | 869.9 | boys vs |
| | | | girls | | | girls | | | girls |
| 10 | 172.6 | 177.6 | 7.5% | 366.0 | 403.2 | 11.5% | 814.3 | 883.3 | 8.1% |

105.    As serious runners will recognize, differences of 3%, 5%, or 8% are not easily overcome. During track competition the difference between first and second place, or second and third place, or third and fourth place (and so on) is often 0.5 - 0.7%, with some contests being determined by as little as 0.01%.

106.    I performed an analysis of running events (consisting of the 100-m, 200-m, 400-m, 800-m, 1500-m, 5000-m, and 10,000-m) in the Division 1, Division 2, and Division 3 NCAA Outdoor championships for the years of 2010-2019: the mean difference between 1st and 2nd place was 0.48% for men and 0.86% for women. The mean difference between 2nd and 3rd place was 0.46% for men and 0.57% for women. The mean difference between 3rd place and 4th place was 0.31% for men and 0.44% for women. The mean difference between 1st place and 8th place (the last place to earn the title of All American) was 2.65% for men and 3.77% for women. (Brown et al. Unpublished observations, to be presented at the 2022 Annual Meeting of the American College of Sports Medicine.)

107.    A common response to empirical data showing pre-pubertal performance advantages in boys is the argument that the performance of boys may

35

represent a social–cultural bias for boys to be more physically active, rather than representing inherent sex-based differences in pre-pubertal physical fitness. However, the younger the age at which such differences are observed, and the more egalitarian the culture within which they are observed, the less plausible this hypothesis becomes. Eiberg et al. (2005) measured body composition, $VO_2$max, and physical activity in 366 Danish boys and 332 Danish girls between the ages of 6 and 7 years old. Their observations indicated that $VO_2$max was 11% higher in boys than girls. When expressed relative to body mass the boys' $VO_2$max was still 8% higher than the girls. The authors stated that "…no differences in haemoglobin or sex hormones[10] have been reported in this age group," yet "… when children with the same $VO_2$max were compared, boys were still more active, and in boys and girls with the same P[hysical] A[ctivity] level, boys were fitter." (728). These data indicate that in pre-pubertal children, in a very egalitarian culture regarding gender roles and gender norms, boys still have a measurable advantage in regards to aerobic fitness when known physiological and physical activity differences are accounted for.

108.    And, as I have mentioned above, even by the age of 4 or 5, in a ruler-drop test, boys exhibit 4% to 6% faster reaction times than girls. (Latorre-Roman 2018.)

109.    When looking at the data on testosterone concentrations previously presented, along with the data on physical fitness and athletic performance presented, boys have advantages in athletic performance and physical fitness before there are marked differences in testosterone concentrations between boys and girls.

110.    For the most part, the data I review above relate to pre-pubertal children. Today, we also face the question of inclusion in female athletics of males who have undergone "puberty suppression." The UK Sport Councils Literature Review notes that, "In the UK, so-called 'puberty blockers' are generally not used until Tanner maturation stage 2-3 (i.e. after puberty has progressed into early sexual maturation)." (9.) While it is outside my expertise, my understanding is that current practice with regard to administration of puberty blockers is similar in the Unites States. Tanner stages 2 and 3 generally encompass an age range from 10 to 14 years old, with significant differences between individuals. Like the authors of the UK Sports Council Literature Review, I am "not aware of research" directly addressing the implications for athletic capability of the use of puberty blockers. (UK Sport Councils Literature Review at 9.) As Handelsman documents, the male advantage begins to increase rapidly–along with testosterone levels–at about age 11, or "very closely aligned to the timing of the onset of male puberty." (Handelsman 2017.) It seems likely that males who have undergone puberty suppression will

---

[10] This term would include testosterone and estrogens.

have physiological and performance advantages over females somewhere between those possessed by pre-pubertal boys, and those who have gone through full male puberty, with the degree of advantage in individual cases depending on that individual's development and the timing of the start of puberty blockade.

111.    Tack et al. (2018) observed that in 21 transgender-identifying biological males, administration of antiandrogens for 5-31 months (commencing at $16.3 \pm 1.21$ years of age), resulted in nearly, but not completely, halting of normal age-related *increases* in muscle strength. Importantly, muscle strength did not decrease after administration of antiandrogens. Rather, despite antiandrogens, these individuals retained higher muscle mass, lower percent body fat, higher body mass, higher body height, and higher grip strength than comparable girls of the same age. (Supplemental tables).

112.    Klaver et al. (2018 at 256) demonstrated that the use of puberty blockers did not eliminate the differences in lean body mass between biological male and female teenagers. Subsequent use of puberty blockers combined with cross-sex hormone use (in the same subjects) still did not eliminate the differences in lean body mass between biological male and female teenagers. Furthermore, by 22 years of age, the use of puberty blockers, and then puberty blockers combined with cross sex hormones, and then cross hormone therapy alone for over 8 total years of treatment still had not eliminated the difference in lean body mass between biological males and females.

113.    The effects of puberty blockers on growth and development, including muscle mass, fat mass, or other factors that influence athletic performance, have been minimally researched. Indeed, Klaver et al. (2018) is the only published research that I am aware of that has evaluated the use of puberty blockers on body composition. As stated by Roberts and Carswell (2021), "No published studies have fully characterized the impact of [puberty blockers on] final adult height or current height in an actively growing TGD youth." (1680). Likewise, "[n]o published literature provides guidance on how to best predict the final adult height for TGD youth receiving GnRHa and gender- affirming hormonal treatment." (1681). Thus, the effect of prescribing puberty blockers to a male child before the onset of puberty on the physical components of athletic performance is largely unknown. There is not any scientific evidence that such treatment eliminates the pre-existing performance advantages that prepubertal males have over prepubertal females.

### B. The rapid increase in testosterone across male puberty drives characteristic male physiological changes and the increasing performance advantages.

114.    While boys exhibit some performance advantage even before puberty, it is both true and well known to common experience that the male advantage

increases rapidly, and becomes much larger, as boys undergo puberty and become men. Empirically, this can be seen by contrasting the modest advantages reviewed immediately above against the large performance advantages enjoyed by men that I have detailed in Section II.

115.   Multiple studies (along with common observation) document that the male performance advantage begins to increase during the early years of puberty, and then increases rapidly across the middle years of puberty (about ages 12-16). (Tønnessen 2015; Handelsman 2018 at 812-813.) Since it is well known that testosterone levels increase by more than an order of magnitude in boys across puberty, it is unsurprising that Handelsman finds that these increases in male performance advantage correlate to increasing testosterone levels, as presented in his chart reproduced below. (Handelsman 2018 at 812-13.)



116.   Handelsman further finds that certain characteristic male changes including boys' increase in muscle mass do not begin at all until "circulating testosterone concentrations rise into the range of males at mid-puberty, which are higher than in women at any age." (Handelsman 2018 at 810.)

117.   Knox et al. (2019) agree that "[i]t is well recognised that testosterone contributes to physiological factors including body composition, skeletal structure, and the cardiovascular and respiratory systems across the life span, with significant influence during the pubertal period. These physiological factors underpin strength, speed, and recovery with all three elements required to be competitive in almost all sports." (Knox 2019 at 397.) "High testosterone levels and prior male physiology provide an all-purpose benefit, and a substantial advantage. As the IAAF says, 'To the best of our knowledge, there is no other genetic or biological trait encountered in female athletics that confers such a huge performance advantage.'" (Knox 2019 at 399.)

118.   However, the undisputed fact that high (that is, normal male) levels of testosterone drive the characteristically male physiological changes that occur across male puberty does not at all imply that artificially *depressing* testosterone levels after those changes occur will reverse all or most of those changes so as to eliminate the male athletic advantage. This is an empirical question. As it turns out, the answer is that while some normal male characteristics can be changed by means of testosterone suppression, others cannot be, and all the reliable evidence indicates that males retain large athletic advantages even after long-term testosterone suppression.

## V.   The available evidence shows that suppression of testosterone in a male after puberty has occurred does <u>not</u> substantially eliminate the male athletic advantage.

119.   The 2011 "NCAA Policy on Transgender Student-Athlete Participation" requires only that males who identify as transgender be on unspecified and unquantified "testosterone suppression treatment" for "one calendar year" prior to competing in women's events. In supposed justification of this policy, the NCAA's Office of Inclusion asserts that, "It is also important to know that any strength and endurance advantages a transgender woman arguably may have as a result of her prior testosterone levels dissipate after about one year of estrogen or testosterone-suppression therapy." (NCAA 2011 at 8.)

120.   Similarly, writing in 2018, Handelsman et al. could speculate that even though some male advantages established during puberty are "fixed and irreversible (bone size)," "[t]he limited available prospective evidence . . . suggests that the advantageous increases in muscle and hemoglobin due to male circulating testosterone concentrations are induced or reversed during the first 12 months." (Handelsman 2018 at 824.)

121.   But these assertions or hypotheses of the NCAA and Handelsman are now strongly contradicted by the available science. In this section, I examine what is known about whether suppression of testosterone in males can eliminate the male physiological and performance advantages over females.

### A. Empirical studies find that males retain a strong performance advantage even after lengthy testosterone suppression.

122.   As my review in Section II indicates, a very large body of literature documents the large performance advantage enjoyed by males across a wide range of athletics. To date, only a limited number of studies have directly measured the effect of testosterone suppression and the administration of female hormones on the athletic performance of males. These studies report that testosterone suppression for a full year (and in some cases much longer) does not come close to eliminating

Brown 0160

G. Brown                                                    Expert Report, B.P.J. v. WV BOE et al.

male advantage in strength (hand grip, leg strength, and arm strength) or running speed.

### Hand Grip Strength

123.   As I have noted, hand grip strength is a well-accepted proxy for general strength. Multiple separate studies, from separate groups, report that males retain a large advantage in hand strength even after testosterone suppression to female levels.

124.   In a longitudinal study, Van Caenegem et al. reported that males who underwent standard testosterone suppression protocols lost only 7% hand strength after 12 months of treatment, and only a cumulative 9% after two years. (Van Caenegem 2015 at 42.) As I note above, on average men exhibit in the neighborhood of 60% greater hand grip strength than women, so these small decreases do not remotely eliminate that advantage. Van Caenegem et al. document that their sample of males who elected testosterone suppression began with less strength than a control male population. Nevertheless, after one year of suppression, their study population still had hand grip only 21% less than the control male population, and thus still far higher than a female population. (Van Caenegem 2015 at 42.)

125.   Scharff et al. (2019) measured grip strength in a large cohort of male-to-female subjects from before the start of hormone therapy through one year of hormone therapy. The hormone therapy included suppression of testosterone to less than 2 nml/L "in the majority of the transwomen," (1024), as well as administration of estradiol (1021). These researchers observed a small decrease in grip strength in these subjects over that time (Fig. 2), but mean grip strength of this group remained far higher than mean grip strength of females—specifically, "After 12 months, the median grip strength of transwomen [male-to-female subjects] still falls in the 95th percentile for age-matched females." (1026).

126.   Still a third longitudinal study, looking at teen males undergoing testosterone suppression, "noted no change in grip strength after hormonal treatment (average duration 11 months) of 21 transgender girls." (Hilton 2021 at 207, summarizing Tack 2018.)

127.   In a fourth study, Lapauw et al. (2008) looked at the extreme case of testosterone suppression by studying a population of 23 biologically male individuals who had undergone at least two years of testosterone suppression, followed by sex reassignment surgery that included "orchidectomy" (that is, surgical castration), and then at least an additional three years before the study date. Comparing this group against a control of age- and height-matched healthy males, the researchers found that the individuals who had gone through testosterone suppression and then surgical castration had an average hand grip (41 kg) that was

G. Brown                                                    Expert Report, B.P.J. v. WV BOE et al.

24% weaker than the control group of healthy males. But this remains at least 25% *higher* than the average hand-grip strength of biological females as measured by Bohannon et al. (2019).

128.   Summarizing these and a few other studies measuring strength loss (in most cases based on hand grip) following testosterone suppression, Harper et al. (2021) conclude that "strength loss with 12 months of [testosterone suppression] . . . ranged from non-significant to 7%. . . . [T]he small decrease in strength in transwomen after 12-36 months of [testosterone suppression] suggests that transwomen likely retain a strength advantage over cisgender women." (Hilton 2021 at 870.)

**Arm Strength**

129.   Lapauw et al. (2008) found that 3 years after surgical castration, preceded by at least two years of testosterone suppression, biologically male subjects had 33% less bicep strength than healthy male controls. (Lapauw (2008) at 1018.) Given that healthy men exhibit between 89% and 109% greater arm strength than healthy women, this leaves a very large residual arm strength advantage over biological women.

130.   Roberts et al. have recently published an interesting longitudinal study, one arm of which considered biological males who began testosterone suppression and cross-sex hormones while serving in the United States Air Force. (Roberts 2020.) One measured performance criterion was pushups per minute, which, while not exclusively, primarily tests arm strength under repetition. *Before* treatment, the biological male study subjects who underwent testosterone suppression could do 45% more pushups per minute than the average for all Air Force women under the age of 30 (47.3 vs. 32.5). *After* between one and two years of testosterone suppression, this group could still do 33% more pushups per minute. (Table 4.) Further, the body weight of the study group did not decline at all after one to two years of testosterone suppression (in fact rose slightly) (Table 3), and was approximately 24 pounds (11.0 kg) higher than the average for Air Force women under the age of 30. (Roberts 2020 at 3.) This means that the individuals who had undergone at least one year of testosterone suppression were not only doing 1/3 more pushups per minute, but were lifting significantly more weight with each pushup.

131.   After two years of testosterone suppression, the study sample in Roberts et al. was only able to do 6% more pushups per minute than the Air Force female average. But their weight remained unchanged from their pre-treatment starting point, and thus about 24 pounds higher than the Air Force female average. As Roberts et al. explain, "as a group, transwomen weigh more than CW [cis-women]. Thus, transwomen will have a higher power output than CW when

G. Brown                                                    Expert Report, B.P.J. v. WV BOE et al.

performing an equivalent number of push-ups. Therefore, our study may underestimate the advantage in strength that transwomen have over CW." (Roberts 2020 at 4.)

### Leg Strength

132.   Wiik et al. (2020), in a longitudinal study that tracked 11 males from the start of testosterone suppression through 12 months after treatment initiation, found that isometric strength levels measured at the knee "were maintained over the [study period]."[11] (808) "At T12 [the conclusion of the one-year study], the absolute levels of strength and muscle volume were greater in [male-to-female subjects] than in . . . CW [women who had not undergone any hormonal therapy]." (Wiik 2020 at 808.) In fact, Wiik et al. reported that "muscle strength after 12 months of testosterone suppression was comparable to baseline strength. As a result, transgender women remained about 50% stronger than . . . a reference group of females." (Hilton 2021 at 207, summarizing Wiik 2020.)

133.   Lapauw et al. (2008) found that 3 years after surgical castration, preceded by at least two years of testosterone suppression, subjects had peak knee torque only 25% lower than healthy male controls. (Lapauw 2008 at 1018.) Again, given that healthy males exhibit 54% greater maximum knee torque than healthy females, this leaves these individuals with a large average strength advantage over females even years after sex reassignment surgery.

### Running speed

134.   The most striking finding of the recent Roberts et al. study concerned running speed over a 1.5 mile distance–a distance that tests midrange endurance. Before suppression, the MtF study group ran 21% faster than the Air Force female average. After at least 2 year of testosterone suppression, these subjects still ran 12% faster than the Air Force female average. (Roberts 2020 Table 4.)

135.   The specific experience of the well-known case of NCAA athlete Cece Telfer is consistent with the more statistically meaningful results of Roberts et al., further illustrating that male-to-female transgender treatment does not negate the inherent athletic performance advantages of a post-pubertal male. In 2016 and 2017 Cece Telfer competed as Craig Telfer on the Franklin Pierce University men's track team, being ranked 200th and 390th (respectively) against other NCAA Division 2 men. "Craig" Telfer did not qualify for the National Championships in any events. Telfer did not compete in the 2018 season while undergoing testosterone

―――――――――――――

[11] Isometric strength measures muscular force production for a given amount of time at a specific joint angle but with no joint movement.

suppression (per NCAA policy). In 2019 Cece Telfer competed on the Franklin Pierce University *women's* team, qualified for the NCAA Division 2 Track and Field National Championships, and placed 1st in the women's 400 meter hurdles and placed third in the women's 100 meter hurdles. (For examples of the media coverage of this please see https://www.washingtontimes.com/news/2019/jun/3/cece-telfer-franklin-pierce-transgenderhurdler-wi/ last accessed May 29, 2020. https://www.newshub.co.nz/home/sport/2019/06/athletics-transgender-woman-cece-telfer-whopreviously-competed-as-a-man-wins-ncaa-track-championship.html (last accessed May 29, 2020.)

    136.    The table below shows the best collegiate performance times from the combined 2015 and 2016 seasons for Cece Telfer when competing as a man in men's events, and the best collegiate performance times from the 2019 season when competing as a woman in women's events. Comparing the times for the running events (in which male and female athletes run the same distance) there is no statistical difference between Telfer's "before and after" times. Calculating the difference in time between the male and female times, Telfer performed an average of 0.22% *faster* as a female. (Comparing the performance for the hurdle events (marked with H) is of questionable validity due to differences between men's and women's events in hurdle heights and spacing, and distance for the 110m vs. 100 m.) While this is simply one example, and does not represent a controlled experimental analysis, this information provides some evidence that male-to-female transgender treatment does not negate the inherent athletic performance advantages of a postpubertal male. (These times were obtained from https://www.tfrrs.org/athletes/6994616/Franklin_Pierce/CeCe_Telfer.html and https://www.tfrrs.org/athletes/5108308.html, last accessed May 29, 2020).

| As Craig Telfer (male athlete) | | As Cece Telfer (female athlete) | |
|---|---|---|---|
| Event | Time (seconds) | Event | Time (seconds) |
| 55 | 7.01 | 55 | 7.02 |
| 60 | 7.67 | 60 | 7.63 |
| 100 | 12.17 | 100 | 12.24 |
| 200 | 24.03 | 200 | 24.30 |
| 400 | 55.77 | 400 | 54.41 |
| 55 H † | 7.98 | 55 H† | 7.91 |
| 60 H † | 8.52 | 60 H† | 8.33 |
| 110 H† | 15.17 | 100 H† | 13.41* |
| 400 H‡ | 57.34 | 400 H‡ | 57.53** |

\* women's 3rd place, NCAA Division 2 National Championships
\*\* women's 1st place, NCAA Division 2 National Championships
† men's hurdle height is 42 inches with differences in hurdle spacing between men and women
‡ men's hurdle height is 36 inches, women's height is 30 inches with the same spacing between hurdles

137.   Similarly, University of Pennsylvania swimmer Lia Thomas began competing in the women's division in the fall of 2021, after previously competing for U. Penn. in the men's division. Thomas has promptly set school, pool, and/or league women's records in 200 yard freestyle, 500 yard freestyle, and 1650 yard freestyle competitions, beating the nearest female in the 1650 yard by an unheard-of 38 seconds.

138.   In a pre-peer review article, Senefeld, Coleman, Hunter, and Joyner (doi: https://doi.org/10.1101/2021.12.28.21268483, accessed January 12, 2022) "compared the gender-related differences in performance of a transgender swimmer who competed in both the male and female NCAA (collegiate) categories to the sex-related differences in performance of world and national class swimmers" and observed that this athlete [presumably Lia Thomas based on performance times and the timing of this article] was unranked in 2018-2019 in the 100-yard, ranked 551st in the 200-yard, 65th in the 500-yard 32nd in the 1650-yards men's freestyle.  After following the NCAA protocol for testosterone suppression and competing as a woman in 2021-2022, this swimmer was ranked 94th in the 100-yard, 1st in the 200-yard, 1st in the 500-yard, and 6th in the 1650-yard women's freestyle. The performance times swimming as a female, when compared to swimming as a male, were 4.6% slower in the 100-yard, 2.6% slower in the 200-yard, 5.6% slower in the 500-yard, and 6.8% slower in the 1650-yard events than when swimming as a male. *It is important to note that these are mid-season race times and do not represent season best performance times or in a championship event where athletes often set their personal record times.* The authors concluded "…that for middle distance events (100, 200 and 400m or their imperial equivalents) lasting between about one and five minutes, the decrements in performance of the transgender woman swimmer are less than expected on the basis of a comparison of a large cohort of world and national class performances by female and male swimmers" and "it is possible that the relative improvements in this swimmer's rankings in the women's category relative to the men's category are due to legacy effects of testosterone on a number of physiological factors that can influence athletic performance."

139.   Harper (2015) has often been cited as "proving" that testosterone suppression eliminates male advantage. And indeed, hedged with many disclaimers, the author in that article does more or less make that claim with respect to "distance races," while emphasizing that "the author makes no claims as to the equality of performances, pre and post gender transition, in any other sport." (Harper 2015 at 8.) However, Harper (2015) is in effect a collection of unverified anecdotes, not science. It is built around self-reported race times from just eight self-selected transgender runners, recruited "mostly" online. How and on what websites the subjects were recruited is not disclosed, nor is anything said about how those not recruited online were recruited. Thus, there is no information to tell us whether these eight runners could in any way be representative, and the

recruitment pools and methodology, which could bear on ideological bias in their
self-reports, is not disclosed.

140.    Further, the self-reported race times relied on by Harper (2015) *span
29 years*. It is well known that self-reported data, particularly concerning
emotionally or ideologically fraught topics, is unreliable, and likewise that memory
of distant events is unreliable. Whether the subjects were responding from memory
or from written records, and if so what records, is not disclosed, and does not appear
to be known to the author. For six of the subjects, the author claims to have been
able to verify "approximately half" of the self-reported times. Which scores these are
is not disclosed. The other two subjects responded only anonymously, so nothing
about their claims could be or was verified. In short, neither the author nor the
reader knows whether the supposed "facts" on which the paper's analysis is based
are true.

141.    Even if we could accept them at face value, the data are largely
meaningless. Only two of the eight study subjects reported (undefined) "stable
training patterns," and even with consistent training, athletic performance
generally declines with age. As a result, when the few data points span 29 years, it
is not possible to attribute declines in performance to asserted testosterone
suppression. Further, distance running is usually not on a track, and race times
vary significantly depending on the course and the weather. Only one reporting
subject who claimed a "stable training pattern" reported "before and after" times on
the same course within three years' time," which the author acknowledges would
"represent the best comparison points."

142.    Harper (2015) to some extent acknowledges its profound
methodological flaws, but seeks to excuse them by the difficulty of breaking new
ground. The author states that, "The first problem is how to formulate a study to
create a meaningful measurement of athletic performance, both before and after
testosterone suppression. No methodology has been previously devised to make
meaningful measurements." (2)  This statement was not accurate at the time of
publication, as there are innumerable publications with validated methodology for
comparing physical fitness and/or athletic performance between people of different
ages, sexes, and before and after medical treatment, any of which could easily have
been used with minimal or no adaptation for the purposes of this study. Indeed, well
before the publication of Harper (2015), several authors that I have cited in this
review had performed and published disciplined and methodologically reliable
studies of physical performance and physiological attributes "before and after"
testosterone suppression.

143.    More recently, and to her credit, Harper has acknowledged the finding
of Roberts (2020) regarding the durable male advantage in running speed in the 1.5
mile distance, even after two years of testosterone suppression. She joins with co-

45

authors in acknowledging that this study of individuals who (due to Air Force physical fitness requirements) "could at least be considered exercise trained," agrees that Roberts' data shows that "transwomen ran significantly faster during the 1.5 mile fitness test than ciswomen," and declares that this result is "consistent with the findings of the current review in untrained transgender individuals" that even 30 months of testosterone suppression does not eliminate all male advantages "associated with muscle endurance and performance." (Harper 2021 at 8.) The Harper (2021) authors conclude overall "that strength may be well preserved in transwomen during the first 3 years of hormone therapy," and that [w]hether transgender and cisgender women can engage in meaningful sport [in competition with each other], even after [testosterone suppression], is a highly debated question." (Harper 2021 at 1, 8.)

144.   Higerd (2021) "[a]ssess[ed] the probability of a girls' champion being biologically male" by evaluating 920,11 American high school track and field performances available through the track and field database Athletic.net in five states (CA, FL, MN, NY, WA), over three years (2017 – 2019),in eight events; high jump, long jump, 100M, 200M, 400M, 800M, 1600M, and 3200M and estimated that "there is a simulated 81%-98% probability of transgender dominance occurring in the female track and field event" and further concluded that "in the majority of cases, the entire podium (top of the state) would be MTF [transgender athletes]" (at xii).

## B. Testosterone suppression does not reverse important male physiological advantages.

145.   We see that, once a male has gone through male puberty, later testosterone suppression (or even castration) leaves large strength and performance advantages over females in place. It is not surprising that this is so. What is now a fairly extensive body of literature has documented that many of the specific male physiological advantages that I reviewed in Section II are not reversed by testosterone suppression after puberty, or are reduced only modestly, leaving a large advantage over female norms still in place.

146.   Handelsman has well documented that the large increases in physiological and performance advantages characteristic of men develop in tandem with, and are likely driven by, the rapid and large increases in circulating testosterone levels that males experience across puberty, or generally between the ages of about 12 through 18. (Handelsman 2018.) Some have misinterpreted Handelsman as suggesting that all of those advantages are and remain entirely dependent–on an ongoing basis–on *current* circulating testosterone levels. This is a misreading of Handelsman, who makes no such claim. As the studies reviewed above demonstrate, it is also empirically false with respect to multiple measures of

performance. Indeed, Handelsman himself, referring to the Roberts et al. (2020) study which I describe below, has recently written that "transwomen treated with estrogens after completing male puberty experienced only minimal declines in physical performance over 12 months, substantially surpassing average female performance for up to 8 years." (Handelsman 2020.)

147.   As to individual physiological advantages, the more accurate and more complicated reality is reflected in a statement titled "The Role of Testosterone in Athletic Performance," published in 2019 by several dozen sports medicine experts and physicians from many top medical schools and hospitals in the U.S. and around the world. (Levine et al. 2019.) This expert group concurs with Handelsman regarding the importance of testosterone to the male advantage, but recognizes that those advantages depend not only on *current* circulating testosterone levels in the individual, but on the "exposure in biological males to much higher levels of testosterone <u>during growth, development</u>, and throughout the athletic career." (*Emphasis added*.) In other words, both past and current circulating testosterone levels affect physiology and athletic capability.

148.   Available research enables us to sort out, in some detail, which specific physiological advantages are immutable once they occur, which can be reversed only in part, and which appear to be highly responsive to later hormonal manipulation. The bottom line is that very few of the male physiological advantages I have reviewed in Section II above are largely reversible by testosterone suppression once an individual has passed through male puberty.

### Skeletal Configuration

149.   It is obvious that some of the physiological changes that occur during "growth and development" across puberty cannot be reversed. Some of these irreversible physiological changes are quite evident in photographs that have recently appeared in the news of transgender competitors in female events. These include skeletal configuration advantages including:

- Longer and larger bones that give height, weight, and leverage advantages to men;

- More advantageous hip shape and configuration as compared to women.

### Cardiovascular Advantages

150.   Developmental changes for which there is no apparent means of reversal, and no literature suggesting reversibility, also include multiple

PageID #: 0168

G. Brown                                                    Expert Report, B.P.J. v. WV BOE et al.

contributors to the male cardiovascular advantage, including diaphragm placement, lung and trachea size, and heart size and therefore pumping capacity.[12]

151.   On the other hand, the evidence is mixed as to hemoglobin concentration, which as discussed above is a contributing factor to $V0_2$ max. Harper (2021) surveyed the literature and found that "Nine studies reported the levels of Hgb [hemoglobin] or HCT [red blood cell count] in transwomen before and after [testosterone suppression], from a minimum of three to a maximum of 36 months post hormone therapy. Eight of these studies. . . found that hormone therapy led to a significant (4.6%–14.0%) decrease in Hgb/HCT (p<0.01), while one study found no significant difference after 6 months," but only one of those eight studies returned results at the generally accepted 95% confidence level. (Harper 2021 at 5-6 and Table 5.)

152.   I have not found any study of the effect of testosterone suppression on the male advantage in mitochondrial biogenesis.

**Muscle mass**

153.   Multiple studies have found that muscle mass decreases modestly or not at all in response to testosterone suppression. Knox et al. report that "healthy young men did not lose significant muscle mass (or power) when their circulating testosterone levels were reduced to 8.8 nmol/L (lower than the 2015 IOC guideline of 10 nmol/L) for 20 weeks." (Knox 2019 at 398.) Gooren found that "[i]n spite of muscle surface area reduction induced by androgen deprivation, after 1 year the mean muscle surface area in male-to- female transsexuals remained significantly greater than in untreated female-to-male transsexuals." (Gooren 2011 at 653.) An earlier study by Gooren found that after one year of testosterone suppression, muscle mass at the thigh was reduced by only about 10%, exhibited "no further reduction after 3 years of hormones," and "remained significantly greater" than in his sample of untreated women. (Gooren 2004 at 426-427.) Van Caenegem et al. found that muscle cross section in the calf and forearm decreased only trivially (4% and 1% respectively) after two years of testosterone suppression. (Van Caenegem 2015 Table 4.)

154.   Taking measurements one month after start of testosterone suppression in male-to-female (non-athlete) subjects, and again 3 and 11 months after start of feminizing hormone replacement therapy in these subjects, Wiik et al.

---

[12] "[H]ormone therapy will not alter … lung volume or heart size of the transwoman athlete, especially if [that athlete] transitions postpuberty, so natural advantages including joint articulation, stroke volume and maximal oxygen uptake will be maintained." (Knox 2019 at 398.)

found that total lean tissue (i.e. primarily muscle) did not decrease significantly across the entire period. Indeed, "some of the [subjects] did not lose any muscle mass at all." (Wiik 2020 at 812.) And even though they observed a small decrease in thigh muscle mass, they found that isometric strength levels measured at the knee "were maintained over the [study period]." (808) "At T12 [the conclusion of the one-year study], the absolute levels of strength and muscle volume were greater in [male-to-female subjects] than in [female-to-male subjects] and CW [women who had not undergone any hormonal therapy]." (808)

155.    Hilton & Lundberg summarize an extensive survey of the literature as follows:

> "12 longitudinal studies have examined the effects of testosterone suppression on lean body mass or muscle size in transgender women. The collective evidence from these studies suggests that 12 months, which is the most commonly examined intervention period, of testosterone suppression to female typical reference levels results in a modest (approximately− 5%) loss of lean body mass or muscle size. . . .

> "Thus, given the large baseline differences in muscle mass between males and females (Table 1; approximately 40%), the reduction achieved by 12 months of testosterone suppression can reasonably be assessed as small relative to the initial superior mass. We, therefore, conclude that the muscle mass advantage males possess over females, and the performance implications thereof, are not removed by the currently studied durations (4 months, 1, 2 and 3 years) of testosterone suppression in transgender women. (Hilton 2021 at 205-207.)

156.    When we recall that "women have 50% to 60% of men's upper arm muscle cross-sectional area and 65% to 70% of men's thigh muscle cross-sectional area" (Handelsman 2018 at 812), it is clear that Hilton's conclusion is correct. In other words, biologically male subjects possess substantially larger muscles than biologically female subjects after undergoing a year or even three years of testosterone suppression.

157.    I note that outside the context of transgender athletes, the testosterone-driven increase in muscle mass and strength enjoyed by these male-to-female subjects would constitute a disqualifying doping violation under all league anti-doping rules with which I am familiar.

### C. Responsible voices internationally are increasingly recognizing that suppression of testosterone in a male after puberty has occurred does not substantially reverse the male athletic advantage.

158.    The previous very permissive NCAA policy governing transgender participation in women's collegiate athletics was adopted in 2011, and the previous IOC guidelines were adopted in 2015. At those dates, much of the scientific analysis of the actual impact of testosterone suppression had not yet been performed, much less any wider synthesis of that science. In fact, a series of important peer-reviewed studies and literature reviews have been published only very recently, since I prepared my first paper on this topic, in early 2020.

159.    These new scientific publications reflect a remarkably consistent consensus: once an individual has gone through male puberty, testosterone suppression does not substantially eliminate the physiological and performance advantages that that individual enjoys over female competitors.

160.    Importantly, I have found no peer-reviewed scientific paper, nor any respected scientific voice, that is now asserting the contrary–that is, that testosterone suppression can eliminate or even largely eliminate the male biological advantage once puberty has occurred.

161.    I excerpt the key conclusions from important recent peer-reviewed papers below.

162.    Roberts 2020: "In this study, we confirmed that . . . the pretreatment differences between transgender and cis gender women persist beyond the 12-month time requirement currently being proposed for athletic competition by the World Athletics and the IOC." (6)

163.    Wiik 2020: The muscular and strength changes in males undergoing testosterone suppression "were modest. The question of when it is fair to permit a transgender woman to compete in sport in line with her experienced gender identity is challenging." (812)

164.    Harper 2021: "[V]alues for strength, LBM [lean body mass], and muscle area in transwomen remain above those of cisgender women, even after 36 months of hormone therapy." (1)

165.    Hilton & Lundberg 2021: "evidence for loss of the male performance advantage, established by testosterone at puberty and translating in elite athletes to a 10–50% performance advantage, is lacking. . . . These data significantly

undermine the delivery of fairness and safety presumed by the criteria set out in transgender inclusion policies . . ." (211)

166.    Hamilton et al. 2020, "Response to the United Nations Human Rights Council's Report on Race and Gender Discrimination in Sport: An Expression of Concern and a Call to Prioritize Research": "There is growing support for the idea that development influenced by high testosterone levels may result in retained anatomical and physiological advantages . . . . If a biologically male athlete self-identifies as a female, legitimately with a diagnosis of gender dysphoria or illegitimately to win medals, the athlete already possesses a physiological advantage that undermines fairness and safety. This is not equitable, nor consistent with the fundamental principles of the Olympic Charter."

167.    Hamilton et al. 2021, "Consensus Statement of the Fédération Internationale de Médecine du Sport" (International Federation of Sports Medicine, or FIMS), signed by more than 60 sports medicine experts from prestigious institutions around the world: The available studies "make it difficult to suggest that the athletic capabilities of transwomen individuals undergoing HRT or GAS are comparable to those of cisgender women." The findings of Roberts et al. "question the required testosterone suppression time of 12 months for transwomen to be eligible to compete in women's sport, as most advantages over ciswomen were not negated after 12 months of HRT."

168.    Outside the forum of peer-reviewed journals, respected voices in sport are reaching the same conclusion.

169.    The **Women's Sports Policy Working Group** identifies among its members and "supporters" many women Olympic medalists, former women's tennis champion and LGBTQ activist Martina Navratilova, Professor Doriane Coleman, a former All-American women's track competitor, transgender athletes Joanna Harper and Dr. Renee Richards, and many other leaders in women's sports and civil rights. I have referenced other published work of Joanna Harper and Professor Coleman. In early 2021 the Women's Sports Policy Working Group published a "Briefing Book" on the issue of transgender participation in women's sports,[13] in which they reviewed largely the same body of literature I have reviewed above, and analyzed the implications of that science for fairness and safety in women's sports.

170.    Among other things, the Women's Sports Policy Working Group concluded:

---

[13] https://womenssportspolicy.org/wp-content/uploads/2021/02/Congressional-Briefing-WSPWG-Transgender-Women-Sports-2.27.21.pdf

- "[T]he evidence is increasingly clear that hormones do not eliminate the legacy advantages associated with male physical development" (8) due to "the considerable size and strength advantages that remain even after hormone treatments or surgical procedures." (17)

- "[T]here is convincing evidence that, depending on the task, skill, sport, or event, trans women maintain male sex-linked (legacy) advantages even after a year on standard gender-affirming hormone treatment." (26, citing Roberts 2020.)

- "[S]everal peer-reviewed studies, including one based on data from the U.S. military, have confirmed that trans women retain their male sex-linked advantages even after a year on gender affirming hormones. . . . Because of these retained advantages, USA Powerlifting and World Rugby have recently concluded that it isn't possible fairly and safely to include trans women in women's competition." (32)

171.   As has been widely reported, in 2020, after an extensive scientific consultation process, the **World Rugby** organization issued its Transgender Guidelines, finding that it would not be consistent with fairness or safety to permit biological males to compete in World Rugby women's matches, no matter what hormonal or surgical procedures they might have undergone. Based on their review of the science, World Rugby concluded:

- "Current policies regulating the inclusion of transgender women in sport are based on the premise that reducing testosterone to levels found in biological females is sufficient to remove many of the biologically-based performance advantages described above. However, peer-reviewed evidence suggests that this is not the case."

- "Longitudinal research studies on the effect of reducing testosterone to female levels for periods of 12 months or more do not support the contention that variables such as mass, lean mass and strength are altered meaningfully in comparison to the original male-female differences in these variables. The lowering of testosterone removes only a small proportion of the documented biological differences, with large, retained advantages in these physiological attributes, with the safety and performance implications described previously."

- ". . . given the size of the biological differences prior to testosterone suppression, this comparatively small effect of testosterone reduction allows substantial and meaningful differences to remain. This has significant implications for the risk of injury . . . ."

- " . . . bone mass is typically maintained in transgender women over the course of at least 24 months of testosterone suppression, . . . . Height and other skeletal measurements such as bone length and hip width have also not been shown to change with testosterone suppression, and nor is there any plausible biological mechanism by which this might occur, and so sporting advantages due to skeletal differences between males and females appear unlikely to change with testosterone reduction.

172.    In September 2021 the government-commissioned Sports Councils of the United Kingdom and its subsidiary parts (the five Sports Councils responsible for supporting and investing in sport across England, Wales, Scotland and Northern Ireland) issued a formal "Guidance for Transgender Inclusion in Domestic Sport" (UK Sport Councils 2021), following an extensive consultation process, and a commissioned "International Research Literature Review" prepared by the Carbmill Consulting group (UK Sport Literature Review 2021). The UK Sport Literature Review identified largely the same relevant literature that I review in this paper, characterizes that literature consistently with my own reading and description, and based on that science reaches conclusions similar to mine.

173.    The UK Sport Literature Review 2021 concluded:

- "Sexual dimorphism in relation to sport is significant and the most important determinant of sporting capacity. The challenge to sporting bodies is most evident in the inclusion of transgender people in female sport." "[The] evidence suggests that parity in physical performance in relation to gender-affected sport cannot be achieved for transgender people in female sport through testosterone suppression. Theoretical estimation in contact and collision sport indicate injury risk is likely to be increased for female competitors." (10)

- "From the synthesis of current research, the understanding is that testosterone suppression for the mandated one year before competition will result in little or no change to the anatomical differences between the sexes, and a more complete reversal of some acute phase metabolic pathways such as haemoglobin levels although the impact on running performance appears limited, and a modest change in muscle mass and strength: The average of around 5% loss of muscle mass and strength will not reverse the average 40-50% difference in strength that typically exists between the two sexes." (7)

- "These findings are at odds with the accepted intention of current policy in sport, in which twelve months of testosterone suppression is

expected to create equivalence between transgender women and females." (7)

174.   Taking into account the science detailed in the UK Sport Literature Review 2021, the UK Sports Councils have concluded:

- "[T]he latest research, evidence and studies made clear that there are retained differences in strength, stamina and physique between the average woman compared with the average transgender woman or non-binary person registered male at birth, with or without testosterone suppression." (3)

- "Competitive fairness cannot be reconciled with self-identification into the female category in gender-affected sport." (7)

- "As a result of what the review found, the Guidance concludes that the inclusion of transgender people into female sport cannot be balanced regarding transgender inclusion, fairness and safety in gender-affected sport where there is meaningful competition. This is due to retained differences in strength, stamina and physique between the average woman compared with the average transgender woman or non-binary person assigned male at birth, with or without testosterone suppression." (6)

- "Based upon current evidence, testosterone suppression is unlikely to guarantee fairness between transgender women and natal females in gender-affected sports. . . . Transgender women are on average likely to retain physical advantage in terms of physique, stamina, and strength. Such physical differences will also impact safety parameters in sports which are combat, collision or contact in nature." (7)

175.   On January 15, 2022 the American Swimming Coaches Association (ASCA) issued a statement stating, "The American Swimming Coaches Association urges the NCAA and all governing bodies to work quickly to update their policies and rules to maintain fair competition in the women's category of swimming. ASCA supports following all available science and evidenced-based research in setting the new policies, and we strongly advocate for more research to be conducted" and further stated "The current NCAA policy regarding when transgender females can compete in the women's category can be unfair to cisgender females and needs to be reviewed and changed in a transparent manner." (https://swimswam.com/asca-issues-statement-calling-for-ncaa-to-review-transgender-rules/; Accessed January 16, 2022.)

54

176.   On January 19, 2022, the NCAA Board of Governors approved a change to the policy on transgender inclusion in sport and stated that "…the updated NCAA policy calls for transgender participation for each sport to be determined by the policy for the national governing body of that sport, subject to ongoing review and recommendation by the NCAA Committee on Competitive Safeguards and Medical Aspects of Sports to the Board of Governors. If there is no N[ational]G[overning]B[ody] policy for a sport, that sport's international federation policy would be followed. If there is no international federation policy, previously established IOC policy criteria would be followed" (https://www.ncaa.org/news/2022/1/19/media-center-board-of-governors-updates-transgender-participation-policy.aspx; Accessed January 20, 2022.)

177.   On February 1, 2022, because "…a competitive difference in the male and female categories and the disadvantages this presents in elite head-to-head competition … supported by statistical data that shows that the top-ranked female in 2021, on average, would be ranked 536th across all short course yards (25 yards) male events in the country and 326th across all long course meters (50 meters) male events in the country, among USA Swimming members," USA Swimming released its Athlete Inclusion, Competitive Equity and Eligibility Policy. The policy is intended to "provide a level-playing field for elite cisgender women, and to mitigate the advantages associated with male puberty and physiology." (USA Swimming Releases Athlete Inclusion, Competitive Equity and Eligibility Policy, available at https://www.usaswimming.org/news/2022/02/01/usa-swimming-releases-athlete-inclusion-competitive-equity-and-eligibility-policy.) The policy states:

- For biologically male athletes seeking to compete in the female category in certain "elite" level events, the athlete has the burden of demonstrating to a panel of independent medical experts that:

  o "From a medical perspective, the prior physical development of the athlete as Male, as mitigated by any medical intervention, does not give the athlete a competitive advantage over the athlete's cisgender Female competitors" and

  o There is a presumption that the athlete is not eligible unless the athlete "demonstrates that the concentration of testosterone in the athlete's serum has been less than 5 nmol/L . . . continuously for a period of at least thirty-six (36) months before the date of the Application." This presumption may be rebutted "if the Panel finds, in the unique circumstances of the case, that [the athlete's prior physical development does not give the athlete a competitive advantage] notwithstanding the athlete's serum testosterone results (e.g., the athlete has a medical condition

App. 2775 0176

G. Brown                                    Expert Report, B.P.J. v. WV BOE et al.

which limits bioavailability of the athlete's free testosterone)."
(USA Swimming Athlete Inclusion Procedures at 43.)

## Conclusions

The research and actual observed data show the following:

- At the level of (a) elite, (b) collegiate, (c) scholastic, and (d) recreational competition, men, adolescent boys, or male children, have an advantage over equally gifted, aged and trained women, adolescent girls, or female children in almost all athletic events;

- Biological male physiology is the basis for the performance advantage that men, adolescent boys, or male children have over women, adolescent girls, or female children in almost all athletic events; and

- The administration of androgen inhibitors and cross-sex hormones to men or adolescent boys after the onset of male puberty does not eliminate the performance advantage that men and adolescent boys have over women and adolescent girls in almost all athletic events. Likewise, there is no published scientific evidence that the administration of puberty blockers to males before puberty eliminates the pre-existing athletic advantage that prepubertal males have over prepubertal females in almost all athletic events.

For over a decade sports governing bodies (such as the IOC and NCAA) have wrestled with the question of transgender inclusion in female sports. The previous polices implemented by these sporting bodies had an underlying "premise that reducing testosterone to levels found in biological females is sufficient to remove many of the biologically-based performance advantages." (World Rugby 2020 at 13.) Disagreements centered around what the appropriate threshold for testosterone levels must be–whether the 10nmol/liter value adopted by the IOC in 2015, or the 5nmol/liter value adopted by the IAAF.

But the science that has become available within just the last few years contradicts that premise. Instead, as the UK Sports Councils, World Rugby, the FIMS Consensus Statement, and the Women's Sports Policy Working Group have all recognized the science is now sharply "at odds with the accepted intention of current policy in sport, in which twelve months of testosterone suppression is expected to create equivalence between transgender women and females" (UK Sports Literature Review 2021 at 7), and it is now "difficult to suggest that the athletic capabilities of transwomen individuals undergoing HRT or GAS are comparable to those of cisgender women." (Hamilton, FIMS Consensus Statement 2021.) It is important to note that while the 2021 "IOC Framework on Fairness,

Inclusion, and Non-Discrimination on the Basis of Gender Identity and Sex Variations" calls for an "evidence-based approach," that Framework does not actually reference *any* of the now extensive scientific evidence relating to the physiological differences between the sexes, and the inefficacy of hormonal intervention to eliminate male advantages relevant to most sports. Instead, the IOC calls on other sporting bodies to define criteria for transgender inclusion, while demanding that such criteria simultaneously ensure fairness, safety, and inclusion for all. The recently updated NCAA policy on transgender participation also relies on other sporting bodies to establish criteria for transgender inclusion while calling for fair competition and safety.

But what we currently know tells us that these policy goals—fairness, safety, and full transgender inclusion—are irreconcilable for many or most sports. Long human experience is now joined by large numbers of research papers that document that males outperform females in muscle strength, muscular endurance, aerobic and anaerobic power output, $VO_2max$, running speed, swimming speed, vertical jump height, reaction time, and most other measures of physical fitness and physical performance that are essential for athletic success. The male advantages have been observed in fitness testing in children as young as 3 years old, with the male advantages increasing immensely during puberty. To ignore what we know to be true about males' athletic advantages over females, based on mere hope or speculation that cross sex hormone therapy (puberty blockers, androgen inhibitors, or cross-sex hormones) might neutralize that advantage, when the currently available evidence says it does not, is not science and is not "evidence-based" policy-making.

Because of the recent research and analysis in the general field of transgender athletics, many sports organizations have revised their policies or are in the process of doing so. As a result, there is not any universally recognized policy among sports organizations, and transgender inclusion policies are in a state of flux, likely because of the increasing awareness that the goals of fairness, safety, and full transgender inclusion are irreconcilable.

Sports have been separated by sex for the purposes of safety and fairness for a considerable number of years. The values of safety and fairness are endorsed by numerous sports bodies, including the NCAA and IOC. The existing evidence of durable physiological and performance differences based on biological sex provides a strong evidence-based rationale for keeping rules and policies for such sex-based separation in place (or implementing them as the case may be).

As set forth in detail in this report, there are physiological differences between males and females that result in males having a significant performance advantage over similarly gifted, aged, and trained females in nearly all athletic events before, during, and after puberty. There is not scientific evidence that any

57

BPJ 0178

G. Brown                                                    Expert Report, B.P.J. v. WV BOE et al.

amount or duration of cross sex hormone therapy (puberty blockers, androgen inhibitors, or cross-sex hormones) eliminates all physiological advantages that result in males performing better than females in nearly all athletic events. Males who have received such therapy retain sufficient male physiological traits that enhance athletic performance vis-à-vis similarly aged females and are thus, from a physiological perspective, more accurately categorized as male and not female.

.

## Bibliography

Bhargava, A. et al. *Considering Sex as a Biological Variable in Basic and Clinical Studies: An Endocrine Society Scientific Statement.* Endocr Rev. 42:219-258 (2021).

Bohannon, R.W. et al., *Handgrip strength: a comparison of values obtained from the NHANES and NIH toolbox studies.* Am. J. Occ. Therapy 73(2) (March/April 2019).

Catley, M. and G.Tomkinson, *Normative health-related fitness values for children: analysis of 85,437 test results on 9-17-year-old Australians since 1985.* Br. J. Sports Med. published online October 21, 2011. Bjsm.bmj.com. Additional versions of this article were published by BJSM in 2012 and 2013, including Br. J. Sports Med. 47:98-108 (2013).

Chu, Y. et al., *Biomechanical comparison between elite female and male baseball pitchers.* J. App. Biomechanics 25:22-31 (2009).

Coleman, D.L. and W. Shreve, *Comparing athletic performances: the best elite women to boys and men.* web.law.duke.edu/sites/default/files/centers/sportslaw/comparingathleticperform ances.pdf. (Accessed 06/20/21)

Coleman, D. L. et al., *Re-affirming the value of the sports exception to Title IX's general non-discrimination rule.* Duke J. of Gender and Law Policy 27(69):69-134 (2020).

Davis SM, Kaar JL, Ringham BM, Hockett CW, Glueck DH, and Dabelea D. *Sex differences in infant body composition emerge in the first 5 months of life.* J Pediatr Endocrinol Metab 32: 1235-1239 (2019).

De Miguel-Etayo, P. et al., *Physical fitness reference standards in European children: the IDEFICS study.* Int. J. Obes (Lond) 38(2):557-566 (2014).

Dogan, B., *Multiple-choice reaction and visual perception in female and male elite athletes.*  J. Sports Med. and Physical Fitness 49:91-96 (2009).

Dykiert, D. and G. Der, *Sex differences in reaction time mean and intraindividual variability across the life span.* Developmental Psychology 48(5): 1262-76 (2012).

Eiberg, S. et al, *Maximum oxygen uptake and objectively measured physical activity in Danish children 6-7 years of age: the Copenhagen school child intervention study.* Br J Sports Med 39:725-30 (2005).

a

Fessler, D.M. et al. *Sexual dimorphism in foot length proportionate to stature.* Ann Hum Biol. 32:44-59 (2005).

Fields J. et al., *Seasonal and Longitudinal Changes in Body Composition by Sport-Position in NCAA Division I Basketball Athletes.* Sports (Basel). 22:6 (2018).

Gauthier. R. et al. The physical work capacity of Canadian children, aged 7 to 17 in 1983. A comparison with 1968. CAHPER Journal/Revue de l'ACSEPR 50:4–9 (1983).

Gershoni, M. & Pietrokovski, S. *The landscape of sex-differential transcriptome and its consequent selection in human adults.* BMC BIOL 15: 7 (2017).

Gooren, L., *The significance of testosterone for fair participation of the female sex in competitive sports*, 13 Asian J. of Andrology 653 (2011).

Gooren, L., et al., *Transsexuals and competitive sports.* Eur. J. Endocrinol. 151:425-9 (2004).

Haizlip, K.M. et al., *Sex-based differences in skeletal muscle kinetics and fiber-type composition.* PHYSIOLOGY (BETHESDA) 30: 30–39 (2015).

Hamilton, B. et al, *Integrating transwomen and female athletes with differences of sex development (DSD) into elite competition: the FIMS 2021 consensus statement.* Sports Med 2021. doi: 10.1007/s40279-021-01451-8.

Hamilton, B. et al., *Response to the United Nations Human Rights Council's report on race and gender discrimination in sport: an expression of concern and a call to prioritise research.* Sports Med 2020.  doi: 10.1007/s40279-020-01380-4.

Handelsman, D.J. et al., *Circulating testosterone as the hormonal basis of sex differences in athletic performance.* Endocrine Reviews 39(5):803-829 (Oct 2018).

Handelsman, D.J., *Sex differences in athletic performance emerge coinciding with the onset of male puberty*, 87 Clinical Endocrinology 68 (2017).

Handelsman, D.J., *"Perspective,"* at https://www.healio.com/news/endocrinology/20201216/transgender-women-outpace-cisgender-women-in-athletic-tests-after-1-year-on-hormones (last accessed September 29, 2021).

Harper, J. et al., *How does hormone transition in transgender women change body composition, muscle strength and haemoglobin? Systematic review with a focus on the implications for sport participation.* Br J Sports Med 55(15):865-872 (2021).

Elater 0181

G. Brown                                                    Expert Report, B.P.J. v. WV BOE et al.

Harper, J., *Race time for transgender athletes.* J. Sporting Cultures & Identities 6:1 (2015).

Heydari R, et al. *Y chromosome is moving out of sex determination shadow.* Cell Biosci. 12:4. (2022).

Higerd, G.A. *Assessing the Potential Transgender Impact on Girl Champions in American High School Track and Field.* Doctoral Dissertation United States Sports Academy. (2020). https://www.proquest.com/openview/65d34c1e949899aa823beecad873afae/1?pq-origsite=gscholar&cbl=18750&diss=y

Hilton, E. N. and T.R. Lundberg, *Transgender women in the female category of sport: perspectives on testosterone suppression and performance advantage.* Sports Medicine 51:199-214 (2021).

Hubal, M., H. Gordish-Dressman, P. Thompson, et al., *Variability in muscle size and strength gain after unilateral resistance training*, Med & Sci in Sports & Exercise 964 (2005).

Jain, A. et al., *A comparative study of visual and auditory reaction times on the basis of gender and physical activity levels of medical first year students.* Int J App & Basic Med Res 5:2(124-27) (May-Aug 2015).

Klaver M, et al.. *Early Hormonal Treatment Affects Body Composition and Body Shape in Young Transgender Adolescents.* J Sex Med 15: 251-260 (2018).

Knechtle, B., P. T. Nikolaidis et al., *World single age records in running from 5 km to marathon*, Frontiers in Psych 9(1) (2013).

Knox, T., L.C. Anderson, et al., *Transwomen in elite sport: scientific & ethical considerations*, 45 J. Med Ethics 395 (2019).

Lapauw, B. et al., *Body composition, volumetric and areal bone parameters in male-to-female transsexual persons.* Bone 43:1016-21 (2008).

Latorre-Roman, P. et al., *Reaction times of preschool children on the ruler drop test: a cross-sectional study with reference values.* Perceptual & Motor Skills 125(5):866-78 (2018).

Lepers, R., B. Knechtle et al., *Trends in triathlon performance: effects of sex & age*, 43 Sports Med 851 (2013).

Lesinski, M., A. Schmelcher, et al., *Maturation-, age-, and sex-specific anthropometric and physical fitness percentiles of German elite young athletes.* PLoS One. 15(8):e0237423 (2020).

Levine, B., M. Joyner et al., *The role of testosterone in athletic performance.*
Available at
https://web.law.duke.edu/sites/default/files/centers/sportslaw/Experts_T_Statem
ent_2019.pdf  (January 2019).

Leyk, D, W. Gorges et al., *Hand-grip strength of young men, women and highly
trained female athletes*, Eur J Appl Physiol. 2007 Mar; 99(4):415-21 (2007).

Lombardo, M. and R. Deaner, *On the evolution of the sex differences in throwing:
throwing as a male adaptation in humans*, Quarterly Rev of Biology 93(2):91-119
(2018).

Malina R.M., Bouchards, C., Bar-Or, O.  Growth, Maturation, and Physical Activity
(2nd edition). Published by Human Kinetics. 2004.

McManus, A. and N. Armstrong, *Physiology of elite young female athletes.* J Med &
Sport Sci 56:23-46 (2011).

Millard-Stafford, M. et al., *Nature versus nurture: have performance gaps between
men and women reached an asymptote?* Int'l J. Sports Physiol. & Performance
13:530-35 (2018).

Miller, V.M. *Why are sex and gender important to basic physiology and translational
and individualized medicine?* Am J Physiol Heart Circ Physiol 306(6): H781-788,
(2014).

Mormile, M. et al., *The role of gender in neuropsychological assessment in healthy
adolescents.*  J Sports Rehab 27:16-21 (2018).

Morris, J. et al., *Sexual dimorphism in human arm power and force: implications
for sexual selection on fighting ability.* J Exp Bio 223 (2020).

National Collegiate Athletic Association, *Inclusion of transgender student-athletes.*
https://ncaaorg.s3.amazonaws.com/inclusion/lgbtq/INC_TransgenderHandbook.p
df (August 2011).

Neder, J.A. et al., *Reference values for concentric knee isokinetic strength and power
in nonathletic men and women from 20 to 80 years old.*  J. Orth. & Sports Phys.
Therapy 29(2):116-126 (1999).

Pate, R. and A. Kriska, *Physiological basis of the sex difference in cardiorespiratory
endurance.*  Sports Med 1:87-98 (1984).

Pocek, S. et al., *Anthropometric Characteristics and Vertical Jump Abilities by Player Position and Performance Level of Junior Female Volleyball Players*. Int J Environ Res Public Health. 18: 8377-8386 (2021).

Ramírez-Vélez, R. et al., *Vertical Jump and Leg Power Normative Data for Colombian Schoolchildren Aged 9-17.9 Years: The FUPRECOL Study*. J Strength Cond Res. 31: 990-998 (2017).

Roberts, S.A., J.M. Carswell. *Growth, growth potential, and influences on adult height in the transgender and gender-diverse population*. Andrology. 9:1679-1688 (2021).

Roberts, T.A. et al., *Effect of gender affirming hormones on athletic performance in transwomen and transmen: implications for sporting organisations and legislators*. Br J Sports Med published online at 10.1136/bjsports-2020-102329 (Dec. 7, 2020).

Roser, M., Cameron Appel and Hannah Ritchie (2013) "Human Height". Published online at OurWorldInData.org. Retrieved from: https://ourworldindata.org/human-height [Online Resource]

Ross, J.G. and G.G. Gilbert. *National Children and Youth Fitness Study*. J Physical Educ Rec Dance (JOPERD) 56: 45 − 50 (1985).

Sakamoto, K. et al., *Comparison of kicking speed between female and male soccer players*. Procedia Eng 72:50-55 (2014).

Santos, R. et al. *Physical fitness percentiles for Portuguese children and adolescents aged 10-18 years*. J Sports Sci. 32:1510-8. (2014).

Sattler, T. et al., *Vertical jump performance of professional male and female volleyball players: effects of playing position and competition level*.  J Strength & Cond Res 29(6):1486-93 (2015).

Sax L. *How common is intersex? a response to Anne Fausto-Sterling*. J Sex Res. 39(3):174-8 (2002).

Scharff, M. et al., *Change in grip strength in trans people and its association with lean body mass and bone density*. Endocrine Connections 8:1020-28 (2019).

Senefeld, J.W., et al. *Divergence in timing and magnitude of testosterone levels between male and female youths*, JAMA 324(1):99-101 (2020).

Shah, K. et al. *Do you know the sex of your cells?* Am J Physiol Cell Physiol. 306(1):C3-18 (2014).

Silverman, I., *The secular trend for grip strength in Canada and the United States*, J Sports Sci 29(6):599-606 (2011).

Spierer, D. et al., *Gender influence on response time to sensory stimuli.* J Strength & Cond Res 24:4(957-63) (2010).

Staiano AE, Katzmarzyk PT. *Ethnic and sex differences in body fat and visceral and subcutaneous adiposity in children and adolescents.* Int J Obes (Lond). 36:1261-9. (2012).

Tack, L.J.W. et al., *Proandrogenic and antiandrogenic progestins in transgender youth: differential effects on body composition and bone metabolism.* J. Clin. Endocrinol. Metab, 103(6):2147-56 (2018).

Tambalis, K. et al., *Physical fitness normative values for 6-18-year-old Greek boys and girls, using the empirical distribution and the lambda, mu, and sigma statistical method.* Eur J Sports Sci 16:6(736-46) (2016).

Taylor, M.J. et al., *Vertical jumping and leg power normative data for English school children aged 10-15 years.* J Sports Sci. 28:867-72. (2010).

Taylor RW, Gold E, Manning P, and Goulding A. *Gender differences in body fat content are present well before puberty.* Int J Obes Relat Metab Disord 21: 1082-1084, 1997.

Taylor RW, Grant AM, Williams SM, and Goulding A. *Sex differences in regional body fat distribution from pre- to postpuberty.* Obesity (Silver Spring) 18: 1410-1416, 2010.

Thibault, V., M. Guillaume et al., *Women and men in sport performance: the gender gap has not evolved since 1983.* J Sports Science & Med 9:214-223 (2010).

Thomas, J.R. and K. E. French, *Gender differences across age in motor performance: a meta-analysis.* Psych. Bull. 98(2):260-282 (1985).

Tomkinson, G. et al., *European normative values for physical fitness in children and adolescents aged 9-17 years: results from 2,779,165 Eurofit performances representing 30 countries.* Br J Sports Med 52:1445-56 (2018).

Tomkinson, G. et al., *International normative 20 m shuttle run values from 1,142,026 children and youth representing 50 countries.* Br J Sports Med. 51:1545-1554 (2017).

f

Tønnessen, E., I. S. Svendsen et al., *Performance development in adolescent track & field athletes according to age, sex, and sport discipline.* PLoS ONE 10(6): e0129014 (2015).

Tønnessen, E. et al., *Reaction time aspects of elite sprinters in athletic world championships.* J Strength & Cond Res 27(4):885-92 (2013).

United Kingdom Sports Councils, *Guidance for transgender inclusion in domestic sport.* Available at https://equalityinsport.org/docs/300921/Guidance for Transgender Inclusion in Domestic Sport 2021 - Summary of Background Documents.pdf. September 2021.

United Kingdom Sports Councils, *International Research Literature Review.* Available at https://equalityinsport.org/docs/300921/Transgender%20International%20Research%20Literature%20Review%202021.pdf. September 2021.

USA Swimming Athlete Inclusion Procedures, last revision February 1, 2022, available at https://www.usaswimming.org/docs/default-source/governance/governance-lsc-website/rules_policies/usa-swimming-policy-19.pdf.

VanCaenegem, E. et al, *Preservation of volumetric bone density and geometry in trans women during cross-sex hormonal therapy: a prospective observational study.* Osteoporos Int 26:35-47 (2015).

Wiik, A., T. R Lundberg et al., *Muscle strength, size, and composition following 12 months of gender-affirming treatment in transgender individuals.* J. Clinical Endocrin. & Metab. 105(3):e805-813 (2020).

Women's Sports Policy Working Group, *Briefing book: a request to Congress and the administration to preserve girls' and women's sport and accommodate transgender athletes.* Available at womenssportspolicy.org. (2021).

World Rugby Transgender Guidelines. https://www.world.rugby/the-game/player-welfare/guidelines/transgender (2020).

World Rugby Transgender Women's Guidelines. https://www.world.rugby/the-game/player-welfare/guidelines/transgender/women (2020).

Wunderlich RE, Cavanagh PR. *Gender differences in adult foot shape: implications for shoe design.* Med Sci Sports Exerc. 33:605-1 (2001).

G. Brown                                                    Expert Report, B.P.J. v. WV BOE et al.

## Appendix 1 – Data Tables

### Presidential Physical Fitness Results[14]

**Curl-Ups (# in 1 minute)**

| Age | Male 50th %ile | Male 85th %ile | Female 50th %ile | Female 85th %ile | Age | Male-Female % Difference 50th %ile | Male-Female % Difference 85th %ile |
|---|---|---|---|---|---|---|---|
| 6 | 22 | 33 | 23 | 32 | 6 | -4.3% | 3.1% |
| 7 | 28 | 36 | 25 | 34 | 7 | 12.0% | 5.9% |
| 8 | 31 | 40 | 29 | 38 | 8 | 6.9% | 5.3% |
| 9 | 32 | 41 | 30 | 39 | 9 | 6.7% | 5.1% |
| 10 | 35 | 45 | 30 | 40 | 10 | 16.7% | 12.5% |
| 11 | 37 | 47 | 32 | 42 | 11 | 15.6% | 11.9% |
| 12 | 40 | 50 | 35 | 45 | 12 | 14.3% | 11.1% |
| 13 | 42 | 53 | 37 | 46 | 13 | 13.5% | 15.2% |
| 14 | 45 | 56 | 37 | 47 | 14 | 21.6% | 19.1% |
| 15 | 45 | 57 | 36 | 48 | 15 | 25.0% | 18.8% |
| 16 | 45 | 56 | 35 | 45 | 16 | 28.6% | 24.4% |
| 17 | 44 | 55 | 34 | 44 | 17 | 29.4% | 25.0% |

---

[14] This data is available from a variety of sources. including:
https://gilmore.gvsd.us/documents/Info/Forms/Teacher%20Forms/Presidentialchallengetest.pdf

h

G. Brown                                                                    Expert Report, B.P.J. v. WV BOE et al.

**Shuttle Run (seconds)**

| | Male | | Female | | | Male-Female % Difference | |
|---|---|---|---|---|---|---|---|
| Age | 50th %ile | 85th %ile | 50th %ile | 85th %ile | Age | 50th %ile | 85th %ile |
| 6 | 13.3 | 12.1 | 13.8 | 12.4 | 6 | 3.6% | 2.4% |
| 7 | 12.8 | 11.5 | 13.2 | 12.1 | 7 | 3.0% | 5.0% |
| 8 | 12.2 | 11.1 | 12.9 | 11.8 | 8 | 5.4% | 5.9% |
| 9 | 11.9 | 10.9 | 12.5 | 11.1 | 9 | 4.8% | 1.8% |
| 10 | 11.5 | 10.3 | 12.1 | 10.8 | 10 | 5.0% | 4.6% |
| 11 | 11.1 | 10 | 11.5 | 10.5 | 11 | 3.5% | 4.8% |
| 12 | 10.6 | 9.8 | 11.3 | 10.4 | 12 | 6.2% | 5.8% |
| 13 | 10.2 | 9.5 | 11.1 | 10.2 | 13 | 8.1% | 6.9% |
| 14 | 9.9 | 9.1 | 11.2 | 10.1 | 14 | 11.6% | 9.9% |
| 15 | 9.7 | 9.0 | 11.0 | 10.0 | 15 | 11.8% | 10.0% |
| 16 | 9.4 | 8.7 | 10.9 | 10.1 | 16 | 13.8% | 13.9% |
| 17 | 9.4 | 8.7 | 11.0 | 10.0 | 17 | 14.5% | 13.0% |

**1 mile run (seconds)**

| | Male | | Female | | | Male-Female % Difference | |
|---|---|---|---|---|---|---|---|
| Age | 50th %ile | 85th %ile | 50th %ile | 85th %ile | Age | 50th %ile | 85th %ile |
| 6 | 756 | 615 | 792 | 680 | 6 | 4.5% | 9.6% |
| 7 | 700 | 562 | 776 | 636 | 7 | 9.8% | 11.6% |
| 8 | 665 | 528 | 750 | 602 | 8 | 11.3% | 12.3% |
| 9 | 630 | 511 | 712 | 570 | 9 | 11.5% | 10.4% |
| 10 | 588 | 477 | 682 | 559 | 10 | 13.8% | 14.7% |
| 11 | 560 | 452 | 677 | 542 | 11 | 17.3% | 16.6% |
| 12 | 520 | 431 | 665 | 503 | 12 | 21.8% | 14.3% |
| 13 | 486 | 410 | 623 | 493 | 13 | 22.0% | 16.8% |
| 14 | 464 | 386 | 606 | 479 | 14 | 23.4% | 19.4% |
| 15 | 450 | 380 | 598 | 488 | 15 | 24.7% | 22.1% |
| 16 | 430 | 368 | 631 | 503 | 16 | 31.9% | 26.8% |
| 17 | 424 | 366 | 622 | 495 | 17 | 31.8% | 26.1% |

i

G. Brown                                                      Expert Report, B.P.J. v. WV BOE et al.

## Pull Ups (# completed)

| | Male | | Female | | | Male-Female % Difference | |
|---|---|---|---|---|---|---|---|
| Age | 50th %ile | 85th %ile | 50th %ile | 85th %ile | Age | 50th %ile | 85th %ile |
| 6 | 1 | 2 | 1 | 2 | 6 | 0.0% | 0.0% |
| 7 | 1 | 4 | 1 | 2 | 7 | 0.0% | 100.0% |
| 8 | 1 | 5 | 1 | 2 | 8 | 0.0% | 150.0% |
| 9 | 2 | 5 | 1 | 2 | 9 | 100.0% | 150.0% |
| 10 | 2 | 6 | 1 | 3 | 10 | 100.0% | 100.0% |
| 11 | 2 | 6 | 1 | 3 | 11 | 100.0% | 100.0% |
| 12 | 2 | 7 | 1 | 2 | 12 | 100.0% | 250.0% |
| 13 | 3 | 7 | 1 | 2 | 13 | 200.0% | 250.0% |
| 14 | 5 | 10 | 1 | 2 | 14 | 400.0% | 400.0% |
| 15 | 6 | 11 | 1 | 2 | 15 | 500.0% | 450.0% |
| 16 | 7 | 11 | 1 | 1 | 16 | 600.0% | 1000.0% |
| 17 | 8 | 13 | 1 | 1 | 17 | 700.0% | 1200.0% |

## Data Compiled from Athletic.Net

2021 National 3000 m cross country race time in seconds

| Rank | 7-8 years old | | | 9-10 years old | | | 11-12 year old | | |
|---|---|---|---|---|---|---|---|---|---|
| | Boys | Girls | | Boys | Girls | | Boys | Girls | |
| 1 | 691.8 | 728.4 | Difference | 607.7 | 659.8 | Difference | 608.1 | 632.6 | Difference |
| 2 | 722.5 | 739.0 | #1 boy vs # | 619.6 | 674.0 | #1 boy vs # | 608.7 | 639.8 | #1 boy vs # |
| 3 | 740.5 | 783.0 | 1 girl | 620.1 | 674.7 | 1 girl | 611.3 | 664.1 | 1 girl |
| 4 | 759.3 | 783.5 | 5.0% | 643.2 | 683.7 | 7.9% | 618.6 | 664.4 | 3.9% |
| 5 | 759.6 | 792.8 | | 646.8 | 685.0 | | 619.7 | 671.6 | |
| 6 | 760.0 | 824.1 | | 648.0 | 686.4 | | 631.2 | 672.1 | |
| 7 | 772.0 | 825.7 | Average | 648.8 | 687.0 | Average | 631.7 | 672.3 | Average |
| 8 | 773.0 | 832.3 | difference | 658.0 | 691.0 | difference | 634.9 | 678.4 | difference |
| 9 | 780.7 | 834.3 | boys vs girls | 659.5 | 692.2 | boys vs girls | 635.0 | 679.3 | boys vs girls |
| 10 | 735.1 | 844.4 | 6.2% | 663.9 | 663.3 | 5.6% | 635.1 | 679.4 | 6.3% |

j

G. Brown

Expert Report, B.P.J. v. WV BOE et al.

2021 National 3000 m cross country race time in seconds

| Rank | 5th grade Boys | Girls | | 6th grade Boys | Girls | | 7th grade Boys | Girls | |
|---|---|---|---|---|---|---|---|---|---|
| 1 | 625.5 | 667.0 | Difference | 545.3 | 582.0 | Difference | 534.0 | 560.7 | Difference |
| 2 | 648.8 | 685.0 | #1 boy vs # | 553.2 | 584.3 | #1 boy vs # | 541.0 | 567.0 | #1 boy vs # |
| 3 | 653.5 | 712.9 | 1 girl | 562.3 | 585.1 | 1 girl | 542.6 | 581.8 | 1 girl |
| 4 | 658.4 | 719.2 | 6.2% | 562.9 | 599.8 | 6.3% | 544.6 | 583.0 | 4.8% |
| 5 | 675.3 | 725.2 | | 571.5 | 612.9 | | 546.0 | 595.0 | |
| 6 | 677.4 | 727.7 | | 588.0 | 622.0 | | 556.0 | 599.0 | |
| 7 | 677.6 | 734.0 | Average | 591.3 | 624.9 | Average | 556.0 | 604.3 | Average |
| 8 | 679.1 | 739.4 | difference | 593.0 | 626.0 | difference | 556.0 | 606.0 | difference |
| 9 | 686.4 | 739.4 | boys vs girls | 593.8 | 628.0 | boys vs girls | 558.6 | 606.8 | boys vs girls |
| 10 | 686.4 | 746.4 | 7.3% | 594.1 | 645.6 | 5.8% | 563.2 | 617.0 | 7.1% |

2021 National 100 m Track race time in seconds

| Rank | 7-8 years old Boys | Girls | | 9-10 years old Boys | Girls | | 11-12 year old Boys | Girls | |
|---|---|---|---|---|---|---|---|---|---|
| 1 | 13.06 | 14.24 | Difference #1 | 10.87 | 12.10 | Difference #1 | 11.37 | 12.08 | Difference #1 |
| 2 | 13.54 | 14.41 | boy vs # 1 | 10.91 | 12.24 | boy vs # 1 | 11.61 | 12.43 | boy vs # 1 |
| 3 | 13.73 | 14.44 | girl | 11.09 | 12.63 | girl | 11.73 | 12.51 | girl |
| 4 | 14.10 | 14.48 | 8.3% | 11.25 | 12.70 | 10.2% | 11.84 | 12.55 | 5.9% |
| 5 | 14.19 | 14.49 | | 11.27 | 12.75 | | 11.89 | 12.57 | |
| 6 | 14.31 | 14.58 | | 11.33 | 12.80 | | 11.91 | 12.62 | |
| 7 | 14.34 | 14.69 | Average | 11.42 | 12.83 | Average | 11.94 | 12.65 | Average |
| 8 | 14.35 | 14.72 | difference | 11.43 | 12.84 | difference | 11.97 | 12.71 | difference |
| 9 | 14.41 | 14.77 | boys vs girls | 11.44 | 12.88 | boys vs girls | 12.08 | 12.71 | boys vs girls |
| 10 | 14.43 | 14.86 | 3.6% | 11.51 | 12.91 | 11.1% | 12.12 | 12.75 | 5.7% |

2021 National 200 m Track race time in seconds

| Rank | 7-8 years old Boys | Girls | | 9-10 years old Boys | Girls | | 11-12 year old Boys | Girls | |
|---|---|---|---|---|---|---|---|---|---|
| 1 | 24.02 | 28.72 | Difference #1 | 21.77 | 25.36 | Difference #1 | 20.66 | 25.03 | Difference #1 |
| 2 | 24.03 | 28.87 | boy vs # 1 | 22.25 | 25.50 | boy vs # 1 | 22.91 | 25.18 | boy vs # 1 |
| 3 | 28.07 | 29.92 | girl | 22.48 | 25.55 | girl | 23.14 | 25.22 | girl |
| 4 | 28.44 | 29.95 | 16.4% | 22.57 | 25.70 | 14.2% | 23.69 | 25.49 | 17.5% |
| 5 | 28.97 | 30.04 | | 22.65 | 26.08 | | 23.84 | 25.78 | |
| 6 | 29.26 | 30.09 | | 22.77 | 26.22 | | 24.23 | 25.89 | |
| 7 | 29.34 | 30.27 | Average | 23.11 | 26.79 | Average | 24.35 | 26.03 | Average |
| 8 | 29.38 | 30.34 | difference | 23.16 | 26.84 | difference | 24.58 | 26.07 | difference |
| 9 | 29.65 | 30.41 | boys vs girls | 23.28 | 26.91 | boys vs girls | 24.59 | 26.10 | boys vs girls |
| 10 | 29.78 | 30.54 | 6.1% | 23.47 | 26.85 | 13.1% | 24.61 | 26.13 | 7.9% |

k

G. Brown                                                      Expert Report, B.P.J. v. WV BOE et al.

2021 National 400 m Track race time in seconds

| Rank | 7-8 years old | | | 9-10 years old | | | 11-12 year old | | |
|---|---|---|---|---|---|---|---|---|---|
| | Boys | Girls | | Boys | Girls | | Boys | Girls | |
| 1 | 66.30 | 67.12 | Difference #1 | 49.29 | 56.80 | Difference #1 | 51.96 | 55.70 | Difference #1 |
| 2 | 66.88 | 67.67 | boy vs # 1 | 50.47 | 58.57 | boy vs # 1 | 55.52 | 57.08 | boy vs # 1 |
| 3 | 67.59 | 67.74 | girl | 52.28 | 60.65 | girl | 55.58 | 57.60 | girl |
| 4 | 68.16 | 68.26 | 1.2% | 52.44 | 61.45 | 13.2% | 55.59 | 57.79 | 6.7% |
| 5 | 68.51 | 68.37 | | 53.31 | 61.81 | | 55.72 | 58.02 | |
| 6 | 69.13 | 71.02 | | 53.65 | 62.03 | | 55.84 | 58.25 | |
| 7 | 69.75 | 72.73 | Average | 53.78 | 62.32 | Average | 55.92 | 59.25 | Average |
| 8 | 69.80 | 73.25 | difference | 54.51 | 62.33 | difference | 57.12 | 59.27 | difference |
| 9 | 69.81 | 73.31 | boys vs girls | 55.84 | 62.34 | boys vs girls | 57.18 | 59.40 | boys vs girls |
| 10 | 70.32 | 73.48 | 2.4% | 55.90 | 62.40 | 13.0% | 57.22 | 59.49 | 4.2% |

2021 National 800 m Track race time in seconds

| Rank | 7-8 years old | | | 9-10 years old | | | 11-12 year old | | |
|---|---|---|---|---|---|---|---|---|---|
| | Boys | Girls | | Boys | Girls | | Boys | Girls | |
| 1 | 152.2 | 157.9 | Difference #1 | 120.8 | 141.4 | Difference #1 | 127.8 | 138.5 | Difference #1 |
| 2 | 155.2 | 164.6 | boy vs # 1 | 124.0 | 142.2 | boy vs # 1 | 129.7 | 143.1 | boy vs # 1 |
| 3 | 161.0 | 164.9 | girl | 125.1 | 148.8 | girl | 130.5 | 144.2 | girl |
| 4 | 161.1 | 165.9 | 3.6% | 125.6 | 151.3 | 14.5% | 133.2 | 144.2 | 7.7% |
| 5 | 161.2 | 168.5 | | 126.5 | 151.6 | | 136.2 | 144.9 | |
| 6 | 161.6 | 169.9 | | 136.5 | 152.5 | | 136.5 | 145.0 | |
| 7 | 161.8 | 171.5 | Average | 137.1 | 153.1 | Average | 136.7 | 145.2 | Average |
| 8 | 162.2 | 173.1 | difference | 138.5 | 153.7 | difference | 136.7 | 145.6 | difference |
| 9 | 165.3 | 173.4 | boys vs girls | 139.5 | 153.8 | boys vs girls | 137.0 | 145.6 | boys vs girls |
| 10 | 166.9 | 174.7 | 4.5% | 140.2 | 154.2 | 12.6% | 137.9 | 145.8 | 6.9% |

2021 National 1600 m Track race time in seconds

| Rank | 7-8 years old | | | 9-10 years old | | | 11-12 year old | | |
|---|---|---|---|---|---|---|---|---|---|
| | Boys | Girls | | Boys | Girls | | Boys | Girls | |
| 1 | 372.4 | 397.6 | Difference #1 | 307.4 | 319.3 | Difference #1 | 297.3 | 313.8 | Difference #1 |
| 2 | 378.3 | 400.9 | boy vs # 1 | 313.7 | 322.2 | boy vs # 1 | 298.4 | 317.1 | boy vs # 1 |
| 3 | 378.4 | 405.6 | girl | 315.0 | 322.6 | girl | 307.0 | 319.9 | girl |
| 4 | 402.0 | 435.2 | 6.3% | 318.2 | 337.5 | 3.7% | 313.9 | 323.3 | 5.2% |
| 5 | 406.4 | 445.0 | | 318.4 | 345.2 | | 319.2 | 325.3 | |
| 6 | 413.4 | 457.0 | | 320.5 | 345.7 | | 320.4 | 326.2 | |
| 7 | 457.4 | 466.0 | Average | 327.0 | 345.9 | Average | 321.1 | 327.0 | Average |
| 8 | 473.3 | 466.8 | difference | 330.3 | 347.1 | difference | 321.9 | 330.0 | difference |
| 9 | 498.3 | 492.3 | boys vs girls | 333.4 | 347.5 | boys vs girls | 325.5 | 331.1 | boys vs girls |
| 10 | 505.0 | 495.0 | 4.0% | 347.0 | 355.6 | 4.7% | 327.1 | 332.5 | 2.9% |

G. Brown

Expert Report, B.P.J. v. WV BOE et al.

**2021 National 3000 m Track race time in seconds**

| Rank | 7-8 years old Boys | Girls | | 9-10 years old Boys | Girls | | 11-12 year old Boys | Girls | |
|---|---|---|---|---|---|---|---|---|---|
| 1 | 794.2 | 859.9 | Difference #1 | 602.3 | 679.2 | Difference #1 | 556.6 | 623.7 | Difference #1 |
| 2 | 856.3 | | boy vs # 1 | 644.9 | 709.7 | boy vs # 1 | 591.6 | 649.5 | boy vs # 1 |
| 3 | | | girl | 646.6 | 714.2 | girl | 600.8 | 651.6 | girl |
| 4 | | | 7.6% | 648.2 | 741.9 | 11.3% | 607.1 | 654.9 | 10.8% |
| 5 | No further data | No Further Data | | 648.4 | 742.7 | | 609.1 | 662.9 | |
| 6 | | | | 652.8 | 756.6 | | 611.5 | 664.1 | |
| 7 | | | Average | 658.9 | 760.2 | Average | 615.7 | 666.3 | Average |
| 8 | | | difference | 660.1 | 762.5 | difference | 617.3 | 666.8 | difference |
| 9 | | | boys vs girls | 662.7 | 780.2 | boys vs girls | 618.4 | 673.2 | boys vs girls |
| 10 | | | NA% | 671.6 | 792.3 | 12.7% | 620.6 | 674.4 | 8.2% |

**2021 National Long Jump Distance (in inches)**

| Rank | 7-8 years old Boys | Girls | | 9-10 years old Boys | Girls | | 11-12 year old Boys | Girls | |
|---|---|---|---|---|---|---|---|---|---|
| 1 | 156.0 | 176.0 | Difference #1 | 256.8 | 213.8 | Difference #1 | 224.0 | 201.3 | Difference #1 |
| 2 | 156.0 | 163.8 | boy vs # 1 | 247.0 | 212.0 | boy vs # 1 | 222.5 | 197.3 | boy vs # 1 |
| 3 | 155.0 | 153.0 | girl | 241.0 | 210.8 | girl | 220.5 | 195.8 | girl |
| 4 | 154.3 | 152.0 | -11.4% | 236.3 | 208.8 | 20.1% | 210.3 | 193.5 | 11.3% |
| 5 | 154.0 | 149.5 | | 231.5 | 207.0 | | 210.0 | 193.3 | |
| 6 | 152.8 | 146.0 | | 225.0 | 204.8 | | 206.8 | 192.5 | |
| 7 | 151.5 | 144.5 | Average | 224.0 | 194.5 | Average | 206.0 | 192.3 | Average |
| 8 | 150.8 | 137.5 | difference | 224.0 | 192.5 | difference | 205.5 | 192.0 | difference |
| 9 | 150.5 | 137.0 | boys vs girls | 221.8 | 192.3 | boys vs girls | 205.0 | 191.3 | boys vs girls |
| 10 | | No Further Data | 1.4% | | | 13.2% | | | 9.1% |
| | 150.5 | Data | | 219.0 | 187.5 | | 204.5 | 189.0 | |

**2021 National High Jump Distance (in inches)**

| Rank | 7-8 years old Boys | Girls | | 9-10 years old Boys | Girls | | 11-12 year old Boys | Girls | |
|---|---|---|---|---|---|---|---|---|---|
| 1 | 38.0 | 37.5 | Difference #1 | 72.0 | 58.0 | Difference #1 | 63.0 | 56.0 | Difference #1 |
| 2 | 38.0 | 34.0 | boy vs # 1 | 70.0 | 58.0 | boy vs # 1 | 61.0 | 56.0 | boy vs # 1 |
| 3 | 36.0 | 32.0 | girl | 65.8 | 57.0 | girl | 60.0 | 57.0 | girl |
| 4 | 36.0 | 32.0 | 1.3 | 62.0 | 56.0 | 24.1% | 59.0 | 56.0 | 12.5% |
| 5 | 35.8 | 32.0 | | 62.0 | 56.0 | | 59.0 | 56.0 | |
| 6 | 35.5 | | | 62.0 | 55.0 | | 59.0 | 55.0 | |
| 7 | 34.0 | | Average | 61.0 | 54.0 | Average | 59.0 | 54.0 | Average |
| 8 | 32.0 | No further Data | difference | 60.0 | 54.0 | difference | 58.0 | 54.0 | difference |
| 9 | 59.0 | | boys vs girls | 59.0 | No Further Data | boys vs girls | 57.8 | 56.0 | boys vs girls |
| 10 | | | 21.6% | | | 12.5% | | | 6.9% |
| | 56.0 | | | 56.0 | | | 57.8 | 56.0 | |

m

## Appendix 2 – Scholarly Publications in Past 10 Years

### Refereed Publications

1. Brown GA, Shaw BS, Shaw I.  How much water is in a mouthful, and how many mouthfuls should I drink? A laboratory exercise to help students understand developing a hydration plan.  Adv Physiol Educ 45: 589–593, 2021.

2. Schneider KM and Brown GA (as Faculty Mentor).  What's at Stake: Is it a Vampire or a Virus? International Journal of Undergraduate Research and Creative Activities. 11, Article 4. 2019.

3. Christner C and Brown GA (as Faculty Mentor).  Explaining the Vampire Legend through Disease.  UNK Undergraduate Research Journal.  23(1), 2019. (*This is an on-campus publication.)

4. Schneekloth B and Brown GA.  Comparison of Physical Activity during Zumba with a Human or Video Game Instructor.  11(4):1019-1030. International Journal of Exercise Science, 2018.

5. Bice MR, Hollman A, Bickford S, Bickford N, Ball JW, Wiedenman EM, Brown GA, Dinkel D, and Adkins M.   Kinesiology in 360 Degrees.  International Journal of Kinesiology in Higher Education, 1: 9-17, 2017

6. Shaw I, Shaw BS, Brown GA, and Shariat A. Review of the Role of Resistance Training and Musculoskeletal Injury Prevention and Rehabilitation.  Gavin Journal of Orthopedic Research and Therapy.  1: 5-9, 2016

7. Kahle A, Brown GA, Shaw I, & Shaw BS. Mechanical and Physiological Analysis of Minimalist versus Traditionally Shod Running.  J Sports Med Phys Fitness. 56(9):974-9, 2016

8. Bice MR, Carey J, Brown GA, Adkins M, and Ball JW.  The Use of Mobile Applications to Enhance Learning of the Skeletal System in Introductory Anatomy & Physiology Students.  Int J Kines Higher Educ 27(1) 16-22, 2016

9. Shaw BS, Shaw I, & Brown GA. Resistance Exercise is Medicine. Int J Ther Rehab.  22: 233-237, 2015.

10. Brown GA, Bice MR, Shaw BS, & Shaw I.  Online Quizzes Promote Inconsistent Improvements on In-Class Test Performance in Introductory Anatomy & Physiology.  Adv. Physiol. Educ.  39: 63-6, 2015

11. Brown GA, Heiserman K, Shaw BS, & Shaw I. Rectus abdominis and rectus femoris muscle activity while performing conventional unweighted and weighted seated abdominal trunk curls.  Medicina dello Sport. 68: 9-18.  2015

12. Botha DM, Shaw BS, Shaw I & Brown GA.  Role of hyperbaric oxygen therapy in the promotion of cardiopulmonary health and rehabilitation. African Journal for

n

Physical, Health Education, Recreation and Dance (AJPHERD). Supplement 2 (September), 20: 62-73, 2014

13. Abbey BA, Heelan KA, Brown, GA, & Bartee RT.  Validity of HydraTrend™ Reagent Strips for the Assessment of Hydration Status.  J Strength Cond Res. 28: 2634-9. 2014

14. Scheer KC, Siebrandt SM, Brown GA, Shaw BS, & Shaw I.  Wii, Kinect, & Move. Heart Rate, Oxygen Consumption, Energy Expenditure, and Ventilation due to Different Physically Active Video Game Systems in College Students. International Journal of Exercise Science: 7: 22-32, 2014

15. Shaw BS, Shaw I, & Brown GA.  Effect of concurrent aerobic and resistive breathing training on respiratory muscle length and spirometry in asthmatics. African Journal for Physical, Health Education, Recreation and Dance (AJPHERD). Supplement 1 (November), 170-183, 2013

16. Adkins M, Brown GA, Heelan K, Ansorge C, Shaw BS & Shaw I. Can dance exergaming contribute to improving physical activity levels in elementary school children?  African Journal for Physical, Health Education, Recreation and Dance (AJPHERD).  19: 576-585, 2013

17. Jarvi MB, Brown GA, Shaw BS & Shaw I.  Measurements of Heart Rate and Accelerometry to Determine the Physical Activity Level in Boys Playing Paintball.  International Journal of Exercise Science: 6: 199-207, 2013

18. Brown GA, Krueger RD, Cook CM, Heelan KA, Shaw BS & Shaw I. A prediction equation for the estimation of cardiorespiratory fitness using an elliptical motion trainer. West Indian Medical Journal. 61: 114-117, 2013.

19. Shaw BS, Shaw I, & Brown GA. Body composition variation following diaphragmatic breathing. African Journal for Physical, Health Education, Recreation and Dance (AJPHERD). 18: 787-794, 2012.

## Refereed Presentations

1. Brown GA.  Transwomen competing in women's sports: What we know, and what we don't.  American Physiological Society New Trends in Sex and Gender Medicine conference.  Held virtually due to Covid-19 pandemic.  October 19 - 22, 2021, 2021.

2. Shaw BS, Boshoff VE, Coetzee S, Brown GA, Shaw I.  A Home-based Resistance Training Intervention Strategy To Decrease Cardiovascular Disease Risk In Overweight Children  Med Sci Sport Exerc. 53(5), 742. 68th Annual Meeting of the American College of Sports Medicine. Held virtually due to Covid-19 pandemic.  June 1-5, 2021.

3. Shaw I, Cronje M, Brown GA, Shaw BS.  Exercise Effects On Cognitive Function And Quality Of Life In Alzheimer's Patients In Long-term Care.  Med

Sci Sport Exerc.  53(5), 743.  68th Annual Meeting of the American College of Sports Medicine. Held virtually due to Covid-19 pandemic.  June 1-5, 2021.

4. Brown GA, Escalera M, Oleena A, Turek T, Shaw I, Shaw BS.  Relationships between Body Composition, Abdominal Muscle Strength, and Well Defined Abdominal Muscles.  Med Sci Sport Exerc.  53(5), 197.  68th Annual Meeting of the American College of Sports Medicine. Held virtually due to Covid-19 pandemic.  June 1-5, 2021.

5. Brown GA, Jackson B, Szekely B, Schramm T, Shaw BS, Shaw I.  A Pre-Workout Supplement Does Not Improve 400 M Sprint Running or Bicycle Wingate Test Performance in Recreationally Trained Individuals.  Med Sci Sport Exerc.  50(5), 2932.  65th Annual Meeting of the American College of Sports Medicine. Minneapolis, MN.  June 2018.

6. Paulsen SM, Brown GA. Neither Coffee Nor A Stimulant Containing "Pre-workout" Drink Alter Cardiovascular Drift During Walking In Young Men. Med Sci Sport Exerc.  50(5), 2409.  65th Annual Meeting of the American College of Sports Medicine. Minneapolis, MN.  June 2018.

7. Adkins M, Bice M, Bickford N, Brown GA.  Farm to Fresh! A Multidisciplinary Approach to Teaching Health and Physical Activity. 2018 spring SHAPE America central district conference.  Sioux Falls, SD.  January 2018.

8. Shaw I, Kinsey JE, Richards R, Shaw BS, and Brown GA. Effect Of Resistance Training During Nebulization In Adults With Cystic Fibrosis.  International Journal of Arts & Sciences' (IJAS). International Conference for Physical, Life and Health Sciences which will be held at FHWien University of Applied Sciences of WKW, at Währinger Gürtel 97, Vienna, Austria, from 25-29 June 2017.

9. Bongers M, Abbey BM, Heelan K, Steele JE, Brown GA. Nutrition Education Improves Nutrition Knowledge, Not Dietary Habits In Female Collegiate Distance Runners.  Med Sci Sport Exerc.  49(5), 389.  64th Annual Meeting of the American College of Sports Medicine. Denver, CO.  May 2017.

10. Brown GA, Steele JE, Shaw I, Shaw BS.  Using Elisa to Enhance the Biochemistry Laboratory Experience for Exercise Science Students.  Med Sci Sport Exerc.  49(5), 1108.  64th Annual Meeting of the American College of Sports Medicine. Denver, CO. May 2017.

11. Brown GA, Shaw BS, and Shaw I.  Effects of a 6 Week Conditioning Program on Jumping, Sprinting, and Agility Performance In Youth.  Med Sci Sport Exerc.  48(5), 3730.  63rd Annual Meeting of the American College of Sports Medicine. Boston, MA.  June 2016.

12. Shaw I, Shaw BS, Boshoff VE, Coetzee S, and Brown GA. Kinanthropometric Responses To Callisthenic Strength Training In Children.  Med Sci Sport Exerc.

48(5), 3221.  63rd  Annual Meeting of the American College of Sports Medicine. Boston, MA.  June 2016.

13. Shaw BS, Shaw I, Gouveia M, McIntyre S, and Brown GA.  Kinanthropometric Responses To Moderate-intensity Resistance Training In Postmenopausal Women.  Med Sci Sport Exerc.  48(5), 2127.  63rd  Annual Meeting of the American College of Sports Medicine. Boston, MA.  June 2016.

14. Bice MR, Cary JD, Brown GA, Adkins M, and Ball JW.  The use of mobile applications to enhance introductory anatomy & physiology student performance on topic specific in-class tests.  National Association for Kinesiology in Higher Education National Conference. January 8, 2016.

15. Shaw I, Shaw BS, Lawrence KE, Brown GA, and Shariat A. Concurrent Resistance and Aerobic Exercise Training Improves Hemodynamics in Normotensive Overweight and Obese Individuals. Med Sci Sport Exerc.  47(5), 559.  62nd  Annual Meeting of the American College of Sports Medicine. San Diego, CA.  May 2015.

16. Shaw BS, Shaw I, McCrorie C, Turner S., Schnetler A, and Brown GA. Concurrent Resistance and Aerobic Training in the Prevention of Overweight and Obesity in Young Adults.  Med Sci Sport Exerc.  47(5), 223.  62nd  Annual Meeting of the American College of Sports Medicine. San Diego, CA.  May 2015.

17. Schneekloth B, Shaw I, Shaw BS, and Brown GA.  Physical Activity Levels Using Kinect™ Zumba Fitness versus Zumba Fitness with a Human Instructor. Med Sci Sport Exerc.  46(5), 326.  61st Annual Meeting of the American College of Sports Medicine. Orlando, FL.  June 2014.

18. Shaw I, Lawrence KE, Shaw BS, and Brown GA.  Callisthenic Exercise-related Changes in Body Composition in Overweight and Obese Adults.  Med Sci Sport Exerc.  46(5), 394.  61st Annual Meeting of the American College of Sports Medicine. Orlando, FL June 2014.

19. Shaw BS, Shaw I, Fourie M, Gildenhuys M, and Brown GA.  Variances In The Body Composition Of Elderly Woman Following Progressive Mat Pilates.  Med Sci Sport Exerc.  46(5), 558. 61st Annual Meeting of the American College of Sports Medicine. Orlando, FL June 2014.

20. Brown GA, Shaw I, Shaw BS, and Bice M. Online Quizzes Enhance Introductory Anatomy & Physiology Performance on Subsequent Tests, But Not Examinations.  Med Sci Sport Exerc.  46(5), 1655.  61st Annual Meeting of the American College of Sports Medicine. Orlando, FL June 2014.

21. Kahle, A.  and Brown, G.A.  Electromyography in the Gastrocnemius and Tibialis Anterior, and Oxygen Consumption, Ventilation, and Heart Rate During Minimalist versus Traditionally Shod Running.  27th National Conference on Undergraduate Research (NCUR).  La Crosse, Wisconsin USA. April 11-13, 2013

q

22. Shaw, I., Shaw, B.S., and Brown, G.A. Resistive Breathing Effects on Pulmonary Function, Aerobic Capacity and Medication Usage in Adult Asthmatics Med Sci Sports Exerc 45 (5). S1602 2013.  60th Annual Meeting of the American College of Sports Medicine, Indianapolis, IN USA, May 26-30 3013

23. Shaw, B.S.  Gildenhuys, G.A., Fourie, M. Shaw I, and Brown, G.A. Function Changes In The Aged Following Pilates Exercise Training.  Med Sci Sports Exerc 45 (5). S1566 60th Annual Meeting of the American College of Sports Medicine, Indianapolis, IN USA, May 26-30 2013

24. Brown, G.A., Abbey, B.M., Ray, M.W., Shaw B.S., & Shaw, I. Changes in Plasma Free Testosterone and Cortisol Concentrations During Plyometric Depth Jumps.  Med Sci Sports Exerc 44 (5). S598, 2012.  59th Annual Meeting of the American College of Sports Medicine.  May 29 - June 2, 2012; San Francisco, California

25. Shaw, I., Fourie, M., Gildenhuys, G.M., Shaw B.S., & Brown, G.A. Group Pilates Program and Muscular Strength and Endurance Among Elderly Woman.  Med Sci Sports Exerc 44 (5). S1426.  59th Annual Meeting of the American College of Sports Medicine.  May 29 - June 2, 2012; San Francisco, California

26. Shaw B.S., Shaw, I., & Brown, G.A. Concurrent Inspiratory-Expiratory and Aerobic Training Effects On Respiratory Muscle Strength In Asthmatics.  Med Sci Sports Exerc 44 (5). S2163.  59th Annual Meeting of the American College of Sports Medicine.  May 29 - June 2, 2012; San Francisco, California

27. Scheer, K., Siebrandt, S., Brown, G.A, Shaw B.S., & Shaw, I.  Heart Rate, Oxygen Consumption, and Ventilation due to Different Physically Active Video Game Systems.  Med Sci Sports Exerc 44 (5). S1763.  59th Annual Meeting of the American College of Sports Medicine.  May 29 - June 2, 2012; San Francisco, California

28. Jarvi M.B., Shaw B.S., Shaw, I., & Brown, G.A. (2012) Paintball Is A Blast, But Is It Exercise? Heart Rate and Accelerometry In Boys Playing Paintball.  Med Sci Sports Exerc 44 (5). S3503.  59th Annual Meeting of the American College of Sports Medicine.  May 29 - June 2, 2012; San Francisco, California

## Book Chapters

1. Shaw BS, Shaw I, Brown G.A.  Importance of resistance training in the management of cardiovascular disease risk.  In Cardiovascular Risk Factors. IntechOpen, 2021.

r

Lifescitrc 0197

2. Brown, G.A.  Chapters on Androstenedione and DHEA.  In: Nutritional Supplements in Sport, Exercise and Health an A-Z Guide. edited by Linda M. Castell, Samantha J. Stear, Louise M. Burke.  Routledge 2015.

**Refereed Web Content**

1. Brown GA.  Looking back and moving forward. The importance of reflective assessment in physiology education. (January 13, 2022) https://blog.lifescitrc.org/pecop/2022/01/13/looking-back-and-moving-forward-the-importance-of-reflective-assessment-in-physiology-education/

2. Brown GA.  The Olympics, sex, and gender in the physiology classroom. Physiology Educators Community of Practice, managed by the Education group of the American Physiological Society (August 18, 2021) https://blog.lifescitrc.org/pecop/2021/08/18/the-olympics-sex-and-gender-in-the-physiology-classroom/

A complete CV is available at https://www.unk.edu/academics/hperls/bio_pages/current-vita-gab.pdf

## IN THE UNITED STATES DISTRICT COURT
### FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA
### CHARLESTON DIVISION

B.P.J., by her next friend and mother, HEATHER JACKSON,

*Plaintiff,*

vs.

WEST VIRGINIA STATE BOARD OF EDUCATION; HARRISON COUNTY BOARD OF EDUCATION; WEST VIRGINIA SECONDARY SCHOOLS ACTIVITIES COMMISSION; W. CLAYTON BURCH, in his official capacity as State Superintendent, DORA STUTLER, in her official capacity as the Harrison County Superintendent, and the STATE OF WEST VIRGINIA,

*Defendants,*

and

LAINEY ARMISTEAD,

*Defendant-Intervenor.*

Case No. 2:21-cv-00316

Hon. Joseph R. Goodwin

## DECLARATION OF DR. CHAD T. CARLSON, M.D., FACSM

I, Dr. Chad T. Carlson, pursuant to 28 U.S. Code § 1746, declare under penalty of perjury under the laws of the United States of America that the facts contained in my Expert Report of Dr. Chad T. Carlson, M.D., FACM prepared for *B.P.J. v. West Virginia*, attached hereto, are true and correct to the best of my knowledge and belief, and that the opinions expressed therein represent my own expert opinions.

Executed on February 23, 2022.

Chad T. Carlson, MD

i

Enjoin 0199

Carlson 0200

**Expert Report of Dr. Chad Thomas Carlson, M.D., FACM**
**prepared for *B.P.J. v. West Virginia***
**February 23, 2022**

## TABLE OF CONTENTS

Table of Contents .................................................................................................... iv

Introduction.............................................................................................................. 1

Credentials .............................................................................................................. 5

   I.   OVERVIEW .................................................................................................... 8

   II.  A BRIEF HISTORY OF THE RATIONALE FOR SEPARATION OF SPORT BY SEX......................................................................................................... 10

   III.   UNDERSTANDING THE CAUSES OF SPORTS INJURIES ..................... 13

      A.   The epidemiological model of injury .........................................................13

      B.   The biomechanical model of injury ..........................................................18

   IV.   THE PHYSICS OF SPORTS INJURY........................................................ 20

   V.  GENDER DIFFERENCES RELEVANT TO INJURY ................................... 24

      A.   Height and weight .....................................................................................25

      B.   Bone and connective tissue strength .......................................................26

      C.   Speed .........................................................................................................27

      D.   Strength/Power .........................................................................................27

      E.   Throwing and kicking speed .....................................................................30

   VI.   ENHANCED FEMALE VULNERABILITY TO CERTAIN INJURIES....... 33

      A.   Concussions................................................................................................35

      B.   Anterior Cruciate Ligament injuries .......................................................42

   VII.   TESTOSTERONE SUPPRESSION WILL NOT PREVENT THE HARM TO FEMALE SAFETY IN ATHLETICS ........................................................ 46

      A.   Size and weight..........................................................................................51

      B.   Bone density...............................................................................................52

      C.   Strength ....................................................................................................52

      D.   Speed .........................................................................................................55

Conclusion ............................................................................................................. 56

Bibliography ........................................................................................................... 61

Appendix – List of Publications .......................................................................... 71

Curriculum Vitae (Abbreviated) ......................................................................... 72

Pl. App. 0202

## INTRODUCTION

Up to the present, the great majority of news, debate, and even scholarship about transgender participation in female athletics has focused on track and field events and athletes, and the debate has largely concerned questions of fairness and inclusion. However, the transgender eligibility policies of many high school athletic associations in the United States apply with equal force to all sports, including sports in which players frequently collide with each other, or can be forcefully struck by balls or equipment such as hockey or lacrosse sticks. And in fact, biologically male transgender athletes have competed in a wide range of high school, collegiate, and professional girls' or women's sports, including, at least, basketball,[1] soccer,[2] volleyball,[3] softball,[4] lacrosse,[5] and even women's tackle football.[6]

---

[1] https://www.espn.com/espnw/athletes-life/story/_/id/10170842/espnw-gabrielle-ludwig-52-year-old-transgender-women-college-basketball-player-enjoying-best-year-life (accessed 2/17/22)

[2] https://www.unionleader.com/news/education/nh-bill-limits-women-s-sports-to-girls-born-female/article_d1998ea1-a1b9-5ba4-a48d-51a2aa01b910.html; https://www.outsports.com/2020/1/17/21069390/womens-soccer-mara-gomez-transgender-player-argentina-primera-division-villa-san-marcos (accessed 6/20/21)

[3] https://news.ucsc.edu/2016/09/challenging-assumptions.html (accessed 6/20/21); https://www.outsports.com/2017/3/20/14987924/trans-athlete-volleyball-tia-thompson (accessed 6/20/21)

[4] https://www.foxnews.com/us/californias-transgender-law-allows-male-high-schooler-to-make-girls-softball-team (accessed 6/20/21)

[5] https://savewomenssports.com/f/emilys-story?blogcategory=Our+Stories (accessed 6/20/21)

[6] https://www.outsports.com/2017/12/13/16748322/britney-stinson-trans-football-baseball (accessed 6/20/21); https://www.mprnews.org/story/2018/12/22/transgender-football-player-prevails-in-lawsuit (accessed 6/20/21)

Mascall 0203

The science of sex-specific differences in physiology, intersecting with the physics of sports injury, leaves little doubt that participation by biological males in these types of girls' or women's sports, based on gender identity, creates significant additional risk of injury for the biologically female participants competing alongside these transgender athletes.

In 2020, after an extensive review of the scientific literature, consultation with experts, and modeling of expected injuries, World Rugby published revised rules governing transgender participation, along with a detailed explanation of how the new policy was supported by current evidence. World Rugby concluded that "there is currently no basis with which safety and fairness can be assured to biologically female rugby players should they encounter contact situations with players whose biological male advantages persist to a large degree," and that after puberty, "the lowering of testosterone removes only a small proportion of the documented biological differences." Hence, World Rugby concluded that biological men should not compete in women's rugby. (World Rugby Transgender Women Guidelines 2020.) World Rugby has been criticized by some for its new guidelines, but those criticisms have often avoided discussions of medical science entirely, or have asserted that modeling scenarios can overstate true risk. What cannot be denied, however, is that World Rugby's approach is evidence-based, and rooted in concern for athlete safety. As a medical doctor who has spent my career in sports medicine, it is my opinion that World Rugby's assessment of the evidence is scientifically sound, and that injury modeling

Holden 0204

meaningfully predicts that biologically male transgender athletes do constitute a safety risk for the biologically female athlete in women's sports.

In a similar vein, in 2021, the UK Sports Councils' Equality Group released new guidance for transgender inclusion in organized sports. This guidance was formulated after extensive conversations with stakeholders, a review of scientific findings related to transgender athletes in sport through early 2021, and an assessment of the use by some sport national governing bodies of case-by-case assessment to determine eligibility. Noteworthy within these stakeholder consultations was a lack of consensus on any workable solution, as well as concerns related to athlete safety and "adherence to rules which give sport validity." The Literature Review accompanying the guidance document further noted that "[t]here are significant differences between the sexes which render direct competition between males and females . . . unsafe in sports which allow physical contact and collisions." (UK Sports Councils' Equality Group Literature Review 2021 at 1.) Their review of the science "made clear that there are retained differences in strength, stamina and physique between the average woman compared with the average transgender woman….with or without testosterone suppression." (UK Sports Councils' Equality Group Guidance at 3.) This was also reflected in their ten guiding principles, stating that physical differences between the sexes will "impact safety parameters in sports which are combat, collision or contact in nature." (UK Sports Councils' Equality Group Guidance 2021 at 7.) Ultimately, UK Sport

concluded that the full inclusion of transgender athletes in women's sports "cannot be reconciled within the current structure of sport," stating that "the inclusion of transgender people into female sport cannot be balanced regarding transgender inclusion, fairness and safety in gender-affected sport where there is meaningful competition . . . . due to retained differences in strength, stamina and physique between the average woman compared with the average transgender woman…, with or without testosterone suppression." (UK Sports Councils' Equality Group Guidance 2021 at 6.) Finally, UK Sport affirmed the use of sex categorization in sport, along with age and disability, as important for the maintenance of safety and fairness. (UK Sports Councils' Equality Group Guidance 2021 at 7-8.)

Unfortunately, apart from World Rugby's careful review and the recent release of UK Sports Councils' guidance, the public discourse is lacking any careful consideration of the question of safety. As a physician who has spent my career caring for athletes, I find this silence about safety both surprising and concerning. It is my hope through this white paper to equip and motivate sports leagues and policy makers to give adequate attention to the issue of safety for female athletes when transgender policies are being considered. I first explain the nature and causes of common sports injuries. I then review physiological differences between male and female bodies that affect the risk and severity of injuries to females when biological males compete in the female category, and

Tingley 0205

Hecox_0206

explain why testosterone suppression does not eliminate these heightened risks to females. Finally, I explain certain conclusions about those risks.

## CREDENTIALS

1.      I am a medical doctor practicing Sports Medicine, maintaining an active clinical practice at Stadia Sports Medicine in West Des Moines, Iowa. I received my M.D. from the University of Nebraska College of Medicine in 1994 and completed a residency in family medicine at the University of Michigan in 1997.

2.      Following my time in Ann Arbor, I matched to a fellowship in Sports Medicine at Ball Memorial Hospital in Muncie, Indiana, training from 1997 to 1999, with clinical time split between Central Indiana Orthopedics, the Ball State Human Performance Laboratory, and the Ball State University training room. I received my board certification in Sports Medicine in 1999, which I continue to hold. Since residency training, my practice has focused on Sports Medicine—the treatment and prevention of injuries related to sport and physical activity.

3.      Since 1997, I have served in several clinical practices and settings as a treating physician, including time as team physician for both the University of Illinois and Ball State University, where I provided care to athletes in several sports, including football, ice hockey, basketball, field hockey, softball, gymnastics, soccer, and volleyball. In the course of my career, I have provided coverage for NCAA Power Five Conference championships and NCAA National

5

Doe v. NCAA 0207

Championship events in basketball, field hockey and gymnastics, among other sports, as well as provided coverage for national championship events for U.S.A. gymnastics, and U.S. Swimming and Diving. I have also covered professional soccer in Des Moines.

4.      Since 2006, I have been the physician owner of Stadia Sports Medicine in West Des Moines, Iowa. My practice focuses on treatment of sports and activity-related injury, including concussive injury, as well as problems related to the physiology of sport.

5.      I have served in and provided leadership for several professional organizations over the course of my career. In 2004, I was designated a Fellow of the American College of Sports Medicine (ACSM). I have served on ACSM's Health and Science Policy Committee since 2010, and for a time chaired their Clinical Medicine Subcommittee. From 2009 to 2013, I served two elected terms on the Board of Directors of the American Medical Society for Sports Medicine (AMSSM), and during that time served as Chair of that body's Practice and Policy Committee. I was subsequently elected to a four-year term on AMSSM's executive committee in 2017, and from 2019-20, I served as AMSSM's President. AMSSM is the largest organization of sports medicine physicians in the world. I gained fellowship status through AMSSM in 2020–my first year of eligibility. My work for ACSM and AMSSM has brought with it extensive experience in public policy as relates to Sports Medicine.

6.     In 2020, I was named as AMSSM's first board delegate to the newly-constituted Physical Activity Alliance. I am a named member of an NCAA advisory group on COVID-19, through which I provided input regarding the cancellation of the basketball tournament in 2020. I also serve as a member of the Iowa Medical Society's Sports Medicine Subcommittee and have been asked to serve on the Iowa High School Athletic Association's newly-forming Sports Medicine Advisory Committee.

7.     I have served as a manuscript reviewer for organizational policy pronouncements, and for several professional publications, most recently a sports medicine board review book just published in 2021. I have published several articles on topics related to musculoskeletal injuries in sports and rehabilitation, which have been published in peer-reviewed journals such as Clinical Journal of Sports Medicine, British Journal of Sports Medicine, Current Reviews in Musculoskeletal Medicine, Athletic Therapy Today, and the Journal of Athletic Training. In conjunction with my work in policy advocacy, I have helped write several pieces of legislation, including the initial draft of what became the Sports Medicine Licensure Clarity Act, signed into law by President Trump in 2018, which eases the restrictions on certain practitioners to provide health services to athletes and athletic teams outside of the practitioner's home state. A list of my publications over the past ten (10) years is included as an appendix to this report.

8.     In the past four years, I have not testified as an expert witness in a deposition or at trial.

9.     I am being compensated for my services as an expert witness in this case at the rates of $650 per hour for consultation, $800 per hour for deposition testimony, and $3,500 per half-day of trial testimony.

## I.     OVERVIEW

10.     In this statement, I offer information and my own professional opinion on the potential for increased injury risk to females in sports when they compete against biologically male transgender athletes.[7] At many points in this statement, I provide citations to published, peer-reviewed articles that provide relevant and supporting information to the points I make.

11.     The principal conclusions that I set out in this white paper are as follows:

> a. Government and sporting organizations have historically considered the preservation of athlete safety as one component of competitive equity.
>
> b. Injury in sport is somewhat predictable based on modeling assumptions that take into account relevant internal and external risk factors.

---

[7] In the body of this paper, I use the terms "male" and "female" according to their ordinary medical meaning–that is to say, to refer to the two biological sexes. I also use the word "man" to refer to a biologically male human, and "woman" to refer to a biologically female human. In the context of this opinion, I include in these categories non-syndromic, biologically-normal males and females who identify as a member of the opposite sex, including those who use endogenous hormone suppression to alter their body habitus. In contexts that are not focused on questions of biology and physiology, terms of gender are sometimes used to refer to subjective identities rather than to biological categories – something I avoid for purposes of a paper focused on sports science

8

Hose - 0210

c. Males exhibit large average advantages in size, weight, and physical capacity over females—often falling far outside female ranges. Even before puberty, males have a performance advantage over females in most athletic events. Failure to preserve protected female-only categories in contact sports (broadly defined) will ultimately increase both the frequency and severity of injury suffered by female athletes who share playing space with these males.

d. Current research supports the conclusion that suppression of testosterone levels by males who have already begun puberty will not fully reverse the effects of testosterone on skeletal size, strength, or muscle hypertrophy, leading to persistence of sex-based differences in power, speed, and force-generating capacity.

12.   In this white paper, I use the term "contact sports" to refer broadly to all sports in which collisions between players, or collisions between equipment such as a stick or ball and the body of a player, occur with some frequency (whether or not permitted by the rules of the game), and are well recognized in the field of sports medicine as causes of sport-related injuries.[8] The 1975 Title IX implementing regulations (34 CFR § 106.41) say that "for purposes of this [regulation] contact sports include boxing, wrestling, rugby, ice hockey, football, basketball, *and other sports* the purpose or major activity of which involves bodily contact."  Certainly, all of the sports specifically named in the regulation fall within my definition of "contact sport."  Mixed martial arts, field hockey (Barboza 2018), soccer (Kuczinski 2018), rugby (Viviers 2018), lacrosse

---

[8] It is common to see, within the medical literature, reference to distinctions between "contact" and "collision" sports. For purposes of clarity, I have combined these terms, since in the context of injury risk modeling, there is no practical distinction between them.

9

0211

(Pierpoint 2019), volleyball,[9] baseball, and softball also involve collisions that can and do result in injuries, and so also fall within my definition.

## II.   A BRIEF HISTORY OF THE RATIONALE FOR SEPARATION OF SPORT BY SEX

13.    World Rugby is correct when it notes that "the women's category exists to ensure protection, safety, and equality" for women. (World Rugby Transgender Women Guidelines 2020.) To some extent, those in charge of sport governing bodies in the modern era have always recognized the importance of grouping athletes together based on physical attributes, in order to ensure both safety and competitive balance. Weight classifications have existed in wrestling since it reappeared as an Olympic event in 1904. Women and men have participated in separate categories since the advent of intercollegiate sporting clubs early in the 20th century. When Title IX went into effect in 1975, there were just under 300,000 female high school athletes, and fewer than 10,000 female collegiate athletes. With the changes that resulted from Title IX, it was assumed that newly-available funds for women in sport would ensure the maintenance of existing, or creation of new, sex-segregated athletic teams that would foster greater participation by women. This has been borne out subsequently; by the first half of the 1980's these numbers had risen to 1.9 million and nearly 100,000 respectively. (Hult 1989.)

---

[9] See https://www.latimes.com/sports/story/2020-12-08/stanford-volleyball-hayley-hodson-concussions-cte-lawsuit, and https://volleyballmag.com/corinneatchison/ (both accessed 6/20/21).

Coleman 0212

14.    The rationale for ongoing "separate but equal" status when it came to sex-segregated sports was made clear within the language of the original implementing regulations of Title IX , which, acknowledging real, biologically-driven differences between the sexes, created carve-out exceptions authorizing sex-separation of sport for reasons rooted in the maintenance of competitive equity. Importantly, the effect of these innate sex-based differences on the health and safety of the athlete were acknowledged by the express authorization of sex-separated teams for sports with higher perceived injury risk—i.e., "contact sports." (Coleman 2020.)

15.    In the almost half century since those regulations were adopted, the persistent reality of sex-determined differences in athletic performance and safety has been recognized by the ongoing and nearly universal segregation of men's and women's teams–even those that are not classically defined as being part of a contact or collision sport.

16.    Now, however, many schools and sports leagues in this country are permitting males to compete in female athletics—including in contact sports—based on gender identity. In my view, these policies have been adopted without careful analysis of safety implications. Other researchers and clinicians have addressed questions of the negative impact of such policies on fairness, or equality of athletic experiences for girls and women, in published articles, and in court submissions. One recent review of track and field performances, including sprints, distance races and field events, noted that men surpass the

Whitaker 0213

top female performance in each category between 1000 and 10,000 times *each year*, with hundreds or thousands of men beating the top women in each event. (Coleman & Shreve.) Although this was not their primary focus, World Rugby well-summarized the point when it observed that in a ranking list of the top thousand performances in most sports, every year, *every one* will have been achieved by a biological male. (World Rugby Transgender Women Guidelines 2020.) Although most easily documented in athletes who have gone through puberty, these differences are not exclusively limited to post-pubescent athletes either.

17.     I have reviewed the expert declaration of Gregory A. Brown, Ph.D., FACM of February 23, 2022, provided in this case, which includes evidence from a wide variety of sources, including population-based mass testing data, as well as age-stratified competition results, all of which support the idea that prepubertal males run faster, jump higher and farther, exhibit higher aerobic power output, and have greater upper body strength (evidenced by stronger hand grip and better performance with chin-ups or bent arm hang) than comparably aged females. This performance gap is well-documented in population-based physiologic testing data that exists in databases such as the Presidential Fitness Test, the Eurofit Fitness test, and additional mass testing data from the UK and Australia. Collectively, this data reveals that pre-pubertal males outperform comparably aged females in a wide array of athletic tests including but not limited to the countermovement jump test, drop jump test, change of direction

12

Bridge 0214

test, long jump, timed sit-up test, the 10 X 5 meter shuttle run test, the 20 meter shuttle run test, curl-ups, pull-ups, push-ups, one mile run, standing broad jump, and bent arm hang test. Dr. Brown further references studies showing a significant difference in the body composition of males and females before puberty. In sum, a large and unbridgeable performance gap between the sexes is well-studied and equally well-documented, beginning in many cases before puberty. In this white paper, I focus on some of these differences as they touch on the question of athlete safety.

### III.   UNDERSTANDING THE CAUSES OF SPORTS INJURIES

18.    The causes for injury in sport are multifactorial. In recent decades, medical researchers have provided us an evolving understanding of how sports injuries occur, as well as the factors that make them more or less probable, and more or less severe. Broadly speaking, there are two ways of modeling injury: the epidemiological model, and the biomechanical model. These models are not mutually exclusive, but provide complementary conceptual frameworks to help us stratify risk in sport.

### A.    The epidemiological model of injury

19.    From a practical standpoint, sports medicine researchers and clinicians often use the "epidemiological model" to explain, prevent and manage sports injuries. Broadly speaking, this model views an injury in sport as the product of internal and external risk factors, triggered by an inciting event. In other words, a given injury is "caused" by a number of different factors that are

unique to a given situation. (Meeuwise 1994.) When the interplay of these factors exceeds the injury threshold, injury occurs. One example of how this interplay might work would be a female distance runner in track who develops a tibial stress fracture, with identified risks of low estrogen state from amenorrhea (suppression of menses), an aggressive winter training program on an indoor tile surface, and shoes that have been used for too many miles, and are no longer providing proper shock absorption. Most risk factors ebb and flow, with the overall injury risk at any given time fluctuating as well. Proper attention to risk factor reduction *before* the start of the sports season (including appropriate rule-making) is the best way to reduce actual injury rates *during* the season.

20. As alluded to, the risk factors associated with injury can be broadly categorized as internal or external. Internal risk factors are internal to the athlete. These include relatively fixed variables, such as the athlete's age, biological sex, bone mineral density (which affects bone strength) and joint laxity, as well as more mutable variables such as body weight, fitness level, hydration state, current illness, prior injury, or psychosocial factors such as aggression.

21. External risk factors are, as the name suggests, external to the athlete. These include non-human risks such as the condition of the playing surface or equipment, athletic shoe wear, or environmental conditions. Other external risk factors come from opposing competitors, and include such

14

variables as player size, speed, aggressiveness, and overall adherence to the rules of the game. As already mentioned, these risks can be minimized through the proper creation and enforcement of rules, as well as the appropriate grouping of athletes together for purposes of competition. To the latter point, children don't play contact sports with adults and, in the great majority of cases, men and women compete in categories specific to their own biological sex. Certainly these categorical separations are motivated in part by average performance differences and considerations of fairness and opportunity. But they are also motivated by safety concerns. When properly applied, these divisions enhance safety because, when it comes to physical traits such as body size, weight, speed, muscle girth, and bone strength, although a certain amount of variability exists within each group, the averages and medians differ widely *between* the separated groups.[10]

22.     Thus, each of these commonly utilized groupings of athletes represents a pool of individuals with predictable commonalities. Epidemiological risk assessment is somewhat predictable and translatable as long as these pools remain intact. But the introduction of outside individuals

---

[10] In some cases, safety requires even further division or exclusion. A welterweight boxer would not compete against a heavyweight, nor a heavyweight wrestle against a smaller athlete. In the case of youth sports, when children are at an age where growth rates can vary widely, leagues will accommodate for naturally-occurring large discrepancies in body size by limiting larger athletes from playing positions where their size and strength is likely to result in injury to smaller players. Thus, in youth football, players exceeding a certain weight threshold may be temporarily restricted to playing on the line and disallowed from carrying the ball, or playing in the defensive secondary, where they could impose high-velocity hits on smaller players.

into a given pool (e.g. an adult onto a youth football team, or males into most women's sports) would change the balance of risk inside that pool. Simply put, when you introduce larger, faster, and stronger athletes from one pool into a second pool of athletes who are *categorically* smaller (whether as a result of age or sex), you have altered the characteristics of the second pool, and, based on known injury modeling, have statistically increased the injury risk for the original athletes in that pool. This, in a nutshell, is the basis for World Rugby's recommendations.

23.     Most clinical studies of the epidemiology of sports injuries use a multivariate approach, identifying multiple independent risk factors and examining how these factors might interact, in order to determine their relative contribution to injury risk, and make educated inferences about causation. (Meeuwise 1994.)

24.     In applying the multivariate approach, the goal is to keep as many variables as possible the same so as to isolate the potential effect of a single variable (such as age or biological sex) on injury risk, as well as to determine how the isolated variable interacts with the other analyzed variables to affect injury risk. Failure to consider relevant independent variables can lead to error. Researchers focusing on differences between male and female athletes, for example, would not compare concussion rates of a high school girls' soccer team to concussion rates of a professional men's soccer team, because differences in the concussion rate might be due to a number of factors besides sex, such as age,

Ritchie 273117 0218

body mass, relative differences in skill, speed, or power, as well as differences in training volume and intensity.

25.    As indicated earlier, an injury event is usually the end product of a number of different risk factors coming together. (Bahr 2005.) A collision between two soccer players who both attempt to head the ball, for example, might be the inciting event that causes a concussion. Although the linear and angular forces that occur through sudden deceleration would be the proximate cause of this injury, the epidemiological model of injury would also factor in "upstream" risks, predicting the possibility of an injury outcome for each athlete differently depending on the sum of these risks. If the collision injury described above occurs between two disparately-sized players, the smaller athlete will tend to decelerate more abruptly than the larger athlete, increasing the smaller athlete's risk for injury. Additional discrepancies in factors such as neck strength, running speeds, and muscle force generation capacity all result in differing risks and thus, the potential for differing injury outcomes from the same collision. As I discuss later in this white paper, there are significant statistical differences between the sexes when it comes to each of these variables, meaning that in a collision sport where skeletally mature males and females are playing against one another, there is a higher statistical likelihood that injury will result when collisions occur, and in particular there is a higher likelihood that a female will suffer injury. This again is the basis for the recent decision by World Rugby to disallow the crossover of men into women's rugby,

regardless of gender identity. (World Rugby Transgender Women Guidelines 2020.) The decision-making represented by this policy change is rational and rooted in objective facts and objective risks of harm, because it takes real, acknowledged, and documented physical differences between the sexes (in many cases before adolescence), and models expected injury risk on the basis of the known differences that persist even after hormone manipulation.

### B.    The biomechanical model of injury

26.    Sports medicine researchers and clinicians also consider a biomechanical approach when it comes to understanding sports injuries. In the biomechanical model of injury, injury is considered to be analogous to the failure of a machine or other structure. Every bone, muscle, or connective tissue structure in an athlete's body has a certain load tolerance. Conceptually, when an external "load" exceeds the load tolerance of a given structure in the human body, an injury occurs. (Fung 1993 at 1.) Thus, researchers focus on the mechanical load—the force exerted on a bone, ligament, joint or other body part—and the load tolerance of that impacted or stressed body part, to understand what the typical threshold for injury is, and how predictable this might be. (McIntosh 2005 at 2-3.) Biomechanical models of injury usually consider forces in isolation. The more consistent the movement pattern of an individual, and the fewer the contributions of unexpected outside forces to the athlete, the more accurate biomechanical predictions of injury will be.

18

27.     Biomechanical modeling can be highly predictive in relatively simple settings. For example, in blunt trauma injury from falls, mortality predictably rises the greater the fall. About 50% of people who fall four stories will survive, while only 10% will survive a fall of seven stories. (Buckman 1991.) As complexity increases, predictability in turn decreases. In sport, the pitching motion is highly reproducible, and strain injury to the ulnar collateral ligament (UCL) of the elbow can be modeled. The load tolerance of the UCL of a pitcher's elbow is about 32 Newton-meters, but the failure threshold of a ligament like this in isolation is not the only determinant of whether injury will occur. During the pitching motion, the valgus force imparted to the elbow (gapping stress across the inner elbow that stretches the UCL) routinely reaches 64 Newtons, which is obviously greater than the failure threshold of the ligament. Since not all pitchers tear their UCLs, other variables innate to an athlete must mitigate force transmission to the ligament and reduce risk. The load tolerance of any particular part of an athlete's body is thus determined by other internal factors such as joint stiffness, total ligament support, muscle strength across the joint, or bone mineral density. Injury load can be self-generated, as in the case of a pitcher's elbow, or externally-generated, as in the case of a linebacker hitting a wide receiver. While load tolerance will vary by individual, as described above, and is often reliant on characteristics innate to a given athlete, external load is determined by outside factors such as the nature of the playing surface or

equipment used, in combination with the weight and speed of other players or objects (such as a batted ball) with which the player collides. (Bahr 2005.)

28.     As this suggests, the two "models" of sports injuries described above are not in any sense inconsistent or in tension with each other. Instead, they are complementary ways of thinking about injuries that can provide different insights. But the important point to make regarding these models is that in either model, injury risk (or the threshold for injury) rises and falls depending on the size of an externally-applied force, and the ability of a given athlete to absorb or mitigate that force.

## IV.    THE PHYSICS OF SPORTS INJURY

29.     Sports injuries often result from collisions between players, or between a player and a rapidly moving object (e.g. a ball or hockey puck, a lacrosse or hockey stick). In soccer, for example, most head injuries result from collisions with another player's head or body, collision with the goal or ground, or from an unanticipated blow from a kicked ball. (Boden 1998; Mooney 2020.) In basketball, players often collide with each other during screens, while diving for a loose ball, or while driving to the basket. In lacrosse or field hockey, player-to-player, or player-to-stick contact is common.

30.     But what are the results of those collisions on the human body? Basic principles of physics can cast light on this question from more than one angle. A general understanding of these principles can help us identify factors

that will predictably increase the relative risk, frequency, and severity of sports injuries, given certain assumptions.

31.     First, we can consider **energy**. Every collision involves an object or objects that possess energy. The energy embodied in a moving object (whether a human body, a ball, or anything else) is called kinetic energy.

32.     Importantly, the kinetic energy of a moving object is expressed as: $E_k = \frac{1}{2}mv^2$. That is, kinetic energy is a function of the mass of the object multiplied by the *square* of its velocity. (Dashnaw 2012.) To illustrate with a simple but extreme example: if athletes A and B are moving at the same speed, but athlete A is twice as heavy, athlete A carries twice as much kinetic energy as athlete B. If the two athletes weigh the same amount, but athlete A is going twice as fast, athlete A carries four times as much kinetic energy as athlete B. But as I have noted, the kinetic energy of a moving object is a function of the mass of the object multiplied by the square of its velocity. Thus, if athlete A is twice as heavy, and moving twice as fast, athlete A will carry eight times the kinetic energy of athlete B into a collision.[11]

33.     The implication of this equation means that what appear to be relatively minor discrepancies in size and speed can result in major differences in energy imparted in a collision, to the point that more frequent and more severe injuries can occur. To use figures that correspond more closely to average

---

[11] $2 \times 2^2 = 8$

21

differences between men and women, if Player M weighs only 20% more than Player F, and runs only 15% faster, Player M will bring *58% more kinetic energy* into a collision than Player F.[12]

34.   The law of conservation of energy tells us that energy is never destroyed or "used up." If kinetic energy is "lost" by one body in a collision, it is inevitably transferred to another body, or into a different form. In the case of collision between players, or between (e.g.) a ball and a player's head, some of the energy "lost" by one player, or by the ball, may be transformed into (harmless) sound; some may result in an increase in the kinetic energy of the player who is struck (through acceleration, which I discuss below); but some of it may result in *deformation* of the player's body—which, depending on its severity, may result in injury. Thus, the greater the kinetic energy brought into a collision, the greater the potential for injury, all other things being equal.

35.   Alternately, we can consider force and *acceleration*, which is particularly relevant to concussion injuries.

36.   Newton's third law of motion tells us that when two players collide, their bodies experience equal and opposite forces at the point of impact.

37.   Acceleration refers to the rate of change in speed (or velocity). When two athletes collide, their bodies necessarily accelerate (or decelerate) rapidly: stopping abruptly, bouncing back, or being deflected in a different

---

[12] $1.2 \times (1.15)^2 = 1.587$

direction. Newton's second law of motion tells us that: $\boldsymbol{F = ma}$ (that is, force equals mass multiplied by acceleration). From this equation we see that when a larger and a smaller body collide, and (necessarily) experience equal and opposite forces, the smaller body (or smaller player, in sport) will experience more rapid acceleration. We observe this physical principle in action when we watch a bowling ball strike bowling pins: the heavy bowling ball only slightly changes its course and speed; the lighter pins go flying.

38.    This same equation also tells us that if a given player's body or head is hit with a *larger* force (e.g., from a ball that has been thrown or hit faster), it will experience *greater* acceleration, everything else being equal.

39.    Of course, sport is by definition somewhat chaotic, and forces are often not purely linear. Many collisions also involve angular velocities, with the production of rotational force, or torque. Torque can be thought of as force that causes rotation around a central point. A different but similar equation of Newtonian physics  governs the principles involved. [13] Torque is relevant to injury in several ways. When torque is applied through joints in directions those joints are not able to accommodate, injury can occur. In addition, rotational force can cause different parts of the body to accelerate at different rates—in some cases, very rapid rates, also leading to injury. For example, a collision where the

---

[13] In this equation, $\boldsymbol{\tau = I\alpha}$, torque equals moment of inertia multiplied by angular acceleration, where "moment of inertia" is defined as $\boldsymbol{I = mr^2}$, that is, mass multiplied by the square of the distance to the rotational axis.

body is impacted at the waist can result in high torque and acceleration on the neck and head.

40.     Sport-related concussion—a common sports injury and one with potentially significant effects—is attributable to linear, angular, or rotational acceleration and deceleration forces that result from impact to the head, or from an impact to the body that results in a whiplash "snap" of the head. (Rowson 2016.) In the case of a concussive head injury, it is the brain that accelerates or decelerates on impact, colliding with the inner surface of the skull. (Barth 2001 at 255.)

41.     None of this is mysterious: each of us, if we had to choose between being hit either by a large, heavy athlete running at full speed, or by a small, lighter athlete, would intuitively choose collision with the small, light athlete as the lesser of the two evils. And we would be right. One author referred to the "increase in kinetic energy, and therefore imparted forces" resulting from collision with larger, faster players as "profound." (Dashnaw 2012.)

## V.   GENDER DIFFERENCES RELEVANT TO INJURY

42.     It is important to state up front that it is self-evident to most people familiar with sport and sport injuries that if men and women were to consistently participate together in competitive contact sports, there would be higher rates of injury in women. This is one reason that rule modifications often

exist in leagues where co-ed participation occurs.[14] Understanding the physics of sports injuries helps provide a theoretical framework for why this is true, but so does common sense and experience. All of us are familiar with basic objective physiological differences between the sexes, some of which exist in childhood, and some of which become apparent after the onset of puberty, and persist throughout adulthood. And as a result of personal experience, all of us also have some intuitive sense of what types of collisions are likely to cause pain or injury. Not surprisingly, our "common sense" on these basic facts about the human condition is also consistent with the observations of medical science. Below, I provide quantifications of some of these well-known differences between the sexes that are relevant to injury risk, as well as some categorical differences that may be less well known.

### A.   Height and weight

43.     It is an inescapable fact of the human species that males as a group are statistically larger and heavier than females. On average, men are 7% to 8% taller than women. (Handelsman 2018 at 818.) According to the most recently available Centers for Disease Control and Prevention (CDC) statistics, the weight of the average U.S. adult male is 16% greater than that of the average U.S. adult female. (CDC 2018.) This disparity persists into the athletic cohort.

---

[14] For example, see https://www.athleticbusiness.com/college/intramural-coed-basketball-playing-rules-vary-greatly.html (detailing variety of rule modifications applied in co-ed basketball). Similarly, coed soccer leagues often prohibit so-called "slide tackles," which are not prohibited in either men's or women's soccer. See, e.g.., http://www.premiercoedsports.com/pages/rulesandpolicies/soccer.

Researchers find that while athletes tend on average to be lighter than non-athletes, the weight difference between the average adult male and female athlete remains within the same range—between 14% and 23%, depending on the sport analyzed. (Santos 2014; Fields 2018.) Indeed, World Rugby estimates that the typical male rugby player weighs 20% to 40% more than the typical female rugby player. (World Rugby Transgender Women Guidelines 2020.) This size advantage by itself allows men to bring more force to bear in a collision.

**B.    Bone and connective tissue strength**

44.    Men have bones in their arms, legs, feet, and hands that are both larger and stronger per unit volume than those of women, due to greater cross-sectional area, greater bone mineral content, and greater bone density. The advantage in bone size (cross-sectional area) holds true in both upper and lower extremities, even when adjusted for lean body mass. (Handelsman 2018 at 818; Nieves 2005 at 530.) Greater bone size in men is also correlated with stronger tendons that are more adaptable to training (Magnusson 2007), and an increased ability to withstand the forces produced by larger muscles (Morris 2020 at 5). Male bones are not merely larger, they are stronger per unit of volume. Studies of differences in arm and leg bone mineral density – one component of bone strength – find that male bones are denser, with measured advantages of between 5% and 14%. (Gilsanz 2011; Nieves 2005.)

45.     Men also have larger ligaments than women (Lin 2019 at 5), and stiffer connective tissue (Hilton 2021 at Table 1), providing greater protection against joint injury.

### C.     Speed

46.     When it comes to acceleration from a static position to a sprint, men are consistently faster than women. World record sprint performance gaps between the sexes remain significant at between 7% and 10.5%, with world record times in women now exhibiting a plateau (no longer rapidly improving with time) similar to the historical trends seen in men. (Cheuvront 2005.) This performance gap has to do with, among other factors, increased skeletal stiffness, greater cross-sectional muscle area, denser muscle fiber composition and greater limb length. (Handelsman 2018.) Collectively, males, on average, run about 10% faster than females. (Lombardo 2018 at 93.) This becomes important as it pertains to injury risk, because males involved in sport will often be travelling at faster speeds than their female counterparts in comparable settings, with resultant faster speed at impact, and thus greater impact force, in a given collision.

### D.     Strength/Power

47.     In 2014, a male mixed-martial art fighter identifying as female and fighting under the name Fallon Fox fought a woman named Tamikka Brents, and caused significant facial injuries in the course of their bout. Speaking about their fight later, Brents said:

> "I've fought a lot of women and have never felt the strength that I felt in a fight as I did that night. I can't answer whether it's because she was born a man or not because I'm not a doctor. I can only say, I've never felt so overpowered ever in my life, and I am an abnormally strong female in my own right."[15]

48.     So far as I am aware, mixed martial arts is not a collegiate or high school interscholastic sport. Nevertheless, what Brent experienced in an extreme setting is true and relevant to safety in all sports that involve contact. In absolute terms, males as a group are substantially stronger than women.

49.     Compared to women, men have "larger and denser muscle mass, and stiffer connective tissue, with associated capacity to exert greater muscular force more rapidly and efficiently." (Hilton 2021 at 201.) Research shows that on average, during the prime athletic years (ages 18-29) men have, on average, 54% greater total muscle mass than women (33.7 kg vs. 21.8 kg) including 64% greater muscle mass in the upper body, and 47% greater in the lower body. (Janssen 2000 at Table 1.) The cross-sectional area of muscle in women is only 50% to 60% that of men in the upper arm, and 65% to 70% of that of men in the thigh. This translates to women having only 50% to 60% of men's upper limb strength and 60% to 80% of men's lower limb strength. (Handelsman 2018 at 812.) Male weightlifters have been shown to be approximately 30% stronger than female weightlifters of equivalent stature and mass. (Hilton 2021 at 203.) But in competitive athletics, since the stature and mass of the average male

---

[15] https://bjj-world.com/transgender-mma-fighter-fallon-fox-breaks-skull-of-her-female-opponent/

exceeds that of the average female, actual differences in strength between average body types will, on average, exceed this. The longer limb lengths of males augment strength as well. Statistically, in comparison with women, men also have lower total body fat, differently distributed, and greater lean muscle mass, which increases their power-to-weight ratios and upper-to-lower limb strength ratios as a group. Looking at another common metric of strength, males average 57% greater grip strength (Bohannon 2019) and 54% greater knee extension torque (Neder 1999). Research shows that sex-based discrepancies in lean muscle mass begin to be established from infancy, and persist through childhood to adolescence. (Davis 2019; Kirchengast 2001; Taylor 1997; Taylor 2010; McManus 2011.)

50.   Using their legs and torso for power generation, men can apply substantially larger forces with their arms and upper body, enabling them to generate more ball velocity through overhead motions, as well as to generate more pushing or punching power. In other words, isolated sex-specific differences in muscle strength in one region (even differences that in isolation seem small) can, and do combine to generate even greater sex-specific differences in more complex sport-specific functions. One study looking at moderately-trained individuals found that males can generate 162% more punching power than females. (Morris 2020.) Thus, multiple small advantages aggregate into larger ones.

Whitaker 0231

### E.     Throwing and kicking speed

51.     One result of the combined effects of these sex-determined differences in skeletal structure is that men are, on average, able to throw objects faster than women. (Lombardo 2018; Chu 2009; Thomas 1985.) By age seventeen, the *average* male can throw a ball farther than 99% of seventeen-year-old females—which necessarily means at a faster initial speed assuming a similar angle of release— despite the fact that factors such as arm length, muscle mass, and joint stiffness individually don't come close to exhibiting this degree of sex-defined advantage. One study of elite male and female baseball pitchers showed that men throw baseballs 35% faster than women—81 miles/hour for men vs. 60 miles/hour for women. The authors of this study attribute this to a sex-specific difference in the ability to generate muscle torque and power. (Chu 2009.) A study showing greater throwing velocity in male versus female handball players attributed it to differences in body size, including height, muscle mass, and arm length. (Van Den Tillaar 2012.) Interestingly, significant sex-related difference in throwing ability has been shown to manifest even before puberty, but the difference increases rapidly during and after puberty. (Thomas 1985 at 266.) These sex-determined differences in throwing speed are not limited to sports where a ball is thrown. Males have repeatedly been shown to throw a javelin more than 30% farther than females. (Lombardo 2018 Table 2; Hilton 2021 at 203.) Even in preadolescent children, differences exist. International youth records for 5- to

12-year-olds in the javelin show 34-55% greater distance in males vs. females using a 400g javelin.[16]

52.      Men also serve and spike volleyballs with higher velocity than women, with a performance advantage in the range of 29-34%. (Hilton 2021.) Analysis of first and second tier Belgian national elite male volleyball players shows ball spike speeds of 63 mph and 56 mph respectively. (Forthomme 2005.) NCAA Division I female volleyball players—roughly comparable to the second-tier male elite group referenced above—average a ball spike velocity of approximately 40 mph (18.1 m/s). (Ferris 1995 at Table 2.) Notably, based on the measurements of these studies, male spiking speed in *lower* elite divisions is almost 40% greater than that of NCAA Division I female collegiate players. Separate analyses of serving speed between elite men and women Spanish volleyball players showed that the average power serving speed in men was 54.6 mph (range 45.3–64.6 mph), with maximal speed of 76.4 mph. In women, average power serving speed was 49 mph (range 41–55.3 mph) with maximal speed of 59 mph. This translates to an almost 30% advantage in maximal serve velocity in men. (Palao 2014.)

53.      Recall that kinetic energy is dependent on mass and the square of velocity. A volleyball (with fixed mass) struck by a male, and traveling an

---

[16] http://age-records.125mb.com/.

31

Exhibit 27 0233

average 35% faster than one struck by a female, will deliver 82% more energy to a head upon impact.

54.     The greater leg strength and jumping ability of men confer a further large advantage in volleyball that is relevant to injury risk. In volleyball, an "attack jump" is a jump to position a player to spike the ball downward over the net against the opposing team. Research on elite national volleyball players found that on average, males exhibited a 50% greater vertical jump height during an "attack" than did females. (Sattler 2015.) Similar data looking at countermovement jumps (to block a shot) in national basketball players reveals a 35% male advantage in jump height. (Kellis 1999.) In volleyball, this dramatic difference in jump height means that male players who are competing in female divisions will more often be able to successfully perform a spike, and this will be all the more true considering that the women's net height is seven inches lower than that used in men's volleyball. Confirming this inference, research also shows that the successful attack percentage (that is, the frequency with which the ball is successfully hit over the net into the opponent's court in an attempt to score) is so much higher with men than women that someone analyzing game statistics can consistently identify games played by men as opposed to women on the basis of this statistic alone. These enhanced and more consistently successful attacks by men directly correlate to their greater jumping ability and attack velocity at the net. (Kountouris 2015.)

55.     The combination of the innate male-female differences cited above, along with the lower net height in women's volleyball, means that if a reasonably athletic male is permitted to compete against women, the participating female players will likely be exposed to higher ball velocities that are outside the range of what is typically seen in women's volleyball. When we recall that ball-to-head impact is a common cause of concussion among women volleyball players, this fact makes it clear that participation in girls' or women's volleyball by biologically male individuals will increase concussion injury risk for participating girls or women.

56.     Male sex-based advantages in leg strength also lead to greater kick velocity. In comparison with women, men kick balls harder and faster. A study comparing kicking velocity between university-level male and female soccer players found that males kick the ball with an average 20% greater velocity than females. (Sakamoto 2014.) Applying the same principles of physics we have just used above, we see that a soccer ball kicked by a male, travelling an average 20% faster than a ball kicked by a female, will deliver 44% more energy on head impact. Greater force-generating capacity will thus increase the risk of an impact injury such as concussion.

## VI.   ENHANCED FEMALE VULNERABILITY TO CERTAIN INJURIES

57.     Above, I have reviewed physiological differences that result in the male body bringing greater weight, speed, and force to the athletic field or court,

and how these differences can result in a greater risk of injury to females when males compete against them. It is also true that the female body is more vulnerable than the male body to certain types of injury even when subject to comparable forces. This risk appears to extend to the younger age cohorts as well. An analysis of Finnish student athletes from 1987-1991, analyzing over 600,000 person-years of activity exposures, found, in students under fifteen years of age, higher rates of injury in girls than boys in soccer, volleyball, judo and karate. (Kujala 1995.) Another epidemiological study looking specifically at injury rates in over 14,000 middle schoolers over a 20 year period showed that "in sex-matched sports, middle school girls were more likely to sustain *any* injury (RR = 1.15, 95% CI = 1.1, 1.2) or a time-loss injury (RR = 1.09, 95% CI = 1.0, 1.2) than middle school boys." In analyzed both-sex sports (i.e., sex-separated sports that both girls and boys play, like soccer), girls sustained higher injury rates, and greater rates of time-loss injury. (Beachy 2014.) Another study of over 2000 middle school students at nine schools showed that the injury rate was higher for girls' basketball than for football (39.4 v 30.7/1000 AEs), and injury rates for girls' soccer were nearly double that of boys' soccer (26.3 v. 14.7/1000 AEs). (Caswell 2017.) In this regard, I will focus on two areas of heightened female vulnerability to collision-related injury which have been extensively studied: concussions, and anterior cruciate ligament injuries.

## A.    Concussions

58.    Females are more likely than males to suffer concussions in comparable sports, and on average suffer more severe and longer lasting disability once a concussion does occur. (Harmon 2013 at 4; Berz 2015; Blumenfeld 2016; Covassin 2003; Rowson 2016.) Females also seem to be at higher risk for post-concussion syndrome than males. (Berz 2015; Blumenfeld 2016; Broshek 2005; Colvin 2009; Covassin 2012; Dick 2009; Marar 2012; Preiss-Farzanegan 2009.)

59.    The most widely-accepted definition of sport-related concussion comes from the Consensus Statement on Concussion in Sport (see below).[17] (McCrory 2018.) To summarize, concussion is "a traumatically induced transient

---

[17] "Sport related concussion is a traumatic brain injury induced by biomechanical forces. Several common features that may be utilised in clinically defining the nature of a concussive head injury include:

SRC may be caused either by a direct blow to the head, face, neck or elsewhere on the body with an impulsive force transmitted to the head.

SRC typically results in the rapid onset of short-lived impairment of neurological function that resolves spontaneously. However, in some cases, signs and symptoms evolve over a number of minutes to hours.

SRC may result in neuropathological changes, but the acute clinical signs and symptoms largely reflect a functional disturbance rather than a structural injury and, as such, no abnormality is seen on standard structural neuroimaging studies.

SRC results in a range of clinical signs and symptoms that may or may not involve loss of consciousness. Resolution of the clinical and cognitive features typically follows a sequential course. However, in some cases symptoms may be prolonged.

The clinical signs and symptoms cannot be explained by drug, alcohol, or medication use, other injuries (such as cervical injuries, peripheral vestibular dysfunction, etc) or other comorbidities (e.g., psychological factors or coexisting medical conditions)."

disturbance of brain function and involves a complex pathophysiological process" that can manifest in a variety of ways. (Harmon 2013 at 1.)

60.    Sport-related concussions have undergone a significant increase in societal awareness and concurrent injury reporting since the initial passage of the Zachery Lystedt Concussion Law in Washington State in 2009 (Bompadre 2014), and the subsequent passage of similar legislation governing return-to-play criteria for concussed athletes in most other states in the United States. (Nat'l Cnf. of State Leg's 2018). Concussion is now widely recognized as a common sport-related injury, occurring in both male and female athletes. (CDC 2007.) Sport-related concussions can result from player-surface contact or player-equipment contact in virtually any sport. However, sudden impact via a player-to-player collision, with rapid deceleration and the transmission of linear or rotational forces through the brain, is also a common cause of concussion injury. (Covassin 2012; Marar 2012; Barth 2001; Blumenfeld 2016; Boden 1998; Harmon 2013 at 4.)

61.    A large retrospective study of U.S. high school athletes showed a higher rate of female concussions in soccer (79% higher), volleyball (0.6 concussions/10,000 exposures, with 485,000 reported exposures, vs. no concussions in the male cohort), basketball (31% higher), and softball/baseball (320% higher). (Marar 2012.) A similarly-sized, similarly-designed study comparing concussion rates between NCAA male and female collegiate athletes showed, overall, a concussion rate among females 40% higher than that of

36

males. Higher rates of injury were seen across individual sports as well, including ice hockey (10% higher); soccer (54% higher); basketball (40% higher); and softball/baseball (95% higher). (Covassin 2016.) The observations of these authors, my own observations from clinical practice, and the acknowledgment of our own Society's Position Statement (Harmon 2013), all validate the higher frequency and severity of sport-related concussions in women and girls.

62.    Most epidemiological studies to date looking at sport-related concussion in middle schoolers show that more boys than girls are concussed. There are fewer studies estimating concussion *rate*. This is, in part, because measuring injury rate is more time and labor-intensive. Researchers at a childrens' hospital, for example, could analyze the number of children presenting to the emergency department with sport-related concussion and publish findings of absolute number. However, to study concussion incidence, athlete exposures also have to be recorded. Generally speaking, an athlete exposure is a single practice or game where an athlete is exposed to playing conditions that could reasonably supply the necessary conditions for an injury to occur. Rates of athletic injury, concussion among them, are then, by convention, expressed in terms of injury rate per 1000 athletic exposures. More recently, some studies have been published that analyze the rates of concussion in the middle school population. Looking at the evidence, the conclusion can be made that females experience increased susceptibility to concussive injuries before puberty. For example, Ewing-Cobbs, et al. (2018) found elevated post-

concussion symptoms in girls across all age ranges studied, including children between the ages of 4 and 8.  Kerr's 2017 study of middle school students showed over three times the rate of female vs male concussion in students participating in sex-comparable sports [0.18 v. 0.66/1000 A.E.'s]. (Kerr 2017.) This is the first study I am aware of that mimics the trends seen in adolescent injury epidemiology showing a higher rate of concussion in girls than boys in comparable sports.

63.    More recent research looking at the incidence of sport-related concussions in U.S. middle schoolers between 2015 and 2020, found that the rate of concussion was higher in middle school athletes than those in high school. In this study, girls had more than twice the rate of concussion injury (0.49/1000 athletic exposures vs 0.23/1000 AE) in analyzed sports (baseball/softball, basketball, soccer and track), as well as statistically greater time loss. (Hacherl 2021 (Journal of Athletic Training); Hacherl 2021 (Archives of Clinical Neuropsychology).) The authors hypothesized that the increasing incidence of concussion in middle school may relate to "other distinct differences associated with the middle school sport setting itself, such as, the large variations in player size and skill."[18]

64.    In addition, females on average suffer materially greater cognitive impairment than males when they do suffer a concussion. Group differences in

---

[18] https://www.nata.org/press-release/062421/middle-school-sports-have-overall-higher-rate-concussion-reported-high-school.

cognitive impairment between females and males who have suffered concussion have been extensively studied. A study of 2340 high school and collegiate athletes who suffered concussions determined that females had a 170% higher frequency of cognitive impairment following concussions, and that in comparison with males, female athletes had significantly greater declines in simple and complex reaction times relative to their preseason baseline levels. Moreover, the females experienced greater objective and subjective adverse effects from concussion even after adjusting for potentially protective effect of helmets used by some groups of male athletes. (Broshek 2005 at 856, 861; Colvin 2009; Covassin 2012.)

65.    This large discrepancy in frequency and severity of concussion injury is consistent with my own observations across many years of clinical practice. The large majority of student athletes who have presented at my practice with severe and long-lasting cognitive disturbance have been adolescent girls. I have seen girls remain symptomatic for over a year, and lose ground academically and become isolated from their peer groups due to these ongoing symptoms. For patients who experience these severe effects, post-concussion syndrome can be life-altering.

66.    Some of the anatomical and physiological differences that we have considered between males and females help to explain the documented differences in concussion rates and in symptoms between males and females. (Covassin 2016; La Fountaine 2019; Lin 2019; Tierney 2005; Wunderle 2014.)

Sims 00241

Anatomically, there are significant sex-based differences in head and neck anatomy, with females exhibiting in the range of 30% to 40% less head-neck segment mass and neck girth, and 49% lower neck isometric strength. This means that when a female athlete's head is subjected to the same load as an analogous male, there will be a greater tendency for head acceleration, and resultant injury. (Tierney 2005 at 276-277.)

67.    When modeling the effect of the introduction of male mass, speed, and strength into women's rugby, World Rugby gave particular attention to the resulting increases in forces and acceleration (and injury risk) experienced in the head and neck of female players. Their analysis found that "the magnitude of the known risk factors for head injury are . . . predicted by the size of the disparity in mass between players. The addition of [male] speed as a biomechanical variable further increases these disparities," and their model showed an increase of up to 50% in neck and head acceleration that would be experienced in a typical tackle scenario in women's rugby. As a result, "a number of tackles that currently lie beneath the threshold for injury would now exceed it, causing head injury." (World Rugby Transgender Women Guidelines 2020.) While rugby is notoriously contact-intensive, similar increases to risk of head and neck injury to women are predictable in any sport context in which males and females collide at significant speed, as happens from time to time in sports including soccer, softball, and basketball.

Gilreath 0242

68.     In addition, even when the heads of female and male athletes are subjected to identical accelerative forces, there are sex-based differences in neural anatomy and physiology, cerebrovascular organization, and cellular response to concussive stimuli that make the female more likely to suffer concussive injury, or more severe concussive injury. For instance, hypothalamic-pituitary disruption is thought to play a role in post-concussion symptomatology that differentially impacts women. (McGroarty 2020; Broshek 2005 at 861.) Another study found that elevated progesterone levels during one portion of the menstrual cycle were associated with more severe post-concussion symptomatology that differentially impacted women. (Wunderle 2014.)

69.     As it stands, when females compete against each other, they already have higher rates of concussive injury than males, across most sports. The addition of biologically male athletes into women's contact sports will inevitably increase the risk of concussive injury to girls and women, for the multiple reasons I have explained above, including, but not limited to, the innate male advantage in speed and lean muscle mass. Because the effects of concussion can be severe and long-lasting, particularly for biological females, we can predict with some confidence that if participation by biological males in women's contact sports based on gender identity becomes more common, more biological females will suffer substantial concussive injury and the potential for long-term harm as a result.

### B.     Anterior Cruciate Ligament injuries

70.     The Anterior Cruciate Ligament ("ACL") is a key knee stabilizer that prevents anterior translation of the tibia relative to the femur and also provides rotatory and valgus knee stability.[19] (Lin 2019 at 4.) Girls and women are far more vulnerable to ACL injuries than are boys and men. The physics of injury that we have reviewed above makes it inevitable that the introduction of biologically male athletes into the female category will increase still further the occurrence of ACL injuries among girls or women who encounter these players on the field.

71.     Sports-related injury to the ACL is so common that it is easy to overlook the significance of it. But it is by no means a trivial injury, as it can end sports careers, require surgery, and usually results in early-onset, post-traumatic osteoarthritis, triggering long-term pain and mobility problems later in life. (Wang 2020.)

72.     Even in the historic context in which girls and women limit competition to (and so only collide with) other girls and women, the rate of ACL injury is substantially higher among female than male athletes. (Flaxman 2014; Lin 2019; Agel 2005.) One meta-analysis of 58 studies reports that female athletes have a 150% relative risk for ACL injury compared with male athletes, with other estimates suggesting as much as a 300% increased risk. (Montalvo 2019; Sutton 2013.) Particularly in those sports designated as contact sports, or

---

[19] Valgus force at the knee is a side-applied force that gaps the medial knee open.

42

sports with frequent cutting and sharp directional changes (basketball, field hockey, lacrosse, soccer), females are at greater risk of ACL injury. In basketball and soccer, this risk extends across all skill levels, with female athletes between two and eight times more likely to sustain an ACL injury than their male counterparts. (Lin 2019 at 5.) These observations are widely validated, and consistent with the relative frequencies of ACL injuries that I see in my own practice.

73.     When the reasons underlying the difference in the incidence of ACL injury between males and females were first studied in the early 1990s, researchers speculated that the difference might be attributable to females' relative inexperience in contact sports, or to their lack of appropriate training. However, a follow-up 2005 study looking at ACL tear disparities reported that, "Despite vast attention to the discrepancy between anterior cruciate ligament injury rates between men and women, these differences continue to exist." (Agel 2005 at 524.) Inexperience and lack of training do not explain the differences. Sex seems to be an independent predictor of ACL tear risk.

74.     In fact, as researchers have continued to study this discrepancy, they have determined that multiple identifiable anatomical and physiological differences between males and females play significant roles in making females more vulnerable to ACL injuries than males. (Flaxman 2014; Lin 2019; Wolf 2015.) Summarizing the findings of a number of separate studies, one researcher recently cited as anatomical risk factors for ACL injury smaller ligament size,

43

decreased femoral notch width, increased posterior-inferior slope of the lateral tibia plateau, increased knee and generalized laxity, and increased body mass index (BMI). With the exception of increased BMI, each of these factors is more likely to occur in female than male athletes. (Lin 2019 at 5.) In addition, female athletes often stand in more knee valgus (that is, in a "knock-kneed" posture) due to wider hips and a medially-oriented femur. Often, this is also associated with a worsening of knee valgus during jump landings. The body types and movement patterns associated with these valgus knee postures are more common in females and increase the risk for ACL tear. (Hewett 2005.)

75.     As with concussion, the cyclic fluctuation of sex-specific hormones in women is also thought to be a possible risk factor for ACL injury. Estrogen acts on ligaments to make them more lax, and it is thought that during the ovulatory phase of menses (when estrogen levels peak), the risk of ACL tear is higher. (Chidi-Ogbolu 2019 at 1; Herzberg 2017.)

76.     Whatever the factors that increase the injury risk for ACL tears in women, the fact that a sex-specific difference in the rate of ACL injury exists is well established and widely accepted.

77.     Although non-contact mechanisms are the most common reason for ACL tears in females, tears related to contact are also common, with ranges reported across multiple studies of from 20%-36% of all ACL injuries in women. (Kobayashi 2010 at 672.) For example, when a soccer player who is kicking a ball is struck by another player in the lateral knee of the stance leg, medial and

rotational forces can tear the medial collateral ligament (MCL), the ACL, and the meniscus. Thus, as participation in the female category based on identity rather than biology becomes more common (entailing the introduction of athletes with characteristics such as greater speed and lean muscle mass), and as collision forces suffered by girls and women across the knee increase accordingly, the risk for orthopedic injury and in particular ACL tears among impacted girls and women will inevitably rise.

78.     Of course there exists variation in all these factors within a given group of males or females. However, it is also true that within sex-specific pools, size differential is somewhat predictable and bounded, even considering outliers. When males are permitted to enter into the pool of female athletes based on gender identity rather than biological sex, there is an increased possibility that a statistical outlier in terms of size, weight, speed, and strength—and potentially an extreme outlier—is now entering the female pool. Although injury is not guaranteed, risks to female participants will increase. And as I discuss later, the available evidence together suggests that this will be true even with respect to males who have been on testosterone suppression for a year or more. World Rugby relied heavily upon this when they were determining their own policy, and I think it is important to reiterate that this policy, rooted in concern for athlete safety, is justifiable based upon current evidence from medical research and what we know about biology.

## VII.   TESTOSTERONE SUPPRESSION WILL NOT PREVENT THE HARM TO FEMALE SAFETY IN ATHLETICS

79.    A recent editorial in the New England Journal of Medicine opined that policies governing transgender participation in female athletics "must safeguard the rights of all women—whether cisgender or transgender." (Dolgin 2020.) Unfortunately, the physics and medical science reviewed above tell us that this is not practically possible. If biological males are given a "right" to participate in the female category based on gender identity, then biological women will be denied the right to reasonable expectations of safety and injury risk that have historically been guaranteed by ensuring that females compete (and collide) only with other females.

80.    Advocates of unquestioning inclusion based on gender identity often contend that hormonal manipulation of a male athlete can feminize the athlete enough that he is comparable with females for purposes of competition. The NCAA's Office of Inclusion asserts (still accessible on the NCAA website as of this writing) that "It is also important to know that any strength and endurance advantages a transgender woman arguably may have as a result of her prior testosterone levels dissipate after about one year of estrogen or testosterone suppression therapy."[20] (NCAA 2011 at 8.) Whether or not this is true is a critically important question.

---

[20] https://www.ncaa.org/sports/2016/3/2/lesbian-gay-bisexual-transgender-and-questioning-lgbtq.aspx

81.    At the outset, we should note that while advocates sometimes claim that testosterone suppression *can* eliminate physiological advantages in a biological male, none of the relevant transgender eligibility policies that I am aware of prior to 2021 requires any demonstration that it has *actually* achieved that effect in a particular male who seeks admission into the female category. The Connecticut policy that is currently at issue in ongoing litigation permits admission to the female category at the high school level without requiring any testosterone suppression at all. Prior to their new policy, just announced in January 2022, the NCAA's policy required no demonstration of any reduction of performance capability, change in weight, or regression of any other physical attribute of the biological male toward female levels. It did not require achievement of any particular testosterone level, and did not provide for any monitoring of athletes for compliance. Moving forward, through a phasing process, the NCAA will ultimately require athletes in each sport to meet requirements of their sport's national governing body (NGB). If no policy exists, the policy of that sport's international governing body applies, or, finally, if no policy exists there, the 2015 policy of the International Olympic Committee (IOC) will apply. The 2015 IOC policy requires no showing of any diminution of any performance capability or physical attribute of the biological male, and requires achievement and compliance monitoring only of a testosterone level below 10nmol/liter—a level far above levels occurring in normal biological

47

females (0.06 to 1.68 nmol/L).[21] Indeed, female athletes with polycystic ovarian disorder—a condition that results in elevated testosterone levels—rarely exceed 4.8 nmol/L, which is the basis for setting the testing threshold to detect testosterone *doping* in females at 5.0 nmol/L. Thus, males who qualify under the 2015 IOC policy to compete as transgender women may have testosterone levels—even after hormone suppression—*double* the level that would disqualify a biological female for doping with testosterone.[22]

82.    As Dr. Emma Hilton has observed, the fact that there are over 3000 sex-specific differences in skeletal muscle alone makes the hypothesis that sex-linked performance advantages are attributable solely to current circulating testosterone levels improbable at best. (Hilton 2021 at 200-01.)

83.    In fact, the available evidence strongly indicates that no amount of testosterone suppression can eliminate male physiological advantages relevant to performance and safety. Several authors have recently reviewed the science and statistics from numerous studies that demonstrate that one year (or more) of testosterone suppression does not substantially eliminate male performance advantages. (Hilton 2021; De Varona 2021; Harper 2021.) As a medical doctor, I will focus on those specific sex-based characteristics of males who have

---

[21] Normal testosterone range in a healthy male averages between 7.7 and 29.4 nmol/L.

[22] In November 2021, the IOC released new guidelines, deferring decision-making about a given sport's gender-affectedness to its governing body. The current NCAA policy, however, still utilizes the 2015 IOC policy to determine an athlete's eligibility in event that the sport's national and international governing bodies lack policies to determine eligibility.

undergone normal sex-determined pubertal skeletal growth and maturation that are relevant to the *safety* of female athletes. Here, too, the available science tells us that testosterone suppression does not eliminate the increased risk to females or solve the safety problem.

84.    The World Rugby organization reached this same determination based on the currently available science, concluding that male physiological advantages that "create risks [to female players] appear to be only minimally affected" by testosterone suppression. (World Rugby Transgender Women Guidelines 2020.)

85.    Surprisingly, so far as public information reveals, the NCAA's Committee on Competitive Safeguards is not monitoring and documenting instances of transgender participation on women's teams for purposes of injury reporting. In practice, the NCAA is conducting an experiment which in theory predicts an increased frequency and severity of injuries to women in contact sports, while at the same time failing to collect the relevant data from its experiment.

86.    In their recent guidelines, UK Sport determined that, "based upon current evidence, testosterone suppression is unlikely to guarantee fairness between transgender women and natal females in gender-affected sports." (UK Sports Councils' Equality Group Guidance 2021 at 7.) They also warned that migration to a scenario by NGBs where eligibility is determined through case-by-case assessment "is unlikely to be practical nor verifiable for entry into

Plaintiffs 0251

gender-affected sports," in part because "many tests related to sports performance are volitional," and incentives on the part of those tested would align with intentional poor performance. (UK Sports Councils' Equality Group Guidance 2021 at 8.)

87.     Despite these concerns, this appears to be exactly the route that the IOC is taking, as reflected in their Framework on Fairness, Inclusion and Non-Discrimination on the Basis of Gender Identity, released in November of 2021.[23] In it, the IOC lists two disparate goals. First, that "where sports organizations elect to issue eligibility criteria for men's and women's categories for a given competition, they should do so with a view to . . . [p]roviding confidence that no athlete within a category has an unfair and disproportionate competitive advantage . . . [and] preventing a risk to the physical safety of other athletes." (IOC Framework 2021 § 4.1.) At the same time, governing bodies are not to preclude any athlete from competing until evidence exists based upon "robust and peer-reviewed research that . . . demonstrates a consistent, unfair, disproportionate competitive advantage in performance and/or an unpreventable risk to the physical safety of other athletes" – research moreover that "is largely based on data collected *from a demographic group that is consistent in gender and athletic engagement with the group that the eligibility*

---

[23] The IOC Framework on Fairness, Inclusion and Non-Discrimination on the Basis of Gender Identity and Sex Variations is available at https://stillmed.olympics.com/media/Documents/News/2021/11/IOC-Framework-Fairness-Inclusion-Non-discrimination-2021.pdf?_ga=2.72651665.34591192.1645554375-759350959.1644946978

*criteria aim to regulate.*"  (IOC Framework 2021 § 6.1) Finally, affected athletes may appeal any evidence-based decision-making process through a further "appropriate internal mediation mechanism, such as a Court of Arbitration for Sport."  (IOC Framework 2021 § 6.1.) Rather than cite any of the growing evidence that testosterone suppression cannot mitigate sex-based performance differences, the IOC's new policy remains aspirational and opaque. And yet the research relating to hormonal suppression in transgender athletes, as confirmed by World Rugby and UK Sport, already speaks very clearly to the fact that males retain a competitive advantage over women that cannot be eliminated through testosterone suppression alone. What follows is a brief summary of some of these retained differences as they relate to sport safety.

### A.    Size and weight

88.    Males are, on average, larger and heavier. As we have seen, these facts alone mean that males bring more kinetic energy into collisions, and that lighter females will suffer more abrupt deceleration in collisions with larger bodies, creating heightened injury risk for impacted females.

89.    I start with what is obvious and so far as I am aware undisputed— that after the male pubertal growth spurt, suppression of testosterone does not materially *shrink* bones so as to eliminate height, leverage, performance, and weight differences that follow from simply having longer, larger bones, and being subsequently taller.

90.     In addition, multiple studies have found that testosterone suppression may modestly reduce, but does not come close to eliminating the male advantage in muscle mass and lean body mass, which together contribute to the greater average male weight. Researchers looking at transitioning adolescents found that the weight of biological male subjects *increased* rather than decreased after treatment with an antiandrogen testosterone suppressor. (Tack 2018.) In one recent meta-analysis, researchers looking at the musculoskeletal effects of hormonal transition found that even after males had undergone 36 months of therapy, their lean body mass and muscle area remained above those of females. (Harper 2021.) Another group in 2004 studied the effects of testosterone suppression to less than 1 nmol/L in men after one or more years, but still found only a 12% total loss of muscle area by the end of thirty-six months. (Gooren 2004.)

### B.     Bone density

91.     Bone mass (which includes both size and density) is maintained over *at least* two years of testosterone suppression (Singh-Ospina 2017; Fighera 2019), and one study found it to be preserved even over a median of 12.5 years of suppression (Hilton 2021; Ruetsche 2005).

### C.     Strength

92.     A large number of studies have now observed minimal or no reduction in strength in male subjects following testosterone suppression. In one recent meta-analysis, strength loss after twelve months of hormone therapy

52

Wiik et al. 0254

ranged from negligible to 7%. (Harper 2021.) Given the baseline male strength advantage in various muscle groups of from approximately 25% to 100% above female levels that I have noted in Section V.D above, even a 7% reduction leaves a large retained advantage in strength. Another study looking at handgrip strength—which is a proxy for general strength—showed a 9% loss of strength after two years of hormonal treatment in males who were transitioning, leaving a 23% retained advantage over the female baseline. (Hilton 2021.) Yet another study which found a 17% retained grip strength advantage noted that this placed the median of the group treated with hormone therapy in the 95th percentile for grip strength among age-matched females. (Scharff 2019.) Researchers looking at transitioning adolescents showed no loss of grip strength after hormone treatment. (Tack 2018.)

93.     One recent study on male Air Force service members undergoing transition showed that they retained more than two thirds of pretreatment performance advantage over females in sit-ups and push-ups after between one and two years of testosterone-reducing hormonal treatment. (Roberts 2020.) Another recently-published observational cohort study looked at thigh strength and thigh muscle cross-sectional area in men undergoing hormonal transition to transgender females. After one year of hormonal suppression, this group saw only a 4% decrease in thigh muscle cross-sectional area, and a negligible decrease in thigh muscle strength. (Wiik 2020.) Wiik and colleagues looked at isokinetic strength measurements in individuals who had undergone at least 12

53

months of hormonal transition and found that muscle strength was comparable to baseline, leaving transitioned males with a 50% strength advantage over reference females. (Wiik 2020.) Finally, one cross-sectional study that compared men who had undergone transition at least three years prior to analysis, to age-matched, healthy males found that the transgender individuals had retained enough strength that they were still outside normative values for women. This imbalance continued to hold even after *eight* years of hormone suppression. The authors also noted that since males who identify as women often have lower baseline (i.e., before hormone treatment) muscle mass than the general population of males, and since baseline measures for this study were unavailable, the post-transition comparison may actually represent an overestimate of muscle mass regression in transgender females. (Lapauw 2008; Hilton 2021.)

94.    World Rugby came to the same conclusion based on its own review of the literature, reporting that testosterone suppression "does not reverse muscle size to female levels," and in fact that "studies assessing [reductions in] mass, muscle mass, and/or strength suggest that reduction in these variables range between 5% and 10%. Given that the typical male vs female advantages range from 30% to 100%, these reductions are small." (World Rugby Transgender Women Guidelines 2020.)

95.    It is true that most studies of change in physical characteristics or capabilities over time after testosterone suppression involve untrained subjects

rather than athletes, or subjects with low to moderate training. It may be assumed that all of the Air Force members who were subjects in the study I mention above were physically fit and engaged in regular physical training. But neither that study nor those studies looking at athletes quantify the volume or type of strength training athletes are undergoing. The important point to make is that the only effect strength training could have on these athletes is to *counteract* and reduce the limited loss of muscle mass and strength that does otherwise occur to some extent over time with testosterone blockade. There has been at least one study that illustrates this, although only over a short period, measuring strength during a twelve-week period where testosterone was suppressed to levels of 2 nmol/L. During that time, subjects actually increased leg lean mass by 4%, and total lean mass by 2%, and subject performance on the 10 rep-max leg press improved by 32%, while their bench press performance improved by 17%. (Kvorning 2006.)

96.     The point for safety is that superior strength enables a biological male to apply greater force against an opponent's body during body contact, or to throw, hit, or kick a ball at speeds outside the ranges normally encountered in female-only play, with the attendant increased risks of injury that I have already explained.

**D.     Speed**

97.     As to speed, the study of transitioning Air Force members found that these males retained a 9% running speed advantage over the female control

group after one year of testosterone suppression, and their average speed had not declined significantly farther by the end of the 2.5 year study period. (Roberts 2020.) Again, I have already explained the implications of greater male speed on safety for females on the field and court, particularly in combination with the greater male body weight.

## CONCLUSION

Since the average male athlete is larger and exerts greater power than the average female athlete in similar sports, male–female collisions will produce greater energy at impact, and impart greater risk of injury to a female, than would occur in most female-female collisions. Because of the well-documented physiological testing and elite performance differences in speed and strength, as well as differences in lean muscle mass that exist across all age ranges, the conclusions of this paper can apply to a certain extent before, as well as during, and after puberty. We have seen that males who have undergone hormone therapy in transition toward a female body type nevertheless retain musculoskeletal "legacy" advantages in muscle girth, strength, and size. We have also seen that the additive effects of these individual advantages create multiplied advantages in terms of power, force generation and momentum on the field of play. In contact or collision sports, sports involving projectiles, or sports where a stick is used to strike something, the physics and physiology reviewed above tell us that permitting male-bodied athletes to compete against, or on the same team as females—even when undergoing testosterone

Exhibit 49 0258

suppression—must be expected to create predictable, identifiable, substantially increased, and unequal risks of injuries to the participating women.

Based on its independent and extensive analysis of the literature coupled with injury modeling, World Rugby recognized the inadequacy of the International Olympic Committee's policy to preserve safety for female athletes in their contact sport (the NCAA policy is even more lax in its admission of biological males into the female category). Among the explicit findings of the World Rugby working group were the following:

- Forces and inertia faced by a smaller and slower player during collisions are significantly greater when in contact with a larger, faster player.

- Discrepancies in mass and speed (such as between two opponents in a tackle) are significant determinants of various head and other musculoskeletal injury risks.

- The risk of injury to females is increased by biological males' greater ability to exert force (strength and power), and also by females' reduced ability to receive or tolerate that force.

- Testosterone suppression results in only "small" reductions in the male physiological advantages. As a result, heightened injury risks remain for females who share the same field or court with biological males.

- These findings together predict a significant increase in injury rates for females in rugby if males are permitted to participate based on gender identity, *with or without testosterone suppression*, since the magnitude of forces and energy transfer during collisions will increase substantially, directly correlated to the differences in physical attributes that exist between the biological sexes.

Summarizing their work, the authors of the World Rugby Guidelines said that, "World Rugby's number one stated priority is to make the game as safe as

possible, and so World Rugby cannot allow the risk to players to be increased to such an extent by allowing people who have the force and power advantages conferred by testosterone to play with and against those who do not." (World Rugby Transgender Guidelines 2020.) As my own analysis above makes clear, I agree with the concerns of UK Sport and the conclusions of World Rugby regarding risk to female athletes. Importantly, I also agree that it must be a high priority for sports governing bodies (and other regulatory or governmental bodies governing sports) to make each sport as safe as reasonably possible. And in my view, medical practitioners with expertise in this area have an obligation to advocate for science-based policies that promote safety.

The *performance* advantages retained by males who participate in women's sports based on gender identity are readily recognized by the public. When an NCAA hurdler who ranked 200th while running in the collegiate male division transitions and immediately leaps to a number one ranking in the women's division;[24] when a high school male sprinter who ranked 181st in the state running in the boys' division transitions and likewise takes first place in the girls' division (De Varona 2021), the problem of fairness and equal opportunities for girls and women is immediately apparent, and indeed this problem is being widely discussed today in the media.

---

[24] https://en.wikipedia.org/wiki/Cece_Telfer (accessed 6/20/21)

58

The causes of sports injuries, however, are multivariate and not always as immediately apparent. While, as I have noted, some biological males have indeed competed in a variety of girls' and women's contact sports, the numbers up till now have been small. But recent studies have reported very large increases in the number of children and young people identifying as transgender compared to historical experience. For example, an extensive survey of 9th and 11th graders in Minnesota found that 2.7% identified as transgender or gender-nonconforming— well over 100 times historical rates (Rider 2018), and many other sources likewise report this trend.[25]

Faced with this rapid social change, it is my view as a medical doctor that policymakers have an important and pressing duty not to wait while avoidable injuries are inflicted on girls and women, but instead to proactively establish policies governing participation of biological males in female athletics that give proper and scientifically-based priority to safety in sport for these girls and women. Separating participants in contact sports based on biological sex preserves competitive equity, but also promotes the safety of female athletes by protecting them from predictable and preventable injury. Otherwise, the hard science that I have reviewed in this white paper leaves little doubt that eligibility policies based on ideology or gender identity rather than science, will,

---

[25] https://www.nytimes.com/2016/07/01/health/transgender-population.html?.?mc=aud_dev&ad-keywords=auddevgate&gclid=Cj0KCQjwkZiFBhD9ARIsAGxFX8BV5pozB9LI5Ut57OQzuMhu rWThv BMisV9NyN9YTXIzWl7OAnGT6VkaAu0jEALw_wcB&gclsrc=aw.ds (accessed 6/20/21)

over time, result in increased, and more serious, injuries to girls and women who are forced to compete against biologically male transgender athletes. When basic science and physiology both predict increased injury, then leagues, policy-makers, and legislators have a responsibility to act to protect girls and women before they get hurt.

Chad Carlson, M.D.,
FACSM Stadia Sports
Medicine West Des
Moines, Iowa Past-
President, AMSSM

60

# BIBLIOGRAPHY

Agel, J. et al., Anterior cruciate ligament injury in National Collegiate Athletic
    Association basketball and soccer: a 13-year review. Am. J. Sports Med.
    33(4):524-531 (2005).

Athletic Business, "College intramural playing rules vary greatly."
    https://www.athleticbusiness.com/college/intramural-coed-basketball-
    playing-rules-vary-greatly.html.

Bahr, R. and T. Krosshaug, Understanding injury mechanisms: a key
    component of preventing injuries in sport. Br. J. Sports Med 39:324-329
    (2005).

Barboza, S.D. et al., Injuries in field hockey players: a systematic review.
    Sports Med. 48:849-66 (2018).

Barth, J.T. et al., Acceleration-deceleration sport-related concussion: the
    gravity of it all. J. Athletic Training 36(3):253-56 (2001).

Beachy, G. and M. Rauh, Middle school injuries: a 20-year (1988-2008)
    multisport evaluation. J. Athl. Train. 49(4):493-506 (2014).

Berz, K. et al., Sex-specific differences in the severity of symptoms and
    recovery rate following sports-related concussion in young athletes. The
    Physician and Sports Med. 41(2):58-63 (2015).

BJJ World, "Transgender MMA Fighter Fallon Fox Breaks Skull of Her
    Female Opponent." https://bjj-world.com/transgender-mma-fighter-
    fallon-fox-breaks-skull-of-her-female-opponent/.

Blankenship, M.J. et al., Sex-based analysis of the biomechanics of pitching.
    38th International Society of Biomechanics in Sport Conference (July
    2020).

Blumenfeld, R.S. et al., The epidemiology of sports-related head injury and
    concussion in water polo. Front. Neurol. 7(98) (2016).

Boden, B.P. et al., Concussion incidence in elite college soccer players. Am. J.
    Sports Med. 26(2):238-241 (1998).

Bohannon, R.W. et al., Handgrip strength: a comparison of values obtained
    from the NHANES and NIH toolbox studies. Am. J. Occ. Therapy 73(2)
    (March/April 2019).

WVDHHR_0263

Bompadre, V. et al., Washington State's Lystedt Law in concussion documentation in Seattle public high schools. J. Athletic Training 49(4):486-92 (2014).

Broshek, D.K. et al., Sex differences in outcome following sports-related concussion, J. Neurosurg. 102:856-63 (May 2005).

Buckman, R. F. and Buckman, P.D., Vertical deceleration trauma: principles of management. Surg .Clin. N. Am. 71(2):331–44 (1991).

Caswell, S.V., et al., Epidemiology of sports injuries among middle school students. Brit. J. of Sports Med. 51(4):305 (2017).

Centers for Disease Control, CDC National Health Statistics Report Number 122, 12/20/2018.

Centers for Disease Control, Nonfatal traumatic brain injuries from sports and recreation activities–United States, 2001-2005, JAMA 298(11):1271-72 (Sept 2007).

Cheuvront, S.N. et al., Running performance differences between men and women: an update. Sports Med. 35(12):1017-24 (2005).

Chidi-Ogbolu, N. and K. Baar, Effect of estrogen on musculoskeletal performance and injury risk. Front. Physiol. 9:1834 (2019).

Chu, Y. et al., Biomechanical comparison between elite female and male baseball pitchers. J. Applied Biomechanics 25:22-31 (2009).

Coleman, D.L. and W. Shreve, Comparing athletic performances: the best elite women to boys and men. web.law.duke.edu/sites/default/files/centers/sportslaw/comparingathleticperform ances.pdf. (Accessed 06/20/21)

Coleman, D. L. et al., Re-affirming the value of the sports exception to Title IX's general non-discrimination rule. Duke J. of Gender and Law Policy 27(69):69134 (2020).

Colvin, A.C. et al., The role of concussion history and gender in recovery from soccer-related concussion. Am. J. Sports Med, 37(9):1699-1704 (2009).

Covassin, T. et al., Sex differences and the incidence of concussions among collegiate athletes. J. Ath. Training 38(3):238-244 (2003).

Covassin, T. et al., Sex differences in reported concussion injury rates and time loss from participation: an update of the National Collegiate Athletic

Association Injury Surveillance Program from 2004-2005 through 2009-2009. J. Ath. Training 51(3):189-194 (2016).

Covassin, T. et al., The role of age and sex in symptoms, neurocognitive performance, and postural stability in athletes after concussion. Am. J. Sports Med. 40(6):1303-1312 (2012).

Dashnaw, M.L. et al., An overview of the basic science of concussion and subconcussion: where we are and where we are going. Neurosurg. Focus 33(6) E5 (2012).

Davis, S.M., et al., Sex Differences in Infant Body Composition Emerge in First 5 Months of Life. J. Pediatr. Endocrinol. Metab. 32(11): 1235–1239 (2019)

De Varona, D. et al., Briefing book: a request to Congress and the Administration to preserve girls' and women's sport and accommodate transgender athletes. Women's Sports Policy Working Group (2021), available at https://womenssportspolicy.org/wp-content/uploads/2021/02/Congressional-Briefing-WSPWG-Transgender-Women-Sports-2.27.21.pdf.

Dick, R.W., Is there a gender difference in concussion incidence and outcomes? Br. J. Sports Med. 43(Supp I):i46-i50 (2009).

Dolgin, J., Transgender women on college athletic teams – the case of Lindsay Hecox. NEJM 383(21):2000-2002 (2020).

Ewing-Cobbs, et al., Persistent postconcussion symptoms after injury. Pediatrics 142(5):e20180939 (2018).

Ferris, D.P. et al., The relationship between physical and physiological variables and volleyball spiking velocity. J. Strength & Cond. Research 9(1):32-36 (1995).

Fields, J.B. et al., Body composition variables by sport and sport-position in elite collegiate athletics. J. Strength & Cond. Research 32(11):3153-3159 (Nov 2018).

Fighera, T.M. et al., Bone mass effects of cross-sex hormone therapy in transgender people: updated systematic review and meta-analysis. J. Endocrine Soc. 3(5):943-964 (May 2019).

Flaxman, T.E. et al., Sex-related differences in neuromuscular control: implications for injury mechanisms or healthy stabilization strategies? J. Ortho. Research 310-317 (Feb 2014).

Forthomme, B. et al., Factors correlated with volleyball spike velocity. AJSM 33(10):1513-1519 (2005).

Fung, Y.C.,The application of biomechanics to the understanding of injury and healing. A.M. Nahum et al. (eds), Accidental Injury, Springer Science & Business Media: New York (1993).

Gay, T., Football physics: the science of the game. Rodale Books (2004).

Gilsanz, V. et al., Age at onset of puberty predicts bone mass in young adulthood. J. Pediatr. 158(1):100-105 (Jan 2011).

Gooren, L.J.G. et al., Transsexuals and competitive sports. Eur. J. Endocrinol. 151:425-9 (2004).

Hacherl, S.L., et al., Concussion rates and sports participation time loss in sex-comparable middle school sports. Archives of Clinical Neuropsychology 36:650 (2021).

Hacherl, S.L., et al., Concussion rates in U.S. middle school athletes from the 2015-16 to 2019-20 school years. J. Athl. Train. 56(6s):S-21 (2021).

Handelsman, D.J. et al., Circulating testosterone as the hormonal basis of sex differences in athletic performance. Endocrine Reviews 39(5):803-829 (Oct 2018).

Harmon, K.G. et al., American Medical Society for Sports Medicine position statement: concussion in sport. Br. J. Sports Med. 47:15-26 (2013).

Harper, J. et al., How does hormone transition in transgender women change body composition, muscle strength and haemoglobin? Systematic review with a focus on the implications for sport participation. BJSM 55(15):865-72 (2021).

Herzberg, S.D. et al., The effect of menstrual cycle and contraceptives on ACL injuries and laxity: a systematic review and meta-analysis. Orthop. J. Sports Med. 5(7) (2017).

Hewett, T.E. et al., Biomechanical measures of neuromuscular control and valgus loading of the knee predict anterior cruciate ligament injury risk in female athletes: a prospective study. AJSM 33(4):492-501 (2005).

Hilton, E. N. and T.R. Lundberg, Transgender women in the female category of sport: perspectives on testosterone suppression and performance advantage. Sports Medicine 51:199-214 (2021).

64

Hon, W.H.C. and S.H. Kock, Sports related fractures: a review of 113 cases. J. Orhopaedic Surg. 9(1):35-38 (2001).

Howell, D.R. et al., Collision and contact sport participation and quality of life among adolescent athletes. J. Athletic Training 55(11):1174-1180 (2020).

Hult, J.S., Women's struggle for governance in U.S. amateur athletics. Int. Rev. for Soc. of Sports 24(3):249-61 (1989).

International Olympic Committee. IOC Framework on Fairness, Inclusion and Non-Discrimination on the Basis of Gender Identity and Sex Variations (2021).

Janssen, I. et al., Skeletal muscle mass and distribution in 468 men and women aged 18-88 yr. J. Appl. Physiol. 89:81-88 (2000).

Kellis, S.E. et al., The evaluation of jumping ability of male and female basketball players according to their chronological age and major leagues. J. Strength and Conditioning Res. 13(1):40-46 (1999).

Kerr, Z., et al., Concussion rates in U.S. middle school athletes, 2015-16 school year, Am. J. Prev. Med. 53(6):914-18 (2017).

Kirchengast, S., Sexual dimorphism in body composition, weight status and growth in prepubertal school children from rural areas of eastern Austria. Collegium Antropologicum 25(1):21-30 (2001).

Kobayashi, H. et al., Mechanisms of the anterior cruciate ligament injury in sports activities: A twenty-year clinical research of 1700 athletes. J. Sports Science & Medicine 9:669-675 (2010).

Kountouris, P. et al., Evidence for differences in men's and women's volleyball games based on skills effectiveness in four consecutive Olympic tournaments. Comprehensive Psychology 4(9) (2015).

Kuczinski, A. et al., Trends and epidemiologic factors contributing to soccer-related fractures that presented to emergency departments in the United States. Sports Health 11(1):27-31 (2018).

Kujala U.M., et al., Acute injuries in soccer, ice hockey, volleyball, basketball, judo, and karate: analysis of national registry data. BMJ 311(7018):1465-68 (1995).

Kvorning, T. et al., Suppression of endogenous testosterone production attenuates the response to strength training: a randomized, placebo-

controlled, and blinded intervention study. Am. J. Physiol .Metab. 291:E1325-E1332 (2006).

La Fountaine, M.F. et al., Preliminary evidence for a window of increased vulnerability to sustain a concussion in females: a brief report. Front. Neurol. 10:691 (2019).

Lapauw, B. et al., Body composition, volumetric and areal bone parameters in male-to-female transsexual persons. Bone 43:1016-21 (2008).

Lin, C. et al., Sex differences in common sports injuries. PM R 10(10):1073-1082 (2019).

Lombardo, M.P. and R. O. Deaner, On the evolution of sex differences in throwing. Qu. Review of Bio. 93(2):91-119 (2018).

Los Angeles Times, "Volleyball star Haley Hodson had it all, until blows to her head changed everything." https://www.latimes.com/sports/story/2020-12-08/stanford-volleyball-hayley-hodson-concussions-cte-lawsuit.

Magnusson, S.P. et al., The adaptability of tendon loading differs in men and women. Int. J. Exp. Pathol. 88:237-40 (2007).

Marar, M. et al., Epidemiology of concussions among United States high school athletes in 20 sports. Am. J. Sports Med. 40(4):747-755 (2012).

McCrory, P. et al., Consensus statement on concussion in sport—the 5th international conference on concussion in sport held in Berlin, October 2016. BJSM 51:838-847 (2018).

McGroarty, N.K. et al., Sport-related concussion in female athletes: a systematic review. Orthop. J. Sports Med. 8(7) (2020).

McIntosh, A.S., Risk compensation, motivation, injuries, and biomechanics in competitive sport, Br. J. Sports Med (39):2-3 (2005).

McManus, A. and N. Armstrong, Physiology of elite young female athletes. J Med & Sport Sci 56:23-46 (2011).

Meeuwise, W.H., Assessing causation in sports injury: a multifactorial model. Clinical J. of Sports Med. 4(3):166-70 (1994).

Montalvo, A.M. et al., Anterior cruciate ligament injury risk in sport: a systematic review and meta-analysis of injury incidence by sex and sport classification. J. Ath. Training 54(5):472-482 (2019).

Montalvo, A.M. et al., "What's my risk of sustaining an ACL injury while playing sports?": a systematic review with meta-analysis. Br. J. Sports Med. 53:10031012 (2019).

Mooney, J. et al., Concussion in soccer: a comprehensive review of the literature. Concussion 5(3) (2020).

Morris, J.S. et al., Sexual dimorphism in human arm power and force: implications for sexual selection on fighting ability. J. Exp. Biol. 223(Pt 2) (2020).

National Collegiate Athletic Association, Inclusion of transgender student-athletes. https://ncaaorg.s3.amazonaws.com/inclusion/lgbtq/INC_TransgenderHandbook.pdf (August 2011).

National Conference of State Legislatures, Report on traumatic brain injury legislation. https://www.ncsl.org/research/health/traumatic-brain-injury-legislation.aspx#1 (2018).

Neder, J.A. et al., Reference values for concentric knee isokinetic strength and power in nonathletic men and women from 20 to 80 years old. J. Orth. & Sports Phys. Therapy 29(2):116-126 (1999).

New York Times, "Estimate of U.S. transgender population doubles to 1.4 Million adults." https://www.nytimes.com/2016/07/01/health/transgender-population.html?.?mc=aud_dev&ad-keywords=auddevgate&gclid=Cj0KCQjwkZiFBhD9ARIsAGxFX8BV5pozB9LI5Ut57OQzuMhurWThvBMisV9NyN9YTXIzWl7OAnGT6VkaAu0jEALw_wcB&gclsr c=aw.ds. (July 1, 2016).

Nieves, J.W. et al., Males have larger skeletal size and bone mass than females, despite comparable body size. J. Bone Mineral Res. 20(3):529-35 (2005).

Palao, J.M. et al., Normative profiles for serve speed for the training of the serve and reception in volleyball. The Sport Journal (July 2014).

Pierpoint, L. et al., The first decade of web-based sports injury surveillance: descriptive epidemiology of injuries in US high school boys' (and girls) lacrosse (2008–2009 Through 2013–2014) and National Collegiate Athletic Association men's lacrosse (2004–2005 Through 2013–2014). J. Athl. Training 54(1):30-41 (2019).

Preiss-Farzanegan, S.J. et al., The relationship between gender and postconcussion symptoms after sport-related mild traumatic brain injury. PM R 1(3):245-53 (2009).

Rider, G.N. et al., Health and care utilization of transgender and gender nonconforming youth: a population-based study. Pediatrics 141:3 (March 2018).

Roberts, T.A. et al., Effect of gender affirming hormones on athletic performance in transwomen and transmen: implications for sporting organisations and legislators. BJSM 0:1-7 (2020).

Rowson, S. et al., Biomechanical perspectives on concussion in sport, Sports Med. Arthrosc. 24(3):100-107 (Sept 2016).

Ruetsche, A.G. et al., Cortical and trabecular bone mineral density in transsexuals after long-term cross-sex hormonal treatment: a cross-sectional study. Osteoporos. Int. 16:791-798 (2005).

Sakamoto, K. et al., Comparison of kicking speed between female and male soccer players. Procedia Engineering 72:50-55 (2014).

Santos, D.A. et al., Reference values for body composition and anthropometric measurements in athletes. PLOSOne 9(5) (May 2014).

Sattler, T. et al., Vertical jump performance of professional male and female volleyball players: effects of playing position and competition level. J. Strength and Conditioning Res. 29(6):1486-93 (2015).

Scharff, M. et al., Change in grip strength in trans people and its association with lean body mass and bone density. Endocrine Connections 8:1020-28 (2019).

Singh-Ospina, N. et al., Effect of sex steroids on the bone health of transgender individuals: a systematic review and meta-analysis. J. Clin. Endocrinol. Metab. 102(11):3904-13 (Nov 2017).

Sutton, K.M. et al., Anterior cruciate ligament rupture: differences between males and females. J. Am. Acad. Orthop. Surg. 21(1):41-50 (2013).

Tack, L.J.W. et al., Proandrogenic and antiandrogenic progestins in transgender youth: differential effects on body composition and bone metabolism. J. Clin. Endocrinol. Metab, 103(6):2147-56 (2018).

Taylor, R.W., et al., Gender differences in body fat content are present well before puberty. Int. J. Obes. Relat. Metab. Disord. 21(11): 1082-4 (1997).

Taylor, R.W., et al., Sex differences in regional body fat distribution from pre-
to postpuberty. Obesity 18(7): 1410-16 (2010).

Thomas, J.R. and K. E. French, Gender differences across age in motor
performance: a meta-analysis. Psych. Bull. 98(2):260-282 (1985).

Tierney, R.T. et al., Gender differences in head-neck segment dynamic
stabilization during head acceleration. Med. and Sci. in Sports and
Exercise, American College of Sports Medicine 37(2):272-9 (2005).

UK Sports Councils' Equality Group, Guidance for Transgender Inclusion in
Domestic Sport,
https://equalityinsport.org/docs/300921/Guidance%20for%20Transgende
r%20Inclusion%20in%20Domestic%20Sport%202021.pdf (2021).

UK Sports Councils' Equality Group, International Research Literature
Review,
https://equalityinsport.org/docs/300921/Transgender%20International%
20Research%20Literature%20Review%202021.pdf (2021).

Van Den Tillaar, R. and J. M. H. Cabri, Gender differences in the kinematics
and ball velocity of overarm throwing in elite team handball players. J.
Sports Sciences 30(8):807-813 (2012).

Viviers, P. et al., A review of a decade of rugby union injury epidemiology:
20072017. Sports Health 10(3):223-27 (2018).

VolleyballMag.com, "Hit by volleyballs: concussions have changed coach
Corinne Atchison's life." https://volleyballmag.com/corinneatchison/
(9/25/16).

Wang, L. et al., Post-traumatic osteoarthritis following ACL injury. Arthritis
Res. and Therapy 22(57) (2020)

Wiik, A., T. R Lundberg et al., Muscle strength, size, and composition following
12 months of gender-affirming treatment in transgender individuals. J.
Clinical Endocrin. & Metab. 105(3):e805-813 (2020).

Wikipedia, "Cece Telfer." https://en.wikipedia.org/wiki/Cece_Telfer.

Wolf, J.M. et al., Male and female differences in musculoskeletal disease. J.
Am. Acad. Orthop. Surg. 23:339-347 (2015).

World Regby Transgender Guidelines. https://www.world.rugby/the-
game/player-welfare/guidelines/transgender (2020).

World Rugby Transgender Women Guidelines. https://www.world.rugby/the-game/player-welfare/guidelines/transgender/women (2020).

Wunderle, K. et al, Menstrual phase as predictor of outcome after mild traumatic brain injury in women. J. Head Trauma Rehabil. 29(5):E1-E8 (2014).

## APPENDIX – LIST OF PUBLICATIONS

**Publications of Dr. Chad Thomas Carlson, M.D., FACSM**

Sports Medicine CAQ Study Guide, Healthy Learning, 2021 [editor].

SEXUAL VIOLENCE IN SPORT: AMERICAN MEDICAL SOCIETY FOR
    SPORTS MEDICINE POSITION STATEMENT. Published in Curr
    Sports Med Reports June 2020;19(6):232-4; Clin J Sports Med June 8
    2020; Br J Sports Med 2020;0:1-3.

Traveling with Medication. NCAA Sports Science Institute Bulletin, 2015
    http://www.ncaa.org/sport-science-institute/traveling-medication.

A SURVEY OF STATE MEDICAL LICENSING BOARDS: CAN THE
    TRAVELING TEAM PHYSICIAN PRACTICE IN YOUR STATE? 2013.
    Jan (47)1:60-62.

AXIAL BACK PAIN IN THE ATHLETE: PATHOPHYSIOLOGY AND
    APPROACH TO REHABILITATION. Curr Rev Musculoskel Med. 2009
    (2):88-93.

THE NATURAL HISTORY AND MANAGEMENT OF HAMSTRING
    INJURIES. Curr Rev Musculoskel Med 2008 (1):120-128.

SPONDYLOLYSIS AND THE ATHLETE. Athletic Ther Today. 2007 (12)4:37-
    39.

"ACUTE SUBDURAL HEMATOMA IN A HIGH SCHOOL FOOTBALL
    PLAYER," J Athl Training, 38;2(63), 2003.

THE RELATIONSHIP OF EXCESSIVE WEIGHT LOSS TO PERFORMANCE
    IN HIGH SCHOOL WRESTLERS – A PILOT STUDY; presented at the
    AMSSM national meeting, San Diego, CA, 2000; Clinical Journal of
    Sport Medicine 10(4):310, October, 2000.

71

Carlson 0273

## CURRICULUM VITAE (ABBREVIATED)

**Chad Thomas Carlson, MD**

Work Address: Stadia Sports Medicine
6000 University Ave.
Suite 250
West Des Moines, IA, 50266
Phone (515) 221-1102

Active professional licenses: IA, NE, CA, TX, TN, NC, AZ, FL (telemed)

Board certified family medicine, ABMS 1998; recertified 2005, 2012

Board certified sports medicine, ABMS 1999; recertified 2009, 2019

EDUCATION:

- Fellowship:  Sports Medicine -- Ball Memorial Hospital/Central Indiana Orthopedics, 1997-1999; Completed 4/99
- Residency:  University of Michigan Department of Family Medicine,1994-97
- University of Nebraska College of Medicine
M.D. obtained May 1994
- University of Nebraska at Lincoln
B.S. with majors in history (emphasis American) and biology obtained May 1990

EMPLOYMENT HISTORY:

- Physician Owner, Stadia Sports Medicine, West Des Moines, IA, 2006 - present
- Staff Physician, University of Illinois, 9/04-6/06
- Director, Carle Sports Medicine, Carle Foundation Hospital, Urbana, IL, 2001-2004; Team physician, University of Illinois.
- Private practice, Ionia County Hospital, Ionia, MI, 1999-2001.

HOSPITAL AFFILIATIONS:

- Iowa Methodist Hospital, Des Moines
- Mercy Medical Center, Des Moines

PROFESSIONAL HONORS/AWARDS:

- Appointed to Board of Directors, Physical Activity Alliance, 2020
- Appointed to joint AMSSM/NCAA COVID-19 Working Group, March 2020-present
  - Medical advisory panel, 2021 Women's Division I NCAA Basketball Tournament
- AMSSM Founders Award 2019, awarded once annually for the Sports Medicine Physician nationally who best exemplifies the practice of Sports Medicine
- Fellow designation, American Medical Society for Sports Medicine, 2019
- Elected to Executive Committee, American Medical Society for Sports Medicine, 2017-21
  - **President of AMSSM, 2019-2020**

Medina 0274

- Practice/Policy Committee, AMSSM, 2007-2016 (Former Chair)
  - Author of US HR 921, the Sports Medicine Licensure Clarity Act, which passed the US House of Representatives and Senate in January 2017, and was signed into law by President Trump, 2017
- Appointed member of physician liaison group to the NCAA to discuss return to sport strategies in the COVID-19 pandemic, 2020
- Appointed to Board of Directors, Running the Race, 2018-present
- Sports Ultrasound Committee, Policy Co-Chair, AMSSM, 2015-2017
- Elected to Board of Directors, American Medical Society for Sports Medicine, 2009-2013.
- Member, Health and Science Policy Committee, ACSM, 2010-present
  - Chair, Clinical Medicine Subcommittee, HSPC, ACSM, 2012-2015
- Iowa Medical Society Leadership Development Committee, 2022
- Member of Sports Medicine Subcommittee for the Iowa State Medical Society, 2007-present
  - Iowa designate to National Youth Sports Safety Summit
    - New York City – 2015
    - Indianapolis – 2016
    - Kansas City – 2017
- AMSSM designate for the American Academy of Orthopaedic Surgeons' Knee Osteoarthritis Quality Measure review committee, 2014-2016
- Associate Editor, Current Reviews in Musculoskeletal Medicine, 2006-2010.
- Fellow, American College of Sports Medicine:  Designated in 2004


SPECIAL QUALIFICATIONS:

- Prior legal consulting work in cases with both local and national reach
- Extensive training in office musculoskeletal injury
- Oversight of treadmill stress testing/metabolic stress testing
- Independent consultation regarding establishment of individual exercise programs consistent with revised ACSM guidelines
- Proficient at evaluation/management of bone mineral density problems at all ages

- Qualified procedurally for:
  - Ultrasound diagnostic testing and guided injections
  - Joint injection/aspiration
  - Percutaneous tenotomy (TENEX)
  - Rotator cuff barbotage
  - Lactate/Anaerobic threshold, $VO_{2\,MAX}$/ exercise testing
  - Laryngoscopy for vocal cord assessment
  - Compartment pressure assessment
  - Ultrasound-guided nerve blocks
- Extensive experience speaking to large national groups on issues pertaining to sports medicine, including, but not limited to:
  - Overuse Injury
  - Head and Neck Injuries on the Field
  - Exercise-Induced Asthma
  - The Shoulder Exam
  - Principles of Exercise Prescription
  - Traumatic Brain Injury in Sport
  - The Knee Exam
  - The Ankle Exam
  - The Hip Exam
  - The Pre-Participation Exam
  - Cardiopulmonary Exercise Testing for Determination of Training Zone Estimates and to Identify Causes of Exercise-Related Dyspnea
  - Athletic Amenorrhea
  - Advocacy in Sports Medicine
  - Medical Practice Economics

Sims 0275

PUBLICATIONS/RESEARCH:

- Sports Medicine CAQ Study Guide, Healthy Learning, Monterey, CA. 2021.[editor].
- AXIAL BACK PAIN IN THE ATHLETE:  PATHOPHYSIOLOGY AND APPROACH TO REHABILITATION.  Curr Rev Musculoskel Med. 2009 (2):88-93
- SPONDYLOLYSIS AND THE ATHLETE.  Athletic Ther Today. 2007 (12)4:37-39.
- THE NATURAL HISTORY AND MANAGEMENT OF HAMSTRING INJURIES.  Curr Rev Musculoskel Med 2008 (1):120-128.
- A SURVEY OF STATE MEDICAL LICENSING BOARDS: CAN THE TRAVELING TEAM PHYSICIAN PRACTICE IN YOUR STATE?  BJSM. 2013. Jan (47)1:60-62.
- SEXUAL VIOLENCE IN SPORT:  AMERICAN MEDICAL SOCIETY FOR SPORTS MEDICINE POSITION STATEMENT
    - Curr Sports Med Reports June 2020;19(6):232-4.
    - Clin J Sports Med June 8 2020;
    - Br J Sports Med 2020;0:1-3
- "ACUTE SUBDURAL HEMATOMA IN A HIGH SCHOOL FOOTBALL PLAYER," J Athl Training, 38;2(63), 2003
- Traveling with Medication. NCAA Sports Science Institute Bulletin, 2015  http://www.ncaa.org/sport-science-institute/traveling-medication
- THE RELATIONSHIP OF EXCESSIVE WEIGHT LOSS TO PERFORMANCE IN HIGH SCHOOL WRESTLERS – A PILOT STUDY;  presented at the AMSSM national meeting, San Diego, CA, 2000   Clinical Journal of Sport Medicine 10(4):310, October, 2000

Appx 0276

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA**
**CHARLESTON DIVISION**

B.P.J., by her next friend and mother, HEATHER
JACKSON,

                    *Plaintiff,*

        vs.

WEST VIRGINIA STATE BOARD OF EDUCATION,
et al.,                                              Case No. 2:21-cv-00316

                    *Defendants,*                    Hon. Joseph R. Goodwin

        and

LAINEY ARMISTEAD,

                    *Defendant-Intervenor.*

---

### DECLARATION OF STEPHEN B. LEVINE, MD

        I, Dr. Stephen B. Levine, pursuant to 28 U.S. Code § 1746, declare under penalty of perjury under the laws of the United States of America that the facts contained in my Expert Report of Stephen B. Levine, MD., in the Case of B.P.J. v. West Virginia State Board of Education, dated February 23, 2022 and attached hereto, are true and correct to the best of my knowledge and belief, and that the opinions expressed therein represent my own expert opinions.

Executed on February 23, 2022.              *Stephen B. Levine* (AU)

                                            Stephen B. Levine, MD

0277

- ii -

Privilege 0278

Expert Report of

**Stephen B. Levine, MD**

In the case of B.P.J. vs. West Virginia State Board of Education.

February 23, 2022

## TABLE OF CONTENTS

I.   CREDENTIALS & SUMMARY ................................................................. 1

II.  BACKGROUND ON THE FIELD ........................................................... 8

    A.   The biological baseline of the binary sexes.............................................. 8

    B.   Definition and diagnosis of gender dysphoria........................................... 12

    C.   Impact of gender dysphoria on minority and vulnerable groups...................... 13

    D.   Three competing conceptual models of gender dysphoria and transgender identity........................................................................................... 14

    E.   Four competing models of therapy....................................................... 16

III. THERE IS NO CONSENSUS OR AGREED "STANDARD OF CARE" CONCERNING THERAPEUTIC APPROACHES TO CHILD OR ADOLESCENT GENDER DYSPHORIA........................................................ 22

    A.   Experts and organizations disagree as to whether "distress" is a necessary element for diagnoses that justifies treatment for gender identity issues. ...................... 23

    B.   Opinions and practices vary widely about the utilization of social transition for children and adolescents. ................................................................ 24

    C.   The WPATH "Standards of Care" is not an impartial or evidence-based document. .................................................................................... 25

    D.   Opinions and practices differ widely with respect to the proper role of psychological counseling before, as part of, or after a diagnosis of gender dysphoria. .................................................................................... 28

    E.   Opinions and practices vary widely with respect to the administration of puberty blockers and cross-sex hormones. .................................................... 30

IV.  TRANSGENDER IDENTITY IS NOT BIOLOGICALLY BASED. ........................... 33

    A.   No theory of biological basis has been scientifically validated. .................... 34

    B.   Large changes across time and geography in the epidemiology of transgender identification are inconsistent with the hypothesis of a biological basis for transgender identity. ..................................................................... 35

    C.   Disorders of sexual development (or DSDs) and gender identity are very different phenomena, and it is an error to conflate the two........................... 38

    D.   Studies of individuals born with DSDs suggest that there may be a biological predisposition towards *typical* gender identifications, but provide no support for a biological basis for *trans*gender identification. ............................... 39

V.   GENDER IDENTITY IS EMPIRICALLY NOT FIXED FOR MANY INDIVIDUALS. ................................................................................ 40

    A.   Most children who experience gender dysphoria ultimately "desist" and resolve to cisgender identification. ............................................................ 40

    B.   Desistance is increasingly observed among teens and young adults who first manifest GD during or after adolescence. ..................................... 42

VI.   **TRANSITION AND AFFIRMATION IS AN IMPORTANT PSYCHOLOGICAL AND MEDICAL INTERVENTION THAT CHANGES GENDER IDENTITY OUTCOMES.** .............................................. **45**

    A.   If both a typical gender or a transgender long-term gender identity outcome are possible for a particular patient, the alternatives are not medically neutral. ................. 45

    B.   Social transition of young children is a powerful psychotherapeutic intervention that radically changes outcomes, almost eliminating desistance.................................... 46

    C.   Administration of puberty blockers is a powerful medical and psychotherapeutic intervention that radically changes outcomes, almost eliminating desistance on the historically observed timeline..................................................... 48

VII. **TRANSITION AND AFFIRMATION ARE EXPERIMENTAL THERAPIES THAT HAVE NOT BEEN SHOWN TO IMPROVE MENTAL OR PHYSICAL HEALTH OUTCOMES BY YOUNG ADULTHOOD.** ...................................... **49**

    A.   The knowledge base concerning therapies for gender dysphoria is "very low quality." ..................................................................................... 50

    B.   Youth who adopt a transgender identity show no durable improvement in mental health after social, hormonal, or surgical transition and affirmation. ........................... 52

    C.   Long-term mental health outcomes for individuals who persist in a transgender identity are poor............................................................................... 54

VIII.  **TRANSITION AND AFFIRMATION DO NOT DECREASE, AND MAY INCREASE, THE RISK OF SUICIDE.** ............................................... **56**

    A.   The risk of suicide among transgender youth is confused and exaggerated in the public mind. ............................................................................... 56

    B.   Transition of any sort has not been shown to reduce levels of suicide. ........................ 58

    C.   Long-term life in a transgender identity correlates with very high rates of completed suicide. ..................................................................... 59

IX.  **HORMONAL INTERVENTIONS ARE EXPERIMENTAL PROCEDURES THAT HAVE NOT BEEN PROVEN SAFE.** ................................................ **61**

    A.   Use of puberty blockers has not been shown to be safe or reversible for gender dysphoria. ................................................................................. 62

    B.   Use of cross-sex hormones in adolescents for gender dysphoria has not been shown to be medically safe except in the short term.................................... 66

    C.   The timing of harms. .......................................................................... 70

**Bibliography** ................................................................................ **72**

## I.    CREDENTIALS & SUMMARY

1.    I am Clinical Professor of Psychiatry at Case Western Reserve University School of Medicine, and maintain an active private clinical practice. I received my MD from Case Western Reserve University in 1967, and completed a psychiatric residency at the University Hospitals of Cleveland in 1973. I became an Assistant Professor of Psychiatry at Case Western in 1973, became a Full Professor in 1985, and in 2021 was honored to be inducted into the Department of Psychiatry's "Hall of Fame."

2.    Since July 1973, my specialties have included psychological problems and conditions relating to individuals' sexuality and sexual relations, therapies for sexual problems, and the relationship between love, intimate relationships, and wider mental health. In 2005, I received the Masters and Johnson Lifetime Achievement Award from the Society of Sex Therapy and Research. I am a Distinguished Life Fellow of the American Psychiatric Association.

3.    I have served as a book and manuscript reviewer for numerous professional publications. I have been the Senior Editor of the first (2003), second (2010), and third (2016) editions of the *Handbook of Clinical Sexuality for Mental Health Professionals*. In addition to five previously solo-authored books for professionals, I have recently published *Psychotherapeutic Approaches to Sexual Problems* (2020). The book has a chapter titled "The Gender Revolution."

4.    In total I have authored or co-authored over 180 journal articles and book chapters, 20 of which deal with the issue of gender dysphoria. I am an invited member of a Cochrane Collaboration subcommittee that is currently preparing a review of the scientific literature on the effectiveness of puberty blocking hormones and of cross-sex hormones for

gender dysphoria for adolescents. Cochrane Reviews are a well-respected cornerstone of evidence-based practice, comprising a systematic review that aims to identify, appraise, and synthesize all the empirical evidence that meets pre-specified eligibility criteria in response to a particular research question.

5.      I first encountered a patient suffering what we would now call gender dysphoria in July 1973. In 1974, I founded the Case Western Reserve University Gender Identity Clinic, and have served as Co-Director of that clinic since that time. Across the years, our Clinic treated hundreds of patients who were experiencing a transgender identity. An occasional child was seen during this era. I was the primary psychiatric caregiver for several dozen of our patients and supervisor of the work of other therapists. I was an early member of the Harry Benjamin International Gender Dysphoria Association (later known as WPATH) and served as the Chairman of the committee that developed the 5th version of its Standards of Care. In 1993 the Gender Identity Clinic was renamed, moved to a new location, and became independent of Case Western Reserve University. I continue to serve as Co-Director.

6.      In the course of my five decades of practice treating patients who suffered from gender dysphoria, I have at one time or another recommended or prescribed or supported social transition, cross-sex hormones, and surgery for particular patients, but only after extensive diagnostic and psychotherapeutic work.

7.      In 2006, Judge Mark Wolf of the Eastern District of Massachusetts asked me to serve as an independent, court-appointed expert in a litigation involving the treatment of a transgender inmate within the Massachusetts prison system. In that litigation, the U.S. Court of Appeals for the First Circuit in a 2014 (En Banc) opinion cited and relied on my expert

testimony. I have been retained by the Massachusetts Department of Corrections as a consultant

on the treatment of transgender inmates since 2007.

8.      In 2019, I was qualified as an expert and testified concerning the diagnosis,

understanding, developmental paths and outcomes, and therapeutic treatment of transgenderism

and gender dysphoria, particularly as it relates to children, in the matter of *In the Interest of*

*J.A.D.Y. and J.U.D.Y.*, Case No. DF-15-09887-S, 255th Judicial District, Dallas County, TX (the

"*Younger* litigation"). I have provided expert testimony in other litigation as listed in my

curriculum vitae. In 2019, I provided written expert testimony in the landmark case in the United

Kingdom; *Bell v. The Tavistock and Portman NHS Foundation Trust*.

9.      I am regularly requested to speak on the topic of gender dysphoria and have given

countless presentations to academic conferences and Departments of Psychiatry around the

country. In May of this year, I will be co-presenting a symposium on the management of

adolescent-onset transgender identity at American Psychiatric Association's Annual Meeting.

10.     A fuller review of my professional experience, publications, and awards is

provided in my curriculum vitae, a copy of which is attached hereto as Exhibit A.

11.     I am being compensated for my time spent in connection with this case at a rate of

$400.00 per hour for consultation and $500.00 per hour for time spent testifying.

12.     I have reviewed the "Declaration and Expert Report of Deanna Adkins, MD,"

dated January 21, 2022 ("Adkins"). In that declaration Dr. Adkins makes a variety of statements

about gender dysphoria, therapies for gender dysphoria, and outcomes of therapies, which I

believe to be inaccurate, or unsupported by scientific evidence. Dr. Adkins is a pediatric

endocrinologist. I note with some concern that Dr. Adkins makes a number of sweeping and

0284

purportedly scientific assertions but cites almost no peer-reviewed articles or studies that support her opinions.

13.     Based on her declaration, Dr. Adkins' practice is focused on children and adolescents; her CV and declaration do not suggest substantial experience in working with adults or older young adults who are living in a transgender identity, or who suffer from gender dysphoria. (This diagnosis requires "clinically significant" distress.) The wider lifecycle view that derives from experience with these adults (and familiarity with the literature concerning them) provides an important cautionary perspective. The psychiatrist or psychologist treating a trans child or adolescent, of course seeks to make the young patient happy, but the overriding consideration is the creation of a happy, highly functional, mentally healthy person for the next 50 to 70 years of life. I refer to treatment that keeps this goal in view as the "life course" perspective.

14.     Dr. Adkins' stated belief that the only way to avoid harm is affirmative care is just one of many questionable assumptions that lack firm scientific foundation. Others that frequently ride along with advocates' convictions about affirmative care include:

    a.   A trans identity is immutable;

    b.   Trans identities are primarily caused by biological forces;

    c.   Gender identity and orientation are distinct stable dimensions of identity;

    d.   There are no alternative treatments to affirmative care;

    e.   Affirmative care lastingly improves mental health and social function;

    f.   Affirmative care reduces the rates of suicidal ideation and suicide;

    g.   Young teens can give informed consent for hormones because they know best what will make them happy now and in the future;

h.  De-transition of affirmed youth is rare;

i.  Associated psychopathology during and after affirmative care is primarily due to minority stress.

15.     These assertions are inaccurate or unsupported, for reasons that I explain in this Declaration. I will provide citations to published, peer-reviewed articles that inform my judgments.

16.      I have also reviewed the "Expert Report and Declaration of Joshua D. Safer, MD," dated January 21, 2022 ("Safer"). In that declaration Dr. Safer similarly makes a variety of statements about gender dysphoria, therapies for gender dysphoria, and outcomes of therapies, which I believe to be inaccurate, or unsupported by scientific evidence. Dr. Safer also makes a number of sweeping and purportedly scientific assertions that are not substantiated by peer-reviewed articles or studies.

17.     It is also my opinion that a number of Dr. Safer's assertions are inaccurate or unsupported, for reasons that I explain in this Declaration. Similarly, I will provide citations to published, peer-reviewed articles that inform my judgments.

18.     A summary of the key points that I explain in this report is as follows:

a.  Sex as defined by biology and reproductive function is clear, binary, and cannot be changed. While hormonal and surgical procedures may enable some individuals to "pass" as the opposite gender during some or all of their lives, such procedures carry with them physical, psychological, and social risks, and no procedures can enable an individual to perform the reproductive role of the opposite sex. (Section II.A.)

- 5 -

b.   The diagnosis of "gender dysphoria" encompasses a diverse array of conditions, with widely differing pathways and characteristics depending on age of onset, biological sex, mental health, intelligence, motivations for gender transition, socioeconomic status, country of origin, etc. Data from one population (e.g., adults) cannot be assumed to be applicable to others (e.g., children). (Section II.B.)

c.   Among practitioners in the field, there are currently widely varying views concerning both the causes of and appropriate therapeutic response to gender dysphoria in children or adolescents. There are no generally accepted "standards of care" and existing studies do not provide a basis for a scientific conclusion as to which therapeutic response results in the best long-term outcomes for affected individuals. (Section III.)

d.   Transgender identity is not biologically based. Rather, gender dysphoria is a psychiatric condition that cannot be identified by any biological test or measurement. (Sections IV.A, IV.B.)

e.   Disorders of sexual development ("DSDs") are biological phenomena. It is an error to conflate and/or scientifically link DSDs with incidents of gender dysphoria. (Sections IV.C, IV.D.)

f.   The large majority of children who are diagnosed with gender dysphoria "desist"—that is, their gender dysphoria does not persist—by puberty or adulthood. Desistance is also increasingly observed among teens and young adults who have experienced "rapid onset gender dysphoria" — first manifesting gender dysphoria during or shortly after adolescence. (Section V.A., V.B.)

g.   "Social transition" —the active affirmation of transgender identity—in young children is a powerful psychotherapeutic intervention that will substantially reduce the

number of children "desisting" from transgender identity. Therefore, the profound implications of "affirmative" treatment—which include taking puberty blockers and cross-sex hormones—must be taken into account where social transition is being considered. (Section VI.A,, VI.B.)

h.   Administration of puberty blockers is not a benign "pause" of puberty, but rather a powerful medical and psychotherapeutic intervention that almost invariably leads to persistence in a transgender identity and, ultimately, to the administration of cross-sex hormones. (Section VI.C.)

i.   The knowledge base concerning the "affirmative" treatment of gender dysphoria available today has very low scientific quality with many long-term implications remaining unknown. (Section VII.A)

j.   There are no studies that show that affirmation of transgender identity in young children reduces suicide or suicidal ideation, or improves long-term outcomes, as compared to other therapeutic approaches. Meanwhile, multiple studies show that adult individuals living transgender lives suffer much higher rates of suicidal ideation, completed suicide, and negative physical and mental health conditions than does the general population. This is true before and after transition, hormones, and surgery. (Section VII.B., VII.C.)

k.   In light of what is known and not known about the impact of affirmation on the incidence of suicide, suicidal ideation, and other indicators of mental and physical health, it is scientifically baseless, and therefore unethical, to assert that a child or adolescent who express an interest in a transgender identity will kill him- or herself unless adults and peers affirm that child in a transgender identity. (Section VIII.)

0288

l.   Hormonal interventions to treat gender dysphoria are experimental in nature and have not been shown to be safe, but rather put an individual at risk of a wide range of long-term and even life-long harms including: physical health risks; sterilization and the associated emotional response; impaired sexual response; surgical complications and life-long after-care; alienation of family and romantic relationships; elevated mental health risks of depression, anxiety, and substance abuse. (Section IX.)

## II.   BACKGROUND ON THE FIELD

### A.   The biological baseline of the binary sexes

19.   Dr. Adkins asserts that "the terms biological sex and biological male or female are imprecise and should be avoided." (Adkins at 10.) Dr. Safer further asserts that the term biological sex "can cause confusion," and moreover that a person's sex encompasses gender identity. (Safer at 6.) These statements are untrue. Biological sex is very well defined in all biological sciences including medicine. It is pervasively important in human development throughout the lifecycle.

20.   Sex is not "assigned at birth" by humans visualizing the genitals of a newborn; it is not imprecise. Rather, it is clear, binary, and determined at conception. The sex of a human individual at its core structures the individual's biological reproductive capabilities—to produce ova and bear children as a mother, or to produce semen and beget children as a father. As physicians know, sex determination occurs at the instant of conception, depending on whether a sperm's X or Y chromosome fertilizes the egg. A publication of the federal government's National Institute of Health accurately summarizes the scientific facts:

> "Sex is a biological classification, encoded in our DNA. Males have XY chromosomes, and females have XX chromosomes. Sex makes us male or female. Every cell in your body has a sex— making up tissues and organs, like your skin, brain, heart, and

- 8 -

stomach. Each cell is either male or female depending on whether
you are a man or a woman." (NIH 2022.)

21.     The binary of biological sex is so fundamental and wide-ranging in its effects on

human (and mammal) development and physiology that since 2014 the NIH has required all

funded research on humans or vertebrate animals to include "sex as a biological variable" and

give "adequate consideration of both sexes in experiments." (NIH 2015). In 2021, the Endocrine

Society issued a position paper elaborating on the application of the NIH requirement. The

Endocrine Society correctly stated that "Sex is a biological concept . . . all mammals have 2

distinct sexes;" that "biological sex is . . . a fundamental source of intraspecific variation in

anatomy and physiology;" and that "In mammals, numerous sexual traits (gonads, genitalia, etc.)

that typically differ in males and females are tightly linked to each other because one

characteristic leads to sex differences in other traits." (Bhargava et al. 2021 at 221, 229.)

22.     The Endocrine Society emphasized that "The terms sex and gender should not be

used interchangeably," and noted that even in the case of those "rare" individuals who suffer

from some defect such that they "possess a combination of male- and female-typical

characteristics, those clusters of traits are sufficient to classify most individuals as either

biologically male or female." They concluded, "Sex is an essential part of vertebrate biology, but

gender is a human phenomenon. Sex often influences gender, but gender cannot influence sex."

(Bhargava et al. 2021 at 220-221, 228.) For purposes of this litigation, Dr. Bhargava's statement

that gender cannot influence sex is of central importance.

23.     As these statements and the NIH requirement suggest, biological sex pervasively

influences human anatomy, its development and physiology. This includes, of course, the

development of the human brain, in which many sexually dimorphic characteristics have now

been identified. In particular, the Endocrine Society and countless other researchers have

determined that human brains undergo particular sex-specific developmental stages during puberty. This predictable developmental process is a genetically controlled coordinated endocrine response that begins with pituitary influences leading to increases in circulating sex hormones. (Bhargava et al. 2021 at 225, 229; Blakemore et al. 2010 at 926-927, 929; NIH 2001.).

24.     Humans have viewed themselves in terms of binary sexes since the earliest historical records. Recognizing a concept of "gender identity" as something distinct from sex is a rather recent innovation whose earliest manifestations likely began in the late 1940s. Its usage became common in medicine in the 1980s and subsequently in the larger culture. Definitions of gender have been evolving and remain individual-centric and subjective. In a statement on "Gender and Health," the World Health Organization defines "gender" as "the characteristics of women, men, girls and boys that are socially constructed" and that "var[y] from society to society and can change over time," and "gender identity" as referring to "a person's deeply felt, internal and individual experience of gender." (WHO Gender and Health.) As these definitions indicate, a person's "felt" "experience of gender" is inextricably bound up with and affected by societal gender roles and stereotypes—or, more precisely, by the affected individual's *perception* of societal gender roles and stereotypes and their personal idiosyncratic meanings. Typically, gendered persons also have subtly different, often idiosyncratic, reactions to societal gender roles and stereotypes without preoccupation with changing their anatomy.

25.     Thus, the self-perceived gender of a child begins to develop along with the early stages of identity formation generally, influenced in part from how others label the infant: "I love you, son (daughter)." This designation occurs thousands of times in the first two years of life when a child begins to show awareness of the two possibilities. As acceptance of the designated

- 10 -

gender corresponding to the child's sex is the outcome in >99% of children everywhere, anomalous gender identity formation begs for understanding. Is it biologically shaped? Is it biologically determined? Is it the product of how the child was privately regarded and treated? Is it a product of the quality of early life caregiver attachments? Does it stem from trauma-based rejection of maleness or femaleness, and if so, flowing from what trauma? Does it derive from a tense, chaotic interpersonal parental relationship without physical or sexual abuse? Is it a symptom of another, as of yet unrevealed, emotional disturbance or neuropsychiatric condition (autism)? The answers to these relevant questions are not scientifically known but are not likely to be the same for every trans-identified child, adolescent, or adult.

26.     Under the influence of hormones secreted by the testes or ovaries, numerous additional sex-specific differences between male and female bodies continuously develop postnatally, culminating in the dramatic maturation of the primary and secondary sex characteristics with puberty. These include differences in hormone levels, height, weight, bone mass, shape, musculature, body fat levels and distribution, and hair patterns, as well as physiological differences such as menstruation and ejaculation. These are genetically programmed biological consequences of sex—the actual meaning of sex over time. Among the consequences of sex is the consolidation of gender identity during and after puberty.

27.     Despite the increasing ability of hormones and various surgical procedures to reconfigure some male bodies to visually pass as female, or vice versa, the biology of the person remains as defined by his (XY) or her (XX) chromosomes, including cellular, anatomic, and physiologic characteristics and the particular disease vulnerabilities associated with that chromosomally defined sex. For instance, the XX (genetically female) individual who takes testosterone to stimulate certain male secondary sex characteristics will nevertheless remain

unable to produce sperm and father children. It is certainly true, as Dr. Adkins writes, that "[h]ormone therapy and social transition significantly change a person's physical appearance." (Adkins at 8.) But in critical respects this change can only be "skin deep." Contrary to assertions and hopes that medicine and society can fulfill the aspiration of the trans individual to become "a complete man" or "a complete woman," this is not biologically attainable. (Levine 2018 at 6; Levine 2016 at 238.) It is possible for some adolescents and adults to pass unnoticed—that is, to be perceived by most individuals as a member of the gender that they aspire to be—but with limitations, costs, and risks, as I detail later.

### B.   Definition and diagnosis of gender dysphoria

28.    Specialists have used a variety of terms over time, with somewhat shifting definitions, to identify and speak about a distressing incongruence between an individual's genetically determined sex and the gender with which they identify or to which they aspire. Today's American Psychiatric Association *Diagnostic and Statistical Manual of Mental Disorders* ("DSM-5") employs the term Gender Dysphoria and defines it with separate sets of criteria for adolescents and adults on the one hand, and children on the other.

29.    There are at least five distinct pathways to gender dysphoria: early childhood onset; onset near or after puberty with no prior cross gender patterns; onset after defining oneself as gay for several or more years and participating in a homosexual lifestyle; adult onset after years of heterosexual transvestism; and onset in later adulthood with few or no prior indications of cross-gender tendencies or identity. (Levine 2021.) The early childhood onset pathway and the more recently observed onset around puberty pathway are most relevant to this matter.

30.    Gender dysphoria has very different characteristics depending on age and sex at onset. Young children who are living a transgender identity commonly suffer materially fewer symptoms of concurrent mental distress than do older patients. (Zucker 2018 at 10.) The

developmental and mental health patterns for each of these groups are sufficiently different that data developed in connection with one of these populations cannot be assumed to be applicable to another.

31.     The criteria used in DSM-5 to identify Gender Dysphoria include a number of signs of discomfort with one's natal sex and vary somewhat depending on the age of the patient, but in all cases require "clinically significant distress or impairment in . . . important areas of functioning" such as social, school, or occupational settings. The symptoms must persist for at least six months.

32.     Children who conclude that they are transgender are often unaware of a vast array of adaptive possibilities for how to live life as a man or a woman—possibilities that become increasingly apparent over time to both males and females. A boy or a girl who claims or expresses interest in pursuing a transgender identity often does so based on stereotypical notions of femaleness and maleness that reflect constrictive notions of what men and women can be. (Levine 2017 at 7.) A young child's—or even an adolescent's—understanding of this topic is quite limited. Nor can they grasp what it may mean for their future to be sterile. These children and adolescents consider themselves to be relatively unique; they do not realize that discomfort with the body and perceived social role is neither rare nor new to civilization. What is new is that such discomfort is thought to indicate that they must be a trans person.

**C.     Impact of gender dysphoria on minority and vulnerable groups**

33.     Given that, as I discuss later, a diagnosis of gender dysphoria is now frequently putting even young children on a pathway that leads to irreversible physical changes and sterilization by young adulthood, it should be of serious concern to all practitioners that minority and vulnerable groups are receiving this diagnosis at disproportionately high rates. These include: children of color (Rider et al. 2018), children with mental developmental disabilities

- 13 -

Miller et al. 0294

(Reisner et al. 2015), children on the autistic spectrum (at a rate more than 7x the general population) (Shumer et al. 2016; van der Miesen et al. 2018), children with ADHD (Becerra-Culqui et al. 2018), children residing in foster care homes, adopted children (at a rate more than 3x the general population) (Shumer et al. 2017), victims of childhood sexual or physical abuse or other "adverse childhood events" (Thoma 2021 et al.; Newcomb et al. 2020; Kozlowska et al. 2021), children with a prior history of psychiatric illness (Edwards-Leeper et al. 2017; Kaltiala-Heino et al. 2015; Littman 2018), and more recently adolescent girls (in a large recent study, at a rate more than 2x that of boys) (Rider et al. 2018 at 4).

     **D.**    **Three competing conceptual models of gender dysphoria and transgender identity**

34.    Discussions about appropriate responses by mental health professionals ("MHPs") to actual or sub-threshold gender dysphoria are complicated by the fact that various speakers and advocates (or a single speaker at different times) view transgenderism through at least three very different paradigms, often without being aware of, or at least without acknowledging, the distinctions.

35.    Gender dysphoria is **conceptualized and described by some professionals and laypersons as though it were a serious, physical medical illness that causes suffering**, comparable to diseases that are curable before it spreads, such as melanoma or sepsis. Within this paradigm, whatever is causing distress associated with gender dysphoria—whether secondary sex characteristics such as facial hair, nose and jaw shape, presence or absence of breasts, or the primary anatomical sex organs of testes, ovaries, penis, or vagina—should be removed to alleviate the illness. The promise of these interventions is the cure of the gender dysphoria.

36.     Dr. Adkins appears to endorse this perspective, asserting that gender dysphoria is a "medical condition." (Adkins at 4.) It should be noted, however, that gender dysphoria is a psychiatric, not a medical, diagnosis. Since its inception in DSM-III in 1983, it has always been specified in the psychiatric DSM manuals and has not been specified in medical diagnostic manuals. Notably, gender dysphoria is the only psychiatric condition to be treated by surgery, even though no endocrine or surgical intervention package corrects any identified biological abnormality. (Levine 2016 at 240.)

37.     Gender dysphoria is alternatively **conceptualized in developmental terms**, as an adaptation to a psychological problem that may have been first manifested as a failure to establish a comfortable conventional sense of self in early childhood. This paradigm starts from the premise that all human lives are influenced by past processes and events. Trans lives are not exceptions to this axiom. (Levine 2016 at 238.) MHPs who think of gender dysphoria through this paradigm may work both to identify and address causes of the basic problem of the deeply uncomfortable self or a sense of self impaired by later adversity or abuse. The purpose is to ameliorate suffering when the underlying problem cannot be solved. MHPs first work with the patient and (ideally) family to learn about the events and processes that may have led to the trans person repudiating the gender associated with his sex. The developmental paradigm is mindful of temperamental, parental bonding, psychological, sexual, and physical trauma influences, and the fact that young children work out their psychological issues through fantasy and play and adolescents work out their issues by adopting various interests and identity labels.

38.     There is evidence among adolescents that peer social influences through "friend groups" (Littman 2018) or through the internet can increase the incidence of gender dysphoria or claims of transgender identity. Responsible MHPs will want to probe these potential influences

to better understand what is truly deeply tied to the psychology of the patient, and what may instead be being "tried on" by the youth as part of the adolescent process of self-exploration and self-definition.

39.     In addition, the developmental paradigm recognizes that, with the important exception of genetic sex, essentially all aspects of an individual's identity evolve—often markedly—across the individual's lifetime. This includes gender. Some advocates assert that a transgender identity is biologically caused, fixed from early life, and eternally present in an unchanging manner. As I review later, however, this assertion is not supported by science.[1]

40.     The third paradigm through which gender dysphoria is alternatively conceptualized is from **a sexual minority rights perspective**. Under this paradigm, any response other than medical and societal affirmation and implementation of a patient's claim to "be" the opposite gender is a violation of the individual's civil right to self-expression. Any effort to ask "why" questions about the patient's condition, or to address underlying causes, is viewed as a violation of autonomy and civil rights. In the last few years, this paradigm has been successful in influencing public policy and the education of pediatricians, endocrinologists, and many mental health professionals. Obviously, however, this is not a medical or psychiatric perspective. Unfortunately, it appears to be the most powerful perspective that exists in the public, non-scientific debate.

### E.     Four competing models of therapy

41.     Few would disagree that the human psyche is complex. Few would disagree that children's and adolescents' developmental pathways typically have surprising twists and turns. The complexity and unpredictability of childhood and adolescent development equally applies to

---

[1] Even the advocacy organization The Human Rights Campaign asserts that a person can have "a fluid or unfixed gender identity." https://www.hrc.org/resources/glossary-of-terms.

trans-identifying youth. Because of past difficulties of running placebo-controlled clinical trials in the transgender treatment arena, substantial disagreements among professionals about the causes of trans identities and their ideal treatments exist. These current disagreements might have been minimized if trans treated persons were carefully followed up to determine long term outcomes. They have not been. When we add to this to the very different current paradigms for understanding transgender phenomena, it is not scientifically surprising that disagreements are sharply drawn. It is with this in mind that I summarize below the leading approaches, and offer certain observations and opinions concerning them.

### (1)    The "watchful waiting" therapy model

42.    In Section V.A below I review the uniform finding of eleven follow-up studies that the large majority of children who present with gender dysphoria will desist from desiring a transgender identity by adulthood if left untreated by social transition approaches.

43.    When a pre-adolescent child presents with gender dysphoria, a "watchful waiting" approach seeks to allow for the fluid nature of gender identity in children to naturally evolve—that is, take its course from forces within and surrounding the child. Watchful waiting has two versions:

a.   Treating any other psychological co-morbidities—that is, other mental illnesses as defined by DSM-5 (separation anxiety disorder, attention deficit hyperactivity disorder, autism spectrum disorder, obsessive compulsive disorder, etc), or subthreshold for diagnosis but behavioral problems that the child may exhibit (school avoidance, bedwetting, inability to make friends, aggression/defiance) without a focus on gender (**model #1**); and

b.   No treatment at all for anything but a regular follow-up appointment. This might be labeled a "hands off" approach **(model #2)**.

- 17 -

(2)     **The psychotherapy model: Alleviate distress by identifying and addressing causes (model #3)**

44.     One of the foundational principles of psychotherapy has long been to work with a patient to identify the causes of observed psychological distress and then to address those causes as a means of alleviating the distress. The National Institute of Mental Health has promulgated the idea that 75% of adult psychopathology has its origins in childhood experience.

45.     Many experienced practitioners in the field of gender dysphoria, including myself, have believed that it makes sense to employ these long-standing tools of psychotherapy for patients suffering gender dysphoria, asking the question as to what factors in the patient's life are the determinants of the patient's repudiation of his or her natal sex. (Levine 2017 at 8; Levine 2021.) I and others have reported success in alleviating distress in this way for at least some patients, whether the patient's sense of discomfort or incongruence with his or her natal sex entirely disappeared or not. Relieving accompanying psychological co-morbidities leaves the patient freer to consider the pros and cons of transition as he or she matures.

46.     Among other things, the psychotherapist who is applying traditional methods of psychotherapy may help—for example—the male patient appreciate the wide range of masculine emotional and behavioral patterns as he grows older. He may discuss with his patient, for example, that one does not have to become a "woman" in order to be kind, compassionate, caring, noncompetitive, to love the arts, and to be devoted to others' feelings and needs. (Levine 2017 at 7.) Many biologically male trans individuals, from childhood to older ages, speak of their perceptions of femaleness as enabling them to discuss their feelings openly, whereas they perceive boys and men to be constrained from emotional expression within the family and larger culture, and to be aggressive. Men, of course, can be emotionally expressive, just as they can

wear pink. Converse examples can be given for girls and women. These types of ideas regularly arise during psychotherapies.

47. As I note above, many gender-nonconforming children and adolescents in recent years derive from minority and vulnerable groups who have reasons to feel isolated and have an uncomfortable sense of self. A trans identity may be a hopeful attempt to redefine the self in a manner that increases their comfort and decreases their anxiety. The clinician who uses traditional methods of psychotherapy may not focus on their gender identity, but instead work to help them to address the actual sources of their discomfort. Success in this effort may remove or reduce the desire for a redefined identity. This often involves a focus on disruptions in their attachment to parents in vulnerable children, for instance, those in the foster care system.

48. Because "watchful waiting" can include treatment of accompanying psychological co-morbidities, and the psychotherapist who hopes to relieve gender dysphoria may focus on potentially causal sources of psychological distress rather than on the gender dysphoria itself, there is no sharp line between "watchful waiting" and the psychotherapy model in the case of prepubescent children.

49. To my knowledge, there is no evidence beyond anecdotal reports that psychotherapy can enable a return to male identification for genetically male boys, adolescents, and men, or return to female identification for genetically female girls, adolescents, and women. On the other hand, anecdotal evidence of such outcomes does exist; I and other clinicians have witnessed reinvestment in the patient's biological sex in some individual patients who are undergoing psychotherapy. The Internet contains many such reports, and I have published a paper on a patient who sought my therapeutic assistance to reclaim his male gender identity after 30 years living as a woman and is in fact living as a man today. (Levine 2019.) I have seen

Exhibit 27399 0300

children desist even before puberty in response to thoughtful parental interactions and a few meetings of the child with a therapist. There are now a series of articles and at least one major book on the psychological treatment of adolescents. (D'Angelo et al. 2021 at 7-16; Evans & Evans 2021.)

### (3)    The affirmation therapy model (model #4)

50.    While it is widely agreed that the therapist should not directly challenge a claimed transgender identity in a child, some advocates and practitioners go much further, and promote and recommend that any expression of transgender identity should be immediately accepted as decisive, and thoroughly affirmed by means of consistent use of clothing, toys, pronouns, etc., associated with transgender identity. They argue that the child should be comprehensively re-socialized in grade school in their aspired-to gender. As I understand it, this is asserted as a reason why male students who assert a female gender identity must be permitted to compete in girls' or women's athletic events. These advocates treat any question about the causes of the child's transgender identification as inappropriate. They may not recognize the child's ambivalence.  They assume that observed psychological co-morbidities in the children or their families are unrelated or will get better with transition, and need not be addressed by the MHP who is providing supportive guidance concerning the child's gender identity.

51.    Some advocates, indeed, assert that unquestioning affirmation of any claim of transgender identity in children is essential, and that the child will otherwise face a high risk of suicide or severe psychological damage. Dr. Adkins appears to follow this line, asserting that "My clinical experience . . . has been that [patients] suffer and experience worse health outcomes" when they are not permitted to enter all spaces and participate in all activities in a manner "consistent with gender identity." (Adkins at 9.) This claim is simply not supported by the clinical data we have available to us. Indeed, available long-term data contradicts Dr.

- 20 -

Adkins' claim. I address physical and mental health outcomes in Section VII below, and suicide in Section VIII below.

52.     Dr. Adkins also asserts that fully supported social transition is the "only treatment for prepubertal children." (Adkins at 6.) As I review in the next section, this is not correct. This may be the only treatment that Dr. Adkins considers, but my own conversations and contacts lead me to believe that Dr. James Cantor was correct when he wrote that "almost all clinics and professional associations in the world" do not use "gender affirmation" for prepubescent children and instead "delay any transitions after the onset of puberty." (Cantor 2019 at 1.)

53.     I do not know what proportion of practitioners are using which model. However, in my opinion, in the case of young children, prompt and thorough affirmation of a transgender identity disregards the principles of child development and family dynamics and is not supported by science. Instead of science, this approach is currently being reinforced by an echo-chamber of approval from other like-minded child-oriented professionals who do not sufficiently consider the known negative medical and psychiatric outcomes of trans adults. Rather than recommend social transition in grade school, the MHP must focus attention on the child's underlying internal and familial issues. Ongoing relationships between the MHP and the parents, and the MHP and the child, are vital to help the parents, child, other family members, and the MHP to understand over time the issues that need to be dealt with by each of them.

54.     Likewise, since the child's sense of gender develops in interaction with his parents and their own gender roles and relationships, the responsible MHP will almost certainly need to delve into family and marital dynamics.

0302

### III.   THERE IS NO CONSENSUS OR AGREED "STANDARD OF CARE" CONCERNING THERAPEUTIC APPROACHES TO CHILD OR ADOLESCENT GENDER DYSPHORIA.

55.     Dr. Adkins states that "[t]he only treatment to avoid [ ] serious harm is to recognize the gender identity of patients with gender dysphoria and follow appropriate treatment protocols to affirm gender identity and alleviate distress," and appears to believe that transition and affirmation of children who suffer from gender dysphoria is a generally accepted "standard of care." (Adkins at 5.) It is not.

56.     As I review in separate sections later, there is far too little firm clinical evidence in this field to permit any evidence-based standard of care. Given the lack of scientific evidence, it is neither surprising nor improper that—as I detailed in Section II—there is a diversity of views among practitioners as to as to the best therapeutic response for the child, adolescent, or young adult who suffers from gender dysphoria. Dr. Adkins is unwittingly confusing therapeutic precedent among those who agree with her views, armed with ideas promulgated by WPATH, with careful scientific documentation of her concepts. She presumes that her views have been scientifically established even though much has been published highlighting the lack of supportive definitive evidence.

57.     Reviewing the state of opinion and practice in 2021, the Royal Australian and New Zealand College of Psychiatrists observed that "There are polarised views and mixed evidence regarding treatment options for people presenting with gender identity concerns, especially children and young people." (RANZCP, 2021.) Similarly, a few years earlier prominent Dutch researchers noted: "[T]here is currently no general consensus about the best approach to dealing with the (uncertain) future development of children with GD, and making decisions that may influence the function and/or development of the child — such as social

Hill et al. 0303

transition." (Ristori & Steensma 2016 at 18.)[2] In this Section, I comment on some of the more important areas of disagreement within the field.

### A.  Experts and organizations disagree as to whether "distress" is a necessary element for diagnoses that justifies treatment for gender identity issues.

58.  As outlined in Section II.B above, "clinically significant distress" is one of the criteria used in DSM-5 to identify gender dysphoria. This indicates a heightened level of distress that rises beyond a threshold level of social awkwardness or discomfort with the changing body. It is known that many trans-identified youth with incongruence between their sexed bodies and their gender identity choose not to take hormones; their incongruence is quite tolerable as they further clarify their sexual identity elements. This population raises the questions of what distress is being measured when DSM-5 criteria are met and what else might be done about it.

59.  I note that there is no "clinically significant distress" requirement in World Health Organization's International Classification of Diseases (ICD-11) criteria for gender incongruence, which rather indicates "a marked and persistent incongruence between an individual´s experienced gender and the assigned sex." (World Health Organization 2019.)

60.  Therefore, even between these two committee-based authorities, there is a significant disagreement as to what constitutes a gender condition justifying life-changing interventions. To my knowledge, some American gender clinics and practitioners are essentially operating under the ICD-11 criteria rather than the APA's DSM-5 criteria, prescribing transition for children, hormonal interventions for slightly older children, and different hormones for adolescents who assert a desire for a transgender identity whether or not they are exhibiting "clinically significant distress." Others adhere to the DSM-5 diagnostic standard.

---

[2] *See also* Zucker 2020 which questions the merit of social transition as a first-line treatment.

61.     I will add that even from within one "school of thought," such as embodied by Dr. Adkins, it is not responsible to make a single, categorical statement about the proper treatment of children or adolescents presenting with gender dysphoria or other gender-related issues. There is no single pathway to the development of a trans identity and no reasonably uniform short- or long-term outcome of medically treating it. As individuals grow physically, mature psychologically, and experience or fail to experience satisfying romantic relationships, their life course depends on their differing psychological, social, familial, and life experiences. There should be no trust in assertions that trans identified youth must be treated in a particular manner to avoid harm for two reasons: first, there is no systematic data on the nature of, and the rate of harms of either affirmative treatment, no treatment, or psychological only treatment. Second, as in other youthful psychiatric and other challenges, outcomes vary.

**B.      Opinions and practices vary widely about the utilization of social transition for children and adolescents.**

62.     Dr. Adkins notes that she is a member of the World Professional Association for Transgender Health (WPATH), invokes a guidance document that that organization has chosen to publish under the title of "standards of care," and asserts that the WPATH Standards of Care are "widely accepted." (Adkins at 3, 5.) Below, I will provide some explanation of WPATH and its "Standards of Care," which are not the product of a strictly scientific organization, and are by no means accepted by all or even most practitioners as setting out best practices.

63.     Here, however, I will note that WPATH does not take a position concerning whether or when social transition may be appropriate for pre-pubertal children. Instead, the WPATH "Standards of Care" states that the question of social transition for children is a "controversial issue" and calls for mental health professionals to support families in what it describes as "difficult decisions" concerning social transition.

- 24 -

64.     Dr. Erica Anderson is a prominent practitioner in this area who identifies as a transgender woman, who was the first transgender president of USPATH, and who is a former board member of WPATH. Dr. Anderson recently resigned from those organizations and has condemned automatic approval of transition upon the request of a child or adolescent, noting that "adolescents . . . are notoriously susceptible to peer influence," that transition "doesn't cure depression, doesn't cure anxiety disorders, doesn't cure autism-spectrum disorder, doesn't cure ADHD," and instead that "a comprehensive biopsychosocial evaluation" should proceed allowing a child to transition. (Davis 2022.) And as I have explained previously, my own view based on 50 years of experience in this area favors strong caution before approving life-altering interventions such as social transition, puberty blockers, or cross-sex hormones.

**C.      The WPATH "Standards of Care" is not an impartial or evidence-based document.**

65.     Because WPATH is frequently cited by advocates of social, hormonal, and surgical transition, I provide some context concerning that private organization and its "Standards of Care."

66.     I was a member of the Harry Benjamin International Gender Dysphoria Association from 1974 until 2001. From 1997 through 1998, I served as the Chairman of the eight-person International Standards of Care Committee that issued the fifth version of the Standards of Care. I resigned my membership in 2002 due to my regretful conclusion that the organization and its recommendations had become dominated by politics and ideology, rather than by scientific process, as it was years earlier. In approximately 2007, the Harry Benjamin International Gender Dysphoria Association changed its name to the World Professional Association for Transgender Health.

PlaintiffExh27405 0306

67.     WPATH is a voluntary membership organization. Since at least 2002, attendance at its biennial meetings has been open to trans individuals who are not licensed professionals. While this ensures taking patients' needs into consideration, it limits the ability for honest and scientific debate, and means that WPATH can no longer be considered a purely professional organization.

68.     WPATH takes a decided view on issues as to which there is a wide range of opinion among professionals. WPATH explicitly views itself as not merely a scientific organization, but also as an advocacy organization. (Levine 2016 at 240.) WPATH is supportive to those who want sex reassignment surgery ("SRS"). Skepticism as to the benefits of SRS to patients, and strong alternate views, are not well tolerated in discussions within the organization or their educational outreach programs. Such views have been known to be shouted down and effectively silenced by the large numbers of nonprofessional adults who attend the organization's biennial meetings. Two groups of individuals that I regularly work with have attended recent and separate WPATH continuing education sessions. There, questions about alternative approaches were quickly dismissed with "There are none. This is how it is done." Such a response does not accurately reflect what is known, what is unknown, and the diversity of clinical approaches in this complex field.

69.     The Standards of Care ("SOC") document is the product of an effort to be balanced, but it is not politically neutral. WPATH aspires to be both a scientific organization and an advocacy group for the transgendered. These aspirations sometimes conflict. The limitations of the Standards of Care, however, are not primarily political. They are caused by the lack of rigorous research in the field, which allows room for passionate convictions on how to care for the transgendered. And, of course, once individuals have socially, medically, and surgically

- 26 -

0307

transitioned, WPATH members and the trans people themselves at the meetings are committed to supporting others in their transitions. Not only have some trans participants been distrustful or hostile to those who question the wisdom of these interventions, their presence makes it difficult for professionals to raise their concerns. Vocal trans rights advocates have a worrisome track record of attacking those who have alternative views. (Dreger 2015.)

70.     In recent years, WPATH has fully adopted some mix of the medical and civil rights paradigms. It has downgraded the role of counseling or psychotherapy as a requirement for these life-changing processes. WPATH no longer considers preoperative psychotherapy to be a requirement. It is important to WPATH that the person has gender dysphoria; the pathway to the development of this state is not. (Levine 2016 at 240.) The trans person is assumed to have thoughtfully considered his or her options before seeking hormones, for instance.

71.     Most psychiatrists and psychologists who treat patients suffering sufficiently severe distress from gender dysphoria to seek inpatient psychiatric care are not members of WPATH. Many psychiatrists, psychologists, and pediatricians who treat some patients suffering gender dysphoria on an outpatient basis are not members of WPATH. WPATH represents a self-selected subset of the profession along with its many non-professional members; it does not capture the clinical experiences of others. WPATH claims to speak for the medical profession; however, it does not welcome skepticism and therefore, deviates from the philosophical core of medical science. There are pediatricians, psychiatrists, endocrinologists, and surgeons who object strongly, on professional grounds, to transitioning children and providing affirmation in a transgender identity as the first treatment option. WPATH does not speak for all of the medical profession.

72.     In 2010 the WPATH Board of Directors issued a statement advocating that incongruence between sex and felt gender identity should cease to be identified in the DSM as a pathology.[3] This position was debated but not adopted by the (much larger) American Psychiatric Association, which maintained the definitions and diagnoses of gender dysphoria as a pathology in the DSM-5 manual issued in 2013.

73.     In my experience some current members of WPATH have little ongoing experience with the mentally ill, and many trans care facilities are staffed by MHPs who are not deeply experienced with recognizing and treating frequently associated psychiatric co-morbidities. Further, being a mental health professional, per se, does not guarantee experience and skill in recognizing and effectively intervening in serious or subtle patterns. Because the 7th version of the WPATH SOC deleted the requirement for therapy, trans care facilities that consider these Standards sufficient are permitting patients to be counseled to transition by means of social presentation, hormones, and surgery by individuals with masters rather than medical degrees.

**D.     Opinions and practices differ widely with respect to the proper role of psychological counseling before, as part of, or after a diagnosis of gender dysphoria.**

74.     In Version 7 of its Standards of Care, released in 2012, WPATH downgraded the role of counseling or psychotherapy, and the organization no longer sees psychotherapy without transition and hormonal interventions as a potential path to eliminate gender dysphoria by enabling a patient to return to or achieve comfort with the gender identity aligned with his or her biology.

---

[3] WPATH *De-Psychopathologisation Statement* (May 26, 2010), available at wpath.org/policies (last accessed January 21, 2020).

- 28 -

75.     Around the world, many prominent voices and practitioners disagree. For example, renowned gender therapists Dr. Laura Edwards-Leeper and Dr. Erica Anderson (who, as mentioned above, identifies as a transgender woman) have recently spoken out arguing that children and adolescents are being subjected to puberty blockers and hormonal intervention far too quickly, when careful and extended psychotherapy and investigation for potential causes of feelings of dysphoria (such as prior sexual abuse) should be the first port of call and might resolve the dysphoria. (Edwards-Leeper & Anderson 2021; Davis 2022.)

76.     In a recently published position statement on gender dysphoria, the Royal Australian and New Zealand College of Psychiatrists emphasized the critical nature of mental health treatment for gender dysphoric minors, stressing "the importance of the psychiatrist's role to undertake thorough assessment and evidence-based treatment ideally as part of a multidisciplinary team, especially highlighting co-existing issues which may need addressing and treating." The Royal College also emphasized the importance of assessing the "psychological state and context in which Gender Dysphoria has arisen," before any treatment decisions are made. (RANZCP, 2021.)

77.     Dr. Paul Hruz of the University of Washington St. Louis Medical School has noted, "The WPATH has rejected psychological counseling as a viable means to address sex–gender discordance with the claim that this approach has been proven to be unsuccessful and is harmful (Coleman et al. 2012). Yet the evidence cited to support this assertion, mostly from case reports published over forty years ago, includes data showing patients who benefited from this approach (Cohen-Kettenis and Kuiper 1984)." (Hruz 2020.)

Pltfs' Resp. 0310

E. **Opinions and practices vary widely with respect to the administration of puberty blockers and cross-sex hormones.**

78. There is likewise no broadly accepted standard of care with respect to use of puberty blockers. The WPATH Standards of Care explicitly recognize the lack of any consensus on this important point, stating: "Among adolescents who are referred to gender identity clinics, the number considered eligible for early medical treatment—starting with GnRH analogues to suppress puberty in the first Tanner stages—differs among countries and centers. Not all clinics offer puberty suppression. . . The percentages of treated adolescents are likely influenced by the organization of health care, insurance aspects, cultural differences, opinions of health professionals, and diagnostic procedures offered in different settings."

79. The use of puberty blockers as a therapeutic intervention for gender dysphoria is often justified by reference to the seminal work of a respected Dutch research team that developed a protocol that administered puberty blockers to children no younger than age 14. However, it is well known that many clinics in North America now administer puberty blockers to children at much younger ages than the "Dutch Protocol" allows. (Zucker 2019.) The Dutch protocol only treated children with these characteristics:  a stable cross gender identity from early childhood; dysphoria that worsened with the onset of puberty; were otherwise psychologically healthy; had healthy families; the patient and family agreed to individual and family counselling throughout the protocol. But the experience and results of the Dutch model is being used as a justification for giving puberty blockers to children who differ considerably from these criteria. Its authors have also recently noted this fact. (de Vries 2020.)

80. However, Zucker notes that "it is well known" that clinicians are administering cross-sex hormones, and approving surgery, at ages lower than the minimum age thresholds set by that "Dutch Protocol." (Zucker 2019 at 5.)

81.     Similarly, at least one prominent clinic—that of Dr. Safer at Columbia's Mt. Sinai Medical Center—is quite openly admitting patients for even *surgical* transition who are not eligible under the criteria set out in WPATH's Standards of Care. A recent study published by Dr. Safer and colleagues revealed that of a sample of 139 individuals, 45% were eligible for surgery "immediately" under the center's own criteria, while only 15% were eligible under WPATH's criteria. That is, *three times* as many patients immediately qualified for surgery under the center's loose standards than would have qualified under WPATH criteria. (Lichenstein et al. 2020.)

82.     Internationally, there has been a recent marked trend *against* use of puberty blockers, as a result of extensive evidence reviews by national medical bodies, which I discuss later. The main gender clinic in Sweden has declared that it will no longer authorize use of puberty blockers for minors below the age of 16. Finland has similarly reversed its course, issuing new guidelines that allow puberty blockers only on a case-by-case basis after an extensive psychiatric assessment. A landmark legal challenge against the UK's National Health Service in 2020 by "detransitioner" Keira Bell led to the suspension of the use of puberty blockers and new procedures to ensure better psychological care, as well as prompting a thorough evidence review by the National Institute for Health and Care Excellence (NICE 2021a; NICE 2021b).[4]

83.     In this country, some voices in the field are now publicly arguing that *no* comprehensive mental health assessment at all should be required before putting teens on puberty blockers or cross-sex hormones (Ghorayshi 2022), while Dr. Anderson and Dr.

---

[4] The decision requiring court approval for administration of hormones to any person younger than age 16 was later reversed on procedural grounds by the Court of Appeal and is currently under consideration by the UK Supreme Court.

Edwards-Leeper argue that U.S. practitioners are already moving too quickly to hormonal interventions. (Edwards-Leeper & Anderson 2021; Davis 2022.) It is evident that opinions and practices are all over the map.

84.     It is true that a committee of the American Academy of Pediatricians has issued a statement supporting administration of puberty blockers to children diagnosed with gender dysphoria. It is also true that no other American medical association has endorsed the use of puberty blockers, and that pediatricians are neither endocrinologists nor psychiatrists. Dr. James Cantor published a peer-reviewed paper detailing that the Academy's statement is not evidence-based and misdescribed the few scientific sources it did reference. (Cantor 2019.) It has been well noted in the field that the AAP has declined invitations to publish any rebuttal to Dr. Cantor's analysis. But this is all part of ongoing debate, simply highlighting the absence of any generally agreed standard of care.

85.     Dr. Adkins asserts that the Society's 2017 Practice Guidelines on Endocrine Treatment of Gender-Dysphoric/Gender-Incongruent Persons (Hembree et al. 2017) amount to "widely accepted standards of care" that were "developed through rigorous scientific processes." (Adkins at 2, 5 and 6.)

86.     Contrary to Dr. Adkins' assertion, the 2017 Endocrine Society Guidelines themselves expressly state that they are *not* "standards of care." The document states: "The guidelines cannot guarantee any specific outcome, *nor do they establish a standard of care*. The guidelines are not intended to dictate the treatment of a particular patient." (Hembree et al. 2017 at 3895 (emphasis added).) Nor do the Guidelines claim to be the result of a "rigorous scientific process." Rather, they expressly advise that their recommendations concerning use of puberty blockers are based only on "low quality" evidence.

- 32 -

87.     Dr. Adkins notes that the 2017 Guidelines assert that: "patients with gender dysphoria often must be treated with 'a safe and effective hormone regimen. . .'" (Adkins at 6.) Notably, however, the Guidelines do not make any firm statement that use of puberty blockers for this purpose *is* safe, and the Guidelines go no further than "suggest[ing]" use of puberty blockers—language the Guidelines warn represents only a "weak recommendation." (Hembree 2017 at 3872.) Several authors have pointed out that not only were the Endocrine Society suggestions regarding use of puberty blockers reached on the basis of "low quality" evidence, but its not-quite claims of 'safety' and 'efficacy' are starkly contradicted by several in-depth evidence reviews. (Laidlaw et al., 2019; Malone et al. 2021.) I detail these contradictory findings in more detail in Section VII below.

88.     While there is too little meaningful clinical data and no consensus concerning best practices or a "standard of care" this area, there are long-standing ethical principles that do or should bind all medical and mental health professionals as they work with, counsel, and prescribe for these individuals.

89.     One of the oldest and most fundamental principles guiding medical and psychological care—part of the Hippocratic Oath—is that the physician must "do no harm." This states an ethical responsibility that cannot be delegated to the patient. Physicians themselves must weigh the risks of treatment against the harm of not treating. If the risks of treatment outweigh the benefits,  principles of medical ethics prohibit the treatment.

## IV.     TRANSGENDER IDENTITY IS NOT BIOLOGICALLY BASED.

90.     Dr. Safer asserts that "Although the detailed mechanisms are unknown, there is a medical consensus that there is a significant biologic component underlying gender identity" and

that gender identity is a "largely biological phenomenon." (Safer at 5, 6.)  Many advocates of affirmative care assert this belief.

91.      However, it is not true. There is no medical consensus that transgender identity has any biological basis. Furthermore, there is considerable well-documented evidence that is inconsistent with the hypothesis of a biological basis for gender identity—at least in the large majority of currently-presenting patients.

**A.      No theory of biological basis has been scientifically validated.**

92.      At the outset, the attempt to identify a single "typically . . . biological" cause for psychiatric conditions (including gender dysphoria) has been strongly criticized as "out of step with the rest of medicine" and as a lingering "ghost" of an understanding of the nature of psychiatric conditions that is now broadly disproven. (Kendler 2019 at 1088-1089.) Gender dysphoria is defined and diagnosed only as a psychiatric, not a medical, condition.

93.      Nonetheless, in a published article, Dr. Safer has referred to data that he asserts supports the existence of "a fixed, biologic basis for gender identity." (Saraswat et al. 2015 at 199.) But on the contrary, this article itself states that studies attempting to find an association between genetics and transgender identification "have been contradictory," and that "no statistically significant association between particular genes [and transgender identity] has been described." (Saraswat 2015 at 202.)

94.      Similarly, while some have pointed to very small brain scan studies as evidence of a biological basis, no studies of brain structure of individuals identifying as transgender have found any statistically significant correlation between any distinct structure or pattern and transgender identification, after controlling for sexual orientation and exposure to exogenous hormones. (Sarawat et al. 2015 at 202; Frigerio et al. 2021.)

95.     Indeed, the Endocrine Society 2017 Guidelines recognizes: "With current knowledge, we cannot predict the psychosexual outcome for any specific child" and "there are currently no criteria to identify the GD/gender-incongruent children to whom this applies. At the present time, clinical experience suggests that persistence of GD/gender incongruence can only be reliably assessed after the first signs of puberty." (Hembree et al. 2017 at 3876.)

96.     In short, no biological test or measurement has been identified that provides any ability to predict which children will exhibit, and which children will persist in, gender dysphoria or a transgender identification. Unless and until such a test is identified, the theory of a biological basis is a hypothesis still searching for support. A hypothesis is not a fact, and responsible scientists will not confuse hypothesis with fact.

**B.      Large changes across time and geography in the epidemiology of transgender identification are inconsistent with the hypothesis of a biological basis for transgender identity.**

97.     In fact, there is substantial evidence that the "biological basis" theory is incorrect, at least with respect to the large majority of patients presenting with gender dysphoria today.

98.     **Vast changes in incidence:** Historically, there were very low reported rates of gender dysphoria or transgender identification. In 2013, the DSM-5 estimated the incidence of gender dysphoria in adults to be at 2-14 per 100,000, or between 0.002% and 0.014%. (APA 2013 at 454.) Recently however, these numbers have increased dramatically, particularly in adolescent populations. Recent surveys estimate that between 2-9% of high school students self-identify as transgender or "gender non-conforming." with a significantly large increase in adolescents claiming "nonbinary" gender identity as well. (Johns et al. 2019; Kidd et al. 2021.) Consistent with these surveys, gender clinics around the world have seen numbers of referrals increase rapidly in the last decade, with the Tavistock clinic in London seeing a 30-fold increase in the last decade (GIDS 2019), and similar increases being observed in Finland (Kaltiala-Heino

- 35 -

et al. 2018), the Netherlands (de Vries 2020), and Canada (Zucker 2019). The rapid change in the number of individuals experiencing gender dysphoria points to social and cultural, not biological, causes.

99.      **Large change in sex ratio:** In recent years there has been a marked shift in the sex ratio of patients presenting with gender dysphoria or transgender identification. The Tavistock clinic in London saw a ratio of 4 biological females(F):5 biological males(M) shift to essentially 11F:4M in a decade. (GIDS 2019.) One researcher summarizing multiple sources documented a swing of 1F:2M or 1F:1.4M through 2005 to 2F:1M generally (but as high as 7F:1M) in more recent samples. (Zucker 2019 at 2.) This phenomenon has been noted by Dr. Erica Anderson, who said: "The data are very clear that adolescent girls are coming to gender clinics in greater proportion than adolescent boys. And this is a change in the last couple of years. And it's an open question: What do we make of that? We don't really know what's going on. And we should be concerned about it." (Davis 2022.)  Again, this large and rapid change in who is experiencing gender dysphoria points to social, not biological, causes.

100.    **Clustering**: Dr. Littman's recent study documented "clustering" of new presentations of gender dysphoria among natal females in specific schools and among specific friend groups. This again points strongly to social causes for gender dysphoria at least among the adolescent female population. (Littman 2018.)

101.    **Desistance:** As I discuss later, there are very high levels of desistance among children diagnosed with gender dysphoria, as well as increasing (or at least increasingly vocal) numbers of individuals who first asserted a transgender identity during or after adolescence, underwent substantial medical interventions to "affirm" that trans-identity, and then "desisted"

- 36 -

and reverted to a gender identity congruent with their sex. (See Section V.B below.) These narratives, too, point to a social and/or psychological cause, rather than a biological one.

102.    **"Fluid" gender identification:** Advocates and some practitioners assert that gender identity is not binary, but can span an almost endless range of gender identity self-labels, which a given individual may try on, inhabit, and often discard. (A recent article identifies 72.[5]) I have not heard any theory offered for how there is or could be a biological basis for gender identity as now expansively defined.

103.    I frequently read attempts to explain away the points in this Section IV.  They include: these problems always existed, but children are now learning that there are effective treatments for their dilemma and are simply seeking them. And; children have hidden their trans identity throughout childhood and now that trans people are recognized and accepted, they are presenting themselves. And; now pediatricians realize that girls can have gender dysphoria and are referring them to gender clinics. But these are all mere hypotheses unsupported by concrete evidence. One set of unproven hypotheses cannot provide support for the unproven hypothesis of biological basis. And none of these hypotheses could even potentially explain the failure of science thus far to identify any predictive biological marker of transgender identification.

104.    **Therapies affect gender identity outcomes:** Finally, the evidence shows that therapeutic choices can have a powerful effect on whether and how gender identity does change, or gender dysphoria desists. Social transition of juveniles, for instance, strongly influences gender identity outcomes to such an extent that it has been described a "unique predictor of

---

[5] Allarakha, *What Are the 72 Other Genders?*, MedicineNet, available at:
https://www.medicinenet.com/what_are_the_72_other_genders/article.htm

persistence." (See Section V.B below.) Again, this observation cuts against the hypothesis of biological origin.

    **C.**    **Disorders of sexual development (or DSDs) and gender identity are very different phenomena, and it is an error to conflate the two.**

    105.    Dr. Adkins spends much of her report discussing individuals who suffer from disorders of sexual development (DSDs), apparently as evidence that sex is not binary or clearly defined, or as somehow supporting the idea that transgender identification has a biological basis. (Adkins at 9.) I have extensively detailed that sex is clear, binary, and determined at conception. (Section II.) Here I explain that gender dysphoria is an entirely different phenomenon than DSDs—which unlike transgender identity are indeed biological phenomena. It is an error to conflate the two distinct concepts.

    106.    Every DSD reflects a genetic enzymatic defect with negative anatomic and physiological consequences. As the Endocrine Society recognized in a 2021 statement: "Given the complexities of the biology of sexual determination and differentiation, it is not surprising that there are dozens of examples of variations or errors in these pathways associated with genetic mutations that are now well known to endocrinologists and geneticists; in medicine, these situations are generally termed *disorders of sexual development* (DSD) or *differences in sexual development*." Gender Identity on the other hand is uniformly defined as a subjective "sense" of being, a feeling or state of mind. (Section II.C.)

    107.    The vast majority of those who experience gender dysphoria or a transgender identity do not suffer from any DSD, nor from any genetic enzymatic disorder at all. Conversely, many who suffer from a DSD do not experience a gender identity different from their chromosomal sex (although some may). In short, those who suffer from gender dysphoria are not a subset of those who suffer from a DSD, nor are those who suffer from a DSD a subset of those

who suffer from gender dysphoria. The two are simply different phenomena, one physical, the other mental, defined only as a psychiatric condition. The issue here is not whether biological forces play a role in personality development; it is whether there is strong evidence that it is determinative. Science has come too far to revert to single explanations for gender dysphoria or any psychiatric diagnosis.

108.    The importance of this distinction is evident from the scientific literature. For example, in a recent study of clinical outcomes for gender dysphoric patients, Tavistock Clinic researchers *excluded* from their analysis any patients who did not have "normal endocrine function and karyotype consistent with birth registered sex." (Carmichael et al. 2021 at 4.) In other words, the researchers specifically *excluded* from their study anyone who suffered from genetic-based DSD, or a DSD comprising any serious defect in hormonal use pathways, in order to ensure the study was focused only on individuals experiencing the psychological effects of what we might call "ordinary" gender dysphoria.

> **D.    Studies of individuals born with DSDs suggest that there may be a biological predisposition towards *typical* gender identifications, but provide no support for a biological basis for *trans*gender identification.**

109.    Studies of individuals born with serious DSDs have been pointed to as evidence of a biological basis for transgender identification. They provide no such support.

110.    One well-known study by Meyer-Bahlburg reviewed the case histories of a number of XY (i.e. biologically male) individuals born with severe DSDs who were surgically "feminized" in infancy and raised as girls. (Meyer-Bahlburg 2005.) The majority of these individuals nevertheless later adopted male gender identity—suggesting a strong biological predisposition towards identification aligned with genetic sex, even in the face of feminized genitalia from earliest childhood, and parental "affirmation" in a transgender identity. But at the same time, the fact that some of these genetically male individuals did *not* later adopt male

gender identity serves as evidence that medical and social influences can indeed encourage and sustain transgender identification.

111.    Importantly, the Meyer-Bahlburg study did *not* include any individuals who were assigned a gender identity congruent with their genetic sex who subsequently adopted a *trans*gender identity. Therefore, the study can provide no evidence of any kind that supports the hypothesis of a biological basis for *trans*gender identity. A second study in this area (Reiner & Gearhart 2004) likewise considered exclusively XY subjects, and similarly provides evidence only for a biological bias towards a gender identity congruent with one's genetic sex, even in the face of medical and social "transition" interventions. None of this provides any evidence at all of a biological basis for transgender identity.

## V.    GENDER IDENTITY IS EMPIRICALLY NOT FIXED FOR MANY INDIVIDUALS.

112.    Dr. Safer states that gender identity is "durable and cannot be changed by medical intervention." (Safer at 5.)  Dr. Adkins likewise states that gender identity "cannot be voluntarily changed." (Adkins at 4.) There is extensive evidence that this is not correct. Instead, gender identity changes over time for many individuals.[6]  I summarize their two opinions as: they assert that a trans identity in a child or adolescent is immutable—unchangeable by medical, psychotherapeutic, or developmental processes.

### A.    Most children who experience gender dysphoria ultimately "desist" and resolve to cisgender identification.

113.    A distinctive and critical characteristic of juvenile gender dysphoria is that multiple studies from separate groups and at different times have reported that in the large

---

[6] See n1 *supra*.

- 40 -

majority of patients, absent a substantial intervention such as social transition or puberty blocking hormone therapy, it does *not* persist through puberty.

114.    A recent article reviewed all existing follow-up studies that the author could identify of children diagnosed with gender dysphoria (11 studies), and reported that "every follow-up study of GD children, without exception, found the same thing: By puberty, the majority of GD children ceased to want to transition." (Cantor 2019 at 1.) Another author reviewed the existing studies and reported that in "prepubertal boys with gender discordance . . . the cross gender wishes usually fade over time and do not persist into adulthood, with only 2.2% to 11.9% continuing to experience gender discordance." (Adelson et al. 2012 at 963; see also Cohen-Kettenis 2008 at 1895.) The Endocrine Society recognized this important baseline fact in its 2017 Guidelines. (Hembree 2017 at 3879.) It should be noted that the reason that the Dutch Protocol waited until age 14 to initiate puberty blockers was that it was well known that many children would desist if left free of hormonal intervention until that age.

115.    Findings of high levels of desistance among children who experience gender dysphoria or incongruence have been reaffirmed in the face of critiques through thorough reanalysis of the underlying data. (Zucker 2018.)

116.    As I explained in detail in Section IV above, it is not yet known how to distinguish those children who will desist from that small minority whose trans identity will persist.

117.    It does appear that prevailing circumstances during particularly formative years can have a significant impact on the outcome of a juvenile's gender dysphoria. A 2016 study reviewing the follow-up literature noted that "the period between 10 and 13 years" was "crucial" in that "both persisters and desisters stated that the changes in their social environment, the

anticipated and actual feminization or masculinization of their bodies, and the first experiences of falling in love and sexual attraction in this period, contributed to an increase (in the persisters) or decrease (in the desisters) of their gender related interests, behaviors, and feelings of gender discomfort." (Ristori & Steensma 2016 at 16.) As I discuss in Section VI below, there is considerable evidence that early transition and affirmation causes far more children to persist in a transgender identity.

**B.      Desistance is increasingly observed among teens and young adults who first manifest GD during or after adolescence.**

118.    Desistance within a relatively short period may also be a common outcome for post-pubertal youths who exhibit recently described "rapid onset gender disorder." I have observed an increasingly vocal online community of young women who have reclaimed a female identity after claiming a male gender identity at some point during their teen years, and young "detransitioners" (individuals in the process of reidentifying with their birth sex after having undergone a gender transition) are now receiving increasing attention in both clinical literature and social media channels. (It is my understanding that March 12, 2022, is scheduled to be Detransition Awareness Day.)

119.    Almost all scientific articles on this topic have appeared within the last few years. Perhaps this historic lack of coverage is not entirely surprising – one academic who undertook an extensive review of the available scientific literature in 2021 noted that the phenomenon was "socially controversial" in that it "poses significant professional and bioethical challenges for those clinicians working in the field of gender dysphoria." (Expósito Campos 2021 at 270.) This review reported on multifarious reasons for why individuals were motivated to detransition, which included coming to "understand[ ] how past trauma, internalized sexism, and other psychological difficulties influenced the experience of GD."

- 42 -

120.     In 2021, Lisa Littman of Brown University conducted a ground-breaking study of 100 teenage and young adults who had transitioned and lived in a transgender identity for a number of years, and then "detransitioned" or changed back to a gender identity matching their sex. Littman noted that the "visibility of individuals who have detransitioned is new and may be rapidly growing." (Littman 2021 at 1.) Of the 100 detransitioners included in Littman's study, 60% reported that their decision to detransition was motivated (at least in part) by the fact that they had become more comfortable identifying as their natal sex, and 38% had concluded that their gender dysphoria was caused by something specific such as trauma, abuse, or a mental health condition. (Littman 2021 at 9.)

121.     A significant majority (76%) did not inform their clinicians of their detransition. (Littman 2021 at 11.)

122.     A similar study that recruited a sample of 237 detransitioners (the large majority of whom had initially transitioned in their teens or early twenties) similarly reported that a common reason for detransitioning was the subject's conclusion that his or her gender dysphoria was related to other issues (70% of the sample). (Vandenbussche 2021.)

123.     The existence of increasing numbers of youth or young adult detransitioners has also been recently noted by Dr. Edwards-Leeper and Dr. Anderson. (Edwards-Leeper & Anderson 2021.) Edwards-Leeper and Anderson noted "the rising number of detransitioners that clinicians report seeing (they are forming support groups online)" which are "typically youth who experienced gender dysphoria and other complex mental health issues, rushed to medicalize their bodies and regretted it." Other clinicians working with detransitioners have also noted the recent phenomenon. (Marchiano 2020.)

124.     A growing body of evidence suggests that for many teens and young adults, a post-pubertal onset of transgender identification can be a transient phase of identity exploration, rather than a permanent identity, as evidenced by a growing number of young detransitioners (Entwistle 2020; Littman 2021; Vandenbussche 2021). Previously, the rate of detransition and regret was reported to be very low, although these estimates suffered from significant limitations and were likely undercounting true regret (D'Angelo 2018). As gender-affirmative care has become popularized, the rate of detransition appears to be accelerating.

125.     A recent study from a UK adult gender clinic observed that 6.9% of those treated with gender-affirmative interventions detransitioned within 16 months, and another 3.4% had a pattern of care suggestive of detransition, yielding a rate of probable detransition in excess of 10%. Another 21.7%, however, disengaged from the clinic without completing their treatment plan. While some of these individuals later re-engaged with the gender service, the authors concluded, "detransitioning might be more frequent than previously reported." (Hall et al. 2021).

126.     Another study from a UK primary care practice found that 12.2% of those who had started hormonal treatments either detransitioned or documented regret, while the total of 20% stopped the treatments for a wider range of reasons. The mean age of their presentation with gender dysphoria was 20, and the patients had been taking gender-affirming hormones for an average 5 years (17 months-10 years) prior to discontinuing. Comparing these much higher rates of treatment discontinuation and detransition to the significantly lower rates reported by the older studies, the researchers noted: "Thus, the detransition rate found in this population is novel and questions may be raised about the phenomenon of overdiagnosis, overtreatment, or iatrogenic harm as found in other medical fields" (Boyd et al. 2022 at 15.) Indeed, given that regret may take up to 8-11 years to materialize (Dhejne et al., 2014; Wiepjes et al., 2018), many more

detransitioners are likely to emerge in the coming years. Detransitioner research is still in its infancy, but the Littman and Vandenbussche studies in 2021 both report that detransitioners from the recently transitioning cohorts feel they were rushed into medical gender-affirmative interventions with irreversible effects, often without the benefit of appropriate, or in some instances any, psychologic exploration.

## VI.   TRANSITION AND AFFIRMATION IS AN IMPORTANT PSYCHOLOGICAL AND MEDICAL INTERVENTION THAT CHANGES GENDER IDENTITY OUTCOMES.

### A.   If both a typical gender or a transgender long-term gender identity outcome are possible for a particular patient, the alternatives are not medically neutral.

127.    Where a juvenile experiences gender dysphoria, the gender identity that is stabilized will have a significant impact on the course of their life. Living in a transgender identity for a time will make desistance, if it is ever considered, more difficult to accomplish.

128.    If the juvenile desists from the gender dysphoria and becomes reasonably comfortable with a gender identity congruent with their sex—the most likely outcome from a statistical perspective absent affirming intervention—the child will not require ongoing pharmaceutical maintenance and will not have their fertility destroyed post-puberty.

129.    However, if the juvenile persists in a transgender identity, under current practices, the child is most likely to require regular administration of hormones for the rest of their lives, exposing them to significant physical, mental health, and relational risks (which I detail in Section IX below), as well as being irreversibly sterilized chemically and/or surgically. The child is therefore rendered a "patient for life" with complex medical implications further to a scientifically unproven course of treatment.

**B.**   **Social transition of young children is a powerful psychotherapeutic intervention that radically changes outcomes, almost eliminating desistance.**

130.   Dr. Adkins asserts that social transition is a "a critical part" of the treatment of gender dysphoria. (Adkins at 6, 7). Rather, social transition has a critical *effect* on the persistence of gender dysphoria. It is evident from the scientific literature that engaging in therapy that encourages social transition before or during puberty—which would include participation on athletic teams designated for the opposite sex—is a psychotherapeutic intervention that dramatically changes outcomes. A prominent group of authors has written that "The gender identity affirmed during puberty appears to predict the gender identity that will persist into adulthood." (Guss et al. 2015 at 421.) Similarly, a comparison of recent and older studies suggests that when an "affirming" methodology is used with children, a substantial proportion of children who would otherwise have desisted by adolescence—that is, achieved comfort identifying with their natal sex—instead persist in a transgender identity. (Zucker 2018 at 7.)

131.   Indeed, a review of multiple studies of children treated for gender dysphoria across the last three decades found that early social transition to living as the opposite sex severely reduces the likelihood that the child will revert to identifying with the child's natal sex, at least in the case of boys. That is, while, as I review above, studies conducted before the widespread use of social transition for young children reported desistance rates in the range of 80-98%, a more recent study reported that fewer than 20% of boys who engaged in a partial or complete social transition before puberty had desisted when surveyed at age 15 or older. (Zucker 2018 at 7[7]; Steensma et al. 2013.)[8] Another researcher observed that a partial or complete gender

---

[7] Zucker found social transition by the child to be strongly correlated with persistence for natal boys, but not for girls. (Zucker 2018 at 5.)

[8] Only 2 (3.6%) of 56 of the male desisters observed by Steensma et al. had made a complete or partial transition prior to puberty, and of the twelve males who made a complete or

social transition prior to puberty "proved to be a unique predictor of persistence." (Singh et al. 2021 at 14.)

132.    Some vocal practitioners of prompt affirmation and social transition even proudly claim that essentially *no* children who come to their clinics exhibiting gender dysphoria or cross-gender identification desist in that identification and return to a gender identity consistent with their biological sex.[9] This is a very large change as compared to the desistance rates documented apart from social transition.

133.    Even voices generally supportive of prompt affirmation and social transition are acknowledging a causal connection between social transition and this change in outcomes. As the Endocrine Society recognized in its 2017 Guidelines: "If children have completely socially transitioned, they may have great difficulty in returning to the original gender role upon entering puberty. . . [S]ocial transition (in addition to GD/gender incongruence) has been found to contribute to the likelihood of persistence." (Hembree et al. 2017 at 3879.) The fact is that these unproven interventions with the lives of kids and their families have systematically documented outcomes. Given this observed phenomenon, I agree with Dr. Ken Zucker who has written that social transition in children must be considered "a form of psychosocial treatment."  (Zucker 2020 at 1.)

134.    Moreover, as I review below, social transition cannot be considered or decided alone. Studies show that engaging in social transition starts a juvenile on a "conveyor belt" path

_____

partial transition prior to puberty, only two had desisted when surveyed at age 15 or older. Steensma 2013 at 584.

    [9] *See, e.g.,* Ehrensaft 2015 at 34: "In my own clinical practice . . . of those children who are carefully assessed as transgender and who are allowed to transition to their affirmed gender, we have no documentation of a child who has 'desisted' and asked to return to his or her assigned gender."

- 47 -

that almost inevitably leads to the administration of puberty blockers, which in turn almost inevitably leads to the administration of cross-sex hormones. The emergence of this well-documented path means that the implications of taking puberty blockers *and* cross-sex hormones must be taken into account even where "only" social transition is being considered or requested by the child or family. As a result, there are a number of important "known risks" associated with social transition.

C.      **Administration of puberty blockers is a powerful medical and psychotherapeutic intervention that radically changes outcomes, almost eliminating desistance on the historically observed timeline.**

135.    Dr. Adkins speaks of the use of puberty blockers as though this major hormonal disruption of some of the most basic aspects of ordinary human development were entirely benign, acting as a "pause." (Adkins at 7.) This optimistic view is not based on science. In fact, it should be understood that puberty blockers are usually administered to early-stage adolescents as part of a path that includes social transition. Moreover, medicine does not know what the long-term health effects on bone, brain, and other organs are of a "pause" between ages 11-16. Medicine also does not know if the long-term effects of these compounds are different in boys than in girls.  The mental health professional establishment likewise does not know the long-term effects on coping skills, interpersonal comfort, and intimate relationships of this "pause" while one's peers are undergoing their maturational gains in these vital arenas of future mental health. I address medical, social, and mental health risks associated with the use of puberty blockers in Section IX. Here, I note that the data strongly suggests that the administration of puberty blockers, too, must be considered to be a component of a "psychosocial treatment" with complex implications, rather than a "pause."

136.    Multiple studies show that the large majority of children who begin puberty blockers go on to receive cross-sex hormones. (de Vries 2020 at 2.) A recent study by the

Tavistock and Portman NHS Gender Identity Development Service (UK)—the world's largest gender clinic—found that 98% of adolescents who underwent puberty suppression continued on to cross-sex hormones. (Carmichael et al 2021 at 12.)[10]

137.    These studies demonstrate that going on puberty blockers virtually eliminates the possibility of desistance in juveniles. Rather than a "pause," puberty blockers appear to act as a psychosocial "switch," decisively shifting many children to a persistent transgender identity. Therefore, as a practical and ethical matter the decision to put a child on puberty blockers must be considered as the equivalent of a decision to put that child on cross-sex hormones, with all the considerations and informed consent obligations implicit in that decision.

## VII.    TRANSITION AND AFFIRMATION ARE EXPERIMENTAL THERAPIES THAT HAVE NOT BEEN SHOWN TO IMPROVE MENTAL OR PHYSICAL HEALTH OUTCOMES BY YOUNG ADULTHOOD.

138.    It is undisputed that children and adolescents who present with gender dysphoria exhibit a very high level of mental health comorbidities. (Section II.C.) Whether the gender dysphoria is cause or effect of other diagnosed or undiagnosed mental health conditions, or whether these are merely coincident comorbidities, is hotly disputed, but the basic fact is not.

139.    Dr. Adkins asserts that when the "transition, affirmation, and hormones" therapy that she advocates is followed, "gender dysphoria is easily managed" (Adkins at 5), implying that transition and hormone therapy have been proven to be effective in relieving gender dysphoria and the general mental health distress that broadly afflicts these children and adolescents. This is scientifically incorrect. It ignores both what is known and what is unknown.

---

[10] *See also* Brik 2020 where Dutch researchers found nearly 97% of adolescents who received puberty blockers proceeded to cross-sex hormones.

- 49 -

PageID 0330

**A.**    **The knowledge base concerning therapies for gender dysphoria is "very low quality."**

140.    At the outset, it is important for all sides to admit that the knowledge base concerning the causes and treatment of gender dysphoria has low scientific quality.

141.    In evaluating claims of scientific or medical knowledge, it is axiomatic in science that no knowledge is absolute, and to recognize the widely accepted hierarchy of reliability when it comes to "knowledge" about medical or psychiatric phenomena and treatments. Unfortunately, in this field opinion is too often confused with knowledge, rather than clearly locating what exactly is scientifically known. In order of increasing confidence, such "knowledge" may be based upon data comprising:

a.    Expert opinion—it is perhaps surprising to educated laypersons that expert opinion standing alone is the lowest form of knowledge, the least likely to be proven correct in the future, and therefore does not garner as much respect from professionals as what follows;

b.    A single case or series of cases (what could be called anecdotal evidence) (Levine 2016 at 239.);

c.    A series of cases with a control group;

d.    A cohort study;

e.    A randomized double-blind clinical trial;

f.    A review of multiple trials;

g.    A meta-analysis of multiple trials that maximizes the number of patients treated despite their methodological differences to detect trends from larger data sets.

142.    Prominent voices in the field have emphasized the severe lack of scientific knowledge in this field. The American Academy of Child and Adolescent Psychiatry has

recognized that "Different clinical approaches have been advocated for childhood gender

discordance. . . . There have been no randomized controlled trials of any treatment. . . . [T]he

proposed benefits of treatment to eliminate gender discordance … must be carefully weighed

against … possible deleterious effects." (Adelson et al. at 968–69.) Similarly, the American

Psychological Association has stated, "because no approach to working with [transgender and

gender nonconforming] children has been adequately, empirically validated, consensus does not

exist regarding best practice with pre-pubertal children." (APA 2015 at 842.)

143.    Critically, "there are no randomized control trials with regard to treatment of

children with gender dysphoria." (Zucker 2018 at 8.) On numerous critical questions relating to

cause, developmental path if untreated, and the effect of alternative treatments, the knowledge

base remains primarily at the level of the practitioner's exposure to individual cases, or multiple

individual cases. As a result, claims to certainty are not justifiable. (Levine 2016 at 239.)

144.    Within the last two years, at least three formal evidence reviews concerning

hormonal interventions for gender dysphoria have been conducted. All three found all of the

available clinical evidence to be very low quality.

145.    The British National Health Service (NHS) commissioned formal "evidence

reviews" of all clinical papers concerning the efficacy and safety of puberty blockers and cross-

sex hormones as treatments for gender dysphoria. These evidence reviews were performed by the

U.K. National Institute for Health and Care Excellence (NICE), applying the respected

"GRADE" criteria for evaluating the strength of clinical evidence.

146.    Both the review of evidence concerning puberty blockers and the review of

evidence concerning cross-sex hormones were published in 2020, and both found that *all*

available evidence as to both efficacy and safety was "very low quality" according to the

GRADE criteria. (NICE 2021a; NICE 2021b.) "Very low quality" according to GRADE means there is a high likelihood that the patient *will not experience* the hypothesized benefits of the treatment. (Balshem et al. 2011.)

147.     Similarly, the highly respected Cochrane Library—the leading source of independent systematic evidence reviews in health care—commissioned an evidence review concerning the efficacy and safety of hormonal treatments now commonly administered to "transitioning transgender women" (i.e., testosterone suppression and estrogen administration to biological males). That review, also published in 2020, concluded that "We found insufficient evidence to determine the efficacy or safety of hormonal treatment approaches for transgender women in transition." (Haupt et al. 2020 at 2.) It must be understood that both the NICE and the Cochrane reviews considered *all* published scientific studies concerning these treatments.

148.     As to social transition, as I have noted above, considerable evidence suggests that socially transitioning a pre-pubertal child puts him or her on a path from which very few children escape—a path which includes puberty blockers and cross-sex hormones before age 18. As a practical matter, then, a decision about social transition for a child must be made in light of what is known and what is unknown about the effects of those expected hormonal interventions.

149.     I discuss safety considerations in Section IX below. Here, I detail what is known about the effectiveness of social and hormonal transition and affirmation to improve the mental health of individuals diagnosed with gender dysphoria.

**B.     Youth who adopt a transgender identity show no durable improvement in mental health after social, hormonal, or surgical transition and affirmation.**

150.     As I noted above, the evidence reviews for the efficacy and safety of hormonal interventions published in 2020 concluded that the supporting evidence is so poor that there is "a

high likelihood that the patient will not experience the hypothesized benefits of the treatment." There is now some concrete evidence that on average they do not experience those benefits.

151.    An important paper published in 2021 by Tavistock clinic clinicians provided the results of the first longitudinal study that measured widely used metrics of general psychological function and suicidality before commencement of puberty blockers, and then at least annually after commencing puberty blockers. After up to three years, they "found no evidence of change in psychological function with GnRHa treatment as indicated by parent report (CBCL) or self-report (YSR) of overall problems, internalizing or externalizing problems or self-harm" as compared to the pre-puberty-blocker baseline evaluations. "Outcomes that were not formally tested also showed little change." (Carmichael at al. 2021 at 18-19.) Similarly, a study by Branström and Pachankis of the case histories of a set of individuals diagnosed with GD in Sweden found no positive effect on mental health from hormonal treatment. (Landen 2020.)

152.    A cohort study by authors from Harvard and Boston Children's Hospital found that youth and young adults (ages 12-29) who self-identified as transgender had an elevated risk of depression (50.6% vs. 20.6%) and anxiety (26.7% vs. 10.0%); a higher risk of suicidal ideation (31.1% vs. 11.1%), suicide attempts (17.2% vs. 6.1%), and self-harm without lethal intent (16.7% vs. 4.4%) relative to the matched controls; and a significantly greater proportion of transgender youth accessed inpatient mental health care (22.8% vs. 11.1%) and outpatient mental health care (45.6% vs. 16.1%) services. (Reisner et al. 2015 at 6.) Similarly, a recent longitudinal study of transgender and gender diverse youth and young adults in Chicago found rates of alcohol and substance abuse "substantially higher than those reported by large population-based studies of youth and adults." (Newcomb et al. 2020 at 14.) Members of the clinical and research team at the prominent Dutch VU University gender dysphoria center recently compared mental

health metrics of two groups of subjects before (mean age 14.5) and after (mean age 16.8) puberty blockers. But they acknowledged that the structure of their study meant that it "can . . . not provide evidence about . . . long-term mental health outcomes," and that based on what continues to be extremely limited scientific data, "Conclusions about the long-term benefits of puberty suppression should . . . be made with extreme caution." In other words, we just don't know. (van der Miesen et al. 2020 at 703.)

153.    Kiera Bell, who was diagnosed with gender dysphoria at the Tavistock Clinic, given cross-sex hormones, and subjected to a mastectomy, before desisting and reclaiming her female gender identity, and a Swedish teen girl who appeared in a recent documentary after walking that same path, have both stated that they feel that they were treated "like guinea pigs," experimental subjects. They are not wrong.

**C.    Long-term mental health outcomes for individuals who persist in a transgender identity are poor.**

154.    The responsible MHP cannot focus narrowly on the short-term happiness of the young patient, but must instead consider the happiness and health of the patient from a "life course" perspective. When we look at the available studies of individuals who continue to inhabit a transgender identity across adult years, the results are strongly negative.

155.    In the United States, the death rates of trans veterans are comparable to those with schizophrenia and bipolar diagnoses—20 years earlier than expected. These crude death rates include significantly elevated rates of substance abuse as well as suicide. (Levine 2017 at 10.) Similarly, researchers in Sweden and Denmark have reported on almost all individuals who underwent sex-reassignment surgery over a 30-year period. (Dhejne et al. 2011; Simonsen et al. 2016.) The Swedish follow-up study similarly found a suicide rate in the post-SRS population

19.1 times greater than that of the controls; both studies demonstrated elevated mortality rates from medical and psychiatric conditions. (Levine 2017 at 10.)

156.    A recent study in the American Journal of Psychiatry reported high mental health utilization patterns of adults for ten years after surgery for approximately 35% of patients. (Bränström & Panchankis, 2020.) Indeed, earlier Swedish researchers in a long-term study of all patients provided with SRS over a 30-year period (median time since SRS of > 10 years) concluded that individuals who have SRS exhibit such poor mental health that they should be provided very long-term psychiatric care as the "final" transition step of SRS. (Dhejne et al. 2011, at 6-7.) Unfortunately, across the succeeding decade, in Sweden and elsewhere their suggestion has been ignored.

157.    I will note that these studies do not tell us whether the subjects first experienced gender dysphoria as children, adolescents, or adults, so we cannot be certain how their findings apply to each of these subpopulations which represent quite different pathways. But in the absence of knowledge, we should be cautious.

158.    Meanwhile, no studies show that affirmation of pre-pubescent children or adolescents leads to more positive outcomes (mental, physical, social, or romantic) by, e.g., age 25 or older than does "watchful waiting" or ordinary therapy.

159.    The many studies that I have cited here warn us that as we look ahead to the patient's life as a young adult and adult, the prognosis for the physical health, mental health, and social well-being of the child or adolescent who transitions to live in a transgender identity is not good. Gender dysphoria is not "easily managed" when one understands the marginalized, vulnerable physical, social, and psychological status of adult trans populations.

## VIII.   TRANSITION AND AFFIRMATION DO NOT DECREASE, AND MAY INCREASE, THE RISK OF SUICIDE.

### A.   The risk of suicide among transgender youth is confused and exaggerated in the public mind.

160.   While suicide is closely linked to mental health, I comment on it separately because rhetoric relating to suicide figures so prominently in debates about responses to gender dysphoria.

161.   At the outset, I will note that any discussion of suicide when considering younger children involves very long-range and very uncertain prediction. Suicide in pre-pubescent children is extremely rare, and the existing studies of gender identity issues in pre-pubescent children do not report significant incidents of suicide. Any suggestion otherwise is misinformed. Our focus for this topic, then, is on adolescents and adults.

162.   Some authors have reported rates of suicidal thoughts and behaviors among trans-identifying teens or adults ranging from 25% to as high as 52%, generally through non-longitudinal self-reports obtained from non-representative survey samples. (Toomey et al. 2018.) Dr. Adkins asserted in her declaration submitted in support of Plaintiff's preliminary injunction motion that "Attempted suicide rates in the transgender community are over 40%," and that "[t]he only treatment to avoid this serious harm is to . . . affirm gender identity." (Adkins at 6.) Contrary to these assertions, no studies show that affirmation of children (or anyone else) reduces suicide, prevents suicidal ideation, or improves long-term outcomes, as compared to either a "watchful waiting" or a psychotherapeutic model of response, as I have described above. Rhetorical references to figures such as 40%—and some published studies—confuse suicidal thoughts and actions that represent a cry for help, manipulation, or expression of rage with serious attempts to end life. Such statements or studies ignore a crucial and long-recognized distinction.

- 56 -

163.   I have included suicidality in my discussion of mental health above. Here, I focus on actual suicide. Too often, in public comment suicidal thoughts are blurred with suicide. Yet the available data tells us that suicide among children and youth suffering from gender dysphoria is extremely rare.

164.   An important new analysis of data covering patients as well as those on the waiting list (and thus untreated) at the UK Tavistock gender clinic—the world's largest gender clinic—found a total of only four completed suicides across 11 years' worth of patient data, reflecting an estimated cumulative 30,000 patient-years spent by patients under the clinic's care or on its waiting list. This corresponded to an annual suicide rate of 0.013%. The proportion of individual patients who died by suicide was 0.03%, which is orders of magnitude smaller than trans adolescents who self-report suicidal behavior or thoughts on surveys. (Biggs 2022b.)

165.   Thus, only a minute fraction of trans-identifying adolescents who report thoughts or conduct considered to represent "suicidality" actually commit suicide. I agree with the statement by Dr. Zucker that the assertion by, for example, Karasic and Ehrensaft (2015) that completed suicides among transgender youth are "alarmingly high" "has no formal and systematic empirical basis." (Zucker 2019 at 3.)

166.   Professor Biggs of Oxford, author of the study of incidence of suicide among Tavistock clinic patients, rightly cautions that it is "irresponsible to exaggerate the prevalence of suicide." (Biggs 2022b at 4.) It is my opinion that telling parents—or even allowing them to believe from their internet reading—that they face a choice between "a live son or a dead daughter" is both factually wrong and unethical. Informed consent requires clinicians to tell the truth and ensure that their patients understand the truth. To be kind, the clinicians who believe

- 57 -

such figures represent high risk of ultimate suicide in adolescence simply do not know the truth; they are ill-informed.

**B.     Transition of any sort has not been shown to reduce levels of suicide.**

167.    Every suicide is a tragedy, and steps that reduce suicide should be adopted. I have noted above that suicidality (that is, suicidal thoughts or behaviors, rather than suicide) is common among transgender adolescents and young adults before, during, and after social and medical transition. If a medical or mental health professional believes that an individual he or she is diagnosing or treating for gender dysphoria presents a suicide risk, in my view it is unethical for that professional merely to proceed with treatment for gender dysphoria and hope that "solves the problem." Rather, that professional has an obligation to provide or refer the patient for evidence-based therapies for addressing depression and suicidal thoughts that are well-known to the profession. (Levine 2016 at 242.)

168.    This is all the more true because there is in fact no evidence that social and/or medical transition reduces the risk or incidence of actual suicide. On the contrary, in his analysis of those who were patients of or on the waiting list of the Tavistock clinic, Professor Biggs found that the suicide rate was not higher among those on the clinic's waiting list (and thus as-yet untreated), than for those who were patients under care. (Biggs 2022b.) And as corrected, Bränström and Pachankis similarly acknowledge that their review of records of GD patients "demonstrated no advantage of surgery in relation to . . . hospitalizations following suicide attempts." (I assume for this purpose that attempts that result in hospitalization are judged to be so serious as to predict a high rate of future suicide if not successfully addressed.")[11]

---

[11] Turban et al. (2020) has been described in press reports as demonstrating that administration of puberty suppressing hormones to transgender adolescents reduces suicide or suicidal ideation. The paper itself does not make that claim, nor permit that conclusion.

C.     **Long-term life in a transgender identity correlates with very high rates of completed suicide.**

169.    As with mental health generally, the patient, parent, or clinician fearing the risk of suicide must consider not just the next month or year, but a life course perspective.

170.    There are now four long-term studies that analyze <u>completed suicide</u> among those living in transgender identities into adulthood. The results vary significantly, but are uniformly highly negative.

171.    Dhejne reported a long-term follow-up study of subjects after sex reassignment surgery. Across the multi-year study, subjects who had undergone SRS committed suicide at 19.1 times the expected rate compared to general population controls matched by age and both sexes. MtF subjects committed suicide at 13.9 times the expected rate, and FtM subjects committed suicide at 40.0 times the expected rate. (Dhejne et al. 2011 Supplemental Table S1.)

172.    Asscheman, also writing in 2011, reported results of a long-term follow-up of all transsexual subjects of the Netherlands' leading gender medicine clinic who started cross-sex hormones before July 1, 1997, a total of 1331 patients. Due to the Dutch system of medical and death records, extensive follow-up was achieved. Median follow-up period was 18.5 years. The mortality rate among MtF patients was 51% higher than among the age-matched general population; the rate of completed suicide among MtF patients was six times that of the age-matched general population. (Asscheman et al. 2011.)

173.    Importantly, Asscheman et al. found that "No suicides occurred within the first 2 years of hormone treatment, while there were six suicides after 2-5 years, seven after 5-10 years, and four after more than 10 years of CSH treatment at a mean age of 41.5 years." (Asscheman et al. 2011 at 637-638.) This suggests that studies that follow patients for only a year or two after treatment are insufficient. Asscheman et al.'s data suggest that such short-term follow-up is

engaging only with an initial period of optimism, and will simply miss the feelings of disillusion and the increase in completed suicide that follows in later years.

174.     A retrospective, long-term study published in 2020 of a very large cohort (8263) of patients referred to the Amsterdam University gender clinic between 1972 and 2017 found that the annual rate of completed suicides among the transgender subjects was "three to four times higher than the general Dutch population." "[T]he incidence of observed suicide deaths was almost equally distributed over the different stages of treatment." The authors concluded that "vulnerability for suicide occurs similarly in the different stages of transition." (Wiepjes et al. 2020.) In other words, neither social nor medical transition reduced the rate of suicide.

175.     As with Asscheman et al., Wiepjes et al. found that the median time between start of hormones and suicide (when suicide occurred) was 6.1 years for natal males, and 6.9 years for natal females. Again, short- or even medium-term studies will miss this suicide phenomenon.

176.     A 2021 study analyzed the case histories of a cohort of 175 gender dysphoria patients treated at one of the seven UK adult gender clinics who were "discharged" (discontinued as patients) within a selected one-year period. The authors reported the rather shocking result that 7.7% (3/39) of natal males who were diagnosed and admitted for treatment, and who were between 17 and 24 years old, were "discharged" because they committed suicide *during* treatment. (Hall et al. 2021, Table 2.)

177.     None of these studies demonstrates that the hormonal or surgical intervention *caused* suicide. That is possible, but as we have seen, the population that identifies as transgender suffers from a high incidence of comorbidities that correlate with suicide. What these studies demonstrate—at the least—is that this remains a troubled population in need of extensive and careful psychological care that they generally do not receive, and that neither

Vineyard 0341

hormonal nor surgical transition and "affirmation" resolve their underlying problems and put them on the path to a stable and healthy life.

178.     In sum, claims that affirmation will reduce the risk of suicide for children and adolescents are not based on science. Instead, transition of any sort must be justified, if at all, as a life-enhancing measure, not a lifesaving measure. (Levine 2016 at 242.) In my opinion, this is an important fact that patients, parents, and even many MHPs fail to understand.

## IX.     HORMONAL INTERVENTIONS ARE EXPERIMENTAL PROCEDURES THAT HAVE NOT BEEN PROVEN SAFE.

179.     Dr. Adkins also appears to assert as a fact—but without citation to peer-reviewed literature—that social transition, puberty blockers, and cross-sex hormones are known to be "safe." (Adkins at 5-6, 8.) This is not true. And Dr. Adkins, along with a number of voices in the field, also asserts that puberty blockers act merely as a "pause" in the process of puberty-driven maturation, suggesting that this hormonal intervention has been proven to be fully reversible. This is also an unproven belief.

180.     On the contrary, no studies have been done that meaningfully demonstrate that either puberty blockers or cross-sex hormones, as prescribed for gender dysphoria, are safe in other than the short run. No studies have attempted to determine whether the effects of puberty blockers, as currently being prescribed for gender dysphoria, are fully reversible. Neither Dr. Adkins nor Dr. Safer cites any such studies, and there are none. There are only pronouncements. In fact, there are substantial reasons for concern that these hormonal interventions are not safe. Multiple researchers have expressed concern that the full range of possible harms have not even been correctly conceptualized.

181.     Because, as I have explained in Section VI, recent evidence demonstrates that pre-pubertal social transition almost always leads to progression on to puberty blockers which in turn

almost always leads to the use of cross-sex hormones, physicians bear the ethical responsibility for a thorough informed consent process for parents and patients that includes this fact and its full implications. Informed consent does not mean sharing with the parents and patients what the doctor believes: it means sharing what is known and what is not known about the intervention. So much of what doctors believe is based on mere trust in what they have been taught. Neither they themselves nor their teachers may be aware of the scientific foundation and scientific limitations of what they are recommending.

A.   **Use of puberty blockers has not been shown to be safe or reversible for gender dysphoria.**

182.   As I noted above, the recent very thorough literature review performed for the British NHS concluded that *all* available clinical evidence relating to "safety outcomes" from administration of puberty blockers for gender dysphoria is of "very low certainty." (NHS 2020a at 6.)

183.   In its 2017 Guidelines, the Endocrine Society cautioned that "in the future we need more rigorous evaluations of the effectiveness <u>and safety</u> of endocrine and surgical protocols" including "careful assessment of . . . the effects of prolonged delay of puberty in adolescents on bone health, gonadal function, and the brain (including effects on cognitive, emotional, social, and sexual development)." (Hembree et al. 2017 at 3874.) No such "careful" or "rigorous" evaluation of these very serious safety questions has yet been done.

184.   Some advocates appear to assume that puberty blockers are "safe" because they have been approved by the Food and Drug Administration (FDA) for use to treat precocious puberty—a rare condition in which the puberty process may start at eight or younger. No such conclusion can be drawn. As the "label" for Lupron (one of the most widely prescribed puberty blockers) explains, the FDA approved the drug only *until* the "age was appropriate for entry into

- 62 -

puberty." The study provides no information at all as to the safety or reversibility of instead *blocking* healthy, normally-timed puberty's beginning, and *throughout* the years that body-wide continuing changes normally occur. Given the physical, social, and psychological dangers to the child with precocious puberty, drugs like Lupron are effective in returning the child to a puerile state without a high incidence of significant side effects—that is, they are "safe" to reverse the condition. But use of drugs to suppress normal puberty has multiple organ system effects whose long-term consequences have not been investigated.

185.    **Fertility**: The Endocrine Society Guidelines rightly say that research is needed into the effect of puberty blockade on "gonadal function" and "sexual development." The core purpose and function of puberty blockers is to prevent the maturation of the ovaries or testes, the sources of female hormones and male hormones when stimulated by the pituitary gland. From this predictable process fertility is accomplished within a few years. Despite widespread assertions that puberty blockers are "fully reversible," there has been no study published on the critical question of whether patients ever develop normal levels of fertility if puberty blockers are terminated after a "prolonged delay of puberty." The 2017 Endocrine Society Guidelines are correct that are no data on achievement of fertility "following prolonged gonadotropin suppression" (that is, puberty blockade). (Hembree et al. 2017 at 3880.)

186.    **Bone strength**: Multiple studies have documented adverse effects from puberty blockers on bone density. (Klink et al. 2015; Vlot et al. 2016; Joseph et al. 2019.) The most recent found that after two years on puberty blockers, the bone density measurements for a significant minority of the children had declined to clinically concerning levels. Density in the spines of some subjects fell to a level found in only 0.13% of the population. (Biggs 2021.) Some

other studies have found less concerning effects on bone density. While the available evidence remains limited and conflicting, it is not possible to conclude that the treatment is "safe."

187.    **Brain development:** Important neurological growth and development in the brain occurs across puberty. The anatomic and functional effect on brain development of blocking the natural puberty process has not been well studied. A prominent Australian clinical team recently expressed concern that "no data were (or are) available on whether delaying the exposure of the brain to a sex steroid affects psychosexual, cognitive, emotional, or other neuropsychological maturation." (Kozlowska et al. 2021 at 89.) In my opinion, given the observed correlation between puberty and brain development, the default hypothesis must be that there *would* be a negative impact. For the purpose of protecting patients all over the world, the burden of proof should be on advocates to first demonstrate to a reasonable degree of certainty that brain structure and its measurable cognitive and affect processing are not negatively affected. This recalls the ethical principle: Above All Do No Harm.

188.    The Endocrine Society Guidelines acknowledge as much, stating that side effects of pubertal suppression "may include . . . unknown effects on brain development," that "we need more rigorous evaluations of . . . the effects of prolonged delay of puberty in adolescents on . . . the brain (including effects on cognitive, emotional, social, and sexual development)," and stating that "animal data suggests there may be an effect of GnRH analogs [puberty blockers] on cognitive function." (Hembree et al. 2017 at 3874, 3882, 3883.) Given this concern, one can only wonder why this relevant question has not been scientifically investigated in a large group of natal males and females.

189.    There has been a longitudinal study of one natal male child, assessed before, and again 20 months after, puberty suppression was commenced. It reported a reduction in the

patient's "global IQ," measured an anomalous absence of certain structural brain development expected during normal male puberty, and hypothesized that "a plausible explanation for the G[lobal] IQ decrease should consider a disruption of the synchronic [i.e., appropriately timed] development of brain areas by pubertal suppression." (Schneider et al. 2017 at 7.) This should cause parents and practitioners serious concern.

190.    Whether any impairment of brain development is "reversed" upon later termination of puberty blockade has, to my knowledge, not been studied at all. As a result, assertions by medical or mental health professionals that puberty blockade is "fully reversible" are unjustified and based on hope rather than science.

191.    Without a number of additional case studies—or preferably statistically significant clinical studies—two questions remain unanswered: Are there brain anatomic or functional impairment from puberty blockers? And are the documented changes reversed over time when puberty blockers are stopped? With these questions unanswered, it is impossible to assert with certainty that the effects of this class of medications are "fully reversible." Such an assertion is another example of ideas based on beliefs rather than on documentation, on hope not science.

192.    **Psycho-social harm**: Puberty is a time of stress, anxiety, bodily discomfort during physical development, and identity formation for *all* humans. No careful study has been done of the long-term impact on the young person's coping skills, interpersonal comfort, and intimate relationships from remaining puerile for, e.g., two to five years while one's peers are undergoing pubertal transformations, and of then undergoing an artificial puberty at an older age. However, pediatricians and mental health professionals hear of distress, concern, and social awkwardness in those who naturally have a delayed onset of puberty. In my opinion, individuals

- 65 -

in whom puberty is delayed multiple years are likely to suffer at least subtle negative psychosocial and self-confidence effects as they stand on the sidelines witnessing their peers developing the social relationships (and attendant painful social learning experiences) that come with adolescence. (Levine 2018 at 9.) Social anxiety and social avoidance are common findings in the evaluation of trans-identified children and teens. Are we expected to believe that creating years of being further different than their peers has no lasting internal consequences? Do we ignore Adolescent Psychiatry's knowledge of the importance of peer groups among adolescents?

193.    We simply do not know what all the psychological impacts of NOT grappling with puberty at the ordinary time may be, because it has not been studied. And we have no information as to whether that impact is "fully reversible."

194.    In addition, since the overwhelming proportion of children who begin puberty blockers continue on to cross-sex hormones, it appears that there is an important element of "psychological irreversibility" in play. The question of to what extent the physical and developmental impacts of puberty blockers might be reversible is an academic one, if psycho-social realities mean that very few patients well ever be able to make that choice once they have started down the road of social transition and puberty blockers.

   **B.    Use of cross-sex hormones in adolescents for gender dysphoria has not been shown to be medically safe except in the short term.**

195.    As with puberty blockers, all evidence concerning the safety of extended use of cross-sex hormones is of "very low quality." The U.K. NICE evidence review cautioned that "the safety profiles" of cross-sex hormone treatments are "largely unknown," and that several of the limited studies that do exist reported high numbers of subjects "lost to follow-up," without explanation—a worrying indicator. (NICE 2020b.)

196.    The 2020 Cochrane Review reported that: "We found insufficient evidence to determine the . . . safety of hormonal treatment approaches for transgender women in transition." (Haupt et al. 2020 at 4.) Even the Endocrine Society tagged all its recommendations for the administration of cross-sex hormones as based on "low quality evidence." (Hembree et al. 2017 at 3889.)

197.    **Sterilization**: It is undisputed, however, that harm to the gonads is an expected effect, to the extent that it must be assumed that cross-sex hormones will sterilize the patient. Thus, the Endocrine Society 2017 Guidelines caution that "[p]rolonged exposure of the testes to estrogen has been associated with testicular damage," that "[r]estoration of spermatogenesis after prolonged estrogen treatment has not been studied," and that "[i]n biological females, the effect of prolonged treatment with exogenous testosterone upon ovarian function is uncertain." (Hembree et al. 2017 at 3880.) [12]

198.    The Guidelines go on to recommend that the practitioner counsel the patient about the (problematic and uncertain) options available to collect and preserve fertile sperm or ova before beginning cross-sex hormones. The life-long negative emotional impact of infertility on both men and women has been well studied. While this impact has not been studied specifically within the transgender population, the opportunity to be a parent is likely a human, emotional need, and so should be considered an important risk factor when considering gender transition for any patient.

---

[12] *See also* Guss et al. 2015 at 4 ("a side effect [of cross-sex hormones] may be infertility") and at 5 ("cross-sex hormones . . . may have irreversible effects"); Tishelman et al. 2015 at 8 (Cross-sex hormones are "irreversible interventions" with "significant ramifications for fertility").

199.    **Sexual response**: Puberty blockers prevent maturation of the sexual organs and response. Some, and perhaps many, transgender individuals who did not go through puberty consistent with their sex and are then put on cross-sex hormones face significantly diminished sexual response as they enter adulthood and are unable ever to experience orgasm. In the case of males, the cross-sex administration of estrogen limits penile genital growth and function. In the case of females, prolonged exposure to exogenous testosterone impairs vaginal function. Much has been written about the negative psychological and relational consequences of anorgasmia among non-transgender individuals that is ultimately applicable to the transgendered. (Levine 2018 at 6.) At the same time, prolonged exposure of females to exogenous testosterone often increases sexual drive to a distracting degree. It is likely that parents and physicians are uncomfortable discussing any aspects of genital sexual activity with patients.

200.    **Cardiovascular harm**: Several researchers have reported that cross-sex hormones increase the occurrence of various types of cardiovascular disease, including strokes, blood clots, and other acute cardiovascular events. (Getahun et al. 2018; Guss et al. 2015; Asscheman et al. 2011.) With that said, I agree with the conclusion of the Endocrine Society committee (like that of the NICE Evidence Review) that: "A systematic review of the literature found that data were insufficient (due to very low–quality evidence) to allow a meaningful assessment of patient-important outcomes, such as death, stroke, myocardial infarction, or venous thromboembolism in transgender males. Future research is needed to ascertain the potential harm of hormonal therapies." (Hembree et al. 2017 at 3891.) Future research questions concerning long-term harms need to be far more precisely defined. The question of whether cross-sex hormones are safe for adolescents and young adults cannot be answered by analogies to hormone replacement therapy in menopausal women (which is not a cross-sex usage).

- 68 -

Medicine has answered safety questions for menopausal women in terms of cancer and cardiovascular safety: at what dose, for what duration, and at what age range. The science of endocrine treatment of gender dysphoric youth is being bypassed by short-term clinical impressions of safety even though physicians know that cardiovascular and cancer processes often develop over many years.

201.    Further, in contrast to administration for menopausal women, hormones begun in adolescence are likely to be administered for four to six decades. The published evidence of adverse impact, coupled with the lack of data sufficient to reach a firm conclusion, make it irresponsible to assert that cross-sex hormones "are safe."

202.    **Harm to family and friendship relationships:** As a psychiatrist, I recognize that mental health is a critical part of health generally, and that relationships cannot be separated from and profoundly impact mental health. Gender transition routinely leads to isolation from at least a significant portion of one's family in adulthood. In the case of a juvenile transition, this will be less dramatic while the child is young, but commonly increases over time as siblings who marry and have children of their own do not wish the transgender individual to be in contact with those children. By adulthood, the friendships of transgender individuals tend to be confined to other transgender individuals (often "virtual" friends known only online) and the generally limited set of others who are comfortable interacting with transgender individuals. (Levine 2017 at 5.) My concerns about this are based on decades of observations in my professional work with patients.

203.    **Sexual-romantic harms associated with transition:** After adolescence, transgender individuals find the pool of individuals willing to develop a romantic and intimate relationship with them to be greatly diminished. When a trans person who passes well reveals his or her natal sex, many potential mates lose interest. When a trans person does not pass well,

- 69 -

options are likely further diminished. But regardless of a person's appearance, these adults soon learn that many of their dates are looking for exotic sexual experiences rather than genuinely loving relationships. (Levine 2017 at 5, 13; Levine 2013 at 40.)

### C.    The timing of harms.

204.    The multi-year delay between start of hormones and the spike in completed suicide observed by Professor Biggs in the Tavistock data (as discussed in Section VIII above) warns us that the safety and beneficence of these treatments cannot be judged based on short-term studies, or studies that do not continue into adulthood. Similarly, several of the harms that I discuss above would not be expected to manifest until the patients reaches at least middle-age. For example, stroke or other serious cardiovascular event is a complication that is unlikely to manifest during teen years even if its likelihood over the patient's lifetime has been materially increased via obesity, lipid abnormalities, and smoking. Regret over sterilization or over an inability to form a stable romantic relationship may occur sooner. Psychological challenges of being a trans adult may become manifest after the medical profession is only doing routine follow up care—or, in many cases, has lost contact with the patient altogether. Because few, if any, clinics in this country are conducting systematic long-term follow-up with their child and adolescent patients, the doctors who counsel, prescribe, or perform hormonal and surgical therapies are unlikely ever to become aware of the later negative life impacts, however severe. These concerns are compounded by the findings in the recent "detransitioner" research that 76% did not inform their clinicians of their detransition. (Littman 2021.)

205.    The possibility that steps along the transition and affirmation pathway, while lessening the pain of gender dysphoria in the short term, could lead to additional sources of crippling emotional and psychological pain, are too often not considered by advocates of social transition and not considered at all by the trans child. (Levine 2016 at 243.) Clinicians must

- 70 -

distinguish the apparent short-term safety of hormones from likely or possible long-term consequences, and help the patient or parents understand these implications as well. The young patient may feel, "I don't care if I die young, just as long I get to live as a woman." The mature adult may take a different view. Hopefully, so will the child's physician.

206.    Individual patients often pin excessive hope in transition, believing that transition will solve what are in fact ordinary social stresses associated with maturation, or mental health co-morbidities. In this way, transition can prevent them from mastering personal challenges at the appropriate time or directly addressing conditions that require treatment. When the hoped-for "vanishing" of other mental health or social difficulties does not occur, disappointment, distress, and depression may ensue. It is noteworthy that half of the respondents to the larger "detransitioner" survey reported that their transition had not helped the gender dysphoria, and 70% had concluded that their gender dysphoria was related to other issues. (Vandenbussche 2021.) Without the clinical experience of monitoring the psychosocial outcomes of these young patients as they age into adulthood, many such professionals experience no challenge to their affirmative beliefs. But medical and mental health professionals who deliver trans affirmative care for those with previous and co-existing mental health problems have an ethical obligation to inform themselves, and to inform patients and parents, that these dramatic treatments are not a panacea.

207.    In sum, whether we consider physical or mental health, science does not permit us to say that either puberty blockers or cross-sex hormones are "safe," and the data concerning the mental health of patients before, during, and after such treatments strongly contradict the assertion that gender dysphoria is "easily managed."

## Bibliography

Adelson, S. & American Academy of Child & Adolescent Psychiatry (2012). *Practice Parameter on Gay, Lesbian, or Bisexual Sexual Orientation, Gender Nonconformity, and Gender Discordance in Children and Adolescents*. JOURNAL OF THE AMERICAN ACADEMY OF CHILD & ADOLESCENT PSYCHIATRY 51(9) 957.

American Psychiatric Association. (2013). *Diagnostic and statistical manual of mental disorders* (5th ed.). https://doi.org/10.1176/appi.books.9780890425596

American Psychological Association. *Guidelines for Psychological Practice with Transgender & Gender Nonconforming People* (2015). AMERICAN PSYCHOLOGIST 70(9) 832.

Anderson, E. (2022, January 3). *Opinion: When it comes to trans youth, we're in danger of losing our way*. THE SAN FRANCISCO EXAMINER.  Accessed January 5, 2022 http://www.sfexaminer.com/opinion/are-we-seeing-a-phenomenon-of-trans-youth-social-contagion/

Anzani, A., Lindley, L., Tognasso, G., Galupo, M. & Prunas, A. (2021).  *"Being Talked to Like I Was a Sex Toy, Like Being Transgender Was Simply for the Enjoyment of Someone Else": Fetishization and Sexualization of Transgender and Nonbinary Individuals.* ARCHIVES OF SEXUAL BEHAVIOR 50(3) 897-911..

Asscheman, H., Giltay, E. J., Megens, J. A. J., de Ronde, W. (Pim), van Trotsenburg, M. A. A., & Gooren, L. J. G. (2011). *A long-term follow-up study of mortality in transsexuals receiving treatment with cross-sex hormones*. EUROPEAN JOURNAL OF ENDOCRINOLOGY *164*(4) 635–642.

Balshem, H., Helfand, M., Schünemann, H. J., Oxman, A. D., Kunz, R., Brozek, J., Vist, G. E., Falck-Ytter, Y., Meerpohl, J., & Norris, S. (2011). *GRADE guidelines: 3. Rating the quality of evidence.* JOURNAL OF CLINICAL EPIDEMIOLOGY *64*(4), 401–406.

Becerra-Culqui, T. et al. (2018).  *Mental Health of Transgender and Gender Nonconforming Youth Compared with Their Peers*.  PEDIATRICS 141(5).

Bhargava, A., et al. (2021).  *Considering Sex as a Biological Variable in Basic and Clinical Studies:  An Endocrine Society Scientific Statement*.  ENDOCRINE REVIEWS 42(3) 219-158.

Biggs, M. (2021).  *Revisiting the effect of GnRH analogue treatment on bone mineral density in young adolescents with gender dysphoria.*  JOURNAL OF PEDIATRIC ENDOCRINOLOGY AND METABOLISM 34(7), 937-939.

Biggs, M. (2022a).  *Estrogen is Associated with Greater Suicidality among Transgender Males, and Puberty Suppression is not Associated with Better Mental Health Outcomes for Either Sex.*  Journals.plos.org/plosone/article/comment?id=10.1371/annotation/dcc6a58e-592a-49d4-9b65-ff65df2aa8f6.

Biggs, M. (2022b). *Suicide by Clinic-Referred Transgender Adolescents in the United Kingdom.* ARCHIVES OF SEXUAL BEHAVIOR.  Doi.org/10.1007/s10508-022-02287-7.

Blakemore, S., Burnett, S., and Dahl, R. (2010).  *The Role of Puberty in the Developing Adolescent Brain*.  HUMAN BRAIN MAPPING 31:926.933.

Boyd, I.,  Hackett, T. &, Bewley, S. (2022).. *Care of Transgender Patients: A General Practice Quality Improvement Approach.* HEALTHCARE. 10(1):121.

Bränström, R., & Pachankis, J. E. (2020a). *Reduction in Mental Health Treatment Utilization Among Transgender Individuals After Gender-Affirming Surgeries: A Total Population Study*. AMERICAN JOURNAL OF PSYCHIATRY *177*(8) 727–734.

Bränström, R., & Pachankis, J. E. (2020b). *Correction to Bränström and Pachankis*. (2020). AMERICAN JOURNAL OF PSYCHIATRY, *177*(8), 734–734. https://doi.org/10.1176/appi.ajp.2020.1778correction

Brik, T. et al. (2020).  *Trajectories of Adolescents Treated with Gonadotropin-Releasing Hormone Analogues for Gender Dysphoria*.  ARCHIVES OF SEXUAL BEHAVIOR. https://doi.org/10.1007/s10508-020-01660-8.

Cantor, J.  (2019). *Transgender and Gender Diverse Children and Adolescents: Fact-Checking of AAP Policy*. JOURNAL OF SEX & MARITAL THERAPY, *46*(4), 307–313.

Carmichael, P., Butler, G., Masic, U., Cole, T. J., De Stavola, B. L., Davidson, S., Skageberg, E. M., Khadr, S., & Viner, R. M. (2021). *Short-term outcomes of pubertal suppression in a selected cohort of 12- to 15-year-old young people with persistent gender dysphoria in the UK*. PLOS ONE, 16(2), e0243894.

Cohen-Kettenis, P. and Kuiper, B. (1984). *Transsexuality and Psychotherapy*.  TIJDSCHRIFT VOOR PSYCHOTHERAPIE 10 (153-166).

Cohen-Kettenis, P. T., Delemarre-van de Waal, H. A., & Gooren, L. J. G. (2008). *The treatment of adolescent transsexuals: Changing insights.* THE JOURNAL OF SEXUAL MEDICINE, *5*(8), 1892–1897.

D'Angelo, R. (2018). *Psychiatry's ethical involvement in gender-affirming care*. AUSTRALASIAN PSYCHIATRY *26*(5), 460–463.

D'Angelo, R., Syrulnik, El, Ayad, S., Marchiano, L., Kenny, D.T., & Clarke, P. (2021). *One Size Does Not Fit All:  In Support of Psychotherapy for Gender Dysphoria*. ARCHIVES OF SEXUAL BEHAVIOR 50(1) 7-16.

Davis, L. (2022).  *A Trans Pioneer Explains Her Resignation from the US Professional Association for Transgender Health.* QUILETTE.  Accessed February 1, 2022. https://quillette.com/2022/01/06/a-transgender-pioneer-explains-why-she-stepped-down-from-uspath-and-wpath/

de Vries, A. L. C. (2020). *Challenges in Timing Puberty Suppression for Gender-Nonconforming Adolescents*. PEDIATRICS 146(4), e2020010611.

Dhejne, C., Lichtenstein, P., Boman, M., Johansson, A. L. V., Långström, N., & Landén, M. (2011). *Long-Term Follow-Up of Transsexual Persons Undergoing Sex Reassignment Surgery: Cohort Study in Sweden*. PLoS ONE *6*(2), e16885.

Dhejne, C., Öberg, K., Arver, S., & Landén, M. (2014). *An Analysis of All Applications for Sex Reassignment Surgery in Sweden, 1960–2010: Prevalence, Incidence, and Regrets*. ARCHIVES OF SEXUAL BEHAVIOR, 43(8), 1535–1545.

Dreger, A. (2015) *Galileo's Middle Finger: Heretics, Activists, and One Scholar's Search for Justice Paperback*. PENGUIN BOOKS.

Edwards-Leeper, L. and Anderson, E. (November 24, 2021).  *The Mental Health Establishment is Failing Trans Kids*. THE WASHINGTON POST.  Accessed February 1, 2022. https://www.washingtonpost.com/outlook/2021/11/24/trans-kids-therapy-psychologist/

Edwards-Leeper, L. et al. (2017).  *Psychological Profile of the First Sample of Transgender Youth Presenting for Medical Intervention in a U.S. Pediatric Gender Center.* PSYCHOLOGY OF SEXUAL ORIENTATION AND GENDER DIVERSITY 4(3) 374.

Ehrensaft , B.(2015).  *Listening and Learning from Gender-Nonconforming Children.* THE PSYCHOANALYTIC STUDY OF THE CHILD 68(1) 28.

Entwistle, K. (2020). *Debate: Reality check – Detransitioners' testimonies require us to rethink gender dysphoria*. CHILD AND ADOLESCENT MENTAL HEALTH camh.12380.

Evans, M. and Evans, S. (2021).  *Psychotherapy of Gender Dysphoria of Children and Young Adults*.  PHOENIX PUBLICATION, UK.

Expósito-Campos, P. (2021). *A Typology of Gender Detransition and Its Implications for Healthcare Providers*.  JOURNAL OF SEX & MARITAL THERAPY. https://doi.org/10.1080/0092623X.2020.1869126.

- 74 -

Frigerio, A. et al. (2021). *Structural, Functional, and Metabolic Brain Differences as a Function of Gender Identity or Sexual Orientation: A Systematic Review of the Human Neuroimaging Literature.* ARCHIVES OF SEXUAL BEHAVIOR 50:3329-3352.

Getahun, D., Nash, R., Flanders, W. D., Baird, T. C., Becerra-Culqui, T. A., Cromwell, L., Hunkeler, E., Lash, T. L., Millman, A., Quinn, V. P., Robinson, B., Roblin, D., Silverberg, M. J., Safer, J., Slovis, J., Tangpricha, V., & Goodman, M. (2018). *Cross-sex Hormones and Acute Cardiovascular Events in Transgender Persons: A Cohort Study*. ANNALS OF INTERNAL MEDICINE, *169*(4), 205.

Gender Identity Development Service of the NHS (2019). *Referrals to the Gender Identity Development Service (GIDS) Level Off in 2018-19.* https://tavistockandportman.nhg.uk/about-us/news/stories/referrals-gender-identity-development-service-gids-level-2018-19.

Ghorayshi, A. (2022, January 13). *Doctors Debate Whether Trans Teens Need Therapy Before Hormones.* THE NEW YORK TIMES. Accessed February 1, 2022. https://www.nytimes.com/2022/01/13/health/transgender-teens-hormones.html.

Griffin, L., Clyde, K., Byng, R., & Bewley, S. (2021). *Sex, Gender and Gender Identity: A Re-evaluation of the Evidence*. BJPSYCH BULLETIN, 45(5), 291-299.

Guss, C. et al. (2015). *Transgender and Gender Nonconforming Adolescent Care: Psychosocial and Medical Considerations*. CURRENT OPINIONS IN PEDIATRICS 26(4) 421.

Hall, R., Mitchell, L., & Sachdeva, J. (2021). *Access to care and frequency of detransition among a cohort discharged by a UK national adult gender identity clinic: Retrospective case-note review*. BJPSYCH OPEN, *7*(6), e184.

Haupt, C. et al. (2020). *Antiandrogen or Estradiol Treatment or Both During Hormone Therapy in Transitioning Transgender Women (Review)*. COCHRANE DATABASE OF SYSTEMATIC REVIEWS 11. DOI: 10.1002/14651858.CD013138.pub2.

Hembree, W. C., Cohen-Kettenis, P. T., Gooren, L., Hannema, S. E., Meyer, W. J., Murad, M. H., Rosenthal, S. M., Safer, J. D., Tangpricha, V., & T'Sjoen, G. G. (2017). *Endocrine Treatment of Gender-Dysphoric/Gender-Incongruent Persons: An Endocrine Society\* Clinical Practice Guideline*. THE JOURNAL OF CLINICAL ENDOCRINOLOGY & METABOLISM *102*(11), 3869–3903.

Hruz, P. (2020). *Deficiencies in Scientific Evidence for Medical Management of Gender Dysphoria*. THE LINACRE QUARTERLY 87(1):34-42.

Johns, M. M., Lowry, R., Andrzejewski, J., Barrios, L. C., Demissie, Z., McManus, T., Rasberry, C. N., Robin, L., & Underwood, J. M. (2019). *Transgender Identity and Experiences of Violence Victimization, Substance Use, Suicide Risk, and Sexual Risk*

*Behaviors Among High School Students—19 States and Large Urban School Districts, 2017.* MORBIDITY AND MORTALITY WEEKLY REPORT *68*(3) 67–71.

Joseph, T., Ting, J., & Butler, G. (2019). *The effect of GnRH analogue treatment on bone mineral density in young adolescents with gender dysphoria: findings from a large national cohort.* JOURNAL OF PEDIATRIC ENDOCRINOLOGY METABOLISM 32(10):1077-1081.

Kaltiala-Heino, R., Bergman, H., Työläjärvi, M., & Frisen, L. (2018). *Gender dysphoria in adolescence: Current perspectives.* ADOLESCENT HEALTH, MEDICINE AND THERAPEUTICS *9* (31–41).

Kaltiala-Heino, R., Sumia, M., Työläjärvi, M., & Lindberg, N. (2015). *Two years of gender identity service for minors: Overrepresentation of natal girls with severe problems in adolescent development*. CHILD AND ADOLESCENT PSYCHIATRY AND MENTAL HEALTH, 9(1), 9.

Kendler K. S. (2019). *From Many to One to Many-the Search for Causes of Psychiatric Illness*. *JAMA PSYCHIATRY*, *76*(10) 1085–1091.

Kidd, K. M., Sequeira, G. M., Douglas, C., Paglisotti, T., Inwards-Breland, D. J., Miller, E., & Coulter, R. W. S. (2021). *Prevalence of Gender-Diverse Youth in an Urban School District*. PEDIATRICS, *147*(6) e2020049823.

Klink, D. et al. (2015). *Bone mass in young adulthood following gonadotropin-releasing hormone analog treatment and cross-sex hormone treatment in adolescents with gender dysphoria.* JOURNAL OF CLINICAL ENDOCRINOLOGY METABOLIAM 100(2):E270-5.

Kozlowska, K., Chudleigh, C., McClure, G., Maguire, A. M., & Ambler, G. R. (2021). *Attachment Patterns in Children and Adolescents with Gender Dysphoria*. FRONTIERS IN PSYCHOLOGY 11. https://doi.org/10.3389/fpsyg.2020.582688.

Laidlaw, M. K., Van Meter, Q. L., Hruz, P. W., Van Mol, A., & Malone, W. J. (2019). *Letter to the Editor: "Endocrine Treatment of Gender-Dysphoric/Gender-Incongruent Persons: An Endocrine Society Clinical Practice Guideline".* THE JOURNAL OF CLINICAL ENDOCRINOLOGY AND METABOLISM. 104(3), 686–687.

Landén, M. (2020). *The Effect of Gender-Affirming Treatment on Psychiatric Morbidity Is Still Undecided*. AMERICAN JOURNAL OF PSYCHIATRY. 177(8):767-768.

Levine, S. (2013).  *Barriers to Loving: A Clinician's Perspective.*  (Routledge, New York 2013).

Levine, S. (2016). *Reflections on the Legal Battles Over Prisoners with Gender Dysphoria*. JOURNAL OF THE AMERICAN ACADEMY OF PSYCHIATRY LAW 44, 236.

Levine, S. (2017). *Ethical Concerns About Emerging Treatment Paradigms for Gender Dysphoria*. JOURNAL OF SEX & MARITAL THERAPY at 7.  <u>DOI: 10.1080/0092623X.2017.1309482</u>.

Levine, S. (2019). *Informed Consent for Transgender Patients,* JOURNAL OF SEX & MARITAL THERAPY 45(3):218-229.

Levine, S. (2021). *Reflections on the Clinician's Role with Individuals Who Self-identify as Transgender*. ARCHIVES OF SEXUAL BEHAVIOR. <u>https://doi.org/10.1007/s10508-021-02142-1</u>

Lichtenstein M, Stein L, Connolly E, Goldstein ZG, Martinson T, Tiersten L, Shin SJ, Pang JH, Safer JD (2020).  *The Mount Sinai patient-centered preoperative criteria meant to optimize outcomes are less of a barrier to care than WPATH SOC 7 criteria before transgender-specific surgery*.  TRANSGENDER HEALTH 5:3, 166–172.

Littman, L. (2018). *Parent reports of adolescents and young adults perceived to show signs of a rapid onset of gender dysphoria*. PLoS ONE 13(8): e0202330.

Littman, L. (2021). *Individuals Treated for Gender Dysphoria with Medical and/or Surgical Transition Who Subsequently Detransitioned: A Survey of 100 Detransitioners*. ARCHIVES OF SEXUAL BEHAVIOR. <u>https://doi.org/10.1007/s10508-021-02163-w</u>

Malone, W., Hruz, P., Mason, J., Beck, S., (2021).  *Letter to the Editor from William J. Malone et al: "Proper Care of Transgender and Gender-diverse Persons in the Setting of Proposed Discrimination: A Policy Perspective".*  THE JOURNAL OF CLINICAL ENDOCRINOLOGY & METABOLISM Volume 106, Issue 8, August 2021, Pages e3287–e3288.

Marchiano, L. (2021). *Gender detransition: a case study*. JOURNAL OF ANALYTICAL PSYCHOLOGY.  66:813– 832.

Meyer-Bahlburg H. F. (2005).  *Gender identity outcome in female-raised 46,XY persons with penile agenesis, cloacal exstrophy of the bladder, or penile ablation.* ARCHIVES OF SEXUAL BEHAVIOR, 34(4), 423–438.

National Institute for Health and Care Excellence (2021a). *Evidence review: Gonadotrophin releasing hormone analogues for children and adolescents with gender dysphoria.* <u>https://arms.nice.org.uk/resources/hub/1070905/attachment</u>

National Institute for Health and Care Excellence. (2021b). *Evidence review: Gender-affirming hormones for children and adolescents with gender dysphoria.* <u>https://arms.nice.org.uk/resources/hub/1070871/attachment</u>

National Institutes of Health.  *NIH Policy and Guidelines on The Inclusion of Women and Minorities as Subjects in Clinical Research*.  Notice Number NOT-OD-02-001 released 10-09-2001.  https://grants.nih.gov/policy/inclusion/women-and-minorities/guidelines.htm

National Institutes of Health.  *Consideration of Sex as a Biological Variable in NIH-Funded Research*.  Notice Number NOT-OD-15-102 released 06-09-2015.  https://grants.nih.gov/grants/guide/notice-files/NOT-OD-15-102.html

National Institutes of Health, Office of Research on Women's Health.  *How Sex and Gender Influence Health and Disease*.  Downloaded 2-11-2022 https://orwh.od.nih.gov/sites/orwh/files/docs/SexGenderInfographic_11x17_508.pdf.

Newcomb, M. et al. (2020).  *High Burden of Mental Health Problems, Substance Use, Violence, and Related Psychosocial Factors in Transgender, Non-Binary, and Gender Diverse Youth and Young Adults*.  ARCHIVES OF SEXUAL BEHAVIOR 49(2) 645-659.

Reiner, W. G., & Gearhart, J. P. (2004).  *Discordant sexual identity in some genetic males with cloacal exstrophy assigned to female sex at birth.*  THE NEW ENGLAND JOURNAL OF MEDICINE 350(4), 333–341.

Reisner, S. et al. (2015), *Mental Health of Transgender Youth in Care at an Adolescent Urban Community Health Center: A Matched Retrospective Cohort Study*, JOURNAL OF ADOLESCENT HEALTH 56(3) at 6.

Rider, G. et al. (2018), *Health and Care Utilization of Transgender/Gender Non-Conforming Youth: A Population Based Study*.  PEDIATRICS at 4, DOI: 10.1542/peds.2017-1683.

Ristori, J., & Steensma, T. D. (2016). *Gender dysphoria in childhood.* INTERNATIONAL REVIEW OF PSYCHIATRY, 28(1), 13–20.

Royal Australian and New Zealand College of Psychiatrists. (2021) *Statement: Recognising and addressing the mental health needs of people experiencing Gender Dysphoria / Gender Incongruence.*  https://www.ranzcp.org/news-policy/policy-and-advocacy/position-statements/gender-dysphoria

Saraswat, A. et al. (2015). *Evidence Supporting the Biologic Nature of Gender Identity*. ENDOCRINE PRACTICE 21(2) 199.

Schneider, M. et al. (2017). *Brain Maturation, Cognition and Voice Pattern in a Gender Dysphoria Case Under Pubertal Suppression.* FRONTIERS IN HUMAN NEUROSCIENCE 11:528.

Shumer, D. & Tishelman, A. (2015).  *The Role of Assent in the Treatment of Transgender Adolescents*, INTERNATIONAL JOURNAL OF TRANSGENDERISM at 1. DOI: 10.1080/15532739.2015.1075929.

Shumer, D. et al. (2016), *Evaluation of Asperger Syndrome in Youth Presenting to a Gender Dysphoria Clinic*, LGBT HEALTH 3(5) 387.

Shumer, D. et al. (2017), *Overrepresentation of Adopted Adolescents at a Hospital-Based Gender Dysphoria Clinic*, TRANSGENDER HEALTH Vol. 2(1) 76.

Simonsen, R.K.  et al. (2016), *Long-Term Follow-Up of Individuals Undergoing Sex Reassignment Surgery: Psychiatric Morbidity & Mortality*, NORDIC JOURNAL OF PSYCHIATRY 70(4).

Singh, D., Bradley, S. J., & Zucker, K. J. (2021). *A Follow-Up Study of Boys with Gender Identity Disorder*. FRONTIERS IN PSYCHIATRY, *12*. https://doi.org/10.3389/fpsyt.2021.632784

Steensma, T. D., McGuire, J. K., Kreukels, B. P. C., Beekman, A. J., & Cohen-Kettenis, P. T. (2013). *Factors Associated with Desistence and Persistence of Childhood Gender Dysphoria: A Quantitative Follow-Up Study*. JOURNAL OF THE AMERICAN ACADEMY OF CHILD & ADOLESCENT PSYCHIATRY, 52(6), 582–590.

Thoma, B. et al. (2021).  *Disparities in Childhood Abuse Between Transgender and Cisgender Adolescents*.  PEDIATRICS 148(2).

Tishelman, A. C., Kaufman, R., Edwards-Leeper, L., Mandel, F. H., Shumer, D. E., & Spack, N. P. (2015).  S*erving Transgender Youth: Challenges, Dilemmas and Clinical Examples*. PROFESSIONAL PSYCHOLOGY, RESEARCH AND PRACTICE 46(1), 37–45.

Toomey R. B., Syvertsen A. K., Shramko M. (2018).  *Transgender Adolescent Suicide Behavior*. PEDIATRICS.142(4):e20174218.

Turban, J. L., King, D., Carswell, J. M., & Keuroghlian, A. S. (2020). *Pubertal Suppression for Transgender Youth and Risk of Suicidal Ideation*. PEDIATRICS *145*(2), e20191725..

Vandenbussche, E. (2021). *Detransition-Related Needs and Support: A Cross-Sectional Online Survey*. JOURNAL OF HOMOSEXUALITY 20. https://doi.org/10.1080/00918369.2021.1919479.

van der Miesen, A. I. R., Cohen-Kettenis, P. T., & de Vries, A. L. C. (2018). *Is There a Link Between Gender Dysphoria and Autism Spectrum Disorder?* JOURNAL OF THE AMERICAN ACADEMY OF CHILD & ADOLESCENT PSYCHIATRY *57*(11), 884–885.

Pltf's Resp App. 0360

van der Miesen, A. I. R. et al. (2020). *Psychological Functioning in Transgender Adolescents Before and After Gender-Affirmative Care Compared With Cisgender General Population Peers*. JOURNAL OF ADOLESCENT HEALTH, Volume 66, Issue 6, 699-704.

Vlot, M. et al. (2016). *Effect of pubertal suppression and cross-sex hormone therapy on bone turnover markers and bone mineral apparent density (BMAD) in transgender adolescents*. BONE 95:11-19.

Wiepjes, C. M., Nota, N. M., de Blok, C. J. M., Klaver, M., de Vries, A. L. C., Wensing-Kruger, S. A., de Jongh, R. T., Bouman, M.-B., Steensma, T. D., Cohen-Kettenis, P., Gooren, L. J. G., Kreukels, B. P. C., & den Heijer, M. (2018). *The Amsterdam Cohort of Gender Dysphoria Study (1972–2015): Trends in Prevalence, Treatment, and Regrets*. THE JOURNAL OF SEXUAL MEDICINE, *15*(4), 582–590.

Wiepjes, C. M., den Heijer, M., Bremmer, M. A., Nota, N. M., Blok, C. J. M., Coumou, B. J. G., & Steensma, T. D. (2020). *Trends in suicide death risk in transgender people: Results from the Amsterdam Cohort of Gender Dysphoria study (1972–2017)*. ACTA PSYCHIATRICA SCANDINAVICA *141*(6) 486–491.

World Health Organization.  Gender and Health.  https://www.who.int/health-topics/gender#tab=tab_1.  Downloaded 2-11-2022.

World Health Organization (2019). *International statistical classification of diseases and related health problems (11th ed.)*. https://icd.who.int/.

WPATH *De-Psychopathologisation Statement* (May 26, 2010), available at wpath.org/policies (last accessed January 21, 2020).

Zucker, K. (2018).  *The myth of persistence: Response to "A critical commentary on follow-up studies and 'desistance' theories about transgender and gender non-conforming children" by Temple Newhook et al.* (2018). INTERNATIONAL JOURNAL OF TRANSGENDERISM *19*(2) 231–245.

Zucker, K. (2019).  *Adolescents with Gender Dysphoria: Reflections on Some Contemporary Clinical and Research Issues*. ARCHIVES OF SEXUAL BEHAVIOR  48(7) 1983–1992.

Zucker, K. (2020).  *Different strokes for different folks.* CHILD ADOLESC MENT HEALTH 25(1): 36–37.  https://doi: 10.1111/camh.12330.

Lineage-760 0361

# LEVINE EXPERT REPORT

# EXHIBIT A

Levine 0362

Stephen B. Levine, M.D.                                         Curriculum Vita
                                                               February, 2022

## Brief Introduction

Dr. Levine is Clinical Professor of Psychiatry at Case Western Reserve University School of Medicine. He is the author or coauthor of numerous books on topics relating to human sexuality and related relationship and mental health issues. Dr. Levine has been teaching, providing clinical care, and writing since 1973, and has generated original research, invited papers, commentaries, chapters, and book reviews. He has served as a journal manuscript and book prospectus reviewer for many years. Dr. Levine has been co-director of the Center for Marital and Sexual Health/ Levine, Risen & Associates, Inc. in Beachwood, Ohio from 1992 to the present. He received a lifetime achievement Masters and Johnson's Award from the Society for Sex Therapy and Research in March 2005.

## Personal Information

Date of birth 1/14/42

Medical license no. Ohio 35-03-0234-L

Board Certification 6/76 American Board of Neurology and Psychiatry

## Education

1963 BA Washington and Jefferson College

1967 MD Case Western Reserve University School of Medicine

1967-68 internship in Internal Medicine University Hospitals of Cleveland

1968-70 Research associate, National Institute of Arthritis and Metabolic Diseases, Epidemiology Field Studies Unit, Phoenix, Arizona, United States Public Health Service

1970-73 Psychiatric Residency, University Hospitals of Cleveland

1974-77 Robert Wood Johnson Foundation Clinical Scholar

## Appointments at Case Western Reserve University School of Medicine

1973- Assistant Professor of Psychiatry

1979- Associate Professor

1982- Awarded tenure

1985- Full Professor

1993- Clinical Professor

Page 1 of 22

## Honors

Summa Cum Laude, Washington & Jefferson

Teaching Excellence Award-1990 and 2010 (Residency program)

Visiting Professorships

- Stanford University-Pfizer Professorship program (3 days)–1995
- St. Elizabeth's Hospital, Washington, DC –1998
- St. Elizabeth's Hospital, Washington, DC--2002

Named to America's Top Doctors consecutively since 2001

Invitations to present various Grand Rounds at Departments of Psychiatry and Continuing Education Lectures and Workshops

Masters and Johnson Lifetime Achievement Award from the Society of Sex Therapy and Research, April 2005 along with Candace Risen and Stanley Althof

2006 SSTAR Book Award for The Handbook of Clinical Sexuality for Mental Health Professionals: Exceptional Merit

2018—Albert Marquis Lifetime Achievement Award from Marquis Who's Who. (Exceling in one's field for at least twenty years)

## Professional Societies

1971- American Psychiatric Association; fellow; #19909

2005- American Psychiatric Association, Distinguished Life Fellow

1973- Cleveland Psychiatric Society

1973- Cleveland Medical Library Association

- 1985 - Life Fellow
- 2003 - Distinguished Life Fellow

1974-Society for Sex Therapy and Research

- 1987-89-President

1983- International Academy of Sex Research

1983- Harry Benjamin International Gender Dysphoria Association

- 1997-8 Chairman, Standards of Care Committee

1994- 1999 Society for Scientific Study of Sex

Page 2 of 22

Mississippi 0364

## Community Boards

1999-2002 Case Western Reserve University Medical Alumni Association

1996-2001 Bellefaire Jewish Children's Bureau

1999-2001 Physicians' Advisory Committee, The Gathering Place (cancer rehabilitation)

## Editorial Boards

1978-80 Book Review Editor Journal Sex and Marital Therapy

**Manuscript Reviewer for:**

a. Archives of Sexual Behavior

b. Annals of Internal Medicine

c. British Journal of Obstetrics and Gynecology

d. JAMA

e. Diabetes Care

f. American Journal of Psychiatry

g. Maturitas

h. Psychosomatic Medicine

i. Sexuality and Disability

j. Journal of Nervous and Mental Diseases

k. Journal of Neuropsychiatry and Clinical Neurosciences

l. Neurology

m. Journal Sex and Marital Therapy

n. Journal Sex Education and Therapy

o. Social Behavior and Personality: an international journal (New Zealand)

p. International Journal of Psychoanalysis

q. International Journal of Transgenderism

r. Journal of Urology

s. Journal of Sexual Medicine

t. Current Psychiatry

u. International Journal of Impotence Research

v. Postgraduate medical journal

w. Academic Psychiatry

Prospectus Reviewer

    a.  Guilford

    b.  Oxford University Press

    c.  Brunner/Routledge

    d.  Routledge

## Administrative Responsibilities

Principal Investigator of approximately 70 separate studies involving pharmacological interventions for sexual dysfunction since 1989.

Co-leader of case conferences at DELRLLC.com

## Expert testimony at trial or by deposition within the last 4 years

Provided expert testimony for Massachusetts Dept. of Corrections in its defense of a lawsuit brought by prisoner Katheena Soneeya, including by deposition in October 2018, and in-court testimony in 2019.

Provided expert testimony by deposition and at trial in *In the Interests of the Younger Children* (Dallas, TX), 2019.

Testified in an administrative hearing in *In the matter of Rhys & Lynn Crawford* (Washington State), March 2021.

Testified multiple times in juvenile court in *In the matter of Asha Kerwin* (Tucson, Arizona), 2021.

Provided expert testimony by deposition in *Kadel et al v. Folwell et al.* (North Carolina), 2021.

## Consultancies

Massachusetts Department of Corrections—evaluation of 12 transsexual prisoners and the development of a Gender Identity Disorders Program for the state prison system. Monthly consultation with the GID treatment team since February 2009 and the GID policy committee since February 2010.

California Department of Corrections and Rehabilitation; 2012-2015; education, inmate evaluation, commentary on inmate circumstances, suggestions on future policies.

Virginia Department of Corrections –evaluation of an inmate.

New Jersey Department of Corrections—evaluation of an inmate.

Idaho Department of Corrections—workshop 2016.

## Grant Support/Research Studies

TAP–studies of Apomorphine sublingual in treatment of erectile dysfunction.

Pfizer–Sertraline for premature ejaculation.

Pfizer–Viagra and depression; Viagra and female sexual dysfunction; Viagra as a treatment for SSRI-induced erectile dysfunction.

NIH- Systemic lupus erythematosis and sexuality in women.

Sihler Mental Health Foundation

      a.   Program for Professionals

      b.   Setting up of Center for Marital and Sexual Health

      c.   Clomipramine and Premature ejaculation

      d.   Follow-up study of clergy accused of sexual impropriety

      e.   Establishment of services for women with breast cancer

Alza–controlled study of a novel SSRI for rapid ejaculation.

Pfizer–Viagra and self-esteem.

Pfizer- double-blind placebo control studies of a compound for premature ejaculation.

Johnson & Johnson – controlled studies of Dapoxetine for rapid ejaculation.

Proctor and Gamble: multiple studies to test testosterone patch for post menopausal sexual dysfunction for women on and off estrogen replacement.

Lilly-Icos—study of Cialis for erectile dysfunction.

VIVUS – study for premenopausal women with FSAD.

Palatin Technologies- studies of bremelanotide in female sexual dysfunction—first intranasal then subcutaneous administration.

Medtap – interview validation questionnaire studies.

HRA- quantitative debriefing study for Female partners os men with premature ejaculation, Validation of a New Distress Measure for FSD.

Boehringer-Ingelheim- double blind and open label studies of a prosexual agent for hypoactive female sexual desire disorder.

Biosante- studies of testosterone gel administration for post menopausal women with HSDD.

J&J a single-blind, multi-center, in home use study to evaluate sexual enhancement effects of a product in females.

UBC-Content validity study of an electronic FSEP-R and FSDS-DAO and usability of study PRO measures in premenopausal women with FSAD, HSDD or Mixed FSAD/HSDD.

National registry trial for women with HSDD.

Endoceutics—two studies of DHEA for vaginal atrophy and dryness in post menopausal women.

Page 5 of 22

Palatin—study of SQ Bremelanotide for HSDD and FSAD.

Trimel- a double-blind, placebo controlled study for women with acquired female orgasmic disorder.

S1 Biopharma- a phase 1-B non-blinded study of safety, tolerability and efficacy of Lorexys in premenopausal women with HSDD.

HRA – qualitative and cognitive interview study for men experiencing PE.

## Publications

A) Books

1)      Pariser SR, Levine SB, McDowell M (eds.), <u>Clinical Sexuality</u>, Marcel Dekker, New York, 1985

2)      <u>Sex Is Not Simple</u>, Ohio Psychological Publishing Company, 1988; Reissued in paperback as: <u>Solving Common Sexual Problems: Toward a Problem Free Sexual Life</u>, Jason Aronson, Livingston, NJ. 1997

3)      <u>Sexual Life: A Clinician's Guide</u>. Plenum Publishing Corporation. New York, 1992

4)      <u>Sexuality in Midlife</u>. Plenum Publishing Corporation. New York, 1998

5)      Editor, <u>Clinical Sexuality</u>. Psychiatric Clinics of North America, March, 1995.

6)      Editor, (Candace Risen and Stanley Althof, associate editors) <u>Handbook of Clinical Sexuality for Mental Health Professionals</u>. Routledge, New York, 2003

1.      2006 SSTAR Book Award: Exceptional Merit

7)      <u>Demystifying Love: Plain Talk For The Mental Health Professional.</u> Routledge, New York, 2006

8)      Senior editor, (Candace B. Risen and Stanley E. Althof, Associate editors), <u>Handbook of Clinical Sexuality for Mental Health Professionals</u>, 2nd edition. Routledge, New York, 2010.

9)      <u>Barriers to Loving: A Clinician's Perspective</u>. Routledge, New York, 2014.

10)     Senior editor Candace B. Risen and Stanley E. Althof, Associate editors), <u>Handbook of Clinical Sexuality for Mental Health Professionals</u>. 3rd edition Routledge, New York, 2016

B)  **Research and Invited Papers**

When his name is not listed in a citation, Dr. Levine is either the solo or the senior author.

1)      Sampliner R. Parotid enlargement in Pima Indians. Annals of Internal Medicine 1970; 73:571-73

Page 6 of 22

2)      Confrontation and residency activism: A technique for assisting residency change: World Journal of Psychosynthesis 1974; 6: 23-26

3)      Activism and confrontation: A technique to spur reform. Resident and Intern Consultant 173; 2

4)      Medicine and Sexuality. Case Western Reserve Medical Alumni Bulletin 1974:37:9-11.

5)      Some thoughts on the pathogenesis of premature ejaculation. J. Sex & Marital Therapy 1975; 1:326-334

6)      Marital Sexual Dysfunction: Introductory Concepts. Annals of Internal Medicine 1976;84:448-453

7)      Marital Sexual Dysfunction: Ejaculation Disturbances 1976; 84:575-579

8)      Yost MA: Frequency of female sexual dysfunction in a gynecology clinic: An epidemiological approach. Archives of Sexual Behavior 1976;5:229-238

9)      Engel IM, Resnick PJ, Levine SB: Use of programmed patients and videotape in teaching medical students to take a sexual history. Journal of Medical Education 1976;51:425-427

10)     Marital Sexual Dysfunction: Erectile dysfunction. Annals of Internal Medicine 1976;85:342-350

11)     Male Sexual Problems. Resident and Staff Physician 1981:2:90-5

12)     Female Sexual Problems. Resident and Staff Physician 1981:3:79-92

13)     How can I determine whether a recent depression in a 40 year old married man is due to organic loss of erectile function or whether the depression is the source of the dysfunction? Sexual Medicine Today 1977;1:13

14)     Corradi RB, Resnick PJ Levine SB, Gold F. For chronic psychologic impotence: sex therapy or psychotherapy? I & II Roche Reports; 1977

15)     Marital Sexual Dysfunction: Female dysfunctions 1977; 86:588-597

16)     Current problems in the diagnosis and treatment of psychogenic impotence. Journal of Sex & Marital Therapy 1977;3:177-186

17)     Resnick PJ, Engel IM. Sexuality curriculum for gynecology residents. Journal of Medical Education 1978; 53:510-15

18)     Agle DP. Effectiveness of sex therapy for chronic secondary psychological impotence Journal of Sex & Marital Therapy 1978;4:235-258

19)     DePalma RG, Levine SB, Feldman S. Preservation of erectile function after aortoiliac reconstruction. Archives of Surgery 1978:113-958-962

20)     Conceptual suggestions for outcome research in sex therapy Journal of Sex & Marital Therapy 1981;6:102-108

Page 7 of 22

Lindsay 0369

21)     Lothstein LM. Transsexualism or the gender dysphoria syndrome. Journal of Sex & Marital Therapy 1982; 7:85-113

22)     Lothstein LM, Levine SB. Expressive psychotherapy with gender dysphoria patients Archives General Psychiatry 1981; 38:924-929

23)     Stern RG Sexual function in cystic fibrosis. Chest 1982; 81:422-8

24)     Shumaker R. Increasingly Ruth: Towards understanding sex reassignment surgery Archives of Sexual Behavior 1983;12:247-61

25)     Psychiatric diagnosis of patients requesting sex reassignment surgery. Journal of Sex & Marital Therapy 1980; 6:164-173

26)     Problem solving in sexual medicine I. British Journal of Sexual Medicine 1982;9:21-28

27)     A modern perspective on nymphomania. Journal of Sex & Marital Therapy 1982;8:316-324

28)     Nymphomania. Female Patient 1982;7:47-54

29)     Commentary on Beverly Mead's article: When your patient fears impotence. Patient Care 1982;16:135-9

30)     Relation of sexual problems to sexual enlightenment. Physician and Patient 1983 2:62

31)     Clinical overview of impotence. Physician and Patient 1983; 8:52-55.

32)     An analytical approach to problem-solving in sexual medicine: a clinical introduction to the psychological sexual dysfunctions. II. British Journal of Sexual Medicine

33)     Coffman CB, Levine SB, Althof SE, Stern RG Sexual Adaptation among single young adults with cystic fibrosis. Chest 1984;86:412-418

34)     Althof SE, Coffman CB, Levine SB. The effects of coronary bypass in female sexual, psychological, and vocational adaptation. Journal of Sex & Marital Therapy 1984;10:176-184

35)     Letter to the editor: Follow-up on Increasingly Ruth. Archives of Sexual Behavior 1984;13:287-9

36)     Essay on the nature of sexual desire Journal of Sex & Marital Therapy 1984; 10:83-96

37)     Introduction to the sexual consequences of hemophilia. Scandanavian Journal of Haemology 1984; 33:(supplement 40).75-

38)     Agle DP, Heine P. Hemophila and Acquired Immune Deficiency Syndrome: Intimacy and Sexual Behavior. National Hemophilia Foundation; July, 1985

39)     Turner LA, Althof SE, Levine SB, Bodner DR, Kursh ED, Resnick MI.

External vacuum devices in the treatment of erectile dysfunction: a one-year study of sexual and psychosocial impact. Journal of Sex & Marital Therapy

40)     Schein M, Zyzanski SJ, Levine SB, Medalie JH, Dickman RL, Alemagno SA. The frequency of sexual problems among family practice patients. Family Practice Research Journal 1988; 7:122-134

41)     More on the nature of sexual desire. Journal of Sex & Marital Therapy 1987;13:35-44

42)     Waltz G, Risen CB, Levine SB. Antiandrogen treatment of male sex offenders. Health Matrix 1987; V.51-55.

43)     Lets talk about sex. National Hemophilia Foundation January, 1988

44)     Sexuality, Intimacy, and Hemophilia: questions and answers . National Hemophilia Foundation January, 1988

45)     Prevalence of sexual problems. Journal Clinical Practice in Sexuality 1988;4:14-16.

46)     Kursh E, Bodner D, Resnick MI, Althof SE, Turner L, Risen CB, Levine SB. Injection Therapy for Impotence. Urologic Clinics of North America 1988; 15(4):625-630

47)     Bradley SJ, Blanchard R, Coates S, Green R, Levine S, Meyer-Bahlburg H, Pauly I, Zucker KJ. Interim report of the DSM-IV Subcommittee for Gender Identity Disorders. Archives of Sexual Behavior 1991;;20(4):333-43.

48)     Sexual passion in mid-life. Journal of Clinical Practice in Sexuality 1991 6(8):13-19

49)     Althof SE, Turner LA, Levine SB, Risen CB, Bodner DR, Resnick MI. Intracavernosal injections in the treatment of impotence: A prospective study of sexual, psychological, and marital functioning. Journal of Sex & Marital Therapy 1987**;** 13:155-167

50)     Althof SE, Turner LA, Risen CB, Bodner DR, Kursh ED, Resnick MI. Side effects of self-administration of intracavernosal injection of papaverine and phentolamine for treatment of impotence. Journal of Urology 1989;141:54-7

51)     Turner LA, Froman SL, Althof SE, Levine SB, Tobias TR, Kursh ED, Bodner DR. Intracavernous injection in the management of diabetic impotence. Journal of Sexual Education and Therapy 16(2):126-36, 1989

52)     Is it time for sexual mental health centers? Journal of Sex & Marital Therapy 1989

53)     Althof SE, Turner LA, Levine SB, Risen CB, Bodner D, Kursh ED, Resnick MI. Sexual, psychological, and marital impact of self injection of papaverine and phentolamine: a long-term prospective study. Journal of Sex & Marital Therapy

54)   Althof SE, Turner LA, Levine SB, Risen CB, Bodner D, Kursh ED, Resnick MI. Why do so many men drop out of intracavernosal treatment?  Journal of Sex & Marital Therapy. 1989;15:121-9

55)   Turner LA, Althof SE, Levine SB, Risen CB, Bodner D, Kursh ED, Resnick MI. Self injection of papaverine and phentolamine in the treatment of psychogenic impotence. Journal of Sex & Marital Therapy. 1989; 15(3):163-78

56)   Turner LA, Althof SE, Levine SB, Risen CB, Bodner D, Kursh ED, Resnick MI. Treating erectile dysfunction with external vacuum devices: impact upon sexual, psychological, and marital functioning. Journal of Urology 1990;141(1):79-82

57)   Risen CB, Althof SE. An essay on the diagnosis and nature of paraphilia Journal of Sex & Marital Therapy 1990; 16(2):89-102.

58)   Althof SE, Turner LA, Levine SB, Risen CB, Bodner DB, Kursh ED, Resnick MI. Through the eyes of women: the sexual and psychological responses of women to their partners' treatment with self-injection or vacuum constriction therapy. International Journal of Impotence Research (supplement 2)1990;346-7.

59)   Althof SE, Turner LA, Levine SB, Risen CB, Bodner DB, Kursh ED, Resnick MI. A comparison of the effectiveness of two treatments for erectile dysfunction: self injection vs. external vacuum devices. . International Journal of Impotence Research (supplement 2)1990;289-90

60)   Kursh E, Turner L, Bodner D, Althof S, Levine S. A prospective study on the use of the vacuum pump for the treatment of impotence.International Journal of Impotence Research (supplement 2)1990;340-1.

61)   Althof SE, Turner LA, Levine SB, Risen CB, Bodner DB, Kursh ED, Resnick MI. Long term use of intracavernous therapy in the treatment of erectile dysfunction in Journal of Sex & Marital Therapy 1991; 17(2):101-112

62)   Althof SE, Turner LA, Levine SB, Risen CB, Bodner DB, Kursh ED, Resnick MI. Long term use of vacuum pump devices in the treatment of erectile dsyfunction in Journal of Sex & Marital Therapy 1991;17(2):81-93

63)   Turner LA, Althof SE, Levine SB, Bodner DB, Kursh ED, Resnick MI. A 12-month comparison of the effectiveness of two treatments for erectile dysfunction: self injection vs. external vacuum devices. Urology 1992;39(2):139-44

64)   Althof SE, The pathogenesis of psychogenic impotence. J. Sex Education and Therapy. 1991; 17(4):251-66

65)   Mehta P, Bedell WH, Cumming W, Bussing R, Warner R, Levine SB. Letter to the editor. Reflections on hemophilia camp. Clinical Pediatrics 1991; 30(4):259-260

66)   Successful Sexuality. Belonging/Hemophilia. (Caremark Therapeutic

Services), Autumn, 1991

67)     Psychological intimacy. Journal of Sex & Marital Therapy 1991; 17(4):259-68

68)     Male sexual problems and the general physician, Georgia State Medical Journal 1992; 81(5): 211-6

69)     Althof SE, Turner LA, Levine SB, Bodner DB, Kursh E, Resnick MI. Through the eyes of women: The sexual and psychological responses of women to their partner's treatment with self-injection or vacuum constriction devices. Journal of Urology 1992; 147(4):1024-7

70)     Curry SL, Levine SB, Jones PK, Kurit DM. Medical and Psychosocial predictors of sexual outcome among women with systemic lupus erythematosis. Arthritis Care and Research 1993; 6:23-30

71)     Althof SE, Levine SB. Clinical approach to sexuality of patients with spinal cord injury. Urological Clinics of North America 1993; 20(3):527-34

72)     Gender-disturbed males. Journal of Sex & Marital Therapy 19(2):131-141, 1993

73)     Curry SL, Levine SB, Jones PK, Kurit DM. The impact of systemic lupus erythematosis on women's sexual functioning. Journal of Rheumatology 1994; 21(12):2254-60

74)     Althof SE, Levine SB, Corty E, Risen CB, Stern EB, Kurit D. Clomipramine as a treatment for rapid ejaculation: a double-blind crossover trial of 15 couples. Journal of Clinical Psychiatry 1995;56(9):402-7

75)     Risen CB, Althof SE. Professionals who sexually offend: evaluation procedures and preliminary findings. Journal of Sex & Marital Therapy 1994; 20(4):288-302

76)     On Love, Journal of Sex & Marital Therapy 1995; 21(3):183-191

77)     What is clinical sexuality? Psychiatric Clinics of North America 1995; 18(1):1-6

78)     "Love" and the mental health professions: Towards an understanding of adult love. Journal of Sex & Marital Therapy 1996; 22(3)191-202

79)     The role of Psychiatry in erectile dysfunction: a cautionary essay on the emerging treatments. Medscape Mental Health 2(8):1997 on the Internet. September, 1997.

80)     Discussion of Dr. Derek Polonsky's SSTAR presentation on Countertransference. Journal of Sex Education and Therapy 1998; 22(3):13-17

81)     Understanding the sexual consequences of the menopause. Women's Health in Primary Care, 1998

82)    Fones CSL, Levine SB. Psychological aspects at the interface of diabetes and erectile dysfunction. Diabetes Reviews 1998; 6(1):1-8

83)    Guay AT, Levine SB, Montague DK. New treatments for erectile dysfunction. Patient Care March 15, 1998

84)    Extramarital Affairs. Journal of Sex & Marital Therapy 1998; 24(3):207-216

85)    Levine SB (chairman), Brown G, Cohen-Kettenis P, Coleman E, Hage JJ, Petersen M, Pfäfflin F, Shaeffer L, van Masdam J, Standards of Care of the Harry Benjamin International Gender Dysphoria Association, 5th revision, 1998. International Journal of Transgenderism at http://www.symposion.com/ijt

  •     Reprinted by the Harry Benjamin International Gender Dysphoria Association, Minneapolis, Minnesota

86)    Althof SE, Corty E, Levine SB, Levine F, Burnett A, McVary K, Stecher V, Seftel. The EDITS: the development of questionnaires for evaluating satisfaction with treatments for erectile dysfunction. Urology 1999;53:793-799

87)    Fones CSL, Levine SB, Althof SE, Risen CB. The sexual struggles of 23 clergymen: a follow-up study. Journal of Sex & Marital Therapy 1999

88)    The Newly Devised Standards of Care for Gender Identity Disorders. Journal of Sex Education and Therapy 24(3):1-11,1999

89)    Levine, S. B. (1999). The newly revised standards of care for gender identity disorders. Journal of Sex Education & Therapy, 24, 117-127.

90)    Melman A, Levine SB, Sachs B, Segraves RT, Van Driel MF. Psychological Issues in Diagnosis of Treatment (committee 11) in Erectile Dysfunction (A. Jarden, G. Wagner, S. Khoury, F. Guiliano, H. Padma-nathan, R. Rosen, eds.) Plymbridge Distributors Limited, London, 2000

91)    Pallas J, Levine SB, Althof SE, Risen CB. A study using Viagra in a mental health practice. J Sex&Marital Therapy.26(1):41-50, 2000

92)    Levine SB, Stagno S. Informed Consent for Case Reports: the ethical dilemma between right to privacy and pedagogical freedom. Journal of Psychotherapy: Practice and Research, 2001, 10 (3): 193-201.

93)    Alloggiamento T., Zipp C., Raxwal VK, Ashley E, Dey S. Levine SB, Froelicher VF. Sex, the Heart, and Sildenafil. Current Problems in Cardiology 26 June 2001(6):381-416

94)    Re-exploring The Nature of Sexual Desire. Journal of Sex and Marital Therapy 28(1):39-51, 2002.

95)    Understanding Male Heterosexuality and Its Disorders in Psychiatric Times XIX(2):13-14, February, 2002

96)    Erectile Dysfunction: Why drug therapy isn't always enough. (2003)

Cleveland Clinic Journal of Medicine, 70(3): 241-246.

97)     The Nature of Sexual Desire: A Clinician's Perspective. Archives of Sexual Behavior 32(3):279-286, 2003 .

98)     Laura Davis. What I Did For Love: Temporary Returns to the Male Gender Role. International Journal of Transgenderism, 6(4), 2002 and http://www.symposion.com/ijt

99)     Risen C.B., The Crisis in the Church: Dealing with the Many Faces of Cultural Hysteria in The International Journal of Applied Psychoanalytic Studies, 1(4):364-370, 2004

100)    Althof SE, Leiblum SR (chairpersons), Chevert-Measson M. Hartman U., Levine SB, McCabe M., Plaut M, Rodrigues O, Wylie K., Psychological and Interpersonal Dimensions of Sexual Function and Dysfunction in World Health Organization Conference Proceedings on Sexual Dysfunctions, Paris, 2003. Published in a book issued in 2004.

101)    Commentary on Ejaculatory Restrictions as a Factor in the Treatment of Haredi (Ultra-Orthodox) Jewish Couples: How Does Therapy Work? Archives of Sexual Behavior, 33(3):June 2004

102)    What is love anyway? J Sex & Marital Therapy 31(2):143-152,2005.

103)    A Slightly Different Idea, Commentary on Y. M. Binik's Should Dyspareunia Be Retained as a Sexual Dysfunction in DSM-V? A Painful Classification Decision. Archives of Sexual Behavior 34(1):38-39, 2005. http://dx.doi.org/10.1007/s10508-005-7469-3

104)    Commentary: Pharmacologic Treatment of Erectile Dysfunction: Not always a simple matter. BJM USA; Primary Care Medicine for the American Physician, 4(6):325-326, July 2004

105)    Leading Comment: A Clinical Perspective on Infidelity. Journal of Sexual and Relationship Therapy, 20(2):143-153, May 2005.

106)    Multiple authors. Efficacy and safety of sildenafil citrate (Viagra) in men with serotonergic antidepressant-associated erectile dysfunction: Results from a randomized, double-blind, placebo-controlled trial. Submitted to Journal of Clinical Psychiatry Feb 2005

107)    Althof SE, Leiblum SR, Chevert-Measson M, Hartman U, Levine SB, McCabe M, Plaut M, Rodrigues O, Wylie K. Psychological and Interpersonal Dimensions of Sexual Function and Dysfunction. Journal of Sexual Medicine, 2(6): 793-800, November, 2005

108)    Shifren JL, Davis SR, Moreau M, Waldbaum A, Bouchard C., DeRogatis L., Derzko C., Bearnson P., Kakos N., O'Neill S., Levine S., Wekselman K., Buch A., Rodenberg C., Kroll R. Testosterone Patch for the Treatment of Hypoactive Sexual

Desire Disorder in Naturally Menopausal Women: Results for the INTIMATE NM1 Study. Menopause: The Journal of the North American Menopause Society 13(5) 2006.

109)   Reintroduction to Clinical Sexuality. Focus: A Journal of Lifelong Learning in Psychiatry Fall 2005. III (4):526-531

110)   PDE-5 Inhibitors and Psychiatry in J Psychiatric Practice 12 (1): 46-49, 2006.

111)   Sexual Dysfunction: What does love have to do with it? Current Psychiatry 5(7):59-68, 2006.

112)   How to take a Sexual History (Without Blushing), Current Psychiatry 5(8): August, 2006.

113)   Linking Depression and ED: Impact on sexual function and relationships in Sexual Function and Men's Health Through the Life Cycle under the auspices of the Consortium for Improvement of Erectile Function (CIEF),12-19, November, 2006.

114)   The First Principle of Clinical Sexuality. Editorial. Journal of Sexual Medicine,4:853-854, 2007

115)   Commentary on David Rowland's editorial, "Will Medical Solutions to Sexual Problems Make Sexological Care and Science Obsolete?" Journal of Sex and Marital Therapy, 33(5), 2007

116)   Real-Life Test Experience: Recommendations for Revisions to the Standards of Care of the World Professional Association for Transgender Health International Journal of Transgenderism, Volume 11 Issue 3, 186-193, 2009

117)   Sexual Disorders: Psychiatrists and Clinical Sexuality. Psychiatric Times XXIV (9), 42-43, August 2007

118)   I am not a sex therapist! Commentary to I. Binik and M. Meana's article Sex Therapy: Is there a future in this outfit? Archives of Sexual Behavior, Volume 38, Issue 6 (2009), 1033-1034

119)   Solomon A (2009) Meanings and Political Implications of "Psychopathology" in a Gender Identity Clinic: Report of 10 cases. Journal of Sex and Marital Therapy 35(1): 40-57.

120)   Perelman, MA., Levine SB, Fischkoff SA. Randomized, Placebo-Controlled, Crossover Study to Evaluate the Effects of Intranasal Bremelanotide on Perceptions of Desire and Arousal in Postmenopausal Women with Sexual Arousal Disorder submitted to Journal of Sexual Medicine July 2009, rejected

121)   What is Sexual Addiction? Journal of Sex and Marital Therapy.2010 May;36(3):261-75

122)   David Scott (2010)  Sexual Education of Psychiatric Residents. Academic Psychiatry, 34(5) 349-352.

123)   Chris G. McMahon, Stanley E. Althof, Joel M. Kaufman, Jacques Buvat, Stephen B. Levine, Joseph W. Aquilina, Fisseha Tesfaye, Margaret Rothman, David A. Rivas, Hartmut Porst. Efficacy and Safety of Dapoxetine for the Treatment of Premature Ejaculation: Integrated Analysis of Results From 5 Phase 3 Trials Journal of Sexual Medicine 2011 Feb;8(2):524-39.

124)   Commentary on Consideration of Diagnostic Criteria for Erectile Dysfunction in DSM V. Journal of Sexual Medicine July 2010

125)   Hypoactive Sexual Desire Disorder in Men: Basic types, causes, and treatment. Psychiatric Times 27(6)4-34. 2010

126)   Male Sexual Dysfunctions, an audio lecture, American Physician Institute 2013

127)   Fashions in Genital Fashion: Where is the line for physicians? Commentary on David Veale and Joe Daniels' Cosmetic Clitoridectomy in a 33-year-old woman. Arch Sex Behav (2012) 41:735–736   DOI 10.1007/s10508-011-9849-7

128)   Review: Problematic Sexual Excess. Neuropsychiatry 2(1):1-12, 2012

129)   The Essence of Psychotherapy. Psychiatric Times 28 (2): August 2, 2012 t

130)   Parran TV, Pisman, AR, Youngner SJ, Levine SB.Evolution of remedial CME course in professionalism: Addressing learner needs, developing content, and evaluating outcomes. *Journal of Continuing Education in the Health Professions,* 33(3): 174-179, 2013.

131)   Love and Psychiatry. Psychiatric Times November 2013

132)   Orgasmic Disorders, Sexual Pain Disorders, and Sexual Dysfunction Due to a Medical Condition. Board Review Psychiatry 2013-2014 Audio Digest CD 27. Audio recording of a one-hour lecture available October 2013.

133)   Towards a Compendium of the Psychopathologies of Love. Archives of Sexual Behavior Online First December 25, 2013 DOI 10.1007/s10508-013-0242-6 43(1)213-220.

134)   Flibanserin. (editorial) Archives of Sexual Behavior 44 (8), 2015 November 2015. DOI: 10.1007/s10508-015-0617-y

135)   Martel C, Labrie F, Archer DF, Ke Y, Gonthier R, Simard JN, Lavoie L, Vaillancourt M, Montesino M, Balser J, Moyneur É; other participating members of the Prasterone Clinical Research Group. (2016) Serum steroid concentrations remain within normal postmenopausal values in women receiving daily 6.5mg intravaginal prasterone for 12 weeks.J Steroid Biochem Mol Biol. 2016 May;159:142-53. doi: 10.1016/j.jsbmb.2016.03.016

136)    Reflections of an Expert on the Legal Battles Over Prisoners with Gender Dysphoria. J Am Acad Psychiatry Law 44:236–45, 2016

137)    Cooper E, McBride J, Levine SB. Does Flibanserin have a future? Psychiatric Times accepted October 23, 2015.

138)    Levine SB, Sheridan DL, Cooper EB. The Quest for a Prosexual Medication for Women, Current Sexual Health Reports (2016) 8: 129. doi:10.1007/s11930-016-0085-y

139)    Why Sex Is Important: Background for Helping Patients with Their Sexual Lives., British Journal of Psychiatry Advances (2017), vol. 23(5) 300-306; DOI: 10.1192/apt.bp.116.016428

140)    Commentary on "Asexuality: Orientation, paraphilia, dysfunction, or none of the above? Archives Sexual Behavior, Archives of Sexual Behavior April 2017, Volume 46, Issue 3, pp. 639–642 DOI: 10.1007/s10508-017-0947-z

141)    Sexual Dysfunction in Clinical Psychiatry, Psychiatric Times, March 2017

142)    Ethical Concerns About the Emerging Treatment of Gender Dysphoria, Journal of Sex and Marital Therapy, 44(1):29-44. 2017. DOI 10.1080/0092623X.2017.1309482

143)    The Psychiatrist's Role in Managing Transgender Youth: Navigating Today's Politicized Terrain. CMEtoGO Audio Lecture Series, May 2017

144)    Transitioning Back to Maleness, Archives of Sexual Behavior, 2017 Dec 20. doi: 10.1007/s10508-017-1136-9; 47(4), 1295-1300, May 2018

145)    Informed Consent for Transgender Patients, Journal of Sex and Marital Therapy, 2018 Dec 22:1-12. doi: 10.1080/0092623X.2018.1518885.

146)    Reflections On The Clinician's Role with Individuals Who Self-Identify as Transgender (2021) Archives Sexual Behavior, 50(8):3527-3536. doi: 10.1007/s10508-021-02142-1.

147)    Levine SB, Abbruzzese E, Mason J. Reconsideration of Informed Consent for Trans-identified Children, Adolescents, and Young Adults. J. Sex and Marital Therapy, in press 2022.


C)  **Book Chapters**

1)      Overview of Sex Therapy. In Sholevar GP (ed) The Handbook of Marriage and Marital Therapy. New York. Spectrum Publications, 1981 pp. 417-41

2)      Why study sexual functioning in diabetes? In Hamburg BA, Lipsett LF, Inoff GE, Drash A (eds) Behavioral & Psychosocial Issues in Diabetes: Proceedings of a National conference. Washington, DC. US Dept. of Health & Human Services. PHS NIH, Pub. #80-1933

3)      Sexual Problems in the Diabetic in Bleicher SJ, Brodoff B (eds) Diabetes Mellitus and Obesity. Williams and Wilkins, 1992

4)      Clinical Introduction to Human Sexual Dysfunction. In Pariser SF, Levine SB, McDowell M (eds) Clinical Sexuality. New York, Marcel Dekker Publisher, 1983.

5)      Psychodynamically-oriented clinician's overview of psychogenic impotence. In RT Segraves (ed) Impotence. New York, Plenum, 1985

6)      Origins of sexual preferences. In Shelp EE (ed) Sexuality and Medicine. D. Reidel Publishing co. 1987. pp. 39-54.

7)      Hypoactive Sexual Desire and Other Problems of Sexual Desire. In H. Lief (ed). The Treatment of Psychosexual Dysfunctions/ III. American Psychiatric Press, chapter 207, pp. 2264-79, 1989

8)      Psychological Sexual Dysfunction. In Sudak H (ed) Clinical Psychiatry. Warren H. Green. St. Louis, 1985

9)      Male sexual dysfunction. In Sudak H (ed) Clinical Psychiatry. Warren H. Green. St. Louis, 1985

10)     Sexuality and Aging. In Sudak H (ed) Clinical Psychiatry. Warren H. Green. St. Louis, 1985

11)     Homosexuality. In Sudak H (ed) Clinical Psychiatry. Warren H. Green. St. Louis, 1985

12)     Individual and intrapsychic factors in sexual desire. In Leiblum SR, Rosen RC (eds). Clinical Perspectives on Sexual Desire Disorders. Guilford Press, New York, 1988, pp. 21-44

13)     Gender Identity Disorders. In Sadock B, Kaplan H(eds). Comprehensive Textbook of Psychiatry, Baltimore, William and Wilkins, 1989, pp. 1061-9

14)     Intrapsychic and Interpersonal Aspects of Impotence: Psychogenic Erectile Dysfunction. In Leiblum SR, Rosen RC (eds). Erectile Disorders: Assessment and Treatment. Guilford Press, New York, 1992

15)     Psychological Factors in Impotence. In Resnick MI, Kursh ED, (eds.) Current Therapy in Genitourinary Surgery, 2nd edition. BC Decker, 1991, pp. 549-51

16)     The Vagaries of Sexual Desire. In Leiblum SR, Rosen RC (eds). In Case Studies in Sex Therapy. Guilford Press, New York, 1995

17)     Rosenblatt EA. Sexual Disorders (chapter 62). In Tasman A, Kay J, Liberman JA (eds). Psychiatry Volume II, W.B.Saunders, Philadelphia. 1997, pp. 1173-2000.

18)     Althof SE. Psychological Evaluation and Sex Therapy.  In Mulcahy JJ (ed)

Diagnosis and Management of Male Sexual Dysfunction Igaku-Shoin, New York, 1996, pp. 74-88

19)     Althof SE, Levine SB. Psychological Aspects of Erectile Dysfunction. In Hellstrum WJG (ed) Male Infertility and Dysfunction. Springer-Verlag, New York, 1997. pp. 468-73

20)     Paraphilias. In Comprehensive Textbook of Psychiatry/VII. Sadock BJ, Sadock VA (eds.) Lippincott Williams & Wilkins, Baltimore, 1999, pp. 1631-1645.

21)     Women's Sexual Capacities at Mid-Life in The Menopause: Comprehensive Management B. Eskind (ed). Parthenon Publishing, Carnforth, UK, 2000.

22)     Male Heterosexuality in Masculinity and Sexuality:Selected Topics in the Psychology of Men, (Richard C. Friedman and Jennifer I. Downey, eds) Annual Review of Psychiatry, American Psychiatric Press, Washington, DC, W-18. pp. 29-54.

23)     R.T.Segraves. Introduction to section on Sexuality: Treatment of Psychiatric Disorders-III (G.O.Gabbard, ed), American Psychiatric Press, Washington, DC, 2001

24)     Sexual Disorders (2003) in Tasman A, Kay J, Liberman JA (eds). Psychiatry 2nd edition, Volume II, W.B.Saunders, Philadelphia. Chapter 74

25)     What Patients Mean by Love, Psychological Intimacy, and Sexual Desire (2003) in SB Levine, CB Risen, SE Althof (eds) Handbook of Clinical Sexuality for Mental Health Professionals, Brunner-Routledge, New York, pp. .21-36.

26)     Infidelity (2003) in SB Levine, CB Risen, SE Althof (eds) Handbook of Clinical Sexuality for Mental Health Professionals, Brunner-Routledge, New York, pp. 57-74

27)     Preface (2003) in SB Levine, CB Risen, SE Althof (eds) Handbook of Clinical Sexuality for Mental Health Professionals, Brunner-Routledge, New York, pp. xiii-xviii

28)     A Psychiatric Perspective on Psychogenic Erectile Dysfunction (2004) in T.F. Lue (ed) Atlas of Male Sexual Dysfunction, Current Medicine, Philadelphia Chapter 5

29)     Levine, SB., Seagraves, RT. Introduction to Sexuality Section, Treatment of Psychiatric Disorders, 3rd edition (Gabbard GO, editor), American Psychiatric Press, 2007

30)     Risen CB, (2009)Professionals Who Are Accused of Sexual Boundary Violations In Sex Offenders: Identification, Risk Assessment, Treatment, and Legal Issues edited by Fabian M. Saleh, Albert J. Grudzinskas, Jr., and John M. Bradford, Oxford University Press, 2009

31)     What Patients Mean by Love, Intimacy, and Sexual Desire, in Handbook of

Clinical Sexuality for Mental Health Professionals edited by Levine SB, Risen, CB, and Althof, SE, Routledge, New York, 2010

32)     Infidelity in Handbook of Clinical Sexuality for Mental Health Professionals edited by Levine SB, Risen, CB, and Althof, SE, Routledge, New York, 2010

33)     Scott DL, Levine, SB. Understanding Gay and Lesbian Life in Handbook of Clinical Sexuality for Mental Health Professionals edited by Levine SB, Risen, CB, and Althof, SE, Routledge, New York, 2010

34)     Levine, SB, Hasan, S., Boraz M. (2009) Male Hypoactive Sexual Desire Disorder (HSDD) in Clinical Manual of Sexual Disorders (R. Balon and RT Segraves, eds), American Psychiatric Press, Washington, DC.

35)     Levine, SB. Sexual Disorders in Fundamentals of Psychiatry (by Allan Tasman and Wanda Mohr, eds.) <http://eu.wiley.com/WileyCDA/WileyTitle/productCd-0470665777.html>, .

36)     Infidelity in Principles and Practices of Sex Therapy (I Binik, K. Hall, editors), 5th edition, Guilford Press, New York, 2014.

37)     Why is Sex Important? In Handbook of Clinical Sexuality for Mental Health Professionals 3rd ed. [SB Levine, CB Risen, SE Althof, eds] New York. Routledge, 2016, Chapter 1

38)     The Rich Ambiguity of Key Terms: Making Distinctions. In Handbook of Clinical Sexuality for Mental Health Professionals 3rd ed. [SB Levine, CB Risen, SE Althof, eds] New York. Routledge, 2016. Chapter 4

39)     The Mental Health Professional's Treatment of Erection Problems . In Handbook of Clinical Sexuality for Mental Health Professionals 3rd ed. [SB Levine, CB Risen, SE Althof, eds] New York. Routledge, 2016 Chapter 11

40)     Why is Sex Important? In Sexual Health in the Couple: Management of Sexual Dysfunction in Men and Women [L Lipshultz, A Pastuszak, M Perelman, A Giraldi, J Buster, eds.] New York, Springer, 2016.

41)     Sommers, B., Levine, S.B., Physician's Attitude Towards Sexuality, in Psychiatry and Sexual Medicine: A Comprehensive Guide for Clinical Practitioners, 2020.

42)     Boundaries And The Ethics Of Professional Misconduct in A. Steinberg, J. L. Alpert, C A. Courtois( Eds.) Sexual Boundary Violations In Psychotherapy: Therapist Indiscretions, & Transgressions, & Misconduct American Psychological Association, 2021.

**D) Book Reviews**

1)     Homosexualities: A Study of Diversity Among Men and Women by Alan P. Bell and Martin S. Weinberg, Simon and Schuster, New York, 1978. In Journal of

Sex & Marital Therapy 1979; 5:

2)      Marriage and Marital Therapies: Psychoanalytic, Behavioral & System Theory Perspectives by TJ Paolino and BS McCrady. Brunner/Mazel, New York, 1978. In Journal of Sex & Marital Therapy 1979; 5:

3)      Management of Male Impotence. Volume 5 International Perspectives in Urology AH Bennett, (ed) Williams and Wilkins, Baltimore, 1992. In American Journal of Psychiatry, 1984

4)      The Sexual Relationship by DE Scharff, Routledge & Kegan Paul, 1982 in Family Process 1983;22:556-8

5)      Phenomenology and Treatment of Psychosexual Disorders, by WE Fann, I Karacan, AD Pokorny, RL Williams (eds). Spectrum Publications, New York, 1983. In American Journal of Psychiatry 1985;142:512-6

6)      The Treatment of Sexual Disorders: Concepts and Techniques of Couple Therapy, G Arentewicz and G Schmidt. Basic Books, New York, 1983. In American Journal of Psychiatry 1985;142:983-5

7)      Gender Dysphoria: Development, Research, Management. BN Steiner (ed). Plenum Press, 1985 in Journal of Clinical Psychiatry, 1986

8)      Gender Dysphoria: Development, Research, Management. BN Steiner (ed). Plenum Press, 1985 in Contemporary Psychology 1986:31:421-2 [titled, The Limitations of Science, the Limitations of Understanding]

9)      Psychopharmacology of Sexual Disorders by M Segal (ed) John Libbey & Co Ltd, London, 1987 in American Journal of Psychiatry 1987;144:1093

10)     "The Sissy Boy Syndrome" and the Development of Homosexuality by R Green. Yale University Press, New Haven, 1987. In American Journal of Psychiatry 1988;145:1028

11)     Male Homosexuality: A contemporary psychoanalytic perspective by RC Friedman, Yale University Press, New Haven, 1988 in Journal of Clinical Psychiatry 1989;50:4, 149

12)     Sexual Landscapes: Why we are what we are, why we love whom we love. By JD Weinrich, Charles Schribner's Sons, New York, 1987 in Archives of Sexual Behavior 21 (3):323-26, 1991

13)     How to Overcome Premature Ejaculation by HS Kaplan, Brunner/Mazel, New York, 1989 in Journal of Clinical Psychiatry 51(3):130, 1990

14)     Clinical Management of Gender Identity Disorders in Children and Adults R. Blanchard, BN Steiner (eds) American Psychiatry Press, Washington, DC, 1990. In Journal of Clinical Psychiatry 52(6):283, 1991

15)     Psychiatric Aspects of Modern Reproductive Technologies. NL Stotland

(ed) American Psychiatric Press, Washington DC, 1990. In Journal of Clinical Psychiatry 1991;52(9):390

16)     Homosexualities: Reality, Fantasy, and the Arts. CW Socarides, VD Volkan (eds). International Universities Press, Madison, Connecticut, 1990. In Journal of Clinical Psychiatry 1992;(10)

17)     Reparative Therapy of Male Homosexuality: A New Clinical Approach. J Nicolosi, Jason Aronson, Northvale NJ, 1992. In Contemporary Psychology 38(2):165-6, 1993 [entitled Is Evidence Required?]

18)     Male Victims of Sexual Assault, GC Mezey, MB King (eds) Oxford University Press, New York, 1992. In Journal of Clinical Psychiatry 1993;54(9):358,

19)     AIDS and Sex: An Integrated Biomedical and Biobehavioral Approach. B Voeller, JM Reinisch, M Gottlieb, Oxford University Press, New York, 1990. In American Journal of Psychiatry

20)     Porn: Myths for the Twentieth Century by RJ Stoller, Yale University Press, New Haven, 1991. In Archives of Sexual Behavior 1995;24(6):663-668

21)     Sexual Dysfunction: Neurologic, Urologic, and Gynecologic Aspects. R Lechtenberg, DA Ohl (eds) Lea & Febiger, Philiadelphia, 1994. In Neurology

22)     The Sexual Desire Disorders: Dysfunctional Regulation of Sexual Motivation. HS Kaplan Brunner/Mazel, New York, 1995. In Neurology 1996; 47:316

23)     Femininities, Masculinities, Sexualities: Freud and Beyond. N. Chodorow. The University Press of Kentucky, Lexington, 1994. Archives of Sexual Behavior 28(5):397-400,1999

24)     Sexual Function in People with Disability and Chronic Illness: A Health Professional's Guide by ML Sipski, CJ Alexander. Aspen Publishers, Gaitersburg, Md, 1997. In Journal of Sex Education and Therapy, 1998;23(2):171-2

25)     Sexual Aggression by J Shaw (ed). American Psychiatric Press, Washington, DC, 1998. In American Journal of Psychiatry, May, 1999

26)     The *Wounded* Healer: Addiction-Sensitive Approach to the Sexually Exploitative Professional by Richard Irons and Jennifer P. Schneider. Jason Aronson, Northvale, N.J., 1999 in American Journal of Psychiatry 157(5):8-9,2000.

27)     Culture of the Internet by Sara Kiesler (editor), Lawrence Erlbaum Associates, Mahway, New Jersey, 1997. 463pp in Journal of Sex Research, 2001

28)     Psychological Perspectives on Human Sexuality. Lenore T. Szuchman and Frank Muscarella (editors), Wiley and Sons, New York, American Journal of Psychiatry, April, 2002

29)    "How Sexual Science Operates" a review of Sex, Love, and Health in America: Private Choices and Public Policies. EO Laumann and RT Michael, editors. Chicago, University of Chicago, 2001 in Second Opinion, The Park Ridge Center for the Study of Health, Faith, and Ethics, 11:82-3, April, 2004.

30)    Sexual Orientation and Psychoanalysis: Sexual Science and Clinical Practice. R.C. Friedman and J.I. Downey (eds). New York. Columbia University Press. in Archives of Sexual Behavior (2003) 31(5):473-474

31)    Prozac on the Couch: Prescribing Gender in the Era of Wonder Drugs, Jonathon Michel Metzl. Duke University Press, Durham, 2003 in American Journal of Psychiatry, November, 2004.

32)    Sex and Gender by M. Diamond and A. Yates Child Psychiatric Clinics of North America W. B. Saunders, Philadelphia, Pennsylvania, 2004, 268 pp. in Archives of Sexual Behavior April 2007 online publication in Dec.2006 at http://dx.doi.org/10.1007/s10508-006-9114-7

33)    Getting Past the Affair: A program to help you cope, heal, and move on—together or apart by Douglas K. Snyder, Ph.D, Donald H. Baucom, Ph.D, and Kristina Coop Gordon, Ph.D, New York, Guilford Press, 2007 in Journal of Sex and Marital Therapy,34:*1-3*, 2007

34)    Dancing with Science, Ideology and Technique. A review of Sexual Desire Disorders: A casebook Sandra R. Leiblum editor, Guilford Press, New York, 2010. In Journal of Sex Research 2011.

35)    What is more bizarre: the transsexual or transsexual politics? A review of Men Trapped in Men's Bodies: Narratives of Autogynephilic Transsexualism by Anne A. Lawrence, New York, Springer, 2014. In Sex Roles: a Journal of Research, **70, Issue 3 (2014), Page 158-160**, 2014. DOI: 10.1007/s11199-013-0341-9

36)    There Are Different Ways of Knowing. A review of: How Sexual Desire Works: The Enigmatic Urge by Frederick Toates, Cambridge, UK, Cambridge University Press, in Sexuality and Cu1ture (2015) 19:407–409 DOI 10.1007/s12119-015-9279-0

37)    The Dynamics of Infidelity: Applying Relationship Science to Clinical Practice by Lawrence Josephs, American Psychological Association, Washington, DC, 2018, pp. . 287, $69.95  in Journal of Sex and Marital Therapy10.1080/0092623X.2018.1466954, 2018. For free access: https://www.tandfonline.com/eprint/UgiIHbWbpdedbsXWXpNf/full

38)    Transgender Mental Health by Eric Yarbrough, American Psychiatric Association Publications, 2018, Journal and Marital & Sexual Therapy, https://doi.org/10.1080/0092623X.2018.1563345 .

## IN THE UNITED STATES DISTRICT COURT
### FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA
### CHARLESTON DIVISION

**B.P.J.**, by her next friend and mother, HEATHER JACKSON,

*Plaintiff,*

*v.*

**WEST VIRGINIA STATE BOARD OF EDUCATION**, **HARRISON COUNTY BOARD OF EDUCATION**, *et al.,*

*Defendants,*

*and*

**LAINEY ARMISTEAD**,

*Defendant-Intervenor.*

Civil Action No: 2:21-cv-00316

**THE HONORABLE JOSEPH R. GOODWIN**

## DECLARATION OF JAMES M. CANTOR, PhD.

I, Dr. James Cantor, pursuant to 28 U.S. Code § 1746, declare under penalty of perjury under the laws of the United States of America that the facts contained in my Expert Report of James M. Cantor, Ph.D., in the Case of *B.P.J. v. West Virginia State Board of Education*, dated February 23, 2022, attached hereto, are true and correct to the best of my knowledge and belief, and that the opinions expressed therein represent my own expert opinions.

_____

Dr. James M. Cantor, PhD.

Executed February 23, 2022

Case 27484 0385

ii

0386

Expert Report of

**James M. Cantor, PhD.**

In the case of *B.P.J. vs. West Virginia State Board of Education.*

February 23, 2022

iii

Case 27486 0387

iv

# Table of Contents

I.  Background & Credentials ................................................................................. 1

II.  Introduction .................................................................................................. 3

III.  Clarifying Terms ........................................................................................... 4

IV.  Evidence Cited by Plaintiffs' Expert Reports .................................................. 5

V.  Evidence Missing from Plaintiffs' Expert Reports ......................................... 11

    A.  Adult-Onset Gender Dysphoria ............................................................. 12

        1.  Outcome Studies of Transition in Adult-Onset Gender Dysphoria ..... 13

        2.  Mental Health Issues in Adult-Onset Gender Dysphoria ................... 13

    B.  Childhood Onset (Pre-Puberty) Gender Dysphoria .................................... 15

        1.  Prospective Studies of Childhood-Onset Gender Dysphoria Show
            that Most Children Desist in the "Natural Course" by Puberty .......... 15

        2.  "Watchful Waiting" and "The Dutch Approach" ................................. 18

        3.  Studies of Transition Outcomes: Overview ...................................... 20

            a.  Outcomes of The Dutch Approach (studies from before 2017):
                Mix of positive, negative, and neutral outcomes ......................... 21

            b.  Clinicians and advocates have invoked the Dutch Approach
                while departing from its protocols in important ways. ................... 23

            c.  Studies by other clinicians in other countries have failed to
                reliably replicate the positive components of the results
                reported by the Dutch clinicians in de Vries et al. 2011. ............... 24

        4.  Mental Health Issues in Childhood-Onset Gender Dysphoria ............. 26

    C.  Adolescent-Onset Gender Dysphoria ........................................................ 28

        1.  Features of Adolescent-Onset Gender Dysphoria ............................... 28

        2.  Prospective Studies of Social Transition and Puberty Blockers in
            Adolescence .............................................................................. 29

        3.  Mental Illness in Adolescent-Onset Gender Dysphoria ...................... 30

VI.    Alleged Scientific Claims Assessed ................................................................ 32

    A.  Conversion Therapy ........................................................................... 32

    B.  Claims that All Childhood Outcome Studies Are Wrong ......................... 33

    C.  Assessing Claims of Suicidality ............................................................ 34

    D.  Assessing Demands for Social Transition and Affirmation-Only or Affirmation-on-Demand Treatment in Pre-Pubertal Children. ................ 37

    E.  Assessing the "Minority Stress Hypothesis" .......................................... 41

VII.   Assessing Statements from Professional Associations .................................... 42

    A.  Understanding the Value of Statements from Professional Associations ......................................................................................... 42

    B.  Misrepresentations of statements of professional associations. ............... 43

        1.  World Professional Association for Transgender Health (WPATH) .... 44

        2.  Endocrine Society (ES) ............................................................. 45

        3.  Pediatric Endocrine Society and Endocrine Society (ES/PES) ............ 46

        4.  American Academy of Child & Adolescent Psychiatry (AACAP) ......... 47

        5.  American College of Obstetricians & Gynecologists (ACOG) .............. 48

        6.  American College of Physicians (ACP) ...................................... 49

        7.  American Academy of Pediatrics (AAP) ................................... 51

        8.  The ESPE-LWPES GnRH Analogs Consensus Conference Group ...... 51

References ...................................................................................................... 53

## I.     Background & Credentials

1.     I am a clinical psychologist and Director of the Toronto Sexuality Centre in Canada. For my education and training, I received my Bachelor of Science degree from Rensselaer Polytechnic Institute, where I studied mathematics, physics, and computer science. I received my Master of Arts degree in psychology from Boston University, where I studied neuropsychology. I earned my Doctoral degree in psychology from McGill University, which included successfully defending my doctoral dissertation studying the effects of psychiatric medication and neurochemical changes on sexual behavior, and included a clinical internship assessing and treating people with a wide range of sexual and gender identity issues.

2.     Over my academic career, my posts have included Psychologist and Senior Scientist at the Centre for Addiction and Mental Health (CAMH) and Head of Research for CAMH's Sexual Behaviour Clinic, Associate Professor of Psychiatry on the University of Toronto Faculty of Medicine, and Editor-in-Chief of the peer reviewed journal, *Sexual Abuse*. That journal is one of the top-impact, peer-reviewed journals in sexual behavior science and is the official journal of the Association for the Treatment of Sexual Abusers. In that appointment, I was charged to be the final arbiter for impartially deciding which contributions from other scientists in my field merited publication. I believe that appointment indicates not only my extensive experience evaluating scientific claims and methods, but also the faith put in me by the other scientists in my field. I have also served on the Editorial Boards of the *Journal of Sex Research*, the *Archives of Sexual Behavior*, and *Journal of Sexual Aggression*. Thus, although I cannot speak for other scientists, I regularly interact with and am routinely exposed to the views and opinions of most of the scientists active in our field today, within the United States and throughout the world.

3.     My scientific expertise spans the biological and non-biological development of human sexuality, the classification of sexual interest patterns, the assessment and

1

treatment of atypical sexualities, and the application of statistics and research methodology in sex research. I am the author of over 50 peer-reviewed articles in my field, spanning the development of sexual orientation, gender identity, hypersexuality, and atypical sexualities collectively referred to as *paraphilias*. I am the author of the past three editions of the gender identity and atypical sexualities chapter of the *Oxford Textbook of Psychopathology*. These works are now routinely cited in the field and are included in numerous other textbooks of sex research.

4.     I began providing clinical services to people with gender dysphoria in 1998. I trained under Dr. Ray Blanchard of CAMH and have participated in the assessment of treatment of over one hundred individuals at various stages of considering and enacting both transition and detransition, including its legal, social, and medical (both cross-hormonal and surgical) aspects. My clinical experience includes the assessment and treatment of several thousand individuals experiencing other atypical sexuality issues. I am regularly called upon to provide objective assessment of the science of human sexuality by the courts (prosecution and defense), professional media, and mental health care providers.

5.     I have served as an expert witness in a total of 14 cases, which are listed in my *curriculum vitae*, attached here as Appendix 1, which includes a list of cases in which I have recently testified.

6.     A substantial proportion of the existing research on gender dysphoria comes from two clinics, one in Canada and one in the Netherlands. The CAMH gender clinic (previously, Clarke Institute of Psychiatry) was in operation for several decades, and its research was directed by Dr. Kenneth Zucker. I was employed by CAMH between 1998 and 2018. I was a member of the hospital's adult forensic program. However, I was in regular contact with members of the CAMH child psychiatry program (of which Dr. Zucker was a member), and we collaborated on multiple projects.

2

7.      For my work in this case, I am being compensated at the hourly rate of $400 per hour. My compensation does not change based on the conclusions and opinions that I provide here or later in this case or on the outcome of this lawsuit.

## II.   Introduction

8.      The principal opinions that I offer and explain in detail in this report are:

a. Biological sex is a clear, scientifically valid, and well-defined category. The existence of disorders of sexual development in an extremely small proportion of individuals does not change this.

b. Neither early-onset (childhood) gender dysphoria nor adolescent-onset gender dysphoria can be assumed to reflect a fixed aspect of a person's psychological make-up or self-perception.

c. No study has demonstrated that "affirming" the transgender identity of a child or adolescent produces better mental health outcomes or reduced suicidality relative to psychotherapy and mental health support.

d. On the contrary, the contemporary studies have failed to find improved mental health in teens and young adults after administration of puberty blockers and/or cross-sex hormones.

e. e) Affirmation of a transgender identity in minors who suffer from early-onset or adolescent-onset gender dysphoria is not an accepted "standard of care."

In addition, I have been asked to provide an expert opinion on how relevant professional organizations have addressed these questions and whether any of them have taken any meritorious position that would undermine West Virginia's Protect Women's Sports Act (H.B. 3292) ("Act"). As I explain in detail in this report, it is my opinion that Plaintiffs' expert reports display a wide variety of flaws that call their conclusions into question and that no professional organization has articulated a meritorious position that calls into question the basis for the Act.

3

9.     To prepare the present report, I reviewed the following resources related to this litigation:

    a.  West Virginia's Protect Women's Sports Act, H.B. 3293.

    b.  The Amended Complaint in this litigation.

    c.  Ms. Armistead's Declaration, Doc. 95-1.

    d.  Declaration and Expert Report of Deanna Adkins, MD.

    e.  Expert Report and Declaration of Joshua D. Safer, MD, FACP, FACE.

## III.   Clarifying Terms

10.    Most scientific discussions begin with the relevant vocabulary and definitions of terms. In the highly polarized and politicized debates surrounding transgender issues, that is less feasible: Different authors have used terms in differing, overlapping ways. Activists and the public (especially on social media) will use the same terms, but to mean different things, and some have actively misapplied terms so that original documents appear to assert something they do not.

11.    "Gender expression" is one such term. For another example, the word "child" is used in some contexts to refer specifically to children before puberty; in some contexts, to refer to children before adolescence (thus including ages of puberty); in still other contexts, to refer to people under the legal age of consent, which is age sixteen in the Netherlands (where much of the research was conducted) or age eighteen in much of North America. Thus, care should be taken in both using and interpreting the word "child" in this field.

12.    Because the present document is meant to compare the claims made by others, it is the definitions used by those specific authors in those specific contexts which are relevant. Thus, definitions to my own uses of terms are provided where appropriate, but primarily explicate how terms were defined and used in their original contexts.

4

## IV.   Evidence Cited by Plaintiffs' Expert Reports

13.    Dr. Adkins claimed a person's gender identity cannot be voluntarily changed. In actual clinical practice, that is rarely the relevant issue. The far more typical situation is youth who are *mistaken* about their gender identity. These youth are misinterpreting their experiences to indicate they are transgender, or they are exaggerating their descriptions of their experiences in service of attention-seeking or other psychological needs. Dr. Adkins' claim is not merely lacking any science to support it; the claim itself defies scientific thinking. In science, it is not possible to know that gender identity cannot be changed: We can know only that we lack evidence of such a procedure. In the scientific method, it remains eternally possible for evidence of such a treatment to emerge, and unlike sexual orientation's long history with conversion therapy, there have not been systematic attempts to change gender identity.

14.    Dr. Adkins claimed that untreated gender dysphoria can result in several mental health issues, including suicidality. The relevant research on suicidality is summarized in its own section to follow. Nonetheless, Dr. Adkins' claim is a misleading half-truth: Missing is that people with gender dysphoria continue to experience those mental health symptoms even after they do transition, including a 19 times greater risk of death from suicide.[1] This is why clinical guidelines repeatedly indicate that mental health issues should be resolved *before* any transition, as indicated in multiple sets of clinical guidelines, summarized in their own section to follow. As emphasized even by authorities Dr. Adkins cites herself: Transition should not be relied upon itself to improve mental health status.

15.    Adkins' support for the claim that untreated gender dysphoria lessens mental health consisted of two articles: Olson, *et al.* (2016) and Spack (2012). Such is a terrible  misrepresentation of the state of the scientific literature. Although Olson,

---

[1]    Dhejne, *et al.*, 2011.

et al., did indeed report that gender dysphoric children showed no mental health differences from the non-transgender control groups, Olson's report turned out to be incorrect. The Olson data were reanalyzed, and after correcting for statistical errors in the original analysis, the data instead showed that the gender dysphoric children under Olson's care *did,* in fact, exhibit significantly lower mental health.[2]

16.    I conducted an electronic search of the research literature to identify any responses from the Olson team regarding the Schumm and Crawford re-analysis of the Olson data and was not able to locate any. I contacted Professor Schumm by email on August 22, 2021 to verify that conclusion, to which he wrote there has been: "No response [from Olson]."[3]

17.    Adkins also misrepresented the views of Dr. Norman Spack. The article Adkins cited—Spack, 2012—repeatedly emphasized that children with gender dysphoria exhibit very many symptoms of mental illnesses. Spack asserted unambiguously that "Gender dysphoric children who do not receive *counseling* have a high risk of behavioural and emotional problems and psychiatric diagnoses."[4] The wording of Dr. Adkins' report ("gender dysphoria . . . if left untreated") misrepresents Spack so as to suggest Spack was advocating for medical transition to treat the gender dysphoria rather than counseling to treat suicidality and any other mental health issues. Moreover still, missing from Adkins' report was Spack's conclusion that "[m]ental health intervention should persist for the long term, even after surgery, *as patients continue to be at mental health risk, including for suicide.* While the causes of suicide are multifactorial, the possibility cannot be ruled out that some patients unrealistically believe that surgery(ies) solves their psychological distress."[5] Whereas

---

[2]    Schumm & Crawford, 2020; Schumm, *et al.,* 2019.
[3]    Schumm, email communication, Aug. 22, 2021 (on file with author).
[4]    Spack, *et al.,* 2012, at 422, italics added.
[5]    Spack, *et al.,* 2013, at 484, italics added

Adkins (selectively) cited Spack to support her insinuation that transition relieves distress, Spack instead explicitly warned against drawing exactly that conclusion.

18.    Next, Adkins claimed to have achieved levels of success in her professional clinical practice unlike those reported by anyone anywhere else in the world: "All of my patients have suffered from persistent gender dysphoria, which has been alleviated through clinical appropriate treatment."[6] It is difficult to evaluate such a bold self-assessment of success. No clinic has published success rates even approximating this. By contrast, the peer-reviewed research literature repeatedly indicates that clients misrepresent themselves to their care-providers, engaging in "image management" so as to appear as having better mental health than they actually do.[7] In the absence of objective evidence, it is not possible to differentiate Adkins' claims of success from the simpler explanation that she and her patients are telling each other what they want and expect to hear.

19.    Adkins referred to the clinical practice guidelines (CPG's) of three professional societies: the American Association of Pediatrics (AAP), the World Professional Association for Transgender Health (WPATH), and the Endocrine Society. This provides only an incomplete and inaccurate portrayal of the field.  I am aware of six rather than three professional societies providing clinical guidelines for the care of gender dysphoric children.  They are detailed more fully in their own section of this report. Nonetheless, with the broad exception of the AAP, their statements repeatedly noted:

- Desistance of gender dysphoria occurs in the majority of prepubescent children.
- Mental health issues need to be assessed as potentially contributing factors and need to be addressed before transition.
- Puberty-blocking medication is an experimental, not a routine, treatment.

---

[6]    Adkins Report at 5.
[7]    Anzani, *et al.*, 2020; Lehmann, *et al.*, 2021.

- Social transition is not generally recommended until after puberty.

Although some other associations have published broad statements of moral support for sexual minorities and against discrimination, they did not include any specific standards or guidelines regarding medical- or transition-related care.

20.    Although Adkins referred to them as "widely accepted," the WPATH and the Endocrine Society guidelines have both been subjected to standardized evaluation, the Appraisal of Guidelines for Research and Evaluation ("AGREE II") method, as part of an appraisal of all published CPGs regarding sex and gender minority healthcare.[8] Utilizing community stakeholders to set domain priorities for the evaluation, the assessment concluded that the guidelines regarding HIV and its prevention were of high quality, but that "[t]ransition-related CPGs tended to lack methodological rigour and rely on patchier, lower-quality primary research."[9] Neither the Endocrine Society's or WPATH's guidelines were recommended for use. Indeed, the WPATH guidelines received unanimous ratings of "Do not recommend."[10]

21.    Immediately following the publication of the AAP policy, I conducted a point-by-point fact-check of the claims it asserted and the references it cited in support. I submitted that to the *Journal of Sex & Marital Therapy*, a well-known research journal of my field, where it underwent blind peer review and was published. I append that article as part of this report. *See* Appendix 2. A great deal of published attention ensued; however, the AAP has yet to respond to the errors I demonstrated its policy contained. Writing for *The Economist* about the use of puberty blockers, Helen Joyce asked AAP directly, "Has the AAP responded to Dr Cantor? If not, have you any response now?" The AAP Media Relations Manager, Lisa Black, responded: "We do not have anyone available for comment."

---

[8]    Dahlen, *et al.,* 2021.
[9]    Dahlen, *et al.,* 2021, at 6.
[10]    Dahlen, *et al.,* 2021, at 7.

22.      Finally, the clinical guidelines from all these associations have become largely outdated. As detailed in the *Studies of Transition Outcomes* section of this report, there was some reason, circa 2010, to expect positive outcomes among children who transition, owing to optimistic findings reported from the Netherlands.[11] Early positive findings, however, have been retracted after statistical errors were identified,[12] or shown to be more attributable to mental health counseling rather than to medical transition.[13] The professional societies' statements were produced during that earlier phase.

23.      In contrast with these U.S.-based associations, public healthcare systems throughout the world have instead been withdrawing their earlier support for childhood transition, responding to the increasingly recognized risks associated with hormonal interventions and the now clear lack of evidence that medical transition was benefitting most children, as opposed to the mental health counseling accompanying transition. These have included Sweden[14, 15], Finland[16, 17], and the United Kingdom[18], and the Royal Australian and New Zealand College of Psychiatrists.[19]

24.      Adkins repeatedly claimed success on the basis of what her patients tell her. In the absence of any systematic method, however, it is not possible to evaluate to what extent such a conclusion reflects human recall bias, cases of negative outcomes dropping out of treatment thus becoming invisible to Adkins, the aforementioned impression management efforts of clients, psychotherapy that they were receiving at the same time, or simple maturation during which the patients

---

[11]   de Vries, et al., 2011.
[12]   Kalin, 2020.
[13]   c.f., Carmichael, *et al.,* 2021; Biggs, 2019; Biggs, 2020.
[14]   Swedish Agency of Health Technology Assessment and Assessment of Social Services, 2019.
[15]   Nainggolan, 2021.
[16]   Finland Ministry of Social Affairs and Health, Council for Choices in Health Care, 2020, June 11.
[17]   Finland Ministry of Social Affairs and Health, Council for Choices in Health Care, 2020, June 16.
[18]   United Kingdom National Health Service (NHS), 2021, March 11.
[19]   McCall, 2021.

would have experienced improved mental health regardless of transition. Indeed, the very purpose of engaging in systematic, peer-reviewed research instead of relating anecdotal recollections is to rule out exactly these biases.

25.      Adkins referred to disorders of sexual development (DSDs) and intersex variations to claim that the very notion of there being two sexes is inherently flawed (*i.e.*, challenging "singular biological sex").  Although they both potentially involve medical alteration of genitalia, these are not comparable issues.  DSDs and intersex conditions develop before birth, and objective medical testing is capable of confirming diagnoses. Her claims not only misrepresent the research literature on DSDs, but also failed to engage the relevant scientific concept, "construct validity." Adkins claimed DSD prevalences of 1 in 1000 live births and 1 in 300 people in the world (Adkins Report at 11), leaving unclear how there could be a larger proportion of such people living in the world than are born in the first place. The scientific literature, however, shows that DSDs are much rarer than this[20] and that the very large majority of DSDs are the hypospadias—mislocations of the urethra on the penis.[21] Because of the biological processes involved in causing them, hypospadias are classified as disorders of sexual development. That some boys are born with mislocated urethra is falsely taken by Adkins to demonstrate that 'there are more than just boys and girls'.

26.      Overall, Adkins' argument was that, because there exist exceptions among features which distinguish male from female, the distinction itself is entirely moot. Although she did not use the term, Adkins is claiming that the existence of these exceptions demonstrates that sex lacks "construct validity." Her argument does not, however, follow from how construct validity is determined in science—very many scientific classification systems include exceptions. Scientific constructs are not

---

[20]   Sax, 2002.
[21]   Bancroft, 2009.

determined by any one of the components it reflects, in this case being each of the sex chromosomes, sex hormones, sexually dimorphic genitalia, etc. Rather, such constructs are represented by the generalizable interrelationships among its multiple components. Notwithstanding exceptions in an individual component in an individual case, the interrelationships among the network of components remains intact. The existence of people born with a clubfoot or undeveloped leg does not challenge the classification of humans as a bipedal species.

27.    Similarly to Dr. Adkins, Dr. Safer claimed that "gender identity is durable and cannot be changed by medical intervention," providing no evidence or reference to the research literature. It is not at all apparent upon what basis such a statement about durability can be made, however. It has been the unanimous conclusion of every follow-up study of gender dysphoric children ever conducted, not only that gender identity does change, but also that it changes in the large majority of cases, as documented below. This is, of course, very different from what is reported by transgender adults—they are the very people for whom gender dysphoria did endure. Regarding responses to clinical intervention, I am not aware of, and Safer did not cite any research reports of medical interventions attempting to change gender identity, regardless of outcome. It is not clear whether Safer intended this comment to apply also to psychological/non-medical interventions.

**V.    Evidence Missing from Plaintiffs' Expert Reports**

28.    One of the most widespread public misunderstandings about transsexualism and people with gender dysphoria is that all cases of gender dysphoria represent the same phenomenon; however, the clinical science has long and consistently demonstrated that gender dysphoric children (cases of *early-onset* gender dysphoria) do not represent the same phenomenon as adult gender dysphoria

11

(cases of *late-onset* gender dysphoria),[22] merely attending clinics at younger ages. That is, gender dysphoric children are not simply younger versions of gender dysphoric adults. They differ in every known regard, from sexual interest patterns, to responses to treatments. A third presentation has recently become increasingly observed among people presenting to gender clinics: These cases appear to have an onset in adolescence in the absence of any childhood history of gender dysphoria. Such cases have been called adolescent-onset or "rapid-onset" gender dysphoria (ROGD).

29.     In the context of school athletics, the adult-onset phenomenon would not seem relevant; however, very many public misunderstandings and expert misstatements come from misattributing evidence or personal experience from one of these types to the other.  For example, there exist only very few cases of transition regret among adult transitioners, whereas the research has unanimously shown that the majority of children with gender dysphoria desist—that is, cease to experience such dysphoria by or during puberty. A brief summary of the adult-onset phenomenon is included, to facilitate distinguishing features which are unique to childhood gender dysphoria.

### A. Adult-Onset Gender Dysphoria

30.     People with adult-onset gender dysphoria typically attend clinics requesting transition services in mid-adulthood, usually in their 30s or 40s. Such individuals are nearly exclusively male.[23] They typically report being sexually attracted to women and sometimes to both men and women. Some cases profess asexuality, but very few indicate any sexual interest in or behavior involving men.[24] Cases of adult-onset gender dysphoria are typically associated with a sexual interest pattern (medically, a *paraphilia*) involving themselves in female form.[25]

---

[22]   Blanchard, 1985.
[23]   Blanchard, 1990, 1991.
[24]   Blanchard, 1988.
[25]   Blanchard 1989a, 1989b, 1991.

### 1. Outcome Studies of Transition in Adult-Onset Gender Dysphoria

31.     Clinical research facilities studying gender dysphoria have repeatedly reported low rates of regret (less than 3%) among adult-onset patients who underwent complete transition (*i.e.*, social, plus hormonal, plus surgical transition). This has been widely reported by clinics in Canada,[26] Sweden,[27] and the Netherlands.[28]

32.     Importantly, each of the Canadian, Swedish, and Dutch clinics for adults with gender dysphoria all performed "gate-keeping" procedures, disqualifying from medical services people with mental health or other contraindications. One would not expect the same results to emerge in the absence of such gate-keeping or when gate-keepers apply only minimal standards or cursory assessment.

### 2. Mental Health Issues in Adult-Onset Gender Dysphoria

33.     The research evidence on mental health issues in gender dysphoria indicates it to be different between adult-onset versus adolescent-onset versus prepubescent-onset types. The co-occurrence of mental illness with gender dysphoria in adults is widely recognized and widely documented.[29] A research team in 2016 published a comprehensive and systematic review of all studies examining rates of mental health issues in transgender adults.[30] There were 38 studies in total. The review indicated that many studies were methodologically weak, but nonetheless concluded (1) that rates of mental health issues among people are highly elevated both before and after transition, (2) but that rates were less elevated among those who completed transition. Analyses were not conducted in a way so as to compare the elevation in mental health issues observed among people newly attending clinics to improvement after transition. Also, several studies showed more than 40% of patients

---

[26]   Blanchard, *et al.*, 1989.
[27]   Dhejneberg, *et al.*, 2014.
[28]   Wiepjes, *et al.*, 2018.
[29]   *See, e.g.*, Hepp, *et al.*, 2005.
[30]   Dhejne, *et al.*, 2016.

becoming "lost to follow-up." With attrition rates that high, it is unclear to what extent the information from the available participants genuinely reflects the whole sample. The very high "lost to follow-up" rate leaves open the possibility of considerably more negative results overall.

34.     An important caution applies to interpreting these results: These very high proportions of mental health issues come from people who are attending a clinic for the first time and are undergoing assessment. Clinics serving a "gate-keeper" role divert candidates with mental health issues away from medical intervention. The side-effect of removing these people from the samples of transitioners is that if a researcher compared the average mental health of individuals coming into the clinic with the average mental health of individuals going through medical transition, then the post-transition group would appear to show a substantial improvement, even though transition had *no effect at all*: The removal of people with poorer mental health created the statistical illusion of improvement among the remaining people.

35.     The long-standing and consistent finding that gender dysphoric adults have high rates of mental health issues both before and after transition and the finding that those mental health issues cause the gender dysphoria (the epiphenomenon) rather than the other way around indicate a critical point: To the extent that gender dysphoric children resemble adults, we should not expect mental health to improve as a result of transition. Mental health issues should be resolved before any transition.

14

### B. Childhood Onset (Pre-Puberty) Gender Dysphoria

#### 1. Prospective Studies of Childhood-Onset Gender Dysphoria Show that Most Children Desist in the "Natural Course" by Puberty

36.     The large majority of childhood onset cases of gender dysphoria occur in biological males, with clinics reporting 2–6 biological male children to each female.[31]

37.     Prepubescent children (and their parents) have been approaching mental health professionals for help with their unhappiness with their sex and belief they would be happier living as the other for many decades. Projects following-up and reporting on such cases began being published in the 1970s, with subsequent generations of research employing increasingly sophisticated methods studying the outcomes of increasingly large samples. In total, there have now been a total of 11 such outcomes studies. *See* the appendix to Appendix 2 (listing these studies).

38.     In sum, despite coming from a variety of countries, conducted by a variety of labs, using a variety of methods, all spanning four decades, every study without exception has come to the identical conclusion: Among prepubescent children who feel gender dysphoric, the majority cease to want to be the other gender over the course of puberty—ranging from 61–88% desistance across the large, prospective studies. Such cases are often referred to as "desisters," whereas children who continue to feel gender dysphoria are often called "persisters."

39.     Notably, in most cases, these children were receiving professional psychosocial support across the study period aimed not at affirming cross-gender identification, but at resolving stressors and issues potentially interfering with desistance. While beneficial to these children and their families, the inclusion of therapy in the study protocol represents a complication for the interpretation of the results: That is, it is not possible to know to what extent the observed outcomes (predominant desistance, with a small but consistent occurrence of persistence) were

---

[31]   Cohen-Kettenis, *et al.*, 2003; Steensma, *et al.,* 2018; Wood, *et al.*, 2013.

influenced by the psychosocial support, or would have emerged regardless. It can be concluded only that prepubescent children who suffer gender dysphoria and receive psychosocial support focused on issues other than "affirmation" of cross-gender identification do in fact desist in suffering from gender dysphoria, at high rates, over the course of puberty.

40.    While the absolute number of those who present as prepubescent children with gender dysphoria and "persist" through adolescence is very small in relation to the total population, persistence in some subjects was observed in each of these studies. Thus, the clinician cannot take either outcome for granted.

41.    It is because of this long-established and invariably consistent research finding that desistance is probable, but not inevitable, that the "watchful waiting" method became the standard approach for assisting gender dysphoric children. The balance of potential risks to potential benefits is very different for groups likely to desist versus groups unlikely to desist: If a child is very likely to persist, then taking on the risks of medical transition might be more worthwhile than if that child is very likely to desist in transgender feelings.

42.    The consistent observation of high rates of desistance among pre-pubertal children who present with gender dysphoria demonstrates a pivotally important—yet often overlooked—feature: because gender dysphoria so often desists on its own, clinical researchers cannot assume that therapeutic intervention cannot facilitate or speed desistance for at least some patients. Such is an empirical question, and there has not yet been any such study.

43.    It is also important to note that research has not yet identified any reliable procedure for discerning which children who present with gender dysphoria will persist, as against the majority who will desist, absent transition and "affirmation." Such a method would be valuable, as the more accurately that potential persisters can be distinguished from desisters, the better the risks and benefits of options can

be weighted. Such "risk prediction" and behavioral "test construction" are standard components of applied statistics in the behavioral sciences. Multiple research teams have reported that, on average, groups of persisters are somewhat more gender non-conforming than desisters, but not so different as to usefully predict the course of a particular child.[32]

44.     In contrast, a single research team, led by Dr. Kristina Olson, claimed the opposite, asserting to have developed a method of distinguishing persisters from desisters, using a single composite score representing a combination of children's "peer preference, toy preference, clothing preference, gender similarity, and gender identity."[33] That team reported a statistical association (mathematically equivalent to a correlation) between that composite score and the probability of persistence. As they described their result, "Our model predicted that a child with a gender-nonconformity score of .50 would have roughly a .30 probability . . . of socially transitioning. By contrast, a child with gender-nonconformity score of .75 would have roughly a .48 probability."[34] Although the authors declared that "social transitions may be predictable from gender identification and preferences,"[35] their actual results suggest the opposite: The gender-nonconforming group who went on to transition (socially) had a mean composite score of .73 (which is less than .75), and the gender-nonconforming group who did not transition had a mean composite score of .61, also less than .75.[36] Both of those are lower than the value of .75, so both of those would be more likely than not to desist, rather than to proceed to transition. Thus, Olson's model does not distinguish likely from unlikely to transition; rather, it distinguishes unlikely from even less likely to transition.

---

[32]   Singh, *et al.* (2021); Steensma *et al.*, 2013.
[33]   Rae, *et al.*, 2019, at 671.
[34]   Rae, *et al.*, 2019, at 673.
[35]   Rae, *et al.*, 2019, at 669.
[36]   Rae, *et al.*, 2019, Supplemental Material at 6, Table S1, bottom line.

45.    Although it remains possible for some future finding to yield a method to identify with sufficient accuracy which gender dysphoric children will persist, there does not exist such a method at the present time. Moreover, in the absence of long-term follow-up, it cannot be known what proportions come to regret having transitioned and then *de*transition. Because only a minority of gender dysphoric children persist in feeling gender dysphoric in the first place, "transition-on-demand" increases the probably of unnecessary transition and unnecessary medical risks.

### 2.   "Watchful Waiting" and "The Dutch Approach"

46.    It was this state of the science—that the majority of prepubescent children will desist in their feelings of gender dysphoria and that we lack an accurate method of identifying which children will persist—that led to the development of a clinical approach, often called "The Dutch Approach" (referring to The Netherlands clinic where it was developed) including "Watchful Waiting" periods. Internationally, the Dutch Approach is currently the most widely respected and utilized method for treatment of children who present with gender dysphoria.

47.    The purpose of these methods was to compromise the conflicting needs among: clients' desires upon assessment, the long-established and repeated observation that those preferences will change in the majority of (but not all) childhood cases, and that cosmetic aspects of medical transition are perceived to be better when they occur earlier rather than later.

48.    The Dutch Approach (also called the "Dutch Protocol") was developed over many years by the Netherlands' child gender identity clinic, incorporating the accumulating findings from their own research as well as those reported by other clinics working with gender dysphoric children. They summarized and explicated the approach in their peer-reviewed report, *Clinical management of gender dysphoria in children and adolescents: The Dutch Approach* (de Vries & Cohen-Kettenis, 2012).

18

The components of the Dutch Approach are:

- no social transition at all considered before age 12 (watchful waiting period),
- no puberty blockers considered before age 12,
- cross-sex hormones considered only after age 16, and
- resolution of mental health issues before any transition.

49.     For youth under age 12, "the general recommendation is watchful waiting and carefully observing how gender dysphoria develops in the first stages of puberty."[37]

50.     The age cut-offs of the Dutch Approach authors were not based on any research demonstrating their superiority over other potential age cut-off's. Rather, they were chosen to correspond to ages of consent to medical procedures under Dutch law. But whatever their original rationale, the data from this clinic simply contains no information about safety or efficacy of these measures at younger ages.

51.     The authors of the Dutch Approach repeatedly and consistently emphasize the need for extensive mental health assessment, including clinical interviews, formal psychological testing with validated psychometric instruments, and multiple sessions with the child and the child's parents.

52.     Within the Dutch approach, there is no social transition before age twelve. That is, social affirmation of the new gender may not begin until age 12—as desistance is less likely to occur past that age. "Watchful Waiting" refers to a child's developmental period up to that age. Watchful waiting does not mean do nothing but passively observe the child. Such children and families typically present with substantial distress involving both gender and non-gender issues. It is during the watchful waiting period that a child (and other family members as appropriate) would undergo therapy, resolving other issues which may be exacerbating psychological stress or dysphoria. As noted by the Dutch clinic, "[T]he adolescents in this study received extensive family or other social support . . . [and they] were all regularly

---

[37]   de Vries & Cohen-Kettenis, 2012, at 301.

seen by one of the clinic's psychologists or psychiatrists."[38] One is actively treating the person, while carefully "watching" the dysphoria.

53.    The inclusion of psychotherapy and support during the watchful waiting period is, clinically, a great benefit to the gender dysphoric children and their parents. The inclusion of psychotherapy and support poses a scientific complication, however: It becomes difficult to know to what extent the outcomes of these cases might be related to receiving psychotherapy received versus being "spontaneous" desistance, which would have occurred on its own anyway. This situation is referred to in science as a "confound."

### 3.  Studies of Transition Outcomes: Overview

54.    Very many strong claims have appeared in the media and on social media asserting that transition results in improved mental health or, contradictorily, in decreased mental health. In the highly politicized context of gender and transgender research, many authors have cited only the findings which appear to support one side, cherry-picking from the complete set of research reports. Seemingly contradictory findings are common in science with on-going research projects. When considered together, however, the full set of relevant reports show that a coherent pattern and conclusion has emerged over time, as detailed in the following sections. Initial optimism was suggested by reports of improvements in mental health.[39] Upon continued analysis, these seeming successes turned out to be illusory, however: The Bränström and Pachankis (2019) finding has been retracted.[40] The greater mental health among transitioners reported by Costa, *et al.* (2015) was noted to be because the control group consisted of cases excluded from hormone eligibility exactly because they showed poor mental health to begin with.[41] The improvements reported by the

---

[38]  de Vries, *et al.*, 2011, at 2280-81.
[39]  Bränström & Pachankis 2019; Costa, *et al.*, 2015; de Vries, *et al.*, 2011; de Vries, *et al.*, 2014.
[40]  Kalin, 2020.
[41]  Biggs, 2019.

de Vries studies from the Dutch Clinic themselves appear genuine; however, because that clinic also provides psychotherapy to all cases receiving puberty-blockers, it remains entirely plausible that the psychotherapy and not the puberty blockers caused the improvements.[42] New studies continued to appear an accelerating rate, repeatedly reporting deteriorations or lacks of improvement in mental health[43] or lack of improvement beyond psychotherapy alone,[44] and other studies continue to report on only the combined effect of both psychotherapy and hormone treatment together.[45]

### a. Outcomes of The Dutch Approach (studies from before 2017): Mix of positive, negative, and neutral outcomes

55. The research confirms that some, but not all, adolescents improve on some, but not all, indicators of mental health and that those indicators are inconsistent across studies. Thus, the balance of potential benefits to potential risks differs across cases, and thus suggests different courses of treatment across cases.

56. The Dutch clinical research team followed up 70 youth undergoing puberty suppression at their clinic.[46] The youth improved on several variables upon follow-up as compared to pre-suppression measurement, including depressive symptoms and general functioning. No changes were detected in feelings of anxiety or anger or in gender dysphoria as a result of puberty suppression; however, natal females using puberty suppression suffered *increased* body dissatisfaction both with their secondary sex characteristics and with nonsexual characteristics.[47]

57. As the report authors noted, while it is possible that the improvement on some variables was due to the puberty-blockers, it is also possible that the improvement was due to the mental health support, and it is possible that the

---

[42] Biggs, 2020.
[43] Carmichael, *et al.*, 2021; Hisle-Gorman, *et al.*, 2021; Kaltiala, *et al.*, 2020.
[44] Achille, *et al.*, 2020.
[45] Kuper, *et al.*, 2020; van der Miesen, *et al.*, 2020, at 703.
[46] de Vries, *et al.* 2011.
[47] Biggs, 2020.

21

improvement occurred only on its own with natural maturation. So any conclusion that puberty blockers improved the mental health of the treated children is not justified by the data. Because this study did not include a control group (another group of adolescents matching the first group, but *not* receiving medical or social support), these possibilities cannot be distinguished from each other, representing a confound. The authors of the study were explicit in noting this themselves: "All these factors may have contributed to the psychological well-being of these gender dysphoric adolescents."[48]

58.     The authors were careful not to overstate the implications of their results, "We *cautiously* conclude that puberty suppression *may be* a valuable *element* in clinical management of adolescent gender dysphoria."[49]

59.     Costa, *et al.* (2015) reported on preliminary outcomes from the Tavistock and Portman NHS Foundation Trust clinic in the UK. They compared the psychological functioning of one group of youth receiving psychological support with a second group receiving both psychological support as well as puberty blocking medication. Both groups improved in psychological functioning over the course of the study, but no statistically significant differences between the groups was detected at any point.[50] As those authors concluded, "Psychological support and puberty suppression were both associated with an improved global psychosocial functioning in GD adolescence. Both these interventions may be considered effective in the clinical management of psychosocial functioning difficulties in GD adolescence."[51] Because psychological support does not pose the physical health risks that hormonal interventions or surgery does (such as loss of reproductive function), one cannot justify taking on the greater risks of social transition, puberty blockers or surgery

---

[48]   de Vries, *et al.* 2011, at 2281.
[49]   de Vries, *et al.* 2011, at 2282, italics added.
[50]   Costa, *et al.*, at 2212 Table 2.
[51]   Costa, *et al.*, at 2206.

without evidence of such treatment producing superior results. Such evidence does not exist.

### b. Clinicians and advocates have invoked the Dutch Approach while departing from its protocols in important ways.

60.     The reports of partial success contained in de Vries, *et al.* 2011 called for additional research, both to confirm those results and to search for ways to maximize beneficial results and minimize negative outcomes. Instead, many other clinics and clinicians proceeded on the basis of the positives only, broadened the range of people beyond those represented in the research findings, and removed the protections applied in the procedures that led to those outcomes. Many clinics and individual clinicians have reduced the minimum age for transition to 10 instead of 12. While the Dutch Protocol involves interdisciplinary teams of clinicians, many clinics now rely on a single assessor, in some cases one without adequate professional training in childhood and adolescent mental health. Comprehensive, longitudinal assessments (*e.g.*, one and a half *years*[52]) became approvals after one or two assessment sessions. Validated, objective measures of youths' psychological functioning were replaced with clinicians' subjective (and first) opinions, often reflecting only the clients' own self-report. Systematic recordings of outcomes, so as to allow for detection and correction of clinical deficiencies, were eliminated.

61.     Notably, Dr. Thomas Steensma, central researcher of the Dutch clinic, has decried other clinics for "blindly adopting our research" despite the indications that those results may not actually apply: "We don't know whether studies we have done in the past are still applicable to today. Many more children are registering, and also a different type."[53] Steensma opined that "every doctor or psychologist who is involved in transgender care should feel the obligation to do a good pre- and post-test." But few if any are doing so.

---

[52]   de Vries, *et al.*, 2011.
[53]   Tetelepta, 2021.

### c. Studies by other clinicians in other countries have failed to reliably replicate the positive components of the results reported by the Dutch clinicians in de Vries et al. 2011.

62.    The indications of potential benefit from puberty suppression in at least some cases has led some clinicians to attempt to replicate the positive aspects of those findings. These efforts have not succeeded.

63.    The Tavistock and Portman clinic in the U.K. recently released its findings, attempting to replicate the outcomes reported by the Dutch clinic.[54] Study participants were ages 12–15 (Tanner stages 3 for natal males, Tanner 2 for natal females) and were repeatedly tested before beginning puberty-blocking medications and then every six months thereafter. Cases exhibiting serious mental illnesses (*e.g.*, psychosis, bipolar disorder, anorexia nervosa, severe body-dysmorphic disorder unrelated to gender dysphoria) were excluded. Relative to the time point before beginning puberty suppression, there were *no* significant changes in any psychological measure, from either the patients' or their parents' perspective.

64.    A multidisciplinary team from Dallas published a prospective follow-up study which included 25 youths as they began puberty suppression.[55] (The other 123 study participants were undergoing cross-sex hormone treatment.) Interventions were administered according to "Endocrine Society Clinical Practice Guidelines."[56] Their analyses found *no statistically significant changes* in the group undergoing puberty suppression on any of the nine measures of wellbeing measured, spanning tests of body satisfaction, depressive symptoms, or anxiety symptoms.[57] (Although the authors reported detecting some improvements, these were only found when the large group undergoing cross-sex hormone treatment were added in.) Although the Dutch

---

[54]   Carmichael, *et al.*, 2021.
[55]   Kuper, *et al.*, 2020, at 5.
[56]   Kuper, *et al.*, 2020, at 3, referring to Hembree, *et al.*, 2017.
[57]   Kuper, *et al.*, 2020, at Table 2.

Approach includes age 12 as a minimum for puberty suppression treatment, this team provided such treatment beginning at age 9.8 years (full range: 9.8–14.9 years).[58]

65.     Achille, *et al.* (2020) at Stony Brook Children's Hospital in New York treated a sample of 95 youth with gender dysphoria, providing follow-up data on 50 of them. (The report did not indicate how these 50 were selected from the 95.) As well as receiving puberty blocking medications, "Most subjects were followed by mental health professionals. Those that were not were encouraged to see a mental health professional."[59] The puberty blockers themselves "were introduced in accordance with the Endocrine Society and the WPATH guidelines."[60] Upon follow-up, some incremental improvements were noted; however, after statistically adjusting for psychiatric medication and engagement in counselling, "*most predictors did not reach statistical significance.*"[61] That is, puberty blockers did not improve mental health any more than did mental health care on its own.

66.     In a recent update, the Dutch clinic reported continuing to find improvement in transgender adolescents' psychological functioning, reaching age-typical levels, "after the start of specialized transgender care involving puberty suppression."[62] Unfortunately, because the transgender care method of that clinic involves both psychosocial support and puberty suppression, it cannot be known which of those (or their combination) is driving the improvement. Also, the authors indicate that the changing demographic and other features among gender dysphoric youth might have caused the treated group to differ from the control group in unknown ways. As the study authors themselves noted, "The present study can, therefore, not provide

---

[58]   Kuper, *et al.*, 2020, at 4.
[59]   Achille, *et al.*, 2020, at 2.
[60]   Achille, *et al.*, 2020, at 2.
[61]   Achille, *et al.*, 2020, at 3 (italics added).
[62]   van der Miesen, *et al.*, 2020, at 699.

25

evidence about the direct benefits of puberty suppression over time and long-term mental health outcomes."[63]

67.     It has not yet been determined why the successful outcomes reported by the Dutch child gender clinic a decade ago failed to emerge when applied by others more recently. It is possible that:

> (1) The Dutch Approach itself does *not* work and that their originally successful results were a fluke;
>
> (2) The Dutch Approach *does* work, but only in the Netherlands, with local cultural, genetic, or other unrecognized factors that do not generalize to other countries;
>
> (3) The Dutch Approach itself *does* work, but other clinics and individual clinicians are removing safeguards and adding short-cuts to the approach, and those changes are hampering success.
>
> (4) The Dutch Approach *does* work, but the cause of the improvement is the psychosocial support, rather than any medical intervention, which other clinics are *not* providing.

68.     The failure of other clinics to repeat the already very qualified success of the Dutch clinic demonstrates the need for still greater caution before endorsing transition and the greater need to resolve potential mental health obstacles before doing so.

### 4.  Mental Health Issues in Childhood-Onset Gender Dysphoria

69.     As shown by the outcomes studies, there is no statistically significant evidence that transition reduces the presence of mental illness among transitioners. As shown repeatedly by clinical guidelines from multiple professional associations, mental health issues are expected or required to be resolved *before* undergoing transition.   The reasoning behind these conclusions is that children may be expressing gender dysphoria, not because they are experiencing what gender dysphoric adults report, but because they mistake what their experiences indicate or to what they might lead.   For example, a child experiencing depression from social

---

[63]   van der Miesen, *et al.*, 2020, at 703.

isolation might develop hope—and the unrealistic expectation—that transition will help them fit in, this time as and with the other sex.

70.    If a child undergoes transition, discovering only then that their mental health or social situations will not in fact change, the medical risks and side-effects (such as sterilization) will have been borne for no reason.  If, however, a child resolves the mental health issues first with the gender dysphoria resolving with it (which the research literature shows to be the case in the large majority), then the child need not undergo transition at all, but yet still retains the opportunity to do so later.

71.    Elevated rates of multiple mental health issues among gender dysphoric children are reported throughout the research literature. A formal analysis of children (ages 4–11) undergoing assessment at the Dutch child gender clinic showed 52% fulfilled criteria for a DSM axis-I disorder.[64] A comparison of the children attending the Canadian versus Dutch child gender dysphoria clinic showed only few differences between them, but a large proportion in both groups were diagnosable with clinically significant mental health issues. Results of standard assessment instruments (Child Behavior Check List, or CBCL) demonstrated that the average score was in the clinical rather than healthy range, among children in both clinics.[65] When expressed as percentages, among 6–11-year-olds, 61.7% of the Canadian and 62.1% of the Dutch sample were in the clinical range.

72.    A systematic, comprehensive review of all studies of Autism Spectrum Disorders (ASDs) and Attention-Deficit Hyperactivity Disorder (ADHD) among children diagnosed with gender dysphoria was recently conducted. It was able to identify a total of 22 studies examining the prevalence of ASD or ADHD I youth with gender dysphoria. Studies reviewing medical records of children and adolescents referred to gender clinics showed 5–26% to have been diagnosed with ASD.[66]

---

[64]   Wallien, *et al.*, 2007.
[65]   Cohen-Kettenis, *et al.*, 2003, at 46.
[66]   Thrower, *et al.*, 2020.

27

Moreover, those authors gave specific caution on the "considerable overlap between symptoms of ASD and symptoms of gender variance, exemplified by the subthreshold group which may display symptoms which could be interpreted as either ASD or gender variance. Overlap between symptoms of ASD and symptoms of GD may well confound results."[67] When two or more issues are present at the same time (in this case, gender dysphoria present at the same time as ADHD or ASD), researchers cannot distinguish when a result is associated with or caused by the issue of interest (gender dysphoria itself) or one of the side issues, called *confounds* (ADHD or ASD, in the present case).[68] The rate of ADHD among children with GD was 8.3–11%. Conversely, in data from children (ages 6–18) with Autism Spectrum Disorders (ASDs) show they are more than seven times more likely to have parent-reported "gender variance."[69]

### C. Adolescent-Onset Gender Dysphoria

#### 1. Features of Adolescent-Onset Gender Dysphoria

73.    A third profile has begun to present to clinicians or socially, characteristically distinct from the previously identified ones.[70] Unlike adult-onset gender dysphoria (and also unlike childhood-onset, *see supra* Part IV.B.2), this group is predominately biologically female. This group first presents in adolescence, but lacks the history of cross-gender behavior in childhood like the childhood-onset cases have. It is this feature which led to the term Rapid Onset Gender Dysphoria (ROGD).[71] The majority of cases appear to occur within clusters of peers and in association with increased social media use[72] and especially among people with autism or other neurodevelopmental or mental health issues.[73]

---

[67]   Thrower, *et al.*, 2020, at 703.
[68]   Cohen-Kettenis *et al.,* 2003, at 51; Skelly *et al.,* 2012.
[69]   Janssen, *et al.*, 2016.
[70]   Kaltiala-Heino, *et al.*, 2015; Littman, 2018.
[71]   Littman, 2018.
[72]   Littman, 2018.
[73]   Kaltiala-Heino, *et al.*, 2015; Littman, 2018; Warrier, *et al.*, 2020.

28

74.     It cannot be easily determined whether the self-reported gender dysphoria is a result of other underlying issues or if those mental health issues are the result of the stresses of being a stigmatized minority, as some writers are quick to assume.[74] *See infra* Part VI.E (discussing the minority stress hypothesis). Importantly, and unlike other presentations of gender dysphoria, people with rapid-onset gender dysphoria often (47.2%) experienced *declines* rather than improvements in mental health when they publicly acknowledged their gender status.[75] Although long-term outcomes have not yet been reported, these distinctions argue against generalizing findings from the other types of gender dysphoria to this one. That is, in the absence of evidence, researchers cannot assume that the pattern found in childhood-onset or adult-onset gender dysphoria also applies to rapid-onset (aka adolescent-onset) gender dysphoria. That is, the group differences already observed argue against the conclusion that any given feature would be present, in general, throughout all types of gender dysphoria.

## 2. Prospective Studies of Social Transition and Puberty Blockers in Adolescence

75.     There do not yet exist prospective outcomes studies either for social transition or for medical interventions for people whose gender dysphoria began in adolescence. That is, instead of taking a sample of individuals and following them forward over time (thus permitting researchers to account for people dropping out of the study, people misremembering the order of events, etc.), all studies have thus far been *retrospective*. It is not possible for such studies to identify what factors caused what outcomes. No study has yet been organized in such a way as to allow for an analysis of the adolescent-onset group, as distinct from childhood-onset or adult-onset cases. Many of the newer clinics (not the original clinics systematically tracking and reporting on their case results) fail to distinguish between people who had childhood-

---

[74] Boivin, *et al.*, 2020.
[75] Biggs, 2020; Littman, 2018.

onset gender dysphoria and have aged into adolescence and people whose onset was not until adolescence. Similarly, there are clinics failing to distinguish people who had adolescent-onset gender dysphoria and aged into adulthood from adult-onset gender dysphoria. Studies selecting groups according to their current age instead of their ages of onset can produce only confounded results, representing unclear mixes according to how many of each type of case wound up in the final sample.

### 3.  Mental Illness in Adolescent-Onset Gender Dysphoria

76.     In 2019, a Special Section of the *Archives of Sexual Behavior* was published: "Clinical Approaches to Adolescents with Gender Dysphoria." It included this brief yet thorough summary of rates of mental health issues among adolescents expressing gender dysphoria by Dr. Aron Janssen of the Department of Child and Adolescent Psychiatry of New York University:[76] The literature varies in the range of percentages of adolescents with co-occurring disorders. The range for depressive symptoms ranges was 6–42%,[77] with suicide attempts ranging 10 to 45%.[78] Self-injurious thoughts and behaviors range 14–39%.[79] Anxiety disorders and disruptive behavior difficulties including Attention Deficit/Hyperactivity Disorder are also prevalent.[80] Gender dysphoria also overlaps with Autism Spectrum Disorder.[81]

77.     Of particular concern in the context of adolescent onset gender dysphoria is *Borderline Personality Disorder* (BPD). The DSM criteria for BPD are:

> A pervasive pattern of instability of interpersonal relationships, self-image, and affects, and marked impulsivity beginning by early adulthood and present in a variety of contexts, as indicated by five (or more) of the following:
>
> 1.  Frantic efforts to avoid real or imagined abandonment. (Note: Do not include suicidal or self-mutilating behaviour covered in Criterion 5.)

---

[76]   Janssen, *et al.*, 2019.
[77]   Holt, *et al.*, 2016; Skagerberg, *et al.*, 2013; Wallien, *et al.*, 2007.
[78]   Reisner, *et al.*, 2015.
[79]   Holt, *et al.*, 2016; Skagerberg, *et al.*, 2013.
[80]   de Vries, *et al.*, 2011; Mustanski, *et al.*, 2010; Wallien, *et al.*, 2007.
[81]   de Vries, *et al.*, 2010; Jacobs, *et al.*, 2014; Janssen, *et al.*, 2016; May, *et al.*, 2016; Strang, *et al.*, 2014, 2016.

2. A pattern of unstable and intense interpersonal relationship characterized by alternating between extremes of idealization and devaluation.

3. *Identity disturbance: markedly and persistently unstable self-image or sense of self.*

4. Impulsivity in at least two areas that are potentially self-damaging (e.g., spending, sex, substance abuse, reckless driving, binge eating). (Note: Do not include suicidal or self-mutilating behavior covered in Criterion 5.)

5. *Recurrent suicidal behaviour, gestures, or threats, or self-mutilating behavior.*

6. Affective instability due to a marked reactivity of mood (e.g., intense episodic dysphoria, irritability, or anxiety usually lasting a few hours and only rarely more than a few days).

7. Chronic feelings of emptiness.

8. Inappropriate, intense anger or difficulty controlling anger (e.g., frequent displays of temper, constant anger, recurrent physical fights).

9. Transient, stress-related paranoid ideation or severe dissociative symptoms.

(Italics added.)

78.    It is increasingly hypothesized that very many cases appearing to be adolescent-onset gender dysphoria are actually cases of BPD.[82] That is, some people may be misinterpreting their experiences to represent a gender identity issue, when it instead represents the "identity disturbance" noted in symptom Criterion 3. Like adolescent-onset gender dysphoria, BPD begins to manifest in adolescence, is substantially more common among biological females than males, and occurs in 2–3% of the population, rather than 1-in-5,000 people (*i.e.*, 0.02%). Thus, if even only a portion of people with BPD had an 'identity disturbance' that focused on gender identity and were mistaken for transgender, they could easily overwhelm the number of genuine cases of gender dysphoria.

79.    A primary cause for concern is symptom Criterion 5: recurrent suicidality. Regarding the provision of mental health care, this is a crucial distinction: A person with BPD going undiagnosed will not receive the appropriate treatments (the

---

[82]    *E.g.*, Zucker, 2019.

currently most effective of which is Dialectical Behavior Therapy). A person with a cross-gender identity would be expected to feel relief from medical transition, but someone with BPD would not: The problem was not about *gender* identity, but about having an *unstable* identity. Moreover, after a failure of medical transition to provide relief, one would predict for these people increased levels of hopelessness and increased risk of suicidality. One would predict also that misdiagnoses would occur more often if one reflexively dismissed or discounted symptoms of BPD as responses to "minority stress." *See infra* Part VI.D (discussing minority stress).

80.   Regarding research, there have now been several attempts to document rates of suicidality among gender dysphoric adolescents. *See infra* Part VI.C. The scientific concern presented by BPD is that it poses a potential confound: samples of gender dysphoric adolescents could appear to have elevated rates of suicidality, not because of the gender dysphoria (or transphobia in society), but because of the number of people with BPD in the sample.

## VI.   Alleged Scientific Claims Assessed

### A. Conversion Therapy

81.   Activists and social media increasingly, but erroneously, apply the term "conversion therapy" moving farther and farther from what the research has reported.  "Conversion therapy" (or "reparative therapy" and other names) was the attempt to change a person's sexual orientation; however, with the public more frequently accustomed to "LGB" being expanded to "LGBTQ+", the claims relevant only to sexual orientation are being misapplied to gender identity.  The research has repeatedly demonstrated that once one explicitly acknowledges being gay or lesbian, this is only rarely mistaken.  That is entirely unlike gender identity, wherein the great majority of children who declare cross-gender identity cease to do so by puberty, as shown unanimously by every follow-up study ever published. As the field grows increasingly polarized, any therapy failing to provide affirmation-on-demand is

mislabeled "conversion therapy."[83] Indeed, even actions of non-therapists, unrelated to any therapy have been labelled conversion therapy, including the very prohibition of biological males competing on female teams.[84]

### B. Claims that All Childhood Outcome Studies Are Wrong

82.     As already indicated, the follow-up studies of gender dysphoric children are unanimous in their conclusion that gender dysphoria desists in the large majority of cases. Nonetheless, some authors assert that the entire set of prospective outcomes studies on prepubescent children is wrong; that desistance is not, in fact, the usual outcome for gender dysphoric children; and that results from various retrospective studies are the more accurate picture.[85] As indicated in the responses published from authors of several prospective outcomes studies (and as summarized below), the detractors' arguments are invalid.[86]

83.     There have been accusations that some of the prospective outcome studies are old. This criticism would be valid only if newer studies showed different results from the older studies; however, the findings of desistance are the same, indicating that age of the studies is not, in fact, a factor.

84.     There have been accusations that some studies failed to use a DSM diagnosis, and should therefore be rejected. That would be a valid criticism only if studies using the DSM showed different results from studies not using the DSM. Because both kinds of studies showed the same results, one may conclude that DSM status was not a factor, even if using a DSM diagnosis would have been a preferred method.

---

[83]   D'Angelo, R., Syrulnik, E., Ayad, S., Marchiano, L., Kenny, D. T., & Clarke, P. (2021). One size does not fit all: In support of psychotherapy for gender dysphoria. *Archives of Sexual Behavior, 50,* 7–16.

[84]   Turban, J. (2021, March 16). Trans girls belong on girls' sports teams. *Scientific American.* www.scientificamerican.com/article/trans-girls-belong-on-girls-sports-teams/

[85]   Temple Newhook, *et al.*, 2018; Winters, *et al.*, 2018.

[86]   Steensma, *et al.*, 2018a; Zucker, *et al.* 2018.

33

85.     There have been criticisms that some studies are too small to provide a reliable result. It is indeed true that if larger studies showed different results from the smaller studies, we would tend to favor the results of the larger studies. Because the smaller studies came to the same conclusion as the larger studies, however, the criticism is, once again, entirely moot.

86.     There have been accusations that studies did not use the current DSM-5 as their method of diagnosing gender dysphoric children. This criticism would be valid only if there existed any studies using the DSM-5 against which to compare the existing studies. The DSM-5 is still too recent for there yet to have been long-term follow-up studies. It can be seen, however, that the outcome studies are the same across the DSM-III, DSM-III-R, DSM-IV, and DSM-IV-TR.

87.     In science, there cannot be any such thing as a perfect study. Especially in medical research, where we cannot manipulate people in ways that would clear up difficult questions, all studies will have a fault. In science, we do not, however, reject every study with any identifiable short-coming—rather, we gather a diversity of observations, made with their diversity of compromises to safety and ethics (and time and cost, etc.), and tentatively accept the most parsimonious (simplest) explanation of the full set, weighting each study according to their individual strengths and weaknesses.

### C. Assessing Claims of Suicidality

88.     In the absence of scientific evidence associating improvement with transition among youth, demands for transition are increasingly accompanied by hyperbolic warnings of suicide should there be delay or obstacle to affirmation-on-demand. Social media circulate claims of extreme suicidality accompanied by declarations that "I'd rather have a trans daughter than a dead son." Such claims convey only grossly misleading misrepresentations of the research literature, however.

34

89.     Despite that the media treat them as near synonyms, suicide and suicidality are distinct phenomena.  They represent different behaviors with different motivations, with different mental health issues, and with differing clinical needs. *Suicide* refers to completed suicides and the sincere intent to die.  It is substantially associated with impulsivity, using more lethal means, and being a biological male.[87] *Suicidality* refers to parasuicidal behaviors, including suicidal ideation, threats, and gestures.  These typically represent cries for help rather than an intent to die and are more common among biological females. Suicidal threats can indicate any of many problems or represent emotional blackmail, as typified in "If you leave me, I will kill myself." Professing suicidality is also used for attention- seeking or for the support or sympathy it evokes from others, indicating distress much more frequently than an intent to die.

90.     The scientific study of suicide is inextricably linked to that of mental illness. For example, as noted in the preceding, suicidality is a well-documented symptom of Borderline Personality Disorder (as are chronic identity issues), and personality disorders are highly elevated among transgender populations, especially adolescent-onset. Thus, the elevations of suicidality among gender dysphoric adolescents may not be a result of anything related to transition (or lack of transition), but to the overlap with mental illness of which suicidality is a substantial part. Conversely, improvements in suicidality reported in some studies may not be the result of anything related to transition, but rather to the concurrent general mental health support which is reported by the clinical reported prospective outcomes. Studies that include more than one factor at the same time without accounting for each other represent a "confound," and it cannot be known which factor (or both) is the one causing the effects observed. That is, when a study provides both mental health

---

[87]   Freeman, *et al.,* 2017.

services and medical transition services at the same time, it cannot be known which (or both) is what caused any changes.

91.    A primary criterion for readiness for transition used by the clinics demonstrating successful transition is the absence or resolution of other mental health concerns, such as suicidality. In the popular media, however, indications of mental health concerns are instead often dismissed as an expectable result caused by Sexual Minority Stress (SMS).  It is generally implied that such symptoms will resolve upon transition and integration into an affirming environment. Dr. Adkins makes it explicit in her report that the purpose of "the medical treatment for gender dysphoria is to eliminate the clinically significant distress." (Adkins, p. 5.)

92.    Despite that relevant professional association statements repeatedly call for mental health issues, including suicidality, to be resolved before transition (see *infra* Section VI), threats of suicide are instead oftentimes used as the very justification for labelling transition a 'medical necessity'.  However plausible it might seem that failing to affirm transition causes suicidality, the epidemiological evidence indicates that hypothesis to be incorrect: Suicide rates remains elevated even after complete transition, as shown by a comprehensive review of 19 studies of suicidality in gender dysphoria.[88]

93.    Of particular relevance in the present context is suicidality as a well-documented symptom of Borderline Personality Disorder (BPD) and that very many cases appearing to be adolescent-onset gender dysphoria actually represent cases of BPD. [See full DSM-5 criteria already listed herein.]  That is, some people may be misinterpreting their experiencing of the broader "identity disturbance" of symptom Criterion 3 to represent a gender identity issue specifically. Like adolescent-onset gender dysphoria, BPD begins to manifest in adolescence and occurs in 2–3% of the

---

[88]    McNeil, et al., 2017.

36

population, rather than 1-in-5,000 people. (Thus, if even only a portion of people with BPD experienced an identity disturbance that focused on gender identity and were mistaken for transgender, they could easily overwhelm the number of genuine cases of gender dysphoria.)

94.     Rates of completed suicide are elevated among post-transition transsexuals, but are nonetheless rare,[89] and BPD is repeatedly documented to be greatly elevated among sexual minorities[90]. Overall, rates of suicidal ideation and suicidal attempts appear to be related—not to transition status—but to the social support received: The research evidence shows that support decreases suicidality, but that transition itself does not. Indeed, in some situations, social support was associated with increased suicide attempts, suggesting the reported suicidality may represent attempts to evoke more support.[91]

### D. Assessing Demands for Social Transition and Affirmation-Only or Affirmation-on-Demand Treatment in Pre-Pubertal Children.

95.     Colloquially, affirmation refers broadly to any actions that treat the person as belonging to a new gender. In different contexts, that could apply to social actions (use of a new name and pronouns), legal actions (changes to birth certificates), or medical actions (hormonal and surgical interventions). That is, social transition, legal transition, and medical transition (and subparts thereof) need not, and rarely do, occur at the same time. In practice, there are cases in which a child has socially only partially transitioned, such as presenting as one gender at home and another at school or presenting as one gender with one custodial parent and another gender with the other parent.

96.     Referring to "affirmation" as a treatment approach is ambiguous: Although often used in public discourse to take advantage of the positive connotations of the

---

[89]   Wiepjes, *et al.,* 2020.
[90]   Reuter, *et al.,* 2016; Rodriguez-Seiljas, *et al.,* 2021; Zanarni, *et al.,* 2021.
[91]   Bauer, *et al.*, 2015; Canetto, et al., 2021.

term, it obfuscates what exactly is being affirmed. This often leads to confusion, such as quoting a study of the benefits and risks of social affirmation in a discussion of medical affirmation, where the appearance of the isolated word "affirmation" refers to entirely different actions.

97.    It is also an error to divide treatment approaches into affirmative versus non-affirmative. As noted already, the widely adopted Dutch Approach (and the guidelines of the multiple professional associations based on it) cannot be said to be either: It is a staged set of interventions, wherein social transition (and puberty blocking) may not begin until age 12 and cross-sex hormonal and other medical interventions, later.

98.    Formal clinical approaches to helping children expressing gender dysphoria employ a gate-keeper model, with decision trees to help clinicians decide when and if the potential benefits of affirmation of the new gender would outweigh the potential risks of doing so.  Because the gate-keepers and decision-trees generally include the possibility of affirmation in at least some cases, it is misleading to refer to any one approach as "the affirmation approach."  The most extreme decision-tree would be accurately called affirmation-*on-demand,* involving little or no opportunity for children to explore at all whether the distress they feel is due to some other, less obvious, factor, whereas more moderate gate-keeping would endorse transition only in select situations, when the likelihood of regretting transition is minimized.

99.    Many outcomes studies have been published examining the results of gate-keeper models, but no such studies have been published regarding affirmation-on-demand with children. Although there have been claims that affirmation-on-demand causes mental health or other improvement, these have been the result only of "retrospective" rather than "prospective" studies.  That is, such studies did not take a sample of children and follow them up over time, to see how many dropped out altogether, how many transitioned successfully, and how many transitioned and

regretted it or detransitioned. Rather, such studies took a sample of successfully transitioned adults and asked them retrospective questions about their past. In such studies, it is not possible to know how many other people dropped out or regretted transition, and it is not possible to infer causality from any of the correlations detected, despite authors implying and inferring causality.

100. Olson and colleagues employed exactly such a retrospective study. They offered their survey to children in the TransYouth Project—people who have socially transitioned, their families, and any contacts they had, by word of mouth. This method is referred to as "convenience sampling," and differs from genuinely representative samples in applying to means of ensuring study participants accurately represent the population being studied. There were three groups of children for comparison: (i) children who had already socially transitioned, (ii) their siblings, and (iii) children in a university database of families interested in participating in child development research. As noted by the study authors, "For the first time, this article reports on socially transitioned gender children's mental health as reported by the children."[92] Reports from parents were also recorded.[93] In contrast, no reports or ratings were provided by any mental health care professional or researcher at all. That is, although adding self-assessments to the professional assessments might indeed provide novel insights, this project did not add self-assessment to professional assessment. Rather, it replaced professional assessment with self-assessment. Moreover, as already noted, Olson's data did not show what the Olson team claimed.[94] The dataset was subsequently re-analyzed, and "[T]o the contrary, the transgender children, even when supported by their parents, had significantly lower average scores on anxiety and self-worth."[95]

---

[92] Durwood, *et al.*, 2017, at 121 (italics added).
[93] *See* Olson, *et al.*, 2016.
[94] Schumm, *et al.,* 2019.
[95] Schumm & Crawford, 2020, p. 9

101.   It is well established in the field of psychology that participant self-assessment can be severely unreliable for multiple reasons. For example, one well-known phenomenon in psychological research is known as "socially desirable responding"—the tendency of subjects to give answers that they believe will make themselves look good, rather than accurate answers. Specifically, subjects' reports that they are enjoying good mental health and functioning well could reflect the subjects' desire to be *perceived* as healthy and as having made good choices, rather than reflecting their actual mental health.

102.   In their analyses, the study reported finding no significant differences between the transgender children, their non-transgender siblings, or the community controls. As the authors noted, "[t]hese findings are in striking contrast to previous work with gender-nonconforming children who had not socially transitioned, which found very high rates of depression and anxiety."[96] The authors are correct to note that their result contrasts with the previous research, but they do not discuss that this could reflect a problem with the novel research design they used: The subjective self-reports of the children and their parents' reports may not be reflecting reality objectively, as careful professional researchers would. Because the study did not employ any method to detect and control for participants indulging in "socially desirable responding" or acting under other biasing motivations, this possibility cannot be assessed or ruled out.

103.   Because this was a single-time study relying on self-reporting, rather than a before-and-after transition study relying on professional evaluation, it is not possible to know if the children reported as well-functioning are in fact well-functioning, nor if so whether they are well-functioning because they were permitted to transition, or whether instead the fact is that they were already well-functioning

---

[96]   Durwood, *et al.*, 2017, at 116.

and therefore permitted to transition. Finally, because the TransYouth project lacks a prospective design, it cannot be known how many cases attempted transition, reacted poorly, and then detransitioned, thus never having entered into the study in the first place.

### E. Assessing the "Minority Stress Hypothesis"

104.   The elevated levels of mental health problems among lesbian, gay, and bisexual populations is a well-documented phenomenon, and the idea that it is caused by living within a socially hostile environment is called the *Minority Stress Hypothesis*.[97] The association is not entirely straight-forward, however. For example, although lesbian, gay, and bisexual populations are more vulnerable to suicide ideation overall, the evidence specifically on adult lesbian and bisexual women is unclear. Meyer did not include transgender populations in originating the hypothesis, and it remains a legitimate question to what extent and in what ways it might apply to gender identity.

105.   Minority stress is associated, in large part, with being a visible minority. There is little evidence that transgender populations show the patterns suggested by the hypothesis. For example, the minority stress hypothesis would predict differences according to how visibly a person is discernable as a member of the minority, which often changes greatly upon transition. Biological males who are very effeminate stand out throughout childhood, but in some cases can successfully blend in as adult females; whereas the adult-onset transitioners blend in very much as heterosexual cis-gendered males during their youth and begin visibly to stand out in adulthood, only for the first time.

106.   Also suggesting minority stress cannot be the full story is that the mental health symptoms associated with minority stress do not entirely correspond with

---

[97]   Meyer, 2003.

41

those associated with gender dysphoria. The primary symptoms associated with minority stress are depressive symptoms, substance use, and suicidal ideation.[98] The symptoms associated with gender dysphoria indeed include depressive symptoms and suicidal ideation, but also include anxiety symptoms, Autism Spectrum Disorders, and personality disorders.

## VII.   Assessing Statements from Professional Associations

### A. Understanding the Value of Statements from Professional Associations

107.   The value of position statements from professional associations should be neither over- nor under-estimated. In the ideal, an organization of licensed health care professionals would convene a panel of experts who would systematically collect all the available evidence about an issue, synthesizing it into recommendations or enforceable standards for clinical care, according to the quality of the evidence for each alternative. For politically neutral issues, with relevant expertise contained among association members, this ideal can be readily achievable. For controversial issues with no clear consensus, the optimal statement would summarize each perspective and explicate the strengths and weaknesses of each, providing relatively reserved recommendations and suggestions for future research that might resolve the continuing questions. Several obstacles can hinder that goal, however. Committees within professional organizations are typically volunteer activities, subject to the same internal politics of all human social structures. That is, committee members are not necessarily committees of experts on a topic—they are often committees of generalists handling a wide variety of issues or members of an interest group who feel strongly about political implications of an issue, instead of scientists engaged in the objective study of the topic.

---

[98]   Meyer, 2003.

42

108.  Thus, documents from professional associations may represent required standards, the violation of which may merit sanctions, or may represent only recommendations or guidelines. A document may represent the views of an association's full membership or only of the committee's members (or majorities thereof). Documents may be based on systematic, comprehensive reviews of the available research or selected portions of the research. In sum, the weight best placed on any association's statement is the amount by which that association employed evidence versus other considerations in its process.

### B.  Misrepresentations of statements of professional associations.

109.  In the presently highly politicized context, official statements of professional associations have been widely misrepresented. In preparing the present report, I searched the professional research literature for documentation of statements from these bodies and from my own files, for which I have been collecting such information for many years. I was able to identify statements from six such organizations. Although not strictly a medical association, the World Professional Association for Transgender Health (WPATH) also distributed a set of guidelines in wide use and on which other organizations' guidelines are based.

110.  Notably, despite that all these medical associations reiterate the need for mental health issues to be resolved before engaging in medical transition, only the AACAP members have medical training in mental health. The other medical specialties include clinical participation with this population, but their assistance in transition generally assumes the mental health aspects have already been assessed and treated beforehand.

### 1. World Professional Association for Transgender Health (WPATH)

111.   The WPATH standards as they relate to prepubescent children begin with the acknowledgement of the known rates of desistance among gender dysphoric children:

> [I]n follow-up studies of prepubertal children (mainly boys) who were referred to clinics for assessment of gender dysphoria, the dysphoria persisted into adulthood for only 6–23% of children (Cohen-Kettenis, 2001; Zucker & Bradley, 1995). Boys in these studies were more likely to identify as gay in adulthood than as transgender (Green, 1987; Money & Russo, 1979; Zucker & Bradley, 1995; Zuger, 1984). Newer studies, also including girls, showed a 12–27% persistence rate of gender dysphoria into adulthood (Drummond, Bradley, Peterson-Badali, & Zucker, 2008; Wallien & Cohen-Kettenis, 2008).[99]

112.   That is, "In most children, gender dysphoria will disappear before, or early in, puberty."[100]

113.   Although WPATH does not refer to puberty blocking medications as "experimental," the document indicates the non-routine, or at least inconsistent availability of the treatment:

> Among adolescents who are referred to gender identity clinics, the number considered eligible for early medical treatment—starting with GnRH analogues to suppress puberty in the first Tanner stages—differs among countries and centers. Not all clinics offer puberty suppression. If such treatment is offered, the pubertal stage at which adolescents are allowed to start varies from Tanner stage 2 to stage 4 (Delemarre, van de Waal & Cohen-Kettenis, 2006; Zucker et al., [2012]).[101]

114.   WPATH neither endorses nor proscribes social transitions before puberty, instead recognizing the diversity among families' decisions:

> Social transitions in early childhood do occur within some families with early success. This is a controversial issue, and divergent views are held by health professionals. The current evidence base is insufficient to predict the long-term outcomes of completing a gender role transition during early childhood.[102]

115.   It does caution, however, "Relevant in this respect are the previously described relatively low persistence rates of childhood gender dysphoria."[103]

---

[99]   Coleman, *et al.*, 2012, at 172.
[100]  Coleman, *et al.*, 2012, at 173.
[101]  Coleman, *et al.*, 2012, at 173.
[102]  Coleman, *et al.*, 2012, at 176.
[103]  Coleman, *et al.*, 2012, at 176 (quoting Drummond, *et al.*, 2008; Wallien & Cohen-Kettenis, 2008).

## 2. Endocrine Society (ES)

116.    The 150,000-member Endocrine Society appointed a nine-member task force, plus a methodologist and a medical writer, who commissioned two systematic reviews of the research literature and, in 2017, published an update of their 2009 recommendations, based on the best available evidence identified. The guideline was co-sponsored by the American Association of Clinical Endocrinologists, American Society of Andrology, European Society for Paediatric Endocrinology, European Society of Endocrinology, Pediatric Endocrine Society (PES), and the World Professional Association for Transgender Health (WPATH).

117.    The document acknowledged the frequency of desistance among gender dysphoric children:

> Prospective follow-up studies show that childhood GD/gender incongruence does not invariably persist into adolescence and adulthood (so-called "desisters"). Combining all outcome studies to date, the GD/gender incongruence of a minority of prepubertal children appears to persist in adolescence. . . . In adolescence, a significant number of these desisters identify as homosexual or bisexual.[104]

118.    The statement similarly acknowledges inability to predict desistance or persistence, "With current knowledge, we cannot predict the psychosexual outcome for any specific child."[105]

119.    Although outside their area of professional expertise, mental health issues were also addressed by the Endocrine Society, repeating the need to handle such issues before engaging in transition, "In cases in which severe psychopathology, circumstances, or both seriously interfere with the diagnostic work or make satisfactory treatment unlikely, clinicians should assist the adolescent in managing these other issues."[106] This ordering—to address mental health issues before embarking on transition—avoids relying on the unproven belief that transition will solve such issues.

---

[104]    Hembree, *et al.*, 2017, at 3876.
[105]    Hembree, *et al.*, 2017, at 3876.
[106]    Hembree, *et al.*, 2017, at 3877.

45

120.    The Endocrine Society did not endorse any affirmation-only approach. The guidelines were neutral with regard to social transitions before puberty, instead advising that such decisions be made only under clinical supervision: "We advise that decisions regarding the social transition of prepubertal youth are made with the assistance of a mental health professional or similarly experienced professional."[107]

121.    The Endocrine Society guidelines make explicit that, after gathering information from adolescent clients seeking medical interventions and their parents, the clinician "provides correct information to prevent unrealistically high expectations [and] assesses whether medical interventions may result in unfavorable psychological and social outcomes."[108]

### 3.  Pediatric Endocrine Society and Endocrine Society (ES/PES)

122.    In 2020, the 1500-member Pediatric Endocrine Society partnered with the Endocrine Society to create and endorse a brief, two-page position statement.[109] Although strongly worded, the document provided no specific guidelines, instead deferring to the Endocrine Society guidelines.[110]

123.    It is not clear to what extent this endorsement is meaningful, however. According to the PES, the Endocrine Society "recommendations include evidence that treatment of gender dysphoria/gender incongruence is medically necessary and should be covered by insurance."[111] However, the Endocrine Society makes neither statement. Although the two-page PES document mentioned insurance coverage four times, the only mention of health insurance by the Endocrine Society was: "If GnRH analog treatment is not available (insurance denial, prohibitive cost, or other reasons), postpubertal, transgender female adolescents may be treated with an

---

[107]  Hembree, *et al.*, 2017, at 3872.
[108]  Hembree, *et al.*, 2017, at 3877.
[109]  PES, online; Pediatric Endocrine Society & Endocrine Society, Dec. 2020.
[110]  Pediatric Endocrine Society & Endocrine Society, Dec. 2020, at 1; Hembree, *et al.*, 2017.
[111]  Pediatric Endocrine Society & Endocrine Society, Dec. 2020, at 1.

antiandrogen that directly suppresses androgen synthesis or action."[112] Despite the PES asserting it as "medically necessary," the Endocrine Society stopped short of that. Its only use of that phrase was instead limiting: "We recommend that a patient pursue genital gender-affirming surgery only after the MHP and the clinician responsible for endocrine transition therapy both agree that surgery is medically necessary and would benefit the patient's overall health and/or well-being."[113]

### 4. American Academy of Child & Adolescent Psychiatry (AACAP)

124.   The 2012 statement of the American Academy of Child & Adolescent Psychiatry (AACAP) is not an affirmation-only policy. It notes:

> Just as family rejection is associated with problems such as depression, suicidality, and substance abuse in gay youth, the proposed benefits of treatment to eliminate gender discordance in youth must be carefully weighed against such possible deleterious effects. . . . In general, it is desirable to help adolescents who may be experiencing gender distress and dysphoria to defer sex reassignment until adulthood, or at least until the wish to change sex is unequivocal, consistent, and made with appropriate consent.[114]

125.   The AACAP's language repeats the description of the use of puberty blockers only as an exception: "For situations in which deferral of sex reassignment decisions until adulthood is *not clinically feasible*, one approach that has been described in case series is sex hormone suppression under endocrinological management with psychiatric consultation using gonadotropin-releasing hormone analogues."[115]

126.   The AACAP statement acknowledges the long-term outcomes literature for gender dysphoric children: "In follow-up studies of prepubertal boys with gender discordance—including many without any mental health treatment—the cross gender wishes usually fade over time and do not persist into adulthood,"[116] adding that "[c]linicians should be aware of current evidence on the natural course of gender

---

[112]   Hembree, *et al.* 2017, at 3883.
[113]   Hembree, *et al.*, 2017 at 3872, 3894.
[114]   Adelson & AACAP, 2012, at 969.
[115]   Adelson & AACAP, 2012, at 969 (italics added).
[116]   Adelson & AACAP, 2012, at 963.

47

discordance and associated psychopathology in children and adolescents in choosing the treatment goals and modality."[117]

127.     The policy similarly includes a provision for resolving mental health issues: "Gender reassignment services are available in conjunction with mental health services focusing on exploration of gender identity, cross-sex treatment wishes, counseling during such treatment if any, and *treatment of associated mental health problems*."[118] The document also includes minority stress issues and the need to deal with mental health aspects of minority status (*e.g.*, bullying).[119]

128.     Rather than endorse social transition for prepubertal children, the AACAP indicates: "There is similarly no data at present from controlled studies to guide clinical decisions regarding the risks and benefits of sending gender discordant children to school in their desired gender. Such decisions must be made based on clinical judgment, bearing in mind the potential risks and benefits of doing so."[120]

### 5.  American College of Obstetricians & Gynecologists (ACOG)

129.     The American College of Obstetricians & Gynecologists (ACOG) published a "Committee Opinion" expressing recommendations in 2017. The statement indicates it was developed by the ACOG's Committee on Adolescent Health Care, but does not indicate participation based on professional expertise or a systematic method of objectively assessing the existing research. It includes the disclaimer: "This document reflects emerging clinical and scientific advances as of the date issued and is subject to change. The information should not be construed as dictating an exclusive course of treatment or procedure to be followed."[121]

---

[117]  Adelson & AACAP, 2012, at 968.
[118]  Adelson & AACAP, 2012, at 970 (italics added).
[119]  Adelson & AACAP, 2012, at 969.
[120]  Adelson & AACAP, 2012, at 969.
[121]  ACOG, 2017, at 1.

48

130.   Prepubertal children do not typically have clinical contact with gynecologists, and the ACOG recommendations include that the client additionally have a primary health care provider.[122]

131.   The ACOG statement cites the statements made by other medical associations—European Society for Pediatric Endocrinology (ESPE),, PES, and the Endocrine Society—and by WPATH.[123] It does not cite any professional association of *mental* health care providers, however. The ACOG recommendations repeat the previously mentioned eligibility/readiness criteria of having no mental illness that would hamper diagnosis and no medical contraindications to treatment. It notes: "*Before* any treatment is undertaken, the patient must display eligibility and readiness (Table 1), meaning that the adolescent has been evaluated by a mental health professional, has no contraindications to therapy, and displays an understanding of the risks involved."[124]

132.   The "Eligibility and Readiness Criteria" also include, "Diagnosis established for gender dysphoria, transgender, transsexualism."[125] This standard, requiring a formal diagnosis, forestalls affirmation-on-demand because self-declared self-identification is not sufficient for DSM diagnosis.

133.   ACOG's remaining recommendations pertain only to post-transition, medically oriented concerns. Pre-pubertal social transition is not mentioned in the document, and the outcomes studies of gender dysphoric (prepubescent) children are not cited.

### 6. American College of Physicians (ACP)

134.   The American College of Physicians published a position paper broadly expressing support for the treatment of LGBT patients and their families, including

---

[122]   ACOG, 2017, at 1.
[123]   ACOG, 2017, at 1, 3.
[124]   ACOG, 2017, at 1, 3 (citing the Endocrine Society guidelines) (italics added).
[125]   ACOG, 2017, at 3 Table 1.

49

nondiscrimination, antiharassment, and defining "family" by emotional rather than biological or legal relationships in visitation policies, and the inclusion of transgender health care services in public and private health benefit plans.[126]

135.    ACP did not provide guidelines or standards for child or adult gender transitions. The policy paper opposed attempting "reparative therapy;" however, the paper confabulated sexual orientation with gender identity in doing so. That is, on the one hand, ACP explicitly recognized that "[s]exual orientation and gender identity are inherently different."[127] It based this statement on the fact that "the American Psychological Association conducted a literature review of 83 studies on the efficacy of efforts to change *sexual orientation*."[128] The APA's document, entitled "Report of the American Psychological Task Force on appropriate therapeutic responses to *sexual orientation*" does not include or reference research on gender identity.[129] Despite citing no research about transgenderism, the ACP nonetheless included in its statement: "Available research does not support the use of reparative therapy as an effective method in the treatment of LGB*T* persons."[130] That is, the inclusion of "T" with "LGB" is based on something other than the existing evidence.

136.    There is another statement,[131] which was funded by ACP and published in the Annals of Internal Medicine under its "*In the Clinic*" feature, noting that "'In the Clinic' does not necessarily represent official ACP clinical policy."[132] The document discusses medical transition procedures for adults rather than for children, except to note that "[n]o medical intervention is indicated for prepubescent youth,"[133] that a "mental health provider can assist the child and family with identifying an

---

[126]   Daniel & Butkus, 2015a, 2015b.
[127]   Daniel & Butkus, 2015b, at 2.
[128]   Daniel & Butkus, 2015b, at 8 (italics added).
[129]   APA, 2009 (italics added).
[130]   Daniel & Butkus, 2015b, at 8 (italics added).
[131]   Safer & Tangpricha, 2019.
[132]   Safer & Tangpricha, 2019, at ITC1.
[133]   Safer & Tangpricha, 2019, at ITC9.

appropriate time for a social transition,"[134] and that the "child should be assessed and managed for coexisting mood disorders during this period because risk for suicide is higher than in their cisgender peers."[135]

### 7. American Academy of Pediatrics (AAP)

137.   The policy of the American Academy of Pediatrics (AAP) is unique among the major medical associations in being the only one to endorse an affirmation-on-demand policy, including social transition before puberty without any watchful waiting period. Although changes in recommendations can obviously be appropriate in response to new research evidence, the AAP provided none. Rather, the research studies AAP cited in support of its policy simply did not say what AAP claimed they did. In fact, the references that AAP cited as the basis of their policy instead outright contradicted that policy, repeatedly endorsing watchful waiting.[136] Moreover, of all the outcomes research published, the AAP policy cited *one*, and that without mentioning the outcome data it contained.[137]

### 8. The ESPE-LWPES GnRH Analogs Consensus Conference Group

138.   Included in the interest of completeness, there was also a collaborative report in 2009, between the European Society for Pediatric Endocrinology (ESPE) and the Lawson Wilkins Pediatric Endocrine Society (LWPES).[138] Thirty experts were convened, evenly divided between North American and European labs and evenly divided male/female, who comprehensively rated the research literature on gonadotropin-release hormone analogs in children.

139.   The effort concluded that "[u]se of gonadotropin-releasing hormone analogs for conditions other than central precocious puberty requires additional investigation

---

[134]  Safer & Tangpricha, 2019, at ITC9.
[135]  Safer & Tangpricha, 2019, at ITC9.
[136]  Cantor, 2020.
[137]  Cantor, 2020, at 1.
[138]  Carel et al., 2009.

and cannot be suggested routinely."[139] However, gender dysphoria was not explicitly mentioned as one of those other conditions.

---

[139] Carel et al. 2009, at 752.

# References

Achille, C., Taggart, T., Eaton, N. R., Osipoff, J., Tafuri, K., Lane, A., & Wilson, T. A. (2020). Longitudinal impact of gender-affirming endocrine intervention on the mental health and well-being of transgender youths: Preliminary results. *International Journal of Pediatric Endocrinology*. doi: 10.1186/s13633-020-00078-2

Adelson, S. L., & American Academy of Child and Adolescent Psychiatry (AACAP) Committee on Quality Issues. (2012). Practice parameter on gay, lesbian, or bisexual sexual orientation, gender nonconformity, and gender discordance in children and adolescents. *Journal of the American Academy of Child & Adolescent Psychiatry, 51*, 957–974.

American College of Obstetricians and Gynecologists. (2017). Care for transgender Adolescents. Committee Opinion No. 685. Retrieved from www.acog.org/clinical/clinical-guidance/committee-opinion/articles/2017/01/care-for-transgender-adolescents

American Psychological Association, Task Force on Appropriate Therapeutic Responses to Sexual Orientation. (2009). Report of the American Psychological Association Task Force on Appropriate Therapeutic Responses to Sexual Orientation. Retrieved from http://www. apa.org/pi/lgbc/publications/therapeutic-resp.html

Anzani, A., De Panfilis, C., Scandurra, C., & Prunas, A. (2020). Personality Disorders and Personality Profiles in a Sample of Transgender Individuals Requesting Gender-Affirming Treatments. *International Journal of Environmental Research and Public Health, 27, 17,* 1521. www.ncbi.nlm.nih.gov/pmc/articles/PMC7084367/

Bancroft, J. (2009). *Human sexuality and its problems (3rd ed.).* New York: Elsevier.

Bauer, G. R., Scheim, A. I., Pyne, J., Travers, R., & Hammond, R. (2015). Intervenable factors associated with suicide risk in transgender persons: A respondent driven sampling study in Ontario, Canada. *BMC Public Health*, 15, 525.

Biggs, M. (2019). A letter to the editor regarding the original article by Costa et al: Psychological support, puberty suppression, and psychosocial functioning in adolescents with gender dysphoria. *Journal of Sexual Medicine, 16,* 2043.

Biggs, M. (2020). Gender dysphoria and psychological functioning in adolescents treated with GnRHa: Comparing Dutch and English prospective studies. *Archives of Sexual Behavior*, 49, 2231–2236.

Blanchard, R. (1985). Typology of male-to-female transsexualism. *Archives of Sexual Behavior*, 14, 247–261.

Blanchard, R. (1988). Nonhomosexual gender dysphoria. *The Journal of Sex Research*, 24, 188–193.

Blanchard, R. (1989a). The classification and labeling of nonhomosexual gender dysphorias. *Archives of Sexual Behavior*, 18, 315–334.

Blanchard, R. (1989b). The concept of autogynephilia and the typology of male gender dysphoria. *Journal of Nervous and Mental Disease*, 177, 616–623.

Blanchard, R. (1990). Gender identity disorders in adult women. In R. Blanchard & B. W. Steiner (Eds.), *Clinical management of gender identity disorders in children and adults* (pp. 77–91). Washington, DC: American Psychiatric Press.

Blanchard, R. (1991). Clinical observations and systematic studies of autogynephilia. *Journal of Sex and Marital Therapy*, 17, 235–251.

Blanchard, R., Steiner, B. W., Clemmensen, L. H., & Dickey, R. (1989). Prediction of regrets in postoperative transsexuals. *Canadian Journal of Psychiatry*, 34, 43–45.

Bränström, R., & Pachankis, J. E. (2019). Reduction in mental health treatment utilization among transgender individuals after gender-affirming surgeries: A total population study. *American Journal of Psychiatry, 177,* 727–734.

Boivin, L., Notredame, C.-E., Jardri, R., & Medjkane, F. (2020). Supporting parents of transgender adolescents: Yes, but how? *Archives of Sexual Behavior*, 49, 81–83.

Cantor, J. M. (2020). Transgender and gender diverse children and adolescents: Fact-checking of AAP policy. *Journal of Sex & Marital Therapy*, 46, 307–313.

Canetto, S. S., Antonelli, P., Ciccotti, A., Dettore, D., & Lamis, D. A. (2021). Suicidal as normal: A lesbian, gay, and bisexual youth script? *Crisis, 42,* 292–300.

Carel, J. C., Eugster, E. A., Rogol, A., Ghizzoni, L., Palmert, M. R.; ESPE-LWPES GnRH Analogs Consensus Conference Group, Antoniazzi, F., Berenbaum, S., Bourguignon, J. P., Chrousos, G. P., Coste, J., Deal, S., de Vries, L., Foster, C., Heger, S., Holland, J., Jahnukainen, K., Juul, A., Kaplowitz, P., Lahlou, N., Lee, M. M., Lee, P., Merke, D. P., Neely, E. K., Oostdijk, W., Phillip, M., Rosenfield, R. L., Shulman, D., Styne, D., Tauber, M., Wit, J. M. (2009). Consensus statement on the use of gonadotropin-releasing hormone analogs in children. *Pediatrics*, 123(4), e752–e762.

Cohen, J., Cohen, P., West, S. G. Cohen, J., Cohen, P., West, S. G., & Aiken, L. S. (2003). *Applied multiple regression/correlation analysis for the behavioral sciences (3rd ed.).* Mahwah, NJ: Lawrence Erlbaum Associates.

Carmichael, P., Butler, G., Masic, U., Cole, T. J., De Stavola, B. L., Davidson, S., Skageberg, E. M., Khadr, S., Viner, R. M. (2021). Short-term outcomes of pubertal suppression in a selected cohort of 12 to 15 year old young people with persistent gender dysphoria in the UK. *PLosONE*, 16(2): e0243894.

Cohen-Kettenis, P. T. (2001). Gender identity disorder in DSM? *Journal of the American Academy of Child & Adolescent Psychiatry*, 40, 391–391.

Cohen-Kettenis, P. T., Owen, A., Kaijser, V. G., Bradley, S. J., & Zucker, K. J. (2003). Demographic characteristics, social competence, and behavior problems in children with gender identity disorder: A cross-national, cross-clinic comparative analysis. *Journal of Abnormal Child Psychology*, 31, 41–53.

Coleman, E., Bockting, W., Botzer, M., Cohen-Kettenis, P., DeCuypere, G., Feldman, J., Fraser, L., Green, J., Knudson, G., Meyer, W. J., Monstrey, S., Adler, R. K.,

Brown, G. R., Devor, A. H., Ehrbar, R., Ettner, R., Eyler, E., Garofalo, R., Karasic, D. H., Lev, A. I., Mayer, G., Meyer-Bahlburg, H., Hall, B. P., Pfaefflin, F., Rachlin, K., Robinson, B., Schechter, L. S., Tangpricha, V., van Trotsenburg, M., Vitale, A., Winter, S., Whittle, S., Wylie, K. R., & Zucker, K. (2012). Standards of care for the health of transsexual, transgender, and gender-nonconforming people, version 7. *International Journal of Transgenderism*, 13, 165–232.

Costa, R., Dunsford, M., Skagerberg, E., Holt V., Carmichael, P., & Colizzi, M. (2015). Psychological support, puberty suppression, and psychosocial functioning in adolescents with gender dysphoria. *Journal of Sexual Medicine*, 12, 2206–2214.

Dahlen, S., Connolly, D., Arif, I., Hyder Junejo, M., Bewley, S., & Meads, C. (2021). *International clinical practice guidelines for gender minority/trans people: Systematic review and quality assessment. BMJ Open, 11,* e048943.

Daniel, H., & Butkus, R. (2015a). Lesbian, gay, bisexual, and transgender health disparities: Executive summary of a policy position paper from the American College of Physicians. *Annals of Internal Medicine*, 163, 135–137.

Daniel, H., & Butkus, R. (2015b). Appendix: Lesbian, gay, bisexual, and transgender health disparities: A policy position paper from the American College of Physicians. *Annals of Internal Medicine*, 163(2), [unpaginated].

de Vries, A. L. C. & Cohen-Kettenis, P. T. (2012). Clinical management of gender dysphoria in children and adolescents: The Dutch Approach. *Journal of Homosexuality*, 59, 301–320.

de Vries, A. L. C., McGuire, J. K., Steensma, T. D., Wagenaar, E. C. F., Doreleijers, T. A. H., & Cohen-Kettenis, P. T. (2014). Young adult psychological outcome after puberty suppression and gender reassignment. *Pediatrics*, 134, 1–9.

de Vries, A. L. C., Steensma, T. D., Doreleijers, T. A. H., & Cohen-Kettenis, P. T. (2011). Puberty suppression in adolescents with gender identity disorder: A prospective follow-up study. *Journal of Sexual Medicine*, 8, 2276–2283.

de Vries, A. L., Doreleijers, T. A., Steensma, T. D., & Cohen-Kettenis, P. T. (2011). Psychiatric comorbidity in gender dysphoric adolescents. *Journal of Child Psychology and Psychiatry*, 52, 1195–1202.

de Vries, A. L., Noens, I. L., Cohen-Kettenis, P. T., van Berckelaer- Onnes, I. A., & Doreleijers, T. A. (2010). Autism spectrum disorders in gender dysphoric children and adolescents. *Journal of Autism and Developmental Disorders*, 40, 930–936.

Delemarre-van de Waal, H. A., & Cohen- Kettenis, P. T. (2006). Clinical management of gender identity disorder in adolescents: A protocol on psychological and paediatric endocrinology aspects. *European Journal of Endocrinology*, 155 (suppl 1), S131–S137.

Dhejne, C., Van Vlerken, R., Geylens, G., & Arcelus, J. (2016). Mental health and gender dysphoria: A review of the literature. *International Review of Psychiatry*, 28, 44–57.

Dhejne, C., Lichtenstein, P., Boman, M., Johansson, A. L. V., Langström, N., & Landén, M. (2011). Long-term follow-up of transsexual persons undergoing sex

reassignment surgery: Cohort study in Sweden. *PLoS ONE 6*(2), e16885.

Dhejneberg, C., Öberg, K., Arver, S., & Landén, M. (2014). An analysis of all applications for sex reassignment surgery in Sweden, 1960–2010: Prevalence, incidence, and regrets. *Archives of Sexual Behavior*, 43, 1535–1545.

Drummond, K. D., Bradley, S. J., Peterson-Badali, M., & Zucker, K. J. (2008). A follow up study of girls with gender identity disorder. *Developmental Psychology*, 44, 34–45.

Durwood, L., McLaughlin, K. A., & Olson, K. R. (2017). Mental health and self-worth in socially transitioned transgender youth. *Journal of the American Academy of Child & Adolescent Psychiatry*, 56, 116–123.

Finland Ministry of Social Affairs and Health, Council for Choices in Health Care. (2020, June 11). *Medical treatment methods for dysphoria associated with variations in gender identity in minors—Recommendation*. Retrieved from https://palveluvalikoima.fi/documents/1237350/22895008/Summary_minors_en+(1).pdf/fa2054c5-8c35-8492-59d6-b3de1c00de49/Summary_minors_en+(1).pdf?t=1631773838474

Finland Ministry of Social Affairs and Health, Council for Choices in Health Care. (2020, June 16). *Medical treatments for gender dysphoria that reduces functional capacity in transgender people—Recommendation*. Retrieved from https://palveluvalikoima.fi/documents/1237350/22895838/Summary+transgender.pdf/2cc3f053-2e34-39ce-4e21-becd685b3044/Summary+transgender.pdf?t=1592318543000

Freeman, A., Mergl, R., Kohls, E., Székely, A., Gusmao, R., Arensman, E., Koburger, N., Hegerl, U., & Rummel-Kluge, C. (2017). A cross-national study on gender differences in suicide intent. *BMC Psychiatry, 17,* 234.

Green, R. (1987). *The "sissy boy syndrome" and the development of homosexuality*. New Haven, CT: Yale University Press.

Hembree, W. C., Cohen-Kettenis, P. T., Gooren, L., Hannema, S. E., Meyer, W. J., Murad, M. H., Rosenthal, S. M., Safer, T. D., Tangpricha, V., & T'Sjoen, G. G. (2017). Endocrine treatment of gender-dysphoric/ gender-incongruent persons: An Endocrine Society clinical practice guideline. *Journal of Clinical Endocrinology & Metabolism*, 102, 3869–3903.

Hepp, U., Kraemer, B., Schnyder, U., Miller, N., & Delsignore, A. (2005). Psychiatric comorbidity in gender identity disorder. *Journal of Psychosomatic Research, 58,* 259–261.

Hisle-Gorman, E., Schvey, N. A., Adirim, T. A., Rayne, A. K., Susi, A., Roberts, T. A., & Klein, D. A. (2021). Mental healthcare utilization of transgender youth before and after affirming treatment. *The Journal of Sexual Medicine, 18,* 1444–1454.

Holt, V., Skagerberg, E., & Dunsford, M. (2016). Young people with features of gender dysphoria: Demographics and associated difficulties. *Clinical Child Psychology and Psychiatry, 21*, 108–118.

Jacobs, L. A., Rachlin, K., Erickson-Schroth, L., & Janssen, A. (2014). Gender dysphoria and co-occurring autism spectrum disorders: Review, case examples,

and treatment considerations. *LGBT Health, 1*, 277–282.

Janssen, A., Busa, S., Wernick, J. (2019). The complexities of treatment planning for transgender youth with co-occurring severe mental illness: A literature review and case study. *Archives of Sexual Behavior, 48*, 2003–2009.

Janssen, A., Huang, H., & Duncan, C. (2016). Gender variance among youth with autism spectrum disorders: A retrospective chart review. *Transgender Health, 1*, 63–68.

Kalin, N. H. (2020). Reassessing mental health treatment utilization reduction in transgender individuals after gender-affirming surgeries: A comment by the Editor on the process. *American Journal of Psychiatry, 177,* 765.

Kaltiala, R, Heino, E., Työläjärvi, & Suomalainen, L. (2020). Adolescent development and psychosocial functioning after starting cross-sex hormones for gender dysphoria. *Nordic Journal of Psychiatry, 74,* 213–219.

Kaltiala-Heino, R., Sumia, M., Työläjärvi, M., & Lindberg, N. (2015). Two years of gender identity service for minors: Overrepresentation of natal girls with severe problems in adolescent development. *Child and Adolescent Psychiatry and Mental Health, 9*, 9.

Kuper, L. E., Stewart, S., Preston, S., Lau, M., & Lopez, X. (2020). Body dissatisfaction and mental health outcomes of youth on gender- affirming hormone therapy. *Pediatrics, 145*, e20193006.

Lehmann, K., Rosato, M., McKenna, H., & Leavey, G. (2021). Dramaturgical accounts of transgender individuals: Impression management in the presentation of self to specialist gender services. *Archives of Sexual Behavior, 50,* 3539–3549.

Littman, L. (2018). Parent reports of adolescents and young adults perceived to show signs of a raid onset of gender dysphoria. *PLoS ONE, 13*(8), e0202330.

May, T., Pang, K., & Williams, K. J. (2016). Gender variance in children and adolescents with autism spectrum disorder from the National Database for Autism Research. *International Journal of Transgenderism, 18*, 7–15.

McCall, B. (2021, October 7). Psychiatrists shift stance on gender dysphoria, recommend therapy. *Medscape Psychiatry*. Retrieved from www.medscape.com/viewarticle/960390?src=soc_tw_share

McNeil, J., Ellis, S. J., & Eccles, F. J. R. (2017). Suicide in trans populations: A systematic review of prevalence and correlates. Psychology of Sexual Orientation and Gender Diversity, 4, 341–353.

Meyer, I. H. (2003). Prejudice, social stress, and mental health in lesbian, gay, and bisexual populations: Conceptual issues and research evidence. *Psychological Bulletin, 129*, 674–697.

Money, J., & Russo, A. J. (1979). Homosexual outcome of discordant gender identity/role in childhood: Longitudinal follow-up. *Journal of Pediatric Psychology, 4*, 29–41.

Mustanski, B. S., Garofalo, R., & Emerson, E. M. (2010). Mental health disorders,

psychological distress, and suicidality in a diverse sample of lesbian, gay, bisexual, and transgender youths. *American Journal of Public Health, 100*, 2426–2432.

Nainggolan, L. (2021, May 12). Hormonal Tx of youth with gender dysphoria stops in Sweden. Medscape Psychiatry. Retrieved from www.medscape.com/viewarticle/950964?src=soc_tw_share

Olson, K. R., Durwood, L., DeMeules, M., & McLaughlin, K. A. (2016). Mental health of transgender children who are supported in their identities. *Pediatrics, 137*, e20153223.

Pediatric Endocrine Society & Endocrine Society. (2020, December 15). *Transgender health*. Retrieved from www.endocrine.org/advocacy/position-statements/transgender-health.

Pediatric Endocrine Society. (Online). About PES. Retrieved from https://pedsendo.org/about-pes/

Rae, J. R., Gülgoz, S., Durwood, L., DeMeules, M., Lowe, R., Lindquist, G., & Olson, K. R. (2019). Predicting early-childhood gender transitions. *Psychological Science, 30*, 669–681.

Rafferty, J., AAP Committee on psychosocial aspects of child and family health, AAP Committee on adolescence, AAP Section on lesbian, gay, bisexual, and transgender health and wellness. (2018). Ensuring comprehensive care and support for transgender and gender-diverse children and adolescents. *Pediatrics, 142*(4), e20182162

Reisner, S. L., Vetters, R., Leclerc, M., Zaslow, S., Wolfrum, S., Shumer, D., & Mimiaga, M. J. (2015). Mental health of transgender youth in care at an adolescent urban community health center: A matched retrospective cohort study. *Journal of Adolescent Health, 56(3)*, 274–279.

Reuter, T. R., Sharp, C., Kalpakci, A. H., Choi, H. J., & Temple, J. R. (2016). Sexual orientation and Borderline Personality Disorder features in a community sample of adolescents. *Journal of Personality Disorders, 30,* 694–707.

Rodriguez-Seijlas, C., Morgan, T. A., & Zimmerman, M. (2021). A population-based examination of criterion-level disparities in the diagnosis of Borderline Personality Disorder among sexual minority adults. *Assessment, 28,* 1097–1109.

Safer, J. D., Tangpricha, V. (2019). In the clinic: Care of the transgender patient. *Annals of Internal Medicine, 171*(1), ITC1–ITC6.

Sax, L. (2002). How common is Intersex? A response to Ann Fausto-Sterling. *The Journal of Sex Research, 39,* 174–178.

Schumm, W. R., Crawford, D. W., Fawver, M. M., Gray, N. K., Niess, Z. M., & Wagner, A. D. (2019). Statistical errors in major journals: Two case studies used in a basic statistics class to assess understanding of applied statistics. *Psychology and Education—An Interdisciplinary Journal, 56,* 35–42.

Schumm, W. R., & Crawford, D. W. (2020). Is research on transgender children what it seems? Comments on recent research on transgender children with high levels

of parental support. *The Linacre Quarterly, 87,* 9–24.

Singh, D., Bradley, S. J., & Zucker, K. J. (2021). A follow-up study of boys with gender identity disorder. *Frontiers in Psychiatry*, 12, 632784.

Skagerberg, E., Parkinson, R., & Carmichael, P. (2013). Self-harming thoughts and behaviors in a group of children and adolescents with gender dysphoria. *International Journal of Transgenderism, 14,* 86–92.

Skelly, A. C., Dettori, J. R., & Brodt, E. D. (2012). Assessing bias: The importance of considering confounding. *Evidence-based Spine-Care Journal, 3,* 9–12.

Spack, N. P., Edwards-Leeper, L., Feldman, H. A., Leibowitz, S., Mandel, F., Diamond, D. A., & Vance, S. R. (2012). Children and adolescents with gender identity disorder referred to a pediatric medical center. *Pediatrics, 129,* 418–425.

Spack, N. P. (2013). Management of transgenderism. *Journal of the American Medical Association, 309,* 478–484.

Steensma, T. D., & Cohen-Kettenis, P. T. (2018a). A critical commentary on "A critical commentary on follow-up studies and 'desistance' theories about transgender and gender-nonconforming children". *International Journal of Transgenderism, 19,* 225–230.

Steensma, T. D., Cohen-Kettenis, P. T., & Zucker, K. J. (2018b). Evidence for a change in the sex ratio of children referred for gender dysphoria: Data from the Center of Expertise on Gender Dysphoria in Amsterdam (1988–2016). *Journal of Sex & Marital Therapy, 44,* 713–715.

Steensma, T. D., McGuire, J. K., Kreukels, B. P. C., Beekman, A. J., & Cohen-Kettenis, P. T. (2013). Factors associated with desistence and persistence of childhood gender dysphoria: A quantitative follow-up study. *Journal of the American Academy of Child and Adolescent Psychiatry, 52,* 582–590.

Strang, J. F., Kenworthy, L., Dominska, A., Sokoloff, J., Kenealy, L. E., Berl, M., … Wallace, G. L. (2014). Increased gender variance in autism spectrum disorders and attention deficit hyperactivity disorder. *Archives of Sexual Behavior, 43,* 1525–1533.

Strang, J. F., Meagher, H., Kenworthy, L., de Vries, A. L., Menvielle, E., Leibowitz, S., … Anthony, L. G. (2016). Initial clinical guidelines for co-occurring autism spectrum disorder and gender dysphoria or incongruence in adolescents. *Journal of Clinical Child and Adolescent Psychology, 47,* 105–115.

Swedish Agency of Health Technology Assessment and Assessment of Social Services. (2019). *Gender dysphoria in children and adolescents: An inventory of the literature.* Retrieved from: www.sbu.se/en/publications/sbu-bereder/gender-dysphoria-in-children-and-adolescents-an-inventory-of-the-literature/

Temple Newhook, J., Pyne, J., Winters, K., Feder, S., Holmes, C., Tosh, J. Sinnott, M.-L., Jamieson, A., & Pickett, S. (2018). A critical commentary on follow-up studies and "desistance" theories about transgender and gender-nonconforming children. *International Journal of Transgenderism, 19,* 212–224.

59

Tetelepta, B. (2021, Feb 27). More research is urgently needed into transgender care for young people: 'Where does the large flow of children come from?' [translated]. Algemeen Dagblad. Retrieved from www.ad.nl/nijmegen/dringend-meer-onderzoek-nodig-naar-transgenderzorg-aan-jongeren-waar-komt-de-grote-stroom-kinderen-vandaan~aec79d00/?referrer=https%3A%2F%2Ft.co%2F.

Thrower, E., Bretherton, I., Pang, K. C., Zajac, J. D., & Cheung, A. S. (2020). Prevalence of Autism Spectrum Disorder and Attention-Deficit Hyperactivity Disorder amongst individuals with Gender Dysphoria: A systematic review. *Journal of Autism and Developmental Disorders, 50*, 695–706.

United Kingdom National Health Service (NHS), National Institute for Health and Care Excellence, (2021, March 11). *Evidence review: Gonadotrophin releasing hormone analogues for children and adolescents with gender dysphoria.* Retrieved from www.evidence.nhs.uk/document?id=2334888&returnUrl=search%3ffrom%3d2020-01-01%26q%3dgender%2bdysphoria%26sp%3don%26to%3d2021-03-31

van der Miesen, A. I. R., Steensma, T. D., de Vries, A. L. C., Bos, H., Popma, A. (2020). Psychological functioning in transgender adolescence before and after gender-affirmative care compared with cisgender general population peers. *Journal of Adolescent Health, 66*, 699–704.

Wallien, M. S. C., & Cohen-Kettenis, P. T. (2008). Psychosexual outcome of gender-dysphoric children. *Journal of the American Academy of Child & Adolescent Psychiatry, 47*, 1413–1423.

Wallien, M. S., Swaab, H., & Cohen-Kettenis, P. T. (2007). Psychiatric comorbidity among children with gender identity disorder. *Journal of the American Academy of Child and Adolescent Psychiatry, 46*, 1307–1314.

Warrier, V., Greenberg, D. M., Weir, E., Buckingham, C., Smith, P., Lai, M.-C., Allison, C., & Baron-Cohen, S. (2020). Elevated rates of autism, other neurodevelopmental and psychiatric diagnoses, and autistic traits in transgender and gender-diverse individuals. *Nature Communications, 11,* 3959.

Wiepjes, C. M., den Heijer, M., Bremmer, M. A., Nota, N. M., de Block, C. J. M., Coumou, B. J. G., & Steensma, T. D. (2020). Trends in suicide death risk in transgender people: Results from the Amsterdam Cohort of Gender Dysphoria study (1972–2017). *Acta Psychiatrica Scandinavica, 141,* 486–491.

Wiepjes, C. M., Nota, N. M., de Bok, C. J. M., Klaver, M., de Vries, A. L. C., Wensing-Kruger, S. A., de Jongh, R. T., Bouman, M-B., Steensma, T. D., Cohen-Kettenis, P., Gooren, L. J. G., Kreukels B. P. C., & den Heijer, M. (2018). The Amsterdam Cohort of Gender Dysphoria Study (1972–2015): Trends in prevalence, treatment, and regrets. *Journal of Sexual Medicine, 15*, 582–590.

Winters, K., Temple Newhook, J., Pyne, J., Feder, S., Jamieson, A., Holmes, C., Sinnott, M.-L., Pickett, S., & Tosh J. (2018). Learning to listen to trans and gender diverse children: A Response to Zucker (2018) and Steensma and Cohen-Kettenis (2018). *International Journal of Transgenderism, 19*, 246–250.

Wood, H., Sasaki, S., Bradley, S. J., Singh, D., Fantus, S., Own-Anderson, A., Di Giacomo, A., Bain, J., & Zucker, K. J. (2013). Patterns of referral to a gender

Williams 0450

identity service for children and adolescents (1976–2011): Age, sex ratio, and sexual orientation. *Journal of Sex & Marital Therapy, 39,* 1–6.

Zanarini, M. C., Magni, L. R., Temes, C. M., Hein, K. E., Aguirre, B. A., & Goodman, M. (2021). Sexual orientation and gender of intimate relationship partners among adolescents with BPD and psychiatrically healthy adolescents. *Journal of Personality Disorders, 35 (Suppl. B),* 1–7.

Zucker, K. J. (2018). The myth of persistence: Response to "A critical commentary on follow-up studies and 'desistance' theories about transgender and gender-nonconforming children" by Temple Newhook et al. (2018). *International Journal of Transgenderism, 19,* 231–245.

Zucker, K. J. (2019). Adolescents with gender dysphoria: Reflections on some contemporary clinical and research issues. *Archives of Sexual Behavior, 48,* 1983–1992.

Zucker, K. J., & Bradley, S. J. (1995). *Gender identity disorder and psychosexual problems in children and adolescents.* New York: Guilford Press.

Zucker, K. J., Bradley, S. J., Owen-Anderson, A., Kibblewhite, S. J., Wood, H., Singh, D., & Choi, K. (2012). Demographics, behavior problems, and psychosexual characteristics of adolescents with gender identity disorder or transvestic fetishism. *Journal of Sex & Marital Therapy, 38,* 151–189.

Zuger, B. (1984). Early effeminate behavior in boys: Outcome and significance for homosexuality. *Journal of Nervous and Mental Disease, 172,* 90–97.

Cantor 0451

EXPERT REPORT OF JAMES M. CANTOR, PHD


# APPENDIX 1

Cantor 0452

# James M. Cantor, PhD

Toronto Sexuality Centre
2 Carlton Ave., suite 1820
Toronto, Ontario, Canada M5B 1J3

416-766-8733 (o)
416-352-6003 (f)
jamescantorphd@gmail.com

## EDUCATION

**Postdoctoral Fellowship**                              Jan., 2000–May, 2004
Centre for Addiction and Mental Health • Toronto, Canada

**Doctor of Philosophy**                              Sep., 1993–Jun., 2000
Psychology • McGill University • Montréal, Canada

**Master of Arts**                              Sep., 1990–Jan., 1992
Psychology • Boston University • Boston, MA

**Bachelor of Science**                              Sep. 1984–Aug., 1988
Interdisciplinary Science • Rensselaer Polytechnic Institute • Troy, NY
Concentrations: Computer science, mathematics, physics

## EMPLOYMENT HISTORY

**Director**                              Feb., 2017–Present
Toronto Sexuality Centre • Toronto, Canada

**Senior Scientist (Inaugural Member)**                              Aug., 2012–May, 2018
Campbell Family Mental Health Research Institute
Centre for Addiction and Mental Health • Toronto, Canada

**Senior Scientist**                              Jan., 2012–May, 2018
Complex Mental Illness Program
Centre for Addiction and Mental Health • Toronto, Canada

**Head of Research**                              Nov., 2010–Apr. 2014
Sexual Behaviours Clinic
Centre for Addiction and Mental Health • Toronto, Canada

**Research Section Head**                              Dec., 2009–Sep. 2012
Law & Mental Health Program
Centre for Addiction and Mental Health • Toronto, Canada

**Psychologist**                              May, 2004–Dec., 2011
Law & Mental Health Program
Centre for Addiction and Mental Health • Toronto, Canada

1/32

Aird 0453

**Clinical Psychology Intern**                    Sep., 1998–Aug., 1999
Centre for Addiction and Mental Health • Toronto, Canada

**Teaching Assistant**                            Sep., 1993–May, 1998
Department of Psychology
McGill University • Montréal, Canada

**Pre-Doctoral Practicum**                        Sep., 1993–Jun., 1997
Sex and Couples Therapy Unit
Royal Victoria Hospital • Montréal, Canada

**Pre-Doctoral Practicum**                        May, 1994–Dec., 1994
Department of Psychiatry
Queen Elizabeth Hospital • Montréal, Canada

## ACADEMIC APPOINTMENTS

**Associate Professor**                           Jul., 2010–May, 2019
Department of Psychiatry
University of Toronto Faculty of Medicine • Toronto, Canada

**Adjunct Faculty**                               Aug. 2013–Jun., 2018
Graduate Program in Psychology
York University • Toronto, Canada

**Associate Faculty (Hon)**                       Oct., 2017–Dec., 2017
School of Behavioural, Cognitive & Social Science
University of New England • Armidale, Australia

**Assistant Professor**                           Jun., 2005–Jun., 2010
Department of Psychiatry
University of Toronto Faculty of Medicine • Toronto, Canada

**Adjunct Faculty**                               Sep., 2004–Jun., 2010
Clinical Psychology Residency Program
St. Joseph's Healthcare • Hamilton, Canada

2/32

# PUBLICATIONS

1. Cantor, J. M. (2020). Transgender and gender diverse children and adolescents: Fact-checking of AAP policy. *Journal of Sex & Marital Therapy, 46,* 307–313. doi: 10.1080/0092623X.2019.1698481

2. Shirazi, T., Self, H., Cantor, J., Dawood, K., Cardenas, R.,Rosenfield, K., Ortiz, T., Carré, J., McDaniel, M., Blanchard, R., Balasubramanian, R., Delaney, A., Crowley, W., S Marc Breedlove, S. M., & Puts, D. (2020).  Timing of peripubertal steroid exposure predicts visuospatial cognition in men: Evidence from three samples. *Hormones and Behavior, 121, 104712.*

3. Stephens, S., Seto, M. C., Cantor, J. M., & Lalumière, M. L. (2019). The Screening Scale for Pedophilic Interest-Revised (SSPI-2) may be a measure of pedohebephilia. *Journal of Sexual Medicine, 16,* 1655−1663. doi: 10.1016/j.jsxm.2019.07.015

4. McPhail, I. V., Hermann, C. A., Fernane, S., Fernandez, Y. M., Nunes, K. L., & Cantor, J. M. (2019). Validity in phallometric testing for sexual interests in children: A meta-analytic review. *Assessment, 26,* 535–551.  doi: 10.1177/1073191117706139

5. Cantor, J. M. (2018). Can pedophiles change? *Current Sexual Health Reports, 10,* 203–206. doi: 10.1007/s11930-018-0165-2

6. Cantor, J. M., & Fedoroff, J. P. (2018). Can pedophiles change? Response to opening arguments and conclusions. *Current Sexual Health Reports, 10,* 213–220. doi: 10.1007/s11930-018-0167-0z

7. Stephens, S., Seto, M. C., Goodwill, A. M., & Cantor, J. M. (2018). Age diversity among victims of hebephilic sexual offenders. *Sexual Abuse, 30,* 332–339. doi: 10.1177/1079063216665837

8. Stephens, S., Seto, M. C., Goodwill, A. M., & Cantor, J. M. (2018). The relationships between victim age, gender, and relationship polymorphism and sexual recidivism. *Sexual Abuse, 30,* 132−146. doi: 10.1177/1079063216630983

9. Stephens, S., Newman, J. E., Cantor, J. M., & Seto, M. C. (2018). The Static-99R predicts sexual and violent recidivism for individuals with low intellectual functioning. *Journal of Sexual Aggression, 24,* 1–11. doi: 10.1080/13552600.2017.1372936

10. Cantor, J. M. (2017). Sexual deviance or social deviance: What MRI research reveals about pedophilia. *ATSA Forum, 29*(2). Association for the Treatment of Sexual Abusers. Beaverton, OR. http://newsmanager.commpartners.com/atsa/issues/2017-03-15/2.html

11. Walton, M. T., Cantor, J. M., Bhullar, N., & Lykins, A. D. (2017). Hypersexuality: A critical review and introduction to the "Sexhavior Cycle." *Archives of Sexual Behavior, 46,* 2231–2251. doi: 10.1007/s10508-017-0991-8

12. Stephens, S., Leroux, E., Skilling, T., Cantor, J. M., & Seto, M. C. (2017).  A taxometric analysis of pedophilia utilizing self-report, behavioral, and sexual arousal indicators. *Journal of Abnormal Psychology, 126,* 1114–1119. doi: 10.1037/abn0000291

13. Fazio, R. L., Dyshniku, F., Lykins, A. D., & Cantor, J. M. (2017). Leg length versus torso length in pedophilia: Further evidence of atypical physical development early in life. *Sexual Abuse: A Journal of Research and Treatment, 29,* 500–514. doi: 10.1177/1079063215609936

14. Seto, M. C., Stephens, S., Lalumière, M. L., & Cantor, J. M. (2017). The Revised Screening Scale for Pedophilic Interests (SSPI-2): Development and criterion-related validation. *Sexual Abuse: A Journal of Research and Treatment, 29,* 619–635. doi:

27554 0455

10.1177/1079063215612444

15. Stephens, S., Cantor, J. M., Goodwill, A. M., & Seto, M. C. (2017). Multiple indicators of sexual interest in prepubescent or pubescent children as predictors of sexual recidivism. *Journal of Consulting and Clinical Psychology, 85,* 585–595. doi: 10.1037/ccp0000194

16. Stephens, S., Seto, M. C., Goodwill, A. M., & Cantor, J. M. (2017). Evidence of construct validity in the assessment of hebephilia. *Archives of Sexual Behavior, 46,* 301–309. doi: 10.1007/s10508-016-0907-z

17. Walton, M. T., Cantor, J. M., & Lykins, A. D. (2017). An online assessment of personality, psychological, and sexuality trait variables associated with self-reported hypersexual behavior. *Archives of Sexual Behavior, 46,* 721–733. doi: 10.1007/s10508-015-0606-1

18. Cantor, J. M., Lafaille, S. J., Hannah, J., Kucyi, A., Soh, D. W., Girard, T. A., & Mikulis, D. J. (2016). Independent component analysis of resting-state functional magnetic resonance imaging in pedophiles. *Journal of Sexual Medicine, 13,* 1546–1554. doi: 10.1016/j.jsxm.2016.08.004

19. Cantor, J. M., & McPhail, I. V. (2016). Non-offending pedophiles. *Current Sexual Health Reports, 8,* 121–128. doi: 10.1007/s11930-016-0076-z

20. Cantor, J. M. (2015). Milestones in sex research: What causes pedophilia? In J. S. Hyde, J. D. DeLamater, & E. S. Byers (Eds.), *Understanding human sexuality* (6th Canadian ed.) (pp. 452–453). Toronto: McGraw-Hill Ryerson.

21. Cantor, J. M. (2015). Pedophilia. In R. Cautin & S. Lilienfeld (Eds.), *Encyclopedia of clinical psychology.* Malden, MA: Wiley-Blackwell. doi: 10.1002/9781118625392.wbecp184

22. Nunes, K. L., & Cantor, J. M. (2015). Sex offenders. In P. Whelehan & A. Bolin (Eds.), *International encyclopedia of human sexuality.* Malden, MA: Wiley-Blackwell.

23. Cantor, J. M., Lafaille, S., Soh, D. W., Moayedi, M., Mikulis, D. J., & Girard, T. A. (2015). Diffusion Tensor Imaging of pedophilia. *Archives of Sexual Behavior, 44,* 2161–2172. doi: 10.1007/s10508-015-0599-9

24. Cantor, J. M., & McPhail, I. V. (2015). Sensitivity and specificity for the phallometric test of hebephilia. *Journal of Sexual Medicine, 12,* 1940–1950. doi: 10.1111/jsm12970

25. Dyshniku, F., Murray, M. E., Fazio, R. L., Lykins, A. D., & Cantor, J. M. (2015). Minor physical anomalies as a window into the prenatal origins of pedophilia. *Archives of Sexual Behavior, 44,* 2151–2159. doi: 10.1007/s10508-015-0564-7

26. Fazio, R. L., & Cantor, J. M. (2015). Factor structure of the Edinburgh Handedness Inventory versus the Fazio Laterality Inventory in a population with established atypical handedness. *Applied Neuropsychology, 22,* 156–160. doi: 10.1080/23279095.2014.940043

27. Lykins, A. D., Robinson, J. J., LeBlanc, S., & Cantor, J. M. (2015). The effects of common medications on volumetric phallometry. *Journal of Sexual Aggression, 21,* 385–393. doi: 10.1080/13552600.2014.900121

28. Sutton, K. S., Stratton, N., Pytyck, J., Kolla, N. J., & Cantor, J. M. (2015). Patient characteristics by type of hypersexuality referral: A quantitative chart review of 115 consecutive male cases. *Journal of Sex and Marital Therapy, 41,* 563−580. doi: 10.1080/0092623X.2014.935539

29. Cantor, J. M. (2014). Gold star pedophiles in general sex therapy practice. In Y. M. Binik and K. Hall (Eds.), *Principles and practice of sex therapy* (5th ed.) (pp. 219–234). New York: Guilford.

30. Cantor, J. M., & Sutton, K. S. (2014). Paraphilia, gender dysphoria, and hypersexuality. In P. H. Blaney & T. Millon (Eds.), *Oxford textbook of psychopathology* (3rd ed.) (pp. 589–614). New York: Oxford University Press.

31. Chivers, M. L., Roy, C., Grimbos, T., Cantor, J. M., & Seto, M. C. (2014). Specificity of sexual arousal for sexual activities in men and women with conventional and masochistic sexual interests. *Archives of Sexual Behavior, 43,* 931−940. doi: 10.1007/s10508-013-0174-1

32. Fazio, R. L., Lykins, A. D., & Cantor, J. M. (2014). Elevated rates of atypical-handedness in paedophilia: Theory and implications. *Laterality, 19,* 690−704. doi: 10.1080/1357650X.2014.898648

33. Lykins, A. D., & Cantor, J. M. (2014). Vorarephilia: A case study in masochism and erotic consumption. *Archives of Sexual Behavior, 43,* 181–186. doi: 10.1007/s10508-013-0185-y

34. Cantor, J. M., Klein, C., Lykins, A., Rullo, J. E., Thaler, L., & Walling, B. R. (2013). A treatment-oriented typology of self-identified hypersexuality referrals. *Archives of Sexual Behavior, 42,* 883–893. doi: 10.1007/s10508-013-0085-1

35. Blanchard, R., Kuban, M. E., Blak, T., Klassen, P. E., Dickey, R., & Cantor, J. M. (2012). Sexual attraction to others: A comparison of two models of alloerotic responding in men. *Archives of Sexual Behavior, 41,* 13–29. doi: 10.1007/s10508-010-9675-3

36. Cantor, J. M. (2012). Brain research and pedophilia: What it says and what it means [Invited article]. *Sex Offender Law Report, 13,* 81–85.

37. Cantor, J. M. (2012). Is homosexuality a paraphilia? The evidence for and against. *Archives of Sexual Behavior, 41,* 237–247. doi: 10.1007/s10508-012-9900-3

38. Lykins, A. D., Cantor, J. M., Kuban, M. E., Blak, T., Dickey, R., Klassen, P. E., & Blanchard, R. (2010). Sexual arousal to female children in gynephilic men. *Sexual Abuse: A Journal of Research and Treatment, 22,* 279–289. doi: 10.1177/1079063210372141

39. Lykins, A. D., Cantor, J. M., Kuban, M. E., Blak, T., Dickey, R., Klassen, P. E., & Blanchard, R. (2010). The relation between peak response magnitudes and agreement in diagnoses obtained from two different phallometric tests for pedophilia. *Sexual Abuse: A Journal of Research and Treatment, 22,* 42–57. doi: 10.1177/1079063209352094

40. Cantor, J. M., Blanchard, R., & Barbaree, H. E. (2009). Sexual disorders. In P. H. Blaney & T. Millon (Eds.), *Oxford textbook of psychopathology* (2nd ed.) (pp. 527–548). New York: Oxford University Press.

41. Barbaree, H. E., Langton, C. M., Blanchard, R., & Cantor, J. M. (2009). Aging versus stable enduring traits as explanatory constructs in sex offender recidivism: Partitioning actuarial prediction into conceptually meaningful components. *Criminal Justice and Behavior: An International Journal, 36,* 443–465. doi: 10.1177/0093854809332283

42. Blanchard, R., Kuban, M. E., Blak, T., Cantor, J. M., Klassen, P. E., & Dickey, R. (2009). Absolute versus relative ascertainment of pedophilia in men. *Sexual Abuse: A Journal of Research and Treatment, 21,* 431–441. doi: 10.1177/1079063209347906

43. Blanchard, R., Lykins, A. D., Wherrett, D., Kuban, M. E., Cantor, J. M., Blak, T., Dickey, R., & Klassen, P. E. (2009). Pedophilia, hebephilia, and the DSM–V. *Archives of Sexual Behavior, 38,* 335–350. doi: 10.1007/s10508-008-9399-9.

44. Cantor, J. M. (2008). MRI research on pedophilia: What ATSA members should know

[Invited article]. *ATSA Forum, 20*(4), 6–10.

45.  Cantor, J. M., Kabani, N., Christensen, B. K., Zipursky, R. B., Barbaree, H. E., Dickey, R., Klassen, P. E., Mikulis, D. J., Kuban, M. E., Blak, T., Richards, B. A., Hanratty, M. K., & Blanchard, R. (2008). Cerebral white matter deficiencies in pedophilic men. *Journal of Psychiatric Research, 42,* 167–183. doi: 10.1016/j.jpsychires.2007.10.013

46.  Blanchard, R., Kolla, N. J., Cantor, J. M., Klassen, P. E., Dickey, R., Kuban, M. E., & Blak, T. (2007). IQ, handedness, and pedophilia in adult male patients stratified by referral source. *Sexual Abuse: A Journal of Research and Treatment, 19,* 285–309. doi: 10.1007/s11194-007-9049-0

47.  Cantor, J. M., Kuban, M. E., Blak, T., Klassen, P. E., Dickey, R., & Blanchard, R. (2007). Physical height in pedophilia and hebephilia. *Sexual Abuse: A Journal of Research and Treatment, 19,* 395–407. doi: 10.1007/s11194-007-9060-5

48.  Blanchard, R., Cantor, J. M., Bogaert, A. F., Breedlove, S. M., & Ellis, L. (2006). Interaction of fraternal birth order and handedness in the development of male homosexuality. *Hormones and Behavior, 49,* 405–414. doi: 10.1016/j.yhbeh.2005.09.002

49.  Blanchard, R., Kuban, M. E., Blak, T., Cantor, J. M., Klassen, P., & Dickey, R. (2006). Phallometric comparison of pedophilic interest in nonadmitting sexual offenders against stepdaughters, biological daughters, other biologically related girls, and unrelated girls. *Sexual Abuse: A Journal of Research and Treatment, 18,* 1–14. doi: 10.1007/s11194-006-9000-9

50.  Blanchard, R., Cantor, J. M., & Robichaud, L. K. (2006). Biological factors in the development of sexual deviance and aggression in males. In H. E. Barbaree & W. L. Marshall (Eds.), *The juvenile sex offender* (2nd ed., pp. 77–104). New York: Guilford.

51.  Cantor, J. M., Kuban, M. E., Blak, T., Klassen, P. E., Dickey, R., & Blanchard, R. (2006). Grade failure and special education placement in sexual offenders' educational histories. *Archives of Sexual Behavior, 35,* 743–751. doi: 10.1007/s10508-006-9018-6

52.  Seto, M. C., Cantor, J. M., & Blanchard, R. (2006). Child pornography offenses are a valid diagnostic indicator of pedophilia. *Journal of Abnormal Psychology, 115,* 610–615. doi: 10.1037/0021-843X.115.3.610

53.  Zucker, K. J., Mitchell, J. N., Bradley, S. J., Tkachuk, J., Cantor, J. M., & Allin, S. M. (2006). The Recalled Childhood Gender Identity/Gender Role Questionnaire: Psychometric properties. *Sex Roles, 54,* 469–483. doi 10.1007/s11199-006-9019-x

54.  Cantor, J. M., Blanchard, R., Robichaud, L. K., & Christensen, B. K. (2005). Quantitative reanalysis of aggregate data on IQ in sexual offenders. *Psychological Bulletin, 131,* 555–568. doi: 10.1037/0033-2909.131.4.555

55.  Cantor, J. M., Klassen, P. E., Dickey, R., Christensen, B. K., Kuban, M. E., Blak, T., Williams, N. S., & Blanchard, R. (2005). Handedness in pedophilia and hebephilia. *Archives of Sexual Behavior, 34,* 447–459. doi: 10.1007/s10508-005-4344-7

56.  Cantor, J. M., Blanchard, R., Christensen, B. K., Dickey, R., Klassen, P. E., Beckstead, A. L., Blak, T., & Kuban, M. E. (2004). Intelligence, memory, and handedness in pedophilia. *Neuropsychology, 18,* 3–14. doi: 10.1037/0894-4105.18.1.3

57.  Blanchard, R., Kuban, M. E., Klassen, P., Dickey, R., Christensen, B. K., Cantor, J. M., & Blak, T. (2003). Self-reported injuries before and after age 13 in pedophilic and non-pedophilic men referred for clinical assessment. *Archives of Sexual Behavior, 32,* 573–581.

58. Blanchard, R., Christensen, B. K., Strong, S. M., Cantor, J. M., Kuban, M. E., Klassen, P., Dickey, R., & Blak, T. (2002). Retrospective self-reports of childhood accidents causing unconsciousness in phallometrically diagnosed pedophiles. *Archives of Sexual Behavior, 31,* 511–526.

59. Cantor, J. M., Blanchard, R., Paterson, A. D., Bogaert, A. F. (2002). How many gay men owe their sexual orientation to fraternal birth order? *Archives of Sexual Behavior, 31,* 63–71.

60. Cantor, J. M., Binik, Y. M., & Pfaus, J. G. (1999). Chronic fluoxetine inhibits sexual behavior in the male rat: Reversal with oxytocin. *Psychopharmacology*, *144*, 355–362.

61. Binik, Y. M., Cantor, J., Ochs, E., & Meana, M. (1997). From the couch to the keyboard: Psychotherapy in cyberspace. In S. Kiesler (Ed.), *Culture of the internet* (pp. 71–100). Mahwah, NJ: Lawrence Erlbaum.

62. Johnson, M. K., O'Connor, M., & Cantor, J. (1997). Confabulation, memory deficits, and frontal dysfunction. *Brain and Cognition*, *34*, 189–206.

63. Keane, M. M., Gabrieli, J. D. E., Monti, L. A., Fleischman, D. A., Cantor, J. M., & Nolan, J. S. (1997). Intact and impaired conceptual memory processes in amnesia. *Neuropsychology*, *11*, 59–69.

64. Pilkington, N. W., & Cantor, J. M. (1996). Perceptions of heterosexual bias in professional psychology programs: A survey of graduate students. *Professional Psychology: Research and Practice*, *27*, 604–612.

# PUBLICATIONS

## LETTERS AND COMMENTARIES

1. Cantor, J. M. (2015). Research methods, statistical analysis, and the phallometric test for hebephilia: Response to Fedoroff [Editorial Commentary]. *Journal of Sexual Medicine, 12,* 2499–2500. doi: 10.1111/jsm.13040

2. Cantor, J. M. (2015). In his own words: Response to Moser [Editorial Commentary]. *Journal of Sexual Medicine, 12,* 2502–2503. doi: 10.1111/jsm.13075

3. Cantor, J. M. (2015). Purported changes in pedophilia as statistical artefacts: Comment on Müller et al. (2014). *Archives of Sexual Behavior, 44,* 253–254. doi: 10.1007/s10508-014-0343-x

4. McPhail, I. V., & Cantor, J. M. (2015). Pedophilia, height, and the magnitude of the association: A research note. *Deviant Behavior, 36,* 288–292. doi: 10.1080/01639625.2014.935644

5. Soh, D. W., & Cantor, J. M. (2015). A peek inside a furry convention [Letter to the Editor]. *Archives of Sexual Behavior, 44,* 1–2. doi: 10.1007/s10508-014-0423-y

6. Cantor, J. M. (2012).  Reply to Italiano's (2012) comment on Cantor (2011) [Letter to the Editor].  *Archives of Sexual Behavior, 41,* 1081–1082.  doi: 10.1007/s10508-012-0011-y

7. Cantor, J. M. (2012). The errors of Karen Franklin's *Pretextuality* [Commentary]. *International Journal of Forensic Mental Health, 11,* 59–62. doi: 10.1080/14999013.2012.672945

8. Cantor, J. M., & Blanchard, R. (2012). White matter volumes in pedophiles, hebephiles, and teleiophiles [Letter to the Editor]. *Archives of Sexual Behavior, 41, 749–752.* doi: 10.1007/s10508-012-9954-2

9. Cantor, J. M. (2011). New MRI studies support the Blanchard typology of male-to-female transsexualism [Letter to the Editor]. *Archives of Sexual Behavior, 40,* 863–864. doi: 10.1007/s10508-011-9805-6

10. Zucker, K. J., Bradley, S. J., Own-Anderson, A., Kibblewhite, S. J., & Cantor, J. M. (2008). Is gender identity disorder in adolescents coming out of the closet? *Journal of Sex and Marital Therapy, 34,* 287–290.

11. Cantor, J. M. (2003, Summer). Review of the book *The Man Who Would Be Queen* by J. Michael Bailey. *Newsletter of Division 44 of the American Psychological Association, 19*(2), 6.

12. Cantor, J. M. (2003, Spring). What are the hot topics in LGBT research in psychology? *Newsletter of Division 44 of the American Psychological Association, 19*(1), 21–24.

13. Cantor, J. M. (2002, Fall). Male homosexuality, science, and pedophilia. *Newsletter of Division 44 of the American Psychological Association, 18*(3), 5–8.

14. Cantor, J. M. (2000). Review of the book *Sexual Addiction: An Integrated Approach. Journal of Sex and Marital Therapy, 26*, 107–109.

## EDITORIALS

1. Cantor, J. M. (2012). Editorial. *Sexual Abuse: A Journal of Research and Treatment, 24*.

Cantor 0460

2. Cantor, J. M. (2011). Editorial note. *Sexual Abuse: A Journal of Research and Treatment, 23,* 414.

3. Barbaree, H. E., & Cantor, J. M. (2010). Performance indicates for *Sexual Abuse: A Journal of Research and Treatment* (SAJRT) [Editorial]. *Sexual Abuse: A Journal of Research and Treatment, 22,* 371–373.

4. Barbaree, H. E., & Cantor, J. M. (2009). *Sexual Abuse: A Journal of Research and Treatment* performance indicators for 2007 [Editorial]. *Sexual Abuse: A Journal of Research and Treatment, 21,* 3–5.

5. Zucker, K. J., & Cantor, J. M. (2009). Cruising: Impact factor data [Editorial]. *Archives of Sexual Research, 38,* 878–882.

6. Barbaree, H. E., & Cantor, J. M. (2008). Performance indicators for *Sexual Abuse: A Journal of Research and Treatment* [Editorial]. *Sexual Abuse: A Journal of Research and Treatment, 20,* 3–4.

7. Zucker, K. J., & Cantor, J. M. (2008). The *Archives* in the era of online first ahead of print[Editorial]. *Archives of Sexual Behavior, 37,* 512–516.

8. Zucker, K. J., & Cantor, J. M. (2006). The impact factor: The *Archives* breaks from the pack [Editorial]. *Archives of Sexual Behavior, 35,* 7–9.

9. Zucker, K. J., & Cantor, J. M. (2005). The impact factor: "Goin' up" [Editorial]. *Archives of Sexual Behavior, 34,* 7–9.

10. Zucker, K., & Cantor, J. M. (2003). The numbers game: The impact factor and all that jazz [Editorial]. *Archives of Sexual Behavior, 32,* 3–5.

# FUNDING HISTORY

Principal Investigators: Doug VanderLaan, Meng-Chuan Lai
Co-Investigators: James M. Cantor, Megha Mallar Chakravarty, Nancy Lobaugh, M. Palmert, M. Skorska
Title: *Brain function and connectomics following sex hormone treatment in adolescents experience gender dysphoria*
Agency: Canadian Institutes of Health Research (CIHR), Behavioural Sciences-B-2
Funds: $650,250 / 5 years (July, 2018)

Principal Investigator: Michael C. Seto
Co-Investigators: Martin Lalumière , James M. Cantor
Title: *Are connectivity differences unique to pedophilia?*
Agency: University Medical Research Fund, Royal Ottawa Hospital
Funds: $50,000 / 1 year (January, 2018)

Principal Investigator: Lori Brotto
Co-Investigators: Anthony Bogaert, James M. Cantor, Gerulf Rieger
Title: *Investigations into the neural underpinnings and biological correlates of asexuality*
Agency: Natural Sciences and Engineering Research Council (NSERC), Discovery Grants Program
Funds: $195,000 / 5 years (April, 2017)

Principal Investigator: Doug VanderLaan
Co-Investigators: Jerald Bain, James M. Cantor, Megha Mallar Chakravarty, Sofia Chavez, Nancy Lobaugh, and Kenneth J. Zucker
Title: *Effects of sex hormone treatment on brain development: A magnetic resonance imaging study of adolescents with gender dysphoria*
Agency: Canadian Institutes of Health Research (CIHR), Transitional Open Grant Program
Funds: $952,955 / 5 years (September, 2015)

Principal Investigator: James M. Cantor
Co-Investigators: Howard E. Barbaree, Ray Blanchard, Robert Dickey, Todd A. Girard, Phillip E. Klassen, and David J. Mikulis
Title: *Neuroanatomic features specific to pedophilia*
Agency: Canadian Institutes of Health Research (CIHR)
Funds: $1,071,920 / 5 years (October, 2008)

Principal Investigator: James M. Cantor
Title: *A preliminary study of fMRI as a diagnostic test of pedophilia*
Agency: Dean of Medicine New Faculty Grant Competition, Univ. of Toronto
Funds: $10,000 (July, 2008)

Cantorhealth 0462

Principal Investigator:   James M. Cantor
Co-Investigator:          Ray Blanchard
Title:                    *Morphological and neuropsychological correlates of pedophilia*
Agency:                   Canadian Institutes of Health Research (CIHR)
Funds:                    $196,902 / 3 years (April, 2006)

# KEYNOTE AND INVITED ADDRESSES

1. Cantor, J. M. (2021, September 28). *No topic too tough for this expert panel: A year in review.* Plenary Session for the 40th Annual Research and Treatment Conference, Association for the Treatment of Sexual Abusers.

2. Cantor, J. M. (2019, May 1). *Introduction and Q&A for 'I, Pedophile.'* StopSO 2nd Annual Conference, London, UK.

3. Cantor, J. M. (2018, August 29). *Neurobiology of pedophilia or paraphilia? Towards a 'Grand Unified Theory' of sexual interests.* Keynote address to the International Association for the Treatment of Sexual Offenders, Vilnius, Lithuania.

4. Cantor, J. M. (2018, August 29). *Pedophilia and the brain: Three questions asked and answered.* Preconference training presented to the International Association for the Treatment of Sexual Offenders, Vilnius, Lithuania.

5. Cantor, J. M. (2018, April 13). *The responses to* I, Pedophile *from We, the people.* Keynote address to the Minnesota Association for the Treatment of Sexual Abusers, Minneapolis, Minnesota.

6. Cantor, J. M. (2018, April 11). *Studying atypical sexualities: From vanilla to* I, Pedophile. Full day workshop at the Minnesota Association for the Treatment of Sexual Abusers, Minneapolis, Minnesota.

7. Cantor, J. M. (2018, January 20). *How much sex is enough for a happy life?* Invited lecture to the University of Toronto Division of Urology Men's Health Summit, Toronto, Canada.

8. Cantor, J. M. (2017, November 2). Pedophilia as a phenomenon of the brain: Update of evidence and the public response. Invited presentation to the 7th annual SBC education event, Centre for Addiction and Mental Health, Toronto, Canada.

9. Cantor, J. M. (2017, June 9). Pedophilia being in the brain: The evidence and the public's reaction. Invited presentation to *SEXposium at the ROM: The science of love and sex,* Toronto, Canada.

10. Cantor, J. M., & Campea, M. (2017, April 20). *"I, Pedophile" showing and discussion.* Invited presentation to the 42nd annual meeting of the Society for Sex Therapy and Research, Montréal, Canada.

11. Cantor, J. M. (2017, March 1). *Functional and structural neuroimaging of pedophilia: Consistencies across methods and modalities.* Invited lecture to the Brain Imaging Centre, Royal Ottawa Hospital, Ottawa, Canada.

12. Cantor, J. M. (2017, January 26). *Pedophilia being in the brain: The evidence and the public reaction.* Inaugural keynote address to the University of Toronto Sexuality Interest Network, Toronto, Ontario, Canada.

13. Cantor, J. M. (2016, October 14). *Discussion of CBC's "I, Pedophile."* Office of the Children's Lawyer Educational Session, Toronto, Ontario, Canada.

14. Cantor, J. M. (2016, September 15). *Evaluating the risk to reoffend: What we know and what we don't.* Invited lecture to the Association of Ontario Judges, Ontario Court of Justice Annual Family Law Program, Blue Mountains, Ontario, Canada. [Private link only: https://vimeo.com/239131108/3387c80652]

15. Cantor, J. M. (2016, April 8). *Pedophilia and the brain: Conclusions from the second generation of research.* Invited lecture at the 10th annual Risk and Recovery Forensic Conference, Hamilton, Ontario.

16. Cantor, J. M. (2016, April 7). *Hypersexuality without the hyperbole.* Keynote address to the 10th annual Risk and Recovery Forensic Conference, Hamilton, Ontario.

17. Cantor, J. M. (2015, November). *No one asks to be sexually attracted to children: Living in Daniel's World.* Grand Rounds, Centre for Addiction and Mental Health. Toronto, Canada.

18. Cantor, J. M. (2015, August). *Hypersexuality: Getting past whether "it" is or "it" isn't.* Invited address at the 41st annual meeting of the International Academy of Sex Research. Toronto, Canada.

19. Cantor, J. M. (2015, July). *A unified theory of typical and atypical sexual interest in men: Paraphilia, hypersexuality, asexuality, and vanilla as outcomes of a single, dual opponent process.* Invited presentation to the 2015 Puzzles of Sexual Orientation conference, Lethbridge, AL, Canada.

20. Cantor, J. M. (2015, June). *Hypersexuality.* Keynote Address to the Ontario Problem Gambling Provincial Forum. Toronto, Canada.

21. Cantor, J. M. (2015, May). *Assessment of pedophilia: Past, present, future.* Keynote Address to the International Symposium on Neural Mechanisms Underlying Pedophilia and Child Sexual Abuse (NeMUP). Berlin, Germany.

22. Cantor, J. M. (2015, March). *Prevention of sexual abuse by tackling the biggest stigma of them all: Making sex therapy available to pedophiles.* Keynote address to the 40th annual meeting of the Society for Sex Therapy and Research, Boston, MA.

23. Cantor, J. M. (2015, March. *Pedophilia: Predisposition or perversion?* Panel discussion at Columbia University School of Journalism. New York, NY.

24. Cantor, J. M. (2015, February). *Hypersexuality.* Research Day Grand Rounds presentation to Ontario Shores Centre for Mental Health Sciences, Whitby, Ontario, Canada.

25. Cantor, J. M. (2015, January). *Brain research and pedophilia: What it means for assessment, research, and policy.* Keynote address to the inaugural meeting of the Netherlands Association for the Treatment of Sexual Abusers, Utrecht, Netherlands.

26. Cantor, J. M. (2014, December). *Understanding pedophilia and the brain: Implications for safety and society.* Keynote address for The Jewish Community Confronts Violence and Abuse: Crisis Centre for Religious Women, Jerusalem, Israel.

27. Cantor, J. M. (2014, October). *Understanding pedophilia & the brain.* Invited full-day workshop for the Sex Offender Assessment Board of Pennsylvania, Harrisburg, PA.

28. Cantor, J. M. (2014, September). *Understanding neuroimaging of pedophilia: Current status and implications.* Invited lecture presented to the Mental Health and Addition Rounds, St. Joseph's Healthcare, Hamilton, Ontario, Canada.

29. Cantor, J. M. (2014, June). *An evening with Dr. James Cantor.* Invited lecture presented to the Ontario Medical Association, District 11 Doctors' Lounge Program, Toronto, Ontario, Canada.

30. Cantor, J. M. (2014, April). *Pedophilia and the brain.* Invited lecture presented to the University of Toronto Medical Students lunchtime lecture. Toronto, Ontario, Canada.

31. Cantor, J. M. (2014, February). *Pedophilia and the brain: Recap and update.* Workshop presented at the 2014 annual meeting of the Washington State Association for the Treatment of Sexual Abusers, Cle Elum, WA.

32. Cantor, J. M., Lafaille, S., Hannah, J., Kucyi, A., Soh, D., Girard, T. A., & Mikulis, D. M. (2014, February). *Functional connectivity in pedophilia.* Neuropsychiatry Rounds, Toronto Western Hospital, Toronto, Ontario, Canada.

33. Cantor, J. M. (2013, November). *Understanding pedophilia and the brain: The basics, the current status, and their implications.* Invited lecture to the Forensic Psychology Research Centre, Carleton University, Ottawa, Canada.

34. Cantor, J. M. (2013, November). *Mistaking puberty, mistaking hebephilia.* Keynote address presented to the 32nd annual meeting of the Association for the Treatment of Sexual Abusers, Chicago, IL.

35. Cantor, J. M. (2013, October). *Understanding pedophilia and the brain: A recap and update.* Invited workshop presented at the 32nd annual meeting of the Association for the Treatment of Sexual Abusers, Chicago, IL.

36. Cantor, J. M. (2013, October). *Compulsive-hyper-sex-addiction: I don't care what we all it, what can we do?* Invited address presented to the Board of Examiners of Sex Therapists and Counselors of Ontario, Toronto, Ontario, Canada.

37. Cantor, J. M. (2013, September). *Neuroimaging of pedophilia: Current status and implications.* McGill University Health Centre, Department of Psychiatry Grand Rounds presentation, Montréal, Québec, Canada.

38. Cantor, J. M. (2013, April). *Understanding pedophilia and the brain.* Invited workshop presented at the 2013 meeting of the Minnesota Association for the Treatment of Sexual Abusers, Minneapolis, MN.

39. Cantor, J. M. (2013, April). *The neurobiology of pedophilia and its implications for assessment, treatment, and public policy.* Invited lecture at the 38th annual meeting of the Society for Sex Therapy and Research, Baltimore, MD.

40. Cantor, J. M. (2013, April). *Sex offenders: Relating research to policy.* Invited roundtable presentation at the annual meeting of the Academy of Criminal Justice Sciences, Dallas, TX.

41. Cantor, J. M. (2013, March). *Pedophilia and brain research: From the basics to the state-of-the-art.* Invited workshop presented to the annual meeting of the Forensic Mental Health Association of California, Monterey, CA.

42. Cantor, J. M. (2013, January). *Pedophilia and child molestation.* Invited lecture presented to the Canadian Border Services Agency, Toronto, Ontario, Canada.

43. Cantor, J. M. (2012, November). *Understanding pedophilia and sexual offenders against children: Neuroimaging and its implications for public safety.* Invited guest lecture to University of New Mexico School of Medicine Health Sciences Center, Albuquerque, NM.

44. Cantor, J. M. (2012, November). *Pedophilia and brain research.* Invited guest lecture to the annual meeting of the Circles of Support and Accountability, Toronto, Ontario, Canada.

45. Cantor, J. M. (2012, January). *Current findings on pedophilia brain research.* Invited workshop at the San Diego International Conference on Child and Family Maltreatment, San Diego, CA.

46. Cantor, J. M. (2012, January). *Pedophilia and the risk to re-offend.* Invited lecture to the Ontario Court of Justice Judicial Development Institute, Toronto, Ontario, Canada.

47. Cantor, J. M. (2011, November). *Pedophilia and the brain: What it means for assessment, treatment, and policy.* Plenary Lecture presented at the Association for the Treatment of Sexual Abusers, Toronto, Ontario, Canada.

48. Cantor, J. M. (2011, July). *Towards understanding contradictory findings in the neuroimaging of pedophilic men.* Keynote address to 7th annual conference on Research in Forensic Psychiatry, Regensberg, Germany.

14/32

49. Cantor, J. M. (2011, March). *Understanding sexual offending and the brain: Brain basics to the state of the art.* Workshop presented at the winter conference of the Oregon Association for the Treatment of Sexual Abusers, Oregon City, OR.

50. Cantor, J. M. (2010, October). *Manuscript publishing for students.* Workshop presented at the 29th annual meeting of the Association for the Treatment of Sexual Abusers, Phoenix, AZ.

51. Cantor, J. M. (2010, August). *Is sexual orientation a paraphilia?* Invited lecture at the International Behavioral Development Symposium, Lethbridge, Alberta, Canada.

52. Cantor, J. M. (2010, March). *Understanding sexual offending and the brain: From the basics to the state of the art.* Workshop presented at the annual meeting of the Washington State Association for the Treatment of Sexual Abusers, Blaine, WA.

53. Cantor, J. M. (2009, January). *Brain structure and function of pedophilia men.* Neuropsychiatry Rounds, Toronto Western Hospital, Toronto, Ontario.

54. Cantor, J. M. (2008, April). *Is pedophilia caused by brain dysfunction?* Invited address to the University-wide Science Day Lecture Series, SUNY Oswego, Oswego, NY.

55. Cantor, J. M., Kabani, N., Christensen, B. K., Zipursky, R. B., Barbaree, H. E., Dickey, R., Klassen, P. E., Mikulis, D. J., Kuban, M. E., Blak, T., Richards, B. A., Hanratty, M. K., & Blanchard, R. (2006, September). *MRIs of pedophilic men.* Invited presentation at the 25th annual meeting of the Association for the Treatment of Sexual Abusers, Chicago.

56. Cantor, J. M., Blanchard, R., & Christensen, B. K. (2003, March). *Findings in and implications of neuropsychology and epidemiology of pedophilia.* Invited lecture at the 28th annual meeting of the Society for Sex Therapy and Research, Miami.

57. Cantor, J. M., Christensen, B. K., Klassen, P. E., Dickey, R., & Blanchard, R. (2001, July). *Neuropsychological functioning in pedophiles.* Invited lecture presented at the 27th annual meeting of the International Academy of Sex Research, Bromont, Canada.

58. Cantor, J. M., Blanchard, R., Christensen, B., Klassen, P., & Dickey, R. (2001, February). *First glance at IQ, memory functioning and handedness in sex offenders.* Lecture presented at the Forensic Lecture Series, Centre for Addiction and Mental Health, Toronto, Ontario, Canada.

59. Cantor, J. M. (1999, November). *Reversal of SSRI-induced male sexual dysfunction: Suggestions from an animal model.* Grand Rounds presentation at the Allan Memorial Institute, Royal Victoria Hospital, Montréal, Canada.

Hartmann 0467

## PAPER PRESENTATIONS AND SYMPOSIA

1. Cantor, J. M. (2020, April). "I'd rather have a trans kid than a dead kid": Critical assessment of reported rates of suicidality in trans kids. *Paper presented at the annual meeting of the Society for the Sex Therapy and Research.* Online in lieu of in person meeting.

2. Stephens, S., Lalumière, M., Seto, M. C., & Cantor, J. M. (2017, October). *The relationship between sexual responsiveness and sexual exclusivity in phallometric profiles.* Paper presented at the annual meeting of the Canadian Sex Research Forum, Fredericton, New Brunswick, Canada.

3. Stephens, S., Cantor, J. M., & Seto, M. C. (2017, March). *Can the SSPI-2 detect hebephilic sexual interest?* Paper presented at the annual meeting of the American-Psychology Law Society Annual Meeting, Seattle, WA.

4. Stephens, S., Seto, M. C., Goodwill, A. M., & Cantor, J. M. (2015, October). *Victim choice polymorphism and recidivism.* Symposium Presentation. Paper presented at the 34th annual meeting of the Association for the Treatment of Sexual Abusers, Montréal, Canada.

5. McPhail, I. V., Hermann, C. A., Fernane, S. Fernandez, Y., Cantor, J. M., & Nunes, K. L. (2014, October). *Sexual deviance in sexual offenders against children: A meta-analytic review of phallometric research.* Paper presented at the 33rd annual meeting of the Association for the Treatment of Sexual Abusers, San Diego, CA.

6. Stephens, S., Seto, M. C., Cantor, J. M., & Goodwill, A. M. (2014, October). *Is hebephilic sexual interest a criminogenic need?: A large scale recidivism study.* Paper presented at the 33rd annual meeting of the Association for the Treatment of Sexual Abusers, San Diego, CA.

7. Stephens, S., Seto, M. C., Cantor, J. M., & Lalumière, M. (2014, October). *Development and validation of the Revised Screening Scale for Pedophilic Interests (SSPI–2).* Paper presented at the 33rd annual meeting of the Association for the Treatment of Sexual Abusers, San Diego, CA.

8. Cantor, J. M., Lafaille, S., Hannah, J., Kucyi, A., Soh, D., Girard, T. A., & Mikulis, D. M. (2014, September). *Pedophilia and the brain: White matter differences detected with DTI.* Paper presented at the 13th annual meeting of the International Association for the Treatment of Sexual Abusers, Porto, Portugal.

9. Stephens, S., Seto, M., Cantor, J. M., Goodwill, A. M., & Kuban, M. (2014, March). *The role of hebephilic sexual interests in sexual victim choice.* Paper presented at the annual meeting of the American Psychology and Law Society, New Orleans, LA.

10. McPhail, I. V., Fernane, S. A., Hermann, C. A., Fernandez, Y. M., Nunes, K. L., & Cantor, J. M. (2013, November). *Sexual deviance and sexual recidivism in sexual offenders against children: A meta-analysis.* Paper presented at the 32nd annual meeting of the Association for the Treatment of Sexual Abusers, Chicago, IL.

11. Cantor, J. M. (2013, September). *Pedophilia and the brain: Current MRI research and its implications.* Paper presented at the 21st annual World Congress for Sexual Health, Porto Alegre, Brazil. [Featured among Best Abstracts, top 10 of 500.]

12. Cantor, J. M. (Chair). (2012, March). *Innovations in sex research.* Symposium conducted at the 37th annual meeting of the Society for Sex Therapy and Research, Chicago.

13. Cantor, J. M., & Blanchard, R. (2011, August). fMRI versus phallometry in the diagnosis of pedophilia and hebephilia. In J. M. Cantor (Chair), *Neuroimaging of men's object*

*preferences.* Symposium presented at the 37th annual meeting of the International Academy of Sex Research, Los Angeles, USA.

14.  Cantor, J. M. (Chair). (2011, August). *Neuroimaging of men's object preferences.* Symposium conducted at the 37th annual meeting of the International Academy of Sex Research, Los Angeles.

15.  Cantor, J. M. (2010, October). A meta-analysis of neuroimaging studies of male sexual arousal. In S. Stolerú (Chair), *Brain processing of sexual stimuli in pedophilia: An application of functional neuroimaging.* Symposium presented at the 29th annual meeting of the Association for the Treatment of Sexual Abusers, Phoenix, AZ.

16.  Chivers, M. L., Seto, M. C., Cantor, J. C., Grimbos, T., & Roy, C. (April, 2010). *Psychophysiological assessment of sexual activity preferences in women.* Paper presented at the 35th annual meeting of the Society for Sex Therapy and Research, Boston, USA.

17.  Cantor, J. M., Girard, T. A., & Lovett-Barron, M. (2008, November). *The brain regions that respond to erotica: Sexual neuroscience for dummies.* Paper presented at the 51st annual meeting of the Society for the Scientific Study of Sexuality, San Juan, Puerto Rico.

18.  Barbaree, H., Langton, C., Blanchard, R., & Cantor, J. M. (2007, October). *The role of age-at-release in the evaluation of recidivism risk of sexual offenders.* Paper presented at the 26th annual meetingof the Association for the Treatment of Sexual Abusers, San Diego.

19.  Cantor, J. M., Kabani, N., Christensen, B. K., Zipursky, R. B., Barbaree, H. E., Dickey, R., Klassen, P. E., Mikulis, D. J., Kuban, M. E., Blak, T., Richards, B. A., Hanratty, M. K., & Blanchard, R. (2006, July). *Pedophilia and brain morphology.* Abstract and paper presented at the 32nd annual meeting of the International Academy of Sex Research, Amsterdam, Netherlands.

20.  Seto, M. C., Cantor, J. M., & Blanchard, R. (2006, March). *Child pornography offending is a diagnostic indicator of pedophilia.* Paper presented at the 2006 annual meeting of the American Psychology-Law Society Conference, St. Petersburg, Florida.

21.  Blanchard, R., Cantor, J. M., Bogaert, A. F., Breedlove, S. M., & Ellis, L. (2005, August). *Interaction of fraternal birth order and handedness in the development of male homosexuality.* Abstract and paper presented at the International Behavioral Development Symposium, Minot, North Dakota.

22.  Cantor, J. M., & Blanchard, R. (2005, July). *Quantitative reanalysis of aggregate data on IQ in sexual offenders.* Abstract and poster presented at the 31st annual meeting of the International Academy of Sex Research, Ottawa, Canada.

23.  Cantor, J. M. (2003, August). *Sex reassignment on demand: The clinician's dilemma.* Paper presented at the 111th annual meeting of the American Psychological Association, Toronto, Canada.

24.  Cantor, J. M. (2003, June). *Meta-analysis of VIQ–PIQ differences in male sex offenders.* Paper presented at the Harvey Stancer Research Day, Toronto, Ontario, Canada.

25.  Cantor, J. M. (2002, August). *Gender role in autogynephilic transsexuals: The more things change...* Paper presented at the 110th annual meeting of the American Psychological Association, Chicago.

Ricci et al. 0469

26. Cantor, J. M., Christensen, B. K., Klassen, P. E., Dickey, R., & Blanchard, R. (2001, June). *IQ, memory functioning, and handedness in male sex offenders.* Paper presented at the Harvey Stancer Research Day, Toronto, Ontario, Canada.

27. Cantor, J. M. (1998, August). *Convention orientation for lesbian, gay, and bisexual students*. Papers presented at the 106th annual meeting of the American Psychological Association.

28. Cantor, J. M. (1997, August). *Discussion hour for lesbian, gay, and bisexual students*. Presented at the 105th annual meeting of the American Psychological Association.

29. Cantor, J. M. (1997, August). *Convention orientation for lesbian, gay, and bisexual students*. Paper presented at the 105th annual meeting of the American Psychological Association.

30. Cantor, J. M. (1996, August). *Discussion hour for lesbian, gay, and bisexual students*. Presented at the 104th annual meeting of the American Psychological Association.

31. Cantor, J. M. (1996, August). *Symposium: Question of inclusion: Lesbian and gay psychologists and accreditation*. Paper presented at the 104th annual meeting of the American Psychological Association, Toronto.

32. Cantor, J. M. (1996, August). *Convention orientation for lesbian, gay, and bisexual students*. Papers presented at the 104th annual meeting of the American Psychological Association.

33. Cantor, J. M. (1995, August). *Discussion hour for lesbian, gay, and bisexual students*. Presented at the 103rd annual meeting of the American Psychological Association.

34. Cantor, J. M. (1995, August). *Convention orientation for lesbian, gay, and bisexual students*. Papers presented at the 103rd annual meeting of the American Psychological Association.

35. Cantor, J. M. (1994, August). *Discussion hour for lesbian, gay, and bisexual students*. Presented at the 102nd annual meeting of the American Psychological Association.

36. Cantor, J. M. (1994, August). *Convention orientation for lesbian, gay, and bisexual students*. Papers presented at the 102nd annual meeting of the American Psychological Association.

37. Cantor, J. M., & Pilkington, N. W. (1992, August). *Homophobia in psychology programs: A survey of graduate students.* Paper presented at the Centennial Convention of the American Psychological Association, Washington, DC. (ERIC Document Reproduction Service No. ED 351 618)

38. Cantor, J. M. (1991, August). *Being gay and being a graduate student: Double the memberships, four times the problems*. Paper presented at the 99th annual meeting of the American Psychological Association, San Francisco.

## POSTER PRESENTATIONS

1. Klein, L., Stephens, S., Goodwill, A. M., Cantor, J. M., & Seto, M. C. (2015, October). *The psychological propensities of risk in undetected sexual offenders.* Poster presented at the 34th annual meeting of the Association for the Treatment of Sexual Abusers, Montréal, Canada.

2. Pullman, L. E., Stephens, S., Seto, M. C., Goodwill, A. M., & Cantor, J. M. (2015, October). *Why are incest offenders less likely to recidivate?* Poster presented at the 34th annual meeting of the Association for the Treatment of Sexual Abusers, Montréal, Canada.

3. Seto, M. C., Stephens, S. M., Cantor, J. M., Lalumiere, M. L., Sandler, J. C., & Freeman, N. A. (2015, August). *The development and validation of the Revised Screening Scale for Pedophilic Interests (SSPI-2).* Poster presentation at the 41st annual meeting of the International Academy of Sex Research. Toronto, Canada.

4. Soh, D. W., & Cantor, J. M. (2015, August). *A peek inside a furry convention.* Poster presentation at the 41st annual meeting of the International Academy of Sex Research. Toronto, Canada.

5. VanderLaan, D. P., Lobaugh, N. J., Chakravarty, M. M., Patel, R., Chavez, S. Stojanovski, S. O., Takagi, A., Hughes, S. K., Wasserman, L., Bain, J., Cantor, J. M., & Zucker, K. J. (2015, August). *The neurohormonal hypothesis of gender dysphoria: Preliminary evidence of cortical surface area differences in adolescent natal females.* Poster presentation at the 31st annual meeting of the International Academy of Sex Research. Toronto, Canada.

6. Cantor, J. M., Lafaille, S. J., Moayedi, M., Mikulis, D. M., & Girard, T. A. (2015, June). *Diffusion tensor imaging (DTI) of the brain in pedohebephilic men: Preliminary analyses.* Harvey Stancer Research Day, Toronto, Ontario Canada.

7. Newman, J. E., Stephens, S., Seto, M. C., & Cantor, J. M. (2014, October). *The validity of the Static-99 in sexual offenders with low intellectual abilities.* Poster presentation at the 33rd annual meeting of the Association for the Treatment of Sexual Abusers, San Diego, CA.

8. Lykins, A. D., Walton, M. T., & Cantor, J. M. (2014, June). *An online assessment of personality, psychological, and sexuality trait variables associated with self-reported hypersexual behavior.* Poster presentation at the 30th annual meeting of the International Academy of Sex Research, Dubrovnik, Croatia.

9. Stephens, S., Seto, M. C., Cantor, J. M., Goodwill, A. M., & Kuban, M. (2013, November). *The utility of phallometry in the assessment of hebephilia.* Poster presented at the 32nd annual meeting of the Association for the Treatment of Sexual Abusers, Chicago.

10. Stephens, S., Seto, M. C., Cantor, J. M., Goodwill, A. M., & Kuban, M. (2013, October). *The role of hebephilic sexual interests in sexual victim choice.* Poster presented at the 32nd annual meeting of the Association for the Treatment of Sexual Abusers, Chicago.

11. Fazio, R. L., & Cantor, J. M. (2013, October). *Analysis of the Fazio Laterality Inventory (FLI) in a population with established atypical handedness.* Poster presented at the 33rd annual meeting of the National Academy of Neuropsychology, San Diego.

12. Lafaille, S., Hannah, J., Soh, D., Kucyi, A., Girard, T. A., Mikulis, D. M., & Cantor, J. M. (2013, August). *Investigating resting state networks in pedohebephiles.* Poster presented at the 29th annual meeting of the International Academy of Sex Research, Chicago.

13. McPhail, I. V., Lykins, A. D., Robinson, J. J., LeBlanc, S., & Cantor, J. M. (2013, August). *Effects of prescription medication on volumetric phallometry output.* Poster presented at the 29th annual meeting of the International Academy of Sex Research, Chicago.

14. Murray, M. E., Dyshniku, F., Fazio, R. L., & Cantor, J. M. (2013, August). *Minor physical anomalies as a window into the prenatal origins of pedophilia.* Poster presented at the 29th annual meeting of the International Academy of Sex Research, Chicago.

15. Sutton, K. S., Stephens, S., Dyshniku, F., Tulloch, T., & Cantor, J. M. (2013, August). *Pilot group treatment for "procrasturbation."* Poster presented at 39th annual meeting of the International Academy of Sex Research, Chicago.

16. Sutton, K. S., Pytyck, J., Stratton, N., Sylva, D., Kolla, N., & Cantor, J. M. (2013, August). *Client characteristics by type of hypersexuality referral: A quantitative chart review.* Poster presented at the 39th annual meeting of the International Academy of Sex Research, Chicago.

17. Fazio, R. L., & Cantor, J. M. (2013, June). *A replication and extension of the psychometric properties of the Digit Vigilance Test.* Poster presented at the 11th annual meeting of the American Academy of Clinical Neuropsychology, Chicago.

18. Lafaille, S., Moayedi, M., Mikulis, D. M., Girard, T. A., Kuban, M., Blak, T., & Cantor, J. M. (2012, July). *Diffusion Tensor Imaging (DTI) of the brain in pedohebephilic men: Preliminary analyses.* Poster presented at the 38th annual meeting of the International Academy of Sex Research, Lisbon, Portugal.

19. Lykins, A. D., Cantor, J. M., Kuban, M. E., Blak, T., Dickey, R., Klassen, P. E., & Blanchard, R. (2010, July). *Sexual arousal to female children in gynephilic men.* Poster presented at the 38th annual meeting of the International Academy of Sex Research, Prague, Czech Republic.

20. Cantor, J. M., Girard, T. A., Lovett-Barron, M., & Blak, T. (2008, July). *Brain regions responding to visual sexual stimuli: Meta-analysis of PET and fMRI studies.* Abstract and poster presented at the 34th annual meeting of the International Academy of Sex Research, Leuven, Belgium.

21. Lykins, A. D., Blanchard, R., Cantor, J. M., Blak, T., & Kuban, M. E. (2008, July). *Diagnosing sexual attraction to children: Considerations for DSM-V.* Poster presented at the 34th annual meeting of the International Academy of Sex Research, Leuven, Belgium.

22. Cantor, J. M., Blak, T., Kuban, M. E., Klassen, P. E., Dickey, R. and Blanchard, R. (2007, October). *Physical height in pedophilia and hebephilia.* Poster presented at the 26th annual meeting of the Association for the Treatment of Sexual Abusers, San Diego.

23. Cantor, J. M., Blak, T., Kuban, M. E., Klassen, P. E., Dickey, R. and Blanchard, R. (2007, August). *Physical height in pedophilia and hebephilia.* Abstract and poster presented at the 33rd annual meeting of the International Academy of Sex Research, Vancouver, Canada.

24. Puts, D. A., Blanchard, R., Cardenas, R., Cantor, J., Jordan, C. L., & Breedlove, S. M. (2007, August). *Earlier puberty predicts superior performance on male-biased visuospatial tasks in men but not women.* Abstract and poster presented at the 33rd annual meeting of the International Academy of Sex Research, Vancouver, Canada.

25. Seto, M. C., Cantor, J. M., & Blanchard, R. (2005, November). *Possession of child pornography is a diagnostic indicator of pedophilia.* Poster presented at the 24th annual meeting of the Association for the Treatment of Sexual Abusers, New Orleans.

26. Blanchard, R., Cantor, J. M., Bogaert, A. F., Breedlove. S. M., & Ellis, L. (2005, July). *Interaction of fraternal birth order and handedness in the development of male homosexuality.* Abstract and poster presented at the 31st annual meeting of the International Academy of Sex Research, Ottawa, Canada.

27. Cantor, J. M., & Blanchard, R. (2003, July). *The reported VIQ–PIQ differences in male sex offenders are artifactual?* Abstract and poster presented at the 29th annual meeting of the International Academy of Sex Research, Bloomington, Indiana.

28. Christensen, B. K., Cantor, J. M., Millikin, C., & Blanchard, R. (2002, February). *Factor analysis of two brief memory tests: Preliminary evidence for modality-specific measurement.* Poster presented at the 30th annual meeting of the International Neuropsychological Society, Toronto, Ontario, Canada.

29. Cantor, J. M., Blanchard, R., Paterson, A., Bogaert, A. (2000, June). *How many gay men owe their sexual orientation to fraternal birth order?* Abstract and poster presented at the International Behavioral Development Symposium, Minot, North Dakota.

30. Cantor, J. M., Binik, Y., & Pfaus, J. G. (1996, November). *Fluoxetine inhibition of male rat sexual behavior: Reversal by oxytocin.* Poster presented at the 26th annual meeting of the Society for Neurosciences, Washington, DC.

31. Cantor, J. M., Binik, Y., & Pfaus, J. G. (1996, June). *An animal model of fluoxetine-induced sexual dysfunction: Dose dependence and time course.* Poster presented at the 28th annual Conference on Reproductive Behavior, Montréal, Canada.

32. Cantor, J. M., O'Connor, M. G., Kaplan, B., & Cermak, L. S. (1993, June). *Transient events test of retrograde memory: Performance of amnestic and unimpaired populations.* Poster presented at the 2nd annual science symposium of the Massachusetts Neuropsychological Society, Cambridge, MA.

Hubbard 0473

## EDITORIAL AND PEER-REVIEWING ACTIVITIES

### Editor-in-Chief
*Sexual Abuse: A Journal of Research and Treatment*                    Jan., 2010–Dec., 2014

### Editorial Board Memberships
*Journal of Sexual Aggression*                                        Jan., 2010–Dec., 2021
*Journal of Sex Research, The*                                        Jan., 2008–Aug., 2020
*Sexual Abuse: A Journal of Research and Treatment*                   Jan., 2006–Dec., 2019
*Archives of Sexual Behavior*                                         Jan., 2004–Present
*The Clinical Psychologist*                                           Jan., 2004–Dec., 2005

### Ad hoc Journal Reviewer Activity

*American Journal of Psychiatry*  
*Annual Review of Sex Research*  
*Archives of General Psychiatry*  
*Assessment*  
*Biological Psychiatry*  
*BMC Psychiatry*  
*Brain Structure and Function*  
*British Journal of Psychiatry*  
*British Medical Journal*  
*Canadian Journal of Behavioural Science*  
*Canadian Journal of Psychiatry*  
*Cerebral Cortex*  
*Clinical Case Studies*  
*Comprehensive Psychiatry*  
*Developmental Psychology*  
*European Psychologist*  
*Frontiers in Human Neuroscience*  
*Human Brain Mapping*  
*International Journal of Epidemiology*  
*International Journal of Impotence Research*  
*International Journal of Sexual Health*  
*International Journal of Transgenderism*  
*Journal of Abnormal Psychology*  
*Journal of Clinical Psychology*  

*Journal of Consulting and Clinical Psychology*  
*Journal of Forensic Psychology Practice*  
*Journal for the Scientific Study of Religion*  
*Journal of Sexual Aggression*  
*Journal of Sexual Medicine*  
*Journal of Psychiatric Research*  
*Nature Neuroscience*  
*Neurobiology Reviews*  
*Neuroscience & Biobehavioral Reviews*  
*Neuroscience Letters*  
*Proceedings of the Royal Society B*  
    *(Biological Sciences)*  
*Psychological Assessment*  
*Psychological Medicine*  
*Psychological Science*  
*Psychology of Men & Masculinity*  
*Sex Roles*  
*Sexual and Marital Therapy*  
*Sexual and Relationship Therapy*  
*Sexuality & Culture*  
*Sexuality Research and Social Policy*  
*The Clinical Psychologist*  
*Traumatology*  
*World Journal of Biological Psychiatry*

## GRANT REVIEW PANELS

2017–2021    Member, College of Reviewers, *Canadian Institutes of Health Research,* Canada.

2017    Committee Member, Peer Review Committee—Doctoral Research Awards A. *Canadian Institutes of Health Research*, Canada.

2017    Member, International Review Board, Research collaborations on behavioural disorders related to violence, neglect, maltreatment and abuse in childhood and adolescence. *Bundesministerium für Bildung und Forschung [Ministry of Education and Research],* Germany.

2016    Reviewer.  National Science Center [*Narodowe Centrum Nauki*], Poland.

2016    Committee Member, Peer Review Committee—Doctoral Research Awards A. *Canadian Institutes of Health Research*, Canada.

2015    Assessor (Peer Reviewer). Discovery Grants Program. *Australian Research Council,* Australia.

2015    Reviewer. *Czech Science Foundation,* Czech Republic.

2015    Reviewer, "Off the beaten track" grant scheme. *Volkswagen Foundation,* Germany.

2015    External Reviewer, Discovery Grants program—Biological Systems and Functions. *National Sciences and Engineering Research Council of Canada*, Canada

2015    Committee Member, Peer Review Committee—Doctoral Research Awards A. *Canadian Institutes of Health Research*, Canada.

2014    Assessor (Peer Reviewer).  Discovery Grants Program. *Australian Research Council,* Australia.

2014    External Reviewer, Discovery Grants program—Biological Systems and Functions. *National Sciences and Engineering Research Council of Canada*, Canada.

2014    Panel Member, Dean's Fund—Clinical Science Panel. *University of Toronto Faculty of Medicine*, Canada.

2014    Committee Member, Peer Review Committee—Doctoral Research Awards A. *Canadian Institutes of Health Research*, Canada.

2013    Panel Member, Grant Miller Cancer Research Grant Panel. *University of Toronto Faculty of Medicine*, Canada.

Nguyen 0475

| | |
|---|---|
| 2013 | Panel Member, Dean of Medicine Fund New Faculty Grant Clinical Science Panel. *University of Toronto Faculty of Medicine,* Canada. |
| 2012 | Board Member, International Review Board, Research collaborations on behavioural disorders related to violence, neglect, maltreatment and abuse in childhood and adolescence (2nd round). *Bundesministerium für Bildung und Forschung [Ministry of Education and Research],* Germany. |
| 2012 | External Reviewer, University of Ottawa Medical Research Fund. *University of Ottawa Department of Psychiatry*, Canada. |
| 2012 | External Reviewer, Behavioural Sciences—B. *Canadian Institutes of Health Research*, Canada. |
| 2011 | Board Member, International Review Board, Research collaborations on behavioural disorders related to violence, neglect, maltreatment and abuse in childhood and adolescence.  *Bundesministerium für Bildung und Forschung [Ministry of Education and Research],* Germany. |

# TEACHING AND TRAINING

**PostDoctoral Research Supervision**
**Law & Mental Health Program, Centre for Addiction and Mental Health, Toronto, Canada**

| | |
|---|---|
| Dr. Katherine S. Sutton | Sept., 2012–Dec., 2013 |
| Dr. Rachel Fazio | Sept., 2012–Aug., 2013 |
| Dr. Amy Lykins | Sept., 2008–Nov., 2009 |

**Doctoral Research Supervision**
**Centre for Addiction and Mental Health, Toronto, Canada**

| | |
|---|---|
| Michael Walton • University of New England, Australia | Sept., 2017–Aug., 2018 |
| Debra Soh • York University | May, 2013–Aug, 2017 |
| Skye Stephens • Ryerson University | April, 2012–June, 2016 |

**Masters Research Supervision**
**Centre for Addiction and Mental Health, Toronto, Canada**

| | |
|---|---|
| Nicole Cormier • Ryerson University | June, 2012–present |
| Debra Soh • Ryerson University | May, 2009–April, 2010 |

**Undergraduate Research Supervision**
**Centre for Addiction and Mental Health, Toronto, Canada**

| | |
|---|---|
| Kylie Reale • Ryerson University | Spring, 2014 |
| Jarrett Hannah • University of Rochester | Summer, 2013 |
| Michael Humeniuk • University of Toronto | Summer, 2012 |

**Clinical Supervision (Doctoral Internship)**
**Clinical Internship Program, Centre for Addiction and Mental Health, Toronto, Canada**

| | |
|---|---|
| Katherine S. Sutton • Queen's University | 2011–2012 |
| David Sylva • Northwestern University | 2011–2012 |
| Jordan Rullo • University of Utah | 2010–2011 |
| Lea Thaler • University of Nevada, Las Vegas | 2010–2011 |
| Carolin Klein • University of British Columbia | 2009–2010 |
| Bobby R. Walling • University of Manitoba | 2009–2010 |

Gilead 0477

# TEACHING AND TRAINING

**Clinical Supervision (Doctoral- and Masters- level practica)**
**Centre for Addiction and Mental Health, Toronto, Canada**

| | |
|---|---|
| Tyler Tulloch • Ryerson University | 2013–2014 |
| Natalie Stratton • Ryerson University | Summer, 2013 |
| Fiona Dyshniku • University of Windsor | Summer, 2013 |
| Mackenzie Becker • McMaster University | Summer, 2013 |
| Skye Stephens • Ryerson University | 2012–2013 |
| Vivian Nyantakyi • Capella University | 2010–2011 |
| Cailey Hartwick • University of Guelph | Fall, 2010 |
| Tricia Teeft • Humber College | Summer, 2010 |
| Allison Reeves • Ontario Institute for Studies in Education/Univ. of Toronto | 2009–2010 |
| Helen Bailey • Ryerson University | Summer, 2009 |
| Edna Aryee • Ontario Institute for Studies in Education/Univ. of Toronto | 2008–2009 |
| Iryna Ivanova • Ontario Institute for Studies in Education/Univ. of Toronto | 2008–2009 |
| Jennifer Robinson • Ontario Institute for Studies in Education/Univ. of Toronto | 2008–2009 |
| Zoë Laksman • Adler School of Professional Psychology | 2005–2006 |
| Diana Mandelew • Adler School of Professional Psychology | 2005–2006 |
| Susan Wnuk • York University | 2004–2005 |
| Hiten Lad • Adler School of Professional Psychology | 2004–2005 |
| Natasha Williams • Adler School of Professional Psychology | 2003–2004 |
| Lisa Couperthwaite • Ontario Institute for Studies in Education/Univ. of Toronto | 2003–2004 |
| Lori Gray, née Robichaud • University of Windsor | Summer, 2003 |
| Sandra Belfry • Ontario Institute for Studies in Education/Univ. of Toronto | 2002–2003 |
| Althea Monteiro • York University | Summer, 2002 |
| Samantha Dworsky • York University | 2001–2002 |
| Kerry Collins • University of Windsor | Summer, 2001 |
| Jennifer Fogarty • Waterloo University | 2000–2001 |
| Emily Cripps • Waterloo University | Summer, 2000 |
| Lee Beckstead • University of Utah | 2000 |

PlntfResp 0478

## PROFESSIONAL SOCIETY ACTIVITIES

### OFFICES HELD

| | |
|---|---|
| 2018–2019 | Local Host.  Society for Sex Therapy and Research. |
| 2015 | Member, International Scientific Committee, World Association for Sexual Health. |
| 2015 | Member, Program Planning and Conference Committee, Association for the Treatment of Sexual Abusers |
| 2012–2013 | Chair, Student Research Awards Committee, Society for Sex Therapy & Research |
| 2012–2013 | Member, Program Planning and Conference Committee, Association for the Treatment of Sexual Abusers |
| 2011–2012 | Chair, Student Research Awards Committee, Society for Sex Therapy & Research |
| 2010–2011 | Scientific Program Committee, International Academy of Sex Research |
| 2002–2004 | Membership Committee • APA Division 12 (Clinical Psychology) |
| 2002–2003 | Chair, Committee on Science Issues, APA Division 44 |
| 2002 | Observer, Grant Review Committee • Canadian Institutes of Health Research Behavioural Sciences (B) |
| 2001–2009 | Reviewer • APA Division 44 Convention Program Committee |
| 2001, 2002 | Reviewer • APA Malyon-Smith Scholarship Committee |
| 2000–2005 | Task Force on Transgender Issues, APA Division 44 |
| 1998–1999 | Consultant, APA Board of Directors Working Group on Psychology Marketplace |
| 1997 | Student Representative • APA Board of Professional Affairs' Institute on TeleHealth |
| 1997–1998 | Founder and Chair • APA/APAGS Task Force on New Psychologists' Concerns |
| 1997–1999 | Student Representative • APA/CAPP Sub-Committee for a National Strategy for Prescription Privileges |
| 1997–1999 | Liaison • APA Committee for the Advancement of Professional Practice |
| 1997–1998 | Liaison • APA Board of Professional Affairs |
| 1993–1997 | Founder and Chair • APA/APAGS Committee on LGB Concerns |

Spine Ex. 27578 0479

# PROFESSIONAL SOCIETY ACTIVITIES

## MEMBERSHIPS

| | |
|---|---|
| 2017–2021 | Member • *Canadian Sex Research Forum* |
| 2009–Present | Member • *Society for Sex Therapy and Research* |
| 2006–Present | Member (elected) • *International Academy of Sex Research* |
| 2006–Present | Research and Clinical Member • *Association for the Treatment of Sex Abusers* |
| 2003–2006 | Associate Member (elected) • *International Academy of Sex Research* |
| 2002 | Founding Member • CPA Section on Sexual Orientation and Gender Identity |
| 2001–2013 | Member • *Canadian Psychological Association* (CPA) |
| 2000–2015 | Member • *American Association for the Advancement of Science* |
| 2000–2015 | Member • *American Psychological Association* (APA) |
| | APA Division 12 (Clinical Psychology) |
| | APA Division 44 (Society for the Psychological Study of LGB Issues) |
| 2000–2020 | Member • *Society for the Scientific Study of Sexuality* |
| 1995–2000 | Student Member • *Society for the Scientific Study of Sexuality* |
| 1993–2000 | Student Affiliate • *American Psychological Association* |
| 1990–1999 | Member, American Psychological Association of Graduate Students (APAGS) |

Windsor_0480

## CLINICAL LICENSURE/REGISTRATION

Certificate of Registration, Number 3793
College of Psychologists of Ontario, Ontario, Canada

## AWARDS AND HONORS

**2017 Elected Fellow, Association for the Treatment of Sexual Abusers**

**2011 Howard E. Barbaree Award for Excellence in Research**
Centre for Addiction and Mental Health, Law and Mental Health Program

**2004 fMRI Visiting Fellowship Program at Massachusetts General Hospital**
American Psychological Association Advanced Training Institute and NIH

**1999–2001 CAMH Post-Doctoral Research Fellowship**
Centre for Addiction and Mental Health Foundation and Ontario Ministry of Health

**1998 Award for Distinguished Contribution by a Student**
American Psychological Association, Division 44

**1995 Dissertation Research Grant**
Society for the Scientific Study of Sexuality

**1994–1996 McGill University Doctoral Scholarship**

**1994 Award for Outstanding Contribution to Undergraduate Teaching**
"TA of the Year Award," from the McGill Psychology Undergraduate Student Association

## MAJOR MEDIA
(Complete list available upon request.)

### Feature-length Documentaries
Vice Canada Reports.  *Age of Consent.* 14 Jan 2017.
Canadian Broadcasting Company.  *I, Pedophile.* Firsthand documentaries. 10 Mar 2016.

### Appearances and Interviews
11 Mar 2020. Ibbitson, John. It is crucial that Parliament gets the conversion-therapy ban right. *The Globe & Mail.*
25 Jan 2020. Ook de hulpvaardige buurman kan verzamelaar van kinderporno zin.  *De Morgen.*
3 Nov 2019. Village of the damned.  *60 Minutes Australia.*
1 Nov 2019. HÅKON F. HØYDAL. Norsk nettovergriper: – Jeg hater meg selv: Nordmannen laster ned overgrepsmateriale fra nettet – og oppfordrer politiet til å gi amnesti for slike som ham.
10 Oct 2019. Smith, T. Growing efforts are looking at how—or if—#MeToo offenders can be reformed.  *National Public Radio.*
29 Sep 2019. Carey, B. Preying on Children: The Emerging Psychology of Pedophiles.  *New York Times.*
29 Apr 2019.  Mathieu, Isabelle.  La poupée qui a troublé les Terre-Neuviens.  *La Tribune.*
21 Mar 2019. Pope Francis wants psychological testing to prevent problem priests. But can it really do that?  *The Washington Post.*
12 Dec 2018. Child sex dolls: Illegal in Canada, and dozens seized at the border. Ontario Today with Rita Celli. *CBC.*
12 Dec 2018. Celli, R. & Harris, K. Dozens of child sex dolls seized by Canadian border agents. *CBC News.*
27 Apr 2018. Rogers, Brook A. The online 'incel' culture is real–and dangerous. *New York Post.*
25 Apr 2018. Yang, J. Number cited in cryptic Facebook post matches Alek Minassian's military ID: Source. *Toronto Star.*
24 Ap 2018 Understanding 'incel'.  *CTV News.*
27 Nov 2017. Carey, B. Therapy for Sexual Misconduct? It's Mostly Unproven. *New York Times.*
14 Nov 2017. Tremonti, A. M. The Current. *CBC.*
9 Nov 2017. Christensen, J. Why men use masturbation to harass women. *CNN.* http://www.cnn.com/2017/11/09/health/masturbation-sexual-harassment/index.html
7 Nov 2017. Nazaryan, A. Why is the alt-right obsessed with pedophilia? *Newsweek.*
15 Oct 2017. Ouatik, B. Déscouvre. Pédophilie et science. *CBC Radio Canada.*
12 Oct 2017. Ouatik, B. Peut-on guérir la pédophilie? *CBC Radio Canada.*
11 Sep 2017. Burns, C. The young paedophiles who say they don't abuse children. *BBC News.*
18 Aug 2017. Interview. *National Post Radio.* Sirius XM Canada.
16 Aug 2017. Blackwell, Tom. Man says he was cured of pedophilia at Ottawa clinic: 'It's like a weight that's been lifted': But skeptics worry about the impact of sending pedophiles into the world convinced their curse has been vanquished. *National Post.*
26 Apr 2017. Zalkind, S. Prep schools hid sex abuse just like the catholic church. *VICE.*
24 Apr 2017. Sastre, P. Pédophilie: une panique morale jamais n'abolira un crime. *Slate France.*
12 Feb 2017. Payette, G. Child sex doll trial opens Pandora's box of questions. *CBC News.*
26 Nov 2016. Det morke uvettet ["The unknown darkness]". *Fedrelandsvennen.*
13 July 2016. Paedophilia: Shedding light on the dark field. *The Economist.*

30/32

1 Jul 2016. Debusschere, B. Niet iedereen die kinderporno kijkt, is een pedofiel: De mythes rond pedofilie ontkracht. *De Morgen.*

12 Apr 2016. O'Connor, R. Terence Martin: The Tasmanian MP whose medication 'turned him into a paedophile'. *The Independent.*

8 Mar 2016. Bielski, Z. 'The most viscerally hated group on earth': Documentary explores how intervention can stop pedophiles. *The Globe and Mail.*

1 Mar 2016. Elmhirst, S. What should we do about paedophiles? *The Guardian.*

24 Feb 2016. The man whose brain tumour 'turned him into a paedophile'. *The Independent.*

24 Nov 2015. Byron, T. The truth about child sex abuse. *BBC Two.*

20 Aug 2015. The Jared Fogle case: Why we understand so little about abuse. *Washington Post.*

19 Aug 2015. Blackwell, T. Treat sex offenders for impotence—to keep them out of trouble, Canadian psychiatrist says. *National Post.*

2 Aug 2015. Menendez, J. BBC News Hour. *BBC World Service.*

13 Jul 2015. The nature of pedophilia. *BBC Radio 4.*

9 Jul 2015. The sex-offender test: How a computerized assessment can help determine the fate of men who've been accused of sexually abusing children. *The Atlantic.*

10 Apr 2015. NWT failed to prevent sex offender from abusing stepdaughter again. *CBC News.*

10 Feb 2015. Savage, D. "The ethical sadist." In Savage Love. *The Stranger.*

31 Jan 2015. Begrip voor/van pedofilie [Understanding pedophilia]. *de Volkskrant.*

9 Dec 2014. Carey, B. When a rapist's weapon is a pill. *New York Times.*

1 Dec 2014. Singal, J. Can virtual reality help pedophiles? *New York Magazine.*

17 Nov 2014. Say pedófilo, busco aydua. *El Pais.*

4 Sep 2014. Born that way? *Ideas, with Paul Kennedy.* CBC Radio One.

27 Aug 2014. Interrogating the statistics for the prevalence of paedophilia. BBC.

25 Jul 2014. Stephenson, W. The prevalence of paedophilia. *BBC World Service.*

21 Jul 2014. Hildebrandt, A. Virtuous Pedophiles group gives support therapy cannot. *CBC.*

26 Jan 2014. Paedophilia a result of faulty wiring, scientists suggest. *Daily Mail.*

22 Dec 2013. Kane, L. Is pedophilia a sexual orientation? *Toronto Star.*

21 Jul 2013. Miller, L. The turn-on switch: Fetish theory, post-Freud. *New York Magazine.*

1 Jul 2013. Morin, H. Pédophilie: la difficile quête d'une origine biologique. *Le Monde.*

2 Jun 2013. Malcolm, L. The psychology of paedophilia. *Australian National Radio.*

1 Mar 2013. Kay, J. The mobbing of Tom Flanagan is unwarranted and cruel. *National Post.*

6 Feb 2013. Boy Scouts board delays vote on lifting ban on gays. *L.A. Times.*

31 Aug 2012. CNN Newsroom interview with Ashleigh Banfield. *CNN.*

24 Jun 2012. CNN Newsroom interview with Don Lemon. *CNN.*

Bindaes 0483

## LEGAL TESTIMONY, PAST 5 YEARS

| | | |
|---|---|---|
| 2021 | Cross et al. v Loudoun School Board | Loudoun, VA |
| 2021 | Allan M. Josephson v Neeli Bendapudi | Western District of Kentucky |
| 2021 | Re Commitment of Michael Hughes (Frye Hearing) | Cook County, Illinois |
| 2019 | US vs Peter Bright | Southern District of New York, NY |
| 2019 | Probate and Family Court (Custody Hearing) | Boston, Massachusetts |
| 2019 | Re Commitment of Steven Casper (Frye Hearing) | Kendall County, Illinois |
| 2019 | Re Commitment of Inger (Frye Hearing) | Poughkeepsie, NY |
| 2018 | Re Commitment of Fernando Little (Frye Hearing) | Utica, NY |
| 2018 | Canada vs John Fitzpatrick (Sentencing Hearing) | Toronto, Ontario, Canada |

Pittman 0484

EXPERT REPORT OF JAMES M. CANTOR, PHD

# APPENDIX 2

JOURNAL OF SEX & MARITAL THERAPY
https://doi.org/10.1080/0092623X.2019.1698481





# Transgender and Gender Diverse Children and Adolescents: Fact-Checking of AAP Policy

James M. Cantor

Toronto Sexuality Centre, Toronto, Canada

**ABSTRACT**
The American Academy of Pediatrics (AAP) recently published a policy statement: *Ensuring comprehensive care and support for transgender and gender-diverse children and adolescents*. Although almost all clinics and professional associations in the world use what's called the *watchful waiting* approach to helping gender diverse (GD) children, the AAP statement instead rejected that consensus, endorsing *gender affirmation* as the only acceptable approach. Remarkably, not only did the AAP statement fail to include any of the actual outcomes literature on such cases, but it also misrepresented the contents of its citations, which repeatedly said the very opposite of what AAP attributed to them.

The American Academy of Pediatrics (AAP) recently published a policy statement entitled, *Ensuring comprehensive care and support for transgender and gender-diverse children and adolescents* (Rafferty, AAP Committee on Psychosocial Aspects of Child and Family Health, AAP Committee on Adolescence, AAP Section on Lesbian, Gay, Bisexual, and Transgender Health and Wellness, 2018). These are children who manifest discontent with the sex they were born as and desire to live as the other sex (or as some alternative gender role). The policy was quite a remarkable document: Although almost all clinics and professional associations in the world use what's called the *watchful waiting* approach to helping transgender and gender diverse (GD) children, the AAP statement rejected that consensus, endorsing only *gender affirmation*. That is, where the consensus is to delay any transitions after the onset of puberty, AAP instead rejected waiting before transition. With AAP taking such a dramatic departure from other professional associations, I was immediately curious about what evidence led them to that conclusion. As I read the works on which they based their policy, however, I was pretty surprised—rather alarmed, actually: These documents simply did not say what AAP claimed they did. In fact, the references that AAP cited as the basis of their policy instead outright contradicted that policy, repeatedly endorsing *watchful waiting*.

The AAP statement was also remarkable in what it left out—namely, the actual outcomes research on GD children. In total, there have been 11 follow-up studies of GD children, of which AAP cited one (Wallien & Cohen-Kettenis, 2008), doing so without actually mentioning the outcome data it contained. The literature on outcomes was neither reviewed, summarized, nor subjected to meta-analysis to be considered in the aggregate—It was merely disappeared. (The list of all existing studies appears in the appendix.) As they make clear, *every* follow-up study of GD children, without exception, found the same thing: Over puberty, the majority of GD children cease to want to transition. AAP is, of course, free to establish whatever policy it likes on

---

**CONTACT** James Cantor ✉ jamescantorphd@gmail.com 🏢 Toronto Sexuality Centre, 2 Carlton Street, suite 1820, Toronto, Ontario M5B 1J3, Canada.
© 2019 Taylor & Francis Group, LLC

whatever basis it likes. But any assertion that their policy is based on evidence is demonstrably false, as detailed below.

AAP divided clinical approaches into three types—conversion therapy, watchful waiting, and gender affirmation. It rejected the first two and endorsed *gender affirmation* as the only acceptable alternative. Most readers will likely be familiar already with attempts to use conversion therapy to change sexual orientation. With regard to gender identity, AAP wrote:

> "[C]onversion" or "reparative" treatment models are used to prevent children and adolescents from identifying as transgender or to dissuade them from exhibiting gender diverse expressions. ... Reparative approaches have been proven to be not only unsuccessful[38] but also deleterious and are considered outside the mainstream of traditional medical practice.[29,39 42]

The citations were:

38. Haldeman DC. The practice and ethics of sexual orientation conversion therapy. *J Consult Clin Psychol.* 1994;62(2):221 227.

29. Adelson SL; American Academy of Child and Adolescent Psychiatry (AACAP) Committee on Quality Issues (CQI). Practice parameter on gay, lesbian, or bisexual sexual orientation, gender nonconformity, and gender discordance in children and adolescents. *J Am Acad Child Adolesc Psychiatry.* 2012;51(9):957 974.

39. Byne W. Regulations restrict practice of conversion therapy. *LGBT Health.* 2016;3(2):97 99.

40. Cohen Kettenis PT, Delemarrevan de Waal HA, Gooren LJ. The treatment of adolescent transsexuals: changing insights. *J Sex Med.* 2008;5(8):1892 1897.

41. Bryant K. Making gender identity disorder of childhood: historical lessons for contemporary debates. *Sex Res Soc Policy.* 2006;3(3):23 39.

42. World Professional Association for Transgender Health. *WPATH De Psychopathologisation Statement.* Minneapolis, MN: World Professional Association for Transgender Health; 2010.

AAP's claims struck me as odd because *there are no studies of conversion therapy for gender identity.* Studies of conversion therapy have been limited to *sexual orientation,* and, moreover, to the sexual orientation *of adults,* not to gender identity and not of children in any case. The article AAP cited to support their claim (reference number 38) is indeed a classic and well-known review, but it is a review of sexual orientation research *only.* Neither gender identity, nor even children, received a single mention in it. Indeed, the narrower scope of that article should be clear to anyone reading even just its title: "The practice and ethics of *sexual orientation* conversion therapy" [italics added].

AAP continued, saying that conversion approaches for GD children have already been rejected by medical consensus, citing five sources. This claim struck me as just as odd, however—I recalled associations banning conversion therapy for sexual orientation, but not for gender identity, exactly because there is no evidence for generalizing from adult sexual orientation to childhood gender identity. So, I started checking AAP's citations for that, and these sources too pertained only to sexual orientation, not gender identity (specifics below). What AAP's sources *did* repeatedly emphasize was that:

A. Sexual orientation of adults is unaffected by conversion therapy and any other [known] intervention;

B. Gender dysphoria in childhood before puberty desists in the majority of cases, becoming (cis-gendered) homosexuality in adulthood, again regardless of any [known] intervention; and

C. Gender dysphoria in childhood persisting after puberty tends to persist entirely.

That is, in the context of GD children, it simply makes no sense to refer to externally induced "conversion": The majority of children "convert" to cisgender or "desist" from transgender

*regardless* of any attempt to change them. "Conversion" only makes sense with regard to adult sexual orientation because (unlike childhood gender identity), adult homosexuality never or nearly never spontaneously changes to heterosexuality. Although gender identity and sexual orientation may often be analogous and discussed together with regard to social or political values and to civil rights, they are nonetheless distinct—with distinct origins, needs, and responses to medical and mental health care choices. Although AAP emphasized to the reader that "gender identity is not synonymous with 'sexual orientation'" (Rafferty et al., 2018, p. 3), they went ahead to treat them as such nonetheless.

To return to checking AAP's fidelity to its sources: Reference 29 was a practice guideline from the Committee on Quality Issues of the American Academy of Child and Adolescent Psychiatry (AACAP). Despite AAP applying this source to *gender identity,* AACAP was quite unambiguous regarding their intent to speak to sexual orientation and *only* to sexual orientation: "Principle 6. Clinicians should be aware that there is no evidence that *sexual orientation* can be altered through therapy, and that attempts to do so may be harmful. There is no established evidence that change in a predominant, enduring *homosexual* pattern of development is possible. Although sexual fantasies can, to some degree, be suppressed or repressed by those who are ashamed of or in conflict about them, sexual desire is not a choice. However, behavior, social role, and—to a degree—identity and self-acceptance are. Although operant conditioning modifies sexual fetishes, it does not alter *homosexuality.* Psychiatric efforts to alter *sexual orientation* through 'reparative therapy' *in adults* have found little or no change in *sexual orientation,* while causing significant risk of harm to self-esteem" (AACAP, 2012, p. 967, italics added).

Whereas AAP cites AACAP to support gender affirmation as the only alternative for treating GD children, AACAP's actual view was decidedly neutral, noting the lack of evidence: "Given the lack of empirical evidence from randomized, controlled trials of the efficacy of treatment aimed at eliminating gender discordance, the potential risks of treatment, and longitudinal evidence that gender discordance persists in only a small minority of untreated cases arising in childhood, further research is needed on predictors of persistence and desistence of childhood gender discordance as well as the long-term risks and benefits of intervention before any treatment to eliminate gender discordance can be endorsed" (AACAP, 2012, p. 969). Moreover, whereas AAP rejected watchful waiting, what AACAP recommended was: "In general, it is desirable to help adolescents who may be experiencing gender distress and dysphoria to defer sex reassignment until adulthood" (AACAP, 2012, p. 969). So, not only did AAP attribute to AACAP something AACAP never said, but also AAP withheld from readers AACAP's actual view.

Next, in reference 39, Byne (2016) also addressed only sexual orientation, doing so very clearly: "Reparative therapy is a subset of conversion therapies based on the premise that *same-sex attraction* are reparations for childhood trauma. Thus, practitioners of reparative therapy believe that exploring, isolating, and repairing these childhood emotional wounds will often result in reducing *same-sex attractions*" (Byne, 2016, p. 97). Byne does not say this of gender identity, as the AAP statement misrepresents.

In AAP reference 40, Cohen-Kettenis et al. (2008) did finally pertain to gender identity; however, this article never mentions conversion therapy. (!) Rather, in this study, the authors presented that clinic's lowering of their minimum age for cross-sex hormone treatment from age 18 to 16, which they did on the basis of a series of studies showing the high rates of success with this age group. Although it did strike me as odd that AAP picked as support against conversion therapy an article that did not mention conversion therapy, I could imagine AAP cited the article as an example of what the "mainstream of traditional medical practice" consists of (the logic being that conversion therapy falls outside what an 'ideal' clinic like this one provides). However, what this clinic provides is the very *watchful waiting* approach that AAP rejected. The approach

Aq1j4ea17587 0488

espoused by Cohen-Kettenis (and the other clinics mentioned in the source—Gent, Boston, Oslo, and now formerly, Toronto) is to make puberty-halting interventions available at age 12 because: "[P]ubertal suppression may give adolescents, together with the attending health professional, more time to explore their gender identity, without the distress of the developing secondary sex characteristics. The precision of the diagnosis may thus be improved" (Cohen-Kettenis et al., 2008, p. 1894).

Reference 41 presented a very interesting history spanning the 1960s–1990s about how feminine boys and tomboyish girls came to be recognized as mostly pre-homosexual, and how that status came to be entered into the DSM at the same time as homosexuality was being *removed* from the DSM. Conversion therapy is never mentioned. Indeed, to the extent that Bryant mentions treatment at all, it is to say that treatment is entirely irrelevant to his analysis: "An important omission from the *DSM* is a discussion of the kinds of treatment that GIDC children should receive. (This omission is a general orientation of the DSM and not unique to GIDC)" (Bryant, 2006, p. 35). How this article supports AAP's claim is a mystery. Moreover, how AAP could cite a 2006 history discussing events of the 1990s and earlier to support a claim about the *current* consensus in this quickly evolving discussion remains all the more unfathomable.

Cited last in this section was a one-paragraph press release from the World Professional Association for Transgender Health. Written during the early stages of the American Psychiatric Association's (APA's) update of the DSM, the statement asserted simply that "The WPATH Board of Directors strongly urges the de-psychopathologisation of gender variance worldwide." Very reasonable debate can (and should) be had regarding whether gender dysphoria should be removed from the DSM as homosexuality was, and WPATH was well within its purview to assert that it should. Now that the DSM revision process is years completed however, history has seen that APA ultimately retained the diagnostic categories, rejecting WPATH's urging. This makes AAP's logic entirely backwards: That WPATH's request to depathologize gender dysphoria was *rejected* suggests that it is *WPATH's* view—and therefore the AAP policy—which fall "outside the mainstream of traditional medical practice." (!)

AAP based this entire line of reasoning on their belief that conversion therapy is being used "to prevent children and adolescents from identifying as transgender" (Rafferty et al., 2018, p. 4). That claim is left without citation or support. In contrast, what is said by AAP's sources is "delaying affirmation should *not* be construed as conversion therapy or an attempt to change gender identity" in the first place (Byne, 2016, p. 2). Nonetheless, AAP seems to be doing exactly that: simply relabeling any alternative approach as equivalent to conversion therapy.

Although AAP (and anyone else) may reject (what they label to be) conversion therapy purely on the basis of political or personal values, there is no evidence to back the AAP's stated claim about the existing science on gender identity at all, never mind gender identity of children.

AAP also dismissed the watchful waiting approach out of hand, not citing any evidence, but repeatedly calling it "outdated." The criticisms AAP provided, however, again defied the existing evidence, with even its own sources repeatedly calling watchful waiting the current standard. According to AAP:

> [G]ender affirmation is in contrast to the outdated approach in which a child's gender diverse assertions are held as "possibly true" until an arbitrary age (often after pubertal onset) when they can be considered valid, an approach that authors of the literature have termed "watchful waiting." This outdated approach does not serve the child because critical support is withheld. Watchful waiting is based on binary notions of gender in which gender diversity and fluidity is pathologized; in watchful waiting, it is also assumed that notions of gender identity become fixed at a certain age. The approach is also influenced by a group of early studies with validity concerns, methodologic flaws, and limited follow up on children who identified as TGD and, by adolescence, did not seek further treatment ("desisters").[45,47]

The citations from AAP's reference list are:

JOURNAL OF SEX & MARITAL THERAPY   5

45. Ehrensaft D, Giammattei SV, Storck K, Tishelman AC, Keo Meier C. Prepubertal social gender transitions: what we know; what we can learn   a view from a gender affirmative lens. *Int J Transgend.* 2018;19(2):251 268

47. Olson KR. Prepubescent transgender children: what we do and do not know. *J Am Acad Child Adolesc Psychiatry.* 2016;55(3):155 156.e3

I was surprised first by the AAP's claim that watchful waiting's delay to puberty was somehow "arbitrary." The literature, including AAP's sources, repeatedly indicated the pivotal importance of puberty, noting that outcomes strongly diverge at that point. According to AAP reference 29, in "*prepubertal* boys with gender discordance—including many without any mental health treatment—the cross gender wishes usually fade over time and do not persist into adulthood, with only 2.2% to 11.9% continuing to experience gender discordance" (Adelson & AACAP, 2012, p. 963, italics added), whereas "when gender variance with the desire to be the other sex is present *in adolescence,* this desire usually does persist through adulthood" (Adelson & AACAP, 2012, p. 964, italics added). Similarly, according to AAP reference 40, "Symptoms of GID *at prepubertal ages* decrease or even disappear in a considerable percentage of children (estimates range from 80–95%). Therefore, any intervention in childhood would seem premature and inappropriate. However, GID persisting *into early puberty* appears to be highly persistent" (Cohen-Kettenis et al., 2008, p. 1895, italics added). That follow-up studies of prepubertal transition differ from postpubertal transition is the very meaning of non-arbitrary. AAP gave readers exactly the reverse of what was contained in its own sources. If AAP were correct in saying that puberty is an arbitrarily selected age, then AAP will be able to offer another point to wait for with as much empirical backing as puberty has.

Next, it was not clear on what basis AAP could say that watchful waiting withholds support—AAP cited no support for its claim. The people in such programs often receive substantial support during this period. Also unclear is on what basis AAP could already know exactly which treatments are "critical" and which are not—Answering that question is the very purpose of this entire endeavor. Indeed, the logic of AAP's claim appears entirely circular: It is only if one were already pre-convinced that gender affirmation is the only acceptable alternative that would make watchful waiting seem to withhold critical support—What it delays is gender affirmation, the method one has already decided to be critical.

Although AAP's next claim did not have a citation appearing at the end of its sentence, binary notions of gender were mentioned both in references 45 and 47. Specifically, both pointed out that existing outcome studies have been about people transitioning from one sex to the other, rather than from one sex to an in-between status or a combination of masculine/feminine features. Neither reference presented this as a reason to reject the results from the existing studies of complete transition however (which is how AAP cast it). Although it is indeed true that the outcome data have been about complete transition, some future study showing that partial transition shows a different outcome would not invalidate what is known about complete transition. Indeed, data showing that partial transition gives better outcomes than complete transition would, once again, support the watchful waiting approach which AAP rejected.

Next was a vague reference alleging concerns and criticisms about early studies. Had AAP indicated what those alleged concerns and flaws were (or which studies they were), then it would be possible to evaluate or address them. Nonetheless, the argument is a red herring: Because all of the later studies showed the same result as did the early studies, any such allegation is necessarily moot.

Reference 47 was a one-and-a-half page commentary in which the author off-handedly mentions criticisms previously made of three of the eleven outcome studies of GD children, but does not provide any analysis or discussion. The only specific claim was that studies (whether early or late) had limited follow-up periods—the logic being that had outcome researchers lengthened the follow-up period, then people who seemed to have desisted might have returned to the clinic as

cases of "persistence-after-interruption." Although one could debate the merits of that prediction, AAP instead simply withheld from the reader the result from the original researchers having tested that very prediction directly: Steensma and Cohen-Kettenis (2015) conducted another analysis of their cohort, by then ages 19–28 (mean age 25.9 years), and found that 3.3% (5 people of the sample of 150) later returned. That is, in long-term follow-up, the childhood sample showed 66.7% desistence instead of 70.0% desistance.

Reference 45 did not support the claim that watchful-waiting is "outdated" either. Indeed, that source said the very opposite, explicitly referring to watchful waiting as the *current* approach: "Put another way, if clinicians are straying from SOC 7 guidelines for social transitions, not abiding by the watchful waiting model *favored by the standards,* we will have adolescents who have been consistently living in their affirmed gender since age 3, 4, or 5" (Ehrensaft et al., 2018, p. 255). Moreover, Ehrensaft et al. said there are cases in which they too would still use watchful waiting: "When a child's gender identity is unclear, the watchful waiting approach can give the child and their family time to develop a clearer understanding and is not necessarily in contrast to the needs of the child" (p. 259). Ehrensaft et al. are indeed critical of the watchful waiting model (which they feel is applied too conservatively), but they do not come close to the position the AAP policy espouses. Where Ehrensaft summaries the potential benefits and potential risks both to transitioning and not transitioning, the AAP presents an ironically binary narrative.

In its policy statement, AAP told neither the truth nor the whole truth, committing sins both of commission and of omission, asserting claims easily falsified by anyone caring to do any fact-checking at all. AAP claimed, "This policy statement is focused specifically on children and youth that identify as TGD rather than the larger LGBTQ population"; however, much of that evidence was about sexual orientation, not gender identity. AAP claimed, "Current available research and expert opinion from clinical and research leaders … will serve as the basis for recommendations" (pp. 1–2); however, they provided recommendations entirely unsupported and even in direct opposition to that research and opinion.

AAP is advocating for something far in excess of mainstream practice and medical consensus. In the presence of compelling evidence, that is just what is called for. The problems with Rafferty, however, do not constitute merely a misquote, a misinterpretation of an ambiguous statement, or a missing reference or two. Rather, AAP's statement is a systematic exclusion and misrepresentation of entire literatures. Not only did AAP fail to provide compelling evidence, it failed to provide the evidence at all. Indeed, AAP's recommendations are *despite* the existing evidence.

## Disclosure statement

No potential conflict of interest was reported by the author.

## References

Rafferty, J., AAP Committee on Psychosocial Aspects of Child and Family Health, AAP Committee on Adolescence, AAP Section on Lesbian, Gay, Bisexual, and Transgender Health and Wellness. (2018). Ensuring comprehensive care and support for transgender and gender diverse children and adolescents. *Pediatrics, 142*(4), e20182162 doi:10.1542/peds.2018 2162

Steensma, T. D., & Cohen Kettenis, P. T. (2015). More than two developmental pathways in children with gender dysphoria? *Journal of the American Academy of Child and Adolescent Psychiatry, 52,* 147 148. doi:10.1016/j.jaac.2014.10.016

Wallien, M. S. C., & Cohen Kettenis, P. T. (2008). Psychosexual outcome of gender dysphoric children. *Journal of the American Academy of Child and Adolescent Psychiatry, 47,* 1413 1423. doi:10.1097/CHI.0b013e31818956b9

## Appendix

| Count | Group | Study |
|---|---|---|
| 2/16<br>4/16<br>10/16 | gay*<br>trans /crossdress<br>straight*/uncertain | Lebovitz, P. S. (1972). Feminine behavior in boys: Aspects of its outcome. *American Journal of Psychiatry, 128,* 1283 1289. |
| 2/16<br>2/16<br>12/16 | trans<br>uncertain<br>gay | Zuger, B. (1978). Effeminate behavior present in boys from childhood: Ten additional years of follow up. *Comprehensive Psychiatry, 19,* 363 369. |
| 0/9<br>9/9 | trans<br>gay | Money, J., & Russo, A. J. (1979). Homosexual outcome of discordant gender identity/role: Longitudinal follow up. *Journal of Pediatric Psychology, 4,* 29 41. |
| 2/45<br>10/45<br>33/45 | trans /crossdress<br>uncertain<br>gay | Zuger, B. (1984). Early effeminate behavior in boys: Outcome and significance for homosexuality. *Journal of Nervous and Mental Disease, 172,* 90 97. |
| 1/10<br>2/10<br>3/10<br>4/10 | trans<br>gay<br>uncertain<br>straight | Davenport, C. W. (1986). A follow up study of 10 feminine boys. *Archives of Sexual Behavior, 15,* 511 517. |
| 1/44<br>43/44 | trans<br>cis | Green, R. (1987). *The "sissy boy syndrome" and the development of homosexuality.* New Haven, CT: Yale University Press. |
| 0/8<br>8/8 | trans<br>cis | Kosky, R. J. (1987). Gender disordered children: Does inpatient treatment help? *Medical Journal of Australia, 146,* 565 569. |
| 21/54<br>33/54 | trans<br>cis | Wallien, M. S. C., & Cohen Kettenis, P. T. (2008). Psychosexual outcome of gender dysphoric children. *Journal of the American Academy of Child and Adolescent Psychiatry, 47,* 1413 1423. |
| 3/25<br>6/25<br>16/25 | trans<br>lesbian/bi<br>straight | Drummond, K. D., Bradley, S. J., Badali Peterson, M., & Zucker, K. J. (2008). A follow up study of girls with gender identity disorder. *Developmental Psychology, 44,* 34 45. |
| 17/139<br>122/139 | trans<br>cis | Singh, D. (2012). *A follow up study of boys with gender identity disorder.* Unpublished doctoral dissertation, University of Toronto. |
| 47/127<br>80/127 | trans<br>cis | Steensma, T. D., McGuire, J. K., Kreukels, B. P. C., Beekman, A. J., & Cohen Kettenis, P. T. (2013). Factors associated with desistence and persistence of childhood gender dysphoria: A quantitative follow up study. *Journal of the American Academy of Child and Adolescent Psychiatry, 52,* 582 590. |

*For brevity, the list uses "gay" for "gay and cis ", "straight" for "straight and cis ", etc.

IN THE UNITED STATES DISTRICT COURT

FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA

*   *   *   *   *   *

B.P.J., by her next friend and      *

mother, HEATHER JACKSON,            *

    Plaintiffs                      * Case No.

    vs.                             * 2:21-CV-00316

WEST VIRGINIA STATE BOARD OF        *

EDUCATION, HARRISON COUNTY BOARD OF*

EDUCATION, WEST VIRGINIA SECONDARY *

SCHOOL ACTIVITIES COMMISSION, W.   *

CLAYTON BURCH in his official       *

capacity as State Superintendent,   *

and DORA STUTLER in her official    *

capacity as Harrison County         *

Superintendent, PATRICK MORRISEY in*

VIDEOTAPED DEPOSITION OF

MARY D. FRY, PH.D.

March 29, 2022

Any reproduction of this transcript

is prohibited without authorization

by the certifying agency.

Page 2

```
1    his official capacity as Attorney   *
2    General, and THE STATE OF WEST       *
3    VIRGINIA,                            *
4         Defendants                      *
5                      *   *   *   *   *   *
6
7                    VIDEOTAPED DEPOSITION OF
8                       MARY D. FRY, PH.D.
9                        March 29, 2022
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
```

Page 4

```
1                    A P P E A R A N C E S
2
3    KATHLEEN R. HARTNETT, ESQUIRE
4    JULIE VEROFF, ESQUIRE
5    ZOE HELSTROM, ESQUIRE
6    KATELYN KANG, ESQUIRE
7    ELIZABETH REINHARDT, ESQUIRE
8    VALERIA M. PELET DEL TORO, ESQUIRE
9    Cooley, LLP
10   3 Embarcadero Center
11   20th Floor
12   San Francisco, CA  94111-4004
13       COUNSELS FOR PLAINTIFF
14
15   SRUTI SWAMINATHAN, ESQUIRE
16   Lambda Legal
17   120 Wall Street
18   19th Floor
19   New York, NY  10005-3919
20       COUNSEL FOR PLAINTIFF
21
22
23
24
```

Page 3

```
1                 VIDEOTAPED DEPOSITION
2                         OF
3    MARY D. FRY, PH.D.  taken on behalf of the Intervenor
4    herein, pursuant to the Rules of Civil Procedure, taken
5    before me, the undersigned, Nicole Montagano, a Court
6    Reporter and Notary Public in and for the Commonwealth
7    of Pennsylvania, taken via videoconference, on Tuesday,
8    March 29, 2022 at 10:03 a.m.
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
```

Page 5

```
1              A P P E A R A N C E S (cont'd)
2
3    DAVID TRYON, ESQUIRE
4    State Capitol Complex
5    Building 1, Room E-26
6    Charleston, WV  25305
7        COUNSEL FOR STATE OF WEST VIRGINIA
8
9    ROBERTA F. GREEN, ESQUIRE
10   Shuman McCuskey Slicer, PLLC
11   1411 Virginia Street East
12   Suite 200
13   Charleston, WV  25301
14       COUNSEL FOR WEST VIRGINIA SECONDARY SCHOOL
15       ACTIVITIES COMMISSION
16
17   JEFFREY M. CROPP, ESQUIRE
18   Steptoe & Johnson
19   400 White Oaks Boulevard
20   Bridgeport, WV  26330
21       COUNSEL FOR HARRISON COUNTY BOARD OF EDUCATION and
22       HARRISON COUNTY SUPERINTENDENT DORA STUTLER
23
24
```

Page 6

APPEARANCES (cont'd)

 1        A P P E A R A N C E S (cont'd)

 2

 3    KELLY C. MORGAN, ESQUIRE

 4    Bailey Wyant

 5    500 Virginia Street East

 6    Suite 600

 7    Charleston, WV  25301

 8      COUNSEL FOR WEST VIRGINIA BOARD OF EDUCATION and

 9      SUPERINTENDANT W. CLAYTON BURCH

10

11    JOHNATHAN SCRUGGS, ESQUIRE

12    RACHEL CSUTOROS, ESQUIRE

13    Alliance Defending Freedom

14    15100 North 90th Street

15    Scottsdale, AZ  85260

16      COUNSEL FOR INTERVENOR, LAINEY ARMISTEAD

---

Page 8

EXHIBIT PAGE

| NUMBER | IDENTIFICATION | PAGE | IDENTIFIED |
|---|---|---|---|
| 1 | Declaration | 23 | |
| 2 | Expert Report of Dr. Fry | 24 | |
| 3 | HB-3293 | 25 | |
| 4 | Article by Dr. Fry | 58 | |
| 5 | Article | 61 | |
| 6 | Fairness and Enjoyment in School Sponsored Youth Sports | 103 | |
| 7 | Article | 149 | |
| 8 | Article | 159 | |
| 9 | Article on Lia Thomas | 211 | |
| 11 | Article on Reka Gyorgy | --- | |

---

Page 7

I N D E X

DISCUSSION AMONG PARTIES                    10 - 14
WITNESS: MARY D. FRY, PH.D.
EXAMINATION
  By Attorney Tryon              14 - 234
EXAMINATION
  By Attorney Scruggs            235 - 259
DISCUSSION AMONG PARTIES           259 - 260
CERTIFICATE                           261

---

Page 9

OBJECTION PAGE

ATTORNEY                                    PAGE
Veroff  26, 27, 29, 30, 31, 32, 33, 34, 35, 36, 37, 38,
39, 40, 41, 42, 43, 44, 45, 46, 47, 48, 49, 50, 51, 52,
53, 54, 57, 59, 60, 62, 66, 67, 73, 74, 85, 91, 92, 93,
94, 96, 97, 98, 100, 101, 105, 107, 108, 109, 112, 113,
114, 115, 116, 117, 118, 119, 120, 121, 122, 123, 124,
125, 131, 135, 137, 138, 139, 145, 154, 156, 157, 162,
163, 165, 166, 167, 168, 169, 170, 171, 172, 173, 174,
175, 176, 177, 178, 179, 180, 181, 182, 183, 187, 188,
189, 190, 194, 195, 197, 198, 199, 200, 203, 204, 206,
207, 208, 209, 210, 212, 213, 214, 216, 217, 218, 220,
221, 222, 223, 224, 225, 226, 227, 228, 229, 231, 232,
234, 237, 239, 240, 241, 242, 243, 244, 245, 246, 248,
249, 251, 252, 253, 254, 255, 256, 257, 258, 259

## Page 10

```
 1        S T I P U L A T I O N
 2    --------------------------------------------------
 3    (It is hereby stipulated and agreed by and between
 4    counsel for the respective parties that reading,
 5    signing, sealing, certification and filing are not
 6    waived.)
 7    --------------------------------------------------
 8        P R O C E E D I N G S
 9    --------------------------------------------------
10
11        MARY D. FRY, PH.D.,
12    CALLED AS A WITNESS IN THE FOLLOWING PROCEEDING, AND
13    HAVING FIRST BEEN DULY SWORN, TESTIFIED AND SAID AS
14    FOLLOWS:
15        ---
16        MS. BURKDOLL:  My name is Dana Burkdoll,
17    CSR, Notary for the State of Kansas.
18        ATTORNEY TRYON:  We might want to go off
19    the record.
20        VIDEOGRAPHER:  Going off the record.
21    Current time reads 10:03 a.m.
22    OFF VIDEOTAPE
23        ---
24    (WHEREUPON, AN OFF RECORD DISCUSSION WAS HELD.)
```

## Page 11

```
 1        ---
 2    ON VIDEOTAPE
 3        VIDEOGRAPHER:  We are now back on the
 4    record my name is Jacob Stock.  I'm a Certified Legal
 5    Video Specialist employed by Sargent's Court Reporting
 6    Services.  The date today is March 29th, 2022.  The
 7    current time reads 10:05 a.m.  Eastern Standard Time.
 8    This deposition is being taken remotely by a Zoom
 9    conference.  The caption of this case is in the United
10    States District Court for the Southern District of West
11    Virginia, Charleston Division.  BPJ, et al. versus the
12    West Virginia Board of Education, et al.  Civil Action
13    Number 2:21-CV-00316.  The name of the witness is Mary
14    Fry, who has already been sworn in.  Will the attorneys
15    present state their names and the parties they
16    represent?
17        ATTORNEY TRYON:  This is David Tryon
18    representing the State of West Virginia and I'm with the
19    Attorney General's Office.
20        ATTORNEY VEROFF:  Julie Veroff with
21    Cooley, LLP.  I represent the Plaintiff.  And I'll let
22    my co-counsel introduce themselves.
23        ATTORNEY HARTNETT:  Hi.  This is Kathleen
24    Hartnett from Cooley.  I'm in the room with Julie,
```

## Page 12

```
 1    representing Plaintiff.
 2        ATTORNEY KANG:  Hi.  This is Katelyn
 3    Kang representing Plaintiffs.
 4        ATTORNEY REINHARDT:  This is Elizabeth
 5    Reinhardt with Cooley, also for Plaintiffs.
 6        ATTORNEY HELSTROM:  Zoe Helstrom, with
 7    Cooley, also for Plaintiffs.
 8        ATTORNEY SWAMINATHAN:  This is Sruti
 9    Swaminathan from Lambda Legal also for Plaintiff.
10        ATTORNEY SCRUGGS:  Johnathan Scruggs with
11    Alliance for Freedom for the intervening Defendants.
12    And also with me on the Zoom is Rachel Csutoros, also
13    for the intervening Defendant.
14        ATTORNEY CROPP:  This is Jeffery Cropp
15    from Steptoe & Johnson representing the Defendants
16    Harrison County Board of Education and Superintendent
17    Dora Stutler.
18        ATTORNEY GREEN:  This is Roberta Green
19    here on behalf of West Virginia Secondary School
20    Activities Commission.
21        VIDEOGRAPHER:  And if that is everyone we
22    can begin.
23        ATTORNEY TRYON:  Is Kelly on the line?
24    Did I miss that?
```

## Page 13

```
 1        ATTORNEY GREEN:  Actually I just got a
 2    text from Kelly that she can't locate the link.
 3        ATTORNEY VEROFF:  Let's go off the record
 4    while we reach out to her.
 5        VIDEOGRAPHER:  Going off the record.  The
 6    time reads 10:08 a.m.
 7    OFF VIDEOTAPE
 8        ---
 9    (WHEREUPON, A SHORT BREAK WAS TAKEN.)
10        ---
11    ON VIDEOTAPE
12        VIDEOGRAPHER:  We are back on the record.
13    The current time reads 10:08 Eastern Standard Time.
14        ATTORNEY MORGAN:  This is Kelly Morgan on
15    behalf of the West Virginia Board of Education and
16    Superintendent Burch.
17        ATTORNEY TRYON:  Okay.
18        Then I think we will move forward now.
19    So prior to going on the record we would limit
20    objections to objection to privilege, objections to
21    scope and objections to form which would include all
22    other objections, and that is when we say objection
23    we'll preserve those objections.  Is that acceptable to
24    you, Julie?
```

0496

Page 14

1          ATTORNEY VEROFF:  Yes, thank you so much.
2          ATTORNEY TRYON:  Does anybody else have
3     any objection to doing it that way?  Okay.  Then let's
4     move forward.
5                         ---
6                    EXAMINATION
7                         ---
8     BY ATTORNEY TRYON:
9     Q.   Hello, Professor Fry.  How are you?
10    A.   Doing well.  Thank you.
11    Q.   Do you prefer calling you Professor Green ---
12    excuse me Professor Fry?  Does that work?
13    A.   Sure.
14    Q.   Okay.
15         Can you state your full name for the record
16    please?
17    A.   Mary Diane Fry.
18    Q.   Are you represented by counsel this morning?
19    A.   Yes.
20    Q.   And who is your --- primarily representing you
21    today?
22    A.   Julie, Julie Veroff.
23    Q.   Great.  And have you been deposed before?
24    A.   I have not.

Page 15

1     Q.   Have you testified in court before?
2     A.   One time.
3     Q.   Tell me about that.
4     A.   Years ago my husband and I returned from our
5     honeymoon and we found out we had been robbed.  And a
6     neighbor had seen three guys crawling out of our bedroom
7     window, and so I appeared in court to share what was
8     missing when we returned.
9     Q.   Well, I'm sorry.  That doesn't sound like a
10    great way to end a honeymoon.  So any other times you
11    testified at trial?
12    A.   No.
13    Q.   And when we're speaking, you know, since we're
14    in a deposition, this is a communication privilege
15    unlike any other, but one of the things that we need to
16    make to make it easier for the court reporter to
17    understand what we're doing.  So when I ask you a
18    question please make sure you answer verbally as opposed
19    to just nodding your head.
20         Okay?
21    A.   Okay.
22    Q.   If you don't understand a question that I ask
23    you, tell me and I'll try and rephrase.
24         All right?

Page 16

1     A.   Sounds good.
2     Q.   And if you answer I'll have to assume that you
3     understood the question.  Do you understand that?
4     A.   Yes.
5     Q.   And as we stated off the record, if you need a
6     break at any time, let us know.  We will break for you
7     and the only caveat on that is once I ask a question you
8     have to wait until you finish your answer before we can
9     take a break.
10         All right?
11    A.   Okay.  Thank you.
12    Q.   Do you have any questions about this proceeding
13    before we get started?
14    A.   No.
15    Q.   Okay.
16         Well, just for the record, this deposition is
17    being conducted as on Cross Examination.  And Professor
18    Fry, did you bring any documents to the deposition
19    today?
20    A.   Yes.
21    Q.   What did you bring?
22    A.   I have before me my Declaration, the House Bill,
23    my expert report and my Vitae.
24    Q.   And when you talk --- mention your Declaration,

Page 17

1     is this the first one that was filed in the case?  Is
2     that what you mean?
3     A.   Yes.
4     Q.   Is there anyone else in the room with you at
5     this point?
6     A.   No.
7     Q.   What documents did you review in preparation for
8     your deposition today?
9     A.   I reviewed my statement and my Vitae and some of
10    the Court documents, the Complaint and a cursory review
11    of some of the other statements.  I reviewed the
12    Plaintiff's statement and her mother's statement.
13    Q.   Any other Court documents besides the Complaint
14    and the statement with the Plaintiff and the mother?
15    A.   A cursory review of other expert witnesses and,
16    yeah, any of the case documents, a cursory review.
17    Q.   Which expert reports did you look at?
18    A.   I couldn't call them all by name but the expert
19    witnesses that are medical experts.
20    Q.   The Plaintiff's experts or Defendants' or both?
21    A.   Both.
22    Q.   So there is a total of, now including yours,
23    eight expert reports.  Have you seen all of those?
24    A.   You know, I'm not positive.  There was a report

Page 18

1  from two on each side and then a response, and so I ---
2  and again I didn't read these in detail, but I did have
3  a look at them.
4      Q.   Okay.
5          Was there anything in particular that you were
6  looking for when you looked through those expert
7  reports?
8      A.   No, just trying to get a sense of the case.  I
9  kept a focus on my purpose here today.
10     Q.   And so are you aware of this case?  Do you know
11 who BPJ is?
12     A.   Yes.
13     Q.   And who is BPJ?
14     A.   She is a young athlete in West Virginia who is a
15 transathlete and wanted to play sports in her school.
16     Q.   And you understand BPJ is the Plaintiff.
17         Is that right?
18     A.   Yes.
19     Q.   Do you know who Heather Jackson is?
20     A.   Her mother.
21     Q.   Have you ever spoken to either one of them?
22     A.   I have not.
23     Q.   So I presume by the same rationale you have not
24 met either one of them either.

Page 19

1          Correct?
2      A.   I have not.
3      Q.   When did you first hear about BPJ?
4      A.   About a year ago I was contacted by Plaintiff's
5  Counsel in late April.
6      Q.   And of course, don't tell me anything that your
7  counsel --- any discussions you had after you were
8  retained by counsel, but prior to being retained by
9  counsel --- well, let me back up.
10         At one point you were retained by counsel to be
11 an expert in this case.
12         Right?
13     A.   Right.
14     Q.   When was that?
15     A.   Late April, early May, I believe.
16     Q.   And what were you first told about the case
17 before you were retained?
18     A.   That this case involved a young athlete who was
19 headed to Middle School and really wanted to be able to
20 play sports.
21     Q.   Were you told which sport?
22     A.   I think so at the time.
23     Q.   So at this point in time do you know which
24 sports BPJ wanted to participate in at the time that BPJ

Page 20

1  filed the lawsuit?
2      A.   You know, it's hard to recall.  There's quite a
3  bit of water under the bridge.  I know now that she
4  wanted to do cheerleading and run track, and I'm not
5  sure I could tell you the exact date I knew either one
6  of those.
7      Q.   Okay.
8          Let me rephrase my question because I'm not
9  asking what the date was, I'm asking if you now know
10 what --- at this time what sport BPJ participated in?
11     A.   Yes.
12     Q.   And which one?
13     A.   She participated in cheerleading and now track.
14     Q.   And so it was cross-country is that the same
15 thing as track?
16     A.   Sorry, cross-country.  It's a different season,
17 cross-country.
18     Q.   Is that part of track and field or is it
19 different?
20     A.   It's a different season,  yeah.  I mean,
21 usually it's grouped together, track and cross-country,
22 but I should have said cross-country.  That is what I
23 meant.
24     Q.   Okay.

Page 21

1          At the time that you were retained had you
2  already prepared any report similar to what was
3  ultimately filed in this case on your behalf?
4      A.   Yes.
5      Q.   So tell me about that.
6      A.   Okay.
7      Q.   So let me make sure we are communicating.  So
8  before you were contacted by counsel for BPJ, had you
9  already prepared something that what was filed as your
10 Declaration?
11     A.   Yes.
12     Q.   Okay.
13         Tell me about that.
14     A.   Okay.
15         In the spring of 2020 I was contacted to see if
16 I would be willing to be an expert witness first in the
17 Connecticut case, transathlete case and then in Idaho.
18 And those sort of overlapped in the spring of 2020 a
19 little bit, but I've been involved in providing expert
20 reports for both of those.
21     Q.   Okay.
22         So you did serve as an expert witness in the
23 Connecticut case.
24         Is that right?

6 (Pages 18 to 21)

Page 22

1    A.  Yes.
2    Q.  Was something that you prepared filed in the
3  Connecticut case?
4    A.  Yes.
5    Q.  Same thing in the Idaho case?
6    A.  Yes.
7    Q.  Have you served as an expert witness in any
8  other cases besides those two?
9    A.  I'm serving as an expert witness in the Florida
10  case as well.
11    Q.  But you, to date, have not testified in any of
12  those cases.
13    Right?
14    A.  That's correct.
15    Q.  And you haven't been deposed in those cases
16  either I take it.
17    Right?
18    A.  That's right.  I have not.
19    Q.  Have you actually prepared an expert report for
20  Florida at this point?
21    A.  Yes.
22    Q.  Has that been submitted to court yet?
23    A.  I believe so.
24    ATTORNEY TRYON:  At this point your

Page 23

1  initial report that was filed with the court, the
2  initial Declaration.  Let's mark that as Exhibit-1 and I
3  will ask the court reporter to bring that up.
4    ---
5    (Whereupon, Exhibit 1, Declaration,
6    marked for identification.)
7    ---
8  BY ATTORNEY TRYON:
9    Q.  And feel free to look at your hard copy as we
10  are discussing these exhibits, okay, Professor?
11    A.  Okay.
12    ATTORNEY VEROFF:  Sorry.  I think this is
13  the expert report and I think you were asking for the
14  Declaration.
15    ATTORNEY TRYON:  Yes, right.
16    VIDEOGRAPHER:  My apologies.
17    ATTORNEY TRYON:  It should have the Court
18  stamp on the left at the top as I recall.
19    VIDEOGRAPHER:  I see that.  My apologies.
20  BY ATTORNEY TRYON:
21    Q.  So first of all, I want to establish that this
22  is the Declaration that you first prepared for this
23  case.
24    Is that right?

Page 24

1    A.  Yes.
2    ATTORNEY TRYON:  And Jake, do you have
3  that marked as Exhibit-1?  Are you able to do that?
4    VIDEOGRAPHER:  I don't have it marked
5  with a sticker at the moment, but I can mark them if you
6  want me to.
7    ATTORNEY TRYON:  Yes.  That would be
8  great.
9    VIDEOGRAPHER:  Okay.
10    ATTORNEY TRYON:  And what I would like to
11  do, the expert report, which is the one that you
12  previously brought up, Jake, that would be Exhibit-2.
13  So if you could bring that up and make sure we all
14  understand what Exhibit-2 is.
15    ---
16    (Whereupon, Exhibit 2, Expert Report of
17    Dr. Fry, was marked for identification.)
18    ---
19    ATTORNEY TRYON:  Will you be able to mark
20  these while we are in this proceeding, Jake.
21    VIDEOGRAPHER:  I have it on my computer
22  but I'm not on my computer at the moment.  I don't think
23  I can unless we could go off record for me to do so.
24    ATTORNEY TRYON:  We will keep on going

Page 25

1  and ask if you recognize what they are and then maybe
2  during a break you can do that.
3    VIDEOGRAPHER:  That works for me.
4    ATTORNEY TRYON:  And for the record we
5  will be looking at the statute, which we will be marking
6  as Exhibit-3 to this deposition.
7    ---
8    (Whereupon, Exhibit 3, HB-3293, was
9    marked for identification.)
10    ---
11  BY ATTORNEY TRYON:
12    Q.  So now let's go to Exhibit-2, which is your
13  current expert report.  I'm going to try to manipulate
14  my page so I can see you, Professor, at the same time.
15  I can switch this over to another screen, but it's not
16  working.  Let's try this.  All right.  So looking at
17  Number 4 --- let me back up, paragraph number three, you
18  say you have knowledge of the matters stated in this
19  expert report and Declaration.  I have collected and
20  cite to relevant literature concerning the issues that
21  arise in this litigation.  Do you see that?
22    A.  Yes.
23    Q.  So what are the issues that arise in this
24  litigation as you understand it?

Page 26

1    ATTORNEY VEROFF:  I'm sorry.  I'll just
2  object to the extent that complete paragraph three
3  wasn't read.
4    ATTORNEY TRYON:  Okay.
5  BY ATTORNEY TRYON:
6    Q.  Okay.
7    Feel free to read the entire paragraph if you
8  want but I'm just asking about that specific clause.
9    A.  The issues that are relevant are that there's a
10  categorical exclusion of transathletes.  And that is of
11  concern because of the many benefits that athletes reap
12  from having the opportunity to participate in sports.
13    Q.  Any other issues that arise in this litigation?
14    A.  Nothing comes to mind at the moment.
15    Q.  So that's what you refer to when you say issues
16  arise in this litigation, and you said the categorical
17  exclusion of transgender athletes because of benefits
18  athletes receive from sport.  Is that about right?  It's
19  not exactly what you said, but that is about right?
20    A.  Yeah, because of the categorical exclusion of
21  transgender athletes in sports that prevent them from
22  having opportunities to reap all the benefits in sport.
23    Q.  You have said already on the record and you also
24  say in paragraph four that in preparing this expert

Page 27

1  report and Declaration I reviewed West Virginia HB-3293,
2  the bill at issue in this litigation.
3    Right?
4    A.  Yes.
5    Q.  So how --- did you read the entire thing?
6    A.  The entire bill?
7    Q.  That's my question.
8    A.  Yes, yes.
9    Q.  What did the legislature say the purpose is?
10    A.  Well, to prevent transgender females from
11  participating in a sport in West Virginia.
12    Q.  The bill does not use the word transgender at
13  all, does it?
14    ATTORNEY VEROFF:  Sorry.  Mr. Tryon, I'm
15  going to object.  If you're going to ask the witness
16  about the bill, if you could please put it up on the
17  screen so she could have it in front of her.
18    ATTORNEY TRYON:  We will do it in a
19  moment.  I think she's looking at it anyway, so it's
20  been put up on the screen.
21    ATTORNEY VEROFF:  Is that right,
22  Professor Fry?  Do you have a hard copy of the bill in
23  front of you?
24    THE WITNESS:  Yes.

Page 28

1    ATTORNEY TRYON:  So that would be
2  Exhibit-3.  Are you finding that, Jake?  You're muted.
3    VIDEOGRAPHER:  I'm looking in my folder.
4  I just had it this morning.  It might be on my other
5  computer.  Counsel, if you want to go off the record I
6  can grab that and then get the software to mark these
7  for you.
8    ATTORNEY TRYON:  Okay.
9    How long would that take?
10    VIDEOGRAPHER:  Three minutes.
11    ATTORNEY TRYON:  Okay.
12    Let's do that.
13    VIDEOGRAPHER:  Okay.
14    I apologize truly.  Going off the record.
15  The current time reads 10:30 a.m.
16  OFF VIDEOTAPE
17    ---
18  (WHEREUPON, A SHORT BREAK WAS TAKEN.)
19    ---
20  ON VIDEOTAPE
21    VIDEOGRAPHER:  We are back on the record.
22  The current time reads 10:34 a.m. Eastern Standard Time.
23    ATTORNEY TRYON:  And Jake, if you could
24  bring up Exhibit-3 now, please, which is the HB-3293.

Page 29

1  So this has previously been marked but for this
2  deposition we will mark it as Exhibit-3.
3  BY ATTORNEY TRYON:
4    Q.  So this is the House Bill that you --- the law
5  that you reviewed, Professor Fry?
6    A.  Yes.
7    Q.  Excuse me.  And nowhere in here does it use the
8  word transgender, does it?
9    A.  No.
10    ATTORNEY VEROFF:  Objection.
11  BY ATTORNEY TRYON:
12    Q.  Take a look at paragraph one --- excuse me,
13  page one, under 18-2-25(e), line 1A, it starts A,
14  legislature hereby finds there are inherent differences
15  between biological males and biological females and that
16  these differences are cause for celebration as
17  determined by the Supreme Court of the United States in
18  United States versus Virginia 1996, in parentheses.  Do
19  you see that?
20    A.  Yes.
21    Q.  Do you agree with that statement?
22    ATTORNEY VEROFF:  Objection.
23  BY ATTORNEY TRYON:
24    Q.  Go ahead.

Page 30

1    A.   Yes.
2    Q.   **Number two in parentheses says, these inherent**
3    **differences are not a valid justification for sex-based**
4    **classifications that make overbroad generalizations or**
5    **perpetuate the legal, social and economic inferiority of**
6    **either sex.  Rather these inherent differences are a**
7    **valid justification for sex-based classifications when**
8    **they realistically reflect the fact that the sexes are**
9    **not similarly situated in certain circumstances, as**
10   **recognized by the Supreme Court of the United States in**
11   **Michael V. Sonoma County Association of Intercollegiate**
12   **Athletics, and NIA in parentheses or National Junior**
13   **College Athletic Association.  I goofed that.  Sorry.  I**
14   **skipped a page.  So continuing it said in Michael M. v.**
15   **Sonoma County Superior Court 1981, in parentheses, and**
16   **Supreme Court of Appeals in West Virginia in Israel v.**
17   **Secondary Schools Commission in 1989 in parentheses.**
18   **Other than the citations of those cases do you agree**
19   **with that statement?**
20        ATTORNEY VEROFF:  Objection.
21        THE WITNESS: I believe that it's more
22   complex than just to have a binary understanding of
23   males and females.
24   BY ATTORNEY TRYON:

Page 31

1    Q.   **So let me restrict my question to this part.  It**
2    **says these inherent differences are a valid**
3    **justification for sex-based classifications when they**
4    **realistically reflect the fact that sexes are not**
5    **similarly situated in certain circumstances.  That**
6    **clause, do you agree with or disagree with?**
7        ATTORNEY VEROFF:  Objection.
8        THE WITNESS: Yeah, I would just say that
9    it's all --- more complex than just saying that we have
10   males and females.
11   BY ATTORNEY TRYON:
12   Q.   **Okay.**
13        **I'm sorry, what did you say last?**
14   A.   Yeah, that it's more complex than just
15   considering males --- everyone fits tightly into a male
16   or female category.
17   Q.   **And so you would disagree with that statement?**
18        ATTORNEY VEROFF:  Objection.
19        THE WITNESS:  Yeah, I would agree with
20   the first sentence, that we shouldn't use these to
21   discriminate.
22   BY ATTORNEY TRYON:
23   Q.   **Does that specific clause, you don't agree with**
24   **that, is that a fair statement?**

Page 32

1        ATTORNEY VEROFF:  Objection.
2        THE WITNESS: The first sentence of number
3    two?
4    BY ATTORNEY TRYON:
5    Q.   **I'm sorry.  Let me make sure we're clear on the**
6    **record.  The phrase that says these inherent differences**
7    **are a valid justification for sex-based classifications**
8    **when they realistically reflect the fact that sexes are**
9    **not similarly situated in certain circumstances, that**
10   **clause, as I understand your testimony, you do not agree**
11   **with in its entirety.  Is that true?**
12        ATTORNEY VEROFF:  Sorry, Mr. Tryon.
13   Objection.
14        THE WITNESS: Right, that's true.
15   BY ATTORNEY TRYON:
16   Q.   **Okay.**
17        **Number three, it says in the context of sports**
18   **involving competitive stellar contact --- actually,**
19   **strike that.**
20        **Let's move down.  I want to make sure I**
21   **understand.  These are using terms that are defined**
22   **below, so I want to see if we have a mutual agreement on**
23   **the meaning of these terms.  And on line 25, as shown on**
24   **the left-hand side, it defines, quote, biological sex,**

Page 33

1    **closed quote, means an individual's physical form as a**
2    **male or female based solely on the individual's**
3    **reproductive biology and genetics at birth.  Do you see**
4    **that?**
5    A.   Yes, I see that.
6    Q.   **Is that a fair definition of biological sex?**
7        ATTORNEY VEROFF:  Objection.
8        THE WITNESS: I disagree.  I think it is
9    more complex than that.
10   BY ATTORNEY TRYON:
11   Q.   **Okay.**
12        **How would you define biological sex?**
13        ATTORNEY VEROFF:  Objection.
14        THE WITNESS:  Based on multiple factors
15   besides just the reproductive biology in genetics at
16   birth.
17   BY ATTORNEY TRYON:
18   Q.   **Okay.**
19        **And what would your definition be?**
20        ATTORNEY VEROFF:  Objection.
21        THE WITNESS: I'm not sure.
22   BY ATTORNEY TRYON:
23   Q.   **Okay.**
24        **Well, the reason I ask is because we are**

Page 34

1    probably using these terms throughout this deposition
2    today, so I'm trying to make sure we have a mutual
3    understanding of what biological sex means.  So I don't
4    want to try and impose upon you a definition that you
5    are uncomfortable with.
6        A.   Okay.
7        Q.   So if you could give me something that you would
8    be comfortable with, I would appreciate it.
9             ATTORNEY VEROFF:  Objection.
10            THE WITNESS:  Yeah, I would feel more
11   comfortable --- yeah, I'm not sure, to be honest.
12   BY ATTORNEY TRYON:
13       Q.   All right.
14            So I assume that the definition of female in
15   here you're also uncomfortable with.  Is that a fair
16   statement?
17       A.   Yes.
18            ATTORNEY VEROFF:  Objection.
19   BY ATTORNEY TRYON:
20       Q.   How about the definition of male, can we reach
21   an agreement that male means an individual whose
22   biological sex determined at birth is male?
23            ATTORNEY VEROFF:  Objection.
24            THE WITNESS: Yes, I would not agree with

Page 35

1    that.
2    BY ATTORNEY TRYON:
3        Q.   You would not agree with that.  Does the word
4    male have a meaning to you?
5             ATTORNEY VEROFF:  Objection.
6             THE WITNESS: Yes.  I feel like it's
7    related to how people see themselves in terms of male or
8    female.
9    BY ATTORNEY TRYON:
10       Q.   So it's only --- the term male only means how
11   somebody sees him or herself?
12            ATTORNEY VEROFF:  Objection.
13            THE WITNESS:  They view their identity as
14   male and female, I think that's the critical thing.
15   BY ATTORNEY TRYON:
16       Q.   And does biology have any importance at all?
17            ATTORNEY VEROFF:  Objection.
18            THE WITNESS: Yes, it does.  It's just not
19   the only factor.
20   BY ATTORNEY TRYON:
21       Q.   So how about this, how about if we will refer to
22   male today, male or boy, we mean someone whose birth ---
23   on whose Birth Certificate it designates them as male or
24   as male?

Page 36

1             ATTORNEY VEROFF:  Objection.
2    BY ATTORNEY TRYON:
3        Q.   Can we use that as a definition today?
4             ATTORNEY VEROFF:  Objection.
5             THE WITNESS:  I think it's more
6    appropriate to use the term to refer to people who
7    identify as male.
8    BY ATTORNEY TRYON:
9        Q.   So you don't think there is such a thing as a
10   biological male?  Is that what you are telling me?
11            ATTORNEY VEROFF:  Objection.
12            THE WITNESS:  I think term biological
13   male is a complex term, that a lot goes into that.
14   BY ATTORNEY TRYON:
15       Q.   You're familiar with the term cismale, right?
16       A.   Yes.
17       Q.   What does that mean?
18       A.   Well, first is somebody whose identity aligns
19   with their birth characteristics.
20       Q.   Okay.
21            What birth characteristics are those?
22            ATTORNEY VEROFF:  Objection.
23            THE WITNESS:  I think the male, female
24   category works in general, but there is people who fall

Page 37

1    in between and may not be from a biological perspective
2    nice and tightly categorized into either of those
3    categories.  So when I say it is complex, it is is not
4    just the way somebody was born or one particular, you
5    know, physical characteristic or so.
6    BY ATTORNEY TRYON:
7        Q.   Well, I'm just try to understand the term you
8    just gave me.  You said that cisgender is someone that
9    identifies in the same --- identifies with the sex that
10   corresponds with their birth characteristics.  And I'm
11   asking what you meant when you said birth
12   characteristics.
13            ATTORNEY VEROFF:  Objection.
14            THE WITNESS:  Yeah, I feel like there's
15   medical terms that go beyond my expertise.  But in my
16   understanding, someone can be born and have
17   characteristics of cross gender.  So using just a binary
18   system where we categorize and put everyone in either a
19   male or female category is limiting and not helpful.
20   BY ATTORNEY TRYON:
21       Q.   So then what is a cisgender person?
22            ATTORNEY VEROFF:  Objection.
23            THE WITNESS:  Someone who may align
24   physically at birth with one of the genders.  And also

Page 38

1  when I say align, those match up with how they perceive
2  themselves along with their birth characteristics.
3  BY ATTORNEY TRYON:
4      Q.   Again you use that term birth characteristics.
5  I need to know what you mean by that.
6          ATTORNEY VEROFF:  Objection.
7          THE WITNESS:  Again, using this in --- in
8  --- from my perspective, I would listen to the doctors
9  who study this and say that we can't just classify
10  people tightly into these categories.  And some people
11  may share characteristics of either gender at birth and
12  so it may be more complicated.
13  BY ATTORNEY TRYON:
14      Q.   So we still don't even have a definition of
15  cisgender from you.
16          ATTORNEY VEROFF:  Objection.
17  BY ATTORNEY TRYON:
18      Q.   So you don't know what birth characteristics
19  are?  Is that what you are telling me?
20          ATTORNEY VEROFF:  Objection, asked and
21  answered?
22          THE WITNESS:  Yeah, I think some people
23  are born and they fit nicely into these categories of
24  male and female.  I'm just acknowledging that not

Page 39

1  everyone does.  And if they do fit nicely into those,
2  nicely just meaning that they are --- they, you know,
3  are considered male at birth and they also perceive that
4  they are than --- or the other way is female, then that
5  would be a cisgender person.
6          ATTORNEY TRYON:  Jake, how do I get to
7  the live feed?
8          VIDEOGRAPHER:  You mean like the video
9  feed or like the real time?
10          ATTORNEY TRYON:  Yes.
11          VIDEOGRAPHER:  Give me one sec, I'll
12  repost the link.
13          ATTORNEY TRYON:  Are you going to put
14  that in the chat room?
15          VIDEOGRAPHER:  It should be visible now.
16  BY ATTORNEY TRYON:
17      Q.   When you --- you used the term now considered
18  male at birth.  Can you tell me what you mean by that?
19          ATTORNEY VEROFF:  Objection.
20  BY ATTORNEY TRYON:
21      Q.   I'm not trying to trick you.  I'm just trying to
22  establish some definition so we can communicate properly
23  today.
24      A.   Yeah.

Page 40

1          ATTORNEY VEROFF:  Objection.
2          THE WITNESS:  Yeah, I think a medical
3  professional says that a baby has all the
4  characteristics of a male, right.  I'm just simply
5  saying that everyone doesn't fit nice and tightly into
6  that male or female, that there's two cross overs that
7  the doctors seem to agree on.
8  BY ATTORNEY TRYON:
9      Q.   And what the doctors seem to agree on is what
10  they put on the Birth Certificate, right, at least
11  initially?  Fair statement?
12          ATTORNEY VEROFF:  Objection.
13          THE WITNESS:  Yeah.  I'd say in general
14  doctors choose one or the other that's closest.
15  BY ATTORNEY TRYON:
16      Q.   So at least for purposes of today, when I say
17  male or boy can we agree that I'm referring to someone
18  who on the Birth Certificate, the original Birth
19  Certificate, it is stated that that person is male?
20      A.   I can agree to proceed that way.
21      Q.   Okay.
22          And the same thing with respect to female or
23  girl.
24          Right?

Page 41

1          ATTORNEY VEROFF:  Objection.
2          THE WITNESS:  Yes.  Can we also agree
3  that if I -- that I can use the term transfemale to
4  refer to someone who may share characteristics across
5  gender and may identify as a female?
6  BY ATTORNEY TRYON:
7      Q.   Let's be clear on that.  Please tell me what
8  your definition of trans --- let's first cite what does
9  transgender mean?
10          ATTORNEY VEROFF:  Objection.
11          THE WITNESS:  Transgender refers to
12  someone who may have been classified as birth as one
13  gender but identifies as the other gender.
14  BY ATTORNEY TRYON:
15      Q.   And then transgender girl, can you give me your
16  definition of that?
17      A.   Yes, someone who may have been assigned the male
18  sex at birth and identifies as female.
19      Q.   And then transgender boy?
20      A.   Someone who may have been assigned female ---
21  assigned a female gender at birth but perceives ---
22  identifies with a male sex, male gender.
23      Q.   Now, when I asked you about transgender you said
24  someone classified at birth.  And then when I asked you

11 (Pages 38 to 41)

JA7602 0503

Page 42

1  about transgender girl you said assigned.  Is there a
2  difference between classified and assigned in your mind?
3          ATTORNEY VEROFF:  Objection.
4          THE WITNESS: No, there wasn't a
5  distinction there.
6  BY ATTORNEY TRYON:
7      Q.   Okay.
8          And could that sex of a child be assigned
9  before birth?
10          ATTORNEY VEROFF:  Objection.
11          THE WITNESS:  Yeah, possibly.
12  BY ATTORNEY TRYON:
13      Q.   Going back to the bill itself, on line 12, on
14  page two, in the context of sports involving competitive
15  skill or contact biological males and biological females
16  are not, in fact, similarly situated.  Do you agree with
17  that statement?
18          ATTORNEY VEROFF:  Objection.
19          THE WITNESS: I'm not sure what that
20  statement means by the fact similarly situated.
21  BY ATTORNEY TRYON:
22      Q.   Okay.
23          Let's go to the next sentence.  Biological
24  males would displace females to a substantial extent if

Page 43

1  permitted to compete on teams designated for biological
2  females and then it cites a case.  Do you agree with
3  that statement?
4          ATTORNEY VEROFF:  Objection.
5          THE WITNESS: I believe there can be a
6  fair playing ground for people who are born male and who
7  receive treatment, follow the rules and play the sport
8  for them to be able to participate as females.
9  BY ATTORNEY TRYON:
10      Q.   So I take it you do not fully agree with that
11  statement.
12          Is that a fair statement?
13      A.   Yeah.
14          ATTORNEY VEROFF:  Objection.
15          THE WITNESS: I do not.
16  BY ATTORNEY TRYON:
17      Q.   Item Number 5, line 21 says, classification of
18  teams according to biological sex is necessary to
19  promote equal athletic opportunities for the female sex.
20  Do you agree with that statement?
21          ATTORNEY VEROFF:  Objection.
22          THE WITNESS:  Not if it means excluding
23  transgender athletes.
24  BY ATTORNEY TRYON:

Page 44

1      Q.   Okay.
2          I need to apologize at this point.  On the
3  floor where I'm at they are doing construction, so
4  periodically you may hear pounding or other noise, and
5  I'm sorry about that.
6          Let me ask you about the definition of another
7  word that appears periodically, the word arbitrary.  And
8  I looked that up in a dictionary, an online dictionary,
9  Cambridge.org, and the definition it gave me was based
10  on chance rather than being planned or based on reason.
11  Is that a fair definition of arbitrary?
12          ATTORNEY VEROFF:  Objection.
13          THE WITNESS: I'm not sure.
14  BY ATTORNEY TRYON:
15      Q.   Okay.
16          What is your definition of arbitrary?
17          ATTORNEY VEROFF:  Objection.
18          THE WITNESS: I'm not sure.
19  BY ATTORNEY TRYON:
20      Q.   You have a Bachelor's Degree.
21          Right?
22      A.   I do.
23      Q.   And a Master's Degree.
24          Right?

Page 45

1      A.   Yes.
2      Q.   So I recall you also have a Ph.D.
3          Is that right?
4      A.   That is right.
5      Q.   And you can't define for me what arbitrary
6  means?
7          ATTORNEY VEROFF:  Objection.
8          THE WITNESS: No, not at the moment.
9  BY ATTORNEY TRYON:
10      Q.   You used the word arbitrary in this report, yet
11  you don't know what it means?
12          ATTORNEY VEROFF:  Objection.
13          THE WITNESS: Yeah.  Do you want to go to
14  where I used it?
15  BY ATTORNEY TRYON:
16      Q.   No.  I want to know if you, in fact, don't know
17  what arbitrary means?
18          ATTORNEY VEROFF:  Objection.  I think the
19  witness has asked to see where term is used in her
20  report.  And it would be helpful to show it to her for
21  context.
22          ATTORNEY TRYON:  Thank you, Counsel.  I
23  would like the witness to tell me how she doesn't know
24  --- since she has a Ph.D., she can't tell me what

Page 46

1    arbitrary means.  And then you won't even agree with the
2    definition that I found in the Cambridge.org Dictionary.
3         ATTORNEY VEROFF:  Objection.
4         THE WITNESS: Can you repeat that
5    definition again?
6    BY ATTORNEY TRYON:
7         **Q.    Based on chance rather than being planned or**
8    **based on reason.**
9         A.    Okay.
10            I'm going to go back and accept that.
11        **Q.    Okay.**
12            **In paragraph seven of your report --- we can go**
13   **back to the report now.  This is Exhibit-2.  In**
14   **paragraph seven that is on the screen or you can look at**
15   **your hard copy, you mention that you spent five years**
16   **teaching physical education and coaching tennis at**
17   **schools and summer camps.  Tell me a little bit about**
18   **your coaching tennis.**
19        A.    Yes, I was the head coach of both the boys and
20   the girls team, high school.  And the --- we had a
21   varsity and a junior varsity team.  They competed in the
22   fall season.  That was a team competition.  And then the
23   individual in spring, so it is a year-round sport in
24   Texas.

Page 47

1         **Q.    So why did they divide it between varsity and**
2    **junior varsity?**
3         A.    Because some of the kids are --- because it
4    gives the more advanced athletes a chance to compete at
5    the varsity level and can be very inclusive and give a
6    lot of kids an opportunity to play also as well with a
7    junior varsity.
8         **Q.    And you had no problem with that, right?**
9         ATTORNEY VEROFF:  Objection.
10        THE WITNESS:  That's right.
11   BY ATTORNEY TRYON:
12        **Q.    And then you said they divided it into boys and**
13   **girls teams.  Why did they do that?**
14        ATTORNEY VEROFF:  Objection.
15        THE WITNESS: Because, in general, that
16   classification works, but there are exceptions to it.
17   BY ATTORNEY TRYON:
18        **Q.    And when you said boys, what did you mean by**
19   **boys?**
20        A.    I mean those who may have been classified as a
21   male in their lives and also identify that way.
22        **Q.    So the team, the tennis team was based on those**
23   **who were born, classified as males and also identified**
24   **that way?**

Page 48

1         A.    Again, I can't speak for every athlete.
2         **Q.    And then when you said there was a girls team,**
3    **what did that mean?  What did you have to be to be on**
4    **the girls team?**
5         A.    Yeah.  And in general, they are females and see
6    that classification as appropriate and participate as
7    females.
8         **Q.    And why is that classification appropriate for**
9    **tennis?**
10        ATTORNEY VEROFF:  Objection.
11        THE WITNESS:  I think it's in general
12   appropriate to have --- to let males and females compete
13   separately.
14   BY ATTORNEY TRYON:
15        **Q.    Is that because in general males are better at**
16   **tennis?**
17        ATTORNEY VEROFF:  Objection.
18        THE WITNESS: I wouldn't agree with that.
19   BY ATTORNEY TRYON:
20        **Q.    Then why is it appropriate to let them compete**
21   **separately?**
22        ATTORNEY VEROFF:  Objection.
23        THE WITNESS: Yeah, I think males would,
24   in general, due to, you know, their physical

Page 49

1    characteristics would have a --- could have an
2    advantage.
3    BY ATTORNEY TRYON:
4         **Q.    What kind of advantage?**
5         ATTORNEY VEROFF:  Objection.
6         THE WITNESS: Yeah, greater --- greater
7    testosterone levels, which can lead to --- which can
8    impact muscle mass and size.
9    BY ATTORNEY TRYON:
10        **Q.    As the coach, did you actually observe that**
11   **there was a difference, performance difference between**
12   **boys and girls teams?**
13        A.    I would ---.
14        **Q.    I'm sorry.  Let me rephrase that.  As the coach,**
15   **did you actually observe that there was a performance**
16   **difference between boys and girls?**
17        A.    Yes.
18        ATTORNEY VEROFF:  Objection.
19        THE WITNESS: I think if you compare the
20   mean level of ability across the two, then there is a
21   moderate difference, but there was --- there was big
22   differences within each gender.  I had some very
23   talented males and some males that were not very
24   talented.  And the same with females.  Ability levels

Stinson 0505

Page 50

1    really varied.  And I had females across my years
2    coaching high school that were stronger than males.  So
3    it is not a --- you have to be careful to say that every
4    male out performs every female because that has not been
5    my experience.
6    BY ATTORNEY TRYON:
7        Q.   Understood.  On the average, though, is it safe
8    to say that the boys out perform the females?
9             ATTORNEY VEROFF:  Objection.
10            THE WITNESS: Right, if we just look at a
11   mean across the gender, yes.
12   BY ATTORNEY TRYON:
13       Q.   Okay.
14            You used the word mean instead of average.  Can
15   you explain?
16       A.   Yes, on average.
17       Q.   Okay.
18            I just want to make sure we are communicating
19   correctly.
20       A.   Sure.
21       Q.   Have you ever done --- looked at the standard
22   deviation, the bell curve for each of those groups?
23            ATTORNEY VEROFF:  Objection.
24            THE WITNESS:  I'm familiar with the bell

Page 51

1    curve.  Do you mean ---?
2    BY ATTORNEY TRYON:
3        Q.   Okay.
4             Have you looked at the bell curve for
5    performance between those two groups of tennis players,
6    boys versus girls?
7             ATTORNEY VEROFF:  Objection.
8             THE WITNESS:  Okay.
9             I have been --- I haven't collected data
10   that I could share from when I coached high school.
11   What I could say is that, if we took any skill, let's
12   say their ability to serve accurately or hit a crisp
13   volley or hit a solid backhand across the court, that
14   their --- those bell curves are very close to each
15   other, but overall for just looking at the two groups
16   the boys could have a slight advantage.  But those two
17   bell curves, if we are looking at the bottom of those,
18   you're going to say there is tremendous variability with
19   the males and females.  And so it is easy to get kind of
20   focused on this small mean difference across gender when
21   there is huge differences across, you know, each gender
22   as well.
23   BY ATTORNEY TRYON:
24       Q.   Understood.  As far as the first standard

Page 52

1    deviation, do you know if the first standard deviation
2    would overlap between two groups?
3             ATTORNEY VEROFF:  Objection.
4             THE WITNESS:  I think so in high school
5    tennis, right.
6    BY ATTORNEY TRYON:
7        Q.   Okay.
8             Have you actually --- that's from just your
9    generalized experience, but have you actually done a
10   data compilation to determine that?
11            ATTORNEY VEROFF:  Objection.
12            THE WITNESS:  No.
13   BY ATTORNEY TRYON:
14       Q.   Do you know of such a thing, any studies that do
15   that?
16       A.   I couldn't identify specifically studies, but
17   when I see these things like if I --- if I pick up the
18   Kansas City paper or after the marathon I see males and
19   females interspersed all the way through with their
20   times, right.  So it's not a thing where every male that
21   ran the marathon out performed every female that ran the
22   marathon.  So I think it's pretty consistent that those
23   differences are smaller, too, if we are not talking
24   about the elite of elite athletes.

Page 53

1        Q.   When you were coaching, how long did you coach?
2        A.   I coached four years full time and then my
3    graduate program at Greensboro I was --- I had an
4    assistantship at a Middle School to teach --- to assist
5    teachers with teaching physical education.
6        Q.   In paragraph eight of your report it says that
7    you graduated with a Master of Science in sports
8    psychology/pedagogy from the University of North
9    Carolina in Greensboro, North Carolina, in 1990.  During
10   that did you take any classes in sports biomechanics?
11       A.   I believe I took one.
12       Q.   What is sports biomechanics?
13       A.   Sports biomechanics looks at the study of
14   movement and how to optimize skills and movement
15   patterns.
16       Q.   And is it fair to say that the biomechanics of
17   males and females are different?
18            ATTORNEY VEROFF:  Objection.
19            THE WITNESS:  With regard to everything
20   across the board, like walking?
21   BY ATTORNEY TRYON:
22       Q.   In athletics --- well, we'll talk about in
23   walking.  Is it different in walking?
24            ATTORNEY VEROFF:  Objection.

Page 54

1       THE WITNESS: I would say there is more
2   similarity across the genders, more variability with age
3   than across genders on most movements.
4   BY ATTORNEY TRYON:
5       **Q.   Okay.**
6       **So you don't think there is a difference**
7   **between males and females in the context of**
8   **biomechanics?**
9       ATTORNEY VEROFF:  Objection.
10      THE WITNESS:  Yeah, I think I just need
11  something more specific, right, if males in general can
12  generate more power or something in a particular
13  movement, that may be the case.  It is not my area of
14  expertise.
15  BY ATTORNEY TRYON:
16      **Q.   Okay.  Fair enough.  Are you a psychologist?**
17      A.   I am not.
18      **Q.   Are you a psychiatrist?**
19      A.   No.
20      **Q.   Have you had any clinical experience seeing any**
21  **patients?**
22      A.   Not clinical experience, no.
23      **Q.   Other types of experience seeing patients?**
24      A.   No.

Page 55

1       **Q.   And so I a presume you never treated any**
2   **patients?**
3       A.   That's correct.
4       **Q.   Have you ever worked as a counselor or social**
5   **worker?**
6       A.   No.
7       **Q.   Have you ever counseled with kids on either a**
8   **formal basis or informal basis on mental health issues?**
9       A.   I'm on the educational side of sports psychology
10  and so I might provide educational information, right,
11  about how to develop strong mental skills, right, that
12  are going to help you enjoy your sport better and
13  perform better, right.  It's all on the educational
14  side, so not on a diagnosis side or treatment of mental
15  health.  That would be beyond my credentials and I would
16  refer athletes to someone else.
17      **Q.   Okay.**
18      **Have you ever counseled with kids on gender**
19  **dysphoria issues?**
20      A.   I have not.
21      **Q.   Have you counseled with kids or young adults on**
22  **transgender issues?**
23      A.   I have not.  To say that would be beyond my
24  expertise and training.

Page 56

1       **Q.   Fair enough.**
2       ATTORNEY TRYON:  Well, we've been going a
3   little over an hour.  I'm happy to keep on going.  But
4   if you need a break, let me know.
5       ATTORNEY VEROFF:  I think it would be
6   good to take a short break.
7       VIDEOGRAPHER:  Going off the record.  The
8   current time reads 11:15 Eastern Standard Time.
9   OFF VIDEOTAPE
10      ---
11  (WHEREUPON, A SHORT BREAK WAS TAKEN.)
12      ---
13  ON VIDEOTAPE
14      VIDEOGRAPHER:  We are back on the record.
15  The current time reads 11:27 Eastern Standard Time.
16  BY ATTORNEY TRYON:
17      **Q.   In paragraph nine of your report you refer to a**
18  **Coacher's Guide of Maximizing Youth Sport Experience.**
19  **And did you write that whole book?**
20      A.   With colleagues, we did.
21      **Q.   Does that book address transgender athletes at**
22  **all?**
23      A.   It addresses how to create an environment that
24  can be inclusive and help all athletes have a great

Page 57

1   experience.  It's not specifically written --- you know,
2   it's not about about transgender athletes overall.  What
3   I would say they're included in the sense that it is
4   beneficial to be inclusive in sport.
5       **Q.   Is the term transgender, does it appear in the**
6   **book at all?**
7       A.   Beyond -- I'm not sure.
8       **Q.   When was that book written?**
9       A.   It was released in 2020.
10      **Q.   When was the first time that you became aware of**
11  **the issue of transgender girls participating in girls**
12  **sports?**
13      ATTORNEY VEROFF:  Objection.
14      THE WITNESS: I'm not sure.  Years ago.  I
15  take conferences regularly, or sports psychology
16  conference, and there has been sessions for a long time.
17      ATTORNEY TRYON:  Let me ask you to take a
18  look at some documents.  Jake, if you can pull up the
19  document Cortisole and Stress Response during the Game
20  and Practice in Female Collegiate Soccer Players.
21      VIDEOGRAPHER:  Do you want that marked?
22      ATTORNEY TRYON:  Yes, this would be
23  Number 4.
24      ---

Page 58

1        (Whereupon, Exhibit 4, Article by Dr.
2        Fry, was marked for identification.)
3        ---
4        ATTORNEY TRYON:  And just for the court
5   reporter, my name is spelled T-R-Y-O-N.
6   BY ATTORNEY TRYON:
7        Q.   Okay.
8        This is a document, an article that you wrote,
9   correct, Professor Fry?
10       A.   This was a Master's thesis from one of our
11  students and I served on her committee.
12       Q.   I see.  Who is Andrew Fry?
13       A.   He's my husband.
14       Q.   Okay.
15       Why did this document only focus on female
16  soccer players?
17       A.   Typically, in a Master's thesis you kind of can
18  keep things smaller and tighter, and it's not like a
19  doctoral dissertation I think would be one of the key
20  reasons.  There's probably been less research with
21  females and cortisol because it's a little more
22  complicated with menstrual cycles and all that, too.
23  And I think this athlete --- I'm sorry, this student was
24  very interested in any female student to the literature.

Page 59

1        Q.   Is there a difference in cortisol and stress
2   responses between male and female soccer players?
3        ATTORNEY VEROFF:  Objection.
4        THE WITNESS:  Yeah, you know, this is ---
5   I would need to review this.  And again, it's beyond my
6   expertise in looking at gender differences in cortisol.
7   BY ATTORNEY TRYON:
8        Q.   So I'm a little puzzled.  You said that you're
9   on the committee to review the students' work.  Did I
10  get that about right?
11       A.   I helped with this project, but this was her
12  thesis research, and she also had some I think
13  psychological measures.  This has been a while.  It was
14  published in 2007, but she was --- I'm not even sure I
15  could tell you what year she graduated or if this was
16  right over, but you know, quite a bit of time has
17  passed.  I would have to go back and review this and it
18  is not my primary area of expertise, but I was an author
19  on this paper.
20       Q.   So when you say you're an author, does that mean
21  you wrote portions of it or just supervised it?
22       A.   You know, it varies and I would have to go back
23  to this one.  Honestly, in reviewing it, I haven't
24  looked at this in a long time.

Page 60

1        Q.   Do you know how the student identified if
2   someone was a female?
3        A.   I think she used a female collegiate soccer team
4   and so those were female athletes on the team.
5        Q.   Do you know if any of those female athletes were
6   transfemales?
7        A.   No, I don't.
8        Q.   Would that have made a difference for the study
9   if some were transfemales and others were what I would
10  call biological females?
11       ATTORNEY VEROFF:  Objection.
12       THE WITNESS: I don't know.  And I think
13  it would depend on where the transathletes were.
14  BY ATTORNEY TRYON:
15       Q.   Where they were?  What do you mean?
16       A.   I'm sorry, where they --- I'm sorry, Dana just
17  came in with cords and I got distracted for a second.
18  With where they were in the transitioning process.
19       ATTORNEY TRYON:  Okay.
20       If you could bring up the next document,
21  Examination of the Psychometric Properties of Perceived
22  Motivational Climate in Sports Questionnaire.
23       VIDEOGRAPHER:  I'm sorry.  Can you repeat
24  that title?

Page 61

1        ATTORNEY TRYON:  Yes.  Examination of the
2   Psychometric Properties of the Perceived Motivational
3   Climate in Sports Questionnaire.
4        VIDEOGRAPHER:  Okay.
5        Just give me one moment?
6        THE WITNESS:  You may want to take this
7   home for bedtime reading tonight, right.
8        ATTORNEY TRYON:  This is now marked as
9   Exhibit-5, I believe.
10       ---
11       (Whereupon, Exhibit 5, Article, was
12       marked for identification.)
13       ---
14  BY ATTORNEY TRYON:
15       Q.   Have you seen this document before?
16       A.   I have.  It's been a while since I looked at it,
17  but, yeah, I have.
18       Q.   And what is the purpose of this document?
19       A.   So there was a measure, a perceived motivational
20  climate of sports questionnaire.  And Maria Newton in
21  her dissertation, she wanted to expand on the measure
22  and create little subscales within what we call task in
23  ego involving climates.  And I think she ran it with a
24  couple of samples here just to be able to test the

| Page 62 |
| --- |

1  psychometrics of the measure.
2  **Q.   Why was this one limited to female athletes?**
3  A.   It's a good question.  Why does any researcher
4  includes females, males and/or both?  Maria had access
5  to, as I remember, a massive tournament, volleyball
6  tournament, and could get the group onboard and be able
7  to access a lot of teams because research is hard to do.
8  You really need to be able to access a number of teams
9  and she was able to do that with this study.
10  **Q.   So you don't know why it would be separated to**
11  **be only for female athletes?**
12  A.   I think she was only interested in volleyball
13  and in particular females.
14  **Q.   Is there a difference in volleyball between**
15  **female and male athletes?**
16          ATTORNEY VEROFF:  Objection.
17          THE WITNESS: A difference in what sense?
18  BY ATTORNEY TRYON:
19  **Q.   In psychometric properties, the perceived**
20  **motivational climate?**
21  A.   Okay.
22      So while she didn't look at that in the study
23  because she only had females, so we just have to look at
24  the broader literature, right.  And the theory

| Page 63 |
| --- |

1  predictions hold up in that athletes can perceive the
2  climate as very task involving or ego involving, right.
3  And in some samples athletes, you know, males or females
4  may see it one way or another more, but the predictions
5  just align consistently that if you perceive the task
6  involving climate at least to good things.  Like people
7  have more fun and try harder, they're more committed to
8  their sports, they have better relationships with
9  others, those kind of things.
10  **Q.   All right.**
11          ATTORNEY TRYON:  I'm finished with that
12  exhibit then.  Let me then ask you some other questions.
13  BY ATTORNEY TRYON:
14  **Q.   Is your expertise limited to sports psychology?**
15  A.   Sports psychology is a broad term, you know, but
16  yes, I would say that is my expertise. I don't know if
17  you would consider youth sport as a part of that.
18  **Q.   I'm sorry.  I missed what you said.**
19  A.   The youth sport.
20  **Q.   Oh, youth support?**
21  A.   Yes, in particular within sports psychology my
22  focus has been on youth.
23  **Q.   Okay.**
24  A.   Not exclusively.

| Page 64 |
| --- |

1  **Q.   So just to be clear, you are not an exercise**
2  **physiologist, right?**
3  A.   I am not.
4  **Q.   And you are not a medical doctor.**
5      **Correct?**
6  A.   That's correct.
7  **Q.   And you don't have expertise in the science of**
8  **performance advantage, do you?**
9  A.   No.
10  **Q.   And you have no expertise in sports safety.  Is**
11  **that true?**
12  A.   Yes, true.
13  **Q.   And do you have any expertise in concussion**
14  **management?**
15  A.   No.
16  **Q.   Do you have any expertise in ACL injuries?**
17  A.   No.
18  **Q.   Have you done any research studies or papers**
19  **regarding transgender females in sports?**
20  A.   No.
21  **Q.   Have you taught any classes on that?**
22  A.   Not like a complete course, but it's a topic
23  that we can cover in our undergraduate score psychology
24  class.

| Page 65 |
| --- |

1  **Q.   And so is that a class that you teach?**
2  A.   Yes.
3  **Q.   And what exactly have you covered with regard to**
4  **transgender females in that class?**
5  A.   So late this semester I'm teaching the class and
6  later in April we have a trans --- a transfemale who is
7  a retired athlete and coach coming in for that day and
8  we will probably take a partial class before that just
9  to have some discussions and lay some groundwork.  It is
10  an educational session where we just --- we have
11  students who may be well informed and passionate about
12  transathletes in sport and we have had other students
13  who have had very little exposure.  So it's not a big
14  --- it's not a big chunk of the class, right, it's a
15  class or two that we touch on it.
16  **Q.   Aside from any research, have you attended any**
17  **seminars or classes on transgender females in sports?**
18  A.   Yes.  Typically at our national conference, the
19  Association of Applied Sports Psychology, you know,
20  that's a jampacked schedule, and probably most
21  conferences I'll sit in on a session.  Sometimes they
22  --- they will do a webinar, things like that.  So over
23  the years, yes, I have participated in those.
24  **Q.   Have you reviewed any literature on transgender**

17 (Pages 62 to 65)

christicanary 0509

Page 66

1    participation in sports to prepare your opinion in this
2    case?
3        A.   Like over the last two years I've read some.  I
4    couldn't point or identify, hey, this is exactly the
5    literature I've read.  Just someone who's reading often
6    in my --- you know, within sports psychology.
7        Q.   Your bibliography doesn't include any papers
8    studying transgender athletes, does it?
9        A.   No.
10       Q.   And have you done any studies or papers
11   regarding the harm to motivation on females when
12   biological boys or trans/transgender girls are allowed
13   to compete on girls teams?
14           ATTORNEY VEROFF:  Objection.
15           THE WITNESS: I have.
16   BY ATTORNEY TRYON:
17       Q.   Do you mean have not?
18       A.   I'm sorry, have not.
19       Q.   Have you taught any classes on that topic?
20           ATTORNEY VEROFF:  Objection.
21           THE WITNESS:  I have not.
22   BY ATTORNEY TRYON:
23       Q.   Have you attended any seminars or classes on
24   that topic?

Page 67

1            ATTORNEY VEROFF:  Objection.
2            THE WITNESS: I have not.
3    BY ATTORNEY TRYON:
4        Q.   Have you prepared any papers regarding
5    differences for motivation between males and females?
6            ATTORNEY VEROFF:  Objection.
7            THE WITNESS:  Yes.
8    BY ATTORNEY TRYON:
9        Q.   Okay.
10           Well, what are those?
11       A.   Okay.
12           I think in, oh, gosh --- in --- sometimes in
13   papers we, you know, we see if there were gender
14   differences in terms of motivation.  When there are
15   differences they're slight and we are back to that bell
16   curve mean thing that there might be a slight difference
17   but they don't impact the hypotheses in the sense that
18   --- in the sense that someone has a high task
19   orientation and/or perceives a task involving climate or
20   caring climate, whether you are male or female those
21   predictions hold up in terms of the outcomes.
22       Q.   Are there papers in your bibliography that would
23   show that to be the case that it's the same for boys and
24   girls.  Feel free to take a look at it.  You have got it

Page 68

1    there.
2            VIDEOGRAPHER:  I would note that we
3    gained another participant.  If they would identify
4    themselves for the record.
5            ATTORNEY PELET:  Good morning.  My name
6    is Valeria Pelet del Toro for Cooley, LP, for Plaintiff
7    BPJ.
8            THE WITNESS:  Thank you for that time.
9    The Hogue, Fry and Fry 2017, I have to review that
10   paper.  I can't remember if there were any gender
11   differences.  These were Middle School kids who
12   were ---.
13   BY ATTORNEY TRYON:
14       Q.   Let me stop you for just a second.  Can you tell
15   me what page that's on?
16       A.   Yes, page 14, the second from the last
17   reference.
18       Q.   And which one is it again?
19       A.   The Hogue Fry and Fry, 2017.
20       Q.   Page 14 you said?
21       A.   Yes, page 14, the second reference from the
22   bottom of the page.
23       Q.   I'm seeing Walling, M.D.
24       A.   Okay.  Sorry.

Page 69

1        Q.   Maybe the pagination is different on your copy.
2        A.   I'm sorry.  Are you looking at the expert report
3    and Declaration?
4        Q.   Yes, I am.
5        A.   Okay.
6            It should be the same.  If you go in
7    alphabetical order, Hogue with an H, H-O-G-U-E.
8        Q.   Okay.
9            Here is the issue.  I see.  Hogue, et cetera.
10       A.   Yes.
11       Q.   There's two by Hogue.  Which year?  They're both
12   2013.
13       A.   The 2017.
14       Q.   What is the title?
15       A.   The title is the Differential Impact of
16   Motivational Climate on Adolescents Psychological and
17   Physiological Stress Responses.
18           ATTORNEY TRYON:  It is on page three.
19   Can you bring that up, Jake?  It is under 14.
20           VIDEOGRAPHER:  I was trying to look for
21   it too.
22           ATTORNEY VEROFF:  I think there is two
23   page 14s.  So there is a bibliography that directly
24   follows the expert report and then there is the

Page 70

1  citations that are encompassed in Exhibit A, the first
2  page 14.
3       ATTORNEY TRYON:  Thank you, Julie, for
4  helping us out with that.  I see it now.  I'm sorry for
5  that confusion.
6  BY ATTORNEY TRYON:
7     **Q.  You were going to explain that paper.**
8     A.  I'm sorry.  Did you ask me to explain the paper?
9     **Q.  Yes.  You were starting to talk about that, so I**
10  **would appreciate if you could talk about that?**
11    A.  So in this study Middle School kids are
12  recruited to participate in an intervention.  They come
13  in and they learn an activity.  And they're assigned ---
14  randomly assigned to either caring task involving
15  climate or an ego involving climate.  And as they
16  participate across the interventions, their cortisol is
17  measured.  Cortisol is a stress hormone and it can
18  indicate that people are experiencing higher stress.
19  And so in this study we found that athletes in the
20  caring task environment climate, their cortisol levels
21  actually decreased, right, suggesting that they were not
22  stressed.  In addition they had more fun, they indicated
23  they tried harder, they made more progress learning the
24  activity, they experienced, you know, less shame, less

Page 71

1  embarrassment, less anxiety.  That is what I'm recalling
2  from memory, okay.  There are probably a couple of other
3  things.
4       And if they participated in an ego involving
5  climate you got to flip all of those.  They didn't have
6  as much fun, didn't indicate that they wanted to
7  continue with the activity and their cortisol levels
8  were significantly higher than those in the other group.
9  And the results were consistent for males and females.
10  What I would have to go back and check were there any
11  --- going back to these slight mean differences, were
12  there any differences between the males and females in
13  the other variables.  And that I couldn't tell you
14  without reviewing it.  But in general, the purpose of
15  the study was to see how this environment affects kids
16  and the results were similar for males and females.
17    **Q.  And what age group was that?**
18    A.  This was Middle School, so six, seven and eight
19  graders.  I think it leaned heavier on the six grade,
20  seven grade participants, but the mean age was probably
21  12.
22    **Q.  Any other papers in your bibliography talking**
23  **about whether or not there is a difference between males**
24  **and females and how they are motivated, if there is any**

Page 72

1  difference between them that is?
2     A.  Yeah.  I think with any of these studies,
3  honestly, I just have to go back and see if there were
4  any minor little differences between gender, but across
5  gender the results are consistent.
6     **Q.  Okay.  All right.**
7        Let me ask you, have you prepared any papers
8  regarding motivations for biological boys identifying as
9  girls?
10    A.  I have not.
11    **Q.  Have you prepared any papers regarding**
12  **transgender girls?**
13    A.  I have not.
14    **Q.  Have you studied that issue?**
15    A.  No.
16    **Q.  Would that be something worth studying?**
17    A.  It could --- I'm sorry.  Could you repeat that?
18    **Q.  Motivation regarding transgender girls?**
19    A.  Yes, it could be valuable.
20    **Q.  As far as you know, has anyone studied that?**
21    A.  Yeah, I --- you know, I hear people saying, you
22  know, that there is just going to be more and more
23  research coming out.  I think there is isolated papers
24  out there probably that people have had a look at or ---

Page 73

1  but I couldn't name them right now for you.
2     **Q.  Have you prepared any papers regarding coaching**
3  **transgender girls versus biological girls?**
4     A.  I have not.
5        ATTORNEY VEROFF:  Objection.
6  BY ATTORNEY TRYON:
7     **Q.  Are you aware of any studies that do address**
8  **that?**
9        ATTORNEY VEROFF:  Objection.
10       THE WITNESS:  No.
11  BY ATTORNEY TRYON:
12    **Q.  Have you prepared any papers regarding the**
13  **opportunity for collegiate athletic scholarships**
14  **motivates student athletes?**
15    A.  Have I prepared any papers?
16    **Q.  That is my question.**
17    A.  No.
18    **Q.  Would you agree that the opportunity for**
19  **collegiate athletic scholarships does, in fact, motivate**
20  **the student athletes?**
21    A.  Some student athletes.
22    **Q.  Now, you qualify that as some.  Any idea what**
23  **that percentage might be?**
24    A.  No.

Sidley 0511

Page 74

1    Q.   Are you familiar with Title 9?
2         ATTORNEY VEROFF:  Objection.
3         THE WITNESS: Yes, to some degree.
4    BY ATTORNEY TRYON:
5    Q.   Tell me what your understanding of Title 9 is in
6    the context of girls sports.
7         ATTORNEY VEROFF:  Objection.
8         THE WITNESS:  More opportunities are
9    provided to girls to the same degree as boys and that
10   fairness is given across other aspects of resources and
11   so on, facilities and things like that.
12   BY ATTORNEY TRYON:
13   Q.   Have you ever written any papers on Title 9?
14   A.   No.
15   Q.   Have you written any papers on college
16   scholarships for girls?
17   A.   On college scholarships for girls?
18   Q.   Yes.
19   A.   No.
20   Q.   So you wouldn't be an expert on that, would you?
21   A.   No.
22   Q.   Have you submitted any comments to the
23   Department of Education on proposed rules or regulations
24   under Title 9?

Page 75

1    A.   No.
2    Q.   Let me ask you a question a little bit different
3    than the one earlier.  Can the opportunity for
4    scholarships for girls collegiate sports be a motivator
5    for girls to compete in girls sports?
6    A.   It can be for some athletes.
7    Q.   So in paragraph 11 of your expert report, which
8    is Exhibit-2, it says on the national level I've served
9    with the Association of Applied Sports --- Sport
10   Psychology, AASP, as a member of the Program Review
11   Committee.  That is correct, isn't it?
12   A.   Yes.
13   Q.   It's my understanding that the purpose of that
14   organization is primarily to help train coaches.
15       Is that fair?
16   A.   No, that would be not accurate.
17   Q.   Tell me the purpose of it.
18   A.   Okay.
19       I'm --- I'm about to in the coming months.  A
20   in the area of sport and exercise psychology and to say
21   there's probably two aims, that these professionals are
22   trying to help people, a wide variety of people across
23   the lifespan reap off the benefits from participation in
24   physical activity and also help people perform up to

Page 76

1    their potential or help them perform better.  It is a
2    mix of the organization.  There are people who are
3    faculty members and people that are involved in the
4    team, are involved in programs but there's also people
5    that are trained on the clinical side or that are more
6    focused on sort of counseling aspects of sports
7    psychology.
8    Q.   Are you actually a member of the organization?
9    A.   Yes, I am.
10   Q.   Now, on the website it said that there is 2900
11   members in 50 countries.  Is that about right to your
12   knowledge?
13   A.   That sounds right.
14   Q.   So I divided that out.  That would be 58 per
15   country.  That doesn't sound very big per country.  So
16   let me ask you, do you know how many of those are
17   members are in the United States?
18   A.   I don't know.  I would guess it's heavily
19   weighted in the U.S.  I would say over half.  I think
20   there's a lot of countries that might have one person or
21   so.  So even though 50 countries are represented, you
22   know, some of them are small and may have a really small
23   participation, right.
24   Q.   Okay.  Fair enough.

Page 77

1         So you mention in this paragraph the
2    certification exam.  So there is a certification exam.
3         Is that right?
4    A.   Yes.  It's pretty new.  There has been a
5    certification.  The fact that it is exam based is a new
6    direction over the last few years.
7    Q.   What is the purpose or meaning of that
8    certification?
9    A.   It's called CMPC, Certified Medical Performance
10   Consultant, and it is good for the field because the
11   people who have that credential, it designates sort of,
12   you know, acceptable level of competence to go out and
13   to work with athletes and coaches.  So there is a number
14   of courses people have to have.  They have to have hours
15   of training working directly with athletes.  And then
16   when they complete all those requirements they take ---
17   they take an exam.
18   Q.   Have you taken the exam?
19   A.   I'm --- I'm about to in the coming months.  A
20   little back story on this is that the certification
21   originally came out as I was wrapping up my doctoral
22   training, and I would have needed to stay another year
23   to get the other requirements that I was missing and my
24   doctoral advisor at the time said, you know, yeah, I'd

Page 78

1    just go and graduate and get rolling in your career.
2    And she wasn't sure if this would take off or how big a
3    deal it would be, and so over the years it has been sort
4    of slow to take off. I have, for example, people come
5    and say do you have this AASP Certification until the
6    last year or two. So I think the public is becoming,
7    you know, more aware of it.
8         I was asked to write the chapter in the
9    Essentials Text, which is really the text for people to
10   prepare for the exam. And so I was asked to write the
11   motivation chapter, a key chapter on motivation
12   theories. And so there's this double blind system on
13   writing one of the chapters that I needed to wait longer
14   to actually take the exam. But currently I'm an
15   approved mentor to train students who are seeking the
16   certification.
17      Q.   But you don't have the certification at this
18   point.
19           Correct?
20      A.   Right. Just as a mentor. I have --- I received
21   all the thumbs up on every --- on --- you know, you
22   submit a packet of materials showing you have all the
23   credentials and all. So I've done that. I just need
24   now to sit for the exam. And I haven't done that yet.

Page 79

1    I will probably do it once the semester is over.
2       Q.   Do you consider yourself an athlete?
3       A.   I'm smiling. I do.
4       Q.   Okay.
5       A.   I work closely with the Women's Inner Sport
6    Network in Kansas City and they say that should be the
7    mantra. Every female should say I'm an athlete. I'm
8    not currently competing.
9       Q.   Okay.
10           What sports have you participated in?
11      A.   Tennis and softball were my primary sports.
12      Q.   And when did you compete in or participate in
13   those?
14      A.   Softball was kind of a Middle School thing and I
15   transitioned to tennis as I hit high school and competed
16   through high school and college and then probably
17   through my 20s still competing in tournaments around the
18   state.
19      Q.   So after college were you still competing in
20   some fashion?
21      A.   I was, yeah. Just one of the nice things about
22   teaching and you have that summer break. And my friends
23   enjoyed playing so we would play in tournaments around
24   the state.

Page 80

1       Q.   Did you want to win?
2       A.   I did.
3       Q.   And so were you --- let's go back to the terms
4    you already mentioned, like ego oriented and task
5    oriented, right?
6       A.   Uh-huh (yes), yes.
7       Q.   And so tell me just in layman's terms what those
8    mean.
9       A.   Okay.
10           They were developed in a theory by a guy named
11   John Nicholls and he said --- what he was really --- the
12   question he was trying to address is what should we be
13   doing if we are trying to help every athlete reach their
14   own potential. And so his theory it has three facets to
15   it. One is the goal orientation and those refer to your
16   personal definition of success. And so some people ---
17   he identified two, task orientation and ego. And people
18   who have a high task orientation, they really feel most
19   successful when they can walk away knowing they gave
20   their best effort and they're focused on their
21   improvement over time. But that is where genuine
22   feelings of success come.
23           In contrast, some people have a strong ego
24   orientation and they're more focused on how they compare

Page 81

1    to everyone or are they winning. And they may say,
2    yeah, good for me, I tried hard, who cares. What I care
3    about is how did I compare to everyone. Did I
4    demonstrate confidence? Did I look better than others,
5    did I win?
6       Q.   And can somebody have both an ego orientation
7    and a task orientation?
8       A.   Yes. They can be high in both, high in one and
9    low in another.
10      Q.   And when you were playing tennis, were you ---
11   which one were you? Ego oriented or task oriented?
12      A.   I think I've always had a high task orientation.
13   I just loved sport and the chance to complete, and I
14   would say I had a moderate ego orientation.
15      Q.   Is one better than the other?
16      A.   It depends what your aim is. If we want
17   athletes to have fun and to keep playing and to try hard
18   to have good relationships with others and to be good
19   sports, then we should try to promote task orientation
20   because ego orientation is not related to those things
21   pretty consistently.
22      Q.   And under your theory then should we try to
23   suppress ego orientation?
24      A.   No. I think the second part of the theory is

Kristen Galles 0513

Page 82

1    what kind of environment we create for our athletes, and
2    so the research is very strong in this area suggesting
3    many benefits when we can create a task and a caring
4    climate for athletes.  So the problem with the climate
5    for a coach is that you really need to pick what am I
6    going to do because you can't do both or it becomes a
7    wash or a neutral environment.  So those features of
8    each of the climates, they're really in direct contrast
9    with one another.
10   **Q.   When you say you are an athlete, what does that**
11   **mean to be an athlete?**
12   A.   You know, for me it means someone who just loves
13   having the opportunity to do their best and to try and
14   improve and to walk away on one --- you know, today I'm
15   going to go out there, I'm going to give my best and
16   tomorrow I'm going to get up and go do it again whatever
17   happened, right, because there is just so much fun and
18   joy that comes from having that opportunity.
19   **Q.   So just as I recall you said you do like to win,**
20   **right?**
21   A.   I do.
22   **Q.   And you can like to win and want to win whether**
23   **you are personally ego oriented or task oriented, right?**
24   A.   Absolutely.  I mean, who plays sports and

Page 83

1    doesn't want to win.  I mean, that's just sort of a
2    given.  What does winning mean for us, right?  Is it a
3    chance for me to kind of put my chest out and say I'm
4    better than you, I beat you, or is it kind of a
5    celebration of me being able to say, boy, I've worked
6    hard and I can see I'm improving, right.
7    **Q.   Right.  But if you are in an environment where**
8    **you basically are prevented from winning, that would be**
9    **very discouraging.**
10   **Right?**
11   A.   I'm not aware of any of those environments where
12   you are prevented from winning.
13   **Q.   Well, what if the coach doesn't let you play?**
14   A.   Does that mean like you're not a starter or ---
15   is that what you're referring to?
16   **Q.   Well, if you are just a bench warmer, would that**
17   **be discouraging to some people?**
18   A.   You know, this comes back to the climate.  If a
19   coach is saying you're an important part of this team
20   which is one of the features of a task and caring
21   climate, right, you're valuable, you push everybody,
22   your opportunities are going to be coming.  And what
23   it's really about is let's do all we can to help you
24   keep developing, right.  If we are just like, hey,

Page 84

1    please stay out of the way, go sit at the end of the
2    bench, go down to the end of the court because I'm
3    working with these few star athletes I've got here, then
4    yeah, it would be discouraging.
5    **Q.   Would you agree that rules are important in**
6    **sports?**
7    A.   Yes.
8    **Q.   So you mentioned you have played tennis and**
9    **softball.  And what other sports are you familiar with?**
10   A.   Played a little bit of volleyball going through
11   --- yeah, you know, I grew up in Texas and tennis is
12   just a year-round sport, right.
13   **Q.   Right.**
14   A.   So that is a lot of my experience.  My son is a
15   baseball player, so I've watched an awful lot of
16   baseball as well.
17   **Q.   Are you familiar with track and cross-country**
18   **even though you haven't done it?**
19   A.   Yeah, yes.
20   **Q.   Are you familiar with football?**
21   A.   Yes.
22   **Q.   So how about basketball?**
23   A.   Yes.
24   **Q.   Who is going to go on in the final four?**

Page 85

1    A.   Absolutely.  A little excitement here in town.
2    **Q.   Yes.  So do sports have to be athletic to be**
3    **sports?**
4         ATTORNEY VEROFF:  Objection.
5         THE WITNESS:  Do they have to be
6    athletic?
7    BY ATTORNEY TRYON:
8    **Q.   That is my question.**
9    A.   Okay.
10   I think it just depends on how you define
11   athletic.
12   **Q.   Well that's what I'm wondering.  So for example,**
13   **are video games sports?**
14   A.   You know, some universities are considering
15   those.  They have sports teams and they are considering
16   that part of the athletics.  It's not my particular area
17   of interest.
18   **Q.   Okay.**
19   So some sports are solo and some are with
20   teams.
21   Is that a fair statement?
22   A.   Yes and no.  Again, I would say it is how you
23   define it, right.  If you are going to say a track team
24   with the best individual, I would say there is relays

Page 86

1  and it depends how the coach approaches it.  Are we just
2  a lot of individuals doing our thing out here, are we a
3  team working together?
4      Q.   Well, when you --- so that may be in high school
5  there is teams.  But outside of high school or college
6  there are sports you participate in that, for example, a
7  marathon, you could be on a marathon and simply you're
8  participating as an individual, right?
9      A.   Uh-huh (yes), I agree.
10     Q.   And but --- so some athletic events can be done
11  without being on a team.  Are there others that you can
12  think of besides marathons?
13     A.   Sure.  As people graduate and they can run
14  races, yeah, they can participate in weightlifting.
15     Q.   And a lot of these things ---?
16     A.   They could have ---.
17     Q.   Sorry to interrupt you.  Go ahead.
18     A.   I'm sorry.  They could swim.  I'm just throwing
19  out another one.
20     Q.   Yeah.  So swimming is both --- you do it as a
21  sole --- as an individual but also as part of a team in
22  high school and college, right?
23     A.   Right.
24     Q.   And both cases you, as an individual, want to

Page 87

1  win in these sports but also you're trying to help your
2  team win.  Is that a fair statement?
3      A.   Yes, at its best.
4      Q.   And there is sometimes when you feel like
5  running, it can be something you just like to run.  You
6  don't have to be on a team or you can compete, you just
7  run on your own, right?
8      A.   That's true.
9      Q.   I see little kids, why walk when you can run.
10  So that's something that you can do alone or you can do
11  with your family, right?
12     A.   Uh-huh (yes).
13     Q.   Is that a yes?
14     A.   Yes, sorry.
15     Q.   Thanks.  And it's something you can do either
16  competitively or not competitively, right?
17     A.   Yes,
18     Q.   Now when you're on a team, for example, a track
19  team, you're competing against other people on your
20  team.
21         Is that right?
22     A.   Again, I would just say --- I would just check
23  --- that is not how I would phrase it if I were a coach,
24  that we're competing against each other.  I would say we

Page 88

1  are a team and we are working together to bring out the
2  best in each one of us, but the goal is every athlete
3  reach their potential.
4      Q.   But every one of those kids on a track team
5  still wants to be the best on the track team as a
6  general rule, right?
7      A.   I don't know that that is necessarily true, but
8  I think they want to compete and they want to do well.
9  I would agree with that.
10     Q.   I probably overstated that, but many of them ---
11  at least some of them want to be the best on the team,
12  the fastest on the team, right?
13     A.   Yes.
14     Q.   So those are the people that are comparing
15  themselves to others and just want to be --- so they
16  would be ego centered, ego oriented.
17         Is that right?  But not necessarily?
18     A.   Yeah, not necessarily.
19     Q.   Okay.
20     A.   Do you want me to comment on it?
21     Q.   Sure.
22     A.   Okay.
23         If I could just use an example.  Like a track
24  athlete, Al Oerter was an athlete in the '50s and '60s,

Page 89

1  he won four gold medals consecutively across four
2  Olympics, it's crazy, throwing the discus.  And he said
3  --- a reporter asked him how did you beat the world, how
4  were you so great, how were you better than everybody
5  else these four Olympics, and he said --- his response
6  was like that's nonsense.  It is never about being
7  better than somebody else.  It's about being the best
8  that you can be, right.  And so what if is just good
9  enough.  What if I beat you, good, but maybe I can be so
10  much better than that.  So for my sights to be set on
11  just being better than you it is limiting, right.  And
12  if you are so much better than me and so much less
13  talented, why don't I just focus every day on being the
14  best that I can be, right.  So Al Oreter, you think four
15  time Olympic gold medalist, he's got to be high on ego
16  orientation.  He's somebody who's really high in task
17  and would have been lower.  But we could look at other
18  athletes that would be the flip and definitely.  So when
19  you say athletes who want to win that doesn't
20  distinguish the task and ego aspect of it.
21     Q.   So task and ego orientation doesn't affect
22  somebody's desire to win.  Desire to win is separate
23  from the ego versus task orientation, that's what you're
24  saying, right?

Page 90

1    A.   I think it comes down more to what does winning
2  mean.
3    Q.   All sports have rules, we've established that,
4  right?
5    A.   Uh-huh (yes).
6    Q.   Is that a yes?
7    A.   Yes.
8    Q.   The purposes of the rules is, one, tells you how
9  to play the game, right?
10   A.   Yes.
11   Q.   Another is for safety. You have rules for
12  safety, is that right?
13   A.   Yes.
14   Q.   And you have rules to make things fair, right?
15   A.   Yes.
16   Q.   What other reasons do we have rules in sports?
17  Does that cover it?
18   A.   Nothing else comes to mind right now.
19   Q.   Who generally makes rules for sports?
20   A.   The leagues and sports organizations per se.
21   Q.   Would it be fair to say that the participants
22  rely on the rules?
23   A.   Rely on the rules?
24   Q.   Yes.

Page 91

1    A.   Fair to say that participants when they join a
2  league or, you know, their understanding that there are
3  rules that they need to abide by.
4    Q.   And they expect that others have to abide by
5  those same rules; right?
6    A.   Yes.
7    Q.   And it is important to have consistent rules,
8  rules that don't change periodically, right?
9    A.   I think rules change all the time in sports.
10   Q.   Why do they change?
11   A.   I think they change because they are recognizing
12  those things that you mentioned that maybe something
13  would be safer or something would be more fair or more
14  inclusive.
15   Q.   And sometimes those changes are made in
16  anticipation of problems, not waiting for problems to
17  happen.
18        Is that fair?
19        ATTORNEY VEROFF: Objection.
20        THE WITNESS: Yeah, I'm not sure.
21  BY ATTORNEY TRYON:
22   Q.   Okay.
23        What about safety, rules for safety, do
24  sometimes safety rules anticipate problems and sometimes

Page 92

1  they react to problems that have already occurred?
2        ATTORNEY VEROFF: Objection.
3        THE WITNESS: Yes.
4  BY ATTORNEY TRYON:
5    Q.   Is that a yes?
6    A.   Yes.
7    Q.   And then how about fairness, we have rules
8  designed for fairness and those are sometimes set in
9  motion because of something that has happened, right?
10   A.   Uh-huh (yes).
11   Q.   Yes?
12   A.   Yes.
13   Q.   And other times it's in anticipation of problems
14  that we see might come down the road but we want to set
15  rules for fairness, right?
16        ATTORNEY VEROFF: Objection.
17        THE WITNESS: Yes.
18  BY ATTORNEY TRYON:
19   Q.   And in all sports there is scoring, right?
20   A.   Yes.
21   Q.   That is part of the rules, right?
22   A.   Uh-huh (yes), yes.
23   Q.   And those scores decide who wins, right?
24   A.   Yes.

Page 93

1    Q.   Would you say scoring is a motivator?
2    A.   For some athletes.
3    Q.   When an athlete perceives something as being
4  unfair, that's a de-motivator, would you agree?
5        ATTORNEY VEROFF: Objection.
6        THE WITNESS: In some cases.
7  BY ATTORNEY TRYON:
8    Q.   So sports also have rankings, individual
9  rankings and team rankings, right?
10   A.   That's right.
11   Q.   And for some athletes those rankings are
12  motivators, right?
13   A.   Yes, for some.
14   Q.   And sports, you give out trophies for winners,
15  right?
16   A.   I'm sorry. You broke up.
17   Q.   In sports we give out --- at least in some cases
18  we give out trophies to winners, right?
19   A.   In some cases.
20   Q.   So let me see if I understand. Are you
21  advocating that sports should eliminate scoring?
22        ATTORNEY VEROFF: Objection.
23        THE WITNESS: No.
24  BY ATTORNEY TRYON:

1    Q.   Are you advocating that they should eliminate
2  rankings?
3    A.   I don't think it would hurt at lower levels.  I
4  don't think we need to have a focus on that when
5  you're five or six years old, on rankings, and we ought
6  to be focused just on learning the game and having fun,
7  but in general I'm not opposed to us having ---
8  identifying winners and ranking teams and so on.
9    Q.   And sports teams, the coaches decide who plays
10  in different positions in different games.
11       Is that right?
12    A.   That's right.
13    Q.   And should how good the student athlete is have
14  anything to do with when, where and how to play
15  according to the coach?
16       ATTORNEY VEROFF:  Objection.
17       THE WITNESS: Should the athlete's talent
18  have something to do with how much playing time they
19  get?
20  BY ATTORNEY TRYON:
21    Q.   That would be a fair way to characterize my
22  question, yes.  What is your answer?
23    A.   I would agree with that particularly as we move
24  up in levels.  I really like the rules that some youth

1  sport leagues have that we have eight-year-olds and
2  we're not just going to say, hey, Julie, you're on the
3  bench because you're not as good so you don't get any
4  playing time.  I like the rules that say everybody gets
5  in there a few innings and gets some playing time or
6  gets to bat, or whatever the sport might be.  So I think
7  it really varies on what sport we are talking about.
8    Q.   Let's look back at your report, Exhibit-2.  Look
9  at paragraph 35.  Do you see that?
10    A.   Yes, I do.
11    Q.   The first sentence says, thus the benefits
12  associated with youth and young adult sport are not
13  limited to whether athletes are winning competitions,
14  where they are ranked in their sport or what level of
15  publicity they are getting.
16       Do you see that?
17    A.   Yes.
18    Q.   So you would agree with me that one of the
19  benefits is the opportunity to win competitions.
20       Right?
21    A.   I would probably word it one of the benefits is
22  the opportunity to compete.
23    Q.   Well, here you say winning.  You say it is not
24  limited to whether athletes are winning, which suggests

1  that winning competitions is one of the benefits.
2       Correct?
3       ATTORNEY VEROFF:  Objection.
4       THE WITNESS:  Yeah.  I think what I mean
5  by that is if only --- if you have to win to have a
6  great experience in sports, then half of our teams
7  are not going to have a good experience, right.  So what I'm
8  suggesting here is that and as the data backs this up
9  that if you are in a good climate, then you can go out
10  there and have fun and try hard and maybe your team
11  didn't end up with a winning record, but you can still
12  reap the benefits.  And so it is not the case that only
13  winning teams reap these benefits that come along with
14  sports.
15  BY ATTORNEY TRYON:
16    Q.   So you are saying winning is not a benefit?
17       ATTORNEY VEROFF:  Objection.
18       THE WITNESS:  I'm going to say winning
19  can be a benefit.  It's not a primary one in my mind
20  in sport, but yes, winning can help us see our improvement
21  and, you know, winning has its place for sure.
22  BY ATTORNEY TRYON:
23    Q.   And you see athletes when they win, they are
24  pretty excited, aren't they?

1    A.   Many of them are.
2    Q.   Well, have you ever seen anybody disappointed
3  about winning?
4    A.   Maybe not disappointed, but if --- let's just
5  say you are really skilled in tennis and you come and
6  you know, you leave me behind, you beat me 6061, there
7  might not be a lot of joy for you in beating me, right,
8  but for some athletes it might be, hey, it's another win
9  for me and I'm super excited about that.  So that is
10  what I mean.
11    Q.   And where they're ranked in their sport, that is
12  one of the benefits.
13       Right?
14       ATTORNEY VEROFF:  Objection.
15       THE WITNESS: Yeah, I think we may have a
16  different view on benefits.  With benefits I'm just
17  thinking what's going to help us long term.  And it
18  reminds me of this Olympic gold medalist who said her
19  kid was going through kind of a junk drawer and found
20  her gold medal, right.  So winning --- she's a gold
21  medalist, didn't mean as much as all the experience and
22  just reflecting on the ability to give your best effort
23  and to build these relationships and to push yourself so
24  hard.  Those seem like benefits more than, you know, the

Page 98

1   trophy or something winning.  I'm not disputing that
2   winning, yeah, can be fun and it is definitely part of
3   sport.
4   BY ATTORNEY TRYON:
5       Q.   Yeah.  And so all those things you just
6   mentioned certainly are benefits to sports.  I'm not
7   trying to suggest that's not the case.  I just want to
8   understand when you say in this paragraph, thus benefits
9   associated with youth and young adult sports are not
10  limited to whether athletes are winning competitions,
11  where they are ranked in their sport or what level of
12  publicity they are getting, it's not limited to that,
13  but it does include those three things, right?
14          ATTORNEY VEROFF:  Objection.
15          THE WITNESS:  I'm going to give you that
16  those are benefits.  I'm just going to put them down
17  lower on what we value.
18  BY ATTORNEY TRYON:
19      Q.   Okay.
20      A.   Or more important benefits.
21      Q.   Is the opportunity to get a college scholarship
22  also a benefit in youth sports?
23      A.   For a very small proportion of children in youth
24  --- in our youth sport world are able to secure college

Page 99

1   scholarships and go on, and so our youth sport world
2   shouldn't be centered around that I believe.
3       Q.   But for those that want to and can get college
4   scholarships, that is a big benefit for them, right?
5       A.   Yes, that's very cool.
6       Q.   And it can be worth tens of thousands of
7   dollars, right?
8       A.   Yes, it can.
9       Q.   And even just being recruited to play on a
10  college team, that's a big benefit for high schoolers,
11  right?
12      A.   Yes, for some.
13      Q.   Well, right, for some.  And in order to get
14  there you need to be able to --- have the opportunity to
15  --- well, strike that.
16          And for obviously a smaller minority still the
17  opportunity to ultimately go on and play professional
18  sports, that is another benefit, right?
19      A.   Yeah, it's a benefit for such a small proportion
20  that, again, I would just say that's not how we should
21  set up our sports world, for those few.
22      Q.   I understand that, but nonetheless there are
23  many who never get to that place, but that's what they
24  strive for and that's one of the reasons why they are in

Page 100

1   sports, right?
2           ATTORNEY VEROFF:  Objection.
3           THE WITNESS:  I think there could be
4   people like that for sure.
5   BY ATTORNEY TRYON:
6       Q.   And same thing with scholarships, there are a
7   lot of kids that want to get scholarships, they may not
8   get them, but they're in sports because they want to get
9   that scholarship and they think they'll be able to.
10  Fair statement?
11          ATTORNEY VEROFF:  Objection.
12          THE WITNESS:  Yeah, I'm not sure what the
13  percentages are.  There are probably a lot more who
14  would like to have a college scholarship who don't
15  receive them because of the small proportion who do,
16  right.  But definitely.  That's called extrinsic
17  motivation.  If I'm just playing a sport because that's
18  the --- that's what I'm going for is a scholarship,
19  yeah, there could definitely be athletes focused along
20  those lines.
21  BY ATTORNEY TRYON:
22      Q.   And would you agree that colleges generally
23  select scholarship athletes from the pool of people that
24  are actually playing high school athletics?  That is a

Page 101

1   correct statement, right?
2       A.   I would say the majority have played high school
3   athletics, yes.
4       Q.   And those that are seeking that scholarship are
5   athletes who use their high school performance to
6   compete for college scholarships, right?
7           ATTORNEY VEROFF:  Objection.
8           THE WITNESS:  Yes, probably many do.
9   BY ATTORNEY TRYON:
10      Q.   And the market for athletic scholarships is, in
11  fact, competitive, right?
12      A.   Many schools it is.  Definitely not all schools,
13  though.
14      Q.   Okay.
15          What would it be otherwise?
16      A.   I think some of the --- some smaller schools
17  just will --- we have a local college that will give
18  students like $8,000 or $10,000 a year towards their
19  tuition fees if they participate on a sport team.  And
20  of course, you know, there has to be some level of skill
21  there, but I wouldn't --- it is a good place for people
22  who want to continue to play a sport but may not have
23  the highest skill levels and definitely aren't being
24  recruited at the division --- for the most part, a

## Page 102

1    Division I level or something like that.

2        Q.   But they still compete for that scholarship,

3    fair enough?

4        A.   Yes.

5            ATTORNEY VEROFF:  We've been going for a

6    little over an hour.  I just wanted to check in see,

7    David, if you have a sense of when you are wrapping up

8    this module.  Maybe it would be a good time to take a

9    break.

10           ATTORNEY TRYON:  Yes, give me another

11   five minutes and we can break if anybody wants to.

12           ATTORNEY VEROFF:  Great.

13           ATTORNEY TRYON:  Well, we can break right

14   now.  I'll leave it up to the witness.  I'm not going to

15   force it upon the witness or Plaintiff's Counsel.  Would

16   you like a short break?

17           THE WITNESS:  That would be great.  Thank

18   you.

19           ATTORNEY TRYON:  Let's go back how about

20   20 till.  Does that work?

21           VIDEOGRAPHER:  Going off the record.  The

22   current time reads 12:32:00 p m. Eastern Standard Time.

23   OFF VIDEOTAPE

24           ---

## Page 103

1    (WHEREUPON, A SHORT BREAK WAS TAKEN.)

2            ---

3    ON VIDEOTAPE

4            VIDEOGRAPHER:  We are back on the record.

5    The current time reads 12:41 Eastern Standard Time.

6    BY ATTORNEY TRYON:

7        Q.   So let me then ask you, Professor Fry, have you

8    heard of the International View for Sociology of Sport?

9        A.   That journal?

10       Q.   Yes.

11       A.   Yes, I've heard of it.

12       Q.   Okay.

13           Are you familiar with Warren Whisenant?

14       A.   No.

15       Q.   Okay.

16           How about Jeremy S. Jordan?

17       A.   No.

18       Q.   Okay.  Fair enough.  Let me show you Exhibit ---

19   if we could mark this, I guess we're at Exhibit 6,

20   Fairness and Enjoyment in School Sponsored Youth Sports.

21   If you could bring that up, Jacob.

22           ---

23           (Whereupon, Exhibit 6, Fairness and

24            Enjoyment in School Sponsored Youth

## Page 104

1            Sports, was marked for identification.)

2            ---

3            ATTORNEY TRYON:  Jacob, if you could just

4    put --- I think we've done this before.  Put this in a

5    PDF in the chat box, can you do that?

6            VIDEOGRAPHER:  Yes, I just have to do

7    that while it is not being shared and then I can share

8    it again.

9            ATTORNEY TRYON:  Okay.

10           Well I think we can just share it for now

11   and then we can put it in there.  If not, then if we

12   need to, we can do it.

13           VIDEOGRAPHER:  Okay.

14           I mean, I already have it dragged in.

15           ATTORNEY TRYON:  Great.  It doesn't take

16   long at all.  Great.

17   BY ATTORNEY TRYON:

18       Q.   So have you ever seen this article before?

19       A.   I haven't.  Can you enlarge it a little bit?

20   And what year was this at the top?

21       Q.   It looks like 2008.

22       A.   Thank you.

23           ATTORNEY VEROFF:  If you give the witness

24   a minute if she wants to scroll and get a sense of what

## Page 105

1    this is.

2    BY ATTORNEY TRYON:

3        Q.   Well, before I ask you any questions about this

4    let me just ask you some questions overall.  Would you

5    agree that fairness in sports is an important value?

6        A.   Yes.

7            ATTORNEY VEROFF:  Objection.

8    BY ATTORNEY TRYON:

9        Q.   And have you done any research on the issue of

10   fairness and sports?

11       A.   No.  I'm just hesitating because we have

12   included measures of sportspersonship, being a good

13   sport.  So if you include that then, yes.  But in

14   general, just fairness, I would say no.

15       Q.   Okay.

16           Have you read any papers that specifically

17   focus on fairness in sports?

18       A.   You know, probably, but I couldn't name them.

19       Q.   Okay.

20           Let's go down to --- I really only have one

21   question here, which we'll look at and then if you want

22   to review more of the article you are certainly welcome

23   to do that.  But if you go to what is labeled as page 97

24   at the top.

Page 106

1  A.  Could I just read the abstract first?  Do you
2  mind?
3  Q.  Yes.
4      VIDEOGRAPHER:  If you need that made
5  bigger, let me know.
6      THE WITNESS:  Maybe one more notch up.
7  Thank you.
8      VIDEOGRAPHER:  You're welcome.
9      THE WITNESS:  Okay.
10 BY ATTORNEY TRYON:
11  Q.  If you turn to 97, and the third full paragraph
12 on that page it says an organizational climate embracing
13 fairness is a critical factor influencing student
14 athletes' attitude towards the sport they participate in
15 and their desire to continue participation.  Do you
16 agree with that statement?
17     ATTORNEY VEROFF:  I will just remind the
18 witness if she would find it helpful to read more
19 context around that statement before you answer, you're
20 welcome to do so.
21     THE WITNESS:  Yes, I think it would be
22 helpful to look at how they measure fairness and, you
23 know, the methods used in the study, but in general I
24 can imagine that, yeah, that this is true.

Page 107

1  BY ATTORNEY TRYON:
2   Q.  Okay.
3   You don't --- just as a general statement you
4  don't disagree with it?
5   A.  Right.
6   Q.  So I'm not going to ask you about any of their
7  results or anything else, I just wanted to get your
8  reaction on that statement.  And you are not offering
9  any expert opinion on fairness in sports.
10  Right?
11  A.  That's right.
12  Q.  Are you offering an expert opinion on whether or
13 not HB-3293 is fair?
14  A.  I'm --- I believe that the sport organizations
15 at every level really value being inclusive and it would
16 be harmful to exclude athletes where they wouldn't have
17 an opportunity to reap the benefits of sport.
18  Q.  And there are a lot of things that go into
19 fairness, right?
20     ATTORNEY VEROFF:  Objection.
21     THE WITNESS: Yes.
22 BY ATTORNEY TRYON:
23  Q.  And it requires balancing of interests of
24 various people and groups and values; right?

Page 108

1      ATTORNEY VEROFF:  Objection.
2      THE WITNESS:  Yes.
3  BY ATTORNEY TRYON:
4   Q.  You have not attempted to do that balancing in
5  connection with HB-3293, have you?
6      ATTORNEY VEROFF:  Objection.
7      THE WITNESS:  Yeah, I think my expertise
8  is to weigh in on all the benefits that athletes would
9  not have an opportunity to reap if they weren't able to
10 participate.  But I think there are people who know a
11 whole lot more more with any sport about how to keep
12 making the rules fair for everyone.
13 BY ATTORNEY TRYON:
14  Q.  Okay.
15  But just to be clear you have not attempted to
16 do that balancing with HB-3293?
17     ATTORNEY VEROFF:  Objection.
18     THE WITNESS:  I'm not sure I understand
19 the question.
20 BY ATTORNEY TRYON:
21  Q.  Okay.
22  Let me try again.  We established that fairness
23 depends on balancing a lot of interests and views of
24 different groups, different people, right?

Page 109

1  A.  Yes.
2      ATTORNEY VEROFF:  Objection.
3  BY ATTORNEY TRYON:
4   Q.  And that balancing, you have not attempted to do
5  with respect to 32 --- HB-3293.
6   Correct?
7      ATTORNEY VEROFF:  Objection.
8      THE WITNESS:  I think it would be unfair
9  to categorically exclude a group of athletes from having
10 the opportunity to participate.  So I'm not sure if that
11 --- if you interpret that as balancing or not balancing.
12 BY ATTORNEY TRYON:
13  Q.  Have you balanced the interests --- have you
14 looked at the interests of other people in that decision
15 that went into 32, HB-3293?
16     ATTORNEY VEROFF:  Objection.
17     THE WITNESS:  Yes, I think this House
18 Bill is not fair to transfemale athletes.
19 BY ATTORNEY TRYON:
20  Q.  Okay.
21  We will move onto that in little bit then.
22 What is your qualifications to determine fairness?
23     ATTORNEY VEROFF:  Objection.
24     THE WITNESS:  I think I was called to be

Freedom 0520

Page 110

1   an expert witness in this case to speak to the many
2   benefits that come from participating in sports.  And so
3   from my experience as an athlete and a coach and a
4   scholar in this area I think I have, you know, insight
5   and can speak to the many benefits and how we should do
6   all we can to prevent --- or all we can to not exclude
7   athletes from having the opportunity to participate.
8   BY ATTORNEY TRYON:
9       Q.   You said you are a tennis player, right?
10      A.   Yes.
11      Q.   When is the last time you played tennis?
12      A.   I --- there's a wall right outside my office,
13  and so I hit on a backboard.  I haven't played a match
14  in a little while.  I'm not sure the last time was.
15      Q.   And when you played --- the most recent time you
16  played competitively, was that in a league or how does
17  that work?
18      A.   I haven't played leagues in a while.  It was
19  just for fun.  I'd play with a couple of my friends,
20  when we go to conferences, we bring our racquets and we
21  get together and play.  I've moved into, you know, other
22  exercise forms now and I swim and hike and so on.
23      Q.   And so when you were playing tennis, team, is
24  that what it was, on a team?

Page 111

1       A.   Uh-huh (yes), yes.
2       Q.   What team was that?
3       A.   I played USTA leagues.  Those are for adults.
4   And after college, you know, there is just like a
5   circuit in Texas that you can sign up for tournaments
6   all around the State and play and go for ranking.
7       Q.   But in college you played, right?
8       A.   Yes.
9       Q.   And was that on a girls team or a mixed team or
10  what?  I don't know much about tennis so I'm just trying
11  to understand that.
12      A.   Okay.
13           There was a men's and women's team.  We had a
14  head coach for both and assistant.  Maybe in the last
15  year there were separate head coaches, but we worked out
16  together.  We traveled to tournaments together.  When
17  you add up the score you got to --- you got to --- the
18  women had a score and the men had a score, so it wasn't
19  a total team win like that.
20      Q.   Okay.
21           So if you're on the women's team and you go up
22  against some other team and they just said we're going
23  to have boys, we're going to have men participate in the
24  women's team against you, you wouldn't have thought that

Page 112

1   was fair, right?
2           ATTORNEY VEROFF:  Objection.
3           THE WITNESS: Well, I'm assuming you mean
4   transfemales playing and ---?
5   BY ATTORNEY TRYON:
6       Q.   I do not mean that.  I meant exactly what I
7   said.  If you go to compete against another team and
8   that team says we have two men, biological men, and they
9   are going to compete against you, you would have said
10  that is not fair, right?
11          ATTORNEY VEROFF:  Objection.
12          THE WITNESS: I would have said --- sorry.
13          ATTORNEY VEROFF:  That is all right.
14          THE WITNESS:  I think I would have said
15  what are the rules, right.  And if the rules are that
16  somebody could play, then I would say bring them on,
17  right.  And if the rules are that they can't play, then
18  I'd say, yeah, we probably shouldn't do it that way
19  until the rules change, right.
20  BY ATTORNEY TRYON:
21      Q.   So whatever the rules are by definition are
22  fair, right?
23          ATTORNEY VEROFF:  Objection.
24          THE WITNESS: No, I didn't say that.  I'm

Page 113

1   sorry, Julie.
2           ATTORNEY VEROFF:  No, that's quite all
3   right.
4           THE WITNESS:  I didn't say the rules are
5   always fair, but I think we have to start somewhere and
6   we have to acknowledge them and respect them.
7   BY ATTORNEY TRYON:
8       Q.   Well, if they said we are going to have these
9   men compete against you and they just changed the rules
10  on you, wouldn't you object to the rules being changed?
11          ATTORNEY VEROFF:  Objection.
12          THE WITNESS:  Yeah.  You know, in the
13  context of what is taking place that seems not like a
14  very realistic example in my mind.  So I'm not sure I'm
15  thinking about it.
16  BY ATTORNEY TRYON:
17      Q.   So you don't want to answer my question?
18          ATTORNEY VEROFF:  Objection.
19          THE WITNESS:  Yeah, I think it's --- I
20  think what we are talking about is just more
21  complicated, right, and it is not just --- if we are
22  talking about transfemale athletes, I think we are
23  talking about a different ball game than you are.
24  BY ATTORNEY TRYON:

Page 114

1    Q.   Yeah.  Well, I was not talking about them, at
2  least not yet.  I'm just asking if suddenly men are
3  allowed to compete against women in tennis, whether or
4  not they identify as female, do you think that would be
5  fair to the women?
6           ATTORNEY VEROFF:  Objection.
7           THE WITNESS:  Again, I would just go back
8  to the rules.  But just in general, that if I decide
9  today, hey, I will go --- we have a really weak men's
10  tennis team, so today I think I'll go play on the males
11  tennis team, yeah, I don't think that would be right,
12  right, that I could switchover to win.  Right.  The
13  point is can people be their genuine, authenticate self
14  and play with a gender identity that they have.
15  BY ATTORNEY TRYON:
16    Q.   So I mean you're answering your own question
17  your own way, but so that's fine, but you have also said
18  that you think HB-3293, which sets a rule, you think
19  that rule is unfair, right?
20    A.   Yes, I do.
21           ATTORNEY VEROFF:  Objection.
22  BY ATTORNEY TRYON:
23    Q.   But the legislature balanced a lot of different
24  interests in making that rule, right?

Page 115

1           ATTORNEY VEROFF:  Objection.
2           THE WITNESS: I don't know.  I don't know
3  that that is true.
4  BY ATTORNEY TRYON:
5    Q.   You don't know one way or the other what
6  interests they balanced, right?
7    A.   I don't know what their ---.
8           ATTORNEY VEROFF:  Objection.
9           THE WITNESS:  --- I don't know what their
10  knowledge base is or their real involvement.  I don't
11  know if they've taken a close look.  It looks like in
12  this situation, that PBJ (sic), that people close to it
13  are saying, hey, let's let this child play, right, and,
14  you know, the world is not going to end and kids can
15  have good experiences and we can --- we can go.  So
16  yeah, I can't speak to what the legislators have --- the
17  background they've done or their mindset.
18  BY ATTORNEY TRYON:
19    Q.   Do you think that the legislation, this
20  legislation should be tailored to each individual?
21           ATTORNEY VEROFF:  Objection.
22           THE WITNESS:  No, no.  I think the sport
23  organizations at every level, from the Olympic Committee
24  to the NCAA, all of them are saying we really value

Page 116

1  being inclusive and let's do all we can to, you know,
2  balance these things and make things fair but also being
3  inclusive and not totally excluding a group of athletes.
4  BY ATTORNEY TRYON:
5    Q.   So what would be the rule that you would set up
6  for high school for transgender people --- let me
7  rephrase that.  What would be the rule that you would
8  set up in high school sports for a male who expresses
9  that he is now identifying as female should be allowed
10  to participate in girls sports?
11           ATTORNEY VEROFF:  Objection.  Go ahead.
12           THE WITNESS:  Yeah, I think we should
13  rely on the experts and the medical doctors and the
14  exercise physiologists who really study this and can
15  say, hey, across these sports this is --- seems to
16  create a fair playing ground.  I think, you know, it
17  sounds like our local weatherman, we have incoming data,
18  right, but this is relatively new in the sport world and
19  I think all of these researchers are gathering more data
20  all the time that is going to help inform these
21  decisions moving forward on how we create it.  So you
22  know, I'm not an expert to say, hey, what would those
23  exact guidelines be, but just to have a blanket
24  exclusion of all we set the stakes to do a lot of harm,

Page 117

1  and BPJ would be a recipient of that harm in my opinion.
2  BY ATTORNEY TRYON:
3    Q.   So we should rely on experts about safety for
4  one thing, right?
5           ATTORNEY VEROFF:  Objection.
6           THE WITNESS:  Yes.
7  BY ATTORNEY TRYON:
8    Q.   And we should also rely upon experts in
9  performance, right?
10           ATTORNEY VEROFF:  Objection.
11           THE WITNESS:  Yes.
12  BY ATTORNEY TRYON:
13    Q.   So you keep focusing on BPJ, so if we are going
14  to focus on each individual, we have to have in each
15  sport an example of someone who is a male identifying as
16  a female has to be individually evaluated to determine
17  whether that person should be allowed to participate in
18  whatever sport that person wants to be in?
19           ATTORNEY VEROFF:  Objection.
20           THE WITNESS:  No, I didn't say that.  And
21  it may be just we could have general guidelines at the
22  high school level.  I'm just saying I'm not --- that is
23  not my expertise as on the performance and exercise
24  physiology of it all to think what would be fair.  I

1  think as we branch up and get to more elite levels, then
2  that seems to be the direction that NCAA is going, that,
3  hey, let's pull in these national governing bodies
4  across the sport because they know the sport the best
5  and are in the best position to maybe offer those
6  guidelines.
7  BY ATTORNEY TRYON:
8     Q.   Do you have an opinion about other --- well, we
9  will get to that later.  Let's go back to your report
10 and if we could go to after paragraph 17.  Well, that
11 doesn't seem right.  There we go.  Okay.  The title of
12 this section on top of page five it says Focusing Solely
13 on Performance Outcomes Undermines the Benefits of Sport
14 for Youth and Young Adult Athletes.  Do you see that?
15    A.   Yes.
16    Q.   Are you aware of any middle schools, elementary
17 schools or high schools that focus primarily on
18 outcomes?
19         ATTORNEY VEROFF:  Objection.
20         THE WITNESS:  No.
21 BY ATTORNEY TRYON:
22    Q.   Are you aware of any surveys or studies of
23 middle schools or high schools that find out if there
24 are any schools that focus solely on performance

1  outcomes?
2          ATTORNEY VEROFF:  Objection.
3          THE WITNESS:  I would just say that it
4  depends what we mean by solely focus on performance
5  outcomes.  I think there are coaches out there that
6  absolutely that is their primary thing and they care
7  less about the hollistic, you know, wellness and just
8  the overall experience of their kids and they are just
9  trying to put the team together that is going to give
10 them the best chance to win.
11 BY ATTORNEY TRYON:
12    Q.   What coaches are you aware of in high school
13 that do that?
14    A.   Just in my experience across years.  I see --- I
15 see coaches that are very focused on winning that use a
16 lot of punishment for mistakes and that seems to be what
17 drives them.
18    Q.   And so you believe there are coaches out there
19 that focus solely on performance outcomes for youth and
20 young adult athletes?
21    A.   Yes, it just seems like a weird way to talk
22 about it, that I'm not sure when --- I mean to put a
23 percentage, if you're asking that, so are there coaches
24 that 100 percent they're just focused on winning and

1  winning only, I'm not sure.  I think there are probably
2  coaches out there that are.
3     Q.   Sorry.  Go ahead.
4     A.   Yeah, probably most, you know, it's not a
5  100 percent, but when we say primary that that's what's
6  really driving the boat for them.  I think there are
7  coaches out there.
8     Q.   Well, you didn't say primary.  You said solely.
9  Those are your words, right?
10    A.   Right.
11         ATTORNEY VEROFF:  Objection.
12 BY ATTORNEY TRYON:
13    Q.   Do you now want to modify that in your opinion?
14         ATTORNEY VEROFF:  I'm sorry, objection.
15         THE WITNESS:  Sorry.  I'm just going back
16 to this wording that you're talking about.  Are you
17 saying ---?
18 BY ATTORNEY TRYON:
19    Q.   At the heading.  Right about paragraph 18.
20    A.   Sorry.  I was looking underneath.  Yeah, I mean
21 it in the sense that that seems to be what all the
22 discussion is about, that all were focused on just this
23 isn't fair in terms of performance, and I'm saying that
24 is missing a bigger picture of what youth sport can be.

1     Q.   What discussion is that?  You said that
2  discussions all about it.  What discussions are you
3  talking about?
4          ATTORNEY VEROFF:  Objection.
5          THE WITNESS:  The idea that it's not fair
6  for transathletes to participate, right.  And the only
7  reason that we have any concern about this is from the
8  performance issue.  So in this case, I'm just saying if
9  we think about BPJ and her being excluded from having
10 the opportunity to play a sport, there's a lot at stake
11 there as well as the other side is saying, hey, is this
12 fair in terms of performance for athletes, right.  That
13 is what I meant by this.
14 BY ATTORNEY TRYON:
15    Q.   So who is --- but you're not aware of any
16 schools or colleges that have a policy of focusing
17 solely on performance outcomes, right?
18    A.   Right.
19    Q.   But you think the statute, HB-3293 solely
20 focuses on performance outcomes?
21         ATTORNEY VEROFF:  Objection.
22         THE WITNESS:  I'm not sure what leads me
23 to say that, but I think the statute excludes a group of
24 athletes and that that would be unfortunate that they

## Page 122

1  wouldn't have a chance to just reap these benefits that
2  can come from being a sports team.
3  BY ATTORNEY TRYON:
4  **Q.   So you are not saying that you believe that**
5  **HB-3293 focuses solely on performance outcomes, right?**
6  A.   Okay.  I'm not saying that.  I think performance
7  outcomes is --- seems to be a piece in it.
8  **Q.   Is that an appropriate piece to consider?**
9      ATTORNEY VEROFF:  Objection.
10 BY ATTORNEY TRYON:
11 **Q.   Let me rephrase that.  Is performance outcomes**
12 **something that's an appropriate thing for a legislature**
13 **or a school to focus on?**
14     ATTORNEY VEROFF:  Objection.
15     THE WITNESS: Yes.
16 BY ATTORNEY TRYON:
17 **Q.   Now, in paragraph 18 itself, you say, the second**
18 **sentence, a myopic focus on winning in youth and young**
19 **adult athletes ignore the other important benefits that**
20 **school athletics offers young athletes such as teamwork**
21 **and camaraderie which all advance when all athletes have**
22 **the opportunity to play the sports they love and reap**
23 **the benefits of such participation.  Do you see that?**
24 A.   Yes.

## Page 123

1  **Q.   When you say a myopic focus, you're not**
2  **excluding an appropriate level of focus on winning.**
3  **Right?**
4      ATTORNEY VEROFF:  Objection.
5      THE WITNESS:  That's right.
6  BY ATTORNEY TRYON:
7  **Q.   Is there a reasonable variance of opinions in**
8  **the sporting world --- sports world on what exactly the**
9  **proper focus on winning ought to be versus the other**
10 **benefits?**
11     ATTORNEY VEROFF:  Objection.
12     THE WITNESS:  Yes, I think there is an
13 agreement within our field of sport exercise psychology
14 that at the youth sport level the focus should be on
15 giving as many kids as possible a chance to participate
16 in youth support, right.  And then as athletes move up
17 the levels, that there is more emphasis and importance
18 placed on winning.
19 BY ATTORNEY TRYON:
20 **Q.   What do you mean by that, as athletes move up**
21 **the levels?**
22 A.   That typically there's a greater focus in high
23 school than middle school, greater focus in middle
24 school than elementary school, not that they have

## Page 124

1  organized sports within their schools, but just compare
2  that to Little League, that as you move up to college,
3  the emphasis on winning may increase and so on.
4  **Q.   Thank you.  Would you agree with me that there**
5  **is nothing in HB-3293 that says there should be a sole**
6  **or myopic focus on winning in any of the sports it**
7  **covers?**
8      ATTORNEY VEROFF:  Objection.
9      THE WITNESS: Yes, I would agree.
10 BY ATTORNEY TRYON:
11 **Q.   And the law doesn't say anything anywhere that**
12 **there are not other benefits to sports other than**
13 **winning.  Right?**
14     ATTORNEY VEROFF:  Objection.
15     THE WITNESS: Right.
16     ATTORNEY VEROFF:  I think if we are going
17 to have any questions about what the law says we should
18 put it back up on the screen.
19     ATTORNEY TRYON:  I don't have any more
20 questions on that.
21     ATTORNEY VEROFF:  Thank you.
22 BY ATTORNEY TRYON:
23 **Q.   Let's look at paragraph 21 in your report.  You**
24 **say there are many benefits to young people from**

## Page 125

1  participating in athletic activities discussed further
2  herein.  Do you see that?
3  A.   Yes.
4  **Q.   Is it possible that some young people are**
5  **actually harmed by participation in athletic activities?**
6      ATTORNEY VEROFF:  Objection.
7      THE WITNESS:  Yes, I think so.
8  BY ATTORNEY TRYON:
9  **Q.   What are some of those possible harms?**
10 A.   Some of those harms might be they have abusive
11 coaches that push them too hard physically, that you
12 know, don't treat them in a developmentally appropriate
13 way, that there --- coaches allow like bullying to go
14 on, that kids are made to feel shame if they don't
15 perform well.  Those kind of things.
16 **Q.   Outside the coaching, you mentioned bullying.**
17 **So in sports that happens, right, some athletes bully**
18 **other athletes, right?**
19 A.   It happens sometimes.
20 **Q.   And that can have long-term lasting negative**
21 **impacts, right?**
22 A.   Yes.
23 **Q.   Are you aware that sometimes those who are**
24 **athletes also belittle those who are not?**

Johns 0524

Page 126

1    A.   Yes, I'm aware of that.
2    Q.   Let's move onto paragraph number 23.  In
3  paragraph 23 you talked about achievement goal
4  perspective theory, right?
5    A.   Yes.
6    Q.   Does this theory apply to outside sports, say
7  for example, to academics?
8    A.   Yes, John Nicholls actually started there in
9  classroom research.
10    Q.   So goal perspective theory is about goals,
11  right?
12    A.   Yes.
13    Q.   And how to set goals and how to reach goals?
14    A.   Not exactly.  I would use sort of another area
15  of goal setting, but goal perspective theory is more
16  about what is our --- how do we define success and how
17  are we kind of valuing what is important in life.  Some
18  people think of goal perspective is how we set goals,
19  right, that they need to be specific measurable.  That
20  is sort of another part of the literature.  And instead,
21  Nicholls is just thinking how to understand people's
22  perspective on what they are trying to get out of
23  things, right.  And if you have this task goal
24  perspectives that you are moving through life thinking

Page 127

1  how can I just give it my best and be the best that I
2  can be.  And if you are moving through life with an ego
3  perspective, you are thinking, hey, how can I
4  demonstrate my competent --- my competence and show
5  other people I'm better.
6    Q.   And that happens in all aspects of life, right,
7  not just in academics?
8    A.   Yes, it's a pretty relevant theory.
9    Q.   You probably see it in faculty lounges and
10  college boards and you will certainly see it lots of
11  places in academia, right?
12    A.   Right, academia from I'm guessing law firms and
13  probably everywhere we go in the world.
14    Q.   You bet.  Absolutely you see it in law firms and
15  pretty much every place, I agree with you.
16       Let me look at paragraph 24 with you.  You say
17  first is the developmental component of achievement goal
18  perspective theory.  Young children are incapable of
19  accurately comparing their ability to others,
20  overestimate their ability and are naturally focused on
21  their effort as a marker of success.  So I'm not saying
22  that's wrong, but I don't see a source for that.  Do you
23  have a source for that statement?
24    A.   I do.  Nicholls 1989 and my dissertation.  I

Page 128

1  apologize for missing that.
2    Q.   Your dissertation?
3    A.   Yes, I did a --- this was my line of work.
4  Early in my career I did a series of three studies kind
5  of tapping into those, how children gain an
6  understanding of the concepts of effort, luck and
7  ability.
8    Q.   They gain an understanding of concepts of
9  effort, of luck and ability.  Is that what you said?
10    A.   Yes.
11    Q.   What does that mean, luck and ability?
12    A.   So when kids are really little those --- they
13  don't clearly distinguish these.  So they just think,
14  hey, whoever tries hardest, they are going to do the
15  best, right, and they don't recognize ability in the
16  same way that we do as we mature over time and that we
17  understand, hey, gosh, you could run circles around me
18  today, you were much better, faster or stronger runner
19  than I am, for example, right.  And that doesn't mean
20  that I can't try harder to improve but our ability
21  levels are really different today.
22       So in these studies we set up scenarios and we
23  show kids, and so there's kind of a contrast.  Somebody
24  didn't try hard at all actually outperformed somebody

Page 129

1  who seems to be focused and concentrating, and we say,
2  you know, what do we think is happening here.  And so
3  these concepts are just really blurred and kids are
4  saying yeah, you know, this person is definitely trying
5  harder. I don't know why they didn't perform very well.
6  This person looks like they are not trying hard.  But if
7  they both do it again and they try hard then I think
8  they will get the same score.  So just this wide variety
9  of scenarios.  Kids don't distinguish like luck and
10  ability.  So you know, if you're around little kids, you
11  know, they like games like Chutes and Ladders or
12  Candyland.  Those are a hundred percent luck games,
13  right. There's no ---.
14    Q.   Now I understand.  I thought you said lock,
15  L-O-C-K.  You are saying luck, L-U-C-K?
16    A.   Right, right.
17    Q.   Thank you.  I didn't mean to have you go on with
18  that long explanation when I just misunderstood your one
19  word. But thank you for that explanation.  That helps
20  me understand what you're saying here.
21       So my --- then I'm just interested in what is it
22  that at some point little kids somehow realize that they
23  have overestimated their ability, is that something that
24  just naturally happens or is it something that other

Page 130

1    people have to point out for them for them to realize
2    it, whether it be teachers or coaches or just the kids
3    around them?
4        A.   Okay.
5            So just a quick example.  Nicholls would put a
6    list of faces, you know, like generic smiley faces 1 to
7    30 and you go in with a class of five-year-olds and you
8    interview them one at a time.  And you say, okay, this
9    is everybody in your class and they are listed by how
10   good a reader they are, right.  And so this person is
11   the very best in your class, right, this person is just
12   the worst reader, this person is the middle.  Which one
13   is you?  And the mean for kids in kindergarten is like
14   three, which tells us they're all saying well, that's me
15   up there, high, right, I'm the best reader in the class.
16   But as you move through those elementary school years,
17   the mean shifts to like 15 by the time they're say in
18   sixth grade, because when you ask six graders, all
19   right, here's everybody in your class, where do you fit
20   in, they are much more accurate.  And when they ask the
21   teachers, there's no correlation, right, with younger
22   kids, because they are all over the place.  But by the
23   time you get to the upper elementary grades it
24   correlates highly with what the teachers are saying in

Page 131

1    terms of the kids' reading ability.  And Nicholls said
2    this is so key because it makes Middle School a very key
3    developmental period as kids are gaining this
4    understanding all of a sudden now there is a reason to
5    try your hardest or withdraw effort because you don't
6    want to look silly.  You know that other people might be
7    more skilled than you.  And that's why he was so
8    passionate about this theory.  Even though we are
9    capable of looking at the world that way, we all can
10   choose to just stay focused on our effort and ability
11   and being the best that we can be.
12       Q.   So there are people that --- sorry.
13       A.   That is the other piece of the climate, how do
14   we train teachers and coaches to create that
15   environment.  That tells people keep that task
16   involvement going.
17       Q.   And there are people that continue to
18   overestimate their abilities throughout life, right?
19       A.   Yes.
20       Q.   And that is exacerbated if those people are
21   never corrected to let them know in some way that their
22   abilities are not what they think they are, right?
23            ATTORNEY VEROFF:  Objection.
24            THE WITNESS:  Yeah, I'd say our bigger

Page 132

1    issue within education is not that kids are
2    overestimating but they're --- you know, don't have as
3    high self-esteem or confidence and those type of things.
4    But are there people out there that could be
5    overestimating?  Absolutely.
6    BY ATTORNEY TRYON:
7        Q.   So Nicholls did the study of academic.  Did he
8    do any study athletically?
9        A.   That's where I picked it up and looked in the
10   physical domain and made scenario specific to physical
11   activity and conducted these three studies that looked
12   at effort and luck and ability with kids aged 5 to 12
13   and sort of replicated his work, and we found that kids
14   move through these same levels of understanding in the
15   physical domain where things are a little bit more
16   obvious for us to see, right.  If we're sitting here
17   working on math problems we not be able --- it might not
18   be as evident that, hey, somebody is moving through
19   these and they are stronger, right.  But in the physical
20   domain, when we see each other and move and we can see
21   each other's skill levels, in some of these things move
22   a tiny bit faster but it was the same sort of stages of
23   development, if you will.
24       Q.   Is your dissertation cited in your bibliography?

Page 133

1        A.   No, it is not.
2        Q.   Is it in your list of publications?
3        A.   It's in my Vitae.
4        Q.   You have a lot of publications.  Can you direct
5    me to it?
6        A.   You're going to go back a ways.  Okay.  So the
7    dissertation study is on 1997, it's on page six.  Fry
8    and Duda.
9        Q.   I see Fry and Duda, 1997.
10       A.   Yes, those are my dissertation studies.  And I
11   followed it up with two studies at the top of that page,
12   Fry 2000.  There are two different studies.
13       Q.   Okay.
14            Let me move on to paragraph 25 of your report.
15   I just goofed on my --- there we go.  I lost all the
16   pictures, so I couldn't see you anymore.  Just one of
17   the hazards of technology.  Okay.  So I'm looking at
18   paragraph 25 and you talk about task.  Here you talk
19   about goal --- primary goal orientations are task and
20   ego orientation, right?
21       A.   Yes.
22       Q.   So you're not saying --- I think you've said
23   this before, but I just want to make sure I understand.
24   You're not saying that ego orientation is bad from an

Steinmetz 0526

Page 134

1 individual basis, are you?  It just kind of sounds like
2 it's a pejorative.  You don't mean it that way, do you?
3     A.   I think it depends on what your aim is and if
4 you have --- if you want athletes to have fun and try
5 hard and have good relationships and, you know, feel
6 good about themselves, have confidence, have empathy for
7 others, things like that, then it's not something we
8 would want to promote is the orientation because across
9 a wide body of literature those just don't lead to what
10 we call adaptive outcomes, right.
11     On the other hand, many elite athletes are high
12 in task and ego orientation, right.  And the big deal
13 here is that people really need that high task
14 orientation to sustain motivation over time with the ups
15 and downs and overcoming injuries, with all of that, but
16 ego orientation isn't necessarily a bad thing in this
17 case.  But it probably isn't great if you don't have
18 that high task orientation to go with it.
19     Q.   So let's move on to paragraph 26.  Okay.  So in
20 the last sentence, I think it is the next to last
21 sentence.  Okay.  The sentence that starts when the
22 environment created by coaches and others is a caring
23 environment, do you see that part?
24     A.   Yes.

Page 135

1     Q.   It continues, athletes are more likely to
2 perceive the overall climate as task-involving.  A
3 caring environment is one where athletes feel safe,
4 welcome, comfortable and valued and are treated with
5 kindness and respect by all in the sports setting.  You
6 wrote that, right?
7     A.   Yes.
8     Q.   And that means a caring environment for all
9 athletes, right?
10     A.   Yes.
11     Q.   And a caring environment also requires rules?
12     A.   Yes.
13     Q.   A caring environment still includes the coach
14 --- let me rephrase that.  A caring environment still
15 includes the coach and officials and requires them to
16 make calls that make --- that some athletes don't like
17 and may even get upset, right?
18          ATTORNEY VEROFF:  Objection.
19          THE WITNESS:  Right.
20 BY ATTORNEY TRYON:
21     Q.   So how do you square that with a caring
22 environment when the rules are going to make some
23 athletes unhappy?
24     A.   So this is about coaches kind of saying, yes, I

Page 136

1 want to be intentional and I want to do everything I can
2 to create this environment that is going to help bring
3 out the best in my athletes, right, and I don't have
4 total control over what my athletes perceive.  I'm just
5 going to do what I can to promote these features that
6 are in the last sentence.  I'm also going to get
7 athletes, trying to get them to buy in so that they see
8 how valuable this is if we create this caring
9 task-involving climate.  It doesn't in any way mean, you
10 know, we're not going to get a bad call or things aren't
11 going to happen, things don't go our way, somebody
12 starts before I do.  Right.  All kinds of things.  Those
13 are just part of sports, right, but this refers to the
14 coaches buying into this truckload of research that we
15 have that shows how we can help all athletes have a good
16 experience.
17     Q.   You're not advocating for laws requiring a task
18 oriented environment, are you?
19     A.   No.  That would be tempting.  No.  We're just
20 saying if our goal is to help athletes reach their
21 potential, then we have a lot of scholarship to guide
22 --- to guide what we do.  We know a lot about how to
23 make that happen.
24     Q.   Do you think coaches are unfair if they don't

Page 137

1 adopt a task oriented approach?
2          ATTORNEY VEROFF:  Objection.
3          THE WITNESS:  I think they do a lot of
4 harm, right, and they set athletes up to experience all
5 these negative aspects, right, and they don't have fun
6 and they don't try as hard.  They don't have as good a
7 relationship, they experience shame.  And all of that
8 stuff just means that a lot of kids aren't going to
9 stick with it and we are going to lose a lot.  And that
10 just has long-term implications for people living
11 physically active lives, right.  When you have bad
12 experiences, you know, a lot of people are running back
13 out there to keep participating.
14 BY ATTORNEY TRYON:
15     Q.   Well, officials make calls all the time that
16 upset athletes.  Athletes think they're unfair or
17 they're wrong.  You're a tennis player.  You remember
18 John McEnroe?
19     A.   I do.
20     Q.   He yelled all the time.  All the time is an
21 exaggeration.  He frequently claimed the calls the
22 officials made were unfair, right?
23     A.   Yes.
24     Q.   Do you think that the umpires should have

Fry 06/01/2022 0527

| | |
|---|---|
| **Page 138** | **Page 140** |

**Page 138**

1   changed their calls to satisfy him in order to provide a
2   more caring environment for him?
3        ATTORNEY VEROFF:  Objection.
4        THE WITNESS:  I think they should have
5   taken him out of a few tournaments and I feel like that
6   would have nipped it in the bud.  But with respect to a
7   caring and task-involving climate, what you're trying to
8   say is we are trying to treat everyone with kindness and
9   respect and we're going to understand that officials are
10   out there trying to do the best they can, and they're
11   going to make mistakes just like all of us make
12   mistakes.  And so the goal would be for us to be
13   respectful.  And if we feel like bad calls are made we
14   would deal with it in a respectful way, right, but we
15   don't deal with it like Will Smith did, right, like when
16   he --- we're trying to learn to control our emotions,
17   right, and wow, it just makes sport a powerful arena
18   when athletes can learn those terms.
19   BY ATTORNEY TRYON:
20     Q.  Right.  I understand that.  And I'm just asking,
21   so you got rules, you got calls by higher powers and you
22   got to live by those rules.  And if you think they're
23   unfair then you should ask them to have them changed,
24   right?

**Page 139**

1     A.  Yes.
2     Q.  But it is still a caring environment and just
3   because you think it is unfair to you in particular
4   doesn't make it uncaring.
5     Is that a fair statement?
6        ATTORNEY VEROFF:  Objection.
7        THE WITNESS:  You know, the way research
8   is done is you're asking every athlete on the team to
9   fill out a survey, right.  So it doesn't mean that there
10   is a 100 percent agreement, right.  I may feel like the
11   coach isn't fair, hasn't given me a fair shot, right,
12   and somebody else may not feel that way.  But in
13   general, there's sort of a consensus on most teams, you
14   know, that people are seeing it more similarly.
15   BY ATTORNEY TRYON:
16     Q.  Yes, I guess I'm just asking specifically about
17   rules.  Rules by their very nature, they are not caring,
18   they don't care about individuals.  They are just set
19   there and you need to follow them, right?
20        ATTORNEY VEROFF:  Objection.
21        THE WITNESS:  Yeah.  Hopefully they have
22   been established in a caring way, thinking about what is
23   best for athletes, but there is just so many things
24   across sports that are not necessarily fair, right, and

**Page 140**

1   so we just kind of have to keep the focus on the rules.
2   I had an athlete tell me that his teammate has been
3   diagnosed with MS and that doesn't seem very fair,
4   right, that a young person has to go through that, but
5   I'm glad that they are part of a caring and
6   task-involving team where they want this athlete to
7   continue to be part of the team, right.  And in more of
8   an ego involving team, we might just say, hey, sorry,
9   you are really going to impair our ability to win.
10   That's our focus, that's why we are here, so you know,
11   have a good life, right.  And I mean, what's happening
12   is they are just working with this athlete to still be a
13   vital part of the team.
14   BY ATTORNEY TRYON:
15     Q.  Do you think you need to be an athlete to have a
16   fulfilling life?
17     A.  No.
18     Q.  I'm glad to hear you say that because I'm not
19   much of an athlete.
20        ATTORNEY TRYON:  Well, if people want to
21   break for lunch now, I'm okay with that.  I can take a
22   break now or we can keep on going.  Whatever Dr. Fry ---
23   Professor Fry, whatever your preference is and other
24   counsel?

**Page 141**

1        THE WITNESS:  It might be nice to have a
2   break at this point.
3        ATTORNEY TRYON:  Okay.  Do you want to go
4   and get some lunch?
5        THE WITNESS:  Yes, sounds good.
6        ATTORNEY TRYON:  How long do you need?  I
7   don't know what your environment is around you, if you
8   brought a lunch or there's a restaurant nearby.  Is half
9   an hour long enough?  Do you need longer?
10        THE WITNESS:  No, a half hour would be
11   great.
12        ATTORNEY TRYON:  Then why don't we take a
13   break and come back at ten minutes after the hour?
14        THE WITNESS:  Okay.
15        VIDEOGRAPHER:  Going off the record.  The
16   current time reads 1:40 p.m. Eastern Standard Time.
17   OFF VIDEOTAPE
18        ---
19   (WHEREUPON, A SHORT BREAK WAS TAKEN.)
20        ---
21   ON VIDEOTAPE
22        VIDEOGRAPHER:  We are back on the record.
23   The current time reads 2:11:00 p.m. Eastern Standard
24   Time.

Livingston 0528

Page 142

1    BY ATTORNEY TRYON:
2        Q.   Okay.
3            Let's go back to paragraph 30 of your report.
4    It says athletes high in task orientation also report
5    greater confidence and perceived ability and task
6    orientation has been correlated with both self and team
7    efficacy and greater perceived confidence ---
8    competence, excuse me.  You are saying greater
9    confidence and perceived ability.  Perceived ability is
10   different than reality, isn't it?
11       A.   Yes.
12       Q.   Are you saying that is a good thing?
13       A.   In the psychology world it is pretty well
14   accepted that perceptions are very important.  So yeah,
15   you are right in identifying that this is athletes'
16   perceptions of their ability.  And so athletes who have
17   a high task orientation in turn, you know, seem to have
18   more confidence and believe that they have higher
19   ability.
20       Q.   And then in paragraph 31 you say, by contrast,
21   ego orientation, i.e. the non-pejorative descriptive
22   term for defining success based on ability and
23   performance outcomes is not correlated with perceived
24   ability in general confidence of athletes high in ego

Page 143

1    orientation was more of based on their perception of
2    ability and having a strong physical presence.  But in
3    that first sentence it indicates --- it suggests that
4    ego orientation is based on actual reality --- excuse,
5    actual ability rather than perceived ability.  Do I
6    understand that indication correctly?
7        A.   Where do you see that it is on actual ability?
8        Q.   Okay.
9            Let me start that over.  So in the sentence it
10   says, by contrast, ego orientation i.e. the
11   non-pejorative descriptive term for defining success
12   based on ability and performance outcomes is not
13   correlated with perceived ability in general.  Does that
14   mean it's correlated with actual ability rather than
15   perceived ability?
16       A.   Okay.  I understand.  No.  No, what it means is
17   that if you're --- if you're somebody who's high in task
18   orientation, then you're feeling successful when you
19   give your best effort, when you see improvement, right.
20   Those are things we have more control over.  And so when
21   you're focused that way you tend to have higher
22   perceptions of ability, right, because that is your
23   focus.  If you are high in ego orientation, right, and
24   so I'm feeling successful if I out perform others, if I

Page 144

1    win, if I demonstrate competence, right, to a greater
2    degree than other people, right, so if that doesn't
3    happen but that is how I judge success, then chances are
4    my perceptions of ability are going to be lower.
5            If I'm the star on the team and I judge success
6    based on how I compare to others, then I probably get a
7    lot of kudos and get reenforced for that.  So that's why
8    we will guess there is no correlation there in the way
9    there is task, right.  And that is why Nicholls was most
10   concerned about people high in ego orientation who had
11   lower perceptions of ability, because it makes us
12   vulnerable.  That's why I'm so focused and care about
13   I'm not --- you know I'm not as good.  Does that make
14   sense?
15       Q.   I'm processing it.  I still want to understand
16   it a little better.  In paragraph 30,  athletes high in
17   task orientation also report greater confidence in
18   perceived ability.  Am I right that perceived ability is
19   not actual ability?
20       A.   Right, it's not.  Items would just tap into I
21   would be responding to a question like I'm really good
22   at basketball or something, I'm very skilled in
23   basketball or I'm not very skilled and I would be
24   answering it on a quantitative scale, so it would be my

Page 145

1    perception of it.
2        Q.   Isn't it important that athletes understand
3    their actual ability rather than just their perceived
4    ability?
5            ATTORNEY VEROFF:  Objection.
6            THE WITNESS:  I think it's important for
7    coaches to share with athletes where they are and what
8    they can do to keep improving.  I'm not sure it's super
9    beneficial that we need to go around and tell athletes,
10   hey, you're not very good, this person is better than
11   you, right, those are just kind of distractions, but
12   helping people see where they are and what they can do
13   to improve, yeah, would seem valuable.
14   BY ATTORNEY TRYON:
15       Q.   In order for an athlete to improve doesn't the
16   athlete need to understand where he or she is rather
17   than just where he or she perceives him or herself to
18   be?
19       A.   Yes, we get into kind of --- are we talking like
20   morbid ability, right, or --- and so in that sense do I
21   need to tell --- I've got five athletes here.  Do I need
22   to make sure they all know where they rank between one
23   and five, right, in my mine who's the best?  Or do I
24   just need to take each athlete aside, right, and make

Page 146

1    sure that they understand here's some areas you could
2    really improve on, and I care less about even having a
3    conversation about who's the best right now, right, that
4    this person is better than this person, right, it's
5    moot.  And that's where Nicholls was coming from.  What
6    if we as coaches did more just to focus people on,
7    right, on what they could do to keep improving?
8       Q.   And athletics it is certainly obvious, though,
9    what your athletic ability is at least as far things
10   involving racing times, for example, you get your times
11   so you know what your ability is as compared to yourself
12   or as compared to other people, right?
13      A.   Right.  I think there is just a lot in sport
14   that's giving us feedback of how we compare to others.
15   And also when we see these times it's --- that's
16   information that we can track how we're improving,
17   right, and how we are doing.
18      Q.   So why do we share with people --- well, strike
19   that.  I will move on.
20           Okay.  Paragraph 32, please.  Let me know when
21   you see that.
22      A.   I see it.  Thanks.
23      Q.   Athletes high in ego orientation report lower
24   companionship and greater conflict with teammates.  For

Page 147

1    that phrase --- you can go ahead and read the whole
2    sentence if you want, but I want to ask you a question
3    about that phrase or that clause.
4       A.   Okay.
5       Q.   So for that clause you cite Balaguer in that
6    study, right?
7       A.   Yes, Balaguer (corrects pronunciation).
8       Q.   Thank you for helping me pronounce that,
9    Balaguer.  And is there anything else on which you base
10   that first clause?
11      A.   Yes, there are other references.  This paragraph
12   in general is just referring to we have better
13   relationships, right, when people are high in task
14   orientation.  They're really valuing that aspect of
15   helping each other improve.  And in an ego orientation,
16   when, I'm just kind of zoned in on me and me wanting to
17   show that I'm better than my teammates, right, it just
18   sets things up to not having as good a relationship.
19   This doesn't mean that every athlete out there that is
20   high in orientation, it just means there's a tendency
21   that this correlates --- that you're much more likely to
22   see this when people have a high ego orientation.
23      Q.   So I'm just --- my question is a little more
24   precise.  Thank you for that explanation.  But the first

Page 148

1    clause there you cite only to Balaguer.  I'm asking if
2    there are other sources for that contention that
3    athletes high in ego orientation report lower
4    companionship and greater conflict with teammates.  And
5    if there are other things, what are those other studies?
6       A.   Like Smith and Small found that in youth sport
7    athletes, you know, didn't like their coach as much,
8    didn't think their coach knew as much about the sport,
9    didn't like their teammates as much when they had high
10   high ego orientation.
11      Q.   Is there a reason why you didn't cite Smith and
12   Small for that proposition?
13      A.   Yes.  Yeah, I think it crosses documents.  We
14   could have added another, you know, 150 references
15   probably.  Tried to keep it more manageable, which it's
16   just consistent, that if that is something that you care
17   about, the quality of relationships, then it doesn't
18   come out often as --- you know, it comes out with the
19   task orientation, not an ego.
20      Q.   Well, the reason I'm asking this is I read that
21   Balaguer report, and I did not see anything in there
22   that supported this proposition of this first clause of
23   this sentence.  Are you confident that it's in there?
24      A.   It would be good for me to review.

Page 149

1       Q.   If I showed you the article would you be able to
2    locate it without too much difficulty?
3       A.   I'm not sure.  I'd probably just have to review
4    it.  But having ---.
5            ATTORNEY TRYON:  Well, let's bring it up,
6    and maybe I've just missed it.  And so that would be ---
7    the name of it is Motivational Climate and Goal
8    Orientations as Predictors of Perceptions of Improvement
9    Satisfaction in Coach Ratings Among Tennis Players.
10   Educators.  So Jake, if you could find that and pull
11   that up.
12           VIDEOGRAPHER:  Do you want it marked?
13           ATTORNEY TRYON:  Yes.  I think we are on
14   8 now, right?
15           VIDEOGRAPHER:  I think it's 7, unless I
16   missed something.
17           ATTORNEY TRYON:  Well, I will take your
18   word for that.
19                       ---
20           (Whereupon, Exhibit 7, Article, was
21            marked for identification.)
22                       ---
23           ATTORNEY TRYON:  You know what, I should
24   ask you, Jake, go ahead and put that in the chat room so

Griffin 0530

1    that Professor Fry can download it and look at it real
2    quick.
3           VIDEOGRAPHER:  Already did.
4           ATTORNEY TRYON:  Great.
5    BY ATTORNEY TRYON:
6        **Q.   So Professor Fry, you can either look at this**
7    **with me or it might be best if you just double check in**
8    **the chat room and then it should download it and you**
9    **should be able to bring it up and look through there at**
10   **your --- I don't want to say leisure but how you would**
11   **prefer to do it.**
12       A.   Okay.  I may have to get help here because it's
13   not appearing on my end.
14       **Q.   Do you see it in the chat room?**
15       A.   Yeah, I can click on it, but then it takes me to
16   some case view net thing and it says I need a code and
17   password.  I'm using their system, so I'm guessing it's
18   related to that.
19          VIDEOGRAPHER:  Not the link.  There
20   should be a PDF document you can just click open.
21          THE WITNESS:  Okay.
22          VIDEOGRAPHER:  I don't know how it is on
23   an iPad, so I will admit I'm at a loss.
24          THE WITNESS:  Okay.

1    BY ATTORNEY TRYON:
2        **Q.   Are you able to look at it now?**
3           VIDEOGRAPHER:  The document called 007 at
4    the beginning?
5           THE WITNESS:  When I click on the chat
6    I'm just seeing one link listed.
7    BY ATTORNEY TRYON:
8        **Q.   Underneath the link there should be a PDF.**
9        A.   Okay.  It's not showing up for me.
10       **Q.   Okay.**
11          VIDEOGRAPHER:  Alternatively, Counsel, I
12   can give remote control of the document to her so that
13   she can scroll on it herself.
14          ATTORNEY TRYON:  Let's do that.
15          VIDEOGRAPHER:  Okay.
16          THE WITNESS:  Thank you.
17          VIDEOGRAPHER:  You should have control if
18   you just try to click on the screen and you just scroll
19   it and move it.  Perfect.
20          THE WITNESS:  Okay.
21          So how do I move the document?
22          VIDEOGRAPHER:  So if you would move the
23   cursor like over here and drag it.
24          THE WITNESS:  Sorry.  Can you say that

1    again?
2           VIDEOGRAPHER:  You can control the mouse
3    cursor right now, so you would have to move it over here
4    and just drag it down or click on this down arrow down
5    here?
6           THE WITNESS:  So I don't really have a
7    mouse, right, with this.  It's just using my finger on
8    the screen.
9           VIDEOGRAPHER:  Right.  If it works like
10   normal iPad things, then you would --- to click
11   something you would double tap it and then hold, which
12   sounds convoluted.
13          ATTORNEY TRYON:  Well, if you have any
14   difficulties with it, why don't we let Jake take control
15   and scroll down with it?
16          THE WITNESS:  Okay.
17          I think Dana is outside, if you want me
18   to get her to help real quick to save time.
19          ATTORNEY TRYON:  I'll tell you what,
20   let's do this.  This is not a critical point for me.  I
21   just wanted to try and understand this.  So let's come
22   back to this later.  All right?
23          THE WITNESS:  Okay.
24          ATTORNEY TRYON:  We have time.

1    BY ATTORNEY TRYON:
2        **Q.   In paragraph 32, you talked several times about**
3    **the climate, right?**
4        A.   Yes.
5        **Q.   And in the sentence it says despite the ego**
6    **involving climates emphasis on the performance outcomes**
7    **results across studies suggest the benefits of task**
8    **involving climate may have a direct impact on athletic**
9    **performance and ultimately improve performance outcomes.**
10   **So that sentence is talking about the climate, not the**
11   **individual's orientation, right?**
12       A.   That's correct.
13       **Q.   And you say it may have a direct impact.  So by**
14   **may that is not suggesting that it's probable, it is**
15   **just saying that it might.  Is that a fair statement?**
16       A.   Yes.
17       **Q.   Then let me move down to paragraph 33.**
18       A.   Can I just say on that point ---?
19       **Q.   Yes.**
20       A.   I think this is an area within our body of
21   research that there is less support for, but the studies
22   that are in place would suggest that perceptions of a
23   task involving climate would lead to greater
24   performance.  So there is some evidence for that, but I

1  would agree it's not strong and that is why the wording
2  is softer there, right, but there is no evidence
3  suggesting that perceptions in an ego involving climate
4  would lead to better performance.  And so on the one
5  hand people just might be thinking, wow, that's a
6  no-brainer, right, if all you care about performance go
7  with that ego involving climate, but for all these other
8  reasons we would argue it makes sense, right.  If people
9  are having more fun and having better relationships and
10  trying hard and so on, that it might lead to better
11  performance.
12      Q.   In paragraph 33 you talk about young athletes
13  with a high ego orientation participating in a variety
14  of sports have reported higher traits and state
15  cognitive and somatic anxiety as well as greater
16  concentration dysfunction, maladaptive perfectionism and
17  concern over making mistakes.  Now, my question is,
18  isn't that true for basically any endeavor, that there's
19  going to be --- you're going to have anxiety in trying
20  to succeed?
21          ATTORNEY VEROFF:  Objection.
22          THE WITNESS:  You know, definitely anxiety
23  and stress is part of sport.  With these climates though
24  what we're seeing consistently is that athletes report

1  that when they perform their best they were less
2  bothered by stress and anxiety.  In fact, the kind of
3  epitome of being --- what we call being in flow, right,
4  you just --- you feel high confidence, you're
5  concentrating well, you're not worried about
6  distractions, you 're not stressed, right.  And so
7  consistently people would report a higher ego
8  orientation, they just --- no matter how it's measured
9  all this kind of bad stuff that we'd rather take out,
10  right, and not have people worried about, young athletes
11  worried about, they just experience it more.  So the
12  cognitive anxiety is what's going on up here, right,
13  worry and doubt, and the somatic anxiety is I can't get
14  a grip on my heart rate, my muscles feel tense, I have
15  butterflies and those kinds of things.  So we see that
16  more with athletes high in ego orientation.
17      Q.   Well, when you were going through college and
18  getting your Ph.D., you were striving to do your very
19  best and you were striving to succeed and get As to get
20  your Ph.D.  All of those things are something that
21  requires you to succeed and to convince other people how
22  good you are, right?
23      A.   To succeed and make the world better.
24      Q.   Right, but to get a Ph.D. that's a tough --- is

1  that an easy thing to do?
2      A.   No, it is not.
3      Q.   And it is based on what other people think of
4  you and your work, right?
5      A.   Yeah.  I mean, there's requirements to complete
6  a Ph.D. for sure that involve other people.
7      Q.   And they're judging your work, right?
8      A.   Right.
9      Q.   And that creates, I presume, for most people it
10  creates a lot of anxiety.  Did it for you?
11          ATTORNEY VEROFF:  Objection.
12          THE WITNESS:  You know, at times it was
13  stressful, but I enjoyed every minute of it.  And so
14  some of this comes back to anxiety is pretty typical and
15  we're going to experience that, but what I'm feeling
16  about it is helping people develop strong coping skills
17  so that they can deal with that stress and anxiety.  And
18  that is, you know, another study that we recently
19  published that people who perceived a caring task
20  involving climate reported greater coping skills, right.
21  BY ATTORNEY TRYON:
22      Q.   And to develop those coping skills you need to
23  sometimes follow the rules of others like those on the
24  Ph.D. committee, if that's the right terminology, rather

1  than saying, hey, committee you're wrong, I'm right, you
2  have to do what I say, right?
3          ATTORNEY VEROFF:  Objection.
4          THE WITNESS:  I'm not sure that's related
5  to coping skills, but what you said is true, it does
6  take place when you're working on a Ph.D.
7  BY ATTORNEY TRYON:
8      Q.   And pretty much every part of life you can't
9  just say I don't like your rules, do it my way and get
10  your way, you have to cope with the world as it is, not
11  as you want it to be all the time, right?
12      A.   Right.
13          ATTORNEY VEROFF:  Objection.
14  BY ATTORNEY TRYON:
15      Q.   And that's a hard thing, right?
16      A.   It is.
17      Q.   But it builds character, doesn't it?
18      A.   It sure can.
19      Q.   So let me move on then.  I think I understand
20  what you're saying in this paragraph.  Looking at
21  paragraph 35, okay, let me see if we addressed some of
22  these things.  Have you studied depression and mental
23  health with athletes?
24      A.   No, it's not my area.  Yes, I've read some, but

Page 158

1  no, it's not an area that I studied in depth.
2      Q.   So you haven't written on it?
3      A.   We might have a study where we include some
4  parameters of psychological well-being, like studies
5  with kids, looking at how the climate relates to a
6  caring climate relating to reporting greater hope and
7  happiness and less depression and sadness, but studying
8  like depression is not a primary area for me.
9      Q.   Have you looked at the issue for athletes
10 between injuries and mental health or depression?
11     A.   No, no.
12     Q.   Are you aware that there are studies and papers
13 on that issue?
14     A.   Yes.
15     Q.   Okay.
16         Let me ask you to take a look at --- well,
17 before we go, have you heard of the American College of
18 Sports Medicine?
19     A.   I have.
20     Q.   And are they well regarded?
21     A.   Yes.
22     Q.   Have you heard of Andrew Wolanin?
23     A.   I have not.
24         ATTORNEY TRYON:  Okay.

Page 159

1         Well, let's bring up this exhibit, which
2  will be then Exhibit --- I think this will be --- well,
3  I will just ask, Jake, help me out with numbers.  The
4  title is Depression and Athletes, Prevalence and Risk
5  Factors.
6         VIDEOGRAPHER:  I believe we're on Number
7  8 now.
8         ATTORNEY TRYON:  Okay.  Perfect.
9         VIDEOGRAPHER:  Just give me one moment.
10        ---
11        (Whereupon, Exhibit 8, Article, was
12         marked for identification.)
13        ---
14 BY ATTORNEY TRYON:
15     Q.   Have you seen this document that I now marked as
16 Exhibit-8 before?
17     A.   No, I haven't.  Jake, can you show the top again
18 please?
19        VIDEOGRAPHER:  That is as far up as it
20 goes.
21        THE WITNESS:  Okay.
22 BY ATTORNEY TRYON:
23     Q.   Are you familiar with any of the three authors?
24     A.   No.

Page 160

1      Q.   So I am going to ask you about several parts in
2  here, so it might be helpful to have --- try one more
3  time to see if you can --- give you access to it, to
4  give you control over the screen so you can scroll down.
5  And you should be able to treat it just like anything
6  else on your iPad, with your fingers or however you do
7  it.
8      A.   So when I click on control it has like a
9  keyboard and then it has a question mark.
10        ATTORNEY TRYON:  Jake, any input?
11        VIDEOGRAPHER:  It sounds like it's just
12 bringing up the iPad keyboard and there should be
13 something that looks like a keyboard and that minimizes
14 the keyboard itself so you can just get back to the
15 screen.
16        ATTORNEY VEROFF:  I'm sorry, Dr. Fry.
17        THE WITNESS:  No, go ahead.
18        ATTORNEY VEROFF:  I was just going to
19 ask, Dave, is there any way to get in touch with Dana.
20 Maybe we could send her the PDF and have her print them
21 so that the witness could have hard copies.  That might
22 make this all work a little bit easier for any --- for
23 this or any other studies that you would want her to
24 look at.

Page 161

1         ATTORNEY TRYON:  Yeah, except they're in
2  a hotel room now.  That's one of the --- is Dana outside
3  the door did you say?
4         THE WITNESS:  Yes, is it okay if I just
5  check with her because I think she has a little business
6  center set up maybe.
7         ATTORNEY VEROFF:  If we can go off the
8  record for a moment.
9         ATTORNEY TRYON:  Great.
10        VIDEOGRAPHER:  Going off the record.  The
11 current time reads 239 p.m. Eastern Standard Time.
12 OFF VIDEOTAPE
13        ---
14 (WHEREUPON, A SHORT BREAK WAS TAKEN.)
15        ---
16 ON VIDEOTAPE
17        VIDEOGRAPHER:  We are back on the record.
18 The current time reads 2:42 p.m. Eastern Standard Time.
19        ATTORNEY TRYON:  Okay.  If you can now
20 look at --- give me a moment.  Let's look at your
21 original report on page 12, that would be Exhibit-1.
22        VIDEOGRAPHER:  Did you say page 12 or
23 paragraph 12?
24        ATTORNEY TRYON:  Page 12.

Midwest 0533

Page 162

1      VIDEOGRAPHER:  Okay.
2      ATTORNEY TRYON:  Okay, right there is
3  great.
4  BY ATTORNEY TRYON:
5      Q.   Okay.
6      Do you see that, Doctor Fry?
7      A.   Yes.
8      Q.   So the title you have here is Excluding Groups
9  from Participating in High school Athletics would
10  Deprive Them and Their Teammates of a Wide Range of
11  Educational Benefits.  Did you write that?
12      A.   Yes.
13      Q.   Okay.
14      Then I would like to compare that to the title
15  that you have in your latest report, if you could bring
16  that up, and that is on page ten.  So here you change
17  groups from to excluding transgender students.  Why did
18  you make that change?
19      A.   I think just because it's specific to this case.
20      Q.   Well, the specifics of this case were the same
21  before as they are now, so do you have any better
22  explanation?
23      ATTORNEY VEROFF:  Objection.
24      THE WITNESS:  You know, I edit everything

Page 163

1  I write, and so if I see something that may clarify more
2  or change a word, you know, that makes it better, then I
3  would do that.  I think that's what happened here.
4  BY ATTORNEY TRYON:
5      Q.   Are you aware of any groups being excluded from
6  participating in youth or adult athletics?
7      ATTORNEY VEROFF:  Objection.
8      THE WITNESS:  You know, I think a lot of
9  times kids with disabilities are kept out.  I think kids
10  who have limited financial resources sometimes are
11  limited.  I think groups are --- so it may not be a rule
12  that you cannot play, but you know, there are other
13  groups who miss out on the opportunities to play.
14  BY ATTORNEY TRYON:
15      Q.   Other than that, can you think of any groups
16  that are excluded by any rule or requirements from any
17  athletic activities?
18      ATTORNEY VEROFF:  Objection.
19      THE WITNESS:  Not that's coming to mind
20  that are, you know, like obvious or stated in the rules,
21  but I think there's personal different ethnic, minority
22  groups, for example, that might have less exposure to
23  sport, things like that.
24  BY ATTORNEY TRYON:

Page 164

1      Q.   Let me ask you about Special Olympics.  Is the
2  entrance into Special Olympics --- do you know anything
3  about --- let me back up.  You're aware of what Special
4  Olympics is, right?
5      A.   Yes, I'm aware of it.
6      Q.   And do you know if there are specific
7  requirements in order to be able to participate in
8  Special Olympics?
9      A.   I know there are.  I couldn't tell you what they
10  are across the different categories and all.
11      Q.   Can able bodied athletes and able minded
12  athletes participate in Special Olympics?
13      A.   Special Olympics was created to give athletes
14  --- okay.  Dana said she hadn't received those.  Just to
15  double check, that it is Dana@midwestreporters.net.
16  It's not .com.
17      VIDEOGRAPHER:  I will double check it.
18      THE WITNESS:  Thank you.
19      ATTORNEY TRYON:  Sorry to interrupt your
20  flow.
21  BY ATTORNEY TRYON:
22      Q.   So my question was can able-bodied athletes and
23  able-minded athletes participate in Special Olympics,
24  and you started to say Special Olympics was created.

Page 165

1      A.   Right.  The answer is no, they can't
2  participate.
3      Q.   So that is an exclusion, right?
4      A.   Yes.
5      Q.   And it's a categorical exclusion, right?
6      A.   Yes.
7      Q.   Do you think it's a fair exclusion?
8      ATTORNEY VEROFF:  Objection.
9      THE WITNESS:  Sorry.  Yes, in this case.
10  BY ATTORNEY TRYON:
11      Q.   And why?
12      A.   Because those able-bodied athletes have another
13  area where they can compete.
14      Q.   And so Special Olympics is especially designated
15  for certain athletes who are not able to compete against
16  able-bodied and able-minded athletes, right?
17      A.   Uh-huh (yes), yes.
18      Q.   So it's essentially a protected category, right?
19      ATTORNEY VEROFF:  Objection.
20      THE WITNESS:  Yes.  I don't know if it is
21  protection so much, as just provide an opportunity.
22  BY ATTORNEY TRYON:
23      Q.   And that exclusion is of --- with respect to
24  Special Olympics, you wouldn't call that arbitrary,

lisear27633 0534

Page 166

1   would you?
2        ATTORNEY VEROFF:  Objection.
3        THE WITNESS: No.
4   BY ATTORNEY TRYON:
5        Q.   Now, if we go down in paragraph 37, the second
6   sentence says, if transgender students are arbitrarily
7   excluded from youth sports they are, in turn, deprived
8   of those positive experiences and outcomes and their
9   teammates are deprived of a genuinely optimal sports
10   experience.
11        Do you see that?
12        A.   I do.
13        Q.   If that exclusion is based on safety concerns or
14   performance concerns then it would not be arbitrary.
15        Correct?
16        ATTORNEY VEROFF:  Objection.
17        THE WITNESS:  If there were strong
18   evidence for those.
19   BY ATTORNEY TRYON:
20        Q.   And just --- I think we covered this, but I just
21   want to make sure I'm correct, you are not an expert on
22   safety issues, right?
23        A.   That's right.
24        Q.   And you are also not an expert on performance

Page 167

1   issues, right?
2        A.   That's right.
3        Q.   What would you call strong evidence?
4        ATTORNEY VEROFF:  Objection.
5        THE WITNESS:  I call it data that the
6   experts come to agree that --- you know, how they can
7   guide the rules for sport, right, and balance inclusion
8   and fairness.
9   BY ATTORNEY TRYON:
10        Q.   Would you agree with me that not all experts
11   agree on everything, even with their own field, right?
12        A.   That's right.
13        Q.   Is there a minimum number of experts that would
14   have to agree before it's strong evidence or is that
15   sort of a --- I don't know how to say it.  What do you
16   think?
17        ATTORNEY VEROFF:  Objection.
18        THE WITNESS:  I think with respect to
19   this case, that organizations can, you know, weigh in on
20   the evidence there to see --- I mean, there is just a
21   lot of injury within sport that happens, right, it's
22   just part of sport.  So I think they would have to
23   really consider the evidence to see if there are safety
24   concerns for having transathletes participate.

Page 168

1   BY ATTORNEY TRYON:
2        Q.   Do you think in high school that every sport
3   should have a different rule of when transgender girls
4   can participate in those specific girls sports?
5        ATTORNEY VEROFF:  Objection.
6        THE WITNESS: You know, I just come back
7   to my expertise and why I've been asked to be on this
8   case is just to address the benefits that athletes
9   receive from participating in sport.  So I wouldn't
10   perceive that they are at the high school level.  There
11   is different rules for every sport, but I don't know
12   where we will be down the road, right, as we just figure
13   all this out and strive to include all athletes.
14   BY ATTORNEY TRYON:
15        Q.   So you don't know what the rules should be?
16        ATTORNEY VEROFF:  Objection.
17        THE WITNESS:  Right, I'm not the best
18   person to make those decisions.  I think we need people
19   who are studying these issues, and that is beyond my
20   expertise.
21   BY ATTORNEY TRYON:
22        Q.   Fair enough.  I don't want you to go beyond your
23   expertise.  Well, let me ask you just some related
24   questions.  And you may say the same thing on this, but

Page 169

1   I'm going to ask you and we will see if you have any
2   thoughts.  You may have already answered this, but let
3   me ask you these.  On what teams should student athletes
4   participate on if they are transgender?  If they are a
5   transgender girl, should they participate on boys or
6   girls teams?
7        ATTORNEY VEROFF:  Objection.
8        THE WITNESS:  I think it depends what the
9   rules are, but, you know, over the last decade across
10   organizations, organizations have found a way to allow
11   transgender females to participate.
12   BY ATTORNEY TRYON:
13        Q.   And those rules have changed over time, right?
14        A.   They do.
15        Q.   NCAA just changed its rules, right?
16        ATTORNEY VEROFF:  Objection.
17   BY ATTORNEY TRYON:
18        Q.   Did you answer?
19        A.   You know, I'm not sure of the latest.  I thought
20   they were going to leave --- yeah, they're going to be
21   looking at other options and getting feedback from the
22   governing bodies is my understanding.
23        Q.   Are you aware of what the Rugby Association
24   says?

1    ATTORNEY VEROFF:  Objection.
2    THE WITNESS: No.
3  BY ATTORNEY TRYON:
4    Q.   Are you aware of USA Swimming, what their rules
5  are?
6    ATTORNEY VEROFF:  Objection.
7    THE WITNESS: I couldn't tell you all the
8  details, but I know USA Swimming really is trying to
9  find a way to be inclusive, and so I know at the youth
10 levels that transgender youth are able to participate,
11 right, and that they have allowed some rule changes for
12 what swimsuit kids wear and things like that.
13 BY ATTORNEY TRYON:
14   Q.   But those transgender girls have to --- or
15 transgender women have to meet certain requirements
16 before they can participate on a female team.
17   Right?
18   ATTORNEY VEROFF:  Objection.
19   THE WITNESS: Yes.
20 BY ATTORNEY TRYON:
21   Q.   Are you aware of the specifics?
22   A.   No.  I've read some of this, but I'm not sure
23 I've retained it and it's not something that I spent a
24 long time on across sports.

1    Q.   Okay.
2    Let me ask you then if you have ever heard of
3  the term nonbinary?
4    A.   I have heard of that term.
5    Q.   Is this a fair definition, that it is people who
6  do not describe themselves or their genders as fitting
7  in the category of man or woman?  Does that sound like a
8  fair definition?
9    ATTORNEY VEROFF:  Objection.
10   THE WITNESS: Yes.
11 BY ATTORNEY TRYON:
12   Q.   Should a biological male who identifies as
13 nonbinary who is an athlete participate in high school
14 on the boys or girls team?
15   ATTORNEY VEROFF:  Objection.
16   THE WITNESS:  I think it depends on what
17 the rules are.  And I think the goal of the sport
18 organizations seems to be how can we look at these
19 issues and just still try to be as inclusive as
20 possible.
21 BY ATTORNEY TRYON:
22   Q.   What are the rules on that in high school?
23   ATTORNEY VEROFF:  Objection.
24   THE WITNESS:  Right, it seems to vary

1  across states.
2  BY ATTORNEY TRYON:
3    Q.   Do you know of any rule --- do you know of any
4  rule that specifically addresses nonbinary athletes?
5    ATTORNEY VEROFF:  Objection.
6    THE WITNESS: No.
7  BY ATTORNEY TRYON:
8    Q.   Have you heard the term bigender?
9    ATTORNEY VEROFF:  Objection.
10   THE WITNESS: Yes.
11 BY ATTORNEY TRYON:
12   Q.   The definition that I have read is a person who
13 identifies as bigender has two genders.  Is that your
14 understanding as well?
15   ATTORNEY VEROFF:  Objection.
16   THE WITNESS: Yes.
17 BY ATTORNEY TRYON:
18   Q.   And in high school the biological male
19 identifies as bigender and wants to participate on a
20 girls sports team, should that be allowed?
21   ATTORNEY VEROFF:  Objection.
22   THE WITNESS:  I think greater context is
23 needed.  There's a --- you know, understand what's going
24 on with that particular athlete.  And again, I just want

1  to --- this is a little bit beyond my expertise and I'm
2  here to just reenforce that there is a lot of benefits
3  for all athletes to be able to participate.
4  BY ATTORNEY TRYON:
5    Q.   What if a biological male wants to be on a girls
6  team, even though he does not identify as a girl, should
7  he be allowed to do so?
8    ATTORNEY VEROFF:  Objection.
9    THE WITNESS:  No.
10 BY ATTORNEY TRYON:
11   Q.   And why not?
12   A.   Because he's wanting to play on a --- on a
13 female team and he doesn't --- hasn't transitioned and
14 isn't identifying as a female.
15   Q.   If a biological male wants to participate on a
16 girls team and identifies as a female but has not
17 transitioned in any way, should he be allowed to
18 participate on the girls team?
19   ATTORNEY VEROFF:  Objection.
20   THE WITNESS:  In --- in general I would
21 say no, but we're missing the context.  What if this was
22 --- yeah, I think we want that person to transition.
23 BY ATTORNEY TRYON:
24   Q.   Okay.

Plaintiffs 0536

Page 174

1    **What transitioning would be necessary?**
2         ATTORNEY VEROFF:  Objection.
3         THE WITNESS:  I think that's out for
4    debate, discussion, and to figure out at these different
5    levels of sports what that criteria is going to be.
6    BY ATTORNEY TRYON:
7         **Q.   So in high school is it simply changing your**
8    **name to a female name, would that --- for a male to**
9    **change to a female name, would that be adequate to then**
10   **be allowed to play on the girls team?**
11        ATTORNEY VEROFF:  Objection.
12        THE WITNESS:  No, I'd say in general that
13   wouldn't be the case.
14   BY ATTORNEY TRYON:
15        **Q.   Okay.**
16        **If that person, in addition to changing his**
17   **name to a female name and says I want to be addressed**
18   **using female pronouns, is that adequate?**
19        ATTORNEY VEROFF:  Objection.
20        THE WITNESS:  I think that we've got this
21   kind of continuum it sounds like, right, to what degree
22   people are transitioning to know transitioning.  And to
23   just have a blanket statement that no one --- that no
24   transathlete can ever participate in sport ever across

Page 175

1    the universe is harmful for many athletes, right.  And
2    so these specifics of where we are going to go with what
3    the criteria is for athletes, right, I think there's a
4    lot of people studying these issues and weighing in and
5    I'm not one of those individuals who's really studying
6    this stuff in detail at that level, but I do know ---.
7    BY ATTORNEY TRYON:
8         **Q.   Sorry.  Go ahead.**
9         A.   I do know that inclusion in sport has many
10   benefits and that it would be a shame to not hold a
11   category of athletes out to participate.
12        **Q.   So there would be nothing to stop a male**
13   **athlete, a biological male athlete identifying as a**
14   **female from participating on a boys team, right?**
15        ATTORNEY VEROFF:  Objection.
16        THE WITNESS:  Right.  I did not state
17   that.  I'm not sure what that criteria should be, but it
18   helps us balance, being inclusive and also being fair.
19   BY ATTORNEY TRYON:
20        **Q.   So it's not excluding that person from**
21   **participating in sports, it's just excluding that person**
22   **from participating on the team that person wants to**
23   **participate on, right?**
24        ATTORNEY VEROFF:  Objection.

Page 176

1         THE WITNESS:  If we understand that
2    transathletes are identifying with a particular gender,
3    so in this case transfemales then, then no, that wouldn't be
4    an option so go participate on a male team.
5    BY ATTORNEY TRYON:
6         **Q.   Well, why is that not an option?**
7         A.   Right, well, I just point to PBJ, right, who has
8    identified as a girl for a long time and looks very much
9    like a girl and is the --- I believe the principal said,
10   you know, we're just creating problems.  This little
11   girl can be with her friends, can run cross-country, can
12   reap all these benefits, right, and it's not an option
13   to send her over to the boys team because she is a girl.
14        **Q.   Do you need to look like a girl to be on the**
15   **girls team?**
16        ATTORNEY VEROFF:  Objection.
17        THE WITNESS:  No, I'm not sure what that
18   means.
19   BY ATTORNEY TRYON:
20        **Q.   Well, there are girls that look masculine that**
21   **are girls and they, of course, want to be on the girls**
22   **team.  I would presume you would agree they should be on**
23   **the girls team, right?**
24        ATTORNEY VEROFF:  Objection.

Page 177

1         THE WITNESS:  Right, there are --- you
2    know, we may get into a debate about what is masculine
3    or feminine if we're saying that --- you're describing
4    somebody as more --- a female that's more masculine, but
5    maybe other people see it that there's a feminine
6    quality to whatever, being strong, yeah, having a solid
7    build, those things.
8    BY ATTORNEY TRYON:
9         **Q.   Well, you're the one that pointed out that BPJ**
10   **looks like a little girl and suggesting that that was**
11   **one of the reasons that BPJ should be on the girls team.**
12   **Did I understand that incorrectly?**
13        A.   What I meant to emphasize is that she sees
14   herself as a girl, and so we put her in a really
15   uncomfortable spot to say you can't be with the girls
16   and you have to go be with the boys even though in your
17   heart of hearts you know you're a girl.
18        **Q.   Can that be uncomfortable for the biological**
19   **girls on the girls team if biological boys who identify**
20   **themselves as internally as being girls are allowed to**
21   **participate on the girls team?**
22        ATTORNEY VEROFF:  Objection.
23        THE WITNESS:  Could --- you know, could
24   the fact that a transgender girl is participating in a

disclosure 0537

Page 178

1    sport, on a team, could that make someone feel
2    uncomfortable?  Definitely it's possible.
3    BY ATTORNEY TRYON:
4        Q.   Not only is it possible, but it happens, right?
5             ATTORNEY VEROFF:  Objection.
6             THE WITNESS:  Yes, I think it probably
7    happens.  It probably happens both ways, that there are
8    also teammates that are very supportive.
9    BY ATTORNEY TRYON:
10       Q.   But the feelings of the biological girls who are
11   uncomfortable with a biological male identifying as a
12   female or a transgender girl, as you have said, their
13   feelings are important too, right?
14            ATTORNEY VEROFF:  Objection.
15            THE WITNESS:  You know, pulling from my
16   expertise, if we're trying to create that caring task
17   involving climate, then yes, it would be very important
18   for a coach to sit down with those athletes and talk and
19   encourage them.  If the transfemale athlete is playing
20   by the rules and has done everything that has been asked
21   and they are part of a team, then coaches should really
22   talk with the athletes that help them understand, help
23   them not let this be a distraction, help them embrace
24   all their teammates, right.  There is so much in the

Page 179

1    sport that any of us on a team might like to change,
2    right, or wish our teammates did other things, right,
3    wish they worked harder or wish they used less
4    recreational drugs or anything, right, but we are a team
5    and we come together and we just support each other and
6    we keep the focus on being the best we can be every day.
7    BY ATTORNEY TRYON:
8        Q.   So biological girls just need to knuckle under
9    and accept things the way that you want them to be.  Is
10   that what you are saying?
11            ATTORNEY VEROFF:  Objection.
12            THE WITNESS:  I'm saying being part of a
13   team is challenging, and for some people having a
14   teammate that is transgender may be one of those
15   challenges they have to deal with.  But everyone is
16   dealing with challenges with the teams, right.  And if
17   that transgender athlete is there playing by the rules,
18   right, and is allowed to be there, then yeah, I guess
19   the others have to deal with it.
20   BY ATTORNEY TRYON:
21       Q.   So on the other hand, you can tell that
22   transgender female to participate on the boys team and
23   the coach on the boys team would sit down with the boys
24   and say you will not make fun of this child, you accept

Page 180

1    this child as one of our own even though this child is a
2    transgender female, this transgender female will be on
3    the boys team and you will treat this transgender female
4    with respect and be a full part of the team, right, that
5    coach could do that?
6             ATTORNEY VEROFF:  Objection.
7             THE WITNESS:  Yes, the problem is that the
8    transgender athlete is a female, right, and has the
9    right to participate with the female team.
10   BY ATTORNEY TRYON:
11       Q.   Where is that right found?  You just said she
12   has that right.  Where is that right?
13            ATTORNEY VEROFF:  Objection.
14            THE WITNESS:  I mean as it comes within
15   the rules, right.  I'm sorry, Julie.  I mean, as it
16   falls within the rules, right.
17   BY ATTORNEY TRYON:
18       Q.   Well, right now the rule is HB-3293, which says
19   that that transgender girl must participate on the boys
20   team.  And since that is the rule, following your ---
21   your logic, you go to the boys team and the boys coach
22   and you say this child is going to be participating in
23   this team, you will welcome her with open arms onto our
24   team just as we do on football, we open with --- welcome

Page 181

1    with open arms girls who are playing on a boys football
2    team, right?
3             ATTORNEY VEROFF:  Objection.
4             THE WITNESS:  My understanding in this
5    case is that the judge is --- has kind of looked at the
6    evidence and said right now I think there is potential
7    discrimination and so we're going to let BPJ continue to
8    compete and all through this so ---.
9    BY ATTORNEY TRYON:
10       Q.   That's right, the Judge did say that for now,
11   but he did not say that for everything.  But I'm asking
12   for a more general rule.  Putting aside BPJ, as a
13   general rule, why would you say coach of the boys team,
14   you will allow these transgender girls to come and play
15   on your team and you will welcome them with open arms
16   just as we do with our football teams that allow girls
17   to play on them?
18            ATTORNEY VEROFF:  Objection.
19   BY ATTORNEY TRYON:
20       Q.   Because after all, as you said, the transgender
21   girl is a girl and so should be allowed to play on the
22   boys team if she chooses?
23            ATTORNEY VEROFF:  Objection.
24            THE WITNESS:  I think football is a great

einhart 0538

Page 182

1  sport, and I wish they had male and female teams.
2  Typically, it's just a male team, so a female who wants
3  to play football doesn't have another option.  But in
4  this case BPJ and others who identify as a female and
5  should be able to compete with other females, their
6  friend group and --- so I see that as an indifference.
7  BY ATTORNEY TRYON:
8      Q.   Their friend group?  So girls can't have boy
9  friends?
10     A.   No.  I meant it --- sorry, I meant in this case
11 BPJ is saying her closest friends are on the girls team.
12 She is a girl and she --- and so it would be harmful,
13 not fair to not let her compete with that team.
14     Q.   How do you define fair?  You told me before you
15 are not an expert on fairness.  Are you now saying that
16 you do know what is fair?
17          ATTORNEY VEROFF:  Objection.
18          THE WITNESS:  I'm just keeping focused on
19 what the rules are and the Judge has ruled right now
20 that BPJ should be able to compete with the girls
21 because she is a girl, and so from my perspective,
22 that's where it stands right now.
23 BY ATTORNEY TRYON:
24     Q.   Okay.

Page 183

1          That's just because that's what the Judge said
2  then, right?
3          ATTORNEY VEROFF:  Objection.
4          THE WITNESS:  No.  I think the core issue
5  is BPJ identifies as a girl, has lived the majority of
6  her life as a girl and wants to be able to participate
7  in her school activities as a girl, including
8  cross-country.
9  BY ATTORNEY TRYON:
10     Q.   So how long do you think a transgender girl has
11 to live as a girl before participating on the girls
12 team?
13          ATTORNEY VEROFF:  Objection.
14          THE WITNESS:  Again, I think I'm not the
15 best person for that line of inquiry.  I'm not sure, but
16 I know others are studying that, those kind of issues,
17 and can add greater insight to it.
18 BY ATTORNEY TRYON:
19     Q.   Okay.
20     A.   I'm just someone who would hate to see BPJ not
21 be allowed to participate in her school activities, just
22 to be told no, I'm sorry.
23     Q.   On the girls team?
24     A.   Right.

Page 184

1      Q.   And of course, not all athletes compete on
2  teams.  Sometimes if they just love to run, if that is
3  the key, they just love to run, they don't have to be on
4  a team to run, right?
5      A.   Right.
6          ATTORNEY TRYON:  So we have gone for an
7  hour.  And I would like to get some documents printed
8  since we're not able to easily look at them on your
9  iPad.  So why don't we go off the record to see if we
10 can get that taken care of.  Is that okay with you,
11 Julie?
12          ATTORNEY VEROFF:  That is great.  Thank
13 you.
14          VIDEOGRAPHER:  Going off the record.  The
15 current time reads 3:15 p.m. Eastern Standard Time.
16 OFF VIDEOTAPE
17                    ---
18 (WHEREUPON, A SHORT BREAK WAS TAKEN.)
19                    ---
20 ON VIDEOTAPE
21          VIDEOGRAPHER:  We are back on the record.
22 The current time reads 3:37 p.m. Eastern Standard Time.
23 BY ATTORNEY TRYON:
24     Q.   Professor Fry, thank you for helping us with

Page 185

1  that technical issue.
2      A.   No problem.
3      Q.   I would like you to find the exhibit that says
4  Depression in Athletes.  It should be Exhibit-8, I
5  believe.
6      A.   I've got it.
7      Q.   Okay.
8          I've lost you.  There you are.  Okay.  Let me
9  find the right page I'm outlining to.  Okay.  So Exhibit
10 8 is Depression in Athletes:  Prevalence and Risk
11 Factors by Andrew Wolanin and other authors, right?
12     A.   Yes.
13     Q.   So I wanted to ask you about a passage on the
14 second page of this, which is page 57, under the title
15 Sports Injuries and Depression at the bottom of the
16 first column.  So I will just read the passage that I
17 have a question about and if you choose to read it, too,
18 if you want to read it more --- in fact, did you already
19 read the abstract on this earlier?
20     A.   I just did.
21     Q.   Okay.
22          So you've read the abstract.  My question is
23 on, as I said, under Sports Injuries and Depression.
24 And I will just read into the record, Bruer and Petrie,

Live-27638 0539

Page 186

1   seven in parentheses, were among the first researchers
2   to compare depression symptoms between athletes who had
3   and had not experienced injuries.  In this retrospective
4   study it was found that athletes who experienced an
5   injury during the previous year reported significantly
6   higher depression symptom scores than those reported by
7   non-injured athletes, as measured by the Validated
8   Center for Epidemiological Studies Depression,
9   parentheses, CES-D scale.  Do you see that?
10   A.  I do.
11   Q.   And my question is do you have any reason to
12   dispute this or contest this finding in this statement?
13   A.  No.
14   Q.   Would it be fair to say that you agree with it?
15   A.  You know, it's retrospective, so they're going
16   back in time and asking, hey, when you were injured what
17   was going on, but no, I would accept this is --- could
18   be a legitimate finding.
19   Q.   Okay.
20       Then in the next column, first full paragraph,
21   there has been a recent surge of evidence suggesting
22   that sports concussions can lead to changes in emotional
23   state, parentheses, 14, closed paren, period.
24   Furthermore, there is recent evidence to suggest that

Page 187

1   sports concussions can have long-lasting emotional
2   impact.  And my question is, do you have any reason to
3   contest this statement?  And feel free to look at it and
4   make sure I'm not reading it out of context.
5   A.  No, I don't contest this.
6   Q.   Then in the beginning of the last full paragraph
7   on the page it says, while the relationship between
8   concussion and depression may be significant there is
9   also evidence to suggest that a concussion may have the
10   same effect as other injuries on mental health.  For
11   example, Main Wearing, et al., 18 in parentheses,
12   conducted a study to examine the differences between
13   emotional responses in athletes who had a concussion
14   compared with anterior cruciate ligament, ACL, injury.
15   They found that athletes with ACL injuries had more
16   severe levels of depression and longer duration of
17   depression compared to those athletes with concussion.
18   Do you see that?
19   A.  I do.
20   Q.   And do you have any reason to contest that
21   statement?
22       ATTORNEY VEROFF:  I'll just object to the
23   extent this statement relies on a study that is actually
24   not before the witness.

Page 188

1   BY ATTORNEY TRYON:
2   Q.   Go ahead, you may answer.
3   A.  Okay.
4       You know, there is probably just a lot of
5   background to this, so I agree.  I haven't read this one
6   but I would jus say ACL injuries can be extensive and
7   last over months, right, and take an athlete out of
8   sports for months.  Whereas a concussion, you know, it
9   varies in severity and somebody might be back relatively
10   quickly in comparison.  But, you know, both of --- both
11   of these injuries are not fun for athletes to deal with
12   and, yeah, can cause stress and depression.
13   Q.   Okay.
14       So I think you would agree that it's important
15   for athletes to avoid injuries where possible, right?
16   A.  Right, right, and --- yeah.
17   Q.   And would you agree that it is important to have
18   rules in place to avoid injuries where possible?
19   A.  Yes, I would agree.
20   Q.   And would you agree that we don't need to wait
21   for actual harm before putting rules in place to prevent
22   harm if it's reasonably foreseeable?
23       ATTORNEY VEROFF:  Objection.
24       THE WITNESS:  Yeah, the keyword is

Page 189

1   reasonably.
2   BY ATTORNEY TRYON:
3   Q.   Right.  So you agree with that but focusing on
4   the word reasonably, right?
5       ATTORNEY VEROFF:  Objection.
6       THE WITNESS:  Right.
7   BY ATTORNEY TRYON:
8   Q.   Would you agree that segregation of male and
9   female sports is at least in part to protect girls from
10   injury, at least for some sports?
11       ATTORNEY VEROFF:  Objection.
12       THE WITNESS:  Possibly.  I would just
13   note that there is tremendous variability within each
14   gender and if that were totally what was driving this
15   then we really would be concerned about some, for
16   example, not as strong males competing against bigger,
17   stronger males and same with females.  So the issue just
18   transcend gender, you know, it's an issue within each
19   gender.
20   BY ATTORNEY TRYON:
21   Q.   Well, you said you had some familiarity with
22   Title 9, right?
23   A.  Yes.
24   Q.   And Title 9 divides sports into boys --- male

48  (Pages 186 to 189)

1   and female sports in some instances, right?
2            ATTORNEY VEROFF:  Objection.
3            THE WITNESS:  Yes.
4   BY ATTORNEY TRYON:
5        Q.    And in particular, with respect to contact
6   sports, right?
7            ATTORNEY VEROFF:  Objection.
8            THE WITNESS:  Yes.
9   BY ATTORNEY TRYON:
10       Q.    And would it be fair to say that those contact
11   sports Title 9 does that specifically to --- for safety
12   purposes?
13           ATTORNEY VEROFF:  Objection.
14           THE WITNESS:  I think it's fair to say
15   that that is a --- is a concern, yeah.
16   BY ATTORNEY TRYON:
17       Q.    You wouldn't say that Title 9, the regulations
18   for Title 9 that regulate that, do you think those are
19   unfair or should be determined to be illegal?
20           ATTORNEY VEROFF:  Objection.
21           THE WITNESS:  Right, no.
22   BY ATTORNEY TRYON:
23       Q.    So let's go back to the study by --- I will say
24   it wrong, in Balaguer?

1        A.    Yes, Balaguer.
2        Q.    Balaguer, thank you.   Do you speak French?
3        A.    No, but she is one of my favorite people in the
4   world.
5        Q.    Oh, okay.
6            VIDEOGRAPHER:  Counsel help me out here,
7   which exhibit number is that?
8            THE WITNESS:  Maybe 2.
9            ATTORNEY TRYON:  No, the Balaguer.
10           VIDEOGRAPHER:  If you can tell me the
11   title I can tell you the number.
12           ATTORNEY TRYON:  I'm sorry.
13           VIDEOGRAPHER:  I said if you can tell me
14   the title I can tell you the number.
15           ATTORNEY TRYON:  Here it is.  I think it
16   is number 7, Motivational Climate and Goal Orientation
17   as predictors of Perceptions.
18           VIDEOGRAPHER:  Correct, that would be
19   Number 7.
20   BY ATTORNEY TRYON:
21       Q.    And is that printed out for you, Professor Fry?
22       A.    Yes.
23       Q.    And going back in the report --- let me see if I
24   can find the right paragraph.  Here we go, paragraph 32

1   of your most recent report.  Okay.  So the first clause
2   of that first sentence says athletes high in ego
3   orientation report lower companionship and greater
4   conflicts with teammates and you cite Balaguer for that
5   proposition.  I simply was not able to find that
6   proposition in the Balaguer report.  By the way, the
7   University of Valencia, where is that?  Is that in
8   Spain?
9        A.    It is.
10       Q.    Then why does Elizabeth have a French name?  I'm
11   sorry.  If you could just look through and tell me if
12   you can find the language that supports your language in
13   paragraph 32.
14       A.    Yeah, yeah, just one more second.  Yeah, okay.
15   They give you this.  I think this wasn't the best
16   article.  It was referring to the coach instead of the
17   teammates with this one.  But if you would look on ---
18   or maybe --- 383, that paragraph in the middle of the
19   first column.  Yeah, just a little bit lower.  But the
20   wording in this paragraph on the left, yeah, if you can
21   fit the whole thing in again.  Right.  So partway down
22   it's just asking about --- to write your current coach
23   or somebody that --- so one would be just doesn't
24   coincide at all with the coach I would like to have

1   versus my ideal coach.  So the lower rating on the coach
2   is just --- that is not a good thing when you're going
3   this is not the coach that I want, right, or all the way
4   up to this is my ideal coach.  So it supports the
5   findings that relationships aren't that strong, but it
6   is not the best study --- or you know, it shouldn't have
7   been slotted there because it's just referring to the
8   coach instead of the athletes.  If you look at that
9   table underneath where we're looking now, Table 2.
10   BY ATTORNEY TRYON:
11       Q.    I'm looking at it.
12       A.    Whoops, is that it.  Under satisfaction and so
13   the middle part on the left and the bottom one,
14   satisfaction with the coach, you can just see that the
15   more you perceive a task climate, the more you are
16   thinking this is the ideal coach, I'd like to have, the
17   more respect I have for the coach, or however you want
18   to put that in your words and the more you perceive an
19   ego climate the less and the more on the task
20   orientation, you are more likely to just say this is a
21   coach I'm glad I have.  And with the ego orientation,
22   it's just not significant --- so anyway, it supports
23   the results for saying overall, but that was not the
24   best reference there.  It shouldn't have been used right

Maguire 0541

Page 194

```
 1    there.
 2        Q.   So just to make sure I understand then, the
 3    Balaguer report does not actually support the idea that
 4    athletes high in ego orientation report lower
 5    companionship and greater conflict with teammates,
 6    right?
 7            ATTORNEY VEROFF:  Objection.
 8            THE WITNESS:  Right.
 9    BY ATTORNEY TRYON:
10        Q.   Do you believe Smith and Small does?
11        A.   Yeah.  You know, a little while ago when we were
12    looking at that passage, it just included like ten
13    variables that were cognitive anxiety and worry and
14    concentration disruption and I don't know, five other
15    things, a lot of ways to measure stress.  And so across
16    these studies a lot of ways that these relationships
17    with coaches and athletes, but it's not like everyone is
18    using one uniform measure.  Yeah, so there's probably
19    more studies showing that you have better relationships
20    when people perceive a task involving climate or have a
21    task orientation and then it's kind of a mix on the ego
22    side.  So sometimes that comes out and sometimes it
23    doesn't.
24        Q.   Don't studies show that the best mix is a high
```

Page 195

```
 1    ego orientation and a high task orientation?
 2            ATTORNEY VEROFF:  Objection.
 3            THE WITNESS:  No, I wouldn't agree with
 4    that, that mixes --- it's not necessarily that that is
 5    harmful, right, having a high task and high ego.  But to
 6    say it is the best, no, I wouldn't say that.
 7    BY ATTORNEY TRYON:
 8        Q.   Is Smith and Small cited in the bibliography?
 9        A.   One of their articles by Grossbar is, but that
10    is looking more at the orientations in climate.  That
11    one, I lost that page.  I was just trying to see if
12    there was another one.  There is one by Cummings, 2007,
13    Is Winning Everything, the Contributions of Climate
14    and ---.
15        Q.   And that is going to tell me that --- is going
16    to support the statement that ego orientation creates
17    more conflict?
18        A.   No, no.  I'm not sure.  I think I'd have to step
19    back and review to tell you for sure what those are, but
20    I can certainly do that.
21        Q.   All right.
22            Well, let's move on.  I don't want to keep you
23    here any longer than we need to be here.
24        A.   Thank you.  I appreciate that.
```

Page 196

```
 1        Q.   You bet.  So let me redirect your attention to
 2    paragraph 39.  So in the last --- let's see, the
 3    sentence that says because these positive benefits are
 4    fostered in task involving environment, arbitrary
 5    exclusions can cause harm not only to the athletes who
 6    are excluded but also to the other athletes on the team.
 7    Can you tell me what harms it causes to other athletes
 8    on the team?
 9        A.   It could cause harm to athletes who aren't
10    allowed to have their --- their friends participate,
11    their friends who should be on the team, right, if ---
12    BPJ was not allowed to participate and her friends
13    really were looking forward to that being a part of the
14    sport, right.  The sport experience is to share that
15    together.  That could be harmful.  It is also just, you
16    know, it could be a missed opportunity to --- for kids
17    to learn and to grow and to become more familiar and to
18    become more accepting, right.
19        Q.   So if that's the case, couldn't the coach just
20    say to them I know you would like to have your friend on
21    the team, but that's not the way it works and help them
22    work through that, just as you told me the coach can
23    counsel kids who disagree with the decisions --- some
24    other decisions?
```

Page 197

```
 1            ATTORNEY VEROFF:  Objection.
 2            THE WITNESS:  Okay.
 3            Definitely a coach could do that, but
 4    that doesn't change the fact that --- that it could be
 5    harmful in the sense that knowing that other people you
 6    care about and evaluate are being excluded in an unfair
 7    way.
 8    BY ATTORNEY TRYON:
 9        Q.   And that term, the unfair way, is something that
10    you said that you are not an expert on what's fair and
11    what's unfair, right?
12        A.   Right.  I said it's not a primary area of study,
13    right.
14        Q.   Yeah.  Well, I want to ask you a question.  I
15    think you're referring to the Plaintiff as PBJ, with
16    first letter being P.
17            Am I hearing you right?
18        A.   I didn't think so.  But it does --- but BPJ.
19    Sorry.
20        Q.   All right.  I want to make sure we're all saying
21    the correct initials.
22            VIDEOGRAPHER:  Excuse me, Counsel.  If I
23    could interrupt for a second.  If I could just ask the
24    witness to kind of sit up.  You're starting to slouch
```

Williams 0542

Page 198

1    down and your head is getting cut off in the video.
2    Thank you.
3          THE WITNESS:  All right.  Sorry about
4    that.
5    BY ATTORNEY TRYON:
6    **Q.   You're not saying that any West Virginia sports**
7    **organization or educational education has adopted an**
8    **ego-promoting philosophy, are you?**
9    A.  I'm not.
10   **Q.   And you don't know of any coaches in West**
11  **Virginia that have either, right?**
12         ATTORNEY VEROFF:  Objection.
13         THE WITNESS:  No.
14  BY ATTORNEY TRYON:
15  **Q.   And a team can build a task oriented climate**
16  **with sports separated by sex, right?**
17  A.  That's right.
18  **Q.   Do you know if female teams are better at**
19  **building task oriented climates than boys teams or vice**
20  **versa?**
21    A.   Yeah.  It's possible to build a strong task
22  involving caring climate in both teams with males and
23  females.  There may be a slight tendency across some
24  studies where those scores come out a little bit higher

Page 199

1    for females than males, but it's not consistent, right,
2    but females sometimes really value that --- those social
3    aspects of the sport.  Not that males don't, but maybe a
4    slightly higher --- if we're looking at those bell
5    curves again, they would be really close, but it's
6    possible that for --- if we are looking at guys they
7    might come out a little bit higher on the ego aspects of
8    the climate and females the task.
9    BY ATTORNEY TRYON:
10   **Q.   Can we look at paragraph 41 of your report,**
11  **please?**
12    A.  Yes.
13   **Q.   So you say the climate of youth sports must be**
14  **geared to include all participants, so that teams are**
15  **more likely to help every athlete maximize their**
16  **potential.  Now, the word must is a mandatory word,**
17  **right?**
18    A.   Yeah.  I think it means must in the sense that
19  that's our aim, to maximize the potential of every
20  athlete.  If that's our aim, then it is pretty key to
21  creating that climate.
22   **Q.   So who would be the --- what entity would be the**
23  **one to enforce that?**
24         ATTORNEY VEROFF:  Objection.

Page 200

1         THE WITNESS:  Right, I think it comes
2    down to a matter of administrators in sport leagues and
3    having a desire to provide coaching education, try to
4    help coaches understand this research and to help foster
5    caring and task involving climate.
6    BY ATTORNEY TRYON:
7    **Q.   Are you suggesting there should be a statewide**
8    **or nation-wide rule on this?**
9    A.  No.
10         ATTORNEY VEROFF:  Objection.
11        THE WITNESS:  No, I'm not suggesting.
12  I'm sorry, Julie.
13         ATTORNEY VEROFF:  That is quite okay.  Go
14  ahead.
15         THE WITNESS:  No, I'm not suggesting
16  that, although I would just note that Canada has a basic
17  coaching education for anyone who is going to work with
18  even very young athletes, right, and then they have
19  these different levels that people need to go through
20  this coaching education because they really value trying
21  to help create inclusive environments that help kids
22  focus on their effort and improvement and can be set up
23  in a way to bring out the best in any child.
24  BY ATTORNEY TRYON:

Page 201

1    **Q.   So what you said in Canada, they have this, who**
2    **has this?**
3    A.   I believe it kind of trickled down from the
4    government, that they just said --- you know, in the
5    States, in the U.S., our model is if you have a
6    heartbeat, right, and you're willing, let's put you with
7    a team because we just want --- want to have as many
8    teams and neighborhoods where kids can participate.  But
9    in Canada they just set the bar higher and they said if
10  you're going to work with kids, we want you to have some
11  basic coaching education.  And so it's just a rule
12  across their sort of sporting government.
13  BY ATTORNEY TRYON:
14  **Q.   You say sporting government.  Are you saying the**
15  **national government is doing this or some sporting**
16  **organization?  I don't know much --- anything about**
17  **Canada as far as that is concerned.**
18    A.   Yeah.  You know, I would have to look at that
19  more closely.  Definitely their sporting organizations,
20  but I'm not sure that doesn't trickle down from some of
21  their government rules, but I won't say that for the
22  record.  For the record, I'll just say that they do
23  require any use for a coach to have a basic introduction
24  to coaching education, which would include some of these

Page 202

1    concepts.
2        Q.   But you're not advocating that for the United
3    States, are you?
4        A.   No.
5        Q.   Okay.
6            Let's see, so my next question is you say so
7    that teams are more likely to help every athlete ---
8    I'm sorry, strike that.
9            Still that first clause.  The climate of youth
10   sport must be geared to include all participants.  So
11   who gets to participate?  When you say all participants
12   what do you mean by that?
13       A.   Hopefully, we have an avenue for all young
14   people to gain some exposure to youth sport, so all
15   athletes who want to.
16       Q.   Okay.
17           So in some sports and high school athletes and
18   in college you have tryouts.  And if you don't make the
19   tryouts, you don't make the team.
20           Right?
21       A.   That's right.
22       Q.   And do you think that's okay or do you think
23   that we should do away with tryouts and everybody should
24   be on the team if they want to be on the team?

Page 203

1            ATTORNEY VEROFF:  Objection.
2            THE WITNESS: I think there is a lot of
3    benefits to looking at high school sports and including
4    as many athletes as we can.  But no, I wouldn't say that
5    I'm against all --- everywhere we should have a no cut
6    policy.  But I think it's valuable to look and say, hey,
7    are we including as many kids as we can.  Because the
8    evidence supports that kids feel more connected at
9    school, you know, their attendance is better.  There's a
10   lot pluses when kids get that opportunity to
11   participate.
12   BY ATTORNEY TRYON:
13       Q.   Don't sports sometimes take kids away from their
14   academics?
15           ATTORNEY VEROFF:  Objection.
16           THE WITNESS:  They sometimes do for some
17   kids.
18   BY ATTORNEY TRYON:
19       Q.   For a lot of kids, isn't it?
20       A.   I'm not sure what the percentages are, but yeah,
21   some kids may be less focused on academics.
22       Q.   And that is why a lot of schools actually have
23   rules on minimum academic scores that you are getting in
24   order to be on a team, right?

Page 204

1        A.   Probably so, yes.
2        Q.   So going back to cutting kids off teams, that's
3    a thing where kids, if they don't perform at a certain
4    level, they're cut from the team or never allowed onto
5    the team, right?
6        A.   Right.
7        Q.   And so if somebody does better than you on that
8    team, then you are at a disadvantage, right?
9            ATTORNEY VEROFF:  Objection.
10   BY ATTORNEY TRYON:
11       Q.   If you are cut from the team?
12       A.   Yes.
13       Q.   Now, you say from an educational standpoint it
14   is optimal to encourage all athletes to do the best they
15   can and to help all athletes enjoy the sport they love,
16   right?
17       A.   Uh-huh (yes).  Yes.
18       Q.   So when you say from an educational perspective
19   let me just ask you --- do you feel like you are an
20   expert on education or teaching methodology?
21       A.   It depends.  When I say an educational
22   perspective I mean from the sports psychology
23   literature.  And you know, it's not what I study in ---
24   sorry, I'm just going to think for a second.

Page 205

1        Q.   Take your time.  I want to get an accurate
2    answer from you.  I'm not trying to fool you or
3    anything.
4        A.   Thank you.  Yeah, I think this is building on
5    achievement goal perspective theory that just as we
6    should be helping all kids be the best that they can be,
7    right, and if we're not doing that, then we're more
8    likely setting it up to just focus on those kids who we
9    think are going to be the best and the highest
10   achievers, but to keep the focus on helping every
11   athlete, every student, be the best that they can be I
12   think is really a valuable aim.
13       Q.   Do you know how many schools in West Virginia
14   have sports programs?
15       A.   I do not.
16       Q.   Do you have any idea of what percentage of kids
17   are in athletic programs in West Virginia schools?
18       A.   I don't.
19       Q.   Do you know about in any of the universities in
20   West Virginia?
21       A.   No, I don't know.
22       Q.   Take a look at paragraph 42.  Read that.  I'm
23   not going to read it all out loud, but I do have some
24   questions for you about paragraph 42.

Page 206

1    A.   Okay.  Okay.
2    Q.   As far as I can tell, this paragraph has nothing
3  to do with House Bill 3293, does it?
4         ATTORNEY VEROFF:  Objection.
5         THE WITNESS:  I think it takes a bigger
6  picture perspective of just the youth sport world, and
7  so what's true for parents, for this parent, Jim
8  Thompson, who had a child who experienced so much
9  negative, you know, interactions when he first signed up
10 for sport, that Jim Thompson was like, wow, this is
11 crazy, and he went on to start this organization to
12 provide coaching education for --- you know, for
13 coaches.  He has materials for parents, for officials,
14 but you know, reading it, it makes me think it would be
15 healthy for all of us to step back and just say, hey,
16 let's not get too, too over crazy about this, right.
17 And in the case of BPJ, right, how cool if we can let
18 her have the experience of running cross-country school
19 and wouldn't it be a shame if we just had a blanket
20 exclusion of kids based on their gender identity.
21 BY ATTORNEY TRYON:
22   Q.   Okay.
23        But what does that have to do with HB-3293?
24        ATTORNEY VEROFF:  Objection.

Page 207

1         THE WITNESS:  You know, it's probably
2  just a matter of how we interpret this, but if we --- if
3  we have legislators just making a blanket decision that
4  across our state no child in secondary education, no
5  athletes in universities who are transathletes can
6  participate, it feels like we are really doing a
7  disadvantage to those athletes and not allowing them to
8  participate and reap the benefit.  And I think Jim
9  Thompson here is just saying there is just so many
10 benefits and what if we were all united and saying how
11 can we come in and just make sport be all it can be.
12 Parents play a big role in that, but they're definitely
13 not the only party that does.
14 BY ATTORNEY TRYON:
15   Q.   Is it your position then that a child or youth,
16 a young adult should be allowed to participate on
17 whatever team that child identifies as being a gender
18 associated with that team?  That wasn't very artfully
19 said, so let me try again.  Is it your position that any
20 child that identifies as a girl should be allowed to
21 participate on a girls team or women's team as the case
22 may be?
23        ATTORNEY VEROFF:  Objection.
24        THE WITNESS:  It's my position that when

Page 208

1  I look at the sport organizations across this country
2  and internationally that sport leaders are recognizing
3  that we want to balance fairness with inclusion and that
4  there has been success in that already and that that is
5  something that we can do and that we don't have to just
6  exclude all trans athletes from participating in sport.
7  BY ATTORNEY TRYON:
8    Q.   So you have not answered my question directly.
9  Is that because you don't want to or because you don't
10 feel like you can?
11        ATTORNEY VEROFF:  Objection.
12        THE WITNESS:  I feel like it's more
13 complex than what you're mapping it out.  When we talk
14 about transathletes and their gender identity and
15 whether they may be transitioning and all these other
16 factors, it's just a bigger picture than saying any male
17 should be able to decide at any moment I want to compete
18 as a female.  No, we have to have guidelines in place
19 that are fair and inclusive.
20 BY ATTORNEY TRYON:
21   Q.   So if we just narrowed down the statute somewhat
22 to imply with your views on that, then you think it
23 would be okay to exclude some transgenders ---
24 transgender girls from competing on girls teams but not

Page 209

1  all?
2         ATTORNEY VEROFF:  Objection.
3  BY ATTORNEY TRYON:
4    Q.   Is that right?
5    A.   Right.  I think that's what's happening right
6  now, right, there are like criteria within the NCAA, for
7  example, and athletes have meet that criteria to
8  participate as a transgender female.
9    Q.   And so a statute that did that you would find
10 okay?
11        ATTORNEY VEROFF:  Objection.
12        THE WITNESS:  I believe sport
13 organizations and leaders are going to be able to find a
14 way to balance inclusion and fairness, and what that may
15 look like across sports or different levels, yeah, I'm
16 not an expert on that and couldn't outline all that for
17 you right now.  I could just say it makes me sad when
18 athletes are excluded and not given a chance to reap all
19 these amazing benefits from being a part of sport.
20 BY ATTORNEY TRYON:
21   Q.   I hear you, but I still want to know if you
22 believe that there's a place for the State to pass laws
23 to regulate that?
24        ATTORNEY VEROFF:  Objection.

Gibson 0545

Page 210

1  THE WITNESS: Yeah, I don't think the
2  State legislators in my view are the best position. I
3  feel like the sport organizations and sport leaders and
4  people really invested and knowledgeable and involved in
5  the sports at different levels should be making these
6  calls.
7  BY ATTORNEY TRYON:
8  Q. So you don't believe that the State should pass
9  any law whatsoever regulating participation of
10  transgender girls in girls sports?
11  ATTORNEY VEROFF: Objection.
12  THE WITNESS: Yeah, I'm not speaking to
13  every possible law that could ever be invented, but with
14  regard to this House Bill, right, I think it's
15  unfortunate to have just a blanket exclusion for
16  transathletes, for transfemales.
17  BY ATTORNEY TRYON:
18  Q. Fair enough. What about maybe a --- well, let
19  me just ask this question. When kids are competing, is
20  it their identity that's competing or is it their body
21  that's competing?
22  ATTORNEY VEROFF: Objection.
23  THE WITNESS: I'm sorry. I wouldn't even
24  know where to begin to address that question or what

Page 211

1  even ---.
2  BY ATTORNEY TRYON:
3  Q. Let me see, you're not an expert on puberty
4  blockers therapy for boys or young men who want to be on
5  the girls teams, right?
6  A. I am not.
7  Q. And you're not an expert on testosterone
8  suppression for boys or young men who wanted to be on a
9  girls team, right?
10  A. That is correct.
11  Q. And you are not an expert on hormone therapy for
12  boys or young men who want to compete on girls teams,
13  right?
14  A. That's correct.
15  Q. Let's take a look at Exhibit-11.
16  ATTORNEY TRYON: Jake, if you could bring
17  that up. Excuse me, Exhibit-9. I beg your pardon. I
18  have to relabel some of these.
19  ---
20  (Whereupon, Exhibit 9, Article on Lia
21  Thomas, was marked for identification.)
22  ---
23  BY ATTORNEY TRYON:
24  Q. So I'm sure you expected that I was going to ask

Page 212

1  you some questions about Lia Thomas, didn't you?
2  A. I didn't know what to expect, honestly.
3  ATTORNEY VEROFF: Objection.
4  THE WITNESS: I didn't know what to
5  expect.
6  BY ATTORNEY TRYON:
7  Q. Of course, the whole issue with Lia Thomas has
8  been in the news a lot, and so I want to ask you about
9  --- this is an article in Fox News. It says Penn
10  Swimmer Slams School's Handling of Lia Thomas Saga.
11  They Don't Actually Care about Women at All. So have
12  you seen this article?
13  A. No.
14  Q. But you are aware of the Lia Thomas what I will
15  call controversy, right?
16  A. Yes.
17  Q. So the first paragraph says a swimmer on
18  University of Pennsylvania Women's team says she feels
19  the school's decision to allow transgender swimmer Lia
20  Thomas to compete has created an unfair balance within a
21  sport that prioritizes Thomas's rights over that of
22  biological female student athletes. A student who spoke
23  to Fox New Digital on the condition of anonymity out of
24  fear of retribution said she was hopeful after learning

Page 213

1  the NCAA's decision last week to update its policies of
2  allowing transgender girls to compete based on hormone
3  levels. And then skipping down it says stuff like that,
4  it's not just the difference between two girls and how
5  one may have slightly larger lungs that gives them a
6  slight advantage. These are monumental advantages that
7  biological males just develop through puberty and it's
8  not something that a year of hormone treatments, in
9  brackets, can suppress because they still have all the
10  muscle mass that they had for the last 20 years, closed
11  quote. Do you believe that this swimmer is justified in
12  her feelings about this being unfair?
13  ATTORNEY VEROFF: Objection.
14  THE WITNESS: I believe this swimmer has
15  the right to her opinion, for sure.
16  BY ATTORNEY TRYON:
17  Q. Do you agree that it was unfair for Lia Thomas
18  to compete with the girls on the team?
19  ATTORNEY VEROFF: Objection.
20  THE WITNESS: The NCAA has set these
21  standards in place and Lia Thomas followed everything,
22  she has followed the rules and so it's really
23  unfortunate to see how much hate and lack of respect and
24  lack of kindness has been thrown her way. It's just

## Page 214

1  really hard stuff.  I understand that athletes --- this
2  is new and I think each sport will be just looking at
3  the criteria they use and so, you know, they may tweak
4  some things along the way.  But I don't think we can
5  take it out on Lia Thomas who has done everything that
6  has been asked of her.
7  BY ATTORNEY TRYON:
8  **Q.   Is there anything that you are aware of --- this**
9  **swimmer doesn't say I hate Lia Thomas.  You just started**
10 **out talking about hate.  Where do you get that from?**
11      ATTORNEY VEROFF:  Objection.
12      THE WITNESS:  From everything coming from
13 social media.  And so she fears retribution and wants to
14 stay anonymous.  Lia Thomas I feel has a lot of courage
15 to put herself out there knowing that there is going to
16 be a lot of people unhappy and a lot of pushback and,
17 you know, kind of couple of things that she says is just
18 referring to be who she is, ready to compete.  And so
19 I'm acknowledging this is a really difficult situation,
20 right, for swimmers, for her teammates, but I think in
21 this case we have to wait to see what the NCAA and what
22 the USA Swim group decides to do and what they decide is
23 fair.  And they have ongoing studies about how to be
24 inclusive and yet fair, and I'm confident that we can

## Page 215

1  keep pursuing that and there may be a learning curve for
2  us, right, or it may be that this is determined with
3  data over time that this is exactly what the criteria
4  needs to be.
5  BY ATTORNEY TRYON:
6  **Q.   So let's turn to the third page underneath that**
7  **picture, it says --- keep going down.  I'm sorry.  More**
8  **please, below the next picture.  There we go.  And right**
9  **--- so the paragraph, it says they are just proving,**
10 **once again, that they don't actually care about women**
11 **athletes, the swimmer said of the University of**
12 **Pennsylvania.  They said they care and that they're here**
13 **for our emotions, but why do we have to be gracious**
14 **losers?  Who are you you to tell me that I shouldn't**
15 **want to win because I'm swimming.  I'm swimming.**
16 **I'm dedicating more than 20 hours a week to the sport.**
17 **And obviously I want to win.  You can't just tell me**
18 **that I should be happy with second place.  I'm not.  And**
19 **these people in Penn's administrative department who**
20 **just think that women should just roll over, it's**
21 **disturbing and it's reminiscent of the 1970s when the**
22 **are fighting for Title 9 and stuff like that.  They**
23 **don't actually care about women at all.  What would you**
24 **say to this swimmer?**

## Page 216

1      ATTORNEY VEROFF:  Objection.
2      THE WITNESS:  I'd say I just recognize
3  that you're really frustrated with this and you don't
4  agree with it and that we --- well, I think, you know
5  when stuff is new and we don't have a lot of experience
6  or exposure to it, you know, that is really hard.  I
7  just reflect back to my first semester at college and I
8  was just having lunch at a long table with lots of
9  women, and my roommate told me afterwards that every
10 person that we had lunch with, which was a lot, that
11 they were all gay.  And I had no idea, never --- I grew
12 up in Texas, never talked to anybody, never knew anybody
13 that I knew was gay, was probably just naive.
14      And so down the road now, some people
15 that I'm closest to and love in the world are gay and it
16 is not anything that I give any thought to.  It's like,
17 you know, crazy that is what happens over time.  And I
18 see the same thing happening with transgender athletes.
19 We're just going to --- who would want to have the
20 courage to come out and just put your lives out there
21 and your family and do everything that they have to do,
22 too, and so I think we'll all just grow and we'll learn
23 more about what this experience is and we'll be able to
24 see, right, that here is just another athlete like me.

## Page 217

1  We have more in common than we don't.  And I think over
2  time a lot of views will change and we'll just keep
3  working on trying to be as fair as we can on what the
4  criteria should be.  But with this athlete I would say
5  nothing changes for you.  What you are trying to do is
6  be the absolute very best that you can be, right, and so
7  let's keep working hard, let's keep seeing what you can
8  do.  In swimming, that's a nice sport to just be able to
9  stay focused on your time and your performance and
10 proving your technique.
11 BY ATTORNEY TRYON:
12 **Q.   And so you are saying that this girl should be a**
13 **gracious loser, period, right?**
14      ATTORNEY VEROFF:  Objection.
15      THE WITNESS:  No.  I'm saying if that
16 suggests that every transgender female that ever
17 competes in sports is going to be every female, right,
18 and that's just crazy, so --- and you know, I'm not
19 following it that closely, but Lia Thomas has lost races
20 as well.  So just to say that she is here.
21 BY ATTORNEY TRYON:
22 **Q.   Right.**
23 A.   And I'm just a big loser for now because I can
24 never, you know, beat her, no, you just go out there and

1    compete because that's what sports is about.
2        Q.   And that --- sorry, go ahead.  I thought you
3    were finished.
4        A.   Sorry.  It's just out of, you know, some of
5    these rules are things that are just out of her control
6    so she needs to stay focused on what she can focus on.
7        Q.   Is it your view that these girls that are
8    objecting to Lia Thomas being on the team are doing it
9    because they hate Lia Thomas?
10           ATTORNEY VEROFF:  Objection.
11           THE WITNESS:  No, no, I don't know any of
12   these athletes.
13   BY ATTORNEY TRYON:
14       Q.   Let me ask you to take a look at Exhibit-11.
15   Let me know when you have it.
16       A.   Okay, I have it.
17       Q.   This is the opening paragraph and this says
18   Virginia Tech, fifth year Reka Gyorgy has released a
19   letter to NCAA addressing her opinion on the
20   organization's controversial transgender policy which
21   allowed Penn fifth year Lia Thomas to compete at the
22   NCAA championships last week.  And if we can turn to the
23   page we can see the actual letter written by this
24   swimmer.  It is in italics.  And let me start with the

1    second paragraph.  My name is Reka Gyorgy of Hungary.  I
2    am a 2016 Rio Olympian, represented Virginia Tech for
3    the past five years, a two-time ACC champion, two time
4    all-American and three-time honorable mention
5    all-American.  And then skipping down one paragraph she
6    says, Micka, if I'm saying her name right, says I'm
7    writing this letter right now in hopes that the NCAA
8    will open their eyes and change these rules in the
9    future.  It doesn't promote our sport in a good way and
10   I think it's disrespectful against the biologically
11   female swimmers who are competing in the NCAA.
12           And then I want to skip down --- well, let's
13   just continue on the next paragraph.  I don't want to
14   skip too much.  I swam the 500 free at NCAA on
15   March 17th, 2022, where I got 17th which means I didn't
16   make it back to the finals and first alternate.  I am a
17   fifth-year senior.  I have been top 16 and top 8 and I
18   know how much a privilege it is to make finals at a big
19   --- at a meet this big.  This is my last college meet
20   ever and I feel frustrated.  It feels like that final
21   spot was taken away from me because of the NCAA's
22   decision to let someone who is not a biological female
23   compete.  I know you can say I had the opportunity to
24   swim faster, make the top 16, but this situation makes

1    it a bit different and I can't help but be angry or sad.
2    It hurts me, my team and other women in the pool.  One
3    spot was taken away from a girl that got 9th in the 500
4    free and didn't make it back to the A final, preventing
5    her from being an all-American.  Every event that
6    transgender athletes competed in was one spot taken away
7    from biological females throughout the meet.  Do you
8    disagree with Reka Gyorgy?
9            ATTORNEY VEROFF:  Objection.
10           THE WITNESS:  I recognize that she is
11   very frustrated and feels that this decision was not
12   fair.  You know, if we're looking at a bigger picture I
13   think sport organizations at the Olympic level,
14   international level, national level, are all invested in
15   keeping this value of inclusion, right, and trying to
16   balance that with fairness, and so I think it's
17   something these organizations are really going to keep
18   working on and that ---.
19   BY ATTORNEY TRYON:
20       Q.   Sorry.  Go ahead.
21       A.   And that they are going to be able to find a
22   good spot that is somewhere --- somewhere in a place
23   that can be respectful, be it transfemale athletes and
24   also the female athletes on these teams.

1        Q.   So you talk about a good spot.  You don't know
2    what that good spot is.
3            Is that right?
4            ATTORNEY VEROFF:  Objection.
5            THE WITNESS:  No, I don't --- sorry,
6    Julie, but I'm confident that there are many people
7    looking --- spending a lot of time and trying to figure
8    out how to answer some of these questions.  In response
9    to this athlete, she's probably knocked out a lot of
10   other female athletes because maybe she had more
11   advantages along the way, right.  Maybe her parents were
12   able to put her in good programs or good coaching and
13   things like that.  So you know, it's just never like a
14   --- we like to just think what a sweet, perfect world it
15   is where everyone has the same opportunities and, you
16   know, there's just a lot that's not fair out there,
17   right, across for athletes, but I think we do the best
18   we can, which is what the NCAA has tried to do at this
19   point.  And like I said, things may be changing, yeah,
20   but then --- but just to go back to the other side, for
21   the answer to be a blanket exclusion of all transgender
22   athletes at every level is not helping us move forward.
23   BY ATTORNEY TRYON:
24       Q.   But you think even Lia Thomas should have been

Page 222

1    allowed to participate in this swim meet, right?
2         ATTORNEY VEROFF:  Objection.
3         THE WITNESS:  Yeah, I don't think it
4    matters what I think because I'm just not that emersed
5    in the sport to know everything.  So whether it's ten
6    whatever it is nanomols per liter or whether, you know,
7    that's going to change, I don't know, but I think she
8    --- I respect her, she did everything the sport has
9    asked her to do.  And she says she gets in the pool
10   every day and gives it her best effort.  And those are
11   the kind of teammates I like to have, right, that are
12   that way.  So I think everybody can --- her teammates
13   can look at this as maybe they can make each other
14   better and grow as human beings and make the world
15   better.
16   BY ATTORNEY TRYON:
17      Q.   So again you think Lia Thomas's teammates should
18   just knuckle under and be happy about it and be
19   complete, is that right?
20        ATTORNEY VEROFF:  Objection.
21        THE WITNESS:  I feel sympathy and empathy
22   for so many athletes that are dealing with difficult
23   challenges, right, including these athletes, right, and
24   I just acknowledge, yeah, it must be tough, right,

Page 223

1    you've just been doing your thing in your sport for a
2    long time and then you happen to be at the center stage
3    of some of this taking place, but, you know, it's just a
4    lot of challenges that athletes are dealing with on many
5    levels and so I don't think they are unique in, you
6    know, it's not like they are the only athletes that have
7    challenges to deal with.
8    BY ATTORNEY TRYON:
9       Q.   Do you think that --- are you equating the fact
10   that this swimmer might have had some advantages in her
11   life to the fact that Lia Thomas had been --- had gone
12   through puberty and was maybe as much as a foot taller
13   than the other swimmers, those are just the same thing?
14      A.   No.
15        ATTORNEY VEROFF:  Objection.
16        THE WITNESS:  I'm sorry.  I'm not
17   equating those.  I'm just simply saying what I feel as
18   the truth, that not everybody out there has all the same
19   opportunities, right, and access and great coaching and
20   facilities and everything else.  So I think the NCAA is
21   trying to do the best that they can and everybody is
22   learning, right, so ---.
23   BY ATTORNEY TRYON:
24      Q.   One of the things that we are learning that

Page 224

1    these other girls, biological girls, are feeling very
2    marginalized.  Does that count for anything?
3         ATTORNEY VEROFF:  Objection.
4         THE WITNESS:  I think there is a lot that
5    our field of sports psychology can offer here in terms
6    of helping people work through these things.  But I
7    would just go back to if we think the answer is to
8    exclude all transgender female athletes from competing,
9    then that's not right, and so we're going to have to
10   maneuver this, we are all going to have to be involved
11   in helping figure out how to move forward.
12   BY ATTORNEY TRYON:
13      Q.   Let me just be clear, HB-3293 does not exclude
14   any athletes from competing in sports, does it?
15        ATTORNEY VEROFF:  Objection.
16        THE WITNESS:  Okay.
17        From my perception it does because BPJ is
18   a female and wants to compete with her female peers.
19   BY ATTORNEY TRYON:
20      Q.   Okay.
21      A.   So I don't see that as a good option for her to
22   compete with the males.
23      Q.   What about Lia Thomas?  I mean, Lia Thomas looks
24   like a male?

Page 225

1         ATTORNEY VEROFF:  Objection.
2    BY ATTORNEY TRYON:
3       Q.   And couldn't he compete on the male team as he
4    had been for years and then the coach on that team
5    simply say, yeah, Lia Thomas now goes by she, but Lia
6    Thomas is going to compete on the boys teams and you
7    guys just need to respect that?
8         ATTORNEY VEROFF:  Objection.
9         THE WITNESS:  As a cisgender female it's
10   hard to fathom that you wake up and you just feel like
11   you are in the wrong body, right.  And the more I've
12   read over the years and the more I've heard people share
13   their stories, it must just be excruciatingly painful to
14   go through life and feel like that's your situation, and
15   so ---.
16   BY ATTORNEY TRYON:
17      Q.   Right.  And nobody is disagreeing with that,
18   nobody is contesting that, just the question --- the
19   right question is what's fair to everyone, not just to
20   the transgender person, but also to the biological
21   girls.
22        Isn't that the question?
23        ATTORNEY VEROFF:  Objection.
24        THE WITNESS:  Right.  I think the

57  (Pages 222 to 225)

Bixby 27648 0549

Page 226

1  question is how do we balance that inclusion and
2  fairness.
3  BY ATTORNEY TRYON:
4      Q.   I'm almost finished.  I'm going to read you a
5  series of statements and please tell me if you agree or
6  disagree.  Either one is fine.  I just want to
7  understand your position.  Or you may say I don't know.
8  That's fine too.  The first statement, there are
9  physiological differences between natal males and natal
10  females.
11         ATTORNEY VEROFF: Objection. Apologies,
12  objection.
13         THE WITNESS: True.
14         ATTORNEY VEROFF:  Sorry to --- Mr. Tryon,
15  are these your documents or are these statements coming
16  from a  document somewhere.
17         ATTORNEY TRYON:  No, these are my
18  statements.
19         ATTORNEY VEROFF:  Thank you for the
20  clarification.
21  BY ATTORNEY TRYON:
22      Q.   Second, there are physiological difference in
23  natal males and natal females that result in males
24  having a significant performance advantage over

Page 227

1  similarly gifted age and trained females in nearly all
2  athletic events after puberty?
3         ATTORNEY VEROFF: Objection.
4  BY ATTORNEY TRYON:
5      Q.   Agree or disagree?
6         ATTORNEY VEROFF: Objection.
7         THE WITNESS:  I think there is exceptions
8  to this, but as a general rule that is true.
9  BY ATTORNEY TRYON:
10      Q.   Number three, there are physiological
11  differences between males and females that result in
12  males having a significant performance advantage over
13  similarly gifted aged and trained females in nearly all
14  athletic events during puberty as opposed to after
15  puberty.  Do you agree or disagree?
16         ATTORNEY VEROFF: Objection.
17         THE WITNESS:  Yeah, I think it --- I
18  think that statement somewhat depends on what we define
19  as significant.
20  BY ATTORNEY TRYON:
21      Q.   Fair enough.  Four, there are physiological
22  differences between males and females that result in
23  males having a significant performance advantage over
24  similarly gifted aged and trained females in all

Page 228

1  athletic events before puberty?
2         ATTORNEY VEROFF: Objection.
3         THE WITNESS: Disagree.
4  BY ATTORNEY TRYON:
5      Q.   Okay.
6         Number five, there is not scientific evidence
7  that any amount or duration of cross sex hormone
8  therapy, puberty blockers, androgen inhibitors or cross
9  sex hormones, eliminates all physiological advantages
10  that result in males performing better than females in
11  nearly all athletic events?
12         ATTORNEY VEROFF:  Objection.
13         THE WITNESS: Okay.
14         And I'm just going to say that is beyond
15  my expertise and knowledge of that literature.
16  BY ATTORNEY TRYON:
17      Q.   Males who have recently --- excuse me, males who
18  have received such therapy retain sufficient male
19  physiological traits that enhance athletic performance
20  vis-à-vis similarly aged females from a physiological
21  perspective more accurately characterized as male ---
22  agree or disagree?
23         COURT REPORTER:  I'm sorry, Counsel.  Can
24  you restate that question?  I missed it.

Page 229

1         ATTORNEY TRYON:  Sure.
2  BY ATTORNEY TRYON:
3      Q.   Males who have received such therapy that I
4  mentioned in question number five retain sufficient male
5  physiological traits that enhance athletic performance
6  vis-à-vis similarly aged females and are thus from a
7  physiological perspective more accurately characterized
8  as male and not female?
9         ATTORNEY VEROFF:  Objection.
10         THE WITNESS:  Again, I would say that
11  exceeds my expertise.
12         ATTORNEY TRYON:  Fair enough.  Let me go
13  off the record for just a few minutes.  I think I've
14  covered everything, but I just want to make sure, and
15  then I will turn the time over to my co-Defendants if
16  they have any questions.  So just give me five minutes
17  to go off the record.  Is that all right with everyone?
18         ATTORNEY VEROFF:  Thank you.
19         THE WITNESS: Yes.
20         VIDEOGRAPHER:  Going off the record.  The
21  time reads 4:45 p.m. Eastern Standard Time.
22  OFF VIDEOTAPE
23         ---
24  (WHEREUPON, A SHORT BREAK WAS TAKEN.)

Fry Deposition 0550

Page 230

```
 1              ---
 2   ON VIDEOTAPE
 3          VIDEOGRAPHER:  We are back on the record.
 4   The current time is 4:53 p.m. Eastern Standard Time.
 5          ATTORNEY VEROFF:  Excellent.  Thank you.
 6   Mr. Tryon, in our last exchange with Professor Fry you
 7   read a series of statements and I asked you if these
 8   statements were coming from any documents.  You said,
 9   no, these are my statements.  And I just want to put on
10   the record that it appears that in some of those
11   statements you were reading from portions of the report
12   of Doctor Brown, one of Defendant's expert witnesses.
13          ATTORNEY TRYON:  Well, in response, they
14   were generated from that, but they are not his
15   statements precisely, so --- and I think that I
16   represented that correctly if you are suggesting that I
17   misrepresented it.
18          ATTORNEY VEROFF:  Thank you.
19          ATTORNEY TRYON:  More over I don't think
20   I need to reference the source of my questions, but I
21   appreciate your statement.
22          ATTORNEY VEROFF:  Thank you.  I was just
23   clarifying, I thought that the answer that you gave
24   earlier was your statements and was inaccurate, and so I
```

Page 231

```
 1   just wanted to clarify that for the record.
 2          ATTORNEY TRYON:  Well, I believe it to be
 3   accurate, but we'll agree to disagree perhaps.
 4   BY ATTORNEY TRYON:
 5      Q.  So back to my questions, Professor Fry, it seems
 6   that you have a specific view about transgender girls or
 7   women participating on girls or women's teams.
 8      Is that a fair statement?
 9          ATTORNEY VEROFF:  Objection.
10          THE WITNESS:  Can you be more specific?
11   BY ATTORNEY TRYON:
12      Q.  So you indicated numerous times of your belief,
13   generally, that trans --- that males who identify as
14   females should be allowed to participate on girls teams.
15      Right?
16          ATTORNEY VEROFF:  Objection.
17          THE WITNESS:  Again, I've stated that I'm
18   opposed to having a blanket exclusion policy for all
19   transfemale athletes.
20   BY ATTORNEY TRYON:
21      Q.  When did you arrive at that position?
22      A.  I'm not sure.
23      Q.  Was it sometime in the past two years or
24   somewhere before then?
```

Page 232

```
 1      A.  I'd say before then, but I'm not sure.
 2      Q.  Okay.
 3      Do you have any idea at all what timeframe?
 4          ATTORNEY VEROFF:  Objection.  Asked and
 5   answered.
 6          THE WITNESS:  I'm really not sure.  You
 7   know, things just kind of blur over time.
 8   BY ATTORNEY TRYON:
 9      Q.  Sure.
10      A.  But I'm a fan of trying to let athletes
11   participate.  So I'm not sure.  I definitely learned
12   more over the last few years and may come from a more
13   knowledgeable position but I think it's one I felt for
14   sometime.
15      Q.  For more than ten years?
16          ATTORNEY VEROFF:  Objection.
17          THE WITNESS:  You know, it's just hard to
18   say.  I don't remember this being part of the
19   conversation so much ten years ago, so if someone had
20   asked, yeah, I'm really not sure how to put a timeframe
21   on it.
22   BY ATTORNEY TRYON:
23      Q.  Do you know when the first time is you heard of
24   the idea of transgender women participating or
```

Page 233

```
 1   transgender females participating on girls sports?
 2      A.  Again, I don't know.  You know, I've been
 3   attending sports psychology conferences for the last
 4   30 years, and I don't remember the first time I sat in
 5   on a session, or you know, began to learn more.
 6      Q.  Okay.
 7      A.  I really don't.
 8      Q.  Very good.  What's the total compensation that
 9   you received or that you've charged for in this case so
10   far?
11      A.  In this case?
12      Q.  Yes, in this case.
13      A.  Yeah, I haven't turned in a bill, so I haven't
14   received anything.
15      Q.  So how much have you incurred so far as fees in
16   this case?
17      A.  Yeah, I've --- I think it's in the ballpark of
18   eight to ten hours probably prior to today.
19      Q.  And what is your hourly rate?
20      A.  $250.
21      Q.  And how about in the other three cases combined,
22   how much have you --- how many hours have you expended?
23      A.  Probably eight to ten hours for the Connecticut
24   and Idaho cases together.
```

idm-fry-27650 0551

Page 234

1    Q.   And Florida?
2    A.   In Florida, four.
3    Q.   So when you first ---?
4    A.   Sorry.
5    Q.   Sorry, go ahead.
6    A.   Four to six, and I billed for four, though, so I
7    received a thousand for Florida --- in the Florida case.
8    Q.   Do I understand correctly then that the first
9    report that you did was for Connecticut?
10   A.   We started that one and then there was ---
11   that's when COVID hit and the season was on hold.  I
12   would have to go back and look.  But I think the first
13   one that was filed ended up being Idaho even though we
14   started on Connecticut --- or I was part of the
15   Connecticut one.
16   Q.   And you believe you are able to put this whole
17   report together in eight to ten hours for Connecticut?
18        ATTORNEY VEROFF:  Objection.
19        THE WITNESS:  Yes.
20   BY ATTORNEY TRYON:
21   Q.   And your billing rate is the same for all of
22   them?
23   A.   That's correct.
24        ATTORNEY TRYON:  I don't have any further

Page 235

1    questions.  And so thank you for your time.  It is
2    always stressful and so I appreciate it.  I recognize
3    that it was stressful and that I do appreciate your
4    patience and your time.  Thanks?
5        THE WITNESS:  Thank you.  Thanks very
6    much.
7        ATTORNEY SCRUGGS:  I guess I will jump in
8    since none of the other Defendants want to.
9        ATTORNEY TRYON:  Go ahead.
10       ATTORNEY SCRUGGS:  Okay.
11            ---
12            EXAMINATION
13            ---
14   BY ATTORNEY SCRUGGS:
15   Q.   Hello, Doctor Fry.  How are you doing?  Can you
16   hear me okay?
17   A.   I can.  Doing well.  Thank you.
18   Q.   So my name is Johnathan Scruggs.  I'm an
19   attorney for the intervening Defendant, Lainey
20   Armistead, in this case.  So I'm just going to ask you a
21   few questions.  The good news is I won't ask many
22   questions as the prior testimony, and I can't since we
23   are limited in time.  So I will try to go quick.  But
24   the most important question actually I have for you is

Page 236

1    what is your favorite barbecue place in Memphis?  That's
2    the real question.
3    A.   I guess I'd have to go with the Rendezvous.  My
4    husband and I had our first date there.  That was kind
5    of special.
6    Q.   Well, I'm from there originally, so that's why I
7    asked.
8    A.   Where are you from?
9    Q.   I'm from Memphis, the Memphis area originally.
10   A.   Okay.
11   Q.   I'm more partial to central barbecue places, but
12   they're all good.  So anyway, I want to turn a little
13   bit to paragraph 38 of your expert report.  It is
14   Exhibit 2 there.  And I want to turn you more toward the
15   end of that paragraph where it says when athletes are
16   excluded from participating in the sport or in a climate
17   where they do not feel accepted or respected, they do
18   not have the opportunity to reap these benefits.  Now,
19   what benefits are you talking about there?
20   A.   The benefits of participating in sport and to
21   --- yeah, sorry, let me read this one more time, this
22   paragraph, please.
23   Q.   Absolutely.
24   A.   Yeah, so I was referring to the benefits

Page 237

1    highlighted throughout this statement that come from
2    having a chance to participate in a really positive
3    climate.  But in this particular paragraph saying that
4    there's some advantages to females who are able to
5    participate, right, and might be more likely to go on to
6    college and those things.
7    Q.   Let's just talk generally real quick.  Can you
8    outline, kind of, just as general benefit beyond that
9    one specific one you mentioned?
10       ATTORNEY VEROFF:  Objection.  Asked and
11   answered.
12   BY ATTORNEY SCRUGGS:
13   Q.   You can answer the question.
14   A.   Okay.  Well, throughout the statement these
15   benefits of being able to participate in sport, you
16   know, in a caring climate that, you know, people can
17   have fun, can have good experiences and good
18   relationships with coaches and athletes.  They can have
19   --- just reap the physical benefits of being in better
20   health and --- both psychologically and physically.
21   They can express greater empathy for others, and you
22   know, better sportspersonship, right, really evaluate
23   being a respectful competitor and things like that.
24   Q.   Now, in your last sentence in paragraph 38, you

60  (Pages 234 to 237)

Page 238

```
 1    don't have a timeframe mentioned in terms of when
 2    athletes are excluded from participating in sports they
 3    don't have the opportunity to reap these benefits.  Do
 4    you mean when they don't have an opportunity for a
 5    substantial period of time or any type of loss of
 6    participation for any period of time?
 7        A.   So when athletes are excluded from sport --- I'm
 8    not sure I'm following you, but if they were excluded
 9    for a day or two, are you saying would that be a big
10    deal or are they excluded for a whole season or
11    they ---?
12        Q.   Sure.  Sure.  I'm just wondering if you can put
13    that in a timeframe?
14        A.   No, but I would grant that if they're excluded
15    for a day or something like that, we wouldn't be here
16    talking about it probably, but yeah, on a bigger scale.
17        Q.   But you would agree that if students were
18    excluded from participating in high school sports for
19    four years, they would miss out on the opportunities for
20    participating in youth sports?
21        A.   Yes.
22        Q.   And I assume the same is for a year.
23             Correct?
24        A.   Yes.
```

Page 239

```
 1        Q.   Let's say there's a policy as far as males with
 2    female gender identities to undergo testosterone
 3    suppression for a year before they can participate on
 4    the girl's team, would that policy force at least some
 5    athletes to miss out on some opportunities associated
 6    with youth sports?
 7             ATTORNEY VEROFF:  Objection.
 8             THE WITNESS:  It could.
 9    BY ATTORNEY SCRUGGS:
10        Q.   Well, could you envision where it wouldn't?
11             ATTORNEY VEROFF:  Objection.
12             THE WITNESS:  I'm just thinking they
13    might have other options or could play on a co-gender
14    team that's maybe not part of their school, what they
15    really wanted to do was on their school, but there could
16    be another possibility.
17    BY ATTORNEY SCRUGGS:
18        Q.   Yeah, so being a situation where they only
19    wanted to be on their school and had to undergo
20    testosterone suppression for a year to do so, they would
21    lose out on those benefits for that year.
22             Correct?
23             ATTORNEY VEROFF:  Objection.
24             THE WITNESS: Uh-huh (yes).
```

Page 240

```
 1    BY ATTORNEY SCRUGGS:
 2        Q.   Now, earlier we discussed HB-3293 the law that
 3    is at issue in the case.  Now, I don't want to retread a
 4    lot of old ground, but I just want to put it in your
 5    words. So what is the problem, in your opinion, with
 6    this law?
 7             ATTORNEY VEROFF:  Objection as to scope
 8             THE WITNESS:  I think it's --- you know,
 9    provides a blanket of exclusion of transgender female
10    athletes from participating in the secondary and college
11    level, and that is unfortunate and harmful
12    BY ATTORNEY SCRUGGS:
13        Q.   Ma'am, I'm sorry your answer broke up there.  I
14    think my internet connection was a bit faulty.  Can I
15    ask the court reporter to read back that answer?
16             ---
17    (WHEREUPON, COURT REPORTER READS BACK PREVIOUS ANSWER)
18             ---
19    BY ATTORNEY SCRUGGS:
20        Q.   And how harmful exactly?
21             ATTORNEY VEROFF:  Objection
22             THE WITNESS:  It is harmful, because I
23    think what school districts are trying to do is help
24    every child reach their own potential and bring out
```

Page 241

```
 1    their best and but we have these activities available
 2    but we are telling a particular group of kids that you
 3    can't participate in these activities and these maybe
 4    very important to them and be extremely valuable part of
 5    their educational experience through the secondary
 6    schools.
 7    BY ATTORNEY SCRUGGS:
 8        Q.   Got it.  Got it.  And now earlier in your
 9    testimony you mentioned you didn't think it's a problem
10    if a male --- that would be a male that was excluded
11    from, for example, the women's girl track team.
12             Do you remember that?
13             ATTORNEY VEROFF:  Objection.
14             THE WITNESS:  I'm sorry, did you say a
15    male who identifies as a male?
16    BY ATTORNEY SCRUGGS:
17        Q.   Yes, yes.  From the women's sports team?
18        A.   Right.  The team for the females is for the
19    females, right, so I would agree.
20        Q.   So you don't think HB-3293 is not problematic in
21    that situation?
22             ATTORNEY VEROFF:  Objection.
23             THE WITNESS:  Right.
24    BY ATTORNEY SCRUGGS:
```

1  Q.   And that's true even if that male loses out on
2  an opportunity from participating on the girl's track
3  team?
4          ATTORNEY VEROFF:  Objection.
5          THE WITNESS:  Right.  Right.  But they're
6  identifying as a male and can perform on a --- can
7  participate on the male's team.
8  BY ATTORNEY SCRUGGS:
9  Q.   So they can participate on the male's team and
10 that is why they talk about it?
11         ATTORNEY VEROFF:  Objection.
12         THE WITNESS:  Right.
13 BY ATTORNEY SCRUGGS:
14 Q.   What if that male athlete is not fast enough to
15 run on the male team?
16         ATTORNEY VEROFF:  Objection.
17         THE WITNESS:  In say cross-country
18 or ---?
19 BY ATTORNEY SCRUGGS:
20 Q.   Yes.  On cross country is not fast enough for
21 the male team, cannot run on the male team, should that
22 male at least be able to participate on the female track
23 team?
24         ATTORNEY VEROFF:  Objection.

1          THE WITNESS:  Right, no, no.  No people
2  at tryouts do not make teams.  But he is a male,
3  identifying as a male then he should stick with that
4  team.
5  BY ATTORNEY SCRUGGS:
6  Q.   So in that situation, it doesn't matter, that
7  male athlete doesn't have another option?
8          ATTORNEY VEROFF:  Objection.
9          THE WITNESS:  Right.
10 BY ATTORNEY SCRUGGS:
11 Q.   Okay.
12        Wouldn't it be more inclusive to allow the man
13 to participate on the female track team?
14         ATTORNEY VEROFF:  Objection.
15         THE WITNESS:  I don't see it like that,
16 right.  There's a male track team and a male can try out
17 for the that.  And the good news is with cross-country
18 they can handle a lot of athletes so often there is not
19 a cut policy in cross-country.
20 BY ATTORNEY SCRUGGS:
21 Q.   Well, I think I can easily give a scenario where
22 the male can't make the male track team, but there is an
23 open slot on the female track team, so that males who
24 identify as males, should that person be able to

1  participate on the female track team?
2          ATTORNEY VEROFF:  Objection.
3          THE WITNESS:  No.  Sorry.  No.  No, I
4  don't think so.
5  BY ATTORNEY SCRUGGS:
6  Q.   Well, why doesn't --- why shouldn't we value
7  their participation on an athletic team?
8          ATTORNEY VEROFF:  Objection.
9          THE WITNESS:  I don't think we're saying
10 we wouldn't value that, right.  That happens all the
11 time.
12 BY ATTORNEY SCRUGGS:
13 Q.   Yeah.  I'm saying why don't we value --- why
14 don't we promote their participation in athletics and
15 allow them to participate on the female track team?
16         ATTORNEY VEROFF:  Objection.  And please
17 let the witness finish her answer.
18         THE WITNESS:  I think there's a team for
19 this male athlete to at least try out for and go for and
20 so I don't see the issue that we're not being inclusive
21 and giving this athlete an opportunity to try out for
22 that team.  Across teams and across schools, many
23 athletes try out for sports and don't make the team.
24 BY ATTORNEY SCRUGGS:

1  Q.   Well, BPJ can try out for the male track team.
2  Correct?
3          ATTORNEY VEROFF:  Objection.
4          THE WITNESS:  That doesn't seem to be a
5  viable option since BPJ is a female.
6  BY ATTORNEY SCRUGGS:
7  Q.   Gotcha.  Okay.  Let me turn you toward
8  paragraph 37 in your expert report, again I'm going to
9  ask you about the second question --- the second -- or
10 the last sentence, excuse me, there, where it says if
11 transgender students are arbitrarily excluded from these
12 sports they are in turn deprived of this positive
13 experience as an outcome and their teammates are
14 deprived of a generally optimal sport experience.  Did I
15 read that correctly?
16 A.   Yes, I think so.
17 Q.   Now, would you agree that if we just said any
18 student is excluded from youth sports, they are deprived
19 of those positive experiences and outcomes and their
20 teammates are deprived of a generally optimal sports
21 experience?
22 A.   Yeah, I'm not thinking of a situation where that
23 is not the case right now.
24 Q.   So would you agree that if it said if any

Page 246

1   student, no matter their gender identity, were
2   arbitrarily excluded from youth sports, they are
3   deprived of those positive experiences and outcomes?
4       A.   I would just add that based on their gender
5   identity, right.  So you could have a trans female
6   athlete who tries out for a team and doesn't make it,
7   right, we're not including that in the same ballpark
8   here with just having a blanket statement that
9   transfemale athletes may not participate.
10      Q.   I guess I'm not really following you.  But
11  again, you would agree that if any students are
12  arbitrarily excluded, they reap the benefits from youth
13  sports?
14           ATTORNEY VEROFF:  Objection.  Asked and
15  answered.
16           THE WITNESS:  No, I wouldn't agree with
17  that.  I would need the context of that because the
18  example I'm giving is transgender female athlete tries
19  out for a female team and doesn't make it, right, and so
20  would be excluded for that reason, that they're --- this
21  team is limited in how many positions they have and they
22  --- particular, you know, some kids try and don't make
23  the team.
24  BY ATTORNEY SCRUGGS:

Page 247

1       Q.   Let me turn you to your Declaration, your
2   initial expert Declaration, I think it's Exhibit 1, and
3   then let me turn you to paragraph 44 and just read the
4   second sentence, which says, if athletes are arbitrarily
5   excluded from youth sports, they are, in turn, deprived
6   of those positive experiences and outcomes and their
7   teammates are deprived of a generally task involving and
8   caring sports climate.  Do you see that?
9       A.   I do.
10      Q.   And are you referring to all athletes there?
11      A.   I think the point is arbitrarily there.
12      Q.   Uh-huh (yes).
13      A.   Right, then --- so if we're just saying we
14  should have a cut policy because that's not fair, right,
15  that's not what I'm insinuating here, right, just saying
16  but to have this --- make this decision that as a
17  blanket statement that certain group of athletes can't
18  participate, can't try out, can't participate, then,
19  yes, I think the statement is true.
20      Q.   Yes, I think we are saying the same thing.  Let
21  me ask it another way.  Again, focusing on the
22  arbitrarily, if all athletes --- if any athlete is
23  arbitrarily excluded, that creates a problem in your
24  mind?

Page 248

1           ATTORNEY VEROFF:  Objection.  Asked and
2   answered.
3           THE WITNESS:  Yes, I think it changes the
4   meaning to say if any athletes, any athlete under any
5   circumstances, but I just mean --- athletes here.
6   BY ATTORNEY SCRUGGS:
7       Q.   Yeah, I'm not saying under any circumstances.  I
8   guess what I'm trying to figure out is what role does an
9   athlete's gender identity play in that sentence.  It
10  says if athletes were arbitrarily excluded, so I assume
11  there could be a male athlete who identifies as male.
12  If that athlete is arbitrarily excluded, that creates a
13  problem that you identify in that paragraph?
14      A.   I'm not familiar with --- sorry, Julie.
15           ATTORNEY VEROFF:  Objection.
16           THE WITNESS:  I'm not familiar with that
17  case where the male athlete is arbitrarily prevented
18  from participating.  I'm not sure what you're referring
19  to there.
20  BY ATTORNEY SCRUGGS:
21      Q.   Well, let's think about a situation on the
22  sports team where a coach cuts an athlete, a female
23  athlete who identifies as female and instead it favors
24  the coach's own daughter, for example.  You would

Page 249

1   consider that an arbitrary exclusion, right?
2           ATTORNEY VEROFF:  Objection.
3           THE WITNESS:  No.  We'd have to know a
4   whole lot more about that situation.
5   BY ATTORNEY SCRUGGS:
6       Q.   Okay.
7       A.   Maybe the coach's daughter deserves to be on
8   the team and if the team can only handle so many maybe
9   that's how it had to be.  But to make the assumption
10  that because it was the coach's daughter that it wasn't
11  a fair process ---.
12      Q.   I'm assuming that was the only reason that the
13  athletes have been chosen and someone else is excluded?
14      A.   In other words, if a coach just says I don't
15  like you, I don't want you on my team.
16      Q.   Exactly.
17      A.   It seems like there would be guidelines in place
18  for someone to appeal that to the Athletic Director and
19  so on, and yeah, that doesn't sound like it'd be very
20  fair to not give someone a chance.
21      Q.   Exactly.  And that kind of principle applies
22  regardless of someone's gender identity?
23           ATTORNEY VEROFF:  Objection.
24           THE WITNESS:  Okay.  Yeah.  If I'm

Page 250

1    following you, yes, I think.
2    BY ATTORNEY SCRUGGS:
3        **Q.   Yeah.  Now, switching gears slightly, you**
4    **mentioned --- to go back --- let's go back actually to**
5    **your expert report, paragraph 37.  And again, that last**
6    **sentence that transgender students are arbitrarily**
7    **excluded, what is the situation when a transgender**
8    **student is not arbitrarily excluded from youth sports**
9    **--- or let me strike that.  Let me rephrase.**
10       **What is a situation, to use your term,**
11   **transgender student doesn't make the sports team and**
12   **that's not arbitrary?  Did you hear that question?**
13       A.   Sorry, I thought the court reporter was asking
14   for it to be repeated or something.
15       **Q.   No.  I'm sorry.**
16       A.   No, that's okay.  I lost something, okay.  So
17   you're saying, for example, a transfemale athlete tries
18   out for a female athletic team and doesn't make it?.
19       **Q.   I'm asking is that an example of a non-arbitrary**
20   **exclusion?**
21       A.   Yes.  In general, I would say, yes, without
22   having more details, all right, but it doesn't ---
23   transathletes, right, would just have the right to try
24   out, the right to, you know, potentially participate,

Page 251

1    but it doesn't mean that everyone would make the team.
2        **Q.   Got it.  So that situation where you have the**
3    **male athlete who identifies as female, right, and just**
4    **doesn't make the team, do they lose out on the**
5    **experiences and opportunities associated with**
6    **participating in sports?**
7        ATTORNEY VEROFF:  Objection.
8        THE WITNESS:  Yeah, it depends.  You
9    know, some might participate in another sport, right, or
10   find another avenue, but the potential is there for
11   that, yeah.
12   BY ATTORNEY SCRUGGS:
13       **Q.   So in a situation where there is no other**
14   **opportunity or avenue, but we are saying that athlete**
15   **just can't make that team because they just don't have**
16   **that athletic skill, in that situation they would lose**
17   **out on the opportunity outcomes associated with**
18   **participating on that team?**
19       ATTORNEY VEROFF:  Objection.
20   BY ATTORNEY SCRUGGS
21       **Q.   So the word arbitrary doesn't really determine**
22   **whether someone benefits from the experience and**
23   **outcomes of participating in youth sports?**
24       ATTORNEY VEROFF:  Objection.

Page 252

1        THE WITNESS:  Right.  Inherent within
2    sports, unfortunately, particularly at the secondary
3    level, is that not all schools are in a position to let
4    every child participant who wants to, right, and so
5    there is a cut policy.  Personally, because of
6    everything I've outlined today, I wish every school
7    district was doing everything possible to include as
8    many kids, as many athletes as they could, right, but
9    that's not the reality.  Boys and girls try out for
10   teams and they get --- you know, they don't make it.  I
11   just saw this clip this weekend, Billy Mills, Olympic
12   gold medalist, right, he was cut from his track team as
13   a freshman, right.  So that happens.  And I'm
14   distinguishing that from just arbitrarily saying this
15   whole group of athletes, you don't have the right to
16   even try out for the team.
17   BY ATTORNEY SCRUGGS:
18       **Q.   But in terms of taking advantage of the benefits**
19   **associated with sports, it's not so much why someone is**
20   **excluded but just the fact that they are excluded?**
21       ATTORNEY VEROFF:  Objection, asked and
22   answered.
23       THE WITNESS:  I would say it's important
24   to consider why they are excluded.

Page 253

1    BY ATTORNEY SCRUGGS:
2        **Q.   Okay.**
3        **And why is that important?**
4        A.   Because I believe it's harmful to just have a
5    blanket exclusion of a group of athletes like
6    transathletes to say you don't have the right to
7    participate in your school activities, to try out,
8    right, and to be part of these teams and activities.
9        **Q.   Well, I'm asking with respect to your expertise**
10   **about benefiting from the outcome and advantages of**
11   **participating in sports.  It seems to me that any type**
12   **of exclusion from sports was by definition maybe cannot**
13   **take advantage of this opportunity to benefit.  Isn't**
14   **that correct?**
15       ATTORNEY VEROFF:  Objection.  Asked and
16   answered.
17       THE WITNESS:  No.  I'm speaking
18   specifically about sport because that's what's on the
19   table in this case, but you know, somebody else might
20   really experience a caring task involving climate and
21   have great opportunities in other activities of school
22   that they're passionate about, like school or music,
23   right.  But if like BPJ, if her passion is sport,
24   wanting to run track, right, then --- and there's just a

Lainey 27655 0556

Page 254

1   blanket statement saying you're not --- you can't, you
2   can't try out for the women's track team, right, then
3   that would prevent her from the potential benefits that
4   she could be reaping, right, and just enhancing her
5   school experience.
6       Q.   Got it.  Like the male that identifies as male
7   and can't participate on either the males sports team or
8   the female sports team?
9            ATTORNEY VEROFF:  Objection.
10           THE WITNESS:  Right.  The distinction is
11  that he can participate on the male team.  He can try
12  out, right, just like the transgender female can try out
13  for the women's team, but there's no guarantee that the
14  athletes make the team.
15  BY ATTORNEY SCRUGGS:
16      Q.   Exactly.  So I mentioned to you that I represent
17  Lainey Armistead.  And I will represent to you that she
18  is a female soccer player on the West Virginia State
19  University soccer team.  Now, I think earlier you
20  mentioned that you reviewed some documents in the case.
21  Did you happen to run across any documents mentioning
22  Ms. Armistead?
23      A.   Yes, I read her statement.  It's been a little
24  bit of time, so I might need to be refreshed on it, but

Page 255

1   I did take a look at that.
2       Q.   Okay.
3            Well, let me go to Exhibit --- paragraph 41 of
4   your expert report.
5            VIDEOGRAPHER:  What number did you say,
6   Counsel?
7            ATTORNEY SCRUGGS:  Paragraph 41.
8            VIDEOGRAPHER:  Thank you.
9   BY ATTORNEY SCRUGGS:
10      Q.   And it says the climate of youth sport must be
11  geared to include all participants so the teams are more
12  likely to help every athlete maximize their potential.
13  From an educational perspective it is optimal to
14  encourage all athletes to do the best they can and to
15  help all athletes enjoy the sport that they love.
16           Did I read that correctly?
17      A.   Yes.
18      Q.   So I assume that would include Ms. Armistead in
19  your opinion.
20           Correct?
21           ATTORNEY VEROFF:  Objection.
22           THE WITNESS:  I think some of the ideas
23  hold, but you know, we were referring here to the
24  climate of youth sport.  Typically in our field we

Page 256

1   consider youth sport through high school and we would
2   separate that from collegiate sport.
3   BY ATTORNEY SCRUGGS:
4       Q.   Do you think it would be wrong to say that we
5   should not --- you know, strike that.
6            Do you think that we shouldn't gear athletic or
7   college sports to include all participants?
8            ATTORNEY VEROFF:  Objection.
9            THE WITNESS:  You know, at a place like
10  the University of Kansas where I am, we have different
11  levels and so you have the D-1 sport, right, and then
12  you have club sport where people who don't have the
13  skill level or the experience to play a D-1 sport can
14  try out for the club sport those --- I think there's
15  like 40 teams or maybe more we have, and the skill level
16  among those sport club teams really varies, right.  You
17  got some, that are not hit and giggle, you know, just
18  everyone's welcome and they don't have --- you know, a
19  cut policy.  Others are pretty competitive and maybe
20  competing at national levels.
21           But you have another level of intermurals
22  that is open to every student on campus can sign up,
23  because they want to play whatever it is basketball or
24  indoor soccer or something.  So I think ideally, you

Page 257

1   know, universities should offer lots of opportunities
2   for people to participate in sport.
3            It is not realistic that every student on
4   campus could participate in you know D-1 sport or
5   whatever the level, you know, a school might have.
6   BY ATTORNEY SCRUGGS:
7       Q.   So Doctor, if we had a male that identifies as
8   female, it wouldn't be problematic to exclude that
9   person from the female collegiate track team?
10           ATTORNEY VEROFF:  Objection.
11           THE WITNESS:  I think it depends on what
12  the rules are in place, but if this transgender female
13  meets the criteria and participates, right, that is
14  great.
15  BY ATTORNEY SCRUGGS:
16      Q.   Well, again, assuming the rules are --- the
17  rules of West Virginia are in place and says we now
18  require all natal males to participate on the male team
19  rather than on the female team, why can't we just tell
20  the male college athletes to identify as females, they
21  can go play on the club sports club team?
22           ATTORNEY VEROFF:  Objection.
23           THE WITNESS:  I think the transgender
24  female athlete should have the right to participate on

Page 258

1    whichever of those levels that they want to participate
2    on. Right. The female D-1 team the sports team, the
3    intermural team, they should have the right to try out
4    as long as they meet the criteria that's in place.
5    BY ATTORNEY SCRUGGS:
6        Q.   Do you feel that Ms. Armistead should have the
7    right to participate on the female women's soccer team?
8            ATTORNEY VEROFF:  Objection.
9            THE WITNESS:  Yes.
10   BY ATTORNEY SCRUGGS:
11       Q.   Doctor Fry, you would agree that if Ms.
12   Armistead lost her spot on the soccer team to a male
13   soccer play who identifies as female, Ms. Armistead
14   would be deprived of the positive experiences associated
15   with participating on that soccer team?
16           ATTORNEY VEROFF:  Objection.
17           THE WITNESS:  Right. If the transgender
18   female is meeting the criteria in place by the
19   NCAA, right, and then --- and makes the team and someone
20   else doesn't make the team, right, I would say that's
21   --- that's part of sport just like Ms. Armistead, I
22   think, right, if she tried out and she didn't make the
23   team because there's other cisfemale athletes that had a
24   better performance or made the team, but either way she

Page 259

1    would be missing out on the benefits if she didn't make
2    the team.
3    BY ATTORNEY SCRUGGS:
4        Q.   And that's not my point. I understand your
5    argument. I understand that, as a matter of fact, she
6    would lose out on the benefits and opportunities for
7    participating on the sports team.
8            ATTORNEY VEROFF:  I'm going to object to
9    Counsel testifying.
10   BY ATTORNEY SCRUGGS:
11       Q.   I'm asking if you agree with that?
12           ATTORNEY VEROFF:  Objection to the
13   question.
14           THE WITNESS:  Yeah, I'm agreeing that
15   athletes try out for teams, and when they don't make it,
16   it's hard for them to reap the benefits of being part of
17   their team if they, you know, don't participate and
18   aren't part of that.
19           ATTORNEY SCRUGGS:  I understand. I have
20   no further questions. Thank you, Dr. Fry.
21           ATTORNEY CROPP:  This is Jeffrey Cropp,
22   Counsel for Defendant Harrison County Board of
23   Education, and Superintendant Dora Stutler. I have no
24   questions.

Page 260

1            ATTORNEY GREEN:  This is Roberta Green on
2    behalf of West Virginia Secondary School Activities
3    Commission. I have no questions.
4            ATTORNEY MORGAN:  This is Kelly Morgan on
5    behalf of the West Virginia Board of Education and
6    Superintendent Burch. I have no questions.
7            ATTORNEY TRYON:  And this is Dave Tryon.
8    I have no further questions, unless the Defense Counsel
9    does. Excuse me, Plaintiff's Counsel.
10           ATTORNEY VEROFF:  No, we don't have any
11   further questions. The witness will read and sign
12   later.
13           VIDEOGRAPHER:  Okay.
14           If there's no further questions that
15   concludes this deposition. The current time reads
16   5:38 p.m. Eastern Standard Time.
17           * * * * * * *
18   VIDEOTAPED DEPOSITION CONCLUDED AT 5:38 P.M.
19           * * * * * * *
20
21
22
23
24

Page 261

1        COMMONWEALTH OF PENNSYLVANIA)
2        COUNTY OF PHILADELPHIA      )
3             CERTIFICATE
4        I, Nicole Montagano, a Notary Public in and
5    for the Commonwealth of Pennsylvania, do hereby certify:
6        That the foregoing proceedings, deposition
7    of Mary D. Fry, Ph.D., was reported by me on March 29,
8    2022 and that I, Nicole Montagano, read this transcript,
9    and that I attest that this transcript is a true and
10       accurate record of the proceeding.
11       That the witness was first duly sworn to
12   testify to the truth, the whole truth, and nothing but
13   the truth and that the foregoing deposition was taken at
14       the time and place stated herein.
15       I further certify that I am not a relative,
16   employee or attorney of any of the parties, nor a
17   relative or employee of counsel, and that I am in no way
18       interested directly or indirectly in this action.
19       Dated the 4 day of April, 2022
20            .
21
22
23
24

**A**

**a.m** 3:8
 10:21 11:7
 13:6 28:15
 28:22
**AASP** 75:10
 78:5
**abide** 91:3,4
**abilities**
 131:18,22
**ability**
 49:20,24
 51:12
 97:22
 127:19,20
 128:7,9,11
 128:15,20
 129:10,23
 131:1,10
 132:12
 140:9
 142:5,9,9
 142:16,19
 142:22,24
 143:2,5,5
 143:7,12
 143:13,14
 143:15,22
 144:4,11
 144:18,18
 144:19
 145:3,4,20
 146:9,11
**able** 19:19
 24:3,19
 43:8 61:24
 62:6,8,9
 83:5 98:24
 99:14
 100:9
 108:9
 132:17
 149:1
 150:9
 151:2
 160:5
 164:7,11
 164:11
 165:15
 170:10
 173:3
 182:5,20

 183:6
 184:8
 192:5
 208:17
 209:13
 216:23
 217:8
 220:21
 221:12
 234:16
 237:4,15
 242:22
 243:24
**able-bodied**
 164:22
 165:12,16
**able-minded**
 164:23
 165:16
**absolute**
 217:6
**absolutely**
 82:24 85:1
 119:6
 127:14
 132:5
 236:23
**abstract**
 106:1
 185:19,22
**abusive**
 125:10
**academia**
 127:11,12
**academic**
 132:7
 203:23
**academics**
 126:7
 127:7
 203:14,21
**ACC** 219:3
**accept** 46:10
 179:9,24
 186:17
**acceptable**
 13:23
 77:12
**accepted**
 142:14
 236:17
**accepting**
 196:18

**access** 62:4
 62:7,8
 160:3
 223:19
**accurate**
 75:16
 130:20
 205:1
 231:3
 261:10
**accurately**
 51:12
 127:19
 228:21
 229:7
**achievement**
 126:3
 127:17
 205:5
**achievers**
 205:10
**acknowledge**
 113:6
 222:24
**acknowle...**
 38:24
 214:19
**ACL** 64:16
 187:14,15
 188:6
**action** 11:12
 261:18
**active**
 137:11
**activities**
 1:11 5:15
 12:20
 125:1,5
 163:17
 183:7,21
 241:1,3
 253:7,8,21
 260:2
**activity**
 70:13,24
 71:7 75:24
 132:11
**actual** 143:4
 143:5,7,14
 144:19
 145:3
 188:21
 218:23

**adaptive**
 134:10
**add** 111:17
 183:17
 246:4
**added** 148:14
**addition**
 70:22
 174:16
**address**
 56:21 73:7
 80:12
 168:8
 210:24
**addressed**
 157:21
 174:17
**addresses**
 56:23
 172:4
**addressing**
 218:19
**adequate**
 174:9,18
**administ...**
 215:19
**administ...**
 200:2
**admit** 150:23
**Adolescents**
 69:16
**adopt** 137:1
**adopted**
 198:7
**adult** 95:12
 98:9
 118:14
 119:20
 122:19
 163:6
 207:16
**adults** 55:21
 111:3
**advance**
 122:21
**advanced**
 47:4
**advantage**
 49:2,4
 51:16 64:8
 213:6
 226:24
 227:12,23

 252:18
 253:13
**advantages**
 213:6
 221:11
 223:10
 228:9
 237:4
 253:10
**advisor**
 77:24
**advocating**
 93:21 94:1
 136:17
 202:2
**affect** 89:21
**age** 54:2
 71:17,20
 227:1
**aged** 132:12
 227:13,24
 228:20
 229:6
**agency** 1:24
**ago** 15:4
 19:4 57:14
 194:11
 232:19
**agree** 29:21
 30:18 31:6
 31:19,23
 32:10
 34:24 35:3
 40:7,9,17
 40:20 41:2
 42:16 43:2
 43:10,20
 46:1 48:18
 73:18 84:5
 86:9 88:9
 93:4 94:23
 95:18
 100:22
 105:5
 106:16
 124:4,9
 127:15
 154:1
 167:6,10
 167:11,14
 176:22
 186:14
 188:5,14

0558

188:17,19
188:20
189:3,8
195:3
213:17
216:4
226:5
227:5,15
228:22
231:3
238:17
241:19
245:17,24
246:11,16
258:11
259:11
**agreed** 10:3
**agreeing**
259:14
**agreement**
32:22
34:21
123:13
139:10
**ahead** 29:24
86:17
116:11
120:3
147:1
149:24
160:17
175:8
188:2
200:14
218:2
220:20
234:5
235:9
**aim** 81:16
134:3
199:19,20
205:12
**aims** 75:21
**al** 11:11,12
88:24
89:14
187:11
**align** 37:23
38:1 63:5
**aligns** 36:18
**all-Amer...**
219:4,5
220:5

**Alliance**
6:13 12:11
**allow** 125:13
169:10
181:14,16
212:19
243:12
244:15
**allowed**
66:12
114:3
116:9
117:17
170:11
172:20
173:7,17
174:10
177:20
179:18
181:21
183:21
196:10,12
204:4
207:16,20
218:21
222:1
231:14
**allowing**
207:7
213:2
**alphabet...**
69:7
**alternate**
219:16
**Alternat...**
151:11
**amazing**
209:19
**American**
158:17
**amount** 228:7
**and/or** 62:4
67:19
**Andrew** 58:12
158:22
185:11
**androgen**
228:8
**angry** 220:1
**anonymity**
212:23
**anonymous**
214:14

**answer** 15:18
16:2,8
94:22
106:19
113:17
165:1
169:18
188:2
205:2
221:8,21
224:7
230:23
237:13
240:13,15
240:17
244:17
**answered**
38:21
169:2
208:8
232:5
237:11
246:15
248:2
252:22
253:16
**answering**
114:16
144:24
**anterior**
187:14
**anticipate**
91:24
**anticipa...**
91:16
92:13
**anxiety** 71:1
154:15,19
154:22
155:2,12
155:13
156:10,14
156:17
194:13
**anybody** 14:2
97:2
102:11
216:12,12
**anymore**
133:16
**anyway** 27:19
193:22
236:12

**apologies**
23:16,19
226:11
**apologize**
28:14 44:2
128:1
**appeal**
249:18
**Appeals**
30:16
**appear** 57:5
**appeared**
15:7
**appearing**
150:13
**appears** 44:7
230:10
**Applied**
65:19 75:9
**applies**
249:21
**apply** 126:6
**appreciate**
34:8 70:10
195:24
230:21
235:2,3
**approach**
137:1
**approaches**
86:1
**appropriate**
36:6 48:6
48:8,12,20
122:8,12
123:2
125:12
**approved**
78:15
**April** 19:5
19:15 65:6
261:19
**arbitrarily**
166:6
245:11
246:2,12
247:4,11
247:22,23
248:10,12
248:17
250:6,8
252:14
**arbitrary**

44:7,11,16
45:5,10,17
46:1
165:24
166:14
196:4
249:1
250:12
251:21
**area** 54:13
59:18
75:20 82:2
85:16
110:4
126:14
153:20
157:24
158:1,8
165:13
197:12
236:9
**areas** 146:1
**arena** 138:17
**argue** 154:8
**argument**
259:5
**Armistead**
6:16
235:20
254:17,22
255:18
258:6,12
258:13,21
**arms** 180:23
181:1,15
**arrive**
231:21
**arrow** 152:4
**artfully**
207:18
**article** 8:8
8:9,12,13
8:14,15
58:1,8
61:11
104:18
105:22
149:1,20
159:11
192:16
211:20
212:9,12
**articles**

195:9
**aside** 65:16
145:24
181:12
**asked** 38:20
41:23,24
45:19 78:8
78:10 89:3
168:7
178:20
214:6
222:9
230:7
232:4,20
236:7
237:10
246:14
248:1
252:21
253:15
**asking** 20:9
20:9 23:13
26:8 37:11
114:2
119:23
138:20
139:8,16
148:1,20
181:11
186:16
192:22
250:13,19
253:9
259:11
**aspect** 89:20
147:14
**aspects**
74:10 76:6
127:6
137:5
199:3,7
**assigned**
41:17,20
41:21 42:1
42:2,8
70:13,14
**assist** 53:4
**assistant**
111:14
**assistan...**
53:4
**associated**
95:12 98:9

207:18
239:5
251:5,17
252:19
258:14
**Association**
30:11,13
65:19 75:9
169:23
**assume** 16:2
34:14
238:22
248:10
255:18
**assuming**
112:3
249:12
257:16
**assumption**
249:9
**athlete**
18:14
19:18 48:1
58:23 65:7
79:2,7
80:13
82:10,11
88:2,24,24
93:3 94:13
110:3
139:8
140:2,6,12
140:15,19
145:15,16
145:24
147:19
171:13
172:24
175:13,13
178:19
179:17
180:8
188:7
199:15,20
202:7
205:11
216:24
217:4
221:9
242:14
243:7
244:19,21
246:6,18

247:22
248:4,11
248:12,17
248:22,23
250:17
251:3,14
255:12
257:24
**athlete's**
94:17
248:9
**athletes**
26:11,17
26:18,21
43:23 47:4
52:24
55:16
56:21,24
57:2 60:4
60:5 62:2
62:11,15
63:1,3
66:8 70:19
73:14,20
73:21 75:6
77:13,15
81:17 82:1
82:4 84:3
89:18,19
93:2,11
95:13,24
96:23 97:8
98:10
100:19,23
101:5
107:16
108:8
109:9,18
110:7
113:22
116:3
118:14
119:20
121:12,24
122:19,20
122:21
123:16,20
125:17,18
125:24
134:4,11
135:1,3,9
135:16,23
136:3,4,7

136:15,20
137:4,16
137:16
138:18
139:23
142:4,16
142:24
144:16
145:2,7,9
145:21
146:23
148:3,7
154:12,24
155:10,16
157:23
158:9
159:4
164:11,12
164:13,22
164:23
165:12,15
165:16
168:8,13
169:3
172:4
173:3
175:1,3,11
178:18,22
184:1
185:4,10
186:2,4,7
187:13,15
187:17
188:11,15
192:2
193:8
194:4,17
196:5,6,7
196:9
200:18
202:15,17
203:4
204:14,15
207:5,7
208:6
209:7,18
212:22
214:1
215:11
216:18
218:12
220:6,23
220:24

221:10,17
221:22
222:22,23
223:4,6
224:8,14
231:19
232:10
236:15
237:18
238:2,7
239:5
240:10
243:18
244:23
246:9
247:4,10
247:17,22
248:4,5,10
249:13
252:8,15
253:5
254:14
255:14,15
257:20
258:23
259:15
**athletes'**
106:14
142:15
**athletic**
30:13
43:19
73:13,19
85:2,6,11
86:10
101:10
125:1,5
146:9
153:8
163:17
205:17
227:2,14
228:1,11
228:19
229:5
244:7
249:18
250:18
251:16
256:6
**athletic...**
132:8
**athletics**

| | | | | |
|---|---|---|---|---|
| 30:12 | 33:17,20 | 63:11,13 | 117:19 | 166:19 |
| 53:22 | 33:22 34:9 | 66:14,16 | 118:7,19 | 167:4,9,17 |
| 85:16 | 34:12,18 | 66:20,22 | 118:21 | 168:1,5,14 |
| 100:24 | 34:19,23 | 67:1,3,6,8 | 119:2,11 | 168:16,21 |
| 101:3 | 35:2,5,9 | 68:5,13 | 120:11,12 | 169:7,12 |
| 122:20 | 35:12,15 | 69:18,22 | 120:14,18 | 169:16,17 |
| 146:8 | 35:17,20 | 70:3,6 | 121:4,14 | 170:1,3,6 |
| 162:9 | 36:1,2,4,8 | 73:5,6,9 | 121:21 | 170:13,18 |
| 163:6 | 36:11,14 | 73:11 74:2 | 122:3,9,10 | 170:20 |
| 244:14 | 36:22 37:6 | 74:4,7,12 | 122:14,16 | 171:9,11 |
| **attempted** | 37:13,20 | 85:4,7 | 123:4,6,11 | 171:15,21 |
| 108:4,15 | 37:22 38:3 | 91:19,21 | 123:19 | 171:23 |
| 109:4 | 38:6,13,16 | 92:2,4,16 | 124:8,10 | 172:2,5,7 |
| **attendance** | 38:17,20 | 92:18 93:5 | 124:14,16 | 172:9,11 |
| 203:9 | 39:6,10,13 | 93:7,22,24 | 124:19,21 | 172:15,17 |
| **attended** | 39:16,19 | 94:16,20 | 124:22 | 172:21 |
| 65:16 | 39:20 40:1 | 96:3,15,17 | 125:6,8 | 173:4,8,10 |
| 66:23 | 40:8,12,15 | 96:22 | 131:23 | 173:19,23 |
| **attending** | 41:1,6,10 | 97:14 98:4 | 132:6 | 174:2,6,11 |
| 233:3 | 41:14 42:3 | 98:14,18 | 135:18,20 | 174:14,19 |
| **attention** | 42:6,10,12 | 100:2,5,11 | 137:2,14 | 175:7,15 |
| 196:1 | 42:18,21 | 100:21 | 138:3,19 | 175:19,24 |
| **attest** 261:9 | 43:4,9,14 | 101:7,9 | 139:6,15 | 176:5,16 |
| **attitude** | 43:16,21 | 102:5,10 | 139:20 | 176:19,24 |
| 106:14 | 43:24 | 102:12,13 | 140:14,20 | 177:8,22 |
| **attorney** 2:1 | 44:12,14 | 102:19 | 141:3,6,12 | 178:3,5,9 |
| 7:6,8 9:3 | 44:17,19 | 103:6 | 142:1 | 178:14 |
| 10:18 | 45:7,9,12 | 104:3,9,15 | 145:5,14 | 179:7,11 |
| 11:17,19 | 45:15,18 | 104:17,23 | 149:5,13 | 179:20 |
| 11:20,23 | 45:22 46:3 | 105:2,7,8 | 149:17,23 | 180:6,10 |
| 12:2,4,6,8 | 46:6 47:9 | 106:10,17 | 150:4,5 | 180:13,17 |
| 12:10,14 | 47:11,14 | 107:1,20 | 151:1,7,14 | 181:3,9,18 |
| 12:18,23 | 47:17 | 107:22 | 152:13,19 | 181:19,23 |
| 13:1,3,14 | 48:10,14 | 108:1,3,6 | 152:24 | 182:7,17 |
| 13:17 14:1 | 48:17,19 | 108:13,17 | 153:1 | 182:23 |
| 14:2,8 | 48:22 49:3 | 108:20 | 154:21 | 183:3,9,13 |
| 22:24 23:8 | 49:5,9,18 | 109:2,3,7 | 156:11,21 | 183:18 |
| 23:12,15 | 50:6,9,12 | 109:12,16 | 157:3,7,13 | 184:6,12 |
| 23:17,20 | 50:23 51:2 | 109:19,23 | 157:14 | 184:23 |
| 24:2,7,10 | 51:7,23 | 110:8 | 158:24 | 187:22 |
| 24:19,24 | 52:3,6,11 | 112:2,5,11 | 159:8,14 | 188:1,23 |
| 25:4,11 | 52:13 | 112:13,20 | 159:22 | 189:2,5,7 |
| 26:1,4,5 | 53:18,21 | 112:23 | 160:10,16 | 189:11,20 |
| 27:14,18 | 53:24 54:4 | 113:2,7,11 | 160:18 | 190:2,4,7 |
| 27:21 28:1 | 54:9,15 | 113:16,18 | 161:1,7,9 | 190:9,13 |
| 28:8,11,23 | 56:2,5,16 | 113:24 | 161:19,24 | 190:16,20 |
| 29:3,10,11 | 57:13,17 | 114:6,15 | 162:2,4,23 | 190:22 |
| 29:22,23 | 57:22 58:4 | 114:21,22 | 163:4,7,14 | 191:9,12 |
| 30:20,24 | 58:6 59:3 | 115:1,4,8 | 163:18,24 | 191:15,20 |
| 31:7,11,18 | 59:7 60:11 | 115:18,21 | 164:19,21 | 193:10 |
| 31:22 32:1 | 60:14,19 | 116:4,11 | 165:8,10 | 194:7,9 |
| 32:4,12,15 | 61:1,8,14 | 117:2,5,7 | 165:19,22 | 195:2,7 |
| 33:7,10,13 | 62:16,18 | 117:10,12 | 166:2,4,16 | 197:1,8 |

Laurie 27661 0562

198:14
199:9,24
200:6,10
200:13,24
201:13
203:1,12
203:15,18
204:9,10
206:4,21
206:24
207:14,23
208:7,11
208:20
209:2,3,11
209:20,24
210:7,11
210:17,22
211:2,16
211:23
212:3,6
213:13,16
213:19
214:7,11
215:5
216:1
217:11,14
217:21
218:10,13
220:9,19
221:4,23
222:2,16
222:20
223:8,15
223:23
224:3,12
224:15,19
225:1,2,8
225:16,23
226:3,11
226:14,17
226:19,21
227:3,4,6
227:9,16
227:20
228:2,4,12
228:16
229:1,2,9
229:12,18
230:5,13
230:18,19
230:22
231:2,4,9
231:11,16

231:20
232:4,8,16
232:22
234:18,20
234:24
235:7,9,10
235:14,19
237:10,12
239:7,9,11
239:17,23
240:1,7,12
240:19,21
241:7,13
241:16,22
241:24
242:4,8,11
242:13,16
242:19,24
243:5,8,10
243:14,20
244:2,5,8
244:12,16
244:24
245:3,6
246:14,24
248:1,6,15
248:20
249:2,5,23
250:2
251:7,12
251:19,20
251:24
252:17,21
253:1,15
254:9,15
255:7,9,21
256:3,8
257:6,10
257:15,22
258:5,8,10
258:16
259:3,8,10
259:12,19
259:21
260:1,4,7
260:10
261:16
**attorneys**
 11:14
**authenti...**
 114:13
**author** 59:18
 59:20

**authoriz...**
 1:23
**authors**
 159:23
 185:11
**available**
 241:1
**avenue**
 202:13
 251:10,14
**average** 50:7
 50:14,16
**avoid** 188:15
 188:18
**aware** 18:10
 57:10  73:7
 78:7  83:11
 118:16,22
 119:12
 121:15
 125:23
 126:1
 158:12
 163:5
 164:3,5
 169:23
 170:4,21
 212:14
 214:8
**awful** 84:15
**AZ** 6:15
——————
**B**
**B.P.J** 1:4
**baby** 40:3
**Bachelor's**
 44:20
**back** 11:3
 13:12  19:9
 25:17
 28:21
 42:13
 46:10,13
 56:14
 59:17,22
 67:15
 71:10,11
 72:3  77:20
 80:3  83:18
 95:8
 102:19
 103:4
 114:7

118:9
 120:15
 124:18
 133:6
 137:12
 141:13,22
 142:3
 152:22
 156:14
 160:14
 161:17
 164:3
 168:6
 184:21
 186:16
 188:9
 190:23
 191:23
 195:19
 204:2
 206:15
 216:7
 219:16
 220:4
 221:20
 224:7
 230:3
 231:5
 234:12
 240:15,17
 250:4,4
**backboard**
 110:13
**background**
 115:17
 188:5
**backhand**
 51:13
**backs** 96:8
**bad** 133:24
 134:16
 136:10
 137:11
 138:13
 155:9
**Bailey** 6:4
**Balaguer**
 147:5,7,9
 148:1,21
 190:24
 191:1,2,9
 192:4,6
 194:3

**balance**
 116:2
 167:7
 175:18
 208:3
 209:14
 212:20
 220:16
 226:1
**balanced**
 109:13
 114:23
 115:6
**balancing**
 107:23
 108:4,16
 108:23
 109:4,11
 109:11
**ball** 113:23
**ballpark**
 233:17
 246:7
**bar** 201:9
**barbecue**
 236:1,11
**base** 115:10
 147:9
**baseball**
 84:15,16
**based** 33:2
 33:14  44:9
 44:10  46:7
 46:8  47:22
 77:5
 142:22
 143:1,4,12
 144:6
 156:3
 166:13
 206:20
 213:2
 246:4
**basic** 200:16
 201:11,23
**basically**
 83:8
 154:18
**basis** 55:8,8
 134:1
**basketball**
 84:22
 144:22,23

256:23
**bat** 95:6
**beat** 83:4
  89:3,9
  97:6
  217:24
**beating** 97:7
**becoming**
  78:6
**bedroom** 15:6
**bedtime** 61:7
**beg** 211:17
**began** 233:5
**beginning**
  151:4
  187:6
**behalf** 3:3
  12:19
  13:15  21:3
  260:2,5
**beings**
  222:14
**belief**
  231:12
**believe**
  19:15
  22:23
  30:21  43:5
  53:11  61:9
  99:2
  107:14
  119:18
  122:4
  142:18
  159:6
  176:9
  185:5
  194:10
  201:3
  209:12,22
  210:8
  213:11,14
  231:2
  234:16
  253:4
**belittle**
  125:24
**bell** 50:22
  50:24  51:4
  51:14,17
  67:15
  199:4
**bench** 83:16

84:2  95:3
**beneficial**
  57:4  145:9
**benefit**
  96:16,19
  98:22  99:4
  99:10,18
  99:19
  237:8
  253:13
**benefiting**
  253:10
**benefits**
  26:11,17
  26:22
  75:23  82:3
  95:11,19
  95:21  96:1
  96:12,13
  97:12,16
  97:16,24
  98:6,8,16
  98:20
  107:17
  108:8
  110:2,5
  118:13
  122:1,19
  122:23
  123:10
  124:12,24
  153:7
  162:11
  168:8
  173:2
  175:10
  176:12
  196:3
  203:3
  207:8,10
  209:19
  236:18,19
  236:20,24
  237:15,19
  238:3
  239:21
  246:12
  251:22
  252:18
  254:3
  259:1,6,16
**best** 80:20
  82:13,15

85:24  87:3
  88:2,5,11
  89:7,14
  97:22
  118:4,5
  119:10
  127:1,1
  128:15
  130:11,15
  131:11
  136:3
  138:10
  139:23
  143:19
  145:23
  146:3
  150:7
  155:1,19
  168:17
  179:6
  183:15
  192:15
  193:6,24
  194:24
  195:6
  200:23
  204:14
  205:6,9,11
  210:2
  217:6
  221:17
  222:10
  223:21
  241:1
  255:14
**bet** 127:14
  196:1
**better** 48:15
  55:12,13
  63:8  76:1
  81:4,15
  83:4  89:4
  89:7,10,11
  89:12
  127:5
  128:18
  144:16
  145:10
  146:4
  147:12,17
  154:4,9,10
  155:23
  162:21

163:2
  194:19
  198:18
  203:9
  204:7
  222:14,15
  228:10
  237:19,22
  258:24
**beyond** 37:15
  55:15,23
  57:7  59:5
  168:19,22
  173:1
  228:14
  237:8
**bibliogr...**
  66:7  67:22
  69:23
  71:22
  132:24
  195:8
**big** 49:21
  65:13,14
  76:15  78:2
  99:4,10
  134:12
  207:12
  217:23
  219:18,19
  238:9
**bigender**
  172:8,13
  172:19
**bigger** 106:5
  120:24
  131:24
  189:16
  206:5
  208:16
  220:12
  238:16
**bill** 16:22
  27:2,6,12
  27:16,22
  29:4  42:13
  109:18
  206:3
  210:14
  233:13
**billed** 234:6
**billing**
  234:21

**Billy** 252:11
**binary** 30:22
  37:17
**biological**
  29:15,15
  32:24  33:6
  33:12  34:3
  34:22
  36:10,12
  37:1  42:15
  42:15,23
  43:1,18
  60:10
  66:12  72:8
  73:3  112:8
  171:12
  172:18
  173:5,15
  175:13
  177:18,19
  178:10,11
  179:8
  212:22
  213:7
  219:22
  220:7
  224:1
  225:20
**biologic...**
  219:10
**biology** 33:3
  33:15
  35:16
**biomecha...**
  53:10,12
  53:13,16
  54:8
**birth** 33:3
  33:16
  34:22
  35:22,23
  36:19,21
  37:10,11
  37:24  38:2
  38:4,11,18
  39:3,18
  40:10,18
  40:18
  41:12,18
  41:21,24
  42:9
**bit** 20:3
  21:19

0564

46:17
59:16 75:2
84:10
104:19
109:21
132:15,22
160:22
173:1
192:19
198:24
199:7
220:1
236:13
240:14
254:24
**blanket**
116:23
174:23
206:19
207:3
210:15
221:21
231:18
240:9
246:8
247:17
253:5
254:1
**blind** 78:12
**blockers**
211:4
228:8
**blur** 232:7
**blurred**
129:3
**board** 1:8,9
5:21 6:8
11:12
12:16
13:15
53:20
259:22
260:5
**boards**
127:10
**boat** 120:6
**bodied**
164:11
**bodies** 118:3
169:22
**body** 134:9
153:20
210:20

225:11
**book** 56:19
56:21 57:6
57:8
**born** 37:4,16
38:23 43:6
47:23
**bothered**
155:2
**bottom** 51:17
68:22
185:15
193:13
**Boulevard**
5:19
**box** 104:5
**boy** 35:22
40:17
41:19 83:5
182:8
**boys** 46:19
47:12,18
47:19
49:12,16
50:8 51:6
51:16
66:12
67:23 72:8
74:9
111:23
169:5
171:14
175:14
176:13
177:16,19
179:22,23
179:23
180:3,19
180:21,21
181:1,13
181:22
189:24
198:19
211:4,8,12
225:6
252:9
**BPJ** 11:11
18:11,13
18:16 19:3
19:24,24
20:10 21:8
68:7 117:1
117:13

121:9
177:9,11
181:7,12
182:4,11
182:20
183:5,20
196:12
197:18
206:17
224:17
245:1,5
253:23
**brackets**
213:9
**branch** 118:1
**break** 13:9
16:6,6,9
25:2 28:18
56:4,6,11
79:22
102:9,11
102:13,16
103:1
140:21,22
141:2,13
141:19
161:14
184:18
229:24
**bridge** 20:3
**Bridgeport**
5:20
**bring** 16:18
16:21 23:3
24:13
28:24
60:20
69:19 88:1
103:21
110:20
112:16
136:2
149:5
150:9
159:1
162:15
200:23
211:16
240:24
**bringing**
160:12
**broad** 63:15
**broader**

62:24
**broke** 93:16
240:13
**brought**
24:12
141:8
**Brown** 230:12
**Bruer** 185:24
**bud** 138:6
**build** 97:23
177:7
198:15,21
**building** 5:5
198:19
205:4
**builds**
157:17
**bully** 125:17
**bullying**
125:13,16
125:13,16
**Burch** 1:12
6:9 13:16
260:6
**Burkdoll**
10:16,16
**business**
161:5
**butterflies**
155:15
**buy** 136:7
**buying**
136:14

————————
C
————————
**C** 4:1  5:1
6:1,3 10:8
**CA** 4:12
**call** 17:18
60:10
61:22
134:10
136:10
155:3
165:24
167:3,5
212:15
**called** 10:12
77:9
100:16
109:24
151:3
**calling**
14:11

**calls** 135:16
137:15,21
138:1,13
138:21
210:6
**camaraderie**
122:21
**Cambridg...**
44:9 46:2
**camps** 46:17
**campus**
256:22
257:4
**Canada**
200:16
201:1,9,17
**Candyland**
129:12
**capable**
131:9
**capacity**
1:13,15
2:1
**Capitol** 5:4
**caption** 11:9
**care** 81:2
119:6
139:18
144:12
146:2
148:16
154:6
184:10
197:6
212:11
215:10,12
215:23
**career** 78:1
128:4
**careful** 50:3
**cares** 81:2
**caring** 67:20
70:14,20
82:3 83:20
134:22
135:3,8,11
135:13,14
135:21
136:8
138:2,7
139:2,17
139:22
140:5

AdvancePage 0565

156:19
158:6
178:16
198:22
200:5
237:16
247:8
253:20
**Carolina**
53:9,9
**case** 1:6
11:9 17:1
17:16 18:8
18:10
19:11,16
19:18 21:3
21:17,17
21:23 22:3
22:5,10
23:23 43:2
54:13 66:2
67:23
96:12 98:7
110:1
121:8
134:17
150:16
162:19,20
165:9
167:19
168:8
174:13
176:3
181:5
182:4,10
196:19
206:17
207:21
214:21
233:9,11
233:12,16
234:7
235:20
240:3
245:23
248:17
253:19
254:20
**cases** 22:8
22:12,15
30:18
86:24 93:6
93:17,19

233:21,24
**categorical**
26:10,16
26:20
165:5
**categori...**
109:9
**categories**
37:3 38:10
38:23
164:10
**categorize**
37:18
**categorized**
37:2
**category**
31:16
36:24
37:19
165:18
171:7
175:11
**cause** 29:16
188:12
196:5,9
**causes** 196:7
**caveat** 16:7
**celebration**
29:16 83:5
**center** 4:10
161:6
186:8
223:2
**centered**
88:16 99:2
**central**
236:11
**certain** 30:9
31:5 32:9
165:15
170:15
204:3
247:17
**certainly**
98:6
105:22
127:10
146:8
195:20
**Certificate**
7:10 35:23
40:10,18
40:19

261:3
**certific...**
10:5 77:2
77:2,5,8
77:20 78:5
78:16,17
**Certified**
11:4 77:9
**certify**
261:5,15
**certifying**
1:24
**CES-D** 186:9
**cetera** 69:9
**challenges**
179:15,16
222:23
223:4,7
**challenging**
179:13
**champion**
219:3
**champion...**
218:22
**chance** 44:10
46:7 47:4
81:13 83:3
119:10
122:1
123:15
209:18
237:2
249:20
**chances**
144:3
**change** 91:8
91:9,10,11
112:19
162:16,18
163:2
174:9
179:1
197:4
217:2
219:8
222:7
**changed**
113:9,10
138:1,23
169:13,15
**changes**
91:15
170:11

186:22
217:5
248:3
**changing**
174:7,16
221:19
**chapter** 78:8
78:11,11
**chapters**
78:13
**character**
157:17
**characte...**
37:5
**characte...**
36:19,21
37:10,12
37:17 38:2
38:4,11,18
40:4 41:4
49:1
**characte...**
94:21
**characte...**
228:21
229:7
**charged**
233:9
**Charleston**
5:6,13 6:7
11:11
**chat** 39:14
104:5
149:24
150:8,14
151:5
**check** 71:10
87:22
102:6
150:7
161:5
164:15,17
**cheerlea...**
20:4,13
**chest** 83:3
**child** 42:8
115:13
179:24
180:1,1,22
200:23
206:8
207:4,15
207:17,20

240:24
252:4
**children**
98:23
127:18
128:5
**choose** 40:14
131:10
185:17
**chooses**
181:22
**chosen**
249:13
**chunk** 65:14
**Chutes**
129:11
**circles**
128:17
**circuit**
111:5
**circumst...**
30:9 31:5
32:9 248:5
248:7
**cisfemale**
258:23
**cisgender**
37:8,21
38:15 39:5
225:9
**cismale**
36:15
**citations**
30:18 70:1
**cite** 25:20
41:8 147:5
148:1,11
192:4
**cited** 132:24
195:8
**cites** 43:2
**City** 52:18
79:6
**Civil** 3:4
11:12
**claimed**
137:21
**clarific...**
226:20
**clarify**
163:1
231:1
**clarifying**

eliteagree 0566

230:23
**class** 64:24
65:1,4,5,8
65:14,15
130:7,9,11
130:15,19
**classes**
53:10
64:21
65:17
66:19,23
**classifi...**
43:17
47:16 48:6
48:8
**classifi...**
30:4,7
31:3 32:7
**classified**
41:12,24
42:2 47:20
47:23
**classify**
38:9
**classroom**
126:9
**clause** 26:8
31:6,23
32:10
147:3,5,10
148:1,22
192:1
202:9
**CLAYTON** 1:12
6:9
**clear** 32:5
41:7 64:1
108:15
224:13
**clearly**
128:13
**click** 150:15
150:20
151:5,18
152:4,10
160:8
**climate**
60:22 61:3
61:20
62:20 63:2
63:6 67:19
67:20
69:16

70:15,15
70:20 71:5
82:4,4
83:18,21
96:9
106:12
131:13
135:2
136:9
138:7
149:7
153:3,8,10
153:23
154:3,7
156:20
158:5,6
178:17
191:16
193:15,19
194:20
195:10,13
198:15,22
199:8,13
199:21
200:5
202:9
236:16
237:3,16
247:8
253:20
255:10,24
**climates**
61:23 82:8
153:6
154:23
198:19
**clinical**
54:20,22
76:5
**clip** 252:11
**close** 51:14
115:11,12
199:5
**closed** 33:1
186:23
213:10
**closely** 79:5
201:19
217:19
**closest**
40:14
182:11
216:15

**club** 256:12
256:14,16
257:21,21
**CMPC** 77:9
**co-counsel**
11:22
**co-Defen...**
229:15
**co-gender**
239:13
**coach** 46:19
49:10,14
53:1 65:7
82:5 83:13
83:19 86:1
87:23
94:15
110:3
111:14
135:13,15
139:11
148:7,8
149:9
178:18
179:23
180:5,21
181:13
192:16,22
192:24
193:1,1,3
193:4,8,14
193:16,17
193:21
196:19,22
197:3
201:23
225:4
248:22
249:14
**coach's**
248:24
249:7,10
**coached**
51:10 53:2
**Coacher's**
56:18
**coaches**
75:14
77:13 94:9
111:15
119:5,12
119:15,18
119:23

120:2,7
125:11,13
130:2
131:14
134:22
135:24
136:14,24
145:7
146:6
178:21
194:17
198:10
200:4
206:13
237:18
**coaching**
46:16,18
50:2 53:1
73:2
125:16
200:3,17
200:20
201:11,24
206:12
221:12
223:19
**code** 150:16
**cognitive**
154:15
155:12
194:13
**coincide**
192:24
**colleagues**
56:20
**collected**
25:19 51:9
**college**
30:13
74:15,17
79:16,19
86:5,22
98:21,24
99:3,10
100:14
101:6,17
111:4,7
124:2
127:10
155:17
158:17
202:18
216:7

219:19
237:6
240:10
256:7
257:20
**colleges**
100:22
121:16
**collegiate**
57:20 60:3
73:13,19
75:4 256:2
257:9
**column**
185:16
186:20
192:19
**com** 164:16
**combined**
233:21
**come** 70:12
78:4 80:22
92:14
96:13 97:5
110:2
122:2
141:13
148:18
152:21
167:6
168:6
179:5
181:14
198:24
199:7
207:11
216:20
232:12
237:1
**comes** 26:14
82:18
83:18 90:1
90:18
148:18
156:14
180:14
194:22
200:1
**comfortable**
34:8,11
135:4
**coming** 65:7
72:23

77:19
83:22
146:5
163:19
214:12
226:15
230:8
**comment**
88:20
**comments**
74:22
**Commission**
1:11 5:15
12:20
30:17
260:3
**committed**
63:7
**committee**
58:11 59:9
75:11
115:23
156:24
157:1
**common** 217:1
**Commonwe...**
3:6 261:1
261:5
**communicate**
39:22
**communic...**
21:7 50:18
**communic...**
15:14
**companio...**
146:24
148:4
192:3
194:5
**compare**
49:19
80:24 81:3
124:1
144:6
146:14
162:14
186:2
**compared**
146:11,12
187:14,17
**comparing**
88:14
127:19

**comparison**
188:10
**compensa...**
233:8
**compete** 43:1
47:4 48:12
48:20
66:13 75:5
79:12 87:6
88:8 95:22
101:6
102:2
112:7,9
113:9
114:3
165:13,15
181:8
182:5,13
182:20
184:1
208:17
211:12
212:20
213:2,18
214:18
218:1,21
219:23
224:18,22
225:3,6
**competed**
46:21
79:15
220:6
**competence**
77:12
127:4
142:8
144:1
**competent**
127:4
**competes**
217:17
**competing**
79:8,17,19
87:19,24
189:16
208:24
210:19,20
210:21
219:11
224:8,14
256:20
**competition**

46:22
**competit...**
95:13,19
96:1 98:10
**competitive**
32:18
42:14
101:11
256:19
**competit...**
87:16,16
110:16
**competitor**
237:23
**compilation**
52:10
**Complaint**
17:10,13
**complete**
26:2 64:22
77:16
81:13
156:5
222:19
**complex** 5:4
30:22 31:9
31:14 33:9
36:13 37:3
208:13
**complicated**
38:12
58:22
113:21
**component**
127:17
**computer**
24:21,22
28:5
**concentr...**
129:1
155:5
**concentr...**
154:16
194:14
**concepts**
128:6,8
129:3
202:1
**concern**
26:11
121:7
154:17
190:15

**concerned**
144:10
189:15
201:17
**concerning**
25:20
**concerns**
166:13,14
167:24
**CONCLUDED**
260:18
**concludes**
260:15
**concussion**
64:13
187:8,9,13
187:17
188:8
**concussions**
186:22
187:1
**condition**
212:23
**conducted**
16:17
132:11
187:12
**conference**
11:9 57:16
65:18
**conferences**
57:15
65:21
110:20
233:3
**confidence**
81:4 132:3
134:6
142:5,7,9
142:18,24
144:17
155:4
**confident**
148:23
214:24
221:6
**conflict**
146:24
148:4
194:5
195:17
**conflicts**
192:4

**confusion**
70:5
**connected**
203:8
**Connecticut**
21:17,23
22:3
233:23
234:9,14
234:15,17
**connection**
108:5
240:14
**consecut...**
89:1
**consensus**
139:13
**consider**
63:17 79:2
122:8
167:23
249:1
252:24
256:1
**considered**
39:3,17
**considering**
31:15
85:14,15
**consistent**
52:22 71:9
72:5 91:7
148:16
199:1
**consiste...**
63:5 81:21
154:24
155:7
**construc...**
44:3
**Consultant**
77:10
**cont'd** 5:1
6:1
**contact**
32:18
42:15
190:5,10
**contacted**
19:4 21:8
21:15
**contention**
148:2

PageID #: 27667 0568

contest
  186:12
  187:3,5,20
contesting
  225:18
context
  32:17
  42:14
  45:21 54:7
  74:6
  106:19
  113:13
  172:22
  173:21
  187:4
  246:17
continue
  71:7
  101:22
  106:15
  131:17
  140:7
  181:7
  219:13
continues
  135:1
continuing
  30:14
continuum
  174:21
contrast
  80:23 82:8
  128:23
  142:20
  143:10
Contribu...
  195:13
control
  136:4
  138:16
  143:20
  151:12,17
  152:2,14
  160:4,8
  218:5
controve...
  218:20
controversy
  212:15
conversa...
  146:3
  232:19
convince

155:21
convoluted
  152:12
cool 99:5
  206:17
Cooley 4:9
  11:21,24
  12:5,7
  68:6
cope 157:10
copies
  160:21
coping
  156:16,20
  156:22
  157:5
copy 23:9
  27:22
  46:15 69:1
cords 60:17
core 183:4
correct 19:1
  22:14 55:3
  58:9 64:5
  64:6 75:11
  78:19 96:2
  101:1
  109:6
  153:12
  166:15,21
  191:18
  197:21
  211:10,14
  234:23
  238:23
  239:22
  245:2
  253:14
  255:20
corrected
  131:21
correctly
  50:19
  143:6
  230:16
  234:8
  245:15
  255:16
corrects
  147:7
correlated
  142:6,23
  143:13,14

correlates
  130:24
  147:21
correlation
  130:21
  144:8
corresponds
  37:10
cortisol
  58:21 59:1
  59:6 70:16
  70:17,20
  71:7
Cortisole
  57:19
counsel 4:20
  5:7,14,21
  6:8,16
  10:4 14:18
  19:5,7,8,9
  19:10 21:8
  28:5 45:22
  102:15
  140:24
  151:11
  191:6
  196:23
  197:22
  228:23
  255:6
  259:9,22
  260:8,9
  261:17
counseled
  55:7,18,21
counseling
  76:6
counselor
  55:4
COUNSELS
  4:13
count 224:2
countries
  76:11,20
  76:21
country
  76:15,15
  208:1
  242:20
County 1:9
  1:15 5:21
  5:22 12:16
  30:11,15

259:22
  261:2
couple 61:24
  71:2
  110:19
  214:17
courage
  214:14
  216:20
course 19:6
  64:22
  101:20
  176:21
  184:1
  212:7
courses
  77:14
court 1:1
  3:5 11:5
  11:10 15:1
  15:7,16
  17:10,13
  22:22 23:1
  23:3,17
  29:17
  30:10,15
  30:16
  51:13 58:4
  84:2
  228:23
  240:15,17
  250:13
cover 64:23
  90:17
covered 65:3
  166:20
  229:14
covers 124:7
COVID 234:11
crawling
  15:6
crazy 89:2
  206:11,16
  216:17
  217:18
create 56:23
  61:22 82:1
  82:3
  116:16,21
  131:14
  136:2,8
  178:16
  200:21

created
  134:22
  164:13,24
  212:20
creates
  156:9,10
  195:16
  247:23
  248:12
creating
  176:10
  199:21
credential
  77:11
credentials
  55:15
  78:23
crisp 51:12
criteria
  174:5
  175:3,17
  209:6,7
  214:3
  215:3
  217:4
  257:13
  258:4,18
critical
  35:14
  106:13
  152:20
Cropp 5:17
  12:14,14
  259:21,21
cross 16:17
  37:17 40:6
  228:7,8
  242:20
cross-co...
  20:14,16
  20:17,21
  20:22
  84:17
  176:11
  183:8
  206:18
  242:17
  243:17,19
crosses
  148:13
cruciate
  187:14
CSR 10:17

Csutoros
  6:12 12:12
Cummings
  195:12
current
  10:21 11:7
  13:13
  25:13
  28:15,22
  56:8,15
  102:22
  103:5
  141:16,23
  161:11,18
  184:15,22
  192:22
  230:4
  260:15
currently
  78:14 79:8
cursor
  151:23
  152:3
cursory
  17:10,15
  17:16
curve 50:22
  51:1,4
  67:16
  215:1
curves 51:14
  51:17
  199:5
cut 198:1
  203:5
  204:4,11
  243:19
  247:14
  252:5,12
  256:19
cuts 248:22
cutting
  204:2
cycles 58:22

          D
D 1:19 2:8
  3:3 7:1,4
  10:8,11
  261:7
D-1 256:11
  256:13
  257:4

258:2
Dana 10:16
  60:16
  152:17
  160:19
  161:2
  164:14
Dana@mid...
  164:15
data 51:9
  52:10 96:8
  116:17,19
  167:5
  215:3
date 11:6
  20:5,9
  22:11
  236:4
Dated 261:19
daughter
  248:24
  249:7,10
Dave 160:19
  260:7
David 5:3
  11:17
  102:7
day 65:7
  89:13
  179:6
  222:10
  238:9,15
  261:19
de-motiv...
  93:4
deal 78:3
  134:12
  138:14,15
  156:17
  179:15,19
  188:11
  223:7
  238:10
dealing
  179:16
  222:22
  223:4
debate 174:4
  177:2
decade 169:9
decide 92:23
  94:9 114:8
  208:17

214:22
decides
  214:22
decision
  109:14
  207:3
  212:19
  213:1
  219:22
  220:11
  247:16
decisions
  116:21
  168:18
  196:23,24
Declaration
  8:5 16:22
  16:24
  21:10 23:2
  23:5,14,22
  25:19 27:1
  69:3 247:1
  247:2
decreased
  70:21
dedicating
  215:16
Defendant
  12:13
  235:19
  259:22
Defendant's
  230:12
Defendants
  2:4 12:11
  12:15
  235:8
Defendants'
  17:20
Defending
  6:13
Defense
  260:8
define 33:12
  45:5 85:10
  85:23
  126:16
  182:14
  227:18
defined
  32:21
defines
  32:24

defining
  142:22
  143:11
definitely
  89:18 98:2
  100:16,19
  101:12,23
  129:4
  154:22
  178:2
  197:3
  201:19
  207:12
  232:11
definition
  33:6,19
  34:4,14,20
  36:3 38:14
  39:22 41:8
  41:16 44:6
  44:9,11,16
  46:2,5
  80:16
  112:21
  171:5,8
  172:12
  253:12
degree 44:20
  44:23 74:3
  74:9 144:2
  174:21
del 4:8 68:6
demonstrate
  81:4 127:4
  144:1
department
  74:23
  215:19
depend 60:13
depends
  81:16
  85:10 86:1
  108:23
  119:4
  134:3
  169:8
  171:16
  204:21
  227:18
  251:8
  257:11
deposed
  14:23

22:15
deposition
  1:18 2:7
  3:1 11:8
  15:14
  16:16,18
  17:8 25:6
  29:2 34:1
  260:15,18
  261:6,13
depression
  157:22
  158:7,8,10
  159:4
  185:4,10
  185:15,23
  186:2,6,8
  187:8,16
  187:17
  188:12
Deprive
  162:10
deprived
  166:7,9
  245:12,14
  245:18,20
  246:3
  247:5,7
  258:14
depth 158:1
describe
  171:6
describing
  177:3
descriptive
  142:21
  143:11
deserves
  249:7
designated
  43:1
  165:14
designates
  35:23
  77:11
designed
  92:8
desire 89:22
  89:22
  106:15
  200:3
despite
  153:5

detail 18:2
  175:6
details
  170:8
  250:22
determine
  52:10
  109:22
  117:16
  251:21
determined
  29:17
  34:22
  190:19
  215:2
develop
  55:11
  156:16,22
  213:7
developed
  80:10
developing
  83:24
development
  132:23
developm...
  127:17
  131:3
developm...
  125:12
deviation
  50:22 52:1
  52:1
diagnosed
  140:3
diagnosis
  55:14
Diane 14:17
dictionary
  44:8,8
  46:2
difference
  42:2 49:11
  49:11,16
  49:21
  51:20 54:6
  59:1 60:8
  62:14,17
  67:16
  71:23 72:1
  213:4
  226:22
differences

29:14,16
30:3,6
31:2 32:6
49:22
51:21
52:23 59:6
67:5,14,15
68:11
71:11,12
72:4
187:12
226:9
227:11,22
different
20:16,19
20:20
53:17,23
69:1 75:2
94:10,10
97:16
108:24,24
113:23
114:23
128:21
133:12
142:10
163:21
164:10
168:3,11
174:4
200:19
209:15
210:5
220:1
256:10
Differen...
69:15
difficult
214:19
222:22
difficul...
152:14
difficulty
149:2
Digital
212:23
direct 82:8
133:4
153:8,13
direction
77:6 118:2
directly
69:23

77:15
208:8
261:18
Director
249:18
disabili...
163:9
disadvan...
204:8
207:7
disagree
31:6,17
33:8 107:4
196:23
220:8
226:6
227:5,15
228:3,22
231:3
disagreeing
225:17
disappoi...
97:2,4
discoura...
83:9,17
84:4
discrimi...
31:21
discrimi...
181:7
discus 89:2
discussed
125:1
240:2
discussing
23:10
discussion
7:3,9
10:24
120:22
121:1
174:4
discussions
19:7 65:9
121:2,2
displace
42:24
dispute
186:12
disputing
98:1
disrespe...
219:10

disruption
194:14
disserta...
58:19
61:21
127:24
128:2
132:24
133:7,10
distinction
42:5
254:10
distinguish
89:20
128:13
129:9
distingu...
252:14
distracted
60:17
distraction
178:23
distract...
145:11
155:6
district 1:1
1:2 11:10
11:10
252:7
districts
240:23
disturbing
215:21
divide 47:1
divided
47:12
76:14
divides
189:24
division
11:11
101:24
102:1
doctor 64:4
162:6
230:12
235:15
257:7
doctoral
58:19
77:21,24
doctors 38:8

40:7,9,14
116:13
document
57:19 58:8
58:15
60:20
61:15,18
150:20
151:3,12
151:21
159:15
226:16
documents
16:18 17:7
17:10,13
17:16
57:18
148:13
184:7
226:15
230:8
254:20,21
doing 14:3
14:10
15:17 44:3
80:13 86:2
146:17
201:15
205:7
207:6
218:8
223:1
235:15,17
252:7
dollars 99:7
domain
132:10,15
132:20
door 161:3
Dora 1:14
5:22 12:17
259:23
double 78:12
150:7
152:11
164:15,17
doubt 155:13
download
150:1,8
downs 134:15
Dr 8:6,8
24:17 58:1
140:22

160:16
259:20
**drag** 151:23
152:4
**dragged**
104:14
**drawer** 97:19
**drives**
119:17
**driving**
120:6
189:14
**drugs** 179:4
**Duda** 133:8,9
**due** 48:24
**duly** 10:13
261:11
**duration**
187:16
228:7
**dysfunction**
154:16
**dysphoria**
55:19

――――――
E
**E** 4:1,1  5:1
5:1  6:1,1
7:1  10:8,8
**E-26** 5:5
**earlier** 75:3
185:19
230:24
240:2
241:8
254:19
**early** 19:15
128:4
**easier** 15:16
160:22
**easily** 184:8
243:21
**East** 5:11
6:5
**Eastern** 11:7
13:13
28:22  56:8
56:15
102:22
103:5
141:16,23
161:11,18
184:15,22

229:21
230:4
260:16
**easy** 51:19
156:1
**economic**
30:5
**edit** 162:24
**education**
1:9,10
5:21  6:8
11:12
12:16
13:15
46:16  53:5
74:23
132:1
198:7
200:3,17
200:20
201:11,24
204:20
206:12
207:4
259:23
260:5
**educational**
55:9,10,13
65:10
162:11
198:7
204:13,18
204:21
241:5
255:13
**Educators**
149:10
**effect**
187:10
**efficacy**
142:7
**effort** 80:20
97:22
127:21
128:6,9
131:5,10
132:12
143:19
200:22
222:10
**ego** 61:23
63:2  70:15
71:4  80:4

80:17,23
81:6,11,14
81:20,23
82:23
88:16,16
89:15,20
89:21,23
127:2
133:20,24
134:12,16
140:8
142:21,24
143:4,10
143:23
144:10
146:23
147:15,22
148:3,10
148:19
153:5
154:3,7,13
155:7,16
192:2
193:19,21
194:4,21
195:1,5,16
199:7
**ego-prom...**
198:8
**eight** 17:23
53:6  71:18
233:18,23
234:17
**eight-ye...**
95:1
**either** 18:21
18:24,24
20:5  22:16
30:6  37:2
37:18
38:11  55:7
70:14
87:15
150:6
198:11
226:6
254:7
258:24
**elementary**
118:16
123:24
130:16,23
**eliminate**

93:21  94:1
**eliminates**
228:9
**elite** 52:24
52:24
118:1
134:11
**Elizabeth**
4:7  12:4
192:10
**Embarcadero**
4:10
**embarras...**
71:1
**embrace**
178:23
**embracing**
106:12
**emersed**
222:4
**emotional**
186:22
187:1,13
**emotions**
138:16
215:13
**empathy**
134:6
222:21
237:21
**emphasis**
123:17
124:3
153:6
**emphasize**
177:13
**employed**
11:5
**employee**
261:16,17
**encompassed**
70:1
**encourage**
178:19
204:14
255:14
**endeavor**
154:18
**ended** 234:13
**enforce**
199:23
**enhance**
228:19

229:5
**enhancing**
254:4
**enjoy** 55:12
204:15
255:15
**enjoyed**
79:23
156:13
**Enjoyment**
8:10
103:20,24
**enlarge**
104:19
**entire** 26:7
27:5,6
**entirety**
32:11
**entity**
199:22
**entrance**
164:2
**environment**
56:23
70:20
71:15  82:1
82:7  83:7
131:15
134:22,23
135:3,8,11
135:13,14
135:22
136:2,18
138:2
139:2
141:7
196:4
**environm...**
83:11
200:21
**envision**
239:10
**Epidemio...**
186:8
**epitome**
155:3
**equal** 43:19
**equating**
223:9,17
**especially**
165:14
**ESQUIRE** 4:3
4:4,5,6,7

4:8,15 5:3
5:9,17 6:3
6:11,12
**essentially**
165:18
**Essentials**
78:9
**establish**
23:21
39:22
**established**
90:3
108:22
139:22
**et** 11:11,12
69:9
187:11
**ethnic**
163:21
**evaluate**
197:6
237:22
**evaluated**
117:16
**event** 220:5
**events** 86:10
227:2,14
228:1,11
**everybody**
83:21 89:4
95:4 130:9
130:19
202:23
222:12
223:18,21
**everyone's**
256:18
**evidence**
153:24
154:2
166:18
167:3,14
167:20,23
181:6
186:21,24
187:9
203:8
228:6
**evident**
132:18
**exacerbated**
131:20
**exact** 20:5

116:23
**exactly**
26:19 65:3
66:4 112:6
123:8
126:14
215:3
240:20
249:16,21
254:16
**exaggera...**
137:21
**exam** 77:2,2
77:5,17,18
78:10,14
78:24
**Examination**
7:5,7 14:6
16:17
60:21 61:1
235:12
**examine**
187:12
**example** 78:4
85:12 86:6
87:18
88:23
113:14
117:15
126:7
128:19
130:5
146:10
163:22
187:11
189:16
209:7
241:11
246:18
248:24
250:17,19
**exceeds**
229:11
**Excellent**
230:5
**exceptions**
47:16
227:7
**exchange**
230:6
**excited**
96:24 97:9
**excitement**

85:1
**exclude**
107:16
109:9
110:6
208:6,23
224:8,13
257:8
**excluded**
121:9
163:5,16
166:7
196:6
197:6
209:18
236:16
238:2,7,8
238:10,14
238:18
241:10
245:11,18
246:2,12
246:20
247:5,23
248:10,12
249:13
250:7,8
252:20,20
252:24
**excludes**
121:23
**excluding**
43:22
116:3
123:2
162:8,17
175:20,21
**exclusion**
26:10,17
26:20
116:24
165:3,5,7
165:23
166:13
206:20
210:15
221:21
231:18
240:9
249:1
250:20
253:5,12
**exclusions**

196:5
**exclusively**
63:24
**excrucia...**
225:13
**excuse** 14:12
29:7,12
142:8
143:4
197:22
211:17
228:17
245:10
260:9
**exercise**
64:1 75:20
110:22
116:14
117:23
123:13
**exhibit** 8:1
23:5 24:16
25:8 58:1
61:11
63:12 70:1
103:18,19
103:23
149:20
159:1,2,11
185:3,9
191:7
211:20
236:14
247:2
255:3
**Exhibit-1**
23:2 24:3
161:21
**Exhibit-11**
211:15
218:14
**Exhibit-2**
24:12,14
25:12
46:13 75:8
95:8
**Exhibit-3**
25:6 28:2
28:24 29:2
**Exhibit-5**
61:9
**Exhibit-8**
159:16

185:4
**Exhibit-9**
211:17
**exhibits**
23:10
**expand** 61:21
**expect** 91:4
212:2,5
**expected**
211:24
**expended**
233:22
**experience**
50:5 52:9
54:20,22
54:23
56:18 57:1
84:14 96:6
96:7 97:21
110:3
119:8,14
136:16
137:4,7
155:11
156:15
166:10
196:14
206:18
216:5,23
241:5
245:13,14
245:21
251:22
253:20
254:5
256:13
**experienced**
70:24
186:3,4
206:8
**experiences**
115:15
137:12
166:8
237:17
245:19
246:3
247:6
251:5
258:14
**experien...**
70:18
**expert** 8:6

16:23
17:15,17
17:18,23
18:6  19:11
21:16,19
21:22  22:7
22:9,19
23:13
24:11,16
25:13,19
26:24  69:2
69:24
74:20  75:7
107:9,12
110:1
116:22
166:21,24
182:15
197:10
204:20
209:16
211:3,7,11
230:12
236:13
245:8
247:2
250:5
255:4
**expertise**
37:15
54:14
55:24  59:6
59:18
63:14,16
64:7,10,13
64:16
108:7
117:23
168:7,20
168:23
173:1
178:14
228:15
229:11
253:9
**experts**
17:19,20
116:13
117:3,8
167:6,10
167:13
**explain**
50:15  70:7

70:8
**explanation**
129:18,19
147:24
162:22
**exposure**
65:13
163:22
202:14
216:6
**express**
237:21
**expresses**
116:8
**extensive**
188:6
**extent** 26:2
42:24
187:23
**extremely**
241:4
**extrinsic**
100:16
**eyes** 219:8
_____
**F**
**F** 5:9
**faces** 130:6
130:6
**facets** 80:14
**facilities**
74:11
223:20
**fact** 30:8
31:4  32:8
42:16,20
45:16
73:19  77:5
101:11
155:2
177:24
185:18
197:4
223:9,11
252:20
259:5
**factor** 35:19
106:13
**factors**
33:14
159:5
185:11
208:16

**faculty** 76:3
127:9
**fair** 31:24
33:6  34:15
40:11  43:6
43:12
44:11
53:16
54:16  56:1
75:15
76:24
85:21  87:2
90:14,21
91:1,13,18
94:21
100:10
102:3
103:18
107:13
108:12
109:18
112:1,10
112:22
113:5
114:5
116:2,16
117:24
120:23
121:5,12
139:5,11
139:11,24
140:3
153:15
165:7
168:22
171:5,8
175:18
182:13,14
182:16
186:14
190:10,14
197:10
208:19
210:18
214:23,24
217:3
220:12
221:16
225:19
227:21
229:12
231:8
247:14

249:11,20
**fairness**
8:10  74:10
92:7,8,15
103:20,23
105:5,10
105:14,17
106:13,22
107:9,19
108:22
109:22
167:8
182:15
208:3
209:14
220:16
226:2
**fall** 36:24
46:22
**falls** 180:16
**familiar**
36:15
50:24  74:1
84:9,17,20
103:13
159:23
196:17
248:14,16
**familiarity**
189:21
**family** 87:11
216:21
**fan** 232:10
**far** 51:24
72:20
146:9
159:19
201:17
206:2
233:10,15
239:1
**fashion**
79:20
**fast** 242:14
242:20
**faster**
128:18
132:22
219:24
**fastest**
88:12
**fathom**
225:10

**faulty**
240:14
**favorite**
191:3
236:1
**favors**
248:23
**fear** 212:24
**fears** 214:13
**features**
82:7  83:20
136:5
**feed** 39:7,9
**feedback**
146:14
169:21
**feel** 23:9
26:7  34:10
35:6  37:14
67:24
80:18  87:4
125:14
134:5
135:3
138:5,13
139:10,12
155:4,14
178:1
187:3
203:8
204:19
208:10,12
210:3
214:14
219:20
222:21
223:17
225:10,14
236:17
258:6
**feeling**
143:18,24
156:15
224:1
**feelings**
80:22
178:10,13
213:12
**feels** 207:6
212:18
219:20
220:11
**fees** 101:19

233:15
**felt** 232:13
**female** 31:16
  33:2 34:14
  35:8,14
  36:23
  37:19
  38:24 39:4
  40:6,22
  41:5,18,20
  41:21
  43:19 50:4
  52:21
  57:20
  58:15,24
  59:2 60:2
  60:3,4,5
  62:2,11,15
  67:20 79:7
  114:4
  116:9
  117:16
  170:16
  173:13,14
  173:16
  174:8,9,17
  174:18
  175:14
  177:4
  178:12
  179:22
  180:2,2,3
  180:8,9
  182:1,2,4
  189:9
  190:1
  198:18
  208:18
  209:8
  212:22
  217:16,17
  219:11,22
  220:24
  221:10
  224:8,18
  224:18
  225:9
  229:8
  239:2
  240:9
  242:22
  243:13,23
  244:1,15

245:5
246:5,18
246:19
248:22,23
250:18
251:3
254:8,12
254:18
257:8,9,12
257:19,24
258:2,7,13
258:18
**females**
  27:10
  29:15
  30:23
  31:10
  42:15,24
  43:2,8
  48:5,7,12
  49:24 50:1
  50:8 51:19
  52:19
  53:17 54:7
  58:21
  60:10 62:4
  62:13,23
  63:3 64:19
  65:4,17
  66:11 67:5
  71:9,12,16
  71:24
  169:11
  182:5
  189:17
  198:23
  199:1,2,8
  220:7
  226:10,23
  227:1,11
  227:13,22
  227:24
  228:10,20
  229:6
  231:14
  233:1
  237:4
  241:18,19
  257:20
**feminine**
  177:3,5
**field** 20:18
  77:10

123:13
167:11
224:5
255:24
**fifth** 218:18
  218:21
**fifth-year**
  219:17
**fighting**
  215:22
**figure**
  168:12
  174:4
  221:7
  224:11
  248:8
**filed** 17:1
  20:1 21:3
  21:9 22:2
  23:1
  234:13
**filing** 10:5
**fill** 139:9
**final** 84:24
  219:20
  220:4
**finals**
  219:16,18
**financial**
  163:10
**find** 106:18
  118:23
  149:10
  170:9
  185:3,9
  191:24
  192:5
  209:9,13
  220:21
  251:10
**finding** 28:2
  186:12,18
**findings**
  193:5
**finds** 29:14
**fine** 114:17
  226:6,8
**finger** 152:7
**fingers**
  160:6
**finish** 16:8
  244:17
**finished**

63:11
218:3
226:4
**firms** 127:12
  127:14
**first** 10:13
  17:1 19:3
  19:16
  21:16
  23:21,22
  31:20 32:2
  36:18 41:8
  51:24 52:1
  57:10 70:1
  95:11
  106:1
  127:17
  143:3
  147:10,24
  148:22
  185:16
  186:1,20
  192:1,2,19
  197:16
  202:9
  206:9
  212:17
  216:7
  219:16
  226:8
  232:23
  233:4
  234:3,8,12
  236:4
  261:11
**fit** 38:23
  39:1 40:5
  130:19
  192:21
**fits** 31:15
**fitting**
  171:6
**five** 46:15
  94:5
  102:11
  118:12
  145:21,23
  194:14
  219:3
  228:6
  229:4,16
**five-yea...**
  130:7

**flip** 71:5
  89:18
**floor** 4:11
  4:18 44:3
**Florida** 22:9
  22:20
  234:1,2,7
  234:7
**flow** 155:3
  164:20
**focus** 18:9
  58:15
  63:22
  89:13 94:4
  105:17
  117:14
  118:17,24
  119:4,19
  122:13,18
  123:1,2,9
  123:14,22
  123:23
  124:6
  140:1,10
  143:23
  146:6
  179:6
  200:22
  205:8,10
  218:6
**focused**
  51:20 76:6
  80:20,24
  94:6
  100:19
  119:15,24
  120:22
  127:20
  129:1
  131:10
  143:21
  144:12
  182:18
  203:21
  217:9
  218:6
**focuses**
  121:20
  122:5
**focusing**
  117:13
  118:12
  121:16

Baker - Vol 4 0575

189:3
247:21
**folder** 28:3
**follow** 43:7
139:19
156:23
**followed**
133:11
213:21,22
**following**
10:12
180:20
217:19
238:8
246:10
250:1
**follows**
10:14
69:24
**fool** 205:2
**foot** 223:12
**football**
84:20
180:24
181:1,16
181:24
182:3
**force** 102:15
239:4
**foregoing**
261:6,13
**foreseeable**
188:22
**form** 13:21
33:1
**formal** 55:8
**forms** 110:22
**forward**
13:18  14:4
116:21
196:13
221:22
224:11
**foster** 200:4
**fostered**
196:4
**found** 15:5
46:2  70:19
97:19
132:13
148:6
169:10
180:11

186:4
187:15
**four** 26:24
53:2  84:24
89:1,1,5
89:14
227:21
234:2,6,6
238:19
**Fox** 212:9,23
**Francisco**
4:12
**free** 23:9
26:7  67:24
187:3
219:14
220:4
**Freedom** 6:13
12:11
**French** 191:2
192:10
**frequently**
137:21
**freshman**
252:13
**friend** 1:4
182:6,8
196:20
**friends**
79:22
110:19
176:11
182:9,11
196:10,11
196:12
**front** 27:17
27:23
**frustrated**
216:3
219:20
220:11
**Fry** 1:19  2:8
3:3  7:4
8:6,8
10:11
11:14  14:9
14:12,17
16:18
24:17
27:22  29:5
58:2,9,12
68:9,9,12
68:19

103:7
133:7,9,12
140:22,23
150:1,6
160:16
162:6
184:24
191:21
230:6
231:5
235:15
258:11
259:20
261:7
**fulfilling**
140:16
**full** 14:15
53:2
106:11
180:4
186:20
187:6
**fully** 43:10
**fun** 63:7
70:22  71:6
81:17
82:17  94:6
96:10  98:2
110:19
134:4
137:5
154:9
179:24
188:11
237:17
**further**
125:1
234:24
259:20
260:8,11
260:14
261:15
**Furthermore**
186:24
**future** 219:9

——— G ———

**G** 10:8
**gain** 128:5,8
202:14
**gained** 68:3
**gaining**
131:3

**game** 57:19
90:9  94:6
113:23
**games** 85:13
94:10
129:11,12
**gathering**
116:19
**gay** 216:11
216:13,15
**gear** 256:6
**geared**
199:14
202:10
255:11
**gears** 250:3
**gender** 37:17
38:11  41:5
41:13,13
41:21,22
49:22
50:11
51:20,21
55:18  59:6
67:13
68:10  72:4
72:5
114:14
176:2
189:14,18
189:19
206:20
207:17
208:14
239:2
246:1,4
248:9
249:22
**genders**
37:24  54:2
54:3  171:6
172:13
**general** 2:2
36:24
40:13
47:15  48:5
48:11,15
48:24
54:11
71:14  88:6
94:7
105:14
106:23

107:3
114:8
117:21
139:13
142:24
143:13
147:12
173:20
174:12
181:12,13
227:8
237:8
250:21
**General's**
11:19
**generali...**
30:4
**generalized**
52:9
**generally**
90:19
100:22
231:13
237:7
245:14,20
247:7
**generate**
54:12
**generated**
230:14
**generic**
130:6
**genetics**
33:3,15
**genuine**
80:21
114:13
**genuinely**
166:9
**getting**
95:15
98:12
155:18
169:21
198:1
203:23
**gifted** 227:1
227:13,24
**giggle**
256:17
**girl** 40:23
41:15  42:1
169:5

Dinatale 0576

| | | | | |
|---|---|---|---|---|
| 173:6 | 207:21 | 29:24 | 215:8 | 85:23 95:2 |
| 176:8,9,11 | 208:24,24 | 37:15 | 217:24 | 96:7,18 |
| 176:13,14 | 210:10,10 | 42:23 | 218:2 | 97:17,19 |
| 177:10,14 | 211:5,9,12 | 45:13 | 220:20 | 98:15,16 |
| 177:17,24 | 213:2,4,18 | 46:10,12 | 221:20 | 100:18 |
| 178:12 | 218:7 | 59:17,22 | 224:7 | 102:5,14 |
| 180:19 | 224:1,1 | 69:6 71:10 | 225:14 | 102:21 |
| 181:21,21 | 225:21 | 72:3 77:12 | 229:12,17 | 107:6 |
| 182:12,21 | 231:6,7,14 | 78:1 80:3 | 234:5,12 | 111:22,23 |
| 183:5,6,7 | 233:1 | 82:15,16 | 235:9,23 | 112:9 |
| 183:10,11 | 252:9 | 84:1,2,24 | 236:3 | 113:8 |
| 207:20 | **give** 34:7 | 86:17 96:9 | 237:5 | 115:14 |
| 217:12 | 39:11 | 99:1,17 | 244:19 | 116:20 |
| 220:3 | 41:15 47:5 | 102:19 | 250:4,4 | 117:13 |
| 241:11 | 61:5 82:15 | 105:20,23 | 255:3 | 118:2 |
| **girl's** 239:4 | 93:14,17 | 107:18 | 257:21 | 119:9 |
| 242:2 | 93:18 | 110:20 | **goal** 80:15 | 120:15 |
| **girls** 46:20 | 97:22 | 111:6,21 | 88:2 126:3 | 124:16 |
| 47:13 48:2 | 98:15 | 112:7 | 126:10,15 | 128:14 |
| 48:4 49:12 | 101:17 | 114:7,9,10 | 126:15,18 | 131:16 |
| 49:16 51:6 | 102:10 | 115:15 | 126:23 | 133:6 |
| 57:11,11 | 104:23 | 116:11 | 127:17 | 135:22 |
| 66:12,13 | 119:9 | 118:9,10 | 133:19,19 | 136:2,5,6 |
| 67:24 72:9 | 127:1 | 118:11 | 136:20 | 136:10,11 |
| 72:12,18 | 143:19 | 120:3 | 138:12 | 137:8,9 |
| 73:3,3 | 151:12 | 125:13 | 149:7 | 138:9,11 |
| 74:6,9,16 | 159:9 | 127:13 | 171:17 | 140:9,22 |
| 74:17 75:4 | 160:3,4 | 129:17 | 191:16 | 141:15 |
| 75:5,5 | 161:20 | 130:7 | 205:5 | 144:4 |
| 111:9 | 164:13 | 133:6,15 | **goals** 126:10 | 154:19,19 |
| 116:10 | 192:15 | 134:18 | 126:13,13 | 155:12,17 |
| 168:3,4 | 216:16 | 136:11 | 126:18 | 156:15 |
| 169:6 | 229:16 | 140:4 | **goes** 36:13 | 160:1,18 |
| 170:14 | 243:21 | 141:3 | 159:20 | 161:10 |
| 171:14 | 249:20 | 142:3 | 225:5 | 169:1,20 |
| 172:20 | **given** 74:10 | 145:9 | **going** 10:20 | 169:20 |
| 173:5,16 | 83:2 | 147:1 | 13:5,19 | 172:23 |
| 173:18 | 139:11 | 149:24 | 24:24 | 174:5 |
| 174:10 | 209:18 | 154:6 | 25:13 | 175:2 |
| 176:15,20 | **gives** 47:4 | 158:17 | 27:15,15 | 180:22 |
| 176:21,21 | 213:5 | 160:17 | 28:14 | 181:7 |
| 176:23 | 222:10 | 161:7 | 39:13 | 184:14 |
| 177:11,15 | **giving** | 166:5 | 42:13 | 186:15,17 |
| 177:19,19 | 123:15 | 168:22 | 46:10 | 191:23 |
| 177:20,21 | 146:14 | 175:2,8 | 51:18 | 193:2 |
| 178:10 | 244:21 | 176:4 | 55:12 56:2 | 195:15,15 |
| 179:8 | 246:18 | 177:16 | 56:3,7 | 200:17 |
| 181:1,14 | **glad** 140:5 | 180:21 | 70:7 71:11 | 201:10 |
| 181:16 | 140:18 | 184:9 | 72:22 82:6 | 204:2,24 |
| 182:8,11 | 193:21 | 188:2 | 82:15,15 | 205:9,23 |
| 182:20 | **go** 10:18 | 190:23 | 82:16 | 209:13 |
| 183:11,23 | 13:3 24:23 | 191:24 | 83:22 | 211:24 |
| 189:9 | 25:12 28:5 | 200:13,19 | 84:10,24 | 214:15 |

27676 0577

215:7
216:19
217:17
220:17,21
222:7
224:9,10
225:6
226:4
228:14
229:20
235:20
245:8
259:8
**gold** 89:1,15
97:18,20
97:20
252:12
**good** 16:1
56:6 62:3
63:6 68:5
77:10 81:2
81:18,18
89:8,9
94:13 95:3
96:7,9
101:21
102:8
105:12
115:15
130:10
134:5,6
136:15
137:6
140:11
141:5
142:12
144:13,21
145:10
147:18
148:24
155:22
193:2
219:9
220:22
221:1,2,12
221:12
224:21
233:8
235:21
236:12
237:17,17
243:17
**goofed** 30:13

133:15
**gosh** 67:12
128:17
**Gotcha** 245:7
**governing**
118:3
169:22
**government**
201:4,12
201:14,15
201:21
**grab** 28:6
**gracious**
215:13
217:13
**grade** 71:19
71:20
130:18
**graders**
71:19
130:18
**grades**
130:23
**graduate**
53:3 78:1
86:13
**graduated**
53:7 59:15
**grant** 238:14
**great** 14:23
15:10 24:8
56:24 89:4
96:6
102:12,17
104:15,16
134:17
141:11
150:4
161:9
162:3
181:24
184:12
223:19
253:21
257:14
**greater** 49:6
49:6
123:22,23
142:5,7,8
144:1,17
146:24
148:4
153:23

154:15
156:20
158:6
172:22
183:17
192:3
194:5
237:21
**Green** 5:9
12:18,18
13:1 14:11
260:1,1
**Greensboro**
53:3,9
**grew** 84:11
216:11
**grip** 155:14
**Grossbar**
195:9
**ground** 43:6
116:16
240:4
**groundwork**
65:9
**group** 62:6
71:8,17
109:9
116:3
121:23
182:6,8
214:22
241:2
247:17
252:15
253:5
**grouped**
20:21
**groups** 50:22
51:5,15
52:2
107:24
108:24
162:8,17
163:5,11
163:13,15
163:22
**grow** 196:17
216:22
222:14
**guarantee**
254:13
**guess** 76:18
103:19

139:16
144:8
179:18
235:7
236:3
246:10
248:8
**guessing**
127:12
150:17
**guide** 56:18
136:21,22
167:7
**guidelines**
116:23
117:21
118:6
208:18
249:17
**guy** 80:10
**guys** 15:6
199:6
225:7
**Gyorgy** 8:15
218:18
219:1
220:8

————————
### H
————————
**H** 69:7
**H-O-G-U-E**
69:7
**half** 76:19
96:6 141:8
141:10
**hand** 134:11
154:5
179:21
**handle**
243:18
249:8
**Handling**
212:10
**happen** 91:17
136:11,23
144:3
223:2
254:21
**happened**
82:17 92:9
163:3
**happening**
129:2

140:11
209:5
216:18
**happens**
125:17,19
127:6
129:24
167:21
178:4,7,7
216:17
244:10
252:13
**happiness**
158:7
**happy** 56:3
215:18
222:18
**hard** 20:2
23:9 27:22
46:15 62:7
81:2,17
83:6 96:10
97:24
125:11
128:24
129:6,7
134:5
137:6
154:10
157:15
160:21
214:1
216:6
217:7
225:10
232:17
259:16
**harder** 63:7
70:23
128:20
129:5
179:3
**hardest**
128:14
131:5
**harm** 66:11
116:24
117:1
137:4
188:21,22
196:5,9
**harmed** 125:5
**harmful**

107:16
175:1
182:12
195:5
196:15
197:5
240:11,20
240:22
253:4
**harms** 125:9
125:10
196:7
**Harrison** 1:9
1:15  5:21
5:22  12:16
259:22
**Hartnett** 4:3
11:23,24
**hate** 183:20
213:23
214:9,10
218:9
**hazards**
133:17
**HB-3293** 8:7
25:8  27:1
28:24
107:13
108:5,16
109:5,15
114:18
121:19
122:5
124:5
180:18
206:23
224:13
240:2
241:20
**head** 15:19
46:19
111:14,15
198:1
**headed** 19:19
**heading**
120:19
**health** 55:8
55:15
157:23
158:10
187:10
237:20
**healthy**

206:15
**hear** 19:3
44:4  72:21
140:18
209:21
235:16
250:12
**heard** 103:8
103:11
158:17,22
171:2,4
172:8
225:12
232:23
**hearing**
197:17
**heart** 155:14
177:17
**heartbeat**
201:6
**hearts**
177:17
**Heather** 1:5
18:19
**heavier**
71:19
**heavily**
76:18
**HELD** 10:24
**Hello** 14:9
235:15
**help** 55:12
56:24
75:14,22
75:24  76:1
80:13
83:23  87:1
96:20
97:17
116:20
136:2,15
136:20
150:12
152:18
159:3
178:22,22
178:23
191:6
196:21
199:15
200:4,4,21
200:21
202:7

204:15
220:1
240:23
255:12,15
**helped** 59:11
**helpful**
37:19
45:20
106:18,22
160:2
**helping** 70:4
145:12
147:8,15
156:16
184:24
205:6,10
221:22
224:6,11
**helps** 129:19
175:18
**Helstrom** 4:5
12:6,6
**hesitating**
105:11
**hey** 66:4
83:24  95:2
97:8  114:9
115:13
116:15,22
118:3
121:11
127:3
128:14,17
132:18
140:8
145:10
157:1
186:16
203:6
206:15
**Hi** 11:23
12:2
**high** 46:20
50:2  51:10
52:4  67:18
79:15,16
80:18  81:8
81:8,12
86:4,5,22
89:15,16
99:10
100:24
101:2,5

116:6,8
117:22
118:17,23
119:12
123:22
130:15
132:3
134:11,13
134:18
142:4,17
142:24
143:17,23
144:10,16
146:23
147:13,20
147:22
148:3,10
154:13
155:4,16
162:9
168:2,10
171:13,22
172:18
174:7
192:2
194:4,24
195:1,5,5
202:17
203:3
238:18
256:1
**higher** 70:18
71:8
138:21
142:18
143:21
154:14
155:7
186:6
198:24
199:4,7
201:9
**highest**
101:23
205:9
**highlighted**
237:1
**highly**
130:24
**hike** 110:22
**hit** 51:12,13
79:15
110:13

234:11
256:17
**Hogue** 68:9
68:19  69:7
69:9,11
**hold** 63:1
67:21
152:11
175:10
234:11
255:23
**hollistic**
119:7
**home** 61:7
**honest** 34:11
**honestly**
59:23  72:3
212:2
**honeymoon**
15:5,10
**honorable**
219:4
**hope** 158:6
**hopeful**
212:24
**Hopefully**
139:21
202:13
**hopes** 219:7
**hormone**
70:17
211:11
213:2,8
228:7
**hormones**
228:9
**hotel** 161:2
**hour** 56:3
102:6
141:9,10
141:13
184:7
**hourly**
233:19
**hours** 77:14
215:16
233:18,22
233:23
234:17
**House** 16:22
29:4
109:17
206:3

Case 2:21-cv-00316 0578

huge 51:21
human 222:14
hundred
  129:12
Hungary
  219:1
hurt 94:3
hurts 220:2
husband 15:4
  58:13
  236:4
hypotheses
  67:17

I

i.e 142:21
  143:10
Idaho 21:17
  22:5
  233:24
  234:13
idea 73:22
  121:5
  194:3
  205:16
  216:11
  232:3,24
ideal 193:1
  193:4,16
ideally
  256:24
ideas 255:22
identifi...
  8:4 23:6
  24:17 25:9
  58:2 61:12
  104:1
  149:21
  159:12
  211:21
identified
  8:4 47:23
  60:1 80:17
  176:8
identifies
  37:9,9
  41:13,18
  41:22
  171:12
  172:13,19
  173:16
  183:5
  207:17,20

241:15
248:11,23
251:3
254:6
257:7
258:13
identify
  36:7 41:5
  47:21
  52:16 66:4
  68:3 114:4
  173:6
  177:19
  182:4
  231:13
  243:24
  248:13
  257:20
identifying
  72:8 94:8
  116:9
  117:15
  142:15
  173:14
  175:13
  176:2
  178:11
  242:6
  243:3
identities
  239:2
identity
  35:13
  36:18
  114:14
  206:20
  208:14
  210:20
  246:1,5
  248:9
  249:22
ignore
  122:19
illegal
  190:19
imagine
  106:24
impact 49:8
  67:17
  69:15
  153:8,13
  187:2
impacts

125:21
impair 140:9
implicat...
  137:10
imply 208:22
importance
  35:16
  123:17
important
  83:19 84:5
  91:7 98:20
  105:5
  122:19
  126:17
  142:14
  145:2,6
  178:13,17
  188:14,17
  235:24
  241:4
  252:23
  253:3
impose 34:4
improve
  82:14
  128:20
  145:13,15
  146:2
  147:15
  153:9
improvement
  80:21
  96:20
  143:19
  149:8
  200:22
improving
  83:6 145:8
  146:7,16
inaccurate
  230:24
incapable
  127:18
include
  13:21 66:7
  98:13
  105:13
  158:3
  168:13
  199:14
  201:24
  202:10
  252:7

255:11,18
256:7
included
  57:3
  105:12
  194:12
includes
  62:4
  135:13,15
including
  17:22
  183:7
  203:3,7
  222:23
  246:7
inclusion
  167:7
  175:9
  208:3
  209:14
  220:15
  226:1
inclusive
  47:5 56:24
  57:4 91:14
  107:15
  116:1,3
  170:9
  171:19
  175:18
  200:21
  208:19
  214:24
  243:12
  244:20
incoming
  116:17
incorrectly
  177:12
increase
  124:3
incurred
  233:15
indicate
  70:18 71:6
indicated
  70:22
  231:12
indicates
  143:3
indication
  143:6
indiffer...

182:6
indirectly
  261:18
individual
  34:21
  46:23
  85:24 86:8
  86:21,24
  93:8
  115:20
  117:14
  134:1
individu...
  33:1,2
  153:11
individu...
  117:16
individuals
  86:2
  139:18
  175:5
indoor
  256:24
inferiority
  30:5
influencing
  106:13
inform
  116:20
informal
  55:8
information
  55:10
  146:16
informed
  65:11
inherent
  29:14 30:2
  30:6 31:2
  32:6 252:1
inhibitors
  228:8
initial 23:1
  23:2 247:2
initially
  40:11
initials
  197:21
injured
  186:16
injuries
  64:16
  134:15

PageID #: 0579

158:10
185:15,23
186:3
187:10,15
188:6,11
188:15,18
**injury**
167:21
186:5
187:14
189:10
**Inner** 79:5
**innings** 95:5
**input** 160:10
**inquiry**
183:15
**insight**
110:4
183:17
**insinuating**
247:15
**instances**
190:1
**intentional**
136:1
**interact...**
206:9
**Intercol...**
30:11
**interest**
85:17
**interested**
58:24
62:12
129:21
261:18
**interests**
107:23
108:23
109:13,14
114:24
115:6
**intermural**
258:3
**intermurals**
256:21
**internally**
177:20
**internat...**
103:8
220:14
**internat...**
208:2

**internet**
240:14
**interpret**
109:11
207:2
**interrupt**
86:17
164:19
197:23
**interspe...**
52:19
**intervening**
12:11,13
235:19
**Intervenor**
3:3 6:16
**interven...**
70:12
**interven...**
70:16
**interview**
130:8
**introduce**
11:22
**introduc...**
201:23
**invented**
210:13
**invested**
210:4
220:14
**involve**
156:6
**involved**
19:18
21:19 76:3
76:4 210:4
224:10
**involvement**
115:10
131:16
**involving**
32:18
42:14
61:23 63:2
63:2,6
67:19
70:14,15
71:4 140:8
146:10
153:6,8,23
154:3,7
156:20

178:17
194:20
196:4
198:22
200:5
247:7
253:20
**iPad** 150:23
152:10
160:6,12
184:9
**isolated**
72:23
**Israel** 30:16
**issue** 27:2
57:11 69:9
72:14
105:9
121:8
132:1
158:9,13
183:4
185:1
189:17,18
212:7
240:3
244:20
**issues** 25:20
25:23 26:9
26:13,15
55:8,19,22
166:22
167:1
168:19
171:19
175:4
183:16
**it'd** 249:19
**italics**
218:24
**Item** 43:17
**Items** 144:20

_____

**J**

**Jackson** 1:5
18:19
**Jacob** 11:4
103:21
104:3
**Jake** 24:2,12
24:20 28:2
28:23 39:6
57:18

69:19
149:10,24
152:14
159:3,17
160:10
211:16
**jampacked**
65:20
**Jeffery**
12:14
**Jeffrey** 5:17
259:21
**Jeremy**
103:16
**Jim** 206:7,10
207:8
**John** 80:11
126:8
137:18
**Johnathan**
6:11 12:10
235:18
**Johnson** 5:18
12:15
**join** 91:1
**Jordan**
103:16
**journal**
103:9
**joy** 82:18
97:7
**judge** 144:3
144:5
181:5,10
182:19
183:1
**judging**
156:7
**Julie** 4:4
11:20,24
13:24
14:22,22
70:3 95:2
113:1
180:15
184:11
200:12
221:6
248:14
**jump** 235:7
**junior** 30:12
46:21 47:2
47:7

**junk** 97:19
**jus** 188:6
**justific...**
30:3,7
31:3 32:7
**justified**
213:11

_____

**K**

**Kang** 4:6
12:2,3
**Kansas** 10:17
52:18 79:6
256:10
**Katelyn** 4:6
12:2
**Kathleen** 4:3
11:23
**keep** 24:24
56:3 58:18
81:17
83:24
108:11
117:13
131:15
137:13
140:1,22
145:8
146:7
148:15
179:6
195:22
205:10
215:1,7
217:2,7,7
220:17
**keeping**
182:18
220:15
**Kelly** 6:3
12:23 13:2
13:14
260:4
**kept** 18:9
163:9
**key** 58:19
78:11
131:2,2
184:3
199:20
**keyboard**
160:9,12
160:13,14

**keyword**
188:24
**kid** 97:19
**kids** 47:3,6
55:7,18,21
68:11
70:11
71:15 87:9
88:4 100:7
115:14
119:8
123:15
125:14
128:12,23
129:3,9,10
129:22
130:2,13
130:22
131:3
132:1,12
132:13
137:8
158:5
163:9,9
170:12
196:16,23
200:21
201:8,10
203:7,8,10
203:13,17
203:19,21
204:2,3
205:6,8,16
206:20
210:19
241:2
246:22
252:8
**kids'** 131:1
**kind** 49:4
51:19
58:17 63:9
79:14 82:1
83:3,4
97:19
125:15
126:17
128:4,23
134:1
135:24
140:1
145:11,19
147:16

155:2,9
174:21
181:5
183:16
194:21
197:24
201:3
214:17
222:11
232:7
236:4
237:8
249:21
**kinderga...**
130:13
**kindness**
135:5
138:8
213:24
**kinds** 136:12
155:15
**knew** 20:5
148:8
216:12,13
**knocked**
221:9
**know** 15:13
16:6 17:24
18:10,19
19:23 20:2
20:3,9
37:5 38:5
38:18 39:2
45:11,16
45:16,23
48:24
51:21 52:1
52:14 56:4
57:1 59:4
59:16,22
60:1,5,12
62:10 63:3
63:15,16
65:19 66:6
67:13
70:24
72:20,21
72:22
76:16,18
76:22
77:12,24
78:7,21
82:12,14

83:18
84:11
85:14 88:7
91:2 96:21
97:6,24
101:20
105:18
106:5,23
108:10
110:4,21
111:4,10
113:12
115:2,2,5
115:7,9,11
115:14
116:1,16
116:22
118:4
119:7
120:4
125:12
129:2,4,5
129:10,11
130:6
131:6,21
132:2
134:5
136:10,22
137:12
139:7,14
140:10
141:7
142:17
144:13
145:22
146:11,20
148:7,14
148:18
149:23
150:22
154:22
156:12,18
162:24
163:2,8,12
163:20
164:2,6,9
165:20
167:6,15
167:19
168:6,11
168:15
169:9,19
170:8,9

172:3,3,23
174:22
175:6,9
176:10
177:2,17
177:23
178:15
182:16
183:16
186:15
188:4,8,10
189:18
193:6
194:11,14
196:16,20
198:10,18
201:4,16
201:18
203:9
204:23
205:13,19
205:21
206:9,12
206:14
207:1
209:21
210:24
212:2,4
214:3,17
216:4,6,17
217:18,24
218:4,11
218:15
219:18,23
220:12
221:1,13
221:16
222:5,6,7
223:3,6
226:7
232:7,17
232:23
233:2,2,5
237:16,16
237:22
240:8
246:22
249:3
250:24
251:9
252:10
253:19
255:23

256:5,9,17
256:18
257:1,4,5
259:17
**knowing**
80:19
197:5
214:15
**knowledge**
25:18
76:12
115:10
228:15
**knowledg...**
210:4
232:13
**knuckle**
179:8
222:18
**kudos** 144:7

**L**
**L** 10:1
**L-O-C-K**
129:15
**L-U-C-K**
129:15
**labeled**
105:23
**lack** 213:23
213:24
**Ladders**
129:11
**Lainey** 6:16
235:19
254:17
**Lambda** 4:16
12:9
**language**
192:12,12
**larger** 213:5
**lasting**
125:20
**late** 19:5,15
65:5
**latest**
162:15
169:19
**law** 29:4
124:11,17
127:12,14
210:9,13
240:2,6

**laws** 136:17
  209:22
**lawsuit** 20:1
**lay** 65:9
**layman's**
  80:7
**lead** 49:7
  134:9
  153:23
  154:4,10
  186:22
**leaders**
  208:2
  209:13
  210:3
**leads** 121:22
**league** 91:2
  110:16
  124:2
**leagues**
  90:20 95:1
  110:18
  111:3
  200:2
**leaned** 71:19
**learn** 70:13
  138:16,18
  196:17
  216:22
  233:5
**learned**
  232:11
**learning**
  70:23 94:6
  212:24
  215:1
  223:22,24
**leave** 97:6
  102:14
  169:20
**left** 23:18
  192:20
  193:13
**left-hand**
  32:24
**legal** 4:16
  11:4 12:9
  30:5
**legislation**
  115:19,20
**legislators**
  115:16
  207:3

210:2
**legislature**
  27:9 29:14
  114:23
  122:12
**legitimate**
  186:18
**leisure**
  150:10
**let's** 13:3
  14:3 23:2
  25:12,16
  28:12
  32:20 41:7
  41:8 42:23
  51:11 80:3
  83:23 95:8
  97:4
  102:19
  105:20
  115:13
  116:1
  118:3,9
  124:23
  126:2
  134:19
  142:3
  149:5
  151:14
  152:20,21
  159:1
  161:20
  190:23
  195:22
  196:2
  201:6
  202:6
  206:16
  211:15
  215:6
  217:7,7
  219:12
  237:7
  239:1
  248:21
  250:4
**letter**
  197:16
  218:19,23
  219:7
**level** 47:5
  49:20 75:8
  77:12

95:14
98:11
101:20
102:1
107:15
115:23
117:22
123:2,14
168:10
175:6
204:4
220:13,14
220:14
221:22
240:11
252:3
256:13,15
256:21
257:5
**levels** 49:7
  49:24
  70:20 71:7
  94:3,24
  101:23
  118:1
  123:17,21
  128:21
  132:14,21
  170:10
  174:5
  187:16
  200:19
  209:15
  210:5
  213:3
  223:5
  256:11,20
  258:1
**Lia** 8:14
  211:20
  212:1,7,10
  212:14,19
  213:17,21
  214:5,9,14
  217:19
  218:8,9,21
  221:24
  222:17
  223:11
  224:23,23
  225:5,5
**life** 126:17
  126:24

127:2,6
131:18
140:11,16
157:8
183:6
223:11
225:14
**lifespan**
  75:23
**ligament**
  187:14
**limit** 13:19
**limited** 62:2
  63:14
  95:13,24
  98:10,12
  163:10,11
  235:23
  246:21
**limiting**
  37:19
  89:11
**line** 12:23
  29:13
  32:23
  42:13
  43:17
  128:3
  183:15
**lines** 100:20
**link** 13:2
  39:12
  150:19
  151:6,8
**list** 130:6
  133:2
**listed** 130:9
  151:6
**listen** 38:8
**liter** 222:6
**literature**
  25:20
  58:24
  62:24
  65:24 66:5
  126:20
  134:9
  204:23
  228:15
**litigation**
  25:21,24
  26:13,16
  27:2

**little** 21:19
  46:17 56:3
  58:21 59:8
  61:22
  65:13 72:4
  75:2 77:20
  84:10 85:1
  87:9 102:6
  104:19
  109:21
  110:14
  124:2
  128:12
  129:10,22
  132:15
  144:16
  147:23
  160:22
  161:5
  173:1
  176:10
  177:10
  192:19
  194:11
  198:24
  199:7
  236:12
  254:23
**live** 39:7
  138:22
  183:11
**lived** 183:5
**lives** 47:21
  137:11
  216:20
**living**
  137:10
**LLP** 4:9
  11:21
**local** 101:17
  116:17
**locate** 13:2
  149:2
**lock** 129:14
**logic** 180:21
**long** 28:9
  53:1 57:16
  59:24
  97:17
  104:16
  129:18
  141:6,9
  170:24

176:8
183:10
216:8
223:2
258:4
**long-las...**
187:1
**long-term**
125:20
137:10
**longer** 78:13
141:9
187:16
195:23
**look** 17:17
18:3 23:9
29:12
46:14
50:10
57:18
62:22,23
67:24
69:20
72:24 81:4
89:17 95:8
95:8
105:21
106:22
115:11
124:23
127:16
131:6
150:1,6,9
151:2
158:16
160:24
161:20,20
171:18
176:14,20
184:8
187:3
192:11,17
193:8
199:10
201:18
203:6
205:22
208:1
209:15
211:15
218:14
222:13
234:12

255:1
**looked** 18:6
44:8 50:21
51:4 59:24
61:16
109:14
132:9,11
158:9
181:5
**looking** 18:6
25:5,16
27:19 28:3
51:15,17
59:6 69:2
120:20
131:9
133:17
157:20
158:5
169:21
193:9,11
194:12
195:10
196:13
199:4,6
203:3
214:2
220:12
221:7
**looks** 53:13
104:21
115:11
129:6
160:13
176:8
177:10
224:23
**lose** 137:9
239:21
251:4,16
259:6
**loser** 217:13
217:23
**losers**
215:14
**loses** 242:1
**loss** 150:23
238:5
**lost** 133:15
185:8
195:11
217:19
250:16

258:12
**lot** 36:13
47:6 62:7
76:20
84:14,15
86:2,15
97:7 100:7
100:13
107:18
108:11,23
114:23
116:24
119:16
121:10
133:4
136:21,22
137:3,8,9
137:12
144:7
146:13
156:10
163:8
167:21
173:2
175:4
188:4
194:15,16
203:2,10
203:19,22
212:8
214:14,16
214:16
216:5,10
217:2
221:7,9,16
223:4
224:4
240:4
243:18
249:4
**lots** 127:10
216:8
257:1
**loud** 205:23
**lounges**
127:9
**love** 122:22
184:2,3
204:15
216:15
255:15
**loved** 81:13
**loves** 82:12

**low** 81:9
**lower** 89:17
94:3 98:17
144:4,11
146:23
148:3
192:3,19
193:1
194:4
**LP** 68:6
**luck** 128:6,9
128:11
129:9,12
129:15
132:12
**lunch** 140:21
141:4,8
216:8,10
**lungs** 213:5

——————————
M
——————————
**M** 4:8 5:17
30:14
**M.D** 68:23
**Ma'am** 240:13
**Main** 187:11
**majority**
101:2
183:5
**making**
108:12
114:24
154:17
207:3
210:5
**maladaptive**
154:16
**male** 31:15
33:2 34:20
34:21,22
35:4,7,10
35:14,22
35:22,23
35:24 36:7
36:10,13
36:23
37:19
38:24 39:3
39:18 40:4
40:6,17,19
41:17,22
41:22 43:6
47:21 50:4

52:20 59:2
62:15
67:20
116:8
117:15
171:12
172:18
173:5,15
174:8
175:12,13
176:4
178:11
182:1,2
189:8,24
208:16
224:24
225:3
228:18,21
229:4,8
241:10,10
241:15,15
242:1,6,14
242:15,21
242:21,22
243:2,3,7
243:16,16
243:22,22
244:19
245:1
248:11,11
248:17
251:3
254:6,6,11
257:7,18
257:20
258:12
**male's** 242:7
242:9
**males** 29:15
30:23
31:10
42:15,24
47:23
48:12,15
48:23
49:23,23
50:2 51:19
52:18
53:17 54:7
54:11 62:4
63:3 67:5
71:9,12,16
71:23

114:10
189:16,17
198:22
199:1,3
213:7
224:22
226:9,23
226:23
227:11,12
227:22,23
228:10,17
228:17
229:3
231:13
239:1
243:23,24
254:7
257:18
**man** 171:7
243:12
**manageable**
148:15
**management**
64:14
**mandatory**
199:16
**maneuver**
224:10
**manipulate**
25:13
**mantra** 79:7
**mapping**
208:13
**marathon**
52:18,21
52:22 86:7
86:7
**marathons**
86:12
**March** 1:20
2:9 3:8
11:6
219:15
261:7
**marginal...**
224:2
**Maria** 61:20
62:4
**mark** 23:2
24:5,19
28:6 29:2
103:19
160:9

**marked** 23:6
24:3,4,17
25:9 29:1
57:21 58:2
61:8,12
104:1
149:12,21
159:12,15
211:21
**marker**
127:21
**market**
101:10
**marking** 25:5
**Mary** 1:19
2:8 3:3
7:4 10:11
11:13
14:17
261:7
**masculine**
176:20
177:2,4
**mass** 49:8
213:10
**massive** 62:5
**Master** 53:7
**Master's**
44:23
58:10,17
**match** 38:1
110:13
**materials**
78:22
206:13
**math** 132:17
**matter** 155:8
200:2
207:2
243:6
246:1
259:5
**matters**
25:18
222:4
**mature**
128:16
**maximize**
199:15,19
255:12
**Maximizing**
56:18
**McCuskey**

5:10
**McEnroe**
137:18
**mean** 17:2
20:20
35:22
36:17 38:5
39:8,18
41:9 47:18
47:20 48:3
49:20
50:11,14
51:1,20
59:20
60:15
66:17
67:16
71:11,20
80:8 82:11
82:24 83:1
83:2,14
90:2 96:4
97:10,21
104:14
112:3,6
114:16
119:4,22
120:20
123:20
128:11,19
129:17
130:13,17
134:2
136:9
139:9
140:11
143:14
147:19
156:5
167:20
180:14,15
202:12
204:22
224:23
238:4
248:5
251:1
**meaning**
32:23 35:4
39:2 77:7
248:4
**means** 33:1
34:3,21

35:10
42:20
43:22 45:6
45:11,17
46:1 82:12
135:8
137:8
143:16
147:20
176:18
199:18
219:15
**meant** 20:23
37:11
112:6
121:13
177:13
182:10,10
**measurable**
126:19
**measure**
61:19,21
62:1
106:22
194:15,18
**measured**
70:17
155:8
186:7
**measures**
59:13
105:12
**medal** 97:20
**medalist**
89:15
97:18,21
252:12
**medals** 89:1
**media** 214:13
**medical**
17:19
37:15 40:2
64:4 77:9
116:13
**Medicine**
158:18
**meet** 170:15
209:7
219:19,19
220:7
222:1
258:4
**meeting**

258:18
**meets** 257:13
**member** 75:10
76:8
**members** 76:3
76:11,17
**memory** 71:2
**Memphis**
236:1,9,9
**men** 111:18
111:23
112:8,8
113:9
114:2
211:4,8,12
**men's** 111:13
114:9
**menstrual**
58:22
**mental** 55:8
55:11,14
157:22
158:10
187:10
**mention**
16:24
46:15 77:1
219:4
**mentioned**
80:4 84:8
91:12 98:6
125:16
229:4
237:9
238:1
241:9
250:4
254:16,20
**mentioning**
254:21
**mentor** 78:15
78:20
**met** 18:24
**methodology**
204:20
**methods**
106:23
**Michael**
30:11,14
**Micka** 219:6
**middle** 19:19
53:4 68:11
70:11

71:18
79:14
118:16,23
123:23,23
130:12
131:2
192:18
193:13
**Mills** 252:11
**mind** 26:14
42:2 90:18
96:19
106:2
113:14
163:19
247:24
**minded**
164:11
**mindset**
115:17
**mine** 145:23
**minimizes**
160:13
**minimum**
167:13
203:23
**minor** 72:4
**minority**
99:16
163:21
**minute**
104:24
156:13
**minutes**
28:10
102:11
141:13
229:13,16
**misrepre...**
230:17
**missed** 63:18
149:6,16
196:16
228:24
**missing** 15:8
77:23
120:24
128:1
173:21
259:1
**mistakes**
119:16
138:11,12

154:17
**misunder...**
129:18
**mix** 76:2
194:21,24
**mixed** 111:9
**mixes** 195:4
**model** 201:5
**moderate**
49:21
81:14
**modify**
120:13
**module** 102:8
**moment** 24:5
24:22
26:14
27:19 45:8
61:5 159:9
161:8,20
208:17
Montagano
3:5 261:4
261:8
**months** 77:19
188:7,8
**monumental**
213:6
**moot** 146:5
**morbid**
145:20
**Morgan** 6:3
13:14,14
260:4,4
**morning**
14:18 28:4
68:5
**MORRISEY**
1:16
**mother** 1:5
17:14
18:20
**mother's**
17:12
**motion** 92:9
**motivate**
73:19
**motivated**
71:24
**motivates**
73:14
**motivation**
66:11 67:5

67:14
72:18
78:11,11
100:17
134:14
**motivati...**
60:22 61:2
61:19
62:20
69:16
149:7
191:16
**motivations**
72:8
**motivator**
75:4 93:1
**motivators**
93:12
**mouse** 152:2
152:7
**move** 13:18
14:4 32:20
94:23
109:21
123:16,20
124:2
126:2
130:16
132:14,20
132:21
133:14
134:19
146:19
151:19,21
151:22
152:3
153:17
157:19
195:22
221:22
224:11
**moved** 110:21
**movement**
53:14,14
54:13
**movements**
54:3
**moving**
116:21
126:24
127:2
132:18
**multiple**

33:14
**muscle** 49:8
213:10
**muscles**
155:14
**music** 253:22
**muted** 28:2
**mutual** 32:22
34:2
**myopic**
122:18
123:1
124:6

_____

**N**

**N** 4:1 5:1
6:1 7:1
10:1,8
**naive** 216:13
**name** 10:16
11:4,13
14:15
17:18 58:5
68:5 73:1
105:18
149:7
174:8,8,9
174:17,17
192:10
219:1,6
235:18
**named** 80:10
**names** 11:15
**nanomols**
222:6
**narrowed**
208:21
**natal** 226:9
226:9,23
226:23
257:18
**nation-wide**
200:8
**national**
30:12
65:18 75:8
118:3
201:15
220:14
256:20
**naturally**
127:20
129:24

**nature**
139:17
**NCAA** 115:24
118:2
169:15
209:6
213:20
214:21
218:19,22
219:7,11
219:14
221:18
223:20
258:19
**NCAA's** 213:1
219:21
**nearby** 141:8
**nearly** 227:1
227:13
228:11
**necessarily**
88:7,17,18
134:16
139:24
195:4
**necessary**
43:18
174:1
**need** 15:15
16:5 38:5
44:2 54:10
56:4 59:5
62:8 78:23
82:5 91:3
94:4 99:14
104:12
106:4
126:19
134:13
139:19
140:15
141:6,9
145:9,16
145:21,21
145:24
150:16
156:22
168:18
176:14
179:8
188:20
195:23
200:19

225:7
230:20
246:17
254:24
**needed** 77:22
78:13
172:23
**needs** 215:4
218:6
**negative**
125:20
137:5
206:9
**neighbor**
15:6
**neighbor...**
201:8
**net** 150:16
**Network** 79:6
**neutral** 82:7
**never** 55:1
89:6 99:23
131:21
204:4
216:11,12
216:12
217:24
221:13
**new** 4:19
77:4,5
116:18
212:23
214:2
216:5
**news** 212:8,9
235:21
243:17
**Newton** 61:20
**NIA** 30:12
**nice** 37:2
40:5 79:21
141:1
217:8
**nicely** 38:23
39:1,2
**Nicholls**
80:11
126:8,21
127:24
130:5
131:1
132:7
144:9

146:5
**Nicole** 3:5
261:4,8
**nine** 56:17
**nipped** 138:6
**no-brainer**
154:6
**nodding**
15:19
**noise** 44:4
**non-arbi...**
250:19
**non-injured**
186:7
**non-pejo...**
142:21
143:11
**nonbinary**
171:3,13
172:4
**nonsense**
89:6
**normal**
152:10
**North** 6:14
53:8,9
**Notary** 3:6
10:17
261:4
**notch** 106:6
**note** 68:2
189:13
200:16
**number** 8:4
11:13
25:17,17
30:2 32:2
32:17
43:17
57:23 62:8
77:13
126:2
159:6
167:13
191:7,11
191:14,16
191:19
227:10
228:6
229:4
255:5
**numbers**
159:3

**numerous**
231:12
**NY** 4:19
——————
O
**O** 10:1,8
**Oaks** 5:19
**object** 26:2
27:15
113:10
187:22
259:8
**objecting**
218:8
**objection**
9:1 13:20
13:22 14:3
29:10,22
30:20 31:7
31:18 32:1
32:13 33:7
33:13,20
34:9,18,23
35:5,12,17
36:1,4,11
36:22
37:13,22
38:6,16,20
39:19 40:1
40:12 41:1
41:10 42:3
42:10,18
43:4,14,21
44:12,17
45:7,12,18
46:3 47:9
47:14
48:10,17
48:22 49:5
49:18 50:9
50:23 51:7
52:3,11
53:18,24
54:9 57:13
59:3 60:11
62:16
66:14,20
67:1,6
73:5,9
74:2,7
85:4 91:19
92:2,16
93:5,22

94:16 96:3
96:17
97:14
98:14
100:2,11
101:7
105:7
107:20
108:1,6,17
109:2,7,16
109:23
112:2,11
112:23
113:11,18
114:6,21
115:1,8,21
116:11
117:5,10
117:19
118:19
119:2
120:11,14
121:4,21
122:9,14
123:4,11
124:8,14
125:6
131:23
135:18
137:2
138:3
139:6,20
145:5
154:21
156:11
157:3,13
162:23
163:7,18
165:8,19
166:2,16
167:4,17
168:5,16
169:7,16
170:1,6,18
171:9,15
171:23
172:5,9,15
172:21
173:8,19
174:2,11
174:19
175:15,24
176:16,24

177:22
178:5,14
179:11
180:6,13
181:3,18
181:23
182:17
183:3,13
188:23
189:5,11
190:2,7,13
190:20
194:7
195:2
197:1
198:12
199:24
200:10
203:1,15
204:9
206:4,24
207:23
208:11
209:2,11
209:24
210:11,22
212:3
213:13,19
214:11
216:1
217:14
218:10
220:9
221:4
222:2,20
223:15
224:3,15
225:1,8,23
226:11,12
227:3,6,16
228:2,12
229:9
231:9,16
232:4,16
234:18
237:10
239:7,11
239:23
240:7,21
241:13,22
242:4,11
242:16,24
243:8,14

```
244:2,8,16        15:20,21          134:19,21        old 94:5           253:21
245:3             16:11,15          140:21            240:4             257:1
246:14            18:4 20:7         141:3,14          Olympian          259:6
248:1,15          20:24 21:6        142:2             219:2             opportunity
249:2,23          21:12,14          143:8,16          Olympic           26:12 47:6
251:7,19          21:21             146:20            89:15             73:13,18
251:24            23:10,11          147:4             97:18             75:3 82:13
252:21            24:9 26:4         150:12,21         115:23            82:18
253:15            26:6 28:8         150:24            220:13            95:19,22
254:9             28:11,13          151:9,10          252:11           98:21
255:21            31:12             151:15,20         Olympics          99:14,17
256:8             32:16             152:16,23         89:2,5            107:17
257:10,22         33:11,18          157:21            164:1,2,4        108:9
258:8,16          33:23 34:6        158:15,24         164:8,12         109:10
259:12            36:20             159:8,21          164:13,23        110:7
objections        40:21 42:7        161:4,19          164:24           121:10
13:20,20          42:22 44:1        162:1,2,5         165:14,24        122:22
13:21,22          44:15 46:9        162:13            onboard 62:6     165:21
13:23             46:11             164:14            once 16:7        196:16
observe           50:13,17          171:1             79:1             203:10
49:10,15          51:3,8            173:24            215:10           219:23
obvious           52:7 54:5         174:15            ongoing          236:18
132:16            54:16             182:24            214:23           238:3,4
146:8             55:17 58:7        183:19            online 44:8      242:2
163:20            58:14             184:10            open 150:20      244:21
obviously         60:19 61:4        185:7,8,9         180:23,24        251:14,17
99:16             62:21             185:21            181:1,15         253:13
215:17            63:23 67:9        186:19            219:8            opposed
occurred          67:11             188:3,13          243:23           15:18 94:7
92:1              68:24 69:5        191:5             256:22           227:14
Oerter 88:24      69:8 71:2         192:1,14          opening          231:18
offer 118:5       72:6 75:18        197:2             218:17           optimal
224:5             76:24 79:4        200:13            opinion 66:1     166:9
257:1             79:9 80:9         202:5,16          107:9,12         204:14
offering          85:9,18           202:22            117:1            245:14,20
107:8,12          88:19,22          206:1,1,22        118:8            255:13
offers            91:22             208:23            120:13           optimize
122:20            98:19             209:10            213:15           53:14
office 11:19      101:14            218:16            218:19           option 176:4
110:12            103:12,15         224:16,20         240:5            176:6,12
official          103:18            228:5,13          255:19           182:3
1:12,14           104:9,13          232:2             opinions         224:21
2:1               105:15,19         233:6             123:7            243:7
officials         106:9             235:10,16         opportun...      245:5
135:15            107:2             236:10            26:22            options
137:15,22         108:14,21         237:14            43:19 74:8       169:21
138:9             109:20            243:11            83:22            239:13
206:13            111:12,20         245:7             163:13           order 69:7
oh 63:20          118:11            249:6,24          221:15           99:13
67:12             122:6             250:16,16         223:19           138:1
191:5             130:4,8           253:2             238:19           145:15
okay 13:17        133:6,13          255:2             239:5            164:7
14:3,14           133:17            260:13            251:5            203:24
```

Oreter 89:14
organiza...
  75:14,19
  76:2,8
  198:7
  201:16
  206:11
organiza...
  218:20
organiza...
  106:12
organiza...
  90:20
  107:14
  115:23
  167:19
  169:10,10
  171:18
  201:19
  208:1
  209:13
  210:3
  220:13,17
organized
  124:1
orientation
  67:19
  80:15,17
  80:18,24
  81:6,7,12
  81:14,19
  81:20,23
  89:16,21
  89:23
  133:20,24
  134:8,12
  134:14,16
  134:18
  142:4,6,17
  142:21
  143:1,4,10
  143:18,23
  144:10,17
  146:23
  147:14,15
  147:20,22
  148:3,10
  148:19
  153:11
  154:13
  155:8,16
  191:16
  192:3

193:20,21
194:4,21
195:1,1,16
orientat...
  133:19
  149:8
  195:10
oriented
  80:4,5
  81:11,11
  82:23,23
  88:16
  136:18
  137:1
  198:15,19
original
  40:18
  161:21
originally
  77:21
  236:6,9
other's
  132:21
ought 94:5
  123:9
outcome
  245:13
  253:10
outcomes
  67:21
  118:13,18
  119:1,5,19
  121:17,20
  122:5,7,11
  134:10
  142:23
  143:12
  153:6,9
  166:8
  245:19
  246:3
  247:6
  251:17,23
outline
  209:16
  237:8
outlined
  252:6
outlining
  185:9
outperfo...
  128:24
outside 86:5

110:12
125:16
126:6
152:17
161:2
overall
  51:15 57:2
  105:4
  119:8
  135:2
  193:23
overbroad
  30:4
overcoming
  134:15
overesti...
  127:20
  131:18
overesti...
  129:23
overesti...
  132:2,5
overlap 52:2
overlapped
  21:18
overs 40:6
overstated
  88:10

_____
        P
_____
P 4:1,1 5:1
  5:1 6:1,1
  10:1,8
  197:16
p.m 102:22
  141:16,23
  161:11,18
  184:15,22
  229:21
  230:4
  260:16,18
packet 78:22
page 8:1,3
  9:1,3
  25:14
  29:13
  30:14
  42:14
  68:15,16
  68:20,21
  68:22
  69:18,23
  70:2

105:23
106:12
118:12
133:7,11
161:21,22
161:24
162:16
185:9,14
185:14
187:7
195:11
215:6
218:23
pagination
  69:1
painful
  225:13
paper 52:18
  59:19
  68:10 70:7
  70:8
papers 64:18
  66:7,10
  67:4,13,22
  71:22 72:7
  72:11,23
  73:2,12,15
  74:13,15
  105:16
  158:12
paragraph
  25:17 26:2
  26:7,24
  29:12
  46:12,14
  53:6 56:17
  75:7 77:1
  95:9 98:8
  106:11
  118:10
  120:19
  122:17
  124:23
  126:2,3
  127:16
  133:14,18
  134:19
  142:3,20
  144:16
  146:20
  147:11
  153:2,17
  154:12

157:20,21
161:23
166:5
186:20
187:6
191:24,24
192:13,18
192:20
196:2
199:10
205:22,24
206:2
212:17
215:9
218:17
219:1,5,13
236:13,15
236:22
237:3,24
245:8
247:3
248:13
250:5
255:3,7
parameters
  158:4
pardon
  211:17
paren 186:23
parent 206:7
parentheses
  29:18 30:2
  30:12,15
  30:17
  186:1,9,23
  187:11
parents
  206:7,13
  207:12
  221:11
part 20:18
  31:1 63:17
  81:24
  83:19
  85:16
  86:21
  92:21 98:2
  101:24
  126:20
  134:23
  136:13
  140:5,7,13
  154:23

157:8
167:22
178:21
179:12
180:4
189:9
193:13
196:13
209:19
232:18
234:14
239:14
241:4
253:8
258:21
259:16,18
**partial** 65:8
236:11
**participant**
68:3 252:4
**particip...**
71:20
90:21 91:1
199:14
202:10,11
255:11
256:7
**participate**
19:24
26:12 43:8
48:6 70:12
70:16
79:12 86:6
86:14
101:19
106:14
108:10
109:10
110:7
111:23
116:10
117:17
121:6
123:15
164:7,12
164:23
165:2
167:24
168:4
169:4,5,11
170:10,16
171:13
172:19

173:3,15
173:18
174:24
175:11,23
176:4
177:21
179:22
180:9,19
183:6,21
196:10,12
201:8
202:11
203:11
207:6,8,16
207:21
209:8
222:1
231:14
232:11
237:2,5,15
239:3
241:3
242:7,9,22
243:13
244:1,15
246:9
247:18,18
250:24
251:9
253:7
254:7,11
257:2,4,18
257:24
258:1,7
259:17
**particip...**
20:10,13
65:23 71:4
79:10
**particip...**
257:13
**particip...**
27:11
57:11 86:8
110:2
125:1
137:13
154:13
162:9
163:6
168:9
175:14,21
175:22

177:24
180:22
183:11
208:6
231:7
232:24
233:1
236:16,20
238:2,18
238:20
240:10
242:2
248:18
251:6,18
251:23
253:11
258:15
259:7
**particip...**
66:1 75:23
76:23
106:15
122:23
125:5
210:9
238:6
244:7,14
**particular**
18:5 37:4
54:12
62:13
63:21
85:16
139:3
172:24
176:2
190:5
237:3
241:2
246:22
**particul...**
94:23
252:2
**parties** 7:3
7:9 10:4
11:15
261:16
**parts** 160:1
**partway**
192:21
**party** 207:13
**pass** 209:22
210:8

**passage**
185:13,16
194:12
**passed** 59:17
**passion**
253:23
**passionate**
65:11
131:8
253:22
**password**
150:17
**patience**
235:4
**patients**
54:21,23
55:2
**PATRICK** 1:16
**patterns**
53:15
**PBJ** 115:12
176:7
197:15
**PDF** 104:5
150:20
151:8
160:20
**peers** 224:18
**pejorative**
134:2
**Pelet** 4:8
68:5,6
**Penn** 212:9
218:21
**Penn's**
215:19
**Pennsylv...**
3:7 212:18
215:12
261:1,5
**people** 35:7
36:6,24
38:10,10
38:22 43:6
63:6 70:18
72:21,24
75:22,22
75:24 76:2
76:3,4
77:11,14
78:4,9
80:16,17
80:23

83:17
86:13
87:19
88:14
100:4,23
101:21
107:24
108:10,24
109:14
114:13
115:12
116:6
124:24
125:4
126:18
127:5
130:1
131:6,12
131:15,17
131:20
132:4
134:13
137:10,12
139:14
140:20
144:2,10
145:12
146:6,12
146:18
147:13,22
154:5,8
155:7,10
155:21
156:3,6,9
156:16,19
168:18
171:5
174:22
175:4
177:5
179:13
191:3
194:20
197:5
200:19
202:14
210:4
214:16
215:19
216:14
221:6
224:6
225:12

PageID #: 27690 0590

237:16
243:1
256:12
257:2
people's
126:21
perceive
38:1 39:3
63:1,5
135:2
136:4
168:10
193:15,18
194:20
perceived
60:21 61:2
61:19
62:19
142:5,7,9
142:9,23
143:5,13
143:15
144:18,18
145:3
156:19
perceives
41:21
67:19 93:3
145:17
percent
119:24
120:5
129:12
139:10
percentage
73:23
119:23
205:16
percentages
100:13
203:20
perception
143:1
145:1
224:17
perceptions
142:14,16
143:22
144:4,11
149:8
153:22
154:3
191:17

perfect
151:19
159:8
221:14
perfecti...
154:16
perform 50:8
55:13
75:24 76:1
125:15
129:5
143:24
155:1
204:3
242:6
performance
49:11,15
51:5 64:8
77:9 101:5
117:9,23
118:13,24
119:4,19
120:23
121:8,12
121:17,20
122:5,6,11
142:23
143:12
153:6,9,9
153:24
154:4,6,11
166:14,24
217:9
226:24
227:12,23
228:19
229:5
258:24
performed
52:21
performing
228:10
performs
50:4
period 131:3
186:23
217:13
238:5,6
periodic...
44:4,7
91:8
permitted
43:1

perpetuate
30:5
person 37:21
39:5 40:19
76:20
117:17,18
129:4,6
130:10,11
130:12
140:4
145:10
146:4,4
168:18
172:12
173:22
174:16
175:20,21
175:22
183:15
216:10
225:20
243:24
257:9
personal
80:16
163:21
personally
82:23
252:5
perspective
37:1 38:8
126:4,10
126:15,18
126:22
127:3,18
182:21
204:18,22
205:5
206:6
228:21
229:7
255:13
perspect...
126:24
Petrie
185:24
Ph.D 1:19
2:8 3:3
7:4 10:11
45:2,24
155:18,20
155:24
156:6,24

157:6
261:7
PHILADEL...
261:2
philosophy
198:8
phrase 32:6
87:23
147:1,3
physical
33:1 37:5
46:16
48:24 53:5
75:24
132:10,10
132:15,19
143:2
237:19
physically
37:24
125:11
137:11
237:20
physiolo...
69:17
226:9,22
227:10,21
228:9,19
228:20
229:5,7
physiolo...
64:2
physiolo...
116:14
physiology
117:24
pick 52:17
82:5
picked 132:9
picture
120:24
206:6
208:16
215:7,8
220:12
pictures
133:16
piece 122:7
122:8
131:13
place 96:21
99:23
101:21

113:13
127:15
130:22
153:22
157:6
188:18,21
208:18
209:22
213:21
215:18
220:22
223:3
236:1
249:17
256:9
257:12,17
258:4,18
261:14
placed
123:18
places
127:11
236:11
Plaintiff
4:13,20
11:21 12:1
12:9 17:14
18:16 68:6
197:15
Plaintiff's
17:12,20
19:4
102:15
260:9
Plaintiffs
1:6 12:3,5
12:7
planned
44:10 46:7
play 18:15
19:20 43:7
47:6 79:23
83:13 90:9
94:14 99:9
99:17
101:22
110:19,21
111:6
112:16,17
114:10,14
115:13
121:10
122:22

163:12,13
173:12
174:10
181:14,17
181:21
182:3
207:12
239:13
248:9
256:13,23
257:21
258:13
**played** 84:8
84:10
101:2
110:11,13
110:15,16
110:18
111:3,7
**player** 84:15
110:9
137:17
254:18
**players** 51:5
57:20
58:16 59:2
149:9
**playing** 43:6
79:23
81:10,17
94:18 95:4
95:5
100:17,24
110:23
112:4
116:16
178:19
179:17
181:1
**plays** 82:24
94:9
**please** 14:16
15:18
27:16
28:24 41:7
84:1
146:20
159:18
199:11
215:8
226:5
236:22
244:16

**PLLC** 5:10
**pluses**
203:10
**point** 17:5
19:10,23
22:20,24
44:2 66:4
78:18
114:13
129:22
130:1
141:2
152:20
153:18
176:7
221:19
247:11
259:4
**pointed**
177:9
**policies**
213:1
**policy**
121:16
203:6
218:20
231:18
239:1,4
243:19
247:14
252:5
256:19
**pool** 100:23
220:2
222:9
**portions**
59:21
230:11
**position**
118:5
207:15,19
207:24
210:2
226:7
231:21
232:13
252:3
**positions**
94:10
246:21
**positive**
17:24
166:8

196:3
237:2
245:12,19
246:3
247:6
258:14
**possibility**
239:16
**possible**
123:15
125:4,9
171:20
178:2,4
188:15,18
198:21
199:6
210:13
252:7
**possibly**
42:11
189:12
**potential**
76:1 80:14
88:3
136:21
181:6
199:16,19
240:24
251:10
254:3
255:12
**potentially**
250:24
**pounding**
44:4
**power** 54:12
**powerful**
138:17
**powers**
138:21
**Practice**
57:20
**precise**
147:24
**precisely**
230:15
**predictions**
63:1,4
67:21
**predictors**
149:8
191:17
**prefer** 14:11

150:11
**preference**
140:23
**preparation**
17:7
**prepare** 66:1
78:10
**prepared**
21:2,9
22:2,19
23:22 67:4
72:7,11
73:2,12,15
**preparing**
26:24
**presence**
143:2
**present**
11:15
**preserve**
13:23
**presume**
18:23 55:1
156:9
176:22
**pretty** 52:22
77:4 81:21
96:24
127:8,15
142:13
156:14
157:8
199:20
256:19
**Prevalence**
159:4
185:10
**prevent**
26:21
27:10
110:6
188:21
254:3
**prevented**
83:8,12
248:17
**preventing**
220:4
**previous**
186:5
240:17
**previously**
24:12 29:1

**primarily**
14:20
75:14
118:17
**primary**
59:18
79:11
96:19
119:6
120:5,8
133:19
158:8
197:12
**principal**
176:9
**principle**
249:21
**print** 160:20
**printed**
184:7
191:21
**prior** 13:19
19:8
233:18
235:22
**prioritizes**
212:21
**privilege**
13:20
15:14
219:18
**probable**
153:14
**probably**
34:1 58:20
65:8,20
71:2,20
72:24
75:21 79:1
79:16
88:10
95:21
100:13
101:8
105:18
112:18
120:1,4
127:9,13
134:17
144:6
148:15
149:3
178:6,7

188:4
194:18
204:1
207:1
216:13
221:9
233:18,23
238:16
problem 47:8
82:4 180:7
185:2
240:5
241:9
247:23
248:13
problematic
241:20
257:8
problems
91:16,16
91:24 92:1
92:13
132:17
176:10
Procedure
3:4
proceed
40:20
proceeding
10:12
16:12
24:20
261:10
proceedings
261:6
process
60:18
249:11
processing
144:15
professi...
40:3 99:17
professi...
75:19,21
Professor
14:9,11,12
16:17
23:10
25:14
27:22 29:5
58:9 103:7
140:23
150:1,6

184:24
191:21
230:6
231:5
program 53:3
75:10
programs
76:4
205:14,17
221:12
progress
70:23
prohibited
1:23
project
59:11
promote
43:19
81:19
134:8
136:5
219:9
244:14
pronounce
147:8
pronouns
174:18
pronunci...
147:7
proper 123:9
properly
39:22
properties
60:21 61:2
62:19
proportion
98:23
99:19
100:15
proposed
74:23
proposition
148:12,22
192:5,6
protect
189:9
protected
165:18
protection
165:21
provide
55:10
138:1

165:21
200:3
206:12
provided
74:9
provides
240:9
providing
21:19
proving
215:1
217:10
psychiat...
54:18
psycholo...
59:13
69:16
158:4
psycholo...
237:20
psycholo...
54:16
psychology
55:9 57:15
63:14,15
63:21
64:23
65:19 66:6
75:10,20
76:7
123:13
142:13
204:22
224:5
233:3
psycholo...
53:8
psychome...
60:21 61:2
62:19
psychome...
62:1
puberty
211:3
213:7
223:12
227:2,14
227:15
228:1,8
public 3:6
78:6 261:4
publicat...
133:2,4

publicity
95:15
98:12
published
59:14
156:19
pull 57:18
118:3
149:10
pulling
178:15
punishment
119:16
purpose 18:9
27:9 61:18
71:14
75:13,17
77:7
purposes
40:16 90:8
190:12
pursuant 3:4
pursuing
215:1
push 83:21
97:23
125:11
pushback
214:16
put 27:16,20
37:18
39:13
40:10 83:3
98:16
104:4,4,11
119:9,22
124:18
130:5
149:24
177:14
193:18
201:6
214:15
216:20
221:12
230:9
232:20
234:16
238:12
240:4
putting
181:12
188:21

puzzled 59:8
_____
Q
qualific...
109:22
qualify
73:22
quality
148:17
177:6
quantita...
144:24
question
15:18,22
16:3,7
20:8 27:7
31:1 62:3
73:16 75:2
80:12 85:8
94:22
105:21
108:19
113:17
114:16
144:21
147:2,23
154:17
160:9
164:22
185:17,22
186:11
187:2
197:14
202:6
208:8
210:19,24
225:18,19
225:22
226:1
228:24
229:4
235:24
236:2
237:13
245:9
250:12
259:13
question...
60:22 61:3
61:20
questions
16:12
63:12

Bates # 27692 0593

105:3,4
124:17,20
168:24
205:24
212:1
221:8
229:16
230:20
231:5
235:1,21
235:22
259:20,24
260:3,6,8
260:11,14
**quick** 130:5
150:2
152:18
235:23
237:7
**quickly**
188:10
**quite** 20:2
59:16
113:2
200:13
**quote** 32:24
33:1
213:11

———————
**R**
**R** 4:1,3 5:1
6:1 10:8
**races** 86:14
217:19
**Rachel** 6:12
12:12
**racing**
146:10
**racquets**
110:20
**ran** 52:21,21
61:23
**randomly**
70:14
**Range** 162:10
**rank** 145:22
**ranked** 95:14
97:11
98:11
**ranking** 94:8
111:6
**rankings**
93:8,9,9

93:11 94:2
94:5
**rate** 155:14
233:19
234:21
**rating** 193:1
**Ratings**
149:9
**rationale**
18:23
**reach** 13:4
34:20
80:13 88:3
126:13
136:20
240:24
**react** 92:1
**reaction**
107:8
**read** 18:2
26:3,7
27:5 66:3
66:5
105:16
106:1,18
147:1
148:20
157:24
170:22
172:12
185:16,17
185:18,19
185:22,24
188:5
205:22,23
225:12
226:4
230:7
236:21
240:15
245:15
247:3
254:23
255:16
260:11
261:8
**reader**
130:10,12
130:15
**reading** 10:4
61:7 66:5
131:1
187:4

206:14
230:11
**reads** 10:21
11:7 13:6
13:13
28:15,22
56:8,15
102:22
103:5
141:16,23
161:11,18
184:15,22
229:21
240:17
260:15
**ready** 214:18
**real** 39:9
115:10
150:1
152:18
236:2
237:7
**realistic**
113:14
257:3
**realisti...**
30:8 31:4
32:8
**reality**
142:10
143:4
252:9
**realize**
129:22
130:1
**really** 19:19
50:1 62:8
76:22 78:9
80:11,18
82:5,8
83:23
89:16
94:24 95:7
97:5
105:20
107:15
114:9
115:24
116:14
120:6
128:12,21
129:3
134:13

140:9
144:21
146:2
147:14
152:6
167:23
170:8
175:5
177:14
178:21
189:15
196:13
199:2,5
200:20
205:12
207:6
210:4
213:22
214:1,19
216:3,6
220:17
232:6,20
233:7
237:2,22
239:15
246:10
251:21
253:20
256:16
**reap** 26:11
26:22
75:23
96:12,13
107:17
108:9
122:1,22
176:12
207:8
209:18
236:18
237:19
238:3
246:12
259:16
**reaping**
254:4
**reason** 33:24
44:10 46:8
121:7
131:4
148:11,20
186:11
187:2,20

246:20
249:12
**reasonable**
123:7
**reasonably**
188:22
189:1,4
**reasons**
58:20
90:16
99:24
154:8
177:11
**recall** 20:2
23:18 45:2
82:19
**recalling**
71:1
**receive**
26:18 43:7
100:15
168:9
**received**
78:20
164:14
228:18
229:3
233:9,14
234:7
**recipient**
117:1
**recognize**
25:1
128:15
216:2
220:10
235:2
**recognized**
30:10
**recognizing**
91:11
208:2
**record** 10:19
10:20,24
11:4 13:3
13:5,12,19
14:15 16:5
16:16
24:23 25:4
26:23 28:5
28:14,21
32:6 56:7
56:14 68:4

96:11
102:21
103:4
141:15,22
161:8,10
161:17
184:9,14
184:21
185:24
201:22,22
229:13,17
229:20
230:3,10
231:1
261:10
recreati...
179:4
recruited
70:12 99:9
101:24
redirect
196:1
reenforce
173:2
reenforced
144:7
refer 26:15
35:21 36:6
41:4 55:16
56:17
80:15
reference
68:17,21
193:24
230:20
references
147:11
148:14
referring
40:17
83:15
147:12
192:16
193:7
197:15
214:18
236:24
247:10
248:18
255:23
refers 41:11
136:13
reflect 30:8

31:4 32:8
216:7
reflecting
97:22
refreshed
254:24
regard 53:19
65:3
210:14
regarded
158:20
regarding
64:19
66:11 67:4
72:8,11,18
73:2,12
regardless
249:22
regularly
57:15
regulate
190:18
209:23
regulating
210:9
regulations
74:23
190:17
Reinhardt
4:7 12:4,5
Reka 8:15
218:18
219:1
220:8
relabel
211:18
related 35:7
81:20
150:18
157:4
168:23
relates
158:5
relating
158:6
relation...
137:7
147:18
187:7
relation...
63:8 81:18
97:23
134:5

147:13
148:17
154:9
193:5
194:16,19
237:18
relative
261:15,17
relatively
116:18
188:9
relays 85:24
released
57:9
218:18
relevant
25:20 26:9
127:8
relies
187:23
rely 90:22
90:23
116:13
117:3,8
remember
62:5 68:10
137:17
232:18
233:4
241:12
remind
106:17
reminds
97:18
reminiscent
215:21
remote
151:12
remotely
11:8
Rendezvous
236:3
repeat 46:4
60:23
72:17
repeated
250:14
rephrase
15:23 20:8
49:14
116:7
122:11
135:14

250:9
replicated
132:13
report 8:6
16:23
17:24 21:2
22:19 23:1
23:13
24:11,16
25:13,19
27:1 45:10
45:20
46:12,13
53:6 56:17
69:2,24
75:7 95:8
118:9
124:23
133:14
142:3,4
144:17
146:23
148:3,21
154:24
155:7
161:21
162:15
191:23
192:1,3,6
194:3,4
199:10
230:11
234:9,17
236:13
245:8
250:5
255:4
reported
154:14
156:20
186:5,6
261:7
reporter 3:6
15:16 23:3
58:5 89:3
228:23
240:15,17
250:13
reporting
11:5 158:6
reports
17:17,23
18:7 21:20

repost 39:12
represent
11:16,21
254:16,17
represented
14:18
76:21
219:2
230:16
represen...
11:18 12:1
12:3,15
14:20
reproduc...
1:22
reproduc...
33:3,15
require
201:23
257:18
requirem...
77:16,23
156:5
163:16
164:7
170:15
requires
107:23
135:11,15
155:21
requiring
136:17
research
58:20
59:12 62:7
64:18
65:16
72:23 82:2
105:9
126:9
136:14
139:7
153:21
200:4
researcher
62:3
researchers
116:19
186:1
resources
74:10
163:10
respect

| | | | | |
|---|---|---|---|---|
| 40:22 | **retired** 65:7 | 64:2 65:14 | 120:19 | 155:12,22 |
| 109:5 | **retread** | 70:21 72:6 | 121:6,12 | 155:24 |
| 113:6 | 240:3 | 73:1 76:11 | 121:17,18 | 156:4,7,8 |
| 135:5 | **retribution** | 76:13,23 | 122:5 | 156:20,24 |
| 138:6,9 | 212:24 | 77:3 78:20 | 123:3,5,16 | 157:1,2,11 |
| 165:23 | 214:13 | 80:5 82:17 | 124:13,15 | 157:12,15 |
| 167:18 | **retrospe...** | 82:20,23 | 125:17,18 | 162:2 |
| 180:4 | 186:3,15 | 83:2,6,7 | 125:21 | 164:4 |
| 190:5 | **returned** | 83:10,21 | 126:4,11 | 165:1,3,5 |
| 193:17 | 15:4,8 | 83:24 | 126:19,23 | 165:16,18 |
| 213:23 | **review** 17:7 | 84:12,13 | 127:6,11 | 166:22,23 |
| 222:8 | 17:10,15 | 85:23 86:8 | 127:12 | 167:1,2,7 |
| 225:7 | 17:16 59:5 | 86:22,23 | 128:15,19 | 167:11,12 |
| 253:9 | 59:9,17 | 87:7,11,16 | 129:13,16 | 167:21 |
| **respected** | 68:9 75:10 | 87:21 88:6 | 129:16 | 168:12,17 |
| 236:17 | 105:22 | 88:12,17 | 130:10,11 | 169:13,15 |
| **respectful** | 148:24 | 89:8,11,14 | 130:15,19 | 170:11,17 |
| 138:13,14 | 149:3 | 89:24 90:4 | 130:21 | 171:24 |
| 220:23 | 195:19 | 90:9,12,14 | 131:18,22 | 174:21 |
| 237:23 | **reviewed** | 90:18 91:5 | 132:16,19 | 175:1,3,14 |
| **respective** | 17:9,11 | 91:8 92:9 | 133:20 | 175:16,23 |
| 10:4 | 27:1 29:5 | 92:15,19 | 134:10,12 | 176:7,7,12 |
| **responding** | 65:24 | 92:21,23 | 135:6,9,17 | 176:23 |
| 144:21 | 254:20 | 93:9,10,12 | 135:19 | 177:1 |
| **response** | **reviewing** | 93:15,18 | 136:3,12 | 178:4,13 |
| 18:1 57:19 | 59:23 | 94:11,12 | 136:13 | 178:24 |
| 89:5 221:8 | 71:14 | 95:20 96:7 | 137:4,5,11 | 179:2,2,4 |
| 230:13 | **right** 15:24 | 97:7,13,20 | 137:22 | 179:16,18 |
| **responses** | 16:10 | 98:13 99:4 | 138:14,15 | 180:4,8,9 |
| 59:2 69:17 | 18:17 | 99:7,11,13 | 138:17,20 | 180:11,12 |
| 187:13 | 19:12,13 | 99:18 | 138:24 | 180:12,15 |
| **restate** | 21:24 | 100:1,16 | 139:9,10 | 180:16,18 |
| 228:24 | 22:13,17 | 101:1,6,11 | 139:11,19 | 181:2,6,10 |
| **restaurant** | 22:18 | 102:13 | 139:24 | 182:19,22 |
| 141:8 | 23:15,24 | 107:5,10 | 140:4,7,11 | 183:2,24 |
| **restrict** | 25:16 | 107:11,19 | 142:15 | 184:4,5 |
| 31:1 | 26:18,19 | 107:24 | 143:19,22 | 185:9,11 |
| **result** | 27:3,21 | 108:24 | 143:23 | 188:7,15 |
| 226:23 | 32:14 | 110:9,12 | 144:1,2,9 | 188:16,16 |
| 227:11,22 | 34:13 | 111:7 | 144:18,20 | 189:3,4,6 |
| 228:10 | 36:15 40:4 | 112:1,10 | 145:11,20 | 189:22 |
| **results** 71:9 | 40:10,24 | 112:13,15 | 145:23,24 | 190:1,6,21 |
| 71:16 72:5 | 44:21,24 | 112:17,19 | 146:3,3,4 | 191:24 |
| 107:7 | 45:3,4 | 112:22 | 146:7,12 | 192:21 |
| 153:7 | 47:8,10 | 113:3,21 | 146:13,17 | 193:3,24 |
| 193:23 | 50:10 52:5 | 114:11,12 | 147:6,13 | 194:6,8 |
| **retain** | 52:20 | 114:12,19 | 147:17 | 195:5,21 |
| 228:18 | 54:11 | 114:24 | 149:14 | 196:11,14 |
| 229:4 | 55:10,11 | 115:6,13 | 152:3,7,9 | 196:18 |
| **retained** | 55:13 | 116:18 | 152:22 | 197:11,12 |
| 19:8,8,10 | 59:10,16 | 117:4,9 | 153:3,11 | 197:13,17 |
| 19:17 21:1 | 61:7 62:24 | 118:11 | 154:2,6,8 | 197:20 |
| 170:23 | 63:2,10 | 120:9,10 | 155:3,6,10 | 198:3,11 |

Lindsay 27695 0596

199:1,17
200:1,18
201:6
202:20,21
203:24
204:5,6,8
204:16
205:7
206:16,17
209:4,5,5
209:6,17
210:14
211:5,9,13
212:15
213:15
214:20
215:2,8
216:24
217:6,13
217:17,22
219:6,7
220:15
221:3,11
221:17
222:1,11
222:19,23
222:23,24
223:19,22
224:9
225:11,17
225:19,24
229:17
231:15
237:5,22
241:18,19
241:23
242:5,5,12
243:1,9,16
244:10
245:23
246:5,7,19
247:13,14
247:15
249:1
250:22,23
250:23,24
251:3,9
252:1,4,8
252:12,13
252:15
253:6,8,23
253:24
254:2,4,10

254:12
256:11,16
257:13,24
258:2,3,7
258:17,19
258:20,22
**rights**
212:21
**Rio** 219:2
**Risk** 159:4
185:10
**road** 92:14
168:12
216:14
**robbed** 15:5
**Roberta** 5:9
12:18
260:1
**role** 207:12
248:8
**roll** 215:20
**rolling** 78:1
**room** 5:5
11:24 17:4
39:14
149:24
150:8,14
161:2
**roommate**
216:9
**Rugby** 169:23
**rule** 88:6
114:18,19
114:24
116:5,7
163:11,16
168:3
170:11
172:3,4
180:18,20
181:12,13
200:8
201:11
227:8
**ruled** 182:19
**rules** 3:4
43:7 74:23
84:5 90:3
90:8,11,14
90:16,19
90:22,23
91:3,5,7,8
91:9,23,24

92:7,15,21
94:24 95:4
108:12
112:15,15
112:17,19
112:21
113:4,9,10
114:8
135:11,22
138:21,22
139:17,17
140:1
156:23
157:9
163:20
167:7
168:11,15
169:9,13
169:15
170:4
171:17,22
178:20
179:17
180:15,16
182:19
188:18,21
201:21
203:23
213:22
218:5
219:8
257:12,16
257:17
**run** 20:4
86:13 87:5
87:7,9
128:17
176:11
184:2,3,4
242:15,21
253:24
254:21
**runner**
128:18
**running** 87:5
137:12
206:18

——————
**S**
——————
**S** 4:1 5:1
6:1 10:1,8
103:16
**sad** 209:17

220:1
**sadness**
158:7
**safe** 50:7
135:3
**safer** 91:13
**safety** 64:10
90:11,12
91:23,23
91:24
117:3
166:13,22
167:23
190:11
**Saga** 212:10
**samples**
61:24 63:3
**San** 4:12
**Sargent's**
11:5
**sat** 233:4
**satisfac...**
149:9
193:12,14
**satisfy**
138:1
**save** 152:18
**saw** 252:11
**saying** 31:9
40:5 72:21
83:19
89:24
96:16
115:13,24
117:22
120:17,23
121:8,11
122:4,6
127:21
129:4,15
129:20
130:14,24
133:22,24
135:24
136:20
142:8,12
153:15
157:1,20
177:3
179:10,12
182:11,15
193:23
197:20

198:6
201:14
207:9,10
208:16
217:12,15
219:6
223:17
237:3
238:9
244:9,13
247:13,15
247:20
248:7
250:17
251:14
252:14
254:1
**says** 30:2
31:2 32:6
32:17 40:3
43:17 53:6
75:8 95:11
106:12
112:8
118:12
124:5,17
142:4
143:10
150:16
153:5
166:6
169:24
174:17
180:18
185:3
187:7
192:2
196:3
212:9,17
212:18
213:3
214:17
215:7,9
218:17
219:6,6
222:9
236:15
245:10
247:4
248:10
249:14
255:10
257:17

**scale** 144:24
186:9
238:16
**scenario**
132:10
243:21
**scenarios**
128:22
129:9
**schedule**
65:20
**scholar**
110:4
**scholarship**
98:21
100:9,14
100:18,23
101:4
102:2
136:21
**scholars...**
73:13,19
74:16,17
75:4 99:1
99:4 100:6
100:7
101:6,10
**school** 1:11
5:14 8:10
12:19
18:15
19:19
46:20 50:2
51:10 52:4
53:4 68:11
70:11
71:18
79:14,15
79:16 86:4
86:5,22
100:24
101:2,5
103:20,24
116:6,8
117:22
119:12
122:13,20
123:23,23
123:24,24
130:16
131:2
162:9
168:2,10

171:13,22
172:18
174:7
183:7,21
202:17
203:3,9
206:18
238:18
239:14,15
239:19
240:23
252:6
253:7,21
253:22
254:5
256:1
257:5
260:2
**school's**
212:10,19
**schoolers**
99:10
**schools**
30:17
46:17
101:12,12
101:16
118:16,17
118:17,23
118:23,24
121:16
124:1
203:22
205:13,17
241:6
244:22
252:3
**science** 53:7
64:7
**scientific**
228:6
**scope** 13:21
240:7
**score** 64:23
111:17,18
111:18
129:8
**scores** 92:23
186:6
198:24
203:23
**scoring**
92:19 93:1

93:21
**Scottsdale**
6:15
**screen** 25:15
27:17,20
46:14
124:18
151:18
152:8
160:4,15
**scroll**
104:24
151:13,18
152:15
160:4
**Scruggs** 6:11
7:8 12:10
12:10
235:7,10
235:14,18
237:12
239:9,17
240:1,12
240:19
241:7,16
241:24
242:8,13
242:19
243:5,10
243:20
244:5,12
244:24
245:6
246:24
248:6,20
249:5
250:2
251:12,20
252:17
253:1
254:15
255:7,9
256:3
257:6,15
258:5,10
259:3,10
259:19
**se** 90:20
**sealing** 10:5
**season** 20:16
20:20
46:22
234:11

238:10
**sec** 39:11
**second** 60:17
68:14,16
68:21
81:24
122:17
166:5
185:14
192:14
197:23
204:24
215:18
219:1
226:22
245:9,9
247:4
**secondary**
1:10 5:14
12:19
30:17
207:4
240:10
241:5
252:2
260:2
**section**
118:12
**secure** 98:24
**see** 21:15
23:19
25:14,21
29:19
32:22 33:3
33:5 35:7
45:19 48:5
52:17,18
58:12 63:4
67:13 69:9
70:4 71:15
72:3 83:6
87:9 92:14
93:20 95:9
95:16
96:20,23
102:6
118:14
119:14,15
122:23
125:2
127:9,10
127:14,22
132:16,20

132:20
133:9,16
134:23
136:7
143:7,19
145:12
146:15,21
146:22
147:22
148:21
150:14
155:15
157:21
160:3
162:6
163:1
166:11
167:20,23
169:1
177:5
182:6
183:20
184:9
186:9
187:18
191:23
192:12
193:14
195:11
196:2
202:6
211:3
213:23
214:21
216:18,24
218:23
224:21
243:15
244:20
247:8
**seeing** 54:20
54:23
68:23
139:14
151:6
154:24
217:7
**seeking**
78:15
101:4
**seen** 15:6
17:23
61:15 97:2

0598

104:18
159:15
212:12
**sees** 35:11
177:13
**segregation**
189:8
**select**
100:23
**self** 114:13
142:6
**self-esteem**
132:3
**semester**
65:5 79:1
216:7
**seminars**
65:17
66:23
**send** 160:20
176:13
**senior**
219:17
**sense** 18:8
57:3 62:17
67:17,18
102:7
104:24
120:21
144:14
145:20
154:8
197:5
199:18
**sentence**
31:20 32:2
42:23
95:11
122:18
134:20,21
134:21
136:6
143:3,9
147:2
148:23
153:5,10
166:6
192:2
196:3
237:24
245:10
247:4
248:9

250:6
**separate**
89:22
111:15
256:2
**separated**
62:10
198:16
**separately**
48:13,21
31:3 32:7
**series** 128:4
226:5
230:7
**serve** 21:22
51:12
**served** 22:7
58:11 75:8
**Services**
11:6
**serving** 22:9
**session**
65:10,21
233:5
**sessions**
57:16
**set** 89:10
92:8,14
99:21
116:5,8,24
126:13,18
128:22
137:4
139:18
161:6
200:22
201:9
213:20
**sets** 114:18
147:18
**setting**
126:15
135:5
205:8
**seven** 46:12
46:14
71:18,20
186:1
**severe**
187:16
**severity**
188:9
**sex** 30:6
32:24 33:6

33:12 34:3
34:22 37:9
41:18,22
42:8 43:18
43:19
198:16
228:7,9
**sex-based**
30:3,7
31:3 32:7
**sexes** 30:8
31:4 32:8
**shame** 70:24
125:14
137:7
175:10
206:19
**share** 15:7
38:11 41:4
51:10
104:7,10
145:7
146:18
196:14
225:12
**shared** 104:7
**shifts**
130:17
**short** 13:9
28:18 56:6
56:11
102:16
103:1
141:19
161:14
184:18
229:24
**shot** 139:11
**show** 45:20
67:23
103:18
127:4
128:23
147:17
159:17
194:24
**showed** 149:1
**showing**
78:22
151:9
194:19
**shown** 32:23
**shows** 136:15

**Shuman** 5:10
**sic** 115:12
**side** 18:1
32:24 55:9
55:14,14
76:5
121:11
194:22
221:20
**sights** 89:10
**sign** 111:5
256:22
260:11
**signed** 206:9
**significant**
187:8
193:22
226:24
227:12,19
227:23
**signific...**
71:8 186:5
**signing** 10:5
**silly** 131:6
**similar** 21:2
71:16
**similarity**
54:2
**similarly**
30:9 31:5
32:9 42:16
42:20
139:14
227:1,13
227:24
228:20
229:6
**simply** 40:4
86:7 174:7
192:5
223:17
225:5
**sit** 65:21
78:24 84:1
178:18
179:23
197:24
**sitting**
132:16
**situated**
30:9 31:5
32:9 42:16
42:20

**situation**
115:12
214:19
219:24
225:14
239:18
241:21
243:6
245:22
248:21
249:4
250:7,10
251:2,13
251:16
**six** 71:18,19
94:5
130:18
133:7
234:6
**sixth** 130:18
**size** 49:8
**skill** 42:15
51:11
101:20,23
132:21
251:16
256:13,15
**skilled** 97:5
131:7
144:22,23
**skills** 53:14
55:11
156:16,20
156:22
157:5
**skip** 219:12
219:14
**skipped**
30:14
**skipping**
213:3
219:5
**Slams** 212:10
**Slicer** 5:10
**slight** 51:16
67:15,16
71:11
198:23
213:6
**slightly**
199:4
213:5
250:3

Litser 27698 0599

slot 243:23
slotted
 193:7
slouch
 197:24
slow 78:4
small 51:20
 76:22,22
 98:23
 99:19
 100:15
 148:6,12
 194:10
 195:8
smaller
 52:23
 58:18
 99:16
 101:16
smiley 130:6
smiling 79:3
Smith 138:15
 148:6,11
 194:10
 195:8
soccer 57:20
 58:16 59:2
 60:3
 254:18,19
 256:24
 258:7,12
 258:13,15
social 30:5
 55:4 199:2
 214:13
Sociology
 103:8
softball
 79:11,14
 84:9
softer 154:2
software
 28:6
sole 86:21
 124:5
solely 33:2
 118:12,24
 119:4,19
 120:8
 121:17,19
 122:5
solid 51:13
 177:6

solo 85:19
somatic
 154:15
 155:13
somebody
 35:11
 36:18 37:4
 81:6 89:7
 89:16
 112:16
 128:23,24
 132:18
 136:11
 139:12
 143:17
 177:4
 188:9
 192:23
 204:7
 253:19
somebody's
 89:22
someone's
 249:22
somewhat
 208:21
 227:18
son 84:14
Sonoma 30:11
 30:15
sorry 15:9
 20:16
 23:12 26:1
 27:14
 30:13
 31:13 32:5
 32:12 44:5
 49:14
 58:23
 60:16,16
 60:23
 63:18
 66:18
 68:24 69:2
 70:4,8
 72:17
 86:17,18
 87:14
 93:16
 112:12
 113:1
 120:3,14
 120:15,20

131:12
 140:8
 151:24
 160:16
 164:19
 165:9
 175:8
 180:15
 182:10
 183:22
 191:12
 192:11
 197:19
 198:3
 200:12
 202:8
 204:24
 210:23
 215:7
 218:2,4
 220:20
 221:5
 223:16
 226:14
 228:23
 234:4,5
 236:21
 240:13
 241:14
 244:3
 248:14
 250:13,15
sort 21:18
 76:6 77:11
 78:3 83:1
 126:14,20
 132:13,22
 139:13
 167:15
 201:12
sound 15:9
 76:15
 171:7
 249:19
sounds 16:1
 76:13
 116:17
 134:1
 141:5
 152:12
 160:11
 174:21
source

127:22,23
 230:20
sources
 148:2
Southern 1:2
 11:10
Spain 192:8
speak 48:1
 110:1,5
 115:16
 191:2
speaking
 15:13
 210:12
 253:17
special
 164:1,2,3
 164:8,12
 164:13,23
 164:24
 165:14,24
 236:5
Specialist
 11:5
specific
 26:8 31:23
 54:11
 126:19
 132:10
 162:19
 164:6
 168:4
 231:6,10
 237:9
specific...
 52:16 57:1
 105:16
 139:16
 172:4
 190:11
 253:18
specifics
 162:20
 170:21
 175:2
spelled 58:5
spending
 221:7
spent 46:15
 170:23
spoke 212:22
spoken 18:21
Sponsored

8:11
 103:20,24
sport 19:21
 20:10
 26:18,22
 27:11 43:7
 46:23
 55:12
 56:18 57:4
 63:17,19
 65:12 75:9
 75:20 79:5
 81:13
 84:12 95:1
 95:6,7,12
 95:14
 96:20
 97:11 98:3
 98:11,24
 99:1
 100:17
 101:19,22
 103:8
 105:13
 106:14
 107:14,17
 108:11
 115:22
 116:18
 117:15,18
 118:4,4,13
 120:24
 121:10
 123:13,14
 138:17
 146:13
 148:6,8
 154:23
 163:23
 167:7,21
 167:22
 168:2,9,11
 171:17
 174:24
 175:9
 178:1
 179:1
 182:1
 196:14,14
 199:3
 200:2
 202:10,14
 204:15

206:6,10
207:11
208:1,2,6
209:12,19
210:3,3
212:21
214:2
215:16
217:8
219:9
220:13
222:5,8
223:1
236:16,20
237:15
238:7
245:14
251:9
253:18,23
255:10,15
255:24
256:1,2,11
256:12,13
256:14,16
257:2,4
258:21
**sporting**
  123:8
  201:12,14
  201:15,19
**sports** 8:11
  18:15
  19:20,24
  26:12,21
  32:17
  42:14 53:7
  53:10,12
  53:13 55:9
  57:12,15
  60:22 61:3
  61:20 63:8
  63:14,15
  63:21
  64:10,19
  65:17,19
  66:1,6
  74:6 75:4
  75:5,9
  76:6 79:10
  79:11
  81:19
  82:24 84:6
  84:9 85:2

85:3,13,15
85:19 86:6
87:1 90:3
90:16,19
90:20 91:9
92:19 93:8
93:14,17
93:21 94:9
96:6,14
98:6,9,22
99:18,21
100:1,8
103:20
104:1
105:5,10
105:17
107:9
110:2
116:8,10
116:15
122:2,22
123:8
124:1,6,12
125:17
126:6
135:5
136:13
139:24
154:14
158:18
166:7,9
168:4
170:24
172:20
174:5
175:21
185:15,23
186:22
187:1
188:8
189:9,10
189:24
190:1,6,11
198:6,16
199:13
202:17
203:3,13
204:22
205:14
209:15
210:5,10
217:17
218:1

224:5,14
233:1,3
238:2,18
238:20
239:6
241:17
244:23
245:12,18
245:20
246:2,13
247:5,8
248:22
250:8,11
251:6,23
252:2,19
253:11,12
254:7,8
256:7
257:21
258:2
259:7
**sportspe...**
  105:12
  237:22
**spot** 177:15
  219:21
  220:3,6,22
  221:1,2
  258:12
**spring** 21:15
  21:18
  46:23
**square**
  135:21
**Sruti** 4:15
  12:8
**stage** 223:2
**stages**
  132:22
**stake** 121:10
**stakes**
  116:24
**stamp** 23:18
**standard**
  11:7 13:13
  28:22
  50:21
  51:24 52:1
  56:8,15
  102:22
  103:5
  141:16,23
  161:11,18

184:15,22
229:21
230:4
260:16
**standards**
  213:21
**standpoint**
  204:13
**stands**
  182:22
**star** 84:3
  144:5
**start** 113:5
  143:9
  206:11
  218:24
**started**
  16:13
  126:8
  164:24
  214:9
  234:10,14
**starter**
  83:14
**starting**
  70:9
  197:24
**starts** 29:13
  134:21
  136:12
**state** 1:8,13
  2:2 5:4,7
  10:17
  11:15,18
  14:15
  79:18,24
  111:6
  154:14
  175:16
  186:23
  207:4
  209:22
  210:2,8
  254:18
**stated** 16:5
  25:18
  40:19
  163:20
  231:17
  261:14
**statement**
  17:9,12,12
  17:14

29:21
30:19
31:17,24
34:16
40:11
42:17,20
43:3,11,12
43:20
85:21 87:2
100:10
101:1
106:16,19
107:3,8
127:23
139:5
153:15
174:23
186:12
187:3,21
187:23
195:16
226:8
227:18
230:21
231:8
237:1,14
246:8
247:17,19
254:1,23
**statements**
  17:11
  226:5,15
  226:18
  230:7,8,9
  230:11,15
  230:24
**states** 1:1
  11:10
  29:17,18
  30:10
  76:17
  172:1
  201:5
  202:3
**statewide**
  200:7
**statute** 25:5
  121:19,23
  208:21
  209:9
**stay** 77:22
  84:1
  131:10

214:14
217:9
218:6
**stellar**
32:18
**step** 195:18
206:15
**Steptoe** 5:18
12:15
**stick** 137:9
243:3
**sticker** 24:5
**stipulated**
10:3
**Stock** 11:4
**stop** 68:14
175:12
**stories**
225:13
**story** 77:20
**Street** 4:17
5:11  6:5
6:14
**stress** 57:19
59:1  69:17
70:17,18
154:23
155:2
156:17
188:12
194:15
**stressed**
70:22
155:6
**stressful**
156:13
235:2,3
**strike** 32:19
99:15
146:18
202:8
250:9
256:5
**strive** 99:24
168:13
**striving**
155:18,19
**strong** 55:11
80:23 82:2
143:2
154:1
156:16
166:17

167:3,14
177:6
189:16
193:5
198:21
**stronger**
50:2
128:18
132:19
189:17
**student**
58:23,24
60:1  73:14
73:20,21
94:13
106:13
169:3
205:11
212:22,22
245:18
246:1
250:8,11
256:22
257:3
**students**
58:11
65:11,12
78:15
101:18
162:17
166:6
238:17
245:11
246:11
250:6
**students'**
59:9
**studied**
72:14,20
157:22
158:1
**studies**
52:14,16
64:18
66:10 72:2
73:7
118:22
128:4,22
132:11
133:10,11
133:12
148:5
153:7,21

158:4,12
160:23
186:8
194:16,19
194:24
198:24
214:23
**study** 38:9
53:13 60:8
62:9,22
70:11,19
71:15
106:23
116:14
132:7,8
133:7
147:6
156:18
158:3
186:4
187:12,23
190:23
193:6
197:12
204:23
**studying**
66:8 72:16
158:7
168:19
175:4,5
183:16
**stuff** 137:8
155:9
175:6
213:3
214:1
215:22
216:5
**Stutler** 1:14
5:22 12:17
259:23
**submit** 78:22
**submitted**
22:22
74:22
**subscales**
61:22
**substantial**
42:24
238:5
**succeed**
154:20
155:19,21

155:23
**success**
80:16,22
126:16
127:21
142:22
143:11
144:3,5
208:4
**successful**
80:19
143:18,24
**sudden** 131:4
**suddenly**
114:2
**sufficient**
228:18
229:4
**suggest** 98:7
153:7,22
186:24
187:9
**suggesting**
70:21 82:2
96:8
153:14
154:3
177:10
186:21
200:7,11
200:15
230:16
**suggests**
95:24
143:3
217:16
**Suite** 5:12
6:6
**summer** 46:17
79:22
**super** 97:9
145:8
**Superint...**
6:9 13:16
259:23
260:6
**Superint...**
1:13,16
5:22 12:16
**Superior**
30:15
**supervised**
59:21

**support**
63:20
123:16
153:21
179:5
194:3
195:16
**supported**
148:22
**supportive**
178:8
**supports**
192:12
193:4,22
203:8
**suppress**
81:23
213:9
**suppression**
211:8
239:3,20
**Supreme**
29:17
30:10,16
**sure** 14:13
15:18 20:5
21:7 24:13
32:5,20
33:21 34:2
34:11
42:19
44:13,18
50:18,20
57:7,14
59:14 78:2
86:13
88:21
91:20
96:21
100:4,12
108:18
109:10
110:14
113:14
119:22
120:1
121:22
133:23
145:8,22
146:1
149:3
156:6
157:4,18

166:21
169:19
170:22
175:17
176:17
183:15
187:4
194:2
195:18,19
197:20
201:20
203:20
211:24
213:15
229:1,14
231:22
232:1,6,9
232:11,20
238:8,12
238:12
248:18
**surge** 186:21
**survey** 139:9
**surveys**
118:22
**sustain**
134:14
**swam** 219:14
**Swaminathan**
4:15 12:8
12:9
**sweet** 221:14
**swim** 86:18
110:22
214:22
219:24
222:1
**swimmer**
212:10,17
212:19
213:11,14
214:9
215:11,24
218:24
223:10
**swimmers**
214:20
219:11
223:13
**swimming**
86:20
170:4,8
215:15

217:8
**swimsuit**
170:12
**switch** 25:15
**switching**
250:3
**switchover**
114:12
**sworn** 10:13
11:14
261:11
**sympathy**
222:21
**symptom**
186:6
**symptoms**
186:2
**system** 37:18
78:12
150:17

---
**T**
---
**T** 10:1,1
**T-R-Y-O-N**
58:5
**table** 193:9
193:9
216:8
253:19
**tailored**
115:20
**take** 16:9
22:16 28:9
29:12
43:10
53:10 56:6
57:15,17
61:6 65:8
67:24
77:16,17
78:2,4,14
102:8
104:15
140:21
141:12
145:24
149:17
152:14
155:9
157:6
158:16
188:7
203:13

205:1,22
211:15
214:5
218:14
253:13
255:1
**taken** 3:3,4
3:7 11:8
13:9 28:18
56:11
77:18
103:1
115:11
138:5
141:19
161:14
184:10,18
219:21
220:3,6
229:24
261:13
**takes** 150:15
206:5
**talent** 94:17
**talented**
49:23,24
89:13
**talk** 16:24
53:22 70:9
70:10
119:21
133:18,18
154:12
178:18,22
208:13
221:1
237:7
242:10
**talked** 126:3
153:2
216:12
**talking**
52:23
71:22 95:7
113:20,22
113:23
114:1
120:16
121:3
145:19
153:10
214:10
236:19

238:16
**taller**
223:12
**tap** 144:20
152:11
**tapping**
128:5
**task** 61:22
63:2,5
67:18,19
70:14,20
80:4,17,18
81:7,11,12
81:19 82:3
82:23
83:20
89:16,20
89:21,23
126:23
131:15
133:18,19
134:12,13
134:18
136:17
137:1
142:4,5,17
143:17
144:9,17
147:13
148:19
153:7,23
156:19
178:16
193:15,19
194:20,21
195:1,5
196:4
198:15,19
198:21
199:8
200:5
247:7
253:20
**task-inv...**
135:2
136:9
138:7
140:6
**taught** 64:21
66:19
**teach** 53:4
65:1
**teachers**

53:5 130:2
130:21,24
131:14
**teaching**
46:16 53:5
65:5 79:22
204:20
**team** 46:20
46:21,22
47:22,22
48:2,4
60:3,4
76:4 83:19
85:23 86:3
86:11,21
87:2,6,18
87:19,20
88:1,4,5
88:11,12
93:9 96:10
99:10
101:19
110:23,24
111:2,9,9
111:13,19
111:21,22
111:24
112:7,8
114:10,11
119:9
122:2
139:8
140:6,7,8
140:13
142:6
144:5
170:16
171:14
172:20
173:6,13
173:16,18
174:10
175:14,22
176:4,13
176:15,22
176:23
177:11,19
177:21
178:1,21
179:1,4,13
179:22,23
180:3,4,9
180:20,21

180:23,24
181:2,13
181:15,22
182:2,11
182:13
183:12,23
184:4
196:6,8,11
196:21
198:15
201:7
202:19,24
202:24
203:24
204:4,5,8
204:11
207:17,18
207:21,21
211:9
212:18
213:18
218:8
220:2
225:3,4
239:4,14
241:11,17
241:18
242:3,7,9
242:15,21
242:21,23
243:4,13
243:16,22
243:23
244:1,7,15
244:18,22
244:23
245:1
246:6,19
246:21,23
248:22
249:8,8,15
250:11,18
251:1,4,15
251:18
252:12,16
254:2,7,8
254:11,13
254:14,19
257:9,18
257:19,21
258:2,2,3
258:7,12
258:15,19

258:20,23
258:24
259:2,7,17
**teammate**
140:2
179:14
**teammates**
146:24
147:17
148:4,9
162:10
166:9
178:8,24
179:2
192:4,17
194:5
214:20
222:11,12
222:17
245:13,20
247:7
**teams** 43:1
43:18
47:13
49:12 62:7
62:8 66:13
85:15,20
86:5 94:8
94:9 96:6
96:13
139:13
169:3,6
179:16
181:16
182:1
184:2
198:18,19
198:22
199:14
201:8
202:7
204:2
208:24
211:5,12
220:24
225:6
231:7,14
243:2
244:22
252:10
253:8
255:11
256:15,16

259:15
**teamwork**
122:20
**Tech** 218:18
219:2
**technical**
185:1
**technique**
217:10
**technology**
133:17
**tell** 15:3,23
19:6 20:5
21:5,13
39:18 41:7
45:23,24
46:17
59:15
68:14
71:13 74:5
75:17 80:7
140:2
145:9,21
152:19
164:9
170:7
179:21
191:10,11
191:13,14
192:11
195:15,19
196:7
206:2
215:14,17
226:5
257:19
**telling**
36:10
38:19
241:2
**tells** 90:8
130:14
131:15
**tempting**
136:19
**ten** 141:13
162:16
194:12
222:5
232:15,19
233:18,23
234:17
**tend** 143:21

**tendency**
147:20
198:23
**tennis** 46:16
46:18
47:22 48:9
48:16 51:5
52:5 79:11
79:15
81:10 84:8
84:11 97:5
110:9,11
110:23
111:10
114:3,10
114:11
137:17
149:9
**tens** 99:6
**tense** 155:14
**term** 35:10
36:6,12,13
36:15 37:7
38:4 39:17
41:3 45:19
57:5 63:15
97:17
142:22
143:11
171:3,4
172:8
197:9
250:10
**terminology**
156:24
**terms** 32:21
32:23 34:1
35:7 37:15
67:14,21
80:3,7
120:23
121:12
131:1
138:18
224:5
238:1
252:18
**test** 61:24
**testified**
10:13 15:1
15:11
22:11
**testify**

261:12
**testifying**
259:9
**testimony**
32:10
235:22
241:9
**testoste...**
49:7 211:7
239:2,20
**Texas** 46:24
84:11
111:5
216:12
**text** 13:2
78:9,9
**thank** 14:1
14:10
16:11
45:22 68:8
70:3
102:17
104:22
106:7
124:4,21
129:17,19
147:8,24
151:16
164:18
184:12,24
191:2
195:24
198:2
205:4
226:19
229:18
230:5,18
230:22
235:1,5,17
255:8
259:20
**Thanks** 87:15
146:22
235:4,5
**theories**
78:12
**theory** 62:24
80:10,14
81:22,24
126:4,6,10
126:15
127:8,18
131:8

205:5
**therapy**
211:4,11
228:8,18
229:3
**thesis** 58:10
58:17
59:12
**thing** 20:15
22:5 27:5
35:14 36:9
40:22
52:14,20
67:16
79:14 86:2
100:6
117:4
119:6
122:12
134:16
142:12
150:16
156:1
157:15
168:24
192:21
193:2
204:3
216:18
223:1,13
247:20
**things** 15:15
52:17
58:18 63:6
63:9 65:22
71:3 74:11
79:21
81:20
86:15
90:14
91:12 98:5
98:13
107:18
116:2,2
125:15
126:23
132:3,15
132:21
134:7
136:10,11
136:12
139:23
143:20

146:9
147:18
148:5
152:10
155:15,20
157:22
163:23
170:12
177:7
179:2,9
194:15
214:4,17
218:5
221:13,19
223:24
224:6
232:7
237:6,23
**think** 13:18
19:22
23:12,13
24:22
27:19 33:8
35:14 36:5
36:9,12,23
38:22 40:2
45:18
48:11,23
49:19 52:4
52:22 54:6
54:10 56:5
58:19,23
59:12 60:3
60:12
61:23
62:12
67:12
69:22
71:19 72:2
72:23
76:19 78:6
81:12,24
85:10
86:12 88:8
89:14 90:1
91:9,11
94:3,4
95:6 96:4
97:15
100:3,9
101:16
104:4,10
106:21

108:7,10
109:8,17
109:24
110:4
112:14
113:5,19
113:20,22
114:4,10
114:11,18
114:18
115:19,22
116:12,16
116:19
117:24
118:1
119:5
120:1,6
121:9,19
121:23
122:6
123:12
124:16
125:7
126:18
128:13
129:2,7
131:22
133:22
134:3,20
136:24
137:3,16
137:24
138:4,22
139:3
140:15
145:6
146:13
148:8,13
149:13,15
152:17
153:20
156:3
157:19
159:2
161:5
162:19
163:3,8,9
163:11,15
163:21
165:7
166:20
167:16,18
167:22

168:2,18
169:8
171:16,17
172:22
173:22
174:3,20
175:3
178:6
181:6,24
183:4,10
183:14
188:14
190:14,18
191:15
192:15
195:18
197:15,18
199:18
200:1
202:22,22
203:2,6
204:24
205:4,9,12
206:5,14
207:8
208:22
209:5
210:1,14
214:2,4,20
215:20
216:4,22
217:1
219:10
220:13,16
221:14,17
221:24
222:3,4,7
222:12,17
223:5,9,20
224:4,7
225:24
227:7,17
227:18
229:13
230:15,19
232:13
233:17
234:12
240:8,14
240:23
241:9,20
243:21
244:4,9,18

245:16
247:2,11
247:19,20
248:3,21
250:1
254:19
255:22
256:4,6,14
256:24
257:11,23
258:22
**thinking**
97:17
113:15
126:21,24
127:3
139:22
154:5
193:16
239:12
245:22
**third** 106:11
215:6
**Thomas** 8:14
211:21
212:1,7,10
212:14,20
213:17,21
214:5,9,14
217:19
218:8,9,21
221:24
223:11
224:23,23
225:5,6
**Thomas's**
212:21
222:17
**Thompson**
206:8,10
207:9
**thought**
111:24
129:14
169:19
216:16
218:2
230:23
250:13
**thoughts**
169:2
**thousand**
234:7

thousands
  99:6
three 15:6
  25:17 26:2
  28:10
  32:17
  69:18
  80:14
  98:13
  128:4
  130:14
  132:11
  159:23
  227:10
  233:21
three-time
  219:4
throwing
  86:18 89:2
thrown
  213:24
thumbs 78:21
tighter
  58:18
tightly
  31:15 37:2
  38:10 40:5
till 102:20
time 10:21
  11:7,7
  13:6,13,13
  15:2 16:6
  19:22,23
  19:24
  20:10 21:1
  25:14
  28:15,22
  28:22 39:9
  53:2 56:8
  56:8,15,15
  57:10,16
  59:16,24
  68:8 77:24
  80:21
  89:15 91:9
  94:18 95:4
  95:5 102:8
  102:22,22
  103:5,5
  110:11,14
  110:15
  116:20
  128:16

130:8,17
130:23
134:14
137:15,20
137:20
141:16,16
141:23,24
152:18,24
157:11
160:3
161:11,11
161:18,18
169:13
170:24
176:8
184:15,15
184:22,22
186:16
205:1
215:3
216:17
217:2,9
219:3
221:7
223:2
229:15,21
229:21
230:4,4
232:7,23
233:4
235:1,4,23
236:21
238:5,6
244:11
254:24
260:15,16
261:14
timeframe
232:3,20
238:1,13
times 15:10
52:20
92:13
146:10,10
146:15
153:2
156:12
163:9
231:12
tiny 132:22
title 60:24
69:14,15
74:1,5,13

74:24
118:11
159:4
162:8,14
185:14
189:22,24
190:11,17
190:18
191:11,14
215:22
today 11:6
14:21
16:19 17:8
18:9 34:2
35:22 36:3
39:23
40:16
82:14
114:9,10
128:18,21
233:18
252:6
told 19:16
19:21
182:14
183:22
196:22
216:9
tomorrow
82:16
tonight 61:7
top 23:18
104:20
105:24
118:12
133:11
159:17
219:17,17
219:24
topic 64:22
66:19,24
Toro 4:8
68:6
total 17:22
111:19
136:4
233:8
totally
116:3
189:14
touch 65:15
160:19
tough 155:24

222:24
tournament
62:5,6
tournaments
79:17,23
111:5,16
138:5
town 85:1
track 20:4
20:13,15
20:18,21
84:17
85:23
87:18 88:4
88:5,23
146:16
241:11
242:2,22
243:13,16
243:22,23
244:1,15
245:1
252:12
253:24
254:2
257:9
train 75:14
78:15
131:14
trained 76:5
227:1,13
227:24
training
55:24
77:15,22
traits
154:14
228:19
229:5
trans 41:8
65:6 208:6
231:13
246:5
trans/tr...
66:12
transath...
18:15
21:17
174:24
transath...
26:10
60:13
65:12

121:6
167:24
176:2
207:5
208:14
210:16
250:23
253:6
transcend
189:18
transcript
1:22 261:8
261:9
transfemale
41:3 65:6
109:18
113:22
178:19
220:23
231:19
246:9
250:17
transfem...
60:6,9
112:4
176:3
210:16
transgender
26:17,21
27:10,12
29:8 41:9
41:11,15
41:19,23
42:1 43:23
55:22
56:21 57:2
57:5,11
64:19 65:4
65:17,24
66:8 72:12
72:18 73:3
116:6
162:17
166:6
168:3
169:4,5,11
170:10,14
170:15
177:24
178:12
179:14,17
179:22
180:2,2,3

180:8,19
181:14,20
183:10
208:24
209:8
210:10
212:19
213:2
216:18
217:16
218:20
220:6
221:21
224:8
225:20
231:6
232:24
233:1
240:9
245:11
246:18
250:6,7,11
254:12
257:12,23
258:17
**transgen...**
  208:23
**transition**
  173:22
**transiti...**
  79:15
  173:13,17
**transiti...**
  60:18
  174:1,22
  174:22
  208:15
**traveled**
  111:16
**treat** 125:12
  138:8
  160:5
  180:3
**treated** 55:1
  135:4
**treatment**
  43:7 55:14
**treatments**
  213:8
**tremendous**
  51:18
  189:13
**trial** 15:11

**trick** 39:21
**trickle**
  201:20
**trickled**
  201:3
**tried** 70:23
  81:2
  148:15
  221:18
  258:22
**tries** 128:14
  246:6,18
  250:17
**trophies**
  93:14,18
**trophy** 98:1
**truckload**
  136:14
**true** 32:11
  32:14
  64:11,12
  87:8 88:7
  106:24
  115:3
  154:18
  157:5
  206:7
  226:13
  227:8
  242:1
  247:19
  261:9
**truly** 28:14
**truth** 223:18
  261:12,12
  261:13
**try** 15:23
  25:13,16
  34:4 37:7
  63:7 81:17
  81:19,22
  82:13
  96:10
  108:22
  128:20,24
  129:7
  131:5
  134:4
  137:6
  151:18
  152:21
  160:2
  171:19

200:3
207:19
235:23
243:16
244:19,21
244:23
245:1
246:22
247:18
250:23
252:9,16
253:7
254:2,11
254:12
256:14
258:3
259:15
**trying** 18:8
  34:2 39:21
  39:21
  69:20
  75:22
  80:12,13
  87:1 98:7
  111:10
  119:9
  126:22
  129:4,6
  136:7
  138:7,8,10
  138:16
  154:10,19
  170:8
  178:16
  195:11
  200:20
  205:2
  217:3,5
  220:15
  221:7
  223:21
  232:10
  240:23
  248:8
**Tryon** 5:3
  7:6 10:18
  11:17,17
  12:23
  13:17 14:2
  14:8 22:24
  23:8,15,17
  23:20 24:2
  24:7,10,19

24:24 25:4
25:11 26:4
26:5 27:14
27:18 28:1
28:8,11,23
29:3,11,23
30:24
31:11,22
32:4,12,15
33:10,17
33:22
34:12,19
35:2,9,15
35:20 36:2
36:8,14
37:6,20
38:3,13,17
39:6,10,13
39:16,20
40:8,15
41:6,14
42:6,12,21
43:9,16,24
44:14,19
45:9,15,22
46:6 47:11
47:17
48:14,19
49:3,9
50:6,12
51:2,23
52:6,13
53:21 54:4
54:15 56:2
56:16
57:17,22
58:4,6
59:7 60:14
60:19 61:1
61:8,14
62:18
63:11,13
66:16,22
67:3,8
68:13
69:18 70:3
70:6 73:6
73:11 74:4
74:12 85:7
91:21 92:4
92:18 93:7
93:24
94:20

96:15,22
98:4,18
100:5,21
101:9
102:10,13
102:19
103:6
104:3,9,15
104:17
105:2,8
106:10
107:1,22
108:3,13
108:20
109:3,12
109:19
110:8
112:5,20
113:7,16
113:24
114:15,22
115:4,18
116:4
117:2,7,12
118:7,21
119:11
120:12,18
121:14
122:3,10
122:16
123:6,19
124:10,19
124:22
125:8
132:6
135:20
137:14
138:19
139:15
140:14,20
141:3,6,12
142:1
145:14
149:5,13
149:17,23
150:4,5
151:1,7,14
152:13,19
152:24
153:1
156:21
157:7,14
158:24

159:8,14
159:22
160:10
161:1,9,19
161:24
162:2,4
163:4,14
163:24
164:19,21
165:10,22
166:4,19
167:9
168:1,14
168:21
169:12,17
170:3,13
170:20
171:11,21
172:2,7,11
172:17
173:4,10
173:23
174:6,14
175:7,19
176:5,19
177:8
178:3,9
179:7,20
180:10,17
181:9,19
182:7,23
183:9,18
184:6,23
188:1
189:2,7,20
190:4,9,16
190:22
191:9,12
191:15,20
193:10
194:9
195:7
197:8
198:5,14
199:9
200:6,24
201:13
203:12,18
204:10
206:21
207:14
208:7,20
209:3,20

210:7,17
211:2,16
211:23
212:6
213:16
214:7
215:5
217:11,21
218:13
220:19
221:23
222:16
223:8,23
224:12,19
225:2,16
226:3,14
226:17,21
227:4,9,20
228:4,16
229:1,2,12
230:6,13
230:19
231:2,4,11
231:20
232:8,22
234:20,24
235:9
260:7,7
**tryouts**
202:18,19
202:23
243:2
**Tuesday** 3:7
**tuition**
101:19
**turn** 106:11
142:17
166:7
215:6
218:22
229:15
236:12,14
245:7,12
247:1,3,5
**turned**
233:13
**tweak** 214:3
**two** 18:1
22:8 30:2
32:3 40:6
42:14
49:20 51:5
51:15,16

52:2 65:15
66:3 69:11
69:22
75:21 78:6
80:17
112:8
133:11,12
172:13
213:4
219:3
231:23
238:9
**two-time**
219:3
**type** 132:3
238:5
253:11
**types** 54:23
**typical**
156:14
**typically**
58:17
65:18
123:22
182:2
255:24

_____

U

**U** 10:1
**U.S** 76:19
201:5
**Uh-huh** 80:6
86:9 87:12
90:5 92:10
92:22
111:1
165:17
204:17
239:24
247:12
**ultimately**
21:3 99:17
153:9
**umpires**
137:24
**uncaring**
139:4
**uncomfor...**
34:5,15
177:15,18
178:2,11
**undergo**
239:2,19

**undergra...**
64:23
**Undermines**
118:13
**underneath**
120:20
151:8
193:9
215:6
**undersigned**
3:5
**understand**
15:17,22
16:3 18:16
24:14
25:24
32:10,21
37:7 93:20
98:8 99:22
108:18
111:11
126:21
128:17
129:14,20
133:23
138:9,20
143:6,16
144:15
145:2,16
146:1
152:21
157:19
172:23
176:1
177:12
178:22
194:2
200:4
214:1
226:7
234:8
259:4,5,19
**understa...**
30:22 34:3
37:16 74:5
75:13 91:2
128:6,8
131:4
132:14
169:22
172:14
181:4
**understood**

16:3 50:7
51:24
**unfair** 93:4
109:8
114:19
136:24
137:16,22
138:23
139:3
190:19
197:6,9,11
212:20
213:12,17
**unfortunate**
121:24
210:15
213:23
240:11
**unfortun...**
252:2
**unhappy**
135:23
214:16
**uniform**
194:18
**unique** 223:5
**united** 1:1
11:9 29:17
29:18
30:10
76:17
202:2
207:10
**universe**
175:1
**universi...**
85:14
205:19
207:5
257:1
**University**
53:8 192:7
212:18
215:11
254:19
256:10
**update** 213:1
**upper** 130:23
**ups** 134:14
**upset** 135:17
137:16
**USA** 170:4,8
214:22

0607

**use** 27:12
  29:7 31:20
  36:3,6
  38:4 41:3
  88:23
  101:5
  119:15
  126:14
  201:23
  214:3
  250:10
**USTA** 111:3
**usually**
  20:21

     **V**

**v** 30:11,14
  30:16
**Valencia**
  192:7
**Valeria** 4:8
  68:6
**valid** 30:3,7
  31:2 32:7
**Validated**
  186:7
**valuable**
  72:19
  83:21
  136:8
  145:13
  203:6
  205:12
  241:4
**value** 98:17
  105:5
  107:15
  115:24
  199:2
  200:20
  220:15
  244:6,10
  244:13
**valued** 135:4
**values**
  107:24
**valuing**
  126:17
  147:14
**variability**
  51:18 54:2
  189:13
**variables**

  71:13
  194:13
**variance**
  123:7
**varied** 50:1
**varies** 59:22
  95:7 188:9
  256:16
**variety**
  75:22
  129:8
  154:13
**various**
  107:24
**varsity**
  46:21,21
  47:1,2,5,7
**vary** 171:24
**verbally**
  15:18
**Veroff** 4:4
  9:4 11:20
  11:20 13:3
  14:1,22
  23:12 26:1
  27:14,21
  29:10,22
  30:20 31:7
  31:18 32:1
  32:12 33:7
  33:13,20
  34:9,18,23
  35:5,12,17
  36:1,4,11
  36:22
  37:13,22
  38:6,16,20
  39:19 40:1
  40:12 41:1
  41:10 42:3
  42:10,18
  43:4,14,21
  44:12,17
  45:7,12,18
  46:3 47:9
  47:14
  48:10,17
  48:22 49:5
  49:18 50:9
  50:23 51:7
  52:3,11
  53:18,24
  54:9 56:5

  57:13 59:3
  60:11
  62:16
  66:14,20
  67:1,6
  69:22 73:5
  73:9 74:2
  74:7 85:4
  91:19 92:2
  92:16 93:5
  93:22
  94:16 96:3
  96:17
  97:14
  98:14
  100:2,11
  101:7
  102:5,12
  104:23
  105:7
  106:17
  107:20
  108:1,6,17
  109:2,7,16
  109:23
  112:2,11
  112:13,23
  113:2,11
  113:18
  114:6,21
  115:1,8,21
  116:11
  117:5,10
  117:19
  118:19
  119:2
  120:11,14
  121:4,21
  122:9,14
  123:4,11
  124:8,14
  124:16,21
  125:6
  131:23
  135:18
  137:2
  138:3
  139:6,20
  145:5
  154:21
  156:11
  157:3,13
  160:16,18

  161:7
  162:23
  163:7,18
  165:8,19
  166:2,16
  167:4,17
  168:5,16
  169:7,16
  170:1,6,18
  171:9,15
  171:23
  172:5,9,15
  172:21
  173:8,19
  174:2,11
  174:19
  175:15,24
  176:16,24
  177:22
  178:5,14
  179:11
  180:6,13
  181:3,18
  181:23
  182:17
  183:3,13
  184:12
  187:22
  188:23
  189:5,11
  190:2,7,13
  190:20
  194:7
  195:2
  197:1
  198:12
  199:24
  200:10,13
  203:1,15
  204:9
  206:4,24
  207:23
  208:11
  209:2,11
  209:24
  210:11,22
  212:3
  213:13,19
  214:11
  216:1
  217:14
  218:10
  220:9

  221:4
  222:2,20
  223:15
  224:3,15
  225:1,8,23
  226:11,14
  226:19
  227:3,6,16
  228:2,12
  229:9,18
  230:5,18
  230:22
  231:9,16
  232:4,16
  234:18
  237:10
  239:7,11
  239:23
  240:7,21
  241:13,22
  242:4,11
  242:16,24
  243:8,14
  244:2,8,16
  245:3
  246:14
  248:1,15
  249:2,23
  251:7,19
  251:24
  252:21
  253:15
  254:9
  255:21
  256:8
  257:10,22
  258:8,16
  259:8,12
  260:10
**versa** 198:20
**versus** 11:11
  29:18 51:6
  73:3 89:23
  123:9
  193:1
**viable** 245:5
**vice** 198:19
**video** 11:5
  39:8 85:13
  198:1
**videocon...**
  3:7
**VIDEOGRA...**

10:20 11:3
12:21 13:5
13:12
23:16,19
24:4,9,21
25:3 28:3
28:10,13
28:21 39:8
39:11,15
56:7,14
57:21
60:23 61:4
68:2 69:20
102:21
103:4
104:6,13
106:4,8
141:15,22
149:12,15
150:3,19
150:22
151:3,11
151:15,17
151:22
152:2,9
159:6,9,19
160:11
161:10,17
161:22
162:1
164:17
184:14,21
191:6,10
191:13,18
197:22
229:20
230:3
255:5,8
260:13
**VIDEOTAPE**
10:22 11:2
13:7,11
28:16,20
56:9,13
102:23
103:3
141:17,21
161:12,16
184:16,20
229:22
230:2
**VIDEOTAPED**
1:18 2:7

**view** 35:13
97:16
103:8
150:16
210:2
218:7
231:6
**views** 108:23
208:22
217:2
**Virginia** 1:2
1:8,10 2:3
5:7,11,14
6:5,8
11:11,12
11:18
12:19
13:15
18:14 27:1
27:11
29:18
30:16
198:6,11
205:13,17
205:20
218:18
219:2
254:18
257:17
260:2,5
**vis-a-vis**
229:6
**vis-à-vis**
228:20
**visible**
39:15
**Vitae** 16:23
17:9 133:3
**vital** 140:13
**volley** 51:13
**volleyball**
62:5,12,14
84:10
**vs** 1:7
**vulnerable**
144:12

——————
**W**
——————
**W** 1:11 6:9
**wait** 16:8
78:13
188:20

214:21
**waiting**
91:16
**waived** 10:6
**wake** 225:10
**walk** 80:19
82:14 87:9
**walking**
53:20,23
53:23
**wall** 4:17
110:12
**Walling**
68:23
**want** 10:18
23:21 24:6
26:8 28:5
32:20,22
34:4 45:13
45:16
50:18
57:21 61:6
80:1 81:16
82:22 83:1
86:24 88:8
88:8,11,15
88:20
89:19
92:14 98:7
99:3 100:7
100:8
101:22
105:21
113:17
120:13
131:6
133:23
134:4,8
136:1,1
140:6,20
141:3
144:15
147:2,2
149:12
150:10
152:17
157:11
160:23
166:21
168:22
172:24
173:22
174:17

176:21
179:9
185:18
193:3,17
195:22
197:14,20
201:7,7,10
202:15,24
205:1
208:3,9,17
209:21
211:4,12
212:8
215:15,15
215:17
216:19
219:12,13
226:6
229:14
230:9
235:8
236:12,14
240:3,4
249:15
256:23
258:1
**wanted** 18:15
19:19,24
20:4 61:21
71:6 102:6
107:7
152:21
185:13
211:8
231:1
239:15,19
**wanting**
147:16
173:12
253:24
**wants** 88:5
102:11
104:24
117:18
172:19
173:5,15
175:22
182:2
183:6
214:13
224:18
252:4
**warmer** 83:16

**Warren**
103:13
**wash** 82:7
**wasn't** 26:3
42:4 78:2
111:18
192:15
207:18
220:11
249:10
**watched**
84:15
**water** 20:3
**way** 14:3
15:10 37:4
39:4 40:20
47:21,24
52:19 63:4
84:1 94:21
112:18
114:17
115:5
119:21
125:13
128:16
131:9,21
134:2
136:9,11
138:14
139:7,12
139:22
143:21
144:8
157:9,10
160:19
169:10
170:9
173:17
179:9
192:6
193:3
196:21
197:7,9
200:23
209:14
213:24
214:4
219:9
221:11
222:12
247:21
258:24
261:17

178:7
194:15,16
**we'll** 13:23
53:22
105:21
216:22,22
216:23
217:2
231:3
**we're** 15:13
15:13,17
32:5 87:24
95:2
103:19
111:22,23
132:16
136:10,19
138:9,16
146:16
154:24
156:15
159:6
173:21
176:10
177:3
178:16
181:7
184:8
193:9
197:20
199:4
205:7,7
216:19
220:12
224:9
244:9,20
246:7
247:13
**we've** 56:2
90:3 102:5
104:4
174:20
**weak** 114:9
**wear** 170:12
**Wearing**
187:11
**weatherman**
116:17
**webinar**
65:22
**website**
76:10
**week** 213:1

215:16
218:22
**weekend**
252:11
**weigh** 108:8
167:19
**weighing**
175:4
**weighted**
76:19
**weightli...**
86:14
**weird** 119:21
**welcome**
105:22
106:8,20
135:4
180:23,24
181:15
256:18
**well-being**
158:4
**wellness**
119:7
**went** 109:15
206:11
**weren't**
108:9
**West** 1:2,8
1:10 2:2
5:7,14 6:8
11:10,12
11:18
12:19
13:15
18:14 27:1
27:11
30:16
198:6,10
205:13,17
205:20
254:18
257:17
260:2,5
**whatsoever**
210:9
**whichever**
258:1
**Whisenant**
103:13
**White** 5:19
**Whoops**
193:12

**wide** 75:22
129:8
134:9
162:10
**willing**
21:16
201:6
**win** 80:1
81:5 82:19
82:22,22
83:1 87:1
87:2 89:19
89:22,22
95:19 96:5
96:23 97:8
111:19
114:12
119:10
140:9
144:1
215:15,15
215:17
**window** 15:7
**winners**
93:14,18
94:8
**winning** 81:1
83:2,8,12
90:1 95:13
95:23,24
96:1,11,13
96:16,18
96:20,21
97:3,20
98:1,2,10
119:15,24
120:1
122:18
123:2,9,18
124:3,6,13
195:13
**wins** 92:23
**wish** 179:2,3
179:3
182:1
252:6
**withdraw**
131:5
**witness** 7:4
10:12
11:13
21:16,22
22:7,9

27:15,24
30:21 31:8
31:19 32:2
32:14 33:8
33:14,21
34:10,24
35:6,13,18
36:5,12,23
37:14,23
38:7,22
40:2,13
41:2,11
42:4,11,19
43:5,15,22
44:13,18
45:23 46:4
47:10,15
48:11,18
48:23 49:6
49:19
50:10,24
51:8 52:4
52:12
53:19 54:1
54:10
57:14 59:4
60:12 61:6
62:17
66:15,21
67:2,7
68:8 73:10
74:3,8
85:5 91:20
92:3,17
93:6,23
94:17 96:4
96:18
97:15
98:15
100:3,12
101:8
102:14,15
102:17
104:23
106:6,9,18
106:21
107:21
108:2,7,18
109:8,17
109:24
110:1
112:3,12

112:14,24
113:4,12
113:19
114:7
115:2,9,22
116:12
117:6,11
117:20
118:20
119:3
120:15
121:5,22
122:15
123:5,12
124:9,15
125:7
131:24
135:19
137:3
138:4
139:7,21
141:1,5,10
141:14
145:6
150:21,24
151:5,16
151:20,24
152:6,16
152:23
154:22
156:12
157:4
159:21
160:17,21
161:4
162:24
163:8,19
164:18
165:9,20
166:3,17
167:5,18
168:6,17
169:8
170:2,7,19
171:10,16
171:24
172:6,10
172:16,22
173:9,20
174:3,12
174:20
175:16
176:1,17

0610

177:1,23
178:6,15
179:12
180:7,14
181:4,24
182:18
183:4,14
187:24
188:24
189:6,12
190:3,8,14
190:21
191:8
194:8
195:3
197:2,24
198:3,13
200:1,11
200:15
203:2,16
206:5
207:1,24
208:12
209:12
210:1,12
210:23
212:4
213:14,20
214:12
216:2
217:15
218:11
220:10
221:5
222:3,21
223:16
224:4,16
225:9,24
226:13
227:7,17
228:3,13
229:10,19
231:10,17
232:6,17
234:19
235:5
239:8,12
239:24
240:8,22
241:14,23
242:5,12
242:17
243:1,9,15

244:3,9,17
244:18
245:4
246:16
248:3,16
249:3,24
251:8
252:1,23
253:17
254:10
255:22
256:9
257:11,23
258:9,17
259:14
260:11
261:11
**witnesses**
 17:15,19
 230:12
**Wolanin**
 158:22
 185:11
**woman** 171:7
**women** 111:18
 114:3,5
 170:15
 212:11
 215:10,20
 215:23
 216:9
 220:2
 231:7
 232:24
**women's** 79:5
 111:13,21
 111:24
 207:21
 212:18
 231:7
 241:11,17
 254:2,13
 258:7
**won** 89:1
**wondering**
 85:12
 238:12
**word** 27:12
 29:8 35:3
 44:7,7
 45:10
 50:14
 95:21

129:19
149:18
163:2
189:4
199:16,16
251:21
**wording**
 120:16
 154:1
 192:20
**words** 120:9
 193:18
 240:5
 249:14
**work** 14:12
 59:7 75:19
 77:13 79:5
 102:20
 110:17
 128:3
 132:13
 156:4,7
 160:22
 196:22
 200:17
 201:10
 224:6
**worked** 55:4
 83:5
 111:15
 179:3
**worker** 55:5
**working**
 25:16
 77:15 84:3
 86:3 88:1
 132:17
 140:12
 157:6
 217:3,7
 220:18
**works** 25:3
 36:24
 47:16
 152:9
 196:21
**world** 89:3
 98:24 99:1
 99:21
 115:14
 116:18
 123:8,8
 127:13

131:9
142:13
155:23
157:10
191:4
206:6
216:15
221:14
222:14
**worried**
 155:5,10
 155:11
**worry** 155:13
 194:13
**worst** 130:12
**worth** 72:16
 99:6
**wouldn't**
 48:18
 74:20
 101:21
 107:16
 111:24
 113:10
 122:1
 165:24
 168:9
 174:13
 176:3
 190:17
 195:3,6
 203:4
 206:19
 210:23
 238:15
 239:10
 243:12
 244:10
 246:16
 257:8
**wow** 138:17
 154:5
 206:10
**wrapping**
 77:21
 102:7
**write** 56:19
 78:8,10
 162:11
 163:1
 192:22
**writing**
 78:13

219:7
**written** 57:1
 57:8 74:13
 74:15
 158:2
 218:23
**wrong** 127:22
 137:17
 157:1
 190:24
 225:11
 256:4
**wrote** 58:8
 59:21
 135:6
**WV** 5:6,13,20
 6:7
**Wyant** 6:4

_____
**X**
**X** 7:1

_____
**Y**
**yeah** 17:16
 20:20
 26:20 31:8
 31:14,19
 34:10,11
 37:14
 38:22
 39:24 40:2
 40:13
 42:11
 43:13
 45:13 48:5
 48:23 49:6
 54:10 59:4
 61:17 72:2
 72:21
 77:24
 79:21 81:2
 84:4,11,19
 86:14,20
 88:18
 91:20 96:4
 97:15 98:2
 98:5 99:19
 100:12,19
 106:24
 108:7
 112:18
 113:12,19
 114:1,11

115:16
116:12
120:4,20
129:4
131:24
139:21
142:14
145:13
148:13
150:15
156:5
161:1
169:20
173:22
177:6
179:18
188:12,16
188:24
190:15
192:14,14
192:14,19
192:20
194:11,18
197:14
198:21
199:18
201:18
203:20
205:4
209:15
210:1,12
221:19
222:3,24
225:5
227:17
232:20
233:13,17
236:21,24
238:16
239:18
244:13
245:22
248:7
249:19,24
250:3
251:8,11
259:14
**year** 19:4
59:15
69:11
77:22  78:6
101:18
104:20

111:15
186:5
213:8
218:18,21
238:22
239:3,20
239:21
**year-round**
46:23
84:12
**years** 15:4
46:15  50:1
53:2  57:14
65:23  66:3
77:6  78:3
94:5
119:14
130:16
213:10
219:3
225:4,12
231:23
232:12,15
232:19
233:4
238:19
**yelled**
137:20
**York** 4:19
**young** 18:14
19:18
55:21
95:12  98:9
118:14
119:20
122:18,20
124:24
125:4
127:18
140:4
154:12
155:10
200:18
202:13
207:16
211:4,8,12
**younger**
130:21
**youth** 8:11
56:18
63:17,19
63:20,22
94:24

95:12  98:9
98:22,23
98:24  99:1
103:20,24
118:14
119:19
120:24
122:18
123:14,16
148:6
163:6
166:7
170:9,10
199:13
202:9,14
206:6
207:15
238:20
239:6
245:18
246:2,12
247:5
250:8
251:23
255:10,24
256:1
————————
**Z**
**Zoe** 4:5  12:6
**zoned** 147:16
**Zoom** 11:8
12:12
————————
**0**
**007** 151:3
————————
**1**
**1** 5:5  8:5
23:5  130:6
247:2
**1:40** 141:16
**10** 7:3
**10,000**
101:18
**10:03** 3:8
10:21
**10:05** 11:7
**10:08** 13:6
13:13
**10:30** 28:15
**10:34** 28:22
**100** 9:7
119:24

120:5
139:10
**10005-3919**
4:19
**101** 9:7
**103** 8:11
**105** 9:7
**107** 9:7
**108** 9:7
**109** 9:7
**11** 8:15  75:7
**11:15** 56:8
**11:27** 56:15
**112** 9:7
**113** 9:7
**114** 9:8
**115** 9:8
**116** 9:8
**117** 9:8
**118** 9:8
**119** 9:8
**12** 42:13
71:21
132:12
161:21,22
161:23,24
**12:32:00**
102:22
**12:41** 103:5
**120** 4:17  9:8
**121** 9:8
**122** 9:8
**123** 9:8
**124** 9:8
**125** 9:9
**131** 9:9
**135** 9:9
**137** 9:9
**138** 9:9
**139** 9:9
**14** 7:3,6
68:16,20
68:21
69:19  70:2
186:23
**1411** 5:11
**145** 9:9
**149** 8:12
**14s** 69:23
**15** 130:17
**150** 148:14
**15100** 6:14
**154** 9:9

**156** 9:9
**157** 9:9
**159** 8:13
**16** 219:17,24
**162** 9:9
**163** 9:10
**165** 9:10
**166** 9:10
**167** 9:10
**168** 9:10
**169** 9:10
**17** 118:10
**170** 9:10
**171** 9:10
**172** 9:10
**173** 9:10
**174** 9:10
**175** 9:11
**176** 9:11
**177** 9:11
**178** 9:11
**179** 9:11
**17th** 219:15
219:15
**18** 120:19
122:17
187:11
**18-2-25(e)**
29:13
**180** 9:11
**181** 9:11
**182** 9:11
**183** 9:11
**187** 9:11
**188** 9:11
**189** 9:12
**190** 9:12
**194** 9:12
**195** 9:12
**197** 9:12
**1970s** 215:21
**198** 9:12
**1981** 30:15
**1989** 30:17
127:24
**199** 9:12
**1990** 53:9
**1996** 29:18
**1997** 133:7,9
**19th** 4:18
**1A** 29:13
————————
**2**

2 8:6 24:16
  191:8
  193:9
  236:14
2:11:00
  141:23
2:21-CV-...
  1:7 11:13
2:42 161:18
20 102:20
  213:10
  215:16
200 5:12
  9:12
2000 133:12
2007 59:14
  195:12
2008 104:21
2013 69:12
2016 219:2
2017 68:9,19
  69:13
2020 21:15
  21:18 57:9
2022 1:20
  2:9 3:8
  11:6
  219:15
  261:8,19
203 9:12
204 9:12
206 9:12
207 9:13
208 9:13
209 9:13
20s 79:17
20th 4:11
21 43:17
  124:23
210 9:13
211 8:14
212 9:13
213 9:13
214 9:13
216 9:13
217 9:13
218 9:13
220 9:13
221 9:14
222 9:14
223 9:14
224 9:14
225 9:14

226 9:14
227 9:14
228 9:14
229 9:14
23 8:5 126:2
  126:3
231 9:14
232 9:14
234 7:6 9:15
235 7:8
237 9:15
239 9:15
  161:11
24 8:6
  127:16
240 9:15
241 9:15
242 9:15
243 9:15
244 9:15
245 9:15
246 9:15
248 9:15
249 9:16
25 8:7 32:23
  133:14,18
250 233:20
251 9:16
252 9:16
253 9:16
25301 5:13
  6:7
25305 5:6
254 9:16
255 9:16
256 9:16
257 9:16
258 9:16
259 7:8,9
  9:16
26 9:4
  134:19
260 7:9
261 7:10
26330 5:20
27 9:4
29 1:20 2:9
  3:8 9:4
  261:7
290 76:10
29th 11:6

**3**

3 4:10 8:7
  25:8
3:15 184:15
3:37 184:22
30 9:4 130:7
  142:3
  144:16
  233:4
31 9:4
  142:20
32 9:4 109:5
  109:15
  146:20
  153:2
  191:24
  192:13
3293 206:3
33 9:4
  153:17
  154:12
34 9:4
35 9:4 95:9
  157:21
36 9:4
37 9:4 166:5
  245:8
  250:5
38 9:4
  236:13
  237:24
383 192:18
39 9:5 196:2

**4**

4 8:8 25:17
  57:23 58:1
  261:19
4:45 229:21
4:53 230:4
40 9:5
  256:15
400 5:19
41 9:5
  199:10
  255:3,7
42 9:5
  205:22,24
43 9:5
44 9:5 247:3
45 9:5
46 9:5
47 9:5
48 9:5

49 9:5

**5**

5 8:9 43:17
  61:11
  132:12
5:38 260:16
  260:18
50 9:5 76:11
  76:21
500 6:5
  219:14
  220:3
50s 88:24
51 9:5
52 9:5
53 9:6
54 9:6
57 9:6
  185:14
58 8:8 76:14
59 9:6

**6**

6 8:10
  103:19,23
60 9:6
600 6:6
6061 97:6
60s 88:24
61 8:9
62 9:6
66 9:6
67 9:6

**7**

7 8:12
  149:15,20
  191:16,19
73 9:6
74 9:6

**8**

8 8:13
  149:14
  159:7,11
  185:10
  219:17
8,000 101:18
85 9:6
85260 6:15

**9**

9 8:14 74:1
  74:5,13,24
  189:22,24
  190:11,17
  190:18
  211:20
  215:22
90th 6:14
91 9:6
92 9:6
93 9:6
94 9:7
94111-4004
  4:12
96 9:7
97 9:7
  105:23
  106:11
98 9:7
9th 220:3

Exhibit 13 0614

Page 1

              IN THE UNITED STATES DISTRICT COURT

         FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA

                  *    *    *    *    *    *

B.P.J., by her next friend and      *

mother, HEATHER JACKSON,            *

     Plaintiffs                     * Case No.

     vs.                            * 2:21-CV-00316

WEST VIRGINIA STATE BOARD OF        *

EDUCATION, HARRISON COUNTY BOARD OF*

EDUCATION, WEST VIRGINIA SECONDARY *

SCHOOL ACTIVITIES COMMISSION, W.    *

CLAYTON BURCH in his official       *

capacity as State Superintendent,   *

and DORA STUTLER in her official    *

capacity as Harrison County         *

Superintendent, PATRICK MORRISEY in*


                VIDEOTAPED DEPOSITION OF

                   JOSHUA SAFER, M.D.

                    March 24, 2022


            Any reproduction of this transcript

             is prohibited without authorization

               by the certifying agency.

Page 2

```
1    his official capacity as Attorney  *
2    General, and THE STATE OF WEST      *
3    VIRGINIA,                           *
4         Defendants                     *
5                        *   *   *   *   *   *
6
7                VIDEOTAPED DEPOSITION OF
8                    JOSHUA SAFER, M.D.
9                      March 24, 2022
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
```

Page 3

```
1           VIDEOTAPED DEPOSITION
2                   OF
3    JOSHUA SAFER, M.D., taken on behalf of the Intervenor
4    herein, pursuant to the Rules of Civil Procedure, taken
5    before me, the undersigned, Nicole Montagano, a Court
6    Reporter and Notary Public in and for the Commonwealth
7    of Pennsylvania, taken via videoconference, on
8    Wednesday, March 24, 2022 at 9:30 a.m.
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
```

Page 4

```
1                A P P E A R A N C E S
2
3    JOSHUA BLOCK, ESQUIRE
4    American Civil Liberties Union Foundation
5    125 Broad Street
6    New York, NY  10004
7    COUNSEL FOR PLAINTIFF
8
9    KATHLEEN R. HARTNETT, ESQUIRE
10   ANDREW BARR, ESQUIRE
11   JULIE VEROFF, ESQUIRE
12   ZOE HELSTROM, ESQUIRE
13   KATELYN KANG, ESQUIRE
14   Cooley, LLP
15   3 Embarcadero Center
16   20th Floor
17   San Francisco, CA  94111-4004
18       COUNSELS FOR PLAINTIFF
19
20
21
22
23
24
```

Page 5

```
1            A P P E A R A N C E S (cont'd)
2
3    SRUTI SWAMINATHAN, ESQUIRE
4    Lambda Legal
5    120 Wall Street
6    19th Floor
7    New York, NY  10005-3919
8        COUNSEL FOR PLAINTIFF
9
10   DAVID TRYON, ESQUIRE
11   State Capitol Complex
12   Building 1, Room E-26
13   Charleston, WV  25305
14       COUNSEL FOR STATE OF WEST VIRGINIA
15
16   ROBERTA F. GREEN, ESQUIRE
17   Shuman McCuskey Slicer, PLLC
18   1411 Virginia Street East
19   Suite 200
20   Charleston, WV  25301
21       COUNSEL FOR WEST VIRGINIA SECONDARY SCHOOL
22       ACTIVITIES COMMISSION
23
24
```

Page 6

```
 1        A P P E A R A N C E S (cont'd)
 2
 3    SUSAN DENIKER, ESQUIRE
 4    Steptoe & Johnson
 5    400 White Oaks Boulevard
 6    Bridgeport, WV 26330
 7        COUNSEL FOR HARRISON COUNTY BOARD OF EDUCATION and
 8        HARRISON COUNTY SUPERINTENDENT DORA STUTLER
 9
10    KELLY C  MORGAN, ESQUIRE
11    Bailey Wyant
12    500 Virginia Street East
13    Suite 600
14    Charleston, WV  25301
15        COUNSEL FOR WEST VIRGINIA BOARD OF EDUCATION and
16        SUPERINTENDANT W  CLAYTON BURCH
17
18
19
20
21
22
23
24
```

Page 8

I N D E X

```
 1
 2
 3    DISCUSSION AMONG PARTIES            12 - 14
 4    WITNESS: JOSHUA SAFER, M.D.
 5    EXAMINATION
 6      By Attorney Brooks              14 - 252
 7    EXAMINATION
 8      By Attorney Tryon              253 - 288
 9    DISCUSSION AMONG PARTIES          288 - 289
10    CERTIFICATE                          290
11
12
13
14
15
16
17
18
19
20
21
22
23
24
```

Page 7

```
 1        A P P E A R A N C E S (cont'd)
 2
 3    ROGER BROOKS, ESQUIRE
 4    LAURENCE WILKINSON, ESQUIRE
 5    CHRISTIANA HOLCOMB, ESQUIRE
 6    JOHNATHAN SCRUGGS, ESQUIRE
 7    Alliance Defending Freedom
 8    15100 North 90th Street
 9    Scottsdale, AZ  85260
10        COUNSEL FOR INTERVENOR, LAINEY ARMISTEAD
11
12
13
14
15
16
17
18
19
20
21
22
23
24
```

Page 9

EXHIBIT PAGE

```
 1
 2
 3                          PAGE
 4    NUMBER  IDENTIFICATION              IDENTIFIED
 5      1    Report of Dr. Safer          15
 6      2    Rebuttal Report of Dr. Safer     15
 7      3    Fairness for Transgender People in
 8           Sport Article               16
 9      4    Professor Handelsman Article      43
10      5    Court of Arbitration for Sport Decision  63
11      6    5/10/21 Declartion of Dr. Safer   75
12      7    Transgender Women in a Female Category
13           Of Sport                    99
14      8    Endocrine Society Guidelines     113
15      9    Care of the Transgender Patient Article 127
16     10    Roberts, et al. Article      133
17     11    Race Times for Transgender
18           Athletes Article            142
19     12    Joanna Harper Article        145
20     13    Dr. Roberts Article          156
21     14    Guidance With Transgender Inclusion in
22           Domestic Sport              161
23     15    Dr. Safer Article            183
24
```

Page 10

EXHIBIT PAGE

```
 1
 2
 3                              PAGE
 4   NUMBER  IDENTIFICATION              IDENTIFIED
 5   16    Aruna Sawaswat Article        216
 6   17    2005 Paper by Professor Heino
 7         Meyer-Bahlburg               225
 8   18    Paper by Doctor Reiner        234
 9   19    Article                       259
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
```

Page 11

OBJECTION PAGE

```
 1
 2
 3   ATTORNEY                    PAGE
 4   Block   16, 17, 18, 19, 19, 20, 22, 23, 24, 24, 26, 27,
 5   28, 29, 30, 30, 31, 33, 34, 36, 36, 36, 37, 37, 38, 38,
 6   39, 41, 42, 42, 43, 43, 46, 46, 46, 47, 48, 48, 49, 50,
 7   52, 53, 54, 55, 55, 56, 57, 59, 60, 63, 65, 66, 67, 68,
 8   68, 70, 70, 72, 75, 79, 80, 81, 82, 82, 83, 83, 83, 84,
 9   84, 85, 85, 86, 86, 87, 89, 90, 91, 91, 92, 93, 93, 95.
10   95, 96, 97, 98, 101, 102, 102, 103, 103, 105, 105, 106,
11   107, 107, 108, 108, 109, 109, 110, 112, 115, 116, 118,
12   120, 123, 123, 124, 125, 126, 130, 133, 134, 134, 134,
13   136, 136, 137, 142, 144, 148, 148, 149, 150, 151, 152,
14   153, 154, 155, 156, 157, 158, 158, 160, 160, 161, 163,
15   165, 166, 167, 168, 169, 170, 170, 172, 172, 173, 173,
16   174, 174, 174, 175, 175, 176, 176, 177, 178, 180, 181,
17   183, 185, 187, 187, 188, 188, 183, 193, 195, 196, 197,
18   197, 198, 200, 200, 201, 202, 204, 205, 205, 207, 215,
19   215, 219, 222, 224, 231, 240, 244, 246, 254, 255, 255,
20   256, 257, 260, 261, 261, 262, 262, 263, 263, 264, 265,
21   268, 268, 270, 270, 271, 271, 273, 274, 275, 275, 277,
22   278, 279, 280, 280, 281, 283, 284, 285
23
24   Brooks                      213
```

Page 12

STIPULATION

```
 1
 2   -----------------------------------------------------
 3   (It is hereby stipulated and agreed by and between
 4   counsel for the respective parties that reading,
 5   signing, sealing, certification and filing are not not
 6   waived.)
 7   -----------------------------------------------------
 8              P R O C E E D I N G S
 9   -----------------------------------------------------
10         MR. BABWAH:  My name is Brandon Babwah.
11   I'm a notary public out of the State of New York.
12         VIDEOGRAPHER:  We are now on the record.
13   My name is Jacob Stock.  I'm a Certified Legal Video
14   Specialist employed by Sargent's Court Reporting
15   Services.  The date today is March 24th, 2022.  The
16   current time on the video monitor reads 9:17 a.m.
17   Eastern Standard Time.  This deposition is taken
18   remotely by videoconference.  The caption of this case
19   is the United States District Court for the Southern
20   District of West Virginia at Charleston, BPJ, et al.
21   versus West Virginia State of Board of Education, et
22   al., Civil Action No. 2:21-cv-00316.  The name of the
23   witness is Joshua Safer.  Will the attorneys present
24   state their names and the parties they represent?
```

Page 13

```
 1         ATTORNEY BROOKS:  Roger Brooks for the
 2   Intervenor, Lainey Armistead, in the room --- in the
 3   conference room with the witness.  With me is my
 4   colleague, Lawrence Wilkerson.
 5         ATTORNEY HOLCOMB:  Christiana Holcomb for
 6   the Intervenor.
 7         ATTORNEY TRYON:  This is David Tryon
 8   representing the State of West Virginia.  I'm with the
 9   Attorney General's Office.
10         ATTORNEY MORGAN:  This is Kelly Morgan on
11   behalf of the West Virginia Board of Education and
12   Superintendent Burch.
13         ATTORNEY DENIKER:  Good morning.  Susan
14   Deniker representing Harrison County Board of Education
15   and Superintendent Dora Stutler.
16         ATTORNEY GREEN:  Roberta Green here on
17   behalf of West Virginia Secondary School Activities
18   Commission.
19         ATTORNEY BLOCK:  For the Plaintiff in the
20   room is Josh Block from the ACLU.
21         ATTORNEY SWAMINATHAN:  And you have Sruti
22   Swaminathan from Lambda Legal.
23         ATTORNEY HARTNETT:  Good morning.  This
24   is Kathleen Hartnett from Cooley for the Plaintiff.
```

Page 14

1    ATTORNEY BARR:  This is Andrew Barr from
2  Coley for Plaintiff.
3    ATTORNEY KANG:  Good morning.  This is
4  Katelyn Kang from Cooley for the Plaintiff.
5    ATTORNEY HELSTROM:  Hello.  This is Zoe
6  Helstrom from Cooley for Plaintiff.
7    VIDEOGRAPHER:  And if that's everyone,
8  may I ask the notary to swear in the witness?
9    ---
10    JOSHUA SAFER, M.D.,
11  CALLED AS A WITNESS IN THE FOLLOWING PROCEEDING, AND
12  HAVING FIRST BEEN DULY SWORN BY A NOTARY PUBLIC,
13  TESTIFIED AND SAID AS FOLLOWS:
14    ---
15    VIDEOGRAPHER:  May I also ask the notary
16  to identify himself for the record as well?
17    NOTARY:  My name is Brandon Babwah.
18    VIDEOGRAPHER:  And at this time the
19  notary may be dismissed and we can begin.
20    ATTORNEY BROOKS:  Thank you.  And thank
21  you all for making all this complicated stuff work.
22    ---
23    EXAMINATION
24    ---

Page 15

1  BY ATTORNEY BROOKS:
2    Q.   Doctor Safer, good morning.  I want to first put
3  in front of you your expert report and your rebuttal
4  report so that you have those if at any point you want
5  to refer to them.  It looks --- for convenience let's
6  mark those as Exhibit 1 and 2 for the deposition.
7    ATTORNEY TRYON:  Roger, one moment.  I'm
8  looking at the realtime, and it's recording you as
9  Attorney Capehart.  So I don't know if that needs to be
10  corrected now.  And it's showing me as Attorney
11  Hartnett.
12    ATTORNEY BROOKS:  She will get that fixed
13  and the record will be correct.
14    ATTORNEY TRYON:  Okay.
15    ---
16    (Whereupon, Exhibit 1, Report of Dr. Safer,
17    was marked for identification.)
18    (Whereupon, Exhibit 2, Rebuttal Report of
19    Dr. Safer, was marked for identification.)
20    ---
21    ATTORNEY BROOKS:  And at the moment I'm
22  handing copies to the witness.  And I would like to mark
23  as Safer Exhibit 3 a short article entitled Fairness for
24  Transgender People in Sport by Joshua Safer.

Page 16

1    ATTORNEY WILKINSON:  Tab 82.
2    ---
3    (Whereupon, Exhibit 3, Fairness for
4    Transgender People in Sports Article, was
5    marked for identification.)
6    ---
7    ATTORNEY BROOKS:  And the court reporter
8  will hand the stamped copy to the witness; am I correct?
9  BY ATTORNEY BROOKS:
10    Q.   And Doctor Safer, I will ask you questions if
11  you go about your expert reports but let me ask you now
12  to focus your attention on Exhibit Number 3.  Am I right
13  that this is an article that you have just very recently
14  published?
15    A.   Yes.
16    Q.   When did this come out?
17    A.   This came out within the past few weeks I think.
18    Q.   And this is not a recording of the original
19  research.  This is a two page piece simply explaining
20  current issues to the readership of this journal?
21    ATTORNEY BLOCK:  Objection to form.
22    THE WITNESS:  So this is not original
23  research, that's correct.
24    ATTORNEY BROOKS:  Thank you.

Page 17

1  BY ATTORNEY BROOKS:
2    Q.   How would you describe the purpose of this
3  article?
4    A.   The purpose of this article is to educate
5  endocrinologists, frame the issues and also serves a bit
6  as a charge to endocrinologists in terms of work that
7  needs to be done.
8    Q.   Thank you.  If you look at the first column of
9  the first page, in the third paragraph you will see it
10  begins a possible tension exists because of the
11  observation that on average cisgender boys and men have
12  better performance outcomes in athletics than do
13  cisgender girls and women.  Do you see that language?
14    A.   I do.
15    Q.   And you are referring there to the general
16  observation that natal males have better average
17  athletic performance than natal females in a variety of
18  measures.
19    Correct?
20    ATTORNEY BLOCK:  Objection to form.
21    THE WITNESS:  So I guess I need to be
22  more specific or I can clarify.
23  BY ATTORNEY BROOKS:
24    Q.   If you would be more specific.

Page 18

1    A.   So cisgender men at a certain age have better
2 sports outcomes than cisgender women.
3    **Q.   But you wrote in this just published article**
4 **that cisgender boys and men have better performance**
5 **outcomes than the cisgender girls and women.**
6    **Correct?**
7    A.   That is correct.
8    **Q.   And what did you mean in that statement by your**
9 **reference to boys and girls?**
10    A.   Boys and girls who are basically --- it depends,
11 it's context I guess.  So boys and girls who are
12 developed to that point.
13    **Q.   So those --- what you had in mind are boys and**
14 **girls, once the puberty process begins in males in**
15 **particular?**
16         ATTORNEY BLOCK:  Objection to form.
17         THE WITNESS:  Yes, I guess I would say
18 that what we know is what is towards the end of puberty
19 and subsequent development beyond puberty.
20 BY ATTORNEY BROOKS:
21    **Q.   You say in the next sentence --- well, let me**
22 **just clarify, you accept as a scientific fact the**
23 **general observation that, on average, boys and men,**
24 **defining boys as you just did, have significantly**

Page 19

1 **stronger athletic performance in a variety of metrics**
2 **than girls and women as you just defined girls; correct?**
3         ATTORNEY BLOCK:  Objection to form.
4         THE WITNESS:  So I guess how I would say
5 that is I accept as fact that men and boys who are
6 appropriately developed have, yeah, have bad performance
7 outcomes in certain sports than do cisgender women and
8 cisgender girls again appropriately developed.
9 BY ATTORNEY BROOKS:
10    **Q.   And the next sentence reads the performance**
11 **difference has resulted in the establishment of female**
12 **only divisions for sport participation for girls and**
13 **women and safely compete in the live events, closed**
14 **quote.  Do you see that language?**
15    A.   I do.
16    **Q.   And there you were, am I correct, explaining the**
17 **relationship of your observation about male performance**
18 **with the existence in our society of sex-separated**
19 **sports.**
20         **Correct?**
21         ATTORNEY BLOCK:  Objection to form.
22         THE WITNESS:  So I guess --- I would
23 think the way I would say it myself is this is a ---
24 this is the reason why we have the carve-out for the

Page 20

1 female category.
2 BY ATTORNEY BROOKS:
3    **Q.   And one reason is to give cisgender girls and**
4 **women an opportunity to, quote, reliably win events.**
5    **Correct?**
6         ATTORNEY BLOCK:  Objection.
7         COURT REPORTER:  I'm sorry, Counsel, I
8 can't hear you.
9 BY ATTORNEY BROOKS:
10    **Q.   One reason, according to what you've written in**
11 **this article, that there have been a carve-out in a**
12 **separate female division is to provide girls and women**
13 **with opportunities to, quote, reliably win events,**
14 **closed quote.**
15    **Correct?**
16    A.   So I guess the way I would say it is if we are
17 going to be really careful with the language here that
18 it would be on average to reliably win events, that is
19 --- yeah, I will leave it at that.
20    **Q.   Certainly not every girl and women is going to**
21 **win events, as I know as a male who never won an event?**
22    A.   Exactly.
23    **Q.   And another reason, according to this sentence**
24 **that you wrote, for having a separate category for girls**

Page 21

1 **and women is so that they can, quote, safely compete.**
2    **Correct?**
3    A.   The word safely in that context is kind of ---
4 accentuates reliably.
5    **Q.   And you wrote in the next sentence that, quote,**
6 **the female-only divisions are a major factor to**
7 **encourage greater participation of girls and women in**
8 **sports with a goal of equal participation rates.**
9         **Do you see that language?**
10    A.   I do.
11    **Q.   And can you explain to me what you understand or**
12 **what you were trying to explain as the relationship**
13 **between having a separate female category on the one**
14 **hand and encouraging greater participation by women and**
15 **girls on the other?**
16    A.   Some of the goals of the people who are in sport
17 who organize sport are to get as high fractions of the
18 population to participate as can be encouraged to do so
19 for sheer health of those individuals and then of
20 everybody.  And so the purpose of the carve-out then in
21 these circumstances is to encourage girls and women to
22 participate in larger numbers than they might otherwise.
23    **Q.   And do you have an opinion, do you have an**
24 **expert opinion as to whether the existence of separate**

Diiease47719 0620

Page 22

1  categories for female sports has in fact been a, quote,
2  major factor in encouraging greater participation by
3  women and girls in sport?
4      A.  I don't have an expert opinion.
5      Q.  You don't know whether that is objectively true
6  or not?
7          ATTORNEY BLOCK:  Objection to form.
8          THE WITNESS:  I don't --- right, I can't
9  state as an expert on the details of that subject,
10  that's right.
11  BY ATTORNEY BROOKS:
12      Q.  On the second column, in the --- the first full
13  sentence begins many hormone related.  Do you see that?
14      A.  Yes, I do.
15      Q.  Let me read that sentence into the record.
16  Quote, many hormone-related physical characteristics
17  acquired during puberty are not reversed if hormone
18  levels are changed later in life.  Can you tell us what
19  physical characteristics associated with typical male
20  development are in your opinion not reversed if hormone
21  levels are changed later in life?
22      A.  Again, so I don't know that I would off the top
23  of my head give an exhaustive list but a classic would
24  be height.

Page 23

1      Q.  Would you --- I understand your list may not be
2  exhaustive, but let me ask you to tell us all the
3  examples as you're able to sit here thinking today of
4  physical characteristics acquired during male puberty
5  that are not reversed if hormone levels are changed
6  later in life.
7          ATTORNEY BLOCK:  Objection to form.
8          THE WITNESS:  I don't know that I could
9  --- I don't know that I would want to accidentally go
10  down that path and conjecture too much, but if I'm
11  expanding a bit on height and thinking about bone
12  characteristics, especially there might be modest change
13  but significant residual bone would be the biggest
14  example.  And some other elements --- I can't even say I
15  was about to say a bit proportional, but it's more
16  complicated than that, so other --- other tissues partly
17  influenced by that fact.
18  BY ATTORNEY BROOKS:
19      Q.  If we jump down to the next paragraph it begins,
20  quote, the questions arise most with transgender women
21  who began hormone treatment after puberty.  And then it
22  continues, quote, the situation includes most
23  transfeminine people because it is most common to
24  undergo endogenous puberty prior to seeking medical

Page 24

1  interventions appropriate to gender identity.  Have I
2  read that correctly?
3      A.  Yes.
4      Q.  And is it consistent with your experience that
5  most natal males who seek what you refer to as gender
6  confirming treatment do so after experiencing at least
7  most of the ordinary male puberty?
8          ATTORNEY BLOCK:  Objection to form.
9          THE WITNESS:  Yes.  So just terminology,
10  just to be clear, so people who are recorded male at
11  birth who are looking for gender affirming is the term
12  but gender confirming is fine.  And sorry, the question
13  there?
14  BY ATTORNEY BROOKS:
15      Q.  I will ask it again.  Is it consistent with your
16  personal experience that most natal males who seek
17  gender affirming treatment present after undergoing at
18  least most of a natural male puberty?
19          ATTORNEY BLOCK:  Same objection to
20  terminology.
21          THE WITNESS:  Yes.  So most transgender
22  women who come seeking medical treatment have gone
23  through a typical male puberty, that is correct, right
24  now.

Page 25

1  BY ATTORNEY BROOKS:
2      Q.  And in your clinic most of them have gone
3  through what you would consider to be a complete male
4  puberty process?
5      A.  I can't answer that completely because we define
6  puberty in this narrow way with the Tanner stages, but
7  then people continue to have development even beyond
8  that to a significant degree.
9      Q.  But they have experienced, in your professional
10  experience, at least the bulk of the pubertal changes?
11      A.  Yes, I mean the --- I guess --- the way I would
12  say it is, is that most of the transgender women who are
13  coming or even girls who are coming for medical
14  attention have gone through the classic Tanner stages of
15  puberty through Tanner five, which is the last one, by
16  the time they have determined that they're interested in
17  gender-affirming treatment, yes.
18      Q.  And let's go back to the very first paragraph of
19  your article in which you mention about five lines down,
20  quote, concern for possible residual athletic advantages
21  from a history of typical male puberty, closed quote.
22  Do you see that language?
23      A.  Let me find it.  Where is it?
24      Q.  It's about five lines down on the very first

## Page 26

1     paragraph of the article.
2       A.   Oh, the middle of the sentence, exactly.
3       Q.   And so in your opinion, it is concern for
4     possible residual athletic advantages from a history of
5     typical male puberty that drives a great deal of concern
6     about how to address inclusion of natal males who
7     experience a female gender identity in female athletics.
8       Am I correct?
9           ATTORNEY BLOCK:  Objection to form.
10          THE WITNESS:  So the concern about the
11 residual impact of testosterone during puberty for
12 transgender women who went through a typical male
13 puberty is the source of --- right, is a source of
14 tension at a medical sensitive level, yes.
15 BY ATTORNEY BROOKS:
16       Q.   And that's an issue that, for instance, you
17     engage in extensive discussions about in connection with
18     your service on the committee for the IAAF.
19       Am I correct?
20       A.   So the --- right, the conversation at World
21 Athletics now, but formerly IAAF, has dealt and I'm sure
22 will continue to deal with that which is the question of
23 to what degree are some of those characteristics, a
24 cause for relevant athletic advantage.

## Page 27

1       Q.   And in your opinion, concern about possible
2     residual athletic advantages resulting from a history of
3     typical male puberty is legitimate concern.
4       Right?
5          ATTORNEY BLOCK:  Objection to form.
6          THE WITNESS:  Right.  I don't know that
7 I'm as an expert commenting on its legitimacy.  My role
8 on the committee is talking about what is.
9 BY ATTORNEY BROOKS:
10       Q.   Do you have any expert opinion as to whether
11     concern for possible residual athletic advantages from a
12     history of typical male puberty is a legitimate concern?
13       A.   I'm sorry.  Say that again.
14       Q.   Do you have any expert opinion as to whether
15     concern for possible residual athletic advantage from a
16     history of a typical male puberty is a legitimate
17     concern?
18       A.   I don't know that I would --- again, I don't
19 know that I'm an expert on what is legitimate or not.  I
20 come into the room as the scientist talking about what
21 is true and what is not true, what do we know and what
22 do we not know.
23       Q.   So on the question then after the science has
24     been put on the table as to how to balance that with

## Page 28

1     other considerations of fairness, of inclusion, that is
2     not your expertise is what you are telling me?
3       A.   That is right, that is not my expertise.
4       Q.   If we go to page two, in the first column, the
5     second full paragraph begins because testosterone.  Do
6     you see that paragraph?
7       A.   I do.
8       Q.   And you discuss there World Athletic
9     requirements, that is the former IAAF I believe you just
10     testified?
11       A.   Yes.
12       Q.   And the World Athletics has adopted a
13     requirement to suppress testerone (sic) to five
14     nanomolar per liter testosterone.
15       Correct?
16       A.   World Athletics threshold is five nanomolar per
17 liter for those sports where they have a threshold.
18 That's right, yes.
19       Q.   And at least formally the International Olympic
20     Committee had a ten nanomolar threshold as part of what
21     you would call out in this paragraph.
22       Is that correct?
23          ATTORNEY BLOCK:  Objection to form.
24          THE WITNESS:  Yes.  So it was the case

## Page 29

1 that the International Olympic Committee Medical Group
2 was trying to form a unified approach just for purposes
3 of organization.  And at that time a ten nanomolar per
4 liter suggestion was put out.  And that is about as far
5 as it got because it then was shifted to all of the
6 individual international federations.
7 BY ATTORNEY BROOKS:
8       Q.   You say in the final sentence of that paragraph,
9     quote, such thresholds are considered to be fair to
10     transgender women because they are well above the 1.7
11     nanomolar per liter target testosterone threshold in
12     medical treatment guidelines, closed quote.
13       Do you see that language?
14       A.   Yes.
15       Q.   Am I correct that in your professional
16     understanding the 1.7 nanomolar per liter target is set
17     because that's generally believed to be at the upper
18     range of testosterone levels in normal, healthy females?
19          ATTORNEY BLOCK:  Objection to form.
20          THE WITNESS:  So the 1.7 nanomolar per
21 liter target is the upper level for adults cisgender
22 women.
23 BY ATTORNEY BROOKS:
24       Q.   And with that clarified, can you explain to me

1  what you meant by the sentence that I just read, what
2  the point is there?
3      A.   The point of the sentence is to --- I guess
4  there are a couple of considerations in terms of
5  determining these numbers, but --- so part of the point
6  is to identify numbers that are feasible for transgender
7  women on their medical treatment.
8      Q.   Is there some other point to this sentence in
9  your understanding as it is offered?
10          ATTORNEY BLOCK:  Objection to form.
11          THE WITNESS:  So the sentence references
12  that piece, but there is the additional context of
13  having a number that is fair to the greater female
14  committee cisgender and transgender too.
15  BY ATTORNEY BROOKS:
16      Q.   So it's fair in your judgment to transgender
17  women because the threshold that is being set gives,
18  what should we say, plenty of buffer above what is
19  considered to be the upper range of normal female
20  testosterone levels?
21          ATTORNEY BLOCK:  Objection to form.
22          THE WITNESS:  Right.  So I'm not taking a
23  position on what is fair to be clear.
24  BY ATTORNEY BROOKS:

1      Q.   Thank you.
2      A.   But the concept of those in the room making that
3  distinction felt that this cutoff would be fair because
4  there would be, indeed, create some buffer and,
5  therefore, people who weren't perfectly at goal would
6  still be included.
7      Q.   So because this may be important, let me
8  clarify, when you wrote such thresholds are considered
9  to be fair, you were not offering a personal opinion
10  about fairness but explaining the judgment that had been
11  made by this committee about fairness?
12      A.   That's correct.
13      Q.   Thank you.  And did it cause you personally any
14  concern that the threshold --- that because the
15  threshold that was set was more than three times higher
16  than the upper bounds of testosterone concentrations in
17  normal healthy women, that that might be unfair to the
18  broader population of cisgender women?
19          ATTORNEY BLOCK:  Objection to form.
20          THE WITNESS:  So to be clear, I'm not
21  rendering an opinion as an expert on what is fair, but I
22  can interpret the considerations of people having these
23  conversations.  And so while it is true that the
24  laboratory range for testosterone for healthy cisgender

1  women has an upper limit of 1.7 nanomolar per liter,
2  there are cisgender women who, for a variety of reasons,
3  have numbers higher than that and so that and --- so
4  that is part of the consideration.
5  BY ATTORNEY BROOKS:
6      Q.   Let me take you to the two paragraphs below that
7  to the paragraph that begins the societal priorities.
8  Do you see that paragraph?
9      A.   I do.
10      Q.   The last sentence of that paragraph reads if
11  advantage from testosterone is demonstrated, does
12  society want to implement rules that may indirectly
13  coerce transgender children to begin medical regimens
14  prior to their being ready and that they might never
15  actually choose otherwise, closed quote.
16          Do you see that language?
17      A.   I do.
18      Q.   Would you explain to me the concern that you are
19  expressing there?
20      A.   If a societal goal --- and again here recognize
21  I'm not acting as an expert in this space, but I'm
22  trying to explain to my colleagues what people are
23  discussing.  And if our concern is increased
24  participation in sport by various people, then you can

1  envision a circumstance where some girls farther along
2  in puberty have a testosterone advantage that could be
3  demonstrated.  Again, not that we even have at this
4  point.  And then we would be faced with that question,
5  which is that competing goal of making those transgender
6  girls participate in sports and a recognition if they
7  are sufficiently far along in their development that
8  they may have an advantage if we demonstrate such an
9  advantage.
10      Q.   Let me see if I can break that out.  Were you
11  talking here about a concern about a hypothetical rule
12  that says to a natal male who identifies as female that
13  you may play if you have suppressed testosterone --- you
14  may play if you have taken puberty blockers at an early
15  age but you may not play if you have not taken puberty
16  blockers from an early stage?  Is that the hypothetical
17  structure that you were addressing in this sentence?
18          ATTORNEY BLOCK:  Objection to form.
19          THE WITNESS:  So the --- it is a
20  hypothetical and it would be that if we make a specific
21  testosterone lowering rule at a scholastic level, might
22  we run into a circumstance where we are encouraging
23  somebody to make medication who might not otherwise take
24  that medication.

Smith Rptg 0623

Page 34

1    BY ATTORNEY BROOKS:

2        Q.   And staying away from questions of fairness and

3    speaking from what I think is a medical ethics

4    perspective, would you think it raises ethical problems

5    if society were to adopt a rule that permitted certain

6    individuals to compete in female athletics if they had

7    taken puberty blockers but did not permit them to

8    compete with the athletic if they had not taken puberty

9    blockers?

10       ATTORNEY BLOCK:  Objection to form.

11       THE WITNESS:  I think that's beyond where

12   I'm commenting as an expert witness.  Some of that

13   decision is a society decision or for other experts.

14   BY ATTORNEY BROOKS:

15       Q.   Do you consider yourself to have some expertise

16   on medical ethics?

17       A.   Not as an expert.

18       Q.   And you don't feel able --- you don't have any

19   opinion as you sit here today as to whether a policy

20   that created incentives for children to begin medical

21   regimes relating to gender transition could raise

22   medical ethical concerns?

23       A.   Not as a medical expert, that's right.

24       Q.   In the next paragraph --- and I think we said

Page 35

1    this is just out in the last couple of weeks, this

2    publication.

3        Right?

4        A.   It's very fresh.  Number five, so yes.

5        Q.   I'm not playing memory games.  It says at the

6    top advance access publication 17 March 2022?

7        A.   Good.

8        Q.   So very recent?

9        A.   Yes.

10       Q.   And you believe you are reasonably current in

11   the science of this area?

12       A.   I am reasonably current, indeed.

13       Q.   I didn't ask if you know it all because nobody

14   knows it all, but you say at the beginning of this

15   paragraph much remains unknown scientifically.  And you

16   continue, quote, for example, at what point in puberty

17   is advantage from testosterone significant.  Is there a

18   point where such advantage would outweigh a priority to

19   outweigh all participants --- all to participate in

20   sport of some sort, closed quote.

21       Do you see that language?

22       A.   I do.

23       Q.   And actually the point in writing the second

24   sentence there --- strike that.

Page 36

1        Let me just ask this in general.  Do you have

2    an opinion as to how much of a performance advantage

3    would count for those --- for natal males versus natal

4    females, how much of a performance advantage would be,

5    quote, significant?

6        ATTORNEY BLOCK:  Objection to form.

7        THE WITNESS:  I do not have an opinion.

8    BY ATTORNEY BROOKS:

9        Q.   And in your view, is that even a scientific

10   question?

11       ATTORNEY BLOCK:  Objection to form.

12       THE WITNESS:  Let me think.  No, that

13   isn't a scientific question.

14   BY ATTORNEY BROOKS:

15       Q.   And you --- and the next sentence is there a

16   point where an advantage, such an advantage would

17   outweigh a priority to motivate all to participate.  Am

18   I correct that you also don't consider that to be a

19   scientific question?

20       A.   That is correct.

21       Q.   That is a value judgment?

22       ATTORNEY BLOCK:  Objection to form.

23       THE WITNESS:  So it's not a scientific

24   question.  I can go a little more in --- I can expand a

Page 37

1    little bit there which is to say that we have various

2    advantages and degrees of unfairness.  So what could be

3    a scientific question, if we knew the answers, would

4    include the degree of advantage for some circumstance

5    versus another circumstance where we are able to measure

6    those things.

7    BY ATTORNEY BROOKS:

8        Q.   But the question of whether an advantage on the

9    one hand outweighs a desire to be inclusive on the other

10   hand is a value question, not a scientific question?

11       ATTORNEY BLOCK:  Objection to form.

12   BY ATTORNEY BROOKS:

13       Q.   In your opinion.

14       ATTORNEY BLOCK:  Objection to form.

15       THE WITNESS:  So I guess I would just go

16   back to saying how I said it, which is the scientific

17   question in there would be to provide that degree of

18   difference and show, for example, that this would be ---

19   this is small advantages versus someone that we are

20   already do in society as big advantage and that would be

21   how --- that would be the role of the scientist.

22   BY ATTORNEY BROOKS:

23       Q.   I understand that's what you would like to say,

24   but my question for you is, in your opinion, is the next

1  step of deciding of whether that advantage which has now
2  been scientifically detailed outweighs a priority to
3  motivate all to participate is a value decision.
4          ATTORNEY BLOCK:  Objection to form.
5          THE WITNESS:  Yeah, I don't --- I guess I
6  can't as an expert say for certain that in all
7  circumstances that is a value to consider.
8  BY ATTORNEY BROOKS:
9      Q.   You continue among your lists of things that
10  are, quote, unknown scientifically, quote, for those who
11  have completed puberty, what duration of
12  testosterone-lowering treatment is sufficient to create
13  a level playing field in a given sport, closed quote.
14          Do you see that?
15      A.   Yes.
16      Q.   And in your view, the question of what duration
17  of testosterone lowering treatment, if any, can be
18  sufficient to create a level playing field in a given
19  sport is currently unknown scientifically?
20          ATTORNEY BLOCK:  Objection to form.
21          THE WITNESS:  It's unknown scientifically
22  across virtually all sports.  What duration of
23  testosterone lowering raises what degree of advantage.
24  It's just at that level.  To go to the level playing

1  field is a whole further tier.
2  BY ATTORNEY BROOKS:
3      Q.   And in your final paragraph I think you said at
4  the beginning that, in part, this was a call to the
5  field of endocrinology for needed research.  In the
6  final paragraph you say, quote, we in the endocrine
7  healthcare community have much work to do to create an
8  evidence base to help guide decision makers so the
9  choices for transgender women in sport are data driven,
10  closed quote.
11          Have I read that language correctly?
12      A.   Yes.
13      Q.   So it's your view as of 2002 that the data that
14  we have available today are insufficient to enable data
15  driven choices about transgender participation in female
16  athletics.
17          Correct?
18          ATTORNEY BLOCK:  Objection to form.
19          THE WITNESS:  I would say that in 2022 we
20  have insufficient data to --- how would I say this, we
21  have insufficient data to make rules for, let's say,
22  transgender women, mostly talking about older more
23  developed people, that would address these concerns for
24  participation.

1  BY ATTORNEY BROOKS:
2      Q.   Let me ask you to find your initial expert
3  report, which is Exhibit-1, and there I will ask you to
4  turn to paragraph 58.  At the beginning of paragraph 58
5  you wrote in this report executed on January 21, 2022,
6  which is two months prior to the publication date of the
7  article we just looked at --- and actually, let me pause
8  and ask you, when did you write the article that we just
9  looked at?  And the process always grinds on for a
10  little while.  When do you think you substantially
11  completed the task?
12      A.   I honestly don't remember.
13      Q.   Sorry.  The question was when do you think you
14  substantially wrote the text in the article that you
15  just looked at?
16      A.   I honestly don't remember the details.  We can
17  talk in years, so it would be 2022 and back into 2021.
18      Q.   Okay.
19          So about the same time that you were preparing
20  this expert report?
21      A.   There certainly would be some overlap.
22      Q.   You wrote in paragraph 58, quote, even if
23  evidence were eventually to show that on average
24  transgender women have some level of advantage compared

1  to average non-transgender women, closed quote.
2          Do you see that language?
3      A.   I do.
4      Q.   Now, in fact, you are aware of substantial
5  evidence that, on average, transgender women do have
6  some level of advantage compared to advantage
7  non-transgender women.
8          Correct?
9          ATTORNEY BLOCK:  Objection to form.
10          THE WITNESS:  No, I'm not.  So that isn't
11  my statement.
12  BY ATTORNEY BROOKS:
13      Q.   And is the question --- so you served on the
14  IAAF Committee discussing questions of testosterone
15  levels.  And in that context you did not become
16  acquainted with data showing that on average transgender
17  women have some level of advantage compared to average
18  non-transgender women?
19      A.   Not in --- so, no.  In the context of specific
20  sports, no.
21      Q.   Do you consider the question of how much
22  advantage natal males have over natal females in
23  particular sports to be within your professional
24  expertise?

Armistead 0625

Page 42

1        ATTORNEY BLOCK:  Objection to form.
2        THE WITNESS:  So sorry --- so cisgender
3   men versus cisgender women, that difference at an adult
4   level, is at my expertise to know that degree of
5   difference?  Is that the question?
6   BY ATTORNEY BROOKS:
7        Q.   It is.
8        A.   No, that is not my expertise.
9        Q.   And is it within your expertise to know the
10  level of advantage enjoyed by natal males who have
11  transitioned to female gender identity over cisgender
12  women in any particular sport?
13       ATTORNEY BLOCK:  Objection to form.
14       THE WITNESS:  So in the --- so if we are
15  talking cisgender women versus transgender women, it
16  would be in my expertise to know what data we have on
17  this subject, which is different from knowing the degree
18  of difference because we don't have those data.
19  BY ATTORNEY BROOKS:
20       Q.   You say in paragraph 60, let me find this,
21  quote, there is no inherent reason why transgender women
22  physiological characteristics related to athletic
23  performance should be treated as any more of an unfair
24  advantage than the advantages that already exist among

Page 43

1   different women athletes.  Do you see that language?
2        A.   I do.
3        Q.   Now, earlier you told me rather emphatically
4   that the question of fairness is outside your
5   professional expertise.
6        Correct?
7        ATTORNEY BLOCK:  Objection to form.
8        THE WITNESS:  It is outside my expertise.
9   BY ATTORNEY BROOKS:
10       Q.   So why did you offer here an opinion about what
11  is fair or unfair?
12       ATTORNEY BLOCK:  Objection to form.
13       THE WITNESS:  Right.  So I'm not
14  determining the fairness per se as an expert, but I'm
15  simply talking about the inputs where somebody who is
16  determining what is fair --- where somebody is
17  determining what is fair would consider.
18       ATTORNEY BROOKS:  Let me mark as Safer
19  Exhibit 4 an article by Professor Handelsman entitled
20  Circulating Testosterone on a Hormonal Basis of Sex
21  Differences in Athletic Performance.
22       ---
23       (Whereupon, Exhibit 4, Professor Handelsman
24       Article, was marked for identification.)

Page 44

1        ---
2        ATTORNEY WILKINSON:  Tab 18.
3        VIDEOGRAPHER:  I'm sorry, what tab is it?
4        ATTORNEY BROOKS:  Tab 18.
5   BY ATTORNEY BROOKS:
6        Q.   And Doctor Safer, am I correct this is an
7   article that you read with some care?
8        A.   This is an article that I read with some care.
9        Q.   You cited in your expert report.
10       Correct?
11       A.   I think so.
12       Q.   I think so, too.  It's not a memory test.  I
13  retract the question.  We will come to it shortly.
14       Let me ask you to turn in --- and let me ask
15  you, do you know Professor Handelsman personally?
16       A.   I do not.
17       Q.   Have you encountered him in any other actions?
18       A.   I have.
19       Q.   Once, more than once?
20       A.   That is also a trick question for me.  For sure
21  once.
22       Q.   Okay.
23       Do you consider him to have a high reputation
24  in the field?

Page 45

1        A.   If that question is as an expert I can't --- I
2   won't comment, but he certainly has published widely and
3   we quote him.
4        Q.   What do you mean by we in that answer?
5        A.   The rest of us in the field and I certainly
6   quote him in an expert opinion.
7        Q.   All right.
8        And this article in particular we note you
9   widely reference?
10       A.   This article is --- yeah, I think that is
11  actually a fair thing to say.  It is as widely
12  referenced as anything in a relatively small field.
13       Q.   Let me ask you to turn to the second page of
14  this article where Professor Handelsman in the first
15  full paragraph --- the second full paragraph begins
16  nevertheless.  He says, quote, fairness is an elusive
17  subjective concept with malleable boundaries that may
18  change over time as social concepts of fairness evolve.
19       Do you see that?
20       A.   I do.
21       Q.   Do you agree with that statement?
22       A.   As an expert I can't comment.
23       Q.   You don't purport to be able to give any
24  definition of fairness?

1  ATTORNEY BLOCK: Objection to form.
2  THE WITNESS: Yes, not as an expert.
3  BY ATTORNEY BROOKS:
4  **Q.   And you don't have any opinion as to whether**
5  **standards of fairness can change over time?**
6  ATTORNEY BLOCK: Objection to form.
7  THE WITNESS: I'm aware of the
8  conversation on the subject, of course, but if you are
9  asking me to comment as an expert, then no.
10  BY ATTORNEY BROOKS:
11  **Q.   If the actual evidence shows that the actual**
12  **scientific data were to show that, quote, on average**
13  **transgender women have, closed quote, a very large**
14  **advantage compared to average non-transgender women,**
15  **would you then have any view as to whether permitting**
16  **non-transgender women to compete in female categories is**
17  **fair?**
18  ATTORNEY BLOCK: Objection to form.  I'm
19  sorry, what's the quotation?
20  BY ATTORNEY BROOKS:
21  **Q.   If actual data were to show that on average**
22  **transgender women have a very large advantage compared**
23  **to non-transgender women, then would you have any**
24  **opinion as to whether it is fair to permit the**

1  **transgender women to compete in the female category?**
2  ATTORNEY BLOCK: Objection to form.
3  THE WITNESS: No, that would not change.
4  I would simply as an expert I would talk about those
5  degrees of difference as information.
6  BY ATTORNEY BROOKS:
7  **Q.   But you would offer no opinion as to whether**
8  **permitting the participation in the female category was**
9  **or was not appropriate?**
10  A.   I would not offer an expert opinion.  That's
11  right.
12  **Q.   Now, you say in paragraph 60 of your expert**
13  **record that there is, quote, no inherent why transgender**
14  **women's physiological characteristics related to**
15  **athletic performance should be treated as any more of an**
16  **unfair advantage than the advantages that already exist**
17  **among different women athletes, close quote.  We have**
18  **looked at that language.**
19  **Correct?**
20  A.   You are reading that correctly.
21  Q.   Thank you.
22  A.   Whatever the question is.
23  **Q.   No question beyond that so far.  And your point**
24  **I take it is that for any given sport some women just**

1  **have substantially more favorable physiques than others?**
2  ATTORNEY BLOCK: Objection to form.
3  THE WITNESS: Right.  So for any given
4  sport some women have advantages relatively to others,
5  yes.
6  BY ATTORNEY BROOKS:
7  **Q.   And in basketball some are simply genetically**
8  **going to be substantially taller than others?**
9  A.   In basketball some are taller than others, yes.
10  **Q.   I'm not speaking for you, I, at 5'8",  in my**
11  **shoes for instance am --- am just physiologically**
12  **disadvantaged for basketball compared to a man who is**
13  **6'10"?**
14  ATTORNEY BLOCK: Objection to form.
15  THE WITNESS: So as an expert I actually
16  wouldn't go there because there are other
17  characteristics in basketball per se.
18  BY ATTORNEY BROOKS:
19  **Q.   That's true, although I have none of them.  But**
20  **is it, in your view, equally true that there is no**
21  **inherent reason why cisgender men's physiological**
22  **characteristics related to athletic performance should**
23  **be treated as any more of an unfair advantage for**
24  **competing in the women's category than the advantages**

1  **that already exist among different women athletes?**
2  A.   So yeah, let's go through this more slowly a
3  second so I'm clear.
4  **Q.   All I did was substitute cisgender men for**
5  **transgender women in that sentence.  And my question is**
6  **doesn't your argument as stated there apply exactly with**
7  **equal force to cisgender male?**
8  A.   No.
9  Q.   Why is that?
10  A.   When we talk about --- when we're talking about
11  a range of characteristics among a range of people
12  versus something that might be systematically true or
13  not and so it just --- so the answer just ends up being
14  more complex.
15  **Q.   Well, you have testified that most natal women**
16  **--- pardon me, you testified that most natal males with**
17  **female gender identity have undergone at least the**
18  **majority of male puberty before they present for gender**
19  **affirming treatment.**
20  **Correct?**
21  ATTORNEY BLOCK: Objection to form.
22  THE WITNESS: So most cisgender women
23  when they come to medical attention have gone through a
24  significant puberty, the five Tanner stages.

Page 50

BY ATTORNEY BROOKS:

Q.   And just to clarify, to use your terms, in giving that answer you said cisgender women.  That is not what you meant.

Correct?

A.   That is not what I meant, thank you. Transgender women.

Q.   And therefore, they systematically have gone through --- systematically gone through physiologic changes associated with male puberty?

ATTORNEY BLOCK:  Objection to form.

THE WITNESS:  So the --- so they --- they have gone through male puberty.  And there is something on average that may be true there, but whether that relates to an advantage in a specific sport I can't go there.

BY ATTORNEY BROOKS:

Q.   Well, the example that you gave earlier of a systematic difference resulting from male puberty that these transgender women enjoy is height, that is you mentioned that earlier.

Correct?

A.   Uh-huh (yes).

Q.   So again, let me ask, given that according to

Page 51

your testimony and experience the substantial majority of transgender women have undergone most of male puberty, why is it not equally true that there is no inherent reason why cisgender men's physiological characteristics related to athletic performance should be treated as any more of an unfair advantages than the advantages that already exist among different women athletes?

A.   So if I'm following this correctly then it's --- then the answer to the question why are cisgender men different than transgender women?

Q.   Why does this logic apply differently to the cisgender men than to the transgender women?

A.   So let's see.  It actually doesn't.  So if you have a sport where that --- where the advantage or --- for the --- where a known advantage for cisgender men versus cisgender women was sufficiently modest, and again, I wouldn't be the judge of that, but you could envision that becoming a coed sport.

Q.   Are you offering an opinion that either government or leagues have an obligation to do an individual by individual assessment as to whether a particular natal male who experiences a female gender identity does or does not enjoy a physiological

Page 52

advantage in the sport they wish to play in as a result of typical male development that they had gone through?

ATTORNEY BLOCK:  Objection to form.

THE WITNESS:  Right, I'm not offering an opinion.  It was a long question.

BY ATTORNEY BROOKS:

Q.   Would you like to hear the question back?

A.   Sure, but I'm not offering an opinion on several aspects.

ATTORNEY BROOKS:  Would you read that question back, please?

---

(COURT REPORTER READS BACK PREVIOUS QUESTION.)

---

BY ATTORNEY BROOKS:

Q.   And your answer is?

A.   So I'm not offering an opinion.  I should expand a bit because how that question was phrased as an individual by individual person and most of these rules are across a group of sports.

Q.   And my question was about an individual person.

A.   Your question was an individual person, but ---.

Q.   Right.  Looking at your paragraph 60, again, do you believe there is --- are you offering an opinion ---

Page 53

let me start that again.  Are you able to identify for me any inherent reason why a relatively weak or small or slow male --- strike that.

You referenced in your report and also the article we just looked at the IAAF regulations that excluded from the female category any individual who has circulating testosterone higher than five nanomolar per liter.  Do you recall that?

ATTORNEY BLOCK:  Objection to form.

THE WITNESS:  So just to clarify, it is not --- that rule for five nanomolars is not across all sports.

BY ATTORNEY BROOKS:

Q.   And which sports in your recollection did that apply to?

A.   Yeah, that's --- I don't remember off the top of my head.

Q.   At the very least it applied to track events.  Correct?

A.   It does.  But if you start to quiz me on the specific distances, I won't get that.

Q.   And nor will I so quiz you.  And that requirement as applied to track competition was, in fact, the subject of a major international arbitration,

Semenya 0628

Page 54

1    as you're aware.
2         Correct?
3         A.   If we're referencing the Caster Semenya case,
4    yes.
5         Q.   Did you yourself have any participation in that
6    arbitration?
7         A.   I did not.
8         Q.   Do you know whether Doctor Handelsman had any
9    participation in that?
10             ATTORNEY BLOCK:  Objection.
11             THE WITNESS:  I don't know off the top
12   off of my head.
13   BY ATTORNEY BROOKS:
14        Q.   Have you ever read the arbitrarial decision in
15   that case?
16        A.   I'm certain I read excerpts, but that is as much
17   as I could say.
18        Q.   Okay.
19             You participated in developing on the --- a
20   member of the committee that developed the regulation
21   that you've referenced, the 7.5 nanomolar threshold?
22        A.   I was on the committee that helped determine
23   that particular threshold conceptual, yes.
24        Q.   And you're aware that in addition to individuals

Page 55

1    such as Caster Semenya, who suffered of a disorder of
2    sexual development, that that rule would exclude some
3    transgender women from female athletics that were
4    subject to that IAAF rule.
5         Correct?
6              ATTORNEY BLOCK:  Objection to the
7    terminology.
8              THE WITNESS:  So I was aware that by
9    setting a threshold that there --- and even that
10   threshold in particular, that there would be transgender
11   women who would not achieve that threshold for whatever
12   reason.
13   BY ATTORNEY BROOKS:
14        Q.   And did you nevertheless consider the regulation
15   to be reasonable?
16        A.   If you are asking me as an expert, then again I
17   can't comment.
18        Q.   Well, let me just ask you as Doctor Safer.
19        A.   Am I allowed to ---?
20             ATTORNEY BLOCK:  Objection to form.
21   BY ATTORNEY BROOKS:
22        Q.   You are allowed.
23        A.   Okay.  So having a rule does make sense to me,
24   yes.

Page 56

1         Q.   And you thought that that rule was reasonable?
2         A.   As with the data we have currently, yes,
3    personally.
4         Q.   And what, in your opinion, is the inherent
5    reason that advantages conferred by testosterone levels
6    far outside the normal female range should be treated as
7    any more of an unfair advantage than the advantages that
8    already exist among different women athletes?
9              ATTORNEY BLOCK:  Objection.  I'm sorry.
10   Can you clarify as an expert or as an individual just
11   because you shifted back and forth?
12   BY ATTORNEY BROOKS:
13        Q.   First as an expert.
14        A.   So yes --- give me the question again.  I'm
15   sorry.
16        Q.   What, in your opinion, is the inherent reason
17   that advantages conferred by testosterone levels outside
18   the normal female range should be treated as any more of
19   an unfair advantage than the advantages that already
20   exist among different women athletes?
21        A.   So to clarify we --- so, okay, let me go back.
22   Let me answer in pieces I guess or ask you to say it in
23   pieces.  So what is different between typical male
24   levels of testosterone in an individual and some other

Page 57

1    characteristics that are across the range of
2    characteristics of cisgender women?  Is that the
3    question?  Am I rephrasing that correctly?
4         Q.   I'm actually referencing paragraph 60 of your
5    expert report, but my question --- and let's take for
6    instance, a natal male who has press testosterone but
7    only achieved six nanomolar per liter concentration, do
8    you have that concentration, do you have that in mind?
9         A.   A transgender woman whose testosterone level is
10   six.
11        Q.   Right.  What in your opinion is the inherent
12   reason that advantages conferred by testosterone levels
13   above a threshold such as five nanomolars should be
14   treated as any more of an unfair advantage than the
15   advantages that already exist among different women
16   athletes?
17             ATTORNEY BLOCK:  Objection to form.
18             THE WITNESS:  So a couple of things.
19   First of all, I don't know that a testosterone level of
20   six is from a scientific perspective demonstratively
21   different than a testosterone level of five.  It's just
22   a matter of affecting it overall.  So I want to clarify
23   that.  It's not that --- that that small degree is
24   necessarily relevant.  And I can't even say that we

Hudson 0629

Page 58

1  demonstrated advantage.  It's still a theoretical with
2  regard to some of those higher testosterone levels.  Let
3  me think about those for a second.  Yes, so some of the
4  logic pattern for having a threshold is in order to be
5  able to limit the entire conversation to dealing with
6  transgender women or women with --- or intersex women or
7  women who for any reason have have elevated testosterone
8  levels and not to open the door at the elite level for a
9  participation by cisgender men posing as cisgender women
10  if that makes sense.
11  BY ATTORNEY BROOKS:
12    **Q.   Is there, in your judgment, any inherent reason**
13  **that advantages conferred by testosterone levels well**
14  **outside normal female ranges should be treated as any**
15  **more of an unfair advantage than the advantages that**
16  **already exist among different women athletes?**
17    A.   So I have to go back to that one.  Is it my
18  opinion that male level testosterone levels ---?
19    **Q.   Let me --- my question is testosterone levels**
20  **significantly above normal female ranges?**
21    A.   Are --- then no, sorry.  It took me a little
22  while to get there, but no.
23    **Q.   Because the question was complicated and the**
24  **answer was broken up I will ask you again, not to insult**

Page 59

1  **you but so we have a clear record.  I think I understood**
2  **your answer but is there, in your opinion, any reason**
3  **why advantages provided by testosterone level well**
4  **outside normal female ranges should be treated as any**
5  **more of an unfair advantage than the advantages that**
6  **already exist among different women athletes?**
7         ATTORNEY BLOCK:  Objection to form.
8         THE WITNESS:  And as an expert I'm not
9  rendering an opinion there, that's right.
10  BY ATTORNEY BROOKS:
11    **Q.   Okay.**
12         **In paragraph 55 of your ---.**
13         ATTORNEY BLOCK:  Would now be a good time
14  for a break?
15         ATTORNEY BROOKS:  Let me just ask this
16  one question and then yes.
17  BY ATTORNEY BROOKS:
18    **Q.   In paragraph 55 you cite a 2015 article by**
19  **Joanna Harper?**
20    A.   I do, yes.
21    **Q.   Have you ever met Joanna Harper?**
22    A.   I have.
23    **Q.   And have you collaborated with Joanna Harper in**
24  **any way?**

Page 60

1         ATTORNEY BLOCK:  Objection to the form.
2         THE WITNESS:  Yeah, I don't, but I guess
3  --- it's a complicated answer, so I need to know what
4  you mean by that.
5  BY ATTORNEY BROOKS:
6    **Q.   I mean it broadly.  Have you worked with her on**
7  **any sorts of projects or committees?**
8    A.   Well, we were both in the working group for
9  World Athletics that helped develop this threshold.
10    **Q.   And do you consider Doctor Harper to be**
11  **knowledgeable in the field of sports physiology?**
12    A.   I do.
13    **Q.   And do you consider Doctor Harper to be**
14  **knowledgeable with regard to the impact of testosterone**
15  **suppression on athletic capabilities in male?**
16    A.   So do I consider her to be knowledgeable in the
17  field?  I certainly do.  For what it's worth, she is
18  still Ms. Harper.  She's actually in the Ph.D. program
19  now.
20    **Q.   Oh, okay.  I just gave her an honorary degree.**
21    A.   She occupies a prominent place in the field.
22         ATTORNEY BROOKS:  Let's take that break.
23         VIDEOGRAPHER:  Going off the record.  The
24  current time is 10:25 a.m. Eastern Standard Time.

Page 61

1  OFF VIDEOTAPE
2         ---
3  (WHEREUPON, A SHORT BREAK WAS TAKEN.)
4         ---
5  ON VIDEOTAPE
6         VIDEOGRAPHER:  We are back on the record.
7  Current time reads 10:39 a.m. Eastern Standard Time.
8  BY ATTORNEY BROOKS:
9    **Q.   Dr. Safer, let me ask you to go back to Exhibit**
10  **4 Professor Handelsman's article.  And if you would turn**
11  **in that article to page 805, the first paragraph begins**
12  **the strongest classification in a league sport is that**
13  **after puberty men 20 times more testosterone than women.**
14         **Do you see that language?**
15    A.   I do.
16    **Q.   And he discusses a number of results and ends**
17  **his paragraph by saying in concert --- quote, in concert**
18  **these render women on average unable to compete**
19  **effectively against men in power based or endurance**
20  **based sports.**
21         **Do you see that?**
22    A.   I do.
23    **Q.   And do you consider yourself qualified to**
24  **evaluate Professor Handelman's assertion that women are**

Page 62

1  on average unable to compete effectively against men in
2  power based or endurance based sports?
3      A.  No.
4      Q.  Not qualified?
5      A.  Not qualified, correct.
6      Q.  Do you believe you have an understanding ---
7  well, let me ask you this.  Do you consider yourself
8  qualified to offer any opinion as to why sports have
9  been separated by sex historically?
10     A.  I guess I would say I'm aware of the history.
11     Q.  And in your understanding what is the reason
12 that sports have been separated by sex historically?
13     A.  The history is that at a certain point where
14 sufficient development has taken place there is a
15 differential in at least some sports between men and
16 women --- between cisgender men and cisgender women such
17 that in order for women to win those events reliably
18 there needs to be a carve-out.
19     Q.  And as you sit here today can you identify for
20 me any sport in which you believe that cisgender men
21 after puberty do not enjoy a significant performance
22 advantage over cisgender women?
23     A.  Yes.
24     Q.  Please do.

Page 63

1      A.  Examples include --- well, I guess I better not
2  get too far and be the expert here, but I believe
3  riflery and others in the category of hand/eye
4  coordination.  I think some of the equestrian sports are
5  examples.
6      Q.  Okay.
7          You are not offering any opinion, are you, that
8  the reason for separation of sports by sex is to affirm
9  sex specific social roles or identities?
10     A.  I'm not aware of that.  I'm not an expert on
11 those pieces, but I'm not aware personally.
12     Q.  And it is not your opinion, is it, that
13 separation of sport by sex is in general unfair?
14         ATTORNEY BLOCK:  Objection to form.
15         THE WITNESS:  So again, as an expert I'm
16 not commenting on fairness.
17         ATTORNEY BROOKS:  I'm going to mark as
18 Safer Exhibit 5, a Decision in the arbitral award
19 delivered in the Court of Arbitration for Sport in
20 connection with the arbitration between Athletic South
21 Africa and the IAAF, a bulky document, unfortunately.
22         ---
23         (Whereupon, Exhibit 5, Court of Arbitration
24         for Sport Decision, was marked for

Page 64

1          identification.)
2          ---
3  BY ATTORNEY BROOKS:
4      Q.  And Doctor Safer, now that you have --- I asked
5  you earlier about whether you had seen the arbitration
6  decision and I think you said you might have read
7  excerpts of it.  Looking at it today, do you believe
8  that you have ever seen a copy of the whole Decision?
9      A.  I do not think I've read through the whole
10 Decision.
11     Q.  Do you think you've ever held this whole
12 document in your hand before?
13     A.  This is the first time that I held the whole
14 document.
15     Q.  I'm going to ask you about a few quotations in
16 it, not to ask your opinions about the judgment but to
17 elicit your opinions about the science.  So if you would
18 turn --- and the structure of the document is that
19 everything in it has a paragraph number which, thank
20 goodness, makes it easy to find things.  So if you would
21 turn to paragraph 556.  The first sentence of
22 paragraph 556 of this Decision reads there is no dispute
23 that ensuring fair competition in the female category of
24 elite competitive athletics is a legitimate objective

Page 65

1  for the IAAF to pursue, closed quote.  As a member of
2  the IAAF Committee that established the policy that was
3  challenged in this arbitration, do you agree or disagree
4  that there is no dispute that ensuring fair competition
5  in the female category is a legitimate objective for the
6  IAAF to pursue?
7          ATTORNEY BLOCK:  Objection to form.
8          THE WITNESS:  As an expert I do not have
9  an opinion.
10 BY ATTORNEY BROOKS:
11     Q.  Okay.
12         Let me ask you to turn to paragraph 456.  And
13 this arbitration, as you noted, deals with the case of
14 Caster Semenya and therefore with track events, not with
15 riflery and with equestrian events.  So I will ask your
16 reaction to that context.  In the middle of
17 paragraph 456, beginning halfway through the sixth line
18 the panel wrote, quote, suffice to say that post puberty
19 generally speaking males outperform female athletes ---
20 I'm sorry, male athletes outperform female athletes at
21 an elite level.  This difference is insurmountable,
22 closed quote.
23         Do you see that?
24     A.  I do.

1          Q.   And do you believe it to be true, false or
2     outside of your expertise that male athletes outperform
3     female athletes at the elite level at a difference that
4     is insurmountable?
5               ATTORNEY BLOCK:  Objection to form.
6               THE WITNESS:  As a blanket statement, no,
7     I would say that is not my expertise.
8     BY ATTORNEY BROOKS:
9          Q.   Let me ask you to turn to 576.  I said 576.  I
10    meant 577.  I apologize.  At the end of 577 the panel
11    has written, quote, ---.
12              ATTORNEY BROOKS:  We just had static
13    here, so let me ask whether people outside the
14    conference room are hearing us?  If somebody could
15    unmute.
16              ATTORNEY TRYON:  I can hear you.
17              ATTORNEY BROOKS:  We just had some static
18    that caused me concern.
19    BY ATTORNEY BROOKS:
20         Q.   At the end of paragraph 577 the panel wrote,
21    quote, male athletes do not have to be elite to surpass
22    even the very best female athletes.  Dr. Berman pointed
23    out that in a race such as the 800 meter, a 1.6 percent
24    advantage, as calculated in BG17, was sufficient to

1     determine first place by the region of nine meters,
2     closed quote.
3          Do you see that language?
4          A.   Yes.
5          Q.   And do you consider it to be true, false or
6     outside your expertise that male athletes do not even
7     have to be elite to surpass the very best female
8     athletes?
9               ATTORNEY BLOCK:  Objection to form.
10              THE WITNESS:  In a --- as a blanket
11    statement it is outside my expertise.
12    BY ATTORNEY BROOKS:
13         Q.   And do you have an opinion as to whether a
14    1.6 percent advantage is a significant advantage or
15    insignificant advantage?
16         A.   I think that's too complicated as phrased for me
17    to answer.
18         Q.   That's actually one of the simpler questions
19    that I've asked today.  Let me ask it again and ask you
20    to think.  Do you have an opinion, and if you --- one
21    answer of course is I don't have an opinion or it is
22    outside of my expertise, but do you have an opinion as
23    to whether a 1.6 percent advantage in a track event is a
24    significant advantage?

1               ATTORNEY BLOCK:  Objection to form.
2               THE WITNESS:  So it depends on the event.
3     BY ATTORNEY BROOKS:
4          Q.   Why does it depend on the event?
5          A.   Well, there are events where we see --- as an
6     elite Olympic event where the runners are virtually
7     tied.  And 1.6 percent then will be significant in the
8     moment because that will be described in that field.
9     And yet there are other events where people are far more
10    spread out and there's greater --- in every element,
11    then 1.6 percent advantage becomes lost in that noise.
12         Q.   And --- well, let's take competitive high school
13    athletics, competitive high school track.  Do you have
14    an opinion as to 1.6 percent advantage in that context
15    is significant or insignificant?
16         A.   I do not have an opinion.
17         Q.   So if I understand correctly, your point in some
18    context you know that 1.6 percent is significant but
19    that in other context you don't know one way or the
20    other?
21              ATTORNEY BLOCK:  Objection to the form.
22              THE WITNESS:  Yes, I would say
23    that in some context I can see that 1.6 percent is
24    significant and then in other context I can see that 1.6

1     percent does not appear to be significant.  And actually
2     even if you're asking as an expert, what even is
3     significant is outside my purview, but with that
4     understood I can still see that someone would say it one
5     way and not say it the other way.
6     BY ATTORNEY BROOKS:
7          Q.   Let me ask you to turn to paragraph 357.  And
8     first I will ask you to turn to page 88, paragraph 351,
9     just so you can see we're in a section summarizing the
10    testimony of Professor David Handelsman.  That begins at
11    paragraph 351.  And then I'm going to call your
12    attention to paragraph 357 and it puts you to the
13    statement there.
14         357 includes a number of bullet points.  The
15    third bullet point, which is on page 91, reads --- and
16    again this is --- the paragraph begins, quote, Professor
17    Handelsman went on to explain in greater detail why the
18    sex difference in circulating testosterone is the cause
19    of the difference in athletic performance between men
20    and women, and then there are bullet points.  The third
21    bullet point reads, on average, women have 50 to
22    60 percent of men's upper arm muscle cross-sectional
23    area, 65 to 70 percent of men's thigh muscle
24    cross-sectional area, 50 to 60 percent of men's limb

Robinson 0632

Page 70

1    strength and 60 to 80 of men's leg strength.  Do you see
2    that language?
3            ATTORNEY BLOCK:  Objection to form.
4            THE WITNESS:  I do.
5    BY ATTORNEY BROOKS:
6        Q.   Do you have any knowledge as to whether those
7    statistics are on correct as given by Dr. Handelsman?
8        A.   I do not.
9        Q.   And do you have any expert knowledge as to how
10   those statistics do or do not change under the influence
11   of testosterone suppression in natal males who
12   experience a female gender identity?
13           ATTORNEY BLOCK:  Objection to
14   terminology.
15           THE WITNESS:  So I guess the --- I have
16   no expert knowledge about these numbers, per se, but I
17   do know as an expert that when testosterone levels are
18   suppressed in transgender women and actually in
19   cisgender men, anyone, that these numbers are decreased.
20   And I can say that with confidence as an expert.
21   BY ATTORNEY BROOKS:
22       Q.   But you're not able to quantify that decrease.
23           Is that correct?
24       A.   I cannot quantify that decrease.  The data gets

Page 71

1    murky when we start to get there.
2        Q.   Have you ever met Professor Coleman at Duke
3    University?
4        A.   Doriane Coleman?
5        Q.   Yes.
6        A.   I have.
7        Q.   And in what context have you interacted with
8    Professor Coleman?
9        A.   The --- a professional context.
10       Q.   Can you describe the context?
11       A.   We have served on some of these --- two of the
12   same committees --- committee task force, whatever you
13   call it, for World Athletics together.
14       Q.   Was she, in fact, on the committee which you
15   participated that set the five nanomolar standard for
16   the IAAF?
17       A.   I don't recall for sure but I think not.
18       Q.   Then can you identify for me the two committees
19   that you recall that you did sit on with Professor
20   Coleman?
21       A.   Subsequent to the initial group, and I don't
22   know that it's two committees, it may be the same
23   committee, they get renamed.  Things like that happen.
24   So it is --- I'm thinking forward to assisting other

Page 72

1    international federations with their rule making.
2        Q.   And do you consider Professor Coleman to be
3    knowledgeable about the relative athletic capabilities
4    and records of male and female athletes?
5        A.   To me that's too vague a question.  She's a
6    lawyer.
7        Q.   Are you aware also of her athletic background as
8    a competitive athlete?
9        A.   I am.
10       Q.   And are you aware of her research and
11   publications having to do with athletic records and
12   capabilities of male and female athletes?
13           ATTORNEY BLOCK:  Objection to form.
14           THE WITNESS:  I'm aware of some of her
15   publications where she has co-authored, but she's not
16   usually the physiology expert in the group.
17   BY ATTORNEY BROOKS:
18       Q.   Let me ask you to turn to paragraph 393.  And if
19   you look at the page you will see that this is within
20   the tribunal summary of testimony of Professor Coleman.
21   Let me ask you since you dealt personally with the
22   professor, because I want the record to be respectful,
23   does she in general use --- prefer to be referred to as
24   Professor Lambelet-Coleman or simply Professor Coleman?

Page 73

1        A.   I don't know the answer.
2        Q.   Okay.
3        A.   I prefer to her on a first name basis.
4        Q.   All right.
5            I will stick with the shorter version.  In
6    paragraph 393 the panel describing Professor Coleman's
7    submission states, quote, Professor Lambelet-Coleman's
8    report compared the lifetime best performance of three
9    elite female athletes in the 400-meter event with the
10   performance of male athletes in the same event during a
11   single year, 2017, period.  This showed not only that
12   the elite females would have lost to the best men by a
13   margin of about 12 percent but also that even at their
14   absolute best the elite females would have lost to
15   thousands of other boys and men by a much smaller
16   margin, closed quote.  Do you see that language?
17       A.   I do.
18       Q.   And do you have any reason to doubt the accuracy
19   of that summary of athletic performance statistics?
20       A.   I can't render an expert opinion there.
21       Q.   Do you as you sit here today have any reason to
22   doubt the accuracy of those statistics?
23       A.   Again, I cannot comment as an expert.  I guess
24   that's the bottom line.

## Page 74

1  Q.  If it is true that the most elite female
2  athletes performing at their absolute best would lose to
3  thousands of others boys and men.  It is also true,
4  would you not agree, that the very best female college
5  athletes would lose to even a larger number of
6  collegiate boys and men?
7  A.  If I'm speaking as an expert, then I'm not
8  rendering an opinion there.
9  Q.  How about as a highly educated and intelligent
10  professor?
11  A.  Simply in that context, it would be true that
12  --- that it would least be true at some level in the
13  elite levels of college.
14  Q.  And the very best female high school athletes
15  would lose to an even larger number of high school boys.
16  Correct?
17  A.  So now I can render a little bit of an expert
18  comment, which is that as you move down that line, the
19  degree of difference falls because the degree of
20  testosterone impact on body is evolving across those
21  ages.
22  Q.  If it's true that the world fastest female
23  athletes would lose to thousands of boys and men then it
24  is inevitably true, is it not, Doctor Safer, to say that

## Page 75

1  the very best female high school athletes would lose to
2  even larger numbers of high school boys?
3      ATTORNEY BLOCK:  Objection to form.
4      THE WITNESS:  So the --- it is the coils
5  here.  So it would be larger numbers of cisgender men in
6  general, including people who are older than they are,
7  but I'm not sure where that would be going.
8  BY ATTORNEY BROOKS:
9  Q.  Let me take you back to your expert report,
10  Exhibit 1, and take you to paragraph 48.  Actually, let
11  me have the Declaration, which is Tab 50.
12      ATTORNEY BROOKS:  Let me mark as Safer
13  Exhibit 6 a Declaration of Dr. Safer executed in
14  May 10th, 2021.
15      ---
16  (Whereupon, Exhibit 6, 5/10/21 Declaration
17  of Dr. Safer, was marked for
18  identification.)
19      ---
20  BY ATTORNEY BROOKS:
21  Q.  And I apologize, it's paragraph 50.  Dr. Safer,
22  did you, in fact, prepare and execute this Declaration
23  in the time leading up to May 26, 2021?
24  A.  Yes.

## Page 76

1  Q.  And you state in paragraph 48 that, quote, age,
2  grade competitive sports records show minimal or no
3  difference in athletic performance between
4  non-transgender boys and non-transgender girls before
5  puberty, and you cite Handelsman, the article that we
6  have been looking at.
7  Correct?
8  A.  Yes.
9  Q.  And what research did you do to arrive at the
10  conclusion that age grade competitive sports records
11  show minimal or no difference in athletic performance
12  between non-transgender boys and non-transgender girls?
13  A.  Is the question of original research on my part?
14  Q.  No, what steps did you take to arrive at that
15  conclusion?
16  A.  Reading relevant literature.
17  Q.  You cited only Professor Handelman's 2018
18  article.  Did you read other literature that gave you
19  comfort that is a true statement?
20  A.  I have read other literature, but I would
21  suggest that Doctor Handelsman gave --- Doctor
22  Handelsman's paper is the best summary of the point.
23  Q.  And again, in making this statement, what did
24  you consider to be a minimal difference?

## Page 77

1  A.  When I'm thinking about this as a scientist it
2  is a difference where I'm not sure if it is true or
3  whether it is significant when defining the word
4  minimum.
5  Q.  You just defined minimal by using the work
6  significant.  You force me to ask you what do you mean
7  by significant?
8  A.  Sorry.  So as a scientist --- well, there are
9  two definitions of significant.  So the one is that it
10  is relevant for those --- for decision makers.  And that
11  actually gets outside of my expertise.  And then we do
12  use it as a term of art in science as well.
13  Q.  You meant statistically significant?
14  A.  The second would be statistically significant,
15  that's right.
16  Q.  Dr. Safer, you deleted that sentence from your
17  expert report.
18  Is that correct?
19  A.  I have to look.
20  Q.  I don't mean it to be a trick question.  Let me
21  ask you this.  Do you recall removing that sentence as
22  you revised your Declaration to create your expert
23  report?
24  A.  No.

1    **Q.   All right.**
2    A.   I don't recall.
3    **Q.   We will just move on to the science and not ask**
4    **you deleted the question.  Let me take you to paragraph**
5    **44 of your expert report, Exhibit 1.  And just to be**
6    **sure, you are on the expert report now and not the**
7    **Declaration?  They are so similar that it is easy to get**
8    **confused.**
9    A.   Yes.
10   **Q.   Paragraph 44 you say in the second sentence,**
11   **increased testosterone begins to affect athletic**
12   **performance at the beginning of puberty, but those**
13   **effects continue to increase each year of puberty until**
14   **about 18, with the full impact of puberty resulting from**
15   **the cumulative effect of each year.  Do you see that**
16   **language?**
17   A.   I do.
18   **Q.   And just to clarify, in making this statement**
19   **what do you refer to as, quote, the beginning of**
20   **puberty?  And we're talking about male typical puberty**
21   **in this discussion so as to clarify.  So what do you**
22   **have in mind as the beginning of male puberty?**
23   A.   So the answer is complex.  The typical male
24   puberty is defined as beginning with what we label as

1    Tanner 2.  And in terms of when you would see impact on
2    athletic performance, per se, is not well established.
3    **Q.   And now stretching that in both directions, on**
4    **the one hand Tanner Stage 2, if I'm correct, is**
5    **essentially defined as certain first observable physical**
6    **changes in a boy's body.**
7    **Right?**
8    A.   Tanner 2 is specifically defined as specific
9    observable changes in a person's body, yes.
10   **Q.   And therefore, testosterone levels have begun to**
11   **increase even before the first observable changes that**
12   **result.**
13   **Correct?**
14   A.   The way it's understood in medicine is it is
15   reflective of existing reality.  So it is not
16   necessarily --- you know, only in the absolute.
17   **Q.   Well, as a medical doctor, you would agree with**
18   **me or would you not that testosterone levels must**
19   **increase in the body before observable changes in the**
20   **body caused by testosterone can be --- can come about?**
21   ATTORNEY BLOCK:  Objection to the form.
22   THE WITNESS:  So it must be the case that
23   the testosterone levels would have to rise prior to
24   their having a noticeable effect, that is true.

1    BY ATTORNEY BROOKS:
2    **Q.   Cause has to precede effect?**
3    A.   Cause in this case has to precede effect,
4    exactly.  But I caution that it is not clear that that's
5    something that we could parse out medically in a given
6    person in a reasonable way.  That is I don't know that I
7    could do a blood test and catch it as it were.
8    **Q.   Okay.**
9    **Can you explain to me what you were referring**
10   **to when you mentioned the cumulative effect of pubertal**
11   **changes at the end of that sentence?**
12   A.   Where are we now?
13   **Q.   We are in the second sentence of paragraph 44 of**
14   **Exhibit-1.  And you say at the end with a full impact of**
15   **puberty resulting from the cumulative effect of each**
16   **year, and if you would explain for the Court what you**
17   **meant by cumulative effect that would be helpful.**
18   ATTORNEY BLOCK:  Objection to form.
19   THE WITNESS:  So the testosterone has
20   impact on certain tissues, and then it continues to have
21   impact on tissues.  And I don't know that I have any
22   greater explanation for the right cumulative impact.
23   BY ATTORNEY BROOKS:
24   **Q.   So your point is that by the age of 18 whatever**

1    **advantages in athletic performance a particular male has**
2    **is due to body changes that have happened each year**
3    **since puberty began, not due simply to the testosterone**
4    **level of that individual at age 18?**
5    ATTORNEY BLOCK:  Objection to form.
6    THE WITNESS:  The meaning isn't as --- I
7    guess I would be careful about overstating it, so there
8    can --- there might be some impact earlier and then
9    there might be additional impact over time, but --- and
10   so in the absolute it would be true to say that all of
11   the effect doesn't occur at Tanner 5, which is the
12   defined end.
13   BY ATTORNEY BROOKS:
14   **Q.   Okay.**
15   **The cumulative physiological changes that you**
16   **are referring to here result from a multi-year history**
17   **of male typical levels of testosterone by age 18.**
18   **Correct?**
19   A.   Yes.  Well, even that is --- there's complexity
20   but yes.
21   **Q.   You say --- sorry, we are jumping back and**
22   **forth.**
23   A.   Actually, just continuing a little bit further,
24   it's also about age 18 is not a trivial word.

1    Q.   Understood.  And I simply used that as a
2  representative end marker and for some individuals it
3  would be earlier and for some individuals it would be
4  later.
5        Correct?
6    A.   That's right, even with the college athletes.
7    Q.   You state at the beginning of paragraph 44 that,
8  quote, the concerns that animated the World Athletics
9  and prior IOC policies are even more attenuated for
10  students in the middle of high school where athletes
11  typically range from 11 to 18.
12        Do you see that?
13    A.   I do.  Was this paragraph 44?
14    Q.   It is.  And by attenuated you mean the same in
15  nature but smaller in scale.
16        Correct?
17        ATTORNEY BLOCK:  Objection to form.
18        THE WITNESS:  Yeah, I can't even say that
19  so --- yeah, I can't ---.
20  BY ATTORNEY BROOKS:
21    Q.   Isn't that what attenuated means?
22        ATTORNEY BLOCK:  Objection to form.
23        THE WITNESS:  Attenuated is both in scale
24  and type in this case.

1  BY ATTORNEY BROOKS:
2    Q.   All right.
3        You are not here or anywhere denying that the
4  same type of concern, that is physiological advantages,
5  exist at for instance age 15?
6        ATTORNEY BLOCK:  Objection to form.
7        THE WITNESS:  So sorry, say that again.
8  BY ATTORNEY BROOKS:
9    Q.   You are not in this paragraph or anywhere
10  offering an opinion that the same type of concerns, that
11  is physiologic or in performance advantages, exist to
12  some degree at, for instance, age 15?
13        ATTORNEY BLOCK:  Objection to form.
14        THE WITNESS:  I'm not offering an opinion
15  there, that's right.
16  BY ATTORNEY BROOKS:
17    Q.   And the same is true at age 13?
18        ATTORNEY BLOCK:  Objection to form.
19        THE WITNESS:  I'm not --- so I guess as
20  we --- as you move along to the continuum, then ---.
21  BY ATTORNEY BROOKS:
22    Q.   It gets more attenuated?
23    A.   The opinion --- right, the opinion shifts
24  because it depends on context.

1    Q.   In paragraph 49 of your expert report you write
2  in the third full sentence, quote, West Virginia
3  categorically prevents girls who are transgender from
4  participating on girls teams regardless of whether they
5  are prepubertal, receiving puberty blockers, or
6  receiving gender-affirming hormone therapy, closed
7  quoted.  Do you see that?
8    A.   I do.
9    Q.   What in your opinion is the significance of that
10  statement?  What is your point?
11        ATTORNEY BLOCK:  Objection.  Could you
12  just give him some time to read the context?
13  BY ATTORNEY BROOKS:
14    Q.   Yes.
15    A.   So I guess I maybe make the --- help me with
16  where you're going with that question.  I'm --- the rule
17  as written includes all transgender girls.
18    Q.   Are you --- did you mean to suggest that medical
19  science would dictate that the West Virginia law should
20  make an exception for natal males who have
21  suppressed puberty?
22        ATTORNEY BLOCK:  Object to form.
23        THE WITNESS:  The context for the --- the
24  context of different transgender girls with different

1  degrees of treatment and different stages of puberty are
2  different.  I guess that's as much I would say.  I'm not
3  expressing an opinion about what the --- I'm serving
4  here just as a scientist in terms of what the --- what
5  the --- what we know about athleticism.
6  BY ATTORNEY BROOKS:
7    Q.   You are not offering an opinion that either
8  science or reasonableness requires that West Virginia's
9  laws make an exception for natal males who have
10  suppressed puberty?
11        ATTORNEY BLOCK:  Objection to form.
12        THE WITNESS:  I'm not offering an opinion
13  that that would be --- that would be a logical law for
14  transgender girls in that circumstance.
15  BY ATTORNEY BROOKS:
16    Q.   And in the article that we began today looking
17  at you expressed concern about policies that would
18  create incentives for children to begin puberty
19  blockers, would you not?
20        ATTORNEY BLOCK:  Objection to form.
21        THE WITNESS:  So earlier in my --- I
22  reference that as a concern.  I want to be clear that as
23  an expert I'm not suggesting that --- I'm not suggesting
24  an expert opinion that these needs to be concerns.  I'm

| | |
|---|---|
| **Page 86** | **Page 88** |

**Page 86**

1    raising the issues that we are considering.
2    BY ATTORNEY BROOKS:
3        Q.   Well, what you wrote to educate your colleagues
4    as an endocrinologist, you, Professor Safer, raise that
5    as a concern?
6            ATTORNEY BLOCK: Objection to form.
7            THE WITNESS: To be clear, I raised it as
8    a concern of the community. I did not take an opinion
9    in that article that it was a concern that I was
10   offering as an expert.
11   BY ATTORNEY BROOKS:
12       Q.   Well, let me ask you as a medical doctor sitting
13   here today, an endocrinologist, it would cause you
14   concern, would it not, that policies are adopted that
15   created incentives for children to start puberty
16   blockers when they might otherwise not choose to do so?
17           ATTORNEY BLOCK: Objection to form and to
18   scope.
19           THE WITNESS: It's too broad of a
20   question as you're asking it because there is certainly
21   --- in medicine it is certainly the case that we fear
22   coercing people to certain treatments and certain
23   circumstances but they are certainly alternate examples
24   where we very much coerce people to have certain medical

**Page 87**

1    interventions. And so as an expert I have no opinion,
2    as we said already. And simply as somebody trying to be
3    logical and thoughtful I can come up with examples in
4    both certain circumstances.
5    BY ATTORNEY BROOKS:
6        Q.   I'm going to ask you to take Exhibit-6 --- no,
7    Exhibit 4, the Handelsman article if you would.
8        A.   Yes.
9            ATTORNEY TRYON: Roger, would you speak
10   up a little more, please? And Josh, when you shuffle
11   your papers, it really garbles the testimony. If you'd
12   be a little more careful about that, I'd appreciate it.
13           ATTORNEY BLOCK: Sorry.
14           ATTORNEY BROOKS: It's a crowded table
15   and we have papers bumping up against the mic. So just
16   call out if we do that wrong.
17   BY ATTORNEY BROOKS:
18       Q.   So Dr. Safer, you pointed to the Handelsman
19   article as the best source on the proposition --- on the
20   question to what extent if any natal male has
21   physiological or I should say athletic performance
22   advantages over natal females before puberty.
23       Correct?
24           ATTORNEY BLOCK: Objection to

**Page 88**

1    terminology?
2            THE WITNESS: And if I said the word best
3    maybe that's not the best way of saying it, but it's a
4    very clean, well-written summary of the circumstance.
5    BY ATTORNEY BROOKS:
6        Q.   At any rate, it's the one that you chose to
7    cite?
8        A.   And it is the one that I chose to cite.
9        Q.   I'm going to give you a three by five card to
10   help read a chart that doesn't have grid lines on it so
11   you have a straight edge. And I want to take you in
12   Handelsman's 2018 article, Exhibit 4, to page 813 and
13   figure one. And you've familiar with this figure and
14   these curves, are you not?
15       A.   I am, yes.
16       Q.   When you studied this article carefully this is
17   part of what you studied.
18       Right?
19       A.   It is.
20       Q.   And these charts show percentage performance
21   advantage of males over females and just to simplify
22   terminology I believe there's nothing in here about
23   dealing with transgender individuals in these charts.
24   So with your permission I'll simply use male and female

**Page 89**

1    to be the dare I say simple biological designations as
2    we had previous discussions. Is that acceptable?
3        A.   I think so.
4        Q.   If it's something that comes up ---.
5        A.   I will mention it, yes.
6        Q.   I don't think it will in this discussion. First
7    of all, would you agree with me that, generally
8    speaking, junior high contemplates grades 7 through 9
9    and commonly ages in the range of 12 to 15?
10           ATTORNEY BLOCK: Objection to form.
11           THE WITNESS: Junior high is grades 7
12   through 9. It used to be. Now there is Middle School.
13   BY ATTORNEY BROOKS:
14       Q.   I know?
15       A.   Exactly.
16       Q.   Let's just work with you and I are of general
17   age. So Junior High is 7 to 9?
18       A.   Okay.
19       Q.   And in your general understanding, this is
20   layman's stuff, not expert stuff, that is ages 12 to
21   15-ish?
22       A.   Let's see, seven --- let me think about this.
23   Right, 15 at about the max, right, because there is
24   about 14.

| | Page 90 |
|---|---|

1    Q.   And high school is 14, 15 through age 18-ish.
2    Some people graduate at age 17?
3    A.   Yes.  As a non-expert I would believe, yes.
4    Q.   All right.
5         And this chart charts the percentage advantage
6    enjoyed --- on average enjoyed by males over females in
7    three different events at over --- on a year by year
8    basis from ages 10 up to 19.
9         Am I describing it correctly?
10        ATTORNEY BLOCK:  Objection to form.  Just
11   for the record, it's percentage differences, not
12   percentage advantages.
13   BY ATTORNEY BROOKS:
14   Q.   Correct, it says --- it says gender difference
15   percentage to read the Y axis.
16   A.   Clear, yes.
17   Q.   Okay.
18        So let's look at running and you have your
19   straight edge if it is helpful to you.  At age 12, what,
20   according to Dr. Handelsman, is the gender difference in
21   running performance?
22   A.   So in this paper there is a range.  But just to
23   help you get to your point faster I guess we can --- it
24   is about five percent of tab over.

| | Page 91 |
|---|---|

1    Q.   And for reasons best known to Professor
2    Handelsman, his arrow bars extend only upwards, correct,
3    in this chart?
4    A.   Right.  I will have to attribute that to
5    cleanliness of the figure.
6    Q.   Or if he has chosen to fit his curve to the
7    bottom end of this error range possibly?
8         ATTORNEY BLOCK:  Objection to form.
9         THE WITNESS:  Yeah, I can't comment
10   there, but that wouldn't be usual.
11   BY ATTORNEY BROOKS:
12   Q.   That would not be usual, I agree.  And what
13   advantage --- what gender difference between male and
14   female does Professor Handelsman report at age ten
15   approximately?
16   A.   At age ten in the particular figure that we are
17   referencing it is --- the average is --- well, actually,
18   so here it ranges from about two percent because that is
19   probably how the air bars are meant to be up to just a
20   little north to three percent.
21   Q.   And going back to age 12, do you consider a five
22   percent difference between male and female performance
23   to be minimal?
24        ATTORNEY BLOCK:  Objection to form.

| | Page 92 |
|---|---|

1         THE WITNESS:  So the problem here with
2    going right to this figure is it's including a range of
3    inputs, and so this is --- so these are what are called
4    cross-sectional studies, and so the --- if your question
5    is just in the narrow point of this five percent
6    minimal, well, even then I don't know that I can
7    comment because it depends on how broad the variation is
8    among the group.
9    BY ATTORNEY BROOKS:
10   Q.   And what gender difference did Dr. Handelsman
11   report in running at age 15?
12   A.   At age 15, a range that is hovering about 9 to
13   10 percent.
14   Q.   And by age 15, according to his sample, the
15   gender difference is approached --- begins to level off.
16   In other words, it has --- most of the gender difference
17   has been achieved at age 15.
18        Correct?
19        ATTORNEY BLOCK:  Objection to form.
20        THE WITNESS:  Among this data in this
21   study set, yes, I will agree with you it does level off.
22   BY ATTORNEY BROOKS:
23   Q.   So let me ask you this.  Do you have an
24   understanding of the physiological basis of what you

| | Page 93 |
|---|---|

1    described as a two to three percent male advantage at
2    age ten in running?
3         ATTORNEY BLOCK:  Objection to form.
4    BY ATTORNEY BROOKS:
5    Q.   If any?
6    A.   So speaking as an expert, there's no --- there
7    is no physiological --- there is no expectation of a
8    physiological explanation.  And there is awareness of
9    other confounders in terms of experience, exposure to
10   sport and things like that.
11   Q.   Let me ask you to look at jumping, at age ten.
12   And this is --- at age ten what performance of gender
13   difference advantage did Dr. Handelsman report for boys
14   in jumping?
15   A.   So at age ten it would go on --- so at age ten
16   then the range ---.
17   Q.   This by the way tells us that he cannot be
18   inclined in arrow bar --- a symmetrical arrow bar below.
19   Correct?
20        ATTORNEY BLOCK:  Objection to form.
21        THE WITNESS:  So he can't.  In fact, the
22   range that he's showing there goes from an advantage for
23   girls --- that is it goes below to an advantage --- for
24   boys.  The range is included and it just --- for both

| Page 94 |
| --- |

1  sexes.
2  BY ATTORNEY BROOKS:
3    **Q.   So what is the average advantage that he reports**
4  **at age ten for boys?**
5    A.   So in this dataset the average is about a six
6  percent average for boys, but it is important to
7  understand the data.  And the data that --- the point
8  being that if we were to repeat the study you would
9  anticipate that that average would fall across those
10  entire --- the entire range shown so that in a different
11  day it might show a bigger advantage for boys, but a
12  different day it might also show an advantage for girls
13  about higher.
14    **Q.   Are you aware of any dataset that shows a**
15  **smaller advantage in jumping for girls at age ten?**
16    A.   Off the top of my head I cannot guide --- lead
17  you to a dataset.
18    **Q.   At age 12 what advantage in jumping --- well,**
19  **let me start over.  At age 12 what advantage in jumping**
20  **does Dr. Handelsman report for boys?**
21    A.   So in this dataset at age 12 he shows the
22  advantage --- the average advantage to be of the less
23  than the average advantage for age ten, but this exactly
24  points to the caution that I was referencing, which is

| Page 95 |
| --- |

1  that the range of possibilities that you might
2  anticipate based on this particular dataset at age 12
3  has a range of four to six percent advantage for boys.
4    **Q.   The arrow bar has tightened up a lot?**
5    A.   The arrow bar in that age range is tighter.
6    **Q.   And do you consider a six percent advantage to**
7  **be minimal?**
8    ATTORNEY BLOCK:  Objection to form.
9    THE WITNESS:  As an expert I can't answer
10  that because it depends on context on the heterogeneity
11  of all these events.
12  BY ATTORNEY BROOKS:
13    **Q.   And at age 15 what average advantage in jumping**
14  **did Dr. Handelsman report for boys?**
15    A.   For age 15 he has a range or the average sits at
16  15 percent and the range runs from about 14 percent to
17  maybe 17 percent.
18    **Q.   Is there any context in your opinion, any**
19  **athletic endeavor that involves jumping in which a 15**
20  **percent advantage is in your view minimal?**
21    ATTORNEY BLOCK:  Objection to form.
22    THE WITNESS:  Yes, I think as an expert I
23  can't answer that.  If you're thinking at the scholastic
24  level where there is a wide range of --- where there's a

| Page 96 |
| --- |

1  quite wide range of heterogeneity in development, body
2  type, et cetera, I certainly could envision a situation,
3  yes.
4  BY ATTORNEY BROOKS:
5    **Q.   Dr. Safer, in your Declaration filed in May you**
6  **stated that before puberty athletic advantage by boys**
7  **was minimal.  Do you recall that language?**
8    A.   The way I would say it is the difference between
9  boys and girls before puberty is minimal or
10  non-existent.  I don't know if I could be wiser than
11  that.
12    **Q.   All right.  But now you are telling me when I**
13  **asked you questions about minimal that you as an expert**
14  **are not able to define minimal.  How do you reconcile**
15  **those two?**
16    ATTORNEY BLOCK:  Objection to form.
17    THE WITNESS:  So the definition of
18  minimal is in context.  And so as we discussed it was
19  not a significant difference using both those
20  definitions that we already used were no different at
21  all.
22  BY ATTORNEY BROOKS:
23    **Q.   Your statement in your Declaration simply**
24  **asserted categorically in almost no context that the**

| Page 97 |
| --- |

1  **difference in athletic capability of boys to girls were**
2  **both minimal.  My question for you is using whatever**
3  **definition you had in mind when you wrote that do you**
4  **consider a --- I will look at jumping, a five percent**
5  **difference in capability to be minimum?**
6    ATTORNEY BLOCK:  Objection to form and
7  characterization of the report.
8    THE WITNESS:  So it's a context.  So in
9  the report the reference is to prepubertal children.
10  And there it is easier to be more categorical.  Where
11  now we're moving into an area where there is --- where
12  things are more complex and so it is a harder context to
13  make that statement.
14  BY ATTORNEY BROOKS:
15    **Q.   That is a sample of ten-year old boys includes**
16  **some who are no longer prepubertal.**
17    **Correct?**
18    A.   No.  I'm saying it more the other way, which is
19  a sample of ten-year-old boys would overwhelmingly be
20  prepubertal but a sample of 15-year-old boys would have
21  more of a range and have more heterogeneity.  And
22  there's more to it even than that, which is the
23  definition of minimal also includes the context of the
24  entire population who participated in the sport.

Page 98

1    Q.   So focusing on ten-year-old boys and jumping you
2    said at age ten the large majority of boys are,
3    according to your definition, prepubertal.  Referring
4    back to Declaration and the meaning that you ascribed to
5    the word minimal there, in your view, is a six-percent
6    difference in capability minimal or not minimal?
7              ATTORNEY BLOCK:  Objection to form and to
8    talking about his Declaration without it being in front
9    of him.
10             ATTORNEY BROOKS:  He has it in front of
11   him and we already looked at the language.
12   BY ATTORNEY BROOKS:
13   Q.   You may answer.
14   A.   So the graph that we are looking at includes
15   arrow bars that include the possibility that boys would
16   have --- that the girls would have a superior outcome,
17   and so the answer then becomes, yes.  Where the data are
18   either small or are suspect or not significant, then all
19   of that collectively certainly is --- would be included
20   as minimal to non-existent.
21             ATTORNEY BROOKS:  Let me mark as Exhibit
22   Safer 7 a paper by Emma Colton and Tommy Lundsburg
23   entitled Transgender Women in a Female Category of
24   Sport, from 2021, previously marked as Exhibit 13 at Dr.

Page 99

1    Adkins's deposition.
2              ---
3              (Whereupon, Exhibit 7, Transgender Women In
4              a Female Category of Sport, was marked for
5              identification.)
6              ---
7    BY ATTORNEY BROOKS:
8    Q.   And first, Professor Safer, let me ask whether
9    you're familiar with this paper published last year?
10   A.   I am familiar.
11   Q.   And have you interacted professionally with
12   either Dr. Colton or --- and I don't know his degree,
13   Mr. Lundsburg in any context?
14   A.   Here I don't remember.
15   Q.   Okay.
16        Do you believe that you became aware of this
17   paper soon after it was published?
18   A.   I don't know if I can answer that cleanly
19   either, but I certainly have became aware of it
20   somewhere between then and now.
21   Q.   And have you read it with some care?
22   A.   I have read it with some care, yes.
23   Q.   Let me ask you --- well, let me ask you this
24   first.  Would you describe this paper as reporting

Page 100

1    original research or as more of a literature review
2    paper?
3    A.   I don't recall them reporting on their original
4    research, but I would have to look.  It's mostly a
5    review paper.
6    Q.   That is also my impression.  I just didn't want
7    to create a different impression.  Let me ask you to
8    turn to page 201, and there in the first column
9    beginning six lines down there is a sentence that begins
10   an extensive review.  Let me ask you to find that.
11   A.   I have it.
12   Q.   And that --- I'll read it into the record.
13   Quote, an extensive review of fitness data from over
14   85,000 Australian children age 9 to 17 years old showed
15   that compared with nine-year-old females, nine-year-old
16   males were faster over short sprints, 9.8 percent, and
17   one mile, 16.6 percent, could jump 9.5 percent farther
18   from a standing start, which tested explosive power,
19   could complete 33 more push-ups in 30 seconds and have
20   13.8 percent stronger grip.  Male advantage of a similar
21   magnitude was detected in a group study of children
22   where compared to a six-year old females six-year old
23   males competed 16.6 percent more shuttle runs in a given
24   time and could jump 9.7 percent further from a standing

Page 101

1    position.  Do you see that language?
2    A.   I do.
3    Q.   And on the Australian study, if you follow the
4    footnote you will see that it references a study by
5    Kaitlin Thompkinson.  That's footnote 22.  And my first
6    question is have you read the reference study by Kaitlin
7    Thompkinson?
8    A.   I don't recall.  I'm guessing yes.
9    Q.   All right.  All right.
10        Do you have any reason to doubt the accuracy of
11   this summary of the findings of Kaitlin Thompkinson
12   based on data from over 85,000 Australian children?
13             ATTORNEY BLOCK:  Objection to form.
14             THE WITNESS:  I think the important thing
15   to recognize when you look at these sorts of data are
16   recognizing the multiple inputs.  So the larger these
17   groups --- these cross-sectional studies get the more
18   confounded they get by access and other social
19   explanations why there are boys participating in sports
20   to a greater degree.
21   BY ATTORNEY BROOKS:
22   Q.   So putting aside causation, which might be
23   physiological and might be cultural, as you said there
24   could be various causes, do you have any reason to doubt

26  (Pages 98 to 101)

Page 102

1    the accuracy of the findings of performance advantage
2    summarized here in the passage that I've just read?
3              ATTORNEY BLOCK:  Objection to form and
4    terminology.
5              THE WITNESS:  Putting aside causation, I
6    have no --- I can't offer an expert opinion I guess if
7    that's the bottom line.  But if you're asking me just as
8    an individual, I'm not expecting that they're
9    fabricating that data.  I am not expecting that.
10   BY ATTORNEY BROOKS:
11       Q.   And you agree that advantages on a scale of 9
12   percent, 16 percent could provide a significant
13   advantage in athletic competition, do you not?
14             ATTORNEY BLOCK:  Objection to
15   terminology.
16             THE WITNESS:  So say that question again.
17   BY ATTORNEY BROOKS:
18       Q.   You agree that advantages on the scale of
19   9.8 percent or 16.6 percent would provide a large
20   advantage in athletic competition, do you not?
21             ATTORNEY BLOCK:  Same objection to
22   terminology.
23             THE WITNESS:  In elite athletic
24   competition, yes.

Page 103

1    BY ATTORNEY BROOKS:
2        Q.   Did you play any sport in high school?
3        A.   At a sophisticated level I did not.
4        Q.   Your general knowledge permits you to say, does
5    it not, that at the high school level also a 9.8 percent
6    or a 16.6 percent advantage is a very large advantage?
7              ATTORNEY BLOCK:  Objection to form and
8    terminology?
9              THE WITNESS:  So there it gets more
10   diffuse, therefore, and I can't answer as an expert.
11   BY ATTORNEY BROOKS:
12       Q.   Can you answer as an informed adult citizen?
13             ATTORNEY BLOCK:  Same objection.
14             THE WITNESS:  So as an expert for sure
15   not.  As an informed adult, it falls back to the same
16   situation.  When there is a wide range of athletes in a
17   certain context, then it is going to seem less relevant.
18   And obviously with the example I gave before with an
19   elite circumstance where that --- it describes the
20   entire field is more significant.
21   BY ATTORNEY BROOKS:
22       Q.   Let me ask you to find your rebuttal report.
23       A.   And actually --- do others need a break?
24       Q.   Any time --- your concentration is most

Page 104

1    important.  So if you need a break, we'll take a break.
2        A.   So I'm good.
3              ATTORNEY BROOKS:  Well, obviously, if
4    anybody wants a break, we can take a break.
5              ATTORNEY BLOCK:  Do you need a break?
6              ATTORNEY SWAMINATHAN:  No.
7              ATTORNEY BLOCK:  We are good.
8              THE WITNESS:  So my rebuttal.
9    BY ATTORNEY BROOKS:
10       Q.   Your rebuttal, which is Exhibit 2, so it's
11   probably at the bottom.  And in that I'm going to draw
12   your attention to paragraph 11.  And there you wrote
13   there is also no basis to confidently predict the
14   patterns about the athletic performance of prepubertal
15   cisgender boys will be the same for prepubertal
16   transgender girls, closed quote.  Do you see that?
17       A.   I do.
18       Q.   And let me attempt to see if I understand the
19   point of this paragraph.  And indeed, if you would like
20   to read the whole paragraph you should.  But my
21   understanding of the point is that you're saying that
22   even if prepubertal boys have some performance, some
23   statistically significant performance advantage over
24   prepubertal girls, that you are not confident that the

Page 105

1    athletic performance capabilities of natal males who
2    identify as females before puberty will be the same as
3    those of natal males who identified as male before
4    puberty?
5              ATTORNEY BLOCK:  Objection to the
6    terminology.
7              THE WITNESS:  So to the extent --- so
8    were differences to be determined between cisgender boys
9    and cisgender girls, it is correct to say that that
10   won't conclusively demonstrate that the same applies for
11   transgender girls.  That's right.
12   BY ATTORNEY BROOKS:
13       Q.   Now, elsewhere in your writings you have said
14   that it is well known that the majority of prepubertal
15   children who experience gender dysphoria do not persist
16   in that dysphoria into pubertal adolescence.
17       Correct?
18             ATTORNEY BLOCK:  Objection.
19             THE WITNESS:  No.
20   BY ATTORNEY BROOKS:
21       Q.   Not correct?
22       A.   Not correct.
23       Q.   Then we will come back to that.  In this
24   paragraph 11, you speculate a little farther down that,

**Page 106**

1  quote, the experience of transgender girls might be more
2  similar to the experience of cisgender girls?
3       ATTORNEY BLOCK:  Objection to the
4  characterization and speculative.
5  BY ATTORNEY BROOKS:
6    Q.   Well, by using the word might you meant to
7  indicate, did you not, Dr. Safer, this is a hypothesis,
8  this is not a documented fact?
9    A.   That if the question is do I know that the
10 experience of transgender girls is definitely in this
11 circumstance the same as cisgender girls, that's right,
12 I don't know that.  It only might be true.
13   Q.   And towards the end, in the last line, you refer
14 to potential biological underpinnings of gender
15 identity.  Again, the word potential signaling that no
16 such specific underpinnings have yet been identified.
17       Correct?
18   A.   Say that question again.
19   Q.   In the last line, your reference to, quote,
20 potential biological underpinnings of gender identify,
21 by the word potential you are indicating that no
22 specific biological underpinning has yet been
23 identified.
24       Correct?

**Page 107**

1       ATTORNEY BLOCK:  Objection to form.
2       THE WITNESS:  So it's --- so no,
3  potential in this context does reference that most of
4  this biology is unknown, so that part is true, but it
5  doesn't mean that there is nothing known.
6  BY ATTORNEY BROOKS:
7    Q.   You do not propose to offer any opinion that
8  natal males --- let me strike that and start again.
9       You do not propose to offer any opinion, do
10 you, that prior to puberty natal males who identify as
11 female are less athletic capable on average than natal
12 males who identify as male?
13       ATTORNEY BLOCK:  Objection to form.
14       THE WITNESS:  I'm not offering an opinion
15 with regard to cisgender --- excuse me --- cisgender
16 boys versus transgender girls and their athleticism when
17 they are prepubertal.  If that's what you are asking,
18 then yes, I'm not offering an opinion between those two
19 groups.  I'm simply raising the possibility that
20 something like biology associated with transgender could
21 have influence into it.
22 BY ATTORNEY BROOKS:
23   Q.   Let me ask you to turn to paragraph 22 of your
24 rebuttal report.  And there you write Doctor Brown also

**Page 108**

1  refers to widely publicized anecdotes about isolated
2  cases of transgender girls and women state championships
3  in high school sports or NCAA championships in college.
4  Do you see that?
5    A.   I do.
6    Q.   And you go on to write but transgender athletes
7  of women have been competing in NCAA and secondary
8  school athletics for many years at this point, closed
9  quote.  Do you see that language?
10   A.   I do.
11   Q.   Let me ask you to name all instances of male
12 males known to you who have competed in women's division
13 varsity athletics in any athletic endeavor for any NCAA
14 member school?
15       ATTORNEY BLOCK:  Objection to form and
16 scope.
17       THE WITNESS:  Right, so I certainly can't
18 do that usefully off the top of my head, name
19 transgender women and all these context in such an
20 exhaustive way like that.
21 BY ATTORNEY BROOKS:
22   Q.   Well, I asked you accused Doctor Brown of citing
23 isolated cases.  Do you have any basis to assert that he
24 has done anything other than cite all cases in which

**Page 109**

1  natal males have competed in NCAA athletics in the
2  female category?
3    A.   So the --- if our focus is on the word isolated
4  then per se they are all --- these are all isolated
5  cases.  These aren't systematic analyses of any cohort
6  of people.
7    Q.   You are not accusing Doctor Brown of picking and
8  choosing?
9        ATTORNEY BLOCK:  Objection to form.
10       THE WITNESS:  So let me think about that.
11 By simply choosing individual cases that are in the
12 press then it is by its nature picking and choosing.
13 BY ATTORNEY BROOKS:
14   Q.   What do you mean by that?
15   A.   Well, these are simply individual cases that
16 have --- that have come to public attention, and so I
17 --- so --- and that's the basis of my statement as
18 opposed to some exhaustive attempt to identify
19 transgender people in a systematic fashion.
20   Q.   As you sit here today, Dr. Safer, are you aware
21 of a single case not mentioned by Doctor Brown in his
22 report of a natal male who has competed in NCAA
23 athletics in the women's category?
24       ATTORNEY BLOCK:  Objection to form.

28  (Pages 106 to 109)

Page 110

1       THE WITNESS:  Can I name somebody off the
2  top of my head?  I cannot.
3  BY ATTORNEY BROOKS:
4       Q.   Do you have any concrete --- leaving aside
5  whether you remember a precise name, do you have any
6  factual basis to know that Doctor Brown has omitted any
7  case of a natal male who has competed in the female
8  division of NCAA athletics?
9       ATTORNEY BLOCK:  Objection to form.
10      THE WITNESS:  So I guess if the question
11  is what can I do off the top of my head, then I cannot.
12  BY ATTORNEY BROOKS:
13      Q.   Off the top of your head, you recall the case of
14  June Eastwood, do you not?
15      A.   You have to remind me what that is.
16      Q.   A runner in Montana?
17      A.   I actually would need to be reminded of those
18  details.
19      Q.   All right.  Certainly you recall Lia Thomas
20  because none of us can mis Lia Thomas these days?
21      A.   Lia Thomas is still in the news.
22      Q.   Do you recall the case of CeCe Telfer?
23      A.   Names are not my strength.
24      Q.   All right.  No more on that.

Page 111

1       You say at the end of this paragraph, quote,
2  the occasional championship that has been widely
3  publicized do not come close to constituting the rates
4  one would expect if they, that is transgender athletes,
5  wanted rates that are proportional to their overall
6  percentage of the population, which is approximately one
7  percent.  Do you see that language?
8       A.   I do.
9       Q.   Do you have any knowledge as to what --- first
10  of all, let me ask, what is your basis for believing
11  that the current student population in college and high
12  school level is approximately one percent transgender?
13      A.   The statistic for the percentage of the
14  population who are transgender comes from surveys.
15      Q.   And do you have any knowledge at all as to what
16  percentage of varsity athletes in America today at the
17  NCAA --- among NCAA member schools in the women's
18  division are transgender?
19      A.   If the question is that a survey in that
20  population, I'm not aware of a survey that's been done.
21      Q.   So you don't know whether the number of
22  victories of championships that have been taken in the
23  women's division by transgender competitors is higher or
24  lower than the percentage of athletes in those divisions

Page 112

1  who are transgender?
2       ATTORNEY BLOCK:  Objection to form.
3       THE WITNESS:  That is correct.  I do not
4  know the percentage that --- what we know is the
5  percentage of transgender people and then we know the
6  percentage of identified athletes winning competitions.
7  And even then we don't know that absolutely.  We only
8  know the ones that are publicized.  But, right, in the
9  in between, we don't have statistics.  That's right.
10      ATTORNEY BROOKS:  Counsel, I'm going to
11  suggest --- in my experience, if we break for lunch at
12  noon, it makes it a little long afternoon.  So I would
13  suggest that we take a short break now and then keep
14  going until like 12:45 or something.  It's seven hours
15  on the clock and I'm here just to tell you that the
16  afternoon gets long.  So unless you are starving I'd
17  recommend ---?
18      THE WITNESS:  No, I think that's a great
19  idea.
20      ATTORNEY BROOKS:  Take a short break now.
21      THE WITNESS:  So you don't know who is on
22  the phone so give them a break.
23      ATTORNEY BROOKS:  Let's go off the
24  record.

Page 113

1       VIDEOGRAPHER:  Going off the record.  The
2  current time reads 12:01:00 p.m. Eastern Standard Time.
3  OFF VIDEOTAPE
4       ---
5  (WHEREUPON, A SHORT BREAK WAS TAKEN.)
6       ---
7  ON VIDEOTAPE
8       VIDEOGRAPHER:  Back on the record.
9  Current time reads 12:14 p.m. Eastern Standard Time.
10      ATTORNEY BROOKS:  Let me mark as Safer
11  Exhibit 8 the Endocrine --- Treatment of Gender
12  Dysphoric Gender Incongruent Persons, an Endocrine
13  Society Clinical Practice Guidelines from 2017
14  previously marked as Adkins Exhibit 4.
15      ATTORNEY WILKINSON:  Tab 5.
16      ---
17  (Whereupon, Exhibit 8, Endocrine Society
18  Guidelines, was marked for identification.)
19      ---
20  BY ATTORNEY BROOKS:
21      Q.   And Doctor Safer, am I correct you served the
22  committee that created this revised version of the
23  Endocrine Society's Guidelines?
24      A.   Yes.

Page 114

1    Q.    And is it reasonable for me to assume therefore
2   that you are familiar with it in some detail?
3    A.    I am familiar with it in some detail.
4    Q.    They also pertain to your practice?
5        Am I correct.
6    A.    And they do pertain to my practice, yes.
7    Q.    Let me ask you to turn in Exhibit-5 to Page 3879
8   --- Exhibit 8, 3879.  And there I will call your
9   attention to the specific recommendation that's numbered
10  1.4.  And it says there we recommend against puberty
11  blocking and gender-affirming hormone treatment in
12  prepubertal children with GD/gender incongruence.
13       Do you see that?
14   A.    I do.
15   Q.    And then there is a section headed evidence,
16  right?
17   A.    Yes.
18   Q.    And the first statement in the sentence that is
19  --- in the section headed evidence is, quote, in most
20  children diagnosed with GD/gender incongruence it did
21  not persist into adolescence, closed quote.
22       Do you see that?
23   A.    I do.
24   Q.    Do you believe that to be a false statement?

Page 115

1    A.    I wouldn't --- I guess it depends on context
2   here too.  So as of when this was written, the
3   literature being referenced had a broader diagnosis for
4   gender dysphoria and gender incongruence or really
5   gender dysphoria is the label that was being used and
6   still is.  Gender incongruence is where we are headed.
7   And so with that broader definition, that included
8   gender expansive children who were not necessarily
9   transgender.
10   Q.    The statement is I think fairly specific.  And
11  as you are aware, the discussion cites various
12  references, but the introductory sentence states in most
13  children diagnosed with GD a gender dysphoria or gender
14  incongruence did not persist into adolescence.  Do you
15  believe to be a true statement or false statement?
16       ATTORNEY BLOCK:  Objection to form.
17       THE WITNESS:  The problem is I can't
18  answer that quite that cleanly.  The statement
19  references a circumstance that I just referenced where
20  children receiving that label have to --- for the most
21  part were not transgender.  The only caution I want to
22  make is that as we grow more refined in our
23  understanding of gender identity and also in our
24  labeling, that we are more specific in identifying

Page 116

1   transgender kids with these sorts of labels.
2   BY ATTORNEY BROOKS:
3    Q.    Well, recommendation 1.4 says we recommend
4   against puberty blocking and a gender hormone treatment
5   in prepubertal children with gender dysphoria or gender
6   incongruence.  Do you have an understanding of why these
7   Endocrine Society guidelines of which you're a co-author
8   recommended against puberty blocking in prepubertal
9   children?
10   A.    Yes.
11   Q.    Why?
12   A.    They have no impact.
13   Q.    Can you point me to anywhere in the evidence
14  discussion that suggests that is the reason for this
15  recommendation?
16   A.    I don't know.  Let me look.
17   Q.    The evidence discussion is just two paragraphs.
18       ATTORNEY BLOCK:  I just want to object to
19  the extent you're limiting his review to the evidence
20  section.
21  BY ATTORNEY BROOKS:
22   Q.    My question pertains to the evidence section.
23   A.    So those two paragraphs are both primarily
24  referencing 1.3 and not 1.4.

Page 117

1    Q.    Well, let me ask you to turn to page 3881.  And
2   at the top of that first column on 3881 it reads we,
3   therefore, advise starting suppression in early puberty
4   to prevent irreversible development of undesirable
5   secondary sex characteristics.  However, comma,
6   adolescents with gender dysphoria, slash, gender
7   incongruence should experience the first changes of
8   their endogenous puberty because their emotional
9   reaction to these first physical changes has diagnostic
10  value in establishing the persistence of gender
11  dysphoria/gender incongruence.
12       Do you see that language?
13   A.    I do.
14   Q.    And as a scientist and practitioner do you agree
15  with that statement?
16   A.    I would say that the validity of that statement
17  is in evolution.
18   Q.    In your practice, over time --- well, let me ask
19  you this.  When this was drafted did you raise an
20  objection to the proposition that the child's emotional
21  reaction to the first physical changes of puberty had
22  important diagnostic value?
23   A.    I cannot recall our specific conversations, but
24  if you're asking if my view has shifted since let's say

1  2015, 2016, 2017, no, the recognition that there is an
2  evolution was already part of my opinion.
3      Q.   What do you mean the recognition that there is
4  an evolution about?
5      A.   So the evolution is that whether there is a need
6  to start puberty as a diagnostic --- as a necessary
7  diagnostic circumstance.
8      Q.   In your practice today do you prescribe puberty
9  blockers prior to Tanner Stage 2?
10     A.   I --- so two things.  My practice is with
11 adults.  And although I will see older kids because I
12 don't have a hard threshold of age 18, but I don't
13 prescribe puberty blockers because I don't --- my
14 practice does not include those age children.  But two,
15 it is still the guidance and so the pediatricians who
16 are part of my program do not prescribe puberty blockers
17 prior to Tanner 2 for the reason I stated initially.
18     Q.   And according to these guidelines, by the time
19 you reach Tanner Stage 2 there have been sufficient
20 first pubertal --- stages of pubertal development to
21 give a chance to observe the child's reaction to
22 pubertal changes for diagnostic purposes.
23     Correct?
24         ATTORNEY BLOCK:  Objection to form.

1          THE WITNESS:  So the --- so I guess there
2  are kind of two pieces.  The sentence is --- that
3  sentence is written, but that is the sentence that I'm
4  suggesting is an opinion that is in evolution, like I'm
5  saying, to whether that need really exists or not.  The
6  reason why we still don't prescribe puberty blockers
7  before Tanner 2 is that there is no point, there is no
8  preventive element to puberty blockers and so there is
9  no point to give them before puberty begins and there is
10 no way to know that until there is an observable
11 objective finding.
12     Q.   Has your own practice ever involved to a
13 significant extent treating prepubertal or early
14 pubertal stage children for gender dysphoria or gender
15 incongruence incongruence?
16     A.   Have I personally cared for prepubertal children
17 who are transgender or otherwise?  Actually, in the
18 subjects, no.
19     Q.   And do physicians who do treat prepubertal
20 children report to you in connection with your position
21 at the clinic or the Mount Sinai Medical Hospital?
22     A.   Yes.
23     Q.   And do you know whether your clinic makes use of
24 children's emotional reactions to the first physical

1  changes of puberty as part of their process of
2  determining whether transgender hormonal therapies of
3  any sort are appropriate for that child?
4      A.   Yeah, I can't give you give you an answer.  I
5  would actually have to go survey my psychologists.
6      Q.   Let me direct you to paragraph 17 of your
7  rebuttal report.  And there you say in the second
8  sentence under current standards of care transgender
9  adolescents are eligible to receive puberty blockers
10 when they reach Tanner 2, not Tanner 3, which is early
11 enough to prevent endogenous puberty from taking place,
12 closed quote.
13     Do you see that?
14     A.   I do.
15     Q.   Now, just for context, you testified previously
16 that the large majority of minors I'll say who present
17 with gender incongruence or gender dysphoria are, in
18 fact, considerably older and have gone through at least
19 most of the Tanner stages.
20     Correct?
21         ATTORNEY BLOCK:  Objection to
22 characterization.
23         THE WITNESS:  Most of the people we are
24 seeing in clinical practice are coming to us at later

1  stages of development, yes.
2  BY ATTORNEY BROOKS:
3      Q.   And so when we talk about prepubertal children,
4  we're talking about a small minority of the patients
5  coming in to ---?
6      A.   I can't define small, but it is the minority,
7  that's correct.
8      Q.   And do you believe that what your clinic is
9  seeing in that regard is typical of what's being seen
10 across the country these days?
11     A.   So if I'm sitting here as an expert, I don't
12 have an expert survey to point to, to give you an answer
13 there.
14     Q.   But you read the literature and you talk to
15 colleagues at other institutions.
16     Am I correct?
17     A.   I certainly both read the literature and talk to
18 colleagues.
19     Q.   And is it your current belief that what you are
20 seeing in terms of the breakdown of patient population
21 is similar to or quite different from what other major
22 gender clinics are experiencing?
23     A.   So kind of separating, I'm living in my expert
24 role, I really want to point to data where I have any

**Page 122**

1  confidence at all, and I have none.  If you are asking
2  me in a more informal way among our conversations, then
3  I can answer that our experience seems similar to
4  others' experience.
5  Q.   All right.
6      So in talking about prepubertal children ---
7  well, strike that.  We've been through that.
8      In your rebuttal report when you said beginning
9  puberty blockers at Tanner stage 2 is early enough to
10  prevent endogenous puberty from taking place, let me ask
11  you, in consideration, do you believe it is accurate as
12  stated?
13  A.   So Tanner 2 early enough to prevent endogenous
14  puberty from taking place, yes, that is accurate.
15  Q.   You would agree with me, would you not, that the
16  endocrine guidelines of which you are a co-author
17  recommend to treat beginning puberty blockers at Tanner
18  Stage 2?
19  A.   So to clarify, under the cited guidelines what
20  they say the recommendation is do not use puberty
21  blockers prior to puberty beginning, prior to Tanner 2.
22  Q.   Let me direct you to recommendation 2.2 on
23  page 3880.  Recommendation 2.2 reads we suggest the
24  clinicians begin pubertal hormone suppression after

**Page 123**

1  girls and boys first exhibit physical changes of
2  puberty.
3      Do you see that?
4  A.   I do.
5  Q.   And then it says, paren, Tanner stages G2/B2
6  which is to say the girls Tanner 2 or boys Tanner 2,
7  correct?
8  A.   That is what that means, yes.
9  Q.   So the official recommendation from the
10  Endocrine Society is begin at or after Tanner Stage 2,
11  right?
12      ATTORNEY BLOCK:  Objection to form.
13      THE WITNESS:  That is a correct.
14  BY ATTORNEY BROOKS:
15  Q.   And it says that Tanner Stage 2 is defined as
16  girls and boys first exhibiting physical changes of
17  puberty.
18      Correct?
19      ATTORNEY BLOCK:  Objection to form.
20      THE WITNESS:  The definition of Tanner 2,
21  is where there is any objective evidence when puberty
22  has begun.
23  BY ATTORNEY BROOKS:
24  Q.   So in fact, beginning puberty blockers at Tanner

**Page 124**

1  Stage 2 does not categorically prevent endogenous
2  puberty from taking place but instead prevents a
3  substantial portion of endogenous puberty from taking
4  place.
5      Correct?
6      ATTORNEY BLOCK:  Objection to form.
7      THE WITNESS:  So let me ---.
8  BY ATTORNEY BROOKS:
9  Q.   It is in paragraph 17.
10  A.   So the --- I guess the way this is understood is
11  --- I guess it depends on how extreme you want to take
12  things.  It is back to our original conversation of that
13  cause has to take place before effect.  So it's parsing
14  it to that degree.
15      In a biological context it really is the case
16  that we need some objective evidence before we begin
17  things so that we don't make the mistake of using a
18  medication prior to its having any impact.  And then
19  it's also true that some of the hormone mediated changes
20  that we see do actually regress to that prepubertal
21  state when we --- when you use puberty blockers at
22  Tanner 2.  So the statement as written --- as I wrote it
23  is accurate in the way we think of these things in
24  biology.

**Page 125**

1  Q.   Although the guidelines specifically state that
2  adolescents should --- before puberty blockers, quote,
3  should experience the first changes of their endogenous,
4  spontaneous puberty.  And the recommendation calls for
5  beginning puberty blockers, quote, after girls and boys
6  first exhibit physical changes at puberty, paren, Tanner
7  stages 2, closed paren.  I'm not misreading anything, am
8  I?
9      ATTORNEY BLOCK:  Objection to just
10  reading an excerpt.
11      THE WITNESS:  Right.  I don't know --- I
12  don't know if those were all direct quotes or not so
13  I won't comment on whether you're misreading or not, but
14  the first statement that you reference, as I've said, is
15  one where there is an evolving understanding of its
16  veracity or its applicability.
17      The statement 2.2 is simply using
18  alternate phrasing for saying Tanner 2, that is we need
19  to have objective evidence that puberty is genuinely
20  beginning.  The focus and the purpose of these
21  statements is to avoid people using puberty blockers on
22  non-pubertal kids.
23  BY ATTORNEY BROOKS:
24  Q.   Well, you would agree with me, would you not,

275 0646

Page 126

1  that if one administer puberty blockers in accordance
2  with Endocrine Society guidelines, then some stages of
3  endogenous male puberty will have occurred in natal male
4  patients?
5        ATTORNEY BLOCK:  Objection the form.
6        THE WITNESS:  So when we are ---
7  specifically we're referencing transgender girls here.
8  And although pre-pubertis gender boys, when we see
9  Tanner 2, then some --- some degree of development has
10  taken place.  That part is true.  So in the absolute
11  sense, then yes.  But in a biological sense, like I said
12  already, the --- some interesting reality is that some
13  of that does regress.
14  BY ATTORNEY BROOKS:
15     Q.   By the way, you, yourself, do not have any
16  knowledge as to what developments of endogenous male
17  puberty BPJ underwent prior to initiating puberty
18  blockers, do you?
19     A.   I have had no physical contact with BPJ.
20     Q.   Nor have you studied BPJ's chart sufficiently to
21  be feel that you know the answer to that question?
22     A.   Right, I'm not expressing any opinion to the
23  specific medical terms, that's right.
24     Q.   Have you, yourself, ever supervised any

Page 127

1  research, clinical research, concerning treatment of
2  prepubertal children for gender dysphoria or gender
3  incongruence?
4     A.   Have I supervised research on treatment of
5  prepubertal transgender girls?  Let me think about that.
6  Nothing is coming to mind, but our program does do
7  research across an age span.
8     Q.   Well, some of your colleagues might have done
9  such research, but my question is whether you have been
10  personally supervised or involved in such research?
11     A.   I'm pretty involved actually, especially in our
12  research program, but I'm having a difficult time coming
13  up with an example.
14     Q.   All right.
15          I just want to make sure I know about it if it
16  exists.
17     A.   Yes.
18          ATTORNEY BROOKS:  Let me mark as Safer
19  Exhibit 9 an article entitled --- an article or a
20  chapter or something entitled Care of the Transgender
21  Patient dated 2019 by Dr. Safer and by Doctor Vin
22  Tangpricha.
23          ---
24          (Whereupon, Exhibit 9, Care of the

Page 128

1  Transgender Patient Article, was marked
2  for identification.)
3          ---
4  BY ATTORNEY BROOKS:
5     Q.   Am I correct that this is --- well, you tell me,
6  is this an article or book chapter?  How would you
7  describe this document?
8     A.   This is a review article from the Annals of
9  Internal Medicine.
10     Q.   And by review you mean it's not reporting on
11  original research but rather summarizing the state of
12  knowledge in a particular area?
13     A.   That is correct.
14     Q.   Okay.
15          And the pages may have ITC and a number, but
16  I'll just refer to the number if I may.  On page three,
17  column two, is a statement that I think is just
18  repeating what you told me, that is most --- quote, most
19  transgender persons present to clinicians in late
20  adolescence or adulthood, closed quote.  That is
21  consistent with what you testified earlier.
22          Correct?
23     A.   That is, yes.
24     Q.   And if you turn then to page five, column two,

Page 129

1  you write in the first full sentence in column two,
2  prior effects of androgens on the skeleton height and
3  size and shape of the hands, feet, jaw and pelvis and
4  voice, including visibly --- visible laryngeal
5  prominence, will not be altered if treatment is
6  initiated after puberty.
7          Do you see that language?
8     A.   I do.
9     Q.   And is it consistent with your understanding
10  that at this stage also changes to the size of the heart
11  and the lungs will not be altered if testosterone is
12  commenced after the initiation of puberty?
13     A.   Not quite.
14     Q.   Explain that to me, please.
15     A.   So transgender women, if they have gone through
16  a typical male puberty, are going to remain larger, but
17  the testosterone has action on certain tissues, so
18  specifically muscle, and that --- when those
19  testosterone levels shrink, then that muscle shrinks and
20  the heart muscle is --- well, the heart is a muscle, so
21  it will be --- there will be an impact from body size,
22  but there will also be impact from the lower level of
23  testosterone.  So it will be kind of a mix of those two.
24     Q.   The heart is a muscle but it has in it cavities

Page 130

1    of a certain size in which blood flows, out of which
2    blood is pumped, correct?  Do you have any knowledge,
3    are you aware or any literature that documents that
4    testosterone suppression reduces the heart's pumping
5    capacity?
6            ATTORNEY BLOCK:  Objection to form.
7            THE WITNESS:  So the --- so there is a
8    gap there of transgender research --- so no, that is
9    something that's not been studied.
10   BY ATTORNEY BROOKS:
11       Q.   And the lungs are not muscle tissue.  Are you
12   aware of any science that indicates or even suggests to
13   you as an expert that an individual who has gone through
14   typical male puberty, that individual's lungs reduce in
15   size if testosterone is suppressed?
16       A.   So the answer with regard to lungs is going to
17   have some of those same inputs as heart or other tissues
18   actually where overall size of the individual is not ---
19   well, certainly height at least is not decreasing, and
20   so this person is larger.  And so lung size matches that
21   to some degree.  And testosterone has some impact on
22   surrounding muscle.  And so to the degree that that
23   shrinks there might be lung shrinking too.  And so you
24   hear that --- that is going to be a complex answer.  And

Page 131

1    in terms of interpreting it even, you then would also
2    have to interpret it in the context of the size of the
3    body if you want to consider function, and none of this
4    has been studied.
5        Q.   Certainly you don't believe, do you, that an
6    individual who has been --- let me start that again.  It
7    is not your opinion, is it, that testosterone
8    suppression by an individual who has been through a
9    typical male puberty reduces that individuals VO2 mass
10   to typical female levels?
11       A.   So the more we get into some of the subtler
12   physiology, I will take a step back and give you an
13   expert opinion, but I will --- in addition to that point
14   out that we don't even have studies on this.  We're just
15   at a stage of beginning to look at that sort f thing.
16           ATTORNEY BLOCK:  Roger, are you able to
17   speak up a little?
18           ATTORNEY BROOKS:  I will try.
19   BY ATTORNEY BROOKS:
20       Q.   You state that in paragraph 55 of your expert
21   report, Exhibit 1?
22       A.   So paragraph 55.
23       Q.   Fifty-five (55).  You state that there are,
24   quote, only two studies examining the effect of

Page 132

1    gender-affirming hormone therapy on athletic
2    performance, closed quote.  Do you see that?
3        A.   Yes.
4        Q.   You are aware, are you not, that there are a
5    substantially larger number of studies that examine the
6    effect of testosterone suppression on strength or muscle
7    mass in natal males?
8            ATTORNEY BLOCK:  Objection to form.
9            THE WITNESS:  There are --- there are a
10   handful of studies on the impact of testosterone
11   lowering treatment on transgender women on some tissues,
12   yes.
13   BY ATTORNEY BROOKS:
14       Q.   Well --- and not to get carried away with the
15   terminology, there are also studies that relate to
16   application of testosterone suppression to males who
17   don't identify as transgender, are there not?
18       A.   To cisgender men in addition to transgender
19   women there are some studies --- yes, there are actually
20   some modest studies, yes, on cisgender men.
21       Q.   And have you now taken some care to review
22   yourself all the peer-reviewed studies of that type that
23   were cited in Doctor Brown's report?
24       A.   I have looked at papers that were cited by

Page 133

1    Doctor Brown.  The moment we use the word all I
2    hesitate, but certainly I've read through the papers
3    that were cited.
4            ATTORNEY BROOKS:  Well, let's start with
5    one you referenced, article by Roberts, et al., from
6    2020, which I will mark as Exhibit --- Safer Exhibit-10.
7            COURT REPORTER:  10.
8            ATTORNEY WILKINSON:  10, Tab 60.
9            ---
10           (Whereupon, Exhibit 10, Roberts, et al,
11           Articles, was marked for
12           identification.)
13   BY ATTORNEY BROOKS:
14       Q.   And in fact, this is one of only very few
15   articles that you cite in your expert report start to
16   finish.
17           Correct?
18           ATTORNEY BLOCK:  Objection to form.
19           THE WITNESS:  So this paper is referenced
20   to an expert report.
21   BY ATTORNEY BROOKS:
22       Q.   Let me direct you to the last page of your
23   expert report where there is a bibliography.  And other
24   than citing to your own writings as the entire basis of

Page 134

1   your opinions you cited only six articles.
2       Correct?
3           ATTORNEY BLOCK:  Objection to
4   characterization about its entire cases for his
5   opinions.
6           THE WITNESS:  So the paper specifically
7   referenced two reviews and six papers but recognized
8   that some of these papers specifically are summaries of
9   the topic.
10  BY ATTORNEY BROOKS:
11      Q.   You have studied the Roberts 2020 article with
12  some care.
13      Is that correct?
14      A.   I have indeed, yes.
15      Q.   And so far as you know it is the only
16  longitudinal study of the impact of testosterone
17  suppression in natal males and actual athletic
18  performance and in this case running.
19      Correct?
20          ATTORNEY BLOCK:  Objection to form.
21          THE WITNESS:  So the Roberts study and
22  the Harper study are both studies of transgender women
23  with at least two time points.
24  BY ATTORNEY BROOKS:

Page 135

1       Q.   The Harper study is strictly retrospective, it
2   is not a prospective, longitudinal study?
3       A.   The Harper study is --- that's a good question.
4   I actually don't know if it is --- it's probably mixed,
5   honestly.
6       Q.   Well, we can look at it, but it is not mixed.
7   It is a one-time survey.
8       A.   Well, to be clear, the way we phrase these
9   things sometimes are --- I'm trying to be --- are
10  according to certain conventions academically, so that
11  sometimes it will be framed that way because from an
12  academic perspective we'll use that context, but I think
13  some of the data was actually collected in both
14  collections.
15      Q.   The Roberts study you understand to be a
16  prospective, longitudinal study, do you not?
17      A.   Well, actually, you are testing me on that.  Did
18  they set out at the beginning to do it or did they go
19  back and look?  I'd have to see.
20      Q.   Well, based on the method, I think the answer is
21  they went back and looked because it begins we reviewed?
22      A.   Yes.
23      Q.   Do you --- is it your opinion that amongst the
24  available data, the Roberts study is --- on the impact

Page 136

1   of testosterone on athletic performance is some of the
2   strongest data that we have available?
3           ATTORNEY BLOCK:  Objection to form.
4           THE WITNESS:  It is my opinion that the
5   Roberts and Harper studies are the only two studies that
6   we have available.
7   BY ATTORNEY BROOKS:
8       Q.   Is it your opinion as an expert, is it not, that
9   the structure of the Roberts study renders it --- and
10  the source of its data renders it far more reliable than
11  the Harper 2015 study?
12          ATTORNEY BLOCK:  Objection to form.
13          THE WITNESS:  I would not overstate that,
14  so no.  If I'm being --- if I'm being professorial and
15  saying this is how to organize something, then in that
16  context I might say that, but in terms of simply
17  believability of data, I got two modest papers that are
18  the sum of the world literature on the subject.
19  BY ATTORNEY BROOKS:
20      Q.   You say in paragraph 56 of your report that
21  Roberts found, quote, after two years of
22  gender-affirming hormone therapy transgender women
23  completed the 1.5 mile run 12 percent faster on average
24  than non-transgender women, closed quote.  Do you see

Page 137

1   that?
2           ATTORNEY BLOCK:  I think he needs some
3   time to get ---.
4           THE WITNESS:  Yeah, to actually find
5   the ---.
6   BY ATTORNEY BROOKS:
7       Q.   Paragraph 56.  And I will refer you to the third
8   sentence.
9       A.   All right.
10          Sorry say that again.
11      Q.   I'm simply calling your attention to the place
12  where you wrote at the Roberts report that after two
13  years of a gender-affirming hormone therapy transgender
14  women completed the 1.5 mile run 12 percent faster on
15  average than non-transgender women.
16      A.   Yes.
17      Q.   And two years, not a trick question here, twice
18  as long as the one year testosterone suppression
19  requirement that led to the NCAA rule.
20      Correct?
21      A.   Two years is twice one year, yes.
22      Q.   And you would agree with me that a 12 percent
23  faster in women's time is a substantial advantage?
24          ATTORNEY BLOCK:  Objection to form.

Safer 0649

## Page 138

1  THE WITNESS: So this is a bit --- this
2  is a bit of the same conversation. I guess I can't say
3  that in a blanket way. It depends on context.
4  BY ATTORNEY BROOKS:
5  Q. The context here is that that these are all Air
6  Force members, do you recall?
7  A. I believe they are all Air Force members, yes.
8  Q. All subject to Air Force physical fitness
9  requirements. So we are not talking about couch
10  potatoes?
11  A. I'm not rendering an opinion there as an expert.
12  Q. Generally you would accept that this is a
13  relatively fit population?
14  A. I can't even render an opinion there as an
15  expert.
16  Q. Do you have some unhealthy relative who's a
17  member of the armed forces?
18  A. I was in the National Guard, so I do have some
19  insight.
20  Q. Okay.
21  You would agree, would you not, that running
22  speed and endurance, per se, are relevant to quite a
23  number of sports?
24  A. Running speed and endurance are relevant to many

## Page 139

1  sports. I'm certain that is true. I'm not ---
2  Q. Well ---.
3  A. --- an expert again.
4  Q. I'm no sports fan, but we've all seen enough
5  sports to know there's a lot of running involved not
6  just in track but in basketball, soccer, lacrosse and
7  field hockey.
8  Correct?
9  A. I have observed that, yes. But again, I'm not
10  rendering an expert opinion there, but yes.
11  Q. And on page six of this paper ---.
12  A. This is Roberts.
13  Q. Yes, Roberts and Exhibit 10. Roberts and his
14  co-authors summarize in their conclusion by stating,
15  quote, in this study we confirm that the use of gender
16  affirming hormones are associated with changes in
17  athletic performance and demonstrated that the
18  pretreatment differences between a transgender and a
19  cisgender woman persist beyond the 12-month time
20  currently --- requirement currently being proposed for
21  athletic competition by the World Athletics and the IOC.
22  Do you see that?
23  A. This is the conclusion section?
24  Q. It is.

## Page 140

1  A. Yes, I see that.
2  Q. And you don't have any expert opinions that the
3  findings of Roberts are inaccurate or unreliable, do
4  you?
5  A. So the --- this is again a question of context.
6  So I have no reason to suspect that these data are
7  suspect. The only question then is what we conclude
8  when you do a study of --- for the transgender women I
9  think we are talking about 29 people, which I certainly
10  like a lot better than simply pointing to a random
11  individual, but I recognize as also simply 29
12  individuals in a certain circumstance that might or
13  might not be replicated as we do this again and increase
14  the numbers of people that we evaluate.
15  Q. You don't propose to offer any expert opinion
16  that the findings of Roberts as reported in this paper
17  of 2020 are inaccurate?
18  A. So, I guess the way I said it is how I said it
19  already, which is I'm not doubting Roberts' data, but I
20  wouldn't then over generalize to say that I know that
21  these would be the findings we would see in every
22  similar circumstance.
23  Q. And are you aware that one common track event or
24  cross-country event, I can never keep them straight, is

## Page 141

1  the 1600 meter, which is about a mile?
2  A. Actually, that is not my expertise. I believe
3  you.
4  Q. Are you aware that the 3,000 meter, a 1.8 mile
5  distance, is a standard event?
6  A. If you are meaning to quiz me on the standard
7  lengths these days and meters and all of that, no.
8  ATTORNEY BROOKS: Well, I can't complete
9  my next document in two minutes, if we if we want to break
10  at 1:00 now or I can do one more document.
11  ATTORNEY BLOCK: I'm fine continuing if
12  you are.
13  THE WITNESS: My bias is to push.
14  ATTORNEY BROOKS: Folks online, we're
15  going to continue a little bit farther.
16  BY ATTORNEY BROOKS:
17  Q. You cited a paper by Harper from 2015. And that
18  paper also I take it you studied with some detail?
19  A. Yes.
20  Q. And how many individuals did Harper have in that
21  study?
22  A. I --- do we have her ---?
23  Q. Everything that you mention I have.
24  ATTORNEY BROOKS: Let me mark as Safer

1    Exhibit 11 ---
2        ATTORNEY WILKINSON: Yes.
3        ATTORNEY BROOKS: --- Harper's --- Harper
4    et al. or just Harper, article Race Times for
5    Transgender Athletes from 2015.
6        ATTORNEY WILKINSON: Tab 61.
7        ---
8        (Whereupon, Exhibit 11, Race Times for
9        Transgender Athletes Article, was marked for
10       identification.)
11       ---
12       THE WITNESS: Thank you.
13   BY ATTORNEY BROOKS:
14   Q.   You say you have worked with Joanna Harper, you
15   are aware that Dr. Harper is both an athlete and
16   transgender?
17       ATTORNEY BLOCK: Objection to form.
18       THE WITNESS: I am aware. I am aware
19   that she is an athlete, and I'm aware that she is
20   transgender.
21   BY ATTORNEY BROOKS:
22   Q.   Did you have after studying the paper end up
23   with an understanding of how many participants there
24   were?

1    A.   There were eight participants. I'm looking at
2    Table 5.
3    Q.   Did you have an understanding of how those
4    participants were recruited?
5    A.   I do have some understanding of that, yes.
6    Q.   How is that?
7    A.   The --- how would I characterize this? It's
8    somewhat ad hoc in the sense that Ms. Harper is in the
9    category of these other participants, and so she was
10   able to identify others that met the criteria of being
11   both transgender and being sufficiently intense in their
12   middle distance running that they had race times that
13   they could identify that would allow for the --- for
14   these determinations here of age based --- I don't know all
15   the terminology here, but their age-based grade
16   proportional to others in that same sex category.
17   Q.   And it is consistent with your understanding, is
18   it not, that all of the information in this study about
19   what hormonal treatment these individuals had undergone
20   was self reported?
21   A.   This is --- the entire study is self report,
22   that is she didn't have --- Ms. Harper did not have
23   access to people's individual records independently.
24   Q.   So there was no independent confirmation of how

1    long that they had suppressed testosterone.
2        Correct?
3    A.   There was no independent confirmation beyond Ms.
4    Harper and her dealing with other subjects directly.
5    Q.   Well, in your view as a scientist, that's not
6    independent confirmation, is it?
7        ATTORNEY BLOCK: Objection to form.
8        THE WITNESS: So I'm not expressing an
9    opinion there because in a science --- you know, in a
10   scientific paper we would have --- we would have peer
11   review, but we don't --- that just --- ends up being a
12   little bit of a fuzzy realty.
13   BY ATTORNEY BROOKS:
14   Q.   There is no information in this paper about what
15   testosterone levels were achieved by any of these
16   individuals as a result of suppression, is there?
17   A.   I don't know. Let's --- I can look through that
18   a little bit because does she reference how many of them
19   have had surgery and such? It has been quite a while,
20   you know. So notably, there is some independent
21   confirmation of some of the data because some of this
22   was posted.
23   Q.   Wait. Let me just be clear. Some of the times
24   were verified independently.

1        Correct?
2    A.   That's correct.
3    Q.   Nothing about the hormonal treatment?
4    A.   Right.
5        ATTORNEY BLOCK: Do you want to give him
6    a chance to review it?
7    BY ATTORNEY BROOKS:
8    Q.   Doctor Safer, let me just withdraw that question
9    and ask you another question.
10   A.   Yeah, go ahead.
11   Q.   Do you know whether Doctor Harper stands behind
12   the conclusions of her 2015 paper today?
13   A.   If you ask me do I know it, that's too strong a
14   statement.
15       ATTORNEY BROOKS: Let me mark as Safer
16   Exhibit 12 an article by Joanna Harper and others from
17   2021 entitled How Does Hormone Transition in Transgender
18   Women Change Body Composition, Muscle Strength and
19   Hemoglobin.
20       ATTORNEY WILKINSON: Tab 21.
21       ---
22       (Whereupon, Exhibit 12, Joanna Harper
23       Article, was marked for identification.)
24       ---

37  (Pages 142 to 145)

Page 146

BY ATTORNEY BROOKS:

Q.   Dr. Safer, have we put that in front of you?
Yes, we have.  Are you familiar with this article?

A.   I am.

Q.   And have you read it, reviewed it recently?

A.   I have reviewed it relatively recently.

Q.   And do you understand, and I didn't completely
read the title.  The second sentence of the title says
Systematic Review with the Focus on Implications for
Sport Participation.

Do you see that?

A.   I do.

Q.   Can you tell me why when you cited Harper's 2015
paper that you just referred to as older science you
didn't cite Harper's 2021 publication?

A.   So to be clear, I didn't use the older science.
I simply referenced Harper's paper as one of the only
two papers on the subject.  And your question?

Q.   Why didn't you cite Harper's 2021 paper on the
topic?

A.   So this paper is more in the category of the
papers looking at impact on tissues of which there are
several papers as opposed to actually investigating a
specific activity, a person's activity.  And does this

Page 147

have primary data in it?

Q.   Well, let me take you to page eight.

A.   Yeah, I don't even think this has a final data
in it.

Q.   Describing the Roberts study, Harper here on
page eight, column one, about halfway down, summarizes
as follows:  Quote, trans women ran significantly faster
during the 1.5 mile fitness test than ciswomen.  These
observations in trained transgender individuals are
consistent with the finding of the current review in
untrained individuals whereby 30 months of gender
affirming hormone therapy maybe sufficient to attenuate
some but all influencing factors associated with
muscular endurance and performance, closed quote.

Do you see that?

A.   Yes.  This is the end of the paragraph there?

Q.   Yes.

A.   We're starting with these observations, yes, I
see that.

Q.   And do you propose to offer any expert opinion
inconsistent with Joanna Harper's summary of the data
here suggesting that 30 months of gender affirming
hormone therapy may be sufficient to attenuate some but
not all influencing factors associated with muscular

Page 148

endurance and performance?

A.   The statement here is too broad, so it's simply
raising questions.

Q.   Well, Joanna Harper says here that the findings
of her current review were that 30 months of gender
affirming hormone therapy may be sufficient to attenuate
some but not all influencing factors associated with
muscular endurance and performance?

ATTORNEY BLOCK:  Objection to leaving out
words of what you quoted.

BY ATTORNEY BROOKS:

Q.   And my question for you is do you intend to
offer an expert opinion that you believe is inconsistent
with that statement?

ATTORNEY BLOCK:  Same objection.  It's
misquoting the document.

THE WITNESS:  So the operative or
inoperative word here is may be sufficient, and so when
we're --- these are research questions as we try to
understand physiology and the relevance of certain
testosterone levels at certain endpoints and then not
just endpoints as surrogates, which is what most of the
papers to date still are, but endpoints in actual
athleticism and athletic competition.  And so that's all

Page 149

this is doing is putting out some questions or some
potential thoughts.

BY ATTORNEY BROOKS:

Q.   Let me ask you to turn to page one and column
one.

A.   Of this same paper?

Q.   Of the same paper.  In the conclusion of the
abstract the last sentence reads, quote, these findings
suggest the strength may be well be preserved in trans
women during the first three years of hormone therapy,
closed quote.

Do you see that?

A.   I do.

Q.   And having reviewed whatever literature you have
reviewed to date do you share Doctor Harper's
understanding that strength may well be preserved in
trans women during the first three years of hormone
therapy?

ATTORNEY BLOCK:  Objection to misquoting
the document.

THE WITNESS:  So I can't comment on Ms.
Harper's understanding, but if you're asking is that ---
you know, is the question a question, so the question is
a question.  These findings suggest that strength may

## Page 150

1    and again an operative word is may.
2    BY ATTORNEY BROOKS:
3    Q.   Yes.
4    A.   And these are as I, a scientist, and she is a
5    scientist too, we are turning the earth, as it were, of
6    what we know looking for what questions we might want to
7    study and how we might want to frame studies going
8    forward.
9    Q.   Let me take you back to page eight, if I may.
10   And the penultimate sentence of this paper at the bottom
11   of the first column of paragraph of page eight reads,
12   quote --- well, let me read --- yeah, I will just read
13   that, quote, whether transgender and cisgender women can
14   engage in meaningful sport even after gender affirming
15   hormone therapy is a highly debated question, closed
16   quote.
17      Do you see that language?
18   A.   I do.
19   Q.   You'll agree that up to the present that is a
20   highly debated question?
21      ATTORNEY BLOCK:  Objection to form.
22      THE WITNESS:  There's context there too.
23   So this is referencing a league sport and it's --- as
24   well there are a range of potential sports, and so the

## Page 151

1    question and the degree to which it is highly debated
2    even I'm not going to render an official opinion there.
3    So the --- whether transgender and cisgender women can
4    engage in meaningful sport depends on what sport we're
5    talking about, what treatment we're talking about, age
6    group, whether elite versus more of an intermural
7    setting.  And so it's just a relatively simple statement
8    and to summarize a paper I guess.
9    BY ATTORNEY BROOKS:
10   Q.   You agree that this --- that is the question of
11   whether transgender and cisgender women can engage in
12   meaningful sport even after gender affirming hormone
13   therapy is one on which reasonable scientists can
14   disagree and today are disagreeing?
15      ATTORNEY BLOCK:  Objection to form.
16      THE WITNESS:  So going back --- so is
17   your --- so are you asking me --- I guess help me
18   reframe what the question is there because there are a
19   bunch of things packed into that sentence actually.  And
20   you heard me try to unpack them both.
21   BY ATTORNEY BROOKS:
22   Q.   That may be a complex question, as debated
23   questions often are, but my question is do you agree
24   that the question of whether transgender and cisgender

## Page 152

1    women can engage in meaningful sport even after gender
2    affirming hormone therapy is one on which reasonable
3    scientists can differ and are differing today given the
4    possibility of data?
5       ATTORNEY BLOCK:  Objection to form for
6    the same reasons.
7       THE WITNESS:  So I'm sitting here as a
8    scientist talking about differences in athleticism and
9    such and whether --- and so moving onto meaningful sport
10   goes beyond my expertise.  I'm only putting data
11   together in a --- that's my lane on this subject.
12      ATTORNEY BROOKS:  Okay.
13   Let's break for lunch.
14      ATTORNEY BLOCK:  Let's go off the record,
15   so 2:15.
16      ATTORNEY BROOKS:  2:15?  Any dissent?  No
17   dissent.
18      VIDEOGRAPHER:  Going off the record.  The
19   current time is 1:16 p.m. Eastern Standard Time.
20   OFF VIDEOTAPE
21      ---
22   (WHEREUPON, A SHORT BREAK WAS TAKEN.)
23      ---
24   ON VIDEOTAPE

## Page 153

1       VIDEOGRAPHER:  Back on the record.  The
2    current time is 2:18 p.m. Eastern Standard Time.
3    BY ATTORNEY BROOKS:
4    Q.   Good afternoon, Dr. Safer.  Take you back into
5    context, I'm going to ask you to find your expert
6    report, Exhibit-1, and find paragraph 25, which we have
7    looked at before.  And there in the third sentence it
8    reads based on current research comparing
9    non-transgender boys and men with non-transgender girls
10   and women before, during and after puberty the primary
11   known biological driver of these average group
12   differences is testosterone starting at puberty, and not
13   reproductive biology or genetics, period, closed quote.
14      Do you see that language?
15   A.   Yes.
16   Q.   And your one cite for that is the endocrine that
17   we've already looked at already.
18      Right?
19      ATTORNEY BLOCK:  Objection to the form.
20      THE WITNESS:  So the citation in that
21   paragraph is the Handelsman, yes.
22   BY ATTORNEY BROOKS:
23   Q.   And do you recall our earlier discussion about
24   how the effects of testosterone are cumulative over time

Page 154

1    rather than depending solely on the testosterone level
2    of an individual at a particular time, right?  Do you
3    recall that discussion?
4        A.   So the impact --- excuse me, the impact of
5    testosterone is cumulative.  It depends what impacts
6    we're talking about.  So there are impacts that are
7    cumulative, like height, and there are impacts that
8    really do reflect that point in time.
9        Q.   Now, at the moment let me ask just based on your
10   recollection.  The Handelsman article is Exhibit-4.  Do
11   you have that?  And I will ask you to find it in your
12   pile.  I should have neated up your pile of exhibits
13   while you were out.  That looks like it.
14       A.   Got it, yes.
15       Q.   The Handelsman article, as far as you recall,
16   does not contain any data or conclusions concerning the
17   effects of testosterone after the beginning of male
18   puberty, does it?
19              ATTORNEY BLOCK:  Objection to form.
20              THE WITNESS:  Honestly, I would have to
21   go look carefully.
22   BY ATTORNEY BROOKS:
23       Q.   Then I won't take time to do that.
24       A.   Okay.

Page 155

1        Q.   It does or it doesn't.  We will deal with that.
2        A.   Yes.
3        Q.   Do you know whether any other writing Professor
4    Handelsman has expressed any view as to whether
5    testosterone suppression after male puberty eliminates
6    sex-based physical advantages sufficiently to maintain
7    fairness in sports for women?
8              ATTORNEY BLOCK:  Objection to the form.
9              THE WITNESS:  So first of all, putting it
10   altogether that way isn't necessarily how I would say it
11   or how I would expect it to be said.  It would be
12   testosterone suppression and whatever the scientific
13   finding at the moment would be.  So we already know that
14   the data that relate to athleticism are just the Roberts
15   paper and the Harper paper, so I guess that is as much
16   as I can say in that particular context.  And in terms
17   of --- so yes, I think that it wouldn't be --- I forgot
18   already how you phrased that.
19   BY ATTORNEY BROOKS:
20       Q.   Let me just ask again.
21       A.   Yes.
22       Q.   So the first question is not a hard one.
23       A.   Okay.
24       Q.   Do you know whether Professor Handelsman has

Page 156

1    himself in his publication expressed any view whether
2    testosterone suppression after male puberty eliminates
3    sex-based physical advantages sufficiently to maintain
4    fairness in sports for women?
5              ATTORNEY BLOCK:  Objection to form.
6              THE WITNESS:  So I don't know if he has
7    written something covering all those bases that you just
8    described, how you described it.
9              ATTORNEY BROOKS:  All right.  Let's look
10   at treatment variable.  Let me mark as Exhibit 13 a
11   short article by Dr. Roberts with a subsequent comment
12   by David Handelsman.
13              ATTORNEY WILKINSON:  Tab 62.
14              ATTORNEY BROOKS:  And unfortunately, the
15   words were a little clipped on this.  We will see how we
16   do.
17                          ---
18   (Whereupon, Exhibit 13, Dr. Roberts Article, was
19   marked for identification.)
20                          ---
21              ATTORNEY BLOCK:  Thanks.
22   BY ATTORNEY BROOKS:
23       Q.   And I think a fair description of what we have
24   here is a relatively popular press type piece by Dr.

Page 157

1    Roberts first.  And this document is dated December 16,
2    2020.
3              ATTORNEY BLOCK:  Objection.  Does it say
4    where it was published?
5              ATTORNEY BROOKS:  No, it doesn't say on
6    its face where it was published.  And as we sit here
7    right now I don't recall, though actually looking at it
8    I do recall that Kilio is an online publication of some
9    sort, and I've seen the brand came from the Kilio
10   website.
11   BY ATTORNEY BROOKS:
12       Q.   At any rate, I see the date, I see the title.
13   It purports to be an article by Professor Roberts.  I
14   just want to be clear in my description it does not ---
15   it does not have the appearance of a separate peer
16   review article since the summary taken off of the
17   article that we've already looked at.  And then at the
18   end of it is a two-paragraph prospective on this offered
19   by Dr. Handelsman.
20          Do you see that?
21       A.   I do.
22       Q.   And he begins by making clear that he is
23   commenting on this study, that is Roberts study that is
24   discussed above.  He is not introducing new science,

linearJYS53 0654

Page 158

1 correct, is that consistent with your understanding?
2          ATTORNEY BLOCK:  Objection.  Give him a
3 chance to read it.
4          THE WITNESS:  So that, yes, my
5 understanding, too, is that there is not new data here,
6 mostly a commentary within the context some of our
7 existing knowledge on the Roberts study.
8 BY ATTORNEY BROOKS:
9      Q.   And in his comment to Dr. Handelsman states in
10 the second paragraph, as of 2020, quote, a major
11 question remains whether gender affirming hormone
12 treatment overcomes sex-based physical advantages
13 sufficiently to maintain fairness so that an exception
14 can be made for trans women, paren, natal males, closed
15 paren, treated with estrogen.
16          Do you see that language?
17      A.   I do.
18          ATTORNEY BLOCK:  Objection.  I believe
19 that is what it says, but I just want to note for the
20 record that there is text cut off on the left.
21          ATTORNEY BROOKS:  There is.  And I'll get
22 better copies.  I'm looking at a copy that's not cut off
23 I will represent.
24 BY ATTORNEY BROOKS:

Page 159

1      Q.   And do you have an expert opinion as to ---
2 well, do you propose to offer any opinion disagreeing
3 with Professor Handelsman that as of 2020 it remained a
4 major question whether gender affirming hormone
5 treatment to overcome sex-based physical advantages
6 sufficiently to maintain fairness so that an exception
7 could be made for trans women treated with estrogen?
8      A.   So to me that's too broad a question if you're
9 asking me to render an expert opinion about his opinion.
10     Q.   I'm asking whether you propose to offer an
11 expert opinion inconsistent with his view that remains a
12 major question as of 2020.
13     A.   It's --- I might --- well, I would at least
14 phrase things differently in there --- we might have to
15 go through pieces of it because certainly where we lack
16 data I think we would agree, but in terms of those
17 statements that then go on to editorialize, I don't know
18 that we necessarily agree in how we would frame that.
19     Q.   A little farther down, maybe two sentences down
20 it reads, quote, by contrast, trans women treated with
21 estrogens after completing male puberty experienced only
22 minimal declines in physical performance over 12 months,
23 substantially surpassing average female performance for
24 up to eight years, closed quote.  Do you agree or

Page 160

1 disagree with Professor Handelsman summary of the
2 findings of Roberts?
3          ATTORNEY BLOCK:  Objection to form.  I'm
4 just not sure it's all based on Roberts?
5          THE WITNESS:  It is not clear to me that
6 it's --- that it is based on Roberts for what it's
7 worth.  It's also somewhat simplistically written.  And
8 an example is we don't --- the contention with regard to
9 athletic outcomes relates more to testosterone, and so
10 saying transgender women treated with estrogens wouldn't
11 be precisely how I would frame that either.
12 BY ATTORNEY BROOKS:
13     Q.   He concludes --- Professor Handelsman concludes
14 by stating supporting federations should incorporate
15 these findings in the strategies for including trans
16 women in elite female competitions while maintaining
17 fairness and safety for other women.  Dr. Safer, do you
18 agree that maintaining safety for cisgender women is a
19 legitimate and indeed important concern?
20          ATTORNEY BLOCK:  Objection to form.
21          THE WITNESS:  As an expert I'm not going
22 to give an opinion.
23 BY ATTORNEY BROOKS:
24     Q.   As Doctor Safer do you agree that ensuring

Page 161

1 safety for cisgender women and girls is a legitimate
2 concern?
3          ATTORNEY BLOCK:  Objection to form.
4          THE WITNESS:  So if I'm simply speaking
5 not as an expert, just as an educated person in the
6 field, then it is true that safety is important, but I'm
7 not clear that --- I don't know that in most of these
8 athletic activities it's actually a concern.
9          ATTORNEY BROOKS:  Let me mark as Safer
10 Exhibit 14 a document entitled Guidance with Transgender
11 Inclusion in Domestic Sport with symbols of a number of
12 UK sport governing bodies across the front and a
13 statement published September 2021.
14          ATTORNEY WILKINSON:  Tab 22.
15          ---
16          (Whereupon, Exhibit 14, Guidance with
17          Transgender Inclusion in Domestic Sport,
18          marked for identification.)
19          ---
20          THE WITNESS:  Thank you.
21 BY ATTORNEY BROOKS:
22     Q.   And my first question for you, Dr. Safer, is
23 whether you have seen this document before?
24     A.   I have seen this document before.

Page 162

1    Q.   And were you aware of it prior to its reference
2  in this litigation?
3    A.   I don't know that I was.
4    Q.   And are you familiar with the role of the
5  supporting body mentioned on the front page in
6  governance of sport within the United Kingdom?
7    A.   By looking at all their logos, I cannot say that
8  I know them all, no.
9    Q.   And do you have any knowledge as to whether
10 these are official government charted --- chartered
11 sporting governing bodies?
12   A.   I do not have that knowledge.
13   Q.   Have you now studied this document with some
14 care?
15   A.   I would say that I have only looked at this
16 document superficially.  I'm certainly happy to look
17 through it.
18   Q.   I will ask you just about a couple of passages.
19 Let me ask you to turn to page three of the document.
20 And towards the very bottom and the next to the last
21 paragraph this --- five organizations states, quote, our
22 work exploring the latest research, evidence and studies
23 made clear that there are retained differences in
24 strength, stamina and physique between the average women

Page 163

1  compared with the average transgender women for
2  nonbinary person registered male at birth with or
3  without testosterone suppression.
4      Do you see that language?
5    A.   I do.
6    Q.   And do you disagree with the conclusion of these
7  UK sporting bodies that the latest research, evidence
8  and studies now make clear that there are retained
9  differences in strength, stamina and physique in
10 nonbinary --- in transgender women or nonbinary persons
11 registered male at birth with or without testosterone?
12        ATTORNEY BLOCK:  Objection to referring
13 to this as something written by the governing bodies as
14 opposed to the quality council that makes
15 recommendations to the governing bodies.
16        THE WITNESS:  To the statement written by
17 whoever actually wrote it that evidence and studies on
18 the subject of transgender people make clear anything, I
19 disagree.
20 BY ATTORNEY BROOKS:
21   Q.   Let me ask you to turn to page six, under the
22 heading question review is recommending it states,
23 quote, as a result of what the review found the guidance
24 concludes that the inclusion of transgender people into

Page 164

1  female sport cannot be balanced regarding transgender
2  inclusion, fairness and safety in gender affected sport
3  where there is meaningful competition, period, closed
4  quote.
5      Do you see that?
6    A.   I do.
7    Q.   And do you disagree with that conclusion of this
8  organization or these organizations?
9    A.   So I really --- as we discussed earlier, I'm not
10 going to express as an expert --- I don't think I'd be
11 able to express as an expert fairness and so I can't
12 comment any further.
13   Q.   Let me ask you to turn to page nine in your
14 expert report, paragraph 49.
15   A.   Okay.  Paragraph 49.
16   Q.   At the end of paragraph 49 you state, quote, a
17 person's genetic makeup and internal and external
18 reproductive anatomy are not useful indicators of
19 athletic performance and have not been used in elite
20 competition for decades.  In making that statement when
21 you refer to a person's genetic makeup were you
22 referring to the question of whether they had XX or XY
23 chromosomes?
24   A.   So when I'm making the statement genetic makeup

Page 165

1  I'm heavily referencing chromosomes.  So I guess I would
2  say that is mostly correct with some --- with perhaps
3  some known genes, but mostly chromosomes.
4    Q.   You would agree, would you not, that respected
5  voices in the field take the view that genetic sex it is
6  at least an important determinant of athletic
7  performance, do you not?
8        ATTORNEY BLOCK:  Objection to form.
9        THE WITNESS:  So that I'm supposed to
10 comment that there are people in the field who say that?
11 I guess what I would say is the consensus right now
12 among medical people advising elite athletic
13 organizations would be to move away from using that as a
14 surrogate.  In the past it was.  There were chromosome
15 tests and the problem is that people have --- there is
16 quite a bit of variety in biology and of course the
17 moment you make a rule you see the exceptions.
18 BY ATTORNEY BROOKS:
19   Q.   The exceptions.
20   A.   And so I would say that as an expert I can't
21 comment in terms of, you know, some study of everybody's
22 opinion or some survey.  But as somebody who has been on
23 these committees I've observed that that was discarded.
24   Q.   So if you put alongside individuals who suffer

Page 166

1    from any condition that has been identified as a
2    disorder of sexual development, am I correct that you
3    consider yourself to have expertise in what constitutes
4    a disorder of sexual development?
5        A.   I have some expertise.  And the terminology is
6    actually differences of sexual development or sexual
7    differentiation or intersex are the terms that are more
8    popularly used.
9        Q.   You would agree with me, would you not, that
10   many respective sources up to the present would continue
11   to refer to disorders of sexual development?
12            ATTORNEY BLOCK:  Objection to form.
13            THE WITNESS:  So there --- what I would
14   say there is that --- the newer terminology has not ---
15   has not yet permeated because there have not been
16   revisions to all the documents that have been created.
17   BY ATTORNEY BROOKS:
18       Q.   How about if we say DSD?
19       A.   DSD is a reasonably safe or DSD intersex is what
20   some people do, yes.
21       Q.   Well, not all DSDs would be considered intersex
22   conditions.
23            Correct?
24       A.   You are right that some people try to parse

Page 167

1    those two terms even.  And there is --- but I think
2    those kinds of distinctions might be on the scope of
3    what we are discussing.
4        Q.   Probably so.  If we put on side individuals who
5    suffer from anything that is characterized in the field
6    as a DSD you would agree, would you not, that genetic
7    makeup and specifically whether the individual possesses
8    XX or XY chromosomes is a statistically meaningful
9    indicator of athletic performance?
10            ATTORNEY BLOCK:  Objection to form.
11            THE WITNESS:  So no, and the --- it's ---
12   I guess it depends what you mean is what it comes down
13   to.  So if you are --- if you are simply saying, well, a
14   certain fraction of people of these chromosomes are
15   going to be --- have this other characteristic, then
16   maybe there are those kinds of associations.  But if you
17   are going to say that it's connected to the point where
18   you could actually use one of those let's say observing
19   a chromosome as an actual determination for a given
20   individual, then I would say no.
21   BY ATTORNEY BROOKS:
22       Q.   Is it your opinion that a gender identity itself
23   is a --- or useful indicator of athletic performance?
24       A.   It is my opinion that gender identity itself is

Page 168

1    not a useful indicator of athletic performance.
2        Q.   You say at paragraph 44 of your report --- I
3    will save that.  I think that is a new Declaration and
4    we will not take time to do that.
5            Let me ask you to look at paragraph 24 of your
6    rebuttal report.  You say in paragraph 24 that none of
7    Doctor Carlson's arguments support HB-3293 categorical
8    ban of all girls who are transgender from all girls
9    sports teams.
10            Do you see that?
11       A.   I do.
12       Q.   And I should continue.  I'm sorry.  Doctor
13   Carlson's safety argument relates solely to contact and
14   collision sports and the physical characteristics
15   developed during puberty, period.  By referring to a
16   categorical ban let me ask this.  Do you agree that
17   safety considerations could justify or may justify
18   excluding natal males who experienced all or significant
19   part of male typical pubertal development from
20   participating in female division of contact or collision
21   sports such as basketball and soccer?
22            ATTORNEY BLOCK:  Objection to form.
23            THE WITNESS:  So if the question is would
24   I anticipate as an expert that there would be a safety

Page 169

1    explanation for banning transgender women from the
2    female category, then I would --- I wouldn't --- I
3    certainly --- let me think about which way to phrase it.
4    I would have a hard time coming up with an example where
5    I would use being transgender as a safety criterion as
6    opposed to body habitus size or some other more
7    objective criterion.
8    BY ATTORNEY BROOKS:
9        Q.   Well, and I didn't say anything about gender
10   status.  Let me ask again.  Would you agree that safety
11   considerations could justify excluding natal males who
12   have experienced all or a significant part of male
13   typical pubertal development from participating in
14   female division contact and collision sports such as
15   basketball or soccer?
16            ATTORNEY BLOCK:  Objection to form.
17            THE WITNESS:  So you're saying that even
18   if we otherwise decided that it would be okay for
19   cisgender males to play with cisgender females, would I
20   envision there being a safety reason to ban those
21   cisgender males?
22   BY ATTORNEY BROOKS:
23       Q.   All I asked had nothing to do with gender
24   identity.  Do you agree that the introduction onto the

## Page 170

1   field or the court in or have been spoken of its contact
2   or collision sports in the female division of natal
3   males who have gone through all or a significant part of
4   male typical pubertal development could raise legitimate
5   concerns about safety for the natal females?
6            ATTORNEY BLOCK:  Same objections as the
7   previous two questions.
8            THE WITNESS:  So any person who's gone
9   through a male puberty would that, per se, make me
10  invoke a safety concern, if that's the question ---.
11  BY ATTORNEY BROOKS:
12       Q.   Could that in your mind raise the given safety
13  concerns?
14       A.   So I would not --- the word legitimate I'm not
15  addressing, but I'm not aware of that in and of itself
16  being a safety concern.
17       Q.   You state in paragraph 22 of your rebuttal
18  report that, quote, transgender athletes and women have
19  been competing in NCAA and secondary school athletics
20  for many years at this point.  Let me ask you if you are
21  aware of any instance in which natal males have competed
22  in the female category in any contact or collision sport
23  in either the NCAA or high school division?
24            ATTORNEY BLOCK:  Objection to form.

## Page 171

1            THE WITNESS:  So can I identify
2   transgender girls or women specifically and specific
3   instances of participation?  I cannot.
4   BY ATTORNEY BROOKS:
5        Q.   What was your basis for asserting that such
6   athletes have been competing in the NCAA and secondary
7   school athletics for many years?
8            ATTORNEY BLOCK:  I'm sorry.  Is the
9   question about collision sports?  Because you are
10  quoting something that is not about collision sports.
11            ATTORNEY BROOKS:  Let me break that out.
12  Thank you.
13  BY ATTORNEY BROOKS:
14       Q.   Do you have a view as to whether --- I shouldn't
15  say a view.  Do you have any information as to whether
16  transgender athletes have been competing in the women's
17  division of NCAA or secondary school athletics in any
18  contact or collision sports for many years?
19       A.   That information on the validity is that they
20  have had access because there has not been a ban.
21       Q.   But whether they have done so you do not have
22  any information?
23       A.   But I cannot point to specific instances,
24  exactly.

## Page 172

1        Q.   I apologize if I asked something early in the
2   morning, but it's faster than trying to dig back into
3   the transcript.  Do you have any opinion as to whether
4   it is reasonable to exclude a natal male with a male
5   gender identity from a high school girls basketball
6   team?
7            ATTORNEY BLOCK:  Objection to form.
8            THE WITNESS:  So ask that again a little
9   bit slower.
10  BY ATTORNEY BROOKS:
11       Q.   Do you have have any opinion as to whether it is
12  reasonable to exclude a natal male with a male gender
13  identity from participation in a girls high school
14  basketball team?
15            ATTORNEY BLOCK:  Objection.
16            THE WITNESS:  I do not have an expert
17  opinion on that subject.
18  BY ATTORNEY BROOKS:
19       Q.   Do you have a personal view?
20       A.   I don't know that I --- there it would get more
21  complicated depending on context.
22       Q.   You don't have a simple yes or no personal view
23  on that question?
24       A.   I don't.

## Page 173

1        Q.   And do you have a view whether it is reasonable
2   to exclude a natal male with a female gender identity
3   from participation in a high school girls basketball
4   team?
5            ATTORNEY BLOCK:  Objection to form.
6            THE WITNESS:  So do I have a view on
7   participation of a cisgender girl in the girls category?
8   Sorry.  Say it again.
9   BY ATTORNEY BROOKS:
10       Q.   I said do you have a view on whether it is
11  reasonable to exclude a natal male with a female gender
12  identity from participation in the high school girls
13  basketball team?
14            ATTORNEY BLOCK:  Objection to form.
15            THE WITNESS:  So that is a transgender
16  girl, got it.  So --- and the question is do I have a
17  view on --- I apologize.  Go back.
18  BY ATTORNEY BROOKS:
19       Q.   I can do it again.
20       A.   Yes, do it again.  Sorry.
21       Q.   Do you have a view as to whether it is
22  reasonable to exclude a natal male with a transgender
23  identity from participation in the girls high school
24  basketball team?

Page 174

1    ATTORNEY BLOCK:  Objection to form.
2    THE WITNESS:  And it is do I have a view
3    on excluding --- as an expert am I opining on that?  I'm
4    not.  I'm opining as a scientist on what the data are.
5    BY ATTORNEY BROOKS:
6    Q.   Do you consider a policy that excludes natal
7    males with a male gender identity from the girls
8    basketball team to be, quote, discriminatory?
9    ATTORNEY BLOCK:  Objection to form and
10   scope.
11   THE WITNESS:  So as an expert I'm not
12   taking a position on excluding cisgender males from the
13   female category, if I answered that correctly.
14   BY ATTORNEY BROOKS:
15   Q.   My question was simply do you consider such a
16   policy to be a discriminatory policy?
17   ATTORNEY BLOCK:  Objection to form and
18   scope.
19   THE WITNESS:  So are you asking me as an
20   expert to define discrimination?
21   BY ATTORNEY BROOKS:
22   Q.   I will direct you to paragraph 27 of your
23   rebuttal report.  And there you wrote Doctor Carlson has
24   not offered cogent explanation for why alleged safety

Page 175

1    concerns based on average differences in size and
2    strength should be addressed within an across the board
3    exclusion of transgender women as opposed to tailored
4    nondiscriminatory policies.
5    Do you see that?
6    A.   I do.
7    Q.   So understanding discriminatory, however you did
8    understand it when you wrote that, do you consider a
9    policy that prohibits natal males with a male gender
10   identity from participating on the girls basketball team
11   to be a discriminatory policy?
12   ATTORNEY BLOCK:  Same objections.
13   THE WITNESS:  Right.  So I'm not defining
14   --- I'm not defining discriminatory here.  I'm ---
15   right.  So if you are asking as an expert to define
16   discriminatory, that I can't do.
17   BY ATTORNEY BROOKS:
18   Q.   Well, if you don't know what discriminatory
19   means, what do you mean when you referred to a tailored
20   nondiscriminatory policy?
21   ATTORNEY BLOCK:  Objection to form.
22   THE WITNESS:  I guess I have to circle
23   back initially to --- I mean we can do that for any word
24   here, right, where I could have like my own personal

Page 176

1    definition or am I acting as an expert to define these
2    words, and I think we are kind of in that situation.
3    BY ATTORNEY BROOKS:
4    Q.   But I'm asking you about your expert reports in
5    the litigation.  You must have meant something.  What
6    did you mean by nondiscriminatory when you submitted
7    this expert report?
8    ATTORNEY BLOCK:  Objection to form.
9    THE WITNESS:  So when I'm using the word
10   nondiscriminatory I am using it to mean something that
11   isn't using some other indicator --- well, I'm really
12   just using it in the broadest sense to something that is
13   including people.
14   BY ATTORNEY BROOKS:
15   Q.   Using it in the broadest sense, discriminating
16   between one category and another is --- could be a good
17   thing or a bad thing.
18   Correct?
19   ATTORNEY BLOCK:  Objection to form.
20   THE WITNESS:  As an expert I --- that is
21   way outside my scope.  But simply as an English speaker,
22   yes, discrimination could be good or it can be bad, yes.
23   BY ATTORNEY BROOKS:
24   Q.   And for instance, if you are --- well, you said

Page 177

1    you don't prescribe to minors, so --- but if you are
2    dealing with a 19-year-old who says and you concluded I
3    need gender affirming hormone, and I will use the term
4    you prefer, if that individual's hormones and biology
5    are female then gender affirming hormones are going to
6    consist, among other things, perhaps of administering
7    testosterone.
8    Correct?
9    A.   Yes, typically we would have ---.
10   Q.   And if that individual's biology and hormones
11   endogenous were male, then the gender affirming hormones
12   would include among other things estrogen or estrogen
13   analog.
14   Correct?
15   ATTORNEY BLOCK:  Objection to form.
16   THE WITNESS:  If that person had
17   typically --- typically a male hormone profile, right,
18   to move toward a more feminine profile that typically
19   would include estrogens or some other agents that were
20   other than testosterone, yes.
21   BY ATTORNEY BROOKS:
22   Q.   So speaking scientifically and not in civil
23   rights terms, if I may, you as a scientist, as you
24   decide which regimen of hormones to administer to this

45  (Pages 174 to 177)

0659

Page 178

1    individual have to discriminate between those who are
2    endogenously male and those who are endogenously female
3    in deciding which regimen you prescribe.
4         Correct?
5              ATTORNEY BLOCK:  Objection to the form.
6              THE WITNESS:  We have to make a decision.
7    And so if you are trying to get me to say that
8    discrimination can be defined as making decisions, I'm
9    with you and yes.
10   BY ATTORNEY BROOKS:
11        Q.   Okay.
12             Let me just run down a few items to make sure.
13   You have not personally engaged in any research
14   regarding sports physiology, have you?
15        A.   I'm trying to think it there's anything.  I
16   don't believe I have.
17        Q.   You yourself haven't personally engaged in any
18   research or published any papers --- that's a compound
19   question.  You, yourself, haven't engaged in any
20   research relating to sports medicine or sports injuries,
21   have you?
22        A.   I have not engaged in any research with regard
23   to sports injuries.  And the answer to the first part of
24   that gets a little muddled because some of the papers

Page 179

1    that I have written about physiology and transgender
2    people could apply to sports medicine.
3         Q.   Have you, yourself, ever participated in
4    devising any athletic training regimes for individuals
5    of either sex?
6         A.   I've not been involved in devising any training
7    regimes.
8         Q.   Have you done any research with related to male
9    physiology --- I'm sorry, male physiological advantages
10   relevant to athletics before, during or after puberty?
11        A.   So there I have --- none of the research that I
12   have done to date has been specifically loopholed as ---
13   well, I can't even say that.  So research that I have
14   done with regard to observing physiology among my
15   subjects can be applicable to sports medicine in some
16   context.
17        Q.   On what publications, if any, of yours do you
18   believe relate to male physiological advantages in
19   athletics before, during or after puberty?
20        A.   Well, just off the top of my head, without
21   looking at it exhaustively, I have a paper on
22   hematocrit, which is the oxygen-carrying cells in
23   people.  In transgender people I have a paper on
24   testosterone levels with different treatments.  So those

Page 180

1    can have --- those actually can have a sports context.
2         Q.   Have you done any research on the impact of
3    testosterone suppression on athletic performance or any
4    measurement of strength?
5         A.   So the second piece of that is I have not done
6    any research that specifically used strength as an
7    endpoint in my own studies.  To the second piece of
8    those --- I forgot what ---.
9         Q.   Athletic performance?
10        A.   Athletic performance, there it gets a muddled
11   thing.  The research that I have done can be applicable
12   in that context.
13        Q.   Well, that is if your endpoint is hematocrit
14   count, to use the right term, you're saying that might
15   have implications for athletic performance?  Is that
16   your point?
17        A.   That is correct, yes.
18        Q.   But you have not done any research in which any
19   measurement of athletic performance is an endpoint?
20             ATTORNEY BLOCK:  Objection to form.
21             THE WITNESS:  Again, I have to think
22   about how to say that because some of the --- part of
23   the problem is that papers that we're looking at include
24   quite a bit of literature on components that may be

Page 181

1    applicable --- that may be applicable in sports
2    medicine, whether it is muscle strength and muscle size
3    or blood cell counts and such.  And so that more
4    expansively than my research is in that category.
5    Whereas, if I'm trying to be focused and narrow, then
6    I've got those two studies, the one by Roberts and the
7    one by Harper.  And my papers are not those.
8    BY ATTORNEY BROOKS:
9         Q.   You don't have any information about numbers of
10   children in West Virginia who suffer from any DSD, do
11   you?
12        A.   No, as --- I guess I have to say no there in
13   terms of actual surveys of kids in West Virginia, I know
14   some brought statistics.  West Virginia is big enough
15   that you would predict that the statistics would
16   generally apply, but that is as smart as I could get on
17   the subject.
18        Q.   And you are --- I think you effectively answered
19   this, but to be clear for the record you are not opining
20   that BPJ suffers from any DSD?
21             ATTORNEY BLOCK:  Objection to the form.
22             THE WITNESS:  So the --- here too we get
23   into --- into an evolving area of definitions where you
24   could envision if some of the specific genetics that are

Page 182

1   associated with being transgender became identified,
2   would we in the medical world start to label those
3   instances as DSD? It's possible. So that is just ---.
4   BY ATTORNEY BROOKS:
5       Q.   Thus far no such indicators have been
6   identified.
7           Correct?
8       A.   I can't even --- I can't even say that
9   definitively. It is an area of active conversation in
10  terms of --- in terms of boarder setting in the medical
11  community right now.
12      Q.   However, I think my question is easier. You're
13  not offering an opinion --- any opinion that BPJ suffers
14  from any DSD, are you?
15      A.   So I don't have --- so to be clear first I don't
16  know the --- BPJ's specific medical condition. I wasn't
17  brought in to evaluate that and I have not. So I can't
18  actually render an opinion on any of the medical story
19  there.
20      Q.   And you don't know whether any child or typical
21  XY chromosome --- pardon me, you don't know whether any
22  child with XY chromosomes who suffers from a DSD has
23  ever sought to compete in female athletics in West
24  Virginia up until the present?

Page 183

1           ATTORNEY BLOCK: Objection to the form.
2           THE WITNESS: So the question is do I
3   know of an instance of a specific individual with XY
4   chromosomes and a DSD connected to that who has
5   specifically participated in sports in West Virginia?
6   BY ATTORNEY BROOKS:
7       Q.   Who has sought to participate in female
8   athletics in West Virginia?
9       A.   Right, so who has sought to participate in
10  female sports in West Virginia. I cannot give you a
11  specific instance, that is true. I can say, though,
12  knowing the percentage of people who have DSDs and the
13  size of the State of West Virginia that you would
14  predict it would be true, but that would be again as
15  smart as I could be on one subject.
16          ATTORNEY BROOKS: Let me mark as Safer
17  Exhibit 15 what was previously designated as Tab 53, an
18  article by Dr. Safer and others entitled the Mount Sinai
19  Patient Center Preoperative Criteria Meant to Optimize
20  Outcomes are Less of a Barrier to Care than WPATH SOC 7
21  Criteria Before Transgender Specific Surgery. And yes,
22  that is a mouthful.
23          ---
24          (Whereupon, Exhibit 15, Dr. Safer Article,

Page 184

1           was marked for identification.)
2           ---
3   BY ATTORNEY BROOKS:
4       Q.   Now, Dr. Safer, to be fair, I see that you are
5   the last listed author on a fairly lengthy list of
6   authors. And maybe that does and maybe that doesn't
7   have significance in terms of how in depth your
8   involvement in this paper was. Let me ask. Was this a
9   paper of which you had some significant input?
10      A.   I had significant input. I can tell you that in
11  the medical and scientific community the first author
12  typically did the work and the last author is the senior
13  author and supervisor. And the middle authors are
14  actually the ones where you ---.
15      Q.   Okay.
16          I was aware of the significance of the first.
17  I was not aware of the significance of the last. Okay.
18  That is helpful. All of the authors here, if I'm
19  correct, are colleagues within the Mount Sinai Clinic or
20  division that you supervise.
21          Am I correct?
22      A.   All of the authors were in those positions at
23  some point, which is how we came together to write the
24  paper.

Page 185

1       Q.   And the paper I should say for the record is
2   dated 2020. And let me see if I correctly understood
3   what the paper is about. If we --- in this paper you
4   compare the eligibility of patients who are seeking
5   vaginoplasty under the WPATH Standard of Care 7 criteria
6   versus the criteria actually used by your clinic.
7           Am I correct?
8       A.   Yes.
9       Q.   And just so we're clear, vaginoplasty is a
10  surgery that is only done on biological male, natal male
11  individuals.
12          Correct?
13          ATTORNEY BLOCK: Objection to form.
14          THE WITNESS: So a vaginal plasty is the
15  genital reconstruction surgery to create a vagina in a
16  person. When we are using it as a gender affirming
17  surgery, then we are using it on people who have what
18  would be considered typically male anatomy in that
19  circumstance but the surgery could also be used on
20  somebody with typically female anatomy requiring
21  construction for whatever their circumstance may be.
22  BY ATTORNEY BROOKS:
23      Q.   That said, the subjects discussed in this paper
24  are all individuals who are seeking the surgery for

47 (Pages 182 to 185)

Page 186

1  gender affirming purposes rather than, for instance,
2  because of a severe DSD.
3      Correct?
4      A.   The people in this circumstance are all people
5  seeking the surgery for gender affirming purposes and
6  not those for DSD or for other purposes, reconstruction
7  of vaginas for accidents and cancers.  I mean there is
8  quite a range.
9      Q.   And the result as summarized in the abstract is
10  that of 139 patients who were identified as subjects of
11  this study, 63 qualified for surgery immediately based
12  on the Mount Sinai criteria.
13      Correct?
14      A.  Yes.
15      Q.   Whereas only 21 of those would have qualified
16  based on the criteria set out in the WPATH Standard of
17  Care Version 7?
18      A.  Yes.
19      Q.   Three times as many individuals qualified for
20  immediate surgery under the standard used by your clinic
21  as opposed to the standards set out in the WPATH
22  Standard of Care?
23      A.  That's correct.
24      Q.   When did your clinic begin approving surgery for

Page 187

1  patients who are not eligible under the WPATH Standard
2  of Care?
3          ATTORNEY BLOCK:  Objection to form.
4          THE WITNESS:  Yeah, so to be clear, the
5  patients in our program qualify by both criteria.  The
6  paper is simply pointing out that our process is more
7  efficient and patient friendly, but it's not to say that
8  we were not informed by WPATH criteria also.  And I
9  think I need to expand even a little bit further.  Part
10  of the point of the paper is that it includes --- it
11  includes efforts to know benefit to the patient that end
12  up being time consuming and therefore are a waste of
13  energy in contrast to our approach, which is actually
14  more conservative than WPATH's approach.  We actually
15  look at more things but we do so in a more efficient
16  fashion and that is actually the point of the paper.
17  BY ATTORNEY BROOKS:
18      Q.   Well, let me clarify one thing you just said.
19  According to this paper, it is not the case, is it, that
20  every patient for whom your clinic approved surgery was
21  at that time qualified according to the WPATH criteria?
22          ATTORNEY BLOCK:  Objection to form.
23          THE WITNESS:  Wait.  Say it again.  Could
24  you repeat that?

Page 188

1  BY ATTORNEY BROOKS:
2      Q.   It is not the case, is it, that every patient
3  who was qualified for surgery by your clinic had been
4  demonstrated to satisfy the WPATH criteria for
5  eligibility?
6      A.   It is --- so there were --- the patients just as
7  stated who qualified by our criteria but not by WPATH
8  criteria, there is such a group that existed, exactly,
9  yes.
10      Q.   Okay.
11      And specifically, according to your criteria,
12  three times as many patients are eligible according to
13  WPATH criteria?
14          ATTORNEY BLOCK:  Objection to form.
15          THE WITNESS:  It's not so much the three
16  times.  It is the pace.  Some of this relates to pace
17  and efficiency.
18  BY ATTORNEY BROOKS:
19      Q.   Dr. Safer, your clinic, according to this paper,
20  approved for surgery 42 patients who were at that time
21  not eligible according to WPATH criteria.
22      Correct?
23          ATTORNEY BLOCK:  Objection to form.
24          THE WITNESS:  No.  So the reality is we

Page 189

1  still live in the universe that everybody else lives in,
2  so we are --- so this paper proposes a more appropriate
3  and a more patient appropriate model, but it is not the
4  case that we actually sent people to surgery who would
5  not be approved by WPATH.
6  BY ATTORNEY BROOKS:
7      Q.   Well, were you personally involved in developing
8  and approving Mount Sinai's criteria?
9      A.   Let me look at the role here.  Yes, I definitely
10  had a role in developing our criteria.
11      Q.   Let me ask you to look at page 168, column one,
12  call your attention quite a bit to table one.  And if I
13  understand correctly, table one is designed to help us
14  compare and contrast what is required by the WPATH
15  criteria for surgical readiness versus the Mount Sinai
16  criteria for surgical readiness.
17      Correct?
18      A.   That is correct, yes.
19      Q.   And the WPATH requires a letter of support from
20  the patient's hormone provider confirming the hormone
21  regimen and the length of time of hormone therapy.
22      Correct?
23      A.   That is how it is written, yes.
24      Q.   And farther down, under mental health it says

Jane Doe 7 0662

Page 190

1  that it requires two letters of support from mental
2  health providers?
3      A.  It does, yes.
4      Q.  And it gives on page 157 a definition who is a
5  qualified mental health professional down towards the
6  bottom of the second column.  I'm going to ask you to
7  find that language if you could?
8      A.  Uh-huh (yes), yes.
9      Q.  You say, many define licensed mental health
10  providers having one or more of the following
11  credentials, the LCSW, Licensed Clinical Social Worker.
12      Is that right?
13      A.  LCSW is Licensed Clinical Social Worker, yes.
14      Q.  And MD, DO that is a medical doctor, a doctor of
15  --- what does the O stand for?
16      A.  Osteopathy.
17      Q.  There we go.  A psychiatrist, a Ph.D., yes, that
18  was surprising to me.  Surely not just any Ph.D.?
19      A.  Right, that's referring to a Ph.D. clinical
20  psychologist.
21      Q.  Okay.
22          Or any Master's level for above counseling
23  degrees.  But then you go on to say that in your
24  evaluation based on SOC-7 criteria.  That's the WPATH

Page 191

1  criteria?
2      A.  That's the WPATH criteria, yes.
3      Q.  We included the above degrees with the following
4  exclusions, mental health providers with lower than
5  Master's level training and unlicensed mental health
6  providers of any type, NPs and PAs without mental health
7  credentials, physicians who are not psychiatrists or
8  mental health providers who are still in training.  Do
9  you see that language?
10      A.  I do.
11      Q.  So under the definition used in your clinic you,
12  yourself, do not qualify as a mental health
13  professional.
14      Correct?
15      A.  That is correct.
16      Q.  So at no point have you relied on your own
17  opinion for any mental health evaluation for
18  eligibility?
19      A.  That's correct.
20      Q.  Okay.
21          I just wanted to understand that clearly.  So
22  back to mental health data.  In says in the WPATH column
23  that two letters of support from mental health providers
24  are required.  In this paper you state on the next page,

Page 192

1  but I will quote it the most significant of the Mount
2  Sinai criteria is the removal of the requirement of two
3  independent psychiatric evaluations.  And that is in
4  column two of page 169, at the end of the first full
5  paragraph.  The first full paragraph, column two, the
6  final sentence.
7      A.  I'm in which column?  Sorry.
8      Q.  Column two.
9      A.  Oh, column two.  Sorry.
10      Q.  The first full paragraph, final sentence.
11      A.  The most significant deletion from the Mount
12  Sinai criteria is the removal of --- yes, I see that.
13      Q.  And you stated at the top of column one on the
14  same page that, quote, finding two mental health
15  providers to do independent evaluations is
16  time-consuming, expensive and difficult.
17      Right?
18      A.  Just trying to find that exact wording.  Yes.
19      Q.  So in your own clinic's practice, while WPATH
20  calls for two letters from independent mental health
21  providers, you concluded that because it was hard to get
22  two independent evaluations your clinic would simply
23  dispense with the requirement of any independent mental
24  health review.

Page 193

1      Correct?
2          ATTORNEY BLOCK:  Objection to form.
3          THE WITNESS:  No, that is not quite
4  correct.  Part of the difference for our operation is
5  that we have --- we have expertise in-house and we have
6  --- if you notice, looking at the table, a longer list
7  of requirements actually than WPATH does, which includes
8  a social work component.  And that actually is the ---
9  that's the source of actually yet a second pair of eyes,
10  as it were.  And so it is not the case that we are ---
11  that we're providing less of a screen, we are actually
12  providing more of a screen.  It's just that we are
13  operating in a more efficient manner for the patient.
14  BY ATTORNEY BROOKS:
15      Q.  Let's flip back to column one.  A few more lines
16  down it says for our analysis patients who otherwise met
17  WPATH SOC 7 criteria received one letter of support from
18  the CTMS mental health provider.  Right?  You would
19  agree with me, would you not, that the only letter of
20  support for a mental health provider required by your
21  protocols is from a mental health provider within your
22  employment?
23          ATTORNEY BLOCK:  Objection to not reading
24  the complete sentence.

49  (Pages 190 to 193)

inweek7762 0663

Page 194

1    THE WITNESS:  So yes.  So maybe let me
2  just --- show me the wording again.
3  BY ATTORNEY BROOKS:
4    Q.   Yes.  For our analysis --- and I'm beginning at
5  perhaps eight lines down.
6    A.   Our analysis, yes.
7    Q.   Patients who otherwise met WPATH SOC 7 criteria
8  received one letter of support from the CTMS mental
9  health provider doing the assessment, period, closed
10  quoted.
11    Do you see that?
12    A.   I do, yes.
13    Q.   As the term is generally understood in your
14  field, a CTMS mental health provider is not independent
15  --- let me use the correct terminology, is not an
16  independent mental health provider?
17    A.   So in a clinic setting I don't know that the
18  word independent actually has the same meaning as in
19  some other context.  So even a WPATH requirement isn't
20  necessarily that it would be an unaffiliated person or I
21  don't know what you were thinking independent might mean
22  here, so I don't want to put words in your mouth or
23  conjecture too much.  But when we say independent we
24  just mean two different people.

Page 195

1    Q.   But in fact, the letter of support from the CTMS
2  mental health provider that you refer to in this
3  paragraph at the top of column one of page 169 actually
4  plays no role in your determination as to whether this
5  patient is eligible for surgery.
6    Correct?
7    ATTORNEY BLOCK:  Objection to form.
8    THE WITNESS:  So yes.  I'm confused by
9  the question.
10  BY ATTORNEY BROOKS:
11    Q.   I'm confused by the text.  The final paragraph
12  --- sentence in that paragraph reads these letters of
13  support were used to satisfy third payor requirements to
14  cover surgery and were not part of the CTMS assessment?
15    A.   Oh, yeah, that's a good point.  The literal
16  letter is because we are all in-house the opinion of the
17  person is, of course, important and so the screen takes
18  place.  But the need to create --- the bureaucratic of
19  creating a specific letter is one of the burdens that we
20  are suggesting could be removed.
21    Q.   In table one, let me find this.  Under mental
22  health WPATH SOC-7 requires, quote, persistent, well
23  documented gender dysphoria.
24    Do you see that?

Page 196

1    A.   I do.
2    Q.   And you understand well documented gender
3  dysphoria to be referring to a general diagnosis under
4  the DSM-V criteria?
5    A.   So for WPATH's purposes I think they are
6  specifically referring to the DSM diagnosis.
7    Q.   In your clinic you are willing to approve for
8  this --- I'm not sure how to actually say the word
9  vaginoplasty surgery, individuals who do not suffer from
10  persistent well documented gender dysphoria.
11    Correct?
12    ATTORNEY BLOCK:  Objection to the form.
13    THE WITNESS:  So if you look, the list of
14  the criteria for Mount Sinai, then the phrasing is a
15  confirmation that this person --- for all intents and
16  purposes, that this person is transgender and with the
17  language and evolution we use that word gender dysphoria
18  and we also use the new word that will replace gender
19  dysphoria, gender incongruence, as the terms I
20  referenced before, transgender.
21  BY ATTORNEY BROOKS:
22    Q.   And the effect of that is you do not require a
23  diagnosis of gender dysphoria under the terms of DSM-V.
24    Correct?

Page 197

1    ATTORNEY BLOCK:  Objection to form.
2    THE WITNESS:  So the --- yeah, if we had
3  our druthers, which is I think you are asking, and we
4  did not --- and we weren't simply satisfying a third
5  party payor, would we insist on that formal DSM-V
6  criteria for a person we otherwise know to be
7  transgender?  We would not.
8  BY ATTORNEY BROOKS:
9    Q.   And in fact, you do not.
10    Correct?
11    ATTORNEY BLOCK:  Objection to form.
12    THE WITNESS:  Well, as a practical
13  matter, like I said, we live in a universe where we end
14  up doing both what we suggest is the necessary approach
15  and we end up, because we still live in the universe
16  that we live in, satisfying the other approach even
17  though we're suggesting that it's cumbersome.
18  BY ATTORNEY BROOKS:
19    Q.   Dr. Safer, you testified earlier that, in fact,
20  in 42 patients your clinic determined they were surgery
21  eligible even though they did not satisfy the SOC
22  criteria listed in column one of table one?
23    A.   Right.  So they are not --- so they would be ---
24  they theoretically would be eligible without having

Page 198

1    satisfied the --- some of those specific WPATH criteria
2    that we discussed.  But in practice nobody went to
3    surgery without covering both sets of criteria.
4        **Q.   Isn't the precise results reported by this paper**
5    **that 42 patients were deemed surgery approved who did**
6    **not qualify under WPATH criteria?**
7        A.   But I guess the bottom line of the paper is that
8    if we followed our --- our rules alone, we would
9    actually cover more details and be more conservative in
10   our approach if a longer list of criteria and we would
11   do so more quickly.  That's all the paper says.  It
12   doesn't say that we have --- that we have actively
13   defied the existing universe and sent people to surgery
14   without covering the criteria that are generally being
15   used by doctors.
16       **Q.   And by the way, the surgery we're talking about,**
17   **vaginoplasty, in the context where it is being used for**
18   **gender affirming purposes, invariably includes**
19   **castrating the individual.**
20       **Correct?**
21       ATTORNEY BLOCK:  Objection to form and
22   foundation.
23       THE WITNESS:  So a vaginoplasty is a
24   genital reconstruction surgery, which in this context is

Page 199

1    taking the existing typically --- typical male genitalia
2    and reconfiguring it into typically female genitalia.
3    And in that --- in the procedure the testes are removed.
4    BY ATTORNEY BROOKS:
5        **Q.   They're not reconfigured?**
6        A.   They are not reconfigured.
7        **Q.   Let me ask you 169, column one, it says about**
8    **two-thirds of the way down, at the end of the paragraph**
9    **that begins medical requirements for the Mount Sinai**
10   **CTMS?  I want to direct your opinion --- your attention**
11   **to the final sentence.**
12       A.   So which paragraph, column one.
13       **Q.   Column one, the paragraph that begins halfway**
14   **down, medical requirements?**
15       A.   Yes.
16       **Q.   Now, let's jump to the end.  The Mount Sinai**
17   **criteria also removed the 12-month continuous hormone**
18   **therapy requirement for the vaginoplasty which**
19   **complicates matters for people who have received hormone**
20   **therapy from non-medical providers.**
21       **Do you see that language?**
22       A.   I do.
23       **Q.   Explain to me the reference for people who have**
24   **received hormone therapy from non-medical providers?**

Page 200

1        A.   Well, it is the circumstance that some people
2    more so outside of New York, some transgender people
3    still do not have access to care for --- to gender
4    affirming care and do get some of their treatment by
5    alternative means.  And if there is an insistence on a
6    documented 12-month continuous hormone therapy
7    requirement, then those people might not be able to be
8    approved for surgery.
9        **Q.   I need to ask you to clarify what you mean by**
10   **obtaining by alternate means?**
11       A.   We have people getting hormones from internet
12   providers.  We have people inappropriate --- well, I
13   apologize, I don't want to make a value judgment there,
14   but we have people getting hormones from friends or
15   connections of theirs, things outside the system.
16       **Q.   So you have some people come to you who have**
17   **effectively self-diagnosed and self-prescribed ---**
18       ATTORNEY BLOCK:  Objection.
19   BY ATTORNEY BROOKS:
20       **Q.   --- hormone therapies?**
21       ATTORNEY BLOCK:  Objection to form.
22       THE WITNESS:  So when we are seeing
23   people for surgeries, then it is no longer a matter of
24   self-diagnosis because we see them ourselves with our

Page 201

1    internal team.  But there are people who have
2    self-prescribed their hormones or obtained them by
3    nonconventional means, that part, yes.
4    BY ATTORNEY BROOKS:
5        **Q.   And when people come in who have obtained**
6    **hormones by nonconventional means and taken them without**
7    **prescription necessarily, you chose to remove the**
8    **requirement for 12 months properly prescribed continuous**
9    **hormone therapy rather than insisting that the patients**
10   **undergo control of hormone therapy for 12 months before**
11   **you operate on them?**
12       ATTORNEY BLOCK:  Objection to form.
13       THE WITNESS:  So to clarify, again, these
14   are --- we are proposing that this would be the
15   protocol.  In practice, we have not been able to do
16   this, that is we have had to do both.  But in our
17   experience, as a program we don't see any benefit to a
18   supervised --- a supervised regimen, that is we are not
19   --- I'll just leave it there.
20   BY ATTORNEY BROOKS:
21       **Q.   WPATH in table one requires that all psychiatric**
22   **symptoms be, quote, well controlled.**
23       **Correct?**
24       A.   They use that language, yes.

Page 202

1    Q.   And the language under the CTMS column is rather
2  different.  Among other things it says no suicide
3  attempt in the last six months.  Do you see that?
4    A.   Let me find it.  We're in the table, right?
5    Q.   We are in the mental health section under CTMS
6  column?
7    A.   Yes.
8    Q.   No suicide attempt in the last six months.  But
9  if the patient tried to commit suicide seven months ago,
10 that's okay?
11        ATTORNEY BLOCK:  Objection to form.
12        THE WITNESS:  So the point here and the
13 distinction is that the WPATH criteria are too vague,
14 and so what you are observing with the Mount Sinai
15 criteria is they're much more granular.  And rather than
16 leaving something to some subjective interpretation we
17 define some of the specifics to make it clearer on what
18 the guidelines should be.
19 BY ATTORNEY BROOKS:
20   Q.   You refer here in your guideline to no suicide
21 attempt in the last six months.  If a patient has
22 entertained suicidal thoughts but made no attempt in the
23 last six months, did that patient potentially satisfy
24 the Mount Sinai criteria?

Page 203

1    A.   So that kind of decision would be at the
2  discretion of the reviewing mental health professional,
3  the psychiatrist or the psychologist, and so you can
4  certainly envision different circumstances.  So even
5  going back to your example of seven months, you could
6  envision that something like that might be considered,
7  depending upon the person, too unstable even though they
8  technically met criteria.  This isn't just a check box.
9  It is more a guideline.  And similarly, to your point
10 about a suicidal ideation, there are different tiers of
11 them.  And I won't claim to be an expert on the
12 specifics there, but my mental health professionals are
13 more concerned about some of those than others.
14        ATTORNEY BROOKS:  Take a break.
15        VIDEOGRAPHER:  The current time reads
16 3:35 p.m. Eastern Standard Time.
17 OFF VIDEOTAPE
18             - - -
19 (WHEREUPON, A SHORT BREAK WAS TAKEN.)
20             - - -
21 ON VIDEOTAPE
22        VIDEOGRAPHER:  We are back on the record.
23 The current time is 3:55 p.m. Eastern Standard Time.
24 BY ATTORNEY BROOKS:

Page 204

1    Q.   Dr. Safer, you testified earlier, and I think
2  I'm using the word that you used that if your clinic had
3  its druthers they would be following or making decisions
4  strictly based on the criteria that are laid out in this
5  paper, Exhibit 15, under the heading of Mount Sinai
6  CTMS.
7        Correct?
8    A.   Yes.
9    Q.   And can I infer from that that you, yourself,
10 don't view the WPATH SOC-7 as setting out scientifically
11 established best practices but rather recommendations on
12 which you use different?
13        ATTORNEY BLOCK:  Objection to form.
14        THE WITNESS:  No, I would not say that.
15 So SOC-7 sets out the guidelines as things were
16 understood in 2011 and 2012, and we have learned ---
17 we've learned and things have evolved since then in
18 terms of the care of transgender people.
19 BY ATTORNEY BROOKS:
20   Q.   Did you have any participation in the
21 development of the SOC-7 guidelines?
22   A.   I had very minimal participation.  I helped
23 review some articles that informed those guidelines.
24   Q.   Those guidelines --- did you have any

Page 205

1  familiarity with the process of how they were being
2  drafted?
3    A.   I'm trying to think if I can say things
4  usefully.  I was not close enough to the process that we
5  would want --- that I would want to start commenting on.
6    Q.   Do you know whether they addressed issues on
7  which opinions within the drafting committee differed?
8    A.   I can't comment on SOC-7.  We are literally
9  writing SOC-8 now.
10   Q.   And on that are there issues that the SOC-8 is
11 addressing on which opinions significantly differ?
12   A.   Yes.
13   Q.   So it's not that every aspect of the guidelines
14 are unanimously agreed by every member?
15        ATTORNEY BLOCK:  Objection to form.
16        THE WITNESS:  So with medical guidelines
17 in general there isn't --- that unanimity wouldn't be a
18 thing.  They're referred to as consensus documents
19 rather than unanimous documents.
20 BY ATTORNEY BROOKS:
21   Q.   And what that tells us is that there is --- that
22 reasonable people differ on at least some aspects of
23 what is set forth in the document?
24        ATTORNEY BLOCK:  Objection to form.

Page 206

1    THE WITNESS:  In all guidelines,
2  including these, members of the committee even differ in
3  terms of how things are framed and when consensus is
4  obtained, but not unanimity.
5  BY ATTORNEY BROOKS:
6    Q.  How many gender performing surgeries or gender
7  affirming surgeries were performed in your clinic in
8  2021?
9    A.  In 2021, all --- there were, according to the
10  New York Times, about 9,000 total surgeries performed at
11  Mount Sinai hospitals, including everything we do.  So
12  that wouldn't just be vaginoplasty.  That would include
13  chest reconstruction surgeries, revisions of older
14  surgeries, et cetera.
15    Q.  Well, you quote the New York Times.  Where did
16  they get the information?
17    A.  I suppose the sources is us.
18    Q.  You believe that number to be approximately
19  accurate?
20    A.  I think that's right.
21    Q.  I don't trust the New York Times, but you have a
22  pass.  And now 2021 may or may not have been affected by
23  COVID in terms of patients presenting and wanting
24  surgery.  Has there been a clear trend in numbers of

Page 207

1  surgeries performed by your clinic over the last five
2  years?
3    ATTORNEY BLOCK:  Objection to form.
4    THE WITNESS:  So there is definitely an
5  increase in the number of surgeries at Mount Sinai over
6  the past five years.  Unfortunately, expectation is the
7  challenge.  We opened the program in 2016, so roughly
8  those five years.  And certainly the first few years
9  were quieter as the reputation grew.  In 2020, numbers
10  were down because we had to divert resources to taking
11  care of people with COVID.  Our group, including myself,
12  literally dropped what we were doing for a period of
13  time to go become COVID hospital employees, and so there
14  was a dip there in 2021 as a little bit of a rebound
15  element to it.
16  BY ATTORNEY BROOKS:
17    Q.  Are you able to give me any average total
18  receipts of your clinic or the hospital as a whole and
19  associated physicians from gender affirming surgeries
20  performed within 2021?
21    A.  I'm sorry, say that again.
22    Q.  Let me just ask this again.  Do you have any
23  knowledge as the total --- as to the total receipts of
24  your clinic or the wider hospital and physicians

Page 208

1  involved as a result of gender affirming surgeries
2  performed by your clinic in the last year?
3    A.  So do I know some of the financial elements?
4    Q.  Correct.
5    A.  So I do know some of the financial elements, but
6  nothing that the hospital would allow me to share.
7    Q.  Your counsel can designate it as confidential
8  later on, so it doesn't become public, but you are
9  obliged to answer the question.
10    ATTORNEY BLOCK:  I'm not ---.
11  BY ATTORNEY BROOKS:
12    Q.  I'm entitled to understand your financial
13  interest in the area of your testimony.
14    ATTORNEY BLOCK:  We are not representing
15  him in the context of any legal dispute with Mount
16  Sinai.
17    ATTORNEY BROOKS:  I am entitled to
18  understand the expert's financial interest.  And I
19  suggest to you, Counsel, that you'd rather have me
20  questions asked here where you can designate it as
21  confidential than at trial in a public courtroom.
22    ATTORNEY BLOCK:  It's not up to me.
23    ATTORNEY BROOKS:  You can confer if you
24  want, because that would be the alternative.  If you

Page 209

1  want to step out and confer with your witness, you
2  should do so.
3    ATTORNEY BLOCK:  It's not up to me to say
4  what he can and can't say in contravention with an
5  agreement with his employer, and so I think if you want
6  to like obtain like a Protective Order, you know, with
7  him.
8    ATTORNEY BROOKS:  We have a Protective
9  Order in place, Counsel.
10    ATTORNEY BLOCK:  I know, I'm not
11  representing him in that capacity, though.  So if you
12  want to interface with his attorney through Mount Sinai
13  then you can, but I don't have an attorney/client
14  relationship with him for purposes of any employment
15  disputes.
16    ATTORNEY BROOKS:  Are you instructing the
17  witness not to answer?
18    ATTORNEY BLOCK:  No, I'm not.
19    ATTORNEY BROOKS:  Are you refusing to
20  answer?
21    THE WITNESS:  I wouldn't be able to
22  answer without including the hospital lawyers.
23  BY ATTORNEY BROOKS:
24    Q.  Can you tell me ---?

53 (Pages 206 to 209)

Page 210

1    ATTORNEY TRYON:  This is Dave Tryon.  I'm
2  sorry ---.
3    ATTORNEY BROOKS:  Go ahead.
4    ATTORNEY TRYON:  May I just also say that
5  I think if the witness is not willing to disclose his
6  financial interest here, that that would be grounds to
7  disqualify him as a witness, which on behalf of the
8  state I would likely pursue.  So I would respectfully
9  request that he answer the question.
10    ATTORNEY BLOCK:  Dave, on what basis is
11  that grounds to --- he has disclosed everything required
12  by the rules.  You're asking for --- he has no financial
13  interest in this litigation.
14    ATTORNEY BROOKS:  We don't need to argue
15  the motion right now.  The motion seems likely, the
16  motion will be briefed, but we don't --- we got no Judge
17  here, we're not going to be deciding ---.
18    ATTORNEY BLOCK:  If you want to file a
19  subpoena as a third-party subpoena for that information
20  with a Court Order, than you're free to do so.  He is
21  appearing here as an expert witness on his expert
22  testimony.  So you have plenty of discovery tools to
23  obtain that information.  And we're not his counsel for
24  that.

Page 211

1    ATTORNEY BROOKS:  I do have discovery
2  tools, including asking him questions at this
3  deposition.  I've attempted to do so.  You have not
4  instructed him not to answer.  The witness has refused
5  to answer.  The record is clear.
6  BY ATTORNEY BROOKS:
7    Q.   Let me ask you about personally.  Does your own
8  income or any bonus you receive depend on any part of
9  the overall revenues of your plan?
10    A.   It does not.
11    Q.   And does your personal income consist strictly
12  of a salary or also a salary plus fees associated with
13  surgeries performed?
14    A.   Exclusively a salary.
15    Q.   And your income depends in no way on how many
16  surgeries, you yourself perform?
17    A.   That --- well, I don't perform surgeries I'm not
18  an endocrinologist.
19    Q.   Pardon me.
20    A.   But that's right, it's not revenue based.
21    Q.   It's not revenue based in any way?
22    A.   In any way.  That's right.
23    Q.   That is helpful.  Do you have any understanding
24  as to the average revenues per patient that your clinic

Page 212

1  receives for patients who are seeking gender affirming
2  surgery in the clinic?
3    A.   We don't characterize it that way.  There's a
4  --- there's a wide range of reimbursements or lack of
5  reimbursements across medicine.  And gender affirming
6  care includes quite that entire range actually, from
7  mental health, which is under reimbursed, to the
8  surgeries which are --- where there's more money.
9    Q.   I've been waiting to hear the flip side of that.
10    A.   So yes, so we have that, so I don't think I
11  could give --- I wouldn't --- even were I allowed by the
12  hospital to give you the specifics, I don't know that I
13  would be able to do that on a per patient basis.
14    Q.   Can you tell me your total personal income in
15  2021 from --- in any way related to your work in
16  connection with your employment at Mount Sinai?
17    A.   So is this something that I'm answering?
18    ATTORNEY BLOCK:  I'm sorry, could you
19  restate the question?
20    THE WITNESS:  He's asking for my ---
21  you're asking for my salary?
22  BY ATTORNEY BROOKS:
23    Q.   I'm asking for your total income, in any way
24  --- in 2021 in any way associated with the clinic at

Page 213

1  Mount Sinai?
2    A.   So we're running into --- so I'm simply on
3  salary, but the specifics of that are also something
4  where I would need to include the Mount Sinai lawyers,
5  because that's part of their practice, and I would have
6  to defer to them.
7    Q.   You decline to answer the question about your
8  own personal income?
9    A.   Yes.
10    ATTORNEY BROOKS:  I won't take time to
11  speak upon it, but I will object.
12  BY ATTORNEY BROOKS:
13    Q.   I read in some document that your spouse is an
14  employee of Parexel --- if I'm pronouncing that company
15  correctly.
16    Is that still the case?
17    A.   Yes.
18    Q.   And does that company derive any revenues from
19  the sales, testing, clinical trials of any
20  pharmaceutical that is used to suppress puberty or is
21  used as a cross sex hormone?
22    A.   I don't know the answer.  Parexel is a very
23  large back office organization supporting clinical
24  research with many clients.  And so you can envision

54 (Pages 210 to 213)

1    some connection buried in there, but I don't know
2    specifics.
3        Q.   Fair enough.
4            ATTORNEY BROOKS:  Let me have 54.
5    BY ATTORNEY BROOKS:
6        Q.   Let me ask you to turn to paragraph 18 in your
7    expert report, and there in the first sentence you write
8    although the detailed mechanisms are unknown, there is a
9    medical consensus that there is a significant biologic
10   component underlying gender identity, closed quote.
11       Do you see that?
12       A.   No, I might have pulled the wrong thing out.
13   Which ---?
14       Q.   It's the expert report not the rebuttal?
15       A.   Expert report.  And it's which paragraph?
16       Q.   Paragraph 18?
17       A.   Oh, sorry.
18       Q.   This is why lawyers number their paragraphs.
19       A.   That is wise.  All right.  Paragraph 18.
20       Q.   I'm just calling your attention --- and I have
21   read into the record the first sentence of that
22   paragraph.
23       A.   I see it.
24       Q.   And picking up on our earlier discussion about

1    consensus.  When you say there is a medical consensus,
2    do you mean that all experts in the field agree or do
3    you mean that in your view this is a majority opinion?
4            ATTORNEY BLOCK:  Objection to form.
5            THE WITNESS:  So when I guess similar to
6    when we talked about guidelines if the question is, is
7    there unanimity, then there is never unanimity, so there
8    you go.
9    BY ATTORNEY BROOKS:
10       Q.   Okay.
11       A.   I can be a little stronger, though, because the
12   mainstream medical organizations have various statements
13   in this space.  So for example, the endocrine society,
14   which is the largest international organization of
15   endocrinologists does actually have a statement where
16   the sum of the modeling for gender affirming care is
17   prefaced with statements that support this.
18       Q.   In providing the basis for your opinion that
19   there is such a consensus, you cite only two papers and
20   those only papers that you had written yourself.
21       Did you consider those papers written by
22   yourself to adequately document the existence of the
23   medical consensus?
24           ATTORNEY BLOCK:  Objection to form.

1            THE WITNESS:  So both of the papers
2    reference reviews with larger bibliographies that
3    reference yet other papers that support the statement.
4    And when we're talking about what's informing the
5    statement, of course, is not limited to the specific
6    papers referenced, so that's part of the reason why I
7    gave that example, for example, the endocrine society's
8    formal statements on the project, which is a consensus
9    view of more people than myself, of course.
10           ATTORNEY BROOKS:  Let me mark as
11   Exhibit 16, an article by Aruna Saraswat and others
12   entitled Evidence Supporting the Biological Nature of
13   Gender Identity from 2015 of which Dr. Safer is one of
14   the co-authors.
15           ATTORNEY WILKINSON:  Tab 54.
16           ---
17           (Whereupon, Exhibit 16, Aruna Saraswat
18           Article, was marked for identification.)
19           ---
20   BY ATTORNEY BROOKS:
21       Q.   And Dr. Safer, is that a paper that you --- I
22   guess I see by placement --- had supervisory
23   responsibility for?
24       A.   Yes.

1        Q.   Let me --- I learned something in this
2    deposition, so that is good.
3        Let me call your attention to page two and
4    column two, and in the very bottom paragraph ---.
5            ATTORNEY BLOCK:  I'm sorry, did you mean
6    200?
7            ATTORNEY BROOKS:  I did mean 200.  I
8    apologize.  That is also the second page.
9    BY ATTORNEY BROOKS:
10       Q.   In the bottom --- first column bottom paragraph
11   it states, quote, however it is important to note that
12   most transgender individuals develop a gender identity
13   that cannot be explained by atypical sexual
14   differentiation, closed quote.
15       A.   So this is column two.
16       Q.   Column one.  If I misspoke I apologize.
17       A.   I could have misunderstood at this hour.
18       Q.   At the bottom paragraph?
19       A.   However it is important to note, I'm there, yes.
20       Q.   All right.
21       Can you explain to me what is meant by the
22   statement that most transgender individuals have a
23   gender identity that cannot be explained by atypical
24   transgender differentiation?

Page 218

1   A.   So that is referencing, in this context at the
2   time that this was written, the anatomy, genitals,
3   reproductive structures.
4   **Q.   And let me just --- for purposes of terminology,**
5   **you said at the time this was written.  This is about**
6   **seven years ago, six years ago?**
7   A.   2015, yes.
8   **Q.   And if you look at the page one, column one**
9   **abstract.  This paper is using the term disorders, in**
10  **sexual development, and that DSD.**
11      **Do you see that?**
12  A.   I do.
13  **Q.   That was a term that you were comfortable with**
14  **most recently?**
15  A.   It was a terminology that I was using that
16  recently, yes.
17  **Q.   The point here, on page 200, column one, that we**
18  **were just looking at is, in fact, most transgender**
19  **individuals do not suffer from any identifiable DSD.**
20      **Is that what this is saying?**
21  A.   From a physically identifiable DSD, that is what
22  this is saying, yes.
23  **Q.   Physically, genetically, hormonally,**
24  **identifiable by any physical measurement.**

Page 219

1      **Correct?**
2      ATTORNEY BLOCK:  Objection to form.
3      THE WITNESS:  So you have to be careful
4   to be not too broad, and part of the reason is the line
5   there is actually blurring.  So when I'm sitting here
6   and talking in 2022 I recognize that there is a
7   potential for some blurring in that line.  But in 2015
8   it was certainly understood to be how you're saying it.
9   BY ATTORNEY BROOKS:
10  **Q.   Well, it remains true today, does it not, that**
11  **the overwhelming majority of transgender individuals do**
12  **not suffer from any identifiable atypicality**
13  **genetically, physically or hormonally.**
14      **Correct?**
15  A.   Well, that's not how I would say it, because
16  gender identity is a biological phenomenon and so one
17  would predict that as we identify certain correlates or
18  even explanations, than we will have things in that
19  space.  But if we're talking about how things were
20  defined in 2015, being transgender was defined as
21  somebody where their gender identity was not aligned
22  with the rest of their biology, and there was no
23  apparent, physical variation either in terms of their
24  anatomy or their chromosomes in terms of their genitals,

Page 220

1   in terms of their reproductive anatomy or in terms of
2   their chromosomes.  So that is how it was defined at the
3   time.
4   **Q.   Well, today, and using identifiable to mean you,**
5   **Doctor safer, are able to identify it now, not**
6   **hypothetically in the future, it remains true that the**
7   **overwhelming majority of transgender individuals do not**
8   **suffer from any current identifiable, physical**
9   **chromosomal or hormonal irregularity.**
10      **Correct?**
11  A.   I would say that right now in 2022, it would be
12  true to say that a transgender person does not have an
13  identifiable genital difference almost by definition or
14  a --- or an internal reproductive organ difference
15  almost by definition.  Chromosomal I can't say, because
16  we actually don't check.  And hormonal gets even grayer
17  than that, because it could be the case that there are
18  hormonal exposures, for example, in utero that explain
19  at, least some people as being transgender.
20  **Q.   As you sit here today, you don't know of any**
21  **chromosomal test that can identify an individual as**
22  **transgender, do you?**
23  A.   Is there a --- there --- as I sit here today
24  there are no tests to identify somebody who is

Page 221

1   transgender.
2   **Q.   And that includes genetic tests?**
3   A.   There's no scan and there are no blood tests and
4   there are no genetic tests.
5   **Q.   And no hormonal tests?**
6   A.   That's right.  There are no hormonal tests right
7   now to identify a transgender person.
8   **Q.   As you sit here today and based on your whole**
9   **knowledge of the field, there is no biological test from**
10  **some mental professionals, as they can do, but there is**
11  **no biological test that will tell you in advance which**
12  **prepubertal child who is suffering from gender dysphoria**
13  **would persist and which would desist as they enter**
14  **adolescence?**
15  A.   So I would have to challenge how you're stating
16  that a little bit just so that we are cleaner in terms
17  of how we think.  So we're thinking right now in terms
18  of identifying kids who are transgender.  We use various
19  terminologies, so that --- we've have been using the
20  term gender dysphoria we're going to be shifting to more
21  gender incongruence, but we're trying to identify people
22  who are transgender and who may require intervention
23  later.
24      Recognizing further that only a subset of

Page 222

1    transgender people would require a medical or surgical
2    intervention.  And so if the question is can --- is
3    there a test now in 2022 to determine in an prepubescent
4    kid who says they're transgender or people who suspect
5    may be transgender on whatever they're saying, no, there
6    is no test to know that is true or not and to know if
7    they'll think that later or not, and to know if they'll
8    want treatment or not.
9        Q.   So it is your opinion that there is consensus
10   that there is a biological basis for transgender
11   identification, but as of 2022 you don't know with any
12   confidence what that biological basis is.
13       Correct?
14           ATTORNEY BLOCK:  Objection to form.
15           THE WITNESS:  I would say that it is
16   complicated and there may even be more --- there might
17   be multiple explanations for people being transgender.
18   We see that with other biological entities like
19   diabetes, for example.  So the idea that we don't know
20   what it is, is also a little too narrow.
21   BY ATTORNEY BROOKS:
22       Q.   You don't know any one identifiable biological
23   cause with any confidence that state within a scientific
24   knowledge?

Page 223

1        A.   No.  That's not quite true.  We know that ---
2    and it's not even the biology of being transgender even
3    though that is how I just framed it.  It is even one
4    step back which is the biology of gender identity.  We
5    all have gender identity, and how is that determined and
6    what is that biology.  And we know there --- and we know
7    then that some transgender people have that particular
8    biology not aligned with some of their other biology.
9        So going back to what you just asked, that we
10   don't know any mechanisms is not quite true.  That is
11   people that looks to be true that exposure to androgen,
12   male hormones in utero can have some influence on some
13   people as to their identity.
14       Q.   Well, if there is not yet any test that is
15   predictive of gender identity in a prepubescent child,
16   then as a matter of science it follows that you don't
17   actually know any causal relationship, any biological
18   basis, is that not true?
19       A.   No, that wouldn't be quite sure.  We can't test
20   for somebody deemed transgender, and we can't test
21   gender identity with a test.  But like I said, that at
22   least in some circumstances the androgen exposure in
23   utero, in a mother's womb, could be part of the
24   explanation for some people.  Maybe isn't all the

Page 224

1    explanation for some people.
2        Q.   It could be, but no science has been done to
3    prove that that is a fact, has it?
4        A.   So it isn't really a hypothetical, that is we do
5    have --- we do have data that support it, but it doesn't
6    lead us to a test.
7        Q.   If it is not testable, then it is a hypothesis,
8    not a fact, isn't it, not of science.
9        Correct?
10           ATTORNEY BLOCK:  Objection to form.
11           THE WITNESS:  No, that is using testing
12   two different ways.  So in a scientific sense, then a
13   hypothesis is something that you have based on a certain
14   --- based on certain data, but then you test to see how
15   true it might be.  But when I was using the word test,
16   I'm talking about like a blood test or something that we
17   could actually do on a given individual to know their
18   circumstance with regard to their gender identity.
19   BY ATTORNEY BROOKS:
20       Q.   Let me ask you to look at the paper that I've
21   marked as Exhibit 16, Evidence Supporting the Biological
22   Nature.  Is that that which you have in front of you?
23       A.   I do, yes.
24       Q.   And on the first page you refer under the result

Page 225

1    that begins by discussion of a seminal study by
2    Meyer-Bahlburg.  Do you see that?  Second column,
3    beginning of the results section.
4        A.   Yes.
5        Q.   And is it your contention that the
6    Meyer-Bahlburg study provides evidence of a biological
7    basis for transgender identification?
8        A.   What the Meyer-Bahlburg study does is it
9    provides evidence of a biological basis for gender
10   identity.
11       Q.   Well, specifically the study, the Meyer-Bahlburg
12   study --- let me have that so we are not shooting in the
13   dark.  Exhibit 17 is a paper from 2005 from Professor
14   Heino Meyer-Bahlburg, entitled Gender Identity Outcome
15   in Female Raised 46, comma XY persons with penile
16   agenesis, and it continues.  It's a long document.
17           ATTORNEY WILKINSON:  Tab 14.
18           ---
19       (Whereupon, Exhibit 17, 2005 Paper by
20       Professor Heino Meyer-Bahlburg, was marked
21       for identification.)
22           ---
23   BY ATTORNEY BROOKS:
24       Q.   I believe the level of questions that I will be

Page 226

1  asking, however, are the ones that you will know off the
2  top of your head given the importance of this study in
3  the field.  The study concerned exclusively children who
4  are born with what's referred to as a 46 XY condition.
5      **Right?**
6      A.  Yes.
7      **Q.   And that is long recognized as a DSD?**
8      A.  No, 46 XY is the classic male chromosome
9  pattern.
10     **Q.   Yes.  Pardon me.  So these are individuals with**
11 **typical male pattern chromosomes?**
12     A.  Yes.
13     **Q.   Who, however, for some reason have had a**
14 **developmental disorder or defect affecting their**
15 **genitals?**
16     A.  Who have had some sort of alteration or
17 development of their genitals, exactly.
18     **Q.   And the study concerns the results of efforts to**
19 **raise such genetically male children as female in some**
20 **cases after surgical procedures to feminize them and in**
21 **some cases absent surgical procedures.**
22     **Correct?**
23     A.  The study really relates to the gender identity
24 of those where there is an attempt to raise them as

Page 228

1  can be summarized as follows.  One, the majority of 46
2  XY individuals with presumably normal male prenatal
3  hormonal milieu, comma, non-hormonal anatomic
4  abnormalities of the genitals, comma, and female gender
5  assignment at birth or in early childhood have not
6  changed gender to male.  Do you see that?
7      A.  I do see it.
8      **Q.   And one thing, and I understand the**
9  **qualifications that you've just described this is not**
10 **recording a carefully structured study performed by**
11 **Doctor Meyer-Bahlburg but rather a review of case**
12 **histories.**
13     **Right?**
14     A.  Exactly.
15     **Q.   But his conclusion from his review of those is**
16 **that the majority of genetically presumably normal male**
17 **individuals who were raised female, and I believe it's**
18 **fair to summarize in most cases after feminizing genital**
19 **surgery, adhered to a female gender identity at least to**
20 **the data we have?**
21     A.  Yes, so I don't know whether they actually all
22 had surgery or not.
23     **Q.   They did not all have surgery.**
24     A.  Right or even the larger number.  I don't know.

Page 227

1  females.
2      **Q.   And the results, if I understand the study, were**
3  **mixed, that is that some of the individuals who were**
4  **raised as females nevertheless came to identify as male**
5  **and some of the individuals who were raised as females**
6  **came --- persisted in identifying as female.**
7      **Correct?**
8      A.  It is not actually as clean as you're saying it.
9  So we should look at some of the specifics and we might
10 need to point out to specific sentences, but this too is
11 a survey of --- a survey of studies, to be clear, it's
12 not its own isolated study, and then there --- in none
13 of these studies were they systematic or, you know, I
14 guess I will just use the word systematic in
15 ascertaining that all of the people who were being
16 raised female and ascertaining all of the gender
17 identity of those people.  But what they are really
18 observing is that the numbers that they mention of the
19 people who they were trying to raise female who had male
20 gender identity were whatever the numbers were.  I don't
21 know if that makes sense, but you'll follow as
22 necessary.
23     **Q.   If you turn to page 432 it begins under the**
24 **heading discussion.  It begins, quote, the main findings**

Page 229

1  I would have to go through.
2      **Q.   Fair enough.**
3      A.   But the --- and it was his opinion at the time
4  he was writing this that the majority who were reared
5  female were living as female, although we don't know
6  their gender --- but now this is me stepping out, saying
7  we don't know their gender identity, nobody asked.  The
8  reason why this paper is interesting is even in the
9  circumstance where they were being so passive in how
10 they were collecting the data, such a large fraction of
11 these individuals were so clear in their male gender
12 identity that they actually identified themselves
13 against the protocols.
14     **Q.   And that seemed to be evidence that --- of a**
15 **biologic basis of gender identity congruent with their**
16 **male genetics.**
17     **Correct?**
18     A.   That --- for these people, that's right.  That
19 is with or --- with their chromosomes.
20     **Q.   Right.**
21     A.   Which you would predict.  If we think about ---
22 if we recognize --- if we think that by survey a half a
23 percent or even a full percent of people are transgender
24 that would mean that 99 percent of people are cisgender.

1    And so if you take a population of people with certain
2    chromosomes, 99 percent of them are going to be
3    cisgender and will have a gender identity incongruent
4    with their chromosomes.
5        Q.   The study includes no individuals who were
6    raised with a gender identity inconsistent with their
7    male chromosomes who came to identify or later perceived
8    themselves as identifying as female.
9            Correct?
10       A.   Well, we don't know that because they were ---
11   they're all XY individuals who were being raised female.
12   And somebody who had a female gender identity who is
13   transgender among them would never be identified as
14   transgender in this case.
15       Q.   So my question was a little more specific.  The
16   study simply doesn't include any individual who had male
17   chromosomes who was raised male who came to identify as
18   female?
19       A.   That's correct.  All of these people who are XY
20   chromosome people raised female.
21       Q.   And you would agree with me, would you not, the
22   study provides some evidence that external forces such
23   as feminizing surgery or how their parents treat the
24   child can have some influence on the formation of gender

1    identity?
2        A.   I can't say that because the study really
3    doesn't go there.  The study is only passive observation
4    and all --- the only thing I would say with some
5    confidence is that some fraction of these individuals
6    who are so clear in their gender identity that despite
7    nobody even looking for that sort of thing, because that
8    wasn't even a consideration when these --- when these
9    cases occurred, they --- the individuals spontaneously
10   announced to the authorities around them, parents and
11   doctors, that they were wrong, that the parents and
12   doctors were wrong.
13       Q.   And that, in your view, provides at least some
14   evidence of a genetic basis for gender identity
15   congruent with chromosomal sex?
16           ATTORNEY BLOCK:  Objection to form.
17           THE WITNESS:  No.  It provides some
18   evidence of a biological basis for gender identity that
19   can't be manipulated externally.
20   BY ATTORNEY BROOKS:
21       Q.   Well, considering that the study included no
22   examples of any individual who adopted a transgender
23   identity inconsistent with how they were raised, the
24   study simply can't provide any information about

1    biologic basis of transgender identification, can it?
2        A.   Wait.  I think say that again.
3        Q.   The study includes no individuals who adopted a
4    gender identity, a transgender identity apart from
5    social transition and, therefore, can provide no
6    information one way or the other about whether there is
7    or is not a biologic basis for transgender
8    identification?
9        A.   So not quite.  So the --- because remember the
10   point is that gender identity, period, universally, has
11   a biological basis.  It's not that we --- and to be
12   clear, I don't even know that we won't find and some
13   people even wonder if we will find a gene that
14   associates a gene with transgender, per se.  But I'm not
15   even saying that.  If there's --- I'm only saying that
16   we will find let's say genes associated with gender
17   identity and not everybody will have them aligned with
18   the rest of their biology.  So I just want to preface
19   with that.
20           And in this particular review, they're taking
21   people who have XY chromosomes exclusively.  So
22   therefore, if one --- if a certain fraction of them were
23   to have female gender identity despite assuming
24   different development they would have had male --- they

1    would have had other male biology, those are the people
2    we would have categorized as transgender using current
3    definitions.  And those individuals would not have been
4    apparent in this study they were being raised female
5    anyway.
6        Q.   And my point was that, therefore, that this
7    study can't provide any information about whether there
8    is or isn't a biological basis for transgender
9    identification?
10       A.   So yes.  I guess how you are framing that is
11   where I'm pushing back.  So the point of this study is
12   as evidence of there being a biological basis of gender
13   identity period, having nothing --- not necessarily for
14   being transgender.  In fact, I don't even know if there
15   --- yeah, I don't even know if that would be the model.
16   The model would be somebody who has a certain gender
17   identity, a certain other biology, and then that
18   combination is what we are calling transgender.
19       Q.   You also referenced a paper by Doctor Reiner.
20   And let me have that.
21           ATTORNEY BROOKS:  And I will mark that as
22   Exhibit 18, 2004 Discordant Sexual in Some Genetic Males
23   With Cloacal Exstrophy Assigned to Female Sex at Birth.
24           ATTORNEY WILKINSON:  Tab 71.

Page 234

1              ---
2      (Whereupon, Exhibit 18, Paper by Doctor
3      Reiner, was marked for identification.)
4              ---
5   BY ATTORNEY BROOKS:
6      Q.   And Dr. Safer, you are well familiar with this
7   paper.
8          Am I correct?
9      A.   I am, yes.
10     Q.   And this is the only other paper that you cite
11  for the assertion that gender identity has a biological
12  basis.
13         Am I correct?
14     A.   No, there are a range of categories of papers,
15  but these are two of my favorite papers in the first
16  category, which is the category of attempting to
17  manipulate gender identity externally.
18     Q.   Dr. Bahlburg in his paper, on page 433 of
19  Exhibit 14, in column one ---.
20     A.   Yes.  Let me get there.
21     Q.   Yes.  433, column one.
22     A.   433, column one.
23     Q.   He says about two inches off the bottom,
24  referring to the Reiner and Gearhart paper of 2004,

Page 235

1   which I believe is this paper, he says, quote, it has
2   serious methodological flaws.  Do you agree with that
3   statement?
4      A.   Let's read what he is criticizing.  All these
5   papers have their weaknesses.  All right.  So the
6   remainder of that --- so the remainder of the paragraph
7   is --- details the complaints for Doctor Meyer-Bahlburg,
8   where his --- which I focus as a social science
9   researcher that they didn't do various assessments that
10  would make it --- that would make standard people doing
11  some of this research able to replicate some of the
12  items in the paper.  And I will --- so while Doctor
13  Meyer-Bahlburg may be frustrated and be complaining
14  about that, he is not actually attacking the veracity of
15  their results.
16     Q.   Well, the point was serious methodological flaws
17  is you are not really able to evaluate the veracity of
18  the results.
19         Correct?
20     A.   Not necessarily.
21     Q.   Do you agree with Doctor Meyer-Bahlburg's
22  evaluation that the methodology of the study reported by
23  Reiner and Gearhart suffers from serious methodological
24  flaws?

Page 236

1      A.   No.
2      Q.   So let's summarize this study if I may.  I'm
3   turning to page 334.
4      A.   And extending that too, part of his frustration
5   wouldn't be my frustration because I am not looking for
6   those particular endpoints, that is for my purposes for
7   determining whether gender identity is a biological
8   basis Reiner and Gearhart's paper is actually quite
9   strong.
10     Q.   Let's look at the first page in the summary up
11  front.  It refers to this paper dealt with 16 --- under
12  methods, 16 genetic males.
13         Correct?
14     A.   Yes.
15     Q.   And these were all males who suffered from ---
16  uses the word in the second line of the background as
17  severe developmental disorders affecting their genitals.
18         Correct?
19     A.   That's how it is phrased here.  Where am I
20  seeing that?
21     Q.   The second line of the background says severe.
22     A.   Severe phallic inadequacy, yes, I see that.
23     Q.   Which is to say not --- absent or severely
24  disformed penis?

Page 237

1      A.   That's what that means, yes.
2      Q.   Okay.
3          But these are individuals who are genetically
4   male, and more than that, on page 334, column two,
5   two-thirds of the way down it says the testes were
6   histologically normal in all 14 when examined?
7      A.   I'm on column two.
8      Q.   It is column two.
9      A.   I apologize.
10     Q.   You can kind of see where my finger is pointing
11  here.
12     A.   And this is under ---.
13     Q.   Under methods and the paragraph that begins
14  parents to be educated?
15     A.   Testes were histologically normal in all 14.
16  I'm there, yes.
17     Q.   So we had individuals who were genetically male
18  that had normal testes and had severe deprivation of
19  their penis or it was absent?
20     A.   Yes.
21     Q.   And what was done to these 14 subjects, looking
22  just above that, is that they were assigned a female sex
23  surgically by means of orchiectomy and construction of
24  vulva.

1    **Right?**
2    A.   Yes.
3    **Q.   And orchiectomy is another medical term for what**
4    **the layman thinks of as castration?**
5    A.   As removing the testes.
6    **Q.   And construction of the vulvi is creating a ---**
7    **I'm not sure what the right term is, a pseudo vagina?**
8    A.   It wouldn't be a pseudo vagina, but creating a
9    vagina.
10   **Q.   It says that --- just immediately following the**
11   **description of the surgery 14 of these 16 --- looking**
12   **back at the results paragraph and the abstract, 14 of**
13   **these 16 were assigned female but later declared**
14   **themselves male despite the surgery, despite being**
15   **raised as female.**
16   **Right?**
17   A.   Right, 8 of the 14 who were assigned female.
18   **Q.   I'm sorry, I misread that.  Thank you.  Eight of**
19   **the 14 who were assigned female nevertheless declared**
20   **themselves male at some stage?**
21   A.   That's correct.
22   **Q.   And the two who had been raised as males, even**
23   **though they suffered the same type of phallic**
24   **developmental defect, remained identifying as males.**

1    **Correct?**
2    A.   Yes.
3    **Q.   There was an --- whatever assignment was made,**
4    **this was made to infants.  It wasn't made or based on**
5    **any choice or reported sense on the part of the child?**
6    A.   That's exactly right, yes.
7    **Q.   So several of these individuals, specifically**
8    **six, who were assigned female at least throughout the**
9    **period identified by this study adhered to a female ---**
10   **living out the female gender identity?**
11   A.   Actually it was five because one of the children
12   refused to have contact with the surgeons when some of
13   these conversations began to take place.
14   **Q.   So we know that five --- we don't know what that**
15   **person was thinking, feeling or identifying --- but we**
16   **know that five ---?**
17   A.   They were angry.
18   **Q.   They were angry.  Whichever that came out, I'd**
19   **be angry, so ---**
20   A.   Yes.
21   **Q.   --- so 5 of the 14 subjects who were assigned**
22   **female and surgically transitioned and socially**
23   **transitioned continued to at least physically identify**
24   **as female?**

1    A.   As of when they wrote the paper they were still
2    identifying as female as far as I remember.  That's
3    right.
4    **Q.   And it would be your position that visibly**
5    **identifying as female doesn't necessarily mean that they**
6    **were generally transgender?**
7    A.   That --- we don't know that because that wasn't
8    asked.
9    **Q.   Is it your view that if you had these children**
10   **who were surgically transitioned, socially transitioned**
11   **visibly identifying as female, that if you had simply**
12   **asked them you would have found out the undoubted truth**
13   **about their gender identity?**
14          ATTORNEY BLOCK:  Objection to form.
15          THE WITNESS:  So it is true that as
16   people develop and assuming that there are good language
17   skills and that there aren't other developmental, mental
18   developmental reasons or other mental health reasons why
19   people would not be clear, that people are able to
20   articulate their gender identity.  Certainly adults do
21   so apparently quite reliably and older teenagers the
22   same, so depending on age.  But yes, there would be a
23   point in time when you could simply ascertain that by
24   asking.

1    BY ATTORNEY BROOKS:
2    **Q.   Dr. Safer is that fundamentally a medical**
3    **question or a psychology/mental health question?  The**
4    **question of the reliability of a patient's self report?**
5    A.   I don't know that I separate it that way.  I say
6    that based on the data we slowly develop overtime of
7    transgender people where we see that any absence of
8    other confounding items along the lines that I said,
9    people at a certain stage in maturity who tell you a
10   certain thing about their gender identity are consistent
11   in that regard.
12   **Q.   This study, the Reiner Gearhart study,**
13   **Exhibit 18, concerns --- looks at the effect of trying**
14   **to raise individuals in a gender identity discordant**
15   **with their chromosomal sex.**
16   **Correct?**
17   A.   It is discorded with quite a number of things,
18   but yes, chromosomal is one of your hard data points.
19   **Q.   This study does not look at the question about**
20   **whether and when or how any sort of intervention might**
21   **encourage development of a gender identity consistent**
22   **with one's genetics sex; does it?  It simply does not**
23   **look at this issue?**
24   A.   Say that again, sorry.

Page 242

1      Q.   This study does not address the question of
2   whether or how or at what developmental stage
3   therapeutic interventions might encourage the
4   development of a gender identity consistent with one's
5   chromosomal sex?
6      A.   The study is --- the way I'm interpreting the
7   study is it's looking at our inability to manipulate
8   gender identity.  And it's just that.  And I'm a little
9   fuzzy on the rest of what you're asking me.
10     Q.   Well, the study looks at efforts to manipulate
11  gender identity away from chromosomal from the identity
12  normally associated with one's chromosomal sex.  In this
13  case the male sex.
14          Right?
15     A.   It does.
16     Q.   This study simply does not look at efforts to
17  manipulate gender identity towards alignment with the
18  identity normally associated with a subject's
19  chromosomal sex?
20     A.   I think I'm following you now.  So you're
21  suggesting that if we took a transgender person and
22  tried to manipulate their gender identity to align with
23  some of the rest of their biology?
24     Q.   I'm not suggesting that I'm simply saying this

Page 243

1   study.
2      A.   That particular instance.  Yes.
3          ATTORNEY BROOKS:  15.  It is one of the
4   previous marked ones, if that matters.  All right.
5          I will not show you that document.  Let
6   me ask the court reporter how many --- how much time we
7   have left on the clock.
8          COURT REPORTER:  I have 5:52, five hours
9   and 52 minutes.
10         ATTORNEY TRYON:  I didn't hear that.
11  Could you repeat that?
12         ATTORNEY BROOKS:  We've got an hour and
13  eight minutes according to the clock of the court
14  reporter here, and I believe that our friend in the
15  ether is calculating separately.
16         VIDEOGRAPHER:  Correct.  And it sounds
17  like the same.  I have to do the math.
18         ATTORNEY BROOKS:  Okay.
19  BY ATTORNEY TRYON:
20     Q.   Are you familiar Dr. Safer with a paper recently
21  published by Lisa Littman of Brown University looking at
22  the surveying 100 teens or young adults --- actually
23  surveying a hundred individuals who report having
24  de-transitioned and gone from identifying as transgender

Page 244

1   to identifying in a manner consistent with their genetic
2   sex?
3          ATTORNEY BLOCK:  Objection to form.
4          THE WITNESS:  So I'm aware of Dr. Littman
5   having written a second paper.  But I'm not facile, I
6   guess.
7   BY ATTORNEY BROOKS:
8      Q.   You haven't read that paper?
9      A.   I have not read the paper.  I probably did read
10  it, but I would not be able to be quizzed on it.
11     Q.   Then I won't quiz you on it.  I always tell
12  witnesses I don't know is the easiest way out of a line
13  of questioning.
14          Are you --- let me ask you this, does your
15  clinic have any procedure in place to track outcomes on
16  patients on whom you perform gender conforming surgery
17  long term?
18     A.   We're actually in the --- we have a couple of
19  processes, so I guess the short answers are yes and
20  we're going to be more rigorous going forward.
21     Q.   Do you have any knowledge as to how many
22  patients on whom your clinic has performed surgery have
23  after that surgery committed suicide?
24     A.   I don't off the top of my head know that.

Page 245

1      Q.   Do you believe that your clinic possesses
2   reasonably complete information on that question?
3      A.   I actually don't think our information is
4   sufficiently complete currently, and that actually is an
5   area where we're going to develop more vigorously,
6   because I would actually like to know that.
7      Q.   Do you know whether any patients on whom your
8   clinic has performed surgery has subsequently sought to
9   de-transition and take on or revert to, whichever way
10  you want to see it, a gender identity that's aligned
11  with their chromosomal sex?
12     A.   So it's a complicated question.  And actually I
13  just want to go back to the first part where you were
14  talking about suicide.
15          To be clear, the rigor I'm talking about is not
16  suicide focused, because I actually am not anticipating
17  that that is --- that that is happening or is happening
18  more than with being seen in a general population, but
19  for all encompassing that we do definitely need that.
20          But back to your current question ---.
21     Q.   Let me jump back to suicide for a moment.  Are
22  you aware of studies coming out of DeVry University and
23  Amsterdam suggesting that post-surgical transgender
24  populations continues to experience elevated rates of

1    complete suicides compared to controlled populations?
2        ATTORNEY BLOCK:  Objection to form.
3        THE WITNESS:  So I'm aware that
4    transgender people have more mental health morbidity
5    than other populations.  Once corrections are made for
6    other confounding factors I don't know that we would
7    have --- that we're very clear yet on those data
8    including ---.
9    BY ATTORNEY BROOKS:
10       Q.   When I refer to a published study coming out of
11   DeVry University of Amsterdam showing high rates of
12   suicidality in postsurgical transgender patients, you
13   believe you're familiar with that literature?
14       A.   I guess it would fall in the same category as
15   Littman's second paper.
16       Q.   Okay.
17       A.   Where I'm familiar with the fact that they're
18   doing surveys and I'm familiar with the broad outlines,
19   but could not ---
20       Q.   Okay.
21       A.   --- comment on specific studies without it being
22   in front of me.
23       Q.   And have any patients on whom your clinic has
24   performed surgery subsequently decided to de-transition

1    and assume a gender identity aligned with their
2    chromosomal sex?
3        A.   I don't --- I don't know.  There is absolutely
4    the case that there are people who stop their treatment
5    at different levels, so it has definitely been my
6    experience that I have patients who I've put on hormone
7    treatments who have stopped those hormone treatments.
8    And there are also, among our patients --- I don't know
9    if any of the patients where we performed the original
10   surgery they actually were opting for a different
11   surgery, but we definitely have patients who have come
12   to us, who had a surgery done elsewhere who were looking
13   for a degree basically what you're calling a reversal,
14   to the degree that that's possible.  So that such a
15   thing does exist.  So the point about saying that they
16   have a different gender identity, that would --- that is
17   not typically how the patients come saying it.  They
18   don't say, oh, it turns out my gender identity is not
19   that.  It's more often society is not treating me well,
20   this isn't working out.  That's the more --- that's the
21   --- that's the typical scenario.  I mean, yes, we
22   definitely have seen that circumstance.
23       Q.   Dave Tryon, who is with us remotely as Counsel
24   for West Virginia, I have promised him an hour, so I

1    have to stop, even though I have so many more
2    interesting questions.
3        ATTORNEY BROOKS:  So Dave, I will stop
4    and I will turn the witness over to you.
5        ATTORNEY BLOCK:  Could we take a break
6    now?
7        ATTORNEY BROOKS:  Of course, it is a good
8    time for sure.
9        ATTORNEY BLOCK:  Thanks.  Can we go off
10   the record?
11       VIDEOGRAPHER:  The time is 5:03 p.m.
12   Eastern Standard Time.
13   OFF VIDEOTAPE
14            ---
15   (WHEREUPON, A SHORT BREAK WAS TAKEN.)
16            ---
17   ON VIDEOTAPE
18       VIDEOGRAPHER:  We are back on the record.
19   The current time reads 5:25 p.m. Eastern standard Time.
20       ATTORNEY BLOCK:  This is Josh Block on
21   behalf of the Plaintiff.  We have conferred off the
22   record, including with counsel from Mount Sinai, and
23   Doctor Safer can answer the two questions he declined to
24   answer before provided that we mark those portions of

1    the deposition transcript confidential, and all counsel
2    for Defendants have agreed with that.
3        ATTORNEY BROOKS:  And this is Roger
4    Brooks, and yes, I confirm that all counsel for
5    Defendants have agreed to that.
6    CONFIDENTIAL PORTION BEGINS
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24

Safer 0677



Page 250

Page 251

Page 252

13  CONFIDENTIAL PORTION ENDS
14
15
16
17
18
19
20
21
22
23
24

Page 253

1              ---
2          EXAMINATION
3              ---
4   BY ATTORNEY TRYON:
5      Q.   Hello, Dr. Safer.  Thanks for your time today.
6   So I am David Tryon.  I represent the State of Virginia.
7   I'm appointed by the Attorney General's Office.  And I
8   wanted to start out by looking at --- asking you to take
9   a look at your Rebuttal Report.  I don't recall what
10  exhibit number that is.  If you could tell us what it is
11  marked?
12          ATTORNEY WILKINSON:  Exhibit 2.
13          ATTORNEY TRYON:  Exhibit 2.
14          ATTORNEY WILKINSON:  Tab 51.
15          THE WITNESS:  I have that in front of me.
16  BY ATTORNEY TRYON:
17     Q.   Could you take a look at paragraph six, please?
18  Do you have that in front of you?
19     A.   Yes.
20     Q.   Great.  Now, in here it says in the second or
21  maybe third sentence as reflected in the same source
22  cited by Doctor Brown dimorphous sexual characteristics
23  in men and women are produced by a combination of genes,
24  prenatal androgen exposure to sex hormones.  And I'd

Kaiser 27717 0678

Page 254

1  like to focus on that particular clause.  Can you
2  explain what prenatal androgen exposure to sex hormones
3  is?
4      A.   Yes.  That references --- I guess to me it's
5  more or less exactly what it says, which is that the
6  developing fetus is exposed to various hormones and
7  other factors and androgen is specifically the male ---
8  is typically what we consider to be the male sex
9  hormone, although everyone has some.  And then prenatal
10  just means and in utero or in the mother's womb.
11     Q.   So androgen for males is testosterone.
12          Is that right?
13     A.   Androgen in general is that category of hormones
14  that we think of as typically male, even though, like I
15  said, we all have them.  And one of the androgens is
16  testosterone.  And with adults it is the one that we are
17  talking about most of the time, of course.
18     Q.   Okay.
19          So as I understand it, your suggestion is that
20  that prenatal exposure to testosterone can have an
21  impact even after birth.
22          Is that right?
23          ATTORNEY BLOCK:  Objection to form.
24          THE WITNESS:  So all factors --- well, I

Page 255

1  don't want to overstate it, but factors that occur to
2  which a fetus is exposed in the womb have impact on the
3  development of that fetus, of that person when they are
4  born, and so androgens, including testosterone, would be
5  part of that, so yes.
6  BY ATTORNEY TRYON:
7      Q.   So are you aware of studies addressing the
8  impact of prenatal exposure to testosterone as it
9  impacts people after their birth?
10         ATTORNEY BLOCK:  Objection to form.
11         THE WITNESS:  I think I need you to be
12  specific about which studies.
13  BY ATTORNEY TRYON:
14     Q.   Are you aware of any study that addresses the
15  effect of prenatal testosterone upon boys after they're
16  born?
17         ATTORNEY BLOCK:  Objection to form.
18         THE WITNESS:  So the ---.
19  BY ATTORNEY TRYON:
20     Q.   Or men?
21     A.   So I can --- I guess --- I have to --- kind of
22  two answers.  Exposure to prenatal androgens, kind of
23  generally because it is not always, testosterone explain
24  the development of what we consider to be typically male

Page 256

1  genitalia so that all babies born with what --- with a
2  penis and with a urethra that is the part for which you
3  urinate, that's up inside the penis and having the
4  gonads, which would typically be testes in the scrotum,
5  all of that happens in response to testosterone.
6  BY ATTORNEY TRYON:
7      Q.   And then that also triggers a question I had.
8  You had previously said in your original report a
9  person's genetic makeup and internal and external
10  reproductive anatomy are not useful indicators of
11  athletic performance and have not been used in a league
12  competition for decades.
13         My question on that is, when you say a person's
14  genetic makeup doesn't their genetic makeup trigger
15  whether or not they are going to --- a person's genetic
16  makeup will determine whether or not they're a boy or a
17  girl, and therefore if they're a boy that would trigger
18  their generation of more testosterone than a girl.
19         Is that a fair statement?
20         ATTORNEY BLOCK:  Objection to form.
21         THE WITNESS:  Yeah, no, that's --- so I
22  think I need to walk that back a little bit.  Why don't
23  we --- can we do it like piece by piece or have you
24  restate parts?

Page 257

1  BY ATTORNEY TRYON:
2      Q.   I will restate it.  So when you say a person's
3  genetic makeup, what does that mean?
4      A.   Mostly in this context I'm referencing their
5  chromosomes that's the specific that in the further past
6  was actually being used to identify people which we no
7  longer do.  It's not sufficiently reliable.
8      Q.   Does the --- you have an X Y chromosome that is
9  typically considered to mean that you're a male.
10         Correct?
11     A.   The XY chromosome is typically considered to
12  mean that you're a male, correct.
13     Q.   And that would mean that you would be generating
14  more testosterone than if you have an X chromosome.
15         Right?
16         ATTORNEY BLOCK:  Objection to form.
17         THE WITNESS:  So the presence alone of
18  that XY pattern is insufficient to know with certainty
19  that you're producing more testosterone and that is part
20  of the point of I'm saying it is that biological sex is
21  more complex, and you could have the gene for the testes
22  that produce testosterone elsewhere, and then you
23  wouldn't have that pattern and you still would be
24  producing the testosterone or vice versa.

Uncertified 0679

Page 258

1   BY ATTORNEY TRYON:
2       Q.   Okay.
3            Well, let's go back to prenatal testosterone.
4   So you're not --- if I understood what you're saying
5   before, you're not aware of any studies that show
6   whether or not prenatal testosterone would have --- let
7   me just start that over again.
8            Are you aware of any studies that address
9   whether prenatal testosterone has impact on sporting, on
10  athletics in children after birth?
11      A.   Correct.  That would be right to say that there
12  are no studies of which I'm aware that can associate
13  prenatal testosterone with athleticism.  And I don't
14  know what levels we're even talking.  Like an adult
15  level?  What's your question there?
16      Q.   My next question is, have you heard of the
17  Journal of Sports Science and Medicine?
18      A.   I guess you would have to show it to me.
19      Q.   Okay.
20           Have you ever heard the name Jim Goldby or
21  Jennifer Mays?
22      A.   No.
23           ATTORNEY TRYON:  Jake, could you bring up
24  the Exhibit that I sent to you today, which is the

Page 259

1   General Sports Science and Medicine?
2            ATTORNEY WILKINSON:  Do you see anything?
3            THE WITNESS:  I don't see anything.  Oh,
4   that'S too small.  Okay.  That's okay.
5            ATTORNEY TRYON:  Okay.
6            And this will be Exhibit --- what Exhibit
7   are we on Jake, do you know?
8            VIDEOGRAPHER:  This is 19.
9            ---
10           (Whereupon, Exhibit 19, Article, was
11            marked for identification.)
12           ---
13           ATTORNEY TRYON:  I'm sorry, 19?
14           VIDEOGRAPHER:  Correct.
15  BY ATTORNEY TRYON:
16      Q.   Okay.
17           I take it from your earlier answers, you
18  probably never seen it before.
19           Is that right?
20      A.   I certainly don't recall.  I don't want to state
21  definitively I've never seen it either, but it's
22  certainly not a paper that I'm going to know off the top
23  of my head.
24      Q.   Well, let me ask you to take a look at the

Page 260

1   conclusion on page 449?
2       A.   So can we move the pictures because they're
3   blocking.
4       Q.   Can you see it?
5       A.   We're getting there.  And then is there a way to
6   move that?  Oh perfect.  Yes.
7       Q.   Okay.
8            The conclusion says, current paper provides
9   initial support from an association between prenatal
10  testosterone levels and mental toughness, optimism, goal
11  orientations, coping strategies and hostility, period.
12  Findings tentatively suggest that the mentioned
13  psychological characteristics may be partially
14  biologically predetermined.
15           Do you see that?
16      A.   I do see it, yes.
17      Q.   Do you have any reason to believe whether that's
18  true or not true?
19           ATTORNEY BLOCK:  Objection.  I just
20  object to asking him about a conclusion when he just has
21  a little snippet of that and hasn't reviewed the
22  article.  And I'm not even sure if it has been cited in
23  the other expert reports.
24           THE WITNESS:  I certainly can ---

Page 261

1   BY ATTORNEY TRYON:
2       Q.   Go ahead.
3       A.   I certainly cannot say if that conclusion has
4   any logic to it without knowing the study.
5       Q.   Understood.  Is it possible since this
6   particular study suggests there is an impact on adults
7   by prenatal testosterone?  Is it that prenatal
8   testosterone could also have a DSD explanation for why
9   should boys at 11 years old have more athletic ability
10  than girls?
11           ATTORNEY BLOCK:  Objection to form.
12           THE WITNESS:  So speaking --- yeah,
13  speaking as an expert, I can't give you an expert
14  comment there without seeing their study.
15  BY ATTORNEY TRYON:
16      Q.   Okay.
17           So you just can't say one way or the other.
18           Correct?
19           ATTORNEY BLOCK:  Objection to form.
20           THE WITNESS:  I mostly wouldn't want to
21  comment on their study.  I will only make the
22  observation that the data of which I am aware do not
23  show differences for prepubertal children, if that was
24  part of your question.

Wildlatz-27779 0680

Page 262

1    BY ATTORNEY TRYON:
2        Q.   And so the performance data that Dr. Handelsman
3    pointed out showing that there are some damages given
4    before puberty, you reject those?
5            ATTORNEY BLOCK:  Objection to form.
6            THE WITNESS:  So those broad
7    cross-sectional studies don't get at input, whether they
8    are referencing biological explanations versus societal
9    explanations.
10   BY ATTORNEY TRYON:
11       Q.   Okay.
12           Whether it's societal or biologic explanations,
13   Handelsman still demonstrated that there is an advantage
14   for pre-pubescent males over females in athletics.
15       Right?
16           ATTORNEY BLOCK:  Objection to form.
17           THE WITNESS:  No, neither Dr. Handelsman
18   in his paper --- he doesn't actually say that.  And if
19   you --- I think we looked previously at one of the
20   figures where specifically the range of outcomes, if you
21   were to repeat the study, included the girls doing
22   better than the boys.
23   BY ATTORNEY TRYON:
24       Q.   Well, that was only one of them.  That was not

Page 263

1    it.  That was one of the charts.  The other chart showed
2    that there was an advantage, right?
3            ATTORNEY BLOCK:  Objection to form.
4            THE WITNESS:  The other --- yeah, let me
5    think with that one.  Right.  We are not getting into
6    what the causality is, then the other charts did show
7    the boys doing better.  And again, the caveat remains
8    what is not --- what is not demonstrated there is that
9    there is --- that that is a biological thing versus
10   simply the very longstanding societal and cultural
11   environments.
12   BY ATTORNEY TRYON:
13       Q.   And you've contended that there's a biological
14   component to gender identity.
15       Correct?
16       A.   Yes.
17       Q.   Which we have not been able to identify in this
18   deposition.
19       Correct?
20           ATTORNEY BLOCK:  Objection to form.
21           THE WITNESS:  So it is not quite --- well
22   I actually don't know what's been identified in the
23   deposition.  The data are included in my --- in the
24   papers that I referenced that are what are convincing to

Page 264

1    the medical community right now.  The detailed
2    explanations for the specific biology are not known if
3    that's where you're going.
4    BY ATTORNEY TRYON:
5        Q.   Assuming there is actually a biological
6    component, as you say, to gender identity, that says
7    nothing about whether a biological male identifying as a
8    female should, as a public policy matter, be allowed to
9    participate on a girls athletic team in high school and
10   middle school.
11       Right?
12           ATTORNEY BLOCK:  Objection to form.
13           THE WITNESS:  So the way that I would say
14   that is even if we recognize that there is a biological
15   explanation for gender identity, that does not --- well,
16   I don't know that then I can go on to make an expert
17   statement, honestly, because that gets outside my
18   purview and in terms of --- my lane is just simply to
19   say that.
20   BY ATTORNEY TRYON:
21       Q.   Got it.  Can you look at your rebuttal report
22   and look at page two?
23       A.   I have my rebuttal in front of me and I'm on
24   page two.

Page 265

1        Q.   Paragraph 4B?
2        A.   I have that in front of me.
3        Q.   You say --- great.  You say circulating
4    testosterone is the primary known biological driver of
5    average differences in athletic performance.  Do you see
6    that?
7        A.   I do.
8        Q.   You say it is primary so what are the other
9    biological drivers of average differences in athletic
10   performance?
11           ATTORNEY BLOCK:  Objection to form.
12           THE WITNESS:  So when I --- so we're
13   talking about circulating testosterone --- let me just
14   look at this.  Right.  The truth is, is that it may ---
15   that the only candidates that we have so far are
16   testosterone at puberty and testosterone at the moment.
17   BY ATTORNEY TRYON:
18       Q.   So it's --- according to you, it's testosterone
19   at puberty and circulating testosterone are the only
20   biological drivers of average differences in athletic
21   performance.
22       Is that right?
23       A.   So excuse me.  I'm actually --- so this is the
24   president of the hospital.

Page 266

1    ATTORNEY BLOCK: I'm sorry. Can we go
2    off the record for a minute and take a break. The
3    president of the hospital is returning his previous
4    call.
5    VIDEOGRAPHER: Going off the record. The
6    current time is 5:48 Eastern Standard Time.
7    OFF VIDEOTAPE
8    ---
9    (WHEREUPON, A SHORT BREAK WAS TAKEN.)
10    ---
11    ON VIDEOTAPE
12    VIDEOGRAPHER: Back on the record. The
13    current time reads 5:54 p.m. Eastern Standard Time.
14    BY ATTORNEY TRYON:
15    Q.   My last question was according --- according to
16    you, testosterone at puberty and circulating
17    testosterone are the only biological drivers of average
18    differences in athletic performance.
19    Is that right?
20    A.   Right, they are the only ones that are known.
21    Q.   And in paragraph 4C, looking on page three ---
22    let's move over to page three, at the top of the page,
23    your statement is there is no basis to expect that
24    transgender girls who receive puberty delaying

Page 267

1    medication followed by gender affirming hormones would
2    have an athletic advantage. There's a comma. But if we
3    just put a period there, is that your opinion?
4    A.   That is correct. Yes, that is my opinion.
5    Q.   Let me ask you the converse. You say there is
6    no basis to expect that transgender girls who receive
7    puberty delaying medication followed by gender affirming
8    hormones would not have an athletic advantage, period.
9    Would you agree with that statement?
10    A.   No.
11    Q.   Do you have any --- excuse me, any performance
12    data from an actual athletic event that support your
13    opinion?
14    A.   I do not have any data from an actual athletic
15    performance study for that. No, I do not in that
16    context, in that specific instance.
17    Q.   Let me ask you to look at your report. Turn to
18    paragraph 45.
19    A.   So my report, paragraph 45. All right. I have
20    that in front of me.
21    Q.   Great. Finally, unlike elite international
22    competition, schools and colleges often provide athletic
23    competition as part of a broader educational mission.
24    In that context, when scholastic athletics are

Page 268

1    components of the educational process, institutions may
2    adopt policies designed to emphasize inclusion and to
3    provide the most athletic opportunities to the greatest
4    number of people. You see that.
5    Right?
6    A.   I do.
7    Q.   So these policies you referred to are designed
8    to emphasize inclusion and to provide the most athletic
9    opportunities to the greatest number of people, what's
10    the source of that policy? Did you come up with that or
11    did you see it someplace else?
12    ATTORNEY BLOCK: Objection to the form.
13    THE WITNESS: So the question is how am I
14    aware? Yeah --- I apologize. You can hear that I'm
15    confused on your question.
16    BY ATTORNEY TRYON:
17    Q.   I'll try and do better. You said intuitions may
18    adopt policies designed to emphasize inclusion and to
19    provide the most athletic opportunities to embrace a
20    number of people. And those policies that you're saying
21    there, is that a policy that you read about somewhere or
22    something you are just suggesting? What's the source of
23    that?
24    ATTORNEY BLOCK: Objection to form.

Page 269

1    THE WITNESS: So an operative word in
2    this may adopt policies, so this isn't referencing a
3    specific policy that I would give you right this moment,
4    if that's what you are asking.
5    BY ATTORNEY TRYON:
6    Q.   So right, just aside from education --- this
7    whole paragraph is talking about education, but you're
8    not an expert on education or teaching methodology, are
9    you?
10    A.   I certainly am not.
11    Q.   And you don't have any degrees in education or
12    training in teaching methodology, do you?
13    A.   I do not.
14    Q.   And you have no degrees or training in pedagogy?
15    A.   I have no degree in pedagogy. I will be careful
16    how absolutely I do not, because that's not my ---
17    that's not where I am representing myself to be an
18    expert. I am involved in some education, but at the
19    scholastic level not, so let's just say no.
20    Q.   And you have no expertise as to whether sports
21    or how sports are used as part of educational systems.
22    Right.
23    A.   Correct. That is not the expertise. The how
24    and my decisions among this are not my expertise.

Page 270

1    Q.   Do you have any idea how many schools actually
2  have sports programs?
3            ATTORNEY BLOCK:  Objection.  I couldn't
4  hear the full question.  You cut out.
5  BY ATTORNEY TRYON:
6    Q.   Sorry.  Do you have any idea how many schools
7  have sports programs?
8    A.   I could not give you a number, no.
9    Q.   Are you aware that some colleges do not have
10  athletic programs?
11   A.   I guess I'm vaguely aware.  If you're asking me
12  as an expert than I wouldn't comment on that as an
13  expert, but as a human in society I certainly am aware
14  that that is a thing.
15   Q.   Okay.
16         And do you have any idea what percentage of
17  kids are in athletic programs in schools versus those
18  that are not that are still students?
19   A.   No, I would not be your source for that data
20  point.
21   Q.   So when you are expressing this opinion in
22  paragraph 45 that's not an expert opinion there, is it?
23           ATTORNEY BLOCK:  Objection to form.
24           THE WITNESS:  So right, I guess it's a

Page 271

1  bit confusing here, because it's not my expert opinion
2  that --- well, I'm certainly aware as an individual that
3  this is a priority and when I sit on --- when I sit on
4  committees where we discuss relative priorities, there
5  are experts present who discuss these priorities.  But
6  if I'm speaking to you as an expert, then I --- then I
7  can't be the representative expert in that space.
8  BY ATTORNEY TRYON:
9    Q.   Right.  Well, I'm just asking, in paragraph 45,
10  given your lack of expertise and education, you are not
11  giving an expert opinion in paragraph 45.
12         Is that a correct statement?
13           ATTORNEY BLOCK:  Objection, asked and
14  answered.
15           THE WITNESS:  So I'm simply --- I'm
16  raising all of the issues that we know exist, but then
17  I'm not providing an expert opinion in terms of the
18  relative priorities among these circumstances that
19  exist.
20  BY ATTORNEY TRYON:
21   Q.   Let me just ask you very clearly is paragraph 45
22  an expert opinion of yours?
23           ATTORNEY BLOCK:  Objection to form.
24           THE WITNESS:  I don't think I'm even

Page 272

1  expressing an opinion in paragraph 45, expert or
2  otherwise.  I'm simply stating the background situation.
3  BY ATTORNEY TRYON:
4    Q.   Okay.
5         But --- okay.  I would ask you to turn to
6  paragraph 37 of your report.
7    A.   All right.
8         I have that in front of me.
9    Q.   This is talking about the International Olympics
10  Committee.  Right?  Let me move back to paragraphs 35
11  and 36.
12   A.   Yes, this is the International Olympic
13  Committee.  This relates to the International Olympic
14  Committee.
15   Q.   So this 2021 framework, do you believe that you
16  understand this framework?
17   A.   I think you'll have to ask more specific
18  questions because I might understand parts and I might
19  have questions about parts.
20   Q.   Very good.  First of all, it says the 2021
21  framework further provides that, quote, any restrictions
22  arising from eligibility criteria should be based on
23  robust and peer-reviewed research that, A, demonstrates
24  a consistent, unfair, disproportionate competitive

Page 273

1  advantage with performance and/or an unpreventable risk
2  to the physical safety of other athletes.  You see that
3  part, right?
4    A.   I do, yes.
5    Q.   Do you understand what the word disproportionate
6  means in this context?
7    A.   To a degree.
8    Q.   Okay.
9         What do you understand it to mean when it says
10  a disproportionate competitive advantage in performance?
11   A.   The IOC is aware that there's quite a wide range
12  of advantages with different body types and different
13  biology, and so they use language like disproportionate
14  when they want to talk about something that's --- that's
15  --- that's systematically associated with one
16  circumstance in a way that they think would violate the
17  rules, whatever they might be, for a specific sport.
18   Q.   That's pretty ambiguous.  I have no idea what
19  that means.  Let me see if we can narrow it down.  Is a
20  disproportionate competitive advantage in performance
21  --- would 20 percent be a disproportionate competitive
22  advantage?
23           ATTORNEY BLOCK:  Objection to form.
24           THE WITNESS:  So that's --- I can't

Page 274

1  answer that, because it depends on context, and I'm not
2  the person who wrote the specific language in that
3  document, so that is the quote from the document. But
4  in terms of --- I don't --- I think we go someplace we
5  don't want to go if we try to over define the specific
6  word disproportionate.
7  BY ATTORNEY TRYON:
8  **Q.  So it's just not something that you or I could**
9  **look at and reach any kind of conclusion to tell them**
10  **what that means sitting here today.**
11  **Is that right?**
12  A.  I think if we look at a specific sport, I think
13  that if it was limited to just the two of us we might
14  need more expertise to make a decision.
15  **Q.  Well, let's say if we talked about the one mile**
16  **--- running one mile, is that something that we could**
17  **then determine what disproportionate competitive**
18  **advantage and performance would mean?**
19  ATTORNEY BLOCK:  Objection to form.
20  THE WITNESS:  It would depend on context.
21  And if we're talking about at the elite level which is
22  what the IOC references and we limited --- even then if
23  we limit it just to you and to myself, we would want
24  more expertise.

Page 275

1  BY ATTORNEY TRYON:
2  **Q.  Right.  Okay.**
3  **So we don't know what the IOC meant by this in**
4  **any particular context do we?**
5  ATTORNEY BLOCK:  Objection to form.
6  ATTORNEY TRYON:  Actually, let me redraw
7  this question.
8  BY ATTORNEY TRYON:
9  **Q.  You as an expert would not be able to give me an**
10  **expert opinion on what disproportionate competitive**
11  **advantage in performance of the one mile run would be;**
12  **right?  You could not give me an expert opinion on that.**
13  **Fair statement?**
14  A.  If you break the words out in that --- in that
15  fashion then it does become difficult.  If you ask me
16  what the entire statement after the letter A is
17  referencing, I can at least explain some of the thought
18  process for the IOC there.
19  **Q.  Well, my question is simply, you as an expert,**
20  **are you able to tell me what --- able to define for me**
21  **what would be a consistent, unfair disproportionate**
22  **competitive advantage in performance in a one mile run**
23  **for the IOC?**
24  ATTORNEY BLOCK:  Objection to form.

Page 276

1  THE WITNESS:  I, as an expert, cannot
2  give you a blanket explanation of what would
3  specifically consist of --- what would specifically meet
4  that definition.  When they wrote the statement they
5  didn't actually even have specific guidance, that is
6  simply the spirit of a guideline --- the spirit of what
7  a specific guideline should consider when that guideline
8  is made.
9  BY ATTORNEY TRYON:
10  **Q.  Do you know what they meant when they said**
11  **unfair?**
12  A.  So the --- it's kind of the same circumstance.
13  That is the purpose of this statement is to be global
14  guidance for the experts in the specific sport when they
15  might develop guidelines relevant to their specific
16  sport.  So for example, the group with expertise in that
17  one mile run that you're referencing should think in
18  this context.  That's all this is doing.
19  **Q.  And some of the sporting organizations have come**
20  **up with some very specific rules.**
21  **Correct?**
22  A.  Some of the sporting federations have come up
23  with specific rules, yes.
24  **Q.  And as I recall, some of them require a certain**

Page 277

1  **level of circulating testosterone.**
2  **Is that right?**
3  A.  Some of the sporting federations use a certain
4  level of circulating hormone as part or all of their
5  roles.
6  **Q.  And some of them use the level that you've**
7  **mentioned that you were involved in setting, which was 5**
8  **Nmol --- say it for me.  Nmol something.**
9  A.  Nmol/Ls per liter.  Yes, some of them use that
10  nmol/L per liter threshold.
11  **Q.  Did they --- where did they get that 5 nmol/L**
12  **quantity, do you know?**
13  ATTORNEY BLOCK:  Objection to form.
14  THE WITNESS:  So I do know where that
15  number comes from originally for World Athletics, which
16  is the first one to put that number out.  And that
17  number comes from studies of some Olympic athletes in
18  some races where there was for at least certain
19  distances a demonstrable difference between people who
20  had --- and specifically people in the female category
21  who had lower numbers of testosterone than that and
22  higher numbers of testosterone than that.
23  BY ATTORNEY TRYON:
24  **Q.  You were on that committee.**

1       **Right?**
2           A.   I was on the group that wrote that World
3    Athletics policy, yes.  Not on the group that did that
4    study.
5           **Q.   And so how did you finally come up with the**
6    **number of five as opposed to four or six or three or**
7    **seven?**
8           A.   The number five discriminates in terms --- in
9    terms of there being some demonstrated advantage or
10   improved outcome is really what it was, for those with
11   higher numbers versus those with lower numbers.  That
12   was not true necessarily with a lower testosterone
13   threshold.  That is a difference was not as apparent and
14   that's really the entire logic pattern there.
15          **Q.   Well, earlier you just said it could have been**
16   **--- you didn't think there was that much difference**
17   **between five and six.  That was your testimony earlier**
18   **as I recall.**
19          **Right?**
20             ATTORNEY BLOCK:  Objection.
21             THE WITNESS:  As an endocrinologist I can
22   tell you that those difference --- that that's right
23   that to --- the difference between five and six would be
24   hard to demonstrate.

1    BY ATTORNEY TRYON:
2           **Q.   So how did you settle on five instead of six or**
3    **five or six instead of four?**
4           A.   So I guess the inputs are that there needed to
5    be a line so that there's ability to enforce something.
6    There needed to be a rule.  And the choice of five,
7    mostly, is what I've been saying already, which is ---
8    it's a clean number where there's at least some
9    distances, there's a demonstrable difference in outcomes
10   at that level --- above and below that level.
11          **Q.   So are you saying that there is a value of**
12   **having a hard rule?**
13             ATTORNEY BLOCK:  Objection to form.
14   BY ATTORNEY TRYON:
15          **Q.   Maybe I should say having a clean rule?**
16          A.   So as an expert I'm not --- that wasn't my role
17   on the committee to determine that there needed to be a
18   rule, but that is certainly the logic pattern of the
19   committee that there ought to be a rule.  That is not my
20   expert opinion.
21          **Q.   Okay.**
22          **But different organizations are free to come up**
23   **with different conclusions of about what their rules**
24   **ought to be.**

1       **Right?**
2             ATTORNEY BLOCK:  Objection to form.
3             THE WITNESS:  So the different
4    International Athletic Federations were to make use of
5    data such as it exists to make their own rules for
6    participation in their sports.
7    BY ATTORNEY TRYON:
8           **Q.   And different organizations came up with very**
9    **different rules.**
10          **Right?**
11             ATTORNEY BLOCK:  Objection to form.
12             THE WITNESS:  So most of the
13   international federations still do not have rules,
14   actually.  And honestly, that's mostly a logistics
15   situation where some of these organizations are too
16   small to put the data together or the committees
17   together to make rules.
18   BY ATTORNEY TRYON:
19          **Q.   Those that do have rules have different rules.**
20   **Correct?**
21          A.   Those that do have rules have had different
22   conversations in the space.  I don't know that I could
23   systematically go through all of them, but there is some
24   variation, yes.

1           **Q.   Some require --- have a Level 5 nanomoles per**
2    **liter and some still have ten.**
3           **Right?**
4           A.   So I'd have to go back and look.  You would have
5    to show me.  World Athletics has five for sure.  And
6    that's the one where I'm most familiar because I was
7    actually sitting in the room helping draft that.  The
8    IOC in the past had used ten as a line, but that just
9    sits there right now as a --- as a number someone might
10   adopt.  I actually don't know off the top of my head if
11   anybody has adopted that for their formal rules.
12          **Q.   What was the scientific basis for the ten**
13   **nanomoles per liter?**
14          A.   The logic for ten at the time is it is the
15   bottom of the male range.  That's its history.
16          **Q.   Okay.**
17          **So it sounds to me like there is room for**
18   **reasonable discussion about what the appropriate rule**
19   **ought to be?**
20             ATTORNEY BLOCK:  Objection to form.
21             THE WITNESS:  The way I would say it is
22   as different athletic organizations obtain data, they
23   might use those data to determine differences, including
24   if the --- if our best measure is testosterone,

Page 282

1  different thresholds of testosterone.
2  BY ATTORNEY TRYON:
3      Q.   Would it be appropriate to use performance data
4  as well to make those decisions?
5      A.   The best data in my opinion are actual outcomes
6  within a given sport.
7      Q.   What do you mean by outcomes, performance?  Are
8  we saying the same thing?
9      A.   I don't know if we're saying the same thing.  So
10  the studies that I reference are the Roberts study and
11  the Harper study, where they actually look at specific
12  athletic endeavors and measure those as opposed to the
13  studies where they're simply sitting in a physiology lab
14  measuring somebody move an arm back and forth and
15  thinking that it might associate with some actual
16  athletic performance.
17      Q.   Somebody moving their arm back and forth with
18  weights, that's not athletic?
19      A.   It's --- again, it would --- right, that's ---
20  that's only --- that's what we would call a surrogate
21  endpoint where you are simply looking at something that
22  might correlate with what you want, but --- but you
23  don't know it until you test it.  It ends up being what
24  we call hypothesis generating.  That is how we would say

Page 283

1  it in a scientific way.
2      Q.   And the same would hold true with the level of
3  circulating testosterone, you would want to actually
4  test that in real life to see how people's circulating
5  testosterone actually translates into performance of an
6  actual athletic contest.
7      Right?
8      A.   That's right.  So the data that were used to
9  determine the five nanomole per liter cut point are
10  passively collected data.  And if somebody did a study
11  looking at that threshold and found that there was,
12  let's say, no difference, then that rule might be
13  discarded.
14      Q.   And so far, other than Roberts and Harper, if I
15  recall correctly, those are the only two that you know
16  of.
17      Right?
18          ATTORNEY BLOCK:  Objection to form.
19          THE WITNESS:  Those are the only two
20  studies that have gone that extra step and looked at an
21  actual athletic activity with an outcome that is part of
22  that athletic activity and not what I was just
23  referencing, as a surrogate endpoint.
24  BY ATTORNEY TRYON:

Page 284

1      Q.   In those two studies did they check the
2  circulating testosterone in the individuals in these
3  studies?
4      A.   I'd have to look.  I think we did look earlier
5  today with regard to the Harper study, and I don't think
6  she's referencing testosterone levels at all.  Again,
7  I'd have to go back and look to be sure.  We were
8  talking about whether they were self-reported.  And the
9  --- with the Robert study I would have to go back and
10  look at that one, too.  I'm feeling like the answer is
11  no, but we can look there if you want.
12      Q.   Yeah, we don't need to.  I'm pretty sure that we
13  just talked about how long they had been in the therapy
14  rather than actual measurements.
15      Well, let me move on.  I know we don't have a
16  lot of time left.
17      So you said you're familiar in your expert
18  report you are familiar with HB-3293.
19      Is that right?
20          ATTORNEY BLOCK:  Objection to form.
21          THE WITNESS:  So yes, I'm somewhat
22  familiar.
23  BY ATTORNEY TRYON:
24      Q.   Have you read the whole thing?

Page 285

1      A.   I don't think I've read the whole thing, no.
2      Q.   When did you first hear of HB-3293?
3      A.   I probably first heard of it when the --- when I
4  received contact from the ACLU to serve as an expert
5  witness.
6      Q.   Do you recall if that was before or after it was
7  passed?
8      A.   I don't recall.  I would have to speculate that
9  it would be after, because that would --- I mean that
10  would make sense that that is true, but I don't recall,
11  so I wouldn't be able to answer that.
12      Q.   Okay.
13      So we would refer to this as State Women's
14  Sports Law and there's other types of laws like this
15  throughout the country.
16      Are you aware of that?
17          ATTORNEY BLOCK:  Objection to form.
18          THE WITNESS:  So I'm aware that there are
19  attempts at legislation and some actual legislation
20  passed to block transgender athletes in various
21  permeations, including transgender women in several
22  states.  I'm aware of that, yes.
23  BY ATTORNEY TRYON:
24      Q.   Are you aware then House Bill 3293 the word

Page 286

1    transgender does not appear at all?
2    A.   House Bill --- that's this one?
3    **Q.   That is this one.**
4    A.   I was not aware that the word transgender does
5    not appear at all.
6    **Q.   Are you tracking the other bills out there that**
7    **are similar to House Bill 3293?**
8    A.   I am not personally tracking the other bills,
9    no.
10   **Q.   Can you take a look at the Handelsman report**
11   **that you have in front of you.  I don't recall the**
12   **exhibit number.**
13         ATTORNEY WILKINSON:  I think Exhibit 13
14   --- oh, sorry, it's Exhibit 4, I think.
15         THE WITNESS:  I don't see.
16         ATTORNEY WILKINSON:  I can give you that.
17         THE WITNESS:  The stack got big.
18         ATTORNEY TRYON:  We can just bring it ---
19   if you can't find it we can bring it up on the screen?
20         THE WITNESS:  Okay.
21         I was given another copy, so we're good.
22   I have it in front of me.
23   BY ATTORNEY TRYON:
24   **Q.   Okay.**

Page 287

1         **On the second page?**
2    A.   On the second page.
3    **Q.   Okay.**
4         **Under fairness and segregation in sports.**
5         **Do you see that section?**
6    A.   I do.
7    **Q.   In the third full paragraph underneath there ---**
8    **oh the formatting there is a little different than the**
9    **copy that I have.  Let's see.  There's a paragraph that**
10   **starts the terms sex and gender.  There it is.  The**
11   **terms sex and gender are often confused as**
12   **interchangeable.  Now, I want you to focus on this next**
13   **sentence.  Sex is an objective specific biological**
14   **state, a term with distinct fixed facets notably**
15   **genetic, chromosomal, gonadal, hormonal and phenotypic**
16   **including genital sex, each of which has a**
17   **characteristic defined binary form.  Did I read that**
18   **correctly?**
19   A.   You read that correctly, yes.
20   **Q.   Do you agree with that statement?**
21   A.   I don't agree with that statement completely,
22   no.
23   **Q.   What specifically do you find objectionable.**
24   A.   It's missing some components of sex, including,

Page 288

1    for example gender identity.  And the phrasing
2    characteristic defined binary form is not necessarily
3    true for each component of biological sex.
4    **Q.   So you disagree with the statement in the**
5    **Handelsman report, is that --- did I state that fairly?**
6    A.   Right.  I would characterize the statement as
7    not exhaustive.
8         ATTORNEY TRYON:  Let me ask the court
9    reporter if I have any time.
10         COURT REPORTER:  I have six minutes and
11   58 --- six hours and 58 minutes.
12         ATTORNEY TRYON:  Well, I guess with my
13   last two minutes I'll just say thank you for your time
14   and I appreciate it.  And I don't have any other
15   questions.  I don't know if any of the other Defendants
16   do.  I doubt it.  But go ahead.  If they do, go ahead.
17   Kelly?
18         ATTORNEY MORGAN:  This is Kelly Morgan.
19   I don't have any questions.  Thank you so much.
20         ATTORNEY TRYON:  Roberta?  Susan, you're
21   next.
22         ATTORNEY GREEN:  This is Roberta Green on
23   the behalf of the SSAC.  No questions.  Thank you.
24         ATTORNEY DENIKER:  Dr. Safer, this is

Page 289

1    Susan Deniker.  I have no questions.  Thank you for your
2    time today.
3         ATTORNEY TRYON:  We are finished.
4         VIDEOGRAPHER:  This concludes this
5    deposition.  The current time reads 6:31 p.m. Eastern
6    Standard Time.
7               * * * * * * *
8         VIDEOTAPED DEPOSITION CONCLUDED AT 6:31 P.M.
9               * * * * * * *
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24

**A**

a.m 3:8
 12:16
 60:24  61:7
ability
 261:9
 279:5
able 23:3
 34:18  37:5
 45:23  53:1
 58:5  70:22
 96:14
 131:16
 143:10
 164:11
 200:7
 201:15
 207:17
 209:21
 212:13
 220:5
 235:11,17
 240:19
 244:10
 251:5,21
 263:17
 275:9,20
 275:20
 285:11
abnormal...
 228:4
absence
 241:7
absent
 226:21
 236:23
 237:19
absolute
 73:14  74:2
 79:16
 81:10
 126:10
absolutely
 112:7
 247:3
 251:2
 269:16
abstract
 149:8
 186:9
 218:9
 238:12

academic
 135:12
academic...
 135:10
accentuates
 21:4
accept 18:22
 19:5
 138:12
acceptable
 89:2
access 35:6
 101:18
 143:23
 171:20
 200:3
accident...
 23:9
accidents
 186:7
accountant
 251:10
accountants
 252:3
accuracy
 73:18,22
 101:10
 102:1
accurate
 122:11,14
 124:23
 206:19
accused
 108:22
accusing
 109:7
achieve
 55:11
achieved
 57:7  92:17
 144:15
ACLU 13:20
 285:4
acquainted
 41:16
acquired
 22:17  23:4
acting 32:21
 176:1
action 12:22
 129:17
actions
 44:17

active 182:9
actively
 198:12
activities
 1:11  5:22
 13:17
 161:8
activity
 146:24,24
 283:21,22
actual 46:11
 46:11,21
 134:17
 148:23
 167:19
 181:13
 267:12,14
 282:5,15
 283:6,21
 284:14
 285:19
ad 143:8
addition
 54:24
 131:13
 132:18
additional
 30:12  81:9
address 26:6
 39:23
 242:1
 258:8
addressed
 175:2
 205:6
addresses
 255:14
addressing
 33:17
 170:15
 205:11
 255:7
adequately
 215:22
adhered
 228:19
 239:9
Adkins
 113:14
Adkins's
 99:1
administer
 126:1

177:24
administ...
 177:6
adolescence
 105:16
 114:21
 115:14
 128:20
 221:14
adolescents
 117:6
 120:9
 125:2
adopt 34:5
 268:2,18
 269:2
 281:10
adopted
 28:12
 86:14
 231:22
 232:3
 281:11
adult 42:3
 103:12,15
 258:14
adulthood
 128:20
adults 29:21
 118:11
 240:20
 243:22
 254:16
 261:6
advance 35:6
 221:11
advantage
 26:24
 27:15
 32:11  33:2
 33:8,9
 35:17,18
 36:2,4,16
 36:16  37:4
 37:8,20
 38:1,23
 40:24  41:6
 41:6,17,22
 42:10,24
 46:14,22
 47:16
 48:23
 50:15

51:15,16
 52:1  56:7
 56:19
 57:14  58:1
 58:15  59:5
 62:22
 66:24
 67:14,14
 67:15,23
 67:24
 68:11,14
 88:21  90:5
 91:13  93:1
 93:13,22
 93:23  94:3
 94:11,12
 94:15,18
 94:19,22
 94:22,23
 95:3,6,13
 95:20  96:6
 100:20
 102:1,13
 102:20
 103:6,6
 104:23
 137:23
 262:13
 263:2
 267:2,8
 273:1,10
 273:20,22
 274:18
 275:11,22
 278:9
advantages
 25:20  26:4
 27:2,11
 37:2,19
 42:24
 47:16  48:4
 48:24  51:6
 51:7  56:5
 56:7,17,19
 57:12,15
 58:13,15
 59:3,5
 81:1  83:4
 83:11
 87:22
 90:12
 102:11,18
 155:6

156:3
158:12
159:5
179:9,18
273:12
**advise** 117:3
**advising**
165:12
**affect** 78:11
**affirm** 63:8
**affirming**
24:11,17
49:19
139:16
147:12,22
148:6
150:14
151:12
152:2
158:11
159:4
177:3,5,11
185:16
186:1,5
198:18
200:4
206:7
207:19
208:1
212:1,5
215:16
250:17
251:8
267:1,7
**Africa** 63:21
**afternoon**
112:12,16
153:4
**age** 18:1
33:15  76:1
76:10
80:24  81:4
81:17,24
83:5,12,17
89:17  90:1
90:2,19
91:14,16
91:21
92:11,12
92:14,17
93:2,11,12
93:15,15
94:4,15,18

94:19,21
94:23  95:2
95:5,13,15
98:2
100:14
118:12,14
127:7
143:14
151:5
240:22
**age-based**
143:15
**agency** 1:24
**agenesis**
225:16
**agents**
177:19
**ages** 74:21
89:9,20
90:8
**ago** 202:9
218:6,6
**agree** 45:21
65:3  74:4
79:17  89:7
91:12
92:21
102:11,18
117:14
122:15
125:24
137:22
138:21
150:19
151:10,23
159:16,18
159:24
160:18,24
165:4
166:9
167:6
168:16
169:10,24
193:19
215:2
230:21
235:2,21
267:9
287:20,21
**agreed** 12:3
205:14
249:2,5
**agreement**

209:5
**ahead** 145:10
210:3
261:2
288:16,16
**air** 91:19
138:5,7,8
**al** 9:16
12:20,22
133:5,10
142:4
**align** 242:22
**aligned**
219:21
223:8
232:17
245:10
247:1
**alignment**
242:17
**alleged**
174:24
**Alliance** 7:7
**allow** 143:13
208:6
**allowed**
55:19,22
212:11
264:8
**alongside**
165:24
**alteration**
226:16
**altered**
129:5,11
**alternate**
86:23
125:18
200:10
**alternative**
200:5
208:24
**altogether**
155:10
**ambiguous**
273:18
**America**
111:16
**American** 4:4
**Amsterdam**
245:23
246:11
**analog**

177:13
**analyses**
109:5
**analysis**
193:16
194:4,6
**anatomic**
228:3
**anatomy**
164:18
185:18,20
218:2
219:24
220:1
256:10
**and/or** 273:1
**Andrew** 4:10
14:1
**androgen**
223:11,22
253:24
254:2,7,11
254:13
**androgens**
129:2
254:15
255:4,22
**anecdotes**
108:1
**angry** 239:17
239:18,19
**animated**
82:8
**Annals** 128:8
**announced**
231:10
**answer** 25:5
45:4  49:13
50:3  51:10
52:16
56:22
58:24  59:2
60:3  67:17
67:21  73:1
78:23  95:9
95:23
98:13,17
99:18
103:10,12
115:18
120:4
121:12
122:3

126:21
130:16,24
135:20
178:23
208:9
209:17,20
209:22
210:9
211:4,5
213:7,22
248:23,24
274:1
284:10
285:11
**answered**
174:13
181:18
271:14
**answering**
212:17
**answers** 37:3
244:19
255:22
259:17
**anticipate**
94:9  95:2
168:24
**anticipa...**
245:16
**anybody**
104:4
281:11
**anyway** 233:5
**apart** 232:4
**apologize**
66:10
75:21
172:1
173:17
200:13
217:8,16
237:9
268:14
**apparent**
219:23
233:4
278:13
**apparently**
240:21
**appear** 69:1
286:1,5
**appearance**
157:15

appearing
 210:21
applicab...
 125:16
applicable
 179:15
 180:11
 181:1,1
application
 132:16
applied
 53:18,23
applies
 105:10
apply 49:6
 51:12
 53:15
 179:2
 181:16
appointed
 253:7
appreciate
 87:12
 288:14
approach
 29:2
 187:13,14
 197:14,16
 198:10
approached
 92:15
appropriate
 24:1 47:9
 120:3
 189:2,3
 281:18
 282:3
appropri...
 19:6,8
approve
 196:7
approved
 187:20
 188:20
 189:5
 198:5
 200:8
approving
 186:24
 189:8
approxim...
 91:15
 111:6,12

 206:18
arbitral
 63:18
arbitrarial
 54:14
arbitration
 9:10 53:24
 54:6 63:19
 63:20,23
 64:5 65:3
 65:13
area 35:11
 69:23,24
 97:11
 128:12
 181:23
 182:9
 208:13
 245:5
argue 210:14
argument
 49:6
 168:13
arguments
 168:7
arising
 272:22
arm 69:22
 282:14,17
armed 138:17
Armistead
 7:10 13:2
arrive 76:9
 76:14
arrow 91:2
 93:18,18
 95:4,5
 98:15
art 77:12
article 9:8
 9:9,15,16
 9:18,19,20
 9:23 10:5
 10:9 15:23
 16:4,13
 17:3,4
 18:3 20:11
 25:19 26:1
 40:7,8,14
 43:19,24
 44:7,8
 45:8,10,14
 53:5 59:18

 61:10,11
 76:5,18
 85:16 86:9
 87:7,19
 88:12,16
 127:19,19
 128:1,6,8
 133:5
 134:11
 142:4,9
 145:16,23
 146:3
 154:10,15
 156:11,18
 157:13,16
 157:17
 183:18,24
 216:11,18
 259:10
 260:22
articles
 133:11,15
 134:1
 204:23
articulate
 240:20
Aruna 10:5
 216:11,17
ascertain
 240:23
ascertai...
 227:15,16
ascribed
 98:4
aside 101:22
 102:5
 110:4
 269:6
asked 64:4
 67:19
 96:13
 108:22
 169:23
 172:1
 208:20
 223:9
 229:7
 240:8,12
 252:1
 271:13
asking 46:9
 55:16 69:2
 86:20

 102:7
 107:17
 117:24
 122:1
 149:22
 151:17
 159:9,10
 174:19
 175:15
 176:4
 197:3
 210:12
 211:2
 212:20,21
 212:23
 226:1
 240:24
 242:9
 253:8
 260:20
 269:4
 270:11
 271:9
aspect
 205:13
aspects 52:9
 205:22
assert
 108:23
asserted
 96:24
asserting
 171:5
assertion
 61:24
 234:11
assess 251:1
assessment
 51:22
 194:9
 195:14
assessments
 235:9
assigned
 233:23
 237:22
 238:13,17
 238:19
 239:8,21
assignment
 228:5
 239:3
assisting

 71:24
associate
 258:12
 282:15
associated
 22:19
 50:10
 107:20
 139:16
 147:13,24
 148:7
 182:1
 207:19
 211:12
 212:24
 232:16
 242:12,18
 251:7
 252:8
 273:15
associates
 232:14
association
 260:9
associat...
 167:16
assume 114:1
 247:1
assuming
 232:23
 240:16
 264:5
athlete 72:8
 142:15,19
athletes
 9:18 43:1
 47:17 49:1
 51:8 56:8
 56:20
 57:16
 58:16 59:6
 65:19,20
 65:20 66:2
 66:3,21,22
 67:6,8
 72:4,12
 73:9,10
 74:2,5,14
 74:23 75:1
 82:6,10
 103:16
 108:6
 111:4,16

CaseID #: 27789 0690

111:24
112:6
142:5,9
170:18
171:6,16
273:2
277:17
285:20
**athletic**
17:17 19:1
25:20 26:4
26:24 27:2
27:11,15
28:8 34:8
42:22
43:21
47:15
48:22 51:5
60:15
63:20
69:19 72:3
72:7,11
73:19 76:3
76:11
78:11 79:2
81:1 87:21
95:19 96:6
97:1
102:13,20
102:23
104:14
105:1
107:11
108:13
132:1
134:17
136:1
139:17,21
148:24
160:9
161:8
164:19
165:6,12
167:9,23
168:1
179:4
180:3,9,10
180:15,19
256:11
261:9
264:9
265:5,9,20
266:18

267:2,8,12
267:14,22
268:3,8,19
270:10,17
280:4
281:22
282:12,16
282:18
283:6,21
283:22
**athleticism**
85:5
107:16
148:24
152:8
155:14
258:13
**athletics**
17:12 26:7
26:21
28:12,16
34:6 39:16
55:3 60:9
64:24
68:13
71:13 82:8
108:8,13
109:1,23
110:8
139:21
170:19
171:7,17
179:10,19
182:23
183:8
258:10
262:14
267:24
277:15
278:3
281:5
**attacking**
235:14
**attempt**
104:18
109:18
202:3,8,21
202:22
226:24
**attempted**
211:3
**attempting**
234:16

**attempts**
285:19
**attention**
16:12
25:14
49:23
69:12
104:12
109:16
114:9
137:11
189:12
199:10
214:20
217:3
**attenuate**
147:12,23
148:6
**attenuated**
82:9,14,21
82:23
83:22
**attorney** 2:1
8:6,8 11:3
13:1,5,7,9
13:10,13
13:16,19
13:21,23
14:1,3,5
14:20 15:1
15:7,9,10
15:12,14
15:21 16:1
16:7,9,21
16:24 17:1
17:20,23
18:16,20
19:3,9,21
20:2,6,9
22:7,11
23:7,18
24:8,14,19
25:1 26:9
26:15 27:5
27:9 28:23
29:7,19,23
30:10,15
30:21,24
31:19 32:5
33:18 34:1
34:10,14
36:6,8,11
36:14,22

37:7,11,12
37:14,22
38:4,8,20
39:2,18
40:1 41:9
41:12 42:1
42:6,13,19
43:7,9,12
43:18 44:2
44:4,5
46:1,3,6
46:10,18
46:20 47:2
47:6 48:2
48:6,14,18
49:21 50:1
50:11,17
52:3,6,10
52:15 53:9
53:13
54:10,13
55:6,13,20
55:21 56:9
56:12
57:17
58:11 59:7
59:10,13
59:15,17
60:1,5,22
61:8 63:14
63:17 64:3
65:7,10
66:5,8,12
66:16,17
66:19 67:9
67:12 68:1
68:3,21
69:6 70:3
70:5,13,21
72:13,17
75:3,8,12
75:20
79:21 80:1
80:18,23
81:5,13
82:17,20
82:22 83:1
83:6,8,13
83:16,18
83:21
84:11,13
84:22 85:6
85:11,15

85:20 86:2
86:6,11,17
87:5,9,13
87:14,17
87:24 88:5
89:10,13
90:10,13
91:8,11,24
92:9,19,22
93:3,4,20
94:2 95:8
95:12,21
96:4,16,22
97:6,14
98:7,10,12
98:21 99:7
101:13,21
102:3,10
102:14,17
102:21
103:1,7,11
103:13,21
104:3,5,6
104:7,9
105:5,12
105:18,20
106:3,5
107:1,6,13
107:22
108:15,21
109:9,13
109:24
110:3,9,12
112:2,10
112:20,23
113:10,15
113:20
115:16
116:2,18
116:21
118:24
120:21
121:2
123:12,14
123:19,23
124:6,8
125:9,23
126:5,14
127:18
128:4
130:6,10
131:16,18
131:19

132:8,13
133:4,8,13
133:18,21
134:3,10
134:20,24
136:3,7,12
136:19
137:2,6,24
138:4
141:8,11
141:14,16
141:24
142:2,3,6
142:13,17
142:21
144:7,13
145:5,7,15
145:20
146:1
148:9,11
148:15
149:3,19
150:2,21
151:9,15
151:21
152:5,12
152:14,16
153:3,19
153:22
154:19,22
155:8,19
156:5,9,13
156:14,21
156:22
157:3,5,11
158:2,8,18
158:21,24
160:3,12
160:20,23
161:3,9,14
161:21
163:12,20
165:8,18
166:12,17
167:10,21
168:22
169:8,16
169:22
170:6,11
170:24
171:4,8,11
171:13
172:7,10

172:15,18
173:5,9,14
173:18
174:1,5,9
174:14,17
174:21
175:12,17
175:21
176:3,8,14
176:19,23
177:15,21
178:5,10
180:20
181:8,21
182:4
183:1,6,16
184:3
185:13,22
187:3,17
187:22
188:1,14
188:18,23
189:6
193:2,14
193:23
194:3
195:7,10
196:12,21
197:1,8,11
197:18
198:21
199:4
200:18,19
200:21
201:4,12
201:20
202:11,19
203:14,24
204:13,19
205:15,20
205:24
206:5
207:3,16
208:10,11
208:14,17
208:22,23
209:3,8,10
209:12,16
209:18,19
209:23
210:1,3,4
210:10,14
210:18

211:1,6
212:18,22
213:10,12
214:4,5
215:4,9,24
216:10,15
216:20
217:5,7,9
219:2,9
222:14,21
224:10,19
225:17,23
231:16,20
233:21,24
234:5
240:14
241:1
243:3,10
243:12,18
243:19
244:3,7
246:2,9
248:3,5,7
248:9,20
249:3
250:2
252:11
253:4,7,12
253:13,14
253:16
254:23
255:6,10
255:13,17
255:19
256:6,20
257:1,16
258:1,23
259:2,5,13
259:15
260:19
261:1,11
261:15,19
262:1,5,10
262:16,23
263:3,12
263:20
264:4,12
264:20
265:11,17
266:1,14
268:12,16
268:24
269:5

270:3,5,23
271:8,13
271:20,23
272:3
273:23
274:7,19
275:1,5,6
275:8,24
276:9
277:13,23
278:20
279:1,13
279:14
280:2,7,11
280:18
281:20
282:2
283:18,24
284:20,23
285:17,23
286:13,16
286:18,23
288:8,12
288:18,20
288:22,24
289:3
**attorney...**
  209:13
**attorneys**
  12:23
**attribute**
  91:4
**atypical**
  217:13,23
**atypicality**
  219:12
**Australian**
  100:14
  101:3,12
**author** 184:5
  184:11,12
  184:13
**authorities**
  231:10
**authoriz...**
  1:23
**authors**
  184:6,13
  184:18,22
**available**
  39:14
  135:24
  136:2,6

**average**
  17:11,16
  18:23
  20:18
  40:23  41:1
  41:5,16,17
  46:12,14
  46:21
  50:14
  61:18  62:1
  69:21  90:6
  91:17  94:3
  94:5,6,9
  94:22,23
  95:13,15
  107:11
  136:23
  137:15
  153:11
  159:23
  162:24
  163:1
  175:1
  207:17
  211:24
  265:5,9,20
  266:17
**avoid** 125:21
**award** 63:18
**aware** 41:4
  46:7  54:1
  54:24  55:8
  62:10
  63:10,11
  72:7,10,14
  94:14
  99:16,19
  109:20
  111:20
  115:11
  130:3,12
  132:4
  140:23
  141:4
  142:15,18
  142:18,19
  162:1
  170:15,21
  184:16,17
  244:4
  245:22
  246:3
  251:3

255:7,14
258:5,8,12
261:22
268:14
270:9,11
270:13
271:2
273:11
285:16,18
285:22,24
286:4
**awareness**
93:8
**axis** 90:15
**AZ** 7:9

**B**

**B.P.J** 1:4
**babies** 256:1
**Babwah** 12:10
12:10
14:17
**back** 25:18
37:16
40:17 52:7
52:11,13
56:11,21
58:17 61:6
61:9 75:9
81:21
91:21 98:4
103:15
105:23
113:8
124:12
131:12
135:19,21
150:9
151:16
153:1,4
172:2
173:17
175:23
191:22
193:15
203:5,22
213:23
223:4,9
233:11
238:12
245:13,20
245:21
248:18

256:22
258:3
266:12
272:10
281:4
282:14,17
284:7,9
**background**
72:7
236:16,21
272:2
**bad** 19:6
176:17,22
**Bahlburg**
234:18
**Bailey** 6:11
**balance**
27:24
**balanced**
164:1
**ballpark**
251:6
**ban** 168:8,16
169:20
171:20
**banning**
169:1
**bar** 93:18,18
95:4,5
**Barr** 4:10
14:1,1
**Barrier**
183:20
**bars** 91:2,19
98:15
**base** 39:8
**based** 61:19
61:20 62:2
62:2 95:2
101:12
135:20
143:14
153:8
154:9
160:4,6
175:1
186:11,16
190:24
204:4
211:20,21
221:8
224:13,14
239:4

241:6
272:22
**bases** 156:7
**basically**
18:10
247:13
**basis** 43:20
73:3 90:8
92:24
104:13
108:23
109:17
110:6
111:10
133:24
171:5
210:10
212:13
215:18
222:10,12
223:18
225:7,9
229:15
231:14,18
232:1,7,11
233:8,12
234:12
236:8
266:23
267:6
281:12
**basketball**
48:7,9,12
48:17
139:6
168:21
169:15
172:5,14
173:3,13
173:24
174:8
175:10
**becoming**
51:19
**began** 23:21
81:3 85:16
239:13
**beginning**
35:14 39:4
40:4 65:17
78:12,19
78:22,24
82:7 100:9

122:8,17
122:21
123:24
125:5,20
131:15
135:18
154:17
194:4
225:3
**begins** 17:10
18:14
22:13
23:19 28:5
32:7 45:15
61:11
69:10,16
78:11
92:15
100:9
119:9
135:21
157:22
199:9,13
225:1
227:23,24
237:13
249:6
**begun** 79:10
123:22
**behalf** 3:3
13:11,17
210:7
248:21
288:23
**belief**
121:19
**believab...**
136:17
**believe** 28:9
35:10
52:24 62:6
62:20 63:2
64:7 66:1
88:22 90:3
99:16
114:24
115:15
121:8
122:11
131:5
138:7
141:2
148:13

158:18
178:16
179:18
206:18
225:24
228:17
235:1
243:14
245:1
246:13
260:17
272:15
**believed**
29:17
**believing**
111:10
**benefit**
187:11
201:17
**Berman** 66:22
**best** 66:22
67:7 73:8
73:12,14
74:2,4,14
75:1 76:22
87:19 88:2
88:3 91:1
204:11
281:24
282:5
**better** 17:12
17:16 18:1
18:4 63:1
140:10
158:22
262:22
263:7
268:17
**beyond** 18:19
25:7 34:11
47:23
139:19
144:3
152:10
**BG17** 66:24
**bias** 141:13
**bibliogr...**
216:2
**bibliogr...**
133:23
**big** 37:20
181:14
251:20,22

DisAbility 0693

286:17
**bigger** 94:11
**biggest**
 23:13
**Bill** 285:24
 286:2,7
**bills** 286:6
 286:8
**binary**
 287:17
 288:2
**biologic**
 214:9
 229:15
 232:1,7
 262:12
**biological**
 89:1
 106:14,20
 106:22
 124:15
 126:11
 153:11
 185:10
 216:12
 219:16
 221:9,11
 222:10,12
 222:18,22
 223:17
 224:21
 225:6,9
 231:18
 232:11
 233:8,12
 234:11
 236:7
 257:20
 262:8
 263:9,13
 264:5,7,14
 265:4,9,20
 266:17
 287:13
 288:3
**biologic...**
 260:14
**biology**
 107:4,20
 124:24
 153:13
 165:16
 177:4,10

219:22
223:2,4,6
223:8,8
232:18
233:1,17
242:23
264:2
273:13
**birth** 24:11
163:2,11
228:5
233:23
254:21
255:9
258:10
**bit** 17:5
23:11,15
37:1 52:18
74:17
81:23
138:1,2
141:15
144:12,18
165:16
172:9
180:24
187:9
189:12
207:14
221:16
256:22
271:1
**black** 251:3
251:4
**blanket** 66:6
67:10
138:3
276:2
**block** 4:3
11:4 13:19
13:20
16:21
17:20
18:16 19:3
19:21 20:6
22:7 23:7
24:8,19
26:9 27:5
28:23
29:19
30:10,21
31:19
33:18

34:10 36:6
36:11,22
37:11,14
38:4,20
39:18 41:9
42:1,13
43:7,12
46:1,6,18
47:2 48:2
48:14
49:21
50:11 52:3
53:9 54:10
55:6,20
56:9 57:17
59:7,13
60:1 63:14
65:7 66:5
67:9 68:1
68:21 70:3
70:13
72:13 75:3
79:21
80:18 81:5
82:17,22
83:6,13,18
84:11,22
85:11,20
86:6,17
87:13,24
89:10
90:10 91:8
91:24
92:19 93:3
93:20 95:8
95:21
96:16 97:6
98:7
101:13
102:3,14
102:21
103:7,13
104:5,7
105:5,18
106:3
107:1,13
108:15
109:9,24
110:9
112:2
115:16
116:18
118:24

120:21
123:12,19
124:6
125:9
126:5
130:6
131:16
132:8
133:18
134:3,20
136:3,12
137:2,24
141:11
142:17
144:7
145:5
148:9,15
149:19
150:21
151:15
152:5,14
153:19
154:19
155:8
156:5,21
157:3
158:2,18
160:3,20
161:3
163:12
165:8
166:12
167:10
168:22
169:16
170:6,24
171:8
172:7,15
173:5,14
174:1,9,17
175:12,21
176:8,19
177:15
178:5
180:20
181:21
183:1
185:13
187:3,22
188:14,23
193:2,23
195:7
196:12

197:1,11
198:21
200:18,21
201:12
202:11
204:13
205:15,24
207:3
208:10,14
208:22
209:3,10
209:18
210:10,18
212:18
215:4,24
217:5
219:2
222:14
224:10
231:16
240:14
244:3
246:2
248:5,9,20
248:20
254:23
255:10,17
256:20
257:16
260:19
261:11,19
262:5,16
263:3,20
264:12
265:11
266:1
268:12,24
270:3,23
271:13,23
273:23
274:19
275:5,24
277:13
278:20
279:13
280:2,11
281:20
283:18
284:20
285:17,20
**blockers**
 33:14,16
 34:7,9

84:5 85:19
86:16
118:9,13
118:16
119:6,8
120:9
122:9,17
122:21
123:24
124:21
125:2,5,21
126:1,18
**blocking**
114:11
116:4,8
260:3
**blood** 80:7
130:1,2
181:3
221:3
224:16
**blurring**
219:5,7
**board** 1:8,9
6:7,15
12:21
13:11,14
175:2
**boarder**
182:10
**bodies**
161:12
162:11
163:7,13
163:15
**body** 74:20
79:6,9,19
79:20 81:2
96:1
129:21
131:3
145:18
162:5
169:6
273:12
**bone** 23:11
23:13
**bonus** 211:8
**book** 128:6
**born** 226:4
255:4,16
256:1
**bottom** 73:24

91:7 102:7
104:11
150:10
162:20
190:6
198:7
217:4,10
217:10,18
234:23
252:2
281:15
**Boulevard**
6:5
**boundaries**
45:17
**bounds** 31:16
**box** 203:8
**boy** 256:16
256:17
**boy's** 79:6
**boys** 17:11
18:4,9,10
18:11,13
18:23,24
19:5 73:15
74:3,6,15
74:23 75:2
76:4,12
93:13,24
94:4,6,11
94:20 95:3
95:14 96:6
96:9 97:1
97:15,19
97:20 98:1
98:2,15
101:19
104:15,22
105:8
107:16
123:1,6,16
125:5
126:8
153:9
255:15
261:9
262:22
263:7
**BPJ** 12:20
126:17,19
181:20
182:13
**BPJ's** 126:20

182:16
**brand** 157:9
**Brandon**
12:10
14:17
**break** 33:10
59:14
60:22 61:3
103:23
104:1,1,4
104:4,5
112:11,13
112:20,22
113:5
141:9
152:13,22
171:11
203:14,19
248:5,15
266:2,9
275:14
**breakdown**
121:20
**Bridgeport**
6:6
**briefed**
210:16
**bring** 258:23
286:18,19
**broad** 4:5
86:19 92:7
148:2
159:8
219:4
246:18
262:6
**broader**
31:18
115:3,7
267:23
**broadest**
176:12,15
**broadly** 60:6
**broken** 58:24
**Brooks** 7:3
8:6 11:24
13:1,1
14:20 15:1
15:12,21
16:7,9,24
17:1,23
18:20 19:9
20:2,9

22:11
23:18
24:14 25:1
26:15 27:9
29:7,23
30:15,24
32:5 34:1
34:14 36:8
36:14 37:7
37:12,22
38:8 39:2
40:1 41:12
42:6,19
43:9,18
44:4,5
46:3,10,20
47:6 48:6
48:18 50:1
50:17 52:6
52:10,15
53:13
54:13
55:13,21
56:12
58:11
59:10,15
59:17 60:5
60:22 61:8
63:17 64:3
65:10 66:8
66:12,17
66:19
67:12 68:3
69:6 70:5
70:21
72:17 75:8
75:12,20
80:1,23
81:13
82:20 83:1
83:8,16,21
84:13 85:6
85:15 86:2
86:11 87:5
87:14,17
88:5 89:13
90:13
91:11 92:9
92:22 93:4
94:2 95:12
96:4,22
97:14
98:10,12

98:21 99:7
101:21
102:10,17
103:1,11
103:21
104:3,9
105:12,20
106:5
107:6,22
108:21
109:13
110:3,12
112:10,20
112:23
113:10,20
116:2,21
121:2
123:14,23
124:8
125:23
126:14
127:18
128:4
130:10
131:18,19
132:13
133:4,13
133:21
134:10,24
136:7,19
137:6
138:4
141:8,14
141:16,24
142:3,13
142:21
144:13
145:7,15
146:1
148:11
149:3
150:2
151:9,21
152:12,16
153:3,22
154:22
155:19
156:9,14
156:22
157:5,11
158:8,21
158:24
160:12,23

161:9,21
163:20
165:18
166:17
167:21
169:8,22
170:11
171:4,11
171:13
172:10,18
173:9,18
174:5,14
174:21
175:17
176:3,14
176:23
177:21
178:10
181:8
182:4
183:6,16
184:3
185:22
187:17
188:1,18
189:6
193:14
194:3
195:10
196:21
197:8,18
199:4
200:19
201:4,20
202:19
203:14,24
204:19
205:20
206:5
207:16
208:11,17
208:23
209:8,16
209:19,23
210:3,14
211:1,6
212:22
213:10,12
214:4,5
215:9
216:10,20
217:7,9
219:9

222:21
224:19
225:23
231:20
233:21
234:5
241:1
243:3,12
243:18
244:7
246:9
248:3,7
249:3,4
250:2
252:11
**brought**
181:14
182:17
**Brown** 107:24
108:22
109:7,21
110:6
133:1
243:21
253:22
**Brown's**
132:23
**buffer** 30:18
31:4
**Building**
5:12
**bulk** 25:10
**bulky** 63:21
**bullet** 69:14
69:15,20
69:21
**bumping**
87:15
**bunch** 151:19
**Burch** 1:12
6:16 13:12
**burdens**
195:19
**bureaucr...**
195:18
**buried** 214:1

―――――――――
**C**

**C** 4:1  5:1
6:1,10  7:1
12:8
**CA** 4:17
**calculated**

66:24
**calculating**
243:15
**call** 28:21
39:4 69:11
71:13
87:16
114:8
189:12
217:3
266:4
282:20,24
**called** 14:11
92:3
**calling**
137:11
214:20
233:18
247:13
**calls** 125:4
192:20
**cancers**
186:7
**candidates**
265:15
**capabili...**
60:15 72:3
72:12
105:1
**capability**
97:1,5
98:6
**capable**
107:11
**capacity**
1:13,15
2:1 130:5
209:11
**Capehart**
15:9
**Capitol** 5:11
**caption**
12:18
**card** 88:9
**care** 9:15
44:7,8
99:21,22
120:8
127:20,24
132:21
134:12
162:14
183:20

185:5
186:17,22
187:2
200:3,4
204:18
207:11
212:6
215:16
**cared** 119:16
**careful**
20:17 81:7
87:12
219:3
269:15
**carefully**
88:16
154:21
228:10
**Carlson**
174:23
**Carlson's**
168:7,13
**carried**
132:14
**carve-out**
19:24
20:11
21:20
62:18
**case** 1:6
12:18
28:24 54:3
54:15
65:13
79:22 80:3
82:24
86:21
109:21
110:7,13
110:22
124:15
134:18
187:19
188:2
189:4
193:10
213:16
220:17
228:11
230:14
242:13
247:4
**cases** 108:2

108:23,24
109:5,11
109:15
134:4
226:20,21
228:18
231:9
**Caster** 54:3
55:1 65:14
**castrating**
198:19
**castration**
238:4
**catch** 80:7
**categorical**
97:10
168:7,16
**categori...**
84:3 96:24
124:1
**categories**
22:1 46:16
234:14
**categorized**
233:2
**category**
9:12 20:1
20:24
21:13 47:1
47:8 48:24
53:6 63:3
64:23 65:5
98:23 99:4
109:2,23
143:9,16
146:21
169:2
170:22
173:7
174:13
176:16
181:4
234:16,16
246:14
254:13
277:20
**causal**
223:17
**causality**
263:6
**causation**
101:22
102:5

Ulrich #: 27795 0696

**cause** 26:24
31:13
69:18 80:2
80:3 86:13
124:13
222:23
**caused** 66:18
79:20
**causes**
101:24
**caution** 80:4
94:24
115:21
**caveat** 263:7
**cavities**
129:24
**CeCe** 110:22
**cell** 181:3
**cells** 179:22
**Center** 4:15
183:19
250:6,8
**certain** 18:1
19:7 34:5
38:6 54:16
62:13 79:5
80:20
86:22,22
86:24 87:4
103:17
129:17
130:1
135:10
139:1
140:12
148:20,21
167:14
219:17
224:13,14
230:1
232:22
233:16,17
241:9,10
276:24
277:3,18
**certainly**
20:20
40:21 45:2
45:5 60:17
86:20,21
86:23 96:2
98:19
99:19

108:17
110:19
121:17
130:19
131:5
133:2
140:9
159:15
162:16
169:3
203:4
207:8
219:8
240:20
259:20,22
260:24
261:3
269:10
270:13
271:2
279:18
**certainty**
257:18
**CERTIFICATE**
8:10
**certific...**
12:5
**Certified**
12:13
**certifying**
1:24
**cetera** 96:2
206:14
**challenge**
207:7
221:15
**challenged**
65:3
**champion...**
111:2
**champion...**
108:2,3
111:22
**chance**
118:21
145:6
158:3
**change** 23:12
45:18 46:5
47:3 70:10
145:18
**changed**
22:18,21

23:5 228:6
**changes**
25:10
50:10 79:6
79:9,11,19
80:11 81:2
81:15
117:7,9,21
118:22
120:1
123:1,16
124:19
125:3,6
129:10
139:16
**chapter**
127:20
128:6
**characte...**
167:15
287:17
288:2
**characte...**
22:16,19
23:4,12
26:23
42:22
47:14
48:17,22
49:11 51:5
57:1,2
117:5
168:14
253:22
260:13
**characte...**
97:7 106:4
120:22
134:4
**characte...**
143:7
212:3
288:6
**characte...**
167:5
**charge** 17:6
**charged**
250:15
**Charleston**
5:13,20
6:14 12:20
**chart** 88:10
90:5 91:3

126:20
263:1
**charted**
162:10
**chartered**
162:10
**charts** 88:20
88:23 90:5
263:1,6
**check** 203:8
220:16
284:1
**chest** 206:13
**child** 120:3
182:20,22
221:12
223:15
230:24
239:5
**child's**
117:20
118:21
**childhood**
228:5
**children**
32:13
34:20
85:18
86:15 97:9
100:14,21
101:12
105:15
114:12,20
115:8,13
115:20
116:5,9
118:14
119:14,16
119:20
121:3
122:6
127:2
181:10
226:3,19
239:11
240:9
258:10
261:23
**children's**
119:24
**choice** 239:5
279:6
**choices** 39:9

39:15
**choose** 32:15
86:16
**choosing**
109:8,11
109:12
**chose** 88:6,8
201:7
**chosen** 91:6
**Christiana**
7:5 13:5
**chromosomal**
220:9,15
220:21
231:15
241:15,18
242:5,11
242:12,19
245:11
247:2
287:15
**chromosome**
165:14
167:19
182:21
226:8
230:20
257:8,11
257:14
**chromosomes**
164:23
165:1,3
167:8,14
182:22
183:4
219:24
220:2
226:11
229:19
230:2,4,7
230:17
232:21
257:5
**circle**
175:22
**circulating**
43:20 53:7
69:18
265:3,13
265:19
266:16
277:1,4
283:3,4

284:2
circumst...
33:1,22
37:4,5
85:14 88:4
103:19
106:11
115:19
118:7
140:12,22
185:19,21
186:4
200:1
224:18
229:9
247:22
273:16
276:12
circumst...
21:21 38:7
86:23 87:4
203:4
223:22
271:18
cisgender
17:11,13
18:1,2,4,5
19:7,8
20:3 29:21
30:14
31:18,24
32:2 42:2
42:3,11,15
48:21 49:4
49:7,22
50:3 51:4
51:10,13
51:16,17
57:2 58:9
58:9 62:16
62:16,20
62:22
70:19 75:5
104:15
105:8,9
106:2,11
107:15,15
132:18,20
139:19
150:13
151:3,11
151:24
160:18

161:1
169:19,19
169:21
173:7
174:12
229:24
230:3
ciswomen
147:8
citation
153:20
cite 59:18
76:5 88:7
88:8
108:24
133:15
146:15,19
153:16
215:19
234:10
cited 44:9
76:17
122:19
132:23,24
133:3
134:1
141:17
146:13
253:22
260:22
cites 115:11
citing
108:22
133:24
citizen
103:12
civil 3:4
4:4 12:22
177:22
claim 203:11
clarified
29:24
clarify
17:22
18:22 31:8
50:2 53:10
56:10,21
57:22
78:18,21
122:19
187:18
200:9
201:13

clarity
251:16
classic
22:23
25:14
226:8
classifi...
61:12
clause 254:1
CLAYTON 1:12
6:16
clean 88:4
227:8
279:8,15
cleaner
221:16
cleanliness
91:5
cleanly
99:18
115:18
clear 24:10
30:23
31:20 49:3
59:1 80:4
85:22 86:7
90:16
135:8
144:23
146:16
157:14,22
160:5
161:7
162:23
163:8,18
181:19
182:15
185:9
187:4
206:24
211:5
227:11
229:11
231:6
232:12
240:19
245:15
246:7
clearer
202:17
clearly
191:21
271:21

clients
213:24
clinic 25:2
119:21,23
121:8
184:19
185:6
186:20,24
187:20
188:3,19
191:11
192:22
194:17
196:7
197:20
204:2
206:7
207:1,18
207:24
208:2
211:24
212:2,24
244:15,22
245:1,8
246:23
250:15,18
250:22,23
251:1,7
252:9
clinic's
192:19
clinical
113:13
120:24
127:1
190:11,13
190:19
213:19,23
clinicians
122:24
128:19
clinics
121:22
clipped
156:15
Cloacal
233:23
clock 112:15
243:7,13
close 47:17
111:3
205:4
closed 19:13

20:14
25:21
29:12
32:15
35:20
38:13
39:10 41:1
46:13 65:1
65:22 67:2
73:16 84:6
104:16
108:8
114:21
120:12
125:7
128:20
132:2
136:24
147:14
149:11
150:15
153:13
158:14
159:24
164:3
194:9
214:10
217:14
co-author
116:7
122:16
co-authored
72:15
co-authors
139:14
216:14
coed 51:19
coerce 32:13
86:24
coercing
86:22
cogent
174:24
cohort 109:5
coils 75:4
Coleman 71:2
71:4,8,20
72:2,20,24
Coleman's
73:6
Coley 14:2
collabor...
59:23

Litigation 0697

colleague
 13:4
colleagues
 32:22 86:3
 121:15,18
 127:8
 184:19
collected
 135:13
 283:10
collecting
 229:10
collections
 135:14
collecti...
 98:19
 250:14
college 74:4
 74:13 82:6
 108:3
 111:11
colleges
 267:22
 270:9
collegiate
 74:6
collision
 168:14,20
 169:14
 170:2,22
 171:9,10
 171:18
Colton 98:22
 99:12
column 17:8
 22:12 28:4
 100:8
 117:2
 128:17,24
 129:1
 147:6
 149:4
 150:11
 189:11
 190:6
 191:22
 192:4,5,7
 192:8,9,13
 193:15
 195:3
 197:22
 199:7,12
 199:13

202:1,6
 217:4,10
 217:15,16
 218:8,17
 225:2
 234:19,21
 234:22
 237:4,7,8
combination
 233:18
 253:23
come 16:16
 24:22
 27:20
 44:13
 49:23
 79:20 87:3
 105:23
 109:16
 111:3
 200:16
 201:5
 247:11,17
 268:10
 276:19,22
 278:5
 279:22
comes 89:4
 111:14
 167:12
 277:15,17
comfort
 76:19
comfortable
 218:13
coming 25:13
 25:13
 120:24
 121:5
 127:6,12
 169:4
 245:22
 246:10
comma 117:5
 225:15
 228:3,4
 267:2
commenced
 129:12
comment 45:2
 45:22 46:9
 55:17
 73:23

74:18 91:9
 92:7
 125:13
 149:21
 156:11
 158:9
 164:12
 165:10,21
 205:8
 246:21
 261:14,21
 270:12
commentary
 158:6
commenting
 27:7 34:12
 63:16
 157:23
 205:5
Commission
 1:11 5:22
 13:18
commit 202:9
committed
 244:23
committee
 26:18 27:8
 28:20 29:1
 30:14
 31:11
 41:14
 54:20,22
 65:2 71:12
 71:14,23
 113:22
 205:7
 206:2
 272:10,13
 272:14
 277:24
 279:17,19
committees
 60:7 71:12
 71:18,22
 165:23
 271:4
 280:16
common 23:23
 140:23
commonly
 89:9
Commonwe...
 3:6

community
 39:7 86:8
 182:11
 184:11
 264:1
company
 213:14,18
compare
 185:4
 189:14
compared
 40:24 41:6
 41:17
 46:14,22
 48:12 73:8
 100:15,22
 163:1
 246:1
comparing
 153:8
compensa...
 250:4,10
compete
 19:13 21:1
 34:6,8
 46:16 47:1
 61:18 62:1
 182:23
competed
 100:23
 108:12
 109:1,22
 110:7
 170:21
competing
 33:5 48:24
 108:7
 170:19
 171:6,16
competition
 53:2
 64:23 65:4
 102:13,20
 102:24
 139:21
 148:24
 164:3,20
 256:12
 267:22,23
competit...
 112:6
 160:16
competitive

64:24
 68:12,13
 72:8 76:2
 76:10
 272:24
 273:10,20
 273:21
 274:17
 275:10,22
competitors
 111:23
complaining
 235:13
complaints
 235:7
complete
 25:3
 100:19
 141:8
 193:24
 245:2,4
 246:1
completed
 38:11
 40:11
 136:23
 137:14
completely
 25:5 146:7
 287:21
completing
 159:21
complex 5:11
 49:14
 78:23
 97:12
 130:24
 151:22
 257:21
complexity
 81:19
complicated
 14:21
 23:16
 58:23 60:3
 67:16
 172:21
 222:16
 245:12
complicates
 199:19
component
 193:8

214:10
263:14
264:6
288:3
**components**
180:24
268:1
287:24
**Composition**
145:18
**compound**
178:18
**concentr...**
57:7,8
103:24
**concentr...**
31:16
**concept** 31:2
45:17
**concepts**
45:18
**conceptual**
54:23
**concern**
25:20 26:3
26:5,10
27:1,3,11
27:12,15
27:17
31:14
32:18,23
33:11
66:18 83:4
85:17,22
86:5,8,9
86:14
160:19
161:2,8
170:10,16
**concerned**
203:10
226:3
**concerning**
127:1
154:16
**concerns**
34:22
39:23 82:8
83:10
85:24
170:5,13
175:1
226:18

241:13
**concert**
61:17,17
**conclude**
140:7
**concluded**
177:2
192:21
289:8
**concludes**
160:13,13
163:24
289:4
**conclusion**
76:10,15
139:14,23
149:7
163:6
164:7
228:15
260:1,8,20
261:3
274:9
**conclusions**
145:12
154:16
279:23
**conclusi...**
105:10
**concrete**
110:4
**condition**
166:1
182:16
226:4
**conditions**
166:22
**confer**
208:23
209:1
**conference**
13:3 66:14
**conferred**
56:5,17
57:12
58:13
248:21
**confidence**
70:20
122:1
222:12,23
231:5
251:9,21

**confident**
104:24
**confiden...**
208:7,21
249:1,6
252:13
**confidently**
104:13
**confirm**
139:15
249:4
**confirma...**
143:24
144:3,6,21
196:15
**confirming**
24:6,12
189:20
**conforming**
244:16
**confounded**
101:18
**confounders**
93:9
**confounding**
241:8
246:6
**confused**
78:8 195:8
195:11
268:15
287:11
**confusing**
271:1
**congruent**
229:15
231:15
**conjecture**
23:10
194:23
**connected**
167:17
183:4
**connection**
26:17
63:20
119:20
212:16
214:1
250:5
**connections**
200:15
**consensus**

165:11
205:18
206:3
214:9
215:1,1,19
215:23
216:8
222:9
**conserva...**
187:14
198:9
**consider**
25:3 34:15
36:18 38:7
41:21
43:17
44:23
55:14
60:10,13
60:16
61:23 62:7
67:5 72:2
76:24
91:21 95:6
97:4 131:3
166:3
174:6,15
175:8
215:21
254:8
255:24
276:7
**consider...**
120:18
**consider...**
32:4
122:11
231:8
**consider...**
28:1 30:4
31:22
168:17
169:11
**considered**
29:9 30:19
31:8
166:21
185:18
203:6
257:9,11
**considering**
86:1
231:21

**consist**
177:6
211:11
276:3
**consistent**
24:4,15
128:21
129:9
143:17
147:10
158:1
241:10,21
242:4
244:1
272:24
275:21
**constitutes**
166:3
**constitu...**
111:3
**construc...**
185:21
237:23
238:6
**consuming**
187:12
**cont'd** 5:1
6:1 7:1
**contact**
126:19
168:13,20
169:14
170:1,22
171:18
239:12
285:4
**contain**
154:16
**contempl...**
89:8
**contended**
263:13
**contention**
160:8
225:5
**contest**
283:6
**context**
18:11 21:3
30:12
41:15,19
65:16
68:14,18

Citizens 0699

68:19,23
68:24  71:7
71:9,10
74:11
83:24
84:12,23
84:24
95:10,18
96:18,24
97:8,12,23
99:13
103:17
107:3
108:19
115:1
120:15
124:15
131:2
135:12
136:16
138:3,5
140:5
150:22
153:5
155:16
158:6
172:21
179:16
180:1,12
194:19
198:17,24
208:15
218:1
257:4
267:16,24
273:6
274:1,20
275:4
276:18
**continue**
25:7  26:22
35:16  38:9
78:13
141:15
166:10
168:12
**continued**
239:23
**continues**
23:22
80:20
225:16
245:24

**continuing**
81:23
141:11
**continuous**
199:17
200:6
201:8
**continuum**
83:20
**contrast**
159:20
187:13
189:14
**contrave...**
209:4
**control**
201:10
**controlled**
201:22
246:1
**convenience**
15:5
**conventions**
135:10
**conversa...**
26:20  46:8
58:5
124:12
138:2
182:9
**conversa...**
31:23
117:23
122:2
239:13
280:22
**converse**
267:5
**convincing**
263:24
**Cooley** 4:14
13:24  14:4
14:6
**coordina...**
63:4
**copies** 15:22
158:22
**coping**
260:11
**copy** 16:8
64:8
158:22
286:21

287:9
**correct**
15:13  16:8
16:23
17:19  18:6
18:7  19:2
19:16,20
20:5,15
21:2  24:23
26:8,19
28:15,22
29:15
31:12
36:18,20
39:17  41:8
43:6  44:6
44:10
47:19
49:20  50:5
50:22
53:19  54:2
55:5  62:5
70:7,23
74:16  76:7
77:18  79:4
79:13
81:18  82:5
82:16
87:23
90:14  91:2
92:18
93:19
97:17
105:9,17
105:21,22
106:17,24
112:3
113:21
114:5
118:23
120:20
121:7,16
123:7,13
123:18
124:5
128:5,13
128:22
130:2
133:17
134:2,13
134:19
137:20
139:8

144:2
145:1,2
158:1
165:2
166:2,23
176:18
177:8,14
178:4
180:17
182:7
184:19,21
185:7,12
186:3,13
186:23
188:22
189:17,18
189:22
191:14,15
191:19
193:1,4
194:15
195:6
196:11,24
197:10
198:20
201:23
204:7
208:4
219:1,14
220:10
222:13
224:9
226:22
227:7
229:17
230:9,19
234:8,13
235:19
236:13,18
238:21
239:1
241:16
243:16
257:10,12
258:11
259:14
261:18
263:15,19
267:4
269:23
271:12
276:21
280:20

**corrected**
15:10
**corrections**
246:5
**correctly**
24:2  39:11
47:20  51:9
57:3  68:17
90:9
174:13
185:2
189:13
213:15
283:15
287:18,19
**correlate**
282:22
**correlates**
219:17
**couch** 138:9
**council**
163:14
**counsel** 4:7
5:8,14,21
6:7,15
7:10  12:4
20:7
112:10
208:7,19
209:9
210:23
247:23
248:22
249:1,4
**counseling**
190:22
**COUNSELS**
4:18
**count** 36:3
180:14
**country**
121:10
285:15
**counts** 181:3
**County** 1:9
1:15  6:7,8
13:14
**couple** 30:4
35:1  57:18
162:18
244:18
**course** 46:8
67:21

165:16
195:17
216:5,9
248:7
254:17
**court** 1:1
3:5  9:10
12:14,19
16:7  20:7
52:13
63:19,23
80:16
133:7
170:1
210:20
243:6,8,13
251:6
288:8,10
**courtroom**
208:21
**cover** 195:14
198:9
**covering**
156:7
198:3,14
**COVID** 206:23
207:11,13
**create** 31:4
38:12,18
39:7  77:22
85:18
100:7
185:15
195:18
**created**
34:20
86:15
113:22
166:16
**creating**
195:19
238:6,8
**credentials**
190:11
191:7
**criteria**
143:10
183:19,21
185:5,6
186:12,16
187:5,8,21
188:4,7,8
188:11,13

188:21
189:8,10
189:15,16
190:24
191:1,2
192:2,12
193:17
194:7
196:4,14
197:6,22
198:1,3,6
198:10,14
199:17
202:13,15
202:24
203:8
204:4
272:22
**criterion**
169:5,7
**criticizing**
235:4
**cross** 213:21
**cross-co...**
140:24
**cross-se...**
69:22,24
92:4
101:17
262:7
**crowded**
87:14
**CTMS** 193:18
194:8,14
195:1,14
199:10
202:1,5
204:6
**cultural**
101:23
263:10
**cumbersome**
197:17
**cumulative**
78:15
80:10,15
80:17,22
81:15
153:24
154:5,7
**current**
12:16
16:20

35:10,12
60:24  61:7
111:11
113:2,9
120:8
121:19
147:10
148:5
152:19
153:2,8
203:15,23
220:8
233:2
245:20
248:19
260:8
266:6,13
289:5
**currently**
38:19  56:2
139:20,20
245:4
**curve** 91:6
**curves** 88:14
**cut** 158:20
158:22
270:4
283:9
**cutoff** 31:3

_____

**D**

**D** 8:1  12:8
**damages**
262:3
**dare** 89:1
**dark** 225:13
**data** 39:9,13
39:14,20
39:21
41:16
42:16,18
46:12,21
56:2  70:24
92:20  94:7
94:7  98:17
100:13
101:12,15
102:9
121:24
135:13,24
136:2,10
136:17
140:6,19

144:21
147:1,3,21
152:4,10
154:16
155:14
158:5
159:16
174:4
191:22
224:5,14
228:20
229:10
241:6,18
246:7
261:22
262:2
263:23
267:12,14
270:19
280:5,16
281:22,23
282:3,5
283:8,10
**dataset** 94:5
94:14,17
94:21  95:2
**date** 12:15
40:6
148:23
149:15
157:12
179:12
**dated** 127:21
157:1
185:2
**Dave** 210:1
210:10
247:23
248:3
252:11
**David** 5:10
13:7  69:10
156:12
253:6
**day** 94:11,12
**days** 110:20
121:10
141:7
**de-trans...**
245:9
**de-trans...**
243:24

**deal** 26:5,22
155:1
**dealing** 58:5
88:23
144:4
177:2
**deals** 65:13
**dealt** 26:21
72:21
236:11
**debated**
150:15,20
151:1,22
**decades**
164:20
256:12
**December**
157:1
**decide**
177:24
**decided**
169:18
246:24
**deciding**
38:1  178:3
210:17
**decision**
9:10  34:13
34:13  38:3
39:8  54:14
63:18,24
64:6,8,10
64:22
77:10
178:6
203:1
274:14
**decisions**
178:8
204:3
269:24
282:4
**Declaration**
75:11,13
75:16,22
77:22  78:7
96:5,23
98:4,8
168:3
**declared**
238:13,19
**Declartion**
9:11

**decline**
  213:7
**declined**
  248:23
**declines**
  159:22
**decrease**
  70:22,24
**decreased**
  70:19
**decreasing**
  130:19
**deemed** 198:5
  223:20
**defect**
  226:14
  238:24
**Defendants**
  2:4 249:2
  249:5
  288:15
**Defending**
  7:7
**defer** 213:6
**deferred**
  250:10
**defied**
  198:13
**define** 25:5
  96:14
  121:6
  174:20
  175:15
  176:1
  190:9
  202:17
  274:5
  275:20
**defined** 19:2
  77:5 78:24
  79:5,8
  81:12
  123:15
  178:8
  219:20,20
  220:2
  287:17
  288:2
**defining**
  18:24 77:3
  175:13,14
**definitely**
  106:10

  189:9
  207:4
  245:19
  247:5,11
  247:22
**definition**
  45:24
  96:17 97:3
  97:23 98:3
  115:7
  123:20
  176:1
  190:4
  191:11
  220:13,15
  276:4
**definitions**
  77:9 96:20
  181:23
  233:3
**definiti...**
  182:9
  259:21
**degree** 25:8
  26:23 37:4
  37:17
  38:23 42:4
  42:17
  57:23
  60:20
  74:19,19
  83:12
  99:12
  101:20
  124:14
  126:9
  130:21,22
  151:1
  247:13,14
  269:15
  273:7
**degrees** 37:2
  47:5 85:1
  190:23
  191:3
  269:11,14
**delaying**
  266:24
  267:7
**deleted**
  77:16 78:4
**deletion**
  192:11

**delivered**
  63:19
**demonstr...**
  277:19
  279:9
**demonstrate**
  33:8
  105:10
  278:24
**demonstr...**
  32:11 33:3
  58:1
  139:17
  188:4
  262:13
  263:8
  278:9
**demonstr...**
  272:23
**demonstr...**
  57:20
**Deniker** 6:3
  13:13,14
  288:24
  289:1
**denying** 83:3
**depend** 68:4
  211:8
  274:20
**depending**
  154:1
  172:21
  203:7
  240:22
**depends**
  18:10 68:2
  83:24 92:7
  95:10
  115:1
  124:11
  138:3
  151:4
  154:5
  167:12
  211:15
  251:14
  274:1
**deposition**
  1:18 2:7
  3:1 12:17
  15:6 99:1
  211:3
  217:2

  249:1
  263:18,23
  289:5,8
**deprivation**
  237:18
**depth** 184:7
**derive**
  213:18
**describe**
  17:2 71:10
  99:24
  128:7
**described**
  68:8 93:1
  156:8,8
  228:9
**describes**
  103:19
**describing**
  73:6 90:9
  147:5
**description**
  156:23
  157:14
  238:11
**designate**
  208:7,20
**designated**
  183:17
**designat...**
  89:1
**designed**
  189:13
  268:2,7,18
**desire** 37:9
**desist**
  221:13
**despite**
  231:6
  232:23
  238:14,14
**detail** 69:17
  114:2,3
  141:18
**detailed**
  38:2 214:8
  264:1
**details** 22:9
  40:16
  110:18
  198:9
  235:7
**detected**

  100:21
**determinant**
  165:6
**determin...**
  167:19
  195:4
**determin...**
  143:14
**determine**
  54:22 67:1
  222:3
  256:16
  274:17
  279:17
  281:23
  283:9
**determined**
  25:16
  105:8
  197:20
  223:5
**determining**
  30:5 43:14
  43:16,17
  120:2
  236:7
**develop** 60:9
  217:12
  240:16
  241:6
  245:5
  276:15
**developed**
  18:12 19:6
  19:8 39:23
  54:20
  168:15
**developing**
  54:19
  189:7,10
  254:6
**development**
  18:19
  22:20 25:7
  33:7 52:2
  55:2 62:14
  96:1 117:4
  118:20
  121:1
  126:9
  166:2,4,6
  166:11
  168:19

169:13
170:4
204:21
218:10
226:17
232:24
241:21
242:4
255:3,24
developm...
226:14
236:17
238:24
240:17,18
242:2
developm...
126:16
devising
179:4,6
DeVry 245:22
246:11
diabetes
222:19
diagnosed
114:20
115:13
diagnosis
115:3
196:3,6,23
diagnostic
117:9,22
118:6,7,22
dictate
84:19
differ 152:3
205:11,22
206:2
differed
205:7
difference
19:11
37:18  42:3
42:5,18
47:5  50:19
65:21  66:3
69:18,19
74:19  76:3
76:11,24
77:2  90:14
90:20
91:13,22
92:10,15
92:16

93:13  96:8
96:19  97:1
97:5  98:6
193:4
220:13,14
277:19
278:13,16
278:22,23
279:9
283:12
differences
43:21
90:11
105:8
139:18
152:8
153:12
162:23
163:9
166:6
175:1
261:23
265:5,9,20
266:18
281:23
different
42:17  43:1
47:17  49:1
51:7,11
56:8,20,23
57:15,21
58:16  59:6
84:24,24
85:1,2
90:7  94:10
94:12
96:20
100:7
121:21
179:24
194:24
202:2
203:4,10
204:12
224:12
232:24
247:5,10
247:16
273:12,12
279:22,23
280:3,8,9
280:19,21
281:22

282:1
287:8
differen...
62:15
differen...
166:7
217:14,24
differently
51:12
159:14
differing
152:3
difficult
127:12
192:16
275:15
diffuse
103:10
dig 172:2
dimorphous
253:22
dip 207:14
direct 120:6
122:22
125:12
133:22
174:22
199:10
directions
79:3
directly
144:4
Director
250:5,7,22
disadvan...
48:12
disagree
65:3
151:14
160:1
163:6,19
164:7
288:4
disagreeing
151:14
159:2
discarded
165:23
283:13
disclose
210:5
disclosed
210:11

discordant
233:22
241:14
discorded
241:17
discovery
210:22
211:1
discretion
203:2
discrimi...
178:1
discrimi...
278:8
discrimi...
176:15
discrimi...
174:20
176:22
178:8
discrimi...
174:8,16
175:7,11
175:14,16
175:18
discuss 28:8
271:4,5
discussed
96:18
157:24
164:9
185:23
198:2
discusses
61:16
discussing
32:23
41:14
167:3
discussion
8:3,9
78:21  89:6
115:11
116:14,17
153:23
154:3
214:24
225:1
227:24
281:18
discussions
26:17  89:2
disformed

236:24
dismissed
14:19
disorder
55:1  166:2
166:4
226:14
disorders
166:11
218:9
236:17
dispense
192:23
dispropo...
272:24
273:5,10
273:13,20
273:21
274:6,17
275:10,21
dispute
64:22  65:4
208:15
disputes
209:15
disqualify
210:7
dissent
152:16,17
distance
141:5
143:12
distances
53:21
277:19
279:9
distinct
287:14
distinction
31:3
202:13
distinct...
167:2
District 1:1
1:2  12:19
12:20
divert
207:10
division
20:12
108:12
110:8
111:18,23

168:20
169:14
170:2,23
171:17
184:20
**divisions**
19:12 21:6
111:24
**doctor** 10:8
15:2 16:10
44:6 54:8
55:18
60:10,13
64:4 74:24
76:21,21
79:17
86:12
107:24
108:22
109:7,21
110:6
113:21
127:21
132:23
133:1
145:8,11
149:15
160:24
168:7,12
174:23
190:14,14
220:5
228:11
233:19
234:2
235:7,12
235:21
248:23
253:22
**doctors**
198:15
231:11,12
250:15
251:18
252:1
**document**
63:21
64:12,14
64:18
128:7
141:9,10
148:16
149:20

157:1
161:10,23
161:24
162:13,16
162:19
205:23
213:13
215:22
225:16
243:5
274:3,3
**documented**
106:8
195:23
196:2,10
200:6
**documents**
130:3
166:16
205:18,19
**doing** 149:1
194:9
197:14
207:12
235:10
246:18
262:21
263:7
276:18
**Domestic**
9:22
161:11,17
**door** 58:8
**Dora** 1:14
6:8 13:15
**Doriane** 71:4
**doubt** 73:18
73:22
101:10,24
288:16
**doubting**
140:13
**Dr** 9:5,6,11
9:20,23
15:16,19
61:9 66:22
70:7 75:13
75:17,21
77:16
87:18
90:20
92:10
93:13

94:20
95:14 96:5
98:24
99:12
106:7
109:20
127:21
142:15
146:2
153:4
156:11,18
156:24
157:19
158:9
160:17
161:22
183:18,24
184:4
188:19
197:19
204:1
216:13,21
234:6,18
241:2
243:20
244:4
253:5
262:2,17
288:24
**draft** 281:7
**drafted**
117:19
205:2
**drafting**
205:7
**draw** 104:11
**driven** 39:9
39:15
**driver**
153:11
265:4
**drivers**
265:9,20
266:17
**drives** 26:5
**dropped**
207:12
**druthers**
197:3
204:3
**DSD** 166:18
166:19,19
167:6

181:10,20
182:3,14
182:22
183:4
186:2,6
218:10,19
218:21
226:7
261:8
**DSDs** 166:21
183:12
**DSM** 196:6
**DSM-V** 196:4
196:23
197:5
**due** 81:2,3
**Duke** 71:2
**DULY** 14:12
**duration**
38:11,16
38:22
**dysphoria**
105:15,16
115:4,5,13
116:5
117:6
119:14
120:17
127:2
195:23
196:3,10
196:17,19
196:23
221:12,20
**dysphori...**
117:11
**Dysphoric**
113:12

_____
E
_____
**E** 4:1,1 5:1
5:1 6:1,1
7:1,1 8:1
12:8,8
**E-26** 5:12
**earlier** 43:3
50:18,21
64:5 81:8
82:3 85:21
128:21
153:23
164:9
197:19

204:1
214:24
259:17
278:15,17
284:4
**early** 33:14
33:16
117:3
119:13
120:10
122:9,13
172:1
228:5
**earth** 150:5
**easier** 97:10
182:12
**easiest**
244:12
**East** 5:18
6:12
**Eastern**
12:17
60:24 61:7
113:2,9
152:19
153:2
203:16,23
248:12,19
266:6,13
289:5
**Eastwood**
110:14
**easy** 64:20
78:7
**edge** 88:11
90:19
**editoria...**
159:17
**educate** 17:4
86:3
**educated**
74:9 161:5
237:14
**education**
1:9,10 6:7
6:15 12:21
13:11,14
269:6,7,8
269:11,18
271:10
**educational**
267:23
268:1

269:21
**effect** 78:15
79:24 80:2
80:3,10,15
80:17
81:11
124:13
131:24
132:6
196:22
241:13
255:15
**effectively**
61:19 62:1
181:18
200:17
**effects**
78:13
129:2
153:24
154:17
**efficiency**
188:17
**efficient**
187:7,15
193:13
**efforts**
187:11
226:18
242:10,16
**eight** 143:1
147:2,6
150:9,11
159:24
194:5
238:18
243:13
**either** 51:20
85:7 98:18
99:12,19
160:11
170:23
179:5
219:23
259:21
**element**
68:10
119:8
207:15
**elements**
23:14
208:3,5
**elevated**

58:7
245:24
**elicit** 64:17
**eligibility**
185:4
188:5
191:18
272:22
**eligible**
120:9
187:1
188:12,21
195:5
197:21,24
**eliminates**
155:5
156:2
**elite** 58:8
64:24
65:21 66:3
66:21 67:7
68:6 73:9
73:12,14
74:1,13
102:23
103:19
151:6
160:16
164:19
165:12
267:21
274:21
**elusive**
45:16
**Embarcadero**
4:15
**embrace**
268:19
**Emma** 98:22
**emotional**
117:8,20
119:24
**emphasize**
268:2,8,18
**emphatic...**
43:3
**employed**
12:14
**employee**
213:14
**employees**
207:13
**employer**

209:5
**employment**
193:22
209:14
212:16
**enable** 39:14
**encompas...**
245:19
**encountered**
44:17
**encourage**
21:7,21
241:21
242:3
**encouraged**
21:18
**encouraging**
21:14 22:2
33:22
**endeavor**
95:19
108:13
**endeavors**
282:12
**endocrine**
9:14 39:6
113:11,12
113:17,23
116:7
122:16
123:10
126:2
153:16
215:13
216:7
**endocrin...**
86:4,13
211:18
278:21
**endocrin...**
17:5,6
215:15
**endocrin...**
39:5
**endogenous**
23:24
117:8
120:11
122:10,13
124:1,3
125:3
126:3,16
177:11

**endogeno...**
178:2,2
**endpoint**
180:7,13
180:19
282:21
283:23
**endpoints**
148:21,22
148:23
236:6
**ends** 49:13
61:16
144:11
251:20
252:13
282:23
**endurance**
61:19 62:2
138:22,24
147:14
148:1,8
**energy**
187:13
**enforce**
279:5
**engage** 26:17
150:14
151:4,11
152:1
**engaged**
178:13,17
178:19,22
**English**
176:21
**enjoy** 50:20
51:24
62:21
**enjoyed**
42:10 90:6
90:6
**ensuring**
64:23 65:4
160:24
**enter** 221:13
**entertained**
202:22
**entire** 58:5
94:10,10
97:24
103:20
133:24
134:4

143:21
212:6
275:16
278:14
**entities**
222:18
**entitled**
15:23
43:19
98:23
127:19,20
145:17
161:10
183:18
208:12,17
216:12
225:14
**environm...**
263:11
**envision**
33:1 51:19
96:2
169:20
181:24
203:4,6
213:24
**equal** 21:8
49:7
**equally**
48:20 51:3
**equestrian**
63:4 65:15
**error** 91:7
**especially**
23:12
127:11
**ESQUIRE** 4:3
4:9,10,11
4:12,13
5:3,10,16
6:3,10 7:3
7:4,5,6
**essentially**
79:5
**established**
65:2 79:2
204:11
**establis...**
117:10
**establis...**
19:11
**estrogen**
158:15

159:7
177:12,12
**estrogens**
159:21
160:10
177:19
**et** 9:16
12:20,21
96:2 133:5
133:10
142:4
206:14
**ether** 243:15
**ethical** 34:4
34:22
**ethics** 34:3
34:16
**evaluate**
61:24
140:14
182:17
235:17
**evaluation**
190:24
191:17
235:22
**evaluations**
192:3,15
192:22
**event** 20:21
67:23 68:2
68:4,6
73:9,10
140:23,24
141:5
267:12
**events** 19:13
20:4,13,18
20:21
53:18
62:17
65:14,15
68:5,9
90:7 95:11
**eventually**
40:23
**everybody**
21:20
189:1
232:17
**everybody's**
165:21
**evidence**

39:8 40:23
41:5 46:11
114:15,19
116:13,17
116:19,22
123:21
124:16
125:19
162:22
163:7,17
216:12
224:21
225:6,9
229:14
230:22
231:14,18
233:12
**evolution**
117:17
118:2,4,5
119:4
196:17
**evolve** 45:18
**evolved**
204:17
**evolving**
74:20
125:15
181:23
**exact** 192:18
**exactly**
20:22 26:2
49:6 80:4
89:15
94:23
171:24
188:8
226:17
228:14
239:6
250:12
254:5
**EXAMINATION**
8:5,7
14:23
253:2
**examine**
132:5
**examined**
237:6
**examining**
131:24
**example**

23:14
35:16
37:18
50:18
103:18
127:13
160:8
169:4
203:5
215:13
216:7,7
220:18
222:19
276:16
288:1
**examples**
23:3 63:1
63:5 86:23
87:3
231:22
**exceed** 252:9
**exception**
84:20 85:9
158:13
159:6
**exceptions**
165:17,19
**excerpt**
125:10
**excerpts**
54:16 64:7
**exclude** 55:2
172:4,12
173:2,11
173:22
**excluded**
53:6
**excludes**
174:6
**excluding**
168:18
169:11
174:3,12
**exclusion**
175:3
**exclusions**
191:4
**exclusively**
211:14
226:3
232:21
**excuse**
107:15

154:4
265:23
267:11
**execute**
75:22
**executed**
40:5 75:13
**Executive**
250:7,21
**exhaustive**
22:23 23:2
108:20
109:18
288:7
**exhausti...**
179:21
**exhibit** 9:1
10:1 15:6
15:16,18
15:23 16:3
16:12
43:19,23
61:9 63:18
63:23
75:10,13
75:16 78:5
87:7 88:12
98:21,24
99:3
104:10
113:11,14
113:17
114:8
123:1
125:6
127:19,24
131:21
133:6,10
139:13
142:1,8
145:16,22
156:10,18
161:10,16
183:17,24
204:5
216:11,17
224:21
225:13,19
233:22
234:2,19
241:13
253:10,12
253:13

258:24
259:6,6,10
286:12,13
286:14
**Exhibit-1**
40:3 80:14
153:6
**Exhibit-10**
133:6
**Exhibit-4**
154:10
**Exhibit-5**
114:7
**Exhibit-6**
87:6
**exhibiting**
123:16
**exhibits**
154:12
**exist** 42:24
47:16 49:1
51:7 56:8
56:20
57:15
58:16 59:6
83:5,11
247:15
271:16,19
**existed**
188:8
**existence**
19:18
21:24
215:22
**existing**
79:15
158:7
198:13
199:1
**exists** 17:10
119:5
127:16
280:5
**expand** 36:24
52:17
187:9
**expanding**
23:11
**expansive**
115:8
**expansively**
181:4
**expect** 111:4

155:11
266:23
267:6
**expectation**
93:7 207:6
**expecting**
102:8,9
**expenses**
251:18,24
**expensive**
192:16
**experience**
24:4,16
25:10 26:7
51:1 70:12
93:9
105:15
106:1,2,10
112:11
117:7
122:3,4
125:3
201:17
245:24
247:6
**experienced**
25:9
159:21
168:18
169:12
**experiences**
51:23
**experien...**
24:6
121:22
**expert** 15:3
16:11
21:24 22:4
22:9 27:7
27:10,14
27:19
31:21
32:21
34:12,17
34:23 38:6
40:2,20
43:14 44:9
45:1,6,22
46:2,9
47:4,10,12
48:15
55:16
56:10,13

57:5 59:8
63:2,10,15
65:8 69:2
70:9,16,17
70:20
72:16
73:20,23
74:7,17
75:9 77:17
77:22 78:5
78:6 84:1
85:23,24
86:10 87:1
89:20 93:6
95:9,22
96:13
102:6
103:10,14
121:11,12
121:23
130:13
131:13,20
133:15,20
133:23
136:8
138:11,15
139:3,10
140:2,15
147:20
148:13
153:5
159:1,9,11
160:21
161:5
164:10,11
164:14
165:20
168:24
172:16
174:3,11
174:20
175:15
176:1,4,7
176:20
203:11
210:21,21
214:7,14
214:15
260:23
261:13,13
264:16
269:8,18
270:12,13

270:22
271:1,6,7
271:11,17
271:22
272:1
275:9,10
275:12,19
276:1
279:16,20
284:17
285:4
**expert's**
208:18
**expertise**
28:2,3
34:15
41:24 42:4
42:8,9,16
43:5,8
66:2,7
67:6,11,22
77:11
141:2
152:10
166:3,5
193:5
269:20,23
269:24
271:10
274:14,24
276:16
**experts**
34:13
215:2
271:5
276:14
**explain**
21:11,12
29:24
32:18,22
69:17 80:9
80:16
129:14
199:23
217:21
220:18
251:16
254:2
255:23
275:17
**explained**
217:13,23
**explaining**

16:19
19:16
31:10
**explanation**
80:22 93:8
169:1
174:24
223:24
224:1
261:8
264:15
276:2
**explanat...**
101:19
219:18
222:17
262:8,9,12
264:2
**exploring**
162:22
**explosive**
100:18
**exposed**
254:6
255:2
**exposure**
93:9
223:11,22
253:24
254:2,20
255:8,22
**exposures**
220:18
**express**
164:10,11
**expressed**
85:17
155:4
156:1
**expressing**
32:19 85:3
126:22
144:8
270:21
272:1
**Exstrophy**
233:23
**extend** 91:2
**extending**
236:4
**extensive**
26:17
100:10,13

**extent** 87:20
105:7
116:19
119:13
**external**
164:17
230:22
256:9
**externally**
231:19
234:17
**extra** 283:20
**extreme**
124:11
**eyes** 193:9

**F**

**f** 5:16
131:15
**fabricating**
102:9
**face** 157:6
**faced** 33:4
**facets**
287:14
**facile** 244:5
**fact** 18:22
19:5 22:1
23:17 41:4
53:24
71:14
75:22
93:21
106:8
120:18
123:24
133:14
195:1
197:9,19
218:18
224:3,8
233:14
246:17
**factor** 21:6
22:2
**factors**
147:13,24
148:7
246:6
254:7,24
255:1
**factual**
110:6

**fair** 29:9
30:13,16
30:23 31:3
31:9,21
43:11,16
43:17
45:11
46:17,24
64:23 65:4
156:23
184:4
214:3
228:18
229:2
256:19
275:13
**fairly**
115:10
184:5
288:5
**fairness** 9:7
15:23 16:3
28:1 31:10
31:11 34:2
43:4,14
45:16,18
45:24 46:5
63:16
155:7
156:4
158:13
159:6
160:17
164:2,11
287:4
**fall** 94:9
246:14
**falls** 74:19
103:15
**false** 66:1
67:5
114:24
115:15
**familiar**
88:13 99:9
99:10
114:2,3
146:3
162:4
234:6
243:20
246:13,17
246:18

281:6
284:17,18
284:22
**familiarity**
205:1
**fan** 139:4
**far** 29:4
33:7 47:23
56:6 63:2
68:9
134:15
136:10
154:15
182:5
240:2
265:15
283:14
**farther** 33:1
100:17
105:24
141:15
159:19
189:24
**fashion**
109:15
187:16
275:15
**faster** 90:23
100:16
136:23
137:14,23
147:7
172:2
**fastest**
74:22
**favorable**
48:1
**favorite**
234:15
**fear** 86:21
**feasible**
30:6
**federations**
29:6 72:1
160:14
276:22
277:3
280:4,13
**feel** 34:18
126:21
**feeling**
239:15
284:10

**fees** 211:12
250:15
251:18
**feet** 129:3
**felt** 31:3
251:20
**female** 9:12
19:11 20:1
20:12
21:13 22:1
26:7,7
30:13,19
33:12 34:6
39:15
42:11
46:16 47:1
47:8 49:17
51:23 53:6
55:3 56:6
56:18
58:14,20
59:4 64:23
65:5,19,20
66:3,22
67:7 70:12
72:4,12
73:9 74:1
74:4,14,22
75:1 88:24
91:14,22
98:23 99:4
107:11
109:2
110:7
131:10
159:23
160:16
164:1
168:20
169:2,14
170:2,22
173:2,11
174:13
177:5
178:2
182:23
183:7,10
185:20
199:2
225:15
226:19
227:6,16
227:19

228:4,17
228:19
229:5,5
230:8,11
230:12,18
230:20
232:23
233:4,23
237:22
238:13,15
238:17,19
239:8,9,10
239:22,24
240:2,5,11
264:8
277:20
**female-only**
21:6
**females**
17:17
29:18 36:4
41:22
73:12,14
87:22
88:21 90:6
100:15,22
105:2
169:19
170:5
227:1,4,5
262:14
**feminine**
177:18
**feminize**
226:20
**feminizing**
228:18
230:23
**fetus** 254:6
255:2,3
**field** 38:13
38:18 39:1
39:5 44:24
45:5,12
60:11,17
60:21 68:8
103:20
139:7
161:6
165:5,10
167:5
170:1
194:14

215:2
221:9
226:3
**Fifty-five**
131:23
**figure** 88:13
88:13 91:5
91:16 92:2
251:6
**figures**
262:20
**file** 210:18
**filed** 96:5
**filing** 12:5
**final** 29:8
39:3,6
147:3
192:6,10
195:11
199:11
**finally**
267:21
278:5
**financial**
208:3,5,12
208:18
210:6,12
250:23
251:1
**find** 25:23
40:2 42:20
64:20
100:10
103:22
137:4
153:5,6
154:11
190:7
192:18
195:21
202:4
232:12,13
232:16
286:19
287:23
**finding**
119:11
147:10
155:13
192:14
**findings**
101:11
102:1

0708

Rinehart 0709

140:3,16
140:21
148:4
149:8,24
160:2,15
227:24
260:12
**fine** 24:12
141:11
**finger**
237:10
**finish**
133:16
**finished**
289:3
**first** 14:12
15:2 17:8
17:9 22:12
25:18,24
28:4 45:14
56:13
57:19
61:11
64:13,21
67:1 69:8
73:3 79:5
79:11 89:6
99:8,24
100:8
101:5
111:9
114:18
117:2,7,9
117:21
118:20
119:24
123:1,16
125:3,6,14
129:1
149:10,17
150:11
155:9,22
157:1
161:22
178:23
182:15
184:11,16
192:4,5,10
207:8
214:7,21
217:10
224:24
234:15

236:10
245:13
272:20
277:16
285:2,3
**fit** 91:6
138:13
**fitness**
100:13
138:8
147:8
**five** 25:15
25:19,24
28:13,16
35:4 49:24
53:7,11
57:13,21
71:15 88:9
90:24
91:21 92:5
97:4
128:24
162:21
207:1,6,8
239:11,14
239:16
243:8
278:6,8,17
278:23
279:2,3,6
281:5
283:9
**fixed** 15:12
287:14
**flaws** 235:2
235:16,24
**flip** 193:15
212:9
**Floor** 4:16
5:6
**flows** 130:1
**focus** 16:12
109:3
125:20
146:9
235:8
254:1
287:12
**focused**
181:5
245:16
**focusing**
98:1

**Folks** 141:14
**follow** 101:3
227:21
**followed**
198:8
267:1,7
**following**
14:11 51:9
190:10
191:3
204:3
238:10
242:20
**follows**
14:13
147:7
223:16
228:1
**footnote**
101:4,5
**force** 49:7
71:12 77:6
138:6,7,8
**forces**
138:17
230:22
**forgot**
155:17
180:8
**form** 16:21
17:20
18:16 19:3
19:21 22:7
23:7 24:8
26:9 27:5
28:23 29:2
29:19
30:10,21
31:19
33:18
34:10 36:6
36:11,22
37:11,14
38:4,20
39:18 41:9
42:1,13
43:7,12
46:1,6,18
47:2 48:2
48:14
49:21
50:11 52:3
53:9 55:20

57:17 59:7
60:1 63:14
65:7 66:5
67:9 68:1
68:21 70:3
72:13 75:3
79:21
80:18 81:5
82:17,22
83:6,13,18
84:22
85:11,20
86:6,17
89:10
90:10 91:8
91:24
92:19 93:3
93:20 95:8
95:21
96:16 97:6
98:7
101:13
102:3
103:7
107:1,13
108:15
109:9,24
110:9
112:2
115:16
118:24
123:12,19
124:6
126:5
130:6
132:8
133:18
134:20
136:3,12
137:24
142:17
144:7
150:21
151:15
152:5
153:19
154:19
155:8
156:5
160:3,20
161:3
165:8
166:12

167:10
168:22
169:16
170:24
172:7
173:5,14
174:1,9,17
175:21
176:8,19
177:15
178:5
180:20
181:21
183:1
185:13
187:3,22
188:14,23
193:2
195:7
196:12
197:1,11
198:21
200:21
201:12
202:11
204:13
205:15,24
207:3
215:4,24
219:2
222:14
224:10
231:16
240:14
244:3
246:2
254:23
255:10,17
256:20
257:16
261:11,19
262:5,16
263:3,20
264:12
265:11
268:12,24
270:23
271:23
273:23
274:19
275:5,24
277:13
279:13

280:2,11
281:20
283:18
284:20
285:17
287:17
288:2
**formal** 197:5
216:8
281:11
**formally**
28:19
**formation**
230:24
**formatting**
287:8
**former** 28:9
250:13
**formerly**
26:21
**forth** 56:11
81:22
205:23
282:14,17
**forward**
71:24
150:8
244:20
**found** 136:21
163:23
240:12
283:11
**foundation**
4:4  198:22
**four** 95:3
278:6
279:3
**fraction**
167:14
229:10
231:5
232:22
**fractions**
21:17
**frame** 17:5
150:7
159:18
160:11
**framed**
135:11
206:3
223:3
**framework**

272:15,16
272:21
**framing**
233:10
**Francisco**
4:17
**free** 210:20
279:22
**Freedom** 7:7
**fresh** 35:4
**friend** 1:4
243:14
**friendly**
187:7
**friends**
200:14
**front** 15:3
98:8,10
146:2
161:12
162:5
224:22
236:11
246:22
253:15,18
264:23
265:2
267:20
272:8
286:11,22
**frustrated**
235:13
**frustration**
236:4,5
**full** 22:12
28:5  45:15
45:15
78:14
80:14  84:2
129:1
192:4,5,10
229:23
270:4
287:7
**function**
131:3
**fundamen...**
241:2
**further** 39:1
81:23
100:24
164:12
187:9

221:24
257:5
272:21
**future** 220:6
**fuzzy** 144:12
242:9

─────── **G** ───────
**G** 12:8
**G2/B2** 123:5
**games** 35:5
**gap** 130:8
**garbles**
87:11
**GD** 115:13
**GD/gender**
114:12,20
**Gearhart**
234:24
235:23
241:12
**Gearhart's**
236:8
**gender** 24:1
24:5,11,12
24:17  26:7
34:21
42:11
49:17,18
51:23
70:12
90:14,20
91:13
92:10,15
92:16
93:12
105:15
106:14,20
113:11,12
115:4,4,5
115:6,8,13
115:13,23
116:4,5,5
117:6,6,10
119:14,14
120:17,17
121:22
126:8
127:2,2
139:15
147:11,22
148:5
150:14

151:12
152:1
158:11
159:4
164:2
167:22,24
169:9,23
172:5,12
173:2,11
174:7
175:9
177:3,5,11
185:16
186:1,5
195:23
196:2,10
196:17,18
196:19,23
198:18
200:3
206:6,6
207:19
208:1
212:1,5
214:10
215:16
216:13
217:12,23
219:16,21
221:12,20
221:21
223:4,5,15
223:21
224:18
225:9,14
226:23
227:16,20
228:4,6,19
229:6,7,11
229:15
230:3,6,12
230:24
231:6,14
231:18
232:4,10
232:16,23
233:12,16
234:11,17
236:7
239:10
240:13,20
241:10,14
241:21

242:4,8,11
242:17,22
244:16
245:10
247:1,16
247:18
250:6,17
251:7
263:14
264:6,15
267:1,7
287:10,11
288:1
**gender-a...**
25:17  84:6
114:11
132:1
136:22
137:13
**gene** 232:13
232:14
257:21
**general** 2:2
17:15
18:23  36:1
63:13
72:23  75:6
89:16,19
103:4
196:3
205:17
245:18
254:13
259:1
**General's**
13:9  253:7
**generalize**
140:20
**generally**
29:17
65:19  89:7
138:12
181:16
194:13
198:14
240:6
255:23
**generating**
257:13
282:24
**generation**
256:18
**genes** 165:3

232:16
253:23
**genetic**
164:17,21
164:24
165:5
167:6
221:2,4
231:14
233:22
236:12
244:1
256:9,14
256:14,15
257:3
287:15
**genetically**
48:7
218:23
219:13
226:19
228:16
237:3,17
**genetics**
153:13
181:24
229:16
241:22
**genital**
185:15
198:24
220:13
228:18
287:16
**genitalia**
199:1,2
256:1
**genitals**
218:2
219:24
226:15,17
228:4
236:17
**genuinely**
125:19
**getting**
200:11,14
260:5
263:5
**girl** 20:20
173:7,16
256:17,18
**girls** 17:13

18:5,9,10
18:11,14
19:2,2,8
19:12 20:3
20:12,24
21:7,15,21
22:3 25:13
33:1,6
76:4,12
84:3,4,17
84:24
85:14
93:23
94:12,15
96:9 97:1
98:16
104:16,24
105:9,11
106:1,2,10
106:11
107:16
108:2
123:1,6,16
125:5
126:7
127:5
153:9
161:1
168:8,8
171:2
172:5,13
173:3,7,12
173:23
174:7
175:10
261:10
262:21
264:9
266:24
267:6
**give** 20:3
22:23
45:23
56:14
84:12 88:9
112:22
118:21
119:9
120:4,4
121:12
131:12
145:5
158:2

160:22
183:10
207:17
212:11,12
251:15
261:13
269:3
270:8
275:9,12
276:2
286:16
**given** 38:13
38:18
47:24 48:3
50:24 70:7
80:5
100:23
152:3
167:19
170:12
224:17
226:2
262:3
271:10
282:6
286:21
**gives** 30:17
190:4
**giving** 50:3
271:11
**global**
276:13
**go** 16:11
23:9 25:18
28:4 36:24
37:15
38:24
48:16 49:2
50:15
56:21
58:17 61:9
93:15
108:6
112:23
120:5
135:18
145:10
152:14
154:21
159:15,17
173:17
190:17,23
207:13

210:3
215:8
229:1
231:3
245:13
248:9
251:10
252:3
258:3
261:2
264:16
266:1
274:4,5
280:23
281:4
284:7,9
288:16,16
**goal** 21:8
31:5 32:20
33:5
260:10
**goals** 21:16
**goes** 93:22
93:23
152:10
**going** 20:17
20:20 48:8
60:23
63:17
64:15
69:11 75:7
84:16 87:6
88:9 91:21
92:2
103:17
104:11
112:10,14
113:1
129:16
130:16,24
141:15
150:7
151:2,16
152:18
153:5
160:21
164:10
167:15,17
177:5
190:6
203:5
210:17
221:20

223:9
230:2
244:20,20
245:5
251:21
256:15
259:22
264:3
266:5
**Goldby**
258:20
**gonadal**
287:15
**gonads** 256:4
**good** 13:13
13:23 14:3
15:2 35:7
59:13
104:2,7
135:3
153:4
176:16,22
195:15
217:2
240:16
248:7
272:20
286:21
**goodness**
64:20
**governance**
162:6
**governing**
161:12
162:11
163:13,15
**government**
51:21
162:10
**grade** 76:2
76:10
143:15
**grades** 89:8
89:11
**graduate**
90:2
**granular**
202:15
**graph** 98:14
**grayer**
220:16
**great** 26:5
112:18

253:20
265:3
267:21
**greater** 21:7
21:14 22:2
30:13
68:10
69:17
80:22
101:20
**greatest**
268:3,9
**Green** 5:16
13:16,16
288:22,22
**grew** 207:9
**grid** 88:10
**grinds** 40:9
**grip** 100:20
**gross** 252:1
252:7
**grounds**
210:6,11
**group** 29:1
52:20 60:8
71:21
72:16 92:8
100:21
151:6
153:11
188:8
207:11
276:16
278:2,3
**groups**
101:17
107:19
**grow** 115:22
**Guard** 138:18
**guess** 17:21
18:11,17
19:4,22
20:16
25:11 30:3
37:15 38:5
56:22 60:2
62:10 63:1
68:22
70:15
73:23 81:7
83:19
84:15 85:2
90:23

102:6
110:10
115:1
119:1
124:10,11
138:2
140:18
151:8,17
155:15
165:1,11
167:12
175:22
181:12
198:7
215:5
216:22
227:14
233:10
244:6,19
246:14
251:19
254:4
255:21
258:18
270:11,24
279:4
288:12
**guessing**
101:8
**guidance**
9:21
118:15
161:10,16
163:23
276:5,14
**guide** 39:8
94:16
**guideline**
202:20
203:9
276:6,7,7
**guidelines**
9:14 29:12
113:13,18
113:23
116:7
118:18
122:16,19
125:1
126:2
202:18
204:15,21
204:23,24

205:13,16
206:1
215:6
276:15

————————

**H**

**habitus**
169:6
**half** 229:22
**halfway**
65:17
147:6
199:13
**hand** 16:8
21:14 37:9
37:10
64:12 79:4
**hand/eye**
63:3
**Handelman's**
61:24
76:17
**Handelsman**
9:9 43:19
43:23
44:15
45:14 54:8
69:10,17
70:7 76:5
76:21 87:7
87:18
90:20 91:2
91:14
92:10
93:13
94:20
95:14
153:21
154:10,15
155:4,24
156:12
157:19
158:9
159:3
160:1,13
262:2,13
262:17
286:10
288:5
**Handelsm...**
61:10
76:22
88:12

**handful**
132:10
**handing**
15:22
**hands** 129:3
**happen** 71:23
**happened**
81:2
**happening**
245:17,17
**happens**
256:5
**happy** 162:16
**hard** 118:12
155:22
169:4
192:21
241:18
250:24
278:24
279:12
**harder** 97:12
**Harper** 9:19
59:19,21
59:23
60:10,13
60:18
134:22
135:1,3
136:5,11
141:17,20
142:3,4,14
142:15
143:8,22
144:4
145:11,16
145:22
147:5
148:4
155:15
181:7
282:11
283:14
284:5
**Harper's**
142:3
146:13,15
146:17,19
147:21
149:15,22
**Harrison** 1:9
1:15 6:7,8
13:14

**Hartnett** 4:9
13:23,24
15:11
**HB-3293**
168:7
284:18
285:2
**head** 22:23
53:17
54:12
94:16
108:18
110:2,11
110:13
179:20
226:2
244:24
252:6
259:23
281:10
**headed**
114:15,19
115:6
**heading**
163:22
204:5
227:24
**health** 21:19
189:24
190:2,5,9
191:4,5,6
191:8,12
191:17,22
191:23
192:14,20
192:24
193:18,20
193:21
194:9,14
194:16
195:2,22
202:5
203:2,12
212:7
240:18
241:3
246:4
250:23
251:1
**healthcare**
39:7
**healthy**
29:18

JA 0712

31:17,24
**hear** 20:8
52:7 66:16
130:24
212:9
243:10
268:14
270:4
285:2
**heard** 151:20
258:16,20
285:3
**hearing**
66:14
**heart** 129:10
129:20,20
129:24
130:17
**heart's**
130:4
**HEATHER** 1:5
**heavily**
165:1
**height** 22:24
23:11
50:20
129:2
130:19
154:7
**Heino** 10:6
225:14,20
**held** 64:11
64:13
**Hello** 14:5
253:5
**help** 39:8
84:15
88:10
90:23
151:17
189:13
**helped** 54:22
60:9
204:22
**helpful**
80:17
90:19
184:18
211:23
**helping**
281:7
**Helstrom**
4:12 14:5

14:6
**hematocrit**
179:22
180:13
**Hemoglobin**
145:19
**hesitate**
133:2
**heteroge...**
95:10 96:1
97:21
**high** 21:17
44:23
68:12,13
74:14,15
75:1,2
82:10 89:8
89:11,17
90:1 103:2
103:5
108:3
111:11
170:23
172:5,13
173:3,12
173:23
246:11
264:9
**higher** 31:15
32:3 53:7
58:2 94:13
111:23
277:22
278:11
**highly** 74:9
150:15,20
151:1
**histolog...**
237:6,15
**historic...**
62:9,12
**histories**
228:12
**history**
25:21 26:4
27:2,12,16
62:10,13
81:16
281:15
**hoc** 143:8
**hockey** 139:7
**Holcomb** 7:5
13:5,5

**hold** 283:2
**honestly**
40:12,16
135:5
154:20
264:17
280:14
**honorary**
60:20
**hormonal**
43:20
120:2
143:19
145:3
220:9,16
220:18
221:5,6
228:3
287:15
**hormonally**
218:23
219:13
**hormone**
22:13,17
22:20 23:5
23:21 84:6
114:11
116:4
122:24
124:19
132:1
136:22
137:13
145:17
147:12,23
148:6
149:10,17
150:15
151:12
152:2
158:11
159:4
177:3,17
189:20,20
189:21
199:17,19
199:24
200:6,20
201:9,10
213:21
247:6,7
254:9
277:4

**hormone-...**
22:16
**hormones**
139:16
177:4,5,10
177:11,24
200:11,14
201:2,6
223:12
253:24
254:2,6,13
267:1,8
**hospital**
119:21
207:13,18
207:24
208:6
209:22
212:12
251:10
252:3
265:24
266:3
**hospitals**
206:11
**hostility**
260:11
**hour** 217:17
243:12
247:24
**hours** 112:14
243:8
288:11
**House** 285:24
286:2,7
**hovering**
92:12
**human** 270:13
**hundred**
243:23
**hypothesis**
106:7
224:7,13
282:24
**hypothet...**
33:11,16
33:20
224:4
**hypothet...**
220:6

_____
I
**IAAF** 26:18

26:21 28:9
41:14 53:5
55:4 63:21
65:1,2,6
71:16
**idea** 112:19
222:19
270:1,6,16
273:18
**ideation**
203:10
**identifi...**
218:19,21
218:24
219:12
220:4,8,13
222:22
**identifi...**
9:4 10:4
15:17,19
16:5 43:24
64:1 75:18
99:5
113:18
128:2
133:12
142:10
145:23
156:19
161:18
184:1
216:18
222:11
225:7,21
232:1,8
233:9
234:3
259:11
**identified**
9:4 10:4
105:3
106:16,23
112:6
166:1
182:1,6
186:10
229:12
230:13
239:9
263:22
**identifies**
33:12
**identify**

14:16 30:6
53:1 62:19
71:18
105:2
106:20
107:10,12
109:18
132:17
143:10,13
171:1
219:17
220:5,21
220:24
221:7,21
227:4
230:7,17
239:23
257:6
263:17
**identifying**
115:24
221:18
227:6
230:8
238:24
239:15
240:2,5,11
243:24
244:1
264:7
**identities**
63:9
**identity**
24:1 26:7
42:11
49:17
51:24
70:12
106:15
115:23
167:22,24
169:24
172:5,13
173:2,12
173:23
174:7
175:10
214:10
216:13
217:12,23
219:16,21
223:4,5,13
223:15,21

224:18
225:10,14
226:23
227:17,20
228:19
229:7,12
229:15
230:3,6,12
231:1,6,14
231:18,23
232:4,4,10
232:17,23
233:13,17
234:11,17
236:7
239:10
240:13,20
241:10,14
241:21
242:4,8,11
242:11,17
242:18,22
245:10
247:1,16
247:18
263:14
264:6,15
288:1
**immediate**
186:20
**immediately**
186:11
238:10
**impact** 26:11
60:14
74:20
78:14 79:1
80:14,20
80:21,22
81:8,9
116:12
124:18
129:21,22
130:21
132:10
134:16
135:24
146:22
154:4,4
180:2
254:21
255:2,8
258:9

261:6
**impacts**
154:5,6,7
255:9
**implement**
32:12
**implicat...**
146:9
180:15
**importance**
226:2
**important**
31:7 94:6
101:14
104:1
117:22
160:19
161:6
165:6
195:17
217:11,19
**impossible**
252:5
**impression**
100:6,7
**improved**
278:10
**in-house**
193:5
195:16
**inability**
242:7
**inaccurate**
140:3,17
**inadequacy**
236:22
**inapprop...**
200:12
**incentives**
34:20
85:18
86:15
**inches**
234:23
**inclined**
93:18
**include** 37:4
63:1 98:15
118:14
177:12,19
180:23
206:12
213:4

230:16
**included**
31:6 93:24
98:19
115:7
191:3
231:21
251:14,16
262:21
263:23
**includes**
23:22
69:14
84:17
97:15,23
98:14
187:10,11
193:7
198:18
212:6
221:2
230:5
232:3
**including**
75:6 92:2
129:4
160:15
176:13
206:2,11
207:11
209:22
211:2
246:8
248:22
250:14
255:4
281:23
285:21
287:16,24
**inclusion**
9:21 26:6
28:1
161:11,17
163:24
164:2
268:2,8,18
**inclusive**
37:9
**income** 211:8
211:11,15
212:14,23
213:8
**incongru...**

114:12,20
115:4,6,14
116:6
117:7,11
119:15,15
120:17
127:3
196:19
221:21
**incongruent**
113:12
230:3
**inconsis...**
147:21
148:13
159:11
230:6
231:23
**incorporate**
160:14
**increase**
78:13
79:11,19
140:13
207:5
**increased**
32:23
78:11
**independent**
143:24
144:3,6,20
192:3,15
192:20,22
192:23
194:14,16
194:18,21
194:23
**independ...**
143:23
144:24
**indicate**
106:7
**indicates**
130:12
**indicating**
106:21
**indicator**
167:9,23
168:1
176:11
**indicators**
164:18
182:5

**indirectly**
32:12
**individual**
29:6 51:22
51:22
52:19,19
52:21,22
53:6 56:10
56:24 81:4
102:8
109:11,15
130:13,18
131:6,8
140:11
143:23
154:2
167:7,20
178:1
183:3
198:19
220:21
224:17
230:16
231:22
250:15
271:2
**individu...**
130:14
177:4,10
**individuals**
21:19 34:6
54:24 82:2
82:3 88:23
131:9
140:12
141:20
143:19
144:16
147:9,11
165:24
167:4
179:4
185:11,24
186:19
196:9
217:12,22
218:19
219:11
220:7
226:10
227:3,5
228:2,17
229:11

230:5,11
231:5,9
232:3
233:3
237:3,17
239:7
241:14
243:23
284:2
**inevitably**
74:24
**infants**
239:4
**infer** 204:9
**influence**
70:10
107:21
223:12
230:24
**influenced**
23:17
**influencing**
147:13,24
148:7
**informal**
122:2
**information**
47:5
143:18
144:14
171:15,19
171:22
181:9
206:16
210:19,23
231:24
232:6
233:7
245:2,3
**informed**
103:12,15
187:8
204:23
**informing**
216:4
**inherent**
42:21
47:13
48:21 51:4
53:2 56:4
56:16
57:11
58:12

**initial** 40:2
71:21
260:9
**initially**
118:17
175:23
**initiated**
129:6
**initiating**
126:17
**initiation**
129:12
**injuries**
178:20,23
**inoperative**
148:18
**input** 184:9
184:10
262:7
**inputs** 43:15
92:3
101:16
130:17
279:4
**inside** 256:3
**insight**
138:19
**insignif...**
67:15
68:15
**insist** 197:5
**insistence**
200:5
**insisting**
201:9
**instance**
26:16
48:11 57:6
83:5,12
170:21
176:24
183:3,11
186:1
243:2
267:16
**instances**
108:11
171:3,23
182:3
**institut...**
121:15
268:1
**instructed**

211:4
**instructing**
209:16
**insuffic...**
39:14,20
39:21
257:18
**insult** 58:24
**insurmou...**
65:21 66:4
**intelligent**
74:9
**intend**
148:12
**intense**
143:11
**intents**
196:15
**interacted**
71:7 99:11
**intercha...**
287:12
**interest**
208:13,18
210:6,13
**interested**
25:16
**interesting**
126:12
229:8
248:2
**interface**
209:12
**intermural**
151:6
**internal**
128:9
164:17
201:1
220:14
256:9
**internat...**
28:19 29:1
29:6 53:24
72:1
215:14
267:21
272:9,12
272:13
280:4,13
**internet**
200:11
**interpret**

31:22
131:2
**interpre...**
202:16
**interpre...**
131:1
242:6
**intersex**
58:6 166:7
166:19,21
**Intervenor**
3:3 7:10
13:2,6
**interven...**
221:22
222:2
241:20
**interven...**
24:1 87:1
242:3
**introducing**
157:24
**introduc...**
169:24
**introduc...**
115:12
**intuitions**
268:17
**invariably**
198:18
**investig...**
146:23
**invoke**
170:10
**involved**
119:12
127:10,11
139:5
179:6
189:7
208:1
269:18
277:7
**involvement**
184:8
**involves**
95:19
**IOC** 82:9
139:21
273:11
274:22
275:3,18
275:23

281:8
**irregula...**
220:9
**irrevers...**
117:4
**isolated**
108:1,23
109:3,4
227:12
**issue** 26:16
241:23
**issues** 16:20
17:5 86:1
205:6,10
271:16
**ITC** 128:15
**items** 178:12
235:12
241:8
250:10

———————
**J**
**JACKSON** 1:5
**Jacob** 12:13
**Jake** 258:23
259:7
**January** 40:5
**jaw** 129:3
**Jennifer**
258:21
**Jim** 258:20
**Joanna** 9:19
59:19,21
59:23
142:14
145:16,22
147:21
148:4
**JOHNATHAN**
7:6
**Johnson** 6:4
**Josh** 13:20
87:10
248:20
**Joshua** 1:19
2:8  3:3
4:3  8:4
12:23
14:10
15:24
**journal**
16:20
258:17

**judge** 51:18
210:16
**judgment**
30:16
31:10
36:21
58:12
64:16
200:13
**JULIE** 4:11
**jump** 23:19
100:17,24
199:16
245:21
**jumping**
81:21
93:11,14
94:15,18
94:19
95:13,19
97:4 98:1
**June** 110:14
**junior** 89:8
89:11,17
**justify**
168:17,17
169:11

———————
**K**
**Kaitlin**
101:5,6,11
**Kang** 4:13
14:3,4
**Katelyn** 4:13
14:4
**Kathleen** 4:9
13:24
**keep** 112:13
140:24
**Kelly** 6:10
13:10
288:17,18
**kid** 222:4
**kids** 116:1
118:11
125:22
181:13
221:18
270:17
**Kilio** 157:8
157:9
**kind** 21:3
119:2

121:23
129:23
176:2
203:1
237:10
255:21,22
274:9
276:12
**kinds** 167:2
167:16
**Kingdom**
162:6
**knew** 37:3
**know** 15:9
18:18
20:21 22:5
22:22 23:8
23:9 27:6
27:18,19
27:21,22
35:13 42:4
42:9,16
44:15 54:8
54:11
57:19 60:3
68:18,19
70:17
71:22 73:1
79:16 80:6
80:21 85:5
89:14 92:6
96:10
99:12,18
106:9,12
110:6
111:21
112:4,4,5
112:7,8,21
116:16
119:10,23
125:11,12
126:21
127:15
134:15
135:4
139:5
140:20
143:14
144:9,17
144:20
145:11,13
149:23
150:6

155:3,13
155:24
156:6
159:17
161:7
162:3,8
165:21
172:20
175:18
181:13
182:16,20
182:21
183:3
187:11
194:17,21
197:6
205:6
208:3,5
209:6,10
212:12
213:22
214:1
220:20
222:6,6,7
222:11,19
222:22
223:1,6,6
223:10,17
224:17
226:1
227:13,21
228:21,24
229:5,7
230:10
232:12
233:14,15
239:14,14
239:16
240:7
241:5
244:12,24
245:6,7
246:6
247:3,8
250:20
251:4,17
252:7
257:18
258:14
259:7,22
263:22
264:16
271:16

275:3
276:10
277:12,14
280:22
281:10
282:9,23
283:15
284:15
288:15
**knowing**
42:17
183:12
261:4
**knowledge**
70:6,9,16
103:4
111:9,15
126:16
128:12
130:2
158:7
162:9,12
207:23
221:9
222:24
244:21
**knowledg...**
60:11,14
60:16 72:3
**known** 51:16
91:1
105:14
107:5
108:12
153:11
165:3
264:2
265:4
266:20
**knows** 35:14

———————
**L**
**L** 12:1
**lab** 282:13
**label** 78:24
115:5,20
182:2
**labeling**
115:24
**labels** 116:1
**laboratory**
31:24
**lack** 159:15

212:4
271:10
**lacrosse**
139:6
**laid** 204:4
**Lainey** 7:10
13:2
**Lambda** 5:4
13:22
**Lambelet...**
72:24
**Lambelet...**
73:7
**lane** 152:11
264:18
**language**
17:13
19:14
20:17  21:9
25:22
29:13
32:16
35:21
39:11  41:2
43:1  47:18
61:14  67:3
70:2 73:16
78:16  96:7
98:11
101:1
108:9
111:7
117:12
129:7
150:17
153:14
158:16
163:4
190:7
191:9
196:17
199:21
201:24
202:1
240:16
273:13
274:2
**large** 46:13
46:22  98:2
102:19
103:6
120:16
213:23

229:10
**larger** 21:22
74:5,15
75:2,5
101:16
129:16
130:20
132:5
216:2
228:24
**largest**
215:14
**laryngeal**
129:4
**late** 128:19
**latest**
162:22
163:7
**LAURENCE** 7:4
**law** 84:19
85:13
285:14
**Lawrence**
13:4
**laws** 85:9
285:14
**lawyer** 72:6
**lawyers**
209:22
213:4
214:18
**layman** 238:4
**layman's**
89:20
**LCSW** 190:11
190:13
**lead** 94:16
224:6
**leading**
75:23
**league** 61:12
150:23
256:11
**leagues**
51:21
**learned**
204:16,17
217:1
**leave** 20:19
201:19
**leaving**
110:4
148:9

202:16
**led** 137:19
**left** 158:20
243:7
284:16
**leg** 70:1
**legal** 5:4
12:13
13:22
208:15
**legislation**
285:19,19
**legitimacy**
27:7
**legitimate**
27:3,12,16
27:19
64:24  65:5
160:19
161:1
170:4,14
**length**
189:21
**lengths**
141:7
**lengthy**
184:5
**let's** 15:5
25:18
39:21  49:2
51:14  57:5
60:22
68:12
89:16,22
90:18
112:23
117:24
133:4
144:17
152:13,14
156:9
167:18
193:15
199:16
232:16
235:4
236:2,10
258:3
266:22
269:19
274:15
283:12
287:9

**letter**
189:19
193:17,19
194:8
195:1,16
195:19
275:16
**letters**
190:1
191:23
192:20
195:12
**level** 26:14
29:21
33:21
38:13,18
38:24,24
40:24  41:6
41:17  42:4
42:10  57:9
57:19,21
58:8,18
59:3 65:21
66:3 74:12
81:4 92:15
92:21
95:24
103:3,5
111:12
129:22
154:1
190:22
191:5
225:24
258:15
269:19
274:21
277:1,4,6
279:10,10
281:1
283:2
**levels** 22:18
22:21 23:5
29:18
30:20
41:15 56:5
56:17,24
57:12 58:2
58:8,13,18
58:19
70:17
74:13
79:10,18

79:23
81:17
129:19
131:10
144:15
148:21
179:24
247:5
258:14
260:10
284:6
**Lia** 110:19
110:20,21
**Liberties**
4:4
**licensed**
190:9,11
190:13
**life** 22:18
22:21 23:6
283:4
**lifetime**
73:8
**limb** 69:24
**limit** 32:1
58:5
274:23
**limited**
216:5
274:13,22
**limiting**
116:19
**line** 65:17
73:24
74:18
102:7
106:13,19
198:7
219:4,7
236:16,21
244:12
252:2
279:5
281:8
**lines** 25:19
25:24
88:10
100:9
193:15
194:5
241:8
**Lisa** 243:21
**list** 22:23

DB.IEH 0717

23:1 184:5
193:6
196:13
198:10
**listed** 184:5
197:22
**lists** 38:9
**liter** 28:14
28:17 29:4
29:11,16
29:21 32:1
53:8 57:7
277:9,10
281:2,13
283:9
**literal**
195:15
**literally**
205:8
207:12
**literature**
76:16,18
76:20
100:1
115:3
121:14,17
130:3
136:18
149:14
180:24
246:13
**litigation**
162:2
176:5
210:13
**little** 36:24
37:1 40:10
58:21
74:17
81:23
87:10,12
91:20
105:24
112:12
131:17
141:15
144:12,18
156:15
159:19
172:8
178:24
187:9
207:14

215:11
221:16
222:20
230:15
242:8
256:22
260:21
287:8
**Littman**
243:21
244:4
**Littman's**
246:15
**live** 19:13
189:1
197:13,15
197:16
**lives** 189:1
**living**
121:23
229:5
239:10
**LLP** 4:14
**logic** 51:12
58:4 261:4
278:14
279:18
281:14
**logical**
85:13 87:3
**logistics**
280:14
**logos** 162:7
**long** 52:5
112:12,16
137:18
144:1
225:16
226:7
244:17
284:13
**longer** 97:16
193:6
198:10
200:23
257:7
**longitud...**
134:16
135:2,16
**longstan...**
263:10
**look** 17:8
72:19

77:19
90:18
93:11 97:4
100:4
101:15
116:16
131:15
135:6,19
144:17
154:21
156:9
162:16
168:5
187:15
189:9,11
196:13
218:8
224:20
227:9
236:10
241:19,23
242:16
250:22
253:9,17
259:24
264:21,22
265:14
267:17
274:9,12
281:4
282:11
284:4,4,7
284:10,11
286:10
**looked** 40:7
40:9,15
47:18 53:5
98:11
132:24
135:21
153:7,17
157:17
162:15
262:19
283:20
**looking** 15:8
24:11
52:23 64:7
76:6 85:16
98:14
143:1
146:22
150:6

157:7
158:22
162:7
179:21
180:23
193:6
218:18
231:7
236:5
237:21
238:11
242:7
243:21
247:12
253:8
266:21
282:21
283:11
**looks** 15:5
154:13
223:11
241:13
242:10
**loopholed**
179:12
**lose** 74:2,5
74:15,23
75:1
**lost** 68:11
73:12,14
**lot** 95:4
139:5
140:10
284:16
**lower** 111:24
129:22
191:4
277:21
278:11,12
**lowering**
33:21
38:17,23
132:11
**lunch** 112:11
152:13
**Lundsburg**
98:22
99:13
**lung** 130:20
130:23
**lungs** 129:11
130:11,14
130:16

**M**
**M.D** 1:19 2:8
3:3 8:4
14:10
**magnitude**
100:21
**main** 227:24
**mainstream**
215:12
**maintain**
155:6
156:3
158:13
159:6
**maintaining**
160:16,18
**major** 21:6
22:2 53:24
121:21
158:10
159:4,12
**majority**
49:18 51:1
98:2
105:14
120:16
215:3
219:11
220:7
228:1,16
229:4
**makers** 39:8
77:10
**makeup**
164:17,21
164:24
167:7
256:9,14
256:14,16
257:3
**making** 14:21
31:2 33:5
72:1 76:23
78:18
157:22
164:20,24
178:8
204:3
**male** 19:17
20:21
22:19 23:4
24:7,10,18

24:23 25:3
25:21 26:5
26:12 27:3
27:12,16
33:12 49:7
49:18
50:10,13
50:19 51:2
51:23 52:2
53:3 56:23
57:6 58:18
60:15
65:20 66:2
66:21 67:6
72:4,12
73:10
78:20,22
78:23 81:1
81:17
87:20
88:24
91:13,22
93:1
100:20
105:3
107:12
108:11
109:22
110:7
126:3,3,16
129:16
130:14
131:9
154:17
155:5
156:2
159:21
163:2,11
168:19
169:12
170:4,9
172:4,4,12
172:12
173:2,11
173:22
174:7
175:9
177:11,17
178:2
179:8,9,18
185:10,10
185:18
199:1

223:12
226:8,11
226:19
227:4,19
228:2,6,16
229:11,16
230:7,16
230:17
232:24
233:1
237:4,17
238:14,20
242:13
254:7,8,14
255:24
257:9,12
264:7
281:15
**males** 17:16
18:14 24:5
24:16 26:6
36:3 41:22
42:10
49:16
65:19
70:11
84:20 85:9
88:21 90:6
100:16,23
105:1,3
107:8,10
107:12
108:12
109:1
132:7,16
134:17
158:14
168:18
169:11,19
169:21
170:3,21
174:7,12
175:9
233:22
236:12,15
238:22,24
254:11
262:14
**malleable**
45:17
**man** 48:12
**manipulate**
234:17

242:7,10
242:17,22
**manipulated**
231:19
**manner**
193:13
244:1
**March** 1:20
2:9 3:8
12:15 35:6
**margin** 73:13
73:16
**mark** 15:6,22
43:18
63:17
75:12
98:21
113:10
127:18
133:6
141:24
145:15
156:10
161:9
183:16
216:10
233:21
248:24
**marked** 15:17
15:19 16:5
43:24
63:24
75:17
98:24 99:4
113:14,18
128:1
133:11
142:9
145:23
156:19
161:18
184:1
216:18
224:21
225:20
234:3
243:4
253:11
259:11
**marker** 82:2
**mass** 131:9
132:7
**Master's**

190:22
191:5
**matches**
130:20
**math** 243:17
**matter** 57:22
197:13
200:23
223:16
264:8
**matters**
199:19
243:4
**maturity**
241:9
**max** 89:23
**Mays** 258:21
**McCuskey**
5:17
**MD** 190:14
**mean** 18:8
25:11 45:4
60:4,6
77:6,20
82:14
84:18
107:5
109:14
118:3
128:10
167:12
175:19,23
176:6,10
186:7
194:21,24
200:9
215:2,3
217:5,7
220:4
229:24
240:5
247:21
257:3,9,12
257:13
273:9
274:18
282:7
285:9
**meaning** 81:6
98:4 141:6
194:18
**meaningful**
150:14

151:4,12
152:1,9
164:3
167:8
**means** 82:21
123:8
175:19
200:5,10
201:3,6
237:1,23
254:10
273:6,19
274:10
**meant** 30:1
50:4,6
66:10
77:13
80:17
91:19
106:6
176:5
183:19
217:21
275:3
276:10
**measure** 37:5
281:24
282:12
**measurement**
180:4,19
218:24
**measurem...**
284:14
**measures**
17:18
**measuring**
282:14
**mechanisms**
214:8
223:10
**mediated**
124:19
**medical**
23:24
24:22
25:13
26:14 29:1
29:12 30:7
32:13 34:3
34:16,20
34:22,23
49:23
79:17

84:18
86:12,24
119:21
126:23
165:12
182:2,10
182:16,18
184:11
190:14
199:9,14
205:16
214:9
215:1,12
215:23
222:1
238:3
241:2
264:1
**medically**
80:5
**medication**
33:23,24
124:18
267:1,7
**medicine**
79:14
86:21
128:9
178:20
179:2,15
181:2
212:5
250:8
258:17
259:1
**meet** 276:3
**member** 54:20
65:1
108:14
111:17
138:17
205:14
**members**
138:6,7
206:2
**memory** 35:5
44:12
**men** 17:11
18:1,4,23
19:5  42:3
49:4  51:10
51:13,16
58:9  61:13

61:19  62:1
62:15,16
62:20
69:19
70:19
73:12,15
74:3,6,23
75:5
132:18,20
153:9
253:23
255:20
**men's** 48:21
51:4  69:22
69:23,24
70:1
**mental**
189:24
190:1,5,9
191:4,5,6
191:8,12
191:17,22
191:23
192:14,20
192:23
193:18,20
193:21
194:8,14
194:16
195:2,21
202:5
203:2,12
212:7
221:10
240:17,18
246:4
260:10
**mention**
25:19  89:5
141:23
227:18
**mentioned**
50:21
80:10
109:21
162:5
251:24
260:12
277:7
**met** 59:21
71:2
143:10
193:16

194:7
203:8
**meter** 66:23
141:1,4
**meters** 67:1
141:7
**method**
135:20
**methodol...**
235:2,16
235:23
**methodology**
235:22
269:8,12
**methods**
236:12
237:13
**metric**
250:21,24
**metrics** 19:1
**Meyer-Ba...**
10:7  225:2
225:6,8,11
225:14,20
228:11
235:7,13
**Meyer-Ba...**
235:21
**mic** 87:15
**middle** 26:2
65:16
82:10
89:12
143:12
184:13
264:10
**mile** 100:17
136:23
137:14
141:1,4
147:8
274:15,16
275:11,22
276:17
**milieu** 228:3
**million**
251:12
252:9
**mind** 18:13
57:8  78:22
97:3  127:6
170:12
**minimal** 76:2

76:11,24
77:5  91:23
92:6  95:7
95:20  96:7
96:9,13,14
96:18  97:2
97:23  98:5
98:6,6,20
159:22
204:22
**minimum** 77:4
97:5
**minority**
121:4,6
**minors**
120:16
177:1
**minute** 266:2
**minutes**
141:9
243:9,13
288:10,11
288:13
**mis** 110:20
**misquoting**
148:16
149:19
**misread**
238:18
**misreading**
125:7,13
**missing**
287:24
**mission**
267:23
**misspoke**
217:16
**mistake**
124:17
**misunder...**
217:17
**mix** 129:23
**mixed** 135:4
135:6
227:3
**model** 189:3
233:15,16
**modeling**
215:16
**modest** 23:12
51:17
132:20
136:17

**moment** 15:7
15:21  68:8
133:1
154:9
155:13
165:17
245:21
265:16
269:3
**money** 212:8
**monitor**
12:16
**Montagano**
3:5
**Montana**
110:16
**months** 40:6
147:11,22
148:5
159:22
201:8,10
202:3,8,9
202:21,23
203:5
**morbidity**
246:4
**Morgan** 6:10
13:10,10
288:18,18
**morning**
13:13,23
14:3  15:2
172:2
**MORRISEY**
1:16
**mother** 1:5
**mother's**
223:23
254:10
**motion**
210:15,15
210:16
**motivate**
36:17  38:3
**Mount** 119:21
183:18
184:19
186:12
189:8,15
192:1,11
196:14
199:9,16
202:14,24

204:5
206:11
207:5
208:15
209:12
212:16
213:1,4
248:22
250:5,8,14
**mouth** 194:22
**mouthful**
183:22
**move** 74:18
78:3 83:20
165:13
177:18
260:2,6
266:22
272:10
282:14
284:15
**moving** 97:11
152:9
282:17
**muddled**
178:24
180:10
**multi-year**
81:16
**multiple**
101:16
222:17
**murky** 71:1
**muscle** 69:22
69:23
129:18,19
129:20,20
129:24
130:11,22
132:6
145:18
181:2,2
**muscular**
147:14,24
148:8

**N**
**N** 4:1 5:1
6:1 7:1
8:1 12:1,8
**name** 12:10
12:13,22
14:17 73:3

108:11,18
110:1,5
258:20
**names** 12:24
110:23
**nanomolar**
28:14,16
28:20 29:3
29:11,16
29:20 32:1
53:7 54:21
57:7 71:15
**nanomolars**
53:11
57:13
**nanomole**
283:9
**nanomoles**
281:1,13
**narrow** 25:6
92:5 181:5
222:20
273:19
**natal** 17:16
17:17 24:5
24:16 26:6
33:12 36:3
36:3 41:22
41:22
42:10
49:15,16
51:23 57:6
70:11
84:20 85:9
87:20,22
105:1,3
107:8,10
107:11
109:1,22
110:7
126:3
132:7
134:17
158:14
168:18
169:11
170:2,5,21
172:4,12
173:2,11
173:22
174:6
175:9
185:10

**National**
138:18
**natural**
24:18
**nature** 82:15
109:12
216:12
224:22
**NCAA** 108:3,7
108:13
109:1,22
110:8
111:17,17
137:19
170:19,23
171:6,17
**neated**
154:12
**necessarily**
57:24
79:16
115:8
155:10
159:18
194:20
201:7
233:13
235:20
240:5
278:12
288:2
**necessary**
118:6
197:14
227:22
**need** 17:21
60:3
103:23
104:1,5
110:17
118:5
119:5
124:16
125:18
177:3
187:9
195:18
200:9
210:14
213:4
227:10
245:19
255:11

256:22
274:14
284:12
**needed** 39:5
279:4,6,17
**needs** 15:9
17:7 62:18
85:24
137:2
**neither**
262:17
**never** 20:21
32:14
140:24
215:7
230:13
259:18,21
**neverthe...**
45:16
55:14
227:4
238:19
**new** 4:6 5:7
12:11
157:24
158:5
168:3
196:18
200:2
206:10,15
206:21
**newer** 166:14
**news** 110:21
**Nicole** 3:5
**nine** 67:1
164:13
**nine-yea...**
100:15,15
**Nmol** 277:8,8
**nmol/L**
277:10,11
**Nmol/Ls**
277:9
**noise** 68:11
**non-exis...**
96:10
98:20
**non-expert**
90:3
**non-horm...**
228:3
**non-medical**
199:20,24

**non-pube...**
125:22
**non-tran...**
41:1,7,18
46:14,16
46:23 76:4
76:4,12,12
136:24
137:15
153:9,9
**nonbinary**
163:2,10
163:10
**nonconve...**
201:3,6
**nondiscr...**
175:4,20
176:6,10
**noon** 112:12
**normal** 29:18
30:19
31:17 56:6
56:18
58:14,20
59:4 228:2
228:16
237:6,15
237:18
**normally**
242:12,18
**north** 7:8
91:20
**notably**
144:20
287:14
**notary** 3:6
12:11 14:8
14:12,15
14:17,19
**note** 45:8
158:19
217:11,19
**noted** 65:13
**notice** 193:6
**noticeable**
79:24
**NPs** 191:6
**number** 9:4
10:4 16:12
30:13 35:4
61:16
64:19
69:14 74:5

74:15
111:21
128:15,16
132:5
138:23
161:11
206:18
207:5
214:18
228:24
241:17
251:10,15
251:20
253:10
268:4,9,20
270:8
277:15,16
277:17
278:6,8
279:8
281:9
286:12
**numbered**
114:9
**numbers**
21:22 30:5
30:6 32:3
70:16,19
75:2,5
140:14
181:9
206:24
207:9
227:18,20
250:20
277:21,22
278:11,11
**NY** 4:6 5:7

——— **O** ———
**O** 12:1,8
190:15
**Oaks** 6:5
**object** 84:22
116:18
213:11
260:20
**objection**
11:1 16:21
17:20
18:16 19:3
19:21 20:6
22:7 23:7

24:8,19
26:9 27:5
28:23
29:19
30:10,21
31:19
33:18
34:10 36:6
36:11,22
37:11,14
38:4,20
39:18 41:9
42:1,13
43:7,12
46:1,6,18
47:2 48:2
48:14
49:21
50:11 52:3
53:9 54:10
55:6,20
56:9 57:17
59:7 60:1
63:14 65:7
66:5 67:9
68:1,21
70:3,13
72:13 75:3
79:21
80:18 81:5
82:17,22
83:6,13,18
84:11
85:11,20
86:6,17
87:24
89:10
90:10 91:8
91:24
92:19 93:3
93:20 95:8
95:21
96:16 97:6
98:7
101:13
102:3,14
102:21
103:7,13
105:5,18
106:3
107:1,13
108:15
109:9,24

110:9
112:2
115:16
117:20
118:24
120:21
123:12,19
124:6
125:9
126:5
130:6
132:8
133:18
134:3,20
136:3,12
137:24
142:17
144:7
148:9,15
149:19
150:21
151:15
152:5
153:19
154:19
155:8
156:5
157:3
158:2,18
160:3,20
161:3
163:12
165:8
166:12
167:10
168:22
169:16
170:24
172:7,15
173:5,14
174:1,9,17
175:21
176:8,19
177:15
178:5
180:20
181:21
183:1
185:13
187:3,22
188:14,23
193:2,23
195:7

196:12
197:1,11
198:21
200:18,21
201:12
202:11
204:13
205:15,24
207:3
215:4,24
219:2
222:14
224:10
231:16
240:14
244:3
246:2
254:23
255:10,17
256:20
257:16
260:19
261:11,19
262:5,16
263:3,20
264:12
265:11
268:12,24
270:3,23
271:13,23
273:23
274:19
275:5,24
277:13
278:20
279:13
280:2,11
281:20
283:18
284:20
285:17
**objectio...**
287:23
**objections**
170:6
175:12
**objective**
64:24 65:5
119:11
123:21
124:16
125:19
169:7

287:13
**objectively**
22:5
**obligation**
51:21
**obliged**
208:9
**observable**
79:5,9,11
79:19
119:10
**observation**
17:11,16
18:23
19:17
231:3
261:22
**observat...**
147:9,18
**observe**
118:21
**observed**
139:9
165:23
**observing**
167:18
179:14
202:14
227:18
**obtain** 209:6
210:23
252:5
281:22
**obtained**
201:2,5
206:4
**obtaining**
200:10
**obviously**
103:18
104:3
**occasional**
111:2
**occupies**
60:21
**occur** 81:11
255:1
**occurred**
126:3
231:9
**offer** 43:10
47:7,10
62:8 102:6

107:7,9
140:15
147:20
148:13
159:2,10
**offered** 30:9
157:18
174:24
**offering**
31:9 51:20
52:4,8,17
52:24 63:7
83:10,14
85:7,12
86:10
107:14,18
182:13
**office** 13:9
213:23
253:7
**official**
1:12,14
2:1 123:9
151:2
162:10
**oh** 26:2
60:20
192:9
195:15
214:17
247:18
259:3
260:6
286:14
287:8
**okay** 15:14
40:18
44:22
54:18
55:23
56:21
59:11
60:20 63:6
65:11 73:2
80:8 81:14
89:18
90:17
99:15
128:14
138:20
152:12
154:24
155:23

164:15
169:18
178:11
184:15,17
188:10
190:21
191:20
202:10
215:10
237:2
243:18
246:16,20
254:18
258:2,19
259:4,4,5
259:16
260:7
261:16
262:11
270:15
272:4,5
273:8
275:2
279:21
281:16
285:12
286:20,24
287:3
**old** 97:15
100:14,22
100:22
261:9
**older** 39:22
75:6
118:11
120:18
146:14,16
206:13
240:21
**Olympic**
28:19 29:1
68:6
272:12,13
277:17
**Olympics**
272:9
**omitted**
110:6
**once** 18:14
44:19,19
44:21
246:5
**one's** 241:22

242:4,12
**one-time**
135:7
**ones** 112:8
184:14
226:1
243:4
266:20
**online**
141:14
157:8
**open** 58:8
**opened** 207:7
**operate**
201:11
**operating**
193:13
**operation**
193:4
251:22
**operative**
148:17
150:1
269:1
**opining**
174:3,4
181:19
**opinion**
21:23,24
22:4,20
26:3 27:1
27:10,14
31:9,21
34:19 36:2
36:7 37:13
37:24
43:10 45:6
46:4,24
47:7,10
51:20 52:5
52:8,17,24
56:4,16
57:11
58:18 59:2
59:9 62:8
63:7,12
65:9 67:13
67:20,21
67:22
68:14,16
73:20 74:8
83:10,14
83:23,23

84:9 85:3
85:7,12,24
86:8 87:1
95:18
102:6
107:7,9,14
107:18
118:2
119:4
126:22
131:7,13
135:23
136:4,8
138:11,14
139:10
140:15
144:9
147:20
148:13
151:2
159:1,2,9
159:9,11
160:22
165:22
167:22,24
172:3,11
172:17
182:13,13
182:18
191:17
195:16
199:10
215:3,18
222:9
229:3
267:3,4,13
270:21,22
271:1,11
271:17,22
272:1
275:10,12
279:20
282:5
**opinions**
64:16,17
134:1,5
140:2
205:7,11
**opportun...**
20:13
268:3,9,19
**opportunity**
20:4

**opposed**
109:18
146:23
163:14
169:6
175:3
186:21
278:6
282:12
**optimism**
260:10
**Optimize**
183:19
**opting**
247:10
**orchiectomy**
237:23
238:3
**order** 58:4
62:17
209:6,9
210:20
250:3
**ordinary**
24:7
**organ** 220:14
**organiza...**
29:3 164:8
213:23
215:14
**organiza...**
162:21
164:8
165:13
215:12
276:19
279:22
280:8,15
281:22
**organize**
21:17
136:15
**orientat...**
260:11
**original**
16:18,22
76:13
100:1,3
124:12
128:11
247:9
256:8
**originally**

277:15
**Osteopathy**
190:16
**others'**
122:4
**ought** 279:19
279:24
281:19
**outcome**
98:16
225:14
278:10
283:21
**outcomes**
17:12 18:2
18:5 19:7
160:9
183:20
244:15
262:20
279:9
282:5,7
**outlines**
246:18
**outperform**
65:19,20
66:2
**outside** 43:4
43:8 56:6
56:17
58:14 59:4
66:2,13
67:6,11,22
69:3 77:11
176:21
200:2,15
264:17
**outweigh**
35:18,19
36:17
**outweighs**
37:9 38:2
**overall**
57:22
111:5
130:18
211:9
**overcome**
159:5
**overcomes**
158:12
**overlap**
40:21

**overstate**
136:13
255:1
**overstating**
81:7
**overtime**
241:6
**overwhel...**
219:11
220:7
**overwhel...**
97:19
**oxygen-c...**
179:22

_____
P
_____
**P** 4:1,1 5:1
5:1 6:1,1
7:1,1 12:1
12:8
**p.m** 113:2,9
152:19
153:2
203:16,23
248:11,19
266:13
289:5,8
**pace** 188:16
188:16
**packed**
151:19
**page** 9:1,3
10:1,3
11:1,3
16:19 17:9
28:4 45:13
61:11 69:8
69:15
72:19
88:12
100:8
114:7
117:1
122:23
128:16,24
133:22
139:11
147:2,6
149:4
150:9,11
162:5,19
163:21
164:13

189:11
190:4
191:24
192:4,14
195:3
217:3,8
218:8,17
224:24
227:23
234:18
236:3,10
237:4
260:1
264:22,24
266:21,22
266:22
287:1,2
**pages** 128:15
**pair** 193:9
**panel** 65:18
66:10,20
73:6
**paper** 10:6,8
76:22
90:22
98:22 99:9
99:17,24
100:2,5
133:19
134:6
139:11
140:16
141:17,18
142:22
144:10,14
145:12
146:14,17
146:19,21
149:6,7
150:10
151:8
155:15,15
179:21,23
184:8,9,24
185:1,3,3
185:23
187:6,10
187:16,19
188:19
189:2
191:24
198:4,7,11
204:5

216:21
218:9
224:20
225:13,19
229:8
233:19
234:2,7,10
234:18,24
235:1,12
236:8,11
240:1
243:20
244:5,8,9
246:15
259:22
260:8
262:18
**papers** 87:11
87:15
132:24
133:2
134:7,8
136:17
146:18,22
146:23
148:23
178:18,24
180:23
181:7
215:19,20
215:21
216:1,3,6
234:14,15
235:5
263:24
**paragraph**
17:9 23:19
25:18 26:1
28:5,6,21
29:8 32:7
32:8,10
34:24
35:15 39:3
39:6 40:4
40:4,22
42:20
45:15,15
47:12
52:23 57:4
59:12,18
61:11,17
64:19,21
64:22

65:12,17
66:20 69:7
69:8,11,12
69:16
72:18 73:6
75:10,21
76:1 78:4
78:10
80:13 82:7
82:13 83:9
84:1
104:12,19
104:20
105:24
107:23
111:1
120:6
124:9
131:20,22
136:20
137:7
147:16
150:11
153:6,21
158:10
162:21
164:14,15
164:16
168:2,5,6
170:17
174:22
192:5,5,10
195:3,11
195:12
199:8,12
199:13
214:6,15
214:16,19
214:22
217:4,10
217:18
235:6
237:13
238:12
253:17
265:1
266:21
267:18,19
269:7
270:22
271:9,11
271:21
272:1,6

paragraphs
  32:6
  116:17,23
  214:18
  272:10
pardon 49:16
  182:21
  211:19
  226:10
paren 123:5
  125:6,7
  158:14,15
parents
  230:23
  231:10,11
  237:14
Parexel
  213:14,22
parse 80:5
  166:24
parsing
  124:13
part 28:20
  30:5 32:4
  39:4 76:13
  88:17
  107:4
  115:21
  118:2,16
  120:1
  126:10
  168:19
  169:12
  170:3
  178:23
  180:22
  187:9
  193:4
  195:14
  201:3
  211:8
  213:5
  216:6
  219:4
  223:23
  236:4
  239:5
  245:13
  255:5
  256:2
  257:19
  261:24
  267:23

269:21
273:3
277:4
283:21
partially
  260:13
particip...
  35:19
  142:23
  143:1,4,9
participate
  21:18,22
  33:6 35:19
  36:17 38:3
  183:7,9
  264:9
particip...
  54:19
  71:15
  97:24
  179:3
  183:5
particip...
  84:4
  101:19
  168:20
  169:13
  175:10
particip...
  19:12 21:7
  21:8,14
  22:2 32:24
  39:15,24
  47:8 54:5
  54:9 58:9
  146:10
  171:3
  172:13
  173:3,7,12
  173:23
  204:20,22
  280:6
particular
  18:15
  41:23
  42:12 45:8
  51:23
  54:23
  55:10 81:1
  91:16 95:2
  128:12
  154:2
  155:16

223:7
232:20
236:6
243:2
254:1
261:6
275:4
parties 8:3
  8:9 12:4
  12:24
partly 23:16
parts 256:24
  272:18,19
party 197:5
PAs 191:6
pass 206:22
passage
  102:2
passages
  162:18
passed 285:7
  285:20
passive
  229:9
  231:3
passively
  283:10
path 23:10
patient 9:15
  121:20
  127:21
  128:1
  183:19
  187:7,11
  187:20
  188:2
  189:3
  193:13
  195:5
  202:9,21
  202:23
  211:24
  212:13
patient's
  189:20
  241:4
patients
  121:4
  126:4
  185:4
  186:10
  187:1,5
  188:6,12

188:20
193:16
194:7
197:20
198:5
201:9
206:23
212:1
244:16,22
245:7
246:12,23
247:6,8,9
247:11,17
PATRICK 1:16
pattern 58:4
  226:9,11
  257:18,23
  278:14
  279:18
patterns
  104:14
pause 40:7
paying
  251:24
payor 195:13
  197:5
pedagogy
  269:14,15
pediatri...
  118:15
peer 144:10
  157:15
peer-rev...
  132:22
  272:23
pelvis 129:3
penile
  225:15
penis 236:24
  237:19
  256:2,3
Pennsylv...
  3:7
penultimate
  150:10
people 9:7
  15:24 16:4
  21:16
  23:23
  24:10 25:7
  31:5,22
  32:22,24
  39:23

49:11
66:13 68:9
75:6 86:22
86:24 90:2
109:6,19
112:5
120:23
125:21
140:9,14
163:18,24
165:10,12
165:15
166:20,24
167:14
176:13
179:2,23
179:23
183:12
185:17
186:4,4
189:4
194:24
198:13
199:19,23
200:1,2,7
200:11,12
200:14,16
200:23
201:1,5
204:18
205:22
207:11
216:9
220:19
221:21
222:1,4,17
223:7,11
223:13,24
224:1
227:15,17
227:19
229:18,23
229:24
230:1,19
230:20
232:13,21
233:1
235:10
240:16,19
240:19
241:7,9
246:4
247:4

255:9
257:6
268:4,9,20
277:19,20
**people's**
143:23
283:4
**perceived**
230:7
**percent**
66:23
67:14,23
68:7,11,14
68:18,23
69:1,22,23
69:24
73:13
90:24
91:18,20
91:22  92:5
92:13  93:1
94:6  95:3
95:6,16,16
95:17,20
97:4
100:16,17
100:17,20
100:23,24
102:12,12
102:19,19
103:5,6
111:7,12
136:23
137:14,22
229:23,23
229:24
230:2
273:21
**percentage**
88:20  90:5
90:11,12
90:15
111:6,13
111:16,24
112:4,5,6
183:12
270:16
**perfect**
260:6
**perfectly**
31:5
**perform**
211:16,17

244:16
**performance**
17:12,17
18:4  19:1
19:6,10,17
36:2,4
42:23
43:21
47:15
48:22  51:5
62:21
69:19  73:8
73:10,19
76:3,11
78:12  79:2
81:1  83:11
87:21
88:20
90:21
91:22
93:12
102:1
104:14,22
104:23
105:1
132:2
134:18
136:1
139:17
147:14
148:1,8
159:22,23
164:19
165:7
167:9,23
168:1
180:3,9,10
180:15,19
250:17
256:11
262:2
265:5,10
265:21
266:18
267:11,15
273:1,10
273:20
274:18
275:11,22
282:3,7,16
283:5
**performed**
206:7,10

207:1,20
208:2
211:13
228:10
244:22
245:8
246:24
247:9
252:9
**performing**
74:2  206:6
**period** 73:11
153:13
164:3
168:15
194:9
207:12
232:10
233:13
239:9
260:11
267:3,8
**permeated**
166:15
**permeations**
285:21
**permission**
88:24
**permit** 34:7
46:24
**permits**
103:4
**permitted**
34:5
**permitting**
46:15  47:8
**persist**
105:15
114:21
115:14
139:19
221:13
**persisted**
227:6
**persistence**
117:10
**persistent**
195:22
196:10
**person** 52:19
52:21,22
80:6
130:20

161:5
163:2
170:8
177:16
185:16
194:20
195:17
196:15,16
197:6
203:7
220:12
221:7
239:15
242:21
255:3
274:2
**person's**
79:9
146:24
164:17,21
256:9,13
256:15
257:2
**personal**
24:16  31:9
172:19,22
175:24
211:11
212:14
213:8
**personally**
31:13
44:15  56:3
63:11
72:21
119:16
127:10
178:13,17
189:7
211:7
286:8
**persons**
113:12
128:19
163:10
225:15
**perspective**
34:4  57:20
135:12
**pertain**
114:4,6
**pertains**
116:22

**Ph.D** 60:18
190:17,18
190:19
**phallic**
236:22
238:23
**pharmace...**
213:20
**phenomenon**
219:16
**phenotypic**
287:15
**phone** 112:22
**phrase** 135:8
159:14
169:3
**phrased**
52:18
67:16
155:18
236:19
**phrasing**
125:18
196:14
288:1
**physical**
22:16,19
23:4  79:5
117:9,21
119:24
123:1,16
125:6
126:19
138:8
155:6
156:3
158:12
159:5,22
168:14
218:24
219:23
220:8
273:2
**physically**
218:21,23
219:13
239:23
**physicians**
119:19
191:7
207:19,24
**physiologic**
50:9  83:11

physiolo... 244:15
42:22
47:14
48:21 51:4
51:24
81:15 83:4
87:21
92:24 93:7
93:8
101:23
179:9,18
physiolo...
48:11
physiology
60:11
72:16
131:12
148:20
178:14
179:1,9,14
282:13
physique
162:24
163:9
physiques
48:1
picking
109:7,12
214:24
pictures
260:2
piece 16:19
30:12
156:24
180:5,7
256:23,23
pieces 56:22
56:23
63:11
119:2
159:15
pile 154:12
154:12
place 60:21
62:14 67:1
120:11
122:10,14
124:2,4,13
126:10
137:11
195:18
209:9
239:13

placement
216:22
Plaintiff
4:7,18 5:8
13:19,24
14:2,4,6
248:21
Plaintiffs
1:6
plan 211:9
plasty
185:14
play 33:13
33:14,15
52:1 103:2
169:19
playing 35:5
38:13,18
38:24
plays 195:4
please 52:11
62:24
87:10
129:14
253:17
plenty 30:18
210:22
PLLC 5:17
plus 211:12
251:18
point 15:4
18:12 30:2
30:3,5,8
33:4 35:16
35:18,23
36:16
47:23
62:13
68:17
69:15,21
76:22
80:24
84:10
90:23 92:5
94:7
104:19,21
108:8
116:13
119:7,9
121:12,24
131:13
154:8

167:17
170:20
171:23
180:16
184:23
187:10,16
191:16
195:15
202:12
203:9
218:17
227:10
232:10
233:6,11
235:16
240:23
247:15
251:19
257:20
270:20
283:9
pointed
66:22
87:18
262:3
pointing
140:10
187:6
237:10
points 69:14
69:20
94:24
134:23
241:18
policies
82:9 85:17
86:14
175:4
268:2,7,18
268:20
269:2
policy 34:19
65:2 174:6
174:16,16
175:9,11
175:20
264:8
268:10,21
269:3
278:3
popular
156:24
popularly

166:8
population
21:18
31:18
97:24
111:6,11
111:14,20
121:20
138:13
230:1
245:18
populations
245:24
246:1,5
portion
124:3
249:6
252:13
portions
248:24
posing 58:9
position
30:23
101:1
119:20
174:12
240:4
250:5
positions
184:22
possesses
167:7
245:1
possibil...
95:1
possibility
98:15
107:19
152:4
possible
17:10
25:20 26:4
27:1,11,15
182:3
247:14
261:5
possibly
91:7
post 65:18
post-sur...
245:23
posted
144:22

postsurg...
246:12
potatoes
138:10
potential
106:14,15
106:20,21
107:3
149:2
150:24
219:7
potentially
202:23
power 61:19
62:2
100:18
practical
197:12
practice
113:13
114:4,6
117:18
118:8,10
118:14
119:12
120:24
192:19
198:2
201:15
213:5
practices
204:11
practiti...
117:14
pre-pube...
126:8
pre-pube...
262:14
precede 80:2
80:3
precise
110:5
198:4
precisely
160:11
predeter...
260:14
predict
104:13
181:15
183:14
219:17
229:21

Vitullo27827 0728

**predictive**
  223:15
**preface**
  232:18
**prefaced**
  215:17
**prefer** 72:23
  73:3  177:4
**prenatal**
  228:2
  253:24
  254:2,9,20
  255:8,15
  255:22
  258:3,6,9
  258:13
  260:9
  261:7,7
**Preopera...**
  183:19
**prepare**
  75:22
**preparing**
  40:19
**prepubertal**
  84:5  97:9
  97:16,20
  98:3
  104:14,15
  104:22,24
  105:14
  107:17
  114:12
  116:5,8
  119:13,16
  119:19
  121:3
  122:6
  124:20
  127:2,5
  221:12
  261:23
**prepubes...**
  222:3
  223:15
**prescribe**
  118:8,13
  118:16
  119:6
  177:1
  178:3
**prescribed**
  201:8

**prescrip...**
  201:7
**presence**
  257:17
**present**
  12:23
  24:17
  49:18
  120:16
  128:19
  150:19
  166:10
  182:24
  271:5
**presenting**
  206:23
**preserved**
  149:9,16
**president**
  265:24
  266:3
**press** 57:6
  109:12
  156:24
**presumably**
  228:2,16
**pretreat...**
  139:18
**pretty**
  127:11
  251:22
  273:18
  284:12
**prevent**
  117:4
  120:11
  122:10,13
  124:1
**preventive**
  119:8
**prevents**
  84:3  124:2
**previous**
  52:13  89:2
  170:7
  243:4
  266:3
**previously**
  98:24
  113:14
  120:15
  183:17
  256:8

  262:19
**primarily**
  116:23
**primary**
  147:1
  153:10
  265:4,8
**prior** 23:24
  32:14  40:6
  79:23  82:9
  107:10
  118:9,17
  122:21,21
  124:18
  126:17
  129:2
  162:1
**priorities**
  32:7  271:4
  271:5,18
**priority**
  35:18
  36:17  38:2
  271:3
**probably**
  91:19
  104:11
  135:4
  167:4
  244:9
  259:18
  285:3
**problem** 92:1
  115:17
  165:15
  180:23
**problems**
  34:4
**procedure**
  3:4  199:3
  244:15
**procedures**
  226:20,21
**PROCEEDING**
  14:11
**process**
  18:14  25:4
  40:9  120:1
  187:6
  205:1,4
  268:1
  275:18
**processes**

  244:19
**produce**
  257:22
**produced**
  253:23
**producing**
  257:19,24
**professi...**
  25:9  29:15
  41:23  43:5
  71:9  190:5
  191:13
  203:2
**professi...**
  99:11
**professi...**
  203:12
  221:10
**professor**
  9:9  10:6
  43:19,23
  44:15
  45:14
  61:10,24
  69:10,16
  71:2,8,19
  72:2,20,22
  72:24,24
  73:6,7
  74:10
  76:17  86:4
  91:1,14
  99:8  155:3
  155:24
  157:13
  159:3
  160:1,13
  225:13,20
**professo...**
  136:14
**profile**
  177:17,18
**program**
  60:18
  118:16
  127:6,12
  187:5
  201:17
  207:7
**programs**
  270:2,7,10
  270:17
**prohibited**

  1:23
**prohibits**
  175:9
**project**
  216:8
**projects**
  60:7
**prominence**
  129:5
**prominent**
  60:21
**promised**
  247:24
**pronouncing**
  213:14
**properly**
  201:8
**proporti...**
  23:15
  111:5
  143:16
**propose**
  107:7,9
  140:15
  147:20
  159:2,10
**proposed**
  139:20
**proposes**
  189:2
**proposing**
  201:14
**proposition**
  87:19
  117:20
**prospective**
  135:2,16
  157:18
**Protective**
  209:6,8
**protocol**
  201:15
**protocols**
  193:21
  229:13
**prove** 224:3
**provide**
  20:12
  37:17
  102:12,19
  231:24
  232:5
  233:7

267:22
268:3,8,19
**provided**
59:3
248:24
**provider**
189:20
193:18,20
193:21
194:9,14
194:16
195:2
**providers**
190:2,10
191:4,6,8
191:23
192:15,21
199:20,24
200:12
**provides**
225:6,9
230:22
231:13,17
260:8
272:21
**providing**
193:11,12
215:18
271:17
**pseudo** 238:7
238:8
**psychiatric**
192:3
201:21
**psychiat...**
190:17
203:3
**psychiat...**
191:7
**psycholo...**
260:13
**psycholo...**
190:20
203:3
**psycholo...**
120:5
**psycholo...**
241:3
**pubertal**
25:10
80:10
105:16
118:20,20

118:22
119:14
122:24
168:19
169:13
170:4
**puberty**
18:14,18
18:19
22:17 23:4
23:21,24
24:7,18,23
25:4,6,15
25:21 26:5
26:11,13
27:3,12,16
33:2,14,15
34:7,8
35:16
38:11
49:18,24
50:10,13
50:19 51:3
61:13
62:21
65:18 76:5
78:12,13
78:14,20
78:20,22
78:24
80:15 81:3
84:5,21
85:1,10,18
86:15
87:22 96:6
96:9 105:2
105:4
107:10
114:10
116:4,8
117:3,8,21
118:6,8,13
118:16
119:6,8,9
120:1,9,11
122:9,10
122:14,17
122:20,21
123:2,17
123:21,24
124:2,3,21
125:2,4,5
125:6,19

125:21
126:1,3,17
126:17
129:6,12
129:16
130:14
131:9
153:10,12
154:18
155:5
156:2
159:21
168:15
170:9
179:10,19
213:20
262:4
265:16,19
266:16,24
267:7
**public** 3:6
12:11
14:12
109:16
208:8,21
264:8
**publication**
35:2,6
40:6
146:15
156:1
157:8
**publicat...**
72:11,15
179:17
**publicized**
108:1
111:3
112:8
**published**
16:14 18:3
45:2 99:9
99:17
157:4,6
161:13
178:18
243:21
246:10
**pulled**
214:12
**pumped** 130:2
**pumping**
130:4

**purport**
45:23
**purports**
157:13
**purpose** 17:2
17:4 21:20
125:20
276:13
**purposes**
29:2
118:22
186:1,5,6
196:5,16
198:18
209:14
218:4
236:6
**pursuant** 3:4
**pursue** 65:1
65:6 210:8
**purview** 69:3
264:18
**push** 141:13
**push-ups**
100:19
**pushing**
233:11
**put** 15:2
27:24 29:4
146:2
165:24
167:4
194:22
247:6
267:3
277:16
280:16
**puts** 69:12
**putting**
101:22
102:5
149:1
152:10
155:9

_____
**Q**
_____
**qualific...**
228:9
**qualified**
61:23 62:4
62:5,8
186:11,15
186:19

187:21
188:3,7
190:5
**qualify**
187:5
191:12
198:6
**quality**
163:14
**quantify**
70:22,24
**quantity**
277:12
**question**
24:12
26:22
27:23 33:4
36:10,13
36:19,24
37:3,8,10
37:10,17
37:24
38:16
40:13
41:13,21
42:5 43:4
44:13,20
45:1 47:22
47:23 49:5
51:10 52:5
52:7,11,13
52:18,21
52:22
56:14 57:3
57:5 58:19
58:23
59:16 72:5
76:13
77:20 78:4
84:16
86:20
87:20 92:4
97:2 101:6
102:16
106:9,18
110:10
111:19
116:22
126:21
127:9
135:3
137:17
140:5,7

145:8,9
146:18
148:12
149:23,23
149:23,24
150:15,20
151:1,10
151:18,22
151:23,24
155:22
158:11
159:4,8,12
161:22
163:22
164:22
168:23
170:10
171:9
172:23
173:16
174:15
178:19
182:12
183:2
195:9
208:9
210:9
212:19
213:7
215:6
222:2
230:15
241:3,3,4
241:19
242:1
245:2,12
245:20
250:13
256:7,13
258:15,16
261:24
266:15
268:13,15
270:4
275:7,19
**questioning**
244:13
**questions**
16:10
23:20  34:2
41:14
67:18
96:13

148:3,19
149:1
150:6
151:23
170:7
208:20
211:2
225:24
248:2,23
250:3
272:18,19
288:15,19
288:23
289:1
**quickly**
198:11
**quieter**
207:9
**quite** 96:1
115:18
121:21
129:13
138:22
144:19
165:16
180:24
186:8
189:12
193:3
212:6
223:1,10
223:19
232:9
236:8
240:21
241:17
263:21
273:11
**quiz** 53:20
53:22
141:6
244:11
**quizzed**
244:10
**quotation**
46:19
**quotations**
64:15
**quote** 19:14
20:4,13,14
21:1,5
22:1,16
23:20,22

25:20,21
29:9,12
32:15
35:16,20
36:5 38:10
38:10,13
39:6,10
40:22 41:1
42:21 45:3
45:6,16
46:12,13
47:13,17
61:17 65:1
65:18,22
66:11,21
67:2 69:16
73:7,16
76:1 78:19
82:8 84:2
100:13
104:16
106:1,19
108:9
111:1
114:19,21
120:12
125:2,5
128:18,20
131:24
132:2
136:21,24
139:15
147:7,14
149:8,11
150:12,13
150:16
153:13
158:10
159:20,24
162:21
163:23
164:4,16
170:18
174:8
192:1,14
195:22
201:22
206:15
214:10
217:11,14
227:24
235:1
250:12

272:21
274:3
**quoted** 84:7
148:10
194:10
**quotes**
125:12
**quoting**
171:10
─────────
**R**
**R** 4:1,9  5:1
6:1  7:1
12:8
**race** 9:17
66:23
142:4,8
143:12
**races** 277:18
**raise** 34:21
86:4
117:19
170:4,12
226:19,24
227:19
241:14
**raised** 86:7
225:15
227:4,5,16
228:17
230:6,11
230:17,20
231:23
233:4
238:15,22
**raises** 34:4
38:23
**raising** 86:1
107:19
148:3
271:16
**ran** 147:7
**random**
140:10
**range** 29:18
30:19
31:24
49:11,11
56:6,18
57:1 82:11
89:9 90:22
91:7 92:2
92:12

93:16,22
93:24
94:10 95:1
95:3,5,15
95:16,24
96:1 97:21
103:16
150:24
186:8
212:4,6
234:14
262:20
273:11
281:15
**ranges** 58:14
58:20 59:4
91:18
**rate** 88:6
157:12
**rates** 21:8
111:3,5
245:24
246:11
**reach** 118:19
120:10
274:9
**reaction**
65:16
117:9,21
118:21
**reactions**
119:24
**read** 22:15
24:2 30:1
39:11 44:7
44:8 52:10
54:14,16
64:6,9
76:18,20
84:12
88:10
90:15
99:21,22
100:12
101:6
102:2
104:20
121:14,17
133:2
146:5,8
150:12,12
158:3
213:13

Oliver 27831 0731

214:21
235:4
244:8,9,9
268:21
284:24
285:1
287:17,19
**readership**
16:20
**readiness**
189:15,16
**reading** 12:4
47:20
76:16
125:10
193:23
**reads** 12:16
19:10
32:10
52:13  61:7
64:22
69:15,21
113:2,9
117:2
122:23
149:8
150:11
153:8
159:20
195:12
203:15
248:19
266:13
289:5
**ready** 32:14
**real** 283:4
**reality**
79:15
126:12
188:24
**really** 20:17
87:11
115:4
119:5
121:24
124:15
154:8
164:9
176:11
224:4
226:23
227:17
231:2

235:17
278:10,14
**realtime**
15:8
**realty**
144:12
**reared** 229:4
**reason** 19:24
20:3,10,23
42:21
48:21  51:4
53:2  55:12
56:5,16
57:12  58:7
58:12  59:2
62:11  63:8
73:18,21
101:10,24
116:14
118:17
119:6
140:6
169:20
216:6
219:4
226:13
229:8
260:17
**reasonable**
55:15  56:1
80:6  114:1
151:13
152:2
172:4,12
173:1,11
173:22
205:22
281:18
**reasonab...**
85:8
**reasonably**
35:10,12
166:19
245:2
**reasons** 32:2
91:1  152:6
240:18,18
**rebound**
207:14
**rebuttal** 9:6
15:3,18
103:22
104:8,10

107:24
120:7
122:8
168:6
170:17
174:23
214:14
253:9
264:21,23
**recall** 53:8
71:17,19
77:21  78:2
96:7  100:3
101:8
110:13,19
110:22
117:23
138:6
153:23
154:3,15
157:7,8
253:9
259:20
276:24
278:18
283:15
285:6,8,10
286:11
**receipts**
207:18,23
**receive**
120:9
211:8
266:24
267:6
**received**
193:17
194:8
199:19,24
285:4
**receives**
212:1
**receiving**
84:5,6
115:20
**recognition**
33:6  118:1
118:3
**recognize**
32:20
101:15
140:11
219:6

229:22
264:14
**recognized**
134:7
226:7
**recognizing**
101:16
221:24
**recollec...**
53:14
154:10
**recommend**
112:17
114:10
116:3
122:17
**recommen...**
114:9
116:3,15
122:20,22
122:23
123:9
125:4
**recommen...**
163:15
204:11
**recommended**
116:8
**recommen...**
163:22
**reconcile**
96:14
**reconfig...**
199:5,6
**reconfig...**
199:2
**reconstr...**
185:15
186:6
198:24
206:13
**record** 12:12
14:16
15:13
22:15
47:13  59:1
60:23  61:6
72:22
90:11
100:12
112:24
113:1,8
152:14,18

153:1
158:20
181:19
185:1
203:22
211:5
214:21
248:10,18
248:22
266:2,5,12
**recorded**
24:10
**recording**
15:8  16:18
228:10
**records** 72:4
72:11  76:2
76:10
143:23
**recruited**
143:4
**red** 251:4
**redraw** 275:6
**reduce**
130:14
**reduces**
130:4
131:9
**refer** 15:5
24:5  78:19
106:13
128:16
137:7
164:21
166:11
195:2
202:20
224:24
246:10
285:13
**reference**
18:9  45:9
85:22  97:9
101:6
106:19
107:3
125:14
144:18
162:1
199:23
216:2,3
282:10
**referenced**

45:12 53:4
54:21
115:3,19
133:5,19
134:7
146:17
196:20
216:6
233:19
263:24
**references**
30:11
101:4
115:12,19
254:4
274:22
**referencing**
54:3 57:4
91:17
94:24
116:24
126:7
150:23
165:1
218:1
257:4
262:8
269:2
275:17
276:17
283:23
284:6
**referred**
72:23
146:14
175:19
205:18
226:4
268:7
**referring**
17:15 80:9
81:16 98:3
163:12
164:22
168:15
190:19
196:3,6
234:24
**refers** 108:1
236:11
**refined**
115:22
**reflect**

154:8
**reflected**
253:21
**reflective**
79:15
**reframe**
151:18
**refused**
211:4
239:12
**refusing**
209:19
**regard** 58:2
60:14
107:15
121:9
130:16
160:8
178:22
179:14
224:18
241:11
284:5
**regarding**
164:1
178:14
**regardless**
84:4
**regimen**
177:24
178:3
189:21
201:18
**regimens**
32:13
**regimes**
34:21
179:4,7
**region** 67:1
**registered**
163:2,11
**regress**
124:20
126:13
**regulation**
54:20
55:14
**regulations**
53:5
**reimbursed**
212:7
**reimburs...**
212:4,5

**Reiner** 10:8
233:19
234:3,24
235:23
236:8
241:12
**reject** 262:4
**relate**
132:15
155:14
179:18
**related**
22:13
42:22
47:14
48:22 51:5
179:8
212:15
**relates**
50:15
160:9
168:13
188:16
226:23
272:13
**relating**
34:21
178:20
**relation...**
19:17
21:12
209:14
223:17
**relative**
72:3
138:16
271:4,18
**relatively**
45:12 48:4
53:2
138:13
146:6
151:7
156:24
**relevance**
148:20
**relevant**
26:24
57:24
76:16
77:10
103:17
138:22,24

179:10
276:15
**reliability**
241:4
**reliable**
136:10
257:7
**reliably**
20:4,13,18
21:4 62:17
240:21
**relied**
191:16
**remain**
129:16
**remainder**
235:6,6
**remained**
159:3
238:24
**remains**
35:15
158:11
159:11
219:10
220:6
252:2
263:7
**remember**
40:12,16
53:16
99:14
110:5
232:9
240:2
**remind**
110:15
**reminded**
110:17
**remotely**
12:18
247:23
**removal**
192:2,12
**remove** 201:7
**removed**
195:20
199:3,17
**removing**
77:21
238:5
**renamed**
71:23

**render** 61:18
73:20
74:17
138:14
151:2
159:9
182:18
**rendering**
31:21 59:9
74:8
138:11
139:10
**renders**
136:9,10
**repeat** 94:8
187:24
243:11
262:21
**repeating**
128:18
**rephrasing**
57:3
**replace**
196:18
**replicate**
235:11
**replicated**
140:13
**report** 9:5,6
15:3,4,16
15:18 40:3
40:5,20
44:9 53:4
57:5 73:8
75:9 77:17
77:23 78:5
78:6 84:1
91:14
92:11
93:13
94:20
95:14 97:7
97:9
103:22
107:24
109:22
119:20
120:7
122:8
131:21
132:23
133:15,20
133:23

137:12
143:21
153:6
164:14
168:2, 6
170:18
174:23
176:7
214:7, 14
214:15
241:4
243:23
253:9
256:8
264:21
267:17, 19
272:6
284:18
286:10
288:5
**reported**
140:16
143:20
198:4
235:22
239:5
**reporter** 3:6
16:7 20:7
52:13
133:7
243:6, 8, 14
288:9, 10
**reporting**
12:14
99:24
100:3
128:10
**reports**
16:11 94:3
176:4
260:23
**represent**
12:24
158:23
253:6
**represen...**
82:2 271:7
**represen...**
13:8, 14
208:14
209:11
269:17
**reproduc...**

1:22
**reproduc...**
153:13
164:18
218:3
220:1, 14
256:10
**reputation**
44:23
207:9
**request**
210:9
**require**
196:22
221:22
222:1
276:24
281:1
**required**
189:14
191:24
193:20
210:11
**requirement**
28:13
53:23
137:19
139:20
192:2, 23
194:19
199:18
200:7
201:8
**requirem...**
28:9 138:9
193:7
195:13
199:9, 14
**requires**
85:8
189:19
190:1
195:22
201:21
**requiring**
185:20
**research**
16:19, 23
39:5 72:10
76:9, 13
100:1, 4
127:1, 1, 4
127:7, 9, 10

127:12
128:11
130:8
148:19
153:8
162:22
163:7
178:13, 18
178:20, 22
179:8, 11
179:13
180:2, 6, 11
180:18
181:4
213:24
235:11
272:23
**researcher**
235:9
**residents**
251:19
**residual**
23:13
25:20 26:4
26:11 27:2
27:11, 15
**resources**
207:10
**respected**
165:4
**respectful**
72:22
**respectf...**
210:8
**respective**
12:4
166:10
**response**
256:5
**responsi...**
216:23
**rest** 45:5
219:22
232:18
242:9, 23
**restate**
212:19
256:24
257:2
**restrict...**
272:21
**result** 52:1
79:12

81:16
144:16
163:23
186:9
208:1
224:24
**resulted**
19:11
**resulting**
27:2 50:19
78:14
80:15
250:16
**results**
61:16
198:4
225:3
226:18
227:2
235:15, 18
238:12
**retained**
162:23
163:8
**retirement**
250:10
**retract**
44:13
**retrospe...**
135:1
**returning**
266:3
**revenue**
211:20, 21
**revenues**
211:9, 24
213:18
250:14, 16
251:6
252:1, 8
**reversal**
247:13
**reverse**
250:3
**reversed**
22:17, 20
23:5
**revert** 245:9
**review** 100:1
100:5, 10
100:13
116:19
128:8, 10

132:21
144:11
145:6
146:9
147:10
148:5
157:16
163:22, 23
192:24
204:23
228:11, 15
232:20
**reviewed**
135:21
146:5, 6
149:14, 15
260:21
**reviewing**
203:2
**reviews**
134:7
216:2
**revised**
77:22
113:22
**revisions**
166:16
206:13
**riflery** 63:3
65:15
**right** 16:12
22:8, 10
24:23
26:13, 20
27:4, 6
28:3, 18
30:22
34:23 35:3
43:13 45:7
47:11 48:3
52:4, 23
57:11 59:9
73:4 77:15
78:1 79:7
80:22 82:6
83:2, 15, 23
88:18
89:23, 23
90:4 91:4
92:2 96:12
101:9, 9
105:11
106:11

0733

108:17
110:19,24
112:8,9
114:16
122:5
123:11
125:11
126:22,23
127:14
137:9
145:4
153:18
154:2
156:9
157:7
165:11
166:24
175:13,15
175:24
177:17
180:14
182:11
183:9
190:12,19
192:17
193:18
197:23
202:4
206:20
210:15
211:20,22
214:19
217:20
220:11
221:6,6,17
226:5
228:13,24
229:18,20
235:5
238:1,7,16
238:17
239:6
240:3
242:14
243:4
251:9
252:10,11
254:12,22
257:15
258:11
259:19
262:15
263:2,5

264:1,11
265:14,22
266:19,20
267:19
268:5
269:3,6,22
270:24
271:9
272:7,10
273:3
274:11
275:2,12
277:2
278:1,19
278:22
280:1,10
281:3,9
282:19
283:7,8,17
284:19
288:6
**rights**
177:23
**rigor** 245:15
**rigorous**
244:20
**rise** 79:23
**risk** 273:1
**Robert** 284:9
**Roberta** 5:16
13:16
288:20,22
**Roberts** 9:16
9:20 133:5
133:10
134:11,21
135:15,24
136:5,9,21
137:12
139:12,13
139:13
140:3,16
147:5
155:14
156:11,18
157:1,13
157:23
158:7
160:2,4,6
181:6
282:10
283:14
**Roberts'**

140:19
**robust**
272:23
**Roger** 7:3
13:1 15:7
87:9
131:16
249:3
**role** 27:7
37:21
121:24
162:4
189:9,10
195:4
279:16
**roles** 63:9
277:5
**room** 5:12
13:2,3,20
27:20 31:2
66:14
281:7,17
**roughly**
207:7
**rule** 33:11
33:21 34:5
53:11 55:2
55:4,23
56:1 72:1
84:16
137:19
165:17
279:6,12
279:15,18
279:19
281:18
283:12
**rules** 3:4
32:12
39:21
52:19
198:8
210:12
273:17
276:20,23
279:23
280:5,9,13
280:17,19
280:19,21
281:11
**run** 33:22
136:23
137:14

178:12
275:11,22
276:17
**runner**
110:16
**runners** 68:6
**running**
90:18,21
92:11 93:2
134:18
138:21,24
139:5
143:12
213:2
251:3,4
274:16
**runs** 95:16
100:23

_____
S
_____
**S** 4:1  5:1
6:1  7:1
12:1,8
**safe** 166:19
**safely** 19:13
21:1,3
**safer** 1:19
2:8  3:3
8:4  9:5,6
9:11,23
12:23
14:10 15:2
15:16,19
15:23,24
16:10
43:18 44:6
55:18 61:9
63:18 64:4
74:24
75:12,13
75:17,21
77:16 86:4
87:18 96:5
98:22 99:8
106:7
109:20
113:10,21
127:18,21
133:6
141:24
145:8,15
146:2
153:4

160:17,24
161:9,22
183:16,18
183:24
184:4
188:19
197:19
204:1
216:13,21
220:5
234:6
241:2
243:20
248:23
253:5
288:24
**safety**
160:17,18
161:1,6
164:2
168:13,17
168:24
169:5,10
169:20
170:5,10
170:12,16
174:24
273:2
**salary**
211:12,12
211:14
212:21
213:3
250:7,9
**sales** 213:19
**sample** 92:14
97:15,19
97:20
**San** 4:17
**Saraswat**
216:11,17
**Sargent's**
12:14
**satisfied**
198:1
**satisfy**
188:4
195:13
197:21
202:23
**satisfying**
197:4,16
**save** 168:3

Sawaswat
  10:5
saying 37:16
  61:17  88:3
  97:18
  104:21
  119:5
  125:18
  136:15
  160:10
  167:13
  169:17
  180:14
  218:20,22
  219:8
  222:5
  227:8
  229:6
  232:15,15
  242:24
  247:15,17
  257:20
  258:4
  268:20
  279:7,11
  282:8,9
says 33:12
  35:5  45:16
  90:14,14
  114:10
  116:3
  123:5,15
  146:8
  148:4
  158:19
  177:2
  189:24
  191:22
  193:16
  198:11
  199:7
  202:2
  222:4
  234:23
  235:1
  236:21
  237:5
  238:10
  253:20
  254:5
  260:8
  264:6
  272:20

  273:9
scale 82:15
  82:23
  102:11,18
scan 221:3
scenario
  247:21
scholastic
  33:21
  95:23
  267:24
  269:19
school 1:11
  5:21  13:17
  68:12,13
  74:14,15
  75:1,2
  82:10
  89:12  90:1
  103:2,5
  108:3,8,14
  111:12
  170:19,23
  171:7,17
  172:5,13
  173:3,12
  173:23
  264:9,10
schools
  111:17
  267:22
  270:1,6,17
science
  27:23
  35:11
  64:17
  77:12  78:3
  84:19  85:8
  130:12
  144:9
  146:14,16
  157:24
  223:16
  224:2,8
  235:8
  258:17
  259:1
scientific
  18:22  36:9
  36:13,19
  36:23  37:3
  37:10,16
  46:12

57:20
  144:10
  155:12
  184:11
  222:23
  224:12
  281:12
  283:1
scientif...
  35:15  38:2
  38:10,19
  38:21
  177:22
  204:10
scientist
  27:20
  37:21  77:1
  77:8  85:4
  117:14
  144:5
  150:4,5
  152:8
  174:4
  177:23
scientists
  151:13
  152:3
scope 86:18
  108:16
  167:2
  174:10,18
  176:21
Scottsdale
  7:9
screen
  193:11,12
  195:17
  286:19
scrotum
  256:4
SCRUGGS 7:6
se 43:14
  48:17
  70:16  79:2
  109:4
  138:22
  170:9
  232:14
sealing 12:5
second 22:12
  28:5  35:23
  45:13,15
  49:3  58:3

77:14
  78:10
  80:13
  120:7
  146:8
  158:10
  180:5,7
  190:6
  193:9
  217:8
  225:2
  236:16,21
  244:5
  246:15
  253:20
  287:1,2
secondary
  1:10  5:21
  13:17
  108:7
  117:5
  170:19
  171:6,17
seconds
  100:19
section 69:9
  114:15,19
  116:20,22
  139:23
  202:5
  225:3
  287:5
see 17:9,13
  19:14  21:9
  22:13
  25:22  28:6
  29:13  32:8
  32:16
  33:10
  35:21
  38:14  41:2
  43:1  45:19
  51:14
  61:14,21
  65:23  67:3
  68:5,23,24
  69:4,9
  70:1  72:19
  73:16
  78:15  79:1
  82:12  84:7
  89:22
  101:1,4

104:16,18
  108:4,9
  111:7
  114:13,22
  117:12
  118:11
  120:13
  123:3
  124:20
  126:8
  129:7
  132:2
  135:19
  136:24
  139:22
  140:1,21
  146:11
  147:15,19
  149:12
  150:17
  153:14
  156:15
  157:12,12
  157:20
  158:16
  163:4
  164:5
  165:17
  168:10
  175:5
  184:4
  185:2
  191:9
  192:12
  194:11
  195:24
  199:21
  200:24
  201:17
  202:3
  214:11,23
  216:22
  218:11
  222:18
  224:14
  225:2
  228:6,7
  236:22
  237:10
  241:7
  245:10
  259:2,3
  260:4,15

260:16
265:5
268:4,11
273:2,19
283:4
286:15
287:5,9
**seeing**
120:24
121:9,20
200:22
236:20
261:14
**seek** 24:5,16
**seeking**
23:24
24:22
185:4,24
186:5
212:1
**seen** 64:5,8
121:9
139:4
157:9
161:23,24
245:18
247:22
259:18,21
**segregation**
287:4
**self** 143:20
143:21
241:4
**self-dia...**
200:17
**self-dia...**
200:24
**self-pre...**
200:17
201:2
**self-rep...**
284:8
**Semenya** 54:3
55:1 65:14
**seminal**
225:1
**senior**
184:12
**sense** 55:23
58:10
126:11,11
143:8
176:12,15

227:21
239:5
285:10
**sensitive**
26:14
**sent** 189:4
198:13
258:24
**sentence**
18:21
19:10
20:23 21:5
22:13,15
26:2 29:8
30:1,3,8
30:11
32:10
33:17
35:24
36:15 49:5
64:21
77:16,21
78:10
80:11,13
84:2 100:9
114:18
115:12
119:2,3,3
120:8
129:1
137:8
146:8
149:8
150:10
151:19
153:7
192:6,10
193:24
195:12
199:11
214:7,21
253:21
287:13
**sentences**
159:19
227:10
**separate**
20:12,24
21:13,24
157:15
241:5
**separated**
62:9,12

**separately**
243:15
**separating**
121:23
**separation**
63:8,13
**September**
161:13
**serious**
235:2,16
235:23
**serve** 285:4
**served** 41:13
71:11
113:21
**serves** 17:5
**service**
26:18
**services**
12:15
252:8
**serving** 85:3
**set** 29:16
30:17
31:15
71:15
92:21
135:18
186:16,21
205:23
**sets** 198:3
204:15
**setting** 55:9
151:7
182:10
194:17
204:10
277:7
**settle** 279:2
**seven** 89:22
112:14
202:9
203:5
218:6
278:7
**severe** 186:2
236:17,21
236:22
237:18
**severely**
236:23
**sex** 43:20
62:9,12

63:8,9,13
69:18
117:5
143:16
165:5
179:5
213:21
231:15
233:23
237:22
241:15,22
242:5,12
242:13,19
244:2
245:11
247:2
253:24
254:2,8
257:20
287:10,11
287:13,16
287:24
288:3
**sex-based**
155:6
156:3
158:12
159:5
**sex-sepa...**
19:18
**sexes** 94:1
**sexual** 55:2
166:2,4,6
166:6,11
217:13
218:10
233:22
253:22
**shape** 129:3
**share** 149:15
208:6
**sheer** 21:19
**shifted** 29:5
56:11
117:24
**shifting**
221:20
**shifts** 83:23
**shoes** 48:11
**shooting**
225:12
**short** 15:23
61:3

100:16
112:13,20
113:5
152:22
156:11
203:19
244:19
248:15
266:9
**shorter** 73:5
**shortly**
44:13
**show** 37:18
40:23
46:12,21
76:2,11
88:20
94:11,12
194:2
243:5
258:5,18
261:23
263:6
281:5
**showed** 73:11
100:14
263:1
**showing**
15:10
41:16
93:22
246:11
262:3
**shown** 94:10
**shows** 46:11
94:14,21
**shrink**
129:19
**shrinking**
130:23
**shrinks**
129:19
130:23
**shuffle**
87:10
**Shuman** 5:17
**shuttle**
100:23
**sic** 28:13
**side** 167:4
212:9
**signaling**
106:15

significic...
84:9 184:7
184:16,17
**significant**
23:13 25:8
35:17 36:5
49:24
62:21
67:14,24
68:7,15,18
68:24 69:1
69:3 77:3
77:6,7,9
77:13,14
96:19
98:18
102:12
103:20
104:23
119:13
168:18
169:12
170:3
184:9,10
192:1,11
214:9
**signific...**
18:24
58:20
147:7
205:11
**signing** 12:5
**similar** 78:7
100:20
106:2
121:21
122:3
140:22
215:5
286:7
**similarly**
203:9
**simple** 89:1
151:7
172:22
**simpler**
67:18
**simplify**
88:21
**simplist...**
160:7
**simply** 16:19
43:15 47:4

48:7 72:24
74:11 81:3
82:1 87:2
88:24
96:23
107:19
109:11,15
125:17
136:16
137:11
140:10,11
146:17
148:2
161:4
167:13
174:15
176:21
187:6
192:22
197:4
213:2
230:16
231:24
240:11,23
241:22
242:16,24
263:10
264:18
271:15
272:2
275:19
276:6
282:13,21
**Sinai** 119:21
183:18
184:19
186:12
189:15
192:2,12
196:14
199:9,16
202:14,24
204:5
206:11
207:5
208:16
209:12
212:16
213:1,4
248:22
250:5,9,14
**Sinai's**
189:8

**single** 73:11
109:21
**sit** 23:3
34:19
62:19
71:19
73:21
109:20
157:6
220:20,23
221:8
271:3,3
**sits** 95:15
281:9
**sitting**
86:12
121:11
152:7
219:5
274:10
281:7
282:13
**situation**
23:22 96:2
103:16
176:2
272:2
280:15
**six** 57:7,10
57:20 94:5
95:3,6
100:9
134:1,7
139:11
163:21
202:3,8,21
202:23
218:6
239:8
253:17
278:6,17
278:23
279:2,3
288:10,11
**six-percent**
98:5
**six-year**
100:22,22
**sixth** 65:17
**size** 129:3
129:10,21
130:1,15
130:18,20

131:2
169:6
175:1
181:2
183:13
**skeleton**
129:2
**skills**
240:17
**slash** 117:6
**Slicer** 5:17
**slow** 53:3
**slower** 172:9
**slowly** 49:2
241:6
**small** 37:19
45:12 53:2
57:23
98:18
121:4,6
259:4
280:16
**smaller**
73:15
82:15
94:15
**smart** 181:16
183:15
**snippet**
260:21
**SOC** 183:20
193:17
194:7
197:21
**SOC-7** 190:24
195:22
204:10,15
204:21
205:8
**SOC-8** 205:9
205:10
**soccer** 139:6
168:21
169:15
**social** 45:18
63:9
101:18
190:11,13
193:8
232:5
235:8
**socially**
239:22

240:10
**societal**
32:7,20
262:8,12
263:10
**society** 9:14
19:18
32:12 34:5
34:13
37:20
113:13,17
116:7
123:10
126:2
215:13
247:19
270:13
**society's**
113:23
216:7
**solely** 154:1
168:13
**somebody**
33:23
43:15,16
66:14 87:2
110:1
165:22
185:20
219:21
220:24
223:20
230:12
233:16
282:14,17
283:10
**someplace**
268:11
274:4
**somewhat**
143:8
160:7
284:21
**soon** 99:17
**sophisti...**
103:3
**sorry** 20:7
24:12
27:13
40:13 42:2
44:3 46:19
56:9,15
58:21

65:20 77:8
81:21 83:7
87:13
137:10
168:12
171:8
173:8,20
179:9
192:7,9
207:21
210:2
212:18
214:17
217:5
238:18
241:24
259:13
266:1
270:6
286:14
**sort** 35:20
120:3
131:15
157:9
226:16
231:7
241:20
**sorts** 60:7
101:15
116:1
**sought**
182:23
183:7,9
245:8
**sounds**
243:16
281:17
**source** 26:13
26:13
87:19
136:10
193:9
253:21
268:10,22
270:19
**sources**
166:10
206:17
**South** 63:20
**Southern** 1:2
12:19
**space** 32:21
215:13

219:19
271:7
280:22
**span** 127:7
**speak** 87:9
131:17
213:11
**speaker**
176:21
**speaking**
34:3 48:10
65:19 74:7
89:8 93:6
161:4
177:22
261:12,13
271:6
**Specialist**
12:14
**specific**
17:22,24
33:20
41:19
50:15
53:21 63:9
79:8
106:16,22
114:9
115:10,24
117:23
126:23
146:24
171:2,23
181:24
182:16
183:3,11
183:21
195:19
198:1
216:5
227:10
230:15
246:21
255:12
257:5
264:2
267:16
269:3
272:17
273:17
274:2,5,12
276:5,7,14
276:15,20

276:23
282:11
287:13
**specific...**
79:8 125:1
126:7
129:18
134:6,8
167:7
171:2
179:12
180:6
183:5
188:11
196:6
225:11
239:7
254:7
262:20
276:3,3
277:20
287:23
**specifics**
202:17
203:12
212:12
213:3
214:2
227:9
**speculate**
105:24
285:8
**speculative**
106:4
**speed** 138:22
138:24
**spirit** 276:6
276:6
**spoken** 170:1
**spontaneous**
125:4
**spontane...**
231:9
**sport** 9:8,10
9:13,22
15:24
19:12
21:16,17
22:3 32:24
35:20
38:13,19
39:9 42:12
47:24 48:4

50:15
51:15,19
52:1 61:12
62:20
63:13,19
63:24
93:10
97:24
98:24 99:4
103:2
146:10
150:14,23
151:4,4,12
152:1,9
161:11,12
161:17
162:6
164:1,2
170:22
273:17
274:12
276:14,16
282:6
**sporting**
162:11
163:7
258:9
276:19,22
277:3
**sports** 16:4
18:2 19:7
19:19 21:8
22:1 28:17
33:6 38:22
41:20,23
52:20
53:12,14
60:11
61:20 62:2
62:8,12,15
63:4,8
76:2,10
101:19
108:3
138:23
139:1,4,5
150:24
155:7
156:4
168:9,14
168:21
169:14
170:2

171:9,10
171:18
178:14,20
178:20,23
179:2,15
180:1
181:1
183:5,10
258:17
259:1
269:20,21
270:2,7
280:6
285:14
287:4
**spouse**
213:13
**spread** 68:10
**sprints**
100:16
**Sruti** 5:3
13:21
**SSAC** 288:23
**stack** 286:17
**stage** 33:16
79:4 118:9
118:19
119:14
122:9,18
123:10,15
124:1
129:10
131:15
238:20
241:9
242:2
**stages** 25:6
25:14
49:24 85:1
118:20
120:19
121:1
123:5
125:7
126:2
**stamina**
162:24
163:9
**stamped** 16:8
**stand** 190:15
**standard**
12:17
60:24 61:7

97404f30570fa379...0738

71:15
113:2,9
141:5,6
152:19
153:2
185:5
186:16,20
186:22
187:1
203:16,23
235:10
248:12,19
266:6,13
289:6
**standards**
46:5 120:8
186:21
**standing**
100:18,24
**stands**
145:11
**start** 53:1
53:19 71:1
86:15
94:19
100:18
107:8
118:6
131:6
133:4,15
182:2
205:5
253:8
258:7
**starting**
117:3
147:18
153:12
**starts**
287:10
**starving**
112:16
**state** 1:8,13
2:2 5:11
5:14 12:11
12:21,24
13:8 22:9
76:1 82:7
108:2
124:21
125:1
128:11
131:20,23

164:16
170:17
183:13
191:24
210:8
222:23
253:6
259:20
285:13
287:14
288:5
**stated** 49:6
96:6
118:17
122:12
188:7
192:13
**statement**
18:8 41:11
45:21 66:6
67:11
69:13
76:19,23
78:18
84:10
96:23
97:13
109:17
114:18,24
115:10,15
115:15,18
117:15,16
124:22
125:14,17
128:17
145:14
148:2,14
151:7
161:13
163:16
164:20,24
215:15
216:3,5
217:22
235:3
256:19
264:17
266:23
267:9
271:12
275:13,16
276:4,13
287:20,21

288:4,6
**statements**
125:21
159:17
215:12,17
216:8
**states** 1:1
12:19 73:7
115:12
158:9
162:21
163:22
217:11
285:22
**static** 66:12
66:17
**stating**
139:14
160:14
221:15
272:2
**statistic**
111:13
**statisti...**
77:13,14
104:23
167:8
**statistics**
70:7,10
73:19,22
112:9
181:14,15
**status**
169:10
**staying** 34:2
**step** 38:1
131:12
209:1
223:4
283:20
**stepping**
229:6
**steps** 76:14
**Steptoe** 6:4
**stick** 73:5
**stipulated**
12:3
**Stock** 12:13
**stop** 247:4
248:1,3
**stopped**
247:7
**story** 182:18

**straight**
88:11
90:19
140:24
**strategies**
160:15
260:11
**Street** 4:5
5:5,18
6:12 7:8
**strength**
70:1,1
110:23
132:6
145:18
149:9,16
149:24
162:24
163:9
175:2
180:4,6
181:2
**stretching**
79:3
**strictly**
135:1
204:4
211:11
**strike** 35:24
53:3 107:8
122:7
**strong**
145:13
236:9
**stronger**
19:1
100:20
215:11
**strongest**
61:12
136:2
**structure**
33:17
64:18
136:9
**structured**
228:10
250:16
**structures**
218:3
**student**
111:11
**students**

82:10
270:18
**studied**
88:16,17
126:20
130:9
131:4
134:11
141:18
162:13
**studies** 92:4
101:17
131:14,24
132:5,10
132:15,19
132:20,22
134:22
136:5,5
150:7
162:22
163:8,17
180:7
181:6
227:11,13
245:22
246:21
255:7,12
258:5,8,12
262:7
277:17
282:10,13
283:20
284:1,3
**study** 92:21
94:8
100:21
101:3,4,6
134:16,21
134:22
135:1,2,3
135:15,16
135:24
136:9,11
139:15
140:8
141:21
143:18,21
147:5
150:7
157:23,23
158:7
165:21
186:11

224:12
225:1,6,8
225:11,12
226:2,3,18
226:23
227:2,12
228:10
230:5,16
230:22
231:2,3,21
231:24
232:3
233:4,7,11
235:22
236:2
239:9
241:12,12
241:19
242:1,6,7
242:10,16
243:1
246:10
255:14
261:4,6,14
261:21
262:21
267:15
278:4
282:10,11
283:10
284:5,9
**studying**
142:22
**stuff** 14:21
89:20,20
**Stutler** 1:14
6:8  13:15
**subject** 22:9
42:17  46:8
53:24  55:4
136:18
138:8
146:18
152:11
163:18
172:17
181:17
183:15
**subject's**
242:18
**subjective**
45:17
202:16

**subjects**
119:18
144:4
179:15
185:23
186:10
237:21
239:21
**submission**
73:7
**submitted**
176:6
**subpoena**
210:19,19
**subsequent**
18:19
71:21
156:11
**subseque...**
245:8
246:24
**subset**
221:24
**substantial**
41:4  51:1
124:3
137:23
**substant...**
40:10,14
48:1,8
132:5
159:23
**substitute**
49:4
**subtler**
131:11
**suffer**
165:24
167:5
181:10
196:9
218:19
219:12
220:8
**suffered**
55:1
236:15
238:23
**suffering**
221:12
**suffers**
181:20
182:13,22

235:23
**suffice**
65:18
**sufficient**
38:12,18
62:14
66:24
118:19
147:12,23
148:6,18
**sufficie...**
33:7  51:17
126:20
143:11
155:6
156:3
158:13
159:6
245:4
257:7
**suggest**
76:21
84:18
112:11,13
122:23
149:9,24
197:14
208:19
260:12
**suggesting**
85:23,23
119:4
147:22
195:20
197:17
242:21,24
245:23
268:22
**suggestion**
29:4
254:19
**suggests**
116:14
130:12
261:6
**suicidal**
202:22
203:10
**suicidality**
246:12
**suicide**
202:2,8,9
202:20

244:23
245:14,16
245:21
**suicides**
246:1
**Suite** 5:19
6:13
**sum** 136:18
215:16
**summaries**
134:8
**summarize**
139:14
151:8
228:18
236:2
**summarized**
102:2
186:9
228:1
**summarizes**
147:6
**summarizing**
69:9
128:11
**summary**
72:20
73:19
76:22  88:4
101:11
147:21
157:16
160:1
236:10
**superfic...**
162:16
**SUPERINT...**
6:16
**Superint...**
1:13,16
6:8  13:12
13:15
**superior**
98:16
**supervise**
184:20
**supervised**
126:24
127:4,10
201:18,18
**supervisor**
184:13
**supervisory**

216:22
**support**
168:7
189:19
190:1
191:23
193:17,20
194:8
195:1,13
215:17
216:3
224:5
260:9
267:12
**supporting**
160:14
162:5
213:23
216:12
224:21
**suppose**
206:17
**supposed**
165:9
**suppress**
28:13
213:20
**suppressed**
33:13
70:18
84:21
85:10
130:15
144:1
**suppression**
60:15
70:11
117:3
122:24
130:4
131:8
132:6,16
134:17
137:18
144:16
155:5,12
156:2
163:3
180:3
**sure** 26:21
44:20  52:8
71:17  75:7
77:2  78:6

103:14
127:15
160:4
178:12
196:8
223:19
238:7
248:8
260:22
281:5
284:7,12
**Surely**
190:18
**surgeons**
239:12
**surgeries**
200:23
206:6,7,10
206:13,14
207:1,5,19
208:1
211:13,16
211:17
212:8
250:17
251:8
252:8
**surgery**
144:19
183:21
185:10,15
185:17,19
185:24
186:5,11
186:20,24
187:20
188:3,20
189:4
195:5,14
196:9
197:20
198:3,5,13
198:16,24
200:8
206:24
212:2
228:19,22
228:23
230:23
238:11,14
244:16,22
244:23
245:8

246:24
247:10,11
247:12
250:8
**surgical**
189:15,16
222:1
226:20,21
**surgically**
237:23
239:22
240:10
**surpass**
66:21 67:7
**surpassing**
159:23
**surprising**
190:18
**surrogate**
165:14
282:20
283:23
**surrogates**
148:22
**surrounding**
130:22
**survey**
111:19,20
120:5
121:12
135:7
165:22
227:11,11
229:22
**surveying**
243:22,23
**surveys**
111:14
181:13
246:18
**Susan** 6:3
13:13
288:20
289:1
**suspect**
98:18
140:6,7
222:4
**Swaminathan**
5:3 13:21
13:22
104:6
**swear** 14:8

**SWORN** 14:12
**symbols**
161:11
**symmetrical**
93:18
**symptoms**
201:22
**system**
200:15
**systematic**
50:19
109:5,19
146:9
227:13,14
**systemat...**
49:12 50:8
50:9
273:15
280:23
**systems**
269:21

———————
**T**
———————
**T** 12:1,1
**tab** 16:1
44:2,3,4
75:11
90:24
113:15
133:8
142:6
145:20
156:13
161:14
183:17
216:15
225:17
233:24
253:14
**table** 27:24
87:14
143:2
189:12,13
193:6
195:21
197:22
201:21
202:4
**tailored**
175:3,19
**take** 32:6
33:23
47:24 57:5

60:22
68:12 75:9
75:10
76:14 78:4
86:8 87:6
88:11
104:1,4
112:13,20
124:11,13
131:12
141:18
147:2
150:9
153:4
154:23
165:5
168:4
203:14
213:10
230:1
239:13
245:9
248:5
250:11
253:8,17
259:17,24
266:2
286:10
**taken** 3:3,4
3:7 12:17
33:14,15
34:7,8
61:3 62:14
111:22
113:5
126:10
132:21
152:22
157:16
201:6
203:19
248:15
266:9
**takes** 195:17
**talk** 40:17
47:4 49:10
121:3,14
121:17
273:14
**talked** 215:6
274:15
284:13
**talking** 27:8

27:20
33:11
39:22
42:15
43:15
49:10
78:20 98:8
121:4
122:6
138:9
140:9
151:5,5
152:8
154:6
198:16
216:4
219:6,19
224:16
245:14,15
251:11
254:17
258:14
265:13
269:7
272:9
274:21
284:8
**taller** 48:8
48:9
**Tangpricha**
127:22
**Tanner** 25:6
25:14,15
49:24 79:1
79:4,8
81:11
118:9,17
118:19
119:7
120:10,10
120:19
122:9,13
122:17,21
123:5,6,6
123:10,15
123:20,24
124:22
125:6,18
126:9
**target** 29:11
29:16,21
**task** 40:11
71:12

**teaching**
269:8,12
**team** 172:6
172:14
173:4,13
173:24
174:8
175:10
201:1
264:9
**teams** 84:4
168:9
**technically**
203:8
**teenagers**
240:21
**teens** 243:22
**Telfer**
110:22
**tell** 22:18
23:2
112:15
128:5
146:13
184:10
209:24
212:14
221:11
241:9
244:11
250:4,13
251:5,11
253:10
274:9
275:20
278:22
**telling** 28:2
96:12
**tells** 93:17
205:21
**ten** 28:20
29:3 91:14
91:16 93:2
93:11,12
93:15,15
94:4,15,23
98:2 281:2
281:8,12
281:14
**ten-year**
97:15
**ten-year...**
97:19 98:1

**tension**
17:10
26:14
**tentatively**
260:12
**term** 44:12
77:12
177:3
180:14
194:13
218:9,13
221:20
238:3,7
244:17
287:14
**terminol...**
221:19
**terminology**
24:9,20
55:7 70:14
88:1,22
102:4,15
102:22
103:8
105:6
132:15
143:15
166:5,14
194:15
218:4,15
**terms** 17:6
30:4 50:2
79:1 85:4
93:9
121:20
126:23
131:1
136:16
155:16
159:16
165:21
166:7
167:1
177:23
181:13
182:10,10
184:7
196:19,23
204:18
206:3,23
219:23,24
220:1,1
221:16,17

264:18
271:17
274:4
278:8,9
287:10,11
**test** 44:12
80:7 147:8
220:21
221:9,11
222:3,6
223:14,19
223:20,21
224:6,14
224:15,16
282:23
283:4
**testable**
224:7
**tested**
100:18
**testerone**
28:13
**testes** 199:3
237:5,15
237:18
238:5
256:4
257:21
**testified**
14:13
28:10
49:15,16
120:15
128:21
197:19
204:1
**testimony**
51:1 69:10
72:20
87:11
208:13
210:22
278:17
**testing**
135:17
213:19
224:11
**testoste...**
26:11 28:5
28:14
29:11,18
30:20
31:16,24

32:11 33:2
33:13,21
35:17
38:17,23
41:14
43:20 53:7
56:5,17,24
57:6,9,12
57:19,21
58:2,7,13
58:18,19
59:3 60:14
61:13
69:18
70:11,17
74:20
78:11
79:10,18
79:20,23
80:19 81:3
81:17
129:11,17
129:19,23
130:4,15
130:21
131:7
132:6,10
132:16
134:16
136:1
137:18
144:1,15
148:21
153:12,24
154:1,5,17
155:5,12
156:2
160:9
163:3,11
177:7,20
179:24
180:3
254:11,16
254:20
255:4,8,15
255:23
256:5,18
257:14,19
257:22,24
258:3,6,9
258:13
260:10
261:7,8

265:4,13
265:16,16
265:18,19
266:16,17
277:1,21
277:22
278:12
281:24
282:1
283:3,5
284:2,6
**testoste...**
38:12
**tests** 165:15
220:24
221:2,3,4
221:5,6
**text** 40:14
158:20
195:11
**thank** 14:20
14:20
16:24 17:8
31:1,13
47:21 50:6
64:19
142:12
161:20
171:12
238:18
288:13,19
288:23
289:1
**Thanks**
156:21
248:9
253:5
**theirs**
200:15
**theoretical**
58:1
**theoreti...**
197:24
**therapeutic**
242:3
**therapies**
120:2
200:20
**therapy** 84:6
132:1
136:22
137:13
147:12,23

148:6
149:10,18
150:15
151:13
152:2
189:21
199:18,20
199:24
200:6
201:9,10
250:6
284:13
**thigh** 69:23
**thing** 45:11
101:14
131:15
176:17,17
180:11
187:18
205:18
214:12
228:8
231:4,7
241:10
247:15
263:9
270:14
282:8,9
284:24
285:1
**things** 37:6
38:9 57:18
64:20
71:23
93:10
97:12
118:10
124:12,17
124:23
135:9
151:19
159:14
177:6,12
187:15
200:15
202:2
204:15,17
205:3
206:3
219:18,19
241:17
251:14,19
**think** 16:17

19:23 34:3
34:4,11,24
36:12 39:3
40:10,13
44:11,12
45:10 58:3
59:1 63:4
64:6,9,11
67:16,20
71:17 89:3
89:6,22
95:22
101:14
109:10
112:18
115:10
124:23
127:5
128:17
135:12,20
137:2
140:9
147:3
155:17
156:23
159:16
164:10
167:1
168:3
169:3
176:2
178:15
180:21
181:18
182:12
187:9
196:5
197:3
204:1
205:3
206:20
209:5
210:5
212:10
221:17
222:7
229:21,22
232:2
242:20
245:3
254:14
255:11
256:22

262:19
263:5
271:24
272:17
273:16
274:4,12
274:12
276:17
278:16
284:4,5
285:1
286:13,14
**thinking**
23:3,11
71:24 77:1
95:23
194:21
221:17
239:15
251:15,17
282:15
**thinks** 238:4
**third** 17:9
69:15,20
84:2 137:7
153:7
195:13
197:4
253:21
287:7
**third-party**
210:19
**Thomas**
110:19,20
110:21
**Thompkinson**
101:5,7,11
**thought** 56:1
275:17
**thoughtful**
87:3
**thoughts**
149:2
202:22
**thousands**
73:15 74:3
74:23
**three** 31:15
73:8 88:9
90:7 91:20
93:1
128:16
149:10,17

162:19
186:19
188:12,15
266:21,22
278:6
**threshold**
28:16,17
28:20
29:11
30:17
31:14,15
54:21,23
55:9,10,11
57:13 58:4
60:9
118:12
277:10
278:13
283:11
**thresholds**
29:9 31:8
282:1
**tied** 68:7
**tier** 39:1
**tiers** 203:10
**tightened**
95:4
**tighter** 95:5
**time** 12:16
12:17
14:18
25:16 29:3
40:19
45:18 46:5
59:13
60:24,24
61:7,7
64:13
75:23 81:9
84:12
100:24
103:24
113:2,2,9
113:9
117:18
118:18
127:12
134:23
137:3,23
139:19
152:19,19
153:2,2,24
154:2,8,23

168:4
169:4
187:12,21
188:20
189:21
203:15,16
203:23,23
207:13
213:10
218:2,5
220:3
229:3
240:23
243:6
248:8,11
248:12,19
248:19
253:5
254:17
266:6,6,13
266:13
281:14
284:16
288:9,13
289:2,5,6
**time-con...**
192:16
**times** 9:17
31:15
61:13
142:4,8
143:12
144:23
186:19
188:12,16
206:10,15
206:21
**tissue**
130:11
**tissues**
23:16
80:20,21
129:17
130:17
132:11
146:22
**title** 146:8
146:8
157:12
**today** 12:15
23:3 34:19
39:14
62:19 64:7

67:19
73:21
85:16
86:13
109:20
111:16
118:8
145:12
151:14
152:3
219:10
220:4,20
220:23
221:8
253:5
258:24
274:10
284:5
289:2
**told** 43:3
128:18
**Tommy** 98:22
**tools** 210:22
211:2
**top** 22:22
35:6 53:16
54:11
94:16
108:18
110:2,11
110:13
117:2
179:20
192:13
195:3
226:2
244:24
252:5
259:22
266:22
281:10
**topic** 134:9
146:20
**total** 206:10
207:17,23
207:23
212:14,23
250:4
251:23
**totaled**
252:4
**toughness**
260:10

**track** 53:18
53:23
65:14
67:23
68:13
139:6
140:23
244:15
**tracking**
286:6,8
**trained**
147:9
**training**
179:4,6
191:5,8
269:12,14
**trans** 147:7
149:9,17
158:14
159:7,20
160:15
250:17
251:7
**transcript**
1:22 172:3
249:1
**transfem...**
23:23
**transgender**
9:7,12,15
9:17,21
15:24 16:4
23:20
24:21
25:12
26:12
29:10 30:6
30:14,16
32:13 33:5
39:9,15,22
40:24 41:5
41:16
42:15,21
46:13,22
47:1,13
49:5 50:7
50:20 51:2
51:11,13
55:3,10
57:9 58:6
70:18 84:3
84:17,24
85:14

88:23
98:23 99:3
104:16
105:11
106:1,10
107:16,20
108:2,6,19
109:19
111:4,12
111:14,18
111:23
112:1,5
115:9,21
116:1
119:17
120:2,8
126:7
127:5,20
128:1,19
129:15
130:8
132:11,17
132:18
134:22
136:22
137:13
139:18
140:8
142:5,9,16
142:20
143:11
145:17
147:9
150:13
151:3,11
151:24
160:10
161:10,17
163:1,10
163:18,24
164:1
168:8
169:1,5
170:18
171:2,16
173:15,22
175:3
179:1,23
182:1
183:21
196:16,20
197:7
200:2

204:18
217:12,22
217:24
218:18
219:11,20
220:7,12
220:19,22
221:1,7,18
221:22
222:1,4,5
222:10,17
223:2,7,20
225:7
229:23
230:13,14
231:22
232:1,4,7
232:14
233:2,8,14
233:18
240:6
241:7
242:21
243:24
245:23
246:4,12
250:8
266:24
267:6
285:20,21
286:1,4
**transition**
34:21
145:17
232:5
**transiti...**
42:11
239:22,23
240:10,10
**translates**
283:5
**treat** 119:19
122:17
230:23
**treated**
42:23
47:15
48:23 51:6
56:6,18
57:14
58:14 59:4
158:15
159:7,20

160:10
**treating**
119:13
247:19
**treatment**
23:21 24:6
24:17,22
25:17
29:12 30:7
38:12,17
49:19 85:1
113:11
114:11
116:4
127:1,4
129:5
132:11
143:19
145:3
151:5
156:10
158:12
159:5
200:4
222:8
247:4
**treatments**
86:22
179:24
247:7,7
**trend** 206:24
**trial** 208:21
**trials**
213:19
**tribunal**
72:20
**trick** 44:20
77:20
137:17
**tried** 202:9
242:22
**trigger**
256:14,17
**triggers**
256:7
**trivial**
81:24
**true** 22:5
27:21,21
31:23
48:19,20
49:12
50:14 51:3

66:1 67:5
74:1,3,11
74:12,22
74:24
76:19 77:2
79:24
81:10
83:17
106:12
107:4
115:15
124:19
126:10
139:1
161:6
183:11,14
219:10
220:6,12
222:6
223:1,10
223:11,18
224:15
240:15
260:18,18
278:12
283:2
285:10
288:3
**trust** 206:21
**truth** 240:12
265:14
**try** 131:18
148:19
151:20
166:24
250:12,22
268:17
274:5
**trying** 21:12
29:2 32:22
87:2 135:9
172:2
178:7,15
181:5
192:18
205:3
221:21
227:19
241:13
**Tryon** 5:10
8:8 13:7,7
15:7,14
66:16 87:9

210:1,1,4
243:10,19
247:23
253:4,6,13
253:16
255:6,13
255:19
256:6
257:1
258:1,23
259:5,13
259:15
261:1,15
262:1,10
262:23
263:12
264:4,20
265:17
266:14
268:16
269:5
270:5
271:8,20
272:3
274:7
275:1,6,8
276:9
277:23
279:1,14
280:7,18
282:2
283:24
284:23
285:23
286:18,23
288:8,12
288:20
289:3
**turn** 40:4
44:14
45:13
61:10
64:18,21
65:12 66:9
69:7,8
72:18
100:8
107:23
114:7
117:1
128:24
149:4
162:19

163:21
164:13
214:6
227:23
248:4
267:17
272:5
**turning**
150:5
236:3
**turns** 247:18
**twice** 137:17
137:21
**two** 16:19
28:4 32:6
40:6 71:11
71:18,22
77:9 91:18
93:1 96:15
107:18
116:17,23
118:10,14
119:2
128:17,24
129:1,23
131:24
134:7,23
136:5,17
136:21
137:12,17
137:21
141:9
146:18
159:19
167:1
170:7
181:6
190:1
191:23
192:2,4,5
192:8,9,14
192:20,22
194:24
215:19
217:3,4,15
224:12
234:15,23
237:4,7,8
238:22
248:23
250:3
255:22
264:22,24

274:13
283:15,19
284:1
288:13
**two-para...**
157:18
**two-thirds**
199:8
237:5
**type** 82:24
83:4,10
96:2
132:22
156:24
191:6
238:23
**types** 273:12
285:14
**typical**
22:19
24:23
25:21 26:5
26:12 27:3
27:12,16
52:2 56:23
78:20,23
81:17
121:9
129:16
130:14
131:9,10
168:19
169:13
170:4
182:20
199:1
226:11
247:21
**typically**
82:11
177:9,17
177:17,18
184:12
185:18,20
199:1,2
247:17
254:8,14
255:24
256:4
257:9,11
**Tyron** 252:11

_____ U _____

**U** 12:1
**Uh-huh** 50:23
190:8
**UK** 161:12
163:7
**unable** 61:18
62:1
**unaffili...**
194:20
**unanimity**
205:17
206:4
215:7,7
**unanimous**
205:19
**unanimously**
205:14
**undergo**
23:24
201:10
**undergoing**
24:17
**undergone**
49:17 51:2
143:19
**underlying**
214:10
**underneath**
287:7
**underpin...**
106:22
**underpin...**
106:14,16
106:20
**undersigned**
3:5
**understand**
21:11 23:1
37:23
68:17 94:7
104:18
135:15
146:7
148:20
175:8
189:13
191:21
196:2
208:12,18
227:2
228:8
250:23
254:19

272:16,18
273:5,9
understa...
29:16 30:9
62:6,11
89:19
92:24
104:21
115:23
116:6
125:15
129:9
142:23
143:3,5,17
149:16,22
158:1,5
175:7
211:23
understood
59:1 69:4
79:14 82:1
124:10
185:2
194:13
204:16
219:8
258:4
261:5
underwent
126:17
undesirable
117:4
undoubted
240:12
unfair 31:17
42:23
43:11
47:16
48:23 51:6
56:7,19
57:14
58:15 59:5
63:13
272:24
275:21
276:11
unfairness
37:2
unfortun...
63:21
156:14
207:6
unhealthy

138:16
unified 29:2
Union 4:4
United 1:1
12:19
162:6
universally
232:10
universe
189:1
197:13,15
198:13
University
71:3
243:21
245:22
246:11
unknown
35:15
38:10,19
38:21
107:4
214:8
unlicensed
191:5
unmute 66:15
unpack
151:20
unpreven...
273:1
unreliable
140:3
unstable
203:7
untrained
147:11
upper 29:17
29:21
30:19
31:16 32:1
69:22
upwards 91:2
urethra
256:2
urinate
256:3
use 50:2
72:23
77:12
88:24
119:23
122:20
124:21

133:1
135:12
139:15
146:16
167:18
169:5
177:3
180:14
194:15
196:17,18
201:24
204:12
221:18
227:14
250:24
273:13
277:3,6,9
280:4
281:23
282:3
useful
164:18
167:23
168:1
256:10
usefully
108:18
205:4
uses 236:16
usual 91:10
91:12
usually
72:16
utero 220:18
223:12,23
254:10

_____

V

vaguely 72:5
185:15
238:7,8,9
vaginal
185:14
vaginas
186:7
vaginopl...
185:5,9
196:9
198:17,23
199:18
206:12
vague 72:5
202:13

vaguely
270:11
validity
117:16
171:19
value 36:21
37:10 38:3
38:7
117:10,22
200:13
279:11
variable
156:10
variation
92:7
219:23
280:24
variety
17:17 19:1
32:2
165:16
various
32:24 37:1
101:24
115:11
215:12
221:18
235:9
251:18
254:6
285:20
varsity
108:13
111:16
veracity
125:16
235:14,17
verified
144:24
VEROFF 4:11
versa 257:24
version 73:5
113:22
186:17
versus 12:21
36:3 37:5
37:19 42:3
42:15
49:12
51:17
107:16
151:6
185:6

189:15
262:8
263:9
270:17
278:11
vice 257:24
victories
111:22
video 12:13
12:16
videocon...
3:7 12:18
VIDEOGRA...
12:12 14:7
14:15,18
44:3 60:23
61:6 113:1
113:8
152:18
153:1
203:15,22
243:16
248:11,18
259:8,14
266:5,12
289:4
VIDEOTAPE
61:1,5
113:3,7
152:20,24
203:17,21
248:13,17
266:7,11
VIDEOTAPED
1:18 2:7
3:1 289:8
view 36:9
38:16
39:13
46:15
48:20
95:20 98:5
117:24
144:5
155:4
156:1
159:11
165:5
171:14,15
172:19,22
173:1,6,10
173:17,21
174:2

JA027847 0747

204:10
215:3
216:9
231:13
240:9
**vigorously**
245:5
**Vin** 127:21
**violate**
273:16
**Virginia** 1:2
1:8,10 2:3
5:14,18,21
6:12,15
12:20,21
13:8,11,17
84:2,19
181:10,13
181:14
182:24
183:5,8,10
183:13
247:24
253:6
**Virginia's**
85:8
**virtually**
38:22 68:6
**visible**
129:4
**visibly**
129:4
240:4,11
**VO2** 131:9
**voice** 129:4
**voices** 165:5
**vs** 1:7
**vulva** 237:24
**vulvi** 238:6

───────
**W**

**W** 1:11 6:16
**Wait** 144:23
187:23
232:2
**waiting**
212:9
**waived** 12:6
**walk** 256:22
**Wall** 5:5
**want** 15:2,4
23:9 32:12
57:22

72:22
85:22
88:11
100:6
115:21
116:18
121:24
124:11
127:15
131:3
141:9
145:5
150:6,7
157:14
158:19
194:22
199:10
200:13
205:5,5
208:24
209:1,5,12
210:18
222:8
232:18
245:10,13
255:1
259:20
261:20
273:14
274:5,23
282:22
283:3
284:11
287:12
**wanted** 111:5
191:21
253:8
**wanting**
206:23
**wants** 104:4
**wasn't**
182:16
231:8
239:4
240:7
279:16
**waste** 187:12
**way** 19:23
20:16 25:6
25:11
59:24
68:19 69:5
69:5 79:14

80:6 88:3
93:17 96:8
97:18
108:20
119:10
122:2
124:10,23
126:15
135:8,11
138:3
140:18
155:10
169:3
176:21
198:16
199:8
211:15,21
211:22
212:3,15
212:23,24
232:6
237:5
241:5
242:6
244:12
245:9
260:5
261:17
264:13
273:16
281:21
283:1
**ways** 224:12
**we'll** 104:1
135:12
**we're** 49:10
54:3 69:9
78:20
97:11
121:4
126:7
131:14
141:14
147:18
148:19
151:4,5
154:6
180:23
185:9
193:11
197:17
198:16
202:4

210:17,23
213:2
216:4
219:19
221:17,20
221:21
244:18,20
245:5
246:7
251:11,22
258:14
260:5
265:12
274:21
282:9
286:21
**we've** 122:7
139:4
153:17
157:17
204:17
221:19
243:12
**weak** 53:2
**weaknesses**
235:5
**website**
157:10
**Wednesday**
3:8
**weeks** 16:17
35:1
**weights**
282:18
**well-wri...**
88:4
**went** 26:12
69:17
135:21
198:2
**weren't** 31:5
197:4
**West** 1:2,8
1:10 2:2
5:14,21
6:15 12:20
12:21 13:8
13:11,17
84:2,19
85:8
181:10,13
181:14
182:23

183:5,8,10
183:13
247:24
**whichever**
239:18
245:9
**White** 6:5
**wide** 95:24
96:1
103:16
212:4
273:11
**widely** 45:2
45:9,11
108:1
111:2
**wider** 207:24
**Wilkerson**
13:4
**WILKINSON**
7:4 16:1
44:2
113:15
133:8
142:2,6
145:20
156:13
161:14
216:15
225:17
233:24
253:12,14
259:2
286:13,16
**willing**
196:7
210:5
**win** 20:4,13
20:18,21
62:17
**winning**
112:6
**wise** 214:19
**wiser** 96:10
**wish** 52:1
**withdraw**
145:8
**witness** 8:4
12:23 13:3
14:8,11
15:22 16:8
16:22
17:21

| | | | | |
|---|---|---|---|---|
| 18:17 19:4 | 110:1,10 | 188:15,24 | 283:19 | 98:23 99:3 |
| 19:22 22:8 | 112:3,18 | 193:3 | 284:21 | 108:2,7,19 |
| 23:8 24:9 | 112:21 | 194:1 | 285:5,18 | 129:15 |
| 24:21 | 115:17 | 195:8 | 286:15,17 | 132:11,19 |
| 26:10 27:6 | 119:1 | 196:13 | 286:20 | 134:22 |
| 28:24 | 120:23 | 197:2,12 | **witnesses** | 136:22,24 |
| 29:20 | 123:13,20 | 198:23 | 244:12 | 137:14,15 |
| 30:11,22 | 124:7 | 200:22 | **woman** 57:9 | 140:8 |
| 31:20 | 125:11 | 201:13 | 139:19 | 145:18 |
| 33:19 | 126:6 | 202:12 | **womb** 223:23 | 147:7 |
| 34:11,12 | 130:7 | 204:14 | 254:10 | 149:10,17 |
| 36:7,12,23 | 132:9 | 205:16 | 255:2 | 150:13 |
| 37:15 38:5 | 133:19 | 206:1 | **women** 9:12 | 151:3,11 |
| 38:21 | 134:6,21 | 207:4 | 17:13 18:2 | 152:1 |
| 39:19 | 136:4,13 | 209:1,17 | 18:5 19:2 | 153:10 |
| 41:10 42:2 | 137:4 | 209:21 | 19:7,13 | 155:7 |
| 42:14 43:8 | 138:1 | 210:5,7,21 | 20:4,12,20 | 156:4 |
| 43:13 46:2 | 141:13 | 211:4 | 21:1,7,14 | 158:14 |
| 46:7 47:3 | 142:12,18 | 212:20 | 21:21 22:3 | 159:7,20 |
| 48:3,15 | 144:8 | 215:5 | 23:20 | 160:10,16 |
| 49:22 | 148:17 | 216:1 | 24:22 | 160:17,18 |
| 50:12 52:4 | 149:21 | 219:3 | 25:12 | 161:1 |
| 53:10 | 150:22 | 222:15 | 26:12 | 162:24 |
| 54:11 55:8 | 151:16 | 224:11 | 29:10,22 | 163:1,10 |
| 57:18 59:8 | 152:7 | 231:17 | 30:7,17 | 169:1 |
| 60:2 63:15 | 153:20 | 240:15 | 31:17,18 | 170:18 |
| 65:8 66:6 | 154:20 | 244:4 | 32:1,2 | 171:2 |
| 67:10 68:2 | 155:9 | 246:3 | 39:9,22 | 175:3 |
| 68:22 70:4 | 156:6 | 248:4 | 40:24 41:1 | 253:23 |
| 70:15 | 158:4 | 252:12 | 41:5,7,17 | 285:21 |
| 72:14 75:4 | 160:5,21 | 253:15 | 41:18 42:3 | **women's** |
| 79:22 | 161:4,20 | 254:24 | 42:12,15 | 47:14 |
| 80:19 81:6 | 163:16 | 255:11,18 | 42:15,21 | 48:24 |
| 82:18,23 | 165:9 | 256:21 | 43:1 46:13 | 108:12 |
| 83:7,14,19 | 166:13 | 257:17 | 46:14,16 | 109:23 |
| 84:23 | 167:11 | 259:3 | 46:22,23 | 111:17,23 |
| 85:12,21 | 168:23 | 260:24 | 47:1,17,24 | 137:23 |
| 86:7,19 | 169:17 | 261:12,20 | 48:4 49:1 | 171:16 |
| 88:2 89:11 | 170:8 | 262:6,17 | 49:5,15,22 | 285:13 |
| 91:9 92:1 | 171:1 | 263:4,21 | 50:3,7,20 | **won** 20:21 |
| 92:20 | 172:8,16 | 264:13 | 51:2,7,11 | **wonder** |
| 93:21 95:9 | 173:6,15 | 265:12 | 51:13,17 | 232:13 |
| 95:22 | 174:2,11 | 268:13 | 55:3,11 | **word** 21:3 |
| 96:17 97:8 | 174:19 | 269:1 | 56:8,20 | 77:3 81:24 |
| 101:14 | 175:13,22 | 270:24 | 57:2,15 | 88:2 98:5 |
| 102:5,16 | 176:9,20 | 271:15,24 | 58:6,6,6,7 | 106:6,15 |
| 102:23 | 177:16 | 273:24 | 58:9,16 | 106:21 |
| 103:9,14 | 178:6 | 274:20 | 59:6 61:13 | 109:3 |
| 104:8 | 180:21 | 276:1 | 61:18,24 | 133:1 |
| 105:7,19 | 181:22 | 277:14 | 62:16,16 | 148:18 |
| 107:2,14 | 183:2 | 278:21 | 62:17,22 | 150:1 |
| 108:17 | 185:14 | 280:3,12 | 69:20,21 | 170:14 |
| 109:10 | 187:4,23 | 281:21 | 70:18 | 175:23 |

176:9
194:18
196:8,17
196:18
204:2
224:15
227:14
236:16
269:1
273:5
274:6
285:24
286:4
**wording**
192:18
194:2
**words** 92:16
148:10
156:15
176:2
194:22
275:14
**work** 14:21
17:6 39:7
77:5 89:16
162:22
184:12
193:8
212:15
**worked** 60:6
142:14
**Worker**
190:11,13
**working** 60:8
247:20
**world** 26:20
28:8,12,16
60:9 71:13
74:22 82:8
136:18
139:21
182:2
277:15
278:2
281:5
**worth** 60:17
160:7
**wouldn't**
48:16
51:18
91:10
115:1
140:20

155:17
160:10
169:2
205:17
206:12
209:21
212:11
223:19
236:5
238:8
257:23
261:20
270:12
285:11
**WPATH** 183:20
185:5
186:16,21
187:1,8,21
188:4,7,13
188:21
189:5,14
189:19
190:24
191:2,22
192:19
193:7,17
194:7,19
195:22
198:1,6
201:21
202:13
204:10
**WPATH's**
187:14
196:5
**write** 40:8
84:1
107:24
108:6
129:1
184:23
214:7
**writing**
35:23
155:3
205:9
229:4
**writings**
105:13
133:24
**written**
20:10
66:11

84:17
115:2
119:3
124:22
156:7
160:7
163:13,16
179:1
189:23
215:20,21
218:2,5
244:5
**wrong** 87:16
214:12
231:11,12
**wrote** 18:3
20:24 21:5
31:8 40:5
40:14,22
65:18
66:20 86:3
97:3
104:12
124:22
137:12
163:17
174:23
175:8
240:1
274:2
276:4
278:2
**WV** 5:13,20
6:6,14
**Wyant** 6:11

_____
X
_____
**X** 8:1 257:8
257:14
**XX** 164:22
167:8
**XY** 164:22
167:8
182:21,22
183:3
225:15
226:4,8
228:2
230:11,19
232:21
257:11,18
_____
Y
_____

**Y** 90:15
257:8
**yeah** 19:6
20:19 38:5
45:10 49:2
53:16 60:2
82:18,19
91:9 120:4
137:4
145:10
147:3
150:12
187:4
195:15
197:2
233:15
252:2
256:21
261:12
263:4
268:14
284:12
**year** 73:11
78:13,15
80:16 81:2
90:7,7
99:9
137:18,21
208:2
250:22,22
250:24
251:1
**years** 40:17
100:14
108:8
136:21
137:13,17
137:21
149:10,17
159:24
170:20
171:7,18
207:2,6,8
207:8
218:6,6
261:9
**York** 4:6  5:7
12:11
200:2
206:10,15
206:21
**young** 243:22

_____
Z
_____
**Zoe** 4:12
14:5
_____
0
_____
_____
1
_____
**1** 5:12 9:5
15:6,16
75:10 78:5
131:21
**1.3** 116:24
**1.4** 114:10
116:3,24
**1.5** 136:23
137:14
147:8
**1.6** 66:23
67:14,23
68:7,11,14
68:18,23
68:24
**1.7** 29:10,16
29:20 32:1
**1.8** 141:4
**1:00** 141:10
**1:16** 152:19
**10** 9:16 90:8
92:13
133:7,8,10
139:13
**10:25** 60:24
**10:39** 61:7
**100** 243:22
**10004** 4:6
**10005-3919**
5:7
**101** 11:10
**102** 11:10,10
**103** 11:10,10
**105** 11:10,10
**106** 11:10
**107** 11:11,11
**108** 11:11,11
**109** 11:11,11
**10th** 75:14
**11** 9:17
82:11
104:12
105:24
142:1,8
261:9

**110** 11:11
**112** 11:11
**113** 9:14
**115** 11:11
**116** 11:11
**118** 11:11
**12** 8:3  9:19
  73:13  89:9
  89:20
  90:19
  91:21
  94:18,19
  94:21  95:2
  136:23
  137:14,22
  145:16,22
  159:22
  201:8,10
**12-month**
  139:19
  199:17
  200:6
**12:01:00**
  113:2
**12:14** 113:9
**12:45** 112:14
**120** 5:5
  11:12
**123** 11:12,12
**124** 11:12
**125** 4:5
  11:12
**126** 11:12
**127** 9:15
**13** 9:20
  83:17
  98:24
  156:10,18
  286:13
**13.8** 100:20
**130** 11:12
**132** 11:12
**133** 9:16
  11:12
**134** 11:12,12
**136** 11:13,13
**137** 11:13
**139** 186:10
**14** 8:3,6
  9:21  89:24
  90:1  95:16
  161:10,16
  225:17

234:19
237:6,15
237:21
238:11,12
238:17,19
239:21
**1411** 5:18
**142** 9:18
  11:13
**144** 11:13
**145** 9:19
**148** 11:13,13
**149** 11:13
**15** 9:5,6,23
  83:5,12
  89:9,23
  90:1  92:11
  92:12,14
  92:17
  95:13,15
  95:16,19
  183:17,24
  204:5
  243:3
**15-ish** 89:21
**15-year-old**
  97:20
**150** 11:13
**151** 11:13
**15100** 7:8
**152** 11:13
**153** 11:14
**154** 11:14
**155** 11:14
**156** 9:20
  11:14
**157** 11:14
  190:4
**158** 11:14,14
**16** 9:8  10:5
  11:4
  102:12
  157:1
  216:11,17
  224:21
  236:11,12
  238:11,13
**16.6** 100:17
  100:23
  102:19
  103:6
**160** 11:14,14
**1600** 141:1

**161** 9:22
  11:14
**163** 11:14
**165** 11:15
**166** 11:15
**167** 11:15
**168** 11:15
  189:11
**169** 11:15
  192:4
  195:3
  199:7
**17** 10:6  11:4
  35:6  90:2
  95:17
  100:14
  120:6
  124:9
  225:13,19
**170** 11:15,15
**172** 11:15,15
**173** 11:15,15
**174** 11:16,16
  11:16
**175** 11:16,16
**176** 11:16,16
**177** 11:16
**178** 11:16
**18** 10:8  11:4
  44:2,4
  78:14
  80:24  81:4
  81:17,24
  82:11
  118:12
  214:6,16
  214:19
  233:22
  234:2
  241:13
**18-ish** 90:1
**180** 11:16
**181** 11:16
**183** 9:23
  11:17,17
**185** 11:17
**187** 11:17,17
**188** 11:17,17
**19** 10:9  11:4
  11:4  90:8
  259:8,10
  259:13
**19-year-old**

177:2
**193** 11:17
**195** 11:17
**196** 11:17
**197** 11:17,18
**198** 11:18
**19th** 5:6
_____
        **2**
**2** 9:6  15:6
  15:18  79:1
  79:4,8
  104:10
  118:9,17
  118:19
  119:7
  120:10
  122:9,13
  122:18,21
  123:6,6,10
  123:15,20
  124:1,22
  125:7,18
  126:9
  253:12,13
**2.2** 122:22
  122:23
  125:17
**2:15** 152:15
  152:16
**2:18** 153:2
**2:21-cv-...**
  1:7  12:22
**20** 11:4
  61:13
  251:12
  252:9
  273:21
**200** 5:19
  11:18,18
  217:6,7
  218:17
**2002** 39:13
**2004** 233:22
  234:24
**2005** 10:6
  225:13,19
**201** 11:18
  100:8
**2011** 204:16
**2012** 204:16
**2015** 59:18
  118:1

136:11
141:17
142:5
145:12
146:13
216:13
218:7
219:7,20
**2016** 118:1
  207:7
**2017** 73:11
  113:13
  118:1
**2018** 76:17
  88:12
**2019** 127:21
**202** 11:18
**2020** 133:6
  134:11
  140:17
  157:2
  158:10
  159:3,12
  185:2
  207:9
**2021** 40:17
  75:14,23
  98:24
  145:17
  146:15,19
  161:13
  206:8,9,22
  207:14,20
  212:15,24
  250:9
  272:15,20
**2022** 1:20
  2:9  3:8
  12:15  35:6
  39:19  40:5
  40:17
  219:6
  220:11
  222:3,11
**204** 11:18
**205** 11:18,18
**207** 11:18
**20th** 4:16
**21** 40:5
  145:20
  186:15
**213** 11:24
**215** 11:18,19

216 10:5
219 11:19
22 11:4
  101:5
  107:23
  161:14
  170:17
222 11:19
224 11:19
225 10:7
23 11:4
231 11:19
234 10:8
241 1:20 2:9
  3:8 11:4,4
  168:5,6
240 11:19
244 11:19
246 11:19
24th 12:15
25 153:6
252 8:6
253 8:8
25301 5:20
  6:14
25305 5:13
254 11:19
255 11:19,19
256 11:20
257 11:20
259 10:9
26 11:4
  75:23
260 11:20
261 11:20,20
262 11:20,20
263 11:20,20
26330 6:6
264 11:20
265 11:20
268 11:21,21
27 11:4
  174:22
270 11:21,21
271 11:21,21
273 11:21
274 11:21
275 11:21,21
277 11:21
278 11:22
279 11:22
28 11:5
280 11:22,22

281 11:22
283 11:22
284 11:22
285 11:22
288 8:8,9
289 8:9
29 11:5
  140:9,11
290 8:10

--- 3 ---
3 4:15 9:7
  15:23 16:3
  16:12
  120:10
3,000 141:4
3:35 203:16
3:55 203:23
30 11:5,5
  100:19
  147:11,22
  148:5
31 11:5
3293 285:24
  286:7
33 11:5
  100:19
334 236:3
  237:4
34 11:5
35 272:10
351 69:8,11
357 69:7,12
  69:14
36 11:5,5,5
  272:11
37 11:5,5
  272:6
38 11:5,5
3879 114:7,8
3880 122:23
3881 117:1,2
39 11:6
393 72:18
  73:6

--- 4 ---
4 9:9 43:19
  43:23
  61:10 87:7
  88:12
  113:14
  286:14

400 6:5
400-meter
  73:9
41 11:6
42 11:6,6
  188:20
  197:20
  198:5
43 9:9 11:6
  11:6
432 227:23
433 234:18
  234:21,22
44 78:5,10
  80:13 82:7
  82:13
  168:2
449 260:1
45 267:18,19
  270:22
  271:9,11
  271:21
  272:1
456 65:12,17
46 11:6,6,6
  225:15
  226:4,8
  228:1
47 11:6
48 11:6,6
  75:10 76:1
49 11:6 84:1
  164:14,15
  164:16
490,000
  250:9
4B 265:1
4C 266:21

--- 5 ---
5 9:10 63:18
  63:23
  81:11
  113:15
  143:2
  239:21
  277:7,11
  281:1
5'8 48:10
5/10/21 9:11
  75:16
5:03 248:11
5:25 248:19

5:48 266:6
5:52 243:8
5:54 266:13
50 11:6
  69:21,24
  75:11,21
500 6:12
500,000
  250:11
51 253:14
52 11:7
  243:9
53 11:7
  183:17
54 11:7
  214:4
  216:15
55 11:7,7
  59:12,18
  131:20,22
  131:23
556 64:21,22
56 11:7
  136:20
  137:7
57 11:7
576 66:9,9
577 66:10,10
  66:20
58 40:4,4,22
  288:11,11
59 11:7

--- 6 ---
6 9:11 75:13
  75:16
6'10 48:13
6:31 289:5,8
60 11:7
  42:20
  47:12
  52:23 57:4
  69:22,24
  70:1 133:8
600 6:13
61 142:6
62 156:13
63 9:10 11:7
  186:11
65 11:7
  69:23
66 11:7
67 11:7

68 11:7,8

--- 7 ---
7 9:12 89:8
  89:11,17
  98:22 99:3
  183:20
  185:5
  186:17
  193:17
  194:7
7.5 54:21
70 11:8,8
  69:23
71 233:24
72 11:8
75 9:11 11:8
79 11:8

--- 8 ---
8 9:14
  113:11,17
  114:8
  238:17
80 11:8 70:1
800 66:23
805 61:11
81 11:8
813 88:12
82 11:8,8
  16:1
83 11:8,8,8
84 11:8,9
85 11:9,9
85,000
  100:14
  101:12
85260 7:9
86 11:9,9
87 11:9
88 69:8
89 11:9

--- 9 ---
9 9:15 89:8
  89:12,17
  92:12
  100:14
  102:11
  127:19,24
9,000 206:10
9.5 100:17
9.7 100:24

0752

**9.8** 100:16
  102:19
  103:5
**9:17** 12:16
**9:30** 3:8
**90** 11:9
**90th** 7:8
**91** 11:9,9
  69:15
**92** 11:9
**93** 11:9,9
**94** 111-4004
  4:17
**95** 11:9,10
**96** 11:10
**97** 11:10
**98** 11:10
**99** 9:13
  229:24
  230:2

0753

IN THE UNITED STATES DISTRICT COURT

FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA

\*   \*   \*   \*   \*   \*

B.P.J., by her next friend and      \*

mother, HEATHER JACKSON,            \*

    Plaintiffs                    \* Case No.

    vs.                           \* 2:21-CV-00316

WEST VIRGINIA STATE BOARD OF        \*

EDUCATION, HARRISON COUNTY BOARD OF\*

EDUCATION, WEST VIRGINIA SECONDARY \*

SCHOOL ACTIVITIES COMMISSION, W.   \*

CLAYTON BURCH in his official       \*

capacity as State Superintendent,  \*

and DORA STUTLER in her official    \*

capacity as Harrison County         \*

Superintendent, PATRICK MORRISEY in\*


VIDEOTAPED DEPOSITION OF

DEANNA ADKINS, M.D.

March 16, 2022


Any reproduction of this transcript

is prohibited without authorization

by the certifying agency.

Page 2

```
1    his official capacity as Attorney  *
2    General, and THE STATE OF WEST      *
3    VIRGINIA,                           *
4        Defendants                      *
5                        *   *   *   *   *   *
6
7                    VIDEOTAPED DEPOSITION OF
8                      DEANNA ADKINS, M.D.
9                       March 16, 2022
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
```

Page 4

```
1                 A P P E A R A N C E S
2
3    JOSHUA BLOCK, ESQUIRE
4    American Civil Liberties Union Foundation
5    125 Broad Street
6    New York, NY  10004
7    COUNSEL FOR PLAINTIFF
8
9    KATHLEEN R. HARTNETT, ESQUIRE
10   ANDREW BARR, ESQUIRE
11   JULIE VEROFF, ESQUIRE
12   ZOE HELSTROM, ESQUIRE
13   KATELYN KANG, ESQUIRE
14   ELIZABETH REINHARDT, ESQUIRE
15   Cooley, LLP
16   3 Embarcadero Center
17   20th Floor
18   San Francisco, CA  94111-4004
19       COUNSELS FOR PLAINTIFF
20
21
22
23
24
```

Page 3

```
1                    DEPOSITION
2                        OF
3    DEANNA ADKINS, M.D., taken on behalf of the Intervenor
4    herein, pursuant to the Rules of Civil Procedure, taken
5    before me, the undersigned, Lacey C. Scott  a Court
6    Reporter and Notary Public in and for the Commonwealth
7    of Pennsylvania, taken via videoconference, on
8    Wednesday, March 16, 2022 at 9:06 a.m.
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
```

Page 5

```
1              A P P E A R A N C E S (cont'd)
2
3    SRUTI SWAMINATHAN, ESQUIRE
4    TARA BORELLI, ESQUIRE
5    Lambda Legal
6    120 Wall Street
7    19th Floor
8    New York, NY  10005-3919
9        COUNSEL FOR PLAINTIFF
10
11   DAVID TRYON, ESQUIRE
12   State Capitol Complex
13   Building 1, Room E-26
14   Charleston, WV  25305
15       COUNSEL FOR STATE OF WEST VIRGINIA
16
17   ROBERTA F. GREEN, ESQUIRE
18   Shuman McCuskey Slicer, PLLC
19   1411 Virginia Street East
20   Suite 200
21   Charleston, WV  25301
22       COUNSEL FOR WEST VIRGINIA SECONDARY SCHOOL
23       ACTIVITIES COMMISSION
24
```

Page 6

```
 1        A P P E A R A N C E S (cont'd)
 2
 3   SUSAN DENIKER, ESQUIRE
 4   Steptoe & Johnson
 5   400 White Oaks Boulevard
 6   Bridgeport, WV  26330
 7       COUNSEL FOR HARRISON COUNTY BOARD OF EDUCATION and
 8       HARRISON COUNTY SUPERINTENDENT DORA STUTLER
 9
10   KELLY C  MORGAN, ESQUIRE
11   Bailey Wyant
12   500 Virginia Street East
13   Suite 600
14   Charleston, WV  25301
15       COUNSEL FOR WEST VIRGINIA BOARD OF EDUCATION and
16       SUPERINTENDANT W  CLAYTON BURCH
17
18   TIMOTHY D  DUCAR, ESQUIRE
19   Law Office of Timothy D  Ducar
20   7430 East Butherus Drive
21   Suite E
22   Scottsdale, AZ  85260
23       COUNSEL FOR INTERVENOR, LAINEY ARMISTEAD
24
```

Page 7

```
 1        A P P E A R A N C E S (cont'd)
 2
 3   ROGER BROOKS, ESQUIRE
 4   LAURENCE WILKINSON, ESQUIRE
 5   HAL FAMPTON, ESQUIRE
 6   CHRISTIANA HOLCOMB, ESQUIRE
 7   JOHNATHAN SCRUGGS, ESQUIRE
 8   RACHEL CSUTOROS, ESQUIRE
 9   Alliance Defending Freedom
10   15100 North 90th Street
11   Scottsdale, AZ  85260
12       COUNSEL FOR INTERVENOR, LAINEY ARMISTEAD
13
14
15
16
17
18
19
20
21
22
23
24
```

Page 8

```
 1                I N D E X
 2
 3   DISCUSSION AMONG PARTIES            14 - 17
 4   WITNESS: DEANNA ADKINS, M.D.
 5   EXAMINATION
 6     By Attorney Brooks               17 - 300
 7   EXAMINATION
 8     By Attorney Tryonn              301 - 322
 9   CERTIFICATE                        323
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
```

Page 9

```
 1             EXHIBIT PAGE
 2
 3                      PAGE
 4   NUMBER  IDENTIFICATION              IDENTIFIED
 5    1   Report of Deanna Adkins, M.D.      17
 6    2   Curriculum Vitae               17
 7    3   Rebuttal Report                18
 8    4   2017 Endocrine Society Guidelines    42
 9    5   2009 Endocrine Society Guidelines    48
10    6   2017 Lapinski Article          58
11    7   2021 Endocrine Society Scientific
12        Statement                      65
13    8   NIH Sex/Gender Infographic        87
14    9   World Health Organization Webpage    96
15   10   1/10/22 Washington Post Article   131
16   11   1/9/22 Out Sports Article        142
17   12   Duke Journal of Gender Law and Policy
18        Article                        148
19   13   2020 Hilton and Lundberg Article    156
20   14   2016 Podcast Summary           170
21   15   2016 Podcast Transcript        170
22   16   2021 Washington Post Article     213
23   17   Anderson Interview             216
24   18   Declaration of Deanna Adkins, M.D.    225
```

Page 10

```
 1                    EXHIBIT PAGE
 2
 3                         PAGE
 4     NUMBER IDENTIFICATION              IDENTIFIED
 5     19   2020 Herbert Health Publishing Article  228
 6     20   Turban, DeVries and Zucker Article    254
 7     21   NIMH Information Sheet            286
 8
 9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
```

Page 11

```
 1                    OBJECTION PAGE
 2
 3     ATTORNEY                       PAGE
 4     Borelli      19, 19, 20, 20, 20, 21, 21, 21, 21, 22,
 5     22, 23, 24, 24, 25, 25, 26, 26, 26, 27, 27, 33, 33, 34,
 6     34, 34, 36, 36, 36, 37, 37, 39, 39, 40, 40, 40, 40, 41,
 7     41, 42, 42, 43, 43, 44, 45, 45, 46, 46, 47, 47, 48, 48,
 8     49, 49, 50, 50, 51, 51, 52, 53, 53, 54, 54, 55, 55, 55,
 9     55, 55, 56, 56, 56, 57, 57, 58, 59, 60, 61, 61, 62, 62,
10     63, 63, 64, 64, 65, 65, 67, 68, 69, 69, 70, 70, 70, 71,
11     71, 71, 72, 72, 72, 73, 73, 74, 74, 75, 75, 76, 76, 76,
12     77, 77, 78, 78, 79, 79, 80, 80, 81, 81, 82, 83, 83, 83,
13     83, 84, 84, 85, 85, 86, 86, 88, 89, 89, 90, 90, 91, 91,
14     92, 94, 94, 94, 95, 95, 96, 97, 98, 99, 99, 101, 101,
15     102, 102, 103, 103, 104, 105, 106, 107, 107, 107, 107,
16     108, 108, 108, 109, 109, 110, 111, 112, 113, 113, 115,
17     116, 116, 117, 117, 118, 118, 118, 119, 119, 119, 120,
18     120, 120, 121, 121, 123, 124, 124, 124, 125, 125, 126,
19     127, 127, 127, 127, 129, 131, 132, 132, 133, 133,
20     133, 134, 134, 135, 135, 137, 137, 138, 139, 139, 140,
21     140, 141, 141, 141, 142, 143, 144, 144, 145, 145, 146,
22     146, 147, 147, 149, 150, 150, 151, 151, 152, 152, 152,
23     153, 153, 154, 154, 155, 155, 155, 156, 158, 159, 159,
24     159, 160, 161, 161, 161, 162, 162, 162, 163, 163, 166,
```

Page 12

```
 1                    OBJECTION PAGE
 2
 3     ATTORNEY                       PAGE
 4     Borelli      166, 167, 167, 168, 168, 169, 170, 171,
 5     171, 171, 172, 172, 173, 173, 174, 174, 174, 175, 175,
 6     175, 175, 176, 177, 177, 178, 178, 179, 180, 180, 180,
 7     181, 181, 181, 182, 182, 183, 183, 183, 184, 184, 186,
 8     186, 187, 187, 187, 188, 188, 189, 189, 190, 190, 191,
 9     192, 192, 193, 193, 195, 195, 195, 196, 196, 196, 196,
10     196, 197, 197, 198, 198, 200, 200, 201, 203, 204, 204,
11     205, 205, 205, 205, 206, 206, 207, 207, 207, 207, 208,
12     208, 209, 209, 209, 210, 210, 211, 211, 211, 212, 213,
13     213, 213, 214, 214, 214, 215, 215, 216, 217, 217, 218,
14     219, 219, 220, 220, 222, 222, 222, 223, 223, 224, 226,
15     226, 227, 227, 228, 227, 229, 230, 230, 232, 232, 233,
16     233, 233, 234, 235, 235, 235, 236, 236, 237, 237, 237,
17     238, 238, 238, 239, 240, 240, 241, 241, 242, 244, 245,
18     245, 245, 246, 246, 246, 247, 247, 248, 248, 251, 251,
19     251, 252, 252, 252, 252, 253, 253, 253, 254, 254, 257,
20     257, 258, 258, 258, 259, 259, 260, 260, 261, 261, 262,
21     262, 262, 263, 264, 264, 265, 265, 266, 266, 266, 266,
22     267, 267, 267, 268, 268, 269, 269, 270, 270, 271, 271,
23     272, 272, 272, 273, 274, 274, 275, 276, 276, 277, 277,
24     277, 278, 278, 279, 280, 280, 280, 281, 281, 284, 285,
```

Page 13

```
 1                    OBJECTION PAGE
 2
 3     ATTORNEY                       PAGE
 4     Borelli      285, 286, 287, 287, 288, 288, 289, 289,
 5     289, 290, 290, 290, 291, 292, 292, 293, 294, 294, 295,
 6     295, 296, 297, 298, 298, 299, 299, 300, 302, 303, 303,
 7     304, 304, 304, 305, 305, 305, 306, 306, 306, 307, 307,
 8     307, 308, 308, 308, 309, 309, 309, 310, 310, 310, 311,
 9     311, 311, 311, 312, 312, 313, 313, 314, 314, 315, 315,
10     316, 316, 317, 318, 318, 320, 320, 320, 321, 321, 321
11
12
13
14
15
16
17
18
19
20
21
22
23
24
```

Page 14

```
 1            S T I P U L A T I O N
 2   ----------------------------------------------------
 3   (It is hereby stipulated and agreed by and between
 4   counsel for the respective parties that reading,
 5   signing, sealing, certification and filing are not not
 6   waived.)
 7   ----------------------------------------------------
 8            P R O C E E D I N G S
 9   ----------------------------------------------------
10          VIDEOGRAPHER:  Good morning.  We're now
11   on the record.  My name is Jacob Stock.  I'm a Certified
12   Legal Video Specialist employed by Sargent's Court
13   Reporting Services.  Today's date is March 16th, 2022
14   and the current time is 9:06 a m. Eastern Standard Time.
15   This video is being taken place remotely by video
16   conference.  The caption of this case is in the United
17   States District Court for the Southern District of West
18   Virginia, Charleston Division, B.P.J., et al.  V. West
19   Virginia State Board of Education, et al.  Civil Action
20   Number 2:21-CV-00316.  The name of the witness is Deanna
21   Adkins.  Will the attorney present state their names and
22   the parties they represent for the record?
23          ATTORNEY BROOKS:  Roger Brooks taking the
24   deposition with Alliance Defending Freedom and
```

Page 15

```
 1   representing the intervenor.
 2          ATTORNEY HOLCUMB: Christina Holcumb for
 3   intervenor.
 4          ATTORNEY DUCAR:  Timothy Ducar for
 5   intervenor.
 6          ATTORNEY CSUTOROS:  Rachel Csutoros for
 7   intervenor.
 8          ATTORNEY TRYON:  David Tryon at the
 9   Attorney General's Office in West Virginia, and I
10   represent the State of West Virginia.
11          ATTORNEY MORGAN:  Kelly Morgan with
12   Bailey and Wyant on behalf of West Virginia Board of
13   Education and Superintendent Burch.
14          ATTORNEY DENIKER:  Good morning,
15   everyone.  Susan Deniker representing Defendant Harrison
16   County Board of Education and Superintendent Doris
17   Stutler.
18          ATTORNEY GREEN:  Roberta Green, Shuman
19   McCuskey Slicer.  I'm here on behalf of West Virginia
20   Secondary School Activities Commission.
21          ATTORNEY BORELLI:  And this is Tara
22   Borelli with Lambda Legal on behalf of the Plaintiff,
23   B.P.J..
24          ATTORNEY SWAMINATHAN:  This is Sruti
```

Page 16

```
 1   Swaminathan also from Lambda Legal also on behalf of
 2   Plaintiff
 3          ATTORNEY HARTNETT:  And this is Kathleen
 4   Hartnett from Cooley on behalf of the Plaintiff
 5          ATTORNEY BARR:  Andrew Barr, also from
 6   Cooley on behalf of the Plaintiff
 7          ATTORNEY REINHARDT:  This is Elizabeth
 8   Reinhardt, also with Cooley, also for Plaintiff
 9          ATTORNEY BLOCK:  Josh Block from ACLU on
10   behalf of Plaintiff
11          VIDEOGRAPHER:  If that is everybody, then
12   can I ask the notary to swear in the witness?
13          ---
14          DEANNA ADKINS, M D ,
15   CALLED AS A WITNESS IN THE FOLLOWING PROCEEDING, AND
16   HAVING FIRST BEEN DULY SWORN, TESTIFIED AND SAID AS
17   FOLLOWS:
18          ---
19          VIDEOGRAPHER:  And at this time the
20   notary may be dismissed and we can begin
21          ATTORNEY BROOKS:  Thank you, ma'am
22          NOTARY:
23          Thank you  Have a good day everybody
24          ---
```

Page 17

```
 1             EXAMINATION
 2          ---
 3   BY ATTORNEY BROOKS:
 4      Q.   For convenience --- good morning, Dr. Adkins,
 5   ---
 6      A.   Good morning.
 7      Q.   --- and thank you for your time here today.
 8          ATTORNEY BROOKS:  For convenience, let me
 9   start out by marking three exhibits.  As Adkins Exhibit
10   Number 1, I would like to mark the Declaration and
11   expert report of Deanna Adkins, which in the file will
12   be made available to the court reporter is tab two.  And
13   I have copies for the witness and for counsel.  I would
14   also like to mark as Adkins Exhibit 2 what we have
15   provided as tab three, which is the CV of the witness,
16   Deanna Adkins.
17          ---
18          (Whereupon, Adkins Exhibit 1, Report
19          of Deanna Adkins, M.D., was marked for
20          identification.)
21          (Whereupon, Adkins Exhibit 2, Curriculum
22          Vitae, was marked for identification.)
23
24          THE WITNESS:  If you don't mind, it's
```

Adkins 27857 0758

Page 18

1   Deanna (corrects pronunciation).
2           ATTORNEY BROOKS:  Deanna.  I certainly
3   don't mind.  I want to get that right.  Sorry about
4   that.
5           THE WITNESS:  Thank you.
6           ATTORNEY BROOKS:  And I would like to
7   admit as Exhibit 3 the rebuttal report submitted by Dr.
8   Adkins.  I will provide copies of that to the witness.
9   Just write the number on it.
10          THE WITNESS:  Thank you.
11          ATTORNEY BROOKS:  We'll have occasion to
12  come back to those.
13          ---
14          (Whereupon, Adkins Exhibit 3, Rebuttal
15          Report, was marked for identification.)
16          ---
17  BY ATTORNEY BROOKS:
18      **Q.   Dr. Adkins, let me ask you to find amongst the**
19  **three documents I have given you Exhibit 2, which is**
20  **your Curriculum Vitae.**
21          VIDEOGRAPHER:  Counsel, do you want that
22  pulled up on the shared screen?
23          ATTORNEY BROOKS:  That's up to the
24  remote.  You should certainly make it available.

Page 19

1   Obviously, everybody here in the deposition room has it.
2   BY ATTORNEY BROOKS:
3       **Q.   Dr. Adkins, let me ask you to turn to page two**
4   **of Exhibit 2, your Curriculum Vitae.  And you have there**
5   **a list headed professional training and academic career.**
6   **Do you see that?**
7       A.  Yes.
8       **Q.   Am I right that you have done either residencies**
9   **or fellowships in the field of pediatrics and**
10  **endocrinology?**
11          ATTORNEY BORELLI:  Objection, form.
12          THE WITNESS:  I've done both, yes,
13  residency and fellowship in pediatrics followed by
14  endocrinology, yes.
15  BY ATTORNEY BROOKS:
16      **Q.   And you have not done either a residency nor a**
17  **fellowship in psychiatry.  Have you?**
18          ATTORNEY BORELLI:  Objection to form.
19          THE WITNESS:  No.
20  BY ATTORNEY BROOKS:
21      **Q.   And you don't have any degree in child or**
22  **adolescent developmental psychology, do you?**
23      A.  No.
24      **Q.   Do you consider yourself trained and**

Page 20

1   **professionally competent in using the American**
2   **Psychiatric Association Diagnostic and Statistical**
3   **Manual to make child and adolescent mental illness or**
4   **psychiatric diagnoses generally outside the scope of**
5   **gender dysphoria?**
6           ATTORNEY BORELLI:  Objection, form.
7           THE WITNESS:  In pediatrics, we're
8   trained to make some of the diagnoses that are
9   appropriate for a pediatrics provider to treat.
10  BY ATTORNEY BROOKS:
11      **Q.   So is that a --- do you consider yourself**
12  **generally competent in making diagnosis of child or**
13  **adolescent mental illness according to the standards of**
14  **DSM-V?**
15          ATTORNEY BORELLI:  Objection, form.
16          THE WITNESS:  For the things I was
17  trained in and have continued to get CME in, I do.
18  BY ATTORNEY BROOKS:
19      **Q.   And you do not have any training in sports**
20  **physiology, do you?**
21          ATTORNEY BORELLI:  Objection, form.
22          THE WITNESS:  Nothing specific.
23  BY ATTORNEY BROOKS:
24      **Q.   You would consider that to be outside your field**

Page 21

1   of professional expertise.  Am I right?
2           ATTORNEY BORELLI:  Objection, form.
3           THE WITNESS:  There is probably some over
4   lap given that physiology and endocrinology are very
5   important and tied and interlinked, but I couldn't tell
6   you since I don't know where the overlap might be.
7   BY ATTORNEY BROOKS:
8       **Q.   You yourself have not done any research related**
9   **to sports physiology, have you?**
10          ATTORNEY BORELLI:  Objection, form.
11          THE WITNESS:  Not myself, no.
12  BY ATTORNEY BROOKS:
13      **Q.   Nor have you done any research relating to the**
14  **impact of hormones on athletic capability?**
15          ATTORNEY BORELLI:  Objection, form.
16          THE WITNESS:  Not personally.
17  BY ATTORNEY BROOKS:
18      **Q.   Do you consider yourself to be an expert in any**
19  **sense in the question of what is or is not fair?**
20          ATTORNEY BORELLI:  Objection, form.
21          THE WITNESS:  Well, that's a broad
22  question.  That's ---.
23  BY ATTORNEY BROOKS:
24      **Q.   Do you consider yourself an expert in the**

Deposit 27858 0759

Page 22

1   concept of fairness?
2       ATTORNEY BORELLI: Objection.
3       THE WITNESS: I believe that I can
4   recognize fairness and have a concept that would be
5   appropriate for someone of my age.
6   BY ATTORNEY BROOKS:
7       Q.  Do you believe that you have expertise and
8   fairness beyond that from ordinary human experience?
9       ATTORNEY BORELLI: Objection, form.
10      THE WITNESS: I would have to see what
11  that would like to say yes or no to that question.
12  BY ATTORNEY BROOKS:
13      Q.  All right.
14          Let's look at your list of publications, which
15  is on page three of Exhibit 2, your curriculum vitae.
16  And under the --- the page three and continuing onto
17  page four is a section titled Refereed Journal.
18          Correct?
19      A.  Yes.
20      Q.  And by Refereed Journal --- we'll both have to
21  remember that.  And also the court reporter may from
22  time to time tell one of us to slow down.  These all
23  just ordinary parts of the process, just forgetting to
24  speak up or to go slow enough to be transcribed.

Page 23

1           Can you explain for the record what you mean by
2   refereed journal, what the significance of that heading
3   is?
4       A.  Yes.  So for those journals they are reviewed by
5   an editor, and those are peer reviewed as well.
6       Q.  So these --- this would be the list of your
7   publications that would --- you would consider to be
8   peer reviewed publications?
9       ATTORNEY BORELLI: Objection, form.
10      THE WITNESS: Looking at the date on the
11  front of this one, yes.
12  BY ATTORNEY BROOKS:
13      Q.  And that date is January 21st of this year,
14  2022.
15          Right?
16      A.  Yes.
17      Q.  And have you had any peer reviewed publication
18  appear since January 21st of this year?
19      A.  I have one that is --- that's in press for next
20  month.
21      Q.  And what is the title of that?
22      A.  I would have to review the title in my e-mail.
23  It's Clinical Simulation for Education of Nurse
24  Anesthesia in Gender Affirming Care.

Page 24

1       Q.  Thank you.
2       A.  Roughly.
3       Q.  Roughly?
4           I see an article here, number three on the
5   list, Tejwani, from Tejwani, et al, and you are one of
6   the authors shown from year 2017.  Do you see that?
7       A.  Yes.
8       Q.  And that relates to disorders of sexual
9   development.
10          Am I correct?
11      A.  Yes.
12      Q.  And am I correct that that article has ---
13  doesn't speak at all to the questions of gender.
14          Does it?
15      ATTORNEY BORELLI: Objection to form.
16      THE WITNESS: That, no.
17  BY ATTORNEY BROOKS:
18      Q.  Not correct?
19      A.  I'm sorry, no, it doesn't speak.
20      Q.  Just to be clear for the record, the Tejwani et
21  al. article which you are a co-author does not speak at
22  all to questions of gender identity.
23          Correct?
24      ATTORNEY BORELLI: Objection, form.

Page 25

1       THE WITNESS: Correct.
2   BY ATTORNEY BROOKS:
3       Q.  And I see here a Lapinski, et al. article, the
4   4th item, from 2018, entitled Best Practices in
5   Transgender Health: A Clinician's Guide for Primary
6   Care.
7           Do you see that?
8       A.  Yes.
9       Q.  Am I correct that that article does not report
10  on any regional research by the authors?
11      ATTORNEY BORELLI: Objection to form.
12      THE WITNESS: I believe that's true.
13  BY ATTORNEY BROOKS:
14      Q.  Are you the author of any peer reviewed papers
15  that report original clinical research relating to
16  gender identity or for transgender therapies?
17      ATTORNEY BORELLI: Objection to form.
18      ATTORNEY BROOKS: I don't know who spoke
19  to the witness.
20      THE WITNESS: So gosh, I have a lot of
21  things that are in process.  Let me give it a second.
22      ATTORNEY BORELLI: Take the time you need
23  to review that to answer the question fully.
24      THE WITNESS: Could you repeat the

0760

Page 26

1  question?
2  BY ATTORNEY BROOKS:
3      Q.  Yes.  Are you the author of any published peer
4  reviewed papers that report original clinical research
5  relating to gender identity or transgender therapies?
6          ATTORNEY BORELLI:  Objection to form.
7          THE WITNESS:  The item on number six
8  would be the closest.  And it is talking with patients
9  about the gender identity and their experience of
10  transgender care, yes.
11 BY ATTORNEY BROOKS:
12     Q.  The --- that paper in particular is essentially
13 calling for research.
14     Am I correct?
15         ATTORNEY BORELLI:  Objection to form.
16         THE WITNESS:  Yes.
17 BY ATTORNEY BROOKS:
18     Q.  It is not reporting on accomplished clinical
19 research, is it?
20         ATTORNEY BORELLI:  Objection, form.
21         THE WITNESS:  So in that study we
22 actually did interview individuals as part of the study,
23 so it has --- it's done as a --- oh, Lord, words.  I'm
24 going to find the word in a second.  Not in like ---

Page 27

1  more of a public health-based research approach where
2  you do not actual like counting of things like you would
3  do sort of --- search, but more around interviewing and
4  looking at quantitate versus qualitative.  That's the
5  word I'm looking for.  It's a qualitative study which is
6  typically done in public health programs or other public
7  health research.
8      Q.  All right.
9      Am I correct, Dr. Adkins, that you, yourself,
10 have not treated nor personally examined Plaintiff,
11 B.P.J.?
12         ATTORNEY BORELLI:  Objection, form.
13         THE WITNESS:  That's correct.
14 BY ATTORNEY BROOKS:
15     Q.  And you don't have any direct knowledge as to at
16 what Tanner stage B.P.J. began puberty blockers.
17     Am I correct?
18     A.  I don't recall seeing that in any of the
19 documentation.
20     Q.  And you don't have any knowledge as to how
21 B.P.J.'s physiology or athletic capabilities compare to
22 a genetic female of a similar age, do you?
23         ATTORNEY BORELLI:  Objection, form.
24         THE WITNESS:  I haven't assessed the

Page 28

1  particular patient, person.
2  BY ATTORNEY BROOKS:
3      Q.  Let me take you again to Exhibit 2 and page two
4  ---?
5          ATTORNEY MORGAN:  May I interrupt for a
6  moment.
7          ATTORNEY BROOKS:  I'm sorry.  Who's
8  speaking?
9          ATTORNEY MORGAN:  Sure.  This is Kelly
10 Morgan.  I'm having a terrible time understanding the
11 witness.  So before we go on is there any way to see if
12 we can --- it sounds extremely muffled.  I'm only
13 catching like maybe half of the words.
14         ATTORNEY BROOKS:  Most --- most of the
15 voice is coming through very clear on our end.  I'm
16 going to move speaker so that paper shuffling is not as
17 likely to shuffle it.  Beyond that, I think everybody in
18 this room will agree that we're speaking slowly and
19 clearly and, frankly, loudly.  So I'm not sure there's
20 more we can do.
21         ATTORNEY BORELLI:  And Kelly, for what it
22 is worth, I think I caught maybe half of your words.  I
23 wonder if there is a connection issue on your end that
24 might be worth investigating.

Page 29

1          ATTORNEY HARTNETT:  I will just say for
2  the record, and others should speak up too because we
3  obviously want all counsel to hear the deposition.  I
4  have been able to hear Mr. Brooks, the witness, and the
5  objections have been a bit more faint, but we have been
6  able to make them out so far.
7          ATTORNEY TRYON:  This is Dave Tryon.  I
8  share Kelly's frustration.  I'm having difficulty
9  understanding the witness, so ---.
10         ATTORNEY BROOKS:  And similarly, Dave,
11 when we hear you, you're a little bit more muffled than
12 some of the other voices.  So the issue, perhaps the
13 mics and speakers on the other end, but there's nothing
14 more we can do at this end.
15         ATTORNEY GREEN:  This is Roberta Green,
16 and I'm also having trouble hearing.  And I'm
17 considering maybe --- you know, maybe muting my computer
18 and calling in on my phone and see if I can hear better.
19 I think when the doctor looks down to look at documents
20 we lose some of that.  So I'll report in if calling in
21 on my phone is a breakthrough, but I appreciate you all.
22 Thank you.
23         ATTORNEY DENIKER:  Yes.  Thank you.  I'm
24 also having trouble.  And I'm curious if the court

aldicatessen 0761

Page 30

1   reporter is having trouble.  And if she's not, that's
2   good, but I just want to make sure that we --- that
3   everybody can hear.
4           COURT REPORTER:  So my biggest issue is
5   people not saying their names when they're speaking.  So
6   we just had a bunch of people and I really have no idea
7   who is sayin anything.  I don't know who is making the
8   objections.  And ma'am, with the mask on, it is hard to
9   understand you at times. I'm really like having to
10  really focus in on you.  And the objections are coming
11  in quick.  And I mean, there are definitely some
12  challenges, but I don't know.
13          ATTORNEY BORELLI:  Well, in case this is
14  helpful, so this is Tara Borrelli with Lambda Legal on
15  behalf of the Plaintiff.  I am the person defending the
16  deposition, so the objections will be coming from me, in
17  case that's helpful going forward.
18          COURT REPORTER:  Yes.
19          ATTORNEY HARTNETT:  This is Kathleen
20  Hartnett for the Plaintiff from Cooley.  I was the first
21  person that spoke after someone raised the issue.  I
22  believe Miss --- Ms. Morgan had raised the issue of the
23  ability to hear.  And I would just say for the record
24  this is an in person deposition that was scheduled where

Page 31

1   we had proposed it to be remote if parties saw fit to do
2   that.  We're not objecting to it being in person.  We're
3   --- obviously they're defending.  And all parties had
4   the ability to attend in person if they chose to.
5           ATTORNEY BROOKS:  And I --- I will ---
6   this is Roger Brooks taking the deposition.  I will
7   suggest that we just agree by voice acclimation that
8   we're not going to cycle through all the names and try
9   to identify all the people who have chatted with us
10  about their reception and simply move on with the
11  deposition unless anybody objects to that.
12          ATTORNEY MORGAN:  I have no objection to
13  that.  This is Kelly Morgan.  But is there any
14  possibility that the witness would be able to remove her
15  mask if everyone else is masked other than the
16  questioner?  Like I --- I'm not having trouble hearing
17  anyone else other than the witness, and it just seems to
18  get muffled.
19          ATTORNEY BORELLI:  I'm sorry, but I --- I
20  don't believe that's going to be an option.  I mean,
21  this --- this is partly why a remote deposition would
22  have been our --- our preference, but Dr. Adkins
23  obviously has to take precautions because she is
24  continuing to see and treat patients.  And so she needs

Page 32

1   to protect her health.
2           ATTORNEY BROOKS:  And we did agree to
3   proceed in whatever way the witness wanted when it comes
4   to that, so we'll just all have to live with that as
5   part of these days.
6           May we proceed?
7           ATTORNEY TRYON:  Yes.
8   BY ATTORNEY BROOKS:
9   Q.   If you have Exhibit 2 and on page two of that we
10  have professional training and academic career, which
11  towards the bottom includes your current two
12  appointments associated with Duke University.
13          Am I correct?
14  A.   Three.
15  Q.   I apologize.  I see that.  One is you're an
16  Associate Professor of Pediatrics.
17          Correct?
18  A.   Correct.
19  Q.   And you are the Director of the Duke Child and
20  Adolescent Gender Care Clinic?
21  A.   Correct.
22  Q.   And you are a Co-Director of the Duke Sexual and
23  Gender Health and Wellness Program.
24          Correct?

Page 33

1   A.   Correct.
2   Q.   What is the total compensation you receive in
3   connection with those three appointments with Duke
4   University?
5           ATTORNEY BORELLI:  Objection, form.
6           THE WITNESS:  Well, you want a number or
7   ---?
8   BY ATTORNEY BROOKS:
9   Q.   I do.
10  A.   I'm going to have to give an approximation.
11  Q.   And that's fine?
12  A.   Approximately, $173,000 per year.
13  Q.   And that is your total compensation on a W-2
14  from Duke University?
15  A.   No.  Duke University only pays me $20,000 per
16  year.  I work for the private Diagnostic Clinic, which
17  is our private practice, and they pay me the balance.
18  Q.   Okay.
19          And do you receive any other compensation in
20  connection with your work with patients in connection
21  with the Duke Child and Adolescent Gender Care Clinic?
22          ATTORNEY BORELLI:  Objection, form.
23          THE WITNESS:  No.
24  BY ATTORNEY BROOKS:

Page 34

1    Q.   Can you tell me what you earned in speaking fees
2    in 2021, approximately?
3            ATTORNEY BORELLI:  Objection, form.
4            THE WITNESS:  In 2021?  Is that what you
5    said?
6    BY ATTORNEY BROOKS:
7    Q.   I did.
8    A.   Let's see.  I'm losing track of dates.  I think
9    only like $500.
10   Q.   And what were the total expert fees that you
11   received in 2021 in connection with serving as an expert
12   in litigation?
13           ATTORNEY BORELLI:  Objection, form.
14           THE WITNESS:  Nothing.
15   BY ATTORNEY BROOKS:
16   Q.   And in 2021 did you receive any payments for any
17   reasons from any pharmaceutical company?
18           ATTORNEY BORELLI:  Objection, form.
19           THE WITNESS:  No.
20   BY ATTORNEY BROOKS:
21   Q.   Let me ask you to look at Exhibit 1, which is
22   your expert report.  And if you would turn --- if you
23   would turn to paragraph 37 of that report, paragraph 38.
24   And there you say when a child is born a sex assignment

Page 35

1    is usually made based on the infant's externally visible
2    genitals.  This designation is then recorded and usually
3    becomes the sex designation listed on the infant's birth
4    certificate.  Do you see that language?
5    A.   I do.
6    Q.   And as a trained physician, can you tell us how
7    a sex assignment is usually made based on the infant's
8    external visible genitals?
9    A.   Yes.  In most cases the external genitals will
10   have a form that looks typical to a male versus typical
11   to a female.  And if there is a question, then I get
12   consulted, if there's something different.
13   Q.   And by typical to a male, for instance, you mean
14   what?
15   A.   So male external genitalia at birth typically
16   has a phalic structure, penis that is, of a certain
17   length most of the time.  And then there's scrotum and
18   then there are usually testicles, although sometimes
19   they can be up or down in the scrotum.
20   Q.   And do you, yourself, have children?
21   A.   I do.
22   Q.   And you're aware that for quite a number of
23   years now, in fact, parents often learn of the sex of
24   their child before birth.

Page 36

1    Correct?
2            ATTORNEY BORELLI:  Objection, form.
3            THE WITNESS:  I have been aware that
4    ultrasonographers often tell people what they think they
5    are.  And I'm also the one that has to tell the parents
6    that it is different when they're born and it is not
7    exactly accurate.
8    BY ATTORNEY BROOKS:
9    Q.   That is as a result of the quality of imaging on
10   ultrasound sometimes the wrong call is made on that?
11           ATTORNEY BORELLI:  Objection, form.
12           THE WITNESS:  Possibly the quality of
13   imaging, the skill of the person.  There are also
14   sometimes variations that aren't easily visible on
15   ultrasound.
16   BY ATTORNEY BROOKS:
17   Q.   You're are aware, are you not, that the genetic
18   sex of infant is, in fact, determinable by genetic
19   testing as early as the first trimester of pregnancy?
20           ATTORNEY BORELLI:  Objection to form.
21           THE WITNESS:  The typical testing for
22   that is chromosomes, which are broad view and not
23   specific for the hundreds of genes that can change the
24   sex of the individual.

Page 37

1    BY ATTORNEY BROOKS:
2    Q.   Well, my question was you are aware, are you
3    not, that the chromosomal sex of the infant is
4    determinable as early as the first trimester of
5    pregnancy?
6            ATTORNEY BORELLI:  Objection, form.
7            THE WITNESS:  I'm sorry.  I didn't hear
8    you say chromosomal.  I thought you said biological.  I
9    apologize.
10   BY ATTORNEY BROOKS:
11   Q.   I can't swear what I said the first time.
12           ATTORNEY BROOKS:  Let's ask the reporter
13   to read back the second question I asked.  Is the court
14   reporter muted perhaps?
15           COURT REPORTER:  One minute.
16           ATTORNEY BROOKS:  Okay.
17           COURT REPORTER:  You said genetic
18   testing.  Do you want me to read the whole question?
19           ATTORNEY BROOKS:  I do.
20           COURT REPORTER:  You are aware, are you
21   not, that the genetic sex of an infant is determinable
22   by genetic testing as early as the first trimester of
23   pregnancy?
24           ATTORNEY BORELLI:  Objection to form.

Page 38

1    COURT REPORTER:  And again I just want to
2  say that the witness is hard to understand.  There is
3  definitely a lot of muffling words coming through, you
4  know, just like in the sentence there might be two words
5  that I just have to like really --- I'm just struggling
6  over here with this mask.  I can't see your lips moving,
7  so it's really hard, but --.
8        THE WITNESS:  I'll slow down, but I was
9  sick earlier this week, and I'd really rather not share
10  that with anyone in the room.  And I don't think that
11  they would like that, so ---.
12  BY ATTORNEY BROOKS:
13    Q.   Don't consider yourself pressured to take off
14  your mask.  Just do what you can to speak clearly into
15  the microphone.
16        ATTORNEY BORELLI:  Thank you.  And we
17  just moved the mic closer to the witness as well, so we
18  --- we hope that that will help make a difference.
19        ATTORNEY HARNETT:  Excuse me.  This is
20  Kathleen Hartnett from Cooley.  I would like to ask
21  whether the videotaping that's happening now will allow
22  further transcription after the deposition?
23        VIDEOGRAPHER:  Yes, that's --- the
24  videotape is picking up everything that --- I'm having

Page 39

1  no troubles on my side, so it's picking up all of the
2  audio and everything.
3        ATTORNEY HARTNETT:  Thank you very much.
4        VIDEOGRAPHER:  You're welcome.
5        ATTORNEY BROOKS:  And rather than
6  re-reading the question, I'm just going to forget all
7  that and ask you a new question.
8  BY ATTORNEY BROOKS:
9    Q.   You are aware, are you not, that the chromosomal
10  sex of an infant nowadays can be determined as soon as
11  the first trimester of pregnancy?
12        ATTORNEY BORELLI:  Objection to form.
13        THE WITNESS:  You can obtain the baseline
14  chromosomes, yes.
15  BY ATTORNEY BROOKS:
16    Q.   And that will tell you the chromosomal sex of
17  that infant?
18        ATTORNEY BORELLI:  Objection, form.
19        THE WITNESS:  The --- not really a term
20  that is really precise as there's hundreds of genes that
21  can change that.
22  BY ATTORNEY BROOKS:
23    Q.   So you are not able to answer my question yes or
24  no?

Page 40

1        ATTORNEY BORELLI:  Objection to form.
2        THE WITNESS:  I'm not able to answer the
3  question yes or no.
4  BY ATTORNEY BROOKS:
5    Q.   You would agree that the genetic sex of an
6  infant is determined at the instant of conception?
7        ATTORNEY BORELLI:  Objection to form.
8        THE WITNESS:  The actual Y chromosomes
9  are at that time, yes.
10  BY ATTORNEY BROOKS:
11    Q.   That's not something that a doctor has any
12  choice or could change at the time of birth?
13        ATTORNEY BORELLI:  Objection, form.
14        THE WITNESS:  The chromosomes, no.
15  BY ATTORNEY BROOKS:
16    Q.   And you understand what I think we all learned
17  in perhaps sixth grade biology that an individual with
18  two X chromosomes, provided that there is no chromosomal
19  abnormality, is female and an individual free of
20  abnormalities who has an X and a Y chromosome is male.
21    Correct?
22        ATTORNEY BORELLI:  Objection, form.
23        THE WITNESS:  Free of any abnormalities,
24  yes.

Page 41

1  BY ATTORNEY BROOKS:
2    Q.   And you also understand that in humans, like all
3  mammals, a gamete from a male and a gamete from a female
4  are necessary to create a fertilized egg in a new
5  individual?
6        ATTORNEY BORELLI:  Objection, form.
7        THE WITNESS:  Can you read the very first
8  part of the question again, please?
9  BY ATTORNEY BROOKS:
10    Q.   You understand that in humans, as in all
11  mammals, a gamete from a male and a gamete from a female
12  are necessary to create a fertilized egg and a new
13  individual?
14        ATTORNEY BORELLI:  Same objection.
15        THE WITNESS:  Yes.
16  BY ATTORNEY BROOKS:
17    Q.   Now, if you look at paragraph 41 in your
18  declaration ---
19    A.   Yes.
20    Q.   --- in paragraph 41 you state, quote, biological
21  sex, biological male or female are imprecise and should
22  be avoided.  Do you see that?
23    A.   Yes.
24    Q.   And it is your view that the terms biological

hisealr7863 0764

Page 42

```
1   male, biological female and biological sex are so
2   imprecise as to be not useful from a medical point of
3   view?
4           ATTORNEY BORELLI:  Objection, form.
5           THE WITNESS:  In my practice we have to
6   be more careful than that because I see quite a lot of
7   individuals where that wouldn't be a very precise
8   answer.
9   BY ATTORNEY BROOKS:
10      Q.   My question is it your expert opinion, are
11  you offering expert opinion in terms of biological sex,
12  biological male and biological female are so imprecise
13  as to not be medically useful?
14          ATTORNEY BORELLI:  Objection, form.
15          THE WITNESS:  Yes.
16          ATTORNEY BROOKS:  Let me mark as Exhibit
17  4 what is tab 5, and that is the Endocrine Society
18  Guidelines dated 2017, but the number of authors.  The
19  first name is Wiley Hembree.
20          ---
21          (Whereupon, Adkins Exhibit 4, 2017
22          Endocrine Society Guidlines, was marked
23          for identification.)
24          ---
```

Page 43

```
1           ATTORNEY BROOKS:  I'm handing that to the
2   witness and to opposing counsel.
3   BY ATTORNEY BROOKS:
4       Q.   Dr. Adkins, this is a document that you cite in
5   your expert report.
6           Correct?
7       A.   Correct.
8       Q.   And with which you are quite familiar?
9       A.   Correct.
10      Q.   Do you know Dr. Hembree?
11      A.   I spoke with him on the phone.
12      Q.   You would agree, would you not, that he's been
13  prominent in the field of transgender medicine for
14  decades?
15          ATTORNEY BORELLI:  Objection, form.
16          THE WITNESS:  His publications, yes.
17  BY ATTORNEY BROOKS:
18      Q.   And another author is Peggy Cohen-Kettenis.  Do
19  you see that?  She's the second author.
20      A.   Yes.
21      Q.   And likewise, she has been prominent in the
22  field for at least 20 years?
23          ATTORNEY BORELLI:  Objection.
24          THE WITNESS:  I've seen publications in
```

Page 44

```
1   that date range, yes.
2   BY ATTORNEY BROOKS:
3       Q.   Have you met Dr. Cohen-Kettenis?
4       A.   No.
5       Q.   And she is associated with a highly respected
6   institute in Amsterdam.
7           Am I right?
8       A.   I am not certain.  I would have to look that up.
9       Q.   You don't know.  You weren't invited to serve on
10  the committee that drafted these guidelines, were you?
11          ATTORNEY BORELLI:  Objection, form.
12          THE WITNESS:  There is an invitation
13  extended to all Endocrine Society members.  I did find a
14  time.  That was early in my work with this at that time.
15  BY ATTORNEY BROOKS:
16      Q.   If you look down on page one, about five lines
17  from the bottom ---.
18      A.   Say it again.
19      Q.   Page one, five lines from the bottom?
20      A.   Yes.
21      Q.   Actually, let's go two more up and begin a
22  sentence.  There's a sentence that begins they require a
23  safe and effective hormone regimen that will, one,
24  suppress endogenous sex hormone secretion determined by
```

Page 45

```
1   the person's genetic/gonadal sex.  Do you see that?
2       A.   I do.
3       Q.   And do you think you understand what's referred
4   to by the term genetic/gonadal sex?
5           ATTORNEY BORELLI:  Objection, form.
6           THE WITNESS:  Yes.
7   BY ATTORNEY BROOKS:
8       Q.   And what is your understanding of what that
9   refers to?
10      A.   So that would include both the chromosomes as
11  mentioned before, the broad XY, and it should include
12  all of the other genetic mutations as well as what
13  actual gonads are present in the person.
14      Q.   And this committee, these prominent researchers
15  at least considered genetic/gonadal sex to be a
16  meaningful and readily understandable binary
17  classification.
18          Correct?
19          ATTORNEY BORELLI:  Objection, form.
20          THE WITNESS:  That's not clear there and
21  it is different from what you said before.
22  BY ATTORNEY BROOKS:
23      Q.   I try to make each question somewhat different
24  from the one before, so yes.  Let me ask a new question.
```

0765

| Page 46 |
| --- |

```
 1   This committee considered --- the committee that drafted
 2   these guidelines considered genetic/gonadal sex to be a
 3   meaningful and readily understandable classification.
 4          Correct?
 5          ATTORNEY BORELLI:  Objection, form.
 6          THE WITNESS:  Yes.  They didn't use the
 7   word chromosomal sex.  And they included gonads which
 8   are also a part of the broad development of human
 9   reproductive biology.
10   BY ATTORNEY BROOKS:
11       Q.   And in fact, you, yourself, quoted this language
12   in your expert report, did you not?
13       A.   Yes.
14       Q.   And genetic sex, in your understanding, what is
15   the meaning of genetic sex?
16          ATTORNEY BORELLI:  Objection, form.
17          THE WITNESS:  Well, in most patients, in
18   most people, it is whether you received an X or a Y
19   chromosome and all of your body parts include an XY
20   containing or an XX containing cell.  There are cases
21   where you can have mossaicism or different parts of a
22   human at different sex chromosomes where a part is XX, a
23   part is XY, part is XO.  And then there is also some
24   mutations that can occur in lots of other locations that
```

| Page 47 |
| --- |

```
 1   can determine whether or not a patient's, you know,
 2   likely to have the rest of their human development
 3   appear as what we would more typically see in a male
 4   human or a female human.
 5   BY ATTORNEY BROOKS:
 6       Q.   Well, in every human individual who is healthy
 7   and free of disorder of sexual development, genetic sex
 8   and gonadal sex are --- directly correspond.
 9          Correct?
10          ATTORNEY BORELLI:  Objection, form.
11          THE WITNESS:  Typically, yes.
12   BY ATTORNEY BROOKS:
13       Q.   So in a healthy individual free of genetic
14   defect every individual who is chromosomally XX is going
15   to have female gonads and female genitalia.
16          Correct?
17          ATTORNEY BORELLI:  Objection, form.
18          THE WITNESS:  My only concern is I would
19   not use defect as a language.  There's --- you know, we
20   see variation across humans and we --- you know, there
21   are variations that are normal and variations that are
22   typical versus rare.  So I would not call it necessarily
23   a defect, maybe a variation would be the word I would
24   use.
```

| Page 48 |
| --- |

```
 1   BY ATTORNEY BROOKS:
 2       Q.   The relationship between chromosomal sex and
 3   gonads are not separate things that can vary in healthy
 4   individuals, are they?
 5          ATTORNEY BORELLI:  Objection to form.
 6          THE WITNESS:  Well, I have healthy
 7   individuals who have XY chromosomes and external
 8   genitalia that are completely female.
 9          ATTORNEY BROOKS:  Let me mark as Exhibit
10   5 the prior edition guidelines put out by the Endocrine
11   Society in 2009, eight years earlier.
12          ---
13          (Whereupon, Adkins Exhibit 5, 2009
14           Endocrine Society Guidelines, was marked
15           for identification.)
16          ---
17   BY ATTORNEY BROOKS:
18       Q.   And the primary author is on --- the first
19   author on the 2009 guidelines are the same individuals,
20   Dr. Hembree and Cohen-Kettenis?
21          Correct?
22       A.   Correct.
23          ATTORNEY BORELLI:  Objection, form.
24   BY ATTORNEY BROOKS:
```

| Page 49 |
| --- |

```
 1       Q.   In fact, you, yourself, were familiar with and
 2   regularly consulted these guidelines.
 3          Am I correct?
 4          ATTORNEY BORELLI:  Objection to form.
 5          THE WITNESSS:  Prior to 2017?
 6   BY ATTORNEY BROOKS:
 7       Q.   Correct.
 8       A.   I used these guidelines.
 9       Q.   And did you find them to be incomprehensible?
10          ATTORNEY BORELLI:  Objection to form.
11          THE WITNESS:  No.
12   BY ATTORNEY BROOKS:
13       Q.   If you look with me on page marked 3134, which
14   is the third page of the document, second column three
15   quarters of the way down is the definition of --- under
16   the heading of definitions is a definition of
17   transsexual or transsexual people.
18          Do you see that?
19       A.   I see it.
20       Q.   It says there that a transsexual person refers
21   to a biological male who identifies as or desires to be
22   a female --- a member of the female gender or vice
23   versa.
24          Do you see that?
```

Page 50

1    A.   Yes.
2        Q.   And so in 2009 these prominent authors in the
3    field considered biological male to be a scientifically
4    useful and adequately clear term for them to use in
5    these guidelines issued by the Endocrine Society.
6        Correct?
7            ATTORNEY BORELLI:  Objection, form.
8            THE WITNESS:  It's written that way in
9    this paper, yes.
10   BY ATTORNEY BROOKS:
11       Q.   And you in that time period 2009 to just 2017
12   used these guidelines and were able to understand them.
13       Correct?
14           ATTORNEY BORELLI:  Objection, form.
15           THE WITNESS:  You know, I would have to
16   spend some time looking to see what else is in here.  It
17   has been a long time since I've used these particular
18   and pulled out.  And it is a single location.  It can
19   sometimes be misleading if you're aware --- if you've
20   read many medical articles.
21   BY ATTORNEY BROOKS:
22       Q.   So you don't recall whether you found these
23   guidelines to be comprehensible and useful for your
24   purposes in the years between 2009 and 2017?

Page 51

1            ATTORNEY BORELLI:  Objection, form.
2            THE WITNESS:  Generally they were useful.
3    BY ATTORNEY BROOKS:
4        Q.   If you look just a little lower is --- the next
5    definition is transition.
6        Do you see that?
7    A.   Yes.
8        Q.   And it refers to a period of time during which
9    transsexual persons change their physical, social and
10   legal characteristics to the gender opposite that of
11   their biological sex.
12       Do you see that?
13   A.   I do.
14       Q.   And again, these authors used the term
15   biological sex, did they not?
16   A.   They did.
17       Q.   And they indicated their understanding that
18   biological sex is binary in referring to opposite of a
19   biological sex.
20       Correct?
21           ATTORNEY BORELLI:  Objection, form.
22           THE WITNESS:  In this older version they
23   do use more binary terms.  As you know, language changes
24   over time.  In the new guidelines they don't talk as

Page 52

1    much about binary.
2    BY ATTORNEY BROOKS:
3        Q.   Is it your belief that the underlying biology
4    has changed since 2009?
5            ATTORNEY BORELLI:  Objection, form.
6            THE WITNESS:  Our understanding of a lot
7    of things in this area is growing rapidly.  It's a rapid
8    area of research.
9    BY ATTORNEY BROOKS:
10       Q.   Let me ask you to turn in this document to page
11   3141.
12   A.   Same document, 3141?
13   Q.   Yes.
14   A.   Thank you.
15       Q.   And here we're in a discussion of the use of
16   GRNH analogs, which is to say puberty blockers.
17       Am I correct?
18   A.   Which section?
19       Q.   Well, the heading is 2.3, evidence, and it is
20   talking about in the second paragraph treatment with
21   GRNH analogs?
22           ATTORNEY BORELLI:  Counsel, can we give
23   the witness one moment to look at this?
24           ATTORNEY BROOKS:  Of course.

Page 53

1            ATTORNEY BORELLI:  Thank you.
2            THE WITNESS:  Yes, that appears to be
3    what is discussed in this section.
4    BY ATTORNEY BROOKS:
5        Q.   Here the authors in the 2009 Endocrine Society
6    guidelines describe the effect of treatment with puberty
7    blockers.
8        Correct?
9            ATTORNEY BORELLI:  Objection, form.
10           THE WITNESS:  Yes.
11   BY ATTORNEY BROOKS:
12       Q.   And they say among other things that, quote, in
13   girls breast development will become atrophic and menses
14   will stop.  And they continue, quote, in boys
15   verilization will stop and testicular volume will
16   decrease.
17       Do you see those quotes?
18   A.   I do.
19       Q.   Again, in 2009, the Endocrine Society didn't
20   think there was ambiguity or imprecision as to what is a
21   girl and what is a boy for purposes of development in
22   puberty, did they?
23           ATTORNEY BORELLI:  Objection to form.
24           THE WITNESS:  As I said, the language

## Page 54

1 would be different and likely is different in
2 conversations around this because it is not as precise
3 as I would use or my colleagues would use.
4 BY ATTORNEY BROOKS:
5    Q.   In 2009 the Endocrine Society in publishing
6 these guidelines didn't think there was any ambiguity or
7 imprecision as to what is a girl and what is a boy for
8 purposes of the effect of puberty.
9       Correct?
10       ATTORNEY BORELLI:  Objection to form.
11       THE WITNESS:  I would have to read the
12 article up to this point to see what their
13 clarifications are with regard to those phrases.
14 Oftentimes in the beginning of articles they will
15 clarify what they mean by a particular phrase, and
16 taking it out of context is a little bit difficult for
17 me to just say it is true right here on the spot.
18       ATTORNEY BORELLI:  I would also just
19 object to the extent that we're asking about select
20 definitions without having given the witness an
21 opportunity to review the entire definition and section
22 of the document and asking her to draw conclusions about
23 the larger document.
24       ATTORNEY BROOKS:  Counsel, I think that

## Page 55

1 you are supposed to under the Rules to confine your
2 objections to stating objection.
3 BY ATTORNEY BROOKS:
4    Q.   In your practice today with respect to
5 individuals who do not suffer from any disorder of
6 sexual development you don't have any trouble telling
7 girls from boys, do you?
8       ATTORNEY BORELLI:  Objection to form.
9       THE WITNESS:  I do not have trouble
10 deciding who was assigned female at birth versus those
11 who were assigned male at birth.
12 BY ATTORNEY BROOKS:
13    Q.   We have already talked about how that assignment
14 is done based on observation of genitalia, which depend
15 on underlying genetic sex.
16       Right?
17       ATTORNEY BORELLI:  Objection to form.
18       THE WITNESS:  So the typical manner of
19 assignment we have discussed.  Sometimes those things
20 change over time with --- absent of course a difference
21 of sex development or intersex conditions.  Typically
22 they would match.
23 BY ATTORNEY BROOKS:
24    Q.   And if you are, for instance, getting ready to

## Page 56

1 prescribe cross sex hormones for a patient in patients
2 who are free of any disorder of sexual development you
3 don't have any trouble determining which patients need
4 testosterone as a cross sex hormone versus which
5 patients need estrogen as a cross sex hormone, do you?
6       ATTORNEY BORELLI:  Objection, form.
7       THE WITNESS:  My mouth is getting dry.  I
8 don't have any trouble with that.
9 BY ATTORNEY BROOKS:
10    Q.   And that's because absent rare and unusual
11 disorders of sexual development it's really easy for all
12 of us to tell girls from boys, isn't it?
13       ATTORNEY BORELLI:  Objection to form.
14       THE WITNESS:  With regard to their sex
15 assignment at birth, yes.
16 BY ATTORNEY BROOKS:
17    Q.   Now, you've mentioned a couple times when I
18 asked you questions about the 2009 guidelines that
19 perhaps a language that's used has changed.
20       Am I right?
21    A.   Yes.
22    Q.   You are not contending that how human biology
23 works has changed?
24       ATTORNEY BORELLI:  Objection, form.

## Page 57

1       THE WITNESS:  Our understanding of human
2 biology at this time is accelerating greatly, especially
3 in the area of genetics.  We can now look at someone's
4 whole exome, whole chromosome, and it's --- I mean in
5 this timeframe there's an amazing amount of information
6 that's become more clear.
7 BY ATTORNEY BROOKS:
8    Q.   So is it your --- are you asserting that the
9 more recent Endocrine Society policy statement should be
10 accepted as a more precise Scientific statement?
11       ATTORNEY BORELLI:  Objection, form.
12       THE WITNESS:  The goal is for that to be,
13 yes, when you are writing those.  And it's also been
14 sometimes since this was published as well.
15 BY ATTORNEY BROOKS:
16    Q.   Since the 2017 guidelines?
17    A.   Correct.
18    Q.   But in general, is it your view the more recent
19 statements of the Endocrine Society that touch on issues
20 of the definition of gender and sex are --- we should
21 consider more accurate or reliable than earlier
22 statements?
23       ATTORNEY BORELLI:  Objection, form.
24       THE WITNESS:  In the correct context,

Page 58

1   yes.  Sometimes when they're taken out of context and
2   applied to not the exact same population, they may or
3   may not be as precise.
4   BY ATTORNEY BROOKS:
5       **Q.   They may or may not be.  That is you don't**
6   **maintain that generally more recent statements of the**
7   **Endocrine Society relating to definitions of gender and**
8   **sex are more reliable than earlier statements?**
9           ATTORNEY BORELLI:  Objection to form.
10          THE WITNESS:  Their goal and our goal as
11  a community is to be as precise as possible.  Sometimes
12  that works and sometimes it doesn't.
13          ATTORNEY BROOKS:  Let me mark as Exhibit
14  --- what are we at, 6.  Exhibit 6.  What is tab 4 in the
15  materials provided to the court reporter, an article
16  Lapinski, et al., which Dr. Adkins is a coauthor from
17  2017.  Pardon me, 2017.
18          ---
19          (Whereupon, Adkins Exhibit 6, 2017
20          Lapinski Article, was marked for
21          identification.)
22          ---
23  BY ATTORNEY BROOKS:
24      **Q.   And this is your only or perhaps one of only two**

Page 59

1   **peer reviewed articles on which you were an author that**
2   **relate to transgender patients.**
3       **Correct?**
4           ATTORNEY BORELLI:  Objection, form.
5           THE WITNESS:  I'm going to refer back to
6   my ---.
7   BY ATTORNEY BROOKS:
8       **Q.   Please do, and that's Exhibit 2.**
9       A.   I apologize --- I'm sorry.  I was thinking of
10  the book chapter.  Yes, I was thinking of the book
11  chapter I've written there.  So those are also peered
12  reviewed.  So if you just falling manuscript of joint
13  articles, that's true, but I also have one book chapter
14  published and one that is in process.
15      **Q.   Well, at any rate, this article was published in**
16  **2017, the same year as the more recent guidelines from**
17  **the Endocrine Society.**
18      **Correct?**
19      A.   Correct.
20      **Q.   And in this article --- let me ask you to turn**
21  **to page 692.  And looking at a paragraph that actually**
22  **runs over from 689 because of a long intervening table.**
23  **Paragraph is headed understanding the meaning of**
24  **transitioning for transgender patients.**

Page 60

1       **Do you see that?**
2       A.   Yes.
3       **Q.   And the paragraph continues on to page 692 and**
4   **the language I want to call your attention to is there,**
5   **but of course feel free to look at the paragraph?**
6           ATTORNEY BORELLI:  Counsel, for clarity
7   of the record, I'm showing that the heading is on page
8   689.
9           ATTORNEY BROOKS:  Correct.  That's where
10  the paragraph begins and then there's a two-page table
11  breaks up the paragraph and now we're on 692.
12          ATTORNEY BORELLI:  Thank you.
13          THE WITNESS:  Just that paragraph.
14  BY ATTORNEY BROOKS:
15      Q.   Yes.
16      A.   Okay.
17      **Q.   In 2017, writing a guide for clinicians as to**
18  **what you considered to be best practices in transgender**
19  **health you and your coauthors thought that it was clear**
20  **and useful to refer to, quote, the opposite biological**
21  **sex, closed quote, did you not?**
22          ATTORNEY BORELLI:  Objection, form.
23          THE WITNESS:  The language would be
24  reflective of the original publications.

Page 61

1   BY ATTORNEY BROOKS:
2       **Q.   Dr. Adkins, what do you mean by that answer?**
3       A.   When you're putting something into a journal
4   article and you're reporting that original article's
5   information, it would be inappropriate to change the
6   language.  So the original report that states this
7   particular information used those words.
8       **Q.   Well, you didn't put this in quotation marks in**
9   **your article, did you?**
10          ATTORNEY BORELLI:  Objection, form.
11          THE WITNESS:  We don't necessarily have
12  to put them in quotation marks.  In medically referred
13  journals you can just put the reference.
14  BY ATTORNEY BROOKS:
15      **Q.   And in fact, there is no footnote to this, is**
16  **there, there is no reference?**
17          ATTORNEY BORELLI:  Objection, form.
18          THE WITNESS:  Not right at the end of
19  that sentence.
20  BY ATTORNEY BROOKS:
21      **Q.   What that sentence says to get it into the**
22  **record, I'm referring to sexual orientation, it says,**
23  **quote, this fluctuation tends to occur more commonly**
24  **with individuals who are attracted to the opposite**

Page 62

1    biological sex before transitioning, closed quotes.
2    Have I read that language correctly?
3        A.   Correct.
4        Q.   And publishing this guideline for clinicians in
5    2017, is it your testimony that even if you thought that
6    language was inaccurate and confusing you would not have
7    clarified it?
8            ATTORNEY BORELLI:  Objection, form.
9            THE WITNESS:  I can't change what the
10   publication states.  It would be inappropriate for me to
11   make a statement that was different from what the
12   publication states.  And there are people that fall on
13   the binary and people who fall in the middle, and that
14   particular study investigated people who identified on
15   each end of the binary spectrum of individuals
16   identification of gender identity.
17   BY ATTORNEY BROOKS:
18       Q.   So you believe as a scientist and an author that
19   writing in 2017, even if you thought the term biological
20   sex was misleading and inaccurate, you --- it was
21   nevertheless appropriate for you to use that term in a
22   best practices guide that you were writing for
23   clinicians?
24           ATTORNEY BORELLI:  Objection, form.

Page 63

1            THE WITNESS:  So if you would read the
2    entirety of the article, I would hope that we would be
3    clear and it would be understood in that isolated
4    paragraph, again I, have to use what language was used
5    in the original publication.  Otherwise, I'm
6    misrepresenting the original publication and I would not
7    want to do that.
8    BY ATTORNEY BROOKS:
9        Q.   Well, if you thought the original publication
10   was in accurate and misleading you wouldn't want to cite
11   and rely on it, would you?
12           ATTORNEY BORELLI:  Objection, form.
13           THE WITNESS:  As it's stated, it's not
14   inaccurate.  And if you infer things from a sentence it
15   could be misleading.  If you read it straight for what
16   it says, it's accurate to what the report gave in the
17   initial publication.
18   BY ATTORNEY BROOKS:
19       Q.   Are you familiar, Dr. Adkins, with a NIH policy
20   that requires research supported by NIH grants that
21   involves animal or human clinical work to consider what
22   NIH refers to as, quote, sex as a biological variable,
23   closed quote?
24           ATTORNEY BORELLI:  Objection, form.

Page 64

1            THE WITNESS:S  I have seen that policy
2    and also seen the policies that are presented by the NIH
3    which uses sex assigned at birth as well as gender
4    identity and in addition, as variables that should be
5    included in their research.
6    BY ATTORNEY BROOKS:
7        Q.   My question is precise.  Are you familiar with
8    the NIH policy that requires grant supported research in
9    sales or clinical work to, quote, consider sex as a
10   biological variable?
11           ATTORNEY BORELLI:  Objection, form.
12   Counsel, if you are going to continue questioning her
13   about the policy, we'd request a copy be placed in front
14   of the witness.
15           ATTORNEY BROOKS:  At the moment I'm just
16   asking the witness if she's familiar with that policy.
17           ATTORNEY BORELLI:  My objection stands.
18           THE WITNESS:  I haven't read the entire
19   policy.  I have seen that within the documents that you
20   have presented, so I can't accurately state if it is
21   true.
22   BY ATTORNEY BROOKS:
23       Q.   Have you, yourself, ever submitted any grant
24   proposal that was subject to that NIH policy?

Page 65

1            ATTORNEY BORELLI:  Objection, form.
2            THE WITNESS:  I have submitted NIH
3    grants.
4    BY ATTORNEY BROOKS:
5        Q.   And in that connection did you take some steps
6    to assure that your grant proposal would comply with
7    that policy?
8            ATTORNEY BORELLI:  Objection, form.
9            THE WITNESS:  All of my grants
10   applications had sex assigned at birth as a variable
11   that we report.
12   BY ATTORNEY BROOKS:
13       Q.   Let me show you another more recent Endocrine
14   Society policy statement.  This is tab eight.  It will
15   be Exhibit 7.
16           ---
17           (Whereupon, Adkins Exhibit 7, 2021
18            Endocrine Society Scientific Statement,
19            was marked for identification.)
20           ---
21           THE WITNESS:  Before we start this
22   questioning is it possible for me to take a break?
23           ATTORNEY BROOKS:  It certainly is.  At
24   any time that you want to, you just say so.

Page 66

1    VIDEOGRAPHER:  Going off the record.  The
2  current time reads 10:08 a.m.
3  OFF VIDEO
4    ---
5  (WHEREUPON, A PAUSE IN THE RECORD WAS HELD.)
6    ---
7  ON VIDEOTAPE
8    VIDEOGRAPHER:  We're back on the record.
9  Current time reads 10:21 a.m. Eastern Standard Time.
10    ATTORNEY BROOKS:  And this is Roger
11  Brooks resuming the questioning.  And I've put in front of
12  the witness what is marked Exhibit 7, which is a, quote,
13  scientific statement from the Endocrine Society that is
14  entitled Considering Sex as a Biological Variable in
15  Basic and Clinical Studies: An Endocrine Society
16  Scientific Statement, closed quote.  Do you see that?
17  A.   Pardon me.  Yes.
18  Q.   So this is --- document, this statement is from
19  2021, just last year.  And four more years --- recent
20  four more years of science available as compared to the
21  2017 guidelines we looked at earlier.
22    Correct?
23  A.   It is that --- yes, as far as the date goes, I
24  mean, one would think they would be up-to-date.

Page 67

1  Q.   And let me just ask, obviously the Endocrine
2  Society is a large organization, but do you know, either
3  personally or by reputation, any of the authors listed
4  on this document?
5    ATTORNEY BORELLI:  Objection, form.
6    THE WITNESS:  Excuse me.  Walter Miller
7  by reputation.
8  BY ATTORNEY BROOKS:
9  Q.   And Walter Miller is at the University of
10  California, San Francisco, according to the footnote
11  there?
12  A.   Let's see.  That's what it looks like.
13  Q.   And just looking down, the University of
14  California, San Francisco, is a highly prestigious
15  research institution, is it not?
16  A.   It has a good reputation.
17  Q.   And farther down, halfway down the block of
18  institutions that these authors are associated with, I
19  see University of California, Los Angeles.  Do you see
20  that?
21  A.   Yes.
22  Q.   And UCLA, to use its abbreviation, is also a
23  highly respected research university, is it not?
24  A.   You know, there is some variability there.  And

Page 68

1  yes, there are some folks there who do a nice job.
2  Q.   And maybe four lines from the bottom of that
3  block I see a reference to the National Institute of
4  Mental Health.
5    Do you see that?
6  A.   Yes.
7  Q.   And that's a highly respected governmental
8  research laboratory.
9    Correct?
10    ATTORNEY BORELLI:  Objection, form.
11    THE WITNESS:  Yes.
12  BY ATTORNEY BROOKS:
13  Q.   And let me ask you to turn here in this document
14  to the second page, which is page 220.  And this is, in
15  fact, the beginning of the text after the abstract on
16  the previous page.  And there it begins, quote, sex is
17  an important biological variable that must be considered
18  in the design and analysis of human and animal research.
19  The terms sex and gender should not be used
20  interchangeably.  Sex is dichotomous with sex
21  determination in the fertilized zygotes stemming from
22  unequal expression of sex chromosomal genes,  closed
23  quote.
24    Do you see that language?

Page 69

1  A.   I do.
2  Q.   Do you understand the meaning of the word
3  dichotomous?
4  A.   I do.
5  Q.   What does it mean?
6  A.   Two options.
7  Q.   There are two options.  And do you think you
8  understand the significance of the statement that,
9  quote, sex is an important biological variable?
10    ATTORNEY BORELLI:  Objection, form.
11    THE WITNESS:  I understand that it ---
12  yes.
13  BY ATTORNEY BROOKS:
14  Q.   In fact, I believe you testified earlier that in
15  the human body every body part, every cell either has XX
16  chromosomes or XY chromosomes depending on the
17  chromosomal sex of the individual.
18    Is that right?
19    ATTORNEY BORELLI:  Objection, form.
20    THE WITNESS:  Some individuals have a
21  mixture.
22  BY ATTORNEY BROOKS:
23  Q.   And those would be genetic abnormalities.
24    Am I correct?

Page 70

1    ATTORNEY BORELLI:  Objection, form.
2    THE WITNESS:  Again, I don't like the
3  word abnormalities.  It is a variation in presentation
4  of a human.
5  BY ATTORNEY BROOKS:
6    Q.   You would agree, would you not, that any
7  deviation from having either XX or XY chromosomes is
8  widely considered to be an abnormality?
9    ATTORNEY BORELLI:  Objection, form.
10    THE WITNESS:  Again, I don't prefer that
11  language.
12  BY ATTORNEY BROOKS:
13    Q.   Dr. Adkins, I didn't ask you what you prefer.  I
14  understand your preference.  My question is you would
15  agree, would you not, within the scientific community it
16  is widely held view that any chromosomal arrangement
17  other than having XX or XY is abnormal?
18    ATTORNEY BORELLI:  Objection, form.
19    THE WITNESS:  Not in my experience in my
20  group of people that I practice with, they would not
21  describe it that way.
22  BY ATTORNEY BROOKS:
23    Q.   Would you agree that sex is determined to use
24  the language that I have directed you to, quote, in the

Page 71

1  fertilized zygote, closed quote?
2    A.   I'm sorry.  Can you re-read the question or
3  repeat the question?
4    Q.   Yes.  I'm referring to the language that
5  references sex determination in the fertilized zygote.
6  And my question is do you agree that the sex of an
7  individual is determined, quote, in the fertilized
8  zygote, closed quote?
9    ATTORNEY BORELLI:  Objection, form.
10    THE WITNESS:  Again, they're not being
11  very specific in that particular sentence about what
12  they mean by sex.
13  BY ATTORNEY BROOKS:
14    Q.   You're not able to say whether this opening
15  language in this 2021 statement from the Endocrine
16  Society is in your view accurate or in accurate?
17    ATTORNEY BORELLI:  Objection to form.
18    THE WITNESS:  Taking one statement, I
19  can't.  This is a very long document.
20  BY ATTORNEY BROOKS:
21    Q.   I'm asking you now, do you agree or disagree the
22  sex is determined in the fertilized zygote?
23    ATTORNEY BORELLI:  Objection, form.
24    THE WITNESS:  XX and XY components are

Page 72

1  determined in fertilized zygote.  That doesn't
2  necessarily equal sex that's assigned at birth.
3  BY ATTORNEY BROOKS:
4    Q.   Absent any disorder of sexual development, the
5  determination the zygote that you just described will,
6  in fact, dictate 100 percent reliability the sex
7  observed at birth.
8    Correct?
9    ATTORNEY BORELLI:  Objection, form.
10    THE WITNESS:  Well, I can't --- you know,
11  in medicine we don't say anything is 100 percent.  If
12  you use the absent any --- any difference of sex
13  development even an unknown one that we might not know
14  about, that --- that is what we know to be true.
15  BY ATTORNEY BROOKS:
16    Q.   You mentioned earlier that dichotomous means
17  there are two alternatives and only two alternatives.
18    Right?
19    ATTORNEY BORELLI:  Objection, form.
20  BY ATTORNEY BROOKS:
21    Q.   That's just what the word means?
22    ATTORNEY BORELLI:  Same objection.
23    THE WITNESS:  That's what the word means.
24  BY ATTORNEY BROOKS:

Page 73

1    Q.   And in this important statement from the
2  Endocrine Society published just last year drafted by a
3  whole committee of prominent endocrinologists they say
4  that sex is an important biological variable, closed
5  quote.  Do you disagree with this statement from the
6  Endocrine Society?
7    ATTORNEY BORELLI:  Objection, form.
8    THE WITNESS:  In reading that particular
9  statement I would agree if they had used the word sex
10  assigned at birth or something more precise in that
11  sentence.
12  BY ATTORNEY BROOKS:
13    Q.   Well, what they said precisely is sex is a
14  biological variable.  Do you see that language?
15    A.   Yeah.
16    Q.   Do you agree with that?
17    ATTORNEY BORELLI:  Objection, form.
18    THE WITNESS:  So in the context of
19  medicine, when we're talking about sex and we're talking
20  about --- that's very imprecise.  I really think that it
21  is --- I would --- it's hard for me to use that word
22  because it is imprecise, as I have mentioned before.
23  BY ATTORNEY BROOKS:
24    Q.   So you think this statement from last year from

Page 74

1  the Endocrine Society in its opening language is so
2  imprecise that you can't tell me whether you think it is
3  accurate or not?
4        ATTORNEY BORELLI:  Objection, form.
5        THE WITNESS:  I would have to read the
6  entirety of the report and take it within context as I
7  would with any other language used.
8  BY ATTORNEY BROOKS:
9     Q.  Sitting here right now, you're unable to answer
10  my question as to whether you think it is an accurate
11  statement that sex is a biological concept?
12        ATTORNEY BORELLI:  Objection, form.
13        THE WITNESS:  Sex is a biological
14  concept, yes.
15  BY ATTORNEY BROOKS:
16     Q.  And let me take you, in fact, to page 221 of
17  this document, first column.  And there you will see a
18  heading that begins biological sex, the definition of
19  male and female.
20        Do you see that?
21     A.  Yes.
22     Q.  And it begins sex is a biological concept.  And
23  you just said that you think that's a scientifically
24  true statement.

Page 75

1        Right?
2        ATTORNEY BORELLI:  Objection, form.
3  Could --- could she have an opportunity to read this
4  section before we continue questioning?
5        ATTORNEY BROOKS:  Yes.  But I'll ask you
6  not to coach the witness.  I have not denied any
7  requests, but the witness should make them, not counsel.
8        ATTORNEY BORELLI:  The objection stands.
9  It is appropriate to ask that a witness be able to read
10  a section of a document before being asked to opine
11  about the larger meaning of the document.
12        ATTORNEY BORELLI:  I believe the witness
13  threw some more language in this paragraph so that's a
14  good idea.
15  BY ATTORNEY BROOKS:
16     Q.  If you will tell us when you have read that
17  paragraph.
18     A.  Yes.  Sorry.
19     Q.  You have?
20     A.  No, I will tell you.
21        ATTORNEY TYRON:  Jake, could you scroll
22  down a bit, please?
23        THE WITNESS:  Okay.
24  BY ATTORNEY BROOKS:

Page 76

1     Q.  In the first paragraph under the heading
2  biological sex, directing your attention to the
3  statement did you discuss the statement sex is a
4  biological concept.  Do you see that language?
5     A.  I do.
6     Q.  And you believe that to be a scientifically
7  accurate statement?
8        ATTORNEY BORELLI:  Objection to form.
9        THE WITNESS:  Yes.
10  BY ATTORNEY BROOKS:
11     Q.  And in the next sentence this Endocrine Society
12  statement tells us that, quote, all mammals have two
13  distinct sexes, closed quote.  Do you believe that is
14  true or scientifically inaccurate?
15        ATTORNEY BORELLI:  Objection, form.
16        THE WITNESS:  Excuse me.  I'm sorry.  I'm
17  trying to find that language.
18  BY ATTORNEY BROOKS:
19     Q.  Third line of that paragraph, all mammals have
20  two distinct sexes.  My question is do you believe that
21  is inaccurate or accurate scientific ---?
22        ATTORNEY BORELLI:  Objection, form.
23        THE WITNESS:  I still think it is
24  imprecise.

Page 77

1  BY ATTORNEY BROOKS:
2     Q.  Have you finished your answer?
3     A.  Yes.  Sorry.  My allergies are making me ---.
4     Q.  Any time you need a drink.
5     A.  Yeah.  Sorry about that.
6     Q.  Few lines down it says, quote, the classical
7  biological definition of the two sexes is that females
8  have ovaries and make larger female gametes, eggs,
9  whereas the males have testes and make smaller gametes,
10  sperm.  Do you see that language?
11     A.  I do.
12     Q.  Do you agree that is a fair statement of the
13  classical biological definition of the two sexes?
14        ATTORNEY BORELLI:  Objection, form.
15        THE WITNESS:  When you use the word
16  classical it describes what you would see typically, so
17  I agree with that statement.  It allows for there to be
18  some variations that may not be classical.
19  BY ATTORNEY BROOKS:
20     Q.  And it is accepted as a classical definition
21  because it is accurate in the overwhelming percentage of
22  cases.
23        Is that true?
24        ATTORNEY BORELLI:  Objection, form.

Diaz et al. 0773

Page 78

1    THE WITNESS:  So you know, as I mentioned
2  before in my papers that I submitted, it --- you know,
3  the percentage of people with differences of sex
4  development is low and those would be the individuals
5  that would not follow typically within this.
6  BY ATTORNEY BROOKS:
7    Q.   And those individuals are the overwhelming
8  majority.
9       Correct?
10       ATTORNEY BORELLI:  Objection, form.
11       THE WITNESS:  They are the majority.
12  BY ATTORNEY BROOKS:
13    Q.   Well more than 99 percent.
14       Correct?
15       ATTORNEY BORELLI:  Objection, form.
16       THE WITNESS:  I would have to do the math
17  but that sounds accurate.
18  BY ATTORNEY BROOKS:
19    Q.   Let me ask you to turn to page 228.  In the
20  second column, the final paragraph begins on that page,
21  it reads, quote, sex is an essential part of vertebrate
22  biology, but gender is a human phenomenon, semicolon.
23  Sex often influences gender, but gender cannot influence
24  sex.  Do you see that language.

Page 79

1    A.   What is the first word in the sentence again so
2  I can find it?
3    Q.   It's on the second column, the final paragraph.
4    A.   Okay.
5    Q.   I'm really just calling your attention to the
6  first sentence.
7    A.   Yep, read it.
8    Q.   Is there anything in that sentence that you
9  believe to be inaccurate scientifically?
10       ATTORNEY BORELLI:  Objection, form.
11       THE WITNESS:  Again, I think they're
12  imprecise as primates have gender roles and gendered
13  activity, so it's not exactly precise.
14  BY ATTORNEY BROOKS:
15    Q.   Anything else about that statement that you want
16  to say is less than scientifically accurate?
17       ATTORNEY BORELLI:  Objection, form.
18       THE WITNESS:  You know, again they use
19  the word sex without being very specific as to sex
20  assigned at birth.  That's my only other caveat.
21  BY ATTORNEY BROOKS:
22    Q.   If we read that to refer to what the Endocrine
23  Society determined used in the 2017 Endocrine Society
24  statement that we looked at, that is, quote,

Page 80

1  genetic/gonadal sex, then do you you consider this
2  statement to be accurate?
3       ATTORNEY BORELLI:  Objection, form.
4       THE WITNESS:  That's not what it says, so
5  I'll ask you to repeat the question for me.
6  BY ATTORNEY BROOKS:
7    Q.   If we assume hypothetically --- I will ask you
8  to assume that sex as used in this Endocrine Society
9  2021 document, has the meaning that you, in fact,
10  explained from the term used in the 2017 Endocrine
11  Society document that is, quote, genetic-gonadal sex,
12  closed quote, then you believe this to be --- the
13  language that I have read to you from the 2021 document
14  to be accurate?
15       ATTORNEY BORELLI:  Objection, form.
16       THE WITNESS:  So I believe when I
17  answered that question --- I believe when I answered
18  that question sex, gonadal, you know, those are two
19  parts of it.  They have not included the full range of
20  hormonal or external genitalia to be specific.  In my
21  line of work I would need all of that information to
22  really pin down things.
23  BY ATTORNEY BROOKS:
24    Q.   So your testimony now is that the term

Page 81

1  genetic/gonadal '17 guidelines is too imprecise for you
2  really to understand?
3       ATTORNEY BORELLI:  Objection, form.
4       THE WITNESS:  I think you asked that
5  question before.
6  BY ATTORNEY BROOKS:
7    Q.   And I thought you had said you did understand.
8  You seem to be changing your testimony.
9       ATTORNEY BORELLI:  Objection.
10       THE WITNESS:  You can read it back to me
11  if you --- I think that there's multiple things that are
12  left out of that particular phrase to describe, you
13  know, individuals.  I can't say something that is, you
14  know, in my experience and in the literature and in
15  patients with intersex conditions that are --- that
16  could be different from that.  There --- yeah.
17  BY ATTORNEY BROOKS:
18    Q.   If we for a moment focus on individuals who do
19  not suffer from any disorder of sexual development, then
20  do you believe the following quote from Endocrine
21  Society 2021 document is true, and that is, quote, sex
22  is an essential part of vertebrate biology, but gender
23  is a human phenomenon, semicolon, sex often influences
24  gender, comma, but gender cannot influence sex, closed

Page 82

1  quote?
2  ATTORNEY BORELLI:  Objection, form.
3  THE WITNESS:  Trying to think, make sure
4  --- I can't think of an instance right now that makes me
5  disagree with that statement.
6  BY ATTORNEY BROOKS:
7  Q.   Let me take you to the first column on page 228
8  and there's a heading there that says considering sex
9  and/or gender as variables in health and disease.
10  Do you see that?
11  A.   No.  What page are you on?
12  Q.   228 ---
13  A.   Yes.
14  Q.   --- first column, the heading towards the bottom
15  of the page.
16  A.   Okay.
17  Q.   And here they're specifically mentioning sex on
18  one hand and gender on the other.  Do you see that?
19  This paragraph begins, quote, women and men differ in
20  many physiological and psychological variables.
21  Do you see that?
22  A.   Yes.
23  Q.   Do you believe that to be a scientifically
24  accurate statement?

Page 83

1  ATTORNEY BORELLI:  Objection, form.
2  THE WITNESS:  I think if I were to add
3  typical, it's saying there is variability.
4  BY ATTORNEY BROOKS:
5  Q.   Well, it is saying specifically that women and
6  men differ from each other in physiological and
7  psychological ways.
8  Correct?
9  ATTORNEY BORELLI:  Objection, form.
10  THE WITNESS:  That's what it says.
11  BY ATTORNEY BROOKS:
12  Q.   And do you believe that to be a scientifically
13  true statement?
14  ATTORNEY BORELLI:  Objection, form.
15  THE WITNESS:  Again, you know, you have
16  to interpret these in their context of what they are
17  saying.  Statements.
18  BY ATTORNEY BROOKS:
19  Q.   Do you believe it to be true or false that women
20  and men differ in many physiological and psychological
21  variables?
22  ATTORNEY BORELLI:  Objection, form.
23  THE WITNESS:  All people are different.
24  BY ATTORNEY BROOKS:

Page 84

1  Q.   Dr. Adkins, do you believe it to be true or
2  false that women and men as women and men differ from
3  each other in many physiological and psychological
4  variables?
5  ATTORNEY BORELLI:  Objection to the form.
6  THE WITNESS:  So women and men are a
7  gender assignment, not the biological sex which you
8  mentioned before.  And gender is not necessarily a way
9  that I would necessarily think is a scientifically
10  precise way to place that if you're talking about this
11  particular statement.
12  BY ATTORNEY BROOKS:
13  Q.   Is it your belief that the Endocrine Society in
14  this document in the terms women and men is referring to
15  gender identity other than biological --- what does the
16  word physiological mean to you as a doctor?
17  A.   The method of function and interaction of all
18  the parts of the body.
19  Q.   It refers to biology, not to the statement of
20  mind or identity.
21  Correct?
22  ATTORNEY BORELLI:  Objection to form.
23  THE WITNESS:  I would just agree with
24  that statement.

Page 85

1  BY ATTORNEY BROOKS:
2  Q.   Let me ask you to turn to page 229.
3  Q.   The first full paragraph begins, quote, despite
4  the fact that biological sex is such a fundamental
5  source of interest specific variation in anatomy and
6  physiology, much basic and clinical science has tended o
7  focus studies on one sex, typically male, closed quote.
8  Do you see that language?
9  A.   I do.
10  Q.   And do you understand what is meant by
11  intraspecific variation?  Let me offer a suggestion.  Do
12  you understand it to refer to variations within the
13  human species?
14  ATTORNEY BORELLI:  Objection to form.
15  THE WITNESS:  I think you know again in
16  context I would need to intraspecific --- intraspecific
17  could be between me and you.  Isolated in this one
18  sentence, I would need to take a moment to see if it
19  better explains it if I were to read further.
20  BY ATTORNEY BROOKS:
21  Q.   Do you disagree or agree that biological sex is
22  a fundamental source of variation in anatomy and
23  physiology within the human species?
24  ATTORNEY BORELLI:  Objection, form.

Page 86

1    THE WITNESS: I'm sorry.  I got
2  sidetracked in my brain.  Could you please read the
3  question?
4  BY ATTORNEY BROOKS:
5    Q.   Yes, I can.  Do you agree or disagree that
6  biological sex is the fundamental source of variation in
7  anatomy and physiology within the human cease species?
8    ATTORNEY BORELLI:  Objection, form.
9    THE WITNESS:  There is lots of other
10  parts of physiology that are completely unrelated to
11  your reproductive system that is more fundamental.
12  BY ATTORNEY BROOKS:
13    Q.   Dr. Adkins, do you agree or disagree that
14  biological sex is a fundamental source of variation in
15  anatomy and physiology with human species?
16    ATTORNEY BORELLI:  Objection, form.
17    THE WITNESS:  It is one of the variables
18  within variations.
19    ATTORNEY BROOKS:  Let me mark as Exhibit
20  8 an infographic, if I can use that term.  Exhibit 8?
21    VIDEOGRAPHER:  Excuse me, Counsel.  You
22  cut out right after Exhibit 8.  I didn't hear which
23  document that was.
24    ATTORNEY BROOKS:  It is tab 9 and it is a

Page 87

1  one page infographic, if I may, put out by the National
2  Institute of Health titled How Sex and Gender Influence
3  Sex and Disease.
4    ---
5    (Whereupon, Adkins Exhibit 8, NIH
6    Sex/Gender Infographic, was marked for
7    identification.)
8    ---
9  BY ATTORNEY BROOKS:
10    Q.   And first let me ask, Dr. Adkins, are you
11  familiar with the National Institute of Health as an
12  organizations?
13    A.   Yes.
14    Q.   That is a government research institute?
15    A.   Yes.
16    Q.   And major grant --- major source of grants,
17  grant making in the health sciences?
18    A.   Yes.
19    Q.   And are you --- were you aware that it has
20  within it an Office of Research on Women's Health?
21    A.   No.
22    Q.   Do you see that this is published by the
23  National Institute of Health, Office of Research on
24  Women's Health?

Page 88

1    A.   Okay.
2    Q.   In the box at the top it says, and I quote, sex
3  is a biological classification included in our DNA.
4  Males have XY chromosomes and females have XX
5  chromosomes.  Sex makes us male or female.  Do you see
6  that language?
7    A.   I do.
8    Q.   And it continues, every cell in your body has a
9  sex making up tissues and organs like your skin, brain,
10  heart and stomach.  Each cell is either male or female
11  depending on whether you are a man or a woman, closed
12  quote.
13    Do you see that?
14    A.   I do.
15    Q.   And then it continues under that with a
16  definition of gender.  So my question is --- begins
17  here, the opening statement in this NIH publication says
18  that sex is a biological classification.  Do you agree
19  or disagree with that?
20    ATTORNEY BORELLI:  Objection, form.
21    THE WITNESS:  You know, there is a whole
22  literature on --- on this --- the differences in --- in
23  sex.  I --- so biological as opposed to another type of
24  classification, I agree with that statement.

Page 89

1  BY ATTORNEY BROOKS:
2    Q.   It says a little further along that, quote,
3  every cell in your body has a sex, closed quote.  Do you
4  agree or disagree with that?
5    ATTORNEY BORELLI:  Objection to the form.
6    THE WITNESS:  I agree.  And each cell can
7  be different.
8  BY ATTORNEY BROOKS:
9    Q.   Are you saying that within an individual --- a
10  specific individual each cell can have a different sex?
11    A.   Yes.
12    Q.   This NIH publication tells us that, quote, each
13  cell is either male or female, closed quote.  And I take
14  it you simply believe the NIH is wrong about that?
15    ATTORNEY BORELLI:  Objection, form.
16    THE WITNESS:  I think that the nuances
17  are something that you can't publish in a one-page
18  documentation when they're not talking about an entire
19  population.
20  BY ATTORNEY BROOKS:
21    Q.   Under this initial box is a heading that says
22  examples of sex and gender influences.  Do you see that?
23    A.   I do.
24    Q.   And it has various categories of things that may

Page 90

1   be influenced on one end by sex, which is defined in
2   this document as a biological classification, and
3   gender.  Do you see that structure of this document?
4          ATTORNEY BORELLI:  Objection, form.
5          THE WITNESS:  Yeah.
6   BY ATTORNEY BROOKS:
7      Q.   And it says if we go down to cardiovascular risk
8   one of the differences that is identified as based on
9   sex is that, quote, blood vessels in a woman's heart are
10  smaller in diameter and much more intricately branched
11  than those of a man, closed quote.  Do you see that?
12     A.   Under cardiovascular risk, yeah.  Okay.
13     Q.   And the NIH gives this as an example of a
14  physical measurable biological difference that depends
15  on biological sex.
16         Correct?
17         ATTORNEY BORELLI:  Objection, form.
18         THE WITNESS:  Well, actually the words
19  they're using are gender --- gender words, not the words
20  we would use for sex, you know, female or male or a
21  variation in between.  So I would --- if I were editing
22  this document, I probably wouldn't have used the word
23  woman.
24  BY ATTORNEY BROOKS:

Page 91

1      Q.   You would have said a female?
2      A.   Typical female.
3      Q.   Because what --- how the blood vessels in your
4   heart are structured depend on your sex, not on your
5   gender identity.  Am I correct?
6          ATTORNEY BORELLI:  Objection, form.
7          THE WITNESS:  There is many variables
8   that can affect these things and what --- that is one of
9   them.
10  BY ATTORNEY BROOKS:
11     Q.   To your knowledge, gender identity is not a
12  variable that affects how the blood vessels in one's
13  heart are structured, does it?
14         ATTORNEY BORELLI:  Objection, form.
15         THE WITNESS:  Not that I'm aware of.
16  BY ATTORNEY BROOKS:
17     Q.   Under the last item here is knee arthritis.  Do
18  you see that heading?
19     A.   Yes.
20     Q.   I'm sure we'll have the same terminology
21  discussion, but the language there says, quote, women
22  and girls are more likely to injure their knees when
23  playing sports, closed quote.  Do you see that language?
24     A.   I do.

Page 92

1      Q.   And if we use the term --- substitute the term
2   females for women and girls and say females are more
3   likely to injure their knees when playing sports, do you
4   believe that to be a scientifically accurate statement?
5          ATTORNEY BORELLI:  Objection to form.
6          THE WITNESS:  You have to leave some
7   room.  Again, in medicine we're not like 100 percent.
8   But I agree that portions of females that are typical in
9   research have been reported to have more frequent knee
10  injuries.
11  BY ATTORNEY BROOKS:
12     Q.   Okay.
13         Let me ask you to find your report, Exhibit 1,
14  and let's turn to paragraph 15.  And there you wrote,
15  quote, a person's gender identity refers to a person's
16  inner sense of belonging to a particular gender such as
17  male or female.  And you continue every one has a gender
18  identity, closed quote.  Do you see that language?
19     A.   I do.
20     Q.   Let me direct your attention to the Endocrine
21  Society guidelines from 2007, which is Exhibit 4.  And
22  we're going to come back --- if you can make a stack of
23  most of these, but the 2017 guidelines we will come back
24  to with some frequency.  But we're ---

Page 93

1      A.   Keeping it on top?
2      Q.   --- keeping it on top.
3      A.   Okay.
4      Q.   And there I want to call your attention to page
5   3873.
6      A.   3873.
7      Q.   Right.  And in the second column there's a
8   section headed introduction.  And it begins with a
9   historical review of the concept of gender.  And I'm
10  going to ask you a question beginning with the language
11  that is two inches from the bottom, two and a half
12  inches from the bottom that begins these early
13  researchers.  So if you want to kind of glide through
14  what comes before that, let me know and I'll begin my
15  questioning.
16     A.   Yes, I'll look over it.  Thank you.
17         I have read that section.
18     Q.   I want to call your attention to a sentence
19  which my understanding is contrasting against or the
20  history that begins, quote, some experience themselves
21  as having both a male and female gender identity whereas
22  others completely renounce any gender classification,
23  closed quote.  Do you see that language?
24     A.   I do.

Page 94

1  Q.  And in your expert opinion, is that an accurate
2  statement?
3          ATTORNEY BORELLI:  Objection, form.
4          THE WITNESS:  In my clinical experience I
5  have met individuals who are --- identify as agender
6  which would in my mind be similar to this definition,
7  but I typically ask the patient what their gender means
8  to them.
9  BY ATTORNEY BROOKS:
10  Q.  Well, do you have any opinion as to whether some
11  individuals experience both a male and female gender
12  identity?
13          ATTORNEY BORELLI:  Objection, form.
14          THE WITNESS:  I have patients that do
15  that, yes.
16  BY ATTORNEY BROOKS:
17  Q.  And I think you said that --- I don't want to
18  puts words in your mouth.  Do you have an opinion
19  whether some individuals report not having any gender,
20  not fitting any gender classification?
21          ATTORNEY BORELLI:  Objection, form.
22          THE WITNESS:  I do have patients that
23  match that description.
24  BY ATTORNEY BROOKS:

Page 95

1  Q.  And this goes on the next sentence to say,
2  quote, there are also reports of individuals
3  experiencing a continuous and rapid involuntary
4  alternation between a male and female identity, closed
5  quote.
6      Do you see that?
7  A.  I do.
8  Q.  And do you believe that to be an accurate
9  statement?
10          ATTORNEY BORELLI:  Objection, form.
11          THE WITNESS:  I have not had that
12  clinical experience.  I would have to rely on the, you
13  know, medical report with that in particular, and I
14  would probably look at the evidence that was available
15  ---
16  BY ATTORNEY BROOKS:
17  Q.  Well ---
18  A.  --- prior to making a decision.
19  Q.  --- do you as a practitioner consider it
20  reasonable to rely on that assertion in this 2017
21  Endocrine Society statement guideline?
22          ATTORNEY BORELLI:  Objection, form.
23          THE WITNESS:  I would rely on it to be
24  something I should at least consider.

Page 96

1          ATTORNEY BROOKS:  Let me mark as Exhibit
2  9 what is tab 10, and that is a one-page statement from
3  a World Health Organization's website titled Gender and
4  Health.
5          ---
6          (Whereupon, Adkins Exhibit 9, World
7           Health Organization Webpage, was marked
8           for identification.)
9          ---
10          THE WITNESS:  Thank you.
11  BY ATTORNEY BROOKS:
12  Q.  Are you familiar with the World Health
13  Organization as an organization?
14  A.  I am.
15  Q.  And do you consider the World Health
16  Organization to be generally a respected source of
17  information on medical and health topics?
18          ATTORNEY BORELLI:  Objection to form.
19          THE WITNESS:  My general experience so
20  far to date is they're reliable.
21  BY ATTORNEY BROOKS:
22  Q.  Well, I will represent to you that this document
23  came off of a World Health Organization website and the
24  web address is at the bottom of the page.  I see on the

Page 97

1  copy in front of you --- I'll stand by my representation
2  of why mine has it ---.
3  A.  Okay.
4  Q.  This document titled Gender and Health begins
5  gender refers to the characteristics of women, men,
6  girls and boys that are socially constructed, closed
7  quote.  Do you see that?
8  A.  I do.
9  Q.  And is that a definition of gender per se that's
10  consistent with how you are used to seeing the term
11  used?
12          ATTORNEY BORELLI:  Objection, form.
13          THE WITNESS:  So you know, social
14  constructs change regularly, so I would say that, you
15  know, that wouldn't be completely inclusive of current
16  socially constructed genders, in my experience.
17  BY ATTORNEY BROOKS:
18  Q.  Well, let me direct --- why don't you read that
19  whole first paragraph, which is just three sentences,
20  because I think the World Health Organization raises
21  exactly that point.  So I'll ask you to read that?
22  A.  Sure.  Sure.
23          ---
24  (WHEREUPON, WITNESS REVIEWS DOCUMENT.)

25  (Pages 94 to 97)

1           ---
2           THE WITNESS:  Okay.
3    BY ATTORNEY BROOKS:
4       Q.   **So extending into that paragraph, that**
5    **three-sentence paragraph, just that explanation of the**
6    **concept of gender fit with how you are used to seeing**
7    **the term used in your professional experience?**
8           ATTORNEY BORELLI:  Objection, form.
9           THE WITNESS:  So in reading that, my
10   understanding of what they are using those specific
11   words, men, women, girls and boys are examples.  They
12   don't comment on other societies.  Just so --- in that
13   assessment, yes.
14   BY ATTORNEY BROOKS:
15      Q.   **All right.**
16           **If we skip down to the third paragraph it**
17   **begins gender interacts with but is different from sex,**
18   **which refers to the different biological and**
19   **psychological characteristics of females, males and**
20   **intersex persons, such as chromosomes, hormones and**
21   **reproductive organs, closed quote.  Do you see that**
22   **language?**
23      A.   I would like to read it, too, though, if you
24   don't mind.

1       Q.   **Sure.**
2       A.   Yeah.  Okay.  I have read it.
3       Q.   **So first, backing up to the statement, opening**
4    **paragraph, that gender is socially constructed, do you**
5    **believe that to be an accurate statement?**
6           ATTORNEY BORELLI:  Objection, form.
7           THE WITNESS:  Gender is a social
8    construct, yes.
9    BY ATTORNEY BROOKS:
10      Q.   **And then in the third paragraph it states that**
11   **gender identity refers to a person's deeply felt**
12   **internal and individual experience of gender.  Do you**
13   **see that?**
14      A.   I do.
15      Q.   **So gender identity refers to an individual's**
16   **experience in relation to gender, which is a social**
17   **construct.**
18           **Right?**
19           ATTORNEY BORELLI:  Objection, form.
20           THE WITNESS:  I see it, and I would ask
21   you to read the question one more time.  I just want to
22   make sure I'm answering you accurately.
23   BY ATTORNEY BROOKS:
24      Q.   **As I think I see in this document really the**

1    **question is as you understand it ---.**
2       A.   I think that you have to also include ---.
3           COURT REPORTER:  Excuse me.  I need to
4    interrupt.  Excuse me.  I'm sorry to interrupt, but
5    Counsel, your full question didn't come through on this
6    end.
7           ATTORNEY BROOKS:  I'll re-ask it.  Pardon
8    me.
9           ATTORNEY BORELLI:  Actually, why don't we
10   just address one housekeeping matter.  Would you be able
11   to identify for the record the URL that appears on your
12   copy and whether there is a date of the document or date
13   of access just so we have it on the record?
14           ATTORNEY BROOKS:  There is no date of
15   access.  That access is within the last two months.  The
16   address is
17   www.who.int/health-topics/gender#tabequalstab, underline
18   one.
19           ATTORNEY BORELLI:  Thank you.
20           ATTORNEY BROOKS:  I'm glad it wasn't one
21   of these four line ones.
22   BY ATTORNEY BROOKS:
23      Q.   **And I will re-ask my question.**
24      A.   Okay.

1       Q.   **The question is, Dr. Adkins, is it consistent**
2    **with your understanding that gender identity refers to a**
3    **person's individual experience of gender, which is in**
4    **turn a social construct?**
5           ATTORNEY BORELLI:  Objection, form.
6           THE WITNESS:  That doesn't sound to me to
7    be a full explanation.  Just doesn't sound accurate to
8    me.  I'm having a hard time.
9    BY ATTORNEY BROOKS:
10      Q.   **Then let me not take more time on that.**
11      A.   Okay.
12      Q.   **You would agree that gender is a social**
13   **construct that can change over time.**
14           **Am I right?**
15           ATTORNEY BORELLI:  Objection, form.
16           THE WITNESS:  Gender --- so it's a social
17   construct, it's true.  Gender is, you know, how you ---
18   I mean, it's complicated.  It involves more things than
19   --- and so, you know, if you're talking about gender
20   expression, that's different.  Someone's gender as they
21   understand it for their gender identity is different.  I
22   mean, I have patients who are assigned a particular sex
23   and the family and the physicians assign a gender that
24   is more typically correlated with that sex.  And then

1  over time those individuals sometimes don't identify
2  with that gender, and they may change their gender
3  marker, for example, because their identity really just
4  doesn't match what we assigned them at birth.  I'm not
5  sure how to give a clearer answer.  I'm trying.
6  BY ATTORNEY BROOKS:
7      Q.   Well, so if an individual comes into your office
8  and asserts a gender identity of, let's say, man or
9  both, either one of those, how can a clinician verify
10  whether that individual is accurately understanding his
11  own or their own subjective feelings?
12          ATTORNEY BORELLI:  Objection, form.
13          THE WITNESS:  And you know, a gender
14  again is something that's assigned at birth and it is
15  what you work with in your life, and so you know, I
16  would ask them and they could tell me how they were
17  proceeding in life with regard to their gender
18  behaviors.  That would be how I would probably asses
19  their gender.
20  BY ATTORNEY BROOKS:
21      Q.   How do you ascertain whether that individual who
22  claims identity of man or both is telling you, the
23  clinician, the truth?
24          ATTORNEY BORELLI:  Objection, form.

1          THE WITNESS:  So in general, you know,
2  in pediatrics we have a parental report, and it depends
3  on the clinical situation.  We may or may not have
4  another health provider's report or a mental health
5  provider's report.  If we have questions, we start to
6  dig deeper and look at other areas.
7  BY ATTORNEY BROOKS:
8      Q.   Let me call your attention to paragraph 19 in
9  your expert report, Exhibit 1.  And there you refer to
10  DSM-V definition of gender dysphoria.
11          Do you see that?
12      A.   What paragraph?
13      Q.   Paragraph 19?
14      A.   Yeah.
15      Q.   And you mention that among other things the
16  diagnostic criteria under DSM-V for gender dysphoria
17  includes, quote, clinically significant distress.  Do
18  you see that?
19      A.   I do.
20      Q.   And in fact, it includes clinically significant
21  distress that, quote, impairs important areas of
22  functioning, closed quote.
23          Am I correct?  Do you recall that in DSM-V?
24          ATTORNEY BORELLI:  Objection.  Objection

1  to form.
2          THE WITNESS:  That is how I recall that.
3  BY ATTORNEY BROOKS:
4      Q.   Paragraph right?
5      A.   Yeah.  I want to reserve the right to look at it
6  to be certain.  That sounds correct to me at this
7  moment.
8      Q.   And what does clinically significant distress
9  that impairs important areas of functioning look like in
10  a child?
11          ATTORNEY BORELLI:  Objection, form.
12          THE WITNESS:  Yeah.  So you know, it
13  depends on what they are coming in with.  I mean, for
14  some of my patients, you know, who are, you know,
15  hyperthyroid, for example, their brain's run really
16  fast, they can't focus during school, and that would be
17  impairment in their ability to do their main job, which
18  is to be in school and learn.  So that's one area where
19  you can have some impairment in their --- it varies from
20  patient to patient and in each thing we're talking
21  about.
22  BY ATTORNEY BROOKS:
23      Q.   The example you just gave was impairment
24  resulting from a hyperthyroid condition.

1      Am I correct?
2      A.   Correct.
3      Q.   What I asked was impairment due to ---
4  attributable to what gender dysphoria looks like in a
5  child.
6      A.   Oh.
7          ATTORNEY BORELLI:  I don't want to
8  interrupt.  I think there may have been a misreading of
9  the language in the paragraph, and I just want to make
10  sure the record is correct that the final sentence of
11  that paragraph says in order to be diagnosed with gender
12  dysphoria, incongruence must persist for at least six
13  months and be accompanied by clinically significant
14  distress or impairment in social, occupational or other
15  important area of functioning.
16  BY ATTORNEY BROOKS:
17      Q.   I, on the other hand, will ask a question that i
18  believe is more closely tracked to the DSM-V language,
19  which is what is clinically significant distress that
20  impairs important area of functioning look like in a
21  young child?
22          ATTORNEY BORELLI:  Objection, form.
23          THE WITNESS:  Okay.  I misheard you.  I'm
24  sorry.  I didn't hear the gender dysphoria part.  I

1   apologize.  So in patients with gender dysphoria
2   sometimes it can be anxiety that keeps them from going
3   to school.  Sometimes it can be anxiety that keeps them
4   from using public restrooms.  Sometimes it is depression
5   so that they can't get out of bed to function.
6   Sometimes it's just feeling really uncomfortable and ---
7   with how they are being treated and what they're allowed
8   to do in a way that makes it more difficult for them
9   than a person without gender dysphoria.
10  BY ATTORNEY BROOKS:
11      **Q.   In your practice is a full diagnosis of gender**
12  **dysphoria under the DSM-V criteria a precondition for**
13  **recommending or supporting social transitioning?**
14          ATTORNEY BORELLI:  Objection, form.
15          THE WITNESS:  So in my practice the
16  majority of my patients have socially transitioned
17  before they come to see me in order to improve their
18  gender dysphoria.  In general, that is something that
19  their family and their mental health provider decides.
20  Each individual patient is different and we talk through
21  whether that is appropriate for each patient.
22  BY ATTORNEY BROOKS:
23      **Q.   In your practice is a full DSM-V diagnosis of**
24  **gender dysphoria a precondition for recommending social**

1   **transition?**
2           ATTORNEY BORELLI:  Objection, form.
3           THE WITNESS:  No.
4   BY ATTORNEY BROOKS:
5       **Q.   And in your practice is a full DSM-V  gender**
6   **dysphoria diagnosis a precondition for prescribing**
7   **puberty blockers?**
8           ATTORNEY BORELLI:  Objection, form.
9           THE WITNESS:  I use puberty blockers for
10  more than one indication.
11  BY ATTORNEY BROOKS:
12      **Q.   Let me ask a better question.  In your practice**
13  **is a full DSM-V gender dysphoria diagnosis a**
14  **precondition for prescribing puberty blockers as a**
15  **treatment for gender dysphoria?**
16          ATTORNEY BORELLI:  Objection, form.
17          THE WITNESS:  So my patients are
18  evaluated by mental health providers outside the clinic
19  and inside the clinic.  The objective of using puberty
20  blockers can be used to relieve dysphoria and give them
21  time to consider their gender identity.
22  BY ATTORNEY BROOKS:
23      **Q.   In your practice is a full diagnose of gender**
24  **dysphoria under the DSM-V criteria a precondition for**

1   **prescribing puberty blocker for believed gender**
2   **dysphoria?**
3           ATTORNEY BORELLI:  Objection to form.
4           THE WITNESS:  Well, in the way that you
5   stated it, you're saying that the patient already has
6   gender dysphoria, so yes.
7   BY ATTORNEY BROOKS:
8       **Q.   In your practice is the full diagnosis of gender**
9   **dysphoria under the DSM-V criteria a precondition for**
10  **prescribing puberty blockers as a therapy for gender**
11  **dysphoria or gender incongruity?**
12          ATTORNEY BORELLI:  Objection, form.
13          THE WITNESS:  Yes.
14  BY ATTORNEY BROOKS:
15      **Q.   And in your practice is a full diagnosis of**
16  **gender dysphoria according to the DSM-V criteria a**
17  **precondition for prescribing cross sex hormones?**
18          ATTORNEY BORELLI:  Objection, form.
19          THE WITNESS:  They are used to relieve
20  dysphoria.  Typically that would be what we would use
21  them to do, is to relieve that dysphoria so they would
22  have that diagnosis.  On occasion in my practice the
23  incongruence does not necessarily cause dysphoria per
24  se, and yet they still have significant issues that are

1   impairing their ability to move forward in their lives
2   in a happy, healthy way.  And I might use medications
3   such as gender-affirming hormones in those cases.
4   BY ATTORNEY BROOKS:
5       **Q.   So if I understand correctly, you're saying that**
6   **at least some cases in your practice you are willing to**
7   **prescribe cross sex hormones for individuals who do not**
8   **suffer from gender dysphoria according to the criteria**
9   **spelled out in DSM-V?**
10          ATTORNEY BORELLI:  Objection, form.
11          THE WITNESS:  Every patient is different.
12  Most of my patients have gender dysphoria.  All of them
13  have a transgender identity, and I would treat either of
14  those.
15  BY ATTORNEY BROOKS:
16      **Q.   I think this question can be answered yes or no.**
17  **Do you prescribe cross sex hormones for some patients**
18  **who do not suffer from gender dysphoria according to the**
19  **DSM-V criteria?**
20          ATTORNEY BORELLI:  Objection, form.
21          THE WITNESS:  I don't think so.  I mean,
22  gender-affirming hormones --- I use hormones for a lot
23  of different things.  Whether you call them gender
24  affirming or not is --- you know, what is kind of a

0781

1  thing here.  I mean, for people with Klinefelter's, who
2  are clinically significantly depressed because they have
3  low testosterone, I prescribe testosterone to improve
4  their mood, their libido, their muscle strength.  For
5  people who have dysphoria or who have a transgender
6  identity, I do prescribe those medications.  I think
7  that to be precise in my answers I cannot say it as a
8  yes or no answer.
9      Q.   Let me ask you to turn to paragraph ten of your
10  report.  There you say I have treated approximately 500
11  transgender and intersex young people in my career.
12      Do you see that?
13  A.   No, that's not how it's written.
14      Q.   I apologize.  I was reading to you the second
15  sentence of paragraph ten, and I believe I read that
16  ---.
17  A.   Okay.
18      I'm sorry.  I was starting at the beginning.
19  Q.   I understand.
20  A.   Yes.
21      Q.   And let's break that out.  Of those 500,
22  approximately how many suffered from some form of DSD?
23      ATTORNEY BORELLI:  Objection, form.
24      THE WITNESS:  So the --- that I know of,

1  because we don't evaluate every person necessarily for
2  an intersex condition, probably --- gosh, it's hard to
3  estimate.  So I think at least 60 in my clinic and then
4  probably in the hospital at least 10, 15 a year.  At
5  least one a month or so.
6  BY ATTORNEY BROOKS:
7      Q.   Of the 500 transgender intersexual young people
8  that you treated in your career, how many would you
9  estimate suffered from some form of disorder of sexual
10  development?
11      ATTORNEY BORRELLI:  Objection, form.
12      THE WITNESS:  Off the top of my head I
13  can think of one.  I have reviewed a referral for a
14  second one.  Gosh.  With that many patients, that's the
15  best I can do.  Sorry.
16  BY ATTORNEY BROOKS:
17      Q.   And I take it then that the overwhelming
18  majority, almost all the children that you have seen and
19  treated for gender dysphoria did not suffer from any
20  disorder of sexual development?
21      A.   So at the time of my evaluation of them they
22  weren't showing any signs of an intersex condition.  I
23  don't necessarily test for intersex conditions on every
24  person that comes in.  Insurance is really kind of funny

1  about paying for that sort of thing because they don't
2  think it is appropriate to do.  So I can't evaluate them
3  unless they have a symptom of an intersex condition.
4  Those can present even into your 30s and not be evident
5  until you are trying to get pregnant.  So I think to be
6  accurate, that's ---.
7      Q.   To your knowledge, almost all of the children
8  that you have treated for gender dysphoria did not show
9  signs of any intersex condition or disorder of sexual
10  development?
11      ATTORNEY BORELLI:  Objection, form.
12      THE WITNESS:  To best of my knowledge.
13  BY ATTORNEY BROOKS:
14      Q.   Let me call your attention to page three of your
15  report, which is on page five.  And you say there in the
16  second sentence, quote, all of my patients have suffered
17  from persistent gender dysphoria.
18      Do you see that?
19  A.   Uh-huh (yes).
20      Q.   Now, I just don't understand that because a few
21  minutes ago you explained to me that some of your
22  patients suffer from gender dysphoria and some of them
23  don't.  So can you explain to me what you meant by that
24  statement?

1      ATTORNEY BORELLI:  Objection, form.
2      THE WITNESS:  Yeah.  I learn more and
3  more every day about the patients who come into my
4  clinic.  I did state that most of my patients have
5  gender dysphoria.  I am finding individuals currently in
6  my practice who aren't necessarily to the point of
7  having that clinically significant criteria that is
8  mentioned in the --- for dysphoria that have a
9  transgender identification.  The majority I would say do
10  have dysphoria.
11  BY ATTORNEY BROOKS:
12      Q.   You would now say the majority rather than all?
13      ATTORNEY BORELLI:  Objection, form.
14      THE WITNESS:  I can't think of --- yeah,
15  I would say the majority.  There would be a very rare
16  instance and that's why I mentioned it before.
17      ATTORNEY BORELLI:  Counsel, just a quick
18  question about timing and a potential break because
19  we've been going for a little while.
20      ATTORNEY BROOKS:  Right.  I'm inclined to
21  go --- like from my experience, if you stop early for
22  lunch, then it's an awful long afternoon.  So I'd be
23  inclined to go until 12:30 or so and then break for
24  lunch.

Page 114

1    ATTORNEY BORELLI: Does that work for
2    you? Would you like a break now before we later break
3    for lunch or what is best for you, Dr. Adkins?
4    THE WITNESS: Well, since I'm not a
5    breakfast eater, I would prefer to go a little bit
6    earlier if we can.
7    ATTORNEY BROOKS: We can do it. I just
8    warn you it gets to be a long afternoon.
9    THE WITNESS: I understand.
10   ATTORNEY BROOKS: Let me finish up the
11   line of questioning. Well, should we target noon to
12   stop for lunch?
13   THE WITNESS: That's fine. Thank you.
14   BY ATTORNEY BROOKS:
15   **Q.   Let me take you back to the Endocrine Society**
16   **statement on --- back to the biological variable, which**
17   **is Exhibit 7. If you would find that, please. And I'll**
18   **ask you to turn to page 225, second column towards the**
19   **bottom with the heading that reads biological basis of**
20   **diversity and sexual/gender development and orientation.**
21   **Do you see that?**
22   A.   I do.
23   **Q.   And it reads at the beginning given the**
24   **complexities of the biology of sexual determination and**

Page 115

1    **differentiation, comma, it is not surprising that there**
2    **are dozens of examples of variations or errors in these**
3    **pathways associated with genetic mutations that are now**
4    **well known to endocrinologists and geneticists. In**
5    **medicine these situations are generally termed disorders**
6    **of sexual development or differences in sexual**
7    **development, closed quote.**
8    **Do you see that?**
9    A.   Yes.
10   **Q.   Now, in your opinion, a transgender identity is**
11   **not a disorder.**
12   **Am I right?**
13   A.   It is a normal variation, in my opinion, of huma
14   --- of humans in general.
15   **Q.   It's not a mental disorder?**
16   ATTORNEY BORELLI: Objection, form.
17   THE WITNESS: So you know, they have in
18   the past included it in the DSM, which is categorized as
19   those sorts of things. As far as like psychological,
20   there's such over lap between psychological and the
21   physical --- I guess the best word I can use, but that
22   it's hard to --- it's hard to say. You know, I think
23   people are moving more towards that it is more of a
24   medical problem that is occurring within the person that

Page 116

1    is giving them psychological symptoms that we see, which
2    is really common in medicine. We see lots of different
3    medical conditions caused psychological symptoms. I
4    already mentioned one with hypothyroidism.
5    **Q.   In the overwhelming number of cases, transgender**
6    **identification is not associated with any physical**
7    **disorder that you as a doctor have become aware of?**
8    ATTORNEY BORELLI: Objection, form.
9    THE WITNESS: I'm sorry. I got
10   distracted. Can you repeat it?
11   BY ATTORNEY BROOKS:
12   **Q.   Yes. In the overwhelming majority of patients**
13   **that you have seen, the transgender identity is not**
14   **associated with any physical disorder that you are aware**
15   **of.**
16   **Correct?**
17   ATTORNEY BORELLI: Objection, form.
18   THE WITNESS: I mean, I'm going to need a
19   minute to think because I have seen so many patients
20   that I don't --- I guess it sort of depends on how you
21   define that, right. I am --- distress is physical and
22   psychological. The difference is physical in that
23   they're biologically assigned sex and those
24   characteristics associated are different from their

Page 117

1    gender identity. So it's a bit of a mixture.
2    BY ATTORNEY BROOKS:
3    **Q.   Many individuals who suffer from disorder of**
4    **sexual development do not experience gender identity**
5    **that is discordant with their chromosomal sex.**
6    **Correct?**
7    ATTORNEY BORELLI: Objection, form.
8    THE WITNESS: Some do, yes. That is true
9    for some.
10   BY ATTORNEY BROOKS:
11   **Q.   Many individuals who experience a transgender**
12   **identity --- I'm sorry. Many individuals who suffer**
13   **from a disorder of sexual development do not experience**
14   **a gender identity that is discordant with their**
15   **chromosomal sex.**
16   **Correct?**
17   ATTORNEY BORELLI: Objection to form.
18   THE WITNESS: So there's, you know, like
19   100 different variations. Some are more likely to have
20   questions about their gender identity than others. It
21   varies by diagnosis.
22   BY ATTORNEY BROOKS:
23   **Q.   Okay.**
24   **But my question is a high level one. It is**

Blair v. Wade 0783

Page 118

1  true, is it not, that many individuals who suffer from a
2  disorder of sexual development do not experience gender
3  identity that is discordant with their chromosomal sex?
4          ATTORNEY BORELLI:  Objection, form.
5          THE WITNESS:  In the medical literature
6  the reports vary.  Some of the conditions are 90 of them
7  their identity matches with their chromosomal sex and in
8  some cases it's like 30 to 40 percent.
9  BY ATTORNEY BROOKS:
10      Q.   And as you have testified, many individuals who
11  experience transgender identity do not suffer from any
12  identified disorders of sexual development?
13          ATTORNEY BORELLI:  Objection, form.
14          THE WITNESS:  I answered that question
15  already, yeah.
16  BY ATTORNEY BROOKS:
17      Q.   The answer is yes?
18      A.   Yes, I answered the question already.
19      Q.   For clarity I would like you to answer it again.
20          ATTORNEY BORELLI:  Objection, form.
21          THE WITNESS:  Can you repeat it then?
22  BY ATTORNEY BROOKS:
23      Q.   Yes.  Many individuals who experience a
24  transgender identity do not suffer from any known

Page 119

1  disorder of sexual development?
2          ATTORNEY BORELLI:  Objection, form.
3          THE WITNESS:  In my experience that is
4  true.
5  BY ATTORNEY BROOKS:
6      Q.   You have no knowledge as to the number of
7  children who suffer from a disorder of sexual
8  development who presently attend schools or colleges in
9  West Virginia, do you?
10          ATTORNEY BORELLI:  Objection, form.
11          THE WITNESS:  I can only rely on the
12  prevalence that's recorded in the medical literature and
13  then assume that West Virginia has the population base
14  that is similar to those medical reports.
15  BY ATTORNEY BROOKS:
16      Q.   You, yourself, don't have any actual knowledge
17  either way on that.
18      Correct?
19          ATTORNEY BORELLI:  Objection, form.
20          THE WITNESS:  I have not been given a
21  list of the number of individuals, no.
22  BY ATTORNEY BROOKS:
23      Q.   And you are not opining that B.P.J. suffers from
24  any disorder of sexual development, are you?

Page 120

1          ATTORNEY BORELLI:  Objection, form.
2          THE WITNESS:  I don't know B.P.J..  I
3  have not evaluated B.P.J..  I can't say that about
4  B.P.J..
5  BY ATTORNEY BROOKS:
6      Q.   And in fact, you don't know whether any child
7  who is chromosomally XY but suffers from a disorder of
8  sexual development has ever sought to compete in female
9  athletics in West Virginia, do you?
10          ATTORNEY BORELLI:  Objection to form.
11          THE WITNESS:  There are so many people
12  who have competed or tried to compete over the years.  I
13  have not seen a documentation specifically of West
14  Virginia.  It's common in athletics.
15  BY ATTORNEY BROOKS:
16      Q.   You are not aware of a single case that has ever
17  occurred in West Virginia of a chromosomally XY child
18  seeking to compete in female athletics based on a ---
19  let me ask that question again.  You're not aware of any
20  specific instance in which an X --- chromosomally XY
21  child who suffers from a disorder of sexual development
22  has sought to compete in female athletics in West
23  Virginia up to the present?
24          ATTORNEY BORELLI:  Objection to form.

Page 121

1          THE WITNESS:  So some people die with
2  chromosomes XY and look completely female and never
3  knew.  So I can't say that anyone could definitely say
4  that, including myself.
5  BY ATTORNEY BROOKS:
6      Q.   Well, my question was you are not aware of any
7  case of an XY individual who suffered from a disorder of
8  sexual development seeking to compete in female
9  athletics in West Virginia.
10      Right?
11          ATTORNEY BORELLI:  Objection to form.
12          THE WITNESS:  Correct.
13  BY ATTORNEY BROOKS:
14      Q.   And so let me ask you --- a substantial portion
15  of your expert report goes into all sorts of detail
16  about disorders of sexual development.
17      Correct?
18      A.   Correct.
19      Q.   In your understanding, what is the point?  What
20  does that have to do with any opinion you are offering
21  about issues in this case?
22          ATTORNEY BORELLI:  Objection, form.
23          THE WITNESS:  So the folks who have
24  differences of sex development have really been our tool

HighYa 0784

Page 122

1  within medicine to understand gender identity and how it
2  developed over time, especially when there may be some
3  difference in the effects of the chromosomes, the
4  hormonal expression and the biological external
5  reproductive genitalia. And it elicits --- kind of
6  shows us that there can be some variations that identity
7  that you might have --- I'm sorry, sex that you might
8  assign at birth based on one of these categorical things
9  or a mixture of them may not be exactly what a person
10 identifies at birth.
11         For example, there are individuals who
12 are born who never had any hormones, they don't have
13 external genitalia at all when they're born, and so how
14 do you decide what sex to assign that person and thus
15 what gender to assign that person, and so it --- it
16 helps us understand that there are lots of different
17 things that go into determining a gender identity and
18 you may not know it right at birth, certainly not at
19 conception, but you may begin to understand it as the
20 person grows older.
21         And so it's important to know that
22 because when there are differences between those two
23 things it can cause significant distress and harm to the
24 individual as they get older if those two are not

Page 123

1  matching.
2  BY ATTORNEY BROOKS:
3    Q.  Let me take you to paragraph 28 of your expert
4  report. At the end of that paragraph you state I know
5  from experience with my patients that it can be
6  extremely harmful for transgender youth to be excluded
7  from the team consistent with their transgender
8  identity. Do you see that?
9    A.  It actually says with their gender identity.
10   Q.  If I misspoke, I apologize. For the record, let
11 me just do it again. Quote, I know from experience with
12 my patients that it can be extremely harmful for
13 transgender youth to be excluded from the team
14 consistent with their gender identity, closed quote.
15       Do you see that language?
16   A.  I do.
17   Q.  Let me just ask were you a varsity high school
18 or college athlete yourself?
19       ATTORNEY BORELLI: Objection, form.
20       THE WITNESS: I was.
21 BY ATTORNEY BROOKS:
22   Q.  Now, let me ask what you understand to be the
23 significance of that statement, that is are you offering
24 an opinion in this litigation that the West Virginia law

Page 124

1  is unreasonable to the extent that it prevents even a
2  single transgender youth from playing in a division
3  consistent with their gender identity?
4        ATTORNEY BORELLI: Objection, form.
5        THE WITNESS: I'm sorry. That wasn't
6  clear. Can you ---?
7  BY ATTORNEY BROOKS:
8    Q.  Are you offering an opinion that the West
9  Virginia law is unreasonable to the extent it prevents
10 even a single transgender youth from playing in the
11 division consistent with their gender identity?
12       ATTORNEY BORELLI: Objection, form.
13       THE WITNESS: Yes.
14 BY ATTORNEY BROOKS:
15   Q.  Are you offering an opinion that West Virginia
16 does not have a strong interest in ensuring fair and
17 safe competition for females in their schools and
18 universities?
19       ATTORNEY BORELLI: Objection, form.
20       THE WITNESS: I think that would require
21 me to have to, you know, talk with them about that and
22 understand a little bit better. I would hope it would
23 be every one that they were trying to keep safe.
24 BY ATTORNEY BROOKS:

Page 125

1    Q.  Are you offering an opinion that West Virginia
2  law is not a reasonable measure to ensure fair and safe
3  competition for females in schools and colleges?
4        ATTORNEY BORELLI: Objection, form.
5        THE WITNESS: Again, the language is ---
6  it's not really clear with the female who uses the word
7  female. It's like using the word sex. It's just not
8  clear.
9  BY ATTORNEY BROOKS:
10   Q.  Dr. Adkins, I used the word female because
11 earlier in one of these papers where it said woman you
12 said it would work if they said female as a sex
13 indicator to be distinguished from gender identity.
14       Do you recall that testimony?
15   A.  I do.
16   Q.  Let me ask the question again using the term
17 female in the way that you meant in that earlier
18 testimony. Are you offering an opinion that the West
19 Virginia law is not a reasonable measure to ensure fair
20 and safe competition for females in schools and colleges
21 in West Virginia?
22       ATTORNEY BORELLI: Objection, form.
23       THE WITNESSS: Yes.
24 BY ATTORNEY BROOKS:

32 (Pages 122 to 125)

Page 126

1    Q.   Can you tell me the examples that you had in
2 mind when you said I know from experience that it can be
3 extremely harmful for transgender youth to be excluded
4 from the team consistent with their gender identity?
5    A.   I can.
6    Q.   Please do.
7    A.   I have patients who have participated in sports
8 with the teams that they identify as.  Their fellow
9 students only know them as the gender that they identify
10 with and that they express.  If they were asked to
11 participate on a team that matched their sex assigned at
12 birth, then these individuals would, for one, would be
13 on the boys' team and then everyone in school would know
14 that they were transgender.  They don't have to know
15 that.  It is not any of their business.
16      Once they are identified as transgender, they
17 are at high risk for being bullied, harassed, sexually
18 assaulted, and leaving school, which leads to poor jobs,
19 poor insurance, homelessness.  There are any number of
20 reasons that I would want my patient to be able to
21 participate on the team that identifies with their
22 gender identity to keep them healthy.
23    Q.   Dr. Adkins, your answer said if they were
24 required to play on the team corresponding to their I'll

Page 127

1 say chromosomal sex, their natal sex, which suggests you
2 have not actually seen it happen.  Is there a single
3 case you can point me to in which you have observed a
4 patient harmed by being excluded from the team
5 consistent with their gender identity?
6    A.   Yes.
7    Q.   Can you tell me that area?
8         ATTORNEY BORELLI:  Objection, form.
9         THE WITNESS:  Well, one of my patients
10 who had been on middle school sports teams that matched
11 their gender identity was then asked to change.  And
12 they didn't feel comfortable going with the other
13 individuals because their identity would be discovered,
14 their --- individuals would know that they were
15 transgender.  No one at the time knew and still to this
16 day don't know because they chose not to participate
17 rather than be on the team that didn't match their
18 gender identity.
19 BY ATTORNEY BROOKS:
20    Q.   And when and what state did these events occur?
21    A.   North Carolina.
22         ATTORNEY BORELLI:  Objection to form.
23 BY ATTORNEY BROOKS:
24    Q.   That's where, when?  That's your Counsel's

Page 128

1 objection.
2    A.   North Carolina in --- for this particular
3 patient, three years ago.  I have patients that come in
4 every day who this applies.
5    Q.   Dr. Adkins, given that you're testifying under
6 oath and trying to be accurate, is it true that you have
7 patients come in every day that this applies to?
8         ATTORNEY BORELLI:  Objection, form.
9 BY ATTORNEY BROOKS:
10    Q.   Aren't we getting a little carried away here?
11         ATTORNEY BORELLI:  Objection, form.
12         THE WITNESS:  I do like to be precise.
13 BY ATTORNEY BROOKS:
14    Q.   Thank you.
15    A.   In clinic, most days when I'm in clinic I see a
16 patient who doesn't participate in athletics because of
17 the requirement that they go to participate in an area
18 that is for their assigned sex at birth.  Most days I'm
19 in a gender clinic.
20    Q.   And what you state in your document, in your
21 report here, is that you know from experience that being
22 excluded from the team consistent with their gender
23 identity can be, quote, extremely harmful to transgender
24 youth.  You have described to me students who choose not

Page 129

1 to participate in athletics.  Beyond that, can you give
2 me examples of extreme harm that has resulted from such
3 policies?
4         ATTORNEY BORELLI:  Objection, form.
5         THE WITNESS:  You know, some of that
6 would require a bit of speculation because I wouldn't
7 know what would happen to those individuals if they
8 remain in the sport.
9 BY ATTORNEY BROOKS:
10    Q.   I'm not asking you to speculate.
11    A.   So can you re-ask the question so I can kind of
12 figure out how to answer it better.
13    Q.   I'll re-ask it and maybe that you're not able to
14 answer it, but can you identify for me specific extreme
15 harm that individual patients have suffered as a result
16 of not being able to participate in the team consistent
17 with their gender identity?
18         ATTORNEY BORELLI:  Objection, form.
19         THE WITNESS:  So I have had patients who
20 have no longer participated in sports, gained weight,
21 become obese and developed type two diabetes.  I have
22 seen that around --- I can think of at least two
23 examples.  And then, you know, that's a chronic life
24 long disease that can lead to amputation and all kinds

Page 130

1  of other harms.  And let's see, what other things.
2          I have seen patients with --- who were no
3  longer happy at their school and because the time that
4  they were identified as transgender were asked to leave
5  their sport, their friend groups changed.  And you know,
6  it's tough in school.  There are kids who have --- and
7  that kind of can push them down the slope of suicidal
8  ideation and depression and those sorts of things.  I
9  mean, I have to think longer for other examples.  Those
10 are two.
11 BY ATTORNEY BROOKS:
12     Q.   Rather than starting something else, should we
13 break now for lunch?
14         ATTORNEY BORELLI:  That works.
15         VIDEOGRAPHER:  Going off the record.  The
16 current time reads 11:54 a.m. Eastern Standard Time.
17 OFF VIDEO
18             ---
19 (WHEREUPON, A PAUSE IN THE RECORD WAS HELD.)
20             ---
21 ON VIDEO
22         VIDEOGRAPHER:  We're back on the record.
23 Current time reads 12:57 p.m. Eastern Standard Time.
24 BY ATTORNEY BROOKS:

Page 131

1      Q.   Okay.
2          Dr. Adkins, welcome back from lunch.  On we go.
3  We're going to have a long afternoon.  Let me mark as
4  Exhibit 10 what we have previously identified as tab 16,
5  which is an article dated January 10, 2022 from the
6  Washington Post entitled A Transgender College Swimmer
7  is Shattering Records, Sparking a Debate Over Fairness.
8             ---
9          (Whereupon, Adkins Exhibit 10, 1/10/22
10            Washington Post Article, was marked for
11            identification.)
12             ---
13 BY ATTORNEY BROOKS:
14     Q.   Dr. Adkins, let me just ask generally, you're
15 aware of recent events in the news involving Leah
16 Thomas's competition in NCAA swimming.
17         Correct?
18         ATTORNEY BORELLI:  Objection, form.
19         THE WITNESS:  I am aware of various
20 pieces of that.
21 BY ATTORNEY BROOKS:
22     Q.   And I'm not going to try to turn you into an
23 expert on Lia Thomas, but you're just aware of that
24 narrative.  Are you generally aware that at least until

Page 132

1  recently the NCAA policy for a decade at the collegiate
2  level was that XX --- XY individuals, males, to use that
3  terminology, could compete based on gender identity in
4  women's divisions only after they had suppressed
5  testosterone for at lest a year?
6          ATTORNEY BORELLI:  Objection, form.
7          THE WITNESS:  I don't know the details of
8  NCAA.  I just don't.
9  BY ATTORNEY BROOKS:
10     Q.   Are you aware generally that some athletic
11 leagues have a requirement that biological males may
12 compete in women's athletics based on gender identity
13 only after suppressing testosterone for some period of
14 time?
15         ATTORNEY BORELLI:  Objection, form.
16         THE WITNESS:  I have heard that there are
17 individuals who are allowed to participate based on
18 their gender identity and that there's some comment
19 about hormone suppression.
20 BY ATTORNEY BROOKS:
21     Q.   And do you have college-age transgender patients
22 yourself?
23     A.   I do.
24     Q.   Does your statement that we looked at in

Page 133

1  paragraph 28 of your report that it can be extremely
2  harmful for transgender youth to be excluded from the
3  team consistent with their gender identity hold true in
4  your opinion at to collegiate level?  And I was quoting
5  from paragraph 29.
6          ATTORNEY BORELLI:  To clarify, you just
7  said 29 --- 28, paragraph 28?
8          ATTORNEY BROOKS:  It is paragraph 28.  I
9  apologize.
10         ATTORNEY BORELLI:  Thank you.  I can't
11 remember if I lodged an objection.  Objection to form.
12         THE WITNESS:  And the question was?
13 BY ATTORNEY BROOKS:
14     Q.   The question was does your assertion in
15 paragraph 28 of your report that you know from
16 experience the patients --- that it can be extremely
17 harmful for transgender youth to be excluded from the
18 team consistent with their gender identity apply to
19 college-age individuals as well as high school or
20 younger individuals?
21         ATTORNEY BORELLI:  Objection, form.
22         THE WITNESS:  In my experience, that ---
23 yes.
24 BY ATTORNEY BROOKS:

Minneart 0787

| Page 134 | Page 136 |
|---|---|

**Page 134**

1     **Q.  Do you have any opinion as to whether a policy**
2 **that requires biologically male athletes to suppress**
3 **testosterone for a certain period of time or to a**
4 **certain level of testosterone prior to competing in**
5 **women's or girls' athletics is reasonable or**
6 **unreasonable?**
7     ATTORNEY BORELLI:  Objection, form.
8     THE WITNESS:  So you're  asking me if
9 that's my opinion?  I'm sorry.  Could you just repeat
10 the question?
11 BY ATTORNEY BROOKS:
12     **Q.  Do you have an opinion --- do you have an**
13 **opinion as to whether a policy that requires**
14 **biologically male athletes to suppress testosterone**
15 **either for a certain period of time or down to a certain**
16 **level before they can be eligible to compete in women's**
17 **athletics based on gender identity is reasonable or**
18 **unreasonable?**
19     ATTORNEY BORELLI:  Objection, form.
20     THE WITNESS:  It gets tricky.  I am ---
21 you know, when you start throwing in sort of people with
22 PCOS and people with intersex conditions and --- it gets
23 tricky.  So it's harder for me to answer.
24     I think the question was do I have an

**Page 135**

1 opinion if it's reasonable or not reasonable?  Is that
2 the question?
3 BY ATTORNEY BROOKS:
4     **Q.  That is.**
5     A.  Okay.
6     In some cases it might be reasonable and some
7 cases it might not be reasonable.
8     **Q.  If we put on one side and exclude from**
9 **consideration individuals who suffer from any form of**
10 **disorder of sexual development, do you believe that a**
11 **policy that requires biologically male athletes to**
12 **suppress testosterone either for a certain period of**
13 **time or down to a certain level before they can be**
14 **eligible to play in women's athletics based on gender**
15 **identity is reasonable or unreasonable?**
16     ATTORNEY BORELLI:  Objection, form.
17     THE WITNESS:  So you know, for those who
18 are assigned male at birth, it depends on where they
19 are, you know, and what sport they're doing and what's
20 involved.  There are a number of caveats that could be
21 thrown in there along those lines.
22 BY ATTORNEY BROOKS:
23     **Q.  Is it you don't know what you think about that?**
24     ATTORNEY BORELLI:  Objection to form.

**Page 136**

1     THE WITNESS:  I think you misunderstood
2 the answer that I gave.  It would really depend on a
3 specific case.
4 BY ATTORNEY BROOKS:
5     **Q.  Well, let's look at a specific case.  I have put**
6 **in front of you Exhibit 10, this Washington Post article**
7 **from January 10, 2022 about Lia Thomas, who, according**
8 **to the headline, is shattering records.  Let me ask you**
9 **to turn in that article to page three.  And there it ---**
10 **if we look at the third paragraph, the one that begins**
11 **her fastest 200 yard freestyle, and the second sentence**
12 **--- or the third sentence says that's the fastest time**
13 **by any female college swimmer this year, .64 seconds**
14 **faster than Olympian Torri Huske.  And it continues,**
15 **quote, Thomas has also posted the nation's best 500 yard**
16 **freestyle, timed this season at four minutes, 34.06**
17 **seconds, nearly three seconds faster than Olympian**
18 **Brooke Forde.**
19     **Do you see that?**
20     A.  Uh-huh (yes).
21     **Q.  And these records were set after Lia Thomas had**
22 **qualified under the NCAA requirement of testosterone**
23 **suppression for one year.  So my question on the**
24 **specific sport for you is, is it your view that a policy**

**Page 137**

1 **that permits Thomas to compete in the women's division**
2 **against competitors who are biologically female is fair?**
3     ATTORNEY BORELLI:  Objection, form.
4     THE WITNESS:  So you will note in the
5 paragraph above it also says that her time slowed down
6 once she had this happened and she was suppressing her
7 testosterone.  You know, I --- I don't want to use that
8 word.  There are so many things that go into athletic
9 performance and your time that's not totally related to
10 your sex assignment at birth or your current hormonal
11 status, practice, you know, training, whether you had an
12 opportunity to get started at a young age, a lot of
13 variables that aren't related to their current hormones.
14 BY ATTORNEY BROOKS:
15     **Q.  Do you have an opinion as to whether a policy**
16 **that permits Lia Thomas to compete against those born**
17 **female in swimming is fair?**
18     ATTORNEY BORELLI:  Objection to form.
19 Counsel, I think we're starting to get outside the
20 scope.  The witness can answer this question if she can,
21 but we're treading on that territory.
22     THE WITNESS:  So in that there are very
23 few transgender individuals who are involved and there
24 are lots and lots and lots of opportunities for those

Page 138

1      assigned female at birth to compete, I think it is fair.
2      BY ATTORNEY BROOKS:
3          **Q.   And let me call your attention two paragraphs**
4      **down where it begins everybody wants, and quoting**
5      **Michael Joyner, who identifies as a physiologist at the**
6      **Mayo Clinic.  Are you familiar with the reputation of**
7      **the Mayo Clinic?**
8          A.   Yes.
9          **Q.   It is a high reputation.**
10         **Am I correct?**
11             ATTORNEY BORELLI:  Objection, form.
12             THE WITNESS:  In general, people think it
13     has a good reputation.
14     BY ATTORNEY BROOKS:
15         **Q.   If you read this paragraph, Dr. Joyner says,**
16     **quote, everybody wants to maximize each individual's**
17     **opportunity to participate and be as inclusive as**
18     **possible, one of the researchers, Michael Joyner, a**
19     **physiologist at the Mayo Clinic, said in an interview.**
20     **And his quote continues, but how do you balance that**
21     **inclusion at the individual level with the fairness to**
22     **the entire field?  That's really the split the baby**
23     **question, closed quote.**
24         **Do you see that language?**

Page 139

1          A.   I do.
2          **Q.   Do you agree that the question of fairness that**
3      **Dr. Joyner addresses there is, in fact, a tough question**
4      **on which reasonable people could disagree?**
5              ATTORNEY BORELLI:  Objection, form.  And
6      counsel, I need to renew my objection as to scope.
7              ATTORNEY BROOKS:  You can have a standing
8      objection as to scope, but I can pursue this line of
9      questioning.
10             THE WITNESS:  I would like to take a
11     moment to read the whole article, please.
12             ATTORNEY BORELLI:  Counsel, can you point
13     me to the portion of the report where she offers
14     opinions about things?
15             ATTORNEY BROOKS:  She has offered the
16     opinion in the report that denying participation is
17     extremely harmful.  She has testified on the record that
18     in her view, a policy that permits even one transgender
19     individual from playing according to their gender
20     identity, that she has an opinion, but she is offering
21     an opinion that that is an unreasonable policy.  I
22     intend to examine that thoroughly.  Scope is not tightly
23     limited on expert depositions, I assure you.
24             ATTORNEY BORELLI:  I'm going to stand on

Page 140

1      my objection.  We'll see where the line of questioning
2      goes and we'll confer again if we need to.
3              ATTORNEY TRYON:  This is Dave Tryon.  I
4      would ask that if there are further speaking objections
5      or discussions about scope, it be done outside the
6      presence of the witness.
7      BY ATTORNEY BROOKS:
8          **Q.   Let me ask you this without taking the time ---**
9      **without reading the entire document, do you agree or**
10     **disagree with Doctor Joyner that the question of whether**
11     **a biologically male individual such as Lia Thomas should**
12     **be permitted to complete in the women's division against**
13     **biological females is a tough question that reasonable**
14     **people can differ?**
15             ATTORNEY BORELLI:  Objection to form.
16             ATTORNEY BROOKS:  That's enough.  That's
17     all you may say.
18             ATTORNEY BORELLI:  Excuse me.  Counsel,
19     the witness has ---.
20             ATTORNEY BROOKS:  You may say objection
21     to form.
22             ATTORNEY BORELLI:  The witness has ---
23     the witness asked to read the entire document.
24             ATTORNEY BROOKS:  I am asking a question

Page 141

1      free and apart from the document.  And I'm entitled to
2      do that.
3              ATTORNEY BORELLI:  I'm not persuaded that
4      this is free and apart from the document.
5              ATTORNEY BROOKS:  I will make it 100
6      percent apart from the document.
7              ATTORNEY BORELLI:  Can you please restate
8      the question to do that?  Thank you.
9      BY ATTORNEY BROOKS:
10         **Q.   Dr. Adkins, do you agree that the question of**
11     **whether a biological male such as Lia Thomas should be**
12     **permitted to compete against biological females in the**
13     **collegiate level is a tough question on which reasonable**
14     **people can differ?**
15             ATTORNEY BORELLI:  Objection, form.
16     Counsel, you just put an article ---.
17             ATTORNEY BROOKS:  That's enough of the
18     speaking objection.  I can take the article back away
19     from the witness.  My question makes no reference to the
20     article.
21             ATTORNEY BORELLI:  Your question makes
22     reference to ---.
23             ATTORNEY BROOKS:  Counsel, that's enough
24     speaking objections.  You are violating the Federal

36  (Pages 138 to 141)

Page 142

1    Rules.
2          ATTORNEY BORELLI:  I strongly disagree
3    with that characterization.  I don't think that's
4    correct.  You're asking questions about a subject of the
5    article.  Physically removing the article from the
6    witness doesn't remove that question from the subject of
7    the article.
8          ATTORNEY BROOKS:  I don't have to show
9    the witness every article about a topic.  The witness is
10   aware of Lia Thomas.  I'm asking a question about Lia
11   Thomas and competitive swimming.  The witness can
12   answer.
13         ATTORNEY BORELLI:  I stand on my
14   objection.
15         ATTORNEY BROOKS:  You can do so.
16         THE WITNESS:  Sorry.  Thank you.
17         You know, everybody has their opinion
18   based on their experience and their knowledge and
19   they're allowed to state that and confer with others
20   about it.  Whether or not it is reasonable is a whole
21   other question, and that involves perspective and
22   background.  So with that caveat, I could see people
23   having different opinions on this particular matter.
24   BY ATTORNEY BROOKS:

Page 143

1    Q.   Thank you.
2          ATTORNEY BROOKS:  Can we mark as Exhibit
3    11 a document previously identified as tab 17, article
4    from the publication named Out Sports that is dated
5    January 9, 2022.
6          ---
7          (Whereupon, Adkins Exhibit 11, 1/9/22
8          Out Sports Article, was marked for
9          identification.)
10         ---
11   BY ATTORNEY BROOKS:
12   Q.   Dr. Adkins, have you heard the name Iszac Henig?
13   A.   No.
14   Q.   Did you hear any news items that a transgender
15   male competing in the female division that is genetic
16   female, male identity, transgender male competing in the
17   female division, beat Lia Thomas, a transgender female
18   competing in the female division, in certain races?
19   Have you heard that?
20   A.   No.
21         ATTORNEY BORELLI:  Objection, form.
22   BY ATTORNEY BROOKS:
23   Q.   All right.
24         You stated in paragraph 28 that it can be

Page 144

1    harmful for patients, deeply harmful, for transgender
2    youth to be excluded from the team consistent with their
3    gender identity.  In your view is a policy that requires
4    transgender youth who are biologically male to suppress
5    testosterone before they can be eligible to compete on a
6    team consistent with their gender identity extremely
7    harmful to youth?
8          ATTORNEY BORELLI:  Objection, form.
9          THE WITNESS:  I was trying to catch up
10   with you with finding the page.
11   BY ATTORNEY BROOKS:
12   Q.   That was a complicated question.  I will ask it
13   again.
14   A.   Thank you.
15   Q.   In your view is a policy that requires a
16   biological male who experiences a female gender identity
17   to suppress testosterone prior to becoming eligible to
18   compete in the women's division extremely harmful?
19         ATTORNEY BORELLI:  Objection, form.
20         THE WITNESS:  Suppression of the
21   testosterone for my practice isn't the --- you know, the
22   harm.  It is the exclusion that does most of the harm.
23   I think I answered that.
24   BY ATTORNEY BROOKS:

Page 145

1    Q.   Let me try to --- in light of what you just
2    said, let me ask a better question.  In your view, is a
3    policy that excludes a biological male who identifies as
4    a woman from competition in the women's division unless
5    and until that biological male has suppressed
6    testosterone extremely harmful?
7          ATTORNEY BORELLI:  Objection to form.
8          THE WITNESS:  So the sex assigned at
9    birth for this person would be male and would need time
10   to suppress testosterone, which takes time and leads to
11   limitations in participation of sports, in competition.
12   I think that disadvantages most athletes if they have to
13   take time off for any kind of medical treatment for
14   their preparation.  In that fashion it would be harmful
15   to the athlete.
16   BY ATTORNEY BROOKS:
17   Q.   And I believe you testified you don't have any
18   simple single opinion as to whether it would
19   nevertheless be reasonable despite being harmful to that
20   athlete?
21         ATTORNEY BORELLI:  Objection to form.
22         THE WITNESS:  I don't think that's what I
23   said.
24   BY ATTORNEY BROOKS:

Adkins 0790

Page 146

1      Q.   All right.
2           Then I'll ask a different to avoid
3   unclarity.  Do you have an opinion as to whether,
4   **despite the harm that you have described, a policy that**
5   **requires suppression of testosterone in order for such**
6   **an individual to be eligible to compete in a women's**
7   **division is reasonable?**
8           ATTORNEY BORELI:  Objection to form.
9           THE WITNESS:  That's complicated.  I
10  apologize for not answering yes or no.  I just ---
11  sometimes you get lost in your question.  So I don't
12  think it's reasonable to ask them not to participate.
13  They need time to practice and participate like all
14  their peers that are practicing and competing at the
15  time.
16  BY ATTORNEY BROOKS:
17     Q.   **So your testimony as you sit here today is that**
18  **even as a biologically male athletes, natal male**
19  **athletes who have not suppressed testosterone at all, it**
20  **is not reasonable to exclude them from participation in**
21  **the women's division?**
22          ATTORNEY BORELI:  Objection, form.
23          THE WITNESS:  To those who are assigned
24  female at birth, you're again going to cause them harm

Page 147

1   by not allowing them to participate and not be affirmed
2   in their gender.  That --- part of it is a big part of
3   what it means to improve their overall health and what
4   we do to care for these individuals.  You're also
5   marking them by saying that they are, you know,
6   transgender and that is going to cause all kinds of
7   kerfuffle and people are not nice to them.  It can cause
8   extreme harm to them in that way.
9   BY ATTORNEY BROOKS:
10     Q.   **In the beginning of your answer you referred to**
11  **individuals identified as female at birth.**
12     A.   Assigned female at birth.
13     Q.   **And I think that your answer was speaking to**
14  **individuals who are assigned male at birth.**
15     A.   Applies to both.
16          ATTORNEY BORELI:  Objection, form.
17  BY ATTORNEY BROOKS:
18     Q.   **Then let me re-ask my question because I asked**
19  **about individuals assigned male at birth.  As to those**
20  **individuals, is it your opinion that a policy that**
21  **requires them to suppress testosterone prior to becoming**
22  **eligible for participation in the women's division or**
23  **high school level girls division is unreasonable?**
24          ATTORNEY BORELI:  Objection, form.

Page 148

1           THE WITNESS:  For an assigned male at
2   birth, suppressing testosterone, so we're clear because
3   you used the word they in that particular question, I
4   think it is unreasonable for them to be taken out of
5   their sport.  I think it causes harm.  We see evidence
6   that it causes harm with regard to depression, anxiety,
7   suicidality.  It also causes metabolic harm, changes in
8   the performance.
9           ATTORNEY BROOKS:  Let me mark this
10  Exhibit 11, an article by Duke Professor Doriane
11  Lambelet Coleman, Michael Joyner and Donna Lopiano, the
12  Duke Journal of Gender Law and Policy.
13          ---
14          (Whereupon, Adkins Exhibit 11, Duke
15          Journal of Gender Law and Policy
16          Article, was marked for identification.)
17          ---
18          VIDEOGRAPHER:  Counsel, I didn't fully
19  catch which document that was?  Did you say it was tab
20  19?
21          ATTORNEY BROOKS:  It is tab 19, that's
22  correct.
23          VIDEOGRAPHER:  Thank you.
24  BY ATTORNEY BROOKS:

Page 149

1      Q.   **Dr. Adkins, let me ask whether you have before**
2   **now been aware of this article by Duke Professor Coleman**
3   **and others?**
4      A.   I have heard of an article, yes.
5      Q.   **Do you know Professor Coleman?**
6      A.   I met Professor Coleman once.
7      Q.   **And have you ever seen this article before**
8   **today?**
9      A.   I haven't looked at it.
10     Q.   **Probably my questioning about it will be very**
11  **short.  Let me ask you to turn to page 88.  At the very**
12  **bottom of page 88 is a sentence that runs over into 89**
13  **that reads as follows.  If elite sport were coed or**
14  **competition were open, even the best female would be**
15  **rendered invisible by the sea of men and boys who would**
16  **surpass her, closed quote.  Do you see that language?**
17     A.   I do.
18     Q.   **Do you have the expertise to evaluate whether**
19  **that is true or false?**
20          ATTORNEY BORELI:  Object to form.
21          THE WITNESS:  The --- well, again, you
22  are picking one sentence out of a whole article.  And I
23  know that Dr. Coleman has actually called into question
24  some of the information from this report in particular.

Bostic-27890 0791

Page 150

1   And without knowing which things I can't really rely on
2   this document to say whether it's true.  And that's not
3   --- that's her expertise.
4   BY ATTORNEY BROOKS:
5   **Q.   Well, that's my question.  Do you believe that**
6   **it is within your expertise to evaluate that sort of**
7   **question about sporting performance?**
8         ATTORNEY BORELLI:  Object to the form.
9         THE WITNESS:  Again, you are picking one
10   sentence.  I have some professional experience with
11   assisting people in improving their physiology with
12   regard to, you know, muscle mass, fat mass.  Sport would
13   be outside what I would have to say --- this
14   specifically.
15   BY ATTORNEY BROOKS:
16   **Q.   I'm not sure that was a compete sentence, let me**
17   **ask a follow-up question.  Is it the case that it is ---**
18   **you consider it outside your professional expertise to**
19   **evaluate the truth or falsity of this supposed assertion**
20   **that, quote, if elite sport were coed or competition**
21   **were open, even the best female would be rendered**
22   **invisible by the sea of men and boys who would surpass**
23   **her, closed quote?**
24         ATTORNEY BORELLI:  Object to form.

Page 151

1         THE WITNESS:  That's not been my
2   experience.  That's not what we're seeing in sports.  I
3   can't say anything else about whether or not I could
4   assess it.  That would be my only way to assess it based
5   on my experience.
6   BY ATTORNEY BROOKS:
7   **Q.   What is your professional training or research**
8   **that qualifies you to evaluate the impact that would be**
9   **experienced in athletics on biological women if sport**
10   **were coed or competition were open?**
11         ATTORNEY BORELLI:  Objection to form.
12         THE WITNESS:  Yeah.  I don't study
13   sports.
14   BY ATTORNEY BROOKS:
15   **Q.   You are an endocrinologist by training.**
16      **Is that correct?**
17   A.   I am.
18   **Q.   Do you have an expert opinion as to what lasting**
19   **or legacy --- strength and athletic capability if any**
20   **way natal males continue to enjoy over natal females**
21   **after suppressing testosterone?**
22         ATTORNEY BORELLI:  Objection, form.
23         THE WITNESS:  So there's a lack of
24   research in this area.  I feel like we need more

Page 152

1   information regarding this.  I don't think that there's
2   a way to answer that question with the data that we have
3   at this time.
4   BY ATTORNEY BROOKS:
5   **Q.   Is it true in your practice that most of your**
6   **biologically male patients present at your clinic let's**
7   **say after age 13?**
8         ATTORNEY BORELLI:  Object to form.
9         THE WITNESS:  Most of my patients who are
10   assigned which at birth did you say?
11   BY ATTORNEY BROOKS:
12   **Q.   Male.**
13   A.   After age what again?
14   **Q.   I chose 13.**
15         ATTORNEY BORELLI:  Same objection.
16         THE WITNESS:  I would agree with that.
17   BY ATTORNEY BROOKS:
18   **Q.   And implications of that are that those**
19   **individuals have already experienced --- well, let me**
20   **ask it differently.  In your experience or based on your**
21   **training, either one, on average what Tanner stage are**
22   **boys at by the time they have finished their 13th year?**
23         ATTORNEY BORELLI:  Objection, form.
24         THE WITNESS:  So assigned male at birth?

Page 153

1   BY ATTORNEY BROOKS:
2   **Q.   Correct.**
3   A.   The average at 13 is Tanner 3.
4   **Q.   By the end of age 13 you would say Tanner 3?**
5   A.   It is really 13 and a half is what the published
6   literature says.
7   **Q.   So presumably by the end of their 13th year,**
8   **when they're older than 13 they're either in a later**
9   **stage of Tanner stage 3 or moving into Tanner stage 4?**
10         ATTORNEY BORELLI:  Objection, form.
11         THE WITNESS:  On average, but there is
12   such a wide variety of --- they can present with puberty
13   from 9 to 14.  And they all move differently at
14   different rates and different times, so there's a lot of
15   variety in the 13 and a half year olds I see in my
16   clinic who are assigned male at birth.
17   BY ATTORNEY BROOKS:
18   **Q.   And my question was about averages.  So on**
19   **average, by the end of the 13th year the patients you**
20   **see would be towards the end of Tanner stage 3 or**
21   **entering into Tanner stage 4?**
22         ATTORNEY BORELLI:  Objection, form.
23         THE WITNESS:  On average, yeah.
24   BY ATTORNEY BROOKS:

Page 154

1    Q.   And by that time those biologically male who
2    have under gone effects on skeleton, on height, on
3    musculature, typical of or sometimes referred to as
4    verilization.
5        Correct?
6        ATTORNEY BORELLI:  Objection, form.
7        THE WITNESS:  So at 13 and a half the
8    average assigned male at birth is dead center their
9    growth spurt, so they've only gone through about half of
10   it.  They still have about half of it left.
11   BY ATTORNEY BROOKS:
12   Q.   Okay.
13       And do you have any knowledge as to whether
14   they have also undergone changes in heart and lung size
15   and bone strength that are typical of male puberty?
16       ATTORNEY BORELLI:  Objection, form.
17       THE WITNESS:  So I can't comment about
18   the heart and the lung.  The lung size is typically
19   proportioned to the body size.  So in that way, halfway.
20   Bone strength, however, there's more information about.
21   And you know, people don't get their peak bone mass
22   until they're 30, so they have a long way to go starting
23   from 13 and a half before they reach that.
24   BY ATTORNEY BROOKS:

Page 155

1    Q.   Have, on average, males experienced significant
2    bone densification by age --- by the end of their 13th
3    year?
4        ATTORNEY BORELLI:  Objection, form.
5        THE WITNESS:  Depends on your definition
6    of significant.  Clinically significant, medically
7    significant?  Is it, you know, significant with regard
8    to the biological assay.  Is it you're talking about
9    which would --- Dexus scans?
10   BY ATTORNEY BROOKS:
11   Q.   I will take clinically significant.
12       ATTORNEY BORELLI:  Objection to form.
13       THE WITNESS:  Can you repeat your
14   question with that?
15   BY ATTORNEY BROOKS:
16   Q.   Yes.  On average, have biological males
17   experienced clinically significant bone densification by
18   the end of their 13th year?
19       ATTORNEY BORELLI:  Objection, form.
20       THE WITNESS:  Over their life span they
21   do continue to increase their bone density.  The peak of
22   bone density is much later, so every person is different
23   as to where they are in that density scale.  At the
24   middle of puberty, I mean, I would be guessing if I said

Page 156

1    anything specific.
2    BY ATTORNEY BROOKS:
3    Q.   Well, as I tell witnesses I am defending I don't
4    know is always a great conversation stopper.  Is it your
5    testimony that you don't actually know how much bone
6    densification has occurred by the end of the 13th year
7    in those in biological males?
8        ATTORNEY BORELLI:  Objection, form.
9        THE WITNESS:  I haven't looked at it ---
10   I haven't looked at it recently.  There are --- that's
11   an --- interpretations that we use and it comes with our
12   reports and I would have to look at that to rely on it.
13   BY ATTORNEY BROOKS:
14   Q.   Have you heard the name Joanna Harper?
15   A.   No.
16   Q.   Let me see tab 24.
17       ATTORNEY BROOKS:  Marking 13, what was
18   previously designated tab 24, article published December
19   2020 by Emma Hilton and Tommy Lundberg, titled
20   Transgender Women in the Female Category of Sport:
21   Perspectives on Testosterone Suppression and Performance
22   Advantage.
23               ---
24       (Whereupon, Adkins Exhibit 13, 2020

Page 157

1        Hilton and Lundberg Article, was marked
2        for identification.)
3               ---
4    BY ATTORNEY BROOKS:
5    Q.   And Dr. Adkins, let me ask again whether you
6    know the name Emma Hilton or Tommy Lundberg.
7    A.   No.
8    Q.   Can I take it then you have not seen this
9    article before?
10   A.   I wouldn't say that one equals the other.  I'm
11   terrible with names, to be quite honest.
12   Q.   Let me ask --- therefore, I retract that
13   question.  Do you recall seeing this article before
14   today?
15   A.   No.
16   Q.   Okay.
17       Then again, we will be short.  You see the
18   title.  I understand you have not seen it.  Let me ask
19   you to turn to page 201.  About an inch down in the
20   first column, summarizing other research the authors of
21   this paper write an extensive review of fitness  from
22   over 85,000 Australian children age 9 to 17 years old
23   show that, compared with 9 year old females, 9 year old
24   males were faster over short sprints, 9.8 percent, and

Licea Art. 0793

Page 158

1  one mile, 16.6 percent.  Could jump 9.5 percent further
2  from a standing start, a test of explosive power.
3  Quote, could complete 33 more push ups in 30 seconds and
4  had 13.8 percent stronger grip, closed quote.  Do you
5  see that language?
6      A.  Yeah.
7      Q.  And my question for you is you have yourself any
8  knowledge as to whether the facts recited there are
9  scientifically accurate or inaccurate?
10         ATTORNEY BORELLI:  Objection, form.
11         THE WITNESS:  So whenever I'm reviewing
12  an article, and again, I have not seen the full article,
13  it's reporting on population from Australia, which I
14  usually use the population that I'm talking about when I
15  am using that information to help guide my practice.  So
16  I'm not completely sure that would be a thing that would
17  come into my mind when looking at this.  Is this the
18  same population in Australia you're seeing here?
19  That's one of my first questions about it.
20  BY ATTORNEY BROOKS:
21      Q.  And I understand that everybody in Australia is
22  upside down, but my question simply was do you have any
23  knowledge as to whether, as a matter of science, these
24  assertions are true or false?

Page 159

1         ATTORNEY BORELLI:  Objection, form.
2         THE WITNESS:  They have published it in a
3  peer reviewed journal I think.  I would have to look if
4  this is a peer reviewed journal because some are not.
5  If those things are true, the assumption we make in
6  medicine is that they are true.
7  BY ATTORNEY BROOKS:
8      Q.  You are a very trusting person to peer reviewed
9  journals.
10     A.  They get redacted all the time.  So again, my
11  previous thing is you got to look at all of the pieces,
12  et cetera.
13     Q.  In general --- in general, do you consider that
14  your expertise extends to the question of how much
15  athletic advantage biological males enjoy over
16  biological females prior to puberty, if any?
17        ATTORNEY BORELLI:  Objection, form.
18        THE WITNESS:  I know limited amount of
19  that information.  We all learn a little bit, but I
20  wouldn't say that I could say, you know, I know
21  everything that exists.
22  BY ATTORNEY BROOKS:
23     Q.  What is your source of information in that area?
24        ATTORNEY BORELLI:  Objection, form.

Page 160

1         THE WITNESS:  Generally education in
2  medical school and then looking at hormonal effects in
3  muscle and bone and those things.  But not in particular
4  these specific tests.
5  BY ATTORNEY BROOKS:
6      Q.  Do you have any opinion as to whether prior to
7  puberty natal males have strength, speed or other
8  athletic advantages over natal females on average?
9         ATTORNEY BORELLI:  Objection, form.
10        THE WITNESS:  Gosh, there's such a wide
11  variety of humans.  And I know you are asking on
12  average.  I don't think I feel comfortable answering the
13  question.
14  BY ATTORNEY BROOKS:
15     Q.  All right.
16        You have offered the opinion --- we can go back
17  to paragraph 28, I keep referring to the same, that
18  refusing to permit a transgender individual to
19  participate in a sport category corresponding to their
20  gender identity can be or is extremely harmful.  From
21  your medical point of view, what do you consider to be
22  the implications of that opinion when it comes to
23  individuals who claim both a male and a female gender
24  identity?

Page 161

1         ATTORNEY BORELLI:  Objection, form.
2  BY ATTORNEY BROOKS:
3      Q.  Must they be permitted to play in either
4  category according to their choice.
5         ATTORNEY BORELLI:  Objection, form.
6         THE WITNESS:  That is a good question.  I
7  would have to talk to the individual person to really
8  know what harm they might think --- feel that they are
9  having if they were kept from one versus the other.  I
10  think that would be a very individualized question.  I
11  can't answer it with my experience.
12  BY ATTORNEY BROOKS:
13     Q.  All right.
14        Would you have the same answer with regard to
15  an individual who experiences neither gender identity,
16  neither male or female?
17        ATTORNEY BORELLI:  Objection, form.
18        THE WITNESS:  So people who identify as a
19  agender, you know, there is such a wide variety of
20  their life experience, their pubertal experience, their
21  current hormones and what things they might be taking or
22  not taking, where their levels are.  I think it --- and
23  you know, again, I think --- you would have to look at
24  the individual person.

1    BY ATTORNEY BROOKS:
2        Q.   Is it your opinion, Dr. Adkins, that the only
3    reasonable policy for schools, colleges or athletic
4    leagues would be to consider eligibility for transgender
5    individuals on a case by case basis, taking into account
6    all of the types of complexities you just described?
7            ATTORNEY BORELLI: Objection, form.
8            THE WITNESS:  I think that that is
9    completely possible for them to do given the small
10   population that we're talking about.  And I think it is
11   reasonable for them to take the time to do that with
12   each individual human.
13   BY ATTORNEY BROOKS:
14       Q.   Do you think that such a policy is the only
15   reasonable policy?
16           ATTORNEY BORELLI: Objection, form.
17           THE WITNESS:  Yeah, I'm going to venture
18   that, yes.
19   BY ATTORNEY BROOKS:
20       Q.   In your view --- as you've testified earlier a
21   bit about the category of gender fluid individuals. You
22   mentioned the term.  Are you familiar with that
23   category, concept of gender fluid individuals?
24           ATTORNEY BORELLI: Objection, form.

1            THE WITNESS:  I'm aware of the concept.
2    BY ATTORNEY BROOKS:
3        Q.   Can you explain for the court what the concept
4    of --- what a gender fluid individual is or what that
5    person experiences?
6            ATTORNEY BORELLI: Objection to form.
7            THE WITNESS:  So my experience is that
8    every gender fluid person is different, and I have to
9    actually dig deep when I'm talking to someone who is
10   gender fluid as to what that means.  It could mean a
11   wide variety of different experiences.
12   BY ATTORNEY BROOKS:
13       Q.   You're not able to describe at all what it mean
14   to be gender fluid?
15           ATTORNEY BORELLI: Objection, form.
16           THE WITNESS:  I can give you an example.
17   I can give you more than one example.
18   BY ATTORNEY BROOKS:
19       Q.   I'll take an example.
20       A.   Okay.
21           For a patient I'm bringing to mind, for that
22   individual they generally might be expressing their
23   gender identity variably on a particular day.  Their
24   understanding of their identity is that it shifts a

1    little bit.  They sometimes are frilly, like me, very
2    feminine-ish, and on days --- and feel that --- and
3    other days they might wear a suit and tie.  And that
4    gender expression may align with their gender identity I
5    guess, to express themselves a different way.  It's just
6    a matter that, you know, some days I feel like a girl
7    and some days I don't.  And I actually also sometimes
8    have that feeling of, you know, a more girly one day
9    than the other.  I don't know.  I'm not implying that
10   I'm gender fluid, but that particular person is an
11   example of what might happen for someone who's gender
12   fluid.
13       Q.   Let me ask you to find.  I told you we'd dig for
14   it again, the Endocrine Society 2017 Guidelines, which
15   are Exhibit 4.
16       A.   I'm not saying my experience is the one and
17   only, one all be all.
18       Q.   And I'll call your attention to page five,
19   column two?
20       A.   I'm sorry, what is that again?
21       Q.   Page five, column two.  Language looks like
22   this.  That's on page five.  That's fine.
23           ATTORNEY TRYON:  This is Dave Tryon.  I
24   think both of you are starting to trail off at times and

1    speak less loudly and it's getting a little bit harder
2    to hear you.  If you can both remember to keep your
3    voices up, it would be helpful to me.
4            ATTORNEY BROOKS:  We will do our best.
5    Wait until 6:30.
6    BY ATTORNEY BROOKS:
7        Q.   Page 3873, column two.  And towards the bottom
8    is a discussion of the continuum and individuals who
9    experience both or neither and then a reference that we
10   looked at before about reports of individuals
11   experiencing a continuous and rapid involuntary
12   alternation between a male and female gender identity.
13   Do you see that?  It's about eight lines from the
14   bottom.
15       A.   On the right?
16       Q.   Yes.
17       A.   Yeah.
18       Q.   And I'm going to focus you on the rapid
19   involuntary alternation between male and female
20   identity.  And is it your view --- is it your opinion
21   that unless school or league policy allows such gender
22   fluid individuals to play in the league according to
23   their present gender identity, whatever that might be,
24   that it will do extreme harm to those individuals?

Adkins 0795

Page 166

1    ATTORNEY BORELLI:  Objection, form.
2    THE WITNESS:  So I think that unless you
3  are working with that individual person to do what works
4  for them based on their gender identity, you are likely
5  to do harm.
6  BY ATTORNEY BROOKS:
7    Q.   And am I correct that it is your opinion that
8  avoiding harm to students who experience a transgender
9  identity, perhaps a gender fluid identity, is a higher
10  priority than ensuring fairness in competition for those
11  born female?
12    ATTORNEY BORELLI:  Objection to form.
13    THE WITNESS:  So doing a harm to
14  individuals that are transgender can lead directly to
15  their death.  So we're talking about a life and death
16  experience for these individuals.  What you are
17  referring to with regard to sports participation in my
18  vision of all of the sports athletics is a rarity of
19  someone dying, and it is not because of the harm policy
20  --- of transgender person.
21  BY ATTORNEY BROOKS:
22    Q.   What's the answer to my question?
23    COURT REPORTER:  Excuse me.
24    ATTORNEY BORELLI:  Objection.

Page 167

1    COURT REPORTER:  I just want to interrupt
2  because the witness cut out during her answer.
3  BY ATTORNEY BROOKS:
4    Q.   Well, I'm going to re-ask the question.  And
5  we'll both try to speak up and perhaps to some extent
6  the transcript will have to be, you know, cleaned up
7  from the recording.  We'll do the best we can.  Is it
8  your opinion that avoiding harm to transgender
9  individuals, potentially including gender fluid
10  individuals, is a value that is more important than
11  protecting the fairness and safety for girls and women
12  for those born female in sport?
13    ATTORNEY BORELLI:  Objection, form.
14    THE WITNESS:  So when we're talking about
15  life and death, that is the ultimate outcome.  And I
16  still say that if you're talking about a policy that
17  could cause the death of a human being, that, in my
18  judgment, does rank higher than fairness at that time.
19  BY ATTORNEY BROOKS:
20    Q.   And you talked earlier about your assertion that
21  you had patients who have experienced harm as a result
22  of not being permitted to play according to their gender
23  identity.  Do you recall that testimony?
24    ATTORNEY BORELLI:  Objection, form.

Page 168

1    THE WITNESS:  I do.
2  BY ATTORNEY BROOKS:
3    Q.   And do you have specific examples of such
4  patients who experienced increased suicidal ideation
5  specifically as a result of not being permitted to play
6  in athletics according to their gender identity?
7    ATTORNEY BORELLI:  Objection, form.
8    THE WITNESS:  I do.
9  BY ATTORNEY BROOKS:
10    Q.   Tell us about that.
11    ATTORNEY BORELLI:  Objection, form.
12    THE WITNESS:  Yeah.  So one of my
13  patients, for example, had played football.  This
14  patient was assigned female at birth, identifying as
15  male in middle school.  Really wanted to play in high
16  school and was eventually not allowed to do so, and
17  their depression deepened.  They had not had any
18  suicidal ideation before.  They had been well affirmed.
19  They were living in their gender identity in every other
20  aspect of their life.
21    And they ended up having to go on
22  medication to make sure that --- to treat that
23  depression in addition to all of the support in the
24  family and teachers were giving with their gender

Page 169

1  identity.
2  BY ATTORNEY BROOKS:
3    Q.   And do you have any knowledge as to whether that
4  individual would have faced serious safety injury risks
5  had that individual, natal female, been permitted to
6  play football at high school level as your patient's
7  male peers matured into full male stature?
8    ATTORNEY BORELLI:  Objection to form.
9    THE WITNESS:  This particular patient was
10  within the normal range for a male of that age as far as
11  height, weight and BMI, so there wasn't a great
12  disparity with regard to that.  That can come up at
13  times with regards to sports participation in
14  consideration with injury.  So this particular patient,
15  I would not have had any concern there.  Lots of
16  assigned females at birth who are not transgender also
17  play football in high school.
18  BY ATTORNEY BROOKS:
19    Q.   Tab 25.  Dr. Adkins, do you recall permitting
20  the reporting of and being part of a WNYC podcast back
21  in 2016?
22    A.   Yes.
23    Q.   Let me mark as Exhibit 14 a two-page kind of
24  introductory page off the WNYC website describing this

Christian 0796

Page 170

1    podcast.  The document itself, the posting is dated
2    August 2, 2016.  Give me one moment here.
3            ---
4            (Whereupon, Adkins Exhibit 14, 2016
5            Podcast Summary Webpage, was marked for
6            identification.)
7            ---
8            ATTORNEY BROOKS:  And let me also mark as
9    Exhibit 15 the transcript of that podcast downloaded off
10   of the WNYC website.
11           ---
12           (Whereupon, Adkins Exhibit 15, 2016
13           Podcast Transcript, was marked for
14           identification.)
15           ---
16   BY ATTORNEY BROOKS:
17       Q.   And that --- the title apparently of the podcast
18   is, quote, I'd Rather Have a Living Son than a Dead
19   Daughter.  Do you see that?
20       A.   I do.
21       Q.   And you allowed a reporter from WNYC to come
22   into your office and record various conversations.
23           Am I correct?
24           ATTORNEY BORELLI:  Objection, form.

Page 171

1            THE WITNESS:  With the permission of ---
2    the --- everyone involved.
3    BY ATTORNEY BROOKS:
4        Q.   To participate and they waived the privacy with
5    regard to anything that wasn't included in the podcast.
6            Am I correct?
7            ATTORNEY BORELLI:  Objection to form.
8            THE WITNESS:  That would be standard.
9    BY ATTORNEY BROOKS:
10       Q.   At least as far as yourself, do you recall doing
11   that?
12           ATTORNEY BORELLI:  Objection to form.
13           THE WITNESS:  I don't recall.  I suspect
14   I would have.
15   BY ATTORNEY BROOKS:
16       Q.   And did you yourself review the podcast before
17   it was released for any privacy or accuracy concerns?
18           ATTORNEY BORELLI:  Objection, form.
19           THE WITNESS:  I don't remember.  That's
20   been so long ago.
21   BY ATTORNEY BROOKS:
22       Q.   It has been a while.  This was 2016.  And you
23   had been practicing in this area about how long in 2016?
24       A.   In North Carolina?

Page 172

1        Q.   I'm sorry.  In this field of treatment of gender
2    --- of individuals suffering gender dysphoria?
3            ATTORNEY BORELLI:  Objection, form.
4            THE WITNESS:  I started caring for
5    patients who are transgender in --- I think around 2013.
6    BY ATTORNEY BROOKS:
7        Q.   Okay.
8            So between two and three years before the time
9    this was recorded.
10           Okay.
11           Let me ask you to look at Exhibit 15, which is
12   to say the transcript.  And first page, it indicates and
13   I'll just --- it deals with two clients with names, at
14   least for purposes of the podcast, of Drew Adams and
15   Mark.  Do you recall that?
16           ATTORNEY BORELLI:  Objection, form.
17           THE WITNESS:  I would have to verify.
18   Probably accurate, but ---.
19   BY ATTORNEY BROOKS:
20       Q.   Martin shows up on page 13.  A couple inches
21   down we skip to the last patient at the end of a long
22   day and then it says recalling this patient Martin.
23       A.   I see that.
24       Q.   Let's go back and just look at issues relating

Page 173

1    to Drew Adams.  Drew is, if I understand correctly,
2    natal female, identifying at the time of this recording
3    as ---?
4        A.   Drew was assigned female at birth and identified
5    as male at this time.
6        Q.   And so far as you understand, based on your
7    medical evaluation, Drew is somebody who was
8    chromosomally female.
9            Correct?
10           ATTORNEY BORELLI:  Objection to form.
11           THE WITNESS:  I don't get to verify their
12   chromosomes.  We don't do that.
13   BY ATTORNEY BROOKS:
14       Q.   At the time this was recorded, you did have an
15   understanding, did you not, that Drew had female
16   reproductive biology?
17           ATTORNEY BORELLI:  Objection, form.
18           THE WITNESS:  On my exam at that time
19   Drew had external genitalia that appeared female and
20   secondary sex characteristics typical of someone
21   assigned female at birth.
22   BY ATTORNEY BROOKS:
23       Q.   Well, in fact, somebody biologically female.
24           Correct?

Page 174

```
1              ATTORNEY BORELLI:  Objection.
2              THE WITNESS:  Assigned female at birth.
3    BY ATTORNEY BROOKS:
4         Q.  Well, let me ask you this.  You prescribed
5    hormones for Drew.
6         Am I correct?
7         A.  Yes.
8         Q.  And you didn't do that without a high level of
9    confidence in your mind as to the biology of Drew's
10   body.
11        Am I correct?
12             ATTORNEY BORELLI:  Objection to form.
13   BY ATTORNEY BROOKS:
14        Q.  You weren't just based on what somebody happened
15   to be assigned at birth.  You believed that Drew was
16   biologically female, did you not?
17             ATTORNEY BORELLI:  Objection, form.
18             THE WITNESS:  So at the beginning, prior
19   to treating patients, we do look at where their baseline
20   hormones are.  So I did have that information as well as
21   an external exam.  I didn't have chromosomes or an
22   ultrasound.
23   BY ATTORNEY BROOKS:
24        Q.  My question is at the time you prescribed
```

Page 175

```
1    hormones for Drew you believed that Drew was
2    biologically female firmly, did you not?
3              ATTORNEY BORELLI:  Objection, form.
4              THE WITNESS:  I had no reason at that
5    time with the data in front of my to identify Drew as
6    anything other than assigned female at birth.
7    BY ATTORNEY BROOKS:
8         Q.  And you just didn't care what Drew's biology was
9    as you chose hormones to prescribe?
10             ATTORNEY BORELLI:  Objection, form.
11             THE WITNESS:  I investigated what is
12   necessary to move ahead with that prescription and make
13   it safe for the patient.
14   BY ATTORNEY BROOKS:
15        Q.  What was necessary was to determine that
16   biologically Drew was female.
17        Am I correct?
18             ATTORNEY BORELLI:  Objection, form.
19   BY ATTORNEY BROOKS:
20        Q.  You are going to tell the court that you didn't
21   try to determine whether Drew was biologically male or
22   female?
23             ATTORNEY BORELLI:  Objection, form.
24             THE WITNESS:  I obtained baseline blood
```

Page 176

```
1    work like I do with every patient, which is recommended
2    by the Endocrine Society that you get baseline hormone
3    levels.  I did a physical exam.  Not every patient gets
4    to have an ultrasound, a karyotype or a full exon
5    analysis.  It's not the way you can practice medicine.
6    BY ATTORNEY BROOKS:
7         Q.  Turn with me to page three of the transcript.
8    Two, two and a half inches down, MH, who I believe is
9    the reporter, not somebody working for you but the
10   reporter, says, quote, this is Drew's second time here,
11   closed quote.  Do you see that, just two inches down?
12        A.  Yeah.
13        Q.  It's been quite a few years.  Do you believe
14   that that was accurate that what the events that were
15   recorded here were on Drew's second visit to your
16   clinic?
17             ATTORNEY BORELLI:  Objection, form.
18             THE WITNESS:  It has been so long.  To
19   verify it is true I would have to look back at my clinic
20   notes as well as if I even still had it recorded when
21   they were in clinic or not.
22   BY ATTORNEY BROOKS:
23        Q.  And do you know, as you sit here today, whether
24   prior to this perhaps second meeting with Drew any
```

Page 177

```
1    psychologist or psychiatrist associated with your new
2    clinic had personally evaluated Drew to confirm the
3    diagnosis of gender dysphoria?
4              ATTORNEY BORELLI:  Objection, form.
5              THE WITNESS:  Before we start treatment
6    we have our mental health team do an assessment of the
7    patient with regard to finding out their --- any
8    psychological challenges that they may be having and
9    confirm if they have gender dysphoria and confirm the
10   criteria from the DSM --- God, my brain is just tired.
11   From the DSM criteria.  And in addition to that, we have
12   a person who is a local mental health provider also
13   perform any evaluation and develop a relationship with
14   the patient prior to starting the treatment.
15   BY ATTORNEY BROOKS:
16        Q.  Well, let me break that out.  Do you require
17   that a psychologist or psychiatrist associated with Duke
18   confirm a diagnosis of gender dysphoria before you
19   proceed with hormonal interventions?
20             ATTORNEY BORELLI:  Objection, form.
21             THE WITNESS:  I have a team of mental
22   health providers who work with me and do that
23   assessment.  That is part of their standard job.  And
24   every patient is evaluated by that team.  Sometimes it
```

1362 0798

Page 178

1  is a psychiatrist, psychologist.  Sometimes it is a
2  different kind of mental health provider.
3  BY ATTORNEY BROOKS:
4      Q.   Well, if it is not a psychologist or
5  psychiatrist, on what type of mental health --- what
6  qualifications of mental health providers do you rely to
7  make such a diagnosis before prescribing hormonal
8  interventions?
9          ATTORNEY BORELLI:  Objection, form.
10         THE WITNESS:  You know, there are
11 Licensed Clinical Social Workers that we work with that
12 are used by Duke in a number of capacities with regard
13 to mental healthcare.
14 BY ATTORNEY BROOKS:
15     Q.   Is it your testimony --- I want to be careful on
16 this.  Is it your testimony that you are willing to rely
17 on a diagnosis by a social worker with no medical,
18 psychological degree before prescribing a hormonal
19 intervention?
20         ATTORNEY BORELLI:  Objection, form.
21         THE WITNESS:  So the mental health
22 providers that I use have master's degree education in
23 care for patients in this area and have ongoing
24 continuing medical education with regard to their

Page 179

1  ability to asses the mental health of a patient in front
2  of them.
3  BY ATTORNEY BROOKS:
4      Q.   That would be a --- a Master's in social work.
5  Correct?
6      A.   Often it's a Master's in social work.  Also have
7  people who have Master's in public health in addition I
8  should say.
9      Q.   And so if such any evaluations was done by a
10 mental health professional associated with Duke, that
11 would have been at Drew's first visit, not at the visit
12 that was the subject of this podcast recording?
13         ATTORNEY BORELLI:  Objection, form.
14         THE WITNESS:  At that time it could have
15 been done physically at the first visit.  Sometimes we
16 have had them come on a different day than their visit
17 with me.  So it is possible it could have been a
18 different day.  I just don't remember.
19 BY ATTORNEY BROOKS:
20     Q.   Okay.
21         Do you ever rely on the diagnosis of an
22 individual's mental health worker not associated with
23 Duke as an adequate basis to prescribe hormonal
24 interventions?

Page 180

1          ATTORNEY BORELLI:  Objection, form.
2          THE WITNESS:  Our clinic policy is to
3  have someone outside of Duke as well as someone inside
4  of Duke.
5  BY ATTORNEY BROOKS:
6      Q.   So you may recall --- do you recall that Drew
7  and his mother had driven up from Florida for this
8  meetings?
9          ATTORNEY BORELLI:  Objection, form.
10         THE WITNESS:  I do remember that.
11 BY ATTORNEY BROOKS:
12     Q.   And do you sometimes consider diagnosis given by
13 mental --- for purposes of proceeding with hormonal
14 interventions?
15         ATTORNEY BORELLI:  Objection, form.
16         THE WITNESS:  If they are licensed to
17 practice in that area or certified in their state, that
18 is what we rely on.
19 BY ATTORNEY BROOKS:
20     Q.   At the top of page two --- and again, this is
21 the voice of the reporter, so I want to check it with
22 you.  It says, the end of the first full paragraph, that
23 Drew and his mom are driving eight hours from
24 Jacksonville, Florida, to get here because North

Page 181

1  Carolina is also home to one of the only clinics in the
2  south that treats transgender kids.  Do you see that?
3      A.   I do.
4      Q.   And in your understanding was that true in 2016,
5  that you here had one of the only clinics in the south
6  that treated transgender kids?
7          ATTORNEY BORELLI:  Objection, form.
8          THE WITNESS:  We were one of a few.
9  BY ATTORNEY BROOKS:
10     Q.   And they had driven all the way to North
11 Carolina from Florida precisely because whatever mental
12 health providers they were seeing in Florida didn't have
13 expertise in this area.
14     Is that correct?
15         ATTORNEY BORELLI:  Objection, form.
16         THE WITNESS:  They didn't drive here to
17 see a mental health provider.  They drove here to see me
18 as an endocrinologist.
19 BY ATTORNEY BROOKS:
20     Q.   I apologize.  Whatever professionals were
21 advising them in Florida didn't have expertise in this
22 area?
23         ATTORNEY BORELLI:  Objection, form.
24         THE WITNESS:  With regard to hormonal

1  management.
2  BY ATTORNEY BROOKS:
3      Q.   What steps, if any, did you take to give
4  yourself comfort that any comorbidities that might be
5  --- might confound the diagnosis of transgenderism had
6  been appropriately addressed before you prescribed
7  hormones for Drew?
8          ATTORNEY BORELLI:  Objection to form.
9          THE WITNESS:  I mean, I would have to
10  look back at my notes specifically to see exactly what
11  we had in the record.  Our policy again is to have
12  someone who has had a relationship with the patient
13  outside of Duke Clinic that states that they have well
14  managed issues with regard to their mental health and
15  are prepared and safe to move forward with gender
16  affirming hormones.
17  BY ATTORNEY BROOKS:
18      Q.   As a matter of policy in your clinic do you
19  insist on a diagnosis that will tell you whether or not
20  this patient suffers from autism of any sort?
21          ATTORNEY BORELLI:  Objection, form.
22          THE WITNESS:  We do require that they
23  have a screening that is performed within our clinic for
24  any potential signs or symptoms of autism.

1  BY ATTORNEY BROOKS:
2      Q.   And if you identify that a patient does have
3  some signs or symptoms of autism what significance does
4  that have as to how quickly or whether you are willing
5  to proceed with hormonal interventions?
6          ATTORNEY BORELLI:  Objection to the form.
7          THE WITNESS:  So again, every patient is
8  different.  Autism is a spectrum, as it's described
9  autism spectrum disorder, and so you have to figure out
10  each patient's understanding of their gender identity,
11  what's going on in their life and if they're ready.
12  BY ATTORNEY BROOKS:
13      Q.   Do you have any professional opinion as to
14  whether autism itself can cause a patient to feel
15  uncomfortable with their identity?
16          ATTORNEY BORELLI:  Objection to form.
17          THE WITNESS:  Their whole identity?
18  BY ATTORNEY BROOKS:
19      Q.   Yes.
20      A.   I ---.
21          ATTORNEY BORELLI:  Objection ---.
22          THE WITNESS:  Yeah, I don't know if I
23  have seen any reports about their whole identity being
24  called into question just because they have autism.

1  BY ATTORNEY BROOKS:
2      Q.   Do you have any professional opinion as to
3  whether autism itself can cause individuals to feel
4  alienated from or disassociated with their gender
5  identity ---
6          ATTORNEY BORELLI:  Objection, form.
7  BY ATTORNEY BROOKS:
8      Q.   --- or I should say the gender identity
9  associated with their natal sex?
10          ATTORNEY BORELLI:  Objection to form.
11          THE WITNESS:  With the information that I
12  have worked with on our autism team at Duke is that, you
13  know, it can take a little longer for people with autism
14  to truly understand their gender identity.  So we do
15  take care there.  That's why we screen.
16  BY ATTORNEY BROOKS:
17      Q.   I would like to play a clip from this podcast
18  that includes your voice, the reporter's voice, Drew's
19  voice.  I think it will come through loud and clear.
20  I'm optimistic --- for those of you ---.
21          ATTORNEY BORELLI:  While you're settling
22  this, will the words from the recording, do they appear
23  in the transcription.
24          ATTORNEY BROOKS:  They do.  I was about

1  to say that for everybody's benefit.
2          ATTORNEY BORELLI:  Thank you, Counsel.
3          ATTORNEY BROOKS:  Now, I'm thinking.
4  That has to be live.  All right.  So that's unmuted.
5          VIDEOGRAPHER:  You said one?
6          ATTORNEY BROOKS:  What's that?
7          VIDEOGRAPHER:  You said one?
8          ATTORNEY BROOKS:  But I need to say on
9  the record and tell people --- can the court reporter
10  here me.
11          COURT REPORTER:  Yes.
12          ATTORNEY BROOKS:  The clip that I'm about
13  to play appears on page four of the transcript that is
14  marked Exhibit 15 and it makes up kind of the center
15  two-thirds of the transcript.  All the words that you
16  will hear or perhaps won't hear very well appear on the
17  transcript.  We're going to listen to clip one here.
18              ---
19  (WHEREUPON, PODCAST AUDIO WAS PLAYED.)
20              ---
21  BY ATTORNEY BROOKS:
22      Q.   The narrator says that Drew's only question was,
23  quote, when can I start testosterone, and you responded
24  today, sound good, yeah, all right.  Is that consistent

Page 186

1  with your recollection of what happened that day?
2       ATTORNEY BORELLI:  Objection, form.
3       THE WITNESS:  Yes.
4  BY ATTORNEY BROOKS:
5    Q.  Was that your voice?
6    A.  That was my voice.
7    Q.  Okay.
8       And did you know before you came into the room
9  that Drew's goal was to walk out with a testosterone
10 injection or a prescription for a testosterone
11 injection?
12      ATTORNEY BORELLI:  Objection to form.
13      THE WITNESS:  You know, I don't remember.
14 I don't remember what I knew before in walked in the
15 door.  Sometimes I do.  Sometimes I don't.
16 BY ATTORNEY BROOKS:
17   Q.  Now, I want to be fair.  This is --- these are
18 clips and they're carefully done, so I can't be sure
19 whether there are things in between.
20   A.  Correct.
21   Q.  Do you have any recollection as to any
22 discussion or any further evaluation that happened
23 between, hey, how are you, and your voice, and answering
24 the question when can I start, today?

Page 187

1       ATTORNEY BORELLI:  Objection, form.
2       THE WITNESS:  So most typically, before I
3  walk into a room I have reviewed the patient's medical
4  record.  I have reviewed their letter from their mental
5  health provider.  And I have reviewed any laboratory
6  evaluation that I have received from them prior and
7  generally review their records.  So I would come into a
8  visit with that sort of fresh in my mind.
9  BY ATTORNEY BROOKS:
10   Q.  So it is consistent with your recollection that
11 on Drew's second meeting with you, you walked into the
12 room having made up your mind to give Drew testosterone?
13      ATTORNEY BORELLI:  Objection, form.
14      THE WITNESS:  Based on the words that are
15 here, that would be --- I would have reviewed the
16 information that I needed to know that that would be
17 safe.
18 BY ATTORNEY BROOKS:
19   Q.  And in between walking in the room and telling
20 Drew today,  yay, all right, did you make any further
21 inquiry about whether Drew in the last --- since he last
22 saw you had been suffering from any sort of depression?
23      ATTORNEY BORELLI:  Objection to form.
24      THE WITNESS:  So typically that is part

Page 188

1  of our visit.  It's not necessarily part that I would
2  do.  And we also have forms that they fill out that does
3  an assessment of depression prior to me walking in the
4  room.
5  BY ATTORNEY BROOKS:
6    Q.  Did you ensure that an assessment had been done
7  that evaluated the strengths and weaknesses of Drew's
8  relationship with Drew's family?
9       ATTORNEY BORELLI:  Objection, form.
10      THE WITNESS:  The mental health
11 evaluation does include walking through parent
12 relationships, school relationships, teacher
13 relationships and finding out where those are.
14 BY ATTORNEY BROOKS:
15   Q.  Did you feel that you, yourself, needed to have
16 any understanding, for instance, of Drew's relationship
17 with Drew's father before you proceeded to prescribe
18 cross sex hormones?
19      ATTORNEY BORELLI:  Objection, form.
20      THE WITNESS:  I would want to know where
21 their relationships are.
22 BY ATTORNEY BROOKS:
23   Q.  So Drew's mother attended.  What steps did you
24 take to find out what Drew's relationship with Drew's

Page 189

1  father was?
2       ATTORNEY BORELLI:  Objection, form.
3       THE WITNESS:  I don't remember.  I would
4  have to look back.
5  BY ATTORNEY BROOKS:
6    Q.  And does your clinic before prescribing hormonal
7  interventions make sure that an overall psychotherapy
8  treatment plan has been prepared to diagnose and address
9  any other psychological or social difficulties suffered
10 by the patient?
11      ATTORNEY BORELLI:  Objection to form.
12      THE WITNESS:  So you know, I follow the
13 guidelines that say that we should have any of the
14 mental health issues well managed and that's why we use
15 --- have our patients have a mental health provider and
16 that's why we have them tell us that in writing.
17 BY ATTORNEY BROOKS:
18   Q.  So I'm going to play a second clip that picks up
19 exactly where we left off on the transcript, that is at
20 the very bottom of page five and continuing halfway ---
21 I'm sorry, the very bottom of page four and continuing
22 halfway down page five.  If you would.
23
24               ---

1    (WHEREUPON, PODCAST AUDIO WAS PLAYED.)
2            ---
3            ATTORNEY BROOKS:  That was background
4    noise.  I thought it was coming through here.  I
5    apologize.  Just start it again.  My mistake.
6            ---
7    (WHEREUPON, PODCAST AUDIO WAS PLAYED.)
8            ---
9    BY ATTORNEY BROOKS:
10       Q.   Dr. Adkins, do you believe that the basic
11   narrative here accurately describes what happened, that
12   you came in, you spoke with Drew, you went out, and
13   while you were out one of your aides read risk
14   disclosures for consent to Drew and Drew's mother?
15           ATTORNEY BORELLI:  Objection, form.
16           THE WITNESS:  That is part of it.
17   BY ATTORNEY BROOKS:
18       Q.   And the narrator said at the beginning
19   explaining this process that there were still, as of
20   2016, a lot of unknowns about what these hormones will
21   do long term.  Was that an accurate statement at the
22   time in your opinion?
23           ATTORNEY BORELLI:  Objection, form.
24           THE WITNESS:  We've learned a lot more.

1    We have got however many more years, what, five more
2    years at least of information since then.  You can't
3    know what every single thing that every drug is going to
4    do forever.
5    BY ATTORNEY BROOKS:
6        Q.   One of the things that you included at that time
7    in your cautions or disclosures was that taking these
8    cross sex hormones might prevent a patient who had ---
9    was a natal female from ever being able to get pregnant,
10   even if Drew stopped taking testosterone in the future.
11       Correct?
12           ATTORNEY BORELLI:  Objection, form.  One
13   other just piece of clarity for the record, I want to
14   make sure that it is clear that the transcript and
15   recording is not a complete recording of the entire
16   visit.
17           ATTORNEY BROOKS:  I have made that clear
18   I think.
19           ATTORNEY BORELLI:  Thank you, Counsel.
20   BY ATTORNEY BROOKS:
21       Q.   My question is one of your disclosures in 2016
22   was that the administration of testosterone to a natal
23   female might mean that that individual would not ever be
24   able to get pregnant even should the patient stop taking

1    testosterone at a future date.
2        Correct?
3            ATTORNEY BORELLI:  Objection, form.
4            THE WITNESS:  Correct.
5    BY ATTORNEY BROOKS:
6        Q.   And that is still part of your disclosure today;
7    is that correct?
8        A.   That's part of it.  We actually have more
9    studies that show actually an equal fertility rate for
10   our transgender males who have been on testosterone and
11   come off and choose to get pregnant as their cisgender
12   peers, their assigned females at birth who've never been
13   through any testosterone treatment.
14       Q.   Because of the present science you still make
15   exactly the same caution in your warnings to patients
16   before prescribing testosterone.
17       Correct?
18           ATTORNEY BORELLI:  Objection to form.
19           THE WITNESS:  I do.
20   BY ATTORNEY BROOKS:
21       Q.   And so the sequence is that you said with regard
22   to administering testosterone, which you cautioned or
23   clinic cautioned could be potentially sterilizing, you
24   as the doctor said to Drew, sound good, yeah, all right.

1    And then you left the room while somebody else read
2    warnings and disclosures.
3        Is that right?
4            ATTORNEY BORELLI:  Objection, form.
5            THE WITNESS:  That doesn't --- is that
6    what the sequence was in this report?  It looks like
7    that I also make sure that the patients have adequate
8    time to answer questions.  I usually give them this form
9    ahead of the visit so they can review it and in case
10   their reading is their better method versus verbal.
11   That's why we do it in two different ways as far as
12   their learning style.  We make every effort to help make
13   sure that our patients understand.
14           ATTORNEY BORELLI:  We have been going a
15   while.  Can we take a break soon?  I think we should.
16           ATTORNEY BROOKS:  Fairly soon.  We'll
17   finish this line of questioning and this clip.
18   BY ATTORNEY BROOKS:
19       Q.   You yourself didn't ever sit down and talk
20   through known or potential side effects with either the
21   child or the mother in this case, did you?
22           ATTORNEY BORELLI:  Objection, form.
23           THE WITNESS:  I don't remember it
24   specifically every visit from 2016 and exactly what

1 happened.
2 BY ATTORNEY BROOKS:
3    Q.  As a matter ---.
4          ATTORNEY BORELLI:  Counsel, I'm sorry, I
5 think I heard the witness say a moment ago that a break
6 would be good.  Why don't we break here?  Can we come
7 back in say ten minutes?
8          ATTORNEY BROOKS:  We can say that or I
9 can finish this paragraph.
10          ATTORNEY BORELLI:  Why don't we break
11 now.  We've been going a while.  Thank you.
12          VIDEOGRAPHER:  Going off the record.  The
13 current time reads 2:27 p m. Eastern Standard Time.
14 OFF VIDEO
15          ---
16 (WHEREUPON, A PAUSE IN THE RECORD WAS HELD.)
17          ---
18 ON VIDEO
19          VIDEOGRAPHER:  We're back on the record.
20 Current time reads 2:43 p m. Eastern Standard Time.
21 BY ATTORNEY BROOKS:
22    Q.  Dr. Adkins, in dealing with Drew, you have a
23 social worker read the disclosures, the warnings.  Did
24 you, yourself, ever present to Drew options for

1 fertility preservation?
2          ATTORNEY BORELLI:  Objection, form.
3          THE WITNESS:  Yes, that is a conversation
4 I have with my patients.
5 BY ATTORNEY BROOKS:
6    Q.  You, yourself, have that conversation?
7    A.  I do.
8    Q.  Let's --- and did you explain --- I see that the
9 disclosure --- we heard the disclosure that it's ---
10 using testosterone to appear more masculine is off label
11 use.  Is that part of your standard disclosures?
12          ATTORNEY BORELLI:  Objection, form.
13 BY ATTORNEY BROOKS:
14    Q.  Do you explain to your patients that the fact
15 that it is off label means that no studies that
16 establish safety of use of testosterone for that purpose
17 at the level as would be required for FDA approval have
18 been done?
19          ATTORNEY BORELLI:  Objection, form.
20          THE WITNESS:  No, that wouldn't be an
21 accurate statement.  Those studies can be done.  They
22 just haven't been presented by the company manufacturing
23 the medication to the FDA to try and get that
24 certification from the FDA.

1 BY ATTORNEY BROOKS:
2    Q.  Have you, yourself, ever participated as a
3 physician in a so-called phase one clinica trial?
4          ATTORNEY BORELLI:  Objection to form.
5          THE WITNESS:  So phase one typically is
6 dose related.  I have not done those.  I have done phase
7 two, phase three and then after market.
8 BY ATTORNEY BROOKS:
9    Q.  Phase one is, among other things, required to
10 establish safety.
11    Am I correct?
12          ATTORNEY BORELLI:  Objection, form.
13          THE WITNESS:  That is part of the
14 objective of a phase one study.
15 BY ATTORNEY BROOKS:
16    Q.  And indeed, it is a required part of the
17 objective.
18    Right?
19          ATTORNEY BORELLI:  Objection, form.
20          THE WITNESS:  Yes.
21 BY ATTORNEY BROOKS:
22    Q.  And to your knowledge, has any study of safety
23 of administering testosterone for the purpose of
24 appearing more masculine in natal females ever been done

1 at a level of rigor that could satisfy FDA requirements?
2          ATTORNEY BORELLI:  Objection, form.
3          THE WITNESS:  So I don't have the FDA
4 standards right in front of me.  I have, you know, read
5 articles that report outcomes and side effects and
6 safety profiles.  There are other testosterone --- there
7 are testosterone products on the market that are FDA
8 approved for using cisgender females.
9 BY ATTORNEY BROOKS:
10    Q.  Do you know whether any safety study has ever
11 been done for administration of testosterone to natal
12 females for the purpose of appearing more masculine at a
13 level of rigor that could satisfy FDA requirements?
14          ATTORNEY BORELLI:  Objection, form.
15          THE WITNESS:  I can't answer the question
16 without, you know --- I would have to really look at the
17 indications, the FDA rules.
18 BY ATTORNEY BROOKS:
19    Q.  Okay.
20    Let's listen to a third and final clip.  This
21 one begins with a sentence the last one ended with on
22 page five and runs just onto page six, I believe.  End
23 of page five.  Let's hear that.
24

Page 198

```
1                      ---
2     (WHEREUPON, PODCAST AUDIO WAS PLAYED.)
3                      ---
4     BY ATTORNEY BROOKS:
5         Q.   All right.
6             My impression, correct me or tell me if you
7     agree, that clip is just a single unbroken bit of
8     conversation, not pieced together from different things.
9     Is that consistent with what you heard and what you
10    recall?
11            ATTORNEY BORELLI:  Objection, form.
12            THE WITNESS:  You know, I don't remember.
13    BY ATTORNEY BROOKS:
14        Q.   Okay.
15            You come back in the room with a prescription
16    in your hand, the warnings have been read while you were
17    outside.  You ask, guess what I have in my hand.  You
18    heard the clip and I see what it says there.  Is the
19    voice that says happy drugs Drew's voice or your voice?
20            ATTORNEY BORELLI:  Objection, form.
21            THE WITNESS:  Mine.  My voice.
22    BY ATTORNEY BROOKS:
23        Q.   The voice that says happy drugs is your voice.
24    And the voice that says yay, yay, s also your voice?  If
```

Page 199

```
1     you want to hear it again you can.
2         A.   It's not labeled that way.
3         Q.   Well, yay, yay is labeled you?
4         A.   Yay, yay is labeled me?  Okay.
5         Q.   Doctor A?
6         A.   It's really confusing because it's ---.
7         Q.   Let's do this.  Let's listen to this one more
8     time.
9         A.   There is confusion.
10        Q.   I want you to listen --- don't trust the labels.
11    Listen to the voice on happy drugs.  They may be ---.
12                     ---
13    (WHEREUPON, PODCAST AUDIO WAS PLAYED.)
14                     ---
15    BY ATTORNEY BROOKS:
16        Q.   Whose voice says happy drugs?
17        A.   That sounded like Drew.
18        Q.   Okay.
19            So the labeling you believe is correct.  I just
20    wanted to double check that.
21            Are you, as a physician, in light of all of the
22    disclosures that have just been made about potential
23    side effects, potential harmful effects, were you
24    comfortable with the child referring to cross sex
```

Page 200

```
1     hormones as happy drugs?
2             ATTORNEY BORELLI:  Objection, form.
3             THE WITNESS:  So if you will recall, we
4     use the medication to decrease dysphoria, which is a
5     discomfort, and to improve depression.  So any
6     medication that would relieve those things could be
7     described as a happy drug.  I'm okay with that.
8     BY ATTORNEY BROOKS:
9         Q.   And after Drew says happy drug you said yay,
10    yay.  Are you comfortable that's consistent with your
11    role as a doctor in light of potential downsides and
12    side effects of this treatment and this child's life to
13    serve the role of a cheerleader saying yay, yay?
14            ATTORNEY BORELLI:  Objection.  Counsel, I
15    just want to note for the record it's not clear from
16    that recording that both yays are in the same voice.
17    That's actually not what I heard.
18            ATTORNEY BROOKS:  If you have an
19    objection you can raise it later.
20            ATTORNEY BORELLI:  I need to make my
21    record now, Counsel.
22            ATTORNEY BROOKS:  No, you need to raise
23    your objection now.  You get to discuss it further in
24    front of the court.
```

Page 201

```
1     BY ATTORNEY BROOKS:
2         Q.   I will re-ask my question.  Do you consider it
3     consistent with your role as a physician, in light of
4     the potential downsides and side effects from cross sex
5     hormones for this child, for you to play the role of
6     cheerleader saying yay?
7             ATTORNEY BORELLI:  Objection, form.
8             THE WITNESS:  So in my job as a physician
9     I often am helping motivate my patients improve their
10    overall health.  And in that way I often sound like I am
11    a cheerleader and I am trying to help them believe in
12    themselves and understand and feel good moving forward
13    with medication treatments to have the best likelihood
14    of success.  So I may say yay.
15            VIDEOGRAPHER:  Excuse me.  You got cut
16    out there in the middle of that --- in the middle of
17    your answer.
18            THE WITNESS:  Okay.
19            Do you want me to start over?
20            ATTORNEY BROOKS:  Who was that?
21            ATTORNEY WILKINSON:  That was the court
22    reporter.  I can make a recording if everyone is happy
23    with my phone just on the table so we could refer to
24    that later if that's useful if we're concerned about the
```

Page 202

1   audio cutting out.
2          ATTORNEY BROOKS:  There is no harm in a
3   backup recording.  Voices will be identifiable.  If you
4   want to set it there by that speaker.
5          ATTORNEY WILKINSON:  If you're
6   comfortable.
7          ATTORNEY BORELLI:  I just want to check
8   --.
9          COURT REPORTER:  Who is talking right
10  now.  I'm sorry, who is --- who is talking about their
11  phone.  I don't understand.  Like, I don't know who's
12  speaking.
13         ATTORNEY BROOKS:  Just now my colleague
14  Lawrence Wilkinson is proposing to set his iPhone on
15  record by the speaker here so there will be a backup
16  onsite recording in case anything is dropped over the
17  internet.  And that will be made available both to those
18  who are listening and to the court reporter service.
19  Address some of the concerns.  So let's fire that up and
20  it will be there.
21  BY ATTORNEY BROOKS:
22     Q.  I will continue with my questioning.  Did it
23  cause you any concern that in referring --- by referring
24  to a testosterone injection as happy drugs that that was

Page 203

1   an indication that young Drew was not taking seriously
2   the 20 minutes' worth of cautions and warnings that had
3   just been read?
4          ATTORNEY BORELLI:  Objection, form.
5          THE WITNESS:  So given that the
6   medication is used to decrease dysphoria and improve
7   depressive symptoms, in that way it does make someone
8   happier.  And I have no issue with a patient who is
9   using a general reference as happy drugs in that that is
10  part of what will happen with the medication.  I didn't
11  have any concerns with regard to the fact that Drew may
12  not have gotten everything he needed to understand what
13  he was going into going forward with this medication.
14  BY ATTORNEY BROOKS:
15     Q.  Let's back up to page four of the transcript.
16  And we're not going to listen to any ore clips.
17  Everybody will be happy to know perhaps.
18         ATTORNEY BORELLI:  It's unstable.
19         THE WITNESS:  There we go.
20  BY ATTORNEY BROOKS:
21     Q.  Okay.
22         And towards the top of page four, the second
23  paragraph, the narrator --- and this is not you speaking
24  and it is not Drew's mother speaking.  The narrator says

Page 204

1   she doesn't like talking about what Drew's life was like
2   before he started transitioning.  But when I asked her
3   how she knew living as a boy was the right choice for
4   Drew, she was blunt.  She said I'd rather have a living
5   son than a dead daughter.  Do you see that?
6      A.  I do.
7      Q.  Did you ever tell Drew's mother that that was
8   the choice that she faced, between a living son and a
9   dead daughter?
10         ATTORNEY BORELLI:  Objection to form.
11         THE WITNESS:  I would not have used that
12  phrase.  I would have discussed the risk of suicidality.
13  BY ATTORNEY BROOKS:
14     Q.  Did you ever hear Drew's mother say she
15  understood that was the choice she faced, between a
16  living son and a dead daughter?
17         ATTORNEY BORELLI:  Objection, form.
18         THE WITNESS:  You know, I have heard it
19  since then because of the podcast, so I can't remember
20  if I heard it before then or not.  I don't recall
21  hearing it before then.
22  BY ATTORNEY BROOKS:
23     Q.  When you saw the title to the podcast did you
24  call WNYC and express any concern that that title could

Page 205

1   be misleading?
2          ATTORNEY BORELLI:  Objection, form.
3          THE WITNESS:  I did not.
4   BY ATTORNEY BROOKS:
5      Q.  Have you ever consulted research on the rate of
6   suicide among preadolescents for any purpose?
7          ATTORNEY BORELLI:  Objection to form.
8   BY ATTORNEY BROOKS:
9      Q.  In any category?
10     A.  Repeat the question, please.
11     Q.  Have you ever consulted research or data about
12  the rate of suicide among preadolescents, period?
13         ATTORNEY BORELLI:  Objection, form.
14         THE WITNESS:  Preadolescents, have I
15  consulted research on suicidality on preadolescents, so
16  before puberty.  Not in a while.
17  BY ATTORNEY BROOKS:
18     Q.  You are aware, are you not, that incidences of
19  actual suicide are extremely rare in individuals of all
20  categories before puberty?
21         ATTORNEY BORELLI:  Objection, form.
22         THE WITNESS:  That sounds consistent with
23  the leading causes that I recall for death before
24  puberty.

52  (Pages 202 to 205)

1    BY ATTORNEY BROOKS:
2        Q.   And you, yourself, are not aware of a single
3    case of suicide by a preadolescent gender dysphoria
4    patient that has come to your clinic?
5            ATTORNEY BORELLI:  Objection, form.
6            THE WITNESS:  No.
7    BY ATTORNEY BROOKS:
8        Q.   And have you consulted any research on the rate
9    of actual suicide by children suffering from gender
10   dysphoria under the age of 15?
11           ATTORNEY BORELLI:  Objection, form.
12           THE WITNESS:  Have I?  Yes.
13   BY ATTORNEY BROOKS:
14       Q.   And what did that --- what source do you have in
15   mind when you say that?
16           ATTORNEY BORELLI:  Objection, form.
17           THE WITNESS:  Again, I have trouble with
18   remembering and there is a wide variety of reports, some
19   as --- from 25 to 30 percent, some as high as 40
20   percent.  And those are suicide attempts, as I recall,
21   which means that the folks that died wouldn't have even
22   been identified.
23   BY ATTORNEY BROOKS:
24       Q.   Well, you are aware that there's a very wide

1    statistical gap between suicide attempts and suicides.
2        Correct?
3            ATTORNEY BORELLI:  Objection to form.
4            THE WITNESS:  There is some variation
5    between suicide attempts and what was the word, suicide
6    ideation, yeah.
7    BY ATTORNEY BROOKS:
8        Q.   No.  What I said is there is a very wide gap
9    between suicide attempts and actual completed suicide?
10           ATTORNEY BORELLI:  Objection, form.
11           THE WITNESS:  There is a gap between.
12   Not every one who attempts.  Otherwise, there wouldn't
13   be a difference in the name.
14   BY ATTORNEY BROOKS:
15       Q.   In fact, you know as a matter of professional
16   expertise that it is a very wide gap, do you not?
17           ATTORNEY BORELLI:  Objection.
18           THE WITNESS:  I would have to look at the
19   literature, at what the numbers look like and describing
20   it why is an opinion.
21   BY ATTORNEY BROOKS:
22       Q.   Has any patient of the 500 under your care ever
23   committed suicide at an age younger than 14?
24           ATTORNEY BORELLI:  Objection, form.

1            THE WITNESS:  Excuse me.  No.
2    BY ATTORNEY BROOKS:
3        Q.   Have you followed up so that you have current
4    information about Drew's mental, physical and social
5    health as of today, which would be about age 21?
6            ATTORNEY BORELLI:  Objection, form.
7            THE WITNESS:  Drew's no longer my
8    patient, has transitioned to adult care.  That's not
9    what I do, so I don't have access to that.
10   BY ATTORNEY BROOKS:
11       Q.   What procedures do you have in place, if any, in
12   your clinic to follow up long term with those whom you
13   have prescribed puberty blockers or cross sex hormones
14   for?
15           ATTORNEY BORELLI:  Objection, form.
16           THE WITNESS:  So you know, here at Duke
17   we have a multidisciplinary team.  As --- I don't know
18   if I mentioned them before.  It includes a wide variety
19   of individuals.  And that group discusses every month
20   our patients, any concerns or questions.  In addition,
21   that group has put together a registry that starts when
22   they come to my clinic and we follow their health, their
23   mental health through the time that they are in our
24   clinic and then when --- oops.  Sorry.  And then when

1    they are adults transitioning to our adult care team.
2    And in that way I'm able to keep up with those patients
3    who remain at Duke for adult care.
4    BY ATTORNEY BROOKS:
5        Q.   So you have been practicing this field I think
6    you said since about 2013.  And the patients that you
7    saw let's say in 2013, 2014, 2015, I think you said most
8    of your patients presented older than age --- I don't
9    recall exactly.  Your average presentation is older than
10   13?
11           ATTORNEY BORELLI:  Object to the form.
12           THE WITNESS:  Yes.
13           ATTORNEY BORELLI:  You got to pause so I
14   can get in an objection.
15           THE WITNESS:  Oh, yeah.  Yeah.
16   BY ATTORNEY BROOKS:
17       Q.   So --- yeah.  So those patients on average are
18   now in their upper teens or perhaps 20?
19           ATTORNEY BORELLI:  Objection, form.
20           THE WITNESS:  Let's see.  I have patients
21   who are older than that.  I'm not sure of an average.  I
22   have not calculated an average.
23   BY ATTORNEY BROOKS:
24       Q.   Do you have any procedures in place to attempt

1    to monitor the mental health of your patients five years
2    after you first prescribe puberty blockers or cross sex
3    hormones?
4            ATTORNEY BORELLI:  Objection, form.
5            THE WITNESS:  The patients that remain
6    within our registry do have regular mental health
7    follow-up.  We have a team on the adult side as well in
8    both of the two clinics that we work with.
9    BY ATTORNEY BROOKS:
10       Q.   What percentage of your patients that you
11   yourself have authorized cross sex hormones do you have
12   access to data about their mental health five years
13   after initiation of hormone treatment?
14           ATTORNEY BORELLI:  Objection, form.
15           THE WITNESS:  Some are still present in
16   the clinic.  I would have access to those.  You know,
17   I'm not supposed to access records specifically if
18   they're no longer in my care.  The provider can reach
19   out to me with concerns and have a very close
20   relationship with the adult providers and they do ask me
21   questions about some of those.  So in that way I would
22   have access as well as when we calculate on a population
23   base within our registry any outcomes there.
24   BY ATTORNEY BROOKS:

1        Q.   As a matter of research, has --- have you or
2    anybody associated with your clinic attempted a
3    follow-up survey or systematic series of interviews of
4    all patients who were prescribed hormones within, for
5    instance, some particular time period?
6            ATTORNEY BORELLI:  Objection, form.
7            THE WITNESS:  So we currently are
8    enrolling patients in that study.  It's not complete.
9    BY ATTORNEY BROOKS:
10       Q.   As we sit here today, you don't have any
11   systematic reasonably thorough information on the mental
12   health condition of let's say patients for whom you
13   first prescribed hormonal interventions five years ago.
14       Is that correct?
15           ATTORNEY BORELLI:  Objection.  Objection
16   to form.
17           THE WITNESS:  I would consider, you know,
18   a registry with research based systematic method.
19   BY ATTORNEY BROOKS:
20       Q.   A registry with research based ---?
21       A.   That is research based is a systematic program
22   to do that and find out follow-up.
23       Q.   What do you mean by registry that it is research
24   based?

1        A.   A registry is a list of patients who are
2    enrolled in a study, if it's done as a research
3    protocol.  And within that registry, you collect
4    information that you choose to record that's important
5    and then you follow that over time in a systematic way.
6            ATTORNEY BROOKS:  Let me grab tab 29 ---
7    let me mark as Exhibit 16 a document previously
8    designated as tab 29, which is article entitled --- I
9    should say a newspaper article entitled The Mental
10   Health Establishment is Failing Trans Kids by Laura
11   Edwards Leeper and Erica ---.
12           ---
13           (Whereupon, Adkins Exhibit 16, 2021
14           Washington Post Article, was marked for
15           identification.)
16           ---
17   BY ATTORNEY BROOKS:
18       Q.   And Dr. Adkins, am I correct that this in the
19   Washington Post came out in November of 2021 stirred up
20   quite a bit of discussion within your profession?
21           ATTORNEY BORELLI:  Objection, form.
22           THE WITNESS:  I understand that there was
23   an article by Laura Edwards Leeper that there was a lot
24   of conversation around.  I don't know if it was this

1    one.  It is possible.
2    BY ATTORNEY BROOKS:
3        Q.   Did you read this?
4        A.   I haven't read this article.
5        Q.   There was a lot of conversation around a recent
6    article by Dr. Edwards Leeper and Dr. Anderson but you
7    didn't bother to read it?
8            ATTORNEY BORELLI:  Objection to form.
9            THE WITNESS:  I have had discussions with
10   my colleagues around the substance.  I haven't had the
11   time to read it.
12   BY ATTORNEY BROOKS:
13       Q.   Have you had professional interactions in the
14   past with Dr. Edwards Leeper?
15           ATTORNEY BORELLI:  Objection, form.
16           THE WITNESS:  It's possible that we
17   taught at a same conference once, but I don't recall
18   ever having a conversation.
19   BY ATTORNEY BROOKS:
20       Q.   And have you had professional interactions with
21   Dr. Anderson?
22           ATTORNEY BORELLI:  Objection, form.
23           THE WITNESS:  I have not.
24   BY ATTORNEY BROOKS:

Page 214

1    Q.   Are you generally aware of Dr. Edwards Leeper's
2    reputation in the field?
3         ATTORNEY BORELLI:  Objection, form.
4         THE WITNESS:  Yes.
5    BY ATTORNEY BROOKS:
6    Q.   How would you describe that reputation at least
7    prior to publication of this article?
8         ATTORNEY BORELLI:  Objection, form.
9         THE WITNESS:  In general, I would not
10   necessarily say that it has changed.  People have
11   respect for Dr. Edwards Leeper and her publications in
12   general.  I don't know about specific ---.
13   BY ATTORNEY BROOKS:
14   Q.   People generally have respect for her
15   publications?
16   A.   Generally.  I don't know about every one.
17   Q.   Sure.  Were you invited to participate as a
18   member of the committee to revise the WPATH so-called
19   standards of care relating to treatment of transgender
20   individuals?
21        ATTORNEY BORELLI:  Objection, form.
22        THE WITNESS:  I was.
23   BY ATTORNEY BROOKS:
24   Q.   Are you doing that?

Page 215

1    A.   No.
2    Q.   And did you participate in the task force for
3    the American Psychological Association, which developed
4    guidelines for practice guidelines for work with
5    transgender individuals?
6         ATTORNEY BORELLI:  Objection, form.
7         THE WITNESS:  I have not participated in
8    that, no.
9    BY ATTORNEY BROOKS:
10   Q.   Okay.
11        And let me mark the next one, which is an
12   article that consists of an interview with Dr. Anderson.
13   This I will mark as Exhibit 17?
14        ---
15        (Whereupon, Adkins Exhibit 17, Anderson
16        Interview, was marked for
17        identification.)
18        ---
19   BY ATTORNEY BROOKS:
20   Q.   And I believe I asked if you knew her or are you
21   familiar with the reputation of Dr. Anderson, Dr. Laura
22   Anderson?
23        ATTORNEY BORELLI:  Objection, form.
24        THE WITNESS:  Actually, no.

Page 216

1    BY ATTORNEY BROOKS:
2    Q.   So as a representation there I know that Dr.
3    Anderson is transgender, is a natal male who's been
4    living with a female gender identity for many years.
5    That you don't know about one way or the other?
6         ATTORNEY BORELLI:  Objection, form.
7         THE WITNESS:  I do not know that.
8    BY ATTORNEY BROOKS:
9    Q.   Okay.
10        Let me take you back to Exhibit --- sorry, what
11   was the first one we marked?  Was it 17 and 18 or 16 and
12   17?
13        ATTORNEY WILKINSON:  Sixteen (16) and 17,
14   16 and 17.
15   BY ATTORNEY BROOKS:
16   Q.   Let me take you back to Exhibit 16.  And the
17   first paragraph contains a narrative.  I have no idea
18   whether it is a specific narrative or kind of case study
19   narrative about this girl Patricia who told her parents
20   she was transgender at age 13.  It goes on to say that a
21   year earlier she had been sexually assaulted by an older
22   girl.  Do you know what percentage of natal females who
23   come to your clinic after the beginning of puberty have
24   experienced sexual assault before they present to you?

Page 217

1         ATTORNEY BORELLI:  Objection, form.
2         THE WITNESS:  I can't give you a
3    percentage.  It is something that we discuss with every
4    patient in their intake assessment.
5    BY ATTORNEY BROOKS:
6    Q.   Do you believe that natal females who have
7    suffered sexual assault are disproportionately
8    represented among the population who present
9    experiencing gender dysphoria or gender incongruence?
10        ATTORNEY BORELLI:  Objection, form.
11        THE WITNESS:  So those assigned female at
12   birth, I can't say that based on my review of my
13   information that they are overrepresented.  And I would
14   have to have a comparison group.  You know, one in four
15   cisgender women have been attacked sexually at some
16   point in their life. It's hard to get around that.
17   BY ATTORNEY BROOKS:
18   Q.   Let me ask you to turn to page three of Exhibit
19   16.
20   A.   I'm sorry ---.
21   Q.   Page three, Exhibit 16.
22   A.   Okay.  Thank you.  I just had a drink of water.
23   Q.   Of course.
24   A.   They're not labeled on my paper.

Q.   The pages are not.  You are right.  I wrote them on mine.  You would have to count them to be sure, but the third page.

A.   I think I got it.

Q.   These authors, Doctors Edwards Leeper and Anderson, state at the end of the paragraph at the top of page three that, quote, we may be harming some of the young people we strive to support, people who may not be prepared for the gender transitions they are being rushed into, closed quote.

Do you see that?

A.   Where again?

Q.   It's the very last sentence of the partial paragraph at the top?

A.   Right.  Got it.  Thank you.  Yeah, I see it.

Q.   Do you share that concern expressed by Dr. Edwards Leeper and Dr. Anderson that is that some young people are being rushed into transitions and may be harmed rather than supported as a result?

ATTORNEY BORELLI:  Objection, form.

THE WITNESS:  So if you're following the recommendations there's at least six months of time.  In my general experience it is years before they even present to my clinic.  So I don't --- I would not say

that that's a rush.

BY ATTORNEY BROOKS:

Q.   Well, and my question wasn't about your clinic now.  My question was do you share the concern of these authors that looking around the practice more generally that some young people are being harmed rather than supported because they are being rushed into transitions they may not be fully prepared for?

ATTORNEY BORELLI:  Objection, form.

THE WITNESS:  So within research and within my conversations with my colleagues who are doing similar work, we practice similarly.  I don't agree that they are rushing these kids.

BY ATTORNEY BROOKS:

Q.   Let me ask you to turn over to the next page.  And there in the second paragraph from the bottom is a sentence that begins in a recent study.  Do you see that sentence?

A.   I must not be on the right page.

Q.   It is the penultimate page.

A.   In the ---.

Q.   In the penultimate paragraph.

A.   Providers, that one?

Q.   In a recent study of 100 detransitioners.  I

think it does, it begins ---.

A.   Okay.  All right.

Q.   Within that you'll find the sentence that begins in recent study.

A.   Got it.

Q.   And it says in a recent study 100 detransitioners, for instance, 38 percent reported that they believed their original dysphoria have been caused by something specific such as trauma, abuse or mental health condition, closed quote.

Do you see that?

A.   I do.

Q.   Are you, yourself, aware of a recently published survey of 100 detransitioners by Dr. Litman of Brown University?

ATTORNEY BORELLI:  Objection, form.

THE WITNESS:  I have not seen that report.

BY ATTORNEY BROOKS:

Q.   Are you aware of that?

ATTORNEY BORELLI:  Objection to form.

THE WITNESS:  No, actually.  Again, I don't remember names, so when you ask me about an article by Doctor Brown, I know 100 Doctor Brown.  And I

have seen some articles about de-transition.  So without that in front of me to really say, yes, I've seen that article --- it's possible.  I do my best to keep up on the literature.

BY ATTORNEY BROOKS:

Q.   All right.  I'm used to wetting my fingers --- let me take you back to the previous page, the third paragraph --- and the paragraph begins comprehensive assessment.  Do you see that paragraph?

A.   Yes.

Q.   And at the end of that the last sentence reads the messages that teens get from Tik-Tok and other sources may not be very productive for understanding this constellation of issues, referring to gender dysphoria-related issues.  Do you see that sentence?

A.   I do.

Q.   Do you share the concern of these authors, young people are being unduly influenced on issues of gender identity by social media messages?

ATTORNEY BORELLI:  Objection to form.

THE WITNESS:  As a pediatrician, I have my reservations about social media and their effects on teens.  Always reminding teens in my care that they need to check their sources and that TikTok isn't, for

Deanna Adkins 0809

Page 222

1  example, peer reviewed and that they should rely on, you
2  know, the knowledge of their provider.  And they're free
3  to ask those questions and learn that information from a
4  reliable person within our clinic.
5  BY ATTORNEY BROOKS:
6      Q.   Do you share the concern that teens are
7  particularly subject to peer pressure through social
8  media?
9              ATTORNEY BORELLI:  Objection, form.
10             THE WITNESS:  So you know, peer pressure
11  is a recognized phenomenon with adolescents that can
12  affect teens.
13  BY ATTORNEY BROOKS:
14     Q.   Is your clinic seeing an increasing number of
15  older teens or young adults who are considering
16  de-transitioning?
17             ATTORNEY BORELLI:  Objection, form.
18             THE WITNESS:  I'm sorry.  Repeat the very
19  first part of that.
20  BY ATTORNEY BROOKS:
21     Q.   Is your clinic seeing an increasing number of
22  older teens or young adults who are considering
23  de-transitioning?
24             ATTORNEY BORELLI:  Objection, form.

Page 223

1              THE WITNESS:  Increasing over time ---
2  BY ATTORNEY BROOKS:
3      Q.   Yes.
4      A.   --- or in the past?  I wouldn't say the rate has
5  increased in my clinic.
6      Q.   Within the last --- well, let's say within 2021
7  or whatever of 2022 there has been, how many patients
8  have raised with you or to your knowledge anyone in your
9  clinic the possibility of de-transitioning?
10             ATTORNEY BORELLI:  Objection, form.
11             THE WITNESS:  In that timeframe, I would
12  have to look back exactly.  Only three.
13  BY ATTORNEY BROOKS:
14     Q.   Are you aware of multiple reports that the
15  proportion of young people presenting with gender
16  dysphoria or gender incongruence among teens has shifted
17  heavily towards girls over the last decade?
18             ATTORNEY BORELLI:  Objection, form.
19             THE WITNESS:  You will have to clarify
20  the question because girls ---.
21  BY ATTORNEY BROOKS:
22     Q.   Are you aware that the proportion of teens
23  presenting at clinics with gender dysphoria or gender
24  incongruence who are natal female has increased greatly

Page 224

1  over the last decade?
2              ATTORNEY BORELLI:  Objection, form.
3              THE WITNESS:  I have seen at least one
4  study would suggest that.  It has not been my clinical
5  experience.
6  BY ATTORNEY BROOKS:
7      Q.   That has not been the experience in your clinic?
8      A.   No.
9      Q.   Let me take you to paragraph 18 of your expert
10  report.  And there you express the opinion that a
11  person's gender identity cannot be voluntarily changed
12  and is not undermined or altered by the existence of
13  other sexually related characteristics that do not align
14  with it.  Do you see that?
15     A.   I do.
16     Q.   And let me, in fact, have the Declaration ---
17  the preliminary injunction declaration, which is tab one.
18             ATTORNEY BROOKS:  I'm going to mark that
19  as Exhibit --- or did I already mark it?
20             ATTORNEY WILKINSON:  Not marked.
21             ATTORNEY BROOKS:  I did not.  So what
22  exhibit was that?
23             ATTORNEY WILKINSON:  Eighteen (18).
24             ATTORNEY BROOKS:   We will mark the

Page 225

1  Declaration of Deanna Adkins dated 5/21/2021 as Exhibit
2  18.
3              ---
4          (Whereupon, Adkins Exhibit 18,
5          Declaration of Deanna Adkins, M.D., was
6          marked for identification.)
7              ---
8  BY ATTORNEY BROOKS:
9      Q.   And in this document also I want to call your
10  attention to paragraph 18.  And in the declaration filed
11  in May of last year in paragraph 18 you wrote a person's
12  gender identity is fixed.  Do you see that language?
13     A.   I do.
14     Q.   And you eliminated the word --- the assertion
15  that a person's gender identity is fixed from your
16  expert declaration submitted more recently.  Do you see
17  that?
18     A.   I do.
19     Q.   Why did you make that omission?
20     A.   I think that it's too easy to misinterpret.
21     Q.   Explain.
22     A.   So when I'm talking about someone's gender
23  identity it is what it is.  And nothing that I do or
24  they do or their family does can change that gender

Adkins 827909 0810

Page 226

1   identity.  Their understanding of that gender identity
2   may change over time.  And that was my --- what I was
3   trying to say was not changeable.  And when you use the
4   other word it seems that it could be misinterpreted to
5   me.
6       Q.   So you don't mean to say that gender identity
7   never changes in individuals, do you?
8           ATTORNEY BORELLI:  Objection, form.
9           THE WITNESS:  That's not what I said.  I
10  said gender identity is what it is.  And your
11  understanding of it may change over time.
12  BY ATTORNEY BROOKS:
13      Q.   We looked in the Endocrine Society Guidelines,
14  at the language that refers to individuals who
15  experience a continuous and rapid involuntary
16  alternation between male and female.  Do you remember
17  that language?
18      A.   I do.
19      Q.   How does that relate --- how is that consistent
20  with your opinion that gender identity is fixed and
21  means what it is?
22          ATTORNEY BORELLI:  Objection, form.
23          THE WITNESS:  So gender identity is that
24  it moves somewhat along the spectrum.  That doesn't

Page 227

1   change.  That is their identity.
2   BY ATTORNEY BROOKS:
3       Q.   That doesn't change, but you have a professional
4   opinion that individuals who experience a gender fluid
5   identity at some period in their life inevitably remain
6   gender fluid for the rest of their lives?
7           ATTORNEY BORELLI:  Objection, form.
8           THE WITNESS:  Understanding their gender
9   identity may change, what the identity is, is under
10  exploration throughout their lives.  From the time
11  they're young they're discovering their gender identity.
12  BY ATTORNEY BROOKS:
13      Q.   Well, you consider part of your professional
14  practice to believe what people tell you about their
15  gender identity, don't you?
16          ATTORNEY BORELLI:  Objection, form.
17          THE WITNESS:  The gender identity is
18  something that can only be explained by a person because
19  it is their knowledge of themselves.
20  BY ATTORNEY BROOKS:
21      Q.   And if a person at one point in time feels that
22  their gender identity is fluid and another point in time
23  feels that it is not, on what basis do you say that
24  their true gender identity hasn't changed?

Page 228

1           ATTORNEY BORELLI:  Objection, form.
2           THE WITNESS:  Everyone's gender identity
3   is how they explain it.  They may understand it
4   differently over time.  Just because I say I don't like
5   strawberries when I'm eight and I do like strawberries
6   now doesn't meant I never liked strawberries to begin
7   with.  It means I finally had a good strawberry.
8           ATTORNEY BROOKS:  Let me have tab 12.
9   Let me mark as Exhibit 20.
10          ATTORNEY WILKINSON:  Nineteen (19).
11          ATTORNEY BROOKS:  Let me mark as Exhibit
12  19, an article from Herbert Health Publishing by Sadra
13  Katz-Wise, entitled Gender Fluidity: What it Means and
14  Why Support Matters.
15                      ---
16          (Whereupon, Adkins Exhibit 19, 2020
17          Herbert Health Publishing Article, was
18          marked for identification.)
19                      ---
20  BY ATTORNEY BROOKS:
21      Q.   First I'll ask if you have any professional
22  contact with Doctor Sadra Katz-Wise?
23      A.   I don't see the name spelled out.  It doesn't
24  sound familiar.

Page 229

1       Q.   It's just under the graphic here ahead of the
2   text.  You'll see the name.
3       A.   Oh, in red.  That's why I didn't see it.
4       Q.   Yeah, exactly.  Right.
5       A.   Got it.  Katz-Wise.  No.
6       Q.   I see, when I look her up, that Dr. Katz-Wise is
7   associated with Boston Children's Hospital and Harvard
8   Medical School.  That doesn't refresh your recollection
9   as to any previous professional interactions with her?
10      A.   Again, I'm terrible with names.
11      Q.   You're aware that Boston Children's Hospital has
12  a high reputation in the area of transgender therapy?
13          ATTORNEY BORELLI:  Objection, form.
14          THE WITNESS:  Well, they have been
15  involved in transgender therapy for a long time.
16  BY ATTORNEY BROOKS:
17      Q.   And they have a high reputation?
18          ATTORNEY BORELLI:  Objection, form.
19          THE WITNESS:  In general people feel like
20  they do a good job.
21  BY ATTORNEY BROOKS:
22      Q.   Let me ask you to turn to the second page.  And
23  down at the bottom is a heading that says what's the
24  difference between gender fluid and transgender.  Do you

Page 230

1  see that?
2      A.  I do.
3      Q.  And the first sentence there says while some
4  people develop a gender identity early in childhood,
5  others may identify with one gender at one time and then
6  another gender later on.
7      Do you see that?
8      A.  I do.
9      Q.  And do you agree or disagree with that statement
10  by Dr. Sabar Katz-Wise?
11          ATTORNEY BORELLI:  Objection, form.
12          THE WITNESS:  So she is not saying that
13  their gender identity changes.  You know, at different
14  times in your life your understanding may be that this
15  is the group that I belong with.  And as you learn more
16  about your experience and your gender, that can change.
17  BY ATTORNEY BROOKS:
18      Q.  Dr. Adkins, how do you as a clinician --- if you
19  have a patient who at one time identifies one way and
20  another time identifies another way, how do you as a
21  clinician determine which of those is that patient's
22  true gender identity, given that you've said that gender
23  identity is something that only the patient can express
24  to you?

Page 231

1          ATTORNEY BORELLI:  Objection, form.
2          THE WITNESS:  So you know, we're not sort
3  of doing anything to influence that in our patients
4  until they come to us later and have had lots of time to
5  reflect on that.  They by the guidelines need to have at
6  least six months of identification with and
7  understanding that gender identity is a particular way.
8  And typically gender identity is starting to consolidate
9  in adolescence and have a good understanding of your
10  identity at that time.
11  BY ATTORNEY BROOKS:
12      Q.  What do you understand to be meant by the term
13  gender incongruence?
14      A.  It is similar to the gender identity not
15  matching your sex assigned at birth.
16      Q.  Let me ask you to find Exhibit 4, 2007 Endocrine
17  Society guidelines.  And turn if you would to page 3879,
18  first column under the heading evidence, it reads in
19  most children diagnosed with GD/gender incongruence it
20  did not persist into adolescence.
21      Do you see that?
22      A.  I did.
23      Q.  So the point here is that these children were,
24  in fact, diagnosed with gender dysphoria or gender

Page 232

1  incongruence which you just said means that their gender
2  identity doesn't match their gender assigned at birth.
3  And then the Endocrine Society goes on to say that that
4  identity, that sense of incongruence does not persist
5  into adolescence.
6      Do you see that?
7          ATTORNEY BORELLI:  Objection, form.
8          THE WITNESS:  I do.
9  BY ATTORNEY BROOKS:
10      Q.  And how do you reconcile that with your
11  previously expressed opinion that gender identity is,
12  quote, fixed?
13          ATTORNEY BORELLI:  Objection, form.
14          THE WITNESS:  So this is a random piece
15  out of this whole publication.  They are talking --- as
16  far as I can tell right here, and again I would be
17  speculating, that it is about a particular piece of
18  medical evidence.  And medical evidence in this area has
19  varied.  It's based on the different groups and the way
20  they were recruited, et cetera.
21  BY ATTORNEY BROOKS:
22      Q.  Well, you're --- never mind on a particular
23  piece.  You're well aware, are you not, that there are
24  multiple studies that indicate the substantial majority

Page 233

1  of children who are diagnosed with gender dysphoria
2  desist from experiencing gender dysphoria by some stage
3  in adolescence?
4          ATTORNEY BORELLI:  Objection, form.
5  BY ATTORNEY BROOKS:
6      Q.  You discuss that in your report, do you not?
7      A.  I'm sorry.  Can you repeat the question?
8      Q.  You are aware that there are multiple studies
9  that have found that children diagnosed with gender
10  dysphoria, the large majority of those individuals
11  desist from experiencing gender dysphoria by some time
12  in adolescence?
13          ATTORNEY BORELLI:  Objection, form.
14          THE WITNESS:  And I don't typically see
15  those patients in my clinic.
16  BY ATTORNEY BROOKS:
17      Q.  But you're aware of the science that is
18  described though.
19      Right?
20          ATTORNEY BORELLI:  Objection, form.
21          THE WITNESS:  There are patients ---
22  there are studies that were done in the past that were
23  not well done and had a bias with the recruitment that
24  overlapped with other issues.  I'm aware of those

Diesen 0812

Page 234

1    studies.  And children are not being treated in my
2    clinic for gender dysphoria.  Adolescents are who we
3    treat in our clinic.
4    BY ATTORNEY BROOKS:
5        Q.   Well, the study that the Endocrine Society chose
6    to cite for this proposition just a little lower in that
7    paragraph it says as follows.  And this is 2017
8    Endocrine Society Guidelines.  They say a large
9    majority, about 85 percent of prepubertal children with
10   a childhood diagnosis did not remain gender
11   dysphoric/gender incongruent into adolescence.
12       Do you see that language?
13       A.   I see that language.
14       Q.   And this Endocrine Society considered that
15   science worth citing rather than dismissing it as poorly
16   done, as you just attempted.
17       Correct?
18           ATTORNEY BORELLI:  Objection, form.
19           THE WITNESS:  In your goals in creating
20   guidelines you want to be presenting the information
21   that's available.  This study is available.
22   BY ATTORNEY BROOKS:
23       Q.   And the study in question is one by some of the
24   most highly respected researchers in the field.

Page 235

1        Am I correct?
2            ATTORNEY BORELLI:  Objection.
3    BY ATTORNEY BROOKS:
4        Q.   I see you looking at the footnote?
5        A.   Right.
6        Q.   Those are among the most highly respected
7    researchers in the field.
8        Correct?
9        A.   They are some of the --- they're some of the
10   original researchers.
11       Q.   And to this very day they are among the most
12   highly respected in the field.
13       Am I right?
14           ATTORNEY BORELLI:  Objection, form.
15           THE WITNESS:  In general, they are doing
16   good research and publications.  I can't say everything
17   they do is beautiful.
18   BY ATTORNEY BROOKS:
19       Q.   Dr. Adkins, do you refuse to acknowledge that
20   Dr. Steensma, DeVries and Cohen-Kettenis are among the
21   most highly respected researchers in your field?
22           ATTORNEY BORELLI:  Objection, form.
23           THE WITNESS:  Of their work that I have
24   read and seen in general it is based on standards of

Page 236

1    medical literature done well, though I have not read
2    every study.  I'm not going to comment on everything
3    that they have done.  A lot of the things I'm aware of
4    are done well.
5    BY ATTORNEY BROOKS:
6        Q.   I didn't ask you to comment on a single one of
7    their articles.  I asked you isn't their reputation
8    among the highest in your field?
9            ATTORNEY BORELLI:  Objection, form.
10           THE WITNESS:  If --- for gender-affirming
11   care, yes.
12   BY ATTORNEY BROOKS:
13       Q.   Thank you.  How does their finding in large
14   majority of children diagnosed with gender dysphoria
15   desist from experiencing gender dysphoria by some stage
16   in adolescence square with your opinion that gender
17   identity is, quote, fixed?
18           ATTORNEY BORELLI:  Objection, form.
19           THE WITNESS:  I'm sorry.  Where are you
20   reading from and what was that again?
21   BY ATTORNEY BROOKS:
22       Q.   How does their finding that large majority of
23   children diagnosed with gender dysphoria before puberty
24   desist from experiencing gender dysphoria by some stage

Page 237

1    in adolescence fit with your expressed opinion that
2    gender identity is fixed?
3            ATTORNEY BORELLI:  Objection, form.
4            THE WITNESS:  So they are talking about
5    prepubertal children.  Prepubertal children haven't gone
6    through their real under --- development of
7    understanding of their gender identity or their
8    consolidation of gender identity at that time.  It's
9    kind of a false endpoint to put it that way because
10   we're not really again treating these young children and
11   we're not changing anything about them.  These patients
12   wouldn't even come to my clinic.
13   BY ATTORNEY BROOKS:
14       Q.   You don't see prepubertal children at your
15   clinic?
16           ATTORNEY BORELLI:  Objection, form.
17           THE WITNESS:  Very rarely.
18   BY ATTORNEY BROOKS:
19       Q.   And?
20       A.   Gender clinic?
21       Q.   Patients you treat in any capacity?
22           ATTORNEY BORELLI:  Objection to form.
23           THE WITNESS:  I see all kinds of patients
24   from birth until --- I'm credentialed to 30.

Page 238

1    BY ATTORNEY BROOKS:
2       Q.   Do you in your professional work deal with
3    prepubertal children who are experiencing gender
4    dysphoria?
5            ATTORNEY BORELLI:  Objection, form.
6            THE WITNESS:  Some.
7    BY ATTORNEY BROOKS:
8       Q.   Okay.
9            And do you want to revise the statement in your
10   report to say instead that after puberty gender identity
11   is fixed?
12           ATTORNEY BORELLI:  Objection, form.
13           THE WITNESS:  Will you point that out to
14   me?
15   BY ATTORNEY BROOKS:
16      Q.   I'm sorry, point what out to you?
17      A.   That particular statement in my report.
18      Q.   I misspoke.  You asserted in your declaration
19   that gender identity was fixed and my question is on
20   consideration would you prefer to say that gender
21   identity is fixed after puberty has occurred?
22           ATTORNEY BORELLI:  Objection, form.
23           THE WITNESS:  So I didn't put that in a
24   way that --- again, we eliminated the word fixed because

Page 239

1    of the easy ability to misconstrue that.  People undergo
2    a period of time in life where they understand their
3    gender better than other times.  And puberty is part of
4    --- part of the mix.
5    BY ATTORNEY BROOKS:
6       Q.   So --- and this is the opportunity --- you're
7    here, so we're not going to misunderstand your words.
8    You signed and swore to an affidavit last year in which
9    you said gender identity is fixed.  I'm giving you an
10   opportunity if you want to clarify or qualify that.  And
11   my question to you is, is it now your testimony that
12   gender identity is fixed once puberty has occurred?
13           ATTORNEY BORELLI:  Objection, form.
14           THE WITNESS:  Again, I think we have
15   another document here that doesn't use the word fixed.
16   Would you like me to go back and read that part?  I can
17   read through it and find it for you.
18   BY ATTORNEY BROOKS:
19      Q.   No.  I would like to work with your sworn
20   document from May of last year in which you said it was
21   fixed.
22      A.   When we update documents we try to clarify
23   anything that might be confusing.
24      Q.   Dr. Adkins, in May of 2021, which is not so long

Page 240

1    ago, you swore under oath that it was your professional
2    opinion that gender identity was fixed.  I'm entitled to
3    ask you about that.  The fact that you wanted to change
4    a later document is interesting.  It doesn't deprive me
5    of the right to ask you questions about that document.
6            My question for you now is do you want to revise
7    that statement to express the opinion that gender
8    identity is fixed after puberty?
9            ATTORNEY BORELLI:  Objection, form.  I
10   apologize, Counsel.  Can we --- I'm sorry, just lost
11   track.  Have you introduced the PI declaration?
12           ATTORNEY BROOKS:  I have.
13           ATTORNEY BORELLI:  What exhibit number is
14   it?
15           ATTORNEY BROOKS:  It is 18.  Paragraph
16   18.
17           ATTORNEY BORELLI:  Paragraph 18.  Thank
18   you.  Objection to form.
19           THE WITNESS:  So I don't think that my
20   description of people's understanding of gender identity
21   and the way that we understand its development has
22   changed.  I can't do anything to change their identity.
23   You can't do it.  Their parents can't do it.  And in
24   that way I still agree with the fact that in the way

Page 241

1    that that was meant to be stated, that it can't be
2    changed.  Fixed is a similar word.  I use that word.
3    BY ATTORNEY BROOKS:
4       Q.   So and I didn't ask you about our ability to
5    change somebody else.  Let me ask you a different
6    question.  At which developmental stage in your
7    professional opinion does gender identity become fixed?
8            ATTORNEY BORELLI:  Objection, form.
9            THE WITNESS:  Again, I believe I said
10   already that gender identity is what it is from the time
11   you are young.  Your understanding of that develops over
12   time based on your path through life.  That --- in that
13   way you can't change it.
14   BY ATTORNEY BROOKS:
15      Q.   Does that mean that if, according to Steemza and
16   Cohen-Kettenis, 85 percent of prepubertal children who
17   are diagnosed with gender dysphoria ultimately desist
18   from experiencing dysphoria, that their original
19   diagnoses were wrong?
20           ATTORNEY BORELLI:  Objection to form.
21           THE WITNESS:  So there are a lot of
22   individuals who have looked at that information and felt
23   that the original group of individuals didn't have a
24   transgender identity.  In a young group that's hard to

Page 242

1    assess at times.  And so I would say in that way, you
2    know, we --- it's just not the same.  And you can repeat
3    the question for me, please.
4        ATTORNEY BORELLI:  We have been going an
5    hour.  I'd like to take a break.
6        ATTORNEY BROOKS:  Let me repeat the
7    question since I was just invited to do so.
8    BY ATTORNEY BROOKS:
9        Q.   I believe you testified that it is your view
10   that one's gender identity never changes from infancy to
11   adulthood although one's understanding of it may change
12   over time.  My question for you now is does that mean
13   that in every case in which a child is diagnosed as
14   gender dysphoric and they subsequently desist from
15   gender dysphoria that the original diagnosis was wrong?
16       ATTORNEY BORELLI:  Objection, form.
17       THE WITNESS:  So you know, at the time
18   that their understanding of their identity was different
19   from their sex assigned at birth when they were a child,
20   if that was the case, and it is not clear in that study
21   that that was necessarily the case, that the individuals
22   felt dysphoria about that, that is what happened to
23   them.  Their understanding of their identity, if it
24   changed over time, it may relieve some of that gender

Page 243

1    dysphoria.  I guess that's the best way I can state it.
2        ATTORNEY BROOKS:  Let's take that break.
3        THE WITNESS:  Thank you.
4        VIDEOGRAPHER:  Going off the record.  The
5    current time reads 3:43 p.m. Eastern Standard Time.
6    OFF VIDEO
7           ---
8    (WHEREUPON, A PAUSE IN THE RECORD WAS HELD.)
9           ---
10   ON VIDEO
11       VIDEOGRAPHER:
12       We're back on the record.  The current
13   time is 3:59 p.m. Eastern Standard Time.
14       ATTORNEY BROOKS:  I'm just --- sorry.
15   I'm just moving that so --- make sure it's still
16   recording and I didn't muck it up.  I just wanted to not
17   hit it with papers.
18       ATTORNEY WILKINSON:  Yes, it's still
19   recording.
20   BY ATTORNEY BROOKS:
21       Q.   Let's --- Dr. Adkins, if I can ask you to find
22   Exhibit 4 again, which is the 2017 guidelines.  We are
23   again on page 3879 where we just were.  And there after
24   the discussion that we looked at about desistance of

Page 244

1    childhood gender dysphoria, the next sentence reads
2    right after where we stopped if children had completed
3    socially transition, the may have great difficulty in
4    returning to the original gender role upon entering
5    puberty.  And it continues social transition is
6    associated with the persistence of GD/gender
7    incongruence as a child progresses into adolescence.
8        Do you see that?
9        A.   Uh-huh (yes).
10       Q.   At the very end of the paragraph it reads social
11   transition in addition to GD/gender incongruence has
12   been found to contribute to the likelihood of
13   persistence.
14       Do you see that?
15       A.   Uh-huh (yes).
16       Q.   Now, what the Endocrine Society Committee,
17   considering all the available research, says is that
18   social transition has been found to contribute to the
19   likelihood of persistence.  Is that how you read their
20   language here?
21       ATTORNEY BORELLI:  Objection, form.
22       THE WITNESS:  That's how I read it.
23   BY ATTORNEY BROOKS:
24       Q.   And social transition has to do with how the

Page 245

1    people around the child treat him or her, what pronouns
2    they use, what names they use, what clothing they
3    provide, correct, is that consistent with your
4    understanding of social transition?
5        ATTORNEY BORELLI:  Objection, form.
6    BY ATTORNEY BROOKS:
7        Q.   It has to do with how society, how the people
8    around you treat you.
9        Correct?
10       ATTORNEY BORELLI:  Objection, form.
11       THE WITNESS:  Yes.
12   BY ATTORNEY BROOKS:
13       Q.   And therefore, what this is saying is how
14   parents and those around the child treat that child can
15   affect whether that child ends up identifying as
16   transgender or identifying with a gender identity
17   congruent with his or her biology.
18       Correct?
19       ATTORNEY BORELLI:  Objection, form.
20       THE WITNESS:  One more time.
21   BY ATTORNEY BROOKS:
22       Q.   What this is saying is that how parents --- when
23   it says that social transition has been found to
24   contribute to the likelihood of persistence what that

Page 246

1  tells us is how parents and others around the child
2  treat that child can affect whether the child ends up
3  identifying as transgender or cisgender?
4        ATTORNEY BORELLI:  Objection, form.
5        THE WITNESS:  That is the way that reads.
6  I would say that, you know, I don't recommend
7  necessarily --- I recommend we follow the child and
8  watch their gender developments.
9  BY ATTORNEY BROOKS:
10       Q.   This Committee says that by assisting a child to
11 socially transition the available science suggests that
12 adults are contributing to the likelihood of persistence
13 rather than desistance.  That's what it says.
14       Right?
15       ATTORNEY BORELLI:  Objection, form.
16       THE WITNESS:  I'm sorry.  I'm going to
17 make you say it one more time, please.  I apologize.
18 I'm just getting tired.
19 BY ATTORNEY BROOKS:
20       Q.   I know the feeling.  This says that by assisting
21 a child to socially transition the available science
22 suggests that adults are, quote, contributing to the
23 likelihood of persistence rather than desistance.
24       ATTORNEY BORELLI:  Objection, form.

Page 247

1        THE WITNESS:  Gosh.  So I'm not sure what
2  you say sounds right to me.  That is what it says on the
3  paper.
4  BY ATTORNEY BROOKS:
5        Q.   And I will give you a chance to tell us whether
6  you agree or disagree with it, because my understanding
7  is that you, in contrast, believe that external
8  influences can't affect gender identity.
9        Correct?
10       ATTORNEY BORELLI:  Objection to form.
11 BY ATTORNEY BROOKS:
12       Q.   Cannot?
13       A.   So you know, all of your life influences your
14 identity development.  You can't change what it is.  You
15 can --- it can change your experience.  I don't think
16 that these children were likely to have had a different
17 outcome.
18       Q.   So your view is that gender identity can't
19 change and therefore any child whose gender identity
20 appears to change must have been mistaken at some state
21 of their understanding.
22       Correct?
23       ATTORNEY BORELLI:  Objection, form.
24       THE WITNESS:  So their understanding of

Page 248

1  their gender identity can develop over time.
2  BY ATTORNEY BROOKS:
3        Q.   Do you agree or disagree with this statement in
4  the Endocrine Society Guidelines that social transition
5  has been found to contribute to the likelihood of
6  persistence?
7        ATTORNEY BORELLI:  Objection, form.
8        THE WITNESS:  You know, they --- I
9  answered that question.
10 BY ATTORNEY BROOKS:
11       Q.   I'm sorry.  I perhaps didn't correctly
12 understand.  So if you would answer it again, that would
13 be helpful.
14       A.   So kids who --- now I've forgotten the question.
15       Q.   This one is a simple one.  Do you agree or
16 disagree with the statement from this committee, the
17 Endocrine Society, that social transition has been found
18 to contribute to the likelihood of persistence?
19       ATTORNEY BORELLI:  Objection, form.
20       THE WITNESS:  You know, this --- it's
21 hard for me to agree with that.  As a pediatrician I
22 know that people --- prepubertal children, young
23 children, explore their gender identity in a lot of
24 different ways over time, and so I don't know that I can

Page 249

1  agree necessarily that the way that it's written ---
2  that I necessarily agree with the specific terms.
3  BY ATTORNEY BROOKS:
4        Q.   I don't mean to suggest to you by word or tone
5  that this document was handed down on Mount Sinai.  I
6  understand that there's room for scientists to disagree.
7  I am just trying to get clear on your opinion.  I'm
8  pretty sure this document was not handed down on Mount
9  Sinai.
10       Let me find a copy of your rebuttal report, which
11 I believe was marked as Exhibit 3.  Exhibit 3, the
12 rebuttal report.  Let me ask you to turn to page 11 of
13 your rebuttal report.  We can hand you another copy if
14 need be.  We should have one more.
15       A.   I think this is it.
16       Q.   No, we're looking for your rebuttal report.
17 It's going to be a typewritten kind of something or
18 other.
19       A.   Like this, right?
20       Q.   Exhibit 3.
21       A.   I'm sorry.  No that's not --- sugar.
22       Q.   I'm just going to hand you another one.
23       A.   Okay.  Thank you.
24       Q.   No hard feelings.

Page 250

1  A.  I --- I know it's here because I -- there's so
2  many papers.  You warned me there would be so many
3  papers.
4  **Q.  I did.  I tried to warn you.**
5  **Let me ask you to turn to paragraph 11 of your**
6  **rebuttal report.**
7  A.  Oh, okay.  Yeah.
8  **Q.  Page five.**
9  A.  I'm sorry, the number --- one of the numbers
10  skipped and it was just a labeling of a reference, so
11  again 11.
12  **Q.  Yes.  The second sentence there you wrote ---**
13  **and this is of course a recent submission, adolescents**
14  **with persistent gender dysphoria after reaching Tanner**
15  **stage two almost always persist in their gender identity**
16  **in the long term.  Do you see that language?**
17  A.  I do.
18  **Q.  So --- and the basis that you cite for that**
19  **rather specific factual proposition is an article or**
20  **actually a chapter by Turban, DeVries and Zucker.**
21  **Correct?  I'm just looking at footnote three.**
22  A.  Yes.
23  **Q.  So Tanner stage two, as I understand --- or we**
24  **can look at the Endocrine Society note, but this is ---**

Page 251

1  **Tanner stage two is when children first begin to exhibit**
2  **physically recognizable changes in puberty.**
3  **Right?**
4  ATTORNEY BORELLI:  Objection, form.
5  THE WITNESS:  Yes.
6  BY ATTORNEY BROOKS:
7  **Q.  So Tanner stage one, there's nothing observable.**
8  **And the beginning of Tanner stage two is the first**
9  **observable changes?**
10  A.  Yes.
11  ATTORNEY BORELLI:  Objection, form.
12  BY ATTORNEY BROOKS:
13  **Q.  And I think you testified, but if you could just**
14  **remind us kind of the timespan that that tends to begin**
15  **for boys and girls.**
16  ATTORNEY BORELLI:  Objection, form.
17  THE WITNESSS:  Tanner two.  Tanner two,
18  for those assigned female at birth can range in the
19  normal, typical development between the ages of 8 and
20  12.  It does fall outside of that at times and is
21  considered early and could be a marker of a problem as
22  well as delayed could be a marker of a problem.
23  **Q.  For boys?**
24  A.  For those assigned male at birth, so usually

Page 252

1  between 9 and 14.  Anything earlier or later again might
2  trigger some questions that something is going on.
3  **Q.  So age eight is generally girls turn eight in**
4  **second or third grade?  Third grade roughly?**
5  ATTORNEY BORELLI:  Objection, form.
6  THE WITNESS:  That would be --- you know,
7  it varies because early starters, late starters.  But
8  ---.
9  BY ATTORNEY BROOKS:
10  **Q.  And so for nine, for boys would be fourth grade?**
11  ATTORNEY BORELLI:  Objection to form.
12  THE WITNESS:  That would be the typical.
13  BY ATTORNEY BROOKS:
14  **Q.  So we're talking grade school kids here, not**
15  **even the end of grade school?**
16  ATTORNEY BORELLI:  Objection, form.
17  BY ATTORNEY BROOKS:
18  **Q.  And if the type of changes that mark the**
19  **beginning of Tanner stage two are generally at least to**
20  **the layman's eye not visible on a clothed child.**
21  **Correct?**
22  ATTORNEY BORELLI:  Objection, form.
23  BY ATTORNEY BROOKS:
24  **Q.  That mark the beginning Tanner stage two?**

Page 253

1  ATTORNEY BORELLI:  Objection, form.
2  THE WITNESS:  I would say that some
3  assigned females at birth, especially if they're lean,
4  you can see their breast development.
5  BY ATTORNEY BROOKS:
6  **Q.  Just a breast bud.  But in general, when we**
7  **speak of adolescence, we don't --- in common parlance we**
8  **do not include third and fourth graders, do we?**
9  ATTORNEY BORELLI:  Objection, form.
10  THE WITNESS:  Well, the definition of
11  adolescence is the time during puberty, so they should
12  be included.
13  BY ATTORNEY BROOKS:
14  **Q.  In your experience as to how people use the**
15  **term, third and fourth graders included in adolescence?**
16  ATTORNEY BORELLI:  Objection, form.
17  THE WITNESS:  It varies with regard to
18  the context.  Within my medical practice that's the way
19  we use the term.
20  BY ATTORNEY BROOKS:
21  **Q.  At any rate, we're talking about grade school**
22  **ages, not junior high or middle school ages.  What is**
23  **your basis for saying that those children who persist up**
24  **to the beginning of Tanner stage two almost always**

64  (Pages 250 to 253)

Litigation 0817

1    persist transgender identity?
2           ATTORNEY BORELLI:  Objection.  Objection,
3    form.
4           THE WITNESS:  I don't know which
5    reference it is, but I can state that in my practice
6    that's what I have seen.
7    BY ATTORNEY BROOKS:
8       Q.  Let me show you the only reference you did cite
9    for that, which I will mark as Exhibit 20, the article
10   by Turban, DeVries and Zucker cited in footnote 20 of
11   your rebuttal report.  I'm sorry.  Don't know why I said
12   20.  I'm going to hand the witness that article now.
13      A.  Thank you.
14              ---
15           (Whereupon, Adkins Exhibit 20, Turban,
16            DeVries and Zucker Article, was marked
17            for identification.)
18              ---
19           COURT REPORTER:  Excuse me, but you're
20   mumbling and I can't understand everything that you're
21   saying.
22           ATTORNEY BROOKS:  At the moment I'm just
23   shuffling papers and handing out documents.  And I will
24   speak up now and ask a question.  Sorry about that.

1           COURT REPORTER:  Well, we are on the
2    record and I need to be able to hear every single word
3    that you guys are saying.
4           ATTORNEY BROOKS:  We'll do the best we
5    can.
6           COURT REPORTER:  It's hard for me over
7    here.
8    BY ATTORNEY BROOKS:
9       Q.  Is this, in fact, the article that you
10   referenced in your rebuttal report, Dr. Adkins, or the
11   chapter I should say?
12      A.  Yeah.  I mean, I'd have to take a minute to
13   review it.
14           VIDEOGRAPHER:  Counsel, which tab number
15   is this?
16           THE WITNESS:  I'm sorry, you broke up.
17           VIDEOGRAPHER:  Which tab number is this
18   document?
19           ATTORNEY BROOKS:  Tab 39.  I apologize.
20           VIDEOGRAPHER:  Thank you.
21           THE WITNESS:  It is labeled as that.
22   BY ATTORNEY BROOKS:
23      Q.  Well, do you recall recently reading this
24   article since it was cited in this document submitted

1    just last week?
2       A.  I have reviewed this document.  I don't remember
3    when though.
4       Q.  Okay.
5           And in here --- let's look at page 638.  And
6    there at the top of --- near the top of the first column
7    on 638 is a discussion of follow-up studies of
8    persisters and desisters.  Do you see that discussion?
9       A.  Yes.
10      Q.  And it says --- four lines, five lines down it
11   begins, quote, Restoray and Skeemsma have provided the
12   most recent study of 10 follow up studies in which the
13   percentage of participants classified as persisters
14   ranged from two percent to 39 percent collapsed across
15   natal boys and girls, closed quote.  Do you see that?
16      A.  Yeah.
17      Q.  And further down under the heading persistence
18   of gender dysphoria from adolescence to adulthood is a
19   very short paragraph that reads in its entirety in
20   contrast low rates of persistence from childhood into
21   adolescence, it appears that the vast majority of
22   transgender adolescents persist in their transgender
23   identity, closed quote.
24           Do you see is that?

1       A.  Yes.
2       Q.  And was that the language that you had in mind
3    when you cited this reference in footnote three of your
4    rebuttal report?
5       A.  I would have to look all the way through the
6    article.  It's consistent.
7       Q.  And the language that I directed you to at the
8    top summarizes studies that show --- showing of
9    persistence of gender dysphoria among childhood
10   dysphorics of only two percent to 39 percent.
11           Right?
12           ATTORNEY BORELLI:  Objection, form.
13           THE WITNESS:  Those are two different
14   populations.
15   BY ATTORNEY BROOKS:
16      Q.  They are.  And I'm asking you now again about
17   what it says at the top?
18      A.  Please repeat your question.
19      Q.  The discussion at the top summarizes studies
20   showing persistent childhood dysphoria of only between
21   two percent and 39 percent, depending on the study?
22           ATTORNEY BORELLI:  Objection to form.
23           THE WITNESS:  I see that.
24   BY ATTORNEY BROOKS:

Page 258

1    Q.   And that is that the large majority consisted at
2    some stage before adulthood.
3        Correct?
4            ATTORNEY BORELLI:  Objection, form.
5            THE WITNESS:  More than half per this.
6    BY ATTORNEY BROOKS:
7    Q.   And nothing here tells us about exactly what
8    stage of adolescence before adulthood they desisted,
9    does it?
10           ATTORNEY BORELLI:  Objection, form.
11           THE WITNESS:  In this literature
12   adolescence is puberty.  It would have to be at least
13   Tanner two.
14   BY ATTORNEY BROOKS:
15   Q.   At least.  Now, my question was nothing in the
16   discussion up towards the top of the column about these
17   persistence and desistance studies tells us at what
18   stage of puberty the desisters desisted, does it?
19           ATTORNEY BORELLI:  Objection, form.
20           THE WITNESS:  I would have to look at the
21   whole study.  Just in that line that detail is not
22   listed.
23   BY ATTORNEY BROOKS:
24   Q.   And similarly, looking at the discussion under

Page 259

1    the heading persistence of gender dysphoria from
2    adolescence to adulthood not being in that sentence
3    tells us what stage of adolescence, whether it is Tanner
4    stage two or three or four is being referred to when it
5    says the majority of adolescents persist?
6            ATTORNEY BORELLI:  Objection, form.
7            THE WITNESSS:  It's not written right
8    there, no.
9    BY ATTORNEY BROOKS:
10   Q.   Please identify for me all studies you are aware
11   of that show that those who desist from childhood gender
12   dysphoria do so by no later than beginning of Tanner
13   stage two.
14           ATTORNEY BORELLI:  Objection, form.
15           THE WITNESS:  I am not going to be able
16   to remember those off the top of my head.
17   BY ATTORNEY BROOKS:
18   Q.   Can you remember a single one?
19           ATTORNEY BORELLI:  Objection, form.
20           THE WITNESS:  I would have to have you
21   repeat the question, but I doubt it.
22   BY ATTORNEY BROOKS:
23   Q.   I will repeat it.  Identify all studies you're
24   aware of that show that those who desist from childhood

Page 260

1    gender dysphoria do so no later than the time they first
2    reach Tanner stage two?
3            ATTORNEY BORELLI:  Objection, form.
4            THE WITNESS:  I don't think that I recall
5    a study that's been modeled that way.
6    BY ATTORNEY BROOKS:
7    Q.   Can you tell me --- identify for me any study
8    that has examined whether what is called in the
9    literature watchful waiting combined with psychotherapy
10   results in worse outcomes for children as compared to
11   administration of puberty blockers and social outcomes?
12           ATTORNEY BORELLI:  Objection, form.
13           THE WITNESS:  So the experience is that
14   some patients have dysphoria that is significant enough
15   once they are in puberty to be dangerous to their life.
16   I worry about those patients.  We allow them a pause
17   with puberty blockers to continue to figure out their
18   gender identity.  I got lost in my answer, I apologize.
19   BY ATTORNEY BROOKS:
20   Q.   Well, Dr. Adkins, I didn't ask what you were
21   worried about.  I asked can you identify any study that
22   examines whether watchful waiting for children combined
23   with psychotherapy results in better or worse outcomes
24   on average than administering puberty blockers and

Page 261

1    social transition?
2            ATTORNEY BORELLI:  Objection, form.
3            THE WITNESS:  You know, I can't remember
4    the exact study.  We have studies that show that if you
5    are not helping the patients relieve their gender
6    dysphoria and psychotherapy has not been shown to do
7    that, then we would be, you know, at an unethical point
8    to do that study because it would increase risk of death
9    in those patients for us to watch and wait.
10   BY ATTORNEY BROOKS:
11   Q.   So your answer is at no time since the inception
12   of this field, that is therapy for gender dysphoria, are
13   you aware of any study comparing outcomes for gender
14   dysphoric children of on the one hand watchful waiting
15   accompanied by psychotherapy and on the other hand
16   puberty blockers and social transitioning?
17           ATTORNEY BORELLI:  Objection, form.
18           THE WITNESS:  There's a long history of
19   individuals who were left untreated or treated with
20   psychotherapy who died in hospitals or not in hospitals
21   because they were only given those therapies which were
22   the only ones available at the time.
23   BY ATTORNEY BROOKS:
24   Q.   Dr. Adkins, you are also aware, are you not,

Arkansas 0819

Page 262

1    that there's a long history of individuals who have
2    transitioned both socially and hormonally who have
3    committed suicide?
4              ATTORNEY BORELLI:  Objection to form.
5    BY ATTORNEY BROOKS:
6        Q.   That's well documented in the literature, is it
7    not?
8              ATTORNEY BORELLI:  Objection, form.
9              THE WITNESS:  There are individuals who
10   still struggle with depression and anxiety to the point
11   that they are --- do commit suicide and they have not
12   necessarily the reason being related to their gender
13   dysphoria.  Could be.  Hard to know.
14   BY ATTORNEY BROOKS:
15       Q.   In fact, Skeemsma and colleagues at the
16   respected institute in Amsterdam, DeVry University, have
17   documented very high rates of successful completed
18   suicide among transgender adults, have they not?
19             ATTORNEY BORELLI:  Objection, form.
20             THE WITNESS:  I would have to see the
21   study.
22   BY ATTORNEY BROOKS:
23       Q.   You are not aware of that information?
24       A.   I have not seen that study.  I have read the

Page 263

1    literature.  I don't recall a study saying there was a
2    high or why.  I would need a number.
3    BY ATTORNEY BROOKS:
4        Q.   You read Dr. Levine's report?
5        A.   Yeah, it was --- yes.
6        Q.   And do you recall that he cites multiple
7    studies, including studies from DeVry University team
8    documenting high rates of successful completed suicide,
9    not studies, he's done, that clinic has done documented
10   high rates of successful suicide among transgender
11   adults?
12             ATTORNEY BORELLI:  Objection, form.
13             THE WITNESS:  I would need a number.  I'm
14   not going to classify something as high just because ---
15   I would need a number.
16   BY ATTORNEY BROOKS:
17       Q.   Have you thought that it was incumbent upon you
18   somebody assisting young people to transition and
19   prescribing hormones to thoroughly investigation and
20   question suicidality among transitioned transgender
21   individuals?
22             ATTORNEY BORELLI:  Objection, form.
23             THE WITNESS:  Again, yes.  I read those
24   when I can.  I am not good with recalling names in

Page 264

1    specific reports.  I am aware that that is an issue with
2    some people who have transitioned fully.
3    BY ATTORNEY BROOKS:
4        Q.   Do you believe that social transition is an
5    important part of medical care for transgender
6    individuals?
7              ATTORNEY BORELLI:  Objection, form.
8              THE WITNESS:  Yes.
9    BY ATTORNEY BROOKS:
10       Q.   And do you also consider puberty blockers to be
11   part of treatment for children with gender dysphoria?
12             ATTORNEY BORELLI:  Objection to the form.
13             THE WITNESS:  I have seen results from a
14   recent study that said that there was a decrease in
15   dysphoria.  I think it was anxiety and depression.  I
16   would have to double check the article, with puberty
17   blockers.  Our goal with puberty blockers is to pause
18   and allow people to understand their identity and figure
19   out what is going on with that understanding and what is
20   the best care for that patient is.
21   BY ATTORNEY BROOKS:
22       Q.   Is the point of administering puberty blockers
23   to children who are experiencing gender dysphoria to
24   prevent puberty from occurring at the time that it

Page 265

1    naturally would occur in that child?
2              ATTORNEY BORELLI:  Objection, form.
3              THE WITNESS:  In patients --- in patients
4    who are having early puberty it is a different
5    mechanism.  For people with gender dysphoria where you
6    are trying to pause it and we keep it within the realm
7    of normal pubertal development.
8    BY ATTORNEY BROOKS:
9        Q.   For individuals suffering --- children suffering
10   from gender dysphoria the precise point of administering
11   puberty blockers is to prevent puberty from occurring in
12   that child at the time it would otherwise naturally
13   occur.
14       Correct?
15             ATTORNEY BORELLI:  Objection, form.
16             THE WITNESS:  It would --- our pausing
17   the puberty and keeping it within the normal range of
18   pubertal development.
19   BY ATTORNEY BROOKS:
20       Q.   Dr. Adkins, the purpose of administering
21   pubertal blockers to a particular child is to prevent it
22   from happening when it would otherwise happen naturally
23   in that child.
24       Correct?

Ricketts 0820

Page 266

1    ATTORNEY BORELLI: Objection, form.
2    BY ATTORNEY BROOKS:
3    **Q.   There is no other purpose?**
4    ATTORNEY BORELLI: Objection, form.
5    THE WITNESS: I'm sorry. I have to ask
6    --- you used some pronounced in there that were not real
7    clear. If you don't mind repeating the question.
8    BY ATTORNEY BROOKS:
9    **Q.   The purpose of administering puberty blockers to**
10   **a child suffering from gender dysphoria is to prevent**
11   **puberty from happening in that child at the time it**
12   **would otherwise naturally occur in that child absent the**
13   **blockade?**
14   ATTORNEY BORELLI: Objection.
15   THE WITNESS: We are pausing their
16   puberty once it starts, putting a pause.
17   BY ATTORNEY BROOKS:
18   **Q.   I get to ask the questions. That means you**
19   **wanted to prevent puberty from happening when it would**
20   **naturally happen for that child apart from the**
21   **medication?**
22   ATTORNEY BORELLI: Objection, form.
23   THE WITNESS: Yes.
24   BY ATTORNEY BROOKS:

Page 267

1    **Q.   Thank you.**
2    **You regularly tell parents that the**
3    **administration of puberty blockers for that purpose is,**
4    **quote, safe?**
5    **Correct?**
6    ATTORNEY BORELLI: Objection, form.
7    THE WITNESS: I go through very specific
8    list of side effects and effects with my patients with
9    that medication.
10   BY ATTORNEY BROOKS:
11   **Q.   You regularly tell parents using the word that**
12   **puberty blockers are, quote, safe, do you not?**
13   ATTORNEY BORELLI: Objection, form.
14   THE WITNESS: I am telling my patients
15   the risks and benefits. I am telling them I feel
16   comfortable using it.
17   BY ATTORNEY BROOKS:
18   **Q.   Let's find your report, which is Exhibit 1 ---**
19   **no --- yes, Exhibit 1. If you can find your report.**
20   **Apologize. Too much paper. Too long a day.**
21   **Dr. Adkins, do you or do you not tell parents**
22   **that puberty blockers are safe?**
23   ATTORNEY BORELLI: Objection, form.
24   THE WITNESS: Again, I review the effects

Page 268

1    and side effects and my general experience and the
2    publications that are available. Goodness gracious.
3    Boy, that lunch is getting me.
4    I explain to my patients the effects and
5    side effects and I talk with them about whether --- my
6    experience has been I have had very few patients
7    experience a problem with the medication.
8    BY ATTORNEY BROOKS:
9    **Q.   And if you are unwilling to sit here today and**
10   **admit that you tell parents that puberty blockers are**
11   **safe then why have you stated in your expert report to**
12   **the court that treatment, including puberty blockers,**
13   **are safe?**
14   ATTORNEY BORELLI: Objection, form.
15   THE WITNESSS: Every patient is
16   individual. I have to make an individual assessment for
17   each patient. I will say it's safe for the patients
18   that that applies to.
19   BY ATTORNEY BROOKS:
20   **Q.   Which patients does that apply to?**
21   A.   Most of the patients don't have a
22   contraindication to using puberty blockers.
23   **Q.   Is safe a term of art to you as a doctor?**
24   ATTORNEY BORELLI: Objection, form.

Page 269

1    THE WITNESS: I'm not sure what you mean
2    by the word art.
3    BY ATTORNEY BROOKS:
4    **Q.   Does it have a precise meaning? To say a**
5    **pharmaceutical is safe, does that have a meaning to you**
6    **as a doctor?**
7    A.   It has a meaning.
8    **Q.   What is that?**
9    A.   So in general when we're talking about safety
10   and medicine we're talking about limiting the number of
11   negative side effects that can cause significant issues
12   for patients. I think that would --- I think that's
13   what I would say.
14   **Q.   Isn't it a truism you were taught in medical**
15   **school that every pharmaceutical has side effects?**
16   ATTORNEY BORELLI: Objection, form.
17   THE WITNESS: So truism is a word that
18   --- sorry, that is unclear to me. Can you clarify?
19   BY ATTORNEY BROOKS:
20   **Q.   Weren't you taught in medical school that every**
21   **pharmaceutical has side effects?**
22   ATTORNEY BORELLI: Object to form.
23   THE WITNESS: Yes.
24   BY ATTORNEY BROOKS:

Page 270

1    Q.   And do you agree or disagree that a flat
2    assertion that any pharmaceutical is safe is not
3    consistent with accurate medical terminology?
4           ATTORNEY BORELLI:  Objection, form.
5           THE WITNESS:  I would say that I work
6    with what the information is available to me about
7    safety profile.  I apply that to each patient
8    individually.  Sometimes I feel safer using it in one
9    patient versus another patient.  Every drug is
10   different, every side effect profile is different, every
11   patient is different.
12   BY ATTORNEY BROOKS:
13          Q.   Why then did you flatly assert to the court that
14   treatment for transgender youth when you were discussing
15   puberty blockers and hormone therapies is, quote, safe?
16          ATTORNEY BORELLI:  Objection to form.
17          THE WITNESS:  In general I have not
18   experienced nor have I seen published experiences of
19   issues with using these medications that causes a
20   significant problem for my patients.
21   BY ATTORNEY BROOKS:
22          Q.   You regularly tell parents what you have said
23   several times today, that puberty blockers act merely as
24   a pause and are fully reversible, do you not?

Page 271

1           ATTORNEY BORELLI:  Objection, form.
2           THE WITNESS:  I do.
3    BY ATTORNEY BROOKS:
4           Q.   And you are aware, are you not, that the
5    Endocrine Society guidelines advise that before
6    approving puberty blockers a clinician should discuss
7    risks to fertility and the availability, the possibility
8    of fertility preservation.
9           Correct?
10          ATTORNEY BORELLI:  Objection, form.
11          THE WITNESS:  I'm not sure that is in the
12   Endocrine Society guidelines with puberty blockers.  It
13   may be.  That it is no part of the gender affirming
14   hormone recommendation.
15   BY ATTORNEY BROOKS:
16          Q.   Let's look at page 3879 in the guidelines,
17   Exhibit 4.
18          A.   What exhibit again, 4?
19          Q.   Exhibit 4.  And I'm going to call your attention
20   to 3879.  And column two is guideline 1.5 where it says,
21   quote, we recommend the clinicians inform and counsel
22   all individuals seeking gender affirming medical
23   treatment regarding options for fertility preservation
24   prior to initiating puberty suppression in adolescence.

Page 272

1    Do you see that language?
2           ATTORNEY BORELLI:  Objection, form.
3           THE WITNESS:  I do.
4    BY ATTORNEY BROOKS:
5           Q.   And what is your understanding as to why the
6    Endocrine Society advises that it's important to advise
7    about fertility preservation prior to initiating puberty
8    suppression if puberty suppression is nearly nothing but
9    a pause?
10          ATTORNEY BORELLI:  Objection, form.
11          THE WITNESS:  Well, the --- you know,
12   puberty pausing is in my experience and in the reported
13   data always reversible.  I have not ever had a patient
14   who didn't resume their normal puberty when they came
15   off and were on no other treatment of a puberty
16   blockade.  I would think that this is being very careful
17   about young individuals getting puberty blockers.
18   Again, I haven't seen any reports.  In fact, it is used
19   to preserve fertility in cancer patients.
20   BY ATTORNEY BROOKS:
21          Q.   Do you, in fact, counsel all parents and
22   children about fertility preservation options before
23   administering puberty blockers?
24          ATTORNEY BORELLI:  Objection, form.

Page 273

1           THE WITNESS:  I do.
2    BY ATTORNEY BROOKS:
3           Q.   And do you have a view as to whether for
4    instance a 9 year old can even begin to understand
5    puberty, sexual development and the possibility of
6    becoming a parent so as to provide meaningfully informed
7    consent?
8           ATTORNEY BORELLI:  Objection, form.
9           THE WITNESS:  So those individuals also
10   have their parents who are with them to learn about
11   these thing and weigh those things.  The patient is not
12   there in isolation.  They get an option at the time
13   where we would stop puberty blockers or any time that
14   they are on to make a change in that.  It is completely
15   reversible.
16   BY ATTORNEY BROOKS:
17          Q.   You have testified at the beginning of the day
18   you had children of your own.  Both as a professional
19   and as a mother do you have a view as to whether a 9
20   year old can sufficiently understand puberty, sexual
21   development and the possibility of becoming a parent to
22   enable them to provide meaningfully informed consent?
23          ATTORNEY BORELLI:  Objection, form.
24          THE WITNESS:  So in young kids we use

69 (Pages 270 to 273)

Page 274

1 these --- in five year olds --- I have treated a five
2 year old this week with this medication for early
3 puberty. I trust, based on the data that is available
4 to me over the last 30 years using this medication to
5 pause puberty for central precocious puberty that it is
6 a safe medication and that the patient will be fertile.
7 Can't say 100 percent because who knows what else is
8 going on in each individual patient that may cause them
9 to have an infertility issue.
10 BY ATTORNEY BROOKS:
11 **Q. Dr. Adkins, puberty blocking drugs have gone**
12 **through phase one, phase two, phase three clinical**
13 **trials submitted to the FDA, reviewed. They've been**
14 **approved for the indication of precocious puberty.**
15 **Correct?**
16 ATTORNEY BORELLI: Objection, form.
17 THE WITNESS: Yes.
18 BY ATTORNEY BROOKS:
19 **Q. None of that has been done for an indication of**
20 **gender dysphoria to your knowledge.**
21 **Correct?**
22 ATTORNEY BORELLI: Objection, form.
23 THE WITNESS: I use lots of medications
24 that aren't FDA approved for the particular indications.

Page 275

1 Many drugs in pediatrics are not ever tested in
2 children. It's just within the last few years that they
3 have made a recommendation that that happen for a
4 medication. So there are many drugs that haven't been
5 FDA approved that are used in pediatrics based on
6 information for patients in a different indication or
7 adulthood.
8 **Q. Puberty blockers have been tested through phase**
9 **one, phase two, phase three clinical trials for the**
10 **purpose of postponing precocious puberty until the**
11 **normal time period for puberty.**
12 **Correct? That's what has been tested?**
13 ATTORNEY BORELLI: Objection to form.
14 THE WITNESS: Yes.
15 BY ATTORNEY BROOKS:
16 **Q. And no such tests have been done or submitted to**
17 **the FDA ---?**
18 COURT REPORTER: Can you repeat what you
19 said because I'm not sure that last question fully came
20 through.
21 ATTORNEY BROOKS: The last question was
22 --- and I --- I admit that my voice, as the witness's,
23 is dropping. We're trying here. And I --- Dave's
24 resting his voice for a few questions towards the end of

Page 276

1 the day. I'll be glad.
2 BY ATTORNEY BROOKS:
3 **Q. Just to clarify, and I don't mean to harass you,**
4 **but we've been asked to repeat it. Puberty blockers**
5 **have been put through phase one, phase two, phase three**
6 **clinical trials submitted to the FDA for the purpose of**
7 **delaying precocious puberty in children until the normal**
8 **time for puberty. And your answer was?**
9 ATTORNEY BORELLI: Objection, form.
10 THE WITNESS: Yes.
11 BY ATTORNEY BROOKS:
12 **Q. And they have not been tested for safety, for**
13 **efficacy in phase one, phase two or phase three clinical**
14 **trials for the purpose of delaying puberty from its**
15 **naturally occurring time in children who do not suffer**
16 **from precocious puberty.**
17 **Correct?**
18 ATTORNEY BORELLI: Objection, form.
19 THE WITNESS: We use data that wasn't
20 presented to the FDA to --- to look at this to see if it
21 is safe. It's also been approved by the FDA to be used
22 in adults. Also been used and approved for fertility
23 preservation. Has lots of approvals that have verified
24 its safety over time.

Page 277

1 BY ATTORNEY BROOKS:
2 **Q. Well, a moment ago when I asked you if you tell**
3 **people they were safe you were not quite willing to say**
4 **that. Do you want to revise that testimony?**
5 ATTORNEY BORELLI: Objection, form.
6 THE WITNESS: I believe at the end of
7 that I was saying to you that every patient is
8 different. There are some that have risks. When I feel
9 comfortable that my patient in front of me doesn't have
10 those risks based on the medical literature I feel that
11 they're safe to use. I have my experience. I have seen
12 the literature. I feel --- yes.
13 BY ATTORNEY BROOKS:
14 **Q. The law that's being challenged in this lawsuit**
15 **doesn't restrict the use of puberty blockers so far as**
16 **you understand, does it?**
17 ATTORNEY BORELLI: Objection, form.
18 THE WITNESS: I don't recall that being
19 part of the law.
20 BY ATTORNEY BROOKS:
21 **Q. It doesn't exclude anyone for participation on**
22 **any team based on use of puberty blockers, does it?**
23 ATTORNEY BORELLI: Objection, form.
24 THE WITNESS: Not that I recall.

Page 278

1   BY ATTORNEY BROOKS:
2       Q.   And you have previously testified that in your
3   view, the law is unreasonable if it excludes, prevents
4   any individuals with a transgender identity from playing
5   in the category that corresponds to their gender
6   identity.
7       Correct?
8           ATTORNEY BORELLI:  Objection, form.
9           THE WITNESS:  That sounds accurate.
10  BY ATTORNEY BROOKS:
11      Q.   I don't want to mischaracterize your opinion.
12      Okay.
13      So what is the relevance to your opinion that
14  all the discussions in your report about puberty
15  blockers?
16          ATTORNEY BORELLI:  Objection, form.
17          THE WITNESS:  Sorry.  I need some water.
18  And then, if you don't mind, while I'm doing that, could
19  you please re-read the question.  Sorry.
20  BY ATTORNEY BROOKS:
21      Q.   Yes.  I'll even wait until you've had your
22  drink.
23      A.   Sorry.
24      Q.   I'm hitting the bottom myself.

Page 279

1       A.   It's pollen season.  It's bad.
2       Q.   It's just getting going.
3       A.   I know.
4       Q.   Given what we just walked through, ---
5       A.   Yes.
6       Q.   --- what is the relevance of all the discussion
7   about puberty blockers in your expert report and
8   rebuttal report to the opinions you're offering in this
9   case?
10          ATTORNEY BORELLI:  Objection, form.
11          THE WITNESS:  So my part of this is to
12  talk about what care is for people who are transgender
13  and what medications they might be on and what
14  treatments might be ideal for them.
15  BY ATTORNEY BROOKS:
16      Q.   You've talked about how each --- you want to
17  treat each patient differently.  You want to be very
18  careful about their treatment choices, their parents'
19  treatment choices, that they understand all of the
20  considerations.
21          Would it cause you concern if West Virginia put
22  into place a law that created incentives or pressures on
23  parents and children to make decisions about puberty
24  blockers at an early stage?

Page 280

1           ATTORNEY BORELLI:  Objection, form.
2           THE WITNESS:  I would not think it would
3   be appropriate to pressure anyone.
4   BY ATTORNEY BROOKS:
5       Q.   So for instance, a law that said if you take
6   puberty blockers then you can play on the girls team and
7   if you don't you can't, that would cause you concern as
8   a doctor, would it not?
9           ATTORNEY BORELLI:  Objection, form.
10          THE WITNESS:  Ideally, they would be able
11  to whether or not they have the puberty blockers or not
12  play on the team that matches their gender identity.
13  BY ATTORNEY BROOKS:
14      Q.   And ideally and from your perspective and in
15  fact if the law set up an incentive that says you can
16  only play on the girls' team if you take puberty
17  blockers, and if you don't, you're forclosed from female
18  athletics, that would cause you concern as a doctor as
19  biasing the patient's and parents' decisions, would it
20  not?
21          ATTORNEY BORELLI:  Objection, form.
22  BY ATTORNEY BROOKS:
23      Q.   That's not a law you would want to see on the
24  books?

Page 281

1           ATTORNEY BORELLI:  Objection, form.
2           THE WITNESS:  I don't think I would want
3   to see that on the books.  Haven't thought through every
4   detail of that but I don't think so.
5   BY ATTORNEY BROOKS:
6       Q.   You are aware, are you not, that all the
7   recommendations in the 2017 guidelines, also in the 2009
8   guidelines from the Endocrine Society about the
9   administration of puberty blockers is according to the
10  committee that prepares those recommendation based on
11  either low quality or very low quality evidence.
12      Right?
13      A.   You know, all recommendation put together are
14  graded with evidence, and it's in the report --- we use
15  them --- not in the report, in the guidelines.  And we
16  use lots of guidelines that have low quality to help
17  guide our care.
18      Q.   Low quality evidence means that you, as a
19  scientist, you as a doctor, can't be very confidant that
20  the recommendation will result in beneficial results.
21  That is kind of the meaning of low quality evidence.
22      Right?
23          ATTORNEY BORELLI:  Objection to form.
24          THE WITNESS:  I would suggest it gives us

Page 282

1  a place to start and we need to be very mindful when
2  using that information as to how we apply it.
3          ATTORNEY BORELLI:
4          Why don't we go ahead and take another
5  break?
6          ATTORNEY BROOKS:  Let me just ask the
7  court reporter how many --- how much more time in the
8  seven o'clock hours.
9          COURT REPORTER:  We're at six hours and
10 six minutes, so 54 minutes.
11         ATTORNEY BROOKS:  Okay.  We'll take that
12 break.  Absolutely.
13         ---
14 (WHEREUPON, A PAUSE IN THE RECORD WAS HELD.)
15         ---
16         ATTORNEY BROOKS:
17         All right.  We will resume.
18 BY ATTORNEY BROOKS:
19    Q.   Dr. Adkins, once again I will direct you to the
20 Endocrine Society guidelines, Exhibit 4, and ask you to
21 turn with me to page 3874 and column two --- column one,
22 I'm sorry 3874.
23    A.   Column ---?
24    Q.   Column one.  And towards the bottom, penultimate

Page 283

1  paragraph begins in the future we need.  Do you see
2  that?
3     A.   I do.
4     Q.   And it says in the future --- this is in the
5  preliminary section.  Before the specific
6  recommendations it says, quote, in the future we need
7  more rigorous evaluations of the effectiveness and
8  safety of endocrine and surgical protocols.  And it goes
9  on then to say specifically endocrine protocol ---
10 specifically endocrine treatment protocols for GD/gender
11 incongruence should include the careful assessment of
12 the following.  And it lists a number of things, the
13 effective prolonged delay of puberty in adolescence on
14 bone health, gonadal function and the brain, including
15 effects on cognitive, emotional --- emotional, social
16 and sexual development.
17         Have I, with various corrections, read that
18 correctly?
19    A.   Yes.
20    Q.   So as of 2017, in the opinion of the committee
21 that put together these guidelines ---.
22         COURT REPORTER:  Excuse me.  I don't know
23 if you're speaking, but I lost you at cognitive.
24         ATTORNEY BROOKS:  I'm sorry?

Page 284

1          COURT REPORTER:  I lost you at cognitive
2  and then I didn't hear anything for like 20 seconds.  So
3  I wasn't sure if you were still talking since I can't
4  see you.
5          ATTORNEY BROOKS:  Of course.  And I was.
6  So, golly.
7          COURT REPORTER:  Thank you.
8  BY ATTORNEY BROOKS:
9     Q.   So I'm going to pick up that question again.
10         In the paragraph that we're looking at in
11 column one of page 3874 the committee writes that things
12 that need to be better studied include, quote, the
13 effects of prolonged delay of puberty in adolescence on
14 bone health, gonadal function and the brain, including
15 effects on cognitive, emotional, social and sexual
16 development, closed quote.
17         Dr. Adkins, is it your understanding that the
18 committee here is saying that there's not yet adequate
19 scientific evaluation of the impact of puberty blockers
20 on the brain?
21         ATTORNEY BORELLI:  Objection, form.
22         THE WITNESS:  So you know, the
23 recommendation by the same group is that in some
24 patients this is the approach that --- that is used.

Page 285

1  Certainly we all welcome more research.  We all want to
2  know if anything is different from the information that
3  we have as mentioned before for use of this medication
4  in other areas where we're not seeing any effect on
5  these things.
6  BY ATTORNEY BROOKS:
7     Q.   Is it consistent with your understanding as a
8  doctor that the development of the brain in turn affects
9  cognitive, emotional, social and sexual development?
10         ATTORNEY BORELLI:  Objection, form.
11         THE WITNESS:  The brain has effects in
12 all those areas.
13 BY ATTORNEY BROOKS:
14    Q.   To your knowledge, it has effects that change
15 across the course of puberty in all those areas.
16         Correct?
17         ATTORNEY BORELLI:  Objection, form.
18         THE WITNESS:  Yes, they're all
19 interrelated and they're occurring all at the same time.
20         ATTORNEY BROOKS:  Let me mark as Exhibit
21 21 a document that is titled Teenage Brain: A work in
22 Progress, which is am information sheet that is
23 attributes itself to the National Institute of Mental
24 Health, which I believe we discussed earlier.  Tab 32.

72  (Pages 282 to 285)

linear 7920 0825

Page 286

1   Yes, thank you.  I'm sorry, I believe I said it, Exhibit
2   21.
3                       ---
4           (Whereupon, Adkins Exhibit 21, NIMH
5           Information Sheet, was marked for
6           identification.)
7                       ---
8   BY ATTORNEY BROOKS:
9       Q.   So I would like to talk for a moment about the
10  impact of puberty and therefore puberty blockade on
11  brain development.  On the second page at the more
12  information, we see contact information at the National
13  Institute of Mental Health.  And I don't want to
14  misrepresent, did you earlier testify that is a well
15  known and respected source of information about mental
16  health therapies?
17          ATTORNEY BORELLI:  Objection, form.
18          THE WITNESS:  Yes.
19  BY ATTORNEY BROOKS:
20      Q.   And let me take you to page one.  And I'm simply
21  using this to pin down a few kind of basic points.  In
22  the second column out of three, two-thirds of the way
23  down, three-quarters of the way down --- well, the
24  sentence begins halfway down.  In the first such

Page 287

1   longitudinal study of 145 children.  Do you see that?
2       A.   I see that.
3       Q.   And it goes on to describe research that
4   discovered the second wave of overproduction of gray
5   matter, which it refers to as, quote, the thinking part
6   of the brain, just prior to puberty.  Do you see that?
7       A.   I do.
8       Q.   And it goes on to say that this second
9   overproduction peaks at around age 11 in girls and 12 in
10  boys.  Do you see that?
11      A.   Yes.
12      Q.   And according to your earlier testimony, that is
13  probably a bit into --- on average a bit into Tanner
14  stage two.
15          Correct?
16          ATTORNEY BORELLI:  Objection, form.
17          THE WITNESS:  In general.
18  BY ATTORNEY BROOKS:
19      Q.   So a little later than the beginning of Tanner
20  stage two?
21          ATTORNEY BORELLI:  Objection, form.
22          THE WITNESS:  Based on averages, yes.
23  BY ATTORNEY BROOKS:
24      Q.   So this second wave of development of the

Page 288

1   thinking part of the brain happens sometime a bit after
2   the beginning of Tanner stage two according to this
3   description here?
4           ATTORNEY BORELLI:  Objection, form.
5           THE WITNESS:  So let me read it myself.
6   BY ATTORNEY BROOKS:
7       Q.   Sure.
8       A.   What you read was --- it starts before that.  So
9   I just want to read it.
10      Q.   I did misspeak.  Let me just re-ask my question
11  ---
12      A.   Okay.
13      Q.   --- because I mixed up peaks and starts, right,
14  that was the problem.
15          According to the description here this second
16  wave of development of the thinking part of the brain,
17  the gray matter, peaks at sometime after the beginning
18  of Tanner stage two?
19          ATTORNEY BORELLI:  Objection, form.
20          THE WITNESS:  Peaks, yes.
21  BY ATTORNEY BROOKS:
22      Q.   And is it consistent with your understanding
23  that the gray matter in the brain is the thinking part
24  of the brain or is that really outside your expertise

Page 289

1   given that you're not a neurologist?
2           ATTORNEY BORELLI:  Objection, form.
3           THE WITNESS:  I think that that is basic
4   enough in medical school that I can agree with that.
5   BY ATTORNEY BROOKS:
6       Q.   Okay.
7           And in the next column, about the same distance
8   down it reads, quote, the gray matter spurt --- growth
9   spurt just prior to puberty --- we've already talked
10  about the timing, predominates in the frontal lobe,
11  which it goes on to say is the seat of, quote, executive
12  functions, planning, impulse control, and reasoning,
13  closed quote.
14          Do you see that?
15      A.   I do.
16      Q.   And is it within your knowledge or not within
17  your knowledge that the frontal lobe is the seat of
18  executive functions, including planning, impulse control
19  and reasoning?
20          ATTORNEY BORELLI:  Objection, form.
21          THE WITNESS:  That is what my education
22  has informed me.
23  BY ATTORNEY BROOKS:
24      Q.   And certainly all of us you who have raised

---

Page 290

```
 1   children have gratefully seen that planning, impulse
 2   control and reasoning improve across the years of
 3   puberty.
 4        Right?
 5             ATTORNEY BORELLI:  Objection, form.
 6   BY ATTORNEY BROOKS:
 7        Q.   Maybe some ups and some downs?
 8        A.   I'm am just happy that it continuously improves
 9   the whole time.
10        Q.   I won't press --- I won't pres the question.
11   Have you, yourself, attempted to make any study of the
12   timing of brain gray matter development and the role of
13   puberty hormones in promoting that development?
14             ATTORNEY BORELLI:  Objection, form.
15             THE WITNESS:  I have not.
16   BY ATTORNEY BROOKS:
17        Q.   What study, if any, have you made of the effects
18   of blocking puberty and the increased level of hormones
19   associated with puberty on this growth spurt in the
20   thinking part of the brain that otherwise peaks at
21   around 11 in girls and 12 in boys?
22             ATTORNEY BORELLI:  Objection, form.
23             THE WITNESS:  I have not done that study.
24   I don't see it here either.
```

Page 291

```
 1   BY ATTORNEY BROOKS:
 2        Q.   You said in your rebuttal report, paragraph 24,
 3   that patients with gender dysphoria who are treated with
 4   puberty delaying medication undergo hormonal puberty
 5   with all the same brain and other bodily system
 6   development.  Do you recall writing that?
 7             ATTORNEY BORELLI:  Objection, form.
 8             THE WITNESS:  I'm sorry, could you ---?
 9   BY ATTORNEY BROOKS:
10        Q.   Right in front of you.  Your rebuttal report is
11   --- Exhibit 3?
12        A.   I got it.
13        Q.   Paragraph 24.
14        A.   Thank you for your patience.
15        Q.   Here, let me just find it.  Let me see here.
16   And the second sentence says, quote, patients with
17   gender dysphoria treated with puberty delaying
18   medication undergo hormonal puberty with all the same
19   brain and other bodily system development, closed quote.
20   Do you see that?
21        A.   Oh, wait.  I must be looking at the wrong place.
22        Q.   Paragraph 24, second sentence.  It runs over the
23   page?
24        A.   I see.  I see.  Yeah.  I see that.
```

Page 292

```
 1        Q.   Now, all the same brain and bodily development
 2   is a really big absolute statement, isn't it?
 3             ATTORNEY BORELLI:  Objection, form.
 4             THE WITNESS:  There are --- you know, for
 5   the most part, people go through it in this manner.  Of
 6   course, again, with medicine you can't say 100 percent.
 7   BY ATTORNEY BROOKS:
 8        Q.   Well, specifically, as a scientist, based on the
 9   information available to you, you can't say with
10   confidence that patients who are treated with puberty
11   delaying medication undergo all the same brain and
12   bodily system development, can you?
13             ATTORNEY BORELLI:  Objection, form.
14             THE WITNESS:  I used the medication for
15   all of my career.  I have followed patients through
16   their --- into their puberty, in their growth.  When
17   they are done with their pubertal development, we have
18   not seen any definable cognitive developmental issues
19   with them.  Haven't been able to identify that with any
20   of my patients, including precocious puberty.  There's
21   not been any evidence in the literature over a year's
22   worth of use of this medication that there's anything
23   different happening to these individuals.
24   BY ATTORNEY BROOKS:
```

Page 293

```
 1        Q.   Well, you also haven't done any systematic study
 2   of cognitive development of those for whom you have
 3   prescribed puberty blockers as compared to in a control
 4   group, have you?
 5             ATTORNEY BORELLI:  Objection, form.
 6             THE WITNESS:  Not personally.
 7   BY ATTORNEY BROOKS:
 8        Q.   And the --- the Endocrine Society, 2017 --- let
 9   me ask you to turn in Exhibit 4 to page 3882.  And we
10   are in the section here that discusses a recommendation
11   to use GRNH for purposes of puberty suppression when
12   puberty suppression is indicated.  Do you see that?
13   That heading is on the previous page.
14        A.   I see that.
15        Q.   Just wanted to locate you in the discussion
16   we're talking about puberty suppression.  Now, back to
17   3882.  And the first thing --- the first sentence under
18   the heading side effects states that, quote, the primary
19   risks of puberty suppression in GD/gender incongruent
20   adolescents may include and then it lists a number of
21   things, one of which is, quote, unknown effects on brain
22   development, closed quote.  Do you see that?
23        A.   I do.
24        Q.   So the committee that put together the Endocrine
```

Page 294

1   Society guidelines thought that the potential effects of
2   puberty suppression on brain development were at 2017 at
3   least unknown.  You just disagreed?
4              ATTORNEY BORELLI:  Objection, form.
5              THE WITNESS:  I don't have any reason to
6   believe that there's any different effect on individuals
7   based on the research from early puberty and the studies
8   that --- I mean, sorry, my experience with those
9   patients.  I would want to be watchful of those
10  individuals as I would always who use any medication for
11  potential issues.
12  BY ATTORNEY BROOKS:
13     Q.  Endocrine Society thinks the effect on brain
14  development is unknown and you, though you have done no
15  systematic study, are of the view that you know that is
16  not harmful to brain development.  Am I accurately
17  summarizing your testimony?
18             ATTORNEY BORELLI:  Objection.
19             THE WITNESS:  No.
20  BY ATTORNEY BROOKS:
21     Q.  Let me ask it a different way if that was in
22  accurate.
23     A.  I am trying to tell you that you are able to
24  look at the use of this medication in early pubertal

Page 295

1   patients and see what happens to those individuals.
2   Those outcomes can be used to give you some inference as
3   to what might potentially happen if you use it later on
4   for the same purpose of delaying puberty.  It doesn't
5   --- doesn't wholly rule out something different.
6      Q.  And indeed, simply based on observation,
7   nonsystematic observations from one clinic, it's not
8   possible to rule out harmful effects on brain
9   development, is it?
10             ATTORNEY BORELLI:  Objection, form.
11             THE WITNESS:  I'm not sure that there's
12  any study you could do to completely role out any effect
13  --- any specific effect.  Lots of individuals have
14  different effects.
15  BY ATTORNEY BROOKS:
16     Q.  And you in your clinic haven't attempted any
17  study?
18             ATTORNEY BORELLI:  Objection, form.
19             THE WITNESS:  I have not done a study.
20  BY ATTORNEY BROOKS:
21     Q.  Let me have tab 43.  In your report you asserted
22  that those treated with gender dysphoria undergo --- I'm
23  sorry, those treated with puberty delaying medication
24  experience all the same brain and other bodily system

Page 296

1   developments.  The only source you cite in support of
2   that is a 2015 article by Staphorsius.
3         Correct?
4      A.  I would have to look at it and verify that.
5      Q.  Forty-three (43).
6      A.  Which exhibit were you ---?
7      Q.  I have not given it to you yet.  I apologize.
8      A.  No, I mean ---.
9      Q.  Oh, it was paragraph 24 in your rebuttal report,
10  which is ---.
11     A.  Okay.
12     Q.  All right.
13         Did you carefully read the Staphorsius article
14  that you cited in paragraph 24 of your rebuttal report?
15     A.  At some point in time I have read that, yes.
16     Q.  Are you able to describe the experiment that is
17  --- the study that was done in this Staphorsius report
18  --- or the Staphorsius article?
19             ATTORNEY BORELLI:  Objection.
20             THE WITNESS:  I'm not --- familiar ---.
21  BY ATTORNEY BROOKS:
22     Q.  You say also in paragraph 24 of your rebuttal
23  report that Dr. Levine's claims with regard to concern
24  about brain development is, quote, inaccurate for the

Page 297

1   additional reason that some people never go through
2   hormonal puberty such as patients with Turner syndrome
3   and still have normal brain development with respect to
4   cognition and executive function.  Do you see that
5   language?
6      A.  Yes.
7      Q.  And you don't cite anything for that.  What is
8   the basis for that assertion?
9      A.  So when you look at the information regarding
10  Turner syndrome within the medical literature as well as
11  the --- my work with Marsha Gavenport at UNC who runs
12  --- ran the biggest Turner syndrome registry, in that
13  experience we did not see any patients that had problems
14  with --- there may have been some that were --- had sort
15  of issues with visual spatial skills but not cognition
16  issues.  In fact, I have partners that are women with
17  Turner syndrome that practice medicine.
18     Q.  You will agree with me as a scientist, will you
19  not, that kind of anecdotal information about a
20  particular person you know is not very weighty evidence
21  as to whether hormone changes associated with puberty
22  are generally important to cognitive development of
23  humans?
24             ATTORNEY BORELLI:  Objection, form.

Page 298

1    THE WITNESS:  We can delve into Turner
2  syndrome literature.
3  BY ATTORNEY BROOKS:
4    Q.   Well, Dr. Adkins, I hope you understand that
5  your obligation to prepare an expert report was to
6  provide your opinions and the basis of your opinions.
7  What literature are you relying on?
8    ATTORNEY BORELLI:  Objection, form.
9    THE WITNESS:  Every textbook that talks
10  about Turner syndrome with regard to these patients
11  talks about any of the issues that go along with that.
12  I --- and that's something we study in our training as a
13  pediatric endocrinologists because we see these patients
14  routinely.  So that has been my experience and training.
15  BY ATTORNEY BROOKS:
16    Q.   Well, can you identify --- every is not very
17  useful.  Can you identify for me a single source that
18  reports based on statistically significant studies that
19  individuals who never go through puberty experience all
20  the same brain development as individuals who do go
21  through puberty?
22    ATTORNEY BORELLI:  Objection, form.
23    THE WITNESS:  I would have to look back
24  in the literature on those reports because we treat

Page 299

1  patients now when we realize they are not going through
2  puberty.  I can't do that off the top of my head.
3  BY ATTORNEY BROOKS:
4    Q.   And are you now contending that it is not widely
5  accepted that hormonal changes associated with puberty
6  drive important stages of brain growth?
7    ATTORNEY BORELLI:  Objection, form.
8    THE WITNESS:  I'm not saying that.  What
9  I'm saying is there are some things that are specific
10  and you're generalizing my terms.
11  BY ATTORNEY BROOKS:
12    Q.   Okay.
13    Well, flipping it around, you have also been
14  taught whether or not it's --- if we're speaking in the
15  area, I recognize you're not a neurologist.
16    Correct?
17    A.   Correct.
18    Q.   But it's your understanding that hormonal
19  changes associated with puberty do drive important
20  developmental stages in the human brain.
21    Correct?
22    ATTORNEY BORELLI:  Objection, form.
23    THE WITNESS:  Yes.
24  BY ATTORNEY BROOKS:

Page 300

1    Q.   And those are stages that, as we looked at in
2  earlier document, include cognition, social skills,
3  sexual development?
4    ATTORNEY BORELLI:  Objection, form.
5    THE WITNESS:  So you know, that is what
6  is --- was written there.  I agree that that can be
7  affected by those --- by puberty.  I also don't see in
8  any of the literature around people who haven't gone
9  with --- through puberty any mention of any of the
10  concerning cognitive delays or other issues, again
11  visual, spatial has been mentioned.
12  BY ATTORNEY BROOKS:
13    Q.   Visual spatial, can you just --- for the
14  uninitiated, the layman, can you explain what you're
15  referring to?
16    A.   For the use of like driving a car, looking at
17  something and being able to estimate where it is or
18  those sorts of things, navigating with a map versus not.
19    ATTORNEY BROOKS:  Let me ask the court
20  reporter how many minutes we still have on the clock.
21    COURT REPORTER:  We're at six hours, 31
22  minutes, so 29.
23    ATTORNEY BROOKS:  Well, I had promised to
24  hand it over with 30 minutes to go, so I have broken my

Page 301

1  word.  And I will stop and leave the remainder of the
2  time to counsel for the State of West Virginia, Dave
3  Tryon.
4    ---
5    EXAMINATION
6    ---
7  BY ATTORNEY TRYON:
8    Q.   Hello, Dr. Adkins.  Long day.  I appreciate your
9  time.  My name is David Tryon and I do represent the
10  State of West Virginia.  I would like just to ---.
11    A.   You're cutting out.
12    Q.   Okay.
13    ATTORNEY BROOKS:  You are going to have
14  to speak up very clearly because you are literally
15  disappearing half of the time and we have no work around
16  for that.
17  BY ATTORNEY TRYON:
18    A.   Okay.
19    I will speak very loudly.  Can you hear me now?
20    A.   Yes.
21    Q.   Okay.
22    So thank you for your time my.  Name is David
23  Tryon.  I am an attorney for the State of West Virginia.
24  I would like to continue with some questions about your

Page 302

```
1    rebuttal report.  Do you still have that in front of
2    you?
3        A.  Yes.
4        Q.  Okay.
5            First of all, you have indicated that you are
6    --- I'm still here --- give me a moment --- you run a
7    clinic.
8            Correct?
9            ATTORNEY BORELLI:  Objection, form.
10           THE WITNESS:  I have a clinic that I'm
11   the medical director of, yes.
12   BY ATTORNEY TRYON:
13       Q.  And that is --- I'm sorry, what's the name of
14   the clinic again?
15       A.  Duke Child and Adolescent Gender Clinic.
16       Q.  What is a gender care clinic?
17       A.  For our purposes in my clinic it includes
18   patients who are transgender people who are --- also
19   have intersex conditions as well.
20       Q.  Are there other clinics that you consider gender
21   care clinics elsewhere in the country?
22       A.  Yes.
23       Q.  Would you be able to estimate approximately how
24   many of them there are?
```

Page 303

```
1        A.  That number is changing a lot.  It would be
2    difficult for me to say accurately.
3        Q.  Would it be over 100?
4        A.  I'm not sure.  I'm not sure.
5        Q.  Would it be over 50?
6        A.  Oh, it could be definitely over 50.  It could be
7    over 100, but I'm not sure.
8        Q.  And are you --- do you have any meetings with
9    those other gender care clinics?
10           ATTORNEY BORELLI:  Objection, form.
11           THE WITNESS:  Yes.
12   BY ATTORNEY TRYON:
13       Q.  How many --- what fashion --- are those
14   individual meetings or are they group meetings?
15       A.  A bit of both.
16       Q.  Are you aware of the practices of all of those
17   other gender care clinics?
18           ATTORNEY BORELLI:  Objection, form.
19           THE WITNESS:  We do talk about practice
20   when we meet with the ones that I meet with.  Can't
21   speak to all of the others.
22   BY ATTORNEY TRYON:
23       Q.  You are of course familiar with the practices in
24   your clinic.
```

Page 304

```
1        Correct?
2        A.  Yes.
3        Q.  Are you equally familiar with the practices of
4    the other gender care clinics throughout the country?
5            ATTORNEY BORELLI:  Objection, form.
6            THE WITNESS:  I know a lot about them.  I
7    can't say I know everything.
8    BY ATTORNEY TRYON:
9        Q.  Do you know if they have the exact same
10   standards of care and practice that your clinic does?
11           ATTORNEY BORELLI:  Objection, form.
12           THE WITNESS:  We all have discussed that
13   we follow the Endocrine Society guidelines as well as
14   WPATH guidelines.
15   BY ATTORNEY TRYON:
16       Q.  You have disagreed with some of the guidelines
17   in the WPATH guidelines that Mr. Brooks has shown to
18   you.
19           Correct?
20           ATTORNEY BORELLI:  Objection, form.
21           THE WITNESS:  I don't think I've seen the
22   WPATH guidelines today.
23   BY ATTORNEY TRYON:
24       Q.  Sorry, the Endocrine Society guidelines?
```

Page 305

```
1            ATTORNEY BORELLI:  Same objection.
2            THE WITNESS:  So the Endocrine Society
3    guidelines are guidelines.  All of us who use guidelines
4    do vary some from those guidelines when it's appropriate
5    for the particular patient.
6    BY ATTORNEY TRYON:
7        Q.  Do you know if the other clinics have the same
8    reservations about the policies or guidelines in those
9    --- in the endocrine Society's guidelines that you've
10   expressed today?
11           ATTORNEY BORELLI:  Objection, form.
12           THE WITNESS:  I've had some discussions
13   with people who have some reservations along the same
14   lines that I do.
15   BY ATTORNEY TRYON:
16       Q.  How many clinics does that represent?
17       A.  Oh, you went out.  You went out.  Sorry.
18       Q.  How many clinics does that represent?
19           ATTORNEY BORELLI:  Objection, form.
20           THE WITNESS:  It's difficult for me to
21   say because it is at our annual meeting and for some of
22   the meetings, so it could be a lot.  In group meetings
23   that we have, I have some that are one on one and I have
24   some that are about five different groups.
```

1    BY ATTORNEY TRYON:
2        **Q.   So fair to say you don't know?**
3        A.   I'm sorry, you broke up again.
4        **Q.   Is it fair to say you do not know?**
5            ATTORNEY BORELLI:  Objection, form.
6            THE WITNESS:  I do not know what?
7    BY ATTORNEY TRYON:
8        **Q.   You do not know which ones have the same**
9    **reservations that you do about the provisions you've**
10   **expressed reservations about today?**
11           ATTORNEY BORELLI:  Objection, form.
12           THE WITNESS:  I know --- I know --- I
13   know off the top of my head three.  The others I may or
14   may not know where an individual is from when they're
15   talking in all of our meetings.  They are big meetings.
16   BY ATTORNEY TRYON:
17       **Q.   What are those three?**
18       A.   So Rady Children's in Los Angeles and in
19   Seattle, Children's and Texas, Children's.
20   BY ATTORNEY TRYON:
21       **Q.   Are there any gender care clinics in West**
22   **Virginia?**
23           ATTORNEY BORELLI:  Objection to form.
24           THE WITNESS:  I don't know personally any

1    endocrinologists that do pediatric endocrinology or
2    gender care in West Virginia.  I'm not aware.
3    BY ATTORNEY TRYON:
4        **Q.   In the rebuttal report, your paragraph 11, I'd**
5    **like to ask you some questions about that.  If you would**
6    **turn there.**
7        A.   I got it.
8        **Q.   When did you --- well, did you write this**
9    **paragraph 11?**
10           ATTORNEY BORELLI:  Objection, form.
11           THE WITNESS:  Yes.
12   BY ATTORNEY TRYON:
13       **Q.   When did you write it?**
14           ATTORNEY BORELLI:  Objection, form.
15           THE WITNESS:  I don't remember.
16   BY ATTORNEY TRYON:
17       **Q.   Was it after you received the expert reports**
18   **from the Plaintiff's experts --- excuse me, from the**
19   **Defendant's experts?**
20           ATTORNEY BORELLI:  Objection, form.
21           THE WITNESS:  So we wrote the rebuttal
22   after we received the expert witnesses from --- yes.
23   BY ATTORNEY TRYON:
24       **Q.   Who is we?**

1        A.   I'm sorry.  I wrote it --- I'm sorry.  I'm
2    getting really tired.  I apologize.  I wrote it.
3        **Q.   In the --- I believe it is the third sentence**
4    **says no medical treatment is provided to transgender**
5    **youth until they have reached Tanner stage two.  Do you**
6    **see that?**
7        A.   I do.
8        **Q.   When you say no medical treatment, is that ---**
9    **does that include affirmation therapy?**
10           ATTORNEY BORELLI:  Objection, form.
11           THE WITNESS:  I am not aware of anything
12   called affirmation therapy.
13   BY ATTORNEY TRYON:
14       **Q.   Are you aware of the term affirmation for**
15   **transgender individuals?**
16           ATTORNEY BORELLI:  Objection, form.
17           THE WITNESS:  Gender affirming care is a
18   term I am aware of.
19   BY ATTORNEY TRYON:
20       **Q.   Do you consider gender affirming care to be**
21   **medical treatment?**
22           ATTORNEY BORELLI:  Objection, form.
23           THE WITNESS:  So it is meant to be
24   wholistic, so part of it is medical, part of it is

1    social, part of it is surgical.
2    BY ATTORNEY TRYON:
3        **Q.   Is any gender affirming care provided to**
4    **transgender youth before they reach Tanner stage two?**
5            ATTORNEY BORELLI:  Objection, form.
6            THE WITNESS:  So the social transition is
7    considered part of gender affirming care and some
8    individuals do socially transition before Tanner stage
9    two.
10   BY ATTORNEY TRYON:
11       **Q.   Do you assist them in that?**
12           ATTORNEY BORELLI:  Objection, form.
13           THE WITNESS:  Not typically.  They're not
14   usually in my clinic until they are in puberty.
15   BY ATTORNEY TRYON:
16       **Q.   Is there any other type of gender affirming care**
17   **which is conducted or provided prior to Tanner stage**
18   **two?**
19           ATTORNEY BORELLI:  Objection, form.
20           THE WITNESS:  Before Tanner stage two
21   generally it's --- no --- no.  No.
22   BY ATTORNEY TRYON:
23       **Q.   What do you consider to be medical treatment**
24   **which is provided once they reach Tanner stage two?**

Page 310

1          ATTORNEY BORELLI:  Objection, form.
2          THE WITNESS:  Not every patient is
3  treated with medication.  So some do, some don't.
4  Sometimes that is puberty blockers.  Sometimes it is
5  not.  Sometimes it is gender affirming hormones
6  depending on where they're in their development.
7  BY ATTORNEY TRYON:
8      Q.   What about surgery, is that considered medical
9  treatment provided to transgender youth?
10         ATTORNEY BORELLI:  Objection, form.
11         THE WITNESS:  So patients who are
12  children aren't having surgeries.
13  BY ATTORNEY TRYON:
14     Q.   What's the difference between youth and
15  children?
16         ATTORNEY BORELLI:  Objection, form.
17         THE WITNESS:  Youth in general in my mind
18  are somewhat similar to adolescents in that they have
19  started puberty.
20  BY ATTORNEY TRYON:
21     Q.   At what point are --- is --- excuse me, at what
22  point or age is surgery, medical treatment, provided to
23  those who have gender dysphoria or considered to be
24  transgender?

Page 311

1          ATTORNEY BORELLI:  Objection, form.
2          THE WITNESS:  So you cut out and could
3  you repeat the question?
4  BY ATTORNEY TRYON:
5      Q.   Yes.  Let me back up and make sure I understand.
6  Surgery is considered medical treatment.
7      Correct?
8          ATTORNEY BORELLI:  Objection, form.
9          THE WITNESS:  So I hesitate to use those
10  words.  My surgical colleagues would take some offense
11  at that.  They consider themselves surgeons and not
12  medicine doctors.  So I think that's an opinion there.
13  So I'm not sure that that phrase is appropriate.
14  BY ATTORNEY TRYON:
15     Q.   So when you refer to medical treatment in this
16  statement does that include or exclude surgery?
17         ATTORNEY BORELLI:  Objection, form.
18         THE WITNESS:  They do not --- yeah, that
19  would be inclusive of surgery in that particular
20  statement.
21  BY ATTORNEY TRYON:
22     Q.   At what point is surgery provided to transgender
23  persons?
24         ATTORNEY BORELLI:  Objection, form.

Page 312

1          THE WITNESS:  Well, not all individuals
2  who are transgender actually have surgery.  It depends
3  on the patient.  Many, many do not.  Our recommendations
4  are to wait until 18.  There is a caveat in the
5  Endocrine Society guidelines where some surgery could
6  happen between 16 and 18, but generally 18 and up.
7  BY ATTORNEY TRYON:
8      Q.   Why wait until 18?
9          ATTORNEY BORELLI:  Objection, form.
10         THE WITNESS:  That is the --- as I
11  understand it, the legal time at which a person has ---
12  what is the word for it?  You all are the legal people.
13  I'm probably going to say it wrong, the ability to
14  legally consent to things.  Prior to that, we do get
15  what's called an assent from the patient, but it's a
16  little different than a consent from the patient if
17  we're doing a general procedure.
18  BY ATTORNEY TRYON:
19     Q.   Why is that legal consent different for surgery
20  then it is for puberty blockers?
21         ATTORNEY BORELLI:  Objection, form.
22         THE WITNESS:  As I mentioned before,
23  puberty blockers aren't a permanent effect and surgery
24  is complicated to reverse.

Page 313

1  BY ATTORNEY TRYON:
2      Q.   At the point in time that you prescribe puberty
3  blockers for a natal male, that person has at that point
4  concluded that they have a gender identity of female.
5      Correct?
6          ATTORNEY BORELLI:  Objection, form.
7          THE WITNESS:  So for puberty blockers
8  they may not totally be clear on their gender identity.
9  They do have dysphoria with the changes that are
10  happening to their body at the time and need time to get
11  a better understanding of their gender identity.
12  BY ATTORNEY TRYON:
13     Q.   At what point do we know that they have a full
14  understanding of their gender identity?
15         ATTORNEY BORELLI:  Objection, form.
16         THE WITNESS:  Again, we do our best to
17  take each patient as they get older and they are
18  consistent for a period of time.  Again, the
19  recommendation are at least six months.  Everyone is
20  different.  Most of my patients' identity isn't changing
21  substantially.  Their understanding of their identity
22  isn't changing substantially for longer than that before
23  one would do anything different other than puberty
24  blockers.

Page 314

1  BY ATTORNEY TRYON:
2      Q.  At what point --- someone comes to you and says
3  I am a biological male or assigned male at birth,
4  however you want to term that, but I identify it as a
5  --- let me rephrase that because I'm not sure I said
6  that right.
7          Someone comes to you and says I was born an
8  assigned male at birth, but I identify as a female. I
9  have identified as a female for two years now and I want
10 to move forward with any treatment possible so that I
11 can feel comfortable with my true identity as a female.
12 You accept that as their true identity?
13         ATTORNEY BORELLI:  Objection, form.
14         THE WITNESS:  You didn't give an age and
15 I do way that into consideration.
16 BY ATTORNEY TRYON:
17     Q.  Let's say a ten year old?
18         ATTORNEY BORELLI:  Objection, form.
19         THE WITNESS:  So we as I mentioned in my
20 earlier testimony also use assessments from other
21 individuals with regard to the consistency of their
22 gender identity and including family as well as their
23 mental health providers and we would provide
24 individualized care based on that patient.

Page 315

1  BY ATTORNEY TRYON:
2      Q.  At that point do you actually give a diagnosis
3  that they are their true gender identity is female or
4  what happens?
5          ATTORNEY BORELLI:
6          Objection, form.
7          THE WITNESS:  Again, gender identity is a
8  core part of their being and their understanding of it
9  at the time is their understanding of it at the time and
10 that is the only way that we can decide what someone's
11 gender identity is.
12 BY ATTORNEY TRYON:
13     Q.  So at that point in time where the child is 10
14 or 12 or 14, at that point in time where they have
15 concluded my true gender identity is not my natal sex of
16 male but rather my true gender identity is a female, why
17 shouldn't that child then be able to say I want gender
18 --- I want surgery to remove my penis?
19         ATTORNEY BORELLI:  Objection, form.
20         THE WITNESS:  So we don't want to do
21 anything that's permanent until a person is older and
22 their cognitive development is broader.  And in some
23 cases, you know --- well, I'll stop there.
24 BY ATTORNEY TRYON:

Page 316

1      Q.  If that child says, this is extremely harmful to
2  me to still have my penis at this age, I want it
3  removed, and you said yourself that is extremely harmful
4  to not allow this child to not play on a sports team
5  with which that child identifies, isn't having a penis
6  when the child doesn't want one even more harmful?
7          ATTORNEY BORELLI:  Objection, form.
8          THE WITNESS:  I think they're both ---
9  those situations could cause a risk for self harm and
10 suicide.  We would not like to do something that is
11 permanent.  Playing on a sports team is not something
12 that is unchangeable.
13 BY ATTORNEY TRYON:
14     Q.  But you told me, you told us, that gender is
15 unchangeable and that child at that point has
16 identified as a female.  And since that is not going to
17 change what is the harm in removing that child's penis?
18     A.  You broke up after what is the harm in removing
19 that child.
20     Q.  That child's penis?
21         ATTORNEY BORELLI:  Objection, form.
22         THE WITNESS:  I stated that their
23 understanding of their gender identity occurs over the
24 lifespan and so we want to be very careful with regard

Page 317

1  to that --- any permanent treatment.
2  BY ATTORNEY TRYON:
3      Q.  So you're saying you don't --- you're saying you
4  don't believe that that child's true identity is a
5  female, true gender identity is a female, you doubt that
6  child?
7          ATTORNEY BORELLI:  Objection, form.
8          THE WITNESS:  I don't doubt what my
9  patients tell me because --- what they tell me is their
10 truth and their identity.  I do like --- think it is
11 important when you are making these decisions to again
12 corroborate that with other individuals who are with the
13 family --- I'm sorry, with the person.  And we want to
14 make sure that that is a durable place where their
15 understanding is.  Ideally, we would like for it to be
16 as understood as it might be before making a decision
17 that is a permanent decision like surgery.
18         VIDEOGRAPHER:  Mr. Tryon, I sent you a
19 chat, I didn't know if you saw that.  I just wanted to
20 give a five-minute warning.
21         ATTORNEY TRYON:  Oh, it's five minutes
22 left?  Thank you.  I did not see that.  One moment.
23 BY ATTORNEY TRYON:
24     Q.  You are getting paid as an expert witness in

Page 318

1    this case right?
2           ATTORNEY BORELLI:  Objection, form.
3           THE WITNESS:  Yes.
4    BY ATTORNEY TRYON:
5       Q.   Are you being paid as an expert witness in
6    connection to any other litigation or testimony or any
7    other statutes --- similar statutes?
8           ATTORNEY BORELLI:  Objection, form.
9           THE WITNESS:  I am --- have not been
10   paid.  I am involved in other --- another case, two
11   cases.
12   BY ATTORNEY TRYON:
13      Q.   What are those other two cases?
14      A.   I'm not going to be able to tell you the name
15   because I'm terrible with names.  It involves
16   transgender care in Arkansas as well as in
17   sports-related issues with transgender youth in Florida.
18      Q.   Have you testified in those cases yet?
19      A.   I have not.
20      Q.   You testified in other cases.
21           Right?
22      A.   You broke up again.  Could you repeat?
23      Q.   You have testified in other cases.
24           Right?

Page 319

1       A.   Yes.
2       Q.   Which cases are those?
3       A.   The transgender-related cases were with Adams in
4    Florida.  Why am I blanking?
5       Q.   Connecticut?
6       A.   I did not actually --- I have not been deposed
7    in --- except for Adams.
8       Q.   Okay.
9           In your --- in your expert report you say that
10   I have testified twice as an expert at trial or
11   deposition.
12      A.   Yeah, I was involved in another case as an
13   expert witness and was deposed for a case involving an
14   infant with fractures that were --- there was concern
15   for abuse.
16      Q.   I'm sorry, you froze on me.  Can you tell me
17   what that was again?
18      A.   Yeah.  There was a case that I was involved with
19   where the patient's parents --- they had concern for
20   abuse from the parents because the child had fractures.
21      Q.   Well, I'm running out of time, so let me glance
22   through my notes and see if there is anything else.  Do
23   you disagree with the policies of the other agents ---
24   excuse me, of the sporting organizations which require a

Page 320

1    delay in time before a transgender female can
2    participate in those sports?
3           ATTORNEY BORELLI:  Objection, form.
4           THE WITNESS:  I think it would be better
5    for the patient if they did not have to delay.
6    BY ATTORNEY TRYON:
7       Q.   So you --- if it was up to you, you would
8    eliminate that delay that is required by these other
9    sports organizations.
10          Is that right?
11          ATTORNEY BORELLI:  Objection, form.
12          THE WITNESSS:  I think it would be better
13   for my patients.  Yes.
14   BY ATTORNEY TRYON:
15      Q.   And you think those organizations should change
16   their policies to satisfy what your concern is?
17          ATTORNEY BORELLI:  Objection, form.
18          THE WITNESS:  You know, there is a lot to
19   weigh there.  I am not sure that I would be able to like
20   say for their purposes.  I don't know all of the things
21   that are there.  For my patients what would be best for
22   them is to not to have to have that delay.
23   BY ATTORNEY TRYON:
24      Q.   But would you agree with me that the State of

Page 321

1    West Virginia had a lot to weigh as well when it put in
2    place its legislation before they passed the law?
3           ATTORNEY BORELLI:  Objection.  Objection,
4    form.
5           THE WITNESS:  I would hope that every
6    piece of legislation is weighed heavily.
7    BY ATTORNEY TRYON:
8       Q.   And you would agree that in this case there was
9    a lot to weigh on a number of different issues before
10   they passed the law.
11          Correct?
12          ATTORNEY BORELLI:  Objection, form.
13          THE WITNESS:  I would agree.  And I
14   wasn't there to know what was, so I agree there should
15   be.
16   BY ATTORNEY TRYON:
17      Q.   I'm sorry.  I didn't catch that.  You froze up.
18   Can you repeat that?
19      A.   Sure.  I agree there should have been.  I wasn't
20   there to hear what happened with regard to the process,
21   so I don't know if they actually did that.
22          ATTORNEY TRYON:
23          Thank you.  Do I have any time left,
24   Jacob?

81  (Pages 318 to 321)

```
                              Page 322
 1          VIDEOGRAPHER:  I think that's the cap.
 2          ATTORNEY TRYON:  Okay.
 3           Dr. Adkins, thank you very much for your
 4   time.  Appreciate it.
 5          ATTORNEY BORELLI:  This is Tara Borelli
 6   for Plaintiff, B.P.J..  Plaintiff has no questions for
 7   the witness.  We will read and sign.
 8          VIDEOGRAPHER:  That concludes this
 9   deposition.  Current time reads 5:56 p.m. Eastern
10   Standard Time.
11          * * * * * * *
12      VIDEOTAPED DEPOSITION CONCLUDED AT 5:56 P.M.
13          * * * * * * *
14
15
16
17
18
19
20
21
22
23
24
```

**A**

**a.m** 3:8
 14:14  66:2
 66:9
 130:16
**abbrevia...**
 67:22
**ability**
 30:23  31:4
 104:17
 109:1
 179:1
 239:1
 241:4
 312:13
**able** 29:4,6
 31:14
 39:23  40:2
 50:12
 71:14  75:9
 100:10
 126:20
 129:13,16
 163:13
 191:9,24
 209:2
 255:2
 259:15
 280:10
 292:19
 294:23
 296:16
 300:17
 302:23
 315:17
 318:14
 320:19
**abnormal**
 70:17
**abnormal...**
 40:20,23
 69:23  70:3
**abnormality**
 40:19  70:8
**absent** 55:20
 56:10  72:4
 72:12
 266:12
**absolute**
 292:2
**Absolutely**
 282:12

**abstract**
 68:15
**abuse** 220:9
 319:15,20
**academic**
 19:5  32:10
**accelera...**
 57:2
**accept**
 314:12
**accepted**
 57:10
 77:20
 299:5
**access**
 100:13,15
 100:15
 208:9
 210:12,16
 210:17,22
**acclimation**
 31:7
**accompanied**
 105:13
 261:15
**accompli...**
 26:18
**account**
 162:5
**accuracy**
 171:17
**accurate**
 36:7  57:21
 63:10,16
 71:16,16
 74:3,10
 76:7,21
 77:21
 78:17
 79:16  80:2
 80:14
 82:24  92:4
 94:1  95:8
 99:5  101:7
 112:6
 128:6
 158:9
 172:18
 176:14
 190:21
 195:21
 270:3
 278:9

 294:22
**accurately**
 64:20
 99:22
 102:10
 190:11
 294:16
 303:2
**acknowledge**
 235:19
**ACLU** 16:9
**act** 270:23
**Action** 14:19
**Activities**
 1:11  5:23
 15:20
**activity**
 79:13
**actual** 27:2
 40:8  45:13
 119:16
 205:19
 206:9
 207:9
**Adams** 172:14
 173:1
 319:3,7
**add** 83:2
**addition**
 64:4
 168:23
 177:11
 179:7
 208:20
 244:11
**additional**
 297:1
**address**
 96:24
 100:10,16
 189:8
 202:19
**addressed**
 182:6
**addresses**
 139:3
**adequate**
 179:23
 193:7
 284:18
**adequately**
 50:4
**Adkins** 1:19

 2:8  3:3
 8:4  9:5,24
 14:21
 16:14  17:4
 17:9,11,14
 17:16,18
 17:19,21
 18:8,14,18
 19:3  27:9
 31:22
 42:21  43:4
 48:13
 58:16,19
 61:2  63:19
 65:17
 70:13  84:1
 86:13  87:5
 87:10  96:6
 101:1
 114:3
 125:10
 126:23
 128:5
 131:2,9,14
 141:10
 143:7,12
 148:14
 149:1
 156:24
 157:5
 162:2
 169:19
 170:4,12
 190:10
 194:22
 212:13,18
 215:15
 225:1,4,5
 228:16
 230:18
 235:19
 239:24
 243:21
 254:15
 255:10
 260:20
 261:24
 265:20
 267:21
 274:11
 282:19
 284:17
 286:4

 298:4
 301:8
 322:3
**administ...**
 192:22
 196:23
 260:24
 264:22
 265:10,20
 266:9
 272:23
**administ...**
 191:22
 197:11
 260:11
 267:3
 281:9
**admit** 18:7
 268:10
 275:22
**adolescence**
 231:9,20
 232:5
 233:3,12
 234:11
 236:16
 237:1
 244:7
 253:7,11
 253:15
 256:18,21
 258:8,12
 259:2,3
 271:24
 283:13
 284:13
**adolescent**
 19:22  20:3
 20:13
 32:20
 33:21
 302:15
**adolescents**
 222:11
 234:2
 250:13
 256:22
 259:5
 293:20
 310:18
**adult** 208:8
 209:1,3
 210:7,20

adulthood
  242:11
  256:18
  258:2,8
  259:2
  275:7
adults 209:1
  222:15,22
  246:12,22
  262:18
  263:11
  276:22
advantage
  156:22
  159:15
advantages
  160:8
advise 271:5
  272:6
advises
  272:6
advising
  181:21
affect 91:8
  222:12
  245:15
  246:2
  247:8
affidavit
  239:8
affirmation
  308:9,12
  308:14
affirmed
  147:1
  168:18
affirming
  23:24
  109:24
  182:16
  271:13,22
  308:17,20
  309:3,7,16
  310:5
afternoon
  113:22
  114:8
  131:3
age 22:5
  27:22
  137:12
  152:7,13
  153:4

155:2
157:22
169:10
206:10
207:23
208:5
209:8
216:20
252:3
287:9
310:22
314:14
316:2
agency 1:24
agender 94:5
  161:19
agents
  319:23
ages 251:19
  253:22,22
ago 112:21
  128:3
  171:20
  194:5
  211:13
  240:1
  277:2
agree 28:18
  31:7 32:2
  40:5 43:12
  70:6,15,23
  71:6,21
  73:9,16
  77:12,17
  84:23
  85:21 86:5
  86:13
  88:18,24
  89:4,6
  92:8
  101:12
  139:2
  140:9
  141:10
  152:16
  198:7
  219:12
  230:9
  240:24
  247:6
  248:3,15
  248:21
  249:1,2

270:1
289:4
297:18
300:6
320:24
321:8,13
321:14,19
agreed 14:3
ahead 175:12
  193:9
  229:1
  282:4
aides 190:13
al 14:18,19
  24:5,21
  25:3 58:16
alienated
  184:4
align 164:4
  224:13
allergies
  77:3
Alliance 7:9
  14:24
allow 38:21
  260:16
  264:18
  316:4
allowed
  106:7
  132:17
  142:19
  168:16
  170:21
allowing
  147:1
allows 77:17
  165:21
altered
  224:12
alternation
  95:4
  165:12,19
  226:16
alternat...
  72:17,17
amazing 57:5
ambiguity
  53:20 54:6
American 4:4
  20:1 215:3
amount 57:5
  159:18

amputation
  129:24
Amsterdam
  44:6
  262:16
analogs
  52:16,21
analysis
  68:18
  176:5
anatomy 85:5
  85:22 86:7
  86:15
and/or 82:9
Anderson
  9:23 213:6
  213:21
  215:12,15
  215:21,22
  216:3
  218:6,17
Andrew 4:10
  16:5
anecdotal
  297:19
Anesthesia
  23:24
Angeles
  67:19
  306:18
animal 63:21
  68:18
annual
  305:21
answer 25:23
  39:23 40:2
  42:8 61:2
  74:9 77:2
  102:5
  110:8
  118:17,19
  126:23
  129:12,14
  134:23
  136:2
  137:20
  142:12
  147:10,13
  152:2
  161:11,14
  166:22
  167:2
  193:8

197:15
201:17
248:12
260:18
261:11
276:8
answered
  80:17,17
  109:16
  118:14,18
  144:23
  248:9
answering
  99:22
  146:10
  160:12
  186:23
answers
  110:7
anxiety
  106:2,3
  148:6
  262:10
  264:15
anybody
  31:11
  211:2
apart 141:1
  141:4,6
  266:20
apologize
  32:15 37:9
  59:9 106:1
  110:14
  123:10
  133:9
  146:10
  181:20
  190:5
  240:10
  246:17
  255:19
  260:18
  267:20
  296:7
  308:2
apparently
  170:17
appear 23:18
  47:3
  184:22
  185:16
  195:10

appeared
 173:19
appearing
 196:24
 197:12
appears 53:2
 100:11
 185:13
 247:20
 256:21
applicat...
 65:10
applied 58:2
applies
 128:4,7
 147:15
 268:18
apply 133:18
 268:20
 270:7
 282:2
appointm...
 32:12 33:3
appreciate
 29:21
 301:8
 322:4
approach
 27:1
 284:24
appropriate
 20:9 22:5
 62:21 75:9
 106:21
 112:2
 280:3
 305:4
 311:13
appropri...
 182:6
approval
 195:17
approvals
 276:23
approved
 197:8
 274:14,24
 275:5
 276:21,22
approving
 271:6
approxim...
 33:12 34:2

110:10,22
302:23
approxim...
 33:10
area 52:7,8
 57:3
 104:18
 105:15,20
 127:7
 128:17
 151:24
 159:23
 171:23
 178:23
 180:17
 181:13,22
 229:12
 232:18
 299:15
areas 103:6
 103:21
 104:9
 285:4,12
 285:15
Arkansas
 318:16
ARMISTEAD
 6:23 7:12
arrangement
 70:16
art 268:23
 269:2
arthritis
 91:17
article 9:10
 9:15,16,18
 9:19,22
 10:5,6
 24:4,12,21
 25:3,9
 54:12
 58:15,20
 59:15,20
 61:4,9
 63:2 131:5
 131:10
 136:6,9
 139:11
 141:16,18
 141:20
 142:5,5,7
 142:9
 143:3,8

148:10,16
149:2,4,7
149:22
156:18
157:1,9,13
158:12,12
212:8,9,14
212:23
213:4,6
214:7
215:12
220:24
221:3
228:12,17
250:19
254:9,12
254:16
255:9,24
257:6
264:16
296:2,13
296:18
article's
 61:4
articles
 50:20
 54:14 59:1
 59:13
 197:5
 221:1
 236:7
ascertain
 102:21
asked 37:13
 56:18
 75:10 81:4
 105:3
 126:10
 127:11
 130:4
 140:23
 147:18
 204:2
 215:20
 236:7
 260:21
 276:4
 277:2
asking 54:19
 54:22
 64:16
 71:21
 129:10

134:8
140:24
142:4,10
160:11
257:16
aspect
 168:20
assault
 216:24
 217:7
assaulted
 126:18
 216:21
assay 155:8
assent
 312:15
assert
 270:13
asserted
 238:18
 295:21
asserting
 57:8
assertion
 95:20
 133:14
 150:19
 167:20
 225:14
 270:2
 297:8
assertions
 158:24
asserts
 102:8
asses 102:18
 179:1
assess 151:4
 151:4
 242:1
assessed
 27:24
assessment
 98:13
 177:6,23
 188:3,6
 217:4
 221:9
 268:16
 283:11
assessments
 314:20
assign

101:23
122:8,14
122:15
assigned
 55:10,11
 64:3 65:10
 72:2 73:10
 79:20
 101:22
 102:4,14
 116:23
 126:11
 128:18
 135:18
 138:1
 145:8
 146:23
 147:12,14
 147:19
 148:1
 152:10,24
 153:16
 154:8
 168:14
 169:16
 173:4,21
 174:2,15
 175:6
 192:12
 217:11
 231:15
 232:2
 242:19
 251:18,24
 253:3
 314:3,8
assignment
 34:24 35:7
 55:13,19
 56:15 84:7
 137:10
assist
 309:11
assisting
 150:11
 246:10,20
 263:18
Associate
 32:16
associated
 32:12 44:5
 67:18
 115:3

116:6,14
116:24
177:1,17
179:10,22
184:9
211:2
229:7
244:6
290:19
297:21
299:5,19
**Association**
20:2 215:3
**assume** 80:7
80:8
119:13
**assumption**
159:5
**assure** 65:6
139:23
**athlete**
123:18
145:15,20
**athletes**
134:2,14
135:11
145:12
146:18,19
**athletic**
21:14
27:21
132:10
137:8
151:19
159:15
160:8
162:3
**athletics**
120:9,14
120:18,22
121:9
128:16
129:1
132:12
134:5,17
135:14
151:9
166:18
168:6
280:18
**atrophic**
53:13
**attacked**

217:15
**attempt**
209:24
**attempted**
211:2
234:16
290:11
295:16
**attempts**
206:20
207:1,5,9
207:12
**attend** 31:4
119:8
**attended**
188:23
**attention**
60:4 76:2
79:5 92:20
93:4,18
103:8
112:14
138:3
164:18
225:10
271:19
**attorney** 2:1
8:6,8 11:3
12:3 13:3
14:21,23
15:2,4,6,8
15:9,11,14
15:18,21
15:24 16:3
16:5,7,9
16:21 17:3
17:8 18:2
18:6,11,17
18:23 19:2
19:11,15
19:18,20
20:6,10,15
20:18,21
20:23 21:2
21:7,10,12
21:15,17
21:20,23
22:2,6,9
22:12 23:9
23:12
24:15,17
24:24 25:2
25:11,13

25:17,18
25:22 26:2
26:6,11,15
26:17,20
27:12,14
27:23 28:2
28:5,7,9
28:14,21
29:1,7,10
29:15,23
30:13,19
31:5,12,19
32:2,7,8
33:5,8,22
33:24 34:3
34:6,13,15
34:18,20
36:2,8,11
36:16,20
37:1,6,10
37:12,16
37:19,24
38:12,16
38:19 39:3
39:5,8,12
39:15,18
39:22 40:1
40:4,7,10
40:13,15
40:22 41:1
41:6,9,14
41:16 42:4
42:9,14,16
43:1,3,15
43:17,23
44:2,11,15
45:5,7,19
45:22 46:5
46:10,16
47:5,10,12
47:17 48:1
48:5,9,17
48:23,24
49:4,6,10
49:12 50:7
50:10,14
50:21 51:1
51:3,21
52:2,5,9
52:22,24
53:1,4,9
53:11,23
54:4,10,18

54:24 55:3
55:8,12,17
55:23 56:6
56:9,13,16
56:24 57:7
57:11,15
57:23 58:4
58:9,13,23
59:4,7
60:6,9,12
60:14,22
61:1,10,14
61:17,20
62:8,17,24
63:8,12,18
63:24 64:6
64:11,15
64:17,22
65:1,4,8
65:12,23
66:10 67:5
67:8 68:10
68:12
69:10,13
69:19,22
70:1,5,9
70:12,18
70:22 71:9
71:13,17
71:20,23
72:3,9,15
72:19,20
72:22,24
73:7,12,17
73:23 74:4
74:8,12,15
75:2,5,8
75:12,15
75:21,24
76:8,10,15
76:18,22
77:1,14,19
77:24 78:6
78:10,12
78:15,18
79:10,14
79:17,21
80:3,6,15
80:23 81:3
81:6,9,17
82:2,6
83:1,4,9
83:11,14

83:18,22
83:24 84:5
84:12,22
85:1,14,20
85:24 86:4
86:8,12,16
86:19,24
87:9 88:20
89:1,5,8
89:15,20
90:4,6,17
90:24 91:6
91:10,14
91:16 92:5
92:11 94:3
94:9,13,16
94:21,24
95:10,16
95:22 96:1
96:11,18
96:21
97:12,17
98:3,8,14
99:6,9,19
99:23
100:7,9,14
100:19,20
100:22
101:5,9,15
102:6,12
102:20,24
103:7,24
104:3,11
104:22
105:7,16
105:22
106:10,14
106:22
107:2,4,8
107:11,16
107:22
108:3,7,12
108:14,18
109:4,10
109:15,20
110:23
111:6,11
111:16
112:11,13
113:1,11
113:13,17
113:20
114:1,7,10

| | | | | |
|---|---|---|---|---|
| 114:14 | 141:9,15 | 168:2,7,9 | 191:17,19 | 213:22,24 |
| 115:16 | 141:17,21 | 168:11 | 191:20 | 214:3,5,8 |
| 116:8,11 | 141:23 | 169:2,8,18 | 192:3,5,18 | 214:13,21 |
| 116:17 | 142:2,8,13 | 170:8,16 | 192:20 | 214:23 |
| 117:2,7,10 | 142:15,24 | 170:24 | 193:4,14 | 215:6,9,19 |
| 117:17,22 | 143:2,11 | 171:3,7,9 | 193:16,18 | 215:23 |
| 118:4,9,13 | 143:21,22 | 171:12,15 | 193:22 | 216:1,6,8 |
| 118:16,20 | 144:8,11 | 171:18,21 | 194:2,4,8 | 216:13,15 |
| 118:22 | 144:19,24 | 172:3,6,16 | 194:10,21 | 217:1,5,10 |
| 119:2,5,10 | 145:7,16 | 172:19 | 195:2,5,12 | 217:17 |
| 119:15,19 | 145:21,24 | 173:10,13 | 195:13,19 | 218:20 |
| 119:22 | 146:8,16 | 173:17,22 | 196:1,4,8 | 219:2,9,14 |
| 120:1,5,10 | 146:22 | 174:1,3,12 | 196:12,15 | 220:16,19 |
| 120:15,24 | 147:9,16 | 174:13,17 | 196:19,21 | 220:21 |
| 121:5,11 | 147:17,24 | 174:23 | 197:2,9,14 | 221:5,20 |
| 121:13,22 | 148:9,21 | 175:3,7,10 | 197:18 | 222:5,9,13 |
| 123:2,19 | 148:24 | 175:14,18 | 198:4,11 | 222:17,20 |
| 123:21 | 149:20 | 175:19,23 | 198:13,20 | 222:24 |
| 124:4,7,12 | 150:4,8,15 | 176:6,17 | 198:22 | 223:2,10 |
| 124:14,19 | 150:24 | 176:22 | 199:15 | 223:13,18 |
| 124:24 | 151:6,11 | 177:4,15 | 200:2,8,14 | 223:21 |
| 125:4,9,22 | 151:14,22 | 177:20 | 200:18,20 | 224:2,6,18 |
| 125:24 | 152:4,8,11 | 178:3,9,14 | 200:22 | 224:20,21 |
| 127:8,19 | 152:15,17 | 178:20 | 201:1,7,20 | 224:23,24 |
| 127:22,23 | 152:23 | 179:3,13 | 201:21 | 225:8 |
| 128:8,9,11 | 153:1,10 | 179:19 | 202:2,5,7 | 226:8,12 |
| 128:13 | 153:17,22 | 180:1,5,9 | 202:13,21 | 226:22 |
| 129:4,9,18 | 153:24 | 180:11,15 | 203:4,14 | 227:2,7,12 |
| 130:11,14 | 154:6,11 | 180:19 | 203:18,20 | 227:16,20 |
| 130:24 | 154:16,24 | 181:7,9,15 | 204:10,13 | 228:1,8,10 |
| 131:13,18 | 155:4,10 | 181:19,23 | 204:17,22 | 228:11,20 |
| 131:21 | 155:12,15 | 182:2,8,17 | 205:2,4,7 | 229:13,16 |
| 132:6,9,15 | 155:19 | 182:21 | 205:8,13 | 229:18,21 |
| 132:20 | 156:2,8,13 | 183:1,6,12 | 205:17,21 | 230:11,17 |
| 133:6,8,10 | 156:17 | 183:16,18 | 206:1,5,7 | 231:1,11 |
| 133:13,21 | 157:4 | 183:21 | 206:11,13 | 232:7,9,13 |
| 133:24 | 158:10,20 | 184:1,6,7 | 206:16,23 | 232:21 |
| 134:7,11 | 159:1,7,17 | 184:10,16 | 207:3,7,10 | 233:4,5,13 |
| 134:19 | 159:22,24 | 184:21,24 | 207:14,17 | 233:16,20 |
| 135:3,16 | 160:5,9,14 | 185:2,3,6 | 207:21,24 | 234:4,18 |
| 135:22,24 | 161:1,2,5 | 185:8,12 | 208:2,6,10 | 234:22 |
| 136:4 | 161:12,17 | 185:21 | 208:15 | 235:2,3,14 |
| 137:3,14 | 162:1,7,13 | 186:2,4,12 | 209:4,11 | 235:18,22 |
| 137:18 | 162:16,19 | 186:16 | 209:13,16 | 236:5,9,12 |
| 138:2,11 | 162:24 | 187:1,9,13 | 209:19,23 | 236:18,21 |
| 138:14 | 163:2,6,12 | 187:18,23 | 210:4,9,14 | 237:3,13 |
| 139:5,7,12 | 163:15,18 | 188:5,9,14 | 210:24 | 237:16,18 |
| 139:15,24 | 164:23 | 188:19,22 | 211:6,9,15 | 237:22 |
| 140:3,7,15 | 165:4,6 | 189:2,5,11 | 211:19 | 238:1,5,7 |
| 140:16,18 | 166:1,6,12 | 189:17 | 212:6,17 | 238:12,15 |
| 140:20,22 | 166:21,24 | 190:3,9,15 | 212:21 | 238:22 |
| 140:24 | 167:3,13 | 190:17,23 | 213:2,8,12 | 239:5,13 |
| 141:3,5,7 | 167:19,24 | 191:5,12 | 213:15,19 | 239:18 |

| | | | | |
|---|---|---|---|---|
| 240:9,12 | 266:1,2,4 | 291:1,7,9 | 316:7,13 | 184:13 |
| 240:13,15 | 266:8,14 | 292:3,7,13 | 316:21 | **availabi...** |
| 240:17 | 266:17,22 | 292:24 | 317:2,7,21 | 271:7 |
| 241:3,8,14 | 266:24 | 293:5,7 | 317:23 | **available** |
| 241:20 | 267:6,10 | 294:4,12 | 318:2,4,8 | 17:12 |
| 242:4,6,8 | 267:13,17 | 294:18,20 | 318:12 | 18:24 |
| 242:16 | 267:23 | 295:10,15 | 320:3,6,11 | 66:20 |
| 243:2,14 | 268:8,14 | 295:18,20 | 320:14,17 | 95:14 |
| 243:18,20 | 268:19,24 | 296:19,21 | 320:23 | 202:17 |
| 244:21,23 | 269:3,16 | 297:24 | 321:3,7,12 | 234:21,21 |
| 245:5,6,10 | 269:19,22 | 298:3,8,15 | 321:16,22 | 244:17 |
| 245:12,19 | 269:24 | 298:22 | 322:2,5 | 246:11,21 |
| 245:21 | 270:4,12 | 299:3,7,11 | **attracted** | 261:22 |
| 246:4,9,15 | 270:16,21 | 299:22,24 | 61:24 | 268:2 |
| 246:19,24 | 271:1,3,10 | 300:4,12 | **attribut...** | 270:6 |
| 247:4,10 | 271:15 | 300:19,23 | 105:4 | 274:3 |
| 247:11,23 | 272:2,4,10 | 301:7,13 | **attributes** | 292:9 |
| 248:2,7,10 | 272:20,24 | 301:17,23 | 285:23 | **average** |
| 248:19 | 273:2,8,16 | 302:9,12 | **audio** 39:2 | 152:21 |
| 249:3 | 273:23 | 303:10,12 | 185:19 | 153:3,11 |
| 251:4,6,11 | 274:10,16 | 303:18,22 | 190:1,7 | 153:19,23 |
| 251:12,16 | 274:18,22 | 304:5,8,11 | 198:2 | 154:8 |
| 252:5,9,11 | 275:13,15 | 304:15,20 | 199:13 | 155:1,16 |
| 252:13,16 | 275:21 | 304:23 | 202:1 | 160:8,12 |
| 252:17,22 | 276:2,9,11 | 305:1,6,11 | **August** 170:2 | 209:9,17 |
| 252:23 | 276:18 | 305:15,19 | **Australia** | 209:21,22 |
| 253:1,5,9 | 277:1,5,13 | 306:1,5,7 | 158:13,18 | 260:24 |
| 253:13,16 | 277:17,20 | 306:11,16 | 158:21 | 287:13 |
| 253:20 | 277:23 | 306:20,23 | **Australian** | **averages** |
| 254:2,7,22 | 278:1,8,10 | 307:3,10 | 157:22 | 153:18 |
| 255:4,8,19 | 278:16,20 | 307:12,14 | **author** 25:14 | 287:22 |
| 255:22 | 279:10,15 | 307:16,20 | 26:3 43:18 | **avoid** 146:2 |
| 257:12,15 | 280:1,4,9 | 307:23 | 43:19 | **avoided** |
| 257:22,24 | 280:13,21 | 308:10,13 | 48:18,19 | 41:22 |
| 258:4,6,10 | 280:22 | 308:16,19 | 59:1 62:18 | **avoiding** |
| 258:14,19 | 281:1,5,23 | 308:22 | **authoriz...** | 166:8 |
| 258:23 | 282:3,6,11 | 309:2,5,10 | 1:23 | 167:8 |
| 259:6,9,14 | 282:16,18 | 309:12,15 | **authorized** | **aware** 35:22 |
| 259:17,19 | 283:24 | 309:19,22 | 210:11 | 36:3,17 |
| 259:22 | 284:5,8,21 | 310:1,7,10 | **authors** 24:6 | 37:2,20 |
| 260:3,6,12 | 285:6,10 | 310:13,16 | 25:10 | 39:9 50:19 |
| 260:19 | 285:13,17 | 310:20 | 42:18 50:2 | 87:19 |
| 261:2,10 | 285:20 | 311:1,4,8 | 51:14 53:5 | 91:15 |
| 261:17,23 | 286:8,17 | 311:14,17 | 67:3,18 | 116:7,14 |
| 262:4,5,8 | 286:19 | 311:21,24 | 157:20 | 120:16,19 |
| 262:14,19 | 287:16,18 | 312:7,9,18 | 218:5 | 121:6 |
| 262:22 | 287:21,23 | 312:21 | 219:5 | 131:15,19 |
| 263:3,12 | 288:4,6,19 | 313:1,6,12 | 221:17 | 131:23,24 |
| 263:16,22 | 288:21 | 313:15 | **autism** | 132:10 |
| 264:3,7,9 | 289:2,5,20 | 314:1,13 | 182:20,24 | 142:10 |
| 264:12,21 | 289:23 | 314:16,18 | 183:3,8,9 | 149:2 |
| 265:2,8,15 | 290:5,6,14 | 315:1,5,12 | 183:14,24 | 163:1 |
| 265:19 | 290:16,22 | 315:19,24 | 184:3,12 | 205:18 |

206:2,24
214:1
220:13,20
223:14,22
229:11
232:23
233:8,17
233:24
236:3
259:10,24
261:13,24
262:23
264:1
271:4
281:6
303:16
307:2
308:11,14
308:18
**awful** 113:22
**AZ** 6:22  7:11

**B**
**B.P.J** 1:4
14:18
15:23
27:11,16
119:23
120:2,3,4
322:6
**B.P.J.'s**
27:21
**baby** 138:22
**back** 18:12
37:13  59:5
66:8  81:10
92:22,23
114:15,16
130:22
131:2
141:18
160:16
169:20
172:24
176:19
182:10
189:4
194:7,19
198:15
203:15
216:10,16
221:7
223:12

239:16
243:12
293:16
298:23
311:5
**background**
142:22
190:3
**backing** 99:3
**backup** 202:3
202:15
**bad** 279:1
**Bailey** 6:11
15:12
**balance**
33:17
138:20
**Barr** 4:10
16:5,5
**base** 119:13
210:23
**based** 35:1,7
55:14  90:8
120:18
122:8
132:3,12
132:17
134:17
135:14
142:18
151:4
152:20
166:4
173:6
174:14
187:14
211:18,20
211:21,24
217:12
232:19
235:24
241:12
274:3
275:5
277:10,22
281:10
287:22
292:8
294:7
295:6
298:18
314:24
**baseline**

39:13
174:19
175:24
176:2
**basic** 66:15
85:6
190:10
286:21
289:3
**basis** 114:19
162:5
179:23
227:23
250:18
253:23
297:8
298:6
**beat** 143:17
**beautiful**
235:17
**becoming**
144:17
147:21
273:6,21
**bed** 106:5
**began** 27:16
**beginning**
54:14
68:15
93:10
110:18
114:23
147:10
174:18
190:18
216:23
251:8
252:19,24
253:24
259:12
273:17
287:19
288:2,17
**begins** 44:22
60:10
68:16
74:18,22
78:20
82:19  85:3
88:16  93:8
93:12,20
97:4  98:17
136:10

138:4
197:21
219:17
220:1,3
221:8
256:11
283:1
286:24
**behalf** 3:3
15:12,19
15:22  16:1
16:4,6,10
30:15
**behaviors**
102:18
**belief** 52:3
84:13
**believe** 22:3
22:7  25:12
30:22
31:20
62:18
69:14
75:12  76:6
76:13,20
79:9  80:12
80:16,17
81:20
82:23
83:12,19
84:1  89:14
92:4  95:8
99:5
105:18
110:15
135:10
145:17
150:5
176:8,13
190:10
197:22
199:19
201:11
215:20
217:6
227:14
241:9
242:9
247:7
249:11
264:4
277:6
285:24

286:1
294:6
308:3
317:4
**believed**
108:1
174:15
175:1
220:8
**belong**
230:15
**belonging**
92:16
**beneficial**
281:20
**benefit**
185:1
**benefits**
267:15
**best** 25:4
60:18
62:22
111:15
112:12
114:3
115:21
136:15
149:14
150:21
165:4
167:7
201:13
221:3
243:1
255:4
264:20
313:16
320:21
**better** 29:18
85:19
107:12
124:22
129:12
145:2
193:10
239:3
260:23
284:12
313:11
320:4,12
**beyond** 22:8
28:17
129:1

**bias** 233:23
**biasing**
  280:19
**big** 147:2
  292:2
  306:15
**biggest** 30:4
  297:12
**binary** 45:16
  51:18,23
  52:1 62:13
  62:15
**biological**
  37:8 41:20
  41:21,24
  42:1,1,11
  42:12,12
  49:21 50:3
  51:11,15
  51:18,19
  60:20 62:1
  62:19
  63:22
  64:10
  66:14
  68:17 69:9
  73:4,14
  74:11,13
  74:18,22
  76:2,4
  77:7,13
  84:7,15
  85:4,21
  86:6,14
  88:3,18,23
  90:2,14,15
  98:18
  114:16,19
  122:4
  132:11
  140:13
  141:11,12
  144:16
  145:3,5
  151:9
  155:8,16
  156:7
  159:15,16
  314:3
**biologic...**
  116:23
  134:2,14
  135:11

137:2
140:11
144:4
146:18
152:6
154:1
173:23
174:16
175:2,16
175:21
**biology**
  40:17 46:9
  52:3 56:22
  57:2 78:22
  81:22
  84:19
  114:24
  173:16
  174:9
  175:8
  245:17
**birth** 35:3
  35:15,24
  40:12
  55:10,11
  56:15 64:3
  65:10 72:2
  72:7 73:10
  79:20
  102:4,14
  122:8,10
  122:18
  126:12
  128:18
  135:18
  137:10
  138:1
  145:9
  146:24
  147:11,12
  147:14,19
  148:2
  152:10,24
  153:16
  154:8
  168:14
  169:16
  173:4,21
  174:2,15
  175:6
  192:12
  217:12
  231:15

232:2
237:24
242:19
251:18,24
253:3
314:3,8
**bit** 29:5,11
  54:16
  75:22
  114:5
  117:1
  124:22
  129:6
  159:19
  162:21
  164:1
  165:1
  198:7
  212:20
  287:13,13
  288:1
  303:15
**blanking**
  319:4
**block** 4:3
  16:9,9
  67:17 68:3
**blockade**
  266:13
  272:16
  286:10
**blocker**
  108:1
**blockers**
  27:16
  52:16 53:7
  107:7,9,14
  107:20
  108:10
  208:13
  210:2
  260:11,17
  260:24
  261:16
  264:10,17
  264:17,22
  265:11,21
  266:9
  267:3,12
  267:22
  268:10,12
  268:22
  270:15,23

271:6,12
272:17,23
273:13
275:8
276:4
277:15,22
278:15
279:7,24
280:6,11
280:17
281:9
284:19
293:3
310:4
312:20,23
313:3,7,24
**blocking**
  274:11
  290:18
**blood** 90:9
  91:3,12
  175:24
**blunt** 204:4
**BMI** 169:11
**Board** 1:8,9
  6:7,15
  14:19
  15:12,16
**bodily** 291:5
  291:19
  292:1,12
  295:24
**body** 46:19
  69:15,15
  84:18 88:8
  89:3
  154:19
  174:10
  313:10
**bone** 154:15
  154:20,21
  155:2,17
  155:21,22
  156:5
  160:3
  283:14
  284:14
**book** 59:10
  59:10,13
**books** 280:24
  281:3
**Borelli** 5:4
  11:4 12:4

13:4 15:21
15:22
19:11,18
20:6,15,21
21:2,10,15
21:20 22:2
22:9 23:9
24:15,24
25:11,17
25:22 26:6
26:15,20
27:12,23
28:21
30:13
31:19 33:5
33:22 34:3
34:13,18
36:2,11,20
37:6,24
38:16
39:12,18
40:7,13,22
41:6,14
42:4,14
43:15,23
44:11 45:5
45:19 46:5
46:16
47:10,17
48:5,23
49:4,10
50:7,14
51:1,21
52:5,22
53:1,9,23
54:10,18
55:8,17
56:6,13,24
57:11,23
58:9 59:4
60:6,12,22
61:10,17
62:8,24
63:12,24
64:11,17
65:1,8
67:5 68:10
69:10,19
70:1,9,18
71:9,17,23
72:9,19,22
73:7,17
74:4,12

United States 0842

| | | | | |
|---|---|---|---|---|
| 75:2,8 | 129:4,18 | 175:18,23 | 216:6 | 263:12,22 |
| 76:8,15,22 | 130:14 | 176:17 | 217:1,10 | 264:7,12 |
| 77:14,24 | 131:18 | 177:4,20 | 218:20 | 265:2,15 |
| 78:10,15 | 132:6,15 | 178:9,20 | 219:9 | 266:1,4,14 |
| 79:10,17 | 133:6,10 | 179:13 | 220:16,21 | 266:22 |
| 80:3,15 | 133:21 | 180:1,9,15 | 221:20 | 267:6,13 |
| 81:3,9 | 134:7,19 | 181:7,15 | 222:9,17 | 267:23 |
| 82:2 83:1 | 135:16,24 | 181:23 | 222:24 | 268:14,24 |
| 83:9,14,22 | 137:3,18 | 182:8,21 | 223:10,18 | 269:16,22 |
| 84:5,22 | 138:11 | 183:6,16 | 224:2 | 270:4,16 |
| 85:14,24 | 139:5,12 | 183:21 | 226:8,22 | 271:1,10 |
| 86:8,16 | 139:24 | 184:6,10 | 227:7,16 | 272:2,10 |
| 88:20 89:5 | 140:15,18 | 184:21 | 228:1 | 272:24 |
| 89:15 90:4 | 140:22 | 185:2 | 229:13,18 | 273:8,23 |
| 90:17 91:6 | 141:3,7,15 | 186:2,12 | 230:11 | 274:16,22 |
| 91:14 92:5 | 141:21 | 187:1,13 | 231:1 | 275:13 |
| 94:3,13,21 | 142:2,13 | 187:23 | 232:7,13 | 276:9,18 |
| 95:10,22 | 143:21 | 188:9,19 | 233:4,13 | 277:5,17 |
| 96:18 | 144:8,19 | 189:2,11 | 233:20 | 277:23 |
| 97:12 98:8 | 145:7,21 | 190:15,23 | 234:18 | 278:8,16 |
| 99:6,19 | 146:8,22 | 191:12,19 | 235:2,14 | 279:10 |
| 100:9,19 | 147:16,24 | 192:3,18 | 235:22 | 280:1,9,21 |
| 101:5,15 | 149:20 | 193:4,14 | 236:9,18 | 281:1,23 |
| 102:12,24 | 150:8,24 | 193:22 | 237:3,16 | 282:3 |
| 103:24 | 151:11,22 | 194:4,10 | 237:22 | 284:21 |
| 104:11 | 152:8,15 | 195:2,12 | 238:5,12 | 285:10,17 |
| 105:7,22 | 152:23 | 195:19 | 238:22 | 286:17 |
| 106:14 | 153:10,22 | 196:4,12 | 239:13 | 287:16,21 |
| 107:2,8,16 | 154:6,16 | 196:19 | 240:9,13 | 288:4,19 |
| 108:3,12 | 155:4,12 | 197:2,14 | 240:17 | 289:2,20 |
| 108:18 | 155:19 | 198:11,20 | 241:8,20 | 290:5,14 |
| 109:10,20 | 156:8 | 200:2,14 | 242:4,16 | 290:22 |
| 110:23 | 158:10 | 200:20 | 244:21 | 291:7 |
| 112:11 | 159:1,17 | 201:7 | 245:5,10 | 292:3,13 |
| 113:1,13 | 159:24 | 202:7 | 245:19 | 293:5 |
| 113:17 | 160:9 | 203:4,18 | 246:4,15 | 294:4,18 |
| 114:1 | 161:1,5,17 | 204:10,17 | 246:24 | 295:10,18 |
| 115:16 | 162:7,16 | 205:2,7,13 | 247:10,23 | 296:19 |
| 116:8,17 | 162:24 | 205:21 | 248:7,19 | 297:24 |
| 117:7,17 | 163:6,15 | 206:5,11 | 251:4,11 | 298:8,22 |
| 118:4,13 | 166:1,12 | 206:16 | 251:16 | 299:7,22 |
| 118:20 | 166:24 | 207:3,10 | 252:5,11 | 300:4 |
| 119:2,10 | 167:13,24 | 207:17,24 | 252:16,22 | 302:9 |
| 119:19 | 168:7,11 | 208:6,15 | 253:1,9,16 | 303:10,18 |
| 120:1,10 | 169:8 | 209:11,13 | 254:2 | 304:5,11 |
| 120:24 | 170:24 | 209:19 | 257:12,22 | 304:20 |
| 121:11,22 | 171:7,12 | 210:4,14 | 258:4,10 | 305:1,11 |
| 123:19 | 171:18 | 211:6,15 | 258:19 | 305:19 |
| 124:4,12 | 172:3,16 | 212:21 | 259:6,14 | 306:5,11 |
| 124:19 | 173:10,17 | 213:8,15 | 259:19 | 306:23 |
| 125:4,22 | 174:1,12 | 213:22 | 260:3,12 | 307:10,14 |
| 127:8,22 | 174:17 | 214:3,8,21 | 261:2,17 | 307:20 |
| 128:8,11 | 175:3,10 | 215:6,23 | 262:4,8,19 | 308:10,16 |

308:22
309:5,12
309:19
310:1,10
310:16
311:1,8,17
311:24
312:9,21
313:6,15
314:13,18
315:5,19
316:7,21
317:7
318:2,8
320:3,11
320:17
321:3,12
322:5,5
**born** 34:24
36:6
122:12,13
137:16
166:11
167:12
314:7
**Borrelli**
30:14 40:1
111:11
**Boston** 229:7
229:11
**bother** 213:7
**bottom** 32:11
44:17,19
68:2 82:14
93:11,12
96:24
114:19
149:12
165:7,14
189:20,21
219:16
229:23
278:24
282:24
**Boulevard**
6:5
**box** 88:2
89:21
**boy** 53:21
54:7 204:3
268:3
**boys** 53:14
55:7 56:12

97:6 98:11
149:15
150:22
152:22
251:15,23
252:10
256:15
287:10
290:21
**boys'** 126:13
**brain** 86:2
88:9
177:10
283:14
284:14,20
285:8,11
285:21
286:11
287:6
288:1,16
288:23,24
290:12,20
291:5,19
292:1,11
293:21
294:2,13
294:16
295:8,24
296:24
297:3
298:20
299:6,20
**brain's**
104:15
**branched**
90:10
**break** 65:22
110:21
113:18,23
114:2,2
130:13
177:16
193:15
194:5,6,10
242:5
243:2
282:5,12
**breakfast**
114:5
**breaks** 60:11
**breakthr...**
29:21
**breast** 53:13

253:4,6
**Bridgeport**
6:6
**bringing**
163:21
**broad** 4:5
21:21
36:22
45:11 46:8
**broader**
315:22
**broke** 255:16
306:3
316:18
318:22
**broken**
300:24
**Brooke**
136:18
**Brooks** 7:3
8:6 14:23
14:23
16:21 17:3
17:8 18:2
18:6,11,17
18:23 19:2
19:15,20
20:10,18
20:23 21:7
21:12,17
21:23 22:6
22:12
23:12
24:17 25:2
25:13,18
26:2,11,17
27:14 28:2
28:7,14
29:4,10
31:5,6
32:2,8
33:8,24
34:6,15,20
36:8,16
37:1,10,12
37:16,19
38:12 39:5
39:8,15,22
40:4,10,15
41:1,9,16
42:9,16
43:1,3,17
44:2,15

45:7,22
46:10 47:5
47:12 48:1
48:9,17,24
49:6,12
50:10,21
51:3 52:2
52:9,24
53:4,11
54:4,24
55:3,12,23
56:9,16
57:7,15
58:4,13,23
59:7 60:9
60:14 61:1
61:14,20
62:17 63:8
63:18 64:6
64:15,22
65:4,12,23
66:10,11
67:8 68:12
69:13,22
70:5,12,22
71:13,20
72:3,15,20
72:24
73:12,23
74:8,15
75:5,12,15
75:24
76:10,18
77:1,19
78:6,12,18
79:14,21
80:6,23
81:6,17
82:6 83:4
83:11,18
83:24
84:12 85:1
85:20 86:4
86:12,19
86:24 87:9
89:1,8,20
90:6,24
91:10,16
92:11 94:9
94:16,24
95:16 96:1
96:11,21
97:17 98:3

98:14 99:9
99:23
100:7,14
100:20,22
101:9
102:6,20
103:7
104:3,22
105:16
106:10,22
107:4,11
107:22
108:7,14
109:4,15
111:6,16
112:13
113:11,20
114:7,10
114:14
116:11
117:2,10
117:22
118:9,16
118:22
119:5,15
119:22
120:5,15
121:5,13
123:2,21
124:7,14
124:24
125:9,24
127:19,23
128:9,13
129:9
130:11,24
131:13,21
132:9,20
133:8,13
133:24
134:11
135:3,22
136:4
137:14
138:2,14
139:7,15
140:7,16
140:20,24
141:5,9,17
141:23
142:8,15
142:24
143:2,11

Hireright 0845

143:22
144:11,24
145:16,24
146:16
147:9,17
148:9,21
148:24
150:4,15
151:6,14
152:4,11
152:17
153:1,17
153:24
154:11,24
155:10,15
156:2,13
156:17
157:4
158:20
159:7,22
160:5,14
161:2,12
162:1,13
162:19
163:2,12
163:18
165:4,6
166:6,21
167:3,19
168:2,9
169:2,18
170:8,16
171:3,9,15
171:21
172:6,19
173:13,22
174:3,13
174:23
175:7,14
175:19
176:6,22
177:15
178:3,14
179:3,19
180:5,11
180:19
181:9,19
182:2,17
183:1,12
183:18
184:1,7,16
184:24
185:3,6,8

185:12,21
186:4,16
187:9,18
188:5,14
188:22
189:5,17
190:3,9,17
191:5,17
191:20
192:5,20
193:16,18
194:2,8,21
195:5,13
196:1,8,15
196:21
197:9,18
198:4,13
198:22
199:15
200:8,18
200:22
201:1,20
202:2,13
202:21
203:14,20
204:13,22
205:4,8,17
206:1,7,13
206:23
207:7,14
207:21
208:2,10
209:4,16
209:23
210:9,24
211:9,19
212:6,17
213:2,12
213:19,24
214:5,13
214:23
215:9,19
216:1,8,15
217:5,17
219:2,14
220:19
221:5
222:5,13
222:20
223:2,13
223:21
224:6,18
224:21,24

225:8
226:12
227:2,12
227:20
228:8,11
228:20
229:16,21
230:17
231:11
232:9,21
233:5,16
234:4,22
235:3,18
236:5,12
236:21
237:13,18
238:1,7,15
239:5,18
240:12,15
241:3,14
242:6,8
243:2,14
243:20
244:23
245:6,12
245:21
246:9,19
247:4,11
248:2,10
249:3
251:6,12
252:9,13
252:17,23
253:5,13
253:20
254:7,22
255:4,8,19
255:22
257:15,24
258:6,14
258:23
259:9,17
259:22
260:6,19
261:10,23
262:5,14
262:22
263:3,16
264:3,9,21
265:8,19
266:2,8,17
266:24
267:10,17

268:8,19
269:3,24
270:12,21
271:3,15
272:4,20
273:2,16
274:10,18
275:15,21
276:2,11
277:1,13
277:20
278:1,10
278:20
279:15
280:4,13
280:22
281:5
282:6,11
282:16,18
283:24
284:5,8
285:6,13
285:20
286:8,19
287:18,23
288:6,21
289:5,23
290:6,16
291:1,9
292:7,24
293:7
294:12,20
295:15,20
296:21
298:3,15
299:3,11
299:24
300:12,19
300:23
301:13
304:17
**BROOKSS**
269:19
**Brown** 220:14
220:24,24
**bud** 253:6
**Building**
5:13
**bullied**
126:17
**bunch** 30:6
**Burch** 1:12
6:16  15:13

**business**
126:15
**Butherus**
6:20

_____
C
_____
**C** 3:5  4:1
5:1  6:1,10
7:1  14:8
**CA** 4:18
**calculate**
210:22
**calculated**
209:22
**California**
67:10,14
67:19
**call** 36:10
47:22  60:4
93:4,18
103:8
109:23
112:14
138:3
164:18
204:24
225:9
271:19
**called** 16:15
149:23
183:24
260:8
308:12
312:15
**calling**
26:13
29:18,20
79:5
**cancer**
272:19
**cap** 322:1
**capabili...**
27:21
**capability**
21:14
151:19
**capacities**
178:12
**capacity**
1:13,15
2:1  237:21
**Capitol** 5:12
**caption**

2345 0846

14:16
**car** 300:16
**cardiova...**
90:7,12
**care** 23:24
25:6 26:10
32:20
33:21
147:4
175:8
178:23
184:15
207:22
208:8
209:1,3
210:18
214:19
221:23
236:11
264:5,20
279:12
281:17
302:16,21
303:9,17
304:4,10
306:21
307:2
308:17,20
309:3,7,16
314:24
318:16
**career** 19:5
32:10
110:11
111:8
292:15
**careful** 42:6
178:15
272:16
279:18
283:11
316:24
**carefully**
186:18
296:13
**caring** 172:4
**Carolina**
127:21
128:2
171:24
181:1,11
**carried**
128:10

**case** 1:6
14:16
30:13,17
120:16
121:7,21
127:3
136:3,5
150:17
162:5,5
193:9,21
202:16
206:3
216:18
242:13,20
242:21
279:9
318:1,10
319:12,13
319:18
321:8
**cases** 35:9
46:20
77:22
109:3,6
116:5
118:8
135:6,7
315:23
318:11,13
318:18,20
318:23
319:2,3
**catch** 144:9
148:19
321:17
**catching**
28:13
**categorical**
122:8
**categories**
89:24
205:20
**categorized**
115:18
**category**
156:20
160:19
161:4
162:21,23
205:9
278:5
**caught** 28:22
**cause** 108:23

122:23
146:24
147:6,7
167:17
183:14
184:3
202:23
269:11
274:8
279:21
280:7,18
316:9
**caused** 116:3
220:8
**causes** 148:5
148:6,7
205:23
270:19
**caution**
192:15
**cautioned**
192:22,23
**cautions**
191:7
203:2
**caveat** 79:20
142:22
312:4
**caveats**
135:20
**cease** 86:7
**cell** 46:20
69:15 88:8
88:10 89:3
89:6,10,13
**center** 4:16
154:8
185:14
**central**
274:5
**certain**
35:16 44:8
104:6
134:3,4,15
134:15
135:12,13
143:18
**certainly**
18:2,24
65:23
122:18
285:1
289:24

**certificate**
8:9 35:4
**certific...**
14:5
195:24
**certified**
14:11
180:17
**certifying**
1:24
**cetera**
159:12
232:20
**challenged**
277:14
**challenges**
30:12
177:8
**chance** 247:5
**change** 36:23
39:21
40:12 51:9
55:20 61:5
62:9 97:14
101:13
102:2
127:11
225:24
226:2,11
227:1,3,9
230:16
240:3,22
241:5,13
242:11
247:14,15
247:19,20
273:14
285:14
316:17
320:15
**changeable**
226:3
**changed** 52:4
56:19,23
130:5
214:10
224:11
227:24
240:22
241:2
242:24
**changes**
51:23

148:7
154:14
226:7
230:13
242:10
251:2,9
252:18
297:21
299:5,19
313:9
**changing**
81:8
237:11
303:1
313:20,22
**chapter**
59:10,11
59:13
250:20
255:11
**characte...**
51:10 97:5
98:19
116:24
173:20
224:13
**characte...**
142:3
**Charleston**
5:14,21
6:14 14:18
**chat** 317:19
**chatted** 31:9
**check** 180:21
199:20
202:7
221:24
264:16
**cheerleader**
200:13
201:6,11
**child** 19:21
20:3,12
32:19
33:21
34:24
35:24
104:10
105:5,21
120:6,17
120:21
193:21
199:24

201:5
242:13,19
244:7
245:1,14
245:14,15
246:1,2,2
246:7,10
246:21
247:19
252:20
265:1,12
265:21,23
266:10,11
266:12,20
302:15
315:13,17
316:1,4,5
316:6,15
316:19
317:6
319:20
**child's**
200:12
316:17,20
317:4
**childhood**
230:4
234:10
244:1
256:20
257:9,20
259:11,24
**children**
35:20
111:18
112:7
119:7
157:22
206:9
231:19,23
233:1,9
234:1,9
236:14,23
237:5,5,10
237:14
238:3
241:16
244:2
247:16
248:22,23
251:1
253:23
260:10,22

261:14
264:11,23
265:9
272:22
273:18
275:2
276:7,15
279:23
287:1
290:1
310:12,15
**Children's**
229:7,11
306:18,19
306:19
**choice** 40:12
161:4
204:3,8,15
**choices**
279:18,19
**choose**
128:24
192:11
212:4
**chose** 31:4
127:16
152:14
175:9
234:5
**CHRISTIANA**
7:6
**Christina**
15:2
**chromosomal**
37:3,8
39:9,16
40:18 46:7
48:2 68:22
69:17
70:16
117:5,15
118:3,7
127:1
**chromoso...**
47:14
120:7,17
120:20
173:8
**chromosome**
40:20
46:19 57:4
**chromosomes**
36:22

39:14 40:8
40:14,18
45:10
46:22 48:7
69:16,16
70:7 88:4
88:5 98:20
121:2
122:3
173:12
174:21
**chronic**
129:23
**cisgender**
192:11
197:8
217:15
246:3
**cite** 43:4
63:10
234:6
250:18
254:8
296:1
297:7
**cited** 254:10
255:24
257:3
296:14
**cites** 263:6
**citing**
234:15
**Civil** 3:4
4:4 14:19
**claim** 160:23
**claims**
102:22
296:23
**clarific...**
54:13
**clarified**
62:7
**clarify**
54:15
133:6
223:19
239:10,22
269:18
276:3
**clarity** 60:6
118:19
191:13
**classical**

77:6,13,16
77:18,20
**classifi...**
45:17 46:3
88:3,18,24
90:2 93:22
94:20
**classified**
256:13
**classify**
263:14
**CLAYTON** 1:12
6:16
**cleaned**
167:6
**clear** 24:20
28:15
45:20 50:4
57:6 60:19
63:3 124:6
125:6,8
148:2
184:19
191:14,17
200:15
242:20
249:7
266:7
313:8
**clearer**
102:5
**clearly**
28:19
38:14
301:14
**clients**
172:13
**clinic** 32:20
33:16,21
107:18,19
111:3
113:4
128:15,15
128:19
138:6,7,19
152:6
153:16
176:16,19
176:21
177:2
180:2
182:13,18
182:23

189:6
192:23
206:4
208:12,22
208:24
210:16
211:2
216:23
218:24
219:3
222:4,14
222:21
223:5,9
224:7
233:15
234:2,3
237:12,15
237:20
263:9
295:7,16
302:7,10
302:14,15
302:16,17
303:24
304:10
309:14
**clinica**
196:3
**clinical**
23:23
25:15 26:4
26:18
63:21 64:9
66:15 85:6
94:4 95:12
103:3
178:11
224:4
274:12
275:9
276:6,13
**clinically**
103:17,20
104:8
105:13,19
110:2
113:7
155:6,11
155:17
**clinician**
102:9,23
230:18,21
271:6

Clinician's
 25:5
clinicians
 60:17  62:4
 62:23
 271:21
clinics
 181:1,5
 210:8
 223:23
 302:20,21
 303:9,17
 304:4
 305:7,16
 305:18
 306:21
clip 184:17
 185:12,17
 189:18
 193:17
 197:20
 198:7,18
clips 186:18
 203:16
clock 300:20
close 210:19
closed 60:21
 62:1  63:23
 66:16
 68:22  71:1
 71:8  73:4
 76:13
 80:12
 81:24  85:7
 88:11  89:3
 89:13
 90:11
 91:23
 92:18
 93:23  95:4
 97:6  98:21
 103:22
 115:7
 123:14
 138:23
 149:16
 150:23
 158:4
 176:11
 218:10
 220:10
 256:15,23
 284:16

 289:13
 291:19
 293:22
closely
 105:18
closer 38:17
closest 26:8
clothed
 252:20
clothing
 245:2
CME 20:17
co-author
 24:21
Co-Director
 32:22
coach 75:6
coauthor
 58:16
coauthors
 60:19
coed 149:13
 150:20
 151:10
cognition
 297:4
 300:2
cognitive
 283:15,23
 284:1,15
 285:9
 292:18
 293:2
 297:15,22
 300:10
 315:22
Cohen-Ke...
 43:18  44:3
 48:20
 235:20
 241:16
Coleman
 148:11
 149:2,5,6
 149:23
collapsed
 256:14
colleague
 202:13
colleagues
 54:3
 213:10
 219:11

 262:15
 311:10
collect
 212:3
college
 123:18
 131:6
 136:13
college-age
 132:21
 133:19
colleges
 119:8
 125:3,20
 162:3
collegiate
 132:1
 133:4
 141:13
column 49:14
 74:17
 78:20  79:3
 82:7,14
 93:7
 114:18
 157:20
 164:19,21
 165:7
 231:18
 256:6
 258:16
 271:20
 282:21,21
 282:23,24
 284:11
 286:22
 289:7
combined
 260:9,22
come 18:12
 92:22,23
 100:5
 106:17
 113:3
 128:3,7
 158:17
 169:12
 170:21
 179:16
 184:19
 187:7
 192:11
 194:6

 198:15
 206:4
 208:22
 216:23
 231:4
 237:12
comes 32:3
 93:14
 102:7
 111:24
 156:11
 160:22
 314:2,7
comfort
 182:4
comfortable
 127:12
 160:12
 199:24
 200:10
 202:6
 267:16
 277:9
 314:11
coming 28:15
 30:10,16
 38:3
 104:13
 190:4
comma 81:24
 115:1
comment
 98:12
 132:18
 154:17
 236:2,6
Commission
 1:11  5:23
 15:20
commit
 262:11
committed
 207:23
 262:3
committee
 44:10
 45:14  46:1
 46:1  73:3
 214:18
 244:16
 246:10
 248:16
 281:10

 283:20
 284:11,18
 293:24
common 116:2
 120:14
 253:7
commonly
 61:23
Commonwe...
 3:6
community
 58:11
 70:15
comorbid...
 182:4
company
 34:17
 195:22
compare
 27:21
compared
 66:20
 157:23
 260:10
 293:3
comparing
 261:13
comparison
 217:14
compensa...
 33:2,13,19
compete
 120:8,12
 120:18,22
 121:8
 132:3,12
 134:16
 137:1,16
 138:1
 141:12
 144:5,18
 146:6
 150:16
competed
 120:12
competent
 20:1,12
competing
 134:4
 143:15,16
 143:18
 146:14
competition

0848

Case 2:21-cv-00316   Document 377-3   Filed 06/06/22   Page 853 of 1551 PageID #: 27948
PageID #: 27948 0849

| | | | | |
|---|---|---|---|---|
| 124:17 | 98:6 | 309:17 | 211:17 | 270:3 |
| 125:3,20 | 162:23 | **confer** 140:2 | 227:13 | 285:7 |
| 131:16 | 163:1,3 | 142:19 | 264:10 | 288:22 |
| 145:4,11 | **conception** | **conference** | 302:20 | 313:18 |
| 149:14 | 40:6 | 14:16 | 308:20 | **consists** |
| 150:20 | 122:19 | 213:17 | 309:23 | 215:12 |
| 151:10 | **concern** | **confidant** | 311:11 | **consolidate** |
| 166:10 | 47:18 | 281:19 | **consider...** | 231:8 |
| **competitive** | 169:15 | **confidence** | 135:9 | **consolid...** |
| 142:11 | 202:23 | 174:9 | 169:14 | 237:8 |
| **competitors** | 204:24 | 292:10 | 238:20 | **constell...** |
| 137:2 | 218:16 | **confine** 55:1 | 314:15 | 221:14 |
| **complete** | 219:4 | **confirm** | **consider...** | **construct** |
| 140:12 | 221:17 | 177:2,9,9 | 279:20 | 99:8,17 |
| 158:3 | 222:6 | 177:18 | **considered** | 101:4,13 |
| 191:15 | 279:21 | **confound** | 45:15 46:1 | 101:17 |
| 211:8 | 280:7,18 | 182:5 | 46:2 50:3 | **constructed** |
| **completed** | 296:23 | **confusing** | 60:18 | 97:6,16 |
| 207:9 | 319:14,19 | 62:6 199:6 | 68:17 70:8 | 99:4 |
| 244:2 | 320:16 | 239:23 | 234:14 | **constructs** |
| 262:17 | **concerned** | **confusion** | 251:21 | 97:14 |
| 263:8 | 201:24 | 199:9 | 309:7 | **consulted** |
| **completely** | **concerning** | **congruent** | 310:8,23 | 35:12 49:2 |
| 48:8 86:10 | 300:10 | 245:17 | 311:6 | 205:5,11 |
| 93:22 | **concerns** | **Connecticut** | **considering** | 205:15 |
| 97:15 | 171:17 | 319:5 | 29:17 | 206:8 |
| 121:2 | 202:19 | **connection** | 66:14 82:8 | **cont'd** 5:1 |
| 158:16 | 203:11 | 28:23 33:3 | 222:15,22 | 6:1 7:1 |
| 162:9 | 208:20 | 33:20,20 | 244:17 | **contact** |
| 273:14 | 210:19 | 34:11 65:5 | **consisted** | 228:22 |
| 295:12 | **concluded** | 318:6 | 258:1 | 286:12 |
| **Complex** 5:12 | 313:4 | **consent** | **consistency** | **containing** |
| **complexi...** | 315:15 | 190:14 | 314:21 | 46:20,20 |
| 114:24 | 322:12 | 273:7,22 | **consistent** | **contains** |
| 162:6 | **concludes** | 312:14,16 | 97:10 | 216:17 |
| **complicated** | 322:8 | 312:19 | 101:1 | **contending** |
| 101:18 | **conclusions** | **consider** | 123:7,14 | 56:22 |
| 144:12 | 54:22 | 19:24 | 124:3,11 | 299:4 |
| 146:9 | **condition** | 20:11,24 | 126:4 | **context** |
| 312:24 | 104:24 | 21:18,24 | 127:5 | 54:16 |
| **comply** 65:6 | 111:2,22 | 23:7 38:13 | 128:22 | 57:24 58:1 |
| **components** | 112:3,9 | 57:21 | 129:16 | 73:18 74:6 |
| 71:24 | 211:12 | 63:21 64:9 | 133:3,18 | 83:16 |
| **comprehe...** | 220:10 | 80:1 95:19 | 144:2,6 | 85:16 |
| 50:23 | **conditions** | 95:24 | 185:24 | 253:18 |
| **comprehe...** | 55:21 | 96:15 | 187:10 | **continue** |
| 221:8 | 81:15 | 107:21 | 198:9 | 53:14 |
| **computer** | 111:23 | 150:18 | 200:10 | 64:12 75:4 |
| 29:17 | 116:3 | 159:13 | 201:3 | 92:17 |
| **concept** 22:1 | 118:6 | 160:21 | 205:22 | 151:20 |
| 22:4 74:11 | 134:22 | 162:4 | 226:19 | 155:21 |
| 74:14,22 | 302:19 | 180:12 | 245:3 | 202:22 |
| 76:4 93:9 | **conducted** | 201:2 | 257:6 | 260:17 |

continued
 20:17
continues
 60:3 88:8
 88:15
 136:14
 138:20
 244:5
continuing
 22:16
 31:24
 178:24
 189:20,21
continuous
 95:3
 165:11
 226:15
continuo...
 290:8
continuum
 165:8
contrain...
 268:22
contrast
 247:7
 256:20
contrasting
 93:19
contribute
 244:12,18
 245:24
 248:5,18
contribu...
 246:12,22
control
 289:12,18
 290:2
 293:3
convenience
 17:4,8
conversa...
 156:4
 195:3,6
 198:8
 212:24
 213:5,18
conversa...
 54:2
 170:22
 219:11
Cooley 4:15
 16:4,6,8
 30:20

38:20
copies 17:13
 18:8
copy 64:13
 97:1
 100:12
 249:10,13
core 315:8
correct
 22:18
 24:10,12
 24:18,23
 25:1,9
 26:14 27:9
 27:13,17
 32:13,17
 32:18,21
 32:24 33:1
 36:1 40:21
 43:6,7,9
 45:18 46:4
 47:9,16
 48:21,22
 49:3,7
 50:6,13
 51:20
 52:17 53:8
 54:9 57:17
 57:24 59:3
 59:18,19
 60:9 62:3
 66:22 68:9
 69:24 72:8
 78:9,14
 83:8 84:21
 90:16 91:5
 103:23
 104:6
 105:1,2,10
 116:16
 117:6,16
 119:18
 121:12,17
 121:18
 131:17
 138:10
 142:4
 148:22
 151:16
 153:2
 154:5
 166:7
 170:23

171:6
173:9,24
174:6,11
175:17
179:5
181:14
186:20
191:11
192:2,4,7
192:17
196:11
198:6
199:19
207:2
211:14
212:18
234:17
235:1,8
245:3,9,18
247:9,22
250:21
252:21
258:3
265:14,24
267:5
271:9
274:15,21
275:12
276:17
278:7
285:16
287:15
296:3
299:16,17
299:21
302:8
304:1,19
311:7
313:5
321:11
corrections
 283:17
correctly
 62:2 109:5
 173:1
 248:11
 283:18
corrects
 18:1
correlated
 101:24
correspond
 47:8

correspo...
 126:24
 160:19
corresponds
 278:5
corroborate
 317:12
counsel 4:7
 5:9,15,22
 6:7,15,23
 7:12 14:4
 17:13
 18:21 29:3
 43:2 52:22
 54:24 60:6
 64:12 75:7
 86:21
 100:5
 113:17
 137:19
 139:6,12
 140:18
 141:16,23
 148:18
 185:2
 191:19
 194:4
 200:14,21
 240:10
 255:14
 271:21
 272:21
 301:2
Counsel's
 127:24
COUNSELS
 4:19
count 218:2
counting
 27:2
country
 302:21
 304:4
County 1:9
 1:15 6:7,8
 15:16
couple 56:17
 172:20
course 52:24
 55:20 60:5
 217:23
 250:13
 284:5

285:15
292:6
303:23
court 1:1
 3:5 14:12
 14:17
 17:12
 22:21
 29:24 30:4
 30:18
 37:13,15
 37:17,20
 38:1 58:15
 100:3
 163:3
 166:23
 167:1
 175:20
 185:9,11
 200:24
 201:21
 202:9,18
 254:19
 255:1,6
 268:12
 270:13
 275:18
 282:7,9
 283:22
 284:1,7
 300:19,21
create 41:4
 41:12
created
 279:22
creating
 234:19
credenti...
 237:24
criteria
 103:16
 106:12
 107:24
 108:9,16
 109:8,19
 113:7
 177:10,11
cross 56:1,4
 56:5
 108:17
 109:7,17
 188:18
 191:8

RECEIVED 0850

199:24
201:4
208:13
210:2,11
**Csutoros** 7:8
15:6,6
**curious**
29:24
**current**
14:14
32:11 66:2
66:9 97:15
130:16,23
137:10,13
161:21
194:13,20
208:3
243:5,12
322:9
**currently**
113:5
211:7
**curriculum**
9:6 17:21
18:20 19:4
22:15
**cut** 86:22
167:2
201:15
311:2
**cutting**
202:1
301:11
**CV** 17:15
**cycle** 31:8

**D**

**D** 6:18,19
8:1 14:8
**dangerous**
260:15
**data** 152:2
175:5
205:11
210:12
272:13
274:3
276:19
**date** 14:13
23:10,13
44:1 66:23
96:20
100:12,12

100:14
192:1
**dated** 42:18
131:5
143:4
170:1
225:1
**dates** 34:8
**daughter**
170:19
204:5,9,16
**Dave** 29:7,10
140:3
164:23
301:2
**Dave's**
275:23
**David** 5:11
15:8 301:9
301:22
**day** 16:23
113:3
127:16
128:4,7
163:23
164:8
172:22
179:16,18
186:1
235:11
267:20
273:17
276:1
301:8
**days** 32:5
128:15,18
164:2,3,6
164:7
**de-trans...**
221:1
**de-trans...**
222:16,23
223:9
**dead** 154:8
170:18
204:5,9,16
**deal** 238:2
**dealing**
194:22
**deals** 172:13
**Deanna** 1:19
2:8 3:3
8:4 9:5,24

14:20
16:14
17:11,16
17:19 18:1
18:2 225:1
225:5
**death** 166:15
166:15
167:15,17
205:23
261:8
**Debate** 131:7
**decade** 132:1
223:17
224:1
**decades**
43:14
**December**
156:18
**decide**
122:14
315:10
**decides**
106:19
**deciding**
55:10
**decision**
95:18
317:16,17
**decisions**
279:23
280:19
317:11
**declaration**
9:24 17:10
41:18
224:16,17
225:1,5,10
225:16
238:18
240:11
**decrease**
53:16
200:4
203:6
264:14
**deep** 163:9
**deepened**
168:17
**deeper** 103:6
**deeply** 99:11
144:1
**defect** 47:14

47:19,23
**Defendant**
15:15
**Defendant's**
307:19
**Defendants**
2:4
**defending**
7:9 14:24
30:15 31:3
156:3
**definable**
292:18
**define**
116:21
**defined** 90:1
**definitely**
30:11 38:3
121:3
303:6
**definition**
49:15,16
51:5 54:21
57:20
74:18 77:7
77:13,20
88:16 94:6
97:9
103:10
155:5
253:10
**definitions**
49:16
54:20 58:7
**degree** 19:21
178:18,22
**delay** 283:13
284:13
320:1,5,8
320:22
**delayed**
251:22
**delaying**
276:7,14
291:4,17
292:11
295:4,23
**delays**
300:10
**delve** 298:1
**denied** 75:6
**Deniker** 6:3
15:14,15

29:23
**densific...**
155:2,17
156:6
**density**
155:21,22
155:23
**denying**
139:16
**depend** 55:14
91:4 136:2
**depending**
69:16
88:11
257:21
310:6
**depends**
90:14
103:2
104:13
116:20
135:18
155:5
312:2
**deposed**
319:6,13
**deposition**
1:18 2:7
3:1 14:24
19:1 29:3
30:16,24
31:6,11,21
38:22
319:11
322:9,12
**depositions**
139:23
**depressed**
110:2
**depression**
106:4
130:8
148:6
168:17,23
187:22
188:3
200:5
262:10
264:15
**depressive**
203:7
**deprive**
240:4

describe
  53:6 70:21
  81:12
  163:13
  214:6
  287:3
  296:16
described
  72:5
  128:24
  146:4
  162:6
  183:8
  200:7
  233:18
describes
  77:16
  190:11
describing
  169:24
  207:19
description
  94:23
  240:20
  288:3,15
design 68:18
designated
  156:18
  212:8
designation
  35:2,3
desires
  49:21
desist 233:2
  233:11
  236:15,24
  241:17
  242:14
  259:11,24
desistance
  243:24
  246:13,23
  258:17
desisted
  258:8,18
desisters
  256:8
  258:18
despite 85:3
  145:19
  146:4
detail
  121:15

258:21
281:4
details
  132:7
determin...
  36:18 37:4
  37:21
determin...
  68:21 71:5
  72:5
  114:24
determine
  47:1
  175:15,21
  230:21
determined
  39:10 40:6
  44:24
  70:23 71:7
  71:22 72:1
  79:23
determining
  56:3
  122:17
detransi...
  219:24
  220:7,14
develop
  177:13
  230:4
  248:1
developed
  122:2
  129:21
  215:3
development
  24:9 46:8
  47:2,7
  53:13,21
  55:6,21
  56:2,11
  72:4,13
  78:4 81:19
  111:10,20
  112:10
  114:20
  115:6,7
  117:4,13
  118:2,12
  119:1,8,24
  120:8,21
  121:8,16
  121:24

135:10
237:6
240:21
247:14
251:19
253:4
265:7,18
273:5,21
283:16
284:16
285:8,9
286:11
287:24
288:16
290:12,13
291:6,19
292:1,12
292:17
293:2,22
294:2,14
294:16
295:9
296:24
297:3,22
298:20
300:3
310:6
315:22
developm...
  19:22
  241:6
  292:18
  299:20
developm...
  246:8
  296:1
develops
  241:11
deviation
  70:7
DeVries 10:6
  235:20
  250:20
  254:10,16
DeVry 262:16
  263:7
Dexus 155:9
diabetes
  129:21
  207:13
  229:24
  310:14
diagnose
  107:23
  189:8
diagnosed

105:11
231:19,24
233:1,9
236:14,23
241:17
242:13
diagnoses
  20:4,8
  241:19
diagnosis
  20:12
  106:11,23
  107:6,13
  108:8,15
  108:22
  117:21
  177:3,18
  178:7,17
  179:21
  180:12
  182:5,19
  234:10
  242:15
  315:2
diagnostic
  20:2 33:16
  103:16
diameter
  90:10
dichotomous
  68:20 69:3
  72:16
dictate 72:6
die 121:1
died 206:21
  261:20
differ 82:19
  83:6,20
  84:2
  140:14
  141:14
difference
  38:18
  55:20
  72:12
  90:14
  116:22
  122:3
  207:13
  229:24
  310:14
differences
  78:3 88:22

90:8 115:6
121:24
122:22
different
  35:12 36:6
  45:21,23
  46:21,22
  54:1,1
  62:11
  81:16
  83:23 89:7
  89:10
  98:17,18
  101:20,21
  106:20
  109:11,23
  116:2,24
  117:19
  122:16
  142:23
  146:2
  153:14,14
  155:22
  163:8,11
  164:5
  178:2
  179:16,18
  183:8
  193:11
  198:8
  230:13
  232:19
  241:5
  242:18
  247:16
  248:24
  257:13
  265:4
  270:10,10
  270:11
  275:6
  277:8
  285:2
  292:23
  294:6,21
  295:5,14
  305:24
  312:16,19
  313:20,23
  321:9
differen...
  115:1
differently

152:20
153:13
228:4
279:17
**difficult**
54:16
106:8
303:2
305:20
**difficul...**
189:9
**difficulty**
29:8 244:3
**dig** 103:6
163:9
164:13
**direct** 27:15
92:20
97:18
282:19
**directed**
70:24
257:7
**directing**
76:2
**directly**
47:8
166:14
**director**
32:19
302:11
**disadvan...**
145:12
**disagree**
71:21 73:5
82:5 85:21
86:5,13
88:19 89:4
139:4
140:10
142:2
230:9
247:6
248:3,16
249:6
270:1
319:23
**disagreed**
294:3
304:16
**disappea...**
301:15
**disassoc...**

184:4
**disclosure**
192:6
195:9,9
**disclosures**
190:14
191:7,21
193:2
194:23
195:11
199:22
**discomfort**
200:5
**discordant**
117:5,14
118:3
**discovered**
127:13
287:4
**discovering**
227:11
**discuss** 76:3
200:23
217:3
233:6
271:6
**discussed**
53:3 55:19
204:12
285:24
304:12
**discusses**
208:19
293:10
**discussing**
270:14
**discussion**
8:3 52:15
91:21
165:8
186:22
212:20
243:24
256:7,8
257:19
258:16,24
279:6
293:15
**discussions**
140:5
213:9
278:14
305:12

**disease** 82:9
87:3
129:24
**dismissed**
16:20
**dismissing**
234:15
**disorder**
47:7 55:5
56:2 72:4
81:19
111:9,20
112:9
115:11,15
116:7,14
117:3,13
118:2
119:1,7,24
120:7,21
121:7
135:10
183:9
**disorders**
24:8 56:11
115:5
118:12
121:16
**disparity**
169:12
**dispropo...**
217:7
**distance**
289:7
**distinct**
76:13,20
**distingu...**
125:13
**distracted**
116:10
**distress**
103:17,21
104:8
105:14,19
116:21
122:23
**District** 1:1
1:2 14:17
14:17
**diversity**
114:20
**division**
14:18
124:2,11

137:1
140:12
143:15,17
143:18
144:18
145:4
146:7,21
147:22,23
**divisions**
132:4
**DNA** 88:3
**doctor** 29:19
40:11
84:16
116:7
140:10
192:24
199:5
200:11
220:24,24
228:22
268:23
269:6
280:8,18
281:19
285:8
**doctors**
218:5
311:12
**document**
43:4 49:14
52:10,12
54:22,23
66:18 67:4
68:13
71:19
74:17
75:10,11
80:9,11,13
81:21
84:14
86:23 90:2
90:3,22
96:22 97:4
97:24
99:24
100:12
128:20
140:9,23
141:1,4,6
143:3
148:19
150:2

170:1
212:7
225:9
239:15,20
240:4,5
249:5,8
255:18,24
256:2
285:21
300:2
**document...**
27:19
89:18
120:13
**documented**
262:6,17
263:9
**documenting**
263:8
**documents**
18:19
29:19
64:19
239:22
254:23
**doing** 135:19
166:13
171:10
214:24
219:11
231:3
235:15
278:18
312:17
**Donna** 148:11
**door** 186:15
**DORA** 1:14
6:8
**Doriane**
148:10
**Doris** 15:16
**dose** 196:6
**double**
199:20
264:16
**doubt** 259:21
317:5,8
**downloaded**
170:9
**downs** 290:7
**downsides**
200:11
201:4

0853

**Dr** 17:4  18:7
18:18  19:3
27:9  31:22
43:4,10
44:3  48:20
58:16  61:2
63:19
70:13  84:1
86:13
87:10
101:1
114:3
125:10
126:23
128:5
131:2,14
138:15
139:3
141:10
143:12
149:1,23
157:5
162:2
169:19
190:10
194:22
212:18
213:6,6,14
213:21
214:1,11
215:12,21
215:21
216:2
218:16,17
220:14
229:6
230:10,18
235:19,20
239:24
243:21
255:10
260:20
261:24
263:4
265:20
267:21
274:11
282:19
284:17
296:23
298:4
301:8
322:3

**drafted**
44:10  46:1
73:2
**draw** 54:22
**Drew** 172:14
173:1,1,4
173:7,15
173:19
174:5,15
175:1,1,5
175:16,21
176:24
177:2
180:6,23
182:7
187:12,20
187:21
190:12,14
191:10
192:24
194:22,24
199:17
200:9
203:1,11
204:4
**Drew's** 174:9
175:8
176:10,15
179:11
184:18
185:22
186:9
187:11
188:7,8,16
188:17,23
188:24,24
190:14
198:19
203:24
204:1,7,14
208:4,7
**drink** 77:4
217:22
278:22
**drive** 6:20
181:16
299:6,19
**driven** 180:7
181:10
**driving**
180:23
300:16
**dropped**

202:16
**dropping**
103:10,16
275:23
**drove** 181:17
**drug** 191:3
200:7,9
270:9
**drugs** 198:19
198:23
199:11,16
200:1
202:24
203:9
274:11
275:1,4
**dry** 56:7
**DSD** 110:22
**DSM** 115:18
177:10,11
**DSM-V** 20:14
103:10,16
103:23
105:18
106:12,23
107:5,13
107:24
108:9,16
109:9,19
**Ducar** 6:18
6:19  15:4
15:4
**due** 105:3
**Duke** 9:17
32:12,19
32:22  33:3
33:14,15
33:21
148:10,12
148:14
149:2
177:17
178:12
179:10,23
180:3,4
182:13
184:12
208:16
209:3
302:15
**DULY** 16:16
**durable**
317:14
**dying** 166:19

**dysphoria**
20:5
103:10,16
105:4,12
105:24
106:1,9,12
106:18,24
107:6,13
107:15,20
107:24
108:2,6,9
108:11,16
108:20,21
108:23
109:8,12
109:18
110:5
111:19
112:8,17
112:22
113:5,8,10
172:2
177:3,9,18
200:4
203:6
206:3,10
217:9
220:8
223:16,23
231:24
233:1,2,10
233:11
234:2
236:14,15
236:23,24
238:4
241:17,18
242:15,22
243:1
244:1
250:14
256:18
257:9,20
259:1,12
260:1,14
261:6,12
262:13
264:11,15
264:23
265:5,10
266:10
274:20
291:3,17

295:22
310:23
313:9
**dysphori...**
221:15
**dysphoric**
242:14
261:14
**dysphori...**
234:11
**dysphorics**
257:10

_____
**E**
**E** 4:1,1  5:1
5:1  6:1,1
6:21  7:1,1
8:1  14:8,8
**E-26** 5:13
**e-mail** 23:22
**earlier** 38:9
48:11
57:21  58:8
66:21
69:14
72:16
114:6
125:11,17
162:20
167:20
216:21
252:1
285:24
286:14
287:12
300:2
314:20
**early** 36:19
37:4,22
44:14
93:12
113:21
230:4
251:21
252:7
265:4
274:2
279:24
294:7,24
**earned** 34:1
**easily** 36:14
**East** 5:19
6:12,20

**Eastern**
14:14 66:9
130:16,23
194:13,20
243:5,13
322:9
**easy** 56:11
225:20
239:1
**eater** 114:5
**editing**
90:21
**edition**
48:10
**editor** 23:5
**education**
1:9,10 6:7
6:15 14:19
15:13,16
23:23
160:1
178:22,24
289:21
**Edwards**
212:11,23
213:6,14
214:1,11
218:5,17
**effect** 53:6
54:8
270:10
285:4
294:6,13
295:12,13
312:23
**effective**
44:23
283:13
**effectiv...**
283:7
**effects**
122:3
154:2
160:2
193:20
197:5
199:23,23
200:12
201:4
221:22
267:8,8,24
268:1,4,5
269:11,15

269:21
283:15
284:13,15
285:11,14
290:17
293:18,21
294:1
295:8,14
**efficacy**
276:13
**effort**
193:12
**egg** 41:4,12
**eggs** 77:8
**eight** 48:11
65:14
165:13
180:23
228:5
252:3,3
**Eighteen**
224:23
**either** 19:8
19:16 67:2
69:15 70:7
88:10
89:13
102:9
109:13
119:17
134:15
135:12
152:21
153:8
161:3
193:20
281:11
290:24
**elicits**
122:5
**eligibility**
162:4
**eligible**
134:16
135:14
144:5,17
146:6
147:22
**eliminate**
320:8
**eliminated**
225:14
238:24

**elite** 149:13
150:20
**Elizabeth**
4:14 16:7
**Embarcadero**
4:16
**Emma** 156:19
157:6
**emotional**
283:15,15
284:15
285:9
**employed**
14:12
**enable**
273:22
**ended** 168:21
197:21
**endocrine**
9:8,9,11
42:17,22
44:13
48:10,14
50:5 53:5
53:19 54:5
57:9,19
58:7 59:17
65:13,18
66:13,15
67:1 71:15
73:2,6
74:1 76:11
79:22,23
80:8,10
81:20
84:13
92:20
95:21
114:15
164:14
176:2
226:13
231:16
232:3
234:5,8,14
244:16
248:4,17
250:24
271:5,12
272:6
281:8
282:20
283:8,9,10

293:8,24
294:13
304:13,24
305:2,9
312:5
**endocrin...**
151:15
181:18
**endocrin...**
73:3 115:4
298:13
307:1
**endocrin...**
19:10,14
21:4 307:1
**endogenous**
44:24
**endpoint**
237:9
**ends** 245:15
246:2
**enjoy** 151:20
159:15
**enrolled**
212:2
**enrolling**
211:8
**ensure** 125:2
125:19
188:6
**ensuring**
124:16
166:10
**entering**
153:21
244:4
**entire** 54:21
64:18
89:18
138:22
140:9,23
191:15
**entirety**
63:2 74:6
256:19
**entitled**
25:4 66:14
131:6
141:1
212:8,9
228:13
240:2
**equal** 72:2

192:9
**equally**
304:3
**equals**
157:10
**Erica** 212:11
**errors** 115:2
**especially**
57:2 122:2
253:3
**ESQUIRE** 4:3
4:9,10,11
4:12,13,14
5:3,4,11
5:17 6:3
6:10,18
7:3,4,5,6
7:7,8
**essential**
78:21
81:22
**essentially**
26:12
**establish**
195:16
196:10
**Establis...**
212:10
**estimate**
111:3,9
300:17
302:23
**estrogen**
56:5
**et** 14:18,19
24:5,20
25:3 58:16
159:12
232:20
**evaluate**
111:1
112:2
149:18
150:6,19
151:8
**evaluated**
107:18
120:3
177:2,24
188:7
**evaluation**
111:21
173:7

177:13
186:22
187:6
188:11
284:19
evaluations
179:9
283:7
events
127:20
131:15
176:14
eventually
168:16
everybody
16:11,23
19:1 28:17
30:3 138:4
138:16
142:17
158:21
203:17
everybody's
185:1
Everyone's
228:2
evidence
52:19
95:14
148:5
231:18
232:18,18
281:11,14
281:18,21
292:21
297:20
evident
112:4
exact 58:2
261:4
304:9
exactly 36:7
79:13
97:21
122:9
182:10
189:19
192:15
193:24
209:9
223:12
229:4
258:7

exam 173:18
174:21
176:3
EXAMINATION
8:5,7 17:1
301:5
examine
139:22
examined
27:10
260:8
examines
260:22
example
90:13
102:3
104:15,23
122:11
163:16,17
163:19
164:11
168:13
222:1
examples
89:22
98:11
115:2
126:1
129:2,23
130:9
168:3
exclude
135:8
146:20
277:21
311:16
excluded
123:6,13
126:3
127:4
128:22
133:2,17
144:2
excludes
145:3
278:3
exclusion
144:22
excuse 38:19
67:6 76:16
86:21
100:3,4
140:18

166:23
201:15
208:1
254:19
283:22
307:18
310:21
319:24
executive
289:11,18
297:4
exhibit 9:1
10:1 17:9
17:14,18
17:21 18:7
18:14,19
19:4 22:15
28:3 32:9
34:21
42:16,21
48:9,13
58:13,14
58:19 59:8
65:15,17
66:12
86:19,20
86:22 87:5
92:13,21
96:1,6
103:9
114:17
131:4,9
136:6
143:2,7
148:10,14
156:24
164:15
169:23
170:4,9,12
172:11
185:14
212:7,13
215:13,15
216:10,16
217:18,21
224:19,22
225:1,4
228:9,11
228:16
231:16
240:13
243:22
249:11,11

249:20
251:1
254:9,15
267:18,19
271:17,18
271:19
282:20
285:20
286:1,4
291:11
293:9
296:6
exhibits
17:9
existence
224:12
exists
159:21
exome 57:4
exon 176:4
experience
22:8 26:9
70:19
81:14
93:20 94:4
94:11
95:12
96:19
97:16 98:7
99:12,16
101:3
113:21
117:4,11
117:13
118:2,11
118:23
119:3
123:5,11
126:2
128:21
133:16,22
142:18
150:10
151:2,5
152:20
161:11,20
161:20
163:7
164:16
165:9
166:8,16
218:23
224:5,7

226:15
227:4
230:16
247:15
253:14
260:13
268:1,6,7
272:12
277:11
294:8
295:24
297:13
298:14,19
experienced
151:9
152:19
155:1,17
167:21
168:4
216:24
270:18
experiences
144:16
161:15
163:5,11
270:18
experien...
95:3
165:11
217:9
233:2,11
236:15,24
238:3
241:18
264:23
experiment
296:16
expert 17:11
21:18,24
34:10,11
34:22
42:10,11
43:5 46:12
94:1 103:9
121:15
123:3
131:23
139:23
151:18
224:9
225:16
268:11
279:7

298:5
307:17,22
317:24
318:5
319:9,10
319:13
**expertise**
21:1 22:7
149:18
150:3,6,18
159:14
181:13,21
207:16
288:24
**experts**
307:18,19
**explain** 23:1
112:23
163:3
195:8,14
225:21
228:3
268:4
300:14
**explained**
80:10
112:21
227:18
**explaining**
190:19
**explains**
85:19
**explanation**
98:5 101:7
**exploration**
227:10
**explore**
248:23
**explosive**
158:2
**express**
126:10
164:5
204:24
224:10
230:23
240:7
**expressed**
218:16
232:11
237:1
305:10
306:10

**expressing**
163:22
**expression**
68:22
101:20
122:4
164:4
**extended**
44:13
**extending**
98:4
**extends**
159:14
**extensive**
157:21
**extent** 54:19
124:1,9
167:5
**external**
35:8,9,15
48:7 80:20
122:4,13
173:19
174:21
247:7
**externally**
35:1
**extreme**
129:2,14
147:8
165:24
**extremely**
28:12
123:6,12
126:3
128:23
133:1,16
139:17
144:6,18
145:6
160:20
205:19
316:1,3
**eye** 252:20

**F**
**F** 5:17
**faced** 169:4
204:8,15
**fact** 35:23
36:18
46:11 49:1
61:15

68:15
69:14 72:6
74:16 80:9
85:4
103:20
120:6
139:3
173:23
195:14
203:11
207:15
224:16
231:24
240:3,24
255:9
262:15
272:18,21
280:15
297:16
**facts** 158:8
**factual**
250:19
**Failing**
212:10
**faint** 29:5
**fair** 21:19
77:12
124:16
125:2,19
137:2,17
138:1
186:17
306:2,4
**Fairly**
193:16
**fairness**
22:1,4,8
131:7
138:21
139:2
166:10
167:11,18
**fall** 62:12
62:13
251:20
**falling**
59:12
**false** 83:19
84:2
149:19
158:24
237:9
**falsity**

150:19
**familiar**
43:8 49:1
63:19 64:7
64:16
87:11
96:12
138:6
162:22
215:21
228:24
296:20
303:23
304:3
**family**
101:23
106:19
168:24
188:8
225:24
314:22
317:13
**FAMPTON** 7:5
**far** 29:6
66:23
96:20
115:19
169:10
171:10
173:6
193:11
232:16
277:15
**farther**
67:17
**fashion**
145:14
303:13
**fast** 104:16
**faster**
136:14,17
157:24
**fastest**
136:11,12
**fat** 150:12
**father**
188:17
189:1
**FDA** 195:17
195:23,24
197:1,3,7
197:13,17
274:13,24

275:5,17
276:6,20
276:21
**Federal**
141:24
**feel** 60:5
127:12
151:24
160:12
161:8
164:2,6
183:14
184:3
188:15
201:12
229:19
267:15
270:8
277:8,10
277:12
314:11
**feeling**
106:6
164:8
246:20
**feelings**
102:11
249:24
**feels** 227:21
227:23
**fees** 34:1,10
**fellow** 126:8
**fellowship**
19:13,17
**fellowships**
19:9
**felt** 99:11
241:22
242:22
**female** 27:22
35:11
40:19,19
41:3,11,21
42:1,12
47:4,15,15
48:8 49:22
49:22
55:10
74:19 77:8
88:5,10
89:13
90:20 91:1
91:2 92:17

Page 0857

93:21
94:11 95:4
120:8,18
120:22
121:2,8
125:6,7,10
125:12,17
136:13
137:2,17
138:1
143:15,16
143:17,17
143:18
144:16
146:24
147:11,12
149:14
150:21
156:20
160:23
161:16
165:12,19
166:11
167:12
168:14
169:5
173:2,4,8
173:15,19
173:21,23
174:2,16
175:2,6,16
175:22
191:9,23
216:4
217:11
223:24
226:16
251:18
280:17
313:4
314:8,9,11
315:3,16
316:16
317:5,5
320:1
**females** 77:7
88:4 92:2
92:2,8
98:19
124:17
125:3,20
140:13
141:12

151:20
157:23
159:16
160:8
169:16
192:12
196:24
197:8,12
216:22
217:6
253:3
**feminine...**
164:2
**fertile**
274:6
**fertility**
192:9
195:1
271:7,8,23
272:7,19
272:22
276:22
**fertilized**
41:4,12
68:21 71:1
71:5,7,22
72:1
**field** 19:9
20:24
43:13,22
50:3
138:22
172:1
209:5
214:2
234:24
235:7,12
235:21
236:8
261:12
**figure**
129:12
183:9
260:17
264:18
**file** 17:11
**filed** 225:10
**filing** 14:5
**fill** 188:2
**final** 78:20
79:3
105:10
197:20

**finally**
228:7
**find** 18:18
26:24
44:13 49:9
76:17 79:2
92:13
114:17
164:13
188:24
211:22
220:3
231:16
239:17
243:21
249:10
267:18,19
291:15
**finding**
113:5
144:10
177:7
188:13
236:13,22
**fine** 33:11
114:13
164:22
**fingers**
221:6
**finish**
114:10
193:17
194:9
**finished**
77:2
152:22
**fire** 202:19
**firmly** 175:2
**first** 16:16
30:20
36:19 37:4
37:11,22
39:11 41:7
42:19
48:18
74:17 76:1
79:1,6
82:7,14
85:3 87:10
97:19 99:3
157:20
158:19
172:12

179:11,15
180:22
210:2
211:13
216:11,17
222:19
228:21
230:3
231:18
251:1,8
256:6
260:1
286:24
293:17,17
302:5
**fit** 31:1
98:6 237:1
**fitness**
157:21
**fitting**
94:20
**five** 44:16
44:19
112:15
164:18,21
164:22
189:20,22
191:1
197:22,23
210:1,12
211:13
250:8
256:10
274:1,1
305:24
317:21
**five-minute**
317:20
**fixed** 225:12
225:15
226:20
232:12
236:17
237:2
238:11,19
238:21,24
239:9,12
239:15,21
240:2,8
241:2,7
**flat** 270:1
**flatly**
270:13

**flipping**
299:13
**Floor** 4:17
5:7
**Florida**
180:7,24
181:11,12
181:21
318:17
319:4
**fluctuation**
61:23
**fluid** 162:21
162:23
163:4,8,10
163:14
164:10,12
165:22
166:9
167:9
227:4,6,22
229:24
**Fluidity**
228:13
**focus** 30:10
81:18 85:7
104:16
165:18
**folks** 68:1
121:23
206:21
**follow** 78:5
189:12
208:12,22
212:5
246:7
256:12
304:13
**follow-up**
150:17
210:7
211:3,22
256:7
**followed**
19:13
208:3
292:15
**following**
16:15
81:20
218:21
283:12
**follows**

16:17
149:13
234:7
**football**
168:13
169:6,17
**footnote**
61:15
67:10
235:4
250:21
254:10
257:3
**force** 215:2
**forclosed**
280:17
**Forde** 136:18
**forever**
191:4
**forget** 39:6
**forgetting**
22:23
**forgotten**
248:14
**form** 19:11
19:18 20:6
20:15,21
21:2,10,15
21:20 22:9
23:9 24:15
24:24
25:11,17
26:6,15,20
27:12,23
33:5,22
34:3,13,18
35:10 36:2
36:11,20
37:6,24
39:12,18
40:1,7,13
40:22 41:6
42:4,14
43:15
44:11 45:5
45:19 46:5
46:16
47:10,17
48:5,23
49:4,10
50:7,14
51:1,21
52:5 53:9

53:23
54:10 55:8
55:17 56:6
56:13,24
57:11,23
58:9 59:4
60:22
61:10,17
62:8,24
63:12,24
64:11 65:1
65:8 67:5
68:10
69:10,19
70:1,9,18
71:9,17,23
72:9,19
73:7,17
74:4,12
75:2 76:8
76:15,22
77:14,24
78:10,15
79:10,17
80:3,15
81:3 82:2
83:1,9,14
83:22 84:5
84:22
85:14,24
86:8,16
88:20 89:5
89:15 90:4
90:17 91:6
91:14 92:5
94:3,13,21
95:10,22
96:18
97:12 98:8
99:6,19
101:5,15
102:12,24
104:1,11
105:22
106:14
107:2,8,16
108:3,12
108:18
109:10,20
110:22,23
111:9,11
112:11
113:1,13

115:16
116:8,17
117:7,17
118:4,13
118:20
119:2,10
119:19
120:1,10
120:24
121:11,22
123:19
124:4,12
124:19
125:4,22
127:8,22
128:8,11
129:4,18
131:18
132:6,15
133:11,21
134:7,19
135:9,16
135:24
137:3,18
138:11
139:5
140:15,21
141:15
143:21
144:8,19
145:7,21
146:8,22
147:16,24
149:20
150:8,24
151:11,22
152:8,23
153:10,22
154:6,16
155:4,12
155:19
156:8
158:10
159:1,17
159:24
160:9
161:1,5,17
162:7,16
162:24
163:6,15
166:1,12
167:13,24
168:7,11

169:8
170:24
171:7,12
171:18
172:3,16
173:10,17
174:12,17
175:3,10
175:18,23
176:17
177:4,20
178:9,20
179:13
180:1,9,15
181:7,15
181:23
182:8,21
183:6,16
184:6,10
186:2,12
187:1,13
187:23
188:9,19
189:2,11
190:15,23
191:12
192:3,18
193:4,8,22
195:2,12
195:19
196:4,12
196:19
197:2,14
198:11,20
200:2
201:7
203:4
204:10,17
205:2,7,13
205:21
206:5,11
206:16
207:3,10
207:24
208:6,15
209:11,19
210:4,14
211:6,16
212:21
213:8,15
213:22
214:3,8,21
215:6,23

216:6
217:1,10
218:20
219:9
220:16,21
221:20
222:9,17
222:24
223:10,18
224:2
226:8,22
227:7,16
228:1
229:13,18
230:11
231:1
232:7,13
233:4,13
233:20
234:18
235:14,22
236:9,18
237:3,16
237:22
238:5,12
238:22
239:13
240:9,18
241:8,20
242:16
244:21
245:5,10
245:19
246:4,15
246:24
247:10,23
248:7,19
251:4,11
251:16
252:5,11
252:16,22
253:1,9,16
254:3
257:12,22
258:4,10
258:19
259:6,14
259:19
260:3,12
261:2,17
262:4,8,19
263:12,22
264:7,12

266:1,4,22
267:6,13
267:23
268:14,24
269:16,22
270:4,16
271:1,10
272:2,10
272:24
273:8,23
274:16,22
275:13
276:9,18
277:5,17
277:23
278:8,16
279:10
280:1,9,21
281:1,23
284:21
285:10,17
286:17
287:16,21
288:4,19
289:2,20
290:5,14
290:22
291:7
292:3,13
293:5
294:4
295:10,18
297:24
298:8,22
299:7,22
300:4
302:9
303:10,18
304:5,11
304:20
305:11,19
306:5,11
306:23
307:10,14
307:20
308:10,16
308:22
309:5,12
309:19
310:1,10
310:16
311:1,8,17
311:24

312:9,21
313:6,15
314:13,18
315:6,19
316:7,21
317:7
318:2,8
320:3,11
320:17
321:4,12
**forms** 188:2
**Forty-three**
296:5
**forward**
30:17
109:1
182:15
201:12
203:13
314:10
**found** 50:22
233:9
244:12,18
245:23
248:5,17
**Foundation**
4:4
**four** 22:17
66:19,20
68:2
100:21
136:16
185:13
189:21
203:15,22
217:14
256:10
259:4
**fourth**
252:10
253:8,15
**fractures**
319:14,20
**Francisco**
4:18 67:10
67:14
**frankly**
28:19
**free** 40:19
40:23 47:7
47:13 56:2
60:5 141:1
141:4

222:2
**Freedom** 7:9
14:24
**freestyle**
136:11,16
**frequency**
92:24
**frequent**
92:9
**fresh** 187:8
**friend** 1:4
130:5
**frilly** 164:1
**front** 23:11
64:13
66:11 97:1
136:6
175:5
179:1
197:4
200:24
221:2
277:9
291:10
302:1
**frontal**
289:10,17
**froze** 319:16
321:17
**frustration**
29:8
**full** 80:19
85:3 100:5
101:7
106:11,23
107:5,13
107:23
108:8,15
158:12
169:7
176:4
180:22
313:13
**fully** 25:23
148:18
219:8
264:2
270:24
275:19
**function**
84:17
106:5
283:14

284:14
297:4
**functioning**
103:22
104:9
105:15,20
**functions**
289:12,18
**fundamental**
85:4,22
86:6,11,14
**funny** 111:24
**further**
38:22
85:19 89:2
140:4
158:1
186:22
187:20
200:23
256:17
**future**
191:10
192:1
283:1,4,6

————— G —————

G 14:8
**gained**
129:20
**gamete** 41:3
41:3,11,11
**gametes** 77:8
77:9
**gap** 207:1,8
207:11,16
**Gavenport**
297:11
**GD/gender**
231:19
244:6,11
283:10
293:19
**gender** 9:17
20:5 23:24
24:13,22
25:16 26:5
26:9 32:20
32:23
33:21
49:22
51:10
57:20 58:7

62:16 64:3
68:19
78:22,23
78:23
79:12
81:22,24
81:24 82:9
82:18 84:7
84:8,15
87:2 88:16
89:22 90:3
90:19,19
91:5,11
92:15,16
92:17 93:9
93:21,22
94:7,11,19
94:20 96:3
97:4,5,9
98:6,17
99:4,7,11
99:12,15
99:16
101:2,3,12
101:16,17
101:19,20
101:21,23
102:2,2,8
102:13,17
102:19
103:10,16
105:4,11
105:24
106:1,9,11
106:18,24
107:5,13
107:15,21
107:23
108:1,6,8
108:10,11
108:16
109:8,12
109:18,23
111:19
112:8,17
112:22
113:5
117:1,4,14
117:20
118:2
122:1,15
122:17
123:9,14

124:3,11
125:13
126:4,9,22
127:5,11
127:18
128:19,22
129:17
132:3,12
132:18
133:3,18
134:17
135:14
139:19
144:3,6,16
147:2
148:12,15
160:20,23
161:15
162:21,23
163:4,8,10
163:14,23
164:4,4,10
164:11
165:12,21
165:23
166:4,9
167:9,22
168:6,19
168:24
172:1,2
177:3,9,18
182:15
183:10
184:4,8,14
206:3,9
216:4
217:9,9
218:9
221:14,18
223:15,16
223:23,23
224:11
225:12,15
225:22,24
226:1,6,10
226:20,23
227:4,6,8
227:11,15
227:17,22
227:24
228:2,13
229:24
230:4,5,6

230:13,16
230:22,22
231:7,8,13
231:14,24
231:24
232:1,2,11
233:1,2,9
233:11
234:2,10
236:14,15
236:16,23
236:24
237:2,7,8
237:20
238:3,10
238:19,20
239:3,9,12
240:2,7,20
241:7,10
241:17
242:10,14
242:15,24
244:1,4
245:16
246:8
247:8,18
247:19
248:1,23
250:14,15
256:18
257:9
259:1,11
260:1,18
261:5,12
261:13
262:12
264:11,23
265:5,10
266:10
271:13,22
274:20
278:5
280:12
291:3,17
295:22
302:15,16
302:20
303:9,17
304:4
306:21
307:2
308:17,20
309:3,7,16

310:5,23
313:4,8,11
313:14
314:22
315:3,7,11
315:15,16
315:17
316:14,23
317:5
gender-a...
109:3,22
236:10
gendered
79:12
genders
97:16
general 2:2
57:18
96:19
103:1
106:18
115:14
138:12
159:13,13
203:9
214:9,12
218:23
229:19
235:15,24
253:6
268:1
269:9
270:17
287:17
310:17
312:17
General's
15:9
generali...
299:10
generally
20:4,12
51:2 58:6
96:16
115:5
131:14,24
132:10
160:1
163:22
187:7
214:1,14
214:16
219:5

252:3,19
297:22
309:21
312:6
genes 36:23
39:20
68:22
genetic
27:22
36:17,18
37:17,21
37:22 40:5
45:12
46:14,15
47:7,13
55:15
69:23
115:3
143:15
genetic/...
45:1,4,15
46:2 80:1
80:11 81:1
geneticists
115:4
genetics
57:3
genitalia
35:15
47:15 48:8
55:14
80:20
122:5,13
173:19
genitals
35:2,8,9
getting
55:24 56:7
128:10
165:1
246:18
268:3
272:17
279:2
308:2
317:24
girl 53:21
54:7 164:6
216:19,22
girls 53:13
55:7 56:12
91:22 92:2
97:6 98:11

147:23
167:11
223:17,20
251:15
252:3
256:15
280:6
287:9
290:21
girls' 134:5
280:16
girly 164:8
give 25:21
33:10
52:22
102:5
107:20
129:1
163:16,17
170:2
182:3
187:12
193:8
217:2
247:5
295:2
302:6
314:14
315:2
317:20
given 18:19
21:4 54:20
114:23
119:20
128:5
162:9
180:12
203:5
230:22
261:21
279:4
289:1
296:7
gives 90:13
281:24
giving 116:1
168:24
239:9
glad 100:20
276:1
glance
319:21
glide 93:13

**go** 22:24
28:11
44:21  90:7
113:21,23
114:5
122:17
128:17
131:2
137:8
154:22
160:16
168:21
172:24
203:19
239:16
267:7
282:4
292:5
297:1
298:11,19
298:20
300:24
**goal** 57:12
58:10,10
186:9
264:17
**goals** 234:19
**God** 177:10
**goes** 66:23
95:1
121:15
140:2
216:20
232:3
283:8
287:3,8
289:11
**going** 26:24
28:16
30:17  31:8
31:20
33:10  39:6
47:14  59:5
64:12  66:1
92:22
93:10
106:2
113:19
116:18
127:12
130:15
131:3,22
139:24

146:24
147:6
162:17
165:18
167:4
175:20
183:11
185:17
189:18
191:3
193:14
194:11,12
203:13,13
203:16
224:18
236:2
239:7
242:4
243:4
246:16
249:17,22
252:2
254:12
259:15
263:14
264:19
271:19
274:8
279:2
284:9
299:1
301:13
312:13
316:16
318:14
**golly** 284:6
**gonadal** 47:8
80:18
283:14
284:14
**gonads** 45:13
46:7  47:15
48:3
**good** 14:10
15:14
16:23  17:4
17:6  30:2
67:16
75:14
138:13
161:6
185:24
192:24

194:6
201:12
228:7
229:20
231:9
235:16
263:24
**Goodness**
268:2
**gosh** 25:20
111:2,14
160:10
247:1
**gotten**
203:12
**government**
87:14
**governme...**
68:7
**grab** 212:6
**gracious**
268:2
**grade** 40:17
252:4,4,10
252:14,15
253:21
**graded**
281:14
**graders**
253:8,15
**grant** 64:8
64:23  65:6
87:16,17
**grants** 63:20
65:3,9
87:16
**graphic**
229:1
**gratefully**
290:1
**gray** 287:4
288:17,23
289:8
290:12
**great** 156:4
169:11
244:3
**greatly** 57:2
223:24
**Green** 5:17
15:18,18
29:15,15
**grip** 158:4

**GRNH** 52:16
52:21
293:11
**group** 70:20
208:19,21
217:14
230:15
241:23,24
284:23
293:4
303:14
305:22
**groups** 130:5
232:19
305:24
**growing** 52:7
122:20
**grows** 122:20
**growth** 154:9
289:8
290:19
292:16
299:6
**guess** 115:21
116:20
164:5
198:17
243:1
**guessing**
155:24
**guide** 25:5
60:17
62:22
158:15
281:17
**guideline**
62:4  95:21
271:20
**guidelines**
9:8,9
42:18
44:10  46:2
48:10,14
48:19  49:2
49:8  50:5
50:12,23
51:24  53:6
54:6  56:18
57:16
59:16
66:21  81:1
92:21,23
164:14
189:13

215:4,4
226:13
231:5,17
234:8,20
243:22
248:4
271:5,12
271:16
281:7,8,15
281:16
282:20
283:21
294:1
304:13,14
304:16,17
304:22,24
305:3,3,3
305:4,8,9
312:5
**Guidlines**
42:22
**guys** 255:3

━━━━━━━━━
H
━━━━━━━━━

**HAL** 7:5
**half** 28:13
28:22
93:11
153:5,15
154:7,9,10
154:23
176:8
258:5
301:15
**halfway**
67:17
154:19
189:20,22
286:24
**hand** 82:18
105:17
198:16,17
249:13,22
254:12
261:14,15
300:24
**handed** 249:5
249:8
**handing** 43:1
254:23
**happen** 127:2
129:7
164:11

Innea 27961 0862

Plaintiffs' Exhibit 0863

203:10
265:22
266:20
275:3
295:3
312:6
**happened**
137:6
174:14
186:1,22
190:11
194:1
242:22
321:20
**happening**
38:21
265:22
266:11,19
292:23
313:10
**happens**
288:1
295:1
315:4
**happier**
203:8
**happy** 109:2
130:3
198:19,23
199:11,16
200:1,7,9
201:22
202:24
203:9,17
290:8
**harass** 276:3
**harassed**
126:17
**hard** 30:8
38:2,7
73:21
101:8
111:2
115:22,22
217:16
241:24
248:21
249:24
255:6
262:13
**harder**
134:23
165:1

**harm** 122:23
129:2,15
144:22,22
146:4,24
147:8
148:5,6,7
161:8
165:24
166:5,8,13
166:19
167:8,21
202:2
316:9,17
316:18
**harmed** 127:4
218:19
219:6
**harmful**
123:6,12
126:3
128:23
133:2,17
139:17
144:1,1,7
144:18
145:6,14
145:19
160:20
199:23
294:16
295:8
316:1,3,6
**harming**
218:7
**harms** 130:1
**HARNETT**
38:19
**Harper**
156:14
**Harrison** 1:9
1:15 6:7,8
15:15
**Hartnett** 4:9
16:3,4
29:1 30:19
30:20
38:20 39:3
**Harvard**
229:7
**head** 111:12
259:16
299:2
306:13

**headed** 19:5
59:23 93:8
**heading** 23:2
49:16
52:19 60:7
74:18 76:1
82:8,14
89:21
91:18
114:19
229:23
231:18
256:17
259:1
293:13,18
**headline**
136:8
**health** 9:14
10:5 25:5
27:6,7
32:1,23
60:19 68:4
82:9 87:2
87:11,17
87:20,23
87:24 96:3
96:4,7,12
96:15,17
96:23 97:4
97:20
103:4,4
106:19
107:18
147:3
177:6,12
177:22
178:2,5,6
178:21
179:1,7,10
179:22
181:12,17
182:14
187:5
188:10
189:14,15
201:10
208:5,22
208:23
210:1,6,12
211:12
212:10
220:10
228:12,17

283:14
284:14
285:24
286:13,16
314:23
**health-b...**
27:1
**healthcare**
178:13
**healthy** 47:6
47:13 48:3
48:6 109:2
126:22
**hear** 29:3,4
29:11,18
30:3,23
37:7 86:22
105:24
143:14
165:2
185:16,16
197:23
199:1
204:14
255:2
284:2
301:19
321:20
**heard** 132:16
143:12,19
149:4
156:14
194:5
195:9
198:9,18
200:17
204:18,20
**hearing**
29:16
31:16
204:21
**heart** 88:10
90:9 91:4
91:13
154:14,18
**HEATHER** 1:5
**heavily**
223:17
321:6
**height** 154:2
169:11
**held** 66:5
70:16

130:19
194:16
243:8
282:14
**Hello** 301:8
**help** 38:18
158:15
193:12
201:11
281:16
**helpful**
30:14,17
165:3
248:13
**helping**
201:9
261:5
**helps** 122:16
**HELSTROM**
4:12
**Hembree**
42:19
43:10
48:20
**Henig** 143:12
**Herbert** 10:5
228:12,17
**hesitate**
311:9
**hey** 186:23
**high** 117:24
123:17
126:17
133:19
138:9
147:23
168:15
169:6,17
174:8
206:19
229:12,17
253:22
262:17
263:2,8,10
263:14
**higher** 166:9
167:18
**highest**
236:8
**highly** 44:5
67:14,23
68:7
234:24

PageID #: 0864

235:6,12
235:21
**Hilton** 9:19
  156:19
  157:1,6
**historical**
  93:9
**history**
  93:20
  261:18
  262:1
**hit** 243:17
**hitting**
  278:24
**HOLCOMB** 7:6
**Holcumb** 15:2
  15:2
**hold** 133:3
**home** 181:1
**homeless...**
  126:19
**honest**
  157:11
**hope** 38:18
  63:2
  124:22
  298:4
  321:5
**hormonal**
  80:20
  122:4
  137:10
  160:2
  177:19
  178:7,18
  179:23
  180:13
  181:24
  183:5
  189:6
  211:13
  291:4,18
  297:2
  299:5,18
**hormonally**
  262:2
**hormone**
  44:23,24
  56:4,5
  132:19
  176:2
  210:13
  270:15

271:14
297:21
**hormones**
  21:14 56:1
  98:20
  108:17
  109:3,7,17
  109:22,22
  122:12
  137:13
  161:21
  174:5,20
  175:1,9
  182:7,16
  188:18
  190:20
  191:8
  200:1
  201:5
  208:13
  210:3,11
  211:4
  263:19
  290:13,18
  310:5
**hospital**
  111:4
  229:7,11
**hospitals**
  261:20,20
**hour** 242:5
**hours** 180:23
  282:8,9
  300:21
**housekee...**
  100:10
**huma** 115:13
**human** 22:8
  46:8,22
  47:2,4,4,6
  56:22 57:1
  63:21
  68:18
  69:15 70:4
  78:22
  81:23
  85:13,23
  86:7,15
  162:12
  167:17
  299:20
**humans** 41:2
  41:10

47:20
115:14
160:11
297:23
**hundreds**
  36:23
  39:20
**Huske** 136:14
**hyperthy...**
  104:15,24
**hypothet...**
  80:7
**hypothyr...**
  116:4

———————
**I**
**idea** 30:6
  75:14
  216:17
**ideal** 279:14
**ideally**
  280:10,14
  317:15
**ideation**
  130:8
  168:4,18
  207:6
**identifi...**
  202:3
**identifi...**
  9:4 10:4
  17:20,22
  18:15
  42:23
  48:15
  58:21
  62:16
  65:19 87:7
  96:8 113:9
  116:6
  131:11
  143:9
  148:16
  157:2
  170:6,14
  212:15
  215:17
  225:6
  228:18
  231:6
  254:17
  286:6
**identified**

9:4 10:4
62:14 90:8
118:12
126:16
130:4
131:4
143:3
147:11
173:4
206:22
314:9
316:16
**identifies**
  49:21
  122:10
  126:21
  138:5
  145:3
  230:19,20
  316:5
**identify**
  31:9 94:5
  100:11
  102:1
  126:8,9
  129:14
  161:18
  175:5
  183:2
  230:5
  259:10,23
  260:7,21
  292:19
  298:16,17
  314:4,8
**identifying**
  168:14
  173:2
  245:15,16
  246:3
**identity**
  24:22
  25:16 26:5
  26:9 62:16
  64:4 84:15
  84:20 91:5
  91:11
  92:15,18
  93:21
  94:12 95:4
  99:11,15
  101:2,21
  102:3,8,22

107:21
109:13
110:6
115:10
116:13
117:1,4,12
117:14,20
118:3,7,11
118:24
122:1,6,17
123:8,9,14
124:3,11
125:13
126:4,22
127:5,11
127:13,18
128:23
129:17
132:3,12
132:18
133:3,18
134:17
135:15
139:20
143:16
144:3,6,16
160:20,24
161:15
163:23,24
164:4
165:12,20
165:23
166:4,9,9
167:23
168:6,19
169:1
183:10,15
183:17,23
184:5,8,14
216:4
221:19
224:11
225:12,15
225:23
226:1,1,6
226:10,20
226:23
227:1,5,9
227:9,11
227:15,17
227:22,24
228:2
230:4,13

230:22,23
231:7,8,10
231:14
232:2,4,11
236:17
237:2,7,8
238:10,19
238:21
239:9,12
240:2,8,20
240:22
241:7,10
241:24
242:10,18
242:23
245:16
247:8,14
247:18,19
248:1,23
250:15
254:1
256:23
260:18
264:18
278:4,6
280:12
313:4,8,11
313:14,20
313:21
314:11,12
314:22
315:3,7,11
315:15,16
316:23
317:4,5,10
**illness** 20:3
20:13
**imaging** 36:9
36:13
**impact** 21:14
151:8
284:19
286:10
**impairing**
109:1
**impairment**
104:17,19
104:23
105:3,14
**impairs**
103:21
104:9
105:20

**implicat...**
152:18
160:22
**implying**
164:9
**important**
21:5 68:17
69:9 73:1
73:4
103:21
104:9
105:15,20
122:21
167:10
212:4
264:5
272:6
297:22
299:6,19
317:11
**imprecise**
41:21 42:2
42:12
73:20,22
74:2 76:24
79:12 81:1
**imprecision**
53:20 54:7
**impression**
198:6
**improve**
106:17
110:3
147:3
200:5
201:9
203:6
290:2
**improves**
290:8
**improving**
150:11
**impulse**
289:12,18
290:1
**inaccurate**
62:6,20
63:14
76:14,21
79:9 158:9
296:24
**inapprop...**
61:5 62:10

**incentive**
280:15
**incentives**
279:22
**inception**
261:11
**inch** 157:19
**inches** 93:11
93:12
172:20
176:8,11
**incidences**
205:18
**inclined**
113:20,23
**include**
45:10,11
46:19
100:2
188:11
253:8
283:11
284:12
293:20
300:2
308:9
311:16
**included**
46:7 64:5
80:19 88:3
115:18
171:5
191:6
253:12,15
**includes**
32:11
103:17,20
184:18
208:18
302:17
**including**
121:4
167:9
263:7
268:12
283:14
284:14
289:18
292:20
314:22
**inclusion**
138:21
**inclusive**

97:15
138:17
311:19
**incompre...**
49:9
**incongru...**
105:12
108:23
217:9
223:16,24
231:13,19
232:1,4
244:7,11
283:11
**incongruent**
234:11
293:19
**incongruity**
108:11
**increase**
155:21
261:8
**increased**
168:4
223:5,24
290:18
**increasing**
222:14,21
223:1
**incumbent**
263:17
**indicate**
232:24
**indicated**
51:17
293:12
302:5
**indicates**
172:12
**indication**
107:10
203:1
274:14,19
275:6
**indications**
197:17
274:24
**indicator**
125:13
**individual**
36:24
40:17,19
41:5,13

47:6,13,14
69:17 71:7
89:9,10
99:12
101:3
102:7,10
102:21
106:20
121:7
122:24
129:15
138:21
139:19
140:11
146:6
160:18
161:7,15
161:24
162:12
163:4,22
166:3
169:4,5
191:23
268:16,16
274:8
303:14
306:14
**individu...**
99:15
138:16
179:22
**individu...**
161:10
314:24
**individu...**
270:8
**individuals**
26:22 42:7
48:4,7,19
55:5 61:24
62:15
69:20 78:4
78:7 81:13
81:18 94:5
94:11,19
95:2 102:1
109:7
113:5
117:3,11
117:12
118:1,10
118:23
119:21

Page 27965 0866

122:11
126:12
127:13,14
129:7
132:2,17
133:19,20
135:9
137:23
147:4,11
147:14,19
147:20
152:19
160:23
162:5,21
162:23
165:8,10
165:22,24
166:14,16
167:9,10
172:2
184:3
205:19
208:19
214:20
215:5
226:7,14
227:4
233:10
241:22,23
242:21
261:19
262:1,9
263:21
264:6
265:9
271:22
272:17
273:9
278:4
292:23
294:6,10
295:1,13
298:19,20
308:15
309:8
312:1
314:21
317:12
**inevitably**
227:5
**infancy**
242:10
**infant** 36:18

37:3,21
39:10,17
40:6
319:14
**infant's**
35:1,3,7
**infer** 63:14
**inference**
295:2
**infertility**
274:9
**influence**
78:23
81:24 87:2
231:3
**influenced**
90:1
221:18
**influences**
78:23
81:23
89:22
247:8,13
**infographic**
9:13 86:20
87:1,6
**inform**
271:21
**information**
10:7 57:5
61:5,7
80:21
96:17
149:24
152:1
154:20
158:15
159:19,23
174:20
184:11
187:16
191:2
208:4
211:11
212:4
217:13
222:3
234:20
241:22
262:23
270:6
275:6
282:2

285:2,22
286:5,12
286:12,15
292:9
297:9,19
**informed**
273:6,22
289:22
**initial**
63:17
89:21
**initiating**
271:24
272:7
**initiation**
210:13
**injection**
186:10,11
202:24
**injunction**
224:17
**injure** 91:22
92:3
**injuries**
92:10
**injury** 169:4
169:14
**inner** 92:16
**inquiry**
187:21
**inside**
107:19
180:3
**insist**
182:19
**instance**
35:13
55:24 82:4
113:16
120:20
188:16
211:5
220:7
273:4
280:5
**instant** 40:6
**institute**
44:6 68:3
87:2,11,14
87:23
262:16
285:23
286:13

**institution**
67:15
**institut...**
67:18
**insurance**
111:24
126:19
**intake** 217:4
**intend**
139:22
**interaction**
84:17
**interact...**
213:13,20
229:9
**interacts**
98:17
**intercha...**
68:20
**interest**
85:5
124:16
**interesting**
240:4
**interlinked**
21:5
**internal**
99:12
**internet**
202:17
**interpret**
83:16
**interpre...**
156:11
**interrel...**
285:19
**interrupt**
28:5 100:4
100:4
105:8
167:1
**intersex**
55:21
81:15
98:20
110:11
111:2,22
111:23
112:3,9
134:22
302:19
**intersexual**
111:7

**intervening**
59:22
**intervenor**
3:3 6:23
7:12 15:1
15:3,5,7
**interven...**
178:19
**interven...**
177:19
178:8
179:24
180:14
183:5
189:7
211:13
**interview**
9:23 26:22
138:19
215:12,16
**intervie...**
27:3
**interviews**
211:3
**intraspe...**
85:11,16
85:16
**intricately**
90:10
**introduced**
240:11
**introduc...**
93:8
**introduc...**
169:24
**investig...**
62:14
175:11
**investig...**
28:24
**investig...**
263:19
**invisible**
149:15
150:22
**invitation**
44:12
**invited** 44:9
214:17
242:7
**involuntary**
95:3
165:11,19

**226**:15
**involved**
135:20
137:23
171:2
229:15
318:10
319:12,18
**involves**
63:21
101:18
142:21
318:15
**involving**
131:15
319:13
**iPhone**
202:14
**isolated**
63:3 85:17
**isolation**
273:12
**issue** 28:23
29:12 30:4
30:21,22
203:8
264:1
274:9
**issued** 50:5
**issues** 57:19
108:24
121:21
172:24
182:14
189:14
221:14,15
221:18
233:24
269:11
270:19
292:18
294:11
297:15,16
298:11
300:10
318:17
321:9
**Iszac** 143:12
**item** 25:4
26:7 91:17
**items** 143:14

—— **J** ——

**JACKSON** 1:5
**Jacksonv...**
180:24
**Jacob** 14:11
321:24
**Jake** 75:21
**January**
23:13,18
131:5
136:7
143:5
**Joanna**
156:14
**job** 68:1
104:17
177:23
201:8
229:20
**jobs** 126:18
**JOHNATHAN**
7:7
**Johnson** 6:4
**joint** 59:12
**Josh** 16:9
**JOSHUA** 4:3
**journal** 9:17
22:17,20
23:2 61:3
148:12,15
159:3,4
**journals**
23:4 61:13
159:9
**Joyner** 138:5
138:15,18
139:3
140:10
148:11
**judgment**
167:18
**JULIE** 4:11
**jump** 158:1
**junior**
253:22

—— **K** ——

**KANG** 4:13
**karyotype**
176:4
**KATELYN** 4:13
**Kathleen** 4:9
16:3 30:19
38:20

**Katz-Wise**
228:13,22
229:5,6
230:10
**keep** 124:23
126:22
160:17
165:2
209:2
221:3
265:6
**keeping** 93:1
93:2
265:17
**keeps** 106:2
106:3
**Kelly** 6:10
15:11 28:9
28:21
31:13
**Kelly's** 29:8
**kept** 161:9
**kerfuffle**
147:7
**kids** 130:6
181:2,6
212:10
219:13
248:14
252:14
273:24
**kind** 93:13
109:24
111:24
122:5
129:11
130:7
145:13
169:23
178:2
185:14
216:18
237:9
249:17
251:14
281:21
286:21
297:19
**kinds** 129:24
147:6
237:23
**Klinefel...**
110:1

**knee** 91:17
92:9
**knees** 91:22
92:3
**knew** 121:3
127:15
186:14
204:3
215:20
**know** 21:6
25:18
29:17 30:7
30:12 38:4
43:10 44:9
47:1,19,20
50:15
51:23 67:2
67:24
72:10,13
72:14 78:1
78:2 79:18
80:18
81:13,14
83:15
85:15
88:21
90:20
93:14
95:13
97:13,15
101:17,19
102:13,15
103:1
104:12,14
104:14
109:24
110:24
115:17,22
117:18
120:2,6
122:18,21
123:4,11
124:21
126:2,9,13
126:14
127:14,16
128:21
129:5,7,23
130:5
132:7
133:15
134:21
135:17,19

135:23
137:7,11
142:17
144:21
147:5
149:5,23
150:12
154:21
155:7
156:4,5
157:6
159:18,20
159:20
160:11
161:8,19
161:23
164:6,8,9
167:6
176:23
178:10
183:22
184:13
186:8,13
187:16
188:20
189:12
191:3
197:4,10
197:16
198:12
202:11
203:17
204:18
207:15
208:16,17
210:16
211:17
212:24
214:12,16
216:2,5,7
216:22
217:14
220:24
222:2,10
230:13
231:2
242:2,17
246:6,20
247:13
248:8,20
248:22,24
250:1
252:6

254:4,11
261:3,7
262:13
272:11
279:3
281:13
283:22
284:22
285:2
292:4
294:15
297:20
300:5
304:6,7,9
305:7
306:2,4,6
306:8,12
306:12,13
306:14,24
313:13
315:23
317:19
320:18,20
321:14,21
**knowing**
150:1
**knowledge**
27:15,20
91:11
112:7,12
119:6,16
142:18
154:13
158:8,23
169:3
196:22
222:2
223:8
227:19
274:20
285:14
289:16,17
**known** 115:4
118:24
193:20
286:15
**knows** 274:7

— **L** —

**L** 14:1
**label** 195:10
195:15
**labeled**

199:2,3,4
217:24
255:21
**labeling**
199:19
250:10
**labels**
199:10
**laboratory**
68:8 187:5
**Lacey** 3:5
**lack** 151:23
**LAINEY** 6:23
7:12
**Lambda** 5:5
15:22 16:1
30:14
**Lambelet**
148:11
**language**
35:4 46:11
47:19
51:23
53:24
56:19 60:4
60:23 61:6
62:2,6
63:4 68:24
70:11,24
71:4,15
73:14 74:1
74:7 75:13
76:4,17
77:10
78:24
80:13 85:8
88:6 91:21
91:23
92:18
93:10,23
98:22
105:9,18
123:15
125:5
138:24
149:16
158:5
164:21
225:12
226:14,17
234:12,13
244:20
250:16

257:2,7
272:1
297:5
**lap** 21:4
115:20
**Lapinski**
9:10 25:3
58:16,20
**large** 67:2
233:10
234:8
236:13,22
258:1
**larger** 54:23
75:11 77:8
**lasting**
151:18
**late** 252:7
**Laura** 212:10
212:23
215:21
**LAURENCE** 7:4
9:17
123:24
124:9
125:2,19
148:12,15
277:14,19
278:3
279:22
280:5,15
280:23
321:2,10
**Lawrence**
202:14
**lawsuit**
277:14
**layman**
300:14
**layman's**
252:20
**lead** 129:24
166:14
**leading**
205:23
**leads** 126:18
145:10
**league**
165:21,22
**leagues**
132:11
162:4

**Leah** 131:15
**lean** 253:3
**learn** 35:23
104:18
113:2
159:19
222:3
230:15
273:10
**learned**
40:16
190:24
**learning**
193:12
**leave** 92:6
130:4
301:1
**leaving**
126:18
**Leeper**
212:11,23
213:6,14
214:11
218:5,17
**Leeper's**
214:1
**left** 81:12
154:10
189:19
193:1
261:19
317:22
321:23
**legacy**
151:19
**legal** 5:5
14:12
15:22 16:1
30:14
51:10
312:11,12
312:19
**legally**
312:14
**legislation**
321:2,6
**length** 35:17
**lest** 132:5
**let's** 22:14
34:8 37:12
44:21
67:12
92:14

102:8
110:21
130:1
136:5
152:6
172:24
195:8
197:20,23
199:7,7
202:19
203:15
209:7,20
211:12
223:6
243:2,21
256:5
267:18
271:16
314:17
**letter** 187:4
**level** 117:24
132:2
133:4
134:4,16
135:13
138:21
141:13
147:23
169:6
174:8
195:17
197:1,13
290:18
**levels**
161:22
176:3
**Levine's**
263:4
296:23
**Lia** 131:23
136:7,21
137:16
140:11
141:11
142:10,10
143:17
**Liberties**
4:4
**libido** 110:4
**licensed**
178:11
180:16
**life** 102:15

102:17
129:23
155:20
161:20
166:15
167:15
168:20
183:11
200:12
204:1
217:16
227:5
230:14
239:2
241:12
247:13
260:15
**lifespan**
316:24
**light** 145:1
199:1
200:11
201:3
**liked** 228:6
**likelihood**
201:13
244:12,19
245:24
246:12,23
248:5,18
**likewise**
43:21
**limitations**
145:11
**limited**
139:23
159:18
**limiting**
269:10
**line** 76:19
80:21
100:21
114:11
139:8
140:1
193:17
258:21
**lines** 44:16
44:19 68:2
77:6
135:21
165:13
256:10,10

305:14
**lips** 38:6
**list** 19:5
22:14 23:6
24:5
119:21
212:1
267:8
**listed** 35:3
67:3
258:22
**listen**
185:17
197:20
199:7,10
199:11
203:16
**listening**
202:18
**lists** 283:12
293:20
**literally**
301:14
**literature**
81:14
88:22
118:5
119:12
153:6
207:19
221:4
236:1
258:11
260:9
262:6
263:1
277:10,12
292:21
297:10
298:2,7,24
300:8
**litigation**
34:12
123:24
318:6
**Litman**
220:14
**little** 29:11
51:4 54:16
89:2
113:19
114:5
124:22

128:10
159:19
164:1
165:1
184:13
234:6
287:19
312:16
**live** 32:4
185:4
**lives** 109:1
227:6,10
**living**
168:19
170:18
204:3,4,8
204:16
216:4
**LLP** 4:15
**lobe** 289:10
289:17
**local** 177:12
**locate**
293:15
**location**
50:18
**locations**
46:24
**lodged**
133:11
**long** 50:17
59:22
71:19
113:22
114:8
129:24
131:3
154:22
171:20,23
172:21
176:18
190:21
208:12
229:15
239:24
250:16
261:18
262:1
267:20
301:8
**longer**
129:20
130:3,9

184:13
208:7
210:18
313:22
**longitud...**
287:1
**look** 22:11
22:14
29:19
34:21
41:17 44:8
44:16
49:13 51:4
52:23 57:3
60:5 93:16
95:14
103:6
104:5,9
105:20
121:2
136:5,10
156:12
159:3,11
161:23
172:11,24
174:19
176:19
182:10
189:4
197:16
207:18,19
223:12
229:6
250:24
256:5
257:5
258:20
271:16
276:20
294:24
296:4
297:9
298:23
**looked** 66:21
79:24
132:24
149:9
156:9,10
165:10
226:13
241:22
243:24
300:1

**looking**
23:10 27:4
27:5 50:16
59:21
67:13
158:17
160:2
219:5
235:4
249:16
250:21
258:24
284:10
291:21
300:16
**looks** 29:19
35:10
67:12
105:4
164:21
193:6
**Lopiano**
148:11
**Lord** 26:23
**Los** 67:19
306:18
**lose** 29:20
**losing** 34:8
**lost** 146:11
240:10
260:18
283:23
284:1
**lot** 25:20
38:3 42:6
52:6
109:22
137:12
153:14
190:20,24
212:23
213:5
236:3
241:21
248:23
303:1
304:6
305:22
320:18
321:1,9
**lots** 46:24
86:9 116:2
122:16

Prepared by <2790869>

137:24,24
137:24
169:15
231:4
274:23
276:23
281:16
295:13
**loud** 184:19
**loudly** 28:19
165:1
301:19
**low** 78:4
110:3
256:20
281:11,11
281:16,18
281:21
**lower** 51:4
234:6
**lunch** 113:22
113:24
114:3,12
130:13
131:2
268:3
**Lundberg**
9:19
156:19
157:1,6
**lung** 154:14
154:18,18

———————
M
———————
**M.D** 1:19  2:8
3:3  8:4
9:5,24
16:14
17:19
225:5
**ma'am** 16:21
30:8
**main** 104:17
**maintain**
58:6
**major** 87:16
87:16
**majority**
78:8,11
106:16
111:18
113:9,12
113:15

116:12
232:24
233:10
234:9
236:14,22
256:21
258:1
259:5
**making** 20:12
30:7  77:3
87:17  88:9
95:18
317:11,16
**male** 35:10
35:13,15
40:20  41:3
41:11,21
42:1,12
47:3  49:21
50:3  55:11
74:19  77:9
85:7  88:5
88:10
89:13
90:20
92:17
93:21
94:11  95:4
134:2,14
135:11,18
140:11
141:11
143:15,16
143:16
144:4,16
145:3,5,9
146:18,18
147:14,19
148:1
152:6,12
152:24
153:16
154:1,8,15
160:23
161:16
165:12,19
168:15
169:7,7,10
173:5
175:21
216:3
226:16
251:24

313:3
314:3,3,8
315:16
**males** 77:9
88:4  98:19
132:2,11
151:20
155:1,16
156:7
157:24
159:15
160:7
192:10
**mammals** 41:3
41:11
76:12,19
**man** 88:11
90:11
102:8,22
**managed**
182:14
189:14
**management**
182:1
**manner** 55:18
292:5
**Manual** 20:3
**manufact...**
195:22
**manuscript**
59:12
**map** 300:18
**March** 1:20
2:9  3:8
14:13
**mark** 17:10
17:14
42:16  48:9
58:13
86:19  96:1
131:3
143:2
148:9
169:23
170:8
172:15
212:7
215:11,13
224:18,19
224:24
228:9,11
252:18,24
254:9

285:20
**marked** 17:19
17:22
18:15
42:22
48:14
49:13
58:20
65:19
66:12  87:6
96:7
131:10
143:8
148:16
157:1
170:5,13
185:14
212:14
215:16
216:11
224:20
225:6
228:18
249:11
254:16
286:5
**marker** 102:3
251:21,22
**market** 196:7
197:7
**marking** 17:9
147:5
156:17
**marks** 61:8
61:12
**Marsha**
297:11
**Martin**
172:20,22
**masculine**
195:10
196:24
197:12
**mask** 30:8
31:15  38:6
38:14
**masked** 31:15
**mass** 150:12
150:12
154:21
**master's**
178:22
179:4,6,7

**match** 55:22
94:23
102:4
127:17
232:2
**matched**
126:11
127:10
**matches**
118:7
280:12
**matching**
123:1
231:15
**materials**
58:15
**math** 78:16
**matter**
100:10
142:23
158:23
164:6
182:18
194:3
207:15
211:1
287:5
288:17,23
289:8
290:12
**Matters**
228:14
**matured**
169:7
**maximize**
138:16
**Mayo** 138:6,7
138:19
**McCuskey**
5:18  15:19
**mean** 23:1
30:11
31:20
35:13
54:15  57:4
61:2  66:24
69:5  71:12
84:16
101:18,22
104:13
109:21
110:1
116:18

130:9
155:24
163:10,13
182:9
191:23
211:23
226:6
241:15
242:12
249:4
255:12
269:1
276:3
294:8
296:8
**meaning**
  46:15
  59:23 69:2
  75:11 80:9
  269:4,5,7
  281:21
**meaningful**
  45:16 46:3
**meaningf...**
  273:6,22
**means** 72:16
  72:21,23
  94:7 147:3
  163:10
  195:15
  206:21
  226:21
  228:7,13
  232:1
  266:18
  281:18
**meant** 85:10
  112:23
  125:17
  228:6
  231:12
  241:1
  308:23
**measurable**
  90:14
**measure**
  125:2,19
**mechanism**
  265:5
**media** 221:19
  221:22
  222:8
**medical** 42:2

50:20
95:13
96:17
115:24
116:3
118:5
119:12,14
145:13
160:2,21
173:7
178:17,24
187:3
229:8
232:18,18
236:1
253:18
264:5
269:14,20
270:3
271:22
277:10
289:4
297:10
302:11
308:4,8,21
308:24
309:23
310:8,22
311:6,15
**medically**
  42:13
  61:12
  155:6
**medication**
  168:22
  195:23
  200:4,6
  201:13
  203:6,10
  203:13
  266:21
  267:9
  268:7
  274:2,4,6
  275:4
  285:3
  291:4,18
  292:11,14
  292:22
  294:10,24
  295:23
  310:3
**medications**

109:2
110:6
270:19
274:23
279:13
**medicine**
  43:13
  72:11
  73:19 92:7
  115:5
  116:2
  122:1
  159:6
  176:5
  269:10
  292:6
  297:17
  311:12
**meet** 303:20
  303:20
**meeting**
  176:24
  187:11
  305:21
**meetings**
  180:8
  303:8,14
  303:14
  305:22,22
  306:15,15
**member** 49:22
  214:18
**members**
  44:13
**men** 82:19
  83:6,20
  84:2,2,6
  84:14 97:5
  98:11
  149:15
  150:22
**menses** 53:13
**mental** 20:3
  20:13 68:4
  103:4
  106:19
  107:18
  115:15
  177:6,12
  177:21
  178:2,5,6
  178:13,21
  179:1,10

179:22
180:13
181:11,17
182:14
187:4
188:10
189:14,15
208:4,23
210:1,6,12
211:11
212:9
220:9
285:23
286:13,15
314:23
**mention**
  103:15
  300:9
**mentioned**
  45:11
  56:17
  72:16
  73:22 78:1
  84:8 113:8
  113:16
  116:4
  162:22
  208:18
  285:3
  300:11
  312:22
  314:19
**mentioning**
  82:17
**merely**
  270:23
**messages**
  221:12,19
**met** 44:3
  94:5 149:6
**metabolic**
  148:7
**method** 84:17
  193:10
  211:18
**MH** 176:8
**mic** 38:17
**Michael**
  138:5,18
  148:11
**microphone**
  38:15
**mics** 29:13

**middle** 62:13
  127:10
  155:24
  168:15
  201:16,16
  253:22
**mile** 158:1
**Miller** 67:6
  67:9
**mind** 17:24
  18:3 84:20
  94:6 98:24
  126:2
  158:17
  163:21
  174:9
  187:8,12
  206:15
  232:22
  257:2
  266:7
  278:18
  310:17
**mindful**
  282:1
**mine** 97:2
  198:21
  218:2
**minute** 37:15
  116:19
  255:12
**minutes**
  112:21
  136:16
  194:7
  282:10,10
  300:20,22
  300:24
  317:21
**minutes'**
  203:2
**mischara...**
  278:11
**misconstrue**
  239:1
**misheard**
  105:23
**misinter...**
  225:20
**misinter...**
  226:4
**misleading**
  50:19

62:20
63:10, 15
205:1
**misreading**
105:8
**misrepre...**
286:14
**misrepre...**
63:6
**misspeak**
288:10
**misspoke**
123:10
238:18
**mistake**
190:5
**mistaken**
247:20
**misunder...**
239:7
**misunder...**
136:1
**mix** 239:4
**mixed** 288:13
**mixture**
69:21
117:1
122:9
**modeled**
260:5
**mom** 180:23
**moment** 28:6
52:23
64:15
81:18
85:18
104:7
139:11
170:2
194:5
254:22
277:2
286:9
302:6
317:22
**monitor**
210:1
**month** 23:20
111:5
208:19
**months**
100:15
105:13

218:22
231:6
313:19
**mood** 110:4
**Morgan** 6:10
15:11, 11
28:5, 9, 10
30:22
31:12, 13
**morning**
14:10
15:14  17:4
17:6
**MORRISEY**
1:16
**mossaicism**
46:21
**mother** 1:5
180:7
188:23
190:14
193:21
203:24
204:7, 14
273:19
**motivate**
201:9
**Mount** 249:5
249:8
**mouth** 56:7
94:18
**move** 28:16
31:10
109:1
153:13
175:12
182:15
314:10
**moved** 38:17
**moves** 226:24
**moving** 38:6
115:23
153:9
201:12
243:15
**muck** 243:16
**muffled**
28:12
29:11
31:18
**muffling**
38:3
**multidis...**

208:17
**multiple**
81:11
223:14
232:24
233:8
263:6
**mumbling**
254:20
**muscle** 110:4
150:12
160:3
**musculature**
154:3
**mutations**
45:12
46:24
115:3
**muted** 37:14
**muting** 29:17

___

**N**

**N** 4:1  5:1
6:1  7:1
8:1  14:1, 8
**name** 14:11
14:20
42:19
143:12
156:14
157:6
207:13
228:23
229:2
301:9, 22
302:13
318:14
**named** 143:4
**names** 14:21
30:5  31:8
157:11
172:13
220:23
229:10
245:2
263:24
318:15
**narrative**
131:24
190:11
216:17, 18
216:19
**narrator**

185:22
190:18
203:23, 24
**natal** 127:1
146:18
151:20, 20
160:7, 8
169:5
173:2
184:9
191:9, 22
196:24
197:11
216:3, 22
217:6
223:24
256:15
313:3
315:15
**nation's**
136:15
**National**
68:3  87:1
87:11, 23
285:23
286:12
**naturally**
265:1, 12
265:22
266:12, 20
276:15
**navigating**
300:18
**NCAA** 131:16
132:1, 8
136:22
**near** 256:6
**nearly**
136:17
272:8
**necessarily**
47:22
61:11  72:2
84:8, 9
108:23
111:1, 23
113:6
188:1
214:10
242:21
246:7
249:1, 2
262:12

**necessary**
41:4, 12
175:12, 15
**need** 25:22
56:3, 5
77:4  80:21
85:16, 18
100:3
116:18
139:6
140:2
145:9
146:13
151:24
185:8
200:20, 22
221:23
231:5
249:14
255:2
263:2, 13
263:15
278:17
282:1
283:1, 6
284:12
313:10
**needed**
187:16
188:15
203:12
**needs** 31:24
**negative**
269:11
**neither**
161:15, 16
165:9
**neurologist**
289:1
299:15
**never** 121:2
122:12
192:12
226:7
228:6
232:22
242:10
297:1
298:19
**neverthe...**
62:21
145:19
**new** 4:6  5:8

39:7 41:4
41:12
45:24
51:24
177:1
**news** 131:15
143:14
**newspaper**
212:9
**nice** 68:1
147:7
**NIH** 9:13
63:19,20
63:22 64:2
64:8,24
65:2 87:5
88:17
89:12,14
90:13
**NIMH** 10:7
286:4
**nine** 252:10
**Nineteen**
228:10
**noise** 190:4
**nonsyste...**
295:7
**noon** 114:11
**normal** 47:21
115:13
169:10
251:19
265:7,17
272:14
275:11
276:7
297:3
**North** 7:10
127:21
128:2
171:24
180:24
181:10
**notary** 3:6
16:12,20
16:22
**note** 137:4
200:15
250:24
**notes** 176:20
182:10
319:22
**November**

212:19
**nowadays**
39:10
**nuances**
89:16
**number** 9:4
10:4 14:20
17:10 18:9
24:4 26:7
33:6 35:22
42:18
116:5
119:6,21
126:19
135:20
178:12
222:14,21
240:13
250:9
255:14,17
263:2,13
263:15
269:10
283:12
293:20
303:1
321:9
**numbers**
207:19
250:9
**Nurse** 23:23
**NY** 4:6 5:8

——————
O
——————
**o** 14:1,8
85:6
**o'clock**
282:8
**Oaks** 6:5
**oath** 128:6
240:1
**obese** 129:21
**object** 54:19
149:20
150:8,21
152:8
209:11
269:22
**objecting**
31:2
**objection**
11:1 12:1
13:1 19:11

19:18 20:6
20:15,21
21:2,10,15
21:20 22:2
22:9 23:9
24:15,24
25:11,17
26:6,15,20
27:12,23
31:12 33:5
33:22 34:3
34:13,18
36:2,11,20
37:6,24
39:12,18
40:1,7,13
40:22 41:6
41:14 42:4
42:14
43:15,23
44:11 45:5
45:19 46:5
46:16
47:10,17
48:5,23
49:4,10
50:7,14
51:1,21
52:5 53:9
53:23
54:10 55:2
55:8,17
56:6,13,24
57:11,23
58:9 59:4
60:22
61:10,17
62:8,24
63:12,24
64:11,17
65:1,8
67:5 68:10
69:10,19
70:1,9,18
71:9,17,23
72:9,19,22
73:7,17
74:4,12
75:2,8
76:8,15,22
77:14,24
78:10,15
79:10,17

80:3,15
81:3,9
82:2 83:1
83:9,14,22
84:5,22
85:14,24
86:8,16
88:20 89:5
89:15 90:4
90:17 91:6
91:14 92:5
94:3,13,21
95:10,22
96:18
97:12 98:8
99:6,19
101:5,15
102:12,24
103:24,24
104:11
105:22
106:14
107:2,8,16
108:3,12
108:18
109:10,20
110:23
111:11
112:11
113:1,13
115:16
116:8,17
117:7,17
118:4,13
118:20
119:2,10
119:19
120:1,10
120:24
121:11,22
123:19
124:4,12
124:19
125:4,22
127:8,22
128:1,8,11
129:4,18
131:18
132:6,15
133:11,11
133:21
134:7,19
135:16,24

137:3,18
138:11
139:5,6,8
140:1,15
140:20
141:15,18
142:14
143:21
144:8,19
145:7,21
146:8,22
147:16,24
151:11,22
152:15,23
153:10,22
154:6,16
155:4,12
155:19
156:8
158:10
159:1,17
159:24
160:9
161:1,5,17
162:7,16
162:24
163:6,15
166:1,12
166:24
167:13,24
168:7,11
169:8
170:24
171:7,12
171:18
172:3,16
173:10,17
174:1,12
174:17
175:3,10
175:18,23
176:17
177:4,20
178:9,20
179:13
180:1,9,15
181:7,15
181:23
182:8,21
183:6,16
183:21
184:6,10
186:2,12

187:1,13
187:23
188:9,19
189:2,11
190:15,23
191:12
192:3,18
193:4,22
195:2,12
195:19
196:4,12
196:19
197:2,14
198:11,20
200:2,14
200:19,23
201:7
203:4
204:10,17
205:2,7,13
205:21
206:5,11
206:16
207:3,10
207:17,24
208:6,15
209:14,19
210:4,14
211:6,15
211:15
212:21
213:8,15
213:22
214:3,8,21
215:6,23
216:6
217:1,10
218:20
219:9
220:16,21
221:20
222:9,17
222:24
223:10,18
224:2
226:8,22
227:7,16
228:1
229:13,18
230:11
231:1
232:7,13
233:4,13

233:20
234:18
235:2,14
235:22
236:9,18
237:3,16
237:22
238:5,12
238:22
239:13
240:9,18
241:8,20
242:16
244:21
245:5,10
245:19
246:4,15
246:24
247:10,23
248:7,19
251:4,11
251:16
252:5,11
252:16,22
253:1,9,16
254:2,2
257:12,22
258:4,10
258:19
259:6,14
259:19
260:3,12
261:2,17
262:4,8,19
263:12,22
264:7,12
265:2,15
266:1,4,14
266:22
267:6,13
267:23
268:14,24
269:16
270:4,16
271:1,10
272:2,10
272:24
273:8,23
274:16,22
275:13
276:9,18
277:5,17
277:23

278:8,16
279:10
280:1,9,21
281:1,23
284:21
285:10,17
286:17
287:16,21
288:4,19
289:2,20
290:5,14
290:22
291:7
292:3,13
293:5
294:4,18
295:10,18
296:19
297:24
298:8,22
299:7,22
300:4
302:9
303:10,18
304:5,11
304:20
305:1,11
305:19
306:5,11
306:23
307:10,14
307:20
308:10,16
308:22
309:5,12
309:19
310:1,10
310:16
311:1,8,17
311:24
312:9,21
313:6,15
314:13,18
315:6,19
316:7,21
317:7
318:2,8
320:3,11
320:17
321:3,3,12
**objections**
29:5 30:8
30:10,16

55:2 140:4
141:24
**objective**
107:19
196:14,17
**objects**
31:11
**obligation**
298:5
**observable**
251:7,9
**observation**
55:14
295:6
**observat...**
295:7
**observed**
72:7 127:3
**obtain** 39:13
**obtained**
175:24
**obviously**
19:1 29:3
31:3,23
67:1
**occasion**
18:11
108:22
**occupati...**
105:14
**occur** 46:24
61:23
127:20
265:1,13
266:12
**occurred**
120:17
156:6
238:21
239:12
**occurring**
115:24
264:24
265:11
276:15
285:19
**occurs**
316:23
**offense**
311:10
**offer** 85:11
**offered**
139:15

160:16
**offering**
42:11
121:20
123:23
124:8,15
125:1,18
139:20
279:8
**offers**
139:13
**office** 6:19
15:9 87:20
87:23
102:7
170:22
**official**
1:12,14
2:1
**Oftentimes**
54:14
**oh** 26:23
105:6
209:15
229:3
250:7
291:21
296:9
303:6
305:17
317:21
**okay** 33:18
37:16
60:16
75:23 79:4
82:16 88:1
90:12
92:12 93:3
97:3 98:2
99:2
100:24
101:11
105:23
110:17
117:23
131:1
135:5
154:12
157:16
163:20
172:7,10
179:20
186:7

Linstee 927974 0875

197:19
198:14
199:4,18
200:7
201:18
203:21
215:10
216:9
217:22
220:2
238:8
249:23
250:7
256:4
278:12
282:11
288:12
289:6
296:11
299:12
301:12,18
301:21
302:4
319:8
322:2
**old** 157:22
157:23,23
273:4,20
274:2
314:17
**older** 51:22
122:20,24
153:8
209:8,9,21
216:21
222:15,22
313:17
315:21
**olds** 153:15
274:1
**Olympian**
136:14,17
**omission**
225:19
**once** 126:16
137:6
149:6
213:17
239:12
260:15
266:16
282:19
309:24

**one's** 91:12
242:10,11
**one-page**
89:17 96:2
**ones** 100:21
261:22
303:20
306:8
**ongoing**
178:23
**onsite**
202:16
**oops** 208:24
**open** 149:14
150:21
151:10
**opening**
71:14 74:1
88:17 99:3
**opine** 75:10
**opining**
119:23
**opinion**
42:10,11
94:1,10,18
115:10,13
121:20
123:24
124:8,15
125:1,18
133:4
134:1,9,12
134:13
135:1
137:15
139:16,20
139:21
142:17
145:18
146:3
147:20
151:18
160:6,16
160:22
162:2
165:20
166:7
167:8
183:13
184:2
190:22
207:20
224:10

226:20
227:4
232:11
236:16
237:1
240:2,7
241:7
249:7
278:11,13
283:20
311:12
**opinions**
139:14
142:23
279:8
298:6,6
**opportun...**
137:24
**opportunity**
54:21 75:3
137:12
138:17
239:6,10
**opposed**
88:23
**opposing**
43:2
**opposite**
51:10,18
60:20
61:24
**optimistic**
184:20
**option** 31:20
273:12
**options** 69:6
69:7
194:24
271:23
272:22
**order** 105:11
106:17
146:5
**ordinary**
22:8,23
189:7
201:10
**ore** 203:16
**organiza...**
9:14 67:2
96:7,13,13
96:16,23
97:20
**Organiza...**
96:3

**organiza...**
87:12
319:24
320:9,15
**organs** 88:9
98:21
**orientation**
61:22
114:20
**original**
25:15 26:4
60:24 61:4
61:6 63:5
63:6,9
220:8
235:10
241:18,23
242:15
244:4
**outcome**
167:15
247:17
**outcomes**
197:5
210:23
260:10,11
260:23
261:13
295:2
**outside** 20:4
20:24
107:18
137:19
140:5
150:13,18
180:3
182:13
198:17
251:20
288:24
**ovaries** 77:8
**overall**
147:3
189:7
201:10
**overlap** 21:6
**overlapped**
233:24
**overprod...**
287:4,9
**overrepr...**
217:13
**overwhel...**

77:21 78:7
111:17
116:5,12

---

**P**

**P** 4:1,1 5:1
5:1 6:1,1
7:1,1 14:1
14:8
**p.m** 130:23
194:13,20
243:5,13
322:9,12
**page** 9:1,3
10:1,3
11:1,3
12:1,3
13:1,3
19:3 22:15
22:16,17
28:3 32:9
44:16,19
49:13,14
52:10
59:21 60:3
60:7 68:14
68:14,16
74:16
78:19,20
82:7,11,15
85:2 87:1
93:4 96:24
112:14,15
114:18
136:9
144:10
149:11,12
157:19
164:18,21
164:22
165:7
169:24
172:12,20
176:7
180:20
185:13
189:20,21
189:22
197:22,22
197:23
203:15,22
217:18,21
218:3,7

219:15,19
219:20
221:7
229:22
231:17
243:23
249:12
250:8
256:5
271:16
282:21
284:11
286:11,20
291:23
293:9,13
**pages** 218:1
**paid** 317:24
318:5,10
**paper** 26:12
28:16 50:9
157:21
217:24
247:3
267:20
**papers** 25:14
26:4 78:2
125:11
243:17
250:2,3
254:23
**paragraph**
34:23,23
41:17,20
52:20
59:21,23
60:3,5,10
60:11,13
63:4 75:13
75:17 76:1
76:19
78:20 79:3
82:19 85:3
92:14
97:19 98:4
98:5,16
99:4,10
103:8,12
103:13
104:4
105:9,11
110:9,15
123:3,4
133:1,5,7

133:8,15
136:10
137:5
138:15
143:24
160:17
180:22
194:9
203:23
216:17
218:6,14
219:16,22
221:8,8,9
224:9
225:10,11
234:7
240:15,17
244:10
250:5
256:19
283:1
284:10
291:2,13
291:22
296:9,14
296:22
307:4,9
**paragraphs**
138:3
**Pardon** 58:17
66:17
100:7
**parent**
188:11
273:6,21
**parental**
103:2
**parents**
35:23 36:5
216:19
240:23
245:14,22
246:1
267:2,11
267:21
268:10
270:22
272:21
273:10
279:23
319:19,20
**parents'**
279:18

280:19
**parlance**
253:7
**part** 26:22
32:5 41:8
46:8,22,23
46:23
69:15
78:21
81:22
105:24
147:2,2
169:20
177:23
187:24
188:1
190:16
192:6,8
195:11
196:13,16
203:10
222:19
227:13
239:3,4,16
264:5,11
271:13
277:19
279:11
287:5
288:1,16
288:23
290:20
292:5
308:24,24
309:1,7
315:8
**partial**
218:13
**particip...**
256:13
**participate**
126:11,21
127:16
128:16,17
129:1,16
132:17
138:17
146:12,13
147:1
160:19
171:4
214:17
215:2

320:2
**particip...**
126:7
129:20
196:2
215:7
**particip...**
139:16
145:11
146:20
147:22
166:17
169:13
277:21
**particular**
26:12 28:1
50:17
54:15 61:7
62:14
71:11 73:8
81:12
84:11
92:16
95:13
101:22
128:2
142:23
148:3
149:24
160:3
163:23
164:10
169:9,14
211:5
231:7
232:17,22
238:17
265:21
274:24
297:20
305:5
311:19
**particul...**
222:7
**parties** 8:3
14:4,22
31:1,3
**partly** 31:21
**partners**
297:16
**parts** 22:23
46:19,21
80:19

84:18
86:10
**passed** 321:2
321:10
**path** 241:12
**pathways**
115:3
**patience**
291:14
**patient** 28:1
56:1 94:7
104:20,20
106:20,21
108:5
109:11
126:20
127:4
128:3,16
163:21
168:14
169:9,14
172:21,22
175:13
176:1,3
177:7,14
177:24
179:1
182:12,20
183:2,7,14
189:10
191:8,24
203:8
206:4
207:22
208:8
217:4
230:19,23
264:20
268:15,17
270:7,9,9
270:11
272:13
273:11
274:6,8
277:7,9
279:17
305:5
310:2
312:3,15
312:16
313:17
314:24
320:5

hea27976 0877

**patient's**
47:1 169:6
183:10
187:3
230:21
280:19
319:19
**patients**
26:8 31:24
33:20
46:17 56:1
56:3,5
59:2,24
81:15
94:14,22
101:22
104:14
106:1,16
107:17
109:12,17
111:14
112:16,22
113:3,4
116:12,19
123:5,12
126:7
127:9
128:3,7
129:15,19
130:2
132:21
133:16
144:1
152:6,9
153:19
167:21
168:4,13
172:5
174:19
178:23
189:15
192:15
193:7,13
195:4,14
201:9
208:20
209:2,6,8
209:17,20
210:1,5,10
211:4,8,12
212:1
223:7
231:3

233:15,21
237:11,21
237:23
260:14,16
261:5,9
265:3,3
267:8,14
268:4,6,17
268:20,21
269:12
270:20
272:19
275:6
284:24
291:3,16
292:10,15
292:20
294:9
295:1
297:2,13
298:10,13
299:1
302:18
310:11
317:9
320:13,21
**patients'**
313:20
**Patricia**
216:19
**PATRICK** 1:16
**pause** 66:5
130:19
194:16
209:13
243:8
260:16
264:17
265:6
266:16
270:24
272:9
274:5
282:14
**pausing**
265:16
266:15
272:12
**pay** 33:17
**paying** 112:1
**payments**
34:16
**pays** 33:15

**PCOS** 134:22
**peak** 154:21
155:21
**peaks** 287:9
288:13,17
288:20
290:20
**pediatric**
298:13
307:1
**pediatri...**
221:21
248:21
**pediatrics**
19:9,13
20:7,9
32:16
103:2
275:1,5
**peer** 23:5,8
23:17
25:14 26:3
59:1 159:3
159:4,8
222:1,7,10
**peered** 59:11
**peers** 146:14
169:7
192:12
**Peggy** 43:18
**penis** 35:16
315:18
316:2,5,17
316:20
**Pennsylv...**
3:7
**penultimate**
219:20,22
282:24
**people** 30:5
30:6 31:9
36:4 46:18
49:17
62:12,13
62:14
70:20 78:3
83:23
110:1,5,11
111:7
115:23
120:11
121:1
134:21,22

138:12
139:4
140:14
141:14
142:22
147:7
150:11
154:21
161:18
179:7
184:13
185:9
214:10,14
218:8,8,18
219:6
221:18
223:15
227:14
229:19
230:4
239:1
245:1,7
248:22
253:14
263:18
264:2,18
265:5
277:3
279:12
292:5
297:1
300:8
302:18
305:13
312:12
**people's**
240:20
**percent** 72:6
72:11
78:13 92:7
118:8
141:6
157:24
158:1,1,4
206:19,20
220:7
234:9
241:16
256:14,14
257:10,10
257:21,21
274:7
292:6

**percentage**
77:21 78:3
210:10
216:22
217:3
256:13
**perform**
177:13
**performance**
137:9
148:8
150:7
156:21
**performed**
182:23
**period** 50:11
51:8
132:13
134:3,15
135:12
205:12
211:5
227:5
239:2
275:11
313:18
**permanent**
312:23
315:21
316:11
317:1,17
**permission**
171:1
**permit**
160:18
**permits**
137:1,16
139:18
**permitted**
140:12
141:12
161:3
167:22
168:5
169:5
**permitting**
169:19
**persist**
105:12
231:20
232:4
250:15
253:23

254:1
256:22
259:5
**persistence**
244:6,13
244:19
245:24
246:12,23
248:6,18
256:17,20
257:9
258:17
259:1
**persistent**
112:17
250:14
257:20
**persisters**
256:8,13
**person** 28:1
30:15,21
30:24 31:2
31:4 36:13
45:13
49:20
106:9
111:1,24
115:24
122:9,14
122:15,20
145:9
155:22
159:8
161:7,24
163:5,8
164:10
166:3,20
177:12
222:4
227:18,21
297:20
312:11
313:3
315:21
317:13
**person's**
45:1 92:15
92:15
99:11
101:3
224:11
225:11,15
**personally**

21:16
27:10 67:3
177:2
293:6
306:24
**persons** 51:9
98:20
311:23
**perspective**
142:21
280:14
Perspect...
156:21
**persuaded**
141:3
**phalic** 35:16
**pharmace...**
34:17
269:5,15
269:21
270:2
**phase** 196:3
196:5,6,7
196:9,14
274:12,12
274:12
275:8,9,9
276:5,5,5
276:13,13
276:13
**phenomenon**
78:22
81:23
222:11
**phone** 29:18
29:21
43:11
201:23
202:11
**phrase** 54:15
81:12
204:12
311:13
**phrases**
54:13
**physical**
51:9 90:14
115:21
116:6,14
116:21,22
176:3
208:4
**physically**

142:5
179:15
251:2
**physician**
35:6 196:3
199:21
201:3,8
**physicians**
101:23
**physiolo...**
82:20 83:6
83:20 84:3
84:16
**physiolo...**
138:5,19
**physiology**
20:20 21:4
21:9 27:21
85:6,23
86:7,10,15
150:11
**PI** 240:11
**pick** 284:9
**picking**
38:24 39:1
149:22
150:9
**picks** 189:18
**piece** 191:13
232:14,17
232:23
321:6
**pieced** 198:8
**pieces**
131:20
159:11
**pin** 80:22
286:21
**place** 14:15
84:10
208:11
209:24
279:22
282:1
291:21
317:14
321:2
**placed** 64:13
**Plaintiff**
4:7,19 5:9
15:22 16:2
16:4,6,8
16:10

27:10
30:15,20
322:6,6
**Plaintiff's**
307:18
**Plaintiffs**
1:6
**plan** 189:8
**planning**
289:12,18
290:1
**play** 126:24
135:14
161:3
165:22
167:22
168:5,15
169:6,17
184:17
185:13
189:18
201:5
280:6,12
280:16
316:4
**played**
168:13
185:19
190:1,7
198:2
199:13
**playing**
91:23 92:3
124:2,10
139:19
278:4
316:11
**please** 41:8
59:8 75:22
86:2
114:17
126:6
139:11
141:7
205:10
242:3
246:17
257:18
259:10
278:19
**PLLC** 5:18
**podcast** 9:20
9:21

169:20
170:1,5,9
170:13,17
171:5,16
172:14
179:12
184:17
185:19
190:1,7
198:2
199:13
204:19,23
**point** 42:2
54:12
97:21
113:6
121:19
127:3
139:12
160:21
217:16
227:21,22
231:23
238:13,16
261:7
262:10
264:22
265:10
296:15
310:21,22
311:22
313:2,3,13
314:2
315:2,13
315:14
316:15
**points**
286:21
**policies**
64:2 129:3
305:8
319:23
320:16
**policy** 9:17
57:9 63:19
64:1,8,13
64:16,19
64:24 65:7
65:14
132:1
134:1,13
135:11
136:24

137:15
139:18,21
144:3,15
145:3
146:4
147:20
148:12,15
162:3,14
162:15
165:21
166:19
167:16
180:2
182:11,18
**pollen** 279:1
**poor** 126:18
126:19
**poorly**
234:15
**population**
58:2 89:19
119:13
158:13,14
158:18
162:10
210:22
217:8
**populations**
257:14
**portion**
121:14
139:13
**portions**
92:8
**possibility**
31:14
223:9
271:7
273:5,21
**possible**
58:11
65:22
138:18
162:9
179:17
213:1,16
221:3
295:8
314:10
**Possibly**
36:12
**Post** 9:15,22
131:6,10

136:6
212:14,19
**posted**
136:15
**posting**
170:1
**postponing**
275:10
**potential**
113:18
182:24
193:20
199:22,23
200:11
201:4
294:1,11
**potentially**
167:9
192:23
295:3
**power** 158:2
**practice**
33:17 42:5
55:4 70:20
106:11,15
106:23
107:5,12
107:23
108:8,15
108:22
109:6
113:6
137:11
144:21
146:13
152:5
158:15
176:5
180:17
215:4
219:5,12
227:14
253:18
254:5
297:17
303:19
304:10
**practices**
25:4 60:18
62:22
303:16,23
304:3
**practicing**

146:14
171:23
209:5
**practiti...**
95:19
**preadole...**
206:3
**preadole...**
205:6,12
205:14,15
**precautions**
31:23
**precise**
39:20 42:7
54:2 57:10
58:3,11
64:7 73:10
79:13
84:10
110:7
128:12
265:10
269:4
**precisely**
73:13
181:11
**precocious**
274:5,14
275:10
276:7,16
292:20
**precondi...**
106:12,24
107:6,14
107:24
108:9,17
**predomin...**
289:10
**prefer** 70:10
70:13
114:5
238:20
**preference**
31:22
70:14
**pregnancy**
36:19 37:5
37:23
39:11
**pregnant**
112:5
191:9,24
192:11

**prelimiary**
224:17
**preliminary**
283:5
**preparation**
145:14
**prepare**
298:5
**prepared**
182:15
189:8
218:9
219:8
**prepares**
281:10
**prepubertal**
234:9
237:5,5,14
238:3
241:16
248:22
**pres** 290:10
**prescribe**
56:1 109:7
109:17
110:3,6
175:9
179:23
188:17
210:2
313:2
**prescribed**
174:4,24
182:6
208:13
211:4,13
293:3
**prescribing**
107:6,14
108:1,10
108:17
178:7,18
189:6
192:16
263:19
**prescrip...**
175:12
186:10
198:15
**presence**
140:6
**present**
14:21

45:13
112:4
120:23
152:6
153:12
165:23
192:14
194:24
210:15
216:24
217:8
218:24
**presenta...**
70:3 209:9
**presented**
64:2,20
195:22
209:8
276:20
**presenting**
223:15,23
234:20
**presently**
119:8
**preserva...**
195:1
271:8,23
272:7,22
276:23
**preserve**
272:19
**press** 23:19
290:10
**pressure**
222:7,10
280:3
**pressured**
38:13
**pressures**
279:22
**prestigious**
67:14
**presumably**
153:7
**pretty** 249:8
**prevalence**
119:12
**prevent**
191:8
264:24
265:11,21
266:10,19
**prevents**

124:1, 9
278:3
**previous**
68:16
159:11
221:7
229:9
293:13
**previously**
131:4
143:3
156:18
212:7
232:11
278:2
**primary** 25:5
48:18
293:18
**primates**
79:12
**prior** 48:10
49:5 95:18
134:4
144:17
147:21
159:16
160:6
174:18
176:24
177:14
187:6
188:3
214:7
271:24
272:7
287:6
289:9
309:17
312:14
**priority**
166:10
**privacy**
171:4, 17
**private**
33:16, 17
**probably**
21:3 90:22
95:14
102:18
111:2, 4
149:10
172:18
287:13

312:13
**problem**
115:24
251:21, 22
268:7
270:20
288:14
**problems**
297:13
**procedure**
3:4 312:17
**procedures**
208:11
209:24
**proceed** 32:3
32:6
177:19
183:5
**proceeded**
188:17
**proceeding**
16:15
102:17
180:13
**process**
22:23
25:21
59:14
190:19
321:20
**productive**
221:13
**products**
197:7
**profession**
212:20
**professi...**
19:5 21:1
32:10 98:7
150:10, 18
151:7
179:10
183:13
184:2
207:15
213:13, 20
227:3, 13
228:21
229:9
238:2
240:1
241:7
273:18

**professi...**
20:1
**professi...**
181:20
**Professor**
32:16
148:10
149:2, 5, 6
**profile**
270:7, 10
**profiles**
197:6
**program**
32:23
211:21
**programs**
27:6
**Progress**
285:22
**progresses**
244:7
**prohibited**
1:23
**prolonged**
283:13
284:13
**prominent**
43:13, 21
45:14 50:2
73:3
**promised**
300:23
**promoting**
290:13
**pronounced**
266:6
**pronouns**
245:1
**pronunci...**
18:1
**proportion**
223:15, 22
**proporti...**
154:19
**proposal**
64:24 65:6
**proposed**
31:1
**proposing**
202:14
**proposition**
234:6
250:19

**protect** 32:1
**protecting**
167:11
**protocol**
212:3
283:9
**protocols**
283:8, 10
**provide** 18:8
245:3
273:6, 22
298:6
314:23
**provided**
17:15
40:18
58:15
256:11
308:4
309:3, 17
309:24
310:9, 22
311:22
**provider**
20:9
106:19
177:12
178:2
181:17
187:5
189:15
210:18
222:2
**provider's**
103:4, 5
**providers**
107:18
177:22
178:6, 22
181:12
210:20
219:23
314:23
**provisions**
306:9
**psychiatric**
20:2, 4
**psychiat...**
177:1, 17
178:1, 5
**psychiatry**
19:17
**psycholo...**

82:20 83:7
83:20 84:3
98:19
115:19, 20
116:1, 3, 22
177:8
178:18
189:9
215:3
**psycholo...**
177:1, 17
178:1, 4
**psychology**
19:22
**psychoth...**
189:7
260:9, 23
261:6, 15
261:20
**pubertal**
161:20
265:7, 18
265:21
292:17
294:24
**puberty**
27:16
52:16 53:6
53:22 54:8
107:7, 9, 14
107:19
108:1, 10
153:12
154:15
155:24
159:16
160:7
205:16, 20
205:24
208:13
210:2
216:23
236:23
238:10, 21
239:3, 12
240:8
244:5
251:2
253:11
258:12, 18
260:11, 15
260:17, 24
261:16

264:17,22
264:24
265:4,11
265:11,17
266:9,11
266:16,19
267:3,12
267:22
268:10,12
268:22
270:15,23
271:6,12
271:24
272:7,8,12
272:14,15
272:17,23
273:5,13
273:20
274:3,5,5
274:11,14
275:8,10
275:11
276:4,7,8
276:14,16
277:15,22
278:14
279:7,23
280:6,11
280:16
281:9
283:13
284:13,19
285:15
286:10,10
287:6
289:9
290:3,13
290:18,19
291:4,4,17
291:18
292:10,16
292:20
293:3,11
293:12,16
293:19
294:2,7
295:4,23
297:2,21
298:19,21
299:2,5,19
300:7,9
309:14
310:4,19

312:20,23
313:2,7,23
**public** 3:6
27:1,6,6
106:4
179:7
**publication**
23:17
62:10,12
63:5,6,9
63:17
88:17
89:12
143:4
214:7
232:15
**publicat...**
22:14 23:7
23:8 43:16
43:24
60:24
214:11,15
235:16
268:2
**publish**
89:17
**published**
26:3 57:14
59:14,15
73:2 87:22
153:5
156:18
159:2
220:13
270:18
**publishing**
10:5 54:5
62:4
228:12,17
**pulled** 18:22
50:18
**purpose**
195:16
196:23
197:12
205:6
265:20
266:3,9
267:3
275:10
276:6,14
295:4
**purposes**

50:24
53:21 54:8
172:14
180:13
293:11
302:17
320:20
**pursuant** 3:4
**pursue** 139:8
**push** 130:7
158:3
**put** 48:10
61:8,12,13
66:11 87:1
135:8
136:5
141:16
208:21
237:9
238:23
276:5
279:21
281:13
283:21
293:24
321:1
**puts** 94:18
**putting** 61:3
266:16

─────────

**Q**

**qualific...**
178:6
**qualified**
136:22
**qualifies**
151:8
**qualify**
239:10
**qualitative**
27:4,5
**quality** 36:9
36:12
281:11,11
281:16,18
281:21
**quantitate**
27:4
**quarters**
49:15
**question**
21:19,22
22:11

25:23 26:1
35:11 37:2
37:13,18
39:6,7,23
40:3 41:8
42:10
45:23,24
64:7 70:14
71:2,3,6
74:10
76:20 80:5
80:17,18
81:5 86:3
88:16
93:10
99:21
100:1,5,23
101:1
105:17
107:12
109:16
113:18
117:24
118:14,18
120:19
121:6
125:16
129:11
133:12,14
134:10,24
135:2
136:23
137:20
138:23
139:2,3
140:10,13
140:24
141:8,10
141:13,19
141:21
142:6,10
142:21
144:12
145:2
146:11
147:18
148:3
149:23
150:5,7,17
152:2
153:18
155:14
157:13

158:7,22
159:14
160:13
161:6,10
166:22
167:4
174:24
183:24
185:22
186:24
191:21
197:15
201:2
205:10
219:3,4
223:20
233:7
234:23
238:19
239:11
240:6
241:6
242:3,7,12
248:9,14
254:24
257:18
258:15
259:21
263:20
266:7
275:19,21
278:19
284:9
288:10
290:10
311:3
**questioner**
31:16
**questioning**
64:12
65:22
66:11 75:4
93:15
114:11
139:9
140:1
149:10
193:17
202:22
**questions**
24:13,22
56:18
103:5

117:20
142:4
158:19
193:8
208:20
210:21
222:3
240:5
252:2
266:18
275:24
301:24
307:5
322:6
**quick** 30:11
113:17
**quickly**
183:4
**quite** 35:22
42:6 43:8
157:11
176:13
212:20
277:3
**quotation**
61:8,12
**quote** 41:20
53:12,14
60:20,21
61:23
63:22,23
64:9 66:12
66:16
68:16,23
69:9 70:24
71:1,7,8
73:5 76:12
76:13 77:6
78:21
79:24
80:11,12
81:20,21
82:1,19
85:3,7
88:2,12
89:2,3,12
89:13 90:9
90:11
91:21,23
92:15,18
93:20,23
95:2,5
97:7 98:21

103:17,21
103:22
112:16
115:7
123:11,14
128:23
136:15
138:16,20
138:23
149:16
150:20,23
158:3,4
170:18
176:10,11
185:23
218:7,10
220:10
232:12
236:17
246:22
256:11,15
256:23
267:4,12
270:15
271:21
283:6
284:12,16
287:5
289:8,11
289:13
291:16,19
293:18,21
293:22
296:24
**quoted** 46:11
**quotes** 53:17
62:1
**quoting**
133:4
138:4

——————
**R**
**R** 4:1,9 5:1
6:1 7:1
14:8
**races** 143:18
**Rachel** 7:8
15:6
**Rady** 306:18
**raise** 200:19
200:22
**raised** 30:21
30:22

223:8
289:24
**raises** 97:20
**ran** 297:12
**random**
232:14
**range** 44:1
80:19
169:10
251:18
265:17
**ranged**
256:14
**rank** 167:18
**rapid** 52:7
95:3
165:11,18
226:15
**rapidly** 52:7
**rare** 47:22
56:10
113:15
205:19
**rarely**
237:17
**rarity**
166:18
**rate** 59:15
192:9
205:5,12
206:8
223:4
253:21
**rates** 153:14
256:20
262:17
263:8,10
**re-ask** 100:7
100:23
129:11,13
147:18
167:4
201:2
288:10
**re-read** 71:2
278:19
**re-reading**
39:6
**reach** 154:23
210:18
260:2
309:4,24
**reached**

308:5
**reaching**
250:14
**read** 37:13
37:18 41:7
50:20
54:11 62:2
63:1,15
64:18 74:5
75:3,9,16
79:7,22
80:13
81:10
85:19 86:2
93:17
97:18,21
98:23 99:2
99:21
110:15
138:15
139:11
140:23
190:13
193:1
194:23
197:4
198:16
203:3
213:3,4,7
213:11
235:24
236:1
239:16,17
244:19,22
262:24
263:4,23
283:17
288:5,8,9
296:13,15
322:7
**readily**
45:16 46:3
**reading** 14:4
73:8 98:9
110:14
140:9
193:10
236:20
255:23
**reads** 66:2,9
78:21
114:19,23
130:16,23

149:13
194:13,20
221:11
231:18
243:5
244:1,10
246:5
256:19
289:8
322:9
**ready** 55:24
183:11
**real** 237:6
266:6
**realize**
299:1
**really** 30:6
30:9,10
38:5,7,9
39:19,20
56:11
73:20 79:5
80:22 81:2
99:24
102:3
104:15
106:6
111:24
116:2
121:24
125:6
136:2
138:22
150:1
153:5
161:7
168:15
197:16
199:6
221:2
237:10
288:24
292:2
308:2
**realm** 265:6
**reason** 175:4
262:12
294:5
297:1
**reasonable**
95:20
125:2,19
134:5,17

135:1,1,6
135:7,15
139:4
140:13
141:13
142:20
145:19
146:7,12
146:20
162:3,11
162:15
**reasonably**
211:11
**reasoning**
289:12,19
290:2
**reasons**
34:17
126:20
**rebuttal** 9:7
18:7,14
249:10,12
249:13,16
250:6
254:11
255:10
257:4
279:8
291:2,10
296:9,14
296:22
302:1
307:4,21
**recall** 27:18
50:22
103:23
104:2
125:14
157:13
167:23
169:19
171:10,13
172:15
180:6,6
198:10
200:3
204:20
205:23
206:20
209:9
213:17
255:23
260:4

263:1,6
277:18,24
291:6
**recalling**
172:22
263:24
**receive** 33:2
33:19
34:16
**received**
34:11
46:18
187:6
307:17,22
**reception**
31:10
**recited**
158:8
**recogniz...**
251:2
**recognize**
22:4
299:15
**recognized**
222:11
**recollec...**
186:1,21
187:10
229:8
**recommend**
246:6,7
271:21
**recommen...**
271:14
275:3
281:10,13
281:20
284:23
293:10
313:19
**recommen...**
218:22
281:7
283:6
312:3
**recommended**
176:1
**recommen...**
106:13,24
**reconcile**
232:10
**record** 14:11
14:22 23:1

24:20 29:2
30:23 60:7
61:22 66:1
66:5,8
100:11,13
105:10
123:10
130:15,19
130:22
139:17
170:22
182:11
185:9
187:4
191:13
194:12,16
194:19
200:15,21
202:15
212:4
243:4,8,12
255:2
282:14
**recorded**
35:2
119:12
172:9
173:14
176:15,20
**recording**
167:7
173:2
179:12
184:22
191:15,15
200:16
201:22
202:3,16
243:16,19
**records**
131:7
136:8,21
187:7
210:17
**recruited**
232:20
**recruitment**
233:23
**red** 229:3
**redacted**
159:10
**refer** 59:5
60:20

79:22
85:12
103:9
201:23
311:15
**refereed**
22:17,20
23:2
**reference**
61:13,16
68:3
141:19,22
165:9
203:9
250:10
254:5,8
257:3
**referenced**
255:10
**references**
71:5
**referral**
111:13
**referred**
45:3 61:12
147:10
154:3
259:4
**referring**
51:18
61:22 71:4
84:14
160:17
166:17
199:24
202:23,23
221:14
300:15
**refers** 45:9
49:20 51:8
63:22
84:19
92:15 97:5
98:18
99:11,15
101:2
226:14
287:5
**reflect**
231:5
**reflective**
60:24
**refresh**

229:8
**refuse**
235:19
**refusing**
160:18
**regard** 54:13
56:14
102:17
148:6
150:12
155:7
161:14
166:17
169:12
171:5
177:7
178:12,24
181:24
182:14
192:21
203:11
253:17
296:23
298:10
314:21
316:24
321:20
**regarding**
152:1
271:23
297:9
**regards**
169:13
**regimen**
44:23
**regional**
25:10
**registry**
208:21
210:6,23
211:18,20
211:23
212:1,3
297:12
**regular**
210:6
**regularly**
49:2 97:14
267:2,11
270:22
**Reinhardt**
4:14 16:7
16:8

PageID #: 0884

| | | | | |
|---|---|---|---|---|
| **relate** 59:2 | **relying** | 116:10 | 263:4 | 183:23 |
| 226:19 | 298:7 | 118:21 | 267:18,19 | 206:18 |
| **related** 21:8 | **remain** 129:8 | 134:9 | 268:11 | 223:14 |
| 137:9,13 | 209:3 | 155:13 | 278:14 | 264:1 |
| 196:6 | 210:5 | 205:10 | 279:7,8 | 272:18 |
| 224:13 | 227:5 | 222:18 | 281:14,15 | 298:18,24 |
| 262:12 | 234:10 | 233:7 | 291:2,10 | 307:17 |
| **relates** 24:8 | **remainder** | 242:2,6 | 295:21 | **represent** |
| **relating** | 301:1 | 257:18 | 296:9,14 | 14:22 |
| 21:13 | **remember** | 259:21,23 | 296:17,23 | 15:10 |
| 25:15 26:5 | 22:21 | 275:18 | 298:5 | 96:22 |
| 58:7 | 133:11 | 276:4 | 302:1 | 301:9 |
| 172:24 | 165:2 | 311:3 | 307:4 | 305:16,18 |
| 214:19 | 171:19 | 318:22 | 319:9 | **represen...** |
| **relation** | 179:18 | 321:18 | **reported** | 97:1 216:2 |
| 99:16 | 180:10 | **repeating** | 92:9 220:7 | **represented** |
| **relation...** | 186:13,14 | 266:7 | 272:12 | 217:8 |
| 48:2 | 189:3 | **rephrase** | **reporter** 3:6 | **represen...** |
| 177:13 | 193:23 | 314:5 | 17:12 | 15:1,15 |
| 182:12 | 198:12 | **report** 9:5,7 | 22:21 30:1 | **reproduc...** |
| 188:8,16 | 204:19 | 17:11,18 | 30:4,18 | 1:22 |
| 188:24 | 220:23 | 18:7,15 | 37:12,14 | **reproduc...** |
| 210:20 | 226:16 | 25:9,15 | 37:15,17 | 46:9 86:11 |
| **relation...** | 256:2 | 26:4 29:20 | 37:20 38:1 | 98:21 |
| 188:12,12 | 259:16,18 | 34:22,23 | 58:15 | 122:5 |
| 188:13,21 | 261:3 | 43:5 46:12 | 100:3 | 173:16 |
| **released** | 307:15 | 61:6 63:16 | 166:23 | **reputation** |
| 171:17 | **remembering** | 65:11 74:6 | 167:1 | 67:3,7,16 |
| **relevance** | 206:18 | 92:13 | 170:21 | 138:6,9,13 |
| 278:13 | **remind** | 94:19 | 176:9,10 | 214:2,6 |
| 279:6 | 251:14 | 95:13 | 180:21 | 215:21 |
| **reliability** | **reminding** | 103:2,4,5 | 185:9,11 | 229:12,17 |
| 72:6 | 221:23 | 103:9 | 201:22 | 236:7 |
| **reliable** | **remote** 18:24 | 110:10 | 202:9,18 | **request** |
| 57:21 58:8 | 31:1,21 | 112:15 | 254:19 | 64:13 |
| 96:20 | **remotely** | 121:15 | 255:1,6 | **requests** |
| 222:4 | 14:15 | 123:4 | 275:18 | 75:7 |
| **relieve** | **remove** 31:14 | 128:21 | 282:7,9 | **require** |
| 107:20 | 142:6 | 133:1,15 | 283:22 | 44:22 |
| 108:19,21 | 315:18 | 139:13,16 | 284:1,7 | 124:20 |
| 200:6 | **removed** | 149:24 | 300:20,21 | 129:6 |
| 242:24 | 316:3 | 193:6 | **reporter's** | 177:16 |
| 261:5 | **removing** | 197:5 | 184:18 | 182:22 |
| **rely** 63:11 | 142:5 | 220:18 | **reporting** | 319:24 |
| 95:12,20 | 316:17,18 | 224:10 | 14:13 | **required** |
| 95:23 | **rendered** | 233:6 | 26:18 61:4 | 126:24 |
| 119:11 | 149:15 | 238:10,17 | 158:13 | 195:17 |
| 150:1 | 150:21 | 249:10,12 | 169:20 | 196:9,16 |
| 156:12 | **renew** 139:6 | 249:13,16 | **reports** 95:2 | 320:8 |
| 178:6,16 | **renounce** | 250:6 | 118:6 | **requirement** |
| 179:21 | 93:22 | 254:11 | 119:14 | 128:17 |
| 180:18 | **repeat** 25:24 | 255:10 | 156:12 | 132:11 |
| 222:1 | 71:3 80:5 | 257:4 | 165:10 | 136:22 |

requirem...
 197:1,13
requires
 63:20 64:8
 134:2,13
 135:11
 144:3,15
 146:5
 147:21
research
 21:8,13
 25:10,15
 26:4,13,19
 27:1,7
 52:8 63:20
 64:5,8
 67:15,23
 68:8,18
 87:14,20
 87:23 92:9
 151:7,24
 157:20
 205:5,11
 205:15
 206:8
 211:1,18
 211:20,21
 211:23
 212:2
 219:10
 235:16
 244:17
 285:1
 287:3
 294:7
researchers
 45:14
 93:13
 138:18
 234:24
 235:7,10
 235:21
reservat...
 221:22
 305:8,13
 306:9,10
reserve
 104:5
residencies
 19:8
residency
 19:13,16
respect 55:4

214:11,14
297:3
respected
 44:5 67:23
 68:7 96:16
 234:24
 235:6,12
 235:21
 262:16
 286:15
respective
 14:4
responded
 185:23
rest 47:2
 227:6
restate
 141:7
resting
 275:24
Restoray
 256:11
restrict
 277:15
restrooms
 106:4
result 36:9
 129:15
 167:21
 168:5
 218:19
 281:20
resulted
 129:2
resulting
 104:24
results
 260:10,23
 264:13
 281:20
resume
 272:14
 282:17
resuming
 66:11
retract
 157:12
returning
 244:4
reverse
 312:24
reversible
 270:24

272:13
273:15
review 23:22
 25:23
 54:21 93:9
 157:21
 171:16
 187:7
 193:9
 217:12
 255:13
 267:24
reviewed
 23:4,5,8
 23:17
 25:14 26:4
 59:1,12
 111:13
 159:3,4,8
 187:3,4,5
 187:15
 222:1
 256:2
 274:13
reviewing
 158:11
REVIEWS
 97:24
revise
 214:18
 238:9
 240:6
 277:4
right 18:3
 19:8 21:1
 22:13
 23:15 27:8
 44:7 54:17
 55:16
 56:20
 61:18
 69:18
 72:18 74:9
 75:1 82:4
 86:22 93:7
 98:15
 99:18
 101:14
 104:4,5
 113:20
 115:12
 116:21
 121:10

122:18
143:23
146:1
160:15
161:13
165:15
185:4,24
187:20
192:24
193:3
196:18
197:4
198:5
202:9
204:3
218:1,15
219:19
220:2
221:6
229:4
232:16
233:19
235:5,13
240:5
244:2
246:14
247:2
249:19
251:3
257:11
259:7
281:12,22
282:17
288:13
290:4
291:10
296:12
314:6
318:1,21
318:24
320:10
rigor 197:1
 197:13
rigorous
 283:7
risk 90:7,12
 126:17
 190:13
 204:12
 261:8
 316:9
risks 169:4
 267:15

271:7
277:8,10
293:19
Roberta 5:17
 15:18
 29:15
Roger 7:3
 14:23 31:6
 66:10
role 200:11
 200:13
 201:3,5
 244:4
 290:12
 295:12
roles 79:12
room 5:13
 19:1 28:18
 38:10 92:7
 186:8
 187:3,12
 187:19
 188:4
 193:1
 198:15
 249:6
roughly 24:2
 24:3 252:4
routinely
 298:14
rule 295:5,8
rules 3:4
 55:1 142:1
 197:17
run 104:15
 302:6
running
 319:21
runs 59:22
 149:12
 197:22
 291:22
 297:11
rush 219:1
rushed
 218:10,18
 219:7
rushing
 219:13

─────────
S
─────────
s 4:1 5:1
 6:1 7:1

Chase 27985 0886

14:1,8
198:24
**Sabar** 230:10
**Sadra** 228:12
228:22
**safe** 44:23
124:17,23
125:2,20
175:13
182:15
187:17
267:4,12
267:22
268:11,13
268:17,23
269:5
270:2,15
274:6
276:21
277:3,11
**safer** 270:8
**safety**
167:11
169:4
195:16
196:10,22
197:6,10
269:9
270:7
276:12,24
283:8
**sales** 64:9
**San** 4:18
67:10,14
**Sargent's**
14:12
**satisfy**
197:1,13
320:16
**saw** 31:1
187:22
204:23
209:7
317:19
**sayin** 30:7
**saying** 30:5
83:3,5,17
89:9 108:5
109:5
147:5
164:16
200:13
201:6

230:12
245:13,22
253:23
254:21
255:3
263:1
277:7
284:18
299:8,9
317:3,3
**says** 49:20
61:21,22
63:16 77:6
80:4 82:8
83:10 88:2
88:17 89:2
89:21 90:7
91:21
105:11
123:9
136:12
137:5
138:15
153:6
172:22
176:10
180:22
185:22
198:18,19
198:23,24
199:16
200:9
203:24
220:6
229:23
230:3
234:7
244:17
245:23
246:10,13
246:20
247:2
256:10
257:17
259:5
271:20
280:15
283:4,6
291:16
308:4
314:2,7
316:1
**scale** 155:23

**scans** 155:9
**scheduled**
30:24
**school** 1:11
5:22 15:20
104:16,18
106:3
123:17
126:13,18
127:10
130:3,6
133:19
147:23
160:2
165:21
168:15,16
169:6,17
188:12
229:8
252:14,15
253:21,22
269:15,20
289:4
**schools**
119:8
124:17
125:3,20
162:3
**science**
66:20 85:6
158:23
192:14
233:17
234:15
246:11,21
**sciences**
87:17
**scientific**
9:11 57:10
65:18
66:13,16
70:15
76:21
284:19
**scientif...**
50:3 74:23
76:6,14
79:9,16
82:23
83:12 84:9
92:4 158:9
**scientist**
62:18

281:19
292:8
297:18
**scientists**
249:6
**scope** 20:4
137:20
139:6,8,22
140:5
**Scott** 3:5
**Scottsdale**
6:22 7:11
**screen** 18:22
184:15
**screening**
182:23
**scroll** 75:21
**scrotum**
35:17,19
**SCRUGGS** 7:7
**se** 97:9
108:24
**sea** 149:15
150:22
**sealing** 14:5
**search** 27:3
**season**
136:16
279:1
**seat** 289:11
289:17
**Seattle**
306:19
**second** 25:21
26:24
37:13
43:19
49:14
52:20
68:14
78:20 79:3
93:7
110:14
111:14
112:16
114:18
136:11
176:10,15
176:24
187:11
189:18
203:22
219:16

229:22
250:12
252:4
286:11,22
287:4,8,24
288:15
291:16,22
**secondary**
1:10 5:22
15:20
173:20
**seconds**
136:13,17
136:17
158:3
284:2
**secretion**
44:24
**section**
22:17
52:18 53:3
54:21 75:4
75:10 93:8
93:17
283:5
293:10
**see** 19:6
22:10 24:4
24:6 25:3
25:7 28:11
29:18
31:24
32:15 34:8
35:4 38:6
41:22 42:6
43:19 45:1
47:3,20
49:18,19
49:24
50:16 51:6
51:12
53:17
54:12 60:1
66:16
67:12,19
67:19 68:3
68:5,24
73:14
74:17,20
76:4 77:10
77:16
78:24
82:10,18

82:21 85:8
85:18
87:22 88:5
88:13
89:22 90:3
90:11
91:18,23
92:18
93:23 95:6
96:24 97:7
98:21
99:13,20
99:24
103:11,18
106:17
110:12
112:18
114:21
115:8
116:1,2
123:8,15
128:15
130:1
136:19
138:24
140:1
142:22
148:5
149:16
153:15,20
156:16
157:17
158:5
165:13
170:19
172:23
176:11
181:2,17
181:17
182:10
195:8
198:18
204:5
209:20
218:11,15
219:17
220:11
221:9,15
224:14
225:12,16
228:23
229:2,3,6
230:1,7

231:21
232:6
233:14
234:12,13
235:4
237:14,23
244:8,14
250:16
253:4
256:8,15
256:24
257:23
262:20
272:1
276:20
280:23
281:3
283:1
284:4
286:12
287:1,2,6
287:10
289:14
290:24
291:15,20
291:24,24
291:24
293:12,14
293:22
295:1
297:4,13
298:13
300:7
308:6
317:22
319:22
seeing 27:18
97:10 98:6
151:2
157:13
158:18
181:12
222:14,21
285:4
seeking
120:18
121:8
271:22
seen 43:24
64:1,2,19
111:18
116:13,19
120:13

127:2
129:22
130:2
149:7
157:8,18
158:12
183:23
220:17
221:1,2
224:3
235:24
254:6
262:24
264:13
270:18
272:18
277:11
290:1
292:18
304:21
select 54:19
self 316:9
semicolon
78:22
81:23
sense 21:19
92:16
232:4
sent 317:18
sentence
38:4 44:22
44:22
61:19,21
63:14
71:11
73:11
76:11 79:1
79:6,8
85:18
93:18 95:1
105:10
110:15
112:16
136:11,12
149:12,22
150:10,16
197:21
218:13
219:17,18
220:3
221:11,15
230:3
244:1

250:12
259:2
286:24
291:16,22
293:17
308:3
sentences
97:19
separate
48:3
sequence
192:21
193:6
series 211:3
serious
169:4
seriously
203:1
serve 44:9
200:13
service
202:18
Services
14:13
serving
34:11
set 136:21
202:4,14
280:15
settling
184:21
seven 282:8
sex 34:24
35:3,7,23
36:18,24
37:3,21
39:10,16
40:5 41:21
42:1,11
44:24 45:1
45:4,15
46:2,7,14
46:15,22
47:7,8
48:2 51:11
51:15,18
51:19
55:15,21
56:1,4,5
56:14
57:20 58:8
60:21 62:1
62:20

63:22 64:3
64:9 65:10
66:14
68:16,19
68:20,20
68:22 69:9
69:17
70:23 71:5
71:6,12,22
72:2,6,12
73:4,9,13
73:19
74:11,13
74:18,22
76:2,3
78:3,21,23
78:24
79:19,19
80:1,8,11
80:18
81:21,23
81:24 82:8
82:17 84:7
85:4,7,21
86:6,14
87:2,3
88:2,5,9
88:18,23
89:3,10,22
90:1,9,15
90:20 91:4
98:17
101:22,24
108:17
109:7,17
116:23
117:5,15
118:3,7
121:24
122:7,14
125:7,12
126:11
127:1,1
128:18
137:10
145:8
173:20
184:9
188:18
191:8
199:24
201:4
208:13

210:2,11
231:15
242:19
315:15
**Sex/Gender**
9:13 87:6
**sexes** 76:13
76:20 77:7
77:13
**sexual** 24:8
32:22 47:7
55:6 56:2
56:11
61:22 72:4
81:19
111:9,20
112:9
114:24
115:6,6
117:4,13
118:2,12
119:1,7,24
120:8,21
121:8,16
135:10
216:24
217:7
273:5,20
283:16
284:15
285:9
300:3
**sexual/g...**
114:20
**sexually**
126:17
216:21
217:15
224:13
**share** 29:8
38:9
218:16
219:4
221:17
222:6
**shared** 18:22
**shattering**
131:7
136:8
**sheet** 10:7
285:22
286:5
**shifted**

223:16
**shifts**
163:24
**short** 149:11
157:17,24
256:19
**show** 65:13
112:8
142:8
157:23
192:9
254:8
257:8
259:11,24
261:4
**showing** 60:7
111:22
257:8,20
**shown** 24:6
261:6
304:17
**shows** 122:6
172:20
**shuffle**
28:17
**shuffling**
28:16
254:23
**Shuman** 5:18
15:18
**sick** 38:9
**side** 39:1
135:8
193:20
197:5
199:23
200:12
201:4
210:7
267:8
268:1,5
269:11,15
269:21
270:10
293:18
**sidetracked**
86:2
**sign** 322:7
**signed** 239:8
**signific...**
23:2 69:8
123:23
183:3

**significant**
103:17,20
104:8
105:13,19
108:24
113:7
122:23
155:1,6,6
155:7,7,11
155:17
260:14
269:11
270:20
298:18
**signific...**
110:2
**signing** 14:5
**signs** 111:22
112:9
182:24
183:3
**similar**
27:22 94:6
119:14
219:12
231:14
241:2
310:18
318:7
**similarly**
29:10
219:12
258:24
**simple**
145:18
248:15
**simply** 31:10
89:14
158:22
286:20
295:6
**Simulation**
23:23
**Sinai** 249:5
249:9
**single** 50:18
120:16
124:2,10
127:2
145:18
191:3
198:7
206:2

236:6
255:2
259:18
298:17
**sit** 146:17
176:23
193:19
211:10
268:9
**Sitting** 74:9
**situation**
103:3
**situations**
115:5
316:9
**six** 26:7
105:12
197:22
218:22
231:6
282:9,10
300:21
313:19
**Sixteen**
216:13
**sixth** 40:17
**size** 154:14
154:18,19
**Skeemsma**
256:11
262:15
**skeleton**
154:2
**skill** 36:13
**skills**
297:15
300:2
**skin** 88:9
**skip** 98:16
172:21
**skipped**
250:10
**Slicer** 5:18
15:19
**slope** 130:7
**slow** 22:22
22:24 38:8
**slowed** 137:5
**slowly** 28:18
**small** 162:9
**smaller** 77:9
90:10
**so-called**

196:3
214:18
**social** 51:9
97:13 99:7
99:16
101:4,12
101:16
105:14
106:13,24
178:11,17
179:4,6
189:9
194:23
208:4
221:19,22
222:7
244:5,10
244:18,24
245:4,23
248:4,17
260:11
261:1,16
264:4
283:15
284:15
285:9
300:2
309:1,6
**socially**
97:6,16
99:4
106:16
244:3
246:11,21
262:2
309:8
**societies**
98:12
**society** 9:8
9:9,11
42:17,22
44:13
48:11,14
50:5 53:5
53:19 54:5
57:9,19
58:7 59:17
65:14,18
66:13,15
67:2 71:16
73:2,6
74:1 76:11
79:23,23

80:8,11
81:21
84:13
92:21
95:21
114:15
164:14
176:2
226:13
231:17
232:3
234:5,8,14
244:16
245:7
248:4,17
250:24
271:5,12
272:6
281:8
282:20
293:8
294:1,13
304:13,24
305:2
312:5
**Society's**
305:9
**somebody**
173:7,23
174:14
176:9
193:1
241:5
263:18
**someone's**
57:3
101:20
225:22
315:10
**somewhat**
45:23
226:24
310:18
**son** 170:18
204:5,8,16
**soon** 39:10
193:15,16
**sorry** 18:3
24:19 28:7
31:19 37:7
59:9 71:2
75:18
76:16 77:3

77:5 86:1
100:4
105:24
110:18
111:15
116:9
117:12
122:7
124:5
134:9
142:16
164:20
172:1
189:21
194:4
202:10
208:24
216:10
217:20
222:18
233:7
236:19
238:16
240:10
243:14
246:16
248:11
249:21
250:9
254:11,24
255:16
266:5
269:18
278:17,19
278:23
282:22
283:24
286:1
291:8
294:8
295:23
302:13
304:24
305:17
306:3
308:1,1
317:13
319:16
321:17
**sort** 27:3
112:1
116:20
134:21

150:6
182:20
187:8,22
231:2
297:14
**sorts** 115:19
121:15
130:8
300:18
**sought** 120:8
120:22
**sound** 101:6
101:7
185:24
192:24
201:10
228:24
**sounded**
199:17
**sounds** 28:12
78:17
104:6
205:22
247:2
278:9
**source** 85:5
85:22 86:6
86:14
87:16
96:16
159:23
206:14
286:15
296:1
298:17
**sources**
221:13,24
**south** 181:2
181:5
**Southern** 1:2
14:17
**span** 155:20
**Sparking**
131:7
**spatial**
297:15
300:11,13
**speak** 22:24
24:13,19
24:21 29:2
38:14
165:1
167:5

253:7
254:24
301:14,19
303:21
**speaker**
28:16
202:4,15
**speakers**
29:13
**speaking**
28:8,18
30:5 34:1
140:4
141:18,24
147:13
202:12
203:23,24
283:23
299:14
**Specialist**
14:12
**species**
85:13,23
86:7,15
**specific**
20:22
36:23
71:11
79:19
80:20 85:5
89:10
98:10
120:20
129:14
136:3,5,24
156:1
160:4
168:3
214:12
216:18
220:9
249:2
250:19
264:1
267:7
283:5
295:13
299:9
**specific...**
82:17 83:5
120:13
150:14
168:5

182:10
193:24
210:17
283:9,10
292:8
**spectrum**
62:15
183:8,9
226:24
**speculate**
129:10
**speculating**
232:17
**speculation**
129:6
**speed** 160:7
**spelled**
109:9
228:23
**spend** 50:16
**sperm** 77:10
**split** 138:22
**spoke** 25:18
30:21
43:11
190:12
**sport** 129:8
130:5
135:19
136:24
148:5
149:13
150:12,20
151:9
156:20
160:19
167:12
**sporting**
150:7
319:24
**sports** 9:16
20:19 21:9
91:23 92:3
126:7
127:10
129:20
143:4,8
145:11
151:2,13
166:17,18
169:13
316:4,11
320:2,9

sports-r... 318:17
spot 54:17
sprints 157:24
spurt 154:9 289:8,9 290:19
square 236:16
Sruti 5:3 15:24
stack 92:22
stage 27:16 152:21 153:9,9,9 153:20,21 233:2 236:15,24 241:6 250:15,23 251:1,7,8 252:19,24 253:24 258:2,8,18 259:3,4,13 260:2 279:24 287:14,20 288:2,18 308:5 309:4,8,17 309:20,24
stages 299:6 299:20 300:1
stand 97:1 139:24 142:13
standard 14:14 66:9 130:16,23 171:8 177:23 194:13,20 195:11 243:5,13 322:10
standards 20:13 197:4 214:19 235:24

304:10
standing 139:7 158:2
stands 64:17 75:8
Staphorsius 296:2,13 296:17,18
start 17:9 65:21 103:5 134:21 158:2 177:5 185:23 186:24 190:5 201:19 282:1
started 137:12 172:4 204:2 310:19
starters 252:7,7
starting 110:18 130:12 137:19 154:22 164:24 177:14 231:8
starts 208:21 266:16 288:8,13
state 1:8,13 2:2 5:12 5:15 14:19 14:21 15:10 41:20 64:20 113:4 123:4 127:20 128:20 142:19 180:17 218:6

243:1
247:20
254:5
301:2,10
301:23
320:24
stated 63:13 108:5 143:24 241:1 268:11 316:22
statement 9:12 57:9 57:10 62:11 65:14,18 66:13,16 66:18 69:8 71:15,18 73:1,5,9 73:24 74:11,24 76:3,3,7 76:12 77:12,17 79:15,24 80:2 82:5 82:24 83:13 84:11,19 84:24 88:17,24 92:4 94:2 95:9,21 96:2 99:3 99:5 112:24 114:16 123:23 132:24 190:21 195:21 230:9 238:9,17 240:7 248:3,16 292:2 311:16,20
statements 57:19,22 58:6,8 83:17

states 1:1 14:17 61:6 62:10,12 99:10 182:13 293:18
stating 55:2
statistical 20:2 207:1
statisti... 298:18
stature 169:7
status 137:11
statutes 318:7,7
Steemsma 235:20
Steemza 241:15
stemming 68:21
steps 65:5 182:3 188:23
Steptoe 6:4
sterilizing 192:23
stipulated 14:3
stirred 212:19
Stock 14:11
stomach 88:10
stop 53:14 53:15 113:21 114:12 191:24 273:13 301:1 315:23
stopped 191:10 244:2
stopper 156:4
straight 63:15
strawber... 228:5,5,6

strawberry 228:7
Street 4:5 5:6,19 6:12 7:10
strength 110:4 151:19 154:15,20 160:7
strengths 188:7
strive 218:8
strong 124:16
stronger 158:4
strongly 142:2
structure 35:16 90:3
structured 91:4,13
struggle 262:10
struggling 38:5
students 126:9 128:24 166:8
studied 284:12
studies 66:15 85:7 192:9 195:15,21 232:24 233:8,22 234:1 256:7,12 257:8,19 258:17 259:10,23 261:4 263:7,7,9 294:7 298:18
study 26:21 26:22 27:5 62:14 151:12 196:14,22

197:10
211:8
212:2
216:18
219:17,24
220:4,6
224:4
234:5,21
234:23
236:2
242:20
256:12
257:21
258:21
260:5,7,21
261:4,8,13
262:21,24
263:1
264:14
287:1
290:11,17
290:23
293:1
294:15
295:12,17
295:19
296:17
298:12
**Stutler** 1:14
6:8 15:17
**style** 193:12
**subject**
64:24
142:4,6
179:12
222:7
**subjective**
102:11
**submission**
250:13
**submitted**
18:7 64:23
65:2 78:2
225:16
255:24
274:13
275:16
276:6
**subseque...**
242:14
**substance**
213:10
**substantial**

121:14
232:24
**substant...**
313:21,22
**substitute**
92:1
**success**
201:14
**successful**
262:17
263:8,10
**suffer** 55:5
81:19
109:8,18
111:19
112:22
117:3,12
118:1,11
118:24
119:7
135:9
276:15
**suffered**
110:22
111:9
112:16
121:7
129:15
189:9
217:7
**suffering**
172:2
187:22
206:9
265:9,9
266:10
**suffers**
119:23
120:7,21
182:20
**sufficie...**
273:20
**sugar** 249:21
**suggest** 31:7
224:4
249:4
281:24
**suggestion**
85:11
**suggests**
127:1
246:11,22
**suicidal**

130:7
168:4,18
**suicidality**
148:7
204:12
205:15
263:20
**suicide**
205:6,12
205:19
206:3,9,20
207:1,5,5
207:9,9,23
262:3,11
262:18
263:8,10
316:10
**suicides**
207:1
**suit** 164:3
**Suite** 5:20
6:13,21
**summarizes**
257:8,19
**summarizing**
157:20
294:17
**Summary** 9:20
170:5
**SUPERINT...**
6:16
**Superint...**
1:13,16
6:8 15:13
15:16
**support**
168:23
218:8
228:14
296:1
**supported**
63:20 64:8
218:19
219:7
**supporting**
106:13
**supposed**
55:1
150:19
210:17
**suppress**
44:24
134:2,14

135:12
144:4,17
145:10
147:21
**suppressed**
132:4
145:5
146:19
**suppressing**
132:13
137:6
148:2
151:21
**suppression**
132:19
136:23
144:20
146:5
156:21
271:24
272:8,8
293:11,12
293:16,19
294:2
**sure** 28:9,19
30:2 82:3
91:20
97:22,22
99:1,22
102:5
105:10
150:16
158:16
168:22
186:18
189:7
191:14
193:7,13
209:21
214:17
218:2
243:15
247:1
249:8
269:1
271:11
275:19
284:3
288:7
295:11
303:4,4,7
311:5,13
314:5

317:14
320:19
321:19
**surgeons**
311:11
**surgeries**
310:12
**surgery**
310:8,22
311:6,16
311:19,22
312:2,5,19
312:23
315:18
317:17
**surgical**
283:8
309:1
311:10
**surpass**
149:16
150:22
**surprising**
115:1
**survey** 211:3
220:14
**Susan** 6:3
15:15
**suspect**
171:13
**Swaminathan**
5:3 15:24
16:1
**swear** 16:12
37:11
**swimmer**
131:6
136:13
**swimming**
131:16
137:17
142:11
**swore** 239:8
240:1
**sworn** 16:16
239:19
**symptom**
112:3
**symptoms**
116:1,3
182:24
183:3
203:7

0891

**syndrome**
297:2,10
297:12,17
298:2,10
**system** 86:11
291:5,19
292:12
295:24
**systematic**
211:3,11
211:18,21
212:5
293:1
294:15

**T**

**T** 14:1,1
**tab** 17:12,15
42:17
58:14
65:14
86:24  96:2
131:4
143:3
148:19,21
156:16,18
169:19
212:6,8
224:17
228:8
255:14,17
255:19
285:24
295:21
**table** 59:22
60:10
201:23
**take** 25:22
28:3  31:23
38:13  65:5
65:22  74:6
74:16  82:7
85:18
89:13
101:10
111:17
114:15
123:3
139:10
141:18
145:13
155:11
157:8

162:11
163:19
182:3
184:13,15
188:24
193:15
216:10,16
221:7
224:9
242:5
243:2
255:12
280:5,16
282:4,11
286:20
311:10
313:17
**taken** 3:3,4
3:7  14:15
58:1  148:4
**takes** 145:10
**talk** 51:24
106:20
124:21
161:7
193:19
268:5
279:12
286:9
303:19
**talked** 55:13
167:20
279:16
289:9
**talking** 26:8
52:20
73:19,19
84:10
89:18
101:19
104:20
155:8
158:14
162:10
163:9
166:15
167:14,16
202:9,10
204:1
225:22
232:15
237:4
252:14

253:21
269:9,10
284:3
293:16
306:15
**talks** 298:9
298:11
**Tanner** 27:16
152:21
153:3,4,9
153:9,20
153:21
250:14,23
251:1,7,8
251:17,17
252:19,24
253:24
258:13
259:3,12
260:2
287:13,19
288:2,18
308:5
309:4,8,17
309:20,24
**Tara** 5:4
15:21
30:14
322:5
**target**
114:11
**task** 215:2
**taught**
213:17
269:14,20
299:14
**teacher**
188:12
**teachers**
168:24
**team** 123:7
123:13
126:4,11
126:13,21
126:24
127:4,17
128:22
129:16
133:3,18
144:2,6
177:6,21
177:24
184:12

208:17
209:1
210:7
263:7
277:22
280:6,12
280:16
316:4,11
**teams** 126:8
127:10
**Teenage**
285:21
**teens** 209:18
221:12,23
221:23
222:6,12
222:15,22
223:16,22
**Tejwani** 24:5
24:5,20
**tell** 21:5
22:22  34:1
35:6  36:4
36:5  39:16
56:12  74:2
75:16,20
102:16
126:1
127:7
156:3
168:10
175:20
182:19
185:9
189:16
198:6
204:7
227:14
232:16
247:5
260:7
267:2,11
267:21
268:10
270:22
277:2
294:23
317:9,9
318:14
319:16
**telling** 55:6
102:22
187:19

267:14,15
**tells** 76:12
89:12
246:1
258:7,17
259:3
**ten** 110:9,15
194:7
314:17
**tended** 85:6
**tends** 61:23
251:14
**term** 39:19
45:4  50:4
51:14
62:19,21
80:10,24
86:20  92:1
92:1  97:10
98:7
125:16
162:22
190:21
208:12
231:12
250:16
253:15,19
268:23
308:14,18
314:4
**termed** 115:5
**terminology**
91:20
132:3
270:3
**terms** 41:24
42:11
51:23
68:19
84:14
249:2
299:10
**terrible**
28:10
157:11
229:10
318:15
**territory**
137:21
**test** 111:23
158:2
**tested** 275:1
275:8,12

276:12
**testes** 77:9
**testicles**
35:18
**testicular**
53:15
**testified**
16:16
69:14
118:10
139:17
145:17
162:20
242:9
251:13
273:17
278:2
318:18,20
318:23
319:10
**testify**
286:14
**testifying**
128:5
**testimony**
62:5 80:24
81:8
125:14,18
146:17
156:5
167:23
178:15,16
239:11
277:4
287:12
294:17
314:20
318:6
**testing**
36:19,21
37:18,22
**testoste...**
56:4 110:3
110:3
132:5,13
134:3,4,14
135:12
136:22
137:7
144:5,17
144:21
145:6,10
146:5,19

147:21
148:2
151:21
156:21
185:23
186:9,10
187:12
191:10,22
192:1,10
192:13,16
192:22
195:10,16
196:23
197:6,7,11
202:24
**tests** 160:4
275:16
**Texas** 306:19
**text** 68:15
229:2
**textbook**
298:9
**thank** 16:21
16:23 17:7
18:5,10
24:1 29:22
29:23
38:16 39:3
52:14 53:1
60:12
93:16
96:10
100:19
114:13
128:14
133:10
141:8
142:16
143:1
144:14
148:23
185:2
191:19
194:11
217:22
218:15
236:13
240:17
243:3
249:23
254:13
255:20
267:1

284:7
286:1
291:14
301:22
317:22
321:23
322:3
**therapies**
25:16 26:5
261:21
270:15
286:16
**therapy**
108:10
229:12,15
261:12
308:9,12
**thing** 104:20
110:1
112:1
158:16
159:11
191:3
273:11
293:17
**things** 20:16
25:21 27:2
48:3 52:7
53:12
55:19
63:14
80:22
81:11
89:24 91:8
101:18
103:15
109:23
115:19
122:8,17
122:23
130:1,8
137:8
139:14
150:1
159:5
160:3
161:21
186:19
191:6
196:9
198:8
200:6
236:3

273:11
283:12
284:11
285:5
293:21
299:9
300:18
312:14
320:20
**think** 28:17
28:22
29:19 34:8
36:4 38:10
40:16 45:3
53:20 54:6
54:24
66:24 69:7
73:20,24
74:2,10,23
76:23
79:11 81:4
81:11 82:3
82:4 83:2
84:9 85:15
89:16
94:17
97:20
99:24
100:2
105:8
109:16,21
110:6
111:3,13
112:2,5
113:14
115:22
116:19
124:20
129:22
130:9
134:24
135:23
136:1
137:19
138:1,12
142:3
144:23
145:12,22
146:12
147:13
148:4,5
152:1
159:3

160:12
161:8,10
161:22,23
162:8,10
162:14
164:24
166:2
172:5
184:19
191:18
193:15
194:5
209:5,7
218:4
220:1
225:20
239:14
240:19
247:15
249:15
251:13
260:4
264:15
269:12,12
272:16
280:2
281:2,4
289:3
304:21
311:12
316:8
317:10
320:4,12
320:15
322:1
**thinking**
59:9,10
185:3
287:5
288:1,16
288:23
290:20
**thinks**
294:13
**third** 49:14
76:19
98:16
99:10
136:10,12
197:20
218:3
221:7
252:4,4

253:8,15
308:3
**Thomas**
131:23
136:7,15
136:21
137:1,16
140:11
141:11
142:10,11
143:17
**Thomas's**
131:16
**thorough**
211:11
**thoroughly**
139:22
263:19
**thought** 37:8
60:19 62:5
62:19 63:9
81:7 190:4
263:17
281:3
294:1
**three** 17:9
17:15
18:19
22:15,16
24:4 32:14
33:3 49:14
97:19
112:14
128:3
136:9,17
172:8
176:7
196:7
217:18,21
218:7
223:12
250:21
257:3
259:4
274:12
275:9
276:5,13
286:22
306:13,17
**three-qu...**
286:23
**three-se...**
98:5

**threw** 75:13
**throwing**
134:21
**thrown**
135:21
**tie** 164:3
**tied** 21:5
**tightly**
139:22
**Tik-Tok**
221:12
**TikTok**
221:24
**time** 14:14
14:14
16:19 17:7
22:22,22
25:22
28:10
35:17
37:11 40:9
40:12
44:14,14
50:11,16
50:17 51:8
51:24
55:20 57:2
65:24 66:2
66:9,9
77:4 99:21
101:8,10
101:13
102:1
107:21
111:21
122:2
127:15
130:3,16
130:16,23
130:23
132:14
134:3,15
135:13
136:12
137:5,9
140:8
145:9,10
145:13
146:13,15
152:3,22
154:1
159:10
162:11

167:18
172:8
173:2,5,14
173:18
174:24
175:5
176:10
179:14
190:22
191:6
193:8
194:13,13
194:20,20
199:8
208:23
211:5
212:5
213:11
218:22
223:1
226:2,11
227:10,21
227:22
228:4
229:15
230:5,19
230:20
231:4,10
233:11
237:8
239:2
241:10,12
242:12,17
242:24
243:5,5,13
243:13
245:20
246:17
248:1,24
253:11
260:1
261:11,22
264:24
265:12
266:11
273:12,13
275:11
276:8,15
276:24
282:7
285:19
290:9
296:15

301:2,9,15
301:22
312:11
313:2,10
313:10,18
315:9,9,13
315:14
319:21
320:1
321:23
322:4,9,10
**timed** 136:16
**timeframe**
57:5
223:11
**times** 30:9
56:17
153:14
164:24
169:13
230:14
239:3
242:1
251:20
270:23
**timespan**
251:14
**timing**
113:18
289:10
290:12
**Timothy** 6:18
6:19 15:4
**tired** 177:10
246:18
308:2
**tissues** 88:9
**title** 23:21
23:22
157:18
170:17
204:23,24
**titled** 22:17
87:2 96:3
97:4
156:19
285:21
**today** 17:7
55:4
146:17
149:8
157:14
176:23

185:24
186:24
187:20
192:6
208:5
211:10
268:9
270:23
304:22
305:10
306:10
**Today's**
14:13
**told** 164:13
216:19
316:14,14
**Tommy** 156:19
157:6
**tone** 249:4
**tool** 121:24
**top** 88:2
93:1,2
111:12
180:20
203:22
218:6,14
256:6,6
257:8,17
257:19
258:16
259:16
299:2
306:13
**topic** 142:9
**topics** 96:17
**Torri** 136:14
**total** 33:2
33:13
34:10
**totally**
137:9
313:8
**touch** 57:19
**tough** 130:6
139:3
140:13
141:13
**track** 34:8
240:11
**tracked**
105:18
**trail** 164:24
**trained**

19:24 20:8
20:17 35:6
**training**
19:5 20:19
32:10
137:11
151:7,15
152:21
298:12,14
**Trans** 212:10
**transcribed**
22:24
**transcript**
1:22 9:21
167:6
170:9,13
172:12
176:7
185:13,15
185:17
189:19
191:14
203:15
**transcri...**
38:22
184:23
**transgender**
25:5,16
26:5,10
43:11 59:2
59:24
60:18
109:13
110:5,11
111:7
113:9
115:10
116:5,13
117:11
118:11,24
123:6,7,13
124:2,10
126:3,14
126:16
127:15
128:23
130:4
131:6
132:21
133:2,17
137:23
139:18
143:14,16

143:17
144:1,4
147:6
156:20
160:18
162:4
166:8,14
166:20
167:8
169:16
172:5
181:2,6
192:10
214:19
215:5
216:3,20
229:12,15
229:24
241:24
245:16
246:3
254:1
256:22,22
262:18
263:10,20
264:5
270:14
278:4
279:12
302:18
308:4,15
309:4
310:9,24
311:22
312:2
318:16,17
320:1
**transgen...**
319:3
**transgen...**
182:5
**transition**
51:5 107:1
244:3,5,11
244:18,24
245:4,23
246:11,21
248:4,17
261:1
263:18
264:4
309:6,8
**transiti...**

106:16
208:8
262:2
263:20
264:2
**transiti...**
59:24 62:1
106:13
204:2
209:1
261:16
**transitions**
218:9,18
219:7
**transsexual**
49:17,17
49:20 51:9
**trauma** 220:9
**treading**
137:21
**treat** 20:9
31:24
109:13
168:22
234:3
237:21
245:1,8,14
246:2
279:17
298:24
**treated**
27:10
106:7
110:10
111:8,19
112:8
181:6
234:1
261:19
274:1
291:3,17
292:10
295:22,23
310:3
**treating**
174:19
237:10
**treatment**
52:20 53:6
107:15
145:13
172:1
177:5,14

189:8
192:13
200:12
210:13
214:19
264:11
268:12
270:14
271:23
272:15
279:18,19
283:10
308:4,8,21
309:23
310:9,22
311:6,15
314:10
317:1
**treatments**
201:13
279:14
**treats** 181:2
**trial** 196:3
319:10
**trials**
274:13
275:9
276:6,14
**tricky**
134:20,23
**tried** 120:12
250:4
**trigger**
252:2
**trimester**
36:19 37:4
37:22
39:11
**trouble**
29:16,24
30:1 31:16
55:6,9
56:3,8
206:17
**troubles**
39:1
**true** 25:12
54:17
59:13
64:21
72:14
74:24
76:14

77:23
81:21
83:13,19
84:1
101:17
117:8
118:1
119:4
128:6
133:3
149:19
150:2
152:5
158:24
159:5,6
176:19
181:4
227:24
230:22
314:11,12
315:3,15
315:16
317:4,5
**truism**
269:14,17
**truly** 184:14
**trust** 199:10
274:3
**trusting**
159:8
**truth** 102:23
150:19
317:10
**try** 31:8
45:23
131:22
145:1
167:5
175:21
195:23
239:22
**trying** 76:17
82:3 102:5
112:5
124:23
128:6
144:9
201:11
226:3
249:7
265:6
275:23
294:23

15:8,8
29:7,7
32:7 140:3
140:3
164:23,23
301:3,7,9
301:17,23
302:12
303:12,22
304:8,15
304:23
305:6,15
306:1,7,16
306:20
307:3,12
307:16,23
308:13,19
309:2,10
309:15,22
310:7,13
310:20
311:4,14
311:21
312:7,18
313:1,12
314:1,16
315:1,12
315:24
316:13
317:2,18
317:21,23
318:4,12
320:6,14
320:23
321:7,16
321:22
322:2
**Tryonn** 8:8
**Turban** 10:6
250:20
254:10,15
**turn** 19:3
34:22,23
52:10
59:20
68:13
78:19 85:2
92:14
101:4
110:9
114:18
131:22
136:9

149:11
157:19
176:7
217:18
219:15
229:22
231:17
249:12
250:5
252:3
282:21
285:8
293:9
307:6
**Turner** 297:2
297:10,12
297:17
298:1,10
**twice** 319:10
**two** 17:12
19:3 28:3
32:9,11
38:4 40:18
44:21
58:24 69:6
69:7 72:17
72:17
76:12,20
77:7,13
80:18
93:11,11
100:15
122:22,24
129:21,22
130:10
138:3
164:19,21
165:7
172:8,13
176:8,8,11
180:20
193:11
196:7
210:8
250:15,23
251:1,8,17
251:17
252:19,24
253:24
256:14
257:10,13
257:21
258:13

259:4,13
260:2
271:20
274:12
275:9
276:5,13
282:21
287:14,20
288:2,18
308:5
309:4,9,18
309:20,24
314:9
318:10,13
**two-page**
60:10
169:23
**two-thirds**
185:15
286:22
**type** 88:23
129:21
178:5
252:18
309:16
**types** 162:6
**typewritten**
249:17
**typical**
35:10,10
35:13
36:21
47:22
55:18 83:3
91:2 92:8
154:3,15
173:20
251:19
252:12
**typically**
27:6 35:15
47:3,11
55:21
77:16 78:5
85:7 94:7
101:24
108:20
154:18
187:2,24
196:5
231:8
233:14
309:13

**TYRON** 75:21
———————
**U**
**U** 14:1
**UCLA** 67:22
**Uh-huh**
112:19
136:20
244:9,15
**ultimate**
167:15
**ultimately**
241:17
**ultrason...**
36:4
**ultrasound**
36:10,15
174:22
176:4
**unable** 74:9
**unbroken**
198:7
**UNC** 297:11
**unchange...**
316:12,15
**unclarity**
146:3
**unclear**
269:18
**uncomfor...**
106:6
183:15
**undergo**
239:1
291:4,18
292:11
295:22
**undergone**
154:14
**underline**
100:17
**underlying**
52:3 55:15
**undermined**
224:12
**undersigned**
3:5
**understand**
30:9 38:2
40:16 41:2
41:10 45:3
50:12 69:2
69:8,11

70:14 81:2
81:7 85:10
85:12
100:1
101:21
109:5
110:19
112:20
114:9
122:1,16
122:19
123:22
124:22
157:18
158:21
173:1,6
184:14
193:13
201:12
202:11
203:12
212:22
228:3
231:12
239:2
240:21
248:12
249:6
250:23
254:20
264:18
273:4,20
277:16
279:19
298:4
311:5
312:11
**understa...**
45:16 46:3
**understa...**
28:10 29:9
45:8 46:14
51:17 52:6
57:1 59:23
93:19
98:10
101:2
102:10
121:19
163:24
173:15
181:4
183:10

188:16
221:13
226:1,11
227:8
230:14
231:7,9
237:7
240:20
241:11
242:11,18
242:23
245:4
247:6,21
247:24
264:19
272:5
284:17
285:7
288:22
299:18
313:11,14
313:21
315:8,9
316:23
317:15
**understood**
63:3
204:15
317:16
**unduly**
221:18
**unequal**
68:22
**unethical**
261:7
**uninitiated**
300:14
**Union** 4:4
**United** 1:1
14:16
**universi...**
124:18
**university**
32:12 33:4
33:14,15
67:9,13,19
67:23
220:15
262:16
263:7
**unknown**
72:13
293:21

**unknowns**
190:20
**unmuted**
185:4
**unreason...**
124:1,9
134:6,18
135:15
139:21
147:23
148:4
278:3
**unrelated**
86:10
**unstable**
203:18
**untreated**
261:19
**unusual**
56:10
**unwilling**
268:9
**up-to-date**
66:24
**update**
239:22
**upper** 209:18
**ups** 158:3
290:7
**upside**
158:22
**URL** 100:11
**use** 46:6
47:19,24
50:4 51:23
52:15 54:3
54:3 62:21
63:4 67:22
70:23
72:12
73:21
77:15
79:18
86:20
90:20 92:1
107:9
108:20
109:2,22
115:21
132:2
137:7
156:11

158:14
178:22
189:14
195:11,16
200:4
226:3
239:15
241:2
245:2,2
253:14,19
273:24
274:23
276:19
277:11,15
277:22
281:14,16
285:3
292:22
293:11
294:10,24
295:3
300:16
305:3
311:9
314:20
**useful** 42:2
42:13 50:4
50:23 51:2
60:20
201:24
298:17
**uses** 64:3
125:6
**usually** 35:1
35:2,7,18
158:14
193:8
251:24
309:14

---

## V

**V** 14:18
**value** 167:10
**variability**
67:24 83:3
**variable**
63:22
64:10
65:10
66:14
68:17 69:9
73:4,14
91:12

114:16
**variables**
64:4 82:9
82:20
83:21 84:4
86:17 91:7
137:13
**variably**
163:23
**variation**
47:20,23
70:3 85:5
85:11,22
86:6,14
90:21
115:13
207:4
**variations**
36:14
47:21,21
77:18
85:12
86:18
115:2
117:19
122:6
**varied**
232:19
**varies**
104:19
117:21
252:7
253:17
**variety**
153:12,15
160:11
161:19
163:11
206:18
208:18
**various**
89:24
131:19
170:22
283:17
**varsity**
123:17
**vary** 48:3
118:6
305:4
**vast** 256:21
**venture**
162:17

**verbal**
193:10
**verified**
276:23
**verify** 102:9
172:17
173:11
176:19
296:4
**veriliza...**
53:15
154:4
**VEROFF** 4:11
**versa** 49:23
**version**
51:22
**versus** 27:4
35:10
47:22
55:10 56:4
161:9
193:10
270:9
300:18
**vertebrate**
78:21
81:22
**vessels** 90:9
91:3,12
**vice** 49:22
**video** 14:12
14:15,15
66:3
130:17,21
194:14,18
243:6,10
**videocon...**
3:7
**VIDEOGRA...**
14:10
16:11,19
18:21
38:23 39:4
66:1,8
86:21
130:15,22
148:18,23
185:5,7
194:12,19
201:15
243:4,11
255:14,17
255:20

Litigation 0897

317:18
322:1,8
**videotape**
38:24 66:7
**VIDEOTAPED**
1:18 2:7
322:12
**videotaping**
38:21
**view** 36:22
41:24 42:3
57:18
70:16
71:16
136:24
139:18
144:3,15
145:2
160:21
162:20
165:20
242:9
247:18
273:3,19
278:3
294:15
**violating**
141:24
**Virginia** 1:2
1:8,10 2:3
5:15,19,22
6:12,15
14:18,19
15:9,10,12
15:19
119:9,13
120:9,14
120:17,23
121:9
123:24
124:9,15
125:1,19
125:21
279:21
301:2,10
301:23
306:22
307:2
321:1
**visible** 35:1
35:8 36:14
252:20
**vision**

166:18
**visit** 176:15
179:11,11
179:15,16
187:8
188:1
191:16
193:9,24
**visual**
297:15
300:11,13
**vitae** 9:6
17:22
18:20 19:4
22:15
**voice** 28:15
31:7
180:21
184:18,18
184:19
186:5,6,23
198:19,19
198:19,21
198:23,23
198:24,24
199:11,16
200:16
275:22,24
**voices** 29:12
165:3
202:3
**volume** 53:15
**voluntarily**
224:11
**vs** 1:7
_____
**W**
**W** 1:11 6:16
**W-2** 33:13
**wait** 165:5
261:9
278:21
291:21
312:4,8
**waiting**
260:9,22
261:14
**waived** 14:6
171:4
**walk** 186:9
187:3
**walked**
186:14

187:11
279:4
**walking**
187:19
188:3,11
**Wall** 5:6
**Walter** 67:6
67:9
**want** 18:3,21
29:3 30:2
33:6 37:18
38:1 60:4
63:7,10
65:24
79:15 93:4
93:13,18
94:17
99:21
104:5
105:7,9
126:20
137:7
167:1
178:15
180:21
186:17
188:20
191:13
199:1,10
200:15
201:19
202:4,7
225:9
234:20
238:9
239:10
240:6
277:4
278:11
279:16,17
280:23
281:2
285:1
286:13
288:9
294:9
314:4,9
315:17,18
315:20
316:2,6,24
317:13
**wanted** 32:3
168:15

199:20
240:3
243:16
266:19
293:15
317:19
**wants** 138:4
138:16
**warn** 114:8
250:4
**warned** 250:2
**warning**
317:20
**warnings**
192:15
193:2
194:23
198:16
203:2
**Washington**
9:15,22
131:6,10
136:6
212:14,19
**wasn't**
100:20
124:5
169:11
171:5
219:3
276:19
284:3
321:14,19
**watch** 246:8
261:9
**watchful**
260:9,22
261:14
294:9
**water** 217:22
278:17
**wave** 287:4
287:24
288:16
**way** 28:11
32:3 49:15
50:8 70:21
84:8,10
106:8
108:4
109:2
119:17
125:17

147:8
151:4,20
152:2
154:19,22
164:5
176:5
181:10
199:2
201:10
203:7
209:2
210:21
212:5
216:5
230:19,20
231:7
232:19
237:9
238:24
240:21,24
240:24
241:13
242:1
243:1
246:5
249:1
253:18
257:5
260:5
286:22,23
294:21
314:15
315:10
**ways** 83:7
193:11
248:24
**we'll** 18:11
22:20 32:4
91:20
140:1,2
167:5,7
193:16
255:4
282:11
**we're** 14:10
20:7 28:18
31:2,2,8
52:15
54:19
60:11 66:8
73:19,19
92:7,22,24
104:20

Index #: 27997 0898

130:22
131:3
137:19,21
148:2
151:2
158:18
162:10
166:15
167:14
185:17
194:19
201:24
203:16
231:2
237:10,11
239:7
243:12
249:16
252:14
253:21
269:9,10
275:23
282:9
284:10
285:4
293:16
299:14
300:21
312:17
**we've** 113:19
190:24
194:11
276:4
289:9
**weaknesses**
188:7
**wear** 164:3
**web** 96:24
**Webpage** 9:14
96:7 170:5
**website** 96:3
96:23
169:24
170:10
**Wednesday**
3:8
**week** 38:9
256:1
274:2
**weigh** 273:11
320:19
321:1,9
**weighed**

321:6
**weight**
129:20
169:11
**weighty**
297:20
**welcome** 39:4
131:2
285:1
**Wellness**
32:23
**went** 190:12
305:17,17
**weren't** 44:9
111:22
174:14
269:20
**West** 1:2,8
1:10  2:2
5:15,22
6:15  14:17
14:18  15:9
15:10,12
15:19
119:9,13
120:9,13
120:17,22
121:9
123:24
124:8,15
125:1,18
125:21
279:21
301:2,10
301:23
306:21
307:2
321:1
**wetting**
221:6
**White** 6:5
**who've**
192:12
**wholistic**
308:24
**wholly** 295:5
**wide** 153:12
160:10
161:19
163:11
206:18,24
207:8,16
208:18

**widely** 70:8
70:16
299:4
**Wiley** 42:19
**Wilkinson**
7:4 201:21
202:5,14
216:13
224:20,23
228:10
243:18
**willing**
109:6
178:16
183:4
277:3
**witness** 8:4
14:20
16:12,15
17:13,15
17:24 18:5
18:8,10
19:12,19
20:7,16,22
21:3,11,16
21:21 22:3
22:10
23:10
24:16 25:1
25:12,19
25:20,24
26:7,16,21
27:13,24
28:11 29:4
29:9 31:14
31:17 32:3
33:6,23
34:4,14,19
36:3,12,21
37:7 38:2
38:8,17
39:13,19
40:2,8,14
40:23 41:7
41:15 42:5
42:15 43:2
43:16,24
44:12 45:6
45:20 46:6
46:17
47:11,18
48:6 49:11
50:8,15

51:2,22
52:6,23
53:2,10,24
54:11,20
55:9,18
56:7,14
57:1,12,24
58:10 59:5
60:13,23
61:11,18
62:9 63:1
63:13
64:14,16
64:18 65:2
65:9,21
66:12 67:6
68:11
69:11,20
70:2,10,19
71:10,18
71:24
72:10,23
73:8,18
74:5,13
75:6,7,9
75:12,23
76:9,16,23
77:15 78:1
78:11,16
79:11,18
80:4,16
81:4,10
82:3 83:2
83:10,15
83:23 84:6
84:23
85:15 86:1
86:9,17
88:21 89:6
89:16 90:5
90:18 91:7
91:15 92:6
94:4,14,22
95:11,23
96:10,19
97:13,24
98:2,9
99:7,20
101:6,16
102:13
103:1
104:2,12
105:23

106:15
107:3,9,17
108:4,13
108:19
109:11,21
110:24
111:12
112:12
113:2,14
114:4,9,13
115:17
116:9,18
117:8,18
118:5,14
118:21
119:3,11
119:20
120:2,11
121:1,12
121:23
123:20
124:5,13
124:20
125:5
127:9
128:12
129:5,19
131:19
132:7,16
133:12,22
134:8,20
135:17
136:1
137:4,20
137:22
138:12
139:10
140:6,19
140:22,23
141:19
142:6,9,9
142:11,16
144:9,20
145:8,22
146:9,23
148:1
149:21
151:1,12
151:23
152:9,16
152:24
153:11,23
154:7,17

155:5,13
155:20
156:9
158:11
159:2,18
160:1,10
161:6,18
162:8,17
163:1,7,16
166:2,13
167:2,14
168:1,8,12
169:9
171:1,8,13
171:19
172:4,17
173:11,18
174:2,18
175:4,11
175:24
176:18
177:5,21
178:10,21
179:14
180:2,10
180:16
181:8,16
181:24
182:9,22
183:7,17
183:22
184:11
186:3,13
187:2,14
187:24
188:10,20
189:3,12
190:16,24
192:4,19
193:5,23
194:5
195:3,20
196:5,13
196:20
197:3,15
198:12,21
200:3
201:8,18
203:5,19
204:11,18
205:3,14
205:22
206:6,12

206:17
207:4,11
207:18
208:1,7,16
209:12,15
209:20
210:5,15
211:7,17
212:22
213:9,16
213:23
214:4,9,22
215:7,24
216:7
217:2,11
218:21
219:10
220:17,22
221:21
222:10,18
223:1,11
223:19
224:3
226:9,23
227:8,17
228:2
229:14,19
230:12
231:2
232:8,14
233:14,21
234:19
235:15,23
236:10,19
237:4,17
237:23
238:6,13
238:23
239:14
240:19
241:9,21
242:17
243:3
244:22
245:11,20
246:5,16
247:1,24
248:8,20
251:5
252:6,12
253:2,10
253:17
254:4,12

255:16,21
257:13,23
258:5,11
258:20
259:15,20
260:4,13
261:3,18
262:9,20
263:13,23
264:8,13
265:3,16
266:5,15
266:23
267:7,14
267:24
269:1,17
269:23
270:5,17
271:2,11
272:3,11
273:1,9,24
274:17,23
275:14
276:10,19
277:6,18
277:24
278:9,17
279:11
280:2,10
281:2,24
284:22
285:11,18
286:18
287:17,22
288:5,20
289:3,21
290:15,23
291:8
292:4,14
293:6
294:5,19
295:11,19
296:20
298:1,9,23
299:8,23
300:5
302:10
303:11,19
304:6,12
304:21
305:2,12
305:20
306:6,12

306:24
307:11,15
307:21
308:11,17
308:23
309:6,13
309:20
310:2,11
310:17
311:2,9,18
312:1,10
312:22
313:7,16
314:14,19
315:7,20
316:8,22
317:8,24
318:3,5,9
319:13
320:4,18
321:5,13
322:7
**witness's**
  275:22
**WITNESS:S**
  64:1
**witnesses**
  156:3
  307:22
**WITNESSS**
  49:5
  125:23
  150:9
  251:17
  259:7
  268:15
  320:12
**WNYC** 169:20
  169:24
  170:10,21
  204:24
**woman** 88:11
  90:23
  125:11
  145:4
**woman's** 90:9
**women** 82:19
  83:5,19
  84:2,2,6
  84:14
  91:21 92:2
  97:5 98:11
  151:9

156:20
167:11
217:15
297:16
**women's**
87:20,24
132:4,12
134:5,16
135:14
137:1
140:12
144:18
145:4
146:6,21
147:22
**wonder** 28:23
**word** 26:24
27:5 46:7
47:23 69:2
70:3 72:21
72:23 73:9
73:21
77:15 79:1
79:19
84:16
90:22
115:21
125:6,7,10
137:8
148:3
207:5
225:14
226:4
238:24
239:15
241:2,2
249:4
255:2
267:11
269:2,17
301:1
312:12
**words** 26:23
28:13,22
38:3,4
61:7 90:18
90:19,19
94:18
98:11
184:22
185:15
187:14
239:7

311:10
**work** 33:16
33:20
44:14
63:21 64:9
80:21
102:15
114:1
125:12
176:1
177:22
178:11
179:4,6
210:8
215:4
219:12
235:23
238:2
239:19
270:5
285:21
297:11
301:15
**worked**
184:12
**worker**
178:17
179:22
194:23
**Workers**
178:11
**working**
166:3
176:9
**works** 56:23
58:12
130:14
166:3
**World** 9:14
96:3,6,12
96:15,23
97:20
**worried**
260:21
**worry** 260:16
**worse** 260:10
260:23
**worth** 28:22
28:24
203:2
234:15
292:22
**wouldn't**

42:7 63:10
90:22
97:15
129:6
157:10
159:20
195:20
206:21
207:12
223:4
237:12
**WPATH** 214:18
304:14,17
304:22
**write** 18:9
157:21
307:8,13
**writes**
284:11
**writing**
57:13
60:17
62:19,22
189:16
291:6
**written** 50:8
59:11
110:13
249:1
259:7
300:6
**wrong** 36:10
89:14
241:19
242:15
291:21
312:13
**wrote** 92:14
218:1
225:11
250:12
307:21
308:1,2
**WV** 5:14,21
6:6,14
**www.who....**
100:17
**Wyant** 6:11
15:12

___

**X**

**X** 8:1 40:18
40:20

46:18
120:20
**XO** 46:23
**XX** 46:20,22
47:14
69:15 70:7
70:17
71:24 88:4
132:2
**XY** 45:11
46:19,23
48:7 69:16
70:7,17
71:24 88:4
120:7,17
120:20
121:2,7
132:2

___

**Y**

**Y** 40:8,20
46:18
**yard** 136:11
136:15
**yay** 187:20
198:24,24
199:3,3,4
199:4
200:9,10
200:13,13
201:6,14
**yays** 200:16
**yeah** 73:15
77:5 81:16
90:5,12
99:2
103:14
104:5,12
113:2,14
118:15
151:12
153:23
158:6
162:17
165:17
168:12
176:12
183:22
185:24
192:24
207:6
209:15,15
209:17

218:15
229:4
250:7
255:12
256:16
263:5
291:24
311:18
319:12,18
**year** 23:13
23:18 24:6
33:12,16
59:16
66:19 73:2
73:24
111:4
132:5
136:13,23
152:22
153:7,15
153:19
155:3,18
156:6
157:23,23
216:21
225:11
239:8,20
273:4,20
274:1,2
314:17
**year's**
292:21
**years** 35:23
43:22
48:11
50:24
66:19,20
120:12
128:3
157:22
172:8
176:13
191:1,2
210:1,12
211:13
216:4
218:23
274:4
275:2
290:2
314:9
**Yep** 79:7
**York** 4:6 5:8

**young** 105:21
110:11
111:7
137:12
203:1
218:8,17
219:6
221:17
222:15,22
223:15
227:11
237:10
241:11,24
248:22
263:18
272:17
273:24
**younger**
133:20
207:23
**youth** 123:6
123:13
124:2,10
126:3
128:24
133:2,17
144:2,4,7
270:14
308:5
309:4
310:9,14
310:17
318:17

___

**Z**

**ZOE** 4:12
**Zucker** 10:6
250:20
254:10,16
**zygote** 71:1
71:5,8,22
72:1,5
**zygotes**
68:21

___

**0**

___

**1**

**1** 5:13 9:5
17:10,18
34:21
92:13
103:9

267:18,19
1.5 271:20
1/10/22 9:15
131:9
1/9/22 9:16
143:7
10 9:15 96:2
111:4
131:4,5,9
136:6,7
256:12
315:13
10:08 66:2
10:21 66:9
100 72:6,11
92:7
117:19
141:5
219:24
220:6,14
220:24
274:7
292:6
303:3,7
10004 4:6
10005-3919
5:8
101 11:14,14
102 11:15,15
103 11:15,15
104 11:15
105 11:15
106 11:15
107 11:15,15
11:15,15
108 11:16,16
11:16
109 11:16,16
11 9:16
143:3,7
148:10,14
249:12
250:5,11
287:9
290:21
307:4,9
11:54 130:16
110 11:16
111 11:16
112 11:16
113 11:16,16
115 11:16
116 11:17,17

117 11:17,17
118 11:17,17
11:17
119 11:17,17
11:17
12 9:17
228:8
251:20
287:9
290:21
315:14
12:30 113:23
12:57 130:23
120 5:6
11:17,18
11:18
121 11:18,18
123 11:18
124 11:18,18
11:18
125 4:5
11:18,18
126 11:18
127 11:19,19
11:19,19
129 11:19,19
13 9:19
152:7,14
153:3,4,5
153:8,15
154:7,23
156:17,24
172:20
209:10
216:20
13.8 158:4
131 9:15
11:19
132 11:19,19
133 11:19,19
11:20
134 11:20,20
135 11:20,20
137 11:20,20
138 11:20
139 11:20,20
13th 152:22
153:7,19
155:2,18
156:6
14 8:3 9:20
153:13
169:23

170:4
207:23
252:1
315:14
140 11:20,21
141 11:21,21
11:21
1411 5:19
142 9:16
11:21
143 11:21
144 11:21,21
145 11:21,21
287:1
146 11:21,22
147 11:22,22
148 9:18
149 11:22
15 9:21
92:14
111:4
170:9,12
172:11
185:14
206:10
150 11:22,22
151 11:22,22
15100 7:10
152 11:22,22
11:22
153 11:23,23
154 11:23,23
155 11:23,23
11:23
156 9:19
11:23
158 11:23
159 11:23,23
11:24
16 1:20 2:9
3:8 9:22
131:4
212:7,13
216:11,13
216:14,16
217:19,21
312:6
16.6 158:1
160 11:24
161 11:24,24
11:24
162 11:24,24
11:24

163 11:24,24
166 11:24
12:4
167 12:4,4
168 12:4,4
169 12:4
16th 14:13
17 8:3,6 9:5
9:6,23
81:1 143:3
157:22
215:13,15
216:11,12
216:13,14
170 9:20,21
12:4
171 12:4,5,5
172 12:5,5
173 12:5,5
173,000
33:12
174 12:5,5,5
175 12:5,5,6
12:6
176 12:6
177 12:6,6
178 12:6,6
179 12:6
18 9:7,24
216:11
224:9,23
225:2,4,10
225:11
240:15,16
240:17
312:4,6,6
312:8
180 12:6,6,6
181 12:7,7,7
182 12:7,7
183 12:7,7,7
184 12:7,7
186 12:7,8
187 12:8,8,8
188 12:8,8
189 12:8,8
19 10:5 11:4
11:4 103:8
103:13
148:20,21
228:10,12
228:16
190 12:8,8

191 12:8
192 12:9,9
193 12:9,9
195 12:9,9,9
196 12:9,9,9
12:9,10
197 12:10,10
198 12:10,10
19th 5:7

2
2 9:6 17:14
17:21
18:19 19:4
22:15 28:3
32:9 59:8
170:2
2.3 52:19
2:21-CV-...
1:7 14:20
2:27 194:13
2:43 194:20
20 10:6 11:4
11:4,4
43:22
203:2
209:18
228:9
254:9,10
254:12,15
284:2
20,000 33:15
200 5:20
12:10,10
136:11
2007 92:21
231:16
2009 9:9
48:11,13
48:19 50:2
50:11,24
52:4 53:5
53:19 54:5
56:18
281:7
201 12:10
157:19
2013 172:5
209:6,7
2014 209:7
2015 209:7
296:2
2016 9:20,21

169:21
170:2,4,12
171:22,23
181:4
190:20
191:21
193:24
**2017** 9:8,10
24:6 42:18
42:21 49:5
50:11,24
57:16
58:17,17
58:19
59:16
60:17 62:5
62:19
66:21
79:23
80:10
92:23
95:20
164:14
234:7
243:22
281:7
283:20
293:8
294:2
**2018** 25:4
**2020** 9:19
10:5
156:19,24
228:16
**2021** 9:11,22
34:2,4,11
34:16
65:17
66:19
71:15 80:9
80:13
81:21
212:13,19
223:6
239:24
**2022** 1:20
2:9 3:8
14:13
23:14
131:5
136:7
143:5
223:7

**203** 12:10
**204** 12:10,10
**205** 12:11,11
12:11,11
**206** 12:11,11
**207** 12:11,11
12:11,11
**208** 12:11,12
**209** 12:12,12
12:12
**20th** 4:17
**21** 10:7 11:4
11:4,4,4
208:5
285:21
286:2,4
**210** 12:12,12
**211** 12:12,12
12:12
**212** 12:12
**213** 9:22
12:12,13
12:13
**214** 12:13,13
12:13
**215** 12:13,13
**216** 9:23
12:13
**217** 12:13,13
**218** 12:13
**219** 12:14,14
**21st** 23:13
23:18
**22** 11:4,5
**220** 12:14,14
68:14
**221** 74:16
**222** 12:14,14
12:14
**223** 12:14,14
**224** 12:14
**225** 9:24
114:18
**226** 12:14,15
**227** 12:15,15
12:15
**228** 10:5
12:15
78:19 82:7
82:12
**229** 12:15
85:2
**23** 11:5

**230** 12:15,15
**232** 12:15,15
**233** 12:15,16
12:16
**234** 12:16
**235** 12:16,16
12:16
**236** 12:16,16
**237** 12:16,16
12:16
**238** 12:17,17
12:17
**239** 12:17
**24** 11:5,5
156:16,18
291:2,13
291:22
296:9,14
296:22
**240** 12:17,17
**241** 12:17,17
**242** 12:17
**244** 12:17
**245** 12:17,18
12:18
**246** 12:18,18
12:18
**247** 12:18,18
**248** 12:18,18
**25** 11:5,5
169:19
206:19
**251** 12:18,18
12:19
**252** 12:19,19
12:19,19
**253** 12:19,19
12:19
**25301** 5:21
6:14
**25305** 5:14
**254** 10:6
12:19,19
**257** 12:19,20
**258** 12:20,20
12:20
**259** 12:20,20
**26** 11:5,5,5
**260** 12:20,20
**261** 12:20,20
**262** 12:20,21
12:21
**263** 12:21

**26330** 6:6
**264** 12:21,21
**265** 12:21,21
**266** 12:21,21
12:21,21
**267** 12:22,22
12:22
**268** 12:22,22
**269** 12:22,22
**27** 11:5,5
**270** 12:22,22
**271** 12:22,22
**272** 12:23,23
12:23
**273** 12:23
**274** 12:23,23
**275** 12:23
**276** 12:23,23
**277** 12:23,23
12:24
**278** 12:24,24
**279** 12:24
**28** 123:3
133:1,7,7
133:8,15
143:24
160:17
**280** 12:24,24
12:24
**281** 12:24,24
**284** 12:24
**285** 12:24
13:4
**286** 10:7
13:4
**287** 13:4,4
**288** 13:4,4
**289** 13:4,4,5
**29** 133:5,7
212:6,8
300:22
**290** 13:5,5,5
**291** 13:5
**292** 13:5,5
**293** 13:5
**294** 13:5,5
**295** 13:5,6
**296** 13:6
**297** 13:6
**298** 13:6,6
**299** 13:6,6
——— 3 ———

**3** 4:16 9:7
18:7,14
153:3,4,9
153:20
249:11,11
249:20
291:11
**3:43** 243:5
**3:59** 243:13
**30** 118:8
154:22
158:3
206:19
237:24
274:4
300:24
**300** 8:6 13:6
**301** 8:8
**302** 13:6
**303** 13:6,6
**304** 13:7,7,7
**305** 13:7,7,7
**306** 13:7,7,7
**307** 13:7,7,8
**308** 13:8,8,8
**309** 13:8,8,8
**30s** 112:4
**31** 300:21
**310** 13:8,8,8
**311** 13:8,9,9
13:9
**312** 13:9,9
**313** 13:9,9
**3134** 49:13
**314** 13:9,9
**3141** 52:11
52:12
**315** 13:9,9
**316** 13:10,10
**317** 13:10
**318** 13:10,10
**32** 285:24
**320** 13:10,10
13:10
**321** 13:10,10
13:10
**322** 8:8
**323** 8:9
**33** 11:5,5
158:3
**34** 11:5,6,6
**34.06** 136:16
**36** 11:6,6,6

**37** 11:6,6
   34:23
**38** 34:23
   220:7
**3873** 93:5,6
   165:7
**3874** 282:21
   282:22
   284:11
**3879** 231:17
   243:23
   271:16,20
**3882** 293:9
   293:17
**39** 11:6,6
   255:19
   256:14
   257:10,21

———— **4** ————

**4** 9:8  42:17
   42:21
   58:14
   92:21
   153:9,21
   164:15
   231:16
   243:22
   271:17,18
   271:19
   282:20
   293:9
**40** 11:6,6,6
   11:6  118:8
   206:19
**400** 6:5
**41** 11:6,7
   41:17,20
**42** 9:8  11:7
   11:7
**43** 11:7,7
   295:21
   296:5
**44** 11:7
**45** 11:7,7
**46** 11:7,7
**47** 11:7,7
**48** 9:9  11:7
   11:7
**49** 11:8,8
**4th** 25:4

———— **5** ————

**5** 9:9  42:17
   48:10,13
**5/21/2021**
   225:1
**5:56** 322:9
   322:12
**50** 11:8,8
   303:5,6
**500** 6:12
   34:9
   110:10,21
   111:7
   136:15
   207:22
**51** 11:8,8
**52** 11:8
**53** 11:8,8
**54** 11:8,8
   282:10
**55** 11:8,8,8
   11:9,9
**56** 11:9,9,9
**57** 11:9,9
**58** 9:10  11:9
**59** 11:9

———— **6** ————

**6** 9:10  58:14
   58:14,19
**6:30** 165:5
**60** 11:9
   111:3
**600** 6:13
**61** 11:9,9
**62** 11:9,9
**63** 11:10,10
**638** 256:5,7
**64** 11:10,10
   136:13
**65** 9:12
   11:10,10
**67** 11:10
**68** 11:10
**689** 59:22
   60:8
**69** 11:10,10
**692** 59:21
   60:3,11

———— **7** ————

**7** 9:11  65:15
   65:17
   66:12

114:17
**70** 11:10,10
   11:10
**71** 11:10,11
   11:11
**72** 11:11,11
   11:11
**73** 11:11,11
**74** 11:11,11
**7430** 6:20
**75** 11:11,11
**76** 11:11,11
   11:11
**77** 11:12,12
**78** 11:12,12
**79** 11:12,12

———— **8** ————

**8** 9:13  86:20
   86:20,22
   87:5
   251:19
**80** 11:12,12
**81** 11:12,12
**82** 11:12
**83** 11:12,12
   11:12,13
**84** 11:13,13
**85** 11:13,13
   234:9
   241:16
**85,000**
   157:22
**852** 60  6:22
   7:11
**86** 11:13,13
**87** 9:13
**88** 11:13
   149:11,12
**89** 11:13,13
   149:12

———— **9** ————

**9** 9:14  86:24
   96:2,6
   143:5
   153:13
   157:22,23
   157:23
   252:1
   273:4,19
**9.5** 158:1
**9.8** 157:24

**9:06** 3:8
   14:14
**90** 11:13,13
   118:6
**90th** 7:10
**91** 11:13,13
**92** 11:14
**94** 11:14,14
   11:14
**94111-4004**
   4:18
**95** 11:14,14
**96** 9:14
   11:14
**97** 11:14
**98** 11:14
**99** 11:14,14
   78:13

Exhibit 30 0905

IN THE UNITED STATES DISTRICT COURT

FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA

CHARLESTON DIVISION

* * * * * * * *

| | | |
|---|---|---|
| B.P.J., by her next friend and | * | |
| Mother, HEATHER JACKSON, | * | |
|    Plaintiff | * | Case No. |
|    vs. | * | 2:21-CV-00316 |
| WEST VIRGINIA STATE BOARD OF | * | |
| EDUCATION, HARRISON COUNTY | * | |
| BOARD OF EDUCATION, WEST | * | |
| VIRGINIA SECONDARY SCHOOL | * | |
| ACTIVITIES COMMISSION, W. | * | |
| CLAYTON BURCH in his official | * | |
| Capacity as State Superintendent, | * | VIDEOTAPED |
| DORA STUTLER in her official | * | VIDEOCONFERENCE |
| Capacity as Harrison County | * | DEPOSITION |
| Superintendent, PATRICK MORRISEY | * |    OF |
| In his official capacity as | * | ARON JANSSEN, M.D. |
| Attorney General, and THE STATE | * | April 4, 2022 |
| OF WEST VIRGINIA, | * | |
|    Defendants | * | |

Any reproduction of this transcript
is prohibited without authorization
by the certifying agency.

Page 2

```
 1        VIDEOTAPED VIDEOCONFERENCE DEPOSITION
 2                        OF
 3   ARON JANSSEN, M.D., taken on behalf of the Defendant,
 4   State of West Virginia herein, pursuant to the Rules of
 5   Civil Procedure, taken before me, the undersigned, Lacey
 6   C. Scott, a Court Reporter and Notary Public in and for
 7   the State of West Virginia, on Thursday, April 4, 2022,
 8   beginning at 9:09 a.m.
 9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
```

Page 3

```
 1              A P P E A R A N C E S
 2
 3   JOSHUA BLOCK, ESQUIRE
 4   American Civil Liberties Union Foundation
 5   125 Broad Street
 6   New York, NY  10004
 7       COUNSEL FOR PLAINTIFF
 8
 9   KATHLEEN R. HARTNETT, ESQUIRE
10   ANDREW BARR, ESQUIRE
11   ELIZABETH REINHARDT, ESQUIRE
12   VALERIA M. PELE DEL TORO  ESQUIRE
13   Cooley, LLP
14   3 Embarcadero Center, 20th Floor
15   San Francisco, CA  94111-4004
16       COUNSELS FOR PLAINTIFF
17
18   SRUTI SWAMINATHAN, ESQUIRE
19   Lambda Legal
20   120 Wall Street, 19th Floor
21   New York, NY  10005-3919
22       COUNSEL FOR PLAINTIFF
23
24
```

Page 4

```
 1           A P P E A R A N C E S (cont'd)
 2
 3   DAVID TRYON, ESQUIRE
 4   State Capitol Complex
 5   Building 1, Room E-26
 6   Charleston, WV  25305
 7       COUNSEL FOR STATE OF WEST VIRGINIA
 8
 9   ROBERTA F. GREEN, ESQUIRE
10   Shuman McCuskey Slicer, PLLC
11   1411 Virginia Street East
12   Suite 200
13   Charleston, WV  25301
14       COUNSEL FOR WEST VIRGINIA SECONDARY SCHOOL
15       ACTIVITIES COMMISSION
16
17   SUSAN DENIKER, ESQUIRE
18   Steptoe & Johnson
19   400 White Oaks Boulevard
20   Bridgeport, WV  26330
21       COUNSEL FOR HARRISON COUNTY BOARD OF EDUCATION and
22       HARRISON COUNTY SUPERINTENDENT DORA STUTLER
23
24
```

Page 5

```
 1           A P P E A R A N C E S (cont'd)
 2
 3   KELLY C. MORGAN, ESQUIRE
 4   Bailey Wyant
 5   500 Virginia Street East
 6   Suite 600
 7   Charleston, WV  25301
 8       COUNSEL FOR WEST VIRGINIA BOARD OF EDUCATION and
 9       SUPERINTENDANT W. CLAYTON BURCH
10
11   RACHEL CSUTOROS, ESQUIRE
12   Alliance Defending Freedom
13   15100 North 90th Street
14   Scottsdale, AZ  85260
15       COUNSEL FOR INTERVENOR, LAINEY ARMISTEAD
16
17   TRAVIS C. BARHAM, ESQUIRE
18   LAWRENCE WILKINSON, LAW CLERK
19   1000 Hurricane Shoals Road NE
20   Suite D 1100
21   Lawrenceville, GA  30043
22       COUNSEL FOR INTERVENOR, LAINEY ARMISTEAD
23
24
```

Page 6

I N D E X

3   DISCUSSION AMONG PARTIES          11 - 13
4   WITNESS: ARON JANSSEN, M.D.
5   EXAMINATION
6     By Attorney Barham              13 - 295
7   EXAMINATION
8     By Attorney Tryon              295 - 388
9   CERTIFICATE                       390

Page 8

EXHIBIT PAGE

PAGE
NUMBER  DESCRIPTION                  IDENTIFIED

17   Study by Gibson, et al.          126
18   Errata Sheet                     130
19   Article by Tordoff, et al.       131
20   Article by Amy Green, et al.     133
21   Article by Turban, et al.        134
22   Article by Achille, et al.       135
23   Article by Kuper, et al.         137
24   Article by van der Miesen, et al. 138
25   Article by De Vries              140
26   Article by Biggs                 142
27   Article by Costa, et al.         145
28   Article by Edwards-Leeper        148
29   Article by Edwards-Leeper        149
30   Interview by Lisa Selin Davis    176
31   Label of Lupron                  218
32   Puberty Blockers Document        224
33   Endocrine Society's Guidelines   228
34   Article by Blakemore             232
35   Article by Guss, et al.          245
36   Article by Moseson, et al.       247

Page 7

EXHIBIT PAGE

PAGE
NUMBER  DESCRIPTION                  IDENTIFIED

1    Expert Report                    14
2    Endocrine Society's Guidelines   32
3    World Health Organization        35
4    Harvard Medical School Study     43
5    American Psychological Association
     Guidelines                       48
6    Lisa Littman Study               53
7    Study                            76
8    Article by Vandenbussche         82
9    Article by Lily Durwood          84
10   Statement by Royal Australian and
     New Zealand College of
     Psychiatrists                    97
11   Policy Change Regarding Hormonal
     Treatment of Minors              101
12   Article by Lisa Nainggolan       106
13   Study                            107
14   Article Published on Medscape.com 108
15   Article in National Health Service 110
16   Article by Roberto D'Angelo      115

Page 9

EXHIBIT PAGE

PAGE
NUMBER  DESCRIPTION                  IDENTIFIED

37   Article by Steensma              251
38   Analysis                         251
39   Article by Rae, et al.           256
40   Article by Carmichael, et al.    262
41   Washington Post Article          268
42   Out Sports Article               271
43   Article by Turban, et al.        276
44   Article by Ryan, et al.          280
45   Article by Klein and Golub       281
46   Form                             315

OBJECTION PAGE

| | |
|---|---|
| 1 | |
| 2 | |
| 3 | ATTORNEY                          PAGE |

Block  17, 18, 19, 21, 22, 23, 24, 27, 29, 30, 31, 33,
34, 35, 36, 37, 38, 39, 40, 41, 42, 44, 45, 46, 49, 50,
52, 54, 56, 57, 58, 59, 66, 68, 69, 70, 71, 72, 74, 75,
77, 78, 79, 80, 81, 82, 85, 86, 87, 88, 89, 91, 92, 95,
96, 97, 98, 99, 100, 101, 102, 104, 105, 106, 107, 109,
111, 113, 114, 115, 117, 118, 119, 120, 120, 121, 122,
123, 125, 129, 130, 132, 134, 138, 141, 142, 144, 145,
147, 153, 154, 156, 157, 158, 160, 161, 163, 165, 166,
167, 169, 172, 173, 174, 175, 177, 178, 179, 180, 181,
182, 183, 184, 185, 186, 187, 188, 189, 190, 191, 193,
194, 195, 196, 197, 198, 199, 200, 201, 202, 203, 206,
207, 208, 209, 210, 211, 213, 214, 217, 218, 219, 220,
221, 222, 223, 224, 226, 228, 229, 231, 234, 27, 238,
240, 241, 242, 243, 244, 245, 246, 247, 250, 254, 255,
258, 259, 260, 261, 264, 265, 266, 268, 269, 270, 272,
274, 275, 282, 284, 286, 288, 289, 290, 291, 292, 293,
294, 295, 298, 300, 301, 302, 303, 304, 308, 309, 310,
311, 312, 313, 314, 316, 317, 318, 319, 320, 321, 322,
323, 324, 325, 326, 327, 330, 331, 332, 333, 334, 336,
337, 337

S T I P U L A T I O N

----------------------------------------------------

(It is hereby stipulated and agreed by and between

counsel for the respective parties that reading,

signing, sealing, certification and filing are not

waived )

----------------------------------------------------

P R O C E E D I N G S

----------------------------------------------------

ATTORNEY BARHAM:  Counsel has stipulated

that our court reporter present this morning can swear

in the witness, so I will let the court reporter take

care of that

---

ARON JANSSEN, M D ,

CALLED AS A WITNESS IN THE FOLLOWING PROCEEDINGS, AND

HAVING FIRST BEEN DULY SWORN, TESTIFIED AND SAID AS

FOLLOWS:

---

VIDEOGRAPHER:  My name is Jacob Stock

I'm a Certified Legal Video Specialist employed by

Sargent's Court Reporting Services  The date today is

April 4th, 2022  The time on the video monitor reads

9:09 a m  This deposition is being taken remotely by

Zoom conference.  The caption is in the United States

District Court for the Southern District of West

Virginia, Charleston Division, BPJ, et al., versus West

Virginia State Board of Education, et al.  Civil Action

Number 2:21-CV-00316.  The name of the witness is Aron

Janssen.  Will the attorneys present state their names

and the parties they represent?

ATTORNEY BARHAM:  My name is Travis

Barham.  I represent the intervenors in this case.  And

with me is Lawrence Wilkinson.

ATTORNEY CSUTOROS:  Rachel Csutoros also

for intervenor.

ATTORNEY TRYON:  This is David Tryon of

the West Virginia Attorney General's Office,

representing the State of West Virginia.

ATTORNEY DENIKER:  Good morning.  Susan

Deniker.  Counsel for Defendants Harrison County Board

of Education and Superintendent Dora Stutler.

ATTORNEY MORGAN:  This is Kelly Morgan on

behalf of the West Virginia Board of Education and

Superintendent Burch.

ATTORNEY GREEN:  This is Roberta Green

here on behalf of West Virginia Secondary School

Activities Commission.

ATTORNEY BLOCK:  For Plaintiff BPJ, this

is Josh Block from the ACLU.

ATTORNEY SWAMINATHAN:  This is Sruti

Swaminathan from Lambda Legal on behalf of Plaintiff.

ATTORNEY HARTNETT:  Good morning.  This

is Kathleen Hartnett at Cooley on behalf of Plaintiff.

ATTORNEY BARR:  Andrew Barr from Cooley

on behalf of Plaintiff.

ATTORNEY PELET DEL TORO:  Good morning.

This is Valeria Pelet Del Toro from Cooley on behalf of

Plaintiff.

ATTORNEY REINHARDT:  This is Elizabeth

Reinhardt from Cooley on behalf of Plaintiff.

VIDEOGRAPHER:  If that's everyone, the

witness has already been sworn in and we can begin.

---

EXAMINATION

---

BY ATTORNEY BARHAM:

Q.   **Good morning, Dr. Janssen.**

A.   Good morning.

Q.   **Have you ever had a deposition before?**

A.   No.

Q.   **All right.**

**Page 14**

1        I'm going to ask you a series of questions
2    about this case and your involvement in it.  Do your
3    best to answer audibly.  Just nodding the head, while it
4    can be captured on video cannot be captured by our court
5    reporter, and so we'll try to make her life as easy as
6    possible.
7        I'm going to do my best to wait until you finish
8    an answer before starting the next question.  And I will
9    ask that you do the same.  We'll probably violate that
10   rule a few times, but cross talk doesn't translate well
11   on the record.  So if you need to take a break at any
12   time today, please let me know and we will do our best
13   to facilitate that as quickly as possible.  I know we
14   need to take a break at two o'clock.
15   A.   I think about 2:30, 2:45, something like that.
16   Q.   Okay.
17        You just let us know when you need to take it.
18   All right.
19        ATTORNEY BARHAM:  I'm going to show you a
20   document we're going to mark as Exhibit-1.  This will be
21   Tab 90 for online purposes.
22              ---
23        (Whereupon, Exhibit 1, Expert Report, was
24            marked for identification.)

**Page 15**

1              ---
2    BY ATTORNEY BARHAM:
3    Q.   This is a copy of your expert report in this
4    case.
5        Is that correct?
6    A.   Yes, that is correct.
7    Q.   If you'll turn to the first page of your CV.
8    It's probably page 21 of this document.  Do you
9    have ---?
10        VIDEOGRAPHER:  This is the videographer.
11   Can I ask Counsel to speak up?  You are kind of getting
12   cutoff at the end of your sentences.
13        ATTORNEY BARHAM:  Pardon.  I will do my
14   best.
15   BY ATTORNEY BARHAM:
16   Q.   Do you have a degree in adult psychiatry?
17   A.   There is not a degree in psychiatry.
18   Q.   Okay.
19        So your academic training in psychiatry began
20   with your psychiatry residency?  Is that how it works?
21   A.   I did a medical degree, where there is
22   psychiatry training and then a residency in adult
23   psychiatry and a fellowship in child psychiatry.
24   Q.   Do you consider yourself trained and

**Page 16**

1    professionally competent in using the American
2    Psychiatric Association's Diagnostic and Statistical
3    Manual, DSM-V, to make child and adolescent metal
4    illness or psychiatric diagnoses generally beyond just
5    gender dysphoria?
6    A.   Yes.
7    Q.   Do you have any residency or fellowship in
8    pediatrics?
9    A.   No.
10   Q.   Do you have any residency or fellowship in
11   endocrinology?
12   A.   No.
13   Q.   Do you have any training in sports physiology?
14   A.   No.
15   Q.   Do you have any training in sports medicine?
16   A.   No.
17   Q.   Have you published any papers, conducted any
18   research or given any lectures relating to sports
19   physiology?
20   A.   No.
21   Q.   Have you published any papers, conducted any
22   research or given any lectures relating to sports
23   medicine?
24   A.   No.

**Page 17**

1    Q.   Have you published any papers, conducted any
2    research or given any lectures relating to male
3    physiological advantages in athletics before, during or
4    after puberty?
5    A.   No.
6        ATTORNEY BLOCK:  Objection to form.  You
7    can answer.
8    BY ATTORNEY BARHAM:
9    Q.   Have you published any papers, conducted any
10   research or given any lectures relating to the impact of
11   any drugs or hormones on athletic performance?
12   A.   No.
13   Q.   Have you published any papers, conducted any
14   research or given any lectures relating to the impact of
15   testosterone suppression on athletic performance?
16   A.   No.
17   Q.   Have you published any papers, conducted any
18   research or given any lectures relating to the effect of
19   transsex surgeries on athletic performance?
20   A.   No.
21        ATTORNEY BLOCK:  Objection. Objection to
22   terminology.
23   BY ATTORNEY BARHAM:
24   Q.   Have you published any papers, conducted any

Page 18

1   research or given any lectures relating to the safety
2   issues and risks to women associated with transgender
3   participation in female athletics by male athletes?
4          ATTORNEY BLOCK:  Objection to form.
5   Sorry, objection to form.
6          THE WITNESS:  Yeah, I think there's a bit
7   of a premise in there that I don't agree with, but I
8   have not given any lectures about transgender
9   participation in sports.
10  BY ATTORNEY BARHAM:
11     Q.   Do you consider --- do you have any professional
12  expertise related to the concept of fairness?
13     A.   I do not.
14     Q.   Do you have any professional expertise on the
15  definition of fairness?
16     A.   I do not.
17     Q.   Would you agree that fairness is an elusive,
18  subjective concept with malleable boundaries?
19          ATTORNEY BLOCK:  Objection to form.
20          THE WITNESS:  I do not have an opinion on
21  the definition of fairness.
22  BY ATTORNEY BARHAM:
23     Q.   Have you treated or personally examined BPJ?
24     A.   I have not.

Page 19

1      Q.   You have no direct knowledge as to what Tanner
2   stage BPJ started puberty blockers at the age.
3          Correct?
4      A.   Correct.
5      Q.   You do not know how BPJ's physiology or athletic
6   capabilities compare with genetic females at the same
7   age?
8      A.   I do not.
9          ATTORNEY BLOCK:  Objection to
10  terminology.
11  BY ATTORNEY BARHAM:
12     Q.   This report, Exhibit-1 of 20 pages sets out the
13  complete statement of all opinions that you will testify
14  to at trial.
15          Correct?
16     A.   Which report are you referring to?
17     Q.   The report in front of you, Exhibit-1, Tab 90.
18     A.   And can you repeat the question?  Sorry.
19     Q.   This report sets out a complete statement of all
20  opinions that you will testify to at trial.
21          Correct?
22     A.   I do not know the answer to that.  I mean, I
23  would assume so, but I don't know.  I've never been in a
24  trial, so I don't know if there will be questions asked

Page 20

1   outside of this document.
2      Q.   Does this report identify all facts and data
3   that you considered in forming the opinions that you set
4   forth in your report?
5      A.   I wouldn't say it has all facts because I don't
6   think it is possible to include all facts in an expert
7   report, but the relevant facts, yes.
8      Q.   This includes the facts that you'll rely on in
9   supporting those opinions.
10          Correct?
11     A.   That's correct.
12     Q.   Does your report set out all the reasons for the
13  opinions that you propose to offer?
14     A.   Yes.
15     Q.   Your footnotes cite to I believe 32 scientific
16  or professional articles and you reference some others
17  in your CV.  Are those all the articles that form the
18  basis of the opinions you propose to offer?
19     A.   No.
20     Q.   What other articles form the basis of the
21  opinions you propose to offer?
22     A.   I guess the question is what has formed my
23  professional expertise around gender health, and I've
24  read a lot that aren't necessarily going to be apropos

Page 21

1   to this specific report.
2      Q.   But those are the articles that you cited and
3   referenced in this document are those that you relied
4   upon as the basis of opinions that you intend to offer.
5          Correct?
6      A.   That is correct.
7      Q.   You currently serve as the Clinical Associate
8   Professor of Child and Adolescent Psychiatry.
9          Correct?
10     A.   Yes.
11     Q.   And what institution is that with?
12     A.   It is with Northwestern University Feinberg
13  School of Medicine, and Ann and Robert H. Lurie
14  Children's Hospital of Chicago.
15     Q.   And how much of your time in this position is
16  related to discussing or treating gender dysphoric
17  children and adolescents?
18          ATTORNEY BLOCK:  Objection to
19  terminology.
20          THE WITNESS:  It's hard to quantify.
21  Probably about 40 percent of my time is allocated in
22  some way to either clinical care, research or academics
23  around gender health.
24  BY ATTORNEY BARHAM:

smithwesson 0911

Page 22

```
 1        Q.   And what is your compensation for this position?
 2        A.   It is roughly $265,000 a year in salary.
 3        Q.   You also serve as the Vice Chair of the
 4   Pritzker Department of Psychology and Behavioral Health
 5   at the Ann and Robert H. Lurie Children's Hospital of
 6   Chicago.
 7             Correct?
 8        A.   That's correct.
 9        Q.   And how much of your time in this position is
10   related to discussing or treating gender dysphoric
11   children and adolescents?
12             ATTORNEY BLOCK:  Objection to
13   terminology.
14             THE WITNESS:  Again, it is hard to parse
15   out what specific about my leadership role is around
16   gender health but it is a minority of my day-to-day
17   work in that role.
18   BY ATTORNEY BARHAM:
19        Q.   Do you have an approximate percentage?
20        A.   No.
21        Q.   Twenty-five (25) percent, more or less?
22        A.   Probably ten percent.
23        Q.   Ten percent.  Okay.
24             And what is your compensation for that
```

Page 23

```
 1   position?
 2        A.   I get a stipend of around $30,000.
 3        Q.   You currently serve as the Medical Director of
 4   Outpatient Psychiatric Services at the Lurie Children's
 5   Hospital of Chicago.
 6             Is that correct?
 7        A.   That;s correct.
 8        Q.   And how much of your time in this position is
 9   related to discussing or treating gender dysphoric
10   children and adolescents?
11             ATTORNEY BLOCK:  Objection to
12   terminology.
13             THE WITNESS:  About 25 percent of my time
14   is probably spent discussing or related to the health of
15   transgender youth or transgender --- gender diverse
16   youth.
17   BY ATTORNEY BARHAM:
18        Q.   And what is your compensation for that position?
19        A.   There is no compensation.
20        Q.   You currently serve as the Clinical Director of
21   the NYU Gender and Sexuality Services.
22             Is that correct?
23        A.   That is not correct.
24        Q.   When did you conclude your role in that
```

Page 24

```
 1   position?  I'm referencing page one of your CV.
 2        A.   That was when I moved to Chicago a few years
 3   ago.
 4        Q.   Okay.
 5             So where it says 2011 to present Clinical
 6   Director, NYU Sexuality Service, that is just a typo?
 7        A.   That is a typo, yes.
 8        Q.   You currently serve as the Associate Professor
 9   of Child and Adolescent Psychology at Northwestern
10   University, and we have already discussed that.  Is
11   there a difference between Clinical Associate Professor
12   and Associate Professor of Child and Adolescent
13   Psychiatry?
14        A.   No.
15        Q.   You serve as the Vice Chair of Clinical Affairs
16   at the Pritzker Department of Psychiatry and Behavioral
17   Health at the Lurie Children's Hospital.
18             Correct?
19        A.   That's correct.
20        Q.   And how much time in this position is related to
21   discussing or treating gender dysphoric children and
22   adolescents?
23             ATTORNEY BLOCK:  Objection to
24   terminology.
```

Page 25

```
 1             THE WITNESS:  I think I answered that one
 2   with the guess of about ten percent.
 3   BY ATTORNEY BARHAM:
 4        Q.   Okay?
 5             So that's the same as the Vice Chair of the
 6   Department of Psychiatry?
 7        A.   Correct.
 8        Q.   You currently serve as the Associate Editor for
 9   Transgender Health.
10             Correct?
11        A.   That is correct.
12        Q.   And what is your compensation for that position?
13        A.   There is no compensation for that position.
14        Q.   What is that publication's annual income?
15        A.   I do not know.
16        Q.   You serve as a reviewer for LGBT Health.
17             Correct?
18        A.   Yes.
19        Q.   And how much of your time is related --- in that
20   position is related to treating or discussing
21   transgender children and adolescents?
22        A.   I would say 100 percent of my review time with
23   LGBT health is around gender.
24        Q.   Do you receive any compensation for that
```

Delaware 0912

Page 26

1  position?
2      A.  I do not.
3      Q.  Do you receive any compensation for your role as
4  a reviewer with the Journal of the Academy of Child and
5  Adolescent Psychiatry?
6      A.  I do not.
7      Q.  You served in various positions with different
8  professional organizations according to paragraphs 11
9  and 12 of your report.  Do any of those positions
10  provide you financial compensation?
11      A.  No.
12      Q.  You founded and directed Gender Variant Youth
13  and Family Network.
14          Correct?
15      A.  Correct.
16      Q.  What's your compensation for that position?
17      A.  Zero.
18      Q.  What is the entity's annual income or budget?
19      A.  Zero.
20      Q.  You indicate in your report that you have seen
21  approximately 500 transgender patients.
22          Is that correct?
23      A.  That is correct.
24      Q.  How many patients do you see per year?

Page 27

1          ATTORNEY BLOCK:  Objection to form.
2          THE WITNESS:  I'd have to look at my
3  report.  I don't have the information in front of me
4  right now.
5  BY ATTORNEY BARHAM:
6      Q.  Do you have a ballpark of how many patients you
7  see in a year?
8      A.  I don't.
9      Q.  Does this include --- and I'm assuming that your
10  colleagues see additional patients beyond just those
11  that you see.
12          Correct?
13      A.  Correct.
14      Q.  How frequently do you see each patients?
15      A.  I see --- the frequency with which I see
16  patients is dependent upon their clinical need, so
17  between once or twice a week to once every three months.
18      Q.  And how much are patients charged per
19  appointment?
20      A.  Everything is billed to their insurance, so I'm
21  not sure.
22      Q.  Do you receive any other income related to your
23  work on gender dysphoria?
24      A.  I'm being paid for my expert report for this, so

Page 28

1  that's the only other income I receive.
2      Q.  Do you receive any speaking fees?
3      A.  I have received speaking fees for participation
4  and grand rounds as an example.
5      Q.  And how much would those speaking fees run?
6      A.  It is typically about a thousand dollars per
7  event.
8      Q.  Before the last four years had you provided any
9  expert testimony on issues related to gender dysphoria?
10      A.  Can you clarify the difference between
11  testimonies and reports?  I've submitted a report but
12  not ---.
13      Q.  Okay.
14          So you have submitted a report?
15      A.  Correct.
16      Q.  Do you remember what case that involved?
17      A.  That involves Medicaid and top surgery in
18  Arizona.
19      Q.  Okay.
20          Have you ever provided any testimony in trial
21  or deposition before related to gender dysphoria?
22      A.  I have not.
23      Q.  And how much compensation have you received so
24  far in this case?

Page 29

1      A.  This case so far, none thus far.
2      Q.  How much are you expecting to receive so far in
3  this case?
4      A.  I haven't added up my invoice yet, but I imagine
5  it's probably around $10,000.
6      Q.  Okay.
7          Do you have any professional expertise related
8  to the legal definition of relevance?
9      A.  I do not.
10      Q.  Do you have any legal training or education?
11      A.  I do not.
12      Q.  When you were preparing your report did you
13  consult the Federal Rules of Evidence or any other legal
14  sources as to the meaning of relevance?
15      A.  I did not.
16      Q.  Several people in this case have referenced
17  disorders of sexual development.  Would you agree that
18  gender dysphoria is not a disorder of sexual
19  development?
20          ATTORNEY BLOCK:  Objection to form.
21          THE WITNESS:  Gender dysphoria has not
22  been classified as a disorder of sexual development.
23  BY ATTORNEY BARHAM:
24      Q.  Of the approximately 500 transgender patients

Page 30

1   you had seen how many suffered from disorder of sexual
2   development?
3      A.  A minority of patients, less than ten.
4      Q.  So you would agree that the vast majority of
5   individuals with gender dysphoria or who assert a
6   transgender identity do not suffer from a disorder of
7   sexual development.
8         Correct?
9         ATTORNEY BLOCK:  Objection to form.
10        THE WITNESS:  The data we have speaks to
11   the majority of people with gender dysphoria do not have
12   a disorder of sex development.
13   BY ATTORNEY BARHAM:
14     Q.  Do you have any reason to believe that BPJ
15   suffers from a disorder of sexual development?
16     A.  I have not reviewed BPJ's case.
17     Q.  Are you aware of any instance in which an
18   individual with a disorder of sexual development has
19   attempted to play on a girls' or women's sports team in
20   West Virginia?
21     A.  I am not aware.
22     Q.  Is it your opinion that a person's gender
23   identity is durable?
24        ATTORNEY BLOCK:  Objection to form.

Page 31

1         THE WITNESS:  Can you define durable?
2   BY ATTORNEY BARHAM:
3      Q.  Unchanging.
4         ATTORNEY BLOCK:  Objection to form.
5         THE WITNESS:  It is my testimony that
6   there is a concept of gender identity that remains
7   generally fixed for most people throughout their lives.
8   BY ATTORNEY BARHAM:
9      Q.  So it's your opinion that a person's gender
10   identity cannot be changed with medical or mental health
11   intervention.
12        Correct?
13        COURT REPORTER:  Sorry, Counsel, that
14   question one more time.
15   BY ATTORNEY BARHAM:
16     Q.  So it's your opinion that a person's gender
17   identity cannot be changed with medical or mental health
18   intervention.
19        Correct?
20     A.  Yes.
21        ATTORNEY BARHAM:  I'm going to hand you
22   what we're going to mark as Exhibit-2.  This will be
23   Tab 5.
24        ---

Page 32

1         (Whereupon, Exhibit-2, Endocrine
2         Society's Guidelines, was marked for
3         identification.)
4         ---
5   BY ATTORNEY BARHAM:
6      Q.  If you'll turn to page 3873 of this document.
7   This document is the Endocrine Society's Guidelines,
8   Endocrine Treatment of Gender Dysphoric or Gender
9   Incongruent Persons, Endocrine Society Clinical Practice
10   Guideline published in 2017.
11        Correct?
12     A.  That is correct.
13     Q.  On page 3873 of this document the Endocrine
14   Society indicates that this continuum gender identity
15   ranged from all male through something in between to all
16   female yet such a classification does not take into
17   account that people may have gender identities outside
18   this continuum.  For instance, some experience
19   themselves as having both a male and female gender
20   identity whereas others completely renounce any gender
21   classification.  There are also reports of individuals
22   experiencing a continuous and rapid involuntary
23   alternation between a male and female identity.
24        Do you see that?

Page 33

1      A.  I don't see that.
2      Q.  Second column, towards the bottom of the page.
3      A.  Yes, I see that.
4      Q.  Is this consistent with your understanding of
5   gender identity?
6         ATTORNEY BLOCK:  Can you give him time to
7   read?
8         ATTORNEY BARHAM:  Gladly.
9         THE WITNESS:  I think there is a
10   difference between a gender identity and how people
11   understand and express that gender identity.  And in the
12   context of this article the rapid involuntary alteration
13   between male and female identity as an example is a case
14   reported of single individuals subjective experience of
15   their gender according to the reference.
16   BY ATTORNEY BARHAM:
17     Q.  And by that you're referring to note ten?
18     A.  Correct.
19     Q.  So according to this document, someone can be
20   one sex or the other, both, neither or in between.
21        Correct?
22        ATTORNEY BLOCK:  Objection to form.
23        THE WITNESS:  I can't speak for the
24   conclusions drawn by the author of this article.

cvideotear2013 0914

Page 34

1    BY ATTORNEY BARHAM:
2        **Q.   And according to the Endocrine Society a**
3    **person's gender identity can change rapidly.**
4        **Correct?**
5            ATTORNEY BLOCK:  Objection to form.
6            THE WITNESS:  I'm not a part of the
7    Endocrine Society, so I'm not sure how they discuss
8    this.
9    BY ATTORNEY BARHAM:
10       **Q.   According to this document, the Endocrine**
11   **Society is indicating that there are reports, plural, of**
12   **individuals, plural, experiencing a continuous and rapid**
13   **involuntary alternation between male and female gender**
14   **identity.**
15       **Correct?**
16       A.   That is documented in the article.
17       **Q.   Okay.**
18       A.   I'm not sure of the governance of the Endocrine
19   Society.
20       **Q.   Do you think the Endocrine Society Guidelines**
21   **are wrong?**
22           ATTORNEY BLOCK:  Objection to form.
23           THE WITNESS:  I think anything relating
24   to gender identity has to be taken in a broader context

Page 35

1    within both the article in and of itself but in broader
2    practice and specifically around children and
3    adolescents.
4    BY ATTORNEY BARHAM:
5        **Q.   So what is your basis for indicating that this**
6    **statement is potentially inaccurate?**
7            ATTORNEY BLOCK:  Objection to form.
8            THE WITNESS:  I think there is more
9    context that's needed in order to understand the intent
10   of the authors in this particular section.
11           ATTORNEY BARHAM:  I'm going to hand you
12   what we will mark as Exhibit-3.  This is the document
13   from the World Health Organization entitled Gender and
14   Health.
15           ---
16           (Whereupon, Exhibit-3, World Health
17            Organization, was marked for
18            identification.)
19           ---
20   BY ATTORNEY BARHAM:
21       **Q.   Are you familiar with the World Health**
22   **Organization?**
23       A.   I've heard of them.
24       **Q.   Do you agree with these World Health**

Page 36

1    **Organization statements?**
2            ATTORNEY BLOCK:  Objection to form.  Can
3    he have time to read the document?
4            ATTORNEY BARHAM:  Of course.
5            VIDEOGRAPHER:  Counsel, is that Tab 10?
6            LAW CLERK WILKINSON:  Tab 10.
7            ATTORNEY BARHAM:  It is.
8            VIDEOGRAPHER:  Okay.  Thank you.
9            THE WITNESS:  Can you repeat the
10   question?
11   BY ATTORNEY BARHAM:
12       **Q.   Do you agree with these World Health**
13   **Organization statements?**
14       A.   Not in their entirety.
15       **Q.   In what parts do you dispute?**
16       A.   The word gender as a concept is much more
17   complicated and I do not agree with their
18   characterization in this page.
19       **Q.   So the World Health Organization says that**
20   **gender itself is a social construct and can change over**
21   **time.**
22       **Correct?**
23           ATTORNEY BLOCK:  Objection to form.  Does
24   this document have a URL to it?

Page 37

1            ATTORNEY BARHAM:  It does, but I don't
2    see it printed on the document.
3            LAW CLERK WILKINSON:  We can get it.
4            ATTORNEY BARHAM:  We can supply that.
5            THE WITNESS:  I agree that it says on the
6    document that gender varies from society to society and
7    can change over time.
8    BY ATTORNEY BARHAM:
9        **Q.   And according to the World Health Organization,**
10   **gender identity refers to a person's experience of**
11   **gender which is a social construct.**
12       **Correct?**
13           ATTORNEY BLOCK:  Objection to form.
14           THE WITNESS:  I don't see in the document
15   where it refers to gender identity or defines gender
16   identity.
17   BY ATTORNEY BARHAM:
18       **Q.   It says gender interacts with different sex,**
19   **which refers to the different biological and**
20   **physiological characteristics of males, females,**
21   **intersex persons such as chromosomes, hormones and**
22   **reproductive organs.**
23       **Correct?**
24       A.   That is correctly read.  I don't see gender

Page 38

1  identity defined in this document.
2      Q.   Gender identity refers to a person's deeply held
3  internal and individual experience of gender.
4      Correct?
5      A.   That's what it says here, yes.
6      Q.   If an individual asserts an identity of man or
7  both, how can a clinician verify whether that individual
8  is telling the truth?
9          ATTORNEY BLOCK:  Objection to form.
10         THE WITNESS:  I'm not sure what exactly
11  that means.  The process of an assessment for gender
12  care involves a complex series of interviews,
13  diagnostics.
14  BY ATTORNEY BARHAM:
15     Q.   So how does the clinician assess whether the
16  patient is accurately relating their experiences?
17     A.   In the typical process, particularly around
18  child and adolescent psychiatry, part of the assessment
19  involves information gathered from multiple contexts.
20     Q.   Such as?
21     A.   Such as parents, schools, caregivers, other
22  providers, history over time, et cetera.
23     Q.   And if --- so how does one assess from those
24  various contexts whether someone who's claiming to be

Page 39

1  male or both are accurately relating what's going on?
2          ATTORNEY BLOCK:  Objection to form.
3          THE WITNESS:  Yeah, I guess I don't
4  understand the question exactly.  You know, my job is
5  not necessarily to define what is accurate in someone's
6  own experience.  It's to understand how that fits into
7  typical processes and developmental expectations for the
8  broad range of gender diversity over time.
9  BY ATTORNEY BARHAM:
10     Q.   How do you determine whether someone in that
11  scenario is accurately understanding his own subjective
12  feelings --- his or her subjective feelings?
13         ATTORNEY BLOCK:  Objection to form.
14         THE WITNESS:  The context of the
15  treatment is really important.  If an individual is
16  seeking specific interventions that require a mental
17  health assessment, there are specific components of that
18  mental health assessment that must be met.
19  BY ATTORNEY BARHAM:
20     Q.   So what are the treatments that would require a
21  mental health assessment?
22     A.   Puberty blocking medications, hormones or
23  surgery.
24     Q.   And what are the interventions that would not

Page 40

1  require mental health evaluations, in your opinion?
2          ATTORNEY BLOCK:  Objection to form.
3          THE WITNESS:  It depends upon what
4  guidelines you're talking about and what recommendations
5  that the family is looking for.
6  BY ATTORNEY BARHAM:
7      Q.   Well, what are some of the inventions?  You said
8  there's some interventions that would require a mental
9  health evaluation, so that implies that there are some
10  that would not.  What are the interventions that would
11  not require a mental health evaluation?
12         ATTORNEY BLOCK:  Objection to form.
13         THE WITNESS:  You know, parents giving
14  hugs to their kids is not something that a mental health
15  assessment would require.  Providing a way of helping
16  families to understand their kids or asking questions is
17  not something that requires a mental health evaluation
18  and some children will socially transition prior to any
19  assessments by any mental health professional.
20  BY ATTORNEY BARHAM:
21     Q.   How do you determine --- if an individual
22  asserts a gender identity of male or both, how do you
23  determine whether the individual is making a statement
24  based on societal expectations for a particular gender

Page 41

1  rather than ---?
2          ATTORNEY BLOCK:  Objection.  Travis, I'm
3  sorry, the male or both phrasing, is that a quote from
4  something.  I don't have the paper in front of me, so
5  just want to clarify.
6          ATTORNEY BARHAM:  No, that's not a
7  question from something.  That's just my question.
8          ATTORNEY BLOCK:  Okay.
9          THE WITNESS:  Can you repeat the
10  question?
11  BY ATTORNEY BARHAM:
12     Q.   If an individual asserts a gender identity male
13  or both, how can a clinician verify whether the
14  individual is making the statement based on societal
15  expectations for a particular gender rather than his own
16  genuine gender?
17         ATTORNEY BLOCK:  Objection to form.
18         THE WITNESS:  I personally never had
19  anybody assert an identity of male or both, but part of
20  the assessment of --- if we are diagnosing gender
21  dysphoria is understanding the cultural and social
22  contexts and ensuring that folks are not presenting with
23  a gender identity that is incongruent with their sex
24  assigned at birth because of actual or perceived

Page 42

1    cultural advantages.
2    BY ATTORNEY BARHAM:
3       Q.   And how does one go about assessing the
4    motivations behind the claimed gender identity or
5    transgender sex?
6            ATTORNEY BLOCK:  Objection to form.
7            THE WITNESS:  For any psychiatric
8    assessment this is through a combination of interviews,
9    gathering history from relevant data sources and
10   sometimes for some people structured interviews or
11   scales.
12   BY ATTORNEY BARHAM:
13      Q.   And how long does it take to conduct such an
14   assessment?
15      A.   There is no specific timeframe involved in this
16   assessment.  It really depends upon contextual factors
17   that are hard to nail down.
18      Q.   So if you were treating a child or teenager, how
19   many relevant data sources would you need to get
20   information from in order to make a complete assessment
21   of the child's motivations?
22      A.   I don't think there's ever going to be a
23   concrete answer in terms of how many.  There's not a
24   specific answer of how many sources are necessary.  It's

Page 43

1    however many sources are necessary to gather the
2    relevant information.
3       Q.   So how do you determine whether you have
4    gathered enough information to make a competent
5    assessment?
6       A.   It's hard to state this in a non-pithy way, but
7    that's kind of what the process of psychiatry and child
8    psychiatry training helps you to learn.
9       Q.   Could you explain to someone who doesn't have
10   the training how you come to the conclusion, okay, I've
11   gathered enough information to make a competent
12   assessment?
13      A.   Sure.  I can try.  How accurate is the reporter
14   in their description of their history.  How much does it
15   align with reports from other informants, how much does
16   it match with or is deviant from expected phenotypic
17   processes with the disorders in question and what is the
18   impression of the evaluator about the accuracy of the
19   statements.
20           ATTORNEY BARHAM:  I'm going to show you
21   what we will mark as Exhibit-4, this will be Tab 12.
22           ---
23           (Whereupon, Exhibit-4, Harvard Medical
24           School Study, was marked for

Page 44

1            identification.)
2            ---
3    BY ATTORNEY BARHAM:
4       Q.   Are you familiar with this study?  This is a
5    study from the Harvard Medical School entitled Gender
6    Fluidity:  What it Means and Why Support Matters?
7            ATTORNEY BLOCK:  Objection.
8            THE WITNESS:  This looks like a popular
9    website article and not a study.
10   BY ATTORNEY BARHAM:
11      Q.   Are you familiar with the author, Dr. Sabrina
12   Katz --- Sabra Katz-Wise?
13      A.   Dr. Katz-Wise has published in the world of
14   transgender health.  I'm not familiar with them
15   personally, I don't know them.
16      Q.   Do you know Dr. Katz-Wise at least by
17   reputation?
18      A.   I don't.  I've only read some studies.
19      Q.   But you would agree that she is highly respected
20   in this area.
21      Correct?
22      A.   I would not be able to offer an opinion.
23      Q.   But she is widely published in this area.
24      Correct?

Page 45

1            ATTORNEY BLOCK:  Objection to form.
2            THE WITNESS:  From my recollection, yes.
3    BY ATTORNEY BARHAM:
4       Q.   At the bottom of page two of this document, Dr.
5    Katz-Wise indicates that while some people develop a
6    gender identity early in childhood others may identify
7    with one gender at one time and then another gender
8    later on.
9       Is that correct?
10      A.   You're reading that accurately, yeah.
11      Q.   So according to this article, on page three a
12   gender fluid person is one whose gender identity changes
13   frequently.
14      Correct?
15           ATTORNEY BLOCK:  Objection to form.
16           THE WITNESS:  I do not --- I have not
17   read it in here that it is defined in that way and
18   that's not how I would define gender fluidity.
19   BY ATTORNEY BARHAM:
20      Q.   At least you see the statement at the first full
21   paragraph at the top of page three, ultimately anyone
22   who identifies as gender fluid, is a gender fluid person
23   often the term is used for a person's gender expression
24   or gender identity, essentially their internal sense of

Whitaker 0917

Page 46

1    self changes frequently?
2            ATTORNEY BLOCK:  Objection.  We're
3    jumping quickly from pages.  Can you give him some more
4    time to read before answering the question?
5            ATTORNEY BARHAM:  Certainly.
6            THE WITNESS:  Yes.  I'm not seeing where
7    that is here.  Can you point that out for me?
8    BY ATTORNEY BARHAM:
9        Q.   Top of page three, just above that, how is
10   gender fluidity related to health in child and teens?
11       A.   Gender fluidity is a very nonspecific term that
12   means very different things to different people.  In the
13   practice of the clinical work with transgender and
14   gender diverse youth, kids who are self identifying as
15   gender fluid, I want to understand what it means to them
16   and what that definition is for that individual.  I
17   don't think there is one established definition of
18   gender fluidity that has been agreed upon.
19       Q.   But at least some respected professionals in
20   this arena indicate that the term gender fluidity means
21   that the person's internal sense of self, their gender
22   identity changes frequently.
23            Correct?
24            ATTORNEY BLOCK:  Objection to form.

Page 47

1            THE WITNESS:  I can't speak to what Dr.
2    Katz-Wise is using to define it.  The way I would
3    describe gender fluidity, again outside the context of
4    how my patients are actually using the term, is that
5    understanding of the expression of gender identity may
6    change over time.
7    BY ATTORNEY BARHAM:
8        Q.   So you said that their understanding of gender
9    identity can change over time.  Dr. Katz-Wise says that
10   their gender identity changes frequently?
11            Is that correct?
12       A.   That's what it stated in this popular press
13   article.
14       Q.   And Dr. Katz-Wise is an Assistant Professor in
15   Adolescent and Young Adult Medicine at Boston Children's
16   Hospital.
17            Is that correct?
18       A.   I would have to take your word for that.
19       Q.   Okay.
20            Are you aware that she co-directs the Harvard
21   Sexual Orientation and Gender Identity Expression Equity
22   Research Collaborative?
23       A.   I do not know the term, no.
24            ATTORNEY BARHAM:  I'm going to show you

Page 48

1    what we will mark as Exhibit-5, and this will be Tab 13.
2            ---
3            (Whereupon, Exhibit-5, American
4            Psychological Association Guidelines,
5            was marked for identification.)
6            ---
7    BY ATTORNEY BARHAM:
8        Q.   This document is the American Psychological
9    Association Guidelines for Psychological Practice with
10   Transgender and Gender Non-Conforming People.
11            Correct?
12       A.   That is correct.
13       Q.   And on page 836 of this document the APA writes
14   just as some people experience their sexual orientation
15   as being fluid or variable, some people also experience
16   their gender identity as fluid.
17            Correct?
18       A.   Can you show me on the page where that is?
19       Q.   The bottom of the first paragraph in the first
20   column of page 836.
21       A.   Yes.
22       Q.   So the APA Guidelines say that gender identity
23   can be fluid or changing.
24            Correct?

Page 49

1            ATTORNEY BLOCK:  Objection to form.
2            THE WITNESS:  Well, I think the important
3    piece is some people experience gender identity as fluid
4    or variable.
5    BY ATTORNEY BARHAM:
6        Q.   So it can be fluid or changing?
7            Correct?
8            ATTORNEY BLOCK:  Objection to form.
9    BY ATTORNEY BARHAM:
10       Q.   For at least some people.
11            Correct?
12            THE WITNESS:  As I would describe it and
13   understand it, that's the experience of expression of
14   gender identity can be fluid over time, which is
15   different.
16   BY ATTORNEY BARHAM:
17       Q.   How is that different to say that one's gender
18   identity changes?
19       A.   It's getting a little complicated in terms of
20   the concepts that we're talking about, but the identity
21   that gender identity is something that is inherently
22   fixed, that how people understand, experience it and
23   express it can change over time.  That's the difference.
24       Q.   But the American Psychological Association at

Page 50

1    least describes gender identity as being fluid.
2        Correct?
3            ATTORNEY BLOCK:  Objection to form.
4            THE WITNESS:  In the article that you
5    have put in front of me it describes that people's
6    experience of their gender identity is fluid over time.
7    BY ATTORNEY BARHAM:
8        Q.  Let's go back to Tab 5, which is Exhibit-2.  Are
9    you familiar with the Endocrine Society Guidelines?
10       A.  I am.
11       Q.  Is it your view that these guidelines were
12   developed through rigorous scientific processes?
13           ATTORNEY BLOCK:  Objection to form.
14           THE WITNESS:  I agree.
15   BY ATTORNEY BARHAM:
16       Q.  Would you agree that these guidelines were
17   developed by among the most respected researchers in the
18   field?
19           ATTORNEY BLOCK:  Objection to form.
20           THE WITNESS:  I wouldn't disagree with
21   that, no.
22   BY ATTORNEY BARHAM:
23       Q.  Do you respect Dr. Hembree of Columbia
24   University Medical Center?

Page 51

1        A.  I do.
2        Q.  Do you respect Dr. Cohen-Kettenis of the
3    University of Amsterdam?
4        A.  I would say I respect all of these clinicians
5    and researchers, although Sabine Hannema I am not
6    familiar personally.
7        Q.  If you will turn to page 3879 of this document.
8    Right under the heading evidence this article reports
9    that the large majority, about 85 percent of prepubertal
10   children with a childhood diagnosis did not remain GD,
11   slash, gender incongruent in adolescence.
12       Is that correct?
13       A.  That is correctly read, yes.
14       Q.  And footnote 20 of this document cites to Dr.
15   Steensma, de Vries, Cohen-Kettenis article in 2013?
16       A.  That's correct.
17       Q.  These are extensively published original peer
18   reviewed research --- peer reviewed researchers in the
19   field.
20       Correct?
21       A.  Correct.
22       Q.  So this committee reveals evidence that the
23   large majority of children, about 85 percent, with a
24   childhood diagnosis do not remain gender dysphoric in

Page 52

1    gender adolescence.
2        Correct?
3            ATTORNEY BLOCK:  Objection to form.
4            THE WITNESS:  Yeah, in these studies have
5    been published primarily by the Dutch clinic the rates
6    of dissentience of the diagnosis of gender dysphoria has
7    been upwards of 85 percent.
8    BY ATTORNEY BARHAM:
9        Q.  And at the bottom of the first column of
10   page 3879 the committee indicates that their clinical
11   experience suggests that the persistence of gender
12   dysphoria or gender incongruence can only be reliably
13   assessed after the first signs of puberty.
14       Is that correct?
15       A.  That is what is written, yes.
16       Q.  You have not offered an opinion in your report
17   as to whether or --- whether or to what transgender
18   identity has a biological basis.
19       Is that correct?
20       A.  Let me just make sure that I'm reviewing it.  I
21   have not offered an opinion.
22       Q.  If you will turn to page 76 of Exhibit-2, Tab 5.
23   The committee with all of its experience and presenting
24   all the evidence said that gender dysphoria in children,

Page 53

1    quote, does not invariably persist into adolescence and
2    adulthood.
3        Is that correct?
4        A.  That is correct.
5        Q.  In fact, this committee concluded that that
6    gender dysphoria, a minority of prepubertal children
7    appears to persist in adolescence.
8        Is that correct?
9        A.  That is correct.
10       Q.  I'm going to turn your attention to --- this
11   will be Tab 15, Exhibit-6.
12           ---
13           (Whereupon, Exhibit-6, Lisa Littman
14           Study, was marked for identification.)
15           ---
16   BY ATTORNEY BARHAM:
17       Q.  This is a 2021 study by Lisa Littman entitled
18   Individuals Treated for Gender Dysphoria with a Medical
19   and/or Surgical Transition who Subsequently
20   De-transitioned.
21       Is that correct?
22       A.  That is correct.
23       Q.  Are you familiar with this study?
24       A.  I am.

Page 54

1      Q.   The study was based on survey responses from a
2    hundred adult individuals who were approved for hormonal
3    and/or surgical transition, underwent such transition,
4    lived in a transgender identity for a period of years
5    and then decided to de-transition or revert to a gender
6    identity associated with their biological sex.
7         Is that correct?
8      A.   That is my understanding of the study, yes.
9      Q.   And all of the subjects had detransitioned by
10    discontinuing their medications, having surgeries to
11    reverse the effects of transition or both.
12         Correct?
13         ATTORNEY BLOCK:  Objection to form.  Are
14    you reading something?
15         ATTORNEY BARHAM:  I'm referencing
16    page two, column two, at the bottom of the page.
17         THE WITNESS:  My recollection from the
18    study was that this was all self report, so there was no
19    way to verify if that was correct or true.
20    BY ATTORNEY BARHAM:
21      Q.   But that's at least what the participants
22    reported.
23         Correct?
24      A.   From my recollection.  I'd have to reread the

Page 55

1    entire study to say for sure but that is my
2    recollection, yes.
3      Q.   And if you turn to page eight of the second
4    column, under the heading de-transition?
5      A.   I don't have page numbers on mine.
6         ATTORNEY BLOCK:  Do you reference the
7    page number at the top?
8         ATTORNEY BARHAM:  The source contains no
9    page numbers, making it difficult.
10    BY ATTORNEY BARHAM:
11      Q.   Under the heading detransition it's the page
12    right before table four.
13         ATTORNEY BLOCK:  I'm sorry.  Can I see
14    the heading on the document?  Just for the record, this
15    doesn't appear to be a paginated version of the article
16    where, you know, when I pull it up I get a publication,
17    date and pages.  So I don't know if this is the final
18    version of the article or not, but you can proceed with
19    the questions.
20         ATTORNEY BARHAM:  Counsel, I'll return to
21    your concerns, Mr. Block.
22    BY ATTORNEY BARHAM:
23      Q.   Do you see the one page before the page that
24    contains Table 4?

Page 56

1      A.   I do.
2      Q.   Do you see the heading detransition?
3      A.   I do.
4      Q.   And it says there that when participants decided
5    to detransition they were a mean age of 26.4 years old.
6         Correct?
7      A.   That is correct.
8      Q.   Have you read this study before today?
9      A.   I have.
10      Q.   So doesn't this study at least suggest that
11    patients may think they have a sense of belonging to the
12    opposite sex but can be mistaken?
13         ATTORNEY BLOCK:  Objection to form.
14         THE WITNESS:  I think what this study
15    does is hear experiences from a select group of
16    individuals who are motivated to participate in the
17    study about detransition and hear their experiences of
18    their care.
19    BY ATTORNEY BARHAM:
20      Q.   But the study still indicates that those
21    individuals had a sense of belonging to the opposite sex
22    and later concluded that they were were mistaken.
23         Is that correct?
24      A.   You will have to forgive my clinician nature

Page 57

1    here, but language is important when working with
2    patients who are transitioning.  I don't know if that's
3    the language that they would use or if that is the
4    language that was used in this particular survey.
5      Q.   But the effect of detransitioning is that they
6    at one time thought they belonged to the opposite sex
7    and then later concluded that they did not?
8         ATTORNEY BLOCK:  Objection to the form.
9         THE WITNESS:  Again, I think we would
10    want to know specifically what each individual person,
11    how they described their process.  I don't know what
12    detransition means to those who are taking a relatively
13    anonymous survey, so it's hard to draw a conclusion
14    about the specific nature of it.  The generally accepted
15    upon definition of detransition is generally aligned
16    with somebody who reverts back to a gender identity or
17    gender expression that is more aligned with their sex
18    assigned at birth.
19    BY ATTORNEY BARHAM:
20      Q.   This study defines detransition as discontinuing
21    medications, having surgeries to reverse the effect of
22    transition or both.
23         Is that correct?  It is on page two?
24      A.   Show me where on page two.

Page 58

1    Q.   The second column of page two, at the bottom of
2  the page?
3           ATTORNEY BLOCK:  Objection to form.
4           THE WITNESS:  Yeah.  I'm not seeing that
5  Dr. Littman is specifically defining detransition but
6  describing the objective of the study for folks who
7  detransitioned by those aspects that you noted.
8  BY ATTORNEY BARHAM:
9    Q.   Okay.
10           But she notes in the last paragraph on that
11  page the objective of the current study was to describe
12  the population of individuals, skipping, who then
13  detransitioned by discontinuing medications, having
14  surgery to reverse the effects of transition or both?
15    A.   That's correct.
16    Q.   So she is indicating what she understands
17  detransitioning to mean in this article.
18           Correct?
19           ATTORNEY BLOCK:  Objection to form.
20           THE WITNESS:  Again I'm not sure how she
21  specifically defines detransition.  It is not
22  necessarily made clear in that statement.
23  BY ATTORNEY BARHAM:
24    Q.   Is it true that people may mistake feelings

Page 59

1  resulting from trauma, mental illness or homophobia for
2  a genuine sense of transgender identity?
3           ATTORNEY BLOCK:  Objection to form.
4           THE WITNESS:  I think there are a lot of
5  complicated experiences that people may have that make
6  them question their gender identity.
7  BY ATTORNEY BARHAM:
8    Q.   So it's at least possible that people could
9  mistake feelings resulting from trauma, mental illness
10  or homophobia for genuine sense of transgender identity.
11           Correct?
12           ATTORNEY BLOCK:  Objection to form.
13           THE WITNESS:  I don't disagree with that,
14  no.
15  BY ATTORNEY BARHAM:
16    Q.   You said it's complicated, so it sounds like it
17  would be hard sometimes for a clinician to tell with
18  certainty what's going on?
19           ATTORNEY BLOCK:  Objection to form.
20           THE WITNESS:  What I would describe is
21  that in anything related to mental health that there are
22  complications and nuances.  This is no different.
23  BY ATTORNEY BARHAM:
24    Q.   Now, I believe you alluded to this a moment ago.

Page 60

1  You mentioned that this is a self-reporting study and it
2  obviously concerns an emotionally fraught area of gender
3  identity.  So is it your position that this does not
4  produce scientifically meaningful results?
5    A.   I don't know what you mean by scientifically
6  meaningful.
7    Q.   Do you believe that this --- the results of this
8  article are scientifically reliable?
9    A.   It depends upon what question is being asked.
10  As a blanket, any kind of selection bias, particularly
11  for this study based upon where the participants were
12  drawn from makes us not want to draw conclusions about
13  their generalized applicability of this study to other
14  transgender folks, including other folks who may have
15  detransitioned, but the goal of science is not
16  necessarily to draw widely applicable conclusions, but
17  to put us in a position where we can ask more questions
18  and improve our care for our patients.
19    Q.   Now, why do you say --- why do you highlight
20  concerns about where the participants were drawn from?
21    A.   I highlight that because it creates a sense of
22  selection bias, which potentially, as I said, can reduce
23  the why applicability of the conclusions drawn.
24    Q.   And why do you say that there is a potential for

Page 61

1  selection bias in this article?
2    A.   Based upon the websites that Dr. Littman has
3  drawn her participants.
4    Q.   And why do you have concerns about those
5  websites?
6    A.   I have concerns about the websites because of
7  the contents of those websites.
8    Q.   And what is contents of those websites that
9  causes you concern?
10    A.   The content of the websites is unscientific.
11  And I guess I'm not sure how to articulate it in a most
12  defined way very specific to answering a set of
13  questions that reenforces the prestudy hypotheses.
14    Q.   So which websites that she drew participants
15  from cause you concern?
16    A.   As an example, Fourth Wave Now is a website that
17  Dr. Littman had used for some of her study recruitment.
18    Q.   And why are you concerned about the use of
19  Fourth Wave now in the recruitment process?
20    A.   What I would say is that when you're designing a
21  study that presupposes the conclusion and the website is
22  designed to attract people who presuppose that
23  conclusion, that limits the applicability of the
24  results.  It just have to be taken into account.  It

**Page 62**

1  doesn't mean that there isn't data from this kind of
2  snowball recruitment that isn't valuable and I wouldn't
3  say that there isn't value to some of Dr. Littman's
4  work, specifically this study as compared to the last,
5  though you have to take it in the context with which it
6  was developed.
7  **Q.   So are you suggesting that Dr. Littman**
8  **presupposed the conclusion that she wanted to reach in**
9  **designing this survey?**
10  A.   I'm less familiar with the design of this study
11  than previous studies that she has designed, which I
12  would say that was correct.
13  **Q.   What other websites did she use in the process**
14  **to cause you concern?**
15  A.   I'm not as familiar with this study, so I don't
16  know if she specifically identified which websites.  And
17  I can't recall right now on the others which they were.
18  **Q.   If you look at page three she discusses the**
19  **method and the participants and procedures.  Would**
20  **reviewing that refresh your recollection as to any**
21  **concerns about participants?**
22  A.   It would not because she does not describe the
23  specific fora.  She describes a closed Facebook group,
24  Tumbler, Twitter and Reddit, but those are large

**Page 63**

1  websites that have a lot of different kind of content.
2  **Q.   So is it your position that it's not possible to**
3  **know whether anonymous or any results have any relation**
4  **to true fact in actual case histories?**
5  A.   That is not my position.
6  **Q.   Do you have any --- you mentioned earlier**
7  **something about how these were anonymous results.  So is**
8  **it possible to know whether they actually corresponded**
9  **with true cases?**
10  A.   I think anonymous surveys, you have to really
11  dig into the specifics of the survey design in order to
12  draw conclusions.  And again, with any study in any
13  survey in particular you just want to make sure you have
14  an understanding of that context how broadly to draw
15  conclusions.
16  **Q.   Would you agree that online recruitment does not**
17  **provide a statistically meaningful sample?**
18  A.   I would not agree with that.
19  **Q.   Is it your position --- how can an online**
20  **recruitment produce a statistically meaningful sample?**
21  A.   I think I would need to understand the context
22  of what you mean by statistically meaningful.  There is
23  a difference between a survey that could be potentially
24  poorly designed and yet reach statistical significance.

**Page 64**

1  You would need to understand the broader context in
2  order to draw conclusions about what that statistical
3  significance means and that means really digging into
4  the specific methodology of this study.  There is a vast
5  literature about efficacy of survey data and it really
6  depends on the specifics.
7  **Q.   We've previously referenced paragraph eight of**
8  **your report where you mention you've seen approximately**
9  **500 transgender patients.**
10  ATTORNEY BLOCK:  Travis, sorry, not to
11  avoid a pending question, but we're almost at one hour,
12  so if this is a good time, if you're moving to a
13  different subject maybe this would be a good time to
14  break.
15  ATTORNEY BARHAM:  Let me wrap up a few
16  more and then we will do that.
17  ATTORNEY BLOCK:  Thanks.
18  BY ATTORNEY BARHAM:
19  **Q.   Your clinical practice for children and**
20  **adolescents started in 2013, about eight years ago.**
21  **Is that correct?**
22  A.   No, I finished medical school in 2011 and have
23  been working with adults, children and adolescents since
24  then.

**Page 65**

1  **Q.   Okay.**
2  A.   Actually that's when I finished --- to go back,
3  that's when I finished my residency and fellowship.  I
4  finished medical school in 2006.  I can't believe it's
5  been long.
6  **Q.   And when did you begin your work in child and**
7  **adolescent psychiatry?**
8  A.   I had child and adolescent psychiatry
9  experiences when I was in medical school.
10  **Q.   When did you begin practicing child and**
11  **adolescent psychiatry?**
12  A.   That's not a very specific term.  I practiced
13  child psychiatry as a medical student in my training.
14  **Q.   When were you licensed, when were you first**
15  **licensed to practice child and adolescent psychiatry?**
16  A.   There's no specific license to practice child
17  psychiatry.  Anybody who is --- has a medical license
18  can practice any medical specialty.  I was Board
19  Certified in Child and Adolescent Psychiatry, which is a
20  different process and I would have to look through to
21  recall the date.  I'm assuming that it's 2012 or 2013.
22  2013 is when I was Board Certified.
23  **Q.   So when did you begin --- and you finished your**
24  **fellowship in child and adolescent psychiatry when?**

1    A.   2011.

2    Q.   2011.  When did you begin treating as a child

3    and adolescent psychiatrist children with gender

4    dysphoria?

5         ATTORNEY BLOCK:  Objection to form.

6         THE WITNESS:  I saw children with gender

7    dysphoria during my residency and in my fellowship.

8    BY ATTORNEY BARHAM:

9    Q.   And your fellowship?

10   A.   Between 2006 and 2009.

11   Q.   And what proportion of those patients socially

12   transitioned?

13   A.   Of all of the patients that I saw in my training

14   or in all of the patients that I've seen over my time as

15   a physician?

16   Q.   Let's go first with the training.

17   A.   It was a much smaller number, so probably if I

18   were to guess, and I'm going back, probably close to

19   95 percent.

20   Q.   Ninety-five (95) percent socially transitioned

21   when you were in training?

22   A.   Yes.

23   Q.   And how many of your patients overall have

24   socially transitioned?

1    A.   I'm not sure how to answer that question.  Over

2    the course of our time working together, before I

3    started seeing them or --- I'm not sure how to

4    accurately answer that question.

5    Q.   Over the --- just in general how many of your

6    patients socially transitioned, not just while they were

7    being treated under your care?

8    A.   And these are patients who are seeing me

9    specifically through the context of gender or of those

10   500 transgender patients?

11   Q.   Of the 500 transgender patients.

12   A.   Probably --- I mean, it's a guess but probably

13   in the order of 85 percent.

14   Q.   And what proportion of the 500 patients used

15   puberty blockers?

16   A.   Probably a minority of those patients.  If I had

17   to guess, probably 20 percent or less.

18   Q.   And what percent of those 500 transgender

19   patients used cross sex hormones?

20   A.   I don't have my records in front of me, so it

21   would really just be a guess, but probably close to the

22   same percentage that socially transitioned, probably a

23   little bit less than that.

24   Q.   If I recall correctly that's about 85 percent?

1    A.   Probably somewhere on the order of that.

2         ATTORNEY BLOCK:  Would now be a good time

3    for that break?

4         ATTORNEY BARHAM:  One last question.

5    BY ATTORNEY BARHAM:

6    Q.   What systems do you have in place to track these

7    patients five years after they have been in your care?

8    A.   I have the same systems as most psychiatrists.

9    We see the patients within our care.  Folks will reach

10   out to us after time has passed and it's one of the

11   great pleasures of being a child psychiatrist, we get to

12   see folks longitudinally.  So there is not a specific

13   system apart from mutual care.

14   Q.   So you rely on them to reach out to you.

15        Is that correct?

16        ATTORNEY BLOCK:  Objection to form.

17        THE WITNESS: It depends on context.

18   BY ATTORNEY BARHAM:

19   Q.   But do you have any systematic way of tracking

20   all patients five years after they leave your care?

21   A.   There is no systematic way of tracking all

22   patients.

23        ATTORNEY BARHAM:  All right.  Let's take

24   a break.  How long would you all like?

1         ATTORNEY BLOCK:  Five minutes.

2         ATTORNEY BLOCK:  Should we go off the

3    record?

4         VIDEOGRAPHER:  Going off, 10:14 a.m.

5    OFF VIDEOTAPE

6              ---

7    (WHEREUPON, A SHORT BREAK WAS TAKEN.)

8              ---

9    ON VIDEOTAPE

10        VIDEOGRAPHER:  Back on the record.  The

11   time is 10:27 am.

12   BY ATTORNEY BARHAM:

13   Q.   Moments ago we were discussing Dr. Littman's

14   2021 study, that was Tab 15, Exhibit 6.  Are you aware

15   of any studies that contradict Dr. Littman's data?

16   A.   Can you be more specific?

17   Q.   Are you aware of any studies that contradict Dr.

18   Littman's work survey in this article in Exhibit-6 that

19   find fault with her data?

20        ATTORNEY BLOCK:  Objection to the form.

21        THE WITNESS: Yeah.  I'm sorry.  I don't

22   think I understand the question.  There are other

23   articles that have been written about detransition and

24   clinical experiences of patients that have

Page 70

1   detransitioned who have described those experiences.
2   There has not been a specific survey designed of
3   detransitioners outside of this one that I'm aware of.
4   BY ATTORNEY BARHAM:
5   **Q.   Has anyone written an article finding fault with**
6   **the way Dr. Littman interpreted the data that ---?**
7       ATTORNEY BLOCK:  Objection to form.
8       THE WITNESS:  For this specific data set
9   or for previous?
10  BY ATTORNEY BARHAM:
11  **Q.   For this specific data set?**
12      A.   For this specific data set, from my
13  recollection, this was studied --- or published just
14  recently so I'm not aware of any.  It doesn't mean that
15  there aren't.
16      **Q.   Are you aware of any studies that contradict Dr.**
17  **Littman's conclusions in this 2021 article?**
18      A.   If you give me a moment I will read the
19  conclusion.
20      ATTORNEY BLOCK:  Objection to form.
21      THE WITNESS:  Insomuch as Dr. Littman's
22  conclusion is that there's no single narrative to
23  explain the experiences of all individuals who
24  detransitioned and we should take care to avoid painting

Page 71

1   the population with a broad brush, I agree with that
2   conclusion.
3   BY ATTORNEY BARHAM:
4       **Q.   Are you aware of any studies that contradict her**
5   **conclusions not just in the conclusion section but her**
6   **description of the detransitioners?**
7       ATTORNEY BLOCK:  Objection to the form.
8       THE WITNESS:  I think it's hard to
9   provide a specific answer to that question.  We have to
10  look at each study and judge each individual study based
11  upon the merits.  The conclusions she draws are from a
12  subset of patients with a very specific viewpoint, and I
13  agree with her and her conclusion that there needs to be
14  more research to better understand the broader
15  implications of this care.
16  BY ATTORNEY BARHAM:
17      **Q.   You're not aware of any article that has been**
18  **published specifically critiquing this 2021 study by Dr.**
19  **Littman.**
20      **Is that correct?**
21      A.   Not that I'm aware of.
22      ATTORNEY BLOCK:  Objection to form.
23  BY ATTORNEY BARHAM:
24      **Q.   A few moments ago we were also talking about the**

Page 72

1   **patients that you have treated, the 500 transgender**
2   **patients you referenced in your report, and you**
3   **mentioned that about 20 percent or less of those had**
4   **used puberty blockers.  I'm wondering why that**
5   **percentage is so low.**
6       ATTORNEY BLOCK:  Objection to form.
7       THE WITNESS:  I don't know.  Low compared
8   to what?  I think it's important to understand the
9   context that in 2011, when I first started my gender
10  program, that puberty blocking medications were not
11  widely available, cost upwards of $3,000 a month and
12  were not covered by most insurance.  So puberty blockers
13  were not something that were available in the same way
14  they are now.  And I also saw a fair number of adults
15  and older adolescents for whom puberty blockers are not
16  indicated.
17  BY ATTORNEY BARHAM:
18      **Q.   So of the 500 patients that you reference in**
19  **paragraph eight of your report, what percentage of those**
20  **are adults?**
21      A.   I would really have to go back and look.  I
22  mean, in my current practice, I see adolescents and
23  young adults, so kind of parsing out artificially who is
24  18 and up, it would take some time to do that.  Probably

Page 73

1   in the order of 75 percent are children in adolescence,
2   25 percent adults.  But of course, over 2011 to now, a
3   lot of those folks are now adults.
4       **Q.   And when I'm asking about these percentages I**
5   **mean when you were treating them.  What percentage of**
6   **the patients you were treating were children?**
7       A.   That's my best guess.
8       **Q.   Seventy-five (75) percent?**
9       A.   Yes.
10      **Q.   And are you distinguishing between prepubertal**
11  **children and adolescents in that 75 percent or both?**
12      A.   That's both.
13      **Q.   Of that 75 --- of all the patients you've seen,**
14  **at the time you saw them, how many were prepubertal**
15  **children?**
16      A.   Probably --- and again, I have to give this a
17  major caveat.  I would have to go back and look through
18  everything, but I would say probably 25 percent of that
19  75 percent were prepubertal at the time of initial
20  assessment.
21      **Q.   And so then the remaining 75 percent of 75 would**
22  **be adolescents.**
23      **Is that correct?**
24      A.   Correct.

Bi xosoo 0924

Page 74

1    ATTORNEY BLOCK: Objection to form.
2  BY ATTORNEY BARHAM:
3    **Q.  How many of your patients of those 500 patients**
4  **have detransitioned in a year?**
5    A.  It's kind of a hard question to answer.  The one
6  patient who self identifies as having detransitioned
7  started seeing me after she had detransitioned.
8    **Q.  Have any of your patients detransitioned while**
9  **under your care?**
10   A.  Not that I'm aware of.
11   **Q.  And is the one patient who detransitioned before**
12 **starting to see you, is that the only patient you're**
13 **aware of of the 500 that has detransitioned?**
14   A.  That is the only one that I'm aware of, yes.
15 But can I clarify that of those 500 patients there are
16 certainly those who did not choose to transition.
17   **Q.  And how many of the 500 chose not to transition?**
18   A.  If I had to guess, probably about 10 to 20,
19 probably ten percent.
20   **Q.  And did they make that decision before puberty**
21 **began?**
22   A.  It was a mix.
23   **Q.  Of those who chose not to transition, how many**
24 **were children when they made that decision?**

Page 75

1    A.  I couldn't tell you at that point, but
2  significantly more were the prepubertal youth than
3  adolescents.
4    **Q.  This is a sensitive question.  I mean no offense**
5  **by it, but how many of the 500 patients have made the**
6  **sad decision to commit suicide?**
7        ATTORNEY BLOCK: I'm sorry.  I couldn't
8  heat that.  Can you speak up?
9  BY ATTORNEY BARHAM:
10   **Q.  How many of the 500 patients have made the sad**
11 **decision to commit suicide?**
12       ATTORNEY BLOCK: Objection to form.
13       THE WITNESS:  Is your question how many
14 have completed suicide?
15 BY ATTORNEY BARHAM:
16   **Q.  Correct.**
17   A.  Of those 500 patients, zero.
18   **Q.  How many of those 500 patients have been**
19 **hospitalized for a psychiatric illness?**
20   A.  I do not have that information in front of me.
21   **Q.  Do you have any general idea?**
22   A.  I don't.
23   **Q.  After five or more years what percentage of your**
24 **patients would be characterized as lost to follow-up?**

Page 76

1    A.  Lost to follow-up is a specific term used in
2  studies, so it's not something that I would use to
3  describe my patients.
4    **Q.  How many patients do you lose contact with after**
5  **five years?**
6    A.  Again, I don't know how to answer that question.
7  I've been at my current role for three, so I haven't
8  lost touch with any significant number of patients.
9    **Q.  What about patients that you saw before you were**
10 **in your current position?**
11   A.  I'm not in contact with patients from my
12 previous role.
13       ATTORNEY BARHAM: All right.  Let's go to
14 Tab 110.  This is Exhibit-7 I believe.
15       ---
16       (Whereupon, Exhibit-7, Study, was marked
17        for identification.)
18       ---
19 BY ATTORNEY BARHAM:
20   **Q.  Are you familiar with this study?**
21   A.  I am not.
22   **Q.  Have you seen it before today?**
23   A.  I have not.
24   **Q.  On page one this again has been --- it's**

Page 77

1  paginated in the top right corner or top inside corner.
2  On page one the first sentence of the last paragraph
3  says gender transition is as scientifically fascinating
4  as it is socially controversial for it poses significant
5  professional and bioethical challenges for those
6  clinicians working in the field of gender dysphoria.
7    Do you agree that gender detransition poses
8  significant professional and bioethical challenges for
9  professionals treating gender dysphoria?
10       ATTORNEY BLOCK:  Objection to form.
11       THE WITNESS:  I don't necessarily agree
12 with the language.  And certainly don't agree with the
13 author to use something that's scientifically
14 fascinating.  What I think is that every decision that
15 we make in child psychiatry in particular is fraught
16 with ethical challenges.  This is not any different from
17 the ethical challenges that we face with a lot of other
18 interventions.
19 BY ATTORNEY BARHAM:
20   **Q.  What challenges does detransition pose to your**
21 **profession in your view?**
22       ATTORNEY BLOCK:  Objection to form.
23       THE WITNESS:  I don't see how it poses
24 any challenges to my work.

1    BY ATTORNEY BARHAM:
2        Q.   Page three of this article, the authors identify
3    several things that may prompt a person's decision to
4    detransition including understanding how past trauma,
5    internalized sexism and other psychological difficulties
6    influence the experience of gender dysphoria.
7            Correct?
8            ATTORNEY BLOCK:  Objection.  Can you give
9    him a chance to read?
10           ATTORNEY BARHAM:  Of course.
11           THE WITNESS:  And can you repeat what you
12   said?
13   BY ATTORNEY BARHAM:
14       Q.   On page three the authors identify several
15   things that may prompt a person's decision to
16   detransition including, quote, understanding how past
17   trauma, internalized sexism and other psychological
18   difficulties influence the experience of gender
19   dysphoria.
20           Correct?
21       A.   Sorry.  Just give me a second to look at the
22   context here.
23       Q.   Sure.
24       A.   I agree that's how it is written and there

1    appears to be no basis from which the author has built
2    that assertion.  There is no methods described in this
3    whatsoever.
4        Q.   I believe the author in that instance is citing
5    Dodsworth 2020, Gonzalez 2019, Herzog 2017, and one,
6    two, three, four other studies.
7            Do you see that?
8        A.   I see those studies.  I'd have to look at the
9    specific studies in order to understand the implications
10   and the context.
11       Q.   But the authors obviously seem to have a basis
12   or at least a citation basis for what they're saying.
13           Is that correct?
14           ATTORNEY BLOCK:  Objection to form.
15           THE WITNESS:  Again, without knowing the
16   specifics of those studies it's hard for me to say.
17   BY ATTORNEY BARHAM:
18       Q.   The authors also indicate that solving previous
19   psychological or slash emotional problems that
20   contributed to gender dysphoria may prompt the decision
21   to detransition.
22           Is that correct?
23       A.   Where is that?
24       Q.   They are citing Butler and Hutchinson, 2020,

1    Stella 2016.  It is the same paragraph.
2        A.   Got it.  Yeah I don't know what solving a
3    psychological or emotional problem means in this
4    context.
5        Q.   But these authors are at least indicating that
6    solving these problems, however they mean the term, may
7    prompt a decision to detransition.
8            Is that correct?
9            ATTORNEY BLOCK:  Objection to form.
10           THE WITNESS:  I think I've answered how I
11   can answer that.
12   BY ATTORNEY BARHAM:
13       Q.   Okay.
14           Let's go back to Tab 15, which is Exhibit-6.
15   This was the Littman study that we were discussing a
16   moment ago.  On page three --- excuse me, according to
17   Table 5, on page nine, 60 percent of the participants in
18   this survey reported that they became more comfortable
19   identifying as their natal sex.
20           Is that correct?
21           ATTORNEY BLOCK:  Objection to form.
22           THE WITNESS:  I see 65 percent of those
23   assigned female at birth and 48 of those assigned male
24   at birth reported that.

1    BY ATTORNEY BARHAM:
2        Q.   So 45 and 15 is 60, so that would be 60 percent
3    of the 100 participants in the study.
4            Correct?
5            ATTORNEY BLOCK:  Objection to form.
6            THE WITNESS:  I believe.
7    BY ATTORNEY BARHAM:
8        Q.   I'm sorry.  I didn't hear your answer.
9        A.   I trust your math, yes.
10       Q.   Okay.
11           And on page 12, under the heading discussion,
12   this survey indicates that only a small percentage of
13   detransitioners, 24 percent, informed the clinicians and
14   clinics that facilitated their transfer that they ---
15   their transition that they had detransitioned.
16           Is that correct?
17           ATTORNEY BLOCK:  Objection to form.
18           THE WITNESS:  Yes, the participants in
19   the study, that is correct.
20   BY ATTORNEY BARHAM:
21       Q.   And you testified a moment ago, if I recall
22   correctly, please correct me if I'm wrong, that you are
23   aware of only one patient in your career that has
24   detransitioned.

Page 82

1       Is that correct?

2    A.  That I'm aware of, yes.

3    Q.  Let's go to Tab 116, which is Exhibit-8.

4         ---

5         (Whereupon, Exhibit-8, Article by

6         Vandenbussche, was marked for

7         identification.)

8         ---

9  BY ATTORNEY BARHAM:

10    Q.  Are you familiar with this article?

11    A.  I have not read this article.

12    Q.  And this is a 2021 article by I believe a

13  gentleman named --- or an individual named

14  Vandenbussche, Detransitioned Related Needs in Sports.

15       Is that correct?

16    A.  That is correct.

17    Q.  Did you review this article when preparing your

18  report?

19    A.  I did not.

20    Q.  If you look at page four this article examined a

21  sample survey of 237 detransitioners.

22       Is that correct?

23       ATTORNEY BLOCK:  Objection.  Can you give

24  him time to read the document he has never seen before.

Page 83

1       ATTORNEY BARHAM:  Certainly.

2       THE WITNESS:  Can you repeat the

3  question?

4  BY ATTORNEY BARHAM:

5    Q.  This article highlights the results of a survey

6  of 237 detransitioners.

7       Correct?

8    A.  Yes, as they are defining detransitioning, yes.

9    Q.  And on page five these authors --- these

10  researchers report that 70 percent of participants

11  detransitioned because they realized that their gender

12  dysphoria was related to other issues.

13       Correct?

14    A.  Correct.

15    Q.  And that was the most common reported reason for

16  detransitioning.

17       Correct?

18    A.  As they stated, yes.

19    Q.  In paragraph 43 of your report you cite Lisa

20  Littman's 2018 study.  Paragraph 43.  And you highlight

21  what you describe as serious methodological flaws that

22  render the study meaningless.

23       Is that correct?

24    A.  Correct.

Page 84

1       ATTORNEY BARHAM:  I want to show you

2  Tab 117, and this will be Exhibit 9.  It will be an

3  article by Lily Durwood entitled Mental Health and Self

4  Worth in Socially Transitioned Transgender People.

5         ---

6         (Whereupon, Exhibit-9, Article by Lily

7         Durwood, was marked for identification.)

8         ---

9  BY ATTORNEY BARHAM:

10    Q.  Are you familiar with this article?

11    A.  I am.

12    Q.  You cited this in footnote nine of your report

13  as demonstrating the treatment associated with social

14  transitions.

15       Correct?

16    A.  I have to look at the specific footnote.  I know

17  I cited it, but I don't know if it was citing to that

18  specific conclusion.

19    Q.  By all means take a look.

20    A.  Can you point me to where my footnote is?

21    Q.  Footnote nine is --- let me find it myself.

22       ATTORNEY SWAMINATHAN:  It's page 11.

23       THE WITNESS:  Yes.

24  BY ATTORNEY BARHAM:

Page 85

1    Q.  The Durwood article in 2017 is a survey of

2  children and their parents about the children's mental

3  health.

4       Is that correct?

5    A.  Correct.

6    Q.  The children in the Durwood article were not

7  surveyed or assessed by clinicians.

8       Is that correct?

9    A.  I don't know the answer to that.  I'd have to

10  look at the specific ---.

11    Q.  Well, if this is a self report it would be

12  reporting what the children themselves said.

13       Correct?

14       ATTORNEY BLOCK:  Objection.  Let him have

15  time to read the article.

16       THE WITNESS:  The trans youth project was

17  directed by Dr. Ulson involved clinicians in the

18  assessment of the children and their families.  So I'm

19  not sure specifically.  I would have to go through the

20  methods of this one particularly for me to recall.

21       As you will see from the procedure on

22  page 117 whenever possible parents and children

23  completed the measurements in separate rooms or far

24  enough in the same room to be out of ear shot.  And so

Page 86

1  they were researchers who were boarded who were
2  participating in these interviews with the kids and
3  their families.
4  BY ATTORNEY BARHAM:
5      Q.   But those researchers were just recording what
6  the students said out loud?
7      A.   Correct.
8      Q.   So there's no clinical assessment of the
9  children as part of this survey.
10      Is that correct?
11          ATTORNEY BLOCK:  Object to form.
12          THE WITNESS:  I wouldn't be able to
13  answer that question.  It depends upon how it's used.
14  In a research context you might be using the same
15  instruments that we would use for clinical assessments,
16  but for the sake of research purposes it's not used in
17  that way.
18  BY ATTORNEY BARHAM:
19      Q.   But the purpose of this article was just to
20  record what the children said as a self report.
21      Is that correct?
22          ATTORNEY BLOCK:  Objection to form.
23          THE WITNESS:  As far as I understand the
24  point of this article, they utilized child self report

Page 87

1  which is what is typically used in children mental
2  health studies.
3  BY ATTORNEY BARHAM:
4      Q.   According to page --- the second page of this
5  article, which is page 117, the participants were
6  recruited through word of mouth, national and local
7  support groups, summer camps and online forums for
8  families of transgender and gender nonconforming youth.
9      Correct?
10      A.   That is correct.
11      Q.   Frequently in your report you refer to
12  gender-affirming care.  What in your view are the
13  components of gender-affirming care?
14          ATTORNEY BLOCK:  Objection to form.
15          THE WITNESS:  I think that there is no
16  one agreed upon use of that term and it is used by
17  different people in different context to mean whatever
18  they want it to mean, depending upon who is asking the
19  questions.  The way that I define it, for my own
20  practice, is that it's important for children to be
21  heard and listened to, that any particular gender
22  identity outcome is not better than any other and that
23  the child and families should be directing the process
24  with appropriate assessments and interventions.

Page 88

1  BY ATTORNEY BARHAM:
2      Q.   How do you handle a situation where parental
3  desires may be differ than the child's desires?
4      A.   That is almost a universal phenomenon of
5  parenthood, so there's not an atypical process.  When
6  there is disagreement about specific issues in the
7  treatment plan those interventions are going to be
8  tailored to the individual families based upon their
9  need.
10      Q.   So when you use gender-affirming care what do
11  you view as the different components or different
12  aspects of gender-affirming care in your practice?
13          ATTORNEY BLOCK:  Objection to form.
14          THE WITNESS:  I think that is also going
15  to be highly context dependent.  I'm a psychiatrist and
16  I see a lot of children with complex psychiatric needs,
17  so my process for gender-affirming care is going to be
18  different than what somebody else might describe as
19  gender-affirming care, but I think I highlighted what I
20  see as the components of it for myself.
21  BY ATTORNEY BARHAM:
22      Q.   I've missed in your list of the different
23  components, so could you explain again what do you see
24  as the components of gender-affirming care?

Page 89

1      A.   That it should be child and family led, that
2  listening to and understanding the child is an important
3  aspect of the process and that there is no gender
4  identity outcome that is privileged over another.  I'm
5  sure I said it slightly differently than the last time
6  around but the concepts are the same.
7      Q.   Do you consider social transition to be a
8  component of gender-affirming care?
9      A.   I think that understanding the risks, benefits
10  and alternatives of social transition is a part of
11  gender-affirming care.  In that way, sometimes
12  recommending not socially transitioning is a part of
13  gender-affirming care.
14      Q.   But gender-affirming care can be an approach
15  used as part of gender-affirming care.
16      Is that correct?
17          ATTORNEY BLOCK:  Objection to the form.
18          THE WITNESS:  Can you repeat the
19  question?
20  BY ATTORNEY BARHAM:
21      Q.   Social transitioning can be a method used as
22  part of gender-affirming care.
23      Correct?
24      A.   It is an option.

Page 90

```
1        Q.   An available tool.
2             Correct?
3        A.   Yes.
4        Q.   Is it your belief that social transition is a
5    type of medical or mental health treatment for gender
6    dysphoria?
7        A.   It's a hard question to answer.  Social
8    transition is a pretty diverse concept that's hard to
9    get as a categorical variable to study, but the
10   implication is that there's a lot of things that are
11   often helpful for mental health that aren't specifically
12   mental health treatments, right, like exercise, regular
13   sleep.  These aren't specific mental health
14   interventions but nevertheless have impacts on mental
15   health outcomes.
16       Q.   Well, in paragraph 90 --- I mean paragraph 36 of
17   your report you say that social transition is a
18   treatment for gender dysphoria?
19       A.   Yeah I would agree with that.
20       Q.   So what kind of treatment is it?
21       A.   It's a psychosocial intervention.
22       Q.   Psychosocial.  What does social transitioning
23   include in your view?
24       A.   I have to recall if I provided an operational
```

Page 91

```
1    definition for it in my report.  Essentially what we're
2    talking about is an alignment of gender role and gender
3    identity.  So that's transition of name, pronouns, hair,
4    participation in sex-segregated activities, et cetera.
5        Q.   And so social transition in your view means the
6    participation in girls or boys athletic teams in
7    competitions consistent with ones gender identity.
8             Is that correct?
9        A.   Again, it's going to be context dependent.  It
10   is not a yes or no question around social transition.
11   What we're going to be doing in the context of an
12   assessment is understanding the risks and benefits of
13   all the various options that we have.
14       Q.   I understand that it can differ from person to
15   person, but participation in girls or boys athletic
16   teams in competition consistent with one's gender
17   identity is an aspect, a possible aspect, of social
18   transitioning.
19            Correct?
20       A.   It may be an option for some students, yes.
21       Q.   Do you consider the use of puberty blockers to
22   be an available tool as part of gender-affirming care?
23       A.   I do.
24            ATTORNEY BLOCK:  Objection to form.
```

Page 92

```
1    BY ATTORNEY BARHAM:
2        Q.   Do you consider the use of cross sex hormones to
3    be an available tool as part of gender-affirming care?
4             ATTORNEY BLOCK:  Objection to form.
5             THE WITNESS:  Gender-affirming care can
6    include hormones.
7    BY ATTORNEY BARHAM:
8        Q.   Are there any other available tools that you use
9    as part of gender-affirming care?
10       A.   Yes, there is a lot of tools that I use that are
11   involved in gender-affirming care.  Work with the family
12   is one big piece of it.  Work with the school is
13   another.  Referrals for surgery when indicated,
14   recommendations for assessment and treatment of any
15   co-occurring mental health disorder is a part of it.
16       Q.   What is your role in the prescribing of puberty
17   blockers?
18       A.   I'm occasionally in the role of doing a mental
19   health assessment prior to initiation of those
20   medications.
21       Q.   And are you the individual who would prescribe
22   the puberty blockers?
23       A.   I am not.
24       Q.   What type of professional would be responsible
```

Page 93

```
1    for the prescribing?
2        A.   In the clinics that I have worked these are
3    either adolescent medicine specialists or pediatric
4    endocrinologists.
5        Q.   And is the same true with cross sex hormones?
6        A.   Yes.
7        Q.   In your report you describe gender-affirming
8    care as the prevailing model of care for transgender
9    youth.
10            Is that correct?  And I'm referencing
11   paragraph 15 of your report.
12       A.   Yes.
13       Q.   Later on in your report you refer to prevailing
14   standards of care, paragraph 18, paragraph 26, for
15   example.  By that are you referring to gender-affirming
16   care?
17       A.   Which paragraph?
18       Q.   Eighteen (18) and 26.
19       A.   I would say that it is a part of what I'm
20   referring to but not the entirety of what I'm referring
21   to.
22       Q.   What else are you referring to in paragraph 18
23   and 26 when you say prevailing standards of car?
24       A.   This would include a lot of components,
```

24  (Pages 90 to 93)

Simpson 0929

Page 94

1  including both the Endocrine Society Guidelines, the
2  World Professional Association for Transgender Health
3  Guidelines as well as recommendations and ethical
4  guiding principles of the various governing bodies that
5  we all work with.
6      Q.   And you would describe those various documents
7  that you just referenced as reflecting gender-affirming
8  care.
9          Correct?
10     A.   I would have to go through, for example, the
11 Endocrine Society Guidelines to know whether or not they
12 use that specific term.  Again, I think I just want to
13 make sure that I'm emphasizing that gender-affirming
14 care does not have an agreed upon definition so it's
15 controversial and I wouldn't know how to answer that
16 question.
17     Q.   As you use the term and as you define the term
18 in your practice, would you consider the WPATH standards
19 to fall under the umbrella of gender-affirming care?
20     A.   I would yes.
21     Q.   And would you consider the Endocrine Society
22 Guidelines to fall under the umbrella of
23 gender-affirming care?
24     A.   I would, yes.

Page 95

1      Q.   In paragraph 15 of your report you claim that
2  gender-affirming care is endorsed by at least five
3  professional associations.
4          ATTORNEY BLOCK:  Objection to form.
5  BY ATTORNEY BARHAM:
6      Q.   And you reference others.  What other
7  organizations are you alluding to in paragraph 15 of
8  your report?
9      A.   I don't want to get the name of the organization
10 incorrect, but National Association of Social Workers
11 and the National Association of Marital and Family
12 Therapists have released statements about it, but I
13 don't have specific recollection of those sitting here
14 today.
15     Q.   Okay.
16         Are there any other organizations besides those
17 and those listed in paragraph 15?
18     A.   There likely are but none that are coming to
19 mind today.
20     Q.   When you were preparing your report did you
21 consult the standards of care articulated by any
22 international professional organizations?
23     A.   Yes.
24     Q.   Which ones?

Page 96

1      A.   Both the Endocrine Society Guidelines as well as
2  the WPATH standards of care.
3      Q.   Any other international or professional
4  organizations?
5      A.   Not that I can recall, no.
6      Q.   Are you aware that international and
7  professional organizations have been moving away from
8  using puberty blockers and cross sex hormones on
9  children and adolescents under the age of 16?
10         ATTORNEY BLOCK:  Objection to form.
11         THE WITNESS:  I don't see that that is
12 necessarily accurate.  I'm going to have to take a break
13 in five minutes if that is okay.
14         ATTORNEY BARHAM:  This would be the
15 perfect time.
16         THE WITNESS:  I will be quick.
17         VIDEOGRAPHER:  Going off the record.  The
18 current reads 11:01.
19 OFF VIDEOTAPE
20             ---
21 (WHEREUPON, A SHORT BREAK WAS TAKEN.)
22             ---
23 ON VIDEOTAPE
24         VIDEOGRAPHER:  Back on the record.  The

Page 97

1  current time is 11:06 a.m.
2          ATTORNEY BARHAM:  I'm going to show you
3  what we will mark as Exhibit 10, this will be Tab 91.
4              ---
5          (Whereupon, Exhibit-10, Statement by
6          Royal Australian and New Zealand College
7          of Psychiatrists, was marked for
8          identification.)
9              ---
10 BY ATTORNEY BARHAM:
11     Q.   This is a statement from the Royal Australian
12 and New Zealand College of Psychiatrists.
13         Correct?
14         ATTORNEY BLOCK:  Objection.  Can you give
15 him a chance to look at the document?
16         THE WITNESS:  It's what it says.  I don't
17 know what the government structure of this organization
18 is or how they release their statements or how they are
19 developed.
20 BY ATTORNEY BARHAM:
21     Q.   This is Position Statement 103, according to the
22 document.
23         Correct?
24     A.   I will take your word for it if that's what it

Page 98

1  says.
2    Q.  Right below the title.  And it was published in
3  August of 2021.
4       Is that correct?
5    A.  I don't know where it says that.
6    Q.  Right below the tab.
7    A.  Got it.
8    Q.  The Royal Australian and New Zealand College of
9  Psychiatrists is the professional body of psychiatrists
10 for those two countries.
11      Is that correct?
12      ATTORNEY BLOCK:  Objection.
13      THE WITNESS:  I do not know that.
14 BY ATTORNEY BARHAM:
15   Q.  I'm sorry.  I didn't catch your answer.
16   A.  I do not know.
17   Q.  According to page three of this document, the
18 Royal College has concluded that there are, quote,
19 polarized views and mixed evidence regarding treatment
20 options for people presenting with gender identity
21 concerns, especially children and young people.
22      Do you see that?
23   A.  I see that.
24   Q.  Do you agree with their assessment?

Page 99

1    A.  Yes.
2    Q.  So this means that professionals can disagree
3  with each other as to how to treat children and young
4  people with gender dysphoria.
5       Is that correct?
6       ATTORNEY BLOCK:  Objection to form.
7       THE WITNESS:  Yeah.  I think any
8  treatment decision, you're going to have professionals
9  disagreeing with you about the best course of action.
10 This isn't any different than that.
11 BY ATTORNEY BARHAM:
12   Q.  And on page four of the document the Royal
13 College says that psychiatric assessment and treatment
14 should be both --- should be both based on available
15 evidence and allow for full exploration of a person's
16 gender identity.  And it emphasizes the importance of
17 the psychiatrist's role to undertake for assessment in
18 evidence-based treatment ideally as part of a
19 multidisciplinary team, especially highlighting
20 distinguishing issues which may need addressing and
21 treating.  Do you agree with the Royal College's
22 emphasis on psychiatrists' role and how it's important
23 to ensure appropriate care for gender dysphoria?
24      ATTORNEY BLOCK:  Objection to form.

Page 100

1       THE WITNESS:  Psychiatrists are often a
2  useful adjunct to the team, but isn't a necessary
3  requirement.  There are many other mental health
4  professionals who have expertise and can fill this role.
5  BY ATTORNEY BARHAM:
6    Q.  And what other professionals do you think could
7  fill this role?
8    A.  This would be licensed clinical mental health
9  professionals.
10   Q.  And those would include?
11   A.  Psychologists, social workers, marital and
12 family therapists and there are probably other titles
13 that are governed by their regulatory boards that I
14 don't recall right now.
15 BY ATTORNEY BARHAM:
16   Q.  And on what are you basing your disagreement
17 with the Royal College's emphasis on the importance of
18 the psychiatrist's role
19      ATTORNEY BLOCK:  Objection to form and
20 characterization of the document.
21      THE WITNESS:  The WPATH standards of care
22 as an example does not dictate necessary involvement of
23 a psychiatrist.  And I would have to review the
24 Endocrine Society, but I don't believe that they

Page 101

1  specifically --- from my guild either.
2  BY ATTORNEY BARHAM:
3    Q.  Is it true that psychiatrists have training and
4  skills that psychologists and marital therapists and
5  social workers do not have?
6    A.  That is correct.
7       ATTORNEY BARHAM:  I'm going to hand you
8  what we will mark as Exhibit-11.  And this will be
9  Tab 92 for those watching online.
10      ---
11      (Whereupon, Exhibit-11, Policy Change
12      Regarding Hormonal Treatment of Minors,
13      was marked for identification.)
14      ---
15 BY ATTORNEY BARHAM:
16   Q.  This document is an announcement of a policy
17 change regarding hormonal treatment of minors with
18 gender dysphoria at Astrid Lidgren Children's Hospital.
19 Are you aware that this is the main gender clinic in
20 Sweden?
21      ATTORNEY BLOCK:  Objection to form.
22      THE WITNESS:  I don't see any specific
23 information about this document that reports where it's
24 from.

## Page 102

1  BY ATTORNEY BARHAM:
2      Q.   Are you aware of Astrid Lindgren Hospital by
3  reputation?
4      A.   I don't know if that's the name of it.  No, I
5  don't recall the specific name of the Swedish Children's
6  Hospital.
7      Q.   Are you aware that the Swedish Agency for Health
8  Technology Assessment and Assessment of Social Services
9  published an overview of the knowledge base which showed
10  a lack of evidence of both long-term consequences of the
11  treatments of gender dysphoria?
12      A.   I have heard ---.
13          ATTORNEY BLOCK:  Objection to form and
14  where are you quoting from?
15          ATTORNEY BARHAM:  Halfway through the
16  first paragraph of the background section on page one.
17          ATTORNEY BLOCK:  I'm sorry.  Where was
18  this document obtained from?
19          ATTORNEY BARHAM:  I can supply that
20  information, but this is an announcement of a policy
21  change from a Children's Hospital in Sweden.
22          ATTORNEY BLOCK:  Just for the record,
23  this doesn't seem to have a walk --- like --- it just
24  looks like words on a page without other sourcing on it.

## Page 103

1          ATTORNEY BARHAM:  Your objection is
2  noted.
3          THE WITNESS:  I mean without speaking to
4  the providence of the document, I have heard that there
5  was a change within the Swedish establishment in regards
6  to prepubertal youth or prepubertal youth.
7  BY ATTORNEY BARHAM:
8      Q.   And what was your understanding of that change?
9      A.   I would have to look through the specifics to
10  know for sure.
11      Q.   What is your general understanding of the nature
12  of that change?
13      A.   My general understanding was there was a pause
14  on some of the treatments, medical treatments available
15  for children with gender dysphoria.
16      Q.   And by pause, at least according to this
17  document, it means that they had decided hormonal
18  treatments, i.e. puberty blocking and cross sex
19  hormones, will not be initiated in gender-dysphoric
20  patients under the age of 16.
21          Correct?  First bullet point in executive
22  decisions.
23      A.   Again, not knowing the providence of this
24  document, that's what this document says, yes.

## Page 104

1      Q.   Are you aware that the United Kingdom's National
2  Health Service put an end to initiating hormone
3  treatment in new cases of individuals under 16?
4          ATTORNEY BLOCK:  Objection to form and
5  foundation.
6          THE WITNESS:  My understanding is that
7  it's under litigation right now and a final decision has
8  not been reached, but I could be wrong about that.
9  BY ATTORNEY BARHAM:
10      Q.   Are you aware that that's at least a current
11  practice to put an end to initiating hormonal treatment
12  in new patients --- in new cases of individuals under
13  16?
14          ATTORNEY BLOCK:  Objection to form.
15          THE WITNESS:  Can you repeat the
16  question?
17  BY ATTORNEY BARHAM:
18      Q.   Are you aware that the United Kingdom's National
19  Services' current practice is to put an end to
20  initiating hormonal treatments in new cases of
21  individuals under 16?
22          ATTORNEY BLOCK:  Objection to form and
23  foundation.
24          THE WITNESS:  I do not have the NHS

## Page 105

1  policies in front of me, so I cannot speak to that.
2          ATTORNEY BARHAM:  The document Exhibit
3  --- what number are on, 11.
4          LAW CLERK WILKINSON:  11, yes
5  BY ATTORNEY BARHAM:
6      Q.   Exhibit 11 indicates, quote, the United
7  Kingdom's National Health Service put an end to
8  initiating hormonal treatment in new cases of
9  individuals under 16.  Do you have any reason to believe
10  that that statement is inaccurate?
11          ATTORNEY BLOCK:  Just objection that this
12  document came out at a certain time and so it's just not
13  clear what timeframe, you know, this question is
14  referring to.  And just another objection to this
15  document.  This appears to be a translation ---.
16          ATTORNEY BARHAM:  Your objection is
17  noted.  And we've already agreed that there are the
18  three objections, so I will ask you to cease the
19  speaking objections.
20          THE WITNESS:  I have reason to doubt it.
21  Yes.
22  BY ATTORNEY BARHAM:
23      Q.   What is your reason to doubt it?
24      A.   My understanding is that there were legal

1   processes involved that have changed the landscape of
2   this care in the U.K.
3       Q.   Are you aware of the National Health Service
4   reinitiating hormonal treatments in new cases of
5   individuals under 16?
6       A.   I am unsure.  That's where my doubt is.
7       Q.   But you're aware that at one time they put an
8   end to those treatments for individuals under the age of
9   16?
10      A.   Yes.
11          ATTORNEY BLOCK:  Objection to form.
12          THE WITNESS:  Yes.
13          ATTORNEY BARHAM:  I'm going to show you
14   what we will mark as Exhibit-12.  This is a document ---
15   an article by Lisa Nainggolan.  I'm probably butchering
16   the last name.
17          LAW CLERK WILKINSON:  Tab 93.
18          ATTORNEY BARHAM:  Tab 93, entitled
19   Hormonal Treatment of Youth with Gender Dysphoria Stops
20   in Sweden.
21          ---
22          (Whereupon, Exhibit-12, Article by Lisa
23           Nainggolan, was marked for
24           identification.)

1           ---
2    BY ATTORNEY BARHAM:
3        Q.   In the fourth paragraph it indicates that other
4    centers in Sweden that treat gender dysphoria youth in
5    Loom and Licopene will follow the lead of the ALB.  Are
6    you aware that those two clinics had made the same
7    decision as the Astrid Lindgren Children's Hospital?
8        A.   I am not.
9           ATTORNEY BARHAM:  I'm going to show you
10   what we will mark as Exhibit-4 --- I mean, I'm sorry
11   Tab 94, Exhibit 13.
12          ---
13          (Whereupon, Exhibit-13, Study, was marked
14           for identification.)
15          ---
16   BY ATTORNEY BARHAM:
17       Q.   Are you aware that Finland has similarly
18   reversed its course issuing new guidelines that allow
19   puberty blockers only on a case by case basis after
20   extensive psychiatric assessment?
21          ATTORNEY BLOCK: Objection to form.  And
22   can you give the witness and me a chance to see this
23   document?  Can the document be scrolled down?
24          THE WITNESS:  What I can say about this

1    document is that I don't --- I've not heard of what
2    Cohere Finland is and how their recommendations impact
3    policies on the ground in Finland.
4    BY ATTORNEY BARHAM:
5        Q.   So are you not familiar with Cohere as an
6    entity?
7        A.   Correct.
8        Q.   And that was a question.  Are you?
9        A.   I am not.
10       Q.   Have you seen this document before today?
11       A.   I have not.
12          ATTORNEY BARHAM:  I'm going to show you
13   what we'll mark as Exhibit 14, and this will be Tab 95
14   for those watching at a distance.
15          ---
16          (Whereupon, Exhibit-14, Article Published
17           on Medscape.com, was marked for
18           identification.)
19          ---
20   BY ATTORNEY BARHAM:
21       Q.   This is an article by Betsy McCall published on
22   Medscape.com on October 7th, 2021.
23          Is that correct?
24       A.   Yes.

1        Q.   If you look at the third paragraph from the
2    bottom.  Ms. McCall reports that Scandinavian countries,
3    most notably Finland, once eager advocates for the
4    gender-affirmative approach, have pulled back and issued
5    new treatment guidelines in 2020, stating that
6    psychotherapy rather than gender reassignment should be
7    the first line of treatment for gender dysphoric youth.
8    Do you see that?
9        A.   I see that.
10       Q.   Do you agree with that approach?
11          ATTORNEY BLOCK:  Objection to form.
12          THE WITNESS:  Medscape is a popular press
13   forum for discussing issues and the language that is
14   used by this author implies to me that this is not
15   somebody who has a great deal of expertise or
16   understanding in this field.
17   BY ATTORNEY BARHAM:
18       Q.   Do you agree with using psychotherapy rather
19   than gender reassignment as the first line of treatment
20   for gender dysphoric youth?
21       A.   The term gender reassignment in and of itself is
22   not a meaningful term in this context, and so it's
23   unclear what this particular author is trying to get
24   across.  And it's a false dichotomy that is being

## Page 110

1      positive that doesn't actually happen.

2          Q.   Are you aware that Finland had issued new

3      treatment guidelines in 2020?

4          A.   I don't recall the specifics of when guidelines

5      were recommended.  But based upon the document that you

6      placed in front of me it seems to be yes.  But I think

7      the description of those guidelines and what you put in

8      front of me as the Cohere guidelines, which again I'm

9      not sure what they actually represent in terms of their

10     policies, there are contradictions there.

11             ATTORNEY BLOCK:  I'm sorry.  I want to

12     put on the record this document about Finland also

13     appears to be a translation from the original by the

14     Society for Evidence Based Gender Medicine whose website

15     describes it as an unofficial translation.  So I just

16     want to note that for the record.

17             ATTORNEY BARHAM:  So noted.  I'm going to

18     show you what we will mark as Exhibit 15, Tab 96.

19             ---

20             (Whereupon, Exhibit-15, Article in

21             National Health Service, was marked for

22             identification.)

23             ---

24     BY ATTORNEY BARHAM:

## Page 111

1          Q.   And I will direct your attention to page 13.

2      This is a --- to identify the document for the record.

3      This is an Evidence Reviewed Gonadotropin Releasing

4      Hormone Analogs for Children and Adolescents with Gender

5      Dysphoria, from the National Health Service in 2021 ---

6      or in 2020.  On page 13, right at the beginning of the

7      conclusions section the authors indicate that the

8      results of studies that reported impact on the critical

9      outcomes of gender dysphoria and mental health and the

10     important outcomes of body image and psychosocial impact

11     in children and adolescents with gender dysphoria are a

12     very low certainty using modified grade.  They suggest

13     little change with GnRH analogs from baseline to

14     follow-up.  Do you see that?

15         A.   I do not.

16         Q.   First paragraph, under the conclusion.

17         A.   Yes, I see that.

18         Q.   Do you have any scientific basis for disputing

19     this conclusion?

20             ATTORNEY BLOCK:  Objection.  Let him read

21     the document.

22             THE WITNESS:  I mean, without having seen

23     this before, I'm not sure what the scoping was for how

24     they defined which studies to include, which ones were

## Page 112

1      excluded, which would be required in a validated

2      metaanalysis type approach.  So without a very specific

3      description of the methodology it's going to be hard for

4      me to make an educated statement.

5      BY ATTORNEY BARHAM:

6          Q.   If you look at page three of the document, under

7      executive summary it highlights the nine observational

8      studies that were included in the evidence review.

9          A.   Yeah, in a metaanalysis or even a systematic

10     review one of the processes that occurs is you define as

11     the authors what you are searching for, what are the

12     exclusionary and inclusionary criteria for each

13     individual study and a list of every single study that

14     was reviewed and why or why not it was included.  That

15     is missing here, so it's --- I don't know how the

16     authors decided which ones to include or which ones not

17     to include, which makes it hard to draw a conclusion

18     from the report as it stands.

19         Q.   Have you seen any other reports that suggest

20     that the evidence being discussed on page 13 under the

21     conclusions heading isn't anything higher than a very

22     low certainty using modified grade?

23         A.   I'm not 100 percent familiar with modified grade

24     as a methodology, so I can't speak to how that would

## Page 113

1      apply to other studies.

2          Q.   And the next paragraph the authors indicate that

3      studies found differences in outcome could represent

4      changes that are either a questionable clinical value or

5      the studies themselves are not reliable and changes

6      could be due to confounding bias or chance.  Do you

7      agree that that is possible?

8              ATTORNEY BLOCK:  Objection to form.

9              THE WITNESS:  Well, I agree that all

10     things are possible, that scientific literature is not

11     always 100 percent drawing any conclusions.  But again,

12     without knowing specifically how they included what they

13     included or why they included what they included and why

14     they opt to remove others, it's not possible for me to

15     draw a specific conclusion from this.

16     BY ATTORNEY BARHAM:

17         Q.   In paragraph 34 of your report you distinguish

18     Dr. Levine's approach to treating gender dysphoria as

19     --- or you describe it as gender identity conversion

20     model.  Do you recall that?

21         A.   Yes.

22         Q.   In your view are there two approaches to

23     treating gender dysphoria in children and adolescents,

24     the gender-affirming model and the conversion therapy

Page 114

1    model?
2           ATTORNEY BLOCK:  Objection to form.
3           THE WITNESS:  I would not agree with that
4    characterization.
5    BY ATTORNEY BARHAM:
6        Q.   How many other approaches do you see?  How do
7    you categorize the different approaches for treating
8    gender dysphoria in children and adolescents?
9        A.   I don't agree with the premise, but there
10   specific defined treatment paradigms that are used.  I
11   think there are --- there are elements of conversion
12   therapy as I referred to in my report.  There are
13   elements of gender-affirming care and there is a
14   spectrum in between that.
15       Q.   What are the elements --- what are the elements
16   of identity --- gender identity conversion model in your
17   mind?
18       A.   I think the primary element as I understand it
19   in conversion therapy is a presupposition that a
20   transgender outcome is an inherently negative outcome
21   and that engagement or interventions should be put into
22   place in order to make that outcome the least likely as
23   possible.
24       Q.   And in your mind gender-affirming care is care

Page 115

1    that affirms that child's gender identity.
2           Correct?
3           ATTORNEY BLOCK:  Objection to form.
4           THE WITNESS:  As I described earlier,
5    there are multiple components to how I would define
6    gender-affirming therapy.
7           ATTORNEY BARHAM:  Let's go to Exhibit 16,
8    this will be Tab 97.
9                       ---
10          (Whereupon, Exhibit-16, Article by
11          Roberto D'Angelo, was marked for
12          identification.)
13                      ---
14   BY ATTORNEY BARHAM:
15       Q.   This is an article by Roberto D'Angelo published
16   in 2020, entitled One Science Does Not Fit All.  Are you
17   familiar with these authors?
18       A.   Not personally, no.
19       Q.   Are you familiar with them by reputation?
20       A.   Looking at Dr. D'Angelo's footnotes, given that
21   he works for the Society for Evidence Based Gender
22   Medicine, then I might draw some conclusions from that.
23       Q.   And what conclusions would you draw from that?
24       A.   That there is a presupposition that transgender

Page 116

1    identity is a negative outcome.
2        Q.   And why would you draw that conclusion from that
3    association?
4        A.   Based upon the description of the care on the
5    website.  But that would be an assumption.  I would
6    never do that on any individual basis for any of these
7    authors without knowing them.
8        Q.   Beyond the association, do you have any reason
9    to doubt the scholarly integrity of the authors here?
10       A.   I think you can't really talk about scholarly
11   integrity when it's a letter to the editor.  It's not
12   the same --- same level of evidence as another study
13   would be.
14       Q.   It's a letter to the editor that cites 37
15   different sources.
16          Is that correct?  I'm looking at the last page.
17       A.   The sources aren't numbered, so I don't know how
18   many sources it has, but ---.
19          ATTORNEY BLOCK:  Let him look at it.
20   BY ATTORNEY BARHAM:
21       Q.   The references at the end are numbered.  Excuse
22   me.  I apologize.  I was looking at the wrong document.
23       A.   There are 37 footnotes.  I would assume that you
24   are correct on that.

Page 117

1        Q.   We are talking about this letter to the editor
2    --- let me clarify for the record because I was looking
3    at the wrong document prior to questioning for which I
4    apologize.  This letter to the editor contains
5    approximately two pages of typed materials listing the
6    references that it uses.
7           Correct?
8        A.   Yes, correct.
9        Q.   Did you review this article when preparing your
10   report?
11       A.   I did not.
12       Q.   Did you review this article before today?
13       A.   I have not.
14       Q.   The article reviews the document published by
15   Turban, et al., in 2020, a study by Turban, et al, in
16   2020.
17          Is that correct?
18       A.   It does.
19          ATTORNEY BLOCK:  Objection to form.
20   BY ATTORNEY BARHAM:
21       Q.   If you look at the last page, that article is
22   the same article that you cited in paragraph 34 of your
23   report.
24          Is that correct?

1    A.   That's correct.

2    **Q.   This D'Angelo, et al. criticized Turban on**

3    **page one for his simplistic affirmation versus**

4    **conversion binary --- or I should state permeates his**

5    **narrative and establishes a foundation for their**

6    **analysis and conclusions.  Do you see that on the first**

7    **page?**

8    A.   What page?

9    **Q.   The first page, second column, middle paragraph.**

10   A.   I see that, yes.

11   **Q.   These authors state the notion that all therapy**

12   **interventions for gender dysphoria can be categorically**

13   **classified into this simplistic binary betrays a**

14   **misunderstanding of the complexity of psychotherapy.**

15   **Would you agree with that statement?**

16            ATTORNEY BLOCK:  Objection to form and

17   asking him questions about an article he hasn't read.

18            THE WITNESS:  The premise of that

19   statement implies a cognition on behalf of the authors

20   of that study that I don't think is necessarily

21   accurate.  I don't think that the authors of the Turban

22   study would suggest that there is a simple binary of

23   therapy interventions.

24   BY ATTORNEY BARHAM:

1    **Q.   And you would also say there's not a simplistic**

2    **binary.**

3        **Is that correct?**

4    A.   That is correct.

5    **Q.   So in paragraph 34 of your report you're not**

6    **trying to draw a --- you're not trying to draw some sort**

7    **of dichotomy between Dr. Levine's approach and yours?**

8            ATTORNEY BLOCK:  Objection to form.

9            THE WITNESS:  It is less helpful for me

10   to describe it as identifying a dichotomy but really

11   more focused on the goals of treatment approach.  And if

12   the goal of the treatment approach is a conversion type

13   goal, then I think there is a draw between that and the

14   standard of care of the affirmative model.

15   BY ATTORNEY BARHAM:

16   **Q.   So that in your view are there two different**

17   **treatment goals when treating gender dysphoria?  We can**

18   **categorize treatment approaches by the goals, conversion**

19   **therapy versus the gender-affirming model that you have**

20   **outlined?**

21            ATTORNEY BLOCK:  Objection to form.

22            THE WITNESS:  The way I would describe

23   the goal of the gender-affirming model is to have a

24   healthy, resilient child whatever the gender identity

1    ends up being, whether that is a cisgender identity or

2    transgender identity.  The difference between that and a

3    conversion therapy is again a presupposition that a

4    transgender identity is an inherently worse outcome

5    which is not focused on the overall mental health and

6    wellbeing of the child.

7    BY ATTORNEY BARHAM:

8    **Q.   I understand the distinction that you're making.**

9    **I'm trying to understand are there --- as we assess**

10   **different people's approaches to this area, can we**

11   **characterize them by the goals of their approach into a**

12   **gender-affirming model and a conversion therapy model**

13   **and those are basically two different camps.**

14       **Is that correct?**

15            ATTORNEY BLOCK:  Objection to form.

16            THE WITNESS:  We cannot.

17   BY ATTORNEY BARHAM:

18   **Q.   And in saying that I'm not trying to say that**

19   **therapeutic techniques belong in one or the other.  I'm**

20   **just trying to say can we categorize treatment**

21   **approaches by the goals?**

22            ATTORNEY BLOCK:  Objection to form.

23   BY ATTORNEY BARHAM:

24   **Q.   Because that seems to be what you are doing in**

1    paragraph 34 of your report.

2    A.   There's a process versus an outcome question

3    that I'm just not understanding the distinction between

4    for as I'm defining conversion therapy here, it is a

5    specific goal that a transgender outcome is a negative

6    outcome.  For gender-affirming therapy or interventions

7    there is no presupposed outcome that is better than

8    another other than building the mental health and

9    well-being of the child.

10   **Q.   Okay.**

11   A.   And there is many different ways of approaching

12   that question and intervening that are going to be

13   outside of the scope of a goal-based approach.

14   **Q.   It still sounds and again I'm just trying to**

15   **explore and understand what you're saying here.  It**

16   **still sounds like there is one approach that has a goal**

17   **in your view of having the child return to comfort with**

18   **the child's natal sex and then there is another approach**

19   **that has a goal that says I don't care where you end up.**

20   **Is that fair to say?**

21            ATTORNEY BLOCK:  Objection to form.

22            THE WITNESS:  Again, I think it really

23   narrows down what's a highly complex question, so it's

24   really hard to give an answer to that.  But if we define

Page 122

1  conversion as approach one and everything else outside
2  of that, I can work with that if that is helpful for
3  having further discussion or asking more questions.
4  BY ATTORNEY BARHAM:
5  **Q.   Is that the way you would describe this**
6  **situation in the field at present?**
7  A.   It is not the way I would describe the situation
8  in the field.
9  **Q.   On page five of this article ---.**
10       ATTORNEY BLOCK:  I'm sorry, which
11  article?
12       ATTORNEY BARHAM:  On Tab 97 of
13  Exhibit 16.  Dr. D'Angelo's article.
14  BY ATTORNEY BARHAM:
15  **Q.   It sounds to me like you are rejecting what**
16  **these authors describe as a conflation of ethical**
17  **non-affirming psychotherapy and conversion therapy, next**
18  **to the last paragraph on the page.**
19       ATTORNEY BLOCK:  Objection.  Please give
20  him time to read the page.
21       THE WITNESS:  I've never seen of or heard
22  a definition for ethical non-affirmative psychotherapy,
23  so I don't know what that means.
24  BY ATTORNEY BARHAM:

Page 123

1  **Q.   Is it your position that there is no such thing?**
2  A.   I have never heard of such a thing.
3  **Q.   On page six, in the first column, the authors**
4  **write, in fact, some homophobic societies and indeed**
5  **families that reject homosexuality among their children**
6  **have embraced the affirmative biomedical pathway, which**
7  **poses questions as to whether, quote, affirmative care**
8  **in some cases in some instances serve the role of gay**
9  **conversion therapy.  Do you believe that that's a**
10 **legitimate concern?**
11 A.   I do not.
12 **Q.   Why not?**
13 A.   As I mentioned before, affirmative care is not
14 presuppose any one specific outcome.
15 **Q.   Do you think that someone can have a concern**
16 **that affirmative care could serve the role regardless of**
17 **its dole, serve the role of gay conversion therapy?**
18       ATTORNEY BLOCK:  Objection to form.
19       THE WITNESS:  Well, the authors appear to
20 have that concern.  It is not a concern that has been
21 borne out by the literature in my clinical experience.
22 BY ATTORNEY BARHAM:
23 **Q.   Do you believe that the authors are reasonable**
24 **in having that concern?**

Page 124

1  A.   I can't speak to what the authors' motivations
2  are for writing this.  I do not know.
3  **Q.   Based on your knowledge of the field, do you**
4  **believe that that's a reasonable concern?**
5  A.   I do not.
6  **Q.   Why not?**
7  A.   Because understanding the overlap and the
8  interaction between gender identity and sexuality and
9  sexual orientation is a part of the assessment process
10 in affirming care.
11 **Q.   At the bottom of page one the authors write, if**
12 **anything other than affirmation is viewed as GICE ---.**
13 A.   What page is that?
14 **Q.   On page six, I'm sorry.  Same page you were on**
15 **with the gay affirmative therapy or gay conversion**
16 **therapy.  The last paragraph in column one of page six.**
17 **If anything other than affirmation is viewed as GICE, it**
18 **follows that the provision of psychotherapy in these**
19 **clinical scenarios can be seen as harmful conversion**
20 **efforts.  If these therapeutic efforts do not aim to**
21 **convert or consolidate an identity but instead aim to**
22 **help individuals gain a deeper understanding of their**
23 **discomfort with themselves, the factors that have**
24 **contributed to their distress and their motivations for**

Page 125

1  **seeking transition.  Is it your position that there are**
2  **no therapeutic interventions that do not aim to convert**
3  **or consolidate an identity?**
4        ATTORNEY BLOCK:  Objection to form.
5        THE WITNESS:  What I would say is that
6  helping individuals gain a deeper understanding of their
7  discomfort with themselves, the factors contributing to
8  their distress and their motivations for seeking
9  transition is a vital and inherent part of
10 gender-affirming care.
11 BY ATTORNEY BARHAM:
12 **Q.   But a moment ago you indicated that you were not**
13 **aware of any ethical non-affirmative psychotherapy?**
14 A.   That is not a phrase that I have heard or have
15 heard described.  What the passage that you are
16 referring to describes is a very typical process
17 involved in any kind of standard of care around anything
18 really is understanding motivations and understanding
19 distress.  There is nothing --- there is nothing novel
20 about that description of care that is not already under
21 the umbrella of affirming care.
22 **Q.   And a little bit later in that paragraph, I**
23 **believe at the top of column two of page six, the**
24 **authors right both conversion and affirmative therapy**

Page 126

1   efforts carry the risk of undue influence potentially
2   compromising patient autonomy.  Do you agree that that
3   is a possibility?
4       A.   Again, I'm not sure what the authors are
5   referring to when they say affirmation therapy efforts
6   because what they're describing as ethical,
7   non-affirmative interventions falls to me under the
8   clear rubric of affirming care, so I don't know what
9   they mean by this.
10      Q.   Okay.
11          In paragraph 35 of your report you indicate ---
12   you stated research indicates that social transitioning
13   significantly improves the mental health of transgender
14   young people.
15          Is that correct?
16      A.   Yes.
17          ATTORNEY BARHAM:  And I'm going to show
18   you what we will mark as Exhibit 17.  This is Tab 118
19   for those following from a distance.  This is a study by
20   Gibson, et al. published in 2021.
21          ---
22          (Whereupon, Exhibit 17, Study by Gibson,
23           et al., was marked for identification.)
24          ---

Page 127

1   BY ATTORNEY BARHAM:
2       Q.   You've cited this article in footnote nine of
3   your report.
4          Is that correct?
5       A.   Let me just double check.  I believe so.  Yes.
6       Q.   Under methods on page one of Exhibit-17 it
7   indicates this a cross-sectional study.
8          Is that correct?
9       A.   That is correct.
10      Q.   Can cross-sectional studies be used to
11   demonstrate causation?
12      A.   Not on their own, no.
13      Q.   So this study does not show that social
14   transitions caused any improvement in mental health.
15          Correct?
16      A.   This study demonstrated that there was a
17   correlation between improved mental health and social
18   transition.
19      Q.   So it did not show causation.
20          Is that correct?
21      A.   It did not show causation.
22      Q.   I'm going to show you Exhibit 9.  Let's go back
23   to Exhibit 9.
24          LAW CLERK WILKINSON:  Tab 117.

Page 128

1   BY ATTORNEY BARHAM:
2       Q.   Tab 117.  This is the article by Lily Durwood,
3   et al. published in 2017.  You cited this article also
4   in footnote nine of your report.
5          Is that correct?
6       A.   That is correct.
7       Q.   And we have previously discussed how this
8   article reports what children and parents said about the
9   children's mental health.
10          Is that correct?
11      A.   That is correct.
12      Q.   Really a self report.
13          Correct?
14      A.   I think we went through that earlier.  It was
15   not just a self report.  These were interview led
16   evaluations.
17      Q.   But an interview led self report.
18          Correct?
19      A.   There were also parent reports that were ---.
20      Q.   And so self reports of children, parental
21   reports about their children.
22          Correct?
23      A.   Correct.
24      Q.   Okay.

Page 129

1          And then in footnote nine you also cite a study
2   by Olson, et al. in 2016, footnote nine of your report.
3          Correct?
4       A.   That is correct.
5       Q.   And in footnote nine you indicate that alleged
6   statistical errors in that article have already been
7   corrected in 2018.
8          Correct?
9       A.   Correct.
10      Q.   And for that assertion you cite a study by
11   Olson, et al. in 2018.
12          Is that correct?
13      A.   I don't see that.
14          ATTORNEY BLOCK:  Objection.  Where are
15   you at?
16          THE WITNESS:  I don't see it.  If you can
17   point to me where that is.
18   BY ATTORNEY BARHAM:
19      Q.   Footnote nine, on page 11, small statistical
20   errors in Olson 2016 had already been corrected in 2018,
21   see Olson, et al., 2018, mental health of transgender
22   student who are supported in their identity throughout.
23      A.   Yes.
24      Q.   Is that correct?

33  (Pages 126 to 129)

1    A.   Yes.
2         ATTORNEY BARHAM:  I'm going to show you
3    what we are going to mark as Exhibit 18.  This will be
4    tab 119.
5              ---
6         (Whereupon, Exhibit-18, Errata Sheet, was
7              marked for identification.)
8              ---
9    BY ATTORNEY BARHAM:
10        **Q.   This is the errata sheet that you cited in**
11   **footnote nine of your report.**
12        **Is that correct?**
13   A.   That is correct.
14        **Q.   The only change in this 2018 article is the**
15   **highlight and missing common from the 2016 article.**
16        **Is that correct?**
17        ATTORNEY BLOCK:  Objection to form.
18        THE WITNESS:  Yes.
19   BY ATTORNEY BARHAM:
20        **Q.   In paragraph 40 of your report you say that**
21   **studies have repeatedly documented puberty blocking**
22   **medication and gender-affirming hormone therapy are**
23   **associated with mental health benefits in both the short**
24   **and long term.**

1         **Is that correct?**
2    A.   That is correct.
3         **Q.   And the studies that you're citing for that**
4    **assertion are those listed in footnote 14 of your**
5    **report.**
6         **Correct?**
7    A.   That is correct.
8         **Q.   Are there any others that you are referencing?**
9    A.   Those are the only that I'm referencing.
10        **Q.   In paragraph 41 of your report you claim that**
11   **Dr. Cantor fails to discuss many of the studies**
12   **documenting the benefits of puberty blocking medication.**
13   **Which of the studies in footnote 14 did he fail to**
14   **discuss?**
15   A.   I would need to review Dr. Cantor's report to
16   know specifically.
17        **Q.   Do you recall now which ones he failed to**
18   **discuss?**
19   A.   I do not.
20        ATTORNEY BARHAM:  All right.  I'm going
21   to show you what we will mark as Exhibit-19, and this is
22   Tab 98.
23             ---
24        (Whereupon, Exhibit-19, Article by

1    Tordoff,         et al., was marked for
2    identification.)
3              ---
4    BY ATTORNEY BARHAM:
5         **Q.   This is an article by Tordoff, et al, published**
6    **in 2022, entitled Mental Health Outcomes in Transgender**
7    **and Non-Binary Youth Receiving Gender-Affirming Care.**
8    **This is one of the studies that you cited in footnote 14**
9    **of your report.**
10   A.   That is correct.
11        **Q.   According to table one on page five of this**
12   **report 65 percent of the participants were also**
13   **receiving mental health therapy.**
14        **Is that correct?**
15   A.   That is correct.
16        **Q.   So it's not possible to determine how much of**
17   **the improvement was due to puberty blocking medication**
18   **and gender-affirming hormone therapy and how much was**
19   **due to the mental health therapy.**
20        **Correct?**
21        ATTORNEY BLOCK:  Objection to form.
22        THE WITNESS:  There is a lot of questions
23   in that one singular question about study design and
24   what we know about the history of transgender health

1    outcomes prior to the existence of gender-affirming
2    care.  As this study is designed, it is not designed in
3    such a way to be able to specifically keep that apart.
4         ATTORNEY BARHAM:  All right.
5         I'm going to show you what we will mark
6    as Exhibit-20, and this will be Tab 99.
7              ---
8         (Whereupon, Exhibit-20, Article by Amy
9              Green, et al., was marked for
10             identification.)
11             ---
12   BY ATTORNEY BARHAM:
13        **Q.   This is the second article.  This is an article**
14   **by Amy Green entitled ---- it says et al. entitled**
15   **Association of Gender Affirming Hormone Therapy with**
16   **Depression, Thoughts of Suicide and Attempted Suicide**
17   **Among Transgender and Nonbinary Youth published in 2021.**
18   **This is the second article that you cited in footnote 14**
19   **of your report.**
20        **Is that correct?**
21   A.   That is correct.
22        **Q.   On page six of this report, column two, the**
23   **authors indicate that causation cannot be inferred due**
24   **to this study's cross-sectional design.**

Page 134

1          Correct?
2     A.  That is correct.
3     Q.  This study also does not prove that puberty
4  blocking medication and gender-affirming hormone therapy
5  caused any improvements.
6          Correct?
7          ATTORNEY BLOCK:  Objection to form.
8          THE WITNESS:  This study was not designed
9  to show a causal outcome, no.
10         ATTORNEY BARHAM:  Let's go to Exhibit 21,
11 this will be Tab 100.
12         ---
13         (Whereupon, Exhibit-21, Article by
14         Turban, et al., was marked for
15         identification.)
16         ---
17 BY ATTORNEY BARHAM:
18    Q.  This is an article by Turban, et al. published
19 in 2020 entitled Pubertal Risks for Transgender Youth
20 and Risks of Suicide Ideation --- Suicidal Ideation?
21         ATTORNEY BLOCK:  Objection to misreading
22 the name of the study.
23 BY ATTORNEY BARHAM:
24    Q.  This is the third article that you cited in

Page 135

1  footnote 13 of your report.
2          Is that correct?
3     A.  That is correct.
4     Q.  And on page seven of this article the authors
5  also indicate that limitations include the
6  cross-sectional --- the study's cross-sectional design,
7  which does not allow for determination of causation.
8          Is that correct?
9     A.  That is correct.
10    Q.  So this study does not prove that puberty
11 blocking medication and gender affirming hormone therapy
12 caused any improvements.
13         Correct?
14    A.  This study was not designed to demonstrate
15 causation.
16         ATTORNEY BARHAM:  I'm going to show you
17 what we will mark as Exhibit-22.  This is an article by
18 Achille, et al. entitled Longitudinal Impact of Gender
19 Affirming Endocrine Intervention on Mental Health and
20 Well-being of Transgender Youths, Preliminary Results
21 published in 2020.
22         ---
23         (Whereupon, Exhibit-22, Article by
24         Achille, et al., was marked for

Page 136

1  identification.)
2          ---
3  BY ATTORNEY BARHAM:
4     Q.  You also cited this article in footnote 14 of
5  your report.
6          Is that correct?
7     A.  Yes, I did.
8     Q.  And on page two of this report, the bottom of
9  the first column, the authors write that most
10 subjects --- quote, most subjects were followed by
11 mental health professionals, closed quote, and quote,
12 those that were not were encouraged to see a mental
13 health professional.
14         Correct?
15    A.  That is correct.
16    Q.  And on page three, the first column, the authors
17 say that after statistically adjusting for psychiatric
18 medication and engagement in counseling, quote, most
19 predictors did not reach statistical significance.
20         Is that correct?
21    A.  Where are you?
22    Q.  Page three, column one, under regression
23 analysis.
24    A.  Correct.

Page 137

1          ATTORNEY BARHAM:  I'm going to show you
2  what we will mark as Exhibit-23, this is Tab 102.
3          ---
4          (Whereupon, Exhibit-23, Article by Kuper,
5          et al., was marked for identification.)
6          ---
7  BY ATTORNEY BARHAM:
8     Q.  This is an article by Kuper, et al. published in
9  2020, entitled Body Dissatisfaction and Mental Health
10 Outcomes of Youth on Gender Affirming Hormone Therapy.
11 On page six --- let me rephrase that for the record.
12 You cited this article in footnote 14 of your report.
13         Is that correct?
14    A.  That is correct.
15    Q.  According to Table 2 on page six none of the
16 results for those receiving puberty suppression were
17 statistically significant.
18         Correct?
19    A.  I need a few minutes.
20    Q.  Take your time.
21    A.  As I read the bottom of that table, there are a
22 number of analyses that reached statistical
23 significance.
24    Q.  But if you look at the lines for each one under

35  (Pages 134 to 137)

Page 138

```
1   each of the scores, body dissatisfaction, depressive
2   symptoms, depressive symptoms QIDS, anxiety symptoms,
3   panic symptoms, generalized anxiety symptoms, social
4   anxiety symptoms, separation anxiety symptoms, school
5   avoidance symptoms, the lines marked puberty suppression
6   have no superscript on them.
7        Is that correct?
8            ATTORNEY BLOCK:  Objection to form.
9            THE WITNESS:  That is correct.
10  BY ATTORNEY BARHAM:
11       Q.   So none of those --- none of the specific
12  findings regarding individuals on puberty suppression
13  only were statistically significant.
14       Is that correct?
15       A.   None of them were statistically significant as
16  measured by their reports.
17           ATTORNEY BARHAM:  I'm going to show you
18  what we will mark as Exhibit-24.  This will be Tab 103.
19           ---
20           (Whereupon, Exhibit-24, Article by van
21            der Miesen, et al., marked for
22            identification.)
23           ---
24  BY ATTORNEY BARHAM:
```

Page 139

```
1        Q.   This is an article by van der Miesen, et al.,
2   published in 2020 entitled Psychological Functioning in
3   Transgender Adolescents Before and After Gender
4   Affirmative Care Compared with Cisgender General
5   Population of Peers.  You cited this article in footnote
6   14 of your report.
7        Is that correct?
8        A.   That is correct.
9        Q.   The authors on page five, in column two, the
10  authors of this study ---.
11       A.   What page?
12       Q.   Page five.
13       A.   I have that in the 700s.
14       Q.   Oh 703, sorry.  703.  The fifth page, but it's
15  paginated 703.  The authors of this study indicate that,
16  quote, due to its cross-sectional design, the present
17  study cannot provide evidence about the direct benefits
18  of puberty suppression over time and long-term mental
19  health outcomes?
20       Correct?
21       A.   I don't see where that is.
22       Q.   Next to the last paragraph in the second column.
23  The third and most important --- skipping the
24  cross-sectional design of this study different
```

Page 140

```
1   participants in the groups before and after puberty
2   suppression may potentially limit the results?
3        A.   Yes, I see that.
4        Q.   The present study can therefore not provide
5   evidence about the direct benefits of puberty
6   suppression over time and the long-term mental health
7   outcomes?
8        Is that correct?
9        A.   That is correct.
10       Q.   So the authors of this study indicate that
11  conclusions about the long-term benefits of puberty
12  suppression should thus be made with extreme caution,
13  meaning prospective long-term follow-up studies with
14  repeated measured design of individuals being followed
15  over time to confirm.
16       Is that correct?
17       A.   That is correct.
18           ATTORNEY BARHAM:  I'm going to show you
19  what we will mark as Exhibit-25.  This will be Tab 104.
20           ---
21           (Whereupon, Exhibit-25, Article by de
22            Vries, was marked for identification.)
23           ---
24  BY ATTORNEY BARHAM:
```

Page 141

```
1        Q.   This is an article by van der Miesen --- or I
2   mean De Vries, et al --- excuse me, De Vries, et al.,
3   2014, Young Adult Psychosocial Outcome After Puberty
4   Suppression and Gender Reassignment.  This is the last
5   article you cite in footnote 14 of your report.
6        Is that correct?
7        A.   That is correct.
8        Q.   At the Dutch clinic patients who receive puberty
9   blockers also receive psychotherapy.
10       Is that correct?
11       A.   That is correct.
12       Q.   So again, there is no way to determine how much
13  of the improvement reflected in this study is due to the
14  puberty blockers and how much is due to the
15  psychotherapy.
16       Correct?
17           ATTORNEY BLOCK:  Objection to the form.
18           THE WITNESS:  Let me restate my response
19  to the previous question.  The Dutch clinic always
20  recommends participation in therapy.  I'm not a
21  100 percent certain that every participant participated
22  in the therapy as directed.
23  BY ATTORNEY BARHAM:
24       Q.   For the most part, the Dutch model combined
```

Page 142

1   psychotherapy with puberty blockers.
2         Correct?
3         ATTORNEY BLOCK:  Objection.
4         THE WITNESS:  That is correct.  And may I
5   state that I think that is part of the reason the
6   van der Miesen study is quite important because it does
7   start to look at the impact of being on the wait list
8   and the impacts of just getting psychotherapy alone
9   versus access to puberty suppression and/or hormones.
10        ATTORNEY BARHAM:  I'm going to show you
11  what we're going to mark as Exhibit-26.  Tab 105.
12              ---
13        (Whereupon, Exhibit-26, Article, was
14         marked for identification.)
15              ---
16  BY ATTORNEY BARHAM:
17    Q.   This is an article by Michael Biggs published in
18  2020, Gender Dysphoria and Psychological Functioning in
19  Adolescents Treated with GnRHa.  Are you familiar with
20  this study?
21        ATTORNEY BLOCK:  Objection,
22  mischaracterizes the document.
23  BY ATTORNEY BARHAM:
24    Q.   Are you familiar with this letter to the editor?

Page 143

1     A.   I have not read this letter to the editor.
2     Q.   If you look at bottom of page one continuing
3   onto page two, the author writes an additional
4   complication with this treatment is that the Dutch model
5   combines GnRHa with psychological support so the two
6   effects are inevitably conflated.  Do agree with that
7   statement?
8     A.   I do not.
9     Q.   Why?
10    A.   Use of GnRH logs for this kind of intervention
11  were first used in 1999.  So every --- every transgender
12  person prior to 1999 had no access to this kind of
13  treatment.  Between 1999 and probably about 2014 these
14  medications were not widely available and so unavailable
15  for use for most people.  So we have the clinical
16  experience of adults, talking retrospectively, about
17  their experiences as well as the patients that we have
18  treated that did versus did not have access to these
19  interventions.  So we have both clinical experience and
20  some retrospective data that looks at this question
21  specifically.
22    Q.   Can retrospective data demonstrate causation?
23    A.   In some cases it can.
24    Q.   But retrospective data is subject to recall by

Page 144

1   us in other drawbacks that undermind its reliability.
2         Correct?
3         ATTORNEY BLOCK:  Objection to form.
4         THE WITNESS:  It depends upon the type of
5   data that is being calculated.
6   BY ATTORNEY BARHAM:
7     Q.   Why do you mean by that?
8     A.   If it is qualitative interview data, yes, there
9   is retrospective data that reviews contemporary
10  documentation and charts, lab results, imaging results,
11  et cetera.  That is less confounded by that kind of
12  bias.
13    Q.   When we are talking about people recalling their
14  experiences before hormone therapy was available that
15  would be the qualitative type of data.
16        Correct?
17    A.   Correct.  And when analyzing that data you have
18  to take that into account.
19    Q.   So that still doesn't help me understand why you
20  disagree with that statement because the Dutch model
21  combines hormones with psychosocial --- psychological
22  support, the two effects are inevitably conflated?
23    A.   We have a long history of people receiving
24  psychological support alone.  And with the addition of

Page 145

1   these interventions and this model of care, outcomes
2   improve with specific measures around gender dysphoria.
3     Q.   Over that time the psychological support would
4   have evolved as more understanding was gained.
5         Correct?
6     A.   One would hope, yes.
7         ATTORNEY BLOCK:  Objection to form.
8   BY ATTORNEY BARHAM:
9     Q.   But for the individuals who receive treatment
10  under the Dutch model, receiving both the hormones and
11  the psychological support, it's impossible to determine
12  how much improvement was due to the psychological
13  support and how much was due to the hormones.
14        Correct?
15        ATTORNEY BLOCK:  Objection to form.
16        THE WITNESS:  There has not been a study
17  that has sought to identify the specific percentage of
18  impact of those two.
19        ATTORNEY BARHAM:  All right.
20        I'm going to show you what we will mark
21  as Exhibit 27.
22              ---
23        (Whereupon, Exhibit 27, Article, was
24         marked for identification.)

```
1                        ---
2    BY ATTORNEY BARHAM:
3        Q.  Tab 106.  This is an article by Costa, et al.
4    In 2015 Psychological Support, Puberty Expression and
5    Psychosocial Functioning in Adolescents with Gender
6    Dysphoria.
7             Is that correct?
8        A.  That is correct.
9        Q.  You cite this article in footnote 14 of your
10   report.
11            Is that correct?
12       A.  That's correct.
13       Q.  Now, in this study there were two groups of
14   adolescents, those who receive both puberty --- I mean,
15   both therapy and puberty blockers at the outset and
16   those who received just therapy at the outset.
17            Correct?
18       A.  I'll need a minute to refresh myself.
19       Q.  Sure.  And I'm referencing pages 228, the second
20   column over to 229, the top of the first column.
21       A.  That's correct.
22       Q.  And on page 2211 going over to 2212, the
23   author's note that the difference between the
24   immediately eligible group and the delayed eligible
```

```
1    group failed to reach significance.
2             Correct?
3        A.  So as I read this, immediately eligible group
4    who had a higher in psychosocial functioning did not
5    show any significant improvement after 12 months, but
6    after 12 months there was a statistical difference.
7        Q.  Then it says finally, even if the end or
8    follow-up study, plan three, immediately eligible group
9    had a five point higher CGAS score than the delayed
10   eligible group, this difference failed to reach
11   significance.
12            Correct?
13       A.  That's correct.  What I have to point out there,
14   is CGAS is the children's global assessment scale, and
15   not a measure of gender dysphoria or quality of life or
16   distress in body.
17       Q.  Is it a measure of a child's mental health?
18            ATTORNEY BLOCK:  Objection.
19            THE WITNESS:  It is a rough and very
20   precise measure of general functioning.
21   BY ATTORNEY BARHAM:
22       Q.  But it is the scale that this study was using.
23            Correct?
24       A.  That is correct.
```

```
1            ATTORNEY BARHAM:  Let's go to tab 28.
2                        ---
3            (Whereupon, Exhibit 28, Article by
4             Edwards-Leeper, was marked for
5             identification.)
6                        ---
7            THE WITNESS:
8    is clinician rated of remedy objective criteria.
8            And to clarify the CGAS is something that
10   BY ATTORNEY BARHAM:
11       Q.  Do you want to take a break?
12       A.  In a few minutes if that's okay.
13       Q.  Are you aware of Dr. Edwards-Leeper's reputation
14   in the field?
15       A.  I am.
16       Q.  Are you personally acquainted with Dr.
17   Edwards-Leeper?
18       A.  I am.
19       Q.  Have the two of you worked together in the
20   American Psychiatric Academics Association?
21       A.  We have not worked together through the American
22   Psychiatric Association.  Dr. Edwards-Leeper is a
23   psychologist.
24       Q.  She served as a member of the task force to
```

```
1    develop practice guidelines for working with transgender
2    individuals?  Have you served in a similar capacity with
3    the American Psychiatric Association?
4        A.  I have.  And we both worked together on the
5    WPATH standards of care provision.
6        Q.  You anticipated my next question.  So you would
7    agree that Dr. Edwards-Leeper is considered an
8    international expert in this area.
9             Correct?
10       A.  Yes.  Dr. Edwards-Leeper is a complicated figure
11   right now, but yes, she has a lot of expertise.
12            ATTORNEY BARHAM:  I want to show you what
13   we will mark as Exhibit 29.  This is Tab 29.
14                       --
15            (Whereupon, Exhibit 29, Article by
16             Edwards-Leeper, was marked for
17             identification.)
18                       ---
19            ATTORNEY BLOCK:  I imagine you have a lot
20   of questions about this next document, and I just want
21   to make sure the witness has a chance to have a bathroom
22   break if it's going to go on for ten minutes or more.
23            ATTORNEY BARHAM:  I have no objection to
24   that.
```

Page 150

1      THE WITNESS:  Five minutes.
2      ATTORNEY BARHAM:  We will take five
3  minutes.
4      VIDEOGRAPHER:  Going off the record.  The
5  time is 12:12 p.m.
6  OFF VIDEO
7      ---
8  (WHEREUPON, A SHORT BREAK WAS TAKEN.)
9      ---
10  ON VIDEO
11      VIDEOGRAPHER:  We are back on the record
12  the current time reads 12:21 p.m.
13  BY ATTORNEY BARHAM:
14      Q.   A moment ago we were discussing Dr.
15  Edwards-Leeper and you commented that she is a
16  complicated individual.
17          What did you mean by that?
18      A.   What I mean is that she has published some
19  things in popular press that have led me to be talking
20  about her here.
21      Q.   And would one of those be the document before
22  you Exhibit 29?
23      A.   That is correct.
24      Q.   This is an article published in the Washington

Page 151

1  Post by Dr. Edwards-Leeper and Dr. Anderson.
2          Is that correct?
3      A.   That is correct.
4      Q.   What is it --- are there any other publications
5  that Dr. Edwards-Leeper has written recently that caused
6  you to describe her as a complicated figure?
7      A.   No, no.
8      Q.   So just this one article.
9          Is that correct?
10      A.   Yes.
11      Q.   Are you familiar with Dr. Anderson?
12      A.   I am.
13      Q.   She is a clinical psychiatrist?
14      A.   She is a psychologist.
15      Q.   A psychologist.  And Dr. Anderson has been
16  working with transgender youth for a long time.
17          Is that correct?
18      A.   I'm not a hundred percent familiar with Dr.
19  Anderson's history, I don't know.
20      Q.   Was she in the field before you?
21      A.   I don't know.
22      Q.   Dr. Anderson is also a transgender.
23          Is that correct?
24      A.   That is correct.

Page 152

1      Q.   Dr. Anderson is a member of the American
2  Psychological Association Committee tasked with writing
3  guidelines and working with transgender individuals.
4          Is that correct?
5      A.   I do not know.
6      Q.   Dr. Anderson is a former president of the U.S.
7  Professional Association for Transgender Health.
8          Is that correct?
9      A.   That is correct.
10      Q.   Dr. Anderson is a former board member for the
11  World Professional Association for Transgender Health.
12          Correct?
13      A.   I'm not sure.
14      Q.   Beyond the committee assignments listed on
15  page two of your CV have you held any committee
16  assignments for the USPATH or WPATH Organizations?
17      A.   Not additional committee assignments than WPATH
18  or USPATH, no.
19      Q.   In this copy published in the Washington Post
20  Dr. Edwards-Leeper and Dr. Anderson summarizes a
21  situation of a 13-year old natal girl with no prior
22  history of gender dysphoria.  Some issues of sexual
23  assault and depression and then an abrupt announcement
24  of this child of transgender identity.

Page 153

1  Does that summarize the scenario they outline?
2      A.   That is the scenario they outlined.
3      ATTORNEY BLOCK:  Objection to form.
4  BY ATTORNEY BARNHAM:
5      Q.   What percent of your patients first present as a
6  team without a prior gender dysphoria diagnosis?
7      A.   Well, first I just want to address the scenario
8  with Patricia, this is a popular press article, so I
9  have no idea if Patricia is a real person or an amalgam.
10      Q.   Understood.
11      A.   I hope it's an amalgam, because it would be
12  unethical to not have consent to publish this story.
13  Whether or not a child has a diagnosis of gender
14  dysphoria before they come to see me is dependent upon
15  if they've had previous evaluations, so it's dependent.
16  I don't have a specific number for you.
17      Q.   In general, how many of your patients first
18  present as a team versus first presenting as a child?
19      A.   That is very different, depending upon which
20  cite that I was practicing at.  So in New York I saw
21  more prepubertal youth than I do in Chicago.
22      Q.   So in New York, what percent of your patients
23  first presented as adolescents versus children?
24      A.   I think I answered that question earlier.  If I

nsmith 0944

Page 154

1    remember it was 25 percent of the 75 percent.
2        Q.   And in Chicago how many --- what percentage of
3    your patients present as adolescents versus as teen?
4        A.   Probably 90 percent during adolescence.
5        Q.   And are those all adolescents who first
6    presented as adolescents or did they first present with
7    gender dysphoria as a child?
8        A.   It's a combination of both.
9        Q.   So of your adolescent patients how many
10   presented first as an adolescent, and how many presented
11   as a child?
12       A.   I don't have that information in front of me.
13       Q.   Do you have a general ballpark idea?
14       A.   No, I mean, the question --- I guess what I'm
15   struggling with is that there are a lot of adolescents
16   who I see who presented the first as adolescent, but
17   have clear symptoms of gender dysphoria going back to
18   childhood.  So I'm not sure how to characterize those
19   children in your question.
20       Q.   What percent of the patients that present
21   themselves to you first as an adolescent are natal
22   female?
23              ATTORNEY BLOCK:  Objection to
24   terminology.

Page 155

1              THE WITNESS:  I would say in the clinic
2    where I'm practicing, currently certainly over half of
3    the children presenting in adolescence for the first
4    time are assigned female at birth.
5    BY ATTORNEY BARHAM:
6        Q.   And in New York, what percent of the patients
7    that presented to you first as an adolescent or natal
8    female?
9        A.   In New York it was more even split between those
10   assigned female and those assigned male at birth.
11       Q.   And here when you say it's more than 50 percent
12   are we talking 75 percent, we're talking 80 percent,
13   90 percent?
14       A.   I don't have that information in front of me, so
15   I couldn't tell you specifically.  It would be a guess.
16       Q.   Do you have a range?
17       A.   I don't.  I don't.  More than 50 is the closest
18   that I can get right now.
19       Q.   More than 75 percent?
20       A.   Probably not, no.
21       Q.   So somewhere between 50 and 75?
22       A.   That's a good guess.
23       Q.   What proportion of teen girls presenting at your
24   clinic have suffered sexual assault or abuse of any

Page 156

1    sort?
2        A.   So if we're talking assigned females at birth,
3    is that what you mean?
4        Q.   Yes.  Natal females.
5        A.   Between one out four and one out of eight
6    assigned females at birth who do not identify as
7    transgender have exposure to sexual assault and trauma f
8    some kind.  What we know from the literature is that
9    rates of sexual assault and sexual abuse of transgender
10   youth is higher than that and my patients are relatively
11   similar to that, so probably in the order of 25 to
12   30 percent.
13       Q.   What policies do you have in place to ensure
14   adequate counseling and therapy for that trauma before
15   making any decisions regarding hormones?
16              ATTORNEY BLOCK:  Objection to form.
17              THE WITNESS:  Assessing co-occurring
18   psychiatric disorders or stressors or traumas is an
19   inherent part of any assessment.
20   BY ATTORNEY BARHAM:
21       Q.   Beyond just it being an inherent part of any
22   assessment, do you have any other policies or standards
23   that you use to ensure that the trauma is addressed
24   before making decisions regarding hormones?

Page 157

1              ATTORNEY BLOCK:  Objection to form.
2              THE WITNESS:  I mean, I don't have a
3    written down policy.  Incorporating understanding of
4    trauma is always going to be an important part of any
5    informed assessment prior to moving forward with an
6    intervention.
7    BY ATTORNEY BARHAM:
8        Q.   Do you agree or disagree that before prescribing
9    hormones to a teen girl who has suffered sexual abuse or
10   depression, medical professionals have a responsibility
11   to confirm that the patient has received a thorough
12   mental health assessment, including investigating how
13   other mental health issues and any other changes in her
14   life might be contributing to her desire are perceived
15   transgender identification?
16              ATTORNEY BLOCK:  Objection to form and
17   terminology.
18              THE WITNESS:  So for any child regardless
19   of gender, who we are recommending a medical or surgical
20   intervention, we are assessing for the presence of
21   gender dysphoria, the presence of co-occurring
22   psychiatric disorders and their impact on that diagnosis
23   or the capacity to consent to treatment, and a clear
24   understanding of the risks, benefits and alternatives of

Page 158

1   whatever that intervention may be.
2   BY ATTORNEY BARHAM:
3       Q.   So then ---- and that would include investigating
4   how other mental health issues and other changes in her
5   life might be contributing to her desire or perceived
6   transgender identification?
7       A.   That is correct.
8           ATTORNEY BLOCK:  Objection to terminology
9   and pronouns.
10  BY ATTORNEY BARHAM:
11      Q.   Do you agree or disagree that the standards of
12  care recommend mental support and comprehensive
13  assessment for all dysphoric youth before starting
14  medical interventions?
15      A.   I would agree that the current recommendations,
16  which are in the process of being updated recommend that
17  a mental health assessment be in place.  And it's not a
18  mandate that psychotherapy is a requirement prior to
19  initiation of medical care for gender dysphoria, and it
20  is not indicated for every patient.
21      Q.   And that's partly because the standards of care
22  are guidelines not mandates.
23           Correct?
24      A.   It's mostly because of the indications for the

Page 159

1   patient's best interest that psychotherapy is not a
2   requirement for folks who are otherwise doing well.
3       Q.   But it's also true that the standards of care
4   are guidelines not mandates.
5           Correct?
6       A.   That is correct.  They are guidelines.
7       Q.   On page two of this article the author is ----
8   and by this article I'm referring to tab 29.  The author
9   has indicated that a study of ten pediatric gender
10  clinics in Canada found that half do not require
11  psychological assessment before initiating puberty
12  blockers or hormones.
13          Is that your policy?
14      A.   Where is this in the article?  I don't see it.
15      Q.   The bottom of page two?
16      A.   What I want to emphasize is this is an opt ed
17  and a popular press outlet and not a study.  So I have
18  no idea where they gathered their information about this
19  or the accuracy of the statement, nor do I know what the
20  authors meant by a psychological assessment.
21      Q.   I understand.  I did not mean to imply that
22  this article Exhibit ---- tap 29 is a study.  I was
23  merely quoting the authors, that a study of ten
24  pediatric gender clinics found that half do not require

Page 160

1   psychological assessment before initiating puberty
2   blockers or hormones.  My question to you is, is that
3   your policy?
4           ATTORNEY BLOCK:  Objection to form.
5           THE WITNESS:  Again, I can't speak to the
6   accuracy of Dr. Edwards-Leeper and Dr. Anderson's
7   description of a study that I haven't seen.
8   BY ATTORNEY BARHAM:
9       Q.   I'm not asking you to.  I'm asking do you have
10  --- is it your policy at your clinic that you do not
11  require psychological assessments before initiating
12  puberty blockers for hormones?
13      A.   We require psychological assessments prior to
14  initiation, yes.
15          ATTORNEY TRYON:  Travis, it's Dave Tryon.
16  You referred to this as Tab 29, I believe you mean
17  Exhibit 29.  Is that right?
18          ATTORNEY BARHAM:  It's both Exhibit 29
19  and Tab 29.
20  BY ATTORNEY BARHAM:
21      Q.   When patients come to you referred by a
22  pediatrician or counselor with no expertise in gender
23  dysphoria assessment or diagnosis, what policies do you
24  have to ensure that the patients receive full and

Page 161

1   adequate course of mental healthcare before prescribing
2   life altering hormones?
3           ATTORNEY BLOCK:  Objection to form.
4           THE WITNESS:  As a mental health
5   professional I'm not the person who is prescribing those
6   treatments.
7   BY ATTORNEY BARHAM:
8       Q.   Before you recommend someone for eligibility for
9   life-altering hormones?
10          ATTORNEY BLOCK:  Objection to form.
11          THE WITNESS:  Prior to making a
12  recommendation of hormone initiation I'm doing my own
13  assessment and ensuring that those standards are met.
14  BY ATTORNEY BARHAM:
15      Q.   So beyond your own assessments do you have any
16  policies that guide that process?
17      A.   Our clinic has its own policies dependent upon
18  clinical practice or whether or not patients are
19  enrolled in a particular trial, but it is the standard
20  of care as laid out by both Endocrine Society and WPATH
21  that adolescent patients have a psychological
22  assessment.  There's a lot of latitude for what that
23  actually means.
24      Q.   And on page three of this document, Exhibit 29,

41  (Pages 158 to 161)

1   the bottom of the first paragraph the authors write as a
2   result we may be harming some of the young people we
3   strive to support, people who may not be prepared for
4   the gender transitions they are being rushed into.
5        Do you share the concern of these authors?
6   A.   I don't have numbers on my end.  Which --- where
7   is it?
8   Q.   (Indicating).
9   A.   Got it.  Can you repeat the question?  Sorry.
10  Q.   The authors express concern that we may be ---
11  quote, we may be harming some of the young people we
12  strive to support, people who may not be prepared for
13  the gender transitions they are being rushed into.
14       Do you share the author's concern?
15  A.   I do not.  These are tested hypotheses that can
16  be researched, and this is not what this is.
17  Q.   You said you have no concern that people are
18  being rushed into gender transitions?
19  A.   This is a supposition by these two authors that
20  people are being rushed into gender transition.  I'm not
21  sure what that means, and that has not been the clinical
22  experience that I've had nor what the guidelines
23  recommend.
24  Q.   So you were not aware of people being rushed

1   into transitions that they are not ready for?
2   A.   That has not been my experience, no.
3   Q.   On page four towards the bottom of the page, the
4   authors reference a recent study of 100 detransitioners,
5   38 percent of whom reported that they believe their
6   original dysphoria had been caused by something specific
7   such as trauma, abuse or mental health condition.
8   Fifty-five (55) percent of whom said they did not
9   receive adequate evaluation from a Dr. Or mental health
10  professional before starting transition.
11       Are you aware of that study that authors
12  reference here?
13       ATTORNEY BLOCK:  Object to form.
14       THE WITNESS:  I am --- I'm assuming
15  because I think they have a footnote in here somewhere,
16  but it is not in this particular article, but they are
17  receiving to the recent 2021 Littman study
18  detransitioners.
19  BY ATTORNEY BARHAM:
20  Q.   Do you share the concern that some have been
21  misdiagnosed as transgender when their gender dysphoria
22  was, in fact, not innate, but cause by something
23  specific, such as trauma, abuse or mental health
24  condition?

1   A.   I really don't mean to parse this, but I don't
2   know what Dr. Edwards-Leeper or Dr. Anderson's concerns
3   are, but the evidence that we have from the literature
4   and from our clinical experience is that this is not a
5   broad experience of most children.
6   Q.   And what literature, are you referencing when
7   you say we referenced the literature?
8   A.   I'm referencing the literature that I cited in
9   my report.
10  Q.   And which specific portions of your report are
11  you referencing?
12  A.   Let me just take a moment.  What I'm referencing
13  is the longitudinal studies in particular that have
14  followed these kids over time.
15  Q.   And which ones would those be in your report?
16  A.   Really anything from the Dutch clinic is going
17  to have a longitudinal focus to them, but I think what's
18  more important is that in all of these studies, which
19  include some of the Dutch studies both in childhood and
20  adults that have looked at regret rates or detransition
21  have shown that this is a very infrequent occurrence,
22  and there has been nothing I've read within the
23  scientific literature that in, any way, tries to
24  operationalize this idea of children being forced into

1   or pressured into transition.
2   Q.   What steps do you take to ensure that gender
3   dysphoria, the child's --- the child's or teen's gender
4   dysphoria was not caused by something specific such as
5   trauma, abuse and mental health condition before
6   recommending someone for puberty blocking or cross sex
7   hormones?
8        ATTORNEY BLOCK:  Objection to form.
9        THE WITNESS:  I perform a thorough
10  evaluation.
11  BY ATTORNEY BARHAM:
12  Q.   Anything beyond the thorough evaluation?
13  A.   A very thorough evaluation.  It involves
14  multiple steps as I described earlier.
15  Q.   So this comprehensive --- the authors actually
16  talk about a comprehensive assessment on page three of
17  their article.  And they indicate that comprehensive
18  assessment and gender exploratory therapy helps ---
19  quote, helps a young person peel back the layers of
20  their developing adolescent identity and examines
21  factors that contribute to their dysphoria.  And those
22  include --- so what steps did you take to identify the
23  factors that may contribute to a child's or teen's sense
24  of dysphoria?

Christine 28046 0947

Page 166

1  ATTORNEY BLOCK:  Objection to form.
2  THE WITNESS:  It is a thorough assessment
3  and there are multiple factors within that assessment
4  that speak to those concerns specifically.
5  BY ATTORNEY BARHAM:
6  **Q.  And what are those multiple factors?**
7  A.  Understanding developmental history, getting
8  multiple performance, doing the diagnostic assessment of
9  any co-occurring mental health conditions and ensuring
10  that those are adequately explored and understood.
11  **Q.  What factors in a transgender identity do you**
12  **identify as most often contributing to gender dysphoria?**
13  ATTORNEY BLOCK:  Objection to form.
14  THE WITNESS:  I think it's complicated to
15  answer that in a short way, because not every child who
16  identifies as transgender would meet diagnostic criteria
17  for gender dysphoria.  And specifically, if we agreed
18  with the premise that the gender dysphoria is being
19  caused by trauma that's specifically a rule out of the
20  diagnosis of gender dysphoria.  So that is part of what
21  we're doing in an assessment is to understand the role
22  of other potential factors in helping a kid explore and
23  understand their identity.
24  BY ATTORNEY BARHAM:

Page 167

1  **Q.  Then allow me to clarify the question.  What**
2  **factors other than an innate transgender identity do you**
3  **identify as most often contributing to a child's**
4  **transgender identification?**
5  ATTORNEY BLOCK:  Objection to form.
6  THE WITNESS:  The children that I have
7  treated over my years of doing this work that describe a
8  gender identity that is inconsistent who don't
9  ultimately meet the criteria for gender dysphoria are
10  often children who have been subjected to multiple types
11  of trauma.  That would be one of the factors.
12  BY ATTORNEY BARHAM:
13  **Q.  What other ones would you identify?**
14  A.  The other factors are around parental conflicts.
15  That's probably the other large cohort of kids when
16  exploration is the full come around which parents,
17  particularly divorcing parents, are acting in conflict.
18  **Q.  So by that you mean, for example one parent**
19  **supporting an affirmation approach and the other raising**
20  **concerns about proceeding in that direction?**
21  ATTORNEY BLOCK:  Objection to form.
22  THE WITNESS:  That's not an infrequent
23  occurrence and this is a very rare outcome to that, but
24  in that cohort of patients who desist, I would say in

Page 168

1  their identities that is a shared characteristic of some
2  of the patients that I have seen.
3  BY ATTORNEY BARHAM:
4  **Q.  So you have not only two factors that could**
5  **contribute to a child's transgender identification,**
6  **other than ---?**
7  A.  Can I stop you, sir?  I'm not identifying that
8  as a cause or a causal factor in a core gender identity.
9  It is the understanding and expression of that identity
10  that often changes.
11  **Q.  Okay.**
12  **And that is why I was trying to talk about**
13  **transgender identification more broadly.  But you've**
14  **identified two factors that contribute to that not**
15  **necessarily causal but contribute.  Are there any others**
16  **that you have identified as most often contributing**
17  **as ---?**
18  A.  Not that I have seen.
19  **Q.  The authors on page three express a concern**
20  **about other influences that patients can be subjected**
21  **to, so as in these assessments patients reflect on the**
22  **duration of the dysphoria they feel they continue a**
23  **gender --- the intersection of sexual orientation, et**
24  **cetera, social media, internet and peer influences.**

Page 169

1  **Do you share concerns that teens maybe misled by**
2  **TikTok or other social media to self diagnose as**
3  **transgender when, in fact, other factors have driven**
4  **their gender dysphoria or their transgender**
5  **identification?**
6  ATTORNEY BLOCK:  Objection to form.
7  THE WITNESS:  To clarify transgender
8  isn't a diagnosis, so I'm not concerned about that
9  specifically.  And I think that's the study of all
10  phenomenon, whether or not this is occurring, but again,
11  as a part of a comprehensive gender assessment, we are
12  looking at multiple factors beyond a child's
13  self-report.
14  BY ATTORNEY BARHAM:
15  **Q.  So do you share concerns that teens may be**
16  **misled by social media to self declare as transgender**
17  **when, in fact, other factors have driven their gender**
18  **dysphoria?**
19  ATTORNEY BLOCK:  Objection.
20  THE WITNESS:  I would not characterize it
21  in that way.
22  BY ATTORNEY BARHAM:
23  **Q.  How would you characterize it?**
24  A.  I would characterize it by taking exploration of

1   an identity via TikTok for what it is, as a normal
2   process of adolescent development and having a child who
3   self identifies as transgender as a result of seeing a
4   video on TikTok is not going to be the child who meets
5   the typical phenomenology that we would see with gender
6   dysphoria.  That is part of the assessment that we are
7   evaluating.
8      Q.  Okay.
9        **So then in general, you don't agree with the**
10   **concerns that the authors raise regarding the influence**
11   **of social media, internet and peer influences.**
12      **Correct?**
13      A.  I would say it's a matter of degree.  I don't
14   think social media has been a particularly healthy thing
15   for kids in general, and understanding how it impacts
16   kids is something that we all need to be learning more
17   about.
18      **Q.  In the last paragraph on page three, the authors**
19   **talk about how the WPATH recommends collaborative**
20   **approach that involves parents and take into account the**
21   **complexities of adolescents.**
22      **Do you see that?**
23      A.  Yes.
24      **Q.  Do you understand the WPATH standards of care**

1   **for adolescents to call for a collaborative approach**
2   **that involves both parents whenever possible?**
3      A.  There is not a specific call out within the
4   standards of care for my recollection that say both
5   parents need be involved, but that's certainly implied
6   and is the general practice to include all parents or
7   all family members who are involved in the child's life
8   whomever is going to need to be in the room in order to
9   both get a clear understanding of what's going on as
10   well as make sure the child gets the adequate support to
11   be able to thrive.
12      **Q.  So is it your understanding that the WPATH**
13   **standards of care would allow treatment to proceed based**
14   **on the consent of one parent?**
15      A.  As we talked about earlier, these are guidelines
16   and not mandates.  In practice within the United States
17   almost all consent processes for puberty suppression and
18   hormones go through a two parent consent process
19   whenever possible, even though that is not a requirement
20   of the law.
21      **Q.  What I'm trying to get to is what is the**
22   **requirements of the guidelines, recognizing that the**
23   **guidelines are not mandatory, but do the guidelines**
24   **allow for treatment based on the consent of one parent?**

1      A.  I think one of the limitations of an
2   international document is that there is not going to be
3   that level of specificity because consent laws are going
4   to be different from state to state, not to mention
5   country to country.
6      Q.  Okay.
7        **On page two --- I'm sorry, on page three ---**
8   **let me clarify again.  I'm sorry I confused myself.  On**
9   **page two the authors write that after exploring who she**
10   **was --- after a year of exploring who she was, Patricia**
11   **no longer felt she was a boy, she decided to stop**
12   **binding her breasts and wearing boys clothes.**
13      **What proportion of those who present at your**
14   **clinic change their minds and decided to remain with or**
15   **return to the gender identity of their natal sex before**
16   **undergoing any hormonal treatments?**
17        ATTORNEY BLOCK:  Objection to form.
18        THE WITNESS:  I'm one practitioner in my
19   clinic, so I don't have the data on everybody.  And I
20   think a lot of that is going to depend upon the
21   population that you are seeing.
22   BY ATTORNEY BARHAM:
23      **Q.  What proportion of your patients then changed**
24   **their mind and decide to remain or return to the gender**

1   **identity of their natal sex before undergoing any**
2   **hormonal treatments?**
3        ATTORNEY BLOCK:  Objection to form.
4        THE WITNESS:  I would say a minority of
5   patients.
6   BY ATTORNEY BARHAM:
7      **Q.  Do you have a range?**
8      A.  I don't.  I think when you were asking those
9   questions at the beginning about my 500 transgender
10   patients in that cohort, and I think 75 percent pursued
11   some things, but being that 25 percent that didn't.
12   Somewhere in there.
13      **Q.  On page five of this document, the last page the**
14   **authors report a rising a number of detransitioners that**
15   **clinicians report seeing.  Are you aware of this rising**
16   **number of detransitioners?**
17        ATTORNEY BLOCK:  Objection to form.
18        THE WITNESS:  I'm aware that these two
19   authors are raising that it's a possibility.  It is not
20   something that I've seen published in the literature.
21   BY ATTORNEY BARHAM:
22      **Q.  Have you seen a rising number of detransitioners**
23   **at your clinic?**
24      A.  I think the question is whether or not the

Page 174

1  percentage is changing and that's not an answer we know.
2  I think by definition the more people you see the more
3  folks --- the detransition you're going to see. And the
4  difference of children who had access to gender care now
5  compared to a decade ago is just orders of magnitude
6  different. But I don't know or there has not been any
7  evidence that I've seen that the percentage of kids who
8  detransition is any different now than it was a decade
9  ago.
10     Q.   A few paragraphs above what we were just looking
11  at, it says only a quarter of these individuals told
12  their doctors they had reversed their transitions making
13  this population especially hard to track. Would you
14  agree that this population is difficult to track?
15         ATTORNEY BLOCK: Objection to form.
16         THE WITNESS: Again, this is not a study
17  and so it's hard to kind of make a pronouncement about a
18  population without a defined understanding of what that
19  population actually is. Our folks who don't talk to
20  their medical professionals about dissatisfaction in
21  their care, a difficult population to treat, I think,
22  probably by definition that is true.
23  BY ATTORNEY BARHAM:
24     Q.   And to be clear, I wasn't asking if they're

Page 175

1  difficult to treat, I was just asking would you agree
2  they're difficult to track?
3     A.   I think by definition, yes, if they are not
4  reaching out to their providers or dropping out of
5  studies, yes.
6     Q.   The next to last paragraph of this article
7  begins by saying the pressure by activists, medical and
8  mental health providers along with a national LGBT
9  organizations to silence the voices of detransitioners
10  and sabotage the discussion around what is occurring in
11  the field is unconscionable. Do you agree that it is
12  concerning that certain organizations are seeking to
13  silence the voice of detransitioners?
14         ATTORNEY BLOCK: Objection to form.
15         THE WITNESS: It is not my experience
16  that organizations are seeking to silence the voices of
17  folks who identify as detransitioners, no.
18  BY ATTORNEY BARHAM:
19     Q.   If they were would you agree that that is
20  unconscionable?
21         ATTORNEY BLOCK: Objection to form.
22         THE WITNESS: My job as a psychiatrist
23  and a child psychiatrist in particular is to understand
24  the kid who is sitting in front of me in that very

Page 176

1  moment. I want to understand how to best meet their
2  needs. So anything that is going to interfere with me
3  being able to understand that is going to be a problem
4  for me.
5         ATTORNEY BARHAM: I'm going to show you
6  what we will mark as Exhibit-30. This is also Tab 30.
7         ---
8         (Whereupon, Exhibit-30, Interview by Lisa
9          Selin Davis, was marked for
10          identification.)
11         ---
12  BY ATTORNEY BARHAM:
13     Q.   This is an interview written up by Lisa Selin
14  Davis of Quillette entitled Trans Pioneer Explains her
15  Resignation from the U.S. Professional Association for
16  Transgender Health, published at the beginning of 2022.
17  Are you familiar with this article?
18     A.   I am not.
19     Q.   I'm going to direct your attention to
20  page three. This is an interview with Dr. Anderson, the
21  same individual who is a co-author of the Washington
22  Post article we were just discussing.
23         Correct?
24     A.   That is correct.

Page 177

1     Q.   On page three Dr. Anderson states, the data are
2  very clear that adolescent girls are coming to gender
3  clinics in greater proportion than adolescent boys and
4  this is a change in the last couple of years and it's an
5  open question, what do we make of that. We really don't
6  know what's going on and we should be concerned about
7  it. Does her experience match your experience?
8         ATTORNEY BLOCK: Objection to form.
9         THE WITNESS: I think it's consistent in
10  the literature that we've seen more assigned females at
11  birth presenting for care than in the past.
12  BY ATTORNEY BARHAM:
13     Q.   And have you seen this change in balance since
14  approximately 2015?
15     A.   I don't know if I would say --- I could point to
16  one specific year, but with each year it seems like
17  that's --- I think probably that's when the data came
18  out that that demonstrated it.
19     Q.   When do you recall beginning to see this trend
20  develop?
21     A.   I think one of the challenges is that the scope
22  of the literature is limited to a few very specific
23  subsets of where clinical care is practiced, and so we
24  have to just be careful not to completely generalize.

PEAGA0950

Page 178

1    So in these specific clinics what we have seen is a
2    preponderance and an increase of assigned females at
3    birth.  I can't speak to this being a national
4    phenomenon, but the literature probably certainly all
5    points in that direction.  I think personally for me I
6    just started to see more assigned females at birth
7    presenting in adolescence I think in the mid 2010s is
8    not unreasonable.
9        **Q.   Is there any test in scientific understanding as**
10   **to why this trend in the literature is developing?**
11       A.   There is not.
12       **Q.   Do you agree that this is something that**
13   **practitioners should be very concerned about before**
14   **agreeing to administer sterilizing cross sex hormones to**
15   **teen girls?**
16           ATTORNEY BLOCK:  Objection to form.
17           THE WITNESS:  The thing that's important
18   is what are the specific factors of the child in the
19   family that is sitting in front of you and how to ensure
20   that that child has gotten appropriate care and that
21   we're making a recommendation based upon the best
22   interest of that individual child that is irrespective
23   of population-based changes that are happening.
24   BY ATTORNEY BARHAM:

Page 179

1        **Q.   Don't you need to assess though whether the**
2    **individual in front of you is exemplar of that national**
3    **--- of that trend in the literature?**
4        A.   That's where --- that's where an assessment
5    comes in.
6        **Q.   So you would agree then that practitioners**
7    **should be concerned about this trend before deciding to**
8    **administer hormones.**
9        **Correct?**
10           ATTORNEY BLOCK:  Objection to form.
11           THE WITNESS:  What I'm stating is that
12   the guidelines for what's involved in assessment have
13   been relatively clear and that we want to make the
14   decisions based upon what's in the best interest and
15   understanding of the patient and family that we are
16   seeing.  We should always be concerned.  We should
17   always be building up our understanding of the field, as
18   well as some of the epidemiology of the field.  But that
19   doesn't change the individual experiences of the patient
20   and the family that we're meeting with.
21   BY ATTORNEY BARHAM:
22       **Q.   Okay.**
23       **At the bottom of page four Dr. Anderson says**
24   **that she is, quote, worried that there is a new group of**

Page 180

1    **adolescents who have preexisting mental health problems**
2    **and are looking for an explanation about who they are.**
3    **And there's a bit of I would say fantasy about seeking**
4    **to form an identity that may then explain their**
5    **distress.  You would agree that the adolescent years can**
6    **be distressing for many teens, whether they are**
7    **transgender or not.**
8        **Correct?**
9           ATTORNEY BLOCK:  Objection to form.
10          THE WITNESS:  I would wholly agree with
11   that, yes.
12   BY ATTORNEY BARHAM:
13       **Q.   Do you share the concern that some teens who**
14   **present at clinics are indulging in a fantasy about what**
15   **a transgender identity will do for them and their**
16   **distress?**
17       A.   I would not put it in that way, no.
18       **Q.   As part of your assessment do you have to --- as**
19   **part of your thorough assessment do you have to assess**
20   **whether the teen is incorrectly assessing what a**
21   **transgender identity would do for them and their**
22   **distress?**
23       A.   A part of any formed --- informed consent
24   process is assessing the understanding of the child and

Page 181

1    the family's understanding of the risks, benefits and
2    alternatives of that specific intervention.  That would
3    include an unrealistic belief about what the potential
4    benefits may be.
5        **Q.   All right.**
6        **I want to go to page five of this document.**
7    **Dr. Anderson indicates earlier today I talked to some**
8    **parents who brought their child to a health**
9    **professional.  The child is seen three times by a**
10   **therapist and then recommended for hormones.  The**
11   **therapist never talked to the parents.  Do you share her**
12   **concern that three sessions with a mental health**
13   **providers is far less than required before a competent**
14   **diagnosis of a durable transgender identity can be made?**
15          ATTORNEY BLOCK:  Objection to the form.
16          THE WITNESS:  I would not.  The objection
17   as I read it in this article that you've put in front of
18   me with the interview with Dr. Anderson, her concern
19   seems to be more about not having spoken to the parents
20   prior to the recommendation.  And I can't take her word
21   for it that this was true.  We hear a lot of things from
22   parents who express frustration with care that is
23   ultimately found not to be accurate.
24   BY ATTORNEY BARHAM:

Page 182

1    Q.   Would you share the concern that prescribing
2    hormones if one parent is strongly opposed to it is
3    creating a likelihood of family conflict that is going
4    to likely be destabilizing and harmful to the child?
5            ATTORNEY BLOCK:  Objection to the form.
6    Are you referencing something in the article or is this
7    your own question?
8            ATTORNEY BARHAM:  I am referencing
9    page six, where Dr. Anderson says you don't want to rush
10   ahead with a kid, giving them encouragement that they're
11   going to get hormones until we bring their parents
12   along.  Battling the parents is a no win proposition.
13   BY ATTORNEY BARHAM:
14   Q.   So just to be clear about the question do you
15   share the concern that prescribing hormones if one
16   parent is strongly opposed is likely creating the
17   likelihood of family conflict that may be separately
18   destabilizing and harmful to the child?
19           ATTORNEY BLOCK:  Objection to the form
20   and foundation.
21           THE WITNESS:  What I hear Dr. Anderson's
22   concern from this is that battling with parents is a
23   no-win proposition.  I think that's different from
24   recommending a treatment that not all parents agree to.

Page 183

1    I think it's about the work of psychotherapy, which
2    involves understanding and hearing parents' experiences
3    and objections.
4    BY ATTORNEY BARHAM:
5    Q.   Do you think that prescribing hormones if one
6    parent is strongly opposed is likely creating family
7    conflict that may be separately destabilizing and
8    harmful to the child?
9    A.   I can't answer that question without a specific
10   family scenario in front of me.  I have seen the
11   opposite be the case where the conflict is the creation
12   of the lack of consensus as opposed to the other way
13   around.  And I've seen kids in my experience treating
14   kids who had parents who had opted out of any
15   decisional capacity and the kid's medical care but
16   nevertheless do much better when given access to this
17   care.
18   Q.   But it is also possible that prescribing
19   hormones over the objection of one parent can create
20   conflict within the family.
21           Correct?
22           ATTORNEY BLOCK:  Objection to the form.
23           THE WITNESS:  Understanding the impact of
24   any intervention is a part of that consent process.

Page 184

1    BY ATTORNEY BARHAM:
2    Q.   I'm just asking if that's a possible outcome?
3    A.   Yes.
4    Q.   All right.
5            Is it your opinion that it's unreasonable to
6    exclude from female teams biological males, and by that
7    I mean people with XY chromosomes, who have gained a
8    physiological advantage as a result of undergoing male
9    puberty?
10   A.   This is outside of the scope of what I was
11   providing my testimony on.
12   Q.   Well, in paragraph 52 of your report you say no
13   reasonable mental health professional could think the
14   act in question is anything but harmful to the mental
15   health of transgender youth and that preventing
16   transgender youth from participating in the same
17   activities as their peers undermines their ability to
18   socially transition and prevents transgender youth from
19   accessing important educational and social benefits.
20           So I'm asking you is it your opinion that it's
21   unreasonable to exclude from female teams biological
22   males who have gained a physiological advantage as a
23   result of undergoing male puberty?
24           ATTORNEY BLOCK:  Objection to form and

Page 185

1    scope.
2            THE WITNESS:  Again, I can testify to the
3    mental health aspects of exclusion.  I can't testify to
4    the endocrinologic changes of the physiologic changes in
5    sports specifically.
6    BY ATTORNEY BARHAM:
7    Q.   I'm not asking you to testify to the
8    endocrinology aspects of this.  I'm just asking is it
9    your opinion that if we assume that an individual has
10   gained physiological advantage as a result of undergoing
11   male puberty that it is still unfair to --- or
12   unreasonable to exclude them from competing on a women's
13   team?
14           ATTORNEY BLOCK:  Objection to form and
15   scope.
16           THE WITNESS:  That is not an assumption I
17   feel comfortable making.
18   BY ATTORNEY BARHAM:
19   Q.   Well, if you say that it is no reasonable mental
20   health professional can say that this Act is anything
21   but harmful to the mental health of transgender youth
22   that doesn't depend upon whether the child has undergone
23   male puberty or not.
24           Is that correct?

Page 186

1        A.    That is correct.
2        Q.    So even if the child --- even if the individual
3    has undergone male puberty you're saying that no
4    reasonable mental health professional could think that
5    the Act is anything but harmful, barring them from
6    competing on the women's team is anything but harmful.
7            Is that correct?
8        A.    I would say exclusion and isolation from access
9    to same aged peer activities is likely to be harmful
10    from a mental health perspective.
11        Q.    To what extent can puberty blockers started
12    late, such as age 14, unring the bell by reversing the
13    physical changes in male puberty?
14            ATTORNEY BLOCK:  Sorry, I can't hear the
15    questions.
16    BY ATTORNEY BARHAM:
17        Q.    To what extent do puberty blockers started late,
18    for example age 14, unring the bell by reversing the
19    physical changes of male puberty?
20            ATTORNEY BLOCK:  Objection to form and
21    scope.
22            THE WITNESS:  It is a complicated
23    question that is best left to an endocrinologist to
24    answer.

Page 187

1    BY ATTORNEY BARHAM:
2        Q.    Can puberty blockers reverse the physical
3    changes of male puberty to the genitals?
4            ATTORNEY BLOCK:  Objection to form and
5    scope?
6            THE WITNESS:  It's the same answer.  I
7    would defer to an endocrinologist on that response.
8    BY ATTORNEY BARHAM:
9        Q.    Can puberty blockers reverse the physical
10    changes to the hair?
11            ATTORNEY BLOCK:  Same objections.
12            THE WITNESS:  Again, I would defer to an
13    endocrinologist.
14    BY ATTORNEY BARHAM:
15        Q.    Can they reverse the physical changes to the
16    voice or muscles?
17            ATTORNEY BLOCK:  Same objections.
18            THE WITNESS:  Same answer.
19    BY ATTORNEY BARHAM:
20        Q.    Can they reverse the effect --- the physical
21    changes of male puberty to the heart or lung size?
22            ATTORNEY BLOCK:  Same objection.
23            THE WITNESS:   Same answer.
24    BY ATTORNEY BARNHAM:

Page 188

1        Q.    Isn't it true that puberty blockers just stop
2    further typical male development?
3            ATTORNEY BLOCK:  Same objections.
4            THE WITNESS:  I would --- I would give
5    two responses.  One, I would want an endocrinologist to
6    weigh in on the specifics, but clearly puberty blockers
7    are also prescribed to folks assigned females at birth
8    as well.  There's more than just impacts on testosterone
9    as a result of these medications.
10    BY ATTORNEY BARHAM:
11        Q.    I understand, but you make recommendations for
12    whether people are eligible to receive puberty blocking
13    hormones.
14            Is that correct?
15        A.    That is correct.
16        Q.    So you have to have some understanding of the
17    effects of these medications.
18            Is that correct?
19        A.    That is correct.
20        Q.    So isn't it true that puberty blockers
21    administered to natal males should stop further typical
22    male development?
23            ATTORNEY BLOCK:  Objection to form and
24    scope.

Page 189

1            THE WITNESS:   I'd have the same answer,
2    and they do more than that.
3    BY ATTORNEY BARNHAM:
4        Q.    What else do they do?
5        A.    Again, I would defer to the endocrinologist for
6    the specific pathophysiology of how GnRH analogs affect
7    a complicated physiology of the body.
8        Q.    But what is your understanding of how they
9    affect because you said they also do other things?
10            ATTORNEY BLOCK:  Objection to form and
11    scope.
12            THE WITNESS:  I think I answered it.  In
13    the GnRH analogs are given an anatomic manner compared
14    to the pulsatile way in which GnRH is released during
15    the puberty, which is what causes the suppression of
16    other hormones than just testosterone and estrogen.
17    BY ATTORNEY BARNHAM:
18        Q.    If puberty blocking hormones are administered to
19    a natal male, do they cause that individual to undergo
20    typically female pubertal development?
21            ATTORNEY BLOCK:  Objection to form and
22    scope.
23            THE WITNESS:  They do not.
24    BY ATTORNEY BARNHAM:

Page 190

1     Q.   So they just stop further male development.
2   Correct?
3          ATTORNEY BLOCK:  Same objections.
4          THE WITNESS:  As kind of a Gestalt pithy
5   response, yes, they cause puberty for assigned females
6   at birth and assigned males at birth who are given these
7   medications.
8   BY ATTORNEY BARNHAM:
9     Q.   When does puberty typically begin in biological
10  males?
11         ATTORNEY BLOCK:  Same objections.
12         THE WITNESS:  Those are very known data
13  that an endocrinologist could tell you.
14  BY ATTORNEY BARHAM:
15    Q.   I'm sure, though, that as a psychiatrist you
16  have a general understanding of what ages puberty
17  typically begins in biological males?
18         ATTORNEY BLOCK:  Same objections.
19         THE WITNESS:  I do, however, I am
20  assessing individuals who come through my office.  And
21  regardless of what the population says about when
22  puberty is typical, it's going to depend upon who that
23  individual child is and when they develop puberty.
24  BY ATTORNEY BARHAM:

Page 191

1     Q.   I understand, but my question isn't about an
2   individual.  My question is when does it typically begin
3   in biological males.
4          ATTORNEY BLOCK:  Same objections.
5          THE WITNESS:  Again, this is a very
6   knowable fact-based answer in a population level.  It's
7   not information I have in front of me.
8   BY ATTORNEY BARHAM:
9     Q.   So you have no --- is it your testimony that you
10  have no information as to when puberty typically begins
11  in biological females?
12         ATTORNEY BLOCK:  Can I just give a
13  standing objection to questions asking the witness about
14  the effects --- the endocrinology effects of blockers
15  and hormones, so I don't have to make an objection each
16  time?
17         ATTORNEY BARHAM:  Yes.
18         THE WITNESS:  My testimony is I don't
19  want to give an imprecise answer for a question that
20  there is a specific answer to.
21  BY ATTORNEY BARHAM:
22    Q.   What is your understanding, as you sit here
23  today, as to when puberty typically begins in males?
24    A.   The range for typical puberty in males tends to

Page 192

1   be around the 12ish mark.  But there is a broad
2   variability.  And again, there is an answer that exists
3   for this question that I don't have in front of me.
4     Q.   Are you familiar with Tanner stages of puberty?
5     A.   I am.
6     Q.   What are the different Tanner stages of puberty?
7     A.   Tanner stages one through five are the different
8   Tanner stages.
9     Q.   So what is Tanner stage one in biological males?
10    A.   It depends upon if we're talking about genitalia
11  or chest development, but it's no pubertal changes,
12  so ---.
13    Q.   And what is two?
14    A.   Two is at the initial stages of pubertal changes
15  that you start to see.  The specifics of the Tanner
16  staging is something that you need to be trained on.  I
17  would not claim myself as an expert in being able to
18  accurately access the Tanner stage of a child.
19    Q.   Do you know when --- at what ages Tanner Stage 2
20  typically initiates in biological males?
21    A.   Again, it's going to be an individualized
22  experience and that's why we do assessments.
23    Q.   Do you have a range, an age range as to when it
24  typically begins?

Page 193

1     A.   When we talk about the onset of puberty, we're
2   talking about Tanner stage two typically.
3     Q.   And at what age do those typically arise?
4     A.   For assigned males at birth or assigned females?
5     Q.   For biological males.
6          ATTORNEY BLOCK:  Objection to
7   terminology.
8          THE WITNESS:  So for folks assigned male
9   at birth, again, we're going to see it in that 12-ish
10  range.
11  BY ATTORNEY BARHAM:
12    Q.   And Tanner Stage 3, what is that?
13    A.   Further development.  There's tables and charts
14  you would have to look at.  I'm not going to be able to
15  use language to describe it in an accurate way.
16    Q.   And when --- approximately when, what age range
17  does Tanner Stage 3 begin in biological males?
18    A.   That's not an answer that I can give you.
19    Q.   And what is Tanner Stage 4?
20    A.   The same answer is further progression of
21  pubertal changes.
22    Q.   And do you know what age range that typically
23  begins in biological males?
24    A.   Same answer as before.  That's not an answer I

Page 194

1    have here.
2        **Q.   And would the same answers hold true for Tanner**
3    **Stage 5?  Is that a yes?**
4        A.   That's a yes.  I forgot that nodding ---.
5        **Q.   Yes.  You've been pretty good today.  I've been**
6    **impressed.**
7            **Doesn't the position that allowing biological**
8    **males to play on a girls team if they blocked puberty**
9    **before it begins create pressure for parents and**
10   **children to make puberty blocking decision at a young**
11   **age?**
12           ATTORNEY BLOCK:  Objection to form.
13   BY ATTORNEY BARHAM:
14       **Q.   Sort of put them in a now or never situation?**
15       A.   Of those 500 patients that I have seen, that has
16   never come up as a concern.
17       **Q.   The athletic issue has never come up as a**
18   **concern?**
19       A.   It has not.
20       **Q.   Do you think it would --- as a practitioner in**
21   **the field do you think it would even be ethical for the**
22   **State of West Virginia to structure its law in a way**
23   **that puts now or never pressure on parents and children**
24   **who are dealing with gender dysphoria to decide at an**

Page 195

1    **early age whether to stop the natural development of**
2    **puberty?**
3            ATTORNEY BLOCK:  Objection to form.
4            THE WITNESS:  As a child psychiatrist in
5    this field we're doing individual-based assessments with
6    the children and families that are in front of us.  And
7    what that means in the context of this question is that
8    we are assessing all of their different activities,
9    interests and working with all the systems that we can
10   to ensure a safe and appropriate set of decisions that
11   are going to lead to the best outcomes for this
12   individual child and not a medical emphasis that is
13   outside of the scope that I can answer.
14   BY ATTORNEY BARHAM:
15       **Q.   But you're familiar with the ethical standards**
16   **of your field.**
17           **Is that correct?**
18       A.   I am, yes.
19       **Q.   Under those ethical standards would it be**
20   **ethical for the State to structure its law in a way that**
21   **puts this kind of now or never pressure on parents and**
22   **children?**
23           ATTORNEY BLOCK:  Objection to form.  Also
24   the witness is in shadow.  I can't really see him for

Page 196

1    the camera.
2            THE WITNESS:  Is that better?
3            ATTORNEY BLOCK:  Yes.
4            THE WITNESS:  Can you repeat the
5    question?  I'm sorry.
6    BY ATTORNEY BARHAM:
7        **Q.   As someone familiar with the ethical standards**
8    **of psychiatry, do you think it would be ethical for the**
9    **State of West Virginia to structure its law in a way**
10   **that puts now or never pressure on parents and children**
11   **who are dealing with gender dysphoria to decide at an**
12   **early age whether to stop the natural development of**
13   **puberty?**
14           ATTORNEY BLOCK:  Objection to form.
15           THE WITNESS:  I mean that's a question
16   that has a testable hypothesis.  Does X intervention
17   lead to this kind of pressure?  That's not a study that
18   I've ever seen nor has it been my clinical experience
19   that it's been the case.
20   BY ATTORNEY BARHAM:
21       **Q.   Would it be ethical to put that kind of pressure**
22   **on someone under the ethical standards of the field of**
23   **psychiatry?**
24           ATTORNEY BLOCK:  Objection to form and

Page 197

1    foundation?
2            THE WITNESS:  It is a very theoretical
3    question that really doesn't enter into it when we are
4    one on one with these kids and their families.
5    BY ATTORNEY BARHAM:
6        **Q.   I'm not asking about one on one interactions**
7    **with kids and families.  I'm asking in general in theory**
8    **is it ethical to put that kind of pressure on someone?**
9            ATTORNEY BLOCK:  Objection to form and
10   foundation.
11           THE WITNESS:  I'm sorry I can't give a
12   better answer, but ensuring that a child is making a
13   decision without coercion is a part of the informed
14   consent process.
15   BY ATTORNEY BARHAM:
16       **Q.   Is it your opinion that it is unreasonable to**
17   **exclude from female teams biological males who begin**
18   **undergoing male puberty but are now on puberty blockers?**
19           ATTORNEY BLOCK:  Objection to form and
20   scope.
21           THE WITNESS:  Can you repeat the
22   question?
23   BY ATTORNEY BARHAM:
24       **Q.   Is it your opinion that it is unreasonable to**

Digizebra 0955

Page 198

1    exclude from female teams biological males who begin
2    undergoing male puberty but are now on puberty blockers?
3        A.   Is it unethical is the question?
4        Q.   Unreasonable.
5        A.   Unreasonable.  I would defer to kind of our
6    physiology and endocrinology experts and our medical
7    ethics experts in rendering an opinion on that
8    specifically.
9        Q.   Is it your opinion that it is harmful to youth's
10   mental health to be excluded from female teams
11   biological males who begin undergoing male puberty but
12   are now on puberty blockers?
13       A.   What I would say is that exclusion as well as
14   specific legal exclusion from activities of same-aged
15   peers is likely to be harmful for a kid's mental health.
16       Q.   Now, the Act in question does not prevent a
17   biological male who has gender dysphoria from competing
18   on the boys team.
19            Is that correct?
20            ATTORNEY BLOCK:  Objection to form and
21   scope.
22            THE WITNESS:  I'd need to know specifics.
23   I don't know what you're referring to.  I think lots of
24   people have different policies around how this actually

Page 199

1    works.
2    BY ATTORNEY BARHAM:
3        Q.   I'm asking your understanding of the statute
4    upon which you're opining.
5        A.   Can you repeat the question, please?
6        Q.   The Act in question does not prevent a
7    biological male who is experiencing gender dysphoria
8    from competing on the boys team.
9            Correct?
10            ATTORNEY BLOCK:  Objection to form and
11   scope.
12            THE WITNESS:  So one, I don't know what
13   biological male necessarily means.
14   BY ATTORNEY BARHAM:
15       Q.   An individual with XY chromosomes, natal male?
16       A.   So assigned male at birth can have a number of
17   reasons why they might not be able to play on the boys
18   team, including intensity of gender dysphoria.
19       Q.   But the law does not prevent them from playing
20   on the boys team.
21            Correct?
22       A.   From my read of the law it does not prevent them
23   from playing on the boys team.  Again, from a mental
24   health perspective, their gender dysphoria may.

Page 200

1        Q.   So is it harmful to the mental health of a
2    biological male who is experiencing gender dysphoria to
3    be excluded from the women's team even if he is on
4    puberty blockers?
5            ATTORNEY BLOCK:  Objection to form and
6    terminology.
7            THE WITNESS:  Any potential exclusions
8    from a peer-appropriate activity has the potential to
9    have negative consequences on the mental health of that
10   girl.  And again, that's going to be something that on
11   an individual basis we are assessing.
12   BY ATTORNEY BARHAM:
13       Q.   And that would be irrespective of whether the
14   individual is on puberty blockers, begins to undergo
15   male puberty or not.
16            Correct?
17       A.   An individual assessment is going to be
18   inherently tailored to wherever an individual is.
19            ATTORNEY BARHAM:  Why don't we pause for
20   lunch?
21            ATTORNEY BLOCK:  Let's go off the record.
22            VIDEOGRAPHER:  Going off the record.  The
23   current time reads 1:24 p.m.
24   OFF VIDEOTAPE

Page 201

1            ---
2    (WHEREUPON, A SHORT BREAK WAS TAKEN.)
3            ---
4    ON VIDEOTAPE
5            VIDEOGRAPHER:  Back on the record.  The
6    current time reads 1:53 p.m.
7    BY ATTORNEY BROOKS:
8        Q.   What does puberty suppression or puberty
9    blockers do?
10            ATTORNEY BLOCK:  Objection to form and
11   scope.
12            THE WITNESS:  I think I answered that
13   question before.  So they suppress the endogenous
14   release of testosterone and estrogen as well as some
15   other hormones.
16   BY ATTORNEY BARHAM:
17       Q.   How does puberty suppression differ from cross
18   sex hormones?
19            ATTORNEY BLOCK:  Same objection.
20            THE WITNESS:  Totally different
21   medication.  One suppress hormones and the other is a
22   direct hormone itself.
23   BY ATTORNEY BARHAM:
24       Q.   So cross sex hormones are given with the

Christian 0956

Page 202

1    intention of causing development typical to the other
2    sex.
3        **Correct?**
4        A.    It depends upon the context in which hormones
5    are used.  And again, I would defer for my endocrinology
6    colleagues on the specifics.
7        **Q.    So if cross sex hormones are given to a natal**
8    **male as part of treatment for gender dysphoria, what is**
9    **the intention?**
10            ATTORNEY BLOCK:  Objection to form.
11            THE WITNESS:  As I understand it, if an
12   assigned male at birth is given cross sex hormones that
13   is estrogen in order to provide the effects of estrogen
14   on the body.
15   BY ATTORNEY BARHAM:
16       **Q.    And the effects of estrogen on the body are what**
17   **natal females would naturally experience as a result of**
18   **puberty.**
19       **Correct**
20       A.    I mean, that is correct, yes.
21       **Q.    And so if a natal female is given cross sex**
22   **hormones, she's being given testosterone to create the**
23   **effects that natal males would naturally experience**
24   **through puberty.**

Page 203

1        **Correct?**
2        A.    Typically speaking, an assigned female at birth
3    is going to be receiving testosterone and will have the
4    subsequent effects as a result of having testosterone in
5    the bloodstream.
6        **Q.    Maybe I was confused, a natal male who is given**
7    **cross sex hormones?**
8        A.    You were right.
9        **Q.    I was right, okay.  At what Tanner stage do you**
10   **recommend that a patient begin puberty blocker hormones?**
11       A.    Again, that's going to depend upon an
12   individualized assessment with the family, but never
13   before Tanner Stage 2 of puberty.
14       **Q.    And in what age does Tanner Stage 2 begin again?**
15           ATTORNEY BLOCK:  Asked and answered.
16           THE WITNESS:  I think I answered that
17   question.  It really depends upon the person.
18   BY ATTORNEY BARHAM:
19       **Q.    And typically ----.**
20       A.    And for an assigned male at birth we're talking
21   12-ish, but again I would refer to my endocrinology
22   colleagues on the specific dates.
23       **Q.    And through what Tanner stage do you recommend**
24   **that a patient remain on puberty blockers?**

Page 204

1        A.    That's not a question I can speak to.  That's a
2    question for the physician or provider who's prescribing
3    that specific medication.
4        **Q.    So after you recommend that a patient receive**
5    **puberty blocking hormones, what is your continuing**
6    **involvement in the puberty blocking process?**
7        A.    My continuing involvement really depends upon
8    the individual child and family for the sake of a mental
9    health assessment.  For the initiation of puberty
10   suppression it's an assessment for the initiation of
11   puberty suppression.  The involvement thereafter is
12   really dependent upon what the individual needs of that
13   child are.
14       **Q.    Do you play any role in continuing to advise**
15   **whether the patient can continue to receive puberty**
16   **blocking hormones or come off of them?**
17       A.    It really depends upon the context.  If the
18   child is seeking to come off of puberty suppression
19   because of a shift in their understanding of their
20   identity, certainly that's a conversation that I would
21   be involved in.  If they are coming off of puberty
22   suppression because they have a sufficient amount of
23   testosterone or estrogen in their system that they are
24   no longer requiring that from a medical purpose, that's

Page 205

1    not a discussion that I'm privy to.
2        **Q.    When you are discussing puberty blockers with**
3    **patients and their parents do you describe them as**
4    **placing a pause on puberty?**
5        A.    That's not specific language that I use.
6        **Q.    Do you describe them as being reversible?**
7        A.    Again, that's not a language that I use.  I'm
8    much more specific in my discussions.
9        **Q.    So on the issue of whether puberty blocking**
10   **hormones are reversible, what do you tell parents and**
11   **patients?**
12       A.    I would say, by and large, most of the effects
13   of puberty suppression are reversible.
14       **Q.    And when you say by and large what effects are**
15   **you referencing?**
16       A.    What I'm referencing is that the literature is
17   still an open book and we are constantly seeking and
18   learning new information.  We want to understand what
19   those potential new data tell us about the efficacy,
20   safety, et cetera, of these interventions.
21       **Q.    So when you say they are by and large the**
22   **effects are reversible, which effects are you**
23   **referencing are the by and large?**
24       A.    When I say by and large, it's really a caveat to

Armistead 2022 0957

Page 206

1   allow for the things that we don't yet know.
2       Q.   So which effects are reversible?
3       A.   Virtually all of the effects that we're aware of
4   are reversible.
5       Q.   When you're discussing puberty blockers with
6   patients and their parents do you describe them as safe?
7       A.   Safe isn't a binary concept in my world.  There
8   is no such thing as anything that is completely safe or
9   unsafe.  So we talk about gradations of risk with any
10  intervention.
11      Q.   So for puberty blockers what are the --- what's
12  the gradation of risk?
13      A.   It is individualized to the specific needs of
14  the child and the family.
15      Q.   In general, what is your understanding of the
16  gradations of risk across the board?
17          ATTORNEY BLOCK:  Objection to form.
18          THE WITNESS:  I don't have a better
19  answer for you because that's the whole process of doing
20  an informed consent process, is understanding what are
21  the specific risks and benefits and alternatives for
22  that individual child.
23  BY ATTORNEY BARHAM:
24      Q.   Are you aware of the literature regarding any

Page 207

1   testing of puberty blocking hormones and the gradations
2   of risks presented in those tests?
3       A.   I'm not sure what you mean by tests.
4           ATTORNEY BLOCK:  Objection to form.
5           THE WITNESS:  I'm not sure what you mean
6   by testing.
7   BY ATTORNEY BARHAM:
8       Q.   Don't medications undergo testing before they
9   can be used?
10      A.   There's a wide variety of processes by which
11  medications are approved or not approved for certain
12  indications.
13          ATTORNEY BARHAM:  Let's go to Tab 5.  I
14  believe that's Exhibit-2.
15          LAW CLERK WILKINSON:  Exhibit-2.
16  BY ATTORNEY BARHAM:
17      Q.   It's the Endocrine Society Guidelines from 2017.
18          THE WITNESS:  Yes.
19  BY ATTORNEY BARHAM:
20      Q.   On page 3880 the Endocrine Society states we
21  suggest that clinicians begin pubertal hormone
22  suppression therapy --- pubertal hormone suppression
23  after girls and boys first exhibit physical changes of
24  puberty, Tanner stages G-2/B-2.  Is that consistent with

Page 208

1   your practice?
2           ATTORNEY BLOCK:  Objection to form.
3           THE WITNESS:  This is --- the document,
4   as I read it, is a set of guidelines for the practice of
5   care that should be individually applied to each child
6   and family.  My practice takes these recommendations and
7   individually applies them to the specific risks,
8   benefits and alternatives for the child sitting in front
9   of me.
10  BY ATTORNEY BARHAM:
11      Q.   On the prior page in number 1.4 the Endocrine
12  Society recommends against puberty blocking and gender
13  affirming hormone treatment in prepubertal children.  Do
14  you approve the use of puberty blockers before puberty?
15      A.   I do not.
16      Q.   You didn't recommend or prescribe any puberty
17  blockers for BPJ.
18          Is that correct?
19      A.   I have not.
20      Q.   You did not evaluate BPJ before he started
21  taking puberty blockers.
22          Is that correct?
23      A.   I have not evaluated her or seen her, these
24  materials.

Page 209

1       Q.   Is it your opinion that no responsible clinics
2   begin puberty blocking before puberty begins?
3           ATTORNEY BLOCK:  Objection to form and
4   scope.
5           THE WITNESS:  There's no indication to
6   start puberty blocking agents until Tanner Stage 2.
7   BY ATTORNEY BARHAM:
8       Q.   Isn't it true that there have been no Phase I
9   clinical trials to test the safety of GnRH inhibitors
10  for this age group?
11      A.   That is my understanding, but I would have to
12  specifically review the literature with that question in
13  mind.  I'm not familiar --- completely familiar with the
14  phased nomenclature in this context.
15      Q.   Isn't it true that there have been no Phase I
16  clinical trials to test the safety of GnRH inhibitors
17  for this duration?
18      A.   Again I would need to find a definition of what
19  you are referring to by Phase I specifically.
20      Q.   Isn't it true there have been no clinical trials
21  per FDA rules for this use of puberty blockers?
22      A.   I don't know what is meant by per FDA rules.
23      Q.   Food and Drug Administration rules?
24      A.   Yeah.  I'm not familiar with what their rules

Page 210

1    are.  There have been clinical trials of these
2    medications for this purpose.
3        Q.   Which clinical trials are you referencing?
4        A.   There are clinical trials through the Dutch
5    clinic.  There is also an ongoing clinical trial here in
6    the U.S., a multi-phase study.
7        Q.   That study is still ongoing.
8             Correct.
9        A.   That is correct.
10       Q.   So there are no completed clinical trials in the
11   United States under FDA rules.
12            Correct?
13       A.   I am not ---.
14            ATTORNEY BLOCK:  Objection to the form.
15            THE WITNESS:  I can't say that I'm
16   familiar with all clinical trials that have ever
17   happened, so that's not a statement I can answer.
18   BY ATTORNEY BARHAM:
19       Q.   You're not aware of any, though?
20       A.   I don't know what is meant by Phase I and what
21   specifically is registered with the FDA for their
22   purposes versus the copious numbers of clinical trials
23   that have happened.
24       Q.   Are you aware of any clinical trials in the

Page 211

1    United States that have been completed regarding the
2    safety of using puberty blockers for gender dysphoria?
3            ATTORNEY BLOCK:  Objection to form.
4            THE WITNESS:  Yeah, I'm not sure how I
5    can answer that because I'm not aware of all of the
6    trials that have occurred.
7            ATTORNEY BLOCK:  Counsel, can we have a
8    discussion about the scope of this deposition?  I'm
9    happy to have it off the record.  I don't want it to
10   influence the witness at all, but this is a rebuttal
11   witness addressing specific issues and it seems that,
12   you know, there are a lot of questions that are just
13   really far outside the scope.  So I'd love to have a
14   discussion.
15           ATTORNEY BARHAM:  I'm happy to go off the
16   record.
17           VIDEOGRAPHER:  Going off the record.  The
18   current time reads 2:07 p.m.
19   OFF VIDEOTAPE
20                    ---
21   (WHEREUPON, AN OFF RECORD DISCUSSION WAS HELD.)
22                    ---
23   ON VIDEOTAPE
24           VIDEOGRAPHER:  Back on the record.  The

Page 212

1    current time reads 2:17 p.m.
2    BY ATTORNEY BARHAM:
3        Q.   We were looking at Tab 5, which is Exhibit-2,
4    page 3874.  About three-quarters down the first column
5    the Endocrine Society indicates, quote, in the future we
6    need more rigorous evaluations of the effectiveness and
7    safety of endocrine and surgical protocols and
8    specifically highlight the need to include a careful
9    assessment of the effect of prolonged delay of puberty
10   in adolescence on bone health, gonadal function and the
11   brain.
12            Do you see that?
13       A.   I see that, yes.
14       Q.   Do you agree that more rigorous evaluations of
15   the safety of endocrine and surgical protocols are
16   needed?
17       A.   I would agree that that's an important goal for
18   all treatments, yes.
19       Q.   Do you agree that because, as the Endocrine
20   Society indicated here, that these evaluations are
21   needed in the future, that this --- that they have not
22   been done yet?
23       A.   Well, this is published in 2017.  There are
24   ongoing trials that are happening now, and some that

Page 213

1    have had at least preliminary data presented at various
2    meetings that have looked at some of these.
3        Q.   So the issue here is the prolong delay of
4    puberty.  You would agree that it's quite different from
5    treating individuals with precocious puberty.
6            Correct?
7            ATTORNEY BLOCK:  Objection to form and
8    scope.
9            THE WITNESS:  As a non-endocrinologist I
10   wouldn't hazard an opinion on that.
11   BY ATTORNEY BARHAM:
12       Q.   Do you treat individuals for precocious puberty?
13       A.   I do not.
14       Q.   Do you agree with the Endocrine Society that
15   there have not yet been a study of how the prolonged
16   delay of puberty affects bone health?
17            ATTORNEY BLOCK:  Objection to form and
18   scope.
19            THE WITNESS:  I don't know if I can
20   answer that in the most accurate way.  I know I've seen
21   preliminary data presented at various meetings about
22   impacts on bone health, but I'm not as familiar with the
23   endocrine literature as I am with the mental health
24   literature.

Page 214

1  BY ATTORNEY BARHAM:
2      Q.  Do you agree that there has not yet been a study
3  on the prolonged effect of --- the prolonged delay of
4  puberty affecting gonadal function?
5          ATTORNEY BLOCK:  Objection to form and
6  scope.
7          THE WITNESS:  Same answer as to the last
8  one.
9  BY ATTORNEY BARNHAM:
10     Q.  And that is the same as fertility?
11     Correct?
12     A.  There has been more study fertility in those
13  populations.
14     Q.  Do you agree there has not yet been a study on
15  how the prolonged delay of puberty affects the brain?
16     A.  There are ongoing studies.
17     Q.  None complete yet?
18     A.  None that have published thus far that I'm aware
19  of again.
20     Q.  And when you say there are ongoing studies of
21  bone health, none have published so far that you're
22  aware of.
23     Correct?
24     A.  I know I have seen data published at various

Page 215

1  national and international meetings, so I could not
2  answer that question accurately.  I think things have
3  been published on bone health, but I'm not familiar with
4  --- I'm not as familiar with the endocrinologic
5  literature as I am the mental health literature.
6      Q.  Are you aware of any studies that have been
7  completed regarding the prolonged delay of puberty
8  affecting the cognitive, emotional, social and sexual
9  development?
10     A.  Can you repeat the question?
11     Q.  Are you aware of any studies that have been
12  completed regarding the prolonged delay --- of how the
13  prolonged delay of puberty affects the cognitive,
14  emotional, social and sexual development?
15     A.  There have been a number of studies including
16  studies that we have referenced here that have looked at
17  long-term psychosocial outcomes for these kids.  So
18  certainly some of those items have been looked at quite
19  extensively.  Some have not yet or have studies that are
20  ongoing.
21     Q.  If the Endocrine Society is indicating that all
22  of this is needed research, why are you --- what do you
23  tell parents about the relative safety of puberty
24  blocking hormones?

Page 216

1      A.  What I would say this was published in 2017, and
2  so we would want to update since then about any
3  literature since then on these potential risks.  What I
4  want to do is make sure that the endocrinologist or the
5  adolescent medicine specialist, whoever it is that is
6  prescribing the specific treatment knows how to have
7  those discussions based on the psychiatric needs of the
8  patients that I'm seeing.
9      Q.  Let's turn to 3872 in this document.  The
10  Endocrine Society indicates that the task force followed
11  the approach recommended by the grading of
12  recommendations and assessments, development and
13  evaluation group.  The international group with
14  expertise in the development and implementation of
15  evidence based guidelines.  Do you see that in the
16  second column?
17     A.  Yes.
18     Q.  And in this document they indicate that the use
19  of the phrase we recommend and the number one are strong
20  recommendations --- use the phrase we recommend ---
21  recommendations use the phrase of we suggest in number
22  two.
23     Is that correct?
24     A.  Correct.

Page 217

1      Q.  So the recommendations regarding the use of
2  puberty blockers are based on low quality evidence.
3      Correct?
4          ATTORNEY BLOCK:  Objection to form.
5          THE WITNESS:  What I can state is how
6  this particular working group within the Endocrine
7  Society characterized it using the assessment tool and
8  using this assessment tool that is how it was graded for
9  the sake of this set of guidelines.
10  BY ATTORNEY BARHAM:
11     Q.  Were you aware of this when you drafted your
12  report?
13     A.  Yes.
14     Q.  Do you agree or disagree with this assessment of
15  the quality of the evidence?
16     A.  Based upon how they did it, I would agree.  In
17  the world of child psychiatry this is very common.
18  There is very little that we have in terms of very
19  mainstream standard of care treatments that has anything
20  other than poor quality of evidence based upon using
21  these standards.
22          ATTORNEY BARHAM:  I'm going to hand you
23  what we will mark as Exhibit 31, and that will be
24  Tab 76?

55  (Pages 214 to 217)

1    THE WITNESS:  Thanks.
2    LAW CLERK WILKINSON:  You're welcome.
3    ---
4    (Whereupon, Exhibit 31, Label of Lupron,
5    was marked for identification.)
6    ---
7    BY ATTORNEY BARHAM:
8    **Q.   This is the label of Lupron, pharmaceutical**
9    **label for Lupron.  Right at the top of page one, this**
10   **label indicates that Lupron is approved for puberty**
11   **blocking or delay for precocious puberty.**
12   **Correct?**
13   A.   That is correct.
14   **Q.   And precocious puberty is a hormonal imbalance.**
15   **Correct?**
16   A.   I think there's a precise terminology for
17   precocious puberty that involves more than just a
18   hormonal imbalance.
19   **Q.   But it's a malfunction of hormonal controls in**
20   **the brain?**
21   ATTORNEY BLOCK:  Objection to the form.
22   THE WITNESS:  My understanding as a
23   non-endocrinologist is that's initiation of puberty much
24   earlier than anticipated or expected based upon the

1    history of the family.
2    BY ATTORNEY BARHAM:
3    **Q.   So Lupron is inspected and approved by the FDA**
4    **for safety and efficacy for precocious puberty not for**
5    **all other possible uses.**
6    **Correct?**
7    A.   Correct.
8    **Q.   And Lupron was tested only for delaying puberty**
9    **up until the normal age of puberty.**
10   **Correct?**
11   ATTORNEY BLOCK:  Objection to form.
12   THE WITNESS:  I'm not familiar with the
13   literature that was used for gaining the FDA approval
14   for this indication.
15   BY ATTORNEY BARHAM:
16   **Q.   If you turn to section 14.1, 14.1 you'll see**
17   **that it says that this --- Lupron was tested for monthly**
18   **administration on 6 males and 49 females.**
19   **Is that correct?**
20   A.   That is correct.
21   **Q.   And on the next page you'll see it was tested**
22   **for three months administration on 8 males and 76**
23   **females.**
24   **Is that correct?**

1    A.   I do not see where it says that.
2    **Q.   14.2?**
3    A.   Yes.
4    **Q.   Do you know why the test was weighted towards**
5    **girls?**
6    ATTORNEY BLOCK:  Objection to form and
7    scope and foundation.
8    THE WITNESS:  It would be a mere
9    supposition on my end.
10   BY ATTORNEY BARHAM:
11   **Q.   Is it because precocious puberty is more common**
12   **in girls?**
13   A.   I would defer to an endocrinologist on this
14   epidemiology of that.
15   **Q.   But the goal of using Lupron in this context is**
16   **to help steer the body into healthy and normal**
17   **development.**
18   **Correct?**
19   ATTORNEY BLOCK:  Objection to form,
20   scope.
21   THE WITNESS:  Generally speaking I would
22   agree with that.
23   BY ATTORNEY BARHAM:
24   **Q.   Prescribing Lupron or other GnRH for gender**

1    dysphoria disrupts hormones and developments at an early
2    stage.
3    **Correct?**
4    ATTORNEY BLOCK:  Objection to the form
5    and scope.
6    THE WITNESS:  Again, as a mental health
7    professional, this would be outside of my area of
8    expertise to comment on that.
9    BY ATTORNEY BARHAM:
10   **Q.   Would you agree that normal pubertal development**
11   **includes bone growth, such as height?**
12   ATTORNEY BLOCK:  Objection to form and
13   scope.
14   THE WITNESS:  Yes, I would.
15   BY ATTORNEY BARHAM:
16   **Q.   Would you agree that normal pubertal development**
17   **can include bone strengthening?**
18   ATTORNEY BLOCK:  Objection to form and
19   scope.
20   THE WITNESS:  Specifics of that question
21   are really outside of my scope of understanding in the
22   practice that I have.
23   BY ATTORNEY BARHAM:
24   **Q.   But in general, you would agree that bones get**

Vineyard 0061

Page 222

1   stronger during puberty, especially for men?
2       ATTORNEY BLOCK:  Objection to form and
3   scope.
4       THE WITNESS:  My understanding is that
5   the process of bone health is a quite dynamic, not
6   static nor binary process, so it's more complicated than
7   I feel that I can answer that question to.
8   BY ATTORNEY BARHAM:
9       Q.   But do bones generally get stronger as puberty
10  progresses?
11      ATTORNEY BLOCK:  Objection to form and
12  scope.
13      THE WITNESS:  Again, I think it's a more
14  complicated answer than a yes or a no but I'm not ---.
15  BY ATTORNEY BARHAM:
16      Q.   Would you agree that normal pubertal development
17  includes brain development?
18      A.   Yes.
19      Q.   Each of these things have stopped or decreased
20  by the administration of puberty blockers.
21      Correct?
22      A.   I don't think we can say that it's been stopped
23  or decreased.  There's not a term decreasing brain
24  development that has been studied or referred to in the

Page 223

1   literature as I'm aware of it.
2       Q.   Slower brain development?
3       ATTORNEY BLOCK:  Objection to form.
4       THE WITNESS:  Slower isn't a word that
5   I've used, seen in the literature either.
6       ATTORNEY TRYON:  Travis, can you speak up
7   just a little bit more, please?
8       ATTORNEY BARHAM:  Certainly.
9   BY ATTORNEY BARHAM:
10      Q.   Would you agree that normal pubertal development
11  also includes psychosocial development of an adult
12  identity as a sexual being contemporaneous with ones
13  peers?
14      A.   I would say I would agree with that as an
15  adolescent developmental process, not necessarily as a
16  pubertal developmental process.
17      Q.   What's the --- what's your distinction between
18  an adolescent pubertal development --- excuse me, an
19  adolescent developmental process and a pubertal
20  developmental process?
21      A.   As an example, folks who have delayed puberty,
22  so 16-year olds who I have seen that have yet to undergo
23  all stages of puberty nevertheless develop a sense of
24  identity independent of the fact that their puberty has

Page 224

1   been delayed.
2       Q.   But their development in that regard is not
3   contemporaneous with their peers.
4       Correct?
5       ATTORNEY BLOCK:  Objection to form.
6       THE WITNESS:  In my specific hypothetical
7   some of their development is going to be contemporaneous
8   with their peers.  Some of it will not be.
9       ATTORNEY BARHAM:  I'm going to show you
10  what we will mark as Exhibit 32.  This will be Tab 73.
11      ---
12      (Whereupon, Exhibit 32, Puberty Blockers
13      Document, marked for identification.)
14      ---
15      THE WITNESS:  Can I ask a clarifying
16  question, it is 2:32 east coast time, not central.
17      ATTORNEY SWAMINATHAN:  Yes.
18      LAW CLERK WILKINSON:  Tab 73.
19  BY ATTORNEY BARHAM:
20      Q.   This document is a hand out --- or it's from the
21  --- I'm going to butcher the name, Doernbecher
22  Children's Hospital at OHSU from their gender clinic and
23  about puberty blockers document.  At the bottom of page
24  three, this document indicates that researchers have not

Page 225

1   finished studying how safe puberty blockers are in the
2   long-term.
3       Do you agree with that?
4       A.   Yeah, I would agree with that.
5       Q.   On the next page this document says that because
6   puberty block --- because blocking puberty hormones can
7   weaken your bones, it is best to just take them for just
8   two or three years.
9       Do you agree or disagree?
10      A.   That is outside of my scope of expertise.
11      Again, this is a public facing the most like
12  website.  I can't be quite certain what the context of
13  this is, but the individualized discussions you're
14  having with patients and families is always going to be
15  more complex than one or two sentences.
16      Q.   Do you expect to offer any opinion in this case
17  that puberty blockers administered according to your
18  guidelines are safe and reversible?
19      A.   I don't --- I guess I don't understand the
20  question.  I provided my expert testimony and my
21  testimony is focused on the mental health effects of
22  various interventions.
23      Q.   Okay.
24      Do you anticipate saying anything about the

Page 226

1   reversibility of puberty blockers?
2       A.   Other than what I have already discussed, I
3   don't think so.
4       Q.   Let's go to tab 5, I think that's Exhibit 2.
5   And on page 3874, again, about two-thirds down the first
6   column, the Endocrine Society says we still need to
7   study the effects of puberty blocking hormones on
8   gonadal function.
9           Correct?
10      A.   Yes.
11      Q.   That refers to hormone secretion.
12          Correct?
13      A.   Hormone secretion?
14      Q.   Uh-huh (yes).
15      A.   I'm not sure what you mean by that.
16      Q.   Gonadal function refers to the achievement of
17  the production by the gonads of fertile ova or sperm.
18          Correct?
19          ATTORNEY BLOCK:   Objection to form and
20  scope.
21          THE WITNESS:   I can't speak to the
22  author's intent for how they used that language.   It's
23  broader in scope from my perspective than that.
24  BY ATTORNEY BARHAM:

Page 227

1       Q.   Does it include the achievement of production of
2   fertile ova or sperm?
3       A.   That is a component, yes.
4       Q.   What other components do you have in mind for
5   that term?
6       A.   For gonadal development includes size, shape,
7   sexual functioning.
8       Q.   On page 31, I want to go to --- have we done
9   Tab 6 yet?
10          ATTORNEY BARHAM:   I want to introduce
11  what will be marked as Exhibit 33, this will be Tab 6.
12  These are Endocrine Society guidelines from 2009.
13          LAW CLERK WILKINSON:   I don't think I
14  have that.
15          ATTORNEY BARHAM:   Maybe we do.
16          LAW CLERK WILKINSON:   Six?
17          ATTORNEY BARHAM:   Uh-huh (yes).
18          LAW CLERK WILKINSON:   Uh-uh (no).
19  BY ATTORNEY BARHAM:
20      Q.   We will go back to Tab 5 then, Exhibit 2.   Would
21  you agree that if the administration for puberty
22  blockers for gender dysphoria has irreversible effects
23  on brain development, that would be a serious safety
24  problem?

Page 228

1           ATTORNEY BLOCK:   Objection to form.
2           THE WITNESS:   All risks are graded risk
3   an benefits as well as alternatives for each individual
4   child.
5   BY ATTORNEY BARHAM:
6       Q.   But if it had an irreversible affect on brain
7   development that would still be a serious concern,
8   regardless of the gradations that we would have to
9   consider and address it?
10          ATTORNEY BLOCK:   Objection to form.
11          THE WITNESS:   There are a number of
12  interventions that lead to irreversible changes that are
13  beneficial and are not of concern to safety.
14          ATTORNEY BARHAM:   All right.
15  Do we have Tab 32?
16          LAW CLERK WILKINSON:   That one I have.
17          ATTORNEY BARHAM:   This will be Exhibit
18  33, Tab 32 just to make it conducive.
19          ---
20          (Whereupon, Exhibit 33, Endocrine
21          Society's Guidelines, was marked for
22          identification.)
23          ---
24  BY ATTORNEY BARHAM:

Page 229

1       Q.   And if you look on --- at the end of the
2   document where it says for more information, it stated
3   this is a document from the National Institute of Mental
4   Health.
5           Correct?
6           ATTORNEY BLOCK:   Objection to form,
7   foundation.
8           THE WITNESS:   I have no idea of what the
9   context of this website is or what this is from.
10  BY ATTORNEY BARHAM:
11      Q.   But it gives the National Institute of Mental
12  Health's website.
13          Is that correct?
14      A.   It does.
15      Q.   And it says for more information you can e-mail
16  the National Institute of Mental Health e-mail address.
17          Correct?
18      A.   That is correct.
19      Q.   And that's a part of the National Institute.
20          Right?
21      A.   It is.
22      Q.   And the citations it's drawing from articles in
23  1999 and 2000.
24          Correct?

58  (Pages 226 to 229)

## Page 230

1    A.   That is correct.
2    Q.   On page one in the middle column, the article
3  describes gray matter at the thinking part of the brain.
4       Do you agree with that description?
5    A.   I would describe it as a gross
6  mischaracterization of the complexity of the brain.
7    Q.   What is your understanding of the function of
8  the gray matter?
9    A.   That is one element of it.  I think it is a lot
10  of nuance, I guess is the word that I'm looking for.
11  It's not characterized by that much of a pithy phrase,
12  not of a neuropathologist.
13    Q.   The article talks about a second wave of
14  production in gray matter that peaks around age 11 in
15  girls and 12 in boys.  And the article refers to that as
16  just prior to puberty.  In terms of Tanner stages that
17  would be around Tanner 2 for most boys and girls, would
18  it not?
19    A.   That would be Tanner Stage 1.
20    Q.   That would be Tanner Stage 1.  But by 11 or 12
21  you have already --- by age 12-ish in boys, it's typical
22  for puberty blockers to have been administered.
23       Correct?
24    A.   To use the language of this article, the

## Page 231

1  differences in Tanner stages is caused by the, quote,
2  surging sex hormones not the other way around.  So it's
3  not about age, but it's the exposure to hormones that
4  causes the Tanner stages to develop.
5    Q.   Have you made a study yourself about the timing
6  of brain gray matter development and the puberty
7  hormones in causing that development?
8    A.   I have not.
9    Q.   Do you have any reason to doubt the timing and
10  nature of development as set out in this National
11  Institute of Health publication?
12       ATTORNEY BLOCK:  Objection to form and
13  foundation.
14       THE WITNESS:  I only have the context of
15  this article that you've put in front of me for the
16  first time and in this article they describe the brain
17  changes just happening prior to puberty, which is prior
18  to when we would be initiating any interventions
19  medically.
20  BY ATTORNEY BARHAM:
21    Q.   And it says though that it is possibly the
22  thickening peaks around 11 or 12, depending on girls and
23  boys and that's possibly related to the influence of
24  surging sex hormones.

## Page 232

1       Correct?
2    A.   If that's what it says, yes.
3    Q.   Do you know --- have you conducted any studies
4  to determine the effect of administering puberty
5  blockers during the ordinary years of puberty and how
6  that would impact the ordinary development of brain
7  matter in the brain of a child?
8    A.   I have not, but it kind of sounds like that is
9  conflating this as a study, which is definitely not.
10    Q.   No, I'm just asking if you had conducted any
11  such studies?
12    A.   I have not.
13    Q.   Are you aware of any such studies?
14    A.   There are studies that are ongoing now.
15    Q.   That are ongoing.
16       ATTORNEY BARHAM:  Okay.
17       I'm going to show you what we marked as
18  Exhibit 34, this will be Tab 33.
19       ---
20       (Whereupon, Exhibit 34, Article by
21        Blakemore, et al., was marked for
22        identification.)
23       ---
24  BY ATTORNEY BARHAM:

## Page 233

1    Q.   This is an article by Blakemore, et al.,
2  published in 2010, The Role of Puberty in the Developing
3  Adolescent Brain.  On page 929, the article states the
4  ages at which these peaks in gray matter volume were
5  observed correspond to the sexually dimorphic ages
6  gonadarche, I'm mispronouncing that, onset which
7  suggests possible interactions between puberty hormones
8  and gray matter development.
9       Do you agree or disagree with that statement?
10    A.   I'm not seeing where you're referring to this.
11    Q.   On page 929, first column right above the role
12  of puberty in gray matter development?
13    A.   As stated in this study, the changes were
14  observed to correspond to the ages which suggest
15  possible interactions.  I have no objection to the idea
16  that there are possible interactions between puberty
17  hormones and gray matter development, but again, outside
18  the field of my expertise.
19    Q.   Okay.
20       It also refers to other MRI studies showing a
21  gradual emergence of sexual dimorphisms across puberty.
22  Do you know what sexual dimorphism of the brain means?
23    A.   I do.
24    Q.   What does it mean?

Page 234

1    A.  Differences that are measurable between folks
2  assigned female and folks assigned male at birth is
3  typically how that is described.
4    **Q.  On the first page of this document it says**
5  **throughout adolescence there are changes in the**
6  **structure and function of the brain, sexual dimorphism**
7  **in many of these changes suggest possible relationships**
8  **to puberty.**
9       **This article is saying that the available**
10  **evidence suggests sex links puberty hormones to play a**
11  **role in stimulating brain development; do you agree?**
12       ATTORNEY BLOCK:  Objection to form.
13       THE WITNESS:  Certainly I agree that
14  exposure to sex hormone is a part of brain development
15  for all people.  We know less about the developing brain
16  for transgender youth.
17  BY ATTORNEY BARHAM:
18    **Q.  Do you agree this includes a aspects of brain**
19  **development that differ between healthy males and**
20  **healthy females?**
21       ATTORNEY BLOCK:  Objection as to form.
22       THE WITNESS:  I don't.  I haven't seen
23  any literature that speaks to that specific question.
24  BY ATTORNEY BARHAM:

Page 235

1    **Q.  Okay.**
2       **Let's go back to Exhibit 2, page 3882?**
3       ATTORNEY BLOCK:  What page was that,
4  Counsel?
5       ATTORNEY BARHAM:  3882.
6  BY ATTORNEY BARHAM:
7    **Q.  Under the heading side effects, the article**
8  **indicates that the primary risk of pubertal suppression**
9  **in GD, gender incongruent adolescents may include,**
10  **ellipses, unknown effects on brain development, do you**
11  **see that?**
12  A.  I see that.
13    **Q.  And in the first column of 3883 indicates that**
14  **animal data suggests there may be effects of GnRH**
15  **analogs on cognitive function.**
16       **Do you see that?**
17  A.  I see that.
18    **Q.  Cognitive function means the ability to think.**
19  **Correct?**
20  A.  That is one aspect of cognitive functioning.
21    **Q.  Do you tell parents and patients that the**
22  **Endocrine Society has indicated that there are unknown**
23  **effects on brain development related to the use of**
24  **puberty blocking hormones?**

Page 236

1    A.  I typically use language that is more similar to
2  how they actually described it in this article which is
3  to say that it may have unknown effects on brain
4  development.
5    **Q.  Okay.**
6       ATTORNEY BARHAM:  Let's go to Tab 32,
7  which we have already looked at and that is Exhibit.
8       LAW CLERK WILKINSON:  Exhibit 33.
9  BY ATTORNEY BARHAM:
10    **Q.  Exhibit 33?**
11       ATTORNEY GREEN:  Travis, this is Roberta
12  Green.  I'm sorry to interrupt.  I wondered if you
13  wouldn't mind keeping your voice up I'm just having
14  trouble hearing.  No doubt it's me but it'd be great.
15  Thank you.
16       ATTORNEY BARHAM:  It may also be where
17  I'm located in the room, but I'm getting it from enough
18  people, so I appreciate the reminder.
19       VIDEOGRAPHER:  Counsel, did you say
20  Exhibit 33.
21       ATTORNEY BARHAM:  Exhibit 33.
22  BY ATTORNEY BARHAM:
23    **Q.  Page two at the top refers to the gray matter**
24  **--- or the white matter and how research purports a wave**

Page 237

1  of white matter growth that begins at the front of the
2  brain in early childhood, moves to the side after
3  puberty, striking growth spurts can be seen from age 6
4  to 13 in areas connecting brain regions specialized for
5  language and understanding special relationships.  Ages
6  11, 12 and 13 are sort of the heart and center of
7  puberty.
8       **Correct?**
9       ATTORNEY BLOCK:  Objection to form.
10       THE WITNESS:   It depends upon the child.
11  BY ATTORNEY BARHAM:
12    **Q.  In general?**
13       ATTORNEY BLOCK:  Same objection.
14       THE WITNESS:  I don't want it to be like
15  I'm parsing this out, but it's really important.  We
16  can't apply population based data onto an individual and
17  make conclusions about it.
18  BY ATTORNEY BARHAM:
19    **Q.  But we can assess population-based data as to**
20  **when puberty is generally occurring and generally it's**
21  **occurring around the ages of 11 to 13?**
22  A.  I would agree with the statement that puberty is
23  generally occurring within those age ranges, yes.
24    **Q.  And that is also approximately when puberty**

Page 238

1  blocking hormones are being prescribed.
2       Is that true?
3       A.   It depends upon the individual.
4       Q.   But generally around age 12 is what you
5  indicated earlier.
6       Correct?
7       A.   It really depends upon the individual.  To
8  clarify, it's based upon Tanner stage as one element,
9  age has one element, psychosocial functioning has
10  another, family choices.  It's a calculus of the risks,
11  benefits and alternatives that guide when we decide to
12  intervene if we decide to intervene.
13      Q.   So you would agree that a teenage brain and
14  cognitive development across puberty is a very
15  complicated area and one that's not easily understood.
16      Correct?
17          ATTORNEY BLOCK:  Objection to form.
18          THE WITNESS:  Yes, adolescent brain
19  development is a complicated phenomenon for sure.  I
20  have no objection to that.
21  BY ATTORNEY BARHAM:
22      Q.   Is that an area of your professional research
23  and investigation?
24      A.   Specifically on neuroscience with regard to

Page 239

1  adolescent development, no, it is not.
2          ATTORNEY BARHAM:  Let's go to Tab 8.
3          THE WITNESS:  I need to take another
4  bathroom break.
5          ATTORNEY BARHAM:  Let's just take a break
6  now.  Let's go off the record.
7          VIDEOGRAPHER:  Going off the record.  The
8  current time reads 2:53 p.m.
9  OFF VIDEOTAPE
10          ---
11  (WHEREUPON, A SHORT BREAK WAS TAKEN.)
12          ---
13  ON VIDEOTAPE
14          VIDEOGRAPHER:  Back on the record.  The
15  current time reads 3:00 p.m.
16  BY ATTORNEY BARHAM:
17      Q.   Are you an expert on suicide and suicidality?
18      A.   I guess I don't know exactly how to qualify that
19  response.  I know more than most people about suicide
20  and suicidality, yes.
21      Q.   Have you made any systematic study of suicide
22  among the thousands treated at the NYU Gender and
23  Sexuality Service?
24      A.   I have not.

Page 240

1       Q.   Have you made any systematic studies of suicide
2  among the thousands treated at the Lurie Children's
3  Hospital here in Chicago?
4       A.   I have a study ongoing.
5       Q.   Has that study generated any preliminary results
6  yet?
7       A.   It has not.
8       Q.   Have you made any systemic studies of suicide
9  among the thousands you've treated at the Gender Variant
10  Youth and Family Network?
11      A.   That is not a clinical service.
12      Q.   Are you aware that suicide for any reason is
13  extremely rare among children younger than 15?
14          ATTORNEY BLOCK:  Objection to form.
15          THE WITNESS:  I would disagree with that
16  as a statement.  It's among one of the top causes of
17  death for children of ages 10 to 15.
18  BY ATTORNEY BARHAM:
19      Q.   And what's your basis for saying that?
20      A.   The CDC data.
21      Q.   Did you cite that data in your report?
22      A.   I did not.
23      Q.   You're not offering an opinion that BPJ faced a
24  high suicide risk unless put on puberty blockers.

Page 241

1       Correct?
2       A.   I am not.
3       Q.   Has any responsible health authority or
4  organization made a claim that the use of puberty
5  blockers relate to suicide?
6          ATTORNEY BLOCK:  Objection to form.
7          THE WITNESS:  I mean, that's a big list.
8  I don't think any that I'm aware of have made the claim,
9  especially when it comes to causation.
10  BY ATTORNEY BARHAM:
11      Q.   In paragraph 19 of your report you refer to
12  gender-affirming hormone therapy and you make similar
13  statements in paragraphs 39, 40, 41 and 42.  What do you
14  mean by gender affirming hormone therapy?
15      A.   Typically speaking when I'm referring to
16  gender-affirming hormone therapy, these are hormones
17  that are aligned with the gender identity.
18      Q.   So that means the administration of cross sex
19  hormones.
20      Is that correct?
21          ATTORNEY BLOCK:  Objection to form.
22          THE WITNESS:  Yeah.  I mean, I think I
23  would call them gender-affirming hormones.  That is how
24  typically they are referred to in the literature.

Page 242

BY ATTORNEY BARHAM:

Q.   **So this means that you would administer testosterone to natal females.**

**Correct?**

ATTORNEY BLOCK:  Objection to form.

THE WITNESS:  I personally would not, but ---.

BY ATTORNEY BARHAM:

Q.   **Cross sex hormones or gender-affirming hormones refers to the administration of testosterone to natal females.**

**Correct?**

A.   Or assigned females at birth, yes, that's correct.

Q.   **And it means the administration of testosterone suppression of estrogen for natal males.**

**Correct?**

ATTORNEY BLOCK:  Objection to form.

THE WITNESS:  Assigned male at birth, yes.

BY ATTORNEY BARHAM:

Q.   **You mean assigned males at birth?**

A.   Yes.  Is that what I not said?  Sorry.

Q.   **What is your role in the administration of cross**

Page 243

sex hormones?

A.   It depends on the child and the family, but my role is most often as a mental health professional who is either doing the assessment or providing care for the co-occurring psychiatric disorders that are present in that individual child.

Q.   **Cross sex hormones prevent rather than enable an adolescent from becoming capable of reproducing sexually.**

**Correct?**

ATTORNEY BLOCK:  Objection to the form.

THE WITNESS:  That's not something that I can answer.  That's out of the scope of my expertise.

BY ATTORNEY BARHAM:

Q.   **You lack an understanding of the effects of administering cross sex hormones?**

ATTORNEY BLOCK:  Objection to form.

THE WITNESS:  I would disagree with that statement.

BY ATTORNEY BARHAM:

Q.   **So my question is what is the effect of administering cross sex hormones on an adolescent's ability to develop and become capable of reproducing sexually?**

Page 244

A.   It's a highly complicated question that depends upon a lot of factors that are above the scope of my testimony here.  As an example, there are many adult transgender men who become pregnant despite being on testosterone for many years.

Q.   **And what studies are you referencing that support that statement?**

A.   I'm not referencing any studies to this.  I'm referencing personal experiences.

Q.   **Okay.**

**Cross sex hormones cannot cause an adolescent to develop the genitalia associated with his or her --- his or her desired transgender identity.**

**Correct?**

ATTORNEY BLOCK:  Objection to form.

THE WITNESS:  That's correct.

BY ATTORNEY BARHAM:

Q.   **Cross sex hormones also cannot achieve male height in a natal female.**

**Correct?**

ATTORNEY BLOCK:  Objection to form.

THE WITNESS:  I would defer to my endocrine colleagues on that answer.

BY ATTORNEY BARHAM:

Page 245

Q.   **Can cross sex hormones change the hip and leg configuration in a natal male to match that of a natal female?**

ATTORNEY BLOCK:  Objection to form.

THE WITNESS:  I would defer to my endocrine colleagues on that question.

ATTORNEY BARHAM:  Let's go to Tab 77. This is probably new.

LAW CLERK WILKINSON:  Yes.

ATTORNEY BARHAM:  This is an article by Guss, et al. in 2015, entitled Transgender and Gender Non-Conforming Adolescent Care.  This will be Exhibit 35.

---

(Whereupon, Exhibit-35, Article by Guss, et al., was marked for identification.)

---

BY ATTORNEY BARHAM:

Q.   **Are you familiar with the authors?**

LAW CLERK WILKINSON:  I'm sorry.  I gave you the wrong one.  Here is the right one.

THE WITNESS:  I know Dr. Shumer.  And we read something by Katz-Wise earlier.  I don't know Carly Guss.

62  (Pages 242 to 245)

Page 246

1   BY ATTORNEY BARHAM:
2       Q.   Page four of this document indicates that if a
3   patient is on cross sex hormones it's important to
4   remind them that the side effects may be infertility.
5           Is that correct?
6       A.   Where are you pointing to?
7       Q.   The top of page four.
8       A.   Yes.
9       Q.   Do you agree with that statement?
10      A.   I agree.
11      Q.   Do you know of any long-term studies that will
12  change to what extent infertility caused by taking cross
13  sex hormones can be reversed later in life?
14      A.   There are ongoing studies now, but I'm not aware
15  of any that have published anything.
16      Q.   Have you studied the literature regarding mental
17  health problems in adults resulting from sterility?
18          ATTORNEY BLOCK:  Objection to form.
19          THE WITNESS:  I don't know what you mean
20  by studied.  I don't think probably more than any
21  cursory manner.
22  BY ATTORNEY BARHAM:
23      Q.   The use of cross sex hormones to affirm a
24  transgender identity is an off-label use.

Page 247

1       Correct?
2           ATTORNEY BLOCK:  Objection to
3   terminology.
4           THE WITNESS:  If by off label you mean
5   off label for the FDA?
6   BY ATTORNEY BARHAM:
7       Q.   Yes.
8       A.   Yeah, as far as I know.  Again, I'm not
9   prescribing these medications as a psychiatrist.
10      Q.   Earlier you mentioned that some of your
11  patients, some trans --- some women --- natal females
12  who identify as male have been able to become pregnant.
13  Do you recall that testimony?
14      A.   I did not say anything about my patients, I said
15  those were personal experiences.
16      Q.   Personal experiences.  I'm sorry.  I assumed it
17  was patients, so thank you for that correction.  I would
18  like to show you Tab 81.  This is going to be an article
19  by Moseson, et al. in 2020, entitled Pregnancy
20  Intentions and Outcomes, tab 81 for those at home and
21  Exhibit 36 for the record.
22          --
23          (Whereupon, Exhibit-36, Article by
24          Moseson, et al., was marked for

Page 248

1           identification.)
2           ---
3   BY ATTORNEY BARHAM:
4       Q.   Are you familiar with this study?
5       A.   Certainly not the details of it.  This is the
6   first time I'm recalling looking at it.
7       Q.   Are you aware of any other studies regarding the
8   ability of individuals taking cross sex hormones to
9   become pregnant?
10      A.   There are a number of ongoing studies that are
11  looking into these questions, yes.
12      Q.   If you look at Table 3 on page number 36, this
13  table indicates there were 79 pregnancies among the
14  respondents who have ever used testosterone.
15          Do you see that?
16      A.   Yes.
17      Q.   And there were 342 among those who have never
18  used testosterone.
19          Do you see that?
20      A.   I see that.
21      Q.   But only 15 of these pregnancies occurred after
22  initiating testosterone.  Is that correct?  And I'm
23  referencing page 33 when I say that, at the bottom of
24  page 33.

Page 249

1           ATTORNEY BLOCK:  Where is this on page
2   33?
3           ATTORNEY BARHAM:  The very last line on
4   page 33 extending over onto page 35.
5           THE WITNESS:  I see on Table 2 the number
6   of pregnancies after initiating testosterone was 15.
7   BY ATTORNEY BARHAM:
8       Q.   So the other 337 of the pregnancies tell us
9   nothing about the impact of testosterone on female
10  fertility and the possible impact of birth defects.
11          Correct?
12      A.   Well, the question about fertility certainly
13  doesn't speak to us being able to understand it more
14  based upon the data points.  And without reading the
15  article I don't know if the author said anything about
16  birth defects.
17      Q.   On page 35 it indicates that 2 of the 15 --- or
18  4 of the 15 pregnancies that started while taking
19  testosterone half of them ended in miscarriage.
20          Correct?
21      A.   Yes.
22      Q.   One ended in abortion and one was not reported.
23  Correct?
24      A.   I don't see where that is.

1    Q.   It's the same line.  Two of these four
2  pregnancies ended in miscarriage, parentheses, one ended
3  in abortion in the outcome and testosterone duration for
4  the other four were not reported?
5    A.   Yes.
6    Q.   Okay.
7        And there is no data given on the other outcome
8  of the other 11 pregnancies.  So this article does not
9  document a single live birth to a natal female at any
10 time after taking testosterone.
11    Correct?
12        ATTORNEY BLOCK:  Objection to form.  And
13 give him a chance to read, please.
14        THE WITNESS:  I would really have to read
15 the article quite closely to agree with that.  I'm not
16 seeing the text in this article to support that.  In the
17 Pregnancy Intentions and Outcomes, as I'm reading it, it
18 discusses what the potential outcomes are, but it didn't
19 parse those into who had testosterone before or after,
20 so I'm not sure.
21 BY ATTORNEY BARHAM:
22    Q.   Okay.
23        Let me shift gears and turn to paragraph 37 of
24 your report.  There you indicate --- you state that

1  there is no evidence supporting Dr. Levine's speculation
2  that allowing prepubertal children to sexually
3  transition puts children on a conveyor belt to becoming
4  transgender adolescents and adults.  And you say
5  evidence shows that prepubertal children who are likely
6  to have a stable transgender identity into adolescence
7  are the children who are most likely to articulate a
8  strong and consistent need to socially transition.
9        Do you see that?
10    A.   I see that.
11    Q.   And in footnote 11 you cite an article by
12 Steensma published in 2013.
13        Is that correct?
14    A.   That's correct.
15        ATTORNEY BARHAM:  I will show you what
16 we're going to mark as Exhibit 37, Tab 120, and I will
17 also show you Tab 121, which is Exhibit 38.
18        ---
19        (Whereupon, Exhibit-37, Article by
20        Steensma, was marked for
21        identification.)
22        (Whereupon, Exhibit-38, Analysis, was
23        marked for identification.)
24        ---

1  BY ATTORNEY BARHAM:
2    Q.   Tab 120, Exhibit 37, is the Steensma article
3  that you cited in footnote 11 of your report.
4        Is that correct?
5    A.   That is correct.
6    Q.   Let's look at Table 1 on page 584.  And it gives
7  --- in the first four columns it gives numbers on
8  persistence and desistance among the study subjects.
9  And about halfway down it delineates how many of the
10 persisting boys and girls and desisting boys and girls
11 had a childhood diagnosis of gender identity disorder.
12    Correct?
13    A.   Correct.
14    Q.   And it also breaks down how many were
15 subthreshold.  I'm presuming that means for gender
16 identity disorder.
17    Correct?
18    A.   That is correct.
19    Q.   So according to Table 1, 91.3 of the 23
20 persisting boys had gender identity disorder.
21    Correct?
22    A.   Correct.
23    Q.   So that means about 21 of the 23 persisting boys
24 had that condition.

1    Correct.
2    A.   Correct.
3    Q.   And according to Table 1, 95.8 of the 24
4  persisting girls had the same diagnosis or 23 of the 24.
5    Correct?
6    A.   That's correct.
7    Q.   And according to the same Table, 39.3 of the 56
8  desisting boys had that diagnosis.
9    Correct?
10    A.   That is correct.
11    Q.   So that's 22 of the 56.
12    Correct?
13    A.   I'll take your word for the math.
14    Q.   Well, you can see it on Exhibit-121 (sic).  On
15 Table 1, 58.3 of the 24 desisting girls had gender
16 identity disorder or 14 of the 24.
17    Correct?
18    A.   Correct.
19    Q.   Do you see any reason to dispute the figures set
20 forth on Exhibit --- on Tab 121, Exhibit 39 ---
21 Exhibit 38?
22    A.   No, I have no reason to ---.
23        ATTORNEY SWAMINATHAN:  I think he is
24 looking at the wrong document.

Page 254

1  BY ATTORNEY BARHAM:
2     Q.   I'm talking about this.
3     A.   Got it.  So this is a transposition from
4  Table 1?
5     Q.   Correct.
6     A.   I mean, I'm going to  have ---.
7           ATTORNEY BLOCK:  Just objection.  I'm
8  sorry, can we put on the record what this document is?
9  Is it a reprint of what's in the Steensma or is it new
10  analysis that ---?
11          ATTORNEY BARHAM:  Exhibit 38 is an
12  analysis of the Steensma 2013 article that is
13  Exhibit 37.
14          ATTORNEY BLOCK:  Thank you.  And is
15  there an author of the analysis?
16          ATTORNEY BARHAM:  I'm sorry.  Say that
17  again.
18          ATTORNEY BLOCK:  Is there an author of
19  this analysis?
20          ATTORNEY BARHAM:  Yes, it was me.
21  BY ATTORNEY BARHAM:
22     Q.   So according to the figures that have been
23  calculated from table one of the Steensma article, 80
24  children --- of the 80 children who had gender identity

Page 255

1  disorder, 44 persisted and 36 desisted.
2     Is that correct?
3           ATTORNEY BLOCK:  Objection to give the
4  witness a chance to see it on his own what the figures
5  are.
6           THE WITNESS:  I'm not sure I understand
7  what your question is.
8  BY ATTORNEY BARHAM:
9     Q.   Of the children with the --- the 80 children who
10  had a diagnosis of gender identity disorder, 44
11  persisted and 36 desisted.
12     Is that correct?
13     A.   I would have to do the math myself for me to say
14  yes to that, but it's about right.
15     Q.   So according to Steensma figures, of the
16  children with the strongest transgender identity as
17  children 55 percent persisted and 45 percent desisted.
18     Correct?
19          ATTORNEY BLOCK:  Objection to form.
20          THE WITNESS:  Again, I would have to run
21  those numbers myself in order to --- unless it's
22  referred to already in the article, but that sounds
23  about right.
24  BY ATTORNEY BARHAM:

Page 256

1     Q.   In footnote 12 of your report, paragraph 37, you
2  cite an article by Rae saying for the proposition that
3  socially transitioning before puberty did not increase
4  children's cross gender identification and deferring
5  transgender did not decrease cross gender
6  identification.
7     Is that correct?
8     A.   That is correct.
9           ATTORNEY BARHAM:  All right.
10          Let's turn to Tab 108.  This will be
11  Exhibit 39, and it will be an article by Rae, et al.
12  published in 2019, Predicting Early Childhood Gender
13  Transitions.
14          ATTORNEY BLOCK:  It's 2:22 central time.
15  So the witness has to take a break at 2:30?
16          THE WITNESS:  I can do 2:45.
17          ---
18          (Whereupon, Exhibit 39, Article by Rae,
19          et al., marked for identification.)
20          ---
21  BY ATTORNEY BARHAM:
22     Q.   Exhibit 39 is the article that you cited in
23  footnote 12 of your report.
24     Is that correct?

Page 257

1     A.   That's correct.
2     Q.   On page 679 the author indicates that
3  replication of this affect is muted preferably from
4  longitudinal study comparing a single group of children
5  before and after transition.
6     Correct?
7     A.   That's correct.
8     Q.   And the authors also indicate that they tested a
9  sample skewed by race, class, parental that education
10  and political affiliation that may or may not affect the
11  children that are socially transitioning now or in the
12  future.
13     Correct?
14     A.   That is correct.
15     Q.   And they also indicate that follow-up occurred
16  only two years after testing and some of the children
17  who had not transitioned could transition in the future
18  and some who had transitioned could not revert in the
19  future.
20     Correct?
21     A.   Correct.
22     Q.   And they indicated that there sample is likely
23  an over estimate of how many gender conforming children
24  in the general population will socially transition.

Page 258

1    Correct?
2    A.  Where is that in the article?
3    Q.  Second column of page 679.
4    A.  Yes.
5    Q.  Same column they also indicate that they relied
6    on a convenient sample of individuals recruited through
7    lists and events serving transgender children and gender
8    non-conforming children.
9    Correct?
10   A.  That is correct.
11   Q.  Let's go back to Tab 5, which is Exhibit 2.
12   Page 3879, the Endocrine Society indicates that if
13   children have completely socially transitioned they have
14   my greater difficulty returning to the original gender
15   on entering puberty.
16   Is that correct?
17   A.  That's correct.  It says it there, but that's
18   based on supposition.
19   Q.  Footnote 40 --- reference number 40 supposition
20   --- reference number 40 is an article by Steensma, et
21   al., published in 2011.
22   Are you saying that that's a supposition?
23   ATTORNEY BLOCK:  Objection to form.
24   THE WITNESS:  No, I'm saying that the

Page 259

1    part of that article that refers to the theoretical risk
2    is based not on any data that was collected by the
3    researchers in that study.
4    BY ATTORNEY BARHAM:
5    Q.  The Endocrine Society also indicates that the
6    social transition has been found to contribute to the
7    likelihood of persistence.
8    Is that correct?
9    A.  That is a misstating of Dr. Steensma.
10   Q.  That is what the Endocrine Society has
11   concluded.
12   Correct?
13   ATTORNEY BLOCK:  Objection to form.
14   THE WITNESS:  That is what they have
15   written here in the article you presented, yes.
16   ATTORNEY BARHAM:  Let's go to Tab 97
17   number ---.
18   LAW CLERK WILKINSON:  Exhibit 16.
19   BY ATTORNEY BARHAM:
20   Q.  Exhibit Number 16, and we are going to be
21   looking at the sixth page of this document.  And Dr.
22   D'Angelo, et al. article indicates that since almost all
23   the children treated with puberty blockers proceeded to
24   cross sex hormones concerns have been raised that

Page 260

1    puberty blockers may consolidate gender dysphoria in
2    young people putting them on a lifelong path of
3    biomedical invention.
4    Is that correct?
5    ATTORNEY BLOCK:  Object is to form.
6    THE WITNESS:  Can you show me where that
7    is on this page?
8    BY ATTORNEY BARHAM:
9    Q.  The first column on the second paragraph.  The
10   second column.
11   ATTORNEY TRYON:  Jake, can you scroll
12   down a bit?
13   THE WITNESS:  I would not agree with how
14   you asked that question, I guess.  Can you repeat it or
15   clarify?
16   BY ATTORNEY BARHAM:
17   Q.  I just was reading what it said.  They indicate
18   in this section additionally since almost all of the
19   children treated with puberty blockers proceed to cross
20   sex hormones citing de Vries 2014, concerns have been
21   raised at puberty blockers may consolidate gender
22   dysphoria in young people, putting them on a lifelong
23   path of biomedical interventions?
24   A.  It's bit of a logical leap and also just

Page 261

1    incorrect.  The de Vries study specifically was looking
2    at the children in the Amsterdam clinic, which is not
3    broadly applicable to other gender clinics across the
4    rest of the world.
5    Q.  But you relied upon de Vries 2014 article in
6    your report as well, didn't you?
7    A.  I agree.  Yeah.
8    Q.  So there are professionals who have raised these
9    concerns and hold the concerns that social transitioning
10   cannot change the outcome for a child.
11   Is that correct?
12   ATTORNEY BLOCK:  Objection to form.
13   THE WITNESS:  I think there's two
14   different questions.  The first question is, do I agree
15   with this statement that almost all children treated
16   with puberty blockers proceed to cross sex hormones?
17   That is not data that we have nor does this article
18   point to data other than the Dutch clinic that has a
19   very specific protocol.
20   The question about whether social
21   transition changes a child's trajectory is a different
22   question.  It is a question that the Dutch have raised
23   as a possibility, but has not, I have not seen any
24   literature that provides evidence for that.

66 (Pages 258 to 261)

Page 262

1    BY ATTORNEY BARHAM:
2        Q.    But you will recognize that there are some
3    researchers in the field who have raised these concerns
4    and do hold these concerns.
5            Correct?
6        A.    There are researchers in the field who ask these
7    questions, yes.
8            ATTORNEY BARHAM:  Let's go to Tab 38.
9            ATTORNEY TRYON:  How late are we going in
10   this session; until 2:30 or 2:45?
11           ATTORNEY BARHAM:  The witness has
12   indicated he can go to 2:45.
13           ATTORNEY TRYON:  Okay.
14           ATTORNEY BARHAM:  Exhibit 40 is an
15   article by Carmichael, et al. 2021, Short-term Outcomes
16   of Pubertal Suppression in a Selected Cohort of 12 to 15
17   year old Young People.  If you'll turn to page 12.
18           ---
19           (Whereupon, Exhibit 40, Article by
20           Carmichael, et al., was marked for
21           identification.)
22           ---
23   BY ATTORNEY BARHAM:
24       Q.    Are you familiar with this paper?

Page 263

1        A.    I have not read through this paper, yet.
2        Q.    The lead authors are associated with the
3    Tavistock?
4        A.    That is correct.
5        Q.    And that's part of the National Health Services
6    of the UK.
7            Is that correct?
8        A.    Is that correct?
9        Q.    And it's the leading and most respected clinic
10   in the UK.
11           Correct?
12       A.    That I can't answer.
13       Q.    If you'll look at page 12, the authors indicate
14   that one young person decided to stop GnRHa and did not
15   start cross sex hormones due to continued uncertainty
16   and concerns about the side effects of cross sex
17   hormones, the remaining 43 or 98 percent elected to
18   start cross sex hormones.
19           Is that correct?
20       A.    Correct.
21       Q.    So the vast majority of these children who
22   received puberty blockers went onto take cross sex
23   hormones.
24           Correct?

Page 264

1        A.    That is correct.
2        Q.    Would you agree that the majority of children
3    who receive puberty blockers go on and take cross sex
4    hormones?
5            ATTORNEY BLOCK:  Objection to form.
6            THE WITNESS:   That is not a question
7    that we have an answer to based upon the literature.  A
8    majority of patients with gender dysphoria that are
9    prescribe puberty blockers are not involved in clinical
10   care at either the Tavistock clinic or the Amsterdam
11   clinic.
12   BY ATTORNEY BARHAM:
13       Q.    Is it --- in your practice, do the majority of
14   children who receive puberty blockers for gender
15   dysphoria go on to take cross sex hormones?
16       A.    Based upon the demographic of the patients that
17   I'm seeing, particularly in Chicago, yes, but I'm not
18   seeing the younger kids as much as I did in New York.
19       Q.    So as a practical and ethical matter the
20   decision to put a child on puberty blockers must be
21   considered as equivalent of a decision to put the
22   children on cross sex hormones with all of the
23   considerations and full consent obligations listed in
24   that decision.

Page 265

1            Correct?
2            ATTORNEY BLOCK:  Objection to form.
3            THE WITNESS:  No.
4    BY ATTORNEY BARHAM:
5        Q.    Why do you say --- why do you disagree?
6        A.    Inherent in the informed consent process is a
7    specific discussion of the risk benefits and
8    alternatives of a specific intervention.  Hormones are
9    not puberty blockers, it's a separate discussion.
10       Q.    Even though the vast majority according to the
11   research and according to your testimony go onto take
12   cross sex hormones?
13           ATTORNEY BLOCK:  Objection to form and
14   mischaracterizes testimony.
15           THE WITNESS:  A description of the
16   potential trajectories of development is a part of the
17   discussion in an informed consent process for the
18   engagement with puberty suppression agents.  It's not
19   the same as informed consent process discussion around
20   the use of hormones at that time.
21   BY ATTORNEY BARHAM:
22       Q.    So when you're having an informed consent
23   discussion surrounding the decision to start puberty
24   blockers, do you discuss with parents and patients the

Page 266

1    dangers associated with cross sex hormones?
2        A.   This is going to be very individualized
3    discussions that we have with families.  It's a very
4    momentous decision to make this kind of treatment
5    choice.  The potential trajectories are all discussed
6    and there's risk to everything.  I don't think it is
7    useful to use the term dangers in the context of medical
8    care but it's about weighing risks of interventions but
9    also weighing the risks of non-intervening.  And it's
10   appropriate to have those discussions about what those
11   potential outcomes may be with each individual kid.
12       Q.   How do you get informed consent from a child?
13       A.   You get assent from a child, but you get
14   informed consent from a parent.
15       Q.   How do you get --- how can a child even begin to
16   understand the implications of starting puberty blockers
17   and then potentially going to cross sex hormones, the
18   effects that that may have on the fertility when the
19   child is 12-ish?
20           ATTORNEY BLOCK:  Objection to form.
21           THE WITNESS:  Well, I have a skewed
22   perspective here because of the work that I do, but
23   there are 12-year-olds who are often much more capable
24   of having that kind of informed decision than many

Page 267

1    adults that I have encountered, which is to say it's an
2    individualized assessment based upon multiple things,
3    including the cognitive status of the child, their
4    capacity to engage back and forth and have an open
5    discussion and a realistic discussion about the
6    potential benefits, risks and alternatives in specific
7    intervention.
8    BY ATTORNEY BARHAM:
9        Q.   Is it your position that most 12-year-olds have
10   a better understanding or a better capability of making
11   decisions about their long-term fertility than adults?
12       A.   It is not my position and I will reflect that
13   that was a statement meant in jest, but it does reflect
14   some sense of reality in terms of the maturity level of
15   12-year-olds, not speaking to the maturity level of most
16   20-somethings in the world.
17           ATTORNEY BARHAM:  I think this would be a
18   good time to pause for your appointment and give you a
19   few moments before that starts, so we'll go off the
20   record.
21           VIDEOGRAPHER:  Going off the record.  The
22   current time reads 3:37 p.m.
23   OFF VIDEOTAPE
24           ---

Page 268

1    (WHEREUPON, A SHORT BREAK WAS TAKEN.)
2            ---
3    ON VIDEOTAPE
4            VIDEOGRAPHER:  Back on the record the
5    current time reads 4:31 p.m.
6            ATTORNEY BARHAM:  All right.  Let's go to
7    Tab 16, which will be Exhibit Number 41.
8            ---
9            (Whereupon Exhibit 41, Washington Post
10            Article, was marked for identification.)
11           ---
12   BY ATTORNEY BARHAM:
13       Q.   This is will be a Washington Post article from
14   January 10, 2022.  Are you aware of the 2021/2022 season
15   swimming events surrounding the University of
16   Pennsylvania's swimmer Lia Thomas?
17           ATTORNEY BLOCK:  Objection to scope.
18           THE WITNESS:  I have not been following
19   closely, but I've heard about it.
20   BY ATTORNEY BARHAM:
21       Q.   Okay.
22           On page three of Exhibit 41, the article
23   references that Lia Thomas in her first year in the
24   Women's Division after more than a year of testosterone

Page 269

1    suppression set the Women's Division record in two
2    events.
3            Do you see that?
4        A.   I see that, yes.
5        Q.   And Lia Thomas beat the best time of women's
6    Olympian Torri Huske in the 200 freestyle.
7            Do you see that?
8        A.   I see that.
9            ATTORNEY BLOCK:  I just want to note an
10   objection to foundation, that there's no URL.  This
11   appears to be cut and pasted.  So I'm just noting that
12   for the record.
13           ATTORNEY BARHAM:  And I would note For
14   the record that there is an URL at the bottom of page
15   --- at the bottom of each page.
16           ATTORNEY BLOCK:  Thanks.  It's not
17   visible from what's on the screen.
18           ATTORNEY BARHAM:  Okay.
19           Just trying to be clear.
20   BY ATTORNEY BARHAM:
21       Q.   Is it your position that it is fair for Lia
22   Thomas to compete in the Women's Division of swimming?
23           ATTORNEY BLOCK:  Objection to scope.
24           THE WITNESS:  I don't have an opinion on

68  (Pages 266 to 269)

Plaintiffs' 0973

Page 270

1  the fairness.
2  BY ATTORNEY BARHAM:
3      **Q.   Do you believe that it's beneficial to Lia**
4  **Thomas' mental health to compete in the Women's**
5  **Division?**
6      A.   I couldn't tell you that unless I had evaluated
7  Lia Thomas herself.
8      **Q.   But it's your opinion as expressed in**
9  **paragraph 52 of your report that no reasonable mental**
10 **health professional could conclude that the Act is**
11 **anything but harmful to the mental health of transgender**
12 **youth.**
13     **Is that correct?**
14     A.   I would say youth as a class, yes, that is
15 correct, but the specific details of that impact are not
16 going to be known and I wouldn't care to surmise on it
17 for a specific individual that is not under my care.
18     **Q.   Okay.**
19     **But it's your position that allowing a**
20 **transgender --- or allowing natal males to compete in**
21 **the Women's Division if they are gender dysphoric is**
22 **beneficial to their mental health, in general.**
23     **Correct?**
24     ATTORNEY BLOCK:  Objection to terminology

Page 271

1  and form.
2      THE WITNESS: In my report, excluding
3  transgender youth can be harmful to their mental health.
4  BY ATTORNEY BARHAM:
5      **Q.   And when you say excluding them you mean**
6  **excluding them from competition consistent with their**
7  **gender identity.**
8      **Is that correct?**
9      A.   That is correct.
10     ATTORNEY BARHAM:  All right.
11     I want to show you Tab 17 now.  This will
12 be Exhibit-42.
13                  ---
14     (Whereupon, Exhibit 42, Out Sports
15     Article, was marked for identification.)
16                  ---
17 BY ATTORNEY BARHAM:
18     **Q.   Have you read about Iszac Henig before today?**
19     A.   I have not.
20     **Q.   This is an article from Out Sports published on**
21 **January 9th, 2022, by Karleigh Webb entitled Trans**
22 **swimmers Lia Thomas and Iszac Henig went head-to-head in**
23 **the pool, each getting wins.  Are you aware that Iszac**
24 **Henig is a biological female who identifies as male?**

Page 272

1      A.   I have not heard of Iszac Henig until today at
2  least by name.
3      **Q.   Do you see on the first page of this article the**
4  **article reads Henig, a trans man competing on the**
5  **women's swimming team at Yale?**
6      A.   I see that, yes.
7      **Q.   So in this event a biological male identifies as**
8  **female, Lia Thomas, competed against a biological female**
9  **who identifies as male, Iszac Henig, in the women's**
10 **competition?**
11     ATTORNEY BLOCK:  Objection can you give
12 him a chance to read the article.  He's never seen or
13 heard of this before?
14     THE WITNESS:  It seems that is what
15 stipulated in the article.
16 BY ATTORNEY BARHAM:
17     **Q.   Okay.**
18     **According to the terminology you prefer, do you**
19 **consider Henig to be anything other than a man?**
20     ATTORNEY BLOCK:  Objection to form.
21     THE WITNESS:  I will typically ask the
22 individuals that I'm working with or engaging with how
23 they choose to define their own sense of labels.  Not
24 knowing Iszac I can't speak for him.

Page 273

1  BY ATTORNEY BARHAM:
2      **Q.   Okay.**
3      **But according to the terminology that you've**
4  **been using Iszac would be an individual assigned female**
5  **sex at birth and identifying as male.**
6      **Correct?**
7      A.   Again, I don't see ---
8      **Q.   Henig a trans man?**
9      A.   --- a description of his words to describe his
10 identity, so I can't say how he identifies himself, but
11 it appears through that that's how --- that is the
12 implication of the article at least.
13     **Q.   In the article it uses masculine pronouns to**
14 **refer to Henig.**
15     **Correct?**
16     A.   Yes.
17     **Q.   Do you think it'd beneficial to Henig's mental**
18 **health to compete on the women's team?**
19     A.   Again, I can't answer that unless I had
20 evaluated Henig myself.
21     **Q.   In general, if you have a transgender individual**
22 **who wants to compete on the team consistent his or her**
23 **biological sex, do you think it's beneficial to his or**
24 **her mental health to be allowed to do so?**

Page 274

```
1              ATTORNEY BLOCK:  Objection to form.
2              THE WITNESS:   Again, this is an
3    individualized discussion that you have with patients.
4    With the patients that I've had I have had patients who
5    would be harmed by having to compete with the cohort of
6    kids who were aligned with their sex assigned at birth.
7    BY ATTORNEY BARHAM:
8         Q.   I understand your position about kids who are
9    forced to do something, what about kids who want to
10   compete with that same cohort, do you think it's
11   beneficial to allow them to compete as they see fit?
12        A.   As a mental health professional working with
13   kids and families, it really is an individualized
14   discussion.  There is not going to be a specific answer
15   that's universal for all kids.
16        Q.   Do you believe that if Henig were prevented from
17   competing with the women's team as desired, that it
18   could be harmful to Henig's mental health ---
19             ATTORNEY BLOCK:  Objection to form.
20   BY ATTORNEY BARHAM:
21        Q.   --- possibly?
22        A.   I can't speak to the specifics about a person
23   that I've never evaluated.
24        Q.   If it is harmful to someone's mental health to
```

Page 275

```
1    be prevented from participating in athletics on a team
2    consistent with their gender identity, could it be
3    harmful to their mental health to be prevented from
4    competing on a team consistent with their biological sex
5    if they so wanted to?
6              ATTORNEY BLOCK:  Objection to form.
7              THE WITNESS:  I think there's a whole
8    host of hypotheticals that could potentially be
9    possible.
10   BY ATTORNEY BARHAM:
11        Q.   And that is one of them?
12             ATTORNEY BLOCK:  Objection to form.
13             THE WITNESS:  That's possible.
14             ATTORNEY BARHAM:  Okay.
15   BY ATTORNEY BARHAM:
16        Q.   In paragraph 34 of your report you write a
17   recent study found people who reported experiencing
18   those conversion efforts were more likely to report an
19   attempted suicide, especially those who reported
20   receiving such therapy in childhood.
21        Do you see that?
22        A.   I see that.
23        Q.   And there we are talking about conversion
24   therapy.
```

Page 276

```
1        Is that correct?
2        A.   We're talking specifically about the study
3    participants on perceptive perceptions of conversion
4    therapy.
5        Q.   But that's what's meant by those conversion
6    efforts.
7        Correct?
8        A.   Correct.
9        Q.   In footnote six you cite an article by Turban
10   published in 2020.
11        Is that correct?
12        A.   That is correct.
13             ATTORNEY BARHAM:  All right.
14             I'm going to show you Tab 113, which will
15   be Exhibit 43.
16                       ---
17             (Whereupon, Exhibit 43, Article by
18              Turban, et al., was marked for
19              identification.)
20                       ---
21   BY ATTORNEY BARHAM:
22        Q.   This is an article published by Turban, et al.
23   published in 2020, it's entitled Association Between
24   Recalled Exposure to Gender Identity Conversion Efforts
```

Page 277

```
1    and Psychological Distress and Suicide Attempts Among
2    Transgender Adults.  This is the article that you cited
3    in your report.
4        Is that correct?
5        A.   That is correct.
6        Q.   And this is the article cited in footnote six as
7    support for the proposition that studies that found that
8    people who reported conversion efforts are more likely
9    to have reported suicide.
10        Correct?
11        A.   That's correct.
12        Q.   On page two of this article the authors --- and
13   by this article I'm referring to Exhibit 43.  The
14   authors note that they rely upon data from the National
15   Center for Transgender Quality and its 2015 transgender
16   survey.
17        Correct?
18        A.   That is correct.
19        Q.   On page eight of this document, the authors
20   admit that it is cross sectional study designed
21   precludes determination of causation.
22        Correct?
23        A.   I don't have page numbers.  Which one is that?
24        Q.   It's the one with strengths and limitations at
```

Guin/Lea 0975

Page 278

1    the heading at the bottom.
2        A.   Can you repeat the question?
3        Q.   On page eight, the authors admit that the
4    studies cross-sectional study design precludes
5    determination of causation.
6        Correct?
7        A.   That is correct.
8        Q.   The authors also admit that those with worse
9    mental health or internalized transphobia may have been
10   more likely to seek out conversion therapy rather than
11   non GICE therapy suggesting conversion efforts itself
12   were not causative of these poor mental health outcomes.
13       Correct?
14       A.   That is what is written, correct.
15       Q.   Okay.
16       So this study does not establish a causal link
17   between conversion therapy and suicidality.
18       Correct?
19       A.   That is correct.
20       Q.   The authors also admit that they lack data
21   regarding the degree to which GICE occurred.
22       Correct?
23       A.   That is correct.
24       Q.   And they also admit that they lacked information

Page 279

1    as to what specific modalities were used.
2        Correct?
3        A.   That is correct.
4        Q.   Turban et al., in 2020 also admits that
5    participants were not recruited via random sampling and
6    thus the sample may not be nationally representative.
7        Is that correct?
8        A.   That is correct.
9        Q.   In paragraph 37 you go on to say that
10   conclusions further supported by extensive evidence that
11   rejection of a young person's gender identity by family
12   and peers is the strongest predictor for adverse mental
13   health outcomes.
14       Is that correct?
15       A.   That is correct.
16       Q.   And you cite in that article --- you cite in
17   footnote seven an article by Ryan, et al. published in
18   2010.
19       Is that correct?
20       A.   I'm not seeing that.
21       Q.   In footnote seven?
22       A.   Oh, in footnote seven, yes.
23           ATTORNEY BARHAM:  I'm going to show you
24   what we will mark as Exhibit-44, which is Tab 114, an

Page 280

1    article by Ryan, et al. published in 2010 entitled
2    Family Acceptance in Adolescence and the Health of LGBT
3    Young Adults.
4            ---
5            (Whereupon, Exhibit-44, Article by Ryan,
6            et al., was marked for identification.)
7            ---
8    BY ATTORNEY BARHAM:
9        Q.   This is the article that you cited in footnote
10   seven of your report.
11       Correct?
12       A.   That is correct.
13       Q.   On page 206, in the second column, the authors
14   note that they relied on a sample of 245 people.
15       Is that correct?
16       A.   That is correct.
17       Q.   Of that sample, only nine percent identified as
18   transgender.
19       Correct?  That's on page 208.
20       A.   Correct.
21       Q.   That means we're talking about nine people.
22       Correct?  245 times nine percent is 22.05.
23       A.   I'll take your math.
24       Q.   On page 210 the authors admit that they cannot

Page 281

1    claim that this sample is representative of the general
2    population of LGBT individuals.
3        Is that correct?
4        A.   That is correct.
5        Q.   On page 210 to 211 the authors recognize that
6    this is a retrospective study, which, quote, allows for
7    the potential of recall bias in describing specific
8    family reactions to their LGBT identity.
9        Correct?
10       A.   That is correct.
11       Q.   And then in footnote seven of your report you
12   also cite an article by Klein and Golub published in
13   2016.
14       Correct?
15       A.   That is correct.
16       Q.   All right.
17           ATTORNEY BARHAM:  I'm going to show you
18   what we will mark as Exhibit 45, which is Tab 15.
19           ---
20           (Whereupon, Exhibit-45, Article by Klein
21           and Golub, was marked for
22           identification.)
23           ---
24   BY ATTORNEY BARHAM:

71 (Pages 278 to 281)

1      Q.   This is an article by Klein and Golub entitled
2   Family Rejection as a Predictor of Suicide Attempts.
3   This article simply says that family rejection is a
4   predictor of suicide attempts and substance abuse among
5   transgender and gender non-conforming adults.
6      Correct?
7          ATTORNEY BLOCK:  Objection.  Can you
8   point to where you are reading from?
9          ATTORNEY BARHAM:  The title.
10          THE WITNESS:  They identify as a
11   predictor, yes.
12   BY ATTORNEY BARHAM:
13      Q.   In fact, the word strongest does not even appear
14   in this article.
15      Is that correct?
16          ATTORNEY BLOCK:  Objection.
17          THE WITNESS:  I would have to read the
18   whole article.
19          ATTORNEY BLOCK:  Let him read it.
20          THE WITNESS:  The authors note on
21   page 195 on a multi-variant model moderate levels of
22   family rejection were associated with almost twice the
23   odds of attempted suicide and high levels of family
24   rejection were associated with almost three and a half

1   times the odds of attempted suicide.  While there is not
2   any use of the word stronger, I don't see any additional
3   risks that were highlighted in this specific study.
4   BY ATTORNEY BARHAM:
5      Q.   Okay.
6      On page 197 stemming over on to 198 the authors
7   admit that they relied on data NTDS that use sampling
8   techniques that were not random and included a
9   homogenous study population that was largely white,
10   educated and employed.
11      Correct?
12      A.   That is correct.
13      Q.   Do you agree with them that this limits the
14   generalizability of the article's findings?
15      A.   I do.
16      Q.   The authors also admit that the cross sectional
17   nature of the data did not allow us to determine any
18   causal relationship between family rejection and the
19   negative health-related outcomes.
20      Correct?
21      A.   Correct.
22      Q.   The authors also indicate that they did not have
23   any information about the timeframe within which family
24   rejection occurred, including what precipitated the

1   event, the severity of the rejection or whether this
2   changed over time.
3      Correct?
4      A.   Correct.
5      Q.   Do you agree with them that these factors might
6   have influenced their results?
7      A.   Sure.
8      Q.   All right.
9      Let's go to Tab 97, which is Exhibit 16.  This
10   article we discussed before, but this reviews the Turban
11   article that you cited in footnote seven of your report.
12      Is that correct?
13      A.   That is correct.
14      Q.   Or footnote six of your report.  Okay.
15      And in your report you are using the Turban
16   2020 article to critique the use of what you describe as
17   conversion therapy.
18      Is that correct?
19          ATTORNEY BLOCK:  Objection to form.
20          THE WITNESS:  I'm just pulling this up
21   where I have it.  As I stated in my report, the Turban
22   article found that people who reported experiencing
23   those conversion efforts were more likely to have
24   reported attempting suicide.

1   BY ATTORNEY BARHAM:
2      Q.   So you're using it to critique what you
3   described as conversion therapy.
4      Is that fair?
5      A.   I think that's fair.
6      Q.   On page two of Dr. D'Angelo's letter to the
7   editor he notes at the top of the first --- towards the
8   top of the first column that Turban's analysis used data
9   from the 2015 USTS survey of transgender identifying
10   individuals, this survey is convenient sampling
11   methodology which generates lower quality data.
12      Would you agree that convenient sampling
13   generates low quality data?
14      A.   Convenient sampling generates lower quality
15   data.  And then some other statistical method of study
16   design.  One of the ways that you want to counteract
17   that potential for low quality of data is to have
18   increased number of participants.  The difference of
19   27,000 participants in this particular survey analysis
20   versus say 100 in another, 40 in another does add a
21   little bit more context to the applicability of these
22   findings.
23      Q.   Right below that Dr. D'Angelo, et al. notes that
24   the participants were recruited through transgender

Printed: 28076 0977

Page 286

1   advocacy organizations and subjects were asked to pledge
2   to promote survey among friends and family.  This
3   recruiting method yielded a large but highly skewed
4   sample.  Would you agree that the sample for this survey
5   was highly skewed?
6          ATTORNEY BLOCK:  Objection to form.
7          THE WITNESS:  I think we'd have to
8   understand what specifically you mean by skewed and
9   skewed in what way.  It's hard to know.
10  BY ATTORNEY BARHAM:
11      Q.   The authors go on in Table 1 to demonstrate what
12  they mean by skewing of the data.  Upon reviewing their
13  information, would you agree that the sample was skewed?
14         ATTORNEY BLOCK:  Objection to form.
15         THE WITNESS:  Again, I'm not sure skewed
16  in comparative --- comparison to what?
17  BY ATTORNEY BARHAM:
18      Q.   The authors continue on page two by saying that
19  a number of additional data irregularities in the USTS
20  raise further questions about the quality of the data
21  captured by the survey.  They talk about how high number
22  of survey participants had not transitioned medically or
23  socially, significant number reported no intention to
24  transition in the future.  The information about

Page 287

1   treatments does not appear to be accurate as a number of
2   respondents reported the initiation of puberty blockers
3   after the age 18, which is highly improbable.  Further,
4   the survey has developed special waiting due to
5   unexpected high proportion of respondents who reported
6   that they were exactly 18 years old.  Do you agree that
7   these irregularities raise serious questions about the
8   reliability of the data?
9       A.   I think these are all elements that you want to
10  take into context as you're establishing validity of the
11  data and the conclusions that could be drawn.
12      Q.   The second column of page two, the authors note
13  that the emphasis on the survey's goals to highlight the
14  injustices suffered by transgender people during the
15  recruitment stage in the introduction of the survey
16  instrument itself made it eligible for reporting adverse
17  experiences due to demand bias.
18         Do you agree that this demand bias likely
19  skewed the responses?
20      A.   I wouldn't agree that it likely, but that
21  implies that we have data that we don't have.  It's a
22  possibility that these authors are raising.
23      Q.   Now, the authors also note that the experience
24  of detransitioners and the sisters were not included, as

Page 288

1   they were disqualified from completing the survey.  They
2   note that this failure is a serious oversight.
3          Do you agree with them that that's a serious
4   oversight?
5          ATTORNEY BLOCK:  Objection to form.
6          THE WITNESS:  I would need to look at the
7   specific survey instructions for the survey in question
8   to understand the validity of that.  I don't see how in
9   the context of this that folks who detransitioned were
10  specifically excluded, but ---.
11  BY ATTORNEY BARHAM:
12      Q.   Did you review ---?
13      A.   Can you point to where that --- where in the
14  original article or the study that those folks are
15  excluded specifically.  I may have missed it.
16      Q.   I don't have the original survey on hand at the
17  moment.  If it proved that they were excluded, would you
18  agree that that would be a serious oversight?
19         ATTORNEY BLOCK:  Objection to form.
20         THE WITNESS:   It would really depend on
21  how that was done and what the language was used.
22  Without seeing it I can't make a comment otherwise.
23  BY ATTORNEY BARHAM:
24      Q.   What if there was no language involved, it was

Page 289

1   just those who indicated that they were either desisting
2   or detransitioning or not included in the data set?
3       A.   I would need to see the context of it in order
4   to make a judgment on the validity of that structure.
5       Q.   On page four of this document.  The authors note
6   that Turban's hypothesis is further weakened by a
7   significant flaw in their data analysis failure to
8   control for individuals pre-GICE exposure mental health
9   exposure status, noting that this is a potential
10  compound and may mask reverse causation.
11         Do you have any scientific basis for disputing
12  that concern?
13      A.   Let me review this part of the paper, please.
14         ATTORNEY BLOCK:  Just objection.  I don't
15  think he read the full the sentence.
16         THE WITNESS:  I have not seen any
17  literature on specific risks or predictors for
18  individuals who would be exposed to gender identity
19  conversion efforts, and so the supposition inherent in
20  this paragraph that the authors are making that an
21  individual's underlying poor mental health led to their
22  experience of gender identity conversion efforts is not
23  supported by my understanding of the literature.
24  BY ATTORNEY BARHAM:

Hintz 28077 0978

Page 290

1    Q.   Do you have any reason to dispute a potential
2    for a confound or the potential for masking reversed
3    causation that the authors identify here?
4         A.   As I described, I haven't seen any literature
5    that speaks to this nor has that been my clinical
6    experience.
7         Q.   On page two of this document the authors note
8    that Turban's conclusions rest on the assumption that
9    they have a valid way of determining whether or not the
10   respondent was exposed to the unethical practice of
11   conversion therapy.  Do you agree that this lack of
12   context in detail renders the question incapable of
13   differentiating between ethical non-affirming ---
14   non-affirmative neutral and counters unethical
15   conversion therapy?
16        A.   I do not.
17             ATTORNEY BLOCK:  Sorry, objection to
18   form.
19   BY ATTORNEY BARHAM:
20        Q.   Back on page four the authors note that the
21   failure to control for the subjects' baseline mental
22   health makes it impossible to determine whether the
23   mental health or suicidality of a subject person stayed
24   the same or potentially even improved after the

Page 291

1    non-affirming encounter.  Do you have any scientific
2    basis for disputing this observation?
3             ATTORNEY BLOCK:  Objection to form.
4             THE WITNESS:  Again, if we wanted to go
5    back to the Turban study itself and look more
6    specifically at their methodology and their description
7    that would be a more accurate way of getting a potential
8    ups and downs side of this study other than this letter
9    to the editor.
10   BY ATTORNEY BARHAM:
11        Q.   But do you have any basis for -- any scientific
12   basis for disputing that observation?
13             ATTORNEY BLOCK:  Objection to form.
14             THE WITNESS:  This question gets to a
15   very specific type of study designed methodology.  That
16   is something that typically is done by a data scientist,
17   which is not where my level of expertise is.  There are
18   nuances in it.  What I would say is in a population as
19   large of a survey that having a denominator as high as
20   they had helps to reduce the chances of confounders like
21   the authors in this letter to the editor are describing
22   as problematic.
23   BY ATTORNEY BARHAM:
24        Q.   A little bit later on page five the authors

Page 292

1    highlight the cross sectional design of the USTS and
2    indicate that presenting a highly confounded association
3    of causation is a serious error.
4         Do you agree that presenting a confounded
5    association as causation is a serious error?
6             ATTORNEY BLOCK:  Objection to form.
7             THE WITNESS:  I have not claimed nor do I
8    understand my reading of the Turban, et al. article to
9    claim causation when an association has been found, and
10   in fact, they specifically called out that it was not
11   causative or at least the analysis could not prove it
12   was causative with a cross-sectional design.
13   BY ATTORNEY BARHAM:
14        Q.   So when you wrote paragraph 34 of your report
15   and said that a study found that people who reported
16   experiencing these conversion efforts were more likely
17   to have reported attempting suicide, especially those
18   who reported receiving such therapy in childhood, were
19   you suggesting that the conversion efforts caused the
20   suicide attempts?
21        A.   I believe in my testimony I am saying that there
22   is a relationship between those who are exposed to
23   conversion efforts and those who have described
24   reporting attempting suicide.

Page 293

1         Q.   And how would you describe that relationship?
2         A.   As an association.
3         Q.   Is association a synonym for correlation?
4             ATTORNEY BLOCK:  Objection to form.
5             THE WITNESS:  It depends on the context,
6    but generally in plain English association and
7    correlation are relative synonyms for one another.
8    BY ATTORNEY BARHAM:
9         Q.   In this specific context of your report, when
10   you say that you are reporting an association, were you
11   using association in correlation to synonyms?
12        A.   As far as I know I was, yeah.
13        Q.   Have you had patients impacted by not being
14   allowed to play sports consistent with their gender
15   identity?
16        A.   On occasion, yes.
17        Q.   Approximately how many such patients?
18        A.   On the order of less than two or three.
19        Q.   What sports were those patients participating
20   in?
21        A.   I do not recall the specific.  These were ---
22   the two or three that I had were all in the order of
23   between five, six and seven-year-olds.
24        Q.   What was your follow-up with each patient?

0979

Page 294

1        A.    With those particular kids?
2        Q.    Yes.
3        A.    Without having their charts in front of me, it's
4    hard to expound.  My typical process would be
5    understanding why it's happening, what they need and how
6    to coordinate with whatever program to help make sure
7    that the kid gets the support that is going to be most
8    beneficial to them.
9        Q.    Are you offering an opinion that the State of
10   West Virginia does not have a strong interest in
11   ensuring safe competition for women?
12              ATTORNEY BLOCK:  Objection to form.
13              THE WITNESS:  My testimony is about the
14   mental health impacts.  I don't have an opinion on the
15   state interests of West Virginia in this regard.
16   BY ATTORNEY BARHAM:
17       Q.    Are you offering an opinion that the State of
18   West Virginia does not have a strong interest in
19   ensuring fair competition?
20              ATTORNEY BLOCK:  Objection to form.
21              THE WITNESS:  Same answer.
22   BY ATTORNEY BARHAM:
23       Q.    Would you agree that ensuring fairness and
24   safety is an important state interest.

Page 295

1              ATTORNEY BLOCK:  Objection to form and
2    scope.
3              THE WITNESS:  Same answer.
4              ATTORNEY BARHAM:  All right.  I believe
5    those are all my questions for today.  I will turn the
6    floor over to Mr. Tryon.
7              ATTORNEY TYRON:  Okay.
8              Here I am.
9                      ---
10                  EXAMINATION
11                      ---
12   BY ATTORNEY TRYON:
13       Q.    My name's David Tryon.  I am with the West
14   Virginia Attorney General's Office and represent the
15   State of West Virginia.  So we've got about an hour
16   left.  Do you want to just keep on going and finish up
17   or would you like to take a break for five minutes
18   before we finish up?
19       A.    I think let's keep going.  If I have to take a
20   break, I'll let you know.  I appreciate it.
21       Q.    Okay.
22              You bet.  Happy to help you out that way again.
23   I just want to follow up, first of all, on a couple of
24   questions about the Turban study, if I may, that we were

Page 296

1    just discussing.  And Exhibit 16 I believe was the
2    document that addressed that Turban study.
3        A.    I see Exhibit 16 as the letter to the editor
4    from D'Angelo, et al.
5        Q.    And that's the one that we were just looking at
6    addressing the Turban study.
7              Right?
8        A.    Correct.
9        Q.    So let me just ask you, you did cite the Turban
10   study in your report.
11              Right?
12       A.    Yes.
13       Q.    Yeah, and that was to support your opinion.
14              Right?
15       A.    That is to support my opinion, yes.
16       Q.    Now, before you used it did you do something to
17   cite check it to see if there were any articles that
18   either challenged it or critiqued it or criticized it?
19       A.    I would say that a routine review of the
20   literature is a part of my day-to-day practice.  This
21   particular article did not come up in that review.
22       Q.    Okay.
23              Is there a way to specifically search for it to
24   see if --- to look at it and then do a search and see

Page 297

1    what other articles are quoted or cited?
2        A.    My guess is there probably is, I'm not aware of
3    it.
4        Q.    But I think you said you were not aware of the
5    letter which is Exhibit 16 prior to issuing your expert
6    report.
7              Is that right?
8        A.    That is correct.
9        Q.    Would it have been helpful to have seen that
10   ahead of time?
11       A.    I think it would have been helpful for me to
12   feel more prepared in this deposition.  I don't think it
13   would have changed any of my report.
14       Q.    If you had that, would you have investigated
15   those criticisms to see if they were failed criticisms?
16       A.    The authors of the Turban study had raised most
17   of those criticisms themselves in the context of their
18   report.
19       Q.    And did you independently look at it and
20   determine if they were --- if that caused you some
21   concerns?
22       A.    Concerns wouldn't be the right word.  It's about
23   weighing the evidence and making sure that we understand
24   context and applicability.  There's nothing in this

Page 298

1    letter to the editor that changes those demands from my
2    reading of the Turban article.
3        Q.   So you are saying that this letter in the Turban
4    article --- I'm sorry, you're saying this letter to the
5    editor does not raise any new issues at all than what
6    the Turban study itself raised.
7            Is that right?
8        A.   I would have to read through this in a more
9    detailed manner to say for certain that no single issue
10   has been addressed.  None of which we discussed today
11   are elements that hadn't been addressed, either by
12   myself reading the Turban article or by the Turban, et
13   al. in the article itself.
14       Q.   But you do not raise any of those concerns in
15   your report, do you?
16           ATTORNEY BLOCK:  Objection to form.
17           THE WITNESS:  No.  No, not specifically.
18   BY ATTORNEY TRYON:
19       Q.   Okay.  Fair enough.
20           If you can follow your report now, which I'm
21   forgetting which exhibit that is, Exhibit 1.  Thank you.
22           So first of all, you said you were retained by
23   Counsel for the Plaintiffs as an expert.  Can you tell
24   me when you were retained, please?

Page 299

1        A.   I would have to pull up my invoice to give you
2    the specific date, and I'm guessing Mr. Block might have
3    that information at the ready.
4        Q.   Unfortunately, I can't depose him.  I would love
5    to, but I don't think he would agree to that.  So as
6    best you can recall --- first of all, was it this year
7    or last year?
8        A.   It was this year to the best of my recollection.
9        Q.   Okay.
10           Was it after the other expert reports came out
11   or before?
12       A.   I believe I was hired or retained.  I don't know
13   what the correct terminology is so forgive me, after the
14   development of the additional expert reports.  It was
15   the rebuttal to those reports that led to my being
16   retained to my recollection.
17       Q.   I'm sorry?
18       A.   From my recollection.  And I'm terrible with
19   dates, so I apologize for that.
20       Q.   In paragraph four, you say --- you explain what
21   you viewed and you mention the reports of Dr. Safer.
22   Does that refer to Dr. Safer's original report that was
23   filed with the Court and his rebuttal report --- strike
24   that.

Page 300

1        Does that --- so he filed something with the
2    Court originally.  Did you review that one?
3        A.   It was the original report that I had reviewed.
4        Q.   Okay.
5            So let me just be clear.  So he filed an
6    original report back in --- last year and then issued a
7    new report in February of this year and then issued a
8    rebuttal report.  So a total of three.  Did you see all
9    three of those?
10       A.   I would have to see them ---.
11           ATTORNEY BLOCK:  Object to form.
12           THE WITNESS:  I would have to see them in
13   front of me to know if it was something that I had read.
14   I don't know the terminology well enough to know if I
15   was reading the original report or rebuttal report or
16   the third type.
17   BY ATTORNEY TRYON:
18       Q.   So one of them was expert report which was
19   issued I believe in February of this year.  I believe
20   you saw that one.
21       A.   Again, I would have to see the report in front
22   of me to know if it was the one I saw.
23       Q.   Okay.
24           There was another one which was labeled as

Page 301

1    rebuttal.  Do you remember if you saw that one?
2        A.   I would have to go back through my notes.  I
3    don't have it in front of me, so I apologize for not
4    recalling.
5        Q.   Well, let me ask you this question.  Do you
6    remember how many reports you saw from Dr. Safer?
7        A.   All I can say is I remember seeing at least two.
8        Q.   Very good.  And Dr. Adkins, how many of her
9    reports did you see?
10       A.   I can't be certain, but I think I also saw two
11   of hers.
12       Q.   And I'll represent to you that each of them
13   issued a rebuttal report.  And did you read their
14   rebuttal reports prior to preparing your rebuttal
15   report?
16       A.   I don't have the documentation in front of me in
17   terms of when I was spending time on what piece of this
18   process.  That's a part of my notes that are not here
19   today.
20       Q.   Do you know why you were asked to issue a
21   rebuttal report if Dr. Safer and Dr. Adkins were both
22   issuing rebuttal reports?
23           ATTORNEY BLOCK:  Objection.  Just don't
24   discuss any of the contents of your communications with

confidential 0981

Page 302

1    the attorneys.
2         ATTORNEY TRYON:  Correct.
3         THE WITNESS:  My understanding was to
4    rebut the reports of Dr. Levine and Dr. Cantor.
5    BY ATTORNEY TRYON:
6         Q.   Is your rebuttal different than the rebuttals of
7    Dr. Adkins and Dr. Safer?
8         ATTORNEY BLOCK:  Objection to form.
9         THE WITNESS:  Yes.
10   BY ATTORNEY TRYON:
11        Q.   Pardon me?
12        A.   Yes.
13        Q.   Does your rebuttal report have any opinions
14   which are different from Dr. Safer and Dr. Adkins'
15   reports?
16        ATTORNEY BLOCK:  Objection to form.
17        THE WITNESS:  I think it's hard without
18   the specific reports in front of me.  I know they were
19   long documents and I was specifically rebutting the
20   reports of Dr. Levine and Cantor.
21   BY ATTORNEY TRYON:
22        Q.   Do you have any specific reports that are not
23   rebutting Dr. Levine and Dr. Cantor?
24        A.   The process of developing this rebuttal report

Page 303

1    was for that specific intent.
2         Q.   So you don't believe you have any original
3    opinions to report; would that be a fair statement?
4         ATTORNEY BLOCK:  Objection to form.
5         THE WITNESS:  I'm not --- I guess I'm not
6    sure what you mean by original opinions.
7    BY ATTORNEY TRYON:
8         Q.   So let's move on.  Do you recall the Costa
9    study?
10        A.   Yes, we had reviewed one Costa study earlier.
11   Can you remind me of the exhibit number?
12        Q.   I believe it's Exhibit 27?
13        A.   All right.  Okay.
14        Q.   I believe that during that discussion you
15   referred to the standards in there as being rough or
16   imprecise measure and --- let me get this right, and not
17   objective criteria.
18        Do you remember that?
19        A.   I had described the CGAS, the Children's Global
20   Assessment Scale, as an imprecise measure of children's
21   functioning.
22        Q.   And you said not having any objective criteria;
23   can you help with that?
24        A.   Yes, it's a scale from zero to a hundred that is

Page 304

1    very gestalt that the clinician uses to rate a child.
2    It's not an instrument that I find clinically useful.
3         Q.   Is it not clinically useful because it doesn't
4    have objective criteria?
5         A.   I wouldn't say it's fair to say that there are
6    no objective criteria, but there are at times
7    contradictory objective criteria within the CGAS.  And
8    again I would have to see the CGAS in front of me to
9    point out those specifics, but there are other
10   functions, or other ways of measuring outcomes than the
11   CGAS.
12        Q.   What is an objective criteria?  What does that
13   term mean in other words?
14        ATTORNEY BLOCK:  Objection to form.
15        THE WITNESS:  I guess what would say is
16   we would want a psychometrically valid approach to
17   answering a question, ideally that is of clinical
18   relevance.
19   BY ATTORNEY TRYON:
20        Q.   Can you just repeat your answer for me?  I
21   didn't quite understand it.
22        A.   Probably not the same language.  A
23   psychometrically valid tool that in an ideal world
24   provides some kind of clinical relevance.

Page 305

1         Q.   Okay.
2         You said psychometrically valid tool.
3         Did I get that right?
4         A.   Psychometrically validated tool, yes.
5         Q.   Validated?
6         A.   Yes.
7         Q.   What is that?
8         A.   Essentially you want to understand that the
9    measure you're using is measuring what it says to
10   measure and is reliable across multiple domains.  The
11   CGAS has been widely used in research, it's just not my
12   favorite tool because I don't find it to have that
13   second domain of having that clinical utility.
14        Q.   Let me ask you to take a look at paragraph 19 of
15   your opinion?
16        A.   I'm looking at it now.
17        Q.   You say at one point it says contrary to the
18   portrayal.  Do you see that sentence?
19        A.   I see that, yes.
20        Q.   Contrary to the portrayal in Dr. Levine and Dr.
21   Cantor's reports, gender-affirming treatment also
22   requires a careful and thorough assessment of a
23   patient's mental health, including co-occurring
24   conditions, history of trauma, and substance abuse among

Bridges 0982

## Page 306

1    many other factors.  My question for you is with respect
2    to your language, a careful and thorough assessment, and
3    I'd like to then know are there psychometrically
4    validated tools used to do that?
5        A.   There are on occasion, and particularly when
6    we're looking at research outcomes for transgender youth
7    there are a number of psychometrically validated
8    screenings or outcome measures that are used.
9        Q.   What are those?
10       A.   These include most importantly the Utrecht
11   Gender Dysphoria Scale, the Body Image Scale,
12   historically what's in the Dutch data, the Toronto data,
13   and the Costa data and The Tavistock Clinic, all of them
14   were participatory in kind of the informal research
15   group that agreed to collect the same measures, so these
16   included the Achenbach, CBCL, and they use self report.
17       Q.   I'm sorry.  What was the first one you said
18   before Body Image Scale?
19       A.   Utrecht Gender Dysphoria Scale.
20       Q.   Utrecht Gender Dysphoria Scale?
21       A.   Correct.
22       Q.   What is that?
23       A.   It's a measure of the degree and intensity of
24   gender dysphoria.

## Page 307

1        Q.   How is it --- what does it look like?  Does it
2    have a series of scale one to ten on different issues or
3    what is it?
4        A.   It's a series of questions that I'd have to have
5    in front of me to give a better job of describing, but
6    it provides a rating of --- I can't remember what the
7    range is, from zero to somewhere in the low dozens, that
8    correlates with the intensity of gender dysphoria.
9        Q.   Is that something that you use in your practice
10   to diagnose gender dysphoria?
11       A.   It is an element that I have used.
12       Q.   Do you use that with every patient?
13       A.   It is not something that I use with every
14   patient.  The contents of the Utrecht Gender Dysphoria
15   Scale are generally pieces that I'm getting or gathering
16   from every clinical encounter without necessarily
17   utilizing the specific tool.
18       Q.   This statement, a careful and thorough
19   assessment, does that have a --- is there a source for
20   that particular standard?
21       A.   There are a number of sources for this
22   particular standard.  The general practice of children's
23   mental health from my guild in child adolescence
24   psychiatry, there are years of training and

## Page 308

1    certification in order for you to have demonstrated a
2    careful and thorough assessment.  In order to get Board
3    Certified I had to do a careful and thorough assessment
4    in front of a board of examiners, so this is inherent to
5    the practice of mental health.
6        Q.   Is there --- but there is no requirement that
7    these various standardized tools that you mentioned to
8    me, these psychometrically valid tools have to be used,
9    is there?
10       A.   There isn't, and there is not a clinical
11   verification that they be used in every instance.  For
12   the sake of these kind of studies, it's important to
13   have these validated tools so we're all speaking the
14   same language and that outcomes can be tracked over
15   time, but not necessarily in every clinical event is it
16   going to be warranted.
17       Q.   If you don't use them in every clinical event,
18   then how can how can you adequately track something
19   across patients if you wanted to do a study?
20           ATTORNEY BLOCK:  Objection to form.
21           THE WITNESS:  As an example there are a
22   number of psychometrically validated tools that cannot
23   be administered at every clinical encounter, otherwise
24   they would be rendered invalid.  So there's a lot of

## Page 309

1    nuance in these specific tools and I think that level of
2    nuance is really a clinical judgment based upon
3    professional and prevailing standards.
4    BY ATTORNEY TRYON:
5        Q.   Okay.
6           So there's no objective measure of someone
7    other than --- well, let me back up.  So different
8    psychiatrists would come up with different conclusions.
9           Is that right?
10          ATTORNEY BLOCK:  Objection to form.
11          THE WITNESS:  I don't think that's
12   related to what I was speaking about.  I think different
13   psychiatrists would utilize different instruments to
14   provide an assessment, and that's going to change from
15   person to person.  I can't speak to diagnostic
16   reliability for a psychiatrist that I haven't met or
17   trained.
18   BY ATTORNEY TRYON:
19       Q.   Let me ask you how long you would normally spend
20   with a child before --- or adolescent before prescribing
21   puberty blockers?
22          ATTORNEY BLOCK:  Objection to form.
23          THE WITNESS:  There is not going to be a
24   single answer to that question.  It really is dependent

Page 310

1   on the requirements of the assessment, as well as the
2   individual factors of that child and that family.
3   BY ATTORNEY TRYON:
4      **Q.   Could ten minutes be long enough?**
5      A.   Not in my opinion.
6      **Q.   What about 30 minutes?**
7      A.   Likely not.
8      **Q.   How about an hour?**
9      A.   It would be very atypical in my practice to
10  spend that little time prior to making a recommendation
11  for puberty suppression.  I do a much more thorough
12  assessment than an hour.
13     **Q.   So how long would a thorough assessment normally**
14  **take?**
15             ATTORNEY BLOCK:  Objection to form.
16  BY ATTORNEY TRYON:
17     **Q.   You said more than an hour I think?**
18     A.   Correct.  I would say more than an hour.  I
19  think maybe there's a ceiling, but not a roof.  What I
20  mean by that that is there are certain criteria required
21  in order to make a recommendation for a treatment for
22  gender dysphoria to be offered.  Those include a
23  diagnosis of gender dysphoria, a recognition of any
24  co-occurring mental health issues and whether or not

Page 311

1   they are adequately well controlled enough to be able to
2   proceed with care.  And a clear understanding of the
3   risks, benefits and alternatives of that treatment.
4   There's no specific timeframe on that as an assessment.
5      **Q.   How many visits would you expect to be adequate**
6   **for a careful and thorough assessment?**
7             ATTORNEY BLOCK:  Objection to form.
8             THE WITNESS:  And I apologize, it's ---
9   I'm not trying to be evasive.  It really is going to
10  depend upon each individual child.
11  BY ATTORNEY TRYON:
12     **Q.   What about is one enough?  Have you ever done it**
13  **--- given a recommendation for puberty blocker after**
14  **only one visit for an hour?**
15             ATTORNEY BLOCK:  Compound question.
16             THE WITNESS:  I have never given a
17  recommendation for puberty suppression after a one hour
18  visit personally.
19  BY ATTORNEY TRYON:
20     **Q.   What's the minimum time that you think is**
21  **adequate?**
22             ATTORNEY BLOCK:  Objection to form.
23             THE WITNESS:  As I said, I don't think
24  it's based on time.  It's based about the content.

Page 312

1   There are circumstances in which patients have been
2   followed for several years by therapists, that can
3   provide a tremendous amount of collateral information
4   including information provided by parents, family
5   members, community providers, et cetera, that can allow
6   more abbreviated assessment for some people.
7   BY ATTORNEY TRYON:
8      **Q.   Is someone as consistently spending only an hour**
9   **with one patient, with each patient for recommending**
10  **puberty blockers, that would look kind of like a rubber**
11  **stamp recommendation wouldn't it?**
12             ATTORNEY BLOCK:  Objection.
13  BY ATTORNEY TRYON:
14     **Q.   Assuming that it's happening?**
15             ATTORNEY BLOCK:  Objection to form.
16             THE WITNESS:  I would have to see the
17  specifics in order to make any kind of comment.
18  BY ATTORNEY TRYON:
19     **Q.   Isn't it fair for Dr. Levine or Cantor to**
20  **express concern that in actual practice that may be**
21  **happening?**
22             ATTORNEY BLOCK:  Objection to form.
23             THE WITNESS:  I have not seen anywhere in
24  Dr. Cantor or Dr. Levine's report or within the

Page 313

1   literature that this is a pervasive thing that is
2   happening.
3   BY ATTORNEY TRYON:
4      **Q.   Well, it's not tracked at all so we wouldn't**
5   **know, would we, one way or the other?**
6             ATTORNEY BLOCK:  Objection to form.
7             THE WITNESS:  It is a question that could
8   be asked.  I don't think it's for me to make
9   suppositions, nor do I think it is for Dr. Cantor and
10  Dr. Levine to make suppositions about the critical care
11  of transgender youth in this context.
12  BY ATTORNEY TRYON:
13     **Q.   Is there any --- is there any place where you**
14  **report any central location where you or your clinic**
15  **report how much time and effort and what your thorough**
16  **examination is so that it can be tracked?**
17     A.   The site where I'm at now is part of a four-site
18  NIH trial that has published on the specific assessment
19  processes that the kids who are involved in the study
20  engage in.
21     **Q.   How many kids are in that trial?**
22     A.   I'm not a specific participant in the
23  organization of that trial, so I don't have that
24  information in front of me.

Page 314

1  Q.  Does your clinic report to that trial?
2  A.  My gender clinic, the gender clinic within the
3  hospital that I work in, there are many patients who are
4  enrolled in that trial, yes.
5  Q.  But it's certainly not mandated, right?
6  A.  No.
7  Q.  When these careful and thorough assessments are
8  done, what type of documentation should be used for
9  that?
10  ATTORNEY BLOCK:  Objection to form.
11  THE WITNESS:  That's a very contextual
12  question.  We have prevailing standards in terms of what
13  should and shouldn't be documented through various
14  professional organizations, but that's going to change
15  from state to state, country to country.
16  BY ATTORNEY TRYON:
17  Q.  And what about in the State of West Virginia?
18  A.  I have no knowledge of documentation
19  requirements in the State of West Virginia.
20  Q.  How about in the United States in general?
21  A.  As far as I'm aware, there are no universal
22  recommendations in terms of specifics of how things are
23  documented.
24  Q.  Are there any organizations like the WPATH or

Page 315

1  any other organizations that do give recommendations on
2  what documentation to use in America?
3  A.  WPATH has certainly provided some educational
4  events in terms of best practices in documenting, but
5  these aren't specific guidelines or recommendations.  I
6  think it is notable to say that the Dutch clinic in
7  particular has been quite vigorous in their production
8  of research and is quite well respected in the world in
9  terms of how things are structured, and they actually
10  don't even have a letter that their clinicians write
11  and/or see initiation of puberty suppression for
12  gender-affirming hormones.
13  ATTORNEY TRYON:  Jake, if you could bring
14  up the exhibit entitled Adolescent Medicine,
15  Confidential Patient Questionnaire, which has been
16  redacted?
17  VIDEOGRAPHER:  Do you want that marked?
18  ATTORNEY TYRON:  Yes, please, wherever we
19  are at in the next number.
20  VIDEOGRAPHER:  I believe we're at 44.
21  LAW CLERK WILKINSON:  46.
22  ATTORNEY SWAMINATHAN:  46.
23  ---
24  (Whereupon, Exhibit-46, Form, was marked

Page 316

1  for identification.)
2  ---
3  ATTORNEY TRYON:  If you could bring that
4  up, Jake.
5  VIDEOGRAPHER:  Yes.  Give me one second.
6  I'm just marking that right now.  We might have to mark
7  this one physically.  The program won't mark it because
8  it's a redacted document.
9  ATTORNEY TRYON:  Okay.  Then we'll do
10  that to bring that up.  And then, if you could, Jake,
11  just scroll down in this.  I just have a couple
12  questions about this form.
13  THE WITNESS:  Okay.
14  ATTORNEY TRYON:  Go onto the next page
15  down.
16  BY ATTORNEY TRYON:
17  Q.  Have you ever seen a form like this?
18  ATTORNEY BLOCK:  Objection to form.  No
19  pun intended.
20  THE WITNESS:  Could you be a little more
21  specific?  I mean, I've seen --- this is kind of very
22  typical for a lot of intake-type documents in mental
23  health clinics or in medical clinics.
24  BY ATTORNEY TRYON:

Page 317

1  Q.  So you would characterize this as a typical
2  intake form?
3  ATTORNEY BLOCK:  Objection.
4  THE WITNESS:  I wouldn't characterize it
5  in that way.  I have seen typical intake forms that
6  resemble this in some ways.
7  BY ATTORNEY TRYON:
8  Q.  Would this be something that you would consider
9  adequate to document a careful and thorough assessment?
10  ATTORNEY BLOCK:  Objection to form.
11  THE WITNESS:  Again, without knowing the
12  context of the individual's practice, it's impossible
13  for me to say.
14  BY ATTORNEY TRYON:
15  Q.  Is this a form that you would use for careful
16  and thorough assessment of a patient's mental health?
17  ATTORNEY BLOCK:  Objection to form.
18  THE WITNESS:  I don't use this form.  I
19  can't say whether or not I was in the context this
20  provider was practicing that I wouldn't use this form as
21  part of my assessment.
22  BY ATTORNEY TRYON:
23  Q.  Fair enough.  Do you use it as a part of your
24  careful thought thorough assessment of the patient's

Page 318

1   mental health, are there any other forms that you expect
2   to see in the caregiver's file about that patient's
3   mental health?
4       A.   Not specifically.
5       Q.   This would be adequate?
6           ATTORNEY BLOCK: Objection to form.
7           THE WITNESS:  Again, I can't speak to
8   the adequacy of it without understanding the context of
9   the rest of the treatment.
10  BY ATTORNEY TRYON:
11      Q.   Is there any certification that you think is
12  necessary or appropriate for someone to diagnose gender
13  dysphoria?
14      A.   There is no universal certification process.
15  What we have are guidelines and recommendations for
16  ensuring that folks for the mental health prospective,
17  again, medical professionals are able to diagnose gender
18  dysphoria, but from the mental health prospective, it's
19  recommended that we are licensed clinical professionals
20  that have some, if not an expert level of understanding
21  of gender identity issues and having continuing
22  education in the field.  These are ongoing
23  recommendations.  I wouldn't say it was the expertise,
24  but knowledge about standard of care that's congruent

Page 319

1   with how other disorders are also treated.
2       Q.   Let me ask you about paragraph 16 of your
3   report.
4           Do you see the last sentence there?
5       A.   Yes.
6       Q.   It says HB-3293 does not affect elementary
7   students --- elementary school students who are
8   transgender boys?
9       A.   Yes.
10      Q.   So you previously testified that puberty is ---
11  starts on the average about age 12 for males.
12          Right?
13          ATTORNEY BLOCK: Objection to form.
14          THE WITNESS:  Again, I would defer to our
15  --- that's an answerable question based upon national
16  data that I don't have in front of me, but 12-ish is,
17  yes.
18  BY ATTORNEY TRYON:
19      Q.   And the range would be --- from what I read, the
20  range is generally between 8 and 14 years old.
21          Right?
22      A.   Again, I would defer to my endocrine colleagues,
23  but yes, that's --- that's pretty typical.
24      Q.   And you're aware that boys go into Middle School

Page 320

1   as early as 11 years old or sometimes even earlier.
2       Right?
3       A.   I can't say that I'm familiar with how each
4   state organizes their primary and secondary education
5   systems.  I'm familiar with how it was in New York and
6   Illinois, and that was occasionally the case.
7       Q.   So if an 11-year-old who has not gone through
8   puberty is in Middle School, then this would definitely
9   apply to some pre-pubescent children.
10          Right?
11          ATTORNEY BLOCK: Objection to form.
12  BY ATTORNEY TRYON:
13      Q.   I'm sorry, I didn't make that clear.  So if
14  there are prepubescent boys that are in middle school,
15  then HB-3293 would affect them.
16          Right?
17      A.   I would have to put HB-3293 in front of me to
18  --- to know specifically.  I'd have to refamiliarize
19  myself with it, the specifics of it.
20      Q.   I'm sorry to interrupt you.
21      A.   Yeah, I wouldn't want to comment on something I
22  don't have in front of me right now.
23      Q.   Okay.
24          So just so you know I had to relocate from my

Page 321

1   office to my home, and there's a poodle in here that you
2   may hear.  So forgive you if you hear the interruption.
3           ATTORNEY BLOCK: Objection to the
4   poodle.
5           ATTORNEY TRYON:  Let me take one second.
6   I will be right back.
7           THE WITNESS:  Maybe now is a good time
8   for bathroom break.
9           ATTORNEY BLOCK: Let's go off the record.
10          VIDEOGRAPHER:  Going off the record the
11  time reads 5:46 p.m.
12  OFF VIDEO
13              ---
14  (WHEREUPON, A SHORT BREAK WAS TAKEN.)
15              ---
16  ON VIDEO
17          ATTORNEY TYRON:  Okay let's go back on
18  the record.
19          VIDEOGRAPHER:  Back on the record the
20  current time reads 5:50 p.m.
21  BY ATTORNEY TRYON:
22      Q.   Let me direct you to paragraph 26 of your
23  report?
24      A.   Yep.

Page 322

1    Q.  So there's the --- let's see, starting with the
2    word prepubertal children who he insists are children
3    with non-conforming gender expression who realize at the
4    onset of puberty that their gender identity is
5    consistent with their sex assigned at birth.  Their
6    understanding of their gender identity changes at the
7    onset of puberty, but their gender identity does not.
8    So that's really a circular argument unless there's some
9    objective external way of proving what that child's
10   gender identity actually is, wouldn't you agree?
11          ATTORNEY BLOCK:  Objection to form.
12          THE WITNESS:  I think that the research
13   that we have on inherent gender identity is relatively
14   recent and needs a little bit more robust follow-up.
15   What we have are studies of cognition as well as some
16   very limited brain imaging studies that point to some
17   element of gender identity that has an objective
18   criteria to it.  These are not studies that are
19   significant enough or have enough participants for us to
20   draw any kind of significant conclusions, but it does
21   speak when paired with clinical experiences of kids who
22   have desisted the way that they describe their
23   identity is that it is not a fix or a change in their
24   sense of self but more about the expression of their

Page 323

1    behaviors and their understanding of how they fit into
2    the world that has changed.
3          Q.  So as you say it's too early to really know for
4    sure which of these things it is, right?
5          ATTORNEY BLOCK:  Objection to form.
6          THE WITNESS:  What I would say is it's a
7    preponderance of clinical experience and the studies
8    that we do have point to this being much more likely.
9    BY ATTORNEY TRYON:
10         Q.  Much more likely, is that your testimony?
11         A.  Based on my clinical experiences, yes.
12         Q.  But there's no way that anyone outside of ---
13   there's no objective measurement to make that
14   determination, right?
15         ATTORNEY BLOCK:  Objection to form.
16         THE WITNESS:  The way that I would
17   describe it is that gender dysphoria as a diagnosis
18   includes both identity-based criteria that are objective
19   and are measured through the course of the scales that
20   we talked about earlier, as well as measures of role and
21   behavior and congruence with your body.  These are
22   things that are tracked over time in the studies that we
23   have, and when a child desists from that diagnosis of
24   gender dysphoria it is clear at that point that it was

Page 324

1    primarily the gender role based behaviors that were
2    leading to this diagnosis as opposed to a change in
3    identity.
4    BY ATTORNEY TRYON:
5          Q.  You were freezing up on me, so let me just see
6    if I can understand this by looking at the
7    transcription.  If a child explains the reasons why he
8    or she has a different gender identity, that his or her
9    natal sex, the natal sex designation then later says the
10   opposite, there is really no way of telling whether or
11   not it's just the person's gender identity or the
12   understanding of the identity has changed based on that
13   child's or person's statements.
14         Right?
15         ATTORNEY BLOCK:  Objection to form.
16         THE WITNESS:  I would say to complicate
17   matters even further, a number of the studies that are
18   used to describe this desistance phenomenon were first
19   carried out under the DSM-IV.  On the DSM-IV the
20   diagnosis was gender disorder in childhood.  And in that
21   nomenclature, an identity that is incongruent with sex
22   assigned at birth was not one of the required elements.
23   And so there are children who are described in the
24   common parlance as transgender because they met criteria

Page 325

1    for what was then gender identity disorder, who
2    nevertheless discussed any identity incongruent with
3    their sex at birth.  So that makes it hard to draw firm
4    conclusions about data captured under the DSM-IV.
5    BY ATTORNEY TRYON:
6          Q.  And you are familiar with that diagnostic and
7    statistical manual of mental disorders.
8          Right?
9          A.  I am.
10         Q.  And you cited it in your reports.
11         Right?
12         A.  Correct.
13         Q.  That is a manual to assist in the diagnosis of
14   mental disorders.
15         Right?
16         A.  That is correct.
17         Q.  Is there a value of to classifying a condition
18   as a mental disorders?
19         ATTORNEY BLOCK:  Objection to form.
20         THE WITNESS:  I don't know if I can offer
21   an expert opinion on that.  I have a biased --- talk
22   about a selection bias as a psychiatrist and a mental
23   health professional.  I think it's important for us to
24   destigmatize mental illness as much as possible, so

ATryer.2009 0987

Page 326

1   whatever is going to allow folks access to care, I'm
2   relatively neutral on placing a value on whether or not
3   something is a diagnosis or not.
4   BY ATTORNEY TRYON:
5       Q.   A manual does not recommend any treatments, only
6   tools for diagnosis.
7          Is that right?
8          ATTORNEY BLOCK:  Objection to form.
9          THE WITNESS:  The main goal of DSM for
10  classifying diagnoses and ensuring stability or
11  reliability of those diagnoses across practice
12  locations.
13  BY ATTORNEY TRYON:
14      Q.   That does not recommend or even provide any
15  treatments.
16         Right?
17      A.   The text of the DSM often recommends or
18  describes treatments.
19      Q.   Does it describe treatments for gender
20  dysphoria?
21      A.   The text was recently revised for gender
22  dysphoria, and so I really want to see the text in front
23  of me for me to talk about it.
24      Q.   So in the DSM-V you don't know if it has any

Page 327

1   recommendations for treatments in it for gender
2   dysphoria?
3       A.   I don't know in the revised text how much was
4   changed without familiarizing myself with it.  And I'm
5   happy to look at it.  It's a quick read, but primarily
6   the DSM-V as it comes to gender dysphoria is a
7   description of the phenomenology not a recommendation
8   for treatments.
9       Q.   And when was it revised?
10      A.   It was just released about a week ago, maybe
11  two.
12      Q.   Let me ask you to take a look at your report,
13  paragraph 51.  You say to the contrary, as noted
14  previously, stigma and discrimination have been shown to
15  have a profoundly harmful impact on the mental health of
16  transgender people and other minority groups.  Now, when
17  you say stigma and discrimination, you're not referring
18  specifically to not allowing, as using your term, a
19  transgender girl to participate on a girls sports team
20  to be that type of stigma or discrimination, are you?
21         ATTORNEY BLOCK:  Objection to the form.
22         THE WITNESS:  The reference that I
23  referred to in my report I would want to look at,
24  because they had an operational term for stigma and

Page 328

1   discrimination.  However, there has been literature, I
2   can't remember the names of the authors or the date of
3   the study, that look at specific laws that are enacted
4   to discriminate  against LGBT people and impact on both
5   mental health and medical health, and so those kind of
6   discrimination laws certainly do have real felt impact
7   for transgender folks.
8   BY ATTORNEY TRYON:
9       Q.   So are you saying that this sentence is
10  referring to a law such as HB-3293 or not?
11      A.   I think, as I stated, for the sake of this
12  expert report, the Yhuto reference from 2015 is what I'm
13  using to craft that statement.
14      Q.   I'm sorry, the what from 2015?
15      A.   Footnote number 21.
16      Q.   What are those profound impacts of mental health
17  that you are referring to?
18      A.   Well, as I mentioned earlier in my report are
19  correlation between many exposures that transgender
20  individuals have and increased rates of suicide, self
21  harm, substance use, exposure to trauma that have
22  certainly profound negative impacts for the folks who
23  are experiencing them.
24      Q.   And of those harms that you have just mentioned

Page 329

1   are you aware of any of them caused by --- to a child or
2   person who was not --- who was a transgender female not
3   allowed to participate on a girls or woman's athletic
4   team?
5       A.   As I had testified to earlier, I think I said
6   I've had two or three patients who are excluded from
7   sports teams, one of which was a child who was assigned
8   male at birth, who at age six was not allowed to
9   participate in the sport.  I can't remember what support
10  it was.  This was a child who was heckled and kicked out
11  of the group of friends that were participating in that
12  sport which led to negative mental health consequences
13  for that individual child.
14      Q.   What specific --- I presume that's thoughts of
15  suicidality.
16         Right?
17      A.   Thankfully at that age they were not.
18      Q.   How did that child adapt to the situation?
19      A.   Well, we worked with the child, the family and
20  the sports team, to understand what this child may need
21  and ended up --- I think it was T ball, I think ended up
22  joining the T ball team.
23      Q.   So how much --- how much of a delay was there
24  between wanting to join the T ball team and being

| Page 330 | Page 332 |
|---|---|

**Page 330**

1  allowed to join the T ball team?
2     A.  This was years ago, so I don't recall the
3  specifics.
4     Q.  Would it be your testimony that any delay at all
5  between the time of identifying for a natal male
6  identifying as a female and participating on a female
7  team would be profoundly harmful?
8          ATTORNEY BLOCK:  Objection to form.
9          THE WITNESS:  I have not seen any studies
10  that have asked that question or could speak to the
11  duration of time between exclusion from an activity and
12  the mental health impacts.
13  BY ATTORNEY TRYON:
14     Q.  Is it your position that as soon as the child or
15  person who is a natal male determines or identifies as a
16  female, that that person should be immediately allowed
17  to play on female teams?
18          ATTORNEY BLOCK:  Objection to form and
19  scope.
20          THE WITNESS:  I'm not able to answer that
21  question.  I think that's out of the scope of my
22  expertise.
23  BY ATTORNEY TRYON:
24     Q.  Let me ask it differently because I didn't ask

**Page 331**

1  it quite as artfully as I could have.  You indicated
2  profoundly harmful or have a profoundly harmful impact.
3  So if a child or adolescent or adult, adult meaning
4  anyone through collegiate age, were to be a natal male
5  and identify as a female and is not allowed to
6  immediately participate on female teams, would that be
7  profoundly harmful, would it have a profoundly harmful
8  impact on their mental health?
9     A.  That would require an individualized assessment
10  of that child or young adult in order to understand the
11  potential impacts specific to that individual.
12     Q.  What if they were required to wait a full year,
13  would that be profoundly --- have a profoundly harmful
14  impact on the mental health of that person?
15          ATTORNEY BLOCK:  Objection to form.
16          THE WITNESS:  Same answer.
17  BY BY ATTORNEY TRYON:
18     Q.  Well as a general rule, do you have any opinion
19  as a general rule?
20          ATTORNEY BLOCK:  Objection to form.
21          THE WITNESS:  General rule of what?  I'm
22  not understanding the question.
23  BY ATTORNEY TRYON:
24     Q.  Let me try again.  So is there --- do you have a

**Page 332**

1  general --- I mean you made a generalized statement here
2  in the last sentence of paragraph 51.  So my question
3  is, as it pertains to this generalized statement, is
4  there any delay that would not cause a profoundly
5  harmful impact on the mental health of transgender
6  people if they are denied the opportunity to immediately
7  participate in the sports team of their gender identity?
8          ATTORNEY BLOCK:  Objection to form and
9  characterization.
10          THE WITNESS:  It's a long sentence with a
11  lot of clauses.  I'm trying to --- I'm trying to parse
12  them all out to make sure that I'm answering this
13  accurately.  As I testified to in my report, there's
14  evidence of discrimination, stigma and bias leading to
15  individual harms.  The specific manifestation of those
16  harms are highly individualized and require individual
17  assessment of each child and family in order to know.
18  Which is why you can't speak to the specific impacts for
19  each individual child, but what we know are
20  population-based data.
21     Q.  Is it your view that if after a psychiatrist or
22  psychologist or appropriate healthcare individual
23  determines that there would be a profoundly harmful
24  impact that healthcare professional should be the one to

**Page 333**

1  determine whether or not the child should be allowed to
2  participate on a girl's team?
3     A.  I don't have a specific opinion about how sports
4  administration vary from state to state.  I know it says
5  very different from state to state.  What I would say is
6  from a mental health perspective my goal is to help our
7  kids access spaces that are going to be health promoting
8  and build resilience.  I think it's important for health
9  professionals to be involved in the decisions that are
10  made, but I can't speak to the legislative process
11  within the scope of my expertise.
12     Q.  Is the mental health of the cisgender females
13  who might be at a disadvantage of the participation of a
14  transgender female on the team, is their mental health
15  important?
16          ATTORNEY BLOCK:  Objection to form.
17          THE WITNESS:  I would say first that the
18  mental health of cisgender children who have
19  participated in sports is certainly attestable
20  hypothesis to explore and it's not research that I have
21  seen, nor that I'm aware that it exists.  Beyond that,
22  you know, my expertise does not extend to this
23  population as you have asked this question.
24  BY ATTORNEY TRYON:

Page 334

1  Q.  So then let me ask that specifically, have you
2  treated any cisgender females that have been upset about
3  transgender females participating on the girls team?
4  A.  I have treated cisgender girls who have had
5  transgender teammates.  I have not treated anybody who
6  has expressed any concern or harm from that.
7  Q.  Do you acknowledge that there are those
8  cisgender girls who are suffering from psychological
9  harm from that?
10  ATTORNEY BLOCK:  Objection to form.
11  THE WITNESS:  I would not acknowledge
12  that.  That is not data that I have seen nor has been my
13  personal experience with patients that I have seen or
14  other colleagues who have described this.
15  BY ATTORNEY TRYON:
16  Q.  Are you aware that some of Lia Thomas' cisgender
17  teammates are very upset about Lia Thomas participating
18  on the female swimming team?
19  ATTORNEY BLOCK:  Objection to form.
20  THE WITNESS:  I haven't read much about
21  Lia Thomas or her teammates prior to today, so I'm not
22  aware of any specifics to that.
23  BY ATTORNEY TRYON:
24  Q.  Have you read anything about that incident ---

Page 335

1  excuse me, that situation?
2  A.  Well, I've read something today.
3  Q.  Prior to today?
4  A.  Which did not mention about teammates being
5  upset.  I've heard about it, but I have not read it.
6  Q.  So you're aware of it?
7  A.  I'm vaguely aware of it, yes.  I've not done any
8  primary research into it.
9  ATTORNEY BLOCK:  Could we get a time
10  check?
11  VIDEOGRAPHER:  It looks like I got about
12  three minutes left.
13  ATTORNEY TRYON:  I speak really fast.
14  BY ATTORNEY TRYON:
15  Q.  Well, is there benefits in --- for example, you
16  said that HB --- you've read HB-3293 and you're aware
17  that it does require --- well, first of all, are you
18  aware that HB-3293 does not use the word transgender at
19  all or trans woman or trans girl at all?
20  A.  I would want to look at it specifically to
21  double check that that's correct, but I would take your
22  word for it.
23  Q.  And so in HB-3293, it does require that all
24  biological males must --- let me rephrase that, that

Page 336

1  biological males may not compete on girls teams.
2  Do you understand that?
3  A.  I don't, because biological male as a term is
4  certainly up for debate.
5  Q.  Which word would you like to use?
6  A.  I don't know if there's going to be an answer
7  for that in the context of this particular bill.  I
8  think ---.
9  Q.  How about natal male, does that work?
10  A.  Sure.  We can use that.  I would typically use
11  assigned male at birth, but yes.
12  Q.  Okay.
13  So natal males under this Bill are not allowed
14  to participate on girls sports teams.
15  Do you understand that?
16  ATTORNEY BLOCK:  Objection to form.
17  THE WITNESS:  Yeah.  And I apologize I
18  really don't mean to be parsing, if the text of the Bill
19  is biological males, what that just means is that that
20  is a complex term that doesn't have a universal
21  acceptance.  But I understand that the goal of the Bill
22  is for folks assigned male at birth, not to participate
23  in women's sports teams, yes.
24  BY ATTORNEY TRYON:

Page 337

1  Q.  If a --- to use your term, a person assigned
2  male at birth is told that that person may not
3  participate on girls sports, and as in so many other
4  things in life, you are told that's the rule and you
5  have to live with it, is there value in learning coping
6  skills to deal with rules that you don't agree with and
7  abide by them?
8  ATTORNEY BLOCK:  Objection to form.
9  THE WITNESS:  I guess the way I would
10  approach it is that if we look at the data, clinical
11  experiences and from the testimonies of transgender
12  individuals that they face enough on a daily basis
13  stigma discrimination exclusion, that they all would
14  benefit from a healthy development of coping skills.
15  Nowhere in the field of psychiatry is it recommended
16  that we expose people to traumatic events for them to
17  develop coping skills to manage through.
18  BY ATTORNEY TRYON:
19  Q.  Well, not to intentionally do so, but there's
20  laws and rules that you made that said you have to live
21  with those rules then it's your position that the rules
22  need to be changed to comply with the wishes of that
23  person?
24  ATTORNEY BLOCK:  Objection to form.

```
                                         Page 338
 1              THE WITNESS:  Again my expert testimony
 2    is rebutting the testimony of Dr. Levine and Cantor.  I
 3    can't speak to the specific legislative processes in
 4    terms of the best way for states to approach a complex
 5    issue such as this.
 6              ATTORNEY TRYON:  I have no further
 7    questions.  Thank you for your time I appreciate it.
 8              THE WITNESS:  Thank you.  What is your
 9    poodle's name?  Can I ask that off the record?
10              ATTORNEY BLOCK:  We don't have any
11    Redirect questions.  Dr. Janssen will review the
12    transcript.
13              ATTORNEY GREEN:  This is Roberta Green on
14    behalf of WVSSAC.  No questions.
15              ATTORNEY MORGAN:  This is Kelly Morgan on
16    behalf of the West Virginia Board of Education and
17    Superintendant Burch.  I don't have any questions.
18    Thank you.
19              ATTORNEY DENIKER:  Dr. Janssen, thank you
20    for your time today, this is Susan Deniker.  I have no
21    questions.
22              THE WITNESS:  Thank you, guys.
23              VIDEOGRAPHER:  Going off the record.  The
24    current time reads 6:18 p.m.
```

```
                                         Page 339
 1                    * * * * * * * *
 2       VIDEOTAPED DEPOSITION CONCLUDED AT 6:18 P.M.
 3                    * * * * * * * *
 4
 5
 6
 7
 8
 9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
```

**A**

**a.m** 2:8
  11:24  69:4
  97:1
**abbreviated**
  312:6
**abide** 337:7
**ability**
  184:17
  235:18
  243:23
  248:8
**able** 44:22
  86:12
  133:3
  171:11
  176:3
  192:17
  193:14
  199:17
  247:12
  249:13
  311:1
  318:17
  330:20
**abortion**
  249:22
  250:3
**abrupt**
  152:23
**abuse** 155:24
  156:9
  157:9
  163:7,23
  165:5
  282:4
  305:24
**academic**
  15:19
**academics**
  21:22
  148:20
**Academy** 26:4
**acceptance**
  280:2
  336:21
**accepted**
  57:14
**access** 142:9
  143:12,18
  174:4
  183:16

  186:8
  192:18
  326:1
  333:7
**accessing**
  184:19
**account**
  32:17
  61:24
  144:18
  170:20
**accuracy**
  43:18
  159:19
  160:6
**accurate**
  39:5  43:13
  96:12
  118:21
  181:23
  193:15
  213:20
  287:1
  291:7
**accurately**
  38:16  39:1
  39:11
  45:10  67:4
  192:18
  215:2
  332:13
**Achenbach**
  306:16
**achieve**
  244:18
**achievement**
  226:16
  227:1
**Achille** 8:10
  135:18,24
**acknowledge**
  334:7,11
**ACLU** 13:2
**acquainted**
  148:16
**act** 184:14
  185:20
  186:5
  198:16
  199:6
  270:10
**acting**
  167:17

**action** 12:4
  99:9
**activists**
  175:7
**activities**
  1:13  4:15
  12:24  91:4
  184:17
  186:9
  195:8
  198:14
**activity**
  200:8
  330:11
**actual** 41:24
  63:4
  312:20
**adapt** 329:18
**add** 285:20
**added** 29:4
**addition**
  144:24
**additional**
  27:10
  143:3
  152:17
  283:2
  286:19
  299:14
**addition...**
  260:18
**address**
  153:7
  228:9
  229:16
**addressed**
  156:23
  296:2
  298:10,11
**addressing**
  99:20
  211:11
  296:6
**adequacy**
  318:8
**adequate**
  156:14
  161:1
  163:9
  171:10
  311:5,21
  317:9
  318:5

**adequately**
  166:10
  308:18
  311:1
**adjunct**
  100:2
**adjusting**
  136:17
**Adkins** 301:8
  301:21
  302:7
**Adkins'**
  302:14
**administer**
  178:14
  179:8
  242:2
**administ...**
  188:21
  189:18
  225:17
  230:22
  308:23
**administ...**
  232:4
  243:16,22
**administ...**
  209:23
  219:18,22
  222:20
  227:21
  241:18
  242:10,15
  242:24
  333:4
**admit** 277:20
  278:3,8,20
  278:24
  280:24
  283:7,16
**admits** 279:4
**adolescence**
  51:11  52:1
  53:1,7
  73:1  154:4
  155:3
  178:7
  212:10
  234:5
  251:6
  280:2
  307:23
**adolescent**

  16:3  21:8
  24:9,12
  26:5  38:18
  47:15  65:7
  65:8,11,15
  65:19,24
  66:3  93:3
  154:9,10
  154:16,21
  155:7
  161:21
  165:20
  170:2
  177:2,3
  180:5
  216:5
  223:15,18
  223:19
  233:3
  238:18
  239:1
  243:8
  244:11
  245:12
  309:20
  315:14
  331:3
**adolesce...**
  243:22
**adolescents**
  21:17
  22:11
  23:10
  24:22
  25:21  35:3
  64:20,23
  72:15,22
  73:11,22
  75:3  96:9
  111:4,11
  113:23
  114:8
  139:3
  142:19
  146:5,14
  153:23
  154:3,5,6
  154:15
  170:21
  171:1
  180:1
  235:9
  251:4

**adult** 15:16
  15:22
  47:15 54:2
  141:3
  223:11
  244:3
  331:3,3,10
**adulthood**
  53:2
**adults** 64:23
  72:14,20
  72:23 73:2
  73:3
  143:16
  164:20
  246:17
  251:4
  267:1,11
  277:2
  280:3
  282:5
**advantage**
  184:8,22
  185:10
**advantages**
  17:3 42:1
**adverse**
  279:12
  287:16
**advise**
  204:14
**advocacy**
  286:1
**advocates**
  109:3
**Affairs**
  24:15
**affect** 189:6
  189:9
  228:6
  257:3,10
  319:6
  320:15
**affiliation**
  257:10
**affirm**
  246:23
**affirmation**
  118:3
  124:12,17
  126:5
  167:19
**affirmative**

  119:14
  123:6,7,13
  123:16
  124:15
  125:24
  139:4
**affirming**
  124:10
  125:21
  126:8
  133:15
  135:11,19
  137:10
  208:13
  241:14
**affirms**
  115:1
**age** 19:2,7
  56:5 96:9
  103:20
  106:8
  186:12,18
  192:23
  193:3,16
  193:22
  194:11
  195:1
  196:12
  203:14
  209:10
  219:9
  230:14,21
  231:3
  237:3,23
  238:4,9
  287:3
  319:11
  329:8,17
  331:4
**aged** 186:9
**agency** 1:24
  102:7
**agents** 209:6
  265:18
**ages** 190:16
  192:19
  233:4,5,14
  237:5,21
  240:17
**ago** 24:3
  59:24
  64:20
  69:13

  71:24
  80:16
  81:21
  125:12
  150:14
  174:5,9
  327:10
  330:2
**agree** 18:7
  18:17
  29:17 30:4
  35:24
  36:12,17
  37:5 44:19
  50:14,16
  63:16,18
  71:1,13
  77:7,11,12
  78:24
  90:19
  98:24
  99:21
  109:10,18
  113:7,9
  114:3,9
  118:15
  126:2
  143:6
  149:7
  157:8
  158:11,15
  170:9
  174:14
  175:1,11
  175:19
  178:12
  179:6
  180:5,10
  182:24
  212:14,17
  212:19
  213:4,14
  214:2,14
  217:14,16
  220:22
  221:10,16
  221:24
  222:16
  223:10,14
  225:3,4,9
  227:21
  230:4
  233:9

  234:11,13
  234:18
  237:22
  238:13
  246:9,10
  250:15
  260:13
  261:7,14
  264:2
  283:13
  284:5
  285:12
  286:4,13
  287:6,18
  287:20
  288:3,18
  290:11
  292:4
  294:23
  299:5
  322:10
  337:6
**agreed** 11:3
  46:18
  87:16
  94:14
  105:17
  166:17
  306:15
**agreeing**
  178:14
**ahead** 182:10
  297:10
**aim** 124:20
  124:21
  125:2
**al** 8:5,7,8,9
  8:10,11,12
  8:15,23,24
  9:7,8,11
  9:12 12:3
  12:4
  117:15,15
  118:2
  126:20,23
  128:3
  129:2,11
  129:21
  132:1,5
  133:9,14
  134:14,18
  135:18,24
  137:5,8

  138:21
  139:1
  141:2,2
  146:3
  232:21
  233:1
  245:11,16
  247:19,24
  256:11,19
  258:21
  259:22
  262:15,20
  276:18,22
  279:4,17
  280:1,6
  285:23
  292:8
  296:4
  298:13
**ALB** 107:5
**align** 43:15
**aligned**
  57:15,17
  241:17
  274:6
**alignment**
  91:2
**alleged**
  129:5
**Alliance**
  5:12
**allocated**
  21:21
**allow** 99:15
  107:18
  135:7
  167:1
  171:13,24
  206:1
  274:11
  283:17
  312:5
  326:1
**allowed**
  273:24
  293:14
  329:3,8
  330:1,16
  331:5
  333:1
  336:13
**allowing**
  194:7

251:2
270:19,20
327:18
**allows** 281:6
**alluded**
59:24
**alluding**
95:7
**alteration**
33:12
**altering**
161:2
**alternation**
32:23
34:13
**alternat...**
89:10
157:24
181:2
206:21
208:8
228:3
238:11
265:8
267:6
311:3
**amalgam**
153:9,11
**America**
315:2
**American** 3:4
7:9 16:1
48:3,8
49:24
148:20,21
149:3
152:1
**amount**
204:22
312:3
**Amsterdam**
51:3 261:2
264:10
**Amy** 8:8
133:8,14
**analogs**
111:4,13
189:6,13
235:15
**analyses**
137:22
**analysis** 9:6
118:6

136:23
251:22
254:10,12
254:15,19
285:8,19
289:7
292:11
**analyzing**
144:17
**anatomic**
189:13
**and/or** 53:19
54:3 142:9
315:11
**Anderson**
151:1,11
151:15,22
152:1,6,10
152:20
176:20
177:1
179:23
181:7,18
182:9
**Anderson's**
151:19
160:6
164:2
182:21
**Andrew** 3:10
13:7
**animal**
235:14
**Ann** 21:13
22:5
**announce...**
101:16
102:20
152:23
**annual** 25:14
26:18
**anonymous**
57:13 63:3
63:7,10
**answer** 14:3
14:8 17:7
19:22
42:23,24
67:1,4
71:9 74:5
76:6 80:11
81:8 85:9
86:13 90:7

94:15
98:15
121:24
166:15
174:1
183:9
186:24
187:6,18
187:23
189:1
191:6,19
191:20
192:2
193:18,20
193:24,24
195:13
197:12
206:19
210:17
211:5
213:20
214:7
215:2
222:7,14
243:13
244:23
263:12
264:7
273:19
274:14
294:21
295:3
304:20
309:24
330:20
331:16
336:6
**answerable**
319:15
**answered**
25:1 80:10
153:24
189:12
201:12
203:15,16
**answering**
46:4 61:12
304:17
332:12
**answers**
194:2
**anticipate**
225:24

**anticipated**
149:6
218:24
**anxiety**
138:2,3,4
138:4
**anybody**
41:19
65:17
334:5
**APA** 48:13,22
**apart** 68:13
133:3
**apologize**
116:22
117:4
299:19
301:3
311:8
336:17
**appear** 55:15
123:19
282:13
287:1
**appears** 53:7
79:1
105:15
110:13
269:11
273:11
**applicab...**
60:13,23
61:23
285:21
297:24
**applicable**
60:16
261:3
**applied**
208:5
**applies**
208:7
**apply** 113:1
237:16
320:9
**appointment**
27:19
267:18
**appreciate**
236:18
295:20
338:7
**approach**

89:14
109:4,10
112:2
113:18
119:7,11
119:12
120:11
121:13,16
121:18
122:1
167:19
170:20
171:1
216:11
304:16
337:10
338:4
**approaches**
113:22
114:6,7
119:18
120:10,21
**approaching**
121:11
**appropriate**
87:24
99:23
178:20
195:10
266:10
318:12
332:22
**approval**
219:13
**approve**
208:14
**approved**
54:2
207:11,11
218:10
219:3
**approximate**
22:19
**approxim...**
26:21
29:24 64:8
117:5
177:14
193:16
237:24
293:17
**April** 1:20
2:7 11:23

**apropos**
 20:24
**area** 44:20
 44:23 60:2
 120:10
 149:8
 221:7
 238:15,22
**areas** 237:4
**arena** 46:20
**argument**
 322:8
**Arizona**
 28:18
**ARMISTEAD**
 5:15,22
**Aron** 1:19
 2:3 6:4
 11:15 12:5
**artfully**
 331:1
**article** 7:13
 7:14,20,22
 7:23,24
 8:7,8,9,10
 8:11,12,13
 8:14,15,16
 8:17,22,23
 8:24 9:5,7
 9:8,9,10
 9:11,12,13
 33:12,24
 34:16 35:1
 44:9 45:11
 47:13 50:4
 51:8,15
 55:15,18
 58:17 60:8
 61:1 69:18
 70:5,17
 71:17 78:2
 82:5,10,11
 82:12,17
 82:20 83:5
 84:3,6,10
 85:1,6,15
 86:19,24
 87:5
 106:15,22
 108:16,21
 110:20
 115:10,15
 117:9,12

 117:14,21
 117:22
 118:17
 122:9,11
 122:13
 127:2
 128:2,3,8
 129:6
 130:14,15
 131:24
 132:5
 133:8,13
 133:13,18
 134:13,18
 134:24
 135:4,17
 135:23
 136:4
 137:4,8,12
 138:20
 139:1,5
 140:21
 141:1,5
 142:13,17
 145:23
 146:3,9
 148:3
 149:15
 150:24
 151:8
 153:8
 159:7,8,14
 159:22
 163:16
 165:17
 175:6
 176:17,22
 181:17
 182:6
 230:2,13
 230:15,24
 231:15,16
 232:20
 233:1,3
 234:9
 235:7
 236:2
 245:10,15
 247:18,23
 249:15
 250:8,15
 250:16
 251:11,19

 252:2
 254:12,23
 255:22
 256:2,11
 256:18,22
 258:2,20
 259:1,15
 259:22
 261:5,17
 262:15,19
 268:10,13
 268:22
 271:15,20
 272:3,4,12
 272:15
 273:12,13
 276:9,17
 276:22
 277:2,6,12
 277:13
 279:16,17
 280:1,5,9
 281:12,20
 282:1,3,14
 282:18
 284:10,11
 284:16,22
 288:14
 292:8
 296:21
 298:2,4,12
 298:13
**article's**
 283:14
**articles**
 20:16,17
 20:20 21:2
 69:23
 229:22
 296:17
 297:1
**articulate**
 61:11
 251:7
**articulated**
 95:21
**artifici...**
 72:23
**asked** 19:24
 60:9
 203:15
 260:14
 286:1

 301:20
 313:8
 330:10
 333:23
**asking** 40:16
 73:4 87:18
 118:17
 122:3
 160:9,9
 173:8
 174:24
 175:1
 184:2,20
 185:7,8
 191:13
 197:6,7
 199:3
 232:10
**aspect** 89:3
 91:17,17
 235:20
**aspects** 58:7
 88:12
 185:3,8
 234:18
**assault**
 152:23
 155:24
 156:7,9
**assent**
 266:13
**assert** 30:5
 41:19
**assertion**
 79:2
 129:10
 131:4
**asserts** 38:6
 40:22
 41:12
**assess** 38:15
 38:23
 120:9
 179:1
 180:19
 237:19
**assessed**
 52:13 85:7
**assessing**
 42:3
 156:17
 157:20
 180:20,24

 190:20
 195:8
 200:11
**assessment**
 38:11,18
 39:17,18
 39:21
 40:15
 41:20 42:8
 42:14,16
 42:20 43:5
 43:12
 73:20
 85:18 86:8
 91:12
 92:14,19
 98:24
 99:13,17
 102:8,8
 107:20
 124:9
 147:14
 156:19,22
 157:5,12
 158:13,17
 159:11,20
 160:1,23
 161:13,22
 165:16,18
 166:2,3,8
 166:21
 169:11
 170:6
 179:4,12
 180:18,19
 200:17
 203:12
 204:9,10
 212:9
 217:7,8,14
 243:4
 267:2
 303:20
 305:22
 306:2
 307:19
 308:2,3
 309:14
 310:1,12
 310:13
 311:4,6
 312:6
 313:18

317:9,16
317:21,24
331:9
332:17
**assessments**
40:19
86:15
87:24
160:11,13
161:15
168:21
192:22
195:5
216:12
314:7
**assigned**
41:24
57:18
80:23,23
155:4,10
155:10
156:2,6
177:10
178:2,6
188:7
190:5,6
193:4,4,8
199:16
202:12
203:2,20
234:2,2
242:13,19
242:22
273:4
274:6
322:5
324:22
329:7
336:11,22
337:1
**assignments**
152:14,16
152:17
**assist**
325:13
**Assistant**
47:14
**Associate**
21:7 24:8
24:11,12
25:8
**associated**
18:2 54:6

84:13
130:23
244:12
263:2
266:1
282:22,24
**association**
7:9 48:4,9
49:24 94:2
95:10,11
116:3,8
133:15
148:20,22
149:3
152:2,7,11
176:15
276:23
292:2,5,9
293:2,3,6
293:10,11
**Associat...**
16:2
**associat...**
95:3
**assume** 19:23
116:23
185:9
**assumed**
247:16
**assuming**
27:9 65:21
163:14
312:14
**assumption**
116:5
185:16
290:8
**Astrid**
101:18
102:2
107:7
**athletes**
18:3
**athletic**
17:11,15
17:19 19:5
91:6,15
194:17
329:3
**athletics**
17:3 18:3
275:1
**attempted**

30:19
133:16
275:19
282:23
283:1
**attempting**
284:24
292:17,24
**attempts**
277:1
282:2,4
292:20
**attention**
53:10
111:1
176:19
**attestable**
333:19
**Attorney**
1:20 6:6,8
10:3 11:10
12:8,11,13
12:14,16
12:19,22
13:1,3,5,7
13:9,12,19
14:19 15:2
15:13,15
17:6,8,21
17:23 18:4
18:10,19
18:22 19:9
19:11
21:18,24
22:12,18
23:11,17
24:23 25:3
27:1,5
29:20,23
30:9,13,24
31:2,4,8
31:15,21
32:5 33:6
33:8,16,22
34:1,5,9
34:22 35:4
35:7,11,20
36:2,4,7
36:11,23
37:1,4,8
37:13,17
38:9,14
39:2,9,13

39:19 40:2
40:6,12,20
41:2,6,8
41:11,17
42:2,6,12
43:20 44:3
44:7,10
45:1,3,15
45:19 46:2
46:5,8,24
47:7,24
48:7 49:1
49:5,8,9
49:16 50:3
50:7,13,15
50:19,22
52:3,8
53:16
54:13,15
54:20 55:6
55:8,10,13
55:20,22
56:13,19
57:8,19
58:3,8,19
58:23 59:3
59:7,12,15
59:19,23
64:10,15
64:17,18
66:5,8
68:2,4,5
68:16,18
68:23 69:1
69:2,12,20
70:4,7,10
70:20 71:3
71:7,16,22
71:23 72:6
72:17 74:1
74:2 75:7
75:9,12,15
76:13,19
77:10,19
77:22 78:1
78:8,10,13
79:14,17
80:9,12,21
81:1,5,7
81:17,20
82:9,23
83:1,4
84:1,9,22

84:24
85:14 86:4
86:11,18
86:22 87:3
87:14 88:1
88:13,21
89:17,20
91:24 92:1
92:4,7
95:4,5
96:10,14
97:2,10,14
97:20
98:12,14
99:6,11,24
100:5,15
100:19
101:2,7,15
101:21
102:1,13
102:15,17
102:19,22
103:1,7
104:4,9,14
104:17,22
105:2,5,11
105:16,22
106:11,13
106:18
107:2,9,16
107:21
108:4,12
108:20
109:11,17
110:11,17
110:24
111:20
112:5
113:8,16
114:2,5
115:3,7,14
116:19,20
117:19,20
118:16,24
119:8,15
119:21
120:7,15
120:17,22
120:23
121:21
122:4,10
122:12,14
122:19,24

| | | | | |
|---|---|---|---|---|
| 123:18,22 | 173:3,6,17 | 207:16,19 | 245:4,7,10 | 282:7,9,12 |
| 125:4,11 | 173:21 | 208:2,10 | 245:18 | 282:16,19 |
| 126:17 | 174:15,23 | 209:3,7 | 246:1,18 | 283:4 |
| 127:1 | 175:14,18 | 210:14,18 | 246:22 | 284:19 |
| 128:1 | 175:21 | 211:3,7,15 | 247:2,6 | 285:1 |
| 129:14,18 | 176:5,12 | 212:2 | 248:3 | 286:6,10 |
| 130:2,9,17 | 177:8,12 | 213:7,11 | 249:1,3,7 | 286:14,17 |
| 130:19 | 178:16,24 | 213:17 | 250:12,21 | 288:5,11 |
| 131:20 | 179:10,21 | 214:1,5,9 | 251:15 | 288:19,23 |
| 132:4,21 | 180:9,12 | 217:4,10 | 252:1 | 289:14,24 |
| 133:4,12 | 181:15,24 | 217:22 | 253:23 | 290:17,19 |
| 134:7,10 | 182:5,8,13 | 218:7,21 | 254:1,7,11 | 291:3,10 |
| 134:17,21 | 182:19 | 219:2,11 | 254:14,16 | 291:13,23 |
| 134:23 | 183:4,22 | 219:15 | 254:18,20 | 292:6,13 |
| 135:16 | 184:1,24 | 220:6,10 | 254:21 | 293:4,8 |
| 136:3 | 185:6,14 | 220:19,23 | 255:3,8,19 | 294:12,16 |
| 137:1,7 | 185:18 | 221:4,9,12 | 255:24 | 294:20,22 |
| 138:8,10 | 186:14,16 | 221:15,18 | 256:9,14 | 295:1,4,7 |
| 138:17,24 | 186:20 | 221:23 | 256:21 | 295:12,14 |
| 140:18,24 | 187:1,4,8 | 222:2,8,11 | 258:23 | 298:16,18 |
| 141:17,23 | 187:11,14 | 222:15 | 259:4,13 | 300:11,17 |
| 142:3,10 | 187:17,19 | 223:3,6,8 | 259:16,19 | 301:23 |
| 142:16,21 | 187:22,24 | 223:9 | 260:5,8,11 | 302:2,5,8 |
| 142:23 | 188:3,10 | 224:5,9,17 | 260:16 | 302:10,16 |
| 144:3,6 | 188:23 | 224:19 | 261:12 | 302:21 |
| 145:7,8,15 | 189:3,10 | 226:19,24 | 262:1,8,9 | 303:4,7 |
| 145:19 | 189:17,21 | 227:10,15 | 262:11,13 | 304:14,19 |
| 146:2 | 189:24 | 227:17,19 | 262:14,23 | 308:20 |
| 147:18,21 | 190:3,8,11 | 228:1,5,10 | 264:5,12 | 309:4,10 |
| 148:1,10 | 190:14,18 | 228:14,17 | 265:2,4,13 | 309:18,22 |
| 149:12,19 | 190:24 | 228:24 | 265:21 | 310:3,15 |
| 149:23 | 191:4,8,12 | 229:6,10 | 266:20 | 310:16 |
| 150:2,13 | 191:17,21 | 231:12,20 | 267:8,17 | 311:7,11 |
| 153:3,4 | 193:6,11 | 232:16,24 | 268:6,12 | 311:15,19 |
| 154:23 | 194:12,13 | 234:12,17 | 268:17,20 | 311:22 |
| 155:5 | 195:3,14 | 234:21,24 | 269:9,13 | 312:7,12 |
| 156:16,20 | 195:23 | 235:3,5,6 | 269:16,18 | 312:13,15 |
| 157:1,7,16 | 196:3,6,14 | 236:6,9,11 | 269:20,23 | 312:18,22 |
| 158:2,8,10 | 196:20,24 | 236:16,21 | 270:2,24 | 313:3,6,12 |
| 160:4,8,15 | 197:5,9,15 | 236:22 | 271:4,10 | 314:10,16 |
| 160:18,20 | 197:19,23 | 237:9,11 | 271:17 | 315:13,18 |
| 161:3,7,10 | 198:20 | 237:13,18 | 272:11,16 | 315:22 |
| 161:14 | 199:2,10 | 238:17,21 | 272:20 | 316:3,9,14 |
| 163:13,19 | 199:14 | 239:2,5,16 | 273:1 | 316:16,18 |
| 165:8,11 | 200:5,12 | 240:14,18 | 274:1,7,19 | 316:24 |
| 166:1,5,13 | 200:19,21 | 241:6,10 | 274:20 | 317:3,7,10 |
| 166:24 | 201:7,10 | 241:21 | 275:6,10 | 317:14,17 |
| 167:5,12 | 201:16,19 | 242:1,5,8 | 275:12,14 | 317:22 |
| 167:21 | 201:23 | 242:18,21 | 275:15 | 318:6,10 |
| 168:3 | 202:10,15 | 243:11,14 | 276:13,21 | 319:13,18 |
| 169:6,14 | 203:15,18 | 243:17,20 | 279:23 | 320:11,12 |
| 169:19,22 | 206:17,23 | 244:15,17 | 280:8 | 321:3,5,9 |
| 172:17,22 | 207:4,7,13 | 244:21,24 | 281:17,24 | 321:17,21 |

322:11
323:5,9,15
324:4,15
325:5,19
326:4,8,13
327:21
328:8
330:8,13
330:18,23
331:15,17
331:20,23
332:8
333:16,24
334:10,15
334:19,23
335:9,13
335:14
336:16,24
337:8,18
337:24
338:6,10
338:13,15
338:19
**attorneys**
  12:6 302:1
**attract**
  61:22
**atypical**
  88:5 310:9
**audibly** 14:3
**August** 98:3
**Australian**
  7:15 97:6
  97:11 98:8
**author** 33:24
  44:11
  77:13 79:1
  79:4
  109:14,23
  143:3
  159:7,8
  249:15
  254:15,18
  257:2
**author's**
  146:23
  162:14
  226:22
**authority**
  241:3
**authoriz...**
  1:23
**authors**

35:10 78:2
78:14
79:11,18
80:5 83:9
111:7
112:11,16
113:2
115:17
116:7,9
118:11,19
118:21
122:16
123:3,19
123:23
124:11
125:24
126:4
133:23
135:4
136:9,16
139:9,10
139:15
140:10
159:20,23
162:1,5,10
162:19
163:4,11
165:15
168:19
170:10,18
172:9
173:14,19
245:19
257:8
263:2,13
277:12,14
277:19
278:3,8,20
280:13,24
281:5
282:20
283:6,16
283:22
286:11,18
287:12,22
287:23
289:5,20
290:3,7,20
291:21,24
297:16
328:2
**authors'**
  124:1

**autonomy**
  126:2
**available**
  72:11,13
  90:1 91:22
  92:3,8
  99:14
  103:14
  143:14
  144:14
  234:9
**average**
  319:11
**avoid** 64:11
  70:24
**avoidance**
  138:5
**aware** 30:17
  30:21
  47:20
  69:14,17
  70:3,14,16
  71:4,17,21
  74:10,13
  74:14
  81:23 82:2
  96:6
  101:19
  102:2,7
  104:1,10
  104:18
  106:3,7
  107:6,17
  110:2
  125:13
  148:13
  162:24
  163:11
  173:15,18
  206:3,24
  210:19,24
  211:5
  214:18,22
  215:6,11
  217:11
  223:1
  232:13
  240:12
  241:8
  246:14
  248:7
  268:14
  271:23

297:2,4
314:21
319:24
329:1
333:21
334:16,22
335:6,7,16
335:18
**AZ** 5:14

————————
                **B**
**B.P.J** 1:5
**back** 50:8
  57:16 65:2
  66:18
  69:10
  72:21
  73:17
  80:14
  96:24
  109:4
  127:22
  150:11
  154:17
  165:19
  201:5
  211:24
  227:20
  235:2
  239:14
  258:11
  267:4
  268:4
  290:20
  291:5
  300:6
  301:2
  309:7
  321:6,17
  321:19
**background**
  102:16
**Bailey** 5:4
**balance**
  177:13
**ball** 329:21
  329:22,24
  330:1
**ballpark**
  27:6
  154:13
**Barham** 5:17
  6:6 11:10

12:8,9
13:19
14:19 15:2
15:13,15
17:8,23
18:10,22
19:11
21:24
22:18
23:17 25:3
27:5 29:23
30:13 31:2
31:8,15,21
32:5 33:8
33:16 34:1
34:9 35:4
35:11,20
36:4,7,11
37:1,4,8
37:17
38:14 39:9
39:19 40:6
40:20 41:6
41:11 42:2
42:12
43:20 44:3
44:10 45:3
45:19 46:5
46:8 47:7
47:24 48:7
49:5,9,16
50:7,15,22
52:8 53:16
54:15,20
55:8,10,20
55:22
56:19
57:19 58:8
58:23 59:7
59:15,23
64:15,18
66:8 68:4
68:5,18,23
69:12 70:4
70:10 71:3
71:16,23
72:17 74:2
75:9,15
76:13,19
77:19 78:1
78:10,13
79:17
80:12 81:1

81:7,20
82:9 83:1
83:4 84:1
84:9,24
86:4,18
87:3 88:1
88:21
89:20 92:1
92:7 95:5
96:14 97:2
97:10,20
98:14
99:11
100:5,15
101:2,7,15
102:1,15
102:19
103:1,7
104:9,17
105:2,5,16
105:22
106:13,18
107:2,9,16
108:4,12
108:20
109:17
110:17,24
112:5
113:16
114:5
115:7,14
116:20
117:20
118:24
119:15
120:7,17
120:23
122:4,12
122:14,24
123:22
125:11
126:17
127:1
128:1
129:18
130:2,9,19
131:20
132:4
133:4,12
134:10,17
134:23
135:16
136:3

137:1,7
138:10,17
138:24
140:18,24
141:23
142:10,16
142:23
144:6
145:19
146:2
147:21
148:1,10
149:12,23
150:2,13
155:5
156:20
157:7
158:2,10
160:8,18
160:20
161:7,14
163:19
165:11
166:5,24
167:12
168:3
169:14,22
172:22
173:6,21
174:23
175:18
176:5,12
177:12
178:24
179:21
180:12
181:24
182:8,13
183:4
184:1
185:6,18
186:16
187:1,8,14
187:19
188:10
189:24
190:14,24
191:8,17
191:21
193:11
194:13
195:14
196:6,20

197:5,15
197:23
199:2,14
200:12,19
201:16,23
202:15
203:18
206:23
207:7,13
207:16,19
208:10
209:7
210:18
211:15
212:2
213:11
214:1
217:10,22
218:7
219:2,15
220:10,23
221:9,15
221:23
222:8,15
223:8,9
224:9,19
226:24
227:10,15
227:17,19
228:5,14
228:17,24
229:10
231:20
232:16,24
234:17,24
235:5,6
236:6,9,16
236:21,22
237:11,18
238:21
239:2,5,16
240:18
241:10
242:1,8,21
243:14,20
244:17,24
245:7,10
245:18
246:1,22
247:6
248:3
249:3,7
250:21

251:15
252:1
254:1,11
254:16,20
254:21
255:8,24
256:9,21
259:4,16
259:19
260:8,16
262:1,8,11
262:14,23
264:12
265:4,21
267:8,17
268:6,12
268:20
269:13,18
269:20
270:2
271:4,10
271:17
272:16
273:1
274:7,20
275:10,14
275:15
276:13,21
279:23
280:8
281:17,24
282:9,12
283:4
285:1
286:10,17
288:11,23
289:24
290:19
291:10,23
292:13
293:8
294:16,22
295:4
**BARNHAM**
145:8
153:4
187:24
189:3,17
190:8
214:9
**Barr** 3:10
13:7,7
**barring**

186:5
**base** 102:9
**based** 40:24
41:14 54:1
60:11 61:2
71:10 88:8
99:14
110:5,14
115:21
116:4
124:3
171:13,24
178:21
179:14
216:7,15
217:2,16
217:20
218:24
237:16
238:8
249:14
258:18
259:2
264:7,16
267:2
309:2
311:24,24
319:15
323:11
324:1,12
**baseline**
111:13
290:21
**basically**
120:13
**basing**
100:16
**basis** 20:18
20:20 21:4
35:5 52:18
79:1,11,12
107:19
111:18
116:6
200:11
240:19
289:11
291:2,11
291:12
337:12
**bathroom**
149:21
239:4

321:8
**battling**
182:12,22
**beat** 269:5
**becoming**
243:8
251:3
**began** 15:19
74:21
**beginning**
2:8 111:6
173:9
176:16
177:19
**begins** 175:7
190:17
191:10,23
192:24
193:23
194:9
200:14
209:2
237:1
**behalf** 2:3
12:20,23
13:4,6,8
13:10,13
118:19
338:14,16
**behavior**
323:21
**Behavioral**
22:4 24:16
**behaviors**
323:1
324:1
**belief** 90:4
181:3
**believe**
20:15
30:14
59:24 60:7
65:4 76:14
79:4 81:6
82:12
100:24
105:9
123:9,23
124:4
125:23
127:5
160:16
163:5

207:14
270:3
274:16
292:21
295:4
296:1
299:12
300:19,19
303:2,12
303:14
315:20
**bell** 186:12
186:18
**belong**
120:19
**belonged**
57:6
**belonging**
56:11,21
**belt** 251:3
**beneficial**
228:13
270:3,22
273:17,23
274:11
294:8
**benefit**
337:14
**benefits**
89:9 91:12
130:23
131:12
139:17
140:5,11
157:24
181:1,4
184:19
206:21
208:8
228:3
238:11
265:7
267:6
311:3
335:15
**best** 14:3,7
14:12
15:14 73:7
99:9 159:1
176:1
178:21
179:14
186:23

195:11
225:7
269:5
299:6,8
315:4
338:4
**bet** 295:22
**betrays**
118:13
**Betsy** 108:21
**better** 71:14
87:22
121:7
183:16
196:2
197:12
206:18
267:10,10
307:5
**beyond** 16:4
27:10
116:8
152:14
156:21
161:15
165:12
169:12
333:21
**bias** 60:10
60:22 61:1
113:6
144:12
281:7
287:17,18
325:22
332:14
**biased**
325:21
**big** 92:12
241:7
**Biggs** 8:14
142:17
**bill** 336:7
336:13,18
336:21
**billed** 27:20
**binary** 118:4
118:13,22
119:2
206:7
222:6
**binding**
172:12

**bioethical**
77:5,8
**biological**
37:19
52:18 54:6
184:6,21
190:9,17
191:3,11
192:9,20
193:5,17
193:23
194:7
197:17
198:1,11
198:17
199:7,13
200:2
271:24
272:7,8
273:23
275:4
335:24
336:1,3,19
**biomedical**
123:6
260:3,23
**birth** 41:24
57:18
80:23,24
155:4,10
156:2,6
177:11
178:3,6
188:7
190:6,6
193:4,9
199:16
202:12
203:2,20
234:2
242:13,19
242:22
249:10,16
250:9
273:5
274:6
322:5
324:22
325:3
329:8
336:11,22
337:2
**bit** 18:6

67:23
125:22
180:3
223:7
260:12,24
285:21
291:24
322:14
**Blakemore**
8:22
232:21
233:1
**blanket**
60:10
**block** 3:3
10:4 13:1
13:2 17:6
17:21 18:4
18:19 19:9
21:18
22:12
23:11
24:23 27:1
29:20 30:9
30:24 31:4
33:6,22
34:5,22
35:7 36:2
36:23
37:13 38:9
39:2,13
40:2,12
41:2,8,17
42:6 44:7
45:1,15
46:2,24
49:1,8
50:3,13,19
52:3 54:13
55:6,13,21
56:13 57:8
58:3,19
59:3,12,19
64:10,17
66:5 68:2
68:16 69:1
69:2,20
70:7,20
71:7,22
72:6 74:1
75:7,12
77:10,22
78:8 79:14

80:9,21
81:5,17
82:23
85:14
86:11,22
87:14
88:13
89:17
91:24 92:4
95:4 96:10
97:14
98:12 99:6
99:24
100:19
101:21
102:13,17
102:22
104:4,14
104:22
105:11
106:11
107:21
109:11
110:11
111:20
113:8
114:2
115:3
116:19
117:19
118:16
119:8,21
120:15,22
121:21
122:10,19
123:18
125:4
129:14
130:17
132:21
134:7,21
138:8
141:17
142:3,21
144:3
145:7,15
147:18
149:19
153:3
154:23
156:16
157:1,16
158:8

160:4
161:3,10
163:13
165:8
166:1,13
167:5,21
169:6,19
172:17
173:3,17
174:15
175:14,21
177:8
178:16
179:10
180:9
181:15
182:5,19
183:22
184:24
185:14
186:14,20
187:4,11
187:17,22
188:3,23
189:10,21
190:3,11
190:18
191:4,12
193:6
194:12
195:3,23
196:3,14
196:24
197:9,19
198:20
199:10
200:5,21
201:10,19
202:10
203:15
206:17
207:4
208:2
209:3
210:14
211:3,7
213:7,17
214:5
217:4
218:21
219:11
220:6,19
221:4,12

221:18
222:2,11
223:3
224:5
225:6
226:19
228:1,10
229:6
231:12
234:12,21
235:3
237:9,13
238:17
240:14
241:6,21
242:5,18
243:11,17
244:15,21
245:4
246:18
247:2
249:1
250:12
254:7,14
254:18
255:3,19
256:14
258:23
259:13
260:5
261:12
264:5
265:2,13
266:20
268:17
269:9,16
269:23
270:24
272:11,20
274:1,19
275:6,12
282:7,16
282:19
284:19
286:6,14
288:5,19
289:14
290:17
291:3,13
292:6
293:4
294:12,20
295:1

298:16
299:2
300:11
301:23
302:8,16
303:4
304:14
308:20
309:10,22
310:15
311:7,15
311:22
312:12,15
312:22
313:6
314:10
316:18
317:3,10
317:17
318:6
319:13
320:11
321:3,9
322:11
323:5,15
324:15
325:19
326:8
327:21
330:8,18
331:15,20
332:8
333:16
334:10,19
335:9
336:16
337:8,24
338:10
**blocked**
194:8
**blocker**
203:10
311:13
**blockers**
8:20 19:2
67:15 72:4
72:12,15
91:21
92:17,22
96:8
107:19
141:9,14
142:1

146:15
159:12
160:2,12
186:11,17
187:2,9
188:1,6,20
191:14
197:18
198:2,12
200:4,14
201:9
203:24
205:2
206:5,11
208:14,17
208:21
209:21
211:2
217:2
222:20
224:12,23
225:1,17
226:1
227:22
230:22
232:5
240:24
241:5
259:23
260:1,19
260:21
261:16
263:22
264:3,9,14
264:20
265:9,24
266:16
287:2
309:21
312:10
**blocking**
39:22
72:10
103:18
130:21
131:12
132:17
134:4
135:11
165:6
188:12
189:18
194:10

204:5,6,16
205:9
207:1
208:12
209:2,6
215:24
218:11
225:6
226:7
235:24
238:1
**bloodstream**
203:5
**board** 1:9,11
4:21 5:8
12:4,17,20
65:18,22
152:10
206:16
308:2,4
338:16
**boarded** 86:1
**boards**
100:13
**bodies** 94:4
**body** 98:9
111:10
137:9
138:1
147:16
189:7
202:14,16
220:16
306:11,18
323:21
**bone** 212:10
213:16,22
214:21
215:3
221:11,17
222:5
**bones** 221:24
222:9
225:7
**book** 205:17
**borne** 123:21
**Boston** 47:15
**bottom** 33:2
45:4 48:19
52:9 54:16
58:1 109:2
124:11
136:8

137:21
143:2
159:15
162:1
163:3
179:23
224:23
248:23
269:14,15
278:1
**Boulevard**
4:19
**boundaries**
18:18
**boy** 172:11
**boys** 91:6,15
172:12
177:3
198:18
199:8,17
199:20,23
207:23
230:15,17
230:21
231:23
252:10,10
252:20,23
253:8
319:8,24
320:14
**BPJ** 12:3
13:1 18:23
19:2 30:14
208:17,20
240:23
**BPJ's** 19:5
30:16
**brain** 212:11
214:15
218:20
222:17,23
223:2
227:23
228:6
230:3,6
231:6,16
232:6,7
233:3,22
234:6,11
234:14,15
234:18
235:10,23
236:3

237:2,4
238:13,18
322:16
**break** 14:11
14:14
64:14 68:3
68:24 69:7
96:12,21
148:11
149:22
150:8
201:2
239:4,5,11
256:15
268:1
295:17,20
321:8,14
**breaks**
252:14
**breasts**
172:12
**Bridgeport**
4:20
**bring** 182:11
315:13
316:3,10
**broad** 3:5
39:8 71:1
164:5
192:1
**broader**
34:24 35:1
64:1 71:14
226:23
**broadly**
63:14
168:13
261:3
**BROOKS** 201:7
**brought**
181:8
**brush** 71:1
**budget** 26:18
**build** 333:8
**building** 4:5
121:8
179:17
**built** 79:1
**bullet**
103:21
**Burch** 1:14
5:9 12:21
338:17

**butcher**
224:21
**butchering**
106:15
**Butler** 79:24

———————
**C**

**C** 2:6 3:1
4:1 5:1,3
5:17 11:8
**CA** 3:15
**calculated**
144:5
254:23
**calculus**
238:10
**call** 171:1,3
241:23
**called** 11:16
292:10
**camera** 196:1
**camps** 87:7
120:13
**Canada**
159:10
**Cantor**
131:11
302:4,20
302:23
312:19,24
313:9
338:2
**Cantor's**
131:15
305:21
**capabili...**
19:6
**capability**
267:10
**capable**
243:8,23
266:23
**capacity**
1:15,17,19
149:2
157:23
183:15
267:4
**Capitol** 4:4
**caption** 12:1
**captured**
14:4,4
286:21

325:4
**car** 93:23
**care** 11:13
21:22
38:12
56:18
60:18 67:7
68:7,9,13
68:20
70:24
71:15 74:9
87:12,13
88:10,12
88:17,19
88:24 89:8
89:11,13
89:14,15
89:22
91:22 92:3
92:5,9,11
93:8,8,14
93:16 94:8
94:14,19
94:23 95:2
95:21 96:2
99:23
100:21
106:2
114:13,24
114:24
116:4
119:14
121:19
123:7,13
123:16
124:10
125:10,17
125:20,21
126:8
132:7
133:2
139:4
145:1
149:5
158:12,19
158:21
159:3
161:20
170:24
171:4,13
174:4,21
177:11,23
178:20

181:22
183:15,17
208:5
217:19
243:4
245:12
264:10
266:8
270:16,17
311:2
313:10
318:24
326:1
**career** 81:23
**careful**
177:24
212:8
305:22
306:2
307:18
308:2,3
311:6
314:7
317:9,15
317:24
**caregiver's**
318:2
**caregivers**
38:21
**Carly** 245:23
**Carmichael**
9:8 262:15
262:20
**carried**
324:19
**carry** 126:1
**case** 1:7
12:9 14:2
15:4 28:16
28:24 29:1
29:3,16
30:16
33:13 63:4
107:19,19
183:11
196:19
225:16
320:6
**cases** 63:9
104:3,12
104:20
105:8
106:4

123:8
143:23
**catch** 98:15
**categorical**
90:9
**categori...**
118:12
**categorize**
114:7
119:18
120:20
**causal** 134:9
168:8,15
278:16
283:18
**causation**
127:11,19
127:21
133:23
135:7,15
143:22
241:9
277:21
278:5
289:10
290:3
292:3,5,9
**causative**
278:12
292:11,12
**cause** 61:15
62:14
163:22
168:8
189:19
190:5
244:11
332:4
**caused**
127:14
134:5
135:12
151:5
163:6
165:4
166:19
231:1
246:12
292:19
297:20
329:1
**causes** 61:9
189:15

231:4
240:16
**causing**
202:1
231:7
**caution**
140:12
**caveat** 73:17
205:24
**CBCL** 306:16
**CDC** 240:20
**cease** 105:18
**ceiling**
310:19
**center** 3:14
50:24
237:6
277:15
**centers**
107:4
**central**
224:16
256:14
313:14
**certain**
105:12
141:21
175:12
207:11
225:12
298:9
301:10
310:20
**certainly**
46:5 74:16
77:12 83:1
155:2
171:5
178:4
204:20
215:18
223:8
234:13
248:5
249:12
314:5
315:3
328:6,22
333:19
336:4
**certainty**
59:18
111:12

112:22
**CERTIFICATE**
6:9
**certific...**
11:5 308:1
318:11,14
**Certified**
11:21
65:19,22
308:3
**certifying**
1:24
**cetera** 38:22
91:4
144:11
168:24
205:20
312:5
**CGAS** 147:9
147:14
148:8
303:19
304:7,8,11
305:11
**Chair** 22:3
24:15 25:5
**challenged**
296:18
**challenges**
77:5,8,16
77:17,20
77:24
177:21
**chance** 78:9
97:15
107:22
113:6
149:21
250:13
255:4
272:12
**chances**
291:20
**change** 7:18
34:3 36:20
37:7 47:6
47:9 49:23
101:11,17
102:21
103:5,8,12
111:13
130:14
172:14

177:4,13
179:19
245:1
246:12
261:10
309:14
314:14
322:23
324:2
**changed**
31:10,17
106:1
172:23
284:2
297:13
323:2
324:12
327:4
337:22
**changes**
45:12 46:1
46:22
47:10
49:18
113:4,5
157:13
158:4
168:10
178:23
185:4,4
186:13,19
187:3,10
187:15,21
192:11,14
193:21
207:23
228:12
231:17
233:13
234:5,7
261:21
298:1
322:6
**changing**
48:23 49:6
174:1
**characte...**
168:1
**characte...**
37:20
**characte...**
36:18
100:20

114:4
332:9
characte...
120:11
154:18
169:20,23
169:24
317:1,4
characte...
75:24
217:7
230:11
charged
27:18
Charleston
1:3 4:6,13
5:7 12:3
charts
144:10
193:13
294:3
check 127:5
296:17
335:10,21
chest 192:11
Chicago
21:14 22:6
23:5 24:2
153:21
154:2
240:3
264:17
child 15:23
16:3 21:8
24:9,12
26:4 38:18
42:18 43:7
46:10 65:6
65:8,10,13
65:15,16
65:19,24
66:2 68:11
77:15
86:24
87:23 89:1
89:2
119:24
120:6
121:9,17
152:24
153:13,18
154:7,11
157:18

166:15
170:2,4
171:10
175:23
178:18,20
178:22
180:24
181:8,9
182:4,18
183:8
185:22
186:2
190:23
192:18
195:4,12
197:12
204:8,13
204:18
206:14,22
208:5,8
217:17
228:4
232:7
237:10
243:2,6
261:10
264:20
266:12,13
266:15,19
267:3
304:1
307:23
309:20
310:2
311:10
323:23
324:7
329:1,7,10
329:13,18
329:19,20
330:14
331:3,10
332:17,19
333:1
child's
42:21 88:3
115:1
121:18
147:17
165:3,3,23
167:3
168:5
169:12

171:7
261:21
322:9
324:13
childhood
45:6 51:10
51:24
154:18
164:19
237:2
252:11
256:12
275:20
292:18
324:20
children
21:17
22:11
23:10
24:21
25:21 35:2
40:18
51:10,23
52:24 53:6
64:19,23
66:3,6
73:1,6,11
73:15
74:24 85:2
85:6,12,18
85:22 86:9
86:20 87:1
87:20
88:16 96:9
98:21 99:3
103:15
111:4,11
113:23
114:8
123:5
128:8,20
128:21
153:23
154:19
155:3
164:5,24
167:6,10
174:4
194:10,23
195:6,22
196:10
208:13
240:13,17

251:2,3,5
251:7
254:24,24
255:9,9,16
255:17
257:4,11
257:16,23
258:7,8,13
259:23
260:19
261:2,15
263:21
264:2,14
264:22
320:9
322:2,2
324:23
333:18
children's
21:14 22:5
23:4 24:17
47:15 85:2
101:18
102:5,21
107:7
128:9
147:14
224:22
240:2
256:4
303:19,20
307:22
choice 266:5
choices
238:10
choose 74:16
272:23
chose 74:17
74:23
chromosomes
37:21
184:7
199:15
circular
322:8
circumst...
312:1
cisgender
120:1
139:4
333:12,18
334:2,4,8
334:16

citation
79:12
citations
229:22
cite 20:15
83:19
129:1,10
141:5
146:9
153:20
240:21
251:11
256:2
276:9
279:16,16
281:12
296:9,17
cited 21:2
84:12,17
117:22
127:2
128:3
130:10
132:8
133:18
134:24
136:4
137:12
139:5
164:8
252:3
256:22
277:2,6
280:9
284:11
297:1
325:10
cites 51:14
116:14
citing 79:4
79:24
84:17
131:3
260:20
Civil 2:5
3:4 12:4
claim 95:1
131:10
192:17
241:4,8
281:1
292:9
claimed 42:4

292:7
**claiming**
  38:24
**clarify**
  28:10  41:5
  74:15
  117:2
  148:8
  167:1
  169:7
  172:8
  238:8
  260:15
**clarifying**
  224:15
**class** 257:9
  270:14
**classifi...**
  32:16,21
**classified**
  29:22
  118:13
**classifying**
  325:17
  326:10
**clauses**
  332:11
**CLAYTON** 1:14
  5:9
**clear** 58:22
  105:13
  126:8
  154:17
  157:23
  171:9
  174:24
  177:2
  179:13
  182:14
  269:19
  300:5
  311:2
  320:13
  323:24
**clearly**
  188:6
**CLERK** 5:18
  36:6  37:3
  105:4
  106:17
  127:24
  207:15
  218:2

224:18
227:13,16
227:18
228:16
236:8
245:9,20
259:18
315:21
**clinic** 52:5
101:19
141:8,19
155:1,24
160:10
161:17
164:16
172:14,19
173:23
210:5
224:22
261:2,18
263:9
264:10,11
306:13
313:14
314:1,2,2
315:6
**clinical**
21:7,22
23:20  24:5
24:11,15
27:16  32:9
46:13
52:10
64:19
69:24  86:8
86:15
100:8
113:4
123:21
124:19
143:15,19
151:13
161:18
162:21
164:4
177:23
196:18
209:9,16
209:20
210:1,3,4
210:5,10
210:16,22
210:24

240:11
264:9
290:5
304:17,24
305:13
307:16
308:10,15
308:17,23
309:2
318:19
322:21
323:7,11
337:10
**clinically**
304:2,3
**clinician**
38:7,15
41:13
56:24
59:17
148:9
304:1
**clinicians**
51:4  77:6
81:13  85:7
85:17
173:15
207:21
315:10
**clinics**
81:14  93:2
107:6
159:10,24
177:3
178:1
180:14
209:1
261:3
316:23,23
**close** 66:18
67:21
**closed** 62:23
136:11
**closely**
250:15
268:19
**closest**
155:17
**clothes**
172:12
**co-author**
176:21
**co-directs**

47:20
**co-occur...**
92:15
156:17
157:21
166:9
243:5
305:23
310:24
**coast** 224:16
**coercion**
197:13
**cognition**
118:19
322:15
**cognitive**
215:8,13
235:15,18
235:20
238:14
267:3
**Cohen-Ke...**
51:2,15
**Cohere** 108:2
108:5
110:8
**cohort**
167:15,24
173:10
262:16
274:5,10
**collabor...**
47:22
170:19
171:1
**collateral**
312:3
**colleagues**
27:10
202:6
203:22
244:23
245:6
319:22
334:14
**collect**
306:15
**collected**
259:2
**College** 7:16
97:6,12
98:8,18
99:13

**College's**
99:21
100:17
**collegiate**
331:4
**Columbia**
50:23
**column** 33:2
48:20  52:9
54:16  55:4
58:1  118:9
123:3
124:16
125:23
133:22
136:9,16
136:22
139:9,22
146:20,20
212:4
216:16
226:6
230:2
233:11
235:13
258:3,5
260:9,10
280:13
285:8
287:12
**columns**
252:7
**combination**
42:8  154:8
**combined**
141:24
**combines**
143:5
144:21
**come** 43:10
153:14
160:21
167:16
190:20
194:16,17
204:16,18
296:21
309:8
**comes** 179:5
241:9
327:6
**comfort**
121:17

comfortable
 80:18
 185:17
coming 95:18
 177:2
 204:21
comment
 221:8
 288:22
 312:17
 320:21
commented
 150:15
Commission
 1:13 4:15
 12:24
commit 75:6
 75:11
committee
 51:22
 52:10,23
 53:5 152:2
 152:14,15
 152:17
common 83:15
 130:15
 217:17
 220:11
 324:24
communic...
 301:24
community
 312:5
comparative
 286:16
compare 19:6
compared
 62:4 72:7
 139:4
 174:5
 189:13
comparing
 257:4
comparison
 286:16
compensa...
 22:1,24
 23:18,19
 25:12,13
 25:24 26:3
 26:10,16
 28:23
compete

269:22
270:4,20
273:18,22
274:5,10
274:11
336:1
competed
 272:8
competent
 16:1 43:4
 43:11
 181:13
competing
 185:12
 186:6
 198:17
 199:8
 272:17
 274:17
 275:4
competition
 91:16
 271:6
 272:10
 294:11,19
competit...
 91:7
complete
 19:13,19
 42:20
 214:17
completed
 75:14
 85:23
 210:10
 211:1
 215:7,12
completely
 32:20
 177:24
 206:8
 209:13
 258:13
completing
 288:1
complex 4:4
 38:12
 88:16
 121:23
 225:15
 336:20
 338:4
complexi...

170:21
complexity
 118:14
 230:6
complicate
 324:16
complicated
 36:17
 49:19 59:5
 59:16
 149:10
 150:16
 151:6
 166:14
 186:22
 189:7
 222:6,14
 238:15,19
 244:1
complica...
 143:4
complica...
 59:22
comply
 337:22
component
 89:8 227:3
components
 39:17
 87:13
 88:11,20
 88:23,24
 93:24
 115:5
 227:4
compound
 289:10
 311:15
comprehe...
 158:12
 165:15,16
 165:17
 169:11
compromi...
 126:2
concept
 18:12,18
 31:6 36:16
 90:8 206:7
concepts
 49:20 89:6
concern 61:9
 61:15

62:14
123:10,15
123:20,20
123:24
124:4
162:5,10
162:14,17
163:20
168:19
180:13
181:12,18
182:1,15
182:22
194:16,18
228:7,13
289:12
312:20
334:6
concerned
 61:18
 169:8
 177:6
 178:13
 179:7,16
concerning
 175:12
concerns
 55:21 60:2
 60:20 61:4
 61:6 62:21
 98:21
 164:2
 166:4
 167:20
 169:1,15
 170:10
 259:24
 260:20
 261:9,9
 262:3,4
 263:16
 297:21,22
 298:14
conclude
 23:24
 270:10
concluded
 53:5 56:22
 57:7 98:18
 259:11
 339:2
conclusion
 43:10

57:13
61:21,23
62:8 70:19
70:22 71:2
71:5,13
84:18
111:16,19
112:17
113:15
116:2
conclusions
 33:24
 60:12,16
 60:23
 63:12,15
 64:2 70:17
 71:5,11
 111:7
 112:21
 113:11
 115:22,23
 118:6
 140:11
 237:17
 279:10
 287:11
 290:8
 309:8
 322:20
 325:4
concrete
 42:23
condition
 163:7,24
 165:5
 252:24
 325:17
conditions
 166:9
 305:24
conducive
 228:18
conduct
 42:13
conducted
 16:17,21
 17:1,9,13
 17:17,24
 232:3,10
conference
 12:1
Confiden...
 315:15

configur...
 245:2
confirm
 140:15
 157:11
conflated
 143:6
 144:22
conflating
 232:9
conflation
 122:16
conflict
 167:17
 182:3,17
 183:7,11
 183:20
conflicts
 167:14
conforming
 257:23
confound
 290:2
confounded
 144:11
 292:2,4
confounders
 291:20
confounding
 113:6
confused
 172:8
 203:6
congruence
 323:21
congruent
 318:24
connecting
 237:4
consensus
 183:12
consent
 153:12
 157:23
 171:14,17
 171:18,24
 172:3
 180:23
 183:24
 197:14
 206:20
 264:23
 265:6,17

265:19,22
266:12,14
conseque...
 144:9
 102:10
 200:9
 329:12
consider
 15:24
 18:11 89:7
 91:21 92:2
 94:18,21
 228:9
 272:19
 317:8
consider...
 264:23
considered
 20:3 149:7
 264:21
consistent
 33:4 91:7
 91:16
 177:9
 207:24
 251:8
 271:6
 273:22
 275:2,4
 293:14
 322:5
consiste...
 312:8
consolidate
 124:21
 125:3
 260:1,21
constantly
 205:17
construct
 36:20
 37:11
consult
 29:13
 95:21
cont'd 4:1
 5:1
contact 76:4
 76:11
contains
 55:8,24
 117:4
contempo...
 223:12

224:3,7
contempo...
 144:9
content
 61:10 63:1
 311:24
contents
 61:7,8
 301:24
 307:14
context
 33:12
 34:24 35:9
 39:14 47:3
 62:5 63:14
 63:21 64:1
 67:9 68:17
 72:9 78:22
 79:10 80:4
 86:14
 87:17
 88:15 91:9
 91:11
 109:22
 195:7
 202:4
 204:17
 209:14
 220:15
 225:12
 229:9
 231:14
 266:7
 285:21
 287:10
 288:9
 289:3
 290:12
 293:5,9
 297:17,24
 313:11
 317:12,19
 318:8
 336:7
contexts
 38:19,24
 41:22
contextual
 42:16
 314:11
continue
 168:22
 204:15

286:18
continued
 263:15
continuing
 143:2
 204:5,7,14
 318:21
continuous
 32:22
 34:12
continuum
 32:14,18
contradict
 69:15,17
 70:16 71:4
contradi...
 110:10
contradi...
 304:7
contrary
 305:17,20
 327:13
contribute
 165:21,23
 168:5,14
 168:15
 259:6
contributed
 79:20
 124:24
contribu...
 125:7
 157:14
 158:5
 166:12
 167:3
 168:16
control
 289:8
 290:21
controlled
 311:1
controls
 218:19
controve...
 77:4 94:15
convenient
 258:6
 285:10,12
 285:14
conversa...
 204:20
conversion

113:19,24
114:11,16
114:19
118:4
119:12,18
120:3,12
121:4
122:1,17
123:9,17
124:15,19
125:24
275:18,23
276:3,5,24
277:8
278:10,11
278:17
284:17,23
285:3
289:19,22
290:11,15
292:16,19
292:23
convert
124:21
125:2
conveyor
251:3
Cooley 3:13
13:6,7,10
13:13
coordinate
294:6
coping 337:5
337:14,17
copious
210:22
copy 15:3
152:19
core 168:8
corner 77:1
77:1
correct 15:5
15:6 19:3
19:4,15,21
20:10,11
21:5,6,9
22:7,8
23:6,7,22
23:23
24:18,19
25:7,10,11
25:17
26:14,15

26:22,23
27:12,13
28:15 30:8
31:12,19
32:11,12
33:18,21
34:4,15
36:22
37:12,23
38:4 44:21
44:24 45:9
45:14
46:23
47:11,17
48:11,12
48:17,24
49:7,11
50:2 51:12
51:16,20
51:21 52:2
52:14,19
53:3,4,8,9
53:21,22
54:7,12,19
54:23 56:6
56:7,23
57:23
58:15,18
59:11
62:12
64:21
68:15
71:20
73:23,24
75:16 78:7
78:20
79:13,22
80:8,20
81:4,16,19
81:22 82:1
82:15,16
82:22 83:7
83:13,14
83:17,23
83:24
84:15 85:4
85:5,8,13
86:7,10,21
87:9,10
89:16,23
90:2 91:8
91:19
93:10 94:9

97:13,23
98:4,11
99:5 101:6
103:21
108:7,23
115:2
116:16,24
117:7,8,17
117:24
118:1
119:3,4
120:14
126:15
127:4,8,9
127:15,20
128:5,6,10
128:11,13
128:18,22
128:23
129:3,4,8
129:9,12
129:24
130:12,13
130:16
131:1,2,6
131:7
132:10,14
132:15,20
133:20,21
134:1,2,6
135:2,3,8
135:9,13
136:6,14
136:15,20
136:24
137:13,14
137:18
138:7,9,14
139:7,8,20
140:8,9,16
140:17
141:6,7,10
141:11,16
142:2,4
144:2,16
144:17
145:5,14
146:7,8,11
146:12,17
146:21
147:2,12
147:13,23
147:24

149:9
150:23
151:2,3,9
151:17,23
151:24
152:4,8,9
152:12
158:7,23
159:5,6
170:12
176:23,24
179:9
180:8
183:21
185:24
186:1,7
188:14,15
188:18,19
190:2
195:17
198:19
199:9,21
200:16
202:3,19
202:20
203:1
208:18,22
210:8,9,12
213:6
214:11,23
216:23,24
217:3
218:12,13
218:15
219:6,7,10
219:19,20
219:24
220:18
221:3
222:21
224:4
226:9,12
226:18
229:5,13
229:17,18
229:24
230:1,23
232:1
235:19
237:8
238:6,16
241:1,20
242:4,12

242:14,17
243:10
244:14,16
244:20
246:5
247:1
248:22
249:11,20
249:23
250:11
251:13,14
252:4,5,12
252:13,17
252:18,21
252:22
253:1,2,5
253:6,9,10
253:12,17
253:18
254:5
255:2,12
255:18
256:7,8,24
257:1,6,7
257:13,14
257:20,21
258:1,9,10
258:16,17
259:8,12
260:4
261:11
262:5
263:4,7,8
263:11,19
263:20,24
264:1
265:1
270:13,15
270:23
271:8,9
273:6,15
276:1,7,8
276:11,12
277:4,5,10
277:11,17
277:18,22
278:6,7,13
278:14,18
278:19,22
278:23
279:2,3,7
279:8,14
279:15,19

280:11,12
280:15,16
280:19,20
280:22
281:3,4,9
281:10,14
281:15
282:6,15
283:11,12
283:20,21
284:3,4,12
284:13,18
296:8
297:8
299:13
302:2
306:21
310:18
325:12,16
335:21
**corrected**
129:7,20
**correction**
247:17
**correctly**
37:24
51:13
67:24
81:22
**correlates**
307:8
**correlation**
127:17
293:3,7,11
328:19
**correspond**
233:5,14
**correspo...**
63:8
**cost** 72:11
**Costa** 8:15
146:3
303:8,10
306:13
**counsel** 3:7
3:22 4:7
4:14,21
5:8,15,22
11:4,10
12:17
15:11
31:13 36:5
55:20

211:7
235:4
236:19
298:23
**counseling**
136:18
156:14
**counselor**
160:22
**COUNSELS**
3:16
**counteract**
285:16
**counters**
290:14
**countries**
98:10
109:2
**country**
172:5,5
314:15,15
**County** 1:10
1:17 4:21
4:22 12:17
**couple** 177:4
295:23
316:11
**course** 36:4
67:2 73:2
78:10 99:9
107:18
161:1
323:19
**court** 1:1
2:6 11:11
11:12,22
12:2 14:4
31:13
299:23
300:2
**covered**
72:12
**craft** 328:13
**create**
183:19
194:9
202:22
**creates**
60:21
**creating**
182:3,16
183:6
**creation**

183:11
**criteria**
112:12
148:9
166:16
167:9
303:17,22
304:4,6,7
304:12
310:20
322:18
323:18
324:24
**critical**
111:8
313:10
**criticisms**
297:15,15
297:17
**criticized**
118:2
296:18
**critique**
284:16
285:2
**critiqued**
296:18
**critiquing**
71:18
**cross** 14:10
67:19 92:2
93:5 96:8
103:18
165:6
178:14
201:17,24
202:7,12
202:21
203:7
241:18
242:9,24
243:7,16
243:22
244:11,18
245:1
246:3,12
246:23
248:8
256:4,5
259:24
260:19
261:16
263:15,16

263:18,22
264:3,15
264:22
265:12
266:1,17
277:20
283:16
292:1
**cross-se...**
127:7,10
133:24
135:6,6
139:16,24
278:4
292:12
**Csutoros**
5:11 12:11
12:11
**cultural**
41:21 42:1
**current**
58:11
72:22 76:7
76:10
96:18 97:1
104:10,19
150:12
158:15
200:23
201:6
211:18
212:1
239:8,15
267:22
268:5
321:20
338:24
**currently**
21:7 23:3
23:20 24:8
25:8 155:2
**cursory**
246:21
**cut** 269:11
**cutoff** 15:12
**CV** 15:7
20:17 24:1
152:15
_____
D
**D** 5:20 6:1
11:8
**D'Angelo**

7:24
115:11,15
118:2
259:22
285:23
296:4
**D'Angelo's**
115:20
122:13
285:6
**daily** 337:12
**dangers**
266:1,7
**data** 20:2
30:10 42:9
42:19 62:1
64:5 69:15
69:19 70:6
70:8,11,12
143:20,22
143:24
144:5,8,9
144:15,17
172:19
177:1,17
190:12
205:19
213:1,21
214:24
235:14
237:16,19
240:20,21
249:14
250:7
259:2
261:17,18
277:14
278:20
283:7,17
285:8,11
285:13,15
285:17
286:12,19
286:20
287:8,11
287:21
289:2,7
291:16
306:12,12
306:13
319:16
325:4
332:20

334:12
337:10
**date** 11:22
55:17
65:21
299:2
328:2
**dates** 203:22
299:19
**Dave** 160:15
**David** 4:3
12:13
295:13
**Davis** 8:18
176:9,14
**day-to-day**
22:16
296:20
**de** 8:13
51:15
140:21
141:2,2
260:20
261:1,5
**de-trans...**
54:5 55:4
**De-trans...**
53:20
**deal** 109:15
337:6
**dealing**
194:24
196:11
**death** 240:17
**debate** 336:4
**decade** 174:5
174:8
**decide**
172:24
194:24
196:11
238:11,12
**decided** 54:5
56:4
103:17
112:16
172:11,14
263:14
**deciding**
179:7
**decision**
74:20,24
75:6,11

77:14 78:3
78:15
79:20 80:7
99:8 104:7
107:7
194:10
197:13
264:20,21
264:24
265:23
266:4,24
**decisional**
183:15
**decisions**
103:22
156:15,24
179:14
195:10
267:11
333:9
**declare**
169:16
**decrease**
256:5
**decreased**
222:19,23
**decreasing**
222:23
**deeper**
124:22
125:6
**deeply** 38:2
**defects**
249:10,16
**Defendant**
2:3
**Defendants**
1:22 12:17
**Defending**
5:12
**defer** 187:7
187:12
189:5
198:5
202:5
220:13
244:22
245:5
319:14,22
**deferring**
256:4
**define** 31:1
39:5 45:18

47:2 87:19
94:17
112:10
115:5
121:24
272:23
**defined** 38:1
45:17
61:12
111:24
114:10
174:18
**defines**
37:15
57:20
58:21
**defining**
58:5 83:8
121:4
**definitely**
232:9
320:8
**definition**
18:15,21
29:8 46:16
46:17
57:15 91:1
94:14
122:22
174:2,22
175:3
209:18
**degree** 15:16
15:17,21
170:13
278:21
306:23
**Del** 3:12
13:9,10
**delay** 212:9
213:3,16
214:3,15
215:7,12
215:13
218:11
329:23
330:4
332:4
**delayed**
146:24
147:9
223:21
224:1

**delaying**
219:8
**delineates**
252:9
**demand**
287:17,18
**demands**
298:1
**demographic**
264:16
**demonstrate**
127:11
135:14
143:22
286:11
**demonstr...**
127:16
177:18
308:1
**demonstr...**
84:13
**denied** 332:6
**Deniker** 4:17
12:16,17
338:19,20
**denominator**
291:19
**Department**
22:4 24:16
25:6
**depend**
172:20
185:22
190:22
203:11
288:20
311:10
**dependent**
27:16
88:15 91:9
153:14,15
161:17
204:12
309:24
**depending**
87:18
153:19
231:22
**depends** 40:3
42:16 60:9
64:6 68:17
86:13
144:4

192:10
202:4
203:17
204:7,17
237:10
238:3,7
243:2
244:1
293:5
**depose** 299:4
**deposition**
1:17 2:1
11:24
13:22
28:21
211:8
297:12
339:2
**depression**
133:16
152:23
157:10
**depressive**
138:1,2
**der** 8:12
138:21
139:1
141:1
142:6
**describe**
47:3 49:12
58:11
59:20
62:22 76:3
83:21
88:18 93:7
94:6
113:19
119:10,22
122:5,7,16
151:6
167:7
193:15
205:3,6
206:6
230:5
231:16
273:9
284:16
293:1
322:22
323:17
324:18

326:19
**described**
57:11 70:1
79:2 115:4
125:15
165:14
234:3
236:2
285:3
290:4
292:23
303:19
324:23
334:14
**describes**
50:1,5
62:23
110:15
125:16
230:3
326:18
**describing**
58:6 126:6
281:7
291:21
307:5
**description**
7:4 8:4
9:4 43:14
71:6 110:7
112:3
116:4
125:20
160:7
230:4
265:15
273:9
291:6
327:7
**design** 62:10
63:11
132:23
133:24
135:6
139:16,24
140:14
278:4
285:16
292:1,12
**designation**
324:9
**designed**
61:22

62:11
63:24 70:2
133:2,2
134:8
135:14
277:20
291:15
**designing**
61:20 62:9
**desire**
157:14
158:5
**desired**
244:13
274:17
**desires** 88:3
88:3
**desist**
167:24
**desistance**
252:8
324:18
**desisted**
255:1,11
255:17
322:22
**desisting**
252:10
253:8,15
289:1
**desists**
323:23
**despite**
244:4
**destabil...**
182:4,18
183:7
**destigma...**
325:24
**detail**
290:12
**detailed**
298:9
**details**
248:5
270:15
**determin...**
135:7
277:21
278:5
323:14
**determine**
39:10

40:21,23
43:3
132:16
141:12
145:11
232:4
283:17
290:22
297:20
333:1
**determines**
330:15
332:23
**determining**
290:9
**detransi...**
55:11 56:2
56:5,17
57:12,15
57:20 58:5
58:21
69:23 77:7
77:20 78:4
78:16
79:21 80:7
164:20
174:3,8
**detransi...**
54:9 58:7
58:13
60:15 70:1
70:24 74:4
74:6,7,8
74:11,13
81:15,24
82:14
83:11
288:9
**detransi...**
70:3 71:6
81:13
82:21 83:6
163:4,18
173:14,16
173:22
175:9,13
175:17
287:24
**detransi...**
57:5 58:17
83:8,16
289:2
**develop** 45:5

149:1
177:20
190:23
223:23
231:4
243:23
244:12
337:17
**developed**
50:12,17
62:6 97:19
287:4
**developing**
165:20
178:10
233:2
234:15
302:24
**development**
29:17,19
29:22 30:2
30:7,12,15
30:18
170:2
188:2,22
189:20
190:1
192:11
193:13
195:1
196:12
202:1
215:9,14
216:12,14
220:17
221:10,16
222:16,17
222:24
223:2,10
223:11,18
224:2,7
227:6,23
228:7
231:6,7,10
232:6
233:8,12
233:17
234:11,14
234:19
235:10,23
236:4
238:14,19
239:1

265:16
299:14
337:14
**developm...**
39:7 166:7
223:15,16
223:19,20
**developm...**
221:1
**deviant**
43:16
**diagnose**
169:2
307:10
318:12,17
**diagnoses**
16:4
326:10,11
**diagnosing**
41:20
**diagnosis**
51:10,24
52:6 153:6
153:13
157:22
160:23
166:20
169:8
181:14
252:11
253:4,8
255:10
310:23
323:17,23
324:2,20
325:13
326:3,6
**diagnostic**
16:2 166:8
166:16
309:15
325:6
**diagnostics**
38:13
**dichotomy**
109:24
119:7,10
**dictate**
100:22
**differ** 88:3
91:14
201:17
234:19

**difference**
24:11
28:10
33:10
49:23
63:23
120:2
146:23
147:6,10
174:4
285:18
**differences**
113:3
231:1
234:1
**different**
26:7 37:18
37:19
46:12,12
49:15,17
59:22 63:1
64:13
65:20
77:16
87:17,17
88:11,11
88:18,22
99:10
114:7
116:15
119:16
120:10,13
121:11
139:24
153:19
172:4
174:6,8
182:23
192:6,7
195:8
198:24
201:20
213:4
261:14,21
302:6,14
307:2
309:7,8,12
309:13
324:8
333:5
**differen...**
290:13
**differently**

| | | | | |
|---|---|---|---|---|
| 89:5 | 99:9 | 175:10 | 108:14 | 99:12 |
| 330:24 | disagree... | 205:1 | 126:19 | 100:20 |
| **difficult** | 88:6 | 211:8,14 | **distinction** | 101:16,23 |
| 55:9 | 100:16 | 211:21 | 120:8 | 102:18 |
| 174:14,21 | **discomfort** | 265:7,9,17 | 121:3 | 103:4,17 |
| 175:1,2 | 124:23 | 265:19,23 | 223:17 | 103:24,24 |
| **difficul...** | 125:7 | 267:5,5 | **distinguish** | 105:2,12 |
| 78:5,18 | **disconti...** | 274:3,14 | 113:17 | 105:15 |
| **difficulty** | 54:10 | 303:14 | **distingu...** | 106:14 |
| 258:14 | 57:20 | **discussions** | 73:10 | 107:23,23 |
| **dig** 63:11 | 58:13 | 205:8 | 99:20 | 108:1,10 |
| **digging** 64:3 | **discrimi...** | 216:7 | **distress** | 110:5,12 |
| **dimorphic** | 328:4 | 225:13 | 124:24 | 111:2,21 |
| 233:5 | **discrimi...** | 266:3,10 | 125:8,19 | 112:6 |
| **dimorphism** | 327:14,17 | **disorder** | 147:16 | 116:22 |
| 233:22 | 327:20 | 29:18,22 | 180:5,16 | 117:3,14 |
| 234:6 | 328:1,6 | 30:1,6,12 | 180:22 | 142:22 |
| **dimorphisms** | 332:14 | 30:15,18 | 277:1 | 149:20 |
| 233:21 | 337:13 | 92:15 | **distressing** | 150:21 |
| **direct** 19:1 | **discuss** 34:7 | 252:11,16 | 180:6 | 161:24 |
| 111:1 | 131:11,14 | 252:20 | **District** 1:1 | 172:2 |
| 139:17 | 131:18 | 253:16 | 1:2 12:2,2 | 173:13 |
| 140:5 | 265:24 | 255:1,10 | **diverse** | 181:6 |
| 176:19 | 301:24 | 324:20 | 23:15 | 208:3 |
| 201:22 | **discussed** | 325:1 | 46:14 90:8 | 216:9,18 |
| 321:22 | 24:10 | **disorders** | **diversity** | 224:13,20 |
| **directed** | 112:20 | 29:17 | 39:8 | 224:23,24 |
| 26:12 | 128:7 | 43:17 | **Division** 1:3 | 225:5 |
| 85:17 | 226:2 | 156:18 | 12:3 | 229:2,3 |
| 141:22 | 266:5 | 157:22 | 268:24 | 234:4 |
| **directing** | 284:10 | 243:5 | 269:1,22 | 246:2 |
| 87:23 | 298:10 | 319:1 | 270:5,21 | 250:9 |
| **direction** | 325:2 | 325:7,14 | **divorcing** | 253:24 |
| 167:20 | **discusses** | 325:18 | 167:17 | 254:8 |
| 178:5 | 62:18 | **dispute** | **doctors** | 259:21 |
| **Director** | 250:18 | 36:15 | 174:12 | 277:19 |
| 23:3,20 | **discussing** | 253:19 | **document** | 289:5 |
| 24:6 | 21:16 | 290:1 | 8:20 14:20 | 290:7 |
| **disadvan...** | 22:10 23:9 | **disputing** | 15:8 20:1 | 296:2 |
| 333:13 | 23:14 | 111:18 | 21:3 32:6 | 316:8 |
| **disagree** | 24:21 | 289:11 | 32:7,13 | 317:9 |
| 50:20 | 25:20 | 291:2,12 | 33:19 | **document...** |
| 59:13 99:2 | 69:13 | **disquali...** | 34:10 | 144:10 |
| 144:20 | 80:15 | 288:1 | 35:12 36:3 | 301:16 |
| 157:8 | 109:13 | **disrupts** | 36:24 37:2 | 314:8,18 |
| 158:11 | 150:14 | 221:1 | 37:6,14 | 315:2 |
| 217:14 | 176:22 | **dissatis...** | 38:1 45:4 | **documented** |
| 225:9 | 205:2 | 137:9 | 48:8,13 | 34:16 |
| 233:9 | 206:5 | 138:1 | 51:7,14 | 130:21 |
| 240:15 | 296:1 | 174:20 | 55:14 | 314:13,23 |
| 243:18 | **discussion** | **dissenti...** | 82:24 | **documenting** |
| 265:5 | 6:3 81:11 | 52:6 | 97:15,22 | 131:12 |
| **disagreeing** | 122:3 | **distance** | 98:17 | 315:4 |

94:6
302:19
316:22
Dodsworth
79:5
Doernbecher
224:21
doing 91:11
92:18
120:24
159:2
161:12
166:8,21
167:7
195:5
206:19
243:4
dole 123:17
dollars 28:6
domain
305:13
domains
305:10
Dora 1:16
4:22 12:18
double 127:5
335:21
doubt 105:20
105:23
106:6
116:9
231:9
236:14
downs 291:8
dozens 307:7
Dr 13:20
44:11,13
44:16 45:4
47:1,9,14
50:23 51:2
51:14 58:5
61:2,17
62:3,7
69:13,15
69:17 70:6
70:16,21
71:18
85:17
113:18
115:20
119:7
122:13
131:11,15

148:13,16
148:22
149:7,10
150:14
151:1,1,5
151:11,15
151:18,22
152:1,6,10
152:20,20
160:6,6
163:9
164:2,2
176:20
177:1
179:23
181:7,18
182:9,21
245:22
251:1
259:9,21
285:6,23
299:21,22
301:6,8,21
301:21
302:4,4,7
302:7,14
302:14,20
302:23,23
305:20,20
312:19,24
312:24
313:9,10
338:2,11
338:19
drafted
217:11
draw 57:13
60:12,16
63:12,14
64:2
112:17
113:15
115:22,23
116:2
119:6,6,13
322:20
325:3
drawbacks
144:1
drawing
113:11
229:22
drawn 33:24

60:12,20
60:23 61:3
287:11
draws 71:11
drew 61:14
driven 169:3
169:17
dropping
175:4
Drug 209:23
drugs 17:11
DSM 326:9,17
DSM-IV
324:19,19
325:4
DSM-V 16:3
326:24
327:6
due 113:6
132:17,19
133:23
139:16
141:13,14
145:12,13
263:15
287:4,17
DULY 11:17
durable
30:23 31:1
181:14
duration
168:22
209:17
250:3
330:11
Durwood 7:14
84:3,7
85:1,6
128:2
Dutch 52:5
141:8,19
141:24
143:4
144:20
145:10
164:16,19
210:4
261:18,22
306:12
315:6
dynamic
222:5
dysphoria

16:5 27:23
28:9,21
29:18,21
30:5,11
41:21 52:6
52:12,24
53:6,18
66:4,7
77:6,9
78:6,19
79:20
83:12 90:6
90:18 99:4
99:23
101:18
102:11
103:15
106:19
107:4
111:5,9,11
113:18,23
114:8
118:12
119:17
142:18
145:2
146:6
147:15
152:22
153:6,14
154:7,17
157:21
158:19
160:23
163:6,21
165:3,4,21
165:24
166:12,17
166:18,20
167:9
168:22
169:4,18
170:6
194:24
196:11
198:17
199:7,18
199:24
200:2
202:8
211:2
221:1
227:22

260:1,22
264:8,15
306:11,19
306:20,24
307:8,10
307:14
310:22,23
318:13,18
323:17,24
326:20,22
327:2,6
dysphoric
21:16
22:10 23:9
24:21 32:8
51:24
109:7,20
158:13
270:21

E

E 3:1,1 4:1
4:1 5:1,1
6:1 11:8,8
E-26 4:5
e-mail
229:15,16
eager 109:3
ear 85:24
earlier 63:6
115:4
128:14
153:24
165:14
171:15
181:7
218:24
238:5
245:23
247:10
303:10
320:1
323:20
328:18
329:5
early 45:6
195:1
196:12
221:1
237:2
256:12
320:1
323:3

238:15
**east** 4:11
  5:5 224:16
**easy** 14:5
**ed** 159:16
**editor** 25:8
  116:11,14
  117:1,4
  142:24
  143:1
  285:7
  291:9,21
  296:3
  298:1,5
**educated**
  112:4
  283:10
**education**
  1:10,11
  4:21 5:8
  12:4,18,20
  29:10
  257:9
  318:22
  320:4
  338:16
**educational**
  184:19
  315:3
**Edwards-...**
  8:16,17
  148:4,17
  148:22
  149:7,10
  149:16
  150:15
  151:1,5
  152:20
  160:6
  164:2
**Edwards-...**
  148:13
**effect** 17:18
  57:5,21
  187:20
  212:9
  214:3
  232:4
  243:21
**effectiv...**
  212:6
**effects**
  54:11

58:14
143:6
144:22
188:17
191:14,14
202:13,16
202:23
203:4
205:12,14
205:22,22
206:2,3
225:21
226:7
227:22
235:7,10
235:14,23
236:3
243:15
246:4
263:16
266:18
**efficacy**
64:5
205:19
219:4
**effort**
313:15
**efforts**
124:20,20
126:1,5
275:18
276:6,24
277:8
278:11
284:23
289:19,22
292:16,19
292:23
**eight** 55:3
64:7,20
72:19
156:5
277:19
278:3
**Eighteen**
93:18
**either** 21:22
93:3 101:1
113:4
223:5
243:4
264:10
289:1

296:18
298:11
**elected**
263:17
**element**
114:18
230:9
238:8,9
307:11
322:17
**elementary**
319:6,7
**elements**
114:11,13
114:15,15
287:9
298:11
324:22
**eligibility**
161:8
**eligible**
146:24,24
147:3,8,10
188:12
287:16
**Elizabeth**
3:11 13:12
**ellipses**
235:10
**elusive**
18:17
**Embarcadero**
3:14
**embraced**
123:6
**emergence**
233:21
**emotional**
79:19 80:3
215:8,14
**emotionally**
60:2
**emphasis**
99:22
100:17
195:12
287:13
**emphasize**
159:16
**emphasizes**
99:16
**emphasizing**
94:13

**employed**
11:21
283:10
**enable** 243:7
**enacted**
328:3
**encounter**
291:1
307:16
308:23
**encountered**
267:1
**encouraged**
136:12
**encourag...**
182:10
**ended** 249:19
249:22
250:2,2
329:21,21
**endocrine**
7:6 8:21
32:1,7,8,9
32:13 34:2
34:7,10,18
34:20 50:9
94:1,11,21
96:1
100:24
135:19
161:20
207:17,20
208:11
212:5,7,15
212:19
213:14,23
215:21
216:10
217:6
226:6
227:12
228:20
235:22
244:23
245:6
258:12
259:5,10
319:22
**endocrin...**
185:4
215:4
**endocrin...**
186:23

187:7,13
188:5
189:5
190:13
216:4
220:13
**endocrin...**
93:4
**endocrin...**
16:11
185:8
191:14
198:6
202:5
203:21
**endogenous**
201:13
**endorsed**
95:2
**ends** 120:1
**engage** 267:4
313:20
**engagement**
114:21
136:18
265:18
**engaging**
272:22
**English**
293:6
**enrolled**
161:19
314:4
**ensure** 99:23
156:13,23
160:24
165:2
178:19
195:10
**ensuring**
41:22
161:13
166:9
197:12
294:11,19
294:23
318:16
326:10
**enter** 197:3
**entering**
258:15
**entire** 55:1
**entirety**

36:14
93:20
**entitled**
35:13 44:5
53:17 84:3
106:18
115:16
132:6
133:14,14
134:19
135:18
137:9
139:2
176:14
245:11
247:19
271:21
276:23
280:1
282:1
315:14
**entity** 108:6
**entity's**
26:18
**epidemio...**
179:18
220:14
**Equity** 47:21
**equivalent**
264:21
**errata** 8:6
130:6,10
**error** 292:3
292:5
**errors** 129:6
129:20
**especially**
98:21
99:19
174:13
222:1
241:9
275:19
292:17
**ESQUIRE** 3:3
3:9,10,11
3:12,18
4:3,9,17
5:3,11,17
**essentially**
45:24 91:1
305:8
**establish**

278:16
**established**
46:17
**establishes**
118:5
**establis...**
287:10
**establis...**
103:5
**estimate**
257:23
**estrogen**
189:16
201:14
202:13,13
202:16
204:23
242:16
**et** 8:5,7,8,9
8:10,11,12
8:15,23,24
9:7,8,11
9:12 12:3
12:4 38:22
91:4
117:15,15
118:2
126:20,23
128:3
129:2,11
129:21
132:1,5
133:9,14
134:14,18
135:18,24
137:5,8
138:21
139:1
141:2,2
144:11
146:3
168:23
205:20
232:21
233:1
245:11,16
247:19,24
256:11,19
258:20
259:22
262:15,20
276:18,22
279:4,17

280:1,6
285:23
292:8
296:4
298:12
312:5
**ethical**
77:16,17
94:3
122:16,22
125:13
126:6
194:21
195:15,19
195:20
196:7,8,21
196:22
197:8
264:19
290:13
**ethics** 198:7
**evaluate**
208:20
**evaluated**
208:23
270:6
273:20
274:23
**evaluating**
170:7
**evaluation**
40:9,11,17
163:9
165:10,12
165:13
216:13
**evaluations**
40:1
128:16
153:15
212:6,14
212:20
**evaluator**
43:18
**evasive**
311:9
**event** 28:7
272:7
284:1
308:15,17
**events** 258:7
268:15
269:2

315:4
337:16
**everybody**
172:19
**evidence**
29:13 51:8
51:22
52:24
98:19
99:15
102:10
110:14
111:3
112:8,20
115:21
116:12
139:17
140:5
164:3
174:7
216:15
217:2,15
217:20
234:10
251:1,5
261:24
279:10
297:23
332:14
**evidence...**
99:18
**evolved**
145:4
**exactly**
38:10 39:4
239:18
287:6
**examination**
6:5,7
13:17
295:10
313:16
**examined**
18:23
82:20
**examiners**
308:4
**examines**
165:20
**example** 28:4
33:13
61:16
93:15

94:10
100:22
167:18
186:18
223:21
244:3
308:21
335:15
**exclude**
184:6,21
185:12
197:17
198:1
**excluded**
112:1
198:10
200:3
288:10,15
288:17
329:6
**excluding**
271:2,5,6
**exclusion**
185:3
186:8
198:13,14
330:11
337:13
**exclusio...**
112:12
**exclusions**
200:7
**excuse** 80:16
116:21
141:2
223:18
335:1
**executive**
103:21
112:7
**exemplar**
179:2
**exercise**
90:12
**exhibit** 7:1
8:1 9:1
14:23
69:14 84:2
97:3 105:2
105:6
107:11
108:13
110:18

122:13
126:18,22
127:22,23
130:3
134:10
145:21,23
148:3
149:13,15
150:22
159:22
160:17,18
161:24
207:23
217:23
218:4
224:10,12
226:4
227:11,20
228:17,20
232:18,20
235:2
236:7,8,10
236:20,21
245:13
247:21
251:16,17
252:2
253:20,20
253:21
254:11,13
256:11,18
256:22
258:11
259:18,20
262:14,19
268:7,9,22
271:14
276:15,17
277:13
281:18
284:9
296:1,3
297:5
298:21,21
303:11,12
315:14
**Exhibit-1**
14:20
19:12,17
**Exhibit-10**
97:5
**Exhibit-11**
101:8,11

**Exhibit-12**
106:14,22
**Exhibit-121**
253:14
**Exhibit-13**
107:13
**Exhibit-14**
108:16
**Exhibit-15**
110:20
**Exhibit-16**
115:10
**Exhibit-17**
127:6
**Exhibit-18**
130:6
**Exhibit-19**
131:21,24
**Exhibit-2**
31:22 32:1
50:8 52:22
207:14,15
212:3
**Exhibit-20**
133:6,8
**Exhibit-21**
134:13
**Exhibit-22**
135:17,23
**Exhibit-23**
137:2,4
**Exhibit-24**
138:18,20
**Exhibit-25**
140:19,21
**Exhibit-26**
142:11,13
**Exhibit-3**
35:12,16
**Exhibit-30**
176:6,8
**Exhibit-35**
245:15
**Exhibit-36**
247:23
**Exhibit-37**
251:19
**Exhibit-38**
251:22
**Exhibit-4**
43:21,23
107:10
**Exhibit-42**

271:12
**Exhibit-44**
279:24
280:5
**Exhibit-45**
281:20
**Exhibit-46**
315:24
**Exhibit-5**
48:1,3
**Exhibit-6**
53:11,13
69:18
80:14
**Exhibit-7**
76:14,16
**Exhibit-8**
82:3,5
**Exhibit-9**
84:6
**existence**
133:1
**exists** 192:2
333:21
**expect**
225:16
311:5
318:1
**expectat...**
39:7 40:24
41:15
**expected**
43:16
218:24
**expecting**
29:2
**experience**
32:18
33:14
37:10 38:3
39:6 48:14
48:15 49:3
49:13,22
50:6 52:11
52:23 78:6
78:18
123:21
143:16,19
162:22
163:2
164:4,5
175:15
177:7,7

183:13
192:22
196:18
202:17,23
287:23
289:22
290:6
323:7
334:13
**experiences**
38:16
56:15,17
59:5 65:9
69:24 70:1
70:23
143:17
144:14
179:19
183:2
244:9
247:15,16
287:17
322:21
323:11
337:11
**experien...**
32:22
34:12
199:7
200:2
275:17
284:22
292:16
328:23
**expert** 7:5
14:23 15:3
20:6 27:24
28:9 149:8
192:17
225:20
239:17
297:5
298:23
299:10,14
300:18
318:20
325:21
328:12
338:1
**expertise**
18:12,14
20:23 29:7
100:4

109:15
149:11
160:22
216:14
221:8
225:10
233:18
243:13
291:17
318:23
330:22
333:11,22
**experts**
198:6,7
**explain** 43:9
70:23
88:23
180:4
299:20
**explains**
176:14
324:7
**explanation**
180:2
**exploration**
99:15
167:16
169:24
**exploratory**
165:18
**explore**
121:15
166:22
333:20
**explored**
166:10
**exploring**
172:9,10
**expose**
337:16
**exposed**
289:18
290:10
292:22
**exposure**
156:7
231:3
234:14
276:24
289:8,9
328:21
**exposures**
328:19

**expound**
294:4
**express**
33:11
49:23
162:10
168:19
181:22
312:20
**expressed**
270:8
334:6
**expression**
45:23  47:5
47:21
49:13
57:17
146:4
168:9
322:3,24
**extend**
333:22
**extending**
249:4
**extensive**
107:20
279:10
**extensively**
51:17
215:19
**extent**
186:11,17
246:12
**external**
322:9
**extreme**
140:12
**extremely**
240:13

———————
**F**
**f** 4:9  156:7
**face** 77:17
337:12
**Facebook**
62:23
**faced** 240:23
**facilitate**
14:13
**facilitated**
81:14
**facing**
225:11

**fact** 53:5
63:4  123:4
163:22
169:3,17
223:24
282:13
292:10
**fact-based**
191:6
**factor** 168:8
**factors**
42:16
124:23
125:7
165:21,23
166:3,6,11
166:22
167:2,11
167:14
168:4,14
169:3,12
169:17
178:18
244:2
284:5
306:1
310:2
**facts** 20:2,5
20:6,7,8
**fail** 131:13
**failed**
131:17
147:1,10
297:15
**fails** 131:11
**failure**
288:2
289:7
290:21
**fair** 72:14
121:20
269:21
285:4,5
294:19
298:19
303:3
304:5
312:19
317:23
**fairness**
18:12,15
18:17,21
270:1

294:23
**fall** 94:19
94:22
**falls** 126:7
**false** 109:24
**familiar**
35:21  44:4
44:11,14
50:9  51:6
53:23
62:10,15
76:20
82:10
84:10
108:5
112:23
115:17,19
142:19,24
151:11,18
176:17
192:4
195:15
196:7
209:13,13
209:24
210:16
213:22
215:3,4
219:12
245:19
248:4
262:24
320:3,5
325:6
**familiar...**
327:4
**families**
40:16
85:18  86:3
87:8,23
88:8  123:5
195:6
197:4,7
225:14
266:3
274:13
**family** 26:13
40:5  89:1
92:11
95:11
100:12
171:7
178:19

179:15,20
182:3,17
183:6,10
183:20
203:12
204:8
206:14
208:6
219:1
238:10
240:10
243:2
279:11
280:2
281:8
282:2,3,22
282:23
283:18,23
286:2
310:2
312:4
329:19
332:17
**family's**
181:1
**fantasy**
180:3,14
**far** 28:24
29:1,1,2
85:23
86:23
181:13
211:13
214:18,21
247:8
293:12
314:21
**fascinating**
77:3,14
**fast** 335:13
**fault** 69:19
70:5
**favorite**
305:12
**FDA** 209:21
209:22
210:11,21
219:3,13
247:5
**February**
300:7,19
**Federal**
29:13

**feel** 168:22
185:17
222:7
297:12
**feelings**
39:12,12
58:24  59:9
**fees** 28:2,3
28:5
**Feinberg**
21:12
**fellowship**
15:23  16:7
16:10  65:3
65:24  66:7
66:9
**felt** 172:11
328:6
**female** 18:3
32:16,19
32:23
33:13
34:13
80:23
154:22
155:4,8,10
184:6,21
189:20
197:17
198:1,10
202:21
203:2
234:2
244:19
245:3
249:9
250:9
271:24
272:8,8
273:4
329:2
330:6,6,16
330:17
331:5,6
333:14
334:18
**females** 19:6
37:20
156:2,4,6
177:10
178:2,6
188:7
190:5

191:11
193:4
202:17
219:18,23
234:20
242:3,11
242:13
247:11
333:12
334:2,3
**fertile**
226:17
227:2
**fertility**
214:10,12
249:10,12
266:18
267:11
**field** 50:18
51:19 77:6
109:16
122:6,8
124:3
148:14
151:20
175:11
179:17,18
194:21
195:5,16
196:22
233:18
262:3,6
318:22
337:15
**fifth** 139:14
**Fifty-five**
163:8
**figure**
149:10
151:6
**figures**
253:19
254:22
255:4,15
**file** 318:2
**filed** 299:23
300:1,5
**filing** 11:5
**fill** 100:4,7
**final** 55:17
104:7
**finally**
147:7

**financial**
26:10
**find** 69:19
84:21
209:18
304:2
305:12
**finding** 70:5
**findings**
138:12
283:14
285:22
**finish** 14:7
295:16,18
**finished**
64:22 65:2
65:3,4,23
225:1
**Finland**
107:17
108:2,3
109:3
110:2,12
**firm** 325:3
**first** 11:17
15:7 45:20
48:19,19
52:9,13
65:14
66:16 72:9
77:2
102:16
103:21
109:7,19
111:16
118:6,9
123:3
136:9,16
143:11
146:20
153:5,7,17
153:18,23
154:5,6,10
154:16,21
155:3,7
162:1
207:23
212:4
226:5
231:16
233:11
234:4
235:13

248:6
252:7
260:9
261:14
268:23
272:3
285:7,8
295:23
298:22
299:6
306:17
324:18
333:17
335:17
**fit** 115:16
274:11
323:1
**fits** 39:6
**five** 68:7,20
69:1 75:23
76:5 83:9
95:2 96:13
122:9
132:11
139:9,12
147:9
150:1,2
173:13
181:6
192:7
291:24
293:23
295:17
**fix** 322:23
**fixed** 31:7
49:22
**flaw** 289:7
**flaws** 83:21
**floor** 3:14
3:20 295:6
**fluid** 45:12
45:22,22
46:15
48:15,16
48:23 49:3
49:6,14
50:1,6
**fluidity**
44:6 45:18
46:10,11
46:18,20
47:3
**focus** 164:17

**focused**
119:11
120:5
225:21
**folks** 41:22
58:6 60:14
60:14 68:9
68:12 73:3
159:2
174:3,19
175:17
188:7
193:8
223:21
234:1,2
288:9,14
318:16
326:1
328:7,22
336:22
**follow** 107:5
295:23
298:20
**follow-up**
75:24 76:1
111:14
140:13
147:8
257:15
293:24
322:14
**followed**
136:10
140:14
164:14
216:10
312:2
**following**
11:16
126:19
268:18
**follows**
11:18
124:18
**Food** 209:23
**footnote**
51:14
84:12,16
84:20,21
127:2
128:4
129:1,2,5
129:19

130:11
131:4,13
132:8
133:18
135:1
136:4
137:12
139:5
141:5
146:9
163:15
251:11
252:3
256:1,23
258:19
276:9
277:6
279:17,21
279:22
280:9
281:11
284:11,14
328:15
**footnotes**
20:15
115:20
116:23
**fora** 62:23
**force** 148:24
216:10
**forced**
164:24
274:9
**forgetting**
298:21
**forgive**
56:24
299:13
321:2
**forgot** 194:4
**form** 9:14
17:6 18:4
18:5,19
20:17,20
27:1 29:20
30:9,24
31:4 33:22
34:5,22
35:7 36:2
36:23
37:13 38:9
39:2,13
40:2,12

41:17 42:6
45:1,15
46:24 49:1
49:8 50:3
50:13,19
52:3 54:13
56:13 57:8
58:3,19
59:3,12,19
66:5 68:16
69:20 70:7
70:20 71:7
71:22 72:6
74:1 75:12
77:10,22
79:14 80:9
80:21 81:5
81:17
86:11,22
87:14
88:13
89:17
91:24 92:4
95:4 96:10
99:6,24
100:19
101:21
102:13
104:4,14
104:22
106:11
107:21
109:11
113:8
114:2
115:3
117:19
118:16
119:8,21
120:15,22
121:21
123:18
125:4
130:17
132:21
134:7
138:8
141:17
144:3
145:7,15
153:3
156:16
157:1,16

160:4
161:3,10
163:13
165:8
166:1,13
167:5,21
169:6
172:17
173:3,17
174:15
175:14,21
177:8
178:16
179:10
180:4,9
181:15
182:5,19
183:22
184:24
185:14
186:20
187:4
188:23
189:10,21
194:12
195:3,23
196:14,24
197:9,19
198:20
199:10
200:5
201:10
202:10
206:17
207:4
208:2
209:3
210:14
211:3
213:7,17
214:5
217:4
218:21
219:11
220:6,19
221:4,12
221:18
222:2,11
223:3
224:5
226:19
228:1,10
229:6

231:12
234:12,21
237:9
238:17
240:14
241:6,21
242:5,18
243:11,17
244:15,21
245:4
246:18
250:12
255:19
258:23
259:13
260:5
261:12
264:5
265:2,13
266:20
271:1
272:20
274:1,19
275:6,12
284:19
286:6,14
288:5,19
290:18
291:3,13
292:6
293:4
294:12,20
295:1
298:16
300:11
302:8,16
303:4
304:14
308:20
309:10,22
310:15
311:7,22
312:15,22
313:6
314:10
315:24
316:12,17
316:18
317:2,10
317:15,17
317:18,20
318:6
319:13

320:11
322:11
323:5,15
324:15
325:19
326:8
327:21
330:8,18
331:15,20
332:8
333:16
334:10,19
336:16
337:8,24
**formed** 20:22
180:23
**former** 152:6
152:10
**forming** 20:3
**forms** 317:5
318:1
**forth** 20:4
253:20
267:4
**forum** 109:13
**forums** 87:7
**forward**
157:5
**found** 113:3
159:10,24
181:23
259:6
275:17
277:7
284:22
292:9,15
**foundation**
3:4 104:5
104:23
118:5
182:20
197:1,10
220:7
229:7
231:13
269:10
**founded**
26:12
**four** 28:8
55:12 79:6
82:20
99:12
156:5

163:3
179:23
246:2,7
250:1,4
252:7
289:5
290:20
299:20
**four-site**
313:17
**fourth** 61:16
61:19
107:3
**Francisco**
3:15
**fraught** 60:2
77:15
**Freedom** 5:12
**freestyle**
269:6
**freezing**
324:5
**frequency**
27:15
**frequently**
27:14
45:13 46:1
46:22
47:10
87:11
**friend** 1:5
**friends**
286:2
329:11
**front** 19:17
27:3 41:4
50:5 67:20
75:20
105:1
110:6,8
154:12
155:14
175:24
178:19
179:2
181:17
183:10
191:7
192:3
195:6
208:8
231:15
237:1

294:3
300:13,21
301:3,16
302:18
304:8
307:5
308:4
313:24
319:16
320:17,22
326:22
**frustration**
181:22
**full** 45:20
99:15
160:24
167:16
264:23
289:15
331:12
**function**
212:10
214:4
226:8,16
230:7
234:6
235:15,18
**functioning**
139:2
142:18
146:5
147:4,20
227:7
235:20
238:9
303:21
**functions**
304:10
**further**
122:3
188:2,21
190:1
193:13,20
279:10
286:20
287:3
289:6
324:17
338:6
**future** 212:5
212:21
257:12,17
257:19

286:24

**G**

**G** 11:8
**G-2/B-2**
207:24
**GA** 5:21
**gain** 124:22
125:6
**gained** 145:4
184:7,22
185:10
**gaining**
219:13
**gather** 43:1
**gathered**
38:19 43:4
43:11
159:18
**gathering**
42:9
307:15
**gay** 123:8,17
124:15,15
**GD** 51:10
235:9
**gears** 250:23
**gender** 16:5
20:23
21:16,23
22:10,16
23:9,15,21
24:21
25:23
26:12
27:23 28:9
28:21
29:18,21
30:5,11,22
31:6,9,16
32:8,8,14
32:17,19
32:20 33:5
33:10,11
33:15 34:3
34:13,24
35:13
36:16,20
37:6,10,11
37:15,15
37:18,24
38:2,3,11
39:8 40:22

40:24
41:12,15
41:16,20
41:23 42:4
44:5 45:6
45:7,7,12
45:12,18
45:22,22
45:23,24
46:10,11
46:14,15
46:18,20
46:21 47:3
47:5,8,10
47:21
48:10,16
48:22 49:3
49:14,17
49:21 50:1
50:6 51:11
51:24 52:1
52:6,11,12
52:24 53:6
53:18 54:5
57:16,17
59:6 60:2
66:3,6
67:9 72:9
77:3,6,7,9
78:6,18
79:20
83:11 87:8
87:21 89:3
90:5,18
91:2,2,7
91:16
98:20 99:4
99:16,23
101:18,19
102:11
103:15
106:19
107:4
109:6,7,19
109:20,21
110:14
111:4,9,11
113:18,19
113:23
114:8,16
115:1,21
118:12
119:17,24

124:8
133:15
135:11,18
137:10
139:3
141:4
142:18
145:2
146:5
147:15
152:22
153:6,13
154:7,17
157:19,21
158:19
159:9,24
160:22
162:4,13
162:18,20
163:21
165:2,3,18
166:12,17
166:18,20
167:8,9
168:8,23
169:4,11
169:17
170:5
172:15,24
174:4
177:2
194:24
196:11
198:17
199:7,18
199:24
200:2
202:8
208:12
211:2
220:24
224:22
227:22
235:9
239:22
240:9
241:14,17
245:11
252:11,15
252:20
253:15
254:24
255:10

256:4,5,12
257:23
258:7,14
260:1,21
261:3
264:8,14
270:21
271:7
275:2
276:24
279:11
282:5
289:18,22
293:14
306:11,19
306:20,24
307:8,10
307:14
310:22,23
314:2,2
318:12,17
318:21
322:3,4,6
322:7,10
322:13,17
323:17,24
324:1,8,11
324:20
325:1
326:19,21
327:1,6
332:7
**gender-a...**
109:4
**gender-a...**
87:12,13
88:10,12
88:17,19
88:24 89:8
89:11,13
89:14,15
89:22
91:22 92:3
92:5,9,11
93:7,15
94:7,13,19
94:23 95:2
113:24
114:13,24
115:6
119:19,23
120:12
121:6

125:10
130:22
132:7,18
133:1
134:4
241:12,16
241:23
242:9
305:21
315:12
**gender-d...**
103:19
**general** 1:20
67:5 75:21
103:11,13
139:4
147:20
153:17
154:13
170:9,15
171:6
190:16
197:7
206:15
221:24
237:12
257:24
270:22
273:21
281:1
307:22
314:20
331:18,19
331:21
332:1
**General's**
12:14
295:14
**generali...**
283:14
**generalize**
177:24
**generalized**
60:13
138:3
332:1,3
**generally**
16:4 31:7
57:14,15
220:21
222:9
237:20,20
237:23

238:4
293:6
307:15
319:20
**generated**
240:5
**generates**
285:11,13
285:14
**genetic** 19:6
**genitalia**
192:10
244:12
**genitals**
187:3
**gentleman**
82:13
**genuine**
41:16 59:2
59:10
**gestalt**
190:4
304:1
**getting**
15:11
49:19
142:8
166:7
236:17
271:23
291:7
307:15
**Gibson** 8:5
126:20,22
**GICE** 124:12
124:17
278:11,21
**girl** 152:21
157:9
200:10
327:19
335:19
**girl's** 333:2
**girls** 91:6
91:15
155:23
177:2
178:15
194:8
207:23
220:5,12
230:15,17
231:22

252:10,10
253:4,15
327:19
329:3
334:3,4,8
336:1,14
337:3
**girls'** 30:19
**give** 33:6
46:3 70:18
73:16 78:8
78:21
82:23
97:14
107:22
121:24
122:19
188:4
191:12,19
193:18
197:11
250:13
255:3
267:18
272:11
299:1
307:5
315:1
316:5
**given** 16:18
16:22 17:2
17:10,14
17:18 18:1
18:8
115:20
183:16
189:13
190:6
201:24
202:7,12
202:21,22
203:6
250:7
311:13,16
**gives** 229:11
252:6,7
**giving** 40:13
182:10
**Gladly** 33:8
**global**
147:14
303:19
**GnRH** 111:13

143:10
189:6,13
189:14
209:9,16
220:24
235:14
**GnRHa** 142:19
143:5
263:14
**go** 42:3 50:8
65:2 66:16
69:2 72:21
73:17
76:13
80:14 82:3
85:19
94:10
115:7
127:22
134:10
148:1
149:22
171:18
181:6
200:21
207:13
211:15
226:4
227:8,20
235:2
236:6
239:2,6
245:7
258:11
259:16
262:8,12
264:3,15
265:11
267:19
268:6
279:9
284:9
286:11
291:4
301:2
316:14
319:24
321:9,17
**goal** 60:15
119:12,13
119:23
121:5,16
121:19

212:17
220:15
326:9
333:6
336:21
**goal-based**
121:13
**goals** 119:11
119:17,18
120:11,21
287:13
**going** 14:1,7
14:19,20
20:24
31:21,22
35:11 39:1
42:22
43:20
47:24
53:10
59:18
66:18 69:4
88:7,14,17
91:9,11
96:12,17
97:2 99:8
101:7
106:13
107:9
108:12
110:17
112:3
121:12
126:17
127:22
130:2,3
131:20
133:5
135:16
137:1
138:17
140:18
142:10,11
145:20
146:22
149:22
150:4
154:17
157:4
164:16
170:4
171:8,9
172:2,3,20

174:3
176:2,3,5
176:19
177:6
182:3,11
190:22
192:21
193:9,14
195:11
200:10,17
200:22
203:3,11
211:17
217:22
224:7,9,21
225:14
232:17
239:7
247:18
251:16
254:6
259:20
262:9
266:2,17
267:21
270:16
274:14
276:14
279:23
281:17
294:7
295:16,19
308:16
309:14,23
311:9
314:14
321:10
326:1
333:7
336:6
338:23
**Golub** 9:13
281:12,21
282:1
**gonadal**
212:10
214:4
226:8,16
227:6
**gonadarche**
233:6
**Gonadotr...**
111:3

**gonads**
226:17
**Gonzalez**
79:5
**good** 12:16
13:5,9,20
13:21
64:12,13
68:2
155:22
194:5
267:18
301:8
321:7
**gotten**
178:20
**governance**
34:18
**governed**
100:13
**governing**
94:4
**government**
97:17
**gradation**
206:12
**gradations**
206:9,16
207:1
228:8
**grade** 111:12
112:22,23
**graded** 217:8
228:2
**grading**
216:11
**gradual**
233:21
**grand** 28:4
**gray** 230:3,8
230:14
231:6
233:4,8,12
233:17
236:23
**great** 68:11
109:15
236:14
**greater**
177:3
258:14
**Green** 4:9
8:8 12:22

12:22
133:9,14
236:11,12
338:13,13
**gross** 230:5
**ground** 108:3
**group** 56:15
62:23
146:24
147:1,3,8
147:10
179:24
209:10
216:13,13
217:6
257:4
306:15
329:11
**groups** 87:7
140:1
146:13
327:16
**growth**
221:11
237:1,3
**guess** 20:22
25:2 39:3
61:11
66:18
67:12,17
67:21 73:7
74:18
154:14
155:15,22
225:19
230:10
239:18
260:14
297:2
303:5
304:15
337:9
**guessing**
299:2
**guide** 161:16
238:11
**Guideline**
32:10
**guidelines**
7:6,10
8:21 32:2
32:7 34:20
40:4 48:4

48:9,22
50:9,11,16
94:1,3,11
94:22 96:1
107:18
109:5
110:3,4,7
110:8
149:1
152:3
158:22
159:4,6
162:22
171:15,22
171:23,23
179:12
207:17
208:4
216:15
217:9
225:18
227:12
228:21
315:5
318:15
**guiding** 94:4
**guild** 101:1
307:23
**Guss** 8:23
245:11,15
245:24
**guys** 338:22

———————
**H**

**H** 21:13 22:5
**hair** 91:3
187:10
**half** 155:2
159:10,24
249:19
282:24
**halfway**
102:15
252:9
**hand** 31:21
35:11
101:7
217:22
224:20
288:16
**handle** 88:2
**Hannema** 51:5
**happen** 110:1

**happened**
210:17,23
**happening**
178:23
212:24
231:17
294:5
312:14,21
313:2
**happy** 211:9
211:15
295:22
327:5
**hard** 21:20
22:14
42:17 43:6
57:13
59:17 71:8
74:5 79:16
90:7,8
112:3,17
121:24
174:13,17
286:9
294:4
302:17
325:3
**harm** 328:21
334:6,9
**harmed** 274:5
**harmful**
124:19
182:4,18
183:8
184:14
185:21
186:5,6,9
198:9,15
200:1
270:11
271:3
274:18,24
275:3
327:15
330:7
331:2,2,7
331:7,13
332:5,23
**harming**
162:2,11
**harms** 328:24
332:15,16
**Harrison**

1:10,17
4:21,22
12:17
**Hartnett** 3:9
13:5,6
**Harvard** 7:8
43:23 44:5
47:20
**hazard**
213:10
**HB** 335:16
**HB-3293**
319:6
320:15,17
328:10
335:16,18
335:23
**head** 14:3
**head-to-...**
271:22
**heading** 51:8
55:4,11,14
56:2 81:11
112:21
235:7
278:1
**health** 7:7
7:23 20:23
21:23 22:4
22:16
23:14
24:17 25:9
25:16,23
31:10,17
35:13,14
35:16,21
35:24
36:12,19
37:9 39:17
39:18,21
40:1,9,11
40:14,17
40:19
44:14
46:10
59:21 84:3
85:3 87:2
90:5,11,12
90:13,15
92:15,19
94:2 100:3
100:8
102:7

104:2
105:7
106:3
110:21
111:5,9
120:5
121:8
126:13
127:14,17
128:9
129:21
130:23
132:6,13
132:19,24
135:19
136:11,13
137:9
139:19
140:6
147:17
152:7,11
157:12,13
158:4,17
161:4
163:7,9,23
165:5
166:9
175:8
176:16
180:1
181:8,12
184:13,15
185:3,20
185:21
186:4,10
198:10,15
199:24
200:1,9
204:9
212:10
213:16,22
213:23
214:21
215:3,5
221:6
222:5
225:21
229:4,16
231:11
241:3
243:3
246:17
263:5

270:4,10
270:11,22
271:3
273:18,24
274:12,18
274:24
275:3
278:9,12
279:13
280:2
289:8,21
290:22,23
294:14
305:23
307:23
308:5
310:24
316:23
317:16
318:1,3,16
318:18
325:23
327:15
328:5,5,16
329:12
330:12
331:8,14
332:5
333:6,7,8
333:12,14
333:18
**Health's**
229:12
**health-r...**
283:19
**healthcare**
161:1
332:22,24
**healthy**
119:24
170:14
220:16
234:19,20
337:14
**hear** 56:15
56:17 81:8
181:21
182:21
186:14
321:2,2
**heard** 35:23
87:21
102:12

103:4
108:1
122:21
123:2
125:14,15
268:19
272:1,13
335:5
**hearing**
183:2
236:14
**heart** 187:21
237:6
**heat** 75:8
**HEATHER** 1:6
**heckled**
329:10
**height**
221:11
244:19
**held** 38:2
152:15
211:21
**help** 124:22
144:19
220:16
294:6
295:22
303:23
333:6
**helpful**
90:11
119:9
122:2
297:9,11
**helping**
40:15
125:6
166:22
**helps** 43:8
165:18,19
291:20
**Hembree**
50:23
**Henig** 271:18
271:22,24
272:1,4,9
272:19
273:8,14
273:20
274:16
**Henig's**
273:17

274:18
**Herzog** 79:5
**high** 240:24
282:23
286:21
287:5
291:19
**higher**
112:21
147:4,9
156:10
**highlight**
60:19,21
83:20
130:15
212:8
287:13
292:1
**highlighted**
88:19
283:3
**highligh...**
99:19
**highlights**
83:5 112:7
**highly** 44:19
88:15
121:23
244:1
286:3,5
287:3
292:2
332:16
**hip** 245:1
**hired** 299:12
**historic...**
306:12
**histories**
63:4
**history**
38:22 42:9
43:14
132:24
144:23
151:19
152:22
166:7
219:1
305:24
**hold** 194:2
261:9
262:4
**home** 247:20

homogenous 160:2,12
283:9
homophobia 165:7
59:1,10
homophobic 178:14
123:4
homosexu... 181:10
123:5
hope 145:6
153:11
hormonal
7:18 54:2
101:12,17
103:17
104:11,20
105:8
106:4,19
172:16
173:2
218:14,18
218:19
hormone
104:2
111:4
130:22
132:18
133:15
134:4
135:11
137:10
144:14
161:12
201:22
207:21,22
208:13
226:11,13
234:14
241:12,14
241:16
hormones
17:11
37:21
39:22
67:19 92:2
92:6 93:5
96:8
103:19
142:9
144:21
145:10,13
156:15,24
157:9
159:12

161:2,9
171:18
178:14
179:8
181:10
182:2,11
182:15
183:5,19
188:13
189:16,18
191:15
201:15,18
201:21,24
202:4,7,12
202:22
203:7,10
204:5,16
205:10
207:1
215:24
221:1
225:6
226:7
231:2,3,7
231:24
233:7,17
234:10
235:24
238:1
241:16,19
241:23
242:9,9
243:1,7,16
243:22
244:11,18
245:1
246:3,13
246:23
248:8
259:24
260:20
261:16
263:15,17
263:18,23
264:4,15
264:22
265:8,12
265:20
266:1,17
315:12
hospital

21:14 22:5
23:5 24:17
47:16
101:18
102:2,6,21
107:7
224:22
240:3
314:3
hospital...
75:19
host 275:8
hour 64:11
295:15
310:8,12
310:17,18
311:14,17
312:8
hugs 40:14
hundred 54:2
151:18
303:24
Hurricane
5:19
Huske 269:6
Hutchinson
79:24
hypotheses
61:13
162:15
hypothesis
196:16
289:6
333:20
hypothet...
224:6
hypothet...
275:8
_____
I
i.e 103:18
idea 75:21
153:9
154:13
159:18
164:24
229:8
233:15
ideal 304:23
ideally
99:18
304:17
Ideation

134:20,20
identifi...
14:24 32:3
35:18 44:1
48:5 53:14
76:17 82:7
84:7 97:8
101:13
106:24
107:14
108:18
110:22
115:12
126:23
130:7
132:2
133:10
134:15
136:1
137:5
138:22
140:22
142:14
145:24
148:5
149:17
157:15
158:6
167:4
168:5,13
169:5
176:10
218:5
224:13
228:22
232:22
245:16
248:1
251:21,23
256:4,6,19
262:21
268:10
271:15
276:19
280:6
281:22
316:1
identified
7:4 8:4
9:4 62:16
168:14,16
280:17
identifies

45:22 74:6
166:16
170:3
271:24
272:7,9
273:10
330:15
identify
20:2 45:6
78:2,14
111:2
145:17
156:6
165:22
166:12
167:3,13
175:17
247:12
282:10
290:3
331:5
identifying
46:14
80:19
119:10
168:7
273:5
285:9
330:5,6
identities
32:17
168:1
identity
30:6,23
31:6,10,17
32:14,20
32:23 33:5
33:10,11
33:13 34:3
34:14,24
37:10,15
37:16 38:1
38:2,6
40:22
41:12,19
41:23 42:4
45:6,12,24
46:22 47:5
47:9,10,21
48:16,22
49:3,14,18
49:20,21
50:1,6

52:18 54:4
54:6 57:16
59:2,6,10
60:3 87:22
89:4 91:3
91:7,17
98:20
99:16
113:19
114:16,16
115:1
116:1
119:24
120:1,2,4
124:8,21
125:3
129:22
152:24
165:20
166:11,23
167:2,8
168:8,9
170:1
172:15
173:1
180:4,15
180:21
181:14
204:20
223:12,24
241:17
244:13
246:24
251:6
252:11,16
252:20
253:16
254:24
255:10,16
271:7
273:10
275:2
276:24
279:11
281:8
289:18,22
293:15
318:21
322:4,6,7
322:10,13
322:17,23
324:3,8,11
324:12,21

325:1,2
332:7
**identity...**
323:18
**Illinois**
320:6
**illness** 16:4
59:1,9
75:19
325:24
**image** 111:10
306:11,18
**imagine** 29:4
149:19
**imaging**
144:10
322:16
**imbalance**
218:14,18
**immediately**
146:24
147:3,8
330:16
331:6
332:6
**impact** 17:10
17:14
108:2
111:8,10
135:18
142:7
145:18
157:22
183:23
232:6
249:9,10
270:15
327:15
328:4,6
331:2,8,14
332:5,24
**impacted**
293:13
**impacts**
90:14
142:8
170:15
188:8
213:22
294:14
328:16,22
330:12
331:11

332:18
**implemen...**
216:14
**implication**
90:10
273:12
**implicat...**
71:15 79:9
266:16
**implied**
171:5
**implies** 40:9
109:14
118:19
287:21
**imply** 159:21
**importance**
99:16
100:17
**important**
39:15 49:2
57:1 72:8
87:20 89:2
99:22
111:10
139:23
142:6
157:4
164:18
178:17
184:19
212:17
237:15
246:3
294:24
308:12
325:23
333:8,15
**importantly**
306:10
**impossible**
145:11
290:22
317:12
**imprecise**
191:19
303:16,20
**impressed**
194:6
**impression**
43:18
**improbable**
287:3

**improve**
60:18
145:2
**improved**
127:17
290:24
**improvement**
127:14
132:17
141:13
145:12
147:5
**improvem...**
134:5
135:12
**improves**
126:13
**inaccurate**
35:6
105:10
**incapable**
290:12
**incident**
334:24
**include** 20:6
27:9 90:23
92:6 93:24
100:10
111:24
112:16,17
135:5
158:3
164:19
165:22
171:6
181:3
212:8
221:17
227:1
235:9
306:10
310:22
**included**
112:8,14
113:12,13
113:13,13
283:8
287:24
289:2
306:16
**includes**
20:8
221:11

222:17
223:11
227:6
234:18
323:18
**including**
60:14 78:4
78:16 94:1
157:12
199:18
215:15
267:3
283:24
305:23
312:4
**inclusio...**
112:12
**income** 25:14
26:18
27:22 28:1
**incongru...**
52:12
**incongruent**
32:9 41:23
51:11
235:9
324:21
325:2
**inconsis...**
167:8
**Incorpor...**
157:3
**incorrect**
95:10
261:1
**incorrectly**
180:20
**increase**
178:2
256:3
**increased**
285:18
328:20
**independent**
223:24
**independ...**
297:19
**indicate**
26:20
46:20
79:18
111:7
113:2

126:11
129:5
133:23
135:5
139:15
140:10
165:17
216:18
250:24
257:8,15
258:5
260:17
263:13
283:22
292:2
**indicated**
72:16
92:13
125:12
158:20
159:9
212:20
235:22
238:5
257:22
262:12
289:1
331:1
**indicates**
32:14 45:5
52:10
56:20
81:12
105:6
107:3
126:12
127:7
181:7
212:5
216:10
218:10
224:24
235:8,13
246:2
248:13
249:17
257:2
258:12
259:5,22
**indicating**
34:11 35:5
58:16 80:5
162:8

215:21
**indication**
209:5
219:14
**indications**
158:24
207:12
**individual**
30:18 38:3
38:6,7
39:15
40:21,23
41:12,14
46:16
57:10
71:10
82:13 88:8
92:21
112:13
116:6
150:16
176:21
178:22
179:2,19
185:9
186:2
189:19
190:23
191:2
195:12
199:15
200:11,14
200:17,18
204:8,12
206:22
228:3
237:16
238:3,7
243:6
266:11
270:17
273:4,21
310:2
311:10
329:13
331:11
332:15,16
332:19,22
**individu...**
289:21
**individu...**
195:5

**individu...**
192:21
203:12
206:13
225:13
266:2
267:2
274:3,13
331:9
332:16
**individu...**
208:5,7
**individuals**
30:5 32:21
33:14
34:12
53:18 54:2
56:16,21
58:12
70:23
104:3,12
104:21
105:9
106:5,8
124:22
125:6
138:12
140:14
145:9
149:2
152:3
174:11
190:20
213:5,12
248:8
258:6
272:22
281:2
285:10
289:8,18
328:20
337:12
**indulging**
180:14
**inevitably**
143:6
144:22
**inferred**
133:23
**infertility**
246:4,12
**influence**
78:6,18

126:1
170:10
211:10
231:23
**influenced**
284:6
**influences**
168:20,24
170:11
**informal**
306:14
**informants**
43:15
**information**
27:3 38:19
42:20 43:2
43:4,11
75:20
101:23
102:20
154:12
155:14
159:18
191:7,10
205:18
229:2,15
278:24
283:23
286:13,24
299:3
312:3,4
313:24
**informed**
81:13
157:5
180:23
197:13
206:20
265:6,17
265:19,22
266:12,14
266:24
**infrequent**
164:21
167:22
**inherent**
125:9
156:19,21
265:6
289:19
308:4
322:13
**inherently**

49:21
114:20
120:4
200:18
**inhibitors**
209:9,16
**initial**
73:19
192:14
**initiated**
103:19
**initiates**
192:20
**initiating**
104:2,11
104:20
105:8
159:11
160:1,11
231:18
248:22
249:6
**initiation**
92:19
158:19
160:14
161:12
204:9,10
218:23
287:2
315:11
**injustices**
287:14
**innate**
163:22
167:2
**inside** 77:1
**insists**
322:2
**Insomuch**
70:21
**inspected**
219:3
**instance**
30:17
32:18 79:4
308:11
**instances**
123:8
**Institute**
229:3,11
229:16,19
231:11

institution
  21:11
instruct...
  288:7
instrument
  287:16
  304:2
instruments
  86:15
  309:13
insurance
  27:20
  72:12
intake 317:2
  317:5
intake-type
  316:22
integrity
  116:9,11
intend 21:4
intended
  316:19
intensity
  199:18
  306:23
  307:8
intent 35:9
  226:22
  303:1
intention
  202:1,9
  286:23
intentio...
  337:19
Intentions
  247:20
  250:17
interaction
  124:8
interact...
  197:6
  233:7,15
  233:16
interacts
  37:18
interest
  159:1
  178:22
  179:14
  294:10,18
  294:24
interests
  195:9

294:15
interfere
  176:2
internal
  38:3  45:24
  46:21
internal...
  78:5,17
  278:9
internat...
  95:22  96:3
  96:6  149:8
  172:2
  215:1
  216:13
internet
  168:24
  170:11
interpreted
  70:6
interrupt
  236:12
  320:20
interrup...
  321:2
intersec...
  168:23
intersex
  37:21
intervene
  238:12,12
intervening
  121:12
intervenor
  5:15,22
  12:12
intervenors
  12:9
interven...
  31:11,18
  90:21
  135:19
  143:10
  157:6,20
  158:1
  181:2
  183:24
  196:16
  206:10
  265:8
  267:7
interven...
  39:16,24

40:8,10
  77:18
  87:24  88:7
  90:14
  114:21
  118:12,23
  121:6
  125:2
  126:7
  143:19
  145:1
  158:14
  205:20
  225:22
  228:12
  231:18
  260:23
  266:8
interview
  8:18
  128:15,17
  144:8
  176:8,13
  176:20
  181:18
interviews
  38:12  42:8
  42:10  86:2
introduce
  227:10
introduc...
  287:15
invalid
  308:24
invariably
  53:1
invention
  260:3
inventions
  40:7
investig...
  297:14
investig...
  157:12
  158:3
investig...
  238:23
invoice 29:4
  299:1
involuntary
  32:12
  33:12
  34:13

involved
  28:16
  42:15
  85:17
  92:11
  106:1
  125:17
  171:5,7
  179:12
  204:21
  264:9
  288:24
  313:19
  333:9
involvement
  14:2
  100:22
  204:6,7,11
involves
  28:17
  38:12,19
  165:13
  170:20
  171:2
  183:2
  218:17
irregula...
  286:19
  287:7
irrespec...
  178:22
  200:13
irrevers...
  227:22
  228:6,12
isolation
  186:8
issue 194:17
  205:9
  213:3
  298:9
  301:20
  338:5
issued 109:4
  110:2
  300:6,7,19
  301:13
issues 18:2
  28:9  83:12
  88:6  99:20
  109:13
  152:22
  157:13

158:4
  211:11
  298:5
  307:2
  310:24
  318:21
issuing
  107:18
  297:5
  301:22
Iszac 271:18
  271:22,23
  272:1,9,24
  273:4
it'd 236:14
  273:17
items 215:18

                J

JACKSON 1:6
Jacob 11:20
Jake 260:11
  315:13
  316:4,10
Janssen 1:19
  2:3  6:4
  11:15  12:6
  13:20
  338:11,19
January
  268:14
  271:21
jest 267:13
job 39:4
  175:22
  307:5
Johnson 4:18
join 329:24
  330:1
joining
  329:22
Josh 13:2
JOSHUA 3:3
Journal 26:4
judge 71:10
judgment
  289:4
  309:2
jumping 46:3

                K

Karleigh
  271:21

**Kathleen** 3:9
  13:6
**Katz** 44:12
**Katz-Wise**
  44:12,13
  44:16 45:5
  47:2,9,14
  245:23
**keep** 133:3
  295:16,19
**keeping**
  236:13
**Kelly** 5:3
  12:19
  338:15
**kicked**
  329:10
**kid** 166:22
  175:24
  182:10
  266:11
  294:7
**kid's** 183:15
  198:15
**kids** 40:14
  40:16
  46:14 86:2
  164:14
  167:15
  170:15,16
  174:7
  183:13,14
  197:4,7
  215:17
  264:18
  274:6,8,9
  274:13,15
  294:1
  313:19,21
  322:21
  333:7
**kind** 15:11
  43:7 60:10
  62:1 63:1
  72:23 74:5
  90:20
  125:17
  143:10,12
  144:11
  156:8
  174:17
  190:4
  195:21

  196:17,21
  197:8
  198:5
  232:8
  266:4,24
  304:24
  306:14
  308:12
  312:10,17
  316:21
  322:20
  328:5
**Kingdom's**
  104:1,18
  105:7
**Klein** 9:13
  281:12,20
  282:1
**know** 14:12
  14:13,17
  19:5,22,23
  19:24
  25:15 39:4
  40:13
  44:15,16
  47:23
  55:16,17
  57:2,10,11
  60:5 62:16
  63:3,8
  72:7 76:6
  80:2 84:16
  84:17 85:9
  94:11,15
  97:17 98:5
  98:13,16
  102:4
  103:10
  105:13
  112:15
  116:17
  122:23
  124:2
  126:8
  131:16
  132:24
  151:19,21
  152:5
  156:8
  159:19
  164:2
  174:1,6
  177:6,15

  192:19
  193:22
  198:22,23
  199:12
  206:1
  209:22
  210:20
  211:12
  213:19,20
  214:24
  220:4
  232:3
  233:22
  234:15
  239:18,19
  245:22,23
  246:11,19
  247:8
  249:15
  286:9
  293:12
  295:20
  299:12
  300:13,14
  300:14,22
  301:20
  302:18
  306:3
  313:5
  320:18,24
  323:3
  325:20
  326:24
  327:3
  332:17,19
  333:4,22
  336:6
**knowable**
  191:6
**knowing**
  79:15
  103:23
  113:12
  116:7
  272:24
  317:11
**knowledge**
  19:1 102:9
  124:3
  314:18
  318:24
**known** 190:12
  270:16

**knows** 216:6
**Kuper** 8:11
  137:4,8

_____
        **L**
_____
**L** 11:1
**lab** 144:10
**label** 8:19
  218:4,8,9
  218:10
  247:4,5
**labeled**
  300:24
**labels**
  272:23
**Lacey** 2:5
**lack** 102:10
  183:12
  243:15
  278:20
  290:11
**lacked**
  278:24
**laid** 161:20
**LAINEY** 5:15
  5:22
**Lambda** 3:19
  13:4
**landscape**
  106:1
**language**
  57:1,3,4
  77:12
  109:13
  193:15
  205:5,7
  226:22
  230:24
  236:1
  237:5
  288:21,24
  304:22
  306:2
  308:14
**large** 51:9
  51:23
  62:24
  167:15
  205:12,14
  205:21,23
  205:24
  286:3
  291:19

**largely**
  283:9
**late** 186:12
  186:17
  262:9
**latitude**
  161:22
**law** 5:18
  36:6 37:3
  105:4
  106:17
  127:24
  171:20
  194:22
  195:20
  196:9
  199:19,22
  207:15
  218:2
  224:18
  227:13,16
  227:18
  228:16
  236:8
  245:9,20
  259:18
  315:21
  328:10
**Lawrence**
  5:18 12:10
**Lawrence...**
  5:21
**laws** 172:3
  328:3,6
  337:20
**layers**
  165:19
**lead** 107:5
  195:11
  196:17
  228:12
  263:2
**leadership**
  22:15
**leading**
  263:9
  324:2
  332:14
**leap** 260:24
**learn** 43:8
**learning**
  170:16
  205:18

337:5
**leave** 68:20
**lectures**
  16:18,22
  17:2,10,14
  17:18  18:1
  18:8
**led** 89:1
  128:15,17
  150:19
  289:21
  299:15
  329:12
**left** 186:23
  295:16
  335:12
**leg** 245:1
**legal** 3:19
  11:21  13:4
  29:8,10,13
  105:24
  198:14
**legislative**
  333:10
  338:3
**legitimate**
  123:10
**let's** 50:8
  66:16
  68:23
  76:13
  80:14  82:3
  115:7
  127:22
  134:10
  148:1
  200:21
  207:13
  216:9
  226:4
  235:2
  236:6
  239:2,5,6
  245:7
  252:6
  256:10
  258:11
  259:16
  262:8
  268:6
  284:9
  295:19
  303:8

321:9,17
322:1
**letter**
  116:11,14
  117:1,4
  142:24
  143:1
  285:6
  291:8,21
  296:3
  297:5
  298:1,3,4
  315:10
**level** 116:12
  172:3
  191:6
  267:14,15
  291:17
  309:1
  318:20
**levels**
  282:21,23
**Levine** 302:4
  302:20,23
  305:12
  312:19
  313:10
  338:2
**Levine's**
  113:18
  119:7
  251:1
  312:24
**LGBT** 25:16
  25:23
  175:8
  280:2
  281:2,8
  328:4
**Lia** 268:16
  268:23
  269:5,21
  270:3,7
  271:22
  272:8
  334:16,17
  334:21
**Liberties**
  3:4
**license**
  65:16,17
**licensed**
  65:14,15

100:8
318:19
**Licopene**
  107:5
**Lidgren**
  101:18
**life** 14:5
  147:15
  157:14
  158:5
  161:2
  171:7
  246:13
  337:4
**life-alt...**
  161:9
**lifelong**
  260:2,22
**likelihood**
  182:3,17
  259:7
**Lily** 7:14
  84:3,6
  128:2
**limit** 140:2
**limitations**
  135:5
  172:1
  277:24
**limited**
  177:22
  322:16
**limits** 61:23
  283:13
**Lindgren**
  102:2
  107:7
**line** 109:7
  109:19
  249:3
  250:1
**lines** 137:24
  138:5
**link** 278:16
**links** 234:10
**Lisa** 7:11,20
  8:18  53:13
  53:17
  83:19
  106:15,22
  176:8,13
**list** 88:22
  112:13

142:7
241:7
**listed** 95:17
  131:4
  152:14
  264:23
**listened**
  87:21
**listening**
  89:2
**listing**
  117:5
**lists** 258:7
**literature**
  64:5
  113:10
  123:21
  156:8
  164:3,6,7
  164:8,23
  173:20
  177:10,22
  178:4,10
  179:3
  205:16
  206:24
  209:12
  213:23,24
  215:5,5
  216:3
  219:13
  223:1,5
  234:23
  241:24
  246:16
  261:24
  264:7
  289:17,23
  290:4
  296:20
  313:1
  328:1
**litigation**
  104:7
**little** 49:19
  67:23
  111:13
  125:22
  217:18
  223:7
  285:21
  291:24
  310:10

316:20
322:14
**Littman** 7:11
  53:13,17
  58:5  61:2
  61:17  62:7
  70:6  71:19
  80:15
  163:17
**Littman's**
  62:3  69:13
  69:15,18
  70:17,21
  83:20
**live** 250:9
  337:5,20
**lived** 54:4
**lives** 31:7
**LLP** 3:13
**local** 87:6
**located**
  236:17
**location**
  313:14
**locations**
  326:12
**logical**
  260:24
**logs** 143:10
**long** 42:13
  65:5  68:24
  130:24
  144:23
  151:16
  302:19
  309:19
  310:4,13
  332:10
**long-term**
  102:10
  139:18
  140:6,11
  140:13
  215:17
  225:2
  246:11
  267:11
**longer**
  172:11
  204:24
**longitud...**
  135:18
  164:13,17

257:4
**longitud...**
68:12
**look** 27:2
62:18
65:20
71:10
72:21
73:17
78:21  79:8
82:20
84:16,19
85:10
97:15
103:9
109:1
112:6
116:19
117:21
137:24
142:7
143:2
193:14
229:1
248:12
252:6
263:13
288:6
291:5
296:24
297:19
305:14
307:1
312:10
327:5,12
327:23
328:3
335:20
337:10
**looked**
164:20
213:2
215:16,18
236:7
**looking** 40:5
115:20
116:16,22
117:2
169:12
174:10
180:2
212:3
230:10

248:6,11
253:24
259:21
261:1
296:5
305:16
306:6
324:6
**looks** 44:8
102:24
143:20
335:11
**Loom** 107:5
**lose** 76:4
**lost** 75:24
76:1,8
**lot** 20:24
59:4  63:1
73:3  77:17
88:16
90:10
92:10
93:24
132:22
149:11,19
154:15
161:22
172:20
181:21
211:12
230:9
244:2
308:24
316:22
332:11
**lots** 198:23
**loud** 86:6
**love** 211:13
299:4
**low** 72:5,7
111:12
112:22
217:2
285:13,17
307:7
**lower** 285:11
285:14
**lunch** 200:20
**lung** 187:21
**Lupron** 8:19
218:4,8,9
218:10
219:3,8,17

220:15,24
**Lurie** 21:13
22:5  23:4
24:17
240:2

———————————
M
———————————
**M** 3:12
**M.D** 1:19  2:3
6:4  11:15
**magnitude**
174:5
**main** 101:19
326:9
**mainstream**
217:19
**major** 73:17
**majority**
30:4,11
51:9,23
263:21
264:2,8,13
265:10
**making** 40:23
41:14  55:9
120:8
156:15,24
161:11
174:12
178:21
185:17
197:12
267:10
289:20
297:23
310:10
**male** 17:2
18:3  32:15
32:19,23
33:13
34:13  39:1
40:22  41:3
41:12,19
80:23
155:10
184:8,23
185:11,23
186:3,13
186:19
187:3,21
188:2,22
189:19
190:1

193:8
197:18
198:2,11
198:17
199:7,13
199:15,16
200:2,15
202:8,12
203:6,20
234:2
242:19
244:18
245:2
247:12
271:24
272:7,9
273:5
329:8
330:5,15
331:4
336:3,9,11
336:22
337:2
**males** 37:20
184:6,22
188:21
190:6,10
190:17
191:3,23
191:24
192:9,20
193:4,5,17
193:23
194:8
197:17
198:1,11
202:23
219:18,22
234:19
242:16,22
270:20
319:11
335:24
336:1,13
336:19
**malfunction**
218:19
**malleable**
18:18
**man** 38:6
272:4,19
273:8
**manage**

337:17
**mandate**
158:18
**mandated**
314:5
**mandates**
158:22
159:4
171:16
**mandatory**
171:23
**manifest...**
332:15
**manner**
189:13
246:21
298:9
**manual** 16:3
325:7,13
326:5
**marital**
95:11
100:11
101:4
**mark** 14:20
31:22
35:12
43:21  48:1
97:3  101:8
106:14
107:10
108:13
110:18
126:18
130:3
131:21
133:5
135:17
137:2
138:18
140:19
142:11
145:20
149:13
176:6
192:1
217:23
224:10
251:16
279:24
281:18
316:6,7
**marked** 14:24

32:2 35:17
43:24 48:5
53:14
76:16 82:6
84:7 97:7
101:13
106:23
107:13
108:17
110:21
115:11
126:23
130:7
132:1
133:9
134:14
135:24
137:5
138:5,21
140:22
142:14
145:24
148:4
149:16
176:9
218:5
224:13
227:11
228:21
232:17,21
245:16
247:24
251:20,23
256:19
262:20
268:10
271:15
276:18
280:6
281:21
315:17,24
**marking**
316:6
**masculine**
273:13
**mask** 289:10
**masking**
290:2
**match** 43:16
177:7
245:2
**materials**
117:5

208:24
**math** 81:9
253:13
255:13
280:23
**matter**
170:13
230:3,8,14
231:6
232:7
233:4,8,12
233:17
236:23,24
237:1
264:19
**matters** 44:6
324:17
**maturity**
267:14,15
**McCall**
108:21
109:2
**McCuskey**
4:10
**mean** 19:22
56:5 58:17
60:5 62:1
63:22
67:12
70:14
72:22 73:5
75:4 80:6
87:17,18
90:16
103:3
107:10
111:22
126:9
141:2
144:7
146:14
150:17,18
154:14
156:3
157:2
159:21
160:16
164:1
167:18
184:7
196:15
202:20
207:3,5

226:15
233:24
241:7,14
241:22
242:22
246:19
247:4
254:6
271:5
286:8,12
303:6
304:13
310:20
316:21
332:1
336:18
**meaning**
29:14
140:13
331:3
**meaningful**
60:4,6
63:17,20
63:22
109:22
**meaningless**
83:22
**means** 38:11
44:6 46:12
46:15,20
57:12 64:3
64:3 80:3
84:19 91:5
99:2
103:17
122:23
161:23
162:21
195:7
199:13
233:22
235:18
241:18
242:2,15
252:15,23
280:21
336:19
**meant** 159:20
209:22
210:20
267:13
276:5
**measurable**

234:1
**measure**
147:15,17
147:20
303:16,20
305:9,10
306:23
309:6
**measured**
138:16
140:14
323:19
**measurement**
323:13
**measurem...**
85:23
**measures**
145:2
306:8,15
323:20
**measuring**
304:10
305:9
**media** 168:24
169:2,16
170:11,14
**Medicaid**
28:17
**medical** 7:8
15:21 23:3
31:10,17
43:23 44:5
50:24
53:18
64:22 65:4
65:9,13,17
65:18 90:5
103:14
157:10,19
158:14,19
174:20
175:7
183:15
195:12
198:6
204:24
266:7
316:23
318:17
328:5
**medically**
231:19
286:22

**medication**
130:22
131:12
132:17
134:4
135:11
136:18
201:21
204:3
**medications**
39:22
54:10
57:21
58:13
72:10
92:20
143:14
188:9,17
190:7
207:8,11
210:2
247:9
**medicine**
16:15,23
21:13
47:15 93:3
110:14
115:22
216:5
315:14
**Medscape**
109:12
**Medscape...**
7:22
108:17,22
**meet** 166:16
167:9
176:1
**meeting**
179:20
**meetings**
213:2,21
215:1
**meets** 170:4
**member**
148:24
152:1,10
**members**
171:7
312:5
**men** 222:1
244:4
**mental** 31:10

31:17
39:16,18
39:21 40:1
40:8,11,14
40:17,19
59:1,9,21
84:3 85:2
87:1 90:5
90:11,12
90:13,14
92:15,18
100:3,8
111:9
120:5
121:8
126:13
127:14,17
128:9
129:21
130:23
132:6,13
132:19
135:19
136:11,12
137:9
139:18
140:6
147:17
157:12,13
158:4,12
158:17
161:1,4
163:7,9,23
165:5
166:9
175:8
180:1
181:12
184:13,14
185:3,19
185:21
186:4,10
198:10,15
199:23
200:1,9
204:8
213:23
215:5
221:6
225:21
229:3,11
229:16
243:3

246:16
270:4,9,11
270:22
271:3
273:17,24
274:12,18
274:24
275:3
278:9,12
279:12
289:8,21
290:21,23
294:14
305:23
307:23
308:5
310:24
316:22
317:16
318:1,3,16
318:18
325:7,14
325:18,22
325:24
327:15
328:5,16
329:12
330:12
331:8,14
332:5
333:6,12
333:14,18
**mention** 64:8
172:4
299:21
335:4
**mentioned**
60:1 63:6
72:3
123:13
247:10
308:7
328:18,24
**mere** 220:8
**merely**
159:23
**merits** 71:11
**met** 39:18
161:13
309:16
324:24
**metaanal...**
112:2,9

**metal** 16:3
**method** 62:19
89:21
285:15
286:3
**methodol...**
83:21
**methodology**
64:4 112:3
112:24
285:11
291:6,15
**methods** 79:2
85:20
127:6
**Michael**
142:17
**mid** 178:7
**middle** 118:9
230:2
319:24
320:8,14
**Miesen** 8:12
138:21
139:1
141:1
142:6
**mind** 95:19
114:17,24
172:24
209:13
227:4
236:13
**minds** 172:14
**mine** 55:5
**minimum**
311:20
**minority**
22:16 30:3
53:6 67:16
173:4
327:16
**minors** 7:19
101:12,17
**minute**
146:18
**minutes** 69:1
96:13
137:19
148:12
149:22
150:1,3
295:17

310:4,6
335:12
**miscarriage**
249:19
250:2
**mischara...**
230:6
**mischara...**
142:22
265:14
**misdiagn...**
163:21
**misled** 169:1
169:16
**misprono...**
233:6
**misreading**
134:21
**missed** 88:22
288:15
**missing**
112:15
130:15
**misstating**
259:9
**mistake**
58:24 59:9
**mistaken**
56:12,22
**misunder...**
118:14
**mix** 74:22
**mixed** 98:19
**modalities**
279:1
**model** 93:8
113:20,24
114:1,16
119:14,19
119:23
120:12,12
141:24
143:4
144:20
145:1,10
282:21
**moderate**
282:21
**modified**
111:12
112:22,23
**moment** 59:24
70:18

80:16
81:21
125:12
150:14
164:12
176:1
288:17
**momentous**
266:4
**moments**
69:13
71:24
267:19
**monitor**
11:23
**month** 72:11
**monthly**
219:17
**months** 27:17
147:5,6
219:22
**Morgan** 5:3
12:19,19
338:15,15
**morning**
11:11
12:16 13:5
13:9,20,21
**MORRISEY**
1:18
**Moseson** 8:24
247:19,24
**Mother** 1:6
**motivated**
56:16
**motivations**
42:4,21
124:1,24
125:8,18
**mouth** 87:6
**move** 303:8
**moved** 24:2
**moves** 237:2
**moving** 64:12
96:7 157:5
**MRI** 233:20
**multi-phase**
210:6
**multi-va...**
282:21
**multidis...**
99:19
**multiple**

38:19
115:5
165:14
166:3, 6, 8
167:10
169:12
267:2
305:10
**muscles**
187:16
**muted** 257:3
**mutual** 68:13

**N**

**N** 3:1  4:1
5:1  6:1
11:1, 8
**nail** 42:17
**Nainggolan**
7:20
106:15, 23
**name** 11:20
12:5, 8
91:3  95:9
102:4, 5
106:16
134:22
224:21
272:2
338:9
**name's**
295:13
**named** 82:13
82:13
**names** 12:6
328:2
**narrative**
70:22
118:5
**narrows**
121:23
**natal** 80:19
121:18
152:21
154:21
155:7
156:4
172:15
173:1
188:21
189:19
199:15
202:7, 17

202:21, 23
203:6
242:3, 10
242:16
244:19
245:2, 2
247:11
250:9
270:20
324:9, 9
330:5, 15
331:4
336:9, 13
**national**
7:23  87:6
95:10, 11
104:1, 18
105:7
106:3
110:21
111:5
175:8
178:3
179:2
215:1
229:3, 11
229:16, 19
231:10
263:5
277:14
319:15
**nationally**
279:6
**natural**
195:1
196:12
**naturally**
202:17, 23
**nature** 56:24
57:14
103:11
231:10
283:17
**NE** 5:19
**necessarily**
20:24  39:5
58:22
60:16
77:11
96:12
118:20
168:15
199:13

223:15
307:16
308:15
**necessary**
42:24  43:1
100:2, 22
318:12
**need** 14:11
14:14, 17
27:16
42:19
63:21  64:1
88:9  99:20
131:15
137:19
146:18
170:16
171:5, 8
179:1
192:16
198:22
209:18
212:6, 8
226:6
239:3
251:8
288:6
289:3
294:5
329:20
337:22
**needed** 35:9
212:16, 21
215:22
**needs** 71:13
82:14
88:16
176:2
204:12
206:13
216:7
322:14
**negative**
114:20
116:1
121:5
200:9
283:19
328:22
329:12
**neither**
33:20
**Network**

26:13
240:10
**neuropat...**
230:12
**neurosci...**
238:24
**neutral**
290:14
326:2
**never** 19:23
41:18
82:24
116:6
122:21
123:2
181:11
194:14, 16
194:17, 23
195:21
196:10
203:12
248:17
272:12
274:23
311:16
**neverthe...**
90:14
183:16
223:23
325:2
**new** 3:6, 21
7:16  97:6
97:12  98:8
104:3, 12
104:12, 20
105:8
106:4
107:18
109:5
110:2
153:20, 22
155:6, 9
179:24
205:18, 19
245:8
254:9
264:18
298:5
300:7
320:5
**NHS** 104:24
**NIH** 313:18
**nine** 80:17

84:12, 21
112:7
127:2
128:4
129:1, 2, 5
129:19
130:11
280:17, 21
280:22
**Ninety-five**
66:20
**no-win**
182:23
**nodding** 14:3
194:4
**nomencla...**
209:14
324:21
**non** 278:11
**non-affi...**
122:22
125:13
126:7
290:14
**non-affi...**
122:17
290:13
291:1
**Non-Binary**
132:7
**non-conf...**
48:10
245:12
258:8
282:5
322:3
**non-endo...**
213:9
218:23
**non-inte...**
266:9
**non-pithy**
43:6
**Nonbinary**
133:17
**nonconfo...**
87:8
**nonspecific**
46:11
**normal** 170:1
219:9
220:16
221:10, 16

223:10
**normally**
309:19
310:13
**North** 5:13
**Northwes...**
21:12 24:9
**notable**
315:6
**notably**
109:3
**Notary** 2:6
**note** 33:17
110:16
146:23
269:9,13
277:14
280:14
282:20
287:12,23
288:2
289:5
290:7,20
**noted** 58:7
103:2
105:17
110:17
327:13
**notes** 58:10
285:7,23
301:2,18
**noting**
269:11
289:9
**notion**
118:11
**novel** 125:19
**NTDS** 283:7
**nuance**
230:10
309:1,2
**nuances**
59:22
291:18
**number** 7:4
8:4 9:4
12:5 55:7
66:17
72:14 76:8
105:3
137:22
153:16
173:14,16

173:22
199:16
208:11
215:15
216:19,21
228:11
248:10,12
249:5
258:19,20
259:17,20
268:7
285:18
286:19,21
286:23
287:1
303:11
306:7
307:21
308:22
315:19
324:17
328:15
**numbered**
116:17,21
**numbers** 55:5
55:9 162:6
210:22
252:7
255:21
277:23
**NY** 3:6,21
**NYU** 23:21
24:6
239:22
——————
**O**
**O** 11:1,8
**o'clock**
14:14
**Oaks** 4:19
**Object** 86:11
163:13
260:5
300:11
**objection**
10:1 17:6
17:21,21
18:4,5,19
19:9 21:18
22:12
23:11
24:23 27:1
29:20 30:9

30:24 31:4
33:22 34:5
34:22 35:7
36:2,23
37:13 38:9
39:2,13
40:2,12
41:2,17
42:6 44:7
45:1,15
46:2,24
49:1,8
50:3,13,19
52:3 54:13
56:13 57:8
58:3,19
59:3,12,19
66:5 68:16
69:20 70:7
70:20 71:7
71:22 72:6
74:1 75:12
77:10,22
78:8 79:14
80:9,21
81:5,17
82:23
85:14
86:22
87:14
88:13
89:17
91:24 92:4
95:4 96:10
97:14
98:12 99:6
99:24
100:19
101:21
102:13
103:1
104:4,14
104:22
105:11,14
105:16
106:11
107:21
109:11
111:20
113:8
114:2
115:3
117:19

118:16
119:8,21
120:15,22
121:21
122:19
123:18
125:4
129:14
130:17
132:21
134:7,21
138:8
141:17
142:3,21
144:3
145:7,15
147:18
149:23
153:3
154:23
156:16
157:1,16
158:8
160:4
161:3,10
165:8
166:1,13
167:5,21
169:6,19
172:17
173:3,17
174:15
175:14,21
177:8
178:16
179:10
180:9
181:15,16
182:5,19
183:19,22
184:24
185:14
186:20
187:4,22
188:23
189:10,21
191:13,15
193:6
194:12
195:3,23
196:14,24
197:9,19
198:20

199:10
200:5
201:10,19
202:10
206:17
207:4
208:2
209:3
210:14
211:3
213:7,17
214:5
217:4
218:21
219:11
220:6,19
221:4,12
221:18
222:2,11
223:3
224:5
226:19
228:1,10
229:6
231:12
233:15
234:12,21
237:9,13
238:17,20
240:14
241:6,21
242:5,18
243:11,17
244:15,21
245:4
246:18
247:2
250:12
254:7
255:3,19
258:23
259:13
261:12
264:5
265:2,13
266:20
268:17
269:10,23
270:24
272:11,20
274:1,19
275:6,12
282:7,16

284:19
286:6,14
288:5,19
289:14
290:17
291:3,13
292:6
293:4
294:12,20
295:1
298:16
301:23
302:8,16
303:4
304:14
308:20
309:10,22
310:15
311:7,22
312:12,15
312:22
313:6
314:10
316:18
317:3,10
317:17
318:6
319:13
320:11
321:3
322:11
323:5,15
324:15
325:19
326:8
327:21
330:8,18
331:15,20
332:8
333:16
334:10,19
336:16
337:8,24
**objections**
105:18,19
183:3
187:11,17
188:3
190:3,11
190:18
191:4
**objective**
58:6,11

148:9
303:17,22
304:4,6,7
304:12
309:6
322:9,17
323:13,18
**obligations**
264:23
**observation**
291:2,12
**observat...**
112:7
**observed**
233:5,14
**obtained**
102:18
**obviously**
60:2 79:11
**occasion**
293:16
306:5
**occasion...**
92:18
320:6
**occurred**
211:6
248:21
257:15
278:21
283:24
**occurrence**
164:21
167:23
**occurring**
169:10
175:10
237:20,21
237:23
**occurs**
112:10
**October**
108:22
**odds** 282:23
283:1
**off-label**
246:24
**offense** 75:4
**offer** 20:13
20:18,21
21:4 44:22
225:16
325:20

**offered**
52:16,21
310:22
**offering**
240:23
294:9,17
**office** 12:14
190:20
295:14
321:1
**official**
1:14,16,19
**Oh** 139:14
279:22
**OHSU** 224:22
**okay** 14:16
15:18
22:23 24:4
25:4 28:13
28:19 29:6
34:17 36:8
41:8 43:10
47:19 58:9
65:1 80:13
81:10
95:15
96:13
121:10
126:10
128:24
148:12
168:11
170:8
172:6
179:22
203:9
225:23
232:16
233:19
235:1
236:5
244:10
250:6,22
262:13
268:21
269:18
270:18
272:17
273:2
275:14
278:15
283:5
284:14

295:7,21
296:22
298:19
299:9
300:4,23
303:13
305:1
309:5
316:9,13
320:23
321:17
336:12
**old** 56:5
152:21
262:17
287:6
319:20
320:1
**older** 72:15
**olds** 223:22
**Olson** 129:2
129:11,20
129:21
**Olympian**
269:6
**once** 27:17
27:17
109:3
**one's** 49:17
91:16
**ones** 91:7
95:24
111:24
112:16,16
131:17
164:15
167:13
223:12
**ongoing**
210:5,7
212:24
214:16,20
215:20
232:14,15
240:4
246:14
248:10
318:22
**online** 14:21
63:16,19
87:7 101:9
**onset** 193:1
233:6

322:4,7
**open** 177:5
205:17
267:4
**operational**
90:24
327:24
**operatio...**
164:24
**opining**
199:4
**opinion**
18:20
30:22 31:9
31:16 40:1
44:22
52:16,21
184:5,20
185:9
197:16,24
198:7,9
209:1
213:10
225:16
240:23
269:24
270:8
294:9,14
294:17
296:13,15
305:15
310:5
325:21
331:18
333:3
**opinions**
19:13,20
20:3,9,13
20:18,21
21:4
302:13
303:3,6
**opportunity**
332:6
**opposed**
182:2,16
183:6,12
324:2
**opposite**
56:12,21
57:6
183:11
324:10

**opt** 113:14
  159:16
**opted** 183:14
**option** 89:24
  91:20
**options**
  91:13
  98:20
**order** 35:9
  42:20
  63:11 64:2
  67:13 68:1
  73:1 79:9
  114:22
  156:11
  171:8
  202:13
  255:21
  289:3
  293:18,22
  308:1,2
  310:21
  312:17
  331:10
  332:17
**orders** 174:5
**ordinary**
  232:5,6
**organiza...**
  7:7 35:13
  35:17,22
  36:1,13,19
  37:9 95:9
  97:17
  241:4
  313:23
**organiza...**
  26:8 95:7
  95:16,22
  96:4,7
  152:16
  175:9,12
  175:16
  286:1
  314:14,24
  315:1
**organizes**
  320:4
**organs** 37:22
**orientation**
  47:21
  48:14
  124:9

  168:23
**original**
  51:17
  110:13
  163:6
  258:14
  288:14,16
  299:22
  300:3,6,15
  303:2,6
**originally**
  300:2
**outcome**
  87:22 89:4
  113:3
  114:20,20
  114:22
  116:1
  120:4
  121:2,5,6
  121:7
  123:14
  134:9
  141:3
  167:23
  184:2
  250:3,7
  261:10
  306:8
**outcomes**
  90:15
  111:9,10
  132:6
  133:1
  137:10
  139:19
  140:7
  145:1
  195:11
  215:17
  247:20
  250:17,18
  262:15
  266:11
  278:12
  279:13
  283:19
  304:10
  306:6
  308:14
**outlet**
  159:17
**outline**

  153:1
**outlined**
  119:20
  153:2
**Outpatient**
  23:4
**outset**
  146:15,16
**outside** 20:1
  32:17 47:3
  70:3
  121:13
  122:1
  184:10
  195:13
  211:13
  221:7,21
  225:10
  233:17
  323:12
**ova** 226:17
  227:2
**overall**
  66:23
  120:5
**overlap**
  124:7
**oversight**
  288:2,4,18
**overview**
  102:9

_____
        **P**
**P** 3:1,1 4:1
  4:1 5:1,1
  11:1,8
**p.m** 150:5,12
  200:23
  201:6
  211:18
  212:1
  239:8,15
  267:22
  268:5
  321:11,20
  338:24
  339:2
**page** 7:1,3
  8:1,3 9:1
  9:3 10:1,3
  15:7,8
  24:1 32:6
  32:13 33:2

  36:18 45:4
  45:11,21
  46:9 48:13
  48:18,20
  51:7 52:10
  52:22
  54:16,16
  55:3,5,7,9
  55:11,23
  55:23
  57:23,24
  58:1,2,11
  62:18
  76:24 77:2
  78:2,14
  80:16,17
  81:11
  82:20 83:9
  84:22
  85:22 87:4
  87:4,5
  98:17
  99:12
  102:16,24
  111:1,6
  112:6,20
  116:16
  117:21
  118:3,7,8
  118:9
  122:9,18
  122:20
  123:3
  124:11,13
  124:14,14
  124:16
  125:23
  127:6
  129:19
  132:11
  133:22
  135:4
  136:8,16
  136:22
  137:11,15
  139:9,11
  139:12,14
  143:2,3
  146:22
  152:15
  159:7,15
  161:24
  163:3,3

  165:16
  168:19
  170:18
  172:7,7,9
  173:13,13
  176:20
  177:1
  179:23
  181:6
  182:9
  207:20
  208:11
  212:4
  218:9
  219:21
  224:23
  225:5
  226:5
  227:8
  230:2
  233:3,11
  234:4
  235:2,3
  236:23
  246:2,7
  248:12,23
  248:24
  249:1,4,4
  249:17
  252:6
  257:2
  258:3,12
  259:21
  260:7
  262:17
  263:13
  268:22
  269:14,15
  272:3
  277:12,19
  277:23
  278:3
  280:13,19
  280:24
  281:5
  282:21
  283:6
  285:6
  286:18
  287:12
  289:5
  290:7,20
  291:24

316:14
**pages** 19:12
46:3 55:17
117:5
146:19
**paginated**
55:15 77:1
139:15
**paid** 27:24
**painting**
70:24
**paired**
322:21
**panic** 138:3
**paper** 41:4
262:24
263:1
289:13
**papers** 16:17
16:21 17:1
17:9,13,17
17:24
**paradigms**
114:10
**paragraph**
45:21
48:19
58:10 64:7
72:19 77:2
80:1 83:19
83:20
90:16,16
93:11,14
93:14,17
93:22 95:1
95:7,17
102:16
107:3
109:1
111:16
113:2,17
117:22
118:9
119:5
121:1
122:18
124:16
125:22
126:11
130:20
131:10
139:22
162:1

170:18
175:6
184:12
241:11
250:23
256:1
260:9
270:9
275:16
279:9
289:20
292:14
299:20
305:14
319:2
321:22
327:13
332:2
**paragraphs**
26:8
174:10
241:13
**Pardon** 15:13
302:11
**parent**
128:19
167:18
171:14,18
171:24
182:2,16
183:6,19
266:14
**parental**
88:2
128:20
167:14
257:9
**parentheses**
250:2
**parenthood**
88:5
**parents**
38:21
40:13 85:2
85:22
128:8
167:16,17
170:20
171:2,5,6
181:8,11
181:19,22
182:11,12
182:22,24

183:14
194:9,23
195:21
196:10
205:3,10
206:6
215:23
235:21
265:24
312:4
**parents'**
183:2
**parlance**
324:24
**parse** 22:14
164:1
250:19
332:11
**parsing**
72:23
237:15
336:18
**part** 34:6
38:18
41:19 86:9
89:10,12
89:15,22
91:22 92:3
92:9,15
93:19
99:18
124:9
125:9
141:24
142:5
156:19,21
157:4
166:20
169:11
170:6
180:18,19
180:23
183:24
197:13
202:8
229:19
230:3
234:14
259:1
263:5
265:16
289:13
296:20

301:18
313:17
317:21,23
**participant**
141:21
313:22
**particip...**
54:21 56:4
60:11,20
61:3,14
62:19,21
80:17 81:3
81:18
83:10 87:5
132:12
140:1
276:3
279:5
285:18,19
285:24
286:22
322:19
**participate**
56:16
327:19
329:3,9
331:6
332:7
333:2
336:14,22
337:3
**particip...**
141:21
333:19
**particip...**
86:2
184:16
275:1
293:19
329:11
330:6
334:3,17
**particip...**
18:3,9
28:3 91:4
91:6,15
141:20
333:13
**particip...**
306:14
**particular**
35:10
40:24

41:15 57:4
63:13
77:15
87:21
109:23
161:19
163:16
164:13
175:23
217:6
285:19
294:1
296:21
307:20,22
315:7
336:7
**particul...**
38:17
60:10
85:20
167:17
170:14
264:17
306:5
**parties** 6:3
11:4 12:7
**partly**
158:21
**parts** 36:15
**passage**
125:15
**passed** 68:10
**pasted**
269:11
**path** 260:2
260:23
**pathophy...**
189:6
**pathway**
123:6
**patient**
38:16 74:6
74:11,12
81:23
126:2
157:11
158:20
179:15,19
203:10,24
204:4,15
246:3
293:24
307:12,14

312:9,9
315:15
**patient's**
159:1
305:23
317:16,24
318:2
**patients**
26:21,24
27:6,10,14
27:16,18
29:24 30:3
47:4 56:11
57:2 60:18
64:9 66:11
66:13,14
66:23 67:6
67:8,10,11
67:14,16
67:19 68:7
68:9,20,22
69:24
71:12 72:1
72:2,18
73:6,13
74:3,3,8
74:15 75:5
75:10,17
75:18,24
76:3,4,8,9
76:11
103:20
104:12
141:8
143:17
153:5,17
153:22
154:3,9,20
155:6
156:10
160:21,24
161:18,21
167:24
168:2,20
168:21
172:23
173:5,10
194:15
205:3,11
206:6
216:8
225:14
235:21

247:11,14
247:17
264:8,16
265:24
274:3,4,4
293:13,17
293:19
308:19
312:1
314:3
329:6
334:13
**Patricia**
153:8,9
172:10
**PATRICK** 1:18
**pause** 103:13
103:16
200:19
205:4
267:18
**peaks** 230:14
231:22
233:4
**pediatric**
93:3 159:9
159:24
**pediatri...**
160:22
**pediatrics**
16:8
**peel** 165:19
**peer** 51:17
51:18
168:24
170:11
186:9
**peer-app...**
200:8
**peers** 139:5
184:17
198:15
223:13
224:3,8
279:12
**PELE** 3:12
**Pelet** 13:9
13:10
**pending**
64:11
**Pennsylv...**
268:16
**people** 29:16

30:11 31:7
32:17
33:10
42:10 45:5
46:12
48:10,14
48:15 49:3
49:10,22
58:24 59:5
59:8 61:22
84:4 87:17
98:20,21
99:4
126:14
143:15
144:13,23
162:2,3,11
162:12,17
162:20,24
174:2
184:7
188:12
198:24
234:15
236:18
239:19
260:2,22
262:17
275:17
277:8
280:14,21
284:22
287:14
292:15
312:6
327:16
328:4
332:6
337:16
**people's**
50:5
120:10
**perceived**
41:24
157:14
158:5
**percent**
21:21
22:21,22
22:23
23:13 25:2
25:22 51:9
51:23 52:7

66:19,20
67:13,17
67:18,24
72:3 73:1
73:2,8,11
73:18,19
73:21
74:19
80:17,22
81:2,13
83:10
112:23
113:11
132:12
141:21
151:18
153:5,22
154:1,1,4
154:20
155:6,11
155:12,12
155:13,19
156:12
163:5,8
173:10,11
255:17,17
263:17
280:17,22
**percentage**
22:19
67:22 72:5
72:19 73:5
75:23
81:12
145:17
154:2
174:1,7
**percentages**
73:4
**perceptions**
276:3
**perceptive**
276:3
**perfect**
96:15
**perform**
165:9
**performance**
17:11,15
17:19
166:8
**period** 54:4
**permeates**

118:4
**persist** 53:1
53:7
**persisted**
255:1,11
255:17
**persistence**
52:11
252:8
259:7
**persisting**
252:10,20
252:23
253:4
**person** 45:12
45:22
57:10
91:14,15
143:12
153:9
161:5
165:19
203:17
263:14
274:22
290:23
309:15,15
329:2
330:15,16
331:14
337:1,2,23
**person's**
30:22 31:9
31:16 34:3
37:10 38:2
45:23
46:21 78:3
78:15
99:15
279:11
324:11,13
**personal**
244:9
247:15,16
334:13
**personally**
18:23
41:18
44:15 51:6
115:18
148:16
178:5
242:6

311:18
**persons** 32:9
   37:21
**perspective**
   186:10
   199:24
   226:23
   266:22
   333:6
**pertains**
   332:3
**pervasive**
   313:1
**pharmace...**
   218:8
**Phase** 209:8
   209:15,19
   210:20
**phased**
   209:14
**phenomen...**
   170:5
   327:7
**phenomenon**
   88:4
   169:10
   178:4
   238:19
   324:18
**phenotypic**
   43:16
**phrase**
   125:14
   216:19,20
   216:21
   230:11
**phrasing**
   41:3
**physical**
   186:13,19
   187:2,9,15
   187:20
   207:23
**physically**
   316:7
**physician**
   66:15
   204:2
**physiologic**
   185:4
**physiolo...**
   17:3  37:20
   184:8,22

185:10
**physiology**
   16:13,19
   19:5  189:7
   198:6
**piece** 49:3
   92:12
   301:17
**pieces**
   307:15
**Pioneer**
   176:14
**pithy** 190:4
   230:11
**place** 68:6
   114:22
   156:13
   158:17
   313:13
**placed** 110:6
**placing**
   205:4
   326:2
**plain** 293:6
**Plaintiff**
   1:7  3:7,16
   3:22  13:1
   13:4,6,8
   13:11,13
**Plaintiffs**
   298:23
**plan** 88:7
   147:8
**play** 30:19
   194:8
   199:17
   204:14
   234:10
   293:14
   330:17
**playing**
   199:19,23
**please** 14:12
   81:22
   122:19
   199:5
   223:7
   250:13
   289:13
   298:24
   315:18
**pleasures**
   68:11

**pledge** 286:1
**PLLC** 4:10
**plural** 34:11
   34:12
**point** 46:7
   75:1  84:20
   86:24
   103:21
   129:17
   147:9,13
   177:15
   261:18
   282:8
   288:13
   304:9
   305:17
   322:16
   323:8,24
**pointing**
   246:6
**points** 178:5
   249:14
**polarized**
   98:19
**policies**
   105:1
   108:3
   110:10
   156:13,22
   160:23
   161:16,17
   198:24
**policy** 7:18
   101:11,16
   102:20
   157:3
   159:13
   160:3,10
**political**
   257:10
**poodle** 321:1
   321:4
**poodle's**
   338:9
**pool** 271:23
**poor** 217:20
   278:12
   289:21
**poorly** 63:24
**popular** 44:8
   47:12
   109:12
   150:19

153:8
   159:17
**population**
   58:12  71:1
   139:5
   172:21
   174:13,14
   174:18,19
   174:21
   190:21
   191:6
   237:16
   257:24
   281:2
   283:9
   291:18
   333:23
**populati...**
   178:23
   237:19
   332:20
**populations**
   214:13
**portions**
   164:10
**portrayal**
   305:18,20
**pose** 77:20
**poses** 77:4,7
   77:23
   123:7
**position**
   21:15  22:1
   22:9  23:1
   23:8,18
   24:1,20
   25:12,13
   25:20  26:1
   26:16  60:3
   60:17  63:2
   63:5,19
   76:10
   97:21
   123:1
   125:1
   194:7
   267:9,12
   269:21
   270:19
   274:8
   330:14
   337:21
**positions**

26:7,9
**positive**
   110:1
**possibility**
   126:3
   173:19
   261:23
   287:22
**possible**
   14:6,13
   20:6  59:8
   63:2,8
   85:22
   91:17
   113:7,10
   113:14
   114:23
   132:16
   171:2,19
   183:18
   184:2
   219:5
   233:7,15
   233:16
   234:7
   249:10
   275:9,13
   325:24
**possibly**
   231:21,23
   274:21
**Post** 9:9
   151:1
   152:19
   176:22
   268:9,13
**potential**
   60:24
   166:22
   181:3
   200:7,8
   205:19
   216:3
   250:18
   265:16
   266:5,11
   267:6
   281:7
   285:17
   289:9
   290:1,2
   291:7
   331:11

potentially
  35:6 60:22
  63:23
  126:1
  140:2
  266:17
  275:8
  290:24
practical
  264:19
practice
  32:9 35:2
  46:13 48:9
  64:19
  65:15,16
  65:18
  72:22
  87:20
  88:12
  94:18
  104:11,19
  149:1
  161:18
  171:6,16
  208:1,4,6
  221:22
  264:13
  290:10
  296:20
  307:9,22
  308:5
  310:9
  312:20
  317:12
  326:11
practiced
  65:12
  177:23
practices
  315:4
practicing
  65:10
  153:20
  155:2
  317:20
practiti...
  172:18
  194:20
practiti...
  178:13
  179:6
pre-GICE
  289:8

pre-pube...
  320:9
precipit...
  283:24
precise
  147:20
  218:16
precludes
  277:21
  278:4
precocious
  213:5,12
  218:11,14
  218:17
  219:4
  220:11
Predicting
  256:12
predictor
  279:12
  282:2,4,11
predictors
  136:19
  289:17
preexisting
  180:1
prefer
  272:18
preferably
  257:3
pregnancies
  248:13,21
  249:6,8,18
  250:2,8
Pregnancy
  247:19
  250:17
pregnant
  244:4
  247:12
  248:9
preliminary
  135:20
  213:1,21
  240:5
premise 18:7
  114:9
  118:18
  166:18
prepared
  162:3,12
  297:12
preparing

29:12
82:17
95:20
117:9
301:14
preponde...
  178:2
  323:7
prepubertal
  51:9 53:6
  73:10,14
  73:19 75:2
  103:6,6
  153:21
  208:13
  251:2,5
  322:2
prepubes...
  320:14
prescribe
  92:21
  208:16
  264:9
prescribed
  188:7
  238:1
prescribing
  92:16 93:1
  157:8
  161:1,5
  182:1,15
  183:5,18
  204:2
  216:6
  220:24
  247:9
  309:20
presence
  157:20,21
present
  11:11 12:6
  24:5 122:6
  139:16
  140:4
  153:5,18
  154:3,6,20
  172:13
  180:14
  243:5
presented
  153:23
  154:6,10
  154:10,16

155:7
207:2
213:1,21
259:15
presenting
  41:22
  52:23
  98:20
  153:18
  155:3,23
  177:11
  178:7
  292:2,4
president
  152:6
press 47:12
  109:12
  150:19
  153:8
  159:17
pressure
  175:7
  194:9,23
  195:21
  196:10,17
  196:21
  197:8
pressured
  165:1
prestudy
  61:13
presume
  329:14
presuming
  252:15
presuppose
  61:22
presupposed
  62:8 121:7
  123:14
presupposes
  61:21
presuppo...
  114:19
  115:24
  120:3
pretty 90:8
  194:5
  319:23
prevailing
  93:8,13,23
  309:3
  314:12

prevent
  198:16
  199:6,19
  199:22
  243:7
prevented
  274:16
  275:1,3
preventing
  184:15
prevents
  184:18
previous
  62:11 70:9
  76:12
  79:18
  141:19
  153:15
previously
  64:7 128:7
  319:10
  327:14
primarily
  52:5 324:1
  327:5
primary
  114:18
  235:8
  320:4
  335:8
principles
  94:4
printed 37:2
prior 40:18
  92:19
  117:3
  133:1
  143:12
  152:21
  153:6
  157:5
  158:18
  160:13
  161:11
  181:20
  208:11
  230:16
  231:17,17
  297:5
  301:14
  310:10
  334:21
  335:3

**Pritzker**
  22:4 24:16
**privileged**
  89:4
**privy** 205:1
**probably**
  14:9 15:8
  21:21
  22:22
  23:14 29:5
  66:17,18
  67:12,12
  67:16,17
  67:21,22
  68:1 72:24
  73:16,18
  74:18,19
  100:12
  106:15
  143:13
  154:4
  155:20
  156:11
  167:15
  174:22
  177:17
  178:4
  245:8
  246:20
  297:2
  304:22
**problem** 80:3
  176:3
  227:24
**problematic**
  291:22
**problems**
  79:19 80:6
  180:1
  246:17
**procedure**
  2:5 85:21
**procedures**
  62:19
**proceed**
  55:18
  171:13
  260:19
  261:16
  311:2
**proceeded**
  259:23
**proceeding**

  167:20
**PROCEEDINGS**
  11:16
**process**
  38:11,17
  43:7 57:11
  61:19
  62:13
  65:20
  87:23 88:5
  88:17 89:3
  121:2
  124:9
  125:16
  158:16
  161:16
  170:2
  171:18
  180:24
  183:24
  197:14
  204:6
  206:19,20
  222:5,6
  223:15,16
  223:19,20
  265:6,17
  265:19
  294:4
  301:18
  302:24
  318:14
  333:10
**processes**
  39:7 43:17
  50:12
  106:1
  112:10
  171:17
  207:10
  313:19
  338:3
**produce** 60:4
  63:20
**production**
  226:17
  227:1
  230:14
  315:7
**profession**
  77:21
**professi...**
  18:11,14

  20:16,23
  26:8 29:7
  40:19 77:5
  77:8 92:24
  94:2 95:3
  95:22 96:3
  96:7 98:9
  136:13
  152:7,11
  161:5
  163:10
  176:15
  181:9
  184:13
  185:20
  186:4
  221:7
  238:22
  243:3
  270:10
  274:12
  309:3
  314:14
  325:23
  332:24
**professi...**
  16:1
**professi...**
  46:19 77:9
  99:2,8
  100:4,6,9
  136:11
  157:10
  174:20
  261:8
  318:17,19
  333:9
**Professor**
  21:8 24:8
  24:11,12
  47:14
**profound**
  328:16,22
**profoundly**
  327:15
  330:7
  331:2,2,7
  331:7,13
  331:13
  332:4,23
**program**
  72:10
  294:6

  316:7
**progresses**
  222:10
**progression**
  193:20
**prohibited**
  1:23
**project**
  85:16
**prolong**
  213:3
**prolonged**
  212:9
  213:15
  214:3,3,15
  215:7,12
  215:13
**promote**
  286:2
**promoting**
  333:7
**prompt** 78:3
  78:15
  79:20 80:7
**pronounc...**
  174:17
**pronouns**
  91:3 158:9
  273:13
**proportion**
  66:11
  67:14
  155:23
  172:13,23
  177:3
  287:5
**propose**
  20:13,18
  20:21
**proposition**
  182:12,23
  256:2
  277:7
**prospective**
  140:13
  318:16,18
**protocol**
  261:19
**protocols**
  212:7,15
**prove** 134:3
  135:10
  292:11

**proved**
  288:17
**provide**
  26:10
  63:17 71:9
  139:17
  140:4
  202:13
  309:14
  312:3
  326:14
**provided**
  28:8,20
  90:24
  225:20
  312:4
  315:3
**providence**
  103:4,23
**provider**
  204:2
  317:20
**providers**
  38:22
  175:4,8
  181:13
  312:5
**provides**
  261:24
  304:24
  307:6
**providing**
  40:15
  184:11
  243:4
**proving**
  322:9
**provision**
  124:18
  149:5
**psychiatric**
  16:2,4
  23:4 42:7
  75:19
  88:16
  99:13
  107:20
  136:17
  148:20,22
  149:3
  156:18
  157:22
  216:7

243:5
**psychiat...**
66:3 68:11
88:15
100:23
151:13
175:22,23
190:15
195:4
247:9
309:16
325:22
332:21
**psychiat...**
99:17
100:18
**psychiat...**
7:17 68:8
97:7,12
98:9,9
100:1
101:3
309:8,13
**psychiat...**
99:22
**psychiatry**
15:16,17
15:19,20
15:22,23
15:23 21:8
24:13,16
25:6 26:5
38:18 43:7
43:8 65:7
65:8,11,13
65:15,17
65:19,24
77:15
196:8,23
217:17
307:24
337:15
**psycholo...**
7:9 48:4,8
48:9 49:24
78:5,17
79:19 80:3
139:2
142:18
143:5
144:21,24
145:3,11
145:12

146:4
152:2
159:11,20
160:1,11
160:13
161:21
277:1
334:8
**psycholo...**
148:23
151:14,15
332:22
**psycholo...**
100:11
101:4
**Psychology**
22:4 24:9
**psychome...**
304:16,23
305:2,4
306:3,7
308:8,22
**psychoso...**
90:21,22
111:10
141:3
144:21
146:5
147:4
215:17
223:11
238:9
**psychoth...**
109:6,18
118:14
122:17,22
124:18
125:13
141:9,15
142:1,8
158:18
159:1
183:1
**pubertal**
134:19
189:20
192:11,14
193:21
207:21,22
221:10,16
222:16
223:10,16
223:18,19

235:8
262:16
**puberty** 8:20
17:4 19:2
39:22
52:13
67:15 72:4
72:10,12
72:15
74:20
91:21
92:16,22
96:8
103:18
107:19
130:21
131:12
132:17
134:3
135:10
137:16
138:5,12
139:18
140:1,5,11
141:3,8,14
142:1,9
146:4,14
146:15
159:11
160:1,12
165:6
171:17
184:9,23
185:11,23
186:3,11
186:13,17
186:19
187:2,3,9
187:21
188:1,6,12
188:20
189:15,18
190:5,9,16
190:22,23
191:10,23
191:24
192:4,6
193:1
194:8,10
195:2
196:13
197:18,18
198:2,2,11

198:12
200:4,14
200:15
201:8,8,17
202:18,24
203:10,13
203:24
204:5,6,9
204:11,15
204:18,21
205:2,4,9
205:13
206:5,11
207:1,24
208:12,14
208:14,16
208:21
209:2,2,6
209:21
211:2
212:9
213:4,5,12
213:16
214:4,15
215:7,13
215:23
217:2
218:10,11
218:14,17
218:23
219:4,8,9
220:11
222:1,9,20
223:21,23
223:24
224:12,23
225:1,6,6
225:17
226:1,7
227:21
230:16,22
231:6,17
232:4,5
233:2,7,12
233:16,21
234:8,10
235:24
237:3,7,20
237:22,24
238:14
240:24
241:4
256:3

258:15
259:23
260:1,19
260:21
261:16
263:22
264:3,9,14
264:20
265:9,18
265:23
266:16
287:2
309:21
310:11
311:13,17
312:10
315:11
319:10
320:8
322:4,7
**public** 2:6
225:11
**publication**
55:16
231:11
**publicat...**
25:14
**publicat...**
151:4
**publish**
153:12
**published**
7:22 16:17
16:21 17:1
17:9,13,17
17:24
32:10
44:13,23
51:17 52:5
70:13
71:18 98:2
102:9
108:16,21
115:15
117:14
126:20
128:3
132:5
133:17
134:18
135:21
137:8
139:2

142:17
150:18,24
152:19
173:20
176:16
212:23
214:18,21
214:24
215:3
216:1
233:2
246:15
251:12
256:12
258:21
271:20
276:10,22
276:23
279:17
280:1
281:12
313:18
**pull** 55:16
299:1
**pulled** 109:4
**pulling**
284:20
**pulsatile**
189:14
**pun** 316:19
**purports**
236:24
**purpose**
86:19
204:24
210:2
**purposes**
14:21
86:16
210:22
**pursuant** 2:4
**pursued**
173:10
**put** 50:5
60:17
104:2,11
104:19
105:7
106:7
110:7,12
114:21
180:17
181:17

194:14
196:21
197:8
231:15
240:24
254:8
264:20,21
320:17
**puts** 194:23
195:21
196:10
251:3
**putting**
260:2,22

——————
**Q**
**QIDS** 138:2
**qualify**
239:18
**qualitative**
144:8,15
**quality**
147:15
217:2,15
217:20
277:15
285:11,13
285:14,17
286:20
**quantify**
21:20
**quarter**
174:11
**question**
14:8 19:18
20:22
31:14
36:10 39:4
41:7,7,10
43:17 46:4
59:6 60:9
64:11 67:1
67:4 68:4
69:22 71:9
74:5 75:4
75:13 76:6
83:3 86:13
89:19 90:7
91:10
94:16
104:16
105:13
108:8

121:2,12
121:23
132:23
141:19
143:20
149:6
153:24
154:14,19
160:2
162:9
167:1
173:24
177:5
182:7,14
183:9
184:14
186:23
191:1,2,19
192:3
195:7
196:5,15
197:3,22
198:3,16
199:5,6
201:13
203:17
204:1,2
209:12
215:2,10
221:20
222:7
224:16
225:20
234:23
243:21
244:1
245:6
249:12
255:7
260:14
261:14,20
261:22,22
264:6
278:2
288:7
290:12
291:14
301:5
304:17
306:1
309:24
311:15
313:7

314:12
319:15
330:10,21
331:22
332:2
333:23
**question...**
113:4
**questioning**
117:3
**Question...**
315:15
**questions**
14:1 19:24
40:16
55:19
60:17
61:13
87:19
118:17
122:3
123:7
132:22
149:20
173:9
186:15
191:13
211:12
248:11
261:14
262:7
286:20
287:7
295:5,24
307:4
316:12
338:7,11
338:14,17
338:21
**quick** 96:16
327:5
**quickly**
14:13 46:3
**Quillette**
176:14
**quite** 142:6
213:4
215:18
222:5
225:12
250:15
304:21
315:7,8

331:1
**quote** 41:3
53:1 78:16
98:18
105:6
123:7
136:10,11
136:11,18
139:16
162:11
165:19
179:24
212:5
231:1
281:6
**quoted** 297:1
**quoting**
102:14
159:23

——————
**R**
**R** 3:1,9 4:1
5:1 11:8
**race** 257:9
**Rachel** 5:11
12:11
**Rae** 9:7
256:2,11
256:18
**raise** 170:10
286:20
287:7
298:5,14
**raised**
259:24
260:21
261:8,22
262:3
297:16
298:6
**raising**
167:19
173:19
287:22
**random** 279:5
283:8
**range** 39:8
155:16
173:7
191:24
192:23,23
193:10,16
193:22

307:7
319:19,20
**ranged** 32:15
**ranges**
237:23
**rapid** 32:22
33:12
34:12
**rapidly** 34:3
**rare** 167:23
240:13
**rate** 304:1
**rated** 148:9
**rates** 52:5
156:9
164:20
328:20
**rating** 307:6
**reach** 62:8
63:24 68:9
68:14
136:19
147:1,10
**reached**
104:8
137:22
**reaching**
175:4
**reactions**
281:8
**read** 20:24
33:7 36:3
37:24
44:18
45:17 46:4
51:13 56:8
70:18 78:9
82:11,24
85:15
111:20
118:17
122:20
137:21
143:1
147:3
164:22
181:17
199:22
208:4
245:23
250:13,14
263:1
271:18

272:12
282:17,19
289:15
298:8
300:13
301:13
319:19
327:5
334:20,24
335:2,5,16
**reading** 11:4
45:10
54:14
249:14
250:17
260:17
282:8
292:8
298:2,12
300:15
**reads** 11:23
96:18
150:12
200:23
201:6
211:18
212:1
239:8,15
267:22
268:5
272:4
321:11,20
338:24
**ready** 163:1
299:3
**real** 153:9
328:6
**realistic**
267:5
**reality**
267:14
**realize**
322:3
**realized**
83:11
**really** 39:15
42:16
63:10 64:3
64:5 67:21
72:21
116:10
119:10
121:22,24

125:18
128:12
164:1,16
177:5
195:24
197:3
203:17
204:7,12
204:17
205:24
211:13
221:21
237:15
238:7
250:14
274:13
288:20
309:2,24
311:9
322:8
323:3
324:10
326:22
335:13
336:18
**reason** 30:14
83:15
105:9,20
105:23
116:8
142:5
231:9
240:12
253:19,22
290:1
**reasonable**
123:23
124:4
184:13
185:19
186:4
270:9
**reasons**
20:12
199:17
324:7
**reassign...**
109:6,19
109:21
141:4
**rebut** 302:4
**rebuttal**
211:10

299:15,23
300:8,15
301:1,13
301:14,14
301:21,22
302:6,13
302:24
**rebuttals**
302:6
**rebutting**
302:19,23
338:2
**recall** 62:17
65:21
67:24
81:21
85:20
90:24 96:5
100:14
102:5
110:4
113:20
131:17
143:24
177:19
247:13
281:7
293:21
299:6
303:8
330:2
**Recalled**
276:24
**recalling**
144:13
248:6
301:4
**receive**
25:24 26:3
27:22 28:1
28:2 29:2
141:8,9
145:9
146:14
160:24
163:9
188:12
204:4,15
264:3,14
**received**
28:3,23
146:16
157:11

263:22
**receiving**
132:7,13
137:16
144:23
145:10
163:17
203:3
275:20
292:18
**recognition**
310:23
**recognize**
262:2
281:5
**recognizing**
171:22
**recollec...**
45:2 54:17
54:24 55:2
62:20
70:13
95:13
171:4
299:8,16
299:18
**recommend**
158:12,16
161:8
162:23
203:10,23
204:4
208:16
216:19,20
326:5,14
**recommen...**
161:12
178:21
181:20
310:10,21
311:13,17
312:11
327:7
**recommen...**
40:4 92:14
94:3 108:2
158:15
188:11
208:6
216:12,20
216:21
217:1
314:22

315:1,5
318:15,23
327:1
**recommended**
110:5
181:10
216:11
318:19
337:15
**recommen...**
89:12
157:19
165:6
182:24
312:9
**recommends**
141:20
170:19
208:12
326:17
**record** 14:11
55:14 69:3
69:10
86:20
96:17,24
102:22
110:12,16
111:2
117:2
137:11
150:4,11
200:21,22
201:5
211:9,16
211:17,21
211:24
239:6,7,14
247:21
254:8
267:20,21
268:4
269:1,12
269:14
321:9,10
321:18,19
338:9,23
**recording**
86:5
**records**
67:20
**recruited**
87:6 258:6
279:5

285:24
**recruiting**
286:3
**recruitment**
61:17,19
62:2 63:16
63:20
287:15
**redacted**
315:16
316:8
**Reddit** 62:24
**Redirect**
338:11
**reduce** 60:22
291:20
**reenforces**
61:13
**refamili...**
320:18
**refer** 87:11
93:13
203:21
241:11
273:14
299:22
**reference**
20:16
33:15 55:6
72:18 95:6
163:4,12
258:19,20
327:22
328:12
**referenced**
21:3 29:16
64:7 72:2
94:7 164:7
215:16
**references**
116:21
117:6
268:23
**referencing**
24:1 54:15
93:10
131:8,9
146:19
164:6,8,11
164:12
182:6,8
205:15,16
205:23

210:3
244:6,8,9
248:23
**Referrals**
92:13
**referred**
114:12
160:16,21
222:24
241:24
255:22
303:15
327:23
**referring**
19:16
33:17
93:15,20
93:20,22
105:14
125:16
126:5
159:8
198:23
209:19
233:10
241:15
277:13
327:17
328:10,17
**refers** 37:10
37:15,19
38:2
226:11,16
230:15
233:20
236:23
242:10
259:1
**reflect**
168:21
267:12,13
**reflected**
141:13
**reflecting**
94:7
**refresh**
62:20
146:18
**regard** 224:2
238:24
294:15
**regarding**
7:18 98:19

101:12,17
138:12
156:15,24
170:10
206:24
211:1
215:7,12
217:1
246:16
248:7
278:21
**regardless**
123:16
157:18
190:21
228:8
**regards**
103:5
**regions**
237:4
**registered**
210:21
**regression**
136:22
**regret**
164:20
**regular**
90:12
**regulatory**
100:13
**Reinhardt**
3:11 13:12
13:13
**reinitia...**
106:4
**reject** 123:5
**rejecting**
122:15
**rejection**
279:11
282:2,3,22
282:24
283:18,24
284:1
**relate** 241:5
**related**
18:12
21:16
22:10 23:9
23:14
24:20
25:19,20
27:22 28:9

28:21 29:7
46:10
59:21
82:14
83:12
231:23
235:23
309:12
**relating**
16:18,22
17:2,10,14
17:18 18:1
34:23
38:16 39:1
**relation**
63:3
**relation...**
283:18
292:22
293:1
**relation...**
234:7
237:5
**relative**
215:23
293:7
**relatively**
57:12
156:10
179:13
322:13
326:2
**release**
97:18
201:14
**released**
95:12
189:14
327:10
**Releasing**
111:3
**relevance**
29:8,14
304:18,24
**relevant**
20:7 42:9
42:19 43:2
**reliability**
144:1
287:8
309:16
326:11
**reliable**

| | | | | |
|---|---|---|---|---|
| 60:8 113:5 | 162:9 | 132:9,12 | 54:22 | **represen...** |
| 305:10 | 196:4 | 133:19,22 | 80:18,24 | 12:15 |
| **reliably** | 197:21 | 135:1 | 83:15 | **reprint** |
| 52:12 | 199:5 | 136:5,8 | 111:8 | 254:9 |
| **relied** 21:3 | 215:10 | 137:12 | 163:5 | **reproducing** |
| 258:5 | 260:14 | 139:6 | 249:22 | 243:8,23 |
| 261:5 | 278:2 | 141:5 | 250:4 | **reproduc...** |
| 280:14 | 304:20 | 146:10 | 275:17,19 | 1:23 |
| 283:7 | **repeated** | 164:9,10 | 277:8,9 | **reproduc...** |
| **relocate** | 140:14 | 164:15 | 284:22,24 | 37:22 |
| 320:24 | **repeatedly** | 173:14,15 | 286:23 | **reputation** |
| **rely** 20:8 | 130:21 | 184:12 | 287:2,5 | 44:17 |
| 68:14 | **rephrase** | 217:12 | 292:15,17 | 102:3 |
| 277:14 | 137:11 | 240:21 | 292:18 | 115:19 |
| **remain** 51:10 | 335:24 | 241:11 | **reporter** 2:6 | 148:13 |
| 51:24 | **replication** | 250:24 | 11:11,12 | **require** |
| 172:14,24 | 257:3 | 252:3 | 14:5 31:13 | 39:16,20 |
| 203:24 | **report** 7:5 | 256:1,23 | 43:13 | 40:1,8,11 |
| **remaining** | 14:23 15:3 | 261:6 | **reporting** | 40:15 |
| 73:21 | 19:12,16 | 270:9 | 11:22 | 159:10,24 |
| 263:17 | 19:17,19 | 271:2 | 85:12 | 160:11,13 |
| **remains** 31:6 | 20:2,4,7 | 275:16,18 | 287:16 | 331:9 |
| **remedy** 148:9 | 20:12 21:1 | 277:3 | 292:24 | 332:16 |
| **remember** | 26:9,20 | 280:10 | 293:10 | 335:17,23 |
| 28:16 | 27:3,24 | 281:11 | **reports** | **required** |
| 154:1 | 28:11,14 | 284:11,14 | 28:11 | 112:1 |
| 301:1,6,7 | 29:12 | 284:15,21 | 32:21 | 181:13 |
| 303:18 | 52:16 | 292:14 | 34:11 | 310:20 |
| 307:6 | 54:18 64:8 | 293:9 | 43:15 51:8 | 324:22 |
| 328:2 | 72:2,19 | 296:10 | 101:23 | 331:12 |
| 329:9 | 82:18 | 297:6,13 | 109:2 | **requirement** |
| **remind** 246:4 | 83:10,19 | 297:18 | 112:19 | 100:3 |
| 303:11 | 84:12 | 298:15,20 | 128:8,19 | 158:18 |
| **reminder** | 85:11 | 299:22,23 | 128:20,21 | 159:2 |
| 236:18 | 86:20,24 | 300:3,6,7 | 138:16 | 171:19 |
| **remotely** | 87:11 | 300:8,15 | 299:10,14 | 308:6 |
| 11:24 | 90:17 91:1 | 300:15,18 | 299:15,21 | **requirem...** |
| **remove** | 93:7,11,13 | 300:21 | 301:6,9,14 | 171:22 |
| 113:14 | 95:1,8,20 | 301:13,15 | 301:22 | 310:1 |
| **render** 83:22 | 112:18 | 301:21 | 302:4,15 | 314:19 |
| **rendered** | 113:17 | 302:13,24 | 302:18,20 | **requires** |
| 308:24 | 114:12 | 303:3 | 302:22 | 40:17 |
| **rendering** | 117:10,23 | 306:16 | 305:21 | 305:22 |
| 198:7 | 119:5 | 312:24 | 325:10 | **requiring** |
| **renders** | 121:1 | 313:14,15 | **represent** | 204:24 |
| 290:12 | 126:11 | 314:1 | 12:7,9 | **reread** 54:24 |
| **renounce** | 127:3 | 319:3 | 110:9 | **research** |
| 32:20 | 128:4,12 | 321:23 | 113:3 | 16:18,22 |
| **repeat** 19:18 | 128:15,17 | 327:12,23 | 295:14 | 17:2,10,14 |
| 36:9 41:9 | 129:2 | 328:12,18 | 301:12 | 17:18 18:1 |
| 78:11 83:2 | 130:11,20 | 332:13 | **represen...** | 21:22 |
| 89:18 | 131:5,10 | **reported** | 279:6 | 47:22 |
| 104:15 | 131:15 | 33:14 | 281:1 | 51:18 |

| | | | | |
|---|---|---|---|---|
| 86:14,16 | 190:5 | **reverse** | 284:10 | 324:14 |
| 126:12 | 239:19 | 54:11 | **revised** | 325:8,11 |
| 215:22 | **responses** | 57:21 | 326:21 | 325:15 |
| 236:24 | 54:1 188:5 | 58:14 | 327:3,9 | 326:7,16 |
| 238:22 | 287:19 | 187:2,9,15 | **right** 13:24 | 329:16 |
| 265:11 | **responsi...** | 187:20 | 14:18 27:4 | **rigorous** |
| 305:11 | 157:10 | 289:10 | 51:8 55:12 | 50:12 |
| 306:6,14 | **responsible** | **reversed** | 62:17 | 212:6,14 |
| 315:8 | 92:24 | 107:18 | 68:23 | **rising** |
| 322:12 | 209:1 | 174:12 | 76:13 77:1 | 173:14,15 |
| 333:20 | 241:3 | 246:13 | 90:12 98:2 | 173:22 |
| 335:8 | **rest** 261:4 | 290:2 | 98:6 | **risk** 126:1 |
| **researched** | 290:8 | **reversib...** | 100:14 | 206:9,12 |
| 162:16 | 318:9 | 226:1 | 104:7 | 206:16 |
| **researchers** | **restate** | **reversible** | 111:6 | 228:2 |
| 50:17 51:5 | 141:18 | 205:6,10 | 125:24 | 235:8 |
| 51:18 | **result** 162:2 | 205:13,22 | 131:20 | 240:24 |
| 83:10 86:1 | 170:3 | 206:2,4 | 133:4 | 259:1 |
| 86:5 | 184:8,23 | 225:18 | 145:19 | 265:7 |
| 224:24 | 185:10 | **reversing** | 149:11 | 266:6 |
| 259:3 | 188:9 | 186:12,18 | 155:18 | **risks** 18:2 |
| 262:3,6 | 202:17 | **revert** 54:5 | 160:17 | 89:9 91:12 |
| **resemble** | 203:4 | 257:18 | 181:5 | 134:19,20 |
| 317:6 | **resulting** | **reverts** | 184:4 | 157:24 |
| **residency** | 59:1,9 | 57:16 | 203:8,9 | 181:1 |
| 15:20,22 | 246:17 | **review** 25:22 | 218:9 | 206:21 |
| 16:7,10 | **results** 60:4 | 82:17 | 228:14 | 207:2 |
| 65:3 66:7 | 60:7 61:24 | 100:23 | 229:20 | 208:7 |
| **Resignation** | 63:3,7 | 112:8,10 | 233:11 | 216:3 |
| 176:15 | 83:5 111:8 | 117:9,12 | 245:21 | 228:2 |
| **resilience** | 135:20 | 131:15 | 255:14,23 | 238:10 |
| 333:8 | 137:16 | 209:12 | 256:9 | 266:8,9 |
| **resilient** | 140:2 | 288:12 | 268:6 | 267:6 |
| 119:24 | 144:10,10 | 289:13 | 271:10 | 283:3 |
| **respect** | 240:5 | 296:19,21 | 276:13 | 289:17 |
| 50:23 51:2 | 284:6 | 300:2 | 281:16 | 311:3 |
| 51:4 306:1 | **retained** | 338:11 | 284:8 | **Road** 5:19 |
| **respected** | 298:22,24 | **reviewed** | 285:23 | **Robert** 21:13 |
| 44:19 | 299:12,16 | 30:16 | 295:4 | 22:5 |
| 46:19 | **retrospe...** | 51:18,18 | 296:7,11 | **Roberta** 4:9 |
| 50:17 | 143:20,22 | 111:3 | 296:14 | 12:22 |
| 263:9 | 143:24 | 112:14 | 297:7,22 | 236:11 |
| 315:8 | 144:9 | 300:3 | 298:7 | 338:13 |
| **respective** | 281:6 | 303:10 | 303:13,16 | **Roberto** 7:24 |
| 11:4 | **retrospe...** | **reviewer** | 305:3 | 115:11,15 |
| **respondent** | 143:16 | 25:16 26:4 | 309:9 | **robust** |
| 290:10 | **return** 55:20 | **reviewing** | 314:5 | 322:14 |
| **respondents** | 121:17 | 52:20 | 316:6 | **role** 22:15 |
| 248:14 | 172:15,24 | 62:20 | 319:12,21 | 22:17 |
| 287:2,5 | **returning** | 286:12 | 320:2,10 | 23:24 26:3 |
| **response** | 258:14 | **reviews** | 320:16,22 | 76:7,12 |
| 141:18 | **reveals** | 117:14 | 321:6 | 91:2 92:16 |
| 187:7 | 51:22 | 144:9 | 323:4,14 | 92:18 |

99:17,22
100:4,7,18
123:8,16
123:17
166:21
204:14
233:2,11
234:11
242:24
243:3
323:20
324:1
**roof** 310:19
**room** 4:5
85:24
171:8
236:17
**rooms** 85:23
**rough** 147:19
303:15
**roughly** 22:2
**rounds** 28:4
**routine**
296:19
**Royal** 7:15
97:6,11
98:8,18
99:12,21
100:17
**rubber**
312:10
**rubric** 126:8
**rule** 14:10
166:19
331:18,21
331:21
337:4
**rules** 2:4
29:13
209:21,22
209:23,24
210:11
337:6,20
337:21,21
**run** 28:5
255:20
**rush** 182:9
**rushed** 162:4
162:13,18
162:20,24
**Ryan** 9:12
279:17
280:1,5

**S**

**S** 3:1  4:1
5:1  11:1,8
**Sabine** 51:5
**sabotage**
175:10
**Sabra** 44:12
**Sabrina**
44:11
**sad** 75:6,10
**safe** 195:10
206:6,7,8
225:1,18
294:11
**Safer** 299:21
301:6,21
302:7,14
**Safer's**
299:22
**safety** 18:1
205:20
209:9,16
211:2
212:7,15
215:23
219:4
227:23
228:13
294:24
**sake** 86:16
204:8
217:9
308:12
328:11
**salary** 22:2
**same-aged**
198:14
**sample** 63:17
63:20
82:21
257:9,22
258:6
279:6
280:14,17
281:1
286:4,4,13
**sampling**
279:5
283:7
285:10,12
285:14
**San** 3:15

**Sargent's**
11:22
**saw** 66:6,13
72:14
73:14  76:9
153:20
300:20,22
301:1,6,10
**saying** 79:12
120:18
121:15
175:7
186:3
225:24
234:9
240:19
256:2
258:22,24
286:18
292:21
298:3,4
328:9
**says** 24:5
36:19  37:5
37:18  38:5
47:9  56:4
77:3  97:16
98:1,5
99:13
103:24
121:19
133:14
147:7
174:11
179:23
182:9
190:21
219:17
220:1
225:5
226:6
229:2,15
231:21
232:2
234:4
258:17
282:3
305:9,17
319:6
324:9
**scale** 147:14
147:22
303:20,24

306:11,11
306:18,19
306:20
307:2,15
**scales** 42:11
323:19
**Scandina...**
109:2
**scenario**
39:11
153:1,2,7
183:10
**scenarios**
124:19
**scholarly**
116:9,10
**school** 1:12
4:14  7:8
12:23
21:13
43:24  44:5
64:22  65:4
65:9  92:12
138:4
319:7,24
320:8,14
**schools**
38:21
**science**
60:15
115:16
**scientific**
20:15
50:12
111:18
113:10
164:23
178:9
289:11
291:1,11
**scientif...**
60:4,5,8
77:3,13
**scientist**
291:16
**scope** 121:13
177:21
184:10
185:1,15
186:21
187:5
188:24
189:11,22

195:13
197:20
198:21
199:11
201:11
209:4
211:8,13
213:8,18
214:6
220:7,20
221:5,13
221:19,21
222:3,12
225:10
226:20,23
243:13
244:2
268:17
269:23
295:2
330:19,21
333:11
**scoping**
111:23
**score** 147:9
**scores** 138:1
**Scott** 2:6
**Scottsdale**
5:14
**screen**
269:17
**screenings**
306:8
**scroll**
260:11
316:11
**scrolled**
107:23
**sealing** 11:5
**search**
296:23,24
**searching**
112:11
**season**
268:14
**second** 33:2
55:3  58:1
78:21  87:4
118:9
133:13,18
139:22
146:19
216:16

230:13
258:3
260:9,10
280:13
287:12
305:13
316:5
321:5
**secondary**
1:12 4:14
12:23
320:4
**secretion**
226:11,13
**section**
35:10 71:5
102:16
111:7
219:16
260:18
**sectional**
277:20
283:16
292:1
**see** 26:24
27:7,10,11
27:14,15
27:15
32:24 33:1
33:3 37:2
37:14,24
45:20
55:13,23
56:2 68:9
68:12
72:22
74:12
77:23 79:7
79:8 80:22
85:21
88:16,20
88:23
96:11
98:22,23
101:22
107:22
109:8,9
111:14,17
114:6
118:6,10
129:13,16
129:21
136:12

139:21
140:3
153:14
154:16
159:14
170:5,22
174:2,3
177:19
178:6
192:15
193:9
195:24
212:12,13
216:15
219:16,21
220:1
235:11,12
235:16,17
248:15,19
248:20
249:5,24
251:9,10
253:14,19
255:4
269:3,4,7
269:8
272:3,6
273:7
274:11
275:21,22
283:2
288:8
289:3
296:3,17
296:24,24
297:15
300:8,10
300:12,21
301:9
304:8
305:18,19
312:16
315:11
318:2
319:4
322:1
324:5
326:22
**seeing** 46:6
58:4 67:3
67:8 74:7
170:3
172:21

173:15
179:16
216:8
233:10
250:16
264:17,18
279:20
288:22
301:7
**seek** 278:10
**seeking**
39:16
125:1,8
175:12,16
180:3
204:18
205:17
**seen** 26:20
30:1 64:8
66:14
73:13
76:22
82:24
108:10
111:22
112:19
122:21
124:19
160:7
168:2,18
173:20,22
174:7
177:10,13
178:1
181:9
183:10,13
194:15
196:18
208:23
213:20
214:24
223:5,22
234:22
237:3
261:23
272:12
289:16
290:4
297:9
312:23
316:17,21
317:5
330:9

333:21
334:12,13
**select** 56:15
**Selected**
262:16
**selection**
60:10,22
61:1
325:22
**self** 46:1,14
46:21
54:18 74:6
84:3 85:11
86:20,24
128:12,15
128:17,20
169:2,16
170:3
306:16
322:24
328:20
**self-report**
169:13
**self-rep...**
60:1
**Selin** 8:18
176:9,13
**sense** 45:24
46:21
56:11,21
59:2,10
60:21
165:23
223:23
267:14
272:23
322:24
**sensitive**
75:4
**sentence**
77:2
289:15
305:18
319:4
328:9
332:2,10
**sentences**
15:12
225:15
**separate**
85:23
265:9
**separately**

182:17
183:7
**separation**
138:4
**series** 14:1
38:12
307:2,4
**serious**
83:21
227:23
228:7
287:7
288:2,3,18
292:3,5
**serve** 21:7
22:3 23:3
23:20 24:8
24:15 25:8
25:16
123:8,16
123:17
**served** 26:7
148:24
149:2
**service** 7:23
24:6 104:2
105:7
106:3
110:21
111:5
239:23
240:11
**Services**
11:22 23:4
23:21
102:8
263:5
**Services'**
104:19
**serving**
258:7
**session**
262:10
**sessions**
181:12
**set** 20:3,12
61:12 70:8
70:11,12
195:10
208:4
217:9
231:10
253:19

269:1
289:2
**sets** 19:12
19:19
**seven** 135:4
279:17,21
279:22
280:10
281:11
284:11
**seven-ye...**
293:23
**Seventy-...**
73:8
**severity**
284:1
**sex** 30:12
33:20
37:18
41:23  42:5
54:6  56:12
56:21  57:6
57:17
67:19
80:19  92:2
93:5  96:8
103:18
121:18
165:6
172:15
173:1
178:14
201:18,24
202:2,7,12
202:21
203:7
231:2,24
234:10,14
241:18
242:9
243:1,7,16
243:22
244:11,18
245:1
246:3,13
246:23
248:8
259:24
260:20
261:16
263:15,16
263:18,22
264:3,15

264:22
265:12
266:1,17
273:5,23
274:6
275:4
322:5
324:9,9,21
325:3
321:14
**sex-segr...**
91:4
**sexism** 78:5
78:17
**sexual** 29:17
29:18,22
30:1,7,15
30:18
47:21
48:14
124:9
152:22
155:24
156:7,9,9
157:9
168:23
215:8,14
223:12
227:7
233:21,22
234:6
**sexuality**
23:21  24:6
124:8
239:23
**sexually**
233:5
243:9,24
251:2
**shadow**
195:24
**shape** 227:6
**share** 162:5
162:14
163:20
169:1,15
180:13
181:11
182:1,15
**shared** 168:1
**sheet** 8:6
**shift** 204:19
250:23

**Shoals** 5:19
**short** 69:7
96:21
130:23
150:8
166:15
201:2
239:11
268:1
321:14
**Short-term**
262:15
**shot** 85:24
**show** 14:19
43:20
47:24
48:18
57:24  84:1
97:2
106:13
107:9
108:12
110:18
126:17
127:13,19
127:21,22
130:2
131:21
133:5
134:9
135:16
137:1
138:17
140:18
142:10
145:20
147:5
149:12
176:5
224:9
232:17
247:18
251:15,17
260:6
271:11
276:14
279:23
281:17
**showed** 102:9
**showing**
233:20
**shown** 164:21
327:14

**shows** 251:5
**Shuman** 4:10
**Shumer**
245:22
**sic** 253:14
**side** 235:7
237:2
246:4
263:16
291:8
**signific...**
63:24  64:3
136:19
137:23
147:1,11
**significant**
76:8  77:4
77:8
137:17
138:13,15
147:5
286:23
289:7
322:19,20
**signific...**
75:2
126:13
**signing** 11:5
**signs** 52:13
**silence**
175:9,13
175:16
**similar**
149:2
156:11
236:1
241:12
**similarly**
107:17
**simple**
118:22
**simplistic**
118:3,13
119:1
**simply** 282:3
**single** 33:14
70:22
112:13
250:9
257:4
298:9
309:24
**singular**

132:23
**sir** 168:7
**sisters**
287:24
**sit** 191:22
**site** 313:17
**sitting**
95:13
175:24
178:19
208:8
**situation**
88:2  122:6
122:7
152:21
194:14
329:18
335:1
**six** 123:3
124:14,16
125:23
133:22
137:11,15
182:9
227:16
276:9
277:6
284:14
293:23
329:8
**sixth** 259:21
**size** 187:21
227:6
**skewed** 257:9
266:21
286:3,5,8
286:9,13
286:15
287:19
**skewing**
286:12
**skills** 101:4
337:6,14
337:17
**skipping**
58:12
139:23
**slash** 51:11
79:19
**sleep** 90:13
**Slicer** 4:10
**slightly**
89:5

**Slower** 223:2
  223:4
**small** 81:12
  129:19
**smaller**
  66:17
**snowball**
  62:2
**social** 36:20
  37:11
  41:21
  84:13 89:7
  89:10,21
  90:4,7,17
  90:22 91:5
  91:10,17
  95:10
  100:11
  101:5
  102:8
  126:12
  127:13,17
  138:3
  168:24
  169:2,16
  170:11,14
  184:19
  215:8,14
  259:6
  261:9,20
**socially**
  40:18
  66:11,20
  66:24 67:6
  67:22 77:4
  84:4 89:12
  184:18
  251:8
  256:3
  257:11,24
  258:13
  286:23
**societal**
  40:24
  41:14
**societies**
  123:4
**society** 32:9
  32:14 34:2
  34:7,11,19
  34:20 37:6
  37:6 50:9
  94:1,11,21

  96:1
  100:24
  110:14
  115:21
  161:20
  207:17,20
  208:12
  212:5,20
  213:14
  215:21
  216:10
  217:7
  226:6
  227:12
  235:22
  258:12
  259:5,10
**Society's**
  7:6 8:21
  32:2,7
  228:21
**solving**
  79:18 80:2
  80:6
**somebody**
  57:16
  88:18
  109:15
**someone's**
  39:5
  274:24
**soon** 330:14
**sorry** 18:5
  19:18
  31:13 41:3
  55:13
  64:10
  69:21 75:7
  78:21 81:8
  98:15
  102:17
  107:10
  110:11
  122:10
  124:14
  139:14
  162:9
  172:7,8
  186:14
  196:5
  197:11
  236:12
  242:23

  245:20
  247:16
  254:8,16
  290:17
  298:4
  299:17
  306:17
  320:13,20
  328:14
**sort** 119:6
  156:1
  194:14
  237:6
**sought**
  145:17
**sounds** 59:16
  121:14,16
  122:15
  232:8
  255:22
**source** 55:8
  307:19
**sources**
  29:14 42:9
  42:19,24
  43:1
  116:15,17
  116:18
  307:21
**sourcing**
  102:24
**Southern** 1:2
  12:2
**spaces** 333:7
**speak** 15:11
  33:23 47:1
  75:8 105:1
  112:24
  124:1
  160:5
  166:4
  178:3
  204:1
  223:6
  226:21
  249:13
  272:24
  274:22
  309:15
  318:7
  322:21
  330:10
  332:18

  333:10
  335:13
  338:3
**speaking**
  28:2,3,5
  103:3
  105:19
  203:2
  220:21
  241:15
  267:15
  308:13
  309:12
**speaks** 30:10
  234:23
  290:5
**special**
  237:5
  287:4
**specialist**
  11:21
  216:5
**specialists**
  93:3
**specialized**
  237:4
**specialty**
  65:18
**specific**
  21:1 22:15
  39:16,17
  42:15,24
  57:14
  61:12
  62:23 64:4
  65:12,16
  68:12
  69:16 70:2
  70:8,11,12
  71:9,12
  76:1 79:9
  84:16,18
  85:10 88:6
  90:13
  94:12
  95:13
  101:22
  102:5
  112:2
  113:15
  114:10
  121:5
  123:14

  138:11
  145:2,17
  153:16
  163:6,23
  164:10
  165:4
  171:3
  177:16,22
  178:1,18
  181:2
  183:9
  189:6
  191:20
  198:14
  203:22
  204:3
  205:5,8
  206:13,21
  208:7
  211:11
  216:6
  224:6
  234:23
  261:19
  265:7,8
  267:6
  270:15,17
  274:14
  279:1
  281:7
  283:3
  288:7
  289:17
  291:15
  293:9,21
  299:2
  302:18,22
  303:1
  307:17
  309:1
  311:4
  313:18,22
  315:5
  316:21
  328:3
  329:14
  331:11
  332:15,18
  333:3
  338:3
**specific...**
  35:2 57:10
  58:5,21

62:4,16
67:9 71:18
85:19
90:11
101:1
113:12
131:16
133:3
143:21
155:15
166:4,17
166:19
169:9
185:5
198:8
209:12,19
210:21
212:8
238:24
261:1
276:2
286:8
288:10,15
291:6
292:10
296:23
298:17
302:5
318:4
320:18
327:18
334:1
335:20
**specificity**
172:3
**specifics**
63:11 64:6
79:16
103:9
110:4
188:6
192:15
198:22
202:6
221:20
274:22
304:9
312:17
314:22
320:19
330:3
334:22
**spectrum**

114:14
**speculation**
251:1
**spend** 309:19
310:10
**spending**
301:17
312:8
**spent** 23:14
**sperm** 226:17
227:2
**split** 155:9
**spoken**
181:19
**sport** 329:9
329:12
**sports** 9:10
16:13,15
16:18,22
18:9 30:19
82:14
185:5
271:14,20
293:14,19
327:19
329:7,20
332:7
333:3,19
336:14,23
337:3
**spurts** 237:3
**Sruti** 3:18
13:3
**stability**
326:10
**stable** 251:6
**stage** 19:2
192:9,18
192:19
193:2,12
193:17,19
194:3
203:9,13
203:14,23
209:6
221:2
230:19,20
238:8
287:15
**stages** 192:4
192:6,7,8
192:14
207:24

223:23
230:16
231:1,4
**staging**
192:16
**stamp** 312:11
**standard**
119:14
125:17
161:19
217:19
307:20,22
318:24
**standard...**
308:7
**standards**
93:14,23
94:18
95:21 96:2
100:21
149:5
156:22
158:11,21
159:3
161:13
170:24
171:4,13
195:15,19
196:7,22
217:21
303:15
309:3
314:12
**standing**
191:13
**stands**
112:18
**start** 142:7
192:15
209:6
263:15,18
265:23
**started** 19:2
64:20 67:3
72:9 74:7
178:6
186:11,17
208:20
249:18
**starting**
14:8 74:12
158:13
163:10

266:16
322:1
**starts**
267:19
319:11
**state** 1:9,15
1:20 2:4,7
4:4,7 12:4
12:6,15
43:6 118:4
118:11
142:5
172:4,4
194:22
195:20
196:9
217:5
250:24
294:9,15
294:17,24
295:15
314:15,15
314:17,19
320:4
333:4,4,5
333:5
**stated** 47:12
83:18
126:12
229:2
233:13
284:21
328:11
**statement**
7:15 19:13
19:19 35:6
40:23
41:14
45:20
58:22 97:5
97:11,21
105:10
112:4
118:15,19
143:7
144:20
159:19
210:17
233:9
237:22
240:16
243:19
244:7

246:9
261:15
267:13
303:3
307:18
328:13
332:1,3
**statements**
36:1,13
43:19
95:12
97:18
241:13
324:13
**states** 1:1
12:1
171:16
177:1
207:20
210:11
211:1
233:3
314:20
338:4
**static** 222:6
**stating**
109:5
179:11
**statistical**
16:2 63:24
64:2 129:6
129:19
136:19
137:22
147:6
285:15
325:7
**statisti...**
63:17,20
63:22
136:17
137:17
138:13,15
**status** 267:3
289:9
**statute**
199:3
**stayed**
290:23
**Steensma** 9:5
51:15
251:12,20
252:2

254:9,12
254:23
255:15
258:20
259:9
**steer** 220:16
**Stella** 80:1
**stemming**
283:6
**steps** 165:2
165:14,22
**Steptoe** 4:18
**sterility**
246:17
**sterilizing**
178:14
**stigma**
327:14,17
327:20,24
332:14
337:13
**stimulating**
234:11
**stipend** 23:2
**stipulated**
11:3,10
272:15
**Stock** 11:20
**stop** 168:7
172:11
188:1,21
190:1
195:1
196:12
263:14
**stopped**
222:19,22
**Stops** 106:19
**story** 153:12
**Street** 3:5
3:20 4:11
5:5,13
**strength...**
221:17
**strengths**
277:24
**stressors**
156:18
**strike**
299:23
**striking**
237:3
**strive** 162:3

162:12
**strong**
216:19
251:8
294:10,18
**stronger**
222:1,9
283:2
**strongest**
255:16
279:12
282:13
**strongly**
182:2,16
183:6
**structure**
97:17
194:22
195:20
196:9
234:6
289:4
**structured**
42:10
315:9
**struggling**
154:15
**student**
65:13
129:22
**students**
86:6 91:20
319:7,7
**studied**
70:13
222:24
246:16,20
**studies**
44:18 52:4
62:11
69:15,17
70:16 71:4
76:2 79:6
79:8,9,16
87:2 111:8
111:24
112:8
113:1,3,5
127:10
130:21
131:3,11
131:13
132:8

140:13
164:13,18
164:19
175:5
214:16,20
215:6,11
215:15,16
215:19
232:3,11
232:13,14
233:20
240:1,8
244:6,8
246:11,14
248:7,10
277:7
278:4
308:12
322:15,16
322:18
323:7,22
324:17
330:9
**study** 7:8,11
7:12,21
8:5 43:24
44:4,5,9
53:14,17
53:23 54:1
54:8,18
55:1 56:8
56:10,14
56:17,20
57:20 58:6
58:11 60:1
60:11,13
61:17,21
62:4,10,15
63:12 64:4
69:14
71:10,10
71:18
76:16,20
80:15 81:3
81:19
83:20,22
90:9
107:13
112:13,13
116:12
117:15
118:20,22
126:19,22

127:7,13
127:16
129:1,10
132:23
133:2
134:3,8,22
135:10,14
139:10,15
139:17,24
140:4,10
141:13
142:6,20
145:16
146:13
147:8,22
159:9,17
159:22,23
160:7
163:4,11
163:17
169:9
174:16
196:17
210:6,7
213:15
214:2,12
214:14
226:7
231:5
232:9
233:13
239:21
240:4,5
248:4
252:8
257:4
259:3
261:1
275:17
276:2
277:20
278:4,16
281:6
283:3,9
285:15
288:14
291:5,8,15
292:15
295:24
296:2,6,10
297:16
298:6
303:9,10

308:19
313:19
328:3
**study's**
133:24
135:6
**studying**
225:1
**Stutler** 1:16
4:22 12:18
**subject**
64:13
143:24
290:23
**subjected**
167:10
168:20
**subjective**
18:18
33:14
39:11,12
**subjects**
54:9
136:10,10
252:8
286:1
**subjects'**
290:21
**submitted**
28:11,14
**subsequent**
203:4
**Subseque...**
53:19
**subset** 71:12
**subsets**
177:23
**substance**
282:4
305:24
328:21
**subthres...**
252:15
**suffer** 30:6
**suffered**
30:1
155:24
157:9
287:14
**suffering**
334:8
**suffers**
30:15

sufficient
 204:22
suggest
 56:10
 111:12
 112:19
 118:22
 207:21
 216:21
 233:14
 234:7
suggesting
 62:7
 278:11
 292:19
suggests
 52:11
 233:7
 234:10
 235:14
Suicidal
 134:20
suicidality
 239:17,20
 278:17
 290:23
 329:15
suicide 75:6
 75:11,14
 133:16,16
 134:20
 239:17,19
 239:21
 240:1,8,12
 240:24
 241:5
 275:19
 277:1,9
 282:2,4,23
 283:1
 284:24
 292:17,20
 292:24
 328:20
Suite 4:12
 5:6,20
summarize
 153:1
summarizes
 152:20
summary
 112:7
summer 87:7

Superint...
 5:9 338:17
Superint...
 1:15,18
 4:22 12:18
 12:21
superscript
 138:6
supply 37:4
 102:19
support 44:6
 87:7 143:5
 144:22,24
 145:3,11
 145:13
 146:4
 158:12
 162:3,12
 171:10
 244:7
 250:16
 277:7
 294:7
 296:13,15
 329:9
supported
 129:22
 279:10
 289:23
supporting
 20:9
 167:19
 251:1
supposition
 162:19
 220:9
 258:18,19
 258:22
 289:19
supposit...
 313:9,10
suppress
 201:13,21
suppression
 17:15
 137:16
 138:5,12
 139:18
 140:2,6,12
 141:4
 142:9
 171:17
 189:15

201:8,17
 204:10,11
 204:18,22
 205:13
 207:22,22
 235:8
 242:16
 262:16
 265:18
 269:1
 310:11
 311:17
 315:11
sure 27:21
 34:7,18
 38:10
 43:13
 52:20  55:1
 58:20
 61:11
 63:13 67:1
 67:3 78:23
 85:19 89:5
 94:13
 103:10
 110:9
 111:23
 126:4
 146:19
 149:21
 152:13
 154:18
 162:21
 171:10
 190:15
 207:3,5
 211:4
 216:4
 226:15
 238:19
 250:20
 255:6
 284:7
 286:15
 294:6
 297:23
 303:6
 323:4
 332:12
 336:10
surgeries
 17:19
 54:10

57:21
surgery
 28:17
 39:23
 58:14
 92:13
surgical
 53:19 54:3
 157:19
 212:7,15
surging
 231:2,24
surmise
 270:16
surrounding
 265:23
 268:15
survey 54:1
 57:4,13
 62:9 63:11
 63:13,23
 64:5 69:18
 70:2 80:18
 81:12
 82:21 83:5
 85:1 86:9
 277:16
 285:9,10
 285:19
 286:2,4,21
 286:22
 287:4,15
 288:1,7,7
 288:16
 291:19
survey's
 287:13
surveyed
 85:7
surveys
 63:10
Susan 4:17
 12:16
 338:20
Swaminathan
 3:18 13:3
 13:4 84:22
 224:17
 253:23
 315:22
swear 11:11
Sweden
 101:20

102:21
 106:20
 107:4
Swedish
 102:5,7
 103:5
swimmer
 268:16
swimmers
 271:22
swimming
 268:15
 269:22
 272:5
 334:18
sworn 11:17
 13:15
symptoms
 138:2,2,2
 138:3,3,4
 138:4,5
 154:17
synonym
 293:3
synonyms
 293:7,11
system 68:13
 204:23
systematic
 68:19,21
 112:9
 239:21
 240:1
systemic
 240:8
systems 68:6
 68:8 195:9
 320:5

———————
        T
T 11:1,1
 329:21,22
 329:24
 330:1
tab 14:21
 19:17
 31:23 36:5
 36:6 43:21
 48:1 50:8
 52:22
 53:11
 69:14
 76:14

| | | | | |
|---|---|---|---|---|
| 80:14 82:3 | 55:24 | 61:24 69:7 | 231:1,4 | 157:9 |
| 84:2 97:3 | 80:17 | 96:21 | 238:8 | 178:15 |
| 98:6 101:9 | 132:11 | 150:8 | **tap** 159:22 | 180:20 |
| 106:17,18 | 137:15,21 | 201:2 | **task** 148:24 | **teen's** 165:3 |
| 107:11 | 248:12,13 | 239:11 | 216:10 | 165:23 |
| 108:13 | 249:5 | 268:1 | **tasked** 152:2 | **teenage** |
| 110:18 | 252:6,19 | 321:14 | **Tavistock** | 238:13 |
| 115:8 | 253:3,7,15 | **takes** 208:6 | 263:3 | **teenager** |
| 122:12 | 254:4,23 | **talk** 14:10 | 264:10 | 42:18 |
| 126:18 | 286:11 | 116:10 | 306:13 | **teens** 46:10 |
| 127:24 | **tables** | 165:16 | **team** 30:19 | 169:1,15 |
| 128:2 | 193:13 | 168:12 | 99:19 | 180:6,13 |
| 130:4 | **tailored** | 170:19 | 100:2 | **tell** 59:17 |
| 131:22 | 88:8 | 174:19 | 153:6,18 | 75:1 |
| 133:6 | 200:18 | 193:1 | 185:13 | 155:15 |
| 134:11 | **take** 11:12 | 206:9 | 186:6 | 190:13 |
| 137:2 | 14:11,14 | 286:21 | 194:8 | 205:10,19 |
| 138:18 | 14:17 | 325:21 | 198:18 | 215:23 |
| 140:19 | 32:16 | 326:23 | 199:8,18 | 235:21 |
| 142:11 | 42:13 | **talked** | 199:20,23 | 249:8 |
| 146:3 | 47:18 62:5 | 171:15 | 200:3 | 270:6 |
| 148:1 | 68:23 | 181:7,11 | 272:5 | 298:23 |
| 149:13 | 70:24 | 323:20 | 273:18,22 | **telling** 38:8 |
| 159:8 | 72:24 | **talking** 40:4 | 274:17 | 324:10 |
| 160:16,19 | 84:19 | 49:20 | 275:1,4 | **ten** 22:22,23 |
| 176:6 | 96:12 | 71:24 91:2 | 327:19 | 25:2 30:3 |
| 207:13 | 97:24 | 117:1 | 329:4,20 | 33:17 |
| 212:3 | 137:20 | 143:16 | 329:22,24 | 74:19 |
| 217:24 | 144:18 | 144:13 | 330:1,7 | 149:22 |
| 224:10,18 | 148:11 | 150:19 | 332:7 | 159:9,23 |
| 226:4 | 150:2 | 155:12,12 | 333:2,14 | 307:2 |
| 227:9,11 | 164:12 | 156:2 | 334:3,18 | 310:4 |
| 227:20 | 165:2,22 | 192:10 | **teammates** | **tends** 191:24 |
| 228:15,18 | 170:20 | 193:2 | 334:5,17 | **term** 45:23 |
| 232:18 | 181:20 | 203:20 | 334:21 | 46:11,20 |
| 236:6 | 225:7 | 254:2 | 335:4 | 47:4,23 |
| 239:2 | 239:3,5 | 275:23 | **teams** 91:6 | 65:12 76:1 |
| 245:7 | 253:13 | 276:2 | 91:16 | 80:6 87:16 |
| 247:18,20 | 256:15 | 280:21 | 184:6,21 | 94:12,17 |
| 251:16,17 | 263:22 | **talks** 230:13 | 197:17 | 94:17 |
| 252:2 | 264:3,15 | **Tanner** 19:1 | 198:1,10 | 109:21,22 |
| 253:20 | 265:11 | 192:4,6,7 | 329:7 | 130:24 |
| 256:10 | 280:23 | 192:8,9,15 | 330:17 | 222:23 |
| 258:11 | 287:10 | 192:18,19 | 331:6 | 227:5 |
| 259:16 | 295:17,19 | 193:2,12 | 336:1,14 | 266:7 |
| 262:8 | 305:14 | 193:17,19 | 336:23 | 304:13 |
| 268:7 | 310:14 | 194:2 | **techniques** | 327:18,24 |
| 271:11 | 321:5 | 203:9,13 | 120:19 | 336:3,20 |
| 276:14 | 327:12 | 203:14,23 | 283:8 | 337:1 |
| 279:24 | 335:21 | 207:24 | **Technology** | **terminology** |
| 281:18 | **taken** 2:3,5 | 209:6 | 102:8 | 17:22 |
| 284:9 | 11:24 | 230:16,17 | **teen** 154:3 | 19:10 |
| **table** 55:12 | 34:24 | 230:19,20 | 155:23 | 21:19 |

22:13
23:12
24:24
154:24
157:17
158:8
193:7
200:6
218:16
247:3
270:24
272:18
273:3
299:13
300:14
**terms** 42:23
49:19
110:9
217:18
230:16
267:14
301:17
314:12,22
315:4,9
338:4
**terrible**
299:18
**test** 178:9
209:9,16
220:4
**testable**
196:16
**tested**
162:15
219:8,17
219:21
257:8
**testified**
11:17
81:21
319:10
329:5
332:13
**testify**
19:13,20
185:2,3,7
**testimonies**
28:11
337:11
**testimony**
28:9,20
31:5
184:11

191:9,18
225:20,21
244:3
247:13
265:11,14
292:21
294:13
323:10
330:4
338:1,2
**testing**
207:1,6,8
257:16
**testoste...**
17:15
188:8
189:16
201:14
202:22
203:3,4
204:23
242:3,10
242:15
244:5
248:14,18
248:22
249:6,9,19
250:3,10
250:19
268:24
**tests** 207:2
207:3
**text** 250:16
326:17,21
326:22
327:3
336:18
**thank** 36:8
236:15
247:17
254:14
298:21
338:7,8,18
338:19,22
**Thankfully**
329:17
**Thanks** 64:17
218:1
269:16
**That;s** 23:7
**theoretical**
197:2
259:1

**theory** 197:7
**therapeutic**
120:19
124:20
125:2
**therapist**
181:10,11
**therapists**
95:12
100:12
101:4
312:2
**therapy**
113:24
114:12,19
115:6
118:11,23
119:19
120:3,12
121:4,6
122:17
123:9,17
124:15,16
125:24
126:5
130:22
132:13,18
132:19
133:15
134:4
135:11
137:10
141:20,22
144:14
146:15,16
156:14
165:18
207:22
241:12,14
241:16
275:20,24
276:4
278:10,11
278:17
284:17
285:3
290:11,15
292:18
**thickening**
231:22
**thing** 123:1
123:2
170:14

178:17
206:8
313:1
**things** 46:12
78:3,15
90:10
113:10
150:19
173:11
181:21
189:9
206:1
215:2
222:19
267:2
314:22
315:9
323:4,22
337:4
**think** 14:15
18:6 20:6
25:1 33:9
34:20,23
35:8 42:22
46:17 49:2
56:11,14
57:9 59:4
63:10,21
69:22 71:8
72:8 77:14
80:10
87:15
88:14,19
89:9 94:12
99:7 100:6
110:6
114:11,18
116:10
118:20,21
119:13
121:22
123:15
128:14
142:5
153:24
163:15
164:17
166:14
169:9
170:14
172:1,20
173:8,10
173:24

174:2,21
175:3
177:9,17
177:21
178:5,7
182:23
183:1,5
184:13
186:4
189:12
194:20,21
196:8
198:23
201:12
203:16
215:2
218:16
222:13,22
226:3,4
227:13
230:9
235:18
241:8,22
246:20
253:23
261:13
266:6
267:17
273:17,23
274:10
275:7
285:5
286:7
287:9
289:15
295:19
297:4,11
297:12
299:5
301:10
302:17
309:1,11
309:12
310:17,19
311:20,23
313:8,9
315:6
318:11
322:12
325:23
328:11
329:5,21
329:21

330:21
333:8
336:8
**thinking**
  230:3
**third** 109:1
  134:24
  139:23
  300:16
**Thomas**
  268:16,23
  269:5,22
  270:7
  271:22
  272:8
  334:17,21
**Thomas'**
  270:4
  334:16
**thorough**
  157:11
  165:9,12
  165:13
  166:2
  180:19
  305:22
  306:2
  307:18
  308:2,3
  310:11,13
  311:6
  313:15
  314:7
  317:9,16
  317:24
**thought** 57:6
  317:24
**thoughts**
  133:16
  329:14
**thousand**
  28:6
**thousands**
  239:22
  240:2,9
**three** 27:17
  45:11,21
  46:9 62:18
  76:7 78:2
  78:14 79:6
  80:16
  98:17
  105:18

112:6
136:16,22
147:8
161:24
165:16
168:19
170:18
172:7
176:20
177:1
181:9,12
219:22
224:24
225:8
268:22
282:24
293:18,22
300:8,9
329:6
335:12
**three-qu...**
  212:4
**thrive**
  171:11
**Thursday** 2:7
**TikTok** 169:2
  170:1,4
**time** 11:23
  14:12
  21:15,21
  22:9 23:8
  23:13
  24:20
  25:19,22
  31:14 33:6
  36:3,21
  37:7 38:22
  39:8 45:7
  46:4 47:6
  47:9 49:14
  49:23 50:6
  57:6 64:12
  64:13
  66:14 67:2
  68:2,10
  69:11
  72:24
  73:14,19
  82:24
  85:15 89:5
  96:15 97:1
  105:12
  106:7

122:20
137:20
139:18
140:6,15
145:3
150:5,12
151:16
155:4
164:14
191:16
200:23
201:6
211:18
212:1
224:16
231:16
239:8,15
248:6
250:10
256:14
265:20
267:18,22
268:5
269:5
284:2
297:10
301:17
308:15
310:10
311:20,24
313:15
321:7,11
321:20
323:22
330:5,11
335:9
338:7,20
338:24
**timeframe**
  42:15
  105:13
  283:23
  311:4
**times** 14:10
  181:9
  280:22
  283:1
  304:6
**timing** 231:5
  231:9
**title** 98:2
  282:9
**titles**

100:12
**today** 11:22
  14:12 56:8
  76:22
  95:14,19
  108:10
  117:12
  181:7
  191:23
  194:5
  271:18
  272:1
  295:5
  298:10
  301:19
  334:21
  335:2,3
  338:20
**told** 174:11
  337:2,4
**tool** 90:1
  91:22 92:3
  217:7,8
  304:23
  305:2,4,12
  307:17
**tools** 92:8
  92:10
  306:4
  308:7,8,13
  308:22
  309:1
  326:6
**top** 28:17
  45:21 46:9
  55:7 77:1
  77:1
  125:23
  146:20
  218:9
  236:23
  240:16
  246:7
  285:7,8
**Tordoff** 8:7
  132:1,5
**Toro** 3:12
  13:9,10
**Toronto**
  306:12
**Torri** 269:6
**total** 300:8
**Totally**

201:20
**touch** 76:8
**track** 68:6
  174:13,14
  175:2
  308:18
**tracked**
  308:14
  313:4,16
  323:22
**tracking**
  68:19,21
**trained**
  15:24
  192:16
  309:17
**training**
  15:19,22
  16:13,15
  29:10 43:8
  43:10
  65:13
  66:13,16
  66:21
  101:3
  307:24
**trajecto...**
  265:16
  266:5
**trajectory**
  261:21
**trans** 85:16
  176:14
  247:11
  271:21
  272:4
  273:8
  335:19,19
**transcript**
  1:23
  338:12
**transcri...**
  324:7
**transfer**
  81:14
**transgender**
  18:2,8
  23:15,15
  25:9,21
  26:21
  29:24 30:6
  42:5 44:14
  46:13

48:10
52:17 54:4
59:2,10
60:14 64:9
67:10,11
67:18 72:1
84:4 87:8
93:8 94:2
114:20
115:24
120:2,4
121:5
126:13
129:21
132:6,24
133:17
134:19
135:20
139:3
143:11
149:1
151:16,22
152:3,7,11
152:24
156:7,9
157:15
158:6
163:21
166:11,16
167:2,4
168:5,13
169:3,4,7
169:16
170:3
173:9
176:16
180:7,15
180:21
181:14
184:15,16
184:18
185:21
234:16
244:4,13
245:11
246:24
251:4,6
255:16
256:5
258:7
270:11,20
271:3
273:21

277:2,15
277:15
280:18
282:5
285:9,24
287:14
306:6
313:11
319:8
324:24
327:16,19
328:7,19
329:2
332:5
333:14
334:3,5
335:18
337:11
**transition**
40:18
53:19 54:3
54:3,11
57:22
58:14
74:16,17
74:23 77:3
81:15 89:7
89:10 90:4
90:8,17
91:3,5,10
125:1,9
127:18
162:20
163:10
165:1
184:18
251:3,8
257:5,17
257:24
259:6
261:21
286:24
**transiti...**
66:12,20
66:24 67:6
67:22 84:4
257:17,18
258:13
286:22
**transiti...**
57:2 89:12
89:21
90:22

91:18
126:12
256:3
257:11
261:9
**transitions**
84:14
127:14
162:4,13
162:18
163:1
174:12
256:13
**translate**
14:10
**translation**
105:15
110:13,15
**transphobia**
278:9
**transpos...**
254:3
**transsex**
17:19
**trauma** 59:1
59:9 78:4
78:17
156:7,14
156:23
157:4
163:7,23
165:5
166:19
167:11
305:24
328:21
**traumas**
156:18
**traumatic**
337:16
**Travis** 5:17
12:8 41:2
64:10
160:15
223:6
236:11
**treat** 99:3
107:4
174:21
175:1
213:12
**treated**
18:23

53:18 67:7
72:1
142:19
143:18
167:7
239:22
240:2,9
259:23
260:19
261:15
319:1
334:2,4,5
**treating**
21:16
22:10 23:9
24:21
25:20
42:18 66:2
73:5,6
77:9 99:21
113:18,23
114:7
119:17
183:13
213:5
**treatment**
7:19 32:8
39:15
84:13 88:7
90:5,18,20
92:14
98:19 99:8
99:13,18
101:12,17
104:3,11
105:8
106:19
109:5,7,19
110:3
114:10
119:11,12
119:17,18
120:20
143:4,13
145:9
157:23
171:13,24
182:24
202:8
208:13
216:6
266:4
305:21

310:21
311:3
318:9
**treatments**
39:20
90:12
102:11
103:14,14
103:18
104:20
106:4,8
161:6
172:16
173:2
212:18
217:19
287:1
326:5,15
326:18,19
327:1,8
**tremendous**
312:3
**trend** 177:19
178:10
179:3,7
**trial** 19:14
19:20,24
28:20
161:19
210:5
313:18,21
313:23
314:1,4
**trials** 209:9
209:16,20
210:1,3,4
210:10,16
210:22,24
211:6
212:24
**tries** 164:23
**trouble**
236:14
**true** 54:19
58:24 63:4
63:9 93:5
101:3
159:3
174:22
181:21
188:1,20
194:2
209:8,15

209:20
238:2
**trust** 81:9
**truth** 38:8
**try** 14:5
43:13
331:24
**trying**
109:23
119:6,6
120:9,18
120:20
121:14
168:12
171:21
269:19
311:9
332:11,11
**Tryon** 4:3
6:8 12:13
12:13
160:15,15
223:6
260:11
262:9,13
295:6,12
295:13
298:18
300:17
302:2,5,10
302:21
303:7
304:19
309:4,18
310:3,16
311:11,19
312:7,13
312:18
313:3,12
314:16
315:13
316:3,9,14
316:16,24
317:7,14
317:22
318:10
319:18
320:12
321:5,21
323:9
324:4
325:5
326:4,13

328:8
330:13,23
331:17,23
333:24
334:15,23
335:13,14
336:24
337:18
338:6
**Tumbler**
62:24
**Turban** 8:9
9:11
117:15,15
118:2,21
134:14,18
276:9,18
276:22
279:4
284:10,15
284:21
291:5
292:8
295:24
296:2,6,9
297:16
298:2,3,6
298:12,12
**Turban's**
285:8
289:6
290:8
**turn** 15:7
32:6 51:7
52:22
53:10 55:3
216:9
219:16
250:23
256:10
262:17
295:5
**Twenty-five**
22:21
**twice** 27:17
282:22
**Twitter**
62:24
**two** 14:14
45:4 54:16
54:16
57:23,24
58:1 79:6

98:10
107:6
113:22
117:5
119:16
120:13
125:23
133:22
136:8
139:9
143:3,5
144:22
145:18
146:13
148:19
152:15
159:7,15
162:19
168:4,14
171:18
172:7,9
173:18
188:5
192:13,14
193:2
216:22
225:8,15
236:23
250:1
257:16
261:13
269:1
277:12
285:6
286:18
287:12
290:7
293:18,22
301:7,10
327:11
329:6
**two-thirds**
226:5
**type** 90:5
92:24
112:2
119:12
144:4,15
291:15
300:16
314:8
327:20
**typed** 117:5

**types** 167:10
**typical**
38:17 39:7
125:16
170:5
188:2,21
190:22
191:24
202:1
230:21
294:4
316:22
317:1,5
319:23
**typically**
28:6 87:1
189:20
190:9,17
191:2,10
191:23
192:20,24
193:2,3,22
203:2,19
234:3
236:1
241:15,24
272:21
291:16
336:10
**typo** 24:6,7
**TYRON** 295:7
315:18
321:17

_____
U
**U** 11:1
**U.K** 106:2
**U.S** 152:6
176:15
210:6
**Uh-huh**
226:14
227:17
**Uh-uh** 227:18
**UK** 263:6,10
**Ulson** 85:17
**ultimately**
45:21
167:9
181:23
**umbrella**
94:19,22
125:21

**types** 167:10
**unavailable**
143:14
**uncertainty**
263:15
**Unchanging**
31:3
**unclear**
109:23
**unconsci...**
175:11,20
**undergo**
189:19
200:14
207:8
223:22
**undergoing**
172:16
173:1
184:8,23
185:10
197:18
198:2,11
**undergone**
185:22
186:3
**underlying**
289:21
**undermind**
144:1
**undermines**
184:17
**undersigned**
2:5
**understand**
33:11 35:9
39:4,6
40:16
46:15
49:13,22
63:21 64:1
69:22
71:14 72:8
79:9 86:23
91:14
114:18
120:8,9
121:15
144:19
159:21
166:21,23
170:24
175:23
176:1,3

188:11
191:1
202:11
205:18
225:19
249:13
255:6
266:16
274:8
286:8
288:8
292:8
297:23
304:21
305:8
324:6
329:20
331:10
336:2,15
336:21
**understa...**
33:4 39:11
41:21 47:5
47:8 54:8
63:14 78:4
78:16 89:2
89:9 91:12
103:8,11
103:13
104:6
105:24
109:16
121:3
124:7,22
125:6,18
125:18
145:4
157:3,24
166:7
168:9
170:15
171:9,12
174:18
178:9
179:15,17
180:24
181:1
183:2,23
188:16
189:8
190:16
191:22
199:3

204:19
206:15,20
209:11
218:22
221:21
222:4
230:7
237:5
243:15
267:10
289:23
294:5
302:3
311:2
318:8,20
322:6
323:1
324:12
331:22
**understands**
58:16
**understood**
153:10
166:10
238:15
**undertake**
99:17
**underwent**
54:3
**undue** 126:1
**unethical**
153:12
198:3
290:10,14
**unexpected**
287:5
**unfair**
185:11
**Unfortun...**
299:4
**Union** 3:4
**United** 1:1
12:1 104:1
104:18
105:6
171:16
210:11
211:1
314:20
**universal**
88:4
274:15
314:21

318:14
336:20
**University**
21:12
24:10
50:24 51:3
268:15
**unknown**
235:10,22
236:3
**unofficial**
110:15
**unrealistic**
181:3
**unreason...**
178:8
184:5,21
185:12
197:16,24
198:4,5
**unring**
186:12,18
**unsafe** 206:9
**unscient...**
61:10
**unsure** 106:6
**update** 216:2
**updated**
158:16
**ups** 291:8
**upset** 334:2
334:17
335:5
**upwards** 52:7
72:11
**URL** 36:24
269:10,14
**use** 57:3
61:18
62:13 76:2
77:13
86:15
87:16
88:10
91:21 92:2
92:8,10
94:12,17
143:10,15
156:23
193:15
205:5,7
208:14
209:21

216:18,20
216:21
217:1
230:24
235:23
236:1
241:4
246:23,24
265:20
266:7
283:2,7
284:16
306:16
307:9,12
307:13
308:17
315:2
317:15,18
317:20,23
328:21
335:18
336:5,10
336:10
337:1
**useful** 100:2
266:7
304:2,3
**uses** 117:6
219:5
273:13
304:1
**USPATH**
152:16,18
**USTS** 285:9
286:19
292:1
**utility**
305:13
**utilize**
309:13
**utilized**
86:24
**utilizing**
307:17
**Utrecht**
306:10,19
306:20
307:14
_____
**V**
_____
**vaguely**
335:7
**Valeria** 3:12

13:10
**valid** 290:9
304:16,23
305:2
308:8
**validated**
112:1
305:4,5
306:4,7
308:13,22
**validity**
287:10
288:8
289:4
**valuable**
62:2
**value** 62:3
113:4
325:17
326:2
337:5
**van** 8:12
138:20
139:1
141:1
142:6
**Vandenbu...**
7:13 82:6
82:14
**variability**
192:2
**variable**
48:15 49:4
90:9
**Variant**
26:12
240:9
**varies** 37:6
**variety**
207:10
**various** 26:7
38:24
91:13 94:4
94:6 213:1
213:21
214:24
225:22
308:7
314:13
**vary** 333:4
**vast** 30:4
64:4
263:21

265:10
verifica...
 308:11
verify 38:7
 41:13
 54:19
version
 55:15,18
versus 12:3
 118:3
 119:19
 121:2
 142:9
 143:18
 153:18,23
 154:3
 210:22
 285:20
Vice 22:3
 24:15 25:5
video 11:21
 11:23 14:4
 150:6,10
 170:4
 321:12,16
VIDEOCON...
 1:16 2:1
videogra...
 11:20
 13:14
 15:10,10
 36:5,8
 69:4,10
 96:17,24
 150:4,11
 200:22
 201:5
 211:17,24
 236:19
 239:7,14
 267:21
 268:4
 315:17,20
 316:5
 321:10,19
 335:11
 338:23
VIDEOTAPE
 69:5,9
 96:19,23
 200:24
 201:4
 211:19,23

239:9,13
267:23
268:3
VIDEOTAPED
 1:15 2:1
 339:2
view 50:11
 77:21
 87:12
 88:11
 90:23 91:5
 113:22
 119:16
 121:17
 332:21
viewed
 124:12,17
 299:21
viewpoint
 71:12
views 98:19
vigorous
 315:7
violate 14:9
Virginia 1:2
 1:9,12,21
 2:4,7 4:7
 4:11,14
 5:5,8 12:3
 12:4,14,15
 12:20,23
 30:20
 194:22
 196:9
 294:10,15
 294:18
 295:14,15
 314:17,19
 338:16
Virtually
 206:3
visible
 269:17
visit 311:14
 311:18
visits 311:5
vital 125:9
voice 175:13
 187:16
 236:13
voices 175:9
 175:16
volume 233:4

Vries 8:13
 51:15
 140:22
 141:2,2
 260:20
 261:1,5
vs 1:8

——————
   W
——————
W 1:13 5:9
wait 14:7
 142:7
 331:12
waiting
 287:4
waived 11:6
walk 102:23
Wall 3:20
want 41:5
 46:15
 57:10
 60:12
 63:13 84:1
 87:18
 94:12 95:9
 110:11,16
 148:11
 149:12,20
 153:7
 159:16
 176:1
 179:13
 181:6
 182:9
 188:5
 191:19
 205:18
 211:9
 216:2,4
 227:8,10
 237:14
 269:9
 271:11
 274:9
 285:16
 287:9
 295:16,23
 304:16
 305:8
 315:17
 320:21
 326:22
 327:23

335:20
wanted 62:8
 275:5
 291:4
 308:19
wanting
 329:24
wants 273:22
warranted
 308:16
Washington
 9:9 150:24
 152:19
 176:21
 268:9,13
wasn't
 174:24
watching
 101:9
 108:14
wave 61:16
 61:19
 230:13
 236:24
way 21:22
 40:15 43:6
 45:17 47:2
 54:19
 61:12
 68:19,21
 70:6 72:13
 86:17
 87:19
 89:11
 119:22
 122:5,7
 133:3
 141:12
 164:23
 166:15
 169:21
 180:17
 183:12
 189:14
 193:15
 194:22
 195:20
 196:9
 213:20
 231:2
 286:9
 290:9
 291:7

295:22
296:23
313:5
317:5
322:9,22
323:12,16
324:10
337:9
338:4
ways 121:11
 285:16
 304:10
 317:6
we'll 14:5,9
 108:13
 267:19
 316:9
we're 14:20
 31:22 46:2
 49:20
 64:11 91:1
 91:11
 142:11
 155:12
 156:2
 166:21
 178:21
 179:20
 192:10
 193:1,9
 195:5
 203:20
 206:3
 251:16
 276:2
 280:21
 306:6
 308:13
 315:20
we've 64:7
 105:17
 177:10
 295:15
weaken 225:7
weakened
 289:6
wearing
 172:12
Webb 271:21
website 44:9
 61:16,21
 110:14
 116:5

225:12
229:9,12
**websites**
61:2,5,6,7
61:8,10,14
62:13,16
63:1
**week** 27:17
327:10
**weigh** 188:6
**weighing**
266:8,9
297:23
**weighted**
220:4
**welcome**
218:2
**well-being**
121:9
135:20
**wellbeing**
120:6
**went** 128:14
263:22
271:22
**West** 1:2,9
1:11,21
2:4,7 4:7
4:14 5:8
12:2,3,14
12:15,20
12:23
30:20
194:22
196:9
294:10,15
294:18
295:13,15
314:17,19
338:16
**whatsoever**
79:3
**white** 4:19
236:24
237:1
283:9
**wholly**
180:10
**wide** 207:10
**widely** 44:23
60:16
72:11
143:14

305:11
**Wilkinson**
5:18 12:10
36:6 37:3
105:4
106:17
127:24
207:15
218:2
224:18
227:13,16
227:18
228:16
236:8
245:9,20
259:18
315:21
**win** 182:12
**wins** 271:23
**wishes**
337:22
**witness** 6:4
11:12,16
12:5 13:15
18:6,20
21:20
22:14
23:13 25:1
27:2 29:21
30:10 31:1
31:5 33:9
33:23 34:6
34:23 35:8
36:9 37:5
37:14
38:10 39:3
39:14 40:3
40:13 41:9
41:18 42:7
44:8 45:2
45:16 46:6
47:1 49:2
49:12 50:4
50:14,20
52:4 54:17
56:14 57:9
58:4,20
59:4,13,20
66:6 68:17
69:21 70:8
70:21 71:8
72:7 75:13
77:11,23

78:11
79:15
80:10,22
81:6,18
83:2 84:23
85:16
86:12,23
87:15
88:14
89:18 92:5
96:11,16
97:16
98:13 99:7
100:1,21
101:22
103:3
104:6,15
104:24
105:20
106:12
107:22,24
109:12
111:22
113:9
114:3
115:4
118:18
119:9,22
120:16
121:22
122:21
123:19
125:5
129:16
130:18
132:22
134:8
138:9
141:18
142:4
144:4
145:16
147:19
148:7
149:21
150:1
155:1
156:17
157:2,18
160:5
161:4,11
163:14
165:9

166:2,14
167:6,22
169:7,20
172:18
173:4,18
174:16
175:15,22
177:9
178:17
179:11
180:10
181:16
182:21
183:23
185:2,16
186:22
187:6,12
187:18,23
188:4
189:1,12
189:23
190:4,12
190:19
191:5,13
191:18
193:8
195:4,24
196:2,4,15
197:2,11
197:21
198:22
199:12
200:7
201:12,20
202:11
203:16
206:18
207:5,18
208:3
209:5
210:15
211:4,10
211:11
213:9,19
214:7
217:5
218:1,22
219:12
220:8,21
221:6,14
221:20
222:4,13
223:4

224:6,15
226:21
228:2,11
229:8
231:14
234:13,22
237:10,14
238:18
239:3
240:15
241:7,22
242:6,19
243:12,18
244:16,22
245:5,22
246:19
247:4
249:5
250:14
255:4,6,20
256:15,16
258:24
259:14
260:6,13
261:13
262:11
264:6
265:3,15
266:21
268:18
269:24
271:2
272:14,21
274:2
275:7,13
282:10,17
282:20
284:20
286:7,15
288:6,20
289:16
291:4,14
292:7
293:5
294:13,21
295:3
298:17
300:12
302:3,9,17
303:5
304:15
308:21
309:11,23

311:8,16
311:23
312:16,23
313:7
314:11
316:13,20
317:4,11
317:18
318:7
319:14
321:7
322:12
323:6,16
324:16
325:20
326:9
327:22
330:9,20
331:16,21
332:10
333:17
334:11,20
336:17
337:9
338:1,8,22
**woman** 335:19
**woman's**
329:3
**women** 18:2
247:11
294:11
**women's**
30:19
185:12
186:6
200:3
268:24
269:1,5,22
270:4,21
272:5,9
273:18
274:17
336:23
**wondered**
236:12
**wondering**
72:4
**word** 36:16
47:18 87:6
97:24
181:20
223:4
230:10

253:13
282:13
283:2
297:22
322:2
335:18,22
336:5
**words** 102:24
273:9
304:13
**work** 22:17
27:23
46:13 62:4
65:6 69:18
77:24
92:11,12
94:5 122:2
167:7
183:1
266:22
314:3
336:9
**worked** 93:2
148:19,21
149:4
329:19
**workers**
95:10
100:11
101:5
**working** 57:1
64:23 67:2
77:6 149:1
151:16
152:3
195:9
217:6
272:22
274:12
**works** 15:20
115:21
199:1
**world** 7:7
35:13,16
35:21,24
36:12,19
37:9 44:13
94:2
152:11
206:7
217:17
261:4
267:16

304:23
315:8
323:2
**worried**
179:24
**worse** 120:4
278:8
**Worth** 84:4
**wouldn't**
20:5 50:20
62:2 86:12
94:15
213:10
236:13
270:16
287:20
297:22
304:5
312:11
313:4
317:4,20
318:23
320:21
322:10
**WPATH** 94:18
96:2
100:21
149:5
152:16,17
161:20
170:19,24
171:12
314:24
315:3
**wrap** 64:15
**write** 123:4
124:11
136:9
162:1
172:9
275:16
315:10
**writes** 48:13
143:3
**writing**
124:2
152:2
**written**
52:15
69:23 70:5
78:24
151:5
157:3

176:13
259:15
278:14
**wrong** 34:21
81:22
104:8
116:22
117:3
245:21
253:24
**wrote** 292:14
**WV** 4:6,13,20
5:7
**WVSSAC**
338:14
**Wyant** 5:4

_____
**X**
**X** 6:1 196:16
**XY** 184:7
199:15
_____
**Y**
**Yale** 272:5
**yeah** 18:6
39:3 45:10
52:4 58:4
69:21 80:2
90:19 99:7
112:9
209:24
211:4
225:4
241:22
247:8
261:7
293:12
296:13
320:21
336:17
**year** 22:2
26:24 27:7
74:4
172:10
177:16,16
262:17
268:23,24
299:6,7,8
300:6,7,19
331:12
**years** 24:2
28:8 54:4
56:5 64:20

68:7,20
75:23 76:5
167:7
177:4
180:5
225:8
232:5
244:5
257:16
287:6
307:24
312:2
319:20
320:1
330:2
**Yep** 321:24
**Yhuto** 328:12
**yielded**
286:3
**York** 3:6,21
153:20,22
155:6,9
264:18
320:5
**young** 47:15
72:23
98:21 99:3
126:14
141:3
162:2,11
165:19
194:10
260:2,22
262:17
263:14
279:11
280:3
331:10
**younger**
240:13
264:18
**youth** 23:15
23:16
26:12
46:14 75:2
85:16 87:8
93:9 103:6
103:6
106:19
107:4
109:7,20
132:7
133:17

134:19
137:10
151:16
153:21
156:10
158:13
184:15,16
184:18
185:21
234:16
240:10
270:12,14
271:3
306:6
313:11
**youth's**
198:9
**Youths**
135:20

**Z**

**Zealand** 7:16
97:6,12
98:8
**zero** 26:17
26:19
75:17
303:24
307:7
**Zoom** 12:1

**0**

**1**

**1** 4:5  7:5
14:23
230:19,20
252:6,19
253:3,15
254:4
286:11
298:21
**1.4** 208:11
**1:24** 200:23
**1:53** 201:6
**10** 7:15  36:5
36:6  74:18
97:3
240:17
268:14
**10,000** 29:5
**10:14** 69:4
**10:27** 69:11

**100** 10:8
25:22  81:3
112:23
113:11
134:11
141:21
163:4
285:20
**1000** 5:19
**10004** 3:6
**10005-3919**
3:21
**101** 7:19
10:8
**102** 10:8
137:2
**103** 97:21
138:18
**104** 10:8
140:19
**105** 10:8
142:11
**106** 7:20
10:8  146:3
**107** 7:21
10:8
**108** 7:22
256:10
**109** 10:8
**11** 6:3  7:18
26:8  84:22
105:3,4,6
129:19
230:14,20
231:22
237:6,21
250:8
251:11
252:3
320:1
**11-year-old**
320:7
**11:01** 96:18
**11:06** 97:1
**110** 7:23
76:14
**1100** 5:20
**111** 10:9
**113** 10:9
276:14
**114** 10:9
279:24
**115** 7:24

10:9
**116** 82:3
**117** 10:9
84:2  85:22
87:5
127:24
128:2
**118** 10:9
126:18
**119** 10:9
130:4
**12** 7:20  26:9
43:21
81:11
147:5,6
230:15,20
231:22
237:6
238:4
256:1,23
262:16,17
263:13
319:11
**12-ish** 193:9
203:21
230:21
266:19
319:16
**12-year-...**
266:23
267:9,15
**12:12** 150:5
**12:21** 150:12
**120** 3:20
10:9,9
251:16
252:2
**121** 10:9
251:17
253:20
**122** 10:9
**123** 10:10
**125** 3:5
10:10
**126** 8:5
**129** 10:10
**12ish** 192:1
**13** 6:3,6
7:21  48:1
107:11
111:1,6
112:20
135:1

237:4,6,21
**13-year**
152:21
**130** 8:6
10:10
**131** 8:7
**132** 10:10
**133** 8:8
**134** 8:9
10:10
**135** 8:10
**137** 8:11
**138** 8:12
10:10
**14** 7:5,22
108:13
131:4,13
132:8
133:18
136:4
137:12
139:6
141:5
146:9
186:12,18
253:16
319:20
**14.1** 219:16
219:16
**14.2** 220:2
**140** 8:13
**141** 10:10
**1411** 4:11
**142** 8:14
10:10
**144** 10:10
**145** 8:15
10:10
**147** 10:11
**148** 8:16
**149** 8:17
**15** 7:23
53:11
69:14
80:14  81:2
93:11  95:1
95:7,17
110:18
240:13,17
248:21
249:6,17
249:18
262:16

281:18
**15100** 5:13
**153** 10:11
**154** 10:11
**156** 10:11
**157** 10:11
**158** 10:11
**16** 7:24  96:9
103:20
104:3,13
104:21
105:9
106:5,9
115:7
122:13
259:18,20
268:7
284:9
296:1,3
297:5
319:2
**16-year**
223:22
**160** 10:11
**161** 10:11
**163** 10:11
**165** 10:11
**166** 10:11
**167** 10:12
**169** 10:12
**17** 8:5  10:4
126:18,22
271:11
**172** 10:12
**173** 10:12
**174** 10:12
**175** 10:12
**176** 8:18
**177** 10:12
**178** 10:12
**179** 10:12
**18** 8:6  10:4
72:24
93:14,18
93:22
130:3
287:3,6
**180** 10:12
**181** 10:12
**182** 10:13
**183** 10:13
**184** 10:13
**185** 10:13

**186** 10:13
**187** 10:13
**188** 10:13
**189** 10:13
**19** 8:7 10:4
241:11
305:14
**190** 10:13
**191** 10:13
**193** 10:13
**194** 10:14
**195** 10:14
282:21
**196** 10:14
**197** 10:14
283:6
**198** 10:14
283:6
**199** 10:14
**1999** 143:11
143:12,13
229:23
**19th** 3:20

**2**
**2** 7:6 137:15
192:19
203:13,14
209:6
226:4
227:20
230:17
235:2
249:5,17
258:11
**2:07** 211:18
**2:17** 212:1
**2:21-CV-...**
1:8 12:5
**2:22** 256:14
**2:30** 14:15
256:15
262:10
**2:32** 224:16
**2:45** 14:15
256:16
262:10,12
**2:53** 239:8
**20** 8:8 19:12
51:14
67:17 72:3
74:18
**20-somet...**

267:16
**200** 4:12
10:14
269:6
**2000** 229:23
**2006** 65:4
66:10
**2009** 66:10
227:12
**201** 10:14
**2010** 233:2
279:18
280:1
**2010s** 178:7
**2011** 24:5
64:22 66:1
66:2 72:9
73:2
258:21
**2012** 65:21
**2013** 51:15
64:20
65:21,22
251:12
254:12
**2014** 141:3
143:13
260:20
261:5
**2015** 146:4
177:14
245:11
277:15
285:9
328:12,14
**2016** 80:1
129:2,20
130:13
281:13
**2017** 32:10
79:5 85:1
128:3
207:17
212:23
216:1
**2018** 83:20
129:7,11
129:20,21
130:14
**2019** 79:5
256:12
**202** 10:14
**2020** 79:5,24

109:5
110:3
111:6
115:16
117:15,16
134:19
135:21
137:9
139:2
142:18
247:19
276:10,23
279:4
284:16
**2021** 53:17
69:14
70:17
71:18
82:12 98:3
108:22
111:5
126:20
133:17
163:17
262:15
**2021/2022**
268:14
**2022** 1:20
2:7 11:23
132:6
176:16
268:14
271:21
**203** 10:14
**206** 10:14
280:13
**207** 10:15
**208** 10:15
280:19
**209** 10:15
**20th** 3:14
**21** 8:9 10:4
15:8
134:10
252:23
328:15
**210** 10:15
280:24
281:5
**211** 10:15
281:5
**213** 10:15
**214** 10:15

**217** 10:15
**218** 8:19
10:15
**219** 10:15
**22** 8:10 10:4
253:11
**22.05** 280:22
**220** 10:15
**221** 10:16
**2211** 146:22
**2212** 146:22
**222** 10:16
**223** 10:16
**224** 8:20
10:16
**226** 10:16
**228** 8:21
10:16
146:19
**229** 10:16
146:20
**23** 8:11 10:4
252:19,23
253:4
**231** 10:16
**232** 8:22
**234** 10:16
**237** 82:21
83:6
**238** 10:16
**24** 8:12 10:4
81:13
253:3,4,15
253:16
**240** 10:17
**241** 10:17
**242** 10:17
**243** 10:17
**244** 10:17
**245** 8:23
10:17
280:14,22
**246** 10:17
**247** 8:24
10:17
**25** 8:13
22:21
23:13 73:2
73:18
154:1
156:11
173:11
**250** 10:17

**251** 9:5,6
**25301** 4:13
5:7
**25305** 4:6
**254** 10:17
**255** 10:17
**256** 9:7
**258** 10:18
**259** 10:18
**26** 8:14
93:14,18
93:23
321:22
**26.4** 56:5
**260** 10:18
**261** 10:18
**262** 9:8
**26330** 4:20
**264** 10:18
**265** 10:18
**265,000** 22:2
**266** 10:18
**268** 9:9
10:18
**269** 10:18
**27** 8:15 10:4
10:16
145:21,23
303:12
**27,000**
285:19
**270** 10:18
**271** 9:10
**272** 10:18
**274** 10:19
**275** 10:19
**276** 9:11
**28** 8:16
148:1,3
**280** 9:12
**281** 9:13
**282** 10:19
**284** 10:19
**286** 10:19
**288** 10:19
**289** 10:19
**29** 8:17 10:4
149:13,13
149:15
150:22
159:8,22
160:16,17
160:18,19

161:24
**290** 10:19
**291** 10:19
**292** 10:19
**293** 10:19
**294** 10:20
**295** 6:6,8
  10:20
**298** 10:20

**3**

**3** 3:14  7:7
  193:12,17
  248:12
**3,000** 72:11
**3:00** 239:15
**3:37** 267:22
**30** 8:18  10:4
  156:12
  176:6
  310:6
**30,000** 23:2
**300** 10:20
**30043** 5:21
**301** 10:20
**302** 10:20
**303** 10:20
**304** 10:20
**308** 10:20
**309** 10:20
**31** 8:19  10:4
  217:23
  218:4
  227:8
**310** 10:20
**311** 10:21
**312** 10:21
**313** 10:21
**314** 10:21
**315** 9:14
**316** 10:21
**317** 10:21
**318** 10:21
**319** 10:21
**32** 7:6  8:20
  20:15
  224:10,12
  228:15,18
  236:6
**320** 10:21
**321** 10:21
**322** 10:21
**323** 10:22

**324** 10:22
**325** 10:22
**326** 10:22
**327** 10:22
**33** 8:21  10:4
  227:11
  228:18,20
  232:18
  236:8,10
  236:20,21
  248:23,24
  249:2,4
**330** 10:22
**331** 10:22
**332** 10:22
**333** 10:22
**334** 10:22
**336** 10:22
**337** 10:23,23
  249:8
**34** 8:22  10:5
  113:17
  117:22
  119:5
  121:1
  232:18,20
  275:16
  292:14
**342** 248:17
**35** 7:7  8:23
  10:5
  126:11
  245:13
  249:4,17
**36** 8:24  10:5
  90:16
  247:21
  248:12
  255:1,11
**37** 9:5  10:5
  116:14,23
  250:23
  251:16
  252:2
  254:13
  256:1
  279:9
**38** 9:6  10:5
  163:5
  251:17
  253:21
  254:11
  262:8

**3872** 216:9
**3873** 32:6,13
**3874** 212:4
  226:5
**3879** 51:7
  52:10
  258:12
**388** 6:8
**3880** 207:20
**3882** 235:2,5
**3883** 235:13
**39** 9:7  10:5
  241:13
  253:20
  256:11,18
  256:22
**39.3** 253:7
**390** 6:9

**4**

**4** 1:20  2:7
  7:8  55:24
  193:19
  249:18
**4:31** 268:5
**40** 9:8  10:5
  21:21
  130:20
  241:13
  258:19,19
  258:20
  262:14,19
  285:20
**400** 4:19
**41** 9:9  10:5
  131:10
  241:13
  268:7,9,22
**42** 9:10  10:5
  241:13
  271:14
**43** 7:8  9:11
  83:19,20
  263:17
  276:15,17
  277:13
**44** 9:12  10:5
  255:1,10
  315:20
**45** 9:13  10:5
  81:2
  255:17
  281:18

**46** 9:14  10:5
  315:21,22
**48** 7:10
  80:23
**49** 10:5
  219:18
**4th** 11:23

**5**

**5** 7:9  31:23
  50:8  52:22
  80:17
  194:3
  207:13
  212:3
  226:4
  227:20
  258:11
**5:46** 321:11
**5:50** 321:20
**50** 10:5
  155:11,17
  155:21
**500** 5:5
  26:21
  29:24  64:9
  67:10,11
  67:14,18
  72:1,18
  74:3,13,15
  74:17  75:5
  75:10,17
  75:18
  173:9
  194:15
**51** 327:13
  332:2
**52** 10:6
  184:12
  270:9
**53** 7:11
**54** 10:6
**55** 163:8
  255:17
**56** 10:6
  253:7,11
**57** 10:6
**58** 10:6
**58.3** 253:15
**584** 252:6
**59** 10:6

**6**

**6** 7:11  69:14
  219:18
  227:9,11
  237:3
**6:18** 338:24
  339:2
**60** 80:17
  81:2,2
**600** 5:6
  80:22
**65** 80:22
  132:12
**66** 10:6
**679** 257:2
  258:3
**68** 10:6
**69** 10:6

**7**

**7** 7:12
**70** 10:6
  83:10
**700s** 139:13
**703** 139:14
  139:14,15
**71** 10:6
**72** 10:6
**73** 224:10,18
**74** 10:6
**75** 10:6  73:1
  73:8,11,13
  73:19,21
  73:21
  154:1
  155:12,19
  155:21
  173:10
**76** 7:12
  52:22
  217:24
  219:22
**77** 10:7
  245:7
**78** 10:7
**79** 10:7
  248:13
**7th** 108:22

**8**

**8** 7:13
  219:22
  239:2
  319:20
**80** 10:7

| | | | | |
|---|---|---|---|---|
| 155:12 | **9th** 271:21 | | | |
| 254:23,24 | | | | |
| 255:9 | | | | |
| **81** 10:7 | | | | |
| 247:18,20 | | | | |
| **82** 7:13  10:7 | | | | |
| **836** 48:13,20 | | | | |
| **84** 7:14 | | | | |
| **85** 10:7  51:9 | | | | |
| 51:23  52:7 | | | | |
| 67:13,24 | | | | |
| **85260** 5:14 | | | | |
| **86** 10:7 | | | | |
| **87** 10:7 | | | | |
| **88** 10:7 | | | | |
| **89** 10:7 | | | | |
| **9** | | | | |
| **9** 7:14  84:2 | | | | |
| 127:22,23 | | | | |
| **9:09** 2:8 | | | | |
| 11:24 | | | | |
| **90** 14:21 | | | | |
| 19:17 | | | | |
| 90:16 | | | | |
| 154:4 | | | | |
| 155:13 | | | | |
| **90th** 5:13 | | | | |
| **91** 10:7  97:3 | | | | |
| **91.3** 252:19 | | | | |
| **92** 10:7 | | | | |
| 101:9 | | | | |
| **929** 233:3,11 | | | | |
| **93** 106:17,18 | | | | |
| **94** 107:11 | | | | |
| **94111-4004** | | | | |
| 3:15 | | | | |
| **95** 10:7 | | | | |
| 66:19,20 | | | | |
| 108:13 | | | | |
| **95.8** 253:3 | | | | |
| **96** 10:8 | | | | |
| 110:18 | | | | |
| **97** 7:17  10:8 | | | | |
| 115:8 | | | | |
| 122:12 | | | | |
| 259:16 | | | | |
| 284:9 | | | | |
| **98** 10:8 | | | | |
| 131:22 | | | | |
| 263:17 | | | | |
| **99** 10:8 | | | | |
| 133:6 | | | | |

```
 1              IN THE UNITED STATES DISTRICT COURT
 2          FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA
 3                     CHARLESTON DIVISION
 4
 5   B.P.J. BY HER NEXT FRIEND AND      )
     MOTHER, HEATHER JACKSON,           )
 6                                      )
                  PLAINTIFF,            )
 7                                      ) CIVIL ACTION NO.
           VS.                          ) 2:21-cv-00316
 8                                      )
     WEST VIRGINIA STATE BOARD OF       )
 9   EDUCATION, HARRISON COUNTY BOARD   )
     OF EDUCATION, WEST VIRGINIA        )
10   SECONDARY SCHOOL ACTIVITIES        )
     COMMISSION, W. CLAYTON BURCH IN    )
11   HIS OFFICIAL CAPACITY AS STATE     )
     SUPERINTENDENT, DORA STUTLER IN    )
12   HER OFFICIAL CAPACITY AS HARRISON  )
     COUNTY SUPERINTENDENT, AND THE     )
13   STATE OF WEST VIRGINIA,,           )
                                        )
14                DEFENDANTS,           )
                                        )
15           AND                        )
                                        )
16   LAINEY ARMISTEAD,                  )
                                        )
17                DEFENDANT-INTERVENOR. )
     _____   )
18
19        VIDEOTAPED REMOTE ZOOM 30(b)(6) DEPOSITION
20      WEST VIRGINIA SECONDARY SCHOOL ACTIVITIES COMMISSION
21                     BERNARD DOLAN
22              FRIDAY, FEBRUARY 11, 2022
23
24   JOB NO. 5079532
25   REPORTED BY:  DAYNA HESTER, C.S.R. 9970
```

Page 1

**Page 2**

1  VIDEOTAPED REMOTE ZOOM 30(B)(6) DEPOSITION OF WEST
2  VIRGINIA SECONDARY SCHOOL ACTIVITIES COMMISSION BERNARD
3  DOLAN, TAKEN ON BEHALF OF PLAINTIFF B P J , BY HER NEXT
4  FRIEND AND MOTHER, HEATHER JACKSON, AT 12:18 P M , EASTERN
5  STANDARD TIME, FRIDAY, FEBRUARY 11, 2022, WITH THE WITNESS
6  (PHYSICALLY PRESENT WITH COUNSEL), COURT REPORTER, AND
7  VIDEOGRAPHER APPEARING REMOTELY VIA ZOOM VIDEOCONFERENCE,
8  BEFORE DAYNA HESTER, C S R  NO  9970
9
10  APPEARANCES OF COUNSEL:
11  FOR PLAINTIFF B P J , BY HER NEXT FRIEND AND MOTHER,
    HEATHER JACKSON:
12
    COOLEY, LLP
13  BY:  KATELYN KANG, ESQ
        (PRESENT VIA ZOOM VIDEOCONFERENCE)
14  BY:  VALERIA M  PELET DEL TORO, ESQ
        (PRESENT VIA ZOOM VIDEOCONFERENCE)
15  55 HUDSON YARDS
    NEW YORK, NEW YORK  10001-2157
16  (212) 479-6849
    KKANG@COOLEY COM
17  VPELETDELTORO@COOLEY COM
18  COOLEY, LLP
    BY:  KATHLEEN R  HARTNETT, ESQ
19      (PRESENT VIA ZOOM VIDEOCONFERENCE)
    BY:  JULIE VEROFF, ESQ
20      (PRESENT VIA ZOOM VIDEOCONFERENCE)
    BY:  ZOË HELSTROM, ESQ
21      (PRESENT VIA ZOOM VIDEOCONFERENCE)
    3 EMBARCADERO CENTER, 20TH FLOOR
22  SAN FRANCISCO, CALIFORNIA  94111-4004
    (415) 693-2000
23  KHARTNETT@COOLEY COM
    JVEROFF@COOLEY COM
24  ZHELSTROM@COOLEY COM
25  -- APPEARANCES CONTINUED ON NEXT PAGE --

**Page 4**

1  APPEARANCES OF COUNSEL (CONTINUED):
2  FOR DEFENDANT WEST VIRGINIA SECONDARY SCHOOL ACTIVITIES
   COMMISSION:
3
   SHUMAN MCCUSKEY SLICER PLLC
4  BY:  ROBERTA F  GREEN, ESQ
        (PRESENT VIA ZOOM VIDEOCONFERENCE WITH WITNESS)
5  BY:  KIMBERLY M  BANDY, ESQ
        (PRESENT VIA ZOOM VIDEOCONFERENCE)
6  1411 VIRGINIA STREET EAST, SUITE 200
   CHARLESTON, WEST VIRGINIA  25301
7  (304) 345-1400
   RGREEN@SHUMANLAW COM
8  KBANDY@SHUMANLAW COM
9
   FOR DEFENDANT WEST VIRGINIA STATE BOARD OF EDUCATION,
10  W  CLAYTON BURCH IN HIS OFFICIAL CAPACITY AS STATE
   SUPERINTENDENT:
11
   BAILEY & SLOTNICK P L L C
12  BY:  KELLY C  MORGAN, ESQ
        (PRESENT VIA ZOOM VIDEOCONFERENCE)
13  BY:  KRISTEN V  HAMMOND, OF COUNSEL
        (PRESENT VIA ZOOM VIDEOCONFERENCE)
14  500 VIRGINIA STREET EAST, SUITE 600
   CHARLESTON, WEST VIRGINIA  25301
15  (304) 720-0711
   KMORGAN@BAILEYWYANT COM
16  KHAMMOND@BAILEYWYANT COM
17
   FOR DEFENDANT THE STATE OF WEST VIRGINIA:
18
   OFFICE OF THE WEST VIRGINIA ATTORNEY GENERAL
19  BY:  CURTIS CAPEHART, DEPUTY ATTORNEY GENERAL
        (PRESENT VIA ZOOM VIDEOCONFERENCE)
20  BY:  JESSECA RENEE CHURCH, DEPUTY ATTORNEY GENERAL
   1900 KANAWHA BOULEVARD EAST
21  CHARLESTON, WEST VIRGINIA  25305
   (304) 558-2021
22  CURTIS R A  CAPEHART@WVAGO GOV
   JESSECA R CHURCH@WVAGO GOV
23
24
25  -- APPEARANCES CONTINUED ON NEXT PAGE --

**Page 3**

1  APPEARANCES OF COUNSEL (CONTINUED):
2  PLAINTIFF B P J , BY HER NEXT FRIEND AND MOTHER, HEATHER
   JACKSON (CONT'D):
3
   COOLEY, LLP
4  BY:  ANDREW BARR, ESQ
        (PRESENT VIA ZOOM VIDEOCONFERENCE)
5  1144 15TH STREET, SUITE 2300
   DENVER, COLORADO 80202-2686
6  (720) 566-4121
   ABARR@COOLEY COM
7
8  AMERICAN CIVIL LIBERTIES UNION FOUNDATION
   BY:  JOSHUA BLOCK, SENIOR STAFF ATTORNEY
9      (PRESENT VIA ZOOM VIDEOCONFERENCE)
   125 BROAD STREET
10  NEW YORK, NEW YORK  10004
   (212) 549-2569
11  JBLOCK@ACLU ORG
12  AMERICAN CIVIL LIBERTIES UNION OF WEST VIRGINIA
   FOUNDATION
13  BY:  NICHOLAS WARD, STAFF ATTORNEY
        (PRESENT VIA ZOOM VIDEOCONFERENCE)
14  BY:  LOREE STARK, LEGAL DIRECTOR
        (PRESENT VIA ZOOM VIDEOCONFERENCE)
15  P O  BOX 3952
   CHARLESTON, WEST VIRGINIA  25339-3952
16  (914) 393-4614
   NWARD@ACLUWV ORG
17  LSTARK@ACLUWV ORG
18
   LAMBDA LEGAL
19  BY:  SRUTI SWAMINATHAN, STAFF ATTORNEY
      YOUTH NATIONAL HEADQUARTERS
20      (PRESENT VIA ZOOM VIDEOCONFERENCE)
   120 WALL STREET, 19TH FLOOR,
21  NEW YORK, NEW YORK  10005-3919
   (212) 809-8585
22  SWAMINATHAN@LAMBDALEGAL ORG
23
24
25  -- APPEARANCES CONTINUED ON NEXT PAGE --

**Page 5**

1  APPEARANCES OF COUNSEL (CONTINUED):
2  FOR DEFENDANT HARRISON COUNTY BOARD OF EDUCATION, DORA
   STUTLER IN HER OFFICIAL CAPACITY AS HARRISON COUNTY
3  SUPERINTENDENT:
4  STEPTOE & JOHNSON PLLC
   BY:  JEFFREY M  CROPP, OF COUNSEL
5      (PRESENT VIA ZOOM VIDEOCONFERENCE)
   400 WHITE OAKS BOULEVARD
6  BRIDGEPORT, WEST VIRIGINIA  26330
   (304) 933-8145
7  JEFFREY CROPP@STEPTOE-JOHNSON COM
8  FOR DEFENDANT-INTERVENOR LAINEY ARMISTEAD:
9  ALLIANCE DEFENDING FREEDOM
10  BY:  JONATHAN SCRUGGS, SENIOR COUNSEL
        (PRESENT VIA ZOOM VIDEOCONFERENCE)
11  BY:  HAL FRAMPTON, SENIOR COUNSEL
        (PRESENT VIA ZOOM VIDEOCONFERENCE)
12  BY:  CATIE BYRD KELLEY, LEGAL COUNSEL
        (PRESENT VIA ZOOM VIDEOCONFERENCE)
13  BY:  CHRISTIANA HOLCOMB, LEGAL COUNSEL
        (PRESENT VIA ZOOM VIDEOCONFERENCE)
14  15100 NORTH 90TH STREET
   SCOTTSDALE, ARIZONA  85260
15  (480) 444-0020
   JSCRUGGS@ADFLEGAL ORG
16  HFRAMPTON@ADFLEGAL ORG
   CKELLEY@ADFLEGAL ORG
17  HOLCOMB@ADFLEGAL ORG
18
   LAW OFFICES OF TIMOTHY D  DUCAR, P L C
19  BY:  TIMOTHY DANIEL DUCAR, ESQ
        (PRESENT VIA ZOOM VIDEOCONFERENCE)
20  9280 EAST RAINTREE DRIVE, SUITE 104
   SCOTTSDALE, ARIZONA  85260
21  (480) 502-2119
   ORDERS@AZLAWYERS COM
22
23
24
25  -- APPEARANCES CONTINUED ON NEXT PAGE --

2 (Pages 2 - 5)

Page 6

```
 1   APPEARANCES (CONTINUED):
 2   ALSO PRESENT:
 3       HEATHER HUTCHENS, GENERAL COUNSEL
         WEST VIRGINIA DEPARTMENT OF EDUCATION
 4       (PRESENT VIA ZOOM VIDEOCONFERENCE)
 5       MICHELE BLATT, DEPUTY SUPERINTENDENT
         WEST VIRGINIA DEPARTMENT OF EDUCATION
 6       (PRESENT VIA ZOOM VIDEOCONFERENCE)
 7       SHAWNA HYNES, VIDEOGRAPHER
         (PRESENT VIA ZOOM VIDEOCONFERENCE)
 8
         LINDSAY DUPHILY, VERITEXT CONCIERGE
 9       (PRESENT VIA ZOOM VIDEOCONFERENCE)
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

Page 8

```
 1           E X H I B I T S (CONTINUED)
 2   EXHIBIT NO.   PAGE   DESCRIPTION
 3   EXHIBIT 9   140   FILE TITLED
                 "EXHIBIT 0009 - TAB 01.PDF"
 4
     EXHIBIT 10   142   FILE TITLED
 5               "EXHIBIT 0010 - TAB 06.PDF"
 6   EXHIBIT 11   146   FILE TITLED
                 "EXHIBIT 0011 - TAB 03.PDF"
 7
     EXHIBIT 12   148   FILE TITLED
 8               "EXHIBIT 0012   TAB 04 PDF"
 9   EXHIBIT 13   151   FILE TITLED
                 "EXHIBIT 0013 - TAB 17.PDF"
10
     EXHIBIT 14   152   FILE TITLED
11               "EXHIBIT 0014 - TAB 08.PDF"
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

Page 7

```
 1              I N D E X
 2   DEPONENT     EXAMINATION        PAGE
 3   BERNARD DOLAN
 4       BY MS  KANG       14
 5       BY MR  CROPP      158
 6
 7
 8   QUESTIONS INSTRUCTED BY COUNSEL NOT TO ANSWER
 9           (NONE )
10
11          E X H I B I T S
12
     EXHIBIT NO   PAGE   DESCRIPTION
13   EXHIBIT 1   18   FILE TITLED
                 "EXHIBIT 0001 - TAB 14 PDF"
14   EXHIBIT 2   33   FILE TITLED
                 "EXHIBIT 0002 - TAB 19 PDF"
15
     EXHIBIT 3   47   FILE TITLED
16               "EXHIBIT 0003 - TAB 09 PDF"
17   EXHIBIT 4   91   FILE TITLED
                 "EXHIBIT 0004 - TAB 11 PDF"
18
     EXHIBIT 5   103   FILE TITLED
19               "EXHIBIT 0005 - TAB 18 PDF"
20   EXHIBIT 6   121   FILE TITLED
                 "EXHIBIT 0006 - TAB 15 PDF"
21
     EXHIBIT 7   126   FILE TITLED
22               "EXHIBIT 0007 - TAB  02 PDF"
23   EXHIBIT 8   128   FILE TITLED
                 "EXHIBIT 0008 - TAB 07 PDF"
24
25   -- EXHIBITS CONTINUED ON NEXT PAGE --
```

Page 9

```
 1        ZOOM VIDEOCONFERENCE DEPOSITION
 2        FRIDAY, FEBRUARY 11, 2022
 3        12:18 P.M. EASTERN STANDARD TIME
 4
 5        THE VIDEOGRAPHER:  Good afternoon.
 6   We are going on the record at 12:18 p.m.   12:18
 7   EST on February 11th, 2022.          12:18
 8        Please note that the microphones may pick   12:18
 9   up background noise, private conversations, and   12:18
10   interference if unmuted.         12:18
11        When muted remember to unmute to speak on   12:18
12   the record.          12:18
13        Audio and video recording will continue to   12:18
14   take place unless all parties agree to go off the   12:18
15   record.          12:18
16        This is Media Unit 1 of the video-recorded   12:18
17   deposition of 30(b)(6) witness Bernie Dolan taken by   12:19
18   counsel for plaintiff in the matter of B.P.J., by   12:19
19   her next friend and mother, Heather Jackson, versus   12:19
20   West Virginia State Board of Education, et al.,   12:19
21   filed in the United States District Court for the   12:19
22   Southern District of West Virginia, Charleston   12:19
23   Division.  Case Number 2:21-cv-00316.   12:19
24        This deposition is being conducted via   12:19
25   Veritext Virtual Zoom technology and all parties are   12:19
```

3 (Pages 6 - 9)

| | |
|---|---|
| 1 attending remotely.                    12:19 | 1        MS. GREEN:  This is Roberta Green, Shuman   12:21 |
| 2        My name is Shawna Hynes from the firm   12:19 | 2 McCuskey & Slicer.  I'm here on behalf of WVSSAC.   12:21 |
| 3 Veritext Legal Solutions, and I am the videographer.   12:19 | 3        And here with me today is our deponent    12:22 |
| 4        The court reporter is Dayna Hester from   12:19 | 4 30(b)(6) witness Bernie Dolan.              12:22 |
| 5 the firm Veritext Legal Solutions.          12:20 | 5        MS. BANDY:  Hello.                 12:22 |
| 6        I am not related to any party in this   12:20 | 6        This is Kimberly Bandy also on behalf of   12:22 |
| 7 action, nor am I financially interested in the   12:20 | 7 West Virginia SSAC.                       12:22 |
| 8 outcome.                                 12:20 | 8        MS. MORGAN:  This is Kelly Morgan on      12:22 |
| 9        Counsel present and everyone attending   12:20 | 9 behalf of the West Virginia State Board of Education   12:22 |
| 10 remotely will state their appearances and      12:20 | 10 and Superintendent Burch.                  12:22 |
| 11 affiliations for the record.               12:20 | 11       I have with me as well general counsel     12:22 |
| 12       If there are any objections to proceeding,   12:20 | 12 Heather Hutchens and Deputy Superintendent Michelle   12:22 |
| 13 please state them at the time of your appearance   12:20 | 13 Blatt as our representative.               12:22 |
| 14 beginning with the noticing attorney.        12:20 | 14       MR. CAPEHEART:  This is Curtis Capeheart   12:22 |
| 15       MS. KANG:  Hi.                    12:20 | 15 the West Virginia Attorney General's office on     12:22 |
| 16       My name is Katelyn Kang.  I'm an attorney   12:20 | 16 behalf of the defendant State of West Virginia.     12:22 |
| 17 at the law firm of Cooley LLP, and I'm here on   12:20 | 17       Also with me in my office is another     12:22 |
| 18 behalf of the plaintiff.                  12:20 | 18 individual from the office, Jesseca Church.       12:22 |
| 19       And I'll let my co-counsel introduce     12:20 | 19       MR. CROPP:  My name is Jeffrey Cropp.  I'm   12:22 |
| 20 themselves.                              12:20 | 20 with Steptoe & Johnson.  We represent defendants   12:22 |
| 21       MS. HARTNETT:  Hi.                 12:20 | 21 Harrison County Board of Education and           12:22 |
| 22       This is Kathleen Hartnett from Cooley LLP   12:20 | 22 Superintendent Dora Stutler.               12:22 |
| 23 for plaintiff.                           12:20 | 23       MS. HAMMOND:  Hi.                  12:23 |
| 24       MR. BARR:  Good afternoon.          12:20 | 24       This is Kristen Hammond.  I'm also on     12:23 |
| 25       This is Andrew Barr from Cooley LLP on   12:20 | 25 behalf of the West Virginia State Board of Education   12:23 |
| Page 10 | Page 12 |

| | |
|---|---|
| 1 behalf of plaintiff.                      12:20 | 1 and Superintendent Burch.                  12:23 |
| 2        MS. VEROFF:  Hello.               12:20 | 2        MR. SCRUGGS:  All right.  I think that    12:23 |
| 3 This is Julie Veroff from Cooley LP on        12:20 | 3 leaves us as intervenor.                  12:23 |
| 4 behalf of plaintiff.                      12:20 | 4        Jonathan Scruggs on behalf of the       12:23 |
| 5        MS. STARK:  Hi.                   12:20 | 5 Intervenor with Alliance Defending Freedom.       12:23 |
| 6        This is Loree Stark with the American   12:20 | 6        And also attending today on behalf of the   12:23 |
| 7 Civil Liberties Union of West Virginia on behalf of   12:21 | 7 intervenor is my -- let me get my list here -- Catie   12:23 |
| 8 plaintiff.                               12:21 | 8 Kelly, Christiana Holcomb, Hal Frampton, and      12:23 |
| 9        MR. WARD:  Hi.                   12:21 | 9 Timothy Ducar.                           12:23 |
| 10       Nicholas Ward, ACLU West Virginia, on     12:21 | 10       And that is it.                   12:23 |
| 11 behalf of plaintiff.                      12:21 | 11       THE VIDEOGRAPHER:  Thank you.         12:23 |
| 12       MS. HELSTROM:  Hi.                 12:21 | 12       If that's everybody, will the court     12:23 |
| 13 This is Zoë Helstrom from Cooley LLP on       12:21 | 13 reporter please swear in the witness.         12:23 |
| 14 behalf of plaintiff.                      12:21 | 14       THE REPORTER:  Okay.  And because it is a   12:23 |
| 15       MS. PELET DEL TORO:  Hi.           12:21 | 15 federal case, I do have a read-on.  One second.   12:23 |
| 16       This is Valeria Pelet del Toro from Cooley   12:21 | 16       My name is Dayna Hester.  This statement   13:08 |
| 17 LLP on behalf of plaintiff.               12:21 | 17 is to acknowledge my obligations pursuant to Federal   13:08 |
| 18       MS. GREEN:  Hi.                   12:21 | 18 Rules of Civil Procedure.                 13:08 |
| 19       Am I too soon?                     12:21 | 19       Rule 30(b), Subsection 5(a).  My business   13:08 |
| 20       MR. BLOCK:  Hi.                   12:21 | 20 address is 707 Wilshire Boulevard, Los Angeles,    13:08 |
| 21       This is Josh Block from ACLU on behalf of   12:21 | 21 California.  The videographer has stated the      13:08 |
| 22 plaintiff.                               12:21 | 22 additional required information.           13:08 |
| 23       MS. SWAMINATHAN:  And hi.           12:21 | 23       Rule 30(b), Subsection 5(c).  Upon      13:08 |
| 24       This is Sruti Swaminathan from Lambda     12:21 | 24 completion of the deposition, if there is a       13:08 |
| 25 Legal on behalf of plaintiff.              12:21 | 25 stipulation about the custody of the transcript or   13:08 |
| Page 11 | Page 13 |

4 (Pages 10 - 13)

1 other pertinent matters, I will recite such
2 stipulation(s).  Additionally, the videographer will
3 read-off when the deposition concludes.
4         So with this being said, I will now swear
5 in the witness.
6         Mr. Dolan, please, raise your right hand.
7         THE WITNESS:  [Witness did as requested].
8         THE REPORTER:  Do you affirm the testimony
9 you are about to give in the cause now pending will
10 be the truth, the whole truth, and nothing but the
11 truth?                              12:24
12         THE WITNESS:  I do.              12:24
13         THE REPORTER:  Thank you.            12:24
14
15         BERNARD DOLAN
16         having been first duly sworn, was
17         examined and testified as follows:
18
19         EXAMINATION              12:25
20 BY MS. KANG:                       12:25
21     Q.  Hi.  Good afternoon, Mr. Dolan.  How are   12:25
22 you?                             12:25
23     A.  Good.  How are you?              12:25
24     Q.  Doing well.              12:25
25         Thank you so much for spending your Friday  12:25

Page 14

1 afternoon with us.                   12:25
2         Before we get started, would you please   12:25
3 state and spell your name for the record.     12:25
4     A.  Bernard, B-E-R-N-A-R-D; Dolan, D-O-L-A-N.   12:25
5     Q.  Mr. Dolan, before we get started, we have   12:25
6 some housekeeping items.  So the oath you just took  12:25
7 is the same oath you would take if you were     12:25
8 testifying in a courtroom.  So what that means is   12:25
9 you must testify truthfully and not leave out any   12:25
10 important facts.                    12:25
11         Is there any reason you cannot testify   12:25
12 truthfully today?                    12:25
13     A.  No.                        12:25
14     Q.  Please give verbal answers to any of my   12:25
15 questions.  Nodding or shaking your head cannot,   12:25
16 unfortunately, be captured by the court reporter.   12:25
17 So the answer you just gave was perfect.     12:25
18         If you don't understand the question,   12:25
19 please let me know, and I'm happy to try to rephrase  12:25
20 it or make it clear for you.  If you answer, I will   12:25
21 assume you understood.  Is that fair?     12:25
22     A.  Yes.                        12:25
23     Q.  And just to be clear, when I ask questions   12:25
24 I am not seeking communications that you had with   12:26
25 your attorney.                     12:26

Page 15

1         Because the court reporter is taking down   12:26
2 what we say on the record, I'll do my best to avoid   12:26
3 talking over you and to avoid talking at the same   12:26
4 time as you.                      12:26
5         And then, finally, I'm going to try to do   12:26
6 a break every hour or so -- but if at any point you   12:26
7 need a break, we'll finish up whatever question we   12:26
8 are on, and we can take a break whenever you feel   12:26
9 comfortable.                      12:26
10         Does that sound fair?          12:26
11     A.  Yes, ma'am.                  12:26
12     Q.  Have you ever had your deposition taken   12:26
13 before?                         12:26
14     A.  Yes.                        12:26
15     Q.  When was it?                12:26
16     A.  Two years ago, I believe.          12:26
17     Q.  What was it about?              12:26
18     A.  A herpes case in wrestling.          12:26
19     Q.  So were you testifying on behalf of the   12:26
20 WVSSAC?                         12:26
21     A.  Yes, ma'am.                  12:26
22     Q.  And going forward if I say the          12:26
23 "Commission" instead of the "WVSSAC", would that be   12:26
24 all right with you?                  12:26
25     A.  That is fine.                  12:26

Page 16

1     Q.  So you mentioned it's a herpes case.  Can   12:26
2 you tell me whether you testified on behalf of the   12:27
3 W- -- of the Commission or was it in your personal   12:27
4 capacity?                       12:27
5     A.  I believe it was on behalf of the        12:27
6 Commission, but I'm -- I wouldn't -- I'm not sure.   12:27
7     Q.  Have you ever -- have you ever had your   12:27
8 deposition taken other than this time?     12:27
9     A.  Not that I recall.              12:27
10     Q.  Have you ever testified at trial?     12:27
11     A.  Yes.                        12:27
12     Q.  When was this?                12:27
13     A.  Couple years -- I would say probably three  12:27
14 or four years ago.                  12:27
15     Q.  What was it about?              12:27
16     A.  A golf ruling in a championship.     12:27
17     Q.  And so were you also testifying on behalf   12:27
18 of the Commission?                  12:27
19     A.  Yes, ma'am.                  12:27
20     Q.  Did you bring anything with you today?   12:27
21     A.  Just a bottle of water.          12:27
22     Q.  Good.                      12:27
23         And do you understand that you are here to   12:27
24 respond to a 30(b)(6) deposition notice?     12:28
25     A.  Yes.                        12:28

Page 17

5 (Pages 14 - 17)

**Page 18**

1    Q.  Do you know what a 30(b)(6) deposition --    12:28
2    deposition notice is?    12:28
3    A.  Yes.    12:28
4    Q.  Have you had a chance to review the    12:28
5    deposition notice?    12:28
6    A.  Yes.    12:28
7    Q.  So in that deposition notice, there were a    12:28
8    number of topics.    12:28
9        Are you familiar with each of the topics    12:28
10    described in that notice?    12:28
11    A.  Yes.    12:28
12    Q.  So if you go into your Marked Exhibits    12:28
13    folder, I'm going to introduce to you a document    12:28
14    that's been marked as Exhibit 1.    12:28
15        (Deposition Exhibit 1 was marked for    12:28
16        identification and is attached hereto.)    12:28
17  BY MS. KANG:    12:28
18    Q.  Let me know when you have had a chance to    12:28
19    pull that up.    12:28
20    A.  Okay.  Exhibit 1, the deposition notice.    12:28
21    Q.  That's correct.    12:28
22        And I'm going to ask you to scroll down to    12:28
23  Page 6 of Exhibit A.  I believe it's Page 7 of the    12:28
24  actual pdf, if that's helpful, or Page 6.    12:29
25    A.  Yes.  Okay.    12:29

**Page 19**

1    Q.  Great.    12:29
2        So I'm going to go through each of the    12:29
3  topics and just ask you a few questions about them.    12:29
4        So for Topic 1, what did you do to prepare    12:29
5  for Topic 1?    12:29
6    A.  Looked at our organization.    12:29
7    Q.  Did you review any documents?    12:29
8    A.  Our rules and regulations.    12:29
9    Q.  And by looked at your organization, did    12:29
10  you mean --    12:29
11    A.  Review --    12:29
12    Q.  -- look at your -- sorry.  Go ahead.    12:29
13    A.  Just -- there's a part of our rules and    12:29
14  regulations that has a history of the organization.    12:29
15    Q.  Got it.    12:29
16        Is there any reason you can't give full    12:29
17  and complete testimony on Topic 1?    12:29
18    A.  No.    12:29
19    Q.  When preparing for Topic 1, did you    12:30
20  consult with anyone other than your attorney?    12:30
21    A.  No.    12:30
22    Q.  Moving on to Topic 2, same question.  What    12:30
23  did you do to prepare for Topic 2?    12:30
24    A.  Probably just discuss with my attorney.    12:30
25    Q.  And did you review any documents?    12:30

**Page 20**

1    A.  Not necessary for that one.    12:30
2    Q.  And just to clarify, you didn't talk to    12:30
3  anyone other than your attorney?    12:30
4    A.  No.    12:30
5    Q.  For Topic 3, what did you do to prepare    12:30
6  for Topic 3?    12:30
7    A.  Looked at our handbook, rules and    12:30
8  regulations handbook.    12:30
9    Q.  Did you review any other document?    12:30
10    A.  No.    12:30
11    Q.  Did you consult with anyone other than    12:30
12  your attorney?    12:30
13    A.  No.    12:30
14    Q.  And is there any reason you cannot give    12:30
15  full and complete answers on behalf of the    12:30
16  Commission for that topic?    12:30
17    A.  No.    12:30
18    Q.  For Topic 4, what did you do to prepare    12:31
19  for it?    12:31
20    A.  Rules and regulations handbook.    12:31
21    Q.  Did you review anything else?    12:31
22    A.  No.    12:31
23    Q.  Did you consult with anyone other than    12:31
24  your attorney?    12:31
25    A.  No.    12:31

**Page 21**

1    Q.  And is there any reason you cannot give    12:31
2  full and complete answers on behalf of the    12:31
3  Commission for Topic 4?    12:31
4    A.  No.    12:31
5    Q.  For Topic 5, what did you do to prepare    12:31
6  for that?    12:31
7    A.  Looked at our rules and regulations and    12:31
8  probably researched my email.    12:31
9    Q.  Can you clarify for me what you mean by    12:31
10  researched your email?    12:31
11    A.  Just search the email to make sure I    12:31
12  didn't have any communication with the plaintiffs.    12:31
13    Q.  Did you consult with anyone other than    12:31
14  your attorney for Topic 5?    12:32
15    A.  No.    12:32
16    Q.  And is there any reason you cannot give    12:32
17  full and complete answers on behalf of the    12:32
18  Commission?    12:32
19    A.  No.    12:32
20    Q.  Sorry.  I know these questions are    12:32
21  repetitive, but I do appreciate it.    12:32
22        For Topic 6, what did you do to prepare    12:32
23  for Topic 6?    12:32
24    A.  Researched -- or looked through my emails    12:32
25  as well as text messages.    12:32

6 (Pages 18 - 21)

| | Page 22 | | | Page 24 |
|---|---|---|---|---|
| 1 | Q. Did you review any documents?   12:32 | | 1 | Q. Did you consult anyone other than your   12:34 |
| 2 | A. Not really. Just -- I'm sorry.   12:32 | | 2 | attorney?   12:34 |
| 3 | Our transgender policy or our Board   12:32 | | 3 | A. No.   12:34 |
| 4 | policy. That was all.   12:32 | | 4 | Q. Is there any reason you cannot give full   12:34 |
| 5 | Q. Did you review any of the emails or text   12:32 | | 5 | and complete answers on behalf of the Commission?   12:34 |
| 6 | messages that you searched for?   12:32 | | 6 | A. No.   12:34 |
| 7 | A. I probably would have read them for -- to   12:32 | | 7 | Q. All right. We're almost there.   12:34 |
| 8 | determine whether there was any substance to them,   12:32 | | 8 | For Topic 10, what did you do to prepare   12:34 |
| 9 | yes.   12:33 | | 9 | for it?   12:34 |
| 10 | Q. Did you consult with anyone other than   12:33 | | 10 | A. Reviewed the rules and regulations   12:34 |
| 11 | your attorney for Topic 6?   12:33 | | 11 | handbook.   12:35 |
| 12 | A. No.   12:33 | | 12 | Q. Did you review anything else?   12:35 |
| 13 | Q. And is there any reason you cannot give   12:33 | | 13 | A. No.   12:35 |
| 14 | full and complete answers on behalf of the   12:33 | | 14 | Q. Did you -- did you consult anyone other   12:35 |
| 15 | Commission for Topic 6?   12:33 | | 15 | than your attorney?   12:35 |
| 16 | A. No.   12:33 | | 16 | A. No.   12:35 |
| 17 | Q. For Topic 7, what did you do to prepare   12:33 | | 17 | Q. Is there any reason you cannot give full   12:35 |
| 18 | for it?   12:33 | | 18 | and complete answers on behalf of the Commission?   12:35 |
| 19 | A. Looked at our rules and regulations   12:33 | | 19 | A. No.   12:35 |
| 20 | handbook.   12:33 | | 20 | Q. For Topic 11, what did you do to prepare   12:35 |
| 21 | Q. Did you review any documents other than   12:33 | | 21 | for it?   12:35 |
| 22 | the rules and regulations handbook?   12:33 | | 22 | A. Reviewed the rules and regulations   12:35 |
| 23 | A. No.   12:33 | | 23 | handbook as well as the Board policy on transgender.   12:35 |
| 24 | Q. Did you consult with anyone other than   12:33 | | 24 | Q. Did you review anything else?   12:35 |
| 25 | your attorney about Topic 7?   12:33 | | 25 | A. No.   12:35 |

| | Page 23 | | | Page 25 |
|---|---|---|---|---|
| 1 | A. No.   12:33 | | 1 | Q. Did you consult with anyone other than   12:35 |
| 2 | Q. And is there any reason you cannot give   12:33 | | 2 | your attorney?   12:35 |
| 3 | full and complete answers on behalf of the   12:33 | | 3 | A. No.   12:35 |
| 4 | Commission?   12:33 | | 4 | Q. Is there any reason you cannot give full   12:35 |
| 5 | A. No.   12:33 | | 5 | and complete answers on behalf of the Commission?   12:35 |
| 6 | Q. For Topic 8, what did you do to prepare   12:33 | | 6 | A. No.   12:35 |
| 7 | for Topic 8?   12:33 | | 7 | Q. For Topic 12, what did you do to prepare   12:35 |
| 8 | A. Reviewed text messages and emails   12:33 | | 8 | for it?   12:35 |
| 9 | concerning House Bill 3293.   12:34 | | 9 | A. Reviewed the rules and regulations   12:36 |
| 10 | Q. Did you review anything else?   12:34 | | 10 | handbook.   12:36 |
| 11 | A. No.   12:34 | | 11 | Q. Did you review anything else?   12:36 |
| 12 | Q. Did you consult with anyone other than   12:34 | | 12 | A. No.   12:36 |
| 13 | your attorney?   12:34 | | 13 | Q. Did you consult with anyone other than   12:36 |
| 14 | A. No.   12:34 | | 14 | your attorney?   12:36 |
| 15 | Q. And is there any reason you cannot give   12:34 | | 15 | A. No.   12:36 |
| 16 | full and complete answers on behalf of the   12:34 | | 16 | Q. Is there any reason you can't give full   12:36 |
| 17 | Commission?   12:34 | | 17 | and complete answers on behalf of the Commission?   12:36 |
| 18 | A. No.   12:34 | | 18 | A. No.   12:36 |
| 19 | Q. For Topic 9, what did you do to prepare   12:34 | | 19 | Q. For Topic 13, what did you do to prepare   12:36 |
| 20 | for Topic 9?   12:34 | | 20 | for it?   12:36 |
| 21 | A. Reviewed the rules and regulations   12:34 | | 21 | A. Read the rule -- read the House Bill 3293.   12:36 |
| 22 | handbook.   12:34 | | 22 | Q. Did you review anything else?   12:36 |
| 23 | Q. Did you review anything other than the   12:34 | | 23 | A. Just our rules and regulations.   12:36 |
| 24 | rules and regulations handbook?   12:34 | | 24 | Q. Did you consult with anyone other than   12:36 |
| 25 | A. No.   12:34 | | 25 | your attorney?   12:36 |

7 (Pages 22 - 25)

**Page 26**

```
 1      A.  No.                               12:36
 2      Q.  And is there any reason you cannot give   12:36
 3  full and complete answers on behalf of the    12:36
 4  Commission?                                 12:36
 5      A.  I -- I did consult -- I probably -- I had   12:37
 6  a communication with Melissa White from House   12:37
 7  Education.  She had sent me documents -- or a    12:37
 8  document.  So I would say I communicated with    12:37
 9  Melissa White about House Bill 3293.        12:37
10      Q.  Was this in preparation for this    12:37
11  deposition?                                 12:37
12      A.  No.  I'm sorry.                     12:37
13      Q.  No need to apologize.              12:37
14          All right.  Last -- last topic.  What did   12:37
15  you do to prepare for Topic 14?             12:37
16      A.  Primarily reviewed the rules and    12:37
17  regulations handbook and the transgender Board   12:37
18  policy and look at emails and text messages.    12:37
19      Q.  Anything else?                      12:38
20      A.  No.                                 12:38
21      Q.  Did you consult with anyone other than   12:38
22  your attorney?                             12:38
23      A.  No.                                 12:38
24      Q.  Is there any reason you cannot give full   12:38
25  and complete answers on behalf of the Commission?  12:38
```

**Page 27**

```
 1      A.  No.                                 12:38
 2      Q.  So for some of these topics, you mentioned   12:38
 3  reviewing emails and documents.  Do you know if   12:38
 4  those emails and documents have been produced to   12:38
 5  Plaintiff?                                  12:38
 6      A.  They all have, yes.                  12:38
 7      Q.  All right.  Thank you.              12:38
 8          MS. KANG:  You can take down Exhibit 1.   12:38
 9  BY MS. KANG:                                12:38
10      Q.  Do you understand that you're testifying   12:38
11  about these topics in the deposition notice on   12:38
12  behalf of the Commission?                   12:38
13      A.  Yes.                                12:38
14      Q.  So just to be clear, when I ask for your   12:38
15  position on something, I -- I'm asking for the   12:38
16  position of -- of the Commission unless I say   12:38
17  otherwise.                                  12:38
18          You understand?                     12:38
19      A.  Yes, ma'am.                        12:38
20      Q.  In general, what did you do to prepare for   12:38
21  today's deposition?                         12:38
22      A.  Again, reviewed the rule -- the rules and   12:39
23  regulations.                               12:39
24      Q.  Did you meet with anyone other than your   12:39
25  attorney?                                  12:39
```

**Page 28**

```
 1      A.  No.                                 12:39
 2      Q.  Did you discuss today's deposition with   12:39
 3  anyone other than your attorney?            12:39
 4      A.  Just that I had it scheduled so people   12:39
 5  would know in the office not to send me calls.   12:39
 6      Q.  So other employees at -- at the       12:39
 7  Commission; is that right?                  12:39
 8      A.  Yes, ma'am.                        12:39
 9      Q.  Do you know who B.P.J. is?           12:39
10      A.  By name only, yes.                  12:39
11      Q.  Do you know anything else about her?   12:39
12          MS. GREEN:  I'll just object to the form,   12:39
13  to the extent he knows things from me, from counsel.  12:39
14          THE WITNESS:  I have -- only know what --   12:39
15  the documents that have been sent to me.  I don't   12:39
16  know anything firsthand about her.          12:40
17  BY MS. KANG:                                12:40
18      Q.  Do you agree that B.P.J. is a girl who is   12:40
19  transgender?                               12:40
20          MS. GREEN:  I'll object to the form.  And   12:40
21  I'll just object outside the scope.         12:40
22          THE WITNESS:  It's been presented to me   12:40
23  that way.                                  12:40
24  BY MS. KANG:                                12:40
25      Q.  Are you aware that B.P.J. ran          12:40
```

**Page 29**

```
 1  cross-country on the girls' team at Bridgeport   12:40
 2  Middle School?                              12:40
 3      A.  Yes.                                12:40
 4      Q.  How did you become aware of that?       12:40
 5      A.  Through the court case.              12:40
 6      Q.  Have you ever spoken to B.P.J.?        12:40
 7      A.  I have not.                         12:40
 8      Q.  Have you ever spoken to B.P.J.'s parents?  12:40
 9      A.  No.                                 12:40
10          MS. GREEN:  And I'll just object to the   12:40
11  extent this is outside the scope.           12:40
12  BY MS. KANG:                                12:40
13      Q.  Have you ever spoken to B.P.J.'s sibling?  12:40
14      A.  No.                                 12:40
15      Q.  Now, I want to just talk a little bit     12:40
16  about your personal background to sort of better   12:41
17  understand your selection as -- as the witness for   12:41
18  the 30(b)(6) deposition.                     12:41
19          What is your position at the Commission?   12:41
20      A.  I am the executive director.         12:41
21      Q.  What are your responsibilities as      12:41
22  executive director?                         12:41
23      A.  Generally oversee the organization, assign   12:41
24  duties and evaluate staff, make decisions when   12:41
25  there's disagreement amongst schools.       12:41
```

8 (Pages 26 - 29)

1    Q.  What sort of duties do you assign?    12:41
2    A.  Director of all the tournaments.  So    12:41
3  each -- each assistant executive director is    12:41
4  assigned multiple sports that they will oversee    12:41
5  and -- and put on the tournaments.    12:41
6        I assign secretarial duties to the    12:41
7  secretarial staff.    12:41
8    Q.  How many assistant executive directors do    12:42
9  you have?    12:42
10   A.  Three.    12:42
11   Q.  So I believe you said you make decisions    12:42
12 when schools have disputes.  Is that accurate?    12:42
13   A.  Yes, ma'am.    12:42
14   Q.  Can you tell me a little bit -- a little    12:42
15 bit more about that.    12:42
16      MS. GREEN:  I'll just object.  Outside the    12:42
17 scope.    12:42
18      THE WITNESS:  If there is a difference    12:42
19 on -- opinion on eligibility of a student in one    12:42
20 school, one school may say they are eligible, one    12:42
21 school may say they are ineligible.  So we gather    12:42
22 the facts, and we'll make a determination.    12:42
23 BY MS. KANG:    12:42
24   Q.  And by "we," do you mean you as the    12:42
25 executive director or the Commission?    12:42
                                        Page 30

1    A.  The Commission.    12:42
2    Q.  And who is --    12:42
3    A.  And I -- I'm sorry.  Me as the executive    12:42
4  director for the Commission.    12:42
5    Q.  Understood.    12:42
6        How long have you been the executive    12:42
7  director?    12:43
8    A.  Seven years.    12:43
9    Q.  Have you held any other positions at the    12:43
10 Commission?    12:43
11   A.  No.    12:43
12   Q.  Do you --    12:43
13   A.  Pardon me.  Wait a minute.    12:43
14       I was on the Board of Directors at one    12:43
15 point.    12:43
16   Q.  And when was that?    12:43
17   A.  That -- I believe it was 2012 to 2014.    12:43
18   Q.  What was your role when you were on the    12:43
19 Board of Directors?    12:43
20      MS. GREEN:  Object to the form.    12:43
21      THE WITNESS:  Approve -- approve the    12:43
22 workings of the organization to proof financial    12:43
23 reports, those things.    12:43
24       Also to hear appeals of students or    12:43
25 coaches who have been -- who violated the rule and    12:43
                                        Page 31

1  they come up before the Board to either appeal their    12:44
2  discipline or appeal their ineligibility.    12:44
3  BY MS. KANG:    12:44
4    Q.  Do you report to anyone currently as the    12:44
5  executive director?    12:44
6    A.  I have ten Board members, yes.    12:44
7    Q.  Is that the same Board of Directors that    12:44
8  you were just talking about?    12:44
9    A.  Yes, ma'am.    12:44
10   Q.  Does anyone report to you?    12:44
11   A.  My eight other staff members report to me,    12:44
12 yes.    12:44
13   Q.  What are their titles?    12:44
14   A.  Three of --    12:44
15      MS. GREEN:  Object.  Outside the scope.    12:44
16      And can I just have a continuing objection    12:44
17 for the outside scope, or you want be to keep    12:44
18 hopping in?    12:44
19      MS. KANG:  Yes.  I'll grant you a    12:44
20 continuing objection for outside the scope, Roberta.    12:44
21      MS. GREEN:  Thank you.  Thank you.    12:44
22      THE WITNESS:  There are three assistant    12:44
23 executive directors, one events communication    12:44
24 coordinator, one bookkeeper, and three secretaries.    12:44
25 ///
                                        Page 32

1  BY MS. KANG:    12:45
2    Q.  Have you ever been employed by -- employed    12:45
3  by the Attorney General's Office of the State of    12:45
4  West Virginia?    12:45
5    A.  No.    12:45
6    Q.  Have you ever been employed by the    12:45
7  West Virginia House of Delegates?    12:45
8    A.  No.    12:45
9    Q.  Have you ever been employed by the    12:45
10 West Virginia Senate?    12:45
11   A.  No.    12:45
12   Q.  Have you ever been employed by the    12:45
13 Harrison County Board of Education?    12:45
14   A.  No.    12:45
15   Q.  Have you ever been employed by the    12:45
16 West Virginia State Board of Education?    12:45
17   A.  No.    12:45
18   Q.  So I am going to introduce to you a    12:45
19 document that is going to be marked as Exhibit 2.    12:45
20       And I'll let you know when it should    12:45
21 appear in your Marked Exhibit folder.    12:45
22       (Deposition Exhibit 2 was marked for    12:45
23       identification and is attached hereto.)    12:45
24 BY MS. KANG:    12:45
25   Q.  So if you go to your Marked Exhibit    12:45
                                        Page 33

9 (Pages 30 - 33)

1 folder, you should now see a document that's been   12:45
2 marked as Exhibit 2.   12:45
3     Let me know when you see it.   12:46
4   A.  Okay.   12:46
5   Q.  So on Page 2 of Exhibit 2, you'll see a   12:46
6 section entitled "Bernie Dolan," and this is -- I'll   12:46
7 represent to you that this is a screenshot that I   12:46
8 took from the Commission website on February 10th,   12:46
9 2022.  And in the bottom left corner you'll see the   12:46
10 URL stamp where I pulled it from the website.   12:46
11     And I'd just like to ask you a few   12:46
12 questions about your biography in -- on this page.   12:46
13     Do you agree with what's written in the   12:46
14 paragraph on Page 2 of Exhibit 2 under "Bernie   12:46
15 Dolan"?   12:46
16     MS. MORGAN:  Counsel, this is Kelly   12:46
17 Morgan.   12:46
18     I do not see an Exhibit 2 in the Egnyte.   12:46
19     MS. KANG:  So if you're -- if anyone is   12:46
20 having trouble accessing the Marked Exhibits, I   12:46
21 recommend clicking on the folder again to refresh   12:46
22 it.   12:46
23     Let me know if you continue to have   12:47
24 problems.   12:47
25     THE WITNESS:  I do -- I agree with what is   12:47
Page 34

1 written there.   12:47
2 BY MS. KANG:   12:47
3   Q.  Where did you work before your current   12:47
4 role at the Commission?   12:47
5   A.  Ohio County Schools.   12:47
6   Q.  How long did you work there?   12:47
7   A.  30 years.   12:47
8   Q.  Whoa.   12:47
9     Did you interact with any transgender   12:47
10 individuals in that role?   12:47
11   A.  I did not.   12:47
12   Q.  When did you attend West Virginia   12:47
13 University?   12:47
14   A.  I graduated in '85; so probably '81 to   12:47
15 '85.   12:47
16   Q.  And when did you attend Salem   12:47
17 International University?   12:47
18   A.  I would say '99 to 2000 or 2000 to 2001.   12:47
19   Q.  What is the Super Six?   12:47
20   A.  State football championship.   12:47
21   Q.  What was your role there?   12:48
22   A.  I had a variety of roles starting out from   12:48
23 assistant media director over the years to being the   12:48
24 director -- once I was the athletic director of   12:48
25 Wheeling Park High School.   12:48
Page 35

1   Q.  What was your role as the athletic   12:48
2 director?   12:48
3   A.  I was the athletic director at Wheeling   12:48
4 Park High School.   12:48
5     What was the question?   12:48
6   Q.  Sure.   12:48
7     Could you tell me what some of your   12:48
8 responsibilities were in that role?   12:48
9   A.  I would oversee the coaches, do their   12:48
10 evaluations, purchase equipment for each team, as   12:48
11 well as coordinate transportation, and also make   12:48
12 sure all eligibility information was submitted to   12:48
13 the Commission -- Commission as well as accurate.   12:48
14   Q.  What is the state golf tournament?   12:49
15   A.  State championship for golf.   12:49
16   Q.  And what was your role there?   12:49
17   A.  The director.   12:49
18   Q.  What is OVAC?   12:49
19   A.  It's the Ohio Valley Athletic Conference.   12:49
20 It was the conference that Wheeling Park was a   12:49
21 member of, and still is, but it's the athletic   12:49
22 conference for the high schools.   12:49
23   Q.  What was your role there?   12:49
24   A.  I served on executive Board a couple of   12:49
25 the years while I was the athletic director at   12:49
Page 36

1 Wheeling Park.   12:49
2   Q.  Finally, what is WVADA?   12:49
3   A.  West Virginia Athletic Directors   12:49
4 Association.   12:49
5   Q.  What was your role there?   12:49
6   A.  I served on the executive Board -- or the   12:49
7 Board of Directors for a couple of years while I was   12:49
8 the athletic director at Wheeling Park High School.   12:49
9   Q.  And do you yourself play sports?   12:50
10   A.  A little bit still.   12:50
11   Q.  What sports do you play?   12:50
12   A.  Tennis a little bit.  Basketball a little   12:50
13 bit.  Pickleball.   12:50
14   Q.  Do you currently coach any sports?   12:50
15   A.  I do not.   12:50
16   Q.  Did you used to coach?   12:50
17   A.  I did.   12:50
18   Q.  What did you coach?   12:50
19   A.  18 years I coached boys' and girls' track   12:50
20 at Wheeling Park High School;   12:50
21     12 as the head coach for both boys and   12:50
22 girls;   12:50
23     Assistant coach of football;   12:50
24     And assistant coach of girls' basketball.   12:50
25   Q.  Thank you.   12:50
Page 37

10 (Pages 34 - 37)

**Page 38**

1    MS. KANG:  You can take down Exhibit 2    12:50
2  now.                              12:50
3  BY MS. KANG:                      12:50
4    Q.  So now I want to move into talking a    12:50
5  little bit more about the Commission and its    12:50
6  structure.                        12:50
7        When was the Commission founded?    12:50
8    A.  In 1916.                    12:50
9    Q.  Why was it founded?          12:51
10    A.  To primarily handle disputes between    12:51
11  schools at that point, and they did provide    12:51
12  championship opportunities for schools.    12:51
13    Q.  What sort of disputes between schools?    12:51
14    A.  As I said earlier, it could be    12:51
15  eligibility; it could have been breaking of    12:51
16  contracts; could be officials, you know -- who --    12:51
17  what officials get assigned to games.    12:51
18        So there is quite a bit of conflict    12:51
19  possible.                         12:51
20    Q.  How does the Commission define secondary    12:51
21  sports?                           12:51
22    A.  Secondary sports, we are -- we oversee the    12:51
23  sports that we currently have, which is -- a number    12:51
24  of them.                          12:52
25        But the -- what happens is, as the schools    12:52

**Page 39**

1  offer these sports as clubs, once there is enough    12:52
2  schools that offer the sports, then they would    12:52
3  petition us to recognize an additional sport.  So we    12:52
4  have, I believe, 19 championships at this point.    12:52
5    Q.  What grades count as a secondary grade?    12:52
6    A.  6th through 12.                12:52
7    Q.  Do you know if Bridgeport Middle School    12:52
8  qualifies as a secondary school?    12:52
9    A.  They are a member of our association.  So    12:52
10  yes.                             12:52
11    Q.  Can you tell me what is a member of    12:52
12  your -- what does a member of your association mean?  12:52
13    A.  First of all, initially there was    12:52
14  a initia- -- an initiation fee.  And there were    12:52
15  dues.  But we have not charged dues for 20 years.    12:52
16        To be a member, you just have to    12:53
17  provide -- you have to agree to follow all the rules  12:53
18  and regulations as well as provide an opportunity    12:53
19  for a boy sport and a girl sport in each of the    12:53
20  seasons.                          12:53
21    Q.  So each member school has to offer a boys'    12:53
22  team or a girls' team for each support?    12:53
23    A.  Yes.                        12:53
24    Q.  Is that right?                12:53
25    A.  Yes.  Yes.                   12:53

**Page 40**

1    Q.  And you said you stopped collecting dues    12:53
2  for 20 years; is that correct?    12:53
3    A.  Yes.                        12:53
4    Q.  Why did the Commission stop collecting    12:53
5  dues?                             12:53
6    A.  At that point, it was more trouble than it  12:53
7  was worth it.  There wasn't that much money coming    12:53
8  in from dues.  It was before my time, though.    12:53
9    Q.  Understood.                   12:53
10        How many employees does the Commission    12:53
11  have currently?                   12:53
12    A.  Nine.                       12:53
13    Q.  Is there someone who is considered in    12:54
14  charge of the Commission?         12:54
15    A.  I would assume -- I am the executive    12:54
16  director.  So I would be in charge.  But I still    12:54
17  answer to my Board of Directors.    12:54
18    Q.  So does the Commission have a relationship  12:54
19  with the State Board of Education in West Virginia?  12:54
20    A.  We do have a relationship, number one.  As  12:54
21  our rules are promulgated from our members, they    12:54
22  will submit rules to be voted on by the membership    12:54
23  at our Board of Control.           12:54
24        If at the Board of Control they pass by a    12:54
25  majority, then those rules get submitted to the    12:54

**Page 41**

1  State Board of Education who would then put them out  12:54
2  for public comment.               12:54
3        And they would have final vote on whether    12:54
4  or not the rule becomes law.  And if it does, they    12:54
5  will submit that to the Secretary of State's office.  12:55
6    Q.  So just to clarify, who submits the rules    12:55
7  to the Board of Control again?    12:55
8    A.  Principals.  We are a principals    12:55
9  organization.  So each principal has one vote in our  12:55
10  membership.                       12:55
11    Q.  And are you the principal of your member    12:55
12  school?                           12:55
13    A.  Yes, ma'am.                  12:55
14    Q.  Do you personally, as the executive    12:55
15  director, work with the State Board of Education of  12:55
16  West Virginia?                    12:55
17    A.  Not directly.               12:55
18        MS. GREEN:  I'm sorry.  Could -- I'm    12:55
19  sorry.                            12:55
20        Ms. Kang, would you repeat the question?  12:55
21        MS. KANG:  Sure.             12:55
22  BY MS. KANG:                      12:55
23    Q.  Do you personally, as the executive    12:55
24  director, have a role or relationship with the State  12:55
25  Board of Education of West Virginia?    12:55

11 (Pages 38 - 41)

**Page 42**

1    A.  I don't have a -- I mean, I have a working  12:55
2  relationship because we deal with same schools.  But  12:55
3  as far as on a daily basis of any interaction, no --  12:55
4  other than they approve the rules.  12:56
5    Q.  Does the Commission have a relationship  12:56
6  with the County Board of Education?  12:56
7    A.  Not really.  We are a principals  12:56
8  organization.  We do communicate with county boards.  12:56
9  But our membership are the high schools.  12:56
10    Q.  What sort of communication --  12:56
11    A.  And --  12:56
12    Q.  Oh, sorry.  12:56
13    What sort of communications would you have  12:56
14  with the County Board?  12:56
15    A.  Oftentimes we would -- if there is rules  12:56
16  or memos that we go out and send out, sometimes we  12:56
17  will send them to the County Boards of Education  12:56
18  that -- to keep them up to date on what is going on  12:56
19  with the Commission.  12:56
20    Q.  By "rules," do you mean the Commission's  12:56
21  rules?  12:56
22    A.  It could be -- yes, the Commission rules.  12:56
23  Yep.  Yes.  12:57
24    Q.  Does the Commission determine who can play  12:57
25  on a secondary school sports team?  12:57

**Page 43**

1    MS. GREEN:  Object to the form.  12:57
2    THE WITNESS:  When you say "Commission,"  12:57
3  it's not the nine members here at the office.  12:57
4    The Commission, technically, is made up by  12:57
5  the 286 members.  So they have voted in the rules,  12:57
6  and they are required by law -- by the -- being a  12:57
7  member to follow those rules.  So only when there is  12:57
8  a dispute do we intervene.  12:57
9  BY MS. KANG:  12:57
10    Q.  So I'd ask who makes the initial  12:57
11  determination of a student's eligibility?  12:57
12    A.  That would be the school.  12:57
13    Q.  I believe you mentioned earlier the -- a  12:57
14  dispute process.  So the student -- or a student's  12:57
15  eligibility is disputed.  12:57
16    Can you walk me through what would happen  12:57
17  there?  12:57
18    A.  It could be a school sending -- if  12:57
19  Student A left School Number 1, went to School  12:58
20  Number 2, and didn't follow the normal transfer  12:58
21  procedures, School A might file a complaint to say,  12:58
22  "Hey, can you look at so-and-so because they never  12:58
23  sat out with School B, or Number 2."  12:58
24    So we would intervene and get the  12:58
25  information, work with the two schools, and come up  12:58

**Page 44**

1  with a final answer.  12:58
2    Q.  What sort of information would you look  12:58
3  at?  12:58
4    A.  Whether they -- when they enrolled at the  12:58
5  school, who they -- are they still living with their  12:58
6  parents, same household, did they -- did they make a  12:58
7  bona fide move, and whether they have a 2.0 or not.  12:58
8  Things like that.  12:58
9    Q.  Anything else?  12:58
10    A.  Could be age.  There's a number of rules  12:58
11  for eligibility, but those are the biggest ones.  12:58
12    Q.  So if a student is deemed ineligible by  12:59
13  the Commission, is that student -- student  12:59
14  prohibited from playing?  12:59
15    A.  The student would be prohibited from  12:59
16  playing in a varsity or JV game.  There's only a  12:59
17  limited exception as to when they would be able to  12:59
18  even practice with the team.  But for the most part,  12:59
19  if you're ineligible, you're ineligible for all  12:59
20  activities for that team.  12:59
21    Q.  And I believe you mentioned that you have  12:59
22  286 member schools.  Do you know if that includes  12:59
23  all the schools -- secondary schools in  12:59
24  West Virginia?  12:59
25    A.  It does not.  12:59

**Page 45**

1    Q.  Do you know how many schools are not a  12:59
2  member school in West Virginia?  12:59
3    A.  I do not.  12:59
4    Q.  If the Commission finds a person is  12:59
5  ineligible, is there an appeal process?  12:59
6    A.  Yes, there is.  12:59
7    Q.  Can you walk me through what that appeal  13:00
8  process looks like?  13:00
9    A.  They would -- I would send them a letter  13:00
10  telling them initially that they were determined  13:00
11  ineligible.  If they would like a hearing in front  13:00
12  of our Board of Directors, then along with the  13:00
13  level -- along with a letter of ineligibility, I  13:00
14  would send the appeal papers that they would fill  13:00
15  out and return to me.  13:00
16    And then within 30 days, I would bring  13:00
17  them before our Board of Directors for them to make  13:00
18  a decision to grant a waiver or not.  And the Board  13:00
19  can grant a waiver for rule fails to accomplish what  13:00
20  it was intended for or there's a hardship on the  13:00
21  student.  13:00
22    Q.  What sort of hardship would count?  13:00
23    A.  It -- it's up to the Board of Directors.  13:00
24  So there is -- there's no marker that you have to  13:00
25  hit.  So there's lots of different things that may  13:01

12 (Pages 42 - 45)

1 have come up.                                    13:01
2    Q.  Have you taken part in the appeal process  13:01
3 before?                                           13:01
4    A.  When I was a member of the Board of        13:01
5 Directors, yes.                                   13:01
6    Q.  So is it the Board of Directors that makes 13:01
7 the determination on the appeal?                  13:01
8    A.  Yes.                                        13:01
9    Q.  Are you familiar with WVEIS, the           13:01
10 West Virginia Education Information System?       13:01
11   A.  Yes.                                        13:01
12   Q.  Does the Commission have any control over  13:01
13 the information that goes into WVEIS?             13:01
14   A.  No.  We have no access to that note.       13:01
15   Q.  In West Virginia, to your knowledge, has a 13:01
16 college team ever competed against a middle school 13:01
17 team?                                             13:02
18   A.  Has a college team ever competed against a 13:02
19 middle school?                                    13:02
20   Q.  That's correct.                            13:02
21   A.  It would be against our rule if they did.  13:02
22 But no, not to my knowledge.                      13:02
23      MS. KANG:  So I'm going to introduce a      13:02
24 document to you that's going to be marked as      13:02
25 Exhibit 3, and I'll let you know when folks can   13:02
                                          Page 46

1 access it in their Marked Exhibit folder.        13:02
2       (Deposition Exhibit 3 was marked for        13:02
3       identification and is attached hereto.)     13:02
4       MS. KANG:  So Exhibit 3 should now be in    13:02
5 everyone's Marked Exhibit folder.  If you don't see 13:02
6 it, try clicking on the folder again to refresh it. 13:03
7 BY MS. KANG:                                      13:03
8    Q.  Mr. Dolan, let me know when you're able to 13:03
9 access Exhibit 3.                                 13:03
10   A.  Okay.                                       13:03
11   Q.  Do you recognize this document?            13:03
12   A.  It is our rules and regulations handbook.  13:03
13 Yes.                                              13:03
14   Q.  Do you know who prepared this document?    13:03
15   A.  Over time it's -- you know -- you know,     13:03
16 it's the charge of one of my secretaries to -- once 13:03
17 rules are changed, to submit the changes.  But we 13:03
18 take care of that in -- in the office here.       13:03
19   Q.  So is this a Commission that's responsible 13:03
20 for the information in the rules and regulations  13:03
21 handbook?                                         13:03
22   A.  Yes.                                        13:03
23   Q.  So you'll notice that on the first page of 13:03
24 Exhibit 3 says that this was revised and printed  13:04
25 August 2021.                                      13:04
                                          Page 47

1    Is this the most recent version of the       13:04
2 rules and regulations?                            13:04
3    A.  Yes.  There may be editorial changes       13:04
4 between then, but that's the most recent copy we   13:04
5 have, yes.                                         13:04
6    Q.  So is it fair to say --                     13:04
7    A.  For --                                      13:04
8    Q.  I'm sorry.  Go ahead.                       13:04
9    A.  For the current year.                       13:04
10   Q.  So is it fair to say that this document    13:04
11 is -- is currently in effect?                     13:04
12   A.  Yes.                                         13:04
13   Q.  And just to be clear, is this the rules    13:04
14 and regulations handbook that you reviewed when   13:04
15 preparing for this deposition?                    13:04
16   A.  Yes.                                         13:04
17   Q.  Is the Commission required to follow these 13:04
18 rules and regulations?                            13:04
19   A.  The Commission as well as all the member   13:04
20 schools, yes.                                      13:04
21   Q.  So I believe you might have mentioned it   13:04
22 earlier, but just to be clear, can you walk me    13:04
23 through the rule-making process of the rules and  13:05
24 regulations in this handbook?                     13:05
25   A.  Okay.  Any principal can submit a rule     13:05
                                          Page 48

1 proposal.  It has to be in by January 15th.      13:05
2       This rule proposal would then be looked at 13:05
3 by our constitution and bylaws committee.  They   13:05
4 would make sure that it's legal and written       13:05
5 appropriate.                                       13:05
6       In the next week here, we'll be sending     13:05
7 out those proposals, all of our rule proposal     13:05
8 changes out to our membership.                     13:05
9       We will meet in the -- the first week of    13:05
10 in April.  And we will go over all of the rule    13:05
11 proposals, and we'll vote on them individually.   13:05
12      If they pass by a majority, they'll move     13:05
13 on to the State Board of Education, who puts them 13:05
14 out for comment.  And then they will vote on them 13:05
15 whether or not they will move forward as part of our 13:06
16 rule book.                                         13:06
17   Q.  What do you mean by you make sure that the 13:06
18 proposed rule is legal?                           13:06
19   A.  Sometimes the way it's written may not be  13:06
20 appropriate.  You know, there just may be         13:06
21 misspellings, misinterpretation.  So any changes we 13:06
22 make would go back to the person who made it.  We 13:06
23 would re-read it and say, "Is this what your intent 13:06
24 was" to make sure it's written properly.          13:06
25   Q.  And just to be clear, who exactly votes on 13:06
                                          Page 49

13 (Pages 46 - 49)

1 the proposed rule in the Commission?                13:06
2     A.  At our Board of Control, all 286 members    13:06
3 are eligible to vote.  So if they come to our annual 13:06
4 meeting, we will discuss each item.  And then the    13:07
5 next day we vote on every item that we have.         13:07
6     Q.  So it -- it would be the Board of Control    13:07
7 and any member school who participate in that        13:07
8 meeting that would vote on that rule?                13:07
9     A.  That is correct.                             13:07
10    Q.  Who amends these rules if they need          13:07
11 amendments?                                          13:07
12    A.  Beforehand, it would be the constitution     13:07
13 and bylaws.  There is a committee that we have       13:07
14 that -- made up of five principals.                  13:07
15    Q.  Who is responsible for enforcing these       13:07
16 rules?                                               13:07
17    A.  All of the member schools plus the SSAC      13:07
18 office itself.                                       13:07
19    Q.  What happens if a member school doesn't      13:07
20 follow these rules?                                  13:07
21    A.  Either the coach, the administration, or     13:07
22 the school itself could face any sort of penalty     13:07
23 from a letter of warning to suspension or fine.      13:08
24    Q.  By "suspension," do you mean suspension      13:08
25 from being a member school?                          13:08
                                          Page 50

1     A.  I don't know if we have ever suspended       13:08
2 anybody from being a member school, but it would be  13:08
3 suspicion of games, maybe not able to participate in 13:08
4 championships.                                       13:08
5     But, to my knowledge, we have never              13:08
6 suspended anybody from being a member.               13:08
7     Q.  Is it possible for the Commission to         13:08
8 cancel a school's membership?                         13:08
9     A.  I'm not sure.                                13:08
10    Q.  To your knowledge, has anyone ever           13:08
11 submitted a rule proposal about the participation of 13:08
12 transgender students?                                13:08
13    A.  No.                                          13:08
14    Q.  So I'm going to be just walking you          13:09
15 through a couple of excerpts in this exhibit.  And   13:09
16 it is quite long.  So I'm only going to be pointing  13:09
17 to certain sections.                                 13:09
18    So with that said, as I am going through,        13:09
19 if you want me to slow down or pause, or you want to 13:09
20 read over something, just -- just let me know.       13:09
21    So I'm going to ask you to turn to Page 99       13:09
22 of the pdf.  In the bottom right-hand corner, it     13:09
23 will be stamped WVSSAC000216.  And let me know       13:09
24 whenever you happen to get there.                    13:09
25    A.  What page again?                             13:10
                                          Page 51

1     Q.  So it's Page 99 of the pdf.  But I believe   13:10
2 it's Page 85 of the actual document.                 13:10
3     A.  Okay.                                        13:10
4     Q.  And just for future reference, when I --     13:10
5 when I say Page 99 or Page 2, I'm referring the page 13:10
6 of the pdf not the page numbers that may be written  13:10
7 in the exhibit.                                      13:10
8     MS. GREEN:  His assistant is slow.  He has       13:10
9 got a really slow assistant over here who is paging  13:10
10 through a page at a time.  We should be back in      13:10
11 about two weeks.                                     13:10
12    THE WITNESS:  Is it the organizational           13:10
13 chart?                                              13:10
14 BY MS. KANG:                                         13:10
15    Q.  That's correct.                              13:10
16    A.  Okay.  Yes.  I am there.                     13:10
17    Q.  Do you recognize this organizational         13:10
18 chart?                                              13:10
19    A.  I do.                                        13:11
20    Q.  Do you believe that accurately reflects      13:11
21 the organizational structure of the Commission?     13:11
22    A.  Except for the State Board of Education,     13:11
23 they only have oversight of our -- they have final  13:11
24 say of our rules.  So that may be why they are      13:11
25 placed at the top.                                  13:11
                                          Page 52

1     The Board of Directors -- I'm not sure it        13:11
2 accurately reflects our organization.  But yeah.     13:11
3     Q.  Would --                                     13:11
4     A.  The Board of Directors does not answer to    13:11
5 the Board of Control, I guess.                        13:11
6     Q.  So, I guess, where would you place the       13:11
7 Board of Directors in the organizational chart to    13:11
8 make it more accurate?                                13:11
9     A.  Well, I would probably and will probably     13:11
10 move State Board of Education, National Federation   13:11
11 out of the chart, and Board of Directors would be at 13:11
12 the top.  Board of Control would be where the        13:11
13 National Federation is.                              13:12
14    Q.  So is it fair to say that the Board of       13:12
15 Directors is probably the one at the head of the     13:12
16 organization?                                        13:12
17    A.  That is correct.                             13:12
18    Q.  I'm just going to ask you few questions      13:12
19 about a couple of these -- of these entries on the   13:12
20 organizational chart.                                13:12
21    Can you tell me a little more about the          13:12
22 State Board of Education's relationship with the     13:12
23 Board of Control specifically.                       13:12
24    A.  With the Board of Control, the State Board   13:12
25 of Education has final -- they will review and put   13:12
                                          Page 53

1 the rules out for comments by the general public,   13:12
2 and they'll have the final say on the votes.   13:12
3        That's probably the only relationship the   13:12
4 State Board of Education has with the Board of   13:12
5 Control.   13:13
6    Q.  I know you touched a bit on this earlier,   13:13
7 but could you tell me a bit more about what the   13:13
8 Board of Control's role is in the Commission.   13:13
9    A.  The Board of Control's charge is to vote   13:13
10 for rule changes, either vote them up or down.   13:13
11    Q.  What do you mean by "vote them up or   13:13
12 down"?   13:13
13    A.  When the -- they are put up for a vote,   13:13
14 whether it's to create a new rule or not, it's their   13:13
15 vote -- it's a majority of the Board of Control that   13:13
16 is there that day for the vote.   13:13
17        It either passes or it fails.  If it   13:13
18 passes, it goes on to the State Board of Education.   13:13
19    Q.  Does the State Board ever promulgate rules   13:13
20 that the Commission has to follow?   13:13
21    A.  The State Board has a 2.0 policy that is   13:13
22 in our rule book, but it never passed our Board of   13:14
23 Control.  It was -- it's a State Board of Education   13:14
24 policy.   13:14
25    Q.  Does the Commission have to follow that   13:14

Page 54

1 2.0 rule?   13:14
2    A.  Yes.  And all of our members.   13:14
3    Q.  Are you aware of any other rules from the   13:14
4 State Board of Education?   13:14
5    A.  Not really.   13:14
6    Q.  What is the Board of Control's   13:14
7 relationship with the directors, if any?   13:14
8    A.  Five of the Board of Directors are   13:14
9 principals; so five of those principals would be   13:14
10 members of the Board of Control.  That's about   13:14
11 the -- the best relationship -- the only   13:14
12 relationship they have.   13:14
13    Q.  What is the Board of Control's   13:14
14 relationship with the executive director?   13:14
15    A.  None, really.  I mean, the Board -- the   13:15
16 Board -- the five members of the Board of Directors   13:15
17 that are principals represented an administrative   13:15
18 district.  And so the Board -- the Board of   13:15
19 Directors answers to schools in their district.  So   13:15
20 that's the only indirect connection between myself   13:15
21 and the Board of Control.   13:15
22    Q.  And there are ten Board of   13:15
23 Directors members; is that right?   13:15
24    A.  Yes, ma'am.   13:15
25    Q.  Does any member of the Board of Directors   13:15

Page 55

1 ever promulgate or propose rules?   13:15
2    A.  If they are one of the five principals   13:15
3 they can, yes.   13:15
4    Q.  Can you tell me a little bit more about   13:15
5 what your assistant executive directors do in   13:16
6 relation to the rules in this handbook?   13:16
7    A.  Basically they -- they can help interpret   13:16
8 the rules between our member schools, if there is   13:16
9 issues.   13:16
10        But they primarily are responsible for the   13:16
11 championships in their particular sports.  But they   13:16
12 can answer questions and interpretations on disputes   13:16
13 of the rule book between schools.   13:16
14    Q.  By overseeing the championship, does that   13:16
15 include issuing rules for the championship?   13:16
16    A.  No.  All of our playing rules are created   13:16
17 by the National Federation.  There are some times   13:16
18 that they have -- by state adoption that you can   13:16
19 modify rules, but we follow the NFHS playing rules   13:16
20 100 percent.   13:17
21    Q.  So the --   13:17
22    A.  Close a 100 percent.  As close to a   13:17
23 100 percent as possible.   13:17
24    Q.  So does -- so the Commission does not have   13:17
25 any of its own rules in relation to championship?   13:17

Page 56

1    A.  No.  There are rules in there that govern   13:17
2 how many people are at the game; you know, how many   13:17
3 teams are at the game; where the game is going to be   13:17
4 held.  All those things.  The time.  The place.   13:17
5 Those are all determined by our Board of Directors.   13:17
6        And then they are given the charge to   13:17
7 myself or my -- my assistants to run those   13:17
8 championships on those days.   13:17
9    Q.  What does the Sports Medicine Committee   13:17
10 do?   13:17
11    A.  They advise us in all of our rules and   13:17
12 regulations that go in for each sport for safety.   13:18
13 For instance, concussion, heat illness, sudden   13:18
14 cardiac arrest, whether we are making modifications   13:18
15 to practice schedules based on their -- their   13:18
16 expertise.   13:18
17        And so they will make recommendations to   13:18
18 us for modifying sports to make it more safe.   13:18
19    Q.  So who makes up the Sports Medicine   13:18
20 Committee?   13:18
21    A.  There's a variety of doctors and athletic   13:18
22 trainers.  I believe there is -- I mean, there is a   13:18
23 number of them.  At least 12.  I'm not sure of the   13:18
24 exact number because they come off and on.  But   13:18
25 yeah.  So they -- that's who makes it up is a   13:18

Page 57

15 (Pages 54 - 57)

**Page 58**

```
 1   variety of medical personnel.              13:18
 2      Q.   And do they report to you?          13:19
 3      A.   They would make recommendations to me to   13:19
 4   give to the Board of Directors if we happen to have   13:19
 5   changes about -- sport-specific things, practice,   13:19
 6   things like that.  Things that are not in the rule   13:19
 7   book, but they are modifications or rules that they   13:19
 8   would apply.                               13:19
 9           Heat illness is a big example.  They are   13:19
10   providing recommendations on how long a practice is,   13:19
11   what you are allowed to do at a practice, and things   13:19
12   like that.                                 13:19
13      Q.   Do you happen to know if anyone from the   13:19
14   West Virginia Legislature spoke with anyone from the   13:19
15   Sports Medicine Committee before H.B. 3293 was   13:19
16   passed?                                    13:19
17      A.   Not that I know of.                 13:19
18           MS. KANG:  So I think now might be a good   13:19
19   time for a five- to ten-minute break, just let you   13:19
20   stretch your legs a little bit.            13:20
21           THE WITNESS:  Okay.                13:20
22           MS. KANG:  Roberta, are you all right with   13:20
23   that?                                      13:20
24           MS. GREEN:  Yes.  I think it's a good   13:20
25   time.                                      13:20
```

**Page 59**

```
 1           MS. KANG:  All right.  So why don't we --   13:20
 2   why don't we take a break until about 1:30.   13:20
 3           THE WITNESS:  Okay.                13:20
 4           THE VIDEOGRAPHER:  This marks the end of   13:20
 5   Media Number 1.  Going off the record.  The time is   13:20
 6   1:20.                                      13:20
 7           (Brief recess.)                    13:34
 8           THE VIDEOGRAPHER:  This marks the   13:34
 9   beginning of Media Number 2 in the deposition of   13:34
10   30(b)(6) Witness Bernie Dolan.             13:34
11           Back on the record.  The time is 1:35.   13:35
12   BY MS. KANG:                               13:35
13      Q.   Mr. Dolan, before I move on to my next   13:35
14   topic, I just want to ask you two more quick   13:35
15   questions about the Sports Medicine Committee.   13:35
16           To your knowledge, has the Sports Medicine   13:35
17   Committee or anyone from that committee ever made a   13:35
18   recommendation regarding transgender participation   13:35
19   in athletics?                              13:35
20      A.   I don't believe it's ever been on the   13:35
21   agenda, no.                                13:35
22      Q.   Do you know if the Sports Medicine   13:35
23   Committee has ever made a recommendation on girls   13:35
24   playing on boys' teams?                    13:35
25      A.   Not in my tenure here, no.  I don't know   13:35
```

**Page 60**

```
 1   about previous.                            13:35
 2      Q.   All right.  So I'm going to have a similar   13:35
 3   set of questions next.  So just diving a little bit   13:35
 4   more into the Commission's role at -- role in   13:35
 5   sports.                                    13:35
 6           Can you tell me -- I know you mentioned   13:35
 7   some earlier -- what factors are currently used to   13:36
 8   determine a student's eligibility?         13:36
 9      A.   Number one is do they live with their --   13:36
10   are they enrolled in the school;           13:36
11           Number two, do they live with their   13:36
12   parents;                                   13:36
13           Number three, do they reside in the   13:36
14   district where their school is;            13:36
15           What's -- what's their age as of   13:36
16   August 1st of the -- that current year;    13:36
17           Are they playing on any other teams   13:36
18   outside the school team.                   13:36
19           Those are the majority -- and do they have   13:36
20   a 2.0.                                     13:36
21           Those are the majority of the eligibility   13:36
22   reasons that somebody might not be eligible for a   13:36
23   period of time.                            13:36
24      Q.   If I could just put a pin in that.   13:36
25           So a student could be ineligible for a   13:36
```

**Page 61**

```
 1   certain period of time and then gain eligibility?   13:36
 2      A.   Yes.                              13:37
 3      Q.   And the factors that are used to determine   13:37
 4   a student's eligibility -- are those the rules and   13:37
 5   regulations in the handbook plus the rules   13:37
 6   promulgated by the State Board of Education?   13:37
 7      A.   It is the -- the rules that are in our   13:37
 8   rule book, as well as the 2.0, which is the   13:37
 9   West Virginia Department of ED's rule, State Board   13:37
10   of Education.                              13:37
11           It's in our rule book, but it's not   13:37
12   technically our rule, but it's for all of our   13:37
13   member -- all of our public schools, and our private   13:37
14   schools follow it too.                     13:37
15      Q.   Do the -- do the county boards of   13:37
16   education in West Virginia have any rules that   13:37
17   determine a student's eligibility?         13:37
18           MS. GREEN:  And I'll just object to the   13:37
19   form.                                      13:37
20           THE WITNESS:  They are not supposed to   13:37
21   have any rules additional than ours.  They have   13:38
22   given over the rights of overseeing sports to the   13:38
23   SSAC.                                      13:38
24   BY MS. KANG:                               13:38
25      Q.   When a student's eligibility is in   13:38
```

16 (Pages 58 - 61)

Page 62

1  dispute, who makes the final determination as to    13:38
2  that student's eligibility?                          13:38
3      A.  I would make the initial -- well, the       13:38
4  school makes the initial call.  I would then either  13:38
5  verify or overturn their decision based upon the     13:38
6  facts.                                               13:38
7      And then if they're not happy with the          13:38
8  answer that I get, they want to appeal that, they    13:38
9  take that to the Board of Directors.  And if they    13:38
10 are -- if my ruling is sustained at the Board of     13:38
11 Directors, they have a Board of Review that they     13:38
12 could go to to get one final opportunity for a       13:38
13 waiver.                                              13:38
14     Q.  And the Board of Review is that different   13:39
15 from the Board of Control?                           13:39
16     A.  It is.  The Board of Review is the final    13:39
17 Board that has seven members and may or may not be   13:39
18 connected to the schools.  It's more general.  But   13:39
19 they are appointed by the State Board of Education.  13:39
20     Q.  Is the Board of Review a part of the        13:39
21 Commission?                                          13:39
22     A.  They are appointed by the Board of -- or    13:39
23 the State Board of Education.  So I think you've     13:39
24 seen them say WVSSAC Board of Review, but we have no 13:39
25 input as to whether or not -- who the members are.   13:39

Page 63

1      Q.  Are any Commission members currently part   13:39
2  of the Board of Review?                              13:39
3      A.  There may be one member who is a Board      13:39
4  office personnel who also serves on the              13:40
5  Commission -- or on the Board of Review as the       13:40
6  athletic director's association, but she is not a    13:40
7  member -- she's not an employee of one of the        13:40
8  schools.  She works at the county office.            13:40
9      Q.  Which county office?                        13:40
10     A.  I believe Lewis County office.              13:40
11     Q.  Okay.  So I want us to go back to           13:40
12 Exhibit 3.  And this will be Page 16 of the pdf.     13:40
13 And in the bottom right-hand corner it will be Bates 13:40
14 stamped VSV- -- WVSSAC000133.  And let me know       13:40
15 whenever you get a chance to review it.              13:40
16     MS. GREEN:  And, Ms. Kang, what was the         13:40
17 pdf page?                                            13:41
18     MS. KANG:  Sure.  It's Page 16.                 13:41
19     MS. GREEN:  15 or 16?                           13:41
20 BY MS. KANG:                                         13:41
21     Q.  16.  1,6.                                   13:41
22     A.  Okay.  I'm at 14 now.                       13:41
23     MS. GREEN:  Sorry.                              13:41
24     THE WITNESS:  Okay.                             13:41
25     MS. GREEN:  And what does it read at the        13:41

Page 64

1  bottom?                                              13:42
2  BY MS. KANG:                                         13:42
3      Q.  WVSSAC000133.                               13:42
4      A.  Yep.  Okay.  Yes.                           13:42
5      Q.  At the top of Exhibit 3, Page 16, you'll    13:42
6  note it says, "Title 127 Legislative Rule."          13:42
7      Do you know what a legislative rule is?         13:42
8      A.  I assume -- no.  All of our rules are 127.  13:42
9  So I think that's the area that we are in.  But I    13:42
10 would probably be guessing if I did, you know.       13:42
11     MS. GREEN:  Yeah.                               13:42
12     THE WITNESS:  Yeah.                             13:42
13 BY MS. KANG:                                         13:42
14     Q.  Do you know who promulgated this specific   13:42
15 rule?                                                13:42
16     MS. GREEN:  I'll just object to the form.       13:42
17     THE WITNESS:  Well, our rules have been in      13:42
18 place since 1916.  So over time, all of our rules    13:42
19 have had some modification every year.               13:43
20     So as far as when that particular rule,         13:43
21 the most current part, I couldn't tell you.          13:43
22     It's probably -- well, it says it was           13:43
23 effective in September 9 of 2019.  So that means     13:43
24 there was a rule change at the Board of Control in   13:43
25 2019.                                                13:43

Page 65

1  BY MS. KANG:                                         13:43
2      Q.  Okay.  I just want to draw your attention   13:43
3  to the section on the same page it says "127-1-2     13:43
4  Name."                                              13:43
5      And in this paragraph -- I'll read out a        13:43
6  section.  But take your time reading it as well.     13:43
7      It says [as read]:                              13:43
8      "Extracurricular activities of the              13:43
9      students in the public secondary               13:43
10     schools are controlled pursuant to              13:43
11     W. Va. Code 18225, and authority for           13:43
12     the delegation of such control to the          13:43
13     Commission is granted by statute."             13:44
14     A.  Yes.                                        13:44
15     Q.  Now, did I -- did I read this correctly?    13:44
16     A.  You did.                                    13:44
17     Q.  Is this statement accurate?                 13:44
18     A.  I believe it's accurate.  But it's not      13:44
19 inclusive if that's the -- because it's -- we have   13:44
20 private schools as members also.                     13:44
21     But the legislature apparently, by              13:44
22 statute, only dealt with the public schools.         13:44
23     Q.  Do you know how many private schools are    13:44
24 part of your membership?                             13:44
25     A.  Somewhere around 20.  I don't know the      13:44

17 (Pages 62 - 65)

1  exact number.                                          13:44
2     Q.  Are you familiar at all with West Virginia  13:44
3  Code 18225?                                            13:44
4     A.  Yes.                                            13:44
5     Q.  What is your understanding of it?          13:44
6        MS. GREEN:  I'll just object to the extent  13:44
7  it would call for a legal conclusion.                  13:44
8        THE WITNESS:  It was when they authorized   13:45
9  the WVSSAC.                                            13:45
10 BY MS. KANG:                                           13:45
11    Q.  What do you mean "authorized WVSSAC"?      13:45
12    A.  We had been an organization since 1916.    13:45
13 And in the late '60s, they -- for some reason they     13:45
14 put us in the code, I guess.                           13:45
15    Q.  What does "extracurricular activities" in  13:45
16 this section mean?                                     13:45
17    A.  It would be sports and band.               13:45
18    Q.  Does it include club sports?               13:45
19    A.  No.  Not -- not in terms of the WVSSAC,    13:45
20 no.                                                    13:45
21    Q.  When does a club sport become a sport that 13:46
22 is controlled by the WVSSAC?                           13:46
23    A.  When there is more than 30 -- more than 20 13:46
24 we can recognize it.                                   13:46
25        At 32 teams, when there are 32 individual  13:46
                                                     Page 66

1  teams, our Board can authorize a championship for 13:46
2  one class.                                             13:46
3        If there is 50 percent of our              13:46
4    membership -- of the high school membership, they   13:46
5  could authorize two classes; 75 percent they could    13:46
6  authorize three.                                       13:46
7     Q.  So I'm going to draw your attention now    13:46
8  staying on the same page on Exhibit 3 to the section   13:46
9  that says, "127-1-3 Goals."                            13:46
10       And I'm also going to refer you to the      13:46
11 section that says "3.1."  And I'll read it out loud.   13:46
12 And feel free to take your time reading it as well.    13:46
13 [As read]:                                             13:46
14       "This Commission, through the              13:46
15       employment of instrumentalities             13:46
16       hereinafter established, shall              13:47
17       supervise and control interscholastic       13:47
18       athletics and band activities among         13:47
19       member schools."                            13:47
20 A.  Okay.                                              13:47
21    Q.  Did I read this correctly?                 13:47
22 A.  You did.                                           13:47
23    Q.  Is this statement accurate?                13:47
24       MS. GREEN:  Object to form.                 13:47
25       THE WITNESS:  Yes.                          13:47
                                                     Page 67

1  BY MS. KANG:                                           13:47
2     Q.  What does "supervise and control          13:47
3  interscholastic athletics" mean?                       13:47
4        MS. GREEN:  Object to the form.             13:47
5        THE WITNESS:  Provide the rules and make    13:47
6  sure that everybody is following the rules.            13:47
7  BY MS. KANG:                                           13:47
8     Q.  And how do you make sure that everyone is  13:47
9  following the rules?                                   13:47
10    A.  Well, usually it -- you know, it's brought 13:47
11 to our attention either through members of the         13:47
12 public, schools in particular.  Sometimes we see       13:47
13 violations in the newspaper, and we follow up on       13:47
14 them.                                                  13:48
15    Q.  By "follow up," you mean you reach out to  13:48
16 the individual member school?                          13:48
17    A.  Yes.  And ask them for a written response  13:48
18 as to what the allegation might be.                    13:48
19    Q.  And do you have a rough estimate of how    13:48
20 many violations happen a year?                         13:48
21    A.  How many violations?  Or how many times    13:48
22 are we called about a violation?                       13:48
23    Q.  Let's say, how many times you are called   13:48
24 for a violation.                                       13:48
25    A.  If I had to guess, it would probably be    13:48
                                                     Page 68

1  two or three a month.  Not counting the appeals --    13:48
2  the student appeals.                                   13:48
3     Q.  How does a school stop being a member of   13:48
4  the WVSSAC?                                            13:48
5     A.  To be honest with you, I'm not sure how a  13:49
6  public school does.                                    13:49
7        The private school simply writes us a       13:49
8  letter and says, "We no longer want to be a member    13:49
9  of your organization."  There's no penalty for        13:49
10 withdrawal.                                            13:49
11    Q.  Is there a reason why it's a different      13:49
12 rule for a private school versus a public school?     13:49
13    A.  I guess a public could withdraw.           13:49
14    Q.  To your knowledge, has any public school   13:49
15 ever withdrawn?                                        13:49
16    A.  No.  Just -- they have consolidated; and,   13:49
17 therefore, they become a new school, or they've       13:49
18 closed and have been absorbed into a new school.      13:49
19 But, to my knowledge, no public school has ever not   13:49
20 been a member.                                         13:49
21    Q.  Are all public schools in West Virginia    13:49
22 currently members?                                     13:49
23    A.  All public secondary schools 6 through 12, 13:49
24 yes.                                                   13:49
25    Q.  If a school is not a member of the         13:49
                                                     Page 69

18 (Pages 66 - 69)

1  Commission, could it still offer interscholastic     13:49
2  sports?                                                13:49
3      A.  Yes.                                          13:49
4      Q.  Can a school that is not a member compete     13:50
5  with member schools?                                  13:50
6      A.  As long as they are a school, yes.            13:50
7      Q.  So now I would like to draw your attention    13:50
8  to Page 17 of Exhibit 3, it should be just the next   13:50
9  page down.                                            13:50
10        And I'll ask you to look at the paragraph      13:50
11  that starts "127-1-4. Membership."                   13:50
12     A.  Okay.                                         13:50
13     Q.  And that paragraph says [as read]:            13:50
14         "The WVSSAC shall be composed of the          13:50
15         principals or designee, of those public       13:50
16         or private secondary schools which have       13:50
17         certified in writing to the State             13:50
18         Superintendent of Schools of                  13:50
19         West Virginia [paren] (State                  13:50
20         Superintendent) that they have elected        13:50
21         to delegate the control, supervision,         13:50
22         and regulation of their interscholastic       13:50
23         athletic and band activities."                13:50
24         Did I read that correctly?                    13:50
25     A.  Yes.                                          13:50
                                                      Page 70

1      Q.  Is this statement accurate?                   13:51
2          MS. GREEN:  Object to the form.               13:51
3          THE WITNESS:  Yes.                            13:51
4  BY MS. KANG:                                          13:51
5      Q.  What does it mean to "delegate the            13:51
6  control, supervision, and regulation of their         13:51
7  interscholastic athletic and band activities"?        13:51
8          MS. GREEN:  Object to the form.               13:51
9          THE WITNESS:  It means that the WVSSAC and    13:51
10  its member schools will write rules and everybody    13:51
11  will follow them.                                    13:51
12        And so they can't have rules of their own      13:51
13  that are separate from the rules that we have all    13:51
14  agreed to.                                            13:51
15  BY MS. KANG:                                          13:51
16     Q.  So just to be a clear, a member school        13:51
17  cannot issue its own rules -- is that -- for         13:51
18  interscholastic athletics; is that right?            13:51
19     A.  Not if it's in conflict with our rule.       13:51
20     Q.  Can it issue rules that are not in            13:51
21  conflict with the SSAC rules?                        13:51
22     A.  Sure.                                          13:51
23     Q.  Did Bridgeport Middle School delegate its    13:52
24  control, supervision, and regulation of              13:52
25  interscholastic athletic activities to the           13:52
                                                      Page 71

1  Commission?                                           13:52
2      A.  I'm sure they did at one time, yes.           13:52
3      Q.  So we're going to stay on the same page,      13:52
4  but I'm going to draw your attention to the section   13:52
5  that starts with 4.2.b.  Says [as read]:              13:52
6          "The principal or designee is and             13:52
7          shall be responsible for conducting           13:52
8          interscholastic athletic
9          and band activities of the school in
10         accordance with the constitution,
11         bylaws, rules and regulations of the
12         Commission which have been adopted by
13         the Board of Control of the Commission
14         for the governing of such                     13:52
15         activities."                                  13:52
16     A.  Okay.                                         13:52
17     Q.  Did I read this correctly?                    13:52
18     A.  Yes.                                          13:52
19     Q.  Do you believe this statement is accurate?  13:52
20         MS. GREEN:  Object to the form.               13:52
21         THE WITNESS:  Yes.                            13:52
22  BY MS. KANG:                                          13:52
23     Q.  What happens if a principal or a designee    13:52
24  breaks one of the Commission's rules?                13:53
25     A.  There's a -- depends upon what the rule is   13:53
                                                      Page 72

1  and how often, it could be a letter of discipline,    13:53
2  it could be a verbal warning, or it could go all the  13:53
3  way up to suspension or fine.                         13:53
4      Q.  So am I right that, when a member school      13:53
5  makes a determination of what students are eligible   13:53
6  to play secondary sports, it has to follow the rules  13:53
7  and regulations of the Commission?                    13:53
8      A.  Yes.                                          13:53
9      Q.  So now I'm going to ask you to scroll down    13:53
10  two more pages to Page 19.  It should be stamped     13:53
11  WVSSAC000136 of Exhibit 3.  Let me know whenever     13:53
12  you're there.                                        13:53
13     A.  Okay.  We're there.                           13:53
14     Q.  I'm sorry.  Let me actually take you to       13:54
15  Page 20.  That's Bates stamped -137 of Exhibit 3.    13:54
16     A.  Okay.                                         13:54
17     Q.  So in the section that says "127-1-8.         13:54
18  Board of Directors," it says [as read]:              13:54
19         "The Board of Directors shall have            13:54
20         authority to administer the regulations       13:54
21         of the WVSSAC."                               13:54
22         Did I read that correctly?                    13:54
23     A.  You did.                                      13:54
24     Q.  Do you believe the statement is accurate?    13:54
25     A.  Yes.                                          13:54
                                                      Page 73

19 (Pages 70 - 73)

```
 1    Q.  What does administer the regulations of    13:54
 2  the WVSSAC mean?                                 13:54
 3        MS. GREEN:  Object to the form.            13:54
 4        THE WITNESS:  Make sure everybody is       13:54
 5  following the rules as written and interpreted.  13:54
 6        (Simultaneously speaking.)                 13:54
 7  BY MS. KANG:                                     13:54
 8    Q.  By "interpreted," who --                   13:54
 9    A.  The --                                     13:55
10    Q.  -- makes -- oh, sorry.                     13:55
11    A.  Just --                                    13:55
12    Q.  Did you --                                 13:55
13    A.  As the rules are written.                  13:55
14    Q.  Does it mean anything else?                13:55
15    A.  No.                                        13:55
16    Q.  I'm going to ask you to scroll one more    13:55
17  page down to the page that's Bates stamped       13:55
18  WVSSAC -138.  It should be Page 21 of the pdf of 13:55
19  Exhibit 3.                                       13:55
20    A.  Okay.                                      13:55
21    Q.  So I'll draw your attention to             13:55
22  Section 8.5, which says [as read]:               13:55
23        "The Board of Directors shall have         13:55
24        power to decide all cases of               13:55
25        eligibility of students and                13:55
                                           Page 74
```

```
 1    A.  Well, the Commission cannot.  The Board of  13:56
 2  Directors can.  And then the Board of Review can. 13:56
 3  But the -- the office itself cannot grant waivers. 13:56
 4        I'll take that back.                       13:56
 5        I can grant a waiver if it's been ruled    13:56
 6  before in a similar fashion by the Board, but I   13:57
 7  don't have -- I don't execute that.              13:57
 8    Q.  So is it fair to say that if the Board of  13:57
 9  Review issues a determination of a student's     13:57
10  eligibility and the current student before you has a 13:57
11  similar set of facts, you can rely on that previous 13:57
12  determination?                                   13:57
13        MS. GREEN:  Object to the form.            13:57
14        THE WITNESS:  The rule says that, but      13:57
15  they're never -- I've yet to find two cases that are 13:57
16  exactly similar.  So...                          13:57
17  BY MS. KANG:                                     13:57
18    Q.  But you have the ability to -- to do so?   13:57
19    A.  It says that we have the ability to do so, 13:57
20  yes.                                             13:57
21    Q.  So now I'd like to -- we're staying on the 13:57
22  same page -- draw your attention to Paragraph 8.7 13:57
23  and 8.8.                                         13:57
24        So I'll read Paragraph 8.7 first.  It says 13:57
25  [as read]:                                       13:57
                                           Page 76
```

```
 1        participants in interscholastic            13:55
 2        athletic and band activities.  The         13:55
 3        Board may also exercise discretionary      13:55
 4        powers it may deem necessary for the       13:55
 5        furtherance of education and               13:55
 6        interscholastic athletic and band          13:55
 7        activities in the secondary schools of     13:56
 8        West Virginia."                            13:56
 9        Did I read that correctly?                 13:56
10    A.  You did.                                    13:56
11    Q.  Do you believe this statement is accurate? 13:56
12        MS. GREEN:  Object to the form.            13:56
13        THE WITNESS:  Yes.                         13:56
14  BY MS. KANG:                                     13:56
15    Q.  What does it mean "Shall have the power to 13:56
16  decide all cases of eligibility of students and  13:56
17  participants in interscholastic athletic and band 13:56
18  activities"?                                     13:56
19        MS. GREEN:  Object to form.                13:56
20        THE WITNESS:  If I have -- if the school   13:56
21  or I have determined somebody to be ineligible, they 13:56
22  can grant a waiver to make them eligible.        13:56
23  BY MS. KANG:                                     13:56
24    Q.  Can anyone other than the Commission grant 13:56
25  a waiver?                                        13:56
                                           Page 75
```

```
 1        "At the request of the Board of            13:58
 2        Directors, a Deputy Board Member may       13:58
 3        investigate matters of eligibility and     13:58
 4        other violations of the rules and          13:58
 5        regulations of the WVSSAC.  The Deputy      13:58
 6        Board Member shall submit to the Board      13:58
 7        of Directors a written report of           13:58
 8        findings and recommendations for           13:58
 9        disposition of the case(s)."               13:58
10        Did I read that correctly?                 13:58
11    A.  You did.                                    13:58
12    Q.  Do you believe this statement is accurate? 13:58
13        MS. GREEN:  Object to form.                13:58
14        THE WITNESS:  Yes.                         13:58
15  BY MS. KANG:                                     13:58
16    Q.  When would the Board of Directors request 13:58
17  an investigation into matters of eligibility?    13:58
18    A.  If something was brought to them by a      13:58
19  member school or the public at large.            13:58
20    Q.  Are there any Deputy Board Members         13:58
21  currently?                                       13:58
22    A.  There are ten.                             13:58
23    Q.  Who do they report to?                     13:58
24    A.  They have very few -- very few             13:58
25  responsibilities.  We have not asked them to     13:59
                                           Page 77
```

20 (Pages 74 - 77)

1 investigate. We -- you know, we feel like it has    13:59
2 put some them in difficult positions. So most of    13:59
3 the investigations come out of our office.    13:59
4     Q. Can you tell me a little bit more about    13:59
5 putting them in difficult positions; what you mean    13:59
6 by that.    13:59
7     A. If they have to go into somebody else's    13:59
8 school and make a determination on eligibility or    13:59
9 where somebody lives, it could be a rival school and    13:59
10 people might not want them there.    13:59
11        So, you know, we have taken it over    13:59
12 because it's unbiased if we're looking at it.    13:59
13     Q. So are the Deputy Board Members designees    13:59
14 or members of the member school?    13:59
15     A. They are principals of a member school,    13:59
16 yes.    14:00
17     Q. So now on Paragraph 8.8 it says [as read]:    14:00
18        "The Board of Directors shall have    14:00
19        the power to investigate through the
20        Deputy Board Member, or in
21        such other manner as may be found
22        advisable, matters of eligibility and
23        other violations of rules when the
24        Board deems it advisable to do so on
25        the basis of information furnished,
Page 78

1        even though a formal protest is not
2        filed."
3        Did I read that correctly?    14:00
4     A. You did.    14:00
5     Q. Is this statement accurate?    14:00
6        MS. GREEN: Object to the form.    14:00
7        THE WITNESS: It is.    14:00
8 BY MS. KANG:    14:00
9     Q. So when would the Board -- when would the    14:00
10 Board deem it advisable to investigate matters of    14:00
11 eligibility even without formal protest?    14:00
12     A. Sometimes they --    14:00
13        MS. GREEN: Object to the form.    14:00
14        THE WITNESS: Oh. I'm sorry.    14:00
15        Sometimes they get anonymous letters that    14:00
16 would supply some information; and, you know, they    14:00
17 would -- now they would ask us because I also can    14:00
18 investigate. And so we would do it and then --    14:00
19 instead of our Board -- Deputy Board just because we    14:01
20 don't want to put them in a position where they    14:01
21 would be ruling on a -- sometimes a competitor.    14:01
22 BY MS. KANG:    14:01
23     Q. And what is the difference between a    14:01
24 formal protest versus an informal protest?    14:01
Page 79

1     A. A formal protest would be somebody's --    14:01
2 has written it and put their name to it.    14:01
3        Informal would be an anonymous letter or a    14:01
4 phone call.    14:01
5     Q. So I'm going to ask you to scroll one page    14:01
6 down in Exhibit 3 to the page that is Bates    14:01
7 Stamped -139. It should be Page 22 of the pdf.    14:01
8     A. Okay.    14:01
9     Q. So I am looking at Section 127-1-9 titled    14:01
10 "Funds."    14:01
11     A. Okay.    14:01
12     Q. How -- how is the Commission funded?    14:01
13     A. All of our revenue comes from championship    14:02
14 events, ticket sales at championship events;    14:02
15        Regional basketball ticket sales;    14:02
16        Playoffs for football;    14:02
17        Registering of officials;    14:02
18        Coaches Education;    14:02
19        And corporate partnership.    14:02
20     Q. Are there any other sources of revenue?    14:02
21     A. None of any significance.    14:02
22     Q. By "none of any significance," what do you    14:02
23 mean?    14:02
24     A. There would be maybe some fines in there    14:02
25 for people -- coaches not paying -- or not    14:02
Page 80

1 evaluating their officials or not putting scores in.    14:02
2 Things like that.    14:02
3     Q. How much money are those fines usually?    14:02
4     A. $25 or $50 or $10, depending upon what it    14:02
5 is for.    14:03
6     Q. Now, you mentioned the Coaches Education.    14:03
7 Could you tell me a bit more about what that is.    14:03
8     A. The legislature requires that our coaches    14:03
9 who are non-teachers must have a Coaches Education.    14:03
10 And this is a State Board of Education. But they    14:03
11 have charged us with providing the education, but    14:03
12 State Board of Education would do the certification.    14:03
13     Q. Do the coaches pay the Commission for this    14:03
14 education?    14:03
15     A. They do.    14:03
16     Q. Is the Commission a for-profit    14:03
17 organization?    14:03
18     A. We are not.    14:03
19     Q. Do you receive any funds from the federal    14:03
20 government?    14:03
21     A. We received from -- some pandemic funds.    14:03
22        But that was all through the small    14:03
23 business authority.    14:04
24     Q. Anything else?    14:04
25     A. We have received GEAR funding from --    14:04
Page 81

21 (Pages 78 - 81)

**Page 82**

1 through the Department of Education for monies to go   14:04
2 back to the school through AEDs, wet globe bulbs   14:04
3 [verbatim], reimbursement for travel, things like   14:04
4 that.   14:04
5      Because everybody was in short -- low   14:04
6 attendance, and so we were trying to find a way to   14:04
7 help them with their money.   14:04
8      Q.  By "gear funding," do you mean sports gear   14:04
9 or...   14:04
10     A.  For them they also had limited attendance   14:04
11 and limited games.  So --   14:04
12         Did I miss the question?   14:04
13         Okay.  What was your question again?   14:04
14     Q.  Oh.  I just asked that by "gear funding,"   14:04
15 did you mean sports gear?   14:04
16     A.  No.  No.  It is -- I think it's -- GEAR is   14:05
17 the program.   14:05
18     Q.  Understood.   14:05
19         And was this all during the pandemic?   14:05
20     A.  Yes, ma'am.   14:05
21     Q.  Do you receive any funds from your member   14:05
22 schools?   14:05
23     A.  The only funds we receive at this time   14:05
24 would be fines that they would have to pay for not   14:05
25 attending, not putting in scores.   14:05

**Page 83**

1      Sometimes our events might be held at   14:05
2 their schools; so they would collect the gate and   14:05
3 then write us a check.   14:05
4      But that's pretty much all we get from the   14:05
5 schools.   14:05
6     Q.  And how much are the fines?   14:05
7     A.  For not putting in an evaluation, it's   14:05
8 $10;   14:05
9      For not doing your eligibility, it's $25;   14:05
10     And if you don't put in a score, it's $50.   14:05
11    Q.  Is any of the Commission's revenue shared   14:06
12 with the member schools?   14:06
13    A.  Yes.   14:06
14    Q.  How is it shared?   14:06
15    A.  We -- we give reimbursement back to the   14:06
16 schools.  Each sport has a different formula, but we   14:06
17 help with travel and meal money at most of the   14:06
18 events.   14:06
19      At football they also get a commission of   14:06
20 the gate.  20 percent the first week, 15 percent the   14:06
21 second, 10 the third, and 5 at the championship.   14:06
22    Q.  If you had to estimate, what percentage of   14:06
23 Commission funds go to the member schools?   14:06
24    A.  When you say go to the schools, you mean   14:06
25 actually cash sent back to them?  Or do you mean   14:07

**Page 84**

1 services to the school?   14:07
2    Q.  Let's start with cash sent back to them.   14:07
3      MS. GREEN:  Object to the form.   14:07
4      THE WITNESS:  I would say $300,000 out of   14:07
5 a probably $1.5 million budget.   14:07
6 BY MS. KANG:   14:07
7    Q.  So what about services?   14:07
8    A.  The services -- oh, I'm sorry.   14:07
9      Services would be higher because -- I   14:07
10 would think it's probably closer to $700,000   14:07
11 depending upon what you call as "giving back".   14:07
12      You know, if it's -- some people would say   14:07
13 that the expenses to put on tournaments is a way to   14:07
14 give back.   14:07
15      Direct expenses would be, you know, the   14:07
16 things that we are purchasing for them right now,   14:07
17 which would be the AED and the wet globe bulb and   14:07
18 the cooling submersion tubs.   14:07
19    Q.  So what -- what is encompassed in the term   14:08
20 "services"?   14:08
21    A.  Services.  Each -- each season we travel   14:08
22 around the state to meet with all principals for a   14:08
23 regional principal meeting.   14:08
24      We also travel around the state to meet   14:08
25 with each sport during each -- at the beginning of   14:08

**Page 85**

1 each season to make sure -- we go over all the rules   14:08
2 and regulations that are current.   14:08
3      Those are some of -- as well as expenses   14:08
4 that we incur hosting the tournaments for them.   14:08
5      And the coaches -- you know, we have -- we   14:08
6 have expenses in materials for Coaches Education.   14:08
7    Q.  I believe you mentioned you stopped   14:09
8 collecting dues from your members.   14:09
9      Do you currently have any plans to resume   14:09
10 collecting dues?   14:09
11    A.  No.  We have a proposal from one of our   14:09
12 principals for this year to strike out the -- all of   14:09
13 the dues' language and inserting language in there   14:09
14 that says, "Could resume at any time when   14:09
15 necessary."   14:09
16    Q.  So, now, sticking with Exhibit 3, I'm   14:09
17 actually going to ask you to go back up to Page 6 of   14:09
18 the pdf and the Bates stamp is WVSSAC000123.  And   14:09
19 let me know whenever you get there.   14:09
20    A.  Okay.   14:10
21    Q.  So I'm going to direct you to the   14:10
22 paragraph that begins with "Discrimination   14:10
23 Prohibited."   14:10
24      Take your time reading it, and let me know   14:10
25 whenever you are finished reading that paragraph.   14:10

22 (Pages 82 - 85)

1    A. [Witness reviews document].                14:10
2       Okay.                            14:10
3    Q. Do you know who wrote this portion of the  14:10
4 handbook?                              14:10
5    A. I do not.                          14:10
6    Q. Do you know how long this portion has been 14:10
7 in the handbook?                        14:10
8    A. I do not.                          14:10
9    Q. Do you remember ever reviewing this       14:10
10 section of the handbook?                 14:10
11   A. Yes.                              14:10
12   Q. When did you review it?               14:11
13   A. I --                              14:11
14   Q. Oh. Go ahead.                       14:11
15   A. I would say a couple of years ago. We've  14:11
16 tried to have a book study and go through all of 14:11
17 these.                                14:11
18   Q. When you reviewed it a couple of years    14:11
19 ago, did you believe the Commission was required to 14:11
20 comply with Title IX?                    14:11
21   A. Yes.                             14:11
22   Q. Is the Commission currently required to   14:11
23 comply with Title IX?                    14:11
24      MS. GREEN: I'll just object to the form.  14:11
25      THE WITNESS: I would believe that the    14:11
                                       Page 86

1 schools are required to follow Title IX. But I  14:11
2 believe we believe it also.                14:11
3 BY MS. KANG:                           14:11
4    Q. Now, I want to turn your attention to the 14:11
5 section below that titled "Beliefs and Objectives." 14:11
6       Take a moment to read the first paragraph 14:11
7 and let me know whenever you are done.        14:11
8    A. [Witness reviews document].             14:11
9       Okay.                            14:12
10   Q. What are "proper ideals of sportsmanship," 14:12
11 as written in this paragraph?             14:12
12      MS. GREEN: Object to the form.          14:12
13      THE WITNESS: Are you on Paragraph 1 or 3? 14:12
14 BY MS. KANG:                           14:12
15   Q. Paragraph 1 [verbatim] of the Beliefs and 14:12
16 Objectives section.                     14:12
17   A. What was your question again?           14:12
18   Q. Sure.                            14:12
19      What are -- what are the proper ideals of 14:12
20 sportsmanship?                         14:12
21      I'm sorry. I --                    14:12
22   A. The --                           14:12
23   Q. I am referring to Paragraph 3. You had it 14:12
24 right the first time.                   14:12
25   A. Okay.                            14:12
                                       Page 87

1       Sportsmanship is that everybody's on a   14:12
2 fair playing field. And the -- you should be   14:12
3 gracious in losing and winning.             14:13
4    Q. What do you mean by "fair playing field"?  14:13
5       MS. GREEN: Object to the form.          14:13
6       THE WITNESS: Same age. Same gender.      14:13
7 BY MS. KANG:                           14:13
8    Q. Anything else?                      14:13
9    A. No.                             14:13
10      When I say "same age," it would be same   14:13
11 programatic level. So middle -- middle school kids 14:13
12 cannot play against high school but freshmen can 14:13
13 play against seniors.                   14:13
14   Q. What are physical -- the physical and     14:13
15 social benefits that are referenced in this    14:13
16 paragraph?                            14:13
17   A. Just good -- for one, just good health.   14:13
18 Participation. Also, you know, we believe that 14:13
19 it's -- the competitive part is good, and the  14:14
20 training part is beneficial to the student athlete. 14:14
21   Q. Why do you believe it's beneficial?       14:14
22   A. Studies we have read. And as a          14:14
23 participant a long time ago.              14:14
24   Q. What does "partisanship and prejudice"    14:14
25 mean in this paragraph?                  14:14
                                       Page 88

1    A. Partisanship and prejudice would mean that 14:14
2 it's equal. You know, one side -- especially   14:14
3 with -- you know, as far as equipment or what -- if 14:14
4 you come to a game, you can't have lush seats for 14:15
5 you and the other team have foldable chairs and 14:15
6 things like that. So that's part-- partisan.   14:15
7       You know, all the equipment at a game has 14:15
8 to be the same equipment everybody is using. Same 14:15
9 ball. Same rims. Everything is the same.       14:15
10   Q. What do you mean by "prejudice" in this    14:15
11 paragraph?                            14:15
12   A. Prejudice would mean, you know -- you      14:15
13 know, is there some advantage to one team over  14:15
14 another.                              14:15
15   Q. What sort of advantage are you referring   14:15
16 to?                                  14:15
17   A. Could be something as simple as a tarp     14:15
18 over your bench as opposed to the other team not 14:15
19 having it;                             14:15
20      Could be as simple as a heater. You might 14:16
21 have a heater on a sideline at a cold game and they 14:16
22 don't.                                14:16
23      So things that would make the game unfair 14:16
24 that are outside of the game.             14:16
25   Q. Is there anything else that you believe   14:16
                                       Page 89

23 (Pages 86 - 89)

**Page 90**

```
 1   would make the game unfair?                14:16
 2        MS. GREEN:  Object to the form.       14:16
 3        THE WITNESS:  There are probably other 14:16
 4   things, but right off the top of my head not sure. 14:16
 5        Could be something as simple as how far 14:16
 6   you got to walk to your locker room in between 14:16
 7   games.                                     14:16
 8   BY MS. KANG:                               14:16
 9    Q.  Do you believe that allowing transgender 14:16
10   students to participate on sports teams consistent 14:16
11   with their gender identity is consistent with the 14:16
12   goals identified in this paragraph?        14:16
13        MS. GREEN:  Object to the form.       14:16
14        THE WITNESS:  I believe our -- our Board 14:16
15   policy was that, if it was not safe or unfair 14:16
16   advantage, then it would be okay for them to 14:17
17   participate.                               14:17
18   BY MS. KANG:                               14:17
19    Q.  Does Bridgeport Middle School         14:17
20   cross-country count as an interscholastic athletic? 14:17
21    A.  It does.                             14:17
22        MS. KANG:  So I'm actually about to move 14:17
23   into the next session.  I think we are up on an 14:17
24   hour.                                      14:17
25        Roberta, do you have preference as to 14:17
```

**Page 91**

```
 1   whether you want me to get started or you want to 14:17
 2   take a break now?                          14:17
 3        THE WITNESS:  I'm good.               14:17
 4        MS. GREEN:  All right.  Let's do --    14:17
 5        THE WITNESS:  I can't go to the bathroom. 14:17
 6        MS. GREEN:  I know.  Really no need for a 14:17
 7   bathroom break over here.                  14:18
 8        MS. KANG:  All right.  Well, if it's okay 14:18
 9   with you, we'll go on a little bit longer.  14:18
10        Let me know if you do need a break.    14:18
11        So we can take down Exhibit 3.         14:18
12   BY MS. KANG:                               14:18
13    Q.  And I want to talk a little bit about some 14:18
14   of the statistics that the Commission turns over to 14:18
15   various organizations.                     14:18
16        So I'm going to introduce an exhibit that 14:18
17   will be marked as Exhibit 4.               14:18
18        MS. KANG:  And I'll let you know when it's 14:18
19   in everyone's folders.                     14:18
20        (Deposition Exhibit 4 was marked for   14:19
21        identification and is attached hereto.) 14:19
22        MS. KANG:  Exhibit 4 should now be in  14:19
23   everyone's Marked Exhibit folder.          14:19
24        Let me know if anyone has trouble      14:19
25   accessing it.                             14:19
```

**Page 92**

```
 1   BY MS. KANG:                               14:19
 2    Q.  And, Mr. Dolan, let me know whenever you 14:19
 3   have it up.                                14:19
 4    A.  Okay.                                14:19
 5        MS. GREEN:  Counsel, was there a certain 14:19
 6   page in the exhibit?                       14:19
 7        MS. KANG:  Yeah.                      14:19
 8   BY MS. KANG:                               14:19
 9    Q.  If you go to Page 6 to start, that would 14:19
10   be great.  And the Bates stamp is -365.    14:19
11        MS. GREEN:  I'm sorry.                14:19
12        THE WITNESS:  That's fine.            14:19
13        Is this the "2016-'17 Participation    14:19
14   Report"?                                   14:19
15   BY MS. KANG:                               14:19
16    Q.  Do you believe it is?                 14:19
17    A.  Okay.                                14:20
18        [Witness reviews document].           14:20
19        Okay.                                14:20
20    Q.  So I'm going to represent to you that this 14:20
21   is a document that was produced by your counsel in 14:20
22   response to one of plaintiff's discovery requests. 14:20
23        If you want to read the text of the    14:20
24   request, it's Request Number 15 in this same 14:20
25   document.                                  14:20
```

**Page 93**

```
 1        Do you recognize this document that is  14:20
 2   before you right now?                       14:20
 3    A.  I do.                                14:20
 4    Q.  What is it?                           14:20
 5    A.  This is a participation -- the National 14:20
 6   Federation of High School keeps track of how many 14:20
 7   participants are in each sport, trying to find 14:20
 8   trends among the sports, which ones are growing, 14:20
 9   which ones are falling; and if they are falling, how 14:20
10   come.                                      14:20
11    Q.  What is the National Federation of State 14:21
12   High School Associations?                  14:21
13    A.  It is the association of 51 members, the 14:21
14   50 states plus Washington, D.C., and they primarily 14:21
15   provide the sport-specific rules for almost all of 14:21
16   our events.                                14:21
17    Q.  How long have you provided these        14:21
18   statistics to the Federation?              14:21
19    A.  To be honest with you, they've been     14:21
20   tracking them, but I couldn't tell you how long we 14:21
21   have.                                      14:21
22    Q.  Do you think it's --                   14:21
23    A.  I would assume.                       14:21
24    Q.  Go ahead.                             14:21
25    A.  I would assume -- it's a -- it's an     14:21
```

24 (Pages 90 - 93)

1  ongoing thing; so I would think it's probably been   14:21
2  done for a number of years.   14:21
3  Q.  More than ten?   14:21
4  A.  Yes.   14:21
5  Q.  More than 20?   14:21
6  A.  Probably.   14:21
7  Q.  Why do you provide these statistics to the   14:21
8  NFHS?   14:22
9  A.  They -- they gather them for the whole   14:22
10  country to try to monitor which sports are growing   14:22
11  in popularity and which ones might not be.  And the   14:22
12  ones that aren't, they're trying to look and see   14:22
13  why.   14:22
14  Q.  I'm just going to ask you a few questions   14:22
15  to help me understand how to read this chart.   14:22
16      Did you prepare this document?   14:22
17  A.  I personally did not prepare it.  But this   14:22
18  is a document prepared by our office, yes.   14:22
19  Q.  Do you know who prepared this document?   14:22
20  A.  Alice Goodwin in our office.   14:22
21  Q.  What's her position?   14:22
22  A.  Secretary.   14:22
23  Q.  Is she your secretary?   14:22
24  A.  No.   14:22
25  Q.  Do you know which secretary she is?   14:22

1  A.  Well, we don't all have specific   14:22
2  secretaries.  She works primarily with Greg Reed,   14:23
3  but we all ask different people to do different   14:23
4  things, depending upon what the level of activity   14:23
5  going on in the office for that particular staff   14:23
6  member is.   14:23
7  Q.  What is Greg Reed's role?   14:23
8  A.  Assistant executive director.   14:23
9  Q.  Do you contribute any information to this   14:23
10  document?   14:23
11  A.  This document is -- I personally do not.   14:23
12  It's pulled from our website.  And it probably -- it   14:23
13  is self-populating, I believe.  So she doesn't   14:23
14  actually type it in there.  They pull it from our   14:23
15  eligibility sheets.   14:23
16  Q.  And who is "they"?   14:23
17  A.  Our -- our web designer created this form,   14:23
18  and it self-populates from that form, from their   14:24
19  eligibility.   14:24
20  Q.  So in the second column of this chart, it   14:24
21  says "Senior."   14:24
22      What does that mean?   14:24
23  A.  "Senior" means "high school."   14:24
24  Q.  So senior --   14:24
25  A.  9 through 12.   14:24

1  Q.  So it's any grade from 9 to 12?   14:24
2  A.  It's a combination of 9 through 12, yes.   14:24
3  Q.  If we go over to the third column, the one   14:24
4  that says "Male," what does that mean?   14:24
5  A.  That -- it's the same -- when we do our   14:24
6  eligibility sheets by sport, for instance, football,   14:24
7  football doesn't differentiate between boys and   14:24
8  girls.  It's -- they're asking for the number of   14:24
9  participants.   14:25
10      When you get to girls' track, it can only   14:25
11  be done by girls; so, therefore, that -- that's why   14:25
12  there's not -- there's a zero in girls' track for   14:25
13  males and boys' track has a number but girls' does   14:25
14  not.   14:25
15      So football is the number of participants.   14:25
16  So in the blue column under "Male," it would be the   14:25
17  number of male -- or number of people in football.   14:25
18  Could be male or female because our eligibility   14:25
19  doesn't differentiate between the two.   14:25
20  Q.  So just to be clear, even if a girl plays   14:25
21  on the football team, she will not show up in the   14:25
22  column that says "Female" for football?   14:25
23  A.  That's correct.  Because they're asking   14:25
24  for the number of participants in football, and it's   14:25
25  primarily football -- it's primarily a male sport.   14:25

1  So it falls under the male category.  That's the   14:26
2  best we could do for them.   14:26
3      Similarly, cheer is primarily a cheer   14:26
4  event, but there are boys.  But there's no number in   14:26
5  there.  So we just -- it's just the total number in   14:26
6  that -- for that particular sport.   14:26
7  Q.  Okay.  Scroll all the way over to the   14:26
8  gray-colored columns.  They're labeled as   14:26
9  "Mid/Junior."   14:26
10      What does "Mid/Junior" mean?   14:26
11  A.  It was either middle school or junior high   14:26
12  and -- you know.  I don't believe we have any more   14:26
13  junior high.  So probably could be fixed to say just   14:26
14  middle school.   14:26
15  Q.  What grades would those be?   14:26
16  A.  6th through 8.   14:26
17  Q.  So now I'm going to ask you to -- to   14:26
18  scroll down to Page 11.  It will be Bates   14:27
19  stamped -370.   14:27
20      Let me know whenever you get there.   14:27
21  A.  Okay.   14:27
22  Q.  So the last year that you produced this   14:27
23  document is 2020 to 2021.   14:27
24      Do you know when the 2021 to 2022   14:27
25  statistics will be published?   14:27

25 (Pages 94 - 97)

**Page 98**

1    A.  We submitted them over the summer.    14:27
2    Obviously, our spring sports aren't -- aren't in    14:27
3    place yet.  So we wouldn't have numbers for them.    14:27
4       Q.  For the 2021 to 2022 period, do you know    14:27
5    if B.P.J. will be listed in the "Female" column or    14:27
6    the "Male" column?    14:27
7          MS. GREEN:  Object to form.    14:28
8          THE WITNESS:  Which team is she on?    14:28
9    BY MS. KANG:    14:28
10      Q.  She is on the cross-country team for    14:28
11   girls.    14:28
12      A.  And then that's where she will be listed.    14:28
13   Because it's just pulling the number off of the    14:28
14   eligibility of that particular team.    14:28
15      Q.  And the numbers that are submitted, are    14:28
16   they coming from the member schools themselves?    14:28
17      A.  They -- the member schools have to submit    14:28
18   their eligibility on our site.  And from there,    14:28
19   it takes the total of each school and puts them in    14:28
20   their category.    14:28
21      Q.  So I'm going to ask you to scroll down one    14:28
22   more page to the doc- -- to the document that is    14:28
23   Bates Stamped -371.    14:28
24      A.  Okay.    14:28
25      Q.  So this is also a document that was    14:28

**Page 99**

1    produced by your counsel in response to one of    14:29
2    plaintiff's discovery requests.    14:29
3          If you want the read the text of that    14:29
4    request, you can look at Request 14 on Page -4 of    14:29
5    this exhibit.    14:29
6          Do you recognize this document?    14:29
7       A.  This is a form from the National    14:29
8    Federation that puts our participation numbers into    14:29
9    their chart.    14:29
10         So the numbers that came off of that chart    14:29
11   for '18/'19 would match these numbers.    14:29
12         All those sports that are activities that    14:29
13   are -- have zeros by them, those are activities or    14:29
14   sports that we do not offer.  But they are offered    14:29
15   through the National Federation.    14:29
16      Q.  So you do not -- you as a Commission do    14:29
17   not make this form?    14:29
18      A.  No.  They send this back to us.  This is    14:29
19   basically a verification of the form we sent to    14:30
20   them.    14:30
21      Q.  So is it fair to say that the National    14:30
22   Federation takes information that you give them and    14:30
23   puts it into this form?    14:30
24      A.  Yes, ma'am.    14:30
25      Q.  So I noticed that the year only goes to    14:30

**Page 100**

1    2018 to 2019.  Is there a reason why we don't have    14:30
2    the 2019 to 2020 statistics?    14:30
3       A.  I don't know if that's the most recent    14:30
4    one.  Because obviously with COVID and them not    14:30
5    working from the office for a long period of time, I    14:30
6    don't know if they have not submitted the most    14:30
7    recent years.    14:30
8       Q.  So in the column that says "Boys School,"    14:30
9    what does this column indicate?    14:30
10      A.  Are we still on Page 7?    14:30
11      Q.  Yes.  We are -- we are on Page 12.    14:31
12      A.  12.  Okay.    14:31
13      Q.  The Bates stamp is -371.    14:31
14      A.  And which one am I looking for?    14:31
15      Q.  Yeah.  So if you go over, it's the fourth    14:31
16   column.  It says "Boys School."    14:31
17      A.  Boys -- okay.    14:31
18      Q.  Yeah.    14:31
19      A.  These are -- these are the schools that    14:31
20   are offering basketball.  If you are looking at    14:31
21   basketball, there is 124 schools who are offering    14:31
22   boys' basketball.  And there are 124 schools that    14:31
23   are offering girls' basketball.    14:31
24         You'll notice that "Baseball" has 122.    14:31
25   There are no girls -- there are no girls' baseball    14:31

**Page 101**

1    teams.  That's why it is a "0."    14:31
2       Q.  Got it.    14:31
3          And then the boys participation, does that    14:31
4    reflect that 3,052 boys participated of the    14:31
5    124 schools that offer boys' basketball?    14:32
6       A.  Yes.    14:32
7          And I would believe this is just high    14:32
8    school.  It's not middle school also.    14:32
9       Q.  Do you know if co-ed teams are reflected    14:32
10   on the chart?    14:32
11      A.  Again, co-ed teams would be -- they would    14:32
12   be reflected as the -- the majority sport.  So, for    14:32
13   instance, baseball, it could be co-ed if a girl    14:32
14   wanted to play baseball.  But she would be listed on    14:32
15   the -- the school was offering boys' baseball -- or    14:32
16   they are offering baseball, the girl would simply be    14:32
17   listed on the eligibility and be counted as a    14:32
18   baseball participant, not as a female.    14:33
19         So in this -- this study that they are    14:33
20   doing is simply the number of participants in that    14:33
21   sport, not a breakdown of boys and girls if it's    14:33
22   co-ed.    14:33
23      Q.  Who determines whether to make a team    14:33
24   co-ed?    14:33
25      A.  Well, if you have enough boys and have    14:33

26 (Pages 98 - 101)

1 enough girls to have a team, then if we are offering    14:33
2 boys and girls, then you have to have a separate    14:33
3 team.                                             14:33
4        For instance, cross-country, you can have    14:33
5 one girl and she could make up a team or she could    14:33
6 be the team.  But if you only have one soccer girl,    14:33
7 she couldn't be the team.  So she would have to play    14:33
8 with the boys.  And that would be co-ed at the time.    14:34
9    Q.  Is it fair to say that what makes a sport    14:34
10 co-ed depends on the sport?               14:34
11       MS. GREEN:  Object to the form.       14:34
12       THE WITNESS:  It depends on the sport -- I    14:34
13 would say depends upon the participants.        14:34
14       If there are enough of each gender to    14:34
15 participate, we would have separate -- separate    14:34
16 championships.                              14:34
17 BY MS. KANG:                               14:34
18    Q.  So is it fair to say that once a certain    14:34
19 number of participants is reached for boys and    14:34
20 girls, they have to be separate?            14:34
21    A.  At some point based on the number, we    14:34
22 would make a recommendation to the Board of    14:34
23 Directors that we now have enough to break them and    14:35
24 have a stand-alone.                         14:35
25    Q.  Can you give me an example of when you    14:35
                                            Page 102

1 made that recommendation?                    14:35
2    A.  We haven't made it yet.  But I will tell    14:35
3 you that we're -- you know, we have offered more    14:35
4 opportunities for girls in golf.  And our number of    14:35
5 girls playing golf has gone up significantly.    14:35
6        We'll watch the numbers.  And, as time    14:35
7 goes on, if we -- if the numbers continue to grow,    14:35
8 then they will have the opportunity to have a    14:35
9 stand-alone program for girls' golf.  Right now,    14:35
10 they play on the boys' team or the co-ed team.    14:35
11       MS. KANG:  So we can take down this    14:35
12 exhibit, and I'm going to introduce a different    14:35
13 document as the next exhibit, which I believe is    14:36
14 Exhibit 5.                                  14:36
15       (Deposition Exhibit 5 was marked for    14:36
16       identification and is attached hereto.)    14:36
17       MS. KANG:  Exhibit 5 is now in everyone's    14:36
18 Marked Exhibit folder.  Please let me know if you    14:36
19 have trouble accessing it.                  14:36
20 BY MS. KANG:                               14:36
21    Q.  Mr. Dolan, let me know once you have it    14:36
22 up.                                         14:36
23       And once you have it up, if you could go    14:36
24 to Page 5 of the pdf, that would be great.    14:36
25    A.  Okay.                                14:36
                                            Page 103

1    Q.  So I would like to draw your attention to    14:36
2 Interrogatory Number 13 on Exhibit 5.          14:37
3        What does "participation mixed as    14:37
4 indicated to respond to demand" mean?          14:37
5    A.  "Identify all WVSSAC sponsored sports in    14:37
6 which students may participate on a team designated    14:37
7 as co-ed or mixed."                         14:37
8        Is that the question?  And why cheer is    14:37
9 considered mixed?                           14:37
10    Q.  Yeah.  That -- why don't we start there.    14:37
11       Why is cheer considered mixed?        14:37
12    A.  It has both boys and girls.  So it could    14:37
13 be co-ed or mixed.                          14:37
14    Q.  What is the difference between calling    14:37
15 cheer mixed and saying that "participation mixed as    14:38
16 indicated to respond to demand"?            14:38
17    A.  Basically because cheer almost always has    14:38
18 boy members.  Wrestling is starting to get a number    14:38
19 of them.  Baseball very seldom has -- it's very    14:38
20 seldom a mixed sport.  And football is very seldom.    14:38
21 But golf is transitioning into its own sport.    14:38
22    Q.  By "seldom," do you mean girls seldom    14:38
23 participate on those teams?                 14:38
24    A.  That is correct.                     14:38
25    Q.  Just to be clear, football is a boys'    14:38
                                            Page 104

1 team, but if a girl wants to play football, she    14:39
2 would be permitted to play on that team?        14:39
3    A.  That's correct.                       14:39
4    Q.  If a boy wanted to play on a girls' team,    14:39
5 would they be permitted to?                 14:39
6    A.  No.                                   14:39
7    Q.  Why not?                              14:39
8    A.  Because girls have been -- they've been    14:39
9 denied opportunity in the past, and by allowing boys    14:39
10 to participate on girls' teams that are strictly    14:39
11 girls, for instance, girls' soccer, girls'    14:39
12 basketball, volleyball and softball, that girls    14:39
13 would then lose opportunity.                14:39
14    Q.  Do you have any rules preventing a boy    14:39
15 from playing on a girls' team?              14:39
16    A.  Yes.                                  14:39
17    Q.  What rule would that be?              14:39
18    A.  I have to find it in my rule book.     14:40
19    Q.  Why don't we go back to the rule book, and    14:40
20 I'll ask you a few questions on that.        14:40
21       So we'll go back to Exhibit 3.        14:40
22       (Simultaneously speaking.)            14:40
23       THE WITNESS:  I'm trying to --        14:40
24 BY MS. KANG:                               14:40
25    Q.  And it should be --                  14:40
                                            Page 105

27 (Pages 102 - 105)

1   A.  Try --                        14:40
2   Q.  It should be Exhibit 3.  It should be    14:40
3  Page 17, and the Bates stamp should end in -148.    14:40
4   A.  Page 17 talks about our membership.        14:40
5   Q.  Yes.  I'm looking at Paragraph 3.8 of    14:40
6  Exhibit 3 on -148.                      14:40
7   A.  Okay.                       14:40
8   Q.  Take a moment to read Paragraph 3.8 and    14:41
9  let me know when you've had a chance to finish    14:41
10  reading it.                         14:41
11   A.  What page are you on again?  Because I    14:41
12  don't have 3.8.                      14:41
13   Q.  No problem.  It's page 17.  The Bates    14:41
14  stamp should end in -148.                14:41
15   A.  17 of the pdf document or 17 of our --    14:41
16  that's numbered on our rule book?           14:41
17   Q.  This might be page -- this might be 17    14:41
18  that's numbered in your rule book.  My apologies.    14:41
19  It's Page 31 of the pdf.                  14:41
20   A.  Okay.  We're getting there.           14:41
21   MS. GREEN:  We should have music to play    14:41
22  through the...                       14:41
23   THE WITNESS:  Okay.  Scroll down.       14:41
24   Okay.  Yep.  Yes.  Yes.  3.8.        14:42
25  ///
                                    Page 106

1  BY MS. KANG:                      14:42
2   Q.  Is that the rule that you were thinking of    14:42
3  that prevented a transgender boy from playing on a    14:42
4  girls' team?                         14:42
5   A.  Yes.                        14:42
6   MS. GREEN:  Object to the form, if I       14:42
7  can --                            14:42
8   THE WITNESS:  Okay.  Back up?           14:42
9   MS. GREEN:  Yes.                  14:42
10  BY MS. KANG:                      14:42
11   Q.  Why was this rule enacted?           14:42
12   A.  I would assume to -- it complies with    14:42
13  Title IX, but it's -- you know, we're trying to not    14:42
14  allow boys to participate in girls' events to either    14:42
15  hurt them or dominate them.              14:42
16   Q.  When was this rule, Section 3.8, enacted?    14:42
17   A.  I would have to find that out.  I'd have    14:42
18  to go back through all of our rules and find when it    14:42
19  was -- when it was enacted.              14:42
20   Q.  Do you believe that it was enacted within    14:43
21  the past five years?                    14:43
22   A.  No.                        14:43
23   Q.  Past ten?                    14:43
24   A.  No.                        14:43
25   Q.  Past 20?                     14:43
                                    Page 107

1   A.  I -- I'm not sure.  I don't know if it's    14:43
2  gone that far.  But I would say a significant    14:43
3  number, yes.  I don't know if it's made it to 20.    14:43
4   Q.  Fair enough.                   14:43
5   So the team is separated by boys' and       14:43
6  girls' teams.  Can a student ask to participate on a    14:43
7  co-ed team?                         14:43
8   A.  If there is a boys' team and a girls'    14:43
9  team -- are we talking about, like, boys' and girls'    14:43
10  basketball and can the girls' basketball player play    14:44
11  on the boys' team?  Is that what you're asking?    14:44
12   Q.  Yes.                       14:44
13   A.  They cannot.  If there is a team for them,    14:44
14  they must play on the team of their gender.       14:44
15   Q.  Let's go back to Exhibit 5.           14:44
16   And then I think once we are done with       14:44
17  that exhibit, we can take a break.          14:44
18   So let's go back to Page 5 of the pdf.  I    14:44
19  just have a few follow-up questions.  Back to    14:44
20  Interrogatory Number 13.                 14:44
21   Q.  Okay.                       14:44
22   Q.  What grades does junior varsity cover?    14:44
23   A.  It doesn't have a grade.  It could be 9 to    14:44
24  12.  You could be a senior and still on the junior    14:44
25  varsity.  If some -- some schools because of numbers    14:44
                                    Page 108

1  will have just the varsity.  Some will have varsity   14:45
2  and j- -- junior varsity.  And some will have      14:45
3  varsity, junior varsity, and a freshman team.      14:45
4   So just different designation of those     14:45
5  teams.                           14:45
6   Q.  What does junior varsity mean?        14:45
7   A.  Junior varsity --                14:45
8   MS. GREEN:  I was just going to object to    14:45
9  the form.                         14:45
10   THE WITNESS:  Okay.                14:45
11   When you have too many kids and you       14:45
12  have -- you want an opportunity for them, you have a   14:45
13  junior varsity as long as you can get a schedule for   14:45
14  them.                           14:45
15  BY MS. KANG:                      14:45
16   Q.  What does "varsity" mean?           14:45
17   A.  You are the team that participates for the   14:45
18  state championships.                   14:45
19   Q.  What does "freshman" mean?           14:45
20   A.  Some large schools want to give more     14:45
21  opportunity to their student athletes.  So they have   14:45
22  too many kids for a junior varsity, JV; so they have   14:46
23  a separate freshman program.             14:46
24   Q.  Just to be clear, if a student wants to    14:46
25  play a sport that is not in this list -- so it's not    14:46
                                    Page 109

28 (Pages 106 - 109)

1 cheer, wrestling, baseball, football, or golf --   14:46
2 they have to join either the boys' or girls' team?   14:46
3     A.  I think that's everybody that is not   14:46
4 included, yes.   14:46
5     Q.  One last question before we take a break.   14:46
6         I would like to draw your attention to   14:46
7 Page 9 of Exhibit 5, and this is the response to   14:46
8 Interrogatory Number 14.   14:46
9     A.  Okay.   14:46
10     Q.  So just to be clear, to make sure I am   14:46
11 reading this chart correctly, in the first row that   14:46
12 starts with "Andrew Jackson Middle School," it   14:46
13 indicates that one girl participated in wrestling.   14:47
14         Is that an accurate -- is that an accurate   14:47
15 interpretation?   14:47
16     A.  It is.   14:47
17     Q.  How do you collect these statistics?   14:47
18     A.  This was a survey of the schools because,   14:47
19 when they do their eligibility, it doesn't   14:47
20 distinguish between boys and girls.   14:47
21         So to find out who is playing   14:47
22 what sports, how many -- how many girls are   14:47
23 participating in -- in the sports that allow boys   14:47
24 and girls, the co-ed or mixed, we -- we have to   14:47
25 survey them to find out.   14:47

Page 110

1     Q.  When was this survey done?   14:47
2     A.  In the last two weeks, I would imagine.  I   14:47
3 forget.  I mean, it was in the last three -- two to   14:47
4 three weeks.   14:47
5     Q.  Why did you survey the schools?   14:47
6     A.  Just to find out how many girls were   14:47
7 participating in our -- since we don't have accurate   14:47
8 data of how many girls are playing different sports,   14:48
9 this was our opportunity to go ahead and -- and poll   14:48
10 our membership.   14:48
11         Not every school replied.  And we don't   14:48
12 have a way to verify it.  It was just for us to have   14:48
13 an idea.  We looked --   14:48
14     Q.  Are there any -- oh.  Go ahead, please.   14:48
15     A.  We would look at this data, for instance,   14:48
16 golf and wrestling, to determine how close we are to   14:48
17 having its own sport.   14:48
18     Q.  Is this data the current data?  Or is this   14:48
19 data, like, a participation across all years --   14:48
20     A.  And again --   14:48
21     Q.  -- of all time?   14:48
22     A.  I believe -- you know, it wasn't a   14:48
23 certified data.  Schools were primarily listing   14:48
24 second -- second -- or last year's spring sports and   14:48
25 this year's winter and fall.   14:49

Page 111

1     So, obviously, they don't know how many   14:49
2 baseball, softball, track, and tennis participants   14:49
3 we have coming up because we haven't had our teams   14:49
4 yet.   14:49
5     MS. KANG:  Okay.  I think now is a good   14:49
6 time for everybody to take a break, if that is all   14:49
7 right with you, Mr. Dolan.   14:49
8     THE WITNESS:  Sure.   14:49
9     Okay.  Roberta, is that -- does that work   14:49
10 for you?   14:49
11     MS. GREEN:  Sure.  Thank you.   14:49
12     MS. KANG:  Of course.   14:49
13     THE VIDEOGRAPHER:  This marks the end of   14:49
14 Media Number 2.   14:49
15     Going off the record.  The time is 2:49.   14:49
16     (Brief recess.)   14:59
17     THE VIDEOGRAPHER:  This marks the   15:00
18 beginning of Media Number 3 in the deposition of   15:00
19 30(b)(6) Witness Bernie Dolan.   15:00
20     Back on the record.  The time is 3:01.   15:00
21 BY MS. KANG:   15:00
22     Q.  Mr. Dolan, would it be harmful to a   15:01
23 student if they were forbidden from playing school   15:01
24 sports?   15:01
25     MS. GREEN:  Object to the form.   15:01

Page 112

1     THE WITNESS:  There are lots of kids who   15:01
2 are, I think, not allowed to participate for   15:01
3 whatever reason.  It could be eligibility things.   15:01
4 So happens to a lot of kids right now.   15:01
5     We do think there are benefits to   15:01
6 participation.   15:01
7 BY MS. KANG:   15:01
8     Q.  What sort of benefits does playing a   15:01
9 school sport afford?   15:01
10     A.  Giving an opportunity for leadership,   15:01
11 personal health, camaraderie, cooperation.   15:01
12     Q.  I want to talk a little bit about House   15:01
13 Bill 3293, or H.B. 3293, and a little bit more about   15:01
14 the Commission's policy for H.B. 3293 was enacted.   15:01
15     A.  Okay.   15:02
16     Q.  Do you believe that H.B. 3293 forbids   15:02
17 B.P.J. from playing on a girls' team?   15:02
18     MS. GREEN:  Object to the perform.   15:02
19     THE WITNESS:  I would believe it did   15:02
20 before the court case.  Yes.   15:02
21 BY MS. KANG:   15:02
22     Q.  Have you ever talked to any organizations   15:02
23 outside of the State of West Virginia regarding   15:02
24 H.B. 3293?   15:02
25     A.  Not that I know of.   15:02

Page 113

29 (Pages 110 - 113)

1    Q.  Have you ever talked to any organizations    15:02
2  outside of West Virginia concerning transgender    15:02
3  athletes generally?    15:02
4    A.  We may have talked -- you know, our    15:02
5  National Federation, it was probably on a -- one of    15:02
6  our either winter meetings or summer meetings there    15:02
7  was probably a topic.    15:02
8        And I would have to go back and look, but    15:02
9  the state may have put up a presentation on whatever    15:02
10 their -- whatever their rule was.    15:02
11   Q.  Do you remember when this meeting    15:03
12 occurred?    15:03
13   A.  I do not.    15:03
14   Q.  Do you know which state proposed a rule?    15:03
15       MS. GREEN:  Object to the form.    15:03
16       THE WITNESS:  I believe the presentation    15:03
17 was from Connecticut.    15:03
18 BY MS. KANG:    15:03
19   Q.  Do you remember what the rule they    15:03
20 proposed was?    15:03
21       MS. GREEN:  Object to the form.    15:03
22       THE WITNESS:  I don't know.  They weren't    15:03
23 proposing a rule; they were explaining their rule.    15:03
24 BY MS. KANG:    15:03
25   Q.  Do you remember what their rule was?    15:03

Page 114

1    A.  I believe it was full participation by    15:03
2  gender identity.    15:03
3    Q.  Okay.  So I'm going to ask you a few    15:03
4  questions about the Commission's policy.  Before I    15:03
5  do so, just to be totally clear on the record, I'm    15:03
6  just going to give you some terms that I'll explain    15:04
7  my definitions for.  So whenever I ask you    15:04
8  questions, this is what I mean.    15:04
9        When I use the term "cisgender," I am    15:04
10 referring to someone whose gender identity matches    15:04
11 the sex they were assigned at birth.  So, for    15:04
12 example, if someone was assigned male at birth and    15:04
13 they identify as a male, that person would be a    15:04
14 cisgender boy.    15:04
15       When I use the term "transgender," I am    15:04
16 referring to someone whose gender identity does not    15:04
17 match the sex they were assigned at birth.  So, for    15:04
18 example, if someone was assigned male at birth but    15:04
19 then they identify as female, that person would be a    15:04
20 transgender girl or woman.    15:04
21       And so for purposes of the questions I    15:04
22 will be asking next, I'll be using these definitions    15:04
23 for -- for clarity.    15:04
24       Are you all right with that?    15:04
25   A.  Yes.    15:04

Page 115

1        MS. GREEN:  Objection to form.    15:04
2        THE WITNESS:  Sorry.    15:04
3        Yes.    15:04
4  BY MS. KANG:    15:04
5    Q.  And then you may already understand this,    15:04
6  but when I use the phrase "H.B. 3293," I am    15:04
7  referring to House Bill 3293.    15:04
8        Are you familiar with this bill?    15:05
9    A.  Yes.    15:05
10   Q.  To your knowledge, has a cisgender boy    15:05
11 ever played on a girl's sports team?    15:05
12       MS. GREEN:  Objection to the form.    15:05
13       THE WITNESS:  Not to my knowledge.    15:05
14 BY MS. KANG:    15:05
15   Q.  To your knowledge, has it ever been raised    15:05
16 as an issue?    15:05
17       MS. GREEN:  Object to the form.    15:05
18       THE WITNESS:  No.    15:05
19 BY MS. KANG:    15:05
20   Q.  Currently, if a cisgender girl wants to    15:05
21 play football, is she permitted to do so on the    15:05
22 boys' team?    15:05
23   A.  Yes.  Because there's no girls' team at    15:05
24 the moment.    15:05
25   Q.  Before H.B. 3293 was enacted, did the    15:05

Page 116

1  Commission allow transgender students to participate  15:06
2  on sports teams consistent with their gender    15:06
3  identity?    15:06
4        MS. GREEN:  Object to the form.    15:06
5        THE WITNESS:  Our policy ident- ---    15:06
6  whatever the school identified them in WVEIS was how  15:06
7  we recognize them.    15:06
8  BY MS. KANG:    15:06
9    Q.  Can you tell me a little bit more about    15:06
10 this policy?    15:06
11       MS. GREEN:  Object to the form.    15:06
12       THE WITNESS:  Basically, it was to protect  15:06
13 athletes from harm or unfairness because of physical  15:06
14 abilities.  So whatever the school identified them    15:06
15 at if -- if everybody was okay with that, they got    15:06
16 to participate.    15:06
17       If it ever came to a point where somebody    15:07
18 was too big, too strong, or it wasn't safe for that    15:07
19 person to play, then they could appeal to the Board.  15:07
20 BY MS. KANG:    15:07
21   Q.  Can you tell me a little bit more about    15:07
22 what you mean by "it wasn't safe" for them to play?  15:07
23   A.  Could be a volleyball player who could    15:07
24 jump much higher than the girls, much stronger.  And  15:07
25 when he hits the ball, could hurt the -- hurt the    15:07

Page 117

30 (Pages 114 - 117)

1 other participants.                               15:07
2     Q.  How did the Commission come up with this   15:07
3 policy?                                           15:07
4     A.  It was actually created by my predecessor.  15:07
5 And just came in in the beginnings of my time.  And  15:07
6 they were just addressing an issue that hadn't come   15:07
7 to West Virginia at this point, but they wanted to   15:08
8 have something in there as a temporary stopgap   15:08
9 measure.                                          15:08
10          And to this point, no one has written a   15:08
11 rule to be voted on -- our -- by our membership.  So   15:08
12 that has been the -- our guidance since 2016.   15:08
13     Q.  Who was your predecessor?               15:08
14     A.  Gary Ray.                               15:08
15     Q.  And why did he feel the need to enact this   15:08
16 policy?                                           15:08
17        MS. GREEN:  Object to the form.          15:08
18        THE WITNESS:  As we went to the national   15:08
19 meetings more and more, people were saying this was   15:08
20 an issue, and so they wanted -- you know, it had not   15:08
21 hit West Virginia yet but wanted to have something   15:08
22 in place to protect the kids.                    15:09
23 BY MS. KANG:                                     15:09
24     Q.  Did you ever receive any complaints about   15:09
25 this policy?                                      15:09
                                          Page 118

1     A.  No.                                      15:09
2     Q.  Do you know who specifically drafted the   15:09
3 policy?                                           15:09
4     A.  I believe it was probably my predecessor   15:09
5 Gary Ray and -- and the legal counsel at the time.   15:09
6     Q.  Do you know if anyone else participated in   15:09
7 the drafting?                                     15:09
8     A.  I don't think so.                        15:09
9     Q.  Was this policy ever implemented?       15:09
10     A.  We have never used it, if that's what you   15:09
11 are asking.                                       15:09
12     Q.  What do you mean by "never used it"?     15:09
13     A.  Nobody ever brought up a case -- I'm not   15:09
14 even aware of any case of transgender participating.   15:09
15 Therefore, nobody ever brought it to the Board to   15:10
16 decide whether or not it was fair or safe.       15:10
17     Q.  When a school determines a student's    15:10
18 gender, is that always put into WVEIS?           15:10
19        MS. GREEN:  Object to the form.          15:10
20        THE WITNESS:  I am not sure what they put   15:10
21 in WVEIS, to be honest with you.  I'm not -- you   15:10
22 know, each school, I would assume, has rules and   15:10
23 regulations they have to do.                     15:10
24 BY MS. KANG:                                     15:10
25     Q.  Is it fair to say that the Commission   15:10
                                          Page 119

1 looked to WVEIS to determine a student's gender?   15:10
2     A.  We have -- we don't have access to WVEIS.   15:10
3 We would ask the school to provide what they have   15:10
4 designated the student as in WVEIS.              15:10
5     Q.  Has this always been the case?          15:11
6     A.  I would assume that it's always been the   15:11
7 case.  Even before we had a policy, the school   15:11
8 determined what they put in WVEIS.               15:11
9     Q.  Have you received any complaints about   15:11
10 B.P J.'s participation?                          15:11
11     A.  Not that I know of.                     15:11
12     Q.  And to be clear, you haven't received any   15:11
13 complaints about transgender students participating   15:11
14 in West Virginia?                                15:11
15     A.  No.                                     15:11
16     Q.  Have any transgender students ever asked   15:11
17 the Commission if they could participate in sports   15:11
18 at a secondary school level?                     15:11
19        MS. GREEN:  Object to the form.          15:11
20        THE WITNESS:  I had one boy who wanted to   15:11
21 be a -- play volleyball, and we told him he couldn't   15:12
22 play volleyball because it was a girls' sport.  And   15:12
23 he said, "Then I'll be a boy -- I'll be a girl."   15:12
24        And -- but he wasn't -- he never did     15:12
25 anything else with it.  And we assumed he just   15:12
                                          Page 120

1 wanted to play volleyball because it never came back   15:12
2 up.                                               15:12
3          I did have contact with a school who said   15:12
4 they had one student who one day identified as a   15:12
5 girl, next day a boy, and back and forth.  But we   15:12
6 have not heard anything more from that student.   15:12
7 So...                                             15:12
8 BY MS. KANG:                                     15:12
9     Q.  When was that?                          15:12
10     A.  That would have been in the last year.   15:12
11     Q.  Do you remember which school it was from?   15:12
12     A.  Yes.                                    15:12
13     Q.  Which school was it?                    15:12
14     A.  South Charleston High School.           15:12
15     Q.  So I'm going to introduce a document    15:13
16 that's going to be marked as Exhibit 6.          15:13
17        I'll let you know when it's available in   15:13
18 your folder.                                     15:13
19        (Deposition Exhibit 6 was marked for     15:13
20        identification and is attached hereto.)   15:13
21        MS. KANG:  Exhibit 6 is now available in   15:13
22 the shared exhibit folder.                       15:13
23 BY MS. KANG:                                     15:13
24     Q.  Mr. Dolan, let me know when you have had a   15:13
25 chance to look at it.                            15:13
                                          Page 121

31 (Pages 118 - 121)

| | |
|---|---|
| 1    A.  [Witness reviews document].       15:13 | 1  BY MS. KANG:                        15:16 |
| 2       Okay.                         15:13 | 2    Q.  Did you or your staff ever consider   15:16 |
| 3    Q.  Do you recognize this document?   15:14 | 3  putting in this policy -- putting in a hormone   15:16 |
| 4    A.  Yeah.  This was our transgender Board of  15:14 | 4  requirement?                        15:16 |
| 5  Directors policy.                    15:14 | 5       MS. GREEN:  Object to the form.     15:16 |
| 6    Q.  Is this the same policy that we were   15:14 | 6       THE WITNESS:  No.  Because we would not  15:16 |
| 7  discussing earlier?                   15:14 | 7  change the policy.  I think it would -- if it was   15:16 |
| 8    A.  Yes.                         15:14 | 8  going to change, it was going to be changed by a   15:16 |
| 9    Q.  So I want to draw your attention to Bullet  15:14 | 9  rule by our membership and was never brought forward  15:16 |
| 10  Point 1, which says [as read]:          15:14 | 10  as a rule proposal.                    15:16 |
| 11      "The transgender student's school      15:14 | 11  BY MS. KANG:                        15:16 |
| 12      shall make the initial determination as   15:14 | 12    Q.  Am I right to say that this policy was not   15:16 |
| 13      to whether a student may participate in   15:14 | 13  a rule?                            15:16 |
| 14      interscholastic athletics in a gender   15:14 | 14    A.  That's correct.                 15:16 |
| 15      that does not match the gender assigned   15:14 | 15    Q.  What's the difference between this policy   15:16 |
| 16      to him or her at birth."             15:14 | 16  versus a rule?                        15:16 |
| 17      Did I read that correctly?          15:14 | 17    A.  This never went before the membership to   15:16 |
| 18    A.  Yes.                         15:14 | 18  have a vote; so I don't think it has the power of a   15:16 |
| 19    Q.  Why did the Commission give the initial   15:14 | 19  rule.                             15:16 |
| 20  determination to the transgender student's school?   15:14 | 20    Q.  What sort of power would that be?    15:16 |
| 21       MS. GREEN:  Object to the form.     15:14 | 21    A.  Well, this was giving guidance to a Board  15:16 |
| 22       THE WITNESS:  First of all, we -- we don't   15:14 | 22  of Directors.                        15:17 |
| 23  know this student.  There would be no way for us to   15:14 | 23       But a rule is voted on and -- and approved   15:17 |
| 24  know all the factors.                 15:14 | 24  by the State Board of Education; so it is the rule   15:17 |
| 25       So the school is the entity that works   15:14 | 25  of law for high school athletics from the WVSSAC.   15:17 |
| Page 122 | Page 124 |

| | |
|---|---|
| 1  closely with that student and the parents and the   15:15 | 1    Q.  What do you mean by it provided guidance   15:17 |
| 2  family on a daily basis.                15:15 | 2  to the Board of Directors?               15:17 |
| 3  BY MS. KANG:                        15:15 | 3    A.  Would allow them to grant waivers if    15:17 |
| 4    Q.  Why did the Commission think transgender   15:15 | 4  somebody -- if it was unsafe or unfair to other    15:17 |
| 5  students should be able to participate on teams   15:15 | 5  students or to this student.             15:17 |
| 6  consistent with their identity?          15:15 | 6    Q.  By unfair to the student, do you mean    15:17 |
| 7       MS. GREEN:  Object to the form.     15:15 | 7  unfair to the trans student?             15:17 |
| 8       THE WITNESS:  I assume that the school   15:15 | 8    A.  Either one.  Either one.  For safety or   15:17 |
| 9  would put them in the proper place, wherever the   15:15 | 9  given them advantages that made it unfair.   15:17 |
| 10  school decided based on all the factors.    15:15 | 10    Q.  Am I right that this policy does not    15:18 |
| 11  BY MS. KANG:                        15:15 | 11  mention anything about WVEIS?            15:18 |
| 12    Q.  Did you ever consider implementing a    15:15 | 12       MS. GREEN:  Object to the form.     15:18 |
| 13  hormone requirement in this policy?       15:15 | 13       THE WITNESS:  I don't believe it -- I    15:18 |
| 14       MS. GREEN:  I'm sorry. I didn't hear what  15:15 | 14  don't believe it mentions WVEIS.  It does say that   15:18 |
| 15  you said, Ms. Kang.                    15:15 | 15  the school will make the initial determination.   15:18 |
| 16       MS. KANG:  Sure.                 15:15 | 16  BY MS. KANG:                        15:18 |
| 17  BY MS. KANG:                        15:15 | 17    Q.  Under this policy, what happens if a    15:18 |
| 18    Q.  Did you ever consider implementing a    15:15 | 18  student's gender marker in WVEIS is, let's say --   15:18 |
| 19  hormone requirement in this policy?       15:15 | 19  let's say, male, but the school treats the student   15:18 |
| 20       MS. GREEN:  Thank you.            15:15 | 20  as female?  What would the SAC do in that situation?  15:18 |
| 21       Object to the form.             15:15 | 21       MS. GREEN:  I'll object to the form.    15:18 |
| 22       THE WITNESS:  Our -- it was my        15:15 | 22  Speculative.                        15:18 |
| 23  predecessor's.  So I'm not sure of their discussion   15:15 | 23       THE WITNESS:  I think we would have to    15:18 |
| 24  as to whether or not they were going to put that in   15:16 | 24  look at all the factors that were involved in -- you  15:18 |
| 25  or not.                           15:16 | 25  know, I'm not even sure what the factors would be,   15:19 |
| Page 123 | Page 125 |

32 (Pages 122 - 125)

1  but I think we would have to, you know, have        15:19
2  everything presented to us to make a determination.  15:19
3  BY MS. KANG:                                         15:19
4      Q.  So is it fair to say, in that case you       15:19
5  would not strictly follow WVEIS?                     15:19
6          MS. GREEN:  Object to the form.              15:19
7          THE WITNESS:  We would -- it would be in     15:19
8  the cases where it was unsafe and unfair that we     15:19
9  would not be following WVEIS.  If we felt like it    15:19
10 was unsafe or unfair to the participants, other      15:19
11 participants or the transgender student, then the    15:19
12 Board can override it.                               15:19
13 BY MS. KANG:                                         15:19
14     Q.  Okay.  I'm going to ask you to turn your     15:19
15 attention to a document that I'm going to be marking  15:19
16 as Exhibit 7.                                        15:19
17         MS. KANG:  And I'll let you know when it's   15:19
18 available in everyone's folder.                      15:19
19         (Deposition Exhibit 7 was marked for         15:20
20         identification and is attached hereto.)      15:20
21         MS. KANG:  Exhibit 7 should now be           15:20
22 available in everyone's Marked Exhibit folder.       15:20
23 BY MS. KANG:                                         15:20
24     Q.  And let me know, Mr. Dolan, whenever you     15:20
25 have a chance to -- to look at it.                    15:20

                                                       Page 126

1      A.  Okay.                                        15:20
2      Q.  So this is an email that was produced by     15:20
3  your counsel in response to one of plaintiff's       15:20
4  document request.                                    15:20
5          Do you remember this particular email?      15:20
6      A.  After I went back and searched it, yeah.     15:20
7  And I don't remember -- I didn't remember it until I  15:21
8  was looking for it.                                  15:21
9      Q.  Is bernie.dolan@wvssac.org your email        15:21
10 address?                                             15:21
11     A.  It is.                                       15:21
12     Q.  Who is Daniel Swartos?                       15:21
13     A.  He is the executive director for the        15:21
14 South Dakota High School Athletic Association -- or   15:21
15 Activities Association.                              15:21
16     Q.  Is that an association in South Dakota?      15:21
17     A.  Yes.                                         15:21
18     Q.  So I'd like to draw your attention to        15:21
19 Page 2 of this pdf that's been Bates Stamped -224.    15:21
20 Let me know whenever you get there.                  15:21
21     A.  Okay.                                        15:21
22     Q.  In this email you say [as read]:             15:21
23         "It has not been challenged yet."            15:21
24         To clarify, are you referring to the         15:21
25 policy that we looked at in Exhibit 6?               15:21

                                                       Page 127

1      A.  Right.  It had not gone through any court    15:22
2  action.  Yes.                                        15:22
3      Q.  Were you concerned that the policy was       15:22
4  going to be challenged at some point?               15:22
5      A.  All of our -- all of our policies get        15:22
6  challenged at some point.  So...                     15:22
7      Q.  Fair enough.                                15:22
8      A.  Yes.                                         15:22
9      Q.  So now I'm going to introduce a document     15:22
10 as Exhibit 8.  One moment.                           15:22
11         MS. KANG:  Exhibit 8 is now available in     15:22
12 everyone's Marked Exhibit folder.                    15:22
13         (Deposition Exhibit 8 was marked for         15:22
14         identification and is attached hereto.)      15:22
15 BY MS. KANG:                                         15:22
16     Q.  Mr. Dolan, let me know whenever you have     15:22
17 it open.                                             15:22
18     A.  Okay.                                        15:22
19     Q.  So I know this was a while ago, but do you   15:23
20 remember the meeting that is referenced in           15:23
21 Exhibit 8?                                           15:23
22     A.  Not specifically.  But yes.                  15:23
23     Q.  Do you remember at all who was present at    15:23
24 this meeting?                                         15:23
25     A.  It's probably in the minutes.               15:23

                                                       Page 128

1          THE WITNESS:  Can you scroll down to the     15:23
2  next page and see...                                 15:23
3          MS. GREEN:  Okay.                            15:23
4          THE WITNESS:  Keep going.  See if            15:23
5  there's...                                           15:23
6          [Witness reviews document].                 15:24
7          I do not remember.  I would assume it was    15:24
8  all of my Board of Directors, though.               15:24
9  BY MS. KANG:                                         15:24
10     Q.  How often does the Board of Directors        15:24
11 meet?                                                15:24
12     A.  Mostly once a month.  There a couple of      15:24
13 months that we don't meet.  So about ten times a     15:24
14 year.                                                15:24
15     Q.  Is this Board of Directors report given to   15:24
16 anyone outside of the Board of Directors?            15:24
17         MS. GREEN:  Object to the form.              15:24
18         THE WITNESS:  I'm not sure because we        15:24
19 don't give it out anymore.  So I don't know if       15:24
20 that's -- if this came from the interscholastic or   15:24
21 if it was Board of Directors report that somebody    15:24
22 would have submitted.                                15:24
23         I don't do it currently; so I don't know     15:25
24 if it was -- who it went to in the past.             15:25
25 ///

                                                       Page 129

33 (Pages 126 - 129)

1  BY MS. KANG:                             15:25
2      Q.  Did it used to go to someone before?     15:25
3      A.  I don't know.  That's what I...     15:25
4      Q.  So I want to draw your attention to Page 2   15:25
5  of the pdf.  It's been Bates Stamped -283.  And it's   15:25
6  Bullet Point 4 "Legal Update."           15:25
7          And in Bullet Point 4, you'll see another   15:25
8  Bullet Point iv that says "Transgender."     15:25
9          Read that paragraph and let me know when   15:25
10  you are finished.                        15:25
11     A.  [Witness reviews document].       15:25
12         Okay.                            15:25
13     Q.  Regarding this specific topic, what was   15:25
14  discussed?                              15:26
15         MS. GREEN:  Object to the form.     15:26
16         THE WITNESS:  Based on the information   15:26
17  there -- obviously, I can't remember in 2016 -- but   15:26
18  we were discussing the policy and how it was -- how   15:26
19  schools would -- how it would work with the schools.   15:26
20  BY MS. KANG:                            15:26
21     Q.  And what do you mean "how it would work   15:26
22  with the schools"?                      15:26
23     A.  Well, it says, Number 1, the school would   15:26
24  make the first determination; did they meet all   15:26
25  other eligibility requirements; was it fair   15:26
                                        Page 130

1      THE WITNESS:  When we meet with our     15:27
2  principals and -- when we meet with our principals   15:27
3  and also at an administrative workshop for a number   15:28
4  of years, we indicated that whatever they determined   15:28
5  we would accept as long as it was not unsafe or   15:28
6  unfair.                                 15:28
7  BY MS. KANG:                            15:28
8      Q.  So is it fair to say that your member   15:28
9  schools were aware of this policy?        15:28
10     A.  Well, I would think at different times.   15:28
11  Again, the turnover at schools is high.  So if --   15:28
12  did somebody -- every person -- did we verify that   15:28
13  they heard it?  I don't know.           15:28
14         But the turnover is relatively high at all   15:28
15  of our schools, especially at the principal level.   15:28
16  So...                                  15:28
17     Q.  Would it be fair to say that at one point   15:28
18  you did inform the member schools about this policy?   15:28
19         MS. GREEN:  Object to the form.     15:28
20         THE WITNESS:  As long as they attended our   15:29
21  meetings, yes.  They might not --        15:29
22  BY MS. KANG:                            15:29
23     Q.  And by --                       15:29
24     A.  -- have attended.                15:29
25     Q.  And by "meetings," do you mean the Board   15:29
                                        Page 132

1  competition if the school allows; you know, was   15:26
2  there an appeal process; and then make sure that we   15:26
3  look at each case on an individual basis and kind   15:26
4  of -- where the Board stood.            15:26
5      Q.  What do you mean by "where the Board   15:26
6  stood"?                                 15:26
7      A.  I don't know what the discussion was at   15:27
8  that point.                             15:27
9      Q.  I notice that in this line it says   15:27
10  [as read]:                              15:27
11         "Editing our transgender policy and   15:27
12         guidelines...."                  15:27
13         As far as you know, was there any editing   15:27
14  that was done to the policy?            15:27
15     A.  I don't believe we edited anything because   15:27
16  it's still the exact same policy that -- that they   15:27
17  approved months earlier.                15:27
18     Q.  Do you remember if the Board of       15:27
19  Directors -- the Board of Directors unanimously   15:27
20  approved this policy?                    15:27
21     A.  I don't know.                    15:27
22     Q.  Do you remember if anything was ever   15:27
23  conveyed outside of the Board of Directors regarding   15:27
24  this policy?                            15:27
25         MS. GREEN:  Object to the form.     15:27
                                        Page 131

1  of Directors meetings?                  15:29
2      A.  No.  It would be our regional principals   15:29
3  meetings that we did at the beginning of each year.   15:29
4      Q.  Does the Commission report H.B. 3293?   15:29
5         MS. GREEN:  Object to form.        15:29
6         THE WITNESS:  I don't think we ever --   15:29
7  there was ever a position on it.  I think our   15:29
8  position has been we support Title IX and try to   15:29
9  give more opportunities for girls.  But bottom line   15:29
10  is we are not allowed to discriminate by our rule --   15:29
11  by our policies.                        15:29
12  BY MS. KANG:                            15:29
13     Q.  By "not allowed to discriminate," do you   15:29
14  mean also not allowed to discriminate against   15:29
15  transgender students?                   15:30
16     A.  I would think we are not allowed to -- we   15:30
17  are not allowed to discriminate against transgender.   15:30
18  That's correct.                         15:30
19     Q.  Could you tell me a little bit more about   15:30
20  what you mean by advance Title IX?        15:30
21     A.  Well, we continued to offer more   15:30
22  opportunities and protect the opportunities that   15:30
23  girls have.                             15:30
24         We have increased the opportunities for   15:30
25  girl golfers to participate just against girls.  So   15:30
                                        Page 133

34 (Pages 130 - 133)

1   our number of girls' golfers has risen tremendously.   15:30
2       We also have supported a girls' only   15:30
3   wrestling invitational that has allowed more girls   15:30
4   to participate in wrestling.   15:30
5       We have encouraged schools to make sure   15:31
6   that Title IX is followed when they are putting in   15:31
7   fields, putting in locker rooms, money for programs,   15:31
8   and things like that.   15:31
9       Q.  Do you believe that Title IX also protects   15:31
10  transgender girls?   15:31
11      MS. GREEN:  Object to the form.   15:31
12      THE WITNESS:  I -- I am not sure.  I think   15:31
13  that it -- it has been ruled that way, yes.   15:31
14  BY MS. KANG:   15:31
15      Q.  Have there ever been any safety concerns   15:31
16  with girls playing on the boys' team?   15:31
17      MS. GREEN:  Object to the form.   15:31
18      THE WITNESS:  The girls are choosing to   15:31
19  participate.  So I think all kids there's -- there's   15:31
20  an oppor-- there's a possibility of injury.  And   15:31
21  so, you know, it -- it's brought out in their   15:31
22  preparticipation physical that, you know, there is a   15:31
23  possibility of injury.   15:32
24  BY MS. KANG:   15:32
25      Q.  To your knowledge, have there been any   15:32
                                          Page 134

1   injuries from a girl playing on a boys' team?   15:32
2       MS. GREEN:  Object to the form.   15:32
3       THE WITNESS:  Oh, I'm sure.  I mean, I   15:32
4   don't know specifically.  But there's -- people get   15:32
5   hurt every day in every sport.  So I'm sure somebody   15:32
6   has gotten hurt in football or wrestling.   15:32
7   BY MS. KANG:   15:32
8       Q.  In the context of school sports, what is   15:32
9   competitive skill?   15:32
10      MS. GREEN:  Object to the form.   15:32
11      THE WITNESS:  Skill needed to be   15:32
12  successful in that sport.   15:32
13  BY MS. KANG:   15:32
14      Q.  Does cross-country require competitive   15:32
15  skill?   15:32
16      MS. GREEN:  Object to the form.   15:32
17      THE WITNESS:  I would think so.   15:32
18  BY MS. KANG:   15:32
19      Q.  Do you know whether any girls who tried   15:32
20  out for cross-country at Bridgeport Middle School   15:32
21  for the fall of 2021 were unable to join the team?   15:32
22      MS. GREEN:  Object to the form.   15:33
23      THE WITNESS:  We were not involved in the   15:33
24  selection.  So I don't know.   15:33
25  ///   15:33
                                          Page 135

1   BY MS. KANG:   15:33
2       Q.  Believe it or not, I am on my last set of   15:33
3   questions.  So thank you for bearing with me so far.   15:33
4   Hopefully, we can get this done early.   15:33
5       So now I want to talk a little bit more   15:33
6   about House Bill 3293.   15:33
7       Were you involved at all in the passage of   15:33
8   H.B. 3293?   15:33
9       MS. GREEN:  Object to the form.   15:33
10      THE WITNESS:  I wouldn't say I was   15:33
11  involved in the passage.   15:33
12      Oftentimes I get asked to come down and   15:33
13  speak.  And I was asked to speak to the Democratic   15:33
14  caucus.  And I pretty much said what I said earlier.   15:33
15  We support girls' sports and continued to offer more   15:33
16  opportunities for them.  But we're not allowed to   15:33
17  discriminate.   15:34
18  BY MS. KANG:   15:34
19      Q.  Besides the Democratic caucus, did you   15:34
20  speak to anyone else?   15:34
21      A.  I had communication with Melissa White,   15:34
22  who was -- is the counsel for House Ed.   15:34
23      Q.  And did you think --   15:34
24      A.  And I think that --   15:34
25      Q.  Go ahead.   15:34
                                          Page 136

1       A.  I don't think -- I don't think we spoke   15:34
2   about it.  She had sent me an email about it.   15:34
3       Q.  Did you speak to any legislative committee   15:34
4   about H.B. 3293?   15:34
5       MS. GREEN:  Object to the form.   15:34
6       THE WITNESS:  I spoke to the caucus.  I   15:34
7   was down there as a witness in front of finance, I   15:34
8   believe, Senate finance -- or House finance.  But I   15:34
9   was never called in to -- to give an opinion or any   15:34
10  information.   15:34
11  BY MS. KANG:   15:34
12      Q.  So you were called in as a witness but you   15:34
13  didn't testify?   15:34
14      A.  They told me to be available.   15:34
15      Q.  Were you told anything about H.B. 3293   15:35
16  before it was passed?   15:35
17      MS. GREEN:  Object to the form.   15:35
18      THE WITNESS:  Actually, I was sent an   15:35
19  email from Melissa White.  But when I looked at it,   15:35
20  the beginning of it was a home school bill.   15:35
21      So I assumed she sent the wrong bill.   15:35
22  And -- but it did say "transgender" at the top.  So   15:35
23  I sent it to the legal counsel who was helping us   15:35
24  with legislative activity.  Or --   15:35
25      MS. GREEN:  And I'll object to the form.   15:35
                                          Page 137

35 (Pages 134 - 137)

1     THE WITNESS:  Okay.                    15:35
2     MS. GREEN:  Caution him regarding        15:35
3  conversations with counsel.                 15:35
4     THE WITNESS:  Okay.                    15:35
5  BY MS. KANG:                               15:35
6     Q.  By "counsel," was it counsel at the  15:35
7  Commission?                                 15:35
8     A.  It is counsel --                    15:35
9     MS. GREEN:  I'll just --               15:35
10    THE WITNESS:  Okay.                    15:35
11    MS. GREEN:  -- object to the form.      15:36
12    THE WITNESS:  Okay.                    15:36
13    It was counsel we've had at -- that we   15:36
14  used during legislative time.              15:36
15  BY MS. KANG:                               15:36
16    Q.  Who is this person?                 15:36
17    MS. GREEN:  I'll just object to the form.  15:36
18  I think they're in the privilege log.  We identified  15:36
19  them.                                      15:36
20    Do you know the name of the firm?       15:36
21    THE WITNESS:  Dinsmore & Shohl is the law  15:36
22  firm.                                      15:36
23  BY MS. KANG:                               15:36
24    Q.  Did any legislators tell you about the  15:36
25  purpose of H.B. 3293?                      15:36
                                          Page 138

1  would say we're following it, yes.          15:38
2     Q.  Okay.  I'm going to introduce a document  15:38
3  as Exhibit 9, and I'll let you know when it's  15:38
4  available.                                 15:38
5     (Deposition Exhibit 9 was marked for     15:38
6     identification and is attached hereto.)   15:39
7     MS. KANG:  Exhibit 9 is now available in  15:39
8  the Marked Exhibits folder.                 15:39
9  BY MS. KANG:                               15:39
10    Q.  And let me know when you have a chance to  15:39
11  pull it up, Mr. Dolan.                     15:39
12    A.  Okay.                              15:39
13    Q.  So these are some text messages that your  15:39
14  counsel produced in response to Plaintiff's  15:39
15  discovery requests.  It's been Bates stamped  15:39
16  WVSSAC000001.  And I'm going to represent you  15:39
17  that these are texts between you and        15:39
18  Stephen Baldwin.                           15:39
19    Do you remember this conversation?      15:39
20    A.  Yes.                               15:39
21    MS. GREEN:  Object to the form.         15:39
22    THE WITNESS:  Yes, I do.               15:39
23  BY MS. KANG:                               15:39
24    Q.  Who is Stephen Baldwin?             15:39
25    A.  Senator from Greenbrier County.     15:39
                                          Page 140

1     MS. GREEN:  Object to the form.         15:36
2     THE WITNESS:  I don't remember having that  15:36
3  conversation with any of them.  I had one email from  15:36
4  Senator Unger, who sent me the NCAA guidelines at  15:36
5  the time.  It was unsolicited and didn't have  15:36
6  anything, really, with it, just a link to the NCAA  15:36
7  guidelines.                                15:37
8  BY MS. KANG:                               15:37
9     Q.  Did you respond to that email?      15:37
10    A.  I did not.                         15:37
11    Q.  Has the Commission taken any steps to  15:37
12  contemplate policies or rules concerning the  15:37
13  implementation of H.B. 3293?               15:37
14    MS. GREEN:  Object to the form.         15:37
15    THE WITNESS:  The legislation 3293 charged  15:37
16  the Department of Ed with creating the rule.  So  15:37
17  we're going to wait for those guidelines come out  15:37
18  and then probably just bring them into our rule book  15:37
19  like we did the 2.0.                       15:37
20  BY MS. KANG:                               15:37
21    Q.  But to be clear, if the State Board  15:37
22  promulgates a rule, will the Commission have to  15:37
23  follow that rule?                          15:37
24    A.  Our schools would have to follow it,  15:38
25  which, if all of our schools have to follow it, I  15:38
                                          Page 139

1     Q.  Is this the same Democratic office that  15:40
2  you were just talking about?               15:40
3     A.  Yes, ma'am.                        15:40
4     Q.  Why did you decide to participate in this  15:40
5  meeting?                                   15:40
6     MS. GREEN:  Object to the form.         15:40
7     THE WITNESS:  Oftentimes I -- I don't feel  15:40
8  like I have a choice.  When the legislature calls, I  15:40
9  need to go down and be heard.              15:40
10  BY MS. KANG:                               15:40
11    Q.  Did you bring any documents with you to  15:40
12  this meeting?                              15:40
13    A.  Just the -- just our board policy.  15:40
14    Q.  Do you remember if you were shown any  15:40
15  documents at the meeting?                  15:40
16    A.  I don't remember.                  15:40
17    Q.  Did the Democratic Caucus give you any  15:40
18  documents?                                 15:40
19    A.  I don't remember if they gave me the bill  15:40
20  at that time or not.  So I'm not sure.     15:40
21    Q.  So if you scroll down to the document  15:41
22  that's Bates Stamped -006.  And I believe it's  15:41
23  Page 6 of 7 of the pdf of Exhibit 9.       15:41
24    A.  Okay.                              15:41
25    Q.  Do you know who Rucker is?          15:41
                                          Page 141

1    A.  Senator Rucker is the Senate education    15:41
2  chair.                                          15:41
3    Q.  Do you agree with her statement that it is    15:41
4  not a real policy?                              15:41
5    A.  I believe it is a policy that -- but it    15:41
6  had not -- it didn't go through a rule-writing    15:42
7  process and was never challenged in court and    15:42
8  upheld.                                         15:42
9      So we think it was an internal policy,    15:42
10  yes, that we give our --                       15:42
11    Q.  What do you mean --                       15:42
12    A.  We give our board the opportunity to hear    15:42
13  cases of appeals.                              15:42
14    Q.  Can you clarify what you mean by "internal    15:42
15  policy"?                                        15:42
16    A.  Well, it wasn't in our rule book.       15:42
17    Q.  So I'm going to introduce an additional    15:42
18  document as Exhibit 10.                        15:42
19      (Deposition Exhibit 10 was marked for    15:43
20      identification and is attached hereto.)    15:43
21    MS. KANG:  Exhibit 10 is now available in    15:43
22  the Marked Exhibits folder.                    15:43
23  BY MS. KANG:                                    15:43
24    Q.  Let me know when you have it up,        15:43
25  Mr. Dolan.                                      15:43

Page 142

1    A.  [Witness reviews document].             15:43
2      Okay.                                      15:43
3    Q.  Do you remember this email?             15:43
4    A.  After I looked it back up, yes.         15:44
5    Q.  And is that still your email address at    15:44
6  the top?                                        15:44
7    A.  It is.                                   15:44
8    Q.  Who is John Raby?                        15:44
9    A.  John Raby is an Associated Press reporter.    15:44
10    Q.  Had you spoken to him before?           15:44
11    A.  Probably in a different capacity.  When I    15:44
12  was the director of Super Six, he was a reporter    15:44
13  that would come to games.  So...               15:44
14    Q.  So on the first page of Exhibit 10,     15:44
15  Mr. Raby asks the question [as read]:          15:44
16      "What does the WVSSAC think of the        15:44
17      bill?"                                     15:44
18      And then if you go to the next page of    15:44
19  Exhibit 10, in response you write [as read]:    15:44
20      "The WVSSAC has supported Title IX        15:44
21      for the last 50 years...Title IX has      15:44
22      non discrimination language that we       15:44
23      support."                                  15:45
24      What do you mean by "Title IX has         15:45
25  non-discrimination language that we support"?    15:45

Page 143

1    A.  I believe in the Title IX document it says    15:45
2  you can't discriminate.  And so we support Title IX;    15:45
3  so we have to support the whole thing.         15:45
4    Q.  You also say in your response that       15:45
5  [as read]:                                      15:45
6      "This has increased the quantity and      15:45
7      quality of opportunities for girls in      15:45
8      our schools."                               15:45
9      What opportunities do you believe has been    15:45
10  increased?                                      15:45
11    A.  Well, when I was in school, which would    15:45
12  have been the early -- early '70s, may or may not    15:45
13  have had girls' basketball at all and wouldn't have    15:45
14  had volleyball or soccer, for sure, swim.  So over    15:45
15  the last 50 years, we have increased the sports that    15:45
16  girls can participate in a hundred times over.    15:45
17    Q.  Do you believe that B.P.J. should have the    15:45
18  right to these opportunities?                  15:46
19    MS. GREEN:  Object to the form.            15:46
20    THE WITNESS:  I believe we'll follow the    15:46
21  rule -- the law.                                15:46
22  BY MS. KANG:                                    15:46
23    Q.  What do you mean by "follow the law"?    15:46
24    A.  Whatever -- whatever the Department of Ed    15:46
25  writes as the rule, then we have to implement that    15:46

Page 144

1  with all of our schools.                        15:46
2    Q.  Do you believe that B.P.J.'s participation    15:46
3  in cross-country harms any of these opportunities?    15:46
4    MS. GREEN:  Object to the form.            15:46
5    THE WITNESS:  Well, "harm" is a -- a       15:46
6  unique word because harm might be that it might not    15:46
7  physically harm somebody, but they -- you know, harm    15:46
8  might be that you take somebody's position on the    15:46
9  team.                                           15:46
10      In cross-country, only the top seven kids    15:46
11  get to compete on the varsity team, whether it's    15:46
12  middle school or high school.  If you are        15:46
13  number seven and you get bumped out, there might be    15:46
14  harm.                                           15:47
15      But, in general, physical harm, I don't    15:47
16  believe so.                                     15:47
17  BY MS. KANG:                                    15:47
18    Q.  Do you know if B.P.J. has, as you say,    15:47
19  bumped out another girl?                        15:47
20    A.  I do not.                               15:47
21    MS. GREEN:  Object to the form.            15:47
22    THE WITNESS:  Okay.                        15:47
23    MS. KANG:  So I am going to introduce      15:47
24  another document as Exhibit 11.               15:47
25  ///

Page 145

37 (Pages 142 - 145)

1    (Deposition Exhibit 11 was marked for   15:47
2    identification and is attached hereto.)   15:48
3    MS. GREEN:  Okay.   15:48
4    MS. KANG:  Exhibit 11 is now available in   15:48
5 everyone's Marked Exhibit folder.   15:48
6 BY MS. KANG:   15:48
7    Q.  Let me know when you have it up.   15:48
8    And, Mr. Dolan, we can take a five-minute   15:48
9 break, I think, after -- after this email, before we   15:48
10 wrap up.   15:48
11    A.  Okay.   15:48
12    Scroll down.   15:48
13    Okay.   15:48
14    Q.  Do you recognize this email?   15:48
15    A.  I do.   15:48
16    Q.  Do you remember this email?   15:48
17    A.  I don't know if I remember it.  But I   15:48
18 recognize it, yes.   15:48
19    Q.  Who is Josh Weekley?   15:48
20    A.  He runs RunWV which keeps track of all   15:48
21 boys' and girls' track and cross-country times and   15:49
22 posts them on runwv.com.   15:49
23    Q.  Why did you contact him?   15:49
24    A.  I was looking for data in comparing girls'   15:49
25 times to boys' times.   15:49

Page 146

1    Q.  Why did you want that data?   15:49
2    A.  Just curious to see if there were   15:49
3 advantages that boy -- if -- what the actual data   15:49
4 showed for comparison of boys' and girls' times.   15:49
5    Q.  Did you ask in response to any questions   15:49
6 from the West Virginia Legislature?   15:49
7    A.  I don't remember the time frame of this;   15:49
8 so I don't know if it was before or after or during   15:49
9 the legislative time.   15:49
10    Q.  Did you ever get the data from Josh   15:49
11 Weekley?   15:50
12    A.  Did not.  Did not.  They had computer   15:50
13 problems and so...   15:50
14    Q.  What did you mean by "a transgender issue"   15:50
15 on the --   15:50
16    A.  Again --   15:50
17    Q.  -- first page?   15:50
18    A.  I was asking -- I was just telling him.  I   15:50
19 was trying to compare boys' times and girls' times   15:50
20 and what hap- -- you know, what the actual times   15:50
21 were of boys and girls competing against each other.   15:50
22    MS. GREEN:  Okay.  I think if folks are   15:50
23 all right, we will take a five-minute break, and   15:50
24 then I should have -- let's see -- I should have a   15:50
25 couple more exhibits to go through.   15:50

Page 147

1    But we'll take a pause here and come back   15:50
2 around 3:56.   15:50
3    THE WITNESS:  Okay.   15:50
4    THE VIDEOGRAPHER:  Going off the record.   15:50
5 The time is 3:51.   15:50
6    (Brief recess.)   15:57
7    THE VIDEOGRAPHER:  Back on the record.   15:57
8 The time is 3:57.   15:57
9 BY MS. KANG:   15:57
10    Q.  Mr. Dolan, I'm going to introduce another   15:57
11 document as Exhibit 12.   15:57
12    A.  Okay.   15:57
13    Q.  And I'll let you know when it's in there.   15:57
14    (Deposition Exhibit 12 was marked for   15:57
15    identification and is attached hereto.)   15:58
16    MS. KANG:  Okay.  Exhibit 12 is now   15:58
17 available in the Marked Exhibits folder.   15:58
18 BY MS. KANG:   15:58
19    Q.  Let me know when you have had a chance to   15:58
20 pull it up.   15:58
21    Scroll down.   15:58
22    That's it.  Okay.   15:58
23    Okay.   15:58
24    Q.  Is this the same Melissa White as the one   15:59
25 you were referencing earlier?   15:59

Page 148

1    A.  Yes.   15:59
2    Q.  Do you know what Melissa White's position   15:59
3 is?   15:59
4    A.  Well, on the paper it says Chief Counsel   15:59
5 for Committee on Education of West Virginia House of   15:59
6 Delegates.   15:59
7    Q.  Do you know why Melissa White reached out   15:59
8 to you regarding H.B. 3293?   15:59
9    A.  There may have been original language in   15:59
10 there that may have identified the WVSSAC.  I don't   15:59
11 know.  But it involves athletics; so I'm sure, as a   15:59
12 courtesy, she was sending me something.   15:59
13    Q.  Had you spoken to her about athletics   15:59
14 before this email?   15:59
15    MS. GREEN:  I'll object to the form.   15:59
16    THE WITNESS:  This -- that -- last year or   15:59
17 in general?   15:59
18 BY MS. KANG:   15:59
19    Q.  In general.   15:59
20    A.  Yeah.  I mean, every time there is   15:59
21 legislation involving athletics, home school,   15:59
22 whatever, it's not unusual for them to contact me   15:59
23 about our position or our input on it.   16:00
24    Q.  So you notice in the top-right corner,   16:00
25 Thursday, March 11th is underlined.   16:00

Page 149

38 (Pages 146 - 149)

```
 1        Was this the first time that Melissa White  16:00
 2  spoke to you about H.B. 3293?               16:00
 3        MS. GREEN:  Object to the form.        16:00
 4        THE WITNESS:  I believe it was.  I may   16:00
 5  have been underlining that as I was gathering my  16:00
 6  documents to make sure I got them all out of my   16:00
 7  email.  So that might be why that was underlined.  16:00
 8  BY MS. KANG:                                16:00
 9     Q.  In this email, she asks for your thoughts  16:00
10  on H.B. 3293.                                16:00
11        Did you provide her with any thoughts?    16:00
12     A.  I did not.  It was -- it -- I thought    16:00
13  there was an attachment to that, and I sent it off.  16:01
14        Was there -- oh, yeah.  There it is.  Down  16:01
15  at the bottom.                               16:01
16        And I didn't -- I didn't open it.  I sent  16:01
17  it off to Dinsmore & Shohl.                  16:01
18     Q.  Did you ever have any verbal            16:01
19  communications with Melissa White about this bill?  16:01
20     A.  The only communication I could -- might   16:01
21  have had is that when she asked me to come to the   16:01
22  finance meeting and wait outside.  And then I was   16:01
23  told I wasn't needed.                        16:01
24        MS. KANG:  I'm going to introduce a       16:01
25  document as Exhibit 13.                      16:01
                                          Page 150
```

```
 1        (Deposition Exhibit 13 was marked for    16:02
 2        identification and is attached hereto.)   16:02
 3        MS. KANG:  Exhibit 13 is now available in  16:02
 4  everyone's Marked Exhibit folder.            16:02
 5  BY MS. KANG:                                16:02
 6     Q.  So let me know when you have it up.  And  16:02
 7  once you have it up, if you could scroll to the very  16:02
 8  last page that has been Bates stamped -370.  Let me  16:02
 9  know.                                        16:02
10     A.  Okay.                                16:02
11     Q.  Do you recognize this text exchange?    16:02
12     A.  Yes.                                 16:02
13     Q.  Is the Melissa at the top of the thread   16:03
14  referring to Melissa White?                  16:03
15     A.  Yes.                                 16:03
16     Q.  Do you know why she asked for the        16:03
17  transgender policy?                          16:03
18        MS. GREEN:  Object to the form.         16:03
19        THE WITNESS:  At some point, I don't --   16:03
20  I'm not sure of the date.  But at some point we    16:03
21  were -- you know, we had told them that we had a   16:03
22  Board policy for transgender.                 16:03
23        So I'm sure she was trying to get a copy   16:03
24  of that.                                     16:03
25  ///                                         
                                          Page 151
```

```
 1  BY MS. KANG:                                16:03
 2     Q.  Who is "them"?                        16:03
 3     A.  House -- House Education.               16:03
 4     Q.  Did you provide the policy to her?      16:03
 5     A.  I'm sure I did.                        16:03
 6     Q.  Did she say anything to you afterwards    16:03
 7  about the transgender policy?                 16:03
 8     A.  Not that I recall.                     16:03
 9     Q.  Did the two of you discuss H.B. 3293 after  16:03
10  this text conversation at any point?         16:04
11        MS. GREEN:  Object to the form.         16:04
12        THE WITNESS:  Not that I recall.         16:04
13        MS. KANG:  I'm just going to introduce one  16:04
14  last exhibit, Exhibit 14.                    16:04
15        (Deposition Exhibit 14 was marked for    16:04
16        identification and is attached hereto.)   16:04
17        MS. KANG:  Exhibit 14 is now available in  16:04
18  the Marked Exhibits folder.                  16:04
19  BY MS. KANG:                                16:04
20     Q.  And let me know when you have it up.     16:04
21        THE WITNESS:  That is 11.                16:04
22        MS. GREEN:  Oh.  I'm sorry.  Uploaded     16:04
23  error there.                                 16:04
24        THE WITNESS:  It was 9.  Yeah.           16:04
25        There it is.                           16:04
                                          Page 152
```

```
 1        MS. GREEN:  I'm sorry.                   16:04
 2        THE WITNESS:  Okay.                     16:05
 3  BY MS. KANG:                                16:05
 4     Q.  So on the first page that is Bates       16:05
 5  Stamped -286, you will see it reads "Regional     16:05
 6  Principals' Meetings."                       16:05
 7        What is the purpose of the Regional       16:05
 8  Principals' Meetings?                        16:05
 9     A.  It's when we make sure that any new rules,  16:05
10  we go over them.  And then also -- most importantly,  16:05
11  they get their C&I cards, which are all the coaches  16:05
12  get in free to games.                        16:05
13        And so that's the only reason why they    16:05
14  come to the meeting, sadly to say, not to hear me   16:05
15  speak.                                       16:06
16     Q.  And apologies for my ignorance.  But     16:06
17  what's a C&I card?                           16:06
18     A.  Courtesy and identification card.  It's   16:06
19  like a free pass into all high school games.  16:06
20     Q.  All right.  Scroll down one page in      16:06
21  Exhibit 14 to the page Bates Stamped -287.   16:06
22     A.  Is it the schedule?                    16:06
23     Q.  No.  It's just the first --             16:06
24     A.  Regional Principals' Meeting?           16:06
25     Q.  That's correct.                        16:06
                                          Page 153
```

39 (Pages 150 - 153)

**Page 154**

```
 1      A.  First slide?                    16:06
 2      Q.  That's -- that's correct.       16:06
 3      A.  Okay.                    16:06
 4      Q.  So are these the slides that were      16:06
 5  presented at this meeting?              16:06
 6      A.  Yes.                     16:06
 7      Q.  Do you know who prepared these slides?   16:06
 8      A.  Each of us prepared our -- our portion,   16:06
 9  myself and the three assistants.  So we all have   16:06
10  different areas to cover.               16:07
11      Q.  By "three assistants," you mean your three   16:07
12  assistant executive directors?          16:07
13      A.  Uh-huh.                   16:07
14      Q.  So I want to draw your attention to what's   16:07
15  been Bates stamped -346.  Apology if I -- will   16:07
16  identify the page number in a moment.          16:07
17          So it is Page 61 of the pdf.        16:07
18      A.  Okay.                    16:07
19      Q.  Do you recognize this slide?       16:07
20      A.  I'm not there yet.            16:07
21      MS. GREEN:  I'm sorry.           16:07
22  BY MS. KANG:                        16:07
23      Q.  Oh.  I'm sorry.              16:07
24      A.  Yes.                     16:08
25      Q.  Do you know who prepared this slide?     16:08
```

**Page 155**

```
 1      A.  This would have been Cindy Daniel.    16:08
 2      Q.  And she is one of your --         16:08
 3      A.  Assistant executive directors.     16:08
 4      Q.  So in the second bullet point here, it   16:08
 5  says [as read]:                        16:08
 6          "WVSSAC's current position is that    16:08
 7      gender is identified in WVEIS for       16:08
 8      athletic participation purposes."      16:08
 9      What does this mean?             16:08
10      A.  Well, I think this was before the ruling   16:08
11  that B.P.J. could participate; so that we were still   16:08
12  reiterating it in our policy at the time until we   16:08
13  got the final ruling from the Department of Ed.   16:08
14      Q.  Just to be clear, if someone's gender in   16:09
15  WVEIS is male, does that mean they would have to    16:09
16  play on the boys' team?                 16:09
17      A.  Yes.                     16:09
18      Q.  Before H.B. 3293 was enacted and under   16:09
19  your trans policy, did you just rely on the school's   16:09
20  determination of gender or would you go into WVEIS   16:09
21  and look at WVEIS?                     16:09
22      A.  We don't have access to WVEIS; so we   16:09
23  wouldn't be able to.  And, to our knowledge, we   16:09
24  didn't have any other cases prior to this.     16:09
25      Q.  So in this slide, when it says "the   16:09
```

**Page 156**

```
 1  current position is that gender is identified in   16:09
 2  WVEIS," would you have to depend on the school's    16:09
 3  determination?                         16:09
 4      A.  Yes.                     16:09
 5      Q.  Can the information in WVEIS for someone's   16:10
 6  gender be changed?                     16:10
 7      MS. GREEN:  Object to the form.      16:10
 8      THE WITNESS:  I'm not sure what the rules   16:10
 9  are for WVEIS.                         16:10
10  BY MS. KANG:                        16:10
11      Q.  Do you know who contributes information to   16:10
12  WVEIS?                             16:10
13      MS. GREEN:  Object to the form.      16:10
14      THE WITNESS:  Each school does, but I'm   16:10
15  not sure, like, who in each school.         16:10
16  BY MS. KANG:                        16:10
17      Q.  Do you remember if this slide was     16:10
18  discussed during the regional principals' meeting?   16:10
19      A.  Probably was.  I would say yes.    16:10
20      Q.  What was discussed?            16:10
21      MS. GREEN:  Object to the form.      16:10
22      THE WITNESS:  Just what was on the slide,   16:10
23  that current law is being challenged, and we were   16:10
24  waiting for final ruling from the Department of Ed.   16:10
25  ///
```

**Page 157**

```
 1  BY MS. KANG:                        16:10
 2      Q.  Anything else?               16:10
 3      A.  As it relates to transgender as it relates   16:10
 4  to this slide, you mean?                16:10
 5      Q.  That's correct.              16:11
 6      A.  I don't think there was anything more   16:11
 7  discussed, from my knowledge.            16:11
 8      MS. KANG:  So I believe that is all my    16:11
 9  questions.                         16:11
10      I'm going to go off the record for about   16:11
11  five minutes or so and see if there's anything else   16:11
12  I need to ask.                         16:11
13      But, otherwise, I think we're at the     16:11
14  finish line, Mr. Dolan.                 16:11
15      THE WITNESS:  Good.              16:11
16      THE VIDEOGRAPHER:  Off the record.  The   16:11
17  time is 4:11.                         16:11
18      (Brief recess.)                16:17
19      THE VIDEOGRAPHER:  Back on the record.    16:17
20  The time is 4:18.                     16:17
21      MS. KANG:  Mr. Dolan, I am finished asking   16:17
22  my questions.  I will reserve the right to ask any   16:17
23  questions depending on other parties' questions.    16:18
24  I'll also reserve the right to ask questions if   16:18
25  there are changes in the errata.  But otherwise I   16:18
```

40 (Pages 154 - 157)

1  think we're -- you're done with me for today.   16:18
2       THE WITNESS:  Okay.  Thank you.        16:18
3       THE VIDEOGRAPHER:  Is there anybody else   16:18
4  with questions or should I go ahead and close out?   16:18
5       MR. SCRUGGS:  This is Jonathan Scruggs for   16:18
6  the intervenor.  No questions from us.        16:18
7       MS. MORGAN:  This is Kelly Morgan.        16:18
8  No questions for the State Board and        16:18
9  Superintendent Burch.        16:18
10      MR. CROPP:  This is Jeffrey Cropp for        16:18
11 Harrison County Board of Education and Dora Stutler.   16:18
12        16:18
13            EXAMINATION        16:18
14 BY MR. CROPP:        16:18
15     Q.  I just have a couple of follow-up        16:18
16 questions, Mr. Dolan.        16:19
17     A.  Okay.        16:19
18     Q.  Regarding Exhibit 6, which is the        16:19
19 transgender policy, was a copy of that policy ever   16:19
20 distributed to the member schools?        16:19
21     A.  I don't believe so.        16:19
22     Q.  Okay.  Was a copy of the transgender        16:19
23 policy ever given to the principals?        16:19
24     A.  I don't believe so.        16:19
25     Q.  Was a copy of that transgender policy ever   16:19

1  given to the County Boards of Education?        16:19
2     A.  I don't believe so.        16:19
3     Q.  Was a copy of the transgender policy ever   16:19
4  given to the county superintendents?        16:19
5     A.  I don't believe so.        16:19
6     Q.  You mentioned that -- at a regional        16:19
7  meeting that that policy was reviewed with the   16:19
8  principals who attended the -- that meeting.        16:19
9        But my question is, is that -- was that   16:19
10 just at the first meeting where the policy was   16:19
11 introduced, or did you go over that policy every   16:19
12 regional meeting after it was introduced?        16:19
13     MS. GREEN:  Object to the form.        16:19
14     THE WITNESS:  Normally, we would -- you   16:20
15 mean each year?  Or do you mean, like, when we do   16:20
16 ten of them, was it brought up at each ten?        16:20
17 BY MR. CROPP:        16:20
18     Q.  Each year.  So it was introduced in one   16:20
19 year.  My question is at the subsequent years -- did   16:20
20 you go over that policy during the subsequent years   16:20
21 at that -- at all ten regional meetings?        16:20
22     A.  I would say it was -- I don't know when it   16:20
23 came off, but it was on the agenda for a number of   16:20
24 years, yes.        16:20
25     Q.  Whether you say --        16:20

1     A.  I don't --        16:20
2     Q.  Go ahead.        16:20
3     A.  I don't remember if it was on this past   16:20
4  year -- it was on this year with Cindy's slide, but   16:20
5  normally it was on mine.        16:20
6        So I don't -- I would have to go back and   16:20
7  check all my -- if we record them.  And if you   16:20
8  didn't go to the meeting, then you were able to   16:20
9  listen to the recording.        16:20
10     Q.  Okay.  This policy -- excuse me.        16:20
11       The policy was never voted on by the        16:21
12 member schools, the transgender policy?        16:21
13     A.  That's correct.        16:21
14     MR. CROPP:  I don't have any further        16:21
15 questions.        16:21
16     Thank you.        16:21
17     MR. CAPEHEART:  Curtis Capeheart for the   16:21
18 State.        16:21
19     I have no questions.        16:21
20     Thank you, Mr. Dolan.        16:21
21     THE WITNESS:  Thank you.        16:21
22     THE VIDEOGRAPHER:  Okay.  That looks like   16:21
23 everybody.  So I'll go ahead and close out unless   16:21
24 there is anything else.        16:21
25     THE REPORTER:  And this is the reporter.   16:21

1     I did hear that there will be an errata   16:21
2  sheet.  So is the witness reviewing?        16:21
3     MS. GREEN:  Yes.  We'll read and sign.        16:21
4  And if I could --        16:21
5     This is Roberta Green.        16:21
6     So if I could please have it sent to me,   16:21
7  and I'll get with Mr. Dolan.        16:21
8     THE REPORTER:  Thank you.        16:21
9     THE VIDEOGRAPHER:  Thank you.        16:21
10    We are off the record at 4:22 p.m. EST,        16:21
11 and this concludes today's testimony given by        16:22
12 30(b)(6) Witness Bernie Dolan.  The total number of   16:22
13 Media Units used was three.  And will be retained by   16:22
14 Veritext Legal Solutions.        16:22
15    (Whereupon, at 4:22 p.m., the deposition        
16    of BERNARD DOLAN was adjourned.)        
17    --- oOo ---        
18
19
20
21
22
23
24
25

| | |
|---|---|
| 1 | 1  ROBERTA F  GREEN, ESQ |
| 2 | 2  RGREEN@SHUMANLAW COM |
| 3 | 3                    February 28, 2022 |
| 4      I, BERNARD DOLAN, hereby certify under penalty | 4  RE: B P J  vs  WEST VIRGINIA STATE BOARD OF EDUCATION |
| 5  of perjury under the laws of the State of California that | 5  February 11, 2022, BERNARD DOLAN, JOB NO  5079532 |
| 6  the foregoing is true and correct | 6  The above-referenced transcript has been |
| 7      Executed this _____ day of | 7  completed by Veritext Legal Solutions and |
| 8  _____, 2022, at _____, | 8  review of the transcript is being handled as follows: |
| 9  California | 9  __ Per CA State Code (CCP 2025 520 (a)-(e)) – Contact Veritext |
| 10 | 10   to schedule a time to review the original transcript at |
| 11 | 11   a Veritext office |
| 12   _____ | 12  __ Per CA State Code (CCP 2025 520 (a)-(e)) – Locked  PDF |
| 13  BERNARD DOLAN | 13   Transcript - The witness should review the transcript and |
|    30(b)(6) DEPOSITION | 14   make any necessary corrections on the errata pages included |
| 14  WEST VIRGINIA SECONDARY SCHOOL ACTIVITIES COMMISSION | 15   below, noting the page and line number of the corrections |
| 15 | 16   The witness should then sign and date the errata and penalty |
| 16 | 17   of perjury pages and return the completed pages to all |
| 17 | 18   appearing counsel within the period of time determined at |
| 18 | 19   the deposition or provided by the Code of Civil Procedure |
| 19 | 20  __ Waiving the CA Code of Civil Procedure per Stipulation of |
| 20 | 21   Counsel - Original transcript to be released for signature |
| 21 | 22   as determined at the deposition |
| 22 | 23  __ Signature Waived – Reading & Signature was waived at the |
| 23 | 24   time of the deposition |
| 24 | 25 |
| 25                                    Page 162 |                                    Page 164 |

| | |
|---|---|
| 1  STATE OF CALIFORNIA                )          | 1  _x_ Federal R&S Requested (FRCP 30(e)(1)(B)) – Locked .PDF |
| 2  COUNTY OF LOS ANGELES            ) SS. | 2   Transcript - The witness should review the transcript and |
| 3 | 3   make any necessary corrections on the errata pages included |
| 4      I, Dayna Hester, C.S.R. No. 9970, in | 4   below, noting the page and line number of the corrections. |
| 5  and for the State of California, do hereby certify: | 5   The witness should then sign and date the errata and penalty |
| 6      That, prior to being examined, the witness named | 6   of perjury pages and return the completed pages to all |
| 7  in the foregoing deposition was by me duly sworn to | 7   appearing counsel within the period of time determined at |
| 8  testify to the truth, the whole truth, and nothing but the | 8   the deposition or provided by the Federal Rules. |
| 9  truth; | 9  __ Federal R&S Not Requested - Reading & Signature was not |
| 10      That said deposition was taken down by me in | 10   requested before the completion of the deposition. |
| 11  shorthand at the time and place therein named and | 11 |
| 12  thereafter reduced to typewriting under my direction, and | 12 |
| 13  the same is a true, correct, and complete transcript of | 13 |
| 14  said proceedings; | 14 |
| 15      That if the foregoing pertains to the original | 15 |
| 16  transcript of a deposition in a Federal Case, before | 16 |
| 17  completion of the proceedings, review of the transcript | 17 |
| 18  { XX } was { } was not required; | 18 |
| 19      I further certify that I am not interested in | 19 |
| 20  the event of the action. | 20 |
| 21      Witness my hand this 26th day of February, | 21 |
| 22  2022. | 22 |
| 23 | 23 |
| 24      Certified Shorthand Reporter | 24 |
| 25      for the State of California | 25 |
|                                    Page 163 |                                    Page 165 |

1 B.P.J. vs. WEST VIRGINIA STATE BOARD OF EDUCATION

2 BERNARD DOLAN (#5079532)

3     E R R A T A  S H E E T

4 PAGE_____ LINE_____ CHANGE_____

5 _____

6 REASON_____

7 PAGE_____ LINE_____ CHANGE_____

8 _____

9 REASON_____

10 PAGE_____ LINE_____ CHANGE_____

11 _____

12 REASON_____

13 PAGE_____ LINE_____ CHANGE_____

14 _____

15 REASON_____

16 PAGE_____ LINE_____ CHANGE_____

17 _____

18 REASON_____

19 PAGE_____ LINE_____ CHANGE_____

20 _____

21 REASON_____

22

23 _____  _____

24 WITNESS                    Date

25

Page 166

**[& - 2300]**

| & |
|---|
| **&**   4:11 5:4 12:2,20 |
| 138:21 150:17 |
| 164:23 165:9 |

| 0 |
|---|
| **0**   101:1 |
| **0001**   7:13 |
| **0002**   7:14 |
| **0003**   7:16 |
| **0004**   7:17 |
| **0005**   7:19 |
| **0006**   7:20 |
| **0007**   7:22 |
| **0008**   7:23 |
| **0009**   8:3 |
| **0010**   8:5 |
| **0011**   8:6 |
| **0012**   8:8 |
| **0013**   8:9 |
| **0014**   8:11 |
| **00316**   1:7 9:23 |
| **006**   141:22 |
| **01.pdf**   8:3 |
| **02.pdf**   7:22 |
| **03.pdf**   8:6 |
| **04.pdf**   8:8 |
| **06.pdf**   8:5 |
| **07.pdf**   7:23 |
| **08.pdf**   8:11 |
| **09.pdf**   7:16 |

| 1 |
|---|
| **1**   7:12 9:16 18:14 |
| 18:15,20 19:4,5,17 |
| 19:19 27:8 43:19 |
| 59:5 87:13,15 |
| 122:10 130:23 |
| 165:1 |
| **1,6**   63:21 |
| **1.5**   84:5 |

**10**   8:4 24:8 81:4
  83:8,21 142:18,19
  142:21 143:14,19
**100**   56:20,22,23
**10001-2157**   2:15
**10004**   3:10
**10005-3919**   3:21
**103**   7:18
**104**   5:20
**10th**   34:8
**11**   1:22 2:5 8:6 9:2
  24:20 97:18
  145:24 146:1,4
  152:21 164:5
**11.pdf**   7:17
**1144**   3:5
**11th**   9:7 149:25
**12**   8:7 25:7 37:21
  39:6 57:23 69:23
  95:25 96:1,2
  100:11,12 108:24
  148:11,14,16
**120**   3:20
**121**   7:20
**122**   100:24
**124**   100:21,22
  101:5
**125**   3:9
**126**   7:21
**127**   64:6,8
**127-1-2**   65:3
**127-1-3**   67:9
**127-1-4**   70:11
**127-1-8**   73:17
**127-1-9**   80:9
**128**   7:23
**13**   8:9 25:19 104:2
  108:20 150:25
  151:1,3
**137**   73:15

**138**   74:18
**139**   80:7
**14**   7:4 8:10 26:15
  63:22 99:4 110:8
  152:14,15,17
  153:21
**14.pdf**   7:13
**140**   8:3
**1411**   4:6
**142**   8:4
**146**   8:6
**148**   8:7 106:3,6,14
**15**   63:19 83:20
  92:24
**15.pdf**   7:20
**151**   8:9
**15100**   5:14
**152**   8:10
**158**   7:5
**15th**   3:5 49:1
**16**   63:12,18,19,21
  64:5
**17**   70:8 92:13
  106:3,4,13,15,15
  106:17
**17.pdf**   8:9
**18**   7:12 37:19
  99:11
**18.pdf**   7:19
**18225**   65:11 66:3
**18516**   163:23
**19**   39:4 73:10
  99:11
**19.pdf**   7:14
**1900**   4:20
**1916**   38:8 64:18
  66:12
**19th**   3:20
**1:20**   59:6
**1:30**   59:2

**1:35**   59:11
**1st**   60:16

| 2 |
|---|

**2**   7:14 19:22,23
  33:19,22 34:2,5,5
  34:14,14,18 38:1
  43:20,23 52:5
  59:9 112:14
  127:19 130:4
**2.0**   44:7 54:21
  55:1 61:8
**2.0.**   60:20 139:19
**20**   39:15 40:2
  65:25 66:23 73:15
  83:20 94:5 107:25
  108:3
**200**   4:6
**2000**   35:18,18
**2001**   35:18
**2012**   31:17
**2014**   31:17
**2016**   92:13 118:12
  130:17
**2018**   100:1
**2019**   64:23,25
  100:1,2
**2020**   97:23 100:2
**2021**   47:25 97:23
  97:24 98:4 135:21
**2022**   1:22 2:5 9:2
  9:7 34:9 97:24
  98:4 162:8 163:22
  164:3,5
**2025.520**   164:9,12
**20th**   2:21
**21**   74:18
**212**   2:16 3:10,21
**22**   80:7
**224**   127:19
**2300**   3:5

Page 1

**[25 - accomplish]**

**25**  81:4 83:9
**25301**  4:6,14
**25305**  4:21
**25339-3952**  3:15
**26330**  5:6
**26th**  163:21
**28**  164:3
**283**  130:5
**286**  43:5 44:22
  50:2 153:5
**287**  153:21
**2:21**  1:7 9:23
**2:49**  112:15

**3**

**3**  2:21 7:15 20:5,6
  46:25 47:2,4,9,24
  63:12 64:5 67:8
  70:8 73:11,15
  74:19 80:6 85:16
  87:13,23 91:11
  105:21 106:2,6
  112:18
**3,052**  101:4
**3.1.**  67:11
**3.8**  106:5,8 107:16
**3.8.**  106:12,24
**30**  1:19 2:1 9:17
  12:4 13:19,23
  17:24 18:1 29:18
  35:7 45:16 59:10
  66:23 112:19
  161:12 162:13
  165:1
**300,000**  84:4
**304**  4:7,15,21 5:6
**31**  106:19
**32**  66:25,25
**3293**  23:9 25:21
  26:9 58:15 113:13
  113:13,14,16,24
  116:6,7,25 133:4

**136:6,8 137:4,15**
  138:25 139:13,15
  149:8 150:2,10
  152:9 155:18
**33**  7:14
**345-1400**  4:7
**346**  154:15
**365**  92:10
**370**  97:19 151:8
**371**  98:23 100:13
**393-4614**  3:16
**3952**  3:15
**3:01**  112:20
**3:51**  148:5
**3:56**  148:2
**3:57**  148:8

**4**

**4**  7:17 20:18 21:3
  91:17,20,22 99:4
  130:6,7
**4.2.b.**  72:5
**400**  5:5
**415**  2:22
**444-0020**  5:15
**47**  7:15
**479-6849**  2:16
**480**  5:15,21
**4:11**  157:17
**4:18**  157:20
**4:22**  161:10,15

**5**

**5**  7:18 13:19,23
  21:5,14 83:21
  103:14,15,17,24
  104:2 108:15,18
  110:7
**50**  67:3 81:4 83:10
  93:14 143:21
  144:15

**500**  4:14
**502-2119**  5:21
**5079532**  1:24
  164:5 166:2
**51**  93:13
**549-2569**  3:10
**55**  2:15
**558-2021**  4:21
**566-4121**  3:6

**6**

**6**  1:19 2:1 7:20
  9:17 12:4 17:24
  18:1,23,24 21:22
  21:23 22:11,15
  29:18 59:10 69:23
  85:17 92:9 112:19
  121:16,19,21
  127:25 141:23
  158:18 161:12
  162:13
**600**  4:14
**60s**  66:13
**61**  154:17
**693-2000**  2:22
**6th**  39:6 97:16

**7**

**7**  7:21 18:23 22:17
  22:25 100:10
  126:16,19,21
  141:23
**700,000**  84:10
**707**  13:20
**70s**  144:12
**720**  3:6
**720-0711**  4:15
**75**  67:5

**8**

**8**  7:23 23:6,7
  97:16 128:10,11
  128:13,21

**8.5**  74:22
**8.7**  76:22,24
**8.8**  78:17
**8.8.**  76:23
**80202-2686**  3:5
**809-8585**  3:21
**81**  35:14
**85**  35:14,15 52:2
**85260**  5:14,20

**9**

**9**  8:3 23:19,20
  64:23 95:25 96:1
  96:2 108:23 110:7
  140:3,5,7 141:23
  152:24
**90th**  5:14
**91**  7:17
**914**  3:16
**9280**  5:20
**933-8145**  5:6
**94111-4004**  2:22
**99**  35:18 51:21
  52:1,5
**9970**  1:25 2:8
  163:4

**a**

**abarr**  3:6
**abilities**  117:14
**ability**  76:18,19
**able**  44:17 47:8
  51:3 123:5 155:23
  160:8
**absorbed**  69:18
**accept**  132:5
**access**  46:14 47:1
  47:9 120:2 155:22
**accessing**  34:20
  91:25 103:19
**accomplish**  45:19

[accurate - assistants]

**accurate** 30:12 36:13 53:8 65:17 65:18 67:23 71:1 72:19 73:24 75:11 77:12 79:5 110:14 110:14 111:7
**accurately** 52:20 53:2
**acknowledge** 13:17
**aclu** 11:10,21
**aclu.org** 3:11
**acluwv.org** 3:16 3:17
**action** 1:7 10:7 128:2 163:20
**activities** 1:10,20 2:2 4:2 44:20 65:8 66:15 67:18 70:23 71:7,25 72:9,15 75:2,7,18 99:12,13 127:15 162:14
**activity** 95:4 137:24
**actual** 18:24 52:2 147:3,20
**additional** 13:22 39:3 61:21 142:17
**additionally** 14:2
**address** 13:20 127:10 143:5
**addressing** 118:6
**adflegal.org** 5:15 5:16,17
**adjourned** 161:16
**administer** 73:20 74:1
**administration** 50:21
**administrative** 55:17 132:3

**adopted** 72:12
**adoption** 56:18
**advance** 133:20
**advantage** 89:13 89:15 90:16
**advantages** 125:9 147:3
**advisable** 78:22,24 79:10
**advise** 57:11
**aed** 84:17
**aeds** 82:2
**affiliations** 10:11
**affirm** 14:8
**afford** 113:9
**afternoon** 9:5 10:24 14:21 15:1
**age** 44:10 60:15 88:6,10
**agenda** 59:21 159:23
**ago** 16:16 17:14 86:15,19 88:23 128:19
**agree** 9:14 28:18 34:13,25 39:17 142:3
**agreed** 71:14
**ahead** 19:12 48:8 86:14 93:24 111:9 111:14 136:25 158:4 160:2,23
**al** 9:20
**alice** 94:20
**allegation** 68:18
**alliance** 5:9 13:5
**allow** 107:14 110:23 117:1 125:3
**allowed** 58:11 113:2 133:10,13

133:14,16,17 134:3 136:16
**allowing** 90:9 105:9
**allows** 131:1
**amendments** 50:11
**amends** 50:10
**american** 3:8,12 11:6
**andrew** 3:4 10:25 110:12
**angeles** 13:20 163:2
**annual** 50:3
**anonymous** 79:16 80:3
**answer** 7:8 15:17 15:20 40:17 44:1 53:4 56:12 62:8
**answers** 15:14 20:15 21:2,17 22:14 23:3,16 24:5,18 25:5,17 26:3,25 55:19
**anybody** 51:2,6 158:3
**anymore** 129:19
**apologies** 106:18 153:16
**apologize** 26:13
**apology** 154:15
**apparently** 65:21
**appeal** 32:1,2 45:5 45:7,14 46:2,7 62:8 117:19 131:2
**appeals** 31:24 69:1 69:2 142:13
**appear** 33:21
**appearance** 10:13

**appearances** 2:10 2:25 3:1,25 4:1,25 5:1,25 6:1 10:10
**appearing** 2:7 164:18 165:7
**apply** 58:8
**appointed** 62:19 62:22
**appreciate** 21:21
**appropriate** 49:5 49:20
**approve** 31:21,21 42:4
**approved** 124:23 131:17,20
**april** 49:10
**area** 64:9
**areas** 154:10
**arizona** 5:14,20
**armistead** 1:16 5:8
**arrest** 57:14
**asked** 77:25 82:14 120:16 136:12,13 150:21 151:16
**asking** 27:15 96:8 96:23 108:11 115:22 119:11 147:18 157:21
**asks** 143:15 150:9
**assign** 29:23 30:1 30:6
**assigned** 30:4 38:17 115:11,12 115:17,18 122:15
**assistant** 30:3,8 32:22 35:23 37:23 37:24 52:8,9 56:5 95:8 154:12 155:3
**assistants** 57:7 154:9,11

[associated - believe]

| | | | |
|---|---|---|---|
| **associated**  143:9 | **attending**  10:1,9 | 18:1 29:18 43:23 | 130:16 |
| **association**  37:4 | 13:6 82:25 | 59:10 112:19 | **basically**  56:7 |
| 39:9,12 63:6 | **attention**  65:2 | 161:12 162:13 | 99:19 104:17 |
| 93:13 127:14,15 | 67:7 68:11 70:7 | 165:1 | 117:12 |
| 127:16 | 72:4 74:21 76:22 | **b.p.j.**  1:5 2:3,11 | **basis**  42:3 78:25 |
| **associations**  93:12 | 87:4 104:1 110:6 | 3:2 9:18 28:9,18 | 123:2 131:3 |
| **assume**  15:21 | 122:9 126:15 | 28:25 29:6 98:5 | **basketball**  37:12 |
| 40:15 64:8 93:23 | 127:18 130:4 | 113:17 144:17 | 37:24 80:15 |
| 93:25 107:12 | 154:14 | 145:18 155:11 | 100:20,21,22,23 |
| 119:22 120:6 | **attorney**  3:8,13,19 | 164:4 166:1 | 101:5 105:12 |
| 123:8 129:7 | 4:18,19,20 10:14 | **b.p.j.'s**  29:8,13 | 108:10,10 144:13 |
| **assumed**  120:25 | 10:16 12:15 15:25 | 120:10 145:2 | **bates**  63:13 73:15 |
| 137:21 | 19:20,24 20:3,12 | **back**  49:22 52:10 | 74:17 80:6 85:18 |
| **athlete**  88:20 | 20:24 21:14 22:11 | 59:11 63:11 76:4 | 92:10 97:18 98:23 |
| **athletes**  109:21 | 22:25 23:13 24:2 | 82:2 83:15,25 | 100:13 106:3,13 |
| 114:3 117:13 | 24:15 25:2,14,25 | 84:2,11,14 85:17 | 127:19 130:5 |
| **athletic**  35:24 36:1 | 26:22 27:25 28:3 | 99:18 105:19,21 | 140:15 141:22 |
| 36:3,19,21,25 37:3 | 33:3 | 107:8,18 108:15 | 151:8 153:4,21 |
| 37:8 57:21 63:6 | **audio**  9:13 | 108:18,19 112:20 | 154:15 |
| 70:23 71:7,25 | **august**  47:25 | 114:8 121:1,5 | **bathroom**  91:5,7 |
| 72:8 75:2,6,17 | 60:16 | 127:6 143:4 148:1 | **bearing**  136:3 |
| 90:20 127:14 | **authority**  65:11 | 148:7 157:19 | **beginning**  10:14 |
| 155:8 | 73:20 81:23 | 160:6 | 59:9 84:25 112:18 |
| **athletics**  59:19 | **authorize**  67:1,5,6 | **background**  9:9 | 133:3 137:20 |
| 67:18 68:3 71:18 | **authorized**  66:8 | 29:16 | **beginnings**  118:5 |
| 122:14 124:25 | 66:11 | **bailey**  4:11 | **begins**  85:22 |
| 149:11,13,21 | **available**  121:17 | **baileywyant.com** | **behalf**  2:3 10:18 |
| **attached**  18:16 | 121:21 126:18,22 | 4:15,16 | 11:1,4,7,11,14,17 |
| 33:23 47:3 91:21 | 128:11 137:14 | **baldwin**  140:18,24 | 11:21,25 12:2,6,9 |
| 103:16 121:20 | 140:4,7 142:21 | **ball**  89:9 117:25 | 12:16,25 13:4,6 |
| 126:20 128:14 | 146:4 148:17 | **band**  66:17 67:18 | 16:19 17:2,5,17 |
| 140:6 142:20 | 151:3 152:17 | 70:23 71:7 72:9 | 20:15 21:2,17 |
| 146:2 148:15 | **avoid**  16:2,3 | 75:2,6,17 | 22:14 23:3,16 |
| 151:2 152:16 | **aware**  28:25 29:4 | **bandy**  4:5 12:5,6 | 24:5,18 25:5,17 |
| **attachment** | 55:3 119:14 132:9 | **barr**  3:4 10:24,25 | 26:3,25 27:12 |
| 150:13 | **azlawyers.com** | **baseball**  100:24,25 | **beliefs**  87:5,15 |
| **attend**  35:12,16 | 5:21 | 101:13,14,15,16 | **believe**  16:16 17:5 |
| **attendance**  82:6 | | 101:18 104:19 | 18:23 30:11 31:17 |
| 82:10 | **b** | 110:1 112:2 | 39:4 43:13 44:21 |
| **attended**  132:20 | **b**  1:19 2:1 7:10 8:1 | **based**  57:15 62:5 | 48:21 52:1,20 |
| 132:24 159:8 | 9:17 12:4 13:19 | 102:21 123:10 | 57:22 59:20 63:10 |
| | 13:23 15:4 17:24 | | |

**[believe - bylaws]**

65:18 72:19 73:24
75:11 77:12 85:7
86:19,25 87:2,2
88:18,21 89:25
90:9,14 92:16
95:13 97:12 101:7
103:13 107:20
111:22 113:16,19
114:16 115:1
119:4 125:13,14
131:15 134:9
136:2 137:8
141:22 142:5
144:1,9,17,20
145:2,16 150:4
157:8 158:21,24
159:2,5
**bench**  89:18
**beneficial**  88:20
88:21
**benefits**  88:15
113:5,8
**bernard**  1:21 2:2
7:3 14:15 15:4
161:16 162:4,13
164:5 166:2
**bernie**  9:17 12:4
34:6,14 59:10
112:19 161:12
**bernie.dolan**
127:9
**best**  16:2 55:11
97:2
**better**  29:16
**big**  58:9 117:18
**biggest**  44:11
**bill**  23:9 25:21
26:9 113:13 116:7
116:8 136:6
137:20,21 141:19
143:17 150:19

**biography**  34:12
**birth**  115:11,12,17
115:18 122:16
**bit**  29:15 30:14,15
37:10,12,13 38:5
38:18 54:6,7 56:4
58:20 60:3 78:4
81:7 91:9,13
113:12,13 117:9
117:21 133:19
136:5
**blatt**  6:5 12:13
**block**  3:8 11:20,21
**blue**  96:16
**board**  1:8,9 4:9
5:2 9:20 12:9,21
12:25 22:3 24:23
26:17 31:14,19
32:1,6,7 33:13,16
36:24 37:6,7
40:17,19,23,24
41:1,7,15,25 42:6
42:14 45:12,17,18
45:23 46:4,6
49:13 50:2,6
52:22 53:1,4,5,7
53:10,11,12,14,22
53:23,24,24 54:4,4
54:8,9,15,18,19,21
54:22,23 55:4,6,8
55:10,13,15,16,16
55:18,18,21,22,25
57:5 58:4 61:6,9
62:9,10,11,14,15
62:16,17,19,20,22
62:23,24 63:2,3,5
64:24 67:1 72:13
73:18,19 74:23
75:3 76:1,2,6,8
77:1,2,6,6,16,20
78:13,18,20,24

79:9,10,20,20
81:10,12 90:14
102:22 117:19
119:15 122:4
124:21,24 125:2
126:12 129:8,10
129:15,16,21
131:4,5,18,19,23
132:25 139:21
141:13 142:12
151:22 158:8,11
164:4 166:1
**boards**  42:8,17
61:15 159:1
**bona**  44:7
**book**  49:16 54:22
56:13 58:7 61:8
61:11 86:16
105:18,19 106:16
106:18 139:18
142:16
**bookkeeper**  32:24
**bottle**  17:21
**bottom**  34:9 51:22
63:13 64:1 133:9
150:15
**boulevard**  4:20
5:5 13:20
**box**  3:15
**boy**  39:19 104:18
105:4,14 107:3
115:14 116:10
120:20,23 121:5
147:3
**boys**  37:19,21
39:21 59:24 96:7
96:13 97:4 100:8
100:16,17,22
101:3,4,5,15,21,25
102:2,8,19 103:10
104:12,25 105:9

107:14 108:5,8,9
108:11 110:2,20
110:23 116:22
134:16 135:1
146:21,25 147:4
147:19,21 155:16
**break**  16:6,7,8
58:19 59:2 91:2,7
91:10 102:23
108:17 110:5
112:6 146:9
147:23
**breakdown**
101:21
**breaking**  38:15
**breaks**  72:24
**bridgeport**  5:6
29:1 39:7 71:23
90:19 135:20
**brief**  59:7 112:16
148:6 157:18
**bring**  17:20 45:16
139:18 141:11
**broad**  3:9
**brought**  68:10
77:18 119:13,15
124:9 134:21
159:16
**budget**  84:5
**bulb**  84:17
**bulbs**  82:2
**bullet**  122:9 130:6
130:7,8 155:4
**bumped**  145:13,19
**burch**  1:10 4:10
12:10 13:1 158:9
**business**  13:19
81:23
**bylaws**  49:3 50:13
72:11

Page 5

[byrd - come]

**byrd**  5:12

**c**

**c**  4:12 13:23
**c&i**  153:11,17
**c.s.r.**  1:25 2:8
  163:4
**ca**  164:9,12,20
**california**  2:22
  13:21 162:5,9
  163:1,5,25
**call**  62:4 66:7 80:4
  84:11
**called**  68:22,23
  137:9,12
**calling**  104:14
**calls**  28:5 141:8
**camaraderie**
  113:11
**cancel**  51:8
**capacity**  1:11,12
  4:10 5:2 17:4
  143:11
**capehart**  4:19
**capeheart**  12:14
  12:14 160:17,17
**captured**  15:16
**card**  153:17,18
**cardiac**  57:14
**cards**  153:11
**care**  47:18
**case**  9:23 13:15
  16:18 17:1 29:5
  77:9 113:20
  119:13,14 120:5,7
  126:4 131:3
  163:16
**cases**  74:24 75:16
  76:15 126:8
  142:13 155:24
**cash**  83:25 84:2

**category**  97:1
  98:20
**catie**  5:12 13:7
**caucus**  136:14,19
  137:6 141:17
**cause**  14:9
**caution**  138:2
**ccp**  164:9,12
**center**  2:21
**certain**  51:17 61:1
  92:5 102:18
**certification**  81:12
**certified**  70:17
  111:23 163:24
**certify**  162:4
  163:5,19
**chair**  142:2
**chairs**  89:5
**challenged**  127:23
  128:4,6 142:7
  156:23
**championship**
  17:16 35:20 36:15
  38:12 56:14,15,25
  67:1 80:13,14
  83:21
**championships**
  39:4 51:4 56:11
  57:8 102:16
  109:18
**chance**  18:4,18
  63:15 106:9
  121:25 126:25
  140:10 148:19
**change**  64:24
  124:7,8 166:4,7,10
  166:13,16,19
**changed**  47:17
  124:8 156:6
**changes**  47:17
  48:3 49:8,21

**54:10 58:5 157:25**
**charge**  40:14,16
  47:16 54:9 57:6
**charged**  39:15
  81:11 139:15
**charleston**  1:3
  3:15 4:6,14,21
  9:22 121:14
**chart**  52:13,18
  53:7,11,20 94:15
  95:20 99:9,10
  101:10 110:11
**check**  83:3 160:7
**cheer**  97:3,3 104:8
  104:11,15,17
  110:1
**chief**  149:4
**choice**  141:8
**choosing**  134:18
**christiana**  5:13
  13:8
**church**  4:20 12:18
**cindy**  155:1
**cindy's**  160:4
**cisgender**  115:9
  115:14 116:10,20
**civil**  1:7 3:8,12
  11:7 13:18 164:19
  164:20
**ckelley**  5:16
**clarify**  20:2 21:9
  41:6 127:24
  142:14
**clarity**  115:23
**class**  67:2
**classes**  67:5
**clayton**  1:10 4:10
**clear**  15:20,23
  27:14 48:13,22
  49:25 71:16 96:20
  104:25 109:24

**110:10 115:5**
  120:12 139:21
  155:14
**clicking**  34:21
  47:6
**close**  56:22,22
  111:16 158:4
  160:23
**closed**  69:18
**closely**  123:1
**closer**  84:10
**club**  66:18,21
**clubs**  39:1
**coach**  37:14,16,18
  37:21,23,24 50:21
**coached**  37:19
**coaches**  31:25
  36:9 80:18,25
  81:6,8,9,13 85:5,6
  153:11
**code**  65:11 66:3,14
  164:9,12,19,20
**cold**  89:21
**collect**  83:2 110:17
**collecting**  40:1,4
  85:8,10
**college**  46:16,18
**colorado**  3:5
**colored**  97:8
**column**  95:20 96:3
  96:16,22 98:5,6
  100:8,9,16
**columns**  97:8
**combination**  96:2
**come**  32:1 43:25
  46:1 50:3 57:24
  78:3 89:4 93:10
  118:2,6 136:12
  139:17 143:13
  148:1 150:21
  153:14

Page 6

[comes - copy]

comes  80:13
comfortable  16:9
coming  40:7 98:16
  112:3
comment  41:2
  49:14
comments  54:1
commission  1:10
  1:20 2:2 4:2 16:23
  17:3,6,18 20:16
  21:3,18 22:15
  23:4,17 24:5,18
  25:5,17 26:4,25
  27:12,16 28:7
  29:19 30:25 31:1
  31:4,10 34:8 35:4
  36:13,18 38:5,7,20
  40:4,10,14,18 42:5
  42:19,22,24 43:2,4
  44:13 45:4 46:12
  47:19 48:17,19
  50:1 51:7 52:21
  54:8,20,25 56:24
  62:21 63:1,5
  65:13 67:14 70:1
  72:1,12,13 73:7
  75:24 76:1 80:12
  81:13,16 83:19,23
  86:19,22 91:14
  99:16 117:1 118:2
  119:25 120:17
  122:19 123:4
  133:4 138:7
  139:11,22 162:14
commission's
  42:20 60:4 72:24
  83:11 113:14
  115:4
committee  49:3
  50:13 57:9,20
  58:15 59:15,17,17

59:23 137:3 149:5
communicate  42:8
communicated
  26:8
communication
  21:12 26:6 32:23
  42:10 136:21
  150:20
communications
  15:24 42:13
  150:19
compare  147:19
comparing  146:24
comparison  147:4
compete  70:4
  145:11
competed  46:16
  46:18
competing  147:21
competition  131:1
competitive  88:19
  135:9,14
competitor  79:22
complaint  43:21
complaints  118:24
  120:9,13
complete  19:17
  20:15 21:2,17
  22:14 23:3,16
  24:5,18 25:5,17
  26:3,25 163:13
completed  164:7
  164:17 165:6
completion  13:24
  163:17 165:10
complies  107:12
comply  86:20,23
composed  70:14
computer  147:12
concerned  128:3

concerning  23:9
  114:2 139:12
concerns  134:15
concierge  6:8
concludes  14:3
  161:11
conclusion  66:7
concussion  57:13
conducted  9:24
conducting  72:7
conference  36:19
  36:20,22
conflict  38:18
  71:19,21
connected  62:18
connecticut
  114:17
connection  55:20
consider  123:12
  123:18 124:2
considered  40:13
  104:9,11
consistent  90:10
  90:11 117:2 123:6
consolidated
  69:16
constitution  49:3
  50:12 72:10
consult  19:20
  20:11,23 21:13
  22:10,24 23:12
  24:1,14 25:1,13,24
  26:5,21
cont'd  3:2
contact  121:3
  146:23 149:22
  164:9
contemplate
  139:12
context  135:8

continue  9:13
  34:23 103:7
continued  2:25 3:1
  3:25 4:1,25 5:1,25
  6:1 7:25 8:1
  133:21 136:15
continuing  32:16
  32:20
contracts  38:16
contribute  95:9
contributes
  156:11
control  40:23,24
  41:7 46:12 50:2,6
  53:5,12,23,24 54:5
  54:15,23 55:10,21
  62:15 64:24 65:12
  67:17 68:2 70:21
  71:6,24 72:13
control's  54:8,9
  55:6,13
controlled  65:10
  66:22
conversation
  139:3 140:19
  152:10
conversations  9:9
  138:3
conveyed  131:23
cooley  2:12,18 3:3
  10:17,22,25 11:3
  11:13,16
cooley.com  2:16
  2:17,23,23,24 3:6
cooling  84:18
cooperation
  113:11
coordinate  36:11
coordinator  32:24
copy  48:4 151:23
  158:19,22,25

[copy - deposition]

159:3
**corner** 34:9 51:22
63:13 149:24
**corporate** 80:19
**correct** 18:21 40:2
46:20 50:9 52:15
53:17 96:23
104:24 105:3
124:14 133:18
153:25 154:2
157:5 160:13
162:6 163:13
**corrections** 164:14
164:15 165:3,4
**correctly** 65:15
67:21 70:24 72:17
73:22 75:9 77:10
79:3 110:11
122:17
**counsel** 2:6,10 3:1
4:1,13 5:1,4,10,11
5:12,13 6:3 7:8
9:18 10:9,19
12:11 28:13 34:16
92:5,21 99:1
119:5 127:3
136:22 137:23
138:3,6,6,8,13
140:14 149:4
164:18,21 165:7
**count** 39:5 45:22
90:20
**counted** 101:17
**counting** 69:1
**country** 29:1
90:20 94:10 98:10
102:4 135:14,20
145:3,10 146:21
**county** 1:9,12 5:2
5:2 12:21 33:13
35:5 42:6,8,14,17

61:15 63:8,9,10
140:25 158:11
159:1,4 163:2
**couple** 17:13
36:24 37:7 51:15
53:19 86:15,18
129:12 147:25
158:15
**course** 112:12
**court** 1:1 2:6 9:21
10:4 13:12 15:16
16:1 29:5 113:20
128:1 142:7
**courtesy** 149:12
153:18
**courtroom** 15:8
**cover** 108:22
154:10
**covid** 100:4
**create** 54:14
**created** 56:16
95:17 118:4
**creating** 139:16
**cropp** 5:4 7:5
12:19,19 158:10
158:10,14 159:17
160:14
**cross** 29:1 90:20
98:10 102:4
135:14,20 145:3
145:10 146:21
**curious** 147:2
**current** 35:3 48:9
60:16 64:21 76:10
85:2 111:18 155:6
156:1,23
**currently** 32:4
37:14 38:23 40:11
48:11 60:7 63:1
69:22 77:21 85:9
86:22 116:20

129:23
**curtis** 4:19 12:14
160:17
**curtis.r.a.capehart**
4:22
**custody** 13:25
**cv** 1:7 9:23

**d**

**d** 5:18 7:1 15:4,4
**d.c.** 93:14
**daily** 42:3 123:2
**dakota** 127:14,16
**daniel** 5:19 127:12
155:1
**data** 111:8,15,18
111:18,19,23
146:24 147:1,3,10
**date** 42:18 151:20
164:16 165:5
166:24
**day** 50:5 54:16
121:4,5 135:5
162:7 163:21
**dayna** 1:25 2:8
10:4 13:16 163:4
**days** 45:16 57:8
**deal** 42:2
**dealt** 65:22
**decide** 74:24 75:16
119:16 141:4
**decided** 123:10
**decision** 45:18
62:5
**decisions** 29:24
30:11
**deem** 75:4 79:10
**deemed** 44:12
**deems** 78:24
**defendant** 1:17
4:2,9,17 5:2,8
12:16

**defendants** 1:14
12:20
**defending** 5:9 13:5
**define** 38:20
**definitions** 115:7
115:22
**del** 2:14 11:15,16
**delegate** 70:21
71:5,23
**delegates** 33:7
149:6
**delegation** 65:12
**demand** 104:4,16
**democratic** 136:13
136:19 141:1,17
**denied** 105:9
**denver** 3:5
**department** 6:3,5
61:9 82:1 139:16
144:24 155:13
156:24
**depend** 156:2
**depending** 81:4
84:11 95:4 157:23
**depends** 72:25
102:10,12,13
**deponent** 7:2 12:3
**deposition** 1:19
2:1 9:1,17,24
13:24 14:3 16:12
17:8,24 18:1,2,5,7
18:15,20 26:11
27:11,21 28:2
29:18 33:22 47:2
48:15 59:9 91:20
103:15 112:18
121:19 126:19
128:13 140:5
142:19 146:1
148:14 151:1
152:15 161:15

[deposition - dues]

162:13 163:7,10
163:16 164:19,22
164:24 165:8,10
**deputy**   4:19,20 6:5
12:12 77:2,5,20
78:13,20 79:20
**described**   18:10
**description**   7:11
8:2
**designated**   104:6
120:4
**designation**   109:4
**designee**   70:15
72:6,23
**designees**   78:13
**designer**   95:17
**determination**
30:22 43:11 46:7
62:1 73:5 76:9,12
78:8 122:12,20
125:15 126:2
130:24 155:20
156:3
**determine**   22:8
42:24 60:8 61:3
61:17 111:16
120:1
**determined**   45:10
57:5 75:21 120:8
132:4 164:18,22
165:7
**determines**   101:23
119:17
**difference**   30:18
79:24 104:14
124:15
**different**   45:25
62:14 69:11 83:16
95:3,3 103:12
109:4 111:8
132:10 143:11

154:10
**differentiate**   96:7
96:19
**difficult**   78:2,5
**dinsmore**   138:21
150:17
**direct**   84:15 85:21
**direction**   163:12
**directly**   41:17
**director**   3:14
29:20,22 30:2,3,25
31:4,7 32:5 35:23
35:24,24 36:2,3,17
36:25 37:8 40:16
41:15,24 55:14
95:8 127:13
143:12
**director's**   63:6
**directors**   30:8
31:14,19 32:7,23
37:3,7 40:17
45:12,17,23 46:5,6
53:1,4,7,11,15
55:7,8,16,19,23,25
56:5 57:5 58:4
62:9,11 73:18,19
74:23 76:2 77:2,7
77:16 78:18
102:23 122:5
124:22 125:2
129:8,10,15,16,21
131:19,19,23
133:1 154:12
155:3
**disagreement**
29:25
**discipline**   32:2
73:1
**discovery**   92:22
99:2 140:15

**discretionary**   75:3
**discriminate**
133:10,13,14,17
136:17 144:2
**discrimination**
85:22 143:22,25
**discuss**   19:24 28:2
50:4 152:9
**discussed**   130:14
156:18,20 157:7
**discussing**   122:7
130:18
**discussion**   123:23
131:7
**disposition**   77:9
**dispute**   43:8,14
62:1
**disputed**   43:15
**disputes**   30:12
38:10,13 56:12
**distinguish**   110:20
**distributed**   158:20
**district**   1:1,2 9:21
9:22 55:18,19
60:14
**diving**   60:3
**division**   1:3 9:23
**doc**   98:22
**doctors**   57:21
**document**   18:13
20:9 26:8 33:19
34:1 46:24 47:11
47:14 48:10 52:2
86:1 87:8 92:18
92:21,25 93:1
94:16,18,19 95:10
95:11 97:23 98:22
98:25 99:6 103:13
106:15 121:15
122:1,3 126:15
127:4 128:9 129:6

130:11 140:2
141:21 142:18
143:1 144:1
145:24 148:11
150:25
**documents**   19:7
19:25 22:1,21
26:7 27:3,4 28:15
141:11,15,18
150:6
**doing**   14:24 83:9
101:20
**dolan**   1:21 2:3 7:3
9:17 12:4 14:6,15
14:21 15:4,5 34:6
34:15 47:8 59:10
59:13 92:2 103:21
112:7,19,22
121:24 126:24
128:16 140:11
142:25 146:8
148:10 157:14,21
158:16 160:20
161:7,12,16 162:4
162:13 164:5
166:2
**dominate**   107:15
**dora**   1:11 5:2
12:22 158:11
**drafted**   119:2
**drafting**   119:7
**draw**   65:2 67:7
70:7 72:4 74:21
76:22 104:1 110:6
122:9 127:18
130:4 154:14
**drive**   5:20
**ducar**   5:18,19 13:9
**dues**   39:15,15 40:1
40:5,8 85:8,10,13

Page 9

[duly - exhibit]

**duly**  14:16 163:7
**duphily**  6:8
**duties**  29:24 30:1
  30:6

**e**

**e**  7:1,10 8:1 15:4
  164:9,12 165:1
  166:3,3,3
**earlier**  38:14
  43:13 48:22 54:6
  60:7 122:7 131:17
  136:14 148:25
**early**  136:4 144:12
  144:12
**east**  4:6,14,20 5:20
**eastern**  2:4 9:3
**ed**  101:9,11,13,22
  101:24 102:8,10
  103:10 104:7,13
  108:7 110:24
  136:22 139:16
  144:24 155:13
  156:24
**ed's**  61:9
**edited**  131:15
**editing**  131:11,13
**editorial**  48:3
**education**  1:9,9
  4:9 5:2 6:3,5 9:20
  12:9,21,25 26:7
  33:13,16 40:19
  41:1,15,25 42:6,17
  46:10 49:13 52:22
  53:10,25 54:4,18
  54:23 55:4 61:6
  61:10,16 62:19,23
  75:5 80:18 81:6,9
  81:10,11,12,14
  82:1 85:6 124:24
  142:1 149:5 152:3
  158:11 159:1

**164:4 166:1**
**education's**  53:22
**effect**  48:11
**effective**  64:23
**egnyte**  34:18
**eight**  32:11
**either**  32:1 50:21
  54:10,17 62:4
  68:11 97:11
  107:14 110:2
  114:6 125:8,8
**elected**  70:20
**eligibility**  30:19
  36:12 38:15 43:11
  43:15 44:11 60:8
  60:21 61:1,4,17,25
  62:2 74:25 75:16
  76:10 77:3,17
  78:8,22 79:11
  83:9 95:15,19
  96:6,18 98:14,18
  101:17 110:19
  113:3 130:25
**eligible**  30:20 50:3
  60:22 73:5 75:22
**else's**  78:7
**email**  21:8,10,11
  127:2,5,9,22 137:2
  137:19 139:3,9
  143:3,5 146:9,14
  146:16 149:14
  150:7,9
**emails**  21:24 22:5
  23:8 26:18 27:3,4
**embarcadero**  2:21
**employed**  33:2,2,6
  33:9,12,15
**employee**  63:7
**employees**  28:6
  40:10

**employment**  67:15
**enact**  118:15
**enacted**  107:11,16
  107:19,20 113:14
  116:25 155:18
**encompassed**
  84:19
**encouraged**  134:5
**enforcing**  50:15
**enrolled**  44:4
  60:10
**entitled**  34:6
**entity**  122:25
**entries**  53:19
**equal**  89:2
**equipment**  36:10
  89:3,7,8
**errata**  157:25
  161:1 164:14,16
  165:3,5
**error**  152:23
**especially**  89:2
  132:15
**esq**  2:13,14,18,19
  2:20 3:4 4:4,5,12
  5:19 164:1
**est**  9:7 161:10
**established**  67:16
**estimate**  68:19
  83:22
**et**  9:20
**evaluate**  29:24
**evaluating**  81:1
**evaluation**  83:7
**evaluations**  36:10
**event**  97:4 163:20
**events**  32:23 80:14
  80:14 83:1,18
  93:16 107:14
**everybody**  13:12
  68:6 71:10 74:4

**82:5 89:8 110:3**
  112:6 117:15
  160:23
**everybody's**  88:1
**everyone's**  47:5
  91:19,23 103:17
  126:18,22 128:12
  146:5 151:4
**exact**  57:24 66:1
  131:16
**exactly**  49:25
  76:16
**examination**  7:2
  14:19 158:13
**examined**  14:17
  163:6
**example**  58:9
  102:25 115:12,18
**exception**  44:17
**excerpts**  51:15
**exchange**  151:11
**excuse**  160:10
**execute**  76:7
**executed**  162:7
**executive**  29:20,22
  30:3,8,25 31:3,6
  32:5,23 36:24
  37:6 40:15 41:14
  41:23 55:14 56:5
  95:8 127:13
  154:12 155:3
**exercise**  75:3
**exhibit**  7:11,12,13
  7:14,15,16,17
  7:17,18,19,20,20
  7:21,22,23,23 8:2
  8:3,3,4,5,6,6,7,8,9
  8:9,10,11 18:14,15
  18:20,23 27:8
  33:19,21,22,25
  34:2,5,14,18 38:1

[exhibit - foregoing]

46:25 47:1,2,4,5,9
47:24 51:15 52:7
63:12 64:5 67:8
70:8 73:11,15
74:19 80:6 85:16
91:11,16,17,20,22
91:23 92:6 99:5
103:12,13,14,15
103:17,18 104:2
105:21 106:2,6
108:15,17 110:7
121:16,19,21,22
126:16,19,21,22
127:25 128:10,11
128:12,13,21
140:3,5,7 141:23
142:18,19,21
143:14,19 145:24
146:1,4,5 148:11
148:14,16 150:25
151:1,3,4 152:14
152:14,15,17
153:21 158:18
**exhibits**  7:25
18:12 34:20 140:8
142:22 147:25
148:17 152:18
**expenses**  84:13,15
85:3,6
**expertise**  57:16
**explain**  115:6
**explaining**  114:23
**extent**  28:13 29:11
66:6
**extracurricular**
65:8 66:15

**f**

**f**  4:4 164:1
**face**  50:22
**factors**  60:7 61:3
122:24 123:10

125:24,25
**facts**  15:10 30:22
62:6 76:11
**fails**  45:19 54:17
**fair**  15:21 16:10
48:6,10 53:14
76:8 88:2,4 99:21
102:9,18 108:4
119:16,25 126:4
128:7 130:25
132:8,17
**fall**  111:25 135:21
**falling**  93:9,9
**falls**  97:1
**familiar**  18:9 46:9
66:2 116:8
**family**  123:2
**far**  42:3 64:20
89:3 90:5 108:2
131:13 136:3
**fashion**  76:6
**february**  1:22 2:5
9:2,7 34:8 163:21
164:3,5
**federal**  13:15,17
81:19 163:16
165:1,8,9
**federation**  53:10
53:13 56:17 93:6
93:11,18 99:8,15
99:22 114:5
**fee**  39:14
**feel**  16:8 67:12
78:1 118:15 141:7
**felt**  126:9
**female**  96:18,22
98:5 101:18
115:19 125:20
**fide**  44:7
**field**  88:2,4

**fields**  134:7
**file**  7:12,14,15,17
7:18,20,21,23 8:3
8:4,6,7,9,10 43:21
**filed**  9:21 79:2
**fill**  45:14
**final**  41:3 44:1
52:23 53:25 54:2
62:1,12,16 155:13
156:24
**finally**  16:5 37:2
**finance**  137:7,8,8
150:22
**financial**  31:22
**financially**  10:7
**find**  76:15 82:6
93:7 105:18
107:17,18 110:21
110:25 111:6
**findings**  77:8
**finds**  45:4
**fine**  16:25 50:23
73:3 92:12
**fines**  80:24 81:3
82:24 83:6
**finish**  16:7 106:9
157:14
**finished**  85:25
130:10 157:21
**firm**  10:2,5,17
138:20,22
**first**  14:16 39:13
47:23 49:9 76:24
83:20 87:6,24
110:11 122:22
130:24 143:14
147:17 150:1
153:4,23 154:1
159:10
**firsthand**  28:16

**five**  50:14 55:8,9
55:16 56:2 58:19
107:21 146:8
147:23 157:11
**fixed**  97:13
**floor**  2:21 3:20
**foldable**  89:5
**folder**  18:13 33:21
34:1,21 47:1,5,6
91:23 103:18
121:18,22 126:18
126:22 128:12
140:8 142:22
146:5 148:17
151:4 152:18
**folders**  91:19
**folks**  46:25 147:22
**follow**  39:17 43:7
43:20 48:17 50:20
54:20,25 56:19
61:14 68:13,15
71:11 73:6 87:1
108:19 126:5
139:23,24,25
144:20,23 158:15
**followed**  134:6
**following**  68:6,9
74:5 126:9 140:1
**follows**  14:17
164:8
**football**  35:20
37:23 80:16 83:19
96:6,7,15,17,21,22
96:24,25 104:20
104:25 105:1
110:1 116:21
135:6
**forbidden**  112:23
**forbids**  113:16
**foregoing**  162:6
163:7,15

**forget** 111:3
**form** 28:12,20
  31:20 43:1 61:19
  64:16 67:24 68:4
  71:2,8 72:20 74:3
  75:12,19 76:13
  77:13 79:6,13
  84:3 86:24 87:12
  88:5 90:2,13
  95:17,18 98:7
  99:7,17,19,23
  102:11 107:6
  109:9 112:25
  114:15,21 116:1
  116:12,17 117:4
  117:11 118:17
  119:19 120:19
  122:21 123:7,21
  124:5 125:12,21
  126:6 129:17
  130:15 131:25
  132:19 133:5
  134:11,17 135:2
  135:10,16,22
  136:9 137:5,17,25
  138:11,17 139:1
  139:14 140:21
  141:6 144:19
  145:4,21 149:15
  150:3 151:18
  152:11 156:7,13
  156:21 159:13
**formal** 79:1,11,25
  80:1
**formula** 83:16
**forth** 121:5
**forward** 16:22
  49:15 124:9
**found** 78:21
**foundation** 3:8,12

**founded** 38:7,9
**four** 17:14
**fourth** 100:15
**frame** 147:7
**frampton** 5:11
  13:8
**francisco** 2:22
**frcp** 165:1
**free** 67:12 153:12
  153:19
**freedom** 5:9 13:5
**freshman** 109:3
  109:19,23
**freshmen** 88:12
**friday** 1:22 2:5 9:2
  14:25
**friend** 1:5 2:4,11
  3:2 9:19
**front** 45:11 137:7
**full** 19:16 20:15
  21:2,17 22:14
  23:3,16 24:4,17
  25:4,16 26:3,24
  115:1
**funded** 80:12
**funding** 81:25
  82:8,14
**funds** 80:10 81:19
  81:21 82:21,23
  83:23
**furnished** 78:25
**further** 160:14
  163:19
**furtherance** 75:5
**future** 52:4

**g**

**gain** 61:1
**game** 44:16 57:2,3
  57:3 89:4,7,21,23
  89:24 90:1

**games** 38:17 51:3
  82:11 90:7 143:13
  153:12,19
**gary** 118:14 119:5
**gate** 83:2,20
**gather** 30:21 94:9
**gathering** 150:5
**gear** 81:25 82:8,8
  82:14,15,16
**gender** 88:6 90:11
  102:14 108:14
  115:2,10,16 117:2
  119:18 120:1
  122:14,15 125:18
  155:7,14,20 156:1
  156:6
**general** 4:18,19,20
  6:3 12:11 27:20
  54:1 62:18 145:15
  149:17,19
**general's** 12:15
  33:3
**generally** 29:23
  114:3
**getting** 106:20
**girl** 28:18 39:19
  96:20 101:13,16
  102:5,6 105:1
  110:13 115:20
  116:20 120:23
  121:5 133:25
  135:1 145:19
**girl's** 116:11
**girls** 29:1 37:19,22
  37:24 39:22 59:23
  96:8,10,11,12,13
  98:11 100:23,25
  100:25 101:21
  102:1,2,20 103:4,5
  103:9 104:12,22
  105:4,8,10,11,11

105:11,12,15
  107:4,14 108:6,8,9
  108:10 110:2,20
  110:22,24 111:6,8
  113:17 116:23
  117:24 120:22
  133:9,23,25 134:1
  134:2,3,10,16,18
  135:19 136:15
  144:7,13,16
  146:21,24 147:4
  147:19,21
**give** 14:9 15:14
  19:16 20:14 21:1
  21:16 22:13 23:2
  23:15 24:4,17
  25:4,16 26:2,24
  58:4 83:15 84:14
  99:22 102:25
  109:20 115:6
  122:19 129:19
  133:9 137:9
  141:17 142:10,12
**given** 57:6 61:22
  125:9 129:15
  158:23 159:1,4
  161:11
**giving** 84:11
  113:10 124:21
**globe** 82:2 84:17
**go** 9:14 18:12 19:2
  19:12 33:25 42:16
  48:8 49:10,22
  57:12 62:12 63:11
  73:2 78:7 82:1
  83:23,24 85:1,17
  86:14,16 91:5,9
  92:9 93:24 96:3
  100:15 103:23
  105:19,21 107:18
  108:15,18 111:9

111:14 114:8
130:2 136:25
141:9 142:6
143:18 147:25
153:10 155:20
157:10 158:4
159:11,20 160:2,6
160:8,23
**goals**  67:9 90:12
**goes**  46:13 54:18
99:25 103:7
**going**  9:6 16:5,22
18:13,22 19:2
33:18,19 42:18
46:23,24 51:14,16
51:18,21 53:18
57:3 59:5 60:2
67:7,10 72:3,4
73:9 74:16 80:5
85:17,21 91:16
92:20 94:14 95:5
97:17 98:21
103:12 109:8
112:15 115:3,6
121:15,16 123:24
124:8,8 126:14,15
128:4,9 129:4
139:17 140:2,16
142:17 145:23
148:4,10 150:24
152:13 157:10
**golf**  17:16 36:14
36:15 103:4,5,9
104:21 110:1
111:16
**golfers**  133:25
134:1
**good**  9:5 10:24
14:21,23 17:22
58:18,24 88:17,17
88:19 91:3 112:5

157:15
**goodwin**  94:20
**gotten**  135:6
**govern**  57:1
**governing**  72:14
**government**  81:20
**gracious**  88:3
**grade**  39:5 96:1
108:23
**grades**  39:5 97:15
108:22
**graduated**  35:14
**grant**  32:19 45:18
45:19 75:22,24
76:3,5 125:3
**granted**  65:13
**gray**  97:8
**great**  19:1 92:10
103:24
**green**  4:4 11:18
12:1,1 28:12,20
29:10 30:16 31:20
32:15,21 41:18
43:1 52:8 58:24
61:18 63:16,19,23
63:25 64:11,16
66:6 67:24 68:4
71:2,8 72:20 74:3
75:12,19 76:13
77:13 79:6,13
84:3 86:24 87:12
88:5 90:2,13 91:4
91:6 92:5,11 98:7
102:11 106:21
107:6,9 109:8
112:11,25 113:18
114:15,21 116:1
116:12,17 117:4
117:11 118:17
119:19 120:19
122:21 123:7,14

123:20 124:5
125:12,21 126:6
129:3,17 130:15
131:25 132:19
133:5 134:11,17
135:2,10,16,22
136:9 137:5,17,25
138:2,9,11,17
139:1,14 140:21
141:6 144:19
145:4,21 146:3
147:22 149:15
150:3 151:18
152:11,22 153:1
154:21 156:7,13
156:21 159:13
161:3,5 164:1
**greenbrier**  140:25
**greg**  95:2,7
**grow**  103:7
**growing**  93:8
94:10
**guess**  53:5,6 66:14
68:25 69:13
**guessing**  64:10
**guidance**  118:12
124:21 125:1
**guidelines**  131:12
139:4,7,17

| h |
| --- |

**h**  7:10 8:1 166:3
**h.b.**  58:15 113:13
113:14,16,24
116:6,25 133:4
136:8 137:4,15
138:25 139:13
149:8 150:2,10
152:9 155:18
**hal**  5:11 13:8
**hammond**  4:13
12:23,24

**hand**  14:6 51:22
63:13 163:21
**handbook**  20:7,8
20:20 22:20,22
23:22,24 24:11,23
25:10 26:17 47:12
47:21 48:14,24
56:6 61:5 86:4,7
86:10
**handle**  38:10
**handled**  164:8
**hap**  147:20
**happen**  43:16
51:24 58:4,13
68:20
**happens**  38:25
50:19 72:23 113:4
125:17
**happy**  15:19 62:7
**hardship**  45:20,22
**harm**  117:13
145:5,6,7,7,14,15
**harmful**  112:22
**harms**  145:3
**harrison**  1:9,12
5:2,2 12:21 33:13
158:11
**hartnett**  2:18
10:21,22
**head**  15:15 37:21
53:15 90:4
**headquarters**  3:19
**health**  88:17
113:11
**hear**  31:24 123:14
142:12 153:14
161:1
**heard**  121:6
132:13 141:9
**hearing**  45:11

[heat - international]

heat  57:13 58:9
heater  89:20,21
heather  1:5 2:4,11
  3:2 6:3 9:19 12:12
held  31:9 57:4
  83:1
hello  11:2 12:5
help  56:7 82:7
  83:17 94:15
helpful  18:24
helping  137:23
helstrom  2:20
  11:12,13
hereinafter  67:16
hereto  18:16 33:23
  47:3 91:21 103:16
  121:20 126:20
  128:14 140:6
  142:20 146:2
  148:15 151:2
  152:16
herpes  16:18 17:1
hester  1:25 2:8
  10:4 13:16 163:4
hey  43:22
hframpton  5:16
hi  10:15,21 11:5,9
  11:12,15,18,20,23
  12:23 14:21
high  35:25 36:4,22
  37:8,20 42:9 67:4
  88:12 93:6,12
  95:23 97:11,13
  101:7 121:14
  124:25 127:14
  132:11,14 145:12
  153:19
higher  84:9
  117:24
history  19:14

hit  45:25 118:21
hits  117:25
holcomb  5:13,17
  13:8
home  137:20
  149:21
honest  69:5 93:19
  119:21
hopefully  136:4
hopping  32:18
hormone  123:13
  123:19 124:3
hosting  85:4
hour  16:6 90:24
house  23:9 25:21
  26:6,9 33:7
  113:12 116:7
  136:6,22 137:8
  149:5 152:3,3
household  44:6
housekeeping  15:6
hudson  2:15
huh  154:13
hundred  144:16
hurt  107:15
  117:25,25 135:5,6
hutchens  6:3
  12:12
hynes  6:7 10:2

i

idea  111:13
ideals  87:10,19
ident  117:5
identification
  18:16 33:23 47:3
  91:21 103:16
  121:20 126:20
  128:14 140:6
  142:20 146:2
  148:15 151:2
  152:16 153:18

identified  90:12
  117:6,14 121:4
  138:18 149:10
  155:7 156:1
identify  104:5
  115:13,19 154:16
identity  90:11
  115:2,10,16 117:3
  123:6
ignorance  153:16
illness  57:13 58:9
imagine  111:2
implement  144:25
implementation
  139:13
implemented
  119:9
implementing
  123:12,18
important  15:10
importantly
  153:10
include  56:15
  66:18
included  110:4
  164:14 165:3
includes  44:22
inclusive  65:19
increased  133:24
  144:6,10,15
incur  85:4
indicate  100:9
indicated  104:4,16
  132:4
indicates  110:13
indirect  55:20
individual  12:18
  66:25 68:16 131:3
individually  49:11
individuals  35:10

ineligibility  32:2
  45:13
ineligible  30:21
  44:12,19,19 45:5
  45:11 60:25 75:21
inform  132:18
informal  79:25
  80:3
information  13:22
  36:12 43:25 44:2
  46:10,13 47:20
  78:25 79:17 95:9
  99:22 130:16
  137:10 156:5,11
initia  39:14
initial  43:10 62:3,4
  122:12,19 125:15
initially  39:13
  45:10
initiation  39:14
injuries  135:1
injury  134:20,23
input  62:25
  149:23
inserting  85:13
instance  57:13
  96:6 101:13 102:4
  105:11 111:15
instructed  7:8
instrumentalities
  67:15
intended  45:20
intent  49:23
interact  35:9
interaction  42:3
interested  10:7
  163:19
interference  9:10
internal  142:9,14
international
  35:17

[interpret - know]

interpret  56:7
interpretation
  110:15
interpretations
  56:12
interpreted  74:5,8
interrogatory
  104:2 108:20
  110:8
interscholastic
  67:17 68:3 70:1
  70:22 71:7,18,25
  72:8 75:1,6,17
  90:20 122:14
  129:20
intervene  43:8,24
intervenor  1:17
  5:8 13:3,5,7 158:6
introduce  10:19
  18:13 33:18 46:23
  91:16 103:12
  121:15 128:9
  140:2 142:17
  145:23 148:10
  150:24 152:13
introduced  159:11
  159:12,18
investigate  77:3
  78:1,19 79:10,19
investigation
  77:17
investigations
  78:3
invitational  134:3
involved  125:24
  135:23 136:7,11
involves  149:11
involving  149:21
issue  71:17,20
  116:16 118:6,20
  147:14

issues  56:9 76:9
issuing  56:15
item  50:4,5
items  15:6
iv  130:8
ix  86:20,23 87:1
  107:13 133:8,20
  134:6,9 143:20,21
  143:24 144:1,2

j

j  109:2
jackson  1:5 2:4,11
  3:2 9:19 110:12
january  49:1
jblock  3:11
jeffrey  5:4 12:19
  158:10
jeffrey.cropp  5:7
jesseca  4:20 12:18
jesseca.r.church
  4:22
job  1:24 164:5
john  143:8,9
johnson  5:4 12:20
johnson.com  5:7
join  110:2 135:21
jonathan  5:10
  13:4 158:5
josh  11:21 146:19
  147:10
joshua  3:8
jscruggs  5:15
julie  2:19 11:3
jump  117:24
junior  97:9,10,11
  97:13 108:22,24
  109:2,3,6,7,13,22
jv  44:16 109:22
jveroff  2:23

k

kanawha  4:20
kang  2:13 7:4
  10:15,16 14:20
  18:17 27:8,9
  28:17,24 29:12
  30:23 32:3,19
  33:1,24 34:19
  35:2 38:1,3 41:20
  41:21,22 43:9
  46:23 47:4,7
  52:14 58:18,22
  59:1,12 61:24
  63:16,18,20 64:2
  64:13 65:1 66:10
  68:1,7 71:4,15
  72:22 74:7 75:14
  75:23 76:17 77:15
  79:8,23 84:6 87:3
  87:14 88:7 90:8
  90:18,22 91:8,12
  91:18,22 92:1,7,8
  92:15 98:9 102:17
  103:11,17,20
  105:24 107:1,10
  109:15 112:5,12
  112:21 113:7,21
  114:18,24 116:4
  116:14,19 117:8
  117:20 118:23
  119:24 121:8,21
  121:23 123:3,11
  123:15,16,17
  124:1,11 125:16
  126:3,13,17,21,23
  128:11,15 129:9
  130:1,20 132:7,22
  133:12 134:14,24
  135:7,13,18 136:1
  136:18 137:11
  138:5,15,23 139:8

139:20 140:7,9,23
141:10 142:21,23
144:22 145:17,23
146:4,6 148:9,16
148:18 149:18
150:8,24 151:3,5
152:1,13,17,19
153:3 154:22
156:10,16 157:1,8
157:21
katelyn  2:13 10:16
kathleen  2:18
  10:22
kbandy  4:8
keep  32:17 42:18
  129:4
keeps  93:6 146:20
kelley  5:12
kelly  4:12 12:8
  13:8 34:16 158:7
khammond  4:16
khartnett  2:23
kids  88:11 109:11
  109:22 113:1,4
  118:22 134:19
  145:10
kimberly  4:5 12:6
kind  131:3
kkang  2:16
kmorgan  4:15
know  15:19 18:1
  18:18 21:20 27:3
  28:5,9,11,14,16
  33:20 34:3,23
  38:16 39:7 44:22
  45:1 46:25 47:8
  47:14,15,15 49:20
  51:1,20,23 54:6
  57:2 58:13,17
  59:22,25 60:6
  63:14 64:7,10,14

Veritext Legal Solutions
866 299-5127

[know - male]

65:23,25 68:10
73:11 78:1,11
79:17 84:12,15
85:5,19,24 86:3,6
87:7 88:18 89:2,3
89:7,12,13 91:6,10
91:18,24 92:2
94:19,25 97:12,20
97:24 98:4 100:3
100:6 101:9 103:3
103:18,21 106:9
107:13 108:1,3
111:22 112:1
113:25 114:4,14
114:22 118:20
119:2,6,22 120:11
121:17,24 122:23
122:24 125:25
126:1,17,24
127:20 128:16,19
129:19,23 130:3,9
131:1,7,13,21
132:13 134:21,22
135:4,19,24
138:20 140:3,10
141:25 142:24
145:7,18 146:7,17
147:8,20 148:13
148:19 149:2,7,11
151:6,9,16,21
152:20 154:7,25
156:11 159:22
**knowledge** 46:15
46:22 51:5,10
59:16 69:14,19
116:10,13,15
134:25 155:23
157:7
**knows** 28:13
**kristen** 4:13 12:24

**l**

**l** 15:4
**labeled** 97:8
**lainey** 1:16 5:8
**lambda** 3:18 11:24
**lambdalegal.org**
3:22
**language** 85:13,13
143:22,25 149:9
**large** 77:19 109:20
**late** 66:13
**law** 5:18 10:17
41:4 43:6 124:25
138:21 144:21,23
156:23
**laws** 162:5
**leadership** 113:10
**leave** 15:9
**leaves** 13:3
**left** 34:9 43:19
**legal** 3:14,18 5:12
5:13 10:3,5 11:25
49:4,18 66:7
119:5 130:6
137:23 161:14
164:7
**legislation** 139:15
149:21
**legislative** 64:6,7
137:3,24 138:14
147:9
**legislators** 138:24
**legislature** 58:14
65:21 81:8 141:8
147:6
**legs** 58:20
**letter** 45:9,13
50:23 69:8 73:1
80:3
**letters** 79:16

**level** 45:13 88:11
95:4 120:18
132:15
**lewis** 63:10
**liberties** 3:8,12
11:7
**limited** 44:17
82:10,11
**lindsay** 6:8
**line** 131:9 133:9
157:14 164:15
165:4 166:4,7,10
166:13,16,19
**link** 139:6
**list** 13:7 109:25
**listed** 98:5,12
101:14,17
**listen** 160:9
**listing** 111:23
**little** 29:15 30:14
30:14 37:10,12,12
38:5 53:21 56:4
58:20 60:3 78:4
91:9,13 113:12,13
117:9,21 133:19
136:5
**live** 60:9,11
**lives** 78:9
**living** 44:5
**llp** 2:12,18 3:3
10:17,22,25 11:13
11:17
**locked** 164:12
165:1
**locker** 90:6 134:7
**log** 138:18
**long** 31:6 35:6
51:16 58:10 70:6
86:6 88:23 93:17
93:20 100:5
109:13 132:5,20

**longer** 69:8 91:9
**look** 19:12 26:18
43:22 44:2 70:10
94:12 99:4 111:15
114:8 121:25
125:24 126:25
131:3 155:21
**looked** 19:6,9 20:7
21:7,24 22:19
49:2 111:13 120:1
127:25 137:19
143:4
**looking** 78:12 80:9
100:14,20 106:5
127:8 146:24
**looks** 45:8 160:22
**loree** 3:14 11:6
**los** 13:20 163:2
**lose** 105:13
**losing** 88:3
**lot** 113:4
**lots** 45:25 113:1
**loud** 67:11
**low** 82:5
**lp** 11:3
**lstark** 3:17
**lush** 89:4

**m**

**m** 2:14 4:5 5:4
**ma'am** 16:11,21
17:19 27:19 28:8
30:13 32:9 41:13
55:24 82:20 99:24
141:3
**majority** 40:25
49:12 54:15 60:19
60:21 101:12
**making** 48:23
57:14
**male** 96:4,16,17
96:18,25 97:1

[male - mother]

98:6 115:12,13,18
125:19 155:15
**males** 96:13
**manner** 78:21
**march** 149:25
**marked** 18:12,14
18:15 33:19,21,22
33:25 34:2,20
46:24 47:1,2,5
91:17,20,23
103:15,18 121:16
121:19 126:19,22
128:12,13 140:5,8
142:19,22 146:1,5
148:14,17 151:1,4
152:15,18
**marker** 45:24
125:18
**marking** 126:15
**marks** 59:4,8
112:13,17
**match** 99:11
115:17 122:15
**matches** 115:10
**materials** 85:6
**matter** 9:18
**matters** 14:1 77:3
77:17 78:22 79:10
**mccuskey** 4:3 12:2
**meal** 83:17
**mean** 19:10 21:9
30:24 39:12 42:1
42:20 49:17 50:24
54:11 55:15 57:22
66:11,16 68:3,15
71:5 74:2,14
75:15 78:5 80:23
82:8,15 83:24,25
88:4,25 89:1,10,12
95:22 96:4 97:10
104:4,22 109:6,16

109:19 111:3
115:8 117:22
119:12 125:1,6
130:21 131:5
132:25 133:14,20
135:3 142:11,14
143:24 144:23
147:14 149:20
154:11 155:9,15
157:4 159:15,15
**means** 15:8 64:23
71:9 95:23
**measure** 118:9
**media** 9:16 35:23
59:5,9 112:14,18
161:13
**medical** 58:1
**medicine** 57:9,19
58:15 59:15,16,22
**meet** 27:24 49:9
84:22,24 129:11
129:13 130:24
132:1,2
**meeting** 50:4,8
84:23 114:11
128:20,24 141:5
141:12,15 150:22
153:14,24 154:5
156:18 159:7,8,10
159:12 160:8
**meetings** 114:6,6
118:19 132:21,25
133:1,3 153:6,8
159:21
**melissa** 26:6,9
136:21 137:19
148:24 149:2,7
150:1,19 151:13
151:14
**member** 36:21
39:9,11,12,16,21

41:11 43:7 44:22
45:2 46:4 48:19
50:7,17,19,25 51:2
51:6 55:25 56:8
61:13 63:3,7
67:19 68:16 69:3
69:8,20,25 70:4,5
71:10,16 73:4
77:2,6,19 78:14,15
78:20 82:21 83:12
83:23 95:6 98:16
98:17 132:8,18
158:20 160:12
**members** 32:6,11
40:21 43:3,5 50:2
55:2,10,16,23
62:17,25 63:1
65:20 68:11 69:22
77:20 78:13,14
85:8 93:13 104:18
**membership**
40:22 41:10 42:9
49:8 51:8 65:24
67:4,4 70:11
106:4 111:10
118:11 124:9,17
**memos** 42:16
**mention** 125:11
**mentioned** 17:1
27:2 43:13 44:21
48:21 60:6 81:6
85:7 159:6
**mentions** 125:14
**messages** 21:25
22:6 23:8 26:18
140:13
**michele** 6:5
**michelle** 12:12
**microphones** 9:8
**mid** 97:9,10

**middle** 29:2 39:7
46:16,19 71:23
88:11,11 90:19
97:11,14 101:8
110:12 135:20
145:12
**million** 84:5
**mine** 160:5
**minute** 31:13
58:19 146:8
147:23
**minutes** 128:25
157:11
**misinterpretation**
49:21
**misspellings** 49:21
**mixed** 104:3,7,9
104:11,13,15,15
104:20 110:24
**modification**
64:19
**modifications**
57:14 58:7
**modify** 56:19
**modifying** 57:18
**moment** 87:6
106:8 116:24
128:10 154:16
**money** 40:7 81:3
82:7 83:17 134:7
**monies** 82:1
**monitor** 94:10
**month** 69:1
129:12
**months** 129:13
131:17
**morgan** 4:12 12:8
12:8 34:16,17
158:7,7
**mother** 1:5 2:4,11
3:2 9:19

**[move - okay]**

**move** 38:4 44:7
49:12,15 53:10
59:13 90:22
**moving** 19:22
**multiple** 30:4
**music** 106:21
**muted** 9:11

**n**

**n** 7:1 15:4,4
**name** 10:2,16
12:19 13:16 15:3
28:10 65:4 80:2
138:20
**named** 163:6,11
**national** 3:19
53:10,13 56:17
93:5,11 99:7,15,21
114:5 118:18
**ncaa** 139:4,6
**necessary** 20:1
75:4 85:15 164:14
165:3
**need** 16:7 26:13
50:10 91:6,10
118:15 141:9
157:12
**needed** 135:11
150:23
**never** 43:22 51:5
54:22 76:15
119:10,12 120:24
121:1 124:9,17
137:9 142:7
160:11
**new** 2:15,15 3:10
3:10,21,21 54:14
69:17,18 153:9
**newspaper** 68:13
**nfhs** 56:19 94:8
**nicholas** 3:13
11:10

**nine** 40:12 43:3
**nodding** 15:15
**noise** 9:9
**non** 81:9 143:22
143:25
**normal** 43:20
**normally** 159:14
160:5
**north** 5:14
**notating** 164:15
165:4
**note** 9:8 46:14
64:6
**notice** 17:24 18:2
18:5,7,10,20 27:11
47:23 100:24
131:9 149:24
**noticed** 99:25
**noticing** 10:14
**number** 9:23 18:8
38:23 40:20 43:19
43:20,23 44:10
57:23,24 59:5,9
60:9,11,13 66:1
92:24 94:2 96:8
96:13,15,17,17,24
97:4,5 98:13
101:20 102:19,21
103:4 104:2,18
108:3,20 110:8
112:14,18 130:23
132:3 134:1
145:13 154:16
159:23 161:12
164:15 165:4
**numbered** 106:16
106:18
**numbers** 52:6
98:3,15 99:8,10,11
103:6,7 108:25

**nward** 3:16

**o**

**o** 15:4
**oaks** 5:5
**oath** 15:6,7
**object** 28:12,20,21
29:10 30:16 31:20
32:15 43:1 61:18
64:16 66:6 67:24
68:4 71:2,8 72:20
74:3 75:12,19
76:13 77:13 79:6
79:13 84:3 86:24
87:12 88:5 90:2
90:13 98:7 102:11
107:6 109:8
112:25 113:18
114:15,21 116:17
117:4,11 118:17
119:19 120:19
122:21 123:7,21
124:5 125:12,21
126:6 129:17
130:15 131:25
132:19 133:5
134:11,17 135:2
135:10,16,22
136:9 137:5,17,25
138:11,17 139:1
139:14 140:21
141:6 144:19
145:4,21 149:15
150:3 151:18
152:11 156:7,13
156:21 159:13
**objection** 32:16,20
116:1,12
**objections** 10:12
**objectives** 87:5,16
**obligations** 13:17

**obviously** 98:2
100:4 112:1
130:17
**occurred** 114:12
**offer** 39:1,2,21
70:1 99:14 101:5
133:21 136:15
**offered** 99:14
103:3
**offering** 100:20,21
100:23 101:15,16
102:1
**office** 4:18 12:15
12:17,18 28:5
33:3 41:5 43:3
47:18 50:18 63:4
63:8,9,10 76:3
78:3 94:18,20
95:5 100:5 141:1
164:11
**offices** 5:18
**official** 1:11,12
4:10 5:2
**officials** 38:16,17
80:17 81:1
**oftentimes** 42:15
136:12 141:7
**oh** 42:12 74:10
79:15 82:14 84:8
86:14 111:14
135:3 150:14
152:22 154:23
**ohio** 35:5 36:19
**okay** 13:14 18:20
18:25 34:4 47:10
48:25 52:3,16
58:21 59:3 63:11
63:22,24 64:4
65:2 67:20 70:12
72:16 73:13,16
74:20 80:8,11

82:13 85:20 86:2
87:9,25 90:16
91:8 92:4,17,19
97:7,21 98:24
100:12,17 103:25
106:7,20,23,24
107:8 108:21
109:10 110:9
112:5,9 113:15
115:3 117:15
122:2 126:14
127:1,21 128:18
129:3 130:12
138:1,4,10,12
140:2,12 141:24
143:2 145:22
146:3,11,13
147:22 148:3,12
148:16,22,23
151:10 153:2
154:3,18 158:2,17
158:22 160:10,22

**once** 35:24 39:1
47:16 102:18
103:21,23 108:16
129:12 151:7

**ones** 44:11 93:8,9
94:11,12

**ongoing** 94:1

**ooo** 161:17

**open** 128:17
150:16

**opinion** 30:19
137:9

**oppor** 134:20

**opportunities**
38:12 103:4 133:9
133:22,22,24
136:16 144:7,9,18
145:3

**opportunity** 39:18
62:12 103:8 105:9
105:13 109:12,21
111:9 113:10
142:12

**opposed** 89:18

**order** 110:21

**orders** 5:21

**organization** 19:6
19:9,14 29:23
31:22 41:9 42:8
53:2,16 66:12
69:9 81:17

**organizational**
52:12,17,21 53:7
53:20

**organizations**
91:15 113:22
114:1

**original** 149:9
163:15 164:10,21

**outcome** 10:8

**outside** 28:21
29:11 30:16 32:15
32:17,20 60:18
89:24 113:23
114:2 129:16
131:23 150:22

**ovac** 36:18

**override** 126:12

**oversee** 29:23 30:4
36:9 38:22

**overseeing** 56:14
61:22

**oversight** 52:23

**overturn** 62:5

**p**

**p.l.c** 5:18

**p.l.l.c.** 4:11

**p.m.** 2:4 9:3,6
161:10,15

**p.o.** 3:15

**page** 2:25 3:25
4:25 5:25 7:2,11
7:25 8:2 18:23,23
18:24 34:5,12,14
47:23 51:21,25
52:1,2,5,5,5,6,10
63:12,17,18 64:5
65:3 67:8 70:8,9
72:3 73:10,15
74:17,17,18 76:22
80:5,6,7 85:17
92:6,9 97:18
98:22 99:4 100:10
100:11 103:24
106:3,4,11,13,17
106:19 108:18
110:7 127:19
129:2 130:4
141:23 143:14,18
147:17 151:8
153:4,20,21
154:16,17 164:15
165:4 166:4,7,10
166:13,16,19

**pages** 73:10
164:14,17,17
165:3,6,6

**paging** 52:9

**pandemic** 81:21
82:19

**paper** 149:4

**papers** 45:14

**paragraph** 34:14
65:5 70:10,13
76:22,24 78:17
85:22,25 87:6,11
87:13,15,23 88:16
88:25 89:11 90:12
106:5,8 130:9

**pardon** 31:13

**paren** 70:19

**parents** 29:8 44:6
60:12 123:1

**park** 35:25 36:4
36:20 37:1,8,20

**part** 19:13 44:18
46:2 49:15 62:20
63:1 64:21 65:24
88:19,20 89:6

**participant** 88:23
101:18

**participants** 75:1
75:17 93:7 96:9
96:15,24 101:20
102:13,19 112:2
118:1 126:10,11

**participate** 50:7
51:3 90:10,17
102:15 104:6,23
105:10 107:14
108:6 113:2 117:1
117:16 120:17
122:13 123:5
133:25 134:4,19
141:4 144:16
155:11

**participated** 101:4
110:13 119:6

**participates**
109:17

**participating**
110:23 111:7
119:14 120:13

**participation**
51:11 59:18 88:18
92:13 93:5 99:8
101:3 104:3,15
111:19 113:6
115:1 120:10
145:2 155:8

Page 19

[particular - posts]

**particular** 56:11
64:20 68:12 95:5
97:6 98:14 127:5
**parties** 9:14,25
157:23
**partisan** 89:6
**partisanship**
88:24 89:1
**partnership** 80:19
**party** 10:6
**pass** 40:24 49:12
153:19
**passage** 136:7,11
**passed** 54:22
58:16 137:16
**passes** 54:17,18
**pause** 51:19 148:1
**pay** 81:13 82:24
**paying** 80:25
**pdf** 18:24 51:22
52:1,6 63:12,17
74:18 80:7 85:18
103:24 106:15,19
108:18 127:19
130:5 141:23
154:17 164:12
165:1
**pelet** 2:14 11:15
11:16
**penalty** 50:22 69:9
162:4 164:16
165:5
**pending** 14:9
**people** 28:4 57:2
78:10 80:25 84:12
95:3 96:17 118:19
135:4
**percent** 56:20,22
56:23 67:3,5
83:20,20

**percentage** 83:22
**perfect** 15:17
**perform** 113:18
**period** 60:23 61:1
98:4 100:5 164:18
165:7
**perjury** 162:5
164:17 165:6
**permitted** 105:2,5
116:21
**person** 45:4 49:22
115:13,19 117:19
132:12 138:16
**personal** 17:3
29:16 113:11
**personally** 41:14
41:23 94:17 95:11
**personnel** 58:1
63:4
**pertains** 163:15
**pertinent** 14:1
**petition** 39:3
**phone** 80:4
**phrase** 116:6
**physical** 88:14,14
117:13 134:22
145:15
**physically** 2:6
145:7
**pick** 9:8
**pickleball** 37:13
**pin** 60:24
**place** 9:14 53:6
57:4 64:18 98:3
118:22 123:9
163:11
**placed** 52:25
**plaintiff** 1:6 2:3,11
3:2 9:18 10:18,23
11:1,4,8,11,14,17
11:22,25 27:5

**plaintiff's** 92:22
99:2 127:3 140:14
**plaintiffs** 21:12
**plans** 85:9
**play** 37:9,11 42:24
73:6 88:12,13
101:14 102:7
103:10 105:1,2,4
106:21 108:10,14
109:25 116:21
117:19,22 120:21
120:22 121:1
155:16
**played** 116:11
**player** 108:10
117:23
**playing** 44:14,16
56:16,19 59:24
60:17 88:2,4
103:5 105:15
107:3 110:21
111:8 112:23
113:8,17 134:16
135:1
**playoffs** 80:16
**plays** 96:20
**please** 9:8 10:13
13:13 14:6 15:2
15:14,19 103:18
111:14 161:6
**pllc** 4:3 5:4
**plus** 50:17 61:5
93:14
**point** 16:6 31:15
38:11 39:4 40:6
102:21 117:17
118:7,10 122:10
128:4,6 130:6,7,8
131:8 132:17
151:19,20 152:10
155:4

**pointing** 51:16
**policies** 128:5
133:11 139:12
**policy** 22:3,4
24:23 26:18 54:21
54:24 90:15
113:14 115:4
117:5,10 118:3,16
118:25 119:3,9
120:7 122:5,6
123:13,19 124:3,7
124:12,15 125:10
125:17 127:25
128:3 130:18
131:11,14,16,20
131:24 132:9,18
141:13 142:4,5,9
142:15 151:17,22
152:4,7 155:12,19
158:19,19,23,25
159:3,7,10,11,20
160:10,11,12
**poll** 111:9
**popularity** 94:11
**populates** 95:18
**populating** 95:13
**portion** 86:3,6
154:8
**position** 27:15,16
29:19 79:21 94:21
133:7,8 145:8
149:2,23 155:6
156:1
**positions** 31:9
78:2,5
**possibility** 134:20
134:23
**possible** 38:19
51:7 56:23
**posts** 146:22

[power - quantity]

| power  74:24 75:15 78:19 124:18,20 | preventing  105:14 | proceedings  163:14,17 | 93:15 94:7 120:3 150:11 152:4 |
|---|---|---|---|

power  74:24 75:15
 78:19 124:18,20
powers  75:4
practice  44:18
 57:15 58:5,10,11
predecessor  118:4
 118:13 119:4
predecessor's
 123:23
preference  90:25
prejudice  88:24
 89:1,10,12
preparation  26:10
prepare  19:4,23
 20:5,18 21:5,22
 22:17 23:6,19
 24:8,20 25:7,19
 26:15 27:20 94:16
 94:17
prepared  47:14
 94:18,19 154:7,8
 154:25
preparing  19:19
 48:15
preparticipation
 134:22
present  2:6,13,14
 2:19,20,21 3:4,9
 3:13,14,20 4:4,5
 4:12,13,19 5:5,10
 5:11,12,13,19 6:2
 6:4,6,7,9 10:9
 128:23
presentation
 114:9,16
presented  28:22
 126:2 154:5
press  143:9
pretty  83:4 136:14
prevented  107:3

preventing  105:14
previous  60:1
 76:11
primarily  26:16
 38:10 56:10 93:14
 95:2 96:25,25
 97:3 111:23
principal  41:9,11
 48:25 72:6,23
 84:23 132:15
principals  41:8,8
 42:7 50:14 55:9,9
 55:17 56:2 70:15
 78:15 84:22 85:12
 132:2,2 133:2
 153:6,8,24 156:18
 158:23 159:8
printed  47:24
prior  155:24 163:6
private  9:9 61:13
 65:20,23 69:7,12
 70:16
privilege  138:18
probably  17:13
 19:24 21:8 22:7
 26:5 35:14 53:9,9
 53:15 54:3 64:10
 64:22 68:25 84:5
 84:10 90:3 94:1,6
 95:12 97:13 114:5
 114:7 119:4
 128:25 139:18
 143:11 156:19
problem  106:13
problems  34:24
 147:13
procedure  13:18
 164:19,20
procedures  43:21
proceeding  10:12

proceedings
 163:14,17
process  43:14 45:5
 45:8 46:2 48:23
 131:2 142:7
produced  27:4
 92:21 97:22 99:1
 127:2 140:14
profit  81:16
program  82:17
 103:9 109:23
programatic
 88:11
programs  134:7
prohibited  44:14
 44:15 85:23
promulgate  54:19
 56:1
promulgated
 40:21 61:6 64:14
promulgates
 139:22
proof  31:22
proper  87:10,19
 123:9
properly  49:24
proposal  49:1,2,7
 51:11 85:11
 124:10
proposals  49:7,11
propose  56:1
proposed  49:18
 50:1 114:14,20
proposing  114:23
protect  117:12
 118:22 133:22
protects  134:9
protest  79:1,11,25
 79:25 80:1
provide  38:11
 39:17,18 68:5

93:15 94:7 120:3
 150:11 152:4
provided  93:17
 125:1 164:19
 165:8
providing  58:10
 81:11
public  41:2 54:1
 61:13 65:9,22
 68:12 69:6,12,13
 69:14,19,21,23
 70:15 77:19
published  97:25
pull  18:19 95:14
 140:11 148:20
pulled  34:10 95:12
pulling  98:13
purchase  36:10
purchasing  84:16
purpose  138:25
 153:7
purposes  115:21
 155:8
pursuant  13:17
 65:10
put  30:5 41:1
 53:25 54:13 60:24
 66:14 78:2 79:21
 80:2 83:10 84:13
 114:9 119:18,20
 120:8 123:9,24
puts  49:13 98:19
 99:8,23
putting  78:5 81:1
 82:25 83:7 124:3
 124:3 134:6,7

**q**

qualifies  39:8
quality  144:7
quantity  144:6

Veritext Legal Solutions
866 299-5127

[question - repetitive]

**question**  15:18
16:7 19:22 36:5
41:20 82:12,13
87:17 104:8 110:5
143:15 159:9,19
**questions**  7:8
15:15,23 19:3
21:20 34:12 53:18
56:12 59:15 60:3
94:14 105:20
108:19 115:4,8,21
136:3 147:5 157:9
157:22,23,23,24
158:4,6,8,16
160:15,19
**quick**  59:14
**quite**  38:18 51:16

**r**

**r**  2:18 15:4,4 166:3
166:3
**r&s**  165:1,9
**raby**  143:8,9,15
**raintree**  5:20
**raise**  14:6
**raised**  116:15
**ran**  28:25
**ray**  118:14 119:5
**reach**  68:15
**reached**  102:19
149:7
**read**  13:15 14:3
22:7 25:21,21
49:23 51:20 63:25
65:5,7,15 67:11,13
67:21 70:13,24
72:5,17 73:18,22
74:22 75:9 76:24
76:25 77:10 78:17
79:3 87:6 88:22
92:23 94:15 99:3
106:8 122:10,17

127:22 130:9
131:10 143:15,19
144:5 155:5 161:3
**reading**  65:6
67:12 85:24,25
106:10 110:11
164:23 165:9
**reads**  153:5
**real**  142:4
**really**  22:2 42:7
52:9 55:5,15 91:6
139:6
**reason**  15:11
19:16 20:14 21:1
21:16 22:13 23:2
23:15 24:4,17
25:4,16 26:2,24
66:13 69:11 100:1
113:3 153:13
166:6,9,12,15,18
166:21
**reasons**  60:22
**recall**  17:9 152:8
152:12
**receive**  81:19
82:21,23 118:24
**received**  81:21,25
120:9,12
**recess**  59:7 112:16
148:6 157:18
**recite**  14:1
**recognize**  39:3
47:11 52:17 66:24
93:1 99:6 117:7
122:3 146:14,18
151:11 154:19
**recommend**  34:21
**recommendation**
59:18,23 102:22
103:1

**recommendations**
57:17 58:3,10
77:8
**record**  9:6,12,15
10:11 15:3 16:2
59:5,11 112:15,20
115:5 148:4,7
157:10,16,19
160:7 161:10
**recorded**  9:16
**recording**  9:13
160:9
**reduced**  163:12
**reed**  95:2
**reed's**  95:7
**refer**  67:10
**reference**  52:4
**referenced**  88:15
128:20 164:6
**referencing**
148:25
**referring**  52:5
87:23 89:15
115:10,16 116:7
127:24 151:14
**reflect**  101:4
**reflected**  101:9,12
**reflects**  52:20 53:2
**refresh**  34:21 47:6
**regarding**  59:18
113:23 130:13
131:23 138:2
149:8 158:18
**regional**  80:15
84:23 133:2 153:5
153:7,24 156:18
159:6,12,21
**registering**  80:17
**regulation**  70:22
71:6,24

**regulations**  19:8
19:14 20:8,20
21:7 22:19,22
23:21,24 24:10,22
25:9,23 26:17
27:23 39:18 47:12
47:20 48:2,14,18
48:24 57:12 61:5
72:11 73:7,20
74:1 77:5 85:2
119:23
**reimbursement**
82:3 83:15
**reiterating**  155:12
**related**  10:6
**relates**  157:3,3
**relation**  56:6,25
**relationship**  40:18
40:20 41:24 42:2
42:5 53:22 54:3
55:7,11,12,14
**relatively**  132:14
**released**  164:21
**rely**  76:11 155:19
**remember**  9:11
86:9 114:11,19,25
121:11 127:5,7,7
128:20,23 129:7
130:17 131:18,22
139:2 140:19
141:14,16,19
143:3 146:16,17
147:7 156:17
160:3
**remote**  1:19 2:1
**remotely**  2:7 10:1
10:10
**renee**  4:20
**repeat**  41:20
**repetitive**  21:21

Page 22

**[rephrase - runwv.com.]**

rephrase  15:19
replied  111:11
report  32:4,10,11
  58:2 77:7,23
  92:14 129:15,21
  133:4
reported  1:25
reporter  2:6 10:4
  13:13,14 14:8,13
  15:16 16:1 143:9
  143:12 160:25,25
  161:8 163:24
reports  31:23
represent  12:20
  34:7 92:20 140:16
representative
  12:13
represented  55:17
request  77:1,16
  92:24,24 99:4,4
  127:4
requested  14:7
  165:1,9,10
requests  92:22
  99:2 140:15
require  135:14
required  13:22
  43:6 48:17 86:19
  86:22 87:1 163:18
requirement
  123:13,19 124:4
requirements
  130:25
requires  81:8
researched  21:8
  21:10,24
reserve  157:22,24
reside  60:13
respond  17:24
  104:4,16 139:9

response  68:17
  92:22 99:1 110:7
  127:3 140:14
  143:19 144:4
  147:5
responsibilities
  29:21 36:8 77:25
responsible  47:19
  50:15 56:10 72:7
resume  85:9,14
retained  161:13
return  45:15
  164:17 165:6
revenue  80:13,20
  83:11
review  18:4 19:7
  19:11,25 20:9,21
  22:1,5,21 23:10,23
  24:12,24 25:11,22
  53:25 62:11,14,16
  62:20,24 63:2,5,15
  76:2,9 86:12
  163:17 164:8,10
  164:13 165:2
reviewed  23:8,21
  24:10,22 25:9
  26:16 27:22 48:14
  86:18 159:7
reviewing  27:3
  86:9 161:2
reviews  86:1 87:8
  92:18 122:1 129:6
  130:11 143:1
revised  47:24
rgreen  4:7 164:2
right  13:2 14:6
  16:24 24:7 26:14
  27:7 28:7 39:24
  51:22 55:23 58:22
  59:1 60:2 63:13
  71:18 73:4 84:16

87:24 90:4 91:4,8
  93:2 103:9 112:7
  113:4 115:24
  124:12 125:10
  128:1 144:18
  147:23 149:24
  153:20 157:22,24
rights  61:22
rims  89:9
risen  134:1
rival  78:9
roberta  4:4 12:1
  32:20 58:22 90:25
  112:9 161:5 164:1
role  31:18 35:4,10
  35:21 36:1,8,16,23
  37:5 41:24 54:8
  60:4,4 95:7
roles  35:22
room  90:6
rooms  134:7
rough  68:19
row  110:11
rucker  141:25
  142:1
rule  13:19,23
  25:21 27:22 31:25
  41:4 45:19 46:21
  48:23,25 49:2,7,10
  49:16,18 50:1,8
  51:11 54:10,14,22
  55:1 56:13 58:6
  61:8,9,11,12 64:6
  64:7,15,20,24
  69:12 71:19 72:25
  76:14 105:17,18
  105:19 106:16,18
  107:2,11,16
  114:10,14,19,23
  114:23,25 118:11
  124:9,10,13,16,19

124:23,24 133:10
  139:16,18,22,23
  142:6,16 144:21
  144:25
ruled  76:5 134:13
rules  13:18 19:8
  19:13 20:7,20
  21:7 22:19,22
  23:21,24 24:10,22
  25:9,23 26:16
  27:22 39:17 40:21
  40:22,25 41:6
  42:4,15,20,21,22
  43:5,7 44:10
  47:12,17,20 48:2
  48:13,18,23 50:10
  50:16,20 52:24
  54:1,19 55:3 56:1
  56:6,8,15,16,19,19
  56:25 57:1,11
  58:7 61:4,5,7,16
  61:21 64:8,17,18
  68:5,6,9 71:10,12
  71:13,17,20,21
  72:11,24 73:6
  74:5,13 77:4
  78:23 85:1 93:15
  105:14 107:18
  119:22 139:12
  153:9 156:8 165:8
ruling  17:16 62:10
  79:22 155:10,13
  156:24
run  57:7
runs  146:20
runwv  146:20
runwv.com.
  146:22

Page 23

**[s - september]**

| | | | |
|---|---|---|---|
| **s** | 69:18,19,25 70:4,6 | 111:5,23 130:19 | **section** 34:6 65:3,6 |
| **s** 7:10 8:1 14:2 | 71:16,23 72:9 | 130:19,22 132:9 | 66:16 67:8,11 |
| 77:9 166:3 | 73:4 75:20 77:19 | 132:11,15,18 | 72:4 73:17 74:22 |
| **sac** 125:20 | 78:8,9,14,15 82:2 | 134:5 139:24,25 | 80:9 86:10 87:5 |
| **sadly** 153:14 | 84:1 88:11,12 | 144:8 145:1 | 87:16 107:16 |
| **safe** 57:18 90:15 | 90:19 93:6,12 | 158:20 160:12 | **sections** 51:17 |
| 117:18,22 119:16 | 95:23 97:11,14 | **scope** 28:21 29:11 | **see** 34:1,3,5,9,18 |
| **safety** 57:12 125:8 | 98:19 100:8,16 | 30:17 32:15,17,20 | 47:5 68:12 94:12 |
| 134:15 | 101:8,8,15 110:12 | **score** 83:10 | 129:2,4 130:7 |
| **salem** 35:16 | 111:11 112:23 | **scores** 81:1 82:25 | 147:2,24 153:5 |
| **sales** 80:14,15 | 113:9 117:6,14 | **scottsdale** 5:14,20 | 157:11 |
| **san** 2:22 | 119:17,22 120:3,7 | **screenshot** 34:7 | **seeking** 15:24 |
| **sat** 43:23 | 120:18 121:3,11 | **scroll** 18:22 73:9 | **seen** 62:24 |
| **saying** 104:15 | 121:13,14 122:11 | 74:16 80:5 97:7 | **seldom** 104:19,20 |
| 118:19 | 122:20,25 123:8 | 97:18 98:21 | 104:20,22,22 |
| **says** 47:24 64:6,22 | 123:10 124:25 | 106:23 129:1 | **selection** 29:17 |
| 65:3,7 67:9,11 | 125:15,19 127:14 | 141:21 146:12 | 135:24 |
| 69:8 70:13 72:5 | 130:23 131:1 | 148:21 151:7 | **self** 95:13,18 |
| 73:17,18 74:22 | 135:8,20 137:20 | 153:20 | **senate** 33:10 137:8 |
| 76:14,19,24 78:17 | 144:11 145:12,12 | **scruggs** 5:10 13:2 | 142:1 |
| 85:14 95:21 96:4 | 149:21 153:19 | 13:4 158:5,5 | **senator** 139:4 |
| 96:22 100:8,16 | 156:14,15 162:14 | **search** 21:11 | 140:25 142:1 |
| 122:10 130:8,23 | **school's** 51:8 | **searched** 22:6 | **send** 28:5 42:16,17 |
| 131:9 144:1 149:4 | 155:19 156:2 | 127:6 | 45:9,14 99:18 |
| 155:5,25 | **schools** 29:25 | **season** 84:21 85:1 | **sending** 43:18 |
| **schedule** 109:13 | 30:12 35:5 36:22 | **seasons** 39:20 | 49:6 149:12 |
| 153:22 164:10 | 38:11,12,13,25 | **seats** 89:4 | **senior** 3:8 5:10,11 |
| **scheduled** 28:4 | 39:2 42:2,9 43:25 | **second** 13:15 | 95:21,23,24 |
| **schedules** 57:15 | 44:22,23,23 45:1 | 83:21 95:20 | 108:24 |
| **school** 1:10,20 2:2 | 48:20 50:17 55:19 | 111:24,24 155:4 | **seniors** 88:13 |
| 4:2 29:2 30:20,20 | 56:8,13 61:13,14 | **secondary** 1:10,20 | **sent** 26:7 28:15 |
| 30:21 35:25 36:4 | 62:18 63:8 65:10 | 2:2 4:2 38:20,22 | 83:25 84:2 99:19 |
| 37:8,20 39:7,8,21 | 65:20,22,23 67:19 | 39:5,8 42:25 | 137:2,18,21,23 |
| 41:12 42:25 43:12 | 68:12 69:21,23 | 44:23 65:9 69:23 | 139:4 150:13,16 |
| 43:18,19,19,21,23 | 70:5,16,18 71:10 | 70:16 73:6 75:7 | 161:6 |
| 44:5 45:2 46:16 | 75:7 82:22 83:2,5 | 120:18 162:14 | **separate** 71:13 |
| 46:19 50:7,19,22 | 83:12,16,23,24 | **secretarial** 30:6,7 | 102:2,15,15,20 |
| 50:25 51:2 60:10 | 87:1 98:16,17 | **secretaries** 32:24 | 109:23 |
| 60:14,18 62:4 | 100:19,21,22 | 47:16 95:2 | **separated** 108:5 |
| 67:4 68:16 69:3,6 | 101:5 108:25 | **secretary** 41:5 | **september** 64:23 |
| 69:7,12,12,14,17 | 109:20 110:18 | 94:22,23,25 | |

Veritext Legal Solutions
866 299-5127

[served - start]

**served** 36:24 37:6
**serves** 63:4
**services** 84:1,7,8,9
  84:20,21
**session** 90:23
**set** 60:3 76:11
  136:2
**seven** 31:8 62:17
  145:10,13
**sex** 115:11,17
**shaking** 15:15
**shared** 83:11,14
  121:22
**shawna** 6:7 10:2
**sheet** 161:2
**sheets** 95:15 96:6
**shohl** 138:21
  150:17
**short** 82:5
**shorthand** 163:11
  163:24
**show** 96:21
**showed** 147:4
**shown** 141:14
**shuman** 4:3 12:1
**shumanlaw.com**
  4:7,8 164:2
**sibling** 29:13
**side** 89:2
**sideline** 89:21
**sign** 161:3 164:16
  165:5
**signature** 163:23
  164:21,23,23
  165:9
**significance** 80:21
  80:22
**significant** 108:2
**significantly** 103:5
**similar** 60:2 76:6
  76:11,16

**similarly** 97:3
**simple** 89:17,20
  90:5
**simply** 69:7
  101:16,20
**simultaneously**
  74:6 105:22
**site** 98:18
**situation** 125:20
**six** 35:19 143:12
**skill** 135:9,11,15
**slicer** 4:3 12:2
**slide** 154:1,19,25
  155:25 156:17,22
  157:4 160:4
**slides** 154:4,7
**slotnick** 4:11
**slow** 51:19 52:8,9
**small** 81:22
**soccer** 102:6
  105:11 144:14
**social** 88:15
**softball** 105:12
  112:2
**solutions** 10:3,5
  161:14 164:7
**somebody** 60:22
  75:21 78:7,9
  117:17 125:4
  129:21 132:12
  135:5 145:7
**somebody's** 80:1
  145:8
**someone's** 155:14
  156:5
**soon** 11:19
**sorry** 19:12 21:20
  22:2 26:12 31:3
  41:18,19 42:12
  48:8 63:23 73:14
  74:10 79:14,15

**84:8 87:21 92:11**
  116:2 123:14
  152:22 153:1
  154:21,23
**sort** 29:16 30:1
  38:13 42:10,13
  44:2 45:22 50:22
  89:15 113:8
  124:20
**sound** 16:10
**sources** 80:20
**south** 121:14
  127:14,16
**southern** 1:2 9:22
**speak** 9:11 136:13
  136:13,20 137:3
  153:15
**speaking** 74:6
  105:22
**specific** 58:5 64:14
  93:15 95:1 130:13
**specifically** 53:23
  119:2 128:22
  135:4
**speculative** 125:22
**spell** 15:3
**spending** 14:25
**spoke** 58:14 137:1
  137:6 150:2
**spoken** 29:6,8,13
  143:10 149:13
**sponsored** 104:5
**sport** 39:3,19,19
  57:12 58:5 66:21
  66:21 83:16 84:25
  93:7,15 96:6,25
  97:6 101:12,21
  102:9,10,12
  104:20,21 109:25
  111:17 113:9
  120:22 135:5,12

**sports** 30:4 37:9
  37:11,14 38:21,22
  38:23 39:1,2
  42:25 56:11 57:9
  57:18,19 58:15
  59:15,16,22 60:5
  61:22 66:17,18
  70:2 73:6 82:8,15
  90:10 93:8 94:10
  98:2 99:12,14
  104:5 110:22,23
  111:8,24 112:24
  116:11 117:2
  120:17 135:8
  136:15 144:15
**sportsmanship**
  87:10,20 88:1
**spring** 98:2 111:24
**sruti** 3:19 11:24
**ss** 163:2
**ssac** 12:7 50:17
  61:23 71:21
**staff** 3:8,13,19
  29:24 30:7 32:11
  95:5 124:2
**stamp** 34:10 85:18
  92:10 100:13
  106:3,14
**stamped** 51:23
  63:14 73:10,15
  74:17 80:7 97:19
  98:23 127:19
  130:5 140:15
  141:22 151:8
  153:5,21 154:15
**stand** 102:24
  103:9
**standard** 2:5 9:3
**stark** 3:14 11:5,6
**start** 84:2 92:9
  104:10

Veritext Legal Solutions
866 299-5127

[started - take]

**started** 15:2,5 91:1
**starting** 35:22
 104:18
**starts** 70:11 72:5
 110:12
**state** 1:8,11,13 4:9
 4:10,17 9:20
 10:10,13 12:9,16
 12:25 15:3 33:3
 33:16 35:20 36:14
 36:15 40:19 41:1
 41:15,24 49:13
 52:22 53:10,22,24
 54:4,18,19,21,23
 55:4 56:18 61:6,9
 62:19,23 70:17,19
 81:10,12 84:22,24
 93:11 109:18
 113:23 114:9,14
 124:24 139:21
 158:8 160:18
 162:5 163:1,5,25
 164:4,9,12 166:1
**state's** 41:5
**stated** 13:21
**statement** 13:16
 65:17 67:23 71:1
 72:19 73:24 75:11
 77:12 79:5 142:3
**states** 1:1 9:21
 93:14
**statistics** 91:14
 93:18 94:7 97:25
 100:2 110:17
**statute** 65:13,22
**stay** 72:3
**staying** 67:8 76:21
**stephen** 140:18,24
**steps** 139:11
**steptoe** 5:4,7 12:20

**sticking** 85:16
**stipulation** 13:25
 14:2 164:20
**stood** 131:4,6
**stop** 40:4 69:3
**stopgap** 118:8
**stopped** 40:1 85:7
**street** 3:5,9,20 4:6
 4:14 5:14
**stretch** 58:20
**strictly** 105:10
 126:5
**strike** 85:12
**strong** 117:18
**stronger** 117:24
**structure** 38:6
 52:21
**student** 30:19
 43:14,19 44:12,13
 44:13,15 45:21
 60:25 69:2 76:10
 88:20 108:6
 109:21,24 112:23
 120:4 121:4,6
 122:13,23 123:1
 125:5,6,7,19
 126:11
**student's** 43:11,14
 60:8 61:4,17,25
 62:2 76:9 119:17
 120:1 122:11,20
 125:18
**students** 31:24
 51:12 65:9 73:5
 74:25 75:16 90:10
 104:6 117:1
 120:13,16 123:5
 125:5 133:15
**studies** 88:22
**study** 86:16
 101:19

**stutler** 1:11 5:2
 12:22 158:11
**submersion** 84:18
**submit** 40:22 41:5
 47:17 48:25 77:6
 98:17
**submits** 41:6
**submitted** 36:12
 40:25 51:11 98:1
 98:15 100:6
 129:22
**subsection** 13:19
 13:23
**subsequent** 159:19
 159:20
**substance** 22:8
**successful** 135:12
**sudden** 57:13
**suite** 3:5 4:6,14
 5:20
**summer** 98:1
 114:6
**super** 35:19
 143:12
**superintendent**
 1:11,12 4:10 5:3
 6:5 12:10,12,22
 13:1 70:18,20
 158:9
**superintendents**
 159:4
**supervise** 67:17
 68:2
**supervision** 70:21
 71:6,24
**supply** 79:17
**support** 39:22
 133:8 136:15
 143:23,25 144:2,3
**supported** 134:2
 143:20

**supposed** 61:20
**sure** 17:6 21:11
 36:6,12 41:21
 49:4,17,24 51:9
 53:1 57:23 63:18
 68:6,8 69:5 71:22
 72:2 74:4 85:1
 87:18 90:4 108:1
 110:10 112:8,11
 119:20 123:16,23
 125:25 129:18
 131:2 134:5,12
 135:3,5 141:20
 144:14 149:11
 150:6 151:20,23
 152:5 153:9 156:8
 156:15
**survey** 110:18,25
 111:1,5
**suspended** 51:1,6
**suspension** 50:23
 50:24,24 73:3
**suspicion** 51:3
**sustained** 62:10
**swaminathan** 3:19
 3:22 11:23,24
**swartos** 127:12
**swear** 13:13 14:4
**swim** 144:14
**sworn** 14:16 163:7
**system** 46:10

| t |

**t** 7:10 8:1 166:3,3
**tab** 7:13,14,16,17
 7:19,20,22,23 8:3
 8:5,6,8,9,11
**take** 9:14 15:7
 16:8 27:8 38:1
 47:18 59:2 62:9
 65:6 67:12 73:14
 76:4 85:24 87:6

[take - top]

| | | | |
|---|---|---|---|
| 91:2,11 103:11 | **technically** 43:4 | 161:8,9 | 82:23 85:14,24 |
| 106:8 108:17 | 61:12 | **thing** 94:1 144:3 | 87:24 88:23 100:5 |
| 110:5 112:6 145:8 | **technology** 9:25 | **things** 28:13 31:23 | 102:8 103:6 |
| 146:8 147:23 | **tell** 17:2 30:14 | 44:8 45:25 57:4 | 111:21 112:6,15 |
| 148:1 | 36:7 39:11 53:21 | 58:5,6,6,11 81:2 | 112:20 118:5 |
| **taken** 2:3 9:17 | 54:7 56:4 60:6 | 82:3 84:16 89:6 | 119:5 138:14 |
| 16:12 17:8 46:2 | 64:21 78:4 81:7 | 89:23 90:4 95:4 | 139:5 141:20 |
| 78:11 139:11 | 93:20 103:2 117:9 | 113:3 134:8 | 147:7,9 148:5,8 |
| 163:10 | 117:21 133:19 | **think** 13:2 58:18 | 149:20 150:1 |
| **takes** 98:19 99:22 | 138:24 | 58:24 62:23 64:9 | 155:12 157:17,20 |
| **talk** 20:2 29:15 | **telling** 45:10 | 82:16 84:10 90:23 | 163:11 164:10,18 |
| 91:13 113:12 | 147:18 | 93:22 94:1 108:16 | 164:24 165:7 |
| 136:5 | **temporary** 118:8 | 110:3 112:5 113:2 | **times** 56:17 68:21 |
| **talked** 113:22 | **ten** 32:6 55:22 | 113:5 119:8 123:4 | 68:23 129:13 |
| 114:1,4 | 58:19 77:22 94:3 | 124:7,18 125:23 | 132:10 144:16 |
| **talking** 16:3,3 32:8 | 107:23 129:13 | 126:1 132:10 | 146:21,25,25 |
| 38:4 108:9 141:2 | 159:16,16,21 | 133:6,7,16 134:12 | 147:4,19,19,20 |
| **talks** 106:4 | **tennis** 37:12 112:2 | 134:19 135:17 | **timothy** 5:18,19 |
| **tarp** 89:17 | **tenure** 59:25 | 136:23,24 137:1,1 | 13:9 |
| **teachers** 81:9 | **term** 84:19 115:9 | 138:18 142:9 | **title** 64:6 86:20,23 |
| **team** 29:1 36:10 | 115:15 | 143:16 146:9 | 87:1 107:13 133:8 |
| 39:22,22 42:25 | **terms** 66:19 115:6 | 147:22 155:10 | 133:20 134:6,9 |
| 44:18,20 46:16,17 | **testified** 14:17 | 157:6,13 158:1 | 143:20,21,24 |
| 46:18 60:18 89:5 | 17:2,10 | **thinking** 107:2 | 144:1,2 |
| 89:13,18 96:21 | **testify** 15:9,11 | **third** 83:21 96:3 | **titled** 7:12,14,15 |
| 98:8,10,14 101:23 | 137:13 163:8 | **thought** 150:12 | 7:17,18,20,21,23 |
| 102:1,3,5,6,7 | **testifying** 15:8 | **thoughts** 150:9,11 | 8:3,4,6,7,9,10 80:9 |
| 103:10,10 104:6 | 16:19 17:17 27:10 | **thread** 151:13 | 87:5 |
| 105:1,2,4,15 107:4 | **testimony** 14:8 | **three** 17:13 30:10 | **titles** 32:13 |
| 108:5,7,8,9,11,13 | 19:17 161:11 | 32:14,22,24 60:13 | **today** 12:3 13:6 |
| 108:14 109:3,17 | **text** 21:25 22:5 | 67:6 69:1 111:3,4 | 15:12 17:20 158:1 |
| 110:2 113:17 | 23:8 26:18 92:23 | 154:9,11,11 | **today's** 27:21 28:2 |
| 116:11,22,23 | 99:3 140:13 | 161:13 | 161:11 |
| 134:16 135:1,21 | 151:11 152:10 | **thursday** 149:25 | **told** 120:21 137:14 |
| 145:9,11 155:16 | **texts** 140:17 | **ticket** 80:14,15 | 137:15 150:23 |
| **teams** 57:3 59:24 | **thank** 13:11 14:13 | **time** 2:5 9:3 10:13 | 151:21 |
| 60:17 66:25 67:1 | 14:25 27:7 32:21 | 16:4 17:8 40:8 | **top** 52:25 53:12 |
| 90:10 101:1,9,11 | 32:21 37:25 | 47:15 52:10 57:4 | 64:5 90:4 137:22 |
| 104:23 105:10 | 112:11 123:20 | 58:19,25 59:5,11 | 143:6 145:10 |
| 108:6 109:5 112:3 | 136:3 158:2 | 60:23 61:1 64:18 | 149:24 151:13 |
| 117:2 123:5 | 160:16,20,21 | 65:6 67:12 72:2 | |

Veritext Legal Solutions
866 299-5127

**[topic - videographer]**

**topic** 19:4,5,17,19
  19:22,23 20:5,6,16
  20:18 21:3,5,14,22
  21 23 22 11,15,17
  22:25 23:6,7,19,20
  24:8,20 25:7,19
  26:14,15 59:14
  114:7 130:13
**topics** 18:8,9 19:3
  27:2,11
**toro** 2:14 11:15,16
**total** 97:5 98:19
  161:12
**totally** 115:5
**touched** 54:6
**tournament** 36:14
**tournaments** 30:2
  30:5 84:13 85:4
**track** 37:19 93:6
  96:10,12,13 112:2
  146:20,21
**tracking** 93:20
**trainers** 57:22
**training** 88:20
**trans** 125:7 155:19
**transcript** 13:25
  163:13,16,17
  164:6,8,10,13,13
  164:21 165:2,2
**transfer** 43:20
**transgender** 22:3
  24:23 26:17 28:19
  35:9 51:12 59:18
  90:9 107:3 114:2
  115:15,20 117:1
  119:14 120:13,16
  122:4,11,20 123:4
  126:11 130:8
  131:11 133:15,17
  134:10 137:22
  147:14 151:17,22

**152:7 157:3**
  158:19,22,25
  159:3 160:12
**transitioning**
  104:21
**transportation**
  36:11
**travel** 82:3 83:17
  84:21,24
**treats** 125:19
**tremendously**
  134:1
**trends** 93:8
**trial** 17:10
**tried** 86:16 135:19
**trouble** 34:20 40:6
  91:24 103:19
**true** 162:6 163:13
**truth** 14:10,10,11
  163:8,8,9
**truthfully** 15:9,12
**try** 15:19 16:5
  47:6 94:10 106:1
  133:8
**trying** 82:6 93:7
  94:12 105:23
  107:13 147:19
  151:23
**tubs** 84:18
**turn** 51:21 87:4
  126:14
**turnover** 132:11
  132:14
**turns** 91:14
**two** 16:16 43:25
  52:11 59:14 60:11
  67:5 69:1 73:10
  76:15 96:19 111:2
  111:3 152:9
**type** 95:14

**typewriting**
  163:12

**u**

**uh** 154:13
**unable** 135:21
**unanimously**
  131:19
**unbiased** 78:12
**underlined** 149:25
  150:7
**underlining** 150:5
**understand** 15:18
  17:23 27:10,18
  29:17 94:15 116:5
**understanding**
  66:5
**understood** 15:21
  31:5 40:9 82:18
**unfair** 89:23 90:1
  90:15 125:4,6,7,9
  126:8,10 132:6
**unfairness** 117:13
**unfortunately**
  15:16
**unger** 139:4
**union** 3:8,12 11:7
**unique** 145:6
**unit** 9:16
**united** 1:1 9:21
**units** 161:13
**university** 35:13
  35:17
**unmute** 9:11
**unmuted** 9:10
**unsafe** 125:4
  126:8,10 132:5
**unsolicited** 139:5
**unusual** 149:22
**update** 130:6
**upheld** 142:8

**uploaded** 152:22
**url** 34:10
**use** 115:9,15 116:6
**usually** 68:10 81:3

**v**

**v** 4:13
**va** 65:11
**valeria** 2:14 11:16
**valley** 36:19
**variety** 35:22
  57:21 58:1
**various** 91:15
**varsity** 44:16
  108:22,25 109:1,1
  109:2,3,3,6,7,13
  109:16,22 145:11
**verbal** 15:14 73:2
  150:18
**verbatim** 82:3
  87:15
**verification** 99:19
**verify** 62:5 111:12
  132:12
**veritext** 6:8 9:25
  10:3,5 161:14
  164:7,9,11
**veroff** 2:19 11:2,3
**version** 48:1
**versus** 9:19 69:12
  79:25 124:16
**video** 9:13,16
**videoconference**
  2:7,13,14,19,20,21
  3:4,9,13,14,20 4:4
  4:5,12,13,19 5:5
  5:10,11,12,13,19
  6:4,6,7,9 9:1
**videographer** 2:7
  6:7 9:5 10:3 13:11
  13:21 14:2 59:4,8
  112:13,17 148:4,7

Veritext Legal Solutions
866 299-5127

[videographer - witness]

157:16,19 158:3
160:22 161:9
**videotaped**  1:19
2:1
**violated**  31:25
**violation**  68:22,24
**violations**  68:13
68:20,21 77:4
78:23
**virginia**  1:2,8,9,13
1:20 2:2 3:12,15
4:2,6,6,9,14,14,17
4:18 6:3,5 9:20,22
11:7,10 12:7,9,15
12:16,25 33:4,7,10
33:16 35:12 37:3
40:19 41:16,25
44:24 45:2 46:10
46:15 58:14 61:9
61:16 66:2 69:21
70:19 75:8 113:23
114:2 118:7,21
120:14 147:6
149:5 162:14
164:4 166:1
**viriginia**  4:21 5:6
**virtual**  9:25
**volleyball**  105:12
117:23 120:21,22
121:1 144:14
**vote**  41:3,9 49:11
49:14 50:3,5,8
54:9,10,11,13,15
54:16 124:18
**voted**  40:22 43:5
118:11 124:23
160:11
**votes**  49:25 54:2
**vpeletdeltoro**  2:17
**vs**  1:7 164:4 166:1

**vsv**  63:14

**w**

**w**  1:10 4:10 17:3
65:11
**wait**  31:13 139:17
150:22
**waiting**  156:24
**waived**  164:23,23
**waiver**  45:18,19
62:13 75:22,25
76:5
**waivers**  76:3
125:3
**waiving**  164:20
**walk**  43:16 45:7
48:22 90:6
**walking**  51:14
**wall**  3:20
**want**  29:15 32:17
38:4 51:19,19
59:14 62:8 63:11
65:2 69:8 78:10
79:21 87:4 91:1,1
91:13 92:23 99:3
109:12,20 113:12
122:9 130:4 136:5
147:1 154:14
**wanted**  101:14
105:4 118:7,20,21
120:20 121:1
**wants**  105:1
109:24 116:20
**ward**  3:13 11:9,10
**warning**  50:23
73:2
**washington**  93:14
**watch**  103:6
**water**  17:21
**way**  28:23 49:19
73:3 82:6 84:13
97:7 111:12

122:23 134:13
**we've**  86:15
138:13
**web**  95:17
**website**  34:8,10
95:12
**week**  49:6,9 83:20
**weekley**  146:19
147:11
**weeks**  52:11 111:2
111:4
**went**  43:19 118:18
124:17 127:6
129:24
**west**  1:2,8,9,13,20
2:1 3:12,15 4:2,6
4:9,14,17,18,21
5:6 6:3,5 9:20,22
11:7,10 12:7,9,15
12:16,25 33:4,7,10
33:16 35:12 37:3
40:19 41:16,25
44:24 45:2 46:10
46:15 58:14 61:9
61:16 66:2 69:21
70:19 75:8 113:23
114:2 118:7,21
120:14 147:6
149:5 162:14
164:4 166:1
**wet**  82:2 84:17
**wheeling**  35:25
36:3,20 37:1,8,20
**white**  5:5 26:6,9
136:21 137:19
148:24 149:7
150:1,19 151:14
**white's**  149:2
**whoa**  35:8
**wilshire**  13:20

**winning**  88:3
**winter**  111:25
114:6
**withdraw**  69:13
**withdrawal**  69:10
95:12
**withdrawn**  69:15
**witness**  2:5 4:4
9:17 12:4 13:13
14:5,7,7,12 28:14
28:22 29:17 30:18
31:21 32:22 34:25
43:2 52:12 58:21
59:3,10 61:20
63:24 64:12,17
66:8 67:25 68:5
71:3,9 72:21 74:4
75:13,20 76:14
77:14 79:7,15
84:4 86:1,25 87:8
87:13 88:6 90:3
90:14 91:3,5
92:12,18 98:8
102:12 105:23
106:23 107:8
109:10 112:8,19
113:1,19 114:16
114:22 116:2,13
116:18 117:5,12
118:18 119:20
120:20 122:1,22
123:8,22 124:6
125:13,23 126:7
129:1,4,6,18
130:11,16 132:1
132:20 133:6
134:12,18 135:3
135:11,17,23
136:10 137:6,7,12
137:18 138:1,4,10
138:12,21 139:2
139:15 140:22

[witness - zoë]

141:7 143:1
144:20 145:5,22
148:3 149:16
150:4 151:19
152:12,21,24
153:2 156:8,14,22
157:15 158:2
159:14 160:21
161:2,12 163:6,21
164:13,16 165:2,5
166:24
**woman**  115:20
**word**  145:6
**work**  35:3,6 41:15
43:25 112:9
130:19,21
**working**  42:1
100:5
**workings**  31:22
**works**  63:8 95:2
122:25
**workshop**  132:3
**worth**  40:7
**wrap**  146:10
**wrestling**  16:18
104:18 110:1,13
111:16 134:3,4
135:6
**write**  71:10 83:3
143:19
**writes**  69:7 144:25
**writing**  70:17
142:6
**written**  34:13 35:1
49:4,19,24 52:6
68:17 74:5,13
77:7 80:2 87:11
118:10
**wrong**  137:21
**wrote**  86:3

**wvada**  37:2
**wvago.gov**  4:22,22
**wveis**  46:9,13
117:6 119:18,21
120:1,2,4,8 125:11
125:14,18 126:5,9
155:7,15,20,21,22
156:2,5,9,12
**wvssac**  12:2 16:20
16:23 62:24 66:9
66:11,19,22 69:4
70:14 71:9 73:21
74:2,18 77:5
104:5 124:25
143:16,20 149:10
**wvssac's**  155:6
**wvssac.org**  127:9
**wvssac000001**
140:16
**wvssac000123**
85:18
**wvssac000133**
63:14 64:3
**wvssac000136**
73:11
**wvssac000216**
51:23

| x |
| --- |

**x**  7:1,10 8:1 165:1
**xx**  163:18

| y |
| --- |

**yards**  2:15
**yeah**  53:2 57:25
64:11,12 92:7
100:15,18 104:10
122:4 127:6
149:20 150:14
152:24
**year**  48:9 60:16
64:19 68:20 85:12

97:22 99:25
121:10 129:14
133:3 149:16
159:15,18,19
160:4,4
**year's**  111:24,25
**years**  16:16 17:13
17:14 31:8 35:7
35:23 36:25 37:7
37:19 39:15 40:2
86:15,18 94:2
100:7 107:21
111:19 132:4
143:21 144:15
159:19,20,24
**yep**  42:23 64:4
106:24
**york**  2:15,15 3:10
3:10,21,21
**youth**  3:19

| z |
| --- |

**zero**  96:12
**zeros**  99:13
**zhelstrom**  2:24
**zoom**  1:19 2:1,7
2:13,14,19,20,21
3:4,9,13,14,20 4:4
4:5,12,13,19 5:5
5:10,11,12,13,19
6:4,6,7,9 9:1,25
**zoë**  2:20 11:13

Page 30

Federal Rules of Civil Procedure

Rule 30

(e) Review By the Witness; Changes.

(1) Review; Statement of Changes. On request by the deponent or a party before the deposition is completed, the deponent must be allowed 30 days after being notified by the officer that the transcript or recording is available in which:

(A) to review the transcript or recording; and

(B) if there are changes in form or substance, to sign a statement listing the changes and the reasons for making them.

(2) Changes Indicated in the Officer's Certificate. The officer must note in the certificate prescribed by Rule 30(f)(1) whether a review was requested and, if so, must attach any changes the deponent makes during the 30-day period.

DISCLAIMER:  THE FOREGOING FEDERAL PROCEDURE RULES ARE PROVIDED FOR INFORMATIONAL PURPOSES ONLY. THE ABOVE RULES ARE CURRENT AS OF APRIL 1, 2019.  PLEASE REFER TO THE APPLICABLE FEDERAL RULES OF CIVIL PROCEDURE FOR UP-TO-DATE INFORMATION.

VERITEXT LEGAL SOLUTIONS
COMPANY CERTIFICATE AND DISCLOSURE STATEMENT

Veritext Legal Solutions represents that the
foregoing transcript is a true, correct and complete
transcript of the colloquies, questions and answers
as submitted by the court reporter. Veritext Legal
Solutions further represents that the attached
exhibits, if any, are true, correct and complete
documents as submitted by the court reporter and/or
attorneys in relation to this deposition and that
the documents were processed in accordance with
our litigation support and production standards.

Veritext Legal Solutions is committed to maintaining
the confidentiality of client and witness information,
in accordance with the regulations promulgated under
the Health Insurance Portability and Accountability
Act (HIPAA), as amended with respect to protected
health information and the Gramm-Leach-Bliley Act, as
amended, with respect to Personally Identifiable
Information (PII). Physical transcripts and exhibits
are managed under strict facility and personnel access
controls. Electronic files of documents are stored
in encrypted form and are transmitted in an encrypted
fashion to authenticated parties who are permitted to
access the material. Our data is hosted in a Tier 4
SSAE 16 certified facility.

Veritext Legal Solutions complies with all federal and
State regulations with respect to the provision of
court reporting services, and maintains its neutrality
and independence regardless of relationship or the
financial outcome of any litigation. Veritext requires
adherence to the foregoing professional and ethical
standards from all of its subcontractors in their
independent contractor agreements.

Inquiries about Veritext Legal Solutions'
confidentiality and security policies and practices
should be directed to Veritext's Client Services
Associates indicated on the cover of this document or
at www.veritext.com.

```
  1              IN THE UNITED STATES DISTRICT COURT

  2          FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA

  3                    CHARLESTON DIVISION

  4                  * * * * * * * *

  5   B.P.J., by her next friend and    *

  6   Mother, HEATHER JACKSON,          *

  7       Plaintiff                     *   Case No.

  8       vs.                           *   2:21-CV-00316

  9   WEST VIRGINIA STATE BOARD OF      *

 10   EDUCATION, HARRISON COUNTY        *

 11   BOARD OF EDUCATION, WEST          *

 12   VIRGINIA SECONDARY SCHOOL         *

 13   ACTIVITIES COMMISSION, W.         *

 14   CLAYTON BURCH in his official     *  CONFIDENTIAL

 15   Capacity as State Superintendent,*  VIDEOTAPED

 16   DORA STUTLER in her official      *  VIDEOCONFERENCE

 17   Capacity as Harrison County       *  DEPOSITION

 18   Superintendent, PATRICK MORRISEY  *      OF

 19   In his official capacity as       *  KACIE KIDD, M.D.

 20   Attorney General, and THE STATE   *  February 21, 2022

 21   OF WEST VIRGINIA,                 *

 22       Defendants                    *

 23              Any reproduction of this transcript
                 is prohibited without authorization
 24                  by the certifying agency.
```

SARGENT'S COURT REPORTING SERVICE, INC.
(814) 536-8908

```
 1        CONFIDENTIAL VIDEOTAPED VIDEOCONFERENCE DEPOSITION

 2                            OF

 3    KACIE KIDD, M.D., taken on behalf of the Defendant,

 4    State of West Virginia herein, pursuant to the Rules of

 5    Civil Procedure, taken before me, the undersigned,

 6    Nicole Montagano, a Court Reporter and Notary Public in

 7    and for the State of West Virginia, on Monday, February

 8    21, 2022, beginning at 10:16 a.m.

 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24
```

```
 1                     A P P E A R A N C E S

 2

 3    JOSHUA BLOCK, ESQUIRE

 4    American Civil Liberties Union Foundation

 5    125 Broad Street

 6    New York, NY  10004

 7    COUNSEL FOR PLAINTIFF

 8

 9    KATHLEEN R. HARTNETT, ESQUIRE

10    ANDREW BARR, ESQUIRE

11    KATELYN KANG, ESQUIRE

12    ZOE HELSTROM, ESQUIRE

13    ELIZABETH REINHARDT, ESQUIRE

14    Cooley, LLP

15    3 Embarcadero Center

16    20th Floor

17    San Francisco, CA  94111-4004

18        COUNSELS FOR PLAINTIFF

19

20

21

22

23

24
```

```
 1              A P P E A R A N C E S (cont'd)

 2

 3    SRUTI SWAMINATHAN, ESQUIRE

 4    Lambda Legal

 5    120 Wall Street

 6    19th Floor

 7    New York, NY  10005-3919

 8        COUNSEL FOR PLAINTIFF

 9

10    DAVID TRYON, ESQUIRE

11    CURTIS R.A. CAPEHART, ESQUIRE

12    State Capitol Complex

13    Building 1, Room E-26

14    Charleston, WV  25305

15        COUNSEL FOR STATE OF WEST VIRGINIA

16

17    ROBERTA F. GREEN, ESQUIRE

18    Shuman McCuskey Slicer, PLLC

19    1411 Virginia Street East

20    Suite 200

21    Charleston, WV  25301

22        COUNSEL FOR WEST VIRGINIA SECONDARY SCHOOL

23        ACTIVITIES COMMISSION

24
```

```
 1                A P P E A R A N C E S  (cont'd)

 2

 3   SUSAN DENIKER, ESQUIRE

 4   JEFFREY M. CROPP, ESQUIRE

 5   Steptoe & Johnson

 6   400 White Oaks Boulevard

 7   Bridgeport, WV  26330

 8       COUNSEL FOR HARRISON COUNTY BOARD OF EDUCATION and

 9       HARRISON COUNTY SUPERINTENDENT DORA STUTLER

10

11   KELLY C. MORGAN, ESQUIRE

12   MICHAEL W. TAYLOR, ESQUIRE

13   Bailey Wyant

14   500 Virginia Street East

15   Suite 600

16   Charleston, WV  25301

17       COUNSEL FOR WEST VIRGINIA BOARD OF EDUCATION and

18       SUPERINTENDANT W. CLAYTON BURCH

19

20   CHRISTIANA HOLCOMB, ESQUIRE

21   Alliance Defending Freedom

22   15100 North 90th Street

23   Scottsdale, AZ  85260

24       COUNSEL FOR INTERVENOR, LAINEY ARMISTEAD
```

```
 1              A P P E A R A N C E S  (cont'd)

 2

 3    TIMOTHY D. DUCAR, ESQUIRE

 4    Law Office of Timothy D. Ducar

 5    7430 East Butherus Drive, Suite E

 6    Scottsdale, AZ  85260

 7         COUNSEL FOR INTERVENOR, LAINEY ARMISTEAD

 8

 9    TIMOTHY R. LINKOUS, ESQUIRE

10    Lindous Law, PLLC

11    10 Cheat Landing

12    Suite 200

13    Morgantown, WV  26508

14         COUNSEL FOR KACIE KIDD, M.D.

15

16

17

18

19

20

21

22

23

24
```

I N D E X

DISCUSSION AMONG PARTIES                          10  -   15

WITNESS: KACIE KIDD, M.D.

EXAMINATION

    By Attorney Tryon                            16  -  134

DISCUSSION AMONG PARTIES                        134  -  136

CERTIFICATE                                              137

```
 1                        EXHIBIT PAGE

 2

 3                                              PAGE

 4     NUMBER   DESCRIPTION                 IDENTIFIED

 5     16       Doctor's Note                   --

 6     33       Standards of Care for the

 7              Health of Transsexual, Transgender,

 8              And Gender Nonconforming People    --

 9     35       Doctor's Note                   --

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24
```

```
 1                        OBJECTION PAGE

 2

 3    ATTORNEY                                    PAGE

 4    Hartnett     19, 30, 44, 44, 46, 54, 54, 54, 63, 64, 77,

 5    77, 77, 86, 86, 87, 87, 88, 92, 94, 95, 95, 96, 97, 99,

 6    103, 103, 104, 114, 117, 117, 118, 118, 119, 119, 120,

 7    120, 120, 121, 122, 122, 123, 123, 123, 124, 124, 124,

 8    128, 128, 128, 130, 130, 130, 131, 131, 132, 132, 133

 9

10    Linkous                                      23

11

12

13

14

15

16

17

18

19

20

21

22

23

24
```

```
 1                    S T I P U L A T I O N

 2     ----------------------------------------------------

 3     (It is hereby stipulated and agreed by and between

 4     counsel for the respective parties that reading,

 5     signing, sealing, certification and filing are not

 6     waived.)

 7     ----------------------------------------------------

 8                    P R O C E E D I N G S

 9     ----------------------------------------------------

10                 VIDEOGRAPHER: We are now on the record.

11     My name is Jacob Stock.  I'm a Certified Legal Video

12     Specialist employed by Sargent's Court Reporting

13     Services.  The date today is February 21st, 2022, and

14     the current time is 10:16 a.m. Eastern Standard Time.

15     This deposition is being taken remotely by

16     videoconferencing.  The caption of this case in the

17     United States District Court for the Southern District

18     of West Virginia, Charleston Division.  BPJ by her next

19     friend and mother, Heather Jackson v. West Virginia

20     State Board of Education, et al.  Case number

21     2:21-CV-00316.  The name of the witness is Kacie Kidd,

22     M.D.  Will the attorneys present state their names and

23     the parties they represent?

24                 ATTORNEY LINKOUS:  This is Tim Linkous on
```

```
 1    behalf of Kacie Kidd, M.D.

 2                   ATTORNEY TRYON:  This is David Tryon on

 3    behalf of the State of West Virginia.

 4                   ATTORNEY DENIKER:  This is Susan Deniker

 5    on behalf of Defendants Harrison County Board of

 6    Education and Superintendant Dora Stutler.

 7                   ATTORNEY GREEN:  This is Roberta Green on

 8    behalf of West Virginia Secondary School Activities

 9    Commission.

10                   ATTORNEY MORGAN:  This is Kelly Morgan on

11    behalf of West Virginia Board of Education and

12    Superintendant Burch.

13                   ATTORNEY HOLCOMB:  This is Christiana

14    Holcomb on behalf of Intervenor, Lainey Armistead.

15                   ATTORNEY HARTNETT:  And sorry, I think I

16    was on mute before.  This is Kathleen Hartnett from

17    Cooley for Plaintiff.  And there are several others on

18    the line for Plaintiff from Cooley.

19                   ATTORNEY BARR:  Yes.  Good morning.  This

20    is Andrew Barr from Cooley on behalf of Plaintiff.

21                   ATTORNEY KANG:  Good morning.  This is

22    Katelyn Kang from Cooley on behalf of the Plaintiff.

23                   ATTORNEY REINHARDT:  Good morning.  This

24    is Elizabeth Reinhardt on behalf of Plaintiff.
```

```
 1                    ATTORNEY HELSTROM:   Good morning.   This

 2   is Zoe Helstrom from Cooley on behalf of Plaintiff.

 3                    ATTORNEY SWAMINATHAN:   Good morning.

 4   This is Sruti Swaminathan from Lambda Legal on behalf of

 5   Plaintiff.

 6                    ATTORNEY BLOCK:   Good morning.   This is

 7   Josh Block from the ACLU on behalf of Plaintiff.

 8                    VIDEOGRAPHER:   If that's everybody, the

 9   court reporter can swear in the witness, and we can

10   begin.

11                    ATTORNEY TRYON:   Two things.   So first of

12   all, I went to mention that my colleague, Curtis

13   Capehart, is on this call.   And I wanted to take care of

14   a housekeeping matter before we get started.   I wonder

15   if we could do that, if we could exclude Dr. Kidd for

16   just a moment.

17                    VIDEOGRAPHER:

18                    Yes, give me one second.

19                    ATTORNEY TRYON:

20                    Thank you.   So I just wanted to --- we

21   had previously in other depositions we've talked about

22   how we're going to handle objections.   And Mr. Linkous,

23   in some other depositions, we've said that we are going

24   to handle by stating objection for form of the question
```

SARGENT'S COURT REPORTING SERVICE, INC.
(814) 536-8908

 1    or directing the witness not to answer for privilege

 2    issues.  And Kathleen, are you going to be handling this

 3    deposition?

 4                    ATTORNEY HARTNETT:  Yes, David.  And

 5    would you like to discuss this off the record first and

 6    then we can put our agreements on the record?

 7                    ATTORNEY TRYON:  Okay.

 8                    ATTORNEY HARTNETT:  Can we go off the

 9    record?

10                    VIDEOGRAPHER:  Yes.  Going off the

11    record.  The current time is 10:20 a.m.

12    OFF VIDEOTAPE

13                            ---

14    (WHEREUPON, AN OFF RECORD DISCUSSION WAS HELD.)

15                            ---

16    ON VIDEOTAPE

17                    VIDEOGRAPHER:  Back on the record.  The

18    current time is 10:24 a.m.

19                    ATTORNEY TRYON:  Thank you.  So while we

20    were off the record we had a discussion and we've come

21    to an agreement on how to handle objections, that

22    primarily we would be handling objections by stating one

23    of three things, either objection to form, objection as

24    to technology --- or terminology, excuse me, or

```
 1  objection to any privileges or scope.  So I guess that's

 2  four.  And Mr. Linkous has said he will strive for that,

 3  but has not specifically addressed --- agreed to that.

 4  And finally, the counsel for Defendants have indicated

 5  that they will --- if there is an objection by counsel

 6  for Dr. Kidd, then they will be included within that

 7  objection.  So they don't have to object as well.  Is

 8  that a fair summary of our discussion?

 9              ATTORNEY HARTNETT:  Just on the last

10  point, it was objections by the witness to Counsel.

11              ATTORNEY TRYON:  Thank you for correcting

12  me.

13              ATTORNEY LINKOUS:  Hey, Dave, can I ask a

14  quick question?

15              ATTORNEY TRYON:  Yes.

16              ATTORNEY LINKOUS:  Ms. Holcomb, who was

17  on just a second ago, I heard her say she represents an

18  intervenor, and I didn't know there was an intervenor,

19  so who intervened and what's the story there?

20              ATTORNEY TRYON:  The intervenor is Lainey

21  Armistead, I think that's how you say her last name, who

22  is a colleague student, a female college student who has

23  intervened.

24              ATTORNEY LINKOUS:
```

1          Okay.  Thank you.  I appreciate that.

2                    ATTORNEY HARTNETT:  And Tim, that's a

3    gender college student who is seeking to intervene to

4    defend the state law.

5                    ATTORNEY LINKOUS:  I see.  Thank you.

6                    COURT REPORTER:  Josh, one second.  It's

7    the court reporter.  Can you go off the record, please,

8    Josh?

9                    VIDEOGRAPHER:  Going off the record,

10   10:26 a.m.

11   OFF VIDEOTAPE

12                         ---

13   (WHEREUPON, AN OFF RECORD DISCUSSION WAS HELD.)

14                         ---

15   ON VIDEOTAPE

16                    VIDEOGRAPHER:  Back on the record.  The

17   current time reads 10:32 a.m.

18                    ATTORNEY DUCAR:  My name is Tim Ducar.

19   I'm entering an appearance on behalf of the intervenor,

20   Lainey Armistead.

21                    VIDEOGRAPHER:  The court reporter can

22   swear in the witness and we can begin.

23                         - - -

24                    KACIE KIDD, M.D.,

```
 1    CALLED AS A WITNESS IN THE FOLLOWING PROCEEDINGS, HAVING

 2    FIRST BEEN DULY SWORN, TESTIFIED AND SAID AS FOLLOWS:

 3                              -  -  -

 4                          EXAMINATION

 5                              ---

 6    BY ATTORNEY TRYON:

 7        Q.    Dr. Kidd, my name is David Tryon.  I represent

 8    the State of West Virginia.  Can you, first of all, tell

 9    me how you would prefer that I address you?

10        A.    Hi, I'm Kacie Kidd.  I use she/her pronouns.

11    You're welcome to address me as Kacie or Dr. Kidd.

12        Q.    Very good.  So Kacie --- well, let me call you

13    Dr. Kidd.  Dr. Kidd, are you represented by counsel

14    today?

15        A.    I am.

16        Q.    And who is that?

17        A.    Mr. Linkous.

18        Q.    And how long has he represented you?

19        A.    Well, I can't recall our exact first email

20    exchange.  I think it's been over a month.

21        Q.    Okay.

22              Have you ever been deposed before?

23        A.    I have not.

24        Q.    Have you ever testified at trial before?
```

1    A.    I have not.

2    Q.    Excuse me.  Sorry about that.  Have you ever

3    been sued before?

4    A.    I have not.

5    Q.    Have you ever been retained as an expert either

6    as a testifying or consulting expert in any litigation

7    or otherwise?

8    A.    I have not.

9    Q.    We are in Federal Court, so the Federal Rules of

10   Procedure apply here.  And under the Federal Rules of

11   Procedures 30(c)(2) it provides for objections by your

12   counsel or other counsel.  And while we were off the

13   record or before --- we have agreed to certain ways to

14   make objections.  And then even if there are objections,

15   you'll still need to answer questions unless your

16   counsel directs you to not do so.

17         Understand?

18   A.    Yes.

19   Q.    Do you have any questions about that?

20   A.    No.

21   Q.    Okay.

22         So when you answer, as you're doing now, please

23   answer verbally rather than a nod or a shake.  The court

24   reporter, especially since she is not currently watching

SARGENT'S COURT REPORTING SERVICE, INC.
(814) 536-8908

```
 1   us, will not be able to detect anything other than your

 2   actual words.

 3           Okay?

 4   A.    Yes.

 5   Q.    Now, if you don't understand my questions,

 6   please say so, and I will try to reframe them or say it

 7   in a different way.

 8           All right?

 9   A.    Okay.

10   Q.    And if you need a break, let us know and we'll

11   make --- we'll try and accommodate that.  The only thing

12   you can't do is take a break after I've asked a

13   question.  So we need to do it before I ask a question.

14   And I'll also note that this deposition is being

15   conducted as upon Cross Examination.

16           Now, are you familiar with the lawsuit that's

17   involved here?

18   A.    I know of the lawsuit loosely.  I don't know

19   significant details.

20   Q.    Okay.

21           Just briefly, the Plaintiff in the case is BPJ.

22   Are you aware of who BPJ is?

23   A.    I am.

24   Q.    And BPJ is suing various Defendants asserting
```

1  that a law known as HB-3293 is invalid at least as it

2  pertains to BPJ.  Were you aware of that much?

3     A.     Not the numbers and name of that law, but

4  loosely, yes.

5     Q.     Okay.

6            Have you heard of the law, loosely known ---

7  well, it is known as HB-3293, sometimes called the

8  Women's Sports --- Save Women's Sports Act, and maybe

9  there's other names for it, too.  Have you heard of the

10  law?

11                    ATTORNEY HARTNETT:  Objection to the

12  form.

13                    THE WITNESS:  In lay media, yes.

14  BY ATTORNEY TRYON:

15     Q.     You haven't actually seen the lawsuit.

16            Is that right?

17     A.     That's correct.

18     Q.     Have you read that law?

19     A.     I can't recall if I read the actual law that

20  passed.

21     Q.     Okay.

22            Have you brought any documents to the

23  deposition with you today?

24     A.     I was told to have the two --- I think they're

SARGENT'S COURT REPORTING SERVICE, INC.
(814) 536-8908

```
 1    called exhibits, the WPATH Guidelines and my clinical
 2    record.
 3        Q.    Okay.
 4              And do you have those in hard copy or just
 5    electronically?
 6        A.    Both.
 7        Q.    Okay.
 8              And have you reviewed any documents in
 9    preparation for this deposition?
10        A.    Yes.
11        Q.    Which documents are those?
12        A.    They were documents provided by my lawyer
13    telling me about depositions because I add ---.
14                  ATTORNEY LINKOUS:   Stop right there, Dr.
15    Kidd.  Communications from me to you and the substance
16    of those communications are privileged.  You don't have
17    to talk about the substance of those.
18    BY ATTORNEY TRYON:
19        Q.    Yes.  All I need to know and I don't want to
20    know what you and your lawyer talked about.  I just want
21    to know what documents you've looked at in preparation
22    for your deposition today.
23        A.    Sure.  So those documents certainly.
24        Q.    Okay.
```

1          So those are the medical records you mentioned,

2    as well as the WPATH standards?

3    A.     Yes.

4    Q.     Anything else?

5    A.     I've certainly reviewed the medical literature

6    in this case but that is an ongoing process that I'm

7    always engaged in.

8    Q.     Okay.

9          Now, on Saturday we received some additional

10   documents from your office, which appear to be similar

11   to what's previously been marked as Exhibit 16.  Do you

12   have those in front of you as well?

13   A.     I'm not familiar with what Exhibit 16 includes.

14             ATTORNEY LINKOUS:  Mr. Tryon, I will just

15   interrupt and say that those records didn't really come

16   from her office, they came from me.  And I sent them to

17   Plaintiff's Counsel, who then provided them to you.

18             ATTORNEY TRYON:  Got it.  And do you know

19   if Dr. Kidd has those in front of her as well?

20             ATTORNEY LINKOUS:  She should, yes.

21             ATTORNEY TRYON:  Okay.

22   BY ATTORNEY TRYON:

23   Q.     So having gone through those --- excuse me one

24   moment.  So just some quick background.  Can you give me

1  your full name and address, please?

2      A.    My home address or my work address?

3      Q.    Both, please.

4      A.    My full name is Kacie Marie Kidd.  My work

5  address is --- depends on if you're looking at my office

6  or clinical practice, but my office is 1 Medical Center

7  Drive, Morgantown, West Virginia, 26506, I believe.  And

8  my home address ---.

9      Q.    Can you slow down just a little bit, please?

10     A.    Sure.

11     Q.    Go ahead.

12     A.    Do you need me to repeat?  My home address is

13  ███████████████████████████████████████████████████████

14  ████████

15     Q.    And can you give me your work phone number,

16  please?

17     A.    I would need to check my business card.  Is it

18  okay if I do that?

19     Q.    Yes.

20     A.    My work phone (304) 293-6307.

21     Q.    And I would also like to ask you for your

22  personal phone number, which I would use only in the

23  event that for some reason you were no longer

24  represented by counsel.  Otherwise, I would contact you

SARGENT'S COURT REPORTING SERVICE, INC.
(814) 536-8908

 1   through counsel.

 2              ATTORNEY LINKOUS:  I would --- I just

 3   object and instruct her not to answer on that.  I will

 4   accept subpoenas and you can contact me through her.  I

 5   will continue representing her.  And if not, there will

 6   be new counsel assigned and you will be informed of

 7   that.

 8              ATTORNEY TRYON:  Well, I've never had

 9   anyone instruct a witness not to do that before, but

10   I'll move on.

11   BY ATTORNEY TRYON:

12       Q.    Can you tell me where you went to --- about your

13   education, your undergraduate education first, please?

14       A.    Sure.  I received my Bachelor's Degree in

15   biology and women's studies from West Virginia

16   University.  I then went to medical school at West

17   Virginia University School of Medicine.  After that I

18   completed a four-year residency in internal medicine and

19   pediatrics at West Virginia University School of

20   Medicine.  I then completed a three-year fellowship in

21   adolescent medicine at the University of Pittsburgh.

22       Q.    What was your major in your pre-Bachelor's

23   Degree?

24       A.    It was biology and women's studies.

1    Q.    And when did you get your Bachelor's Degree?

2    A.    I graduated with my Bachelor's in 2010.

3    Q.    And medical school, when did you graduate there?

4    A.    2014.

5    Q.    Did you have any particular emphasis at the West

6    Virginia School of Medicine?

7    A.    It's not customary for people to have emphasis

8    in medical school but instead in residency.

9    Q.    Okay.

10         And in your residency what was your specialty

11   or emphasis?

12   A.    I did a dual residency in internal medicine and

13   pediatrics.

14   Q.    And when did you get that?  When did you

15   complete your residency?

16   A.    In 2018.

17   Q.    And then your fellowship, what was that in?

18   A.    Adolescent medicine.

19   Q.    And when did you complete that?

20   A.    In 2021.

21   Q.    Any particular reason that you chose adolescent

22   medicine?

23   A.    Supporting adolescents and young adults is my

24   favorite part of medicine.

1    Q.    Have you had any other specialized training

2    other than what you just discussed?

3    A.    Within adolescent medicine there are several

4    ways to have additional training and I did pursue one of

5    those ways.

6    Q.    And what was that?

7    A.    Gender affirming care.

8    Q.    And in what way did you pursue that?

9    A.    I dedicated much of my clinical training to

10   learning under experts in this space.  I also dedicated

11   my research training in a similar vein, and I engaged in

12   organizations and groups and additional educational

13   opportunities to round out that training.

14   Q.    What experts are you referring to?

15   A.    Doctor Gerald Montano, Doctor Selma Witchell

16   among others.

17   Q.    I'm sorry.  Montano and who is the other one?

18   A.    Selma Witchell.

19   Q.    Can you spell that, please?

20   A.    W-I-T-C-H-E-L-L.

21   Q.    And what was the first name?

22   A.    Selma, S-E-L-M-A.

23   Q.    And where is Selma Witchell?

24   A.    The University of Pittsburgh.

```
 1    Q.    Do you have a license to practice medicine?

 2    A.    I do.

 3    Q.    Where?

 4    A.    In the State of West Virginia.

 5    Q.    Any others?

 6    A.    I previously held a training license in the

 7   State of Pennsylvania when I was a trainee there.

 8    Q.    But currently you do not?

 9    A.    I do not.

10    Q.    And do you have any --- you may have answered

11   this, but do you have any specific specialties?

12    A.    My specialties are pediatrics, internal

13   medicine, adolescent medicine and gender affirming care.

14    Q.    I was wondering if that was my computer dinging

15   or someone else's.

16    A.    I think it may be mine.  Give me a second.  I'll

17   sign out of my email.

18    Q.    Okay.

19    A.    Okay.

20    Q.    Do you have Board Certifications?

21    A.    I do.

22    Q.    What are those?

23    A.    I'm Board Certified in Internal Medicine and

24   Pediatrics.
```

```
 1      Q.     What was necessary to get Board Certification

 2   for internal medicine?

 3      A.     I was trained in internal medication and many of

 4   my patients are adults by legal definition.

 5      Q.     I'm sorry.  You broke up.  Can you repeat that

 6   please?

 7      A.     Sure.  I was trained in internal medicine and

 8   eligible to sit that Board Examination.  Additionally, a

 9   lot of my patients are over the age of 18.

10      Q.     So you had to sit for a Board Examination.

11             Is that right?

12      A.     I sat for two Board Examinations in Pediatrics

13   and Internal Medicine as well as numerous Board

14   Examinations to be allowed to get to that point.

15      Q.     Okay.

16             And you passed those boards?

17      A.     I did.

18      Q.     Are you a member of any medical societies?

19      A.     I am.

20      Q.     What are those?

21      A.     I am currently a member of the American Academy

22   of Pediatrics.  I'm a member of the Society for

23   Adolescent Health and Medicine.  I am also a member of

24   the World Professional Association for Transgender
```

1    Health.

2        Q.     Any others?

3        A.     Not that I can recall.

4        Q.     When you said the Society for Adolescent

5    Medicine, did I hear that right?

6        A.     The Society for Adolescent Health and Medicine,

7    abbreviated SAHM, S-A-H-M.

8        Q.     And what do you need to be a member of that,

9    what do you need to do?

10       A.     Most of these organizations have membership

11   tiers for a variety of persons and you need to pay a

12   fee.  But for the purpose of my membership, it's as a

13   physician.  And for the American Academy of Pediatrics I

14   have a special notation in my membership as someone who

15   has passed the board exam for that field.

16       Q.     For WPATH, what do you need to do to be a member

17   there?

18       A.     You need to sign up and pay a fee and check your

19   membership category.  Mine, again, is physician and

20   although I think I may be still listed as a student

21   member based on my training time at the University of

22   Pittsburgh for that membership, but I am also part of

23   their global education initiative, which is an

24   additional training on top of being a member.

1    Q.    I'm sorry, global what initiative?

2    A.    Education initiative.

3    Q.    Are you a member of the ---?

4    A.    I am not.

5    Q.    Are you a member or on the board of any

6    educational organizations?

7    A.    I think it depends on what you mean by

8    educational organization.

9    Q.    Any organizations that try and educate on any

10   issues?

11   A.    Well, broadly, I'm faculty at West Virginia

12   School of Medicine and I routinely educate a variety of

13   learners at a variety of levels.  I'm also part of

14   something called the Tri-State Gender Collaborative,

15   which is a community-based organization that does

16   provide education.

17   Q.    And do you have privileges at any hospitals?

18   A.    I do have privileges at Ruby Memorial Hospital

19   in Morgantown, West Virginia.

20   Q.    Any others?

21   A.    No.

22   Q.    So tell me of your work experience, your

23   professional work experience.

24   A.    Can you restate your question?

1    Q.    Yes.  So I'm interested to learn your work

2    experience, where you have worked and what you have done

3    starting --- I'm not sure exactly --- you've told me

4    about your internship and then I know that you are doing

5    some other things.  So after your internship, did you

6    have any professional --- did you start working right

7    away or did you just do the fellowship or is fellowship

8    considered work?  Help me out, understand your work

9    history.

10              ATTORNEY HARTNETT:  Objection to the

11   form.

12              THE WITNESS:  Medicine training is

13   complicated, and so the internship is part of residency.

14   That was part of the four years that I spent in internal

15   medicine and pediatrics training.  During that time I

16   was working in a variety of settings to obtain training

17   in both of those fields.

18              After that was completed I was also doing

19   training at the University of Pittsburgh.  One could

20   consider all of those work.  And I was a paid employee

21   during that time when I was a trainee as well.

22   BY ATTORNEY TRYON:

23   Q.    What's the first job in which you were actually

24   treating patients?

1    A.    I have been treating patients since I was a

2    medical student.

3    Q.    Okay.

4          And your first paid job where you were treating

5    patients?

6    A.    That would have been the beginning of my

7    residency, which is often called an internship in

8    internal medicine and pediatrics.

9    Q.    And then how about your fellowship, were you

10   treating patients during your fellowship?

11   A.    Yes.

12   Q.    What is your current --- I don't know what the

13   right term would be profession --- excuse me, profession

14   or your work status?

15   A.    I am currently an assistant professor in the

16   Department of Pediatrics at the WVU School of Medicine.

17   I am also the Medical Director of the WVU Medicine

18   Children's Gender and Sexual Development Clinic.

19   Q.    And then do you have a separate practice where

20   you diagnose and treat patients?

21   A.    Under those titles, yes.

22   Q.    Okay.

23         So it's not separate from those?

24   A.    No.

1    Q.    Do you get paid directly by the patients or just

2    only get paid by the West Virginia University?

3    A.    I am dual employed as is the customary practice

4    for physicians who are working at the WV School of

5    Medicine, and so my dual employment goes both through

6    West Virginia University as well as --- I believe it's

7    called UHA, the University Health Associates, but I may

8    need to clarify that.

9    Q.    Okay.

10        As assistant professor what do you do?

11   A.    Assistant professor is my title in my tenure

12   track of employment, and so it's fairly traditional for

13   assistant professors to be the entry point of tenure

14   track position, if that makes sense.  And my role in

15   that is to provide medical care as well as to conduct

16   research and to provide teaching.

17   Q.    So I understood conduct research and also

18   teaching.  What was the first thing you said?

19   A.    To provide clinical care.

20   Q.    What do you teach?

21   A.    I teach a variety of learner types and topics,

22   but they typically center adolescent medicine and gender

23   affirming care or both.

24   Q.    Are there classes specifically on those topics

```
 1    or is it part of a more general class?
 2        A.    Most often my teaching is as a guest lecturer
 3    for a medical student class or a residency training
 4    program or something called grand rounds, which is a
 5    teaching opportunity for faculty-level positions.
 6        Q.    What types of research do you do?
 7        A.    I conduct mix methods research, including
 8    qualitative and quantitative analyses, centering gender
 9    adversity in people and their experiences as well as the
10    experiences of their family.
11        Q.    How many papers have you published?
12        A.    I don't know that I could give you a complete
13    answer to that question.  I suspect --- I know that it
14    is more than 12.  I suspect less than 20.  It also
15    depends on what you mean by paper.
16        Q.    Okay.
17              When you say provide clinical care --- well,
18    let me come back to that in a minute.  As Medical
19    Director of the West Virginia University --- excuse me,
20    West Virginia University Medicine Children's Gender and
21    Sexual Development --- do I have that title right?
22        A.    Almost.  It's the WVU Medicine Children's Gender
23    and Sexual Development Clinic.
24        Q.    And what is your role?  What do you do in that
```

1   role?

2     A.    I direct the clinical care of gender diverse

3   intersex and questioning youth, ages approximately 3

4   through 26 in our multi-disciplinary team.

5     Q.    So how is that different then from where you

6   provide clinical care as an assistant professor?

7     A.    Those two jobs descriptions overlap quite a bit.

8     Q.    Are there any parts that do not overlap?

9     A.    I would argue that it's outside of my role as an

10   assistant professor but definitely in my role as the

11   Medical Director of the clinic to have meetings where we

12   discuss the care we provide, to meet with our DEI head

13   more promptly, diversity, equity and inclusion, those

14   sorts of things.

15     Q.    Do you supervise anyone in either of your roles?

16     A.    I often precept trainees, residents and medical

17   students.

18     Q.    Could you repeat that?

19     A.    I often precept trainees, including residents

20   and medical students.

21     Q.    You said preset?

22     A.    Precept, P-R-E-C-E-P-T.  It's a word used in

23   medical care to discuss supervision of trainees.  I'm

24   their preceptor.

1      Q.     And do you supervise them as they are giving

2  medical care?

3      A.     Yes.

4      Q.     Would it be fair to say that you are currently a

5  treating physician?

6      A.     Yes.

7      Q.     And just so I have it right rather than me

8  trying to restate it, in what areas do you treat

9  patients?

10     A.     I provide care for adolescents and young adults.

11     Q.     In what areas?

12     A.     In adolescent medicine, in gender affirming

13  care.

14     Q.     Do you provide general --- are you a

15  pediatrician as well?

16     A.     It's complicated.  Adolescent medicine is a

17  complicated --- and there are many adolescent

18  specialists who do provide well child care for young

19  people.  I do that infrequently.  And so for example, if

20  a young person wishes for me to be their primary care

21  provider, I can do that on a limited basis, but the

22  majority of my care is subspecialty care and

23  consultation.

24     Q.     When patients need to come to you do they come

1    to you directly or through the University?

2        A.    Can you restate the question?

3        Q.    So it's my understanding that you do treat

4    patients.  And so my question is do they come to you

5    directly or do they go through the University?

6        A.    I'm not understanding what you mean by coming

7    through the University.

8        Q.    How do you --- how do patients come to you?

9        A.    They can call our scheduling line that is

10   available on our website or they can be referred from

11   another physician or provider.

12       Q.    How much of your time is spent with patients

13   versus your time in doing research and teaching and

14   other things?

15       A.    I am 20 percent clinical and 80 percent

16   research.

17       Q.    So when a new patient comes in what is the ---

18   let me back up for a second.  Have you been --- one

19   second.  When you have a new patient come in --- I'm

20   sorry, let me go back to my other question.  Have you

21   been asked to be an expert witness in this case?

22       A.    No.

23       Q.    Tell me about the intake process for a new

24   patient.

```
 1    A.    Well, depending on how a new patient finds us,
 2  either through direct scheduling or referral, once they
 3  have the visit they usually meet with us for a longer
 4  than perhaps expected visit to compare to other
 5  pediatric practices.  New patients visit with my team
 6  are usually between two and two and a half hours.  An
 7  hour of that is typically spent with me and we have a
 8  fairly long conversation with the young person, with
 9  family members together and separately and then we work
10  together to help support that young person together.
11    Q.    When you say your team, who is on your team?
12    A.    Our team, from my practice, currently includes
13  myself, a child and adolescent psychiatrist, whose name
14  is Dr. Deci, and a clinical therapist, whose name is Ms.
15  Brianna Hayes.
16    Q.    Doctor Steven --- what is his last name?
17    A.    Deci, D-E-C-I.
18    Q.    And Brianna Hayes, what is ---?
19    A.    H-A-Y-E-S.
20    Q.    What's her practice?
21    A.    She is a clinical therapist.
22    Q.    And Doctor Deci, what's the practice?
23    A.    He is a child and adolescent psychiatrist.
24    Q.    When the patient first is coming in --- let me
```

1    back up just a little bit for some more nuts and bolts

2    in my question.  Do they first meet with a secretary or

3    nurse or fill out papers online?  How does that process

4    --- let's start with someone who is just direct

5    scheduling.

6        A.    And so if someone calls our scheduling line,

7    they are scheduled for a visit.  And they would arrive

8    at their visit time, they would check in.  They would

9    sit in the waiting room.  A nurse would call them back,

10   take their vital signs and they would be put in an exam

11   room with their family.  They arrive with family.  And

12   then our team would see them.

13       Q.    As far as the initial record, setting up the

14   initial record of who this person is and what they're

15   coming in for, who does that?

16       A.    The family when they call when to make a visit

17   will ask for a gender visit, and that's the only

18   questioning that happens at that time.

19       Q.    And then everything else that is input into the

20   patient's records would either be from the nurse or from

21   you or your team?

22       A.    For those who are directly scheduling.  If

23   someone has been referred, it may be that they're

24   referring provider or a scheduler from their referral

SARGENT'S COURT REPORTING SERVICE, INC.
(814) 536-8908

1    team put additional documentation in.

2        Q.    Is there any --- okay.

3              So when you meet with the patients, is it

4    initially just you or is it with the entire team first?

5        A.    So it depends.  We like to do a greeting where

6    we all pile in these exam rooms and say hello and

7    introduce ourselves so young people and families know

8    our names and faces.  Sometimes that is not possible for

9    a variety of reasons.  And also sometimes families don't

10   need all of us and may or may not be interested in

11   seeing all of us.  Sometimes families just want to see

12   me or sometimes they just want to see the mental health

13   providers, and we try to accommodate that where we can.

14       Q.    Do you gather their past medical history?

15       A.    Yes.

16       Q.    And is their medical history important?

17       A.    I think that every patient's medical history,

18   medication list, allergies, things like that can be

19   important to their care.

20       Q.    Can you explain to me why?  I mean it may seem

21   obvious to you, but I would like to just understand it.

22       A.    Okay.

23             And so, someone's past medical history could

24   certainly impact their present health, and so part of my

1    routine practice is to ask young people and their

2    families what kind of diagnoses they have had in the

3    past, including things like asthma, allergies, if

4    they've broken their arm before, a whole host of

5    questions.

6         Q.    Are those things relevant to gender care?

7         A.    They could be.

8         Q.    How would allergies be related to gender care?

9         A.    If you had an allergy to a medication that was

10   related or the same as a medication that I could

11   provide, that would be a concern to me.

12        Q.    And do you typically take the history just from

13   the patient or do you reach out to other healthcare

14   providers?

15        A.    I take my history from the patient and parent or

16   guardian in front of me, but I also have access to our

17   electronic health record and I review that as well for

18   meeting new patients.

19        Q.    Tell me about the electronic health record.

20        A.    Our health system uses an electronic health

21   record called Epic.

22        Q.    And what is located in the Epic system?

23        A.    A variety of things, including vital signs from

24   previous visits, notes from prior visits and prior

SARGENT'S COURT REPORTING SERVICE, INC.
(814) 536-8908

```
 1   providers, information about the family address and

 2   phone number, should we need to mail anything or call

 3   them, things like that.

 4      Q.    Does the Epic system --- let me back up.  So the

 5   Epic system is a system used by West Virginia

 6   University.

 7            Is that right?

 8      A.    WV Medicine specifically and UHA uses Epic I

 9   believe in most, if not all, of their hospitals.  I

10   think a couple hospitals are going live with Epic soon.

11   I think it's an incredibly common electronic health

12   record in this country and others I believe.

13      Q.    I've heard of it.  I don't know a lot about it.

14   So tell me, would Epic system that WVU Medicine is

15   using, does it just have information from within the WVU

16   Medicine medical system or does it expand out to all

17   providers in the country, for example?

18      A.    It would be wonderful if it did that if an

19   effective way.  There's a bit of capitalism involved

20   there I suspect, but we do have something called Care

21   Everywhere, which is a tab that you can select and for

22   some circumstances it allows you to see notes from other

23   Epics systems outside of WVU Medicine.

24      Q.    So what is the WVU medical system?  Where else
```

1   are they tied into?

2       A.      Can you restate your question?

3       Q.      First of all, let me make sure I get my

4   terminology correct.  It's WVU Medical?

5       A.      WVU Medicine.  I think that's the brand name for

6   the UHA health family of hospitals and clinics and that

7   sort of thing.

8       Q.      So WVU Medicine uses the Epic system and also

9   you can utilize Care Everywhere.  So my question is,

10  Care Everywhere ties you into what other systems?

11      A.      I don't know the comprehensive list.  It's kind

12  of a bit of luck I think sometimes navigating Care

13  Everywhere.  It's a little bit of what I would consider

14  a clunky system, but Care Everywhere is within Epic.  It

15  is not itself a separate system.

16      Q.      Understood.  But can you recall any other

17  organizations that you can access through Care

18  Everywhere?

19      A.      I know that I can access the University of

20  Pittsburgh in some capacity.  I previously worked in

21  that system, and so I wasn't seeing exactly what it

22  looked like if I was in their system, but I can't really

23  speak to other systems that are connected.

24      Q.      And if a patient comes in and they've had prior

 1   medical providers, do they typically bring in any copies

 2   of medical records?

 3       A.    That would be wonderful, but it doesn't happen

 4   very often.

 5       Q.    Is the intake process any different for when

 6   someone comes in as a referral patient?

 7       A.    It depends on how they've been referred.  So for

 8   example, sometimes providers will reach out to me

 9   through secure communication within Epic and say they

10   have a patient they wish to refer and they might have

11   questions about how to make that happen.  So there may

12   be an additional layer of communication there.  I often

13   ask questions about urgency of need.  Sometimes patients

14   are needing to see me sooner for a variety of reasons,

15   maybe mental health concerns, that may be just stress

16   about getting a visit, and so I can accommodate those

17   things.

18       Q.    So if the referred physician had information,

19   they can send that to you through the Epic system?

20       A.    They can send me a communication and that may

21   include information that they feel is relevant for me to

22   know about the patient they're sending me.

23       Q.    When they send that communication, what does

24   that look like?  Is that email, texting?

1    A.    It's --- it's neither.  It's actually a

2  communication system within Epic.  It's called Inbasket.

3    Q.    And does Inbasket provide for just

4  communications or also sending documents?

5    A.    I believe you can attach documents within those,

6  but I have very intermittent luck of doing so and most

7  folks do not use that feature.

8    Q.    Anything else different about when you receive a

9  referral as opposed to a direct contact?

10                    ATTORNEY HARTNETT:  Objection to form.

11                    THE WITNESS:  Not that I can think of.

12  BY ATTORNEY TRYON:

13    Q.    Let me ask you generally what types of

14  information do you need to diagnose a problem?

15                    ATTORNEY HARTNETT:  Objection to form.

16                    THE WITNESS:  Can you restate the

17  question?

18  BY ATTORNEY TRYON:

19    Q.    Yes.  So in your field, are you --- do you

20  diagnose patients?

21    A.    If it is within my scope of practice, yes.

22    Q.    And what type of --- what information do you

23  need to make a diagnosis of your patients?

24    A.    It depends on the patient and the diagnoses I'm

1  considering.

2     Q.    Is there something called objective versus

3  subjective symptoms?

4     A.    Yes.

5     Q.    Can you explain what those are and the

6  difference?

7     A.    Objective tends to refer to things like vital

8  signs or labs, things that we measure.  Subjective tends

9  to refer to things that patients tell us, like that they

10  have headaches or the severity of their headaches.

11     Q.    How do you measure subjective symptoms?

12     A.    You talk with your patient.

13     Q.    Anything else?

14     A.    That's the primary way to diagnose most things

15  is to have a conversation with your patient.

16     Q.    Is there a --- an objective way to measure the

17  subjective symptoms?

18     A.    We have a lot of scales for a lot of things.  We

19  have a lot of diagnostic criteria for a lot of things,

20  but most of medicine would not exist in my opinion if we

21  didn't talk with our patients.

22     Q.    I understand that.  So it sounds like there's

23  not a good way to actually put a measurement on

24  subjective symptoms.

1           Is that a fair statement?

2                   ATTORNEY HARTNETT:  Object to form.

3                   THE WITNESS:  They are by nature

4    subjective.

5    BY ATTORNEY TRYON:

6    Q.     So when someone comes to you for gender

7    dysphoria issues as opposed to other types of medical

8    issues --- actually, let me start that all over again.

9    Do you ever treat patients or diagnose patients for

10   things other than gender dysphoria issues?

11   A.     Yes.

12   Q.     What other medical issues do you diagnose or

13   treat?

14   A.     It's a very extensive list.

15   Q.     Okay.

16          Then I won't make you go through it, but can

17   you give me some just general ideas?

18   A.     Dysmenorrhea is an incredibly common thing that

19   I treat and diagnose.

20   Q.     Can you repeat that or spell that, please?

21   A.     Dysmenorrhea, D-Y-S-M-E-N-O-R-R-H-E-A.

22   Dysmenorrhea.

23   Q.     What is that?

24   A.     Dysmenorrhea is difficult periods.  It's a whole

```
 1   host of things that lead to heavy bleeding,
 2   uncomfortable bleeding, pain with bleeding, and can
 3   really impact live experience with young people.
 4       Q.    Okay.
 5             Anything else?
 6       A.    As I said, there are many things that I diagnose
 7   and treat.
 8       Q.    Give me a few examples just so I sort of
 9   understand your practice.
10       A.    Okay.
11             Sexually transmitted infections.  I'm an
12   adolescent medicine doctor, so really anything in the
13   pubertal period or young period is in my practice.  But
14   I often screen and treat for sexually-transmitted
15   infections.  I also manage contraception.  I also talk
16   about mood, anxiety, depression.  Would you like more?
17       Q.    I think I'm getting the sense of it.  So let me
18   ask you about gender dysphoria.  Can you give me your
19   definition for what gender dysphoria is?
20       A.    My definition is loosely based on the DSM-V,
21   which has criteria for the diagnosis of gender
22   dysphoria, but it is stress, significant distress often
23   associated with the inconference between one's sex
24   assigned at birth and gender identity lasting longer
```

1   than six months with accompanying things like seeking to

2   present one's self gender expression in line with one's

3   affirmed gender and in opposition to one's sex assigned

4   at birth as well as some other criteria.

5        Q.    Is the actual intake process that we have

6   discussed for someone coming to you for gender dysphoria

7   different than some of these other issues that you've

8   mentioned to me?

9        A.    Can you restate the question?

10       Q.    Sure.

11             When someone comes to you, you have given me

12   sort of the --- explained to me how the intake process

13   works in general.  And my question is, is it any

14   different in general than with respect to someone coming

15   to you with gender dysphoria specifically?

16       A.    In some ways.  I ask a whole lot more questions

17   about gender when we are talking about gender dysphoria,

18   although I ask all of my patients about gender identity.

19       Q.    Why do you ask all of your patients about gender

20   identity?

21       A.    It's important that I'm respectful of them and

22   their name and pronouns, and also we know that gender

23   diverse young people, and by my definition that is

24   anyone who's sex assigned at birth and gender identity

1   do not fully align, we know that those young people face

2   health disparities and inequities associated with mental

3   health, and I want to make sure I can address those if

4   they are present.

5                    ATTORNEY TRYON:  Let me just ask the

6   court reporter if you're able to keep up with this?

7                    COURT REPORTER:  Attorney Tryon, if the

8   doctor could speak a little bit slower because I'm ---

9   yeah, a little bit slower, Doctor, please.

10                    THE WITNESS:  Absolutely.

11                    ATTORNEY HARTNETT:  She is doing a great

12   time on the real time, though, but appreciate the point.

13   BY ATTORNEY TRYON:

14   Q.    What is --- what percentage of your practice

15   involves gender dysphoria or gender identity issues?

16   A.    I couldn't give you an exact number, but my

17   guess would be 80 percent.

18   Q.    Now, you mention there's --- this may not be

19   your word, but there's a process for diagnosing gender

20   dysphoria.

21          Is that right?

22   A.    There are diagnostic criteria, yes.

23   Q.    And can you list those for me again?  You

24   started to go through that a little bit, but if you

SARGENT'S COURT REPORTING SERVICE, INC.
(814) 536-8908

1    could go through that I would appreciate it.

2        A.    These are located in the DSM-V, and I cannot

3    recite them by memory.

4        Q.    Well, as best as you can, can you tell me what

5    they are?

6        A.    Loosely, the definition of gender dysphoria by

7    my interpretation is that there is distress, often

8    significant distress, associated with an incongruent

9    between one's sex assigned at birth and one's gender

10   identity lasting for at least six months and also

11   inclusive of some other criteria, which include things

12   like desiring to align one's gender expression with

13   one's affirmed gender and in opposition to one's

14   assigned sex.

15       Q.    About how many people have come to you to get an

16   initial diagnosis of gender dysphoria?

17       A.    I want to clarify that most folks, at least a

18   substantial portion of folks don't come to me asking for

19   that diagnosis specifically, but more broadly to have

20   conversations about means of support, although I am able

21   to provide that diagnosis.

22       Q.    Okay.

23             And about how many people have you given that

24   diagnosis to?

1    A.    I couldn't give you an exact number.  I can

2  approximate and say that I have seen well over a hundred

3  patients in my clinic.

4    Q.    And in which or for which you've given a

5  diagnosis or gone through that --- let me start that

6  over.  Of those hundreds, those are the --- those you've

7  actually gone through the process to make a diagnosis of

8  gender dysphoria?

9    A.    I've certainly asked all of the relevant

10 questions.  Sometimes young people and their families

11 don't desire to have that diagnosis listed in their

12 chart due to fear of discrimination.

13   Q.    But you would say you've given that diagnosis

14 for over a hundred patients?

15   A.    I've certainly asked the questions associated

16 with that diagnosis, yes.

17   Q.    Okay.

18         But I'm asking where you've done the actual

19 initial diagnose --- given actual diagnosis of that

20 gender dysphoria, would you say over a hundred or not?

21   A.    It's really hard to say because there is no ---

22 there is no way that one gives a formal diagnosis kind

23 of as a here it is.  It's more of a you meet these

24 criteria.  Let's explore what that means.  Does that

SARGENT'S COURT REPORTING SERVICE, INC.
(814) 536-8908

1    feel in line with your life experience.  Sometimes I

2    have to write it in the chart for the purpose of

3    insurance coverage, for medication for example.  But

4    it's a bit more complicated than just saying you checked

5    the boxes, here is your diagnosis.

6        Q.    Okay.

7            Have you ever had a patient that came to you

8    and you discussed gender dysphoria with that patient and

9    ultimately you concluded that the patient did not have

10   gender dysphoria?

11       A.    I have.

12       Q.    Are those patients who initially thought they

13   had gender dysphoria and you concluded they did not?

14       A.    Not usually, no.  Those are more often patients

15   who are questioning this part of themselves and

16   exploring their identities as a normal part of

17   adolescent development.

18       Q.    For any of the patients that have come to you

19   and said they thought they had gender dysphoria, have

20   you arrived at a different diagnosis of what was causing

21   their concerns?

22       A.    I can't recall an occasion like that.

23       Q.    Are you familiar with the concept of watchful

24   waiting?

SARGENT'S COURT REPORTING SERVICE, INC.
(814) 536-8908

1        A.      I am.

2        Q.      Have you ever recommended that to a patient?

3        A.      I have not because it is not recommended by the

4   American Academy of Pediatrics.

5        Q.      Tell me how you are familiar with that.

6        A.      I'm familiar with it through the policy

7   statement on the care of this population of young people

8   from the American Academy of Pediatrics by Rafferty, et

9   al., 2018.

10       Q.      Have you --- tell me that citation again.

11       A.      Sure.  Rafferty, et al., 2018, the American

12   Academy of Pediatrics.

13              ATTORNEY LINKOUS:  Mr. Tryon, I know

14   we've been going about an hour-and-a-half.  When you get

15   to a logical breaking point, I could use three minutes.

16              ATTORNEY TRYON:  Okay.

17              Give me just another couple of minutes

18   and then we will break.

19   BY ATTORNEY TRYON:

20       Q.      Have you read any literature other than that

21   about watchful waiting?

22       A.      That is the literature that most specifically

23   sticks out in my mind.  I'm sure I've read countless

24   articles that discuss this in one form or another.

```
 1      Q.     Are you aware that there are other articles that

 2  do recommend watchful waiting?

 3                    ATTORNEY HARTNETT:  Objection to form.

 4                    THE WITNESS:  I am not familiar with

 5  articles like that from highly-respected medical

 6  organizations.

 7  BY ATTORNEY TRYON:

 8      Q.     Are you aware of any, whether or not they are

 9  from highly-respected medical organizations?

10      A.     Not off the top of my head, no.

11      Q.     Have you read their studies?  I mean, this is a

12  Dutch concept.

13           Right?

14                    ATTORNEY HARTNETT:  Objection to form.

15                    THE WITNESS:  I'm not familiar with what

16  you're talking about.

17  BY ATTORNEY TRYON:

18      Q.     It's called the Dutch Approach, and you're not

19  --- you haven't heard that?

20                    ATTORNEY HARTNETT:  Objection to form.

21                    THE WITNESS:  I certainly am familiar

22  about the Netherlands and the Dutch and the work they've

23  been doing in this space for more than a decade.

24  BY ATTORNEY TRYON:
```

```
 1      Q.    And over there watchful waiting is considered an
 2  appropriate recommendation.
 3           Right?
 4      A.    I can't speak to that.  I know from their
 5  literature they've demonstrated that the approach we
 6  take here in this country when done in their country was
 7  very helpful and reduced mental health concerns in their
 8  young people.  I believe that's a DeVry study from more
 9  than ten years ago.
10      Q.    What is the difference between gender dysphoria
11  and gender nonconformity?
12                ATTORNEY TRYON:  You know what, I will
13  withdraw that question.  We can take a break right now.
14  When we come back we can talk about that.  Okay?
15                ATTORNEY LINKOUS:  We can go off the
16  record.
17                VIDEOGRAPHER:  Going off the record.  The
18  current time reads 11:26 a.m.
19  OFF VIDEOTAPE
20                          ---
21  (WHEREUPON, A SHORT BREAK WAS TAKEN.)
22                          ---
23  ON VIDEOTAPE
24                VIDEOGRAPHER:  We are back on the record.
```

```
 1    The current time reads 11:37 a.m.

 2    BY ATTORNEY TRYON:

 3        Q.    Dr. Kidd, when we concluded, when we took our

 4    break we were just finishing up talking about watchful

 5    waiting.  Let me ask you just one or two more questions

 6    about that.  Is watchful waiting something that --- is

 7    the only reason that you don't ever recommend that is

 8    because of the Rafferty study?

 9        A.    So Rafferty is not a study.  It's a policy

10    statement from the American Academy of Pediatrics that

11    summarizes best practice guidelines for gender diverse

12    young people.  And so in that it does not recommend

13    watchful waiting.

14          Additionally, based on my own literature view

15    conducted over the course of my career thus far I have

16    never seen medical literature that supports the use of

17    that practice and is associated with positive mental

18    health outcomes for youth.

19        Q.    Okay.

20          Let me ask you about gender dysphoria versus

21    gender non-conformity.  You're familiar with both those

22    terms.

23          Right?

24        A.    I am.
```

```
 1      Q.     What's the difference between those two things?

 2      A.     Gender conformity is simply someone rejecting

 3   some tenet of what society presumes they should look

 4   like, act like, think like as it pertains to gender.

 5   And so that could be someone who, like myself, was

 6   assigned female but who is very interested in building

 7   and construction, right.  Typically, that is considered

 8   a more masculine pursuit.  And so that could be gender

 9   non-conformity, and that could extend through my

10   expression.  Perhaps I would want to present myself in a

11   way that is more masculine or more androgenous.  That

12   would also be reflective of gender nonconformity.

13             Where this enters into the territory of gender

14   dysphoria is when you have that significant distress

15   associated with that encumbrance between my sex

16   assignment and my gender identity.  That is the

17   difference.

18      Q.     Could you repeat that last part again?

19      A.     From where?

20             ATTORNEY TRYON:  Can I ask the court

21   reporter to read back that answer?

22             COURT REPORTER:  It is simply someone

23   rejecting of what society presumed they should look

24   like, act like, think like as it pertains to gender.
```

SARGENT'S COURT REPORTING SERVICE, INC.
(814) 536-8908

1   And so that could be someone, who like myself, was

2   assigned female but who is very interested in building

3   and construction, right.  Typically that is considered a

4   more masculine pursuit, and so that could be gender

5   non-conformity and that could express through my

6   expression perhaps.  I would want to perhaps myself in

7   --- want to present myself in a way that is perhaps more

8   masculine or androgenous, where this enters into the

9   area of territory of gender dysphoria where you have

10  that significant distress encumbrance in between my

11  gender society.  That is the difference.  That's the

12  part I messed up.

13  BY ATTORNEY TRYON:

14     Q.    Isn't there always some level of anxiety or

15  distress when someone has a gender non-conformity?

16     A.    No, not always.

17     Q.    So then in every event where there is some level

18  of stress or anxiety does it then turn into gender

19  dysphoria?

20     A.    No.  The word that I use is significant or

21  severe, and I believe that language is also echoed in

22  diagnostic criteria.

23     Q.    So when I use the name BPJ, do you know who that

24  is?

SARGENT'S COURT REPORTING SERVICE, INC.
(814) 536-8908

1   A.   I do.

2   Q.   Who is that?

3   A.   That is B████, my patient.

4   Q.   Last name J██████?

5   A.   I believe it's a hyphenated last name,

6   P████-J██████, but yes.

7   Q.   Very good.  Thank you for correcting me on that.

8   Any --- prior to --- strike that.

9        Do you have any personal relationship with

10  either BPJ or BPJ's family?

11  A.   I am a physician caring for this young person.

12  That is the extent of my relationship with this family

13  and this young person.

14  Q.   When did you first hear of BPJ, with that ---

15  those initials or any other name?

16  A.   I believe the first time I heard about B████ was

17  when Dr. Someshwar, an adolescent medicine specialist

18  who i work with, recommended that she see me.

19  Q.   Remind me how to spell that doctor's name?

20  A.   S-O-M-E-S-C-H-W-A-R (sic), Someshwar.

21  Q.   And how did that come about?

22  A.   So Dr. Someshwar is the division head of

23  Division of Adolescent Medicine and WVU Medicine

24  Children's and my direct supervisor in my current

 1   position, but also Dr. Someshwar provides care for

 2   gender diverse people, as I do, but she does not provide

 3   care for those who are interested in or have received

 4   pubertal blockers.

 5       Q.    Why not?

 6       A.    That is outside of her scope but well within my

 7   own, and that is why she wished for me to see B████.

 8       Q.    And how did --- and I'm also going to use BPJ

 9   because that's the name on the Complaint, number one,

10   and number two, since BPJ is a minor, that's my practice

11   is to refer to people in court proceedings by their

12   initials, all minors.

13             ATTORNEY HARTNETT:  And if I could just

14   --- for the record, this is Kathleen Hartnett for

15   Plaintiff.  It's acceptable to us for you to refer to

16   her as B████ or BPJ in this deposition.  We marked the

17   Complaint BPJ per rules of Court, and we'll mark the

18   parts of this deposition about her medical records, if

19   any, confidential, but Plaintiff has no objection to

20   referring to her in either way.  Thank you.

21             ATTORNEY TRYON:  Well, to be clear, I'm

22   going to continue doing that because if I make the

23   mistake elsewhere, I can be sanctioned by a court, so

24   I'm going to stay with that.

1    BY ATTORNEY TRYON:

2       Q.    So how did BPJ come to the attention to Dr.

3    Someshwar?

4       A.    It is my understanding that Dr. Someshwar had

5    provided care to B█████.

6       Q.    Do you know what care?

7       A.    I had seen a note from Dr. Someshwar.

8       Q.    And what did that note say?

9       A.    I can't recall the contents of that note, simply

10   that I do remember seeing one.

11      Q.    Is that in the records that you mentioned before

12   or the Epic records?

13      A.    It would be in the Epic record, yes.

14      Q.    Do you remember when you had your first contact

15   with BPJ and BPJ's family?

16      A.    I know from my records the exact date.  But

17   without I could easily tell you it was in the fall.  I

18   can look at my records to get you the exact date if that

19   would be helpful.

20      Q.    Before we go there, let me ask you if you have a

21   specific recollection of meeting with BPJ and Heather

22   Jackson.

23      A.    I do.

24      Q.    What do you remember right now about that

1  encounter?

2      A.     I have a mental picture of where B████ and her

3  mom were sitting in the exam room.  That's most of the

4  extent of what I recall just from my own memory and not

5  reviewing the note.

6      Q.     Do you have a mental memory of the discussions

7  you had with BPJ and BPJ's mother?

8      A.     That would certainly refresh from my review of

9  my own note but also my practice is to have fairly

10 similar structured conversations with families, and so I

11 have a rough template in my brain of what we would have

12 talked about.

13     Q.     Tell me about that template.

14     A.     It involves asking lots of questions about young

15 people, their interests, their journey with gender

16 identity, their family.  Sometimes I ask about pets.

17 It's a whole host of things to get to know the young

18 person and their family.

19     Q.     What does that term mean journey with gender

20 identity?

21     A.     We are all forever growing and evolving and

22 changing as humans.  It's part of the human experience,

23 but particularly as it relates to gender for my patients

24 that's often a bit of a long journey, and so that may be

 1    starting from when they are young children.  It may be

 2    starting from when they are adolescents.  But

 3    regardless, there is always much to talk about with

 4    regard to a young person's experience of their own

 5    gender identity over time.

 6        Q.    And is that gender identity sometimes fluid?

 7        A.    It absolutely can be.

 8        Q.    Somebody may be for one period of time have a

 9    gender identity as one gender and then that can change?

10        A.    Yes.

11                ATTORNEY HARTNETT:  Object to form.

12    BY ATTORNEY TRYON:

13        Q.    How many genders are there?

14        A.    There are more genders than we understand, can

15    conceptualize or can count.

16        Q.    So over a hundred?

17        A.    Gender is a spectrum.  There is no solid number.

18    It's someone's lived experience.  It's much more

19    complicated than we try to make it by binarizing people.

20        Q.    So setting aside binder --- how do you say that,

21    binderizing?

22        A.    Binarizing people.  Forcing folks into a binary.

23        Q.    I've read some place there's 27 genders.  Would

24    you agree with that or not?

SARGENT'S COURT REPORTING SERVICE, INC.
(814) 536-8908

1              ATTORNEY HARTNETT:  Object to the form.

2              THE WITNESS:  I'm certainly not familiar

3    with that particular study, but I would dispute it as I

4    could probably list more than 27 myself.

5    BY ATTORNEY TRYON:

6       Q.    And when someone is gender fluid what does that

7    mean?

8       A.    It depends on the individual, and so these terms

9    tend to be applied to folks but what matters to me is

10   the individual's definition of themselves.

11      Q.    Have you had any --- well, let me move on to

12   Exhibit 16.

13             ATTORNEY TRYON:  And let me try to bring

14   this up.  This is going to be a first for me on doing

15   this on the system.

16             VIDEOGRAPHER:  And I'm here if you need

17   some help or I can pull it up as well.

18             ATTORNEY TRYON:  So Jacob, when I pull up

19   exhibits file sharing, it wants me to enter a password.

20             VIDEOGRAPHER:  Did you join with a new

21   link when you rejoined after we got everything fixed?

22             ATTORNEY TRYON:  I attempted to join with

23   the same link.

24             VIDEOGRAPHER:  I can set that new one or

SARGENT'S COURT REPORTING SERVICE, INC.
(814) 536-8908

```
 1   I can just pull it up for you, either/or.
 2                   ATTORNEY TRYON:  Why don't you do that.
 3   Can you pull up Exhibit 16, please?
 4                   VIDEOGRAPHER:  Yes, just give me one
 5   second.
 6                   ATTORNEY TRYON:  No, I had uploaded.
 7   Maybe you can't access them.  I had uploaded three
 8   documents.  One was Exhibit 16 just so we would only
 9   have to look at that one.
10                   VIDEOGRAPHER:  Got you.  If you have them
11   uploaded, then I would not have access to them unless
12   you share them as host and share them with me.
13                   ATTORNEY TRYON:  Let me see if I can do
14   this.
15                   VIDEOGRAPHER:  Also, when you upload if
16   you check mark any of the boxes --- like if you check
17   mark like Defendant's Counsel, they would also all have
18   access to that as well.
19                   ATTORNEY TRYON:  Well, it's now rejecting
20   my password.
21                   VIDEOGRAPHER:  It might be since it's a
22   probably a different link that you joined the meeting
23   with you might have to hit the forget password and set
24   up a new one.  That one --- the  old one that you made
```

```
 1   might be tied to the old link.

 2                   ATTORNEY TRYON:  Let's go off the record

 3   for a second so I can get this straightened out.

 4                   VIDEOGRAPHER:  Going off the record.  The

 5   current time reads 11:52.

 6   OFF VIDEOTAPE

 7                              -  -  -

 8   (WHEREUPON, A SHORT BREAK WAS TAKEN.)

 9                              -  -  -

10   ON VIDEOTAPE

11                   VIDEOGRAPHER:  We are back on the record.

12   The current time reads 11:59 a.m.

13   BY ATTORNEY TRYON:

14      Q.    Dr. Kidd, this is what we've marked as Exhibit

15   16.  Do you recognize this?

16      A.    I'm not able to read any of it due to size.

17      Q.    Okay.

18            I'm trying to blow it up.  Does that help?

19      A.    I have not seen it change.  I may be able to do

20   --- I can do it on my end specifically.  Let me do that.

21   I can only see the first page so far, but this does look

22   familiar, yes.

23      Q.    I believe you can click the different pages, 1

24   through 9.
```

1      A.     I see that now.  Yes.  This looks like my note.

2      Q.     Do you have a hard copy of that in front of you

3  as well?

4      A.     I do.

5      Q.     Feel free to use either one, just to go through

6  this.

7      A.     Yes.

8      Q.     So my first question is simply what is this

9  document?

10      A.     So certainly there are pages associated with

11  this packet that I'm not familiar with.  I think they

12  are part from the pull from the health system.  But

13  specifically as it relates to the section that begins

14  B███  is a 11-year-old patient, that is the beginning of

15  my clinical note from our patient visit.

16      Q.     How is the information in here populated into

17  this document?

18      A.     The note itself?

19      Q.     Well, everything in here.  I'm just trying to

20  understand how this document is created.

21      A.     I can't speak to the ancillary information

22  outside of my patient note.  I can tell you how my note

23  was created.

24      Q.     Well, let's start with that then.

1    A.    Okay.

2         I use a note template that has spaces for me to

3    fill in information, as well as some information that is

4    already populated that I can adjust accordingly.

5    Q.    Is that note template in Epic?

6    A.    It is.

7    Q.    And then Epic takes that information and would

8    populate it into a document that looks like what we have

9    before us?

10   A.    Specifically the section that begins B███ is an

11   11-year-old patient, yes.

12   Q.    The other information in here, for example, the

13   visit date, the name, those sorts of things, do you know

14   how those are populated into this document?

15   A.    So let me --- I don't know that you can see

16   where I am in the document, but this portion here that

17   has the WVU Medicine Children's logo, I think it copied

18   poorly.  But from this section down, this is my note

19   template.  Above that ---.

20   Q.    I cannot see where you're at.

21             ATTORNEY TRYON:  Jacob, can you enable

22   her to show that?

23             ATTORNEY LINKOUS:  Jacob, you're on mute.

24             VIDEOGRAPHER:  I have you enabled to mark

SARGENT'S COURT REPORTING SERVICE, INC.
(814) 536-8908

```
 1    up the document.  You should be able to put in

 2    highlights or drag us around.  Whatever you do we should

 3    see.

 4                    THE WITNESS:  Okay.

 5                    VIDEOGRAPHER:  If you highlighted that

 6    right there, that's --- I see the highlight.  Does

 7    everyone else see that highlight?

 8                    ATTORNEY TRYON:  No, I can't see it.

 9                    VIDEOGRAPHER:  On page three, around the

10    it looks like the logo.

11                    ATTORNEY LINKOUS:  I see it.

12                    ATTORNEY HARTNETT:  This is Kathleen

13    Hartnett.  Just to make sure I'm clear, is the witness

14    able to move the exhibit in the window but the others

15    who see it cannot?

16                    VIDEOGRAPHER:  Right now I have the

17    witness set to move it.  I can give anybody permission

18    to alter it and move it around and stuff.  And it does

19    that for everybody.  So right now I just have the

20    witness with the permission for that.  Does that make

21    sense?

22                    ATTORNEY TYRON:  Yes.

23                    ATTORNEY HARTNETT:  Yes.

24                    ATTORNEY TYRON:  Yes.
```

```
 1   BY ATTORNEY TRYON:

 2      Q.    Is it highlighted in color?

 3      A.    It is yellow.

 4            ATTORNEY LINKOUS:  Mr. Tryon, she is also

 5   on BPJ099.  I don't know if you're on that same page or

 6   not.  I think she moved us down to that page.

 7            VIDEOGRAPHER:  Let me try something to

 8   synch it back up for you, Mr. Tryon.

 9            ATTORNEY TRYON:  Okay.

10            VIDEOGRAPHER:  Do you see it now?

11            ATTORNEY TRYON:  I see the document.  I

12   don't see any yellow highlighting.

13   BY ATTORNEY TRYON:

14      Q.    Well, go ahead and describe where you're at.

15      A.    Sure.  There's a logo on one of these pages that

16   has some cookie-cutter people holding hands and it says

17   WV Medicine Children's, although I think the photocopy

18   did not do that logo any justice.  But that is the logo

19   located on the top of my note.  And that logo and

20   everything beneath it is part of my note template.  I am

21   not familiar with how Epic aggregates the additional

22   information in this packet.

23      Q.    Okay.

24            Do you know who enters in the information, for
```

1    example, the date of birth and the visit date?

2        A.    That information is likely entered at the time

3    of the visit being scheduled, although that is not part

4    of my role and so I cannot be certain.

5        Q.    At the very top of that page, I think it's the

6    same page, do you see it's got a number --- MRN number.

7    Is that the patient's number that's assigned?

8        A.    I have an E number on my screen that's below the

9    date of the visit encounter.  That is in my note

10   template.  That is the patient's medical record number,

11   that E number.

12       Q.    So I'm seeing MRN: E2003446?

13       A.    Yes.  And I know that you're having trouble

14   seeing my highlighting, and I don't know if you can see

15   that piece.  I pulled that number into my notes.  I'm

16   not sure where you're referring to it, but that is the

17   number.

18       Q.    Right at the top, I'm looking at the very top of

19   this page, page --- it's labeled BPJ099, and it's page

20   one.

21       A.    I can see it here.

22       Q.    Yes.  Now I see you're highlighting, although

23   it's not yellow.  Okay.  So then if you move over to the

24   right and it says sex M.  Does that stand for male?

1     A.     It does.

2     Q.     And who would input that that BPJ's sex is male?

3     A.     I cannot speak with certainty, but my guess

4  would be the person who collected the insurance

5  information.

6     Q.     And why would --- if BPJ identifies as a female,

7  as I think you say later on, why would that be put there

8  as male?

9     A.     The sex marker has to line up with the insurance

10  for the purposes of billing in the medical system.

11     Q.     Is that the only reason?

12     A.     That's the reason that I'm familiar with.

13     Q.     So you did not put that information in there?

14     A.     I did not.

15     Q.     If you can scroll down where it says desired to

16  be treated as other gender.

17     A.     Sure.

18     Q.     It shows the name pronouns of she and her.

19            Right?

20     A.     Yes.

21     Q.     And if I scroll down further I look at and I see

22  under gender dysphoria patient describes this experience

23  for themselves as --- why do you use a different pronoun

24  down there?

```
 1      A.     That's part of my standard note template.   The
 2  things before the colons in these sections are part of a
 3  note template.
 4      Q.     Okay.
 5             Then back up to desire to be rid of secondary
 6  sex characteristics.  It says expectations for today's
 7  visit.   That's part of the template?
 8      A.     It is before the colon.
 9      Q.     Right.   And so that template is something that's
10  created by Epic or by someone else?
11      A.     That's a note template that I created within
12  Epic.
13      Q.     I see.   And so it says want to establish care.
14  That seems obvious to me, but can you explain that?
15      A.     This was my first time seeing B██████.   And as
16  part of my first visit with all of my patients I ask,
17  you know, what are their expectations or goals for
18  today's visit.   And when I asked that question, B█████
19  and her mom responded that they wanted to establish care
20  today.   I'm not sure exactly who said that.   I suspect
21  it was mom.
22      Q.     And next it says has ████████████████ since
23  June 2020 placed by Dr. Montano at UPMC.   And you put
24  that in there?
```

```
 1      A.     I did.

 2      Q.     And how did you know about that ████████?

 3      A.     I suspect that mom told me.  That information

 4   was provided to me during this visit.  But also it was

 5   in the medical record that I would have briefly reviewed

 6   prior to this visit.

 7      Q.     What medical record is that?

 8      A.     The notes that are available for me in Epic.

 9      Q.     So you're telling me that in Epic there would be

10   some notes that stated that there was an ██████, a

11   ██████████████? 

12      A.     I believe Dr. Someshwar's note referred to it,

13   yes.

14      Q.     Did you ever ask Dr. Montano if he had placed

15   that ██████?

16      A.     I don't recall specifically asking Dr. Montano

17   if he placed the ██████, no.

18      Q.     Did you do anything to confirm that the ██████

19   was in place?

20      A.     I examined B████'s arm.  I palpated the ████████.

21   I noted the small scar at the insertion site.  I also

22   confirmed it based on lab testing.

23      Q.     Next, under desire to gain secondary sex

24   characteristics of other gender, slash --- other gender,
```

 1  colon, that was part of the form?

 2     A.    That was part of my note template, yes.

 3     Q.    And you created that?

 4     A.    I did.  I should note it's based off of a

 5  template from those that taught me.

 6     Q.    Which would be whom?

 7     A.    Dr. Montano.

 8     Q.    Under there it has --- under severity, wanting

 9  to be other gender, other gender is based on the

10  following, hair style and clothing and desire for

11  hormone therapy, which you created that template.

12         Right.

13     A.    Yes, everything before the colon.

14     Q.    And you inputted feminine, feminine in the

15  future.

16         Right?

17     A.    I did, based on our conversation during this

18  visit.

19     Q.    Are those the things upon which you made a

20  determination --- strike that.

21         Did you make a determination that B████ was

22  gender dysphoric?

23     A.    If you review the criteria for diagnosis for

24  gender dysphoria it's that essentially insistent,

1    persistent, consistent, incongruence associated with

2    significant distress, as I discussed earlier, plus two

3    or more of a list of criteria.  This note outlines those

4    criteria.  And so based on the responses to questions

5    that I asked in relation to my documentation here, yes,

6    B███  does meet the diagnostic criteria for gender

7    dysphoria.

8         Q.    Did you actually make a diagnosis?

9         A.    B███   already had that diagnosis prior to seeing

10   me.

11        Q.    And that was --- who made that diagnosis?

12        A.    I suspect the first person was Dr. Montano,

13   although I don't know that for sure.

14        Q.    And who told you that she already --- that BPJ

15   already had such a diagnosis?

16        A.    The medical record.

17        Q.    And that medical record which was from Dr.

18   Someshwar?

19        A.    And Doctor Someshwar would have had one of those

20   notes, yes.

21        Q.    Any other notes that would have said that?

22        A.    Likely notes from B███ 's therapist.

23        Q.    And you have access to B███ 's therapist's ---

24   excuse me, BPJ's therapist --- let me start that over.

1    You had information from BPJ's therapist?

2        A.    I had documentation.

3                    ATTORNEY HARTNETT:   Object to form.

4                    THE WITNESS:   Of her record.

5    BY ATTORNEY TRYON:

6        Q.    Is that also on Epic?

7        A.    Yes.

8        Q.    So I want to go back to this part where it says

9    desire to gain secondary sex characteristics.  So are

10   hairstyle and clothing the only bases to determine if

11   someone is gender dysphoric?

12                   ATTORNEY HARTNETT:   Object to form.

13                   THE WITNESS:   No.

14   BY ATTORNEY TRYON:

15       Q.    What other?

16       A.    Potential criteria, potential things that we

17   look for.  There's no one single criterion.

18       Q.    But those are the only things that are listed in

19   this form.

20             Right?

21                   ATTORNEY HARTNETT:   Object to form.

22                   THE WITNESS:   In that particular section.

23   BY ATTORNEY TRYON:

24       Q.    And desire for hormone therapy in the future.

```
 1    What additional hormone therapy was desired?
 2        A.    Estrogen.
 3        Q.    And were you told why?
 4        A.    I can't recall our exact conversation, but it is
 5    my typical practice to have pretty detailed
 6    conversations about where a young person is in their
 7    chem thought process and understanding of what estrogen
 8    could mean for them.
 9        Q.    And what could it mean for them?
10        A.    It could meaning gaining secondary sex
11    characteristics of the other gender.
12        Q.    Such as?
13        A.    Breast growth.
14        Q.    Any others?
15        A.    Several others.
16        Q.    What are those?
17        A.    Thinning of hair follicles, softening of skin.
18    Those are the primary.
19        Q.    I'm sorry.  What did you say about hair
20    follicles?
21        A.    Thinning, making the hair follicles less
22    apparent on the body especially.
23        Q.    And do you recall discussing those with BPJ and
24    BPJ's mother?
```

```
1      A.    I can't recall the specifics of that encounter,

2  but is my standard practice to have those discussions.

3      Q.    Up at the top of that page, do you see at the

4  very top where it says P██████-J██████, comma, and it's

5  blocked out?

6      A.    Yes.

7      Q.    So --- let me back up.  This document was

8  produced to Plaintiff's Counsel then gave it to us.

9  Were you involved in that production to Plaintiff's

10 Counsel?

11     A.    I was not.

12     Q.    Okay.

13           Let me move on to the next page.  And let me

14 ask you, during this conversation was BPJ joined by

15 Heather the entire time?

16     A.    It is my standard practice to talk to young

17 people alone for at least a portion of their visit, and

18 so I suspect I did that during this visit.

19     Q.    Do you recall during this visit anyone other

20 than you were involved as far as healthcare providers?

21     A.    It is often that I have trainees with me, most

22 often in the role of shadows to witness how I talk to

23 patients, how I gather this information, that sort of

24 thing, how I provide care.  I do not recall having a
```

```
 1   trainee with me that day, but my memory could be

 2   mistaken there.

 3       Q.    And in your memory was anyone else from WVU in

 4   that meeting?

 5       A.    From WV Medicine?

 6       Q.    Yes.

 7       A.    I don't think so because I know that the other

 8   members of my multidisciplinary team were not a part of

 9   this conversation as B███ was already established with

10   a mental health therapist.

11       Q.    Under past medical history --- and I'm now on

12   page two of this document, it shows mental health HX.

13   What is that?  What does HX stand for?

14       A.    It's a common medical abbreviation for the word

15   history.

16       Q.    In this past medical history that you have put

17   here, the source is --- what was the source?

18       A.    This source was very likely B███'s mother.

19       Q.    Under social history do you see that?

20       A.    I do.

21       Q.    Is there anything in there that affects or would

22   affect a determination or a diagnosis of BPJ having

23   gender dysphoria?

24       A.    These items in the social history are really
```

 1    about getting to know B███  and her family dynamic and

 2    more about her generally.  These are not directly

 3    related to her gender identity.

 4        Q.    And let me just confirm up at the top of the

 5    page it says --- it shows the date being 9/16/2021.  Was

 6    that the date of the visit?

 7        A.    To the best of my recollection, yes.

 8        Q.    On the next page it shows patient active problem

 9    list.  Do you see that?

10        A.    I do.

11        Q.    And what --- it says WCC well check.  Is that

12    something that you inputted?

13        A.    It is not.  So this is a problem list that is

14    maintained in Epic usually by the patient's primary care

15    provider.

16        Q.    Who is this patient's primary care provider?

17        A.    I do not recall.

18        Q.    Is there anything on this form that would tell

19    you?

20        A.    On this particular form, no, although in the

21    Epic record that would likely be noted, at least to the

22    extent of my note.  It is not written in my notes.  It

23    may have been in some of these ancillary pages that I'm

24    not as familiar with.

1    Q.    During the visit did you discuss any of these

2    items under the diagnosis --- well, excuse me, under the

3    patient active problem list?

4    A.    Not to my recollection, no.

5    Q.    I'm sorry.  Let me finish my question.  The six

6    bullet points that are listed there, you did not input

7    any of those?

8    A.    That is correct.

9    Q.    And you didn't discuss any of those with BPJ or

10   BPJ's mother?

11   A.    Not to my recollection, no.

12   Q.    Now, the next paragraph of notes, was that

13   something that you inputted?

14   A.    It is.

15   Q.    And you ordered labs to confirm that the ███ was

16   likely to release medication.  Do I understand that

17   correctly?

18   A.    I ordered labs to confirm that the ███ was

19   continuing to release the medication, as I suspected it

20   would be, yes.

21   Q.    Why do you do that?

22   A.    It's routine and to make sure that the ███ is

23   functioning as we expect it to.  And for my practice I

24   usually check those labs every 6 to 12 months.

SARGENT'S COURT REPORTING SERVICE, INC.
(814) 536-8908

1    Q.    How is the ███ supposed to function?

2    A.    So the ███ has a medication called ████████.

3    ████████ is a gonadotropin-releasing hormone agonist,

4    or abbreviated a GRNHA.  A GRNHA works at the level of a

5    hypervolemic pituitary gonadal access to suppress that

6    access and subsequent release of sex hormones, either

7    testosterone or estrogen, depending on the sex assigned

8    at birth.

9    Q.    Is it the same medication for both to stop

10   either testosterone or estrogen or is it different?

11   A.    It is the same medication.  It works in the same

12   way.

13   Q.    And did you also discuss that a ███ scan be

14   done?

15   A.    I had a discussion with B███ and her mother

16   about why I thought a ███ scan could be helpful and

17   they opted to get one.

18   Q.    It says I shared resources with mom to connect

19   her to local parents support programs.  Who were those

20   resources?

21   A.    I am connected to community organizations run by

22   parents wherein parents can talk with other parents of

23   gender diverse people.  My abbreviation for the program

24   I referred B███'s mom to is, in fact, next to B███'s

```
 1   mom's email.  It's abbreviated POT for the Parent
 2   Outreach Program.
 3       Q.    At the bottom it says on the day of the
 4   encounter a total of 60 minutes was spent on this
 5   patient encounter, including review of historical
 6   information, examination, documentation of post
 7   activities.  And my question is what was the historical
 8   information?
 9       A.    That would have been the conversation with B▓▓▓
10   and her mom talking about the medical history as well as
11   my pre-review of the chart prior to this visit.
12       Q.    And then the examination, what would that
13   entail?
14       A.    For B▓▓▓, to my memory, that included making
15   sure that B▓▓▓'s heart and lungs sounded normal and
16   generally evaluating how she was able to communicate,
17   how she moved about the room, those sorts of things are
18   the aspects of my physical exam.
19       Q.    And when it refers to documentation, what is
20   that referring to?
21       A.    The actual writing of this note.
22       Q.    Anything that is not in this note?
23       A.    It would have also involved me ordering the labs
24   and the ▓▓▓ scan, writing why I was ordering the ▓▓▓
```

SARGENT'S COURT REPORTING SERVICE, INC.
(814) 536-8908

 1    scan, things of that nature.

 2       Q.    And what would the post visit activities refer

 3    to?

 4       A.    That could be things like reviewing the labs if

 5    they came back the same day.  This is a billing

 6    statement and only includes the time spent during that

 7    same day.

 8              ATTORNEY LINKOUS:  I'm sorry.  Can you

 9    repeat that?

10              THE WITNESS:  It is a billing statement

11    and so it is referring to activities that were

12    undertaken on that day.

13    BY ATTORNEY TRYON:

14       Q.    In your discussion with BPJ and BPJ's mother was

15    there any indication that BPJ had ever had any suicidal

16    ideations, suicide plans, threats or attempts?

17       A.    Not to my recollection.

18       Q.    Did you ask?

19       A.    I likely did.  That is part of my standard

20    practice.

21       Q.    Why do you ask that?

22       A.    Because gender diverse young people like B▇▇▇

23    base health inequities particularly as it relates to

24    mental health, although that's at population level and

1   does not necessarily apply to B████ .

2      Q.    Why wouldn't it apply to B████?

3      A.    That's a population statistic, and so B████ is

4   her own person and may or may not be in line population

5   statistics more promptly.

6      Q.    And now I understand.  Do you know if BPJ has

7   ever been hospitalized for anything?

8      A.    I reviewed the chart and don't recall a specific

9   example of hospitalization.  I think there may have been

10  notes from emergency sorts of visits, but I don't

11  remember an inpatient hospitalization.

12     Q.    Before this visit had BPJ ever been diagnosed

13  with any mental or emotional illnesses?

14                 ATTORNEY HARTNETT:  Object to form.

15                 THE WITNESS:  Mom specifically mentioned

16  gender dysphoria, which is a diagnosis within the DSM-V,

17  which is a diagnostic and statistical manual and so I

18  suppose that could count.

19  BY ATTORNEY TRYON:

20     Q.    Well, is that a mental or emotional illness?

21                 ATTORNEY HARTNETT:  Object to form.

22                 THE WITNESS:  It depends on your

23  interpretation.  It is a diagnosis in the DSM-V.

24  BY ATTORNEY TRYON:

1    Q.    Okay.

2          It is a diagnosis.  Is it a diagnosis of mental

3    illness?

4                    ATTORNEY HARTNETT:  Objection to form.

5                    THE WITNESS:  That is a very challenging

6    question, and so the short answer is gender dysphoria is

7    significant distress, and it is that distress that can

8    be considered a mental health concern.  Being gender

9    diverse or transgender is not a pathology.

10   BY ATTORNEY TRYON:

11   Q.    Can you define then for our purposes what you

12   consider --- or based on DSM-V, what is a mental

13   illness?

14                   ATTORNEY HARTNETT:  Object to form.

15                   THE WITNESS:  Can you rephrase the

16   question?

17   BY ATTORNEY TRYON:

18   Q.    Yes.  So you referred to the DSM-V.

19         Right?

20   A.    I mentioned it, yes.

21   Q.    Does that define what a mental illness is?

22   A.    The DSM-V is the diagnostic and statistical

23   manual of essentially all of the things that the

24   American Psychiatric Association considers in their

SARGENT'S COURT REPORTING SERVICE, INC.
(814) 536-8908

```
 1   wheelhouse for diagnoses.  And so things like depression

 2   and anxiety are certainly in there but also things like

 3   gender dysphoria.

 4        Q.    Does it define the term mental illness?

 5        A.    I can't recall.  It's a very broad term.

 6        Q.    Other than gender dysphoria, were there any

 7   other mental or emotional issues or problems that you

 8   were aware that BPJ had been diagnosed with?

 9        A.    Not that I can ---.

10                    ATTORNEY HARTNETT:  Object to the form.

11                    ATTORNEY TRYON:  Jacob, can you pull up

12   Exhibit 33, please?  Actually, I take that back.  Let's

13   stick with this exhibit a little bit longer.

14                    VIDEOGRAPHER:  You got it.

15                    ATTORNEY TRYON:  I apologize for that.

16   BY ATTORNEY TRYON:

17        Q.    So turning to page six of this exhibit?

18        A.    I'm unable to do that on my end.

19        Q.    I can.

20        A.    I can now, yeah.

21        Q.    Okay.

22              If you can go down to where it shows --- sorry,

23   it would be on actually page eight, eight of nine, I

24   believe.  And this was part of the testing that you
```

 1    would have requested.

 2            Is that right?

 3       A.    This is one of those forms that Epic has

 4    compiled for you, but it does look like it is of the

 5    labs that I ordered, yes.

 6       Q.    When this came back did you review it?

 7       A.    I did.

 8       Q.    And it shows under components testosterone total

 9    serum.  Do you see that?

10       A.    Let me highlight and make sure we're looking at

11    the same thing.  Here?

12       Q.    Yes.

13       A.    Yes.

14       Q.    And if you go lower it shows the total serum and

15    it shows value of less than 7.0.

16            Right?

17       A.    Yes.

18       Q.    And down below it shows the Tanner reference

19    stages and for prepubertal, 7-20 for Stage 1.

20            Right?

21       A.    I can see that.

22       Q.    So does that testosterone level indicate that

23    BPJ was at Tanner Stage 1?

24       A.    No, that is not a correct interpretation.

1      Q.     Could you please interpret it for me?

2      A.     Sure.  So the testosterone level demonstrates

3   that it is suppressed, actually below a detectable

4   threshold of 7.0 for the purposes of this lab.  It is

5   important to note that all bodies, unless they are too

6   young or being blocked, make testosterone and that

7   includes people who are assigned female.  And so I

8   myself right now very likely, in fact I'm extremely

9   confident, have a level much higher than seven of

10   testosterone because that is normal for an adult female.

11   And so B████'s testosterone based on this level is fully

12   suppressed.  The reason that the Tanner stage reference

13   guidelines are in this record is that other folks use

14   this lab to monitor pubertal progression.  B████ was

15   Tanner stage prior to the rod and was at Tanner 2 at

16   that time.  And so this table is not relevant to B████,

17   just a refresh in the lab that her testosterone is fully

18   suppressed.

19                    ATTORNEY TRYON:  Okay.

20                    Now let's turn to Exhibit 33.

21                    VIDEOGRAPHER:  Before I show it, you said

22   33.

23                    ATTORNEY TRYON:  I didn't hear you.

24                    VIDEOGRAPHER:  Before I show it, you said

```
 1   33.

 2                   Correct?

 3                   ATTORNEY TRYON:  Right.  I sent you two

 4   other forms.

 5                   VIDEOGRAPHER:  I just wanted to make sure

 6   before I showed it.

 7                   ATTORNEY TRYON:  Yes.

 8                   VIDEOGRAPHER:  And does everybody see

 9   that.

10                   THE WITNESS:  Yes.

11                   ATTORNEY TRYON:  I do.

12   BY ATTORNEY TRYON:

13     Q.   Great.  So if we could go forward into page 11.

14   Sorry, it's going to be page 11 of the document itself,

15   so it looks like that will be page --- I'm not sure.

16          And Dr. Kidd, if you have the hard copy it might

17   be easier to read.  It depends on which one you want to

18   look at.  So the first two sentences of this read

19   through --- actually maybe the first three sentences.

20   Why don't you go ahead and read them to yourself.  We

21   don't need to read them out loud.

22                   VIDEOGRAPHER:  While she's reading that,

23   Mr. Tryon, I also gave you permission to mark the

24   document as well if you need to highlight something or
```

1    guide the witness.

2                         ATTORNEY TRYON:  Thank you.

3                         VIDEOGRAPHER:  You're welcome.

4    BY ATTORNEY TRYON:

5        Q.    Have you finished?

6        A.    I have.

7        Q.    Great.  So this indicates that gender dysphoria

8    during childhood is not evidently continued to childhood

9    rather than the dysphoria persists and resulted for only

10   6 to 23 percent of the children.

11             Right?

12                       ATTORNEY HARTNETT:  Object to form.

13                       THE WITNESS:  I believe, which are a bit

14   dated, but yes, that is what it says.

15   BY ATTORNEY TRYON:

16       Q.    Do you think that percentage has changed?

17       A.    I think our understanding of diagnostic

18   criteria, for example many of those studies were from

19   when we used GID, a different diagnostic criteria, that

20   has evolved additional these guidelines from WV are from

21   2012, I believe.  There is a new version that is set to

22   come out in the I think late winter of this coming year

23   that I was involved in giving feedback for.

24       Q.    Yes.  That version has not yet been accepted or

1    issued, has it?

2        A.    Not yet.  It's expected like within the winter.

3        Q.    Assuming that's accepted, since it's still out

4    for comment, but assuming it's accepted, how does it

5    change in the eighth version, how does it change this

6    language?

7        A.    To be clear, it's still not out for comment.

8    The comment period has ended and it's now back with its

9    writing committee.  But there is more space given, to my

10   recollection, for exploring those differences by

11   diagnostic criteria that we did inform this prior

12   studies.  I think it's important, though, to center

13   B███   in this conversation.   B███   is an adolescent,

14   meaning that the second paragraph discussing the

15   likelihood of her gender identity is more relevant.

16       Q.    And under these guidelines what is the

17   percentage of persistence for adolescents?

18       A.    I couldn't cite a specific number because again

19   it's complicated, but it is the majority is my

20   understanding.

21       Q.    So when BPJ originally identified as being a

22   girl, BPJ was a child.

23             Right?

24       A.    I believe social transition was in third grade,

SARGENT'S COURT REPORTING SERVICE, INC.
(814) 536-8908

1    so into adolescence but perhaps not quite there yet

2    depending on your definition of adolescence.

3        Q.    How do you define adolescence?

4        A.    It depends.  The World Health Organization puts

5    numbers on young people, and so I believe they say age

6    10 to 19.  But that's not necessarily reflective of

7    pubertal changes, which is how I would define

8    adolescence.  And it's normal for pubertal changes to

9    begin at age nine.

10       Q.    And for --- well, let me just ask you, so since

11   this is the current and existing guideline and --- or

12   excuse me, standard of care, which you said you

13   subscribe to.

14             Right?

15             ATTORNEY HARTNETT:  Object to form.

16             THE WITNESS:  Well, I think it is

17   important to note if I may in this document.

18   BY ATTORNEY TRYON:

19       Q.    I apologize.  I didn't hear that.

20       A.    It's possible, I would like to point out on

21   page two, page number two on that part of it where it

22   lists the standards of care are flexible clinical

23   guidelines, that's a critical piece of all of this.  And

24   so they are not a kind of rule book but instead a

1  guideline and there are many circumstances to deviate

2  based on an individual patient circumstance.

3      Q.    So you pick and choose what you agree with?

4              ATTORNEY HARTNETT:  Object to form.

5              THE WITNESS:  Not at all.  I follow

6  numerous guidelines, including those from the American

7  Academy of Pediatrics, but I also shape them to fit the

8  needs of the patient.

9  BY ATTORNEY TRYON:

10     Q.    Do you share with BPJ and BPJ's mother the

11  statistics that 6 to 23 percent of children due to

12  dysphoria --- excuse me, that the dysphoria persists

13  into adulthood for only 6 to 23 percent of children?

14  Did you share that with BPJ or BPJ's mother?

15             ATTORNEY HARTNETT:  Object to form.

16             THE WITNESS:  I believe the comment was

17  not relevant to the patient in front of me.

18  BY ATTORNEY TRYON:

19     Q.    Did you share with BPJ or BPJ's mother the fact

20  that not all adolescents persist into adulthood?

21     A.    I create space for people to explore their

22  gender identities.  I do not assume that any of us will

23  wake up tomorrow feeling the way we feel today about our

24  gender identity.

SARGENT'S COURT REPORTING SERVICE, INC.
(814) 536-8908

1    Q.    So the answer is no, you did not share that with

2    them?

3    A.    I create space to have that conversation.

4    Q.    Did you have a discussion in which you told BPJ

5    or BPJ's mother that BPJ's gender dysphoria may not

6    persist into adulthood?

7    A.    I specifically in my practice make space to have

8    conversations about fluidity and gender identity.

9    Q.    That doesn't mean anything to me.  What do you

10   mean create space?

11              ATTORNEY HARTNETT:  Object to form.

12              THE WITNESS:  We have a conversation

13   where I explain to young people that I don't expect them

14   to be the same person every day for the rest of their

15   lives.  And if they feel that circumstances have changed

16   or if their family feels that circumstances have changed

17   the rod that B█████ has is fully reversible and it's

18   always an option to remove that rod if it was in B█████'s

19   best interest, which I did not feel it was at the time

20   of our encounter.

21   BY ATTORNEY TRYON:

22   Q.    Did you tell BPJ or BPJ's mother that gender

23   dysphoria does not always persist for adolescents into

24   adulthood?

SARGENT'S COURT REPORTING SERVICE, INC.
(814) 536-8908

1    A.    I don't think I said that exact thing, no.

2    Q.    As I understand it --- well, let me back up.

3    Did BPJ or BPJ's mother tell you how it came about that

4    BPJ identified as being a girl instead of a boy?

5    A.    I can't remember our exact conversation, but it

6    is my standard practice to ask questions relative to

7    that point and so I suspect, yes, we had that

8    conversation.

9    Q.    You don't remember anything about that

10   conversation relative what I just asked you?

11   A.    Not beyond what is documented in my note.

12   Q.    In your notes it says that patient has

13   identified gender diverse since, and then you inserted

14   around age two.  Does that refresh your recollection at

15   all as far as what happened at around age two?

16   A.    I document what is talked about during the

17   visit, and so yes, that would have been the

18   conversation.

19   Q.    Do you remember anything else about BPJ

20   identifying as a girl around age two?

21               ATTORNEY HARTNETT:  Object to reading

22   from the document that is not before the witness.

23               ATTORNEY TRYON:  She has a hard copy.

24               ATTORNEY HARTNETT:  I don't know where

```
 1    you're reading from.  Can you tell us where you are

 2    reading from?

 3                    ATTORNEY TRYON:  Sure.  It's on page one

 4    of the --- well, it's on page three of the actual

 5    exhibit and page one of Dr. Kidd's office notes.

 6                    ATTORNEY LINKOUS:  It's okay.  I think

 7    Dr. Kidd has her office notes in front of her.  Go

 8    ahead, Doctor.

 9    BY ATTORNEY TRYON:

10       Q.    So I'm just asking when it says patient has

11    identified as gender diverse since and then you inputted

12    around age two, comma, she said she was a girl around

13    age three, does that refresh your recollection about

14    your conversation about how that came about?

15       A.    Somewhat, yes.

16       Q.    Okay.

17             And what do you remember now?

18       A.    Specifically that B███ and her mom more likely

19    in this conversation would have told me that for me to

20    write it down and so likely B███'s mom said that she

21    identified as gender diverse in some capacity, be that a

22    girl or otherwise, but first said she was a girl at age

23    three.  And that's a common differentiation.  It's often

24    children exhibit behaviors and interests that are
```

1   gendered in a direction parents may not expect.  And

2   that aligns with that question you had earlier about

3   non-conformity.

4       Q.    Do you remember anything else about that

5   conversation relating to that?

6       A.    Well, my next line is that third grade was when

7   she started to wear girl clothes comfortably.  I think I

8   had a typo there.  I meant to write comfortably instead

9   of comfortable.  And that social transition was the

10  summer before third grade.

11      Q.    And you have no other recollection about the

12  conversation?

13      A.    I do not.

14      Q.    Very good.

15              ATTORNEY HARTNETT:  I object to form on

16  the last question.  Sorry.

17  BY ATTORNEY TRYON:

18      Q.    Was the father, Wesley Pepper, in this meeting?

19      A.    No.  My appointment with B███    was with B███

20  and her mom.

21      Q.    Did you ever talk to Wesley Pepper?

22      A.    I have not yet, though I expect to in the

23  future.

24              ATTORNEY TRYON:  Let's take a quick ---

```
 1   off the record for just one moment.

 2                   VIDEOGRAPHER:  We are going off the

 3   record.  The current time reads 12:48 p.m.

 4   OFF VIDEOTAPE

 5                        - - -

 6   (WHEREUPON, A SHORT BREAK WAS TAKEN.)

 7                        - - -

 8   ON VIDEOTAPE

 9                   VIDEOGRAPHER:  We are back on the record.

10   The current time reads 12:48 p.m.

11   BY ATTORNEY TRYON:

12      Q.    So back in Exhibit 33, if we go to what's at the

13   bottom of the page, page 15 of the document itself.  And

14   I have a question for you on paragraph two.  If you can

15   take some time and review that and then I will ask you a

16   question.

17      A.    Beginning with assessment of gender dysphoria?

18      Q.    Correct.

19      A.    Okay.

20      Q.    Are you ready?

21      A.    Yes.

22      Q.    Great.  So the second sentence says a

23   psychodiagnostic and psychiatric assessment covering the

24   areas of emotional functioning, peer and other social
```

1   relationships and intellectual functioning, slash,

2   school achievement should be performed.

3          Did I read that correctly?

4   A.   I believe so.

5   Q.   Do you know if a psychodiagnostic and

6   psychiatric assessment was performed?

7   A.   And so during my visit, portions of that were

8   absolutely performed.  But B████ had those kinds of

9   discussions previously based on my review of the notes

10  and my experience working with Dr. Montano.

11  Q.   So and --- okay.

12         I understand you have had experience with Dr.

13  Montano, but how do you know that those were performed

14  for BPJ specifically?

15  A.   I know Dr. Montano's routine practice because he

16  is one of my teachers and I'm very confident in his

17  skills.

18  Q.   I understand that.  But for BPJ specifically,

19  are you aware if it was done?

20  A.   Based on my review of the chart, I had every

21  indication that --- and I want to quote this, a

22  psychodiagnostic assessment covering areas of emotional

23  functioning, peer and other social relationships and

24  intellectual functioning and school achievement was

```
1    performed.

2        Q.    By whom?

3        A.    By Dr. Montano.

4        Q.    Okay.

5              And there was something in the records that

6    shows that?

7        A.    I was able to see portions of Dr. Montano's

8    note.  It's that Care Everywhere thing we were talking

9    about before, that they're not complete notes.  But

10   based on my understanding of what I was reading, Dr.

11   Montano had the same conversation with B███    that he had

12   with all of the patients that I have witnessed him

13   talking to.

14       Q.    What were in his notes that said that since we

15   don't have those?

16       A.    And so I can't recall exactly what was in his

17   notes, but his notes are templated very similarly to my

18   notes in that they explore things like mental health

19   concerns, like school functioning, like peer support and

20   family support, things of that nature.

21       Q.    And what does --- what's his title or his

22   specialty?

23       A.    So Dr. Montano is the Clinical Director of the

24   Gender and Sexual Development Clinic at the Children's
```

1    Hospital of Pittsburgh.  He is Board Certified in

2    Pediatrics and he is an expert in pediatric gender

3    affirming care.

4        Q.    Is he a psychologist or a psychiatrist?

5                    ATTORNEY HARTNETT:  Object to form.

6                    THE WITNESS:  He is an adolescent

7    medicine specialist.  And adolescent medicine

8    specialists have extensive training and experience in

9    mental health support for young people.

10   BY ATTORNEY TRYON:

11       Q.    Is that a qualification --- does he have

12   qualifications that you don't?

13                   ATTORNEY HARTNETT:  Object to form.

14                   THE WITNESS:  I am not aware.  He may

15   well.  But he certainly had tons of training in the

16   space as have I.

17   BY ATTORNEY TRYON:

18       Q.    Okay.

19             But you are not a psychiatrist or a

20   psychologist.

21             Right?

22       A.    I am neither of those two things.  That is

23   correct.

24       Q.    So when it says psychiatric assessments, what

SARGENT'S COURT REPORTING SERVICE, INC.
(814) 536-8908

1    qualifications do you believe is necessary to do a

2    psychiatric assessment?

3        A.    Someone who has extensive training and

4    background in psychiatric diagnoses like anxiety,

5    depression, and for these purposes gender dysphoria.

6        Q.    And you're asserting you have that

7    qualification?

8        A.    I do have that qualification, yes.

9        Q.    Now, if we wanted these notes out of Epic that

10   you referenced, how would we get those?

11       A.    I honestly am not sure how that system works or

12   the process of you getting those notes works.

13       Q.    Who has control over those?

14              ATTORNEY HARTNETT:  Objection to form.

15              THE WITNESS:  I don't know.

16              ATTORNEY LINKOUS:  Mr. Tryon, I can be of

17   benefit if you would like.

18              ATTORNEY TRYON:  Sure.

19              ATTORNEY LINKOUS:  Health Information

20   Management at West Virginia University Hospitals, Inc.

21   is the owner of the Epic medical records.  I can also

22   send you an address for that.

23              ATTORNEY TRYON:  That would be wonderful

24   if you would do that.

```
 1                    ATTORNEY LINKOUS:  I would be happy to.
 2                    ATTORNEY TRYON:  Can you email that to
 3    me?
 4                    ATTORNEY LINKOUS:  Yes, absolutely.
 5                    ATTORNEY TRYON:  You have either mine
 6    or ---?
 7                    ATTORNEY LINKOUS:  Yes.
 8                    ATTORNEY TRYON:  If not, you have
 9    Curtis'.
10                    Right?
11                    ATTORNEY LINKOUS:  I do, yes.
12                    ATTORNEY TRYON:  That would be wonderful.
13    Thanks.
14                    ATTORNEY HARTNETT:  This is Kathleen
15    Hartnett.  Are you asking for the full Epic records for
16    Dr. Kidd or --- I just was unclear of what records
17    you're asking for.
18                    ATTORNEY TRYON:  Well, I'm a little
19    unclear what exactly there is in Epic, so it's hard for
20    me to ask.  So I guess I would be probably asking for
21    all of the records in Epic for BPJ.
22                    ATTORNEY HARTNETT:  Okay.
23                    Just for the record, as you know, the
24    Plaintiff has requested BPJ's records from WV Medical,
```

```
 1   produced what we have and this Saturday --- and maybe

 2   Mr. Linkous can speak to it further, we produced

 3   additional records that were apparently the printout

 4   that Dr. Kidd was able to see, even though that's not

 5   what the records department produced.  Just for the

 6   record, we produced all records that we received from

 7   WVU Medical, which was in our requests were all records

 8   that exist.

 9                ATTORNEY LINKOUS:  Sure.  And to expedite

10   things, I can certainly --- if counsel agree, I can

11   certainly produce to Kathleen the records I have

12   obtained from WVU, because I represent WVU, obviously,

13   and then Kathleen can redact and send them on.

14                ATTORNEY HARTNETT:  We have done that.

15   Is that the records that you sent this weekend.

16                ATTORNEY LINKOUS:  That is Dr. Kidd's

17   office visit.  I have access to BPJ's records from the

18   health system that go beyond Dr. Kidd's visit.

19                ATTORNEY HARTNETT:  Okay.

20                I mean, obviously whatever you would like

21   to do would be helpful, but I guess for the record to be

22   clear we've asked for and to our knowledge received all

23   documents related to BPJ's treatment by WVU Medical.

24   And that's what we produced to the other parties.  And
```

```
 1   then we understood this weekend that you were able to

 2   --- Dr. Kidd is able to see something different in her

 3   interphase, and so --- which appeared to be largely

 4   additional administrative information, and we produced

 5   that document as soon as we received it from you on

 6   Saturday.

 7                    ATTORNEY LINKOUS:  That's correct.  I can

 8   do it however you would like.

 9                    ATTORNEY TRYON:  So Mr. Linkous, we would

10   like to get the rest of the documents that are in the

11   Epic system that we don't already have.  And we will go

12   over the other documents that I got over the weekend

13   next.  But if there are additional documents in the Epic

14   system, we'd like to obtain those.

15                    ATTORNEY LINKOUS:  Okay.

16                    ATTORNEY HARTNETT:  Just to be clear, are

17   you asking for the --- sorry, the documents from the

18   Epic system from WVU Medical?

19                    ATTORNEY TRYON:  Are you asking me?

20                    ATTORNEY HARTNETT:  Yes, just because I

21   think what the witness has stated is that the Epic

22   system is used by different institutions, and so I think

23   --- I'm just trying to be clear if you are asking Mr.

24   Linkous for the documents from WVU Medical's Epic system
```

```
 1    or you are trying to seek more broadly all of the
 2    documents about BPJ that may be out there in the, you
 3    know, in the Epic systems of other institutions, which
 4    it doesn't sound like he is the person that would be
 5    able to get that for you.
 6                    ATTORNEY TRYON:  Right.  That's my
 7    understanding.  So whatever Mr. Linkous has access to,
 8    including Epic and the Care System, which is part of
 9    Epic.
10                    ATTORNEY LINKOUS:  I only have access to
11    West Virginia University records, and that would include
12    these --- what was the tab called again, Care Everywhere
13    tab.  And I can certainly produce that.  I would prefer
14    to produce that in a link to Kathleen and then let
15    Kathleen look at it.  It may be duplicative of what she
16    already has and then she can produce.
17                    ATTORNEY TRYON:  I will agree to that.
18                    ATTORNEY HARTNETT:  And I will just make
19    a representation for the record that we'll produce it
20    even if it's duplicative just to make clear to the
21    Defendants that we are producing everything we have.
22    And I would expect that those --- any records that were
23    referred to in a different institution have been sought
24    and received from that institution, such as Dr. Montano.
```

1          ATTORNEY LINKOUS:  And just, Mr. Tryon, I

2    want to be completely transparent with you so when you

3    get the records you can understand any distinction or

4    differences that might be in them.  When I get records

5    from West Virginia University I have my nursing staff

6    organize them, Bates stamp them and bookmark them in a

7    PDF document so they're in a format that I typically use

8    for case by case by case.  So for instance, the exhibit

9    you are about to use will have my unique Bates stamp

10   number on it at the bottom center.  I can produce them

11   certainly in that Bates stamped organized, bookmarked

12   fashion to Kathleen or I can produce the native

13   documents as they came to me, however you would like.

14   Does that make sense?

15          ATTORNEY TRYON:  Native, you mean without

16   the Bates stamp?

17          ATTORNEY LINKOUS:  Yes.  So for instance,

18   West Virginia University may end me --- I'm making it up

19   --- a thousand pages of medical records for a patient.

20   I give that to my nursing staff who organizes it by

21   provider, by date, and they bookmark it so you can go to

22   this date, this date, this date, this lab result, this

23   admission, this ER, this pediatrician and you can

24   navigate the records quickly.  So I have my nursing

 1   staff do that for me.

 2                    ATTORNEY TRYON:  That's great.

 3                    ATTORNEY LINKOUS:  I can produce that if

 4   you'd like.  That way there's a Bates stamp and it shows

 5   you every one through how many ever there are.

 6                    ATTORNEY TRYON:  That's fantastic.  I

 7   appreciate it.

 8                    ATTORNEY LINKOUS:  Sure.

 9                    ATTORNEY TRYON:  So I would like to now

10   turn to Exhibit 35.  If you could pull that up, Jacob.

11                    VIDEOGRAPHER:  Can you see that?

12                    ATTORNEY TRYON:  Yes.

13                    ATTORNEY TYRON:  Yes.

14                    VIDEOGRAPHER:  And again, the witness and

15   Mr. Tryon, you have permission to move to pages,

16   highlight that, et cetera.

17                    ATTORNEY TRYON:  Thank you.

18   BY ATTORNEY TRYON:

19      Q.    So Dr. Kidd, my first question simply, do you

20   recognize this document?

21      A.    I recognize that it is a face sheet, and I think

22   this may have been part of the packet that I was sent.

23                    ATTORNEY HARTNETT:  Could I ask for the

24   record what --- we can only see one page at a time and I

```
 1   don't have this exhibit.  So I'd be happy to pull the
 2   document that Mr. Linkous gave us and that we produced
 3   to you, but what Bates numbers are on this document?
 4              ATTORNEY TRYON:  Sure.  They got cut off
 5   because the Bates number is so close to the bottom that
 6   when I printed it out ---.
 7              VIDEOGRAPHER:  And Attorney Hartnett, I
 8   did submit this document, which basically means it is
 9   now shared with everybody.  If you go to the top and
10   click on files, then that --- exhibit file sharing, you
11   should be able to see it off to the right.
12              ATTORNEY HARTNETT:  I do.
13              VIDEOGRAPHER:  And you should be able to
14   download that yourself.
15              ATTORNEY HARTNETT:  Appreciate it.  Thank
16   you.
17              VIDEOGRAPHER:  You're welcome.
18              ATTORNEY TRYON:  And Mr. Linkous' Bates
19   numbers are 101103 through 101137.
20              ATTORNEY HARTNETT:  And these were, just
21   for the record, the documents that we produced on
22   Saturday from Mr. Linkous with Bates BPJ 02510 to BPJ
23   02545.
24   BY ATTORNEY TRYON:
```

1    Q.    Okay.

2          Dr. Kidd, I'm not sure I understood your

3    answer.  What do you understand this document to be?

4    A.    I just scrolled through it and it looks like

5    some supportive documentation around my note.

6    Q.    Would there be any information in this document

7    that's not in Exhibit 16?

8    A.    Is Exhibit 16 the document we reviewed

9    previously.

10   Q.    Yes, it is the --- it's your notes and the lab

11   information.

12   A.    I can't speak to the nuance in this ancillary

13   documentation.  I'm sure that there is information on

14   the face sheet if it was not present in the prior

15   packet, Exhibit 16, but my notes should be the same in

16   both packets.

17   Q.    Now, there are places where there have been

18   redactions of names.

19         Do you see that?

20   A.    Are you referring to --- let me use my

21   highlighter again.

22   Q.    On the very first page that you look at there

23   are three places where information is blocked out, which

24   yeah, you've highlighted it.

1    A.    Yes, I can see that.

2    Q.    Did you have any involvement in that --- in

3    blocking that out or redacting it?

4    A.    No, no, I did not.

5              ATTORNEY HARTNETT:  For the record,

6    Plaintiff produced these to you with that information

7    redacted at the request of Mr. Linkous.

8    BY ATTORNEY TRYON:

9    Q.    On the second page of this exhibit, if you can

10   go there, under the organs inventory, none of that is

11   filled out.  Is there a reason for that?

12   A.    So this is a form that is optional to complete

13   in Epic and is not part of my standard practice for

14   adolescents.

15   Q.    So underneath admission diagnosis, slash, and

16   reasons for visits, do you see that?

17   A.    I do not --- oh, down here at the bottom, yes, I

18   see that now.

19   Q.    What is ICD-10-CM?

20   A.    That is the system that we use for billing codes

21   ICD-10 specifically, I'm not sure what the -CM refers

22   to.

23   Q.    And under it, it says long-term, parentheses,

24   current, closed paren, use of other agents affecting

SARGENT'S COURT REPORTING SERVICE, INC.
(814) 536-8908

1    estrogen receptors and estrogen levels.  And that's

2    under the admission diagnosis and reason for visit.  So

3    tell me what that means.

4        A.    I have to assume because I myself did not enter

5    in that code I believe that that is an umbrella code

6    that the code I actually entered falls under.  But

7    again, I can't be positive about that.  The code I would

8    have ---.

9        Q.    Go ahead.

10       A.    The code I would have entered was likely

11   something along the lines of long-term use of a

12   gonadotropin-releasing hormone agonist or GRNHA.

13       Q.    And is that a diagnosis or reason for visit?

14       A.    So that is a reason to get the labs and the ███

15   scan that I subsequently ordered.  And so when you order

16   labs or imaging you have to tell insurance why it is

17   medically relevant.  And so that is the purpose of that

18   code.

19       Q.    During your visit with BPJ and BPJ's mother, did

20   you actually make any diagnoses?

21              ATTORNEY HARTNETT:  Objection to form.

22              THE WITNESS:  To my recollection, no new

23   diagnoses that had not already been made.

24   BY ATTORNEY TRYON:

1    Q.    On the fourth page, which at the bottom center

2  is 101 to 106, do you see --- let's see.  I'm blowing it

3  up on my screen.  Does it get any larger on yours?

4    A.    No, but I have it zoomed in on mine.

5              VIDEOGRAPHER:  Mr. Tryon, if you

6  highlight or write with the pencil tool, that will share

7  it with everybody.  But the zoom feature --- or the

8  zooming is specific to each person.  So each person can

9  zoom in on the page that whatever their preference is.

10  BY ATTORNEY TRYON:

11    Q.    Okay.

12          So I tried to highlight this one part that says

13  it says gender dysphoria.  Did it highlight on your

14  screen?

15    A.    Where patient describes this experience for

16  themselves as?

17    Q.    Yes.

18    A.    Yes.

19    Q.    So before the colon that's part of the form.

20          Is that right?

21    A.    That's correct.

22    Q.    And then the rest of that language you added?

23    A.    That language came from B█████  and I typed it in

24  to this note.

```
 1      Q.     Do you remember any more about the conversation
 2   with BPJ about those words?
 3      A.     I can't speak more to what other words were
 4   said, but I try to write these as directly as the young
 5   person provides them to me, and I didn't make any
 6   additional notation.  I make additional notation if the
 7   young person's experience is unexpected or different
 8   from my experience in working with gender diverse young
 9   people.  And so in my practice this would suggest that
10   this was what B███ said and that her experience she
11   described was very similar to other young people that I
12   have cared for.
13      Q.     What does it mean angel, slash, devil on
14   shoulder kind of feeling?
15      A.     To my recollection, B███ kind of described that
16   what you often see depicted in media, that there were
17   kind of parts of who she was that were in conflict.  And
18   my interpretation based on my memory was that those
19   parts of her were her gender identity and what society
20   kind of expects of her because of her sex assignment.
21   That's that distress that is associated with the gender
22   dysphoria diagnostic code.
23      Q.     What did society expect from BPJ?
24      A.     Typically when babies are assigned male at birth
```

```
 1   we expect them to identify as boys and eventually men

 2   and to live their lives as such.

 3       Q.     Do you remember anything specifically about BPJ,

 4   though, about what BPJ thought society expected of BPJ?

 5       A.     I can't recall specifically if B▮▮▮▮▮ spoke to

 6   that.

 7       Q.     What does society expect of boys and men?

 8                   ATTORNEY HARTNETT:  Object to form.

 9                   THE WITNESS:  Can you restate that

10   question?

11   BY ATTORNEY TRYON:

12       Q.     Well, I'm just going back to what you said, you

13   said society expects certain things of boys and I think

14   you used the terminology of those that are assigned male

15   at birth and they expect certain things of boys and

16   certain things when they grow up to be men.

17       A.     Society.

18                   ATTORNEY HARTNETT:  Object to form.

19                   THE WITNESS:  To be very clear on this,

20   society expects --- in my experience if someone is

21   assigned male that they identify as male, simply put.

22   BY ATTORNEY TRYON:

23       Q.     Okay.

24                   Well, what specifically does society expect of
```

```
 1   men?

 2                    ATTORNEY HARTNETT:  Object to form.

 3                    THE WITNESS:  Can you rephrase that?

 4   BY ATTORNEY TRYON:

 5      Q.    Well, you're telling me that society expects

 6   certain things of boys and men.  I want to know what you

 7   are saying that society expects from them.

 8                    ATTORNEY HARTNETT:  Object to form.

 9                    THE WITNESS:  I'm simply stating is that

10   folks who are assigned male are expected to identify as

11   male.  That is what society expects.

12   BY ATTORNEY TRYON:

13      Q.    And what does that mean to identify as male?

14      A.    To have one's sense of gender for one's self be

15   on the masculine spectrum.

16      Q.    What's on the masculine spectrum?

17      A.    There is a very helpful tool for this that I

18   often use in talking about gender identity.  It's called

19   the gender unicorn, and it diagrams this out really

20   nicely.  But essentially there are masculine and

21   feminine and nonbinary and other gender components in

22   all of us to some varying degree.  And when I say

23   masculine I mean that the masculine component is

24   dominant.
```

1    Q.    What are masculine components?

2    A.    It's a bit of a cultural and time, so temporally

3  associated sort of thing, and I talk about this with

4  patients and families, but it's often how we

5  communicate, how we carry ourselves, what our place and

6  role in society is, lots of expectations.  But when

7  we're talking about gender identity, it's this inherent

8  sense of self as it relates to gender.

9                ATTORNEY TRYON:  I would ask the court

10  reporter to read back my question, please.

11                COURT REPORTER:  What are the masculine

12  components?

13  BY ATTORNEY TRYON:

14    Q.    Please answer that question.

15                ATTORNEY HARTNETT:  Object to form.

16                THE WITNESS:  They are not specific

17  components but instead a sense of self.

18  BY ATTORNEY TRYON:

19    Q.    So there are no masculine components?

20                ATTORNEY HARTNETT:  Object to form.

21                THE WITNESS:  There is not a checkbox for

22  masculinity, although society does impose ideas on us.

23  BY ATTORNEY TRYON:

24    Q.    Well, you used term masculine components.  I

1    didn't.  What were you referring to?

2       A.    Those thoughts that society has about what is

3    masculine.

4       Q.    Which are what?

5       A.    I think it depends on the society in question.

6       Q.    Okay.

7             Our society here in West Virginia?

8                   ATTORNEY HARTNETT:  Object to form.

9                   THE WITNESS:  Here in West Virginia one

10   may masculine things are --- things like I gave the

11   example earlier of interest in construction, right, and

12   what we were discussing earlier, interest in hunting.

13   While there are many folks who consider those things

14   feminine as well, they stereotypically masculine in our

15   society by my interpretation.

16   BY ATTORNEY TRYON:

17      Q.    So that would be your stereotype?

18                  ATTORNEY HARTNETT:  Object to form.

19                  THE WITNESS:  The stereotype that I

20   observe in our society as part of my job.

21   BY ATTORNEY TRYON:

22      Q.    So how have you reported your observations as to

23   what constitutes a masculine component?

24                  ATTORNEY HARTNETT:  Object to form.

SARGENT'S COURT REPORTING SERVICE, INC.
(814) 536-8908

1          ATTORNEY TRYON:  Do you have a list?

2          THE WITNESS:  Could you repeat the

3     question?

4     BY ATTORNEY TRYON:

5        Q.    Do you have a list of what you've observed to be

6     masculine components in our society here in West

7     Virginia?

8          ATTORNEY HARTNETT:  Object to form.

9          THE WITNESS:  I do not have a list, no.

10    BY ATTORNEY TRYON:

11       Q.    So just when you're talking to a young person

12    how do you know what constitutes a masculine component?

13       A.    I think that's irrelevant for the purposes of

14    discussing someone's gender identity as they see it

15    themselves and instead more relevant to conversations

16    about society's expectations of them.

17       Q.    You say it's relevant or irrelevant?

18       A.    It is relevant in some ways as to how they see

19    themselves certainly.  The primary thing we focus on is

20    how the young person experiences their gender identity.

21       Q.    How did BPJ experience BPJ's identity?

22       A.    She identified as a girl.

23       Q.    And what does that mean then?

24       A.    It means that in her own mind and her own sense

```
 1   of self she is a girl.  She sees herself as a girl.  Her

 2   relationships with people are based on her own internal

 3   sense of self as a girl.

 4      Q.     Did BPJ tell her what components constitute

 5   being a girl?

 6                     ATTORNEY HARTNETT:  Object to form.

 7                     THE WITNESS:  Not to my recollection.

 8   BY ATTORNEY TRYON:

 9      Q.     So just the fact that BPJ said I identify as a

10   girl, that was enough?

11                     ATTORNEY HARTNETT:  Object to form.

12                     THE WITNESS:  No one knows their own

13   lived experience better than the individual themselves.

14   And so when young people tell me how they identify, I

15   explore what that mean for them.  But B████ identifies

16   as a girl and so she is a girl.

17   BY ATTORNEY TRYON:

18      Q.     So you explored that with BPJ.  Can you tell me

19   about that exploration, what it meant for BPJ to be a

20   girl?

21      A.     Only to the extent that I documented it and

22   based on my standard practice.  I don't recall the

23   specifics of our conversation beyond that.

24      Q.     So if someone comes to you and says --- who is a
```

SARGENT'S COURT REPORTING SERVICE, INC.
(814) 536-8908

```
 1   girl who was, as you say, assigned the sex of female at
 2   birth, that says I identify as a male, but all outward
 3   appearances --- let me rephrase that.  Let me just start
 4   over.  If a young woman of any age comes to you and says
 5   I identify as a male, is that in and of itself enough to
 6   establish gender --- now I'm forgetting the terminology,
 7   sorry, gender dysphoria?
 8                ATTORNEY HARTNETT:  Object to form.
 9                THE WITNESS:  It is not because, as we
10   discussed, there are specific diagnostic criteria for
11   that diagnosis.
12   BY ATTORNEY TRYON:
13     Q.    And that is they have to identify as such for
14   six months?
15                ATTORNEY HARTNETT:  Object to form.
16                THE WITNESS:  I'm happy to review based
17   on my memory, but I would refer to the DSM-V and that
18   specific diagnostic criteria.
19   BY ATTORNEY TRYON:
20     Q.    What if that persons says I don't care about
21   DSM-V, you know, I was assigned girl at birth, but I
22   identify as a girl, that's not good enough?
23                ATTORNEY HARTNETT:  Object to form.
24                THE WITNESS:  I think you are confusing
```

 1    the difference between gender dysphoria, the diagnosis,

 2    and gender identity, the experience.

 3    BY ATTORNEY TRYON:

 4       Q.    Thank you for clarifying.  So for someone to

 5    have a gender identity different than what they are

 6    quote assigned at birth, they just simply need to say

 7    that they have a different gender identity.

 8            Is that right?

 9                 ATTORNEY HARTNETT:  Object to form.

10                 THE WITNESS:  They also don't have to say

11    it.  It's something they know in their own minds for

12    themselves and for them to share or not.

13    BY ATTORNEY TRYON:

14       Q.    But if they share that, is it your view that

15    that person needs to accept that, that other folks need

16    to accept that?

17                 ATTORNEY HARTNETT:  Object to form.

18                 THE WITNESS:  It's my view that no one

19    can know inside someone's else's mind better than that

20    person themselves.

21    BY ATTORNEY TRYON:

22       Q.    Do others --- should others be required to

23    accept that or not?

24                 ATTORNEY HARTNETT:  Object to form.

```
 1                    THE WITNESS:  I can't speak to that more
 2   broadly.  All I can talk about is B███ and what she
 3   told me.
 4   BY ATTORNEY TRYON:
 5       Q.    Okay.
 6             If we could turn now to page --- okay.  I'm
 7   looking at what is page 18 of 36.  Do you see that?
 8       A.    I do.
 9       Q.    Okay.  So ---.
10                    ATTORNEY HARTNETT:  Could I just say for
11   the record it's the document with the 101120 at the
12   bottom?
13                    ATTORNEY TRYON:  Correct.
14                    ATTORNEY HARTNETT:  Thank you.
15   BY ATTORNEY TRYON:
16       Q.    And it says --- under messages sent it shows
17   delivery and it shows on 10/25/2021 it looks like a
18   message was sent to Matthew Bunner.  Is that a correct
19   interpretation of that?
20       A.    That would be my guess, although I'm not
21   familiar with that exact message nor is this kind of
22   usually how I see this report.  So outside of this
23   setting, I wouldn't necessarily have access to this
24   view.
```

SARGENT'S COURT REPORTING SERVICE, INC.
(814) 536-8908

1      Q.    Do you remember talking to or sending a message

2   to Mr. Bunner on 10/25/2021?

3      A.    No, I don't have recollection of that and I

4   suspect it was not me who sent the message.

5      Q.    Okay.

6            Then down below further it says call

7   information and it references Steven Deci and you and

8   --- that's all.  It references a call apparently on

9   9/16/2021.  Do you know what that is about?

10      A.    I don't.  I don't recall receiving a phone call.

11   I do know that is the date of the visit and the time of

12   the visit, and so this may be what it is referring to.

13      Q.    Okay.

14            Now, I'm on page 21, which is at the bottom of

15   the page.  The bottom is 101123.  And under here it

16   shows today's visit.  There's a box there.  Do you see

17   that?

18      A.    I do.

19      Q.    And who inputted this information?

20      A.    It depends on what information you're referring

21   to, and I only know partial answers to that question.

22      Q.    Okay.

23            The blood pressure?

24      A.    It is our standard practice that the nurse takes

SARGENT'S COURT REPORTING SERVICE, INC.
(814) 536-8908

1   the blood pressure and then enters it into the chart.

2       Q.    The same thing with the BMI and the weight?

3       A.    So the nurse would take a weight and measure

4   height and then the computer would automatically

5   calculate a BMI.

6       Q.    Okay.

7             And the temperature, the nurse does that as

8   well?

9       A.    Yes.

10      Q.    And the pulse?

11      A.    Yes.

12      Q.    And it says under that percentiles calculated

13  using cc, paren, boys 2, dash, 20 years, closed paren.

14  Do you see that there?

15      A.    I do.

16      Q.    And so why is that percentage using the boys

17  chart as opposed to a girls chart?

18      A.    Because in Epic the sex designation carries over

19  to the gender marker, and so that is what chart is used.

20      Q.    Is there a reason to determine percentiles for

21  the child?

22      A.    The BMI percentiles are important for youth as

23  BMI itself is a poor measure and so BMI percentile is

24  the standard based on my training that is used.

1    Q.    And why is that important?

2    A.    It's important to look at growth and development

3    throughout childhood.   Children are not fixed as adults

4    often are in their height, for example.

5    Q.    So if BPJ identifies as a female, why not use

6    the female chart?

7                    ATTORNEY HARTNETT:  Object to the form.

8                    THE WITNESS:  It's a question and it's a

9    limitation of our health system and our health record.

10   BY ATTORNEY TRYON:

11   Q.    So you don't think it matters which chart is

12   used, whether it's a male or female?

13                   ATTORNEY HARTNETT:  Object to form.

14                   THE WITNESS:  I certainly think it

15   matters.

16   BY ATTORNEY TRYON:

17   Q.    And why does it matter?

18   A.    It matters because these charts are slightly

19   different and based on a child's growth trajectory it

20   may be better to use one chart over the other or even

21   both to make sure that a child growth trajectory is on

22   target.

23   Q.    Did you prescribe any treatment for BPJ?

24                   ATTORNEY HARTNETT:  Object to form.

```
 1              THE WITNESS:  No new treatment.  I did
 2   continue with ███.  For example, we did not discontinue
 3   the ███ during my visit.
 4   BY ATTORNEY TRYON:
 5       Q.    Is --- let me see if I can pronounce this right.
 6   ████████████ hormone, what is that?
 7       A.    ████████████ hormone or LH is a hormone that is
 8   downregulated by the presence of the ███.  It is a
 9   hormone that goes on to stimulate a secretion of sex
10   hormone in the body throughout.
11       Q.    Do you anticipate any of --- prescribing any
12   further treatment?
13       A.    So I think I have a visit with B███ coming up
14   next month and at that point we will be discussing B████
15   and her family's goals and discussing options like
16   ████████.  We began that conversation at our first
17   visit.
18       Q.    And what about options such as surgery?
19       A.    I'm not a surgeon, and in my experience, B████
20   is very young to be making kind of long-term plans in
21   that direction, although if she has questions I will
22   answer them to the best of my ability.
23       Q.    So if that's something that BPJ wanted, is there
24   something that you would --- is that something you would
```

```
 1   refer BPJ to someone else?

 2              ATTORNEY HARTNETT:  Object to form.

 3              THE WITNESS:  When appropriate.

 4   BY ATTORNEY TRYON:

 5      Q.   Do you have someone in particular --- well, have

 6   you ever referred anybody to another specialist for

 7   surgery?

 8      A.   Yes.

 9      Q.   Who have you referred them to?

10      A.   Well, there are usually surgical centers as well

11   as individual surgeons, but it depends on what the young

12   person is seeking and what their insurance coverage is,

13   where their family is located, and a host of other

14   factors.

15      Q.   How many referrals have you made for surgery?

16              ATTORNEY HARTNETT:  Object to form,

17   scope.  Go ahead.

18              THE WITNESS:  I couldn't speak to that

19   specifically.  I don't know off the top of my head.

20   BY ATTORNEY TRYON:

21      Q.   More than one?

22      A.   Yes.

23              ATTORNEY HARTNETT:  Same objection.

24   BY ATTORNEY TRYON:
```

1    Q.    Can you just give me the names of a couple of

2  folks who do this type of --- do surgery for gender

3  transition?

4                  ATTORNEY HARTNETT:  Objection, form,

5  scope.

6                  THE WITNESS:  What type of surgery are we

7  talking about?

8  BY ATTORNEY TRYON:

9    Q.    Sex reassignment surgery.

10                 ATTORNEY HARTNETT:  Objection.  This

11  deposition concerns the diagnosis and treatment of

12  Plaintiff, BPJ aka B█████ P██████-J███████.  I would like

13  to understand how this line of questioning is at all

14  relevant to that.

15                 ATTORNEY TRYON:  To understand the future

16  of possible treatments.

17                 ATTORNEY HARTNETT:  She has not testified

18  to any such future possible treatment with BPJ or --- I

19  just don't understand why having her list the names of

20  providers to conduct surgeries has anything at all to do

21  with BPJ's diagnosis or treatment.

22  BY ATTORNEY TRYON:

23    Q.    You can answer the question.

24    A.    Can you restate the question?

SARGENT'S COURT REPORTING SERVICE, INC.
(814) 536-8908

1    Q.    Can you give me a list of providers for a sex

2    reassignment surgery that you've referred people to?

3              ATTORNEY HARTNETT:   Object to the form

4    and scope.

5              THE WITNESS:   Sex reassignment surgery is

6    very broad, and so I'm not able to give you a specific

7    list of surgeons without further clarity.

8    BY ATTORNEY TRYON:

9    Q.    Then I guess I need to ask you what is included

10   within sex reassignment surgery.

11   A.    It's a rather long list, but none of this

12   pertains to B█████ right now and may not in the future.

13   Q.    But you have referred folks out for some form of

14   sex reassignment surgery or not?

15             ATTORNEY HARTNETT:   Object to form.

16             THE WITNESS:   I have referred patients

17   for a variety of needs outside of my scope of practice,

18   yes.

19   BY ATTORNEY TRYON:

20   Q.    Can you recall the name of even one of the

21   surgeons you've referred people to?

22             ATTORNEY HARTNETT:   Same objection and

23   asked and answered.

24             THE WITNESS:   John Pang.

SARGENT'S COURT REPORTING SERVICE, INC.
(814) 536-8908

```
 1   BY ATTORNEY TRYON:

 2       Q.    How do you spell the last name?

 3       A.    P-A-N-G.

 4       Q.    Give me two more and we will be done.

 5             ATTORNEY HARTNETT:  Objection to scope

 6   and form and harassing the witness.

 7             ATTORNEY LINKOUS:  If you can recall, you

 8   can tell him.

 9             THE WITNESS:  And there are usually teams

10   and not individual surgeons, but Toby Meltzer is someone

11   whose name I had mentioned previously.  And I'm thinking

12   of centers, and so there's lots of folks in centers.

13   BY ATTORNEY TRYON:

14       Q.    Give me a center name?

15       A.    The Hopkins Clinic.

16       Q.    Is that in West Virginia?

17       A.    It is not.  In fact, none of these providers

18   are.

19       Q.    I see.  Okay.

20             ATTORNEY TRYON:  Let's go off the record.

21   Let me take just a very short break and see if there are

22   any other questions that I have.

23             VIDEOGRAPHER:  Going off the record.  The

24   current time reads 1:32 p.m.
```

```
1   OFF VIDEOTAPE

2                        -  -  -

3   (WHEREUPON, A SHORT BREAK WAS TAKEN.)

4                        -  -  -

5   ON VIDEOTAPE

6                  VIDEOGRAPHER:  We are back on the record.

7   The current time reads 1:41 p.m.

8                  ATTORNEY TRYON:  Dr. Kidd, I want to

9   thank you very much for your time.  I have no further

10  questions for you at this time.  In the rare event that,

11  unlikely I will say, event that the Epic records somehow

12  show something that we need to reconvene this for, then

13  I would want to reconvene this.  Otherwise, I have no

14  further questions.  And you have the option to --- well,

15  your counsel will advise you you have the option to read

16  this or waive reading.  So that's all I have.  Thanks

17  again.

18                  ATTORNEY HARTNETT:  And this is Kathleen

19  Hartnett for Plaintiff.  I just would like to

20  provisionally mark the transcript as confidential in

21  light of the discussion of medical records.  And we'll

22  do a more specific designation when we review.

23                      And I also just wanted to state from the

24  Plaintiff's perspective, the deposition is closed
```

```
 1   because we made the production requested of us, but we
 2   will, as I noted, review with what Mr. Linkous sent and
 3   we will send to Defendants anything responsive to RFP-1
 4   per the way we have responded to date in this
 5   litigation.
 6               ATTORNEY LINKOUS:  If there are no more
 7   questions, we will read and sign.  And you may send her
 8   deposition transcript to me and I will facilitate the
 9   errata process to the doctor.
10               ATTORNEY TRYON:  Any other Defendants
11   have any other questions?
12               ATTORNEY CROPP:  This is Jeff Cropp for
13   Defendant Harrison County Board of Education and Doris
14   Stutler.  I came on for Susan Deniker who had to leave
15   early.  We have no questions today.
16               ATTORNEY GREEN:  This is Roberta Green
17   here on behalf of West Virginia Secondary School
18   Activities Commission.  No questions.
19               ATTORNEY TAYLOR:  This is Michael Taylor
20   on behalf of the West Virginia State Board of Education.
21   Kelly Morgan had to step off, so I jumped on, and we
22   have no questions.
23               ATTORNEY TRYON:  Mr. Ducar, you are
24   muted.
```

1          ATTORNEY DUCAR:  Thank you.  Timothy

2    Ducar on behalf of the Intervenor Lainey Armistead.  We

3    have no questions.

4          ATTORNEY TRYON:  Thank you, everyone.

5          VIDEOGRAPHER:  That concludes this

6    deposition.  The current time reads 1:43 p.m.  Thank

7    you, Counsel.

8               * * * * * * *

9         VIDEOTAPED VIDEOCONFERENCE DEPOSITION

10              CONCLUDED AT 1:43 P.M.

11              * * * * * * *

12

13

14

15

16

17

18

19

20

21

22

23

24

137

1    STATE OF WEST VIRGINIA  )

2                       CERTIFICATE

3           I, Nicole Montagano, a Notary Public in

4    and for the State of West Virginia, do hereby

5    certify:

6           That the witness whose testimony appears

7    in the foregoing deposition, was duly sworn by me

8    on said date, and that the transcribed deposition

9    of said witness is a true record of the testimony

10   given by said witness;

11          That the proceeding is herein recorded

12   fully and accurately;

13          That I am neither attorney nor counsel

14   for, nor related to any of the parties to the

15   action in which these depositions were taken, and

16   further that I am not a relative of any attorney

17   or counsel employed by the parties hereto, or

18   financially interested in this action.

19          I certify that the attached transcript

20   meets the requirements set forth within article

21   twenty-seven, chapter forty-seven of the West

22   Virginia.

23

24                         Nicole Montagano,

25                         Court Reporter



```
 1              IN THE UNITED STATES DISTRICT COURT

 2          FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA

 3                    CHARLESTON DIVISION

 4                    * * * * * * * *

 5  B.P.J., by her next friend and    *

 6  Mother, HEATHER JACKSON,          *

 7      Plaintiff                     *  Case No.

 8      vs.                           *  2:21-CV-00316

 9  WEST VIRGINIA STATE BOARD OF      *

10  EDUCATION, HARRISON COUNTY        *

11  BOARD OF EDUCATION, WEST          *

12  VIRGINIA SECONDARY SCHOOL         *

13  ACTIVITIES COMMISSION, W.         *

14  CLAYTON BURCH in his official     *

15  Capacity as State Superintendent,* VIDEOTAPED

16  DORA STUTLER in her official      * VIDEOCONFERENCE

17  Capacity as Harrison County       * DEPOSITION

18  Superintendent, PATRICK MORRISEY  *      OF

19  In his official capacity as       * BPJ

20  Attorney General, and THE STATE   * January 21, 2022

21  OF WEST VIRGINIA,                 *

22      Defendants                    *

23            Any reproduction of this transcript
              is prohibited without authorization
24                by the certifying agency.
```

SARGENT'S COURT REPORTING SERVICE, INC.
(814) 536-8908

```
1              VIDEOTAPED VIDEOCONFERENCE DEPOSITION

2                            OF

3   BPJ, taken on behalf of the Defendant, State of West

4   Virginia herein, pursuant to the Rules of Civil

5   Procedure, taken before me, the undersigned, Nicole

6   Montagano, a Court Reporter and Notary Public in and for

7   the State of West Virginia, on Friday, January 21, 2022,

8   beginning at 10:09 a.m.

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24
```

```
 1                    A P P E A R A N C E S

 2

 3    JOSHUA BLOCK, ESQUIRE

 4    American Civil Liberties Union Foundation

 5    125 Broad Street

 6    New York, NY  10004

 7    COUNSEL FOR PLAINTIFF

 8

 9    LOREE STARK, ESQUIRE

10    ACLU of West Virginia

11    P.O. Box 3952

12    Charleston, WV  25339

13        COUNSEL FOR PLAINTIFF

14

15    KATHLEEN R. HARTNETT, ESQUIRE

16    ANDREW BARR, ESQUIRE

17    JULIE VEROFF, ESQUIRE

18    ZOE HELSTROM, ESQUIRE

19    Cooley, LLP

20    3 Embarcadero Center

21    20th Floor

22    San Francisco, CA  94111-4004

23        COUNSELS FOR PLAINTIFF

24
```

```
1              A P P E A R A N C E S (cont'd)

2

3    SRUTI SWAMINATHAN, ESQUIRE

4    Lambda Legal

5    120 Wall Street

6    19th Floor

7    New York, NY  10005-3919

8        COUNSEL FOR PLAINTIFF

9

10   DAVID TRYON, ESQUIRE

11   CURTIS R.A. CAPEHART, ESQUIRE

12   State Capitol Complex

13   Building 1, Room E-26

14   Charleston, WV  25305

15       COUNSEL FOR STATE OF WEST VIRGINIA

16

17   ROBERTA F. GREEN, ESQUIRE

18   KIMBERLY M. BANDY, ESQUIRE

19   SHANNON ROGERS, ESQUIRE

20   Shuman McCuskey Slicer, PLLC

21   1411 Virginia Street East, Suite 200

22   Charleston, WV  25301

23       COUNSEL FOR WEST VIRGINIA SECONDARY SCHOOL

24       ACTIVITIES COMMISSION
```

```
 1                A P P E A R A N C E S (cont'd)

 2

 3    SUSAN DENIKER, ESQUIRE

 4    Steptoe & Johnson

 5    400 White Oaks Boulevard

 6    Bridgeport, WV  26330

 7         COUNSEL FOR HARRISON COUNTY BOARD OF EDUCATION and

 8         HARRISON COUNTY SUPERINTENDENT DORA STUTLER

 9

10    KELLY C. MORGAN, ESQUIRE

11    KRISTEN V. HAMMOND, ESQUIRE

12    Bailey Wyant

13    500 Virginia Street East

14    Suite 600

15    Charleston, WV  25301

16         COUNSEL FOR WEST VIRGINIA BOARD OF EDUCATION and

17         SUPERINTENDANT W. CLAYTON BURCH

18

19    TIMOTHY D. DUCAR, ESQUIRE

20    Law Office of Timothy D. Ducar

21    7430 East Butherus Drive

22    Suite E

23    Scottsdale, AZ  85260

24         COUNSEL FOR INTERVENOR, LAINEY ARMISTEAD
```

```
1                          I N D E X

2

3    DISCUSSION AMONG PARTIES                11 -   15

4    WITNESS: BPJ

5    EXAMINATION

6       By Attorney Capehart                 15 - 122

7    EXAMINATION

8       By Attorney Rogers                  122 - 123

9    EXAMINATION

10      By Attorney Deniker                 123 - 142

11   EXAMINATION

12      By Attorney Hammond                 143 - 144

13   EXAMINATION

14      By Attorney Ducar                   144 - 155

15   DISCUSSION AMONG PARTIES              155 - 157

16   CERTIFICATE                                 158

17

18

19

20

21

22

23

24
```

```
 1                        EXHIBIT PAGE

 2

 3                                               PAGE

 4    NUMBER    DESCRIPTION                    IDENTIFIED

 5    Exhibit 1    Davis Medical Records         --*

 6    Exhibit 1R   Davis Medical Records         --*

 7    Exhibit 2    Davis Medical Records         --*

 8    Exhibit 3    WVU Medical Records           --*

 9    Exhibit 4    UPMC Children's Medical

10                 Records                       --*

11    Exhibit 5    UPMC Children's Medical

12                 Records                       --*

13    Exhibit 6    UPMC Children's Medical

14                 Records                       --*

15    Exhibit 7    UPMC Children's Medical

16                 Records

17    Exhibit 8    UPMC Children's Medical

18                 Records                       --*

19    Exhibit 9    UPMC Children's Medical

20                 Records                       --*

21    Exhibit 11A Progress Notes                 --*

22    Exhibit 11B Progress Notes                 --*

23    Exhibit 11C Progress Notes                 --*

24    Exhibit 11D Progress Notes                 --*
```

SARGENT'S COURT REPORTING SERVICE, INC.
(814) 536-8908

```
 1                        EXHIBIT PAGE

 2

 3                                              PAGE

 4      NUMBER          DESCRIPTION          IDENTIFIED

 5      Exhibit 12   UPMC Children's Medical

 6                   Records                    --*

 7      Exhibit 13   UMPC Children's Medical

 8                   Records                    --*

 9      Exhibit 14   WVU Medical Records        --*

10      Exhibit 15   WVU Medical Records        --*

11      Exhibit 16   WVU Medical Records        --*

12      Exhibit 17   Gender Support Plan        --*

13      Exhibit 18   Preferred Name Request Form  --*

14      Exhibit 19   Gender Support Plan        --*

15      Exhibit 20   Student Information        --*

16      Exhibit 20R  Student Information        --*

17      Exhibit 21   Screening Results         --*

18      Exhibit 21R  Screening Results         --*

19      Exhibit 22   Birth Certificate         --*

20      Exhibit 22R  Birth Certificate         --*

21      Exhibit 23   Heart Walk Article        --

22      Exhibit 23R  Heart Walk Article        --

23      Exhibit 24   Photo                     --

24      Exhibit 24R  Photo                     --
```

```
1                        EXHIBIT PAGE

2

3                                              PAGE

4    NUMBER        DESCRIPTION              IDENTIFIED

5    Exhibit 25   WV Record                    --

6    Exhibit 26   Photo of Mom and BPJ         --

7    Exhibit 27   Article                      --

8    Exhibit 28   Article                      --

9    Exhibit 29   Lambda Legal Article         --

10   Exhibit 30   Declaration of Heather

11                Jackson                      --

12   Exhibit 31   Declaration of BJP           --

13   Exhibit 32   First Amended Complaint      --

14   Exhibit 33   Standards of Care            --

15   Exhibit 34   House Bill 3293              --

16

17

18

19

20

21

22

23   * CONFIDENTIAL EXHIBITS

24
```

```
1                        OBJECTION PAGE

2

3    ATTORNEY                                          PAGE

4    Hartnett     19, 23, 24, 26, 26, 27, 27, 29, 29, 30, 30,

5    30, 31, 31, 31, 32, 32, 33, 33, 34, 34, 34, 35, 35, 36,

6    36, 37, 37, 38, 38, 39, 41, 41, 42, 43, 43, 44, 44, 45,

7    46, 48, 49, 50, 51, 52, 52, 53, 54, 54, 55, 57, 59, 60,

8    61, 62, 62, 63, 63, 66, 67, 68, 68, 69, 70, 70, 70, 71,

9    72, 72, 73, 74, 74, 75, 76, 76, 78, 79, 80, 81, 81, 82,

10   84, 85, 85, 85, 86, 87, 87, 88, 88, 89, 89, 90, 90, 94,

11   94, 95, 96, 97, 97, 98, 99, 100, 100, 101, 101, 102,

12   103, 104, 104, 107, 108, 108, 109, 109, 110, 110, 111,

13   112, 113, 113, 114, 116, 117, 118, 118, 119, 120, 120,

14   121, 121, 128, 133, 135, 137, 139, 140, 142, 144, 146,

15   146, 147, 148, 150, 150, 150, 151, 151, 151, 153, 153,

16   154, 155, 155, 156

17

18

19

20

21

22

23

24
```

```
 1                    S T I P U L A T I O N
 2     ------------------------------------------------------
 3     (It is hereby stipulated and agreed by and between
 4     counsel for the respective parties that reading,
 5     signing, sealing, certification and filing are not
 6     waived.)
 7     ------------------------------------------------------
 8                    VIDEOGRAPHER:  We're now on the record.
 9     My name is Jacob Stock.  I'm a Certified Legal Video
10     Specialist employed by Sargent's Court Reporting
11     Services, which is located at 210 Main Street,
12     Johnstown, PA 15901.  The date today is January 21st,
13     2022.  The current time reads 10:09 a.m., Eastern
14     Standard Time.  This deposition is being taken remotely
15     by Zoom conference.  The caption of the case is in the
16     United States District Court for the Southern District
17     of West Virginia, Charleston Division, BPJ, by her Next
18     Friend and Mother, Heather Jackson versus West Virginia
19     State Board of Education, et al.  Civil Action Number
20     2:21-CV-00316.  The name of the witness is BPJ.
21                    Will the attorneys present state their
22     names and the parties they represent?
23                    ATTORNEY CAPEHART:  This is Curtis
24     Capehart for the State of West Virginia.  And with me is
```

 1  my colleague, David Tryon.

 2              ATTORNEY HARTNETT:  Good morning.  This

 3  is Kathleen Hartnett from Cooley, LLP, for Plaintiff

 4  BPJ, who is the witness today.  And the other

 5  Plaintiff's Counsel could introduce themselves, first

 6  with the others from Cooley and then we could go to

 7  ACLU, ACLU of West Virginia and Lambda.

 8              ATTORNEY BARR:  Good morning.  This is

 9  Andrew Barr from Cooley, LLP, on behalf of the

10  Plaintiff.

11              ATTORNEY VEROFF:  Good morning.  This is

12  Julie Veroff from Cooley, LLP, on behalf of the

13  Plaintiff.

14              ATTORNEY HELSTROM:  Good morning.  This

15  is Zoe Helstrom from Cooley, LLP, on behalf of the

16  Plaintiff.

17              ATTORNEY BLOCK:  Good morning.  This is

18  Josh Block from ACLU on behalf of Plaintiff.

19              ATTORNEY STARK:  Good morning.  This is

20  Loree Stark with the ACLU of West Virginia on behalf of

21  the Plaintiff.

22              ATTORNEY SWAMINATHAN:  Good morning.

23  This is Sruti Swaminathan from Lambda Legal on behalf of

24  Plaintiff.

```
 1              ATTORNEY DENIKER:  Good morning.  I'm
 2   Susan Deniker with Steptoe and Johnson, counsel for
 3   Defendants Harrison County Board of Education and
 4   Harrison County Superintendant Dora Stutler.
 5              ATTORNEY GREEN:  Good morning.  This is
 6   Roberta Green on behalf of West Virginia Secondary
 7   School Activities Commission, and I will let me
 8   colleagues introduce.
 9              ATTORNEY BANDY:  Hello.  This is Kimberly
10   Bandy also on behalf of West Virginia Secondary School
11   Activities Commission.
12              ATTORNEY HAMMOND:  Good morning.  This is
13   Kristen Hammond.  And Kelly Morgan is also on here with
14   Bailey and Wyant and we represent the West Virginia
15   State Board of Education and Superintendant Burch.
16              ATTORNEY DUCAR:  Good morning.  Timothy
17   Ducar here on behalf of the Intervenor, Lainey
18   Armistead.
19              ATTORNEY HOLCOMB:  Good morning.
20   Christiana Holcomb with Alliance Defending Freedom on
21   behalf of the Intervenor.
22              ATTORNEY CSUTOROS:  Good morning.  This
23   Rachel Csutoros on behalf of Alliance Defending Freedom
24   on behalf of the Intervenor.
```

```
 1                    ATTORNEY BROWN:  And good morning.  Josh

 2    Brown on behalf of the Intervenor.

 3                    VIDEOGRAPHER:  And if that's everybody,

 4    the court reporter can swear in the witness so we can

 5    begin the deposition.

 6                    COURT REPORTER:  Can you please raise

 7    your hand, BPJ?

 8                              ---

 9                         BPJ,

10    CALLED AS A WITNESS IN THE FOLLOWING PROCEEDING, AND

11    HAVING FIRST BEEN DULY SWORN, TESTIFIED AND SAID AS

12    FOLLOWS:

13                              ---

14                    COURT REPORTER:  Thank you.

15                    ATTORNEY HARTNETT:  Before we begin this

16    morning, if it's okay with Mr. Capehart, the parties

17    were going to put on the record a couple of stipulations

18    about objections that they had reached for today's

19    proceedings.  I would just direct the record in this

20    case to the record of the deposition yesterday of

21    Heather Jackson held on January 20th, and the same

22    stipulations with respect to objections for

23    legal/medical and expert testimony with respect to

24    terminology and with respect to potentially
```

1   mischaracterization of the evidence.  Those same

2   stipulations would hold today.  And so for the record,

3   the Plaintiff agrees to that.  And it would be helpful I

4   think if the other Defendants could just assent to those

5   stipulations for today on the record.

6                ATTORNEY DENIKER:  This is Susan Deniker.

7   I stipulate to that.

8                ATTORNEY GREEN:  This is Roberta Green on

9   behalf of WVSSAC.  We stipulate to that.

10                ATTORNEY HAMMOND:  This is Kristen

11   Hammond, and we also stipulate to that.

12                ATTORNEY DUCAR:  This is Tim Ducar.  We

13   also stipulate to that.

14                ATTORNEY CAPEHART:  And the State does as

15   well.

16                ATTORNEY CAPEHART:  Anything else,

17   Kathleen, or should I go ahead?

18                ATTORNEY HARTNETT:  Nothing here.

19                ATTORNEY CAPEHART:  All right.  Thanks

20   very much.

21                           ---

22                       EXAMINATION

23                           ---

24   BY ATTORNEY CAPEHART:

```
 1      Q.     Well, good morning.  Nice to finally get to meet

 2   you.  My name is Curtis Capehart, as I said just a

 3   minute ago.  I represent the State of West Virginia in

 4   this.  Now up to this point we've been referring to you

 5   by the initials as BPJ because that is the way you have

 6   been identified in the Complaint that started this

 7   lawsuit.  Now, is that okay or would you prefer that I

 8   call you something else while we're talking here today?

 9   Because initials can be a little awkward.  So if you

10   feel more comfortable with me calling you something

11   else, that's perfectly fine.  You just let me know what

12   that could be.

13      A.     You can call me B████

14      Q.     Okay.

15                 ATTORNEY HARTNETT:  If I could just say

16   for the record, not to interrupt, that we filed with the

17   BPJ initials in light of the Rules of Court, but the

18   Plaintiff Counsel has no objection to you referring to

19   her as B████ in this deposition.

20                 ATTORNEY CAPEHART:  Okay.

21   BY ATTORNEY CAPEHART:

22      Q.     You are represented by counsel here today and is

23   that Kathleen, Ms. Hartnett, that was speaking just now?

24      A.     Yes.
```

```
 1      Q.     Have you ever been involved in a lawsuit before?

 2      A.     No.

 3      Q.     So you've probably never been deposed before,

 4  have you?

 5      A.     Can you repeat the question?

 6      Q.     Sure.  You haven't been deposed before then,

 7  have you?

 8      A.     No.

 9      Q.     Okay.

10             Also if there is a time where you have trouble

11  understanding me or hearing me, just do what you just

12  did there, let me know and I'll try and speak up a

13  little bit.  We don't have the best microphone

14  placements in here, so that might be a thing as we go

15  through today.

16             So as I go through and answer --- I'm sorry, if

17  I go through and ask you questions today, I just need

18  you to try to remember to answer verbally, not just nod

19  your head or shake your head because there is a video,

20  but we need to have those verbal responses so we can

21  truly understand what your answer is.  And if you do not

22  understand a question, that's fine.  You just need to

23  say so so that I can try and put together a better

24  question or try to explain more of what I'm trying to
```

```
 1   learn.  Okay?
 2            Now, if you answer one of questions that I ask
 3   you today, we are going to assume that you understand
 4   it.  So if there is any kind of confusion, we don't want
 5   to deal with any of that.  It's better you just ask me
 6   and I'll try and improve my question for you.
 7            Does that all make sense?
 8       A.   Yes.
 9       Q.   Okay.
10            Also, I want to kind of touch on a couple of
11   other things here before I get started with some
12   questioning.  Just understand that we are not here to
13   judge you.  We're just trying to learn some of the facts
14   here, things we don't know.  This lawsuit was filed
15   trying to have a West Virginia State Law declared
16   invalid under the U.S. Constitution and another Federal
17   Law referred to as Title 9.  And that's --- that's
18   pretty serious.  So we, as the lawyers for the State,
19   have an obligation to defend that law.  That means I
20   have to ask you some questions that might make all of us
21   uncomfortable a little bit, but I have an obligation to
22   try and get through these.  That's not my goal.  I'm
23   just trying to find out information.  Okay?
24            Now, also if I ask you a question that makes
```

```
 1    you very uncomfortable, tell me, and I can try, if I

 2    can, to rephrase it in a way to make you not

 3    uncomfortable.  I can't say that I won't ask those kinds

 4    of questions because there's some things that we have to

 5    ask questions about, some things that we need to get

 6    your testimony on, but I'm not trying to make you feel

 7    bad or upset you in any way.

 8            Okay?

 9      A.    Okay.

10              ATTORNEY HARTNETT:  I would just object

11    to the extent you're seeking the witness to agree with

12    your description of your role.  But on the other hand, I

13    appreciate you letting her know that she can let you

14    know if she has an upsetting question.

15    BY ATTORNEY CAPEHART:

16      Q.    Also, I'm just going to --- a word about

17    objections.  Sometimes when we go through these, your

18    lawyer might make an objection.  I may ask a question,

19    Kathleen may same objection, something else.  Now, if

20    that happens, the lawyers may have to have a

21    conversation.  It's unlikely, but the lawyers may have

22    to talk about something, at which point you wouldn't be

23    able to hear us or see us.  We don't think that's going

24    to happen, but we at least want to let you know.
```

```
 1              Also, generally, if your lawyer says objection,

 2    you can go ahead and answer the question unless your

 3    lawyer directs you not to.

 4        A.    Okay.

 5        Q.    Oh, and one last thing.  If you need to take a

 6    break for any reason, go to the bathroom, get more

 7    water, something of that nature, just let me know and we

 8    will take a break as soon as we can.  We just can't take

 9    a break if I've asked a question and we are waiting for

10    you to finish your answer.

11              Does that make sense?

12        A.    Yes.

13        Q.    Okay.  Great.

14              We will try and get through this as quickly as

15    we can.  I'm sure you have a lot of other things that

16    you would rather do on a Friday.  So with that, let me

17    ask you, if you can, to please state your name for the

18    record.

19        A.    First and last?

20        Q.    Yes, please.

21        A.    B█████  P███████  J████████.

22        Q.    Great.  What is your address?

23        A.    Could you repeat the question?

24        Q.    Sure.  What is your home address?
```

1    A.    I'm not sure.

2    Q.    Okay.

3          And where do you go to school?

4    A.    Bridgeport Middle School.

5    Q.    Do you remember signing a document called a

6  Declaration back when this lawsuit was first getting

7  started?

8    A.    I can't remember.

9    Q.    Okay.

10         If you could look at --- it's marked Exhibit

11  31.

12              ATTORNEY CAPEHART:  Court Reporter, if

13  you could pull up that exhibit also.

14  BY ATTORNEY CAPEHART:

15   Q.    So do you have Exhibit 31 in front of you?

16   A.    Yes.

17   Q.    It's also up on the screen, just to make sure

18  that we're all looking at this document here?

19              MS. JACKSON:  This is this.

20  BY ATTORNEY CAPEHART:

21   Q.    There's on the screen electronic version of it,

22  too.

23              ATTORNEY HARTNETT:  For the record, we

24  have copies of the exhibits face down in the room with

SARGENT'S COURT REPORTING SERVICE, INC.
(814) 536-8908

 1   the witness, and the witness may feel free to pick up

 2   the exhibit once it's referred to by the questioning

 3   counsel and look at the hard copy.

 4   BY ATTORNEY CAPEHART:

 5      Q.    Okay.

 6            Looking at this, now if you look at the last

 7   page, I believe it is number page four, it has the

 8   initials BPJ there and then some handwritten

 9   signature-like initials of BPJ.  Looking at those, do

10   you recognize those?

11      A.    Yes.

12      Q.    And that's your handwriting, I guess?

13      A.    Yes.

14      Q.    Okay.  Thanks very much.

15            Looking at this, does it jog your memory a

16   little bit that this is something you had to deal with

17   back when the lawsuit was started?

18      A.    Not really.

19      Q.    Okay.

20            And do you remember signing it?

21      A.    A little bit.

22      Q.    I know it's been a while, so I thought you might

23   want to go and look at a couple of these things to

24   remember what was in here.

SARGENT'S COURT REPORTING SERVICE, INC.
(814) 536-8908

```
 1                    MS. JACKSON:  Do you want to read through

 2   it?

 3                    THE WITNESS:  No.

 4   BY ATTORNEY CAPEHART:

 5      Q.    If you want to take a minute, you can kind of

 6   read all through it.  You just go ahead and let us know

 7   when you've had a chance to do that.

 8                    MS. JACKSON:  You need to tell them when

 9   you're done.

10                    THE WITNESS:  Oh, I'm done.

11   BY ATTORNEY CAPEHART:

12      Q.    Thank you.

13            Now, since you signed this back in May of last

14   year, obviously it's been quite a while since May.  And

15   is anything --- well, let me rephrase.  Back at that

16   time, if you look on page two, this was --- in

17   paragraph 11 you were talking about trying out for

18   cross-country and track.  And obviously, with the

19   passage of time, you tried out for the track team,

20   right, cross-country track team.

21                    ATTORNEY HARTNETT:  Objection, form.

22                    THE WITNESS:  I tried out cross-country.

23   Track is not a sport that was available at that time.

24   BY ATTORNEY CAPEHART:
```

1    Q.    Is track a spring sport?

2    A.    Yes.

3    Q.    Okay.

4          So you tried out for cross-country.  Did you

5    make the cross-country team?

6    A.    Yes.

7    Q.    Back on the bottom of the first page, under the

8    paragraph number four, it describes that you when you

9    were younger would play with your mom's clothes, liked

10   paint and girly items.  Whenever you said girly items

11   there with the quotations around it, what kind of items

12   are those?

13   A.    Items that had maybe unicorns on it, sparkles,

14   anything that would stick out in general that was maybe

15   a mystical creature that was like a unicorn maybe.  I

16   had some stuff that was pandas because I really like

17   pandas, and they were always multi-colored.  And that's

18   about it.

19   Q.    Okay.

20         I'm going to set that off to the side for a

21   minute and just ask you a few other questions.  Your

22   mother told us that you are comfortable explaining your

23   gender identity.  Are you?

24                    ATTORNEY HARTNETT:  Objection to form.

SARGENT'S COURT REPORTING SERVICE, INC.
(814) 536-8908

```
 1                    THE WITNESS:  Yes.
 2  BY ATTORNEY CAPEHART:
 3     Q.    Can you explain to me what is your gender
 4  identity?
 5     A.    I am female and I go by the pronoun she or her.
 6     Q.    Do you also refer to yourself as a transgender
 7  girl?
 8     A.    No.  I refer myself as a girl because I am a
 9  girl, and that's it.
10     Q.    Okay.
11           Does it bother you if someone does refer to you
12  as a transgender girl?
13     A.    No, because that's still calling me a girl, but
14  I prefer to be called as just a girl.
15     Q.    Okay.
16           Did you have a problem with --- looking back at
17  your Declaration, at Exhibit 31, in paragraph 12 it
18  says, the second line, I am a transgender girl.  Is that
19  okay with you that that's written that way?
20     A.    Yes, that is fine because that is --- that's
21  still showing that I am a girl and that is on a ---
22  that's on my Declaration.
23     Q.    And transgender female or transgender girl, are
24  both of those terms accurate?
```

```
 1                    ATTORNEY HARTNETT:  Objection to form.

 2                    THE WITNESS:  Yes, because I am a

 3    transgender female and a transgender girl.

 4    BY ATTORNEY CAPEHART:

 5        Q.    Okay.

 6              I just want to make sure I got the terminology

 7    down.  Do you remember the first time you heard the term

 8    transgender?

 9        A.    I can't remember.

10        Q.    Okay.

11              As long as you remember, you just --- have you

12    always had an understanding of what transgender means?

13        A.    I don't know, I don't think so.

14        Q.    So --- and I'm not trying to put words in your

15    mouth.  I'm just trying to understand.  So do you think

16    there was a time that you didn't, but at some point you

17    learned it, you just don't remember when that was?

18        A.    Yes.

19        Q.    All right.

20              Do you have any recollection of a time when you

21    were not a transgender girl?

22                    ATTORNEY HARTNETT:  Objection to form.

23                    THE WITNESS:  A little bit of a memory,

24    but not much.
```

SARGENT'S COURT REPORTING SERVICE, INC.
(814) 536-8908

1    BY ATTORNEY CAPEHART:

2       Q.    What kind of a memory do you have --- let me

3    back up.  How old is that memory?

4       A.    Four or five years.

5       Q.    Okay.

6             Was that memory --- what were you doing that

7    you can remember, I guess, maybe not being a transgender

8    girl at that time?

9                   ATTORNEY HARTNETT:  Objection to form.

10                  THE WITNESS:  I think I was learning

11   something in school and I found it really interesting.

12   BY ATTORNEY CAPEHART:

13      Q.    Okay.

14            You don't remember what that was that you were

15   learning, do you?

16      A.    No.

17      Q.    Your mother also told us that at some point when

18   you were younger you told her that you were a girl.  Do

19   you remember the first time you told your mother that?

20      A.    I can't remember.

21      Q.    Okay.

22            Do you remember the first time you told someone

23   other than your mother that you were a transgender girl?

24                  ATTORNEY HARTNETT:  Objection to form.

```
 1              THE WITNESS:  I --- can you say it again?
 2  BY ATTORNEY CAPEHART:
 3     Q.    Sure.  I will try to make it a little bit
 4  better, too.  Do you remember the time that you first
 5  told someone other than your mother that you were a
 6  girl?
 7     A.    Yes.
 8     Q.    Okay.
 9           Can you tell me about that?
10     A.    It was in school.  It was new, whenever I just
11  came out, and it was the year of 4th grade.
12     Q.    Okay.
13           Do you remember who you were talking to?
14     A.    I don't remember.
15     Q.    Now, you said that was 4th grade, that that was
16  the year that you came out.  Do you use terminology like
17  socially transition when you talk about that time?
18     A.    Could you repeat the question?
19     Q.    Sure.  Let me ask a different one.  Are you
20  familiar with the term social transition or to socially
21  transition?
22     A.    No.
23     Q.    Okay.
24           When you --- and I'm going to use your term,
```

```
 1   okay.  When you said you came out in 4th grade and that

 2   was the time when you maybe started talking to other

 3   people about being a girl, you don't really remember who

 4   that was, but generally how was that time for you?

 5                    ATTORNEY HARTNETT:  Objection to form.

 6                    THE WITNESS:  It was good because I made

 7   a lot of new friends.  A lot of people were really nice

 8   to me.

 9   BY ATTORNEY CAPEHART:

10       Q.    Were your old friends nice to you, too?

11       A.    Yes.

12       Q.    How was everybody at your school, teachers and

13   other folks that worked there?

14                    ATTORNEY HARTNETT:  Objection to form.

15                    THE WITNESS:  They were very good about

16   it.

17   BY ATTORNEY CAPEHART:

18       Q.    Did you have any bad experiences that year?

19       A.    No.

20       Q.    Okay.

21             B███, for you what does it mean to be female

22   or to be a girl?

23       A.    Could you repeat the question?

24       Q.    Sure.  I'm trying to understand your perspective
```

```
 1   on things, and so that's why I'm just asking, to you,

 2   what does it mean to be a girl or to be female?

 3                    ATTORNEY HARTNETT:  Objection to form.

 4                    THE WITNESS:  It means --- it means

 5   everything.  I've always wanted to be a girl.

 6   BY ATTORNEY CAPEHART:

 7      Q.    Okay.

 8            And what is it about a girl or female that

 9   makes them different from boys or males?

10                    ATTORNEY HARTNETT:  Objection to form.

11                    THE WITNESS:  How they act and how they

12   dress their selves.

13   BY ATTORNEY CAPEHART:

14      Q.    Okay.

15            Anything else other than how they act or how

16   they dress?

17      A.    Not that I can think of right now.

18      Q.    Okay.

19            How do girls or females dress differently than

20   boys or males?

21                    ATTORNEY HARTNETT:  Objection to form.

22                    THE WITNESS:  Females would wear ---

23   normally wear dresses and males would normally wear

24   tuxedos and suits.  And their casual clothes are most of
```

1    the time different but sometimes can be the same.

2    BY ATTORNEY CAPEHART:

3       Q.    Okay.

4             So do I look like I'm dressed like a male

5    because I'm wearing a suit jacket and tie?

6                   ATTORNEY HARTNETT:  Objection to form.

7                   THE WITNESS:  Yes.

8    BY ATTORNEY CAPEHART:

9       Q.    Okay.

10      A.    Because that is also how you present yourself.

11      Q.    Okay.

12            Is presenting one's self, when you say that, is

13   that different than how one dresses and how one acts or

14   is it both of those together?

15                  ATTORNEY HARTNETT:  Objection to form.

16   Sorry.

17                  THE WITNESS:  It's kind of a mix of all

18   of it.

19   BY ATTORNEY CAPEHART:

20      Q.    Now, when you say that how someone acts is

21   different regarding girls to boys, what do you mean by

22   that?

23      A.    Normally ---.

24                  ATTORNEY HARTNETT:  Objection to form.

```
 1                    THE WITNESS:  Most of the time males will

 2    look very big and buff and females most of the time do

 3    not like that look, but some can.

 4    BY ATTORNEY CAPEHART:

 5       Q.    Okay.

 6             What else about how a person acts puts them in

 7    a more of a female category than a male category?

 8                    ATTORNEY HARTNETT:  Objection to form.

 9                    THE WITNESS:  They would maybe --- they

10    wouldn't want to look like a guy.  A guy wouldn't want

11    to look like a girl and a girl wouldn't want to look

12    like a guy unless --- unless you do, which sometimes

13    people do do that.

14    BY ATTORNEY CAPEHART:

15       Q.    Okay.

16             So if someone is trying to look like a guy,

17    then they are going to wear more what I'll call

18    traditional attire, like you said, maybe like a tuxedo

19    or a suit with a coat and a tie and they may want to

20    look bigger and buff and in an overall way present

21    themselves as male.

22             Is that right?

23                    ATTORNEY HARTNETT:  Objection to form.

24                    THE WITNESS:  Most of the time but not
```

```
 1    all the time.
 2    BY ATTORNEY CAPEHART:
 3       Q.    Okay.
 4             Are there actions or things that people do that
 5    make you think this person is acting more like a male or
 6    someone is acting more like a female?
 7                     ATTORNEY HARTNETT:  Objection to form.
 8                     THE WITNESS:   Sometimes.
 9    BY ATTORNEY CAPEHART:
10       Q.    Okay.
11             When you say sometimes what are you thinking
12    about?
13       A.    Maybe people are walking around because
14    sometimes it's how they walk that you can tell and their
15    hair sometimes.
16       Q.    What kind of hair is more male as compared with
17    hair that is more female to you?
18                     ATTORNEY HARTNETT:  Objection to form.
19                     THE WITNESS:  I think longer hair is more
20    ladylike and short hair is more manly, but sometimes
21    people do like an option of that where people --- where
22    guys will like long hair and girls will like short hair.
23    BY ATTORNEY CAPEHART:
24       Q.    I think my father would agree with you on what
```

SARGENT'S COURT REPORTING SERVICE, INC.
(814) 536-8908

```
 1   you said there.  Are there other kind of behaviors that
 2   people exhibit that are more male or more female besides
 3   walking and maybe kind of their physical posture?
 4                   ATTORNEY HARTNETT:  Objection to form.
 5                   THE WITNESS:  Not really, no.
 6   BY ATTORNEY CAPEHART:
 7      Q.    Okay.
 8            Besides, as you said, males would be more big
 9   and buff and females not really liking that look as
10   much, although some of them do, are there other physical
11   attributes that makes you think someone is more male or
12   more female?
13                   ATTORNEY HARTNETT:  Objection to form.
14                   THE WITNESS:  Not really.
15   BY ATTORNEY CAPEHART:
16      Q.    Does height have anything to do with it?
17                   ATTORNEY HARTNETT:  Objection to form.
18                   THE WITNESS:  No, because that can go
19   either way.  That's genetics if you're tall or not.
20   BY ATTORNEY CAPEHART:
21      Q.    As you have been growing up, from what I
22   understand, you talk with your mom a lot.
23            Right?
24      A.    Yes.
```

```
 1     Q.    Have you ever talked with your mother about what

 2  it means to be female?

 3     A.    Yes.

 4     Q.    Okay.

 5           What did your mother --- strike that.

 6           Did your mother try to help you as you were

 7  going through this process to kind of understand this a

 8  little bit more what is male and female?

 9                    ATTORNEY HARTNETT:   Objection to form.

10                    THE WITNESS:   Could you repeat the

11  question?

12  BY ATTORNEY CAPEHART:

13     Q.    Sure.  As you've been growing up and as you've

14  been talking with your mother over the years as you

15  realized, as you said, you're a girl and as we were just

16  talking about, that there are certain things in your

17  mind that go more with being female rather than being

18  male, did you and your mom have conversations about that

19  same kind of thing we were just discussing?

20                    ATTORNEY HARTNETT:   Objection to form.

21                    THE WITNESS:   Yes.

22  BY ATTORNEY CAPEHART:

23     Q.    Okay.

24           What did you all talk about?
```

```
 1      A.      We talked about looks and --- mainly looks and

 2   that was about it.

 3      Q.      Okay.

 4              Did you talk about makeup?

 5      A.      Yes.

 6      Q.      Okay.

 7              Is that something to you that is more female or

 8   more male?

 9      A.      More female, but some males do wear them ---

10   wear it.

11      Q.      Did you and your mom talk about jewelry?

12      A.      Ish, not really because jewelry can be worn by

13   males and females.

14      Q.      That's fair.  I'm wearing some myself right now.

15   Did you all talk about anything else other than those

16   few things that you just provided to me and also the

17   makeup?

18                      ATTORNEY HARTNETT:  Objection to form.

19                      THE WITNESS:  Not really.

20   BY ATTORNEY CAPEHART:

21      Q.      Okay.

22              Have you ever had any of those kinds of

23   conversations with your father?

24                      ATTORNEY HARTNETT:  Objection to form.
```

 1                    THE WITNESS:  Not really because I don't

 2    think he would understand it because he is a guy that is

 3    --- he really --- he likes doing manly stuff and I don't

 4    think he'd understand makeup.

 5    BY ATTORNEY CAPEHART:

 6       Q.    So with all that in mind, I'm just trying to

 7    understand how you think about some of these things.

 8    How do you define girls and boys?

 9                    ATTORNEY HARTNETT:  Objection to form.

10                    THE WITNESS:  Males try to look muscular

11    and they do --- they lift weights and have short hair,

12    but girls can also do that, but it's most commonly found

13    with guys.  With girls, they usually have long hair, but

14    guys can have that, too.  They wear makeup and have

15    different clothing than males.

16    BY ATTORNEY CAPEHART:

17       Q.    Okay.

18             Are there activities that girls or females like

19    to do that men don't like to do or that males don't like

20    to do?

21                    ATTORNEY HARTNETT:  Objection to form.

22                    THE WITNESS:  Not really because sports

23    are for everyone and they should --- and every --- and

24    any person should be able to play.

1    BY ATTORNEY CAPEHART:

2      Q.    I thank you for that.  I was making it a little

3    bit more broad than that even though.  Are there other

4    things outside of sports that may be girls and females

5    like to do that typically, from your experience, boys

6    and males don't like to do?

7                    ATTORNEY HARTNETT:  Objection to form.

8                    THE WITNESS:  Not really because anything

9    that a female could do a male could do, and anything a

10   male could do a female could do.

11   BY ATTORNEY CAPEHART:

12     Q.    And among all of your friends, are they mostly

13   girls, mostly boys or all across both boys and girls?

14     A.    They are mostly girls, but I do have some guy

15   friends.

16     Q.    What do you like to do with your friends that

17   are girls?

18     A.    We hang out, sometimes we play video games.

19     Q.    Do you go --- do you like going to the mall or

20   shopping?  I know that has been harder recently since

21   COVID?

22                    ATTORNEY HARTNETT:  Objection to form.

23                    THE WITNESS:  Sometimes, but not really

24   because of COVID.

SARGENT'S COURT REPORTING SERVICE, INC.
(814) 536-8908

BY ATTORNEY CAPEHART:

Q.    Do you do the same kind of things with your
friends that are boys?

A.    We also hang out.  We talk about video games, we
play video games, so, yes, about the same.

Q.    Okay.

At some point you decided to change your name.
Do you remember when you decided to do that?

A.    When I came out.

Q.    So in 4th grade, as you mentioned earlier?

A.    I came out in the third --- the summer of third
grade.  But when I was like actually talking to people
and stuff about it, it was 4th grade.  So yes, when I
came out.

Q.    Okay.

And so when did you start going by B███?

A.    The summer of third grade.

Q.    Did you go by B██ at school at that time, too,
or did you wait until fourth grade for that?

ATTORNEY HARTNETT:  Objection to form.

THE WITNESS:  It was the summer of third
grade and I was kind of presenting through third grade,
but I didn't go by B███, just --- at that point I
waited until fourth grade.

<u>BY ATTORNEY CAPEHART</u>:

Q.    Okay.

       How did you select your new name?

A.    I've always liked the name, so that's what I liked.

Q.    Okay.

       And why did you decide at that time that you needed a new name?

A.    Because I didn't think my name fit for me.

Q.    Okay.

       And you're familiar with the term dead name.

       Right?

A.    Yes.

Q.    Okay.

       Do you remember the first time that you encountered that word --- or I'm sorry, that term?

A.    That term?  When I came out, I was told that I could be dead named and they told me what that was.  And then later I looked it up and figured out what it was more in depth.

Q.    Okay.

       Do you remember who it was that had told you that you could be dead named?

A.    I can't remember.

1    Q.    Was it your mom?

2    A.    It may have been, but I can't remember.

3    Q.    From what your mother and your father told us,

4  it sounds like your mother has been the parent that has

5  taken you to all but maybe one of your appointments to

6  talk to people about being a transgender girl.  Is that

7  about right from your recollection?

8              ATTORNEY HARTNETT:  Objection to form.

9              THE WITNESS:  Yes, that is about right.

10 BY ATTORNEY CAPEHART:

11   Q.    Have you had a lot of appointments to talk with

12 doctors or other healthcare providers about being a

13 transgender girl?

14             ATTORNEY HARTNETT:  Objection to form.

15             THE WITNESS:  I wouldn't say it was a

16 lot, but I also wouldn't say it was like a little.  It

17 was a good amount of appointments.

18 BY ATTORNEY CAPEHART:

19   Q.    Okay.

20         After one of those appointments you received a

21 diagnosis of gender dysphoria.  Have you been told that

22 before?

23   A.    Yes.

24   Q.    Okay.

```
 1              When was the first time you remember
 2    encountering that term gender dysphoria?
 3       A.   I don't know the date, but I think my mom told
 4    me that I had it.
 5       Q.   Okay.
 6            Do you remember generally when that was?
 7       A.   I can't remember.  It may have been 2021 or
 8    2022.
 9       Q.   Also, when you're remembering something, if you
10    remember it by year, I know that is how I remember a lot
11    of things growing up, if something happened at a
12    particular year of school rather than a calendar year.
13    You know, if that's a frame of remembering for you, too,
14    that is fine also.  Calendar years aren't as important.
15            Do you know what gender dysphoria is?
16       A.   A little bit about it, but I don't know the
17    actual definition.
18       Q.   Okay.
19            Did you look it up and research it like you did
20    dead name after you heard it?
21                 ATTORNEY HARTNETT:  Objection to form.
22                 THE WITNESS:  I don't think so because if
23    I did I'd probably know more about it.
24    BY ATTORNEY CAPEHART:
```

1      Q.     And you said --- do you remember the doctor

2    visit where you first heard one of your doctors use that

3    term?

4      A.     I can't remember.

5      Q.     Do you remember an appointment with Dr. Montano?

6      A.     Yes, I remember some of the appointments with

7    him.

8      Q.     Okay.

9             There is some medical records that show that

10   you had an appointment with Dr. Montano where he did a

11   full assessment of you in the summer of 2019.  Do you

12   remember that by any chance?

13                ATTORNEY HARTNETT:  Objection to form.

14                THE WITNESS:  Not really because that was

15   a long time ago.

16   BY ATTORNEY CAPEHART:

17     Q.     Do you remember any appointment with Dr. Montano

18   that was a longer appointment where you talked about a

19   lot of things?

20                ATTORNEY HARTNETT:  Objection to form.

21                THE WITNESS:  Not really because they all

22   felt like they went by so fast because during the things

23   I usually had to miss a day of school, and I was always

24   thinking about what I missed.

1  BY ATTORNEY CAPEHART:

2     Q.    I did the same thing at your age.

3           Whenever you had those appointments with Dr.

4  Montano or at Dr. Montano's office, I know oftentimes at

5  those appointments it's not just the doctor, that there

6  are sometimes other people that work there that will

7  come in and see a patient during the appointment time.

8  What do you recall about those appointments and who you

9  met with?

10                 ATTORNEY HARTNETT:  Objection to form.

11                 THE WITNESS:  I can't remember, but I ---

12  I don't remember their name, but I remember a time where

13  someone else went in there.

14  BY ATTORNEY CAPEHART:

15     Q.    Do you remember the kinds of things that you

16  would talk about with Dr. Montano or any of the other

17  people at those appointments?

18     A.    Maybe --- I don't know.  I can't remember.

19     Q.    When you were at appointments at Dr. Montano's

20  office, do you recall him or any of his staff running

21  tests on you?

22                 ATTORNEY HARTNETT:  Objection to form.

23                 THE WITNESS:  I can't recall.

24  BY ATTORNEY CAPEHART:

```
 1      Q.    Okay.

 2            At those appointments do you remember hearing

 3      people talking about how to treat gender dysphoria?

 4      A.    I can't remember.

 5      Q.    Has your mother discussed with you how your

 6      gender dysphoria is being treated now?

 7      A.    Maybe back whenever I --- whenever I was

 8      diagnosed with it, but I can't remember.

 9      Q.    Whenever there's any decisions that have to get

10      made about your treatment for your gender dysphoria,

11      does your mother talk with you about that and explain

12      everything that's happening?

13      A.    Yes.

14      Q.    Okay.

15            When you all are having those conversations and

16      a decision has to be made, does your mother let you make

17      those decisions?

18                  ATTORNEY HARTNETT:  Objection to form.

19                  THE WITNESS:  Yes, I am part of the

20      making of the decisions what happens to me.

21      BY ATTORNEY CAPEHART:

22      Q.    Okay.

23            Do you and your mother ever disagree about what

24      should be done?
```

1          ATTORNEY HARTNETT:  Objection to form.

2          THE WITNESS:  Not --- not --- I don't

3    think we have, but there is a possibility that could

4    happen or could have happened and I don't recall.

5    BY ATTORNEY CAPEHART:

6       Q.    Okay.

7             Give me just a second.

8          ATTORNEY HARTNETT:  Also, I think it

9    might be a good time to take a quick break just given

10   the youth and amount of water consumption.  So maybe we

11   can take a five to ten-minute bathroom break when it's

12   good for you, Curtis.

13         ATTORNEY CAPEHART:  Oh, yeah, that's

14   actually perfectly fine.

15         ATTORNEY HARTNETT:  Can we take a

16   ten-minute break?  Yeah, let's just take a ten-minute

17   break so we're are not all back too early.

18         ATTORNEY CAPEHART:  Sounds great.

19         VIDEOGRAPHER:  Going off the record.  The

20   current time reads 11:01 a.m.

21   OFF VIDEOTAPE

22                       ---

23   (WHEREUPON, A SHORT BREAK WAS TAKEN.)

24                       ---

```
 1    ON VIDEOTAPE

 2              VIDEOGRAPHER:  We are back on the record.

 3    The current time reads 11:13 a.m.

 4    BY ATTORNEY CAPEHART:

 5         Q.    Okay.

 6              Well, during the break I was going back over

 7    some notes and just have a couple of questions that kind

 8    of relate to some things we already talked about and

 9    then I'm going to move on.

10              Okay?

11         A.    That Declaration that we had looked at earlier,

12    I recall that you had mentioned when you first looked at

13    it you didn't recall seeing it, you didn't recall

14    signing it, you then looked at your initial signatures

15    and then you had read the rest of the document.  After

16    we went through all of that, did that jog your memory

17    any.  Do you remember signing it?

18         A.    I do remember signing it, but I kind of have a

19    little bit of memory seeing it, but I do have a memory

20    signing it.

21         Q.    Okay.

22              Also, when you recalled learning and hearing

23    the term about dead name and that someone might do that

24    to you at school, did anyone actually do that to you at
```

```
 1    school?

 2        A.    Not that I can remember.

 3        Q.    Okay.

 4              I think you had also said you kind of did some

 5    research.  What kind of research did you do looking into

 6    that term?

 7        A.    Just looking what it meant, looking up what it

 8    meant.

 9        Q.    Did you look it up in a book or on the internet?

10        A.    The internet.

11        Q.    Okay.

12              Do you recall where on the internet you found

13    it?

14        A.    I think I looked it up on Google and I did

15    another one, but I can't remember what it was.  It was

16    one of the unpopular ones.

17        Q.    Okay.

18              Also, when you were --- or when we were talking

19    about the characteristics or things that make a person

20    more female or more male you had said that height really

21    didn't make a difference, that that was really more

22    genetic.  Do genetics have something more to do with

23    being a girl or a boy?

24                    ATTORNEY HARTNETT:  Objection to form.
```

SARGENT'S COURT REPORTING SERVICE, INC.
(814) 536-8908

```
 1                    THE WITNESS:  I wouldn't know.

 2   BY ATTORNEY CAPEHART:

 3       Q.    Also, is there anything that definitively makes

 4   a person a girl or a female versus a boy or a male?

 5                    ATTORNEY HARTNETT:  Objection to form.

 6                    THE WITNESS:  Could you repeat the

 7   question?

 8   BY ATTORNEY CAPEHART:

 9       Q.    Sure.  And I will preface it with kind of what

10   we were kind of talking about before.  You were

11   describing how there were a lot of things that are

12   typically --- and I don't think you used that word but

13   I'm going to use it, more typically associated with

14   males like tuxedos or suits, short hair, being buff,

15   working out, that sort of thing, and other things that

16   were more typically associated with being female,

17   wearing dresses, longer hair, not preferring to have

18   that maybe over muscled physique, wearing makeup, that

19   sort of thing, and that there were even some other

20   things you said are maybe more associated with males,

21   but that doesn't mean that females don't do it or vice

22   versa.  I think that's what you said.

23             So I'm wondering is there anything in your mind

24   that if you see a person doing that or wearing that or
```

```
 1   whatever that thing might be, is there something that

 2   you, if you see it associated with a person, you think

 3   only boys do that or only girls do that?

 4                ATTORNEY HARTNETT:  Objection to form.

 5                THE WITNESS:  No, because if I see

 6   someone like that and I don't --- I don't immediately

 7   go, oh, that's a guy, oh, that's a girl.  I ask them,

 8   oh, what are your pronouns, what is your gender

 9   identity.  And that's --- that's the better way to

10   figure out what they --- what they are and if they're

11   male or female or what --- if they're nonbinary or

12   whatever they are.

13   BY ATTORNEY CAPEHART:

14      Q.    You mentioned a term nonbinary.  Can you explain

15   what nonbinary means?

16      A.    It is a person that doesn't identify as a male

17   or female and they go by they/them pronouns.

18      Q.    Do you know anyone that is nonbinary?

19      A.    One of my lawyers is.

20      Q.    Do you know anybody at your school or your

21   hometown that is nonbinary?

22      A.    I don't think so.

23      Q.    Okay.

24                ATTORNEY HARTNETT:  Heather, do you want
```

1   a minute for a break?

2                   MS. JACKSON:  Just to get a sip of water.

3                   ATTORNEY HARTNETT:  Can you give her a

4   mute to, the court reporter, just to let her work

5   through that?  It's happened to all of us.  No worries.

6                   MS. JACKSON:  It went down the wrong

7   pipe.

8                   ATTORNEY CAPEHART:  And again, if you

9   need to take another break, that's fine, too.  All okay

10  on your end?

11                  MS. JACKSON:  We're good.

12                  ATTORNEY CAPEHART:  Okay.

13  BY ATTORNEY CAPEHART:

14    Q.   I don't want to upset you, but I need to ask a

15  couple of questions about some comments that, according

16  to what we learned, your father had made in the past.

17                  ATTORNEY HARTNETT:  Objection to form.

18                  ATTORNEY CAPEHART:  That wasn't a

19  question, but okay.

20  BY ATTORNEY CAPEHART:

21    Q.   We understand that ---.

22                  ATTORNEY HARTNETT:  Sorry.  Just to make

23  clear my objection was that you were stating that

24  certain statements had been made, and I'm objecting to

SARGENT'S COURT REPORTING SERVICE, INC.
(814) 536-8908

```
 1    the foundation.

 2                    ATTORNEY CAPEHART:  Okay.

 3                    ATTORNEY HARTNETT:  Go ahead.

 4    BY ATTORNEY CAPEHART:

 5       Q.    I've looked at some records and there are some

 6    notations and ████████████████████████████████████

 7    ████████████████████████     When we were talking with

 8    your mother she had said she did not know what had

 9    happened there.  Can you tell me what had happened when

10    that occurred?

11                    ATTORNEY HARTNETT:  Objection to form.

12                    THE WITNESS:  Could you repeat the

13    question?

14    BY ATTORNEY CAPEHART:

15       Q.    Sure.  We've seen in some records a notation

16    ████████████████████████████████████████████████████

17    ███████████████████████████     Your mother did not

18    know what had happened on that occasion.  She recalled

19    that when this happened, but she didn't know what had

20    actually occurred ████████████████████████████

21          Do you remember that?

22                    ATTORNEY HARTNETT:  Objection to form.

23    Go ahead.

24                    THE WITNESS:  I can't remember, but I'm
```

```
1    pretty sure it was --- I was scared of something that

2    was --- honestly I shouldn't have been scared of.  It

3    was nowhere near me.  It was probably a spider or

4    something.  But just the phrase ███████████████████

5    ██████████████████████████████ it is like don't be

6    scared of that, there's no reason to.  It's just another

7    use of don't be scared of that.

8    BY ATTORNEY CAPEHART:

9       Q.    Okay.

10            We were --- we were just wondering what had

11   happened there because, as I recall, when this was being

12   discussed yesterday, that your mother indicated you were

13   very upset when you had ████████████████████████████

14   ████████████████████████████████████████████████████

15   ████████████████████████████   Does that help you

16   remember anything more?

17                 ATTORNEY HARTNETT:  Objection, form.

18                 THE WITNESS:  Not really.

19   BY ATTORNEY CAPEHART:

20      Q.    Also, we seen a note in one of the medical

21   records that was, again, discussed yesterday and your

22   mother said we would need to ask you about it.  ████████

23   ████████████████████████████████████████████████████

24   ████████████████████████████████████████████████████
```

```
 1   ████████

 2                  ATTORNEY HARTNETT:  Objection to form.

 3                  THE WITNESS:  Could you restate the

 4   question?

 5   BY ATTORNEY CAPEHART:

 6      Q.     Sure.  We were looking at some records and there

 7   was some notation ████████████████████████████

 8   ████████████████      Your mother wasn't familiar with

 9   that and said we should ask you about it.  So I'm asking

10   you if you recall ever discussing that with one of your

11   treaters?

12                  ATTORNEY HARTNETT:  Objection to form.

13                  THE WITNESS:  I don't remember discussing

14   that with anyone besides my mom really.  But it was a

15   long time ago, so I --- I can't remember if I did or

16   not.

17   BY ATTORNEY CAPEHART:

18      Q.     Okay.

19             Do you know what that would relate to, that

20   reference ████████████████████████

21      A.     He probably got mad at me, like really mad in

22   the situation, and he was probably threatening ████████

23   ████████████████████

24      Q.     Has that happened sometimes?
```

SARGENT'S COURT REPORTING SERVICE, INC.
(814) 536-8908

1    A.    A long time ago.  It doesn't happen anymore now.

2    Q.    Did it happen on multiple occasions or just

3  once?

4    A.    It was --- well, it was a couple of times maybe

5  in like the same three days or something like that, but

6  after those three days it stopped.

7    Q.    Did you talk with your mom about it when that

8  happened?

9    A.    Yes.

10    Q.    Okay.

11         Did she tell you that she was going to talk to

12  your father for you?

13              ATTORNEY HARTNETT:  Objection.  Go ahead.

14              THE WITNESS:  She --- I think she did.

15  She talked to him, and that's why he stopped doing it.

16  BY ATTORNEY CAPEHART:

17    Q.    ████████████████████████████?

18    A.    Could you restate it?

19    Q.    Sure.  Do you have appointments from time to

20  time to ████████████████████████████████████

21  ████████████████████████████████████?

22    ██    ███████

23    ██    ████████

24         ████████████████████

SARGENT'S COURT REPORTING SERVICE, INC.
(814) 536-8908

```
 1                    ATTORNEY CAPEHART:  We've got a fire

 2   drill going on.  Hold on, everybody.

 3                    THE WITNESS:  What happened?

 4                    MS. JACKSON:  They have a fire alarm

 5   going off.

 6                    THE WITNESS:  Oh.

 7                    VIDEOGRAPHER:   Do you want to go off the

 8   record?

 9                    ATTORNEY HARTNETT:  We're fine with that.

10                    VIDEOGRAPHER:  Going off the record.  The

11   current time reads 11:25 a.m.

12   OFF VIDEOTAPE

13                            ---

14   (WHEREUPON, A SHORT BREAK WAS TAKEN.)

15                            ---

16   ON VIDEOTAPE

17                    VIDEOGRAPHER:   Back back on the record.

18   The current time reads 11:41 a.m.

19                    ATTORNEY GREEN:  All right.  Thank you

20   and I will just hop in for a minute.  This is Roberta

21   Green on behalf of WVSSAC.  And I just wanted to note

22   for the record the appearance of my co-counsel, Shannon

23   Rogers, who's with me on behalf of WVSSAC.  I just

24   wanted to note that for the record and I'll hop off.
```

1     Thanks.

2                    ATTORNEY CAPEHART:  Okay.

3                    Now that we are through our building

4     emergency, if I could ask the court reporter to go back

5     to the last line of actual testimony.  I don't recall

6     what point during that event we broke off the record,

7     but if you could go back and tell us where we were

8     whenever loud noises started happening.

9                    COURT REPORTER:  The question, sure.  Do

10    you have any appointments from time to ████████████████

11    ████████████████████████████████████████████████████████

12    ████████████████████████    Answer, yes.  Question, okay.  Who do

13    you meet with?  And then that's when the fire drill

14    happened.

15                   ATTORNEY CAPEHART:  Thank you.

16    BY ATTORNEY CAPEHART:

17    Q.     B████, let's just pick up there.  Who do you

18    meet with?

19    A.     I meet with ████████    His name is ████████

20    Q.     Okay.

21           Do you know what office or group ████████ is

22    with?

23                   ATTORNEY HARTNETT:  Objection to form.

24                   THE WITNESS:  Could you repeat the

```
 1   question?
 2   BY ATTORNEY CAPEHART:
 3       Q.    Sure.  Is                              or is
 4              part of a                  ?
 5       A.    I don't know.
 6       Q.    Do you know the name --- I'm sorry.  I cut you
 7   off.  Go ahead.
 8       A.    I just go to him for              .  That's ---.
 9       Q.    Okay.
10             How often do you meet with        ?
11       A.    It just depends because sometimes maybe it's
12   once a month, but it can be anytime.  If we call him and
13   we need to go, he usually has a spot open.
14       Q.    Okay.
15             And just generally speaking, what kind of
16   things do you discuss with        ?
17       A.
18
19       Q.    Okay.
20             Whenever you meet with        , do you go in
21   alone or does your mother go in with you?
22       A.    It depends.  It usually starts with me and my
23   mom in there, then she waits out in the lobby and we
24   talk.  And sometimes I go out and my mother talks to him
```

```
 1   and then we get back --- we both go in the room at the

 2   end and then we say bye and then we leave.

 3       Q.   Okay.

 4            And how do you like that process, going to talk

 5   to ██████?

 6       A.   I love it because I can talk about ████████

 7   █████.

 8       Q.   Does that help you to feel better?

 9       A.   Uh-huh (yes).

10       Q.   Do you know --- excuse me, do you know whether

11   you have had any ████████████████████████?

12                    ATTORNEY HARTNETT:  Objection to form.

13                    THE WITNESS:  Could you rephrase that?

14   BY ATTORNEY CAPEHART:

15       Q.   Yes.  And let me back up and ask another

16   question I had forgotten to ask earlier.  Do you know

17   what ██████████ profession is?

18       A.   I don't know.

19       Q.   Okay.

20       A.   All I know is that he is a ████████.  That's

21   what I know.

22       Q.   Okay.

23            And do you know whether ████████ is a ███████ of

24   some sort or just a ████████
```

SARGENT'S COURT REPORTING SERVICE, INC.
(814) 536-8908

1              ATTORNEY HARTNETT:  Objection to form.

2              THE WITNESS:  I do not know.

3    BY ATTORNEY CAPEHART:

4       Q.    Okay.  Okay.

5              Now, if you could look at Exhibit 34.  Do you

6    have the document marked as Exhibit 34 in front of you?

7    It says West Virginia Legislature at the top and then in

8    the middle of the page there's a line that says House

9    Bill 3293.

10      A.    Yes, we have that.

11      Q.    Okay.  Great.

12             Have you ever seen this before?

13      A.    I don't think so.

14      Q.    Okay.

15             So if you --- this is just of kind of a cover

16   page for what was House Bill 3293 that passed the

17   legislature and was signed the Governor last year.  This

18   is the --- this is the bill, the law that your lawsuit

19   is challenging.

20             Now, if you look --- start looking at page two

21   you'll see there is a lot of text here.  Have you seen

22   any of this before?  You don't have to read it all, just

23   kind of glance over it.  And if you think you may have

24   seen parts before, you can say so, but ---.

```
 1     A.    I don't think I've seen this before.

 2     Q.    Okay.  Okay.  All right.

 3           Well, I'm not going to ask you to read the

 4   whole thing right now.  I'm just going to ask you about

 5   a couple of parts of it.

 6           Okay?

 7     A.    Uh-huh (yes).

 8     Q.    Because there's a lot to read here.

 9               ATTORNEY HARTNETT:  I'll just refer to

10   our standing objection.  Thank you.

11               ATTORNEY CAPEHART:  Sure.  Sure.

12   BY ATTORNEY CAPEHART:

13     Q.    On what's marked at the bottom of the page as

14   page two you'll see that there are kind of a column of

15   numbers that run down the left-hand side of the page

16   there.  The top number on page two should be a ten?

17     A.    Uh-huh (yes).

18     Q.    Okay.

19           And I'll just refer to those lines to direct

20   you to a couple of spots.  Okay.  And just so you know,

21   that's a standard part of what a bill looks like so that

22   whenever they're looking at legislation people can refer

23   to a procedure or line.  That way they can follow it

24   more easy.
```

SARGENT'S COURT REPORTING SERVICE, INC.
(814) 536-8908

1            So the lines I'm going to direct you to are 25

2    and 26.  This is a definition that is set forth in this

3    bill and it is down in West Virginia Code.  So just read

4    that and let me know when you've read that definition in

5    this bill.

6        A.    I've read it.

7        Q.    Okay.

8            Do you think that's a proper definition of

9    biological sex?

10                ATTORNEY HARTNETT:  Objection to

11   terminology.  Make that a standing objection.

12                THE WITNESS:  I would not know that if I

13   --- if that would be ---.

14   BY ATTORNEY CAPEHART:

15       Q.    Okay.

16            Have you ever heard people use language like

17   biological sex or biological female?

18                ATTORNEY HARTNETT:  Objection to form.

19                THE WITNESS:  Yes, I've heard people use

20   that.

21   BY ATTORNEY CAPEHART:

22       Q.    Okay.

23            Has anyone ever explained what they mean when

24   they have used that terminology around you?

1    A.    I don't think so or I just can't remember.

2    Q.    Okay.

3          This definition, at lines 25 and 26, does this,

4    based on the way that you have heard people use the term

5    in the past, is this about what you think they meant?

6                   ATTORNEY HARTNETT:  Objection to form.

7                   THE WITNESS:  Yes.

8    BY ATTORNEY CAPEHART:

9    Q.    Okay.

10         So now that you've read that in this bill

11   that's what that term means, look up at lines 21 and 22

12   and let me know when you've read those two lines.

13   A.    Okay.

14   Q.    Do you agree with that statement at lines 21 and

15   22?

16                   ATTORNEY HARTNETT:  Objection to form.

17                   THE WITNESS:  I don't because I think if

18   someone wants to play on the girls team, like me, they

19   should be able to even though they are --- they're not

20   following that requirement.

21   BY ATTORNEY CAPEHART:

22   Q.    Okay.

23         Before I move on to ask some questions about

24   cheerleading and track, I just want to talk about a

```
 1    couple of other words that we were just touching on.
 2    But I just want to make sure that we understand each
 3    other or at least you understand me.  You have heard
 4    people use the term biological female or the term
 5    biological male before.
 6              Is that correct?
 7      A.    Yes.
 8      Q.    Okay.
 9              And just so we're clear, if I use the term
10    biological female or biological girl, I'm describing
11    people who were determined to be female at the time of
12    birth.  Okay?  I'm not looking at the statute.  I'm just
13    saying like if I use that term, that's what I'm talking
14    about.  Just so that if I use a word and you're not sure
15    what I mean, I'm trying to explain in advance so there's
16    no confusion.  Does that make sense?
17      A.    Yes.
18      Q.    Okay.
19              And also, if I say biological male or
20    biological boy I mean someone who was determined to be
21    male at the time of birth.
22      A.    Yes.
23      Q.    So if I use that --- if I use that kind of
24    terminology that is what I'm talking about, people who
```

1    were determined to be that at the time of birth.  Okay?

2              When did you first get interested in sports?

3        A.    I've always liked running.  And I think

4    running's a sport, so since I could walk and run.

5        Q.    What kind of sports, in addition to running,

6    have you been interested in?

7        A.    Cheering was one.  I was a little bit interested

8    in volleyball, but not anymore.

9        Q.    Why not?

10       A.    I just never --- I just didn't --- I just lost

11   liking of it.

12       Q.    Whenever I say interested in --- let me

13   rephrase.  Whenever you say that you are interested in

14   running, you were interested in cheer and been part of a

15   team and for a short time you are interested in

16   volleyball but aren't really interested anymore, do you

17   mean interested in participating and playing those

18   sports?

19       A.    Yes.

20       Q.    Okay.

21             Are there other sports that you have been

22   interested in from the perspective of being a viewer but

23   maybe not a participant?

24       A.    Could you repeat the question?

SARGENT'S COURT REPORTING SERVICE, INC.
(814) 536-8908

1    Q.    Sure.  Besides the three that you just talked

2    about, running, cheer, volleyball, are there other

3    sports that you have an interest in as a viewer, as a

4    person that's in the stand watching it, or watching it

5    on television, but you don't have an interest in playing

6    or taking part?

7    A.    I like watching football.

8    Q.    Okay.

9          Anything else?

10   A.    That's about it.

11   Q.    Does your mom watch football?

12   A.    Yeah.  We like the same team.

13   Q.    What team?

14   A.    The Cleveland Browns.

15   Q.    Do you like any other football teams?

16   A.    Not really, no.

17   Q.    Do you just watch professional football or do

18   you watch college, too?

19   A.    Just professional.

20   Q.    Now, have your parents encouraged you to be

21   involved in sports?

22              ATTORNEY HARTNETT:  Objection to form.

23              THE WITNESS:  I'd say so that they

24   encouraged me.

SARGENT'S COURT REPORTING SERVICE, INC.
(814) 536-8908

BY ATTORNEY CAPEHART:

  Q.   Okay.

     Now that you've been on a couple of different kind of teams, girls cross-country and also cheer when you were younger, do you enjoy getting to compete as part of a team?

  A.   Yes, I do.

  Q.   If you were in a sport where you weren't on a team, that you were just an individual on a team, would you enjoy that also?

  A.   No, because that's not --- that's not on --- you're not on a team, you're not doing teamwork, that's just by yourself.

  Q.   So is the bigger appeal to you in sports being part of a team, being part of a group, working towards a common goal?

         ATTORNEY HARTNETT:  Objection to form.

         THE WITNESS:  Could you repeat the question?

BY ATTORNEY CAPEHART:

  Q.   Sure.  You said you wouldn't really like being in an individual sport, maybe something like, I don't know, figure skating maybe, because you wouldn't be part of a team, you would be --- that you like being part of

 1   a team?

 2      A.   Yes.

 3      Q.   So is that what draws you to some of the sports

 4   that you are interested in, the team aspect?

 5      A.   Yeah, the team aspect and I can make new

 6   friends.

 7      Q.   Do you consider yourself competitive whenever

 8   you're playing sports or when you're playing games with

 9   your friends?

10              ATTORNEY HARTNETT:  Objection to form.

11              THE WITNESS:  I want to call myself

12   competitive.  I'm just a person that likes playing

13   games.  I'm not like, oh, I got to win.  I just like

14   playing them, doing sports.

15   BY ATTORNEY CAPEHART:

16      Q.   Okay.

17           Do you have some friends that are like that?

18      A.   Yeah, I have a couple of friends.

19      Q.   I think we all have a couple of friends that are

20   like that.

21           So in those sports that you're interested in,

22   including football, do you think rules are really

23   important in sports?

24              ATTORNEY HARTNETT:  Objection to form.

SARGENT'S COURT REPORTING SERVICE, INC.
(814) 536-8908

```
 1                    THE WITNESS:  Yes, I think rules are

 2   important because you wouldn't want someone having an

 3   unfair advantage, like cheating.

 4   BY ATTORNEY CAPEHART:

 5      Q.    Right.

 6      A.    And like ---.

 7      Q.    Sorry.  Go ahead.

 8      A.    Like in baseball, I don't know what it's called,

 9   but getting a better grip on the ball, that's cheating.

10   That's not fair.

11      Q.    So do you think rules are a big part of or an

12   important part of making sure that sports are fair?

13      A.    Yes.

14                    ATTORNEY HARTNETT:  Objection to form.

15   Sorry, B███.  Just make sure you give me a chance to

16   object, but you should then give your answer.  So let's

17   try that one again.

18                    ATTORNEY CAPEHART:  Court Reporter, can

19   you repeat the last question?

20                    THE WITNESS:  Could you repeat the last

21   question?

22                    COURT REPORTER:  Question, so do you

23   think rules are a big part of or an important part of

24   making sure that sports are fair?
```

SARGENT'S COURT REPORTING SERVICE, INC.
(814) 536-8908

```
 1                    ATTORNEY HARTNETT:  Objection to form.

 2                    THE WITNESS:  I think they are a big part

 3    of making sports fair.

 4    BY ATTORNEY CAPEHART:

 5       Q.    What does it mean for sports, for competition to

 6    be fair?

 7                    ATTORNEY HARTNETT:  Objection to form.

 8                    THE WITNESS:  Well, sometimes it can mean

 9    losing --- maybe winning unfair and winning things

10    because if people are cheating then they could get --- I

11    don't know if there's a cash prize.  So if they cheat,

12    they're going to get that.  That's not fair because they

13    get something out of cheating.

14    BY ATTORNEY CAPEHART:

15       Q.    So it sounds like that you're saying that if

16    somebody breaks a rule like the one that you were

17    talking about in baseball, and by breaking that rule

18    that helps them to win or beat someone else, that that

19    wouldn't be fair.  Is that what you're ---?

20                    ATTORNEY HARTNETT:  Objection.

21                    THE WITNESS: Yes.

22    BY ATTORNEY CAPEHART:

23       Q.    I'm sorry.  I think I lost part of your answer

24    there.
```

```
 1      A.     Yes, that's what I'm saying.

 2      Q.     Who do you think should make up the rules for

 3   sports?

 4                     ATTORNEY HARTNETT:  Objection to form.

 5                     THE WITNESS:  I don't know.

 6   BY ATTORNEY CAPEHART:

 7      Q.     I'm going to ask you a couple of questions about

 8   your time on cheerleading.  How many years were you on

 9   the cheer team?

10      A.     I was on the cheer team for two years.

11      Q.     Okay.

12             And if I recall from what your mother had told

13   us, it was part of the Bridgeport Youth --- is it

14   Bridgeport Youth Football League?  Is that what it was?

15                     MS. JACKSON:  Yes.

16                     COURT REPORTER:  I'm sorry.  Ms. Jackson,

17   did you say yes or was it the witness.  I'm sorry.

18                     MS. JACKSON:  I said yes.

19   BY ATTORNEY CAPEHART:

20      Q.     My understanding is that that's not affiliated

21   with the schools in any way, that's an independent, what

22   a lot of people would maybe call midget football league

23   and that that league has cheerleading teams also.

24             Is that right?
```

```
 1                    ATTORNEY HARTNETT:  Objection to form.

 2                    THE WITNESS:  Yes.  Sorry.

 3   BY ATTORNEY CAPEHART:

 4     Q.    Okay.

 5           I just want to make sure I understood that.

 6   That's how things were when my daughter did midget cheer

 7   --- midget league cheer, also.

 8        What team were you on like B, C D?  Do you

 9   recall?

10                    ATTORNEY HARTNETT:  Objection to form.

11                    THE WITNESS:  I was on Bridgeport Pee Wee

12   Red.

13   BY ATTORNEY CAPEHART:

14     Q.    Okay.

15           And were the members of that team all within

16   --- all the same age or within a year of each other?

17     A.    They were within a year of each other.

18     Q.    So was that third and fourth or fourth and

19   fifth?

20     A.    I think it was fourth and fifth.

21     Q.    Did you enjoy being on the cheerleading team?

22     A.    Yeah, it was really fun.

23     Q.    Did you like cheering at sidelines at games more

24   than competition cheer?
```

```
 1              ATTORNEY HARTNETT:  Objection to form.

 2              THE WITNESS:  I did like cheering on

 3    sidelines better because I had stage fright and I feel

 4    whenever I was cheering on the sidelines most of the

 5    people were paying attention to the game, so I didn't

 6    have as much stage fright.  But at competition, that was

 7    the main thing that everyone was focusing on.

 8    BY ATTORNEY CAPEHART:

 9       Q.    When you would be part of the team and working

10    on your competition cheer, you all did stunts.

11              Is that correct?

12       A.    Yes, that is correct.

13       Q.    Did you get to be a flyer or were you a base?

14       A.    I was a base.

15       Q.    Did you enjoy that more than going up in the

16    air?

17       A.    Definitely, because I have a fear of heights.

18       Q.    Understandable.  So now that you're in Middle

19    School you were on the cross-country track team this

20    fall and you're also interested in running track.

21              Is that correct?

22       A.    Yes.

23       Q.    Okay.

24              I know I've seen in some reports and maybe in
```

```
 1    your Declaration, too, you mentioned that there were

 2    other people in your family that had run.  Is that the

 3    basis for your interest in being on cross-country and

 4    also doing track this spring?

 5       A.    Yes.

 6       Q.    Bridgeport Middle doesn't have coed teams, does

 7    it?

 8                  ATTORNEY HARTNETT:  Objection to form.

 9                  THE WITNESS:  Could you repeat the

10    question?

11    BY ATTORNEY CAPEHART:

12       Q.    Sure.  Do you know what a coed team is?  Have

13    you heard that term before?

14       A.    No.

15       Q.    Okay.

16             I realize I'm probably dating myself a little

17    bit there.  That term is not really used all that

18    frequently maybe nowadays, but that just essentially

19    means that coed would be, you know, boys and girls all

20    on the same team together.  And I guess you don't.  You

21    just have a boys team and a girl teams.

22             Right?

23       A.    Yes.

24                  ATTORNEY HARTNETT:  Objection to form.
```

SARGENT'S COURT REPORTING SERVICE, INC.
(814) 536-8908

```
1                    THE WITNESS:   Sorry.

2    BY ATTORNEY CAPEHART:

3        Q.    Now, in this --- for spring track you're going

4    to try out for the girls team.

5              Correct?

6        A.    Yes.

7        Q.    Now, that tryout and also the one for

8    cross-country track, are those competitive tryouts where

9    everybody has to run and be timed?

10                   ATTORNEY HARTNETT:   Objection to form.

11                   THE WITNESS:   Kind of because when we did

12   cross-country, all of us made it.  But I was told that

13   the year before, when I was in 5th grade, that they had

14   to cut people because there was too many.  So I think

15   that they only cut people if there's not --- if there is

16   too many.

17   BY ATTORNEY CAPEHART:

18       Q.    Do you know how many there were on cross-country

19   this fall?

20       A.    I don't know.

21       Q.    Okay.

22             If there is some upper limit, though, your team

23   didn't reach that limit in terms of participants?

24       A.    I think it may have been exactly the limit or
```

SARGENT'S COURT REPORTING SERVICE, INC.
(814) 536-8908

```
 1  less, but I don't know.

 2     Q.    You don't remember anyone that tried out not

 3  making the team, though?

 4     A.    Nope.  Everyone made it if they didn't quit.

 5     Q.    Okay.

 6           Do you remember how many meets or events you

 7  went to this past fall?

 8     A.    I don't know for a fact, but it was around seven

 9  to eight.

10     Q.    And were all of those competitive team events

11  where they were tracking everyone's times with a team

12  placing at the end?

13                ATTORNEY HARTNETT:  Objection to form.

14                THE WITNESS:  Yes, there was.

15  BY ATTORNEY CAPEHART:

16     Q.    Okay.

17           How did you all do this fall?

18     A.    We did very good.

19     Q.    Great.  Did you place at most of the events that

20  the team went to?

21                ATTORNEY HARTNETT:  Objection to form.

22  BY ATTORNEY CAPEHART:

23     Q.    And by team I mean did the team place at the

24  event that your team participated in?
```

```
 1     A.     Most of the time, yes.  Some of them weren't,

 2   but we always got close.

 3     Q.     Did your team get first place at any of the

 4   events?

 5     A.     Yes.

 6     Q.     How did that feel to be part of a team that got

 7   first place at one of these events?

 8     A.     It felt awesome.  It felt great.

 9     Q.     Okay.

10            So just because I don't know a tremendous

11   amount about cross-country or track and field, for

12   cross-country do you understand how the scoring works or

13   how the timing ends up with a team being first place or

14   second place or last place?

15     A.     I do not know.

16     Q.     But you would like to win, right?  You would

17   like your team to win.

18            Right?

19     A.     Yes.

20     Q.     What track sports do you want to run in this

21   spring, track events I should say?

22     A.     I'm thinking about doing long distance.

23     Q.     And by long distance what does that mean in

24   terms of the actual distance?
```

 1      A.      There is a mile, two miles, and I think there

 2   may be a three-mile one.

 3      Q.      So are you training to build up your stamina to

 4   those right now?

 5      A.      Not currently just because it is really cold

 6   out.

 7      Q.      That's fair.  Just like I was asking you to help

 8   me understand a little bit about how cross-country does

 9   its scoring and placing, I think I know a little bit

10   more about track and field.  In events like the distance

11   runs, the one, two or even --- one mile, two mile or

12   even longer distances, there are individual places in

13   each of those events.

14          Correct?

15      A.      Uh-huh (yes).

16      Q.      So do the first, second, third place finishers

17   get metals in those?

18             ATTORNEY HARTNETT:  Objection to form.

19             THE WITNESS:  I'm not sure because this

20   would be my first year doing track.

21   BY ATTORNEY CAPEHART:

22      Q.      And do you know whether the outcome of those

23   individual races are then factored into some overall

24   team standing?

1      A.    I do not know.

2      Q.    Okay.

3            Now, at all of these events that you have

4    participated in this past fall with the girls track team

5    and then the ones that you would like to be part of this

6    spring for track and field, those are just girls teams

7    against girls teams.

8            Is that correct?

9                  ATTORNEY HARTNETT:  Objection to form.

10                 THE WITNESS:  I do not know because,

11   again, this is my first year.

12   BY ATTORNEY CAPEHART:

13     Q.    Okay.

14           Now, at the cross-country events you went to

15   this past fall, when your team got first place, that was

16   just competing against a girls team.

17           Correct?

18     A.    Yes.

19     Q.    Okay.

20           At those same events or meets are there also

21   boys teams present?

22     A.    Yes.

23     Q.    Okay.

24           But your team only competed against the girls

1    teams.

2         Correct?

3    A.    Yes.

4    Q.    Would you have liked for your teams to have

5    competed against boys teams and girls teams?

6    A.    At a couple of meets they did.  But when they

7    do, they only tallied the girls points and the guys

8    teams differently and then they did the teams' totals.

9    Q.    Okay.

10        Did anyone explain to you why they did that

11   that way?

12   A.    I don't know.

13   Q.    Okay.

14        Do you think that they may have done those

15   tallies differently because someone thought that boys

16   could run faster than girls?

17             ATTORNEY HARTNETT:  Objection to form.

18             THE WITNESS:  I don't know.  I don't know

19   that.

20   BY ATTORNEY CAPEHART:

21   Q.    Okay.

22   A.    But whenever we started the --- a different ---

23   like the guys would go five minutes before and then five

24   minutes later the girls would go, so it was easier to

SARGENT'S COURT REPORTING SERVICE, INC.
(814) 536-8908

 1    tally up all the points.

 2        Q.    Okay.

 3              Do you think that the boys can run faster than

 4    the girls?

 5                    ATTORNEY HARTNETT:  Objection to form.

 6                    THE WITNESS:  I do not believe so because

 7    I also think that is a genetic thing, if you are fast or

 8    not.

 9    BY ATTORNEY CAPEHART:

10        Q.    Okay.

11              From what I remember reading somewhere you're

12    pretty good with math.

13              Is that fair to say?

14        A.    Yes.

15                    ATTORNEY HARTNETT:  Objection to form.

16                    THE WITNESS:  Sorry.

17                    ATTORNEY HARTNETT:  That is okay.

18    BY ATTORNEY CAPEHART:

19        Q.    Do you know what statistics are?

20        A.    I am familiar with the word, but I don't know

21    what it means.

22        Q.    Okay.

23              Would you and your teammates sometimes compare

24    times after meets?

1     A.     Sometimes.

2     Q.     Okay.

3            And at the cross-country events, was the course

4     that you would run a different length every time?

5     A.     It was always around 2 miles to 2.3, so --- so

6     not really.

7     Q.     Okay.

8            I was just curious because I have a number of

9     friends that are athletes and they really seem to enjoy

10    talking about statistics, you know, how fast they run or

11    in baseball a batting average or in football a

12    quarterback's completion percentage or something, that

13    those are, it seems for folks in and around sports, ways

14    that you can try to evaluate or to get a sense of

15    something about a person or group of people.  Have you

16    heard and seen statistics talked about when you watch

17    those football broadcasts with your mom?

18                    ATTORNEY HARTNETT:  Objection to the

19    narrative and to the question form.

20                    THE WITNESS:  Could you repeat the

21    question?

22                    ATTORNEY CAPEHART:  Sure.

23    BY ATTORNEY CAPEHART:

24    Q.     Have you seen or heard statistics talked about

1    on those football broadcasts that you watch with your

2    mom?

3        A.    Sometimes, but I don't really pay attention to

4    those because I mainly like watching the game.

5        Q.    That's fair.

6                    MS. JACKSON:  Excuse me.  She needs to

7    use the restroom.

8                    ATTORNEY CAPEHART:  Absolutely.  Take a

9    break.

10                   MS. JACKSON:  Can you get through?

11                   VIDEOGRAPHER:   Going off the record.

12   The current time reads 12:18 p.m.

13   OFF VIDEOTAPE

14                           ---

15   (WHEREUPON, A SHORT BREAK WAS TAKEN.)

16                           ---

17   ON VIDEOTAPE

18                   VIDEOGRAPHER:  We are back on the record.

19   The current time reads 12:25 p.m.

20   BY ATTORNEY CAPEHART:

21       Q.    All right.

22             Well, let's see.  When we left off I was just

23   asking you about things about statistics.  Have you ever

24   looked up any statistical data about cross-country for

SARGENT'S COURT REPORTING SERVICE, INC.
(814) 536-8908

1  people your age?

2     A.    No, I have not looked up the statistics for

3  people my age.

4     Q.    And I think I framed that question as for

5  cross-country.  Have you ever done that with track and

6  field, for example, the one mile or the two mile?

7     A.    No, I have not.

8     Q.    If you were to see statistics that show that, on

9  average, 11-year-old biological boys were 20 percent

10 faster than 11-year-old biological females in the mile

11 run, would that surprise you?

12                ATTORNEY HARTNETT:  Objection to form.

13                THE WITNESS:  Yes, because I think

14 biological --- it's all about genetics, if you're fast

15 or not.

16 BY ATTORNEY CAPEHART:

17    Q.    So if you're fast or not is about genetics?

18    A.    I think it is, but it could be not.

19    Q.    Okay.

20          If that were true, that there is a statistic

21 somewhere that shows that 11-year-old biological boys

22 are 20 percent faster than biological girls of the same

23 age, would it be fair to have the biological boys

24 running in the mile race with biological girls?

```
 1                    ATTORNEY HARTNETT:  Objection to form.

 2                    THE WITNESS:  Can you say the question

 3  again?

 4  BY ATTORNEY CAPEHART:

 5     Q.    Sure.  If there were statistics that did show

 6  that difference of 20 percent between biological boys at

 7  a certain age and biological girls at that same age,

 8  would it be fair to allow biological boys to run that

 9  same race as the biological girls?

10                    ATTORNEY HARTNETT:  Objection to form.

11                    THE WITNESS:  If they identify as a

12  female, then I think, yes.  But if not, then I don't

13  think that it should.

14  BY ATTORNEY CAPEHART:

15     Q.    Okay.

16           So you said if they identify as a female, then

17  they should be able to run with the biological girls?

18     A.    Yes.

19     Q.    Did I hear you right?

20     A.    Yes.

21     Q.    Okay.

22           So then could any biological boy be on the

23  girls team so long as they identify as female?

24                    ATTORNEY HARTNETT:  Objection to form.
```

1          THE WITNESS:  I think so.  Sorry.

2          ATTORNEY HARTNETT:  Sorry.

3   BY ATTORNEY CAPEHART:

4    Q.    And when you say they identify as female, just

5   explain that to me so I make sure I understand it.

6    A.    When people are transgender from male to female,

7   like me, that's what I think is identifying as a female.

8    Q.    Okay.

9          Is it enough for someone in your mind to

10   identify as female for them to just say that they

11   believe they're female or do they need to do something

12   more than that?

13          ATTORNEY HARTNETT:  Objection to form.

14          THE WITNESS:  I think they need to have

15   an appearance and there has to be a reason.  Like ---

16   well, not a reason, but they have to --- they have to

17   not just say, oh, I identify as female, I should run.

18   They should have already been transitioned.  It can't

19   just be out of nowhere.  Like, oh, all of the sudden,

20   now that I started, I just realize that I can do this,

21   oh, I'm transgender.  That's --- I don't think that ---

22   I think maybe --- I don't know, a year into the

23   transition that you should be able to.

24   BY ATTORNEY CAPEHART:

1       Q.     Okay.

2              So when you say a year into their transition

3       do, you mean like just their social transition, the way

4       they are presenting themselves?

5       A.     Yes.

6       Q.     Okay.

7              For that kind of hypothetical person that you

8       were describing there, if they had gone a year into

9       their transition, as I think you've described it, then

10      in your mind that's what they need to do so that they

11      could be on the girls team?

12                  ATTORNEY HARTNETT:  Objection to form.

13                  THE WITNESS:  Yes.

14      BY ATTORNEY CAPEHART:

15      Q.     Okay.

16             Do they --- do they need to be doing something

17      else like taking puberty blockers or something of that

18      nature?

19                  ATTORNEY HARTNETT:  Objection to form.

20                  THE WITNESS:  I think they should be on

21      puberty blockers to do it because if they have hit

22      puberty, then that's a different story because they hit

23      puberty and that's not changeable.

24      BY ATTORNEY CAPEHART:

SARGENT'S COURT REPORTING SERVICE, INC.
(814) 536-8908

```
1        Q.    Okay.

2              When they hit puberty and that's not

3    changeable, explain that to me a little if you can.

4                    ATTORNEY HARTNETT:  Objection to form.

5    Go ahead.

6                    THE WITNESS:  If they've hit puberty,

7    then they are maturing and they are going to get a

8    deeper voice.  A girl would get a bigger Adam's apple

9    and then that's really it.  And I think that gives them

10   more of an unfair advantage.  I could be wrong, but I

11   think after they hit puberty, I don't know, I think

12   something happens, but I'm not sure.

13   BY ATTORNEY CAPEHART:

14      Q.    Do you think there is something else that

15   happens besides the depth of voice and the Adam's apple?

16      A.    I think they may get faster because their

17   testosterone levels will rise.

18      Q.    Okay.

19              And do you think that's not an issue for

20   someone that hasn't gone through puberty yet?

21                    ATTORNEY HARTNETT:  Objection to form.

22                    THE WITNESS:  Sorry.  Yes, because their

23   testosterone levels, if they are on puberty blockers,

24   won't be as high and they won't be --- it won't be high
```

```
 1  and it won't give them any advantage.
 2  BY ATTORNEY CAPEHART:
 3      Q.    If there was someone in that situation that
 4  wasn't on puberty blockers, do you think that would be
 5  unfair for that person to be on a girls team?
 6                  ATTORNEY HARTNETT:  Objection to form.
 7                  THE WITNESS:  As long as they haven't hit
 8  puberty, then I think it's fine.  But if they have hit
 9  puberty, then I think they should maybe go on hormone
10  blockers and then maybe then, because I --- I could be
11  wrong, but I think their testosterone levels will drop
12  if they go on hormone blockers after puberty.
13  BY ATTORNEY CAPEHART:
14      Q.    Okay.
15            Do you think that they also need to be getting
16  treated for gender dysphoria?
17                  ATTORNEY HARTNETT:  Objection to form.
18                  THE WITNESS:  I don't think that matters
19  because if they don't have gender dysphoria, why should
20  they be getting treated for it.
21  BY ATTORNEY CAPEHART:
22      Q.    So if there was a person that went through that,
23  a biological boy who had done all the things that you
24  say needed to be done and they could be on the girls
```

SARGENT'S COURT REPORTING SERVICE, INC.
(814) 536-8908

1   team, but at some point in the future that person

2   decided they wanted to, I don't know, revert back to

3   being on the boys team for sports, should that be

4   allowed?

5                    ATTORNEY HARTNETT:  Objection to form.

6                    THE WITNESS:  If they want to, then yes,

7   go ahead, because they will --- if they are --- if they

8   still have the requirements to be on the girls team,

9   then they will be on puberty blockers and then the

10  testosterone levels will still be low.  So --- but if

11  they get off, then they'll just raise back, and they

12  could still run on the boys team, but they can't run on

13  the girls.

14  BY ATTORNEY CAPEHART:

15    Q.    Okay.

16          You've been talking about puberty blockers like

17  a person that knows about them, which I think you do.

18  What do you know about puberty blockers?

19                    ATTORNEY HARTNETT:  Objection to the

20  preamble and to the form.

21                    THE WITNESS:  Okay.

22                    Could you repeat the question?

23  BY ATTORNEY CAPEHART:

24    Q.    Sure.  What do you know about puberty blockers?

SARGENT'S COURT REPORTING SERVICE, INC.
(814) 536-8908

```
 1     A.     They stop hormone levels from rising and they

 2   have --- they have a chance for --- they have side

 3   effects, but if you are transgender they can help ---

 4   they can help with the process of a transition because

 5   it will stop you from hitting puberty and you won't grow

 6   an Adam's apple, you won't grow facial hair and your

 7   voice won't get deeper.

 8     Q.     Okay.

 9            You're receiving puberty blocking medications

10   now.

11            Is that correct?

12     A.     Yes, that's correct.

13     Q.     Okay.

14            Did you want to start that medication to delay

15   or prevent puberty?

16     A.     Yes, that is correct.

17     Q.     Okay.

18            We had talked some about your doctors'

19   appointments before.  You had some appointments before

20   receiving the puberty blockers.

21            Correct?

22     A.     Yes, that is correct.

23     Q.     Okay.

24            Do you remember an appointment where you talked
```



1    with a doctor about getting puberty blocking meds?

2        A.    Yes.







18          ATTORNEY CAPEHART:  I think this is a

19   good spot to take a break.  The next part that I'm going

20   to get into I think is going to take a little more time

21   than we have.  I see it's 12:41, so if it's all right

22   with everyone, I suggest we go off the record and talk

23   about when we come back.

24          ATTORNEY HARTNETT:  That's fine with us.

```
 1                    VIDEOGRAPHER:   Going off the record.  The

 2    current time reads 12:41 p.m.

 3    OFF VIDEOTAPE

 4                           ---

 5    (WHEREUPON, A SHORT BREAK WAS TAKEN.)

 6                           ---

 7    ON VIDEOTAPE

 8                    VIDEOGRAPHER:   We are back on the record.

 9    The current time reads 1:19 p.m.

10    BY ATTORNEY CAPEHART:

11       Q.    Okay.

12             Well, before I move onto something else, I just

13    wanted to follow up on something that you had mentioned

14    before the break, B████.  And I hope you had a good

15    break.  You had mentioned testosterone before.  Where

16    had you learned about what testosterone is?

17       A.    The doctors.

18       Q.    Okay.

19             Like Dr. Montano, those people?

20       A.    Yes.

21    ██  ███████████████████████████████████

22    ██████████████████████████████████████

23              ███████████████  ██████████████

24              ██████████████.  █████████████
```

SARGENT'S COURT REPORTING SERVICE, INC.
(814) 536-8908



BY ATTORNEY CAPEHART:

    Q.    Okay.

        You had mentioned before in relation to a biological boy running on a girls team and that they would need to, I think you had said --- I'm not trying to put words in your mouth, but I think you had said something along the lines that they would need to be taking some kind of medication relative to the testosterone if they were either going through puberty or had gone through puberty.

                ATTORNEY HARTNETT:   Objection to form.

BY ATTORNEY CAPEHART:

    Q.    Do you remember that when we were talking earlier?

    A.    Yes.

1    Q.    Okay.

2         Why did you mention testosterone relative to

3    how a biological boy might be performing in running?

4    A.    Because I think that --- that after --- whenever

5    you half an increase of testosterone, that --- I think

6    that increases your athletic ability, but I could be

7    wrong there.

8    Q.    Okay.  Fair enough.

9         Do you know that because of what the doctors

10   had talked to you about?

11              ATTORNEY HARTNETT:  Objection to form.

12              THE WITNESS:  I am pretty sure, yeah.

13   BY ATTORNEY CAPEHART:

14   Q.    Okay.

15        Have you had done any independent research

16   yourself to learn more about testosterone?

17   A.    I don't recall.  I may have, but I don't

18   remember.

19   Q.    Okay.

20        Do you recall reading the Complaint in this

21   lawsuit?

22   A.    I do not.

23   Q.    Okay.

24        If you could look at Exhibit 32 for just a

```
 1    minute.  Okay.  It says Exhibit WV-32 at the bottom
 2    right corner and has a lot of other words, but in
 3    boldface in the upper right center are the words First
 4    Amended Complaint.  Okay.  This is as it says is the
 5    First Amended Complaint, means there was an original
 6    Complaint that had been amended once in its first
 7    Amended Complaint.  Do you recall ever having seen this
 8    before now that you are getting a chance to look at it?
 9        A.    Yes, I think so.
10        Q.    Okay.
11              Do you remember reading over it yourself?
12        A.    I don't think so.
13        Q.    Okay.
14              Do you remember anyone discussing with you what
15    was in the Complaint?
16        A.    I think I discussed it with my mom.
17        Q.    But you don't know everything that's in here
18    because you haven't read it yourself.
19              Is that correct?
20        A.    I don't.
21                    ATTORNEY HARTNETT:  Objection.
22                    THE WITNESS:  I don't remember if I have
23    or haven't.
24    BY ATTORNEY CAPEHART:
```

1   Q.   Okay.

2        You don't remember if you have or have not.

3   Okay.

4        Now, I think we had talked before about the

5   fact that your lawsuit is challenging the HB 3293.  You

6   may have remembered we had looked at that very briefly

7   and I had directed you to a couple of parts of it and

8   you had said you hadn't read the whole thing.  And I

9   will also represent to you that it also had some other

10  definitions in there for biological male and female.  Do

11  you believe there is a difference between biological

12  males and biological females?

13               ATTORNEY HARTNETT:  Objection to form and

14  the preamble.

15               THE WITNESS:  I don't know.

16  BY ATTORNEY CAPEHART:

17    Q.   Okay.

18         You don't know if there is any difference

19  between a biological boy and a biological girl?

20               ATTORNEY HARTNETT:  Objection to form.

21               THE WITNESS:  I don't know.  I don't know

22  if there is a difference.

23  BY ATTORNEY CAPEHART:

24    Q.   Okay.

SARGENT'S COURT REPORTING SERVICE, INC.
(814) 536-8908

```
 1              Do you think there are physical differences
 2   between a biological boy and a biological girl?
 3                    ATTORNEY HARTNETT:  Objection.
 4                    THE WITNESS:  Could you repeat the
 5   question?
 6   BY ATTORNEY CAPEHART:
 7     Q.    Sure.  Do you think there are physical
 8   differences between a biological boy and a biological
 9   girl?
10     A.    Yes.
11     Q.    Okay.
12                    ATTORNEY HARTNETT:  And I just have a
13   standing objection in terminology, but I will not
14   continue to make that objection.
15                    ATTORNEY CAPEHART:  Noted.  Thank you.
16   BY ATTORNEY CAPEHART:
17     Q.    What do you understand the physical differences
18   are between a biological boy and a biological girl?
19     A.    A biological boy has a penis and a biological
20   girl has a vagina.
21     Q.    Okay.
22              Do you believe there are any other physical
23   differences between a biological boy and a biological
24   girl?
```

1    A.    There --- yes, but that part could be with

2    either one, because long hair could also be with a guy

3    or like that's --- like if a girl, a biological girl,

4    would probably have long hair, but a guy could also have

5    long hair.  And then a guy could have --- a guy could

6    have short hair and a girl could also have that.  And a

7    biological guy would probably want to look muscular, but

8    a biological girl would probably --- could probably want

9    to look like that.

10    Q.    So apart from a superficial difference like hair

11   length or how much someone works out and also the

12   difference in genitalia, are you aware of any other

13   differences?

14                    ATTORNEY HARTNETT:  Objection to form.

15                    THE WITNESS:  Not that I can think of

16   right now.

17   BY ATTORNEY CAPEHART:

18    Q.    Okay.  Okay.

19          Can you all look at Exhibit 26?  Do you have

20   Exhibit 26?

21    A.    Yes.

22    Q.    This looks like it is an article from the

23   Gazette Mail.  If you flip to the second page of the

24   exhibit, the fourth block of text up from the bottom it

SARGENT'S COURT REPORTING SERVICE, INC.
(814) 536-8908

```
 1   reads, quote, I just want to run, I come from a family
 2   of runners, close quoted, B███████████ said in a news
 3   release.  Quote, I know how hurtful a law like this is
 4   to all kids like me who just want to play sports with
 5   their classmates, and I'm doing this for them.  Trans
 6   kids deserve better, closed quote.  B████, do you
 7   remember talking to a reporter before this article got
 8   written?
 9       A.    Yes.
10       Q.    Okay.
11             And the quoted language that I was just reading
12   there that's also in the exhibit, do you remember saying
13   that?
14       A.    Yes.
15       Q.    Okay.
16             So those are your words, no one was
17   paraphrasing something you were trying to tell them
18   then?
19       A.    No.
20       Q.    Okay.
21             Is a trans kid an appropriate term to use?
22                   ATTORNEY HARTNETT:  Objection, form.
23                   THE WITNESS:  Could you repeat the
24   question?
```

 1   BY ATTORNEY CAPEHART:

 2      Q.     Sure.  In the quote it says trans kids deserve

 3   better.  I'm just curious, is trans kids a normal term

 4   that is used and is acceptable to use?

 5                    ATTORNEY HARTNETT:  Objection, form.

 6                    THE WITNESS:  Could you repeat the

 7   question one more time?

 8   BY ATTORNEY CAPEHART:

 9      Q.     Sure.  And I'm not trying to trick you.  I'm

10   just trying to understand because you used the term

11   trans kids, and I think I've seen it in maybe another

12   article, too, and I just thought I encountered it

13   another experience.  So I'm asking the question is that

14   an acceptable term to use to refer to transgender boys

15   or transgender girls?

16                    ATTORNEY HARTNETT:  Same objection.

17                    THE WITNESS:  Yes.

18   BY ATTORNEY CAPEHART:

19      Q.     Is it okay to call you a trans kid?

20      A.     If you don't know that I don't know my name and

21   you know I'm trans, then yes, that's acceptable.  But if

22   you know my name and you're purposely calling me that,

23   then not really, but it's still fine.

24      Q.     Yeah.  And I don't intend to.  I was just

SARGENT'S COURT REPORTING SERVICE, INC.
(814) 536-8908

1   curious ---

2      A.    Yes.

3      Q.    --- from the nuances and the acceptable use of

4   the term.  So thank you.  Excuse me.  If you can look

5   at Exhibit 27.

6                ATTORNEY HARTNETT:  And just for the

7   record and the witness's knowledge, B█████, you should

8   feel free to review the full exhibit before you answer

9   questions if you want to.

10               THE WITNESS:  Okay.

11               MS. JACKSON:  So that's the first page.

12               ATTORNEY CAPEHART:  You all just let me

13  know whenever you're ready to proceed.

14               Okay?

15               ATTORNEY HARTNETT:  I'm sorry.  I think

16  B████ is ready.

17               THE WITNESS:  Yeah.

18               ATTORNEY CAPEHART:  Okay.  Thank you.

19  BY ATTORNEY CAPEHART:

20     Q.    I'm going to try to make sure I direct you to

21  the proper page.  It looks like it's the last page of

22  the text, which looks like it's about the fourth to the

23  last page of the exhibit.  At the top of the page the

24  test begins with the word when Justice.  Right there.

SARGENT'S COURT REPORTING SERVICE, INC.
(814) 536-8908

```
 1    Have you all found that on your hard copy?

 2        A.    Yes.

 3        Q.    Okay.  All right.

 4              So let's see, this first block here that reads

 5    when Justice signed the Bill banning transgender girls

 6    from sports teams, B████ was devastated she said.  Then

 7    another quote, I felt horrible because I knew then I

 8    couldn't run with the other girls.  Do you remember

 9    talking to the author of this piece before it came out?

10        A.    Yes.

11        Q.    Okay.

12              And does that quote seem right?  Do you

13    remember saying that?

14        A.    Yes.

15        Q.    Okay.

16              Now, I recall earlier you mentioned that you

17    hadn't read the bill, the new law yourself, but here you

18    said you couldn't run with the other girls after the

19    Governor signed it.  How did you know that since you

20    hadn't read through the bill?

21        A.    I was told by my mom.

22        Q.    Okay.

23              Do you remember when you and your mother had

24    that discussion?
```

```
1        A.     I don't remember.

2        Q.     All right.

3               Were you aware of this bill before your mom

4   told you that it was now a law?

5        A.     I was aware of it, but I didn't know that it was

6   going to get signed.

7        Q.     Okay.

8               What did you know about it before your mom told

9   you it was signed and was now a law?

10       A.     That I wouldn't be able to run with the girls

11  once it got signed.

12       Q.     Okay.  All right.

13              If you move down to and look at the fourth

14  block of text there on the page it says as hard as it is

15  to be a trans kid and a mother of a trans kid, suddenly

16  thrust into the public eye in a conservative state,

17  B▮▮▮ and Jackson agree that the potential payoff makes

18  it all worth it.  You don't have a problem with the

19  author using trans kid there, do you?

20       A.     No.

21       Q.     Okay.

22              How hard has it been in Bridgeport and Lost

23  Creek to be a trans kid, as the author says?

24                   ATTORNEY HARTNETT:  Objection to form.
```

```
 1                    THE WITNESS:  Could you --- could you

 2  repeat the question?

 3  BY ATTORNEY CAPEHART:

 4     Q.    Sure.  This little bit of language here is

 5  talking about it being hard to be a trans kid and the

 6  mother of a trans kid, so my question is how hard has

 7  that been on you in Bridgeport and Lost Creek?

 8                    ATTORNEY HARTNETT:  Objection to form.

 9                    THE WITNESS:  Well, a lot of the people

10  don't support it and don't agree with it, so that's what

11  makes it hard.

12  BY ATTORNEY CAPEHART:

13     Q.    Okay.

14           You had said that school had gone really well

15  with your transition.

16           Correct?

17     A.    Uh-huh (yes).

18     Q.    Okay.

19           So are these people you're describing now, are

20  these all people outside of school?

21                    ATTORNEY HARTNETT:  Objection to form.

22                    THE WITNESS:  Yes.

23  BY ATTORNEY CAPEHART:

24     Q.    Okay.
```

```
 1            What kind of people are these?

 2                    ATTORNEY HARTNETT:  Objection to form.

 3                    THE WITNESS:  Usually adults.

 4   BY ATTORNEY CAPEHART:

 5       Q.    Okay.

 6             Are these people you know or strangers?

 7       A.    Strangers.

 8       Q.    Well, what have they done?

 9       A.    Just not --- just be mean in general.

10       Q.    Well, how are they being mean?

11       A.    They don't support it.  Sometimes people call me

12   names, just be mean.

13       Q.    Okay.

14             Does this happen often?

15       A.    Not as much now, but it used to happen a lot.

16       Q.    When you say used to happen a lot, do you mean

17   back at the time that you transitioned or before that or

18   after that?

19       A.    Well ---.

20                    ATTORNEY HARTNETT:  Objection to form.

21                    THE WITNESS:  Well, at the time and a

22   little bit after because I was so --- I was new to it

23   and I didn't know how to handle people like being

24   meaning about it.
```

1   BY ATTORNEY CAPEHART:

2       Q.    Okay.

3             Would people be mean to you when your parents

4   were around?

5       A.    They wouldn't do it like directly to my face

6   usually.  They would say it to my mom or my dad and then

7   my parents would tell me.  So it wasn't usually directly

8   to me.

9       Q.    So when they would say these things, you weren't

10  in the presence of these people when they were saying

11  them?

12      A.    Most of the time, yes.

13      Q.    Oh, okay.

14            But then your mom and your dad would have

15  people say things to them and then your mom and dad

16  would tell you about what other people had said?

17            ATTORNEY HARTNETT:  Objection to form.

18  BY ATTORNEY CAPEHART:

19      Q.    Is that correct?

20      A.    Yes, but sometimes they wouldn't tell me just

21  I'm assuming to try not to make me sad.

22      Q.    Have any other kids ever said the kind of things

23  to you that your parents said adults had told them?

24            ATTORNEY HARTNETT:  Objection to form.

SARGENT'S COURT REPORTING SERVICE, INC.
(814) 536-8908

1              THE WITNESS:   No.

2    BY ATTORNEY CAPEHART:

3       Q.     No?   Do you and your family attend a church?

4       A.     Not anymore.

5       Q.     Okay.

6              Did you before?

7       A.     For a short period of time, yes.

8       Q.     Okay.

9              Did you ever have any issues or problems there?

10      A.     No.

11      Q.     So there weren't any adults at that church that

12   were mean to you or that said mean things to your

13   parents that you know of?

14      A.     At that time I was not transitioned yet, so

15   there was no comments like that.

16      Q.     Okay.

17             Do you remember when you had said your mom had

18   explained to you because the bill was now signed you

19   wouldn't be able to run, did she explain what part of

20   the new law would stop you from running?

21                 ATTORNEY HARTNETT:   Objection to form.

22                 THE WITNESS:   No, she just told me that

23   because of this I couldn't run.

24   BY ATTORNEY CAPEHART:

1    Q.    Okay.

2          And because you haven't read the bill yourself,

3    you don't have any knowledge of what part of the bill

4    prevents you from running.

5          Is that correct?

6    A.    Yes.

7                ATTORNEY HARTNETT:  Objection to form.

8    BY ATTORNEY CAPEHART:

9    Q.    Thank you.  All right.  Let's see Exhibit 28.

10   I just was going to interject that you are free to read

11   the entirety if you would like to, the 20 pages.  It's a

12   lot, but I have no problem telling you the only thing

13   I'm going to ask you about is the portion on the last

14   page, the part under the subtitle B█████'s trials.

15               MS. JACKSON:  Thank you.

16               ATTORNEY CAPEHART:  You're welcome.

17               THE WITNESS:  I'm ready.

18   BY ATTORNEY CAPEHART:

19   Q.    Okay.  Great.

20         Do you remember talking to this author from

21   ESPN?

22   A.    I can't remember.

23   Q.    It sounds like your tryouts were pretty

24   challenging.

SARGENT'S COURT REPORTING SERVICE, INC.
(814) 536-8908

```
 1           Is that true?
 2    A.    Yes.
 3    Q.    Okay.
 4           Do you recall expressing anything to this
 5    reporter that's quoted here or otherwise described?
 6                 ATTORNEY HARTNETT:  Objection to the
 7    form.
 8                 THE WITNESS:  Could you repeat the
 9    question?
10    BY ATTORNEY CAPEHART:
11    Q.    Sure.  Do you recall saying this part that's
12    quoted here about your friends or discussing any of the
13    rest of it with the reporter?
14    A.    I don't remember, but I think I remember saying
15    maybe some of this, but I can't remember.  I can't
16    remember.
17    Q.    Okay.  Okay.
18           And it seems like you were understandably
19    excited to have made the team.
20           Is that right?
21    A.    Yes.
22    Q.    Okay.
23           How many girls were on the team this past fall?
24                 ATTORNEY HARTNETT:  Objection.  I'm
```

 1   sorry.

 2                        THE WITNESS:  I don't know.

 3   BY ATTORNEY CAPEHART:

 4       Q.    Okay.

 5             And you were the only transgender girl on the

 6   team.

 7             Is that correct?

 8                     ATTORNEY HARTNETT:  Objection to form.

 9                     THE WITNESS:  As I knew of, there may

10   have been people that haven't come yet, but of what I

11   knew I was the only one.

12   BY ATTORNEY CAPEHART:

13       Q.    So far as you know, you're the only transgender

14   girl on the team.

15             Is that correct?

16       A.    Yes.

17       Q.    Okay.  Okay.

18             Exhibit 29, which is much shorter.  Okay.  Take

19   a look at that, however much you would like to, and then

20   let me know whenever you'd like to proceed.

21       A.    I'm done reading.

22       Q.    Okay.

23             Let's see.  Just below kind of the mid point of

24   the page, about the third block of real text it starts

```
 1    off with a quote there and it says, quote, I just want
 2    to run and the State wants to stop me from running as
 3    part of a team at my school, end quote, said B████, an
 4    11-year0old Middle School student.  Quote, I love
 5    running and being part of the team and the State of West
 6    Virginia should explain in court why they won't let me,
 7    end quote.  Do you remember saying or writing that?
 8        A.    I remember saying that.
 9        Q.    Okay.
10              Who did you say that to?
11        A.    I can't remember.
12        Q.    Okay.
13              But those are all your words.
14              Correct?
15        A.    Uh-huh (yes).
16        Q.    Okay.
17        A.    Yes.
18        Q.    In what ways --- strike that.
19              When you say that the State of West Virginia
20    should explain in court why they won't let you be part
21    of the team, are you referring to HB-3293?
22        A.    Yes.
23        Q.    But as you said earlier, you're not sure what
24    part of that prevents you from running, you just know
```

```
 1   that it does because you have been told that.

 2          Correct?

 3                  ATTORNEY HARTNETT:  Objection to form.

 4                  THE WITNESS:  Yes.

 5   BY ATTORNEY CAPEHART:

 6      Q.    Okay.

 7            Sorry for that.  B█████, are you aware of or

 8   have you read anything that the State has filed with the

 9   Court in this case?

10      A.    I think I've skimmed through a couple of things,

11   but not really read them.

12      Q.    Okay.

13            Those couple of things that you think you have

14   skimmed through, do you recall what those were?

15      A.    One of them was the one thing we just read ---

16   the thing that we went through just a little bit, I

17   skimmed through that.  And there was another one, but I

18   don't remember which one it was.

19      Q.    Okay.

20            The thing that we went just went through, I

21   apologize, we have gone through a few things.

22      A.    Just now, the one just now I skimmed through,

23   couple of paragraphs.  I'm pretty sure at least.

24      Q.    Do you mean Exhibit 29?
```

SARGENT'S COURT REPORTING SERVICE, INC.
(814) 536-8908

1                    MS. JACKSON:   This?

2                    THE WITNESS:   Yes.

3    BY ATTORNEY CAPEHART:

4       Q.    Exhibit 29 is not anything that the State has

5    written.   I'm just explaining what this is.   And my

6    understanding is that this is a news release from Lambda

7    Legal.   So you think there may have been something else,

8    though, that you looked at, you're just not really sure?

9       A.    Yeah.

10      Q.    Okay.   Okay.

11            Give me just a second to check a couple of

12   things.   Okay.   There's a couple of things to just run

13   through real quick and then I think I might be done.

14   One, just following back up on the thought of why the

15   State won't let you run, why do you think, to use your

16   words from this press release, that the State won't let

17   you run?

18      A.    Could you repeat the question?

19      Q.    Sure.   In the release here there is, as you

20   said, your language saying that you want the State to

21   explain in court why they won't let you, referring back

22   to being part of a team and running.   Why do you --- why

23   do you think that is?

24                    ATTORNEY HARTNETT:   Objection.   Form.

1          THE WITNESS:  Because I don't think there

2    is a good enough reason for me to not be able to run.

3    BY ATTORNEY CAPEHART:

4      Q.    Okay.

5           When you say there's not a good enough reason,

6    has someone spoken to you or explained some reason why

7    they think that the State wouldn't let you run?

8          ATTORNEY HARTNETT:  Objection to form.

9          THE WITNESS:  Could you repeat the

10   question?

11         ATTORNEY CAPEHART:  Court Reporter, can

12   read that question back for us?

13         COURT REPORTER:  When you say there is

14   not a good enough reason, has someone --- has someone

15   --- I'm sorry.  When you say there's not a good enough

16   reason, has someone spoken to you or explained some

17   reason why they think that the State wouldn't let you

18   run?

19         ATTORNEY HARTNETT:  Objection.

20         THE WITNESS:  No one has explained the

21   reason, but that's why I think there's not a good enough

22   reason for me to not run.

23   BY ATTORNEY CAPEHART:

24     Q.    So you have not had any conversations with

SARGENT'S COURT REPORTING SERVICE, INC.
(814) 536-8908

1   anyone who could explain what reasons the State may have

2   presented as to why they passed this bill?

3                    ATTORNEY HARTNETT:  I would just object

4   to the extent this would entail any conversations with

5   your lawyers, B████, and you should not testify about

6   those conversations.  If there are conversations other

7   than ones with your lawyer, you can testify about that.

8                    THE WITNESS:  What was --- can you repeat

9   the question?

10  BY ATTORNEY CAPEHART:

11     Q.    Sure.  And to pick up on Kathleen's comment, I'm

12  not trying to get you to divulge any confidential

13  communications that you had with your lawyers, but I'm

14  just trying to understand your comment where you said

15  that there is not a good enough reason and that no one

16  has explained a reason why the State passed this bill.

17  So I'm asking you what kind of conversations have you

18  had, if any, with anyone other than your lawyers about

19  the reason why this bill may have been passed?

20     A.    I haven't had any conversations with any of my

21  lawyers.

22     Q.    Okay.

23           Have you talked with your mom about why this

24  law may have been passed?

1    A.    I don't think I have, no.

2    Q.    And you already said you have not looked at any

3  of the State's filings or documents that it has put in

4  before the Court in this case?

5              ATTORNEY HARTNETT:  Objection, MT.

6              THE WITNESS:  I don't think so.

7  BY ATTORNEY CAPEHART:

8    Q.    Okay.

9          You don't recall whether you have seen those,

10  but you don't believe so, is that what you said

11  previously?

12              ATTORNEY HARTNETT:  Objection, MT.

13              THE WITNESS:  Yes.

14  BY ATTORNEY CAPEHART:

15    Q.    Okay.

16          Real briefly, look back at Exhibit 31, which is

17  the Declaration that you looked at when we started.

18  Just let me know when you have it.

19    A.    We have the Declaration.

20    Q.    Okay.

21          Look at page three, if you would.  Got it?

22    A.    Uh-huh (yes), yes.

23    Q.    Okay.

24          There at paragraph number 13 it says, I do not

```
 1    want to run with the boys and I should not have to run
 2    with the boys.  What's wrong with running with the boys?
 3        A.   I'm not a boy.  I'm a girl.  I should be able to
 4    run with the girls.
 5        Q.   Okay.
 6             Are there any competitive concerns if you did
 7    run with the boys?
 8                      ATTORNEY HARTNETT:  Objection.  Form.
 9                      THE WITNESS:  No.  I just think I'm a
10    girl and I shouldn't have to run with the boys.  I
11    should be able to run with the girls because I am a
12    girl.
13    BY ATTORNEY CAPEHART:
14        Q.   Okay.
15             One other --- one other quick question for you.
16    Do you know that under the law you could run with the
17    boys if you wanted to.
18             Right?
19                      ATTORNEY HARTNETT:  Objection to form.
20                      THE WITNESS:  That I could if I wanted
21    to, but that's not --- I'm not running with the boys
22    because I am a girl.
23    BY ATTORNEY CAPEHART:
24        Q.   Okay.
```

```
 1              I just wanted to make sure that someone had

 2     apprised you that the law does not prevent that, that

 3     new law.  Fair enough.  And I believe that's everything

 4     I have for you right now.  Thank you very much for your

 5     patience.

 6                        ATTORNEY CAPEHART:  And whoever the next

 7     person in line wants to take over the questioning, go

 8     right ahead.

 9                        ATTORNEY HARNETT:  And I know we haven't

10     gone for an hour yet, but I just wanted to check to see,

11     B███, do you need a bathroom break before we do more

12     questions?

13                        THE WITNESS:  I'm good.

14                        ATTORNEY ROGERS:  I think I'm next if I'm

15     understanding the order that was established earlier

16     this week.

17                        Is that right?

18                        ATTORNEY HARTNETT:  I believe Roberta

19     went next.

20                        ATTORNEY ROGERS:  All right.

21                                ---

22                             EXAMINATION

23                                ---

24     BY ATTORNEY ROGERS:
```

1      Q.     Hi, B███.  My name is Shannon Rogers.  I am one

2   of the attorneys that represents the West Virginia

3   Secondary School Activities Commission, which is

4   sometimes referred to as the WVSSAC.  And so when I'm

5   saying WVSSAC that's what I'm referring to.

6          Does that make sense?

7      A.     Yes.

8      Q.     Okay.

9          Had you ever had heard of the WVSSAC before?

10     A.     I don't think so.

11     Q.     Okay.

12          Do you know if you have ever spoken to anybody

13   who is with the WVSSAC?

14     A.     I don't know.

15     Q.     You don't know?  Okay.

16          Do you know if anybody --- well, strike that.

17          So you don't think you've ever communicated or

18   you just don't remember?

19     A.     I don't think I've ever communicated.

20                ATTORNEY ROGERS:  Okay.

21             I don't have any other questions.  Thank

22   you, B███.

23                      ---

24                EXAMINATION

```
 1                            ---

 2   BY ATTORNEY DENIKER:

 3      Q.    Hi, B███.  My name is Susan Deniker.  I'm an

 4   attorney who works at a law firm called Steptoe and

 5   Johnson, and I represent the Harrison Board of Education

 6   and the Superintendant Dora Stutler.  Thank you for your

 7   time today.  I know it has been a long day and I know

 8   it's hard to sit in front of a computer screen, so thank

 9   you.  You've done a really great job.

10           I'm going to ask you a few questions about your

11   experience in school and in cross-country.  If I ask you

12   anything that doesn't make sense or that you don't

13   understand, please let me know.  You've done a really

14   great job with that today, but will you let me know if I

15   ask you something that you don't understand?

16      A.    Yes.

17      Q.    Very good.

18           And then also, if you need to take a break at

19   any time, just let me know and we'll be glad to take a

20   break.

21           Okay?

22      A.    Okay.

23      Q.    So yesterday I got to ask some questions of your

24   mom and she told me that you went to elementary school
```

```
 1    at Norwood Elementary.

 2            Is that correct?

 3       A.    Yes.

 4       Q.    And did you go to Norwood Elementary School from

 5    kindergarten through the fifth grade?

 6       A.    Yes.

 7       Q.    How did you like Norwood?

 8       A.    It was a nice school.  I really enjoyed it.

 9       Q.    Did you have a good experience there?

10       A.    Yeah.

11       Q.    Was Mrs. Stutler your principal for a period of

12    the time that you were at Norwood Elementary School?

13       A.    Yes.

14       Q.    Did you know her then?

15       A.    Like know her --- could you repeat the question?

16       Q.    Sure.  No.  It probably wasn't a very good

17    question.  Did you sometimes have interactions with Mrs.

18    Stutler when she was your principal?

19       A.    Yes.

20       Q.    And how was that?  Was she nice with you when

21    you dealt with her?

22       A.    Yes.

23       Q.    Did you think she was a good principal?

24       A.    Yes.
```

```
 1    Q.    Who was the principal after Mrs. Stutler?

 2    A.    Mrs. Shields.

 3    Q.    And did you like Mrs. Shields?

 4    A.    Yeah.

 5    Q.    Was she nice to you when you were at school?

 6    A.    Yes.

 7    Q.    Now, I know you said earlier that you came out

 8   in the fourth grade.

 9          Is that right?

10    A.    I came out in the summer of third grade, but in

11   school it was in the fourth grade.

12    Q.    Okay.

13          And something else I should have said to you at

14   the beginning is that I want to use terms that you're

15   comfortable with.  And so if I don't use the right

16   terms, you correct me.

17          Okay?

18    A.    Okay.

19    Q.    So when you started school in the fourth grade

20   it is my understanding then you came to school

21   presenting as a girl, as a female.

22          Is that correct?

23    A.    Yes.

24    Q.    And did you have any discussions with your
```

```
 1   teachers or the principal or anyone else at Norwood
 2   about making that change?
 3        A.    Yes.
 4        Q.    Tell me about those communications that you
 5   would have had.
 6        A.    I think it was the day before school started we
 7   went to the school to establish where --- everything
 8   about what the teacher should be calling me, where my
 9   bathroom would be and everything like that.
10        Q.    Were you part of that meeting, B████?
11        A.    Yes.
12        Q.    Do you recall who else was in that meeting?
13        A.    There was Mrs. Louder, it was the principal.  I
14   don't know if it at the time it was Mrs. Stutler or Mrs.
15   Shields and someone else.  I can't remember their name.
16        Q.    Was the school counselor maybe part of that
17   meeting?
18        A.    I think so.
19        Q.    Was Mrs. Louder your teacher that year?
20        A.    Yes.
21        Q.    And was your mom also in that meeting?
22        A.    Yes.
23        Q.    Anyone else that you remember?
24        A.    Not really, no.
```

```
 1      Q.     Were you happy with what came out of that

 2   meeting?

 3      A.     Yes.

 4      Q.     You were comfortable with the agreements that

 5   was reached with regard to the name that would be used

 6   and the bathroom facilities and any other accommodations

 7   that would be made for you?

 8                   ATTORNEY HARTNETT:  Objection.

 9                   THE WITNESS:  Yes.

10   BY ATTORNEY DENIKER:

11      Q.     And then how did fourth grade go?  Was it a good

12   --- was it a good year for you?

13      A.     Yeah.

14      Q.     Did you feel that the teachers and the principal

15   and the other employees of the school were supportive of

16   you?

17      A.     Yes, very.

18      Q.     Good.  And did you feel that they treated you

19   kindly and fairly?

20      A.     Yes.

21      Q.     And it sounds like from your earlier testimony

22   that you also had a good experience with the students in

23   the school.

24             Is that correct?
```

```
 1      A.    Yes.

 2      Q.    Tell me about your fifth grade year at Norwood

 3  Elementary School.  Did you have a good experience that

 4  year?

 5      A.    Yes.  There was brand new teachers and my

 6  teacher was Ms. Watson.  She was a very nice teacher.

 7      Q.    And do you feel that everyone at the school was

 8  supportive of you?

 9      A.    Yes.

10      Q.    Did you feel that everybody treated you in a

11  fair and kind manner?

12      A.    Yes.

13      Q.    And so you had a good school year in fifth grade

14  as well?

15      A.    Yes.

16      Q.    Do you recall having any other meetings in

17  fourth or fifth grade to discuss your transitioning to

18  being --- to presenting as a girl at school?

19      A.    Not that I can remember.  Beginning of fourth

20  grade was the only one I think.

21      Q.    And then it's my understanding that this year

22  you started at Bridgeport Middle School.

23            Is that right?

24      A.    Yes.
```

1    Q.    And are you in the sixth grade this year, B███?

2    A.    Yes.

3    Q.    Do you remember when you were in Norwood

4  Elementary School having a meeting and filling out a

5  document that was called a Gender Support Plan?

6    A.    Yes, I remember that.

7    Q.    And did you participate in the meeting where

8  that plan was discussed?

9    A.    Yes.

10   Q.    And did you think that that was a good meeting?

11   A.    Yes.

12   Q.    Were you happy with the outcome of what was

13  agreed upon at that meeting?

14   A.    Yes.

15   Q.    And then you had another one of those meetings

16  with school officials before you started at the Middle

17  School.

18         Is that right?

19   A.    Yes.

20   Q.    And I think that that meeting happened in May of

21  2021, which would have been the end of your fifth grade

22  year.

23         Is that --- does that sound right?

24   A.    Yes.

1    Q.    And were you a part of that meeting?

2    A.    Yes.

3    Q.    Do you remember who else was a part of that

4    meeting?

5    A.    We had my new principal, Mr. Mazza, the

6    counselor there, Mrs. Shields and my mom.

7    Q.    And were you comfortable with what was discussed

8    and agreed upon at that meeting?

9    A.    Yes.

10   Q.    And how has sixth grade been so far?

11   A.    It's been good.

12   Q.    Do you like Mr. Mazza?

13   A.    Yes.

14   Q.    He is your principal this year.

15         Is that right?

16   A.    Yes.

17   Q.    Do you feel like Mr. Mazza is supportive of you?

18   A.    Yes, very.

19   Q.    Good.  And do you think that he treats you in a

20   kind and fair manner?

21   A.    Yes.

22   Q.    How are your classes this year?  Do you like

23   them?

24   A.    Yeah, I like my classes.  I have really nice

```
 1    teachers.
 2       Q.    I think I saw that you are a straight A student.
 3    Maybe I saw that in something that your mom wrote.
 4             Is that right?
 5       A.    Yes.
 6       Q.    Congratulations.  Good for you.  Do you feel
 7    that your teachers are fair and supportive of you?
 8       A.    Yes.
 9       Q.    And are you comfortable with the arrangements
10    that the school has made for you this year in terms of
11    addressing how you want to present at school as being a
12    girl?
13       A.    Yes.
14       Q.    I know that we have discussed today sports and
15    your participation in sports, and I heard you say that
16    you love running.
17             Is that right?
18       A.    Yes.
19       Q.    And I understand that you tried out for the
20    girls cross-country team.
21             Is that correct?
22       A.    Yes.
23       Q.    So I want to talk to you a little bit about that
24    process.  The cross-country team, did they do some
```

 1    training and conditioning over the summer before the

 2    year started?

 3        A.    Yes.   There was a week of conditioning before

 4    the season started.

 5        Q.    And did that happen over the summer?

 6        A.    Yes.

 7        Q.    Did you participate in that conditioning?

 8        A.    Yes.

 9        Q.    And how was that experience?   Was that a

10    positive experience for you?

11        A.    Yes.

12        Q.    And then tryouts I think were in August for

13    cross-country.

14              Is that right?

15        A.    Yes.

16        Q.    And were you permitted to try out for the girls

17    cross-country team?

18        A.    Could you ---?

19        Q.    Let me rephrase that.   Were you allowed to try

20    out for the girls cross-country team?

21                    ATTORNEY HARTNETT:   Objection to form.

22                    THE WITNESS:   Yes.

23    BY ATTORNEY DENIKER:

24        Q.    And was that the team you wanted to try out for?

```
 1      A.     Yes.

 2      Q.     And did you make the team?

 3      A.     Yes.

 4      Q.     And I think you said this year they didn't have

 5  any cuts.

 6             Is that right?

 7      A.     Yes.

 8      Q.     Who were your coaches for cross-country this

 9  year?

10      A.     I had Ms. Schoonmaker, Ms. --- Coach Flesher and

11  Coach McBrayer.

12      Q.     And did they coach both the girls and the boys

13  cross-country teams?

14      A.     Yes.

15      Q.     How was your season?

16      A.     It was good.

17      Q.     Did you like cross-country?

18      A.     Yes.

19      Q.     Did you believe that your coaches treated your

20  fairly and kindly this season?

21      A.     Yes.

22      Q.     Did you feel that they were supportive of you?

23      A.     Yes.

24      Q.     So you think it's fun to run up hills and
```

```
 1    through water and mud, B████?

 2       A.    Yes.

 3       Q.    Because that's what cross-country is about,

 4    isn't it?

 5       A.    Yes.

 6       Q.    It's a hard sport I think.  Do you think it's

 7    hard?

 8       A.    It depends if you've done it before and how much

 9    you run normally.

10       Q.    Do you think you would like to do it again?

11       A.    Yes.

12       Q.    And I heard you talk a little bit about track.

13    Are there other --- is track something that you're

14    interested in doing?

15       A.    Yes.

16       Q.    And I heard you said you might want to be --- do

17    the distance running in track.

18             Is that right?

19       A.    Yes.

20       Q.    You're a tough girl.  Cross-country and distance

21    running and track, those are the hard once, aren't they?

22                  ATTORNEY HARTNETT:  Objection to form.

23                  THE WITNESS:  It just depends if you've

24    ran before or whatever you've done.
```

BY ATTORNEY DENIKER:

Q.    I think that you're right.  I think it depends
how good of shape you're in.  Are you planning to
condition in the off season?

A.    If it's not freezing, then yes.

Q.    I understand.  We were talking about what a cold
day it is here in West Virginia, isn't it?

A.    Yes.

Q.    B███, has anybody in the school system ever
told you that Harrison County Schools wouldn't let you
participate on a girls sports team for any reason?

        ATTORNEY HARTNETT:  Objection to form.

        THE WITNESS:  After a bill was passed,
not --- I don't think there was because when the bill
was passed, I already went trying out and then we ---
then the whatever it was called where I could do ---
where I could play in the sports team from the Judge
came out.

BY ATTORNEY DENIKER:

Q.    And I just want to make clear, did any of your
coaches ever tell you that you couldn't run on the girls
team?

A.    No.

Q.    Did Mr. Mazza ever tell you that you couldn't

```
 1   run on the girls team?
 2      A.    No.
 3      Q.    Did any of your teachers tell you that you
 4   couldn't run on the girls team?
 5      A.    No.
 6      Q.    And did Mrs. Stutler ever tell you that you
 7   couldn't run on the girls team?
 8      A.    There was not a cross-country back then, so I
 9   couldn't run whenever she was my principal, so ---.
10      Q.    And that was when you were in elementary school.
11            Is that right?
12      A.    Yes.
13      Q.    And that's a good point that you brought up,
14   B███.    There aren't any school sports in elementary
15   school in Harrison County, are there?
16                  ATTORNEY HARTNETT:  Objection to form.
17                  THE WITNESS:  No, you're very limited to
18   them and most of them aren't even in the school.  You
19   have to do them outside of school.
20   BY ATTORNEY DENIKER:
21      Q.    Did you have any school-sponsored sports at
22   Norwood Elementary School?
23      A.    I don't know.  I don't --- yeah, I don't know.
24      Q.    Okay.
```

```
 1           Did you try out or participate in any sports

 2   that were run by the school while you were at Norwood?

 3      A.    I --- no.

 4      Q.    And so let me go back and ask you about Mrs.

 5   Stutler.  So it's kind of funny.  You had Mrs. Stutler

 6   as your principal at Norwood for a little bit.

 7           Is that right?

 8      A.    Yes.

 9      Q.    And do you know where she went after she left

10   Norwood?

11      A.    The Board of Education.

12      Q.    She did.  She went to the Central Board Office.

13   And did you know that she's now the Superintendant of

14   Schools?

15      A.    I did not know that.  I just knew she went to

16   the Board of Education.

17      Q.    Well, she's actually your school superintendant

18   now.  And have you had any communications with her since

19   she became superintendant?

20      A.    No.

21      Q.    Well, now you know who your superintendant is.

22   So if you see her at school you can call her

23   Superintendant Stutler now.

24           B████, let me check my notes and see if I have
```

SARGENT'S COURT REPORTING SERVICE, INC.
(814) 536-8908

1    any other questions.  I think I'm just about done.

2            B███, did you have any conversations with

3    anybody that works for the Harrison County Board of

4    Education, teachers, principals, anybody like that,

5    coaches, regarding this House Bill 3293?

6            ATTORNEY HARTNETT:  Objection to form.

7            THE WITNESS:  Could you repeat the

8    question?

9    BY ATTORNEY DENIKER:

10       Q.    Sure.  Did you talk with anybody who works for

11   the Harrison County Board of Education or is somehow

12   connected with the Board of Education about House Bill

13   3293?

14       A.    I think I did.  I think I may have.  I'm not

15   sure.  I can't remember her name.  It started with an S,

16   I know that.

17       Q.    Do you know what that --- what the woman you're

18   referring to, do you know what her job was?

19       A.    I do not know.

20       Q.    Was it a teacher or a principal?

21       A.    I don't know that.  I just --- she was at one of

22   our meetings, and I think we may have talked a little

23   bit about that.

24       Q.    And was that one of your Gender Support Plan

1   meetings?

2       A.      Yes.

3       Q.      Okay.

4               And was that the one before you were going into

5   Middle School?

6       A.      I think.  I can't remember.  I just --- I can't

7   remember, but I think she either talked about that or

8   the Gender Support Plan.

9       Q.      Okay.

10              Do you remember what she said about House Bill

11  3293?

12      A.      I do not.  Because she may have not talked about

13  it.  She --- because she was there at one of our

14  meetings, so she could have not, but I think she did.

15      Q.      But you don't remember what was said?

16      A.      I don't.

17      Q.      Okay.

18              Do you remember any conversations with anybody

19  at school or anybody affiliated with the school about

20  House Bill 3293?

21                      ATTORNEY HARTNETT:  Objection, form.

22                      THE WITNESS:  Not that I can think of off

23  the top of my head.

24  BY ATTORNEY DENIKER:

```
1      Q.    And B▇▇▇, I should have clarified.  Do you know
2   what I'm talking about when I say House Bill 3293?
3      A.    Yeah, HB-3293.  Yes.
4      Q.    Okay.
5            I just wanted to make sure that you knew what I
6   was talking about.  I thought that you did.
7            B▇▇▇, if you had any concerns about how you
8   were being treated at school, would you feel comfortable
9   going to talk to Mr. Mazza about that?
10      A.    Yes.  If I was being treated bad, then I would
11   talk to Mr. Mazza.
12      Q.    Would you also feel comfortable going to some of
13   your teachers about that?
14      A.    Yes.
15      Q.    But do you feel that overall all of the teachers
16   and administrators, including your principals at
17   Bridgeport Middle School, have been supportive of your
18   status as a transgender student?
19      A.    Could you repeat the question?
20      Q.    Sure.  And I apologize, it was a long one.  Do
21   you believe that the teachers and administrators, and
22   that would include the principals and the other
23   employees at Bridgeport Middle School, have been
24   supportive of your transgender status?
```

1    A.    Yes, I think they have been supportive.

2    Q.    When you were on the cross-country team did you

3  believe your teammates were supportive of you?

4    A.    Yes.

5    Q.    And how about in school, have you had any issues

6  with other students or problems with students related to

7  your transgender status?

8              ATTORNEY HARTNETT:  Objection to form.

9              THE WITNESS:  No.  No.

10             ATTORNEY DENIKER:  B███, those are all

11 the questions I have for you now.  Thanks so much for

12 your time today.

13             ATTORNEY HARTNETT:  We can take a break.

14 I think this might be a good time to take a break and

15 then we can come back for questions.

16             VIDEOGRAPHER:  Okay.  Going off the

17 record.  The current time reads 2:28 p.m.

18 OFF VIDEOTAPE

19                       ---

20 (WHEREUPON, A SHORT BREAK WAS TAKEN.)

21                       ---

22 ON VIDEOTAPE

23             VIDEOGRAPHER:  We are back on the record.

24 The current time reads 2:42 p.m.

```
 1                           --

 2                       EXAMINATION

 3                           ---

 4   BY ATTORNEY HAMMOND:

 5       Q.    Hi, B█████.  My name is Kristen Hammond.  And I'm

 6   an attorney with the law firm of Bailey and Wyant.  And

 7   I represent the West Virginia State Board of Education

 8   and the State Superintendant Clayton Burch.  And I just

 9   have I think a few questions for you today.  Do you know

10   what the State Board of Education is?

11       A.    I don't know.

12       Q.    Okay.

13            And do you know or have you ever heard of the

14   West Virginia State Superintendant Clayton Burch?

15       A.    No.

16       Q.    Okay.

17            So I guess since you do not know them, do you

18   have any memory or any recall of maybe talking to

19   anybody at the State level or at the Board of Education

20   level regarding this lawsuit or regarding the House Bill

21   or your sports?  How about we limit it to that?

22       A.    I don't remember if I have or not.

23       Q.    Okay.

24            So you just don't recall.  Could you possibly
```

```
 1   have talked to somebody?

 2                    ATTORNEY HARTNETT:  Objection to form.

 3                    THE WITNESS:  Could you repeat the

 4   question?

 5   BY ATTORNEY HAMMOND:

 6     Q.    Yes.  I just want to see --- you say you don't

 7   recall talking to anybody.  Do you think that it's a

 8   possibility that you did talk to somebody or you don't

 9   believe that you've talked to anybody?

10     A.    I don't believe I've talked to anybody.

11                    ATTORNEY HAMMOND:  Okay.  Thank you for

12   your time.  I just had a couple of questions, and that's

13   all I have for you today.  Thank you.

14                            ---

15                        EXAMINATION

16                            ---

17   BY ATTORNEY DUCAR:

18     Q.    Good afternoon, B       .  I'm Timothy Ducar.  I

19   represent the Intervenor in this case.  I wanted to ask

20   you a question about Exhibit 29.  Do you have that

21   available?

22                    MS. JACKSON:  Give me a second to find

23   it.

24                    ATTORNEY DUCAR:  Yes, that's it.  Can you
```

1     scroll down just four paragraphs?  Thank you.

2     BY ATTORNEY DUCAR:

3        Q.     B████, you had testified earlier that paragraph

4     that starts with I just want to run, that you had ---

5     that's a quote from you.

6            Correct?

7        A.     Yes.

8        Q.     I just wanted to know, is that a quote that you

9     wrote on paper and provided to somebody or wrote on a

10    computer and provided to somebody or did you actually

11    say that with your --- verbally?

12       A.     I said that.

13       Q.     Verbally?

14       A.     Yeah, I said that verbally.

15       Q.     Thank you.  When did you decide you liked

16    running?

17       A.     I've always liked running.  It's from when I

18    could walk, I liked running.

19                ATTORNEY DUCAR:  We're done with this

20    exhibit, Mr. Court Reporter.  Thank you.

21    BY ATTORNEY DUCAR:

22       Q.     When did you decide you wanted to try out for

23    the girls cross-country team?

24       A.     I've always wanted to do cross-country, so when

SARGENT'S COURT REPORTING SERVICE, INC.
(814) 536-8908

```
 1    I had the chance I decided I wanted to.

 2        Q.    And did you know about it because your brothers

 3    ran?

 4        A.    Yes.

 5        Q.    Did your mom encourage you to try out for the

 6    girls team?

 7                      ATTORNEY HARTNETT:  Objection to form.

 8                      THE WITNESS:  Yes.  Yes, she encouraged

 9    me.

10    BY ATTORNEY DUCAR:

11        Q.    And these try-outs were last summer.

12              Correct?

13        A.    Yes.

14        Q.    Going into sixth grade?

15        A.    Yes.

16        Q.    Did your dad encourage you to try out for the

17    girls team?

18        A.    Yes.

19        Q.    Earlier you testified that you did well in

20    cross-country.  Did you have any rankings?

21                      ATTORNEY HARTNETT:  Object to the form.

22                      THE WITNESS:  I --- could you rephrase

23    the question?

24    BY ATTORNEY DUCAR:
```

```
 1      Q.     Do you have any idea how well you did on your

 2  team as an individual?

 3      A.     I don't know.

 4      Q.     Do they keep track of individual times and ---?

 5      A.     I think they put it on a website.

 6      Q.     Is that something you have ever seen?

 7      A.     My mom looks at it, but I don't.

 8      Q.     Do you have any indication whether or not you

 9  were one of the better runners or not one of the better

10  runners on the team?

11                  ATTORNEY HARTNETT:  Objection to form.

12                  THE WITNESS:  I don't know.  I think I

13  was good.

14  BY ATTORNEY DUCAR:

15      Q.     Do you want to run cross-country again next

16  year?

17      A.     Yes.

18      Q.     Track tryouts are coming up in the spring.

19             Correct?

20      A.     Yes.

21      Q.     And you intend to try out for track?

22      A.     Yes.

23      Q.     Do you want to compete in any other sports

24  besides track and cross-country?
```

```
 1      A.    Not really.

 2      Q.    Why not?

 3      A.    I don't find any other sport really interesting

 4  besides running.

 5      Q.    You said trusting?

 6      A.    Interesting.

 7      Q.    What does that mean?

 8      A.    What is interesting?

 9      Q.    Oh, interesting.  I misheard you.  Thank you.

10  And I think I misheard you on something else, so I'm

11  going to re-ask the question.  Do you like to compete?

12                  ATTORNEY HARTNETT:  Objection to the

13  form.

14                  THE WITNESS:  I'm not a really

15  competitive person.  I just play a sport because I think

16  it's fun.

17  BY ATTORNEY DUCAR:

18      Q.    Do you consider yourself a good athlete?

19      A.    Yes.

20      Q.    What makes you a good athlete?

21      A.    I'm good at running, good at the sports I do.

22      Q.    Do you try hard to win?

23      A.    Yes.  Well --- yes.

24      Q.    Have you talked to anybody else about playing
```

```
 1   other sports other than cross-country and track?
 2      A.    I've talked to my mom about playing other
 3   sports.
 4      Q.    What sports have you talked to her about?
 5      A.    Volleyball and maybe basketball.
 6      Q.    And describe for me what you guys talked about
 7   as far as volleyball and basketball?
 8      A.    We talked about trying new sports.
 9      Q.    When did you two talk about those subjects?
10      A.    I can't remember.
11      Q.    Was it in the last six months or ---?
12      A.    I don't --- I can't remember.
13      Q.    Did you bring up the idea of playing volleyball
14   to her?
15      A.    Yes.
16      Q.    And what did she say?
17      A.    That's a good idea.
18      Q.    Did she say that about basketball as well?
19      A.    I think she may have brought up basketball, but
20   I can't remember.  It may have been me or her.
21      Q.    Did you feel like she was encouraging you to
22   play volleyball?
23      A.    She liked the idea.  So I wouldn't say
24   encouraged, but she thought it was a good idea.
```

1    Q.    Did she think playing basketball was a good

2  idea?

3              ATTORNEY HARTNETT:  Objection to form.

4              THE WITNESS:  I think so, yes.

5  BY ATTORNEY DUCAR:

6    Q.    And as you sit here right now, you don't have

7  any plans to go out for a volleyball or a basketball

8  team.

9        Correct?

10   A.    No, not right now.  No.

11   Q.    Do you foresee yourself running on the

12 cross-country team or on the track team later in high

13 school?

14             ATTORNEY HARTNETT:  Objection to form.

15             THE WITNESS:  Yes, yes.

16 BY ATTORNEY DUCAR:

17   Q.    Do you see yourself running on the cross-country

18 team or track team if you ever go to college on a

19 college team?

20             ATTORNEY HARTNETT:  Same objection.

21 Objection to form.

22             THE WITNESS:  Maybe, but I haven't

23 thought that far ahead.

24 BY ATTORNEY DUCAR:

 1      Q.      Sure.   When was the first time you remember

 2   thinking that you wanted to be a girl?

 3                      ATTORNEY HARTNETT:   Objection to form.

 4                      THE WITNESS:   I can't remember.

 5   BY ATTORNEY DUCAR:

 6      Q.      Do you remember the first time you talked to

 7   somebody about the fact that you wanted to become a

 8   girl?

 9                      ATTORNEY HARTNETT:   Objection.

10                      THE WITNESS:   I also can't --- I don't

11   remember.

12   BY ATTORNEY DUCAR:

13      Q.      There's a statement in the record that indicates

14   you feel like a girl.   What does feeling like a girl

15   mean?

16                      ATTORNEY HARTNETT:   Objection to form.

17                      THE WITNESS:   I just know that I want to

18   be a girl and I feel like a girl inside.

19   BY ATTORNEY DUCAR:

20      Q.      You picked out the name B████ for yourself.

21           Correct?

22      A.      Yes.

23      Q.      When did you do that?

24      A.      Whenever I transitioned.

1    Q.    Going into fourth grade?

2    A.    Yes.

3    Q.    How did you pick that name?

4    A.    I've always liked it.

5    Q.    Me, too.  I have a daughter named B████.

6          Did anyone else help you pick that name?

7    A.    I think my friends liked that name, too.

8    Q.    When did you start wearing girl's clothing at

9    home?

10   A.    I mean, I've always wanted my mom's clothes, so

11   I really started dressing like that maybe at home, third

12   grade, the year of third grade.

13   Q.    Did you ask your parents if you could do it or

14   did you just do it?

15   A.    I just did it.

16   Q.    What was their reaction?

17   A.    Positive.

18   Q.    When did you first ask your parents to refer to

19   you as she or her?

20   A.    When I transitioned.

21   Q.    Going into fourth grade?

22   A.    Yes.

23   Q.    When did you start presenting as a girl in other

24   ways at home?  I guess that would be makeup, other ways

```
 1   besides clothing.

 2                    ATTORNEY HARTNETT:  Objection to form.

 3                    THE WITNESS:  Could you restate the

 4   question, please?

 5   BY ATTORNEY DUCAR:

 6       Q.    Yeah.  I'll withdraw that question.

 7             When did you start presenting as a girl at

 8   home?

 9       A.    It started when I was really young.

10                    ATTORNEY HARTNETT:  Objection.

11                    THE WITNESS:  But I fully started wearing

12   clothes on my own, not wearing my mother's, around the

13   third-grade year.

14   BY ATTORNEY DUCAR:

15       Q.    Do you wear jewelry?

16       A.    Not a lot.  I used to wear earrings but not

17   anymore.

18       Q.    Do you wear makeup?

19       A.    No.

20       Q.    Are there other ways you presented at home as a

21   girl besides dressing as a girl?

22       A.    Well, I always wanted girly --- a girly room and

23   girly items.

24       Q.    And you started wearing girls clothing in fourth
```

1    grade.

2           Correct?

3       A.    Yes.

4       Q.    Do you recall the first time you saw a doctor or

5    a therapist about your desire to be a girl?

6       A.    I can't remember.

7       Q.    How did you first learn about puberty blocking

8    treatment?

9       A.    Could you repeat the question, please?

10      Q.    How did you first learn about puberty blocking

11   treatment?

12      A.    My mom.  My mom told me about it whenever I

13   transitioned.

14      Q.    And is that something that you wanted to do?

15      A.    Yes.

16      Q.    At some point you wanted to start hormone

17   therapy?

18      A.    Yes.

19      Q.    Do you know what that means?

20      A.    Getting female hormones.

21      Q.    B████, do you ever feel anxious?

22                   ATTORNEY HARTNETT:  Objection to form.

23                   ATTORNEY DUCAR:  Let me restate that.

24   That's fair.

1   BY ATTORNEY DUCAR:

2      Q.    Does the fact that you are transitioning make

3   you feel anxious?

4      A.    No.

5      Q.    Does the fact that you're part of this lawsuit

6   make you feel anxious?

7                  ATTORNEY HARTNETT:  Objection to form.

8                  THE WITNESS:  No.

9   BY ATTORNEY DUCAR:

10     Q.    Do you know what the word anxious means?

11     A.    Nervous.

12     Q.    Do you know what gender dysphoria is?

13     A.    Yes.

14  ██  ████████████████████████████████████████

15  ███████████████████

16          ████████████████  ███████████████

17          ████████████.  █████████████████████

18  ████████████████████

19                  ATTORNEY DUCAR:  Thank you, B████.  I

20  have no further questions for you today.

21                  ATTORNEY CAPEHART:  We have no further

22  questions at this time.  We're just going to note as we

23  have in the last two depositions the possibility of

24  having to revisit something.  If for some reason some

SARGENT'S COURT REPORTING SERVICE, INC.
(814) 536-8908

1  medical records would could to light, although I

2  understand that's unlikely, we're still noting that, but

3  you would object to that?

4         ATTORNEY HARTNETT:  Yes, we object, but

5  we appreciate you making the record you want to make.

6         ATTORNEY CAPEHART:  Thank you.

7         ATTORNEY HARTNETT:  I'm sorry.  Just on

8  that point, though, I mean, is there any specific item

9  that you lack today that you need to make a record?

10        ATTORNEY CAPEHART:  I think our concern

11 has been the possibility of new records that might be

12 produced following the depositions.

13        ATTORNEY HARTNETT:  Okay.  Thank you.

14        ATTORNEY CAPEHART:  Thank you.

15        ATTORNEY HARTNETT:  I mean, is anyone

16 else going to have any further questioning?  Sorry.

17 Just for the witness's awareness, we're confirming

18 whether or not there will be additional questioning from

19 any Defendant.

20        ATTORNEY ROGERS:  I don't have any

21 further questions.

22        ATTORNEY DENIKER:  I have no further

23 questions.  Thank you again for your time today, B███.

24        ATTORNEY HAMMOND:  I have no further

```
 1   questions.  Thank you.

 2                  ATTORNEY DUCAR:  I have nothing further.

 3   Thank you.

 4                  ATTORNEY HARTNETT:  And we also have no

 5   questions for the witness today.

 6                  VIDEOGRAPHER:  Okay.  If there are no

 7   further questions, that concludes today's deposition.

 8   And the current time reads 3:01 p.m.

 9                  COURT REPORTER:  Is it reading and

10   signing for your client?

11                  ATTORNEY HARTNETT:  Yes.  I'm sorry.  I

12   meant to say that on the record.

13                       * * * * * * *

14          VIDEOTAPED VIDEOCONFERENCE DEPOSITION

15               CONCLUDED AT 3:01 P.M.

16                       * * * * * * *

17

18

19

20

21

22

23

24
```

                                                              158
1    STATE OF WEST VIRGINIA  )

2                    CERTIFICATE

3           I, Nicole Montagano, a Notary Public in

4    and for the State of West Virginia, do hereby

5    certify:

6           That the witness whose testimony appears

7    in the foregoing deposition, was duly sworn by me

8    on said date, and that the transcribed deposition

9    of said witness is a true record of the testimony

10   given by said witness;

11          That the proceeding is herein recorded

12   fully and accurately;

13          That I am neither attorney nor counsel

14   for, nor related to any of the parties to the

15   action in which these depositions were taken, and

16   further that I am not a relative of any attorney

17   or counsel employed by the parties hereto, or

18   financially interested in this action.

19          I certify that the attached transcript

20   meets the requirements set forth within article

21   twenty-seven, chapter forty-seven of the West

22   Virginia.

23   

24                            Nicole Montagano,

25                            Court Reporter

CONFIDENTIAL

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA
CHARLESTON DIVISION

B.P.J. by her next friend and mother, HEATHER JACKSON,

*Plaintiff*,

v.

WEST VIRGINIA STATE BOARD OF EDUCATION, HARRISON COUNTY BOARD OF EDUCATION, WEST VIRGINIA SECONDARY SCHOOL ACTIVITIES COMMISSION, W. CLAYTON BURCH in his official capacity as State Superintendent, DORA STUTLER in her official capacity as Harrison County Superintendent, and THE STATE OF WEST VIRGINIA,

*Defendants*,

and

LAINEY ARMISTEAD,

*Defendant-Intervenor*.

Civil Action No. 2:21-cv-00316

Hon. Joseph R. Goodwin

**PLAINTIFF'S RESPONSES AND OBJECTIONS TO DEFENDANT-INTERVENOR LAINEY ARMISTEAD'S FIRST SET OF REQUESTS FOR ADMISSION**

Pursuant to Federal Rules of Civil Procedure 33 and 36 and the applicable Local Rules of the Southern District of West Virginia and this Court, Plaintiff B.P.J. by her next friend and mother, Heather Jackson, responds as follows to Defendant-Intervenor Lainey Armistead's ("Defendant-Intervenor") First Set of Requests for Admission ("Requests"):

## GENERAL RESPONSES

1.  B.P.J.'s response to the Requests is made to the best of B.P.J.'s present knowledge, information, and belief.  This response is at all times subject to such additional or different information that discovery or further investigation may disclose and, while based on the present state of B.P.J.'s recollection, is subject to such refreshing of recollection, and such

1

additional knowledge of facts, as may result from B.P.J.'s further discovery or investigation.

2. B.P.J. reserves the right to make any use of, or to introduce at any hearing and at trial, information and/or documents responsive to the Requests but discovered subsequent to the date of this response, including, but not limited to, any information or documents obtained in discovery herein.

3. B.P.J. reserves all objections or other questions as to the competency, relevance, materiality, privilege, or admissibility as evidence in any subsequent proceeding in or trial of this or any other action for any purpose whatsoever of this response and any document or thing identified or provided in response to the Requests.

4. B.P.J. reserves the right to object on any ground at any time to such other or supplemental Requests as Defendant-Intervenor may at any time propound involving or relating to the subject matter of these Requests.

5. B.P.J. is willing to meet and confer with Defendant-Intervenor regarding any response or objection to the Requests.

<u>**GENERAL OBJECTIONS**</u>

B.P.J. makes the following general objections, whether or not separately set forth in response to each Request, to each and every Definition, Instruction, and Request made in Defendant-Intervenor's First Set of Requests for Admission:

1. B.P.J. objects generally to all Definitions, Instructions, and Requests inclusive, insofar as each such Request seeks information protected by the attorney-client privilege, the work product doctrine, or any other applicable privilege. Such information shall not be produced in response to the Requests, and any inadvertent production thereof shall not be deemed a

CONFIDENTIAL

waiver of any privilege or right with respect to such information or of any work product doctrine that may attach thereto.

2. B.P.J. objects to all Definitions, Instructions, and Requests inclusive, to the extent they purport to enlarge, expand, or alter in any way the plain meaning and scope of any specific request on the ground that such enlargement, expansion, or alteration renders said Request vague, ambiguous, unintelligible, unduly broad, and uncertain.

3. B.P.J. objects to all Definitions, Instructions, and Requests inclusive, to the extent they seek information or materials not currently in B.P.J.'s possession, custody, or control, or refer to persons, entities, or events not known to B.P.J., on the grounds that such Instructions, Definitions, or Requests seek to require more of B.P.J. than any obligation imposed by law, would subject B.P.J. to unreasonable and undue burden and expense, and would seek to impose upon B.P.J. an obligation to investigate or discover information or materials from third parties or services who are equally accessible to Defendant-Intervenor.

4. B.P.J.'s failure to object to the Requests on a particular ground shall not be construed as a waiver of her right to object on that ground or any additional ground at any time.

5. B.P.J. objects to the number of Requests as burdensome, cumulative, and not proportional to the needs of the case.

6. B.P.J. objects to Requests Nos. 13 through 61 because they do not seek "admissions for the record of facts already known," *Wigler v. Elec. Data Sys. Corp.*, 108 F.R.D. 204, 206 (D. Md. 1985), but instead seek admissions to hypothetical questions regarding the treatment of various endocrine conditions not at issue in this case and/or that have not yet been the subject of expert testimony.  B.P.J. has attempted to respond to the Requests to

CONFIDENTIAL

the best of her ability, but reserves the right to supplement, amend, or withdraw responses

in light of additional facts learned during expert discovery.

## SPECIFIC OBJECTIONS AND RESPONSES TO DOCUMENT REQUESTS

Without waiving or limiting in any manner any of the foregoing General Objections, but

rather incorporating them into each of the following responses to the extent applicable, B.P.J.

responds to the specific requests of Defendant-Intervenor's First Set of Requests for Admission as

follows:

**Request for Admission No. 1:**

1. Admit that B.P.J. has chromosomes characteristic of the male sex (i.e. XY chromosomes).

**B.P.J.'s Response to Request for Admission No. 1:**

B.P.J. objects to the phrase "chromosomes characteristic of the male sex" as vague, and

interprets the phrase to mean "has XY chromosomes."

Subject to these general and specific objections, and without waiver thereof, B.P.J. admits

that B.P.J. has XY chromosomes.

**Request for Admission No. 2:**

2. Admit that, but for the ▬▬▬▬-pharmaceutical intervention B.P.J. has received, B.P.J.

would have hormones—including testosterone levels—characteristic of the male sex.

**B.P.J.'s Response to Request for Admission No. 2:**

B.P.J. objects to the phrase "characteristic of" as vague and construes the phrase to mean

"typical of."

Subject to these general and specific objections, and without waiver thereof, B.P.J. cannot

admit or deny this request for admission because B.P.J. has not gone through puberty and cannot

CONFIDENTIAL

determine what her hormones level would have been if she had not received puberty blocking medication.

**Request for Admission No. 3:**

3. Admit that B.P.J.'s internal and external reproductive organs are characteristic of the male sex.

**B.P.J.'s Response to Request for Admission No. 3:**

B.P.J. objects to the phrase "characteristic of" as vague and construes the phrase to mean "typical of."

Subject to these general and specific objections, and without waiver thereof, B.P.J. admits that B.P.J.'s internal and external reproductive organs are typical of the male sex.

**Request for Admission No. 4:**

4. Admit that B.P.J. is a biological male.

**B.P.J.'s Response to Request for Admission No. 4:**

B.P.J. objects to the phrase "is a biological male" as vague and scientifically inaccurate, and construes the phrase to mean "had a male sex assigned at birth."

Subject to these general and specific objections, and without waiver thereof, B.P.J. admits that B.P.J. had a male sex assigned at birth.

**Request for Admission No. 5:**

5. Admit there are "benefits associated with sex-separated school athletics." (First Am. Compl. ¶ 39).

**B.P.J.'s Response to Request for Admission No. 5:**

B.P.J. admits there are benefits associated with school athletics, including when such athletics are provided in a sex-separated manner.

**Request for Admission No. 6:**

6. Admit that one of the "benefits associated with sex-separated school athletics" (First Am. Compl. ¶ 39) is separation based on sex-related "physiological characteristics associated with athletic performance" (*Id.* ¶ 40).

**B.P.J.'s Response to Request for Admission No. 6:**

Deny.

**Request for Admission No. 7:**

7. Admit there are post-pubescent, high-school-aged male-identifying biological males who cannot run a 5,000 meter track race as quickly as some post-pubescent, high-school aged female-identifying biological females.

**B.P.J.'s Response to Request for Admission No. 7:**

B.P.J. objects to the phrase "male-identifying biological males" as vague and scientifically inaccurate and interprets the phrase to mean "cisgender boys."   B.P.J. objects to the phrase "female-identifying biological females" as vague and scientifically inaccurate and interprets the phrase to mean "cisgender girls."

Subject to these general and specific objections, and without waiver thereof, B.P.J. admits that there are post-pubescent, high-school-aged cisgender boys who cannot run a 5,000 meter track race as quickly as some post-pubescent, high-school aged cisgender girls.

**Request for Admission No. 8:**

8. You have alleged that "[g]irls who are transgender and who *do* go through some or all of their endogenous puberty can receive gender-affirming hormone therapy that reduces their circulating testosterone levels and mitigates and often eliminates any athletic benefit from having gone through endogenous puberty." First Am. Compl. ¶ 42. Admit that such

"gender affirming hormone therapy that reduces circulating testosterone levels" to the levels typical of cisgender females does not necessarily completely "eliminate[] any athletic benefit from having gone through endogenous [male] puberty."

**B.P.J.'s Response to Request for Admission No. 8:**

Deny.

**Request for Admission No. 9:**

9. You have alleged that "[g]irls who are transgender and who *do* go through some or all of their endogenous puberty can receive gender-affirming hormone therapy that reduces their circulating testosterone levels and mitigates and often eliminates any athletic benefit from having gone through endogenous puberty." First Am. Compl. ¶ 42. Admit that female identifying biological males who go through endogenous puberty and do not receive pharmaceutical or surgical intervention have, at the "population level" (as this term is used in First Am. Compl. ¶ 40), athletic performance advantages over female-identifying biological females of the same age who have received no pharmaceutical or surgical intervention.

**B.P.J.'s Response to Request for Admission No. 9:**

B.P.J. objects to the phrase "female-identifying biological males" as vague and scientifically inaccurate and interprets the phrase to mean "girls who are transgender." B.P.J. objects to the phrase "female-identifying biological females" as vague and scientifically inaccurate and interprets the phrase to mean "cisgender girls."

Subject to these general and specific objections, and without waiver thereof, B.P.J. cannot admit or deny this request for admission because there have not been sufficient studies to determine whether there are average differences in performance between girls who are transgender and have

gone through endogenous puberty and not received pharmaceutical or surgical intervention as a group compared to cisgender girls as a group including in light of other possible factors.

**Request for Admission No. 10:**

10. You have alleged that "[g]irls who are transgender and who *do* go through some or all of their endogenous puberty can receive gender-affirming hormone therapy that reduces their circulating testosterone levels and mitigates and often eliminates any athletic benefit from having gone through endogenous puberty." First Am. Compl. ¶ 42. Admit that female identifying biological males who go through endogenous puberty and do not receive pharmaceutical or surgical intervention have, at the "population level" (as this term is used in First Am. Compl. ¶ 40), athletic advantages relevant to performance in track and cross-country events over female-identifying biological females of the same age who have received no pharmaceutical or surgical intervention.

**B.P.J.'s Response to Request for Admission No. 10:**

B.P.J. objects to the phrase "female-identifying biological males" as vague and scientifically inaccurate and interprets the phrase to mean "girls who are transgender." B.P.J. objects to the phrase "female-identifying biological females" as vague and scientifically inaccurate and interprets the phrase to mean "cisgender girls."

Subject to these general and specific objections, and without waiver thereof, B.P.J. cannot admit or deny this request for admission because there have not been sufficient studies to determine whether there are average differences in performance between girls who are transgender and have gone through endogenous puberty and not received pharmaceutical or surgical intervention as a group compared to cisgender girls as a group including in light of other possible factors.

**Request for Admission No. 11:**

8

11. You have alleged that "[g]irls who are transgender and who *do* go through some or all of their endogenous puberty can receive gender-affirming hormone therapy that reduces their circulating testosterone levels and mitigates and often eliminates any athletic benefit from having gone through endogenous puberty." First Am. Compl. ¶ 42. Admit that female identifying biological males who go through endogenous puberty and do not receive pharmaceutical or surgical intervention more often than not have athletic performance advantages over female-identifying biological females of the same age who have received no pharmaceutical or surgical intervention.

**B.P.J.'s Response to Request for Admission No. 11:**

B.P.J. objects to the phrase "female-identifying biological males" as vague and scientifically inaccurate and interprets the phrase to mean "girls who are transgender." B.P.J. objects to the phrase "female-identifying biological females" as vague and scientifically inaccurate and interprets the phrase to mean "cisgender girls."

Subject to these general and specific objections, and without waiver thereof, B.P.J. cannot admit or deny this request for admission because there have not been sufficient studies to determine whether there are average differences in performance between girls who are transgender and have gone through endogenous puberty and not received pharmaceutical or surgical intervention as a group compared to cisgender girls as a group including in light of other possible factors.

**Request for Admission No. 12:**

12. You have alleged that "[g]irls who are transgender and who *do* go through some or all of their endogenous puberty can receive gender-affirming hormone therapy that reduces their circulating testosterone levels and mitigates and often eliminates any athletic benefit from having gone through endogenous puberty." First Am. Compl. ¶ 42. Admit that female

identifying biological males who go through endogenous puberty and do not receive pharmaceutical or surgical intervention more often than not have athletic advantages relevant to performance in track and cross-country events over female-identifying biological females of the same age who have received no pharmaceutical or surgical intervention.

**B.P.J.'s Response to Request for Admission No. 12:**

B.P.J. objects to the phrase "female-identifying biological males" as vague and scientifically inaccurate and interprets the phrase to mean "girls who are transgender." B.P.J. objects to the phrase "female-identifying biological females" as vague and scientifically inaccurate and interprets the phrase to mean "cisgender girls."

Subject to these general and specific objections, and without waiver thereof, B.P.J. cannot admit or deny this request for admission because there have not been sufficient studies to determine whether there are average differences in performance between girls who are transgender and have gone through endogenous puberty and not received pharmaceutical or surgical intervention as a group compared to cisgender girls as a group including in light of other possible factors.

**Request for Admission No. 13:**

13. Admit there are biological males who experience central precocious puberty.

**B.P.J.'s Response to Request for Admission No. 13:**

B.P.J. objects to the phrase "biological males" as vague and scientifically inaccurate, and interprets the phrase to mean "people with a male sex assigned at birth."

Subject to these general and specific objections, and without waiver thereof, B.P.J. admits there are people with a male sex assigned at birth who experience central precocious puberty.

**Request for Admission No. 14:**

10

CONFIDENTIAL

14. Admit that Histrelin is a medically accepted treatment for central precocious puberty.

**B.P.J.'s Response to Request for Admission No. 14:**

Admit.

**Request for Admission No. 15:**

15. Admit that Histrelin is used to treat biological males with idiopathic short stature.

**B.P.J.'s Response to Request for Admission No. 15:**

B.P.J. objects to the phrase "biological males" as vague and scientifically inaccurate, and interprets the phrase to mean "people with a male sex assigned at birth."  B.P.J. objects to the phrase "is used to treat" and interprets the phrase to mean "is a medically accepted treatment for."

Subject to these general and specific objections, and without waiver thereof, B.P.J. denies that Histrelin is a medically accepted treatment for people with a male sex assigned at birth with idiopathic short stature.

**Request for Admission No. 16:**

16. Admit that Histrelin is used to treat biological males with growth hormone deficiency.

**B.P.J.'s Response to Request for Admission No. 16:**

B.P.J. objects to the phrase "biological males" as vague and scientifically inaccurate, and interprets the phrase to mean "people with a male sex assigned at birth."  B.P.J. objects to the phrase "is used to treat" and interprets the phrase to mean "is a medically accepted treatment for."

Subject to these general and specific objections, and without waiver thereof, B.P.J. denies that Histrelin is a medically accepted treatment for people with a male sex assigned at birth with growth hormone deficiency.

**Request for Admission No. 17:**

17. Admit there are biological males who experience delayed puberty.

CONFIDENTIAL

**B.P.J.'s Response to Request for Admission No. 17:**

B.P.J. objects to the phrase "biological males" as vague and scientifically inaccurate, and interprets the phrase to mean "people with a male sex assigned at birth."

Subject to these general and specific objections, and without waiver thereof, B.P.J. admits there are people with a male sex assigned at birth who experience delayed puberty.

**Request for Admission No. 18:**

18. Admit there are biological males who experience hypogonadism.

**B.P.J.'s Response to Request for Admission No. 18:**

B.P.J. objects to the phrase "biological males" as vague and scientifically inaccurate, and interprets the phrase to mean "people with a male sex assigned at birth."

Subject to these general and specific objections, and without waiver thereof, B.P.J. admits there are people with a male sex assigned at birth who experience hypogonadism.

**Request for Admission No. 19:**

19. Admit there are biological males with medical conditions that inhibit testosterone production.

**B.P.J.'s Response to Request for Admission No. 19:**

B.P.J. objects to the phrase "biological males" as vague and scientifically inaccurate, and interprets the phrase to mean "people with a male sex assigned at birth."

Subject to these general and specific objections, and without waiver thereof, B.P.J. admits there are people with a male sex assigned at birth with medical conditions that inhibit testosterone production.

**Request for Admission No. 20:**

20. Admit there are middle-school-aged biological males who, because of delayed puberty, have circulating testosterone comparable to that of biological females of their same age.

**B.P.J.'s Response to Request for Admission No. 20:**

B.P.J. objects to the phrase "biological males" as vague and scientifically inaccurate, and interprets the phrase to mean "people with a male sex assigned at birth." B.P.J. objects to the phrase "biological females" as vague and scientifically inaccurate, and interprets the phrase to mean "people with a female sex assigned at birth." B.P.J. objects to the term "comparable" as vague. B.P.J. objects to this request as vague with respect to whether the phrase "comparable to that of biological females of their same age" refers to typical circulating testosterone levels for people who had a female sex assigned at birth as a group or to the circulating testosterone levels of at least one person with a female sex assigned at birth. B.P.J. also objects to this request as vague because it does not specify whether the people with a female sex assigned at birth at issue have gone through puberty even though cisgender girls on average typically begin puberty at a younger age than cisgender boys on average.

Subject to these general and specific objections, and without waiver thereof, B.P.J. admits that it is possible at least one middle-school-aged person who was assigned a male sex at birth and who had delayed puberty likely has the same levels of circulating testosterone as at least one person of the same age who was assigned a female sex at birth.

**Request for Admission No. 21:**

21. Admit there are high-school-aged biological males who, because of delayed puberty, have circulating testosterone comparable to that of biological females of their same age.

**B.P.J.'s Response to Request for Admission No. 21:**

CONFIDENTIAL

B.P.J. objects to the phrase "biological males" as vague and scientifically inaccurate, and interprets the phrase to mean "people with a male sex assigned at birth."  B.P.J. objects to the phrase "biological females" as vague and scientifically inaccurate, and interprets the phrase to mean "people with a female sex assigned at birth."  B.P.J. objects to the term "comparable" as vague.  B.P.J. also objects to this request as vague with respect to whether the phrase "comparable to that of biological females of their same age" refers to typical circulating testosterone levels for people with a female sex assigned at birth as a group or to the circulating testosterone levels of at least one person who was assigned a female sex at birth.

Subject to these general and specific objections, and without waiver thereof, B.P.J. admits that it is possible at least one high-school-aged person who was assigned a male sex at birth and who had delayed puberty likely has the same levels of circulating testosterone as at least one person of the same age who was assigned a female sex at birth.

**Request for Admission No. 22:**

22. Admit there are middle-school-aged biological males who, because of hypogonadism, have circulating testosterone comparable to that of biological females of their same age.

**B.P.J.'s Response to Request for Admission No. 22:**

B.P.J. objects to the phrase "biological males" as vague and scientifically inaccurate, and interprets the phrase to mean "people with a male sex assigned at birth."  B.P.J. objects to the phrase "biological females" as vague and scientifically inaccurate, and interprets the phrase to mean "people with a female sex assigned at birth."  B.P.J. objects to the term "comparable" as vague.  B.P.J. also objects to this request as vague with respect to whether the phrase "comparable to that of biological females of their same age" refers to typical circulating testosterone levels for people who are assigned a female sex at birth as a group or to the circulating testosterone levels of

at least one person who was assigned a female sex at birth.  B.P.J. also objects to this request as vague because it does not specify whether the people assigned a female sex at births at issue have gone through puberty even though girls on average typically begin puberty at a younger age than boys on average.

Subject to these general and specific objections, and without waiver thereof, B.P.J. admits that it is possible at least one middle-school-aged person who was assigned a male sex at birth and who has hypogonadism likely has the same levels of circulating testosterone as at least one person of the same age who was assigned a female sex at birth.

**Request for Admission No. 23:**

23. Admit there are high-school-aged biological males who, because of hypogonadism, have circulating testosterone comparable to that of biological females of their same age.

**B.P.J.'s Response to Request for Admission No. 23:**

B.P.J. objects to the phrase "biological males" as vague and scientifically inaccurate, and interprets the phrase to mean "people with a male sex assigned at birth."  B.P.J. objects to the phrase "biological females" as vague and scientifically inaccurate, and interprets the phrase to mean "people with a female sex assigned at birth."  B.P.J. objects to the term "comparable" as vague.  B.P.J. also objects to this request as vague with respect to whether the phrase "comparable to that of biological females of their same age" refers to typical circulating testosterone levels for cisgender girls as a group or to the circulating testosterone levels of at least one person with a female sex assigned at birth.

Subject to these general and specific objections, and without waiver thereof, B.P.J. admits that it is possible at least one high-school-aged person who was assigned a male sex at birth and

who had delayed puberty likely has the same levels of circulating testosterone as at least one person of the same age who was assigned a female sex at birth.

**Request for Admission No. 24:**

24. You have alleged that "[g]irls who are transgender are similarly situated to cisgender girls (as opposed to cisgender boys) for purposes of participating on sex-separated school athletic teams." First Am. Compl. ¶ 39. Admit that for purposes of participating on sex separated school athletic teams, B.P.J. is similarly situated to male-identifying biological males of the same age who have received the same puberty blocking treatment as B.P.J

**B.P.J.'s Response to Request for Admission No. 24:**

B.P.J. objects to the phrase "male-identifying biological males" as vague and scientifically inaccurate, and interprets the phrase to mean "cisgender boys." B.P.J. objects to the phrase "similarly situated" as vague. B.P.J. objects to this request to the extent it requires B.P.J. to make the counterfactual assumption that there are cisgender boys of the same age as B.P.J. who have received the same puberty blocking treatment as B.P.J.

Subject to these general and specific objections, and without waiver thereof, B.P.J. denies this request for admission.

**Request for Admission No. 25:**

25. You have alleged that "[g]irls who are transgender are . . . not similarly situated to cisgender boys with respect to physiological characteristics associated with athletic performance." First Am. Compl. ¶ 40. Admit that with respect to any sex-related "physiological characteristics associated with athletic performance" relevant to running track or cross-country, B.P.J. is similarly situated to male-identifying biological males of the same age who have received the same puberty blocking treatment as B.P.J.

16

**B.P.J.'s Response to Request for Admission No. 25:**

B.P.J. objects to the phrase "male-identifying biological males" as vague and scientifically inaccurate, and interprets the phrase to mean "cisgender boys." B.P.J. objects to the phrase "similarly situated" as vague. B.P.J. objects to this request to the extent it requires B.P.J. to make the counterfactual assumption that there are cisgender boys of the same age as B.P.J. who have received the same puberty blocking treatment as B.P.J.

Subject to these general and specific objections, and without waiver thereof, B.P.J. admits that B.P.J. likely has the same level of circulating testosterone as cisgender boys who have not yet begun puberty but denies that they are similarly situated for purposes of Title IX or the Equal Protection Clause.

**Request for Admission No. 26:**

26. You have alleged that "[g]irls who are transgender are similarly situated to cisgender girls (as opposed to cisgender boys) for purposes of participating on sex-separated school athletic teams." First Am. Compl. ¶ 39. Admit that for purposes of participating on sex separated school athletic teams, B.P.J. is similarly situated to biological male students of the same age who have received the same puberty blocking treatment as B.P.J., regardless of the students' gender identity.

**B.P.J.'s Response to Request for Admission No. 26:**

B.P.J. objects to the phrase "biological male students" as vague and scientifically inaccurate, and interprets the phrase to mean "students with a male sex assigned at birth." B.P.J. objects to the phrase "similarly situated" as vague. B.P.J. objects to this request to the extent it requires B.P.J. to make the counterfactual assumption that there are cisgender boys of the same age as B.P.J. who have received the same puberty blocking treatment as B.P.J.

CONFIDENTIAL

Subject to these general and specific objections, and without waiver thereof, B.P.J. denies this request for admission.

**Request for Admission No. 27:**

27. You have alleged that "[g]irls who are transgender are . . . not similarly situated to cisgender boys with respect to physiological characteristics associated with athletic performance." First Am. Compl. ¶ 40. Admit that with respect to any sex-related "physiological characteristics associated with athletic performance" relevant to running track or cross-country, B.P.J. is similarly situated to biological male students of the same age who have received the same puberty blocking treatment as B.P.J., regardless of the students' gender identity.

**B.P.J.'s Response to Request for Admission No. 27:**

B.P.J. objects to the phrase "biological males" as vague and scientifically inaccurate, and interprets the phrase to mean "people who were assigned a male sex at birth." B.P.J. objects to the phrase "similarly situated" as vague. B.P.J. objects to this request to the extent it requires B.P.J. to make the counterfactual assumption that there are cisgender boys of the same age as B.P.J. who have received the same puberty blocking treatment as B.P.J.

Subject to these general and specific objections, and without waiver thereof, B.P.J. admits that B.P.J. likely has the same level of circulating testosterone as other people who were assigned a male sex at birth who have not begun puberty but denies that they are similarly situated regardless of gender identity for purposes of Title IX or the Equal Protection Clause.

**Request for Admission No. 28:**

28. You have alleged that "[g]irls who are transgender are similarly situated to cisgender girls (as opposed to cisgender boys) for purposes of participating on sex-separated school

athletic teams." First Am. Compl. ¶ 39. Admit that for purposes of participating on sex separated school athletic teams, middle school male-identifying biological male students who received puberty blocking treatment that effectively delayed male puberty are similarly situated to middle school female-identifying biological females of the same age who received no puberty blocking treatment.

**B.P.J.'s Response to Request for Admission No. 28:**

B.P.J. objects to the phrase "male-identifying biological male students" as vague and scientifically inaccurate, and interprets the phrase to mean "cisgender boys."  B.P.J. objects to the phrase "female-identifying biological females" as vague and scientifically inaccurate, and interprets the phrase to mean "cisgender girls."  B.P.J. objects to the phrase "similarly situated" as vague.  B.P.J. also objects to this request as vague because it does not specify whether the cisgender girls at issue have gone through puberty even though girls on average typically begin puberty at a younger age than boys on average.

Subject to these general and specific objections, and without waiver thereof, B.P.J. denies this request for admission.

**Request for Admission No. 29:**

29. You have alleged that "[g]irls who are transgender are . . . not similarly situated to cisgender boys with respect to physiological characteristics associated with athletic performance." First Am. Compl. ¶ 40. Admit that with respect to any sex-related "physiological characteristics associated with athletic performance" relevant to running track or cross-country, middle school male-identifying male students who received puberty blocking treatment that effectively delayed male puberty are similarly situated to middle

school female-identifying females of the same age who received no puberty blocking treatment.

**B.P.J.'s Response to Request for Admission No. 29:**

B.P.J. objects to the phrase "male-identifying biological male students" as vague and scientifically inaccurate, and interprets the phrase to mean "cisgender boys." B.P.J. objects to the phrase "female-identifying biological females" as vague and scientifically inaccurate, and interprets the phrase to mean "cisgender girls." B.P.J. objects to the phrase "similarly situated" as vague. B.P.J. also objects to this request as vague because it does not specify whether the cisgender girls at issue have gone through puberty even though girls on average typically begin puberty at a younger age than boys on average.

Subject to these general and specific objections, and without waiver thereof, B.P.J. denies this request for admission.

**Request for Admission No. 30:**

30. You have alleged that "[g]irls who are transgender are similarly situated to cisgender girls (as opposed to cisgender boys) for purposes of participating on sex-separated school athletic teams." First Am. Compl. ¶ 39. Admit that for purposes of participating on sex separated school athletic teams, biological male middle school students, regardless of gender identity, who received puberty blocking treatment that effectively delayed male puberty are similarly situated to middle school female-identifying females of the same age who received no puberty blocking treatment.

**B.P.J.'s Response to Request for Admission No. 30:**

B.P.J. objects to the phrase "biological male middle school students" as vague and scientifically inaccurate, and interprets the phrase to mean "students with a male sex assigned at

CONFIDENTIAL

birth."   B.P.J. objects to the phrase "female-identifying biological females" as vague and scientifically inaccurate, and interprets the phrase to mean "cisgender girls."  B.P.J. objects to the phrase "similarly situated" as vague.

Subject to these general and specific objections, and without waiver thereof, B.P.J. denies this request for admission.

**Request for Admission No. 31:**

31. You have alleged that "[g]irls who are transgender are . . . not similarly situated to cisgender boys with respect to physiological characteristics associated with athletic performance." First Am. Compl. ¶ 40. Admit that with respect to any sex-related "physiological characteristics associated with athletic performance" relevant to running track or cross-country, biological male middle school students, regardless of gender identity, who received puberty blocking treatment that effectively delayed male puberty are similarly situated to female-identifying females of the same age who received no puberty blocking treatment.

**B.P.J.'s Response to Request for Admission No. 31:**

B.P.J. objects to the phrase "biological male middle school students" as vague and scientifically inaccurate, and interprets the phrase to mean "students with a male sex assigned at birth."   B.P.J. objects to the phrase "female-identifying biological females" as vague and scientifically inaccurate, and interprets the phrase to mean "cisgender girls."  B.P.J. objects to the phrase "similarly situated" as vague.   B.P.J. also objects to this request as vague because it does not specify whether the cisgender girls at issue have gone through puberty even though girls on average typically begin puberty at a younger age than boys on average.

CONFIDENTIAL

Subject to these general and specific objections, and without waiver thereof, B.P.J. denies this request for admission.

**Request for Admission No. 32:**

32. You have alleged that "[g]irls who are transgender are similarly situated to cisgender girls (as opposed to cisgender boys) for purposes of participating on sex-separated school athletic teams." First Am. Compl. ¶ 39. Admit that for purposes of participating on sex-separated school athletic teams, high school male-identifying male students who received puberty blocking treatment that effectively delayed male puberty are similarly situated to high school female-identifying females of the same age who received no puberty blocking or other hormone therapy.

**B.P.J.'s Response to Request for Admission No. 32:**

B.P.J. objects to the phrase "male-identifying male students" as vague and scientifically inaccurate, and interprets the phrase to mean "cisgender boys." B.P.J. objects to the phrase "female-identifying biological females" as vague and scientifically inaccurate, and interprets the phrase to mean "cisgender girls." B.P.J. objects to the phrase "similarly situated" as vague. B.P.J. objects to this request to the extent it requires B.P.J. to make the counterfactual assumption that there are cisgender boys in high school who receive puberty blocking treatment.

Subject to these general and specific objections, and without waiver thereof, B.P.J. denies this request for admission.

**Request for Admission No. 33:**

33. You have alleged that "[g]irls who are transgender are . . . not similarly situated to cisgender boys with respect to physiological characteristics associated with athletic performance." First Am. Compl. ¶ 40. Admit that with respect to any sex-related

"physiological characteristics associated with athletic performance" relevant to running track or cross-country, high school male-identifying male students who received puberty blocking treatment that effectively delayed male puberty are similarly situated to high school female-identifying females of the same age who received no puberty blocking or other hormone therapy.

**B.P.J.'s Response to Request for Admission No. 33:**

B.P.J. objects to the phrase "male-identifying male students" as vague and scientifically inaccurate, and interprets the phrase to mean "cisgender boys."  B.P.J. objects to the phrase "female-identifying biological females" as vague and scientifically inaccurate, and interprets the phrase to mean "cisgender girls."  B.P.J. objects to the phrase "similarly situated" as vague.  B.P.J. objects to this request to the extent it requires B.P.J. to make the counterfactual assumption that there are cisgender boys in high school who receive puberty blocking treatment.

Subject to these general and specific objections, and without waiver thereof, B.P.J. denies this request for admission.

**Request for Admission No. 34:**

34. You have alleged that "[g]irls who are transgender are similarly situated to cisgender girls (as opposed to cisgender boys) for purposes of participating on sex-separated school athletic teams." First Am. Compl. ¶ 39. Admit that for purposes of participating on sex separated school athletic teams, biological male high school students, regardless of gender identity, who received puberty blocking treatment that effectively delayed male puberty are similarly situated to high school female-identifying females of the same age who received no puberty blocking or other hormone therapy.

**B.P.J.'s Response to Request for Admission No. 34:**

B.P.J. objects to the phrase "biological male high school students" as vague and scientifically inaccurate, and interprets the phrase to mean "high school students who had a male sex assigned at birth."  B.P.J. objects to the phrase "female-identifying biological females" as vague and scientifically inaccurate, and interprets the phrase to mean "cisgender girls."  B.P.J. objects to the phrase "similarly situated" as vague.  B.P.J. objects to this request to the extent it requires B.P.J. to make the counterfactual assumption that there are cisgender boys in high school who receive puberty blocking treatment.

Subject to these general and specific objections, and without waiver thereof, B.P.J. denies this request for admission.

**Request for Admission No. 35:**

35. You have alleged that "[g]irls who are transgender are . . . not similarly situated to cisgender boys with respect to physiological characteristics associated with athletic performance." First Am. Compl. ¶ 40. Admit that with respect to any sex-related "physiological characteristics associated with athletic performance" relevant to running track or cross-country, biological male high school students, regardless of gender identity, who received puberty blocking treatment that effectively delayed male puberty are similarly situated to high school female-identifying females of the same age who received no puberty blocking or other hormone therapy.

**B.P.J.'s Response to Request for Admission No. 35:**

B.P.J. objects to the phrase "biological male high school students" as vague and scientifically inaccurate, and interprets the phrase to mean "high school students who had a male sex assigned at birth."  B.P.J. objects to the phrase "female-identifying biological females" as vague and scientifically inaccurate, and interprets the phrase to mean "cisgender girls."  B.P.J.

objects to the phrase "similarly situated" as vague.  B.P.J. objects to this request to the extent it requires B.P.J. to make the counterfactual assumption that there are cisgender boys in high school who receive puberty blocking treatment.

Subject to these general and specific objections, and without waiver thereof, B.P.J. denies this request for admission.

**Request for Admission No. 36:**

36. You have alleged that "[g]irls who are transgender are similarly situated to cisgender girls (as opposed to cisgender boys) for purposes of participating on sex-separated school athletic teams." First Am. Compl. ¶ 39. Admit that for purposes of participating on sex-separated school athletic teams, B.P.J. is not similarly situated to female-identifying biological male students of the same age who have not received any form of puberty blocking or other hormone therapy

**B.P.J.'s Response to Request for Admission No. 36:**

B.P.J. objects to the phrase "female-identifying biological male students" as vague and scientifically inaccurate, and interprets the phrase to mean "girls who are transgender."  B.P.J. objects to the phrase "similarly situated" as vague.

Subject to these general and specific objections, and without waiver thereof, B.P.J. denies this request for admission.

**Request for Admission No. 37:**

37. You have alleged that "[g]irls who are transgender are . . . not similarly situated to cisgender boys with respect to physiological characteristics associated with athletic performance." First Am. Compl. ¶ 40. Admit that with respect to any sex-related "physiological characteristics associated with athletic performance" relevant to running

track or cross-country, B.P.J. is not similarly situated to female-identifying biological males of the same age who have not received any form of puberty blocking or other hormone therapy.

**B.P.J.'s Response to Request for Admission No. 37:**

B.P.J. objects to the phrase "female-identifying biological male students" as vague and scientifically inaccurate, and interprets the phrase to mean "girls who are transgender." B.P.J. objects to the phrase "similarly situated" as vague. B.P.J. also objects to this request as vague because it does not specify whether the hypothetical 11-year-old girls who are transgender have begun endogenous puberty.

Subject to these general and specific objections, and without waiver thereof, B.P.J. denies this request for admission.

**Request for Admission No. 38:**

38. You have alleged that "[g]irls who are transgender are similarly situated to cisgender girls (as opposed to cisgender boys) for purposes of participating on sex-separated school athletic teams." First Am. Compl. ¶ 39. Admit that for purposes of participating on sex-separated school athletic teams, B.P.J. is not similarly situated to biological male students of the same age who have not received any form of puberty blocking or other hormone therapy, regardless of the students' gender identity.

**B.P.J.'s Response to Request for Admission No. 38:**

B.P.J. objects to the phrase "biological male students" as vague and scientifically inaccurate, and interprets the phrase to mean "students who were assigned a male sex at birth." B.P.J. objects to the phrase "similarly situated" as vague.

Subject to these general and specific objections, and without waiver thereof, B.P.J. denies the request for admission.

**Request for Admission No. 39:**

39. You have alleged that "[g]irls who are transgender are . . . not similarly situated to cisgender boys with respect to physiological characteristics associated with athletic performance." First Am. Compl. ¶ 40. Admit that with respect to any "physiological characteristics associated with athletic performance" relevant to running track or cross-country, B.P.J. is not similarly situated to biological male students of the same age who have not received any form of puberty blocking or other hormone therapy, regardless of the students' gender identity.

**B.P.J.'s Response to Request for Admission No. 39:**

B.P.J. objects to the phrase "biological male students" as vague and scientifically inaccurate, and interprets the phrase to mean "students who were assigned a male sex at birth." B.P.J. objects to the phrase "similarly situated" as vague.  B.P.J. objects to the phrase "similarly situated" as vague.  B.P.J. also objects to this request as vague because it does not specify whether the hypothetical 11-year-olds with a male sex assigned at birth have begun endogenous puberty.

Subject to these general and specific objections, and without waiver thereof, B.P.J. denies this request for admission.

**Request for Admission No. 40:**

40. You have alleged that "[g]irls who are transgender are similarly situated to cisgender girls (as opposed to cisgender boys) for purposes of participating on sex-separated school athletic teams." First Am. Compl. ¶ 39. Admit that for purposes of participating on sex separated school athletic teams, high school male-identifying biological males who

27

experienced endogenous male puberty but have since received hormone therapy sufficient to bring their circulating testosterone down into the range typical for biological females of their same age are similarly situated to female-identifying biological females of the same age who have received no puberty blocking or other hormone therapy.

**B.P.J.'s Response to Request for Admission No. 40:**

B.P.J. objects to the phrase "male-identifying biological males" as vague and scientifically inaccurate, and interprets the phrase to mean "cisgender boys." B.P.J. objects to the phrase "biological females" as vague and scientifically inaccurate, and interprets the phrase to mean "people who had a female sex assigned at birth." B.P.J. objects to the phrase "similarly situated" as vague. B.P.J. objects to this request to the extent it requires B.P.J. to make the counterfactual assumption that there are cisgender boys in high school who receive hormone therapy sufficient to bring their circulating testosterone down into the range typical for cisgender girls of the same age.

Subject to these general and specific objections, and without waiver thereof, B.P.J. denies this request for admission.

**Request for Admission No. 41:**

41. You have alleged that "[g]irls who are transgender are . . . not similarly situated to cisgender boys with respect to physiological characteristics associated with athletic performance." First Am. Compl. ¶ 40. Admit that with respect to sex-related "physiological characteristics associated with athletic performance" relevant to running track or cross-country, high school male-identifying biological males who experienced endogenous male puberty but have since received hormone therapy sufficient to bring their circulating testosterone down into the range typical for biological females of their same age are

28

similarly situated to female-identifying biological females of the same age who have received no puberty blocking or other hormone therapy.

**B.P.J.'s Response to Request for Admission No. 41:**

B.P.J. objects to the phrase "male-identifying biological males" as vague and scientifically inaccurate, and interprets the phrase to mean "cisgender boys."  B.P.J.  objects to the phrase "biological females" as vague and scientifically inaccurate, and interprets the phrase to mean "people who had a female sex assigned at birth."  B.P.J. objects to the phrase "female identifying biological females" as vague and scientifically inaccurate, and interprets the phrase to mean "cisgender girls."  B.P.J. objects to the phrase "similarly situated" as vague.  B.P.J. objects to this request to the extent it requires B.P.J. to make the counterfactual assumption that there are cisgender boys in high school who receive hormone therapy sufficient to bring their circulating testosterone down into the range typical for cisgender girls of the same age.

Subject to these general and specific objections, and without waiver thereof, B.P.J. admits that cisgender high school boys who lower their levels of circulating testosterone to the same levels that are typical for cisgender girls of the same age would, on average, have the same levels of circulating testosterone as cisgender girls, on average, but denies that the two groups are similarly situated for purposes of Title IX or the Equal Protection Clause.

**Request for Admission No. 42:**

42. You have alleged that "[g]irls who are transgender are similarly situated to cisgender girls (as opposed to cisgender boys) for purposes of participating on sex-separated school athletic teams." First Am. Compl. ¶ 39. Admit that for purposes of participating on sex-separated school athletic teams, biological male middle school students, regardless of gender identity, who experienced endogenous male puberty but have since received

hormone therapy sufficient to bring their circulating testosterone down into the range typical for biological females of their age are similarly situated to female-identifying biological females of the same age who have received no puberty blocking or other hormone therapy.

**B.P.J.'s Response to Request for Admission No. 42:**

B.P.J. objects to the phrase "biological male middle school students" as vague and scientifically inaccurate, and interprets the phrase to mean "middle school students who were assigned a male sex at birth."  B.P.J. objects to the phrase "biological females" as vague and scientifically inaccurate, and interprets the phrase to mean "people who had a female sex assigned at birth."  B.P.J. objects to the phrase "female identifying biological females" as vague and scientifically inaccurate, and interprets the phrase to mean "cisgender girls."  B.P.J. objects to the phrase "similarly situated" as vague.  B.P.J. objects to this request to the extent it requires B.P.J. to make the counterfactual assumption that there are cisgender boys in middle school who receive hormone therapy sufficient to bring their circulating testosterone down into the range typical for cisgender girls of the same age.

Subject to these general and specific objections, and without waiver thereof, B.P.J. denies this request for admission.

**Request for Admission No. 43:**

43. You have alleged that "[g]irls who are transgender are . . . not similarly situated to cisgender boys with respect to physiological characteristics associated with athletic performance." First Am. Compl. ¶ 40. Admit that with respect to sex-related "physiological characteristics associated with athletic performance" relevant to running track and cross-country, biological male middle school students, regardless of gender identity, who

30

CONFIDENTIAL

experienced endogenous male puberty but have since received hormone therapy sufficient to bring their circulating testosterone down into the range typical for biological females of their same age are similarly situated to female-identifying biological females of the same age who have received no puberty blocking or other hormone therapy.

### B.P.J.'s Response to Request for Admission No. 43:

B.P.J. objects to the phrase "biological male middle school students" as vague and scientifically inaccurate, and interprets the phrase to mean "middle school students who were assigned a male sex at birth." B.P.J. objects to the phrase "biological females" as vague and scientifically inaccurate, and interprets the phrase to mean "people who had a female sex assigned at birth." B.P.J. objects to the phrase "female identifying biological females" as vague and scientifically inaccurate, and interprets the phrase to mean "cisgender girls." B.P.J. objects to the phrase "similarly situated" as vague. B.P.J. objects to this request to the extent it requires B.P.J. to make the counterfactual assumption that there are cisgender boys in middle school who receive hormone therapy sufficient to bring their circulating testosterone down into the range typical for cisgender girls of the same age.

Subject to these general and specific objections, and without waiver thereof, B.P.J. admits that the two hypothetical groups of people would have on average the same levels of circulating testosterone but denies that they would be similarly situated for purposes of Title IX and the Equal Protection Clause.

### Request for Admission No. 44:

44. You have alleged that "[g]irls who are transgender are similarly situated to cisgender girls (as opposed to cisgender boys) for purposes of participating on sex-separated school athletic teams." First Am. Compl. ¶ 39. Admit that for purposes of participating on sex

separated school athletic teams, biological male high school students, regardless of gender identity, who experienced endogenous male puberty but have since received hormone therapy sufficient to bring their circulating testosterone down into the range typical for biological females of their same age, are similarly situated to female-identifying biological females of the same age who have received no puberty blocking or other hormone therapy.

**B.P.J.'s Response to Request for Admission No. 44:**

B.P.J. objects to the phrase "biological male high school students" as vague and scientifically inaccurate, and interprets the phrase to mean "high school students who were assigned a male sex at birth."  B.P.J. objects to the phrase "biological females" as vague and scientifically inaccurate, and interprets the phrase to mean "people who had a female sex assigned at birth."  B.P.J. objects to the phrase "female identifying biological females" as vague and scientifically inaccurate, and interprets the phrase to mean "cisgender girls."  B.P.J. objects to the phrase "similarly situated" as vague.  B.P.J. objects to this request to the extent it requires B.P.J. to make the counterfactual assumption that there are high school cisgender boys who experienced endogenous male puberty but have since received hormone therapy sufficient to bring their circulating testosterone down into the range typical for people who had a female sex assigned at birth of their age.

Subject to these general and specific objections, and without waiver thereof, B.P.J. denies this request for admission.

**Request for Admission No. 45:**

45. You have alleged that "[g]irls who are transgender are . . . not similarly situated to cisgender boys with respect to physiological characteristics associated with athletic performance." First Am. Compl. ¶ 40. Admit that with respect to sex-related "physiological

characteristics associated with athletic performance" relevant to running track and cross-country, biological male high school students, regardless of gender identity, who experienced endogenous male puberty but have since received hormone therapy sufficient to bring their circulating testosterone down into the range typical for biological females of their same age are similarly situated to female-identifying biological females of the same age who have received no puberty blocking or other hormone therapy.

**B.P.J.'s Response to Request for Admission No. 45:**

B.P.J. objects to the phrase "biological male high school students" as vague and scientifically inaccurate, and interprets the phrase to mean "high school students who were assigned a male sex at birth." B.P.J. objects to the phrase "biological females" as vague and scientifically inaccurate, and interprets the phrase to mean "people who had a female sex assigned at birth." B.P.J. objects to the phrase "female identifying biological females" as vague and scientifically inaccurate, and interprets the phrase to mean "cisgender girls." B.P.J. objects to the phrase "similarly situated" as vague. B.P.J. objects to this request to the extent it requires B.P.J. to make the counterfactual assumption that there are high school cisgender boys who experienced endogenous male puberty but have since received hormone therapy sufficient to bring their circulating testosterone down into the range typical for people who had a female sex assigned at birth of their age.

Subject to these general and specific objections, and without waiver thereof, B.P.J. admits that the two hypothetical groups of people would have on average the same levels of circulating testosterone but denies that they would be similarly situated for purposes of Title IX and the Equal Protection Clause.

**Request for Admission No. 46:**

46. You have alleged that "[g]irls who are transgender are similarly situated to cisgender girls (as opposed to cisgender boys) for purposes of participating on sex-separated school athletic teams." First Am. Compl. ¶ 39. Admit that for purposes of participating on sex separated school athletic teams, B.P.J. is not similarly situated to female-identifying biological females of the same age who have received hormone therapy to delay female puberty or produce masculinizing effects.

**B.P.J.'s Response to Request for Admission No. 46:**

B.P.J. objects to the phrase "female identifying biological females" as vague and scientifically inaccurate, and interprets the phrase to mean "cisgender girls." B.P.J. objects to the phrase "similarly situated" as vague. B.P.J. objects to the request to the extent that it requires B.P.J. to make the counterfactual assumption that "puberty blocking treatment" can "produce masculinizing effects." B.P.J. objects to this request to the extent it requires B.P.J. to make the counterfactual assumption that there are 11-year-old cisgender girls who receive hormone therapy to delay female puberty or produce masculinizing effects.

Subject to these general and specific objections, and without waiver thereof, B.P.J. denies this request for admission.

**Request for Admission No. 47:**

47. You have alleged that "[g]irls who are transgender are . . . not similarly situated to cisgender boys with respect to physiological characteristics associated with athletic performance." First Am. Compl. ¶ 40. Admit that with respect to sex-related "physiological characteristics associated with athletic performance" relevant to running track or cross-country, B.P.J. is not similarly situated to female-identifying biological females of the same

age who have received puberty blocking treatment to delay female puberty or produce masculinizing effects.

**B.P.J.'s Response to Request for Admission No. 47:**

B.P.J. objects to the phrase "female identifying biological females" as vague and scientifically inaccurate, and interprets the phrase to mean "cisgender girls." B.P.J. objects to the phrase "similarly situated" as vague and requires B.P.J. to make the counterfactual assumption that "puberty blocking treatment" can "produce masculinizing effects." B.P.J. objects to this request to the extent it requires B.P.J. to make the counterfactual assumption that there are 11-year-old cisgender girls who receive hormone therapy to delay female puberty or produce masculinizing effects.

Subject to these general and specific objections, and without waiver thereof, B.P.J. denies this request for admission.

**Request for Admission No. 48:**

48. You have alleged that "[g]irls who are transgender are similarly situated to cisgender girls (as opposed to cisgender boys) for purposes of participating on sex-separated school athletic teams." First Am. Compl. ¶ 39. Admit that for purposes of participating on sex-separated school athletic teams, B.P.J. is not similarly situated to biological female students of the same age who have received puberty blocking treatment to delay female puberty or produce masculinizing effects, regardless of the students' gender identity.

**B.P.J.'s Response to Request for Admission No. 48:**

B.P.J. objects to the phrase "biological female students" as vague and scientifically inaccurate, and interprets the phrase to mean "students who were assigned a female sex at birth."

B.P.J. objects to the phrase "similarly situated" as vague. B.P.J. objects to the request to the extent that it requires B.P.J. to make the counterfactual assumption that "puberty blocking treatment" can "produce masculinizing effects." B.P.J. objects to this request to the extent it requires B.P.J. to make the counterfactual assumption that there are 11-year-old cisgender girls who receive hormone therapy to delay female puberty or produce masculinizing effects.

Subject to these general and specific objections, and without waiver thereof, B.P.J. denies this request for admission.

### Request for Admission No. 49:

49. You have alleged that "[g]irls who are transgender are . . . not similarly situated to cisgender boys with respect to physiological characteristics associated with athletic performance." First Am. Compl. ¶ 40. Admit that with respect to sex-related "physiological characteristics associated with athletic performance" relevant to running track or cross-country, B.P.J. is not similarly situated to biological female students of the same age who have received puberty blocking treatment to delay female puberty or produce masculinizing effects, regardless of the students' gender identity.

### B.P.J.'s Response to Request for Admission No. 49:

B.P.J. objects to the phrase "female identifying biological females" as vague and scientifically inaccurate, and interprets the phrase to mean "cisgender girls." B.P.J. objects to the phrase "similarly situated" as vague. B.P.J. objects to the request to the extent that it requires B.P.J. to make the counterfactual assumption that "puberty blocking treatment" can "produce masculinizing effects." B.P.J. objects to this request to the extent it requires B.P.J. to make the counterfactual assumption that there are 11-year-old cisgender girls who receive puberty blocking treatment.

Subject to these general and specific objections, and without waiver thereof, B.P.J. admits B.P.J. likely has the same circulating levels of testosterone as people of the same age who have a female sex assigned at birth and who receive puberty blocking treatment but denies that B.P.J. is similarly situated to those individuals regardless of the students' gender identity for purposes of Title IX and the Equal Protection Clause.

**Request for Admission No. 50:**

50. You have alleged that "[g]irls who are transgender are similarly situated to cisgender girls (as opposed to cisgender boys) for purposes of participating on sex-separated school athletic teams." First Am. Compl. ¶ 39. Admit that for purposes of participating on sex-separated school athletic teams, B.P.J. is similarly situated to male-identifying biological females of the same age who have not received any form of puberty blocking or other hormone therapy.

**B.P.J.'s Response to Request for Admission No. 50:**

B.P.J. objects to the phrase "male identifying biological females" as vague and scientifically inaccurate, and interprets the phrase to mean "boys who are transgender." B.P.J. objects to the phrase "similarly situated" as vague.

Subject to these general and specific objections, and without waiver thereof, B.P.J. denies this request for admission.

**Request for Admission No. 51:**

51. You have alleged that "[g]irls who are transgender are . . . not similarly situated to cisgender boys with respect to physiological characteristics associated with athletic performance." First Am. Compl. ¶ 40. Admit that with respect to any sex-related "physiological characteristics associated with athletic performance" relevant to running

track or cross country, B.P.J. is similarly situated to male-identifying biological females of the same age who have not received any form of puberty blocking or other hormone therapy.

**B.P.J.'s Response to Request for Admission No. 51:**

B.P.J. objects to the phrase "male identifying biological females" as vague and scientifically inaccurate, and interprets the phrase to mean "boys who are transgender." B.P.J. objects to the phrase "similarly situated" as vague. B.P.J. also objects to the request as vague because it does not specify whether the 11-year-old people who were assigned a female sex at birth at issue have gone through puberty even though girls on average typically begin puberty at a younger age than boys on average.

Subject to these general and specific objections, and without waiver thereof, B.P.J. denies this request for admission.

**Request for Admission No. 52:**

52. You have alleged that "[g]irls who are transgender are similarly situated to cisgender girls (as opposed to cisgender boys) for purposes of participating on sex-separated school athletic teams." Am. Compl. ¶ 39. Admit that for purposes of participating on sex-separated school athletic teams, B.P.J. is similarly situated to biological female students of the same age who have not received any form of puberty blocking or other hormone therapy, regardless of the students' gender identity.

**B.P.J.'s Response to Request for Admission No. 52:**

B.P.J. objects to the phrase "biological female students" as vague and scientifically inaccurate, and interprets the phrase to mean "students who had a female-sex assigned at birth." B.P.J. objects to the phrase "similarly situated" as vague.

CONFIDENTIAL

Subject to these general and specific objections, and without waiver thereof, B.P.J. denies this request for admission.

**Request for Admission No. 53:**

53. You have alleged that "[g]irls who are transgender are . . . not similarly situated to cisgender boys with respect to physiological characteristics associated with athletic performance." First Am. Compl. ¶ 40. Admit that with respect to any sex-related "physiological characteristics associated with athletic performance" relevant to running track or cross-country, B.P.J. is similarly situated to biological female students of the same age who have not received any form of puberty blocking or other hormone therapy, regardless of the students' gender identity.

**B.P.J.'s Response to Request for Admission No. 53:**

B.P.J. objects to the phrase "biological female students" as vague and scientifically inaccurate, and interprets the phrase to mean "people who were assigned a female sex at birth." B.P.J. objects to the phrase "similarly situated" as vague.  B.P.J. also objects to the request as vague because it does not specify whether the 11-year-old people who were assigned a female sex at birth at issue have gone through puberty even though girls on average typically begin puberty at a younger age than boys on average.

Subject to these general and specific objections, and without waiver thereof, B.P.J. denies this request for admission.

**Request for Admission No. 54:**

54. You have alleged that "[g]irls who are transgender are similarly situated to cisgender girls (as opposed to cisgender boys) for purposes of participating on sex-separated school athletic teams." First Am. Compl. ¶ 39. Admit that for purposes of participating on sex-

39

separated school athletic teams, female-identifying biological male middle school students who have not received any form of puberty blocking or other hormone therapy are not similarly situated to female-identifying biological females of the same age who have received no puberty blocking or other hormone therapy.

**B.P.J.'s Response to Request for Admission No. 54:**

B.P.J. objects to the phrase "female-identifying biological male" as vague and scientifically inaccurate, and interprets the phrase to mean "girls who are transgender." B.P.J. objects to the phrase "similarly situated" as vague.

Subject to these general and specific objections, and without waiver thereof, B.P.J. denies this request for admission.

**Request for Admission No. 55:**

55. You have alleged that "[g]irls who are transgender are . . . not similarly situated to cisgender boys with respect to physiological characteristics associated with athletic performance." First Am. Compl. ¶ 40. Admit that with respect to any sex-related "physiological characteristics associated with athletic performance" relevant to running track or cross-country, female-identifying biological male middle school students who have not received any form of puberty blocking or other hormone therapy are not similarly situated to female-identifying biological females of the same age who have received no puberty blocking or other hormone therapy.

**B.P.J.'s Response to Request for Admission No. 55:**

B.P.J. objects to the phrase "female-identifying biological male" as vague and scientifically inaccurate, and interprets the phrase to mean "girls who are transgender." B.P.J. objects to the phrase "female-identifying biological female" as vague and scientifically inaccurate, and interprets

40

the phrase to mean "cisgender girls."  B.P.J. objects to the phrase "similarly situated" as vague. B.P.J. objects to the request as vague because it does not specify whether the cisgender girls at issue have gone through puberty even though girls on average typically begin puberty at a younger age than boys on average.

Subject to these general and specific objections, and without waiver thereof, B.P.J. denies this request for admission.

**Request for Admission No. 56:**

56. You have alleged that "[g]irls who are transgender are similarly situated to cisgender girls (as opposed to cisgender boys) for purposes of participating on sex-separated school athletic teams." First Am. Compl. ¶ 39. Admit that for purposes of participating on sex-separated school athletic teams, female-identifying biological male high school students who have not received any form of puberty blocking or other hormone therapy are not similarly situated to female-identifying biological females of the same age who have received no puberty blocking or other hormone therapy.

**B.P.J.'s Response to Request for Admission No. 56:**

B.P.J. objects to the phrase "female-identifying biological male high school students" as vague and scientifically inaccurate, and interprets the phrase to mean "girls who are transgender who are high school students."  B.P.J. objects to the phrase "female-identifying biological females" as vague and scientifically inaccurate, and interprets the phrase to mean "cisgender girls."  B.P.J. objects to the phrase "similarly situated" as vague.

Subject to these general and specific objections, and without waiver thereof, B.P.J. denies this request for admission.

**Request for Admission No. 57:**

41

57. You have alleged that "[g]irls who are transgender are . . . not similarly situated to cisgender boys with respect to physiological characteristics associated with athletic performance." First Am. Compl. ¶ 40. Admit that with respect to any sex-related "physiological characteristics associated with athletic performance" relevant to running track or cross-country, female-identifying biological male high school students who have not received any form of puberty blocking or other hormone therapy are not similarly situated to female-identifying biological females of the same age who have received no puberty blocking or other hormone therapy.

**B.P.J.'s Response to Request for Admission No. 57:**

B.P.J. objects to the phrase "female-identifying biological male high school students" as vague and scientifically inaccurate, and interprets the phrase to mean "girls who are transgender who are high school students." B.P.J. objects to the phrase "female-identifying biological females" as vague and scientifically inaccurate, and interprets the phrase to mean "cisgender girls." B.P.J. objects to the phrase "similarly situated" as vague.

Subject to these general and specific objections, and without waiver thereof, B.P.J. admits that girls who are transgender who are high school students and who have not received any form of puberty blocking or other hormone therapy will, on average, have higher levels of circulating testosterone than cisgender girls who have received no puberty blocking or other hormone therapy, on average, but deny that the two groups are not similarly situated for purposes of Title IX and the Equal Protection Clause.

**Request for Admission No. 58:**

58. You have alleged that "[g]irls who are transgender are similarly situated to cisgender girls (as opposed to cisgender boys) for purposes of participating on sex-separated school

athletic teams." First Am. Compl. ¶ 39. Admit that for purposes of participating on sex separated school athletic teams, biological male middle school students, regardless of gender identity, who have not received any form of puberty blocking or other hormone therapy are not similarly situated to female-identifying biological females of the same age who have received no puberty blocking or other hormone therapy.

**B.P.J.'s Response to Request for Admission No. 58:**

B.P.J. objects to the phrase "biological male middle school students" as vague and scientifically inaccurate, and interprets the phrase to mean "middle school students who had a male sex assigned at birth."  B.P.J. objects to the phrase "female-identifying biological females" as vague and scientifically inaccurate, and interprets the phrase to mean "cisgender girls."  B.P.J. objects to the phrase "similarly situated" as vague.

Subject to these general and specific objections, and without waiver thereof, B.P.J. denies this request for admission.

**Request for Admission No. 59:**

59. You have alleged that "[g]irls who are transgender are . . . not similarly situated to cisgender boys with respect to physiological characteristics associated with athletic performance." First Am. Compl. ¶ 40. Admit that with respect to any sex-related "physiological characteristics associated with athletic performance" relevant to running track or cross-country, biological male middle school students, regardless of gender identity, who have not received any form of puberty blocking or other hormone therapy are not similarly situated to female identifying biological females of the same age who have received no puberty blocking or other hormone therapy.

**B.P.J.'s Response to Request for Admission No. 59:**

B.P.J. objects to the phrase "biological male middle school students" as vague and scientifically inaccurate, and interprets the phrase to mean "middle school students who had a male sex assigned at birth."  B.P.J. objects to the phrase "female-identifying biological females" as vague and scientifically inaccurate, and interprets the phrase to mean "cisgender girls."  B.P.J. objects to the phrase "similarly situated" as vague.  B.P.J. also objects to this request as vague because it does not specify whether the cisgender girls at issue have gone through puberty even though girls on average typically begin puberty at a younger age than boys on average.

Subject to these general and specific objections, and without waiver thereof, B.P.J. denies this request for admission.

**Request for Admission No. 60:**

60. You have alleged that "[g]irls who are transgender are similarly situated to cisgender girls (as opposed to cisgender boys) for purposes of participating on sex-separated school athletic teams." First Am. Compl. ¶ 39. Admit that for purposes of participating on sex separated school athletic teams, biological male high school students, regardless of gender identity, who have not received any form of puberty blocking or other hormone therapy are not similarly situated to female-identifying biological females of the same age who have received no puberty blocking or other hormone therapy.

**B.P.J.'s Response to Request for Admission No. 60:**

B.P.J. objects to the phrase "biological male high school students" as vague and scientifically inaccurate, and interprets the phrase to mean "high school students who had a male sex assigned at birth."  B.P.J. objects to the phrase "female-identifying biological females" as

vague and scientifically inaccurate, and interprets the phrase to mean "cisgender girls."  B.P.J. objects to the phrase "similarly situated" as vague.

Subject to these general and specific objections, and without waiver thereof, B.P.J. denies this request for admission.

**Request for Admission No. 61:**

61. You have alleged that "[g]irls who are transgender are . . . not similarly situated to cisgender boys with respect to physiological characteristics associated with athletic performance." First Am. Compl. ¶ 40. Admit that with respect to any sex-related "physiological characteristics associated with athletic performance," Am. Compl. ¶ 40, relevant to running track or cross-country, biological male high school students, regardless of gender identity, who have not received any form of puberty blocking or other hormone therapy are not similarly situated to female-identifying biological females of the same age who have received no puberty blocking or other hormone therapy.

**B.P.J.'s Response to Request for Admission No. 61:**

B.P.J. objects to the phrase "biological male high school students" as vague and scientifically inaccurate, and interprets the phrase to mean "high school students who had a male sex assigned at birth."  B.P.J. objects to the phrase "female-identifying biological females" as vague and scientifically inaccurate, and interprets the phrase to mean "cisgender girls."  B.P.J. objects to the phrase "similarly situated" as vague.

Subject to these general and specific objections, and without waiver thereof, B.P.J. admits that high school students who had a male sex assigned at birth who have not received any form of puberty blocking or other hormone therapy will, on average, have higher levels of circulating testosterone than cisgender girls of the same age who have received no puberty blocking or other

hormone therapy, on average, but denies that they are not similarly situated regardless of gender

identity for purposes of Title IX and the Equal Protection Clause.

**Request for Admission No. 62:**

62. Admit that a person's gender identity may be neither male nor female.

**B.P.J.'s Response to Request for Admission No. 62:**

Admit.

**Request for Admission No. 63:**

63. Admit that a person's gender identity may change over time.

**B.P.J.'s Response to Request for Admission No. 63:**

Deny.

**Request for Admission No. 64:**

64. Admit that under H.B. 3293, a male-identifying biological male athlete is precluded from

participating on sex-separated female sports teams regardless of the quantity of circulating

testosterone in this individual's body.

**B.P.J.'s Response to Request for Admission No. 64:**

B.P.J. objects to the phrase "male-identifying biological male" as vague and scientifically

inaccurate, and interprets the phrase to mean "cisgender boy."  B.P.J. further objects to the phrase

"under H.B. 3293" as vague and interprets the phrase to mean the period of time after H.B. 3293

was enacted.

Subject to these general and specific objections, and without waiver thereof, B.P.J. denies

this request for admission because cisgender boys were already precluded from participating on

sex-separated female sports before H.B. 3293 was enacted, but admits that H.B. 3293 continues

this existing policy.

CONFIDENTIAL

**Request for Admission No. 65:**

65. Admit that under H.B. 3293, a male-identifying biological male athlete is precluded from participating on sex-separated female sports teams regardless of the extent to which he has (or has not) experienced endogenous male puberty.

**B.P.J.'s Response to Request for Admission No. 65:**

B.P.J. objects to the phrase "male-identifying biological male" as vague and scientifically inaccurate, and interprets the phrase to mean "cisgender boy."  B.P.J. further objects to the phrase "under H.B. 3293" as vague and interprets the phrase to mean the period of time after H.B. 3293 was enacted.

Subject to these general and specific objections, and without waiver thereof, B.P.J. denies this request for admission because cisgender boys were already precluded from participating on sex-separated female sports before H.B. 3293 was enacted, but admits that H.B. 3293 continues this existing policy.

**Request for Admission No. 66:**

66. Admit that under H.B. 3293, a male-identifying biological male athlete is precluded from participating on sex-separated female sports teams regardless of athletic ability.

**B.P.J.'s Response to Request for Admission No. 66:**

B.P.J. objects to the phrase "male-identifying biological male" as vague and scientifically inaccurate, and interprets the phrase to mean "cisgender boy."  B.P.J. further objects to the phrase "under H.B. 3293" as vague and interprets the phrase to mean the period of time after H.B. 3293 was enacted.

Subject to these general and specific objections, and without waiver thereof, B.P.J. denies this request for admission because cisgender boys were already precluded from participating on

47

CONFIDENTIAL

sex-separated female sports before H.B. 3293 was enacted, but admits that H.B. 3293 continues this existing policy.

**Request for Admission No. 67:**

67. Admit that in the absence of medical intervention, endogenous male puberty provides, at the "population level" (as this term is used in First Am. Compl. ¶ 40), benefits in athletic performance not obtained by people who do not experience male puberty.

**B.P.J.'s Response to Request for Admission No. 67:**

B.P.J. objects to the phrase "benefits in athletic performance" as vague because it does not specify the stage of puberty or the athletic competition at issue. B.P.J. also objects to the phrase "medical intervention" as vague.

Subject to these general and specific objections, and without waiver thereof, B.P.J. cannot admit or deny this request for admission because there have not been sufficient studies across all athletes of all ages in all sports at all levels to determine whether there are average differences in performance between individuals who have gone through endogenous male puberty and not received medical intervention compared to people who have not experienced male puberty including in light of other possible factors.

**Request for Admission No. 68:**

68. Admit that the State of West Virginia has a significant governmental interest in promoting equal athletic opportunities for people born with the physiological characteristics associated with the female sex.

**B.P.J.'s Response to Request for Admission No. 68:**

B.P.J. objects to the phrase "significant governmental interest" as vague. B.P.J. objects to the phrase "promoting equal athletic opportunities for people born with the physiological

CONFIDENTIAL

characteristics associated with the female sex" as vague because it does not specify the comparator group.

Subject to these general and specific objections, and without waiver thereof, B.P.J. denies this request for admission.

**Request for Admission No. 69:**

69. Admit that gender identity, divorced from all forms of hormone therapy or other pharmacological treatment, has no independent effect on athletic ability.

**B.P.J.'s Response to Request for Admission No. 69:**

B.P.J. objects to the phrases "independent effect" and "athletic ability" as vague.

Subject to these general and specific objections, and without waiver thereof, B.P.J. denies this request for admission.

Dated: February 7, 2022

Joshua Block*
Taylor Brown*
Chase Strangio*
AMERICAN CIVIL LIBERTIES UNION
FOUNDATION
125 Broad St.
New York, NY 10004
Phone: (212) 549-2569
jblock@aclu.org

Avatara Smith-Carrington*
LAMBDA LEGAL
3500 Oak Lawn Avenue, Suite 500
Dallas, TX 75219
Phone: (214) 219-8585
asmithcarrington@lambdalegal.org

Carl Charles*
Tara Borelli*
LAMBDA LEGAL
158 West Ponce De Leon Ave., Ste. 105

Respectfully submitted,
/s/ *Loree Stark*

Loree Stark (Bar No. 12936)
AMERICAN CIVIL LIBERTIES UNION OF WEST
VIRGINIA FOUNDATION
P.O. Box 3952
Charleston, WV 25339-3952
Phone: (914) 393-4614
lstark@acluwv.org

Kathleen Hartnett*
Julie Veroff*
COOLEY LLP
3 Embarcadero Center, 20th Floor
San Francisco, CA 94111
Phone: (415) 693-2000
khartnett@cooley.com

Katelyn Kang*
COOLEY LLP
55 Hudson Yards
New York, NY 10001-2157

**CONFIDENTIAL**

Decatur, GA 30
Phone: (404) 897-1880
ccharles@lambdalegal.org

Sruti Swaminathan*
LAMBDA LEGAL
120 Wall Street, 19th Floor
New York, NY 10005
Phone: (212) 809-8585
sswaminathan@lambdalegal.org

Andrew Barr*
COOLEY LLP
1144 15th St. Suite 2300
Denver, CO  80202-5686
Phone: (720) 566-4000
abarr@cooley.com

Phone: (212) 479-6000
kkang@cooley.com

Elizabeth Reinhardt*
COOLEY LLP
500 Boylston Street, 14th Floor
Boston, MA 02116-3736
Phone: (617) 937-2305
ereinhardt@cooley.com

*Visiting Attorneys

Attorneys for Plaintiff

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA
CHARLESTON DIVISION

| | |
|---|---|
| B.P.J. by her next friend and mother, HEATHER JACKSON,<br><br>*Plaintiff*,<br><br>v.<br><br>WEST VIRGINIA STATE BOARD OF EDUCATION, HARRISON COUNTY BOARD OF EDUCATION, WEST VIRGINIA SECONDARY SCHOOL ACTIVITIES COMMISSION, W. CLAYTON BURCH in his official capacity as State Superintendent, DORA STUTLER in her official capacity as Harrison County Superintendent, and THE STATE OF WEST VIRGINIA,<br><br>*Defendants*,<br><br>and<br><br>LAINEY ARMISTEAD,<br><br>*Defendant-Intervenor*. | Civil Action No. 2:21-cv-00316<br><br>Hon. Joseph R. Goodwin<br><br>**PLAINTIFF'S RESPONSES AND OBJECTIONS TO INTERVENOR LAINEY ARMISTEAD'S THIRD SET OF INTERROGATORIES AND SECOND AND THIRD SETS OF REQUESTS FOR ADMISSION** |

Pursuant to Federal Rules of Civil Procedure Rules 26, 33, and 34 Plaintiff B.P.J. by her next friend and mother, Heather Jackson ("B.P.J."), responds as follows to Intervenor Lainey Armistead's ("Intervenor") Third Set of Interrogatories ("Interrogatories") and Second and Third Sets of Requests for Admission ("Requests"):

## **GENERAL RESPONSES**

1.  B.P.J.'s response to the Interrogatories and Requests is made to the best of B.P.J.'s present knowledge, information, and belief.  This response is at all times subject to such additional or different information that discovery or further investigation may disclose and, while based on the present state of B.P.J.'s recollection, is subject to such refreshing of

recollection, and such additional knowledge of facts, as may result from B.P.J.'s further discovery or investigation.

2. To the extent B.P.J. agrees to produce documents or information in response to any particular Interrogatory or Request, B.P.J. will produce only non-privileged, responsive documents in her possession, custody, or control, and in accordance with Exhibit A of the parties' Rule 26(f) report filed on September 7, 2021 (ECF No. 92-1) in this action.

3. B.P.J. has no duty to, and will not, produce or identify documents or information that are not in her possession, custody, or control.  By stating in these responses that B.P.J. will search for or produce documents or information, B.P.J. does not represent that any such documents or information actually exist.  Rather, B.P.J. represents that she will undertake a good-faith search and reasonable inquiry to ascertain whether the documents or information described in any such response do, in fact, exist, and, if so, will produce responsive, non-privileged documents or information within B.P.J.'s possession, custody, or control in accordance with Exhibit A of the parties' Rule 26(f) report filed on September 7, 2021 (ECF No. 92-1) in this action.

4. B.P.J. reserves the right to make any use of, or to introduce at any hearing and at trial, documents responsive to the Interrogatories or Requests but discovered subsequent to the date of B.P.J.'s initial production, including, but not limited to, any documents obtained in discovery herein.

5. B.P.J. reserves all objections or other questions as to the competency, relevance, materiality, privilege, or admissibility as evidence in any subsequent proceeding in or trial

of this or any other action for any purpose whatsoever of this response and any document

or thing produced in response to the Interrogatories or Requests.

6. B.P.J. reserves the right to object on any ground at any time to such other or supplemental

requests for production as Intervenor may at any time propound involving or relating to the

subject matter of these Interrogatories or Requests.

7. B.P.J. is willing to meet and confer with Intervenor regarding any response or objection to

the Interrogatories or Requests.

### GENERAL OBJECTIONS

B.P.J. makes the following general objections, whether or not separately set forth in

response to each Interrogatory or Request, to each and every Definition, Interrogatory, and Request

made in Intervenor's Third Set of Interrogatories and Second and Third Sets of Requests for

Admission:

1. B.P.J. objects generally to all Definitions, Interrogatories, and Requests inclusive, insofar

as each such request seeks production of documents or information protected by the

attorney-client privilege, the work product doctrine, or any other applicable privilege.  Such

documents or information shall not be produced in response to the Interrogatories or

Requests, and any inadvertent production thereof shall not be deemed a waiver of any

privilege or right with respect to such documents or information or of any work product

doctrine that may attach thereto.

2. B.P.J. objects to all Definitions, Interrogatories, and Requests inclusive, to the extent they

purport to enlarge, expand, or alter in any way the plain meaning and scope of any specific

Request on the ground that such enlargement, expansion, or alteration renders said Request

vague, ambiguous, unintelligible, unduly broad, and uncertain.

3.  B.P.J. objects to all Definitions, Interrogatories, and Requests inclusive, to the extent they seek documents not currently in B.P.J.'s possession, custody, or control, or refer to persons, entities, or events not known to B.P.J., on the grounds that such Definitions, Interrogatories, or Requests seek to require more of B.P.J. than any obligation imposed by law, would subject B.P.J. to unreasonable and undue burden and expense, and would seek to impose upon B.P.J. an obligation to investigate or discover information or materials from third parties or services who are equally accessible to Intervenor.

4.  B.P.J.'s failure to object to the Interrogatories or Requests on a particular ground shall not be construed as a waiver of her right to object on that ground or any additional ground at any time.

### SPECIFIC OBJECTIONS AND RESPONSES TO INTERROGATORIES

Without waiving or limiting in any manner any of the foregoing General Objections, but rather incorporating them into each of the following responses to the extent applicable, B.P.J. responds to the specific Requests of Intervenor's Third Set of Interrogatories as follows:

**Interrogatory No. 13:**

13.  Whether you admit or deny Intervenor's Requests for Admission No. 4, please explain the reasons supporting your contention, including all material facts supporting them.

**B.P.J.'s Response To Interrogatory No. 13:**

B.P.J. incorporates the general and specific objections contained in B.P.J.'s response to Intervenor's Request for Admission No. 4.  B.P.J. further objects to Interrogatory 13 because it asks B.P.J. to provide "reasons" and "all material facts supporting" an opposing party's contention that B.P.J. has already admitted.

**Interrogatory No. 14:**

14.    Whether you admit or deny Intervenor's Requests for Admission No. 25, please explain

the reasons supporting your contention, including all material facts supporting them.

**B.P.J.'s Response To Interrogatory No. 14:**

B.P.J. incorporates the general and specific objections contained in B.P.J.'s response to

Intervenor's Request for Admission No. 25.  B.P.J. object to Intervenor's Interrogatory No. 14 to

the extent it requires B.P.J to provide "reasons" and "all material facts supporting" a contention

that B.P.J. has already admitted.

Subject to and without waiving these general and specific objections, B.P.J. states that she

is not similarly situated to a hypothetical cisgender boy who has not yet begun puberty for purposes

of Title IX or the Equal Protection Clause because B.P.J. is a girl.

**Interrogatory No. 15:**

15.    Whether you admit or deny Intervenor's Requests for Admission No. 26, please explain

the reasons supporting your contention, including all material facts supporting them.

**B.P.J.'s Response To Interrogatory No.  15:**

B.P.J. incorporates the general and specific objections contained in B.P.J.'s response to

Intervenor's Request for Admission No. 26.

Subject to and without waiving these general and specific objections, B.P.J. states that she

denies Request for Admission No. 26 because B.P.J. is a girl.

**Interrogatory No. 16:**

16.    Whether you admit or deny Intervenor's Requests for Admission No. 34, please explain

the reasons supporting your contention, including all material facts supporting them.

**B.P.J.'s Response To Interrogatory No. 16:**

B.P.J. incorporates the general and specific objections contained in B.P.J.'s response to Intervenor's Request for Admission No. 34.

Subject to and without waiving these general and specific objections, B.P.J. states that she denies Request for Admission No. 34 because, for purposes of participating on sex-separated school athletic teams, cisgender girls are similarly situated to girls who are transgender and not similarly situated to cisgender boys.

**Interrogatory No. 17:**

17.  Whether you admit or deny Intervenor's Requests for Admission No. 36, please explain the reasons supporting your contention, including all material facts supporting them.

**B.P.J.'s Response To Interrogatory No. 17:**

B.P.J. incorporates the general and specific objections contained in B.P.J.'s response to Intervenor's Request for Admission No. 36.

Subject to and without waiving these general and specific objections, B.P.J. states that she denies Request for Admission No. 36 because, for purposes of participating on sex-separated school athletic teams, girls who are transgender are similarly situated to cisgender girls.

**Interrogatory No. 18:**

18.  Whether you admit or deny Intervenor's Requests for Admission No. 46, please explain the reasons supporting your contention, including all material facts supporting them.

**B.P.J.'s Response To Interrogatory No. 18:**

B.P.J. incorporates the general and specific objections contained in B.P.J.'s response to Intervenor's Request for Admission No. 46.

Subject to and without waiving these general and specific objections, B.P.J. states that she denies Request for Admission No. 46 because B.P.J. and the hypothetical cisgender girl in the Request are both girls.

**Interrogatory No. 19:**

19.     Whether you admit or deny Intervenor's Requests for Admission No. 62, please explain the reasons supporting your contention, including all material facts supporting them.

**B.P.J.'s Response To Interrogatory No. 19:**

B.P.J. incorporates the general and specific objections contained in B.P.J.'s response to Intervenor's Request for Admission No. 62.

Subject to and without waiving these general and specific objections, B.P.J. further objects to Interrogatory No. 19 because it asks B.P.J. to provide "reasons" and "all material facts supporting" an opposing party's contention that B.P.J. has already admitted.

**Interrogatory No. 20:**

20.     Whether you admit or deny Intervenor's Requests for Admission No. 63, please explain the reasons supporting your contention, including all material facts supporting them.

**B.P.J.'s Response To Interrogatory No. 20:**

B.P.J. incorporates the general and specific objections contained in B.P.J.'s response to Intervenor's Request for Admission No. 63.

Subject to and without waiving these general and specific objections, B.P.J. states that she denies Request for Admission No. 63 because gender identity is distinct from gender expression.

**Interrogatory No. 21:**

21.     Whether you admit or deny Intervenor's Requests for Admission No. 67, please explain the reasons supporting your contention, including all material facts supporting them.

**B.P.J.'s Response To Interrogatory No. 21:**

B.P.J. incorporates the general and specific objections contained in B.P.J.'s response to Intervenor's Request for Admission No. 63.

As stated in B.P.J.'s response, B.P.J. cannot admit or deny this Request because there have not been sufficient studies across all athletes of all ages in all sports at all levels to determine whether there are average differences in performance between individuals who have gone through endogenous male puberty and not received medical intervention as compared to people who have not experienced male puberty including in light of other possible factors.

**Interrogatory No. 22:**

22.    Whether you admit or deny Intervenor's Requests for Admission No. 68, please explain the reasons supporting your contention, including all material facts supporting them.

**B.P.J.'s Response To Interrogatory No. 22:**

B.P.J. incorporates the general and specific objections contained in B.P.J.'s response to Intervenor's Request for Admission No. 68.

Subject to and without waiving these general and specific objections, B.P.J. states that she denies Request for Admission No. 68 because the State of West Virginia's significant governmental interest is in promoting equal athletic opportunities for all persons without discrimination on the basis of sex.

**Interrogatory No. 23:**

23.    Whether you admit or deny Intervenor's Requests for Admission No. 70 please explain the reasons supporting your contention, including all material facts supporting them.

**B.P.J.'s Response To Interrogatory No. 23:**

B.P.J. incorporates the general and specific objections contained in B.P.J.'s response to Intervenor's Request for Admission No. 70.

Subject to and without waiving these general and specific objections, B.P.J. states that she denies Request for Admission No. 70 because cisgender boys and men were already prohibited from participating in sports designated for women or girls before H.B. 3293 was enacted.

**Interrogatory No. 24:**

24.    You contend in response to Intervenor's Interrogatory #10 that "H.B. 3293 does not affect the ability of cisgender boys and men to play on sports teams designated for females, women, or girls because cisgender boys and men were already prohibited from doing so before H.B. 3293 was enacted." Identify all material West Virginia laws or policies in effect before H.B. 3293 was enacted that you contend prohibited cisgender boys and men from competing on sports teams designated for females, women, or girls.

**B.P.J.'s Response To Interrogatory No. 24:**

B.P.J. refers Intervenor to W. Va. Code R. § 127-2-3.8.  B.P.J. also refers Intervenor to the 30(b)(6) deposition of the West Virginia Secondary School Activities Commission and the testimony given therein.  B.P.J. also refers Intervenor to Section 18.2 of the National Collegiate Athletic Association Handbooks for Divisions I through III.

**Interrogatory No. 25:**

25.    Identify all government interests that you contend advance H.B. 3293 when applied to exclude a biological male who identifies as a male from West Virginia sports teams designated for women or girls.

**B.P.J.'s Response To Interrogatory No. 25:**

B.P.J. objects to the phrase "a biological male who identifies as male" as vague and scientifically inaccurate and interprets the phrase to mean "a cisgender boy and man." B.P.J. objects to the phrase "government interests that you contend advance H.B. 3293" and interprets the phrase to mean "government interests that you contend are advanced by H.B. 3293."

Subject to and without waiving these general and specific objections, B.P.J. states that H.B. 3293 does not advance any government interests when applied to exclude a cisgender boy or man from sports teams designated for women or girls because cisgender boys and men were already prohibited from participating in sports designated for women or girls before H.B. 3293 was enacted.

**SPECIFIC OBJECTIONS AND RESPONSES TO REQUESTS FOR ADMISSION**

Without waiving or limiting in any manner any of the foregoing General Objections, but rather incorporating them into each of the following responses to the extent applicable, B.P.J. responds to the specific Requests of Intervenor's Second and Third Sets of Requests for Admission as follows:

**Request for Admission No. 70:**

70.     Admit that H.B. 3293 furthers an important government interest by excluding males who identify as male from West Virginia sports designated for women or girls.

**B.P.J.'s Response To Request for Admission No. 70:**

B.P.J. objects to the phrase "males who identify as male" as vague and scientifically inaccurate and interprets the phrase to mean "cisgender boys." B.P.J. objects to the phrase "important governmental interest" as vague. Subject to these general and specific objections, and without waiver thereof, B.P.J. denies this Request.

**Request for Admission No. 71:**

71.  You have alleged that "[g]irls who are transgender are . . . not similarly situated to cisgender boys with respect to physiological characteristics associated with athletic performance." First Am. Compl. ¶ 40. Admit that with respect to any sex-related "physiological characteristics associated with athletic performance" relevant to running track or cross-country, B.P.J. is not similarly situated to female-identifying biological males of the same age who have not received any form of puberty blocking or other hormone therapy and have not begun endogenous male puberty.

**B.P.J.'s Response To Request for Admission No. 71:**

B.P.J. objects to the phrase "female-identifying biological male students" as vague and scientifically inaccurate and interprets the phrase to mean "students who are transgender girls." B.P.J. objects to the phrase "similarly situated" as vague.

Subject to these general and specific objections, and without waiver thereof, B.P.J. denies this Request.

**Request for Admission No. 72:**

72.  You have alleged that "[g]irls who are transgender are . . . not similarly situated to cisgender boys with respect to physiological characteristics associated with athletic performance." First Am. Compl. ¶ 40. Admit that with respect to any sex-related "physiological characteristics associated with athletic performance" relevant to running track or cross-country, B.P.J. is not similarly situated to female-identifying biological males of the same age who have not received any form of puberty blocking or other hormone therapy and have begun endogenous male puberty.

**B.P.J.'s Response To Request for Admission No. 72:**

B.P.J. objects to the phrase "female-identifying biological male students" as vague and scientifically inaccurate and interprets the phrase to mean "students who are transgender girls." B.P.J. objects to the phrase "similarly situated" as vague.  B.P.J. objects to this Request to the extent it requires B.P.J. to make assumptions about the sex-related physiological characteristics associated with athletic performance of a hypothetical girl who is transgender.

Subject to these general and specific objections, and without waiver thereof, B.P.J. admits that girls who are transgender of the same age who have not received any form of puberty blocking or other hormone therapy and have begun endogenous male puberty may not have the same sex-related physiological characteristics associated with athletic performance relevant to running track or cross-country as B.P.J.  B.P.J. denies that the two groups are not similarly situated for purposes of Title IX or the Equal Protection Clause.

**Request for Admission No. 73:**

73.    You have alleged that "[g]irls who are transgender are . . . not similarly situated to cisgender boys with respect to physiological characteristics associated with athletic performance." First Am. Compl. ¶ 40. Admit that with respect to any sex-related "physiological characteristics associated with athletic performance" relevant to running track or cross-country, middle school male-identifying male students who received puberty blocking treatment that effectively delayed male puberty are similarly situated to middle school female-identifying females of the same age who have received no puberty blocking treatment and have not begun endogenous female puberty.

-12-

**B.P.J.'s Response To Request for Admission No. 73:**

B.P.J. objects to the phrase "male-identifying male students" as vague and scientifically inaccurate and interprets the phrase to mean "students who are cisgender boys."  B.P.J. objects to the phrase "female-identifying female students" as vague and scientifically inaccurate and interprets the phrase to mean "students who are cisgender girls."  B.P.J. objects to the phrase "similarly situated" as vague.  B.P.J. objects to this Request to the extent that it requires B.P.J. to make the counterfactual assumption that there are cisgender boys in middle school who receive puberty blocking treatment that effectively delay male puberty.

Subject to these general and specific objections, and without waiver thereof, B.P.J. admits that cisgender boys who have not yet begun puberty would, on average, have similar levels of circulating testosterone as cisgender girls of the same age who have not begun puberty but denies that the two groups are similarly situated for purposes of Title IX or the Equal Protection Clause.

**Request for Admission No. 74:**

74.    You have alleged that "[g]irls who are transgender are . . . not similarly situated to cisgender boys with respect to physiological characteristics associated with athletic performance." First Am. Compl. ¶ 40. Admit that with respect to any sex-related "physiological characteristics associated with athletic performance" relevant to running track or cross-country, middle school male-identifying male students who received puberty blocking treatment that effectively delayed male puberty are similarly situated to middle school female-identifying females of the same age who have received no puberty blocking treatment and have begun endogenous female puberty.

**B.P.J.'s Response To Request for Admission No. 74:**

B.P.J. objects to the phrase "male-identifying male students" as vague and scientifically inaccurate and interprets the phrase to mean "students who are cisgender boys." B.P.J. objects to the phrase "female-identifying female students" as vague and scientifically inaccurate and interprets the phrase to mean "students who are cisgender girls." B.P.J. objects to the phrase "similarly situated" as vague. B.P.J. objects to this Request to the extent that it requires B.P.J. to make the counterfactual assumption that there are cisgender boys in middle school who receive puberty blocking treatment that effectively delay male puberty.

Subject to these general and specific objections, and without waiver thereof, B.P.J. denies this Request.

**Request for Admission No. 75:**

75.    You have alleged that "[g]irls who are transgender are . . . not similarly situated to cisgender boys with respect to physiological characteristics associated with athletic performance." First Am. Compl. ¶ 40. Admit that with respect to any sex-related "physiological characteristics associated with athletic performance" relevant to running track or cross-country, biological male middle school students, regardless of gender identity, who received puberty blocking treatment that effectively delayed male puberty are similarly situated to female-identifying females of the same age who received no puberty blocking treatment and have not begun endogenous female puberty.

**B.P.J.'s Response To Request for Admission No. 75:**

B.P.J. objects to the phrase "biological male middle school students" as vague and scientifically inaccurate and interprets the phrase to mean "middle school students with a male sex

assigned at birth."   B.P.J. objects to the phrase "female-identifying female" as vague and

scientifically inaccurate and interprets the phrase to mean "cisgender girls."   B.P.J. objects to the

phrase "similarly situated" as vague.   B.P.J. objects to this Request to the extent that it requires

B.P.J. to make the counterfactual assumption that there are cisgender boys in middle school who

receive puberty blocking treatment that effectively delay male puberty.

Subject to these general and specific objections, and without waiver thereof, B.P.J. admits

that middle school students with a male sex assigned at birth who have not yet begun puberty

would, on average, have similar levels of circulating testosterone as cisgender girls of the same

age who have not begun puberty but denies that the two groups are similarly situated for purposes

of Title IX or the Equal Protection Clause regardless of gender identity.

## Request for Admission No. 76:

76.     You have alleged that "[g]irls who are transgender are . . . not similarly situated to

cisgender boys with respect to physiological characteristics associated with athletic

performance." First Am. Compl. ¶ 40. Admit that with respect to any sex-related

"physiological characteristics associated with athletic performance" relevant to running

track or cross-country, biological male middle school students, regardless of gender

identity, who received puberty blocking treatment that effectively delayed male

puberty are similarly situated to female-identifying females of the same age who

received no puberty blocking treatment and have begun endogenous female puberty.

## B.P.J.'s Response To Request for Admission No. 76:

B.P.J. objects to the phrase "biological male middle school students" as vague and

scientifically inaccurate and interprets the phrase to mean "middle school students with a male sex

assigned at birth."   B.P.J. objects to the phrase "female-identifying female" as vague and

scientifically inaccurate and interprets the phrase to mean "cisgender girls."  B.P.J. objects to the phrase "similarly situated" as vague.  B.P.J. objects to this Request to the extent that it requires B.P.J. to make the counterfactual assumption that there are cisgender boys in middle school who receive puberty blocking treatment that effectively delay male puberty.

Subject to these general and specific objections, and without waiver thereof, B.P.J. denies this Request.

**Request for Admission No. 77:**

77.    You have alleged that "[g]irls who are transgender are . . . not similarly situated to cisgender boys with respect to physiological characteristics associated with athletic performance." First Am. Compl. ¶ 40. Admit that with respect to any "physiological characteristics associated with athletic performance" relevant to running track or cross-country, B.P.J. is not similarly situated to biological male students of the same age who have not received any form of puberty blocking or other hormone therapy, regardless of the students' gender identity, and have not begun endogenous male puberty.

**B.P.J.'s Response To Request for Admission No. 77:**

B.P.J. objects to the phrase "biological male students" as vague and scientifically inaccurate and interprets the phrase to mean "students with a male sex assigned at birth."  B.P.J. objects to the phrase "similarly situated" as vague.

Subject to these general and specific objections, and without waiver thereof, B.P.J. denies this Request.

**Request for Admission No. 78:**

78.    You have alleged that "[g]irls who are transgender are . . . not similarly situated to cisgender boys with respect to physiological characteristics associated with athletic

-16-

performance." First Am. Compl. ¶ 40. Admit that with respect to any "physiological characteristics associated with athletic performance" relevant to running track or cross-country, B.P.J. is not similarly situated to biological male students of the same age who have not received any form of puberty blocking or other hormone therapy, regardless of the students' gender identity, and have begun endogenous male puberty.

**B.P.J.'s Response To Request for Admission No. 78:**

B.P.J. objects to the phrase "biological male students" as vague and scientifically inaccurate and interprets the phrase to mean "students with a male sex assigned at birth." B.P.J. objects to the phrase "similarly situated" as vague.

Subject to these general and specific objections, and without waiver thereof, B.P.J. admits that students with a male sex assigned at birth who have begun endogenous male puberty would, on average, have high levels of circulating testosterone than B.P.J., but denies that the two groups are similarly situated for purposes of Title IX or the Equal Protection Clause regardless of gender identity.

**Request for Admission No. 79:**

79.    You have alleged that "[g]irls who are transgender are . . . not similarly situated to cisgender boys with respect to physiological characteristics associated with athletic performance." First Am. Compl. ¶ 40. Admit that with respect to any sex-related "physiological characteristics associated with athletic performance" relevant to running track or cross country, B.P.J. is similarly situated to male-identifying biological females of the same age who have not received any form of puberty blocking or other hormone therapy and have not begun endogenous female puberty.

**B.P.J.'s Response To Request for Admission No. 79:**

B.P.J. objects to the phrase "male-identifying biological females" as vague and scientifically inaccurate and interprets the phrase to mean "students who are transgender boys." B.P.J. objects to the phrase "similarly situated" as vague.

Subject to these general and specific objections, and without waiver thereof, B.P.J. admits that students who are transgender boys and have not begun endogenous female puberty would, on average, have similar levels of circulating testosterone as B.P.J. but denies that the two groups are similarly situated for purposes of Title IX or the Equal Protection Clause.

**Request for Admission No. 80:**

80.     You have alleged that "[g]irls who are transgender are . . . not similarly situated to cisgender boys with respect to physiological characteristics associated with athletic performance." First Am. Compl. ¶ 40. Admit that with respect to any sex-related "physiological characteristics associated with athletic performance" relevant to running track or cross country, B.P.J. is similarly situated to male-identifying biological females of the same age who have not received any form of puberty blocking or other hormone therapy and have begun endogenous female puberty.

**B.P.J.'s Response To Request for Admission No. 80:**

B.P.J. objects to the phrase "male-identifying biological females" as vague and scientifically inaccurate and interprets the phrase to mean "students who are transgender boys." B.P.J. objects to the phrase "similarly situated" as vague.

Subject to these general and specific objections, and without waiver thereof, B.P.J. denies this Request.

-18-

### Request for Admission No. 81:

81.     You have alleged that "[g]irls who are transgender are . . . not similarly situated to cisgender boys with respect to physiological characteristics associated with athletic performance." First Am. Compl. ¶ 40. Admit that with respect to any sex-related "physiological characteristics associated with athletic performance" relevant to running track or cross-country, B.P.J. is similarly situated to biological female students of the same age who have not received any form of puberty blocking or other hormone therapy, regardless of the students' gender identity, and have not begun endogenous female puberty.

### B.P.J.'s Response To Request for Admission No. 81:

B.P.J. objects to the phrase "male-identifying biological females" as vague and scientifically inaccurate and interprets the phrase to mean "students who are transgender boys." B.P.J. objects to the phrase "similarly situated" as vague.

Subject to these general and specific objections, and without waiver thereof, B.P.J. admits that students who are transgender boys and have not begun endogenous female puberty would, on average, have similar levels of circulating testosterone as B.P.J. but denies that the two groups are similarly situated for purposes of Title IX or the Equal Protection Clause regardless of gender identity.

### Request for Admission No. 82:

82.     You have alleged that "[g]irls who are transgender are . . . not similarly situated to cisgender boys with respect to physiological characteristics associated with athletic performance." First Am. Compl. ¶ 40. Admit that with respect to any sex-related "physiological characteristics associated with athletic performance" relevant to running

-19-

track or cross-country, B.P.J. is similarly situated to biological female students of the same age who have not received any form of puberty blocking or other hormone therapy, regardless of the students' gender identity, and have not begun endogenous female puberty.

**B.P.J.'s Response To Request for Admission No. 82:**

B.P.J. objects to the phrase "male-identifying biological females" as vague and scientifically inaccurate and interprets the phrase to mean "students who are transgender boys." B.P.J. objects to the phrase "similarly situated" as vague.

Subject to these general and specific objections, and without waiver thereof, B.P.J. denies this Request.


Dated: March 9, 2022

Joshua Block*
Taylor Brown*
Chase Strangio*
AMERICAN CIVIL LIBERTIES UNION
FOUNDATION
125 Broad St.
New York, NY 10004
Phone: (212) 549-2569
jblock@aclu.org
tbrown@aclu.org
cstrangio@aclu.org

Avatara Smith-Carrington*
LAMBDA LEGAL
3500 Oak Lawn Avenue, Suite 500
Dallas, TX 75219
Phone: (214) 219-8585
asmithcarrington@lambdalegal.org

Carl Charles*
Tara Borelli*
LAMBDA LEGAL

Respectfully Submitted,
/s/ Loree Stark

Loree Stark (Bar No. 12936)
AMERICAN CIVIL LIBERTIES UNION OF
WEST
VIRGINIA FOUNDATION
P.O. Box 3952
Charleston, WV 25339-3952
Phone: (914) 393-4614
lstark@acluwv.org

Kathleen Hartnett*
Julie Veroff*
COOLEY LLP
3 Embarcadero Center, 20th Floor
San Francisco, CA 94111
Phone: (415) 693-2000
khartnett@cooley.com
jveroff@cooley.com

Katelyn Kang*
COOLEY LLP
55 Hudson Yards
New York, NY 10001-2157

-20-

158 West Ponce De Leon Ave., Ste. 105
Decatur, GA 30
Phone: (404) 897-1880
ccharles@lambdalegal.org
tborelli@lambdalegal.org

Sruti Swaminathan*
LAMBDA LEGAL
120 Wall Street, 19th Floor
New York, NY 10005
Phone: (212) 809-8585
sswaminathan@lambdalegal.org

Andrew Barr*
COOLEY LLP
1144 15th St. Suite 2300
Denver, CO 80202-5686
Phone: (720) 566-4000
abarr@cooley.com

Phone: (212) 479-6000
kkang@cooley.com

Elizabeth Reinhardt*
COOLEY LLP
500 Boylston Street, 14th Floor
Boston, MA 02116-3736
Phone: (617) 937-2305
ereinhardt@cooley.com

*Visiting Attorneys

Attorneys for Plaintiff

-21-

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA
CHARLESTON DIVISION

| | |
|---|---|
| B.P.J. by her next friend and mother, HEATHER JACKSON,<br><br>*Plaintiff*,<br><br>v.<br><br>WEST VIRGINIA STATE BOARD OF EDUCATION, HARRISON COUNTY BOARD OF EDUCATION, WEST VIRGINIA SECONDARY SCHOOL ACTIVITIES COMMISSION, W. CLAYTON BURCH in his official capacity as State Superintendent, DORA STUTLER in her official capacity as Harrison County Superintendent, and THE STATE OF WEST VIRGINIA,<br><br>*Defendants*,<br><br>and<br><br>LAINEY ARMISTEAD,<br><br>*Defendant-Intervenor*. | Civil Action No. 2:21-cv-00316<br><br>Hon. Joseph R. Goodwin |

## **VERIFICATION**

After being first duly sworn, I, Heather Jackson, depose and say that I have read the foregoing responses in Plaintiff's Responses and Objections to Intervenor Lainey Armistead's Third Set of Interrogatories and Second and Third Sets of Requests for Admission dated March 9, 2022 and know its contents. The foregoing is true to my knowledge, except to those matters stated to be alleged on information and belief, and as to those matters I believe them to be true.

*Heather Jackson*
_____
Signed by: Heather Jackson
Date & Time: March 08, 2022 15:05:04 EST

Heather Jackson

1

**STATE OF WEST VIRGINIA,**

**COUNTY OF** _____Harrison_____ **, to-wit:**

Taken, subscribed and sworn to before me, the undersigned Notary Public, this date,

_____.

Signed by: Zaki Michaels
Date & Time: March 08, 2022 15:05:58 EST

My commission expires:   1/3/2027

OFFICIAL SEAL
ELECTRONIC NOTARY PUBLIC
STATE OF WEST VIRGINIA
Zaki Michaels
Notary Id. N220100003879
PO Box 3952
Charleston WV 25339
My Commission Expires 01/03/2027

This remote online notarization involved the use of audio/visual communication technology

# Video Meeting

Video ID: aakePAipWO, Recording URL: https://ds4u.cc/aakePAipWO, Passcode: 5699

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA
CHARLESTON DIVISION

B.P.J., by her next friend and mother,
HEATHER JACKSON,

*Plaintiff*,

v.

Civil Action No. 2:21-cv-00316
Hon. Joseph R. Goodwin, District Judge

WEST VIRGINIA STATE BOARD OF
EDUCATION, HARRISON COUNTY BOARD
OF EDUCATION, WEST VIRGINIA
SECONDARY SCHOOL ACTIVITIES
COMMISSION, W. CLAYTON BURCH in his
official capacity as State Superintendent,
DORA STUTLER in her official capacity as
Harrison County Superintendent, PATRICK
MORRISEY in his official capacity as Attorney
General, and THE STATE OF WEST VIRGINIA,

*Defendants,*

and

LAINEY ARMISTEAD,

*Defendant-Intervenor*.

**DEFENDANT HARRISON COUNTY BOARD OF EDUCATION'S RESPONSES AND
OBJECTIONS TO PLAINTIFF'S SECOND SET OF REQUESTS FOR ADMISSION**

Pursuant to Rule 36 of the Federal Rules of Civil Procedure, Defendant Harrison

County Board of Education ("County Board") hereby responds and objects to "Plaintiff's Second

Set of Requests for Admission to Defendant Harrison County Board of Education" as follows:

**GENERAL OBJECTION**:  The County Board objects to the definitions of

"County Board" and "County Superintendent" as set forth in Plaintiff's requests for admission.

Those definitions are overly broad and outside the permissible scope of discovery under the

14094080

Federal Rules of Civil Procedure as the definitions improperly broaden the identity of parties in this case. For instance, the definitions of the "County Board" and the "County Superintendent" also include their "officers, directors, employees, partners, corporate parent, subsidiaries, affiliates, attorneys, accountants, consultants, representatives and agents." The County Board objects to providing responses pursuant to the broadened definitions of "County Board" and "County Superintendent." The County Board further objects to the Definitions and Instructions set forth in Plaintiff's requests to the extent they are inconsistent with the Federal Rules of Civil Procedure or applicable law.

**REQUEST NO. 5:** Admit that Plaintiff B.P.J. has been diagnosed with gender dysphoria.

**RESPONSE**: The County Board admits that medical records produced in this case state that Plaintiff B.P.J. has been diagnosed with gender dysphoria.

**REQUEST NO. 6:** Admit that in 2021 Plaintiff B.P.J. was a member of Bridgeport Middle School's girls' cross-country team.

**RESPONSE**: Admitted.

**REQUEST NO. 7:** Admit that Plaintiff B.P.J. placed 51 out of 66 competitors in the girls' middle school cross country Mountain Hollar MS Invitational meet in 2021.

**RESPONSE**: Upon information and belief, and based on information provided on RunWV.com regarding the results of the race, the County Board admits this request.

**REQUEST NO. 8:**     Admit that Plaintiff B.P.J. placed 123 out of 150 competitors in the girls' middle school cross country Doddridge Invitational meet in 2021.

**RESPONSE**:     Upon information and belief, and based on information provided on RunWV.com regarding the results of the race, the County Board admits this request.

**REQUEST NO. 9:**     Admit that you have not received any complaints associated with Plaintiff B.P.J.'s membership on Bridgeport Middle School's girls' cross country team.

**RESPONSE**:     Admitted.

**REQUEST NO. 10:**     Admit that no middle school girl was harmed as a result of B.P.J.'s participation on Bridgeport Middle School's girls' cross country team in 2021.

**RESPONSE**:     **OBJECTION**.  The County Board objects to this request because it is vague.  The County Board does not know what Plaintiff means by the term "harmed." Subject to and without waiving the objection, the County Board admits that no student was cut from the Bridgeport Middle School's girls' cross country team in 2021.  The County Board otherwise denies this request because it is unclear what Plaintiff is asking.

**REQUEST NO. 11:**     Admit that no middle school girl was injured as a result of Plaintiff B.P.J.'s participation on Bridgeport Middle School's girls' cross country team in 2021.

**RESPONSE**:     **OBJECTION**.  The County Board objects to this request because it is vague.  The County Board does not know what Plaintiff means by the term "injured." Subject to and without waiving the objection, the County Board admits that no student was cut from the Bridgeport Middle School's girls' cross country team in 2021.  The County Board otherwise denies this request because it is unclear what Plaintiff is asking.

**REQUEST NO. 12:**  Admit that no Bridgeport Middle School girl student was prohibited from joining Bridgeport Middle School's girls' cross-country team in 2021.

**RESPONSE**:          Admitted.

**REQUEST NO. 13:**  Admit that Bridgeport Middle School's girls' cross-country team did not turn anyone away from participating due to lack of space on the roster in 2021.

**RESPONSE**:          Admitted.

**REQUEST NO. 14:**  Admit that Plaintiff B.P.J. does not have an unfair athletic advantage over other girls participating on the Bridgeport Middle School girls' cross-country team.

**RESPONSE**:          Even with a reasonable inquiry, the County Board cannot admit or deny this request because the information it knows or can readily obtain is insufficient to enable the County Board to admit or deny the request.

**REQUEST NO. 15:**  Admit that Plaintiff B.P.J. does not have an unfair athletic advantage over girls competing against the Bridgeport Middle School girls' cross-country team.

**RESPONSE**:          Even with a reasonable inquiry, the County Board cannot admit or deny this request because the information it knows or can readily obtain is insufficient to enable the County Board to admit or deny the request.

**REQUEST NO. 16:**  Admit that cross country is a sport that requires "competitive skill" as that phrase is used in H.B. 3293 (codified at Code of West Virginia §18-2-25d(c)(2)).

**RESPONSE**:          **OBJECTION**.  The County Board objects to the extent this request is seeking a legal conclusion.  Subject to and without waiving the objection, the County Board cannot admit or deny this request because "competitive skill" is not defined in H.B. 3293.

14094080                                         4

**REQUEST NO. 17:**  Admit that cross country is a sport that requires "competitive skill" as that phrase is used in 34 C.F.R.§106.41(b).

**RESPONSE**:          **OBJECTION**.  The County Board objects to the extent this request is seeking a legal conclusion.  Subject to and without waiving the objection, the County Board cannot admit or deny this request because "competitive skill" is not defined in 34 C.F.R.§106.41(b).

**REQUEST NO. 18:**  Admit that cross country is not a "contact sport" as that phrase is used in H.B. 3293 (codified at Code of West Virginia §18-2-25d(c)(2)).

**RESPONSE**:          **OBJECTION**.  The County Board objects to the extent this request is seeking a legal conclusion.  Subject to and without waiving the objection, the County Board cannot admit or deny this request because "contact sport" is not defined in H.B. 3293.

**REQUEST NO. 19:**  Admit that cross country is not a "contact sport" as that phrase is used in 34 C.F.R.§106.41(b).

**RESPONSE**:          **OBJECTION**.  The County Board objects to the extent this request is seeking a legal conclusion.  Subject to and without waiving the objection, the County Board admits that "cross country" is not specifically identified as a "contact sport" in 34 C.F.R.§106.41(b).

**REQUEST NO. 20:**  Admit that, but for the injunction issued in this case (Dkt. 67), Plaintiff B.P.J. would not have been permitted to be a member of Bridgeport Middle

School's girls' cross-country team in 2021 because of H.B. 3293 (codified at Code of West Virginia §18-2-25d(c)(2)).

**RESPONSE**:        **OBJECTION**.  The County Board objects to the extent this request is seeking a legal conclusion.  Subject to and without waiving the objection, the County Board states as follows:  Because, as it is currently drafted, H.B. Bill 3293 (codified at West Virginia Code § 18- 2-25d) applies to public secondary schools and states that "[a]thletic teams or sports designated for females, women, or girls shall not be open to students of the male sex where selection for such teams is based upon competitive skill or the activity involved is a contact sport[,]" because of the definitions set forth in H.B. 3293, and absent the injunction issues in this case, the County Board admits this request.

**REQUEST NO. 21:**  Admit that, but for the injunction issued in this case (Dkt. 67), Plaintiff B.P.J. would not be permitted to be a member of any girls' athletic team offered at Bridgeport Middle School because of H.B. 3293 (codified at Code of West Virginia §18-2-25d(c)(2)).

**RESPONSE**:        **OBJECTION**.  The County Board objects to the extent this request is seeking a legal conclusion.  Subject to and without waiving the objection, the County Board states as follows:  Because, as it is currently drafted, H.B. Bill 3293 (codified at West Virginia Code § 18- 2-25d) applies to public secondary schools and states that "[a]thletic teams or sports designated for females, women, or girls shall not be open to students of the male sex where selection for such teams is based upon competitive skill or the activity involved is a contact sport[,]" because of the definitions set forth in H.B. 3293, and absent the injunction issued in this case, the County Board admits this request.

**REQUEST NO. 22:** Admit that H.B. 3293 prohibits Plaintiff B.P.J. from participating on girls' athletic teams at all public secondary schools located in West Virginia.

**RESPONSE**:        **OBJECTION**.  The County Board objects to the extent this request is seeking a legal conclusion.  Subject to and without waiving the objection, the County Board states as follows:  Because, as it is currently drafted, H.B. Bill 3293 (codified at West Virginia Code § 18- 2-25d) applies to public secondary schools and states that "[a]thletic teams or sports designated for females, women, or girls shall not be open to students of the male sex where selection for such teams is based upon competitive skill or the activity involved is a contact sport[,]" because of the definitions set forth in H.B. 3293, and absent the injunction issued in this case, the County Board admits this request.

**REQUEST NO. 23:** Admit that the State Board of Education and the State Superintendent must comply with H.B. 3293 unless enjoined from doing so by a court.

**RESPONSE**:        **OBJECTION**.  The County Board objects to the extent this request is seeking a legal conclusion.  Subject to and without waiving the objection, the County Board is not in a position to admit or deny this request because it concerns the State Board of Education and State Superintendent's obligations under H.B. 3293.

**REQUEST NO. 24:** Admit that H.B. 3293 prohibits the State Board of Education and the State Superintendent from adopting or enforcing a policy that would allow B.P.J. to participate on girls' athletic teams at Bridgeport Middle School.

**RESPONSE**:        **OBJECTION**.  The County Board objects to the extent this request is seeking a legal conclusion.  Subject to and without waiving the objection, the County Board is not in a position to admit or deny this request because it concerns the State Board of Education and State Superintendent's obligations under H.B. 3293.

14094080                                    7

**REQUEST NO. 25:**  Admit that the Harrison County Board of Education and the Harrison County School Superintendent must comply with H.B. 3293 unless enjoined from doing so by a court.

**RESPONSE**:        **OBJECTION**.  The County Board objects to the extent this request is seeking a legal conclusion.  Subject to and without waiving the objection, the County Board states as follows:  Because H.B. 3293 is a West Virginia State law that applies to County Boards of Education, including the County Board and its County Superintendent, because H.B. 3293 provides for private causes of action, and thus imposes liability against County Boards of Education, like the County Board, and while the County Board and its County Superintendent did not devise and have not adopted H.B. Bill 3293 as their own policy, the County Board admits this request because, absent an injunction by a court, the County Board would be compelled and required to enforce H.B. Bill 3293 because it is a mandatory State law that affords the County Board no discretion.

**REQUEST NO. 26:**  Admit that H.B. 3293 prohibits the Harrison County Board of Education and the Harrison County Superintendent from adopting or enforcing a policy that would allow B.P.J. to participate on girls' athletic teams at Bridgeport Middle School.

**RESPONSE**:        **OBJECTION**.  The County Board objects to the extent this request is seeking a legal conclusion.  Subject to and without waiving the objection, the County Board states as follows:  Because H.B. 3293 is a West Virginia State law that applies to County Boards of Education, including the County Board and its County Superintendent, because H.B. 3293 provides for private causes of action, and thus imposes liability against County Boards of Education, like the County Board, and while the County Board and its County Superintendent did not devise and have not adopted H.B. Bill 3293 as their own policy, the County Board admits this

request because, absent an injunction by a court, the County Board would be compelled and required to enforce H.B. Bill 3293 because it is a mandatory State law that affords the County Board no discretion.

**REQUEST NO. 27:**  Admit that the West Virginia Secondary School Athletic Commission must comply with H.B. 3293 unless enjoined from doing so by a court.

**RESPONSE**:          **OBJECTION**.  The County Board objects to the extent this request is seeking a legal conclusion.  Subject to and without waiving the objection, the County Board is not in a position to admit or deny this request because it concerns the West Virginia Secondary School Athletic Commission's obligations under H.B. 3293.

**REQUEST NO. 28:**  Admit that H.B. 3293 prohibits the West Virginia Secondary School Athletic Commission from adopting or enforcing a policy that would allow B.P.J. to participate on girls' athletic teams at Bridgeport Middle School

**RESPONSE**:          **OBJECTION**.  The County Board objects to the extent this request is seeking a legal conclusion.  Subject to and without waiving the objection, the County Board is not in a position to admit or deny this request because it concerns the West Virginia Secondary School Athletic Commission's obligations under H.B. 3293.

**REQUEST NO. 29:**  Admit that there are no athletic teams designated as "coed or mixed," as that phrase is used in H.B. 3293 (codified at Code of West Virginia §18-2-25d(c)(1)(C)), offered at Bridgeport Middle School.

**RESPONSE**:          Denied.

**REQUEST NO. 30:**  Admit that there are no athletic teams designated as "coed or mixed," as that phrase is used in H.B. 3293 (codified at Code of West Virginia §18-2-

25d(c)(1)(C)), that compete interscholastically offered at any public secondary school located in West Virginia.

    **RESPONSE**:   Denied.

    **REQUEST NO. 31:** Admit that there are no cross-country teams designated as "coed or mixed," as that phrase is used in H.B. 3293 (codified at Code of West Virginia §18-2-25d(c)(1)(C)), that compete interscholastically offered by any member school of the West Virginia Secondary School Activities Commission.

    **RESPONSE**:   **OBJECTION**.  The County Board objects to the scope of this request.  Subject to and without waiving the objection, the County Board can only answer on behalf of schools in Harrison County, and admits that there are no "co-ed or mixed" cross country teams in Harrison County.

    **REQUEST NO. 32:** Admit that there are no athletic leagues designated as "coed or mixed," as that phrase is used in H.B. 3293 (codified at Code of West Virginia §18-2-25d(c)(1)(C)), that comprise teams from more than one school supervised by the West Virginia Secondary School Activities Commission.

    **RESPONSE**:   **OBJECTION**.  The County Board objects to the extent this request is seeking a legal conclusion.  Subject to and without waiving the objection, and even with a reasonable inquiry, the County Board cannot admit or deny this request because the information it knows or can readily obtain is insufficient to enable the County Board to admit or deny the request.

    **REQUEST NO. 33:** Admit that there are no athletic teams designated as "coed or mixed," as that phrase is used in H.B. 3293 (codified at Code of West Virginia §18-2-

25d(c)(1)(C)),'' that compete interscholastically offered by any public secondary school under the supervision of the West Virginia State Board of Education.

**RESPONSE**:        **OBJECTION**.  The County Board objects to this request because it is vague.  Subject to and without waiving the objection, the County Board denies the request because there are "co-ed" teams in Harrison County, but the County Board cannot admit or deny the rest of the request based on how it is phrased.

**REQUEST NO. 34:**  Admit that H.B. 3293 does not prohibit a cisgender girl student at Bridgeport Middle School from joining a girls' athletic team offered at Bridgeport Middle School.

**RESPONSE**:        **OBJECTION**.  The County Board objects to the extent this request is seeking a legal conclusion.  Subject to and without waiving the objection, and based on the language used in H.B. 3293, the County Board admits this request.

**REQUEST NO. 35:**  Admit that H.B. 3293 does not prohibit a cisgender girl student at any public secondary school in West Virginia from joining a girls' athletic team offered by her public secondary school.

**RESPONSE**:        **OBJECTION**.  The County Board objects to the extent this request is seeking a legal conclusion.  Subject to and without waiving the objection, and based on the language used in H.B. 3293, the County Board admits this request.

**REQUEST NO. 36:**  Admit that H.B. 3293 prohibits a Bridgeport Middle School transgender girl student from joining a girls' athletic team offered at Bridgeport Middle School.

**RESPONSE**:        **OBJECTION**.  The County Board objects to the extent this request is seeking a legal conclusion.  Subject to and without waiving the objection, the County

14094080                                   11

Board states as follows:  Because, as it is currently drafted, H.B. Bill 3293 (codified at West Virginia Code § 18-2-25d) applies to public secondary schools and states that "[a]thletic teams or sports designated for females, women, or girls shall not be open to students of the male sex where selection for such teams is based upon competitive skill or the activity involved is a contact sport[,]" because of the definitions set forth in H.B. 3293, and absent the injunction issued in this case, the County Board admits this request.

**REQUEST NO. 37:**  Admit  that  H.B. 3293  prohibits  any  transgender  girl secondary school student located in West Virginia from joining a girls' athletic team offered by her public secondary school.

**RESPONSE:**        **OBJECTION.**  The County Board objects to the extent this request is seeking a legal conclusion.  Subject to and without waiving the objection, the County Board states as follows:  Because, as it is currently drafted, H.B. Bill 3293 (codified at West Virginia Code § 18-2-25d) applies to public secondary schools and states that "[a]thletic teams or sports designated for females, women, or girls shall not be open to students of the male sex where selection for such teams is based upon competitive skill or the activity involved is a contact sport[,]" because of the definitions set forth in H.B. 3293, and absent the injunction issued in this case, the County Board admits this request.

**REQUEST NO. 38:**  Admit that prior to the enactment of H.B. 3293, cisgender boy students at Bridgeport Middle School were prohibited from joining girls' athletic teams offered at Bridgeport Middle School.

**RESPONSE:**        **OBJECTION.**  The County Board objects to the extent this request is seeking a legal conclusion.  Subject to and without waiving the objection, the County

Board admits that there is a West Virginia Secondary School Activities Commission rule that may apply to this situation.

**REQUEST NO. 39:**  Admit that prior to the enactment of H.B. 3293, a cisgender boy student at any public secondary school in West Virginia was prohibited from joining girls' athletic teams offered at his public secondary school.

**RESPONSE**:        **OBJECTION**.  The County Board objects to the extent this request is seeking a legal conclusion.  Subject to and without waiving the objection, the County Board admits that there is a West Virginia Secondary School Activities Commission rule that may apply to this situation.

**REQUEST NO. 40**:  Admit that prior to the enactment of H.B. 3293, you are not aware of any transgender student athlete participating on an athletic team offered by Bridgeport Middle School.

**RESPONSE**:        Admitted.

**REQUEST NO. 41:**  Admit that prior to the enactment of H.B. 3293, you are not aware of any transgender student athlete participating on an athletic team offered by a public secondary school in West Virginia.

**RESPONSE**:        Admitted.

**REQUEST NO. 42:**  Admit that other than Plaintiff B.P.J., you are not aware of a transgender student athlete participating on an athletic team offered by Bridgeport Middle School.

**RESPONSE**:        Admitted.

**REQUEST NO. 43:**  Admit that other than Plaintiff B.P.J., you are not aware of a transgender student athlete participating on an athletic team offered by a public secondary school in West Virginia.

**RESPONSE**:          Admitted.

**REQUEST NO. 44:**  Admit that students derive social benefits from participation on athletic teams offered by public secondary schools in West Virginia.

**RESPONSE**:          Admitted.

**REQUEST NO. 45:**  Admit that students derive psychological benefits from participation on athletic teams offered by public secondary schools in West Virginia.

**RESPONSE**:          Admitted.

**REQUEST NO. 46:**  Admit that interscholastic athletic competition benefits middle school students.

**RESPONSE**:          Admitted.

**REQUEST NO. 47:**  Admit that middle school students who participate in interscholastic athletics receive benefits regardless whether they win or lose.

**RESPONSE**:          Admitted.

**REQUEST NO. 48:**  Admit that but for the injunction issued in this case, the Harrison County School Board and schools within the Harrison County School District would comply with H.B. 3293.

**RESPONSE**:          **OBJECTION**.  The County Board objects to the extent this request is seeking a legal conclusion.  Subject to and without waiving the objection, the County

Board states as follows:  Because H.B. 3293 is a West Virginia State law that applies to County Boards of Education, including the County Board and its County Superintendent, because H.B. 3293 provides for private causes of action, and thus imposes liability against County Boards of Education, like the County Board, and while the County Board and its County Superintendent did not devise and have not adopted H.B. Bill 3293 as their own policy, the County Board admits this request because, absent an injunction by a court, the County Board would be compelled and required to enforce H.B. Bill 3293 because it is a mandatory State law that affords the County Board no discretion.

**REQUEST NO. 49:**  Admit that but for the injunction in this case (Dkt. 67) the Harrison County School Board and schools within the Harrison County School District would not take any actions that violated H.B. 3293.

**RESPONSE**:          **OBJECTION**.  The County Board objects to the extent this request is seeking a legal conclusion.  Subject to and without waiving the objection, the County Board states as follows:  Because H.B. 3293 is a West Virginia State law that applies to County Boards of Education, including the County Board and its County Superintendent, because H.B. 3293 provides for private causes of action, and thus imposes liability against County Boards of Education, like the County Board, and while the County Board and its County Superintendent did not devise and have not adopted H.B. Bill 3293 as their own policy, the County Board admits this request because, absent an injunction by a court, the County Board would be compelled and required to enforce H.B. Bill 3293 because it is a mandatory State law that affords the County Board no discretion.

**REQUEST NO. 50:**  Admit that, but for the injunction in this case (Dkt. 67), the Harrison County School Board and Bridgeport Middle School would not have permitted Plaintiff

B.P.J. to try out for the Bridgeport Middle School's girls' cross-country team in 2021 because of H.B. 3293 (codified at Code of West Virginia §18-2-25d(c)(2)).

<u>RESPONSE</u>:          <u>OBJECTION</u>.  The County Board objects to the extent this request is seeking a legal conclusion.  Subject to and without waiving the objection, the County Board states as follows:  Because H.B. 3293 is a West Virginia State law that applies to County Boards of Education, including the County Board and its County Superintendent, because H.B. 3293 provides for private causes of action, and thus imposes liability against County Boards of Education, like the County Board, and while the County Board and its County Superintendent did not devise and have not adopted H.B. Bill 3293 as their own policy, the County Board admits this request because, absent an injunction by a court, the County Board would be compelled and required to enforce H.B. Bill 3293 because it is a mandatory State law that affords the County Board no discretion.

<u>REQUEST NO. 51</u>:  Admit that, but for the injunction in this case (Dkt. 67), the Harrison County School Board and Bridgeport Middle School would not have allowed Plaintiff B.P.J. to participate on the Bridgeport Middle School's girls' cross-country team in 2021 because of H.B. 3293 (codified at Code of West Virginia §18-2-25d(c)(2)).

<u>RESPONSE</u>:          <u>OBJECTION</u>.  The County Board objects to the extent this request is seeking a legal conclusion.  Subject to and without waiving the objection, the County Board states as follows:  Because H.B. 3293 is a West Virginia State law that applies to County Boards of Education, including the County Board and its County Superintendent, because H.B. 3293 provides for private causes of action, and thus imposes liability against County Boards of Education, like the County Board, and while the County Board and its County Superintendent did not devise and have not adopted H.B. Bill 3293 as their own policy, the County Board admits this

request because, absent an injunction by a court, the County Board would be compelled and required to enforce H.B. Bill 3293 because it is a mandatory State law that affords the County Board no discretion.

     **REQUEST NO. 52**: Admit that, but for the injunction in this case (Dkt. 67), the Harrison County School Board and Bridgeport Middle School would not permit Plaintiff B.P.J. to try out for any girls' athletic team offered at Bridgeport Middle School because of H.B. 3293 (codified at Code of West Virginia §18-2-25d(c)(2)).

     **RESPONSE**:     **OBJECTION**. The County Board objects to the extent this request is seeking a legal conclusion. Subject to and without waiving the objection, the County Board states as follows: Because H.B. 3293 is a West Virginia State law that applies to County Boards of Education, including the County Board and its County Superintendent, because H.B. 3293 provides for private causes of action, and thus imposes liability against County Boards of Education, like the County Board, and while the County Board and its County Superintendent did not devise and have not adopted H.B. Bill 3293 as their own policy, the County Board admits this request because, absent an injunction by a court, the County Board would be compelled and required to enforce H.B. Bill 3293 because it is a mandatory State law that affords the County Board no discretion.

     **REQUEST NO. 53**: Admit that, but for the injunction issued in this case (Dkt. 67), the Harrison County School Board and Bridgeport Middle School would not permit Plaintiff B.P.J. to be a member of any girls' athletic team offered at Bridgeport Middle School because of H.B. 3293 (codified at Code of West Virginia §18-2-25d(c)(2)).

     **RESPONSE**:     **OBJECTION**. The County Board objects to the extent this request is seeking a legal conclusion. Subject to and without waiving the objection, the County

Board states as follows:  Because H.B. 3293 is a West Virginia State law that applies to County Boards of Education, including the County Board and its County Superintendent, because H.B. 3293 provides for private causes of action, and thus imposes liability against County Boards of Education, like the County Board, and while the County Board and its County Superintendent did not devise and have not adopted H.B. Bill 3293 as their own policy, the County Board admits this request because, absent an injunction by a court, the County Board would be compelled and required to enforce H.B. Bill 3293 because it is a mandatory State law that affords the County Board no discretion.

**REQUEST NO. 54:**  Admit that Plaintiff B.P.J.'s gender is identified as "male" in the West Virginia Education Information System ("WVEIS").

**RESPONSE**:          Admitted.

**REQUEST NO. 55:**  Admit that you have the ability to change Plaintiff B.P.J.'s gender in WVEIS to "female."

**RESPONSE**:          **OBJECTION**.  The County Board objects to the request because it seeks information that is not relevant to any party's claim or defense and is not proportional to the needs of the case.  Subject to and without waiving the objection, the County Board admits that it has the ability to change data in WVEIS.

**REQUEST NO. 56:**  Admit that H.B. 3293 allows a student to bring an action against you for alleged violations of H.B. 3293.

**RESPONSE**:          **OBJECTION**.  The County Board objects to the extent this request is seeking a legal conclusion.  Subject to and without waiving the objection, the County Board admits this request.

14094080                                    18

**REQUEST NO. 57:** Admit that you are required to regulate athletic activities offered by public secondary schools in Harrison County. See Code of West Virginia §18-2-25.

**RESPONSE**: **OBJECTION**. The County Board objects to the extent this request is seeking a legal conclusion. Subject to and without waiving the objection, the County Board admits that the provisions of West Virginia Code §18-2-25 require it to regulate athletic activities of public secondary schools in Harrison County.

**REQUEST NO. 58:** Admit that you are required to control interscholastic athletic events in which Bridgeport Middle School participates. See Code of West Virginia §18-2-25.

**RESPONSE**: **OBJECTION**. The County Board objects to the extent this request is seeking a legal conclusion. Subject to and without waiving the objection, the County Board admits that the provisions of West Virginia Code §18-2-25 require it to control athletic activities of public secondary schools in Harrison County.

**REQUEST NO. 59:** Admit that you are required supervise interscholastic athletic events in which Bridgeport Middle School participates. See Code of West Virginia §18-2-25.

**RESPONSE**: **OBJECTION**. The County Board objects to the extent this request is seeking a legal conclusion. Subject to and without waiving the objection, the County Board admits that the provisions of West Virginia Code §18-2-25 require it to supervise athletic activities of public secondary schools in Harrison County.

**REQUEST NO. 60:** Admit that you are required regulate interscholastic athletic events in which Bridgeport Middle School participates. See Code of West Virginia §18-2-25.

**RESPONSE**: **OBJECTION**. The County Board objects to the extent this request is seeking a legal conclusion. Subject to and without waiving the objection, the County

Board admits that the provisions of West Virginia Code §18-2-25 require it to regulate athletic events in which Bridgeport Middle School participates.

**REQUEST NO. 61:**  Admit that Bridgeport Middle School is a member school of the West Virginia Secondary School Activities Commission.

**RESPONSE**:        Admitted.

**REQUEST NO. 62:**  Admit that you have delegated control over interscholastic athletic events in Harrison County to the West Virginia Secondary School Activities Commission.

**RESPONSE**:        **OBJECTION**.  The County Board objects to the extent this request is seeking a legal conclusion.  Subject to and without waiving the objection, the County Board admits that it has delegated some, but not all, control over interscholastic athletic events in Harrison County to the West Virginia Secondary School Activities Commission.

**REQUEST NO. 63:**  Admit  that  you  have  delegated  supervision  over interscholastic athletic events to the West Virginia Secondary School Activities Commission.

**RESPONSE**:        **OBJECTION**.  The County Board objects to the extent this request is seeking a legal conclusion.  Subject to and without waiving the objection, the County Board admits that it has delegated some, but not all, supervision over interscholastic athletic events to the West Virginia Secondary School Activities Commission.

**REQUEST NO. 64:**  Admit that you have delegated regulation of interscholastic athletic events to the West Virginia Secondary School Activities Commission.

**RESPONSE**:        **OBJECTION**.  The County Board objects to the extent this request is seeking a legal conclusion.  Subject to and without waiving the objection, the County

Board admits that it has delegated some, but not all, regulation of interscholastic athletic events to the West Virginia Secondary School Activities Commission.

**REQUEST NO. 65:**  Admit that the State Board of Education controls you. See Code of West Virginia §18-2-5.

**RESPONSE**:         **OBJECTION**.  The County Board objects to the extent this request is seeking a legal conclusion.  Subject to and without waiving the objection, the County Board denies this request because West Virginia Code §18-2-5 states that "the State Board of Education shall exercise general supervision of the public schools of the state, and shall promulgate rules[.]"

**REQUEST NO. 66:**  Admit that you receive federal financial assistance.

**RESPONSE**:         Admitted.

**REQUEST NO. 67:**  Admit that you must comply with Title IX of the Education Amendments of 1972, 20 U.S.C. §1681 *et seq.*

**RESPONSE**:         **OBJECTION**.  The County Board objects to the extent this request is seeking a legal conclusion.  Subject to and without waiving the objection, the County Board admits this request.

Dated this the 10th day of March, 2022.

<table>
<tr><td></td><td>*/s/ Susan L. Deniker*</td></tr>
<tr><td></td><td>Susan L. Deniker          (WV ID #7992)</td></tr>
<tr><td></td><td>Jeffrey M. Cropp          (WV ID #8030)</td></tr>
<tr><td>STEPTOE & JOHNSON PLLC</td><td>400 White Oaks Boulevard</td></tr>
<tr><td>OF COUNSEL</td><td>Bridgeport, WV 26330-4500</td></tr>
<tr><td></td><td>(304) 933-8000</td></tr>
<tr><td></td><td></td></tr>
<tr><td></td><td>*Counsel for Defendants Harrison County Board of*</td></tr>
<tr><td></td><td>*Education and Dora Stutler*</td></tr>
</table>

14094080                                     21

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA
CHARLESTON DIVISION

B.P.J., by her next friend and mother,
HEATHER JACKSON,

*Plaintiff*,

v.

Civil Action No. 2:21-cv-00316
Hon. Joseph R. Goodwin, District Judge

WEST VIRGINIA STATE BOARD OF
EDUCATION, HARRISON COUNTY BOARD
OF EDUCATION, WEST VIRGINIA
SECONDARY SCHOOL ACTIVITIES
COMMISSION, W. CLAYTON BURCH in his
official capacity as State Superintendent,
DORA STUTLER in her official capacity as
Harrison County Superintendent, PATRICK
MORRISEY in his official capacity as Attorney
General, and THE STATE OF WEST VIRGINIA,

*Defendants,*

and

LAINEY ARMISTEAD,

*Defendant-Intervenor*.

## CERTIFICATE OF SERVICE

I hereby certify that on the 10th day of March, 2022, I electronically filed the

foregoing Certificate of Service of "Defendant Harrison County Board of Education's Responses

and Objections to Plaintiff's Second Set of Requests for Admission" with the Clerk of the Court

using the CM/ECF system, and a true and exact copy of such filing was sent by email to the

following counsel of record:

14094080

**Joshua A. Block, Esquire**
AMERICAN CIVIL LIBERTIES UNION
FOUNDATION
125 Broad Street 18th Floor
New York, NY 10004
*Counsel for Plaintiff*

**Loree Beth Stark, Esquire**
**Nicholas P. Ward, Esquire**
AMERICAN CIVIL LIBERTIES UNION
OF WEST VIRGINIA
1614 Kanawha Boulevard East
Charleston, WV 25311
*Counsel for Plaintiff*

**Avatara A. Smith-Carrington, Esquire**
LAMBDA LEGAL
3500 Oak Lawn Avenue Suite 500
Dallas, TX 75219
*Counsel for Plaintiff*

**Carl Solomon Charles, Esquire**
**Tara L. Borelli, Esquire**
LAMBDA LEGAL
158 West Ponce De Leon Avenue, Suite 105
Decatur, GA 30030
*Counsel for Plaintiff*

**Sruti J. Swaminathan, Esquire**
LAMBDA LEGAL
120 Wall Street 19th Floor
New York, NY 10005
*Counsel for Plaintiff*

**Kathleen R. Hartnett, Esquire**
**Julie Veroff, Esquire**
**Zoë Helstrom, Esquire**
COOLEY LLP
3 Embarcadero Center, 20th Floor
San Francisco, CA 94111
*Counsel for Plaintiff*

**Katelyn Kang, Esquire**
**Valeria M. Pelet del Toro, Esquire**
COOLEY LLP
55 Hudson Yards
New York, NY 10001
*Counsel for Plaintiff*

**Elizabeth Reinhardt, Esquire**
COOLEY LLP
500 Boylston Street, 14th Floor
Boston, MA 02116-3736
*Counsel for Plaintiff*

**Andrew D. Barr, Esquire**
COOLEY LLP
1144 15th Street Suite 2300
Denver, CO 80202
*Counsel for Plaintiff*

**Roberta F. Green, Esquire**
**Kimberly M. Bandy, Esquire**
**Shannon M. Rogers, Esquire**
SHUMAN McCUSKEY & SLICER
PO Box 3953
Charleston, WV 25339-3953
*Counsel for Defendant WV Secondary
School Activities Commission*

14094080

Kelly C. Morgan, Esquire
**Kristen Vickers Hammond, Esquire**
**Michael W. Taylor, Esquire**
BAILEY & WYANT
PO Box 3710
Charleston, WV 25337-3710

*Counsel for Defendants WV State Board of*
*Education and W. Clayton Burch*

**Douglas P. Buffington, II, Esquire**
**Curtis R. Capehart, Esquire**
**David C. Tryon, Esquire**
WV ATTORNEY GENERAL'S
OFFICE
State Capitol Complex
Building 1, Room 26E
1900 Kanawha Boulevard East
Charleston, WV 25305-0220

*Counsel for Defendant The State of*
*West Virginia*

**Brandon Steele, Esquire**
**Joshua D. Brown, Esquire**
THE LAW OFFICES OF BRANDON S.
STEELE
3049 Robert C. Byrd Drive, Suite 100
Beckley, WV 25801

*Counsel for Defendant-Intervenor Lainey*
*Armistead*

**Jonathan Scruggs, Esquire**
**Roger G. Brooks, Esquire**
**Henry W. Frampton, IV, Esquire**
ALLIANCE DEFENDING FREEDOM
15100 N. 90th Street
Scottsdale, AZ 85260

*Counsel for Defendant-Intervenor*
*Lainey Armistead*

**Christina Holcomb, Esquire**
ALLIANCE DEFENDING FREEDOM
440 First Street NW, Suite 600
Washington, DC 20001

*Counsel for Defendant-Intervenor Lainey*
*Armistead*

**Rachel Csutoros, Esquire**
**Tyson Langhofer, Esquire**
ALLIANCE DEFENDING FREEDOM
44180 Riverside Parkway
Lansdowne, VA 20176

*Counsel for Defendant-Intervenor*
*Lainey Armistead*

**Travis Barham, Esquire**
ALLIANCE DEFENDING FREEDOM
1000 Hurricane Shoals Rd NE
STE D-1100
Lawrenceville GA 30043

*Counsel for Defendant-Intervenor Lainey*
*Armistead*

**Timothy D. Ducar, Esquire**
Law Offices of Timothy D. Ducar, PLC
7430 E. Butherus Drive, Suite E
Scottsdale, AZ 85260

*Counsel for Defendant-Intervenor*
*Lainey Armistead*

STEPTOE & JOHNSON PLLC
OF COUNSEL

*/s/ Susan L. Deniker*
Susan L. Deniker        (WV ID #7992)
Jeffrey M. Cropp        (WV ID #8030)
400 White Oaks Boulevard
Bridgeport, WV 26330-4500
(304) 933-8000

*Counsel for Defendants Harrison County Board of*
*Education and Dora Stutler*

14094080

SARGENT'S COURT REPORTING SERVICE, INC.        210 Main Street    Johnstown, PA 15901        814-536-8908    www.sargents.com

## ERRATA SHEET

AFFIDAVIT
State of Pennsylvania
County of _____

I, Joshua Safer, MD , certify under oath or affirmation that I
have read the transcript of my testimony dated 3/24/2022 and that the transcript of my testimony
is accurate with the following corrections:

| Page | Line | Error | Correction | Reason |
|------|------|-------|------------|--------|
| 19 | 6 | bad | better | |
| 26 | 14 | sensitive | scientific | |
| 29 | 21 | adults | adult | |
| 30 | 14 | committee | community | |
| 33 | 1 | farther | further | |
| 33 | 3 | at | that at | |
| 33 | 23 | make | take | |
| 53 | 11 | nanomolars | nanomolar | |
| 54 | 21 | 7.5 | 5 | |
| 57 | 6 | press | suppressed | |
| 68 | 8 | will be described in that | will describe the | |
| 68 | 24 | context | contexts | |
| 72 | 3 | prefer | refer | |
| 74 | 12 | least | at least | |
| 74 | 20 | body | the body | |
| 75 | 4 | the coils here | — | |

Are there additional corrections on a following page?  __ NO  X YES

Signature of Deponent/Affiant _____

Sworn to and subscribed before me, a Notary Public, on this

_____ day of _____, 20_____.

_____
Notary Public

SARGENT'S COURT REPORTING SERVICE, INC.     210 Main Street     Johnstown, PA 15901     814-536-8908     www.sargents.com

## Additional Corrections to the Testimony of Joshua Safer, MD

| Page | Line | Error | Correction | Reason |
|---|---|---|---|---|
| 80 | 22 | right | — | |
| 85 | 24 | needs | need | |
| 86 | 23 | they | there | |
| 90 | 24 | of tab | — | |
| 91 | 19 | air | error | |
| 94 | 13 | about higher | — | |
| 94 | 22 | of the | — | |
| 96 | 20 | were | or | |
| 111 | 19 | that | there | |
| 126 | 8 | pre-pubertis gender | pre-pubertal cisgender | |
| 127 | 7 | an | the | |
| 134 | 7 | recognized | recognize | |
| 135 | 14 | collections | directions | |
| 136 | 17 | I got | I've got | |
| 140 | 11 | as | is | |
| 150 | 23 | a league | elite | |
| 151 | 6 | intermural | intramural | |
| 157 | 8 | Kilio | Healio | |
| 157 | 9 | Kilio | Healio | |
| 163 | 1 | for | or | |
| 167 | 2 | on | beyond | |
| 178 | 15 | it | if | |
| 179 | 12 | loopholed | — | |
| 181 | 4 | than | then | |
| 181 | 14 | brought | broad | |
| 185 | 14 | vaginal plasty | vaginoplasty | |
| 185 | 21 | construction | reconstruction | |

Are there additional corrections on a following page?  ___ NO  ✗ YES

Deponent's / Affiant's Name: _____     Initials: _____

SARGENT'S COURT REPORTING SERVICE, INC.      210 Main Street      Johnstown, PA 15901      814-536-8908      www.sargents.com

### Additional Corrections to the Testimony of Joshua Safer, MD

| Page | Line | Error | Correction | Reason |
|------|------|-------|------------|--------|
| 187 | 11 | Know | no | |
| 197 | 3 | is I | is what I | |
| 198 | 10 | if | with | |
| 207 | 6 | expectation | explanation | |
| 207 | 14 | there in 2021 as | there in 2021 has | |
| 211 | 17 | not | — | |
| 215 | 16 | the sum | some | |
| 216 | 5 | is | it's | |
| 215 | 13 | endocrine Society | Endocrine Society | |
| 216 | 7 | endocrine Society | Endocrine Society | |
| 216 | 8 | project | subject | |
| 223 | 13 | identity | gender identity | |
| 230 | 3 | incongruent | congruent | |
| 241 | 6 | overtime | over time | |
| 241 | 7 | any absence of | absent | |
| 241 | 17 | discorded | discordant | |
| 250 | 19 | is To | is not To | |
| 268 | 17 | intuitions | institutions | |
| 285 | 21 | permeations | permutations | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |

Are there additional corrections on a following page?    X NO    ___ YES

Deponent's / Affiant's Name: _____    Initials: _____

| | |
|---|---|
| **Message** | |
| **From**: | Natalie McBrayer [nataliemcbrayer@gmail.com] |
| **Sent**: | 9/17/2021 12:40:51 PM |
| **To**: | Danyelle Schoonmaker [/o=ExchangeLabs/ou=Exchange Administrative Group (FYDIBOHF23SPDLT)/cn=Recipients/cn=8f240a140f514d269f0bb8dd1486fec2-dlead001]; bridgeportmiddlexc@gmail.com |
| **Subject**: | Varsity Sheet and All Athlete Finish Time Order from Doddridge |
| **Attachments**: | BMS XC-Sept 16-Doddridge Inv Varsity Qualifiers.pdf; BMS XC-Sept 16-Doddridge Inv Finish Time Order.pdf |

> [EXTERNAL SENDER]: Do not click links, open attachments or reply to this email unless you recognize the sender and know the content is safe.

Sorry I didn't do this last night. I have been super tired lately. By the time we finished dinner and got everyone in bed, I was passing out.

I am working on something for next week. :-D I will try to work on sending you a couple weekend homework assignments too.

████ is going to be one of the fastest boys that Bridgeport has ever seen. He is the fastest middle school boy I have seen so far and he is just a joy!

Also, I want to partner some of these kids up. ████ and ████ need to train together.

HCBOE 01167

HCBOE 01168

## BMS XC-Girls

**Doddridge Invitational**
**Thursday, September 16**

| First Name | Last Name | Distance | Actual Time | Pace Per Mile |
|---|---|---|---|---|
| | | 1.9 | 14:13.0 | 07:28.9 |
| | | 1.9 | 14:25.4 | 07:35.5 |
| | | 1.9 | 15:59.3 | 08:24.9 |
| | | 1.9 | 16:40.5 | 08:46.6 |
| | | 1.9 | 16:40.9 | 08:46.8 |
| | | 1.9 | 16:50.8 | 08:52.0 |
| | | 1.9 | 17:25.7 | 09:10.4 |
| | | 1.9 | 17:39.3 | 09:17.5 |
| | | 1.9 | 18:01.3 | 09:29.1 |
| | | 1.9 | 18:05.5 | 09:31.3 |
| | | 1.9 | 19:36.0 | 10:18.9 |
| | | 1.9 | 19:49.2 | 10:25.9 |
| | | 1.9 | 21:50.5 | 11:29.7 |
| | | 1.9 | 22:06.9 | 11:38.4 |
| | | 1.9 | 22:25.5 | 11:48.2 |
| | | 1.9 | 28:48.5 | 15:09.8 |
| | | N/A | N/A | N/A |
| | | N/A | N/A | N/A |

## BMS XC-Boys

**Doddridge Invitational**
**Thursday, September 16**

| First Name | Last Name | Distance | Actual Time | Pace Per Mile |
|---|---|---|---|---|
| | | 1.9 | 11:01.2 | 05:48.0 |
| | | 1.9 | 13:21.8 | 07:02.0 |
| | | 1.9 | 13:39.2 | 07:11.2 |
| | | 1.9 | 14:06.3 | 07:25.4 |
| | | 1.9 | 14:29.7 | 07:37.7 |
| | | 1.9 | 14:36.2 | 07:41.2 |
| | | 1.9 | 15:02.7 | 07:55.1 |
| | | 1.9 | 15:50.6 | 08:20.3 |
| | | 1.9 | 16:37.4 | 08:44.9 |
| | | 1.9 | 16:51.0 | 08:52.1 |
| | | 1.9 | 18:32.6 | 09:45.6 |
| | | 1.9 | 18:57.9 | 09:58.9 |
| | | 1.9 | 21:07.7 | 11:07.2 |
| | | N/A | N/A | N/A |
| | | N/A | N/A | N/A |
| | | N/A | N/A | N/A |
| | | N/A | N/A | N/A |

CONFIDENTIAL

HCBOE 01169

## Doddridge Invitational
### Thursday, September 16

| First Name | Last Name | Distance | Actual Time | Pace Per Mile |
|---|---|---|---|---|
| | | 1.9 | 11:01.2 | 05:48.0 |
| | | 1.9 | 13:21.8 | 07:02.0 |
| | | 1.9 | 13:39.2 | 07:11.2 |
| | | 1.9 | 14:06.3 | 07:25.4 |
| | | 1.9 | 14:13.0 | 07:28.9 |
| | | 1.9 | 14:25.4 | 07:35.5 |
| | | 1.9 | 14:29.7 | 07:37.7 |
| | | 1.9 | 14:36.2 | 07:41.2 |
| | | 1.9 | 15:02.7 | 07:55.1 |
| | | 1.9 | 15:50.6 | 08:20.3 |
| | | 1.9 | 15:59.3 | 08:24.9 |
| | | 1.9 | 16:37.4 | 08:44.9 |
| | | 1.9 | 16:40.5 | 08:46.6 |
| | | 1.9 | 16:40.9 | 08:46.8 |
| | | 1.9 | 16:50.8 | 08:52.0 |
| | | 1.9 | 16:51.0 | 08:52.1 |
| | | 1.9 | 17:25.7 | 09:10.4 |
| | | 1.9 | 17:39.3 | 09:17.5 |
| | | 1.9 | 18:01.3 | 09:29.1 |
| | | 1.9 | 18:05.5 | 09:31.3 |
| | | 1.9 | 18:32.6 | 09:45.6 |
| | | 1.9 | 18:57.9 | 09:58.9 |
| | | 1.9 | 19:36.0 | 10:18.9 |
| | | 1.9 | 19:49.2 | 10:25.9 |
| | | 1.9 | 21:07.7 | 11:07.2 |
| | | 1.9 | 21:50.5 | 11:29.7 |
| | | 1.9 | 22:06.9 | 11:38.4 |
| | | 1.9 | 22:25.5 | 11:48.2 |
| | | 1.9 | 28:48.5 | 15:09.8 |
| | | N/A | N/A | N/A |
| | | N/A | N/A | N/A |
| | | N/A | N/A | N/A |
| | | N/A | N/A | N/A |
| | | N/A | N/A | N/A |
| | | N/A | N/A | N/A |

CONFIDENTIAL

| Message | |
| --- | --- |
| **From**: | Natalie McBrayer [nataliemcbrayer@gmail.com] |
| **Sent**: | 9/27/2021 1:02:03 PM |
| **To**: | bridgeportmiddlexc@gmail.com; Danyelle Schoonmaker [/o=ExchangeLabs/ou=Exchange Administrative Group (FYDIBOHF23SPDLT)/cn=Recipients/cn=8f240a140f514d269f0bb8dd1486fec2-dlead001] |
| **Subject**: | Braxton Results and Varsity Qualifiers |
| **Attachments**: | BMS XC-Sept 25-Braxton Inv Finish Time Order.pdf; BMS XC-Sept 25-Braxton Inv Varsity Qualifiers.pdf |

> [EXTERNAL SENDER]: Do not click links, open attachments or reply to this email unless you recognize the
> sender and know the content is safe.

I attached the Varsity sheet and also a sheet based on finish order.

The race results are searchable and they also have finish line photos that are free to download here: APTiming

CONFIDENTIAL

| First Name | Last Name | Braxton Invitational | | |
| | | Saturday, September 25 | | |
| | | Distance | Actual Time | Pace Per Mile |
|---|---|---|---|---|
| | | 2 | 13:03.5 | 06:31.8 |
| | | 2 | 14:18.5 | 07:09.2 |
| | | 2 | 14:40.6 | 07:20.3 |
| | | 2 | 14:44.8 | 07:22.4 |
| | | 2 | 14:49.9 | 07:25.0 |
| | | 2 | 15:02.3 | 07:31.2 |
| | | 2 | 15:11.3 | 07:35.6 |
| | | 2 | 15:49.2 | 07:54.6 |
| | | 2 | 16:13.9 | 08:07.0 |
| | | 2 | 16:17.8 | 08:08.9 |
| | | 2 | 16:21.4 | 08:10.7 |
| | | 2 | 16:26.4 | 08:13.2 |
| | | 2 | 16:37.1 | 08:18.6 |
| | | 2 | 17:09.2 | 08:34.6 |
| | | 2 | 17:41.7 | 08:50.8 |
| | | 2 | 17:50.3 | 08:55.2 |
| | | 2 | 18:13.6 | 09:06.8 |
| | | 2 | 18:20.2 | 09:10.1 |
| | | 2 | 18:39.3 | 09:19.6 |
| | | 2 | 19:29.9 | 09:45.0 |
| | | 2 | 20:25.0 | 10:12.5 |
| | | 2 | 20:26.5 | 10:13.3 |
| | | 2 | 20:30.8 | 10:15.4 |
| | | 2 | 21:06.2 | 10:33.1 |
| | | 2 | 21:45.0 | 10:52.5 |
| | | 2 | 22:33.3 | 11:16.7 |
| | | 2 | 22:44.2 | 11:22.1 |
| B | P -J | 2 | 24:08.4 | 12:04.2 |
| | | 2 | 27:04.2 | 13:32.1 |
| | | N/A | N/A | N/A |
| | | N/A | N/A | N/A |
| | | N/A | N/A | N/A |
| | | N/A | N/A | N/A |
| | | N/A | N/A | N/A |
| | | N/A | N/A | N/A |

HCBOE 01171

## BMS XC-Boys — Braxton Invitational, Saturday, September 25

| First Name | Last Name | Distance | Actual Time | Pace Per Mile |
|---|---|---|---|---|
| | | 2 | 13:03.5 | 06:31.8 |
| | | 2 | 14:18.5 | 07:09.2 |
| | | 2 | 14:40.6 | 07:20.3 |
| | | 2 | 14:44.8 | 07:22.4 |
| | | 2 | 14:49.9 | 07:25.0 |
| | | 2 | 15:02.3 | 07:31.2 |
| | | 2 | 15:11.3 | 07:35.6 |
| | | 2 | 16:13.9 | 08:07.0 |
| | | 2 | 16:21.4 | 08:10.7 |
| | | 2 | 16:26.4 | 08:13.2 |
| | | 2 | 16:37.1 | 08:18.6 |
| | | 2 | 18:13.6 | 09:06.8 |
| | | 2 | 18:39.3 | 09:19.6 |
| | | 2 | 20:26.5 | 10:13.3 |
| | | 2 | 22:33.3 | 11:16.7 |
| | | N/A | N/A | N/A |
| | | N/A | N/A | N/A |

## BMS XC-Girls — Braxton Invitational, Saturday, September 25

| First Name | Last Name | Distance | Actual Time | Pace Per Mile |
|---|---|---|---|---|
| | | 2 | 15:49.2 | 07:54.6 |
| | | 2 | 16:17.8 | 08:08.9 |
| | | 2 | 17:09.2 | 08:34.6 |
| | | 2 | 17:41.7 | 08:50.8 |
| | | 2 | 17:50.3 | 08:55.2 |
| | | 2 | 18:20.2 | 09:10.1 |
| | | 2 | 19:29.9 | 09:45.0 |
| | | 2 | 20:25.0 | 10:12.5 |
| | | 2 | 20:30.8 | 10:15.4 |
| | | 2 | 21:06.2 | 10:33.1 |
| | | 2 | 21:45.0 | 10:52.5 |
| | | 2 | 22:44.2 | 11:22.1 |
| | | 2 | 24:08.4 | 12:04.2 |
| | | 2 | 27:04.2 | 13:32.1 |
| | | N/A | N/A | N/A |
| | | N/A | N/A | N/A |
| | | N/A | N/A | N/A |
| | | N/A | N/A | N/A |

HCBOE 01172

CONFIDENTIAL

## BMS XC-Boys

| First Name | Last Name | Distance | Actual Time | Pace Per Mile |
|---|---|---|---|---|
| | | 1.9 | 11:00.7 | 05:47.7 |
| | | 1.9 | 12:53.6 | 06:47.2 |
| | | 1.9 | 13:18.6 | 07:00.3 |
| | | 1.9 | 13:23.9 | 07:03.1 |
| | | 1.9 | 13:25.0 | 07:03.7 |
| | | 1.9 | 14:05.5 | 07:25.0 |
| | | 1.9 | 14:20.3 | 07:32.8 |
| | | 1.9 | 14:25.3 | 07:35.4 |
| | | 1.9 | 14:34.8 | 07:40.4 |
| | | 1.9 | 14:53.4 | 07:50.2 |
| | | 1.9 | 15:21.5 | 08:05.0 |
| | | 1.9 | 16:40.2 | 08:46.4 |
| | | 1.9 | 17:27.6 | 09:11.4 |
| | | 1.9 | 19:22.6 | 10:11.9 |
| | | N/A | N/A | N/A |
| | | N/A | N/A | N/A |
| | | N/A | N/A | N/A |

Ritchie County
Saturday, October 1

## BMS XC-Girls

| First Name | Last Name | Distance | Actual Time | Pace Per Mile |
|---|---|---|---|---|
| | | 1.9 | 13:16.7 | 06:59.3 |
| | | 1.9 | 13:19.4 | 07:00.7 |
| | | 1.9 | 14:46.6 | 07:46.6 |
| | | 1.9 | 15:00.6 | 07:54.0 |
| | | 1.9 | 15:02.0 | 07:54.7 |
| | | 1.9 | 15:31.2 | 08:10.1 |
| | | 1.9 | 15:40.2 | 08:14.8 |
| | | 1.9 | 16:03.7 | 08:27.2 |
| | | 1.9 | 17:17.2 | 09:05.9 |
| | | 1.9 | 17:30.1 | 09:12.7 |
| | | 1.9 | 18:11.7 | 09:34.6 |
| | | 1.9 | 19:02.6 | 10:01.4 |
| | | 1.9 | 19:12.5 | 10:06.6 |
| | | 1.9 | 21:13.7 | 11:10.4 |
| | | 1.9 | 24:06.1 | 12:41.1 |
| | | N/A | N/A | N/A |
| | | N/A | N/A | N/A |
| | | N/A | N/A | N/A |

Ritchie County
Saturday, October 1

CONFIDENTIAL

Varsity Sheets

HCBOE 01265

HCBOE 01266

CONFIDENTIAL

2021 Team

| BoyGirl | Grade | First Name | Last Name | Wt Last Call Saturday, October 16 Distance | Actual Time | Pace Per Mile | Harrison County Champs-Mountaineer Middle Wednesday, October 13 TT Place | Distance | Actual Time | Pace Per Mile | XC Time Trial-Bridgeport City Park Course Thursday, October 7 TT Place | Course Length | TT Time | TT Pace/Mile | Ritchie County Saturday, October Distance | Actual Time |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Boy | 8th Grade | | | 2.1 | 13:08.6 | 06:15.5 | | 2.1 | 12:54.1 | 06:08.6 | 1 | 1.55 | 09:34.6 | 06:11.1 | 1.9 | 11:00.7 |
| Boy | 8th Grade | | | 2.1 | 15:00.7 | 07:08.9 | | 2.1 | 14:20.9 | 06:49.9 | 0 | N/A | N/A | N/A | 1.9 | 14:34.8 |
| Boy | 8th Grade | | | 2.1 | 15:19.4 | 07:17.8 | | 2.1 | 14:43.8 | 07:00.9 | 5 | 1.55 | 11:24.7 | 07:22.7 | 1.9 | 12:53.6 |
| Boy | 7th Grade | | | 2.1 | 15:57.5 | 07:35.9 | | 2.1 | 14:51.7 | 07:04.6 | 3 | 1.55 | 10:54.9 | 07:03.0 | 1.9 | 13:25.0 |
| Boy | 7th Grade | | | 2.1 | 16:04.4 | 07:39.2 | | 2.1 | 15:17.6 | 07:17.0 | 6 | N/A | N/A | N/A | 1.9 | 14:53.4 |
| Boy | 8th Grade | | | 2.1 | 16:51.4 | 08:01.6 | | 2.1 | 16:38.1 | 07:55.3 | 8 | 1.55 | 11:42.4 | 07:33.0 | 1.9 | 14:20.3 |
| Boy | 6th Grade | | | 2.1 | 17:20.6 | 08:15.5 | | 2.1 | 16:49.6 | 08:00.8 | 9 | 1.55 | 11:47.7 | 07:37.0 | 1.9 | 14:05.5 |
| Boy | 8th Grade | | | 2.1 | 17:51.5 | 08:30.3 | | 2.1 | 16:47.5 | 07:59.8 | 10 | 1.55 | 12:04.6 | 07:47.0 | 1.9 | 14:05.5 |
| Boy | 7th Grade | | | 2.1 | 18:05.0 | 08:36.7 | | 2.1 | 16:53.4 | 08:02.6 | 11 | 1.55 | 12:08.3 | 07:50.0 | 1.9 | 14:25.3 |
| Boy | 8th Grade | | | 2.1 | 18:34.3 | 08:50.6 | | 2.1 | 18:55.8 | 09:00.9 | 0 | N/A | N/A | N/A | 1.9 | 15:21.5 |
| Boy | 7th Grade | | | 2.1 | 20:39.9 | 09:50.4 | | 2.1 | 19:23.7 | 09:14.1 | 15 | 1.55 | 13:26.9 | 08:41.0 | 1.9 | 17:27.6 |
| Boy | 7th Grade | | | 2.1 | 22:05.1 | 10:31.0 | | 2.1 | 19:27.0 | 09:15.7 | 18 | 1.55 | 13:52.5 | 08:57.0 | 1.9 | 16:40.2 |
| Boy | 7th Grade | | | N/A | N/A | | | 2.1 | 22:04.6 | 10:30.8 | 27 | 1.55 | 19:38.5 | 12:40.0 | 1.9 | 19:22.6 |
| Boy | 7th Grade | | | N/A | N/A | | | 2.1 | 22:32.3 | 10:44.0 | 0 | N/A | N/A | N/A | N/A | N/A |
| Boy | 6th Grade | | | N/A | N/A | | | N/A | | N/A | 0 | N/A | N/A | N/A | N/A | N/A |
| Girl | 8th Grade | | | N/A | N/A | | | N/A | | N/A | 2 | 1.55 | 10:52.2 | 07:01.0 | 1.9 | 13:18.6 |
| Girl | 8th Grade | | | 2.1 | 15:48.7 | 07:31.8 | | 2.1 | 15:32.7 | 07:24.1 | 4 | 1.55 | 10:58.8 | 07:05.0 | 1.9 | 13:23.9 |
| Girl | 6th Grade | | | 2.1 | 16:12.7 | 07:43.2 | | 2.1 | 16:53.4 | 08:02.6 | 6 | 1.55 | 11:25.3 | 07:22.0 | 1.9 | 13:16.7 |
| Girl | 6th Grade | | | 2.1 | 17:27.3 | 08:18.7 | | 2.1 | 18:34.6 | 08:41.2 | 7 | 1.55 | 11:25.8 | 07:22.0 | 1.9 | 13:19.4 |
| Girl | 7th Grade | | | 2.1 | 18:08.5 | 08:38.4 | | 2.1 | 17:55.2 | 08:32.0 | 13 | 1.55 | 12:31.9 | 08:05.0 | 1.9 | 14:46.6 |
| Girl | 6th Grade | | | 2.1 | 19:11.0 | 09:08.1 | | 2.1 | 18:20.5 | 08:44.1 | 0 | N/A | N/A | N/A | 1.9 | 15:31.2 |
| Girl | 8th Grade | | | 2.1 | 19:24.8 | 09:14.7 | | 2.1 | 17:56.8 | 08:32.8 | 23 | 1.55 | 15:23.9 | 09:56.0 | 1.9 | 15:02.0 |
| Girl | 6th Grade | | | 2.1 | 19:57.8 | 09:30.4 | | 2.1 | 19:07.4 | 09:06.4 | 12 | 1.55 | 12:29.5 | 08:04.0 | 1.9 | 16:03.7 |
| Girl | 7th Grade | | | 2.1 | 20:57.9 | 09:59.0 | | 2.1 | 19:02.2 | 09:03.9 | 17 | 1.55 | 13:49.7 | 08:55.0 | 1.9 | 15:40.2 |
| Girl | 7th Grade | | | 2.1 | 21:05.5 | 10:02.6 | | 2.1 | 19:27.7 | 09:16.0 | 16 | 1.55 | 13:44.4 | 08:52.0 | 1.9 | 17:30.1 |
| Girl | 8th Grade | | | 2.1 | 21:11.3 | 10:05.4 | | 2.1 | 18:36.9 | 08:51.9 | 19 | 1.55 | 13:56.8 | 09:00.0 | N/A | |
| Girl | 8th Grade | | | 2.1 | 21:50.8 | 10:24.2 | | 2.1 | 22:38.1 | 10:46.7 | 20 | 1.55 | 14:52.2 | 09:36.0 | 1.9 | 17:17.2 |
| Girl | 6th Grade | | | 2.1 | 22:03.8 | 10:30.4 | | 2.1 | 21:37.2 | 10:17.7 | 24 | 1.55 | 16:10.1 | 10:26.0 | 1.9 | 19:02.6 |
| Girl | 6th Grade | | | 2.1 | 22:39.5 | 10:47.4 | | 2.1 | 22:14.4 | 10:35.4 | 22 | 1.55 | 15:17.6 | 09:52.0 | 1.9 | 19:12.5 |
| Girl | 7th Grade | | | 2.1 | 26:11.1 | 12:28.1 | | 2.1 | 27:59.0 | 13:19.5 | 21 | 1.55 | 14:53.3 | 09:36.0 | 1.9 | 18:11.7 |
| Girl | 8th Grade | | | 2.1 | 27:40.9 | 13:10.9 | | 2.1 | 26:38.8 | 12:41.3 | 26 | 1.55 | 17:51.7 | 11:31.0 | 1.9 | 21:13.7 |
| Girl | 6th Grade | | | 2.1 | 29:14.2 | 13:55.4 | | 2.1 | 32:50.9 | 15:38.5 | 25 | 1.55 | 17:42.1 | 11:25.0 | N/A | |
| Girl | 6th Grade | | | N/A | N/A | | | N/A | | N/A | 28 | 1.55 | 22:15.5 | 14:22.0 | 1.9 | 24:06.1 |
| Girl | 8th Grade | | | N/A | N/A | | | N/A | | N/A | 14 | 1.55 | 12:53.7 | 08:19.0 | 1.9 | 15:00.6 |

HCBOE 01267

| Pace Per Mile | Braxton Invitational — Saturday, September 25 | | | Doddridge Invitational — Thursday, September 16 | | | Taylor County Invitational — Wednesday, September 8 | | | Mountain Holler Invitational-University HS — Thursday, September 2 | | | XC Time Trial-Bridgeport City Park Course — Tuesday, August 24, 2021 | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **1** | Distance | Actual Time | Pace Per Mile | Distance | Actual Time | Pace Per Mile | Distance | Actual Time | Pace Per Mile | Distance | Actual Time | Pace Per Mile | Place | Course Length | TT Time | TT Pace/Mile |
| 05:47.7 | 2 | 13:03.5 | 06:31.8 | 1.9 | 11:01.2 | 05:48.0 | 1.9 | 11:26.0 | 06:01.1 | 2 | 12:10.1 | 06:05.0 | 1 | 1.55 | 10:28.9 | 06:46 |
| N/A | N/A | 14:18.5 | 07:09.2 | N/A | | | 1.9 | 13:00.0 | 06:50.5 | 2 | 13:36.1 | 06:48.1 | 4 | 1.55 | 11:24.8 | 07:22 |
| 07:40.4 | 2 | 14:40.6 | 07:20.3 | 1.9 | 13:21.8 | 07:02.0 | 1.9 | 13:33.0 | 07:07.9 | 2 | 14:20.7 | 07:10.3 | 3 | 1.55 | 11:23.5 | 07:21 |
| 06:47.2 | 2 | 14:44.8 | 07:22.4 | 1.9 | 13:39.2 | 07:11.2 | 1.9 | 13:49.0 | 07:16.3 | 2 | 14:41.8 | 07:20.9 | 11 | 1.55 | 12:13.5 | 07:53 |
| 07:03.7 | 2 | 15:11.3 | 07:35.6 | N/A | | | 1.9 | 13:52.0 | 07:17.9 | 2 | 15:07.6 | 07:33.8 | 8 | 1.55 | 12:07.3 | 07:49 |
| 07:50.2 | 2 | 16:21.4 | 08:10.7 | 1.9 | 14:36.2 | 07:41.2 | 1.9 | 14:32.0 | 07:38.9 | 2 | 16:17.5 | 08:08.8 | 9 | 1.55 | 12:12.6 | 07:53 |
| 07:32.8 | 2 | 16:13.9 | 08:07.0 | 1.9 | 15:50.6 | 08:20.3 | 1.9 | 16:05.0 | 08:27.9 | 2 | 18:13.1 | 09:06.6 | 12 | 1.55 | 12:33.4 | 08:06 |
| 07:25.0 | 2 | 16:26.4 | 08:13.2 | N/A | | | 1.9 | 14:34.0 | 07:40.0 | 2 | 16:52.3 | 08:26.1 | N/A | | | |
| 07:35.4 | 2 | 16:37.1 | 08:18.6 | 1.9 | 16:37.4 | 08:44.9 | 1.9 | 16:49.0 | 08:51.1 | 2 | 18:20.5 | 09:10.3 | 16 | 1.55 | 13:06.2 | 08:27 |
| 09:11.4 | 2 | 18:13.6 | 09:06.8 | 1.9 | 16:51.0 | 08:52.1 | 1.9 | 16:49.1 | 08:51.1 | 2 | 20:03.9 | 10:02.0 | 20 | 1.55 | 14:31.7 | 09:22 |
| 08:46.4 | 2 | 18:39.3 | 09:19.6 | 1.9 | 18:32.6 | 09:45.6 | 1.9 | 17:28.0 | 09:11.6 | 2 | 20:05.1 | 10:02.5 | 28 | 1.55 | 18:37.2 | 12:01 |
| 10:11.9 | 2 | 20:26.5 | 10:13.3 | 1.9 | 18:57.9 | 09:58.9 | 1.9 | 18:50.0 | 09:54.7 | 2 | 21:20.4 | 10:40.2 | 26 | 1.55 | 16:21.2 | 10:33 |
| N/A | 2 | 22:33.3 | 11:16.7 | 1.9 | 21:07.7 | 11:07.2 | 1.9 | 20:40.0 | 10:52.6 | 2 | 21:54.7 | 10:57.4 | 33 | 1.55 | 19:37.6 | 12:40 |
| N/A | N/A | | N/A | N/A | | | 1.9 | 20:58.0 | 11:02.1 | N/A | | | 29 | 1.55 | 18:41.0 | 12:03 |
| 07:00.3 | 2 | 15:02.3 | 07:31.2 | 1.9 | 15:02.7 | 07:55.1 | N/A | | | N/A | | | 10 | 1.55 | 12:13.0 | 07:53 |
| 07:03.1 | 2 | 14:59.9 | 07:25.0 | 1.9 | 14:29.7 | 07:37.7 | 1.9 | 14:10.0 | 07:27.4 | 2 | 15:32.1 | 07:46.1 | 17 | 1.55 | 13:50.2 | 08:56 |
| 06:59.3 | 2 | 15:49.2 | 07:54.6 | 1.9 | 14:06.3 | 07:25.4 | 1.9 | 14:08.0 | 07:26.3 | 2 | 15:28.4 | 07:44.2 | 5 | 1.55 | 11:33.5 | 07:27 |
| 07:00.7 | 2 | 16:17.8 | 08:08.9 | 1.9 | 14:25.4 | 07:35.5 | 1.9 | 13:46.7 | 07:15.1 | 2 | 16:17.8 | 08:08.9 | 7 | 1.55 | 11:38.7 | 07:31 |
| 07:46.6 | 2 | 17:09.2 | 08:34.6 | 1.9 | 14:13.0 | 07:28.9 | 1.9 | 15:25.0 | 08:06.8 | 2 | 14:24.5 | 07:12.3 | 13 | 1.55 | 12:53.4 | 08:19 |
| 08:10.1 | 2 | 18:20.2 | 09:10.1 | 1.9 | 16:40.5 | 08:46.6 | 1.9 | 16:28.0 | 08:40.0 | 2 | 16:24.8 | 08:12.4 | 24 | 1.55 | 15:28.1 | 09:59 |
| 07:54.7 | 2 | 17:50.3 | 08:55.2 | 1.9 | 16:50.8 | 08:52.0 | N/A | | | N/A | | | 19 | 1.55 | 14:18.2 | 09:14 |
| 08:27.2 | 2 | 19:29.9 | 09:45.0 | 1.9 | 15:59.3 | 08:24.9 | 1.9 | 17:41.0 | 09:18.4 | 2 | 18:08.4 | 09:04.2 | 27 | 1.55 | 16:56.1 | 10:56 |
| 08:14.8 | N/A | | | 1.9 | 17:25.7 | 09:10.4 | 1.9 | 16:52.0 | 08:52.6 | 2 | 17:20.1 | 08:40.0 | 15 | 1.55 | 12:59.8 | 08:23 |
| 09:12.7 | 2 | 17:41.7 | 08:50.8 | 1.9 | 17:39.3 | 09:17.5 | 1.9 | 16:43.0 | 08:47.9 | 2 | 17:09.8 | 08:34.9 | 22 | 1.55 | 14:47.2 | 09:32 |
| N/A | N/A | | N/A | N/A | | | 1.9 | 17:58.0 | 09:27.4 | 2 | 18:35.8 | 09:17.9 | 23 | 1.55 | 15:25.5 | 09:57 |
| 09:05.9 | 2 | 20:30.8 | 10:15.4 | 1.9 | 18:01.3 | 09:29.1 | 1.9 | 17:06.0 | 09:00.0 | 2 | 17:34.4 | 08:47.2 | 21 | 1.55 | 14:17.7 | 09:13 |
| 10:01.4 | 2 | 21:06.2 | 10:33.1 | 1.9 | 18:05.5 | 09:31.3 | 1.9 | 18:09.0 | 09:33.2 | 2 | 19:17.1 | 09:38.6 | 18 | 1.55 | 19:04.5 | 12:18 |
| 10:06.6 | 2 | 24:08.4 | 12:04.2 | 1.9 | 21:50.5 | 11:29.7 | 1.9 | 20:31.0 | 10:47.9 | 2 | 19:38.6 | 10:53.0 | 30 | 1.55 | 20:52.5 | 13:28 |
| 09:34.6 | 2 | 22:44.2 | 11:22.1 | 1.9 | 19:49.2 | 10:25.9 | 1.9 | 20:53.0 | 10:59.5 | 2 | 22:33.9 | 11:17.0 | 25 | 1.55 | 15:42.3 | 10:08 |
| 11:10.4 | 2 | 21:45.0 | 10:52.5 | 1.9 | 19:36.0 | 10:18.9 | 1.9 | 19:30.0 | 10:15.8 | 2 | 20:43.7 | 10:21.8 | 34 | 1.55 | 20:34.8 | 13:17 |
| N/A | 2 | 27:04.2 | 13:32.1 | 1.9 | 22:25.5 | 11:48.2 | 1.9 | 23:30.0 | 12:22.1 | 2 | 24:55.9 | 12:28.0 | 32 | 1.55 | 19:16.2 | 12:26 |
| 12:41.1 | N/A | | N/A | 1.9 | 22:06.9 | 11:38.4 | 1.9 | 21:47.0 | 11:27.9 | N/A | | | 36 | 1.55 | 23:44.9 | 15:19 |
| N/A | N/A | | N/A | 1.9 | 28:48.5 | 15:09.8 | N/A | | | N/A | | | 31 | 1.55 | 19:08.6 | 12:21 |
| 07:54.0 | 2 | 20:25.0 | 10:12.5 | N/A | | | N/A | 25:58.0 | 13:40.0 | N/A | 22:55.7 | 11:27.7 | 14 | 1.55 | 12:56.1 | 08:21 |

CONFIDENTIAL

2021 Team

## Time Trial Comparison

| Boy/Girl | Grade | First Name | Last Name | TT Place | Course Length | TT Time | TT Pace/Mile | Place | Course Length | TT Time | TT Pace/Mile | Time | Pace/Mile |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | XC Time Trial-Bridgeport City Park Course Thursday, October 7, 2021 | | | | XC Time Trial-Bridgeport City Park Course Tuesday, August 24, 2021 | | | | Difference (BOLD is improved) | |
| Boy | 7th Grade | | | 0 | N/A | N/A | N/A | 10 | 1.55 | 12:13.0 | 0:07:53 | N/A | N/A |
| Girl | 8th Grade | | | 0 | N/A | N/A | N/A | 31 | 1.55 | 19:08.6 | 0:12:21 | N/A | N/A |
| Boy | 8th Grade | | | 0 | N/A | N/A | N/A | 20 | 1.55 | 14:31.7 | 0:09:22 | N/A | N/A |
| Boy | 7th Grade | | | 0 | N/A | N/A | N/A | 8 | 1.55 | 12:07.3 | 0:07:49 | N/A | N/A |
| Girl | 8th Grade | | | 0 | N/A | N/A | N/A | 4 | 1.55 | 11:24.8 | 0:07:22 | N/A | N/A |
| Girl | 7th Grade | | | 0 | N/A | N/A | N/A | 19 | 1.55 | 14:18.2 | 0:09:14 | N/A | N/A |
| Boy | 7th Grade | | | 0 | N/A | N/A | N/A | 29 | 1.55 | 18:41.0 | 0:12:03 | N/A | N/A |
| Boy | 8th Grade | | | 1 | 1.55 | 09:34.6 | 0:06:11 | 1 | 1.55 | 10:28.9 | 0:06:46 | 00:54.3 | 0:00:35 |
| Boy | 7th Grade | | | 2 | 1.55 | 10:52.2 | 0:07:01 | 17 | 1.55 | 13:50.2 | 0:08:56 | 02:58.0 | 0:01:55 |
| Boy | 7th Grade | | | 3 | 1.55 | 10:54.9 | 0:07:03 | 11 | 1.55 | 12:13.5 | 0:07:53 | 01:18.5 | 0:00:51 |
| Boy | 6th Grade | | | 4 | 1.55 | 10:58.8 | 0:07:05 | 5 | 1.55 | 11:33.5 | 0:07:27 | 00:34.7 | 0:00:22 |
| Boy | 6th Grade | | | 5 | 1.55 | 11:24.7 | 0:07:22 | 3 | 1.55 | 11:23.5 | 0:07:21 | *00:01.2* | *0:00:01* |
| Girl | 8th Grade | | | 6 | 1.55 | 11:25.3 | 0:07:22 | 7 | 1.55 | 11:38.7 | 0:07:31 | 00:13.4 | 0:00:09 |
| Girl | 6th Grade | | | 7 | 1.55 | 11:25.8 | 0:07:22 | 13 | 1.55 | 12:53.0 | 0:08:19 | 01:27.2 | 0:00:56 |
| Boy | 8th Grade | | | 8 | 1.55 | 11:42.4 | 0:07:33 | 9 | 1.55 | 12:12.6 | 0:07:53 | 00:30.2 | 0:00:19 |
| Boy | 6th Grade | | | 9 | 1.55 | 11:47.7 | 0:07:37 | 12 | 1.55 | 12:33.4 | 0:08:06 | 00:45.7 | 0:00:29 |
| Boy | 8th Grade | | | 10 | 1.55 | 12:04.6 | 0:07:47 | 0 N/A | N/A | N/A | N/A | N/A | N/A |
| Boy | 7th Grade | | | 11 | 1.55 | 12:08.3 | 0:07:50 | 16 | 1.55 | 13:06.2 | 0:08:27 | 00:57.8 | 0:00:37 |
| Girl | 8th Grade | | | 12 | 1.55 | 12:29.5 | 0:08:04 | 15 | 1.55 | 12:59.8 | 0:08:23 | 00:30.3 | 0:00:20 |
| Boy | 6th Grade | | | 13 | 1.55 | 12:31.9 | 0:08:05 | 24 | 1.55 | 15:28.1 | 0:09:59 | 02:56.2 | 0:01:54 |
| Boy | 8th Grade | | | 14 | 1.55 | 12:53.7 | 0:08:19 | 14 | 1.55 | 12:56.1 | 0:08:21 | 00:02.4 | 0:00:02 |
| Boy | 7th Grade | | | 15 | 1.55 | 13:26.9 | 0:08:41 | 28 | 1.55 | 18:37.2 | 0:12:01 | 05:10.3 | 0:03:20 |
| Girl | 7th Grade | | | 16 | 1.55 | 13:44.4 | 0:08:52 | 23 | 1.55 | 15:25.5 | 0:09:57 | 01:41.1 | 0:01:05 |
| Girl | 8th Grade | | | 17 | 1.55 | 13:49.7 | 0:08:55 | 22 | 1.55 | 14:47.2 | 0:09:32 | 00:57.5 | 0:00:37 |
| Boy | 7th Grade | | | 18 | 1.55 | 13:52.5 | 0:08:57 | 26 | 1.55 | 16:21.2 | 0:10:33 | 02:28.7 | 0:01:36 |
| Boy | 7th Grade | | | 19 | 1.55 | 13:56.8 | 0:09:00 | 21 | 1.55 | 14:32.2 | 0:09:23 | 00:35.4 | 0:00:23 |
| Girl | 8th Grade | | | 20 | 1.55 | 14:52.2 | 0:09:36 | 18 | 1.55 | 14:17.7 | 0:09:13 | *00:34.5* | *0:00:22* |
| Girl | 8th Grade | | | 21 | 1.55 | 14:53.3 | 0:09:36 | 25 | 1.55 | 15:42.3 | 0:10:08 | 00:49.0 | 0:00:32 |
| Girl | 6th Grade | | | 22 | 1.55 | 15:17.6 | 0:09:52 | 35 | 1.55 | 20:52.5 | 0:13:28 | 05:34.9 | 0:03:36 |
| Girl | 6th Grade | | | 23 | 1.55 | 15:23.9 | 0:09:56 | 27 | 1.55 | 16:56.1 | 0:10:56 | 01:32.2 | 0:01:00 |
| Girl | 6th Grade | | | 24 | 1.55 | 16:10.1 | 0:10:26 | 30 | 1.55 | 19:04.5 | 0:12:18 | 02:54.4 | 0:01:53 |
| Girl | 8th Grade | | | 25 | 1.55 | 17:42.1 | 0:11:25 | 32 | 1.55 | 19:16.2 | 0:12:26 | 01:34.1 | 0:01:01 |
| Girl | 7th Grade | | | 26 | 1.55 | 17:51.7 | 0:11:31 | 34 | 1.55 | 20:34.8 | 0:13:17 | 02:43.1 | 0:01:45 |
| Boy | 7th Grade | | | 27 | 1.55 | 19:38.5 | 0:12:40 | 33 | 1.55 | 19:37.6 | 0:12:40 | *00:00.9* | *0:00:01* |
| Girl | 6th Grade | | | 28 | 1.55 | 22:15.5 | 0:14:22 | 36 | 1.55 | 23:44.9 | 0:15:19 | 01:29.4 | 0:00:58 |

CONFIDENTIAL

Time Trial Comp

HCBOE 01268