IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA
CHARLESTON DIVISION

| | |
|---|---|
| B.P.J. by her next friend and mother, HEATHER JACKSON, | |
| *Plaintiff*, | |
| v. | |
| WEST VIRGINIA STATE BOARD OF EDUCATION, HARRISON COUNTY BOARD OF EDUCATION, WEST VIRGINIA SECONDARY SCHOOL ACTIVITIES COMMISSION, W. CLAYTON BURCH in his official capacity as State Superintendent, DORA STUTLER in her official capacity as Harrison County Superintendent, and THE STATE OF WEST VIRGINIA, | Civil Action No. 2:21-cv-00316<br><br>Hon. Joseph R. Goodwin |
| *Defendants*, | |
| and | |
| LAINEY ARMISTEAD, | |
| *Defendant-Intervenor*. | |

**PLAINTIFF'S CONSOLIDATED REPLY MEMORANDUM OF LAW IN SUPPORT OF MOTION TO RECONSIDER THE GRANT OF LAINEY ARMISTEAD'S PERMISSIVE INTERVENTION**

## TABLE OF CONTENTS

**Page**

INTRODUCTION ................................................................................................... 1

ARGUMENT ........................................................................................................... 3

    I.      Ms. Armistead Has No Connection To This Case. ................................... 3

          A.    Ms. Armistead Is No Longer A West Virginia Female College Athlete. ................................................................................ 3

          B.    Ms. Armistead's Personal Perspective Does Not Accord With The Positions Taken By Her Counsel, And Is Largely Absent From Defendants' Briefing. ............................................................... 5

    II.     Ms. Armistead's Permissive Intervention Has Prejudiced B.P.J. ........................ 10

    III.    Ms. Armistead Did Not Offer Distinct Arguments. ................................. 13

CONCLUSION ...................................................................................................... 16

## TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Carlson v. Bos. Sci. Corp.*,
856 F.3d 320 (4th Cir. 2017) ....................................................................2

*City of Greensboro v. Guilford Cnty. Bd. of Elections*,
No. 15 Civ. 559, 2015 WL 12752936 (M.D.N.C. Oct. 30, 2015) ...........................................10

*Mallory v. Eyrich*,
922 F.2d 1273 (6th Cir. 1991) ....................................................................2

*Mishewal Wappo Tribe of Alexander Valley v. Salazar*,
No. 9 Civ. 2502, 2012 WL 4717814 (N.D. Cal. Sept. 28, 2012)......................................2, 4, 5

*Pers. Adm'r of Mass. v. Feeney*,
442 U.S. 256 (1979).....................................................................14

*Pinney v. Nokia, Inc.*,
402 F.3d 430 (4th Cir. 2005) ....................................................................2

*State v. City of Chicago*,
912 F.3d 979 (7th Cir. 2019) ....................................................................3

*Sutphin v. Ethicon, Inc.*,
No. 14 Civ. 1379, 2020 WL 5269409 (S.D. W.Va. Sept. 3, 2020) .........................................2

**Other Authorities**

Fed. R. Civ. P.
24.....................................................................2
54(b).....................................................................2, 3, 15

## INTRODUCTION

Lainey Armistead intervened in this case on the basis of her status as "a college soccer athlete at West Virginia State University" ("WVSU"), who alleged that H.B. 3293 "directly and personally impairs [her] interest in fair and safe competition and puts her at risk of competing head-to-head with male athletes in competition against other teams and for playing time and positions on her own team." (Dkt. No. 95 (Armistead Mem. ISO Mot. to Intervene) at 1.) Ms. Armistead has now graduated from WVSU and is a rising law school student in Florida with no concrete plans to play on any scholastic women's soccer team, never mind in West Virginia. There is thus no basis for her to remain a defendant in a case challenging H.B. 3293 for preventing a 12-year-old girl, B.P.J., from participating on her middle school girls' cross-country and track teams in West Virginia. Ms. Armistead's graduation from WVSU severs her already tenuous connection to the issues in this litigation.

Ms. Armistead and Defendant State of West Virginia ("State") (collectively, "Defendants") cannot deny that reality, and their opposition to Plaintiff's motion to reconsider Ms. Armistead's intervention likewise fails to substantiate any alleged benefits that Ms. Armistead brings to this case. (Dkt. No. 380 (Armistead Opp.); Dkt. No. 381 (State Opp.).) Ms. Armistead's intervention has indeed "add[ed] [both] too much and too little to this case"[1]—she has saddled this case with voluminous and irrelevant discovery and briefing, without offering a unique perspective or distinct legal arguments, and, indeed, without personally opposing the relief sought by B.P.J.

Defendants claim that Plaintiff has somehow misconstrued Ms. Armistead's intervention as one granted as of right. (Dkt. No. 380 (Armistead Opp.) at 1–3; Dkt. No. 381 (State Opp.) at 5.)

---

[1] (Dkt. No. 380 (Armistead Opp.) at 1; *see also* Dkt. No. 381 (State Opp.) at 1 (similar).)

