**PUBLISHED**

UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

―――――――――――

**No. 23-1078**

―――――――――――

B.P.J., by her next friend and mother; HEATHER JACKSON,

        Plaintiffs – Appellants,

v.

WEST VIRGINIA STATE BOARD OF EDUCATION; HARRISON COUNTY BOARD OF EDUCATION; WEST VIRGINIA SECONDARY SCHOOL ACTIVITIES COMMISSION; W. CLAYTON BURCH, in his official capacity as State Superintendent; DORA STUTLER, in her official capacity as Harrison County Superintendent,

        Defendants – Appellees,

and

THE STATE OF WEST VIRGINIA; LAINEY ARMISTEAD,

        Intervenors – Appellees.

--------------------------------

TREVOR PROJECT; TRANSGENDER WOMEN ATHLETES; UNITED STATES OF AMERICA; NATIONAL WOMEN'S LAW CENTER AND 51 ADDITIONAL ORGANIZATIONS; STATE OF NEW YORK; AMERICAN ACADEMY OF PEDIATRICS; AMERICAN MEDICAL ASSOCIATION; FOUR ADDITIONAL HEALTH CARE ORGANIZATIONS; ATHLETE ALLY; CURRENT AND FORMER PROFESSIONAL, OLYMPIC AND INTERNATIONAL ATHLETES IN WOMENS SPORTS; NATIONAL WOMEN'S SOCCER LEAGUE PLAYERS ASSOCIATION; WOMEN'S SPORTS FOUNDATION; DISTRICT OF COLUMBIA; STATE OF HAWAII; STATE OF CALIFORNIA; STATE OF COLORADO; STATE OF CONNECTICUT; STATE OF DELAWARE; STATE OF ILLINOIS; STATE OF MAINE; STATE OF MARYLAND; STATE OF MASSACHUSETTS; STATE OF MICHIGAN; STATE OF MINNESOTA; STATE OF NEW JERSEY; STATE OF OREGON; STATE OF RHODE ISLAND; STATE OF VERMONT; STATE OF WASHINGTON,

Amici Supporting Appellants,

and

THOMAS MORE SOCIETY; NATIONAL ASSOCIATION OF EVANGELICALS; CONCERNED WOMEN FOR AMERICA; INSTITUTE FOR FAITH AND FAMILY; SAMARITAN'S PURSE; WOMEN'S DECLARATION INTERNATIONAL USA; 25 ATHLETIC OFFICIALS AND COACHES OF FEMALE ATHLETES; FEMALE OLYMPIC ROWERS MARY I. O'CONNOR, CAROL BROWN, PATRICIA SPRATLEN ETEM, VALERIE MCCLAIN, AND JAN PALCHIKOFF; 22 BUSINESS EXECUTIVES; INTERNATIONAL CONSORTIUM ON FEMALE SPORT; INDEPENDENT COUNCIL ON WOMEN'S SPORT; DEFENSE OF FREEDOM INSTITUTE; 78 FEMALE ATHLETES, COACHES, SPORTS OFFICIALS, AND PARENTS OF FEMALE ATHLETES; PUBLIC ADVOCATE OF THE UNITED STATES; AMERICA'S FUTURE; U.S. CONSTITUTIONAL RIGHTS LEGAL DEFENSE FUND; ONE NATION UNDER GOD FOUNDATION; FITZGERALD GRIFFIN FOUNDATION; CONSERVATIVE LEGAL DEFENSE AND EDUCATION FUND; INDEPENDENT WOMEN'S LAW CENTER; PARENTS DEFENDING EDUCATION; ALABAMA, ARKANSAS, AND 15 OTHER STATES,

Amici Supporting Appellees.

———————————

**No. 23-1130**

———————————

B.P.J., by her next friend and mother; HEATHER JACKSON,

Plaintiffs – Appellees,

v.

WEST VIRGINIA SECONDARY SCHOOL ACTIVITIES COMMISSION,

Defendant – Appellant,

and

WEST VIRGINIA STATE BOARD OF EDUCATION; HARRISON COUNTY BOARD OF EDUCATION; W. CLAYTON BURCH, in his official capacity as State Superintendent; DORA STUTLER, in her official capacity as Harrison County

2

Superintendent,

        Defendants,

and

THE STATE OF WEST VIRGINIA; LAINEY ARMISTEAD,

        Intervenors.

------------------------------

THOMAS MORE SOCIETY; NATIONAL ASSOCIATION OF EVANGELICALS; CONCERNED WOMEN FOR AMERICA; INSTITUTE FOR FAITH AND FAMILY; SAMARITAN'S PURSE; WOMEN'S DECLARATION INTERNATIONAL USA; 25 ATHLETIC OFFICIALS AND COACHES OF FEMALE ATHLETES; FEMALE OLYMPIC ROWERS MARY I. O'CONNOR, CAROL BROWN, PATRICIA SPRATLEN ETEM, VALERIE MCCLAIN, AND JAN PALCHIKOFF; 22 BUSINESS EXECUTIVES; INTERNATIONAL CONSORTIUM ON FEMALE SPORT; INDEPENDENT COUNCIL ON WOMEN'S SPORT; DEFENSE OF FREEDOM INSTITUTE; 78 FEMALE ATHLETES, COACHES, SPORTS OFFICIALS, AND PARENTS OF FEMALE ATHLETES; PUBLIC ADVOCATE OF THE UNITED STATES; AMERICA'S FUTURE; U.S. CONSTITUTIONAL RIGHTS LEGAL DEFENSE FUND; ONE NATION UNDER GOD FOUNDATION; FITZGERALD GRIFFIN FOUNDATION; CONSERVATIVE LEGAL DEFENSE AND EDUCATION FUND; INDEPENDENT WOMEN'S LAW CENTER; PARENTS DEFENDING EDUCATION; ALABAMA, ARKANSAS, AND 15 OTHER STATES,

        Amici Supporting Appellants,

and

TREVOR PROJECT; TRANSGENDER WOMEN ATHLETES; UNITED STATES OF AMERICA; NATIONAL WOMEN'S LAW CENTER AND 51 ADDITIONAL ORGANIZATIONS; STATE OF NEW YORK; AMERICAN ACADEMY OF PEDIATRICS; AMERICAN MEDICAL ASSOCIATION; FOUR ADDITIONAL HEALTH CARE ORGANIZATIONS; ATHLETE ALLY; CURRENT AND FORMER PROFESSIONAL, OLYMPIC AND INTERNATIONAL ATHLETES IN WOMENS SPORTS; NATIONAL WOMEN'S SOCCER LEAGUE PLAYERS ASSOCIATION; WOMEN'S SPORTS FOUNDATION; DISTRICT OF COLUMBIA; STATE OF HAWAII; STATE OF CALIFORNIA; STATE OF COLORADO; STATE OF CONNECTICUT; STATE OF DELAWARE; STATE OF ILLINOIS; STATE OF MAINE; STATE OF MARYLAND; STATE OF MASSACHUSETTS; STATE OF

MICHIGAN; STATE OF MINNESOTA; STATE OF NEW JERSEY; STATE OF OREGON; STATE OF RHODE ISLAND; STATE OF VERMONT; STATE OF WASHINGTON,

        Amici Supporting Appellees.

————————

Appeals from the United States District Court for the Southern District of West Virginia, at Charleston. Joseph R. Goodwin, District Judge. (2:21-cv-00316)

————————

Argued: October 27, 2023                      Decided: April 16, 2024

————————

Before AGEE, HARRIS, and HEYTENS, Circuit Judges.

————————

No. 23-1130 dismissed. No. 23-1078 vacated in part, reversed in part, and remanded with instructions by published opinion. Judge Heytens wrote the opinion, which Judge Harris joined and Judge Agee joined as to Parts II and III. Judge Agee wrote an opinion concurring in part and dissenting in part.

————————

**ARGUED:** Joshua A. Block, AMERICAN CIVIL LIBERTIES UNION, New York, New York, for Appellants/Cross-Appellees. Lindsay Sara See, OFFICE OF THE ATTORNEY GENERAL OF WEST VIRGINIA, Charleston, West Virginia; Roberta Frances Green, SHUMAN, MCCUSKEY & SLICER, PLLC, Charleston, West Virginia, for Appellees/Cross-Appellants. **ON BRIEF:** Sruti Swaminathan, New York, New York, Tara Borelli, Carl Charles, LAMBDA LEGAL, Decatur, Georgia; Aubrey Sparks, Nick Ward, AMERICAN CIVIL LIBERTIES UNION OF WEST VIRGINIA FOUNDATION, Charleston, West Virginia; Kathleen Hartnett, Julie Veroff, Zoë Helstrom, San Francisco, California, Andrew Barr, Denver, Colorado, Katelyn Kang, New York, New York, Elizabeth Reinhardt, Boston, Massachusetts, Mariah A. Young, COOLEY LLP, Chicago, Illinois, for Appellant/Cross-Appellee. John J. Bursch, Christiana M. Kiefer, Washington, D.C., Johannes S. Widmalm-Delphonse, Landsdowne, Virginia, Jonathan A. Scruggs, Jacob P. Warner, ALLIANCE DEFENDING FREEDOM, Scottsdale, Arizona, for Intervenor-Appellee Lainey Armistead. Patrick Morrisey, Attorney General, Michael R. Williams, Senior Deputy Solicitor General, Curtis R.A. Capehart, Deputy Attorney General, Grant A. Newman, Assistant Solicitor General, Spencer J. Davenport, Special Assistant, OFFICE OF THE ATTORNEY GENERAL OF WEST VIRGINIA, Charleston, West Virginia, for Intervenor-Appellee State of West Virginia. Roberta F. Green, Kimberly M. Bandy, Shannon M. Rogers, SHUMAN MCCUSKEY SLICER, Charleston, West

Virginia, for Appellee/Cross-Appellant West Virginia Secondary School Activities Commission. Susan L. Deniker, STEPTOE & JOHNSON PLLC, Bridgeport, West Virginia, for Appellees Harrison County Board of Education and Dora Stutler. Kelly C. Morgan, Michael W. Taylor, Kristen V. Hammond, BAILEY & WYANT, PLLC, Charleston, West Virginia, for Appellees West Virginia State Board of Education and W. Clayton Burch, State Superintendent. Shireen A. Barday, Mark C. Davies, PALLAS PARTNERS (US) LLP, New York, New York; Abbey Hudson, Los Angeles, California, Emily Maxim Lamm, Maxwell A. Baldi, GIBSON, DUNN & CRUTCHER LLP, Washington, D.C., for Amicus The Trevor Project. David Brown, TRANSGENDER LEGAL DEFENSE & EDUCATION FUND, New York, New York; Joseph M. Callaghan, MAYER BROWN LLP, Chicago, Illinois, for Amici Transgender Women Athletes. Kristen Clarke, Assistant Attorney General, Bonnie I. Robin-Vergeer, Elizabeth Parr Hecker, Appellate Section, Civil Rights Division, UNITED STATES DEPARTMENT OF JUSTICE, Washington, D.C., for Amicus United States of America. Anne E. Lopez, Attorney General, Kimberly T. Guidry, Solicitor General, Kaliko'onālani D. Fernandes, Deputy Solicitor General, OFFICE OF THE ATTORNEY GENERAL OF HAWAI'I, Honolulu, Hawai'i, for Amicus State of Hawai'i. Letitia James, Attorney General, Mark S. Grube, Assistant Solicitor General, Barbara D. Underwood, Solicitor General, Judith N. Vale, Deputy Solicitor General, OFFICE OF THE ATTORNEY GENERAL OF NEW YORK, New York, New York, for Amicus State of New York. Rob Bonta, Attorney General, OFFICE OF THE ATTORNEY GENERAL OF CALIFORNIA, Sacramento, California, for Amicus State of California. Philip J. Weiser, Attorney General, OFFICE OF THE ATTORNEY GENERAL OF COLORADO, Denver, Colorado, for Amicus State of Colorado. William Tong, Attorney General, OFFICE OF THE ATTORNEY GENERAL OF CONNECTICUT, Hartford, Connecticut, for Amicus State of Connecticut. Kathleen Jennings, Attorney General, OFFICE OF THE ATTORNEY GENERAL OF DELAWARE, Wilmington, Delaware, for Amicus State of Delaware. Kwame Raoul, Attorney General, OFFICE OF THE ATTORNEY GENERAL OF ILLINOIS, Chicago, Illinois, for Amicus State of Illinois. Aaron M. Frey, Attorney General, OFFICE OF THE ATTORNEY GENERAL OF MAINE, Augusta, Maine, for Amicus State of Maine. Anthony G. Brown, Attorney General, OFFICE OF THE ATTORNEY GENERAL OF MARYLAND, Baltimore, Maryland, for Amicus State of Maryland. Andrea Joy Campbell, Attorney General, OFFICE OF THE ATTORNEY GENERAL OF MASSACHUSETTS, Boston, Massachusetts, for Amicus Commonwealth of Massachusetts. Dana Nessel, Attorney General, OFFICE OF THE ATTORNEY GENERAL OF MICHIGAN, Lansing, Michigan, for Amicus State of Michigan. Keith Ellison, Attorney General, OFFICE OF THE ATTORNEY GENERAL OF MINNESOTA, St. Paul, Minnesota, for Amicus State of Minnesota. Matthew J. Platkin, Attorney General, OFFICE OF THE ATTORNEY GENERAL OF NEW JERSEY, Trenton, New Jersey, for Amicus State of New Jersey. Ellen F. Rosenblum, Attorney General, OFFICE OF THE ATTORNEY GENERAL OF OREGON, Salem, Oregon, for Amicus State of Oregon. Peter F. Neronha, Attorney General, OFFICE OF THE ATTORNEY GENERAL OF RHODE ISLAND, Providence, Rhode Island, for Amicus State of Rhode Island. Charity