1

This claim is both wrong and irrelevant. Intervention, whether as of right or permissive, requires that the intervenor have *some* connection to the case. *See Mallory v. Eyrich*, 922 F.2d 1273, 1282 (6th Cir. 1991) (county judges allowed to intervene as of right in voting rights action challenging judicial elections scheme); *Mishewal Wappo Tribe of Alexander Valley v. Salazar*, No. 9 Civ. 2502, 2012 WL 4717814, at *1–2 (N.D. Cal. Sept. 28, 2012) (counties allowed to intervene in case adjudicating rights to land under their control). In the context of permissive intervention, an intervenor's interest must "share[] with the main action a common question of law or fact." Fed. R. Civ. P. 24(b)(1)(B). When a permissive intervenor's "identified interests are not claims that have much of anything in common with the actual issues," rescinding a party's status as intervenor is appropriate. *Mishewal Wappo Tribe*, 2012 WL 4717814, at *6 (counties seeking to protect their interests in land could not maintain their status as intervenors in case no longer involving lands under their control). Having graduated from WVSU and having no non-speculative prospect of being affected by H.B. 3293, Ms. Armistead no longer satisfies the standard for permissive intervention—her asserted interests have nothing in common with the issues in this case. In light of this and other developments discussed more fully below, this Court should reconsider its prior order under Federal Rule of Civil Procedure 54(b) and deny Ms. Armistead intervention.[2]

---

[2] (*See* Dkt. No. 354 (Mem. ISO Mot. to Recon. Intervention) at 2–4 ("[A] court may revise an interlocutory order under the same circumstances in which it may depart from the law of the case: (1) a subsequent trial producing substantially different evidence; (2) a change in applicable law; or (3) clear error causing manifest injustice." *Carlson v. Bos. Sci. Corp.*, 856 F.3d 320, 325 (4th Cir. 2017) (cleaned up); *see also Sutphin v. Ethicon, Inc.*, No. 14 Civ. 1379, 2020 WL 5269409, at *1 (S.D. W.Va. Sept. 3, 2020) (Goodwin, J.) (similar); *Pinney v. Nokia, Inc.*, 402 F.3d 430, 452 (4th Cir. 2005) (noting that "newly discovered (material) evidence" can support reconsideration)).)

Ms. Armistead's opposition brief does not mention the proper standard for reconsideration under Rule 54(b). (Dkt. No. 380 (Armistead Opp.).)

Contrary to Defendants' assertions, (Dkt. No. 380 (Armistead Opp.) at 7; Dkt. No. 381 (State Opp.) at 4), Plaintiff is not relitigating old issues, but instead is promptly responding to new facts: Ms. Armistead's May 2022 graduation from WVSU (confirmed by her recent summary judgment submission), how her specific perspective is nearly absent from and is completely at odds with her briefing, her discovery conduct, and her failure to offer any distinct legal arguments. In other words, Plaintiff brings this matter to the Court's attention now that her "fears [of prejudice] are substantiated." *State v. City of Chicago*, 912 F.3d 979, 988 (7th Cir. 2019).

Unlike Ms. Armistead, several other Defendants who are actively defending this case have a discernable stake in its outcome. Because Ms. Armistead's intervention has been and would continue to be burdensome and redundant, this Court should grant Plaintiff's motion to reconsider the grant of Ms. Armistead's permissive intervention and deny Ms. Armistead intervention.

## ARGUMENT

### I.      Ms. Armistead Has No Connection To This Case.

#### A.      Ms. Armistead Is No Longer A West Virginia Female College Athlete.

Ms. Armistead's permissive intervention was conditioned on her status as a West Virginia female college athlete. In allowing Ms. Armistead to intervene, this Court relied on her contentions that, as a "cisgender girl" who played soccer at WVSU, she "plan[ned] to defend H.B. 3293 as a member of the class of people for whom the law was written." (Dkt. No. 130 (Intervention Order) at 1, 6.) Ms. Armistead claimed that, were H.B. 3293 to be invalidated facially or as applied to B.P.J., Ms. Armistead would risk "injury," "losing her playing spot on her [soccer] team," or "losing an opportunity to meaningfully compete for a championship title." (*Id.* at 1–2.) Ms. Armistead also argued that she would intervene "as a representative of cisgender women athletes who would be subject to the same risks." (*Id.* at 2.)

3

None of that holds true today. Ms. Armistead is no longer "a college soccer athlete at [WVSU]," meaning she does not "currently compete[] in collegiate soccer at a public university." (Dkt. No. 95 (Armistead Mem. ISO Mot. to Intervene) at 1.) She therefore cannot represent the perspective that was the basis for this Court's grant of permissive intervention. Defendants fail to substantiate their position that Ms. Armistead "still provides that different perspective." (Dkt. No. 381 (State Opp.) at 6; *see also* Dkt. No. 380 (Armistead Opp.) at 3–5 (similar).).

Instead of providing specifics, Defendants speculate about Ms. Armistead's plans and mischaracterize her own testimony. For instance, Defendants assert that Ms. Armistead should remain in this case because she has three years of NCAA eligibility that she could theoretically use at some point in the future. The State's opposition brief argues that "she can still use [her NCAA eligibility] *if* her plans change, such as, for example, *if* she returns to [WVSU] for a master's degree, as she testified was a *possibility*." (Dkt. No. 381 (State Opp.) at 6 (emphasis added).) Ms. Armistead's opposition brief states that she "is open to utilizing [her NCAA eligibility] after law school should the right opportunity present itself." (Dkt. No. 380 (Armistead Opp.) at 4 n.2.) But intervention, either when as of right or permissive, needs to be based on a current, existing interest, not "possibility." *See Mishewal Wappo Tribe*, 2012 WL 4717814, at *6 (finding intervention classified either as of right or permissive unsustainable where interests were "either nonexistent, contingent on future events, or tangential to th[e] proceeding"). Ms. Armistead's opposition brief also claims that she "intends to continue playing soccer in some capacity during law school." (Dkt. No. 380 (Armistead Opp.) at 4–5 (citing Dkt. No. 300 (Armistead Supp. App. Ex. 1 (Supp. Armistead Decl.)) at 5 ¶ 7).) But Ms. Armistead's declaration confirms that she has no concrete plans to play on a scholastic team—she says that she "do[es] not currently intend to play soccer on the university's women's soccer team," and says only that she