R. Clark, Attorney General, OFFICE OF THE ATTORNEY GENERAL OF VERMONT, Montpelier, Vermont, for Amicus State of Vermont. Robert W. Ferguson, Attorney General, OFFICE OF THE ATTORNEY GENERAL OF WASHINGTON, Olympia, Washington, for Amicus State of Washington. Brian L. Schwalb, Attorney General, OFFICE OF THE ATTORNEY GENERAL OF THE DISTRICT OF COLUMBIA, Washington, D.C., for Amicus District of Columbia. Matthew D. Cipolla, New York, New York, Illyana A. Green, Washington, D.C., Howard S. Suskin, David M. Kroeger, Chicago, Illinois, Chasel Lee, JENNER & BLOCK LLP, San Francisco, California, for Amici American Academy of Pediatrics, American Medical Association, and Four Additional Health Care Organizations. Fatima Goss Graves, Emily Martin, Sunu Chandy, Shiwali Patel, Auden Perino, Hunter F. Iannucci, NATIONAL WOMEN'S LAW CENTER, Washington, D.C.; Jessica L. Ellsworth, Kaitlyn A. Golden, Devin M. Urness, Washington, D.C., Sarah W. Keller, HOGAN LOVELLS US LLP, Tysons, Virginia, for Amici National Women's Law Center and 51 Additional Organizations. Michelle N. Tanney, Edward J. Jacobs, Michael A. Sabella, Sydney W. Park, BAKER & HOSTETLER LLP, New York, New York, for Amici Current and Former Professional Olympic and International Athletes in Women's Sports; The National Women's Soccer League Players Association; The Women's Sports Foundation; and Athlete Ally. Arthur A. Schulcz, CHAPLAINS COUNSEL, PLLC, Leesburg, Virginia; Timothy Belz, J. Matthew Belz, CLAYTON PLAZA LAW GROUP, L.C., St. Louis, Missouri, for Amici Thomas More Society and National Association of Evangelicals. Deborah J. Dewart, Hubert, North Carolina, for Amicus Institute for Faith & Family. Christopher Mills, SPERO LAW LLC, Charleston, South Carolina, for Amici Concerned Women for America and Samaritan's Purse. Sarah E. Child, NELSON MADDEN BLACK LLP, New York, New York, for Amici Female Olympic Rowers Mary I. O'Connor, Carol Brown, Patricia Spratlen Etem, Valerie McClain, and Jan Palchikoff. Tim Griffin, Attorney General, Nicholas J. Bronni, Solicitor General, Dylan L. Jacobs, Deputy Solicitor General, Hannah L. Templin, Assistant Solicitor General, OFFICE OF THE ATTORNEY GENERAL OF ARKANSAS, Little Rock, Arkansas, for Amicus State of Arkansas. Steve Marshall, Attorney General, Edmund G. LaCour Jr., Solicitor General, Bethany C. Lee, Assistant Solicitor General, OFFICE OF THE ATTORNEY GENERAL OF ALABAMA, Montgomery, Alabama, for Amicus State of Alabama. Chris Carr, Attorney General, OFFICE OF THE ATTORNEY GENERAL OF GEORGIA, Atlanta, Georgia, for Amicus State of Georgia. Raúl R. Labrador, Attorney General, OFFICE OF THE ATTORNEY GENERAL OF IDAHO, Boise, Idaho, for Amicus State of Idaho. Theodore E. Rokita, Attorney General, OFFICE OF THE ATTORNEY GENERAL OF INDIANA, Indianapolis, Indiana, for Amicus State of Indiana. Brenna Bird, Attorney General, OFFICE OF THE ATTORNEY GENERAL OF IOWA, Des Moines, Iowa, for Amicus State of Iowa. Kris W. Kobach, Attorney General, OFFICE OF THE ATTORNEY GENERAL OF KANSAS, Topeka, Kansas, for Amicus State of Kansas. Daniel Cameron, Attorney General, OFFICE OF THE ATTORNEY GENERAL OF KENTUCKY, Frankfort, Kentucky, for Amicus Commonwealth of Kentucky. Jeff Landry, Attorney General, OFFICE OF THE ATTORNEY GENERAL OF LOUISIANA, Baton Rouge, Louisiana, for Amicus State of Louisiana. Austin Knudsen,

Attorney General, OFFICE OF THE ATTORNEY GENERAL OF MONTANA, Helena, Montana, for Amicus State of Montana. Lynn Fitch, Attorney General, OFFICE OF THE ATTORNEY GENERAL OF MISSISSIPPI, Jackson, Mississippi, for Amicus State of Mississippi. Michael T. Hilgers, Attorney General, OFFICE OF THE ATTORNEY GENERAL OF NEBRASKA, Lincoln, Nebraska, for Amicus State of Nebraska. Alan Wilson, Attorney General, OFFICE OF THE ATTORNEY GENERAL OF SOUTH CAROLINA, Columbia, South Carolina, for Amicus State of South Carolina. Marty Jackley, Attorney General, OFFICE OF THE ATTORNEY GENERAL OF SOUTH DAKOTA, Pierre, South Dakota, for Amicus State of South Dakota. Ken Paxton, Attorney General, OFFICE OF THE ATTORNEY GENERAL OF TEXAS, Austin, Texas, for Amicus State of Texas. Sean D. Reyes, Attorney General, OFFICE OF THE ATTORNEY GENERAL OF UTAH, Salt Lake City, Utah, for Amicus State of Utah. Jason Miyares, Attorney General, OFFICE OF THE ATTORNEY GENERAL OF VIRGINIA, Richmond, Virginia, for Amicus Commonwealth of Virginia. Henry P. Wall, Columbia, South Carolina; Donald A. Daugherty, Jr., DEFENSE OF FREEDOM INSTITUTE, Washington, D.C., for Amicus Defense of Freedom Institute. William Bock, III, KROGER GARDIS & REGAS, Indianapolis, Indiana, for Amici International Consortium on Female Sport and Independent Council on Women's Sport. Kristine L. Brown, Denver, Colorado; R. Daniel Gibson, STAM LAW FIRM, PLLC, Apex, North Carolina, for Amici 78 Female Athletes, Coaches, Sports Officials, and Parents of Female Athletes. Jennifer C. Braceras, INDEPENDENT WOMEN'S LAW CENTER, Washington, D.C.; Gene C. Schaerr, Cristina Martinez Squiers, Annika Boone Barkdull, SCHAERR | JAFFE LLP, Washington, D.C., for Amicus Independent Women's Law Center. Samuel J. Salario, Jr., LAWSON HUCK GONZALEZ, PLLC, Tampa, Florida; Kara Dansky, WOMEN'S DECLARATION INTERNATIONAL USA, Washington, D.C., for Amicus Women's Declaration International USA. Anna St. John, HAMILTON LINCOLN LAW INSTITUTE, Washington, D.C., for Amici 25 Athletic Officials and Coaches of Female Athletes. Rick Boyer, INTEGRITY LAW FIRM, Lynchburg, Virginia; Patrick McSweeney, Powhatan, Virginia; Joseph P. Secola, SECOLA LAW OFFICES, LLC, Danbury, Connecticut; J. Mark Brewer, BREWER & PRITCHARD, P.C., Houston, Texas; Kerry L. Morgan, PENTIUK, COUVREUR & KOBILJAK, P.C., Wyandotte, Michigan; William J. Olson, Jeremiah L. Morgan, Robert J. Olson, WILLIAM J. OLSON, P.C., Vienna, Virginia, for Amici Public Advocate of the United States; America's Future; U.S. Constitutional Rights Legal Defense Fund; One Nation Under God Foundation; Fitzgerald Griffin Foundation; and Conservative Legal Defense and Education Fund. J. Michael Connolly, James F. Hasson, CONSOVOY MCCARTHY PLLC, Arlington, Virginia, for Amicus Parents Defending Education. Reese R. Boyd, III, DAVIS & BOYD LLC, Myrtle Beach, South Carolina, for Amici 22 Business Executives.

TOBY HEYTENS, Circuit Judge:

A West Virginia law originally introduced as the "Save Women's Sports Act" provides that "[a]thletic teams or sports designated for females, women, or girls shall not be open to students of the male sex," while defining "male" as "an individual whose biological sex determined at birth is male." W. Va. Code § 18-2-25d(b)(3) & (c)(2). Because West Virginia law and practice have long provided for sex-differentiated sports teams, the Act's sole purpose—and its sole effect—is to prevent transgender girls from playing on girls teams. The question before us is whether the Act may lawfully be applied to prevent a 13-year-old transgender girl who takes puberty blocking medication and has publicly identified as a girl since the third grade from participating in her school's cross country and track teams. We hold it cannot.

I.

A.

To state the obvious, the Act did not originate the concept of sex-based sports teams. Indeed, regulations in West Virginia have stated for at least 30 years that "[s]chools may sponsor separate teams for members of each sex where selection for such teams is based upon competitive skill." W. Va. Code. R. § 127-2-3(3.8).

Nor does the Act represent West Virginia's first effort to address athletic participation by students whose gender identity differs from their sex assigned at birth. Before the Act, such questions were governed by a 2016 policy adopted by the West Virginia Secondary Schools Activities Commission (Commission). Under that policy, transgender students of any sex could join teams matching their gender identity if—but

only if—their school determined that "fair competition" would not be impacted by the student's participation. JA 4214. Any other member school could appeal such determinations to the Commission's board of directors, which would decide whether the student's participation "would adversely affect competitive equity or safety of teammates or opposing players." *Id.* In making its judgment, the board was directed to consider the student's "age," "athletic experience," "strength, size, [and] speed," "the nature of the sport," and "the degree to which fair competition among high school teams would be impacted." *Id.*

The Act worked a sea change in how West Virginia decides which teams a student can participate on. Its first operative provision requires all public high school and college sports teams be "expressly designated" as "[m]ales, men, or boys"; "[f]emales, women, or girls"; or "[c]oed or mixed" and that the designations be "based on biological sex." W. Va. Code. § 18-2-25d(c)(1). The Act next instructs that "[a]thletic teams or sports designated for females, women, or girls shall not be open to students of the male sex where selection for such teams is based upon competitive skill or the activity involved is a contact sport." § 18-2-25d(c)(2). The Act's final substantive provision says it shall not be "construed to restrict the eligibility of any student to participate in any . . . teams or sports designated as 'males,' 'men,' or 'boys' or designated as 'coed' or 'mixed.'" § 18-2-25d(c)(3). The Act defines "male" as "an individual whose biological sex determined at birth is male," "female" as "an individual whose biological sex determined at birth is female," and "biological sex" as "an individual's physical form as male or female based solely on the individual's reproductive biology and genetics at birth." § 18-2-25d(b)(1)–(3).

9

B.

B.P.J. is currently in eighth grade. At birth, B.P.J.'s sex was assigned as male, but she has publicly identified as a girl since third grade. A month after the Act took effect, B.P.J. sued the West Virginia State Board of Education, its then-superintendent, the Harrison County Board of Education, its superintendent, and the Commission, arguing enforcement of the Act against her violated the Equal Protection Clause and Title IX. The State of West Virginia intervened as a defendant, and B.P.J. filed an amended complaint.

During the initial stages of this litigation, the district court granted a preliminary injunction, concluding B.P.J. had shown "a likelihood of success in demonstrating that this statute [wa]s unconstitutional as it applie[d] to her and that it violate[d] Title IX." JA 440. The court emphasized that B.P.J. only sought "relief . . . insofar as this law applie[d] to her" (JA 442), and its grant of relief was also so limited. Although they could have done so, see 28 U.S.C. § 1292(a)(1), the defendants did not appeal that ruling. Since then, B.P.J. has participated in her school's cross country and track teams for girls, first under the district court's preliminary injunction and later under an injunction pending appeal from this Court.

A year and a half later, the district court reversed course. Ruling on the parties' cross-motions for summary judgment, the court rejected both of B.P.J.'s claims. On B.P.J.'s equal protection claim, the court held that West Virginia's "definition of 'girl' as being based on 'biological sex' [wa]s substantially related to the important government interest of providing equal athletic opportunities for females." JA 4274–75. On B.P.J.'s Title IX claim, the court pointed to regulations "authoriz[ing] sex separate sports in the

10

same manner as [the Act], so long as overall athletic opportunities for each sex are equal." JA 4276. Because B.P.J. was still "permitted to try out for boys' teams," the district court concluded her Title IX challenge failed as well. JA 4277.

## II.

We begin our review of the parties' claims with two procedural matters. First, we conclude we have appellate jurisdiction because the district court entered a final judgment against B.P.J. on all her claims against all defendants. Second, we dismiss the Commission's cross appeal (No. 23-1130) because the Commission is not aggrieved by the district court's judgment but seeks to defend a favorable judgment on alternative grounds.

### A.

"We have an independent obligation to ensure that we possess appellate jurisdiction." *Conway v. Smith Dev., Inc.*, 64 F.4th 540, 544 (4th Cir. 2023). The only source of jurisdiction any party identifies here is 28 U.S.C. § 1291, which lets us hear appeals from "final decisions." "Ordinarily, a district court order is not 'final' until it has resolved all claims as to all parties." *Fox v. Baltimore City Police Dep't*, 201 F.3d 526, 530 (4th Cir. 2000).

Now comes the wrinkle. As noted above, B.P.J. brought multiple claims against multiple defendants. Before the district court, one of those defendants—the Commission— chose not to "argue the merits" and instead "only" sought summary judgment on the ground "that it is not a state actor and is therefore not subject to scrutiny under either the Equal Protection Clause or Title IX." JA 4261. The district court rejected that argument, and thus denied the Commission's motion for summary judgment, while also denying B.P.J.'s

summary judgment motion and granting those filed by the remaining defendants. At first glance, based solely on the district court's summary judgment opinion, it looks like we do not have an appealable final decision because the court never disposed of B.P.J.'s claims against the Commission.

But we "look to substance, not form" when deciding whether we have an appealable final decision. *Porter v. Zook*, 803 F.3d 694, 696 (4th Cir. 2015). As directed by Federal Rule of Civil Procedure 58(a), the district court issued "a separate document" setting out its judgment. And in that document, the district court ordered "that judgment be entered in accordance with [the] accompanying Memorandum Opinion and Order, *and that this case be dismissed and stricken from the docket*." JA 4279 (emphasis added). To be sure, B.P.J. could have sought reconsideration of that judgment on the ground that the district court's summary judgment opinion did not actually resolve her claims against the Commission. But that does not matter for purposes of our jurisdiction. Because the district court's written judgment—unlike the opinion it implemented—"resolved all claims as to all parties" and terminated the district court phase of this litigation, *Fox*, 201 F.3d at 530, we have appellate jurisdiction.