4

"intend[s] to find a women's soccer club team on which to compete during law school," without making any effort to specify whether that club team would be associated with her law school or a private group. (Dkt. No. 300 (Armistead Supp. App. Ex. 1 (Supp. Armistead Decl.)) at 5 ¶ 7.) Private club soccer teams are outside the scope of H.B. 3293, which only applies to scholastic athletics. And in any event, Ms. Armistead has articulated no future plans to play on any team with any connection to West Virginia. Accordingly, this Court should not credit Defendants' conjectures about Ms. Armistead's future plans.

In short, Ms. Armistead does not have a viable, current interest that can preserve her status as Defendant-Intervenor. *Mishewal Wappo Tribe*, 2012 WL 4717814, at *6.

### B.   Ms. Armistead's Personal Perspective Does Not Accord With The Positions Taken By Her Counsel, And Is Largely Absent From Defendants' Briefing.

Defendants claim that Ms. Armistead's participation in the case is necessary and valuable given her personal experiences as a cisgender female college athlete. (*See, e.g.*, Dkt. No. 380 (Armistead Opp.) at 1, 3–5; Dkt. No. 381 (State Opp.) at 1.) However, as stated in Plaintiff's opening brief, Ms. Armistead did not connect those experiences to this lawsuit in her deposition. (Dkt. No. 354 (Mem. ISO Mot. to Recon. Intervention) at 4–7.) Moreover, Ms. Armistead's personal perspective about H.B. 3293, the participation of transgender girls in school sports, and B.P.J.'s participation specifically (1) does not align with the positions outlined by her counsel in briefing and (2) is largely absent from her briefing, which instead highlights the perspectives of other individuals. (*Id.*) As explained below, Defendants' opposition briefs do not meaningfully contend with the stark differences between Ms. Armistead's deposition testimony and the briefing prepared by her counsel.

To begin, Ms. Armistead has failed to show how her experiences as a cisgender female college athlete help inform any of the issues presented by this case. (Dkt. No. 130 (Intervention Order) at 1–2.) When given the opportunity to share her personal perspective at her deposition, Ms. Armistead consistently said that she did not know what H.B. 3293 does, who it applies to, or how it works[3]; that she has no personal experience playing with or against transgender girls[4]; that she did not know whether B.P.J. posed a safety or fairness risk[5]; and that she did not know how

---

[3] (Dkt. No. 289-22 (Armistead Dep. Tr.) at 80:6-25 ("Q. Under this law, can B.P.J. play on a girls' sports team? . . . . THE WITNESS: I can't make a legal determination. BY [Plaintiff's counsel] MR. BARR: Q. Is it your understanding that this law would prohibit B.P.J. from playing on her school's girls' team? A. I'm not sure. Q. So sitting here today, you don't know one way or the other whether B.P.J. could play on the girls' team based . . . . on this law? . . . . THE WITNESS: I'm not sure because I'm not an attorney."), 86:22-24 ("Q. Tell me what you know about this law. A. I don't know anything because I'm not an attorney."), 90:2-18 ("Q. I understand that's what you believe the goal of the law to be ["protecting fairness and safety for biological women in sports"]. I'm asking how it does that . . . . THE WITNESS: That's not for me to interpret. BY MR. BARR: Q. Well, you're intervening in this lawsuit to protect the law. I'm trying to understand why. What do you think this law is doing? How does it accomplish those goals? . . . . THE WITNESS: I don't know. I think I already answered your question."), 91:3-12 ("Q. If the law is in effect, can B.P.J. play on a girls' team? . . . . THE WITNESS: I don't know. BY MR. BARR: Q. If the law is in effect, can a transgender woman play on a girls' team? . . . . THE WITNESS: I don't know.").)

[4] (Dkt. No. 289-22 (Armistead Dep. Tr.) at 95:4-6 ("Q. Have you ever competed in a soccer game with or against someone who is transgender? A. I'm not sure. I don't know."), 107:14-24 ("Q . . . . Did I hear you say earlier that you're not aware of having been on a team with a transgender girl? A. I'm not aware of that, no. Q. Have you ever been injured by a transgender girl? A. Not to my knowledge. Q. Have you ever been harmed by a transgender girl? . . . . THE WITNESS: Not to my knowledge."), 114:11-22 ("Q. Do you have any understanding whether a transgender woman can play on Frostburg or Notre Dame's team? . . . . THE WITNESS: I don't know . . . . Q. If you found out that a transgender woman was on Notre Dame or Frostburg's team, what would you do? . . . . THE WITNESS: I would play a soccer game.").)