## B.

Having concluded we have appellate jurisdiction because the district court dismissed all B.P.J.'s claims against all defendants, we dismiss the Commission's cross appeal (No. 23-1130) "as unnecessary and not properly taken." *Harriman v. Associated Indus. Ins.*, 91 F.4th 724, 726 (4th Cir. 2024). The Commission's notice of appeal says it challenges "the 'state actor' and other related determinations related to its summary

judgment motion as set forth in" the district court's summary judgment opinion. JA 4291. "But appellate courts review judgments, not statements in opinions, and the judgment we review here rejected [B.P.J.'s] entire suit on the merits." *Harriman*, 91 F.4th at 728 (quotation marks and citation removed). To be sure, the Commission may defend its favorable judgment "on any basis supported by the record"—including arguments the district court rejected. *Id.* Because the Commission is not aggrieved by the district court's judgment, however, the Commission has no basis to appeal it.

III.

We turn next to various defendants' arguments they should not have been named in the suit. We conclude those arguments lack merit.

The Harrison County Board of Education (County Board)—a defendant only on B.P.J.'s Title IX claim—protests that it has no policy of excluding transgender girls from girls sports teams and that it would merely be complying with state law if it excluded B.P.J. from such teams. But the County Board does not deny the only pertinent facts: that it is a recipient of federal funds and that it would, absent a judicial order to the contrary, prevent B.P.J. from participating in girls teams—the very thing B.P.J. claims violates Title IX. See *Grimm v. Gloucester Cnty. Sch. Bd.*, 972 F.3d 586, 616 (4th Cir. 2020) (listing elements of Title IX claims). Federal law trumps state law, not vice versa, see U.S. Const. art. VI, cl. 2, and those who violate federal law cannot defend on the ground they were simply following state law.

The County Board's only response is to cite an out-of-circuit decision addressing a

13

different issue—municipal liability under 42 U.S.C. § 1983. See Appellees' Br. 53 n.*
(citing *Bethesda Lutheran Homes & Servs., Inc. v. Leean*, 154 F.3d 716, 718 (7th Cir.
1998)). But the reason a lack of a municipal policy matters in that context is not because
compliance with state law is a defense to violating federal law. Rather, it is because—under
Section 1983—there can be no municipal liability without establishing an "official policy"
or custom of that municipality. *Monell v. Department of Soc. Servs. of City of New York*,
436 U.S. 658, 694 (1978). The County Board cites no authority for the view that Title IX
imposes a similar requirement.

Next, Harrison County superintendent Dora Stutler asserts she would "at most . . .
be subject to an injunction" but cannot be found liable for "any monetary award" or
attorneys' fees. Appellees' Br. 54 n.*. That assertion has no consequence at this stage,
where no remedy has been imposed and we are reviewing a district court ruling that all
B.P.J.'s claims fail on the merits.

Finally, the Commission renews its argument that it cannot be held liable for
violating either the Equal Protection Clause or Title IX. Like the district court, we are
unpersuaded.

To begin, we reject the Commission's argument that it is not a state actor and thus
cannot violate the Equal Protection Clause. West Virginia's own highest court has treated
the Commission as a state actor for purposes of federal and state constitutional challenges.
See *Israel v. West Va. Secondary Schs. Activities Comm'n*, 388 S.E.2d 480, 484 n.4 (W.
Va. 1989) (federal and state constitutional challenges); *Jones v. West Va. State Bd. of
Educ.*, 622 S.E.2d 289, 291 (W. Va. 2005) (state constitutional challenge). We see no basis

for a different conclusion. Despite being a nominally private organization, the Commission is "pervasive[ly] entwine[d]" enough with public institutions to be subject to suit. *Brentwood Acad. v. Tennessee Secondary Sch. Athletic Ass'n*, 531 U.S. 288, 298 (2001). The principals of every public secondary school in West Virginia sit on the Commission's governing board. See W. Va. Code § 18-2-25(b). The Commission comprehensively supervises and controls interscholastic athletics among its member schools, including by determining eligibility criteria for all interscholastic athletics. And it does so under a West Virginia statute authorizing schools to delegate "control, supervision, and regulation of interscholastic athletic events" to the Commission and designating dues paid to the Commission by county boards of education as "quasi-public funds." W. Va. Code § 18-2-25(b). It is thus unsurprising that "[e]very court that has considered the question [of] whether associations like the [Commission] are state actors" for the purpose of claims like these has answered that question yes. *Israel*, 388 S.E.2d at 484 n.4.

The Commission's argument that it cannot be sued under Title IX fails for similar reasons. Title IX's prohibitions are not limited to organizations that directly receive federal funds: the statute also covers organizations that "control[] and manage[]" direct funding recipients. *Horner v. Kentucky High Sch. Athletic Ass'n*, 43 F.3d 265, 272 (6th Cir. 1994) (emphasis removed); see *Williams v. Board of Regents of Univ. Sys. of Ga.*, 477 F.3d 1282, 1294 (11th Cir. 2007) (noting any other rule would allow direct funding recipients to "avoid Title IX liability" by "ced[ing] control over their programs to indirect funding recipients"). And for essentially the same reasons we conclude the Commission is a state actor, we also conclude it exercises sufficient control over direct funding recipients to make it a Title IX

15

defendant. The Commission's contrary arguments—which are based on decisions holding the NCAA is not subject to Title IX—are unconvincing. See Appellees' Br. 58–60 (citing *Smith v. NCAA*, 266 F.3d 152, 156–57 (3d Cir. 2001)). Most importantly, even those decisions note several key differences between the NCAA and state athletic associations, including that the NCAA spans every state and that states had "delegated no power to the NCAA to take specific action against any . . . employee." *Smith*, 266 F.3d at 159–60. Unlike the Commission, the NCAA has no statutory authority to control the athletic programs of its member schools.

We also reject the Commission's assertion that B.P.J.'s claims against it are not ripe for adjudication because "the possibility of injury is remote and the issues presented abstract." Appellees' Br. 60. There is no question B.P.J. wishes to participate in her school's cross country and track teams for girls. And there is no question that—absent a judicial order directing otherwise—the Commission would update its enforcement policy to conform to the Act's requirements, thus preventing B.P.J. from doing the very thing she seeks to do. Nothing more is required to show ripeness.

## IV.

We turn to the merits. The district court granted summary judgment to the defendants on both B.P.J.'s equal protection and Title IX claims. We review that decision de novo. See *Griffin v. Bryant*, 56 F.4th 328, 335 (4th Cir. 2022). B.P.J. asks us to go further and hold the district court erred in denying her motion for summary judgment. We review that decision de novo as well. See *W.C. & A.N. Miller Dev. Co. v. Continental Cas. Co.*, 814 F.3d 171, 176 (4th Cir. 2016). Like the district court, we "examine[ ] each motion

16

separately, employing the familiar standard under Rule 56 of the Federal Rules of Civil Procedure." *Desmond v. PNGI Charles Town Gaming L.L.C.*, 630 F.3d 351, 354 (4th Cir. 2011).

We conclude the district court erred in granting summary judgment to the defendants on both of B.P.J.'s claims. We also conclude that, while it would be inappropriate to direct a grant of summary judgment to B.P.J. on her equal protection claims, the district court erred in not granting summary judgment to B.P.J. on her Title IX claims. We thus vacate in part, reverse in part, and remand with instructions to grant summary judgment on B.P.J.'s Title IX claim and for further proceedings consistent with this opinion.

A.

We begin where the parties do: with B.P.J's equal protection claim. In so doing, we do not slight the maxim that courts should not "pass upon a constitutional question . . . if there is also present some other ground upon which the case may be disposed of." *Ashwander v. Tennessee Valley Auth.*, 297 U.S. 288, 347 (1936) (Brandeis, J., concurring). Because B.P.J has named different defendants for her equal protection and Title IX claims, there is no way to fully resolve this appeal without reaching the constitutional question.

1.

The essence of an equal protection claim is that at least one person has been treated differently from another without sufficient justification. See, *e.g.*, *Village of Willbrook v. Olech*, 528 U.S. 562, 564 (2000). For that reason, our first step is to identify the differential

17

treatment that results from the Act.

The Act's substantive provisions make three relevant classifications. #1: All sports teams must be "expressly designated" as male, female, or co-ed. W. Va. Code § 18-2-25d(c)(1). #2: A person's male-ness or female-ness must be determined "based solely on the individual's reproductive biology and genetics at birth." § 18-2-25d(b)(1). #3: "[S]tudents of the male sex" are prohibited from joining female teams but female students are not barred from participating in any team. Compare § 18-2-25d(c)(2), with § 18-2-25d(c)(3).

The defendants insist that the only relevant classification here is the first one and that this fact is fatal to B.P.J.'s equal protection claim. The defendants acknowledge that creating separate teams for boys and girls is a sex-based distinction, which triggers intermediate scrutiny under the Equal Protection Clause. See, *e.g.*, *United States v. Virginia*, 518 U.S. 515 (1996) (*VMI*). But, as the defendants note, B.P.J. has disavowed any "challenge [to] sex separation in sports," insisting that she "simply wants to play on the girls' team like other girls." B.P.J. Br. 26–27. And this, the defendants say, makes all the difference, because it shows "B.P.J. objects to where the state legislature drew the line" between which students can play on which team, "not the fact that the line exists." Appellees' Br. 27.

But even when lines may—or must—be drawn, the Constitution limits how and where they may fall. And here, the way the State has chosen to implement its decision to establish separate athletic teams for boys and girls triggers another round of intermediate scrutiny review for two independent reasons.

18

The first reason is the Act's differing treatment of cisgender girls and transgender girls. If B.P.J. were a cisgender girl, she could play on her school's girls teams. Because she is a transgender girl, she may not. The Act declares a person's sex is defined only by their "reproductive biology and genetics at birth." § 18-2-25d(b)(1). The undisputed purpose—and the only effect—of that definition is to exclude transgender girls from the definition of "female" and thus to exclude them from participation on girls sports teams. That is a facial classification based on gender identity. And, under this Court's binding precedent, such classifications trigger intermediate scrutiny. See *Grimm v. Gloucester Cnty. Sch. Bd.*, 972 F.3d 586, 610–13 (4th Cir. 2020).

The defendants dispute this reading of *Grimm*, claiming that case holds only that a difference in treatment based on gender identity triggers heightened scrutiny "when no genuine governmental interest support[s] it." Appellees' Br. 51. In a similar vein, the dissenting opinion argues intermediate scrutiny does not apply because B.P.J. cannot show she is similarly situated to cisgender girls. That is not how equal protection review works. To the contrary, decades of Supreme Court precedent make clear that whether a particular classification is supported by a good enough reason goes to whether that classification satisfies the relevant level of constitutional scrutiny—not which level of scrutiny applies in the first place. See, *e.g.*, *Adarand Constructors, Inc. v. Pena*, 515 U.S. 200, 226–27 (1995) (race-based classifications); *VMI*, 518 U.S. at 531 (sex-based classifications). *VMI* provides a particularly telling example: Because the challenged policy facially discriminated based on sex, the Court applied intermediate scrutiny without first asking whether the policy was supported by a good enough reason or whether men and women

19

are similarly situated when it comes to attending a physically rigorous military-style academy. See 518 U.S. at 531.

The defendants also insist the Act does not discriminate based on gender identity because it treats all "biological males"—that is, cisgender boys and transgender girls—the same. Appellees' Br 21. But that is just another way of saying the Act treats transgender girls differently from cisgender girls, which is—literally—the definition of gender identity discrimination.

That brings us to the second reason the defendants' argument that no additional scrutiny is warranted since the Act is a concededly "constitutional sex-based classification" (Appellees' Br. 25) fails: The Act contains a second layer of sex-based classification beyond its required separation of teams into those for "boys" and those for "girls." As its final substantive provision reveals, the Act does not mandate that boys teams are open to boys only and girls teams are open to girls only. Instead, by providing it does not "restrict the eligibility of any student"—male or female—"to participate in any . . . teams or sports designated as 'males,' 'men,' or 'boys,' " W. Va. Code § 18-2-25d(c)(3), the Act creates a rule that people whose sex was assigned at birth as female may play on any team but people whose sex was assigned at birth as male may only play on male or co-ed teams. Put another way, the Act would not have forbidden Gavin Grimm (a transgender boy) from playing on the boys teams at B.P.J.'s school but it does forbid B.P.J. (a transgender girl) from playing

20

on the girls teams.[1] To agree the Act is a "constitutional sex-based classification," we would have to conclude this additional level of sex discrimination is also justified.

To sum up: The Act triggers intermediate scrutiny for three reasons. Because its first classification—its requirement that all teams be designated male, female, or co-ed—is conceded to be valid and is necessary to the relief B.P.J. seeks (being allowed to participate in girls cross country and track teams) we need go no further in determining whether the State can justify it. But the Act does not stop there. Instead, it mandates two further classifications—one based on gender identity and the other based on sex—that each forbid B.P.J. from doing the thing she wants to do. For that reason, we must subject those classifications to intermediate scrutiny as well.

## 2.

Having determined the appropriate level of constitutional scrutiny, we must next resolve a dispute about the dimensions of our analytical frame. B.P.J. does not ask us to hold the Act may not constitutionally be applied to anyone in any circumstances. Instead, she "challenges [the Act] only as applied to her" and seeks an injunction that would prevent the defendants from enforcing it against her. B.P.J. Br. 33

In the defendants' view, B.P.J.'s efforts to limit the scope of her challenge make no

---

[1] To be sure, a regulation long predating the Act says people whose sex was assigned at birth as female only have *a right* to play on a team designated male if their school "sponsors no" female team in the relevant sport. W. Va. Code. R. § 127-2-3(3.8). But—unlike the Act—that regulation does not *forbid* schools from permitting students whose sex was assigned as female at birth (including transgender boys) from playing on any male team. And, in any event, the challenge we consider here is against the Act, not the regulation, so it is the Act's classifications that must satisfy constitutional scrutiny.

difference to our analysis. Instead, they say that if applying the Act to the population at large is substantially related to an important state interest, the Act is constitutional—even if its application to B.P.J. would not advance the asserted governmental interests at all. In essence, the defendants claim there really is no such thing as an as-applied equal protection challenge because a plaintiff like B.P.J. can only win by making the same showing needed to demonstrate the Act is facially invalid. And to the extent that an as-applied equal protection challenge even exists, the defendants argue that its as-appliedness goes only to the remedy B.P.J. may obtain rather than the showing she must make to secure relief.