[5] (Dkt. No. 354 (Mem. ISO Mot. to Recon. Intervention) at 7 (citing Dkt. No. 289-22 (Armistead Dep. Tr.) at 139:25–140:4 ("Q . . . . What is the safety concern for middle school cross-country and B.P.J. participating on the girls' team? . . . .THE WITNESS: I don't know."), 143:14–144:11 ("Q. Ms. Armistead, can you point to any specific fairness issue you're concerned about as it relates to B.P.J. running on the girls' cross-country team at her middle school? . . . . THE

she felt about the ultimate question in this case—whether B.P.J. should be allowed to run on the girls' team.[6] Faced with this stark disconnect between this lawsuit and Ms. Armistead's personal views, the State rehashes the argument that, because Ms. Armistead is a cisgender girl, that alone justifies her continued intervention. (Dkt. No. 381 (State Opp.) at 3, 6.) But that alone was not the basis for Ms. Armistead's intervention in the first place and it does not justify it now.

Plaintiff is not, as Ms. Armistead's opposition claims, arguing that Ms. Armistead must be able to articulate nuanced legal arguments about H.B. 3293 in order to intervene. (Dkt. No. 380 (Armistead Opp.) at 6–7.) Plaintiff's point is that Ms. Armistead's request for intervention was premised on her claim to have a distinct perspective on H.B. 3293,[7] including the claimed impact

---

WITNESS: I am not certain for specifics on her—on B.P.J., but I do know that this law promotes fairness and equality for all women, including those who run cross-country at age 11 and college athletes in a contact sport, such as myself. BY [Plaintiff's counsel] MR. BARR: Q. Okay. Just to make sure that I've understood you, you—do not have a specific fairness issue to point to based on my last question. Did I understand that correctly? . . . . THE WITNESS: That's not what I said. I just said overall it's—it wouldn't be fair for all women. BY MR. BARR: Q. But specifics, there's no specific thing you can point to for B.P.J., right? A. I don't know.")).)

[6] (Dkt. No. 354 (Mem. ISO Mot. to Recon. Intervention) at 7 (citing Dkt. No. 289-22 (Armistead Dep. Tr.) at 170:18-22 ("Q. Okay. So sitting here today, everything we've talked about, do you object to B.P.J. playing on the Bridgeport Middle School girls' cross-country team? . . . . THE WITNESS: I don't know.")).)

[7] (*See, e.g.*, Dkt. No. 95 (Armistead Mem. ISO Mot. to Intervene) at 8 ("And as a female athlete who competes on a women's athletic team at a public university that is a member of the NCAA, Armistead and women like her are [H.B. 3293]'s primary beneficiaries . . . . She wishes to maintain female-only competition and a competitive environment shielded from physiologically advantaged male participants who could compromise both the fairness and safety of her sport."); *id.* at 13 ("Armistead . . . seeks the broadest possible interpretation of [H.B. 3293]. She has a personal, competitive interest in putting forth the best possible arguments, to ensure the broadest interpretation and application of [H.B. 3293] so that it protects not only her but future female athletes in West Virginia."); Dkt. No. 95-1 (Armistead Decl. ISO Mot. to Intervene) ¶¶ 35–36 ("I enthusiastically supported [H.B. 3293]" and "never thought this issue could personally impact my competition till I learned a lawsuit had been filed against [H.B. 3293].").)

that transgender girls playing school sports has on cisgender girls.[8] Her actual perspective is therefore critical. And as she stated in her deposition, she does not know who H.B. 3293 applies to, what it does, and whether B.P.J.—the plaintiff in the case in which Ms. Armistead intervened— should be allowed to play. Notably, Ms. Armistead's perspective as expressed in her sworn testimony is completely at odds with the strong positions taken in the briefing prepared by her counsel, including that B.P.J. should not be allowed to play as the girl she is. (*See* Dkt. No. 354 (Mem. ISO Mot. to Recon. Intervention) at 6; *compare, e.g.*, Dkt. No. 289-22 (Armistead Dep. Tr.) at 170:18-22 (Ms. Armistead stating she did not know whether she "object[ed] to B.P.J. playing on the Bridgeport Middle School girls' cross-country team) *with* Dkt. No. 288 (Int. MSJ) at 15–18 (arguing against B.P.J.'s participation in girls' sports).)

Perhaps because Ms. Armistead's sworn testimony does not support the positions being taken by her counsel in this case, Ms. Armistead's summary judgment briefing barely refers to her perspective, and instead focuses on the claimed perspectives of *other* individuals who are not intervenors in this lawsuit. For example, Ms. Armistead's motion for summary judgment relied on irrelevant and untimely declarations from ten individuals,[9] none of whom are West Virginia female

---

[8] (*Compare* Dkt. No. 95-1 (Armistead Decl. ISO Mot. to Intervene) ¶¶ 33–48 (describing the alleged impact of allowing transgender girls to play sports with cisgender girls) *with* Dkt. No. 289-22 (Armistead Dep. Tr.) at 79:2–80:5 ("Q. What is your understanding of the impact of H.B. 3293? A. My understanding is that it will keep biological women competing with biological women in sports. Q. Where did you get that understanding? . . . . THE WITNESS: Through conversations with my attorney. BY [Plaintiff's counsel] MR. BARR: Q. Other than in discussions with your attorney, do you have any other reason to think that's what H.B. 3293 does? A. I had heard that that's what they did too. Q. Who did you hear that from? A. I don't remember exactly. Q. Do you remember when you had that conversation? . . . . THE WITNESS: I don't know how to answer that question without giving privileged information . . . . Q. Let me ask it a different way. Is your entire understanding of the impact of H.B. 3293 based on discussions with your attorney? A. Yes.").)