The problem with that argument: The Supreme Court has repeatedly held a statute can violate the Equal Protection Clause as applied to some without being facially invalid. In *Caban v. Mohammed*, 441 U.S. 380 (1979), and *Lehr v. Robertson*, 463 U.S. 248 (1983), for example, the Court considered equal protection challenges to statutes giving unwed fathers fewer rights than unwed mothers to prevent the adoption of their child. In both decisions, the Supreme Court concluded those sorts of laws would be valid in situations where "the father had not come forward to participate in the rearing of [the] child" but that they "*may not constitutionally be applied* in that class of cases where the mother and father are in fact similarly situated with regard to their relationship with the child." *Lehr*, 463 U.S. at 267 (citing *Caban*, 441 U.S. at 380, 392) (quotation marks removed and emphasis added).

The Supreme Court's decision in *City of Cleburne v. Cleburne Living Center*, 473 U.S. 432 (1985), is similar. That case involved an equal protection challenge to a zoning ordinance requiring a special use permit for group homes for people with

22

intellectual disabilities. See *id.* at 435. Although the plaintiff brought both facial and as-applied claims, the Court specifically declined "to decide whether the special use permit provision [was] facially invalid." *Id.* at 436. Instead, it held that "the ordinance [was] invalid *as applied in this case*" because "the record [did] not reveal any rational basis for believing that" *the specific group home the plaintiff proposed to operate* "would pose any special threat to the city's legitimate interests." *Id.* at 448 (emphasis added); accord *id.* at 456, 474 (Marshall, J., concurring in the judgment in part and dissenting in part) (noting that the Court had invalidated the ordinance "only as applied to respondents, rather than on its face" based on the conclusion "that the ordinance might be 'rational' as applied to some subgroup" of people with intellectual disabilities). Indeed, the *Cleburne* Court described such an as-applied challenge as "the preferred course of adjudication since it enables courts to avoid making unnecessarily broad constitutional judgments." *Id.* at 447.

The defendants respond by quoting the Supreme Court's statement in *Bucklew v. Precythe*, 139 S. Ct. 1112 (2019), that "classifying a lawsuit as facial or as-applied . . . does not speak at all to the substantive rule of law necessary to establish a constitutional violation." *Id.* at 1127. True enough. But the same sentence the defendants quote refutes their argument that the fact a plaintiff is bringing an as-applied challenge goes only to the "relief" a court may grant. Appellees' Br. 33, 35, 36. Rather, as *Bucklew* states—consistent with *Caban*, *Lehr*, and *Cleburne*—B.P.J.'s decision to bring only an as-applied challenge *also* "affects the extent to which the invalidity of the challenged law must be demonstrated." *Bucklew*, 139 S. Ct. at 1127; accord *Carolina Youth Action Project v. Wilson*, 60 F.4th 770, 782 (4th Cir. 2023) (whether a challenge is facial or as applied affects

"how much we consider plaintiffs' particular identity and circumstances").

The defendants also make a more conceptual argument. As they see it, letting B.P.J. bring an as-applied challenge would improperly "convert[ ] intermediate scrutiny into strict" by allowing any party to whom application of a law would not advance the State's interests to obtain a judicially ordered exception. Appellees' Br. 36.

That argument fails to convince, too. Most importantly, it cannot be squared with *Cleburne*, where the Supreme Court entertained—and sustained—an as-applied equal protection challenge despite holding that an even lower substantive standard (rational-basis review) applied to the type of classification at issue. 473 U.S. at 447–48.

The defendants' argument falls short for other reasons as well. For one, it ignores the different consequences that follow when a plaintiff prevails in a facial challenge versus an as-applied one. When a court holds a statute is facially unconstitutional, the result is that the statute cannot be applied to anyone—even if it could hypothetically be "implemented in a manner consistent with the Constitution." *Washington State Grange v. Washington State Republican Party*, 552 U.S. 442, 451 (2008). In contrast, winning an as-applied challenge does not impact the state's ability to apply its law to other parties if doing so would advance the relevant interests. See *Cleburne*, 473 U.S. at 447. Indeed, the injunction B.P.J seeks is the same one she received at the preliminary injunction stage: one limited to her.

Finally, even when a plaintiff brings an as-applied challenge, a defendant may prevail by showing that its refusal to make an exception for the plaintiff's individual circumstances itself satisfies the relevant level of constitutional scrutiny. In *United States*

*v. Lee*, 455 U.S. 252 (1982), for example, the Supreme Court rejected an as-applied challenge to a provision of the tax code requiring employers to pay social security taxes. See *id*. at 254. *Lee* did not examine the strength of the government's interest in applying that requirement to the specific plaintiff before it. Instead, the Court explained "it would be difficult to accommodate the comprehensive social security system with myriad exceptions flowing from a wide variety of religious beliefs." *Id.* at 259–60; accord *Faver v. Clarke*, 24 F.4th 954 (4th Cir. 2022) (prison's requirement that all items stocked in commissary be sourced from a single supplier was narrowly tailored to its compelling interest in preventing contraband, regardless of prisoner's individual circumstances).

3.

We now turn to the ultimate merits question for B.P.J.'s equal protection challenge: Is the decision to exclude B.P.J. from the teams she seeks to join substantially related to an important government interest? The district court concluded B.P.J. failed to create a genuine dispute of material fact on this point, and thus granted summary judgment to the defendants. We disagree and vacate that aspect of the district court's judgment.

During this litigation, the defendants have identified two general justifications for excluding transgender girls from girls sports teams: participant safety and competitive fairness. See Oral Arg. 20:13–21:05 (disclaiming reliance on any other potential interests, including privacy or bodily autonomy). B.P.J. does not dispute that participant safety and competitive fairness are important government interests; instead, she argues that excluding her from the girls cross country and track teams is not substantially related to either goal. For their part, the defendants do not seriously assert that excluding B.P.J. (or any other

transgender girl) from cross country and track—both non-contact sports—is substantially related to the government's important interest in participant safety. See Oral Arg. 20:50–21:19 (acknowledging that their defense against B.P.J.'s as-applied equal protection challenge "doesn't focus on safety"). So, as the defendants acknowledge, the central question for B.P.J's as-applied equal protection challenge is whether excluding her from the girls cross country and track teams is substantially related to the concededly important government interest in competitive fairness. See Oral Arg. 21:19–21:23.

At minimum, the district court erred in concluding the defendants were entitled to summary judgment on this point. For purposes of assessing the defendants' summary judgment motion, we must assume a factfinder would credit all B.P.J.'s evidence and resolve all disputed factual issues in her favor. See, *e.g.*, *Knibbs v. Momphard*, 30 F.4th 200, 215 (4th Cir. 2022). This matters because B.P.J. presented evidence that transgender girls with her background and characteristics possess *no* inherent, biologically-based competitive advantages over cisgender girls when participating in sports.

We note at the outset an argument the defendants have avoided making directly and specifically disclaimed at oral argument that nonetheless forms the basis for much of the dissenting opinion. The argument is one via definition. It starts by positing that girls' sports are exclusively for the benefit of cisgender girls (and, it seems, transgender boys). So, it follows, regardless of whether any given transgender girl has any inherent competitive advantage over cisgender girls in athletic performance, the government may exclude *all* transgender girls from *all* girls teams because it is the only way to ensure no cisgender girl ever has to compete against (and thus risk finishing behind) a transgender girl.

26

That argument is deeply flawed. For one thing, limiting the beneficiaries of the State's largesse "begs the question" of whether the challenged classification is justified in the first place. *Mississippi Univ. for Women v. Hogan*, 458 U.S. 718, 731 n.17 (1982). A State's decision to create a classification that benefits only one class at the expense of others must itself be "substantially related to achieving a legitimate and substantial goal." *Id.* Without more, the defendants may not simply posit that all cisgender girls are entitled to be protected from competition from all transgender girls, even when the result is harm to transgender girls.

To see why this argument cannot be right, imagine a sixth-grade cisgender girl who competes on her middle school's track team. Based on her consistent times throughout the season, she is projected to finish in 15th place at the season-end countywide track meet. But then, the week before the county meet, a new family moves into the county, bringing a girl of the same age who also runs track. As a result, the first girl is now projected to finish in 16th place. Would a State be able to justify otherwise unconstitutional discrimination based on an asserted interest in protecting the first girl's anticipated 15th place finish?

Of course not. As the defendants conceded at oral argument, the government has no interest in protecting one girl's ranking in any competition or "in ensuring that cisgender girls do not lose ever to transgender girls." Oral Arg. 23:35–24:05. True, West Virginia has an interest in preventing "athletic opportunities for women" from being "diminished" by substantial displacement. *Clark v. Arizona Interscholastic Ass'n*, 695 F.2d 1126, 1131 (9th Cir. 1982). But for that interest to carry any weight, the defendants must show the

27

alternative is actually and meaningfully unfair—*i.e.*, that there is "a substantial relationship *between* the exclusion of" all transgender girls from all girls teams and "providing equal opportunities for women." *Id.* (emphasis added). We thus turn to that question.

Before the district court, both sides cited authorities agreeing that the driver of the most significant sex-based differences in athletic performance is differing levels of circulating testosterone. Larger amounts of circulating testosterone produce an increased ability to build muscle mass. And increased muscle mass, in turn, leads to greater strength and speed—two attributes relevant to most competitive sports.

Before puberty, circulating testosterone levels do not vary significantly depending on whether a person has two X chromosomes, one X and one Y chromosome, or some other genetic makeup. Once puberty begins, however, sex-based differences begin to emerge. Those differences—along with others that begin at the same time—lead to different physical processes during puberty. These differences manifest at what medical professionals call the "Tanner 2" stage.

The undisputed evidence shows B.P.J. has never gone through the Tanner 2 stage. As part of her treatment for gender dysphoria, B.P.J. began receiving puberty blocking treatment at the beginning of that stage. The medication prevented B.P.J. from progressing through the Tanner 2 stage, and as a result, B.P.J. has never experienced elevated levels of circulating testosterone. In addition, B.P.J. is receiving gender affirming hormone therapy, which, based on her expert testimony, will cause her to experience physical changes to her bones, muscles, and fat distribution that are typically experienced by cisgender girls. Because B.P.J. has never felt the effects of increased levels of circulating testosterone, the

28

fact that those who do benefit from increased strength and speed provides no justification—much less a substantial one—for excluding B.P.J. from the girls cross country and track teams.

That leaves one final question for purposes of B.P.J.'s as-applied equal protection challenge: Even without undergoing Tanner 2 stage puberty, do people whose sex is assigned as male at birth enjoy a meaningful competitive athletic advantage over cisgender girls?

We conclude there is a genuine dispute of material fact about this question, and that the district court therefore erred in granting summary judgment against B.P.J. on her equal protection claim. B.P.J. provided an expert report stating that—other than the puberty-based changes she will never experience—"[a] person's genetic makeup and internal and external reproductive anatomy are not useful indicators of athletic performance." JA 2104. The report also states that, "[w]ith respect to average athletic performance, girls and women who are transgender and who do not go through . . . puberty are somewhat similarly situated to women with XY chromosomes who have complete androgen insensitivity syndrome"—a group "long . . . recognized" to "have no athletic advantage simply by virtue of having XY chromosomes." *Id.* To be sure, the defendants moved to exclude that testimony. But the district court never ruled on that motion, so it could not ignore that conclusion for purposes of ruling on the defendants' summary judgment motion. See, *e.g.*, *Norse v. City of Santa Cruz*, 629 F.3d 966, 973 (9th ir. 2010) (en banc) (district court must resolve "evidentiary objections that are material to its ruling" on motion for summary judgment). And although the defendants offered their own contrary evidence as well,

Rule 56 required the district court to resolve that factual dispute in B.P.J.'s favor when deciding whether to grant summary judgment against her. See *Knibbs*, 30 F.4th at 215. For that reason, the district court erred in granting summary judgment to the defendants on B.P.J.'s equal protection claim.[2]

The same factual dispute explains why we decline to direct the district court to enter summary judgment in B.P.J.'s favor. The defendants submitted an expert report contradicting the assertions by B.P.J.'s experts and saying that, even apart from increased circulating testosterone levels associated with puberty, there are "significant physiological differences, and significant male athletic performance advantages in certain areas." JA 2514. Here too, B.P.J. moved to exclude that expert's testimony, and offered evidence to rebut it. But the district court never ruled on the motion to exclude. That means we could not grant B.P.J.'s requested relief without doing one of two things: (1) ruling on a *Daubert* motion the district court never ruled on (which could allow us to disregard the defendants' expert); or (2) accepting the defendants' expert's conclusions as true but concluding B.P.J.

---

[2] The circumstances before the Act was passed further undermine the defendants' assertion that the State's chosen means are substantially related to its interest in ensuring competitive fairness. The Commission—to which every West Virginia public school delegates responsibility for regulating eligibility for athletics—already had a policy addressing participation by transgender students. Unlike the Act's categorical rule, that policy was narrowly focused on the interests the State claims the Act advances—competitive fairness and safety. See pp. 8–9, *supra* (describing former policy). As the district court noted, "[t]he record makes abundantly clear . . . that West Virginia had no 'problem' with transgender students . . . creating unfair competition or unsafe conditions" before the Act passed because "at the time it passed the law, West Virginia had no known instance of any transgender person playing school sports." JA 4264. For that reason, the district court aptly described the Act as "at best a solution to a potential, but not yet realized 'problem.' " *Id.*

is still entitled to summary judgment.

We conclude neither step is warranted. For the first, questions about the admissibility of evidence are uniquely within the province of trial courts, and we review such decisions only for abuse of discretion. See, *e.g.*, *Nease v. Ford Motor Co.*, 848 F.3d 219, 228 (4th Cir. 2017). For that reason, appellate courts rarely—if ever—resolve a disputed evidentiary issue in the first instance. See, *e.g.*, *Fox v. Maulding*, 16 F.3d 1079, 1082 (10th Cir. 1994) (declining to decide "in the first instance" an issue that would be reviewed only for abuse of discretion on appeal because to do so would "enter the realm of de novo review").