[9] (*See* Dkt. No. 286-1 (Int. MSJ App.) at 13–83.)

8

college athletes or have any connection to this case, for arguments about "displacement" and safety.[10] (*See* Dkt. No. 354 (Mem. ISO Mot. to Recon. Intervention) at 10.) By contrast, Ms. Armistead's motion for summary judgment and her response to Plaintiff's motion for summary judgment barely cited Ms. Armistead's testimony, with the exception of her statements about her experiences playing against cisgender males in pick-up soccer games.[11] Permissive intervention is not properly used as a vehicle to funnel non-parties' perspectives into a case. (Dkt. No. 354 (Mem. ISO Mot. to Recon. Intervention) at 6.)

In short, Defendants do not and cannot show that the actual *Ms. Armistead*—as opposed to an imagined stereotypical cisgender female athlete opposed to the participation of transgender girls in girls' sports—brings a "unique perspective" or "valuable . . . contributions" to this case. (*See, e.g.*, Dkt. No. 380 (Armistead Opp.) at 1, 10; Dkt. No. 381 (State Opp.) at 1, 10.) Rather,

---

[10] (*See, e.g.*, Dkt. No. 288 (Int. MSJ) at 1–4 ("Chelsea Mitchell lost [to transgender women athletes] on three different occasions. Alana lost to them on three different occasions. And Selina Soule lost to them on at least four occasions. For Selina, the experience was 'demoralizing.' Alanna 'felt defeated before she even got set in her blocks.' And when Chelsea's mother complained, school and state officials repeatedly told her that 'girls have the right to participate, not to win.' . . . . Female players were 'nervous and intimidated,' and 'would often duck and cover' or assume a defensive position . . . because they were 'afraid of getting hurt.' . . . . For these women athletes, the experience was 'deflating,' 'discouraging,' 'frustrating,' and left them feeling 'defeated.'") (cleaned up); Dkt. No. 302 (Int. MSJ Opp.) at 13 (stating that three women lost races when competing against transgender women athletes), 20 ("Cynthia Monteleone witnessed female athletes who were scared to play defense against a male in volleyball because of how hard he spiked the ball."), 23 ("And for female athletes who have competed and lost to [transgender women], the experience was devastating.").)

[11] (*See, e.g.*, Dkt. No. 288 (Int. MSJ) at 6 (stating that Ms. Armistead "has witnessed that men 'compete at a faster pace,' 'kick the ball harder,' and 'have physical frames that are generally larger[,]'" which made her concerned about risk of injury); Dkt. No. 302 (Int. MSJ Opp.) at 6 (stating that Ms. Armistead "is a 22-year old student athlete at [WVSU]"), 20 ("Armistead has also presented the court with anecdotal evidence that women and girls have legitimate safety concerns about competing against males . . . . And Armistead knows from experience that she is more likely to be hurt playing against males than females in a no-holds-barred game of soccer.").)

Defendants fail to engage with Ms. Armistead's actual testimony, which indicates that she does not share her counsel's perspective about B.P.J. and has no other useful information to provide. Additionally, and contrary to the State's assertions,[12] the standard for allowing intervention is not whether *another party* (here, the State) will find an intervenor's presence helpful, but whether the intervenor will "contribute to full development of the underlying factual issues in the suit and to the just and equitable adjudication of the legal questions presented." (Dkt. No. 130 (Intervention Order) at 5 (citation omitted).) Ms. Armistead has failed to provide that promised benefit, and Defendants cite no examples of any such benefit. As such, her status as Defendant-Intervenor should be revoked. *City of Greensboro v. Guilford Cnty. Bd. of Elections*, No. 15 Civ. 559, 2015 WL 12752936, at *1 n.1 (M.D.N.C. Oct. 30, 2015).

## II.      Ms. Armistead's Permissive Intervention Has Prejudiced B.P.J.

Ms. Armistead's approach to discovery in this case substantially and unjustifiably increased the burdens of litigating this matter. Among other burdens were those created by Ms. Armistead's: (1) voluminous, irrelevant hypotheticals in Ms. Armistead's eighty-two requests for admission; (2) haphazard interrogatories asking about the same irrelevant hypotheticals; and (3) support of multiple expert witnesses lacking qualifications and/or holding irrelevant opinions that do not advance the resolution of this case. (Dkt. No. 354 (Mem. ISO Mot. to Recon. Intervention) at 9.) Defendants argue that Plaintiff should have sought relief in the discovery process for these complaints, but there is no authority (and Defendants provide none) for their contention that

---

[12] The State offers the unadorned claim that it "has found that Ms. Armistead's informed perspective and insights throughout the case, contributions in discovery, and legal briefing have been beneficial to a full and fair exploration of the issues presented." (Dkt. No. 381 (State Opp.) at 4.) The State does not provide examples to substantiate any of these claims. If the State finds Ms. Armistead's perspective valuable, it can call her as a witness at trial. Ms. Armistead also could have—and still can—submit an amicus brief.

seeking a protective order against abusive discovery is a prerequisite for seeking to reconsider an order granting intervention.[13] (Dkt. No. 380 (Armistead Opp.) at 8 n.5; Dkt. No. 381 (State Opp.) at 7.)