As for the second possibility: Once the defendants' expert is considered, the same principles that lead us to conclude the district court erred in granting the defendants' summary judgment motion make us reluctant to order the district court to grant B.P.J.'s. For purposes of considering B.P.J.'s summary judgment motion, we must assume a factfinder would credit the defendants' evidence over B.P.J.'s. And although portions of B.P.J.'s briefs in this Court assert that even a significant advantage in athletic performance would not justify excluding her from the girls cross country and track teams, B.P.J. does not develop that argument and focuses instead on arguing that no such advantage exists or is minimal—the very thing the experts disagree about.

For that reason, we conclude the district court erred in granting summary judgment to the defendants on B.P.J.'s equal protection claim but decline to direct the entry of summary judgment in B.P.J.'s favor. Instead, we vacate that portion of the district court's judgment and remand for further proceedings, including consideration of the still-pending

*Daubert* motions.

B.

We turn next to B.P.J.'s Title IX challenge. Although much of what we have already said bears on our analysis here, the details are different, and we arrive at a somewhat different conclusion. Here too, we conclude the district court erred in granting summary judgment to the defendants. But we also conclude B.P.J. has shown applying the Act to her would violate Title IX, and the district court thus erred in denying her motion for summary judgment. For that reason, we reverse this portion of the district court's order and remand with instructions to enter summary judgment for B.P.J. and conduct remedial proceedings on her Title IX claim.

Title IX says "[n]o person . . . shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any education program or activity receiving Federal financial assistance." 20 U.S.C. § 1681(a). The defendants do not dispute that middle school sports are an "education program or activity." Three defendants named in B.P.J.'s Title IX claim (the State of West Virginia, the State Board of Education, and the County Board) also do not deny they receive federal financial assistance, and we have already concluded the fourth (the Commission) may be sued under Title IX because it controls entities that receive such assistance. See Part III, *supra*. The only remaining question is whether B.P.J. has "on the basis of sex, be[en] excluded from participation in," "denied the benefits of," or "subjected to discrimination" in connection with middle school sports. 20 U.S.C. § 1681(a).

We conclude the answer is yes. Although Title IX and equal protection claims are

similar, they are "not . . . wholly congruent." *Fitzgerald v. Barnstable Sch. Comm.*, 555 U.S. 246, 257 (2009). For one thing, not every act of sex-based classification is enough to show legally relevant "discrimination" for purposes of Title IX. Instead, under Title IX, "discrimination 'mean[s] treating [an] individual *worse than* others who are similarly situated.'" *Grimm*, 927 F.3d at 618 (first alteration in original) (emphasis added) (quoting *Bostock v. Clayton Cnty.*, 140 S. Ct. 1731, 1740 (2020)). In addition, even having experienced worse treatment than a similarly situated comparator is not enough to prevail on a Title IX claim. Rather, a plaintiff must establish that the "improper discrimination caused [her] harm." *Id.* at 616. On the other hand, once a Title IX plaintiff shows she has been discriminated against in the relevant sense and suffered harm, no showing of a substantial relationship to an important government interest can save an institution's discriminatory policy. See *Students for Fair Admissions, Inc. v. President & Fellows of Harvard Coll.*, 600 U.S. 181, 309 (2023) (Gorsuch, J., concurring) (noting that Title VI, whose language Title IX mirrors, "does not direct courts to subject these classifications to one degree of scrutiny or another").

Because B.P.J. can show both worse treatment based on sex and resulting harm, she has established each of the disputed requirements for a Title IX claim. First, the Act operates "on the basis of sex" for two reasons that should be familiar by now. For one, this Court has already held that discrimination based on gender identity is discrimination "on the basis of sex" under Title IX, see *Grimm*, 972 F.3d at 616, and this Act discriminates based on gender identity, see Part IV(A)(1), *supra*. The Act also discriminates based on sex assigned at birth by forbidding transgender girls—but not transgender boys—from

participating in teams consistent with their gender identity. See *id.* The Act thus goes beyond even what this Court concluded was impermissible in *Grimm*: Under this Act, a transgender boy like Gavin Grimm may play on boys teams but a transgender girl like B.P.J. may not play on girls teams.

Second, the Act requires treating students differently even when they are similarly situated. The Act forbids one—and only one—category of students from participating in sports teams "corresponding with [their] gender": transgender girls. *Grimm*, 972 F.3d at 618. And it does so on a categorical basis, regardless of whether any given girl possesses any inherent athletic advantages based on being transgender. See *Peltier v. Charter Day Sch., Inc.*, 37 F.4th 104, 130 (4th Cir. 2022) (en banc) (emphasizing that "Title IX protects the rights of individuals, not groups" (quotation marks removed)).

Third, B.P.J. has established that she is harmed by the Act's application to her—both in terms of what the Act forbids her from doing and what it would require if she wants to gain the opportunity to participate in school sports. For starters, "emotional and dignitary harm . . . is legally cognizable under Title IX" and it requires no feat of imagination to appreciate "[t]he stigma of being" unable to participate on a team with one's friends and peers. *Grimm*, 972 F.3d at 617–18.

But the Act goes further by requiring B.P.J. to take on additional harms to avoid forfeiting the ability to play school sports altogether. B.P.J. has been publicly living as a girl for more than five years. During that time, her elementary and middle schools created gender support plans to affirm her gender identity and ensure she is recognized as a girl at school. To align with her gender identity, B.P.J. has changed her name, and the State of

West Virgina (whose Act is challenged here) has issued a birth certificate that recognizes her changed name and lists her sex as female. B.P.J. also takes puberty blocking medication to prevent her body from experiencing male adolescent development and estrogen hormone therapy, which is leading her to develop the outward physical characteristics—including fat distribution, pelvic shape, and bone size—of an adolescent female. Her family, teachers, and classmates have all known B.P.J. as a girl for several years, and—beginning in elementary school—she has participated only on girls athletic teams.

Given these facts, offering B.P.J. a "choice" between not participating in sports and participating only on boys teams is no real choice at all. The defendants cannot expect that B.P.J. will countermand her social transition, her medical treatment, and all the work she has done with her schools, teachers, and coaches for nearly half her life by introducing herself to teammates, coaches, and even opponents as a boy. The defendants do not dispute that doing so would directly contradict the treatment protocols for gender dysphoria. It also would expose B.P.J. to the same risk of unfair competition—and, in some sports, physical danger—from which the defendants claim to be shielding cisgender girls. By participating on boys teams, B.P.J. would be sharing the field with boys who are larger, stronger, and faster than her because of the elevated levels of circulating testosterone she lacks. The Act thus exposes B.P.J. to the very harms Title IX is meant to prevent by effectively "exclud[ing]" her from "participation in" all non-coed sports entirely. 20 U.S.C. § 1681(a).

Rather than trying to show B.P.J. is not harmed by the Act, the defendants offer several arguments that emphasize the historical expectations surrounding Title IX's application and the regulations that have implemented it. But legislators' "expected

applications" of a statute "can never defeat unambiguous statutory text." *Bostock*, 140 S. Ct. at 1750. And "because a regulation must be consistent with the statute it implements, any interpretation of a regulation naturally must accord with the statute as well." *Kentuckians for Commonwealth, Inc. v. Rivenburgh*, 317 F.3d 425, 440 (4th Cir. 2003) (quotation marks removed).

True, regulations introduced soon after Title IX's enactment say recipients of federal funds "may operate . . . separate teams for members of each sex." 34 C.F.R. § 106.41(b). But, once again, B.P.J. does not challenge the legality of having separate teams for boys and girls. Instead, she challenges the Act's requirement that she may compete only on boys or coed teams—even though doing so treats her differently than people to whom she is similar situated, would contradict her gender identity, and would cause her significant harm. The regulations the defendants cite do not purport to address this situation, and they are being reevaluated with an eye toward doing so. See Nondiscrimination on the Basis of Sex in Education Programs or Activities Receiving Federal Financial Assistance: Sex-Related Eligibility Criteria for Male and Female Athletic Teams, 88 Fed. Reg. 22860 (proposed Apr. 13, 2023) (to be codified at 34 C.F.R. § 106.41). For that reason, the defendants' emphasis on the regulations as expressly authorizing the Act's chosen discrimination is misguided.

Finally, the district court erred in rejecting B.P.J.'s Title IX claim on the theory that, under the Act, "overall athletic opportunities for each sex are equal." JA 4276. As our en banc Court has explained, "Title IX protects the rights of individuals, not groups, and does not ask whether the challenged policy treats [one sex] generally less favorably than [the

other].” *Peltier*, 37 F.4th at 130 (quotation marks removed). For the same reason, whether other transgender girls undergo different "medical intervention[s]" that prevent them from being "similarly situated" to cisgender girls for purposes of participating in sports, JA 4277, is irrelevant to B.P.J.'s individual case. B.P.J. has shown that applying the Act to her would treat her worse than people to whom she is similarly situated, deprive her of any meaningful athletic opportunities, and do so on the basis of sex. That is all Title IX requires.[3]

*   *   *

We do not hold that government officials are forbidden from creating separate sports teams for boys and girls or that they lack power to police the line drawn between those teams. We also do not hold that Title IX requires schools to allow every transgender girl to play on girls teams, regardless of whether they have gone through puberty and experienced elevated levels of circulating testosterone. We hold only that the district court erred in granting these defendants' motions for summary judgment in this particular case and in failing to grant summary judgment to B.P.J. on her specific Title IX claim.

The cross-appeal (No. 23-1130) is dismissed. In No. 23-1078, the district court's judgment is vacated in part and reversed in part. The case is remanded with instructions to enter summary judgment for B.P.J. on her Title IX claims and for further proceedings (including remedial proceedings) consistent with this opinion.

---

[3] We decline to consider any argument that we should artificially narrow our interpretation of Title IX because it is Spending Clause legislation. Although such arguments have been made and rejected in other cases, see, *e.g.*, *Grimm*, 972 F.3d at 619 n.18, the defendants have never made such an argument in this case.

*SO ORDERED*

AGEE, Circuit Judge, concurring in part and dissenting in part:

I agree with the majority that we have jurisdiction over this appeal, that the Commission had no basis to appeal from the district court's decision, and that all of the defendants (collectively, "West Virginia") were properly named in this action. I cannot join the rest of the majority's opinion, however, because West Virginia may separate its sports teams by biological sex without running afoul of either the Equal Protection Clause or Title IX. In coming to the opposite conclusion, the majority inappropriately expands the scope of the Equal Protection Clause and upends the essence of Title IX. Therefore, I dissent from all but Parts II and III of the majority opinion.

## I.

In 2021, West Virginia enacted § 18-2-25d (the "Act") to promote equal opportunities for women in sports. Noting the "inherent differences between biological males and biological females," the Act provides that "[i]interscholastic, intercollegiate, intramural, or club athletic teams or sports that are sponsored by any public secondary school or a state institution of higher education . . . shall be expressly designated as [either male, female, or coed] based on biological sex" and that "[a]thletic teams or sports designated for females, women, or girls shall not be open to students of the male sex where selection for such teams is based upon competitive skill or the activity involved is a contact sport." W. Va. Code § 18-2-25d. "Female" is defined under the Act as "an individual whose biological sex determined at birth is female" and "male" is defined as "an individual whose biological sex determined at birth is male." *Id.*

39

Consistent with the Act, B.P.J.—a biological boy who identifies as a girl—was excluded from the middle school girls' track-and-field and cross-country teams. Disagreeing with that result, B.P.J. brought this action, alleging that the Act violates the Equal Protection Clause and Title IX as applied to B.P.J. and transgender girls like B.P.J. who have not gone through endogenous puberty. Although the district court agreed with B.P.J. at the preliminary injunction stage, with the benefit of a developed record, the district court determined in its summary judgment decision that the Act violates neither the Equal Protection Clause nor Title IX. *See B.P.J. v. W. Va. State Bd. of Educ.*, 649 F. Supp. 3d 220 (S.D.W. Va. 2023).

Regarding the equal protection claim, the court acknowledged that "[t]here is no debate that intermediate scrutiny applies to the law at issue here" because it "plainly separates student athletes based on sex." *Id.* at 229. But it explained that preventing "biological males[] from playing on girls' teams is not unconstitutional if the classification is substantially related to an important government interest." *Id.* at 230. And it concluded that, here, the government's interest in "providing equal athletic opportunities for females" satisfied that standard. *Id.* at 231.

As for the Title IX claim, the district court reasoned that B.P.J. was not similarly situated to biological girls because "biological males are not similarly situated to biological females for purposes of athletics." *Id.* at 233. The court also noted that "Title IX authorizes sex separate sports in the same manner as [the Act], so long as overall athletic opportunities for each sex are equal." *Id.*

B.P.J. appealed. Pending that appeal, a majority of this panel granted B.P.J. an injunction, allowing B.P.J. to participate on the middle school's girls' track-and-field team for the spring season.

As West Virginia explained in its motion to stay the injunction, throughout the spring season, B.P.J. dominated track meets. Rather than finishing near the back of the pack—as B.P.J. contended would be the case in the motion for the injunction—B.P.J. consistently placed in the top fifteen participants at track-and-field events and often placed in the top ten. In so doing, over one hundred biological girls participating in these events were displaced by and denied athletic opportunities because of B.P.J. Additionally, B.P.J. earned a spot at the conference championship in both shot put and discus. Because participation in a conference championship event requires that the athlete place in the top three competitors at their school, judged by their best performance that season, two biological girls were denied participation in the conference championships because of B.P.J.

## II.

The majority holds that the Act may violate the Equal Protection Clause and conclusively violates Title IX. I disagree.[1]

---

[1] I note at the outset that there are few cases involving transgender discrimination and the cases that exist are limited to their specific contexts. For example, in *Bostock v. Clayton Cnty.*, the Supreme Court considered whether an employer's termination of employees on the basis of their transgender or homosexual status violated Title VII. 590 U.S. 644, 653 (2020). In determining that it did, the Court explicitly limited its decision to (Continued)

A.