Ms. Armistead also delayed providing information to Plaintiff regarding potential witnesses, belatedly disclosing thirty-seven additional potential witnesses in the midst of a full deposition calendar, thereby stripping Plaintiff of her ability to meaningfully depose or examine any of them. (Dkt. No. 354 (Mem. ISO Mot. to Recon. Intervention) at 10.) Given the timing and volume of the disclosure, there was no practical way for Plaintiff to "subpoena[] those individuals, call[] them, or otherwise contact[] them." (Dkt. No. 381 (State Opp.) at 8.) In addition, Plaintiff had no ability to narrow down the list of individuals because Ms. Armistead refused to provide any information regarding their role in the case, (Dkt. No. 354 (Mem. ISO Mot. to Recon. Intervention) at 10), and said she did not know these individuals when asked about them at her deposition.[14]

---

[13] The State wrongly claims that Plaintiff's motion for reconsideration is singularly focused on "dismissal for discovery abuses" or removing Ms. Armistead "for supplementing [her] initial disclosures." (Dkt. No. 381 (State Opp.) at 7–8.) This characterization misconstrues Plaintiff's motion, which seeks Ms. Armistead's removal as Defendant-Intervenor based on evidence that confirms her lack of connection to the issues in the case, her role in contributing to burdens in discovery and motion practice, and her failure to offer non-duplicative arguments from those made by the other named Defendants.

[14] Ms. Armistead does not know the ten individuals whose declarations her counsel used to support Ms. Armistead's motion for summary judgment. (*See* Dkt. No. 286-1 (Int. MSJ App.) at 13–83 (declarations from ten individuals that were not timely disclosed); Dkt. No. 332-2 (Armistead First Supp. Disclosures) at 4–8 (listing those ten individuals); Dkt. No. 289-22 (Armistead Dep. Tr.) at 164:9–165:21 ("Q. Do you know who Selina Soule is? A. No. Q. Do you know who Chelsea Mitchell is? A. No. Q. Do you know who Christina Mitchell is? A. No. Q. Do you know who Alanna Smith is? A. No. Q. Do you know who L[i]n[nne]a[] S[a]ltz is? A. No . . . . Q. Do you know who Cynthia Monteleone is? A. No. Q. Do you know who Madison Kenyon is? A. No. Q. Do you know who Mary Kate Marshall is? A. No. Q. Do you know who Darcy As[c]hoff is? A.

Ms. Armistead also has not been adequately forthcoming about her graduation plans. Plaintiff learned that Ms. Armistead had graduated from WVSU and decided to attend law school in Florida through a declaration attached to Ms. Armistead's opposition to Plaintiff's motion for summary judgment. (Dkt. No. 300 (Armistead Supp. App. Ex. 1 (Supp. Armistead Decl.)) at 5 ¶ 7.) Ms. Armistead claims that this development was "unexpected." (Dkt. No. 380 (Armistead Opp.) at 4, 4–5 n.3.) The reality is that, even though Ms. Armistead was not forthcoming about her graduation plans during her deposition,[15] she was sure enough about her plans at the time to have submitted an application to graduate and to have applied to out-of-state law schools. Thereafter, she did not contemporaneously inform Plaintiff and the Court when her plans gelled, but instead introduced them in a summary judgment *opposition* brief. (Dkt. No. 354 (Mem. ISO Mot. to Recon. Intervention) at 5.)[16]

_____

No . . . . Q. Do you know who Haley Tan[ne] is? A. No . . . . Q. Have you spoken with any of the people I just named? A. No, I don't think so. No.").)

Ms. Armistead also does not know other witnesses that were not timely disclosed. (*See* Dkt. No. 332-2 (Armistead First Supp. Disclosures) at 6–7 (listing Margaret O'Neal and "female athletes on the University of Pennsylvania women's swimming and diving team" as potential witnesses); Dkt. No. 289-22 (Armistead Dep. Tr.) at 164:19-20 ("Q. Do you know who Margaret O'Ne[a]l is? A. No."), 165:4-6 ("Q. Do you know anyone on the University of Pennsylvania's women's swimming or diving team? A. I do not.").)

[15] (Dkt. No. 354 (Mem. ISO Mot. to Recon. Intervention) at 5 n.2.)

[16] The State argues that Plaintiff "should have known at the time of Ms. Armistead's intervention request that she would likely graduate prior to the conclusion of this litigation," (Dkt. No. 381 (State Opp.) at 8), but Plaintiff could not have known—and did not know until Ms. Armistead finally answered the deposition questions fully—that she had plans to graduate early. And in any event, the point is that whatever was true at the time Ms. Armistead moved to intervene is not true now, and that material change in fact provides the basis for reconsideration under Rule 54(b).

Because Ms. Armistead's continued intervention would only exacerbate the prejudice Plaintiff has already suffered, this Court should reconsider its intervention order and deny her intervention.

### III.    Ms. Armistead Did Not Offer Distinct Arguments.

Another unmet premise of Ms. Armistead's intervention is that she would "advance litigation arguments different from and contrary to the [named] Defendants' arguments." (Dkt. No. 95 (Armistead Mem. ISO Mot. to Intervene) at 14.) But neither the State nor Ms. Armistead is able to identify any legal arguments made by Ms. Armistead that "differ from those of the current defendants." (Dkt. No. 130 (Intervention Order) at 6.) In fact, the State essentially concedes that Ms. Armistead has not offered any distinct legal arguments, stating that "Ms. Armistead has argued the common questions of law" and noting that "[a]n intervenor need not have new, novel or contrary arguments to another party to be a valuable contributor to the case." (Dkt. No. 381 (State Opp.) at 9.)