Assessing the equal protection claim, the majority concludes that the Act discriminates against B.P.J., but remands B.P.J.'s claim because it believes a factual dispute prevents determining whether the Act survives heightened scrutiny. Its analysis is flawed for at least three reasons: the majority (1) without explanation, erroneously concludes that B.P.J.—a biological boy—is similarly situated to biological girls; (2) incorrectly determines that the Act discriminates against transgender athletes on its face; and (3) inaccurately decides that the Act may not be substantially related to West Virginia's important government interest in ensuring equal opportunities for females as applied to B.P.J.

First, the majority fails to grapple with the similarly situated element of B.P.J.'s equal protection claim and, in so doing, erroneously implies that biology is irrelevant to sports. The Equal Protection Clause is "essentially a direction that all persons similarly situated should be treated alike." *City of Cleburne v. Cleburne Living Ctr.*, 473 U.S. 432, 439 (1985). To prove an equal protection violation, the plaintiff must identify persons materially identical to him or her who has received different treatment. *See Nordlinger v. Hahn*, 505 U.S. 1, 10 (1992) (stating that the Equal Protection Clause prevents

---

Title VII and the employment context. *See id.* at 681 ("[W]e do not purport to address bathrooms, locker rooms, or anything else of the kind.").

Similarly, in *Grimm v. Gloucester Cnty. Sch. Bd.*, this Court considered whether a restroom policy that limited the use of male and female restrooms to the corresponding biological sexes violated the Equal Protection Clause and Title IX. 972 F.3d 586, 593 (4th Cir. 2020). Its analysis necessarily applied only to restroom policies. *See id.*

Neither decision, therefore, answers the question before the Court today.

"governmental decisionmakers from treating differently persons who are *in all relevant respects alike*." (emphasis added)).

But B.P.J. cannot make such a showing because it is beyond dispute that biological sex is relevant to sports and therefore that the person who is "in all relevant respects alike" to a transgender girl is a biological boy. It is undisputed that after puberty biological males have physiological advantages over biological females that significantly impact athletic performance. *See* Opening Br. 14 ("[M]edical consensus is that the largest known biological cause of average differences in athletic performance between cisgender men as a group and cisgender women as a group is their levels of circulating testosterone, which start to diverge between boys and girls beginning with puberty."); *Adams ex rel Kasper v. Sch. Bd. of St. Johns Cnty.*, 57 F.4th 791, 819 (11th Cir. 2022) (en banc) (Lagoa, J., specially concurring) ("[I]t is neither myth nor outdated stereotype that there are inherent differences between those born male and those born female and that those born male, including transgender women and girls, have physiological advantages in many sports."). Indeed, "[i]n tangible performance terms, studies have shown that these [biological] differences allow post-pubescent males to 'jump (25%) higher than females, throw (25%) further than females, run (11%) faster than females, and accelerate (20%) faster than females' on average." *Adams*, 57 F.4th at 820 (Lagoa, J., specially concurring) (citation omitted).

Although B.P.J. has not gone through puberty, the majority recognizes that there is evidence that biological boys have a competitive advantage over biological girls *even before puberty*. *See ante* at 30 ("The defendants submitted an expert report contradicting

the assertions by B.P.J.'s experts and saying that, even apart from increased circulating testosterone levels associated with puberty, there are 'significant physiological differences, and significant male athletic performance advantages in certain areas.'" (citation omitted)). And the evidence cited earlier as to B.P.J.'s actual displacement of multiple biological girls despite being on puberty blockers shows that this evidence of a biological advantage is particularly apt in this case.

It seems axiomatic that because biology provides a competitive advantage in sports, biology is a significantly relevant characteristic for the similarly situated analysis. Yet, for reasons unknown, the majority concludes that B.P.J.—a biological boy—is nonetheless similarly situated to biological girls. By so holding—despite evidence that B.P.J. may have a distinct biological advantage over biological girls—the majority necessarily must have determined that transgender girls are similarly situated to biological girls *regardless of the competitive advantage* they may have. It must be, then, that the majority considers gender identity the only relevant factor when determining the individuals with whom B.P.J. is similarly situated. That is plainly incorrect.

It is not enough—and is actually irrelevant when it comes to competitive sports— that B.P.J. identifies as a girl. Gender identity, simply put, has nothing to do with sports. It does not change a person's biology or physical characteristics. It does not affect how fast someone can run or how far they can throw a ball. Biology does. The majority was therefore wrong to conclusively determine that B.P.J. is similarly situated to biological girls based on B.P.J.'s gender identity alone. *See Nguyen v. INS*, 533 U.S. 53, 73 (2001) ("To fail to

acknowledge even our most basic biological differences . . . risks making the guarantee of equal protection superficial, and so disserving it.").[2]

Second, the majority erroneously determines that the Act *facially* treats transgender athletes differently than their peers. To demonstrate that a statute makes a classification on its face, the plaintiff must show that it "explicitly distinguish[es] between individuals on

---

[2] The majority, tellingly, failed to provide *any* similarly situated analysis. It instead perplexingly states that the Court need not determine whether B.P.J. is similarly situated to biological girls prior to determining the appropriate level of scrutiny. *See ante* at 19. The majority misunderstands the equal protection inquiry.

It is not that the Court cannot determine the appropriate level of scrutiny before determining that B.P.J. is similarly situated to biological girls; it is that the Court cannot determine that any discrimination has occurred until it determines with whom B.P.J. is similarly situated. To find that West Virginia discriminated against B.P.J., the Court must conclude that B.P.J. was treated differently than the similarly situated group. *See Morrison v. Garraghty*, 239 F.3d 648, 654 (4th Cir. 2001) ("To succeed on an equal protection claim, a plaintiff must first demonstrate that he has been treated differently from others with whom he is similarly situated[.]"). If B.P.J. is not similarly situated to biological girls, then it is of no consequence that B.P.J. is treated differently than them. *See Nordlinger*, 505 U.S. at 10 ("The Equal Protection Clause does not forbid classifications. It simply keeps governmental decisionmakers from treating differently persons who are in all relevant respects alike."). Consequently, only after the Court concludes that an individual was treated differently does the Court determine the applicable level of scrutiny. The similarly situated analysis thus necessarily precedes any level of review.

It's true that in *United States v. Virginia*, which the majority uses to support its flawed similarly situated contention, the Supreme Court did not explicitly discuss whether women were similarly situated to men when determining whether Virginia could lawfully exclude women from admission to the Virginia Military Institute. 518 U.S. 515 (1996). Nonetheless, it is clear throughout the opinion that the Supreme Court had implicitly come to that conclusion. *See, e.g.*, *id.* at 530 (stating that the question before the Court was whether "Virginia's exclusion of women from the educational opportunities provided by VMI—extraordinary opportunities for military training and civilian leadership development—deny to women *capable of all of the individual activities required of the VMI cadets* the equal protection of the laws guaranteed by the Fourteenth Amendment?" (emphasis added) (cleaned up)); *id.* at 540–41 (noting that the expert testimony established that some women "are capable of all of the individual activities required of VMI cadets" (citation omitted)). Therefore, *Virginia* simply does not support the majority's similarly situated analysis—or, more accurately, its lack thereof.

[protected] grounds." *Shaw v. Reno*, 509 U.S. 630, 642 (1993); *see, e.g.*, *Reed v. Reed*, 404 U.S. 71, 73 (1971) (involving a facial classification where the statute stated that "males must be preferred to females" (cleaned up)).

The Act does not facially discriminate based on transgender status. It simply places athletes on sports teams based on their biological sex. *See* W. Va. Code § 18-2-25d(c)(1) (stating that "[i]nterscholastic, intercollegiate, intramural, or club athletic teams or sports . . . shall be expressly designated as" male, female, or coed, "based on biological sex").[3] Although the Act explicitly treats biological boys and biological girls differently, it does not expressly treat transgender individuals differently.[4]

Indeed, the Act's only reference to transgender status is a statement that the West Virginia Legislature found that "gender identity is separate and distinct from biological sex." *Id.* § 18-2-25d(a)(4). But that factually accurate statement does not serve to treat transgender individuals differently.[5] Applying the Act, schools place all athletes on the

---

[3] The majority makes much of the fact that the Act allows biological girls to play on any team but does not allow the same for biological boys. But this differential treatment of biological boys is justified by West Virginia's exceedingly persuasive government interest in promoting fair competition and safety and ensuring opportunities for girls. Given that biological girls have no physiological advantage over biological boys, their inclusion in boys' sports does not hinder biological boys' competition. The converse is not true.

[4] Given that the Act facially distinguishes between the sexes, it is subject to heightened scrutiny for that reason. But no one disputes that West Virginia has sufficiently important government interests in separating its sports teams by sex. In fact, as the majority acknowledged, B.P.J. "disavowed any challenge to sex separation in sports" and merely challenges the Act's definition of "sex." *Ante* at 18 (cleaned up).

[5] The Act is different from the restroom policy in *Grimm*—which the Court found involved a facial classification—because that policy expressly stated that "students with (Continued)

46

team corresponding with their biological sex. Transgender athletes fair no differently than any other athlete. On its face, therefore, the Act does not discriminate against transgender athletes. *See Adams*, 57 F.4th at 809 ("[W]hile the . . . policy at issue classifies students on the basis of biological sex, it does not facially discriminate on the basis of transgender status.").

It may be that the Act has the *effect* of treating transgender students differently than non-transgender students, but that's irrelevant to a facial challenge under the Equal Protection Clause. If B.P.J. intended to challenge the effect of the Act, B.P.J. should have brought a disparate impact claim, which allows a plaintiff to show discrimination when a statute "otherwise neutral on its face," has a "disproportionate impact" on a particular class of individuals if the statute was enacted with "an invidious discriminatory purpose." *Washington v. Davis*, 426 U.S. 229, 241–42 (1976). But B.P.J. failed to bring such a claim. *See* Opening Br. 23 ("H.B. 3293 *facially* discriminates based on transgender status by explicitly excluding consideration of 'gender identity.'" (emphasis added)). The majority errs by rectifying B.P.J.'s failure and finding a transgender classification on the face of the Act where one does not exist.[6]

---

gender identity issues [would] be provided an alternative appropriate private facility," explicitly placing transgender students in a different restroom than their counterparts. *Grimm*, 972 F.3d at 599 (citation omitted). Here, there is no language *expressly* treating transgender students differently than other students.

[6] Ostensibly recognizing that the Act does not make a facial classification, the majority posits that the "undisputed purpose" of the Act's reliance on biology is to exclude transgender girls from participation on girls' sports teams. *Ante* at 19. But purpose—like effect—is relevant only when considering a disparate impact claim, which, again, B.P.J. (Continued)

Lastly, even assuming that the Act facially treats similarly situated individuals differently than B.P.J., the majority erroneously concludes that there is a material dispute of fact regarding whether the Act survives heightened scrutiny. In this Circuit, a statute that plainly rests on distinctions based on transgender status is suspect. *See Grimm*, 972 F.3d at 610. The Court reviews such a statute with heightened scrutiny, finding it unconstitutional "unless [it is] substantially related to a sufficiently important governmental interest." *Id.* at 608 (quoting *Cleburne*, 473 U.S. at 441). For a statute to survive such scrutiny, "the state must provide an 'exceedingly persuasive justification'" for the distinction. *Id.* (citation omitted). West Virginia has done so here.

Everyone agrees that ensuring equal opportunities for females is a sufficiently important government interest. The dispute centers around whether excluding B.P.J.—and other transgender girls who have not gone through puberty—is substantially related to that interest. It is.[7]

---

did not bring. The Act's purpose has no relevance in a facial classification analysis. *See Shaw*, 509 U.S. at 642 ("No inquiry into legislative purpose is necessary when the racial classification appears on the face of the statute.").

[7] Taking hormone suppressants is not a permanent condition. B.P.J. can, at any point, choose to stop taking them. In fact, as health care providers, states, and entire countries increasingly find that the negative side effects of preventing the human body from going through puberty are too destructive, B.P.J. may be compelled to quit taking hormone suppressants. *See, e.g.*, Josh Parry, *NHS England to Stop Prescribing Puberty Blockers*, BBC (Mar. 13, 2024), https://perma.cc/UA9Y-SMB5 (explaining that Great Britain banned prescribing puberty blockers to minors after finding a lack of evidence that they are safe or effective).

And since B.P.J.'s puberty status can be so easily modified, it seems reasonable to allow West Virginia to apply a blanket ban on transgender girls' participation in biological girls' sports. To hold otherwise puts the burden on West Virginia to ensure that transgender (Continued)

Given how biological differences affect typical outcomes in sports, ensuring equal opportunities for biological girls in sports requires that they not have to compete against biological boys. And B.P.J.'s experience on the girls' track-and-field team is a quintessential example of why transgender girls participating in biological girls' sports interferes with West Virginia's well-founded interest. B.P.J.'s participation did exactly what West Virginia was trying to prevent:  B.P.J. repeatedly took opportunities away from biological girls.

As noted earlier, by consistently placing in the top fifteen—and often in the top ten—competitors at events, B.P.J. displaced at least one hundred biological girls at track-and-field events and pushed multiple girls out of the top ten. Similarly, by making the conference championships in two events (something reserved for the top three girls on a team), B.P.J. took away at least two biological girls' opportunities to participate in the conference championships. And this was in a single season.

Thanks to the new-found rubric of today's majority opinion, such displacement will become commonplace. By continuing to allow B.P.J.—and transgender girls like B.P.J.— to participate on girls' teams, the number of displaced biological girls will expand exponentially. Further, as the spots on teams become more limited, B.P.J. will prevent other

---

girls who *currently* take puberty suppressants remain on them for the entire period they are involved in West Virginia sports programs. But that is hardly feasible. Is West Virginia required to take transgender girls at their word and hope that they don't take advantage of its trust in order to excel in girls' sports? Or does West Virginia have to require transgender girls to undergo periodic medical testing to ensure nothing has changed? I think not.

Instead, recognizing that B.P.J.'s puberty status can change solely at B.P.J.'s discretion permits West Virginia to justify the Act through evidence that transgender girls generally have a physiological advantage over biological girls.

biological girls from participating on the teams altogether, thereby denying them any athletic opportunity.