Ms. Armistead does not deny that, of the five legal arguments she focused on in her intervention papers, both she and the State pressed some of the same arguments, and she failed to advance others. (Dkt. No. 354 (Mem. ISO Mot. to Recon. Intervention) at 11–12.) Instead, she strains to identify distinctions between her arguments and those made by the other Defendants where none exist.

To start, Ms. Armistead claims that she was the "only Defendant to argue that—regardless of B.P.J.'s physiology, gender identity, or medical history—the Sports Act can constitutionally be applied to B.P.J. because the Act provides more than a 'reasonable fit' with the State's significant interests." (Dkt. No. 380 (Armistead Opp.) at 10.) This assertion is inaccurate. The State makes

13

the same argument in its opening brief for summary judgment, in its opposition to B.P.J.'s motion

for summary judgment, and in its response to B.P.J.'s Statement of Undisputed Material Facts.[17]

Ms. Armistead also asserts that her citation to *Personnel Administrator of Massachusetts*

*v. Feeney*, 442 U.S. 256 (1979), constitutes a unique legal argument. (Dkt. No. 380 (Armistead

Opp.) at 10.) But the State offers the same *Feeney* analysis as Ms. Armistead. Ms. Armistead relies

on *Feeney* to argue that H.B. 3293 does not facially discriminate based on gender identity and was

not motivated by an invidious discriminatory purpose. (*See* Dkt. No. 288 (Int. MSJ) at 21.) The

State makes the same arguments throughout its briefing: it contends that H.B. 3293's text facially

"ignores gender identity" and attempts to discredit Plaintiff's evidence that H.B. 3293 was enacted

to target girls and women who are transgender.[18]

The other examples of claimed unique legal arguments mounted by Ms. Armistead are

similarly unavailing: all involve arguments that the State and/or the County Board Defendants

have made throughout their briefing. Both Ms. Armistead and the County Board Defendants, for

example, erroneously apply a rational basis-like review in analyzing H.B. 3293.[19] And both the

---

[17] (*See* Dkt. No. 287 (State MSJ) at 17 (arguing that B.P.J.'s as-applied challenge fails because intermediate scrutiny requires a "fit" that is "reasonable, *not perfect*"); Dkt. No. 305 (State MSJ Opp.) at 22 (same); Dkt. No. 330 (State Resp. Pl's SUF) at 3–4 (stating that "[a]s set forth in the State's Memo. in Op., the permissibility of the Save Women's Sports Act does not turn on Plaintiff's individual characteristics, as that is not how intermediate scrutiny works").)

[18] (*See* Dkt. No. 337 (State Reply) at 8 (arguing that H.B. 3293 "does not categorically address transgender females or any gender identity in any way; it ignores gender identity and speaks in terms of 'sex'"); Dkt. No. 330 (State Resp. Pl's SUF) at 6 (claiming that H.B. 3293 "is not a ban and it does not contain the word 'transgender'"); Dkt. No. 305 (State MSJ Opp.) at 18 (arguing that H.B. 3293 was not enacted "based on 'fear and disapproval of transgender women'").)

[19] (*Compare* Dkt. No. 288 (Int. MSJ) at 15 (arguing that intermediate scrutiny requires examining "characteristics typical of the affected classes rather than by focusing on selected, atypical examples") *with* Dkt. No. 301 (County MSJ Opp.) at 25 n.10 (arguing that intermediate scrutiny

State and Ms. Armistead make the same false claims regarding H.B. 3293's definition of "biological sex"[20]; the same arguments concerning the lack of any evidence of a problem of girls who are transgender participating in sports in West Virginia[21]; the same hearsay allegations regarding cisgender athletes' opposition to the participation of transgender athletes[22]; the same erroneous arguments regarding H.B. 3293's effect on the status quo in West Virginia, which previously did not categorically prohibit girls who are transgender from playing on girls' sports teams[23]; and the same erroneous, irrelevant claims that B.P.J. is seeking to allow "every male who identifies as female" to compete on women's teams.[24] Finally, Ms. Armistead, the State, and the

---

is satisfied where court considered class's characteristics "*on the average*"); *see also* Dkt. No. 336 (County Reply) at 21 (same).)

[20] (*Compare* Dkt. No. 302 (Int. MSJ Opp.) at 8 (arguing that "biological sex" is "valid and scientific") *with* Dkt. No. 305 (State MSJ Opp.) at 6 (arguing that "Biological sex is a clear, scientifically valid, and well-defined category").)

[21] (*Compare* Dkt. No. 288 (Int. MSJ) at 4 (claiming that West Virginia can "rely on the experiences of other jurisdictions") *with* Dkt. No. 337 (State Reply) at 7 (claiming that West Virginia is entitled to rely on experiences "within not only the State but elsewhere") (citing Dkt. No. 305 (State MSJ Opp.)).)

[22] (*Compare* Dkt. No. 302 (Int. MSJ Opp.) at 21 *with* Dkt. No. 287 (State MSJ) at 7–8.)

[23] (*Compare* Dkt. No. 302 (Int. MSJ Opp.) at 9-10 (arguing that H.B. 3293 did not work any meaningful change regarding the participation of transgender girls in school sports) *with* Dkt. No. 330 (State Resp. Pl's SUF) at 5 (claiming that "members of the male sex have long been prohibited from playing on women's sports teams in West Virginia").)