Thus, B.P.J.'s presence in biological girls' sports has taken—and will continue to take—away opportunities from biological girls. The Act, therefore, directly relates to West Virginia's interest in ensuring equal opportunities for girls in sports. The majority errs in concluding otherwise.[8]

At bottom, the majority expands the scope of the Equal Protection Clause and erroneously concludes that biological boys and biological girls who share only the same gender identity are similarly situated for purposes of sports. In so doing, the majority has uncovered an aspect of the Equal Protection Clause hidden from all others for over 150 years: a remarkable find.

## B.

Undeterred, the majority compounds its flawed analysis and, in the process, overturns Title IX's advancement of women in sports.

---

[8] This is especially true given that this case involves a policy decision about the welfare of minor students at school. "Schools operate in loco parentis to students" and, together with the state, are "responsible for maintaining [the] discipline, health, and safety" of students. *Adams*, 57 F.4th at 802 (cleaned up). Given this responsibility, we owe states a certain amount of deference when determining policies that affect student welfare. Of course, states do not have "carte blanche," but when states "have prudently assessed and addressed an issue that affects student welfare, we should pay attention." *Id.* At the very least, we should take care not to unnecessarily usurp the state's ability to make policy decisions regarding such issues. Thus, the fact that West Virginia deemed biological-sex-separated sports necessary in schools after thoroughly considering the issue should have resulted in some degree of deference from the Court. *See id.* ("Given schools' responsibilities, the Supreme Court has afforded deference to their decisions even when examining certain constitutional issues.").

1.

Title IX provides that "[n]o person . . . shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any education program or activity receiving Federal financial assistance." 20 U.S.C. § 1681(a). To prevail on a Title IX claim, a plaintiff must show that: (1) she was "excluded from participation in an education program or activity, denied the benefits of this education, or otherwise subjected to discrimination because of [her] sex;" (2) "the challenged action caused [her] harm"; and (3) "the defendants are recipients of federal funding." *Peltier v. Charter Day Sch., Inc.*, 37 F.4th 104, 129 & n.21 (4th Cir. 2022) (en banc).

B.P.J.'s Title IX claim fails on the first prong. Under Title IX, "'discrimination' means treating an individual worse than others who are similarly situated." *Id.* at 129–30 (cleaned up). The similarly situated analysis is the same under Title IX as it is under the Equal Protection Clause. *See Sheppard v. Visitors of Va. State Univ.*, 993 F.3d 230, 238 (4th Cir. 2021). Thus, for the same reason B.P.J. did not meet the similarly situated element of the equal protection claim, B.P.J. cannot meet this element of the Title IX claim: Biological sex is material to sports.

Yet, the majority again ignores this fact and, without discussion, concludes that B.P.J.—a biological boy—is similarly situated to biological girls for purposes of sports teams. As discussed, because there is evidence that biological boys, particularly B.P.J., have an advantage over biological girls before puberty, the majority could not have supported its similarly situated decision with a finding that B.P.J. has no competitive advantage over biological girls. So, once again, the majority must have concluded that the

51

fact that B.P.J. persistently *identified* as a girl is sufficient to permit a finding that B.P.J. is similarly situated to biological girls, ignoring biology and competitive advantages altogether.

Although this conclusion was also error as to the equal protection claim, it has even further-reaching and destructive implications in the Title IX context. When a court finds that a statute discriminates under an equal protection analysis, it then moves on to the justification inquiry. The statute will be struck down only if the state fails to meet the requisite level of scrutiny—which is unlikely in a case like this. In contrast, Title IX does not require a justification inquiry. If a court finds discrimination under Title IX, the inquiry ends. It does not matter that the state has an exceedingly persuasive justification for its actions.

So, the majority's determination that transgender girls are similarly situated to biological girls *regardless of any potential advantage*, and therefore that separating sports teams by biological sex is discrimination against transgender girls, has far reaching implications under Title IX. In short, it means that states cannot exclude transgender girls from biological girls' sports teams even when the transgender girls have gone through puberty and it is even clearer that they have a significant physiological advantage over biological girls. And allowing transgender girls—regardless of any advantage—as participants in biological girls' sports turns Title IX on its head and reverses the monumental work Title IX has done to promote girls' sports from its inception.

For context, "Title IX 'precipitated a virtual revolution for girls and women in sports.'" *Adams*, 57 F.4th at 818 (Lagoa, J., specially concurring) (quoting Deborah Blake,

52

*The Struggle for Sex Equality in Sport and the Theory Behind Title IX*, 34 U. Mich. J.L. Reform 13, 15 (2000)). It "paved the way for significant increases in athletic participation for girls and women," increasing female student participation in sports from less than 300,000 students in 1971 to over 2.6 million students in 1999. *Id*. at 818 (citation omitted). Notably, this remarkable increase was not the result of a "sudden, anomalous upsurge in women's interest in sports, but the enforcement of Title IX's mandate of gender equity in sports." *Id.* at 819 (citation omitted)). Put simply, girls wanted to be a part of sports but didn't have access to it. Title IX granted them access by evening the playing field.

The majority's decision to "commingle[] . . . the biological sexes in the female athletics arena" hurdles in the opposite direction and "significantly undermine[s] the benefits afforded to female student athletes under Title IX's allowance for sex-separated sports teams." *Id.* "[I]f sport[s] were not sex segregated, most school-aged [biological] females would be eliminated from competition in the earliest rounds" or "may not even make the team." *Id.* at 820 (quoting Doriana Lambelet Coleman et al., *Re-affirming the Value of the Sports Exception to Title IX's General Non-Discrimination Rule*, 27 Duke J. Gender L. & Pol'y 69, 90 (2020)). It is no understatement to say that the inclusion of transgender girls on girls' teams will drive many biological girls out of sports and eviscerate the very purpose of Title IX. *See Williams v. Sch. Dist. of Bethlehem*, 998 F.2d 168, 175 (3d Cir. 1993) (stating that "it would require blinders to ignore that the motivation for" enacting Title IX and its sports regulations was to promote opportunities for girls in sports).

And excluding biological girls from sports will be detrimental on many levels beyond fields, courts, and arenas. Inclusion in sports has countless far-reaching benefits individually and to society at large. "Girls who play sports stay in school longer, suffer fewer health problems, enter the labor force at higher rates, and are more likely to land better jobs. They are also more likely to lead." *Adams*, 57 F.4th at 820 (cleaned up). In fact, 94 percent of female C-Suite executives played a sport. *Id.* This is probably because participating in sports instills the values of "teamwork, sportsmanship, and leadership" and encourages "goal setting, time management, perseverance, discipline, and grit," *Id.* at 820–21 (citation omitted), values that are necessary for successful careers.

By compelling schools to allow transgender girls to participate on biological girls' teams regardless of physiological advantage, the majority uses Title IX to deny the very benefits it was enacted to protect. As we have already seen, B.P.J.'s participation on the girls' track-and-field team resulted in the exclusion of multiple biological girls from competitive achievement and barred them from the conference championships. And that was the effect of just one person over the course of a single season.

### 2.

Moreover, the majority's conclusion that West Virginia violated Title IX by enacting a policy that unremarkably separates its sports teams by biological sex also runs afoul of the Constitution's Spending Clause, U.S. Const., art. 1, § 8, cl.1. When Congress enacts legislation under the Spending Clause—like it did for Title IX—Congress "generates legislation 'much in the nature of a contract: in return for federal funds, the States agree to comply with federally imposed conditions." *See Davis ex rel. LaShonda D.*

*v. Monroe Cnty. Bd. of Educ.*, 526 U.S. 629, 640 (1999) (citation omitted). As a result, Congress is required to provide the States "with unambiguous notice of the conditions they are assuming when they accept" any funding. *Id.* at 637 (cleaned up); *see also Adams*, 57 F.4th at 815 (stating that the Spending Clause mandates that Congress give "a clear statement when imposing a[ny] condition[s] on federal funding"). In that vein, when "interpreting language in spending legislation, [Courts] thus insist that Congress speak with a clear voice, recognizing that there can, of course, be no knowing acceptance of the terms of the putative contract if a State is unaware of the conditions imposed by the legislation or is unable to ascertain what is expected of it." *Davis*, 526 U.S. at 640 (cleaned up).

Applying that principle here, West Virginia cannot be found to have violated Title IX by uncontroversially requiring biological-sex-separated sports teams. Though Title IX prohibits "sex" discrimination, 20 U.S.C. § 1681(a), a Department of Education implementing regulation clarifies that a school may "sponsor separate teams for members of each sex where selection for such teams is based upon competitive skill or the activity involved is a contact sport." 34 C.F.R. § 106.41(b). So, given that West Virginia was expressly allowed to create sex-separated competitive sports teams, the question becomes, does "sex" unambiguously mean gender identity? The answer to that question is undeniably no.

When Title IX was enacted, "virtually every dictionary definition of 'sex' referred to the *physiological* distinctions between males and females." *Grimm*, 972 F.3d at 632 (Niemeyer, J., dissenting) (collecting definitions); *see also Adams*, 57 F.4th at 812 (same). For example, *Webster's New World Dictionary* defined sex as "either of the two divisions,

male or female, into which persons, animals, or plants are divided, with reference to their reproductive functions." *Sex*, *Webster's New World Dictionary* (1972). It cannot be, then, that the definition of "sex" unambiguously means gender identity. If anything, "sex" unambiguously means biological sex.

Indeed, demonstrating that the commonly understood definition of "sex" is biological sex, schools intending to comply with Title IX have long separated sports teams by biological sex. It is not hyperbole to say that, up to this point, most of the country has understood Title IX to prohibit biological-sex discrimination rather than gender-identity discrimination.

Rightfully so. It defies logic to conclude that Congress actually meant to prohibit gender identity discrimination *sub silentio* when enacting Title IX in 1972. Or that West Virginia should have been aware that that is what Congress meant to do. If Congress so intended, it should have explicitly said so. It did not.[9]

\* \* \* \*

It is not the judiciary's role to "become an outcome-driven enterprise prompted by feelings of sympathy." *Grimm*, 972 F.3d at 628 (Niemeyer, J., dissenting). "The judiciary's

---

[9] A divided panel in *Grimm* rejected a similar Spending Clause argument in a footnote, reasoning that "*Bostock* forecloses [the argument] that [the phrase] 'on the basis of sex' is ambiguous as to discrimination against transgender persons." *Grimm*, 972 F.3d at 619 n.18. But the *Grimm* majority's reasoning does not apply here because *Bostock* clearly does not answer the question before the Court today—whether a statute that separates sports by biological sex and does not explicitly treat transgender individuals differently than their peers violates Title IX. The *Bostock* Court did not conclude that discriminating based on biological sex is transgender discrimination and, actually, assumed that the use of the word "sex" in Title VII means biological sex.

Thus, *Grimm*'s discussion of the Spending Clause has no bearing here.

role is simply to construe the law." *Id.* And, here, the law unequivocally allows for biological-sex-separated sports teams.

III.

My dissent rests entirely on the foregoing discussion, which accepts *Grimm* as binding precedent in this Circuit to the extent that its holding has any implications here. That said, because B.P.J. heavily relies on *Grimm*, I also take this opportunity to emphasize that *Grimm* was wrongly decided and should be recognized as such.

In *Grimm*, this Court considered a School Board's policy that stated that its schools would "provide male and female restroom and locker room facilities in its schools, and the use of said facilities [would] be limited to the corresponding biological genders," as listed on the student's birth certificate. 972 F.3d at 608. "[S]tudents with gender identity issues" were provided "alternative appropriate private" facilities. *Id.* at 609. Grimm, a biological girl who identified as a boy, argued that the restroom policy facially violated the Equal Protection Clause and Title IX because it treated Grimm differently than non-transgender students. *Id.* at 593. A divided panel of this Court agreed. They erred.

In concluding that the restroom policy violated the Equal Protection Clause, the *Grimm* majority made three material errors: it incorrectly (1) concluded that Grimm was similarly situated to biological boys; (2) surmised that statutes that classify based on transgender status receive heightened scrutiny; and (3) determined that the restroom policy did not survive heightened scrutiny. Additionally, in holding that the restroom policy

violated Title IX, the *Grimm* majority erroneously concluded that "sex" actually means "gender identity," ignoring a plethora of dictionary definitions in the process.

## A.

I begin with the *Grimm* majority's decision that the restroom policy violates the Equal Protection Clause and its erroneous conclusion that Grimm was similarly situated to biological boys. The *Grimm* majority erroneously rejected the School Board's argument that Grimm was similarly situated to biological girls because his "gender identity did not cause biological changes in his body, and [he] remained biologically female." *Id*. at 610. It posited that "[a]dopting the [School] Board's framing of Grimm's equal protection claim . . . would only vindicate the [School] Board's own misconceptions, which themselves reflect 'stereotypic notions'" of what "sex" means. *Id.* In contrast, the *Grimm* majority concluded that "[t]he overwhelming thrust of everything in the record—from Grimm's declaration, to his treatment letter, to the amicus briefs—is that Grimm was similarly situated to other boys, but was excluded from using the boys restroom facilities based on his sex-assigned-at-birth." *Id.*

But this explanation misunderstands the similarly situated analysis, which, as noted earlier, requires the plaintiff to identify persons *materially identical* to him or her who have received different treatment. When it comes to restroom use, there is nothing more materially relevant than an individual's anatomy. Indeed, "anatomical differences are at the root of why communal restrooms are generally separated on the basis of sex." *Grimm*, 972 F.3d at 636 (Niemeyer, J., dissenting); *see also Adams*, 57 F.4th at 803 n.6 ("When it

58

comes to the bathroom policy, biological sex is the relevant respect with respect to which persons must be similarly situated because biological sex is the sole characteristic on which the bathroom policy and the privacy interests guiding the bathroom policy are based." (cleaned up)). And it was undisputed that Grimm had the same anatomical characteristics as the biological girls at his school. Therefore, "by adopting a policy pursuant to which Grimm was not permitted to use male student restrooms, the School Board did not treat differently persons who are in all *relevant* respects alike." *Grimm*, 972 F.3d at 636 (Niemeyer, J., dissenting) (cleaned up). It treated Grimm the exact same way it treated all individuals with like anatomy. How Grimm persistently identified simply has nothing to do with what occurs in the restroom. This conclusion should have ended the Court's equal protection inquiry.