[24] (*Compare* Dkt. No. 302 (Int. MSJ Opp.) at 24 *with* Dkt. No. 305 (State MSJ Opp.) at 26 (claiming that B.P.J. is seeking "to also allow any biological male on any girls' team").)

County Board Defendants all make the same arguments regarding H.B. 3293's alleged safety interest.[25]

In summary, Ms. Armistead's claim that her participation in this litigation required B.P.J. to brief points "uniquely raised by Ms. Armistead" (Dkt. No. 380 (Armistead Opp.) at 10) is wrong.[26]

## CONCLUSION

For the reasons above, Plaintiff's motion to reconsider the grant of Lainey Armistead's permissive intervention should be granted and Ms. Armistead's intervention request should be denied.

---

[25] (*See* Dkt. No. 302 (Int. MSJ Opp.) at 20) (claiming that "the Act promotes safety on its face"); Dkt. No. 305 (State MSJ Opp.) at 16–17 (claiming that H.B. 3293's governmental interests "are apparent from the preamble and text of the law"); Dkt. No. 301 (County MSJ Opp.) at 22–23 (arguing that safety interest is apparent from H.B. 3293's text).)

[26] (*See* Dkt. No. 357 (Pl's Reply) at 16 ("Finally, Defendant-Intervenor *and the State* ignore that multiple legislators and their staff were candid and unambiguous that the law's focus is on transgender students.") (emphasis added); *id.* ("Defendant-Intervenor *and the State* endeavor to sanitize this legislative history.") (emphasis added); *id.* at 17 ("Defendant-Intervenor asserts that, '[a]t most, some legislators said they wanted to preserve women's sports for biological women and exclude males who identify as female from girls' sports.' . . . *The State likewise* claims that 'nothing in the history of H.B. 3293' indicates that legislators suggested girls who are transgender 'are to be treated with anything other than respect and courtesy.') (emphasis added).)

Dated: June 16, 2022

Joshua Block*
AMERICAN CIVIL LIBERTIES UNION
FOUNDATION
125 Broad St.
New York, NY 10004
Phone: (212) 549-2569
jblock@aclu.org

Avatara Smith-Carrington*
LAMBDA LEGAL
3500 Oak Lawn Avenue, Suite 500
Dallas, TX 75219
Phone: (214) 219-8585
asmithcarrington@lambdalegal.org

Carl Charles*
Tara Borelli*
LAMBDA LEGAL
158 West Ponce De Leon Ave., Ste. 105
Decatur, GA 30030
Phone: (404) 897-1880
ccharles@lambdalegal.org

Sruti Swaminathan*
LAMBDA LEGAL
120 Wall Street, 19th Floor
New York, NY 10005
Phone: (212) 809-8585
sswaminathan@lambdalegal.org

Andrew Barr*
COOLEY LLP
1144 15th St. Suite 2300
Denver, CO 80202
Phone: (720) 566-4000
abarr@cooley.com

Respectfully submitted,
/s/ *Loree Stark*

Loree Stark (Bar No. 12936)
Nick Ward (Bar No. 13703)
AMERICAN CIVIL LIBERTIES UNION OF WEST
VIRGINIA FOUNDATION
P.O. Box 3952
Charleston, WV 25339
Phone: (914) 393-4614
lstark@acluwv.org

Kathleen Hartnett*
Julie Veroff*
Zoë Helstrom*
COOLEY LLP
3 Embarcadero Center, 20th Floor
San Francisco, CA 94111
Phone: (415) 693-2000
khartnett@cooley.com

Katelyn Kang*
Valeria M. Pelet del Toro*
COOLEY LLP
55 Hudson Yards
New York, NY 10001
Phone: (212) 479-6000
kkang@cooley.com

Elizabeth Reinhardt*
COOLEY LLP
500 Boylston Street, 14th Floor
Boston, MA 02116
Phone: (617) 937-2305
ereinhardt@cooley.com

*Visiting Attorneys*

*Attorneys for Plaintiff*

17

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA
CHARLESTON DIVISION

| | |
|---|---|
| B.P.J. by her next friend and mother, HEATHER JACKSON, <br><br> *Plaintiff*, <br><br> v. <br><br> WEST VIRGINIA STATE BOARD OF EDUCATION, HARRISON COUNTY BOARD OF EDUCATION, WEST VIRGINIA SECONDARY SCHOOL ACTIVITIES COMMISSION, W. CLAYTON BURCH in his official capacity as State Superintendent, DORA STUTLER in her official capacity as Harrison County Superintendent, and THE STATE OF WEST VIRGINIA, <br><br> *Defendants*, <br><br> and <br><br> LAINEY ARMISTEAD, <br><br> *Defendant-Intervenor*. | Civil Action No. 2:21-cv-00316 <br><br> Hon. Joseph R. Goodwin |

### CERTIFICATE OF SERVICE

I, Loree Stark, do hereby certify that on this 16th day of June, 2022, I electronically filed a true and exact copy of ***Plaintiff's Consolidated Reply Memorandum of Law in Support of Motion to Reconsider the Grant of Lainey Armistead's Permissive Intervention*** with the Clerk of Court and all parties using the CM/ECF System.


*/s/ Loree Stark*
Loree Stark
West Virginia Bar No. 12936

18