Nonetheless, having erroneously determined those with whom to compare Grimm, the *Grimm* majority then furthered its error by concluding that classifications based on transgender status receive heightened scrutiny. It gave two reasons to support its conclusion: it posited (1) "various forms of discrimination against transgender people constitute sex-based discrimination for purposes of the Equal Protection Clause because such policies punish transgender persons for gender non-conformity, thereby relying on sex stereotypes," *id.* at 608, and (2) "transgender people constitute at least a quasi-suspect class," *id.* at 610. Both of these rationales are incorrect.[10]

---

[10] To be clear, my disagreement stems from the *Grimm* majority's conclusion that transgender-based classifications receive intermediate scrutiny. I take no issue with the *Grimm* majority's additional conclusion that the restroom policy was a sex-based (Continued)

As to the sex-stereotype justification, the *Grimm* majority misunderstood and misapplied Supreme Court precedent. The Supreme Court has explained that states cannot *justify* a sex-based classification by relying on "traditional, often inaccurate, assumptions about the proper roles of men and women." *Miss. Univ. for Women v. Hogan*, 458 U.S. 718, 726 (1982). "The need for [that] requirement is amply revealed by reference to the broad range of statutes already invalidated by [the Supreme] Court, statutes that relied upon the simplistic, outdated assumption that gender could be used as a 'proxy for other, more germane bases of classification,' to establish [the] link between objective and classification" necessary to survive intermediate scrutiny. *Id.* (internal citation omitted). But the Court has never concluded that policies that rely on stereotypes can demonstrate a *classification* where one did not already exist.

Stated differently, the fact that a state relies on a sex stereotype does not affect the Court's analysis as to the existence of a classification; it is, instead, relevant only to the state's justification when trying to meet the already-determined level of scrutiny. *See id.* at 725 ("[I]f the statutory objective is to exclude or 'protect' members of one gender because they are presumed to suffer from an inherent handicap or to be innately inferior, the objective itself is illegitimate."); *United States v. Virginia*, 518 U.S. 515, 550 (1996) ("[G]eneralizations about the way women are, estimates of what is appropriate for *most women*, no longer *justify* denying opportunity to women whose talent and capacity place them outside the average description." (second emphasis added) (cleaned up)); *Craig v.*

---

classification and, therefore, was subject to intermediate scrutiny on that ground. *See* 972 F.3d at 608–09.

*Boren*, 429 U.S. 190, 198 (1976) ("[A]rchaic and overbroad generalizations . . . could not *justify* use of a gender line in determining eligibility for certain governmental entitlements." (emphasis added) (cleaned up)); *J.E.B. v. Alabama ex rel T.B.*, 511 U.S. 127, 138 (1994) ("We shall not accept *as a defense* to gender-based preemptory challenges the very stereotypes the law condemns." (emphasis added) (cleaned up)). So, assuming the restroom policy in *Grimm* did rely on sex stereotypes, that fact would only become relevant when discussing whether the School Board met the appropriate level of scrutiny. It does not support the Court finding a classification.

Further, "[t]o say that the bathroom policy relies on impermissible stereotypes because it is based on the biological differences between males and females is incorrect." *Adams*, 57 F.4th at 810. The policy relies on anatomy, and it is not a stereotype but an undisputed fact that Grimm did not have the same anatomy as the biological boys with whom he wished to share a restroom. *See Nguyen*, 533 U.S. at 73 ("Mechanistic classification of all our differences as stereotypes would operate to obscure those misconceptions and prejudices that are real."). Thus, even assuming the *Grimm* majority was correct to conclude that a sex stereotype can create a classification where none exists, it still erred in applying heightened scrutiny based on this premise because the bathroom policy does not rely on such a stereotype.

Similarly, the *Grimm* majority incorrectly determined that heightened scrutiny applied because transgender individuals form a quasi-suspect class. Importantly, the Supreme Court has not held that transgender persons constitute a suspect or quasi-suspect class. And, to establish a new suspect or quasi-suspect class, Grimm was required to show

that transgender individuals: (1) have historically been subjected to discrimination; (2) "exhibit obvious, immutable, or distinguishing characteristics that define them as a discrete group"; and (3) are a minority lacking political power. *Bowen v. Gilliard*, 483 U.S. 587, 602 (1987) (citation omitted). Grimm did not make the required showing.

Most evidently, transgender individuals do not share an obvious, immutable, or distinguishing characteristic. In fact, as the World Professional Association for Transgender Health Guidelines—relied on by the *Grimm* majority—explain, the word "transgender" is used "to describe a *diverse group* of individuals who cross or transcend culturally-defined categories of gender. The gender identity of transgender people *differs to varying degrees* from the sex they were assigned a birth." World Professional Association for Transgender Health, *Standards of Care for the Health of Transsexual, Transgender, and Gender Nonconforming People*, (7th ed. 2012) https://wpath.org/media/cms/Documents/SOC%20v7/SOC%20V7_English.pdf (emphasis added). As the *Grimm* majority acknowledged, not "everyone identifies as a binary gender of male or female . . . [and] there are other gender-expansive youth who many identify as nonbinary, youth born intersex who do not identify with their sex-assigned-at-birth, and others whose identities belie gender norms." *Grimm*, 972 F.3d at 597.

Further, transgender individuals differ in the extent of their transition to their preferred sex. Some individuals, like B.P.J., take hormone suppressants, some undergo surgery to change their physical appearance, and still others simply socially transition,

keeping their original physical characteristics. This expansive and diverse group can hardly be thought of as sharing a defining characteristic.[11]

Additionally, a substantial number of transgender individuals detransition, meaning that after transitioning to the sex that they were not assigned at birth, these individuals transition back to their sex assigned at birth. *See L.W. ex rel Williams v. Skrmetti*, 83 F.4th 460, 487 (6th Cir. 2023) (noting that being transgender is not immutable "as the stories of 'detransitioners' indicate" (citation omitted)); Pamela Paul, *As Kids, They Thought They were Trans. They no Longer Do.*, The New York Times (Feb. 2, 2024), https://www.nytimes.com/2024/02/02/opinion/transgender-children-gender-dysphoria.html. If a person's transgender status can so easily change of their own volition, it is not immutable.

Therefore, given the high bar required to demonstrate a suspect class, *see L.W.*, 83 F.4th at 486, the Court should have concluded that Grimm failed to show that transgender individuals constitute such a class and therefore that transgender-based classifications do not receive heightened scrutiny.

Even accepting the applicability of heightened scrutiny, however, the *Grimm* majority further erred by concluding that the School Board's justification for the restroom policy—protecting student's privacy—did not meet that scrutiny. In its view, "bodily

---

[11] This is especially true when comparing transgender individuals as a class to the suspect classes that the Supreme Court has recognized. Those groups share obvious characteristics such as a particular race or sex. Unlike any characteristic present in transgender individuals, both of those characteristics are "definitively ascertainable at the moment of birth." *Ondo v. City of Cleveland*, 795 F.3d 597, 609 (6th Cir. 2015).

privacy of cisgender boys using the boys restroom did not increase when Grimm was banned from those restrooms." *Id.* at 614. Although the Court acknowledged that "students have a privacy interest in their body when they go to the bathroom," it opined that the School Board "ignore[d] the reality of how a transgender child uses the bathroom: by entering a stall and closing the door." *Id.* at 613–14 (cleaned up).

But isn't that how all biological women use the restroom? Does that mean that biological women should therefore be allowed open access to the men's restroom? It seems evident that, under the *Grimm* majority's reasoning, privacy is an insufficient justification to support sex-separated restrooms in general. If all that matters is that individuals can go into a stall or utilize a urinal with a privacy strip, why bother with sex-separated restrooms at all? *See id.* at 614 (noting that Grimm's use of the restrooms actually "increased" privacy "because the Board installed privacy strips and screens between the urinals"). Even briefly considering this question underscores the *Grimm* majority's flawed reasoning. It is plain that "the differences between the [sexes] demand a facility for each [sex] that is different" *Faulkner v. Jones*, 10 F.3d 226, 232 (4th Cir. 1993). Thus, separating restrooms by anatomy in order to ensure the privacy of the students using the restroom clearly "serves [an] important government objective[]" that "substantially relate[s] to the achievement of [that] objective[]," satisfying intermediate scrutiny. *See Virginia*, 518 U.S. at 533; *see also id.* at 550 n.19 (acknowledging that ordering an all-male Virginia college to admit female students "would undoubtedly require alterations necessary to afford members of each sex privacy from the other sex in living arrangements").

64

Nonetheless, in order to further its goals of "affirm[ing] the burgeoning values of our bright youth" and abandoning the "prejudices of our past," the *Grimm* majority ignored how the restroom policy plainly related to privacy interests and inappropriately created a new suspect class in the process. *Grimm*, 972 F.3d at 620.

## B.

The *Grimm* majority also incorrectly concluded that the restroom policy violated Title IX. As noted earlier, Title IX provides that "[n]o person . . . shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any education program or activity receiving Federal financial assistance." 20 U.S.C. § 1681(a). A longstanding Department of Education implementing regulation clarifies that, despite that prohibition, Title IX allows for "separate toilet, locker room, and shower facilities on the basis of sex" so long as they are "comparable" to one another. 34 C.F.R. § 106.33.

Given that regulation, the *Grimm* Court's conclusion should have been straightforward: because Title IX allows for restrooms separated by sex, the restroom policy—which did exactly that—did not violate Title IX. Unhappy with that conclusion, the *Grimm* majority maneuvered a different outcome. It posited that Grimm did not challenge *sex-separated restrooms* but the restroom policy's *definition of sex*. *Grimm*, 972 F.3d at 618. And because "the [Department of Education] regulation cannot override the statutory prohibition against *discrimination* on the basis of sex," the *Grimm* majority concluded that the regulation only suggests that "the act of creating sex-separated

restrooms in and of itself is not discriminatory—not that, in applying restroom policies to students like Grimm, the Board may rely on its own discriminatory notions of what 'sex' means." *Id.* In other words, it construed Title IX to require "sex" to be defined as "gender identity" and, therefore, to comport with Title IX restrooms can only be separated on the basis of gender identity. Wrong again.

For starters, "[r]eputable dictionary definitions of 'sex' from the time of Title IX's enactment show that when Congress prohibited discrimination on the basis of 'sex' in education, it meant biological sex, i.e., discrimination between males and females." *Adams¸* 57 F.4th at 812 (collecting definitions); *see Grimm*, 972 F.3d at 632 (Niemeyer, J., dissenting) ("And [when Title IX was enacted], virtually every dictionary definition of 'sex' referred to the *physiological* distinctions between males and females — particularly with respect to their reproductive functions."); *see also Johnson v. Zimmer*, 686 F.3d 224, 232 (4th Cir. 2012) (reiterating that when interpreting statutes, the Court gives undefined statutory provisions "their ordinary, contemporary, common meaning" and that the Court looks to dictionaries to help determine that meaning (cleaned up)). For example, Webster's New World Dictionary defined "sex" as "either of the two divisions, male or female, into which persons, animals or plants are divided, *with reference to their reproductive functions*." *Sex*, *Webster's New World Dictionary* (1972) (emphasis added).[12] Given this

---

[12] Notably, *Bostock* supports this reading of Title IX. Although *Bostock* expressly declined to opine on whether biological-sex-separated bathrooms violated any federal or state laws, it "proceed[ed] on the assumption that 'sex' [as used in Title VII] . . . referr[ed] only to biological distinctions between male and female." *Bostock*, 590 U.S. at 655.

common understanding of "sex," it is unfathomable that Congress silently intended to address gender identity discrimination when enacting Title IX in 1972.

This is especially true given that, "[t]here simply is no limiting principle to cabin [the *Grimm* majority's] definition of 'sex' to . . . bathrooms under Title IX, as opposed to . . . the statutory and regulatory carve-outs for living facilities, showers, and locker rooms." *Adams*, 57 F.4th at 818 (Lagoa, J., specially concurring). And, regardless of the majority's view on restrooms, it defies logic to conclude that Congress meant to allow biological boys who identify as girls to shower with biological girls. *See* 20 U.S.C. § 1686 ("Notwithstanding anything to the contrary contained in this chapter, *nothing contained herein shall be construed to prohibit* any education institution . . . from maintaining separate living facilities for the different sexes." (emphasis added)). Congress clearly intended to affirm certain aspects of sex separation in education—like in restrooms, showers, locker rooms, and sports—within its overall prohibition on sex discrimination.[13]

Moreover, under the *Grimm* majority's—and now this majority's—approach, Title IX "provide[s] more protection against discrimination on the basis of transgender status . . . than it would against discrimination on the basis of sex." *Adams*, 57 F.4th at 814. Indeed, under their reading, ensuring that transgender individuals get access to the restrooms and

---

[13] Had the *Grimm* majority not erroneously concluded that "sex" means gender identity under Title IX, a Department of Education implementing regulation would foreclose the majority's Title IX decision today as well. *See* 34 C.F.R. § 106.41(b) (stating that a school may "sponsor separate teams for members of each sex where selection for such teams is based upon competitive skill or the activity involved is a contact sport").

sports teams of their choosing is more important than biological females' rights to privacy and to play competitive sports. No Congress has ever intended such a result.

IV.

Ignoring what would seem to be clear law, the majority ensures that policy preferences prioritizing transgender persons take precedence. But where will this Court, or any court, draw the line? *Bostock* allegedly drew the line at employment decisions under Title VII. *Grimm* was specific to bathrooms. Yet, here we are again, miles away from the straightforward text of the laws we are called to apply, judicially rewriting the Equal Protection Clause and nullifying Title IX's promise of equal athletic opportunity for women.

And if the commonly understood and accepted limits on restroom usage and sports teams are negated by judicial fiat, I fail to see where the Court will ever impose a limit. No unelected judge is empowered to decide that the Equal Protection Clause and Title IX require schools to allow transgender individuals to share locker rooms and showers with the sex they *identify* with, anatomy notwithstanding. Yet that seems to be the next stop on this runaway train. Neither the drafters of the Equal Protection Clause nor Congress when enacting Title IX intended such a result.

Accordingly, I dissent from all but Parts II and III of the majority opinion. One can only hope that the Supreme Court will take the opportunity with all deliberate speed to resolve these questions of national importance.